**EXHIBIT 36**

Case 09-10138-MFW    Doc 15043-3    Filed 01/13/15    Page 2 of 58

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. Stuart..., 2007 WL 2041144...

**EXHIBIT**

**158**

2007 WL 2041144 (C.A.9) (Appellate Brief)
United States Court of Appeals,
Ninth Circuit.

UNITED STATES OF AMERICA, Plaintiff-Appellee,

v.

Stuart h. WOLFF, Defendant-Appellant.

No. 06-50683.
May 24, 2007.

Appeal from the United States District Court for the Central District of California

**Government's Answering Brief**

George S. Cardona, Acting United States Attorney.

Thomas P. O'brien, Assistant United States Attorney Chief, Criminal Division.

Michael R. Wilner, Assistant United States Attorney, 1100 United States Courthouse, 312 North Spring Street, Los Angeles, California 90012, Telephone: (213) 894-0687, Attorneys for Plaintiff-appellee United States of America.

TABLE OF CONTENTS

| | |
|---|---|
| I ISSUES PRESENTED | 1 |
| II STATEMENT OF THE CASE | 2 |
| A. NATURE OF THE CASE, COURSE OF THE PROCEEDINGS, AND DISPOSITION IN THE DISTRICT COURT | 2 |
| B. JURISDICTION, TIMELINESS, AND BAIL STATUS | 4 |
| C. STATEMENT OF FACTS | 4 |
| 1. Offense Conduct | 4 |
| a. The fraudulent roundtrip deals | 6 |
| b. Lying to the auditors | 8 |
| c. Evidence of defendant's participation in the scheme | 10 |
| i. Executive Vice President Peter Tafeen | 11 |
| ii. CFO Joseph Shew | 13 |
| iii. COO John Giesecke | 15 |
| iv. Additional evidence of defendant's involvement in the fraud | 16 |
| v. Defendant's testimony | 20 |
| 2. Defendant's Motion to Recuse the Trial Judge | 22 |
| 3. Evidence of Restatements | 26 |
| 4. Exclusion of Defense Expert Witness | 28 |
| a. The changing Wertheim submissions | 29 |
| b. The motion to preclude Wertheim | 31 |
| 5. Jury Instruction | 32 |
| III SUMMARY OF ARGUMENT | 33 |
| IV ARGUMENT | 35 |
| A. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING DEFENDANT'S MOTION TO RECUSE THE TRIAL JUDGE | 35 |
| 1. Standard of Review | 35 |
| 2. Defendant's Motion Was Untimely, As He Waited Four Months to File It, and Chose Not to Vigorously Pursue It Until After Conviction | 35 |
| 3. In Any Event, Judge Walter Did Not Abuse His Discretion in Denying the Motion Where the Trial Concerned Homestore Rather Than AOL | 37 |

Case 09-10138-MFW    Doc 15043-3    Filed 01/13/15    Page 3 of 58

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. Stuart..., 2007 WL 2041144...

| | |
|---|---|
| B. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN EXCLUDING DEFENDANT'S EXPERT OR DENYING DEFENDANT'S PROPOSED JURY INSTRUCTION ABOUT ROUNDTRIP TRANSACTIONS ................................................................................................ | 42 |
| 1. Standard of Review ................................................................................................ | 44 |
| 2. The Expert's Testimony, Narrowed to Only the Proposition That Not All Roundtrip Deals Are Illegal, Was Factually Irrelevant to This Case ...................................... | 43 |
| a. Because the Government did not pursue a "structure alone" theory, the expert offered no relevant testimony about any disputed factual issue ............................................... | 46 |
| b. The expert offered no testimony about defendant's subjective knowledge of the roundtrip deals .............. | 48 |
| c. The expert's testimony was premised on facts contrary to defendant's theory of the case. ......................... | 49 |
| 3. Because the Jury Was Instructed That It Had to Find Knowing Fraud by Defendant, and Because Defendant's Instruction Addressed a Theory the Government Did Not Argue, the Jury Instruction Was Unnecessary ......................................................................................... | 50 |
| C. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ADMITTING HOMESTORE'S AMENDED QUARTERLY REPORTS INTO EVIDENCE ........................................................... | 52 |
| 1. Standard of Review ................................................................................................ | 52 |
| 2. Defendant Made Homestore's Income Restatements Relevant by Attempting to Prove Homestore's Overstated Financial Statements Were Immaterial to Investors .................................. | 53 |
| D. ALL OF DEFENDANT'S CLAIMS ALLEGE ONLY HARMLESS ERROR, DUE TO THE OVERWHELMING AND UNCHALLENGED EVIDENCE AT TRIAL ........................................... | 58 |
| E. THE DISTRICT COURT'S LOSS AND RESTITUTION DETERMINATIONS WERE WELL WITHIN ITS DISCRETION ............................................................................................ | 59 |
| 1. Standard of Review ................................................................................................ | 59 |
| 2. Because Three Accepted Loss Calculation Methods All Supported the Largest Guideline Enhancement, the District Court's Calculation Was Proper ................................................... | 60 |
| 3. The Court Properly Ordered Defendant to Pay Restitution to Victims through a Related Civil Case ....... | 66 |
| V. CONCLUSION ........................................................................................................ | 68 |

## TABLE OF AUTHORITIES

FEDERAL CASES

| | |
|---|---|
| *In re CIT Group. Inc., Securities Litigation,* 349 F. Supp. 2d 685 (S.D.N.Y. 2004) .................................................................................... | 57 |
| *Condus v. Howard Savings Bank,* 986 F. Supp. 914 (D.N.J. 1997) ..... | 55 |
| *Daubert v. Merrill Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) . | 45 |
| *Delta Air Lines, Inc. v. Sasser,* 127 F.3d 1296 (11th Cir. 1997) .......... | 38 |
| *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336 (2005) .............. | 62 |
| *E.&J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280 (9th Cir. 1992) ..................................................................................................... | 36 |
| *Freitag v. Avers,* 468 F.3d 528 (9th Cir. 2006) .................................... | 55 |
| *General Electric Co. v. Joiner,* 522 U.S. 136 (1997) ........................... | 43 |
| *Guillory v. Domtar Indus. Inc.,* 95 F.3d 1320 (5th Cir., 1996) ........... | 45 |
| *Harris v. Champion,* 15 F.3d 1538 (10th Cir. 1994) ........................... | 59 |
| *Herrinaton v. Sonoma County,* 834 F.2d 1488 (9th Cir. 1987) .......... | 37 |
| *Jinro American, Inc. v. Secure Investments. Inc.,* 266 F.3d 993 (9th Cir. 2001) ................................................................................................ | 44 |
| *Malone v. Microdyne Corp.,* 26 F.3d 471 (4th Cir. 1994) ................... | 57 |
| *Mangini v. United States,* 314 F.3d 1158 (9th Cir. 2003) ................... | 35 |
| *Patterson v. Mobil Oil Corp.,* 335 F.3d 476 (5th Cir. 2003) .............. | 59 |
| *Tramonte v. Chrysler Corp.,* 136 F.3d 1025 (5th Cir. 1998) .............. | 37-38, 40 |
| *Tyger Construction Co. v. Pensacola Construction Co.,* 29 F.3d 137 (4th Cir. 1994) ......................................................................................... | 45 |
| *United States v. Alvarez,* 358 F.3d 1194 (9th Cir. 2004) ..................... | 53 |
| *United States v. Ameline,* 409 F.3d 1073 (9th Cir. 2005) ................... | 59 |
| *United States v. Armev,* 248 F.3d 984 (10th Cir. 2001) ...................... | 48 |
| *United States v. Bakhit,* 218 F. Supp. 2d 1232 (C.D. Cal. 2002) ........ | 61-65 |
| *United States v. Baxter,* 492 F.2d 150 (9th Cir. 1975) ........................ | 55 |
| *United States v. Berger,* 473 F.3d 1080 (9th Cir. 2007) ..................... | 53, 60 |
| *United States v. Bishop,* 264 F.3d 919 (9th Cir. 2002) ....................... | 59 |

Case 09-10138-MFW    Doc 15043-3    Filed 01/13/15    Page 4 of 58

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. Stuart..., 2007 WL 2041144...

| | |
|---|---|
| *United States v. Branco*, 798 F.2d 1302 (9th Cir. 1986) | 35 |
| *United States v. Bright*, 353 F.3d 1114 (9th Cir. 2004) | 59 |
| *United States v. Catoggio*, 326 F.3d 323 (2d Cir. 2003) | 68 |
| *United States v. Cummings*, 189 F. Supp. 2d 67 (S.D.N.Y. 2002) | 67 |
| *United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006) | 49, 63 |
| *United States v. Finley*, 301 F.3d 1000 (9th Cir. 2002) | 43, 44 |
| *United States v. Frazier*, 53 F.3d 1105 (10th Cir. 1995) | 55 |
| *United States v. Frith*, 461 F.3d 914 (7th Cir. 2006) | 67 |
| *United States v. Grabske*, 260 F. Supp. 2d 866 (N.D. Cal. 2002) | 61, 62 |
| *United States v. Gunning*, 339 F.3d 948 (9th Cir. 2003) | 67 |
| *United States ex rel. Hickman v. Sielaff*, 521 F.2d 378 (7th Cir. 1975) | 36 |
| *United States v. Hicks*, 217 F.3d 1038 (9th Cir. 2000) | 63 |
| *United States v. Lemon*, 824 F.2d 763 (9th Cir. 1987) | 43 |
| *United States v. Molina*, 106 F.3d 1118 (2d Cir. 1997) | 63 |
| *United States v. Morales*, 108 F.3d 1031 (9th Cir. 1997) | 45 |
| *United States v. Moran*, 482 F.3d 1101 (9th Cir. 2007) | 43 |
| *United States v. Nobel*, 696 F.2d 231 (3d Cir. 1982) | 39 |
| *United States v. Phillips*, 367 F.3d 846 (9th Cir. 2004) | 60 |
| *United States v. Ray*, 930 F.3d 1368 (9th Cir. 1990) | 54 |
| *United States v. Rendon-Duarte*, 482 F.3d 1080 (9th Cir. 2007) | 52 |
| *United States v. Rodrigues*, 229 F.3d 842 (9th Cir. 2000) | 60 |
| *United States v. Rogers*, 119 F.3d 1377 (9th Cir. 1997) | 35, 38, 40 |
| *United States v. Rostoff*, 53 F.3d 398 (1st Cir. 1995) | 63 |
| *United States v. Sanchez-Lima*, 161 F.3d 545 (9th Cir. 1998) | 55 |
| *United States v. Scholl*, 166 F.3d 964 (9th Cir. 1999) | 44-46, 48 |
| *United States v. Snyder*, 291 F.3d 1291 (11th Cir. 2002) | 61 |
| *United States v. Welch*, 368 F.3d 970 (7th Cir. 2004) | 44 |
| *United States v. West Coast Aluminum Heat Treating Co.*, 265 F.3d 986 (9th Cir. 2001) | 61 |
| *United States v. Woodley*, 9 F.3d 774 (9th Cir. 1993) | 43 |
| *United States v. Zolp*, 479 F.3d 715 (9th Cir. 2007) | 61-65 |
| *Viterbo v. Dow Chemical Co.*, 826 F.2d 420 (5th Cir. 1987) | 45 |

FEDERAL STATUTES AND REGULATIONS

| | |
|---|---|
| 15 U.S.C. § 78j(b) | 3 |
| 15 U.S.C. § 78m(a) (2) | 2 |
| 15 U.S.C. § 78m (b) (2) (A) | 3 |
| 15 U.S.C. § 78m(b) (2) (B) | 3 |
| 15 U.S.C. § 78m (b) (5) | 3 |
| 15 U.S.C. § 78ff (a) | 2-3 |
| 18 U.S.C. § 1 | 4 |
| 18 U.S.C. § 371 | 2, 67 |
| 18 U.S.C. § 3663A | 66-67 |
| 18 U.S.C. § 3664(f) (1) (A) | 67 |
| 18 U.S.C. § 3231 | 4 |
| 28 U.S.C. § 455(b) (4) | 36-40 |
| 28 U.S.C. § 1291 | 4 |
| 17 C.F.R. § 201.1100 | 68 |
| 17 C.F.R. § 240.10b-5 | 3 |
| 17 C.F.R. § 240.12b-20 | 2 |
| 17 C.F.R. § 240.13a-13 | 2 |
| 17 C.F.R. § 240.13b2-1 | 3 |
| 17 C.F.R. § 240.13b2-2 | 3 |

FEDERAL RULES

| | |
|---|---|
| Fed. R. Crim. P. 52 (a) | 59 |
| Fed. R. Evid. 402 | 31, 44 |
| Fed. R. Evid. 403 | 31, 44, 45, 56 |
| Fed. R. Evid. 407 | 57 |

Case 09-10138-MFW   Doc 15043-3   Filed 01/13/15   Page 5 of 58

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. Stuart..., 2007 WL 2041144...

| | |
|---|---|
| Fed. R. Evid. 702 ................................................................................ | 31, 44-45 |
| Fed. R. Evid. 803(6) ........................................................................... | 54 |
| Fed. R. Evid. 807 ............................................................................... | 55 |
| SENTENCING GUIDELINES | |
| USSG § 1B1.3(a) (3) .......................................................................... | 62 |
| USSG § 2B1.1 ................................................................................... | 59-61, 63 |
| USSG § 2F1.1(b) (1) (S) ..................................................................... | 60 |

**I**

### ISSUES PRESENTED

A. Whether the district court abused its discretion in determining that the trial judge's ownership of stock in a large, publicly traded company that entered into deals with defendant's corporation was not a financial interest in the subject matter of the case that could be affected by the jury's verdict.

B. Whether the district court abused its discretion in excluding expert testimony and rejecting a proposed jury instruction, both of which indicated that three - party deals were not inherently illegal, when that fact was not in dispute at trial, was not relevant to defendant's position that he did not know about the deals at all, and where the jury instructions

required the jury to determine whether defendant knowingly made false statements or otherwise engaged in fraud.

C. Whether the district court abused its discretion in admitting evidence of a corporation's restatement of revenue due to defendant's fraud, where the evidence was admitted to rebut defendant's claim that the fraudulent revenue was not material to shareholders.

D. Whether the district court clearly erred in applying a well-settled method of estimating victim loss in a corporate fraud case recently endorsed by this Court.

E. Whether the district court clearly erred in ordering a corporate executive to pay restitution to victim-shareholders through a class action where the judgment identified each recipient by name and pro rata claim.

**II**

### STATEMENT OF THE CASE

A. NATURE OF THE CASE, COURSE OF THE PROCEEDINGS, AND DISPOSITION IN THE DISTRICT COURT

Defendant-appellant Stuart H. Wolff ("defendant") appeals his conviction and sentence following a jury trial. Defendant was convicted of one count of conspiracy, in violation of 18 U.S.C. § 371; three counts of filing false quarterly reports with the United States Securities and Exchange Commission, in violation of 15 U.S.C. §§ 78m(a)(2) and 78ff(a), and 17 C.F.R. §§ 240.12b-20 and 240.13a-13; five counts of falsifying corporate books and records, in violation of 15 U.S.C. §§ 78m(b) (2) (A), 78m(b)(5), and 78ff(a), and 17 C.F.R. § 240.13b2-1; four counts of lying to accountants, in violation of 15 U.S.C. §§ 78m(b) (2) (B) and 78ff(a), and 17 C.F.R. § 240.13b2-2; and five counts of insider trading, in violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5.

On April 25, 2005, a grand jury in the Central District of California returned an indictment against defendant in connection with a major corporate fraud scandal at Homestore.com, Inc. (CR 1). [1] During 2001, defendant was Homestore's Chief Executive Officer and Chairman of the Board of Directors. The indictment alleged that defendant, co-defendant and former Homestore

Case 09-10138-MFW    Doc 15043-3    Filed 01/13/15    Page 6 of 58

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. Stuart..., 2007 WL 2041144...

Executive Vice President Peter Tafeen, and other corporate officers and employees engaged in a lengthy scheme to inflate Homestore's publicly reported revenue figures. [2]

On March 28, 2006, jury trial began. (CR 290). On June 22, 2006, the jury found defendant guilty on all eighteen counts. (CR 442) . [3]

On October 12, 2006, the district court sentenced defendant to 15 years imprisonment, a 3-year term of supervised release, a $5,000,000 fine, and an $1800 special assessment. (CR 720). The court ordered defendant to pay $8,638,106 restitution to shareholder-victims identified in a related class action lawsuit. (CR 755)

B. JURISDICTION, TIMELINESS, AND BAIL STATUS

The district court had jurisdiction pursuant to 18 U.S.C. § 3231. This court has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 1. The clerk entered judgment on November 30, 2006. (CR 721). Defendant filed a timely notice of appeal on December 4, 2006. (CR 724). Defendant is released on bond pending appeal.

C. STATEMENT OF FACTS

1. Offense Conduct

This was a corporate fraud prosecution involving Homestore.com, a publicly traded California company. At the center of this case was a scheme to inflate the revenues that Homestore reported to investors during 2001.

Homestore's main business was to display Internet residential real estate listings to consumers. Much of Homestore's revenue came through sales of online advertising appearing on the websites. [4] Homestore reported revenue exceeding of $100 million per quarter during 2001. [5]

The government presented evidence at trial that defendant, the CEO and Chairman of Homestore, launched and controlled a scheme to inflate Homestore's revenue through fraudulent transactions, and then to lie to the company's auditors and investors about the deals. The jury heard evidence that defendant caused Homestore to fraudulently inflate its advertising revenue by tens of millions of dollars during the first three fiscal quarters of 2001. By falsely increasing its advertising revenue figures, Homestore was able to exceed Wall Street analysts' financial expectations for the company, and prop up the company's stock price.

During the scheme, defendant signed false SEC reports and letters to Homestore's accountant, and made numerous false statements to investors. Defendant received more than $8 million in profit from selling Homestore stock on the basis of inside information about Homestore's inflated financial results.

a. The fraudulent roundtrip deals

Homestore inflated its revenue by entering into numerous collusive three-way, or "roundtrip," transactions for the purpose of creating advertising sales revenue -- essentially paying money that would return to Homestore as revenue. In a typical fraudulent roundtrip deal, Homestore set up three related transactions to create a circular flow of funds. This schematic diagram shows the flow of funds in a typical roundtrip deal:

Case 09-10138-MFW    Doc 15043-3    Filed 01/13/15    Page 7 of 58

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. Stuart..., 2007 WL 2041144...

TABULAR OR GRAPHIC MATERIAL SET AT THIS POINT IS NOT DISPLAYABLE
TABLE

In the first leg of the fraudulent transactions, Homestore purchased an item from a vendor. In the second leg, the vendor transferred most of the money to an intermediary company. In the third leg, the intermediary purchased online advertising from Homestore. [6]

Homestore reported the amount received from the third leg as "revenue" on its financial statements. The trial evidence demonstrated that Homestore improperly recorded approximately $67 million in revenue from fraudulent transactions during the first three quarters of 2001. [7]

During the three-month trial, the government presented testimony from numerous former Homestore employees and representatives of the vendors and intermediaries. The ex-Homestore employees and the vendor-witnesses established the bogus nature of the first leg transactions. That is, these witnesses (many of whom were charged criminally and pled guilty to felonies) admitted that Homestore paid millions of dollars to two dozen vendors to buy products and services that Homestore did not need or never used, [8] starting a flow of funds that would return to Homestore as revenue. [9]

Trial testimony further established the fraudulent nature of the remainder of the transactions. Even though they purportedly sold products to Homestore, the vendors transferred most of the money received from Homestore to other companies in the second leg of the roundtrip deals based on unwritten agreements with Homestore. [10] Then, in the third leg of the deals, companies paid a portion of this money back to Homestore based on facially stand-alone contracts for the sale of advertising or other products. [11] The jury also received a considerable amount of documentary evidence establishing the scheme, including fraudulent contracts and memoranda. [12]

The roundtrip deals were intended to ensure that Homestore exceeded investors' expectations. Homestore executives understood that, if Homestore missed the quarterly revenue numbers predicted by securities analysts, "the company stock would get devastated" by investors selling the stock. [13] The trial evidence demonstrated that Homestore achieved positive results only through the use of the fraudulent roundtrip deals. [14]

b. Lying to the auditors

Homestore recorded in its financial statements the revenue fraudulently received from the roundtrip deals. Those financial statements were reviewed each quarter by the auditing firm PricewaterhouseCoopers ("PWC"). A key to Homestore's roundtrip deal scheme was to prevent PWC from learning the true nature of the deals. If PWC learned that Homestore was essentially paying itself in bogus deals and calling the payments "revenue," PWC would not have permitted Homestore to recognize the revenue. [15]

Case 09-10138-MFW    Doc 15043-3    Filed 01/13/15    Page 8 of 58

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. Stuart..., 2007 WL 2041144...

Homestore personnel informed PWC about payments made to vendors (the first leg), which were recorded as expenses in Homestore's corporate records. Homestore also told PWC about revenue received from advertisers involved in the deals (the third leg).

However, Homestore employees engaged in numerous deceptive tactics to prevent PWC from learning that those payments were linked (the second leg). Those tactics included altering contract dates, [16] falsifying valuations of useless products bought from vendors, [17] and directly lying to PWC about the fundamental terms of the deals and the accuracy of Homestore's financial statements. [18] Former Homestore Executive Vice President Peter Tafeen testified that Homestore routed money through the three-party deals so it was "able to hide from PWC [] the true nature of the deal." [19] Tafeen testified that Homestore "designed it to appear" that each leg was an independent transaction, but in fact "everything was contingent upon each other." [20]

Testimony by witnesses from Homestore's Finance Department and PWC established the effectiveness of the scheme in misleading PWC. Former Finance Department Vice President John DeSimone flatly admitted that he and his subordinates lied to PWC personnel about the fraudulent roundtrip deals. [21]

Similarly, a PWC audit partner testified that Homestore management repeatedly lied about the links between the components of the roundtrip deals. [22] Homestore falsely denied to PWC that any revenue was derived from payments made to the vendors (the first leg), and that payments received from the sale of advertising (the third leg) were related to other transactions. [23]

Even defendant acknowledged on several occasions during his testimony that Homestore engaged in a massive fraud scheme. [24] Though he denied knowledge of the scheme, defendant admitted that fraudulent deals occurred at Homestore during 2001 while he was Chairman and CEO.

c. Evidence of defendant's participation in the scheme

In a nearly three-month trial, the government called 19 witnesses and introduced over 400 exhibits. The defense called 13 witnesses who testified for nine court days. In the end, the jury convicted defendant on all counts after only one day of deliberation. The district court later stated that "the jury convicted this defendant based on his role in this fraud," and that "the jury found that [defendant] lied [] when he denied any knowledge of this scheme." [25]

As described below, the jury heard uncontroverted testimony that defendant closely controlled Homestore with a core group of three other executives. Those three executives -- Tafeen, former Chief Operating Officer John Giesecke, and former Chief Financial Officer Joseph Shew -- all testified against defendant. Each co-conspirator testified for four or five days and explained his personal discussions with defendant throughout 2001, establishing that defendant knew about the fraudulent deals and knew that Homestore personnel lied to PWC about them.

i. Executive Vice President Peter Tafeen

Case 09-10138-MFW   Doc 15043-3   Filed 01/13/15   Page 9 of 58

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. Stuart..., 2007 WL 2041144...

Tafeen testified that he explained to defendant in March 2001 how Homestore would route money to itself via the three-party deals. Tafeen testified that he actually drew a triangle on a white board in defendant's office to show defendant how Homestore would "send money" to the parties in the deals, "highlighting that each piece was separated as its own deal and not referencing the other pieces of the deal." [26] Tafeen told defendant that "nobody could understand the interrelations of the deal; and, therefore, it would allow [Homestore] to recognize revenue." [27]

Tafeen also told defendant that the fraudulent deals were money-losing propositions that did not make economic sense for Homestore's perspective -- other than to generate bogus revenue. [28] Tafeen explained to defendant that each deal would cost Homestore "roughly between 10 and 20 percent" in unrecouped payments to the vendors. [29] Even so, Tafeen testified that defendant approved use of the roundtrip deals beginning in March 2001. [30]

Tafeen testified about a frank discussion with defendant, Giesecke, and Shew about the fraudulent deals in May 2001. At a corporate event at the Calamigos Ranch conference center, the four executives discussed using the money-losing, roundtrip deals to meet Homestore's second quarter revenue targets. Defendant and his top subordinates expressly agreed that Homestore would lie to its auditors about the deals:

Q. I'm trying to understand the specific words that you recall now Mr. Shew saying.

A. "Is everybody in agreement and understand that we are going to hide this from Pricewaterhouse?"

Q. [] So there wasn't just a silent nodding. Everybody actually voiced their agreement with it?

A. It was like playing ring around the rosy.

"Yes."

"Yes."

"Yes."

"Yes. " [31]

ii. CFO Joseph Shew

Shew confirmed Tafeen's blunt description of the meeting at the Calamigos Ranch. Shew explained to defendant and his co-conspirators that PWC had scrutinized aspects of the first quarter roundtrip deals. [32] Shew explained to defendant the need to "hide the substance of these transactions from Pricewaterhouse so we wouldn't get scrutiny." [33] Shew testified that it "was clear that we were leaving that meeting [at the Calamigos Ranch] to go execute on these deals." [34]

Shew also testified about personal meetings with defendant regarding the fraudulent deals before and after the Calamigos Ranch meeting. Shew described a lunch with defendant in April 2001 following the completion of a large roundtrip deal with AOL

Case 09-10138-MFW   Doc 15043-3   Filed 01/13/15   Page 10 of 58

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. Stuart..., 2007 WL 2041144...

and numerous vendors. [35] Shew testified that he told defendant about the misleading information that Homestore was feeding its auditors about the fraudulent deals. Defendant admitted that "I don't like them either," but decided that Homestore should record revenue from the deals that quarter. [36]

In a July 2001 meeting with defendant, and in a direct and emotional manner, Shew again raised the topic of the fraudulent deals and lying to corporate auditors. [37] Shew confronted defendant in a closed-door meeting in which Shew cried about participating in the roundtrip deals and lying to PWC. Defendant again acknowledged that he did not "like" the deals. [38] Shortly afterward, though, both defendant and Shew signed another false quarterly report for Homestore. [39]

### iii. COO John Giesecke

Giesecke corroborated both Tafeen and Shew about the co-conspirators' meeting at the Calamigos Ranch. Giesecke testified that, in order to claim revenue from the first quarter deals, Shew explained to defendant and the others that Homestore had "hidden the second leg of the transaction [from PWC] -- and [Shew] made that clear -- they [PWC] had not discovered the scheme." [40] Shew then told defendant "very clearly -- and I think he used these words specifically, 'Does everybody know what we're doing here?' And everybody nodded acknowledgment at that point." [41]

Giesecke also testified about a personal meeting with defendant in July 2001 to discuss the roundtrip deals. That meeting focused on the need to lie to Homestore's outside auditors. [42] Giesecke told defendant that it was becoming "impossible to hide" the deals from PWC, and that "the only reason we're doing them is for revenue recognition." [43] Although defendant told Giesecke that he would discuss the matter with Tafeen, the deals continued during Homestore's next quarter.

### iv. Additional evidence of defendant's involvement in the fraud

Trial testimony showed that defendant closely monitored both Homestore's receipt of revenue and payments to vendors in the fraudulent roundtrip deals. Defendant attended regular meetings at which Homestore's quarterly revenue targets were set, adjusted, and tracked against actual business performance. [44] At those meetings, defendant received and reviewed "Risk & Opportunity Reports" that updated Homestore's revenue throughout the quarter, [45] including the revenue from the fraudulent deals. [46]

Defendant personally approved virtually all of the payments made to vendors. [47] Those wire transfers started the flow of funds that wound through the vendors and intermediaries and back to Homestore as revenue. Defendant's signature was required for large, infrequent wire transfers of this size. [48] Defendant specifically was told that the payments were related to deals with an intermediary. [49]

Indeed, defendant, as the CEO of Homestore, personally engaged in at least 20 documented communications with low- and mid-level AOL personnel in order to secure revenue for Homestore for the second quarter of 2001. [50] In one e-mail, defendant

Case 09-10138-MFW   Doc 15043-3   Filed 01/13/15   Page 11 of 58

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. Stuart..., 2007 WL 2041144...

demanded payment from AOL by referring to the roundtrip deals, stating that "we [Homestore] need to get our cash now just as you have gotten yours." [51] Defendant also asked an AOL employee to "change the timing of the buckets" of certain payments to enable Homestore to record additional revenue after the quarter's close. [52]

Defendant directly made false statements to investors and the securities markets about Homestore's financial performance. Defendant personally approved the contents of press releases issued after each quarter's close. [53] He also was the lead speaker during conference calls with investors, and approved the script used in presentations explaining Homestore's financial results. [54]

In those communications with investors during 2001, defendant falsely expounded on Homestore's inflated financial successes during the first and second quarter. Defendant bragged about Homestore's revenue growth, and spoke confidently and knowledgeably about all aspects of Homestore's business. [55] At no time, however, did defendant disclose the fact that Homestore paid itself in sham transactions in order to claim enough revenue to meet investor expectations; that information was deliberately withheld from investors "because the company didn't want the public to know that." [56]

Defendant signed Homestore's quarterly reports on SEC Form 10-Q before they were filed with the agency after each quarter. [57] Those reports contained financial statements that included tens of millions of dollars from the fraudulent roundtrip deals. Also, defendant signed management representation letters in which he stated to PWC that Homestore's financial statements were accurate, and that no information had been withheld from the auditors. [58] The jury convicted defendant of willfully lying in the quarterly reports and in the management representation letters.

Defendant was well aware of the significance of his public remarks about Homestore's financial performance. In deposition testimony that he gave to the Department of Justice in an unrelated antitrust investigation in early 2001, defendant acknowledged the consequences of failing to meet quarterly revenue expectations:

We miss one quarter, *we're essentially dead....* [I]f we had not made our [fourth quarter 2000] numbers and we were fortuitous, *I think we would probably be clobbered,* even this quarter, and I think once we get clobbered, until we're ten years down the road, I don't think you ever get back.

(GER 19) (emphasis added).

Additional evidence showed that defendant was a micromanager who closely monitored virtually all aspects of Homestore's business operations, supporting the conclusion that he focused on the details of the roundtrip deals. Defendant was involved in such mundane matters as the design of Homestore employee ID badges; office assignments; distribution of tickets to sporting events; and the height of the flagpole at Homestore's headquarters. [59]

Uncontroverted evidence showed that defendant sold a tremendous amount of stock during the period of the fraud. On five occasions during 2001, defendant sold Homestore stock for a profit of over $8.6 million. [60]

Case 09-10138-MFW    Doc 15043-3    Filed 01/13/15    Page 12 of 58

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. Stuart..., 2007 WL 2041144...

v. Defendant's testimony

Defendant testified for four days, and flatly denied knowledge of the fraudulent deals or the revenue inflation scheme. Defendant stated that he never recalled anyone even using the terms "round-trip transactions" or "triangular transactions" during 2001. [61]

Defendant further claimed that he did not understand that Homestore derived revenue as a direct result of payments to vendors. Instead, defendant testified that he believed that Homestore received revenue from AOL in "a very complex deal" with "a lot of pieces to this thing, as I could understand it." [62] Similarly, defendant claimed that he did not believe that Homestore paid Cendant to generate revenue received by Homestore. [63]

In addition to denying knowledge about the existence of the roundtrip deals, defendant denied discussions with his co-conspirators about hiding information from PWC. Defendant acknowledged attending the Calamigos meeting but denied recalling any discussion about PWC. [64] Defendant denied that Tafeen explained the roundtrip deal with AOL or drew a triangle on a white board in defendant's office to explain how PWC would be deceived by the fraudulent deals. [65] Defendant further denied that Giesecke came to him in July 2001 to discuss Homestore personnel withholding information from and lying to PWC. [66] Defendant admitted that Shew raised the issue of Shew's "level of discomfort with respect to PWC" during 2001, but defendant claimed that he "didn't understand it." [67]

Defendant's supposed lack of knowledge about the structure of the roundtrip deals was echoed by his attorneys during opening statement and closing argument. Defendant's attorney told the jury that defendant was such a busy man as CEO that "[h]e is not aware ... of every single transaction that takes place or of the structure of every single transaction that takes place." [68] For this reason, "[i]t all depends ... at the end of the day, on what he knew and when he knew it." [69] Defendant's attorney later told the jury that "[t]he question is did he know about the fraudulent aspect of the transactions? Not whether there was a triangle.... that's not the issue." [70] Defendant's attorney then argued why defendant did not know about the deals.

Following trial, the district court observed that the jury disbelieved defendant's testimony. The district court concluded that "[t]he jury convicted this defendant based on his role in this fraud" and that defendant's "participation in this scheme was crucial to its success." [71] The district court further stated that "[t]his was a three-month trial. The jury essentially found that the defense was frivolous." [72]

2. Defendant's Motion to Recuse the Trial Judge

The district court conducted numerous hearings with the parties before trial began. At a hearing on June 22, 2005, Judge Anderson informed the parties that he owned stock in AOL. He then encouraged the parties to consider his disclosure. [73] Co-defendant Tafeen's attorney did not express any concern based on the district court's disclosure. [74] Defendant's attorneys made no comment on this topic at the hearing.

Case 09-10138-MFW   Doc 15043-3   Filed 01/13/15   Page 13 of 58

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. Stuart..., 2007 WL 2041144...

Several months passed after Judge Anderson disclosed owning stock in AOL. During that time, the district court denied a defense request to move the trial date an additional six months. [75] Also, the court denied defendants' motions for a bill of particulars and for certain discovery items. [76] Furthermore, during *in camera* hearings on August 1 and October 3, 2005, the court denied defense requests regarding certain trial subpoenas. (CR 48, 94).

On November 1, 2005 -- over four months after Judge Anderson's disclosure that he owned AOL stock, and after receiving these adverse rulings -- defendant moved to recuse Judge Anderson. (CR 110). Defendant argued that Judge Anderson had a "financial interest in the subject matter in controversy" based on his stock ownership, requiring his recusal. Defendant claimed that AOL, as one of the intermediaries transacting with Homestore in 2001, was an "integral component of the 'topic of dispute'" in the prosecution of Homestore's CEO. (CR 110; GER 338). The defense argued that Judge Anderson had a "financial stake in an entity that will be intimately intertwined in the subject matter in controversy." *Id.* The defense noted that Judge Anderson recused himself from considering a motion filed by AOL to quash a trial subpoena. [77] Defendant's short recusal motion contained no affidavit or supporting evidence.

The recusal motion was referred to another district judge, the Honorable John Walter, for consideration. On November 7, 2005, Judge Walter denied the motion, ruling that defendant failed to meet his evidentiary burden of showing that Judge Anderson's stock ownership was a financial interest in the subject matter in controversy. [78] (CR 112). Judge Walter found that Judge Anderson's decision to "exercise extreme caution" by recusing himself from the AOL motion to quash was "insufficient to demonstrate" a financial interest in the subject matter of the criminal case. (CR 112; ER 98).

Judge Walter also concluded that defendant's bare claim that AOL was a "'potential unindicted co-conspirator in this case' [was] equally insufficient to establish" that Judge Anderson had a personal conflict or interest in the case. (CR 112; ER 98). Judge Walter later explained that "no reasonable person, knowing all the facts and circumstances, would conclude that" Judge Anderson had a financial interest in the subject matter of this case. (ER 503).

Defendant's recusal motion was denied four months before trial began in March 2006. Defendant never renewed his motion to recuse Judge Anderson before trial, nor did he move for recusal or a mistrial after the presentation of trial evidence began. Further, defendant did not ask Judge Anderson for additional information about his holdings in AOL stock. Defendant first sought this information after he was convicted, filed his notice of appeal, and sought bail pending appeal. [79] (CR 653).

During this case, Judge Anderson ruled for defendant on several issues related to AOL. Defendant sought access to evidence obtained in separate investigations of AOL conducted by an east coast United States Attorney and the SEC. Judge Anderson entered a protective order enabling production of that material. (CR 37). The judge also extended the trial date on two occasions because, at least in part, of defendant's stated need to review the AOL discovery before trial. (CR 33, 224). Moreover, Judge Anderson allowed defendant to call two AOL witnesses (Mark Wovsaniker and Samara Jaffe) to testify at trial about AOL's business dealings with Homestore in 2001.

3. Evidence of Restatements

Case 09-10138-MFW    Doc 15043-3    Filed 01/13/15    Page 14 of 58

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. Stuart..., 2007 WL 2041144...

Trial evidence showed that Homestore filed inaccurate quarterly reports with the SEC on Form 10-Q for the first three quarters of 2001. Several Homestore executives testified that Homestore overstated its quarterly revenue by tens of millions of dollars in those filings. [80]

In pretrial proceedings and at trial, defendant argued that the fraudulent revenue inflation scheme was not material to investors. [81] For this reason, the government sought to introduce evidence that Homestore filed amended quarterly reports with the SEC in early 2002. Those quarterly reports restated Homestore's financial performance to delete revenue that the company previously reported from the bogus deals. [82] The government argued that evidence that the company restated this revenue was relevant to proving the materiality of the false information.

The district court admitted evidence of Homestore's restatements. The government briefly addressed the restatements with witnesses Barbara Alexander, Richard Withey, and Mark Rowen. Alexander, a member of Homestore's board of directors, was involved in Homestore's decision to restate results. Withey, the lead PWC accountant who audited Homestore, also directly participated in the restatements. Alexander's testimony regarding Homestore's restatement covered only five trial transcript pages. [83] Withey responded to a few questions regarding specific transactions for which Homestore disavowed revenue it previously recognized. [84] Withey also summarized the total amount of revenue that Homestore fraudulently recognized in 2001 ($67 million) and later restated. [85] Rowen, an analyst with Prudential Securities testified that Homestore's use of the phony 2001 revenue was significant information that he would have considered important in evaluating an investment in Homestore stock for his clients. [86]

The government introduced the restated Homestore Form 10-Qs into evidence as certified copies of publicly filed records. [87] At no point during trial did the government ask any witness about the contents of the exhibits. The restated reports were never displayed to the jury. Finally, the government made only a single reference to Homestore's restatement in opening statement and closing argument. [88]

4. Exclusion of Defense Expert Witness

Defendant sought to offer expert testimony from a professor of accounting, Paul Wertheim. Defendant submitted several reports or proffers regarding Wertheim's testimony. The substance of the proposed testimony changed from report to report. At no point did Wertheim propose to opine about defendant's subjective knowledge of accounting rules or principles; Wertheim never interviewed defendant and had no basis for offering any opinion about defendant's mental state. Ultimately, the nature of Wertheim's testimony was that an individual would need to know the details of a roundtrip transaction to determine the accounting for the deal.

The district court conducted several lengthy hearings to discuss the proposed testimony. The court concluded that the testimony was not relevant to any disputed issue or affirmative defense. The court found that the expert contradicted aspects of defendant's direct testimony regarding his knowledge about the roundtrip deals, which would confuse and mislead the jury.

a. The changing Wertheim submissions

Case 09-10138-MFW   Doc 15043-3   Filed 01/13/15   Page 15 of 58

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. Stuart..., 2007 WL 2041144...

Defendant submitted an expert report from Wertheim shortly before trial in March 2006. (CR 274). In his first report, Wertheim claimed that the Homestore transactions were not roundtrip ones, but were separate, independent deals. Wertheim also opined that, because the transaction legs had quantifiable value and could be independently analyzed, Homestore was entitled to record revenue from them. (CR 274).

On June 5, 2006, defendant submitted a second report. (CR 363; ER 146). Wertheim monitored much of the government's case-in-chief, including admissions of fraud and misconduct by Homestore personnel in the fraudulent deals. As a result, Wertheim no longer would testify that Homestore's payments in the first legs of the roundtrip deals represented fair market value. (ER 167-68). Even so, Wertheim continued to claim that the transactions were not "roundtrip deals," and that Homestore may not have improperly recorded revenue. (ER 150, 158).

On June 12, 2006, defendant submitted a supplemental proffer of Wertheim's expected testimony. (CR 369; ER 179). Defendant stated that Wertheim would testify about general accounting issues, including whether different Homestore transactions could be considered to be roundtrip deals, and "what the accounting issues would be for allowing revenue recognition." (ER 181-82).

At a hearing that day, defense counsel stated that "we certainly don't have any objection if the Court were inclined to defer ruling [on admitting Wertheim's testimony] until after [defendant] testifies and do it that way." [89] At that time, defendant drastically limited the scope of Wertheim's opinions. The defense conceded that Wertheim would not opine on the accounting for Homestore's roundtrip deals. [90] The defense also acknowledged that Wertheim had no insight into defendant's subjective accounting knowledge. [91]

When asked to articulate the details of Wertheim's expected testimony, defense counsel stated that the expert would generally explain:

how, looking at a structure, a triangle, a round-trip, whatever it may be, that does not necessarily provide whoever is viewing that information sufficient information to determine whether or not the transaction is improper from an accounting perspective.

Dr. Wertheim would come in and talk hopefully about what he would need to know to understand a transaction like this, what accounting issues are implicated.

(GER 262). Meanwhile, as described above in section II.C.1.c.v., defendant testified that he did not even know that Homestore entered into roundtrip transactions during 2001.

b. The motion to preclude Wertheim

Based on the changes in Wertheim's submissions and his proffered testimony, the government moved to preclude Wertheim from testifying as an expert. (CR 370). The government argued that Wertheim had a demonstrably incorrect understanding of the Homestore transactions, evidenced by the wild changes in his submissions. Also, based on the proffered testimony, Wertheim was unable to offer evidence on any disputed issue, including defendant's intent. The government argued that Wertheim's testimony was irrelevant, would mislead the jury, and was excludable under Fed. R. Evid. 402, 403, and 703. (CR 370).

On June 19, 2006, following several full days of defendant's testimony, the district court granted the government's motion to preclude Wertheim. In a lengthy statement of its decision, the court explained that "the defense in this case, as I understand it, is that the defendant didn't have knowledge of these transactions." The court found that Wertheim's testimony about "whether these transactions could have been properly accounted for is not relevant to any of the factual issues that are going to be before this jury." [92]

Case 09-10138-MFW    Doc 15043-3    Filed 01/13/15    Page 16 of 58

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. Stuart..., 2007 WL 2041144...

5. Jury Instruction

Defendant sought a jury instruction that "roundtrip or triangle transactions are not automatically illegal or improper," and that "the law requires that the prosecution establish beyond a reasonable doubt that there was, in fact, fraud on the reporting of the transactions." (CR 418). After conducting several hearings regarding jury instructions, the district court declined to give this proposed instruction. [93]

Instead, the court gave jointly submitted instructions regarding the criminal charges. Those joint instructions informed the jury that, to convict defendant, the government had to prove false statements in Homestore's financial statements and other business records. [94] During a hearing on defendant's motion for judgment of acquittal, defense counsel acknowledged that "clearly the jury will be aware of the fact that one of the elements [of the offenses] is falsity" under the joint instructions. [95]

### III

### SUMMARY OF ARGUMENT

During the three - month trial of Homestore's CEO, the jury heard overwhelming evidence of defendant's role in a massive corporate fraud scheme. Defendant's three key co-conspirators -- top executives at Homestore who reported directly to defendant -- testified categorically that defendant was fully aware of and approved the fraudulent revenue inflation plot. The jury also heard considerable evidence about the fraudulent deals themselves, and defendant's role in implementing the transactions. By convicting defendant on all charges, the jury apparently disbelieved defendant's testimony in which he flatly denied any involvement in the fraud at his company.

Defendant's issues on appeal are exceedingly minor in light of the tremendous evidence of defendant's guilt. The district court properly denied defendant's much-delayed and unsupported motion to recuse the trial judge, who clearly had no financial interest in the subject of the case. The independent district judge who heard the motion did not abuse his discretion in finding that the trial judge's ownership of an unknown amount of stock in a large company with deals with Homestore could not have been affected by the outcome of the criminal case against Homestore's CEO.

The district court did not abuse its discretion in precluding testimony from a defense expert and rejecting a proposed defense jury instruction regarding the roundtrip deals. After extensive hearings and submissions from the parties, the district court correctly concluded that the expert's ever- changing opinion was irrelevant and inconsistent with defendant's trial testimony. There ultimately was no dispute at trial about the fact that Homestore's deals were fraudulent, and the trial concerned whether defendant knowingly participated in these crimes. Similarly, the proposed jury instruction neither addressed the government's theory of the case nor any valid defense.

The district court did not abuse its discretion in admitting evidence that Homestore restated its financial results following the fraud's discovery. That evidence was relevant, reliable, not hearsay, and identical to other, admissible statements from participants who admitted the fraud at Homestore. Moreover, the restatement evidence played an insignificant part in the government's presentation at trial.

Finally, both the custodial and financial portions of defendant's sentence should be affirmed. The district court correctly applied settled principles, recently endorsed by this Court, in estimating guideline loss, and applied mandatory restitution in an efficient manner.

Case 09-10138-MFW    Doc 15043-3    Filed 01/13/15    Page 17 of 58

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. Stuart..., 2007 WL 2041144...

IV

## ARGUMENT

## A. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING DEFENDANT'S MOTION TO RECUSE THE TRIAL JUDGE

### 1. Standard of Review

The denial of a motion to recuse a judge for financial conflict of interest is reviewed for abuse of discretion. *See Manaini v. United States,* 314 F.3d 1158, 1161 (9th Cir. 2003).

### 2. Defendant's Motion Was Untimely, As He Waited Four Months to File It, and Chose Not to Vigorously Pursue It Until After Conviction

In evaluating defendant's recusal motion, a "serious threshhold issue" is whether defendant raised the disqualification question in a timely manner. *United States v. Rogers,* 119 F.3d 1377, 1380 (9th Cir. 1997). A party having information that may lead to judicial disqualification "cannot wait until after an unfavorable judgment before bringing the information to the court's attention." *Id.* This Court will not allow a litigant to "take his chances with a judge" only to later seek recusal after a disappointing ruling. *United States v. Branco,* 798 F.2d 1302, 1304 (9th Cir. 1986). The timeliness component for seeking recusal is intended to prevent parties from "withhold[ing] recusal motions, pending a resolution of their dispute on the merits, and then if necessary invok[ing] section 455 in order to get a second bite at the apple." *E.&J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1295 (9th Cir. 1992).

Here, defendant delayed bringing his recusal motion. The judge voluntarily informed the parties of his stock ownership in AOL in June 2005, asking the parties if his stock ownership "poses a problem with the Court proceeding with this case." Defendant made no objection or comment at the time.

Instead, defendant waited until November 2005 before filing his recusal motion. In the intervening four - month period, the judge rejected several defense motions, denied defense requests to continue the trial, and quashed defense subpoenas. Defendant thus waited to determine how the court would view key issues in the case, and filed the delayed recusal motion when he became dissatisfied with the course of the proceedings. [96]

Further, when defendant raised the issue, he did so in form only to preserve an appellate issue in case of conviction. *See United States ex rel. Hickman v. Sielaff,* 521 F.2d 378, 386 (7th Cir. 1975) ("the failure to pursue the matter more forcefully [] was an attempt to derive a tactical advantage"). Defendant filed a five-page motion with no case law or affidavits, never renewed his motion in the district court before or during the trial, and did not seek details about Judge Anderson's financial interest until after the three-month trial and conviction. Such gamesmanship fails to rise above the "serious threshhold" set by this Court for a timely motion. For this reason, this Court should reject defendant's delayed recusal claim.

### 3. In Any Event, Judge Walter Did Not Abuse His Discretion in Denying the Motion Where the Trial Concerned Homestore Rather Than AOL

If this Court should reach the merits of defendant's claim, there is no basis for concluding that Judge Walter abused his discretion in denying the pre-trial recusal motion. Though under Section 455(b) (4), [97] a district judge has a financial interest in the subject of a case where the judge has "even the slightest financial interest in the outcome of litigation," *Herrington v. Sonoma County,*

Case 09-10138-MFW   Doc 15043-3   Filed 01/13/15   Page 18 of 58

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. Stuart..., 2007 WL 2041144...

834 F.2d 1488, 1503 (9th Cir. 1987), recusal is mandated where the judge is "entitled to recover financially" as a result of the trial. *Tramonte v. Chrysler Corp.*, 136 F.3d 1025, 1029 (5th Cir. 1998).

*Tramonte* was a class action alleging defects in Chrysler automobiles. The judge's family members owned Chryslers, potentially making them classmembers with an interest in the outcome of the case. The Fifth Circuit contrasted this "direct financial interest" in the subject matter and outcome of the case (which "runs afoul of § 455(b) (4)) with the "remote, contingent, or speculative interest" of owning stock in a company that itself owned a Chrysler. *Tramonte*, 136 F.3d at 1030. Owning stock in a company that could be affected by the result of a case "is not a disqualifying financial interest under the statute." *Id.; Delta Air Lines, Inc. v. Sasser*, 127 F.3d 1296, 1297 (11th Cir. 1997).

Similarly, this Court held that ownership of stock in a corporate victim of a crime does not mandate a judge's recusal from the criminal trial of the offender. In *Rogers*, the district judge disclosed that he owned stock in Bank of America, the victim of defendant's fraud scheme. This Court determined that the judge, "as one of millions of stockholders in Bank of America, held a limited financial interest in the victim of the crime," which "cannot be deemed a financial interest in the subject matter in controversy." *Rogers*, 119 F.3d at 1384. Additionally, as the only parties in a federal criminal case are "the named defendant and the United States," an unindicted co-conspirator is not a party to a case under Section 455(b) (4). *Id.* Moreover, where "the result in the prosecution could make no difference to the [corporation] or its shareholders," a judge owning shares in that corporation does not hold a financial interest in the subject matter in controversy. *United States v. Nobel*, 696 F.2d 231, 234 n.3 (3d Cir. 1982).

Here, the transactions between Homestore and AOL were not the "subject matter" of the criminal case under Section 455. The subject of the criminal prosecution of defendant was always *Homestore:* how Homestore misled investors; how Homestore filed false quarterly reports with the SEC; how Homestore falsified its books and records; how Homestore lied to its auditors; and the culpability of defendant for those crimes. Though Homestore derived bogus revenue from transactions that passed through AOL, AOL's "guilt" was never at issue. The Homestore fraud scheme was illegal regardless of whether AOL was a participant in it.

Tellingly, defendant never articulated in his recusal motion how Judge Anderson's AOL stock ownership could possibly be affected by defendant's trial. Judge Walter correctly concluded that, as a factual matter, defendant's motion was "insufficient to demonstrate" that Judge Anderson had a financial interest in the subject matter or outcome of the criminal case. Judge Walter explained that "no reasonable person, knowing all the facts and circumstances, would conclude that" Judge Anderson had a financial interest in this case's subject matter.

Those factual determinations were clearly correct. Defendant was on trial for his misconduct as Homestore's CEO in misleading the SEC and investors about Homestore's finances. Whether defendant was acquitted or convicted would have no financial impact on AOL, or on Judge Anderson's indirect ownership as one of millions of AOL shareholders. AOL (now Time Warner) is a multi-national corporation with a vast number of shareholders. As one of those shareholders, the district judge's personal financial interest in the corporation was far too indirect and remote to require disqualification under Section 455 (b) (4). *See Rogers*, 119 F.3d at 1384.[98] AOL's mere role as a potential victim in the Homestore fraud is insufficient to conclude that Judge Anderson had a financial interest in the subject of the criminal trial.

Any theory as to how AOL shareholders could be affected by the outcome of defendant's trial was at best "remote" and "speculative." *Tramonte*, 136 F.3d at 1030. Defendant argues that AOL was complicit in the fraud that Homestore perpetrated on its investors, implying that it would be in Judge Anderson's interest to avoid having AOL implicated in misconduct at trial. Yet the jury was never asked to determine if AOL violated the law or caused defendant to engage in that fraud. No past or present AOL employee was charged as a co-defendant with defendant in the Homestore investigation. Also, despite defendant's reference to other civil and criminal actions regarding AOL, he cannot explain how the result of the Homestore CEO's criminal case would affect those other cases.[99] Additionally, there is no evidence of bias by the trial judge, who allowed defendant to conduct extensive discovery of AOL, obtain grand jury testimony of AOL personnel, and call AOL witnesses at trial.

Case 09-10138-MFW    Doc 15043-3    Filed 01/13/15    Page 19 of 58

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. Stuart..., 2007 WL 2041144...

Defendant insists that the "topic" of criminal case against him was AOL, which prevented Judge Anderson from presiding under Section 455. None of the cases defendant cites supports that claim. Section 455 is intended to prevent a judge from hearing a case in which he has a financial interest. That interest could be in the subject of the case or in a party through a personal investment, but it must be an interest that could be affected by the trial. If the judge has no such financial interest, there is no basis for disqualification. Judge Walter did not abuse his discretion in ruling that defendant's paltry pretrial submission was insufficient to remove Judge Anderson.

## B. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN EXCLUDING DEFENDANT'S EXPERT OR DENYING DEFENDANT'S PROPOSED JURY INSTRUCTION ABOUT ROUNDTRIP TRANSACTIONS

Defendant advances a theory of the case on appeal that is belied by the extensive trial record. He claims that the jury convicted him merely because he knew of the structure of the roundtrip deals, which was "equivalent to knowledge of illegality." (AOB 37). However, this was not an issue at trial. The government did not pursue any so-called "structure alone" theory; rather, the jury instructions required, and the government's evidence proved, that defendant was a willing and knowledgeable participant in a fraud scheme. Defendant disputed this, testifying that he never knew the structure of the deals and was ignorant of Homestore's business deals.

The proffered testimony of defendant's accounting expert and the requested jury instruction were irrelevant to any contested issue. The expert, Wertheim, was never to offer any opinion as to defendant's subjective knowledge of accounting nor, after modifications to the proffered testimony, as to Homestore's accounting for the roundtrip deals. In the end, Wertheim was simply to testify generally that roundtrip transactions are not automatically illegal. Similarly, the requested defense instruction related to no issue advanced by the government or disputed at trial. Further, because defendant testified that he did not know about the structure of the deals at all, both the expert's testimony and the jury instruction contradicted the defense theory of the case.

### 1. Standard of Review

A district court's decision to preclude expert testimony is reviewed for abuse of discretion. *See General Electric Co. v. Joiner,* 522 U.S. 136, 142 (1997). A court abuses its discretion when it bases its decision on "a clearly erroneous view of the facts." *United States v. Finley,* 301 F.3d 1000, 1007 (9th Cir. 2002). A district judge has "'broad discretion' in assessing the relevance and reliability of expert testimony." *Id.*

If the district court's instructions fairly and adequately covered the elements of the offense, the review of the instruction's "precise formulation" is only for an abuse of discretion. *United States v. Woodley,* 9 F.3d 774, 780 (9th Cir. 1993). Further, a defendant is entitled to an instruction only where "evidence in the case makes it applicable." *United States v. Lemon,* 824 F.2d 763, 764 (9th Cir. 1987). In evaluating jury instructions, this Court examines them "as a whole and in context." *United States v. Moran,* 482 F.3d 1101, 1106 (9th Cir. 2007) (no error regarding jury instruction defining "'sham' transactions;" remaining instructions "provided guidance to the jury" regarding whether tax returns were false).

### 2. The Expert's Testimony, Narrowed to Only the Proposition That Not All Roundtrip Deals Are Illegal, Was Factually Irrelevant to This Case

Like other forms of evidence, expert testimony must be relevant to be admissible. Expert testimony is relevant if it "will serve to aid the trier of fact" in evaluating contested issues at trial. *Finley,* 301 F.3d at 1008; Fed. R. Evid. 702. If "there is no 'fit' between [the expert's testimony] and the issue" in dispute, then the expert's proposed testimony is not relevant and is potentially misleading and confusing to a jury. *United States v. Scholl,* 166 F.3d 964, 971 (9th Cir. 1999) (affirming exclusion of experts on tax, accounting, and gambling issues); Fed. R. Evid. 402; 403; 702, Advisory Comm. Note ("Rule 702 simply requires that [] the testimony 'fit' the facts of the case"). "[G]eneralized testimony" that "sheds no light" on the particular transactions at issue is irrelevant and inadmissible. *Jinro American, Inc. v. Secure Investments, Inc.,* 266 F.3d 993, 1011 (9th Cir. 2001) (Wallace,

Case 09-10138-MFW    Doc 15043-3    Filed 01/13/15    Page 20 of 58

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. Stuart..., 2007 WL 2041144...

J., concurring); *United States v. Welch,* 368 F.3d 970, 974 (7th Cir. 2004) (excluding general testimony about eyewitness identifications; evidence lacked "better link to the facts of the case").

Rule 403 allows a court to exclude otherwise relevant evidence on the ground that "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Because expert testimony can be both "powerful and quite misleading," a court applying Rule 403 "exercises more control over experts than over lay witnesses." *Daubert v. Merrill Dow Pharmaceuticals. Inc.,* 509 U.S. 579, 595 (1993). When the "assumptions made by an expert are not based in fact, the expert's testimony is likely to mislead a jury, and should be excluded by the district court." *Tyger Construction Co. v. Pensacola Construction Co.,* 29 F.3d 137, 144 (4th Cir. 1994). Such a determination rests both in Rule 702 (governing expert testimony) and Rule 403, because an unsupported expert opinion "offers no expert assistance to the jury." *Viterbo v. Dow Chemical Co.,* 826 F.2d 420, 422 (5th Cir. 1987). An expert cannot provide "opinion based on facts that are indisputably wrong." *Guillory v. Domtar Indus. Inc.,* 95 F.3d 1320, 1331 (5th Cir. 1996).

Where, as here, the issue to be resolved by the jury involves the defendant's subjective belief or knowledge, expert testimony is of limited assistance. An expert who interviewed a defendant to "gain[] familiarity with [defendant] and her work" may have a factual basis to opine on defendant's knowledge of accounting or bookkeeping skills, assisting a jury in determining if defendant acted with criminal intent. *United States v. Morales,* 108 F.3d 1031, 1039 (9th Cir. 1997). By contrast, tax and accounting experts with "no personal knowledge of any predicate matter relating to [defendant's] own ability to understand" the principles in a financial scheme may be excluded. *Scholl,* 166 F.3d at 973. Moreover, the objective "reasonableness of what [defendant] said he believed is irrelevant" to such expert testimony; "the only relevant issue is whether" defendant subjectively believed he acted properly in the transactions. On that issue, exclusion is proper where experts have "nothing to say." *Id.* (noting that exclusion of experts did not prevent defendant "from pursuing the theory that he believed" he acted properly).

### a. Because the Government did not pursue a "structure alone" theory, the expert offered no relevant testimony about any disputed factual issue

At trial, the government did not argue that defendant was guilty simply because he knew about the "structure alone" of the roundtrip deals. Indeed, during closing argument, defense counsel acknowledged that the government did not so argue:

> You cannot assume that a triangle is problematic per se. It's not. *The Government is not going to tell you it is.*
> And if they do, they completely contradict Ms. Alexander, their own witness. They're not going to do that.

(GER 310) (emphasis added).

Instead, the government proved conclusively that the deals were fraudulent from conception to execution, and that defendant knew he misled Homestore's accountants and investors by implementing them. The government presented powerful testimony from three Homestore executives who on multiple occasions discussed with defendant the deceptive nature of the roundtrip deals. Defendant was told repeatedly that Homestore personnel were lying to the company's auditors and withholding information about the deals.100 The evidence further demonstrated that defendant personally monitored both Homestore's expenditures and revenues in the fraudulent deals, and personally intervened in the second quarter AOL deal to ensure that Homestore received payment in a fraudulent manner. Defendant then deliberately concealed the existence of the roundtrip deals from investors.

The government's case, therefore, was based on proving defendant's personal and direct involvement in deals that he subjectively knew to be fraudulent. The fundamental factual dispute for the jury was straightforward: whether or not defendant knowingly participated in the fraud scheme. [101] In contrast, Wertheim intended to testify that a person who knew the structure of the roundtrip deals might not know that revenue from them could not properly be recorded. Wertheim's analysis of an how an objective person would view roundtrip deals in general did not address or "fit" any disputed issue and could not assist the jury.

Case 09-10138-MFW    Doc 15043-3    Filed 01/13/15    Page 21 of 58

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. Stuart..., 2007 WL 2041144...

**b. The expert offered no testimony about defendant's subjective knowledge of the roundtrip deals**

Defendant's accounting expert also had nothing to say about the issue actually contested at trial - defendant's subjective knowledge of the fraud scheme. This corporate fraud trial involved false financial statements and accounting shenanigans by Homestore personnel. However, the fundamental issue regarding defendant's culpability was not how Homestore should have accounted for the roundtrip deals. Instead, the core question was whether defendant willfully and knowingly joined and directed the fraudulent scheme to inflate his company's revenue.

Wertheim's proposed testimony offered the jury no insight into or assistance with this point. Wertheim never interviewed defendant regarding defendant's familiarity with accounting rules. As a result, Wertheim had no basis for any opinion of defendant's subjective knowledge of those principles. All Wertheim potentially could address is how a reasonable person objectively might evaluate the deals. That opinion, as in *Scholl*, was not relevant to the issue in dispute,102 and was properly excluded.

**c. The expert's testimony was premised on facts contrary to defendant's theory of the case**

Defendant's testimony provided an additional reason that Wertheim's proposed testimony was irrelevant. Defendant testified that he lacked knowledge about the roundtrip deals. Defendant categorically denied knowing about the structure of the deals, understanding the details of the component transactions, or even hearing the term "roundtrip deals" during 2001. As a result, defendant never testified that he believed Homestore's deals to be legal.

Defendant's testimony conflicted with the very premise of Wertheim's opinion, which was that an objective person who knew that a deal was three-legged would not necessarily know that the deal was illegal. If the jury believed defendant's claim that he knew nothing about the roundtrip deals, then an evaluation of Wertheim's objective person was unnecessary. On the other hand, if the jury agreed with the government that defendant deliberately caused Homestore to enter into the deals for the purpose of deceiving Homestore's auditors and falsifying its financial statements, that conduct clearly was criminal. [103] In either circumstance, Wertheim's testimony was irrelevant.

In all, Wertheim's expert opinion was based on -- and intended to explain to the jury -- facts that the district court correctly found not to fit the present case. The district court recognized as much after conducting several hearings on the topic, reviewing defendant's written reports and proffers regarding the expert, and observing defendant's testimony. The defense agreed that it was appropriate for the court to hear defendant's testimony before deciding on the relevancy of the expert's presentation. After considering defendant's testimony, the court gave a reasoned and thoughtful explanation as to why Wertheim's testimony was excluded. The court found the expert testimony was "not relevant to any of the factual issues that are going to be before this jury" and was likely to confuse the jury. [104] Particularly viewed in light of defendant's trial testimony, this factual conclusion was not clearly erroneous.

**3. Because the Jury Was Instructed That It Had to Find Knowing Fraud by Defendant, and Because Defendant's Instruction Addressed a Theory the Government Did Not Argue, the Jury Instruction Was Unnecessary**

Similarly, defendant's proposed instruction sought to tell the jury that roundtrip transactions "are not automatically illegal or improper" and that the government needed to prove that there was fraud in reporting the roundtrip deals. The proposed instruction was unnecessary because it addressed a theory that the government never pursued. Additionally, the full set of jury instructions clearly informed the jury that it needed to find fraud or a false statement as an element of the charged offenses. Because the jury was properly informed about the elements, there was no error in denying defendant's proposed instruction.

Case 09-10138-MFW    Doc 15043-3    Filed 01/13/15    Page 22 of 58

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. Stuart..., 2007 WL 2041144...

Defendant claims he was entitled to the instruction because the government purportedly sought to convict him solely for his knowledge that Homestore engaged in triangular deals. As set forth in Section IV.B.2.a, though, the government did not argue for guilt because defendant knew merely that the deals were triangular. To the contrary, the government argued and proved that defendant knew the deals were fraudulent, and that he implemented and approved the deals to deceive Homestore's auditors. As a result, an instruction regarding the possible legality of roundtrip deals would not have addressed any aspect of the government's case-in-chief or any element of the charged offenses.

Defendant's proposed instruction also was unnecessary given his testimony. Defendant completely denied knowing that Homestore entered into the three-way transactions. [105] Defendant was not entitled to an instruction regarding whether the jury could infer criminal intent from knowledge of the structure of the deals when defendant claimed that he did not even know about that structure. The proposed instruction was therefore inconsistent with defendant's own testimony and unsupported by the evidence.

In any event, the instructions as a whole fairly informed the jury of the elements of the charges. The parties jointly submitted instructions regarding the securities law offenses. For each charged crime, the joint instructions expressly instructed the jury that it was required to find that defendant acted with fraudulent intent [106] or made materially false statements. [107] Because the substantive instructions obliged the jury to find that defendant acted fraudulently, defendant was not entitled to an additional instruction that was unnecessarily redundant and did not fit his theory of the case. Reading the instructions as a whole, the jury was properly instructed.

## C. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ADMITTING HOMESTORE'S AMENDED QUARTERLY REPORTS INTO EVIDENCE

### 1. Standard of Review

Evidentiary rulings are reviewed for abuse of discretion. *See United States v. Rendon-Duarte*, 482 F.3d 1080, 1083 (9th Cir. 2007). A trial judge has "wide discretion" on evidentiary rulings; reversal is required only if "it is more probable than not that the error affected the verdict." *See United States v. Alvarez*, 358 F.3d 1194, 1205 (9th Cir. 2004).

### 2. Defendant Made Homestore's Income Restatements Relevant by Attempting to Prove Homestore's Overstated Financial Statements Were Immaterial to Investors

The government was entitled to present evidence of Homestore's restatement of revenue to prove the disputed factual issue of the materiality of Homestore's false statements. Defendant was charged with violations of the federal securities laws arising from the fraud scheme. The charged offenses required the government to prove that defendant caused Homestore to make materially false statements, which is a question of fact that "must be assessed from the perspective of the reasonable investor." *United States v. Berger*, 473 F.3d 1080, 1100 (9th Cir. 2007). This Court has held that it is "self-evident" that the materiality of information regarding a public company's "financial condition, solvency, and profitability is not subject to serious challenge." *Berger*, 473 F.3d at 1103. Had defendant accepted this proposition at trial, there may have been no reason to introduce Homestore revenue restatements, which defendant argues were overly prejudicial.

Defendant, however, attempted to prove -- through questioning of prosecution witnesses and through the testimony of a finance expert -- that Homestore's inflated revenue was immaterial to investors. For this reason, the government was entitled to present evidence showing that Homestore's overstated financial statements were material to investors. If the amount of fictional revenue was, say, only a small fraction of Homestore's income, the company might have decided that the revised information was not important to investors. However, the bogus financial information here represented a major portion of the company's advertising revenue, causing Homestore's quarterly financial performance to exceed analyst expectations.

Case 09-10138-MFW Doc 15043-3 Filed 01/13/15 Page 23 of 58

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. Stuart..., 2007 WL 2041144...

Relevant evidence of (i) Homestore's decision to restate results and (ii) the amended Form 10-Q quarterly filings with the SEC was admissible. Two percipient witnesses with knowledge about Homestore's finances (PWC auditor Withey and Homestore boardmember Alexander) testified from personal knowledge that Homestore restated its financial results in early 2002. Both were competent to explain what they did and knew when Homestore filed the corrected quarterly reports.

Further, the restated reports were reliable business records that were exceptions to the hearsay rule under Fed. R. Evid. 803(6). A business record is admissible if: (1) made by a person at a regularly conducted business activity with knowledge at or near the time of the information recorded; and (2) kept in the regular course of the business activity. *See United States v. Ray,* 930 F.3d 1368, 1370 (9th Cir. 1990). Such business records are "afforded a presumption of reliability and trustworthiness that the defendants failed to rebut." *Freitag v. Ayers,* 468 F.3d 528, 541 n.5 (9th Cir. 2006). "[F]inancial reports and audits are admissible under Rule 803(6)" even if prepared in advance of litigation so long as they are reliable and trustworthy. *Condus v. Howard Savings Bank,* 986 F. Supp. 914, 918 (D.N.J. 1997). The test of admissibility is "not the motivation of the employee preparing the record, but the function served by the records in the operation itself." *United States v. Baxter,* 492 F.2d 150, 165 (9th Cir. 1975). The key criterion is whether the report "had business significance" apart from the litigation, and is the type of report "upon which independent business decisions are routinely made." *Condus,* 986 F. Supp. at 919; *see also United States v. Frazier,* 53 F.3d 1105, 1110 (10th Cir. 1995) (Department of Labor report following fraud disclosure admissible because it "had business significance" apart from use in prosecution).

Evidence that does not qualify under the business records provision may be admissible under the "catch-all" exception to the hearsay rule, Fed. R. Evid. 807. Such evidence is admissible if it possesses "circumstantial guarantees of trustworthiness equivalent to the listed exceptions to the hearsay rule." *United States v. Sanchez-Lima,* 161 F.3d 545, 547 (9th Cir. 1998). The evidence must also: (1) relate to a material fact; (2) be more probative on the point than any other evidence that can be procured through reasonable efforts; and (3) serve the general purposes of the rules of evidence and the interests of justice.

*Id.*

The Homestore restated financial statements qualified for admission under either evidentiary rule. As a public company, Homestore was under a statutory obligation to file accurate quarterly reports. During trial, Homestore's CFO and outside auditor explained the significance of the company's quarterly filings and the process for submitting them. [108] While the filing of amended reports was an event out of the ordinary, the documents themselves were identical in form and content to other quarterly reports that Homestore regularly prepared. Defendant cannot credibly claim that there was anything untrustworthy about the restated financial statements. Under the circumstances, the restatements contained reliable and probative proof of the materiality of the overstated revenue from the fraudulent roundtrip deals.

There was also no undue prejudice to defendant from admission of the restatements under Fed. R. Evid. 403. Their sole use was to establish that Homestore restated revenue from the 2001 fraudulent deals. Moreover, the defense rejected the government's offer to seek a limiting instruction from the district court regarding the scope of the restatement evidence. (ER 162). [109]

In any event, evidence of the restatement played an exceedingly minor role in the trial in which even defendant acknowledged that there was fraud at Homestore. The government did not emphasize the corporation's decision to restate revenue from those deals. The subject of Homestore's restatement takes up only a few lines in the transcripts of a three-month trial, and the jury heard only a handful of questions on the topic. Similarly, the government made only minimal references to the restatements themselves, never showed the contents of the reports to any witness, and made only a single mention of them in opening statement and closing arguments. [110] As ancillary evidence used in a limited manner, admission of this evidence could not have materially affected the jury's verdict.

Case 09-10138-MFW    Doc 15043-3    Filed 01/13/15    Page 24 of 58

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. Stuart..., 2007 WL 2041144...

### D. ALL OF DEFENDANT'S CLAIMS ALLEGE ONLY HARMLESS ERROR, DUE TO THE OVERWHELMING AND UNCHALLENGED EVIDENCE AT TRIAL

The trial evidence against defendant from this three-month trial was overwhelming -- particularly so for a fraud case, where a defendant's guilty knowledge often has to be inferred from the circumstances. Here, three top executives who closely worked with defendant each testified that they directly discussed the fraud with defendant. As one example, witnesses testified that, at the Calamigos Ranch meeting, all the executives expressly agreed that they would lie to their outside auditors. In another situation, former CFO Shew cried to defendant about the fraud that defendant and the other executives were committing.

Confronted with this evidence, defendant -- a notorious micro-manager -- offered the incredible testimony that he did not even know the details of his company's fraudulent deals. The jury did not believe him, and it convicted on all counts. Indeed, the jury was instructed on June 21, 2006, and it returned its conviction the following morning.

Defendant's claims are reviewed on appeal for harmless error. On this record, each of the claims that defendant raises does not allege an error that likely could have made a difference in the outcome of the trial, even if there was any error at all. Review for harmless error requires "not only an evaluation of the remaining incriminating evidence in the record, but also the most perceptive reflections as to the probabilities of the effect of [the] error on a reasonable trier of fact." *United States v. Bishop,* 264 F.3d 919, 927 (9th Cir. 2002); Fed. R. Crim. P. 52(a). [111] Based on the overwhelming evidence of defendant's guilt, any of the errors defendant alleges was harmless.

### E. THE DISTRICT COURT'S LOSS AND RESTITUTION DETERMINATIONS WERE WELL WITHIN ITS DISCRETION

#### 1. Standard of Review

A district court's determination of loss is a finding of fact which is entitled to "appropriate deference" and is reviewed for clear error. *See United States v. Bright,* 353 F.3d 1114, 1118 (9th Cir. 2004); USSG § 2B1.1, com. n.3(C). [112]

A district court has "broad discretion in ordering restitution." *Berger,* 473 F.3d at 1104. This Court reviews the legality of a restitution order for abuse of discretion provided it is within the bounds of the statutory framework. *United States v. Phillips,* 367 F.3d 846, 854 (9th Cir. 2004). The factual findings supporting the restitution order are reviewed for clear error. *See United States v. Rodrigues,* 229 F.3d 842, 844 (9th Cir. 2000).

#### 2. Because Three Accepted Loss Calculation Methods All Supported the Largest Guideline Enhancement, the District Court's Calculation Was Proper

In its sentencing calculation, the district court found that the government established by clear and convincing evidence that defendant was subject to: (i) an 18-level enhancement for loss in excess of $80 million under the 2000 guidelines; [113] and (ii) a 26-level enhancement for loss in excess of $100 million under the 2001 guidelines. [114] The Probation Office concurred in those calculations. [115]

The government presented clear and convincing evidence supporting the loss amount using three alternative methods to estimate the loss in this corporate fraud case. All of the calculations led to enormous loss amounts that were in the highest tier under both guidelines editions.

There are "several possible approaches" to calculating loss under Section 2B1.1. *United States v. Zolp,* 479 F.3d 715, 719 (9th Cir. 2007). The primary method of calculating loss in a case involving public companies is the "average victim loss" method

Case 09-10138-MFW    Doc 15043-3    Filed 01/13/15    Page 25 of 58

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. Stuart..., 2007 WL 2041144...

of *United States v. Bakhit*, 218 F. Supp. 2d 1232 (C.D. Cal. 2002), and other cases. *See, e.g., United States v. Grabske*, 260 F. Supp. 2d 866 (N.D. Cal. 2002); *United States v. Snyder*, 291 F.3d 1291 (11th Cir. 2002). The average victim loss method need not be "a perfect theoretical model to calculate loss, only a realistic, economic approach." *Bakhit*, 218 F. Supp. 2d at 1242 (citing *United States v. West Coast Aluminum Heat Treating Co.*, 265 F.3d 986 (9th Cir. 2001)).

This Court recently approved of *Bakhit*, noting that the ruling "thoughtfully analyz[ed] several approaches" to calculating loss in a stock fraud case. *Zolp*, 479 F.3d at 719. Under the average victim loss method presented in *Bakhit*, the district court determines the average price of the company's stock during the period of the fraud and compares it to the average price of the company's stock during the period following disclosure of the fraud.

There are several advantages to using *Bakhit's* method to estimate loss for sentencing in a corporate fraud case. By using the average price of the stock over a specified time period, the calculation avoids the "risk that outside factors affecting share price will be given undue weight" if a single day's share price were used for the calculation. *Bakhit*, 218 F. Supp. 2d at 1239. Also, using an average price takes into account that shareholders in the company purchased stock at various prices during the fraud. *Id.* at 1238. Similarly, using an average of the company's stock price following disclosure of the fraud is a way to measure the stock's "residual value after the fraudulent scheme is revealed." *Zolp*, 479 F.3d at 719. There is also no need for the complexity and expense of "battling experts" at sentencing. *Grabske*, 260 F. Supp. 2d at 875.

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), does not compel a different loss calculation method in a criminal case. *Dura* held that, in a civil securities fraud action, a plaintiff must plead and prove that "defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss." *Dura Pharmaceuticals*, 544 U.S. at 346. Yet, for purposes of determining the applicable advisory guidelines tier in a criminal case, the court must simply determine the amount of loss that "resulted from [defendant's] acts or omissions." USSG § 1B1.3(a)(3); *United States v. Hicks*, 217 F.3d 1038, 1048 (9th Cir. 2000); *United States v. Molina*, 106 F.3d 1118, 1124 (2d Cir. 1997). The guidelines' "resulted from" causation standard is far less demanding than a civil-damages standard. Under the guidelines, a defendant is responsible for the "pecuniary harms that the defendant knew or, under the circumstances, reasonably should have known, [were] a potential result of the offense." USSG § 2B1.1, com. n.3(A)(iv).

The process of determining a "reasonable estimate" of loss under the advisory guidelines need not be as precise as in a civil action. A sentencing loss calculation "is more an art than a science. Courts can, and frequently do, deal with rough estimates." *United States v. Rostoff*, 53 F.3d 398, 407 (1st Cir. 1995). In a corporate fraud case, the loss to investors is difficult to calculate because a court "cannot accurately assess what their conduct would have been had they known the truth. However, some estimate *must* be made for Guideline's purposes, or perpetrators of fraud would get a windfall." *Ebbers*, 458 F.3d at 127 (emphasis added) (affirming multi-billion dollar loss calculation and 25-year sentence for former CEO).

Here, the district court did not err in applying the average victim loss method in determining defendant's fraud loss. As the CEO of a public company, defendant orchestrated a massive revenue inflation scheme for the purpose of avoiding a decline in his company's stock price. In accord with *Bakhit* and as later approved by *Zolp*, the district court found that the government established by clear and convincing evidence the average price of Homestore's stock in the periods during the fraud scheme and after its disclosure. [116] The government presented proof of: (i) the average price of Homestore stock during the period of the fraud (April 26-December 22, 2001), [117] (ii) the average price of Homestore stock in the period following disclosure of the fraud (February 22-May 15, 2002); [118] and (iii) the number of outstanding shares [119] of Homestore stock affected by the fraud. [120] This led to a estimated guideline loss of approximately $1.6 billion to investors. [121] The evidence supporting that calculation (stock trading and corporate data obtained from SEC filings and the NASD) was the same type of information used in the *Bakhit* and *Snyder* cases.

The calculation was confirmed by the alternative, market capitalization loss calculations that focused on the movement of Homestore stock price immediately before and after disclosure of the revenue fraud scheme. Those calculations captured the

Case 09-10138-MFW    Doc 15043-3    Filed 01/13/15    Page 26 of 58

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. Stuart..., 2007 WL 2041144...

amount of loss from the public disclosure of the accounting fraud on December 22, 2001, through either: (i) the resumption of public trading of Homestore stock (February 22, 2002); or (ii) the filing of corrected financial statements with the SEC (April 1, 2002). The approximate guideline losses to investors under the market capitalization method were $314 million and $146 million, respectively. [122]

All three loss calculations exceeded $100 million. For fraud loss purposes in a criminal case, each of those loss amounts was literally "off the charts" for the sentencing guidelines. The district court in no way abused its discretion or clearly erred in applying these standard tests to determine a reasonable estimate of loss.

### 3. The Court Properly Ordered Defendant to Pay Restitution to Victims through a Related Civil Case

The district court ordered defendant to pay restitution of approximately $8.6 million pursuant to 18 U.S.C. § 3663A, representing defendant's illegal trading profit from the sale of Homestore stock during the revenue inflation scheme. The court ordered payment of this restitution through a civil class action involving defrauded shareholders of Homestore, *In re Homestore.com, Inc., Securities Litigation,* CV 01-11115-SVW (C.D. Cal.). The parties to that civil class action have, under the oversight of the SEC, established a "Fair Funds" process to make payments to classmembers without deduction of attorneys fees.

Class counsel in the civil case, who appeared at defendant's sentencing, submitted to the district court a list of investors who purchased or acquired Homestore stock during the period from March through November 2001. The district court's judgment and commitment order identified each investor by name and by the percentage claim of the total net loss that each investor incurred. (CR 755). The order used that pro rata figure to identify each investor's restitution claim.

Such a restitution award is a mandatory component of a sentence for a defendant convicted of a Title 18 crime against property in which identifiable victims suffered pecuniary loss. *See* 18 U.S.C. § 3663A(c) (1) (A-B). For restitution, a victim is defined as "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2). The sentencing court "shall order restitution to each victim in the full amount of each victim's losses." 18 U.S.C. § 3664(f)(1)(A); *United States v. Gunning,* 339 F.3d 948, 949 (9th Cir. 2003).

A defendant may be ordered to pay mandatory restitution for conspiring to commit a crime -- a violation of 18 U.S.C. § 371 -- even if the substantive offenses are violations of the securities laws codified under Title 15 rather than Title 18. *See, e.g., United States v. Frith,* 461 F.3d 914, 919 (7th Cir. 2006); *United States v. Cummings,* 189 F. Supp. 2d 67, 73 (S.D.N.Y. 2002) (former CFO ordered to pay restitution).

Here, where the court determined that defendant illegally obtained approximately $8.6 million by selling stock during his Homestore criminal conspiracy, the court sensibly determined that defendant should repay his illegal profits to defrauded Homestore shareholders who purchased or acquired Homestore stock between March and November 2001, the period of the criminal conspiracy charged in count one of the Indictment.

The existence of a certified class and an established claims administrator in the civil action has facilitated restitution payments from other Homestore defendants in related criminal and SEC enforcement cases to date.[123] The district court properly decided to order defendant to pay restitution through this mechanism to maximize the amount of payments to victims. *Cf. United States v. Catoggio,* 326 F.3d 323, 327 (2d Cir. 2003) (praising "creative approach to a difficult" restitution issue in brokerage fraud case; remanding for resentencing because restitution ordered to unidentified victims). The district court's restitution award was not clearly erroneous.

**V**

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. Stuart..., 2007 WL 2041144...

## CONCLUSION

For the above - stated reasons, the government respectfully requests that this Court affirm the judgment and sentence in this case.

Footnotes

1    "CR" refers to the Clerk's Record and is followed by the applicable docket control number. "ER" refers to defendant's excerpts of record, "AOB" to defendant's opening brief, and "GER" to the government's excerpts of record; each are followed by applicable page references. "GX" refers to government trial exhibits admitted into evidence. "RT" refers to the Reporter's Transcript and is followed by applicable date and page references. "PSR" refers to the Presentence Report, which the government is filing concurrently with this brief, and is followed by the applicable paragraph number.

2    Tafeen pled guilty to insider trading charges before trial.

3    On the government's motion, the district court dismissed one charged count. (GER 301-02).

4    GER 77-78, 85-87.

5    GER 99, 113.

6    GER 95-98.

7    GER 242-43; 38 (GX 720).

8    *See, e.g.,* GER 39-40, 140-41, 146-47, 150-56, 214-16; GX 1039; 1044-45.

9    GER 126, 148a.

10    GER 130-31, 136.

11    GER 133 (parties agreed to "funnel the money back to Homestore" through advertising purchases); 148b (payments from AOL to Homestore "based on the amount of referrals [payments from vendors] that Homestore was sending to AOL" in deals).

12    *See, e.g.,* GX 541, 558, 559; GER 119-28, 192-96.

13    GER 205.

14    GER 82.

15    GER 226-27.

16    GER 133a-b.

17    GER 128-29.

18    GER 30-37 (GX 702, 703), 139, 142-43, 163-65, 229-30.

19    GER 206.

20    GER 209.

21    GER 139, 142-43.

22    GER 229-30.

23    GER 232-35.

24    GER 292-93.

25    GER 319-20.

26    GER 209.

27    GER 211.

28    GER 210.

29    *Id.*

30    GER 213.

31    GER 221-22.

32    GER 171.

33    GER 172.

34    GER 173.

35    GER 166-69.

36    GER 169.

37    GER 174-79.

38    GER 177-78.

Case 09-10138-MFW    Doc 15043-3    Filed 01/13/15    Page 28 of 58

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. Stuart..., 2007 WL 2041144...

| | |
|---|---|
| 39 | GER 181. |
| 40 | GER 108. |
| 41 | *Id.* |
| 42 | GER 110-13. |
| 43 | GER 112. |
| 44 | GER 138. |
| 45 | *See, e.g.,* GX 741, 874; GER 159. |
| 46 | GER 188. |
| 47 | *See, e.g.,* GER 23, 26, 28. |
| 48 | GER 160-62, 189. |
| 49 | GER 161. |
| 50 | GER 305-08. |
| 51 | GER 24. |
| 52 | GER 25, 144-45. |
| 53 | GER 92-93, 102. |
| 54 | GER 182-84. |
| 55 | *See* GX 46-48. The jury heard excerpts of the recorded calls from 2001 during trial. *See* GX 46A, 47A, and 48A. |
| 56 | GER 101-03, 213 ("we didn't want anybody to know about [the roundtrip deals.] They were bogus deals."). |
| 57 | GX 2-4. |
| 58 | GER 30-37. |
| 59 | GER 41-47. |
| 60 | GER 1-14. |
| 61 | GER 296. |
| 62 | GER 286, 290 (for the second quarter AOL roundtrip deal, defendant "had not seen the agreements and didn't understand the underlying contractual structure of this deal") |
| 63 | GER 281-82. |
| 64 | GER 283-84 ("It's possible that they mentioned PWC.... I don't recall"). |
| 65 | GER 295-96. |
| 66 | GER 287. |
| 67 | GER 291. |
| 68 | GER 75 (opening). |
| 69 | GER 76. |
| 70 | GER 309 (closing). |
| 71 | GER 319-20. |
| 72 | GER 325. |
| 73 | GER 49-50. |
| 74 | GER 50. |
| 75 | GER 70. |
| 76 | GER 68-69. |
| 77 | Judge Anderson recused himself from considering that September 2005 motion because he had a financial interest in a party to the motion. (CR 83). |
| 78 | In denying part of defendant's motion for bail pending appeal, Judge Walter reiterated that his earlier ruling was based on "defendant's *failure to present any evidence* or otherwise establish that Judge Anderson had a 'financial interest in the subject matter in controversy.'" (CR 707; ER 503) (emphasis added). |
| 79 | For this reason, the record contains no information about when Judge Anderson acquired his AOL stock, how much the stock cost, or whether Judge Anderson even made the decision to buy the stock (as opposed to a financial advisor). |
| 80 | *See, e.g.,* GER 104-07, 180-81. |
| 81 | GER 72. |
| 82 | When a public company amends or restates quarterly reports with the SEC, those reports are publicly available, including via the Internet, like other documents filed with the SEC. (GER 90-91). |

Case 09-10138-MFW Doc 15043-3 Filed 01/13/15 Page 29 of 58

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. Stuart..., 2007 WL 2041144...

83      GER 198-203.

84      GER 225, 236-37.

85      GER 238-43.

86      GER 79-80, 85-87.

87      GX 7-9.

88      GER 74 (opening), 304 (closing).

89      GER 270-71.

90      GER 261-62. ("[DEFENSE COUNSEL]: Dr. Wertheim is not going to provide an opinion on [w]hether or not the transactions were, in fact, accounted for properly, that's not the purpose of his testimony.").

91      GER 288.

92      GER 297-99. The district court permitted defendant to call a finance professor as an expert to testify about Homestore's stock price movement and the materiality of Homestore's false statements.

93      GER 245-46, 260-79, 300.

94      See GER 404-06.

95      GER 245.

96      Defendant cannot credibly claim that Judge Anderson's self-recusal from AOL's motion to quash in September 2005 triggered defendant's recusal motion. As Judge Walter determined, the motion-to-quash recusal was an exercise of "extreme caution" and was irrelevant to the issue of whether Judge Anderson had a financial interest in the criminal case. (CR 112). In any event, defendant waited an additional month- and-a-half after the AOL motion recusal before filing his disqualification motion.

97      A judge shall be disqualified where the judge knows that he "has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding." 28 U.S.C. § 455(b) (4).

98      AOL reported worldwide revenue during 2001 of over $37 billion. The $16 million in revenue that AOL recorded in the Homestore deals was patently insignificant to AOL. Also, AOL publicly restated its results years before the criminal trial of the Homestore CEO. (AOB 29). Therefore, there could be no consequence of negative information about AOL being aired during trial.

99      Defendant attempts to support his recusal claim by referring to trial evidence about AOL's role in the deals. However, his original meager pretrial submission to Judge Walter contained no evidence at all. Even if relevant, testimony not before Judge Walter should not be considered in determining whether the court abused its discretion in denying recusal before trial.

100     Examples of this testimony include: Tafeen's March 2001 whiteboard meeting; Shew's April 2001 lunch meeting; the joint May 2001 Calamigos Ranch meeting; and Shew's and Giesecke's personal July 2001 meetings with defendant.

101     See, e.g., GER 404, 420 (Jointly Proposed Jury Instructions 45, 60).

102     See United States v. Armey, 248 F.3d 984, 991 (10th Cir. 2001) ("The government's straightforward legal theory in this case -- that [defendant's] submission of false tax returns was a material misrepresentation -- undermined [defendant's] need for expert testimony on the accounting and tax issues.").

103     See, e.g., United States v. Ebbers, 458 F.3d 110, 125-26 (2d Cir. 2006) ("If the government proves that a defendant was responsible for financial reports that intentionally and materially misled investors, the statute is satisfied;" government not required to prevail in "a battle of expert witnesses" on accounting rules).

104     GER 299.

105     GER 281-82, 286, 296.

106     GER 407, 417.

107     GER 404-06.

108     GER 157-58, 224.

109     Defendant never objected to the restatements as a subsequent remedial measure under Fed. R. Evid. 407. As such, this claim is reviewed for plain error. Defendant fails to identify how the decision to admit this evidence was error plain enough to affect a substantial right or seriously affect the integrity of the outcome.

        Moreover, evidence of the restatements was not offered to prove an admission of misconduct by a party. See Malone v. Microdyne Corp., 26 F.3d 471, 480 (4th Cir. 1994) (limiting the use of correction to financial statements offered against corporation-defendant); In re CIT Group, Inc., Securities Litigation, 349 F. Supp. 2d 685 (S.D.N.Y. 2004) (same restriction). Rule 407 attempts to avoid deterring subsequent remedial measures, but here there is no such concern. The restatements were admitted against defendant, not Homestore, the party that corrected its fraudulent financial statements.

110     Contrary to defendant's opening brief. (AOB at 16), the government never asked either Giesecke or Shew about Homestore's restatements. Shew testified briefly about why he and his co-conspirators concealed information about the roundtrip deals to avoid

a future restatement by Homestore. (GER 186). The defense raised the topic of a restatement during Giesecke's cross-examination; the government did not raise it with him. (GER 115-17).

111    Harmless error analysis applies to a judge's failure to recuse under 28 U.S.C. § 455(b). *See Harris v. Champion*, 15 F.3d 1538, 1571 (10th Cir. 1994); *Patterson v. Mobil Oil Corp.*, 335 F.3d 476, 485 (5th Cir. 2003).

112    Defendant has not challenged any other aspect of his post-Booker sentence. As such, there is no need for this Court to review the reasonableness of his sentence. *See United States v. Ameline*, 409 F.3d 1073 (9th Cir. 2005).

113    USSG § 2F1.1 (b) (1) (S) . Fifteen of defendant's offenses occurred while the November 2000 edition of the guidelines was in force.

114    USSG § 2B1.l(b) (1) (N); RT 10/12/06: 80-84. Three defendant's crimes occurred while the November 2001 guidelines were in force.

115    PSR at ¶¶ 82-83, 97-98.

116    GER 314-15.

117    April 26, 2001, was the first trading day after Homestore announced its fraudulent financial results for the first quarter of 2001. December 22, 2001, was the day Homestore announced an internal investigation into the fraud and Nasdaq suspended trading in the stock.

118    The February date represents the resumption of public trading in Homestore stock following the Nasdaq's trading suspension in the previous December. On May 15, 2002, Homestore issued its first quarterly reports regarding the state of its business operations following the scandal.

119    Even if shares controlled by other participants in the roundtrip deals (Cendant and AOL) were excluded from the calulation, the total loss still would have exceeded the maximum guideline loss threshholds.

120    GER 452-58, 480-500.

121    GER 456; PSR ¶ 83.

122    GER 458-59, 482-500.

123    *See* 17 C.F.R. § 201.1100 *et sea.* (SEC rules on Fair Fund distribution plans).

---

**End of Document**                                             © 2014 Thomson Reuters. No claim to original U.S. Government Works.

**EXHIBIT 37**

Case 09-10138-MFW   Doc 15043-3   Filed 01/13/15   Page 32 of 58

UNITED STATES OF AMERICA, Plaintiff, v. Stuart H...., 2006 WL 5391721...

**EXHIBIT**

**159**

2006 WL 5391721 (C.D.Cal.) (Trial Motion, Memorandum and Affidavit)
United States District Court, C.D. California.

UNITED STATES OF AMERICA, Plaintiff,

v.

Stuart H. WOLFF, Defendant.

No. CR05-398-PA.
June 11, 2006.

**Government's Motion to Preclude or Limit Scope of Testimony of Defense Expert Witness Prof Paul Wertheim**

Debra Wong Yang, United States Attorney, Thomas P. O'Brien, Assistant United States Attorney, Chief, Criminal Division, Douglas M. Fuchs (Cal. Bar No. 196371), Assistant United States Attorney, Deputy Chief, Major Frauds Section, Michael R. Wilner (Cal. Bar No. 156592), Assistant United States Attorney, Major Frauds Section, 1100 United States Courthouse, 312 North Spring Street, Los Angeles, California 90012, Telephone: (213) 894-6530/0687, Facsimile: (213) 894-6269, E-mail: douglas.fuchs@usdoj.gov, michael.wilner@usdoj.gov, Attorneys for Plaintiff, United States of America.

*TABLE OF CONTENTS*

| | |
|---|---|
| I. INTRODUCTION ........................................................................................................... | 1 |
| II. FACTS .......................................................................................................................... | 2 |
| A. Prof. Wertheim's Revised Report ................................................................................ | 2 |
| 1. Prof. Wertheim Believes that the Ad Representative and Ad Referral Agreements Are Not Linked ........ | 2 |
| 2. Prof. Wertheim Believes that the Homestore Paid Fair Value for Services in the NameProtect Deal ....... | 3 |
| B. The AOL Report ........................................................................................................... | 4 |
| III. LEGAL STANDARD ................................................................................................... | 8 |
| IV. ARGUMENT - PROF. WERTHEIM'S OPINION IS BASED ON UNFOUNDED ASSUMPTIONS ABOUT THE TRANSACTIONS ..................................................................................... | 9 |
| A. Prof. Wertheim Cannot Testify about the Substance of Hearsay Materials ................. | 10 |
| B. Prof. Wertheim's Assumptions about the AOL and NameProtect Transactions Are Factually Wrong and Will Mislead the Jury ........................................................... | 11 |
| V. CONCLUSION ............................................................................................................. | 14 |

*TABLE OF AUTHORITIES*

| | |
|---|---|
| *Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331 (5th Cir, 1996) ................................. | 9 |
| *Paddack v. Dave Christiansen, Inc.*, 745 F.2d 1254 (9th Cir. 1984) ................................. | 8 |
| *Turner v. Burlington Northern Santa Fe Railroad Co.*, 338 F.3d 1058 (9th Cir. 2003) ....... | 8 |
| *Tyger Construction Co. v. Pensacola Construction Co.*, 7 29 F.3d 137 (4th Cir. 1994) ....... | 9 |
| *Viterbo v. Dow Chemical Co.*, 826 F.2d 420 (5th Cir. 1987) ........................................... | 9 |

**MEMORANDUM OF POINTS AND AUTHORITIES**

*I. INTRODUCTION*

The defense seeks to offer testimony from an accounting expert, Prof. Paul Wertheim, about the transactions in this case. Over a dozen witnesses have testified that Homestore engaged in a deliberate scheme to hide information from Homestore's auditors in order to book revenue from roundtrip deals. Nevertheless, Prof. Wertheim's opinion is that Homestore properly could have recorded revenue from the transactions. To support that opinion, Prof. Wertheim believes that the Ad Referral and Ad Representative transactions between AOL and Homestore were independent deals, and not linked to or contingent upon each other.

Case 09-10138-MFW Doc 15043-3 Filed 01/13/15 Page 33 of 58

UNITED STATES OF AMERICA, Plaintiff, v. Stuart H...., 2006 WL 5391721...

According to Prof. Wertheim's recently-modified report, his opinion is based on inadmissible hearsay evidence from an AOL investigation report. The defense essentially wants Wertheim to testify about an excerpt from a report submitted to the SEC about those transactions. The AOL report is hearsay, and is inadmissible under FRE 703.

Moreover, Prof. Wertheim has selectively latched onto a portion of the text of the AOL report, ignored direct statements that contradict that text, and disregarded the uncontroverted trial testimony of at least seven percipient witnesses (including a defense witness) and voluminous documentary evidence establishing the true nature of the AOL-Homestore transactions at issue here. Prof. Wertheim relies on unproven speculation about the deals - or admittedly falsified documents - to reach factually wrong conclusions about the transactions.

Simply put, Prof. Wertheim has a demonstrably incorrect understanding of the AOL transactions. He also has no factual basis to support his conclusions about the accounting for the deals. For this reason, Prof. Wertheim's testimony will be not be grounded in the evidence, will mislead the jury, and is excludable under FRE 402, 403, and 703.

## II. *FACTS*

### A. *Prof. Wertheim's Revised Report*

Prof. Wertheim submitted a revised expert report to this Court dated June 5, 2006 (the "Wertheim Report"). In his report, Prof. Wertheim concludes that Homestore may have properly recorded revenue from the sale of advertising on Homestore's website.

### 1. *Prof. Wertheim Believes that the Ad Representative and Ad Referral Agreements Are Not Linked*

Prof. Wertheim's testimony will be based on his conclusion that the payments that AOL made to Homestore (under the Ad Representative Agreement) and the payments received by AOL (from vendors purchasing AOL ads on instruction from Homestore) were not linked or contingent in any way.

Instead, Prof. Wertheim opines that "the funds received and recorded as revenue by Homestore appeared to have originated with the third party advertisers" obtained by AOL under the Advertising Representative Agreements. Wertheim Report at 12. Prof. Wertheim states in several places that this advertising "was sold by AOL" to advertisers such as Bertelsman, Nestle, Oxygen, and Philips Electronics. Wertheim Report at 18, 19, 22, 23. Prof. Wertheim concludes that "AOL appears to have collected a total of $40.6 million from the third party advertisers" whose ads ran at Homestore. Wertheim Report at 23.

To emphasize this point, Prof. Wertheim includes a diagram to show the cash flow structure of the Advertising Representative Agreement transaction "using Q2 2001 as an example." Wertheim Report at 22. In his example, Prof. Werthcim explains without qualification that AOL collected $21.7 million from advertisers that it subsequently paid on to Homestore.

Prof. Wertheim then concludes that the ads that ran at Homestore were part of a business transaction that was "significantly different from a roundtrip transaction" related to the advertisements that Homestore's vendors bought at AOL. Wertheim Report at 22. In particular, Prof. Wertheim concludes that AOL's payments to Homestore "originated from the third party advertisers..., and not from the funds paid by Homestore to its vendors" for the purchase of ads at AOL's website. Wertheim Report at 22. Prof. Wertheim finds no link between the multiple transactions involving Homestore. From this conclusion, Prof. Wertheim opines that Homestore may not have improperly recorded revenue from the AOL transaction. [1]

### 2. *Prof. Wertheim Believes that the Homestore Paid Fair Value for Services in the NameProtect Deal*

Case 09-10138-MFW    Doc 15043-3    Filed 01/13/15    Page 34 of 58

UNITED STATES OF AMERICA, Plaintiff, v. Stuart H...., 2006 WL 5391721...

Prof. Wertheim also briefly analyzes a separate transaction involving Homestore, NameProtect, and Business Filings. In that transaction, Homestore paid NameProtect to acquire domain name registration and other technology services. Prof. Wertheim concludes that there was evidentiary support for the $5 million value of the services that Homestore bought from NameProtect. Wertheim Report at 29.

In an earlier version of his expert report, Prof. Wertheim relied on a written "justification memo" for the deal prepared in 2001 by Jessica McLellan. *See* Government Ex. 559. However, following Ms. McLellan's trial testimony - in which she admitted that her justification memo was false - Prof. Wertheim modified his report. Instead of relying on Ms. McLellan's false justification memo, Prof. Wertheim now relies on an identical statement by FTI Simpson, a forensic accounting firm that worked on Homestore's restatement in 2002. Wertheim Report at 29 n.11. The FTI Simpson statement is not attached to his modified report. However, given the timing of FTI Simpson's services for Homestore in 2002, it is clear that FTI Simpson's statement was itself based on McLellan's false information about the deal.

### B. *The AOL Report*

The only citation or reference in support of Wertheim's conclusion that AOL was paid for the ads that ran at Homestore's website is in a footnote on page 22 of the Wertheim Report. Prof. Wertheim quotes a sentence fragment from a report that AOL filed with the Securities and Exchange Commission in September 2002 (the "AOL Report"). [2] The AOL Report was prepared and filed with the SEC under Section 21(a) of the Securities Exchange Act of 1934 to explain the company's understanding of transactions involving Homestore and others.

The AOL Report makes two points clear. First, the AOL Report expressly states that the transactions between vendors "referred" by Homestore to AOL and AOL's purchase of advertising at Homestore were clearly "linked" to each other. AOL Report at 8. AOL acknowledged that there was either an oral or written contingent agreement in place for all of the advertising transactions in the first, second, and third quarters of 2001. AOL Report at 31, 41, 42 ("the ad rep and ad referral agreements were related"). For each transaction (be it money in from Homestore's vendors or out to Homestore), the AOL Report contains a chart that contains a section identifying the specific linked, contingent transaction involved. *See, e.g.,* AOL Report at 46 (insertion order from FX Consultants contingent upon Ad Rep and Ad Referral Agreements for second quarter 2001).

The testimony of numerous trial witnesses confirms the statements in the AOL Report that the various legs of these transactions were linked. Homestore witnesses with personal involvement in the deal - Peter Tafeen, John DeSimone, Joe Shew, and John Giesecke - all testified that the amounts of money AOL was to pay Homestore was directly linked to payments made by Homestore's vendors to AOL. This is further corroborated by the clear testimony of two *AOL* witnesses - Steven Rindner and Samara Jaffe - who agreed that these payments were linked. The Court has also seen numerous spreadsheets, contemporaneous e-mails, and charts prepared by Homestore and AOL personnel, as well as the persuasive testimony of PWC partner Richard Withey, corroborating the linked nature of the deals.

Secondly, the AOL Report affirmatively states that most of the companies that received the ads that ran at Homestore *did not pay* AOL or Homestore for the advertising. The AOL Report definitively states that:
• "AOL ran $13 million of BAG [Bertelsman] advertising on the Homestore public site (the advertisements also ran concurrently on AOL, but there was *no incremental cost to BAG for the extra advertising).*" AOL Report at 6 (emphasis added).

• AOL ran an additional $2 million in BAG ads at Homestore in the first quarter of 2001. "These ads were also run concurrently on the AOL service, at *no incremental cost to BAG.*" AOL Report at 30 (emphasis added).

• "AOL placed an additional $3.9 million of third-party advertisements on Homestore's public sites in the third quarter of 2001 to complete AOL's obligations to Homestore under the 2001 Advertising Representative Agreement. These advertisements were provided by AOL as *'bonus ads' (i.e., without cost)* to its partners" Philips Electronics, Nestle, and Oxygent. AOL Report at 8 (emphasis added).

Case 09-10138-MFW    Doc 15043-3    Filed 01/13/15    Page 35 of 58

UNITED STATES OF AMERICA, Plaintiff, v. Stuart H...., 2006 WL 5391721...

The only statement in the AOL Report that suggests that AOL was paid by the third party advertisers is in a section explaining AOL's accounting for the transaction. This section broadly states that AOL "billed and collected on the advertising sold" to advertisers, and that AOL recognized the "gross advertising revenue" from those transactions. AOL Report at 9. That statement contains no details about the source or amount of any payments from any advertisers. It also is directly contradicted by other statements throughout the AOL Report in which AOL stated that it "made a conservative decision to record as revenue only the *net* amount of these transactions," which represented the difference of funds received from Homestore's vendors and amounts paid to Homestore. AOL Report at 8, 42, 45.

Additionally, the largest advertiser in the second quarter deal was again Bertelsman, which had received Homestore advertising for free in the previous quarter. According to June 2001 e-mail, Bertelsman personnel believed that the advertising that it ran on Homestore in the first quarter was "damaging" to Bertelsman's brands. *See* Government Ex. 3.47. It is illogical and sheer speculation to assume that Bertelsman somehow paid AOL for Homestore ads in the second quarter. Moreover, another advertiser involved in the second quarter deal was Time Warner Cable, an affiliated company to AOL under common corporate control. *See* Government Ex. 307. Again, there is no basis to assume that AOL was paid in an arm's-length transaction for Homestore's ads in the second quarter deal.

This information is corroborated by the trial testimony to date. AOL representative Alan Feldenkris testified and authenticated e-mails showing that Bertelsman received free advertising from these deals, while Rindner and Jaffe testified and authenticated e-mails establishing the bonus nature of the Nestle, Oxygen, and Philips ads. There has been no evidence of any payment received by AOL for the supposed "sale" of any Homestore ads to any third party advertiser.

### III. *LEGAL STANDARD*

Federal Rule of Evidence 703 governs the substance of testimony offered by an expert witness at trial. An expert may base an opinion on data of a type "reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Such data "need not be admissible in evidence in order for the opinion or inference to be admitted." However, as revised in 2000, FRE 703 affirmatively states that:

> facts or data that are otherwise inadmissible *shall not be disclosed to the jury* by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

(emphasis added). Put directly, an expert witness cannot tell a jury about inadmissible, hearsay evidence that underlies the expert's opinion.

The district court has wide discretion to enforce the presumption that such evidence is inadmissible, and by extension, preclude some or all of an expert's testimony. *See Turner v. Burlington Northern Santa Fe Railroad Co.,* 338 F.3d 1058, 1061-62 (9th Cir. 2003); *Paddack v. Dave Christiansen, Inc.,* 745 F.2d 1254, 1262 (9th Cir. 1984). In *Turner,* defendant sought to have an arson investigator provide expert testimony about the cause of a fire. His opinion was based on a laboratory report showing the presence of gasoline at the source of the fire. The lab report was inadmissible hearsay evidence. The district court excluded the expert's testimony at trial. The Ninth Circuit affirmed that decision because the expert "used the report not as data upon which an expert in his field would reasonably rely in forming an opinion, but rather intended to use it as substantive evidence of his ultimate conclusions" about how the fire started. *Turner,* 338 F.3d at 1062. The Ninth Circuit agreed that, under FRE 703, the "prejudice that would result from admission of this evidence [expert testimony] was substantial, whereas its probative value was minimal." *Id.*

The district court serves another, if obvious, purpose, as a gatekeeper to admitting expert testimony; an expert cannot provide "an opinion based on facts that are indisputably wrong." *Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331 (5th Cir, 1996) (quotation omitted). When the "assumptions made by an expert are not based in fact, the expert's testimony is likely to mislead a jury, and should be excluded by the district court." *Tyger Construction Co. v. Pensacola Construction Co.*, 29 f.3d 137, 144, (4th Cir. 1994). Such a determination rests both in FRE 703 (governing expert testimony) and FRE 403, because an unsupported expert opinion "offers no expert assistance to the jury." *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987).

## IV. *ARGUMENT - PROF. WERTHEIM'S OPINION IS BASED ON UNFOUNDED ASSUMPTIONS ABOUT THE TRANSACTIONS*

This Court should preclude or sharply limit Prof. Wertheim's expert testimony under either ground. The defense is clearly attempting to use Prof. Wertheim as a vehicle to offer inadmissible evidence about the AOL and NameProtect transactions.

### A. *Prof. Wertheim Cannot Testify about the Substance of Hearsay Materials*

The defense wants Wertheim to testify about what the defense's views of the business terms of those transactions - that AOL was paid by independent advertisers; that the payments to Homestore were not related to payments received from Homestore's vendors; and that Homestore paid fair value for the NameProtect products.

Yet Wertheim's testimony will be wholly based on information contained in the AOL Report and the FTI Simpson materials. There is no proof that either of those reports is the type of evidence reasonably relied on by accountants in Prof. Wertheim's field. Indeed, the AOL Report of Investigation is similar to Homestore's report of its internal investigation. The defense argued strenuously in pretrial proceedings that the results of Homestore's internal investigation should *not* be presented at trial. Here, though, the defense is seeking to make selective and inaccurate reference to an identical document prepared by a company that is not a party to the present case. As to the FTI Simpson materials, the defense has failed to provide the Court or the government with sufficient information to evaluate the document's reliability. These are not the proper bases for expert accounting testimony in a federal criminal trial.

As an evidentiary matter, both the AOL Report and the FTI Simpson records contain massive amounts of hearsay, and are inadmissible at trial. Prof. Wertheim cannot testify without disclosing the substance of those reports. FRE 703 precludes presentation of that material to the jury at trial. Without any valid underlying evidentiary support, Wertheim's expert opinion cannot be substantiated or probed, and is inadmissible.

### B. *Prof. Wertheim's Assumptions about the AOL and NameProtect Transactions Are Factually Wrong and Will Mislead the Jury*

Furthermore, Prof. Wertheim's testimony about the AOL transaction is just wrong. Wertheim's belief about the supposed independence of the legs of the AOL deal - that is, the lack of a link between the Ad Referral and Ad Representative Agreements - is contrary to the proven facts of the case. The Court has heard uncontroverted testimony from numerous witnesses (including an AOL employee called as a defense witness) conclusively establishing the linked, contingent nature of the deals. Because Wertheim's opinion testimony will be counter to the facts and evidence presented at trial, this Court should preclude this misleading testimony under FRE 403 and 703.

Prof. Wertheim has personally attended much of the recent proceedings in the trial. Also, the defense team has access to real-time transcripts of the testimony of all witnesses, and has long had government interview reports and SEC testimony from all significant witnesses. Tellingly, Prof. Wertheim makes *no* reference to any testimony or pretrial statements of any Homestore or AOL witness concerning the obvious link between the two aspects of the Homestore-AOL deals. The Court has heard conclusive

Case 09-10138-MFW   Doc 15043-3   Filed 01/13/15   Page 37 of 58

UNITED STATES OF AMERICA, Plaintiff, v. Stuart H....., 2006 WL 5391721...

evidence from witnesses that Homestore paid advertisers to buy ads at AOL, which led directly to payments from AOL to Homestore for additional ads.

Prof. Wertheim has refused to credit (or even refer to) this evidence in his report. He has ignored the percipient testimony of Tafeen, Shew, Giesecke, DeSimone, Rindner, and Jaffe about the actual link between the Ad Referral and Ad Representative deals. This testimony included evidence about the true purpose of the related agreements at the time of their negotiation. Additionally, these witnesses testified at length about the heated disputes at the end of the second quarter on the issue of the "creditworthiness" of several Homestore advertisers - which led directly to the withholding of payments back to Homestore. This testimonial evidence clearly links the moneys sent by Homestore to AOL with the moneys send from AOL to Homestore. None of this information is contained in Wertheim's report.

Wertheim also completely ignores the unimpeachable, real-15 me documentation of the links between the deals, including:
• AOL's internal records keeping track of the related deals (Government Exs. 366, 370);

• e-mails from AOL authorizing Homestore to run ads at Homestore's website (Government Exs. 353, 356); and

• virtual confessions from Tafeen and defendant Wolff that Homestore has paid cash to AOL and is awaiting repayment of that money (Government Exs. 358, 365).

Instead, Wertheim has allowed himself to be deceived - in the same way that PWC was deceived - by the literal text of bogus contracts drafted to hide the true nature of the deals from Homestore's auditors. Prof. Wertheim has an obviously flawed understanding of the true nature of the AOL deals. He has also chosen to ignore the direct statements in the AOL Report that all of the advertising transactions between AOL and Homestore *were* linked and contingent on each other. Wertheim therefore cannot provide helpful testimony to the jury about the substance of transactions that he does not himself factually understand.

Wertheim's claim that AOL was independently paid by advertisers is also wrong and unsubstantiated. To the contrary, the AOL Report establishes that AOL gave tens of millions of dollars of ads in order to facilitate the Homestore transaction. Moreover, the powerful proof is that payments to Homestore were contingent on AOL's receipt of payments from vendors, *not* any supposed payments from companies like Bertelsman. It would be grossly unfair for the defense to be able to present an "expert" testifying about facts that are simply untrue and irrelevant to the matter at hand.

Finally, it is absurd that Prof. Wertheim should be permitted to opine about the supposed value of the NameProtect products. The FTI Simpson report (which is not in evidence) discussing the NameProtect deal apparently was based on false and fraudulent documents prepared by McLellan, the key Homestore employee involved in the deal. Ms. McLellan dramatically recounted at trial how she falsified those records. Prof. Wertheim likely was convinced by her trial testimony because *he took out reference to McLellan's justification memo in his revised report.* Instead, he substituted a reference to the FTI Simpson materials, which merely mouth the same false information.

It is inconceivable that a document derived from fraudulent materials could properly be the basis of an expert's opinion. Ms. M-cLellan's clear and uncontradicted testimony is that Homestore grossly overpaid in the NameProtect deal for valueless products. No rational purpose is served by presenting the jury with expert evidence based on obviously fraudulent materials.

## V. *CONCLUSION*

The defense should not be permitted to confuse and distract the jury at this stage of a long trial with false statements about these deals. Prof. Wertheim's expert accounting opinion about a given transaction is irrelevant and without merit if he has been given inaccurate information about the transaction.

Prof. Wertheim's testimony should be limited to those facts that have been established with competent evidence or those reasonably relied on by accountants in his field. If he is not able to contain himself within those rules, his testimony should be precluded by this Court.

Dated: June 11, 2006

Respectfully submitted,

DEBRA WONG YANG

United States Attorney

THOMAS P. O'BRIEN

Assistant U.S. Attorney

Chief, Criminal Division

<<signature>>

DOUGLAS M. FUCHS

MICHAEL R. WILNER

Assistant United States Attorneys

Attorneys for Plaintiff

UNITED STATES OF AMERICA

Footnotes

1    At no point in his report does Prof. Wertheim address - or even acknowledge - the evidence showing that Homestore personnel lied
     to PWC staff and hid information about transactions from the company's auditors.
2    A copy of the AOL Report is attached to this motion at Exhibit 1. The AOL Report was not dated 2001 as indicated in the Wertheim
     Report.

End of Document                                                                    © 2011 Thomson Reuters. No claim to original U.S. Government Works.

**EXHIBIT 38**

**ᴣl ERNST & YOUNG**

Ernst & Young
Chartered Accountants
Ernst & Young Building, Harcourt Centre
Harcourt Street, Dublin 2, Ireland

Tel: +353 (0)1 475 0555
Fax: +353 (0)1 475 0599
www.ey.com/ie

1

**EXHIBIT**

**160**

TO ALL KNOWN CREDITORS

12 August 2009

Ref: MLP.7E/CH/ NA/CC/L03540/

Direct line: +353 (0)1 475 0555
Direct fax: +353 (0)1 475 0590

E-mail: niall.coveney@ie.ey.com

Dear Sirs

## Nortel Networks (Ireland) Limited (in administration) (the "Company")

### High Court of Justice of England and Wales, Chancery Division, Companies Court – case number 541 of 2009

I write, in accordance with Rule 2.47 of The Insolvency Rules 1986, to provide creditors with a report on the progress of the administration (the "Report"). This report covers the period from 14 January 2009 to 13 July 2009 and should be read in conjunction with the Administrators' Statement of Proposals dated 25 February 2009 (the "Proposals") and the Notice of Outcome of Meeting dated 26 March 2009. A copy of the Proposals can be obtained at www.nortel.com/corporate/restructuring_emea.html.

The Company entered administration on 14 January 2009 and A Bloom and D Hughes of Ernst & Young LLP, 1 More London Place, London SE1 2AF, were appointed to act as joint administrators (the "Joint Administrators") by an order (the "Order") of the High Court of Justice of England and Wales (the "Court"), following an application made by the Company's directors. Under the terms of the Order, any act required or authorised to be done by the Joint Administrators can be done by any of them. Further information on the Company and details of the Administrators' appointment are set out in Appendix 1 to the Report.

On the same day that the Company entered administration, the Court, following applications made by the directors of each company, made administration orders in respect of 18 other Nortel group companies based in the Europe, Middle East and Africa region ("EMEA"). Details of the 19 companies are at Appendix 1 of this Report. In accordance with Article 3 of the EC Regulation on Insolvency Proceedings 2000 (the "EC Regulation"), the court of the EC member state in which the centre of main interests ("COMI") of a company is situated has jurisdiction to open main insolvency proceedings in respect of that company. In the case of the 19 EMEA group companies (the "EMEA Companies"), the Court was satisfied that their COMI was in England and as such it had jurisdiction to open main insolvency proceedings, namely administration, in respect of each company.

The Nortel group of companies (the "Group") reports in US dollars ("US$"), and accordingly all amounts referred to in this report are in US$ unless otherwise stated.

V Bergin, D Daly, G Deegan, D FitzGerald, W Galloway, G Harman,
J Higgins FCCA, N Hodgson, D Hughes FCCA, L Healy, M Keane,
K Kelly, T Lillywhite, E MacManus, L McCaul, B Maguire, CS Maybury,
C Murphy, F O'Keeffe FCCA, A O'Leary FCCA, P O'Neill, DM Quigley,
D Quinn, PG Smith, A Tiernan, M Treacy.

The Irish firm Ernst & Young is a Member Practice of Ernst & Young
Global. It is authorised by the Institute of Chartered Accountants in
Ireland to carry on investment business in the Republic of Ireland.

### 1.    Executive Summary of Progress of the Administration

The Joint Administrators were appointed in January 2009 as part of a global restructuring process that was initiated concurrently across the Group. Since that time, they have stabilised the businesses, continued to trade, maintained client and supplier relationships and implemented restructuring plans in certain entities as necessary. The Joint Administrators' proposals for the administration were approved without modification by creditors of each of the EMEA Companies at meetings held in March 2009.

The Group's businesses are currently the subject of disposal processes, and the Joint Administrators are working closely with the North American entities to maintain the value of the businesses and pursue sales for the benefit of creditors. Certain disposals have already been announced, and other processes are ongoing. The disposals are being conducted on a Group-wide basis, following a stalking horse procedure in line with the US Bankruptcy Code.

The Joint Administrators have negotiated significant agreements with the rest of the Group in respect of transfer pricing and intercompany services for the duration of 2009, which will facilitate the trading of the EMEA entities and provide greater certainty of obligations for each company during this time.  The Joint Administrators believe that a sale of the Company's ongoing businesses represents the best way to create value for the Company's creditors.

Further information is contained in the sections below.

### 2.    Background to the Administration

The Group is a globally integrated business providing hi-tech telecommunications equipment and services to telecommunications carriers and large enterprise customers operating in a highly competitive industry.  The Group consists of over 240 entities across four regions - North America, Caribbean and Latin America ("CALA"), Asia Pacific and EMEA - and as at the date of administration had approximately 24,000 employees. The Group generated revenue of US$10.4 billion in 2008, although it incurred a net loss of US$5.8 billion in that period. This reported loss includes depreciation and other non-cash charges.

The Group had been incurring trading losses over a number of years, which were predominantly the result of its high cost base and financial obligations including bond debt of approximately $4.2 billion in North America and various defined benefit pension schemes, the most significant of which is the Nortel Networks UK Ltd defined benefit pension scheme. As global economic conditions worsened during 2008, the Group experienced significant trading pressure and faced a deterioration in its trading and liquidity, on a global as well as a regional basis. In addition, the worsening economic conditions and the deterioration in the stock market meant that the Group's defined benefit pension schemes' deficits widened significantly. After extensive consideration of all other alternatives, the Group concluded that a comprehensive financial and business restructuring could be most effectively achieved within the framework of creditor protection proceedings in a number of jurisdictions.

On 14 January 2009, the directors of the Canadian parent company (Nortel Networks Corporation) and certain other companies applied to the Canadian Court for creditor protection under the Companies' Creditors Arrangement Act ("CCAA"). Simultaneously, certain US companies filed for protection in the United States Courts under Chapter 11 of the US Bankruptcy Code.

The structure of the Group is such that the EMEA Companies and other Group Companies in North America and worldwide are heavily interdependent. Accordingly, upon the North American companies filing for creditor protection, the directors of the Company and the 18 other EMEA Companies made applications for administration orders.

Group companies in CALA and Asia Pacific, including LG-Nortel (a joint venture), as well as the Nortel Governmental Services business in North America were not included in the filing process. Nortel Networks (CALA) Inc and the Israeli entities have since filed for creditor protection. Some of the Group's non-EU EMEA entities have not filed for creditor protection and remain under the control of their directors.


3.      Approval of Joint Administrators' Proposals

A meeting of creditors was held on 13 March 2009. At the meeting the Proposals were approved by creditors without modification and a creditors' committee (the "**Committee**") was appointed. In March 2009, the proposals of the Joint Administrators in respect of the other EMEA Companies were also approved without modification.

The purpose of the administration is to achieve one of three objectives, namely:

    a)      rescuing the Company as a going concern; or

    b)      achieving a better result for the Company's creditors as a whole than would be likely
            if the Company were wound up (without first being in administration); or

    c)      realising the property in order to make a distribution to one or more secured or
            preferential creditors.

The Joint Administrators' strategy has been to continue to trade the Company's businesses with a view to achieving objectives (a) or (b) above. The EMEA and North American companies are extremely interdependent and, accordingly, the Joint Administrators continue to work with the North American estates and the other estates with a view to the sale of the Group's business units as going concerns. This strategy is continually under review and will be pursued by the Joint Administrators whilst they consider that it is in the interests of creditors of the Company to do so.


4.      Customers

The Company deals with its customers through direct and indirect sales channels in the EMEA region. For the largest of the EMEA customers, the relationships are global in nature and underlying contracts are occasionally with Group companies outside of the EMEA region, usually in North America.

The Joint Administrators have been working with the rest of the Group to assess and stabilise its customer base by working 'hand-in-hand' with Group-wide customer account teams. This has involved communicating with Group customers at the outset of the administration process to provide reassurance that service levels would be maintained in a "business as usual" fashion. Indeed, throughout the administration period, the Company (and the rest of the Group) has continued to provide uninterrupted support and service to its customers and to further build its customer base by close liaison between the customer and supplier teams. The Group's customer base has to a large extent remained loyal and supportive of the restructuring in a global context.

The Joint Administrators have undertaken a detailed review of the Company's customers' terms and conditions to enable new contracts and contract renewals to be entered into during the administration. Consequently, the Group has maintained its market presence and won new customer contracts as well as renewing important existing customer relationships.

The Joint Administrators continue to work with the Company's management to ensure the ongoing collection of receivables due by its customers in the normal course of business. At 13 July 2009 some 76% of pre-appointment receivable balances have been collected. Where customers have been slow in making payment the Joint Administrators have entered into discussions with the relevant party to resolve any outstanding issues and speed up payment.

## 5.    Suppliers

Following the making of the Order, all key suppliers were contacted in person. Follow up meetings were held to give suppliers certainty over the Company's (and the Group's) ongoing trading plans and requirements to service the customers. As a result, key suppliers continue to be supportive of the restructuring process, which facilitated the present trading strategy being followed by the Joint Administrators.

## 6.    Trading Overview

The Group principally operates in three business segments: Enterprise Solutions, Metro Ethernet Networks (MEN) and Carrier Networks, which comprises Global System for Mobile Communications (GSM), Carrier VoIP Application Solutions (CVAS) and Code Division Multiple Access (CDMA).

The Enterprise Solutions business, accounting for just under a quarter of global revenue, is loss-making. The losses are attributable to the tough economic climate, in which corporate customers have reduced or delayed investments in capital expenditure, combined with the Group's high employee headcount and significant infrastructure cost. Nevertheless, the Enterprise Solutions business has continued to secure valuable customer contracts.

The underlying MEN and Carrier Networks businesses continue to make a profitable contribution towards the Group's overheads.

NN Ireland holds most of the key EMEA Enterprise contracts, and consequently recognises most of the revenue. The Company's trading results for the first quarter comprised revenue of US$77.6 million, with a gross margin of US$23.0 million and a net profit of US$14.8 million. This is before transfer pricing adjustments (see section 8 of this Report).

The Joint Administrators continue to trade in order to maximise the value of potential asset sales. The Joint Administrators balance the decision of continuing to trade with its impact on the interests of creditors. The Joint Administrators consider that the potential realisation values from selling the Company's various businesses as going concerns will result in a better return to creditors than if the businesses ceased to trade and the assets of the Company were sold on a break-up basis. This position is closely monitored by the Joint Administrators who continue to maintain a close dialogue with the Committee on the business disposal and ongoing trading strategy.

7.      **Restructuring Measures**

Prior to the administration, the Group had taken measures globally to reduce its cost base including reviewing employee headcount. On 5 February 2009, as a result of the review, it was announced that the Group intended to reduce its global employee headcount by 3,200. This was in addition to completing a reduction of 1,300 previously announced by the Group (in turn, part of a restructuring plan in February 2008).

*Tax Matters*

The size, complexity and interdependent nature of the group has necessitated careful consideration of the Company's tax matters. The Joint Administrators have established the tax position of the Company to ensure continued compliance, to manage tax risk given the administration overlay, and to plan the business disposal transactions. The Joint Administrators work closely with the Company's tax team on all of the above issues.

A similar analysis of the Company's VAT position has been carried out.

8.      **Transfer Pricing and Trading Position**

The Group, prior to the filings, operated certain transfer pricing arrangements ("TPA"s) which aim to compensate certain companies for the activities carried out by them and costs incurred for the benefit of the Group as a whole. This process is intended, inter alia, to allow for risk-taking activities and to take account of aspects of the intellectual property development within the Group.

Certain entities - limited risk entities ("LRE"s) - receive a fixed 1% return on third party sales. Group sales support entities - or cost plus entities ("CPE"s) - receive a cost plus 10% margin for their sales support activities. Residual profit entities ("RPE"s) receive a fixed 1% return on third party sales, a 15% return on certain excess expenses that benefit the Group, plus a share of the residual group profit or loss. Prior to the filings, transfer pricing adjustments were calculated quarterly to determine the required position under the transfer pricing mechanism.

The Company is an RPE and based on historical and expected trading is a net payer of quarterly adjustments.

The Company has entered a Group-wide arrangement considered and approved by the English High Court, the Ontario Court in Canada and the Delaware Court in the U.S, to fix the TPA commitments in 2009, providing certainty to each entity of their obligations.

9.      **Business Disposal Strategy**

The Joint Administrators believe that a sale of the business will result in an enhanced realisation for creditors of the Company.

All major sales of the businesses are intended to be dealt with on a global basis. The disposals follow a "stalking horse" auction process under Section 363 of the US Bankruptcy Code. A bidder

is selected and contractually committed to purchase the business, unless a better offer is made in a subsequent auction process. After a bidder is selected there is a period during which certain conditions need to be met (e.g. competition clearances) before the sale completes. If the conditions are not met, then the sale will not complete. The process provides relative certainty whilst maintaining competitive tension in the process, thereby maximizing value. The auction process is conducted in accordance with US and Canadian court-approved auction parameters and is a common process in North America.

### Announced disposals

The following stalking horse transactions have been entered into at the date of this Report. The sales values reported are headline global values and are before possible transaction costs. The methodology and allocation of the global sales proceeds to respective seller estates is currently being considered. As such, no proceeds have yet been received by the Company. To the extent that the Company is party to a transaction it will be subject to a process in which the global proceeds of the transaction will be placed into escrow until the allocation of proceeds between individual Group companies is determined by mutual consent or binding arbitration. The mechanism of allocating disposal proceeds between Group companies is currently under negotiation.

### Radware Ltd

On 31 March 2009, certain Group companies concluded the divestiture for US$18 million of certain parts of the Group's Virtual Service Switches business to Radware Ltd, a telecoms company with headquarters in Israel. The proceeds of sale have been placed in escrow for distribution once an allocation formula has been agreed between the Group.

The Company is a party to this agreement.

### Ericsson AB

On 19 June 2009, the Group announced that it had entered into a stalking horse asset sale agreement with Nokia Siemens Networks B. V. for the sale of substantially all of its North American CDMA business and parts of its LTE Access assets. Subsequently, on 25 July 2009, and following an auction process, the Group announced that Ericsson AB will purchase these assets for US$1.13 billion subject to approval by the U.S. and Canadian bankruptcy courts.

Neither the Company nor the other EMEA Companies are parties to this sale. However, EMEA Companies continue to supply services and undertake certain actions to support the sale for the benefit of the EMEA estates and they will participate in any purchase price allocation process.

### Avaya Inc

On 21 July 2009, the Group announced that it had entered into a stalking horse asset and share sale agreement with Avaya Inc for its North American, CALA and Asia Pacific Enterprise Solutions business, and an asset sale agreement with Avaya Inc for the EMEA portion of the Enterprise Solutions business, for a total purchase price of US$475 million. The agreements include the sale of substantially all of the assets of the Group's Enterprise Solutions business globally.

Given the integrated nature of the Group's businesses, the Joint Administrators continue to work closely with the North American management team to explore interests from external parties to acquire the remaining businesses of the Group in which the Company has an interest.

Opportunities for the sale of other business units are currently being evaluated. The Group is undertaking disposal processes for a further three businesses.

## 11.    Receipts and Payments Account

Attached at Appendix 2 is the Joint Administrators' receipts and payments ("R & P") account for the period 14 January 2009 to 13 July 2009, which shows total receipts of US$184.7 million and payments of US$115.3 million. The trading results are described in section 6 above.

The Company held cash in various currencies equivalent to US$129.1 million at 13 July 2009. Neither the transfer pricing costs nor the proceeds from the sale of the businesses referred to in section 9 above are reflected in the R & P.

The R & P account is a statement of cash received and cash paid out and does not reflect estimated future realisations or costs.

For further information, see the detailed notes provided in Appendix 2.

## 12.    Joint Administrators' Remuneration and Disbursements

The Joint Administrators' remuneration was fixed on a time-cost basis by the committee. For the period to 31 May 2009 the Joint Administrators have incurred time costs of GB£1,624,023, of which GB£1,268,873 has been drawn on account in accordance with the court order dated 28 February 2009. GB£22,679 has been drawn in respect of disbursements.

It is the responsibility of the Committee to approve fees incurred. GB£963,646 out of time costs incurred to 31 May 2009 has been approved by a resolution of the Committee. An analysis of the time spent is at Appendix 3 and includes a statement of the Joint Administrators' policy in relation to charging time and disbursements.

### Payments to Other Professionals

The Joint Administrators have engaged the following professional advisors to assist them in the administration. These professionals work on a time cost basis and internal review processes are undertaken to review their invoices. They were chosen on the basis of their experience in dealing with similar assignments and have been paid the following as at 13 July 2009:

Herbert Smith LLP - US$121,697 (Legal Advisors)

William Fry Solicitors - US$818,958 (Legal Advisors)

## 13.    Other Matters

### The Committee

A Committee was formed on 13 March 2009 at the creditors' meeting. The Joint Administrators provide detailed information (including an analysis of their time costs for approval by the Committee) to the members of the Committee as the administration progresses and matters evolve.  The Joint Administrators will keep the Committee appraised of developments.

### Directors' Statement of Affairs

The Joint Administrators had indicated in the Proposals that they were considering seeking a court order in accordance with Rule 2.30 of the Insolvency Rules 1986 to limit disclosure of the Directors' Statement of Affairs ("SoA") on the basis that such information may have been sensitive and prejudicial to maximising creditor recovery. Having further considered this matter, the Joint Administrators decided that the SoA should be filed with the Registrar of Companies for England and Wales ("Companies House") in its entirety. A full copy of the SoA can be obtained either from Companies House or on written request to the Joint Administrators. A summary of the SoA is at Appendix 4. The SoA was completed in Euros being the currency used for local statutory accounts purposes. However, as stated above, the Group accounts between its entities in US$. Accordingly, in the summary provided at Appendix 4 the Joint Administrators have provided the value in US$ using the exchange rate as at the date of the signing of the SoA.

The SoA represents the directors' estimates of the realisable value of the Company's assets at the time of preparation and actual realisations may differ. Similarly, creditors' claims have yet to be quantified and may be higher than indicated. All values are shown before applicable costs associated with realisations. The figures have been compiled by the Company's management and have not been subject to independent review or statutory audit by the Joint Administrators, their staff or anybody else.

### The Prescribed Part

The Prescribed Part is a proportion of floating charge assets set aside for unsecured creditors pursuant to Section 176(A) of the Insolvency Act 1986. The Prescribed Part applies to floating charge assets created on or after 15 September 2003. Given that there are no floating charges granted by the Company, the prescribed part does not apply in this Administration.

### North American Claims Process

In North America, the Canadian applicants and the US debtors have obtained orders approving formal claims processes in each jurisdiction. In both jurisdictions there will be a call for claims, including supplier claims, which arose prior to 14 January 2009, as well as claims pursuant to contracts that were repudiated or rejected on or after that date. Where relevant, the Joint Administrators are submitting claims on behalf of the Company and the EMEA Companies. Creditors with claims in either of the jurisdictions outlined above should seek separate legal advice in relation to submitting such claims against Nortel entities.

### Distributions to Creditors

It is too early to be precise on the potential quantum or timing of any dividend payment, owing to the ongoing sales process in relation to the various businesses operated by the Company, and the fact that the formal process of claims admittance/adjudication has not yet commenced. The Joint Administrators hope that the business disposals will be largely contracted by the end of 2009 or early 2010. At that stage, the Joint Administrators expect to have a much better view not only of the value of the asset realisations, but also of the totality of claims, including contingent claims that might rank for dividend. However, it is already clear that the disposals will be complex and there will be periods of some months between contracting and completion. In addition, the administration is likely to need to remain in place for some time (possibly 12 months or more) to provide transitional services to the purchasers.

*Exit Routes from Administration*

Certain exit routes set out in the Proposals remain viable options and continue to be explored by the Joint Administrators. The Joint Administrators now believe that it is unlikely that they will achieve the first purpose of the administration being the rescue of the Company (i.e. as a legal entity). However, the Joint Administrators do believe that the businesses will be sold to the advantage of creditors.

Under the Insolvency Act 1986, the administration will automatically come to an end after one year, unless an extension is granted by the Court or creditors. Due to the complexity of the administration, the Joint Administrators are likely to apply to the Court for an extension of the administration, although that will depend on the circumstances at the time.

The Joint Administrators will report to you again at the conclusion of the administration or in six months' time, whichever is the sooner.

Yours faithfully
for Nortel Networks (Ireland) Limited (In Administration)

David M. Hughes
Joint Administrator

Enc:   Company information
       Joint Administrators' Receipts and Payments Account
       Summary of Joint Administrators' Time-Costs and Category 2 Disbursements
       Joint Administrators' Policy on Fees and Disbursements
       Summary of Statement of Affairs

*For the Companies listed below, The Institute of Chartered Accountants in England and Wales authorises AR Bloom, SJ Harris and CJW Hill to act as Insolvency Practitioners under section 390(2)(a) of the Insolvency Act 1986 and the Association of Chartered Certified Accountants authorises A M Hudson to act as an Insolvency Practitioner under section 390(2)(a) of the Insolvency Act 1986.*

*The affairs, business and property of the Companies are being managed by the Joint Administrators, AR Bloom, SJ Harris, AM Hudson and CJW Hill who act as agents of the Companies only and without personal liability.*

*The Companies are Nortel Networks UK Limited; Nortel Networks SA; Nortel GmbH; Nortel Networks France SAS; Nortel Networks NV; Nortel Networks SpA; Nortel Networks BV; Nortel Networks Polska SP Zoo; Nortel Networks Hispania SA; Nortel Networks (Austria) GmbH; Nortel Networks sro; Nortel Networks Engineering Service Kft; Nortel Networks Portugal SA; Nortel Networks Slovensko sro; Nortel Networks Oy; Nortel Networks Romania SRL; Nortel Networks AB; Nortel Networks International Finance & Holding BV*

*The affairs, business and property of Nortel Networks (Ireland) Limited are being managed by the Joint Administrators, A R Bloom and DM Hughes, who act as agents of Nortel Networks (Ireland) Limited only and without personal liability.*

*Nortel Networks SA was placed into French liquidation judiciaire on 28 May 2009. The business and assets of the company that are situated in France are now under the control of an administrateur judiciaire.*

## Appendix 1

## Nortel Networks (Ireland) Limited (in administration)

Company information

| | |
|---|---|
| Registered number: | 40287 |
| Company name: | Nortel Networks (Ireland) Limited |
| Registered office address: | Mervue Business Park, Mervue Galway, Republic of Ireland |
| Previous names: | Nortel (Ireland) Limited |

Details of the Administrators and of their appointment

| | |
|---|---|
| Administrators: | AR Bloom of Ernst & Young LLP, 1 More London Place, London, SE1 2AF and DM Hughes of Ernst & Young, Ernst & Young Building, Harcourt Centre, Harcourt Street, Dublin 2. |
| Date of appointment: | 14 January 2009 |
| By whom appointed: | The appointment was made by the High Court of Justice, Chancery Division, Companies Court on the application of the Company's directors |
| Court reference: | High Court of Justice, Chancery Division, Companies Court - case 541 of 2009 |
| Division of the Administrators' responsibility: | Any of the functions to be performed or powers exercisable by the administrators may be carried out/exercised by any one of them acting alone or by any or all of them acting jointly |

### Statement Concerning the EC Regulation

The EC Council Regulation on Insolvency Proceedings 2000 applies to this administration and the proceedings are main proceedings. This means that this administration is conducted according to English insolvency legislation and is not governed by the insolvency law of any other European Union Member State.

**Share Capital**

| Class | Authorised | | Issued & Fully paid | |
|---|---|---|---|---|
| | Number | £ | Number | £ |
| Ordinary | 900,000 | 900,000 | 158,000 | 158,000 |
| Preference | 100,000 | 100,000 | 100,000 | 100,000 |

**Shareholder**

Nortel Networks Limited - 100%

**Directors (current and for the last three years) and company secretary (current)**

| Name | Director or secretary | Date appointed | Date resigned | Current shareholding |
|---|---|---|---|---|
| Michael Conroy | Director | 29/05/2003 | 08/12/2006 | - |
| Alan Kenny | Director | 28/03/2003 | 31/07/2006 | - |
| Peter Kelly | Director | 28/03/2003 | 27/03/2007 | - |
| Orla Fitzpatrick | Director | 03/02/2006 | 14/01/2009 | - |
| Sharon Rolston | Director | 28/08/2006 | - | - |
| David Quane | Director | 28/08/2006 | - | - |
| Charles Wade | Director | 01/05/2007 | 12/12/2008 | - |
| Simon Freemantle | Director | 14/01/2009 | - | - |
| DHKN Corporate Services - corporate secretary | Secretary | n/a | - | - |

# Summary of Nortel Group Corporate Structure



The EMEA Companies in UK administration proceedings:

| Legal Entity | Country of Incorporation |
| --- | --- |
| Nortel Networks UK Limited | England |
| Nortel Networks S.A. | France |
| Nortel Networks France S.A.S. | France |
| Nortel Networks (Ireland) Limited | Ireland |
| Nortel GmbH | Germany |
| Nortel Networks Oy | Finland |
| Nortel Networks Romania SRL | Romania |
| Nortel Networks AB | Sweden |
| Nortel Networks N.V. | Belgium |
| Nortel Networks S.p.A. | Italy |
| Nortel Networks B.V. | Netherlands |
| Nortel Networks International Finance & Holding B.V. | Netherlands |
| Nortel Networks Polska Sp. z.o.o. | Poland |
| Nortel Networks (Austria) GmbH | Austria |
| Nortel Networks s.r.o. | Czech Republic |
| Nortel Networks Engineering Service Kft | Hungary |
| Nortel Networks Portugal S.A. | Portugal |
| Nortel Networks Hispania S.A. | Spain |
| Nortel Networks Slovensko s.r.o. | Slovakia |

## Appendix 2

## Nortel Networks (Ireland) Limited (in administration)

Joint Administrators' Abstract of Receipts and Payments from 14 January 2009 to 13 July 2009

| Statement of affairs<br>Total - EUR | | Total - EUR | Total - US $ |
|---|---|---|---|
| 43,920,247 | Opening balance - 14 January 2009 (close of business) | 46,344,299 | 59,686,822 |
| | **Receipts** | | |
| | *Trading:* | | |
| - | - Post appointment sales | 70,780,934 | 94,525,245 |
| - | - Other taxes | 3,510,441 | 4,692,829 |
| - | - Other receipts | 74,342 | 99,354 |
| - | - Property income | 42,358 | 56,597 |
| - | - Overpayment refunds | 21,035 | 28,106 |
| | *Other:* | | |
| 43,600,000 | - Pre appointment sales | 59,917,777 | 79,933,000 |
| - | - FX translation movement | - | 5,288,025 |
| - | - Bank interest | 85,306 | 113,912 |
| 5,693,000 | - Asset sales | - | - |
| 93,213,247 | | 134,432,191 | 184,737,066 |
| | **Payments** | | |
| | *Trading:* | | |
| | - Intercompany | (61,712,832) | (82,451,585) |
| | - Payroll, employee benefits, and payroll taxes | (12,243,472) | (16,359,360) |
| | - Accounts payable - inventory related | (4,493,621) | (6,000,639) |
| | - FX translation movement on FX transactions within the entity | (2,394,893) | (3,062,983) |
| | - Pension contributions | (1,516,112) | (2,025,783) |
| | - Property costs | (782,900) | (1,046,088) |
| | - Other payments | (501,449) | (669,688) |
| | - Utilities | (365,410) | (488,214) |
| | - Contractors | (153,847) | (205,566) |
| | - Trade payables | (3,595) | (4,804) |
| | *Other:* | | |
| | - Joint Administrators' fees and disbursements | (1,451,362) | (1,939,940) |
| | - Legal fees | (703,962) | (940,655) |
| | - Restructuring costs | (53,868) | (71,977) |
| | - Bank charges and interest | (7,243) | (9,676) |
| | - FX translation movement | (2,953,997) | - |
| | | (89,338,561) | (115,276,958) |
| | **Account reconciliations:** | | |
| | **Closing balance - 13 July 2009** | 91,437,929 | 129,146,931 |
| | **Current accounts** | 11,314,514 | 15,980,619 |
| | **Local deposit accounts** | - | |
| | **Administration deposit accounts** | 80,123,416 | 113,166,312 |
| | | 91,437,929 | 129,146,931 |

## Receipts and payments comments

### Notes to R & P

#### Note 1

Account balances have all been converted into a local currency, EUR, in addition to a common currency across all entities, US$.

Opening balances have been converted using January month end spot rates and closing balances converted using June month end spot rates which have been provided by the Company. This approach is line with the Company's internal reporting procedures.

Transactions that have taken place through the accounts over the course of the reporting period have been converted at average spot rates over this period, which have been sourced from the foreign exchange website Oanda.

#### Note 2

The numbers used to prepare the receipts and payments summary have been provided by the Company and are unaudited. Material items have been reviewed for accuracy and reasonableness.

#### Note 3

All items within the Receipts & Payments analysis are recorded gross of VAT where applicable.

VAT repaid or claimed back by the entity is recorded in a separate line within the Receipts & Payments analysis.

#### Note 4

All amounts referred to are in US$ unless stated otherwise.

### Cash on appointment

There was cash on appointment held in Euro, Sterling, Canadian Dollar, Danish Krone, Norwegian Krone and US$ current and deposit accounts which totalled US$59.7 million.

### RECEIPTS

Total receipts up to 13 July 2009 equate to US$184.7 million. This primarily relates to pre and post appointment sales receipts of US$174.5 million in addition to a foreign exchange translation positive movement of US$5.3 million and other tax receipts of US$4.7 million.

#### Sales receipts

Pre appointment sales receipts total US$79.9 million as at 13 July 2009. This is against a collectible balance on appointment of US$105.7 million and represents 76% of the ledger.

Post appointment sales receipts total US$94.5 million.

ADMC9F03

*Foreign exchange translation movements*

As mentioned previously, opening balances have been converted using January month end spot rates and closing balances converted using June month end spot rates which have been provided by the Company.

Transactions that have taken place through the accounts over the course of the reporting period have been converted at average spot rates over this period.

Consequently, a foreign exchange balance results based on the fluctuations in currency conversion rates over the period.

Whilst the majority of funds are held in US$ accounts there are significant funds held in EUR accounts which, when converted to US$ results in a foreign exchange translation positive movement of US$5.3 million. This is due to the EUR strengthening against the US$ more recently, whilst the average rate to which transactions through the accounts have been converted remains similar to the January month end spot rates when the EUR was weaker against the US$.

However, when all accounts are converted into EUR, a foreign exchange translation negative movement of EUR3.0 million results. This is due to the weak US$ against the EUR.

*Other taxes*

Other tax receipts total US$4.7 million and predominantly relate to sales tax refunds due to the Company.

## PAYMENTS

Total payments up to 13 July 2009 equate to US$115.3 million. This primarily relates to intercompany payments of US$82.5 million and payroll associated costs of US$16.4 million.

*Intercompany payments*

The Company is a net payer through the Citinetting process and net intercompany payments total US$82.5 million. Outside the Citinetting process the Company pays amounts relating to sales office costs to out of scope entities.

*Payroll*

Payroll costs total US$16.4 million and includes net pay in addition to employee expenses, employee benefits and payroll taxes.

## Appendix 3

# Nortel Networks (Ireland) Limited (in administration)

### Summary of Joint Administrators' Time-Costs and Category 2 Disbursements from 14 January 2009 to 31 May 2009 (GBE)

| Activity | Partner / Executive Director | Director | Assistant Director | Manager | Executive | Analyst | Total Sum of Hours | Average hourly ratio | Time costs for period |
|---|---|---|---|---|---|---|---|---|---|
| Administration application and planning | 18.0 | - | 6.0 | - | 12.0 | 18.0 | 54.0 | 397.78 | 21,480.00 |
| Briefings | 4.5 | 2.8 | 3.0 | 4.5 | - | - | 14.8 | 487.38 | 7,213.27 |
| Canada / USA | - | - | 1.7 | - | - | - | 1.7 | 398.41 | 679.00 |
| Case Management | 14.0 | 36.3 | 48.0 | 51.1 | 184.3 | 45.2 | 378.9 | 298.63 | 112,392.83 |
| CODA | - | - | 0.2 | - | - | - | 0.2 | 460.00 | 98.00 |
| Creditors | 28.5 | 36.0 | 8.5 | 59.8 | 35.5 | - | 168.3 | 381.19 | 63,382.27 |
| Creditors Committee | 9.3 | - | 1.0 | 10.2 | 1.0 | 2.9 | 24.4 | 427.17 | 10,423.02 |
| Customers | 3.0 | 7.0 | 60.8 | - | 7.3 | - | 78.1 | 405.31 | 31,654.50 |
| Debtors | - | 25.6 | 144.5 | 5.5 | 259.1 | - | 434.7 | 325.32 | 141,415.50 |
| Employees | 38.0 | 106.6 | 0.2 | 7.3 | 27.0 | - | 177.1 | 472.38 | 83,658.47 |
| Finance, accounting and administration | 2.0 | 27.1 | 31.3 | 16.3 | 274.6 | 0.5 | 352.0 | 276.32 | 97,265.24 |
| Intra Group & Netting | - | 23.2 | 6.0 | 3.0 | 59.5 | - | 91.7 | 297.11 | 27,245.39 |
| Legal | 10.7 | 50.8 | 0.2 | - | 1.0 | - | 62.7 | 517.51 | 32,447.85 |
| Liaising Directors/Communications | 8.0 | 55.0 | 4.0 | 31.0 | 23.5 | - | 133.5 | 408.77 | 54,570.31 |
| M&A | 69.3 | 123.6 | 196.3 | 153.7 | 134.5 | 3.6 | 681.0 | 467.10 | 318,108.80 |
| Other Assets | - | 3.0 | 2.5 | 10.0 | 4.0 | - | 19.5 | 327.17 | 6,379.79 |
| Pensions | 21.0 | 58.9 | - | 2.8 | - | - | 82.7 | 531.22 | 43,932.03 |
| Property | - | 24.0 | 2.4 | 11.3 | 10.5 | - | 48.2 | 385.37 | 18,574.69 |
| Report to Creditors | 11.0 | 82.9 | 37.2 | 61.0 | 31.5 | 7.1 | 250.7 | 386.23 | 96,578.37 |
| ROT | - | 2.8 | - | 1.0 | - | - | 3.8 | 446.99 | 1,698.55 |
| Stabilisation | 7.5 | 11.0 | 6.0 | 23.3 | 20.5 | - | 68.3 | 346.65 | 23,676.00 |
| Statutory | 4.0 | 40.3 | 4.1 | 5.0 | 38.7 | - | 92.1 | 377.80 | 34,795.12 |
| Strategy: Core | - | - | 2.0 | - | - | - | 2.0 | 484.08 | 968.16 |
| Suppliers | 18.5 | 50.3 | 15.5 | 45.0 | 11.5 | - | 148.8 | 417.77 | 62,164.36 |
| Tax / VAT advisory and compliance | 71.1 | 39.1 | 97.8 | 34.0 | 22.6 | 20.5 | 285.1 | 503.80 | 143,633.55 |
| Trading: Cash flow / Forecast | - | 11.3 | 35.1 | 44.5 | 351.2 | - | 442.1 | 237.48 | 104,990.90 |
| Trading: Finance Director | 1.0 | 13.8 | - | - | - | - | 14.8 | 509.44 | 7,539.71 |
| Transfer Pricing | - | 1.3 | 3.5 | - | 1.0 | - | 5.8 | 421.50 | 2,444.70 |
| Treasury / Banks | - | 67.3 | 8.0 | 30.0 | 139.5 | - | 244.8 | 304.76 | 74,604.64 |
| **Grand Total** | **335.4** | **918.0** | **725.8** | **630.3** | **1,652.5** | **97.8** | **4,359.8** | **372.50** | **1,624,023.01** |
| Average hourly rate | 686.77 | 519.76 | 466.15 | 314.37 | 224.71 | 157.51 | | | |
| Time costs for period | 223,543.08 | 477,145.37 | 338,352.96 | 198,138.27 | 371,347.47 | 15,397.85 | | | |

## Category 2 Disbursements

Of the disbursements of GBE22,679 recorded in the receipts and payments account at Appendix 2, GBE5,970 relates to Category 2 disbursements (as defined at Appendix 3).

## Nortel Networks (Ireland) Limited (in administration)

### *Office Holders' Charging Policy for Fees*

The statutory provisions relating to remuneration are set out in Rule 2.106 of the Rules. Further information is given in the Association of Business Recovery Professionals' publication *"A Creditors' Guide to Administrators' Fees"*, a copy of which may be accessed from the web site of the Insolvency Practitioners Association at http://www.insolvency-practitioners.org.uk (follow 'Regulation and Guidance' then 'Creditors' Guides to Fees'), or is available in hard copy upon written request to the Administrators.

The creditors have determined that the Administrators' remuneration should be fixed on the basis of time properly spent by the Administrators and their staff in attending to matters arising in the Administration.

The Administrators have engaged managers and other staff to work on the cases. The work required is delegated to the most appropriate level of staff taking account of the nature of the work and the individual's experience. Additional assistance is provided by accounting and treasury executives dealing with the Company's bank accounts and statutory compliance diaries. Work carried out by all staff is subject to the overall supervision of the Administrators.

All time spent by staff working directly on case-related matters is charged to a separate time code established for each case. Each member of staff has a specific hourly rate, which is subject to change over time. The average hourly rate for each category of staff over the period as shown above, are the current hourly rates used. The current hourly rates may be higher than the average rates, if hourly rates have increased over the period covered by this report.

### *Office Holders' Charging Policy for Disbursements*

Statement of Insolvency Practice No. 9 ("SIP 9") published by R3 (The Association of Business Recovery Professionals) divides disbursements into two categories.

Category 1 disbursements comprise payments made by the office holders' firm, which comprise specific expenditure relating to the administration of the insolvent's affairs and referable to payment to an independent third party. These disbursements can be paid from the insolvent's assets without approval from the Committee. In line with SIP 9, it is our policy to disclose such disbursements drawn but not to seek approval for their payment.

Category 2 disbursements comprise payments made by the office holders' firm which include elements of shared or overhead costs. Such disbursements are subject to approval from Creditors' Committee as if they were remuneration. It is our policy, in line with SIP 9, to seek approval for this category of disbursement before they are drawn.

## Appendix 4

## Nortel Networks (Ireland) Limited (in administration)
## Summary of the Directors' Statement of Affairs as at 14 January 2009

| A - Summary of Assets | Book Value (US$) | Estimated to Realise (US$) | Conversion rate (US$1=): | 0.7773329; |
|---|---|---|---|---|
| **Assets subject to a fixed charge:** | | | | |
| **Assets subject to a floating charge:** | | | | |
| **Uncharged Assets:** | | | | |
| Accounts receivable net | 78,109,077 | 56,089,220 | | |
| Inter company receivables | 7,712,683 | Unknown | | |
| Inventory net | 19,213 | 3,859 | | |
| Other current assets | 10,219,013 | 7,075,475 | | |
| Property, plant and equipment | 13,583,062 | 244,426 | | |
| Cash | 56,501,202 | 56,501,202 | | |
| Estimated total assets available for preferential creditors | 166,144,251 | 119,914,182 | | |

| A1 - Summary of liabilities | Book Value (US$) | Estimated to Realise (US$) |
|---|---|---|
| **Estimated total assets available for preferential creditors (carried from A)** | | 119,914,182 |
| **Liabilities** | | |
| Preferential creditors | | |
| Employment related | (2,645,479) | |
| Tax related | (1,518,241) | (4,163,720) |
| **Estimated deficiency/surplus as regards preferential creditors** | | 115,750,461 |
| Estimated prescribed part of net property where applicable (to carry forward) | | |
| **Estimated total assets available for floating charge holders** | | 115,750,461 |
| Debts secured by floating charges | | |
| **Estimated deficiency/surplus of assets after floating charges** | | 115,750,461 |
| Estimated prescribed part of net property where applicable (brought down) | | |
| **Total assets available to unsecured creditors** | | |
| Unsecured non-preferential claims (excluding any shortfall to floating charge holders) | | |
| Trade and other payables | (5,510,377) | |
| Inter company payables | (67,858,539) | |
| Accrued liabilities | (29,236,096) | |
| Pensions | (16,048,794) | |
| Financial debt | (638,173) | |
| Other long term liabilities | | (119,291,980) |
| **Estimated deficiency/surplus as regards non-preferential creditors (excluding any shortfall to floating charge holders)** | | (3,541,518) |
| Shortfall to floating charge holders (brought down) | | |
| **Estimated deficiency/surplus as regards creditors** | | (414,880) |
| Issued and called up capital | | |
| **Estimated deficiency/surplus as regards members** | | (3,956,399) |

ADM09F03