**<u>EXHIBIT 39</u>**

**EXHIBIT**

**161**

**≡Ⅱ ERNST & YOUNG**

Ernst & Young LLP
1 More London Place
London SE1 2AF

Tel: 020 7951 2000
Fax: 020 7951 1345
www.ey.com/uk

TO ALL KNOWN CREDITORS

13 August 2009

Ref: MLP.7E/CH/ NA/CC/LO3540/

Direct line; +44 (0)121 535  2394
Direct fax:  +44 (0)121 535 2447

E-mail: ccoley@uk.ey.com

Dear Sirs

## Nortel Networks S.A. (in administration and in *liquidation judiciaire*) (the "Company")

### High Court of Justice of England and Wales, Chancery Division, Companies Court – case number 539 of 2009

I write, in accordance with Rule 2.47 of The Insolvency Rules 1986, to provide creditors with a report on the progress of the administration (the "**Report**"). This report covers the period from 14 January 2009 to 13 July 2009 and should be read in conjunction with the Administrators' Statement of Proposals dated 27 February 2009 (the "**Proposals**") and the Notice of Outcome of Meeting dated 2 April 2009. A copy of the Proposals can be obtained at www.nortel.com/corporate/restructuring_emea.html.

The Company entered administration on 14 January 2009 when AR Bloom, AM Hudson, SJ Harris and CJW Hill of Ernst & Young LLP, 1 More London Place, London SE1 2AF, were appointed to act as joint administrators (the "**Joint Administrators**") by an order (the "**Order**") of the High Court of Justice of England and Wales (the "**Court**"), following an application made by the Company's directors. Under the terms of the Order, any act required or authorised to be done by the Joint Administrators can be done by any of them. Further information on the Company and details of the Administrators' appointment are set out in Appendix 1 to the Report.

On the same day that the Company entered administration, the Court, following applications made by the directors of each company, made administration orders in respect of 18 other Nortel group companies based in the Europe, Middle East and Africa region ("**EMEA**"). Details of the 19 companies are at Appendix 1 of this Report. In accordance with Article 3 of the EC Regulation on Insolvency Proceedings 2000 (the "**EC Regulation**"), the court of the EC member state in which the centre of main interests ("**COMI**") of a company is situated has jurisdiction to open main insolvency proceedings in respect of that company. In the case of the 19 EMEA group companies (the "**EMEA Companies**"), the Court was satisfied that their COMI was in England and as such it had jurisdiction to open main insolvency proceedings, namely administration, in respect of each company.

The Joint Administrators on 20 May 2009 filed an application at the French Tribunal de Commerce in Versailles (the "**Tribunal**") requesting that the Company be placed into liquidation judiciaire ("**Liquidation**"), a French insolvency procedure and secondary proceedings under the EC Regulation. The Tribunal placed the Company into Liquidation with authorisation to continue to trade (poursuite d'activités) on 28 May 2009. Section 2 gives further details.

The UK firm Ernst & Young LLP is a limited liability partnership
registered in England and Wales with registered number OC300001
and is a member firm of Ernst & Young Global Limited. A list of
members' names is available for inspection at 1 More London Place,
London SE1 2AF, the firm's principal place of business and
registered office

The Nortel group of companies (the "**Group**") reports in US dollars ("**US$**"), and accordingly all amounts referred to in this report are in US$ unless otherwise stated.

The official version of this Report is in English. Where a translation has been provided, it is for convenience only and the English language version always prevails.

## 1.    Executive Summary of Progress of the Administration

The Joint Administrators were appointed over the EMEA Companies in January 2009 as part of a global restructuring process that was initiated concurrently across the Group. Since that time, they have stabilised the businesses, continued to trade, maintained client and supplier relationships and implemented restructuring plans in certain entities as necessary. The Joint Administrators' proposals for the administration were approved without modification by creditors of each of the EMEA Companies at meetings held in March 2009.

The Group's businesses are currently the subject of disposal processes, and the Joint Administrators are working closely with the North American entities to maintain the value of the businesses and pursue sales for the benefit of creditors. Certain disposals have already been announced, and other processes are ongoing. The disposals are being conducted on a Group-wide basis, following a stalking horse procedure in line with the US Bankruptcy Code.

The Joint Administrators have negotiated significant agreements with the rest of the Group in respect of transfer pricing and intercompany services for the duration of 2009, which will facilitate the trading of the EMEA entities and provide greater certainty of obligations for each company during this time. The Joint Administrators believe that a sale of the Company's ongoing businesses represents the best way to create value for the Company's creditors.

Further information is contained in the sections below.

## 2.    Background to the Administration

The Group is a globally integrated business providing hi-tech telecommunications equipment and services to telecommunications carriers and large enterprise customers operating in a highly competitive industry.  The Group consists of over 240 entities across four regions - North America, Caribbean and Latin America ("**CALA**"), Asia Pacific and EMEA - and as at the date of administration had approximately 24,000 employees. The Group generated revenue of US$10.4 billion in 2008, although it incurred a net loss of US$5.8 billion in that period. This reported loss includes depreciation and other non-cash charges.

The Group had been incurring trading losses over a number of years, which were predominantly the result of its high cost base and financial obligations including bond debt of approximately $4.2 billion in North America and various defined benefit pension schemes, the most significant of which is the Nortel Networks UK Ltd defined benefit pension scheme. As global economic conditions worsened during 2008, the Group experienced significant trading pressure and faced a deterioration in its trading and liquidity, on a global as well as a regional basis. In addition, the

worsening economic conditions and the deterioration in the stock market meant that the Group's defined benefit pension schemes' deficits widened significantly. After extensive consideration of all other alternatives, the Group concluded that a comprehensive financial and business restructuring could be most effectively achieved within the framework of creditor protection proceedings in a number of jurisdictions.

On 14 January 2009, the directors of the Canadian parent company (Nortel Networks Corporation) and certain other companies applied to the Canadian Court for creditor protection under the Companies' Creditors Arrangement Act ("**CCAA**"). Simultaneously, certain US companies filed for protection in the United States Courts under Chapter 11 of the US Bankruptcy Code.

The structure of the Group is such that the EMEA Companies and other Group companies in North America and worldwide are heavily interdependent. Accordingly, upon the North American companies filing for creditor protection, the directors of the Company and the 18 other EMEA Companies made applications for administration orders.

Group companies in CALA and Asia Pacific, including LG-Nortel (a joint venture), as well as the Nortel Governmental Services business in North America were not included in the filing process. Nortel Networks (CALA) Inc and the Israeli entities have since filed for creditor protection. Some of the Group's non-EU EMEA entities have not filed for creditor protection and remain under the control of their directors.

***French Proceedings***

On 17 February 2009, at the request of the Joint Administrators, the *Tribunal* appointed *Maître* Frank Michel as *Mandataire ad-Hoc* to oversee the administration of the Company and to report to the *Tribunal* as necessary.

The Joint Administrators continued to trade the Company during administration with a view to a sale of its businesses as part of the global sales process (see section 9). Owing to high overheads (notably in respect of research and development), the Company was loss-making during this time. The Joint Administrators considered that notwithstanding these losses, benefits from business disposals would outweigh the losses being incurred, and therefore continuation to trade would be in the best interests of the creditors and other stakeholders of the Company.

The Company had circa 700 employees at the date of the administration. It was apparent that this number of employees could not be sustained by the Company and significant redundancies would be crucial to permit the survival of the business. After due consideration, the Joint Administrators believed that the best way to implement a restructuring plan would be through a French process of Liquidation. As such, and following an extensive consultation process with the Company's employees (in accordance with local law), the Joint Administrators made a request to the *Tribunal*, which placed the Company into Liquidation with authorisation to continue to trade on 28 May 2009. This is a secondary proceeding under the EC Regulation. *Maître* Cosme Rogeau was appointed as *liquidateur judiciaire* (the "Liquidator"). *Maître* Michel was appointed as *administrateur judiciaire* (the "**French Administrator**") (together, the "**French Officeholders**") with responsibility for the ongoing trading of the business. Upon the opening of the Liquidation, the French Officeholders became responsible for the business and assets of the Company situated in France, including the ongoing trading of the Company. The Joint Administrators retain control of assets located outside of France.

The French Officeholders have continued to trade the Company in Liquidation. The Joint Administrators have liaised closely with the French Officeholders during this time. In accordance with the terms of a protocol between the Joint Administrators and the French Officeholders, the Joint Administrators, with the cooperation of the French Officeholders, continue to pursue the sale of the Company's businesses as part of the global business disposals process. Such disposals will be carried out in accordance with French law and are likely to require the approval of the *Tribunal*.

## 3.    Approval of the Joint Administrators' Proposals

A meeting of creditors was held on 23 March 2009. At the meeting the Proposals were approved by creditors without modification and a creditors' committee (the **"Committee"**) was appointed. In March 2009, the proposals of the Joint Administrators in respect of the other EMEA Companies were also approved without modification.

The purpose of the administration is to achieve one of three objectives, namely:

a)    rescuing the Company as a going concern; or

b)    achieving a better result for the Company's creditors as a whole than would be likely if the Company were wound up (without first being in administration); or

c)    realising the property in order to make a distribution to one or more secured or preferential creditors.

The Joint Administrators' strategy was to continue to trade the Company's businesses with a view to achieving objectives (a) or (b) above. The EMEA and North American companies are extremely interdependent and, accordingly, the Joint Administrators continue to work with the North American estates and the other estates with a view to the sale of the Group's business units as going concerns.

## 4.    Customers

The Company deals with its customers through direct and indirect sales channels in the EMEA region. For the largest of the EMEA customers, the relationships are global in nature and underlying contracts are occasionally with Group companies outside of the EMEA region, usually in North America.

The Joint Administrators worked with the rest of the Group to assess and stabilise its customer base by working 'hand-in-hand' with Group-wide customer account teams. This involved communicating with Group customers at the outset of the administration process to provide reassurance that service levels would be maintained in a "business as usual" fashion. Indeed, throughout the administration period, the Company (and the rest of the Group) continued to provide uninterrupted support and service to its customers and to further build its customer base by close liaison between the customer and supplier teams. The Group's customer base has to a large extent remained loyal and supportive of the restructuring in a global context.

The Joint Administrators undertook a detailed review of the Company's customers' terms and conditions to enable new contracts and contract renewals to be entered into during the administration. Consequently, the Group has maintained its market presence and won new customer contracts as well as renewing important existing customer relationships.

The Joint Administrators continued to work with the Company's management to ensure the ongoing collection of receivables due by its customers in the normal course of business. At the date of the Liquidation, some 90% of pre-appointment receivable balances had been collected. Where customers were slow in making payment the Joint Administrators entered into discussions with the relevant party to resolve any outstanding issues and speed up payment.

## 5.    Suppliers

Following the making of the Order, all key suppliers were contacted in person. Follow up meetings were held to give suppliers certainty over the Company's (and the Group's) ongoing trading plans and requirements to service the customers. As a result, key suppliers continue to be supportive of the restructuring process, which facilitates the present trading strategy.

## 6.    Trading Overview

The Group principally operates in three business segments: Enterprise Solutions, Metro Ethernet Networks (MEN) and Carrier Networks, which comprises Global System for Mobile Communications (GSM), Carrier VoIP Application Solutions (CVAS) and Code Division Multiple Access (CDMA).

The Enterprise Solutions business, accounting for just under a quarter of global revenue, is loss-making. The losses are attributable to the tough economic climate, in which corporate customers have reduced or delayed investments in capital expenditure, combined with the Group's high employee headcount and significant infrastructure cost. Nevertheless, the Enterprise Solutions business has continued to secure valuable customer contracts.

The underlying MEN and Carrier Networks businesses continue to make a profitable contribution towards the Group's overheads.

The Company's trading results for the first quarter comprised revenue of US$49.6 million, with a gross margin of US$10.5 million and a net loss of US$18.4 million.

This is before transfer pricing adjustments (see section 8 of this Report). The net loss is driven by extremely high payroll costs of US$16.2 million and FX losses of US$3 million.

The French Officeholders, with the approval of the *Tribunal*, are continuing to trade the Company with a view to a sale of the Company's businesses. The Joint Administrators continue to believe that the potential realisation of the Company's various businesses as going concerns

will result in a better return than if the businesses ceased to trade and the assets of the Company were sold on a break-up basis.

## 7.    Restructuring Measures

Prior to the administration, the Group had taken measures globally to reduce its cost base including reviewing employee headcount. On 5 February 2009, as a result of the review, it was announced that the Group intended to reduce its global employee headcount by 3,200. This was in addition to completing a reduction of 1,300 previously announced by the Group (in turn, part of a restructuring plan in February 2008).

Following a consultation process with the Company's employee works council, the French Officeholders have implemented a restructuring social plan affecting 446 of the Company's employees, and as a result 408 employees were made redundant in the two weeks prior to the date of this report.

### Tax Matters

The size, complexity and interdependent nature of the Group has necessitated careful consideration of the Company's tax matters. The Joint Administrators established the tax position of the Company to ensure continued compliance, to manage tax risk given the administration overlay, and to plan the business disposal transactions. The Joint Administrators have made the French Officeholders aware of the tax issues encountered during the administration.

A similar analysis of the Company's VAT position was carried out.

## 8.    Transfer Pricing and Trading Position

The Group, prior to the filings, has operated certain transfer pricing arrangements which aim to compensate certain companies for the activities carried out by them and costs incurred for the benefit of the Group as a whole. This process is intended, inter alia, to allow for risk-taking activities and to take account of aspects of the intellectual property development within the Group.

Certain entities - limited risk entities ("**LRE**"s) - receive a fixed 1% return on third party sales. Group sales support entities - or cost plus entities ("**CPE**"s) - receive a cost plus 10% margin for their sales support activities. Residual profit entities ("**RPE**"s) receive a fixed 1% return on third party sales, a 15% return on certain excess expenses that benefit the Group, plus a share of the residual group profit or loss. Prior to the filings, transfer pricing adjustments (**"TPA"**) were calculated quarterly to determine the required position under the transfer pricing mechanism.

The Company is an RPE and based on historical and expected trading is a net payer of quarterly adjustments.

The other EMEA countries have entered a Group-wide arrangement considered and approved by the English High Court, the Ontario Court in Canada and the Delaware Court in the U.S, to fix the TPA commitments in 2009, providing certainty to each entity of their obligations. The French Officeholders, having sought the approval of the *Tribunal*, have agreed that the Company should accede to that arrangement and have authorised the Joint Administrators to sign an accession agreement to that effect.

## 9.    Business Disposal Strategy

The Joint Administrators believe that a sale of the business will result in an enhanced realisation for creditors of the Company.

All major sales of the businesses are intended to be dealt with on a global basis. The disposals follow a "stalking horse" auction process under Section 363 of the US Bankruptcy Code. A bidder is selected and contractually committed to purchase the business, unless a better offer is made in a subsequent auction process. After a bidder is selected, there is a period during which certain conditions need to be met (e.g. competition clearances) before the sale completes. If the conditions are not met, then the sale will not complete. The process provides relative certainty whilst maintaining competitive tension in the process, thereby maximizing value. The auction process is conducted in accordance with US and Canadian court-approved auction parameters and is a common process in North America.

The Joint Administrators liaise with the French Officeholders in respect of the business disposals. Sales involving assets of the Company will be conducted in accordance with local law and are likely to require the approval of the *Tribunal* prior to their completion.

### Announced disposals

The following stalking horse transactions have been entered into at the date of this Report. The sales values reported are headline global values and are before possible transaction costs. The methodology and allocation of the global sales proceeds to respective seller estates is currently being considered. As such, no proceeds have yet been received by the Company. To the extent that the Company is party to a transaction it will be subject to a process in which the global proceeds of the transaction will be placed into escrow until the allocation of proceeds between individual Group companies is determined by mutual consent or binding arbitration. The mechanism of allocating disposal proceeds between Group companies is currently under negotiation.

### Radware Ltd

On 31 March 2009, certain Group companies concluded the divestiture for US$18 million of certain parts of the Group's Virtual Service Switches business to Radware Ltd, a telecoms company with headquarters in Israel. The proceeds of sale have been placed in escrow for distribution once an allocation formula has been agreed between the Group.

The Company is a party to this agreement.

### Ericsson AB

On 19 June 2009, the Group announced that it had entered into a stalking horse asset sale agreement with Nokia Siemens Networks B. V. for the sale of substantially all of its North American CDMA business and parts of its LTE Access assets. Subsequently, on 25 July 2009, and following an auction process, the Group announced that Ericsson AB will purchase these assets for US$1.13 billion subject to approval by the U.S. and Canadian bankruptcy courts.

Neither the Company nor the other EMEA Companies are parties to this sale. However, EMEA Companies continue to supply services and undertake certain actions to support the sale for the benefit of the EMEA estates and they will participate in any purchase price allocation process.

### Avaya Inc

On 21 July 2009, the Group announced that it had entered into a stalking horse asset and share sale agreement with Avaya Inc for its North American, CALA and Asia Pacific Enterprise Solutions business, and an asset sale agreement with Avaya Inc for the EMEA portion of the Enterprise Solutions business, for a total purchase price of US$475 million. The agreements include the sale of substantially all of the assets of the Group's Enterprise Solutions business globally.

Given the integrated nature of the Group's businesses, the Joint Administrators (in conjunction with the French Officeholders) continue to work closely with the North American management team to explore interests from external parties to acquire the remaining businesses of the Group in which the Company has an interest. Opportunities for the sale of other business units are currently being evaluated. The Group is undertaking disposal processes for a further three businesses.

### 10.    Receipts and Payments Account

Attached at Appendix 2 is the Joint Administrators' receipts and payments ("R & P") account for the period 14 January 2009 to 13 July 2009, which shows total receipts of US$96.2 million and payments of US$80.9 million. The trading results are described in section 6 above. The R & P is separated between the pre- and post-Liquidation periods. Upon the opening of the Liquidation, control of the Company's bank accounts passed to the French Officeholders. The Joint Administrators maintained accounts at the Royal Bank of Scotland in the UK on behalf of the Company. The balance of these accounts at 13 July 2009 was US$18.4m. Since 13 July 2009, the balance of these accounts has been transferred to the accounts controlled by the French Officeholders. The R & P shows only the cash and transactions in the control of the Joint Administrators.

Neither the transfer pricing contribution nor the proceeds from the sale of the businesses referred to in section 9 above are reflected in the R & P.

The R & P account is a statement of cash received and cash paid out and does not reflect estimated future realisations or costs.

For further information, see the detailed notes provided at Appendix 2.

## 11.    Joint Administrators' Remuneration and Disbursements

The Joint Administrators' remuneration was fixed on a time-cost basis by the creditors. For the period to 31 May 2009 the Joint Administrators have incurred time costs of GB£1,922,499, of which GB£1,499,752 has been drawn on account in accordance with the court order dated 28 February 2009. It is the responsibility of the Committee to approve fees incurred. An analysis of the time spent is at Appendix 3 and includes a statement of the Joint Administrators' policy in relation to charging time and disbursements.

### Payments to Other Professionals

The Joint Administrators have engaged the following professional advisors to assist them in the administration. They were chosen on the basis of their experience in dealing with similar assignments and have been paid the following as at 13 July 2009:

Herbert Smith LLP – US$896,864 (Legal Advisors)

## 12.    Other Matters

### The Committee

A Committee was formed on 23 March 2009 at the creditors' meeting. The Joint Administrators provide detailed information (including an analysis of their time costs for approval by the Committee) to the members of the Committee as the administration progresses and matters evolve. The Committee is constituted by virtue of the rules relating to the administration and is not affected by the opening of secondary proceedings. The Joint Administrators continue to keep the Committee appraised of developments.

### Directors' Statement of Affairs

The Joint Administrators had indicated in the Proposals that they were considering seeking a court order in accordance with Rule 2.30 of the Insolvency Rules 1986 to limit disclosure of the Directors' Statement of Affairs ("SoA") on the basis that such information may have been sensitive and prejudicial to maximising creditor recovery. Having further considered this matter, the Joint Administrators decided that the SoA should be filed with the Registrar of Companies for England and Wales ("Companies House") in its entirety. A full copy of the SoA can be obtained either from Companies House or on written request to the Joint Administrators. A summary of the SoA is at Appendix 4. The SoA was completed in Euros being the currency used for local statutory accounts purposes. However, as stated above, the Group accounts between its entities in US$. Accordingly, in the summary provided at Appendix 4 the Joint Administrators have provided the value in US$ using the exchange rate as at the date of the signing of the SoA.

The SoA represents the directors' estimates of the realisable value of the Company's assets at the time of preparation and actual realisations may differ. Similarly, creditors' claims have yet to be quantified and may be higher than indicated. All values are shown before applicable costs associated with realisations. The figures have been compiled by the Company's management and have not been subject to independent review or any audit by the Joint Administrators, their staff or anybody else.

### The Prescribed Part

The Prescribed Part is a proportion of floating charge assets set aside for unsecured creditors pursuant to Section 176(A) of the Insolvency Act 1986. The Prescribed Part applies to floating charge assets created on or after 15 September 2003. Given that there are no floating charges granted by the Company, the prescribed part does not apply in this Administration.

### Claims Process

The Liquidator has called for creditors to make their claims against the Company, as at 14 January 2009, in accordance with French law. The Liquidator can be contacted at 26 rue Hoche, Cedex 3533, 78035 Versailles CX, France.

The Joint Administrators have not commenced a formal process of claims admittance/adjudication and there is no requirement at this stage for creditors to provide details of their claim to the Joint Administrators.

### North American Claims Process

In North America, the Canadian applicants and the US debtors have obtained orders approving formal claims processes in each jurisdiction. In both jurisdictions there will be a call for claims, including supplier claims, which arose prior to 14 January 2009, as well as claims pursuant to contracts that were repudiated or rejected on or after that date. Where relevant, the Joint Administrators are submitting claims on behalf of the Company and the EMEA Companies. Creditors with claims in either of the jurisdictions outlined above should seek separate legal advice in relation to submitting such claims against Nortel entities.

### Distributions to Creditors

Given the opening of the Liquidation, It is likely that any distributions to creditors will be made by the Liquidator in accordance with French law. Any distributions would be highly dependent on the outcome of the ongoing sales processes. The Joint Administrators are unable to give an indication of the potential quantum or timing of any dividend payment.

### Potential Outcomes of the Administration

The Joint Administrators now believe that it is unlikely that they will achieve the first purpose of the administration being the rescue of the Company (i.e. as a legal entity). However, the Joint Administrators do believe that the business will be sold to the advantage of creditors.

Under the Insolvency Act 1986, the administration will automatically come to an end after one year, unless an extension is granted by the Court or creditors. Due to the complexity of the administration, the Joint Administrators are likely to apply to the Court for an extension of the administration, although that will depend on the circumstances at the time.

The Joint Administrators will report to you again at the conclusion of the administration or in six months' time, whichever is the sooner.

Yours faithfully
for Nortel Networks S.A. (in administration and in *liquidation judiciaire*)

SJ Harris
Joint Administrator

Enc:     Company information
         Joint Administrators' Receipts and Payments Account
         Summary of Joint Administrators' Time-Costs and Category 2 Disbursements
         Joint Administrators' Policy on Fees and Disbursements
         Summary of Statement of Affairs

*For the Companies listed below, The Institute of Chartered Accountants in England and Wales authorises AR Bloom, SJ Harris and CJW Hill to act as Insolvency Practitioners under section 390(2)(a) of the Insolvency Act 1986 and the Association of Chartered Certified Accountants authorises A M Hudson to act as an Insolvency Practitioner under section 390(2)(a) of the Insolvency Act 1986.*

*The affairs, business and property of the Companies are being managed by the Joint Administrators, AR Bloom, SJ Harris, AM Hudson and CJW Hill who act as agents of the Companies only and without personal liability.*

*The Companies are Nortel Networks UK Limited; Nortel Networks SA; Nortel GmbH; Nortel Networks France SAS; Nortel Networks NV; Nortel Networks SpA; Nortel Networks BV; Nortel Networks Polska SP Zoo; Nortel Networks Hispania SA; Nortel Networks (Austria) GmbH; Nortel Networks sro; Nortel Networks Engineering Service Kft; Nortel Networks Portugal SA; Nortel Networks Slovensko sro; Nortel Networks Oy; Nortel Networks Romania SRL; Nortel Networks AB; Nortel Networks International Finance & Holding BV*

*The affairs, business and property of Nortel Networks (Ireland) Limited are being managed by the Joint Administrators, AR Bloom and DM Hughes, who act as agents of Nortel Networks (Ireland) Limited only and without personal liability.*

*Nortel Networks SA was placed into French liquidation judiciaire on 28 May 2009. The business and assets of the company that are situated in France are now under the control of an administrateur judiciaire.*

## Appendix 1

## Nortel Networks S.A. (in administration and in *liquidation judiciaire*)

**Company information**

| | |
|---|---|
| Registered number: | FR62389516741 / 389516741 |
| Company name: | Nortel Networks S.A. |
| Registered office address: | Parc d'Activités de Magny-Châteaufort, 78928 Yvelines Cedex 9, France |
| Previous name: | Nortel Matra Cellular |

**Details of the Administrators and of their appointment**

| | |
|---|---|
| Administrators: | AR Bloom, AM Hudson, SJ Harris and CJW Hill of Ernst & Young LLP, 1 More London Place, London, SE1 2AF |
| Date of appointment: | 14 January 2009 |
| By whom appointed: | The appointment was made by the High Court of Justice, Chancery Division, Companies Court on the application of the Company's directors |
| Court reference: | High Court of Justice, Chancery Division, Companies Court - case 539 of 2009 |
| Division of the Administrators' responsibility: | Any of the functions to be performed or powers exercisable by the administrators may be carried out/exercised by any one of them acting alone or by any or all of them acting jointly |

**Statement Concerning the EC Regulation**

The EC Council Regulation on Insolvency Proceedings 2000 applies to this administration and the proceedings are main proceedings. This means that this administration is conducted according to English insolvency legislation and is not governed by the insolvency law of any other European Union Member State.

**Share Capital**

| Class | Authorised | | Issued & Fully paid | |
|---|---|---|---|---|
| | Number | € | Number | £ |
| Ordinary | 91,308,951 | 136,963,426.50 | 91,308,951 | 136,963,426.50 |

**Shareholders**

Nortel Networks International Finance & Holdings B.V. – 8.83%
Nortel Networks Limited – 91.168%
Jean Marie-Lesur – 0.001%
Darry Edwards – 0.001%
Michel Clement – 0.001%
Jean-Luc Khayat – 0.001%

**Directors (current and for the last three years) and company secretary (current)**

| Directors and secretary and their shareholdings name | Director or secretary | Date appointed | Date resigned | Current shareholding |
|---|---|---|---|---|
| Michel Clement | Director | 30/11/2000 | - | 1 share (held on loan) |
| Nortel Networks International Finance and Holdings B.V. | Director | 30/11/2000 | 14/01/2009 | 8,064,326 shares |
| Pascal Debon | Director | 11/03/2002 | 20/02/2006 | - |
| Darryl Edwards | Director | 28/09/2006 | 14/01/2009 | 1 share (held on loan) |
| Jean-Marie Lesur | Director | 19/12/2006 | 14/01/2009 | 1 share (held on loan) |
| Alan Biston | Director | 08/09/2006 | 19/12/2006 | - |
| Steve Pusey | Director | 20/02/2006 | 04/10/2006 | - |
| Jean-Luc Khayat | Secretary | 06/12/2007 | - | 1 share (held on loan) |
| Sharon Rolston | Director | 14/01/2009 | - | - |
| Simon Freemantle | Director | 14/01/2009 | - | - |

# Summary of Nortel Group Corporate Structure



The EMEA Companies in UK administration proceedings:

| Legal Entity | Country of Incorporation |
| --- | --- |
| Nortel Networks UK Limited | England |
| Nortel Networks S.A. | France |
| Nortel Networks France S.A.S. | France |
| Nortel Networks (Ireland) Limited | Ireland |
| Nortel GmbH | Germany |
| Nortel Networks Oy | Finland |
| Nortel Networks Romania SRL | Romania |
| Nortel Networks AB | Sweden |
| Nortel Networks N.V. | Belgium |
| Nortel Networks S.p.A. | Italy |
| Nortel Networks B.V. | Netherlands |
| Nortel Networks International Finance & Holding B.V. | Netherlands |
| Nortel Networks Polska Sp. z.o.o. | Poland |
| Nortel Networks (Austria) GmbH | Austria |
| Nortel Networks s.r.o. | Czech Republic |
| Nortel Networks Engineering Service Kft | Hungary |
| Nortel Networks Portugal S.A. | Portugal |
| Nortel Networks Hispania S.A. | Spain |
| Nortel Networks Slovensko s.r.o. | Slovakia |

## Appendix 2

## Nortel Networks S.A. (in administration and in *liquidation judiciaire*)

**Joint Administrators' Abstract of Receipts and Payments from 14 January 2009 to 13 July 2009**

| Statement of affairs | | | | | | |
|---|---|---|---|---|---|---|
| Total - EUR | | Total - EUR | Total - US $ | | Total - EUR | Total - US $ |
| 2 251,733 | Opening balance - 14 January 2009 (close of business) | 2,453,698 | 3,189,119 | Brought forward balance 28 May 2009 (close of business) | 15,610,883 | 20,689,915 |
| | **Receipts** | | | **Receipts** | | |
| | *Trading:* | | | *Trading:* | | |
| - | - Post appointment sales | 39 241,741 | 43 433,243 | - Post appointment sales | - | - |
| - | - Other revenue | 103,444 | 153,500 | - Other revenue | - | - |
| | *Other:* | | | *Other:* | | |
| 34,600,000 | - Pre-appointment sales | 79 763,405 | 52 243,500 | - Pre-appointment sales | - | - |
| - | - FX/precision movement | - | 545,397 | - FX/precision movement | - | 597,355 |
| - | - Bank interest | 1,912 | 2,557 | - Bank interest | 1,278 | 1,795 |
| 59,730,000 | - Asset sales | - | - | - Asset sales | - | - |
| 14,651,342 | | 72,108,335 | 96,385,336 | | 1,278 | 826,145 |
| | **Payments** | | | **Payments** | | |
| | *Trading:* | | | *Trading:* | | |
| | - Payroll, employee benefits, and payroll taxes | (29,721,048) | (37,317,897) | - Payroll, employee benefits, and payroll taxes | - | - |
| | - Accounts payable - inventory related | (13,878,032) | (18,142,777) | - Accounts payable - inventory related | - | - |
| | - Property costs | (3,736,581) | (4,878,015) | - Property costs | - | - |
| | - Intercompany | (5,116,766) | (5,538,064) | - Intercompany | - | - |
| | - Overheads | (2,635,041) | (3,714,321) | - Overheads | - | - |
| | - Pension contributions | (5,641,193) | (5,709,121) | - Pension contributions | - | - |
| | - Other payments | (5,658,319) | (5,747,145) | - Other payments | - | - |
| | - Trade payables | (11,092,680) | (13,852,319) | - Trade payables | - | - |
| | - FX/precision movement on FX transactions across the entity | - 158,733 | (118,457) | - FX transaction movement on FX transactions across the entity | - | - |
| | - Utilities | (18,915) | (16,001) | - Utilities | - | - |
| | *Other:* | | | *Other:* | | |
| | - Transfer to Liquidation accounts | (7,511,182) | (3,331,462) | - Transfer to Liquidation accounts | (5,000,010) | (3,081,046) |
| | - Joint Administrators fees and disbursements | (1,044,504) | (1,378,017) | - Joint Administrators fees and disbursements | - | - |
| | - Legal fees | (671,220) | (923,596) | - Legal fees | - | - |
| | - Other professional services cost | (104,966) | (104,940) | - Other professional services cost | - | - |
| | - Restructuring cost | (38,574) | (50,811) | - Restructuring cost | - | - |
| | - Bank charges and interest | (9,045) | (12,715) | - Bank charges and interest | - | - |
| | - FX/precision movement | (76,284) | - | - FX/precision movement | 1,259,071 | - |
| | | (82,813,824) | (77,439,951) | | (3,763,121) | (3,081,055) |
| | **Closing balance - 28 May 2009** | 15,610,883 | 20,689,915 | **Closing balance - 13 July 2009** | 13,054,039 | 18,437,524 |
| | | | | *Account reconciliations:* | | |
| | | | | Current accounts | - | - |
| | | | | Local deposit accounts | - | - |
| | | | | Administration deposit accounts | 13,054,039 | 18,437,524 |
| | | | | | 13,054,039 | 18,437,524 |

## Receipts and payments comments

### Notes to R & P

#### Note 1

Account balances have all been converted into a local currency, EUR, in addition to a common currency across all entities, US$.

Opening balances have been converted using January month end spot rates and closing balances converted using June month end spot rates which have been provided by the Company. This approach is line with the Company's internal reporting procedures.

Transactions that have taken place through the accounts over the course of the reporting period have been converted at average spot rates over this period, which have been sourced from the foreign exchange website Oanda.

#### Note 2

The numbers used to prepare the receipts and payments summary have been provided by the Company and are unaudited. Material items have been reviewed for accuracy and reasonableness.

#### Note 3

All items within the Receipts & Payments analysis are recorded gross of VAT where applicable.

VAT repaid or claimed back by the entity is recorded in a separate line within the Receipts & Payments analysis.

#### Note 4

All amounts referred to are in US$ unless stated otherwise.

#### Note 5

On 28 May 2009 the Company entered into secondary proceedings. Consequently, control of the Company's bank accounts, except the Royal Bank of Scotland ("RBS") deposit accounts set up by the Joint Administrators, passed to the French Officeholders. Balances of these accounts as at 28 May 2009 are shown in the R & P as transfers to the Liquidators' accounts. Furthermore, from this point onwards, only transactions that occurred through the RBS accounts have been recorded in the receipts and payments analysis. This predominantly related to bank charges and interest in addition to subsequent transfers that took place from the RBS accounts to the French Officeholders.

**Cash on appointment**

There was cash on appointment held in Euro, Algerian Dinar, Moroccan Dirham and US$ current and deposit accounts which totalled US$3.16 million.

## RECEIPTS

Total receipts up to 13 July 2009 equate to US$96.2 million. This primarily relates to pre and post appointment sales receipts of US$94.6 million.

### Sales receipts

Pre appointment sales receipts total US$52.2 million as at 28 May 2009. This is against a collectible balance on appointment of US$58.1million and represents 89.8% of the ledger.

Post appointment sales receipts total US$42.4 million.

Due to the Company entering into secondary proceedings, sale receipts post 28 May 2009 are not recorded in the analysis.

## PAYMENTS

Total payments up to 13 July 2009 equate to US$80.9 million. This primarily relates to payroll associated costs of US$27.3 million, inventory related payments of US$18.1 million, property costs of US$4.9 million and intercompany payments of US$4.5 million.

There is also a transfer made to the French Officeholders of US$9.9 million.

### Payroll

Payroll costs total US$27.3 million and include net pay in addition to employee expenses, employee benefits and payroll taxes.

### Inventory

Accounts payable, inventory related payments total US$18.1 million.

### Transfer to Liquidator accounts

As mentioned previously, on 28 May 2009 the Company entered into secondary proceedings. Consequently, funds held in all bank accounts, except the RBS deposit accounts set up by the Joint Administrators, were transferred to the French Officeholders. This totalled US$9.9 million.

Since 28 May 2009, further transfers have taken place from the RBS accounts to the French Officeholders' accounts totalling US$3.1 million. This brings total transfers for the period 14 January 2009 to 13 July 2009 to US$13.0 million.

The remaining funds held as at 13 July 2009 total US$18.4 million split between an RBS US$ and RBS Euro account.

It should be noted that since 13 July 2009, the remaining funds held in the RBS US$ and Euro accounts have been transferred to the French Officeholders.

### Property

Property costs total US$4.9 million and predominantly relate to rental costs for premises at Châteaufort in addition to property service management costs.

### Intercompany

Net intercompany payments total US$4.5 million. The majority of these payments are made through the Citinetting process to Nortel Networks UK Limited and Nortel Networks B.V.

### Other payments

Other payments total US$2.0 million. This relates to leased equipment, marketing and advertising, temporary staff and training costs.

## Appendix 3

## Nortel Networks S.A. (in administration and in *liquidation judiciaire*)

### Summary of Joint Administrators' Time-Costs from 14 January 2009 to 31 May 2009 (GB£)

| Activity | Partner/Executive Director | Director | Assistant Director | Manager | Executive | Analyst | Total Sum of Hours | Average hourly rate | Time costs for period |
|---|---|---|---|---|---|---|---|---|---|
| Administration application and planning | 18.0 | - | 6.0 | - | 12.0 | 16.0 | 54.0 | 397.76 | 21,480.00 |
| Briefings | 4.0 | - | 12.0 | 3.8 | - | 6.0 | 25.8 | 414.09 | 10,683.43 |
| Canada / USA | - | - | 2.7 | - | - | - | 2.7 | 490.00 | 1,323.00 |
| Case Management | 62.4 | - | 12.3 | 11.8 | 143.2 | 59.7 | 289.4 | 302.67 | 90,618.86 |
| Creditors | 0.5 | - | - | 20.5 | 18.0 | 3.0 | 42.0 | 280.18 | 11,768.17 |
| Creditors Committee | 9.0 | - | - | 28.0 | 14.5 | 69.5 | 119.0 | 233.36 | 27,783.30 |
| Customers | 55.6 | 13.0 | 4.3 | 3.0 | 98.0 | - | 171.9 | 357.40 | 61,436.96 |
| Debtors | - | 8.0 | 8.9 | 22.5 | 86.4 | - | 125.8 | 302.20 | 37,412.66 |
| Employees | 157.9 | 2.7 | 13.6 | - | 59.0 | 2.0 | 235.2 | 491.61 | 115,624.85 |
| Finance, accounting and administration | 24.3 | 0.1 | 40.2 | - | 331.8 | 182.0 | 578.4 | 222.16 | 128,507.21 |
| Intra Group & Netting | - | - | - | - | 5.5 | - | 5.5 | 194.94 | 1,072.19 |
| Legal | 119.9 | - | 10.0 | 1.0 | 24.5 | 7.0 | 162.4 | 530.54 | 86,159.00 |
| Liaising Directors/Communications | 6.5 | - | - | - | - | - | 6.5 | 650.00 | 4,225.01 |
| M&A | 144.3 | 157.3 | 362.3 | 288.1 | 274.6 | 19.6 | 1,227.3 | 439.89 | 564,405.76 |
| Other Assets | 46.5 | - | - | 2.0 | 33.0 | - | 81.5 | 477.12 | 38,885.40 |
| PR / Media | 1.5 | 1.0 | 2.9 | - | - | - | 5.4 | 527.04 | 2,846.00 |
| Property | 4.0 | 0.2 | 2.6 | - | 6.0 | - | 14.8 | 426.60 | 6,313.67 |
| Report to Creditors | - | - | - | 9.5 | 1.0 | 10.9 | 21.4 | 245.70 | 5,257.96 |
| Stabilisation | 16.5 | - | 27.0 | - | 33.0 | - | 76.5 | 420.74 | 32,186.41 |
| Statutory | 19.0 | - | 1.5 | - | 30.1 | 16.0 | 66.6 | 320.85 | 21,369.51 |
| Strategy - Core | 98.5 | - | 59.6 | 111.0 | 11.0 | - | 281.3 | 456.57 | 128,995.62 |
| Suppliers | 27.0 | - | 71.0 | 79.5 | 359.1 | 433.0 | 969.6 | 219.54 | 212,881.91 |
| Tax / VAT advisory and compliance | 70.5 | 5.5 | 46.7 | 11.3 | 30.3 | 51.5 | 275.8 | 395.34 | 110,182.93 |
| Trading Cash flow / Forecast | 6.0 | - | - | 78.3 | 230.0 | 292.5 | 567.6 | 229.53 | 149,271.33 |
| Trading Outcome / Profit | - | - | 1.0 | - | - | - | 1.0 | 490.00 | 490.00 |
| Treasury / Banks | 6.5 | - | 1.5 | - | 22.5 | 269.0 | 280.5 | 171.18 | 51,288.75 |
| **Grand Total** | **901.4** | **197.8** | **684.3** | **647.3** | **1,847.5** | **1,449.7** | **5,816.1** | **330.44** | **1,922,498.89** |
| | | | | | | | | | |
| Average hourly rate | 614.58 | 845.54 | 493.85 | 355.21 | 229.77 | 180.00 | | | |
| Time costs for period | 553,940.28 | 121,225.08 | 337,837.70 | 228,041.38 | 447,492.54 | 251,961.70 | | | |

## Nortel Networks S.A. (in administration and in *liquidation judiciaire*)

*Officeholders' Charging Policy for Fees*

The statutory provisions relating to remuneration are set out in Rule 2.106 of the Rules. Further information is given in the Association of Business Recovery Professionals' publication "*A Creditors' Guide to Administrators' Fees*", a copy of which may be accessed from the web site of the Insolvency Practitioners Association at http://www.insolvency-practitioners.org.uk (follow 'Regulation and Guidance' then 'Creditors' Guides to Fees'), or is available in hard copy upon written request to the Administrators.

The creditors have determined that the Administrators' remuneration should be fixed on the basis of time properly spent by the Administrators and their staff in attending to matters arising in the Administration.

The Administrators have engaged managers and other staff to work on the cases. The work required is delegated to the most appropriate level of staff taking account of the nature of the work and the individual's experience. Additional assistance is provided by accounting and treasury executives. Work carried out by all staff is subject to the overall supervision of the Administrators.

All time spent by staff working directly on case-related matters is charged to a separate time code established for each case. Each member of staff has a specific hourly rate, which is subject to change over time.  The average hourly rate for each category of staff over the period as shown above, are the current hourly rates used. The current hourly rates may be higher than the average rates, if hourly rates have increased over the period covered by this report.

*Office Holders' Charging Policy for Disbursements*

Statement of Insolvency Practice No. 9 ("SIP 9") published by R3 (The Association of Business Recovery Professionals) divides disbursements into two categories.

Category 1 disbursements comprise payments made by the office holders' firm, which comprise specific expenditure relating to the administration of the insolvent's affairs and referable to payment to an independent third party. These disbursements can be paid from the insolvent's assets without approval from the Committee. In line with SIP 9, it is our policy to disclose such disbursements drawn but not to seek approval for their payment.

Category 2 disbursements comprise payments made by the office holders' firm which include elements of shared or overhead costs. Such disbursements are subject to approval from Creditors' Committee as if they were remuneration. It is our policy, in line with SIP 9, to seek approval for this category of disbursement before they are drawn.

## Appendix 4

## Nortel Networks S.A. (in administration and in *liquidation judiciaire*)
## Summary of the Directors' Statement of Affairs as at 14 January 2009

| A - Summary of Assets | Book Value (US$) | Estimated to Realise (US$) | Conversion rate (US$1=): 0.77733297 |
|---|---|---|---|
| **Assets subject to a fixed charge:** | | | |
| | | | |
| **Assets subject to a floating charge:** | | | |
| | | | |
| **Uncharged Assets:** | | | |
| Accounts receivable net | 56,194,618 | 43,739,300 | |
| Inter company receivables | 17,159,680 | Unknown | |
| Inventory net | 1,034,211 | 257,290 | |
| Other current assets | 81,005,469 | 74,614,100 | |
| Property, plant and equipment | 10,140,353 | 643,225 | |
| Investments and intangibles | | | |
| Cash | 2,896,819 | 2,896,819 | |
| Estimated total assets available for preferential creditors | 168,431,150 | 122,150,734 | |

| A1 - Summary of liabilities | Book Value (US$) | Estimated to Realise (US$) |
|---|---|---|
| **Estimated total assets available for preferential creditors (carried from A)** | | 122,150,734 |
| **Liabilities** | | |
| Preferential creditors | | |
| Employment related | (22,119,654) | |
| Tax related | (4,972,282) | (27,091,936) |
| **Estimated deficiency/surplus as regards preferential creditors** | | 95,058,798 |
| Estimated prescribed part of net property where applicable (to carry forward) | | |
| **Estimated total assets available for floating charge holders** | | 95,058,798 |
| Debts secured by floating charges | | |
| **Estimated deficiency/surplus of assets after floating charges** | | 95,058,798 |
| Estimated prescribed part of net property where applicable (brought down) | | |
| **Total assets available to unsecured creditors** | | |
| Unsecured non-preferential claims (excluding any shortfall to floating charge holders) | | |
| Trade and other payables | (17,737,599) | |
| Inter company payables | (150,277,900) | |
| Accrued liabilities | (35,961,646) | |
| Pensions | (423,937) | |
| Financial debt | (75,461,869) | |
| Other long term liabilities | (996,819) | (280,859,869) |
| **Estimated deficiency/surplus as regards non-preferential creditors (excluding any shortfall to floating charge holders)** | | (185,801,071) |
| Shortfall to floating charge holders (brought down) | | |
| **Estimated deficiency/surplus as regards creditors** | | (176,196,601) |
| Issued and called up capital | | |
| **Estimated deficiency/surplus as regards members** | | (361,997,671) |

**<u>EXHIBIT 40</u>**

B 10 (Official Form 10) (12/08)

| UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE | PROOF OF CLAIM |
|---|---|

| Name of Debtor:  ·  Nortel Networks Inc. | Case Number:  09-10138 |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| | |
|---|---|
| Name of Creditor (the person or other entity to whom the debtor owes money or property):<br>**The Bank of New York Mellon, as Indenture Trustee** | ☐ Check this box to indicate that this claim amends a previously filed claim. |
| Name and address where notices should be sent:<br>Latham & Watkins LLP  and  The Bank of New York Mellon, as Indenture Trustee<br>885 Third Avenue  Corporate Trust Risk<br>New York, NY 10022  101 Barclay Street, Floor 8W<br>Attn:  Robert J. Rosenberg  New York, NY 10286<br>Michael J. Riela  Attn:  Martin N. Feig<br>Telephone: (212) 906-1200 | **Court Claim Number:** _____<br>*(If known)*<br><br>Filed on: _____ |
| Name and address where payment should be sent (if different from above):<br>The Bank of New York Mellon, as Indenture Trustee<br>Corporate Trust Risk<br>101 Barclay Street, Floor 8W<br>New York, NY 10286<br>Attn:  Martin N. Feig | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br>☐ Check this box if you are the debtor or trustee in this case. |

| | |
|---|---|
| 1.    Amount of Claim as of Date Case Filed: <u>$2,785,241,840.28, plus unliquidated amounts (including indemnification), as described in the attachment hereto.</u><br><br>If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.<br><br>If all or part of your claim is entitled to priority, complete item 5.<br><br>☒ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. | 5.    **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** **If any portion of your claim falls in one of the following categories, check the box and state the amount.**<br><br>Specify the priority of the claim.<br><br>☐ Domestic support obligation under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B). |
| 2.    Basis for Claim:  <u>Money loaned under Indenture dated as of July 5, 2006, as supplemented (**see attachment**)</u><br>(See instruction #2 on reverse side.) | ☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507(a)(4). |
| 3.    Last four digits of any number by which creditor identifies debtor: _____<br><br>3a. Debtor may have scheduled account as: _____<br>(See instruction #3a on reverse side.) | |
| 4.    **Secured Claim** (See instruction #4 on reverse side.)<br>Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.<br><br>Nature of property or right of setoff:  ☐ Real Estate  ☐ Motor Vehicle  ☐ Other<br>Describe:<br><br>Value of Property: $_____ Annual Interest Rate _____%<br><br>Amount of arrearage and other charges as of time case filed included in secured claim,<br>if any: $_____  Basis for perfection: _____<br><br>Amount of Secured Claim: $_____  Amount Unsecured: $_____ | ☐ Contributions to an employee benefit plan – 11 U.S.C. §507(a)(5).<br><br>☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507(a)(7).<br><br>☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507(a)(8). |
| 6.    **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. | ☐ Other – Specify applicable paragraph of 11 U.S.C. §507(a)(___). |
| 7.    **Documents:** Attach redacted copies of any do~~...~~  purchase<br>orders, invoices, itemized statements of runni~~ng~~ of<br>agreements. You may also attach a summary.<br>perfection of a security interest. You may als~~o...~~ ~~r~~edacted"<br>*on reverse side.)*<br><br>DO NOT SEND ORIGINAL DOCUMENTS. AT~~TACHED DOCUMENTS MAY BE DESTROYED AFTER~~<br>SCANNING.<br><br>If the documents are not available, please explain: | Filed: USBC - District of Delaware<br>Nortel Networks Inc., Et Al.<br>09-10138 (KG)     0000003972<br><br>**Amount entitled to priority:**<br><br>$_____<br><br>*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to ca~~ses~~ **FILED / RECEIVED** |

| | |
|---|---|
| **DATE:**<br>9\|2\|\|09 | **Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>Martin N. Feig, Vice President, Default Administration Group, The Bank of New York Mellon | **FOR COURT USE ONLY**<br><br>SEP 2 5 2009<br><br>**EPIQ BANKRUPTCY SOLUTIONS, LLC** |

*Penalty for presenting fraudulent claim*: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

**EXHIBIT**

**162**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| NORTEL NETWORKS INC., *et al.*[1] | ) | Case No. 09-10138 (KG) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |
|  | ) |  |

## ATTACHMENT TO PROOF OF CLAIM OF THE BANK OF NEW YORK MELLON, AS INDENTURE TRUSTEE, RELATING TO THE INDENTURE DATED JULY 5, 2006

1.      The Bank of New York Mellon (f/k/a The Bank of New York), as indenture trustee

("BNY"), hereby files this proof of claim (the "Proof of Claim") against debtor Nortel Networks Inc.

("NNI"). BNY serves as indenture trustee under that certain Indenture dated as of July 5, 2006 (as

supplemented by that certain First Supplemental Indenture dated as of July 5, 2006, that certain Second

Supplemental Indenture dated as of May 1, 2007, and that certain Third Supplemental Indenture dated

as of May 28, 2008, and as may otherwise may have amended, modified or supplemented, the

"Indenture"), among Nortel Networks Limited ("NNL"), as issuer, Nortel Networks Corporation

("NNC") and NNI, as guarantors, and BNY, as indenture trustee.

2.      Pursuant to the Indenture, NNL issued (a) the London Interbank Offered Rate (LIBOR)

+ 4.250% Floating Rate Notes due 2011 in the original principal amount of $1,000,000,000.00 (the

"2011 Notes"), (b) the 10.125% Fixed Rate Notes due 2013 in the original principal amount of

$550,000,000.00 (the "2013 Notes") and (c) the 10.75% Fixed Rate Notes due 2016 in the original

principal amount of $1,125,000,000.00 (the "2016 Notes," and together with the 2011 Notes and the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:
Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems
International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722),
Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel
Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358),
Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567).

2013 Notes, the "Notes"). A copy of the Indenture and the three supplemental indentures thereto are annexed hereto as Exhibit A.

3.     Under the Indenture and the related documents, agreements and instruments executed and delivered in connection with the Indenture, NNL is obligated to pay all outstanding principal, any premium, accrued interest and certain other costs and expenses in connection with the Notes. As a guarantor, NNI is also fully liable for NNL's obligations to holders of the Notes.

4.     On January 14, 2009 (the "Petition Date"), NNI and certain of its affiliates filed voluntary chapter 11 petitions in the United States Bankruptcy Court for the District of Delaware. Also on the Petition Date, NNC, NNL, and certain of their Canadian affiliates filed applications with the Ontario Superior Court of Justice under the Companies' Creditors Arrangement Act in Canada (the "Canadian Proceedings").

5.     BNY is authorized to file this Proof of Claim against NNI on behalf of itself and the holders of the Notes pursuant to section 501(a) of title 11 of the United States Code, section 510 of the Indenture, and this Court's August 4, 2009 *Order Establishing Deadlines for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof.* Separately, BNY is filing one or more proofs of claim against NNC and NNL in the Canadian Proceedings in connection with the Indenture and the Notes.

6.     As of the Petition Date, NNL was (and continues to be) indebted to the holders of the Notes issued pursuant to the Indenture in the aggregate amount of $2,785,241,840.28, plus unliquidated amounts as described herein. By virtue of its guaranty, NNI is also indebted to the holders of the Notes for these amounts. NNI's guaranty obligations with respect to the Indenture and the Notes are comprised as follows:

2

a. NNI's guaranty obligations to the holders of the 2011 Notes are in the aggregate principal sum of $1,000,000,000.00, plus accrued and unpaid interest in the amount of $22,419,965.28;

b. NNI's guaranty obligations to the holders of the 2013 Notes are in the aggregate principal sum of $550,000,000.00, plus accrued and unpaid interest in the amount of $27,689,062.50; and

c. NNI's guaranty obligations to the holders of the 2016 Notes are in the aggregate principal sum of $1,125,000,000.00, plus accrued but unpaid interest in the amount of $60,132,812.50.

7.      In addition, NNI has guaranty obligations with respect to any Additional Amounts and Additional Interest (as defined in the Indenture) that are due under the Indenture. Moreover, pursuant to the Indenture and NNI's guaranty of NNL's obligations thereunder, NNI is obligated to indemnify and hold BNY harmless against any loss, damages, claims, liability or expense (including reasonable attorney's fees and expenses) incurred without negligence, bad faith or willful misconduct on the part of BNY, and arising out of or in connection with BNY's role as indenture trustee. BNY hereby asserts a claim in an unliquidated amount with respect to NNI's indemnification obligations, plus any and all other amounts due and owing by NNI under the Indenture.

8.      In addition to any and all other amounts due and owing by NNI as guarantor under the Indenture and the Notes, BNY also asserts a claim in an unliquidated amount for the continuing postpetition (a) accrual of interest (including interest upon the overdue installments of interest), (b) expense reimbursements of BNY as indenture trustee and (c) fees and expense reimbursements of BNY's legal counsel and other professionals, in respect of the Indenture and the Notes.

3

9.      BNY may have post-petition administrative expense claims against NNI. By filing this Proof of Claim, BNY does not waive any of its post-petition claims against NNI, and expressly reserves all of its rights in connection with such claims.

10.     To the best of BNY's knowledge, no judgment has been rendered on the claims set forth herein.

11.     To the best of BNY's knowledge, all payments made by NNI, NNC or NNL in connection with the Notes have been credited and deducted for the purposes of making this Proof of Claim. To the best of BNY's knowledge, the claims described in this Proof of Claim are not subject to any setoff or counterclaim.

12.     BNY does not waive any right of action that it has or may have against NNI, NNC, NNL or any other person or persons.

13.     BNY reserves the right to amend or supplement this Proof of Claim for any purpose, including but not limited to, (a) fixing or liquidating any claims stated herein, (b) specifying and quantifying expenses or other charges or claims incurred by BNY or (c) asserting any claim for priority.

14.     In filing this Proof of Claim, BNY does not submit itself to the jurisdiction of the Court for any purpose other than with respect to this Proof of Claim.

15.     The filing of this Proof of Claim is not intended and should not be construed to be an election of remedies or waiver of any past, present or future defaults or events of default under the terms of the Indenture.

4

16.    All notices and communications concerning this Proof of Claim should be sent to the

following addresses:

>The Bank of New York Mellon, as Indenture Trustee
>Corporate Trust Risk
>101 Barclay Street, Floor 8W
>New York, NY 10286
>Attn:   Martin N. Feig

>and

>Latham & Watkins LLP
>885 Third Avenue
>New York, NY 10022
>Attn:   Robert J. Rosenberg
>          Michael J. Riela
>Telephone: (212) 906-1200

NY\1567682.1

# EXHIBIT A

## Indenture

From:Bank of NY Mellon          12128155802          01/16/2009 13:51          #415 P.001/102

**NORTEL NETWORKS LIMITED**

*as Issuer,*

**NORTEL NETWORKS CORPORATION**

**AND**

**NORTEL NETWORKS INC.**

*as Guarantors,*

**AND**

**THE BANK OF NEW YORK**

*as Trustee*

---

*INDENTURE*

*Dated as of July 5, 2006*

---

[New York #1531731 v17]

**NORTEL NETWORKS LIMITED**
Reconciliation and tie between Trust Indenture Act of 1939 and
Indenture, dated as of July 5, 2006

| Trust Indenture Act Section | Indenture Section |
|---|---|
| 310(a)(1) | 609 |
| (a)(2) | 609 |
| (a)(3) | Not Applicable |
| (a)(4) | Not Applicable |
| (b) | 609 |
| (c) | Not Applicable |
| 311(a) | 610 |
| (b) | 610 |
| 312(a) | 701 |
| (b) | 701(b) |
| (c) | 701(c) |
| 313(a) | 702(a) |
| (b) | 702(a) |
| (c) | 702(a) |
| (d) | 702(b) |
| 314(a) | 703(b) |
| (b) | Not Applicable |
| (c)(1) | 102 |
| (c)(2) | 102 |
| (c)(3) | Not Applicable |
| (d) | Not Applicable |
| (e) | 102 |
| 315(a) | 601(b) |
| (b) | 605 |
| (c) | 601(a) |
| (d) | 601(c) |
| (d)(1) | 601(b) |
| (d)(2) | 601(c)(2) |
| (d)(3) | 601(c)(3) |
| (e) | 511 |
| 316(a)(1)(A) | 506(a)(1) |
| (a)(1)(B) | 506(a)(2) |
| | 503(a) |
| (a)(2) | Not Applicable |
| (b) | 508 |
| 317(a)(1) | 509 |
| (a)(2) | 510 |
| (b) | 1003 |
| 318(a) | 107 |

Note: This reconciliation and tie shall not, for any purpose, be deemed to be a part of the Indenture.

i

01/16/2009 13:52    #415 P. 003/102

12128156802

From:Bank of NY Mellon

## TABLE OF CONTENTS

Page

### ARTICLE ONE
DEFINITIONS AND OTHER PROVISIONS OF GENERAL APPLICATION

Section 101.     Definitions.................................................................................................... 1

(1)     "Acquired Funded Debt" .......................................................................... 1

(2)     "Act"......................................................................................................... 1

(3)     "Additional Amounts".............................................................................. 2

(4)     "Additional Debt Securities" ................................................................... 2

(5)     "Additional Interest"................................................................................ 2

(6)     "Adjusted EBITDA"................................................................................. 2

(7)     "Affiliate".................................................................................................. 3

(8)     "Asset Acquisition" ................................................................................. 3

(9)     "Authorized Newspaper".......................................................................... 3

(10)    "Authorized Officers"............................................................................... 3

(11)    "Board of Directors"................................................................................. 4

(12)    "Board Resolution".................................................................................. 4

(13)    "Business Day" ......................................................................................... 4

(14)    "Capital Stock".......................................................................................... 4

(15)    "Capitalized Lease Obligation" .............................................................. 4

(16)    "Certificated Security".............................................................................. 4

(17)    "Change of Control" ................................................................................. 4

(18)    "Commission"............................................................................................ 6

(19)    "Common Stock"....................................................................................... 6

(20)    "Consolidated Fixed Charge Coverage Ratio" ....................................... 6

(21)    "Consolidated Fixed Charges".................................................................. 7

(22)    "Consolidated Interest Expense".............................................................. 7

(23)    "Consolidated Net Income"...................................................................... 8

(24)    "Consolidated Net Tangible Assets" ....................................................... 8

(25)    "Corporate Trust Office"........................................................................... 9

(26)    "corporation".............................................................................................. 9

(27)    "Credit Enhanced Foreign Subsidiary Debt"............................................ 9

## TABLE OF CONTENTS
(continued)

Page

(28) "Debt Securities" ........................................................... 9
(29) "Default" ...................................................................... 9
(30) "Defaulted Interest" ...................................................... 9
(31) "Depositary" ................................................................ 9
(32) "Designated Qualified Preferred Stock" ......................... 9
(33) "Disclosure Materials" ................................................. 9
(34) "Disqualified Capital Stock" .......................................... 9
(35) "Dollar" ....................................................................... 10
(36) "DTC" ......................................................................... 10
(37) "Event of Default" ......................................................... 10
(38) "Exchange Act" ............................................................ 10
(39) "Exchange Debt Securities" ........................................... 10
(40) "Exchange Offer" .......................................................... 10
(41) "Exchange Rate" ........................................................... 10
(42) "Exchange Rate Officers' Certificate" ............................ 11
(43) "Exchange Registration Statement" ................................ 11
(44) "Excluded Holder" ........................................................ 11
(45) "Existing NNC Convertible Notes" ................................. 11
(46) "Existing Preferred Stock" ............................................. 11
(47) "Foreign Currency" ....................................................... 11
(48) "Foreign Subsidiary" ..................................................... 11
(49) "Funded Debt" .............................................................. 11
(50) "GAAP" ....................................................................... 13
(51) "Global Security" .......................................................... 13
(52) "Guarantee" .................................................................. 13
(53) "Guarantor" .................................................................. 13
(54) "Guarantor Request" ..................................................... 13
(55) "Holder" ....................................................................... 13
(56) "Indenture" ................................................................... 13
(57) "Initial Purchasers" ....................................................... 13

From:Bank of NY Mellon        12128155802        01/16/2009 13:52        #415 P. 004/102

**TABLE OF CONTENTS**
(continued)

Page

| | | |
|---|---|---|
| (58) | "Initial Debt Securities" | 13 |
| (59) | "Interest" | 14 |
| (60) | "Interest Payment Date" | 14 |
| (61) | "Interest Swap Obligations" | 14 |
| (62) | "Investment Grade Status" | 14 |
| (63) | "Issue Date" | 14 |
| (64) | "Issue Date Registration Rights Agreement" | 14 |
| (65) | "Issuer" | 14 |
| (66) | "Issuer Request" and "Issuer Order" | 14 |
| (67) | "Lien" | 14 |
| (68) | "Managed Service Contract Liens" | 14 |
| (69) | "Maturity" | 14 |
| (70) | "Measurement Date" | 15 |
| (71) | "Moody's" | 15 |
| (72) | "NGSH" | 15 |
| (73) | "NNC" | 15 |
| (74) | "NNCC" | 15 |
| (75) | "NNI" | 15 |
| (76) | "NNL" | 15 |
| (77) | "Officers' Certificate" | 15 |
| (78) | "Opinion of Counsel" | 15 |
| (79) | "Original Issue Discount Security" | 15 |
| (80) | "Outstanding" | 15 |
| (81) | "Participant" | 16 |
| (82) | "Paying Agent" | 16 |
| (83) | "Permitted Funded Debt" | 16 |
| (84) | "Person" | 17 |
| (85) | "Place of Payment" | 18 |
| (86) | "Predecessor Security" | 18 |
| (87) | "Preferred Stock" | 18 |

[New York#1531721 v17]

iv

## TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| (88) | "Purchase Money Lien" | 18 |
| (89) | "QIB" | 18 |
| (90) | "Qualified Capital Stock" | 18 |
| (91) | "Qualified Equity Proceeds" | 18 |
| (92) | "Redemption Date" | 18 |
| (93) | "Redemption Price" | 18 |
| (94) | "Refinance" | 18 |
| (95) | "Refinancing Funded Debt" | 19 |
| (96) | "Registration Rights" | 19 |
| (97) | "Registration Rights Agreement" | 19 |
| (98) | "Registration Statement" | 19 |
| (99) | "Regular Record Date" | 19 |
| (100) | "Regulation S" | 19 |
| (101) | "Regulation S Debt Securities" | 19 |
| (102) | "Regulation S Global Security" | 19 |
| (103) | "Resale Restriction Termination Date" | 19 |
| (104) | "Responsible Officer" | 20 |
| (105) | "Restricted Debt Securities" | 20 |
| (106) | "Restricted Debt Securities Certificate" | 20 |
| (107) | "Restricted Debt Securities Legend" | 20 |
| (108) | "Restricted Period" | 20 |
| (109) | "Restricted Subsidiary" | 20 |
| (110) | "Reversion Date" | 20 |
| (111) | "Rule 144A" | 20 |
| (112) | "Rule 144A Debt Securities" | 20 |
| (113) | "Rule 144A Global Security" | 21 |
| (114) | "S&P" | 21 |
| (115) | "Securities Act" | 21 |
| (116) | "Security Custodian" | 21 |
| (117) | "Security Register" | 21 |

**TABLE OF CONTENTS**
(continued)

Page

| | | |
|---|---|---|
| (118) | "Security Registrar" | 21 |
| (119) | "Shelf Registration Statement" | 21 |
| (120) | "Special Record Date" | 21 |
| (121) | "Stated Maturity Date" | 21 |
| (122) | "Subsidiary" | 21 |
| (123) | "Successor Debt Security" | 21 |
| (124) | "Suspended Covenants" | 22 |
| (125) | "Suspension Period" | 22 |
| (126) | "Synthetic Purchase Agreement" | 22 |
| (127) | "Trust Indenture Act" | 22 |
| (128) | "Trustee" | 22 |
| (129) | "United States" | 22 |
| (130) | "Weighted Average Life to Maturity" | 22 |
| Section 102. | Compliance Certificates and Opinions | 23 |
| Section 103. | Form of Documents Delivered to Trustee | 23 |
| Section 104. | Acts of Holders | 24 |
| Section 105. | Notices, etc., to Trustee, Issuer and Guarantors | 25 |
| Section 106. | Notice to Holders; Waiver | 25 |
| Section 107. | Conflict with Trust Indenture Act | 26 |
| Section 108. | Effect of Headings and Table of Contents | 26 |
| Section 109. | Successors and Assigns | 26 |
| Section 110. | Separability Clause | 26 |
| Section 111. | Benefits of Indenture | 26 |
| Section 112. | Governing Law, etc. | 26 |
| Section 113. | WAIVER OF JURY TRIAL | 27 |
| Section 114. | Legal Holidays | 27 |
| Section 201. | Forms Generally | 28 |
| Section 202. | Forms of Debt Securities | 28 |
| Section 203. | Guarantee by Guarantor; Form of Guarantee; Release of Guarantee | 28 |
| Section 204. | Form of Trustee's Certificate of Authentication | 31 |

From:Bank of NY Mellon    12128155802    01/16/2009 13:52    #415 P.007/102

TABLE OF CONTENTS
(continued)

Page

ARTICLE THREE
THE DEBT SECURITIES

| Section 301. | Amount Unlimited; Issuable in Series | 31 |
| Section 302. | Denominations | 34 |
| Section 303. | Execution, Authentication, Delivery and Dating | 34 |
| Section 304. | Temporary Debt Securities | 37 |
| Section 305. | Registration, Registration of Transfer and Exchange | 37 |
| Section 307. | Legends | 40 |
| Section 311. | Mutilated, Destroyed, Lost or Stolen Debt Securities | 45 |
| Section 312. | Payment of Interest; Interest Rights Preserved | 46 |
| Section 315. | Persons Deemed Owners | 49 |
| Section 316. | Cancellation | 49 |
| Section 317. | Computation of Interest | 49 |
| Section 318. | Payment in Currencies | 49 |
| Section 319. | Judgments | 51 |
| Section 320. | CUSIP Numbers | 52 |

ARTICLE FOUR
SATISFACTION AND DISCHARGE

| Section 401. | Satisfaction and Discharge of Indenture | 52 |
| Section 402. | Application of Trust Money | 53 |

ARTICLE FIVE
DEFAULTS AND REMEDIES

| Section 501. | Events of Default and Enforcement | 53 |
| Section 502. | Waiver of Declaration | 55 |
| Section 503. | Waiver | 55 |
| Section 504. | Other Remedies | 56 |
| Section 505. | Application of Money Collected | 56 |
| Section 506. | Control by Holders | 57 |
| Section 507. | Limitation on Suits | 57 |

[New York #1531721 v17]

From:Bank of NY Mellon    12128155802    01/18/2009 13:53    #415 P.008/102

**TABLE OF CONTENTS**
(continued)

Page

Section 508.    Rights of Holders To Receive Payment .................................................. 57
Section 509.    Collection Suit by Trustee ................................................................... 57
Section 510.    Trustee May File Proofs of Claim ......................................................... 58
Section 511.    Undertaking for Costs .......................................................................... 58
Section 512.    Delay or Omission Not Waiver ............................................................ 58
Section 513.    Waiver of Stay or Extension Laws ....................................................... 58

ARTICLE SIX
THE TRUSTEE

Section 601.    Duties of Trustee .................................................................................. 58
Section 602.    Rights of Trustee .................................................................................. 59
Section 603.    Individual Rights of Trustee ................................................................. 60
Section 604.    Trustee's Disclaimer ............................................................................ 60
Section 605.    Notice of Defaults ................................................................................ 60
Section 606.    Compensation and Indemnity ............................................................... 61
Section 607.    Replacement of Trustee ........................................................................ 61
Section 608.    Successor Trustee by Merger, etc. ........................................................ 63
Section 609.    Eligibility; Disqualification ................................................................. 64
Section 610.    Preferential Collection of Claims Against the Issuer ............................. 64

ARTICLE SEVEN
HOLDERS' LISTS AND REPORTS BY TRUSTEE, ISSUER AND GUARANTORS

Section 701.    Preservation of Information; Communications to Holders ........................ 64
Section 702.    Reports by Trustee ............................................................................... 65
Section 703.    Reports by Issuer and Guarantors ......................................................... 66

ARTICLE NINE
SUPPLEMENTAL INDENTURES

Section 901.    Supplemental Indentures Without Consent of Holders ........................... 68
Section 902.    Supplemental Indentures with Consent of Holders ................................ 69
Section 903.    Execution of Supplemental Indentures ................................................. 70
Section 904.    Effect of Supplemental Indentures ....................................................... 71

From:Bank of NY Mellon          12128165802          01/16/2009 13:53          #415 P. 010/102

## TABLE OF CONTENTS
### (continued)

| | | Page |
|---|---|---|
| Section 905. | Conformity with Trust Indenture Act | 71 |
| Section 906. | Reference in Debt Securities to Supplemental Indentures | 71 |

### ARTICLE TEN
### COVENANTS

| | | |
|---|---|---|
| Section 1001. | Payment of Principal, Premium and Interest | 71 |
| Section 1002. | Maintenance of Office or Agency | 71 |
| Section 1003. | Money for Debt Securities Payments to Be Held in Trust | 72 |
| Section 1008. | Compliance Certificate | 80 |
| Section 1009. | Waiver of Certain Covenants | 80 |

### ARTICLE ELEVEN
### REDEMPTION OF DEBT SECURITIES

| | | |
|---|---|---|
| Section 1101. | Applicability of Article | 81 |
| Section 1106. | Debt Securities Payable on Redemption Date | 83 |
| Section 1107. | Debt Security Redeemed in Part | 84 |

### ARTICLE TWELVE
### SINKING FUNDS

| | | |
|---|---|---|
| Section 1201. | Applicability of Article | 84 |
| Section 1202. | Satisfaction of Sinking Fund Payments with Debt Securities | 84 |
| Section 1203. | Redemption of Debt Securities for Sinking Fund | 85 |

### ARTICLE THIRTEEN
### DEFEASANCE

| | | |
|---|---|---|
| Section 1301. | Discharge by Deposit of Money or Debt Securities | 85 |
| Section 1302. | Application of Trust Money | 87 |
| Section 1303. | Repayment to the Issuer or Guarantors | 87 |

### ARTICLE FOURTEEN
### MEETINGS OF HOLDERS OF DEBT SECURITIES

| | | |
|---|---|---|
| Section 1401. | Purposes for Which Meetings May Be Called | 87 |
| Section 1402. | Call, Notice and Place of Meetings | 87 |

01/16/2009 13:53    #415  P. D11/102

12128155802

From:Bank of NY Mellon

**INDENTURE** dated as of July 5, 2006 among Nortel Networks Limited (together with any successors, "NNL" or the "Issuer"), a Canadian corporation having its principal place of business at 8200 Dixie Road, Suite 100, Brampton, Ontario, Canada L6T 5P6, Nortel Networks Corporation (together with any successors, "NNC"), a Canadian corporation having its principal place of business at 8200 Dixie Road, Suite 100, Brampton, Ontario, Canada L6T5P6 and Nortel Networks Inc. (together with any successors, "NNI"), a Delaware corporation having its principal place of business at 4008 Chapel Hill – Nelson Highway, Research Triangle Park, North Carolina, U.S.A., 27709, and The Bank of New York (the "Trustee"), a New York corporation authorized to conduct a banking business, having its Corporate Trust Office at 101 Barclay Street 21W, New York, New York, U.S.A., 10286.

For and in consideration of the premises and the purchase of the Debt Securities by the Holders thereof, it is mutually covenanted and agreed, for the equal and proportionate benefit of all Holders of the Debt Securities or of a series thereof, as follows.

ARTICLE ONE

DEFINITIONS AND OTHER PROVISIONS OF GENERAL APPLICATION

SECTION 101.    *DEFINITIONS.*

For all purposes of this Indenture, except as otherwise expressly provided or unless the context otherwise requires:

    (A) the terms defined in this Article have the meanings assigned to them in this Article, and include the plural as well as the singular;

    (B) all other terms used herein that are defined in the Trust Indenture Act, either directly or by reference therein, have the meanings assigned to them therein;

    (C) all accounting terms not otherwise defined herein have the meanings assigned to them in accordance with GAAP;

    (D) the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other subdivision; and

    (E) each reference to an Article or Section refers to an Article or Section of this Indenture, unless otherwise specified herein.

(1)    "Acquired Funded Debt" means Funded Debt of a Person or any of its Subsidiaries existing at the time such Person becomes a Subsidiary of NNC or at the time it merges, amalgamates or consolidates with or into NNC or any of its Subsidiaries or assumed in connection with the acquisition of property or assets from such Person and in each case not incurred by such Person in connection with, or in anticipation or contemplation of, such Person becoming a Subsidiary of NNC or such acquisition, merger or consolidation or acquisition of such property or assets.

(2)    "Act" when used with respect to any Holder, has the meaning specified in Section 104.

[New York #1531721 v17]

(3)    "Additional Amounts" has the meaning specified in Section 313.

(4)    "Additional Debt Securities" means any Debt Securities of a series issued after the Issue Date of the Initial Debt Securities of such series pursuant to Section 310.

(5)    "Additional Interest" when used with respect to the Debt Securities of any series issued with Registration Rights, has the meaning specified in the applicable Registration Rights Agreement.

(6)    "Adjusted EBITDA" means, with respect to NNC, for any period, the sum, all as determined on a consolidated basis for NNC and its Subsidiaries in accordance with GAAP (without duplication), of:

        (a).    Consolidated Net Income; *plus*

        (b)    to the extent Consolidated Net Income has been reduced thereby (without duplication):

        (i)    all income taxes and related interest and penalties of NNC and its Subsidiaries paid or accrued (net of any income tax credits or gains) in accordance with GAAP for such period;

        (ii)    Consolidated Fixed Charges;

        (iii)    any non-cash expenses, charges or losses that decreased Consolidated Net Income during such period;

        (iv)    any loss, charge or cost attributable to exit or disposal activities approved by the Board of Directors of NNC as part of a restructuring plan;

        (v)    any loss, charge or cost attributable to any restatements of financial information of NNC or any of its subsidiaries described in the Disclosure Materials or any related internal control remedial measures;

        (vi)    any loss, charge or cost attributable to the actual and contemplated transactions with Flextronics described in the Disclosure Materials;

        (vii)    any loss, charge or cost attributable to the finance transformation project of NNC and its Subsidiaries including, without limitation, the implementation of a new information technology platform (SAP) to provide an integrated global financial system;

        (viii)    any loss, charge or cost attributable to any payment of fines, penalties or other amounts paid to any government authority or stock exchange in connection with any regulatory or enforcement proceeding relating to events described in the Disclosure Materials; and

[New York #1531721 v17]               2

#415  P. 013/102        01/16/2009  13:53        12128155802        From:Bank of NY Mellon

(ix)    any loss, charge or cost attributable to the contracts existing on the date of this Indenture with Bharat Sanchar Nigam Limited described in the Disclosure Materials, but not any expansion option, extension, renewal or replacement thereof; *minus*

(c)    any non-cash credits and gains that increased Consolidated Net Income during such period, including any reversal of a charge referred to in subclauses (b)(iii) or (ix) above; *minus*

(d)    to the extent Consolidated Net Income has been increased thereby:

(i)    any gains attributable to reversals prior to the date of this Indenture of provisions relating to a certain customer bankruptcy settlement during the year ended December 31, 2003 as described in the Disclosure Materials;

(ii)    any credits and gains attributable to the restructuring of customer financing receivables prior to the date of this Indenture; and

(iii)    any reversals of any reserves for any losses, charges or costs *with respect* to the matters covered by subclauses (iv), (v), (vi), (vii), (viii) or (ix) of clause (b) above.

(7)    "Affiliate" means, with respect to any specified Person, any other Person who directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, such specified Person. The term "*control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise; and the terms "*controlling*" and "*controlled*" have meanings correlative of the foregoing.

(8)    "Asset Acquisition" means (1) an investment by NNC or any Subsidiary of NNC in any other Person pursuant to which such Person shall become a Subsidiary of NNC or shall be merged, consolidated or amalgamated with or into NNC or any Subsidiary of NNC, or (2) the acquisition by NNC or any Subsidiary of NNC of the assets of any Person (other than a Subsidiary of NNC) which constitute all or substantially all of the assets of such Person or comprise any division or line of business of such Person or any other properties or assets of such Person other than in the ordinary course of business.

(9)    "Authorized Newspaper" means a newspaper in an official language of the country of publication or in the English language customarily published on each Business Day, whether or not published on Saturdays, Sundays or holidays, and of general circulation in the place in connection with which the term is used or in the financial community of such place. Where successive publications are required to be made in Authorized Newspapers, the successive publications may be made in the same or in different newspapers in the same city meeting the foregoing requirements and in each case on any Business Day.

(10)    "Authorized Officers" means, with respect to, (i) each of NNC and NNL, any two of its President and Chief Executive Officer, General Counsel, Chief Legal Officer, Chief Operating Officer and Chief Financial Officer or any one of the aforesaid officers together with any one of its Corporate Secretary, its Treasurer, any Assistant Secretary or any Assistant Treasurer; and (ii) NNI, any one of its President, its Vice-President, Finance and Treasurer, any other of its Vice-

Presidents, its Secretary, or any of its Assistant Secretaries; *provided* that NNC, NNL and NNI may, from time to time, designate additional officers who would qualify as "Authorized Officers" pursuant to an Officers' Certificate delivered to the Trustee.

(11)    "Board of Directors" means, in respect of the Issuer or a Guarantor, the board of directors, the executive committee or any other committee of that board or any group of directors of that board, duly authorized to make a decision on the matter in question.

(12)    "Board Resolution" means a copy of a resolution certified by the Corporate Secretary, the Secretary or an Assistant Secretary of the Issuer or a Guarantor, as the case may be, to have been duly adopted by the Board of Directors of the Issuer or such Guarantor, respectively, and to be in full force and effect on the date of such certification.

(13)    "Business Day" means, (a) when used with respect to any Place of Payment, any Monday, Tuesday, Wednesday, Thursday or Friday that is not a day on which banking institutions in that Place of Payment are authorized or obligated by law to close and (b) otherwise, any Monday, Tuesday, Wednesday, Thursday or Friday that is not a day on which banking institutions in New York City are authorized or obligated by law to close.

(14)    "Capital Stock" means:

> (a)    with respect to any Person that is a corporation, any and all shares, interests, participations or other equivalents (however designated and whether or not voting) of corporate stock, including each class of Common Stock and Preferred Stock of such Person; and

> (b)    with respect to any Person that is not a corporation, any and all partnership, membership or other equity interests of such Person.

(15)    "Capitalized Lease Obligation" means, as to any Person, the obligations of such Person under a lease that are required to be classified and accounted for as capital lease obligations under GAAP and, for purposes of this definition, the amount of such obligations at any date shall be the capitalized amount of such obligations at such date, determined in accordance with GAAP.

(16)    "Certificated Security" means any Debt Security issued under this Indenture in fully-registered, certificated form (other than a Global Security).

(17)    "Change of Control" means the occurrence of one or more of the following events:

> (a)    any "person," including its Affiliates and associates, or any "group," in each case, other than NNC, any one or more Subsidiaries of NNC or NNC's or such Subsidiaries' employee benefit plans, files a Schedule 13D or Schedule TO (or any successor schedule, form or report under the Exchange Act) disclosing that such person or group has become the "beneficial owner" of 50% or more of the combined voting power of NNC's Capital Stock having ordinary power to elect directors, or has the power to, directly or indirectly, elect a majority of the members of the

[New York #1531721 v17]                    4

NNC's Board of Directors; *provided* that the foregoing shall not apply if as a result of, and immediately following, the transaction giving a person or group such beneficial ownership (including an exchange offer or a transaction referred to in clause (c) below), the holders of the Issuer's or NNC's Common Stock immediately prior to such transaction are, directly or indirectly, the beneficial owners of at least a majority of the total voting power in the aggregate of all classes of Capital Stock of such Person;

(b)    NNC ceases to be the "beneficial owner" of 100% of the voting power of the Common Stock of the Issuer;

(c)    there shall be consummated any share exchange, amalgamation, consolidation or merger of NNC pursuant to which NNC's Common Stock would be converted into cash, securities or other property, or the Issuer or NNC sells, assigns, conveys, transfers, leases or otherwise disposes of all or substantially all of its assets, in each case other than pursuant to a share exchange, amalgamation, consolidation or merger of the Issuer or NNC in which the holders of the Issuer's or NNC's Common Stock immediately prior to the share exchange, amalgamation, consolidation or merger have, directly or indirectly, at least a majority of the total voting power in the aggregate of all classes of Capital Stock of the continuing or surviving corporation (or of the parent of such continuing or surviving corporation) immediately after the share exchange, amalgamation, consolidation or merger; or

(d)    the Issuer or NNC is dissolved or liquidated.

For purposes of this "Change of Control" definition:

(i)    "person" or "group" has the meaning given to it for purposes of Sections 13(d) and 14(d) of the Exchange Act or any successor provisions, and the term "group" includes any group acting for the purpose of acquiring, holding or disposing of securities within the meaning of Rule 13d-5(b)(1) under the Exchange Act or any successor provision;

(ii)    a "beneficial owner" will be determined in accordance with Rule 13d-3 under the Exchange Act, as in effect on the date of this Indenture; and

(iii)    the number of shares of the Issuer's voting stock outstanding will be deemed to include, in addition to all outstanding shares of the Issuer's voting stock and unissued shares deemed to be held by the "person" or "group" or other person with respect to which the Change of Control determination is being made, all unissued shares deemed to be held by all other persons.

Notwithstanding the foregoing, any (A) amalgamation, consolidation or merger of NNC with or into the Issuer (whether directly or indirectly by merger with or into an entity with only nominal assets created in anticipation or contemplation of such

From:Bank of NY Mellon        12128155802        01/16/2009 13:54        #415 P. 015/102

amalgamation, consolidation or merger), (B) transfer of assets solely between or among NNC, the Issuer and any successor entity to NNC or the Issuer or (C) liquidation or dissolution of NNC or the Issuer resulting in the transfer of all of the assets of NNC or the Issuer to NNC, the Issuer or any successor entity to NNC or the Issuer shall, in each case, not constitute a Change of Control; *provided* that such transaction does not contravene the terms of Article Eight of this Indenture.

(18)    "Commission" means the United States Securities and Exchange Commission, as from time to time constituted, created under the Exchange Act, or if at any time after the execution of this instrument such Commission is not existing and performing the duties now assigned to it under the Trust Indenture Act, then the body performing such duties on such date.

(19)    "Common Stock" of any Person means any and all shares, interests or other participations in, and other equivalents (however designated and whether voting or non-voting) of, such Person's common equity interests, whether outstanding on the date of this Indenture or issued after the date of this Indenture, and includes, without limitation, all series and classes of such equity interests.

(20)    "Consolidated Fixed Charge Coverage Ratio" means the ratio of (i) Adjusted EBITDA of NNC during the four full fiscal quarters (the "Four Quarter Period") ending prior to the date of the transaction (the "Transaction Date") giving rise to the need to calculate the Consolidated Fixed Charge Coverage Ratio for which financial statements are publicly available to (ii) Consolidated Fixed Charges for such Four Quarter Period. In addition to and without limitation of the foregoing, for purposes of this definition, "Adjusted EBITDA" and "Consolidated Fixed Charges" shall be calculated after giving effect on a *pro forma* basis (as reasonably estimated by NNC) for the period of such calculation to:

   (a)    the incurrence of any Funded Debt of NNC or any of its Subsidiaries giving rise to the need to make such calculation and any incurrence or repayment of other Funded Debt (and the application of the proceeds thereof), other than the incurrence or repayment of Funded Debt in the ordinary course of business for working capital purposes pursuant to working capital facilities, occurring during the Four Quarter Period or at any time subsequent to the last day of the Four Quarter Period and on or prior to the Transaction Date, as if such incurrence or repayment, as the case may be (and the application of the proceeds thereof), occurred on the first day of the Four Quarter Period; and

   (b)    (i) any asset sale during the Four Quarter Period involving the sale of a Subsidiary or line of business by NNC or any of its Subsidiaries, in each case, that accounted for at least $150,000,000 of NNC's consolidated revenue for the Four Quarter Period and (ii) any Asset Acquisition by NNC or any of its Subsidiaries during the Four Quarter Period which would have accounted for at least $150,000,000 of NNC's consolidated revenue for the Four Quarter Period, in each case, so as to exclude or include, as the case may be, NNC's good faith estimate of any Adjusted EBITDA (including any pro forma expense and cost reductions calculated on a basis consistent with Regulation S-X under the Exchange Act)

[New York #1531721 v17]                                    6

attributable to the assets which are the subject of such asset sale or Asset Acquisition, as if such asset sale or Asset Acquisition occurred on the first day of the Four Quarter Period.

If NNC or any of its Subsidiaries directly or indirectly guarantees Funded Debt of a third Person, the preceding sentence shall give effect to the incurrence of such guaranteed Funded Debt, without duplication, as if NNC or any Subsidiary of NNC had directly incurred or otherwise assumed such guaranteed Funded Debt.

Furthermore, in calculating the "Consolidated Fixed Charge Coverage Ratio":

(i)     for purposes of determining the numerator (but not the denominator) of this "Consolidated Fixed Charge Coverage Ratio," interest income determined on a fluctuating basis as of the Transaction Date and which will continue to be so determined thereafter, shall be deemed to have accrued at a fixed rate per annum equal to the applicable rate of interest in effect on the Transaction Date;

(ii)    for purposes of determining the denominator (but not the numerator) of this "Consolidated Fixed Charge Coverage Ratio," interest on outstanding Funded Debt, determined on a fluctuating basis as of the Transaction Date and which will continue to be so determined thereafter, shall be deemed to have accrued at a fixed rate per annum equal to the applicable rate of interest in effect on the Transaction Date; and

(iii)   notwithstanding clause (i) or (ii) above, interest on Funded Debt determined on a fluctuating basis, to the extent such interest is covered by agreements relating to Interest Swap Obligations, shall be deemed to accrue at the rate per annum resulting after giving effect to the operation of such agreements.

(21)    "Consolidated Fixed Charges" means, for any period, the sum, without duplication, of:

       (a)     Consolidated Interest Expense for such period; plus

       (b)     the amount of all dividends on any series of Disqualified Capital Stock (including the Existing Preferred Stock) or Designated Qualified Preferred Stock of NNC or its Subsidiaries paid, declared or accrued during such period multiplied, to the extent such dividend payments are not a deduction to the federal income tax liabilities of NNC or its applicable Subsidiary, by a fraction, the numerator of which is one and the denominator of which is one minus the then current effective consolidated federal, state and local tax rate of NNC or such Subsidiary, expressed as a decimal.

(22)    "Consolidated Interest Expense" means, for any period, total interest expense (including that portion attributable to Capitalized Lease Obligations in accordance with GAAP) of NNC and its Subsidiaries for such period, on a consolidated basis, determined in accordance with GAAP (without duplication).

From:Bank of NY Mellon          12128156802          01/16/2009 13:55          #415 P. 017/102

(23)    "Consolidated Net Income" means, with respect to NNC, for any period, the aggregate net income (or loss) of NNC and its Subsidiaries for such period on a consolidated basis, determined in accordance with GAAP; *provided* that there shall be excluded therefrom (without duplication):

    (a)    net after-tax gains or losses classified in NNC's consolidated statement of operations as gains or losses on the sale of businesses or assets;

    (b)    net after-tax items classified as extraordinary gains or losses;

    (c)    the net after-tax expense (or gain) resulting from any payment, distribution or accrual in connection with the settlement of, or satisfaction of any judgment resulting from, any shareholder litigation or regulatory or law enforcement investigation, in each case, relating to circumstances described in the Disclosure Materials;

    (d)    the net income (but not loss) of any Subsidiary of NNC (other than the Issuer or any Guarantor) to the extent that (i) the declaration of dividends by such Subsidiary of that income is prohibited by a contract, operation of law (other than as a result of any solvency or minimum capital requirement) or applicable judgment and (ii) such net income cannot otherwise be distributed or transferred to NNC;

    (e)    the net income or loss of any Person that is not a Subsidiary of NNC, and any joint ventures in which NNC or any Subsidiary is a party, except to the extent of cash dividends or distributions paid to NNC or to a Subsidiary of NNC by such Person;

    (f)    after-tax income or loss attributable to discontinued operations;

    (g)    the cumulative effect of changes in accounting principles; and

    (h)    for purposes of calculating Consolidated Net Income pursuant to clause (iii) of Section 1007(b) only, in the case of a successor to NNC by consolidation, amalgamation or merger or as a transferee of assets of NNC or the Issuer, as applicable, the net income (but not loss) of the successor corporation prior to such consolidation, amalgamation, merger or transfer of assets (other than the successor of a merger, amalgamation or consolidation of the Issuer with or into NNC or any Subsidiary of NNC or of NNC into any Subsidiary of NNC).

(24)    "Consolidated Net Tangible Assets" means NNC's consolidated total assets after deducting therefrom (i) all current liabilities and (ii) all goodwill, trade names, trademarks, patents, unamortized debt discount and expense and other like intangible assets, as shown in NNC's then most recent consolidated balance sheet prepared in accordance with GAAP contained in (x) NNC's most recent annual or quarterly report on Form 10-K or Form 10-Q, as applicable, as filed with the Commission or (y) if NNC is no longer subject to reporting

[New York #1531721 v17]         8

requirements under the Exchange Act, NNC's most recent annual or quarterly financial statements certified by NNC's chief financial officer.

(25) "Corporate Trust Office" means the principal corporate trust office of the Trustee at which at any particular time its corporate trust business shall be administered.

(26) "corporation" includes corporations, associations, companies and business trusts.

(27) "Credit Enhanced Foreign Subsidiary Debt" means any Funded Debt of a Foreign Subsidiary payable to a financial institution that has (a) sold a participation for cash consideration in the full principal amount of such Funded Debt to NNC, the Issuer or any other Subsidiary of NNC or (b) a Lien on or right of set-off against deposits of cash, cash equivalents or investment securities of NNC, the Issuer or any other Subsidiary of NNC; *provided* that, in the case of clause (b) above, the principal amount of such Funded Debt does not exceed the amount of cash, cash equivalents or investment securities so deposited.

(28) "Debt Securities" means Debt Securities issued by NNL and guaranteed by the Guarantors and authenticated and delivered under this Indenture.

(29) "Default" means an event or condition the occurrence of which is, or with the lapse of time or the giving of notice or both would be, an Event of Default.

(30) "Defaulted Interest" has the meaning specified in Section 312.

(31) "Depositary" means, with respect to the Debt Securities of any series issuable or issued in whole or in part in the form of one or more Global Securities, the Person designated as Depositary by the Issuer pursuant to Section 301 until a successor Depositary shall have become such pursuant to the applicable provisions of this Indenture, and thereafter "Depositary" shall mean or include each Person who is then a Depositary hereunder, and if at any time there is more than one such Person, "Depositary" as used with respect to the Debt Securities of any such series shall mean the Depositary with respect to the Debt Securities of that series.

(32) "Designated Qualified Preferred Stock" means any Preferred Stock consisting of Qualified Capital Stock issued by NNC or any of its Subsidiaries that is designated as such by NNC by an officers' certificate delivered to the Trustee; *provided* that, immediately after giving effect to the issuance thereof, the Consolidated Fixed Charge Coverage Ratio is greater than 2.0 to 1.0.

(33) "Disclosure Materials" means the Offering Memorandum of NNL, dated July 5, 2006, (the "Offering Memorandum") and all materials disclosed in, incorporated by reference in or contemplated by the Offering Memorandum.

(34) "Disqualified Capital Stock" means, with respect to the Debt Securities of any series, that portion of any Capital Stock which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable at the option of the holder thereof), or upon the happening of any event (other than an event which would constitute an asset sale or Change of Control), matures or is mandatorily redeemable (other than such Capital Stock that will be redeemed with Qualified Capital Stock), pursuant to a sinking fund obligation or otherwise, or is

[New York #1531721 v17]                                              9

redeemable at the sole option of the holder thereof (except, in each case, upon the occurrence of an asset sale or Change of Control) on or prior to the final Maturity of the Debt Securities of such series.

(35)    "Dollar" or "$," unless otherwise indicated, means the lawful currency of the United States of America.

(36)    "DTC" means The Depository Trust Company, its nominees and their respective successors and assigns, or such other depositary institution hereinafter appointed by the Issuer that is a clearing agency registered under the Exchange Act.

(37)    "Event of Default" has the meaning specified in Section 501.

(38)    "Exchange Act" means the United States Securities Exchange Act of 1934, as amended, or any successor statute or statutes thereto.

(39)    "Exchange Debt Securities" means (a) any Debt Securities issued in exchange for Initial Debt Securities or Additional Debt Securities pursuant to an Exchange Offer or any other registration under the Securities Act and (b) any Debt Security with respect to which the next preceding Predecessor Security of such Debt Security was an Exchange Debt Security.

(40)    "Exchange Offer" when used with respect to the Debt Securities of any series issued with Registration Rights, means an exchange offer by the Issuer pursuant to which Initial Debt Securities may be exchanged for Exchange Debt Securities evidencing the same, continuing indebtedness as the Initial Debt Securities registered under the Securities Act.

(41)    "Exchange Rate" means: (i) with respect to payments in Dollars to be made on Debt Securities denominated in a Foreign Currency, the noon buying rate for that currency for wire transfers quoted in The City of New York on the Regular Record Date or Special Record Date with respect to such Interest Payment Date or date for payment of Defaulted Interest or the fifteenth day immediately preceding the maturity of an installment of principal, as the case may be, as certified for customs purposes by the Federal Reserve Bank of New York; (ii) with respect to payments in a Foreign Currency to be made on Debt Securities denominated in Dollars, the noon Dollar buying rate for that currency for wire transfers quoted in The City of New York on the Regular Record Date or Special Record Date with respect to such Interest Payment Date or date for payment of Defaulted Interest or the fifteenth day immediately preceding the maturity of an installment of principal, as the case may be, as certified for customs purposes by the Federal Reserve Bank of New York; and (iii) with respect to payments in a Foreign Currency to be made on Debt Securities denominated in a different Foreign Currency, the exchange rate between such Foreign Currencies determined in the manner specified pursuant to Section 301(b)(14). If for any reason such rates are not available with respect to one or more currencies for which an Exchange Rate is required, the Trustee shall use such quotation of the Federal Reserve Bank of New York as of the most recent available date, or quotations from one or more major banks in The City of New York or in the country of issue of the currency in question, or such other quotations as the Trustee shall deem appropriate, such banks being satisfactory to the Issuer. Unless otherwise specified by the Trustee, if there is more than one market for dealing in any currency by reason of foreign exchange regulations or otherwise, the market to be used in respect

[New York #1531721 v17]                    10

of such currency shall be that upon which a non-resident issuer of securities designated in such currency would purchase such currency in order to make payments in respect of such securities.

(42)   "Exchange Rate Officers' Certificate," with respect to any date for the payment of principal of (and premium, if any) and interest on any series of Debt Securities, means a certificate setting forth the applicable Exchange Rate or Exchange Rates as of the Regular Record Date or Special Record Date with respect to such Interest Payment Date, the date for payment of Defaulted Interest or the fifteenth day immediately preceding the maturity of an installment of principal, as the case may be, and the amounts payable in Dollars and Foreign Currencies in respect of the principal of (and premium, if any) and interest on Debt Securities denominated in any Foreign Currency, and signed by an Authorized Officer of the Issuer and delivered to the Trustee.

(43)   "Exchange Registration Statement" means, when used with respect to the Debt Securities of a series having Registration Rights, a registration statement filed by the Issuer and the Guarantors in accordance with the Issue Date Registration Rights Agreement or any other Registration Rights Agreement entered into with respect to such Debt Securities.

(44)   "Excluded Holder" has the meaning specified in Section 313.

(45)   "Existing NNC Convertible Notes" means the 4.25% Convertible Senior Notes due September 1, 2008 issued by NNC and guaranteed by NNL pursuant to the Indenture dated as of August 15, 2001 among NNC, as issuer, NNL, as guarantor, and Deutsche Bank Trust Company Americas, as successor to The Bankers Trust Company, as trustee.

(46)   "Existing Preferred Stock" means the Issuer's Cumulative Redeemable Class A Preferred Shares Series 5, of which 16,000,000 shares are outstanding on the date of this Indenture (and the Issuer's Redeemable Class A Preferred Shares Series 6 into which such shares are convertible), and Non-cumulative Redeemable Class A Preferred Shares Series 7, of which 14,000,000 shares are outstanding on the date of this Indenture (and the Issuer's Non-Cumulative Redeemable Class A Preferred Shares Series 8 into which such shares are convertible), in each case as the same may be amended from time to time.

(47)   "Foreign Currency" means a currency issued by the government of any country other than the United States of America.

(48)   "Foreign Subsidiary" means a Subsidiary of NNC organized under the laws of a jurisdiction outside the United States of America and Canada.

(49)   "Funded Debt" means with respect to any Person, without duplication:

        (a)   all indebtedness of such Person for borrowed money;

        (b)   all indebtedness of such Person evidenced by bonds, debentures, notes or other similar instruments;

        (c)   all Capitalized Lease Obligations of such Person;

[New York #1531721 v17]                    11

(d)    guarantees of indebtedness of another Person of the type referred to in clauses (a) through (c) above and clause (e) below (each such guarantee to constitute Funded Debt in an amount equal to the maximum amount of such other Person's Funded Debt guaranteed thereby);

(e)    all indebtedness of any other Person of the type referred to in clauses (a) through (d) which is secured by any Lien on any property or asset of such Person, the amount of such indebtedness being deemed to be the lesser of the fair market value of such property or asset and the amount of the indebtedness so secured; and

(f)    all Disqualified Capital Stock (including the Existing Preferred Stock) and Designated Qualified Preferred Stock issued by such Person with the amount of Funded Debt represented thereby being equal to the greater of its voluntary or involuntary liquidation preference and its maximum fixed repurchase price, if any, but excluding accrued dividends, if any.

For greater certainty, (i) proceeds received in respect of any factoring, securitization, sale of receivables or similar transaction, (ii) obligations in respect of the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and obligations of a like nature, (iii) guarantees of, and indemnity arrangements with respect to, obligations described in clauses (i) and (ii) of this paragraph, or (iv) obligations under letters of credit and letters of guarantee issued to support (A) trade or performance obligations, (B) obligations under operating leases or (C) contingent obligations arising in connection with the settlement of any shareholder litigation or regulatory or criminal investigation, or satisfaction of any judgment resulting therefrom, will not be considered Funded Debt.

For purposes hereof, the "maximum fixed repurchase price" of any Disqualified Capital Stock that does not have a fixed repurchase price shall be calculated in accordance with the terms of such Disqualified Capital Stock as if such Disqualified Capital Stock were purchased on any date on which Funded Debt shall be required to be determined pursuant to this Indenture, and if such price is based upon, or measured by, the fair market value of such Disqualified Capital Stock shall be determined in accordance with the definition thereof.

Accrual of interest, accrual of dividends, the accretion of accreted value, the payment of interest in the form of additional Funded Debt and the payment of dividends in the form of additional shares of Preferred Stock will not be deemed to be an incurrence of Funded Debt. The amount of any Funded Debt outstanding as of any date shall be (i) the accreted value of the Funded Debt, in the case of any Funded Debt issued with original issue discount or (ii) the principal amount or liquidation preference of such Funded Debt, in any other case.

For purposes of determining compliance with any U.S. dollar-denominated restriction on the incurrence of Funded Debt, the U.S. dollar-equivalent principal amount of Funded Debt denominated in a Foreign Currency shall be calculated based on the relevant currency exchange rate in effect on the date such Funded Debt was incurred, in the case of term Funded Debt, or first committed, in the case of revolving credit Funded Debt. Notwithstanding any other provision of Section 1006 of this Indenture, the maximum amount of Funded Debt that NNC, the Issuer or the Guarantors may incur pursuant to Section 1006 of this Indenture shall not be

deemed to be exceeded solely as a result of fluctuations in the exchange rate of currencies. The principal amount of any Funded Debt incurred to Refinance other Funded Debt, if incurred in a different currency from the Funded Debt being Refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such Refinancing Funded Debt is denominated that is in effect on the date of such Refinancing.

(50)    "GAAP" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as may be approved by a significant segment of the accounting profession of the United States, which are in effect from time to time.

(51)    "Global Security" means a Debt Security evidencing all or part of a series of Debt Securities, issued to the Depositary for such series in accordance with Section 303 and bearing the appropriate legend prescribed in Section 303.

(52)    "Guarantee" means the guarantee of each of the Guarantors as endorsed on each Global Security and Certificated Security authenticated and delivered pursuant to this Indenture and shall include the Guarantee set forth in Section 203 of this Indenture and all other obligations and covenants of the Guarantors contained in this Indenture and any Global Security and Certificated Security.

(53)    "Guarantor" means each of (a) Nortel Networks Corporation, (b) at any time other than during a Suspension Period, Nortel Networks Inc. and (c) any successor corporation to a Guarantor that has become a Guarantor pursuant to the applicable provisions of this Indenture.

(54)    "Guarantor Request" means a written request or order signed in the name of a Guarantor by, in the case of NNC, any two of its President and Chief Executive Officer, General Counsel, Chief Legal Officer, Chief Operating Officer and Chief Financial Officer or any one of the aforesaid officers together with any one of its Authorized Officers, or, in the case of NNI, any one of its Authorized Officers and, in each case, delivered to the Trustee.

(55)    "Holder," with respect to a Debt Security, means the Person in whose name such Debt Security is registered in the Security Register.

(56)    "Indenture" means this instrument as originally executed or as it may from time to time be supplemented, amended or restated by or pursuant to one or more indentures supplemental hereto entered into pursuant to the applicable provisions hereof and, unless the context otherwise requires, shall include the terms of a particular series of Debt Securities established as contemplated by Section 301.

(57)    "Initial Purchasers" means J.P. Morgan Securities Inc., Citigroup Global Markets Inc., ABN AMRO Incorporated, Credit Suisse Securities (USA) LLC and Deutsche Bank Securities Inc.

(58)    "Initial Debt Securities," when used with respect to the Debt Securities of any series having Registration Rights, means the Debt Securities of such series issued upon original

[New York #1351721 v17]                    13

issuance and all Debt Securities, other than Exchange Debt Securities, issued upon the registration of transfer, exchange or partial redemption of Initial Debt Securities.

(59)    "interest," when used with respect to an Original Issue Discount Security that by its terms bears stated interest only after Maturity, refers to interest payable after Maturity.

(60)    "Interest Payment Date,", with respect to any Debt Security, means the Stated Maturity Date of an installment of interest on such Debt Security.

(61)    "Interest Swap Obligations" means the obligations of any Person pursuant to any arrangement with any other Person, whereby, directly or indirectly, such Person is entitled to receive from time to time periodic payments calculated by applying either a floating or a fixed rate of interest on a stated notional amount in exchange for periodic payments made by such other Person calculated by applying a fixed or a floating rate of interest on the same notional amount and shall include, without limitation, interest rate swaps, caps, floors, collars and similar agreements.

(62)    "Investment Grade Status,", with respect to the Debt Securities of any series, shall occur when the Debt Securities of such series have both (a) a rating of "BBB-" or higher from S&P and (b) a rating of "Baa3" or higher from Moody's, and each such rating shall have been published by the applicable agency, in each case with no negative outlook.

(63)    "Issue Date" means the date of original issue of any Initial Debt Securities.

(64)    "Issue Date Registration Rights Agreement" means the registration rights agreement dated as of the date of this Indenture among the Issuer, the Guarantors and the Initial Purchasers.

(65)    "Issuer" has the meaning assigned to such term in the first paragraph of this Indenture.

(66)    "Issuer Request" and "Issuer Order" mean, respectively, a written request or order signed in the name of the Issuer by an Authorized Officer of the Issuer and delivered to the Trustee.

(67)    "Lien" means any mortgage, hypothec, pledge, lien, security interest, privilege, floating charge, conditional sale or other title retention agreement or other similar encumbrance securing indebtedness for borrowed money.  For greater certainty, "Lien" does not include any such encumbrance covering receivables or other assets an interest in which has been transferred to a third party in a factoring, securitization or similar transaction that is accounted for as a sale under GAAP.

(68)    "Managed Service Contract Liens" means any Lien in favor of a customer of NNC or any of its Subsidiaries and/or a third party financing company relating to equipment owned by NNC or any of its Subsidiaries that is (a) used by such customer in the conduct of its business and (b) managed by NNC or any of its Subsidiaries under a managed services or hosting services contract between NNC or any of its Subsidiaries, such customer and/or such third party financing company.

(69)    "Maturity," when used with respect to any Debt Security, means the date on which the principal of such Debt Security becomes due and payable as therein or herein provided, whether

at the Stated Maturity Date or by declaration of acceleration, call for redemption, repayment at the option of the Holder or otherwise.

(70)    "Measurement Date" means March 31, 2006.

(71)    "Moody's" means Moody's Investors Service, Inc. and its successors.

(72)    "NGSH" means Nortel Government Solutions Holding Corporation, a Delaware corporation, and any successor corporation thereto.

(73)    "NNC" has the meaning specified in the preamble hereto.

(74)    "NNCC" means Nortel Networks Capital Corporation, a Delaware corporation, and any successor corporation thereto.

(75)    "NNI" has the meaning specified in the preamble hereto.

(76)    "NNL" has the meaning specified in the preamble hereto.

(77)    "Officers' Certificate" means a certificate signed by, in the case of NNC or NNL, any two of its President and Chief Executive Officer, General Counsel, Chief Legal Officer, Chief Operating Officer and Chief Financial Officer or any one of the aforesaid officers together with any one of its Authorized Officers, and, in the case of NNI, any one of its Authorized Officers and, in each case, delivered to the Trustee.

(78)    "Opinion of Counsel" means a written opinion of counsel, who may be counsel to or an employee of the Issuer or a Guarantor or both, which opinion shall be subject to customary assumptions and qualifications.

(79)    "Original Issue Discount Security" means any Debt Security that is issued with "original issue discount" within the meaning of Section 1273(a) of the United States Internal Revenue Code of 1986 and the regulations thereunder and any other Debt Security designated by the Issuer as issued with original issue discount for United States federal income tax purposes.

(80)    "Outstanding" when used with respect to Debt Securities means, as of the date of determination, all Debt Securities theretofore authenticated and delivered under this Indenture, except:

> (a)    Debt Securities theretofore cancelled by the Trustee or delivered to the Trustee for cancellation;
>
> (b)    Debt Securities for whose payment or redemption money in the necessary amount has been theretofore deposited with the Trustee or any Paying Agent (other than the Issuer or a Guarantor) in trust or set aside and segregated in trust by the Issuer or a Guarantor (if the Issuer or a Guarantor shall act as its own Paying Agent) for the Holders of such Debt Securities; *provided* that if such Debt Securities are to be redeemed, notice of such redemption has been duly given pursuant to this Indenture or provision therefor satisfactory to the Trustee has been made; and

[New York #1531721 v17]                    15

From:Bank of NY Mellon    12128156802    01/16/2009 13:57    #415  P. 025/102

(c)     Debt Securities that have been surrendered to the Trustee pursuant to Section 311 or in exchange for or in lieu of which other Debt Securities have been authenticated and delivered pursuant to this Indenture, other than any such Debt Securities in respect of which there shall have been presented to the Trustee proof that such Debt Securities are held by a *bona fide* purchaser in whose hands such Debt Securities are valid and binding obligations of the Issuer;

*provided* that in determining whether the Holders of the requisite principal amount of Outstanding Debt Securities have taken any Act hereunder, Debt Securities owned by the Issuer or any other obligor upon the Debt Securities or any Affiliate of the Issuer or of such other obligor shall be disregarded and deemed not to be Outstanding; *provided further* that, in determining whether the Trustee shall be protected in relying upon such Act, only Debt Securities that a Responsible Officer of the Trustee knows to be so owned shall be so disregarded; and *provided further* that Debt Securities so owned that have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right to act with respect to such Debt Securities and that the pledgee is not the Issuer or any other obligor upon the Debt Securities or any Affiliate of the Issuer or of such other obligor.

(81)    "Participant" means, with respect to the Depositary, a Person who has a direct account with the Depositary.

(82)    "Paying Agent" means any Person authorized by the Issuer to pay the principal of (and premium, if any) or interest on any Debt Securities on behalf of the Issuer.

(83)    "Permitted Funded Debt" means, without duplication, each of the following:

        (a)     Funded Debt under the Debt Securities issued on the date of this indenture and any Exchange Debt Securities issued with respect to such Debt Securities;

        (b)     Funded Debt incurred to finance the acquisition, improvement or construction of assets that is secured by Purchase Money Liens on the assets so acquired, improved or constructed;

        (c)     Funded Debt of NNC, the Issuer and/or any Subsidiary of NNC outstanding on the date of this Indenture;

        (d)     Funded Debt of NNC, the Issuer and/or any Subsidiary of NNC to NNC, the Issuer and/or any Subsidiary of NNC;

        (e)     Funded Debt of NNC, the Issuer and/or any Subsidiary of NNC owing to any joint-venture in which NNC, the Issuer or such Subsidiary has a minority holding;

[New York #1531721 v17]                                    16

(f)  any guarantee of Funded Debt by NNC, the Issuer or any Subsidiary of NNC so long as the incurrence of such Funded Debt would otherwise be permitted or is otherwise not restricted under this Indenture;

(g)  Refinancing Funded Debt;

(h)  any Credit Enhanced Foreign Subsidiary Debt and any Funded Debt arising out of the deposit of cash or cash equivalents to secure any Credit Enhanced Foreign Subsidiary Debt;

(i)  additional Funded Debt of NNC, the Issuer and any Subsidiary of NNC in an aggregate outstanding principal amount not to exceed, after giving effect to the relevant transaction, $250,000,000;

(j)  any other Funded Debt of any Foreign Subsidiary; *provided* that the aggregate outstanding principal amount of Funded Debt issued or assumed pursuant to this clause (j) by any individual Foreign Subsidiary would not, after giving effect to the relevant transaction, exceed $5,000,000; and

(k)  Funded Debt in an aggregate outstanding principal amount not to exceed 15% of Consolidated Net Tangible Assets after giving effect to any such incurrence of Funded Debt under this clause (k).

For purposes of determining compliance with Section 1006 of this Indenture, in the event that an item of Funded Debt meets the criteria of more than one of the categories of Permitted Funded Debt other than clause (c) above or is entitled to be incurred pursuant to the Consolidated Fixed Charge Coverage Ratio provisions of such covenant, the Issuer or the applicable Guarantor shall, in its sole discretion, classify such item of Funded Debt in any manner that complies with such covenant. In addition, the Issuer or the applicable Guarantor may, at any time, change the classification of an item of Funded Debt (or any portion thereof) to any other clause, and may classify an item in part under any one or more of the clauses listed above, or in whole or in part to Section 1006(a) of this Indenture; *provided* that NNC, the Issuer or any other Subsidiary of NNC would be permitted to incur such item of Funded Debt (or portion thereof) pursuant to such other clause or clauses, as the case may be, or Section 1006(a) of this Indenture, as the case may be, at such time of reclassification. Accrual of interest, accretion or amortization of original issue discount or other discounts or premiums, the payment of interest on any Funded Debt in the form of additional Funded Debt with the same terms, and the payment of dividends on Disqualified Capital Stock or Designated Qualified Preferred Stock in the form of additional shares of the same class of Disqualified Capital Stock or Designated Qualified Preferred Stock and any other changes in reported Funded Debt required by GAAP and other non-cash changes in Funded Debt due to fluctuations in currency exchange rates, will not be deemed to be an incurrence of Funded Debt or an issuance of Disqualified Capital Stock or Designated Qualified Preferred Stock for purposes of Section 1006 of this Indenture.

(84)  "Person" means an individual, partnership, corporation, limited liability company, unincorporated organization, trust or joint venture, or a governmental agency or political subdivision thereof.

[New York #1531721 v17]                    17

#415  P.027/102     01/16/2009 13:57     12128155802     From:Bank of NY Mellon

(85) "Place of Payment" means: (i) when used with respect to the Debt Securities of any series payable in Dollars, the Corporate Trust Office of the Trustee in the Borough of Manhattan, The City and State of New York; and (ii) when used with respect to the Debt Securities of any series payable in a Foreign Currency, the other place or places, if any, where the principal or (and premium, if any) and interest on the Debt Securities of that series are payable as specified as contemplated by Section 301.

(86) "Predecessor Security" of any particular Debt Security means every previous Debt Security evidencing all or a portion of the same debt as that evidenced by such particular Debt Security; and, for the purposes of this definition, any Debt Security authenticated and delivered under Section 311 in lieu of a lost, destroyed or stolen Debt Security shall be deemed to evidence the same debt as the lost, destroyed or stolen Debt Security.

(87) "Preferred Stock" of any Person means any Capital Stock of such Person that has preferential rights to any other Capital Stock of such Person with respect to dividends or redemptions or upon liquidation.

(88) "Purchase Money Lien" means any Lien on property existing at the time of acquisition thereof by NNC or any Subsidiary of NNC; any Lien on any property acquired, constructed or improved by NNC or any Subsidiary of NNC incurred subsequent to the date of this Indenture, which is created or assumed contemporaneously with, or within 180 days after, such acquisition or the completion of such construction or improvement, to secure or provide for the payment of the purchase price thereof or the cost of construction or improvement thereon incurred subsequent to the date of this Indenture (including the cost of any underlying real property); *provided* that in the case of any such acquisition, construction or improvement, the Lien shall not apply to any property previously owned by NNC or any Subsidiary of NNC, other than, in the case of any such construction or improvement, any real property, theretofore substantially unimproved for the purposes of NNC or any Subsidiary of NNC, on which the property so constructed, or the improvement, is located and other than any machinery or equipment installed at any time so as to constitute immovable property or a fixture on the real property on which the property so constructed, or the improvement, is located.

(89) "QIB" means any "qualified institutional buyer" as defined in Rule 144A.

(90) "Qualified Capital Stock" means any Capital Stock that is not Disqualified Capital Stock.

(91) "Qualified Equity Proceeds" means the net cash proceeds from any issuance or sale of Qualified Capital Stock of NNC or NNL, other than issuances or sales to NNC or any Subsidiary of NNC.

(92) "Redemption Date," when used with respect to any Debt Security to be redeemed, means the date fixed for such redemption by or pursuant to this Indenture.

(93) "Redemption Price," when used with respect to any Debt Security to be redeemed, means the price at which it is to be redeemed pursuant to this Indenture.

(94) "Refinance" means, with respect to any security or Funded Debt, to refinance, extend, renew, refund, repay, prepay, redeem, defease or retire, or to issue a security or any Funded Debt

[New York 31531721 v17]                    18

From:Bank of NY Mellon          12128155802          01/16/2009 13:57          #415 P. 028/102

in exchange or replacement for, such security or Funded Debt in whole or in part. "Refinanced" and "Refinancing" have correlative meanings.

(95)    "Refinancing Funded Debt" means any Refinancing by NNC, the Issuer or any other Subsidiary of NNC of Funded Debt permitted by Section 1006 of this Indenture (other than pursuant to clauses (d), (e), (f), (h), (i), (j) or (k) of the definition of "Permitted Funded Debt"), in each case that does not:

        (a)    result in an increase in the aggregate principal amount of Funded Debt of such Person as of the date of such proposed Refinancing (plus the amount of any premium required to be paid under the terms of the instrument governing such Funded Debt and plus the amount of reasonable expenses incurred by NNC, the Issuer or any other Subsidiary of NNC in connection with such Refinancing); or

        (b)    create Funded Debt with either (i) a Weighted Average Life to Maturity that is less than the Weighted Average Life to Maturity of the Funded Debt being Refinanced or (ii) a final maturity earlier than the final Maturity of any Debt Security.

(96)    "Registration Rights," when used with respect to any Debt Security, means that such Debt Security has the benefit of a Registration Rights Agreement entered into in connection with the issuance of such Debt Security.

(97)    "Registration Rights Agreement" means any registration rights agreement among the Issuer, the Guarantors and one or more investment banks acting as initial purchasers in connection with any issuance of Debt Securities under this Indenture, including the Issue Date Registration Rights Agreement.

(98)    "Registration Statement" means an effective Exchange Registration Statement or Shelf Registration Statement.

(99)    "Regular Record Date" for the interest payable on any Interest Payment Date on the Debt Securities of any series means the date specified for that purpose as contemplated by Section 301.

(100)    "Regulation S" means Regulation S under the Securities Act (or any successor provision), as it may be amended from time to time.

(101)    "Regulation S Debt Securities," when used with respect to an identifiable series of the Debt Securities of any series, means all Debt Securities of such series sold (whether in the original issuance or afterwards) pursuant to Regulation S.

(102)    "Regulation S Global Security" has the meaning specified in Section 301(i).

(103)    "Resale Restriction Termination Date" means, (a) for any Restricted Debt Security (or beneficial interest therein) that is not a Regulation S Debt Security, two years (or such other period specified in Rule 144(k)) from the later of (i) the Issue Date thereof and (ii) the last date on which the Issuer, any Guarantor or any Affiliate of the Issuer or any Guarantor was the owner

[New York #1531721 v17]                                    19

of such Debt Securities and (b) for any Restricted Debt Securities that are Regulation S Debt Securities (or beneficial interests in a Regulation S Global Security), 40 days after the later of (i) the Issue Date thereof and (ii) the last date on which the Issuer, any Guarantor or any Affiliate of the Issuer or any Guarantor was the owner of such Debt Securities.

(104)  "Responsible Officer," when used with respect to the Trustee, means any vice-president (whether or not designated by a number or word or words added before or after the title "vice-president"), any assistant secretary, any assistant treasurer, any trust officer or assistant trust officer, or any other officer of the Trustee customarily performing functions similar to those performed by any of the above designated officers and also means, with respect to a particular corporate trust matter, any other officer to whom such matter is referred because of his knowledge of and familiarity with the particular subject.

(105)  "Restricted Debt Securities," when used with respect to an identifiable series of the Debt Securities, means all Debt Securities of such series other than Exchange Debt Securities, and shall include the Regulation S Global Security and the Rule 144A Global Security; provided that Restricted Debt Securities of such series shall cease to be Restricted Debt Securities upon the removal of the Restricted Debt Securities Legend.

(106)  "Restricted Debt Securities Certificate" means a certificate substantially in the form set forth in Exhibit B.

(107)  "Restricted Debt Securities Legend" means, collectively, the legends substantially in the forms of the legends required by Section 307 to be placed upon each Restricted Debt Security.

(108)  "Restricted Period" means, in the case of any Regulation S Debt Securities of an identifiable series, the period of 40 consecutive days beginning on and including the later of (i) the day on which such Debt Securities are first offered to Persons other than distributors (as defined in Regulation S) in reliance on Regulation S and (ii) the Issue Date for such Regulation S Debt Securities.

(109)  "Restricted Subsidiary" means (a) during a Suspension Period, NNI and NNCC, and (b) at all other times, any Subsidiary of NNC (other than the Issuer).

(110)  "Reversion Date" means, for any series of Debt Securities, the date such Debt Securities cease to have the applicable rating from either Moody's or S&P specified in the definition of Investment Grade Status; provided that solely for the purpose of determining whether and when the Reversion Date shall have occurred, a series of Debt Securities shall be deemed to have Investment Grade Status if clauses (a) and (b) of the definition of Investment Grade Status are otherwise satisfied, notwithstanding that either Moody's and/or S&P shall have announced a negative outlook with respect to such Debt Securities.

(111)  "Rule 144A" means Rule 144A under the Securities Act (or any successor provision), as such Rule 144A may be amended from time to time.

(112)  "Rule 144A Debt Securities" means the Debt Securities purchased by the initial purchasers thereof for resale pursuant to Rule 144A. Such term includes the Rule 144A Global Securities.

[New York #1531721 v17]                    20

From:Bank of NY Mellon    12128155802    01/16/2009 13:58    #415 P. 031/102

(113)   "Rule 144A Global Security" has the meaning specified in Section 301(h).

(114)   "S&P" means Standard & Poor's Rating Service, a division of The McGraw-Hill Companies, Inc., and its successors.

(115)   "Securities Act" means the United States Securities Act of 1933, as amended, or any successor statute or statutes thereto.

(116)   "Security Custodian" means the custodian with respect to any Global Security appointed by DTC, or any successor Person thereto, and shall initially be the Trustee.

(117)   "Security Register" has the meaning specified in Section 305.

(118)   "Security Registrar" has the meaning specified in Section 305.

(119)   "Shelf Registration Statement," when used with respect to the Debt Securities of any series having Registration Rights, means an effective shelf registration statement under the Securities Act that registers the resale by Holders (and beneficial owners) of Initial Debt Securities (or beneficial interests therein).

(120)   "Special Record Date" for the payment of any Defaulted Interest means a date fixed by the Trustee pursuant to Section 312.

(121)   "Stated Maturity Date," when used with respect to any Debt Security or any installment of interest thereon, means the date specified in such Debt Security as the fixed date on which the principal of such Debt Security or such installment of interest is due and payable.

(122)   "Subsidiary," with respect to any Person, means:

> (a)   any corporation of which the outstanding Capital Stock having at least a majority of the votes entitled to be cast in the election of directors under ordinary circumstances shall at the time be owned, directly or indirectly, by such Person; or
>
> (b)   any other Person of which at least a majority of the voting interest under ordinary circumstances is at the time, directly or indirectly, owned by such Person;

*provided* that none of (i) NGSH, (ii) any direct or indirect Subsidiary of NGSH or (iii) for so long as it is a tax exempt organization under Section 501(c)(3) of the Internal Revenue Code or an application for such status is pending, Nortel LearnIT, a Virginia non-stock corporation, shall constitute a Subsidiary of NNC or any of its Subsidiaries for purposes of Sections 1005, 1006 and 1007 of this Indenture (or the defined terms used therein other than Consolidated Net Income and Adjusted EBITDA) or any Event of Default.

(123)   "Successor Debt Security" of any particular Debt Security as a series means every Debt Security of such series issued after, and evidencing all or a portion of the same debt as that evidenced by, such particular Debt Security; and, for purposes of this definition, any Debt Security of a series authenticated and delivered under Section 311 of this Indenture in exchange

[New York #1531721 v17]                                    21

from:Bank of NY Mellon          12128155802          01/16/2009 13:58          #415  P. 032/102

for or in lieu of a mutilated, destroyed, lost or stolen Debt Security shall be deemed to evidence the same debt as the mutilated, destroyed, lost or stolen Debt Security.

(124)  "Suspended Covenants" has the meaning specified in Section 1010.

(125)  "Suspension Period" means, for any series of Debt Securities, any period (a) beginning on the date that:

    (i)    the Debt Securities of such series have Investment Grade Status, *provided* that prior to the assignment of the ratings contemplated by the definition of Investment Grade Status, the Issuer has advised Moody's and S&P that the Suspended Covenants will not apply during such Suspension Period;

    (ii)    no Default or Event of Default has occurred and is continuing; and

    (iii)    the Issuer has delivered an Officers' Certificate to the Trustee certifying that the conditions set forth in clauses (i) and (ii) above are satisfied; and

(b) ending on the Reversion Date for such series of Debt Securities.

(126)  "Synthetic Purchase Agreement" shall mean any derivative or similar agreement pursuant to which NNC or any of its Subsidiaries is or may become obligated to make any payment the amount of which is determined by reference to the price or value at any time of any Capital Stock of NNC; *provided* that no phantom stock or similar plan providing for payments only to current or former directors, officers, employees, consultants or contractors of NNC or any Subsidiary of NNC (or to their heirs or estates or successors or assigns) shall be deemed to be a Synthetic Purchase Agreement.

(127)  "Trust Indenture Act" means the United States Trust Indenture Act of 1939 as in force at the date of which this Indenture was executed, except as provided in Sections 609 and 905.

(128)  "Trustee" means the Person named as the "Trustee" in the first paragraph of this Indenture until a successor Trustee shall have become such pursuant to the applicable provisions hereof, and thereafter "Trustee" shall mean or include each Person who is then a Trustee hereunder, and if at any time there is more than one such Person, "Trustee" as used with respect to the Debt Securities of any series shall mean the Trustee with respect to Debt Securities of that series.

(129)  "United States" means the United States of America.

(130)  "Weighted Average Life to Maturity" means, when applied to any Funded Debt at any date, the number of years obtained by dividing (a) the then outstanding aggregate principal amount of such Funded Debt into (b) the sum of the products obtained by multiplying (i) the amount of each then-remaining installment, sinking fund, serial maturity or other required payment of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) which will elapse between such date and the making of such payment.

[New York #1531721 v17]                    22

SECTION 102.    *COMPLIANCE CERTIFICATES AND OPINIONS.*

(a)    Upon any application or request by the Issuer or a Guarantor to the Trustee to take any action under any provision of this Indenture, the Issuer or such Guarantor, as the case may be, shall furnish to the Trustee an Officers' Certificate and Opinion of Counsel stating that all conditions precedent, if any, provided for in this Indenture related to the proposed action have been complied with except that, in the case of any such application or request as to which the furnishing of such documents is specifically required by any provision of this Indenture related to such particular application or request, no additional certificate or opinion need be furnished.

(b)    Every Officers' Certificate or Opinion of Counsel with respect to compliance with a condition or covenant provided for in this Indenture (other than the certificate required by Section 1008) shall include substantially: (1) a statement that each individual signing such certificate or opinion has read such covenant or condition and the definitions herein related thereto; (2) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based; (3) a statement that, in the opinion of each such individual, he has made such examination or investigation as is reasonably necessary to enable him to make the statement or to express an opinion whether such covenant or condition has been complied with; and (4) a statement whether, in the opinion of each such individual, such condition or covenant has been complied with.

SECTION 103.    *FORM OF DOCUMENTS DELIVERED TO TRUSTEE.*

(a)    In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

(b)    Any Officers' Certificate or Opinion of Counsel of the Issuer or a Guarantor may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such officer or counsel knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which such certificate or opinion is based are erroneous. Any such certificate or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an officer or officers of the Issuer or such Guarantor, as the case may be, stating that the information with respect to such factual matters is in the possession of such certifying entity unless such counsel knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to such matters are erroneous.

(c)    Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

[New York #1531721 v17]                    23

#415  P. 033/102     01/16/2009 13:59     12128155802     From:Bank of NY Mellon

SECTION 104.    *ACTS OF HOLDERS.*

(a)    Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Holders of the Debt Securities of any series may be embodied in and evidenced by (i) one or more instruments of substantially similar tenor signed by such Holders in person or by an agent duly appointed in writing; (ii) the record of such Holders voting in favor thereof, either in person or by proxies duly appointed in writing, at any meeting of Holders of the Debt Securities of such series duly called and held in accordance with the provisions of Article Fourteen or (iii) a combination of any such record and one or more instruments of substantially similar tenor signed by such Holders in person or by proxies duly appointed in writing. Except as herein otherwise expressly provided, such action shall become effective when such record or instrument or instruments (and the action embodied therein or, evidenced thereby) are delivered to the Trustee and, where it is hereby expressly required, to the Issuer and the Guarantors or any of them. Such record or instrument or instruments (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of the Holders signing such instrument or instruments or so voting at any such meeting. Proof of execution of any such record or instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and, subject to Section 601, conclusive in favor of the Trustee, the Issuer and the Guarantors, if made in the manner provided in this Section. The record of any meeting of Holders of Debt Securities shall be proved in the manner provided in Section 1406.

(b)    The fact and date of the execution by any Person of any such instrument or writing may be proved by the affidavit of a witness of such execution or by a certificate of a notary public or other officer authorized by law to take acknowledgments of deeds, certifying that the individual signing such instrument or writing acknowledged to him the execution thereof. Where such execution is by a signer acting in a capacity other than his individual capacity, such certificate or affidavit shall also constitute sufficient proof of his authority. The fact and date of the execution of any such instrument or writing, or the authority of the Person executing the same, may also be proved in any other manner that the Trustee deems sufficient.

(c)    The ownership of Debt Securities shall be proved by the Security Register.

(d)    If the Issuer or a Guarantor shall solicit from the Holders of Debt Securities of any series any Act, the Issuer or such Guarantor, as the case may be, may, at its option, by Board Resolution, fix in advance a record date for the determination of Holders of Debt Securities entitled to take such Act, but the Issuer or such Guarantor, as the case may be, shall have no obligation to do so. Any such record date shall be fixed at the discretion of the Issuer or such Guarantor, as the case may be. If such a record date is fixed, such Act may be sought or taken before or after the record date, but only the Holders of record at the close of business on such record date shall be deemed to be Holders for the purpose of determining whether Holders of the requisite proportion of Debt Securities of such series Outstanding have authorized or agreed or consented to such Act, and for that purpose the Debt Securities of such series Outstanding shall be computed as of such record date.

(e)    Any Act of the Holder of any Debt Security shall bind every future holder of the same Debt Security and the Holder of every Debt Security issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof in respect of anything done, suffered or omitted

#415  P. 035/102        01/16/2009  13:59        12128155802        From:Bank of NY Mellon

by the Trustee, the Issuer or the applicable Guarantor in reliance thereon, whether or not notation of such action is made upon such Debt Security.

SECTION 105.        *NOTICES, ETC., TO TRUSTEE, ISSUER AND GUARANTORS.*

Any request, demand, authorization, direction, notice, consent, waiver or Act of Holders or other document provided or permitted by this Indenture to be made upon, given or furnished to, or filed with:

(1)    the Trustee by any Holder, the Issuer or any Guarantor shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to or with the Trustee at its Corporate Trust Office, Attention: Corporate Trust Department, facsimile (212) 815-5915, or such other facsimile number as may be provided by the Trustee from time to time, and shall be deemed to have been made at the time of actual receipt of such written notice or facsimile transmission thereof; *provided* that any delivery made or facsimile sent on a day other than a Business Day in New York shall be deemed to be received on the next following Business Day in New York; or

(2)    the Issuer or any Guarantor by the Trustee or by any Holder shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing to the Issuer or such Guarantor, as the case may be, addressed to it at the address of its executive office specified in the first paragraph of this Indenture, Attention: Corporate Secretary of NNL, facsimile number (905) 863-8386, in the case of NNC, NNL or NNI, or at any other address or facsimile number previously furnished in writing to the Trustee by the Issuer or such Guarantor, as the case may be, and shall be deemed to have been made at the time of delivery or facsimile transmission; *provided* that any delivery made or facsimile sent on a day other than a Business Day in Research Triangle Park, North Carolina, in the case of NNI, or Toronto, Ontario, in the case of the NNC or NNL, shall be deemed to be received on the next following Business Day in Research Triangle Park, North Carolina or Toronto, Ontario, respectively.

SECTION 106.        *NOTICE TO HOLDERS; WAIVER.*

(a)    Except as otherwise expressly provided herein, where this Indenture provides for notice to Holders of the Debt Securities of any series of any event, such notice shall be sufficiently given to such Holders if in writing and mailed, first-class postage prepaid, to each Holder affected by such event, at his address as it appears in the Security Register, not later than the latest date, and not earlier than the earliest date, prescribed for the giving of such notice.

(b)    If the regular mail service is suspended or for any other reason it shall be impracticable to give notice to Holders by mail, then such notification to Holders as shall be made with the approval of the Trustee shall constitute sufficient notification for every purpose hereunder. In any case where notice to Holders is given by mail, neither the failure to mail such notice, nor any defect in any notice so mailed, to any particular Holder shall affect the sufficiency of such notice with respect to other Holders.

[New York #1531721 v17]                            25

(c)    Where this Indenture provides for notice in any manner, such notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice. Waivers of notice by Holders shall be filed with the Trustee, but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

(d)    Any request, demand, authorization, direction, notice, consent, waiver or Act required or permitted under this Indenture shall be in the English language.

SECTION 107.    *CONFLICT WITH TRUST INDENTURE ACT.*

If any provision of this Indenture limits, qualifies or conflicts with a provision of the Trust Indenture Act that is required under the Trust Indenture Act to be a part of and govern this Indenture, the latter provision shall control. If any provision of this Indenture modifies or excludes any provision of the Trust Indenture Act that may be so modified or excluded, the latter provision shall be deemed to apply to this Indenture as so modified or excluded, as the case may be.

SECTION 108.    *EFFECT OF HEADINGS AND TABLE OF CONTENTS.*

The Article and Section headings herein and the Table of Contents are for convenience only and shall not affect the construction hereof.

SECTION 109.    *SUCCESSORS AND ASSIGNS.*

All covenants and agreements in this Indenture by the Issuer or a Guarantor shall bind its successors and assigns, whether expressed or not.

SECTION 110.    *SEPARABILITY CLAUSE.*

If any provision in this Indenture or in the Debt Securities of any series shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

SECTION 111.    *BENEFITS OF INDENTURE.*

Nothing in this Indenture or in the Debt Securities of any series, express or implied, shall give to any Person, other than the parties hereto and their successors hereunder, any Paying Agent and the Holders of such Debt Securities, any benefit or any legal or equitable right, remedy or claim under this Indenture.

SECTION 112.    *GOVERNING LAW, ETC.*

(a)    This Indenture, the Debt Securities and the Guarantees shall be governed by and construed in accordance with the laws of the State of New York, but without giving effect to applicable principles of conflicts of law to the extent that the application of the law of another jurisdiction would be required thereby.

(b)     Each of NNC and the Issuer has appointed CT Corporation System with offices at 111 Eighth Avenue, 13th Floor, New York, New York, 10011 as its authorized agent (the "Authorized Agent") upon whom all writs, process and summonses may be served in any suit, action or proceeding arising out of or based upon this Indenture or the Debt Securities which may be instituted in any state or federal court in The City of New York, New York.  NNC and NNL hereby represent and warrant that the Authorized Agent has accepted such appointment and has agreed to act as said agent for service of process, and NNC and the Issuer agree to take any and all action, including the filing of any and all documents, that may be reasonably necessary to continue each such appointment in full force and effect as aforesaid so long as the Debt Securities remain Outstanding.  NNC and the Issuer agree that the appointment of the Authorized Agent shall be irrevocable so long as any of the Debt Securities remain Outstanding or until the irrevocable appointment by NNC and the Issuer of a successor authorized agent in The City of New York, New York as the authorized agent of each of them for such purpose and the acceptance of such appointment by such successor.  Service of process upon the Authorized Agent shall be deemed, in every respect, effective service of process upon NNC and the Issuer.

(c)     Each of the Issuer and the Guarantors hereby:

(i)     agrees that any suit, action or proceeding against it arising out of or relating to this Indenture or the Debt Securities, as the case may be, may be instituted in any federal or state court sitting in The City of New York,

(ii)    waives to the extent permitted by applicable law, any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding, and any claim that any suit, action or proceeding in such a court has been brought in an inconvenient forum,

(iii)   irrevocably submits to the non-exclusive jurisdiction of such courts in any such suit, action or proceeding, and

(iv)    agrees that service of process by mail to the addresses specified herein shall constitute personal service of such process on it in any such suit, action or proceeding.

SECTION 113.    *WAIVER OF JURY TRIAL.*

EACH PARTY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO A TRIAL BY JURY (BUT NO OTHER JUDICIAL REMEDIES) IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE OR THE TRANSACTIONS CONTEMPLATED THEREBY.

SECTION 114.    *LEGAL HOLIDAYS.*

If any Interest Payment Date, Redemption Date or Stated Maturity Date of any Debt Security shall not be a Business Day at any Place of Payment, then (notwithstanding any other provision of this Indenture or of the Debt Securities) payment of interest or principal (and premium, if any) need not be made at such Place of Payment on such date, but may be made on the next

[New York #1:5]1721 v17]                    27

succeeding Business Day at such Place of Payment with the same force and effect as if made on the Interest Payment Date, Redemption Date or Stated Maturity Date, and no interest shall accrue on such payment for the period from and after such Interest Payment Date, Redemption Date or Stated Maturity Date, as the case may be on account of such delay; *provided*, in the case of any series of Debt Securities for which interest accrues at a floating rate, payment of interest shall accrue until, and be paid upon, the next succeeding Business Day.

ARTICLE TWO
DEBT SECURITY FORMS

SECTION 201.    *FORMS GENERALLY.*

(a)    All Debt Securities, all Guarantees and the Trustee's certificate of authentication shall have such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture or by a Board Resolution and as set forth in an Officers' Certificate or any indenture supplemental hereto and may have such letters, numbers or other marks of identification or designation and such legends or endorsements placed thereon as the Issuer or the applicable Guarantor, as the case may be, may deem appropriate and as are not inconsistent with the provisions of this Indenture, or as may be required to comply with any law or with any rule or regulation made pursuant thereto or with any rule or regulation of any securities exchange on which any of the Debt Securities may be listed, or to conform to usage.

(b)    The Certificated Securities of any series and Guarantees, if any, shall be printed, lithographed or engraved or produced by any combination of these methods on steel engraved borders or may be produced in any other manner; *provided* that such manner is permitted by the rules of any securities exchange on which such Debt Securities may be listed or of any automated quotation system on which such Debt Securities may be quoted, all as determined by the officers executing such Debt Securities and Guarantees, as conclusively evidenced by their execution of such Debt Securities and Guarantees.

SECTION 202.    *FORMS OF DEBT SECURITIES.*

Debt Securities shall be in the forms approved by the officers executing such Debt Securities, as conclusively evidenced by their execution of such Debt Securities, having those terms approved by or pursuant to a Board Resolution and set forth in an Officers' Certificate or one or more indentures supplemental hereto which shall set forth the information required by Section 301. The Debt Securities of each series shall be issuable in registered form without coupons and may be in the form of one or more Global Securities in whole or in part.

SECTION 203.    *GUARANTEE BY GUARANTOR; FORM OF GUARANTEE; RELEASE OF GUARANTEE.*

(a)    Each Guarantor by its execution of this Indenture hereby agrees with each Holder of a Debt Security of each series authenticated and delivered by the Trustee and with the Trustee on behalf of each such Holder, to be unconditionally bound by the terms and provisions of the Guarantees set forth below and authorizes the Trustee to confirm such Guarantees to the Holder of each such Debt Security by its execution and delivery of each such Debt Security, with such Guarantees endorsed thereon, authenticated and delivered by the Trustee.

(New York 81533721 v17)                28

Guarantees to be endorsed on the Debt Securities shall, subject to this Section 203, be in substantially the form set forth below:

## GUARANTEE

### OF

### [GUARANTOR]

For value received, [Guarantor] (the "Guarantor") hereby unconditionally and irrevocably guarantees, jointly and severally to the Holder of the Debt Security upon which this Guarantee is endorsed and to the Trustee on behalf of each such Holder the due and punctual payment of the principal of, premium, if any, interest and Additional Amounts, if any, on such Debt Security and the due and punctual payment of any sinking fund or analogous payments referred to therein, if any, when and as the same shall become due and payable, whether on the Stated Maturity Date, by declaration of acceleration, call for redemption or otherwise, according to the terms thereof and of the indenture dated as of July 5, 2006 among Nortel Networks Limited, as issuer, Nortel Networks Corporation and Nortel Networks Inc., as guarantors and The Bank of New York, as trustee (the "Indenture" and as supplemented by [any applicable supplemental indenture], the "Indenture"). In case of the failure of Nortel Networks Limited, a corporation organized under the laws of Canada (herein called the "Issuer," which term includes any successor Person under the Indenture), punctually to make any such payment of principal, premium, if any, or interest, and Additional Amounts, if any, or any sinking fund or analogous payment, the Guarantor, for so long as this Guarantee shall be in effect, hereby agrees to cause any such payment to be made to or to the order of the Trustee punctually when and as the same shall become due and payable, whether on the Stated Maturity Date or by declaration of acceleration, call for redemption or otherwise, and as if such payment were made by the Issuer.

The Guarantor hereby agrees that its obligations hereunder shall be as if it were the principal debtor and not merely surety, and shall be absolute and unconditional, irrespective of, and shall be unaffected by, any invalidity, irregularity or unenforceability of such Debt Security or the Indenture, any failure to enforce the provisions of such Debt Security or the Indenture, or any waiver, modification or indulgence granted to the Issuer with respect thereto, by the Holder of such Debt Security or the Trustee or any other circumstance which may otherwise constitute a legal or equitable discharge of a surety or guarantor. The Guarantor hereby waives diligence, presentment, demand of payment, filing of claims with a court in the event of merger or bankruptcy of the Issuer, any right to require a proceeding first against the Issuer, protest or notice with respect to such Debt Security or the indebtedness evidenced thereby or with respect to any sinking fund or analogous payment required under such Debt Security and all demands whatsoever, and covenants that this Guarantee will not be discharged except by payment in full of the principal of, premium, if any, and interest on such Debt Security or as otherwise described in Section 203 of the Indenture.

This Guarantee shall be automatically and unconditionally released on the terms set forth in Section 203(b) of the Indenture.

The Guarantor shall be subrogated to all rights of the Holder of such Debt Security and the Trustee against the Issuer in respect of any amounts paid to such Holder by the Guarantor

[New York #1531721 v17]                                29

pursuant to the provisions of this Guarantee; *provided* that the Guarantor shall not be entitled to enforce, or to receive any payments arising out of or based upon such right of subrogation until the principal of, premium, if any, and interest on all Debt Securities of the same series issued under the Indenture shall have been paid in full.

The Guarantor hereby agrees that its obligations hereunder shall be direct, unconditioned and unsubordinated and will rank equally and ratably without preference and at least equally with other senior unsecured obligations of the Guarantor, except to the extent prescribed by law. The Holder of a guaranteed Debt Security will be entitled to payment under the relevant Guarantee without taking any action whatsoever against the Issuer.

No reference herein to the Indenture and no provision of this Guarantee or of the Indenture shall alter or impair the guarantee of the Guarantor, which is absolute and unconditional, of the due and punctual payment of the principal of, premium, if any, and interest on, any Additional Amounts, and any sinking fund or analogous payments with respect to, the Debt Security upon which this Guarantee is endorsed.

This Guarantee shall not be valid or obligatory for any purpose until the certificate of authentication of such Debt Security shall have been manually executed by or on behalf of the Trustee under the Indenture.

All terms used in this Guarantee which are defined in the Indenture shall have the meanings assigned to them in the Indenture.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, but without giving effect to applicable principles of conflicts of law to the extent that the application of the law of another jurisdiction would be required thereby.

Executed and dated the date on the face hereof.

[GUARANTOR]

By _____
    Name:
    Title:


By _____
    Name:
    Title:


(b)    Release of Guarantee.

    (i)    The Guarantee of each Guarantor shall be released automatically with respect to any series of Debt Securities upon discharge or defeasance of such series of Debt Securities as provided below under Article Four or Article Thirteen of this Indenture.

[New York #1531721 v17]        30

#415  P. D41/102

01/16/2009 14:01

12128155802

From:Bank of NY Mellon

(ii)   The Guarantee of NNI will be automatically and unconditionally released and such Guarantor relieved of any obligations under its Guarantee with respect to any series of Debt Securities upon the occurrence of a Suspension Period.

(iii)  At such time as NNI's Guarantee is released with respect to any series of Debt Securities, NNI will no longer be considered a "Guarantor" of such series of Debt Securities. Within 15 Business Days of the occurrence of a Reversion Date with respect to such series of Debt Securities, NNI will enter into a supplemental indenture in order to provide a Guarantee of such series of Debt Securities on the terms set forth herein.

(iv)  The Trustee shall promptly execute any documents reasonably requested by the Issuer or a Guarantor in order to evidence the release of such Guarantor from its obligations under its Guarantee; provided that the Trustee shall not be obligated to execute or deliver any document evidencing the release of a Guarantee pursuant this Section 203(b) unless the Issuer has delivered an Officers' Certificate or an Opinion of Counsel to the effect that such release is in accordance with the provisions of this Indenture. Notwithstanding the foregoing, upon the occurrence of a Reversion Date, NNI hereby agrees to promptly execute and deliver to a Trustee a supplemental indenture guaranteeing such series of Debt Securities on terms substantially similar to those under NNI's Guarantee in effect on the date of this Indenture.

SECTION 204.   *FORM OF TRUSTEE'S CERTIFICATE OF AUTHENTICATION.*

The form of the Trustee's certificate of authentication to be borne by the Debt Securities shall be substantially as follows:

Dated:

### TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This is one of the Debt Securities issued under the within-mentioned Indenture.

THE BANK OF NEW YORK,
*as Trustee*

By:   _____
         *Authorized Signatory*


### ARTICLE THREE

### THE DEBT SECURITIES

SECTION 301.   *AMOUNT UNLIMITED; ISSUABLE IN SERIES.*

(a)   The aggregate principal amount of Debt Securities that may be authenticated and delivered under this Indenture is unlimited.

[New York #1531721 v17]                          31

(b)     The Debt Securities may be issued in one or more series. Not all Debt Securities of any one series need be issued at the same time, and, unless otherwise provided, a series may be reopened for issuances of Additional Debt Securities of such series. There shall be established in or pursuant to a Board Resolution of the Issuer and set forth in an Officers' Certificate of the Issuer and the Guarantors, or established in one or more indentures supplemental hereto, prior to the issuance of Debt Securities of any series:

(1)     the title of the Debt Securities of such series (which shall distinguish the Debt Securities of such series from all other Debt Securities);

(2)     the limit, if any, upon the aggregate principal amount of the Debt Securities of such series that may be authenticated and delivered under this Indenture (except for Debt Securities authenticated and delivered upon registration of transfer of, or in exchange for, or in lieu of, other Debt Securities of such series pursuant to Sections 304, 305, 311, 906 or 1107);

(3)     the date or dates on which the principal of, or premium on, the Debt Securities of such series is payable;

(4)     the rate or rates or the method of determination thereof at which the Debt Securities of such series shall bear interest, if any, the date or dates from which such interest shall accrue, the Interest Payment Dates on which such interest shall be payable, and the Regular Record Dates for the interest payable on such Interest Payment Dates;

(5)     the place or places where the principal of (and premium, if any) and interest on Debt Securities of such series shall be payable;

(6)     the period or periods within which or the date or dates on which, if any, the price or prices at which and the terms and conditions upon which Debt Securities of such series may be repurchased or redeemed, in whole or in part, at the option of the Issuer;

(7)     the obligation, if any, of the Issuer to redeem, repay or purchase Debt Securities of such series either pursuant to any sinking fund or analogous provisions or at the option of a Holder thereof and the period or periods within which, the price or prices at which and the terms and conditions upon which Debt Securities of such series shall be redeemed, repaid or purchased, in whole or in part, pursuant to such obligation;

(8)     whether the Debt Securities of such series shall be issued in whole or in part in the form of one or more Global Securities and, in such case, the Depositary for such Global Security or Global Securities and the terms and conditions, if any, upon which interests in such Global Security or Global Securities may be exchanged in whole or in part for the individual Debt Securities represented thereby;

(9)     the denominations in which Debt Securities of such series shall be issuable;

rom:Bank of NY Mellon          12128155802          01/16/2009 14:01          #415 P. 042/102

(10)  if other than the principal amount thereof, the portion of the principal amount of Debt Securities of such series that shall be payable upon declaration of acceleration of the Maturity thereof pursuant to Section 501;

(11)  the currency or currencies of denominations of the Debt Securities of such series, which may be in Dollars or any Foreign Currency or any currency unit, and, if any such currency of denomination is a currency unit, the agency or organization, if any, responsible for overseeing such currency unit;

(12)  the currency or currencies in which payment of the principal of (and premium, if any) and interest on the Debt Securities of such series will be made, and the currency or currencies, if any, in which payment of the principal of (and premium, if any) or interest on Debt Securities of such series, at the election of each of the Holders thereof, may also be payable;

(13)  if the amount of payments of principal of (and premium, if any) or interest on the Debt Securities of such series may be determined with reference to an index based on a currency or currencies other than that in which the Debt Securities of the series are denominated or designated to be payable, the manner in which such amounts shall be determined;

(14)  if the payments of principal of (and premium, if any) or the interest on the Debt Securities of such series are to be made in a Foreign Currency, other than the Foreign Currency in which such Debt Securities are denominated, the manner in which the Exchange Rate with respect to such payments shall be determined;

(15)  the terms, if any, upon which the Debt Securities of such series will be defeasable;

(16)  whether any legends shall be stamped or imprinted on all or a portion of the Debt Securities of such series, and the terms and conditions upon which any such legends may be removed;

(17)  whether the Debt Securities of such series will be entitled to the benefit of a Registration Rights Agreement, and, if so, any Additional Interest provisions applicable to such Debt Securities;

(18)  any other terms of the series (which terms shall not be inconsistent with the provisions of this Indenture);

(19)  the form of the face and reverse of the Debt Securities of such series; and

(20)  CUSIP numbers, if any.

(c)    Any terms so established by the Issuer or any Guarantor in accordance with Section 301(b) must be reasonably satisfactory to the Trustee.

(d)    Notwithstanding the foregoing, a series may not be reopened to issue Additional Debt Securities of such series within five years of the Maturity of the Outstanding Debt Securities of such series.

[New York #1551721 v17]                33

(e)    All Debt Securities of any one series shall be identical except as to denomination, original Issue Date, aggregate principal amount, initial interest period, initial Restricted Period, registration rights and any changes related thereto and except as may otherwise be provided in or pursuant to such Board Resolution and set forth in such Officers' Certificate or in such indenture or indentures supplemental hereto.

(f)    If any of the terms of a series of Debt Securities are established by action taken pursuant to a Board Resolution, a copy of an appropriate record of such action shall be certified by the Corporate Secretary, the Secretary or an Assistant Secretary of the Issuer and delivered to the Trustee at or prior to the delivery of the Officers' Certificate setting forth the terms of the series.

(g)    Debt Securities of any series that are repayable at the option of the Holders shall be repaid in accordance with the terms of the Debt Securities of such series.

(h)    Debt Securities originally offered and sold to QIBs in reliance on Rule 144A will be issued in the form of one or more permanent Global Securities (each, a "Rule 144A Global Security").

(i)    Debt Securities originally offered and sold outside the United States in reliance on Regulation S will be issued in the form of one or more permanent Global Securities (each, a "Regulation S Global Security").

SECTION 302.    *DENOMINATIONS.*

Unless otherwise provided as contemplated by Section 301 with respect to any series of Debt Securities and except as provided in Section 303, Debt Securities will be issued in denominations of $2,000 and integral multiples of $1,000.

SECTION 303.    *EXECUTION, AUTHENTICATION, DELIVERY AND DATING.*

(a)    The Debt Securities shall be executed on behalf of the Issuer and the Guarantees shall be executed on behalf of each Guarantor by the Authorized Officers of the Issuer or such Guarantor, as the case may be. The Debt Securities and the Guarantee of each Guarantor may but need not be under the corporate seal of the Issuer or such Guarantor, as the case may be, or a reproduction thereof (which reproduction shall for such purposes be deemed to be the corporate seal of the Issuer or such Guarantor, as the case may be). The signature of any of these Authorized Officers on the Debt Securities or the Guarantees may be manual or facsimile. Debt Securities or Guarantees bearing the manual or facsimile signatures of individuals who were at any time the Authorized Officers of the Issuer or applicable Guarantor, as the case may be, shall bind the Issuer or such Guarantor, as the case may be, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Debt Securities or Guarantees.

(b)    At any time and from time to time after the execution and delivery of this Indenture, the Issuer may deliver Debt Securities of any series and the related Guarantees executed by the Issuer and the applicable Guarantors to the Trustee for authentication, together with an Issuer Order for the authentication and delivery of such Debt Securities; whereupon the Trustee, in accordance with such Issuer Order shall authenticate and deliver such Debt Securities. At any

[New York #1531721 v17]    34

time and from time to time after the execution and delivery of this Indenture and after the effectiveness of a registration statement under the Securities Act with respect to the Debt Securities of any series, the Issuer may deliver Exchange Debt Securities evidencing the same, continuing indebtedness and of such series executed by the Issuer (with the Guarantee endorsed thereon executed by the applicable Guarantors) together with an Issuer Order for the authentication and delivery of such Exchange Debt Securities and of a like *principal* amount of Initial Debt Securities of such series for cancellation in accordance with Section 316, and the Trustee in accordance with the Issuer Order shall authenticate and deliver such Exchange Debt Securities. The Trustee shall be entitled to receive, prior to the authentication and delivery of such Debt Securities, the supplemental indenture or the Board Resolution by or pursuant to which the terms of such Debt Securities have been approved, (x) an Opinion or Opinions of Counsel of the Issuer and applicable Guarantor(s) to the effect that:

(i)  in the event that the forms or terms of such Debt Securities and Guarantees have been established in a supplemental indenture, the execution and delivery of such supplemental indenture have been duly authorized by all necessary corporate action of the Issuer and the Guarantors, such supplemental indenture has been duly executed and delivered by the Issuer and the Guarantors and, assuming due authorization, execution and delivery by the Trustee, is a valid and binding obligation enforceable against the Issuer and the Guarantors in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, to general principles of equity and, with regard to NNC and the Issuer, to the effect of judicial application of foreign laws or foreign governmental actions affecting creditors' rights;

(ii)  the execution and delivery of such Debt Securities have been duly authorized by all necessary corporate action of the Issuer and such Debt Securities have been duly executed by the Issuer and, assuming due authentication by the Trustee and delivery by the Issuer, are valid and binding obligations of the Issuer enforceable against the Issuer in accordance with their terms, entitled to the benefits of the Indenture, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, to general principles of equity and, with regard to the Issuer, to the effect of judicial application of foreign laws or foreign governmental actions affecting creditors' rights;

(iii)  the execution and delivery of such Guarantees have been duly authorized by all necessary corporate action of the Guarantors and such Guarantees, if any, have been duly executed by the Guarantors and, assuming due authentication by the Trustee of the Debt Securities and delivery of the Debt Securities by the Issuer and delivery of the Guarantees by the Guarantors, are valid and binding obligations of the Guarantors enforceable against such Guarantors in accordance with their terms, entitled to the benefits of the Indenture, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, to general principles of equity and, with regard to NNC, to the effect of judicial application of foreign laws or foreign governmental actions affecting creditors' rights; and

(iv)  such other matters as the Trustee may reasonably request;

[New York #1531721 v17]

35

and (y) an Officers' Certificate to the effect that:

(i)   the forms of such Debt Securities and Guarantees have been established in conformity with the provisions of this Indenture;

(ii)  the terms of such Debt Securities and Guarantees have been established in conformity with the provisions of this Indenture;

(iii) the amount of Outstanding Debt Securities of such series, together with the amount of such Debt Securities, does not exceed any limit established under the terms of this Indenture, a Board Resolution or any supplemental indenture on the amount of Debt Securities of such series that may be authenticated and delivered; and

(iv)  the absence of any event that is, or after notice or lapse of time or both would become, an Event of Default.

Notwithstanding any contrary provision herein, if the Issuer and applicable Guarantor(s) shall establish pursuant to Section 301 that the Debt Securities of a series may be issued from time to time, it shall not be necessary to deliver the Board Resolution, Officers' Certificate and Opinion of Counsel otherwise required pursuant to this Section 303 or Section 301 at or prior to the time of authentication of each Debt Security of such series if such documents are delivered at or prior to the authentication upon original issuance of the first Debt Security of such series to be issued.

(c)   If the Issuer shall establish pursuant to Section 301 that the Debt Securities of a series are to be issued in whole or in part in the form of one or more Global Securities, then the Issuer and the Guarantors shall execute and the Trustee shall authenticate and deliver one or more Global Securities that shall: (i) represent an aggregate amount equal to the aggregate principal amount of the Outstanding Debt Securities of such series to be represented by one or more Global Securities; (ii) be registered in the name of the Depositary for such Global Security or Global Securities or the nominee of such Depositary; (iii) be held or be delivered by the Trustee to such Depositary or pursuant to such Depositary's instruction; and (iv) bear the legends set forth in Section 307(a) and (c).

(d)   Each Depositary designated pursuant to Section 301 for a Global Security must, at the time of its designation and at all times while it serves as such Depositary, be a clearing agency registered under the Exchange Act and any other applicable statute or regulation.

(e)   The Trustee shall not be required to authenticate any Debt Securities if the issuance of such Debt Securities pursuant to this Indenture will adversely affect the Trustee's own rights, duties or immunities under this Indenture.

(f)   Each Debt Security shall be dated the date of its issue, except as otherwise provided pursuant to Section 301 with respect to Debt Securities of such series.

(g)   No Debt Security or Guarantee endorsed thereon shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose unless there appears on such Debt Security a certificate of authentication substantially in the form provided for herein duly

executed by the Trustee by manual signature of one of its Responsible Officers, and such certificate upon any Debt Security shall be conclusive evidence, and the only evidence, that such Debt Security has been duly authenticated and delivered hereunder and is entitled to the benefits of this Indenture.

SECTION 304.    *TEMPORARY DEBT SECURITIES.*

(a)    Pending the preparation of Certificated Securities of any series, the Issuer may execute, and, upon receipt of an Issuer Order, the Trustee shall authenticate and deliver, temporary Debt Securities that are printed, lithographed, typewritten, photocopied or otherwise produced, in any authorized denomination, substantially of the tenor of the Certificated Securities in lieu of which they are issued, in registered form and having endorsed thereon Guarantees executed by the applicable Guarantors substantially of the tenor of the definitive Guarantees, and in all cases with such appropriate insertions, omissions, substitutions and other variations as the officers of the Issuer and the Guarantors executing such Debt Securities and Guarantees may determine, as conclusively evidenced by their execution of such Debt Securities. Any such temporary Debt Securities may be in global form, representing all or a portion of the Outstanding Debt Securities of such series. Every such temporary Debt Security and Guarantee shall be executed by Authorized Officers of the Issuer and the Guarantors and shall be authenticated and delivered by the Trustee upon the same terms and conditions and in substantially the same manner, and with the same effect, as the Certificated Securities and Guarantees in lieu of which they are issued.

(b)    If temporary Debt Securities of any series are issued, the Issuer will cause Certificated Securities of such series to be prepared without unreasonable delay. Upon surrender for cancellation of any one or more temporary Debt Securities of any series, the Issuer shall execute and the Trustee shall authenticate and deliver in exchange therefor a like principal amount of Certificated Securities of the same series of authorized denominations and of like tenor and having endorsed thereon the Guarantees executed by the applicable Guarantor(s). Until so exchanged, temporary Debt Securities of any series shall in all respects be entitled to the same benefits under this Indenture as individual Debt Securities of such series, except as otherwise specified as contemplated by Section 301 with respect to the payment of interest on Global Securities in temporary form.

(c)    Upon any exchange of a portion of a temporary Global Security for a Certificated Global Security or for the individual Debt Securities represented thereby pursuant to this Section 304 or Section 305, the temporary Global Security shall be endorsed by the Trustee to reflect the reduction of the principal amount evidenced thereby, whereupon the principal amount of such temporary Global Security shall be reduced for all purposes by the amount so exchanged and endorsed.

SECTION 305.    *REGISTRATION, REGISTRATION OF TRANSFER AND EXCHANGE.*

(a)    The Issuer will maintain an office or agency (the "Security Registrar") at which shall be kept a register (the "Security Register") which, subject to such reasonable regulations as it may prescribe, shall contain the names and addresses of the Holders and provide for the registration of Debt Securities and of transfers of Debt Securities. Unless and until otherwise determined by the Issuer, the Trustee shall act as Security Registrar and the Security Registers shall be kept at the office or agency of the Trustee in the Borough of Manhattan, The City of New York. Such

[New York 61531721 v17]                    37

From:Bank of NY Mellon    12128155802    01/16/2009 14:03    #415 P. 048/102

Security Registers shall be in written form or in any other form capable of being converted into written form within a reasonable period of time. At all reasonable times, the Security Registers shall be open for inspection by the Trustee.

(b)    Upon surrender for registration of transfer of any Debt Security of any series at the office or agency of the Issuer maintained for such purpose, the Issuer shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Debt Securities of the same series of any authorized denomination or denominations, of like tenor and aggregate principal amount and having endorsed thereon the Guarantees executed by the applicable Guarantor(s). Every Debt Security presented or surrendered for registration of transfer or for exchange shall (if so required by the Issuer, the Security Registrar or the Trustee) be duly endorsed, or be accompanied by a written instrument of transfer in form satisfactory to the Issuer, the Security Registrar and the Trustee, and duly executed, by the Holder thereof or his attorney duly authorized in writing.

(c)    Notwithstanding any other provision of this Section 305, unless and until it is exchanged in whole or in part for a Certificated Security, a Global Security representing all or a portion of the Debt Securities of a series may not be transferred except as a whole by the Depositary for such series to a nominee of such Depositary or by a nominee of such Depositary to such Depositary or another nominee of such Depositary or by such Depositary or any such nominee to a successor Depositary for such series or a nominee of such successor Depositary.

(d)    At the option of the Holder, Debt Securities of any series (other than a Global Security) may be exchanged for other Debt Securities of the same series of any authorized denomination or denominations of a like aggregate principal amount, upon surrender of the Debt Securities to be exchanged at such office or agency. Whenever any Debt Securities are so surrendered for exchange, the Issuer shall execute the Debt Securities which the Holder making the exchange is entitled to receive, the applicable Guarantor(s) shall execute the Guarantees endorsed thereon, and the Trustee shall authenticate and deliver such Debt Securities.

(e)    If at any time the Depositary for the Debt Securities of a series notifies the Issuer that it is unwilling or unable to continue as Depositary for the Debt Securities of such series or if at any time the Depositary for the Debt Securities of such series shall no longer be eligible under Section 303(d), the Issuer shall appoint a successor Depositary with respect to the Debt Securities of such series.

(f)    The Issuer may at any time and in its sole discretion determine that individual Debt Securities of any series issued in the form of one or more Global Securities shall no longer be represented by such Global Security or Global Securities. In such event, the Issuer will execute, and the Trustee, upon receipt of an Issuer Order for the authentication and delivery of individual Certificated Securities of such series, will authenticate and deliver, individual Certificated Securities of such series in an aggregate principal amount equal to the principal amount of the Global Security or Global Securities representing Debt Securities of such series (which shall have endorsed thereon Guarantee(s) executed by the applicable Guarantor(s)) in exchange for such Global Security or Global Securities.

(g)    If specified by the Issuer pursuant to Section 301 with respect to a series of Debt Securities, the Depositary for such series of Debt Securities may surrender a Global Security for

[New York #1531723 v17]                38

such series of Debt Securities in exchange in whole or in part for individual Certificated Securities of such series on such terms as are acceptable to the Issuer and such Depositary. Thereupon, the Issuer shall execute, and the Trustee shall authenticate and deliver, without service charge: (i) to each Person specified by such Depositary a new individual Certificated Security or Certificated Securities of the same series (which shall have endorsed thereon Guarantee(s) executed by the applicable Guarantor(s)), of any authorized denomination as requested by such Person in aggregate principal amount equal to and in exchange for such Person's beneficial interest in the Global Security; and (ii) to such Depositary a new Global Security (which shall have endorsed thereon Guarantee(s) executed by the applicable Guarantor(s)) in a denomination equal to the difference, if any, between the principal amount of the surrendered Global Security and the aggregate principal amount of Certificated Securities delivered to Holders thereof.

(h)    In any exchange provided for in Section 305(f) or Section 305(g), the Issuer shall execute and the Trustee will authenticate and deliver Debt Securities, which shall have endorsed thereon Guarantee(s) executed by the applicable Guarantor(s), in registered form in authorized denominations.

(i)    Upon the exchange of a Global Security for individual Certificated Securities, such Global Security shall be cancelled by the Trustee. Individual Certificated Securities exchanged for portions of a Global Security pursuant to this Section shall be registered in such names and in such authorized denominations as the Depositary for such Global Security, pursuant to instructions from its direct or indirect participants or otherwise, shall instruct the Trustee. The Trustee shall deliver such Certificated Securities to the Persons in whose names such Certificated Securities are so registered.

(j)    All Debt Securities executed for delivery upon any transfer or exchange of Debt Securities shall be valid obligations of the Issuer evidencing the same debt, and entitled to the same benefits under this Indenture, as the Debt Securities surrendered for such transfer or exchange. No service charge shall be made for any registration of transfer or exchange of Debt Securities, but the Issuer may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any transfer, registration of transfer or exchange of Debt Securities, other than exchanges pursuant to Sections 304, 906 or 1107 not involving any transfer.

(k)    The Issuer shall not be required to: (i) execute for delivery, register the transfer of or exchange of Debt Securities of any particular series during a period beginning at the opening of business 15 days before the day of the mailing of a notice of redemption of Debt Securities of such series selected for redemption under Section 1103 and ending at the close of business on the day of such mailing; or (ii) register the transfer of or exchange of any Debt Security so selected for redemption in whole or in part, except the unredeemed portion of any Debt Security being redeemed in part.

SECTION 306.    GLOBAL SECURITY PROVISIONS.

(a)    Each Global Security initially shall: (i) be registered in the name of the Depositary or the nominee of the Depositary, (ii) be delivered to the Security Custodian, and (iii) bear the appropriate legend, as set forth in Section 307. Any Global Security may be represented by more

[New York #1531721 v17]                                    39

From:Bank of NY Mellon        12128156802        01/16/2009 14:03        #415  P. 049/102

than one certificate. The aggregate principal amount of each Global Security may from time to time be increased or decreased by adjustments made on the records of the Security Custodian, as provided in this Indenture.

(b)    Participants shall have no rights under this Indenture with respect to any Global Security held on their behalf by the Depositary or by the Security Custodian under such Global Security, and the Depositary may be treated by the Issuer, the Guarantors, the Trustee, the Paying Agent and the Security Registrar and any of their agents as the absolute owner of such Global Security for all purposes whatsoever. Notwithstanding the foregoing, nothing herein shall prevent the Issuer, the Guarantors, the Trustee, the Paying Agent or the Security Registrar or any of their agents from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and its Participants, the operation of customary practices of the Depositary governing the exercise of the rights of an owner of a beneficial interest in any Global Security. The registered Holder of a Global Security may grant proxies and otherwise authorize any Person, including Participants and Persons that may hold interests through Participants, to take any action that a Holder is entitled to take under this Indenture or the Debt Securities.

(c)    Except as provided below or in Sections 305(f) or (g), owners of beneficial interests in Global Securities will not be entitled to receive Certificated Securities. Certificated Securities shall be issued to all owners of beneficial interests in a Global Security in exchange for such interests if:

(i)    the Depositary notifies the Issuer that it is unwilling or unable to continue as depositary for such Global Security or the Depositary ceases to be a clearing agency registered under the Exchange Act, at a time when the Depositary is required to be so registered in order to act as depositary, and in each case a successor depositary is not appointed by the Issuer within 90 days of such notice,

(ii)    the Issuer executes and delivers to the Trustee and Security Registrar an Officers' Certificate stating that such Global Security shall be so exchangeable, or

(iii)    an Event of Default has occurred and is continuing and the Security Registrar has received a request to issue Certificated Securities from the Depositary.

In connection with the exchange of an entire Global Security for Certificated Securities pursuant to this paragraph (c), such Global Security shall be surrendered to the Trustee for cancellation, and the Issuer shall execute, and upon Issuer Order the Trustee shall authenticate and deliver, to each beneficial owner identified by the Depositary in exchange for its beneficial interest in such Global Security, an equal aggregate principal amount of Certificated Securities of authorized denominations.

SECTION 307.    LEGENDS

(a)    Global Security Legends. (i) Each Global Security shall bear a legend in substantially the following form:

"THIS IS A GLOBAL SECURITY WITHIN THE MEANING OF THE INDENTURE REFERRED TO HEREINAFTER.

TRANSFERS OF THIS GLOBAL SECURITY SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO NOMINEES OF [INSERT NAME OF DEPOSITARY] OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS OF PORTIONS OF THIS GLOBAL SECURITY SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE REFERRED TO ON THE REVERSE HEREOF."

(ii) If DTC is the Depositary for a Global Security, such Global Security shall also bear the following legend:

"UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), NEW YORK, NEW YORK, TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN."

(b) (i) Securities Act Legends.  Restricted Debt Securities and their Successor Debt Securities shall bear a Restricted Debt Securities Legend substantially in the form set forth below:

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION. THE HOLDER OF THIS SECURITY, BY ITS ACCEPTANCE HEREOF, AGREES ON ITS OWN BEHALF AND ON BEHALF OF ANY INVESTOR ACCOUNT FOR WHICH IT HAS PURCHASED SECURITIES, TO OFFER, SELL OR OTHERWISE TRANSFER SUCH SECURITY, PRIOR TO THE DATE (THE "RESALE RESTRICTION TERMINATION DATE") THAT IS TWO YEARS (IN THE CASE OF RULE 144A DEBT SECURITIES) OR 40 DAYS (IN THE CASE OF REGULATION S DEBT SECURITIES) AFTER THE LATER OF THE ORIGINAL ISSUE DATE HEREOF AND THE LAST DATE ON WHICH THE ISSUER, ANY GUARANTOR OR ANY AFFILIATE OF THE ISSUER OR ANY GUARANTOR WAS THE OWNER OF THIS SECURITY (OR ANY PREDECESSOR OF SUCH SECURITY), ONLY (A) TO THE ISSUER OR A GUARANTOR, (B) PURSUANT TO A REGISTRATION

[New York #1591721 v17]                    41

From:Bank of NY Mellon          12128155802          01/16/2009 14:03          #415  P. 051/102

#415  P. 052/102          01/16/2009 14:04          12128155802          .rom:Bank of NY Mellon

STATEMENT THAT HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, (C) FOR SO LONG AS THE SECURITIES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT, TO A PERSON IT REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (D) PURSUANT TO OFFERS AND SALES THAT OCCUR OUTSIDE THE UNITED STATES WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT, (E) TO AN INSTITUTIONAL "ACCREDITED INVESTOR" WITHIN THE MEANING OF RULE 501(a)(1), (2), (3) OR (7) UNDER THE SECURITIES ACT THAT IS AN INSTITUTIONAL ACCREDITED INVESTOR ACQUIRING THE SECURITY FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF SUCH AN INSTITUTIONAL ACCREDITED INVESTOR, IN EACH CASE IN A MINIMUM PRINCIPAL AMOUNT OF THE SECURITIES OF $250,000, FOR INVESTMENT PURPOSES AND NOT WITH A VIEW TO OR FOR OFFER OR SALE IN CONNECTION WITH ANY DISTRIBUTION IN VIOLATION OF THE SECURITIES ACT, OR (F) PURSUANT TO ANOTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUBJECT TO THE ISSUER'S, ANY GUARANTOR'S AND THE TRUSTEE'S RIGHT PRIOR TO ANY SUCH OFFER, SALE OR TRANSFER PURSUANT TO CLAUSES (D), (E) OR (F) TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATION AND/OR OTHER INFORMATION SATISFACTORY TO EACH OF THEM. THIS LEGEND WILL BE REMOVED UPON THE REQUEST OF THE HOLDER AFTER THE RESALE RESTRICTION TERMINATION DATE.

(c)    Canadian Securities Legend.  Unless the Security Registrar receives an Officers' Certificate confirming that the following legend is not required, each Global Security shall bear a legend in substantially the following form:

"UNLESS PERMITTED UNDER CANADIAN SECURITIES LEGISLATION, THE HOLDER OF THE SECURITY MUST NOT TRADE THE SECURITY IN CANADA BEFORE [INSERT DATE THAT IS FOUR MONTHS PLUS ONE DAY AFTER THE ISSUE DATE]."

SECTION 308.        TRANSFER AND EXCHANGE.

(a)    The following provisions shall apply with respect to any proposed transfer of an interest in a Rule 144A Global Security that is a Restricted Debt Security:  If (1) the owner of a beneficial interest in a Rule 144A Global Security wishes to transfer such interest (or portion thereof) to a Non-U.S. Person pursuant to Regulation S and (2) such Non-U.S. Person wishes to hold its interest in the Debt Securities through a beneficial interest in the Regulation S Global Security, (x) upon receipt by the Security Custodian and Security Registrar of:

(i)    instructions from the Holder of the Rule 144A Global Security directing the Security Custodian and Security Registrar to credit or cause to be credited a beneficial interest in the Regulation S Global Security equal to the principal

01/16/2009 14:04    #415  P. 053/102    12128156602    From:Bank of NY Mellon

amount of the beneficial interest in the Rule 144A Global Security to be transferred, and

(ii)    a certificate in the form of Exhibit B from the transferor,

(y) subject to the rules and procedures of the Depositary, the Security Custodian and Security Registrar shall increase the Regulation S Global Security and decrease the Rule 144A Global Security by such amount in accordance with the foregoing and (z) compliance with the requirements of Section 308(b)(ii), if applicable.

(b)    Other Transfers.  (i) Any transfer of Restricted Debt Securities not described above (other than a transfer of a beneficial interest in a Global Security that does not involve an exchange of such interest for a Certificated Security or a beneficial interest in another Global Security, which must be effected in accordance with applicable law and the rules and procedures of the Depositary, but is not subject to any procedure required by this Indenture) shall be made only upon receipt by the Security Registrar of such Opinions of Counsel, certificates and/or other information reasonably required by and satisfactory to it in order to ensure compliance with the Securities Act and this Section 308.

(ii) Restricted Debt Securities and, unless the Securities Registrar receives an Officers' Certificate confirming that this Section 308(b)(ii) does not apply to Exchange Debt Securities, Exchange Debt Securities shall not be transferred, directly or indirectly, in or into Canada before the date that is four months plus one day after the Issue Date of such Debt Securities except pursuant to an available exemption from the prospectus requirements of applicable provincial or territorial securities laws in Canada.  Any transfer of such Debt Securities in or into Canada shall be made only upon receipt by the Security Registrar of an Opinion of Counsel, certificates and/or other information reasonably required by and satisfactory to it in order to ensure compliance with applicable provincial or territorial securities laws in Canada.

(c)    Use and Removal of Restricted Debt Securities Legends.  Upon the transfer, exchange or replacement of Certificated Securities (or beneficial interests in a Global Security) not bearing (or not required to bear upon such transfer, exchange or replacement) a Restricted Debt Securities Legend, the Security Custodian and Security Registrar shall exchange such Certificated Securities (or beneficial interests) for beneficial interests in a Global Security (or Certificated Securities if they have not been issued pursuant to this paragraph (c)) that does not bear a Restricted Debt Securities Legend.  Upon the transfer, exchange or replacement of Certificated Securities (or beneficial interests in a Global Security) bearing a Restricted Debt Securities Legend, the Security Custodian and Security Registrar shall deliver only Certificated Securities (or beneficial interests in a Global Security) that bear a Restricted Debt Securities Legend unless:

(i)     such Certificated Securities (or beneficial interests) are exchanged in an Exchange Offer;

(ii)    such Certificated Securities (or beneficial interests) are transferred pursuant to a Shelf Registration Statement;

(iii)   such Certificated Securities (or beneficial interests) are transferred pursuant to Rule 144 upon delivery to the Security Registrar of a certificate of the transferor

[New York #1531721 v17]                    43

in the form of Exhibit B and an Opinion of Counsel reasonably satisfactory to the Security Registrar;

(iv)     such Certificated Securities (or beneficial interests) are transferred, replaced or exchanged after the Resale Restriction Termination Date therefor; or

(v)      in connection with such transfer, exchange or replacement the Security Registrar shall have received an Opinion of Counsel and other evidence reasonably satisfactory to it to the effect that neither such Restricted Debt Securities Legend nor the related restrictions on transfer are required in order to maintain compliance with the provisions of the Securities Act.

The Restricted Debt Securities Legend on any Certificated Security shall be removed at the written request of the Holder on or after the Resale Restriction Termination Date therefor. The Holder of a Global Security may exchange an interest therein for an equivalent interest in a Global Security not bearing a Restricted Debt Securities Legend upon transfer of such interest pursuant to any of clauses (i) through (v) of this paragraph (c). The Issuer shall deliver to the Trustee an Officers' Certificate promptly upon effectiveness, withdrawal or suspension of any Registration Statement.

(d)      Consolidation of Global Securities.

(i)      If a Global Security not bearing a Restricted Debt Securities Legend is Outstanding at the time of an Exchange Offer with respect to the same series of Debt Securities, any interests in a Global Security exchanged in such Exchange Offer shall be exchanged for interests in such Outstanding Global Security.

(ii)     Nothing in this Indenture shall provide for the consolidation of any Debt Securities with any other Debt Securities to the extent that they constitute, as determined pursuant to an Opinion of Counsel, different classes of securities for U.S. federal income tax purposes.

(e)      Retention of Documents. The Security Registrar shall retain copies of all letters, notices and other written communications it receives pursuant to this Article Three. The Issuer and each Guarantor shall have the right to inspect and make copies of all such letters, notices or other written communications at any reasonable time upon the giving of reasonable written notice to the Security Registrar.

SECTION 309.     *EXCHANGE DEBT SECURITIES.*

At any time and from time to time after the execution and delivery of this Indenture and after the effectiveness of a Registration Statement under the Securities Act with respect thereto, the Issuer may deliver Exchange Debt Securities executed by the Issuer and having endorsed thereon Guarantees executed by the Guarantors to the Trustee for authentication, together with an Issuer Order in accordance with Section 303 of this Indenture evidencing the same continuing indebtedness and of like principal amount of Initial Debt Securities of such series for cancellation in accordance with Section 316 of this Indenture, and the Trustee in accordance with such Issuer Order shall authenticate and deliver such Debt Securities. Any Initial Debt Securities

[New York #1531723 v17]                          44

From:Bank of NY Mellon    12128155602    01/16/2009 14:04    #415 P.055/102

of any series that remain Outstanding after the completion of the Exchange Offer, together with the Exchange Debt Securities of such series issued in connection with the Exchange Offer, will be treated as a single class of Debt Securities under the Indenture.

SECTION 310.    *ADDITIONAL DEBT SECURITIES.*

(a)    The Issuer may, from time to time, subject to compliance with any other applicable provisions of this Indenture, without the consent of the Holders, create and issue pursuant to this Indenture additional Debt Securities ("Additional Debt Securities") of any series currently outstanding, subject to any limitations on the principal amount of such series established pursuant to Section 301 and the limitations set forth in Section 1006 of this Indenture, and deliver such Additional Debt Securities executed by the Issuer and having endorsed thereon Guarantees executed by the Guarantors to the Trustee for authentication, together with an Issuer Order. Holders of Additional Debt Securities of a series will have the rights to vote together with Holders of Debt Securities of such series issued on the Issue Date of such series of Debt Securities and Exchange Debt Securities of such series as one class. Any Additional Debt Securities of any one series shall have terms and conditions *substantially similar* to those of the Initial Debt Securities and the Exchange Debt Securities of such series, except for the following changes and any other changes related thereto:

(i)    the Additional Debt Securities may have a different Issue Date;

(ii)    the Additional Debt Securities may have a different amount of interest payable on the first Interest Payment Date after issuance than is payable on other Debt Securities of such series; and

(iii)    the Additional Debt Securities may have terms specified in the Board Resolution, Officers' Certificate or supplemental indenture for such Additional Debt Securities making appropriate adjustments to this Article Three, as applicable (and related definitions) applicable to such Additional Debt Securities in order to conform to and ensure compliance with the Securities Act (or other applicable securities laws) and any registration rights or similar agreement applicable to such Additional Debt Securities, which are not adverse in any material respect to the Holder of any Debt Securities (other than such Additional Debt Securities); *provided* that any such terms must be reasonably satisfactory to the Trustee;

*and further provided,* in each case, that no adjustment pursuant to this Section 310 shall cause such Additional Debt Securities to constitute, as determined pursuant to an Opinion of Counsel, a class of securities different from the Original Debt Securities for U.S. federal income tax purposes except for Additional Debt Securities that have a separate CUSIP number from the Debt Securities pending performance by the Issuer of its obligations under the applicable Registration Rights Agreement.

SECTION 311.    *MUTILATED, DESTROYED, LOST OR STOLEN DEBT SECURITIES.*

(a)    If (i) any mutilated Debt Security is surrendered to the Trustee; or (ii) the Issuer, the Guarantors and the Trustee receive evidence to their satisfaction of the destruction, loss or theft of any Debt Security, and the Issuer, the Guarantors and the Trustee receive such security or

[New York 01531721 v17]                    45

indemnity satisfactory to them; then, in the absence of notice to the Issuer, any Guarantor or the Trustee that such Debt Security has been acquired by a *bona fide* purchaser, the Issuer and the Guarantors shall execute and upon such *bona fide* purchaser's written request the Trustee shall authenticate and deliver, in exchange for any such Debt Security, a new Debt Security of the same series and of like tenor and principal amount and having endorsed thereon the Guarantees executed by the Guarantors, in registered form bearing a number not contemporaneously outstanding appertaining to such destroyed, lost or stolen Debt Security.

(b)     If any such mutilated, destroyed, lost or stolen Debt Security has become or is about to become due and payable, the Issuer or the Guarantors in their discretion may, instead of executing for delivery a new Debt Security, pay such Debt Security. Upon the execution for delivery of any new Debt Security under this Section, the Issuer or any Guarantor may require the payment by the Holder of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee) connected therewith.

(c)     Every new Debt Security of any series and the Guarantees endorsed thereon executed for delivery pursuant to this Section in lieu of any destroyed, lost or stolen Debt Security shall constitute contractual obligations of the Issuer and the Guarantors, whether or not such destroyed, lost or stolen Debt Security shall be at any time enforceable by anyone, and any such new Debt Security and Guarantees shall be entitled to all the benefits of this Indenture equally and proportionately with any and all other Debt Securities of the same series and the Guarantees endorsed thereon duly issued hereunder.

(d)     The provisions of this Section are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Debt Securities.

SECTION 312.     *PAYMENT OF INTEREST; INTEREST RIGHTS PRESERVED.*

(a)     Interest on any Debt Security that is payable on any Interest Payment Date shall be paid to the Person in whose name that Debt Security (or one or more Predecessor Securities) is registered at the close of business on the Regular Record Date for such interest. At the option of the Issuer, payment of interest on any Debt Security may be made by check mailed to the address of the Person entitled thereto as such address shall appear in the Security Register or by wire transfer to an account designated by such Person.

(b)     Any interest on any Debt Security of any series that is payable, but is not punctually paid or duly provided for, on any Interest Payment Date (herein called "Defaulted Interest") shall be paid in accordance with the following provisions and not to the registered Holder on the relevant Regular Record Date by virtue of his having been such Holder.

     (i)     The Issuer may elect to make payment of any Defaulted Interest to the Persons in whose names the Debt Securities of such series (or their respective Predecessor Securities) are registered at the close of business on a Special Record Date for the payment of such Defaulted Interest, which shall be fixed in the following manner. The Issuer shall notify the Trustee in writing of the amount of Defaulted Interest proposed to be paid on each Debt Security of such series and the date of the

01/16/2009 14:05    #415  P. 057/102    12128166802    From:Bank of NY Mellon

proposed payment, and at the same time the Issuer shall deposit with the Trustee an amount of money equal to the aggregate amount proposed to be paid in respect of such Defaulted Interest or shall make arrangements satisfactory to the Trustee for such deposit prior to the date of the proposed payment, such money when deposited to be held in trust for the benefit of the Persons entitled to such Defaulted Interest. Thereupon the Trustee shall fix a Special Record Date for the payment of such Defaulted Interest, which shall be not more than 15 days and not less than 10 days prior to the date of the proposed payment and not less than 10 days after the receipt by the Trustee of the notice of the proposed payment. The Trustee shall cause notice of the proposed payment of such Defaulted Interest and the Special Record Date therefor to be mailed, first-class postage prepaid, to each Holder of Debt Securities of such series at his address as it appears in the Security Register, not less than 10 days prior to such Special Record Date. Defaulted Interest shall be paid to the Persons in whose names the Debt Securities of such series (or their respective Predecessor Securities) are registered at the close of business on such Special Record Date and shall no longer be payable pursuant to the following clause (ii).

(ii)     The Issuer may make payment of any Defaulted Interest on the Debt Securities of any series in any other lawful manner not inconsistent with the requirements of any securities exchange on which the Debt Securities may be listed, and upon such notice as may be required by such exchange, if, after notice given by the Issuer to the Trustee of the proposed payment pursuant to this clause, such manner of payment shall be deemed practicable by the Trustee.

(c)     Subject to the foregoing provisions of this Section, each Debt Security delivered under this Indenture upon registration of transfer of or in exchange for or in lieu of any other Debt Security shall carry the rights to interest accrued and unpaid, and to accrue, that were carried by such other Debt Security.

SECTION 313.     ADDITIONAL AMOUNTS.

(a)     All payments made by the Issuer or the Guarantors, as applicable, under or in respect of the Debt Securities or the Guarantees will be made without withholding or deduction for or on account of any present or future taxes, duties, assessments or governmental charges imposed or levied by or on behalf of the government of any jurisdiction, including Canada or any province or territory thereof, or by any authority or agency therein or thereof having power to tax, all of which are herein referred to as "Taxes," unless the Issuer or such Guarantor is required to withhold or deduct Taxes by law or by the interpretation or administration thereof by the relevant governmental authority. If the Issuer or any Guarantor is required to withhold or deduct any amount for or on account of Taxes from any payment made under or in respect of the Debt Securities or the Guarantees, the Issuer or such Guarantor, as applicable, will pay such additional amounts, which are herein referred to as "Additional Amounts," as may be necessary so that the net amount received by each Holder of a Debt Security (including Additional Amounts) after such withholding or deduction will not be less than the amount the Holder would have received if such Taxes had not been withheld or deducted. However, no Additional Amounts will be payable with respect to a payment made to a Holder of a Debt Security, which we refer to as an "Excluded Holder," in respect of a beneficial owner, (i) with which the Issuer or such Guarantor

[New York 21531723 v17]                47

01/16/2009 14:05   12128155802   #415  P.058/102

Fram:Bank of NY Mellon

does not deal at arm's length (*within the meaning of the Income Tax Act (Canada)*) at the time of making such payment, (ii) which is subject to such Taxes by reason of its being connected presently or formerly with any jurisdiction, including Canada or any province or territory thereof, otherwise than by reason of the Holder's purchase of the Debt Securities, the holding of Debt Securities or the receipt of payments in respect of the Debt Securities, (iii) which presents such Debt Security for payment (where presentation is required) more than 30 days after the relevant date (except to the extent that the Holder thereof would have been entitled to such Additional Amounts on presenting a Debt Security for payment on the last day of such 30 day period); for this purpose, the "relevant date" in relation to any payments on any Debt Security means: (A) the due date for payment thereof, or (B) if the full amount of the monies payable on such date has not been received by the Trustee on or prior to such due date, the date on which the full amount of such monies has been so received and notice to that effect has been duly given to Holders of Debt Securities in accordance with this Indenture or (iv) who could lawfully avoid or reduce (but has not so avoided or reduced) such withholding or deduction by complying, or procuring that any third party comply with, any statutory requirements or by making, or procuring that any third party make, a declaration of non-residence, eligibility for treaty benefits or other similar claim for exemption or reduction to any relevant tax authority, the Issuer and such Guarantor, as appropriate; *provided* that in the case of a reduction, the Holder shall be entitled to receive Additional Amounts up to the reduced amount that would have applied had it made the appropriate claim. The Issuer and the applicable Guarantor will also make such withholding or deduction and remit the full amount deducted or withheld to the relevant authority in accordance with applicable law. The Issuer will furnish to the Trustee, within 30 days after the date the payment of any Taxes is due pursuant to applicable law, certified copies of tax receipts evidencing that such payment has been made by the Issuer or the applicable Guarantor or other evidence of such payment satisfactory to the Trustee. If any Holder pays any Taxes or other amounts in respect of payments that the Issuer or Guarantors pay to such Holder, the Issuer and each Guarantor shall indemnify and hold harmless each Holder of Debt Securities (other than an Excluded Holder) and upon written request reimburse each such Holder for the amount of (x) any Taxes so levied or imposed and paid by such Holder as a result of payments made under or with respect to the Debt Securities or the Guarantees, and (y) any Taxes levied or imposed and paid by such Holder with respect to any reimbursement under (x) above, but excluding any such Taxes on such Holder's net income or capital. A certificate of the Holder (or the Trustee on behalf of the Holder) accompanying the written request and containing reasonable detail as to the amount of Taxes to be reimbursed shall be determinative, absent manifest error, of the amount due from the Issuer and Guarantors to the Holder under this Indemnification.

(b)    At least 30 days prior to each date on which any payment under or with respect to the Debt Securities or the Guarantees is due and payable, if the Issuer or any Guarantor is obligated to pay Additional Amounts with respect to such payment, the Issuer will deliver to the Trustee an Officers' Certificate stating the fact that such Additional Amounts will be payable, the amounts so payable and that the Issuer or such Guarantor, as the case may be, will remit such deduction or withholding to the appropriate tax authority, and will set forth such other information necessary to enable the Trustee to pay such Additional Amounts to Holders of the Debt Securities on the relevant date. All references in this Indenture to the payment of principal of, premium or any other amount, if any, and interest on, any Debt Security or Guarantee shall be deemed to include

[New York #1531721 v17]                    48

the payment of Additional Amounts to the extent that, in such context, Additional Amounts are, were or would be payable.

SECTION 314.    *ADDITIONAL INTEREST UNDER REGISTRATION RIGHTS AGREEMENTS.*

Under certain circumstances, the Issuer may be obligated to pay Additional Interest to Holders, all as and to the extent set forth in the Issue Date Registration Rights Agreement or any other Registration Rights Agreement. The terms thereof are hereby incorporated herein by reference and such Additional Interest is deemed to be interest for all purposes of this Indenture.

SECTION 315.    *PERSONS DEEMED OWNERS.*

(a)    Prior to due presentment of a Debt Security for registration of transfer, the Issuer, the Guarantors, the Trustee and any agent of any of the foregoing may treat the Person in whose name such Debt Security is registered as the owner of such Debt Security for the purpose of receiving payment of principal of (and premium, if any) and, subject to Section 312, interest on such Debt Security and for all other purposes whatsoever, whether or not such Debt Security be overdue, and none of the Issuer, the Guarantors, the Trustee or any agent of any of the foregoing shall be affected by notice to the contrary.

(b)    None of the Issuer, the Guarantors, the Trustee, any Paying Agent or the Security Registrar will have any responsibility or liability for any aspect of the records related to or payments made on account of beneficial ownership interests of a Global Security or for maintaining, supervising or reviewing any records related to such beneficial ownership interests.

SECTION 316.    *CANCELLATION.*

Unless otherwise provided, all Debt Securities surrendered for payment, redemption, registration of transfer or exchange shall, if surrendered to any Person other than the Trustee, be delivered to the Trustee and shall be promptly cancelled by it. The Issuer or any Guarantor may deliver to the Trustee for cancellation any Debt Securities previously authenticated and delivered hereunder that the Issuer or such Guarantor may have acquired in any manner whatsoever, and all Debt Securities so delivered shall be promptly cancelled by the Trustee. No Debt Securities shall be authenticated in lieu of or in exchange for any Debt Securities cancelled as provided in this Section, except as expressly permitted by this Indenture. All cancelled Debt Securities held by the Trustee shall be disposed of in accordance with the Trustee's policy of disposal or shall be returned to the Issuer upon Issuer Request; *provided* that the Trustee shall not be required to destroy cancelled Debt Securities.

SECTION 317.    *COMPUTATION OF INTEREST.*

Interest on any series of Debt Securities shall be computed in the manner set forth in the supplemental indenture applicable to such series of Debt Securities.

SECTION 318.    *PAYMENT IN CURRENCIES.*

(a)    Payment of principal of (and premium, if any) and interest on the Debt Securities of any series shall be made in the currency or currencies specified pursuant to Section 301; *provided* that the Holder of a Debt Security of such series may elect to receive such payment in any one of

[New York #1531721 v17]                                   49

from:Bank of NY Mellon    12128155802    01/16/2009 14:06    #415 P. 060/102

Dollars or any other currency designated for such purpose pursuant to Section 301. A Holder may make such election by delivering to the Trustee a written notice thereof, substantially in the form attached hereto as Exhibit A or in such other form as may be acceptable to the Trustee, not later than the close of business on the Regular Record Date or Special Record Date immediately preceding the applicable Interest Payment Date or date for payment of Defaulted Interest or the fifteenth day immediately preceding the Maturity of an installment of principal, as the case may be. Such election shall remain in effect with respect to such Holder until such Holder delivers to the Trustee a written notice substantially in the form attached hereto as Exhibit A or in such other form as may be acceptable to the Trustee specifying a change in the currency in which such payment is to be made; *provided* that any such notice must be delivered to the Trustee not later than the close of business on the Regular Record Date or Special Record Date immediately preceding the next Interest Payment Date or date for payment of Defaulted Interest or the fifteenth day immediately preceding the Maturity of an installment of principal, as the case may be, in order to be effective for the payment to be made thereon; and *provided further* that no such change in currency may be made with respect to payments to be made on any Debt Security with respect to which notice of redemption has been given by the Issuer pursuant to Article Eleven.

(b)    Except as otherwise specified pursuant to Section 301, the Trustee shall deliver to the Issuer, *not later than* the eighth Business Day after the Regular Record Date or Special Record Date with respect to an Interest Payment Date or date for payment of Defaulted Interest or the fifteenth day immediately preceding the Maturity of an installment of principal, as the case may be, with respect to a series of Debt Securities, a written notice specifying, in the currency or currencies in which the Debt Securities of such series are denominated, the aggregate amount of the principal of (and premium, if any) and interest on such Debt Securities to be paid on such payment date. If payments on any such Debt Securities are designated to be made in a currency other than the currency in which such Debt Securities are denominated or if at least one Holder has made the election referred to in paragraph (a) above, then such written notice shall also specify, in each currency in which payment is to be made pursuant to paragraph (a), the amount of principal of (and premium, if any) and interest on such series of Debt Securities to be paid in such currency on such payment date.

(c)    The Issuer shall deliver, not later than the fourth Business Day following each Regular Record Date or Special Record Date or the fifteenth day immediately preceding the Maturity of an installment of principal, as the case may be, to the Trustee an Exchange Rate Officers' Certificate in respect of the Dollar or Foreign Currency payments to be made on such payment date. Except as otherwise specified pursuant to Section 301, the amount receivable by Holders who have elected payment in a currency other than the currency in which such Debt Securities are denominated as provided in paragraph (a) above shall be determined by the Issuer on the basis of the applicable Exchange Rate set forth in the applicable Exchange Rate Officers' Certificate.

(d)    Except as otherwise specified pursuant to Section 301, if the Foreign Currency in which Debt Securities of a series is denominated ceases to be used both by the government of the country that issued such currency and for the settlement of transactions by banks, then with respect to each date for the payment of principal of (and premium, if any) and interest on such Debt Securities occurring after the final date on which the Foreign Currency was so used, all payments with respect to such Debt Securities shall be made in Dollars; *provided* that payment to a Holder of a Debt Security of such series shall be made in a different Foreign Currency if that

Holder has elected or elects payment in such Foreign Currency as provided for by paragraph (a) above. If payment is to be made in Dollars to the Holders of any such Debt Securities pursuant to the provisions of the preceding sentence, then the amount to be paid in Dollars on a payment date by the Issuer to the Trustee and by the Trustee or any Paying Agent to Holders shall be determined by the Trustee as of the Regular Record Date or Special Record Date with respect to such Interest Payment Date or date for payment of Defaulted Interest or the fifteenth day immediately preceding the Maturity of an installment of principal, as the case may be, and shall be equal to the sum obtained by converting the specified Foreign Currency into Dollars at the Exchange Rate on the last Record Date on which such Foreign Currency was so used in such capacity.

(e)    All decisions and determinations of the Trustee regarding conversion of Foreign Currency into Dollars pursuant to Sections 318(d) or 301 or the Exchange Rate shall, in the absence of manifest error, be conclusive for all purposes and irrevocably binding upon the Issuer and all Holders of the Debt Securities of the applicable series. If a Foreign Currency in which payment of Debt Securities of a series may be made ceases to be used both by the government of the country which issued such currency and for the settlement of transactions by banks, the Issuer, after learning thereof, will give written notice pursuant to Section 105 thereof to the Trustee immediately (and the Trustee promptly thereafter will give notice to the Holders in the manner provided in Section 106) specifying the last date on which the Foreign Currency was used for the payment of principal of (and premium, if any) or interest on such Debt Securities. The Trustee shall be fully justified, protected and otherwise held harmless in relying and acting upon the information so received by the Issuer and shall not otherwise have any duty or obligation to determine or verify such information independently.

SECTION 319.    *JUDGMENTS.*

Any payment in respect of principal of (and premium, if any) and interest otherwise due on Debt Securities made in Canadian currency by NNC or the Issuer to any Holder of Debt Securities (the "Payee") pursuant to a judgment or order of a court or tribunal in Canada shall constitute a discharge of NNC or the Issuer only to the extent of the amount of Dollars or Foreign Currency payable on such Debt Securities (the "Purchased Amount") that the Payee, on the date of such payment in Canadian currency, would be able to purchase with the amount so paid based on the noon buying rate for Dollars or the Foreign Currency for wire transfers quoted on the date of payment or, if such date if not a Business Day in Toronto, Canada, on the next Business Day in Toronto, Canada. If the amount otherwise due to the Payee (the "Amount Due") is greater or less than the Purchased Amount, NNC or the Issuer, as the case may be, shall indemnify and hold harmless the Payee to the extent that the Amount Due exceeds the Purchased Amount and NNC or the Issuer, as the case may be, may retain the amount, if any, by which the Amount Due is less than the Purchased Amount. This indemnity shall constitute an obligation that is separate and independent from the other obligations contained in this Indenture and shall give rise to a separate and independent cause of action and shall continue in full force and effect notwithstanding any judgment or order for a liquidated sum in respect of amounts due under the Debt Securities or any judgment or order.

[New York #1531721 v17]                    51

SECTION 320:    *CUSIP NUMBERS*

The Issuer in issuing the Debt Securities may use "CUSIP" numbers (if then generally accepted in use), and if so, the Trustee shall use "CUSIP" numbers in notices and redemption as a convenience to Holders; *provided* that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Debt Securities or as contained in any notice of a redemption and that reliance may be placed only on the other identification numbers printed on the Debt Securities, and any such redemption shall not be affected by any defect in or omission of such numbers. The Issuer will promptly notify the Trustee of any change in the "CUSIP" numbers.

## ARTICLE FOUR

### SATISFACTION AND DISCHARGE

SECTION 401.    ... *SATISFACTION AND DISCHARGE OF INDENTURE.*

(a)    This Indenture shall upon Issuer Request cease to be of further effect (except as to any surviving rights of registration of transfer or exchange of Debt Securities provided for herein and rights to receive payments of principal of (and premium, if any) and interest thereon) with respect to a series of Debt Securities specified by the Issuer, and the Trustee, at the expense of the Issuer, shall execute proper instruments provided to it acknowledging satisfaction and discharge of this Indenture with respect to the Debt Securities of such series, when:

(i)    either

(A)    all Debt Securities of such series theretofore issued by the Issuer and authenticated and delivered hereunder (other than: (1) Debt Securities that have been destroyed, lost or stolen and that have been replaced or paid as provided in Section 311; and (2) Debt Securities for whose payment money has theretofore been deposited in trust or segregated and held in trust by the Issuer and thereafter repaid to the Issuer or discharged from such trust, as provided in Section 1003) have been delivered to the Trustee for cancellation; or

(B)    all Debt Securities of such series issued by the Issuer and authenticated and delivered hereunder and not theretofore delivered to the Trustee for cancellation:

(1)    have become due and payable;

(2)    will become due and payable at their Stated Maturity Date within one year; or

(3)    are to be called for redemption within one year under arrangements satisfactory to the Trustee for the giving of notice by the Trustee in the name, and at the expense, of the Issuer,

and the Issuer, in the case of (B)(1), (B)(2) or (B)(3) above, has irrevocably deposited or caused to be deposited with the Trustee as trust funds in trust an amount sufficient to pay and discharge the entire indebtedness on such Debt Securities for principal (and

[New York #1531721 v17]    52

#415  P. 062/102    01/16/2009 14:06    12128156802    Fax:Bank of NY Mellon

premium, if any) and interest to the date of such deposit (in the case of Debt Securities that have become due and payable) or to the Stated Maturity Date or Redemption Date, as the case may be;

    (ii)   the Issuer or the Guarantors has paid or caused to be paid all other sums payable hereunder by the Issuer or the Guarantors; and

    (iii)  the Issuer has delivered to the Trustee an Officers' Certificate and Opinion of Counsel each stating that all conditions precedent herein provided related to the satisfaction and discharge of this Indenture have been complied with.

(b)    Notwithstanding the satisfaction and discharge of this Indenture, the obligations of the Issuer to the Trustee under Section 606 and, if money shall have been deposited with the Trustee pursuant to paragraph (a)(i)(B) of this Section, the obligations of the Trustee under Section 402 and Section 1003(e) shall survive such satisfaction and discharge.

SECTION 402.    *APPLICATION OF TRUST MONEY.*

Subject to the provisions of Section 1003(e) of this Indenture, all money deposited with the Trustee pursuant to Section 401 of this Indenture shall be held in trust and applied by it, in accordance with the provisions of the Debt Securities, the Guarantees and this Indenture, to the payment, either directly or through any Paying Agent (including the Issuer or a Guarantor, acting as its own Paying Agent) as the Trustee may determine, to the Persons entitled thereto, of the principal (and premium, if any) and interest for whose payment such money has been deposited with the Trustee.

## ARTICLE FIVE

### DEFAULTS AND REMEDIES

SECTION 501.    *EVENTS OF DEFAULT AND ENFORCEMENT.*

If and when any one or more of the following events (herein called an "Event of Default") shall happen and be continuing with respect to the Debt Securities of any series, namely:

    (1)   the failure to pay principal of any Debt Security of such series when such principal becomes due and payable, whether at Maturity, upon redemption or otherwise;

    (2)   the failure to pay interest on any Debt Security of such series when the same becomes due and the continuance of such Default for a continuous period of 30 days;

    (3)   a Default in the deposit of any sinking fund payment on any Debt Security of such series when due;

    (4)   a Default by the Issuer, NNC, or during any period in which NNI is a Guarantor, NNI, in the performance or observance of any of their respective covenants, agreements or other obligations set forth herein for a continuous period of 90 days

[New York #1531721 v17]       53

From:Bank of NY Mellon    12128155802    01/16/2009 14:07    #416 P. 063/102

after the Issuer or such Guarantor receives written notice specifying the Default (and demanding that such Default be remedied) from the Holders of not less than 25% in principal amount of the Outstanding Debt Securities of such series;

(5)     a decree, judgment or order by a court having jurisdiction in the premises shall have been entered adjudging the Issuer or any Guarantor a bankrupt or insolvent or approving as properly filed a petition seeking reorganization, readjustment, arrangement, composition or similar relief for the Issuer or any Guarantor under any bankruptcy, insolvency or other similar applicable law and such decree, judgment or order of a court having jurisdiction in the premises for the appointment of a receiver or liquidator or trustee or assignee in bankruptcy or insolvency of the Issuer or such Guarantor, as the case may be, of a substantial part of its property, or for the winding up or liquidation of its affairs, shall have remained in force for a period of 60 consecutive days; or any substantial part of the property of the Issuer or such Guarantor shall be sequestered or attached and shall not be returned to the possession of the Issuer or such Guarantor or released from such attachment whether by filing of a bond, or stay or otherwise within 60 consecutive days thereafter;.

(6)     the Issuer or any Guarantor shall institute proceedings to be adjudicated a voluntary bankrupt, or shall consent to the filing of a bankruptcy proceeding against it, or shall file a petition or answer or consent seeking reorganization, readjustment, arrangement, composition or similar relief under any bankruptcy, insolvency or other similar applicable law or the Issuer or such Guarantor shall consent to the filing of any such petition, or shall consent to the appointment of a receiver or liquidator or trustee or assignee in bankruptcy or insolvency for it or of a substantial part of its property, or shall make an assignment for the benefit of creditors, or shall be unable, or admit in writing its inability, to pay its debts generally as they become due, or corporate action shall be taken by the Issuer or such Guarantor in furtherance of any of the aforesaid actions;

(7)     a Default by NNC, the Issuer or during any period in which NNI is a Guarantor, NNI, under a single obligation in respect of Funded Debt that exceeds on its face $100,000,000 in principal amount, which results in such Funded Debt becoming or being declared due and payable prior to the date on which it would otherwise become due and payable and such acceleration shall not be rescinded or annulled within 10 days after written notice (i) specifying such Default and (ii) stating that such notice is a "Notice of Default" hereunder, shall have been given to such defaulting entity by Holders of not less than 25% in principal amount of the Outstanding Debt Securities of such series;

(8)     any Guarantee shall cease to be in full force and effect (other than in accordance with the terms of this Indenture) or any Guarantor denies or disaffirms its obligations under its Guarantee;

(9)     one or more judgments in an aggregate amount in excess of $100,000,000 shall have been rendered against NNC, the Issuer or, during any period in which NNI is a Guarantor, NNI, and such judgments remain undischarged, unpaid in

[New York #1531721 v17]                                        54

From:Bank of NY Mellon    12128155802    01/16/2009 14:07    #415 P.064/102

accordance with its or their respective terms or unstayed for a period of 90 days after such judgment or judgments become final and non-appealable;

(10) a failure by the Issuer to make a Change of Control Offer; and

(11) any other Event of Default provided with respect to the Debt Securities of that series and specified in any supplemental indenture applicable to such series of Debt Security;

then, and in each and every such case, the Trustee or the Holders of not less than 25% in principal amount of the Outstanding Debt Securities of such series at such time may declare the principal of (and premium, if any) together with accrued interest on, all Debt Securities of such series to be due and payable immediately, by a notice in writing to the Issuer and the Guarantors, and to the Trustee if given by the Holders, and upon any such declaration such principal amount, together with accrued interest thereon shall become immediately due and payable.

SECTION 502.        *WAIVER OF DECLARATION.*

At any time after such a declaration of acceleration with respect to the Debt Securities of a series has been made and before a judgment or decree for payment of the money due has been obtained by the Trustee as hereinafter provided, the Holders of a majority in principal amount of the Outstanding Debt Securities of such series, by written notice to the Issuer, the Guarantors and the Trustee, may rescind and annul such declaration and its consequences if:

(a)    the Issuer or a Guarantor has paid or deposited with the Trustee a sum sufficient to pay:

(i)     all overdue interest on all the Debt Securities of such series;

(ii)    the principal of any of the Debt Securities of such series that have become due otherwise than by such declaration of acceleration, and interest thereon at the rate or rates prescribed therefor in such Debt Securities; and

(iii)   to the extent that payment of such interest is lawful and applicable, interest upon overdue installments of interest at the rate or rates prescribed therefor in such Debt Securities; and

(b)    all Events of Default with respect to the Debt Securities of such series, other than the non-payment of the principal of, premium if any and interest on, such Debt Securities which have become due solely by such declaration of acceleration, have been cured or waived in accordance with the provisions of the Indenture.

SECTION 503.        *WAIVER.*

(a)    The Holders of not less than a majority in principal amount of the Outstanding Debt Securities of any series may on behalf of the Holders of all Debt Securities of such series waive any past Default hereunder with respect to such series and its consequences, except a Default:

From:Bank of NY Mellon          12128156802          01/16/2009 14:07          #415 P. 066/102

(i)     in the payment of the principal of (or premium, if any) or interest on any Debt Security of such series; or

(ii)    in respect of a covenant or provision hereof that under Article Nine cannot be modified or amended without the consent of the Holder of each Outstanding Debt Security of such series affected.

(b)     Upon any such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, for every purpose of this Indenture. No such waiver shall extend to any subsequent or other Default or impair any right consequent thereon.

SECTION 504.        *OTHER REMEDIES.*

(a)     If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy to collect the payment of principal of (and premium, if any) or interest on Debt Securities or to enforce the performance of any provision of Debt Securities or this Indenture.

(b)     The Trustee may maintain a proceeding even if it does not possess any Debt Securities or does not produce any of them in the proceeding. A delay or omission by the Trustee or any Holder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default. All remedies, except as provided in Section 311, are cumulative to the extent permitted by law.

SECTION 505.        *APPLICATION OF MONEY COLLECTED.*

Any money collected by the Trustee pursuant to this Article shall be applied in the following order, at the dates fixed by the Trustee and, in case of the distribution of such money on account of principal of (and premium, if any) or interest, upon presentation of Debt Securities and the notation thereon of the payment if only partially paid and upon surrender thereof if fully paid:

FIRST: To the payment of all amounts due the Trustee under Section 606;

SECOND: To the payment of the amounts then due and unpaid for principal of (and premium, if any) and interest on the Debt Securities in respect of which or for the benefit of which such money has been collected ratably, without preference or priority of any kind, according to the amounts due and payable on such Debt Securities for principal (and premium, if any) and interest, respectively. The Holders of any Debt Securities denominated in a Foreign Currency shall be entitled to receive a ratable portion of the amount determined by the Trustee converting the principal amount Outstanding of such Debt Securities and accrued but unpaid interest on such Debt Securities in the currency in which such Debt Securities are denominated into Dollars at the Exchange Rate as of the date of declaration of acceleration of the Maturity of the Debt Securities (or, if there is no such rate on such date for the reasons specified in Section 318(d), such rate on the date specified in such Section); and

THIRD: To the Issuer or, to the extent the Trustee collects any amount pursuant to Section 203 hereof from a Guarantor, to such Guarantor.

[New York#1531721 v17]        56

From:Bank of NY Mellon          12128155802          01/16/2009 14:08          #415 P. 067/102

SECTION 506.    *CONTROL BY HOLDERS.*

(a)    The Holders of at least a majority in principal amount of the Outstanding Debt Securities of any series, may:

  (i)    direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on it with respect to the Debt Securities of such series; and

  (ii)    take any other action authorized to be taken by or on behalf of the Holders of any specified aggregate principal amount of Debt Securities under any provisions of this Indenture or under applicable law.

(b)    The Trustee may refuse, however, to follow any direction that conflicts with law or this Indenture or is unduly prejudicial to the rights of any Holders.

SECTION 507.    *LIMITATION ON SUITS.*

(a)    Any Holder of Debt Securities may individually pursue a remedy with respect to this Indenture directly only if: (i) such Holder gives to the Trustee written notice of a continuing Event of Default; (ii) the Holders of at least 25% in principal amount of all of the then-Outstanding Debt Securities issued under the Indenture (treated as a single class) make a request in writing to the Trustee to pursue the remedy; (iii) such Holder or Holders indemnify the Trustee in form satisfactory to it against any loss, liability, claim, damage or expense; (iv) the Trustee does not comply with the request within 60 days after receipt of such request and indemnity; and (v) during such 60-day period the Holders of a majority in principal amount of all of the Outstanding Debt Securities (treated as a single class) do not give the Trustee a direction inconsistent with the request.

(b)    Holders may not use this Indenture to prejudice the rights of another Holder or to obtain a preference or priority over another Holder.

SECTION 508.    *RIGHTS OF HOLDERS TO RECEIVE PAYMENT.*

Notwithstanding any other provision of this Indenture, the right of any Holder to receive payment of principal of (and, premium, if any) and interest on Debt Securities held by such Holder, on or after the respective due dates expressed in the Debt Securities (or, in the case of redemption, on the Redemption Date), or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of the Holder.

SECTION 509.    *COLLECTION SUIT BY TRUSTEE.*

If an Event of Default specified in Section 501(1), (2) or (3) occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust against the Issuer or a Guarantor for the whole amount of principal (and premium, if any) and interest remaining unpaid.

[New York #1531721 v17]                         57

SECTION 510.    *TRUSTEE MAY FILE PROOFS OF CLAIM.*

The Trustee may file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee and the Holders allowed in any judicial proceedings relative to the Issuer or a Guarantor, its creditors or its property.

SECTION 511.    *UNDERTAKING FOR COSTS.*

In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees and expenses, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section does not apply to a suit by the Trustee, a suit by a Holder pursuant to Section 507, or a suit by any Holder or group of Holders of more than 10% in principal amount of the Outstanding Debt Securities.

SECTION 512.    *DELAY OR OMISSION NOT WAIVER.*

No delay or omission of the Trustee or of any Holder of any Debt Security to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein. Every right and remedy given by this Article or by law to the Trustee or to the Holders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Holders, as the case may be.

SECTION 513.    *WAIVER OF STAY OR EXTENSION LAWS.*

The Issuer and each Guarantor, severally and not jointly, covenants (to the extent that it may lawfully do so) that it will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Indenture; and the Issuer and the Guarantors each, severally and not jointly (to the extent that it may lawfully do so), hereby expressly waives all benefit or advantage of any such law, and covenants that it will not hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

## ARTICLE SIX

### THE TRUSTEE

SECTION 601.    *DUTIES OF TRUSTEE.*

(a)    If an Event of Default has occurred and is continuing, the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of his own affairs.

[New York #1531721 v17]                    58

#415  P. 068/102    01/16/2009 14:08    12128155802    From: Bank of NY Mellon

From:Bank of NY Mellon    12128155802    01/16/2009 14:08    #415 P. 069/102

(b)    Except during the continuance of an Event of Default:

    (i)    the Trustee need perform only those duties that are specifically set forth in this Indenture and no others shall be inferred or implied; and

    (ii)    in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; however, the Trustee shall examine the certificates and opinions required to be delivered to it pursuant to the terms of this Indenture to determine whether or not they so conform.

(c)    The Trustee may not be relieved from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

    (i)    this paragraph does not limit the effect of paragraph (b) of this Section;

    (ii)    the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it is proved that the Trustee was negligent in ascertaining the pertinent facts;

    (iii)    the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 506; and

    (iv)    no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(d)    Every provision of this Indenture that in any way relates to the Trustee is subject to the above paragraphs of this Section. The Trustee may refuse to perform any duty or exercise any right or power under this Indenture (including with respect to Section 506) unless it receives indemnity reasonably satisfactory to it for actions taken under this Indenture. The Trustee shall not be liable for interest on any money received by it except as the Trustee may agree in writing with the Issuer or the applicable Guarantor. Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

SECTION 602.    *RIGHTS OF TRUSTEE.*

The Trustee may rely on any document (whether in its original or facsimile form) believed by it to be genuine and to have been signed or presented by the proper person. The Trustee need not investigate any fact or matter stated in the document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Issuer, personally or by agent or attorney at the sole cost of the Issuer and shall incur no liability or additional liability of any kind by reason of

[New York #1531721 v17]    59

such inquiry or investigation. Before the Trustee acts or refrains from acting, it may require an Officers' Certificates or an Opinion of Counsel. The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance thereon. The Trustee may act through agents or attorneys and shall not be responsible for the misconduct or negligence of any agent or attorney appointed with due care. *The Trustee shall not be liable for any action it takes or omits to take in good faith, except as otherwise provided in this Indenture, which it reasonably believes to be authorized or within its rights or powers. The Trustee may consult with counsel of its selection and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.*

The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder as Security Registrar and Security Custodian and each agent, custodian and other Person employed by the Trustee to act hereunder.

SECTION 603.        *INDIVIDUAL RIGHTS OF TRUSTEE.*

The Trustee in its individual or any other capacity may become the owner or pledgee of Debt Securities and may otherwise deal with the Issuer or the Guarantors with the same rights it would have if it were not Trustee. Any agent of the Trustee may do the same with like rights. However, the Trustee is at all times subject to Sections 609 and 610.

SECTION 604.        *TRUSTEE'S DISCLAIMER.*

The recitals contained herein and in the Debt Securities, except the Trustee's certificate of authentication, shall be taken as the statements of the Issuer and the Trustee assumes no responsibility for the correctness of same. The Trustee makes no representations as to the validity or sufficiency of any offering materials, this Indenture or of the Debt Securities. The Trustee shall not be accountable for the use or application by the Issuer of any of the Debt Securities or proceeds of the Debt Securities.

SECTION 605.        *NOTICE OF DEFAULTS.*

(a)    If an Event of Default with respect to a series of Debt Securities occurs and is continuing, the Trustee shall mail to Holders of Debt Securities of such series a notice of the Event of Default within 90 days after it occurs. Except in the case of an Event of Default resulting from nonpayment on any Debt Securities, the Trustee may withhold the notice if and so long as a committee of its Responsible Officers in good faith determines that withholding the notice is in the interests of the Holders of Debt Securities.

(b)    The Trustee shall not be deemed to have notice of any Default or Event of Default unless a Responsible Officer of the Trustee has knowledge thereof or unless written notice of any event which is in fact such a Default is received by the Trustee at the Corporate Trust Office of the Trustee, and such notice references the Debt Securities and this Indenture.

From:Bank of NY Mellon          12128156802          01/16/2009 14:03          #415 P. 071/102

SECTION 606.    *COMPENSATION AND INDEMNITY.*

(a)    The Issuer shall pay to the Trustee from time to time compensation for its services as agreed separately by the Issuer and the Trustee. The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust.

(b)    *The Issuer shall fully indemnify the Trustee and any predecessor Trustee and their agents* for, and to hold them harmless against, any and all loss, damage, claims, liability or expense (including reasonable attorneys' fees and expenses) arising out of or in connection with the acceptance or administration of the trust or trusts hereunder, including the costs and expenses of defending itself against any claim or liability in connection with the exercise or performance of any of its rights, powers, trusts or duties hereunder, except to the extent that such loss, damage, claim, liability or expense *is caused by its own negligent* action or failure to act, willful misconduct or bad faith or, with respect to indemnification of an agent hereunder, the negligent action or failure to act, willful misconduct or bad faith of such agent. The Trustee shall notify the Issuer promptly of any claim for which it may seek indemnity. The Issuer need not pay for any settlement made without its consent.

(c)    Except as otherwise expressly provided herein, the Issuer agrees to reimburse the Trustee upon its request for all reasonable and documented expenses, disbursements and advances incurred or made by the Trustee in accordance with any provision of this Indenture (including the reasonable and documented compensation, expenses and disbursements of its agents and counsel), except any such expense, disbursement or advance as may be attributable to its negligent action or failure to act, willful misconduct or bad faith or, with respect to documented compensation, expenses and disbursements of an agent or attorney, the negligent action or failure to act, willful misconduct or bad faith of such agent or attorney.

(d)    To secure the Issuer's respective payment obligations in this Section, the Trustee shall have a lien prior to Debt Securities on all money or property held or collected by the Trustee, except that held in trust to pay principal of, premium, if any, on and interest on Debt Securities.

When the Trustee incurs expenses or renders services in connection with an Event of Default specified in Section 501(5) or Section 501(6), the reasonable and documented expenses (including the reasonable and documented charges and expenses of its counsel) and compensation for the services are intended to constitute expenses of administration under any applicable Federal or state bankruptcy, insolvency or other similar law.

The provisions of this Section shall survive the satisfaction and discharge of the Debt Securities, termination of this Indenture and the resignation or removal of the Trustee.

SECTION 607.    *REPLACEMENT OF TRUSTEE.*

(a)    *A resignation or removal of the Trustee and appointment of a successor Trustee for the* Debt Securities of any series shall become effective only upon the successor Trustee's acceptance of appointment as provided in this Section.

(b)    The Trustee may resign at any time with respect to Debt Securities of one or more series by giving written notice thereof to the Issuer and the Guarantors. If an instrument of acceptance

by a successor Trustee shall not have been delivered to the Trustee within 30 days after the giving of such notice of resignation, the resigning Trustee may at the expense of the Issuer petition any court of competent jurisdiction for the appointment of a successor Trustee to the Trustee. The Holders of at least a majority in principal amount of the then Outstanding Debt Securities of such series may remove the Trustee by so notifying the Trustee, the Issuer and the Guarantors if: (i) the Trustee fails to comply with Section 609; (ii) the Trustee is adjudged a bankrupt or an insolvent; (iii) a receiver or public officer takes charge of the Trustee or its property; or (iv) the Trustee becomes incapable of acting; in addition, in any such case, (1) the Issuer by a Board Resolution may remove the Trustee with respect to all Debt Securities, or (2) any Holder who has been a bona fide Holder of a Debt Security of any series for at least six months may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee for the Debt Securities of such series and the appointment of a successor Trustee.

(c)     If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason with respect to the Debt Securities of one or more series, the Issuer shall promptly appoint a successor Trustee or Trustees with respect to the Debt Securities of that or those series (it being understood that any such successor Trustee may be appointed with respect to the Debt Securities of one or more or all of such series and that, except as provided by Section 611, at any time there shall be only one Trustee with respect to the Debt Securities of any particular series) and shall comply with the applicable requirements of this Section 607. Within one year after the successor Trustee takes office, the Holders of a majority in principal amount of the Outstanding Debt Securities of any series may appoint a successor Trustee to replace the successor Trustee appointed by the Issuer with respect to the Debt Securities of such series. If such a successor Trustee does not take office within 60 days after the retiring Trustee resigns or is removed, the retiring Trustee, the Issuer or the Holders of at least 10% in principal amount of the Debt Securities of any series may petition any court of competent jurisdiction for the appointment of a successor Trustee with respect to the Debt Securities of such series.

(d)     If the Trustee fails to comply with Section 609, any Holder of Debt Securities may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(e)     The Issuer shall give notice of each resignation and each removal of the Trustee with respect to Debt Securities of any series and each appointment of a successor Trustee with respect to Debt Securities of any series in the manner provided in Section 106. Each notice shall include the name of the successor Trustee with respect to the Debt Securities of such series and the address of its Corporate Trust Office.

(f)     In the case of an appointment hereunder of a successor Trustee with respect to all Debt Securities, every such successor Trustee so appointed shall execute, acknowledge and deliver to the Issuer and to the Guarantors and to the retiring Trustee an instrument accepting such appointment, and thereupon the resignation or removal of the retiring Trustee shall become effective and such successor Trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, trusts and duties of the retiring Trustee; but, on request of the Issuer, any Guarantor or the successor Trustee, such retiring Trustee shall, upon payment of its charges, execute and deliver an instrument transferring to such successor Trustee all the rights,

From:Bank of NY Mellon          12128155802          01/16/2008 14:09          #415  P. 072/102

From:Bank of NY Mellon    12128156802    01/16/2009 14:09    #415 P.073/102

powers, trusts and duties of the retiring Trustee, and shall duly assign, transfer and deliver to such successor Trustee all property and money held by such retiring Trustee hereunder.

(g)    In case of the appointment hereunder of a successor Trustee with respect to the Debt Securities of one or more (but not all) series, the Issuer, the Guarantors, the retiring Trustee upon payment of its charges and each successor Trustee with respect to the Debt Securities of one or more series shall execute and deliver an indenture supplemental hereto wherein each successor Trustee shall accept such appointment and which: (i) shall contain such provisions as shall be necessary or desirable to transfer and confirm to, and to vest in, each successor Trustee all the rights, powers, trusts and duties of the retiring Trustee with respect to the Debt Securities of that or those series to which the appointment of such successor Trustee relates; (ii) if the retiring Trustee is not retiring with respect to all Debt Securities, shall contain such provisions as shall be deemed necessary or desirable to confirm that all the rights, powers, trusts and duties of the retiring Trustee with respect to the Debt Securities of that or those series as to which the retiring Trustee is not retiring shall continue to be vested in the retiring Trustee; and (iii) shall add to or change any of the provisions of this Indenture as shall be necessary to provide for or facilitate the administration of the trusts hereunder by more than one Trustee, it being understood that nothing herein or in such supplemental indenture shall constitute such Trustees co-trustees of the same trust and that each such Trustee shall be trustee of a trust or trusts hereunder separate and apart from any trust or trusts hereunder administered by any other such Trustee; and upon the execution and delivery of such supplemental indenture the resignation or removal of the retiring Trustee shall become effective to the extent provided therein and each such successor Trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, trusts and duties of the retiring Trustee with respect to the Debt Securities of that or those series to which the appointment of such successor Trustee relates; but, on request of the Issuer, any Guarantor or any successor Trustee, such retiring Trustee shall duly assign, transfer and deliver to such successor Trustee all property and money held by such retiring Trustee hereunder with respect to the Debt Securities of that or those series to which the appointment of such successor Trustee relates.

(h)    Upon request of any such successor Trustee, the Issuer and the Guarantors shall execute any and all instruments for more fully and certainly vesting in and confirming to such successor Trustee all such rights, powers, trusts and duties referred to in paragraph (f) or (g) of this Section, as the case may be.

(i)    No successor Trustee shall accept its appointment unless at the time of such acceptance such successor Trustee shall be qualified and eligible under this Article.

SECTION 608.    *SUCCESSOR TRUSTEE BY MERGER, ETC.*

If the Trustee consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business, including this transaction, to, another corporation, the successor corporation without any further act shall be the successor Trustee; *provided* that prior written notice thereof is given to the Issuer and the Guarantors and such successor corporation is acceptable to the Issuer and the Guarantors.

[New York #1531721 v17]

SECTION 609.    *ELIGIBILITY; DISQUALIFICATION.*

This Indenture shall always have a Trustee who satisfies the requirements of Section 310(a)(1) of the Trust Indenture Act as then in effect. The Trustee shall always have a combined capital and surplus of at least $5 million, calculated as permitted by Section 310(a)(2) of the Trust Indenture Act as then in effect. The Trustee is subject to Section 310(b) of the Trust Indenture Act, including the optional provision permitted by the second sentence of Section 310(b)(9) of the Trust Indenture Act.

SECTION 610.    *PREFERENTIAL COLLECTION OF CLAIMS AGAINST THE ISSUER.*

The Trustee is subject to Section 311(a) of the Trust Indenture Act, except with respect to any creditor relationship listed in Section 311(b) of the Trust Indenture Act. A Trustee who has resigned or been removed is subject to Section 311(a) of the Trust Indenture Act to the extent indicated.

SECTION 611.    *APPOINTMENT OF CO-TRUSTEE.*

The Issuer, the Guarantors and the Trustee may, at any time, appoint a co-trustee for any purpose or purposes of this Indenture if considered necessary or desirable in the circumstances including, without limitation, to fulfill any legal requirement under the applicable laws of any jurisdiction, including any applicable provision of the Canada Business Corporations Act, subject to the following provisions and conditions:

   (1)    the instrument appointing the co-trustee shall refer to this Indenture and the conditions of this Section 611;

   (2)    the instrument appointing the co-trustee shall set forth the rights, powers, duties, trusts and obligations under or in connection with this Indenture to be made available to, imposed upon, exercised and performed by each co-trustee and may, for greater certainty, identify those rights, powers, duties, trusts and obligations that will not be made available to, imposed upon, exercised or performed by each such co-trustee; and

   (3)    no trustee hereunder shall be responsible for or personally liable by reason of any act or omission of any other trustee hereunder.

## ARTICLE SEVEN

### HOLDERS' LISTS AND REPORTS BY TRUSTEE, ISSUER AND GUARANTORS

SECTION 701.    *PRESERVATION OF INFORMATION; COMMUNICATIONS TO HOLDERS.*

(a)    The Trustee shall preserve, in as current a form as is reasonably practicable, the names and addresses of the Holders of Debt Securities received by the Security Registrar.

(b)    If three or more Holders of a series of Debt Securities (hereinafter referred to as "applicants") apply in writing to the Trustee, and furnish to the Trustee reasonable proof that each such applicant has owned a Debt Security for a period of at least six months immediately

[New York #1531721 v17]                                    64

From:Bank of NY Mellon         12128155802         01/16/2009 14:10         #415  P.075/102

preceding the date of such application, and such application states that the applicants desire to communicate with other Holders of Debt Securities of a particular series (in which case the applicants must hold Debt Securities of such series) or with all Holders of Debt Securities with respect to their rights under this Indenture or under the Debt Securities and is accompanied by a copy of the form of proxy or other communication which such applicants propose to transmit, then the Trustee shall, within five Business Days after the receipt of such application, at its election, either:

    (i)    afford such applicants access to the information preserved at the time by the Trustee in accordance with Section 701(a); or

    (ii)    inform such applicants as to the approximate number of the Holders of Debt Securities of such series or of all Debt Securities, as the case may be, whose names and addresses appear in the information preserved at the time by the Trustee in accordance with Section 701(a), and as to the approximate cost to the applicant of mailing to such Holders the form of proxy or other communication, if any, specified in such application.

If the Trustee shall elect not to afford such applicants access to such information, the Trustee shall, upon the written request of such applicants, mail to each Holder whose name and address appears in the information preserved at the time by the Trustee in accordance with Section 701(a), a copy of the form of proxy or other communication that is specified in such request, with reasonable promptness after a tender to the Trustee of the material to be mailed and of payment, or provision for the payment, by the applicant, of the reasonable expenses of mailing, unless within five days after such tender, the Trustee shall mail to such applicants and file with the Commission, together with a copy of the material to be mailed, a written statement to the effect that, in the opinion of the Trustee, such mailing would be contr̶a̶r̶y̶ ̶t̶o̶ ̶t̶h̶e̶ ̶b̶e̶s̶t̶ ̶i̶n̶t̶e̶r̶e̶s̶t̶s̶ ̶o̶f̶ the Holders or would be in violation of applicable law. Such written basis of such opinion. If the Commission, after opportunity for a hea̶ specified in the written statement so filed, shall enter an order refusin̶ objections or if, after the entry of an order sustaining one or more of Commission shall find, after notice and opportunity for hearing, that sustained have been met and shall enter an order so declaring, the Tr̶ such material to all such Holders with reasonable promptness after th̶ the renewal of such tender, otherwise the Trustee shall be relieved of̶ such applicants respecting their application.

(c)    Every Holder of Debt Securities, by receiving and holding the same, agrees with the Issuer, the Guarantors and the Trustee that none of the Issuer, the Guarantors and the Trustee shall be held accountable by reason of the disclosure of any such information as to the names and addresses of the Holders in accordance with Section 701(b), regardless of the source from which such information was derived, and that the Trustee shall not be held accountable by reason of mailing any material pursuant to a request made under Section 701(b).

SECTION 702.    *REPORTS BY TRUSTEE.*

(a)    Within 60 days after May 15 of each year following the date of this Indenture, the Trustee shall mail to Holders a brief report dated as of such reporting date that complies with

[New York #1531721 v17]            65

Section 313(a) of the Trust Indenture Act. The Trustee shall also comply with Sections 313(b)(2) and 313(c) of the Trust Indenture Act.

(b)    A copy of each report at the time of its mailing to Holders shall be filed with the Commission and each stock exchange on which Debt Securities of any series are listed.

SECTION 703.    *REPORTS BY ISSUER AND GUARANTORS.*

(a)    NNC or the Issuer will:

    (i)    file with the Trustee, within 15 days after NNC is required to file the same with the Commission, copies of the annual reports and of the information, documents and other reports (or copies of such portions of any of the foregoing as the Commission may from time to time by rules and regulations prescribe) which NNC may be required to file with the Commission pursuant to Section 13 or Section 15(d) of the Exchange Act; or, if NNC is not required to file information, documents or reports pursuant to either of these Sections, NNC will file with the Trustee and the Commission, in accordance with rules and regulations prescribed from time to time by the Commission, such of the supplementary and periodic information, documents and reports that may be required pursuant to Section 13 of the Exchange Act in respect of a security listed and registered on a national securities exchange as may be prescribed from time to time in such rules and regulations;

    (ii)    file with the Trustee and the Commission, in accordance with rules and regulations prescribed from time to time by the Commission, such additional information, documents and reports with respect to compliance thereby with the conditions and covenants of this Indenture as may be required from time to time by such rules and regulations; and

    (iii)    notify the Trustee when Debt Securities of any series are listed on any stock exchange.

(b)    Delivery of such reports, information and documents to the Trustee is for informational purposes only and the Trustee's receipt of such shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Issuer's compliance with any of its covenants hereunder (as to which the Trustee is entitled to rely exclusively on Officers' Certificates).

(c)    The Issuer and the Guarantors shall also comply with the provisions of Section 314(a) of the Trust Indenture Act.

From:Bank of NY Mellon        12128155802        01/16/2009 14:10        #415 P.077/102

## ARTICLE EIGHT

### AMALGAMATION, MERGER, CONVEYANCE, TRANSFER OR LEASE

SECTION 801.    *AMALGAMATIONS AND MERGERS OF ISSUER OR A GUARANTOR AND CONVEYANCES PERMITTED SUBJECT TO CERTAIN CONDITIONS.*

So long as any Debt Security of a particular series remains Outstanding, none of NNC, the Issuer or, during any period in which NNI is a Guarantor, NNI, will amalgamate or merge with any other corporation or enter into any reorganization or arrangement or effect any conveyance, transfer or lease of all or substantially all of its and its Subsidiaries' assets, taken as a whole, unless in any such case:

    (i)    either (A) it shall be the surviving Person or one of the continuing Persons, or (B) the successor corporation (or the Person that leases or that acquires by conveyance or transfer all or substantially all of its and its Subsidiaries' assets, taken as a whole) expressly assumes the due and punctual payment of the principal of (and premium, if any) and interest on all Outstanding Debt Securities issued hereunder, according to their tenor, and the due and punctual performance and observance of all of the covenants and conditions of this Indenture to be performed by it by supplemental indenture pursuant to Article Nine satisfactory to the Trustee, executed and delivered to the Trustee by such Person; and

    (ii)    NNC, the Issuer or, during any period in which NNI is a Guarantor, NNI, or any successor Person, as the case may be, are not immediately thereafter in Default under this Indenture or the Debt Securities.

SECTION 802.    *RIGHTS AND DUTIES OF SUCCESSOR.*

(a)    In case of any such amalgamation, merger, reorganization, arrangement, conveyance, transfer or lease and upon any such assumption by the successor Person, such successor Person shall agree to be bound by the terms of this Indenture as principal obligor or guarantor in place of NNC, the Issuer or NNI with the same effect as if it had been named herein as such. Such successor Person thereupon may cause to be signed, and may issue either in its own name or in the name of NNC, the Issuer or NNI, as the case may be, any or all of Debt Securities of any series issuable and the Guarantees endorsed thereon, hereunder which theretofore shall not have been signed by NNC, the Issuer or NNI, as the case may be, and delivered to the Trustee. All Debt Securities so issued and Guarantees endorsed thereon shall in all respects have the same legal rank and benefit under this Indenture as the Debt Securities and Guarantees theretofore or thereafter issued or endorsed in accordance with the terms of this Indenture as though all of such Debt Securities and Guarantees had been issued or endorsed at the date on which the Debt Securities of such series were originally signed by NNC, the Issuer or NNI, as the case may be, and delivered to the Trustee.

(b)    In the case of any such amalgamation, merger, reorganization, arrangement, conveyance, transfer or lease, such changes in phraseology and form (but not in substance) may be made in Debt Securities and, the Guarantees endorsed thereon, thereafter to be issued as may be appropriate.

SECTION 803.   OPINION OF COUNSEL.

The Trustee shall receive an Opinion of Counsel as conclusive evidence that any such amalgamation, merger, reorganization, arrangement, consolidation, lease, transfer or conveyance, and any such assumption, comply with the provisions of this Article Eight.

ARTICLE NINE

SUPPLEMENTAL INDENTURES

SECTION 901.   SUPPLEMENTAL INDENTURES WITHOUT CONSENT OF HOLDERS.

Without the consent of any Holders, the Issuer and the Guarantors, when authorized by a Board Resolution of the Issuer and Officers' Certificates of the Guarantors, and the Trustee, at any time and from time to time, may enter into one or more indentures supplemental hereto, in form satisfactory to the Trustee, for any of the following purposes:

(1)   to evidence the succession of another corporation to the Issuer or a Guarantor, and the assumption by such successor of the covenants of the Issuer or such Guarantor herein and in the Debt Securities;

(2)   to add to the covenants of the Issuer or a Guarantor, as the case may be, for the benefit of the Holders of all or any series of Debt Securities (and, if such covenants are to be for the benefit of less than all series of Debt Securities, stating that such covenants are expressly being included solely for the benefit of such series), or to surrender any right or power herein conferred upon the Issuer or such Guarantor;

(3)   to add additional items to the definition of Permitted Liens or Permitted Funded Debt which shall apply only to one or more series of Debt Securities; provided that such supplemental indenture is entered into on or prior to the initial Issue Date of any Debt Securities of such series;

(4)   to add any additional Events of Default (and, if such Events of Default are to be applicable to less than all series of Debt Securities, stating that such Events of Default are expressly being included solely to be applicable to such series); provided that in respect of any such additional Events of Default such supplemental indenture may provide for a particular grace period after Default (which period may be shorter or longer than that allowed in the case of other Defaults) or may provide for an immediate enforcement upon such Default or may limit the remedies available to the Trustee upon such Default or may limit the right of the Holders of a majority in aggregate principal amount of the series of Debt Securities to which such additional Events of Default apply to waive such Default;

(5)   to change or eliminate any restrictions on the payment of principal (or premium, if any) of Debt Securities; provided that any such action shall not adversely affect the interests of the Holders of Debt Securities of any series in any material respect;

(6)   to change or eliminate any of the provisions of this Indenture; provided that any such change or elimination shall become effective only when there is no Outstanding Debt Security of

[New York #1531721 v17]                                    68

any series created prior to the execution of such supplemental indenture that is entitled to the benefit of such provision;

(7)     to establish the form or terms of Debt Securities of any series as permitted by Sections 201 and 301;

(8)     to evidence and provide for the acceptance of appointment hereunder by a successor Trustee with respect to the Debt Securities of one or more series and to add to or change any of the provisions of this Indenture as shall be necessary to provide for or facilitate the administration of the trusts hereunder by more than one Trustee;

(9)     to secure the Debt Securities;

(10)    to add an additional Guarantor in respect of the Debt Securities;

(11)    to supplement any of the provisions of this Indenture to such extent as shall be necessary to permit or facilitate the defeasance and discharge of any series of Debt Securities pursuant to Section 401, Section 1301 or Section 1302; *provided* that any such action shall not adversely affect the interests of the Holders of Debt Securities of such series or any other series of Debt Securities in any material respect; or

(12)    to cure any ambiguity, to correct or supplement any provision herein that may be defective or inconsistent with any other provision herein, or to make any other provisions with respect to matters or questions arising under this Indenture that shall not be inconsistent with any provisions of this Indenture, *provided* that such other provisions shall not adversely affect the interests of the Holders of Debt Securities of any series in any material respect.

SECTION 902.     *SUPPLEMENTAL INDENTURES WITH CONSENT OF HOLDERS.*

(a)     With the consent of the Holders of not less than a majority in principal amount of the Outstanding Debt Securities of any series affected by such supplemental indenture, by Act of said Holders delivered to the Issuer, the Guarantors and the Trustee, the Issuer and the Guarantors, when authorized by a Board Resolution of the Issuer and Officers' Certificates of the Guarantors, and the Trustee may enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Indenture or of modifying in any manner the rights of the Holders of such series of Debt Securities under this Indenture or under such series of Debt Securities; provided that no such supplemental indenture shall, without the consent of the Holder of each Outstanding Debt Security affected thereby:

(i)     change the Stated Maturity Date of the principal of, or any installment of interest on, any Debt Security, or reduce the principal amount thereof or the interest thereon or any premium payable upon redemption thereof, or reduce the amount of the principal of an Original Issue Discount Security that would be due and payable upon a declaration of acceleration of the Maturity thereof pursuant to Section 501, or change any Place of Payment, or change the currency in which any Debt Security or interest thereon is payable, or impair the right to institute

[New York #1531721 v17]                                    69

suit for the enforcement of any such payment on or after the Stated Maturity Date thereof (or, in the case of redemption, on or after the Redemption Date);

(ii)     reduce the percentage in principal amount of the Outstanding Debt Securities of any series, the consent of whose Holders is required for any such supplemental indenture, or the consent of whose Holders is required for any waiver (of compliance with certain provisions of this Indenture or certain Defaults hereunder and their consequences) provided for in this Indenture, or reduce the requirements of Section 1404 for quorum or voting;

(iii)    modify any of the provisions of this Section, Section 503 or Section 1009, except to increase any such percentage or to provide that certain other provisions of this Indenture cannot be modified or waived without the consent of the Holder of each Outstanding Debt Security affected thereby; *provided* that this clause shall not be deemed to require the consent of any Holder with respect to changes in the references to "the Trustee" and concomitant changes in this Section and Section 1009, or the deletion of this proviso, in accordance with the requirements of Section 901(8); or

(iv)    change in any manner adverse to the interests of the Holders of any Outstanding Debt Securities the terms and conditions of the obligations of the Guarantors in respect of the due and punctual payment of the principal (or, if the context so requires, lesser amount in the case of Original Issue Discount Securities) thereof (and premium, if any, thereon) and interest thereon or any Additional Amounts or any sinking fund or analogous payments provided in respect thereof.

(b)     It shall not be necessary for any Act of Holders under this Section to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if such Act shall approve the substance thereof.

(c)     A supplemental indenture that changes or eliminates any covenant or other provisions of this Indenture that has expressly been included solely for the benefit of one or more particular series of Debt Securities, or that modifies the rights of the Holders of Debt Securities of such series with respect to such covenant or other provision, shall be deemed not to affect the rights under this Indenture of the Holders of Debt Securities of any other series.

SECTION 903.          EXECUTION OF SUPPLEMENTAL INDENTURES.

In executing, or accepting the additional trusts created by, any supplemental indenture permitted by this Article or the modifications thereby of the trusts created by this Indenture, the Trustee shall be entitled to receive, and, subject to Section 601, shall be fully protected in relying upon, an Opinion of Counsel or Officers' Certificate stating that the execution of such supplemental indenture is authorized or permitted by this Indenture. The Trustee may, but shall not be obligated to, enter into any such supplemental indenture that affects the Trustee's own rights, duties or immunities under this Indenture or otherwise.

From:Bank of NY Mellon    12128155802    01/16/2009 14:11    #415 P.081/102

SECTION 904.        *EFFECT OF SUPPLEMENTAL INDENTURES.*

Upon the execution of any supplemental indenture under this Article, this Indenture shall be modified in accordance therewith, and such supplemental indenture shall form a part of this Indenture for all purposes; and every Holder of Debt Securities theretofore or thereafter authenticated and delivered under this Indenture shall be bound by the supplemental indenture.

SECTION 905.        *CONFORMITY WITH TRUST INDENTURE ACT.*

Every supplemental indenture executed pursuant to this Article shall conform to the requirements of the Trust Indenture Act as then in effect.

SECTION 906.        *REFERENCE IN DEBT SECURITIES TO SUPPLEMENTAL INDENTURES.*

Debt Securities of any series authenticated and delivered after the execution of any supplemental indenture pursuant to this Article may, and shall if required by the Trustee, bear a notation in form approved by the Trustee as to any matter provided for in such supplemental indenture. If the Issuer or the Guarantors shall so determine, new Debt Securities of any series and any Guarantees endorsed thereon so modified as to conform, in the opinion of the Trustee and the Board of Directors of the Issuer, to any such supplemental indenture may be prepared and executed by the Issuer and the Guarantors and authenticated and delivered by the Trustee in exchange for Outstanding Debt Securities of such series.

### ARTICLE TEN

#### COVENANTS

SECTION 1001.        *PAYMENT OF PRINCIPAL, PREMIUM AND INTEREST.*

The Issuer covenants and agrees for the benefit of each particular series of Debt Securities that it will duly and punctually pay the principal of (and premium, if any) and interest on the Debt Securities of such series in accordance with their terms and this Indenture. Principal (and premium, if any) or interest payable with respect to any Debt Securities shall be considered paid on the date due if the Paying Agent, or the Issuer if it acts as its own Paying Agent, holds on that date money sufficient to pay all principal (and premium, if any) and interest then due.

SECTION 1002.        *MAINTENANCE OF OFFICE OR AGENCY.*

(a)        The Issuer will maintain in each Place of Payment for any series of Debt Securities issued hereunder an office or agency where Debt Securities of such series may be presented or surrendered for payment, where Debt Securities of such series may be surrendered for registration of transfer or exchange and where notices and demands to or upon the Issuer in respect of the Debt Securities of such series and this Indenture may be served; and the Guarantors will maintain in The City of New York an office or agency where notices and demands to or upon the Guarantors in respect of Debt Securities of any series and this Indenture may be served. The Issuer and the Guarantors will give prompt written notice to the Trustee of the location, and any change in the location of, any such office or agency. If at any time the Issuer or any Guarantor shall fail to maintain any such required office or agency or shall fail to

[New York #1.53]721 v17]                              71

furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office of the Trustee and the Issuer and the Guarantors each hereby appoints the Trustee its agent to receive all such presentations, surrenders, notices and demands.

(b)    The Issuer may also from time to time designate one or more other offices or agencies (in or outside of such Place of Payment) where the Debt Securities of one or more series may be presented or surrendered for any or all of such purposes, and may from time to time rescind such designations; *provided* that no such designation or rescission shall in any manner relieve the Issuer of its obligation to maintain an office or agency in each Place of Payment for any series of Debt Securities, for such purposes. The Issuer will give prompt written notice to the Trustee of any such designation and any change in the location of any such other office or agency.

SECTION 1003.    *MONEY FOR DEBT SECURITIES PAYMENTS TO BE HELD IN TRUST.*

(a)    If the Issuer or a Guarantor shall at any time act as its own Paying Agent with respect to any series of Debt Securities, it will, on or before each due date of the principal of (and premium, if any) or interest on any of the Debt Securities of such series, segregate and hold in trust for the benefit of the Persons entitled thereto a sum sufficient to pay the principal (and premium, if any) or interest so becoming due until such sums shall be paid to such Persons or otherwise disposed of as herein provided, and will promptly notify the Trustee of its action or failure so to act.

(b)    Whenever the Issuer shall have one or more Paying Agents with respect to any series of Debt Securities, it will, prior to each due date of the principal of (and premium, if any) or interest on any Debt Securities of such series, deposit with a Paying Agent a sum sufficient to pay the principal (and premium, if any) or interest so becoming due, such sum to be held in trust for the benefit of the Persons entitled to such principal, premium or interest, and (unless such Paying Agent is the Trustee) the Issuer will promptly notify the Trustee of its action or failure so to act.

(c)    The Issuer will cause each Paying Agent with respect to any series of Debt Securities, other than the Trustee, to execute and deliver to the Trustee an instrument in which such Paying Agent shall agree with the Trustee, subject to the provisions of this Section, that such Paying Agent will:

    (i)    hold all sums held by it for the payment of the principal of (and premium, if any) or interest on Debt Securities of such series in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as herein provided;

    (ii)    give the Trustee notice of any Default by the Issuer or a Guarantor (or any other obligor upon the Debt Securities of such series or Guarantees endorsed thereon) in the making of any payment of principal of (and premium, if any) or interest on the Debt Securities of such series or Guarantees endorsed thereon; and

    (iii)    at any time during the continuance of any such Default, upon the written request of the Trustee, forthwith pay to the Trustee all sums so held in trust by such Paying Agent.

#415  P. 083/102

01/16/2009  14:12

12128155802

From:Bank of NY Mellon

(d)    The Issuer may at any time, for the purpose of obtaining the satisfaction and discharge of this Indenture or for any other purpose, pay, or by Issuer Order direct any Paying Agent to pay, to the Trustee all sums held in trust by the Issuer or such Paying Agent, such sums to be held by the Trustee upon the same trusts as those upon which such sums were held by the Issuer or such Paying Agent; and, upon such payment by any Paying Agent to the Trustee, such Paying Agent shall be released from all further liability with respect to such money.

(e)    Any money deposited with the Trustee or any Paying Agent, or then held by the Issuer or any Guarantor, in trust for the payment of the principal of (and premium, if any) or interest on any Debt Security of any series and remaining unclaimed for two years after Maturity shall be paid to the Issuer or such Guarantor on Issuer Request or Guarantor Request of such Guarantor, as the case may be, or (if then held by the Issuer or such Guarantor) shall be discharged from such trust; and the Holder of such Debt Security shall thereafter, as an unsecured general creditor, look only to the Issuer or such Guarantor, as the case may be, for payment thereof, and all liability of the Trustee or such Paying Agent with respect to such trust money, and all liability of the Issuer or such Guarantor, as the case may be, as trustee thereof, shall thereupon cease; provided that the Trustee or such Paying Agent, before being required to make any such repayment, may at the expense of the Issuer or such Guarantor, as the case may be, cause to be published once, in an Authorized Newspaper of general circulation in the Borough of Manhattan, The City of New York, and each Place of Payment or mailed to each such Holder, or both, notice that such money remains unclaimed and that, after a date specified therein, which shall not be less than 30 days from the date of such publication or mailing, any unclaimed balance of such money then remaining will be repaid to the Issuer or such Guarantor, as the case may be.

SECTION 1004.    *OFFER TO REPURCHASE UPON CHANGE OF CONTROL.*

(a)    If a Change of Control occurs, the Issuer shall make an offer (a "Change of Control Offer") to each Holder to purchase each Holder's Debt Securities at a purchase price, in cash, equal to 101% of the aggregate principal amount thereof, plus accrued and unpaid interest thereon, if any, up to the date of purchase (the "Change of Control Payment").

(b)    Within 30 days following the date upon which the Change of Control occurs, the Issuer shall mail, or shall cause the Trustee to mail, by first-class mail, a notice to each Holder, with a copy to the Trustee, which notice shall govern the terms of the Change of Control Offer and stating:

    (i)    the CUSIP number, if any, of each series of Debt Securities to which the Change in Control Offer applies;

    (ii)    that the Change of Control Offer is being made pursuant to this Section 1004 and that all Debt Securities tendered will be accepted for payment;

    (iii)    the Change of Control Payment and the purchase date (the "Change of Control Payment Date"), which shall be no earlier than 30 days and no later than 60 days after the date such notice is mailed, other than as may be required to comply with any applicable laws;

    (iv)    that any Debt Security not tendered will continue to accrue interest;

(v)   that unless the Issuer defaults in the payment of the Change of Control Payment, all Debt Securities accepted for payment pursuant to the Change of Control Offer shall cease to accrue interest after the Change of Control Payment Date;

(vi)   that Holders electing to have any Debt Securities purchased pursuant to a Change of Control Offer will be required to surrender the Debt Securities, with the form entitled "Option of Holder to Elect Purchase" (including specifying the portion (in integral multiples of $1,000) of such Holder's Debt Securities that it agrees to sell to the Issuer pursuant to the Change of Control Offer, on the reverse of the Debt Securities completed), to the Paying Agent at the address specified in the notice prior to the close of business on the third Business Day preceding the Change of Control Payment Date;

(vii)   that Holders will be entitled to withdraw their election if the Paying Agent receives, not later than the close of business on the second Business Day preceding the Change of Control Payment Date, a telegram, telex, facsimile transmission or letter setting forth the name of the Holder, the principal amount of Debt Securities delivered for purchase, and a statement that such Holder is withdrawing his election to have the Debt Securities purchased;

(viii)   that Holders whose Debt Securities are being purchased only in part will be issued new Debt Securities equal in principal amount to the unpurchased portion of the Debt Securities surrendered, which unpurchased portion must be an authorized denomination of such Debt Securities; and

(ix)   that Holders electing to have a Debt Security purchased pursuant to a Change of Control Offer may elect to have Debt Securities purchased in authorized denominations of such Debt Securities only.

(c)   On the Change of Control Payment Date, the Issuer shall, to the extent lawful,

(i)   accept for payment all Debt Securities or portions of Debt Securities properly tendered pursuant to the Change of Control Offer;

(ii)   deposit with the Paying Agent an amount equal to the Change of Control Payment in respect of all Debt Securities or portions of Debt Securities properly tendered; and

(iii)   deliver or cause to be delivered to the Trustee the Debt Securities so accepted together with an Officers' Certificate stating the aggregate principal amount of Debt Securities or portions thereof being purchased by the Issuer.

(d)   The Paying Agent shall promptly mail to each Holder of Debt Securities properly tendered the Change of Control Payment for such Debt Securities, and the Trustee shall promptly authenticate and mail (or cause to be transferred by book entry) to each Holder a new Debt Security equal in principal amount to any unpurchased portion of the Debt Securities surrendered, if any; provided that each new Debt Security shall be in an authorized denomination of such Debt Securities.

[New York #1531721 v17]                    74

From:Bank of NY Mellon          12128156802          01/16/2009 14:12          #415 P.065/102

(e)     The provisions of this Section 1004 will be applicable whether or not any other *covenants* or similar provisions of this Indenture are applicable. The Issuer shall comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws or regulations to the extent those laws and regulations are applicable to any Change of Control Offer. If the provisions of any of the applicable securities laws or securities regulations conflict with the provisions of this Section 1004, the Issuer shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under this Section 1004 by virtue of the compliance.

(f)     The Issuer shall not be required to make a Change of Control Offer upon a Change of Control if a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in this Section 1004 and purchases all Debt Securities properly tendered and not withdrawn under such Change of Control Offer.

SECTION 1005.     *RESTRICTIONS ON LIENS.*

(a)     Subject to the following exceptions, as long as any Debt Securities remain Outstanding, NNC and the Issuer will not, and will not permit any Restricted Subsidiary, to issue, assume or guarantee any Funded Debt secured by, and will not secure any Funded Debt by, a Lien upon any property of NNC, the Issuer or any Restricted Subsidiary (whether now owned or hereafter acquired) without in any such case effectively providing concurrently therewith that the Debt Securities then Outstanding shall be secured equally and ratably with such Funded Debt; *provided* that the foregoing restrictions shall not apply to Funded Debt secured by the following Liens ("Permitted Liens"):

(i)     any Lien existing on property at the time of the acquisition of that property by NNC, the Issuer or the relevant Restricted Subsidiary;

(ii)     any Lien on property that is incurred after the date of issuance of the Debt Securities to secure or provide for the payment of the purchase price of the property or the cost of construction or improvement thereon;

(iii)     any Lien on property of a Person existing at the time that Person is liquidated, dissolved or merged into, or amalgamated or consolidated with NNC, the Issuer or any Restricted Subsidiary, or at the time the properties of or equity interests in the Person are sold, leased or otherwise transferred to NNC, the Issuer or any Restricted Subsidiary;

(iv)     any Lien securing intercompany Funded Debt among or between NNC, the Issuer and/or the Restricted Subsidiaries;

(v)     deposits of cash, cash equivalents or investment securities against which the lender of any Credit Enhanced Foreign Subsidiary Debt has a Lien or right of set off;

(vi)     any Lien on property of a Foreign Subsidiary securing any Funded Debt incurred pursuant to clause (j) of the definition of Permitted Funded Debt;

(vii)    Liens in favor of the United States of America or any State thereof, Canada or any Province or territory thereof, or any department, agency or instrumentality or political subdivision thereof, or in favor of any other country or political subdivision, to secure partial, progress, advance or other payments pursuant to any contract or statute or to secure any Funded Debt incurred or guaranteed for the purpose of financing or refinancing all or any part of the purchase price of the property, shares of capital stock or indebtedness subject to such Liens, or the cost of constructing or improving the property subject to such Liens (including, without limitation, Liens incurred in connection with pollution control, industrial revenue or similar financings or relating to the development, restoration, demolition or remediation of property);

(viii)    any Lien created by or resulting from litigation or other proceedings against, or upon property of, NNC, the Issuer or any Restricted Subsidiary, or any Lien securing appeal bonds (or letters of credit or other similar instruments issued in support of or in lieu of appeal bonds) in respect of judgments, in each case, or any Lien for workmen's compensation awards or similar awards, so long as the finality of such judgment or award is being contested and execution thereon is stayed or such Lien relates to a final unappealable judgment which is satisfied within 30 days of such judgment or any Lien incurred by NNC, the Issuer or any Restricted Subsidiary for the purpose of obtaining a stay or discharge in the course of any litigation or other proceeding;

(ix)    any other Liens securing Funded Debt of any Foreign Subsidiary; *provided* that the aggregate outstanding principal amount of Funded Debt secured pursuant to this clause (ix) by any individual Foreign Subsidiary would not, after giving effect to the relevant transaction, exceed $5,000,000;

(x)    Liens existing on the date of this Indenture and any extension, renewal or replacement in whole or in part of any Lien existing on the date of this Indenture or referred to in the above exceptions, so long as the total amount of secured Funded Debt does not increase, and the property securing the Funded Debt is not expanded, as a result of the extension, renewal or replacement; and

(xi)    Managed Service Contract Liens.

(b)    Notwithstanding the foregoing, NNC, the Issuer and any Restricted Subsidiary may issue, assume or guarantee Funded Debt secured by a Lien upon any of their property that would otherwise be subject to the foregoing restrictions, and may carry out any other transactions which would otherwise be subject to the foregoing restrictions, *provided* that the aggregate amount at any time outstanding of all such secured Funded Debt incurred pursuant to this paragraph (b) would not, after giving effect thereto, exceed 10% of Consolidated Net Tangible Assets if incurred on or prior to the earlier of (x) the date of any refinancing or repayment (including by redemption) in full of the Existing NNC Convertible Notes and (y) September 2, 2008, and 15% of *Consolidated Net Tangible Assets* if incurred after such date.

SECTION 1006.    *INCURRENCE OF ADDITIONAL FUNDED DEBT.*

(a)    The Issuer and the Guarantors will not, and will not permit any of their Subsidiaries to, directly or indirectly, create, incur, assume, guarantee, acquire, become liable, contingently or otherwise, with respect to, or otherwise become responsible for the payment of (collectively, "incur") any Funded Debt (other than Permitted Funded Debt); *provided* that the Issuer, any Guarantor and any other Subsidiary of NNC may incur Funded Debt (including, without limitation, Acquired Funded Debt), if on the date of the incurrence of such Funded Debt, after giving effect to the incurrence thereof, the Consolidated Fixed Charge Coverage Ratio is greater than 2.0 to 1.0.

(b)    The Issuer and the Guarantors will not, directly or indirectly, incur any Funded Debt which by its terms (or by the terms of any agreement governing such Funded Debt) is subordinated in right of payment to any other Funded Debt of the Issuer or such Guarantors, unless such Funded Debt is also by its terms (or by the terms of any agreement governing such Funded Debt) made expressly subordinate to the Debt Securities and the Guarantees, as applicable, to the same extent and in the same manner as such Funded Debt is subordinated to other Funded Debt of the Issuer and the Guarantors, as applicable.

SECTION 1007.    *RESTRICTED PAYMENTS.*

The Issuer and the Guarantors will not, and will not cause or permit any of their Subsidiaries to, directly or indirectly:

(a)    declare or pay any dividend or make any distribution (other than dividends or distributions payable in Qualified Capital Stock of NNC) on or in respect of shares of NNC's Capital Stock or the Issuer's Preferred Stock to holders of such Capital Stock or Preferred Stock, as the case may be, in their capacity as such; or

(b)    purchase, redeem or otherwise acquire or retire for value any Capital Stock of NNC or any Preferred Stock of the Issuer or any warrants, rights or options to purchase or acquire shares of any class of such Capital Stock or Preferred Stock or make any payments with respect to Synthetic Purchase Agreements, (each of the foregoing actions set forth in clauses (a) and (b) being referred to as a "Restricted Payment"), if at the time of such Restricted Payment or immediately after giving effect thereto,

(i)    a Default or an Event of Default shall have occurred and be continuing;

(ii)    the Issuer would not be able to incur at least $1.00 of additional Funded Debt (other than Permitted Funded Debt) in compliance with Section 1006; or

(iii)    the aggregate amount of Restricted Payments (including such proposed Restricted Payment) made subsequent to the Measurement Date shall exceed the sum, without duplication (the "Restricted Payments Basket"), of:

(w)    50% of the cumulative Consolidated Net Income of NNC (or if cumulative Consolidated Net Income shall be a loss, minus 100% of such loss) earned subsequent to the Measurement Date and on or prior to the last day of the

[New York #1531721 v17]

77

From:Bank of NY Mellon          12128155802          01/16/2009 14:13          #415 P.087/102

most recent fiscal quarter for which consolidated financial information for NNC is available (the "Reference Date") (treating such period as a single accounting period); plus

(x) . 100% of the aggregate net cash proceeds received by NNC from any Person (other than NNC or a Subsidiary of NNC) or the Issuer from any Person (other than any other Subsidiary of NNC) from the issuance and sale subsequent to the Measurement Date and on or prior to the Reference Date of Qualified Capital Stock of NNC or Preferred Stock (other than Disqualified Capital Stock) of the Issuer or warrants, options or other rights to acquire Qualified Capital Stock of NNC (but excluding any debt security that is convertible into, or exchangeable for, Qualified Capital Stock); plus

(y) 100% of the aggregate net cash proceeds of any equity contribution received by NNC or the Issuer from a holder of NNC's or the Issuer's Capital Stock (other than an equity contribution received by the Issuer from NNC) following the Measurement Date; plus

(z) · the amount by which Funded Debt of NNC, the Issuer or another Subsidiary of NNC is reduced on NNC's consolidated balance sheet subsequent to the Measurement Date upon the conversion or exchange (other than by a Subsidiary of the Issuer) of such Funded Debt for Qualified Capital Stock of NNC or Preferred Stock (other than Disqualified Capital Stock) of the Issuer (less the amount of any cash, or the fair value of any other property, distributed by NNC, the Issuer or another Subsidiary of NNC upon such conversion or exchange).

Notwithstanding the foregoing, the provisions set forth in the preceding paragraphs shall not prohibit:

(1) the payment of any dividend within 60 days after the date of declaration of such dividend if the dividend would have complied with the provisions of this Section 1007 on the date of declaration;

(2) the purchase, defeasance, repurchase, prepayment, redemption or other acquisition or retirement for value of Capital Stock of NNC or Preferred Stock (other than Disqualified Capital Stock) of the Issuer or any warrants, rights or options to purchase or acquire shares of any class of such Capital Stock or Preferred Stock in exchange for, or out of the proceeds of the substantially concurrent sale of, Qualified Capital Stock of NNC or Preferred Stock (other than Disqualified Capital Stock) of the Issuer (other than Capital Stock issued or sold to NNC or a Subsidiary of NNC); *provided* that the net cash proceeds from such exchange or sale shall be excluded from the calculations pursuant to clause (iii)(x) of the preceding paragraph;

(3) the repurchase or other acquisition of Capital Stock of NNC or any warrants, rights or options to purchase or acquire shares of any such Capital Stock or securities convertible into Capital Stock of NNC, from or on behalf of current or former employees, directors, consultants or contractors of NNC or any of its

[New York #1531721 v17]                    78

Subsidiaries (or permitted transferees of such current or former employees, directors, consultants or contractors), pursuant to the terms of the agreements (including employment, consulting or severance agreements) or plans (or amendments thereto) under which such individuals purchase or sell, or are granted the option to purchase or sell, shares of such Capital Stock;

(4)     the redemption by NNC of any rights to purchase shares of Common Stock of NNC outstanding from time to time under the amended and restated shareholder rights plan agreement between NNC and Computershare Trust Company of Canada, as rights agent, dated as of February 14, 2003, as the same may be further amended, restated or replaced from time to time, in accordance with the terms thereof; *provided* that such rights are redeemed for nominal consideration;

(5)     payments to holders or former holders of Capital Stock of NNC, the Issuer or any other Subsidiary of NNC pursuant to a statutory dissent right or appraisal remedy;

(6)     payments to holders of Capital Stock (or to the holders of Funded Debt or Disqualified Capital Stock that is convertible into or exchangeable for Capital Stock upon such conversion or exchange) in lieu of the issuance of fractional shares;

(7)     payments to holders of Capital Stock of NNC under any stock purchase plan or similar employee or director benefit plan in settlement of fractional shares issued under such plan;

(8)     the declaration and payment by NNC or the Issuer of regularly scheduled cash dividends with respect to, and the redemption by NNC or the Issuer on a scheduled mandatory redemption date of, any Disqualified Capital Stock (including Existing Preferred Stock) or Designated Qualified Preferred Stock;

(9)     the declaration and payment by NNC or the Issuer of regularly scheduled cash dividends with respect to, and the redemption by NNC or the Issuer on a scheduled mandatory redemption date of, any Qualified Capital Stock (other than Designated Qualified Preferred Stock) issued after the date of this Indenture in an amount not in excess of the aggregate net cash proceeds received by NNC or the Issuer from any Person (other than NNC or a Subsidiary of NNC) from such issuance; *provided* that the amount of Restricted Payments made pursuant to this clause (9) shall be excluded from the calculation pursuant to clause (iii)(x) of the preceding paragraph;

(10)    any payment or distribution to holders or former holders of Capital Stock of NNC in connection with the settlement of, or satisfaction of a judgment resulting from, any shareholder litigation or regulatory or enforcement proceeding; and

(11)    any other Restricted Payments in an aggregate amount which, when taken together with all other Restricted Payments pursuant to this clause (11), does not exceed $25,000,000.

[New York 91531721 v17]                              79

Notwithstanding the foregoing, none of NNC, the Issuer or any other Subsidiary of NNC may make any Restricted Payment in reliance on clause (11) if, after giving effect to such Restricted Payment, a Default or Event of Default shall have occurred and be continuing. In calculating the aggregate amount of Restricted Payments made subsequent to the date of this Indenture for purposes of clause (iii) of the second preceding paragraph, amounts expended pursuant to clause (1) of the immediately preceding paragraph shall be included in such calculation and amounts expended pursuant to clauses (2) through (11) of the immediately preceding paragraph shall be excluded in such calculation.

SECTION 1008.    *COMPLIANCE CERTIFICATE.*

The Issuer and each Guarantor shall deliver an Officers' Certificate to the Trustee within 120 days after the end of each fiscal year thereof stating whether the signers know of any Event of Default that occurred during the fiscal year. If an Event of Default shall have occurred, the applicable certificate shall describe the nature of the Event of Default and its current status. The certificate shall be in a form in compliance with the Trust Indenture Act.

SECTION 1009.    *WAIVER OF CERTAIN COVENANTS.*

The Issuer and each Guarantor may omit in any particular instance to comply with any covenant or condition set forth in this Indenture or any applicable supplemental indenture, with respect to the Debt Securities of any series if, before the time for such compliance, the Holders of a majority in principal amount of the Outstanding Debt Securities of such series shall, by Act of such Holders, either waive such compliance in such instance or generally waive compliance with such covenant or condition, but no such waiver shall extend to or affect such covenant or condition except to the extent so expressly waived, and, until such waiver shall become effective, the obligations of the Issuer and such Guarantor and the duties of the Trustee in respect of any such covenant or condition shall remain in full force and effect.

SECTION 1010.    *COVENANT SUSPENSION.*

(a)    During any Suspension Period with respect to any series of Debt Securities, NNC and its Subsidiaries will not be subject to the following Sections of this Indenture for purposes of each series of Debt Securities: Section 1006 and Section 1007 (collectively, the "Suspended Covenants"). On any Reversion Date with respect to any series of Debt Securities, NNC and its subsidiaries will thereafter again be subject to the Suspended Covenants for purposes of such series of Debt Securities for all periods until the next Suspension Period, if any. Furthermore, on each Reversion Date with respect to any series of Debt Securities, (i) all Funded Debt of NNC or any Subsidiary of NNC incurred during the Suspension Period prior to such Reversion Date will be deemed for purposes of such series of Debt Securities to have been outstanding on the date of this Indenture and classified as permitted under clause (c) of the definition of Permitted Funded Debt and (ii) all Liens granted or created by any Subsidiary of NNC (other than the Issuer or any Subsidiary that was a Restricted Subsidiary during such Suspension Period) during the Suspension Period prior to such Reversion Date (other than any Lien granted or created in connection with a transaction that directly results in a downgrade in the rating of the Debt Securities of any series from S&P or Moody's to below the applicable rating specified in the definition of Investment Grade Status) will be deemed for purposes of such series of Debt

Securities to have been outstanding on the date of this Indenture and classified as permitted under Section 1005(a)(x).

(b)     For purposes of calculating the amount available to be made as Restricted Payments under clause (iii) of Section 1007(b), calculations under such clause will be made with reference to the Measurement Date as set forth in that clause. Accordingly, Restricted Payments made during the Suspension Period with respect to any series of Debt Securities not otherwise permitted pursuant to any of clauses (1) through (11) under the second paragraph of Section 1007(b) will reduce the amount available to be made as Restricted Payments under clause (iii) of Section 1007(b) for purposes of such series of Debt Securities; *provided* that the amount available to be made as Restricted Payments on the Reversion Date shall not be reduced to below zero solely as a result of such Restricted Payments, but may be reduced to below zero as a result of cumulative Consolidated Net Income for the purpose of sub-clause (w) of clause (iii) of Section 1007(b) being a loss, and the items specified in sub-clauses (w) through (z) of clause (iii) of Section 1007(b) that occur during the Suspension Period will increase the amount available to be made as Restricted Payments under clause (iii) of Section 1007(b). Any Restricted Payments made during the Suspension Period that would have been made pursuant to clause (11) of the second paragraph under the Section 1007(b) if the provisions of such Scetion were then applicable, shall for purposes of such series of Debt Securities reduce the amounts permitted to be incurred under such clause (11) on the Reversion Date.

## ARTICLE ELEVEN

### REDEMPTION OF DEBT SECURITIES

SECTION 1101.     *APPLICABILITY OF ARTICLE.*

Debt Securities of any series that are redeemable before their Stated Maturity Date shall be redeemable in accordance with their terms and (except as otherwise specified pursuant to Section 301 for Debt Securities of any series) in accordance with this Article.

SECTION 1102.     *ELECTION TO REDEEM; NOTICE TO TRUSTEE.*

The election of the Issuer to redeem any or all of the Debt Securities of a series pursuant to Section 1101 of this Indenture shall be evidenced by a Board Resolution of the Issuer. In case of any redemption at the election of the Issuer, the Issuer shall, not later than the earlier of the date that is 35 days prior to the Redemption Date fixed by the Issuer and the date on which notice is given to the Holders (except as provided in Section 1103 or unless a shorter notice shall be satisfactory to the Trustee), notify the Trustee of such Redemption Date and of the principal amount of the Debt Securities to be redeemed, deliver to the Trustee such documentation and records as shall enable the Trustee to select the Debt Securities to be redeemed pursuant to Section 1103 and direct the Trustee to redeem the Debt Securities in accordance with the Board Resolution. Any such notice may be canceled at any time prior to notice of such redemption being mailed to any Holder and shall thereby be void and of no effect.

SECTION 1103.    *SELECTION BY TRUSTEE OF DEBT SECURITIES TO BE REDEEMED.*

(a)    If less than all the Debt Securities of any series are to be redeemed at any time pursuant to an optional redemption, the particular Debt Securities of such series to be redeemed shall be selected not more than 60 days prior to the Redemption Date by the Trustee, from the Outstanding Debt Securities of such series not previously called for redemption, in compliance with the requirements of the principal national securities exchange, if any, on which the Debt Securities of such series are listed, or, if such series of Debt Securities are not so listed, on a *pro rata* basis, by lot or by such other method as the Trustee shall deem fair and appropriate (and in such manner as complies with applicable legal requirements) and which may provide for the selection for redemption of portions of the principal of the Debt Securities of such series; *provided* that Debt Securities selected for partial redemption shall be in authorized denominations of such Debt Securities. If a partial redemption is made with Qualified Equity Proceeds, the Trustee will select the Debt Securities of such series only on a *pro rata* basis or on as nearly a *pro rata* basis as is practicable (subject to procedures of the Depositary).

The Trustee shall promptly notify the Issuer in writing of the Debt Securities of such series selected for redemption and, in the case of any Debt Securities of a series selected for partial redemption, the method it has chosen for the selection of Debt Securities of such series and the principal amount thereof to be redeemed and upon the Issuer's written approval of such selection, the Trustee shall redeem the selected Debt Securities of such series.

For all purposes of this Indenture, unless the context otherwise requires, all provisions relating to redemption of Debt Securities of a series shall relate, in the case of any Debt Security of a series redeemed or to be redeemed only in part, to the portion of the principal amount of such Debt Security which has been or is to be redeemed.

SECTION 1104.    *NOTICE OF REDEMPTION.*

(a)    Notice of redemption shall be given by first-class mail not less than 30 nor more than 60 days prior to the Redemption Date, to each Holder of the Debt Securities of the series to be redeemed at its address as listed in the Securities Register. The Trustee shall give notice of redemption in the Issuer's name and at the Issuer's expense; *provided* that the Issuer shall deliver to the Trustee, at least 35 days prior to the Redemption Date (unless a shorter notice period shall be satisfactory to the Trustee) an Issuer Order requesting that the Trustee give such notice at the Issuer's expense and setting forth the information to be stated in such notice, which shall include:

(i)    the Redemption Date;

(ii)    the Redemption Price and the amount of accrued interest to but excluding the Redemption Date payable as provided in Section 1105, if any;

(iii)    if less than all Outstanding Debt Securities of such series are to be redeemed, the aggregate principal amount of Debt Securities of such series to be redeemed and the aggregate principal amount of Debt Securities of such series to be Outstanding after such partial redemption,

From:Bank of NY Mellon    12128155802    01/16/2008 14:15    #415 P.093/102

(iv)    in case any Debt Security of such series is to be redeemed in part only, the notice that relates to such Debt Security, a statement that, on and after the Redemption Date, upon surrender of such Debt Security, the Holder will receive, without charge, a new Debt Security or Debt Securities of such series of authorized denominations for the principal amount thereof remaining unredeemed;

(v)    a statement that, on the Redemption Date, the Redemption Price of the Debt Securities to be redeemed (and accrued interest, if any, to but excluding the Redemption Date payable as provided in Section 1105 of this Indenture) will become due and payable upon each such Debt Security, or the portion thereof, to be redeemed, and, unless the Issuer defaults in making the redemption payment, that interest on the Debt Securities called for redemption (or the portion thereof) will cease to accrue on and after said date, as long as the Issuer has deposited with the Paying Agent funds in satisfaction of the applicable redemption price;

(vi)    the Place of Payment where such Debt Securities are to be surrendered for payment of the Redemption Price and accrued interest;

(vii)    the CUSIP number, if any, of the series of Debt Securities to be redeemed, *provided* that no representation need be made as to the accuracy or correctness of the CUSIP number, if any, listed in such notice or printed on the Debt Securities, and any redemption shall not be affected by any defect in such CUSIP numbers;

(viii)    the paragraph of the Debt Securities pursuant to which the Debt Securities are to be redeemed,

(b)    If the Issuer exercises its right to redeem the Debt Securities, in whole or in part, the Issuer shall disseminate a press release containing information regarding the redemption, through a public medium *that is customary* for such press releases or publish the information on its website or through such other public medium as the Issuer may use at that time.

SECTION 1105.    *DEPOSIT OF REDEMPTION PRICE.*

On or before 10:00 a.m. in the Place of Payment on any Redemption Date, the Issuer shall deposit with the Trustee or with a Paying Agent (or, if the Issuer is acting as its own Paying Agent, segregate and hold in trust as provided in Section 1003(a)) an amount of money sufficient to pay the Redemption Price of the Debt Securities which are to be redeemed on that date, other than Debt Securities or portions of Debt Securities called for redemption that are beneficially owned by the Issuer and have been delivered by the Issuer to the Trustee for cancellation.

SECTION 1106.    *DEBT SECURITIES PAYABLE ON REDEMPTION DATE.*

(a)    Notice of redemption having been given as aforesaid, the Debt Securities so to be redeemed shall, on the Redemption Date, become due and payable at the Redemption Price specified in such notice. From and after such date (unless the Issuer and the Guarantors shall default in the payment of the Redemption Price and accrued interest) such Debt Securities shall cease to bear interest. Upon surrender of any such Debt Security for redemption in accordance with the notice, such Debt Security shall be paid by the Issuer at the Redemption Price, together

[New York #1531721 v17]                    83

with accrued interest to the Redemption Date; provided that installments of interest on Debt Securities whose Stated Maturity Date is on or prior to the Redemption Date shall be payable to the Holders of such Debt Securities, or one or more Predecessor Securities, registered as such on the relevant Record Dates according to their terms and the provisions of Section 312.

(b)    If any Debt Security called for redemption shall not be so paid upon surrender thereof for redemption, the principal (and premium, if any) shall, until paid, bear interest from the Redemption Date at the rate prescribed therefor in such Debt Security.

SECTION 1107.·    *DEBT SECURITY REDEEMED IN PART.*

Any Debt Security that is to be redeemed only in part shall be surrendered at a Place of Payment therefor (with, if the Issuer, any Guarantor, the Security Registrar or the Trustee so requires, due endorsement by, or a written instrument of transfer in form satisfactory to the Issuer, such Guarantor, the Security Registrar and the Trustee duly executed by, the Holder thereof or his attorney duly authorized in writing), and the Issuer shall execute, and the Trustee shall authenticate and deliver to the Holder of such Debt Security without service charge, a new Debt Security or Debt Securities of the same series, each having endorsed thereon the Guarantee(s) executed by the Guarantors, of any authorized denomination as requested by such Holder in aggregate principal amount equal to and in exchange for the unredeemed portion of the principal of the Debt Security so surrendered; except that if a Global Security is so surrendered, the Issuer shall execute, and the Trustee shall authenticate and deliver to the Depositary for such Global Security, without service charge, a new Global Security, each having endorsed thereon the Guarantees executed by the Guarantor(s), in a denomination equal to and in exchange for the unredeemed portion of the principal of the Global Security so surrendered.

## ARTICLE TWELVE

### SINKING FUNDS

SECTION 1201.    *APPLICABILITY OF ARTICLE.*

. The provisions of this Article shall be applicable to any sinking fund for the retirement of Debt Securities of a series except as otherwise specified pursuant to Section 301 for the Debt Securities of such series. The minimum amount of any sinking fund payment provided for by the terms of Debt Securities of any series is herein referred to as a "mandatory sinking fund payment," and any payment in excess of such minimum amount provided for by the terms of Debt Securities of any series is herein referred to as an "optional sinking fund payment." If provided for by the terms of Debt Securities of any series, the amount of any sinking fund payment may be subject to reduction as provided in Section 1202. Each sinking fund payment shall be applied to the redemption of Debt Securities of any series as provided for by the terms of such Debt Securities.

SECTION 1202.    *SATISFACTION OF SINKING FUND PAYMENTS WITH DEBT SECURITIES.*

The Issuer or the Guarantors may deliver Outstanding Debt Securities of a series (other than any previously called for redemption) and may apply as a credit Debt Securities of a series that have been redeemed either at the election of the Issuer pursuant to the terms of such Debt Securities or

[New York #1531721 v17]                    84

From:Bank of NY Mellon    12128155802    01/16/2008 14:15    #415  P. 095/102

through the application of permitted optional sinking fund payments pursuant to the terms of such Debt Securities, in each case, in satisfaction of all or any part of any sinking fund payment with respect to the Debt Securities of such series required to be made pursuant to, and as provided for by, their terms; *provided* that such Debt Securities have not been previously so credited. Such Debt Securities shall be received and credited for such purpose by the Trustee at the Redemption Price specified in such Debt Securities for redemption through operation of the sinking fund and the amount of such sinking fund payment shall be reduced accordingly.

SECTION 1203.    *REDEMPTION OF DEBT SECURITIES FOR SINKING FUND.*

Not less than 60 days prior to each sinking fund payment date for any series of Debt Securities (unless a shorter period shall be satisfactory to the Trustee), the Issuer will deliver to the Trustee an Officers' Certificate of the Issuer specifying the amount of the next sinking fund payment for that series pursuant to the terms of that series, the portion thereof, if any, that is to be satisfied by payment of cash, the portion thereof, if any, that is to be satisfied by delivering and crediting Debt Securities of that series pursuant to Section 1202 and the basis for any such credit and, prior to or concurrently with the delivery of such Officers' Certificate, will also deliver to the Trustee any Debt Securities to be so credited and not theretofore delivered to the Trustee. Not less than 45 days (unless a shorter period shall be satisfactory to the Trustee) before each such sinking fund payment date the Trustee shall select the Debt Securities to be redeemed upon such sinking fund payment date in the manner specified in Section 1103 and cause notice of the redemption thereof to be given in the name of and at the expense of the Issuer in the manner provided in Section 1104. Such notice having been duly given, the redemption of such Debt Securities shall be made upon the terms and in the manner stated in Sections 1105, 1106 and 1107.

## ARTICLE THIRTEEN

## DEFEASANCE

SECTION 1301.    *DISCHARGE BY DEPOSIT OF MONEY OR DEBT SECURITIES.*

(a)    This Section 1301 shall be applicable to Debt Securities of a series if so provided pursuant to Section 301. All obligations, covenants and agreements of the Issuer and the Guarantors under this Indenture with respect to Debt Securities of a particular series or for the benefit of the Holders thereof (except as to any surviving rights of registration of transfer or exchange of Debt Securities or herein expressly provided for) shall cease, terminate and be discharged if:

    (i)    the Issuer or a Guarantor has, at least 91 days prior thereto, irrevocably deposited with the Trustee, as specific security pledged for, and dedicated solely to, the due payment and ultimate satisfaction of its obligations under the Indenture with respect to the Debt Securities of the series affected,

        (A)    funds in the currency or currencies in which the Debt Securities are payable, and/or

        (B)    an amount of direct obligations of, or obligations the payment of principal of and interest, if any, on are fully guaranteed by, the government(s) that

issued the currency or currencies in which Debt Securities of such series
are payable, and that are not subject to prepayment, redemption or call,

as will together with the predetermined and certain income to accrue thereon without
consideration of any reinvestment thereof, be sufficient (in the case of such obligations,
through the payment of interest and principal thereunder) to pay (1) the principal of (and
premium, if any) and interest on the Outstanding Debt Securities of the particular series
on the Stated Maturity Date of such principal or interest or of any installment thereof, and
(2) any mandatory prepayments or analogous payments applicable to such Debt
Securities on the day on which such payments are due and payable in accordance with the
terms of this Indenture and such Debt Securities;

(ii)     the Issuer or such Guarantor shall have received an Opinion of Counsel to the
effect that Holders of such Debt Securities will not recognize income (whether
taxable to them by deduction or withholding by the Issuer or such Guarantor or
otherwise), gain or loss for United States federal income tax purposes as a result
of such deposit and defeasance in respect of the Issuer's and the Guarantors'
obligations and will be subject to United States federal income tax as if such
deposit and defeasance had not occurred;

(iii)    the Issuer or such Guarantor shall have received an Opinion of Counsel to the
effect that the Holders of the Debt Securities affected will not recognize income
(whether taxable to them by deduction or withholding by the Issuer or such
Guarantor or otherwise), gain or loss for Canadian federal income tax purposes as
a result of such deposit and defeasance in respect of the Issuer's and the
Guarantors' obligations and will be subject to Canadian federal income tax as if
such deposit and defeasance had not occurred;

(iv)    such deposit will not result in a breach or violation of, or constitute a Default
under, this Indenture or any other material agreement or instrument to which the
Issuer or any Guarantor is a party or by which it is bound;

(v)     no Default with respect to the Debt Securities of such series shall have occurred
and be continuing on the date of such deposit;

(vi)    the Issuer or such Guarantor, as the case may be, shall have delivered to the
Trustee an Officers' Certificate or an Opinion of Counsel, stating compliance with
all conditions precedent to the defeasance contemplated by Section 1301 or
Section 1302; and

(vii)   such deposit shall not cause the Trustee with respect to such series of Debt
Securities to have a conflicting interest, within the meaning of this Indenture, and
for purposes of the Trust Indenture Act with respect to such Debt Securities.

(b)     Notwithstanding any defeasance under this Indenture with respect to such series of Debt
Securities, the obligation of the Issuer to indemnify and compensate the Trustee under this
Indenture and the obligations of the Trustee under Sections 1003 and 1303 shall survive with
respect to such series of Debt Securities.

[New York #1551721 v17]                              86

SECTION 1302.    *APPLICATION OF TRUST MONEY.*

All money deposited with the Trustee pursuant to Sections 1301 and 1302 shall be held in trust and applied by it, in accordance with the provisions of the Debt Securities and this Indenture and any applicable direction of the Issuer or a Guarantor to the payment, either directly or through any Paying Agent (including the Issuer or such Guarantor acting as its own Paying Agent), as the Trustee may determine, to the Persons entitled thereto, of the principal (and premium, if any) and interest for whose payment such money has been deposited with the Trustee.

SECTION 1303.    *REPAYMENT TO THE ISSUER OR GUARANTORS.*

(a)    The Trustee and any Paying Agent shall promptly pay to the Issuer or the applicable Guarantor upon Issuer Request or Guarantor Request of such Guarantor, as the case may be, any money or governmental obligations not required for the payment of the principal of (and premium, if any) and interest on Debt Securities of any series for which currency or government obligations have been deposited pursuant to Section 1301 or Section 1302 held by them at any time.

(b)    The Trustee and any Paying Agent shall pay to the Issuer or the applicable Guarantor upon Issuer Request or Guarantor Request of such Guarantor, as the case may be, any money held by them for the payment of principal (and premium, if any) and interest that remains unclaimed for two years after the Maturity of the Debt Securities for which a deposit has been made pursuant to Section 1301 or Section 1302. After such payment to the Issuer or such Guarantor, as the case may be, the Holders of Debt Securities of such series shall thereafter, as unsecured general creditors, look only to the Issuer and the Guarantors for payment thereof, and all liability of the Issuer or Guarantor as trustee thereof shall cease.

ARTICLE FOURTEEN

MEETINGS OF HOLDERS OF DEBT SECURITIES

SECTION 1401.    *PURPOSES FOR WHICH MEETINGS MAY BE CALLED.*

A meeting of Holders of Debt Securities of a series may be called at any time and from time to time pursuant to this Article to make, give or take any Act provided by this Indenture to be made, given or taken by Holders of Debt Securities of such series.

SECTION 1402.    *CALL, NOTICE AND PLACE OF MEETINGS.*

(a)    The Trustee may at any time call a meeting of Holders of Debt Securities of any series for any purpose specified in Section 1401, to be held at such time and at such place in the Borough of Manhattan, The City of New York as specified in a notice to such Holders. Notice of every meeting of Holders of Debt Securities of any series, setting forth the time and place of such meeting and in general terms the action proposed to be taken at such meeting, shall be given, in the manner provided in Section 106, not less than 21 or more than 50 days prior to the date fixed for the meeting.

From:Bank of NY Mellon          12128155802          01/16/2009 14:16          #415 P.097/102

From:Bank of NY Mellon       12128155802       01/16/2009 14:16       #415 P.098/102

(b)   · If at any time the Issuer or a Guarantor, pursuant to a Board Resolution of the Issuer or an Officers' Certificate of such Guarantor, or the Holders of at least 10% in principal amount of the Outstanding Debt Securities of any series shall have requested the Trustee to call a meeting of the Holders of Debt Securities of such series for any purpose specified in Section 1401, by written request setting forth in reasonable detail the action proposed to be taken at the meeting, and the Trustee shall not have made the first publication of the notice of such meeting within 21 · days after receipt of such request or shall not thereafter proceed to cause the meeting to be held as provided herein, then the Issuer, such Guarantor or the Holders of Debt Securities of such series in the amount above specified, as the case may be, may determine the time and the place in the Borough of Manhattan, The City of New York for such meeting and may call such meeting for such purposes by giving notice thereof as provided in paragraph (a) of this Section.

SECTION 1403.   · *PERSONS ENTITLED TO VOTE AT MEETINGS.*

To be entitled to vote at any meeting of Holders of Debt Securities of any series, a Person shall be: (1) a Holder of one or more Outstanding Debt Securities of such series; or (2) a Person appointed by an instrument in writing as proxy for a Holder or Holders of one or more Outstanding Debt Securities of such series by such Holder or Holders. The only Persons who shall be entitled to be present or to speak at any meeting of Holders of Debt Securities of any ' series shall be the Persons entitled to vote at such meeting and their counsel, any representatives of the Trustee and its counsel and any representatives of the Issuer and its counsel or a Guarantor and its counsel.

SECTION 1404.     *QUORUM; ACTION.* ·

(a)     The Persons entitled to vote a majority in principal amount of Outstanding Debt Securities of a series shall constitute a quorum for a meeting of Holders of Debt Securities of such series.  In the absence of a quorum within 45 minutes of the time appointed for any such meeting, the meeting shall, if convened at the request of Holders of Debt Securities of such series, be dissolved.  In the absence of a quorum in any other case the meeting may be adjourned for a period of not less than 10 days as determined by the chairman of the meeting prior to the adjournment of such meeting.  In the absence of a quorum upon the re-convening of any such adjourned meeting, such re-convened meeting may be further adjourned for a period of not less than 10 days as determined by the chairman of the meeting prior to the adjournment thereof. Notice of the reconvening of any adjourned meeting shall be given as provided in Section 1402(a), except that such notice need be given only once not less than five days prior to the date on which the meeting is scheduled to be reconvened.

(b)     Except as limited by the proviso to Section 902, any resolution presented to a meeting or adjourned meeting duly reconvened at which a quorum is present as aforesaid may be adopted only by the affirmative vote of the Holders of a majority in principal amount of Outstanding Debt Securities of that series; *provided* that, except as limited by the proviso to Section 902, any resolution with respect to any Act that this Indenture expressly provides may be made, given or taken by the Holders of a specified percentage, which *is less* than a majority, in principal amount of Outstanding Debt Securities of a series may be adopted at a meeting or an adjourned meeting duly reconvened and at which a quorum is present as aforesaid by the affirmative vote of the Holders of such specified percentage in principal amount of Outstanding Debt Securities of that series.

[New York #153]721 v1.7]                       88

#415 P. 098/102 01/16/2009 14:16 12128155602 From:Bank of NY Mellon

(c)     Any resolution passed or decision taken at any meeting of Holders of Debt Securities of any series duly held in accordance with this Section will be binding on all Holders of Debt Securities of such series, whether or not present or represented at the meeting.

SECTION 1405.     *DETERMINATION OF VOTING RIGHTS; CONDUCT AND ADJOURNMENT OF MEETINGS.*

(a)     Notwithstanding any other provisions of this Indenture, the Trustee may make such reasonable regulations as it may deem advisable for any meeting of Holders of Debt Securities of such series in regard to proof of the holding of Debt Securities of such series and of the appointment of proxies and in regard to the appointment and duties of inspectors of votes, the submission and examination of proxies, certificates and other evidence of the right to vote, and such other matters concerning the conduct of the meeting as it shall deem appropriate. Except as otherwise permitted or required by any such regulations, the holding of Debt Securities shall be proved in the manner specified in Section 104 and the appointment of any proxy shall be proved in the manner specified in Section 104. Such regulations may provide that written instruments appointing proxies, regular on their face, may be presumed valid and genuine without the proof specified in Section 104 or other proof.

(b)     The Trustee shall, by an instrument in writing, appoint a temporary chairman of the meeting, unless the meeting shall have been called by the Issuer, a Guarantor or by Holders of Debt Securities as provided in Section 1402(b), in which case the Issuer, such Guarantor or the Holders of Debt Securities of the series calling the meeting, as the case may be, shall in like manner appoint a temporary chairman. A permanent chairman and a permanent secretary of the meeting shall be elected by vote of the Persons entitled to vote a majority in principal amount of Outstanding Debt Securities of such series represented at the meeting.

(c)     At any meeting each Holder of a Debt Security of such series or proxy shall be entitled to one vote for each $1,000 principal amount (or the equivalent per the Exchange Rate in any Foreign Currency at the date of issue) of Debt Securities of such series held or represented by him; *provided* that no vote shall be cast or counted at any meeting in respect of any Debt Security challenged as not Outstanding and ruled by the chairman of the meeting to be not Outstanding. The chairman of the meeting shall have no right to vote, except as a Holder of a Debt Security of such series or proxy.

(d)     Any meeting of Holders of Debt Securities of any series duly called pursuant to Section 1402 at which a quorum is present may be adjourned from time to time by Persons entitled to vote a majority in principal amount of Outstanding Debt Securities of such series represented at the meeting; and the meeting may be re-convened without further notice.

SECTION 1406.     *COUNTING VOTES AND RECORDING ACTION OF MEETINGS.*

(a)     The vote upon any resolution submitted to any meeting of Holders of Debt Securities of any series shall be by written ballots on which shall be inscribed the signatures of the Holders of Debt Securities of such series or of their representatives by proxy and the principal amounts and serial numbers of Outstanding Debt Securities of such series held or represented by them. The permanent chairman of the meeting shall appoint two inspectors of votes who shall count all votes cast at the meeting for or against any resolution and who shall make and file with the

[New York #1531721 v17]                    89

01/16/2009 14:17    #415 P. 100/102

12128155802

From:Bank of NY Mellon

secretary of the meeting their verified written reports of all votes cast at the meeting. A record of the proceedings of each meeting of Holders of Debt Securities of any series shall be prepared by the secretary of the meeting and there shall be attached to said record the original reports of the inspectors of votes on any vote by ballot taken thereat and affidavits by one or more persons having knowledge of the facts setting forth a copy of the notice of the meeting and showing that said notice was given as provided in Section 1402 and, if applicable, Section 1404. Four copies of each shall be signed and verified by the affidavits of the permanent chairman and secretary of the meeting and one such copy shall be delivered to the Issuer and Guarantors and another to the Trustee to be preserved by the Trustee, the latter to have attached thereto the ballots voted at the meeting. Any record so signed and verified shall be conclusive evidence of the matters therein stated.

This instrument may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

[New York #1531721 v17]    90

From:Bank of NY Mellon    12128155802    01/16/2009 14:17    #415 P. 101/102

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed as of the day and year first above written.

THE BANK OF NEW YORK,
as Trustee

By:_____
　Name:
　Title:

NORTEL NETWORKS LIMITED,
as Issuer

By:_____
　Name: Katharine B. Stevenson
　Title:　Treasurer

By:_____
　Name: Gordon A. Davies
　Title:　General Counsel — Corporate
　　　　　and Corporate Secretary

NORTEL NETWORKS CORPORATION,
as Guarantor

By:_____
　Name: Katharine B. Stevenson
　Title:　Treasurer

By:_____
　Name: Gordon A. Davies
　Title:　General Counsel — Corporate
　　　　　and Corporate Secretary

NORTEL NETWORKS INC.,
as Guarantor

By:_____
　Name: Allen K. Stout
　Title:　Vice President, Finance

Base Indenture

From:Bank of NY Mellon     12128155802     01/16/2008 14:17     #415 P. 102/102

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed as of the day and year first above written.

THE BANK OF NEW YORK,
as Trustee

By:_____
    Name:
    Title:

NORTEL NETWORKS LIMITED,
as Issuer

By:_____
    Name: Katharine B. Stevenson
    Title:  Treasurer

By:_____
    Name: Gordon A. Davies
    Title:  General Counsel — Corporate
        and Corporate Secretary

NORTEL NETWORKS CORPORATION,
as Guarantor

By:_____
    Name: Katharine B. Stevenson
    Title:  Treasurer

By:_____
    Name: Gordon A. Davies
    Title:  General Counsel — Corporate
        and Corporate Secretary

NORTEL NETWORKS INC.,
as Guarantor

By:__Allen K Stout_____
    Name: Allen K. Stout
    Title:  Vice President, Finance

Base Indenture

NORTEL NETWORKS LIMITED

*as Issuer,*

NORTEL NETWORKS CORPORATION

AND

NORTEL NETWORKS INC.

*as Guarantors,*

AND

THE BANK OF NEW YORK

*as Trustee and Calculation Agent*

---

*FIRST SUPPLEMENTAL INDENTURE*

*Dated as of July 5, 2006*

*to*

*Indenture Dated as of July 5, 2006*

---

**FIRST SUPPLEMENTAL INDENTURE** dated as of July 5, 2006 (this "First Supplemental Indenture") to the Indenture dated as of July 5, 2006 among Nortel Networks Limited (together with any successors, "NNL" or the "Issuer"), a Canadian corporation having its principal place of business at 8200 Dixie Road, Suite 100, Brampton, Ontario, Canada L6T 5P6, Nortel Networks Corporation (together with any successors, "NNC"), a Canadian corporation having its principal place of business at 8200 Dixie Road, Suite 100, Brampton, Ontario, Canada L6T5P6 and Nortel Networks Inc. (together with any successors, "NNI"), a Delaware corporation having its principal place of business at 4008 Chapel Hill - Nelson Highway, Research Triangle Park, North Carolina, U.S.A., 27709, and The Bank of New York (the "Trustee"), a New York corporation authorized to conduct a banking business, having its Corporate Trust Office at 101 Barclay Street 21W, New York, New York, U.S.A., 10286 (the "Original Indenture," and as supplemented by this First Supplemental Indenture, the "Indenture").

WHEREAS, NNC, NNL, NNI and the Trustee have heretofore executed and delivered the Original Indenture to provide for the issuance of securities of NNL in one or more registered series;

WHEREAS, Article Nine of the Original Indenture provides, among other things, that NNC, NNL, NNI and the Trustee may enter into indentures supplemental to the Original Indenture to, among other things, provide for the issuance of any series of securities and to set forth the terms thereof;

WHEREAS, NNL has duly authorized the creation of an issue of its 10.750% Senior Notes due 2016 of substantially the tenor and amount hereinafter set forth (the "Original 2016 Fixed Rate Notes") and an issue of securities evidencing the same continuing indebtedness and with substantially identical terms (except that such securities shall be registered under the Securities Act and shall not have a provision for additional interest pursuant to the Issue Date Registration Rights Agreement) in exchange for such Notes (herein called the "2016 Fixed Rate Exchange Notes," and together with the Original 2016 Fixed Rate Notes, the "2016 Fixed Rate Notes");

WHEREAS, NNL has duly authorized the creation of an issue of its 10.125% Senior Notes due 2013 of substantially the tenor and amount hereinafter set forth (the "Original 2013 Fixed Rate Notes") and an issue of securities evidencing the same continuing indebtedness and with substantially identical terms (except that such securities shall be registered under the Securities Act and shall not have a provision for additional interest pursuant to the Issue Date Registration Rights Agreement) to be issued in exchange for such Notes (herein called the "2013 Fixed Rate Exchange Notes," and together with the Original 2013 Fixed Rate Notes, the "2013 Fixed Rate Notes");

WHEREAS, NNL has duly authorized the creation of an issue of its Floating Rate Senior Notes due 2011 of substantially the tenor and amount hereinafter set forth (the "Original Floating Rate Notes") and an issue of securities evidencing the same continuing indebtedness and with substantially identical terms (except that such securities shall be registered under the Securities Act and shall not have a provision for additional interest pursuant to the Issue Date Registration Rights Agreement) to be issued in exchange for such Notes (herein called the "Floating Rate Exchange Notes," and together with the Original Floating Rate Notes, the "Floating Rate

Notes"). We refer herein to the 2016 Fixed Rate Notes, the 2013 Fixed Rate Notes and the Floating Rate Notes collectively, or separately as to any series thereof as the context requires, as the "Notes;"

WHEREAS, each of NNC and NNI (collectively, the "Guarantors") has duly authorized its guarantee of the Notes and to provide therefor, each of the Guarantors has duly authorized the execution and delivery of the Original Indenture, this First Supplemental Indenture and its Guarantee under the terms set forth herein; and

WHEREAS, all acts and things necessary to make the Notes, when executed by NNL, endorsed by the Guarantors and authenticated and delivered by the Trustee as provided in the Original Indenture, the valid and binding obligations of NNL and the Guarantors and to constitute a valid and binding supplemental indenture according to its terms binding on NNL and the Guarantors have been done and performed;

NOW, THEREFORE, THIS FIRST SUPPLEMENTAL INDENTURE WITNESSETH:

SECTION 1. *CREATION OF NOTES.*

(a)     Pursuant to Section 301 of the Original Indenture, there is hereby created a new series of Debt Securities designated as the "10.750% Senior Notes due 2016" issuable by NNL and guaranteed by NNC and NNI.

(b)     Pursuant to Section 301 of the Original Indenture, there is hereby created a new series of Debt Securities designated as the "10.125% Senior Notes due 2013" issuable by NNL and guaranteed by NNC and NNI.

(c)     Pursuant to Section 301 of the Original Indenture, there is hereby created a new series of Debt Securities designated as the "Floating Rate Senior Notes due 2011" issuable by NNL and guaranteed by NNC and NNI.

(d)     Each series of Notes shall be issued as one or more Global Securities in the form specified in Exhibit A to this First Supplemental Indenture, shall have the terms set forth therein and shall be entitled to the benefits of the other provisions of the Original Indenture as modified by this First Supplemental Indenture and specified herein. The Depository Trust Company ("DTC") and its nominees and any successor corporation of DTC and such successor's nominees are hereby designated as the Depositary for the Global Securities representing the Notes.

SECTION 2. *DEFINITIONS.*

(a)     Capitalized terms used herein and not otherwise defined shall have the respective meanings assigned thereto in the Original Indenture.

(b)     Solely for purposes of this First Supplemental Indenture and the Notes and except as otherwise expressly provided or unless the context otherwise requires, the following terms shall have the indicated meanings (such meanings shall apply equally to both the singular and plural forms of the respective terms):

2

"2013 Applicable Premium" means with respect to any 2013 Fixed Rate Note at any Redemption Date, the greater of (1) 1.0% of the principal amount of such 2013 Fixed Rate Note and (2) the excess of (a) the present value at such Redemption Date of (i) the principal amount of such 2013 Fixed Rate Note on July 15, 2013, plus (ii) all required remaining scheduled interest payments due on such 2013 Fixed Rate Note through July 15, 2013 (other than interest accrued to such Redemption Date), computed using a discount rate equal to the Treasury Rate plus 50 basis points over (b) the principal amount of such 2013 Fixed Rate Note on such Redemption Date. Calculation of the 2013 Applicable Premium will be made by the Issuer or on behalf of the Issuer by such Person as the Issuer shall designate; *provided* that such calculation shall not be a duty or obligation of the Trustee or the Calculation Agent.

"2013 Fixed Rate Exchange Notes" has the meaning specified in the recitals of the Issuer in this First Supplemental Indenture.

"2013 Fixed Rate Notes" has the meaning specified in the recitals of the Issuer in this First Supplemental Indenture.

"2016 Applicable Premium" means with respect to any 2016 Fixed Rate Note at any Redemption Date, the greater of (1) 1.0% of the principal amount of such 2016 Fixed Rate Note and (2) the excess of (a) the present value at such Redemption Date of (i) the redemption price of such 2016 Fixed Rate Note on July 15, 2011 plus (ii) all required remaining scheduled interest payments due on such 2016 Fixed Rate Note through July 15, 2011 (other than interest accrued to such Redemption Date), computed using a discount rate equal to the Treasury Rate plus 50 basis points over (b) the principal amount of such 2016 Fixed Rate Note on such Redemption Date. Calculation of the 2016 Applicable Premium will be made by the Issuer or on behalf of the Issuer by such Person as the Issuer shall designate; *provided* that such calculation shall not be a duty or obligation of the Trustee or the Calculation Agent.

"2016 Fixed Rate Exchange Notes" has the meaning specified in the recitals of the Issuer in this First Supplemental Indenture.

"2016 Fixed Rate Notes" has the meaning specified in the recitals of the Issuer in this First Supplemental Indenture.

"Calculation Agent" means the agent appointed by the Issuer to calculate Three-Month LIBOR for purposes of this First Supplemental Indenture, which shall initially be the Trustee.

"Determination Date," with respect to an Interest Period, will be the second London Banking Day preceding the first day of such Interest Period.

"Floating Rate Exchange Notes" has the meaning specified in the recitals of the Issuer of this First Supplemental Indenture.

"Floating Rate Notes" has the meaning specified in the recitals of the Issuer of this First Supplemental Indenture.

3

"Interest Period" means the period commencing on and including an interest payment date and ending on and including the day immediately preceding the next succeeding Interest Payment Date, with the exception that the first Interest Period shall commence on and include the Issue Date and end on and include October 15, 2006.

"London Banking Day" means any day in which dealings in Dollars are transacted or, with respect to any future date, are expected to be transacted in the London interbank market.

"Original 2013 Fixed Rate Notes" has the meaning specified in the recitals of the Issuer in this First Supplemental Indenture.

"Original 2016 Fixed Rate Notes" has the meaning specified in the recitals of the Issuer in this First Supplemental Indenture.

"Original Floating Rate Notes" has the meaning specified in the recitals of the Issuer in this First Supplemental Indenture.

"Original Notes" means the Original 2013 Fixed Rate Notes, the Original 2016 Fixed Rate Notes and the Original Floating Rate Notes.

"Representative Amount" means a principal amount of not less than $1,000,000 for a single transaction in the relevant market at the relevant time.

"Reuters Screen LIBO Page" means the display designated as page "LIBO" on the Reuters Monitor Money Rates Service (or such other page as may replace the LIBO page on that service or a successor service for the purpose of displaying London interbank offered rates of major banks).

"Three-Month LIBOR," with respect to an Interest Period, will be the offered rate (or, if more than one such rate appears, the arithmetic mean of the rates), expressed as a percentage per annum, for deposits in United States dollars for a three-month period that appears on the Reuters Screen LIBO Page as of 11:00 a.m., London time, on the Determination Date for such Interest Period. If fewer than two rates appear on the Reuters Screen LIBO Page or the Reuters Screen LIBO Page is unavailable on such Determination Date, the Calculation Agent will request the principal London office of each of four major banks in the London interbank market, as selected by the Calculation Agent, to provide such bank's offered quotation (expressed as a percentage per annum), as of approximately 11:00 a.m., London time, on such Determination Date, to prime banks in the London interbank market for deposits in a Representative Amount in United States dollars for a three-month period beginning on the first day of such Interest Period. If at least two such offered quotations are so provided, Three-Month LIBOR for the Interest Period will be the arithmetic mean of such quotations. If fewer than two such quotations are so provided, the Calculation Agent will request each of four major banks in New York City, as selected by the Calculation Agent, to provide such bank's rate (expressed as a percentage per annum), as of approximately 11:00 a.m., New York City time, on such Determination Date, for loans in a Representative Amount in United States dollars to leading European banks for a three-month period beginning on such

4

Determination Date. If at least two such rates are so provided, Three-Month LIBOR for the applicable Interest Period will be the arithmetic mean of such rates. If fewer than two such rates are so provided, then Three-Month LIBOR for the applicable Interest Period will be Three-Month LIBOR in effect with respect to the immediately preceding Interest Period.

"Treasury Rate" means, with respect to any Redemption Date, the yield to maturity at the time of computation (which shall be at approximately 11:00 a.m. on the second business day preceding such Redemption Date) of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15(519) that has become publicly available at least two business days prior to such Redemption Date (or, if such Statistical Release is no longer published, any publicly available source of similar market data selected by the Issuer)) most nearly equal to the period from such Redemption Date to July 15, 2011 with respect to the 2016 Fixed Rate Notes (the "2016 Fixed Rate Notes Applicable Period") and to July 15, 2013 with respect to the 2013 Fixed Rate Notes (the "2013 Fixed Rate Notes Applicable Period"); *provided* that if the 2016 Fixed Rate Notes Applicable Period or the 2013 Fixed Rate Notes Applicable Period, as the case may be, is not equal to the constant maturity of the United States Treasury security for which a weekly average yield is given, the Treasury Rate shall be obtained by linear interpolation (calculated to the nearest one-twelfth of a year) from the weekly average yields of United States Treasury securities for which such yields are given, except that if the 2016 Fixed Rate Notes Applicable Period or the 2013 Fixed Rate Notes Applicable Period, as the case may be, is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year shall be used.

SECTION 3. *APPOINTMENT OF CALCULATION AGENT.*

(a)     The Issuer hereby appoints The Bank of New York ("BONY") as its Calculation Agent with respect to the Floating Rate Notes, and BONY hereby accepts such appointment. BONY agrees to perform the duties and obligations of the Calculation Agent for the Floating Rate Notes as set forth in the form of Note for the Floating Rate Notes attached hereto.

(b)     The rights, privileges, protections, immunities and benefits given to the Trustee under Article Six of the Indenture, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in its capacity hereunder as Calculation Agent for the Floating Rate Notes

(c)     BONY may at any time resign or be removed from such appointment as Calculation Agent; *provided* that BONY simultaneously resigns or is removed as Trustee under the Indenture, in which case a successor Calculation Agent with respect to the Floating Rate Notes shall be appointed in the same manner in which a successor Trustee is appointed under Section 607 of the Indenture.

5

SECTION 4. *OPTIONAL REDEMPTION*.

(a)     At any time prior to July 15, 2011, the Issuer may redeem the 2016 Fixed Rate Notes at its option, in whole at any time or in part from time to time, at a redemption price equal to 100% of the principal amount plus the 2016 Applicable Premium as of, and accrued and unpaid interest, if any, to, the applicable Redemption Date (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant Interest Payment Date). At any time on or after July 15, 2011, the Issuer may redeem the 2016 Fixed Rate Notes at its option, in whole at any time or in part from time to time at the redemption prices (expressed as percentages of the principal amount) set forth below plus accrued and unpaid interest on the 2016 Fixed Rate Notes redeemed to the applicable Redemption Date (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant Interest Payment Date), if redeemed during the twelve-month period beginning on July 15 of the years indicated below:

| Year | Redemption Price |
|------|------------------|
| 2011 | 105.375 % |
| 2012 | 103.583 % |
| 2013 | 101.792 % |
| 2014 and each year thereafter | 100.000% |

(b)     The Issuer may redeem the 2013 Fixed Rate Notes at its option, in whole at any time or in part from time to time, at a redemption price equal to 100% of the principal amount plus the 2013 Applicable Premium as of, and accrued and unpaid interest, if any, to, the Redemption Date (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant Interest Payment Date).

(c)     Any redemption pursuant to this Section 4 shall be in accordance with the procedures of Article XI of the Original Indenture.

SECTION 5. *OPTIONAL REDEMPTION WITH QUALIFIED EQUITY PROCEEDS*.

On or prior to July 15, 2009, the Issuer may, at its option, in whole at any time or in part from time to time, use Qualified Equity Proceeds to redeem up to 35% of the original aggregate principal amount of any series of Notes (including any Additional Debt Securities of such series), in whole at any time or in part from time to time, at a redemption price equal to (i) in the case of the 2016 Fixed Rate Notes, 110.750% of the principal amount thereof, (ii) in the case of the 2013 Fixed Rate Notes, 110.125% of the principal amount thereof and (iii) in the case of the Floating Rate Notes, 100% of the principal amount so redeemed plus a premium equal to the interest rate per annum of such Floating Rate Notes applicable on the Redemption Date, in each case, plus accrued and unpaid interest thereon, if any, to the applicable Redemption Date; *provided* that, in each case, the Issuer makes such redemption not more than 90 days after the receipt by NNC or the Issuer of such Qualified Equity Proceeds; *provided further* that such redemption shall be in accordance with the procedures of Article XI of the Original Indenture.

6

SECTION 6. *REDEMPTION FOR CHANGES IN APPLICABLE WITHHOLDING TAXES.*

The Notes of each series are also subject to redemption in whole, but not in part, at the Issuer's option at any time in cash, on not less than 30 nor more than 60 days' notice to the Holders, at a price equal to 100% of the aggregate principal amount, together with accrued and unpaid interest to the Redemption Date and all Additional Amounts then due or becoming due on the Redemption Date, in the event the Issuer or a Guarantor is, has become or would become obligated to pay, on the next date on which any amount would be payable by the Issuer or the Guarantor, as the case may be, with respect to the Notes of such Series, any Additional Amount as a result of an actual or proposed change or amendment in the laws (including any regulations promulgated thereunder) or treaties of any jurisdiction (including Canada or any province or territory thereof) or any change in or new or different position regarding the application, interpretation or administration of such laws, treaties or regulations (including a holding, judgment or order by a court of competent jurisdiction), which change is announced or becomes effective on or after the Issue Date; *provided* that the Issuer delivers to the Trustee an Opinion of Counsel attesting to such change or amendment. For greater certainty, the provisions of this Section 6 shall only apply to any series of the Notes in the case of a Guarantor if the Guarantee of such Guarantor has been called and such Guarantor is required under its Guarantee to make payments of principal, interest or premium, if any, in respect of such series of Notes.

SECTION 7. *GOVERNING LAW.*

This First Supplemental Indenture and each of the Notes shall be governed by, and construed in accordance with, the laws of the State of New York, but without giving effect to applicable principles of conflicts of law to the extent that the application of the law of another jurisdiction would be required thereby.

SECTION 8. *NO RECOURSE AGAINST OTHERS.*

No recourse for the payment of the principal of, premium, if any, or interest on any of the Notes, or payment under any of the Guarantees, or for any claim based thereon or otherwise in respect thereof, and no recourse under or upon any obligation, covenant or agreement of the Issuer or any Guarantor contained in this First Supplemental Indenture, or in any of the Notes or Guarantees, or because of the creation of any indebtedness represented thereby shall be had against any incorporator or against any past, present or future partner, shareholder, other equityholder, officer, director, employee or controlling person, as such, of the Issuer, any Guarantor or of any successor Person thereof, either directly or through the Issuer, any Guarantor or any successor Person thereof, whether by virtue of any constitution, statute or rule of law, or by the enforcement of any assessment or penalty or otherwise, it being expressly understood that all such liability is hereby expressly waived and released as condition of, and as a consideration for, the execution of this First Supplemental Indenture and the issuance of the Notes and the Guarantees.

7

SECTION 9. *COUNTERPARTS.*

This First Supplemental Indenture may be executed in any number of counterparts, each of which shall be an original but such counterparts shall together constitute but one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have caused this First Supplemental Indenture to be duly executed as of the day, month and year first above written.

NORTEL NETWORKS LIMITED,
    as Issuer

By: _____
    Name: Katharine B. Stevenson
    Title:  Treasurer

By: _____
    Name: Gordon A. Davies
    Title:  General Counsel — Corporate
           and Corporate Secretary


NORTEL NETWORKS CORPORATION,
    as Guarantor

By: _____
    Name: Katharine B. Stevenson
    Title:  Treasurer

By: _____
    Name: Gordon A. Davies
    Title:  General Counsel — Corporate
           and Corporate Secretary


NORTEL NETWORKS INC.,
    as Guarantor


By: _____
    Name: Allen K. Stout
    Title:  Vice President, Finance


THE BANK OF NEW YORK,
    as Trustee and Calculation Agent


By: _____
    Name:
    Title:

Supplemental Indenture

IN WITNESS WHEREOF, the parties hereto have caused this First Supplemental Indenture to be duly executed as of the day, month and year first above written.

NORTEL NETWORKS LIMITED,
as Issuer

By:_____
    Name: Katharine B. Stevenson
    Title:  Treasurer

By:_____
    Name: Gordon A. Davies
    Title:  General Counsel — Corporate
           and Corporate Secretary

NORTEL NETWORKS CORPORATION,
as Guarantor

By:_____
    Name: Katharine B. Stevenson
    Title:  Treasurer

By:_____
    Name: Gordon A. Davies
    Title:  General Counsel — Corporate
           and Corporate Secretary

NORTEL NETWORKS INC.,
as Guarantor

By: Allen K. Stout
    Name: Allen K. Stout
    Title:  Vice President, Finance

THE BANK OF NEW YORK,
as Trustee and Calculation Agent

By:_____
    Name:
    Title:

Supplemental Indenture

*EXECUTION VERSION*

### NORTEL NETWORKS LIMITED

*as Issuer,*

### NORTEL NETWORKS CORPORATION

**AND**

### NORTEL NETWORKS INC.

*as Guarantors,*

**AND**

### THE BANK OF NEW YORK

*as Trustee*

---

*SECOND SUPPLEMENTAL INDENTURE*

*Dated as of May 1, 2007*

*to*

*Indenture Dated as of July 5, 2006*

---

**SECOND SUPPLEMENTAL INDENTURE** dated as of May 1, 2007 (this "Second Supplemental Indenture") to the Indenture dated as of July 5, 2006 among Nortel Networks Limited (together with any successors, "NNL" or the "Issuer"), a Canadian corporation having its principal place of business at 195 The West Mall, Toronto, Ontario, Canada M9C 5K1, Nortel Networks Corporation (together with any successors, "NNC"), a Canadian corporation having its principal place of business at 195 The West Mall, Toronto, Ontario, Canada M9C 5K1, and Nortel Networks Inc. (together with any successors, "NNI"), a Delaware corporation having its principal place of business at 4008 Chapel Hill - Nelson Highway, Research Triangle Park, North Carolina, U.S.A. 27709, and The Bank of New York (the "Trustee"), a New York corporation authorized to conduct a banking business, having its Corporate Trust Office at 101 Barclay Street 21W, New York, New York, U.S.A. 10286 (the "Original Indenture," and as supplemented by the First Supplemental Indenture dated as of July 5, 2006 (the "First Supplemental Indenture") among the Issuer, NNC, NNI and the Trustee and this Second Supplemental Indenture, the "Indenture").

WHEREAS, NNC, NNL, NNI and the Trustee have heretofore executed and delivered the Original Indenture and the First Supplemental Indenture;

WHEREAS, Section 901(12) of the Original Indenture provides that NNC, NNL, NNI and the Trustee may enter into indentures supplemental to the Original Indenture to cure any ambiguity or to correct or supplement any provision therein that may be defective or inconsistent with any other provision therein;

WHEREAS, NNC, NNL and NNI have determined that clause (b) of the definition of Consolidated Fixed Charge Coverage Ratio in the Original Indenture is defective and inconsistent with the other provisions of such definition; and

WHEREAS, EACH OF NNC and NNL has changed the location of its principal place of business;

NOW, THEREFORE, THIS SECOND SUPPLEMENTAL INDENTURE WITNESSETH:

SECTION 1. *AMENDMENT.*

(a)     The preamble of the Original Indenture is hereby amended by replacing each reference to "8200 Dixie Road, Suite 100, Brampton, Ontario, Canada L6T 5P6" with "195 The West Mall, Toronto, Ontario, Canada M9C 5K1."

(b)     Clause (b) of the definition of Consolidated Fixed Charge Coverage Ratio in the Original Indenture is hereby amended and restated in its entirety to read as follows: "(i) any asset sale during the Four Quarter Period or at any time subsequent to the last day of the Four Quarter Period and on or prior to the Transaction Date involving the sale of a Subsidiary or line of business by NNC or any of its Subsidiaries, in each case, that accounted for at least $150,000,000 of NNC's consolidated revenue for the Four Quarter Period and (ii) any Asset Acquisition by NNC or any of its Subsidiaries during the Four Quarter Period or at any time subsequent to the last day of the Four Quarter Period and on or prior to the Transaction Date which would have accounted for at least $150,000,000 of NNC's consolidated revenue for the

2

Four Quarter Period, in each case, so as to exclude or include, as the case may be, NNC's good faith estimate of any Adjusted EBITDA (including any pro forma expense and cost reductions calculated on a basis consistent with Regulation S-X under the Exchange Act) attributable to the assets which are the subject of such asset sale or Asset Acquisition, as if such asset sale or Asset Acquisition occurred on the first day of the Four Quarter Period."

SECTION 2. *COUNTERPARTS.*

This Second Supplemental Indenture may be executed in any number of counterparts, each of which shall be an original but such counterparts shall together constitute but one and the same instrument.

3

IN WITNESS WHEREOF, the parties hereto have caused this Second Supplemental Indenture to be duly executed as of the day, month and year first above written.

NORTEL NETWORKS LIMITED, as Issuer

By:_____

    Name: Katharine B. Stevenson
    Title: Treasurer

By:_____

    Name: Gordon A. Davies
    Title: General Counsel — Corporate and Corporate
    Secretary


NORTEL NETWORKS CORPORATION, as Guarantor

By:_____

    Name: Katharine B. Stevenson
    Title: Treasurer

By:_____

    Name: Gordon A. Davies
    Title: General Counsel — Corporate and Corporate
    Secretary


NORTEL NETWORKS INC., as Guarantor

By:_____

    Name: Gordon A. Davies
    Title: Assistant Secretary


THE BANK OF NEW YORK, as Trustee

By:_____

    Name:
    Title:

4

IN WITNESS WHEREOF, the parties hereto have caused this Second Supplemental Indenture to be duly executed as of the day, month and year first above written.

NORTEL NETWORKS LIMITED, as Issuer

By:_____
    Name:  Katharine B. Stevenson
    Title:  Treasurer

By:_____
    Name:  Gordon A. Davies
    Title:  General Counsel — Corporate and Corporate
    Secretary

NORTEL NETWORKS CORPORATION, as Guarantor

By:_____
    Name:  Katharine B. Stevenson
    Title:  Treasurer

By:_____
    Name:  Gordon A. Davies
    Title:  General Counsel — Corporate and Corporate
    Secretary

NORTEL NETWORKS INC., as Guarantor

By:_____
    Name:  Allen K. Stout
    Title:  Vice President, Finance

THE BANK OF NEW YORK, as Trustee

By: *Vanessa Mack*
    Name:  *Vanessa Mack*
    Title:  *Vice President*

4

**NORTEL NETWORKS LIMITED**

*as Issuer,*

**NORTEL NETWORKS CORPORATION**

**AND**

**NORTEL NETWORKS INC.**

*as Guarantors,*

**AND**

**THE BANK OF NEW YORK**

*as Trustee*

———————————————

*THIRD SUPPLEMENTAL INDENTURE*

**Dated as of May 28, 2008**

**to**

**Indenture Dated as of July 5, 2006**

———————————————

**THIRD SUPPLEMENTAL INDENTURE** dated as of May 28, 2008 (this "Third Supplemental Indenture") to the Indenture dated as of July 5, 2006 among Nortel Networks Limited (together with any successors, "NNL" or the "Issuer"), a Canadian corporation having its principal place of business at 195 The West Mall, Toronto, Ontario, Canada M9C 5K1, Nortel Networks Corporation (together with any successors, "NNC"), a Canadian corporation having its principal place of business at 195 The West Mall, Toronto, Ontario, Canada M9C 5K1, and Nortel Networks Inc. (together with any successors, "NNI" and, together with NNC, the "Guarantors"), a Delaware corporation having its principal place of business at 2221 Lakeside Boulevard, Richardson, Texas, U.S.A. 75082, and The Bank of New York (the "Trustee"), a New York corporation authorized to conduct a banking business, having its Corporate Trust Office at 101 Barclay Street 4 East, New York, New York, U.S.A. 10286 (the "Original Indenture," and, as supplemented by the First Supplemental Indenture dated as of July 5, 2006 (the "First Supplemental Indenture"), among the parties hereto, the Second Supplemental Indenture dated as of May 1, 2007 (the "Second Supplemental Indenture") among the parties hereto and this Third Supplemental Indenture, the "Indenture").

WHEREAS, the Issuer, the Guarantors and the Trustee have heretofore executed and delivered the Original Indenture, the First Supplemental Indenture and the Second Supplemental Indenture;

WHEREAS, the Issuer, pursuant to the Original Indenture and the First Supplemental Indenture, issued, and the Guarantors guaranteed, its 10.750% Senior Notes due 2016 (the "2016 Fixed Rate Notes");

WHEREAS, Section 310 of the Original Indenture provides that from time to time the Issuer may create and issue Additional Debt Securities, carrying the Guarantees executed by the Guarantors, on terms and conditions substantially similar to those of the 2016 Fixed Rate Notes, which Additional Debt Securities shall increase the aggregate principal amount of the 2016 Fixed Rate Notes and shall have the right to vote together with Holders of the 2016 Fixed Rate Notes as one class;

WHEREAS, Article Nine of the Original Indenture provides, among other things, that the Issuer, the Guarantors and the Trustee may enter into indentures supplemental to the Original Indenture to, among other things, provide for the form or terms of Additional Debt Securities;

WHEREAS, the Issuer has duly authorized the creation of an additional issue of the Original 2016 Fixed Rate Notes under the Original Indenture (the "Additional Original 2016 Fixed Rate Notes"), and an issue of securities evidencing the same continuing indebtedness and with substantially identical terms (except that such securities shall be registered under the Securities Act and shall not have a provision for additional interest pursuant to the 2008 Registration Rights Agreement) in exchange for such Debt Securities (the "Additional 2016 Fixed Rate Exchange Notes," and together with the Additional Original 2016 Fixed Rate Notes, the "Additional 2016 Fixed Rate Notes"), to be consolidated and form a single series with the 2016 Fixed Rate Notes, and the terms and provisions of which are to be as specified in this Third Supplemental Indenture;

WHEREAS, each Guarantor has duly authorized its guarantee of the Additional 2016 Fixed Rate Notes and to provide therefor, each of the Guarantors has duly authorized the execution and delivery of this Third Supplemental Indenture and its Guarantee under the terms set forth herein; and

WHEREAS, all acts and things necessary to make the Additional 2016 Fixed Rate Notes, when executed by the Issuer, endorsed by the Guarantors and authenticated and delivered by the Trustee as provided in the Original Indenture, the valid and binding obligations of the Issuer and the Guarantors and to constitute a valid and binding supplemental indenture according to its terms binding on the Issuer and the Guarantors have been done and performed;

NOW, THEREFORE, THIS THIRD SUPPLEMENTAL INDENTURE WITNESSETH:

SECTION 1. *ISSUANCE OF ADDITIONAL 2016 FIXED RATE NOTES*.

(a)    Pursuant to Section 310 of the Original Indenture, there is hereby authorized Additional Debt Securities of the Debt Securities designated in the First Supplemental Indenture as the "10.750% Senior Notes due 2016" issuable by NNL and guaranteed by NNC and NNI. The Additional 2016 Fixed Rate Notes will be consolidated to form a single series with, and be fully fungible with, the 2016 Fixed Rate Notes, except that the Additional 2016 Fixed Rate Notes will initially not be fungible for trading purposes with, and will initially bear different CUSIP and ISIN numbers than, the 2016 Fixed Rate Notes.

(b)    The Additional 2016 Fixed Rate Notes shall be initially issued as one or more Global Securities in the form specified in Exhibit A to this Third Supplemental Indenture, shall have the terms set forth therein and shall be entitled to the benefits of the other provisions of the Original Indenture as modified by the First Supplemental Indenture (to the extent applicable to the 2016 Fixed Rate Notes), the Second Supplemental Indenture and this Third Supplemental Indenture and specified herein. The Depository Trust Company ("DTC") and its nominees and any successor corporation of DTC and such successor's nominees are hereby designated as the Depositary for the Global Securities representing the Additional 2016 Fixed Rate Notes.

SECTION 2. *DEFINITIONS*.

(a)    Capitalized terms used herein and not otherwise defined shall have the respective meanings assigned thereto in the Original Indenture and the First Supplemental Indenture, as applicable. Except insofar as herein otherwise expressly provided, all the definitions, terms and conditions of the Original Indenture, the First Supplemental Indenture (to the extent applicable to the 2016 Fixed Rate Notes) and the Second Supplemental Indenture shall remain in full force and effect. The Original Indenture, the First Supplemental Indenture (to the extent applicable to the 2016 Fixed Rate Notes) and the Second Supplemental Indenture shall be read, taken and considered as one and the same instrument for all purposes related to the Additional 2016 Fixed Rate Notes.

(b)    Solely for purposes of this Third Supplemental Indenture and the Additional 2016 Fixed Rate Notes and except as otherwise expressly provided or unless the context otherwise

2

requires, the following terms shall have the indicated meanings (such meanings shall apply equally to both the singular and plural forms of the respective terms):

"2008 Registration Rights Agreement" means the registration rights agreement dated as of the date of this Third Supplemental Indenture among the Issuer, the Guarantors and the Initial Purchasers.

"Clearstream Luxembourg" means Clearstream Banking, S.A., or the successor to its securities clearance and settlement operations.

"Euroclear" means Euroclear Bank, S.A./N.V., as operator of the Euroclear system, or its successor in such capacity.

"Global Security Legend" means the legend set forth in Section 5(a)(i) below.

"Initial Purchasers" means J.P. Morgan Securities Inc., Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, RBC Capital Markets Corporation, Lehman Brothers Inc., Morgan Stanley & Co. Incorporated and UBS Securities LLC.

"Regulation S Global Security" means a Regulation S Temporary Global Security or Regulation S Permanent Global Security, as applicable.

"Regulation S Permanent Global Security" means a permanent Regulation S Global Security, bearing the Global Security Legend and issued in a principal amount equal to the outstanding principal amount of the Regulation S Temporary Global Security upon expiration of the Restricted Period or such lesser portion thereof as to which the certificate required pursuant to Section 4(b) of this Third Supplemental Indenture shall have been received.

"Regulation S Temporary Global Security" means a temporary Regulation S Global Security bearing the Global Security Legend, the Restricted Debt Securities Legend and the Regulation S Temporary Global Security Legend and issued in a principal amount equal to the outstanding principal amount of the Additional 2016 Fixed Rate Notes initially sold pursuant to Regulation S.

"Regulation S Temporary Global Security Legend" means the legend set forth in Section 5(c) below.

"Resale Restriction Termination Date" means, for any Restricted Debt Security (or beneficial interest therein) the date on which the Issuer instructs the Trustee in writing to remove the Restricted Debt Securities Legend from the Restricted Debt Securities in accordance with the procedures described in this Third Supplemental Indenture (which instruction is expected to be given on or about the one-year anniversary of the issuance of such Restricted Debt Security).

SECTION 3. *Original Indenture*

3

(a)    Section 301(i) of the Original Indenture shall, for purposes of the Additional 2016 Fixed Rate Notes only, be replaced with the following:

"(i)    Debt Securities originally offered and sold outside the United States in reliance on Regulation S will be issued in the form of one or more Regulation S Temporary Global Securities, each of which shall be exchangeable for a Regulation S Permanent Global Security, as provided in the applicable supplemental indenture."

(b)    Section 306(c)(ii) of the Original Indenture shall, for purposes of the Additional 2016 Fixed Rate Notes only, be replaced with the following:

"(ii)    the Issuer executes and delivers to the Trustee and Security Registrar an Officers' Certificate stating that such Global Security shall be so exchangeable; *provided* that beneficial interests in a Regulation S Temporary Global Security may not be exchanged for Certificated Securities prior to the later of (1) the expiration of the applicable Restricted Period and (2) the receipt of the certificates required by Section 4(b)(i)(A) of the Third Supplemental Indenture dated as of May 28, 2008 (the "Third Supplemental Indenture") among the Issuer, the Guarantors and the Trustee."

(c)    Section 308(c)(iv) of the Original Indenture shall, for purposes of the Additional 2016 Fixed Rate Notes only, be replaced with the following:

"(iv) such Certificated Securities (or beneficial interests) are transferred, replaced or exchanged after the Resale Restriction Termination Date therefor and, in the case of any such Restricted Debt Security, the Issuer has complied with the applicable procedures for delegending in accordance with Section 6 of the Third Supplemental Indenture; or"

(d)    Exhibit B to the Original Indenture shall, for purposes of the Additional 2016 Fixed Rate Notes only, be replaced with Exhibit B attached hereto.

(e)    The following provision shall be inserted at the end of Section 308 of the Original Indenture, for purposes of the Additional 2016 Fixed Rate Notes only:

"(f)    The following provisions contained in this subsection (f) shall apply with respect to any proposed transfer of an interest in a Regulation S Temporary Global Security, during the applicable Restricted Period:  If (1) the owner of a beneficial interest in such Regulation S Temporary Global Security wishes to transfer such interest (or portion thereof) to a QIB pursuant to Rule 144A and (2) such QIB wishes to hold its interest in the Debt Securities through a beneficial interest in a Rule 144A Global Security, then (x) upon receipt by the Security Custodian and Security Registrar of:

(i)    instructions from the DTC participant holding such interest in the Regulation S Temporary Global Security directing the Security Custodian and Security Registrar to credit or cause to be credited a beneficial interest in a Rule 144A Global Security equal to the principal amount of the interest in such Regulation S Temporary Global Security to be transferred, and

4

(ii)    a certificate in the form of Exhibit C from the transferor,

and (y) in compliance with the requirements of Section 308(b)(i), if applicable, and (z) subject to the rules and procedures of the Depositary, the Security Custodian and Security Registrar shall increase the Rule 144A Global Security and decrease the Regulation S Temporary Global Security by such amount in accordance with the foregoing.

For the avoidance of doubt, transfers made in accordance with this Section 308(f) shall be considered in compliance with, and as contemplated by, Section 308(b)(i).

(g)    No interest in a Regulation S Temporary Global Security will be transferred to a holder of an interest in the Regulation S Permanent Global Security except pursuant to and in compliance with Section 4 of the Third Supplemental Indenture."

SECTION 4. *TEMPORARY REGULATION S GLOBAL SECURITIES.*

(a)    Additional 2016 Fixed Rate Notes that are Regulation S Debt Securities shall be issued initially in the form of one or more Regulation S Temporary Global Securities, which shall be delivered to the Security Custodian and registered in the name of the Depositary or the nominee of the Depositary, duly executed by the Issuer and authenticated by the Trustee as provided in the Original Indenture.

(b)    Following (i) the termination of the Restricted Period and (ii) the receipt by the Trustee of (A) a certification in the form of Exhibit D-1 hereto to the effect that Euroclear or Clearstream Luxembourg, as applicable (or, alternatively, by each DTC participant thereof), has received a certificate in the form of Exhibit D-2 of non-United States beneficial ownership of 100% of the aggregate principal amount of each Regulation S Temporary Global Security (except to the extent of any beneficial owners thereof who acquired an interest therein during the Restricted Period pursuant to another exemption from registration under the Securities Act and who shall take delivery of a beneficial interest in a Rule 144A Global Security bearing the Restricted Debt Securities Legend, all as contemplated by Section 308 of the Original Indenture) and (B) an Officers' Certificate in the form of Exhibit E hereto from the Issuer, the Trustee shall remove the Regulation S Temporary Global Security Legend from the Regulation S Temporary Global Security, following which beneficial interests in the Regulation S Temporary Global Security shall automatically be deemed exchanged for beneficial interests in the Regulation S Permanent Global Security.

(c)    The aggregate principal amount of a Regulation S Temporary Global Security and a Regulation S Permanent Global Security may from time to time be increased or decreased by adjustments made on the records of the Trustee and the Depositary or its nominee, as the case may be, in connection with transfers of interests as provided in the Original Indenture.

(d)    For the avoidance of doubt, the Regulation S Temporary Global Security Legend shall not be removed if less than 100% of the aggregate principal amount of each Regulation S Temporary Global Security is certified, pursuant to clause (b) above, as being beneficially owned by non-United States persons or United States persons who purchased such Regulation S Temporary Global Securities in transactions which did not require registration under the Securities Act.

5

SECTION 5. *LEGENDS.*

(a)    Global Security Legends. (i) Each Global Security representing Additional 2016 Fixed Notes shall bear the legend set forth in Section 307(a)(i) of the Original Indenture.

(ii)    For so long as DTC is the Depositary for a Global Security representing Additional 2016 Fixed Notes, such Global Security shall bear the legend set forth in Section 307(a)(ii) of the Original Indenture.

(b)    Securities Act Legends. Additional 2016 Fixed Rate Notes that are Restricted Debt Securities or their Successor Debt Securities shall, in lieu of the legend set forth in Section 307(b) of the Original Indenture, bear a Restricted Debt Securities Legend substantially in the form set forth below:

**"THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION. THE HOLDER OF THIS SECURITY, BY ITS ACCEPTANCE HEREOF, AGREES ON ITS OWN BEHALF AND ON BEHALF OF ANY INVESTOR ACCOUNT FOR WHICH IT HAS PURCHASED SECURITIES, TO OFFER, SELL OR OTHERWISE TRANSFER SUCH SECURITY, PRIOR TO THE DATE (THE "RESALE RESTRICTION TERMINATION DATE") ON WHICH THE ISSUER INSTRUCTS THE TRUSTEE THAT THIS RESTRICTIVE LEGEND SHALL BE DEEMED REMOVED (WHICH INSTRUCTION IS EXPECTED TO BE GIVEN ON OR ABOUT THE ONE-YEAR ANNIVERSARY OF THE ISSUANCE OF THIS SECURITY), ONLY (A) TO THE ISSUER OR A GUARANTOR, (B) PURSUANT TO A REGISTRATION STATEMENT THAT HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, (C) FOR SO LONG AS THE SECURITIES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT, TO A PERSON IT REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (D) PURSUANT TO OFFERS AND SALES THAT OCCUR OUTSIDE THE UNITED STATES WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT, (E) TO AN INSTITUTIONAL "ACCREDITED INVESTOR" WITHIN THE MEANING OF RULE 501(a)(1), (2), (3) OR (7) UNDER THE SECURITIES ACT THAT IS AN INSTITUTIONAL ACCREDITED INVESTOR ACQUIRING THE SECURITY FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF SUCH AN INSTITUTIONAL ACCREDITED INVESTOR, IN EACH CASE IN A MINIMUM PRINCIPAL AMOUNT OF THE SECURITIES OF $250,000, FOR INVESTMENT PURPOSES AND NOT WITH A VIEW TO OR FOR OFFER OR SALE IN CONNECTION WITH ANY DISTRIBUTION IN VIOLATION OF THE**

6

SECURITIES ACT, OR (F) PURSUANT TO ANOTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUBJECT TO THE ISSUER'S AND ANY GUARANTOR'S RIGHT PRIOR TO ANY SUCH OFFER, SALE OR TRANSFER PURSUANT TO CLAUSES (E) OR (F) TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATION AND/OR OTHER INFORMATION SATISFACTORY TO EACH OF THEM. THIS LEGEND SHALL BE DEEMED REMOVED WITHOUT FURTHER ACTION OF THE ISSUER, THE TRUSTEE OR ANY HOLDER AT SUCH TIME AS THE ISSUER INSTRUCTS THE TRUSTEE IN WRITING TO REMOVE SUCH LEGEND IN ACCORDANCE WITH THE THIRD SUPPLEMENTAL INDENTURE."

(c)     Regulation S Temporary Global Security Legend. Any Regulation S Temporary Global Security representing Additional 2016 Fixed Rate Notes shall bear the Regulation S Temporary Global Security Legend substantially in the form set forth below:

"THIS SECURITY (OR ITS PREDECESSOR) WAS ORIGINALLY ISSUED IN A TRANSACTION ORIGINALLY EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT. NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE TRANSFERRED IN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, ANY U.S. PERSON EXCEPT PURSUANT TO AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND ALL APPLICABLE STATE SECURITIES LAWS. TERMS USED ABOVE HAVE THE MEANINGS GIVEN TO THEM IN REGULATION S UNDER THE SECURITIES ACT."

(d)     Canadian Securities Legend. Each Global Security representing Additional 2016 Fixed Rate Notes shall bear a legend in substantially the form set forth in Section 307(c) of the Original Indenture unless the Security Registrar receives an Officers' Certificate confirming that such legend is not required.

SECTION 6. *APPLICABLE PROCEDURES FOR DELEGENDING.*

(a)     Promptly after one year has elapsed following (i) the date of original issuance of Additional 2016 Fixed Rate Notes or (ii) if the Issuer has issued any Additional Debt Securities with the same terms and the same CUSIP number as the Additional 2016 Fixed Rate Notes under Section 310 of the Original Indenture within one year following the last date of original issuance of Additional 2016 Fixed Rate Notes, the last date of original issuance of such Additional Debt Securities, if the Additional 2016 Fixed Rate Notes (including any Additional Debt Securities with the same terms and the same CUSIP number as the Additional 2016 Fixed Rate Notes) are freely tradable pursuant to Rule 144 under the Securities Act (or otherwise) without volume restrictions by Holders who are not Affiliates of the Issuer, the Issuer shall:

1.      instruct the Trustee in writing to remove the Restricted Debt Securities Legend described in Section 5 above from the Additional 2016 Fixed Rate Notes by delivering to the Trustee a certificate in the form of Exhibit F, and upon such instruction the Restricted Debt Securities Legend shall be deemed removed from

7

any Global Securities representing such Additional 2016 Fixed Rate Notes without further action on the part of Holders;

2. notify Holders of the Additional 2016 Fixed Rate Notes that the Restricted Debt Securities Legend has been removed or deemed removed; and

3. notify the Trustee by delivering to the Trustee a certificate in the form of Exhibit F attached hereto and instruct DTC to change the CUSIP number for the Additional 2016 Fixed Rate Notes to the unrestricted CUSIP number.

In no event will the failure of the Issuer to provide any notice set forth in this paragraph or of the Trustee to remove the Restricted Debt Securities Legend constitute a failure by the Issuer to comply with any of its covenants or agreements set forth in the Indenture for purposes of Section 501 of the Original Indenture or otherwise. Any Restricted Debt Security (or security issued in exchange or substitution therefor) as to which such restrictions on transfer shall have expired in accordance with their terms may, upon surrender of such Restricted Debt Security for exchange to the Security Registrar in accordance with the provisions of Article Three of the Original Indenture, be exchanged for a new Debt Security or Debt Securities, of like tenor and aggregate principal amount, which shall not bear the Restricted Debt Securities Legend required by Article Three of the Original Indenture and this Section 6. The Issuer shall notify the Trustee in writing upon the occurrence of the Resale Restriction Termination Date and promptly after a Registration Statement with respect to the Debt Securities, if any, has been declared effective under the Securities Act.

(b) Notwithstanding any provision of Sections 5 or 6 herein or Section 308 of the Original Indenture to the contrary, in the event that Rule 144 as promulgated under the Securities Act (or any successor rule) is amended to change the one-year holding period thereunder (or the corresponding period under any successor rule), from and after receipt by the Trustee of the Officers' Certificate and Opinion of Counsel provided for in Section 308(c)(iii) of the Original Indenture, (i) each reference in this Section 6 to "one year" and in the Restricted Debt Securities Legend set forth in Section 5(c) to "ONE YEAR" shall be deemed for all purposes hereof to be references to such changed period, and (ii) all corresponding references in the Debt Securities (including the definition of Resale Restriction Termination Date) and the Restricted Debt Securities Legends thereon shall be deemed for all purposes hereof to be references to such changed period, *provided* that such changes shall not become effective if they are otherwise prohibited by, or would otherwise cause a violation of, the then-applicable federal securities laws. The provisions of this Section 6(b) will not be effective until such time as the Opinion of Counsel and Officers' Certificate have been received by the Trustee hereunder. This Section 6 shall apply to successive amendments to Rule 144 (or any successor rule) changing the holding period thereunder.

SECTION 7. *AMENDMENTS*

(a) The preamble of the Original Indenture is hereby amended by replacing each reference to "101 Barclay Street 21W" with "101 Barclay Street 4 East."

8

(b)    The preamble of the Original Indenture is hereby amended by replacing each reference to "4008 Chapel Hill - Nelson Highway, Research Triangle Park, North Carolina, U.S.A. 27709" with "2221 Lakeside Boulevard, Richardson, Texas, U.S.A. 75082."

(c)    Clause (i) of the definition of Permitted Funded Debt set forth in the Original Indenture is hereby amended and restated in its entirety to read as follows: "(i) additional Funded Debt of NNC, the Issuer and/or any Subsidiary of NNC in an aggregate outstanding principal amount not to exceed, after giving effect to the relevant transaction, $250,000,000;".

## SECTION 8. *GOVERNING LAW.*

This Third Supplemental Indenture and each of the Additional 2016 Fixed Rate Notes shall be governed by, and construed in accordance with, the laws of the State of New York, but without giving effect to applicable principles of conflicts of law to the extent that the application of the law of another jurisdiction would be required thereby.

## SECTION 9. *NO RECOURSE AGAINST OTHERS.*

No recourse for the payment of the principal of, premium, if any, or interest on any of the Additional 2016 Fixed Rate Notes, or payment under any of the Guarantees, or for any claim based thereon or otherwise in respect thereof, and no recourse under or upon any obligation, covenant or agreement of the Issuer or any Guarantor contained in this Third Supplemental Indenture, or in any of the Additional 2016 Fixed Rate Notes or Guarantees, or because of the creation of any indebtedness represented thereby shall be had against any incorporator or against any past, present or future partner, shareholder, other equityholder, officer, director, employee or controlling person, as such, of the Issuer, any Guarantor or of any successor Person thereof, either directly or through the Issuer, any Guarantor or any successor Person thereof, whether by virtue of any constitution, statute or rule of law, or by the enforcement of any assessment or penalty or otherwise, it being expressly understood that all such liability is hereby expressly waived and released as condition of, and as a consideration for, the execution of this Third Supplemental Indenture and the issuance of the Additional 2016 Fixed Rate Notes and the Guarantees.

## SECTION 10. *COUNTERPARTS.*

This Third Supplemental Indenture may be executed in any number of counterparts, each of which shall be an original but such counterparts shall together constitute but one and the same instrument.

9

IN WITNESS WHEREOF, the parties hereto have caused this Third Supplemental Indenture to be duly executed as of the day, month and year first above written.

NORTEL NETWORKS LIMITED, as Issuer

By:_____
    Name: Michael W. McCorkle
    Title:  Treasurer

By:_____
    Name: Gordon A. Davies
    Title:  Deputy General Counsel and Corporate Secretary

NORTEL NETWORKS CORPORATION, as Guarantor

By:_____
    Name: Michael W. McCorkle
    Title:  Treasurer

By:_____
    Name: Gordon A. Davies
    Title:  Deputy General Counsel and Corporate Secretary

NORTEL NETWORKS INC., as Guarantor

By:_____
    Name:
    Title:

THE BANK OF NEW YORK, as Trustee

By:_____
    Name:
    Title:

IN WITNESS WHEREOF, the parties hereto have caused this Third Supplemental Indenture to be duly executed as of the day, month and year first above written.

NORTEL NETWORKS LIMITED, as Issuer

By:_____
    Name: Michael W. McCorkle
    Title:  Treasurer

By:_____
    Name: Gordon A. Davies
    Title:  Deputy General Counsel and Corporate Secretary

NORTEL NETWORKS CORPORATION, as Guarantor

By:_____
    Name: Michael W. McCorkle
    Title:  Treasurer

By:_____
    Name: Gordon A. Davies
    Title:  Deputy General Counsel and Corporate Secretary

NORTEL NETWORKS INC., as Guarantor

By:_____
    Name: Lynn C. Egan
    Title:  Assistant Secretary

THE BANK OF NEW YORK, as Trustee

By:_____
    Name:
    Title:

IN WITNESS WHEREOF, the parties hereto have caused this Third Supplemental Indenture to be duly executed as of the day, month and year first above written.

NORTEL NETWORKS LIMITED, as Issuer

By:_____

    Name: Michael W. McCorkle
    Title:  Treasurer

By:_____

    Name: Gordon A. Davies
    Title:  Deputy General Counsel and Corporate Secretary

NORTEL NETWORKS CORPORATION, as Guarantor

By:_____

    Name: Michael W. McCorkle
    Title:  Treasurer

By:_____

    Name: Gordon A. Davies
    Title:  Deputy General Counsel and Corporate Secretary

NORTEL NETWORKS INC., as Guarantor

By:_____

    Name:
    Title:

THE BANK OF NEW YORK, as Trustee

By: _Vanessa Mack_____

    Name:
    Title:  **VANESSA MACK**
             **VICE PRESIDENT**

EXHIBIT A

10.750% Senior Notes due 2016

*[Insert the Global Security Legend, if applicable, pursuant to Section 5 of the Third Supplemental Indenture –*

THIS IS A GLOBAL SECURITY WITHIN THE MEANING OF THE INDENTURE REFERRED TO HEREINAFTER.

TRANSFERS OF THIS GLOBAL SECURITY SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO NOMINEES OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC") OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS OF PORTIONS OF THIS GLOBAL SECURITY SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE REFERRED TO ON THE REVERSE HEREOF.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC, NEW YORK, NEW YORK, TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.]

*[If a Restricted Debt Security or its Successor Debt Securities, then insert the following legend (the "Restricted Debt Security Legend") pursuant to Section 5 of the Third Supplemental Indenture –*

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION. THE HOLDER OF THIS SECURITY, BY ITS ACCEPTANCE HEREOF, AGREES ON ITS OWN BEHALF AND ON BEHALF OF ANY INVESTOR ACCOUNT FOR WHICH IT HAS PURCHASED SECURITIES, TO OFFER, SELL OR OTHERWISE TRANSFER SUCH SECURITY, PRIOR TO THE DATE (THE "RESALE RESTRICTION TERMINATION DATE") ON WHICH THE ISSUER INSTRUCTS THE

A-1

TRUSTEE THAT THIS RESTRICTIVE LEGEND SHALL BE DEEMED REMOVED (WHICH INSTRUCTION IS EXPECTED TO BE GIVEN ON OR ABOUT THE ONE-YEAR ANNIVERSARY OF THE ISSUANCE OF THIS SECURITY), ONLY (A) TO THE ISSUER OR A GUARANTOR, (B) PURSUANT TO A REGISTRATION STATEMENT THAT HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, (C) FOR SO LONG AS THE SECURITIES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT, TO A PERSON IT REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (D) PURSUANT TO OFFERS AND SALES THAT OCCUR OUTSIDE THE UNITED STATES WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT, (E) TO AN INSTITUTIONAL "ACCREDITED INVESTOR" WITHIN THE MEANING OF RULE 501(a)(1), (2), (3) OR (7) UNDER THE SECURITIES ACT THAT IS AN INSTITUTIONAL ACCREDITED INVESTOR ACQUIRING THE SECURITY FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF SUCH AN INSTITUTIONAL ACCREDITED INVESTOR, IN EACH CASE IN A MINIMUM PRINCIPAL AMOUNT OF THE SECURITIES OF $250,000, FOR INVESTMENT PURPOSES AND NOT WITH A VIEW TO OR FOR OFFER OR SALE IN CONNECTION WITH ANY DISTRIBUTION IN VIOLATION OF THE SECURITIES ACT, OR (F) PURSUANT TO ANOTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUBJECT TO THE ISSUER'S AND ANY GUARANTOR'S RIGHT PRIOR TO ANY SUCH OFFER, SALE OR TRANSFER PURSUANT TO CLAUSES (E) OR (F) TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATION AND/OR OTHER INFORMATION SATISFACTORY TO EACH OF THEM. THIS LEGEND SHALL BE DEEMED REMOVED WITHOUT FURTHER ACTION OF THE ISSUER, THE TRUSTEE OR ANY HOLDER AT SUCH TIME AS THE ISSUER INSTRUCTS THE TRUSTEE IN WRITING TO REMOVE SUCH LEGEND IN ACCORDANCE WITH THE THIRD SUPPLEMENTAL INDENTURE.]

*[If this Security is a Regulation S Temporary Global Security issued during the Restricted Period therefor, then insert the following legend (the "Regulation S Temporary Global Security Legend") pursuant to Section 5 of the Third Supplemental Indenture –*

THIS SECURITY (OR ITS PREDECESSOR) WAS ORIGINALLY ISSUED IN A TRANSACTION ORIGINALLY EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT. NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE TRANSFERRED IN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, ANY U.S. PERSON EXCEPT PURSUANT TO AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND ALL APPLICABLE STATE SECURITIES LAWS. TERMS USED ABOVE HAVE THE MEANINGS GIVEN TO THEM IN REGULATION S UNDER THE SECURITIES ACT.]

*[Insert the Canadian Securities Legend, if applicable, pursuant to Section 5 of the Third Supplemental Indenture –*

**UNLESS PERMITTED UNDER CANADIAN SECURITIES LEGISLATION, THE HOLDER OF THIS SECURITY MUST NOT TRADE THE SECURITY IN CANADA BEFORE [INSERT DATE THAT IS FOUR MONTHS PLUS ONE DAY AFTER THE ISSUE DATE].]**

CUSIP/CINS _____ †

No. \_\_\_                                                $_____

**NORTEL NETWORKS LIMITED** (together with any successors, the "Issuer"), a Canadian corporation, promises to pay to CEDE & CO. or registered assigns, the principal sum of _____ DOLLARS on July 15, 2016 (which principal sum may from time to time be reduced or increased as appropriate to reflect exchanges, redemptions, repurchases and transfers of interest, but which, when taken together with the aggregate principal sum of all other Additional 2016 Fixed Rate Notes (as defined in the Third Supplemental Indenture referred to below), shall not exceed $675,000,000 at any time, subject to increase as provided in Section 5 on the reverse of this Note).

Interest Payment Dates:  January 15 and July 15.

Regular Record Dates:  January 1 and July 1.

---

†       At such time as the Company notifies the Trustee to remove the legend set forth in the fourth paragraph hereof pursuant to Section 6 of the Third Supplemental Indenture, the CUSIP number for this Security shall be deemed to be CUSIP No. _____.

A-4

IN WITNESS WHEREOF, the Issuer has caused this instrument to be duly executed as of the date below.

Dated: _____, 2008

NORTEL NETWORKS LIMITED

By:_____
    Name: Michael W. McCorkle
    Title:   Treasurer

By:_____
    Name: Gordon A. Davies
    Title:   Deputy General Counsel and
    Corporate Secretary

A-5

GUARANTEE

OF

NORTEL NETWORKS CORPORATION
AND
NORTEL NETWORKS INC.

For value received, each Guarantor hereby unconditionally and irrevocably guarantees, jointly and severally to the Holder of this Note upon which this Guarantee is endorsed and to the Trustee on behalf of each such Holder the due and punctual payment of the principal of, premium, if any, interest and Additional Amounts, if any, on this Note, when and as the same shall become due and payable, whether on the Stated Maturity Date, by declaration of acceleration, call for redemption or otherwise, according to the terms thereof and of the indenture dated as of July 5, 2006 among Nortel Networks Limited, as issuer, Nortel Networks Corporation and Nortel Networks Inc., as guarantors, and The Bank of New York, as trustee (the "Original Indenture" and, as supplemented by the First Supplemental Indenture dated as of July 5, 2006, the Second Supplemental Indenture dated as of May 1, 2007 and the Third Supplemental Indenture dated as of May 28, 2008 (the "Third Supplemental Indenture"), in each case, among Nortel Networks Limited, as issuer, Nortel Networks Corporation and Nortel Networks Inc., as guarantors, and The Bank of New York, as trustee, the "Indenture"). In case of the failure of Nortel Networks Limited, a corporation organized under the laws of Canada (herein called the "Issuer," which term includes any successor Person under the Indenture), punctually to make any such payment of principal, premium, if any, or interest, and Additional Amounts, if any, each Guarantor, for so long as this Guarantee shall be in effect, hereby agrees to cause any such payment to be made to or to the order of the Trustee punctually when and as the same shall become due and payable, whether on the Stated Maturity Date or by declaration of acceleration, call for redemption or otherwise, and as if such payment were made by the Issuer.

Each Guarantor hereby agrees that its obligations hereunder shall be as if it were the principal debtor and not merely surety, and shall be absolute and unconditional, irrespective of, and shall be unaffected by, any invalidity, irregularity or unenforceability of this Note or the Indenture, any failure to enforce the provisions of this Note or the Indenture, or any waiver, modification or indulgence granted to the Issuer with respect thereto, by the Holder of this Note or the Trustee or any other circumstance which may otherwise constitute a legal or equitable discharge of a surety or guarantor. Each Guarantor hereby waives diligence, presentment, demand of payment, filing of claims with a court in the event of merger or bankruptcy of the Issuer, any right to require a proceeding first against the Issuer, protest or notice with respect to this Note or the indebtedness evidenced and all demands whatsoever, and covenants that this Guarantee will not be discharged except by payment in full of the principal of, premium, if any, and interest on this Note or as otherwise described in Section 203 of the Original Indenture.

The Guarantee of each Guarantor hereunder shall be automatically and unconditionally released on the terms set forth in Section 203(b) of the Original Indenture.

A-6

Each Guarantor shall be subrogated to all rights of the Holder of this Note and the Trustee against the Issuer in respect of any amounts paid to such Holder by such Guarantor pursuant to the provisions of this Guarantee; *provided* that no such Guarantor shall be entitled to enforce, or to receive any payments arising out of or based upon such right of subrogation until the principal of, premium, if any, and interest on all Notes of the same series issued under the Indenture shall have been paid in full.

Each Guarantor hereby agrees that its obligations hereunder shall be direct, unconditioned and unsubordinated and will rank equally and ratably without preference and at least equally with other senior unsecured obligations of such Guarantor, except to the extent prescribed by law. The Holder of a guaranteed Note will be entitled to payment under this Guarantee without taking any action whatsoever against the Issuer.

No reference herein to the Indenture and no provision of this Guarantee or of the Indenture shall alter or impair the guarantees of the Guarantors, which are absolute and unconditional, of the due and punctual payment of the principal of, premium, if any, and interest on, the Note upon which this Guarantee is endorsed.

This Guarantee shall not be valid or obligatory for any purpose until the certificate of authentication of this Note shall have been manually executed by or on behalf of the Trustee under the Indenture.

All terms used in this Guarantee which are defined in the Indenture shall have the meanings assigned to them in the Indenture.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, but without giving effect to applicable principles of conflicts of law to the extent that the application of the law of another jurisdiction would be required thereby.

Executed and dated the date on the face hereof.

NORTEL NETWORKS CORPORATION

By:_____

    Name:  Michael W. McCorkle
    Title:   Treasurer

By:_____

    Name:  Gordon A. Davies
    Title:   Deputy General Counsel and Corporate Secretary

A-8

Executed and dated the date on the face hereof.

NORTEL NETWORKS INC.

By:_____

    Name:

    Title:

A-9

TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This is one of the Additional 2016 Fixed Rate Notes issued under the within-mentioned Indenture.

THE BANK OF NEW YORK,
*as Trustee*

By: _____
                       *Authorized Signatory*

A-10

Back of Note
10.750% Senior Notes due 2016

Capitalized terms used herein shall have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

1. *Interest.* Nortel Networks Limited, a Canadian corporation (such corporation, and its successors and assigns under the Indenture hereinafter referred to, being herein called the "Issuer"), promises to pay interest on the principal amount of this Note at the rate per annum shown above. The Issuer will pay interest semiannually on January 15 and July 15 of each year commencing on July 15, 2008 (or, if any such day is not a Business Day, the next succeeding Business Day) (each, an "Interest Payment Date"). Interest on the Notes will accrue from the most recent date to which interest has been paid on the Notes or, if no interest has been paid, from May 28, 2008. Interest will be computed on the basis of a 360-day year of twelve 30-day months.

    **[If Original Note, then insert**—The Issuer agrees to pay Additional Interest, if any, on the principal amount of this Note as and to the extent set forth in the 2008 Registration Rights Agreement.]

    Solely for purposes of disclosure pursuant to the Interest Act (Canada) and without affecting the calculation of interest on the Notes, the yearly rate of interest for any portion of an interest period of less than a full calendar year is the percent rate per annum noted on the Notes multiplied by the actual number of days in the calendar year in which interest is paid divided by the number of days in such portion of the interest period.

2. *Guarantees.* This Note is entitled to the benefits of the certain senior, unsecured Guarantees of the Guarantors. Reference is hereby made to Article II of the Original Indenture and to the Guarantees endorsed on this Note for a statement of the respective rights, limitations of rights, duties and obligations thereunder of the Guarantors, the Trustee and the Holders. The Guarantee of each Guarantor hereunder shall be automatically and unconditionally released on the terms set forth in Section 203(b) of the Original Indenture.

3. *Method of Payment.* By no later than 11:00 a.m. (New York City time) on the date on which any principal of or interest on any Note is due and payable, the Issuer shall irrevocably deposit with the Trustee or the Paying Agent (as defined below) money sufficient to pay such principal and/or interest. The Issuer will pay interest (except Defaulted Interest) on the principal amount of the Notes on each January 15 and July 15 to the Persons who are registered Holders of Notes at the close of business on the January 1 or July 1 next preceding the Interest Payment Date even if Notes are canceled or repurchased after the Regular Record Date and on or before the Interest Payment Date. Holders must surrender Notes to a Paying Agent to collect principal payments. The Issuer will pay principal and interest in

A-11

Dollars of the United States that at the time of payment is legal tender for payment of public and private debts. The Issuer will make all payments in respect of a Note (including principal and interest) in Dollars at the office of the Trustee. At the Issuer's option, however, the Issuer may make such payments by mailing a check to the registered address of each Holder thereof as such address shall appear on the Security Register or, with respect to Notes represented by a Global Note, by wire transfer of immediately available funds to the accounts specified by the Depositary or its nominee. If a payment date is a date other than a Business Day, payment may be made at that place on the next succeeding day that is a Business Day and no interest shall accrue for the intervening period.

4.    *Paying Agent and Security Registrar.* Initially, The Bank of New York, the Trustee under the Indenture, will act as paying agent (in such capacity, the "Paying Agent") and registrar (in such capacity, the "Security Registrar"). The Issuer may change any Paying Agent or the Security Registrar without notice to any Holder. The Issuer or any of its Subsidiaries may act in any such capacity.

5.    *Indenture.* The Issuer issued the Notes under an Indenture dated as of July 5, 2006 (the "Original Indenture") among Nortel Networks Limited, as Issuer, Nortel Networks Corporation and Nortel Networks Inc., as Guarantors, and the Trustee as supplemented by the First Supplemental Indenture dated as of July 5, 2006 (the "First Supplemental Indenture"), the Second Supplemental Indenture dated as of May 1, 2007 (the "Second Supplemental Indenture") and the Third Supplemental Indenture dated as of May 28, 2008 (the "Third Supplemental Indenture"), in each case, among Nortel Networks Limited, as Issuer, Nortel Networks Corporation and Nortel Networks Inc., as Guarantors, and The Bank of New York, as Trustee. The Original Indenture as supplemented by the First Supplemental Indenture, the Second Supplemental Indenture and the Third Supplemental Indenture is referred to herein as the "Indenture." The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act. The Notes are subject to all such terms, and Holders are referred to the Indenture and such Trust Indenture Act for a statement of such terms. To the extent any provision of this Note conflicts with the express provisions of the Indenture, the provisions of the Indenture shall govern and be controlling. The Notes are obligations of the Issuer. The Notes represented hereby are Additional 2016 Fixed Rate Notes (as defined in the Third Supplemental Indenture), which shall constitute part of a single series with the 2016 Fixed Rate Notes issued under the First Supplemental Indenture. Subject to the conditions set forth in the Indenture and without the consent of the Holders, the Issuer may issue Additional Debt Securities. All Notes of a series, including any Exchange Debt Securities or Additional Debt Securities, will be treated as a single class of securities under the Indenture.

6.    *Optional Redemption.* (a) At any time prior to July 15, 2011, the Issuer may redeem the Notes at its option, in whole at any time or in part from time to time, at a Redemption Price equal to 100% of the principal amount plus the 2016 Applicable Premium as of, and accrued and unpaid interest, if any, to, the

A-12

Redemption Date (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant Interest Payment Date).

(b) At any time on or after July 15, 2011, the Issuer may redeem the Notes at its option, in whole at any time or in part from time to time, at the Redemption Prices (expressed as percentages of the principal amount) set forth below plus accrued and unpaid interest and Additional Interest, if any, on the Notes redeemed to the applicable Redemption Date (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant Interest Payment Date), if redeemed during the twelve-month period beginning on July 15 of the years indicated below:

| Year | Redemption Price |
|------|------------------|
| 2011 | 105.375 % |
| 2012 | 103.583 % |
| 2013 | 101.792 % |
| 2014 and each year thereafter | 100.000% |

(c) A notice of redemption complying with Section 1104(a) of the Original Indenture shall be mailed at least 30 days but *not* more than 60 days before the redemption date to each Holder whose Notes are to be redeemed at its address set forth in the Securities Register. Notes in denominations greater than $2,000 may be redeemed in part but only in whole multiples of $1,000, unless all of the Notes held by a Holder are to be redeemed. On and after the Redemption Date, interest shall cease to accrue on Notes or portions thereof called for redemption as long as the Issuer has deposited with the Paying Agent funds finally collected in satisfaction of the applicable Redemption Price.

(d) Any redemption pursuant to this Section 6 shall be in accordance with the procedures of Article Eleven of the Original Indenture.

7. *Optional Redemption with Qualified Equity Proceeds.* (a) At any time, or from time to time, on or prior to July 15, 2009, the Issuer may, at its option, use Qualified Equity Proceeds to redeem up to 35% of the original aggregate principal amount of the Notes plus any Additional Debt Securities, in whole at any time or in part from time to time, at a Redemption Price equal to 110.750% of the principal amount thereof, plus accrued and unpaid interest thereon, if any, to the applicable Redemption Date; *provided* that the Issuer makes such redemption not more than 90 days after the receipt by the Issuer of such Qualified Equity Proceeds.

(b) A notice of redemption complying with Section 1104(a) of the Original Indenture shall be mailed at least 30 days but *not* more than 60 days before

the Redemption Date to each Holder whose Notes are to be redeemed at its address as set forth in the Securities Register. Notes in denominations greater than $2,000 may be redeemed in part but only in whole multiples of $1,000, unless all of the Notes held by a Holder are to be redeemed. On and after the Redemption Date, interest shall cease to accrue on Notes or portions thereof called for redemption as long as the Issuer has deposited with the Paying Agent funds in satisfaction of the applicable Redemption Price.

8.    *Redemption for Changes in Applicable Withholding Taxes.* The Notes of each series are also subject to redemption in whole, but not in part, at the Issuer's option at any time in cash, on not less than 30 nor more than 60 days' notice to the Holders, at a price equal to 100% of the aggregate principal amount, together with accrued and unpaid interest to the date fixed for redemption and all Additional Amounts then due or becoming due on the Redemption Date, in the event the Issuer or a Guarantor is, has become or would become obligated to pay, on the next date on which any amount would be payable, by the Issuer or the Guarantor, as the case may be, with respect to the Notes of such series, any Additional Amount as a result of an actual or proposed change or amendment in the laws (including any regulations promulgated thereunder) or treaties of any jurisdiction (including Canada or any province or territory thereof) or any change in or new or different position regarding the application, interpretation or administration of such laws, treaties or regulations (including a holding, judgment or order by a court of competent jurisdiction), which change is announced or becomes effective on or after the Issue Date and provided that the Issuer delivers to the Trustee an Opinion of Counsel attesting to such change or amendment. For greater certainty, the provisions of this Section 8 shall only apply to any series of Notes in the case of a Guarantor if the Guarantee of such Guarantor has been called and such Guarantor is required under its Guarantee to make payments of principal, interest or premium, if any, in respect of such series of Notes.

9.    *No Mandatory Redemption.* The Issuer shall not be required to make mandatory redemption payments with respect to the Notes.

10.   *Offer to Repurchase.* (a) If a Change of Control occurs, the Issuer shall make a Change of Control Offer to each Holder to purchase all or any part (equal to $1,000 or an integral multiple thereof) of each Holder's Notes at a purchase price, in cash, equal to 101% of the aggregate principal amount thereof, plus accrued and unpaid interest thereon, if any, up to but excluding the date of purchase (the "Change of Control Payment"). Within 30 days following the date upon which the Change of Control occurs, the Issuer must send, or cause the Trustee to send, by first-class mail, a notice to each Holder, with a copy to the Trustee, which notice shall govern the terms of the Change of Control Offer. Such notice shall state, among other things, the purchase date (the "Change of Control Payment Date"), which must be no earlier than 30 days nor later than 60 days after the date such notice is mailed, other than as may be required to comply with any applicable laws. Each Holder who accepts the Change of Control Offer will be

A-14

required to deliver the form entitled "Option of Holder to Elect Purchase" on the reverse of this Note completed and specifying the portion (in integral multiples of $1,000) of such Holder's Notes that it agrees to sell to the Issuer pursuant to the Change of Control Offer, to the Paying Agent at the address specified in the notice prior to the close of business on the third Business Day prior to the Change of Control Payment Date.

11.    *Denominations, Transfer, Exchange.* The Notes are issued in registered form without coupons in denominations of $2,000 and integral multiples of $1,000. The transfer of Notes may be registered and Notes may be exchanged as provided in the Indenture. The Registrar and the Trustee may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and the Issuer may require a Holder to pay any taxes and fees required by law or permitted by the Indenture. The Issuer need not exchange or register the transfer of any Note or portion of a Note selected for redemption, except for the unredeemed portion of any Note being redeemed in part. Also, the Issuer need not exchange or register the transfer of any Notes for a period of 15 days before a selection of Notes to be redeemed or during the period between a record date and the corresponding Interest Payment Date.

12.    *Persons Deemed Owners.* The registered Holder of a Note may be treated as its owner for all purposes.

13.    *Amendment, Supplement and Waiver.* Subject to certain exceptions, the Indenture and the Notes may be amended or supplemented with the consent of the Holders of at least a majority in principal amount of the then-outstanding Notes and any existing default or non-compliance with any provision of the Indenture or the Notes may be waived with the consent of the Holders of a majority in principal amount of the then-outstanding Notes (including any Additional Debt Securities), voting as a single class. Without the consent of any Holder of Notes, the Indenture or the Notes may be amended or supplemented to the extent permitted under Section 901 of the Original Indenture.

14.    *Defaults and Remedies.* (a) This Note shall be subject to the following Events of Default: (i) the failure to pay the principal of the Notes when such principal becomes due and payable, whether at Maturity, upon redemption or otherwise; (ii) the failure to pay interest on the Notes when the same becomes due and payable and the Default continues for a continuous period of 30 days; (iii) a Default by NNC, the Issuer, or during any period in which NNI is a Guarantor, NNI, in the performance or observance of any of their respective covenants, agreements or other obligations set forth in the Original Indenture for a continuous period of 90 days after the Issuer or such Guarantor receives written notice specifying the Default (and demanding that such Default be remedied) from the Holders of at least 25% of the outstanding principal amount of the Notes (including any Additional Debt Securities); (iv) a decree, judgment or order by a court having jurisdiction in the premises shall have been entered adjudging the Issuer or any Guarantor a bankrupt or insolvent or approving as properly filed a petition

A-15

seeking reorganization, readjustment, arrangement, composition or similar relief for the Issuer or any Guarantor under any bankruptcy, insolvency or other similar applicable law and such decree, judgment or order of a court having jurisdiction in the premises for the appointment of a receiver or liquidator or trustee or assignee in bankruptcy or insolvency of the Issuer or such Guarantor, as the case may be, of a substantial part of its property, or for the winding up or liquidation of its affairs, shall have remained in force for a period of 60 consecutive days; or any substantial part of the property of the Issuer or such Guarantor shall be sequestered or attached and shall not be returned to the possession of the Issuer or such Guarantor or released from such attachment whether by filing of a bond, or stay or otherwise within 60 consecutive days thereafter; (v) the Issuer or any Guarantor shall institute proceedings to be adjudicated a voluntary bankrupt, or shall consent to the filing of a bankruptcy proceeding against it, or shall file a petition or answer or consent seeking reorganization, readjustment, arrangement, composition or similar relief under any bankruptcy, insolvency or other similar applicable law or the Issuer or such Guarantor shall consent to the filing of any such petition, or shall consent to the appointment of a receiver or liquidator or trustee or assignee in bankruptcy or insolvency for it or of a substantial part of its property, or shall make an assignment for the benefit of creditors, or shall be unable, or admit in writing its inability, to pay its debts generally as they become due, or corporate action shall be taken by the Issuer or such Guarantor in furtherance of any of the aforesaid actions; (vi) a Default by NNC, the Issuer or, during any period in which NNI is a Guarantor, NNI, under a single obligation in respect of Funded Debt that exceeds on its face $100,000,000 in principal amount which results in such Funded Debt becoming or being declared due and payable prior to the date on which it would otherwise become due and payable and such acceleration shall not be rescinded or annulled within 10 days after written notice (i) specifying such Default, and (ii) stating that such notice is a "Notice of Default" hereunder, shall have been given to such defaulting entity by Holders of at least 25% of the outstanding principal amount of the Notes; (vii) any Guarantee ceases to be in full force and effect (other than in accordance with the terms of the Original Indenture) or any Guarantor denies or disaffirms its obligations under its Guarantee; (viii) a failure by the Issuer to make a Change of Control Offer; and (ix) one or more judgments in an aggregate amount in excess of $100,000,000 shall have been rendered against the Issuer, NNC or, during any period in which NNI is Guarantor, NNI, and such judgments remain undischarged, unpaid in accordance with its or their respective terms or unstayed for a period of 90 days after such judgment or judgments become final and non-appealable.

(b)     If any Event of Default occurs and is continuing, the Trustee or the Holders of at least 25% in principal amount of the Outstanding Notes (including any Additional Debt Securities) may declare the principal amount of, premium, if any, and any accrued and unpaid interest, including Additional Interest, if any, on all the Notes (including any Additional Debt Securities) to be due and payable immediately, by a notice in writing to the Issuer and the Guarantors, and to the Trustee if given by the Holders, and upon any such declaration such principal

A-16

amount, together with accrued interest thereon shall become immediately due and payable.

(c)  Holders of the Notes may not enforce the Indenture or the Notes except as provided in the Indenture. The Trustee may refuse to enforce the Indenture or the Notes unless it receives reasonable indemnity or security. Subject to certain limitations, Holders of a majority in principal amount of the Outstanding Notes may direct the Trustee in its exercise of any trust or power. The Trustee may withhold from Holders notice of any continuing Default or Event of Default (except a Default or Event of Default in payment of principal or interest) if it determines that withholding notice is in their interest.

15.  *Defeasance.* The Issuer and/or the Guarantors may defease and be discharged from any and all obligations with respect to this Note or the Guarantees, as applicable, or be released from its obligations with respect to certain covenants applicable to this Note in accordance with the terms of the Indenture.

16.  *No Recourse Against Others.* A director, officer, employee, incorporator or stockholder of the Issuer, as such, shall not have any liability for any obligations of the Issuer under the Notes or the Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for the issuance of the Notes.

17.  *Authentication.* This Note shall not be valid until authenticated by the manual signature of the Trustee or an authenticating agent.

18.  *Abbreviations.* Customary abbreviations may be used in the name of a Holder or an assignee, such as: TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian), and U/G/M/A (= Uniform Gifts to Minors Act).

19.  *CUSIP Numbers.* Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Issuer has caused CUSIP numbers to be printed on the Notes and the Trustee may use CUSIP numbers in notices of redemption as a convenience to Holders. No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

20.  *Governing Law.* This Note shall be governed by, and construed in accordance with, the law of the State of New York, but without giving effect to applicable principles of conflicts of law to the extent that the application of the law of another jurisdiction would be required thereby.

A-17

21.  *Submission to Jurisdiction; Waiver of Immunities*.  The Issuer and the Guarantors have agreed that any suit, action or proceeding against the Issuer or the Guarantors brought by any Holder or the Trustee arising out of or based upon the Indenture, the Notes or the Guarantees may be instituted in any state or federal court in the Borough of Manhattan, The City of New York, New York, United States, and any appellate court from any thereof.  The Issuer and the Guarantors have irrevocably submitted to the non-exclusive jurisdiction of such courts for such purpose and waived, to the fullest extent permitted by law, trial by jury and any objection any of them may now or hereafter have to the laying of venue of any such proceeding, and any claim any of them may now or hereafter have that any proceeding in any such court is brought in an inconvenient forum.

The Issuer shall furnish to any Holder upon written request and without charge a copy of the Indenture.  Requests may be made to: Nortel Networks Limited, 195 The West Mall, Toronto, Ontario, Canada M9C 5K1, Attention: Corporate Secretary.

### Assignment Form

To assign this Note, fill in the form below:

(I) or (we) assign and transfer this Note to: _____

*(Insert assignee's legal name)*

*(Insert assignee's soc. sec. or tax I.D. no.)*

*(Print or type assignee's name, address and zip code)*

and irrevocably appoint _____ , as agent, to transfer
this Note on the books of the Issuer. The agent may substitute another to act for him.

Date:_____

Your Signature:_____

*(Sign exactly as your name appears on
the face of this Note)*

Signature Guarantee:_____

A-19

**Option of Holder to Elect Purchase upon a Change of Control**

If you want to elect to have this Note purchased by the Issuer pursuant to Section 10 of the terms set forth on the reverse of this Note (the "Terms"), check the appropriate box below:

    [_] The undersigned Holder hereby elects to have the Issuer purchase its Note pursuant to Section 10 of the Terms.

If you want to elect to have only part of this Note purchased by the Issuer pursuant to Section 10 of the Terms, state the amount you elect to have purchased:

$_____

Date:_____

    Your Signature:_____
        *(Sign exactly as your name appears on*
        *the face of this Note)*

    Tax Identification No.:_____

Signature Guarantee:_____

A-20

**SCHEDULE OF EXCHANGES OF INTERESTS IN THE GLOBAL SECURITY\***
The following exchanges of a part of this Global Security for an interest in another Global Security or for a Certificated Security, or exchanges of a part of another Global Security or Certificated Security for an interest in this Global Security, have been made:

| Date of Exchange | Amount of decrease in Principal Amount of this Global Security | Amount of increase in Principal Amount of this Global Security | Principal Amount of this Global Security following such decrease (or increase) | Signature of authorized officer of Trustee or Note Custodian |
|---|---|---|---|---|
| | | | | |

\* This schedule should be included only if the Note is issued in global form.

A-21

EXHIBIT B

## FORM OF REGULATION S/RULE 144 CERTIFICATE

(For transfers pursuant to Section 308(a) of the Original Indenture of Additional
2016 Fixed Rated Notes that are Restricted Debt Securities)

The Bank of New York,
as Trustee
101 Barclay St., 4 East
New York, New York 10286
Attention: Corporate Trust Administration

> Re:  10.75% Senior Notes due 2016
> of Nortel Networks Limited
> (the "Debt Securities")

Reference is made to the indenture dated as of July 5, 2006 (the "Original Indenture,"
and, as supplemented by the First Supplemental Indenture dated as of July 5, 2006, the Second
Supplemental Indenture dated as of May 1, 2007 and the Third Supplemental Indenture dated as
of May 28, 2008, in each case, among NNL, NNC, NNI and the Trustee, the "Indenture") among
Nortel Networks Limited (together with any successors, "NNL" or the "Issuer"), Nortel
Networks Corporation (together with any successors, "NNC") and Nortel Networks Inc.
(together with any successors, "NNI" and, together with NNC, the "Guarantors"), and The Bank
of New York, as trustee (the "Trustee"). Terms used herein and defined in the Indenture or in
Regulation S or Rule 144 under the U.S. Securities Act of 1933, as amended (the "Securities
Act"), are used herein as so defined.

This certificate relates to U.S. $_____ principal amount of Debt Securities,
which are evidenced by the following certificate(s) (the "Specified Debt Securities"):

CUSIP No(s). _____

CERTIFICATE No(s). _____

The person in whose name this certificate is executed below (the "Undersigned") hereby
certifies that either (i) it is the sole beneficial owner of the Specified Debt Securities or (ii) it is
acting on behalf of all the beneficial owners of the Specified Debt Securities and is duly
authorized by them to do so. Such beneficial owner or owners are referred to herein collectively
as the "Owner." If the Specified Debt Securities are represented by a Global Security, they are
held through the Depositary or a Participant in the name of the Undersigned, as or on behalf of
the Owner. If the Specified Debt Securities are not represented by a Global Security, they are
registered in the name of the Undersigned, as or on behalf of the Owner.

The Owner has requested that the Specified Debt Securities be transferred to a Person
(the "Transferee") who will take delivery in the form of a Regulation S Debt Security. In
connection with such transfer, the Owner hereby certifies that, unless such transfer is being
effected pursuant to an effective registration statement under the Securities Act, it is being

B-1

effected in accordance with Rule 904 or Rule 144 under the Securities Act and with all applicable securities laws of the states of the United States and other jurisdictions. Accordingly, the Owner hereby further certifies as follows:

(a)   *Rule 904 Transfers.* If the transfer is being effected in accordance with Rule 904:

     (i)    the Owner is not a distributor of the Debt Securities, an Affiliate of the Company or any Guarantor or any such distributor or a Person acting on behalf of any of the foregoing;

     (ii)    the offer of the Specified Debt Securities was not made to a Person in the United States;

     (iii)    either:

          (1)    at the time the buy order was originated, the Transferee was outside the United States or the Owner and any Person acting on its behalf reasonably believed that the Transferee was outside the United States, or

          (2)    the transaction is being executed in, on or through the facilities of the Eurobond market, as regulated by the Association of International Bond Dealers, or another designated offshore securities market and neither the Owner nor any Person acting on its behalf knows that the transaction has been prearranged with a buyer in the United States;

     (iv)    no directed selling efforts have been made in the United States by or on behalf of the Owner or any Affiliate thereof;

     (v)    if the Owner is a dealer in securities or has received a selling concession, fee or other remuneration in respect of the Specified Debt Securities, and the transfer is to occur during the Restricted Period, then the requirements of Rule 904(c)(1) have been satisfied; and

     (vi)    the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act.

(b)   *Rule 144 Transfers.* If the transfer is being effected pursuant to Rule 144, the transfer is occurring after a holding period of at least six months (computed in accordance with paragraph (d) of Rule 144) has elapsed since the Specified Debt Securities were last acquired from the Company or a Guarantor or from an Affiliate of the Company or a Guarantor, whichever is later, the Company or a Guarantor is, and has been for a period of at least 90 days immediately before such transfer, subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act and has filed all required reports thereunder in accordance with Rule 144(c)(1) and the Owner is not, and during the preceding three months, has not been, an Affiliate of the Company or Guarantor.

This certificate and the statements contained herein are made for your benefit and the benefit of the Issuer, the Guarantors and the Initial Purchasers of the Debt Securities.

Dated:

_____

(Print the name of the Undersigned,
as such term is defined in the
third paragraph of this certificate.)

By:
Name:
Title:
(If the Undersigned is a corporation, partnership or
fiduciary, the title of the person signing on behalf of the
Undersigned must be stated.)

B-3

EXHIBIT C

## FORM OF TRANSFER CERTIFICATE FOR TRANSFER OF INTERESTS IN REGULATION S DEBT SECURITIES TO QIBS DURING RESTRICTED PERIOD

(For transfers pursuant to Section 308(f) of the Original Indenture, as supplemented by the Third Supplemental Indenture, of Additional 2016 Fixed Rated Notes that are Regulation S Debt Securities during the Restricted Period)

The Bank of New York,
 as Trustee
101 Barclay St., 4 East
New York, New York 10286
Attention: Corporate Trust Administration

> Re:  10.75% Senior Notes due 2016
> of Nortel Networks Limited
> (the "Debt Securities")

Reference is made to the indenture dated as of July 5, 2006 (the "Original Indenture," and, as supplemented by the First Supplemental Indenture dated as of July 5, 2006, the Second Supplemental Indenture dated as of May 1, 2007 and the Third Supplemental Indenture dated as of May 28, 2008, in each case, among NNL, NNC, NNI and the Trustee, the "Indenture") among Nortel Networks Limited (together with any successors, "NNL" or the "Issuer"), Nortel Networks Corporation (together with any successors, "NNC") and Nortel Networks Inc. (together with any successors, "NNI" and, together with NNC, the "Guarantors"), and The Bank of New York, as trustee (the "Trustee"). Terms used herein and defined in the Indenture or in Regulation S or Rule 144 under the U.S. Securities Act of 1933, as amended (the "Securities Act"), are used herein as so defined.

This certificate relates to U.S. $_____ principal amount of Debt Securities, which are evidenced by the following certificate(s) (the "Specified Debt Securities"):

CUSIP No(s). _____

CERTIFICATE No(s). _____

The person in whose name this certificate is executed below (the "Undersigned") hereby certifies that either (i) it is the sole beneficial owner of the Specified Debt Securities or (ii) it is acting on behalf of all the beneficial owners of the Specified Debt Securities and is duly authorized by them to do so. Such beneficial owner or owners are referred to herein collectively as the "Owner." The Specified Debt Securities are represented by a Global Security and are held through the Depositary or a Participant in the name of the Undersigned, as or on behalf of the Owner.

The Owner has requested that the Specified Debt Securities be transferred to a Person (the "Transferee") who will take delivery in the form of a Rule 144A Global Security. In connection with such transfer, the Owner hereby certifies that, unless such transfer is being

C-1

effected pursuant to an effective registration statement under the Securities Act, it is being effected in accordance with Rule 144A under the Securities Act and with all applicable securities laws of the states of the United States and other jurisdictions. Accordingly, the Owner hereby further certifies that at the time the buy order was originated:

> (a)     the Transferee was purchasing the Debt Securities for its own account or the account of a QIB, in a transaction meeting the requirements of Rule 144A, and

> (b)     the Owner and any Person acting on its behalf reasonably believed that, the Transferee, as well as any such account, is a "qualified institutional buyer" within the meaning of Rule 144A.

This certificate and the statements contained herein are made for your benefit and the benefit of the Issuer, the Guarantors and the Initial Purchasers of the Debt Securities.

Dated:

_____
(Print the name of the Undersigned,
as such term is defined in the
third paragraph of this certificate.)


By:
Name:
Title:
(If the Undersigned is a corporation, partnership or
fiduciary, the title of the person signing on behalf of the
Undersigned must be stated.)

C-2

EXHIBIT D-1

## FORM OF NON-U.S. BENEFICIAL OWNERSHIP CERTIFICATION BY EUROCLEAR OR CLEARSTREAM LUXEMBOURG

[Date]

[Depositary of [Euroclear][Clearstream Luxembourg]]

The Bank of New York
101 Barclay Street, Floor 4 East
New York, New York 10286
Attention: Corporate Trust Administration]

> Re:   10.750% Senior Notes due 2016
> of Nortel Networks Limited
> (the "Debt Securities")

This is to certify with respect to $_____ [principal amount] of the Debt Securities that, except as set forth below, we have received in writing, by tested telex or by electronic transmission, from member organizations appearing in our records as persons being entitled to a portion of such [principal amount] (our "Member Organizations") certifications with respect to such portion, substantially to the effect set forth in Exhibit D-2 to the Third Supplemental Indenture relating to the Debt Securities.

We further certify:

(a)     that we are not making available herewith for exchange (or, if relevant, exercise of any rights or collection of any interest) any portion of the Regulation S Temporary Global Security excepted in such certifications; and

(b)     that as of the date hereof we have not received any notification from any of our Member Organizations to the effect that the statements made by such Member Organizations with respect to any portion of the part submitted herewith for exchange (or, if relevant, exercise of any rights or collection of any interest) are no longer true and cannot be relied upon as of the date hereof.

We understand that this certification is required in connection with certain securities laws of the United States. In connection therewith, if administrative or legal proceedings are commenced or threatened in connection with which this certification is or would be relevant, we irrevocably authorize you, Nortel Networks Limited, Nortel Networks Corporation or Nortel Networks Inc. to produce this certification to any interested party in such proceedings.

D-1-1

Dated:

Yours faithfully,
[Euroclear][Clearstream Luxembourg]

By _____

EXHIBIT D-2

**FORM OF NON-U.S. BENEFICIAL OWNERSHIP CERTIFICATION
BY MEMBER ORGANIZATION**

[Date]

[Euroclear or Clearstream Luxembourg, as applicable]

Re:  10.750% Senior Notes due 2016
of Nortel Networks Limited
(the "Debt Securities")

This is to certify that as of the date hereof, and except as set forth below, the Debt Securities held by you for our account are beneficially owned by (a) non-U.S. person(s) or (b) U.S. person(s) who purchased the Debt Securities in transactions which did not require registration under the Securities Act of 1933, as amended (the "Securities Act"). As used in this paragraph the term "U.S. person" has the meaning given to it by Regulation S under the Securities Act.

We undertake to advise you promptly by tested telex on or prior to the date on which you intend to submit your certification relating to the Debt Securities held by you for our account in accordance with your operating procedures if any applicable statement herein is not correct on such date, and in the absence of any such notification it may be assumed that this certification applies as of such date.

This certification excepts and does not relate to $_____ of such interest in the above Debt Securities in respect of which we are not able to certify and as to which we understand exchange and delivery of a Regulation S Permanent Global Security (or, if relevant, exercise of any rights or collection of any interest) cannot be made until we do so certify.

We understand that this certification is required in connection with certain securities laws of the United States. In connection therewith, if administrative or legal proceedings are commenced or threatened in which this certification is or would be relevant, we irrevocably authorize you, Nortel Networks Limited, Nortel Networks Corporation or Nortel Networks Inc. or the Trustee or Security Registrar for the Debt Securities to produce this certification to any interested party in such proceedings.

Date:          . (Not earlier than 15 days prior to the end of the Restricted Period).

By:  _____
[Agent Member]

As Beneficial Owner(s), or as agent for, the
Beneficial Owner(s) of the Debt Securities
to which this certificate relates.

D-2-1

EXHIBIT E

## FORM OF OFFICERS' CERTIFICATE

## NORTEL NETWORKS LIMITED

## OFFICERS' CERTIFICATE

July 7, 2008

Reference is made to (i) that certain indenture dated as of July 5, 2006 (the "Original Indenture" and, as supplemented by the First Supplemental Indenture dated as of July 5, 2006, the Second Supplemental Indenture dated May 1, 2007 and the Third Supplemental Indenture (as defined below), the "Indenture"), among Nortel Networks Limited (the "Corporation"), a Canadian corporation, Nortel Networks Corporation ("NNC"), a Canadian corporation, Nortel Networks Inc. ("NNI" and, together with NNC, the "Guarantors"), a Delaware corporation, and The Bank of New York, as Trustee and (ii) that certain third supplemental indenture dated as of May 28, 2008 (the "Third Supplemental Indenture") among the Corporation, the Guarantors and The Bank of New York, as Trustee. Capitalized terms used herein and not defined shall have the meanings ascribed to them in the Indenture. The undersigned officers of the Corporation, to the best of their knowledge after reasonable investigation, hereby state on behalf of the Corporation, in accordance with Section 4(b) of the Third Supplemental Indenture, that:

(i)     in accordance with Rule 903(b)(3)(ii)(B) of Regulation S, the 40-day distribution compliance period for the Additional 2016 Fixed Rate Notes that are Regulation S Debt Securities issued under the Original Indenture and the Third Supplemental Indenture has terminated; and

(ii)     the Regulation S Temporary Global Security Legend described in Section 5(c) of the Third Supplemental Indenture and set forth on the Regulation S Temporary Global Security shall be deemed removed from such Regulation S Temporary Global Security, in accordance with the terms and conditions of such Regulation S Temporary Global Security and as provided in the Third Supplemental Indenture, without further action on the part of Holders other than as set forth in Section 4(b)(ii)(A) of the Third Supplemental Indenture, following which beneficial interests in the Regulation S Temporary Global Security shall automatically be deemed exchanged for beneficial interests in the Regulation S Permanent Global Security pursuant to the rules and procedures of the Depositary.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the undersigned have hereunto set their hands on the
date first above written.

NORTEL NETWORKS LIMITED

By:_____

Name:  Michael W. McCorkle
Title:   Treasurer

By:_____

Name:  Gordon A. Davies
Title:   Deputy General Counsel and
Corporate Secretary

EXHIBIT F

## FORM OF FREE TRANSFERABILITY CERTIFICATE

Dear Sir/Madam:

In accordance with Section 6 of the Third Supplemental Indenture dated as of May 28, 2008 (the "Third Supplemental Indenture") to the indenture dated as of July 5, 2006 among Nortel Networks Limited (the "Company"), Nortel Networks Corporation ("NNC") and Nortel Networks Inc. ("NNI"), and The Bank of New York, as Trustee (the "Trustee"), as supplemented by the First Supplemental Indenture dated as of July 5, 2006 among the Company, NNC, NNI and the Trustee, the Second Supplemental Indenture dated as of May 1, 2007, among the Company, NNC, NNI and the Trustee, and the Third Supplemental Indenture, the "Indenture"), pursuant to which the additional 10.750% Senior Notes due 2016 (the "Additional Debt Securities") were issued, we hereby instruct you that:

(1)    the restrictive legends described in Section 5(b) of the Third Supplemental Indenture and set forth on the Additional Debt Securities that are Restricted Debt Securities shall be deemed removed from the Additional Debt Securities, in accordance with the terms and conditions of such Additional Debt Securities and as provided in the Third Supplemental Indenture, without further action on the part of Holders; and

(2)    the restricted CUSIP number for the Additional Debt Securities shall be deemed removed from such Restricted Debt Securities and replaced with an unrestricted CUSIP number set forth therein, in accordance with the terms and conditions of the Additional Debt Securities and as provided in the Third Supplemental Indenture, without further action on the part of Holders.

Capitalized terms used but not defined herein shall have the meanings set forth in the Indenture.

Very truly yours,

Nortel Networks Limited

By:_____
Name:
Title:

By:_____
Name:
Title:

F-1

H
A
N
D

D
E
L
I
V
E
R
Y

_RECEIVED BY:_    _DATE_    _TIME_