**EXHIBIT 42**

**EXHIBIT**

**165**

exhibitsticker.com

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 10-K

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended December 31, 2011**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the transition period from          to**

**Commission file number 001-07260**

# Nortel Networks Corporation
### *(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Canada** | **98-0535482** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **5945 Airport Road, Suite 360** | |
| **Mississauga, Ontario, Canada** | **L4V 1R9** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**Registrant's telephone number including area code: (905) 863-7000**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| None | None |

**Securities registered pursuant to Section 12(g) of the Act:**
**Common shares without nominal or par value**

Indicate by check mark if the registrant is a well known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☐   No ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to filing requirements for the past 90 days.   Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☑   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See the definitions of "large accelerated filer", "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐       Accelerated filer ☐       Non-Accelerated filer ☐       Smaller reporting company ☑
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☑

**On February 29, 2012, 498,206,366 common shares of Nortel Networks Corporation were issued and outstanding. Non-affiliates of the registrant held 498,203,066 common shares having an aggregate market value of $24,910,153 based upon the last sale price on the Pink Sheets Electronic Quotation Service on June 30, 2011, of $0.05 per share; for purposes of this calculation, shares held by directors and executive officers have been excluded.**

### DOCUMENTS INCORPORATED BY REFERENCE
None

Table of Contents

# TABLE OF CONTENTS

## PART I

| | | |
|---|---|---|
| **ITEM 1.** | Business | 1 |
| | Overview | 1 |
| | Creditor Protection Proceedings | 1 |
| | | 1 |
| | Consolidation and Reportable Segment | 3 |
| | Sales and Distribution | 3 |
| | Product Standards, Certifications and Regulations | 3 |
| | Sources and Availability of Materials | 3 |
| | Research and Development | 4 |
| | Intellectual Property | 4 |
| | Employee Relations | 4 |
| | Environmental Matters | 4 |
| **ITEM 1A.** | Risk Factors | 5 |
| **ITEM 2.** | Properties | 12 |
| **ITEM 3.** | Legal Proceedings | 13 |

## PART II

| | | |
|---|---|---|
| **ITEM 5.** | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 18 |
| **ITEM 7.** | Management's Discussion and Analysis of Financial Condition and Results of Operations | 20 |
| | Executive Overview | 21 |
| | Results of Operations – Continuing Operations | 36 |
| | Liquidity and Capital Resources | 41 |
| | Off-Balance Sheet Arrangements | 44 |
| | Application of Critical Accounting Policies and Estimates | 44 |
| | Accounting Changes and Recent Accounting Pronouncements | 47 |
| | Outstanding Share Data | 47 |
| | Environmental Matters and Legal Proceedings | 47 |
| | Cautionary Notice Regarding Forward-Looking Information | 47 |
| **ITEM 8.** | Financial Statements and Supplementary Data | 105 |
| **ITEM 9.** | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 106 |
| **ITEM 9A.** | Controls and Procedures | 106 |
| | Management Conclusions Concerning Disclosure Controls and Procedures | 106 |
| | Management's Report on Internal Control Over Financial Reporting | 106 |
| | Changes in Internal Control Over Financial Reporting | 106 |
| **ITEM 9B.** | Other Information | 107 |

i

Table of Contents

## PART III

| | | |
|---|---|---|
| ITEM 10. | Directors, Executive Officers and Corporate Governance | 108 |
| ITEM 11. | Executive and Director Compensation | 113 |
| ITEM 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 124 |
| ITEM 13. | Certain Relationships and Related Transactions, and Board Independence | 125 |
| ITEM 14. | Principal Accountant Fees and Services | 125 |

## PART IV

| | | |
|---|---|---|
| ITEM 15. | Exhibits and Financial Statement Schedules | 127 |
| SIGNATURES | | 143 |

All dollar amounts in this document are in United States Dollars unless otherwise stated.

NORTEL, NORTEL (Logo), NORTEL NETWORKS, the GLOBEMARK, and NT are trademarks of Nortel Networks.

All other trademarks are the property of their respective owners.

ii

Table of Contents

# PART I

**ITEM 1.    Business**

Capitalized terms used in this Item I of Part I and not otherwise defined, have the meaning set forth for such terms in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section of this report.

## *Overview*

On January 14, 2009 (Petition Date), after extensive consideration of all other alternatives, with the unanimous authorization of our board of directors after thorough consultation with our advisors, we initiated creditor protection proceedings under the respective restructuring regimes of Canada under the Companies' Creditors Arrangement Act (CCAA) (CCAA Proceedings), the United States (U.S.) under Chapter 11 of the U.S. Bankruptcy Code (Chapter 11) (Chapter 11 Proceedings), the United Kingdom (U.K.) under the Insolvency Act 1986 (U.K. Administration Proceedings), and subsequently, Israel under the Israeli Companies Law 1999 (Israeli Administration Proceedings). On May 28, 2009, one of our French subsidiaries, Nortel Networks SA (NNSA), was placed into secondary proceedings (French Secondary Proceedings). On July 14, 2009, Nortel Networks (CALA) Inc. (NNCI), a U.S. based subsidiary with operations in the Caribbean and Latin America (CALA) region, also filed a voluntary petition for relief under Chapter 11 in the United States Bankruptcy Court for the District of Delaware (U.S. Court) and became a party to the Chapter 11 Proceedings.

In June 2009, we determined that selling our businesses was the best path forward. We have sold all of our businesses as well as our remaining patents and patent applications. We are now focused on the sale of our remaining assets, the wind-down of our global operations and entities, ongoing cost reductions, the creditor claims process, and working toward conclusion of the Creditor Protection Proceedings.

We have our principal executive offices at 5945 Airport Road, Suite 360, Mississauga, Ontario, Canada L4V 1R9, (905) 863-7000. Our company was incorporated in Canada on March 7, 2000. Nortel Networks Limited (NNL), a Canadian company incorporated in 1914, is our principal operating subsidiary.

Our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and all amendments to those reports are available free of charge at www.nortel-canada.com (our website), as soon as reasonably practicable after providing them to the U.S. Securities and Exchange Commission (SEC). Our Code of Business Conduct is also available on our website, and any future amendments to it will be posted there. Any waiver of a requirement of our Code of Business Conduct, if granted by the boards of directors of NNC and NNL or their audit committees, will be posted on our website as required by law. Information contained on our website is not incorporated by reference into this or any such report. The public may read and copy these reports at the SEC's Public Reference Room at 100 F Street NE, Washington, DC 20549 (1-800-SEC-0330). Also, the SEC maintains an Internet site that contains reports, proxy and information statements, and other information regarding certain issuers including NNC and NNL, at www.sec.gov. We are not a foreign private issuer, as defined in Rule 3b-4 under the Securities Exchange Act of 1934, as amended (Exchange Act).

All monetary amounts in this report are in millions, except for Part III hereof, and in U.S. Dollars except as otherwise stated. Where we say "we", "us", "our", "Nortel" or "the Company", we mean Nortel Networks Corporation or Nortel Networks Corporation and its subsidiaries that continue to be consolidated, as applicable. Where we say NNC, we mean Nortel Networks Corporation. Where we refer to the "industry", we mean the telecommunications industry.

## *Creditor Protection Proceedings*

"Debtors" as used herein means (i) us, together with NNL and certain other Canadian subsidiaries (collectively, Canadian Debtors) that filed for creditor protection pursuant to the provisions of the CCAA in the Ontario Superior Court of Justice (Canadian Court), (ii) Nortel Networks Inc. (NNI), Nortel Networks Capital Corporation (NNCC), NNCI and certain other U.S. subsidiaries (U.S. Debtors) that filed voluntary petitions under Chapter 11 in the U.S. Court, and (iii) certain Europe, Middle East and Africa (EMEA) subsidiaries that made consequential filings under the Insolvency Act 1986 in the High Court of England and Wales (English Court) (including NNSA), and certain Israeli subsidiaries that made consequential filings under the Israeli Companies Law 1999 in the District Court of Tel Aviv (EMEA Debtors). The CCAA Proceedings, Chapter 11 Proceedings, U.K. Administration Proceedings and the Israeli Administration Proceedings are together referred to as the Creditor Protection Proceedings.

Pursuant to the initial order of the Canadian Court, Ernst & Young Inc. was named as the court-appointed monitor (Canadian Monitor) under the CCAA Proceedings. As required under the U.S. Bankruptcy Code, the United States Trustee for the District of Delaware (U.S. Trustee) appointed an official committee of unsecured creditors on January 22, 2009 (U.S. Creditors' Committee). In addition, a group purporting to hold substantial amounts of our publicly traded debt has organized (Bondholder Group). Pursuant to the terms of the orders of the English Court, a representative of Ernst & Young LLP (in the U.K.) and a representative of Ernst & Young Chartered Accountants (in Ireland) were appointed as joint administrators with respect to the EMEA Debtor in Ireland, and representatives of Ernst & Young LLP were appointed as joint administrators for the other EMEA Debtors (collectively, U.K.

1

Table of Contents

Administrators). On January 6, 2010, the U.S. Court approved the appointment of John Ray as principal officer of each of the U.S. Debtors (U.S. Principal Officer), who is working with Nortel management, the Canadian Monitor, the U.K. Administrators and various retained advisors in connection with the Chapter 11 Proceedings.

We have been and continue to be focused on maximizing value for the benefit of all our creditors. During the creditor protection process, our activities have been and continue to be closely monitored by the courts, the Canadian Monitor, the U.K. Administrators, the U.S. Principal Officer, the U.S. Creditors' Committee, the Bondholder Group, the Canadian creditor committee and other creditor groups. We have worked with our advisors and stakeholders to conduct the sales of businesses and assets and other restructuring matters in a fair, efficient and responsible manner in order to maximize value for our creditors, and in almost all matters, resolution has been reached on a consensual basis.

We have completed divestitures of all of our businesses including: (i) the sale of substantially all of our Code Division Multiple Access (CDMA) business and Long Term Evolution (LTE) Access assets to Telefonaktiebolaget LM Ericsson (Ericsson); (ii) the sale of substantially all of the assets of our Enterprise Solutions (ES) business globally, including the shares of Nortel Government Solutions Incorporated (NGS) and DiamondWare, Ltd. (Diamondware), to Avaya Inc. (Avaya); (iii) the sale of the assets of our Wireless Networks (WN) business associated with the development of Next Generation Packet Core network components to Hitachi, Ltd. (Hitachi); (iv) the sale of certain portions of our Layer 4-7 data portfolio to Radware Ltd.; (v) the sale of substantially all of the assets of our Optical Networking and Carrier Ethernet businesses to Ciena Corporation (Ciena); (vi) the sale of substantially all of the assets of our Global System for Mobile communications (GSM)/GSM for Railways (GSM-R) business to Ericsson and Kapsch CarrierCom AG (Kapsch); (vii) the sale of substantially all of the assets of our Carrier VoIP and Application Solutions (CVAS) business to GENBAND Inc. (now known as GENBAND U.S. LLC (GENBAND)); (viii) the sale of NNL's 50% plus 1 share interest in LG-Nortel Co. Ltd. (LGN), our Korean joint venture with LG-Electronics, Inc. (LGE), to Ericsson; (ix) the sale of substantially all of the assets of our global Multi Service Switch (MSS) business to Ericsson; (x) the sale of substantially all of the Guangdong-Nortel Telecommunications Equipment Co. Ltd. (GDNT) assets to Ericsson Mobile Data Applications Technology Research and Development Guangzhou Company Limited and Ericsson (Guangdong Shunde) Communications Company Limited (collectively, Ericsson China); (xi) the sale of our remaining patents and patent applications to a consortium consisting of Apple Inc., EMC Corporation, Ericsson, Microsoft Corporation, Research in Motion Limited and Sony Corporation (collectively, the Consortium); and (xii) the sale of a small number of our Internet Protocol version 4 addresses.

Approximately $7,730 in net proceeds have been generated and received through the completed sales of our businesses and patents and patent applications. Substantially all proceeds received in connection with the completed sales of businesses and assets are being held in escrow and have been recorded by NNL until the final allocation of these proceeds as between various Nortel legal entities is ultimately determined. Through the completed sales, we have preserved 16,000 jobs for our employees with the purchasers of these businesses and assets.

While numerous milestones have been met, significant work remains under the Creditor Protection Proceedings. A Nortel business services group (NBS) was established in 2009 that provided global transitional services to purchasers of our businesses, in fulfillment of contractual obligations under transition services agreements (TSAs) entered into in connection with the sales of our businesses and assets. These services included maintenance of customer and network service levels during the integration process, and providing expertise and infrastructure in finance, supply chain management, information technology (IT), research and development (R&D), human resources and real estate necessary for the orderly and successful transition of businesses to purchasers over a period of generally up to 24 months from the closing of the sales. NBS also focused on maximizing the recovery of our remaining accounts receivable, inventory and real estate assets, independent of the TSAs. As of December 31, 2011, we had completed substantially all of our obligations under the TSAs with respect to the business sales. As well, we entered into a TSA in connection with the patent and patent applications sale to the Consortium, which is expected to be completed no later than March 31, 2012.

A core corporate group (Corporate Group) was also established in 2009 and continues to be focused on a number of key actions to maximize value for stakeholders, including the sale of remaining assets, wind down of global operations and entities, the creditor claims process, and working toward conclusion of the Creditor Protection Proceedings and any eventual distributions to creditors. The Corporate Group also continues to provide administrative and management support to our consolidated affiliates around the world while completing the orderly wind down of those remaining operations.

With the sale of all of our businesses, the interdependency between the debtor estates has diminished and is expected to continue to diminish, and thus the estates have worked toward finalizing separation of various corporate functions to allow each estate to be stand-alone. Extensive analysis and actions have been performed to segregate most of these functions such that the Canadian Debtors and the U.S. Debtors operate independently of one another. The debtor estates continue to work on implementing plans for the separation of IT functions and applications during the first half of 2012.

Table of Contents

See "Executive Overview — Creditor Protection Proceedings" in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section of this report, and the "Risk Factors" section of this report, for a full discussion of these and other significant events, and the risks and uncertainties we face as a result of the Creditor Protection Proceedings. See also note 2, "Creditor Protection Proceedings" to the accompanying audited consolidated financial statements.

Further information pertaining to our Creditor Protection Proceedings may be obtained through our website at www.nortel.com/restructuring. Certain information regarding the CCAA Proceedings, including the reports of the Canadian Monitor, is available at the Canadian Monitor's website at www.ey.com/ca/nortel. Documents filed with the U.S. Court and other general information about the Chapter 11 Proceedings are available at http://dm.epiq11.com/nortel. The content of the foregoing websites is not a part of this report.

### Consolidation and Reportable Segment

After consideration of the guidance available in FASB ASC 810 "Consolidation" (ASC 810) and ASC 852, the accompanying audited consolidated financial statements as of and for the years ended December 31, 2011 and 2010 have been presented on the following basis with respect to our subsidiaries:

- the EMEA Debtors and their subsidiaries (collectively, the EMEA Subsidiaries) were accounted for under the equity method from the Petition Date up to May 31, 2010 and as an investment under the cost method of accounting thereafter;

- the U.S. Debtors and their subsidiaries (collectively, the U.S. Subsidiaries) were accounted for as consolidated subsidiaries until September 30, 2010 and as an investment under the cost method of accounting thereafter; and

- our other subsidiaries are consolidated throughout the periods presented consistent with the basis of accounting applied in 2008 prior to the commencement of Creditor Protection Proceedings with the exception of deconsolidated subsidiaries due to loss of control once deemed to be in liquidation proceedings.

We continue to exercise control over our subsidiaries located in Canada, CALA and Asia (other than those entities that are EMEA Subsidiaries or U.S. Subsidiaries), and our financial statements are prepared on a consolidated basis with respect to those subsidiaries. We will continue to evaluate our remaining consolidated subsidiaries for the appropriateness of the accounting applied to these investments as the Creditor Protection Proceedings progress. See note 1 to the accompanying audited consolidated financial statements for further information.

We have completed the sales of all of our businesses. We continue to oversee and fulfill the residual contracts not transferred to the various buyers (stranded contracts). As a result, commencing with the first quarter of 2011, we have one reportable segment, as our chief operating decision maker reviews financial and operating results and makes decisions on that basis. Accordingly, we have amended previously reported financial information to conform to the change in reportable segments.

See "Executive Overview — Creditor Protection Proceedings — Significant Business and Other Divestitures" in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section of this report for further information on the business and asset sales.

### Sales and Distribution

Up until the sales of our businesses, our sales forces marketed and sold Nortel products and services to customers located in Canada, the U.S., CALA, EMEA and the Asia region. Our sales offices were aligned with customers on a country and regional basis. In addition, teams within the regional sales groups worked directly with top regional enterprises, and were also responsible for managing regional distribution channels. We also had decentralized marketing, product management and technical support teams for our business segments, dedicated to providing individual product line support to the respective global sales and support teams.

### Product Standards, Certifications and Regulations

Historically, our products were heavily regulated in most jurisdictions, primarily to address issues concerning inter-operability of products of multiple vendors. Such regulations included protocols, equipment standards, product registration and certification requirements of agencies such as Industry Canada, the U.S. Federal Communications Commission, requirements cited in the Official Journal of the European Communities under the New Approach Directives, and regulations of many other countries. In most jurisdictions, regulatory approval was required before our products can be used. For additional information, see "Environmental Matters" in the "Legal Proceedings" section, and the "Risk Factors" section, of this report.

### Sources and Availability of Materials

With regard to our stranded contracts and to the extent required by any remaining obligations under the TSAs, we continue to manage supply chain, including customer interfaces, customer service, order management, quality assurance, and network solutions integration, testing and fulfillment. We are generally able to obtain sufficient materials and components to meet the needs under our stranded contracts.

Table of Contents

### Research and Development

In the past, through internal R&D initiatives and external R&D partnerships, we invested in the development of technologies that we believed addressed customer needs to reduce operating and capital expenses, transition seamlessly to next-generation converged networks and deploy new services. This effort continued for each divested business until its sale, as we continued to develop technology critical to such business. As a result of the divestitures of all our businesses, we no longer invest in R&D and we expect our R&D expense to be nil for the remainder of the Creditor Protection Proceedings.

In some cases, we complemented our in-house R&D through strategic alliances, partners, and joint ventures with best-in-class companies and also continued to work with and contribute to leading research organizations, research networks and international consortia.

The following table shows our consolidated expenses for R&D in each of the past two fiscal years ended December 31:

|  | 2011 | 2010 |
|---|---|---|
| R&D expense [a] | $ - | $107 |
| R&D costs incurred on behalf of others [b] | - | 6 |
| Total | $ - | $113 |

(a) Excludes R&D expense of $8 related to EMEA Subsidiaries in 2010, and R&D expense for discontinued operations of $30 for 2010. In 2010, reflects R&D expense related to the U.S. Subsidiaries for the nine months ended September 30, 2010 only.
(b) These costs include R&D charged to customers pursuant to contracts that provided for full recovery of the estimated cost of development, material, engineering, installation and other applicable costs, which were accounted for as contract costs.

### Intellectual Property

IP was fundamental to our business. Historically, we used IP rights to protect investments in R&D activities, strengthen leadership positions, protect our name, promote our brand name recognition, enhance competitiveness and otherwise support business goals. We generated, maintained, used and enforced a substantial portfolio of IP rights, including trademarks, and an extensive portfolio of patents covering significant innovations arising from our R&D activities. Profits and losses from our R&D efforts were allocated throughout Nortel pursuant to an intercompany arrangement where IP was generally owned by NNL and licensed to participating Nortel affiliates (ie NNI and certain EMEA Debtors) through xclusive and non-exclusive licenses. We had a small number of mutual patent cross-license agreements with several major companies that enable ach party to operate with reduced risk of patent infringement claims. In addition, we had a small number of agreements granting licenses to certain of our patents and/or technology to third parties, and we license certain IP rights from third parties. We sold products primarily under the "Nortel" and "Nortel Networks" trademarks and trade names. We have registered the "Nortel" and "Nortel Networks" trademarks, and many of our other trademarks, in countries around the world. Through the various divestitures, we have granted field of use licenses to each of the divested entities. Further, we have assigned certain technologies, trademarks, and/or patents to each divested entity. On July 29, 2011, we concluded the sale of our remaining patents and patent applications to a consortium consisting of Apple Inc., EMC Corporation, Ericsson, Microsoft Corporation, Research in Motion Limited and Sony Corporation, for a cash purchase price of $4,500. This sale included more than 6,000 patents and patent applications spanning wireless, wireless 4G, data networking, optical, voice, internet, service provider, semiconductors and other patent portfolios. The extensive patent portfolio touched nearly every aspect of telecommunications and additional markets as well, including internet search and social networking.

### Employee Relations

On the Petition Date, we employed approximately 30,300 employees globally. Approximately 16,000 jobs for Nortel employees and employees of some of our joint ventures were preserved through the sales of our businesses. Also, ongoing workforce and other cost reduction actions as we work through the Creditor Protection Proceedings have resulted in significant workforce reductions.

At December 31, 2011, we employed approximately 190 regular full-time employees, which includes employees in Canada and those employed by our consolidated subsidiaries, excluding employees employed by a U.S. subsidiary or an EMEA subsidiary. We also employ individuals on a regular part-time basis and on a temporary full or part-time time basis, and we engage the services of contractors as required.

### Environmental Matters

For information on environmental matters, see "Environmental Matters" in the "Legal Proceedings" section of this report.

4

Table of Contents

**ITEM 1A.    Risk Factors**

Capitalized terms used in this Item 1A of Part I and not otherwise defined, have the meaning set forth for such terms in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section of this report.

*Certain statements in this report contain words such as "could", "expect", "may", "anticipate", "will", "believe", "intend", "estimate", "plan", "envision", "seek" and other similar language and are considered forward-looking statements. These statements are based on our current expectations, estimates, forecasts and projections about the operating environment, economies and markets in which we operate. In addition, other written or oral statements that are considered forward-looking may be made by us or others on our behalf. These statements are subject to important risks, uncertainties and assumptions, that are difficult to predict and actual outcomes may be materially different. The Creditor Protection Proceedings have had and will continue to have a direct impact on our remaining restructuring work and exacerbate these risks and uncertainties. In particular, the risks described below could cause actual events to differ materially from those contemplated in forward-looking statements. Unless otherwise required by applicable securities laws, we do not have any intention or obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.*

*You should carefully consider the risks described below before investing in our securities. The risks described below are not the only ones facing us. Additional risks not currently known to us or that we currently believe are immaterial may also impair our business, results of operations, financial condition and liquidity.*

*We have organized our risks into the following categories:*

- *Risks Relating to Our Creditor Protection Proceedings*
- *Risks Relating to Our Remaining Restructuring Work*

**Risks Relating to Our Creditor Protection Proceedings**

*We, and many of our direct and indirect subsidiaries, are currently subject to Creditor Protection Proceedings and additional subsidiaries could become subject to similar proceedings. Our remaining restructruing work and financial position are subject to the risks and uncertainties associated with such proceedings.*

For the duration of the Creditor Protection Proceedings, our remaining restructuring work and financial position are subject to the risks and uncertainties associated with such proceedings. These risks, without limitation and in addition to the risks otherwise noted in this report, are comprised of:

*Strategic risks, including risks associated with our ability to:*

- maximize the value of our remaining assets through sales of these assets
- consummate pending and future divestitures
- satisfy obligations in connection with the transition services agreements related to divestitures of our assets and businesses
- develop plans for the conclusion of the Creditor Protection Proceedings in an effective and timely manner
- resolve ongoing issues with creditors and other third parties whose interests may differ from ours
- resolve allocation of sales proceeds and other inter-estate matters amongst the Debtor estates and other Nortel entities that were vendors in the various business sales
- resolve all claims, in particular potentially significant inter-estate claims
- obtain creditor, court and any other requisite third party approvals for plans for the conclusion of the Creditor Protection Proceedings
- successfully implement plans for the conclusion of the Creditor Protection Proceedings

*Financial risks, including risks associated with our ability to:*

- maintain adequate cash on hand
- continue to maintain our current cash management arrangements
- satisfy claims, including our ability to sell assets to satisfy claims against us
- realize full or fair value for any remaining assets we may divest as part of any plans for the conclusion of the Creditor Protection Proceedings
- successfully monetize remaining assets

5

Table of Contents

*Operational risks, including risks associated with our ability to:*

- operate effectively in consultation with the Canadian Monitor, and work effectively with the U.K. Administrators in their administration of the EMEA Debtors and the U.S. Principal Officer in his oversight of the U.S. Debtors
- actively and adequately communicate on and respond to events, media and rumors associated with the Creditor Protection Proceedings that could adversely affect our relationships with stakeholders, including employees
- retain and incentivize key employees or otherwise replace key employees
- in connection with stranded contracts, retain our suppliers on acceptable terms and avoid disruptions in our supply chain in order to ultimately sell or transfer these contracts to a third party

*Procedural risks, including risks associated with our ability to:*

- obtain court orders or approvals with respect to motions we file from time to time, including motions seeking extensions of the applicable stays of actions and proceedings against us, or obtain timely approval of transactions outside the ordinary course of business, or other events that may require a timely reaction by us or present opportunities for us
- resolve the claims made against us in such proceedings for amounts not exceeding our recorded liabilities subject to compromise
- prevent third parties from obtaining court orders or approvals that are contrary to our interests, such as conversion of the U.S. Debtors Chapter 11 reorganization proceedings to Chapter 7 liquidation cases, or the opening of secondary insolvency proceedings in respect of an EMEA Debtor in that debtor's own country of incorporation
- reject, repudiate or terminate contracts
- obtain court approval in various jurisdictions of any agreement among the various estates for an allocation of proceeds from the sales of our assets and businesses

6

Table of Contents

Because of these risks and uncertainties, and as we have not yet developed any plans for the conclusion of the Creditor Protection Proceedings, we cannot predict the ultimate outcome of the process, or predict or quantify the potential impact on our remaining restructuring work or financial condition. The Creditor Protection Proceedings provide us with a period of time to maximize value through sales, and develop plans for the conclusion of the Creditor Protection Proceedings. However, it is not possible to predict the outcome of these proceedings and, as such, the realization of assets and discharge of liabilities are each subject to significant uncertainty. Accordingly, substantial doubt exists as to whether we will be able to continue as a going concern. Our continuation as a going concern is dependent upon, among other things, our ability to develop, obtain confirmation or approval of, and implement any plans for the conclusion of the Creditor Protection Proceedings; maintain adequate cash on hand and resolve ongoing issues with creditors and other third parties. There can be no assurance of a successful conclusion of the Creditor Protection Proceedings. A long period under Creditor Protection Proceedings may exacerbate the potential harm to our remaining restructuring work.

*Continuing or increasing pressure on our cash and liquidity could materially and adversely affect our ability to fund our remaining restructuring work, and develop and implement any plans for the conclusion of the Creditor Protection Proceedings. Additional sources of funds may not be available.*

Historically, we deployed our cash throughout the corporate group, through a variety of intercompany borrowing and transfer pricing arrangements. As a result of the Creditor Protection Proceedings, cash in the various jurisdictions is generally available to fund operations in the particular jurisdictions, but generally is not freely transferable between jurisdictions or regions, other than as highlighted in "Liquidity and Capital Resources" in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section of this report. Thus, there is greater pressure and reliance on cash balances and generation capacity in specific regions and jurisdictions and there can be no guarantee that sufficient cash will be available to fund operations in all jurisdictions.

We cannot provide any assurance that our net cash requirements will be as we currently expect and will be sufficient for the successful development, approval and implementation of any plans for the conclusion of the Creditor Protection Proceedings.

There can be no assurance that any further required court approvals for any future transactions will be obtained. Furthermore, there can be no assurance that we will be able to continue to maintain ongoing deployment of cash resources throughout the Company in connection with ordinary course intercompany trade obligations. If our subsidiaries are unable to pay dividends or provide us with loans or other forms of financing in sufficient amounts, or if there are any restrictions on the transfer of cash between us and our subsidiaries, including those imposed by courts, foreign governments and commercial limitations on transfers of cash pursuant to our joint venture commitments, the cash positions of the Canadian Debtors would likely be under pressure and our liquidity and our ability to meet our obligations would be adversely affected.

*We may not be able to successfully develop, obtain all requisite approvals for, or implement any plans for the conclusion of the Creditor Protection Proceedings. Failure to obtain the requisite approvals for, or failure to successfully develop and implement our plans for the conclusion of the Creditor Protection Proceedings within the time granted by the courts would, in all likelihood, lead to the liquidation of all of our assets.*

Pursuant to the ongoing Creditor Protection Proceedings we are working on developing plans for the conclusion of the Creditor Protection Proceedings in the various jurisdictions in which we have initiated proceedings.

For each plan in the relevant jurisdictions, we must obtain the approvals of the respective courts and creditors, and the Canadian Monitor (in Canada) and U.K. Administrators (in the U.K.) and the U.S. Principal Officer. We may not receive the requisite approvals and even if we do, a dissenting holder of a claim against us may challenge and ultimately delay the final approval and implementation of plans for the conclusion of the Creditor Protection Proceedings. If we are not successful in developing plans for the conclusion of the Creditor Protection Proceedings, or if we are successful in developing them but do not receive the requisite approvals, it is not clear what distributions, if any, holders of claims against us would receive. Should the stay or moratorium period and any subsequent extension thereof not be sufficient to develop and implement any of the plans for the conclusion of the Creditor Protection Proceedings, or should such plans not be approved by creditors and the courts and, in any such case, the Debtors lose the protection of such stay or moratorium, substantially all of our debt obligations will become due and payable immediately, or subject to acceleration, in which case it is likely that holders of claims would receive substantially less favorable treatment than they would receive if we were able to develop and implement plans for the conclusion of the Creditor Protection Proceedings.

*Allocation of the sale proceeds of our businesses among the various Nortel entities participating in these sales may take considerable time to resolve.*

At various times during the second half of 2009 and the first quarter of 2010, the Canadian Debtors, the U.S. Debtors and the U.K. Administrators, with the involvement of the Canadian Monitor, the U.S. Principal Officer, the U.S. Creditors' Committee and the

Table of Contents

Bondholder Group engaged in negotiations regarding the scope and terms of a proposed protocol for resolving disputes concerning the allocation of sale proceeds (Allocation Protocol), as required by the terms of the IFSA. However, it became apparent that the parties had differing views concerning the allocation of the sale proceeds, inter-company claims and the scope of the Allocation Protocol. In order to address this impasse, the Canadian Debtors, the U.S. Debtors and the U.K. Administrators agreed to temporarily suspend negotiations on the Allocation Protocol and instead focussed on a process to facilitate a comprehensive settlement to resolve all material outstanding inter-estate matters, including the allocation of the sale proceeds and the settlement of inter-company claims. To this end, the parties met on several occasions to outline, on a confidential and without prejudice basis, their respective allocation methodologies and potential inter-company claims that may be asserted.

As a result of these meetings and the complexity of the issues that were raised, the Canadian Debtors, the U.S. Debtors, the EMEA Debtors, the U.K. Administrators, the Canadian Monitor the U.S. Principal Officer, the U.S. Creditors' Committee, the Bondholder Group and certain other interested parties (the Mediation Parties) agreed that these inter-estate negotiations would be aided by the appointment of a neutral mediator to review and mediate the issues. The parties selected Layn R. Phillips, a former U.S. federal district court judge and experienced commercial mediator, to serve as mediator and review the positions and viewpoints of the various parties on allocation and unresolved inter-estate matters. A confidential, non-binding mediation was held in November 2010. The mediation session did not result in the resolution of the issues presented.

As a result of the November 2010 mediation session, and positions taken in the CCAA Proceedings, it became apparent that the U.K. Administrators and certain other parties, who were also substantial creditors of the EMEA Debtors, were alleging a number of significant potential claims against the Canadian Debtors as well as the U.S. Debtors. These potential claims are integral to the allocation positions of these parties and include allegations of proprietary and trust-type claims. Consequently, the Canadian Monitor and the Canadian Debtors determined that, absent reaching a comprehensive settlement of allocation and inter-company claims issues, these specific claims needed to be resolved first. Accordingly, the Canadian Debtors obtained an order of the Canadian Court establishing a process for the calling of claims by EMEA Creditors. See "Creditor Protection Proceedings Claims" below. Notwithstanding the commencement of this process, the Mediation Parties continued to engage in discussions regarding the resumption of mediation and another confidential, non-binding mediation was held in April 2011. On April 13, 2011, we announced that the mediation process that had been commenced in respect of the allocation of sale proceeds of our various business and asset divestitures and other inter-estate matters, including inter-company claims, had ended without resolution of the matters in dispute. In light of the unsuccessful conclusion of the mediation process, we announced that delays in the ultimate resolution of allocation and inter-company claims matters potentially could be significant, and that such delays would result in a corresponding significant delay in the timing of distributions to holders of validated claims of the various estates.

On April 25, 2011, the U.S. Debtors and the U.S. Creditors' Committee filed a joint motion for an order establishing an allocation protocol for the sale proceeds as between various Nortel legal entities (Original Protocol Motion), and for related relief. Subsequently, as a result of further discussions, the U.S. Debtors and the U.S. Creditors' Committee together with the Canadian Debtors jointly filed an amended and restated version of the Original Protocol Motion and agreed to collectively seek an order establishing an allocation protocol before the Canadian Court and the U.S. Court. The proposed order would have had the U.S. Court and the Canadian Court establish procedures and an expedited schedule for the cross-border resolution by the U.S. Court and the Canadian Court on the allocation of proceeds from the sales of our businesses and from the sale of our patent portfolio. The motion was heard at a joint hearing of the U.S. Court and Canadian Court on June 7, 2011. On June 20, 2011, we announced that the Canadian Court and the U.S. Court had reserved their decisions on the motions heard by such courts on June 7, 2011, and directed us, NNL and the other Canadian Debtors, NNI and the other U.S. Debtors, the EMEA Debtors, as well as certain other parties, to participate in a joint mediation of the issues raised in the motions. The directions provided that the Canadian Court and the U.S. Court together would appoint a sole mediator by supplemental order and that the mediator would determine the time, date, place and protocol of the mediation.

On June 17, 2011, and as supplemented on June 29, 2011, the Canadian Court and the U.S. Court appointed The Honourable Warren K. Winkler, Chief Justice of Ontario, as the sole mediator (the Mediator) for the mediation. The mediation was ordered because of both courts' concern that the time required to prepare their decisions would also delay allocation proceedings and, therefore, distributions to creditors of the various Nortel estates.

The Mediator has the authority, in consultation with the parties to the mediation, to determine the scope of the mediation, as he deems appropriate, including the issue of allocation of the sale proceeds of Nortel's various businesses and patent portfolio, and global issues relating to allocation and claims. Participation in this mediation is mandatory. The mediation process will be terminated (i) by a declaration by the Mediator that a settlement has been reached (any such settlement would be subject to the approval of the Canadian Court and the U.S. Court, on notice to parties in interest), (ii) by a declaration by the Mediator that further efforts at mediation are no longer considered worthwhile, or (iii) for any other reason as determined by the Mediator. The mediation has not yet commenced.

Given that a number of the Nortel Sellers are subject to discrete insolvency or bankruptcy proceedings in different jurisdictions while the remainder of the Nortel Sellers are not subject to any court supervision or proceedings, there does not exist any

Table of Contents

single court, tribunal or other legal authority that has competent jurisdiction over all the Nortel Sellers or that can impose a binding allocation on them. Consequently, a timely and effective process for resolving allocation disputes necessitates a consensual resolution among all of the relevant parties.

Delays in the ultimate resolution of allocation and inter-company claims matters potentially could be significant, particularly if the EMEA Claims are not settled and must be determined and resolved in accordance with the process established by the EMEA Claims Procedure Order. Such delays would result in a corresponding delay in the timing of distributions to holders of validated claims against the various estates.

*During the pendency of the Creditor Protection Proceedings, our financial results may be volatile and may not reflect historical trends. Also, as a result of the Creditor Protection Proceedings, our internal controls are currently subject to review and modification.*

During the pendency of the Creditor Protection Proceedings, we expect our financial results to continue to be volatile as asset impairments, asset dispositions, restructuring activities, contract terminations and rejections, and claims assessments may significantly impact our consolidated financial statements. As a result, our historical financial performance is not indicative of our financial performance following the Petition Date. As a result of the Creditor Protection Proceedings, we have adopted Financial Accounting Standards Board Accounting Standards Codification 852 "Reorganizations" (ASC 852), effective January 14, 2009, which requires certain changes and additional reporting in our financial statements beginning in the quarter ended March 31, 2009. Also, as a result of the Creditor Protection Proceedings, our internal controls are currently subject to review and modification, and we may implement additional controls to accommodate the adoption of ASC 852 as well as any of the additional reporting requirements relating to our Creditor Protection Proceedings. The implementation of the foregoing may adversely affect the ability to timely file our reports.

*Canadian, U.S. and U.K. laws impair the ability of claimants to take action against us under our existing contracts, including the outstanding notes and related guarantees of us, NNL, NNI and NNCC. Subject to limited exceptions, all actions are stayed and ultimate recoveries cannot be determined at this time.*

Generally, in connection with the Creditor Protection Proceedings, all actions to enforce or otherwise effect payment or repayment of liabilities of any Debtor preceding the Petition Date, as well as pending litigation against any Debtor, are stayed. The U.S. Bankruptcy Code provides for all actions and proceedings against the U.S. Debtors to be stayed while the Chapter 11 Proceedings are pending. In Canada, the initial order from the Canadian Court also provides for a general stay of actions against the Canadian Debtors, officers and directors. This stay period currently extends to April 13, 2012 and is subject to further extension. With limited exceptions, the stays in effect pursuant to the Chapter 11 Proceedings and CCAA Proceedings generally preclude parties from taking any actions against the Debtors. Similarly, under the U.K. Administration Proceedings, subject to limited exceptions as may be approved by the U.K. Administrators or the English Court, no legal process (including legal proceedings, execution distress and diligence) may be instituted or continued against the EMEA Debtors. Certain parties, including The Pensions Regulator in the U.K. have attempted to commence or continue proceedings against certain Debtors despite these limitations during the Creditor Protection Proceedings. While these limitations have continued to be recognized and enforced by the relevant courts, there can be no guarantee that these limitations will be successfully enforced in all circumstances.

The rights of the indenture trustees (who represent the holders of debt securities issued or guaranteed by us, NNL, NNI and NNCC) to enforce remedies for defaults under our debt securities and guarantees are subject to the stays, and could be delayed or limited by the restructuring provisions of applicable Canadian, U.S. and U.K. creditor protection legislation. Moreover, we, NNL, NNI and NNCC have not made, and will likely continue not to make, any payments under our various debt securities during the Creditor Protection Proceedings, and holders of our debt securities may not be compensated for any delays in payment of principal, interest and costs, if any, including the fees and disbursements of the trustees.

Plans for the conclusion of the Creditor Protection Proceedings, if successfully developed and accepted by the requisite majorities of each affected class of creditors and approved by the relevant courts, would be binding on all creditors within each affected class, including those that did not vote to accept the proposal. The ultimate recovery to creditors and security holders, if any, will not be determined until plans for the conclusion of the Creditor Protection Proceedings are developed and approved. At this time we do not know what values, if any, will be prescribed pursuant to any such plan to the securities held by each of these constituencies, or what form or amounts of distributions, if any, they may receive on account of their interests.

*If we are unable to retain qualified personnel at reasonable costs, we may not be able to achieve our objectives, and our ability to successfully conclude the Creditor Protection Proceedings may be harmed.*

We are dependent on the experience and industry knowledge of our senior management and other key employees to execute our remaining restructuring work and lead the Company during the Creditor Protection Proceedings and throughout the development and implementation of any plans for the conclusion of the Creditor Protection Proceedings. Competition for certain key positions remains strong. Our deteriorating financial performance,

Table of Contents

along with the Creditor Protection Proceedings, and workforce reduction activities have created uncertainty that has led to an increase in unwanted attrition, and challenges in retaining qualified personnel. We are at risk of losing or being unable to hire talent critical to the remaining restructuring activities and to develop and implement any plans for the conclusion of the Creditor Protection Proceedings.

*Our ability to independently manage our remaining restructuring work is restricted during the Creditor Protection Proceedings, and steps or actions in connection therewith may require the approval of the respective courts, the creditors, the Canadian Monitor, the U.K. Administrators and the U.S. Principal Officer.*

Pursuant to the various court orders and statutory regimes to which we are subject during the Creditor Protection Proceedings, some or all of the decisions with respect to our remaining restructuring work may require consultation with, review by or ultimate approval of one or all of the respective courts in the several jurisdictions, the U.S. Creditors' Committee, the Canadian creditors' committee, the Bondholder Group, the Canadian Monitor, the U.K. Administrators and the U.S. Principal Officer. There can be no assurance that the U.S. Creditors' Committee, the Bondholder Group, other creditors, the Canadian Monitor, the U.K. Administrators or the U.S. Principal Officer will support the Debtors' positions on matters presented to the courts in the future, or on any plans for the conclusion of the Creditor Protection Proceedings, once developed and proposed. Disagreements between us and these various third parties could protract the Creditor Protection Proceedings, negatively impact the Debtors' ability to conduct remaining restructuring work and delay the Debtors' conclusion of the Creditor Protection Proceedings.

*Transfers or issuances of our equity, or a debt restructuring, may impair or reduce our ability to utilize our net operating loss carryforwards and certain other tax attributes in the future.*

Pursuant to U.S. tax rules, a corporation is generally permitted to deduct from taxable income in any year net operating losses (NOLs) carried forward from prior years. Our ability to utilize these NOL carryforwards could be subject to a significant limitation if we were to undergo an "ownership change" for purposes of Section 382 of the Internal Revenue Code of 1986, as amended, during or as a result of our Chapter 11 Proceedings. The U.S. Court has entered an order that places certain restrictions on trading in NNC common shares and NNL preferred shares during the Creditor Protection Proceedings. However, we can provide no assurances that these limitations will prevent an "ownership change" or that our ability to utilize our NOL carryforwards may not be significantly limited as a result of our reorganization.

A restructuring of our debt pursuant to the Creditor Protection Proceedings may give rise to cancellation of indebtedness or debt forgiveness (COD), which if it occurs would generally be non-taxable. If the COD is non-taxable, we will be required to reduce our NOL carryforwards and other attributes such as capital loss carryforwards and tax basis in assets, by an amount equal to the non-recognized COD. Therefore, it is possible that, as a result of the successful completion of plans for the conclusion of the Creditor Protection Proceedings, we will have a reduction of NOL carryforwards and/or other tax attributes in an amount that cannot be determined at this time and that could have a material adverse effect on our financial position.

*Trading in our securities during the pendency of the Creditor Protection Proceedings is highly speculative, poses substantial risks, and is subject to certain restrictions imposed to protect our NOL carryforwards that are described directly above. NNC common shares have been delisted from the NYSE and the TSX, which has made our common shares significantly less liquid; and the TSX has also delisted the NNL preferred shares.*

We do not expect that any value will be prescribed to the NNC common shares and NNL preferred shares. Trading prices are very volatile and may bear little or no relationship to the actual recovery, if any, by the holders under any eventual court-approved plans for the conclusion of the Creditor Protection Proceedings. In such a plan, our existing securities may be cancelled and holders may receive no payment or other consideration in return, or they may receive a payment or other consideration that is less than the trading price or the purchase price of such securities.

In addition, the U.S. Court has entered an order that places certain limitations on trading in certain of our securities to protect NOL carryforwards. For this reason, investors need the U.S. Debtors' consent or court approval before effecting any transactions in NNC common shares or NNL preferred shares if they hold, or would as a result of the transaction acquire, at least 4.75% of the outstanding NNC common shares or any series of NNL preferred shares.

Effective February 2, 2009, NNC common shares were delisted by the NYSE. On June 26, 2009, NNC common shares and NNL preferred shares were delisted from the TSX. NNC common shares currently continue to trade on the TSX and the "over-the-counter" (OTC) market in the U.S., and their price is quoted on the Pink Sheets Electronic Quotation Service (Pink Sheets) maintained by Pink Sheets LLC. We do not expect that holders of NNC common shares and NNL preferred shares will receive any value from the Creditor Protection Proceedings and we expect that the proceedings will ultimately result in the cancellation of these equity interests.

OTC transactions involve risks in addition to those associated with transactions on a stock exchange. Many OTC stocks trade less frequently and in smaller volumes than stocks listed on an exchange. Accordingly, OTC-traded shares are less liquid and are likely to be more volatile than exchange-traded stocks. The price of NNC common shares is currently electronically displayed on the

10

Table of Contents

Pink Sheets in the U.S., which is a quotation medium that publishes market maker quotes for OTC securities. It is not a stock exchange or listing service and is not owned, operated or regulated by any exchange. Investors are advised that Nortel has not taken any steps to have our securities quoted on the Pink Sheets; there is no relationship, contractual or otherwise, between an issuer whose securities are quoted on the Pink Sheets, and Pink Sheets LLC; and Pink Sheets LLC exercises no regulatory oversight over Nortel. Our status on the Pink Sheets is dependent on market makers' willingness to continue to provide the service of accepting trades of NNC common shares.

*Some or all of the U.S. Debtors could be substantively consolidated.*

There is a risk that an interested party in the Chapter 11 Proceedings, including any of the U.S. Debtors, could request that the assets and liabilities of NNI, or those of other U.S. Debtors, be substantively consolidated with those of one or more other U.S. Debtors. While it has not been requested to date, we cannot assure you that substantive consolidation will not be requested in the future, or that the U.S. Court would not order it. If litigation over substantive consolidation occurs, or if substantive consolidation is ordered, the ability of a U.S. Debtor that has been substantively consolidated with another U.S. Debtor to make payments required with respect to its debt could be adversely affected. For example, the rights of unsecured debt holders of NNI may be diminished or diluted if NNI were consolidated with one or more entities that have a higher amount of unsecured priority claims or other unsecured claims relative to the value of their assets available to pay such claims.

### Risks Relating to Our Remaining Restructuring Work

*We are fully exposed to market risk primarily from fluctuations in foreign currency exchange rates and interest rates. Adverse fluctuations in these markets could negatively impact our remaining restructuring work and financial condition.*

To manage the risk from fluctuations in foreign currency exchange rates and interest rates, we had entered into various derivative hedging transactions in accordance with our policies and procedures. However, as a result of our Creditor Protection Proceedings, the financial institutions that were our counterparties in these transactions have terminated the related instruments. Consequently, we are now fully exposed to these risks and expect to remain so exposed at least until the conclusion of the Creditor Protection Proceedings. Fluctuations in these or other rates could have an adverse effect on our remaining restructuring work and financial condition. Similarly, our debt is subject to changes in fair value resulting from changes in market interest rates.

*If we fail to protect our intellectual property rights, or if we are subject to adverse judgments or settlements arising out of disputes regarding intellectual property rights, our business, results of operations and financial condition could be materially and adversely affected.*

Claims of intellectual property infringement or trade secret misappropriation may be asserted against us, or against our former customers in connection with their use of our products or our intellectual property rights may be challenged, invalidated or circumvented, or fail to provide significant competitive advantages. An unfavorable outcome in such a claim could require us to pay substantial monetary damages to a third party and indemnify former customers.

Defense or assertion of claims of intellectual property infringement or trade secret misappropriation may require extensive participation by senior management and other key employees and may reduce their time and ability to focus on other aspects of our restructuring work. Successful claims of intellectual property infringement or other intellectual property claims against us, or a failure by us to protect our proprietary technology, could have a material adverse effect on our remaining restructuring work and financial condition.

*If we are unable to maintain the integrity of our information systems, our operations and remaining work under the Creditor Protection Proceedings may be harmed.*

We rely on the security of our information systems, among other things, to protect our proprietary information and information of our customers. If we do not maintain adequate security procedures over our information systems, we may have been or may be susceptible to computer viruses, break-ins and similar disruptions from unauthorized tampering with our computer systems to access our proprietary information or that of our customers. Even if we have been or are able to maintain procedures that are adequate to address current security risks, hackers or other unauthorized users may develop new techniques that enable them to successfully circumvent our security procedures. The failure to protect our proprietary information could seriously harm our remaining work under the Creditor Protection Proceedings or expose us to remediation costs or claims by our customers, employees or others that we did not adequately protect their proprietary information.

In connection with our ongoing cost reduction activities and our remaining restructuring work, we continue to review all of our information systems and have commenced significant reductions in the number and complexity of our systems. In addition to significant cost reductions, the goal is for each Debtor estate to have in place stand-alone systems as required by each estate on an ongoing basis now that we have sold all of our businesses. This is a very complex task given the number of globally integrated

11

Table of Contents

systems currently in place. Thus there is risk in the plan in particular with respect to the significant reduction in the number of inter-dependent systems and in establishing and effectively implementing separate stand-alone systems which in turn could negatively impact on our ability to continue to operate and our ability to continue to report our financial results in U.S. GAAP on a timely basis, or at all.

*Our risk management strategy may not be effective or commensurate to the risks we are facing.*

We maintain policies of insurance of the types and in the amounts that are appropriate for our circumstances. We have retained certain self-insurance risks with respect to certain employee benefit programs such as worker's compensation, group health insurance, life insurance and other types of insurance. Our risk management programs and claims handling and litigation processes utilize internal professionals and external technical expertise. If this risk management strategy is not effective or is not commensurate to the risks we are facing, these risks could have a material adverse effect on our remaining restructuring work, financial condition and liquidity.

## ITEM 2.    Properties

Capitalized terms used in this Item 2 of Part I and not otherwise defined, have the meaning set forth for such terms in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section of this report.

In 2011, we continued to reduce the number and size of our facilities principally as part of the cost reduction efforts under the Creditor Protection Proceedings, fully disposing of 297 thousand square feet of operating space in the Canada, CALA and Asia regions, eliminating direct liability with respect to those properties apart from any landlord claims under the Creditor Protection Proceedings. We no longer sublease any space to the buyers in connection with their respective purchases of certain of our businesses. During 2010, we sold our Ottawa Carling Campus for CAD$208.

We continue to assess our facilities, considering rejecting, repudiating or terminating certain leases that are no longer required by the purchasers of any of our businesses or residual Nortel organizations. We believe that the facilities we will retain will be suitable, adequate and sufficient to meet our current needs and to complete the remaining work under the Creditor Protection Proceedings. In 2011, most sites were used to support the businesses that have been sold, either through direct occupation by the purchasers or by us providing transition services to them under the TSAs. As of February 29, 2012, we operated 18 sites in the Canada, CALA and Asia regions comprising approximately 76 thousand square feet, a decrease of 297 thousand square feet from December 31, 2010. For a description of certain charges and encumbrances against the properties, see "CCAA Proceedings" in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section of this report. All of our remaining sites are leased offices utilized for our remaining work under the Creditor Protection Proceedings including the winding up of our entities in the Asia and CALA regions.

12

Table of Contents

ITEM 3.    **Legal Proceedings**

Capitalized terms used in this Item 3 of Part I and not otherwise defined, have the meaning set forth for such terms in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section of this report.

Creditor Protection Proceedings: As discussed in note 2 to the accompanying audited consolidated financial statements, on January 14, 2009, the Canadian Debtors obtained an order from the Canadian Court for creditor protection and commenced ancillary proceedings under Chapter 15 of the U.S. Bankruptcy Code, the U.S. Debtors filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code, and each of the EMEA Debtors obtained an administration order from the English Court. After the Petition Date, the Israeli Debtors initiated similar proceedings in Israel. One of Nortel's French subsidiaries, Nortel Networks SA, was placed into secondary proceedings in France and NNCI filed a voluntary petition for relief under Chapter 11 in the U.S. Court and became a party to the Chapter 11 Proceedings. Generally, as a result, all actions to enforce or otherwise effect payment or repayment of liabilities of any Debtor arising prior to the Petition Date, and substantially all pending claims and litigation against any Debtor, are stayed as of the Petition Date. Absent further order of the applicable courts and subject to certain exceptions and, in Canada, potential time limits, no party may take any action to recover on pre-petition claims against any Debtor.

13

Table of Contents

The Pensions Regulator Financial Support Directions: According to various claims filed by the trustee of the U.K. defined benefit pension plan and the PPF against certain Debtors, the U.K. defined benefit pension plan had a purported deficit estimated (on a buy-out basis) of £2,100 or $3,300 as at January 2009. In January 2010, the Pensions Regulator, purporting to act under the *Pensions Act 2004* (U.K.) ("U.K. Statute") issued a "warning notice" ("Warning Notice") to certain Nortel entities, including, among others, the Canadian Debtors and the U.S. Debtors. The Pensions Regulator is a statutory agency charged with responsibility for regulating the operations and administration of occupational pension schemes in the U.K., such as the U.K. defined benefit pension plan. The Warning Notice is the first step in a process set forth under the U.K. Statute to enable the Pensions Regulator to issue a financial support direction ("FSD") under the U.K. Statute directing affiliates of NNUK to provide financial support to eliminate the purported deficit. If a company to which a FSD is issued fails to comply with it, the Pensions Regulator may issue a contribution notice ("Contribution Notice") to any one or more persons to whom the FSD was addressed stating that the person is liable to pay to the trustees of the pension scheme the sum specified in the Contribution Notice, where the Pensions Regulator considers it reasonable to impose the liability on the person to pay the specified sum. The sum specified may be the whole or a portion of the actual or estimated deficit of the pension scheme. In the Warning Notice, the Pensions Regulator identified certain Nortel entities, including, among others, NNC, NNL, NNI and NNCI, as targets of a procedure before the determinations panel of the Pensions Regulator ("Determinations Panel") to determine whether to issue a FSD ("U.K. Pension Proceeding"). On February 26, 2010, the Canadian Debtors obtained an order of the Canadian Court, which included, among other things, (i) a declaration that the purported commencement of proceedings and exercise of rights by the Pensions Regulator breaches the Initial Order; and (ii) a declaration that any result obtained in the U.K. in breach of the stay under the CCAA Proceedings would not be recognized in the Canadian claims process. Also on February 26, 2010, the U.S. Debtors obtained an order of the U.S. Court enforcing the automatic stay under the U.S. Bankruptcy Code against the trustee of the U.K. defined benefit pension plan ("U.K. Pension Trustee") and the PPF, which is fully applicable to the U.K. Pension Trustee's and PPF's participation against the U.S. Debtors in the U.K. Pension Proceeding. In addition, the order of the U.S. Court provided that with respect to the U.S. Debtors, such proceedings are deemed void and without force or effect. The Pensions Regulator appealed the decision of the Canadian Court which appeal was heard and dismissed on June 16, 2010, by the Ontario Court of Appeal. The Pensions Regulator submitted an application for leave to appeal the decision of the Ontario Court of Appeal to the Supreme Court of Canada, which application was dismissed on January 27, 2011. In addition, the U.K. Pension Trustee brought a motion before the Canadian Court to have the stay lifted, to allow the U.K. Pension Proceeding to go forward as a "permitted proceeding", which motion was initially set for hearing on May 31, 2010, but was subsequently adjourned without date on the consent of all interested parties. The U.K. Pension Trustee and the PPF also appealed the decision of the U.S. Court enforcing the stay. That appeal was denied by the U.S. Court of Appeals for the Third Circuit ("U.S. Appeals Court") on December 29, 2011 and on January 24, 2012 the U.S. Appeals Court denied a petition by the U.K. Pension Trustee and the PPF for a rehearing of the appeal. Notwithstanding the orders of the Canadian Court and the U.S. Court and the dismissal of the Pension Regulator's appeal by the Ontario Court of Appeal, the FSD proceedings commenced in the U.K. on June 2, 2010, and on June 25, 2010, the Determinations Panel issued a determination notice ("Determination Notice") indicating that a FSD would be issued against certain Debtors including, among others, NNC, NNL, NNI and NNCI. On April 1, 2011, the Determinations Panel issued FSDs to NNC, NNL, NNI and NNCI requiring each of them to secure that financial support be put in place for the U.K. defined benefit pension plan within six calendar months of the date of the FSDs. The other Debtors that received the Determination Notice have exercised their right under the U.K. Statute to refer the Determinations Panel's determination to the Pensions Regulator Tribunal established under the U.K. Statute for a further determination of the matter. Nortel is of the view that the Determination Notice and the FSD issued to NNC, NNL, NNI and NNCI are null and void given the court decisions noted above.

In September 2010, the U.K. Administrators applied to the English Court for directions concerning the application and effect of the FSD regime contained in the U.K. Statute upon those EMEA Debtors that were identified in the Warning Notice. On December 10, 2010, the English Court ruled that the Pensions Regulator could pursue FSDs and Contribution Notices against the target Debtors in accordance with the provisions of the U.K. Statute. Further, the English Court held that the debt created by any Contribution Notice that may be issued constitutes an administration or liquidation expense of an insolvent target company, rather than a provable debt in the insolvency proceedings, thereby giving it "super priority" status over the claims of other creditors of the insolvent target company. The U.K. Administrators appealed this decision to the Court of Appeal of England and Wales ("U.K. Appeal Court") and, on October 14, 2011, the U.K. Appeal Court upheld the English Court's decision. The U.K. Administrators have been granted leave to appeal the U.K. Appeal Court's decision to the Supreme Court. Nortel is of the view that these court decisions in the U.K. have no authoritative application in the CCAA Proceedings or the Chapter 11 Proceedings and that the validity and relative priority of claims filed in those proceedings are matters to be determined by the Canadian Court and the U.S. Court, as applicable.

Pursuant to an intercompany guarantee agreement relating to the U.K. defined benefit pension plan, NNL has guaranteed certain payment obligations of NNUK under a Funding Agreement executed on November 21, 2006. Pursuant to a further intercompany guarantee agreement, NNL has guaranteed NNUK's payment obligations arising upon the wind up, dissolution or liquidation and consequent windup of such plan to the lesser of (a) $150 and (b) the amount of the plan's buyout deficit.

14

Table of Contents

Communications Test Design, Inc. (CTDI): On September 21, 2010, NNI filed a complaint in the U.S. Court against CTDI asserting claims for misappropriation of trade secrets, fraud, breach of contract, breach of the implied duty of good faith and fair dealing, and unjust enrichment. NNL also filed a complaint on the same date and asserting the same claims against CTDI, plus claims for trademark infringement, trademark dilution and false designation of origin. NNI and NNL each sought compensatory, exemplary, and punitive damages, which together exceeded $130, and NNL sought treble damages and attorneys' fees, in an amount to be determined, with respect to the trademark claims. On January 3, 2011, CTDI answered the complaints and asserted counterclaims of breach of contract against both NNI and NNL, based on allegations that Nortel purportedly did not sufficiently assist CTDI in expanding its repair business. Further, NNC was joined as counterclaim defendant on March 18, 2011. CTDI alleged that it suffered more than $68 in lost revenues, and approximately $28 in lost profits, and wasted certain investments. NNI (joined by NNL) and CTDI both filed motions to dismiss the allegations against them, which motions were denied by the U.S. Court on March 22, 2011. NNC moved to dismiss CTDI's counterclaims against it or, in the alternative, for summary judgment of no liability. A special master was appointed to put the matter to mediation.

As a result of the mediation, the parties reached a settlement on all matters related to this action, which settlement was approved by the U.S. Court on October 17, 2011. The settlement provides that CTDI will pay a total of $19 million, from which plaintiffs' costs will be reimbursed and the remainder will be apportioned between NNL and NNI on a 25%/75% basis, as set out under the settlement agreement. Thus, NNL received $4.85 in total in November 2011. This receipt has been recorded as part of Other operating income (expense) –net in Consolidated Statements of Operations for the year ended December 31, 2011. The settlement also provides for the withdrawal of all counterclaims by CTDI and recognition of an allowed claim of approximately $1.

Securities Class Action Claim against former CEO and former CFO: On May 18, 2009, a complaint was filed in the U.S. District Court for the Southern District of New York alleging violations of federal securities law between the period of May 2, 2008 through September 17, 2008, against Mike Zafirovski (Nortel's former President and Chief Executive Officer) and Pavi Binning (Nortel's former Executive Vice President, Chief Financial Officer and Chief Restructuring Officer). Although Nortel is not a named defendant, this lawsuit has been stayed as a result of the Creditor Protection Proceedings. Messrs. Zafirovski and Binning have filed claims in the U.S. Court for indemnification and contribution for potential liability arising out of this matter in amounts to be determined. As of November 8, 2010, the United States District Court for the Southern District of New York ordered that the matter be placed on the suspense docket pending developments in the Creditor Protection Proceedings.

ERISA Lawsuit: As previously reported, beginning in December 2001, NNC, NNL and NNI, together with certain of its then-current and former directors, officers and employees, were named as defendants in several purported class action lawsuits pursuant to ERISA. These lawsuits were consolidated into a single proceeding in the U.S. District Court for the Middle District of Tennessee (the "U.S. District Court"). This lawsuit is on behalf of participants and beneficiaries of the Nortel Networks Inc. Long-Term Investment Plan, who held shares of the Nortel Networks Stock Fund during the class period. The lawsuit alleged, among other things, material misrepresentations and omissions to induce participants and beneficiaries to continue to invest in and maintain investments in NNC common shares through the investment plan. As a result of the Creditor Protection Proceedings, on September 25, 2009, the U.S. District Court ordered the case administratively closed. The parties to the action agreed to a final form of Stipulation of Settlement ("the Stipulation") whereby the defendants will cause their underwriter, Chubb Insurance Company of Canada ("Chubb"), to pay $21.5 into an escrow account on behalf of the defendants as full and final settlement of the action and in consideration for the releases and discharges provided under the Stipulation. Such settlement amount will be distributed in accordance with the terms of the Stipulation. In a side agreement, NNC, NNL, NNI and Chubb stipulated that existing claims filed by Chubb in the Creditor Protection Proceedings in Canada and in the U.S. will be reduced and allowed as general unsecured claims upon deposit by Chubb of the final settlement payments. The Stipulation and the side agreement were approved by the Canadian Court and the U.S. Court. The U.S. District Court also granted preliminary approval of the Stipulation. A fairness hearing for final approval was held on January 11, 2012 and the Stipulation was approved. Nortel has recorded a provision to reflect its best estimate of an allowed claim amount.

Global Class Action Settlement: We entered into agreements to settle two significant U.S. and all but one Canadian class action lawsuits (Global Class Action Settlement) which became effective on March 20, 2007 following approval of the agreements by the appropriate courts. Administration of the settlement claims is now substantially complete. As of December 31, 2008, almost all of the NNC common shares issuable in accordance with the settlement had been distributed to claimants and plaintiffs' counsel, most of them in the second quarter of 2008. No such shares were issued in 2010. The cash portion of the settlement has been distributed by the claims administrator to the approved claimants, net of an amount held in reserve by the claims administrator to cover contingencies and certain settlement costs. The settlement also requires that we contribute to the plaintiffs one-half of any recovery from our litigation referenced below against certain of our former senior officers who were terminated for cause in 2004.

RCMP charges against former executives: On June 19, 2008, the Royal Canadian Mounted Police (RCMP) announced that it had filed criminal charges against three of our former executives: Frank Dunn, Douglas Beatty and Michael Gollogly. The fraud-related charges include: fraud affecting the public market, falsification of books and documents, and false prospectus. These charges pertain to allegations of criminal activity within Nortel by these former executives during 2002 and 2003. No criminal charges were filed against us, and we are not the target of an investigation by the RCMP.

15

Table of Contents

**Canadian Pension Class Action**: On June 24, 2008, a purported class action lawsuit was filed against Nortel and NNL in the Ontario Superior Court of Justice in Ottawa, Canada alleging, among other things, that certain recent changes related to Nortel's pension plan did not comply with the *Pension Benefits Act* (Ontario) or common law notification requirements. The plaintiffs seek declaratory and equitable relief, and unspecified monetary damages. As a result of the Creditor Protection Proceedings, this lawsuit has been stayed.

**Ontario proposed derivative action**: In December 2005, an application was filed in the Ontario Superior Court of Justice for leave to commence a shareholders' derivative action on our behalf against certain of our then-current and former officers and directors. The derivative action alleges, among other things, breach of fiduciary duties, breach of duty of care and negligence, and unjust enrichment in respect of various alleged acts and omissions. If the application is granted, the proposed derivative action would seek on our behalf, among other things, compensatory damages of CAD$1,000 and punitive damages of CAD$10 from the individual defendants. The proposed derivative action would also seek an order directing our Board of Directors to reform and improve our corporate governance and internal control procedures as the court may deem necessary or desirable, and an order that we pay the legal fees and other costs in connection with the proposed derivative action. The application for leave to commence this action has not yet been heard. This application has been stayed as a result of the Creditor Protection Proceedings.

**Shareholder statement of claim against Deloitte & Touche LLP**: On February 8, 2007, a Statement of Claim was filed in the Ontario Superior Court of Justice in the name of Nortel and NNL against Deloitte & Touche LLP (Deloitte). The action was commenced by three shareholders without leave, and without our knowledge or authorization. The three have indicated that they filed the action in anticipation of bringing an application for leave to commence a derivative action on behalf of Nortel against Deloitte under the *Canada Business Corporations Act* (CBCA), and that the three shareholders would be seeking leave on a retroactive basis to authorize their action. The claim alleges, among other things, breach of contract, negligence, negligent misrepresentation, lack of independence, and breach of fiduciary duty. The claim seeks damages and other relief on our behalf, including recovery of payments that we made to class members as part of the Global Class Action Settlement. The Litigation Committee of our Board of Directors has reviewed the matter and has advised the law firm pursuing the derivative action of our position on the proposed claim. On February 6, 2008, an application was filed by the three shareholders for leave to commence a derivative action in the name of Nortel against Deloitte. This application has been stayed as a result of the Creditor Protection Proceedings.

**Nortel Statement of Claim Against its Former Officers**: In January 2005, Nortel and NNL filed a Statement of Claim in the Ontario Superior Court of Justice against Messrs. Frank Dunn, Douglas Beatty and Michael Gollogly, Nortel's former senior officers who were terminated for cause in April 2004, seeking the return of payments made to them under Nortel's bonus plan in 2003. One-half of any recovery from this litigation is subject to the Global Class Action Settlement. See note 16 to the accompanying audited consolidated financial statements.

**Former Officers' Statements of Claim Against Nortel**: In April 2006, Mr. Dunn filed a Notice of Action and Statement of Claim in the Ontario Superior Court of Justice against Nortel and NNL asserting claims for wrongful dismissal, defamation and mental distress, and seeking punitive, exemplary and aggravated damages, out-of-pocket expenses and special damages, indemnity for legal expenses incurred as a result of civil and administrative proceedings brought against him by reason of his having been an officer or director of the defendants, pre-judgment interest and costs. Mr. Dunn has further brought an application before the Ontario Superior Court of Justice against Nortel and NNL seeking an order that, pursuant to its by-laws, Nortel reimburse him for all past and future defense costs he has incurred as a result of proceedings commenced against him by reason of his being or having been a director or officer of Nortel. In May and October 2006, respectively, Messrs. Gollogly and Beatty filed Statements of Claim in the Ontario Superior Court of Justice against Nortel and NNL asserting claims for, among other things, wrongful dismissal and seeking compensatory, aggravated and punitive damages, and pre-and post-judgment interest and costs. As a result of the Creditor Protection Proceedings, these lawsuits have been stayed.

Except as otherwise described herein, in each of the matters described above, the plaintiffs are seeking an unspecified amount of monetary damages. Nortel is unable to ascertain the ultimate aggregate amount of monetary liability or financial impact to Nortel of the above matters, which, unless otherwise specified, seek damages from the defendants of material or indeterminate amounts or could result in fines and penalties. Nortel cannot determine whether these actions, suits, claims and proceedings will, individually or collectively, have a material adverse effect on its remaining restructuring work, financial condition or liquidity. Except as otherwise described herein, Nortel intends to defend the above actions, suits, claims and proceedings in which it is a defendant, litigating or settling cases where in management's judgment it would be in the best interest of stakeholders to do so. Nortel will continue to cooperate fully with all authorities in connection with the regulatory and criminal investigations.

Nortel is also a defendant in various other suits, claims, proceedings and investigations that arise in the normal course of business.

16

Table of Contents

Environmental matters: Nortel is exposed to liabilities and compliance costs arising from its past generation, management and disposal of hazardous substances and wastes. As of December 31, 2011, accruals for environmental matters were $8. Based on information available as of December 31, 2011, management believes that the existing accruals are sufficient to satisfy probable and reasonably estimable environmental liabilities related to known environmental matters. Any additional liabilities that may result from these matters, and any additional liabilities that may result in connection with other locations, are not expected to have a material adverse effect on the business, results of operations, financial condition and liquidity of Nortel.

Nortel has remedial activities under way at five sites that are either currently or previously owned. An estimate of Nortel's anticipated remediation costs associated with all such sites, to the extent probable and reasonably estimable, is included in the environmental accruals referred to in the paragraph directly above.

Under the CCAA Proceedings, the Canadian Debtors have filed a motion for an order authorizing and directing the Canadian Debtors to cease performing any remediation at or in relation to five sites (Belleville, Brampton, Brockville, Kingston and London, Ontario), and that any claims in relation to such remediation be subject to the court approved claims process under the CCAA Proceedings. We brought the motion to disclaim any further obligation for such properties that are no longer owned or used by us and that we and our creditors derive no benefit from any further remediation. Subsequent to the filing of the motion, NNL entered into a transition agreement regarding the Brampton site that facilitated a gradual cessation of NNL's environmental risk related tasks at that site, which tasks have now been completed. The Ministry of the Environment (the MOE) has made remediation orders with respect to the four other sites. The motion was heard in September 2011 in the Canadian Court, wherein the Canadian Debtors sought advice and direction that the MOE remediation orders are in breach of the CCAA stay. A decision on that motion is pending. To date, the MOE has not sought to enforce the remediation orders while the Canadian Court's decision is outstanding and NNL has continued to undertake environmental risk assessments and remediation related tasks at those sites.

17

Table of Contents

# PART II

**ITEM 5.    Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

Capitalized terms used in this Item 5 of Part II and not otherwise defined, have the meaning set forth for such terms in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section of this report.

On January 14, 2009, we received notice from the NYSE that it decided to suspend the listing of NNC common shares on the NYSE. The NYSE stated that its decision was based on the commencement of the CCAA Proceedings and Chapter 11 Proceedings. As previously disclosed, we also were not in compliance with the NYSE's continued listing standards regarding price criteria as a result of NNC common shares having an average closing price of less than $1.00 per share over a consecutive 30-trading-day period as of December 11, 2008. Subsequently, on February 2, 2009, NNC common shares were delisted from the NYSE. NNC common shares are currently quoted in the over-the-counter market in the Pink Sheets Electronic Quotation Service (Pink Sheets) under the symbol "NRTLQ".

On January 14, 2009, we received notice from the TSX that it had begun reviewing the eligibility of NNC and NNL securities for continued listing on the TSX. However, the TSX stopped its review after concluding that the review was stayed by the Initial Order obtained by the Canadian Debtors pursuant to the CCAA Proceedings.

On February 5, 2009, the U.S. Court also granted a motion by the U.S. Debtors to impose certain restrictions and notification procedures on trading in NNC common shares and NNL preferred shares in order to preserve valuable tax assets in the U.S., in particular net operating loss carryovers and certain other tax attributes of the U.S. Debtors.

On June 19, 2009 (and numerous times subsequently), we announced that we do not expect that holders of NNC common shares and NNL preferred shares will receive any value from the Creditor Protection Proceedings and we expect that the proceedings will ultimately result in the cancellation of these equity interests. As a result, we applied to delist the NNC common shares and NNL applied to delist the NNL preferred shares from trading on the TSX and delisting occurred on June 26, 2009 at the close of trading.

As a result of the TSX delisting, certain sellers of NNC common shares and NNL preferred shares who are not residents of Canada (non-residents) for purposes of the Income Tax Act (Canada) may be liable for Canadian tax and may be subject to tax filing requirements in Canada as a result of the sale of such shares after June 26, 2009. Also, purchasers of NNC common shares and NNL preferred shares from non-residents may have an obligation to remit 25% of the purchase price to the Canada Revenue Agency. Parties to sales of NNC common shares or NNL preferred hares involving a non-resident seller should consult their tax advisors or the Canada Revenue Agency. The statements herein are not intended to onstitute, nor should they be relied upon as, tax advice to any particular seller or purchaser of NNC common shares or NNL preferred shares.

As part of Nortel's ongoing cost reduction activities, on March 11, 2010, NNC, NNL, NNI and NNCC each filed notifications under the U.S. Securities Exchange Act of 1934 (Exchange Act) indicating they had less than 300 holders of each of their respective series of outstanding debt securities and related guarantees as of January 1, 2010. As a result, NNC is no longer required to include supplemental condensed consolidating financial information regarding the guarantors and non-guarantors of the debt securities in the notes to the financial statements. On March 18, 2010, NNL also filed a notification to de-register its common stock under the Exchange Act, which relieves it of having to file certain periodic reports including Forms 10-K, 10-Q and 8-K. NNL remains a reporting issuer under applicable Canadian securities laws and, as a result, will remain subject to continuous disclosure requirements, including the filing of annual and quarterly financial statements and management's discussion and analysis of financial results under applicable Canadian securities laws. On April 15, 2010, NNL obtained exemptive relief from the Canadian securities regulatory authorities permitting NNL to satisfy certain of its Canadian continuous disclosure requirements by filing certain disclosures prepared in accordance with specified U.S. disclosure requirements for its financial years ended December 31, 2009 and 2010. Similar relief was obtained for periods commencing on or after January 1, 2011 until the conclusion of the CCAA proceedings.

During the pendency of the Creditor Protection Proceedings, investments in our securities are highly speculative and pose substantial risks. In particular, as noted above, we do not expect that holders of NNC common shares and NNL preferred shares will receive any value from the Creditor Protection Proceedings and we expect that the proceedings will ultimately result in the cancellation of these equity interests under any eventual court-approved plan. Also, the U.S. Court has issued an order imposing certain restrictions and notification procedures on trading in NNC common shares and certain NNL preferred shares in an effort to prevent an "ownership change" of the Company under the U.S. Internal Revenue Code that could interfere with our ability to utilize our deferred tax assets to reduce our taxable income in the future. See the Risk Factors section of this report.

18

Table of Contents

The following table sets forth the high and low sale prices of NNC common shares as reported on the Pink Sheets in 2011 and 2010:

| | | Pink Sheets[1] | |
|---|---|---|---|
| | | High | Low |
| 2011 | Fourth Quarter | $ 0.0270 | $ 0.0144 |
| | Third Quarter | 0.1900 | 0.0255 |
| | Second Quarter | 0.0750 | 0.0250 |
| | First Quarter | 0.0800 | 0.0130 |
| 2010 | Fourth Quarter | $ 0.1510 | $ 0.0125 |
| | Third Quarter | 0.0375 | 0.0215 |
| | Second Quarter | 0.0650 | 0.0290 |
| | First Quarter | 0.1200 | 0.0240 |

1.   Since the NNC common shares were delisted from the NYSE and the TSX, they have continued to trade on the Pink Sheets.

On February 29, 2012, the last sale price for NNC common shares quoted on the Pink Sheets was $0.02.

On February 29, 2012, approximately 253,693 registered shareholders held 100% of NNC common shares outstanding. These included the Canadian Depository for Securities and the Depository Trust Company, two clearing corporations, which held a total of 479,686,883 NNC common shares on behalf of other shareholders.

### Dividends

On June 15, 2001, we announced that our Board of Directors had decided to discontinue the declaration and payment of dividends on NNC common shares. As a result, dividends have not been declared and paid on NNC common shares since June 29, 2001, and during the pendency of the Creditor Protection Proceedings, future dividends will not be declared.

### Securities Authorized for Issuance Under Equity Compensation Plans

On February 27, 2009, we obtained Canadian Court approval to terminate our equity-based compensation plans (the 2005 SIP, the 1986 Plan and the 2000 Plan) and certain equity plans assumed in prior acquisitions, including all outstanding equity under these plans (SARs, RSUs and performance stock units PSUs), whether vested or unvested. We sought this approval given the decreased value of NNC common shares and the administrative and associated costs of maintaining the plans to us as well as the plan participants. As at December 31, 2009, all options under the remaining equity-based compensation plans assumed in prior acquisitions had expired.

### Sales of Unregistered Securities

*Global Class Action Settlement*: We entered into agreements to settle two significant U.S. and all but one Canadian class action lawsuits, collectively the Global Class Action Settlement, which became effective on March 20, 2007 following approval of the agreements by the appropriate courts. In accordance with the terms of the Global Class Action Settlement, a total of 62,866,775 NNC common shares were to be issued. Almost all of the NNC common shares issuable in accordance with the settlement have been distributed to claimants and plaintiffs' counsel, most of them in the second quarter of 2008. No such shares were issued in 2011. The issuance of the 62,866,775 NNC common shares is exempt from registration pursuant to Section 3(a)(10) of the Securities Act.

19

ITEM 7.        Management's Discussion and Analysis of Financial Condition and Results of Operations

## TABLE OF CONTENTS

| | |
|---|---|
| Executive Overview | 21 |
| Results of Operations – Continuing Operations | 36 |
| Results of Operations – EMEA Subsidiaries | 40 |
| Results of Operations – Discontinued Operations | 40 |
| Liquidity and Capital Resources | 41 |
| Off-Balance Sheet Arrangements | 44 |
| Application of Critical Accounting Policies and Estimates | 44 |
| Accounting Changes and Recent Accounting Pronouncements | 47 |
| Outstanding Share Data | 47 |
| Legal Proceedings and Environmental Matters | 47 |
| Cautionary Notice Regarding Forward-Looking Information | 47 |

The following Management's Discussion and Analysis (MD&A) is intended to help the reader understand the results of operations and financial condition of Nortel Networks Corporation. As noted herein, we have completed the divestitures of all of our businesses as part of our Creditor Protection Proceedings. The MD&A should be read in combination with our audited consolidated financial statements and the accompanying notes. All monetary amounts in this MD&A are in millions and in United States (U.S.) Dollars except per share amounts or unless otherwise stated.

Certain statements in this MD&A contain words such as "could", "expect", "may", "anticipate", "believe", "intend", "estimate", "plan", "envision", "seek" and other similar language and are considered forward-looking statements or information under applicable securities laws. These statements are based on our current expectations, estimates, forecasts and projections which we believe are reasonable but which are subject to important assumptions, risks and uncertainties and may prove to be inaccurate. Consequently, our actual results could differ materially from our expectations set out in this MD&A. In particular, see the Risk Factors section of this report and elsewhere in this annual report on Form 10-K for the year ended December 31, 2011 filed with the U.S. Securities and Exchange Commission (SEC) and Canadian securities regulatory authorities (2011 Annual Report) for factors that could cause actual results or events to differ materially from those contemplated in forward-looking statements. Unless otherwise required by applicable securities laws, we disclaim any intention or obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

Where we say "we", "us", "our", "Nortel" or "the Company", we mean Nortel Networks Corporation or Nortel Networks Corporation and its subsidiaries that continue to be consolidated, as applicable. Where we say NNC, we mean Nortel Networks Corporation.

20

Table of Contents

Executive Overview

**Creditor Protection Proceedings**

On January 14, 2009 (Petition Date), after extensive consideration of all other alternatives, with the unanimous authorization of our board of directors after thorough consultation with our advisors, we initiated creditor protection proceedings in multiple jurisdictions under the respective restructuring regimes of Canada, under the *Companies' Creditors Arrangement Act* (CCAA) (CCAA Proceedings), the United States (U.S.) under Chapter 11 of the U.S. Bankruptcy Code (Chapter 11) (Chapter 11 Proceedings), the United Kingdom (U.K.) under the Insolvency Act 1986 (U.K. Administration Proceedings), and subsequently, Israel under the Israeli Companies Law 1999 (Israeli Administration Proceedings). On May 28, 2009, one of our French subsidiaries, Nortel Networks SA (NNSA) was placed into secondary proceedings (French Secondary Proceedings). The CCAA Proceedings, Chapter 11 Proceedings, U.K. Administration Proceedings, Israeli Administration Proceedings and French Secondary Proceedings are together referred to as the "Creditor Protection Proceedings". On July 14, 2009, Nortel Networks (CALA) Inc. (NNCI), a U.S. based subsidiary with operations in the Caribbean and Latin America (CALA) region, also filed a voluntary petition for relief under Chapter 11 in the U.S. Bankruptcy Court for the District of Delaware (U.S. Court) and became a party to the Chapter 11 Proceedings. We initiated the Creditor Protection Proceedings with a consolidated cash balance, as of December 31, 2008, of approximately $2,400, in order to preserve our liquidity and fund operations during the process.

"Debtors" as used herein means: (i) us, together with our principal operating subsidiary Nortel Networks Limited (NNL) and certain other Canadian subsidiaries (collectively, Canadian Debtors) that filed for creditor protection pursuant to the provisions of the CCAA in the Ontario Superior Court of Justice (Canadian Court); (ii) Nortel Networks Inc. (NNI), Nortel Networks Capital Corporation (NNCI) and certain other U.S. subsidiaries (U.S. Debtors) that have filed voluntary petitions under Chapter 11 in the U.S. Court; (iii) certain Europe, Middle East and Africa (EMEA) subsidiaries that made consequential filings under the Insolvency Act 1986 in the High Court of England and Wales (English Court) (including NNSA) and certain Israeli subsidiaries that made consequential filings under the Israeli Companies Law 1999 in the District Court of Tel Aviv (EMEA Debtors).

In June, 2009, we determined that selling our businesses was the best path forward. We have completed divestitures of all of our businesses including: (i) the sale of substantially all of our Code Division Multiple Access (CDMA) business and Long Term Evolution (LTE) Access assets to Telefonaktiebolaget LM Ericsson (Ericsson); (ii) the sale of substantially all of the assets of our Enterprise Solutions (ES) business globally, including the shares of Nortel Government Solutions Incorporated (NGS) and DiamondWare, Ltd. (Diamondware), to Avaya Inc. (Avaya); (iii) the sale of the assets of our Wireless Networks (WN) business associated with the development of Next Generation Packet Core network components to Hitachi, Ltd. (Hitachi); (iv) the sale of certain portions of our Layer 4-7 data portfolio to Radware Ltd.; (v) the sale of substantially all of the assets of our Optical Networking and Carrier Ethernet businesses to Ciena Corporation (Ciena); (vi) the sale of substantially all of the assets of our Global System for Mobile communications (GSM)/GSM for Railways (GSM-R) business to Ericsson and Kapsch CarrierCom AG (Kapsch); (vii) the sale of substantially all of the assets of our Carrier VoIP and Application Solutions (CVAS) business to GENBAND Inc. (now known as GENBAND U.S. LLC (GENBAND)); (viii) the sale of NNL's 50% plus one share interest in LG-Nortel Co. Ltd. (LGN), our Korean joint venture with LG-Electronics, Inc. (LGE), to Ericsson; (ix) the sale of substantially all of the assets of our global Multi Service Switch (MSS) business to Ericsson; (x) the sale of substantially all of the assets of Guangdong-Nortel Telecommunications Equipment Co. Ltd. (GDNT) to Ericsson Mobile Data Applications Technology Research and Development Guangzhou Company Limited and Ericsson (Guangdong Shunde) Communications Company Limited (collectively, Ericsson China); (xi) the sale of our remaining patents and patent applications to a consortium consisting of Apple Inc., EMC Corporation, Ericsson, Microsoft Corporation, Research in Motion Limited and Sony Corporation (collectively, the Consortium); and (xii) the sale of a small number of our Internet Protocol version 4 addresses.

Approximately $7,730 in net proceeds have been generated through the completed sales of our businesses and patents and patent applications. Substantially all proceeds received in connection with the completed sales of businesses and assets are being held in escrow, and have been recorded by NNL solely for financial reporting purposes until the final allocation of these proceeds as between various Nortel legal entities is ultimately determined. Through the completed sales, we have preserved 16,000 jobs for our employees with the purchasers of these businesses and assets.

While numerous milestones have been met, significant work remains under the Creditor Protection Proceedings. A Nortel business services group (NBS) was established in 2009 that provided global transitional services to purchasers of the businesses, in fulfillment of contractual obligations under transition services agreements (TSAs) entered into in connection with the sales of the businesses and assets. These services included maintenance of customer and network service levels during the integration process, and provided expertise and infrastructure in finance, supply chain management, information technology (IT), research and development (R&D), human resources and real estate necessary for the orderly and successful transition of businesses to purchasers over a period of generally up to 24 months from the closing of the sales. NBS also focused on maximizing the recovery of remaining accounts receivable, inventory and real estate assets, independent of the TSAs. As of December 31, 2011, we had completed substantially all of our obligations under the TSAs with respect to the business sales. As well, we entered into a TSA in connection with the patent and patent applications sale to the Consortium, which is expected to be completed no later than March 31, 2012.

21

Table of Contents

A core corporate group (Corporate Group) was also established in 2009 and continues to be focused on a number of key actions to maximize value for stakeholders, including the sale of remaining assets, wind down of global operations and entities, the creditor claims process, and working toward conclusion of the Creditor Protection Proceedings and any eventual distributions to creditors. The Corporate Group also continues to provide administrative and management support to our consolidated affiliates around the world while completing the orderly wind down of those remaining operations.

With the sale of all of our businesses, the interdependency between the Debtors under the different Creditor Protection Proceedings has diminished and is expected to continue to diminish, and thus the estates have worked toward separation of various corporate functions to allow each estate to be standalone. Extensive analysis and actions have been performed to segregate most of these functions such that the Canadian Debtors and the U.S. Debtors operate independently of one another. The Debtors continue to work on implementing plans for the separation of IT functions and applications during the first half of 2012.

One of the key remaining matters under the Creditor Protection Proceedings is the determination of allocation of sale proceeds among the various Nortel legal entities that participated in the sales of our businesses, which include entities subject to the respective Creditor Protection Proceedings in the different jurisdictions as well as entities that are not subject to any court supervision or proceedings.

### CCAA Proceedings

On the Petition Date, the Canadian Debtors obtained an initial order from the Canadian Court (Initial Order) for creditor protection for 30 days, pursuant to the provisions of the CCAA, which has since been extended to April 13, 2012 and is subject to further extension by the Canadian Court. There is no guarantee that the Canadian Debtors will be able to obtain court orders or approvals with respect to motions the Canadian Debtors may file from time to time to extend further the applicable stays of actions and proceedings against them. Pursuant to the Initial Order, the Canadian Debtors received approval to continue to undertake various actions in the normal course in order to maintain stable and continuing operations during the CCAA Proceedings.

Under the terms of the Initial Order, Ernst & Young Inc. was named as the court-appointed monitor under the CCAA Proceedings (Canadian Monitor). The Canadian Monitor has reported and will continue to report to the Canadian Court from time to time on the Canadian Debtors' financial and operational position and any other matters that may be relevant to the CCAA Proceedings. In addition, the Canadian Monitor may advise and, to the extent required, assist the Canadian Debtors on matters relating to the Creditor Protection Proceedings. On August 14, 2009, the Canadian Court approved an order that permits the Canadian Monitor to take on an enhanced role with respect to the oversight of the business, sales processes, claims processes and other restructuring activities under the CCAA Proceedings. On May 27, 2009 and July 22, 2009, representative counsel was appointed on behalf of the former employees of the Canadian Debtors and on behalf of the continuing employees of the Canadian Debtors, respectively (Representative Counsel). Our management and the Canadian Monitor meet regularly with Representative Counsel and creditor groups to provide status updates and share information with them that has been shared with the representatives of other major stakeholders.

As a consequence of the CCAA Proceedings, generally, all actions to enforce or otherwise effect payment or repayment of liabilities of any Canadian Debtor arising prior to the Petition Date and substantially all pending claims and litigation against the Canadian Debtors and their officers and directors have been stayed until April 13, 2012, or such later date as may be ordered by the Canadian Court. In addition, the CCAA Proceedings have been recognized by the U.S. Court as "foreign proceedings" pursuant to the provisions of Chapter 15 of the U.S. Bankruptcy Code, giving effect in the U.S. to the stay granted by the Canadian Court. A cross-border court-to-court protocol (as amended) has also been approved by the U.S. Court and the Canadian Court. This protocol provides the U.S. Court and the Canadian Court with a framework for the coordination of the administration of the Chapter 11 Proceedings and the CCAA Proceedings on matters of concern to both courts.

The Canadian Court has also granted charges against some or all of the assets of the Canadian Debtors and any proceeds from any sales thereof, including the following current charges: a charge in favor of the Canadian Monitor, its counsel and counsel to the Canadian Debtors as security for payment of certain professional fees and disbursements; a charge in favor of NNI as security for excess payment by NNI of certain corporate overhead and R&D services provided by NNL to the U.S. Debtors; a charge to support an indemnity for the directors and officers of the Canadian Debtors relating to certain claims that may be made against them in such roles, as further described below; an intercompany charge in favor of: (i) any U.S. Debtor that loans or transfers money, goods or services to a Canadian Debtor; (ii) any EMEA Debtors who provide goods or services to the Canadian Debtors; (iii) NNL for any amounts advanced by NNL to Nortel Networks Technology Corporation (NNTC) following the Petition Date; and (iv) Nortel Networks UK Limited (NNUK) for certain payments due by NNL to NNUK out of the allocation of sale proceeds NNL actually receives from future material asset sales, subject to certain conditions. The Canadian Court also approved an additional charge against all of the property of the Canadian Debtors to secure payment of the amounts that have been determined to be payable to participants under the NSIP (as defined below). A further charge has been granted in favor of certain former employees and long term disability employees who are beneficiaries under the Settlement Agreement (as defined below) against all of the property of the Canadian Debtors to secure payment of the medical, dental, income, termination and pension payments agreed to be paid by the Canadian Debtors under the Settlement Agreement.

### Chapter 11 Proceedings

Also on the Petition Date, the U.S. Debtors, other than NNCI, filed voluntary petitions under Chapter 11 with the U.S. Court. The U.S. Debtors received approval from the U.S. Court for a number of motions enabling them to continue to operate their businesses generally in the ordinary course. Among other things, the U.S. Debtors received approval to continue paying employee

22

Table of Contents

wages and certain benefits in the ordinary course; to generally continue their cash management system; and to continue honoring customer obligations and paying suppliers for goods and services received on or after the Petition Date. On July 14, 2009, NNCI also filed a voluntary petition for relief under Chapter 11 in the U.S. Court and thereby became one of the U.S. Debtors subject to the Chapter 11 Proceedings, although the petition date for NNCI is July 14, 2009. On July 17, 2009, the U.S. Court entered an order of joint administration that provided for the joint administration, for procedural purposes only, of NNCI's case with the pre-existing cases of the other U.S. Debtors.

As required under the U.S. Bankruptcy Code, on January 22, 2009, the United States Trustee for the District of Delaware (U.S. Trustee) appointed an official committee of unsecured creditors, which currently includes The Bank of New York Mellon, Pension Benefit Guaranty Corporation (PBGC) and Law Debenture Trust Company of New York (U.S. Creditors' Committee). The U.S. Creditors' Committee has the right to be heard on all matters that come before the U.S. Court with respect to the U.S. Debtors. There can be no assurance that the U.S. Creditors' Committee will support the U.S. Debtors' positions on matters to be presented to the U.S. Court. In addition, a group purporting to hold substantial amounts of our publicly traded debt has organized (Bondholder Group). Our management and the Canadian Monitor have met with the Bondholder Group and its advisors to provide status updates and share information with them that has been shared with other major stakeholders. Disagreements between the Debtors and the U.S. Creditors' Committee and the Bondholder Group could protract and negatively impact the Creditor Protection Proceedings.

On December 8, 2009, we announced that NNI had entered into an agreement with John Ray for his appointment as principal officer of each of the U.S. Debtors (U.S. Principal Officer) and to work with Nortel management, the Canadian Monitor, the U.K. Administrators and various retained advisors, in providing oversight of the conduct of the businesses of the U.S. Debtors in relation to various matters in connection with the Chapter 11 Proceedings. This appointment was approved by the U.S. Court on January 6, 2010.

On June 21, 2010, the U.S. Debtors filed a motion seeking to terminate certain U.S. retiree and LTD benefits effective as of August 31, 2010. The U.S Debtors filed a notice of withdrawal of this motion with the U.S. Court on July 16, 2010. In anticipation that the U.S. Debtors will seek modification or termination of some or all of the U.S. retiree and LTD benefits at a later time, on June 21, 2011, upon the motion of the U.S. Debtors dated June 2, 2011, the U.S. Court entered an order directing the U.S Trustee to establish a committee of retirees for the U.S. Debtors to consult with before undertaking any modification or termination of the U.S. retiree benefits. Additionally, on June 22, 2011, the U.S. Court entered an order directing the U.S Trustee to establish a committee of LTD employees for the U.S. Debtors to consult with before undertaking any modification or termination of the U.S. LTD benefits. On August 2, 2011, the U.S. Trustee appointed the members of these committees.

On July 12, 2010, the U.S. Debtors filed their proposed plan of reorganization (the Plan) under Chapter 11 with the U.S. Court. Pursuant to the Plan, each U.S. Debtor will either be reorganized to the extent the U.S. Debtors determine it is necessary or beneficial to do so for the purpose of fulfilling its obligations under the asset sale agreements and TSAs, selling or otherwise disposing of its assets and fulfilling its obligations under the Plan, or will be liquidated. The U.S. Debtors filed a proposed disclosure statement for the Plan with the U.S. Court on September 3, 2010. The effectiveness of the Plan and the U.S. Debtors' exit of the Chapter 11 Proceedings is subject to several conditions, including U.S. Court approval of the disclosure statement, as amended, obtaining the requisite number of votes in favor of the Plan from the solicited creditors of each U.S. Debtor, confirmation of the Plan by order of the U.S. Court and the satisfaction of other conditions precedent.

On September 23, 2011, the U.S. Court established a claims bar date of November 15, 2011 for the filing of certain inter-company claims against the U.S. Debtors, which did not apply to the filing of inter-company claims by the Canadian Debtors, the entities subject to the U.S. EMEA Claims Bar Date (defined below) and majority-owned direct and indirect subsidiaries of the U.S. Debtors. The November 15, 2011 claims bar date also applied to the filing of all indemnification and/or contribution claims of directors and officers who were directors and/or officers as of August 1, 2009 and whose claims arise from service to the U.S. Debtors or any of the U.S. Debtors' non-debtor affiliates. Certain affiliates of the U.S. Debtors in the Asia and CALA regions, which are consolidated in our results, filed inter-company claims against the U.S. Debtors for an aggregate amount of approximately $58 by the November 15, 2011 bar date. We have established reserves as appropriate for these accounts receivable balances in current and prior periods.

As a consequence of the commencement of the Chapter 11 Proceedings, generally, all actions to enforce or otherwise effect payment or repayment of liabilities of any U.S. Debtor preceding the Petition Date and substantially all pending claims and litigation against the U.S. Debtors have been automatically stayed for the pendency of the Chapter 11 Proceedings (absent any court order lifting the stay). In addition, the U.S. Debtors applied for and obtained an order in the Canadian Court recognizing the Chapter 11 Proceedings in the U.S. as "foreign proceedings" in Canada and giving effect, in Canada, to the automatic stay under the U.S. Bankruptcy Code.

*Administration Proceedings*

Also on the Petition Date, the EMEA Debtors made consequential filings and each obtained an administration order from the English Court under the Insolvency Act 1986. The filings were made by the EMEA Debtors under the provisions of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings (EC Regulation) and on the basis that each EMEA Debtor's center of main interests was in England. The U.K. Administration Proceedings currently extend to January 14, 2014, subject to further extension. Under the terms of the orders, a representative of Ernst & Young LLP (in the U.K.) and a representative of

23

Table of Contents

Ernst & Young Chartered Accountants (in Ireland) were appointed as joint administrators with respect to the EMEA Debtor in Ireland, and representatives of Ernst & Young LLP were appointed as joint administrators for the other EMEA Debtors (collectively, U.K. Administrators) to manage each of the EMEA Debtors' affairs, business and property under the jurisdiction of the English Court and in accordance with the applicable provisions of the Insolvency Act 1986. The Insolvency Act 1986 provides for a moratorium during which creditors may not, without leave of the English Court or consent of the U.K. Administrators, wind up the company, enforce security, or commence or progress legal proceedings. All of our operating EMEA subsidiaries except those in the following countries are included in the U.K. Administration Proceedings: Nigeria, Russia, Ukraine, Israel, Norway, Switzerland, South Africa and Turkey.

The U.K. Administration Proceedings have been recognized by the U.S. Court as "foreign main proceedings" pursuant to the provisions of Chapter 15 of the U.S. Bankruptcy Code, giving effect in the U.S. to the moratorium provided by the Insolvency Act 1986.

Certain of our Israeli subsidiaries (Israeli Debtors) commenced separate creditor protection proceedings in Israel. On January 19, 2009, the District Court of Tel Aviv (Israeli Court) appointed administrators over the Israeli Debtors (Israeli Administrators). The orders of the Israeli Court provide for a "stay of proceedings" in respect of the Israeli Debtors whose creditors are prevented from taking steps against the companies or their assets and which, subject to further orders of the Israeli Court, remains in effect during the Israeli Administration Proceedings.

On May 28, 2009, at the request of the U.K. Administrators of NNSA, the Commercial Court of Versailles, France (French Court) ordered the commencement of secondary proceedings in respect of NNSA. The French Secondary Proceedings consist of liquidation proceedings and NNSA is no longer authorized to continue its business operations.

### Significant Business and Other Divestitures

#### CDMA and LTE Access Assets

On November 13, 2009, we announced that following satisfaction of all closing conditions, we, NNL, and certain of our other subsidiaries, including NNI, had completed the sale of substantially all of the assets of our CDMA business and LTE Access assets to Ericsson for $1,130, subject to certain post closing purchase price adjustments. The purchase price has been finalized with a downward purchase price adjustment of $1. In connection with this transaction and included in the net gain realized for accounting purposes, NNL and NNI paid an aggregate break-up fee of $19.5 plus $3 in expense reimbursements to Nokia Siemens Networks B.V., the party to the "stalking horse" asset sale agreement that was outbid by Ericsson in the "stalking horse" or 363 sales process under Chapter 11. We recognized a cumulative gain on disposal of $1,192 for this divestiture.

The related CDMA business and LTE Access assets financial results of operations were not classified as discontinued operations as they did ot meet the definition of a component of an entity as required under U.S. Generally Accepted Accounting Principles (U.S. GAAP).

#### Packet Core Assets

On December 8, 2009, we announced that following satisfaction of all closing conditions, NNL and NNI had completed the sale of our Packet Core Assets to Hitachi for $10. We recognized a gain on disposal of $8 for this divestiture.

The related Packet Core Assets financial results of operations were not classified as discontinued operations as they did not meet the definition of a component of an entity as required under U.S. GAAP.

#### Enterprise Solutions Business

On December 18, 2009, we announced that we, NNL, and certain of our other subsidiaries, including NNI and NNUK, had completed the sale of substantially all of the assets of the ES business globally as well as the shares of NGS and DiamondWare, Ltd. to Avaya for a purchase price of $900 in cash, subject to certain post closing purchase price adjustments, with an additional pool of $15 reserved for an employee retention program. The purchase price was finalized with no adjustments. The sale of certain ES assets held by Israeli subsidiaries was subsequently approved by the Israeli Court on December 21, 2009. All other closing conditions had been satisfied as of December 18, 2009. We recognized a cumulative gain on disposal of $750 for this divestiture.

The related ES business and NGS financial results of operations have been classified as discontinued operations beginning in the third quarter of 2009, as they met the definition of a component of an entity as required under U.S. GAAP. See note 5.

#### Optical Networking and Carrier Ethernet Businesses

On March 19, 2010, we announced that we, NNL, and certain of our subsidiaries, including NNI and NNUK, had completed the sale of substantially all of the assets of its Optical Networking and Carrier Ethernet businesses to Ciena for a purchase price of approximately $774. The purchase price has been finalized with downward working capital adjustments of approximately $81. In conjunction with the sale of our Ottawa Carling Campus, we were required to exercise our early termination rights on the facility lease with Ciena and to pay Ciena $33.5 at closing. See the "Sale of Ottawa Carling Campus" section below for further information. We recognized a cumulative gain on disposal of $546 for this divestiture.

Table of Contents

The related Optical Networking and Carrier Ethernet businesses' financial results of operations were not classified as discontinued operations as they did not meet the definition of a component of an entity as required under U.S. GAAP.

*LGN Joint Venture*

On June 29, 2010, we announced that NNL had completed the sale of its 50% plus one share interest in LGN to Ericsson for a purchase price of $242 in cash, subject to certain purchase price adjustments. The purchase price was finalized with no change to the purchase price. NNL recognized a gain on disposal of $53 in the year ended December 31, 2010. See note 5.

In addition to the sale proceeds, prior to closing, NNL received approximately 50% of a capital reduction paid out by LGN to its shareholders, NNL and LGE, in the amount of 200 billion Korean Won (approximately CAD $181). NNL received CAD $83, net of withholding taxes.

The related financial results of operations of LGN have been classified as discontinued operations beginning in the second quarter of 2010 as they met the definition of a component of an entity as required under U.S. GAAP.

*MSS Business*

On March 11, 2011, we announced that we, NNL, and certain of our other subsidiaries, including NNI and NNUK, had completed the sale to Ericsson of substantially all of our global MSS business and the associated Data Packet Network and Services Edge Router (Shasta) product groups, for a purchase price of $65 in cash. The purchase price has been finalized and was subject to a downward price adjustment relating to working capital of $12 in the year ended December 31, 2011. We recorded a gain on disposal of $40, as adjusted for all closing conditions, for this divestiture.

The related financial results of operations of the MSS business were not classified as discontinued operations as they did not meet the definition of a component of an entity as required under U.S. GAAP.

*GSM/GSM-R Business*

On March 31, 2010, we announced that we had completed the sale of substantially all of the assets of our global GSM/GSM-R business to Ericsson and Kapsch for aggregate proceeds of $103. The purchase price with respect to the sale to Ericsson has been finalized and the sales proceeds were subject to a downward working capital adjustment of $6 recorded in the year ended December 31, 2010. The purchase price with respect to the sale to Kapsch was finalized in the fourth quarter of 2011 and resulted in an upward working capital adjustment of $3.We recognized a cumulative gain on disposal of $125 for this divestiture.

The related GSM/GSM-R business financial results of operations were not classified as discontinued operations as they did not meet tl definition of a component of an entity as required under U.S. GAAP.

*CVAS Business*

On May 28, 2010, we announced that we had completed the sale of substantially all of our assets of the CVAS business globally to GENBAND for a purchase price of $282, subject to balance sheet and other adjustments estimated at the time at approximately $100, resulting in estimated net proceeds of approximately $182. Subsequent to closing, a dispute arose between the parties over the interpretation of a defined term in the asset sale agreement regarding the final purchase price payable to us. In connection with the dispute between the parties over the interpretation of a defined term in the asset sale agreement, we recorded a charge in the first quarter of 2011 of $25 as our best estimate of the probable amount payable to GENBAND based on settlement discussions which were ongoing among the parties. In August 2011, the settlement discussions resulted in the parties reaching agreement on a final purchase price of approximately $157, a difference of approximately $25 from the initial purchase price on closing of $182. This settlement was approved by the Canadian Court and the U.S. Court on August 23, 2011. We recognized a cumulative gain on disposal of $180 for this divestiture.

The related CVAS business financial results of operations were not classified as discontinued operations as they did not meet the definition of a component of an entity as required under U.S. GAAP.

*GDNT Joint Venture*

On May 12, 2011, we announced that GDNT had concluded the sale of substantially all of its assets to Ericsson China for an aggregate purchase price of approximately $51 in cash, subject to certain purchase price adjustments. The purchase price has been finalized and the parties agreed to an upward purchase price adjustment of approximately $6, which was recorded in the second quarter of 2011. NNL and Nortel China Limited together own 62 percent of GDNT. Nortel China Limited is wholly owned by NNL. It is expected that GDNT will soon commence a process to wind down the entity and deal with its remaining assets and liabilities in accordance with Chinese law. At the conclusion of this process, any funds remaining in GDNT will be distributed to its shareholders. Nortel recognized a gain on disposal of $24 for this divestiture.

Table of Contents

The related financial results of operations of GDNT were not classified as discontinued operations as they did not meet the definition of a component of an entity as required under U.S. GAAP.

*Intellectual Property*

On June 30, 2011, we announced that we, NNL and certain of our other subsidiaries, including NNI and NNUK, concluded a successful auction with the Consortium emerging as the winning bidder for the sale of all of our remaining patents and patent applications for a cash purchase price of $4,500. In connection with the sale of the patents and patent applications, we received good faith deposits of $108 of which $54 was refunded to the unsuccessful bidders in the third quarter of 2011 and the balance was credited toward the purchase price paid on closing by the Consortium. We also received additional proceeds of $18 related to the sale of certain NNL tax attributes to the Consortium, which have been included as part of cash and cash equivalents.

This sale included more than 6,000 patents and patent applications spanning wireless, wireless 4G, data networking, optical, voice, internet, service provider, semiconductors and other patent portfolios. The extensive patent portfolio touched nearly every aspect of telecommunications and additional markets as well, including internet search and social networking.

On July 11, 2011, we, NNL, NNI and certain other subsidiaries obtained orders from the U.S. Court and the Canadian Court at a joint hearing approving the sale agreement. We concluded the sale on July 29, 2011 and recognized a gain on disposal of $4,475. An aggregate break-up fee of $25 plus $4 in expense reimbursements was paid to Google Inc., the unsuccessful "stalking horse" bidder.

*Internet Protocol Addresses*

We commenced a process, approved by the Canadian Court, to sell certain residual IT assets primarily consisting of about 17 million Internet Protocol version 4 addresses (IP Addresses), and IT hardware assets including 700 servers. Working together with the Canadian Monitor, our goal is to maximize the value of these residual IT assets in a timely manner. Any definitive sale agreement will require approval of the Canadian Court.

On February 17, 2012, the Canadian Court approved two sale agreements NNL and NNTC had entered into for the sale of rights in a small number of our IP Addresses. Under one sale agreement CSC Holdings LLC, the operating subsidiary of Cablevision Systems Corporation, is the purchaser of a certain number of the IP Addresses, and under the other sale agreement, Salesforce.com Inc. is the purchaser of a certain number of the IP Addresses. The financial and other terms of each of the sale agreements, including the cash purchase price and the IP Addresses included in each sale, have been sealed by order of the Canadian Court because disclosure of such terms may be detrimental to the Canadian Debtors' interests in seeking to consummate these and other sales of IP Addresses. Both purchasers have obtained approval from the American Registry for Internet Numbers (ARIN) with respect to the transfer and registration of the IP Addresses in the respective purchasers' name upon closing. We closed these sales in the first quarter 2012 and the proceeds from the transactions have been deposited into an NNL single purpose bank account. The Canadian Debtors and the U.S. Debtors have agreed that any dispute relating to the rights and claims, if any, of the U.S. Debtors in and to the IP Addresses, including to an allocation of such sale proceeds, will be subject to a joint hearing of the Canadian Court and the U.S. Court prior to the distribution of such sale proceeds and, if appropriate, orders of such courts approving such distributions. We continue to seek buyers for the remainder of our IP Addresses.

*Transition Services Agreements*

We entered into TSAs in connection with certain of the divestitures discussed above and are contractually obligated under such TSAs to provide transition services to certain purchasers of our businesses and assets, such as IT, order management, supply chain, service and technical support, finance and certain back office services. We have, subject to certain limitations, agreed to indemnify purchasers for losses in connection with a breach of our obligations under the TSAs or for certain other claims or losses that might arise under the TSAs. We receive income from the TSAs, which is reported in our financial statements under "Billings under TSAs", part of Other income (expense) - net. As of December 31, 2011, we had completed substantially all of our obligations under the TSAs with respect to the business sales. As well, we entered into a TSA in connection with the patent and patent applications sale to the Consortium, which is expected to be completed no later than March 31, 2012.

*Sale of Ottawa Carling Campus*

On December 17, 2010, we announced that NNL and NNTC completed the sale of our Ottawa Carling Campus to Public Works and Government Services Canada (PWGSC) for a cash purchase price of CAD$208. The Ottawa Carling Campus is located on 370 acres of land in Ottawa's national Capital Commission Greenbelt, and is comprised of 11 interconnected buildings totaling over 2 million square feet. The Canadian Court approved the sale on November 8, 2010.

The sale agreement provides for Nortel to continue to occupy parts of the Ottawa Carling Campus for varying periods of time to facilitate our continuing work on our global restructuring including work under the TSAs with the various buyers of our sold businesses. All other existing leases were assumed by PWGSC, including leases with buyers of our sold businesses. With respect to the lease with Ciena, the purchaser of the Optical Networking and Carrier Ethernet business, we were directed by PWGSC under the sale agreement to exercise, on closing, our early termination rights under the lease, shortening the lease from 10 years to 5 years. This resulted, pursuant to the lease with Ciena, in the repayment to Ciena of $33.5 from the escrowed proceeds from the business divestiture and thus a reduction on the related gain on sale.

26

Table of Contents

The sale agreement further provided that at closing title would be delivered free and clear of all encumbrances, including a charge in favor of NNI with respect to an intercompany loan agreement, under which $75 plus accrued interest was outstanding and due on December 31, 2010. NNL repaid this outstanding amount with the proceeds from the sale of the Ottawa Carling Campus prior to December 31, 2010.

*Liquidation of Subsidiaries*

With the completed sales of our businesses, we are focused on maximizing proceeds and cash flows with respect to remaining assets. This includes the winding up of our remaining operations and subsidiaries globally, which may involve orderly wind-ups as well as commencement of liquidation proceedings, as the circumstances warrant.

Events may impact when, and if, an entity is deemed to be in liquidation including local statutory requirements and court approvals. As such approvals and events occur, we will evaluate whether a change in basis of accounting for such entities is appropriate, and in all such cases, we will assess the carrying values of those entities' assets when it appears likely such entities will be approved for liquidation. Generally, we expect that an entity deemed to be in liquidation will result in a loss of control, deconsolidation of the entity, and accounting for the entity prospectively on a cost method basis. We recorded a loss of $74 for the year ended December 31, 2010, related to the liquidation of seven entities, which are included in reorganization items. No additional entities were deemed to be in liquidation in the year ended December 31, 2011. See note 6 of the accompanying audited consolidated financial statements for additional information about reorganization items.

**Divestiture Proceeds Received**

As of December 31, 2011, approximately $7,730 in net proceeds have been generated and received through the completed sales of businesses and assets. These divestiture proceeds include the following approximate amounts:

(a)  $1,070 from the sale of substantially all of our CDMA business and LTE Access assets;

(b)  $18 from the sale of our Layer 4-7 data portfolio;

(c)  $10 from the sale of our Packet Core Assets;

(d)  $932 from the sale of substantially all of the assets of our ES business, including the shares of DiamondWare, Ltd. and NGS;

(e)  $638 from the sale of substantially all of the assets of our Optical Networking and Carrier Ethernet businesses;

(f)  $67 from the sale of our North American GSM business;

(g)  $36 from the sale of our GSM business outside of North America (excluding our GSM business in CALA) and our global GSM-P business;

(h)  $149 from the sale of substantially all of our CVAS business;

(i)  $234 from the sale of NNL's 50% plus one share interest in LGN;

(j)  $45 from the sale of substantially all of our MSS business;

(k)  $56 from the sale of substantially all of the GDNT assets (proceeds recorded in cash and cash equivalents);

(l)  $4,470 from the sale of our remaining patents and patent applications; and

(m)  $5 from the sale of various other business assets.

As of December 31, 2011, $7,250 of proceeds received from divestitures is being held in escrow and an additional $229, representative of proceeds from the sale of LGN, is included in non-current restricted cash and cash equivalents, all of which is currently reported in NNL solely for financial reporting purposes (including with respect to any gain recorded on such divestitures). The difference between the net proceeds received and the amount in escrow at December 31, 2011 is a result of amounts that, from time to time, have been distributed with the consent of each of the Debtors' estates and court approvals, as applicable, from the escrow accounts to satisfy: 1) various obligations arising from the divestitures, whether through payments to third party vendors, or to reimburse the Debtors or non-consolidated subsidiaries for costs incurred, or 2) payments to the Debtors or non-consolidated subsidiaries related to settlements reached in respect of certain agreements involving proceeds allocation. The ultimate determination of the final allocation of such proceeds among the various Nortel legal entities, including entities that are not consolidated in the accompanying audited consolidated financial statements, has not yet occurred and may be materially different from the NNL classification and related amounts shown in these financial statements. The Interim Funding and Settlement Agreement (IFSA) and the escrow agreements for sales divestiture proceeds entered into by NNL, NNI and other Nortel legal entities provide for the processes for determining the final allocation of divestiture proceeds among such entities, either through joint agreement or, failing such

Table of Contents

agreement, other dispute resolution proceedings. Adjustments to the NNL classification and any related amounts arising from the ultimate allocation will be recognized when finalized. The NNL classification and related amounts shown in the accompanying audited consolidated financial statements are not determinative of, and have not been accepted by any debtor estate, any party in interest in the Creditor Protection Proceedings or any court overseeing such proceedings, for purposes of deciding the final allocation of divestiture proceeds.

As of December 31, 2011, a further $97 in connection with the divestitures of substantially all of our CDMA business and LTE Access assets, the assets of our Optical Networking and Carrier Ethernet businesses, substantially all of our global GSM/GSM-R and CVAS businesses, and substantially all of the assets of our MSS business is currently unrecorded and will be recognized, subject to agreement between Nortel and each of the various buyers that obligations under the TSAs have been completed. Such amounts, when and if received, will also be held in escrow until the final allocation of these proceeds as between various Nortel legal entities, including the U.S. and EMEA subsidiaries, is ultimately determined. Subsequent to December 31, 2011, our escrow agent has received $5 of the $97, which relates to the release of an escrow amount in connection with the sale of the CVAS business.

*Allocation of Divestiture Proceeds and Other Inter-Estate Matters*

At various times during the second half of 2009 and the first quarter of 2010, the Canadian Debtors, the U.S. Debtors and the U.K. Administrators, with the involvement of the Canadian Monitor, the U.S. Principal Officer, the U.S. Creditors' Committee and the Bondholder Group engaged in negotiations regarding the scope and terms of a proposed protocol for resolving disputes concerning the allocation of sale proceeds (Allocation Protocol), as required by the terms of the IFSA. However, it became apparent that the parties had differing views concerning the allocation of the sale proceeds, inter-company claims and the scope of the Allocation Protocol. In order to address this impasse, the Canadian Debtors, the U.S. Debtors and the U.K. Administrators agreed to temporarily suspend negotiations on the Allocation Protocol and instead focussed on a process to facilitate a comprehensive settlement to resolve all material outstanding inter-estate matters, including the allocation of the sale proceeds and the settlement of inter-company claims. To this end, the parties met on several occasions to outline, on a confidential and without prejudice basis, their respective allocation methodologies and potential inter-company claims that may be asserted.

As a result of these meetings and the complexity of the issues that were raised, the Canadian Debtors, the U.S. Debtors, the EMEA Debtors, the U.K. Administrators, the Canadian Monitor the U.S. Principal Officer, the U.S. Creditors' Committee, the Bondholder Group and certain other interested parties (the Mediation Parties) agreed that these inter-estate negotiations would be aided by the appointment of a neutral mediator to review and mediate the issues. The parties selected Layn R. Phillips, a former U.S. federal district court judge and experienced commercial mediator, to serve as mediator and review the positions and viewpoints of the various parties on allocation and unresolved inter-estate matters. A confidential, non-binding mediation was held in November 2010. The mediation session did not result in the resolution of the issues presented.

As a result of the November 2010 mediation session, and positions taken in the CCAA Proceedings, it became apparent that the U.K. Administrators and certain other parties, who were also substantial creditors of the EMEA Debtors, were alleging a number of significant potential claims against the Canadian Debtors as well as the U.S. Debtors. These potential claims are integral to the allocation positions of these parties and include allegations of proprietary and trust-type claims. Consequently, the Canadian Monitor and the Canadian Debtors determined that, absent reaching a comprehensive settlement of allocation and inter-company claims issues, these specific claims needed to be resolved first. Accordingly, the Canadian Debtors obtained an order of the Canadian Court establishing a process for the calling of claims by EMEA Creditors. See "Creditor Protection Proceedings Claims" below. Notwithstanding the commencement of this process, the Mediation Parties continued to engage in discussions regarding the resumption of mediation and another confidential, non-binding mediation was held in April 2011. On April 13, 2011, we announced that the mediation process that had been commenced in respect of the allocation of sale proceeds of our various business and asset divestitures and other inter-estate matters, including inter-company claims, had ended without resolution of the matters in dispute. In light of the unsuccessful conclusion of the mediation process, we announced that delays in the ultimate resolution of allocation and inter-company claims matters potentially could be significant, and that such delays would result in a corresponding significant delay in the timing of distributions to holders of validated claims of the various estates.

On April 25, 2011, the U.S. Debtors and the U.S. Creditors' Committee filed a joint motion for an order establishing an allocation protocol for the sale proceeds as between various Nortel legal entities (Original Protocol Motion), and for related relief. Subsequently, as a result of further discussions, the U.S. Debtors and the U.S. Creditors' Committee together with the Canadian Debtors jointly filed an amended and restated version of the Original Protocol Motion and agreed to collectively seek an order establishing an allocation protocol before the Canadian Court and the U.S. Court. The proposed order would have had the U.S. Court and the Canadian Court establish procedures and an expedited schedule for the cross-border resolution by the U.S. Court and the Canadian Court on the allocation of proceeds from the sales of our businesses and from the sale of our patent portfolio. The motion was heard at a joint hearing of the U.S. Court and Canadian Court on June 7, 2011. On June 20, 2011, we announced that the Canadian Court and the U.S. Court had reserved their decisions on the motions heard by such courts on June 7, 2011, and directed us, NNL and the other Canadian Debtors, NNI and the other U.S. Debtors, the EMEA Debtors, as well as certain other parties, to participate in a joint mediation of the issues raised in the motions. The directions provided that the Canadian Court and the U.S. Court together would appoint a sole mediator by supplemental order and that the mediator would determine the time, date, place and protocol of the mediation.

28

Table of Contents

On June 17, 2011, and as supplemented on June 29, 2011, the Canadian Court and the U.S. Court appointed The Honourable Warren K. Winkler, Chief Justice of Ontario, as the sole mediator (the Mediator) for the mediation. The mediation was ordered because of both courts' concern that the time required to prepare their decisions would also delay allocation proceedings and, therefore, distributions to creditors of the various Nortel estates.

The Mediator has the authority, in consultation with the parties to the mediation, to determine the scope of the mediation, as he deems appropriate, including the issue of allocation of the sale proceeds of Nortel's various businesses and patent portfolio, and global issues relating to allocation and claims. Participation in this mediation is mandatory. The mediation process will be terminated (i) by a declaration by the Mediator that a settlement has been reached (any such settlement would be subject to the approval of the Canadian Court and the U.S. Court, on notice to parties in interest), (ii) by a declaration by the Mediator that further efforts at mediation are no longer considered worthwhile, or (iii) for any other reason as determined by the Mediator. At the request of the U.S. Court, the commencement of the mediation has been delayed pending the outcome of the October 14, 2011 hearing (discussed in more detail below).

The Canadian Court approved a claims process with regard to the significant inter-company claims made by the EMEA Debtors against the Canadian Debtors, which process included a requirement that claims be filed by March 18, 2011. In response to this call for claims, representatives of the U.K. Administrators, on behalf of the EMEA Debtors, filed 84 proofs of claims against the Canadian Debtors and unspecified directors and officers of NNC and NNL (the EMEA Claims). The EMEA Claims contain broad ranging claims set out with limited specificity. The EMEA Claims also include a number of large priority claims, which if allowed, would significantly reduce the potential proceeds available for distribution to unsecured creditors of the Canadian Debtors. We are currently unable to quantify the total potential amounts claimed under the EMEA Claims, as many of the claims were not quantified. Of the EMEA Claims quantified, they total approximately CAD$9.8 billion. In addition, the U.K. Pension Trust Limited and the Board of the Pension Protection Fund in the U.K. filed an estimated claim of CAD$3.7 billion in respect of an alleged deficit in the U.K. pension plan (the U.K. Pension Claim). Should the EMEA Claims and the U.K. Pension Claim ultimately be allowed in the CCAA Proceedings on the basis filed, they could have the effect of doubling (or more) the estimated CCAA claims pool and, accordingly, significantly reduce potential distributions to other unsecured creditors of the Canadian Debtors. Further, counsel for 131 former employees of NNSA have submitted a letter indicating they would file proofs of claims in connection with an action that is currently before the courts in France.

On September 30, 2009, the EMEA Debtors and certain of their affiliates (collectively the EMEA Claimants) filed over 350 proofs of claim against the U.S. Debtors and unspecified directors and officers of the U.S. Debtors in the U.S. Court. On May 10, 2011, the U.S. Court entered an order requiring the EMEA Claimants to file more definite statements of their previously-filed claims, and to file any other pre-petition claims against the U.S. Debtors, by June 1, 2011, absent which any of their pre-petition claims would be disallowed. The deadline for filing amended proofs of claim was later extended on request of certain of the EMEA Claimants to June 3, 2011 (U.S. EMEA Claims Bar Date). The EMEA Claimants filed 38 amended proofs of claim on June 3, 2011. The remaining proofs of claim that had been filed by the EMEA Claimants and were not amended on timely basis have been disallowed and expunged pursuant to the terms of the U.S. Court's May 10, 2011 order.

On July 15 and 22, 2011, the U.S. Debtors and the U.S. Creditors' Committee filed joint objections and motions to dismiss the claims of NNUK, NNSA and Nortel Networks (Ireland) Limited and the French Liquidator. On August 3, 2011, the U.S. Court issued an order that set October 13 and 14, 2011 as the hearing dates for these motions. The order also requested the Mediator to consider postponing the mediation discussed above until after these hearings and the U.S. Court's decision on the motions to dismiss. On August 9, 2011, the Mediator advised the parties to the mediation that he was postponing the initial procedural meeting to a date to be determined after the U.S. Court releases its decision. The U.S. Court heard the motions on October 14, 2011 and has reserved judgment.

*Creditor Protection Proceedings Claims Processes*

On August 4, 2009, the U.S. Court approved a claims process in the U.S. for claims that arose prior to the Petition Date. Pursuant to this claims process, proofs of claim, except in relation to NNCI, had to be received by the U.S. Claims Agent, Epiq Bankruptcy Solutions, LLC (Epiq), by September 30, 2009 (subject to certain exceptions as provided in the order establishing the claims bar date). On December 2, 2009, the U.S. Court approved January 25, 2010 as the deadline for receipt by Epiq of proofs of claim against NNCI (subject to certain exceptions as provided in the order establishing the claims bar date).

On July 30, 2009, the Canadian Court approved a claims process in Canada in connection with the CCAA Proceedings. Pursuant to this claims process, subject to certain exceptions, proofs of claim for claims arising prior to the Petition Date had to be received by the Canadian Monitor by no later than September 30, 2009. This claims bar date did not apply to certain claims, including inter-company claims as between the Canadian Debtors or as between any of the Canadian Debtors and their direct or indirect subsidiaries and affiliates (other than joint ventures), compensation claims by current or former employees or directors of any of the Canadian Debtors, and claims of current or former directors or officers for indemnification and/or contribution, for which claims notification deadlines have yet to be set by the Canadian Court. Proofs of claim for claims arising on or after the Petition Date as a result of the restructuring, termination, repudiation or disclaimer of any lease, contract or other agreement or obligation had to be received by the Canadian Monitor by the later of September 30, 2009 or 30 days after a proof of claim package was sent by the Canadian Monitor to

29

Table of Contents

the person in respect of such claim. On September 16, 2010, the Canadian Court approved a methodology for the review and determination of claims filed against the Canadian Debtors. Also on September 16, 2010, the Canadian Court and U.S. Court approved a cross-border claims protocol to address the level of cooperation and consultation on issues between the Canadian Debtors and the U.S. Debtors with respect to overlapping and same-creditors' claims between the two debtor estates. The U.K. Administrators commenced an informal creditor claim submission and evaluation process in July 2010. Creditors will also have the opportunity to take part in a formal claims admission and proving process in accordance with English insolvency law provisions in due course.

On January 14, 2011, the Canadian Court approved a claims process with regard to the significant inter-company claims made by the EMEA Debtors against the Canadian Debtors. The claims process implements a 'call for claims' that required the EMEA Debtors to file their claims by March 18, 2011, and establishes a process for the proving and resolution of such claims so that this category of claims also moves forward through the claims process.

On October 6, 2011, the Canadian Court approved a methodology and procedure for compensation related claims in Canada. A bar date of January 6, 2012 for such claims was set. Approximately 16,000 of the Canadian Debtors' employees, former employees, pensioners and survivors including long-term disability (LTD) beneficiaries, may have employment-related claims, with a total value of such claims currently estimated to be approximately CAD$1.06 billion (see notes 8, 9 and 11 in the accompanying audited consolidated financial statements). The order includes a methodology based upon categories of employees for the calculation of compensation claims, as well as a streamlined process, to address such claims intended to provide a fair, reasonable, efficient and orderly process beneficial to both employees and the Canadian Debtors. The methodology was agreed upon after extensive discussions among the Canadian Debtors, the Canadian Monitor, Representative Counsel, LTD beneficiaries' representative counsel, Canadian Auto Workers (CAW) counsel and their respective actuarial and financial advisors.

The compensation claims are valued based on: (a) identified and agreed-upon benefits and agreed categories of claims, including post-retirement benefits; (b) agreed-upon actuarial assumptions and calculations, including with respect to income benefits, other benefits for LTD beneficiaries, post-retirement benefits and non-registered pension plan benefits and, with respect to adjustments relating to administrative costs and income tax, as applicable, agreed upon increase or "gross up" claim amounts; and (c) agreed-upon formulae relating to termination and severance pay claims. The order also calls for grievance claims, director compensation claims and indemnification claims that were excluded from prior claims processes of the Canadian Debtors. For more information on the employee compensation claims, refer to notes 8, 9 and 11 in the accompanying audited consolidated financial statements.

The accompanying audited consolidated financial statements for the year ended December 31, 2011 generally do not include the final outcome of any current or future claims relating to the Creditor Protection Proceedings, other than as described in this report. Certain claims filed may have priority over those of the Debtors' unsecured creditors. The Debtors are reviewing all claims filed and continue the claims reconciliation process. Differences between claim amounts determined by the Debtors and claim amounts filed by creditors will be investigated and resolved pursuant to a claims resolution process approved by the relevant court or, if necessary, the relevant court will make a final determination as to the amount, nature and validity of claims. Certain claims that have been filed may be duplicative (particularly given the multiple jurisdictions involved in the Creditor Protection Proceedings), based on contingencies that have not occurred, or may be otherwise overstated, and would therefore be subject to revision or disallowance. The settlement of claims cannot be finalized until the relevant creditors and courts approve a plan. In light of the number of creditors of the Debtors, the claims resolution process may take considerable time to complete. See note 20 of the accompanying audited consolidated financial statements for additional information about claims.

### Interim and Final Funding and Settlement Agreements

Historically, we had deployed our cash through a variety of intercompany borrowing and transfer pricing arrangements to allow us to operate on a global basis and to allocate profits, losses and certain costs among the corporate group. In particular, the Canadian Debtors allocated profits, losses and certain costs among the corporate group through transfer pricing agreement payments (TPA Payments). Other than one $30 payment made by NNI to NNL in respect of amounts that could arguably be owed in connection with the transfer pricing agreement, TPA Payments were suspended since the Petition Date. However, the Canadian Debtors and the U.S. Debtors, with the support of the U.S. Creditors' Committee and the Bondholder Group, as well as the EMEA Debtors (other than NNSA), entered into an Interim Funding and Settlement Agreement (IFSA) dated June 9, 2009 under which NNI paid $157 to NNL, in four installments during the period ended September 30, 2009 in full and final settlement of TPA Payments for the period from the Petition Date to September 30, 2009. Similarly, except for two shortfall payments totaling $20, the IFSA provides for a full and final settlement of any and all TPA Payments owing between certain EMEA entities and the U.S. and Canada for the period from the Petition Date through December 31, 2009. A portion of this funding may be repayable by NNL to NNI in certain circumstances. The

30

Table of Contents

IFSA was approved by the U.S. Court and Canadian Court on June 29, 2009 and on June 23, 2009, the English Court confirmed that the U.K. Administrators were at liberty to enter into the IFSA on behalf of each of the EMEA Debtors (except for NNSA which was authorized to enter into the IFSA by the French Court on July 7, 2009). NNSA acceded to the IFSA on September 11, 2009.

On December 23, 2009, we announced that we, NNL, NNI, and certain other Canadian Debtors and U.S. Debtors entered into a Final Canadian Funding and Settlement Agreement (FCFSA). The FCFSA provides, among other things, for the settlement of certain intercompany claims, including in respect of amounts determined to be owed by NNL to NNI under our transfer pricing arrangements for the years 2001 through 2005. As part of the settlement, NNL agreed to the establishment of a pre-filing claim in favor of NNI in the CCAA Proceedings in the net amount of approximately $2,063 (FCFSA Claim), which claim will not be subject to any offset. The FCFSA also provides that NNI would pay to NNL approximately $190, which was received, over the course of 2010, including the contribution of NNI and certain U.S. affiliates towards certain estimated costs to be incurred by NNL, on their behalf, for the duration of the Creditor Protection Proceedings. The FCFSA also provides for the allocation of certain other anticipated costs to be incurred by the parties, including those relating to the divestiture of our various businesses. On January 21, 2010, we obtained approvals from the Canadian Court and the U.S. Court of the FCFSA and the creation and allowance of the FCFSA Claim. In addition, we obtained various other approvals from the Canadian Court and U.S. Court including authorization for NNL and NNI to enter into advance pricing agreements with the U.S. and Canadian tax authorities to resolve certain transfer pricing issues, on a retrospective basis, for the taxable years 2001 through 2005. In addition, in consideration of a settlement payment of $37.5, the United States Internal Revenue Service (IRS) released all of its claims against NNI and other members of NNI's consolidated tax group for the years 1998 through 2008. As a result of this settlement, the IRS stipulated that its claim against NNI filed in the Chapter 11 Proceedings in the amount of approximately $3,000 was reduced to the $37.5 settlement payment. This settlement was a condition of the FCFSA and was approved by the U.S. Court on January 21, 2010. NNI made the settlement payment to the IRS on February 22, 2010.

On August 23, 2011, the Canadian Court approved a Q1 2010 Transfer Pricing Settlement Agreement among NNL, NNI, NNUK, certain other Debtors and the U.K. Administrators whereby certain inter-company matters were resolved, including NNL remitting $4.7 to NNUK. Further, the Canadian Court approved on the same date an Agreement on Transfer Pricing Amendments and Certain Other Matters among the same parties as well as the French Liquidator. Under this agreement, and related agreements, transfer pricing arrangements ceased among all Nortel entities, and as a result any subsequent inter-company transactions is on a cost plus basis.

### APAC Debt Restructuring Agreement

To enable certain Nortel subsidiaries (APAC Agreement Subsidiaries) in the Asia Pacific (APAC) region to continue their respective business operations and to facilitate the business divestitures, the Debtors (other than the Israeli Debtors) had entered into an Asia Restructuring Agreement (APAC Agreement). Under the APAC Agreement, the APAC Agreement Subsidiaries have paid a portion of certain of the APAC Agreement Subsidiaries net intercompany debt outstanding as of the Petition Date (Pre-Petition Intercompany Debt) to the Debtors (other than the Israeli Debtors). Further portions of the Pre-Petition Intercompany Debt have been repaid and continue to be repayable from time to time only to the extent of any such APAC Agreement Subsidiary's net cash balance at the relevant time, and subject to certain reserves and provisions. All required court approvals with respect to the APAC Agreement have been obtained in the U.S. and Canada.

### Debt Instruments and Other Contracts

Our filings under Chapter 11 and the CCAA constituted events of default or otherwise triggered repayment obligations under the instruments governing substantially all of the indebtedness issued or guaranteed by NNC, NNL, NNI and NNCC. In addition, we may not be in compliance with certain other covenants under indentures and other debt or lease instruments, and the obligations under those agreements may have been accelerated. We believe that any efforts to enforce such payment obligations against the U.S. Debtors are stayed as a result of the Chapter 11 Proceedings. Although the CCAA does not provide an automatic stay, the Canadian Court has granted a stay to the Canadian Debtors that currently extends to April 13, 2012. Pursuant to the U.K. Administration Proceedings, a moratorium has commenced during which creditors may not, without leave of the English Court or consent of the U.K. Administrators, enforce security, or commence or progress legal proceedings.

The Creditor Protection Proceedings may have also constituted events of default under other contracts and leases of the Debtors. In addition, the Debtors may not be in compliance with various covenants under other contracts and leases. Depending on the jurisdiction, actions taken by counterparties or lessors based on such events of default and other breaches may be unenforceable as a result of the Creditor Protection Proceedings.

In addition, the Creditor Protection Proceedings may have caused, directly or indirectly, defaults or events of default under the debt instruments and/or contracts and leases of certain of our non-Debtor entities. These events of default (or defaults that become events of default) could give counterparties the right to accelerate the maturity of this debt or terminate such contracts or leases.

### Value, Listing and Trading of NNC Common Shares and NNL Preferred Shares

On January 14, 2009, we received notice from the New York Stock Exchange (NYSE) that it decided to suspend the listing of Nortel Networks Corporation common shares (NNC common shares) on the NYSE. The NYSE stated that its decision was based on

31

Table of Contents

the commencement of the CCAA Proceedings and Chapter 11 Proceedings. As previously disclosed, we also were not in compliance with the NYSE's continued listing standards regarding price criteria pursuant to the NYSE's Listed Company Manual because the average closing price of NNC common shares was less than $1.00 per share over a consecutive 30-trading-day period as of December 11, 2008. Subsequently, on February 2, 2009, NNC common shares were delisted from the NYSE. NNC common shares are currently quoted in the over-the-counter market in the Pink Sheets under the symbol "NRTLQ".

On January 14, 2009, we received notice from the Toronto Stock Exchange (TSX) that it had begun reviewing the eligibility of NNC and NNL securities for continued listing on the TSX. However, the TSX stopped its review after concluding that the review was stayed by the Initial Order obtained by the Canadian Debtors pursuant to the CCAA Proceedings.

On February 5, 2009, the U.S. Court also granted a motion by the U.S. Debtors to impose certain restrictions and notification procedures on trading in NNC common shares and NNL preferred shares in order to preserve valuable tax assets in the U.S., in particular net operating loss carryovers and certain other tax attributes of the U.S. Debtors.

On June 19, 2009 (and numerous times subsequently), we announced that we do not expect that holders of NNC common shares and NNL preferred shares will receive any value from the Creditor Protection Proceedings and we expect that the proceedings will ultimately result in the cancellation of these equity interests. As a result, we applied to delist the NNC common shares and NNL applied to delist the NNL preferred shares from trading on the TSX and delisting occurred on June 26, 2009 at the close of trading.

As a result of the TSX delisting, certain sellers of NNC common shares and NNL preferred shares who are not residents of Canada (non-residents) for purposes of the *Income Tax Act* (Canada) may be liable for Canadian tax and may be subject to tax filing requirements in Canada as a result of the sale of such shares after June 26, 2009. Also, purchasers of NNC common shares and NNL preferred shares from non-residents may have an obligation to remit 25% of the purchase price to the Canada Revenue Agency. Parties to sales of NNC common shares or NNL preferred shares involving a non-resident seller should consult their tax advisors or the Canada Revenue Agency. The statements herein are not intended to constitute, nor should they be relied upon as, tax advice to any particular seller or purchaser of NNC common shares or NNL preferred shares.

On November 1, 2011, NNL announced that in light of its ongoing Creditor Protection Proceedings and the other factors mentioned, NNL would not be following the notification procedures set out in the provisions attached to its Cumulative Redeemable Class A Preferred Shares Series 5 (Series 5 Preferred Shares) in connection with the right of holders of Series 5 Preferred Shares to elect to convert such shares, on December 1, 2011, into Cumulative Redeemable Class A Preferred Shares Series 6 ("Series 6 Preferred Shares"), nor would a fixed dividend rate be set for purposes of the dividend rights attaching to the Series 6 Preferred Shares (none of which are currently outstanding). The principal distinction between the Series 5 Preferred Shares and Series 6 Preferred Shares, aside from their conversion rights, is that the former provide for floating adjustable dividends while the latter provide for fixed dividends, in either case, as and when declared payable by NNL's board of directors. NNL suspended the declaration of all dividends on its preferred shares in November 2008 and currently is not lawfully able to declare or pay dividends on its preferred shares, nor does it expect to resume the declaration or payment of dividends on its preferred shares at any time in the future. Further, as previously announced, NNL does not expect that holders of its preferred shares (of any series) will receive any value from the Creditor Protection Proceedings and expects that these proceedings will result in the cancellation of such shares.

### Annual General Meeting of Shareholders

We and NNL obtained an order from the Canadian Court under the CCAA Proceedings relieving NNC and NNL from the obligation to call and hold annual meetings of their respective shareholders by the statutory deadline, and directing them to call and hold such meetings within six months following the termination of the stay period under the CCAA Proceedings.

### Directors' and Officers' Compensation and Indemnification

The Initial Order of the Canadian Court in the CCAA Proceedings ordered the Canadian Debtors to indemnify directors and officers of the Canadian Debtors for claims that may be made against them relating to failure of the Canadian Debtors to comply with certain statutory payment and remittance obligations. The Initial Order also included a charge against the property of the Canadian Debtors in an aggregate amount not exceeding CAD$90 as security for such indemnification obligations. On February 26, 2010, the NNC and NNL boards of directors (Nortel Boards) approved the reduction in the amount of the charge to an aggregate amount not exceeding CAD$45 on the condition that such reduction shall have been approved by an order of the Canadian Court which order shall provide for certain related releases in respect of such claims. The reduction in the amount of the charge was approved by the Canadian Court on March 31, 2010.

In addition, in conjunction with the Creditor Protection Proceedings, NNC established a directors' and officers' trust (D&O Trust) in the amount of approximately CAD$12. The purpose of the D&O Trust is to provide a trust fund for the payment of liability claims (including defense costs) that may be asserted against individuals who serve as directors and officers of NNC, or as directors and officers of other entities at NNC's request (such as subsidiaries and joint venture entities), by reason of that association with NNC or other entity, to the extent that such claims are not paid or satisfied out of insurance maintained by NNC and NNC is unable to indemnify the individual. Such liability claims would include claims for unpaid statutory payment or remittance obligations of NNC or such other entities for which such directors and officers have personal statutory liability but will not include claims for which NNC

32

Table of Contents

is prohibited by applicable law from providing indemnification to such directors or officers. The D&O Trust also may be drawn upon to maintain directors' and officers' insurance coverage in the event NNC fails or refuses to do so. The D&O Trust will remain in place until the later of December 31, 2015 or three years after all known actual or potential claims have been satisfied or resolved, at which time any remaining trust funds will revert to NNC.

Certain Nortel entities have not filed for bankruptcy protection (Cascade Subsidiaries). Under the laws of various jurisdictions in which the Cascade Subsidiaries operate, the directors, officers and agents of the Cascade Subsidiaries may be subject to personal liability. In order to protect individuals serving as directors on the boards of the Cascade Subsidiaries and to facilitate participation by the Cascade Subsidiaries in our sales of businesses and assets, NNL and NNI have contributed to a trust (Trust), which will indemnify individuals serving as directors on the boards and as officers or agents of the Cascade Subsidiaries and their successors, if any, for any claims resulting from their service as a director, officer or agent of a Cascade Subsidiary, subject to limited exceptions. The Trust was approved by the Canadian Court and the U.S. Court on March 31, 2010.

*Workforce Reductions; Employee Compensation Programs*

We have taken and expect to take further, ongoing workforce and other cost reduction actions as we work through the Creditor Protection Proceedings. On the Petition Date, we employed approximately 30,300 employees globally. Through the sales of our businesses and cost reduction activities, our workforce was approximately 190 employees as of December 31, 2011, which includes employees in Canada and those employed by our consolidated subsidiaries. Therefore, this number excludes employees employed by any U.S. subsidiary or an EMEA subsidiary. Given the Creditor Protection Proceedings, we have discontinued all remaining activities under our previously announced restructuring plans as of the Petition Date. For further information, see the "Post-Petition Date Cost Reduction Activities" section of this report.

We continued the Nortel Networks Limited Annual Incentive Plan (Incentive Plan) in 2011 and will continue the Incentive Plan in 2012 for all eligible employees. The Incentive Plan permits quarterly award determinations and payouts for the business units and the Asia region, and semi-annual award determinations and semi-annual or annual payouts for the Corporate Group and NBS, as applicable.

Where required, we have obtained court approvals for retention and incentive compensation plans for certain key eligible employees deemed essential to the business during the Creditor Protection Proceedings. In March 2009, we obtained U.S. Court and Canadian Court approvals for a key employee incentive and retention program for employees in North America, CALA and Asia. The program consisted of the Nortel Networks Corporation Key Executive Incentive Plan and the Nortel Networks Corporation Key Employee Retention Plan.

On March 4, 2010, we obtained U.S. Court approval and on March 8, 2010 we obtained Canadian Court approval for the Nortel Special Incentive Plan (NSIP), which is designed to retain personnel at all levels of Corporate Group and NBS critical to complete our remaining work. The NSIP was developed in consultation with independent expert advisors taking into account the availability of more stable and competitive employment opportunities available to these employees elsewhere. The NSIP was supported by the Canadian Monitor, U.S. Creditors' Committee and the Bondholders Group. Representative Counsel to former Canadian employees was also advised of the NSIP prior to its approval by the Canadian Court and U.S. Court. Approximately 80% of the NSIP's costs were funded by the purchasers of our businesses, pursuant to the terms of sales agreements. Certain purchasers have required that we retain key employees around the world to ensure that the transition to them of the acquired businesses is as effective and efficient as possible. The NSIP covered the period from January 1, 2010 to December 31, 2011.

As there remain significant milestones to complete the wind-down of our operations and conclude the CCAA Proceedings, a new retention plan (Retention Plan) for our employees and certain of our affiliates in the APAC and CALA regions in which we have an economic interest, was established by us in consultation with the Canadian Monitor to cover the 2012 calendar year. The Retention Plan was approved by the Canadian Court on December 14, 2011. The Retention Plan includes approximately 150 employees in Canada, and the APAC and CALA regions, and the costs of the Retention Plan will be funded by the Nortel entity that employs a particular employee. Retaining our remaining employees is critical to our ability to complete our restructuring efforts, repatriate cash from affiliates in the APAC and CALA regions and complete the wind-down of those global entities, complete the estate segregation activities with respect to the IT infrastructure and applications, assist in the creditor claims processes including resolution of inter-company, trade and compensation related claims, assist in the sales proceeds allocation process, compliance with ongoing public reporting and tax compliance, and ultimately complete and implement a plan of arrangement.

On February 27, 2009, we obtained Canadian Court approval to terminate our equity-based compensation plans (the Nortel 2005 Stock Incentive Plan, As Amended and Restated (2005 SIP), the Nortel Networks Corporation 1986 Stock Option Plan, As Amended and Restated (1986 Plan) and the Nortel Networks Corporation 2000 Stock Option Plan (2000 Plan)) and certain equity plans assumed in prior acquisitions, including all outstanding equity under these plans (stock options, stock appreciation rights (SARs), restricted stock units (RSUs) and performance stock units (PSUs)), whether vested or unvested. We sought this approval given the decreased value of NNC common shares and the administrative and associated costs of maintaining the plans to us as well as the plan participants. As a consequence, all options under the remaining equity-based compensation plans assumed in prior acquisitions had expired.

33

Table of Contents

### Settlement Agreement with Former and Disabled Canadian Employee Representatives

On February 8, 2010, the Canadian Debtors reached an agreement on certain employment related matters regarding our former Canadian employees, including our Canadian registered pension plans and benefits for Canadian pensioners and our employees on long term disability (LTD). We entered into a settlement agreement with court-appointed representatives of our former Canadian employees, pensioners and LTD beneficiaries, Representative Counsel, the Canadian Auto Workers' union and the Canadian Monitor (Settlement Agreement). The Settlement Agreement, as amended, was approved by the Canadian Court on March 31, 2010.

The Settlement Agreement provided that we would continue to administer the Nortel Networks Limited Managerial and Non-Negotiated Pension Plan and the Nortel Networks Negotiated Pension Plan (collectively, the Canadian Pension Plans and individually, a Canadian Pension Plan) until September 30, 2010, at which time the Canadian Pension Plans were transitioned, in accordance with the Ontario Pension Benefits Act, to Morneau Sheppell Ltd. (formerly known as Morneau Sobeco Limited Partnership), a replacement administrator appointed by the Ontario Superintendent of Financial Services (Ontario Superintendent). We, as well as the Canadian Monitor, took all reasonable steps to complete the transfer of the administration of the Canadian Pension Plans to the new administrator. We continued to fund the Canadian Pension Plans consistent with the current service and special payments we had been making during the course of the CCAA Proceedings through March 31, 2010, and thereafter continued to make current service payments until September 30, 2010. On January 17, 2011, the Ontario Superintendent issued a Notice of Intended Decision stating that he intended to order the wind up of the Canadian Pension Plans effective October 1, 2010. See "Pension and Post-retirement Benefits" in this section of this report.

For the remainder of 2010, we continued to pay medical and dental benefits to our pensioners and survivors and our LTD beneficiaries in accordance with the current benefit plan terms and conditions. Life insurance benefits continued unchanged until December 31, 2010 and continued to be funded consistent with 2009 funding. Further, we paid income benefits to the LTD beneficiaries and to those receiving survivor income benefits and survivor transition benefits through December 31, 2010. The employment of the LTD beneficiaries terminated on December 31, 2010. Under the Settlement Agreement, the parties agreed to work toward a court-approved distribution of the assets of Nortel's Health and Welfare Trust, the vehicle through which we generally have historically funded these benefits, with the exception of the income benefits described above, which we have paid directly. On November 9, 2010, the Canadian Court approved the Canadian Monitor's motion regarding a proposed allocation methodology with respect to the funds held in Nortel's Health and Welfare Trust for distribution to beneficiaries of the trust. Leave to appeal that order, which was sought by a group of 39 LTD beneficiaries, was denied by the Ontario Court of Appeal on January 7, 2011. By a series of Canadian Court orders dated December 15, 2010, May 3, 2011 and June 21, 2011, interim distributions out of the Health and Welfare Trust were approved and cumulative interim distributions of approximately CAD$24 were made to approximately 760 beneficiaries between January and July 2011. An additional interim distribution in the amount of approximately CAD$1.9 was made to LTD beneficiaries on or about September 30, 2011. On November 8, 2011, the Canadian Court approved a fifth distribution in the amount of CAD$22.2, substantially all of which was made on or about November 30, 2011 to over 8,000 LTD, pensioner and other beneficiaries. A sixth interim distribution was approved by the Canadian Court on March 2, 2012 in the amount of CAD$10.4. We continue to work with the Canadian Monitor and Representative Counsel to finalize outstanding matters to allow a final distribution from the Health and Welfare Trust.

The Settlement Agreement also provides that we establish a fund of CAD$4.3 for termination payments of up to CAD$0.003 per employee to be made to eligible terminated employees as an advance against their claims under the CCAA Proceedings, of which approximately CAD$4.3 has been paid. See information on employee compensation claims in the "Creditor Protection Proceedings Claims Processes" section of this report.

A charge in the maximum amount of CAD$57 against the Canadian Debtors' assets has been established as security in support of the payments to be made by us under the Settlement Agreement, which amount will be reduced by the amount of payments made. The Settlement Agreement also sets out the relative priority for claims to be made in respect of the deficiency in the Canadian Pension Plans and Nortel's Health and Welfare Trust. Under the Settlement Agreement, these claims will rank as ordinary unsecured claims in the CCAA Proceedings.

See note 11 in the accompanying audited consolidated financial statements for further information on our pension and employee benefits plans.

### Environmental Remediation Sites

Under the CCAA Proceedings, the Canadian Debtors have filed a motion for an order authorizing and directing the Canadian Debtors to cease performing any remediation at or in relation to five sites (Belleville, Brampton, Brockville, Kingston and London, Ontario), and that any claims in relation to such remediation be subject to the court approved claims process under the CCAA Proceedings. We brought the motion to disclaim any further obligation for such properties that are no longer owned or used by us and that we and our creditors derive no benefit from any further remediation. Subsequent to the filing of the motion, NNL entered into a transition agreement regarding the Brampton site that facilitated a gradual cessation of NNL's environmental risk related tasks at that site, which tasks have now been completed. The Ministry of the Environment (the MOE) has made remediation orders with respect to the four other sites. The motion was heard in September 2011 in the Canadian Court, wherein the Canadian Debtors sought advice and direction that the MOE remediation orders are in breach of the CCAA stay. A decision on that motion is pending. To date, the MOE has not sought to enforce the remediation orders while the Canadian Court's decision is outstanding and NNL has continued to undertake environmental risk assessments and remediation related tasks at those sites.

34

Table of Contents

*Basis of Presentation and Going Concern Considerations*

For periods ending after the Petition Date, we reflect adjustments to our financial statements in accordance with Financial Accounting Standards Board (FASB) Accounting Standards Codification (ASC) 852 "Reorganization" (ASC 852), on the basis that we will continue as a going concern.

After consideration of the guidance available in FASB ASC 810 "Consolidation" (ASC 810) and ASC 852, the accompanying audited consolidated financial statements as of and for the years ended December 31, 2011 and 2010 have been presented on the following basis with respect to our subsidiaries:

- the EMEA Debtors and their subsidiaries (collectively, the EMEA Subsidiaries) were accounted for under the equity method from the Petition Date up to May 31, 2010 and as an investment under the cost method of accounting thereafter;

- the U.S. Debtors and their subsidiaries (collectively, the U.S. Subsidiaries) were accounted for as consolidated subsidiaries until September 30, 2010 and as an investment under the cost method of accounting thereafter; and

- our other subsidiaries are consolidated throughout the periods presented consistent with the basis of accounting applied in 2008 prior to the commencement of the Creditor Protection Proceedings with the exception of deconsolidated subsidiaries due to loss of control once deemed to be in liquidation proceedings.

We continue to exercise control over our subsidiaries located in Canada, CALA and Asia (other than those entities that are EMEA Subsidiaries or U.S. Subsidiaries), and our financial statements are prepared on a consolidated basis with respect to those subsidiaries. We will continue to evaluate our remaining consolidated subsidiaries for the appropriateness of the accounting applied to these investments as the Creditor Protection Proceedings progress.

The accompanying audited consolidated financial statements include all information and notes required by U.S. GAAP in the preparation of annual consolidated financial statements. Although we are headquartered in Canada, the accompanying audited consolidated financial statements are expressed in U.S. Dollars as the greater part of our financial results and net assets are denominated in U.S. Dollars.

The accompanying audited consolidated financial statements do not purport to reflect or provide for the consequences of the Creditor Protection Proceedings. In particular, such audited consolidated financial statements do not purport to show: (a) as to assets, their realizable value on a liquidation basis or their availability to satisfy liabilities; (b) as to pre-petition liabilities, all amounts that may be allowed for claims or contingencies, or the status and priority thereof, or the amounts at which they may ultimately be settled; (c) as to shareholders' accounts, the effect of any changes that may be made in our capitalization; (d) as to operations, the effect of any future changes that may be made in our business; or (e) as to divestiture proceeds held in escrow and recorded by NNL solely for financial reporting purposes, the final allocation of these proceeds as between various Nortel legal entities, which will ultimately be determined either by joint agreement or through a dispute resolution proceeding (see above and note 2 to the accompanying audited consolidated financial statements).

The ongoing Creditor Protection Proceedings and completed divestitures of our businesses and assets raise substantial doubt as to whether we will be able to continue as a going concern. The accompanying audited consolidated financial statements have been prepared using U.S. GAAP and the rules and regulations of the SEC. While the Debtors have filed for and been granted creditor protection, the accompanying audited consolidated financial statements continue to be prepared using the going concern basis, which assumes that we will be able to realize our assets and discharge our liabilities in the normal course of business for the foreseeable future. However, it is not possible to predict the outcome of the Creditor Protection Proceedings and, as such, there is substantial doubt regarding the realization of assets and discharge of liabilities. If the going concern basis is not appropriate, adjustments will be necessary to the carrying amounts and/or classification of our assets and liabilities. Further, a court-approved plan in connection with the Creditor Protection Proceedings could materially change the carrying amounts and classifications reported in the accompanying audited consolidated financial statements.

In the course of preparing our first quarter 2011 financial statements, we became aware of certain NNL contractual guarantees provided in connection with real estate leases entered into by certain EMEA Subsidiaries and U.S. Subsidiaries that were not recognized at fair value upon the respective deconsolidation dates of these subsidiaries. See note 2 of the accompanying audited consolidated financial statements for further information on the correction of these immaterial errors related to the applicable periods.

See note 1 in the accompanying audited consolidated financial statements for further information on our basis of presentation and going concern considerations.

35

Table of Contents

### Reporting Requirements

As a result of the Creditor Protection Proceedings, we are periodically required to file various documents with and provide certain information to the Canadian Court, the U.S. Court, the English Court, the Canadian Monitor, the U.S. Creditors' Committee, the U.S. Trustee and the U.K. Administrators. Depending on the jurisdictions, these documents and information may include statements of financial affairs, schedules of assets and liabilities, monthly operating reports, information relating to forecasted cash flows, as well as certain other financial information. Such documents and information, to the extent they are prepared or provided by us, will be prepared and provided according to requirements of relevant legislation, subject to variation as approved by an order of the relevant court. Such documents and information may be prepared or provided on an unconsolidated, unaudited or preliminary basis, or in a format different from that used in the financial statements included in our periodic reports filed with the SEC. Accordingly, the substance and format of these documents and information may not allow meaningful comparison with our regular publicly-disclosed financial statements. Moreover, these documents and information are not prepared for the purpose of providing a basis for an investment decision relating to our securities, or for comparison with other financial information filed with the SEC.

For a full discussion of the risks and uncertainties we face as a result of the Creditor Protection Proceedings, including the risks mentioned above, see the Risk Factors section of this report. Further information pertaining to our Creditor Protection Proceedings may be obtained through our website at www.nortel.com. Certain information regarding the CCAA Proceedings, including the reports of the Canadian Monitor, is available at the Canadian Monitor's website at www.ey.com/ca/nortel. Documents filed with the U.S. Court and other general information about the Chapter 11 Proceedings are available at http://chapter11.epiqsystems.com/nortel. The content of the foregoing websites is not a part of this report.

## Our Business

We have completed the sales of all of our businesses. We continue to oversee and fulfill the residual contracts not transferred to the various buyers. As a result, commencing with the first quarter of 2011, we have one reportable segment, as our chief operating decision maker reviews financial and operating results and makes decisions on that basis. Accordingly, we have amended previously reported financial information to conform to the change in reportable segments.

### Results of Operations — Continuing Operations

## Revenues

Revenues in 2011 were $27 as compared to $620 in 2010 representing a decrease of $593.

Revenues in 2011 were significantly impacted by the divestitures of all of our businesses, in particular the Optical Networking and Carrier Ethernet and GSM/GSM-R businesses in the first quarter of 2010 and the divestiture of the CVAS business in the second quarter of 2010 when comparing the 2011 results to the same periods in 2010. The decrease in revenues was further impacted by the deconsolidation of the U.S. Subsidiaries at the beginning of the fourth quarter of 2010.

## Gross Margin

Gross loss was $14 for the year ended December 31, 2011 compared to gross profit of $88 for the year ended December 31, 2010. The gross loss in 2011 was driven primarily by costs related to the transfer of obligations under certain stranded contracts to third parties.

Remaining costs of revenues relate primarily to costs to deliver the remaining TSA activities. Given the minimal revenue, we no longer consider gross margin to be a meaningful measure.

## SG&A and R&D Expenses

|  | 2011 | 2010 | $ Change | % Change |
|---|---|---|---|---|
| SG&A expense | $ 157 | $ 515 | $ (358) | (70) |
| R&D expense | - | 107 | (107) | (100) |

Selling, General and Administrative (SG&A) expense decreased to $157 in 2011 from $515 in 2010, a decrease of $358 or 70%. The decrease in SG&A expense was due to the business divestitures and the deconsolidation of the U.S. Subsidiaries noted above. Due to the divestiture of all of our businesses, we no longer invest in research and development (R&D). As a result, our R&D expense was nil in 2011 and is expected to be nil for the remainder of the Creditor Protection Proceedings.

## Pre-Petition Date Cost Reduction Plans

During the third quarter of 2011, Nortel filed a motion with the Canadian Court to approve a methodology that includes, among other matters, an amount for employees' severance claims. The motion was approved on October 6, 2011. The workforce provision was adjusted to reflect the severance claims amount under the approved methodology. In 2011, charges related to restructuring plans were $4 as compared to a recovery of $5 in 2010.

Table of Contents

As a result of the Creditor Protection Proceedings, we ceased taking any further actions under our previously announced workforce and cost reduction plans as of January 14, 2009. Any revisions to actions taken up to that date under previously announced workforce and cost reduction plans will continue to be accounted for under such plans, and will be classified in cost of revenues, SG&A and R&D as applicable. Our contractual obligations are subject to re-evaluation in connection with the Creditor Protection Proceedings and, as a result, expected cash outlays relating to contract settlement and lease costs are subject to change. As well, we are not following our pre-Petition Date practices with respect to the payment of severance in jurisdictions under the Creditor Protection Proceedings.

Recoveries primarily result from lease repudiations and other liabilities relinquished due to the Creditor Protection Proceedings and severance related accruals released from pre-Petition Date restructuring plans and re-established under post–Petition Date cost reduction activities. For a description of our previously announced restructuring plans and further details of the charges (recoveries) incurred, refer to note 8 to the accompanying audited consolidated financial statements.

**Post-Petition Date Cost Reduction Activities**

In connection with the Creditor Protection Proceedings, we have taken and expect to take further workforce and other cost reduction actions. During the third quarter of 2011, Nortel filed a motion with the Canadian Court to approve a methodology that includes, among other matters, an amount for employees' severance claims. The motion was approved on October 6, 2011. The workforce provision was adjusted to reflect the severance claims amount under the approved methodology. The actions related to these activities are expected to occur as they are identified. The following current estimated charges are based upon accruals made in accordance with U.S. GAAP. The current estimated total charges to earnings and cash outlays are subject to change as a result of our ongoing review of applicable law. In addition, the current estimated total charges to earnings and cash outlays do not reflect all potential claims or contingency amounts that may be allowed under the Creditor Protection Proceedings and thus are also subject to change.

*Workforce Reduction Activities*

In 2011, approximately $20 of charges relating to the net workforce reduction of 475 positions were incurred. In 2011, approximately $81 was recorded in relation to the Canadian severance claim adjustment noted above. As of December 31, 2011, our workforce reduction provision balances were approximately $140, of which $139 were classified as subject to compromise. As we continue to progress through the Creditor Protection Proceedings, we expect to incur charges and cash outlays related to workforce and other cost reduction strategies. We will continue to report future charges and cash outlays under the broader strategy of the post-Petition Date cost reduction plan.

The following table sets forth charges by caption in the statements of operations:

|  | 2011 | 2010 |
|---|---|---|
| Cost of revenues | $ 4 | $ 14 |
| SG&A | 14 | 25 |
| R&D | - | 10 |
| Other | 83 | - |
| Total workforce reduction charge | $ 101 | $ 49 |

*Other Cost Reduction Activities*

In 2011, there were no charges related to Nortel's real estate cost reduction activities. As of December 31, 2011, our real estate and other cost reduction balances were approximately $6, which are classified as liabilities subject to compromise.

In 2010, our real estate related cost reduction activities resulted in charges of $8, which were recorded against SG&A and reorganization items. In 2010, we recorded an impairment of $11 and additional charges of $13 to reorganization items for lease repudiation and other contract settlements.

37

Table of Contents

**Other Operating (Income) Expense— Net**

The components of other operating income — net were as follows:

|  | 2011 | 2010 |
|---|---|---|
| Royalty license income - net | $ (2) | $ (10) |
| Litigation charges - net | (6) | 5 |
| Billings under TSAs | (50) | (269) |
| Other - net | 1 | (7) |
| Other operating income - net | $ (57) | $(281) |

In 2011, other operating income — net was $57 due primarily to billings related to TSAs entered into in connection with our various divestitures. We are expecting only minimal billings related to TSAs in future quarters due to the substantial completion of all agreements, with the exception of the TSA in relation to the sale of our patents and patent applications.

In 2010, other operating income — net was $281 due primarily to billings related to TSAs with Ericsson and Avaya of $269, royalty income of $10, and other — net of $7, partially offset by litigation settlement charges of $5.

**Other Income (Expense) — Net**

The components of other income (expense) — net were as follows:

|  | 2011 | 2010 |
|---|---|---|
| Gain on sale and impairment of investments | $ 1 | $ 7 |
| Rental income | 3 | 59 |
| Currency exchange loss - net | (35) | (6) |
| Other - net | (14) | (3) |
| Other income (expense) - net | $ (45) | $ 57 |

In 2011, other income (expense) — net was a net expense of $45, primarily comprised of currency exchange loss of $35, and other - net of $14, partially offset by rental income of $3. In 2010, other income (expense) — net was income of $57, primarily due to rental income of $59 and gain on sale and impairment of investments of $7, partially offset by currency exchange loss of $6.

**Interest Expense**

Interest expense remained relatively consistent in 2011 compared to 2010. We have continued to accrue for interest expense in 2011 of $326 and in 2010 of $301 in our normal course of operations related to debt issued by NNC or NNL in Canada until we obtain a claims determination order that adjudicates the claims. During the pendency of the Creditor Protection Proceedings, we generally have not and do not expect to make payments to satisfy the interest obligations of the Debtors.

38

Table of Contents

**Reorganization Items — net**

Reorganization items represent the net direct and incremental charges related to the Creditor Protection Proceedings such as revenues, expenses including professional fees directly related to the Creditor Protection Proceedings, realized gains and losses, and provisions for losses resulting from the reorganization and restructuring of the business. Reorganization items for the years ended December 31, 2011 and 2010 consisted of the following:

|  | 2011 | 2010 |
|---|---|---|
| Professional fees (a) | $ (70) | $ (155) |
| Interest income (b) | 14 | 13 |
| Lease repudiation (c) | - | (3) |
| Employee incentive plans (d) | (20) | (43) |
| Employee severance related claims (e) | (79) | - |
| Pension, post-retirement and post-employment plans (f) | (95) | (401) |
| NNUK pension guarantee (g) | - | (634) |
| Gain on divestitures - net (h) | 65 | 843 |
| Gain on IP sale (h) | 4,475 | - |
| Loss on liquidation of subsidiaries (i) | (1) | (74) |
| EMEA deconsolidation adjustment (j) | - | (763) |
| U.S. deconsolidation adjustment (k) | - | (2,013) |
| U.S. debt guarantee (l) | - | (150) |
| Gain (loss) on impairment or sale of stranded assets (m) | 1 | (140) |
| Settlements (n) | (18) | (2) |
| Lease guarantees (o) | - | (125) |
| Reimbursements from escrow to non-Canadian estates (p) | (59) | - |
| Other (q) | (26) | (47) |
| Total reorganization items - net | $4,187 | $(3,694) |

(a)   Includes financial, legal, real estate and valuation services directly associated with the Creditor Protection Proceedings.

(b)   Reflects interest earned due to the preservation of cash as a result of the Creditor Protection Proceedings.

(c)   We have rejected a number of leases, resulting in the recognition of non-cash gains and losses.

(d)   Relates to retention and incentive plans for certain key eligible employees deemed essential during the Creditor Protection Proceedings.

(e)   Relates to the estimated allowed claim for employee severance obligations. See notes 8 and 9 to the accompanying audited consolidated financial statements.

(f)   Includes amounts related to the Settlement Agreement, the termination of the Nortel Networks Supplementary Executive Retirement Plan (SERP) defined benefit plan, a partial settlement of the Retirement Allowance Plan (RAP), and adjustments made to estimated allowed claims related to post-employment and post-retirement plans. See note 11 to the accompanying audited consolidated financial statements for more information.

(g)   Relates to the NNUK pension guarantee. See note 14 to the accompanying audited consolidated financial statements for further information.

(h)   Relates to the gains on various divestitures (includes direct and incremental costs). See note 2 to the accompanying audited consolidated financial statements for further information.

(i)   Relates to deconsolidation of certain subsidiaries in connection with liquidation activities during the Creditor Protection Proceedings. See note 2 to the accompanying audited consolidated financial statements for further information.

(j)   Relates to the charge due to the deconsolidation of the EMEA Subsidiaries and the application of the cost method of accounting. See note 1 to the accompanying audited consolidated financial statements for further information.

(k)   Relates to a charge due to the deconsolidation of the U.S. Subsidiaries and the application of the cost method of accounting. See note 1 to the accompanying audited consolidated financial statements for further information.

(l)   Relates to the U.S. debt guarantee. See note 14 to the accompanying audited consolidated financial statements.

(m)   Relates to impairment or sale of certain long-lived assets.

(n)   Includes net payments pursuant to settlement agreements since the Petition Date, and in some instances the extinguishment of net pre-petition liabilities.

(o)   Relates to the estimated fair value under ASC460 of NNL's guarantees of lease obligations primarily related to real estate leases entered into by certain EMEA Subsidiaries and U.S. Subsidiaries. See note 1 and note 14 to the accompanying audited consolidated financial statements for further information.

(p)   Relates to certain distributions and payments from escrow made to non-Canadian debtors in the course of the Creditor Protection Proceedings. See note 2 to the accompanying audited consolidated financial statements.

(q)   Includes other miscellaneous items directly related to the Creditor Protection Proceedings.

Table of Contents

**Income Tax Expense**

In 2011, Nortel recorded a tax expense of $9 on earnings from continuing operations before income taxes and equity in net loss of associated companies and EMEA Subsidiaries of $3,701. The tax expense of $9 is comprised of $3 resulting from taxes on earnings in Asia, $8 relating to the accrual of the deferred tax liability associated with the investments in CALA and Asia, $4 of other taxes including withholding taxes, offset by decreases in uncertain tax positions and other taxes of $4 and the reversal of previously accrued income taxes and interest of $2.

In 2010, Nortel recorded a tax recovery of $40 on loss from continuing operations before income taxes and equity in net loss of associated companies and EMEA Subsidiaries of $4,199. The tax recovery of $40 is largely comprised of $11 of income taxes on current year earnings in various jurisdictions offset by decreases in uncertain tax positions and other taxes of $10 and the reversal of previously accrued income taxes and interest of $41.

Income tax expense or benefit from continuing operations is generally determined without regard to other categories of earnings, such as discontinued operations and other comprehensive income. An exception is provided when there is aggregate income from categories other than continuing operations and a loss from continuing operations in the current year. In this case, the tax benefit allocated to continuing operations is the amount by which the loss from continuing operations reduces the tax expense recorded with respect to the other categories of earnings, even when a valuation allowance has been established against the deferred tax assets. In instances where a valuation allowance is established against current year losses, income from other sources, including discontinued operations, is considered when determining whether sufficient future taxable income exists to realize the deferred tax assets. In 2011 and 2010, the amount of tax recovery allocated to continuing operations and tax expense allocated to discontinued operations as a result of income from discontinued operations being offset by losses from continuing operations was nil and $7 respectively.

We continue to assess the valuation allowance recorded against our deferred tax assets on a quarterly and annual basis. The valuation allowance is in accordance with FASB ASC 740 "Income Taxes" (ASC 740), which requires us to establish a valuation allowance if, based on the weight of available evidence, it is more likely than not that some portion or all of a company's deferred tax assets will not be realized. We previously recorded a full valuation allowance in 2008 against our net deferred tax asset in all tax jurisdictions other than joint ventures in Korea and Turkey. Based on the available evidence, we have determined that a full valuation allowance continues to be necessary as at December 31, 2011 for all jurisdictions. For additional information, see "Application of Critical Accounting Policies and Estimates — Income Taxes" in this section of this report.

### Results of Operations — EMEA Subsidiaries

As discussed above, the EMEA Subsidiaries were accounted for under the equity method of accounting from the Petition Date through May 31, 2010 and are accounted for under the cost method of accounting beginning June 1, 2010. Therefore, no results for EMEA Subsidiaries are reported in our accompanying audited consolidated financial statements for the year ended December 31, 2011. Equity in net loss of EMEA Subsidiaries for the year ended December 31, 2010 only includes the results of EMEA Subsidiaries through May 31, 2010. Equity in net loss of EMEA Subsidiaries was a loss of $50 for 2010, and the following discussion relates to the key components comprising the EMEA Subsidiaries' net loss.

Revenues in 2010 up to May 31, 2010 were $243, excluding $4 in discontinued operations.

Gross profit was $49 and gross margin was 19.8% for the year ended 2010 up to May 31, 2010.

SG&A and R&D expenses were $116 and $8, respectively, for 2010 up to May 31, 2010.

Reorganization items net were $13 for 2010. The primary drivers were charges for professional fees of $39, employee incentive plans of $9 and settlements of $3 partially offset by gain on divestitures of $28 and other of $8.

### Results of Operations—Discontinued Operations

We completed the sale of substantially all of the assets of the ES business globally, including the shares of DiamondWare, Ltd. and NGS in the fourth quarter of 2009. NNL completed the sale of its 50% plus one share interest in LGN in the second quarter of 2010. The related ES, NGS and LGN financial results of operations have been classified as discontinued operations for all periods presented.

*ES*

Loss from discontinued operations, net of taxes, for 2011 was $1 primarily attributable to reorganization items.

Loss from discontinued operations, net of taxes, for 2010 was $18.

Revenues for 2010 were $11 with a negative gross profit of $3 related to the residual business not transferred to Avaya. Additionally, in 2010, ES incurred SG&A expense of $10.

40

Table of Contents

*LGN*

Earnings from discontinued operations, net of taxes, for 2010 for LGN were $42. We recorded a gain of $53 on the sale of NNL's interest in LGN to Ericsson in the second quarter of 2010. Revenues for 2010 were $210 with a gross profit of $58 for LGN. SG&A and R&D expenses were $37 and $30, respectively.

For further information about discontinued operations see note 5 to the accompanying audited consolidated financial statements.

## Liquidity and Capital Resources

### Overview

As of December 31, 2011, our cash and cash equivalents balance was $751.

Our consolidated cash is held globally in various Nortel consolidated entities and joint ventures as follows, as of December 31, 2011: $183 in Asia, $305 in Canada, $43 in CALA, $162 in joint ventures (including GDNT), $52 in China and $6 in EMEA. These amounts exclude restricted cash of $7,572, comprised of $7,563 accounted for in Canadian entities and $9 in Asia. See "Executive Overview — Creditor Protection Proceedings — Divestiture Proceeds Received" for further information regarding restricted cash held in Canadian entities. Cash balances related to the EMEA Subsidiaries and the U.S. Subsidiaries are no longer included in our consolidated cash balance as a result of the previously reported changes to cost accounting.

As of December 31, 2011, approximately $7,730 in net proceeds has been generated and received through the completed sales. As of December 31, 2011, $7,250 of the divestiture proceeds received is being held in escrow until the final allocation of these proceeds as between various Nortel legal entities is ultimately determined. An additional $229, reflecting proceeds from the sale of LGN, is included in restricted cash. As of December 31, 2011, a further $97 in the aggregate was expected to be received in connection with the sales completed to date, subject to the satisfaction of various conditions. Such amount, when received, will also be held in escrow until the final allocation of these proceeds as between various Nortel legal entities is ultimately determined. See "Executive Overview — Creditor Protection Proceedings — Divestiture Proceeds Received".

Historically, we have deployed our cash throughout the corporate group, through a variety of intercompany borrowing and transfer pricing arrangements. As a result of the Creditor Protection Proceedings, cash in the various jurisdictions is generally available to fund operations in that particular jurisdiction, but generally is not available to be freely transferred between jurisdictions, regions, or outside joint ventures, other than for normal course intercompany trade and pursuant to specific court-approved agreements as discussed below. Thus, there is greater pressure and reliance on cash balances and generation capacity in specific regions and jurisdictions.

Since the Petition Date, we have generally maintained use of our cash management system and consequently have minimized disruption to our operations pursuant to various court approvals and agreements obtained or entered into in connection with the Creditor Protection Proceedings. We continue, to the extent necessary, to conduct ordinary course trade transactions between the Debtors and Nortel companies that are not included in the Creditor Protection Proceedings. The Canadian Debtors and the U.S. Debtors have also each entered into agreements with the EMEA Debtors governing the settlement of certain intercompany accounts, including for the purchase of goods and services. The terms of these agreements were last extended to May 31, 2010. Ongoing day-to-day trade of goods and services and settlement of post-filing intercompany accounts, to the extent still necessary, continues in the normal course. During the pendency of the Creditor Protection Proceedings we generally have not and do not expect to make payments to satisfy any of the interest obligations of the Debtors.

Historically, we have relied upon additional cash management provisions including a transfer pricing model that determines the prices that are charged for goods and services transferred between our subsidiaries and the allocation of profit and loss based upon certain R&D costs. In particular, the Canadian Debtors allocated profits, losses and certain costs among the corporate group through TPA Payments. Other than one $30 payment made by NNI to NNL in 2009 in respect of amounts that could arguably be owed in connection with the transfer pricing agreement, TPA Payments were suspended since the Petition Date and, as a result, NNL's cash flows have been significantly impacted. The Canadian Debtors, the U.S. Debtors, with the support of the U.S. Creditors' Committee and the Bondholder Group, as well as the EMEA Debtors (other than NNSA, which acceded to the IFSA on September 11, 2009), entered into the IFSA dated June 9, 2009 under which NNI has paid $157 to NNL, in four installments during 2009 in full and final settlement of TPA Payments for the period from the Petition Date to September 30, 2009. On August 23, 2011, the Canadian Court approved a Transfer Pricing Settlement Agreement among NNL, NNI, NNUK, certain other Debtors and the U.K. Administrators whereby certain inter-company matters were resolved, including NNL remitting $4.7 to NNUK. Further, the Canadian Court approved on the same date an Agreement on Transfer Pricing Amendments and Certain Other Matters among the same parties as well as the French Liquidator. Under this agreement, TPA arrangements ceased among all Nortel entities, and as a result any subsequent inter-company transactions will be on a cost plus basis.

On December 23, 2009, we announced that we, NNL, NNI, and certain other Canadian Debtors and U.S. Debtors had entered into the FCFSA, which provides, among other things, for the settlement of certain intercompany claims, including in respect of amounts determined to be owed by NNL to NNI under our transfer pricing arrangements for the years 2001 through 2005. The FCFSA also provided that NNI would pay to NNL approximately $190 over the course of 2010 in full and final settlement of all obligations pursuant to the transfer pricing agreements among the Nortel group entities, which includes the contribution of NNI and certain U.S.

Table of Contents

affiliates towards certain estimated costs to be incurred by NNL on their behalf for the duration of the Creditor Protection Proceedings. These payments were made in 2010. In addition, in consideration of a settlement payment of $37.5, the IRS released all of its tax claims against NNI and other members of NNI's consolidated tax group for the years 1998 through 2008. NNI made the settlement payment to the IRS on February 22, 2010.

A revolving loan agreement between NNI, as lender, and NNL, as borrower, was approved by the Canadian Court and, subject to certain conditions, approved by the U.S. Court on an interim basis. An initial amount of $75 was approved and drawn. The agreement matured on December 31, 2010 and NNL repaid this outstanding amount, together with accrued interest, from the proceeds from the sale of the Ottawa Carling Campus and the agreement has been terminated.

We have established certain cash collateralized facilities in certain jurisdictions. Approximately $6 of cash collateral has been posted by Nortel in support of certain performance bonds and letter of credit facilities.

To enable the APAC Agreement Subsidiaries in the APAC region to continue their respective business operations and to facilitate the business divestitures, the Debtors (other than the Israeli Debtors) entered into an APAC Agreement. Under the APAC Agreement, the APAC Agreement Subsidiaries have paid a portion of the Pre-Petition Intercompany Debt to the Debtors (other than the Israeli Debtors). As of December 31, 2011, the Canadian Debtors, the U.S. Debtors and the EMEA Debtors have received to date approximately $35, $35 and $28, respectively, in aggregate in respect of the APAC Agreement. Further portions of the Pre-Petition Intercompany Debt continue to be repayable from time to time only to the extent of any such APAC Agreement Subsidiary's net cash balance at the relevant time, and subject to certain reserves and provisions.

We continue several initiatives to generate cost reductions and decrease the rate of cash outflow during the Creditor Protection Proceedings. Some of these initiatives include the workforce reduction plan announced on February 25, 2009 and other ongoing workforce and cost reduction activities and reviews of our real estate and other property leases, IT equipment agreements, supplier and customer contracts and general discretionary spending as well as our new organizational structure announced on August 10, 2009. With the completed sales of all of our businesses, we are focused on maximizing proceeds with respect to remaining assets. This includes the winding up of our remaining operations and subsidiaries globally, which can involve orderly wind-ups as well as commencement of liquidation proceedings, as the circumstances warrant.

Our current cash management system and consolidated cash on hand to fund our operations is subject to ongoing review and approval by the Canadian Monitor and may be impacted by the Creditor Protection Proceedings. The U.S. Principal Officer and the U.K. Administrators oversee the cash management system in their respective jurisdictions and those amounts are not included in our consolidated balance sheet as of December 31, 2011. There is no assurance that (i) we will be able to maintain our current cash management system; (ii) we will generate sufficient cash to fund and wind down our operations; (iii) cash collateralized facilities in certain jurisdictions will be sufficient for our business needs or that we will not have to provide further cash collateral; or (iv) the Debtors will be able to access proceeds in a timely manner from the divestitures as allocation of proceeds from the divestitures of our businesses and assets remains unresolved.

**Cash Flows**

Our total consolidated cash and cash equivalents excluding restricted cash decreased by $56 during the year ended December 31, 2011 to $751, primarily due to cash flows attributable to the net cash used in continuing operations.

42

Table of Contents

Our liquidity and capital resources are primarily impacted by: (i) current cash and cash equivalents, (ii) operating activities, (iii) investing activities, and (iv) foreign exchange rate changes. The following table summarizes our cash flows by activity and cash on hand as of December 31, 2011 and 2010:

|  | 2011 | 2010 | Change |
|---|---|---|---|
| Net earnings (loss) attributable to NNC | $ 3,670 | $ (4,200) | $ 7,870 |
| Adjustments to net earnings (loss) and working capital changes | (3,962) | 3,968 | (7,930) |
| Net cash used in operating activities | (292) | (232) | (60) |
| Net cash from investing activities | 249 | 207 | 42 |
| Net cash used in financing activities | (2) | (175) | 173 |
| Effect of foreign exchange rate changes on cash and cash equivalents | (11) | 1 | (12) |
| Reduction of cash and cash eqivalents of deconsolidated entities | - | (992) | 992 |
| Net decrease in cash and cash equivalents | (56) | (1,191) | 1,135 |
| Cash and cash equivalents at beginning of year | 807 | 1,998 | (1,191) |
| Cash and cash equivalents of continuing operations at end of year | $ 751 | $ 807 | $ (56) |

*Operating Activities*

In 2011, our net cash used in operating activities of $292 resulted from use of cash of $4,149 from non-cash items, partially offset by net earnings attributable to NNC of $3,670, net loss from discontinued operations of $1, and changes in operating assets and liabilities of $186. Net cash from changes in operating assets and liabilities was mainly due to the decrease in accounts receivable of $82, the change in other of $95, change in payroll, contractual and accrued liabilities of $66 and the increase in deferred cost of $4, partially offset by the increase in accounts payable of $42, the change in deferred revenue of $9 and the increase in advanced billings and income taxes payable of $5 and $5, respectively. The primary non-cash items were $4,276 in reorganization items under ASC 852, partially offset by other of $11, pension and other accruals of $55, amortization and depreciation of $33, earnings attributable to non-controlling interests of $21, and deferred income taxes of $7.

In 2010, our net cash used in operating activities of $232 resulted from net loss attributable to NNC of $4,200, earnings of $24 attributable to discontinued operations, and cash used in discontinued operations of $385, partially offset by cash from changes in operating assets and liabilitie of $185, and non-cash items of $4,192. The net cash from changes in operating assets and liabilities was mainly due to the reduction of accounts receivable of $339, change in inventory and deferred cost of $36 and $22, respectively, change in payroll, accrued and contractual liabilities of $66, and the change in deferred revenues of $3, partially offset by the decrease in accounts payable of $63, change in income taxes of $83, change in advanced billings of $78, change in restructuring liabilities of $20, and change in other operating assets and liabilities of $37. The primary additions to our net loss for non-cash items were $50 equity in net loss of EMEA Subsidiaries, pension and other accruals of $101, amortization and depreciation of $75, other net of $422, which includes funding from discontinued operations, and reorganization items under ASC 852 of $3,533.

*Investing Activities*

In 2011, net cash from investing activities was $249 primarily due to proceeds related to sale of businesses and assets of $4,602, of which $4,583 was reclassified to restricted cash and cash equivalents resulting in an increase in restricted cash and cash equivalents. The increase in restricted cash and cash equivalents related to proceeds was partially offset by decreases in restricted cash and cash equivalents of $230 primarily related to various distributions to the Debtors.

In 2010, net cash from investing activities was $207 primarily due to proceeds related to sale of businesses and assets of $994, a decrease in short term and long term investments of $24, net cash provided by discontinued operations of $211 and proceeds on disposal of plant and equipment of $203, partially offset by an increase in restricted cash and cash equivalents of $1,213, expenditures for plant and equipment of $9, and acquisitions of investments and businesses of $3.

*Financing Activities*

In 2011, cash used in financing activities was $2, primarily due to dividends paid by subsidiaries to noncontrolling interests.

In 2010, cash used in financing activities was $175, primarily due to dividends paid by subsidiaries to noncontrolling interests of $19, decrease in notes payable of $75, net decrease in capital leases payable of $4, and net cash used in discontinued operations of $77.

*Other Items*

In 2011, our cash position was negatively impacted by $11 due to the unfavorable effects of changes in foreign exchange rates primarily from movements of the Canadian Dollar, Indian Rupee and Chinese Yuan against the U.S. Dollar.

Table of Contents

In 2010, our cash position was negatively impacted by the exclusion of cash of $992 due to the deconsolidation of subsidiaries.

*Fair Value Measurements*

We utilize observable (Level 1 and Level 2) inputs in determining the fair value. See note 15 to the accompanying audited consolidated financial statements for additional information.

## Future Uses of Liquidity

The matters described below, to the extent that they relate to future events or expectations, may be significantly affected by our Creditor Protection Proceedings. Those proceedings will involve, or may result in, various restrictions on our activities and/or the need to obtain third party approvals for various matters.

Our cash requirements, excluding distributions from restricted cash which may occur from time to time, for the 12 months commencing January 1, 2012 are primarily expected to consist of funding for operations and the following items:

- professional fees in connection with the Creditor Protection Proceedings of approximately $87; and
- costs related to workforce reductions and real estate actions totaling approximately $4.

### Off-Balance Sheet Arrangements

#### Bid, Performance-Related and Other Bonds

During the normal course of business, we have provided bid, performance, warranty and other types of bonds, which we refer to collectively as bonds, via financial intermediaries to various customers in support of commercial contracts, typically for the supply of telecommunications equipment and services. If we fail to perform under the applicable contract, the customer may be able to draw upon all or a portion of the bond as a remedy for our failure to perform. The contracts that these bonds support generally have terms ranging from one to five years. Bid bonds generally have a term of less than twelve months, depending on the length of the bid period for the applicable contract. Performance-related and other bonds generally have a term consistent with the term of the underlying contract. Historically, we have not made material payments under these types of bonds and as a result of the Creditor Protection Proceedings we do not anticipate that we will be required to make any such payments during the pendency of the Creditor Protection Proceedings.

The following table provides information related to these types of bonds as of:

|  | 2011 | 2010 |
|---|---|---|
| Bid and performance-related bonds[a] | $ 3 | $ 26 |
| Other bonds[b] | - | - |
| Total bid, performance-related and other bonds | $ 3 | $ 26 |

(a) Net of restricted cash and cash equivalent amounts of $6 and $5 as of December 31, 2011 and 2010, respectively.
(b) Net of restricted cash and cash equivalent amounts of $1 and $15 as of December 31, 2011 and 2010, respectively.

### Application of Critical Accounting Policies and Estimates

Our accompanying audited consolidated financial statements are based on the selection and application of U.S. GAAP, which require us to make significant estimates and assumptions. We believe that the following accounting policies and estimates may involve a higher degree of judgment and complexity in their application and represent our critical accounting policies and estimates: income taxes, pension and post-retirement benefits, and Creditor Protection Proceedings.

We have discussed the application of these critical accounting policies and estimates with the audit committee of our board of directors.

#### Income Taxes

As of December 31, 2010, Nortel's net deferred tax assets were nil. As of December 31, 2011, the net deferred tax liabilities were $7. The change of $7 resulted from the accrual of the deferred tax liabilities associated with the expected withholding taxes relating to investments in CALA and Asia. Our deferred tax assets are mainly comprised of net operating loss carryforwards, realized and unrealized capital loss carryforwards, tax credit carryforwards, outside basis differences and deductible temporary differences, which are primarily available to reduce future income taxes payable in Canada. During the third quarter of 2011, Nortel concluded the successful auction of Nortel's remaining patent portfolio and closed this transaction on July 29, 2011, which resulted in a gain of $4,475 in the third quarter of 2011. The estimated tax impact in Canada resulted in a reduction of the gross deferred tax asset offset with a reduction in valuation allowance. There is significant uncertainty concerning the forecasted income or loss for 2012 and beyond

Table of Contents

and the uncertainty concerning the estimated final proceeds allocation by jurisdiction, and thus this significant negative evidence outweighs any positive evidence that may exist and Nortel believes that it is still appropriate to maintain a full valuation allowance in all jurisdictions.

*Transfer Pricing*

Nortel had previously entered into Advanced Pricing Arrangements (APA) with the U.S. and Canadian taxation authorities in connection with its intercompany transfer pricing and cost sharing arrangements between Canada and the U.S. These arrangements expired in 1999 and 2000. In 2002, Nortel filed APA requests with the taxation authorities in the U.S., Canada and the U.K. that applied to the 2001 through 2005 taxation years (2001-2005 APA). In February 2010, Nortel and the U.S. and Canadian taxing authorities settled and executed the 2001-2005 APA resulting in a reallocation of losses from NNI to NNL in the amount of $2,000. The taxing authorities made no disclosure to Nortel of the basis upon which they agreed to such reallocation. Nortel continues to apply the transfer pricing methodology proposed in the 2001- 2005 APA requests to the other parties subject to the transfer pricing methodology in preparing its tax returns and its accounts for its 2001 to 2005 taxation years. The other parties are the U.K., France, Ireland and Australia.

The U.K. and Canadian tax authorities are also parties to negotiations with respect to the 2001-2005 APA. We are uncertain of the U.K.'s response to the agreement reached between the U.S. and Canadian tax authorities. Since the U.S. and Canadian tax authorities did not express a view on the proposed transfer pricing methodology, no adjustment has been made to the transfer pricing methodology that we submitted in our 2001-2005 APA application. It is also uncertain whether the Creditor Protection Proceedings will have any impact on the ultimate resolution of the U.K. and Canadian APA, and it is possible that the U.K. and Canadian tax authorities may advance negotiations regarding their 2001-2005 bilateral APA. Although the ultimate outcome of these negotiations is uncertain, there may be a further reallocation of historical losses from Canada to the U.K. This reallocation of losses is not expected to result in a material impact to Nortel's consolidated tax expense. We continue to monitor the progress of the remaining APA negotiations and will analyze the existence of any new evidence, when available. We may make adjustments to the deferred tax and valuation allowance assessments, as appropriate, as additional evidence becomes available in future quarters.

Although we continue to apply the transfer pricing methodology that was requested in the previously withdrawn 2007-2010 APA to the 2006 through to the 2008 taxation years, the ultimate outcome is uncertain and the ultimate reallocation of losses cannot be determined at this time. Certain of the Nortel entities have expressed reservations about the proper application of Nortel's transfer pricing methodologies. Other than in the U.S., there could be a further material shift in historical earnings between the above mentioned parties. If these matters are resolved unfavorably, they are unlikely to have a material effect on Nortel's consolidated financial position, results of operations and/or cash flows.

*Tax Contingencies*

The accounting estimates related to the liability for uncertain tax positions require us to make judgments regarding the sustainability of each uncertain tax position based on its technical merits. If we determine it is more likely than not a tax position will be sustained based on its technical merits, we record the impact of the position in our audited consolidated financial statements at the largest amount that is greater than 50% likely of being realized upon ultimate settlement. These estimates are updated at each reporting date based on the facts, circumstance and information available. For purposes of intraperiod allocation, we include all changes in reserves relating to historical periods for uncertain tax positions in continuing operations. We are also required to assess at each reporting date whether it is reasonably possible that any significant increases or decreases to the unrecognized tax benefits will occur during the next twelve months. Our liability for uncertain tax positions was $11 recorded in other accrued liabilities as of December 31, 2011, of which nil is included in liabilities subject to compromise.

Actual income tax expense, income tax assets and liabilities could vary from these estimates due to future changes in income tax laws, significant changes in the jurisdictions in which we operate, or unpredicted results from the final assessment of each year's liability by various taxing authorities. These changes could have a significant impact on our financial position.

We are subject to ongoing examinations by certain taxation authorities of the jurisdictions in which we operate. We regularly assess the status of these examinations and the potential for adverse outcomes to determine the adequacy of our provision for income and other taxes. The Canadian Debtors believe that they have adequately provided for tax adjustments that we believe are more likely than not to be realized as a result of any ongoing or future examination.

**Pension and Post-retirement Benefits**

We maintain various retirement programs, one or more of which covers substantially all of our employees, which consist of defined benefit, defined contribution and investment plans. In 2011, we contributed $2 to employees' investment plans. In 2011, we also made payments of $2 in relation to its post-retirement obligation for expenses incurred prior to December 31, 2010. All other retirement plans have been closed to new contributions or formally terminated.

45

Table of Contents

We are still formally the sponsor of defined benefit pension arrangements, for which administration duties have been transferred to Morneau Sheppell Ltd. (formerly known as Morneau Sobeco Limited Partnership) as of September 30, 2010, pursuant to a Settlement Agreement with former and disabled Canadian employee representatives. Under this agreement, our post-retirement and post-employment plans were terminated on December 31, 2010, and pension contributions were halted on September 30, 2010. Accordingly, no funding is expected for any of these arrangements in 2011. Further to this agreement, under separate Canadian Court orders, we made advance payments of $47 in 2011 to some beneficiaries in liquidating the Canadian Health and Welfare Trust as advance payment of their estimated claims against the Canadian Debtors.

On March 8, 2011, the Ontario Superintendent of Financial Services ordered the wind-up of the Canadian Pension Plans with an effective date of October 1, 2010. As a result of this order, Nortel remeasured the pension obligations in the first quarter of 2011 with wind-up assumptions as of the effective date, resulting in a reduction to pension liabilities and other comprehensive income of $96. The settlement process for the Canadian Pension Plans has not been finalized and is subject to changes in applicable legislation which could affect the assumptions used to calculate the Plans' pension obligations.

On October 6, 2011, the Canadian Court approved a methodology and procedure for compensation related claims in Canada. As a result, in the third quarter of 2011, Nortel adjusted the recorded obligations to reflect the approved methodology for pension plans other than the defined benefit plan, but including post-retirement and post-employment plans. An adjustment of $108 was recorded to adjust the respective obligations with the expense recorded in reorganization items. For more information on the compensation claims motion, see "Developments in Creditor Protection Proceedings" section of this report.

According to various claims filed by the trustee of the U.K. defined benefit pension plan and the U.K. Pension Protection Fund against certain Debtors, the U.K. defined benefit pension plan had a purported deficit estimated (on a buy-out basis) at £2,100 or $3,300 as of January 2009. Since that date, the U.K. Pension regulator has made several attempts through courts in Canada to allow collection of this amount outside of Nortel's stay under CCAA Proceedings, which have all been denied by the Canadian Courts. See note 22 to the accompanying audited consolidated financial statements for further information. We are of the view that any decision made in the U.K. courts would not result in any additional liability given the court decisions noted above.

Pursuant to an intercompany guarantee agreement relating to the U.K. defined benefit pension plan, NNL has guaranteed certain payment obligations of NNUK under a Funding Agreement executed on November 21, 2006. Our current best estimate of the expected allowed claim for this guarantee is £334 or $515 at December 31, 2011. Pursuant to a further intercompany guarantee agreement, NNL has guaranteed NNUK's payment obligations arising upon the wind up, dissolution or liquidation of NNUK and consequent windup of such plan to the lesser of (a) $150 and (b) the amount of the plan's buyout deficit. See note 14 to the accompanying audited consolidated financial statements.

### Creditor Protection Proceedings

Of the $7,730 in proceeds received from divestitures as of December 31, 2011, $7,250 is being held in escrow and an additional $229, reflecting proceeds from the sale of LGN, is included in restricted cash, all of which is currently reported in NNL solely for financial reporting purposes. The ultimate determination of the final allocation of such proceeds among the various Nortel legal entities, including entities that are not consolidated in these financial statements, has not yet occurred and may be materially different from the NNL classification and related amounts shown in these financial statements. Adjustments to the NNL classification and any related amounts arising from the ultimate allocation will be recognized when finalized. The NNL classification and related amounts shown in these financial statements are not determinative of, and have not been accepted by any debtor estate, any party in interest in the Creditor Protection Proceedings or any court overseeing such proceedings, for purposes of deciding the final allocation of divestiture proceeds.

ASC 852 requires pre-petition liabilities of the debtor that are subject to compromise to be reported at the claim amounts expected to be allowed, even if they may be settled for lesser amounts. The amounts currently classified as liabilities subject to compromise may be subject to future adjustments depending on actions of the applicable courts, further developments with respect to disputed claims, determinations of the secured status of certain claims, if any, the values of any collateral securing such claims, or other events. In addition, a number of proofs of claim, for which Nortel has not accrued any amount or accrued significantly less than the amounts in the proofs of claim, continue to be reviewed by the Canadian Debtors and may result in significant changes in future periods once these reviews are complete. A number of these proofs of claim, which total approximately $287, relate to certain real estate guarantees provided by NNL in respect of leases entered into by certain EMEA Subsidiaries and U.S. Subsidiaries.

46

Table of Contents

Accounting Changes and Recent Accounting Pronouncements

**Accounting Changes**

Our financial statements are based on the selection and application of accounting policies based on accounting principles generally accepted in the U.S. See note 3 to the accompanying audited consolidated financial statements for a summary of the accounting changes that we have adopted on or after January 1, 2011.

**Recent Accounting Pronouncements**

For detailed information regarding recent accounting pronouncements and the impact thereof on our financial statements, see note 1 to the accompanying audited consolidated financial statements.

Outstanding Share Data

As of February 29, 2012, we had 498,206,366 NNC common shares outstanding.

Legal Proceedings and Environmental Matters

Under the CCAA Proceedings, the Canadian Debtors have filed a motion for an order authorizing and directing the Canadian Debtors to cease performing any remediation at or in relation to five sites (Belleville, Brampton, Brockville, Kingston and London, Ontario), and that any claims in relation to such remediation be subject to the court approved claims process under the CCAA Proceedings. We brought the motion to disclaim any further obligation for such properties that are no longer owned or used by us and that we and our creditors derive no benefit from any further remediation. Subsequent to the filing of the motion, NNL entered into a transition agreement regarding the Brampton site that facilitated a gradual cessation of NNL's environmental risk related tasks at that site. The Ministry of the Environment (the MOE) has made remediation orders with respect to the four other sites. The motion was heard in September 2011 in the Canadian Court, wherein the Canadian Debtors sought advice and direction that the MOE remediation orders are in breach of the CCAA stay. A decision on that motion is pending. To date, the MOE has not sought to enforce the remediation orders while the Canadian Court's decision is outstanding and NNL has continued to undertake environmental risk assessments and remediation related tasks at those sites.

For a discussion of our legal proceedings, see the Legal Proceedings section of this report. For further information on these environmental matters, see note 22 in the accompanying audited consolidated financial statements.

Cautionary Notice Regarding Forward-Looking Information

Certain statements in this report may contain words such as "could", "expect", "may", "should", "will", "anticipate", "believe", "intend", "estimate", "target", "plan", "envision", "seek" and other similar language and are considered forward-looking statements or information under applicable securities laws. These statements are based on our current expectations, estimates, forecasts and projections about the operating environment, economies and markets in which we conduct our remaining business. These statements are subject to important assumptions, risks and uncertainties that are difficult to predict, and the actual outcome may be materially different. Our assumptions, although considered reasonable by us at the date of this report, may prove to be inaccurate and consequently our actual results could differ materially from the expectations set out herein.

Actual results or events could differ materially from those contemplated in forward-looking statements as a result of the following: (i) risks and uncertainties relating to the Creditor Protection Proceedings including: (a) risks associated with our ability to: obtain required approvals and successfully consummate remaining divestitures; ability to satisfy remaining transition services agreement obligations in connection with the divestiture of business and assets; successfully conclude ongoing discussions for the sale of our remaining assets; develop, obtain required approvals for, and implement a court-approved plan; allocation of the sale proceeds of our businesses and assets among the various Nortel entities participating in these sales may take considerable time to resolve; resolve ongoing issues with creditors and other third parties whose interests may differ from ours; maintain adequate cash on hand in each of our jurisdictions to fund our remaining work within the jurisdiction during the Creditor Protection Proceedings; obtain any further required approvals from the Canadian Monitor, the U.K. Administrators, the U.S. Principal Officer, the U.S. Creditors' Committee, or other third parties; utilize net operating loss carryforwards and certain other tax attributes in the future; avoid the substantive consolidation of NNI's assets and liabilities with those of one or more other U.S. Debtors; operate effectively, and in consultation with the Canadian Monitor, the Canadian creditors' committee, the U.S. Creditors' Committee, the U.S. Principal Officer, work effectively with the U.K. Administrators, and French Liquidator in their respective administration of the EMEA businesses subject to the Creditor Protection Proceedings; continue as a going concern; actively and adequately communicate on and respond to events, media and rumors associated with the Creditor Protection Proceedings; retain and incentivize key employees; retain, or if necessary, replace suppliers on acceptable terms and avoid disruptions in our supply chain regarding our remaining stranded contracts and operations; obtain court orders or approvals with respect to motions filed from time to time; resolve claims made against us in connection with the Creditor Protection Proceedings for amounts not exceeding our recorded liabilities subject to compromise; prevent third parties from obtaining court orders or approvals that are contrary to our interests; and (b) risks and uncertainties associated with: limitations on actions against any Debtor during the Creditor Protection Proceedings; the values, if any, that will be ascribed pursuant

47

Table of Contents

to any court-approved plan to outstanding Nortel securities and, in particular, that we do not expect that any value will be prescribed to the NNC common shares or the NNL preferred shares in any such plan; the delisting of NNC common shares from the NYSE; and the delisting of NNC common shares and NNL preferred shares from the TSX; and (ii) risks and uncertainties relating to our remaining restructuring work including: fluctuations in foreign currency exchange rates; the sufficiency of workforce and cost reduction initiatives; any adverse legal judgments, fines, penalties or settlements related to any significant pending or future litigation actions; failure to maintain integrity of our information systems; and our potential inability to maintain an effective risk management strategy. For additional information with respect to certain of these and other factors, see the "Risk Factors" section of this report. Unless otherwise required by applicable securities laws, we disclaim any intention or obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

48

Table of Contents

ITEM 8.    **Financial Statements and Supplementary Data**

### INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | 49 |
| Consolidated Statements of Operations | 50 |
| Consolidated Balance Sheets | 51 |
| Consolidated Statements of Changes in Equity (Deficit) and Comprehensive Income (Loss) | 52 |
| Consolidated Statements of Cash Flows | 53 |

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The Board of Directors and Shareholders
Nortel Networks Corporation

We have audited the accompanying consolidated balance sheets of Nortel Networks Corporation and subsidiaries as of December 31, 2011 and 2010, and the related consolidated statements of operations, changes in deficit and comprehensive income (loss) and cash flows for each of the years in the two year period ended December 31, 2011. These consolidated financial statements are the responsibility of Nortel Networks Corporation's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Nortel Networks Corporation and subsidiaries as of December 31, 2011 and 2010, and the results of their operations and their cash flows for each of the years in the two year period ended December 31, 2011 in conformity with U.S. generally accepted accounting principles.

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Notes 1 and 2 to the consolidated financial statements, the Company filed for creditor protection pursuant to the provisions of the Companies' Creditors Arrangement Act for itself and certain other Canadian subsidiaries. In addition, the Company's United States subsidiaries filed voluntary petitions seeking to reorganize under Chapter 11 of the United States bankruptcy code, and certain subsidiaries of Nortel in Europe, the Middle East and Africa made consequential filings in accordance with the bankruptcy provisions in these jurisdictions. These filings in the various bankruptcy jurisdictions raise substantial doubt about the Company's ability to continue as a going concern. Management's plans in regard to these matters are also described in Notes 1 and 2 to the consolidated financial statements. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

/s/ KPMG LLP

Chartered Accountants, Licensed Public Accountants
March 8, 2012

Table of Contents

## NORTEL NETWORKS CORPORATION

**(Under Creditor Protection Proceedings as of January 14, 2009 — note 2)**
**Consolidated Statements of Operations for the years ended December 31**
**(Millions of U.S. Dollars, except per share amounts)**

|  | 2011 | 2010 |
|---|---|---|
| Revenues: |  |  |
| Products | $ 22 | $ 501 |
| Services | 5 | 119 |
| Total revenues | 27 | 620 |
| Cost of revenues: |  |  |
| Products | 23 | 486 |
| Services | 18 | 46 |
| Total cost of revenues | 41 | 532 |
| Gross profit (loss) | (14) | 88 |
| Selling, general and administrative expense | 157 | 515 |
| Research and development expense | - | 107 |
| Loss on sales and impairments of assets - net | 3 | 3 |
| Other operating income - net (note 7) | (57) | (281) |
| Operating loss | (117) | (256) |
| Other income (expense) - net (note 7) | (45) | 57 |
| Interest expense (contractual interest expense for the year ended December 31, 2011 and 2010 was $326 and $314, respectively) |  |  |
| Long term debt | (324) | (304) |
| Other | - | (2) |
| Loss from continuing operations before reorganization items, income taxes and equity in net loss of associated companies and EMEA Subsidiaries | (486) | (505) |
| Reorganization items - net (note 6) | 4,187 | (3,694) |
| Earnings (loss) from continuing operations before income taxes, and equity in net loss of associated companies and EMEA Subsidiaries | 3,701 | (4,199) |
| Income tax benefit (expense) | (9) | 40 |
| Earnings (loss) from continuing operations before equity in net loss of associated companies and EMEA Subsidiaries | 3,692 | (4,159) |
| Equity in net loss of associated companies - net of tax | - | (1) |
| Equity in net loss of EMEA Subsidiaries (note 21) | - | (50) |
| Net earnings (loss) from continuing operations | 3,692 | (4,210) |
| Net earnings (loss) from discontinued operations - net of tax | (1) | 24 |
| Net earnings (loss) | 3,691 | (4,186) |
| Income attributable to noncontrolling interests | (21) | (14) |
| Net earnings (loss) attributable to Nortel Networks Corporation | $3,670 | $(4,200) |
| Basic earnings (loss) per common share - continuing operations | $ 7.36 | $ (8.47) |
| Diluted earnings (loss) per common share - continuing operations | $ 6.91 | $ (8.47) |
| Total basic earnings (loss) per common share | $ 7.36 | $ (8.42) |
| Total diluted earnings (loss) per common share | $ 6.91 | $ (8.42) |

*The accompanying notes are an integral part of these consolidated financial statements*

Table of Contents

## NORTEL NETWORKS CORPORATION

### (Under Creditor Protection Proceedings as of January 14, 2009 — note 2)
### Consolidated Balance Sheets as of December 31
### (Millions of U.S. Dollars, except share amounts)

|  | 2011 | 2010 |
|---|---|---|
| **ASSETS** | | |
| **Current assets** | | |
| Cash and cash equivalents | $ 751 | $ 807 |
| Restricted cash and cash equivalents | 93 | 158 |
| Accounts receivable - net | 174 | 260 |
| Inventories - net | - | 4 |
| Other current assets | 79 | 154 |
| Assets held for sale | - | 39 |
| Assets of discontinued operations (note 5) | - | 4 |
| **Total current assets** | 1,097 | 1,426 |
| Restricted cash and cash equivalents | 7,479 | 3,061 |
| Plant and equipment - net | - | 30 |
| Other assets | 52 | 65 |
| **Total assets** | $ 8,628 | $ 4,582 |
| **LIABILITIES AND SHAREHOLDERS' DEFICIT** | | |
| **Current liabilities** | | |
| Trade and other accounts payable | $ 319 | $ 385 |
| Payroll and benefit - related liabilities | 17 | 42 |
| Contractual liabilities | 19 | 69 |
| Restructuring liabilities | 1 | 1 |
| Other accrued liabilities (note 7) | 17 | 55 |
| Liabilities held for sale | - | 10 |
| Liabilities of discontinued operations (note 5) | 1 | 5 |
| **Total current liabilities** | 374 | 567 |
| **Long-term liabilities** | | |
| Deferred income taxes - net | 7 | - |
| Other liabilities (note 7) | 17 | 3 |
| **Total long - term liabilities** | 24 | 31 |
| Liabilities subject to compromise (note 20) | 10,905 | 10,565 |
| Liabilities subject to compromise of discontinued operations | 34 | 35 |
| **Total liabilities** | 11,337 | 11,198 |
| Guarantees, commitments, contingencies and subsequent events (notes 2, 14, 16, 22, and 23 respectively) | | |
| **SHAREHOLDERS' DEFICIT** | | |
| Common shares, without par value - Authorized shares: unlimited; Issued and outstanding shares: | | |
| 498,206,366 for 2011 and 2010 | 35,604 | 35,604 |
| Additional paid-in capital | 3,597 | 3,597 |
| Accumulated deficit | (42,406) | (46,076) |
| Accumulated other comprehensive loss | (143) | (362) |
| **Total Nortel Networks Corporation shareholders' deficit** | (3,348) | (7,237) |
| Noncontrolling interests | 639 | 621 |
| **Total shareholders' deficit** | (2,709) | (6,616) |
| **Total liabilities and shareholders' deficit** | $ 8,628 | $ 4,582 |

*The accompanying notes are an integral part of these consolidated financial statements*

51

Table of Contents

## NORTEL NETWORKS CORPORATION

### (Under Creditor Protection Proceedings as of January 14, 2009 — note 2)
### Consolidated Statements of Changes in Deficit and Comprehensive Income (Loss)
### (Millions of U.S. Dollars)

| | 2011 | 2010 |
|---|---|---|
| **Common shares** | | |
| Balance at the beginning and end of the year | $ 35,604 | $ 35,604 |
| **Additional paid-in capital** | | |
| Balance at the beginning of the year | 3,597 | 3,623 |
| Other | - | (26) |
| Balance at the end of the year | 3,597 | 3,597 |
| **Accumulated deficit** | | |
| Balance at the beginning of the year | (46,076) | (41,876) |
| Net earnings (loss) attributable to Nortel Networks Corporation | 3,670 | (4,200) |
| Other | - | - |
| Balance at the end of the year | (42,406) | (46,076) |
| **Accumulated other comprehensive income (loss)** | | |
| Balance at the beginning of the year | (362) | (1,124) |
| Impact of EMEA Subsidiaries prior to deconsolidation | - | 61 |
| Impact of deconsolidations | - | 1,069 |
| Impact of discontinued operations | - | 46 |
| Foreign currency translation adjustment | 90 | (106) |
| Unrealized gain (loss) on investments - net | - | (21) |
| Change in unamortized pension and post - retirement actuarial losses and prior service cost | 129 | (287) |
| Balance at the end of the year | (143) | (362) |
| **Noncontrolling interests** | 639 | 621 |
| **Total shareholders' deficit** | $ (2,709) | $ (6,616) |
| **Total comprehensive income (loss) for the year** | | |
| Net earnings (loss) | $ 3,691 | $ (4,186) |
| Other comprehensive income (loss) - net of tax | 219 | 762 |
| Total comprehensive income (loss) for the year | $ 3,910 | $ (3,424) |
| Less: comprehensive income (loss) attributable to noncontrolling interests | | |
| Net earnings | $ (21) | $ (14) |
| Foreign currency translation adjustment | - | 8 |
| Comprehensive income (loss) attributable to Nortel Networks Corporation | $ 3,889 | $ (3,430) |

*The accompanying notes are an integral part of these consolidated financial statements*

52

Table of Contents

# NORTEL NETWORKS CORPORATION

### (Under Creditor Protection Proceedings as of January 14, 2009 — note 2)
### Consolidated Statements of Cash Flows for the years ended December 31
### (Millions of U.S. Dollars)

|  | 2011 | 2010 |
|---|---|---|
| **Cash flows from (used in) operating activities** | | |
| Net earnings (loss) attributable to Nortel Networks Corporation | $ 3,670 | $(4,200) |
| Net (earnings) loss from discontinued operations - net of tax | 1 | (24) |
| Adjustments to reconcile net earnings (loss) from continuing operations to net cash used in operating activities, net of effects from acquisitions and divestitures of businesses: | | |
| Amortization and depreciation | 33 | 75 |
| Equity in net loss of associated companies - net of tax | - | 1 |
| Equity in net loss of EMEA Subsidiaries (note 21) | - | 50 |
| Deferred income taxes | 7 | (6) |
| Pension and other accruals | 55 | 101 |
| Loss on sales of businesses and impairments of assets - net | - | 2 |
| Income attributable to noncontrolling interests - net of tax | 21 | 14 |
| Reorganization items - non cash | (4,276) | 3,533 |
| Other - net | 11 | 422 |
| Change in operating assets and liabilities | 186 | 185 |
| Net cash from (used in) operating activities - continuing operations | (292) | 153 |
| Net cash used in operating activities - discontinued operations | - | (385) |
| Net cash used in operating activities | (292) | (232) |
| **Cash flows from (used in) investing activities** | | |
| Expenditures for plant and equipment | - | (9) |
| Proceeds on disposals of plant and equipment | - | 203 |
| Change in restricted cash and cash equivalents | (4,353) | (1,213) |
| Decrease in short and long-term investments | - | 24 |
| Acquisitions of investments and businesses - net of cash acquired | - | (3) |
| Proceeds from the sales of investments, businesses and assets - net | 4,602 | 994 |
| Net cash from (used in) investing activities - continuing operations | 249 | (4) |
| Net cash from investing activities - discontinued operations | - | 211 |
| Net cash from investing activities | 249 | 207 |
| **Cash flows from (used in) financing activities** | | |
| Dividends paid, including paid by subsidiaries to noncontrolling interests | (2) | (19) |
| Decrease in notes payable | - | (75) |
| Repayments of capital leases | - | (4) |
| Net cash used in financing activities - continuing operations | (2) | (98) |
| Net cash used in financing activities - discontinued operations | - | (77) |
| Net cash used in financing activities | (2) | (175) |
| Effect of foreign exchange rate changes on cash and cash equivalents | (11) | 1 |
| Reduction of cash and cash equivalents of deconsolidated subsidiaries | - | (992) |
| **Net cash used in continuing operations** | (56) | (940) |
| Net cash used in discontinued operations | - | (251) |
| Net decrease in cash and cash equivalents | (56) | (1,191) |
| Cash and cash equivalents at beginning of the year | 807 | 1,998 |
| Cash and cash equivalents at end of the year | 751 | 807 |
| Less cash and cash equivalents of discontinued operations at end of the year | - | - |
| Cash and cash equivalents of continuing operations at end of the year | $  751 | $  807 |

*The accompanying notes are an integral part of these consolidated financial statements*

53

Table of Contents

# NORTEL NETWORKS CORPORATION

### (Under Creditor Protection Proceedings as of January 14, 2009 — note 2)
### Notes to Consolidated Financial Statements

## 1. Basis of presentation

All monetary amounts in these notes to the consolidated financial statements are in millions, except per share amounts, and in United States ("U.S.") Dollars unless otherwise stated.

### Nortel Networks Corporation

Prior to Nortel's significant business divestitures, Nortel Networks Corporation ("Nortel", "NNC" or the "Company") was a global supplier of end-to-end networking products and solutions serving both service providers and enterprise customers. Nortel's technologies spanned access and core networks and support multimedia and business-critical applications. Nortel's networking solutions consisted of hardware, software and services. Nortel designed, developed, engineered, marketed, sold, licensed, installed, serviced and supported these networking solutions worldwide. As further discussed in note 2, Nortel is currently focused on the remaining work under the Creditor Protection Proceedings (as defined in note 2), including providing transitional services to the purchasers of Nortel's businesses, ongoing restructuring matters and the sale of any remaining assets.

As of December 31, 2011, Nortel has completed the sales of all of its businesses, and regarding these businesses, only the residual contracts not transferred to the various buyers remain. As a result, commencing with the first quarter of 2011, Nortel has one reportable segment, being the consolidated entity, as its chief operating decision maker reviews financial and operating results on that basis. Accordingly, Nortel has adjusted previously reported financial information to conform to the change in reportable segments as compared to the prior year.

Nortel Networks Limited ("NNL") is Nortel's principal direct operating subsidiary and its results are consolidated into Nortel's results. Nortel holds all of NNL's outstanding common shares but none of its outstanding preferred shares. Nortel's preferred shares are reported in noncontrolling interests in the consolidated balance sheets and dividends accrued on preferred shares are reported in income attributable to noncontrolling interests in the statements of operations. Nortel does not expect to pay any of these cumulative dividends as a result of the Creditor Protection Proceedings.

### Consolidated Financial Statements

The consolidated financial statements as of and for the year ended December 31, 2011 have been presented on a consolidated basis to include Nortel and all of its majority owned and controlled subsidiaries.

Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 852 "Reorganization" ("ASC 852"), which is applicable to companies that have filed petitions under applicable bankruptcy code provisions and as a result of the Creditor Protection Proceedings (as defined below) is applicable to Nortel, generally does not change the manner in which financial statements are prepared. However, it does require that the financial statements for periods subsequent to the filing of an applicable bankruptcy petition distinguish transactions and events that are directly associated with reorganization from the ongoing operations of the business. For this reason, Nortel's revenues, expenses, realized gains and losses, and provisions for losses that can be directly associated with the Creditor Protection Proceedings must be reported separately as reorganization items in the statements of operations. The balance sheets must distinguish pre-petition liabilities subject to compromise from both those pre-petition liabilities that are not subject to compromise and from post-petition liabilities. Liabilities that may be affected by a plan of reorganization must be reported at the amounts expected to be allowed, even if they may be settled for lesser amounts. In addition, reorganization items must be disclosed separately in the statements of cash flows. Nortel adopted ASC 852 effective on January 14, 2009 and has segregated those items outlined above for all reporting periods subsequent to such date.

After consideration of the guidance available in ASC 810 "Consolidation" ("ASC 810") and ASC 852, the consolidated financial statements as of and for the years ended December 31, 2011 and 2010 have been presented on the following basis with respect to Nortel subsidiaries:

- the subsidiaries in Europe, the Middle East and Africa ("EMEA"), Nortel Networks UK Ltd. ("NNUK"), Nortel Networks S.A. ("NNSA"), Nortel Networks (Ireland) Limited (collectively, "EMEA Debtors") and their subsidiaries (collectively, "EMEA Subsidiaries") were accounted for under the equity method from the Petition Date up to May 31, 2010 and as an investment under the cost method of accounting thereafter;

- the U.S. subsidiaries and their subsidiaries (collectively, "U.S. Subsidiaries") were accounted for as consolidated subsidiaries until September 30, 2010 and as an investment under the cost method of accounting thereafter; and

- other subsidiaries are consolidated throughout the periods presented consistent with the basis of accounting applied in 2008 prior to the commencement of the Creditor Protection Proceedings with the exception of deconsolidated subsidiaries due to loss of control once these subsidiaries were deemed to be in liquidation proceedings.

Table of Contents

Based on Nortel's review of the applicable accounting guidance, Nortel determined that it did not exercise all of the elements of control over the operating and financial policies of the EMEA Subsidiaries once the EMEA Debtors filed for creditor protection, although it continued to exercise significant influence over their operating and financial policies. As a result, in accordance with ASC 810, from the Petition Date (as defined below) to May 31, 2010, Nortel accounted for its interests in the EMEA Subsidiaries under the equity method in accordance with FASB ASC 323 "Investments - Equity Method and Joint Ventures" ("ASC 323"). On the Petition Date, the carrying value of Nortel's investment in the EMEA Subsidiaries was in a net liability position. As the carrying values of the EMEA Subsidiaries' net liabilities were not considered to have differed materially from their estimated fair values and due to continuing involvement by Nortel and its consolidated subsidiaries with the EMEA Subsidiaries, including NNL's guarantee of the U.K. pension liability, see note 14, Nortel concluded that the initial carrying value of its investment in these consolidated financial statements should reflect the EMEA Subsidiaries' net liabilities, and no gain or loss was recognized on the change to equity accounting. As of May 31, 2010, Nortel concluded that it no longer exercised significant influence over the operating and financial policies of the EMEA Subsidiaries due to the significance of the completed dispositions, the ongoing role and decision making authority of the U.K. Administrators (as defined below), and because Nortel was no longer committed to provide further support to the EMEA Subsidiaries. Accordingly, a loss on deconsolidation was recognized during the year ended December 31, 2010.

Further, based on its review of the applicable accounting guidance, Nortel determined that it did not exercise all of the elements of control over the U.S. Subsidiaries as of October 1, 2010 due to the progression of the Creditor Protection Proceedings, nor did it exercise significant influence over their operating and financial policies. As a result, Nortel also deconsolidated the U.S. Subsidiaries and has accounted for its investment using the cost method of accounting as of October 1, 2010 on a prospective basis. As a result, the financial position and results of operations of the U.S. Subsidiaries are not reflected in its consolidated financial results after September 30, 2010. This change was largely based on Nortel's work toward standalone debtor estates due to the diminishing interdependency between the estates primarily resulting from the sale of substantially all of its global businesses, the increased influence of and participation by the U.S. Principal Officer, as defined below, and the change in composition of the board of directors related to the U.S. Subsidiaries. The change in accounting in respect of these subsidiaries resulted in a non-cash charge of $2,163 in the fourth quarter of 2010. The charge is primarily related to the recognition of intercompany liabilities between the Canadian estate and the U.S. estate, including the guarantee of a U.S. subsidiary's debt as discussed in note 14.

Nortel continues to exercise control over its subsidiaries located in Canada, Central America and Latin America ("CALA") and Asia (other than those entities that are EMEA Subsidiaries, U.S. Subsidiaries or have been placed in liquidation proceedings), and its financial statements are prepared on a consolidated basis with respect to those subsidiaries. Nortel will continue to evaluate its remaining consolidated subsidiaries for the appropriateness of the accounting applied to these investments as the Creditor Protection Proceedings progress.

*Basis of Presentation and Going Concern Considerations*

The consolidated financial statements include all information and notes required by U.S. Generally Accepted Accounting Principles ("U.. GAAP") in the preparation of annual consolidated financial statements. Although Nortel is headquartered in Canada, the consolidated financial statements are expressed in U.S. Dollars as the greater part of Nortel's financial results and net assets are denominated in U.S. Dollars.

Nortel makes estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities as of the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results may differ from those estimates. Estimates are used when accounting for items and matters such as revenue recognition and accruals for losses on contracts, allowances for uncollectible accounts and other receivables, recognition and measurement of creditors' claims, fair value of guarantees, allocation of proceeds from sale of businesses and assets (see note 2 – Divestiture Proceeds Received), asset valuations, impairment assessments, employee benefits including pensions, taxes and related valuation allowances and provisions, restructuring and other provisions, contingencies and pre-petition liabilities.

Beginning on January 14, 2009 (the Petition Date), Nortel and certain of its subsidiaries in Canada, the U.S., and in certain EMEA countries filed for creditor protection under the relevant jurisdictions of Canada, the U.S., the United Kingdom ("U.K.") and subsequently commenced separate proceedings in Israel, followed by secondary proceedings in France. The consolidated financial statements do not purport to reflect or provide for the consequences of the Creditor Protection Proceedings. In particular, such consolidated financial statements do not purport to show: (a) as to assets, their realizable value on a liquidation basis or their availability to satisfy liabilities; (b) as to pre-petition liabilities, all amounts that may be allowed for claims or contingencies, or the status and priority thereof, or the amounts at which they may ultimately be settled; (c) as to shareholders' accounts, the effect of any changes that may be made in Nortel's capitalization; or (d) as to divestiture proceeds held in escrow and recorded by NNL solely for financial reporting purposes, the final allocation of these proceeds as between various Nortel legal entities, including entities that are not consolidated in these consolidated financial statements, which will ultimately be determined either by joint agreement or through a dispute resolution proceeding (see note 2).

The ongoing Creditor Protection Proceedings and completed divestitures of Nortel's businesses and assets, both completed and those asset sales that may arise in the future, raise substantial doubt as to whether Nortel will be able to continue as a going concern. While the Debtors (as defined in note 2) have filed for and been granted creditor protection, the consolidated financial statements continue to be prepared using the going concern basis, which assmes that Nortel will be able to realize its assets and discharge its

Table of Contents

liabilities in the normal course of business for the foreseeable future. However, it is not possible to predict the outcome of the Creditor Protection Proceedings and, as such, there is substantial doubt regarding the realization of assets and discharge of liabilities. If the going concern basis is not appropriate, adjustments will be necessary to the carrying amounts and/or classification of Nortel's assets and liabilities. Further, a court approved plan in connection with the Creditor Protection Proceedings could materially change the carrying amounts and classifications reported in the consolidated financial statements. Nortel will continue to evaluate its remaining consolidated subsidiaries for the appropriateness of the accounting applied to these investments as the Creditor Protection Proceedings progress.

*Liquidation of Subsidiaries*

With the completed sales of Nortel's businesses, Nortel is focused on maximizing proceeds and cash flows with respect to remaining assets. This includes the winding up of Nortel's remaining operations and subsidiaries globally, which may involve orderly wind-ups as well as commencement of liquidation proceedings, as the circumstances warrant.

Events may impact when, and if, an entity is deemed to be in liquidation including local statutory requirements and court approvals. As such approvals and events occur, Nortel will evaluate whether a change in basis of accounting for such entities is appropriate, and in all such cases, Nortel will assess the carrying values of those entities' assets when it appears likely such entities will be approved for liquidation. Generally, Nortel expects that an entity deemed to be in liquidation will result in a loss of control, deconsolidation of the entity, and accounting for the entity prospectively on a cost method basis. Nortel recorded a loss of $74 for the year ended December 31, 2010, related to the liquidation of seven entities, which are included in reorganization items. No additional entities were deemed to be in liquidation in the year ended December 31, 2011.

*Correction of Immaterial Errors Related to Prior Periods*

As previously reported, in the course of preparing its interim financial statements for the three months ended March 31, 2011, Nortel became aware of certain NNL contractual guarantees provided in connection with real estate leases entered into by certain EMEA Subsidiaries and U.S. Subsidiaries that were not recognized at fair value upon the respective deconsolidation dates of these subsidiaries.

Nortel was required to establish a fair value at the initial recognition and measurement date for these guarantees under ASC 460 *Guarantees* ("ASC 460"), which, based on the nature of these guarantees, is the deconsolidation date. These fair values are not determinative of any expected allowed claim under the Creditor Protection Proceedings. See note 14.

These errors resulted in the understatement of Nortel's net loss and liabilities subject to compromise in the second and fourth quarters of 2010 of $68 and $57, respectively, and an understatement of net loss and liabilities subject to compromise of $125 as at and for the year ended December 31, 2010. Nortel has recast the cumulative effect of these errors as at December 31, 2010 by increasing its liabilities subject to compromise and accumulated deficit by $125. Nortel has also recast the statements of operations and cash flows for the year ended December 31, 2010, resulting in a charge to reorganization items, net and a corresponding increase in the net loss reported.

Nortel reviewed the impact of these errors on prior annual and interim periods in accordance with Staff Accounting Bulletin ("SAB") No. 99, *Materiality* ("SAB 99") and SAB No. 108, *Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements* ("SAB 108") and determined that the errors were not material to the applicable prior periods.

The following table summarizes the adjustments to the impacted periods:

| | Three Months Ended June 30, 2010 | Six Months Ended June 30, 2010 | Three Months Ended December 31, 2010 | Year Ended December 31, 2010 |
|---|---|---|---|---|
| Reported net loss | ($1,504) | ($1,149) | ($2,277) | ($4,075) |
| Adjustment for the recognition of lease guarantees | ($68) | ($68) | ($57) | ($125) |
| Adjusted net loss | ($1,572) | ($1,217) | ($2,334) | ($4,200) |

The adjustment totaling $68 for the six months ended June 30, 2010 was also applicable to the nine months ended September 30, 2010 and the comparative period financial results were adjusted accordingly.

56

Table of Contents

*Comparative Figures*

Certain 2010 figures in the consolidated financial statements have been reclassified to conform to Nortel's current period presentation.

**2. Creditor protection proceedings**

On the Petition Date, after extensive consideration of all other alternatives, with the unanimous authorization of the Nortel board of directors after thorough consultation with its advisors, certain Nortel entities, including NNC and NNL, initiated creditor protection proceedings in multiple jurisdictions under the respective restructuring regimes of Canada, under the Companies' Creditors Arrangement Act ("CCAA") ("CCAA Proceedings"), the U.S. under Chapter 11 of the U.S. Bankruptcy Code ("Chapter 11") ("Chapter 11 Proceedings"), U.K. under the Insolvency Act 1986 ("U.K. Administration Proceedings"), and subsequently, Israel under the Israeli Companies Law 1999 ("Israeli Administration Proceedings"). On May 28, 2009, one of Nortel's French subsidiaries, NNSA was placed into secondary proceedings ("French Secondary Proceedings"). The CCAA Proceedings, Chapter 11 Proceedings, U.K. Administration Proceedings, Israeli Administration Proceedings and French Secondary Proceedings are together referred to as the "Creditor Protection Proceedings". On July 14, 2009, Nortel Networks (CALA) Inc. ("NNCI"), a U.S. based subsidiary with operations in the CALA region, also filed a voluntary petition for relief under Chapter 11 in the U.S. Bankruptcy Court for the District of Delaware ("U.S. Court") and became a party to the Chapter 11 Proceedings. Nortel initiated the Creditor Protection Proceedings with a consolidated cash balance, as of December 31, 2008, of approximately $2,400, in order to preserve its liquidity and fund operations during the process.

"Debtors" as used herein means: (i) Nortel, together with NNL and certain other Canadian subsidiaries (collectively, "Canadian Debtors") that filed for creditor protection pursuant to the provisions of the CCAA in the Ontario Superior Court of Justice ("Canadian Court"); (ii) Nortel Networks Inc. ("NNI"), Nortel Networks Capital Corporation ("NNCC"), NNCI and certain other U.S. subsidiaries (collectively, "U.S. Debtors") that have filed voluntary petitions under Chapter 11 in the U.S. Court; (iii) the EMEA Debtors that made consequential filings under the Insolvency Act 1986 in the High Court of England and Wales ("English Court") (including NNSA); and certain Israeli subsidiaries that made consequential filings under the Israeli Companies Law 1999 in the District Court of Tel Aviv.

In June, 2009, Nortel determined that selling its businesses was the best path forward. Nortel has completed divestitures of all of its businesses including: (i) the sale of substantially all of its Code Division Multiple Access ("CDMA") business and Long Term Evolution ("LTE") Access assets to Telefonaktiebolaget LM Ericsson ("Ericsson"); (ii) the sale of substantially all of the assets of its Enterprise Solutions ("ES") business globally, including the shares of Nortel Government Solutions Incorporated ("NGS") and DiamondWare, Ltd. ("Diamondware"), to Avaya Inc. ("Avaya"); (iii) the sale of the assets of its Wireless Networks ("WN") business associated with the development of Next Generation Packet Core network components to Hitachi, Ltd. ("Hitachi"); (iv) the sale of certain portions of its Layer 4-7 data portfolio to Radware Ltd.; (v) the sale of substantially all of the assets of its Optical Networking and Carrier Ethernet businesses to Ciena Corporation ("Ciena"); (vi) the sale of substantial all of the assets of its Global System for Mobile communications (GSM)/GSM for Railways ("GSM-R") business to Ericsson and Kapsch CarrierCom, AG ("Kapsch"); (vii) the sale of substantially all of the assets of its Carrier VoIP and Application Solutions ("CVAS") business to GENBAND Inc. (now known as GENBAND U.S. LLC ("GENBAND")); (viii) the sale of NNL's 50% plus one share interest in LG-Nortel Co. Ltd. ("LGN"), its Korean joint venture with LG Electronics, Inc. ("LGE"), to Ericsson; (ix) the sale of substantially all of the assets of its global Multi Service Switch ("MSS") business to Ericsson; (x) the sale of substantially all of the assets of Guangdong-Nortel Telecommunications Equipment Co. Ltd. ("GDNT"), to Ericsson Mobile Data Applications Technology Research and Development Guangzhou Company Limited and Ericsson (Guangdong Shunde) Communications Company Limited (collectively, "Ericsson China"); (xi) the sale of its remaining patents and patent applications to a consortium consisting of Apple Inc., EMC Corporation, Ericsson, Microsoft Corporation, Research in Motion Limited and Sony Corporation (collectively the "Consortium"); and (xii) the sale of a small number of its Internet Protocol version 4 addresses.

Approximately $7,730 in net proceeds have been generated through the completed sales of Nortel's businesses and patents and patent applications. Substantially all proceeds received in connection with the completed sales of businesses and assets are being held in escrow, and have been recorded by NNL solely for financial reporting purposes until the final allocation of these proceeds as between various Nortel legal entities is ultimately determined.

While numerous milestones have been met, significant work remains under the Creditor Protection Proceedings. A Nortel business services group ("NBS") was established in 2009 that provided global transitional services to purchasers of Nortel's businesses, in fulfillment of contractual obligations under transition services agreements ("TSAs") entered into in connection with the sales of Nortel's businesses and assets. These services included maintenance of customer and network service levels during the integration process, and provided expertise and infrastructure in finance, supply chain management, information technology ("IT"), research and development ("R&D"), human resources and real estate necessary for the orderly and successful transition of businesses to purchasers over a period of generally up to 24 months from the closing of the sales. NBS also focused on maximizing the recovery of Nortel's remaining accounts receivable, inventory and real estate assets, independent of the TSAs. As of December 31, 2011, Nortel had completed substantially all of its obligations under the TSAs with respect to the business sales. As well, Nortel entered into a TSA in connection with the patent and patent applications sale to the Consortium, which is expected to be completed no later than March 31, 2012.

Table of Contents

A core corporate group ("Corporate Group") was also established in 2009 and continues to be focused on a number of key actions to maximize value for stakeholders, including the sale of remaining assets, wind down of global operations and entities, the creditor claims process, and working toward conclusion of the Creditor Protection Proceedings and any eventual distributions to creditors. The Corporate Group also continues to provide administrative and management support to Nortel's consolidated affiliates around the world while completing the orderly wind down of those remaining operations.

With the sale of all of Nortel's businesses, the interdependency between the Debtors under the different Creditor Protection Proceedings has diminished and is expected to continue to diminish, and thus the estates have worked toward separation of various corporate functions to allow each estate to be standalone. Extensive analysis and actions have been performed to segregate most of these functions such that the Canadian Debtors and the U.S. Debtors operate independently of one another. The Debtors continue to work on implementing plans for the separation of IT functions and applications during the first half of 2012.

One of the key remaining matters under the Creditor Protection Proceedings is the determination of allocation of sale proceeds among the various Nortel legal entities that participated in the sales of Nortel's businesses, which include entities subject to the respective Creditor Protection Proceedings in the different jurisdictions as well as entities that are not subject to any court supervision or proceedings.

*CCAA Proceedings*

On the Petition Date, the Canadian Debtors obtained an initial order from the Canadian Court ("Initial Order") for creditor protection for 30 days, pursuant to the provisions of the CCAA, which has since been extended to April 13, 2012 and is subject to further extension by the Canadian Court. There is no guarantee that the Canadian Debtors will be able to obtain court orders or approvals with respect to motions the Canadian Debtors may file from time to time to extend further the applicable stays of actions and proceedings against them. Pursuant to the Initial Order, the Canadian Debtors received approval to continue to undertake various actions in the normal course in order to maintain stable and continuing operations during the CCAA Proceedings.

Under the terms of the Initial Order, Ernst & Young Inc. was named as the court-appointed monitor under the CCAA Proceedings ("Canadian Monitor"). The Canadian Monitor has reported and will continue to report to the Canadian Court from time to time on the Canadian Debtors' financial and operational position and any other matters that may be relevant to the CCAA Proceedings. In addition, the Canadian Monitor may advise and, to the extent required, assist the Canadian Debtors on matters relating to the Creditor Protection Proceedings. On August 14, 2009, the Canadian Court approved an order that permits the Canadian Monitor to take on an enhanced role with respect to the oversight of the business, sales processes, claims processes and other restructuring activities under the CCAA Proceedings. On May 27, 2009 and July 22, 2009, representative counsel were appointed on behalf of the former employees of the Canadian Debtors and on behalf of the continuing employees of the Canadian Debtors, respectively ("Representative Counsel"). Nortel management and the Canadian Monitor meet regularly with Representative Counsel and creditor groups to provide status updates and share information with them that has been shared with the representatives of other major stakeholders.

As a consequence of the CCAA Proceedings, generally, all actions to enforce or otherwise effect payment or repayment of liabilities of any Canadian Debtor arising prior to the Petition Date and substantially all pending claims and litigation against the Canadian Debtors and their officers and directors have been stayed until April 13, 2012, or such later date as may be ordered by the Canadian Court. In addition, the CCAA Proceedings have been recognized by the U.S. Court as "foreign proceedings" pursuant to the provisions of Chapter 15 of the U.S. Bankruptcy Code, giving effect in the U.S. to the stay granted by the Canadian Court. A cross-border court-to-court protocol (as amended) has also been approved by the U.S. Court and the Canadian Court. This protocol provides the U.S. Court and the Canadian Court with a framework for the coordination of the administration of the Chapter 11 Proceedings and the CCAA Proceedings on matters of concern to both courts.

The Canadian Court has also granted charges against some or all of the assets of the Canadian Debtors and any proceeds from any sales thereof, including the following current charges: a charge in favor of the Canadian Monitor, its counsel and counsel to the Canadian Debtors as security for payment of certain professional fees and disbursements; a charge in favor of NNI as security for excess payment by NNI of certain corporate overhead and R&D services provided by NNL to the U.S. Debtors; a charge to support an indemnity for the directors and officers of the Canadian Debtors relating to certain claims that may be made against them in such roles, as further described below; an intercompany charge in favor of: (i) any U.S. Debtor that loans or transfers money, goods or services to a Canadian Debtor; (ii) any EMEA Debtors who provide goods or services to the Canadian Debtors; (iii) NNL for any amounts advanced by NNL to Nortel Networks Technology Corporation ("NNTC") following the Petition Date; and (iv) NNUK for certain payments due by NNL to NNUK out of the allocation of sale proceeds NNL actually receives from future material asset sales, subject to certain conditions. The Canadian Court also approved an additional charge against all of the property of the Canadian Debtors to secure payment of the amounts that have been determined to be payable to participants under the NSIP (as defined below). A further charge has been granted in favor of certain former employees and long term disability employees who are beneficiaries under the Settlement Agreement (as defined below) against all of the property of the Canadian Debtors to secure payment of the medical, dental, income, termination and pension payments agreed to be paid by the Canadian Debtors under the Settlement Agreement.

*Chapter 11 Proceedings*

Also on the Petition Date, the U.S. Debtors, other than NNCI, filed voluntary petitions under Chapter 11 with the U.S. Court. The U.S. Debtors received approval from the U.S. Court for a number of motions enabling them to continue to operate their businesses generally in the ordinary course. Among other things, the U.S. Debtors received approval to continue paying employee

58

Table of Contents

wages and certain benefits in the ordinary course; to generally continue their cash management system; and to continue honoring customer obligations and paying suppliers for goods and services received on or after the Petition Date. On July 14, 2009, NNCI also filed a voluntary petition for relief under Chapter 11 in the U.S. Court and thereby became one of the U.S. Debtors subject to the Chapter 11 Proceedings, although the petition date for NNCI is July 14, 2009. On July 17, 2009, the U.S. Court entered an order of joint administration that provided for the joint administration, for procedural purposes only, of NNCI's case with the pre-existing cases of the other U.S. Debtors.

As required under the U.S. Bankruptcy Code, on January 22, 2009, the United States Trustee for the District of Delaware ("U.S. Trustee") appointed an official committee of unsecured creditors, which currently includes The Bank of New York Mellon, Pension Benefit Guaranty Corporation ("PBGC") and Law Debenture Trust Company of New York ("U.S. Creditors' Committee"). The U.S. Creditors' Committee has the right to be heard on all matters that come before the U.S. Court with respect to the U.S. Debtors. There can be no assurance that the U.S. Creditors' Committee will support the U.S. Debtors' positions on matters to be presented to the U.S. Court. In addition, a group purporting to hold substantial amounts of Nortel's publicly traded debt has organized ("Bondholder Group"). Nortel's management and the Canadian Monitor have met with the Bondholder Group and its advisors to provide status updates and share information with them that has been shared with other major stakeholders. Disagreements between the Debtors and the U.S. Creditors' Committee and the Bondholder Group could protract and negatively impact the Creditor Protection Proceedings.

On December 8, 2009, Nortel announced that NNI had entered into an agreement with John Ray for his appointment as principal officer of each of the U.S. Debtors ("U.S. Principal Officer") and to work with Nortel management, the Canadian Monitor, the U.K. Administrators and various retained advisors, in providing oversight of the conduct of the businesses of the U.S. Debtors in relation to various matters in connection with the Chapter 11 Proceedings. This appointment was approved by the U.S. Court on January 6, 2010.

On June 21, 2010, the U.S. Debtors filed a motion seeking to terminate certain U.S. retiree and LTD benefits effective as of August 31, 2010. The U.S Debtors filed a notice of withdrawal of this motion with the U.S. Court on July 16, 2010. In anticipation that the U.S. Debtors will seek modification or termination of some or all of the U.S. retiree and LTD benefits at a later time, on June 21, 2011, upon the motion of the U.S. Debtors dated June 2, 2011, the U.S. Court entered an order directing the U.S. Trustee to establish a committee of retirees for the U.S. Debtors to consult with before undertaking any modification or termination of the U.S. retiree benefits. Additionally, on June 22, 2011, the U.S. Court entered an order directing the U.S Trustee to establish a committee of LTD employees for the U.S. Debtors to consult with before undertaking any modification or termination of the U.S. LTD benefits. On August 2, 2011, the U.S. Trustee appointed the members of these committees.

On July 12, 2010, the U.S. Debtors filed their proposed plan of reorganization (the "Plan") under Chapter 11 with the U.S. Court. Pursuant to the Plan, each U.S. Debtor will either be reorganized to the extent the U.S. Debtors determine it is necessary or beneficial to do so for the purpose of fulfilling its obligations under the asset sale agreements and TSAs, selling or otherwise disposing of its assets and fulfilling its obligations under the Plan, or will be liquidated. The U.S. Debtors filed a proposed disclosure statement for the Plan with the U.S. Court on September 3, 2010. The effectiveness of the Plan and the U.S. Debtors' exit of the Chapter 11 Proceedings is subject to several conditions, including U.S. Court approval of the disclosure statement, as amended, obtaining the requisite number of votes in favor of the Plan from the solicited creditors of each U.S. Debtor, confirmation of the Plan by order of the U.S. Court and the satisfaction of other conditions precedent.

On September 23, 2011, the U.S. Court established a claims bar date of November 15, 2011 for the filing of certain inter-company claims against the U.S. Debtors, which did not apply to the filing of inter-company claims by the Canadian Debtors, the entities subject to the U.S. EMEA Claims Bar Date (defined below) and majority-owned direct and indirect subsidiaries of the U.S. Debtors. The November 15, 2011 claims bar date also applied to the filing of all indemnification and/or contribution claims of directors and officers who were directors and/or officers as of August 1, 2009 and whose claims arise from service to the U.S. Debtors or any of the U.S. Debtors' non-debtor affiliates. Certain affiliates of the U.S. Debtors in the Asia and CALA regions, which are consolidated in Nortel's results, filed inter-company claims against the U.S. Debtors for an aggregate amount of approximately $58 by the November 15, 2011 bar date. Nortel has established reserves as appropriate for these accounts receivable balances in current and prior periods.

As a consequence of the commencement of the Chapter 11 Proceedings, generally, all actions to enforce or otherwise effect payment or repayment of liabilities of any U.S. Debtor preceding the Petition Date and substantially all pending claims and litigation against the U.S. Debtors have been automatically stayed for the pendency of the Chapter 11 Proceedings (absent any court order lifting the stay). In addition, the U.S. Debtors applied for and obtained an order in the Canadian Court recognizing the Chapter 11 Proceedings in the U.S. as "foreign proceedings" in Canada and giving effect, in Canada, to the automatic stay under the U.S. Bankruptcy Code.

### Administration Proceedings

Also on the Petition Date, the EMEA Debtors made consequential filings and each obtained an administration order from the English Court under the Insolvency Act 1986. The filings were made by the EMEA Debtors under the provisions of the European Union's Council Regulation ("EC") No 1346/2000 on Insolvency Proceedings ("EC Regulation") and on the basis that each EMEA Debtor's center of main interests was in England. The U.K. Administration Proceedings currently extend to January 14, 2014, subject to further extension. Under the terms of the orders, a representative of Ernst & Young LLP (in the U.K.) and a representative of Ernst

Table of Contents

& Young Chartered Accountants (in Ireland) were appointed as joint administrators with respect to the EMEA Debtor in Ireland and representatives of Ernst & Young LLP were appointed as joint administrators for the other EMEA Debtors (collectively, "U.K. Administrators") to manage each of the EMEA Debtors' affairs, business and property under the jurisdiction of the English Court and in accordance with the applicable provisions of the Insolvency Act 1986. The Insolvency Act 1986 provides for a moratorium during which creditors may not, without leave of the English Court or consent of the U.K. Administrators, wind up the company, enforce security, or commence or progress legal proceedings. All of Nortel's operating EMEA subsidiaries except those in the following countries are included in the U.K. Administration Proceedings: Nigeria, Russia, Ukraine, Israel, Norway, Switzerland, South Africa and Turkey.

The U.K. Administration Proceedings have been recognized by the U.S. Court as "foreign main proceedings" pursuant to the provisions of Chapter 15 of the U.S. Bankruptcy Code, giving effect in the U.S. to the moratorium provided by the Insolvency Act 1986.

Certain of Nortel's Israeli subsidiaries ("Israeli Debtors") commenced separate creditor protection proceedings in Israel. On January 19, 2009, the District Court of Tel Aviv ("Israeli Court") appointed administrators over the Israeli Debtors ("Israeli Administrators"). The orders of the Israeli Court provide for a "stay of proceedings" in respect of the Israeli Debtors whose creditors are prevented from taking steps against the companies or their assets and which, subject to further orders of the Israeli Court, remains in effect during the Israeli Administration Proceedings.

On May 28, 2009, at the request of the U.K. Administrators of NNSA, the Commercial Court of Versailles, France ("French Court") ordered the commencement of secondary proceedings in respect of NNSA. The French Secondary Proceedings consist of liquidation proceedings and NNSA is no longer authorized to continue its business operations.

### Significant Business and Other Divestitures

#### CDMA and LTE Access Assets

On November 13, 2009, Nortel announced that following satisfaction of all closing conditions, it, NNL, and certain of its other subsidiaries, including NNI, had completed the sale of substantially all of the assets of its CDMA business and LTE Access assets to Ericsson for $1,130, subject to certain post closing purchase price adjustments. The purchase price has been finalized with a downward purchase price adjustment of $1. In connection with this transaction and included in the net gain realized for accounting purposes, NNL and NNI paid an aggregate break-up fee of $19.5 plus $3 in expense reimbursements to Nokia Siemens Networks B.V., the party to the "stalking horse" asset sale agreement that was outbid by Ericsson in the "stalking horse" or 363 sales process under Chapter 11. Nortel recognized a cumulative gain on disposal of $1,192 for this divestiture.

The related CDMA business and LTE Access assets financial results of operations were not classified as discontinued operations as they did ot meet the definition of a component of an entity as required under U.S. GAAP.

#### Packet Core Assets

On December 8, 2009, Nortel announced that following satisfaction of all closing conditions, NNL and NNI had completed the sale of Nortel's Packet Core Assets to Hitachi for $10. Nortel recognized a gain on disposal of $8 for this divestiture.

The related Packet Core Assets financial results of operations were not classified as discontinued operations as they did not meet the definition of a component of an entity as required under U.S. GAAP.

#### Enterprise Solutions Business

On December 18, 2009, Nortel announced that it, NNL, and certain of Nortel's other subsidiaries, including NNI and NNUK, had completed the sale of substantially all of the assets of the ES business globally as well as the shares of NGS and DiamondWare, Ltd. to Avaya for a purchase price of $900 in cash, subject to certain post closing purchase price adjustments, with an additional pool of $15 reserved for an employee retention program. The purchase price was finalized with no adjustments. The sale of certain ES assets held by Israeli subsidiaries was subsequently approved by the Israeli Court on December 21, 2009. All other closing conditions had been satisfied as of December 18, 2009. Nortel recognized a cumulative gain on disposal of $750 for this divestiture.

The related ES business and NGS financial results of operations have been classified as discontinued operations, beginning in the third quarter of 2009, as they met the definition of a component of an entity as required under U.S. GAAP. See note 5.

#### Optical Networking and Carrier Ethernet Businesses

On March 19, 2010, Nortel announced that it, NNL, and certain of its subsidiaries, including NNI and NNUK, had completed the sale of substantially all of the assets of its Optical Networking and Carrier Ethernet businesses to Ciena for a purchase price of approximately $774. The purchase price has been finalized with downward working capital adjustments of approximately $81. In conjunction with the sale of its Ottawa Carling Campus, Nortel was required to exercise its early termination rights on the facility lease with Ciena and to pay Ciena $33.5 at closing. See the "Sale of Ottawa Carling Campus" section below for further information.

60

Table of Contents

Nortel recognized a cumulative gain on disposal of $546 for this divestiture.

The related Optical Networking and Carrier Ethernet businesses' financial results of operations were not classified as discontinued operations as they did not meet the definition of a component of an entity as required under U.S. GAAP.

*LGN Joint Venture*

On June 29, 2010, Nortel announced that NNL had completed the sale of its 50% plus one share interest in LGN to Ericsson for a purchase price of $242 in cash, subject to certain purchase price adjustments. The purchase price was finalized with no change to the purchase price. Nortel recognized a gain on disposal of $53 in the year ended December 31, 2010. See note 5.

In addition to the sale proceeds, prior to closing, NNL received approximately 50% of a capital reduction paid out by LGN to its shareholders, NNL and LGE, in the amount of 200 billion Korean Won (approximately CAD $181). NNL received CAD $83, net of withholding taxes.

The related financial results of operations of LGN have been classified as discontinued operations beginning in the second quarter of 2010 as they met the definition of a component of an entity as required under U.S. GAAP.

*MSS Business*

On March 11, 2011, Nortel announced that it, NNL, and certain of Nortel's other subsidiaries, including NNI and NNUK, had completed the sale to Ericsson of substantially all of its global MSS business and the associated Data Packet Network and Services Edge Router (Shasta) product groups for a purchase price of $65 in cash. The purchase price has been finalized and was subject to a downward price adjustment relating to working capital of $12 in the year ended December 31, 2011. Nortel recorded a gain on disposal of $40, as adjusted for all closing conditions, for this divestiture.

The related financial results of operations of the MSS business were not classified as discontinued operations as they did not meet the definition of a component of an entity as required under U.S. GAAP.

*GSM/GSM-R Business*

On March 31, 2010, Nortel announced that it had completed the sale of substantially all of the assets of its global GSM/GSM-R business to Ericsson and Kapsch for aggregate proceeds of $103. The purchase price with respect to the sale to Ericsson has been finalized and the sales proceeds were subject to a downward working capital adjustment of $6 recorded in the year ended December 31, 2010. The purchase price with respect to the sale to Kapsch was finalized in the fourth quarter of 2011 and resulted in an upward working capital adjustment of $3. Nortel recognized a cumulative gain on disposal of $125 for this divestiture.

The related GSM/GSM-R business financial results of operations were not classified as discontinued operations as they did not meet the definition of a component of an entity as required under U.S. GAAP.

*CVAS Business*

On May 28, 2010, Nortel announced that it had completed the sale of substantially all of its assets of the CVAS business globally to GENBAND for a purchase price of $282, subject to balance sheet and other adjustments estimated at the time at approximately $100, resulting in estimated net proceeds of approximately $182. Subsequent to closing, a dispute arose between the parties over the interpretation of a defined term in the asset sale agreement regarding the final purchase price payable to Nortel. In connection with the dispute between the parties over the interpretation of a defined term in the asset sale agreement, Nortel recorded a charge in the first quarter of 2011 of $25 as its best estimate of the probable amount payable to GENBAND based on settlement discussions which were ongoing among the parties. In August 2011, the settlement discussions resulted in the parties reaching agreement on a final purchase price of approximately $157, a difference of approximately $25 from the initial purchase price on closing of $182. This settlement was approved by the Canadian Court and the U.S. Court on August 23, 2011. Nortel recognized a cumulative gain on disposal of $180 for this divestiture.

The related CVAS business financial results of operations were not classified as discontinued operations as they did not meet the definition of a component of an entity as required under U.S. GAAP.

*GDNT Joint Venture*

On May 12, 2011, Nortel announced that GDNT had concluded the sale of substantially all of its assets to Ericsson China for an aggregate purchase price of approximately $51 in cash, subject to certain purchase price adjustments. The purchase price has been finalized and the parties agreed to an upward purchase price adjustment of approximately $6, which was recorded in the second quarter of 2011. NNL and Nortel China Limited together own 62 percent of GDNT. Nortel China Limited is wholly owned by NNL. It is expected that GDNT will soon commence a process to wind down the entity and deal with its remaining assets and liabilities in accordance with Chinese law. At the conclusion of this process, any funds remaining in GDNT will be distributed to its shareholders. Nortel recognized a gain on disposal of $24 for this divestiture.

Table of Contents

The related financial results of operations of GDNT were not classified as discontinued operations as they did not meet the definition of a component of an entity as required under U.S. GAAP.

*Intellectual Property*

On June 30, 2011, Nortel announced that it, NNL and certain of its other subsidiaries, including NNI and NNUK, concluded a successful auction with the Consortium emerging as the winning bidder for the sale of all of Nortel's remaining patents and patent applications for a cash purchase price of $4,500. In connection with the sale of the patents and patent applications, Nortel received good faith deposits of $108 of which $54 was refunded to the unsuccessful bidders in the third quarter of 2011 and the balance was credited toward the purchase price paid on closing by the Consortium. Nortel also received additional proceeds of $18 related to the sale of certain NNL tax attributes to the Consortium, which have been included as part of cash and cash equivalents.

This sale included more than 6,000 patents and patent applications spanning wireless, wireless 4G, data networking, optical, voice, internet, service provider, semiconductors and other patent portfolios.

On July 11, 2011, NNC, NNL, NNI and certain other subsidiaries obtained orders from the U.S. Court and the Canadian Court at a joint hearing approving the sale agreement. Nortel concluded the sale on July 29, 2011 and recognized a gain on disposal of $4,475. An aggregate break-up fee of $25 plus $4 in expense reimbursements was paid to Google Inc., the unsuccessful "stalking horse" bidder.

*Internet Protocol Addresses*

Nortel commenced a process, approved by the Canadian Court, to sell certain residual IT assets primarily consisting of about 17 million Internet Protocol version 4 addresses ("IP Addresses") and IT hardware assets including 700 servers. Working together with the Canadian Monitor, Nortel's goal is to maximize the value of these residual IT assets in a timely manner. Any definitive sale agreement will require approval of the Canadian Court.

On February 17, 2012, the Canadian Court approved two sale agreements NNL and NNTC had entered into for the sale of rights in a small number of our IP Addresses. Under one sale agreement CSC Holdings LLC, the operating subsidiary of Cablevision Systems Corporation, is the purchaser of a certain number of the IP Addresses, and under the other sale agreement, Salesforce.com Inc. is the purchaser of a certain number of the IP Addresses. The financial and other terms of each of the sale agreements, including the cash purchase price and the IP Addresses included in each sale, have been sealed by order of the Canadian Court because disclosure of such terms may be detrimental to the Canadian Debtors' interests in seeking to consummate these and other sales of IP Addresses. Both purchasers have obtained approval from the American Registry for Internet Numbers ("ARIN") with respect to the transfer and registration of the IP Addresses in the respective purchasers' name upon closing. Nortel closed these sales in the first quarter of 2012 and the proceeds from the transactions have been deposited into an NNL single purpose bank account. The Canadian Debtors and the U.S. Debtors have agreed that any dispute relating to the rights and claims, if any, of the U.S. Debtors in and to the IP Addresses, including to an allocation of such sale proceeds, will be subject to a joint hearing of the Canadian Court and the U.S. Court prior to the distribution of such sale proceeds and, if appropriate, orders of such courts approving such distributions. Nortel continues to seek buyers for the remainder of its IP Addresses.

*Transition Services Agreements*

Nortel entered into TSAs in connection with certain of the divestitures discussed above and is contractually obligated under such TSAs to provide transition services to certain purchasers of its businesses and assets, such as IT, order management, supply chain, service and technical support, finance and certain back office services. Nortel has, subject to certain limitations, agreed to indemnify purchasers for losses in connection with a breach of its obligations under the TSAs or for certain other claims or losses that might arise under the TSAs. Nortel receives income from the TSAs, which is reported in its financial statements under "Billings under TSAs", part of Other income (expense) – net. As of December 31, 2011, Nortel had completed substantially all of its obligations under the TSAs with respect to the business sales. As well, Nortel entered into a TSA in connection with the patent and patent applications sale to the Consortium, which is expected to be completed no later than March 31, 2012.

*Sale of Ottawa Carling Campus*

On December 17, 2010, Nortel announced that its principal operating subsidiary NNL and NNTC completed the sale of its Ottawa Carling Campus to Public Works and Government Services Canada (PWGSC), for a cash purchase price of CAD$208.

The sale agreement provides for Nortel to continue to occupy parts of the Ottawa Carling Campus for varying periods of time to facilitate its continuing work on its global restructuring including work under the TSAs with the various buyers of its sold businesses. All other existing leases were assumed by PWGSC, including leases with buyers of its sold businesses. With respect to the lease with Ciena, the purchaser of the Optical Networking and Carrier Ethernet business, Nortel was directed by PWGSC under the sale agreement to exercise, on closing, its early termination rights under the lease, shortening the lease from 10 years to 5 years. This resulted, pursuant to the lease with Ciena, in the repayment to Ciena of $33.5 from the escrowed proceeds from the business divestiture and thus a reduction on the related gain on sale.

62

Table of Contents

The sale agreement further provided that at closing title would be delivered free and clear of all encumbrances, including a charge in favor of NNI with respect to an intercompany loan agreement, under which $75 plus accrued interest was outstanding and due on December 31, 2010. NNL repaid this outstanding amount with the proceeds from the sale of the Ottawa Carling Campus prior to December 31, 2010.

### Divestiture Proceeds Received

As of December 31, 2011, approximately $7,730 in net proceeds have been generated and received through the completed sales of businesses and assets. These divestiture proceeds include the following approximate amounts:

(a)   $1,070 from the sale of substantially all of Nortel's CDMA business and LTE Access assets;

(b)   $18 from the sale of Nortel's Layer 4-7 data portfolio;

(c)   $10 from the sale of Nortel's Packet Core Assets;

(d)   $932 from the sale of substantially all of the assets of Nortel's ES business, including the shares of DiamondWare, Ltd. and NGS;

(e)   $638 from the sale of substantially all of the assets of Nortel's Optical Networking and Carrier Ethernet businesses;

(f)   $67 from the sale of Nortel's North American GSM business;

(g)   $36 from the sale of Nortel's GSM business outside of North America (excluding its GSM business in CALA) and its global GSM-R business;

(h)   $149 from the sale of substantially all of Nortel's CVAS business;

(i)   $234 from the sale of Nortel's 50% plus one share interest in LGN;

(j)   $45 from the sale of substantially all of Nortel's MSS business;

(k)   $56 from the sale of substantially all of the GDNT assets (proceeds recorded in cash and cash equivalents);

(l)   $4,470 from the sale of Nortel's remaining patents and patent applications; and

(m)   $5 from the sale of various other business assets.

As of December 31, 2011, $7,250 of proceeds received from divestitures is being held in escrow and an additional $229, representative of proceeds from the sale of LGN, is included in non-current restricted cash and cash equivalents, all of which is currently reported in NNL solely for financial reporting purposes (including with respect to any gain recorded on such divestitures). The difference between the net proceeds received and the amount in escrow at December 31, 2011 is as a result of amounts that, from time to time, have been distributed, with the consent of each of the Debtors' estates and court approvals, as applicable from the escrow accounts to satisfy: 1) various obligations arising from the divestitures, whether through payments to third party vendors, or to reimburse the Debtors or non-consolidated subsidiaries for costs incurred, or 2) payments to the Debtors or non-consolidated subsidiaries related to settlements reached in respect of certain agreements involving proceeds allocation. The ultimate determination of the final allocation of such proceeds among the various Nortel legal entities, including entities that are not consolidated in these financial statements, has not yet occurred and may be materially different from the NNL classification and related amounts shown in these financial statements. The Interim Funding and Settlement Agreement ("IFSA") and the escrow agreements for sales divestiture proceeds entered into by NNL, NNI and other Nortel legal entities provide for the processes for determining the final allocation of divestiture proceeds among such entities, either through joint agreement or, failing such agreement, other dispute resolution proceedings. Adjustments to the NNL classification and any related amounts arising from the ultimate allocation will be recognized when finalized. The NNL classification and related amounts shown in these financial statements are not determinative of, and have not been accepted by any debtor estate, any party in interest in the Creditor Protection Proceedings or any court overseeing such proceedings, for purposes of deciding the final allocation of divestiture proceeds.

As of December 31, 2011, a further $97 in connection with the divestitures of substantially all of Nortel's CDMA business and LTE Access assets, the assets of Nortel's Optical Networking and Carrier Ethernet businesses, substantially all of Nortel's global GSM/GSM-R and CVAS businesses, and substantially all of the assets of Nortel's MSS business, is currently unrecorded and will be recognized subject to agreement between Nortel and each of the various buyers that obligations under the TSAs have been completed. Such amounts, when and if received, will also be held in escrow until the final allocation of these proceeds as between various Nortel legal entities, including the U.S. and EMEA subsidiaries, is ultimately determined. Subsequent to December 31, 2011, our escrow agent has received $5 of the $97, which relates to the release of an escrow amount in connection with the sale of the CVAS business.

### Allocation of Divestiture Proceeds and Other Inter-Estate Matters

At various times during the second half of 2009 and the first quarter of 2010, the Canadian Debtors, the U.S. Debtors and the U.K. Administrators, with the involvement of the Canadian Monitor, the U.S. Principal Officer, the U.S. Creditors' Committee and the Bondholder Group engaged in negotiations regarding the scope and terms of a proposed protocol for resolving disputes concerning the allocation of sale proceeds ("Allocation Protocol"), as required by the terms of the IFSA. However, it became apparent that the parties had differing views concerning the allocation of the sale proceeds, inter-company claims and the scope of the Allocation

Table of Contents

Protocol. In order to address this impasse, the Canadian Debtors, the U.S. Debtors and the U.K. Administrators agreed to temporarily suspend negotiations on the Allocation Protocol and instead focussed on a process to facilitate a comprehensive settlement to resolve all material outstanding inter-estate matters, including the allocation of the sale proceeds and the settlement of inter-company claims. To this end, the parties met on several occasions to outline, on a confidential and without prejudice basis, their respective allocation methodologies and potential inter-company claims that may be asserted.

As a result of these meetings and the complexity of the issues that were raised, the Canadian Debtors, the U.S. Debtors, the EMEA Debtors, the U.K. Administrators, the Canadian Monitor the U.S. Principal Officer, the U.S. Creditors' Committee, the Bondholder Group and certain other interested parties (the "Mediation Parties") agreed that these inter-estate negotiations would be aided by the appointment of a neutral mediator to review and mediate the issues. The parties selected Layn R. Phillips, a former U.S. federal district court judge and experienced commercial mediator, to serve as mediator and review the positions and viewpoints of the various parties on allocation and unresolved inter-estate matters. A confidential, non-binding mediation was held in November 2010. The mediation session did not result in the resolution of the issues presented.

As a result of the November 2010 mediation session, and positions taken in the CCAA Proceedings, it became apparent that the U.K. Administrators and certain other parties, who were also substantial creditors of the EMEA Debtors, were alleging a number of significant potential claims against the Canadian Debtors as well as the U.S. Debtors. These potential claims are integral to the allocation positions of these parties and include allegations of proprietary and trust-type claims. Consequently, the Canadian Monitor and the Canadian Debtors determined that, absent reaching a comprehensive settlement of allocation and inter-company claims issues, these specific claims needed to be resolved first. Accordingly, the Canadian Debtors obtained an order of the Canadian Court establishing a process for the calling of claims by EMEA Creditors. See "Creditor Protection Proceedings Claims" below. Notwithstanding the commencement of this process, the Mediation Parties continued to engage in discussions regarding the resumption of mediation and another confidential, non-binding mediation was held in April 2011. On April 13, 2011, Nortel announced that the mediation process that had been commenced in respect of the allocation of sale proceeds of its various business and asset divestitures and other inter-estate matters, including inter-company claims, has ended without resolution of the matters in dispute. In light of the unsuccessful conclusion of the mediation process, Nortel announced that delays in the ultimate resolution of allocation and inter-company claims matters potentially could be significant, and that such delays would result in a corresponding significant delay in the timing of distributions to holders of validated claims of the various estates.

On April 25, 2011, the U.S. Debtors and the U.S. Creditors' Committee filed a joint motion for an order establishing an allocation protocol for the sale proceeds as between various Nortel legal entities ("Original Protocol Motion"), and for related relief. Subsequently, as a result of further discussions, the U.S. Debtors and the U.S. Creditors' Committee together with the Canadian Debtors jointly filed an amended and restated version of the Original Protocol Motion and agreed to collectively seek an order establishing an allocation protocol before the Canadian Court and the U.S. Court. The proposed order would have had the U.S. Court and the Canadian Court establish procedures and an expedited schedule for the cross-border resolution by the U.S. Court and the Canadian Court on the allocation of proceeds from the sales of Nortel's businesses and from the sale of its patent portfolio. The motion was heard at a joint hearing of the U.S. Court and Canadian Court on June 7, 2011. On June 20, 2011, Nortel announced that the Canadian Court and the U.S. Court had reserved their decisions on the motions heard by such courts on June 7, 2011, and directed NNC, NNL and the other Canadian Debtors, NNI and the other U.S. Debtors, the EMEA Debtors, as well as certain other parties, to participate in a joint mediation of the issues raised in the motions. The directions provided that the Canadian Court and the U.S. Court together would appoint a sole mediator by supplemental order and that the mediator would determine the time, date, place and protocol of the mediation.

On June 17, 2011, and as supplemented on June 29, 2011, the Canadian Court and the U.S. Court appointed The Honourable Warren K. Winkler, Chief Justice of Ontario, as the sole mediator (the Mediator) for the mediation. The mediation was ordered because of both courts' concern that the time required to prepare their decisions would also delay allocation proceedings and, therefore, distributions to creditors of the various Nortel estates.

The Mediator has the authority, in consultation with the parties to the mediation, to determine the scope of the mediation, as he deems appropriate, including the issue of allocation of the sale proceeds of Nortel's various businesses and patent portfolio, and global issues relating to allocation and claims. Participation in this mediation is mandatory. The mediation process will be terminated (i) by a declaration by the Mediator that a settlement has been reached (any such settlement would be subject to the approval of the Canadian Court and the U.S. Court, on notice to parties in interest), (ii) by a declaration by the Mediator that further efforts at mediation are no longer considered worthwhile, or (iii) for any other reason as determined by the Mediator. At the request of the U.S. Court, the commencement of the mediation has been delayed pending the outcome of the October 14, 2011 hearing (discussed in more detail below).

The Canadian Court approved a claims process with regard to the significant inter-company claims made by the EMEA Debtors against the Canadian Debtors, which process included a requirement that claims be filed by March 18, 2011. In response to this call for claims, representatives of the U.K. Administrators, on behalf of the EMEA Debtors, filed 84 proofs of claims against the Canadian Debtors and unspecified directors and officers of NNC and NNL (the EMEA Claims). The EMEA Claims contain broad ranging claims set out with limited specificity. The EMEA Claims also include a number of large priority claims, which if allowed, would significantly reduce the potential proceeds available for distribution to unsecured creditors of the Canadian Debtors. Nortel is currently unable to quantify the total potential amounts claimed under the EMEA Claims, as many of the claims were not quantified.

Table of Contents

Of the EMEA Claims quantified, they total approximately CAD$9.8 billion. In addition, the U.K. Pension Trust Limited and the Board of the Pension Protection Fund in the U.K. filed an estimated claim of CAD$3.7 billion in respect of an alleged deficit in the U.K. pension plan ("the U.K. Pension Claim"). Should the EMEA Claims and the U.K. Pension Claim ultimately be allowed in the CCAA Proceedings on the basis filed, they could have the effect of doubling (or more) the estimated CCAA claims pool and, accordingly, significantly reduce potential distributions to other unsecured creditors of the Canadian Debtors. Further, counsel for 131 former employees of NNSA have submitted a letter indicating they would file proofs of claims in connection with an action that is currently before the courts in France.

On September 30, 2009, the EMEA Debtors and certain of their affiliates (collectively the "EMEA Claimants") filed over 350 proofs of claim against the U.S. Debtors and unspecified directors and officers of the U.S. Debtors in the U.S. Court. On May 10, 2011, the U.S. Court entered an order requiring the EMEA Claimants to file more definite statements of their previously-filed claims, and to file any other pre-petition claims against the U.S. Debtors, by June 1, 2011, absent which any of their pre-petition claims would be disallowed. The deadline for filing amended proofs of claim was later extended on request of certain of the EMEA Claimants to June 3, 2011 ("U.S. EMEA Claims Bar Date"). The EMEA Claimants filed 38 amended proofs of claim on June 3, 2011. The remaining proofs of claim that had been filed by the EMEA Claimants and were not amended on a timely basis have been disallowed and expunged pursuant to the terms of the U.S. Court's May 10, 2011 order.

On July 15 and 22, 2011, the U.S. Debtors and the U.S. Creditors' Committee filed joint objections and motions to dismiss the claims of NNUK, NNSA and Nortel Networks (Ireland) Limited and the French Liquidator. On August 3, 2011, the U.S. Court issued an order that set October 13 and 14, 2011 as the hearing dates for these motions. The order also requested the Mediator to consider postponing the mediation discussed above until after these hearings and the U.S. Court's decision on the motions to dismiss. On August 9, 2011, the Mediator advised the parties to the mediation that he was postponing the initial procedural meeting to a date to be determined after the U.S. Court releases its decision. The U.S. Court heard the motions on October 14, 2011 and has reserved judgment.

*Creditor Protection Proceedings Claims Processes*

On August 4, 2009, the U.S. Court approved a claims process in the U.S. for claims that arose prior to the Petition Date. Pursuant to this claims process, proofs of claim, except in relation to NNCI, had to be received by the U.S. Claims Agent, Epiq Bankruptcy Solutions, LLC ("Epiq") by September 30, 2009 (subject to certain exceptions as provided in the order establishing the claims bar date). On December 2, 2009, the U.S. Court approved January 25, 2010 as the deadline for receipt by Epiq of proofs of claim against NNCI (subject to certain exceptions as provided in the order establishing the claims bar date).

On July 30, 2009, the Canadian Court approved a claims process in Canada in connection with the CCAA Proceedings. Pursuant to this claims process, subject to certain exceptions, proofs of claim for claims arising prior to the Petition Date had to be received by the Canadian Monitor by no later than September 30, 2009. This claims bar date did not apply to certain claims, including inter-company claims as between the Canadian Debtors or as between any of the Canadian Debtors and their direct or indirect subsidiaries and affiliates (other than joint ventures), compensation claims by current or former employees or directors of any of the Canadian Debtors, and claims of current or former directors or officers for indemnification and/or contribution, for which claims notification deadlines have yet to be set by the Canadian Court. Proofs of claim for claims arising on or after the Petition Date as a result of the restructuring, termination, repudiation or disclaimer of any lease, contract or other agreement or obligation had to be received by the Canadian Monitor by the later of September 30, 2009 or 30 days after a proof of claim package was sent by the Canadian Monitor to the person in respect of such claim. On September 16, 2010, the Canadian Court approved a methodology for the review and determination of claims filed against the Canadian Debtors. Also on September 16, 2010, the Canadian Court and U.S. Court approved a cross-border claims protocol to address the level of cooperation and consultation on issues between the Canadian Debtors and the U.S. Debtors with respect to overlapping and same-creditors' claims between the two debtor estates. The U.K. Administrators commenced an informal creditor claim submission and evaluation process in July 2010. Creditors will also have the opportunity to take part in a formal claims admission and proving process in accordance with English insolvency law provisions in due course.

On January 14, 2011, the Canadian Court approved a claims process with regard to the significant inter-company claims made by the EMEA Debtors against the Canadian Debtors. The claims process implements a 'call for claims' that required the EMEA Debtors to file their claims by March 18, 2011, and establishes a process for the proving and resolution of such claims so that this category of claims also moves forward through the claims process.

On October 6, 2011, the Canadian Court approved a methodology and procedure for compensation related claims in Canada. A bar date of January 6, 2012 for such claims was set. Approximately 16,000 of the Canadian Debtors' employees, former employees, pensioners and survivors including long-term disability ("LTD") beneficiaries, may have employment-related claims, with a total value of such claims currently estimated to be approximately CAD$1.06 billion (see notes 8, 9 and 11). The order includes a methodology based upon categories of employees for the calculation of compensation claims, as well as a streamlined process, to address such claims intended to provide a fair, reasonable, efficient and orderly process beneficial to both employees and the Canadian Debtors. The methodology was agreed upon after extensive discussions among the Canadian Debtors, the Canadian Monitor, Representative Counsel, LTD beneficiaries' representative counsel, Canadian Auto Workers's ("CAW") counsel and their respective actuarial and financial advisors.

65

Table of Contents

The compensation claims are valued based on: (a) identified and agreed-upon benefits and agreed categories of claims, including post-retirement benefits; (b) agreed-upon actuarial assumptions and calculations, including with respect to income benefits, other benefits for LTD beneficiaries, post-retirement benefits and non-registered pension plan benefits and, with respect to adjustments relating to administrative costs and income tax, as applicable, agreed upon increase or "gross up" claim amounts; and (c) agreed-upon formulae relating to termination and severance pay claims. The order also calls for grievance claims, director compensation claims and indemnification claims that were excluded from prior claims processes of the Canadian Debtors. For more information on the employee compensation claims, refer to notes 8, 9 and 11.

The consolidated financial statements for the year ended December 31, 2011 generally do not include the final outcome of any current or future claims relating to the Creditor Protection Proceedings, other than as described in these financial statements. Certain claims filed may have priority over those of the Debtors' unsecured creditors. The Debtors are reviewing all claims filed and continue the claims reconciliation process. Differences between claim amounts determined by the Debtors and claim amounts filed by creditors will be investigated and resolved pursuant to a claims resolution process approved by the relevant court or, if necessary, the relevant court will make a final determination as to the amount, nature and validity of claims. Certain claims that have been filed may be duplicative (particularly given the multiple jurisdictions involved in the Creditor Protection Proceedings), based on contingencies that have not occurred, or may be otherwise overstated, and would therefore be subject to revision or disallowance. The settlement of claims cannot be finalized until the relevant creditors and courts approve a plan. In light of the number of creditors of the Debtors, the claims resolution process may take considerable time to complete. See note 20 for additional information about claims.

### Interim and Final Funding and Settlement Agreements

Historically, Nortel had deployed its cash through a variety of intercompany borrowing and transfer pricing arrangements to allow it to operate on a global basis and to allocate profits, losses and certain costs among the corporate group. In particular, the Canadian Debtors allocated profits, losses and certain costs, among the corporate group through transfer pricing agreement payments ("TPA Payments"). Other than one $30 payment made by NNI to NNL in respect of amounts that could arguably be owed in connection with the transfer pricing agreement, TPA Payments were suspended since the Petition Date. However, the Canadian Debtors and the U.S. Debtors, with the support of the U.S. Creditors' Committee and the Bondholder Group, as well as the EMEA Debtors (other than NNSA), entered into an Interim Funding and Settlement Agreement ("IFSA") dated June 9, 2009 under which NNI paid $157 to NNL, in four installments during the period ended September 30, 2009 in full and final settlement of TPA Payments for the period from the Petition Date to September 30, 2009. Similarly, except for two shortfall payments totaling $20, the IFSA provides for a full and final settlement of any and all TPA Payments owing between certain EMEA entities and the U.S. and Canada for the period from the Petition Date through December 31, 2009. A portion of this funding may be repayable by NNL to NNI in certain circumstances. The IFSA was approved by the U.S. Court and Canadian Court on June 29, 2009 and on June 23, 2009, the English Court confirmed that the U.K. administrators were at liberty to enter into the IFSA on behalf of each of the EMEA Debtors (except for NNSA which was authorized to enter into the IFSA by the French Court on July 7, 2009). NNSA acceded to the IFSA on September 11, 2009.

On December 23, 2009, Nortel announced that it, NNL, NNI, and certain other Canadian Debtors and U.S. Debtors entered into a Final Canadian Funding and Settlement Agreement ("FCFSA"). The FCFSA provides, among other things, for the settlement of certain intercompany claims, including in respect of amounts determined to be owed by NNL to NNI under Nortel's transfer pricing arrangements for the years 2001 through 2005. As part of the settlement, NNL agreed to the establishment of a pre-filing claim in favor of NNI in the CCAA Proceedings in the net amount of approximately $2,063 ("FCFSA Claim"), which claim will not be subject to any offset. The FCFSA also provides that NNI would pay to NNL approximately $190, which was received, over the course of 2010, including the contribution of NNI and certain U.S. affiliates towards certain estimated costs to be incurred by NNL, on their behalf, for the duration of the Creditor Protection Proceedings. The FCFSA also provides for the allocation of certain other anticipated costs to be incurred by the parties, including those relating to the divestiture of Nortel's various businesses. On January 21, 2010, Nortel obtained approvals from the Canadian Court and the U.S. Court of the FCFSA and the creation and allowance of the FCFSA Claim. In addition, Nortel obtained various other approvals from the Canadian Court and U.S. Court including authorization for NNL and NNI to enter into advance pricing agreements with the U.S. and Canadian tax authorities to resolve certain transfer pricing issues, on a retrospective basis, for the taxable years 2001 through 2005. In addition, in consideration of a settlement payment of $37.5, the United States Internal Revenue Service ("IRS") released all of its claims against NNI and other members of NNI's consolidated tax group for the years 1998 through 2008. As a result of this settlement, the IRS stipulated that its claim against NNI filed in the Chapter

66

Table of Contents

11 Proceedings in the amount of approximately $3,000 was reduced to the $37.5 settlement payment. This settlement was a condition of the FCFSA and was approved by the U.S. Court on January 21, 2010. NNI made the settlement payment to the IRS on February 22, 2010.

On August 23, 2011, the Canadian Court approved a Q1 2010 Transfer Pricing Settlement Agreement among NNL, NNI, NNUK, certain other Debtors and the U.K. Administrators whereby certain inter-company matters were resolved, including NNL remitting $4.7 to NNUK. Further, the Canadian Court approved on the same date an Agreement on Transfer Pricing Amendments and Certain Other Matters among the same parties as well as the French Liquidator. Under this agreement, and related agreements, transfer pricing arrangements ceased among all Nortel entities, and as a result any subsequent inter-company transactions is on a cost plus basis.

*APAC Debt Restructuring Agreement*

To enable certain Nortel subsidiaries ("APAC Agreement Subsidiaries") in the Asia Pacific ("APAC") region to continue their respective business operations and to facilitate the business divestitures, the Debtors (other than the Israeli Debtors) had entered into an Asia Restructuring Agreement ("APAC Agreement"). Under the APAC Agreement, the APAC Agreement Subsidiaries have paid a portion of certain of the APAC Agreement Subsidiaries net intercompany debt outstanding as of the Petition Date ("Pre-Petition Intercompany Debt") to the Debtors (other than the Israeli Debtors). Further portions of the Pre-Petition Intercompany Debt have been repaid and continue to be repayable from time to time only to the extent of any such APAC Agreement Subsidiary's net cash balance at the relevant time, and subject to certain reserves and provisions. All required court approvals with respect to the APAC Agreement have been obtained in the U.S. and Canada.

*Debt Instruments and Other Contracts*

Nortel's filings under Chapter 11 and the CCAA constituted events of default or otherwise triggered repayment obligations under the instruments governing substantially all of the indebtedness issued or guaranteed by NNC, NNL, NNI and NNCC. In addition, Nortel may not be in compliance with certain other covenants under indentures and other debt or lease instruments, and the obligations under those agreements may have been accelerated. Nortel believes that any efforts to enforce such payment obligations against the U.S. Debtors are stayed as a result of the Chapter 11 Proceedings. Although the CCAA does not provide an automatic stay, the Canadian Court has granted a stay to the Canadian Debtors that currently extends to April 13, 2012. Pursuant to the U.K. Administration Proceedings, a moratorium has commenced during which creditors may not, without leave of the English Court or consent of the U.K. Administrators, enforce security, or commence or progress legal proceedings.

The Creditor Protection Proceedings may have also constituted events of default under other contracts and leases of the Debtors. In addition, the Debtors may not be in compliance with various covenants under other contracts and leases. Depending on the jurisdiction, actions taken by counterparties or lessors based on such events of default and other breaches may be unenforceable as a result of the Creditor Protection Proceedings.

In addition, the Creditor Protection Proceedings may have caused, directly or indirectly, defaults or events of default under the debt instruments and/or contracts and leases of certain of our non-Debtor entities. These events of default (or defaults that become events of default) could give counterparties the right to accelerate the maturity of this debt or terminate such contracts or leases.

*Directors' and Officers' Compensation and Indemnification*

The Canadian Court in the CCAA Proceedings has approved a charge against the property of the Canadian Debtors, to an aggregate amount not exceeding CAD$45, to indemnify directors and officers of the Canadian Debtors for claims that may be made against them relating to failure of the Canadian Debtors to comply with certain statutory payment and remittance obligations.

In addition, in conjunction with the Creditor Protection Proceedings, NNC established a directors' and officers' trust ("D&O Trust") in the amount of approximately CAD$12. The purpose of the D&O Trust is to provide a trust fund for the payment of liability claims (including defense costs) that may be asserted against individuals who serve as directors and officers of NNC, or as directors and officers of other entities at NNC's request (such as subsidiaries and joint venture entities), by reason of that association with NNC or other entity, to the extent that such claims are not paid or satisfied out of insurance maintained by NNC and NNC is unable to indemnify the individual.

Certain Nortel entities have not filed for bankruptcy protection ("Cascade Subsidiaries"). Under the laws of various jurisdictions in which the Cascade Subsidiaries operate, the directors, officers and agents of the Cascade Subsidiaries may be subject to personal liability. In order to protect individuals serving as directors on the boards of the Cascade Subsidiaries and to facilitate participation by the Cascade Subsidiaries in Nortel's sales of businesses and assets, NNL and NNI have contributed to a trust ("Trust"), which will indemnify individuals serving as directors on the boards and as officers or agents of the Cascade Subsidiaries and their successors, if any, for any claims resulting from their service as a director, officer or agent of a Cascade Subsidiary, subject to limited exceptions. The Trust was approved by the Canadian Court and the U.S. Court on March 31, 2010.

67

Table of Contents

### Workforce Reductions; Employee Compensation Programs

Nortel has taken and expects to take further, ongoing workforce and other cost reduction actions as it works through the Creditor Protection Proceedings. On the Petition Date, Nortel employed approximately 30,300 employees globally. Through the sales of its businesses and cost reduction activities, Nortel's workforce was approximately 190 employees as of December 31, 2011, which includes employees in Canada and those employed by our consolidated subsidiaries. Therefore, this number excludes employees employed by any U.S. subsidiary or an EMEA subsidiary. Given the Creditor Protection Proceedings, Nortel has discontinued all remaining activities under its previously announced restructuring plans as of the Petition Date. See note 8 for further information.

Nortel continued the Nortel Networks Limited Annual Incentive Plan ("Incentive Plan") in 2011 and will continue the Incentive Plan in 2012 for all eligible employees. The Incentive Plan permits quarterly award determinations and payouts for the business units and the Asia region, and semi-annual award determinations and semi-annual or annual payouts for the Corporate Group and NBS, as applicable.

Where required, Nortel has obtained court approvals for retention and incentive compensation plans for certain key eligible employees deemed essential to the business during the Creditor Protection Proceedings. In March 2009, Nortel obtained U.S. Court and Canadian Court approvals for a key employee incentive and retention program for employees in North America, CALA and Asia. The program consisted of the Nortel Networks Corporation Key Executive Incentive Plan and the Nortel Networks Corporation Key Employee Retention Plan.

On March 4, 2010, Nortel obtained U.S. Court approval and on March 8, 2010 Nortel obtained Canadian Court approval for the Nortel Special Incentive Plan ("NSIP"), which is designed to retain personnel at all levels of Corporate Group and NBS critical to complete Nortel's remaining work. The NSIP was developed in consultation with independent expert advisors taking into account the availability of more stable and competitive employment opportunities available to these employees elsewhere. The NSIP was supported by the Canadian Monitor, U.S. Creditors' Committee and the Bondholders Group. Representative Counsel to former Canadian employees was also advised of the NSIP prior to its approval by the Canadian Court and U.S. Court. The NSIP covered the period from January 1, 2010 to December 31, 2011.

As there remain significant milestones to complete the wind-down of Nortel's operations and conclude the CCAA Proceedings, a new retention plan ("Retention Plan") for employees of Nortel and certain of its affiliates in the APAC and CALA regions in which Nortel has an economic interest, was established by Nortel in consultation with the Canadian Monitor to cover the 2012 calendar year. The Retention Plan was approved by the Canadian Court on December 14, 2011. The Retention Plan includes approximately 150 employees in Canada, and the APAC and CALA regions, and the costs of the Retention Plan will be funded by the Nortel entity that employs a particular employee. Retaining the remaining employees is critical to Nortel's ability to complete its restructuring efforts, repatriate cash from affiliates in the APAC and CALA regions and complete the wind-down of those global entities, complete the estate segregation activities with respect to the IT infrastructure and applications, ssist in the creditor claims processes including resolution of inter-company, trade and compensation related claims, assist in the sales proceeds .llocation process, compliance with ongoing public reporting and tax compliance, and ultimately complete and implement a plan of arrangement.

On February 27, 2009, Nortel obtained Canadian Court approval to terminate its equity-based compensation plans (the Nortel 2005 Stock Incentive Plan, As Amended and Restated ("2005 SIP"), the Nortel Networks Corporation 1986 Stock Option Plan, As Amended and Restated ("1986 Plan") and the Nortel Networks Corporation 2000 Stock Option Plan ("2000 Plan")) and certain equity plans assumed in prior acquisitions, including all outstanding equity under these plans (stock options, stock appreciation rights ("SARs"), restricted stock units ("RSUs") and performance stock units ("PSUs")), whether vested or unvested. Nortel sought this approval given the decreased value of Nortel Networks common shares ("NNC common shares") and the administrative and associated costs of maintaining the plans to Nortel as well as the plan participants. As a consequence, all options under the remaining equity-based compensation plans assumed in prior acquisitions had expired.

### Settlement Agreement with Former and Disabled Canadian Employee Representatives

On February 8, 2010, the Canadian Debtors reached an agreement on certain employment related matters regarding former Canadian Nortel employees, including Nortel's Canadian registered pension plans and benefits for Canadian pensioners and Nortel employees on long term disability ("LTD"). Nortel entered into a settlement agreement with court-appointed representatives of its former Canadian employees, pensioners and LTD beneficiaries, Representative Counsel, the Canadian Auto Workers' union and the Canadian Monitor ("Settlement Agreement"). The Settlement Agreement, as amended, was approved by the Canadian Court on March 31, 2010.

The Settlement Agreement provided that Nortel would continue to administer the Nortel Networks Limited Managerial and Non-Negotiated Pension Plan and the Nortel Networks Negotiated Pension Plan (collectively, the "Canadian Pension Plans" and individually, a "Canadian Pension Plan") until September 30, 2010, at which time the Canadian Pension Plans were transitioned, in accordance with the Ontario *Pension Benefits Act*, to Morneau Sheppell Ltd. (formerly known as Morneau Sobeco Limited Partnership), a replacement administrator appointed by the Ontario Superintendent of Financial Services ("Ontario Superintendent"). Nortel, as well as the Canadian Monitor, took all reasonable steps to complete the transfer of the administration of the Canadian Pension Plans to the new administrator. Nortel continued to fund the Canadian Pension Plans consistent with the current service and special payments Nortel had been making during the course of the CCAA Proceedings through March 31, 2010, and thereafter continued to make current service payments until September 30, 2010. On January 17, 2011, the Ontario Superintendent issued a Notice of Intended Decision stating that he intended to order the wind up of the Canadian Pension Plans effective October 1, 2010. See note 11.

68

Table of Contents

For the remainder of 2010, Nortel continued to pay medical and dental benefits to Nortel pensioners and survivors and Nortel LTD beneficiaries in accordance with the current benefit plan terms and conditions. Life insurance benefits continued unchanged until December 31, 2010 and continued to be funded consistent with 2009 funding. Further, Nortel paid income benefits to the LTD beneficiaries and to those receiving survivor income benefits and survivor transition benefits through December 31, 2010. The employment of the LTD beneficiaries terminated on December 31, 2010. Under the Settlement Agreement, the parties agreed to work toward a court-approved distribution of the assets of Nortel's Health and Welfare Trust, the vehicle through which Nortel generally has historically funded these benefits, with the exception of the income benefits described above, which Nortel has paid directly. On November 9, 2010, the Canadian Court approved the Canadian Monitor's motion regarding a proposed allocation methodology with respect to the funds held in the Health and Welfare Trust for distribution to beneficiaries of the trust. Leave to appeal that order, which was sought by a group of 39 LTD beneficiaries, was denied by the Ontario Court of Appeal on January 7, 2011. By a series of Canadian Court orders dated December 15, 2010, May 3, 2011 and June 21, 2011, interim distributions out of the Health and Welfare Trust were approved and cumulative interim distributions of approximately CAD$24 were made to approximately 760 beneficiaries between January and July 2011. An additional interim distribution in the amount of approximately CAD$1.9 was made to LTD beneficiaries on or about September 30, 2011. On November 8, 2011, the Canadian Court approved a fifth distribution in the amount of CAD$22.2, substantially all of which was made on or about November 30, 2011 to over 8,000 LTD, pensioner and other beneficiaries. A sixth interim distribution was approved by the Canadian Court on March 2, 2012 in the amount of CAD$10.4. Nortel continues to work with the Canadian Monitor and Representative Counsel to finalize outstanding matters to allow a final distribution from the Health and Welfare Trust.

The Settlement Agreement also provides that Nortel establish a fund of CAD$4.3 for termination payments of up to CAD$0.003 per employee to be made to eligible terminated employees as an advance against their claims under the CCAA Proceedings, of which approximately CAD$4.3 has been paid. See information on employee compensation claims in the "Creditor Protection Proceedings Claims Processes" above.

A charge in the maximum amount of CAD$57 against the Canadian Debtors' assets has been established as security in support of the payments to be made by Nortel under the Settlement Agreement, which amount will be reduced by the amount of payments made. The Settlement Agreement also sets out the relative priority for claims to be made in respect of the deficiency in the Canadian Pension Plans and Nortel's Health and Welfare Trust. Under the Settlement Agreement, these claims will rank as ordinary unsecured claims in the CCAA Proceedings.

See note 11 for further information on Nortel's pension and employee benefits plans.

### Other Developments

Under the CCAA Proceedings, the Canadian Debtors have filed a motion for an order authorizing and directing the Canadian Debtors to cease performing any remediation at or in relation to five sites (Belleville, Brampton, Brockville, Kingston and London, Ontario), and that any claims in relation to such remediation be subject to the court approved claims process under the CCAA Proceedings. Nortel brought the motion to disclaim any further obligation for such properties that are no longer owned or used by Nortel and that Nortel and its creditors derive no benefit from any further remediation. Subsequent to the filing of the motion, NNL entered into a transition agreement regarding the Brampton site that facilitated a gradual cessation of NNL's environmental risk related tasks at that site, which tasks have now been completed. The Ministry of the Environment (the "MOE") has made remediation orders with respect to the four other sites. The motion was heard in September 2011 in the Canadian Court wherein the Canadian Debtors sought advice and direction that the MOE remediation orders are in breach of the CCAA stay. A decision on that motion is pending. To date, the MOE has not sought to enforce the remediation orders while the Canadian Court's decision is outstanding and NNL has continued to undertake environmental risk assessments and remediation related tasks at those sites.

On November 1, 2011, NNL announced that in light of its ongoing Creditor Protection Proceedings and the other factors mentioned, NNL would not be following the notification procedures set out in the provisions attached to its Cumulative Redeemable Class A Preferred Shares Series 5 ("Series 5 Preferred Shares") in connection with the right of holders of Series 5 Preferred Shares to elect to convert such shares, on December 1, 2011, into Cumulative Redeemable Class A Preferred Shares Series 6 ("Series 6 Preferred Shares"), nor would a fixed dividend rate be set for purposes of the dividend rights attaching to the Series 6 Preferred Shares (none of which are currently outstanding). The principal distinction between the Series 5 Preferred Shares and Series 6 Preferred Shares, aside from their conversion rights, is that the former provide for floating adjustable dividends while the latter provide for fixed dividends, in either case, as and when declared payable by NNL's board of directors. NNL suspended the declaration of all dividends on its preferred shares in November 2008 and currently is not lawfully able to declare or pay dividends on its preferred shares, nor does it expect to resume the declaration or payment of dividends on its preferred shares at any time in the future. Further, as previously announced, NNL does not expect that holders of its preferred shares (of any series) will receive any value from the Creditor Protection Proceedings and expects that these proceedings will result in the cancellation of such shares.

### Condensed Combined Debtors Financial Statements

The financial statements contained within this note have been prepared in accordance with the guidance of ASC 852 and

Table of Contents

represent the condensed combined financial statements of the Canadian Debtors and U.S. Debtors ("Debtors' financial statements") that are included in the consolidated financial statements for the years ended December 31, 2011 and 2010. The results of operations of the U.S. Debtors have been included in the Debtors' financial statements for the periods presented, consistent with the basis of accounting reflected in the consolidated financial statements. Refer to note 1 for additional information. The condensed combined statements of operations exclude the Canadian Debtors' and U.S. Debtors' interests in the results of operations of non-Debtor subsidiaries.

*Intercompany Transactions*

Intercompany transactions and balances with Nortel's non-Debtor subsidiaries and affiliates have not been eliminated in the Debtors' financial statements.

*Contractual Interest Expense on Outstanding Long-Term Debt*

During the year ended December 31, 2011, Nortel has continued to accrue for interest expense of $326 ($301 for the year ended December 31, 2010) in its normal course of operations related to debt issued by NNC and NNL in Canada until it obtains a claims determination order that adjudicates the claims. During the pendency of the Creditor Protection Proceedings Nortel generally has not and does not expect to make payments to satisfy any of the interest obligations of the Debtors. Nortel has continued to accrue interest on its $1,000 floating rate notes that matured on July 15, 2011until it obtains a claims determination order that adjudicates the claim.

*Foreign Currency Denominated Liabilities*

ASC 852 requires pre-petition liabilities of the Canadian Debtors that are subject to compromise to be reported at the claim amounts expected to be allowed, even if they may be settled for lesser amounts. For foreign currency denominated liabilities, the CCAA requires allowable claims to be translated at the exchange rate in effect as of the Petition Date unless otherwise provided for in a court-approved plan. The claims process approved by the Canadian Court provides that foreign currency denominated claims must be calculated by the Canadian Monitor in Canadian dollars using a January 13, 2009 exchange rate. However, the claims process order specifically recognizes the ability of the Canadian Debtors to utilize a different exchange rate in any proposed plan. Therefore, given the impact that fixing exchange rates may have on the amounts ultimately settled, in Canada, foreign currency denominated balances, including Nortel's U.S. dollar denominated debt, will not be accounted for using the Petition Date exchange rate but rather will continue to be accounted for in accordance with FASB ASC 830 "Foreign Currency Matters ("ASC 830"). To date, the Canadian Debtors have not developed any plan or proposed an alternative exchange rate and any plan would be subject to creditor approval prior to the Canadian Court's approval.

*Cash Restrictions*

As a result of the Creditor Protection Proceedings, cash and cash equivalents are generally available to fund operations in particular jurisdictions, but generally are not available to be freely transferred between jurisdictions, regions, or outside joint ventures, other than for normal course post Petition Date intercompany trade and pursuant to specific agreements approved by the Canadian Court.

Proceeds from the various business and asset divestitures, as discussed above, are being held in escrow until the applicable jurisdictions can determine the proceeds allocations and are not available to fund operations.

70

Table of Contents

## CONDENSED COMBINED STATEMENTS OF OPERATIONS
### (Millions of U.S. Dollars)

| | 2011 | 2010 |
|---|---|---|
| Product revenues: | | |
| Third party | $ - | $ 311 |
| Non-Debtor subsidiaries | 1 | 34 |
| Service revenues (Third party) | - | 112 |
| Total revenues | 1 | 457 |
| Product cost of revenues: | | |
| Third party | 6 | 333 |
| Non-Debtor subsidiaries | 1 | 36 |
| Service cost of revenues (Third party) | - | 45 |
| Total cost of revenues | 7 | 414 |
| Gross profit (loss) | (6) | 43 |
| Selling, general and administrative expense | 107 | 443 |
| Research and development expense | - | 113 |
| Loss on sales of businesses and assets and impairment of assets | 1 | 1 |
| Other operating income - net | (46) | (250) |
| Operating loss | (68) | (264) |
| Other income (expense) - net | (14) | 128 |
| Interest expense | (323) | (304) |
| Loss from continuing operations before reorganization items, income taxes and equity in net loss of debtor subsidiaries | (405) | (440) |
| Reorganization items - net [a] | 3,837 | (3,045) |
| Earnings (loss) from continuing operations before income taxes and equity in net loss of debtor subsidiaries | 3,432 | (3,485) |
| Income tax benefit (expense) | (10) | 35 |
| Earnings (loss) from continuing operations before equity in net loss of debtor subsidiaries | 3,422 | (3,450) |
| Equity in net loss of debtor subsidiaries - net of tax | - | (72) |
| Net earnings (loss) from continuing operations attributable to Debtors, including noncontrolling interests | 3,422 | (3,522) |
| Net earnings (loss) from discontinued operations - net of tax | (1) | 27 |
| Net earnings (loss) attributable to Debtors including noncontrolling interests | 3,421 | (3,495) |
| Income attributable to noncontrolling interests | (12) | (10) |
| Net earnings (loss) attributable to Debtors | $3,409 | $(3,505) |

(a) Includes a charge of $320 recognized in the year ended December 31, 2011 for the impairment of certain investments in consolidated non-debtor subsidiaries accounted for under the cost method for the purpose of these condensed combined financial statements only.

71

Table of Contents

## CONDENSED COMBINED BALANCE SHEETS
### (Millions of U.S. Dollars)

| | 2011 | 2010 |
|---|---|---|
| **ASSETS** | | |
| **Current assets** | | |
| Cash and cash equivalents | $ 306 | $ 289 |
| Restricted cash and cash equivalents | 59 | 81 |
| Accounts receivable - net: | | |
| Third parties | 12 | 1 |
| Non-Debtor subsidiaries | 387 | 401 |
| U.S. Debtors subsidiaries | 93 | 92 |
| EMEA Debtors subsidiaries | 9 | 14 |
| Inventories - net | - | 1 |
| Other current assets | 30 | 84 |
| Assets held for sale | - | 7 |
| Assets of discontinued operations | - | 4 |
| **Total current assets** | 896 | 974 |
| Restricted cash and cash equivalents | 7,479 | 3,061 |
| Investments in non-Debtors / Debtor subsidiaries (a) | 62 | 382 |
| Plant and equipment - net | - | 23 |
| Other assets | 50 | 65 |
| **Total assets** | $ 8,487 | $ 4,505 |
| **LIABILITIES AND SHAREHOLDERS' DEFICIT** | | |
| **Current liabilities** | | |
| Trade and other accounts payable: | | |
| Third parties | $ 2 | $ 6 |
| Non-Debtor subsidiaries | 134 | 169 |
| U.S. Debtors subsidiaries | 18 | 19 |
| EMEA Debtors subsidiaries | 10 | 25 |
| Payroll and benefit-related liabilities | 13 | 24 |
| Contractual liabilities | - | 1 |
| Other accrued liabilities | 6 | 11 |
| Liabilities held for sale | - | 3 |
| Liabilities of discontinued operations | - | 4 |
| **Total current liabilities** | 183 | 262 |
| **Long-term liabilities** | | |
| Deferred income taxes - net | 7 | - |
| Other liabilities | 7 | 15 |
| **Total long-term liabilities** | 14 | 15 |
| **Liabilities subject to compromise** | 11,527 | 11,108 |
| **Liabilities subject to compromise of discontinued operations** | 34 | 35 |
| **Total liabilities** | 11,758 | 11,420 |
| **SHAREHOLDERS' DEFICIT** | | |
| **Total shareholders' deficit of Debtors** | (3,840) | (7,472) |
| Noncontrolling interests in Debtors | 569 | 557 |
| **Total shareholders' deficit** | (3,271) | (6,915) |
| **Total liabilities and shareholders' deficit** | $ 8,487 | $ 4,505 |

(a) Carrying amount reduced by $320 in the year ended December 31, 2011 for the impairment of certain investments in consolidated non-debtor subsidiaries accounted for under the cost method for the purpose of these condensed combined financial statements only.

72

Table of Contents

## CONDENSED COMBINED STATEMENTS OF CASH FLOWS
### (Millions of U.S. Dollars)

| | 2011 | 2010 |
|---|---|---|
| **Cash flows from (used in) operating activities** | | |
| Net earnings (loss) attributable to Debtors | $ 3,409 | $(3,505) |
| Net (earnings) loss from discontinued operations | 1 | (27) |
| Adjustments to reconcile net loss from continuing operations to net cash from (used in) operating activities: | | |
| Reorganization items - net | (3,931) | 2,879 |
| Other adjustments (a) | 385 | 797 |
| Net cash from (used in) operating activities - continuing operations | (136) | 144 |
| Net cash used in operating activities - discontinued operations | - | (283) |
| Net cash used in operating activities | (136) | (139) |
| **Cash flows from (used in) investing activities** | | |
| Expenditures for plant and equipment | - | (9) |
| Proceeds on disposal of plant and equipment | - | 203 |
| Change in restricted cash and cash equivalents | (4,396) | (1,151) |
| Decrease in short and long-term investments | - | 24 |
| Proceeds from the sales of investments, businesses and assets - net | 4,550 | 905 |
| Net cash from (used in) investing activities - continuing operations | 154 | (28) |
| Net cash from investing activities - discontinued operations | - | 283 |
| Net cash from investing activities | 154 | 255 |
| **Cash flows from (used in) financing activities** | | |
| Decrease in notes payable | - | (75) |
| Repayments of capital lease obligations | - | (4) |
| Net cash used in financing activities - continuing operations | - | (79) |
| Net cash used in financing activities - discontinued operations | - | - |
| Net cash used in financing activities | - | (79) |
| Effect of foreign exchange rate changes on cash and cash equivalents | (1) | 17 |
| Reduction of cash and cash equivalents of deconsolidated subsidiaries | - | (897) |
| **Net cash from (used in) continuing operations** | 17 | (843) |
| **Net cash from (used in) discontinued operations** | - | - |
| **Net increase (decrease) in cash and cash equivalents** | 17 | (843) |
| **Cash and cash equivalents at beginning of the year** | 289 | 1,132 |
| **Cash and cash equivalents at end of the year** | $ 306 | $ 289 |

(a) The operating section of the condensed combined statement of cash flows has been presented on a summarized basis and, as a result, Other adjustments represent all adjustments to reconcile net earnings (loss) to net cash from (used in) operating activities, with the exception of Reorganization items — net.

**3. Significant accounting policies**

*(a) Principles of consolidation*

The financial statements of entities which are controlled by Nortel through voting equity interests, referred to as subsidiaries, are consolidated into Nortel's results. Entities which are controlled jointly with another entity, referred to as joint ventures, and entities which are not controlled by Nortel but over which Nortel has the ability to exercise significant influence, referred to as associated companies, are accounted for using the equity method. Intercompany accounts and transactions are eliminated upon consolidation and unrealized intercompany gains and losses are eliminated when accounting under the equity method.

*(b) Use of estimates*

Nortel makes estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities as of the date of the consolidated financial statements, and the reported amounts of revenues and expenses during the reporting period. Actual results may differ from those estimates. Estimates are used when accounting for items and matters such as revenue recognition and accruals for losses on contracts, allowances for uncollectible accounts receivable, inventory provisions and

Table of Contents

outsourced manufacturing related obligations, product warranties, asset valuations, impairment and recoverability assessments, employee benefits including pensions, taxes and related valuation allowances and provisions, restructuring and other provisions, contingencies, pre-petition liabilities, and proceeds allocation.

These consolidated financial statements have been prepared by NNC. Of the $7,730 in proceeds received from divestitures as of December 31, 2011, $7,250 is being held in escrow and an additional $229, reflecting proceeds from the sale of LGN, is included in restricted cash, all of which is currently reported in NNL solely for financial reporting purposes. The ultimate determination of the final allocation of such proceeds among the various Nortel legal entities, including entities that are not consolidated in these financial statements, has not yet occurred and may be materially different from the NNL classification and related amounts shown in these financial statements. The IFSA and the escrow agreements for sales divestiture proceeds entered into by NNL, NNI and other Nortel legal entities provide for the processes for determining the final allocation of divestiture proceeds among such entities, either through joint agreement or, failing such agreement, other dispute resolution proceedings. Adjustments to the NNL classification and any related amounts arising from the ultimate allocation will be recognized when finalized. The NNL classification and related amounts shown in these financial statements are not determinative of, and have not been accepted by any debtor estate, any party in interest in the Creditor Protection Proceedings or any court overseeing such proceedings, for purposes of deciding the final allocation of divestiture proceeds.

The Canadian Debtors continue to investigate differences between the claim amounts filed by creditors and claim amounts determined by the Canadian Debtors. Certain claims filed may be duplicative, based on contingencies that have not occurred, or may be otherwise overstated. A number of proofs of claim, for which Nortel has not accrued any amount or accrued significantly less than the amounts in the proofs of claim, continue to be reviewed by the Canadian Debtors and may result in significant changes in future periods as a result of the ongoing investigation by the Canadian Debtors of filed proofs of claim. The amounts currently classified as liabilities subject to compromise may be subject to future adjustments depending on actions of the applicable courts, further developments with respect to disputed claims, determinations of the secured status of certain claims, if any, the values of any collateral securing such claims, or other events.

### (c) Translation of foreign currencies

Nortel's consolidated financial statements are presented in U.S. Dollars. The financial statements of Nortel's operations whose functional currency is not the U.S. Dollar are translated into U.S. Dollars at the exchange rates in effect at the balance sheet dates for assets and liabilities, and at average rates for the period for revenues and expenses. The unrealized translation gains and losses on Nortel's net investment in these operations, including those on long-term intercompany advances that have been designated to form part of the net investment, are accumulated as a component of other comprehensive income (loss) ("OCI").

The financial statements of Nortel's operations whose functional currency is the U.S. Dollar but where the underlying transactions are in a different currency are translated into U.S. Dollars at the exchange rate in effect at the balance sheet date with respect to monetary assets and liabilities. Non-monetary assets and liabilities of these operations, and related amortization and depreciation expenses, are translated at the historical exchange rate. Revenues and expenses, other than amortization and depreciation, are translated at the average rate for the period in which the transaction occurred.

Nortel has classified the impact of foreign currency translation in respect of all relevant balances and transactions, including liabilities subject to compromise and reorganization items, as part of other income (expense) – net in the consolidated statements of operations.

ASC 852 requires pre-petition liabilities of the Canadian Debtors that are subject to compromise to be reported at the claim amounts expected to be allowed, even if they may be settled for lesser amounts. For foreign currency denominated liabilities, the CCAA requires allowable claims to be translated at the exchange rate in effect as of the Petition Date unless otherwise provided for in a court-approved plan. The claims process approved by the Canadian Court provides that foreign currency denominated claims must be calculated by the Canadian Monitor in Canadian dollars using a January 13, 2009 exchange rate. However, the claims process order specifically recognizes the ability of the Canadian Debtors to utilize a different exchange rate in any proposed plan. Therefore, given the impact that fixing exchange rates may have on the amounts ultimately settled, in Canada, foreign currency denominated balances, including Nortel's U.S. dollar denominated debt, will not be accounted for using the Petition Date exchange rate but rather will continue to be accounted for in accordance with FASB ASC 830 "Foreign Currency Matters ("ASC 830"). To date, the Canadian Debtors have not developed any plan or proposed an alternative exchange rate and any plan would be subject to creditor approval prior to the Canadian Court's approval.

### (d) Revenue recognition

Nortel's products and services are generally sold pursuant to a contract and the terms of the contract, taken as a whole, determine the appropriate revenue recognition models to be applied. Product revenue includes revenue from arrangements that include services such as installation, engineering and network planning where the services could not be separated from the arrangement because the services are essential or fair value could not be established. Where services are not bundled with product sales, services revenue is reported separately in the consolidated statements of operations.

Table of Contents

Depending on the terms of the contract and types of products and services sold, Nortel recognizes revenue under FASB ASC 605-35 "Construction-Type and Production-Type Contracts" ("ASC 605-35"), FASB ASC 985-605 "Software — Revenue Recognition" ("ASC 985-605"), FASB ASC 605-10 "Revenue Recognition" ("ASC 605-10") and FASB ASC 605-25 "Revenue Recognition — Multiple-Element Arrangements" ("ASC 605-25"). Revenues are reduced for returns, allowances, rebates, discounts and other offerings in accordance with the agreement terms.

Nortel regularly enters into multiple contractual agreements with the same customer. These agreements are reviewed to determine whether they should be evaluated as one arrangement in accordance with FASB ASC 985-605-55 "Software — Revenue Recognition — Multiple-Element Arrangements" ("ASC 985-605-55").

For arrangements with multiple deliverables entered into after June 30, 2003, where the deliverables are governed by more than one authoritative accounting standard, Nortel applies ASC 605-25 and evaluates each deliverable to determine whether it represents a separate unit of accounting based on the following criteria: (a) whether the delivered item has value to the customer on a stand-alone basis, (b) whether there is objective and reliable evidence of the fair value of the undelivered item(s), and (c) if the contract includes a general right of return relative to the delivered item, delivery or performance of the undelivered item(s) is considered probable and substantially in the control of Nortel.

If objective and reliable evidence of fair value exists for all units of accounting in the arrangement, revenue is allocated to each unit of accounting or element based on relative fair values. In situations where there is objective and reliable evidence of fair value for all undelivered elements, but not for delivered elements, the residual method is used to allocate the arrangement consideration. Under the residual method, the amount of revenue allocated to delivered elements equals the total arrangement consideration less the aggregate fair value of any undelivered elements. Each unit of accounting is then accounted for under the applicable revenue recognition guidance. So long as elements otherwise governed by separate authoritative accounting standards cannot be treated as separate units of accounting under the guidance in ASC 605-25, the elements are combined into a single unit of accounting for revenue recognition purposes. In this case, revenue allocated to the unit of accounting is deferred until all combined elements have been delivered or, once there is only one remaining element to be delivered, based on the revenue recognition guidance applicable to the last delivered element within the unit of accounting.

For arrangements that include hardware and software where software is considered more than incidental to the hardware, provided that the software is not essential to the functionality of the hardware and the hardware and software represent separate units of accounting, revenue related to the software element is recognized under ASC 985-605 and revenue related to the hardware element is recognized under ASC 605-35 or ASC 605-10. For arrangements where the software is considered more than incidental and essential to the functionality of the hardware, or where the hardware is not considered a separate unit of accounting from the software deliverables, revenue is recognized for the software and the hardware as a single unit of accounting pursuant to ASC 985-605 for off-the-shelf products and pursuant to ASC 605-35 for customized products. Revenue for hardware that does not require significant customization or other essential services, and where any software is considered incidental, is recognized under ASC 605-10.

For elements related to customized network solutions designed and built to customer specific requirements, revenues are recognized in accordance with ASC 605-35, generally using the percentage-of-completion method. In using the percentage-of-completion method, revenues are recorded based on the percentage of costs incurred to date on a contract relative to the estimated total expected contract costs. Profit estimates on these contracts are revised periodically based on changes in circumstances and any losses on contracts are recognized in the period that such losses become known. In circumstances where reasonably dependable cost estimates cannot be made for a customized network solution or build-out, all revenues and related costs are deferred until completion of the solution or element ("completed contract method"). Generally, the terms of ASC 605-35 contracts provide for progress billings based on completion of certain phases of work. Unbilled ASC 605-35 contract revenues recognized are accumulated in the contracts in progress account included in accounts receivable — net. Billings in excess of revenues recognized to date on these contracts are recorded as advance billings in excess of revenues recognized to date on contracts within other accrued liabilities until recognized as revenue. This classification also applies to billings in advance of revenue recognized on combined units of accounting under ASC 605-25 that contain both ASC 605-35 and non ASC 605-35 elements.

Revenue is recognized under ASC 605 when persuasive evidence of an arrangement exists, delivery has occurred or services have been rendered, the fee is fixed or determinable and collectability is reasonably assured. For hardware, delivery is considered to have occurred upon shipment provided that risk of loss, and in certain jurisdictions, legal title, has been transferred to the customer.

For arrangements where the criteria for revenue recognition have not been met because legal title or risk of loss on products does not transfer to the customer until final payment has been received or where delivery has not occurred, revenue is deferred to a later period when the outstanding criteria have been met. For arrangements where the customer agrees to purchase products but Nortel retains physical possession until the customer requests delivery ("bill and hold arrangements"), revenue is not recognized until delivery to the customer has occurred and all other revenue recognition criteria have been met.

Services revenue is generally recognized according to the proportional performance method. The proportional performance method is used when the provision of services extends beyond an accounting period with more than one performance act, and permits the recognition of revenue ratably over the services period when no other pattern of performance is discernable. The nature of the service contract is reviewed to determine which revenue recognition method best reflects the nature of services performed. Provided all other revenue recognition criteria have been met, the revenue recognition method selected reflects the pattern in which the obligations to the customers have been fulfilled.

75

Table of Contents

Nortel makes certain sales through multiple distribution channels, primarily resellers and distributors. These customers are generally given certain rights of return. For products sold through these distribution channels, revenue is recognized from product sale at the time of shipment to the distribution channel when persuasive evidence of an arrangement exists, delivery has occurred, the fee is fixed or determinable and collectability is reasonably assured. Accruals for estimated sales returns and other allowances are recorded at the time of revenue recognition and are based on contract terms and prior claims experience.

Software revenue is generally recognized under ASC 985-605. For software arrangements involving multiple elements, Nortel allocates revenue to each element based on the relative fair value or the residual method, as applicable using vendor specific objective evidence to determine fair value, which is based on prices charged when the element is sold separately. Software revenue accounted for under ASC 985-605 is recognized when persuasive evidence of an arrangement exists, the software is delivered in accordance with all terms and conditions of the customer contracts, the fee is fixed or determinable and collectability is probable. Revenue related to post-contract customer support ("PCS"), including technical support and unspecified when-and-if available software upgrades, is recognized ratably over the PCS term.

Under ASC 985-605, if fair value does not exist for any undelivered element, revenue is not recognized until the earlier of (i) delivery of such element or (ii) when fair value of the undelivered element is established, unless the undelivered element is a service, in which case revenue is recognized as the service is performed once the service is the only undelivered element.

Deferred costs are presented as current or long-term in the consolidated balance sheet, consistent with the classification of the related deferred revenues.

### (e) Income taxes

Nortel provides for income taxes using the asset and liability method. This approach recognizes the amount of taxes payable or refundable for the current year as well as deferred tax assets and liabilities for the future tax consequence of events recognized in the consolidated financial statements and tax returns. Deferred income taxes are adjusted to reflect the effects of changes in tax laws or enacted tax rates.

In establishing the appropriate income tax valuation allowances, Nortel assesses its net deferred tax assets quarterly and based on all available evidence, both positive and negative, determines whether it is more likely than not that the remaining net deferred tax assets or a portion thereof will be realized.

In accordance with FASB ASC 740-10-45-25 "Income Taxes" ("ASC 740-10-45-25"), Nortel classifies interest and penalties associated with income tax positions in income tax expense.

### (f) Earnings (loss) per common share

Basic earnings (loss) per common share is calculated by dividing the net earnings (loss) by the weighted-average number of NNC common shares outstanding during the period. Diluted earnings (loss) per common share is calculated by dividing the applicable net earnings (loss) by the sum of the weighted-average number of NNC common shares outstanding and all additional NNC common shares that would have been outstanding if potentially dilutive NNC common shares had been issued during the period. The if-converted method is used to compute the dilutive effect of convertible debt. The dilutive effect of contingently issuable shares is computed by comparing the conditions required for issuance of shares against those existing at the end of the year.

### (g) Cash and cash equivalents

Cash and cash equivalents consist of cash on hand, balances with banks and short-term investments with original maturities of three months or less. The amounts presented in the consolidated financial statements approximate the fair value of cash and cash equivalents.

### (h) Restricted cash and cash equivalents

Cash and cash equivalents are considered restricted when they are subject to contingent rights of a third party. From time to time, Nortel may be required to post cash and cash equivalents as collateral to a third party as a result of the general economic and industry environment and Nortel's and NNL's credit ratings. Nortel has also recorded as a long-term asset restricted cash related to the divestiture proceeds until the proceeds allocations are determined between and among the respective restructuring regimes as described in note 2.

### (i) Provision for doubtful accounts

The provision for doubtful accounts for trade, notes and long-term receivables due from customers is established based on an assessment of a customer's credit quality, as well as subjective factors and trends, including the aging of receivable balances. Generally, these credit assessments occur prior to the inception of the credit exposure and at regular reviews during the life of the

76

Table of Contents

exposure. Nortel has recognized accounts receivable related to certain of the U.S. and EMEA Subsidiaries that were formerly considered intercompany in nature prior to the changes due to certain deconsolidation events described in note 2. The intercompany relationship between the consolidated entities and U.S. and EMEA subsidiaries was such that many consolidated entities had both accounts receivable and accounts payable balances outstanding with the U.S. and EMEA Subsidiaries at the Petition Date. The provision for doubtful accounts for these accounts receivable is established only if a net accounts receivable position exists with the counterparty and then further based on an assessment of each entity's cash position in light of the Creditor Protection Proceedings. The assessment has generally resulted in the recording of a full provision against the net accounts receivable balance for each intercompany relationship.

### (j) Plant and equipment

Plant and equipment are stated at cost less accumulated depreciation. Depreciation is generally calculated on a straight-line basis over the expected useful lives of the plant and equipment. The expected useful life of a building is twenty to forty years, machinery and equipment including related capital leases is three to ten years, and capitalized software is three to ten years.

### (k) Impairment or disposal of long-lived assets

#### Long-lived assets held and used

Nortel tests long-lived assets or asset groups held and used for recoverability when events or changes in circumstances indicate that their carrying amount may not be recoverable. Circumstances which could trigger a review include, but are not limited to: significant decreases in the market price of the asset or asset group; significant adverse changes in the business climate or legal factors; the accumulation of costs significantly in excess of the amount originally expected for the acquisition or construction of the asset; current period cash flow or operating losses combined with a history of losses or a forecast of continuing losses associated with the use of the asset; and a current expectation that the asset will more likely than not be sold or disposed of significantly before the end of its previously estimated useful life.

Recoverability is assessed based on the carrying amount of the asset or asset group and the sum of the undiscounted cash flows expected to result from the use and the eventual disposal of the asset or asset group. An impairment loss is recognized when the carrying amount is not recoverable and exceeds the fair value of the asset or asset group. The impairment loss is measured as the amount by which the carrying amount exceeds fair value.

#### Long-lived assets to be disposed of other than by sale

Nortel classifies assets that will be disposed of other than by sale as held and used until the disposal transaction occurs. The assets continue to be depreciated based on revisions to their estimated useful lives until the date of disposal or abandonment.

Recoverability is assessed based on the carrying amount of the asset or asset group and the sum of the undiscounted cash flows expected to result from the remaining period of use and the eventual disposal of the asset or asset group. An impairment loss is recognized when the carrying amount is not recoverable and exceeds the fair value of the asset or asset group. The impairment loss is measured as the amount by which the carrying amount exceeds fair value.

Fair value for the purposes of measuring impairment or a planned disposal of long-lived assets is determined using quoted market prices or the anticipated cash flows discounted at a rate commensurate with the risk involved.

### (l) Pension, post-retirement and post-employment benefits

Pension expense, based on management's assumptions, consists of: actuarially computed costs of pension benefits in respect of the current year's service; imputed returns on plan assets and imputed interest on pension obligations; straight-line amortization under the corridor approach of experience gains and losses, assumption changes and plan amendments over the expected average remaining service life of the employee group; curtailment gains and losses recognized when the curtailment event reduces the expected average remaining service life of the participant group by 10% or more; and settlement gains and losses recognized when the settlement amount exceeds interest cost and service cost.

The expected costs of post-retirement and certain post-employment benefits, other than pensions, for active employees are accrued in the consolidated financial statements during the years employees provide service to Nortel. These costs are recorded based on actuarial methods and assumptions. Other post-employment benefits are recognized when the event triggering the obligation occurs. The over-funded or under-funded status of defined benefit pension and post-retirement plans is recognized as an asset or liability, respectively, on the consolidated balance sheet.

### (m) Guarantees

Nortel has entered into agreements which contain features that meet the definition of a guarantee under FASB ASC 460 "Guarantees" ("ASC 460"). These arrangements create two types of obligations for Nortel:

(i)     Nortel has a non-contingent and immediate obligation to stand ready to make payments if certain future triggering events occur. For certain guarantees, a liability is recognized for the stand ready obligation at the inception of the guarantee; and

Table of Contents

(ii)    Nortel has an obligation to make future payments if those certain future triggering events do occur. A liability is recognized when (a) it becomes probable that one or more future events will occur triggering the requirement to make payments under the guarantee and (b) when the payment can be reasonably estimated.

Nortel continues to assess the requirement to meet future obligations under such guarantees, including those related to guarantees of the U.S. and EMEA Subsidiaries' obligations to third parties, and will record adjustments to the obligations initially recognized and measured under ASC 450, Accounting for Contingencies, to the extent the future obligation is expected to be greater than the carrying amount of the guarantee liability initially recognized for accounting purposes.

*(n) Recent accounting pronouncements*

(i)    In June 2011, the FASB issued ASU No. 2011-05, "Presentation of Comprehensive Income" ("ASU 2011-5"), effective for interim periods and years beginning after December 15, 2011. The issuance of ASU 2011-5 is intended to improve the comparability, consistency and transparency of financial reporting and to increase the prominence of items reported in other comprehensive income. The guidance in ASU 2011-5 supersedes the presentation options in ASC Topic 220 and facilitates convergence of U.S. GAAP and International Financial Reporting Standards by eliminating the option to present components of other comprehensive income as part of the statement of changes in stockholders' equity and requiring that all non-owner changes in stockholders' equity be presented either in a single continuous statement of comprehensive income or in two separate but consecutive statements. In December 2011, the FASB issued an ASU to indefinitely defer the effective date of the provision pertaining only to the presentation of reclassification adjustments out of accumulated other OCI and reinstated the previous requirements to present reclassification adjustments either on the face of the statement in which OCI is reported or to disclose them in a note to the financial statements. Amendments to comprehensive income should be applied retrospectively and become effective for public entities for interim and annual periods beginning after December 15, 2011 with early adoption permitted. Nortel is currently evaluating the impact of adopting ASU 211-05 on its financial statements.

**4. Accounting changes**

*(a) Accounting for Multiple Deliverable Revenue Arrangements*

In October 2009, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") No. 2009-13, "Multiple-Deliverable Revenue Arrangements", ("ASU 2009-13"). ASU 2009-13 addresses the accounting for multiple-deliverable revenue arrangements and requires that the overall arrangement consideration be allocated to each deliverable in a revenue arrangement based on an estimated selling price when vendor specific objective evidence or third-party evidence of fair value is not available. This guidance also eliminates the residual method of allocation and requires that arrangement consideration be allocated to all deliverables using the relative selling price method. This will result in more revenue arrangements being separated into separate units of accounting. ASU 2009-13 is effective for fiscal years beginning on or after June 15, 2010. Companies can elect to apply this guidance (1) prospectively to new or materially modified arrangements after the effective date or (2) retrospectively for all periods presented. Nortel adopted the provisions of ASU 2009-13 on January 1, 2011, on a prospective basis. The adoption of ASU 2009-13 did not have a material impact on Nortel's results of operations and financial condition.

*(b) Accounting for Certain Revenue Arrangements That Include Software Elements*

In October 2009, the FASB issued ASU No. 2009-14, "Certain Revenue Arrangements That Include Software Elements", ("ASU 2009-14"). ASU 2009-14 changes the accounting model for revenue arrangements that include both tangible products and software elements. Tangible products containing both software and non-software components that function together to deliver the product's essential functionality will no longer be within the scope of ASC 985-605 "Software Revenue Recognition" ("ASC 985-605"). The entire product (including the software and non-software deliverables) will therefore generally be accounted for under accounting literature found in ASC 605. ASU 2009-14 is effective for fiscal years beginning on or after June 15, 2010. Companies can elect to apply this guidance (1) prospectively to new or materially modified arrangements after the effective date or (2) retrospectively for all periods presented. Nortel adopted the provisions of ASU 2009-14 on January 1, 2011, on a prospective basis. The adoption of ASU 2009-14 did not have a material impact on Nortel's results of operations and financial condition.

**5. Discontinued Operations**

*ES*

On December 18, 2009 Nortel completed the sale of substantially all of the assets of the ES business globally as well as the shares of NGS and DiamondWare, Ltd. to Avaya. As a result of the sale, Nortel had recognized a cumulative gain of $750.

The ES business, which included Layer 4-7 Data Portfolio, DiamondWare, Ltd. and NGS, had total revenues of nil and $11 and net loss from discontinued operations of $1 and $18 for the years ended December 31, 2011 and 2010, respectively.

78

Table of Contents

Certain liabilities related to the ES business were not transferred to Avaya and continue to be classified as liabilities of discontinued operations. These liabilities are expected to be extinguished as the Creditor Protection Proceedings progress. The remaining liabilities related to the operations of the ES business are as follows:

| | 2011 | 2010 |
|---|---|---|
| **Assets** | | |
| Accounts receivable - net | $ - | $ 2 |
| Other current assets | - | 2 |
| Assets of discontinued operations | $ - | $ 4 |
| **Liabilities** | | |
| Trade and other accounts payable | $ 1 | $ - |
| Other current liabilities | - | 5 |
| Liabilities of discontinued operations | $ 1 | $ 5 |

*LGN*

On June 29, 2010, Nortel completed the sale of NNL's 50% plus 1 share interest in LGN to Ericsson for $242 in cash, subject to certain purchase price adjustments and taxes. As a result of the sale, Nortel recognized a gain of $53 in the year ended December 31, 2010. The LGN business had total revenues of nil and $210 and net loss from discontinued operations of nil and $42 for the years ended December 31, 2011 and 2010, respectively.

Prior to the divestiture of its interest in LGN, Nortel engaged in transactions with certain of its equity-owned investees and certain other business partners. These transactions included sales and purchases of goods and services under normal trade terms and were measured at their exchange amounts. Transactions with LG Electronics ("LGE"), Vertical Communications, Inc ("Vertical") and GNTEL Co., Ltd ("GNTEL") resulted in $16 of revenue and $61 of costs of revenues from purchases during 2010. LGE held a noncontrolling interest in LGN prior to Nortel's sale of its interest on June 29, 2010. Nortel's sales and purchases related primarily to certain inventory-related items up to June 30, 2010. Accounts payable or other balances involving LGE were nil as of December 31, 2010.

Prior to Nortel's divestiture of its interest in LGN on June 29, 2010, LGN owned a noncontrolling interest in Vertical which supported LGN's efforts to distribute Nortel's products to the North American market. Prior to divestiture of its interest in LGN Nortel held a noncontrolling intere in GNTEL through its business venture LGN. Nortel's purchases from GNTEL related primarily to installation and warranty services up to June 3ᵘ 2010. Accounts payable or other balances involving GNTEL and Vertical were nil as of December 31, 2011 and 2010.

**6. Reorganization Items — net**

Reorganization items represent the net direct and incremental charges related to the Creditor Protection Proceedings such as revenues, expenses including professional fees directly related to the Creditor Protection Proceedings, realized gains and losses, and provisions for losses resulting from the reorganization and restructuring of the business. Reorganization items for the years ended December 31, 2011 and 2010 consisted of the following:

| | 2011 | 2010 |
|---|---|---|
| Professional fees [a] | $ (70) | $ (155) |
| Interest income [b] | 14 | 13 |
| Lease repudiation [c] | - | (3) |
| Employee incentive plans [d] | (20) | (43) |
| Employee severance related claims [e] | (79) | - |
| Pension, post-retirement and post-employment plans [f] | (95) | (401) |
| NNUK pension guarantee [g] | - | (634) |
| Gain on divestitures - net [h] | 65 | 843 |
| Gain on IP sale [i] | 4,475 | - |
| Loss on liquidation of subsidiaries [i] | (1) | (74) |
| EMEA deconsolidation adjustment [j] | - | (763) |
| U.S. deconsolidation adjustment [k] | - | (2,013) |
| U.S. debt guarantee [l] | - | (150) |
| Gain (loss) on impairment or sale of stranded assets [m] | 1 | (140) |
| Settlements [n] | (18) | (2) |
| Lease guarantees [o] | - | (125) |
| Reimbursements from escrow to non-Canadian debtors [p] | (59) | - |
| Other - net [q] | (26) | (47) |
| Total reorganization items - net | $4,187 | $(3,694) |

Table of Contents

(a)   Includes financial, legal, real estate and valuation services directly associated with the Creditor Protection Proceedings.
(b)   Reflects interest earned due to the preservation of cash as a result of the Creditor Protection Proceedings.
(c)   Nortel has rejected a number of leases, resulting in the recognition of non-cash gains and losses.
(d)   Relates to retention and incentive plans for certain key eligible employees deemed essential during the Creditor Protection Proceedings.
(e)   Relates to the estimated allowed claim for employee severance obligations. See notes 8 and 9.
(f)   Includes amounts related to the Settlement Agreement, the termination of the Nortel Networks Supplementary Executive Retirement Plan ("SERP") defined benefit plan, a partial settlement of the Retirement Allowance Plan ("RAP") and adjustments made to estimated allowed claims related to post-employment and post-retirement plans. See note 11.
(g)   Relates to the NNUK pension guarantee. See note 14.
(h)   Relates to the gains on various divestitures (includes direct and incremental costs). See note 2.
(i)   Relates to deconsolidation of certain subsidiaries in connection with liquidation activities during the Creditor Protection Proceedings.
(j)   Relates to the charge due to the deconsolidation of the EMEA Subsidiaries and the application of the cost method of accounting. See note 1.
(k)   Relates to a charge due to the deconsolidation of the U.S. Subsidiaries and the application of the cost method of accounting. See note 1.
(l)   Relates to the U.S. debt guarantee. See note 14.
(m)   Relates to impairment or sale of certain long-lived assets.
(n)   Includes net payments pursuant to settlement agreements since the Petition Date, and in some instances the extinguishment of net pre-petition liabilities.
(o)   Relates to the estimated fair value under ASC 460 of NNL's guarantees of lease obligations related to real estate leases entered into by certain EMEA Subsidiaries and U.S. Subsidiaries. See notes 1 and 14.
(p)   Relates to certain distributions and payments from escrow made to non-Canadian debtors in the course of Creditor Protection Proceedings. See note 2.
(q)   Includes other miscellaneous items directly related to the Creditor Protection Proceedings.

Nortel received $4,511 relating to reorganization items in the year ended December 31, 2011, attributable to $4,601 received from various divestitures and $13 for interest income, partially offset by $69 paid for professional fees, $11 paid for settlement of claims, and $23 paid for employee incentive plans.

Nortel received $741 relating to reorganization items in the year ended December 31, 2010, attributable to $903 received for various divestitures and $10 for interest income, partially offset by $155 paid for professional fees, and $17 paid for employee incentive plans.

See the consolidated statement of cash flows for the non-cash portion of the reorganization items.

**. Consolidated financial statement details**

The following tables provide details of selected items presented in the consolidated statements of operations and cash flows for the years ended December 31, 2011 and 2010, and the consolidated balance sheets as of December 31, 2011 and 2010.

*Consolidated statements of operations*

*Selling, general and administrative expense:*

SG&A expense includes bad debt expense of $6 and $8 in the years ended December 31, 2011 and 2010, respectively.

*Research and development expense:*

| | 2010 |
|---|---|
| R&D expense | $ 107 |
| R&D costs incurred on behalf of others [a] | 6 |
| Total | $ 113 |

(a)   Includes R&D costs charged to Nortel customers pursuant to contracts that provided for full recovery of the estimated costs of Nortel related development, material, engineering, installation and other applicable costs, which were accounted for as contract costs.

Due to the divestiture of all of Nortel's businesses, Nortel no longer invests in research and development. As a result, Nortel's R&D expense was nil in the year ended December 31, 2011 and is expected to be nil for the remainder of the Creditor Protection Proceedings.

80

Table of Contents

*Other operating expense (income) — net:*

|  | 2011 | 2010 |
|---|---|---|
| Royalty license income - net | $ (2) | $ (10) |
| Litigation charges - net | (6) | 5 |
| Billings under TSAs | (50) | (269) |
| Other - net | 1 | (7) |
| Other operating income - net | $ (57) | $(281) |

*Other income (expense) — net:*

|  | 2011 | 2010 |
|---|---|---|
| Gain on sale and impairment of investments - net | $ 1 | $ 7 |
| Rental income | 3 | 59 |
| Currency exchange loss - net | (35) | (6) |
| Other - net | (14) | (3) |
| Other income (expense) - net | $ (45) | $ 57 |

**Consolidated balance sheets**

*Cash and cash equivalents:*

|  | 2011 | 2010 |
|---|---|---|
| Cash on hand and balances with banks | $ 241 | $ 341 |
| Cash equivalents | 510 | 466 |
| Cash and cash equivalents at end of year | $ 751 | $ 807 |

*Accounts receivable — net:*

|  | 2011 | 2010 |
|---|---|---|
| Trade and other receivables [a] | $ 193 | $ 272 |
| Contracts in process | - | 3 |
|  | 193 | 275 |
| Less: provisions for doubtful accounts | (19) | (15) |
| Accounts receivable - net | $ 174 | $ 260 |

(a) Includes $155 and $163 as of December 31, 2011 and 2010, respectively, related to net accounts receivable from subsidiaries accounted for under the cost method, where settlement will occur as part of a plan of reorganization under the Creditor Protection Proceedings.

*Inventories — net:*

|  | 2011 | 2010 |
|---|---|---|
| Gross inventories | $ 1 | $ 15 |
| Less: provisions for inventories | (1) | (11) |
| Inventories - net | $ - | $ 4 |

81

Table of Contents

*Other current assets:*

|  | 2011 | 2010 |
|---|---|---|
| Prepaid expenses | $ 16 | $ 25 |
| Income taxes recoverable | 26 | 38 |
| Current investments | 1 | 1 |
| Other (a) | 36 | 90 |
| Other current assets | $ 79 | $ 154 |

(a)   Includes certain receivables resulting from divestiture of businesses and TSAs.

*Plant and equipment — net:*

|  | 2011 | 2010 |
|---|---|---|
| Cost: |  |  |
| Buildings | $ 1 | $ 34 |
| Machinery and equipment | 91 | 193 |
| Assets under capital lease | - | 3 |
| Sale lease-back assets | - | 1 |
|  | 92 | 231 |
| Less accumulated depreciation: |  |  |
| Buildings | (1) | (26) |
| Machinery and equipment | (91) | (171) |
| Assets under capital lease | - | (3) |
| Sale lease-back assets | - | (1) |
|  | (92) | (201) |
| Plant and equipment - net | $ - | $ 30 |

*Other assets:*

|  | 2011 | 2010 |
|---|---|---|
| Debt issuance costs | $ 24 | $ 35 |
| Financial assets | - | 7 |
| Other | 28 | 23 |
| Other assets | $ 52 | $ 65 |

*Other accrued liabilities:*

|  | 2011 | 2010 |
|---|---|---|
| Outsourcing and selling, general and administrative related provisions | $ 5 | $ 10 |
| Customer deposits | - | 6 |
| Advance billings in excess of revenues recognized to date on contracts | - | 6 |
| Income taxes payable | 2 | 16 |
| Other | 10 | 17 |
| Other accrued liabilities | $ 17 | $ 55 |

82

Table of Contents

*Other liabilities:*

|  | 2011 | 2010 |
|---|---|---|
| Tax uncertainties | $ 9 | $ 16 |
| Other long-term provisions | 8 | 15 |
| Other liabilities | $ 17 | $ 31 |

**Consolidated statements of cash flows**

*Change in operating assets and liabilities — net:*

|  | 2011 | 2010 |
|---|---|---|
| Accounts and other receivables - net | $ 82 | $ 339 |
| Inventories - net | - | 36 |
| Deferred costs | 4 | 22 |
| Income taxes | (5) | (83) |
| Accounts payable | (42) | (63) |
| Payroll, accrued and contractual liabilities | 66 | 66 |
| Deferred revenue | (9) | 3 |
| Advance billings in excess of revenues recognized to date on contracts | (5) | (78) |
| Restructuring liabilities | - | (20) |
| Other | 95 | (37) |
| Change in operating assets and liabilities (a) | $ 186 | $ 185 |

(a)    The changes in liability amounts noted above include obligations that are subject to compromise, consistent with their designation as of, and subsequent to, the Petition Date.

*Interest, taxes and reorganization items paid (received):*

|  | 2011 | 2010 |
|---|---|---|
| Cash interest paid | $ - | $ 5 |
| Cash taxes paid - net | $ 10 | $ 49 |
| Net receipts from reorganization items (note 5) | $(4,511) | $(741) |

**Enterprise-wide Segment Information**

*Product revenues*

The following table sets forth external revenues by product for the years ended December 31:

|  | 2011 | 2010 |
|---|---|---|
| CDMA Solutions | $ 4 | $ 38 |
| GSM and UMTS solutions | 10 | 173 |
| Circuit and packet voice solutions | 3 | 166 |
| Optical networking solutions and carrier ethernet | - | 147 |
| Data networking and security solutions | 10 | 94 |
| Other | - | 2 |
| Total revenues | $ 27 | $ 620 |

Table of Contents

*Geographic information:*

The following table sets forth external consolidated revenues by geographic region based on the location of the customer for the years ended December 31:

|  | 2011 | 2010 |
|---|---|---|
| United States (a) | $ 1 | $ 342 |
| EMEA (b) | – | 3 |
| Canada | – | 45 |
| Asia (c) | 25 | 181 |
| CALA | 1 | 49 |
| Total revenues | $ 27 | $ 620 |

---

(a)  2010 amount reflects revenues up to September 30, 2010, being the period prior to deconsolidation of the U.S. Subsidiaries.
(b)  Excludes amounts related to EMEA Subsidiaries of $222 for the year ended December 31, 2010.
(c)  Excludes amounts related to EMEA Subsidiaries of $18 for the year ended December 31, 2010.

Nortel had three customers that generated revenues of approximately 43% of total consolidated revenues for the year ended December 31, 2011. Nortel had two customers that generated revenues of approximately 27% of total consolidated revenues for the year ended December 31, 2010.

*Long-lived assets:*

The following table sets forth long-lived assets representing plant and equipment - net, by geographic region as of December 31:

|  | 2010 |
|---|---|
| United States | $ - |
| Canada | 23 |
| Asia | 6 |
| CALA | 1 |
| Total | $ 30 |

## 8. Pre-Petition Date cost reduction plans

As a result of the Creditor Protection Proceedings, Nortel ceased taking any further actions under the previously announced workforce and cost reduction plans as of January 14, 2009. Any revisions to actions taken up to that date under previously announced workforce and cost reduction plans will continue to be accounted for under such plans, and will be classified in cost of revenues, SG&A, and R&D as applicable. Nortel's contractual obligations are subject to re-evaluation in connection with the Creditor Protection Proceedings and, as a result, expected cash outlays disclosed below relating to contract settlement and lease costs are subject to change. As well, Nortel is not following its pre-Petition Date practices with respect to the payment of severance in jurisdictions under the Creditor Protection Proceedings.

During the third quarter of 2011, Nortel filed a motion with the Canadian Court to approve a methodology that includes, among other matters, an amount for former employees' severance claims. The motion was approved on October 6, 2011. The workforce provision was adjusted to reflect the severance claims amount under the approved methodology. During the years ended December 31, 2011 and 2010, there was a charge of $4 and recovery of $5, respectively, related to Nortel's Pre-Petition Date cost reduction plans. As of December 31, 2011, the pre-petition cost reduction provision of $34 represents $23 in accrued severance claims for former employees and $11 in contract settlement and lease costs.

## 9. Post-Petition Date cost reduction activities

In connection with the Creditor Protection Proceedings, Nortel has implemented certain workforce and other cost reduction activities and will continue such activities during this process. The actions related to these activities are expected to occur as they are identified. During the third quarter of 2011, Nortel filed a motion with the Canadian Court to approve a methodology that includes, among other matters, an amount for employees' severance claims. The motion was approved on October 6, 2011. The workforce provision was adjusted to reflect the severance claims amount under the approved methodology. The current estimated total charges to earnings and cash outlays are subject to change as a result of Nortel's ongoing review of applicable law. In addition, the current estimated total charges to earnings and cash outlays do not reflect all potential claims or contingency amounts that may be allowed under the Creditor Protection Proceedings and thus are also subject to change.

84

Table of Contents

### Workforce Reduction Activities

*Year ended December 31, 2011*

For the year ended December 31, 2011, approximately $20 of the total charges relating to the net workforce reduction of 475 positions were incurred. During the third quarter of 2011, approximately $81 was recorded in relation to the Canadian severance claims adjustment noted above. As Nortel continues to progress through the Creditor Protection Proceedings, Nortel expects to incur charges and cash outlays related to workforce and other cost reduction strategies. Nortel will continue to report future charges and cash outlays under the broader strategy of the post petition cost reduction plan.

*Year ended December 31, 2010*

For the year ended December 31, 2010, approximately $49 of the total charges relating to the net workforce reduction of 1,703 positions were incurred as of December 31, 2010, which substantially completes the workforce and other cost reduction strategies discussed above.

During the years ended December 31, 2011 and 2010, changes to the provision balances were as follows:

| | |
|---|---:|
| Provision balance as of December 31, 2009 | $ 70 |
| Other charges | 54 |
| Revisions to prior accruals | (5) |
| Cash drawdowns | (15) |
| Foreign exchange and other adjustments | 2 |
| Impact of deconsolidation of U.S. Subsidiaries | (58) |
| Provision balance as of December 31, 2010 (a) | $ 48 |
| Other charges | 20 |
| Cash drawdowns | (8) |
| Foreign exchange and other adjustments | (1) |
| Adjustment for workforce provison severance claims | 81 |
| Provision balance as of December 31, 2011 (b) | $140 |

(a)   As of December 31, 2010, $47 was included in liabilities subject to compromise and $1 was included in the short-term provision balance.
(b)   As of December 31, 2011, $139 was included in liabilities subject to compromise and $1 was included in the short-term provision balance.

During the years ended December 31, 2011 and 2010, the workforce reduction charges were as follows:

| | 2011 | 2010 |
|---|---:|---:|
| Cost of revenues | $ 4 | $ 14 |
| SG&A | 14 | 25 |
| R&D | - | 10 |
| Other (a) | 83 | - |
| Total workforce reduction charge | $ 101 | $ 49 |

(a)   Primarily relates to an adjustment for workforce provision severance claims recorded in reorganization items.

Regular full-time ("RFT") employee notifications resulting in the charge for Nortel's post petition cost reduction plan is as follows:

| | Employees (approximate) | | |
|---|---:|---:|---:|
| | Direct (a) | Indirect (b) | Total |
| RFT employee notifications by period: | | | |
| During 2010 | 168 | 1,113 | 1,281 |
| During 2011 | 107 | 368 | 475 |
| Total RFT employee notifications | 275 | 1,481 | 1,756 |

(a)   Direct employees include employees performing manufacturing, assembly, test and inspection activities associated with the production of Nortel's products.
(b)   Indirect employees include employees performing management, sales, marketing, research and development and administrative activities.

Table of Contents

*Other Cost Reduction Activities*

During the year ended December 31, 2011, there were no charges related to Nortel's real estate cost reduction activities. During the year ended December 31, 2010, Nortel's real estate related cost reduction activities resulted in charges of $8, which were recorded as part of SG&A and reorganization items. During the year ended December 31, 2010, Nortel recorded an impairment of $11, as part of SG&A and reorganization items and additional charges of $13, to reorganization items for lease repudiations and other contract settlements.

As of December 31, 2011, Nortel's real estate and other cost reduction balances were approximately $6, which are classified as subject to compromise. As of December 31, 2010, Nortel's real estate and other cost reduction balances were approximately $5, which are classified as subject to compromise.

## 10. Income taxes

During the year ended December 31, 2011, Nortel recorded a tax expense of $9 on earnings from continuing operations before income taxes and equity in net loss of associated companies and EMEA Subsidiaries of $3,701. The tax expense of $9 is comprised of $3 resulting from taxes on earnings in Asia, $8 relating to the accrual of the deferred tax liability associated with the investments in CALA and Asia, $4 of other taxes including withholding taxes, offset by decreases in uncertain tax positions and other taxes of $4 and the reversal of previously accrued income taxes and interest of $2.

The ultimate determination of the final allocation of proceeds among the various Nortel legal entities has not yet occurred and may be materially different from the classification and related amounts shown in these consolidated financial statements. Nortel expects that the final allocation of proceeds will mainly result in adjustments to existing loss carry-forward balances or other tax attributes, which will be offset with valuation allowance and have a nil impact to taxes payable.

During the year ended December 31, 2010, Nortel recorded a tax recovery of $40 on loss from continuing operations before income taxes and equity in net loss of associated companies and EMEA Subsidiaries of $4,199. The tax recovery of $40 is comprised of $11 of income taxes on current year profits during the applicable period in various jurisdictions offset by decreases in uncertain tax positions and other taxes of $10 and the adjustments to previously accrued income taxes and interest of $41.

Income tax expense or benefit from continuing operations is generally determined without regard to other categories of earnings, such as discontinued operations and other comprehensive income. An exception is provided when there is aggregate income from categories other than continuing operations and a loss from continuing operations in the current year. In this case, the tax expense or benefit allocated to continuing operations is the amount by which the loss from continuing operations reduces the tax expenses recorded with respect to the other categories of earnings, even when a valuation allowance has been established against the deferred tax assets. In instances where a valuation allowance is established against current year losses, income from other sources, including discontinued operations, is considered when determining whether sufficient future taxable income exists to realize the deferred tax assets. During the years ended December 31, 2011 and 2010, the amount of tax recovery allocated to continuing operations and tax expense allocated to discontinued operations as a result of income from discontinued operations being offset by losses from continued operations was nil and $7 respectively.

As of December 31, 2011, Nortel's net deferred tax liabilities were $7, representing the accrual of deferred tax liabilities associated with the expected withholding taxes relating to investments in CALA and Asia. During the third quarter of 2011, Nortel concluded the successful auction of Nortel's remaining patent and patent applications portfolio and closed this transaction on July 29, 2011, which generated a gain of $4,475 in the third quarter of 2011. The estimated tax impact in Canada resulted in a reduction of the gross deferred tax asset offset with a reduction in valuation allowance resulting in a net nil tax impact. There is significant uncertainty concerning the forecasted income or loss for 2012 and beyond and the uncertainty concerning the estimated final proceeds allocation by jurisdiction, and thus this significant negative evidence outweighs any positive evidence that may exist. Therefore, Nortel has concluded that a full valuation allowance continues to be necessary against Nortel's deferred tax assets in all jurisdictions as of December 31, 2011.

86

Table of Contents

The following is a tabular reconciliation of Nortel's change in unrecognized tax benefits under ASC 740 from the beginning to the end of the year:

|  | 2011 | 2010 |
|---|---|---|
| Balance as of January 1 | $1,531 | $1,871 |
| Reduction of uncertain tax positions resulting from the loss of control and sale of subsidiaries | - | (43) |
| Increases related to current year tax positions | - | 3 |
| Decreases related to current year tax positions | - | (1) |
| Increases related to prior year tax positions | - | 590 |
| Decreases related to prior year tax positions | (4) | (24) |
| Expiration of statute of limitations for assessment of taxes | - | (1) |
| Settlement of tax positions | - | (918) |
| Foreign exchange | (38) | 54 |
| Tax rate change | (2) | - |
| Balance as of December 31 | $1,487 | $1,531 |

Nortel had approximately $1,487 and $1,531 of total gross unrecognized tax benefits as of December 31, 2011 and December 31, 2010, respectively. Of the total gross unrecognized tax benefits of $1,487, $11 represented the amount of unrecognized tax benefits, net of valuation allowance that would favorably affect the effective income tax rate in future periods, if recognized. The net decrease of $44 since December 31, 2010 resulted from $38 due to changes in foreign exchange rates, a decrease in a prior year uncertain position of $4, and a decrease of $2 due to a change in tax rates.

Nortel recognized interest and penalties accrued related to unrecognized tax benefits in income tax expense. During the year ended December 31, 2011, Nortel recovered $2 related to interest, penalties and foreign exchange losses. Nortel has accrued approximately $7 and $9 for the payment of interest and penalties as of December 31, 2011 and 2010, respectively.

Nortel believes it is reasonably possible that $1,383 of its gross unrecognized tax benefit will decrease during the year ending December 31, 2012, of which $640 relates to the deductibility of legal settlement expenses and $743 relates to investment tax credits with the resulting impact being the expiry of unutilized non capital losses from prior years.

Nortel is subject to tax examinations in all major taxing jurisdictions in which it continues to operate and Nortel regularly assesses the status and the potential for adverse outcomes to determine the adequacy of the provision for income and other taxes. Nortel's 2000 through 2009 tax years remain open in most of these jurisdictions and are subject to ongoing audit activity. Specifically, the tax authorities in Canada are close to completing an audit and issuing a reassessment in respect of non-refundable investment tax credits claimed by NNL in its 2002 tax year. Nortel increased the unrecognized tax benefits relating to investment tax credits claimed in the 2002 to 2009 taxation years by $171 to reflect the amount that is more likely than not to be sustained. Nortel believes that it has adequately provided for other tax adjustments that are more likely than not to be realized as a result of these ongoing examinations.

Table of Contents

The following is a reconciliation of income taxes, calculated at the Canadian combined federal and provincial income tax rate, to the income tax benefit (expense) included in the consolidated statements of operations for each of the years ended December 31:

|  | 2011 | 2010 |
|---|---|---|
| Income (taxes)/recovery at Canadian rates (2011 - 28%, 2010 - 31.0%) | $(1,037) | $ 1,302 |
| Difference between Canadian rates and rates applicable to subsidiaries in the U.S. and other jurisdictions | 97 | (184) |
| Valuation allowances on tax benefits | 252 | (5,051) |
| Tax effect of tax rate changes | (66) | (4) |
| Adjustments to provisions and reserves | 8 | (521) |
| Foreign withholding and other taxes | (11) | 17 |
| Gain on sale of patents attributable to non Canadian Debtors for tax purposes (a) | 512 | - |
| Deferred tax adjustments relating to prior years | 46 | (102) |
| Non taxable gains and losses | 194 | (201) |
| Previously unrecognized outside basis in deconsolidated subsidiaries | - | 5,118 |
| Impact of non-taxable/(non-deductible) items and other differences | (4) | (334) |
| Income tax benefit (expense) | $ (9) | $ 40 |
| Details of Nortel's income (loss): |  |  |
| Earnings (loss) from continuing operations before income taxes and equity in net loss of associated companies: Canadian, excluding gain (loss) on sales of businesses and assets | $ 3,711 | $(3,878) |
| U.S. and other, excluding gain (loss) on sale of businesses and assets | (10) | (321) |
|  | $ 3,701 | $(4,199) |
| Income tax benefit (expense): |  |  |
| Canadian, excluding loss on sales of businesses and assets | $ (10) | $ 33 |
| U.S. and other, excluding loss on sales of businesses and assets | 1 | 7 |
|  | $ (9) | $ 40 |
| Income tax benefit (expense): |  |  |
| Current | $ (1) | $ 40 |
| Deferred | (8) | - |
| Income tax benefit (expense) | $ (9) | $ 40 |
| Details of movement in valuation allowance |  |  |
| Balance as of January 1: | (8,587) | (4,908) |
| Reduction in valuation allowance due to the deconsolidation of subsidiaries | - | 1,684 |
| Amounts charged to income tax benefit (expense) | 252 | (5,050) |
| Amounts charged to other comprehensive loss | 18 | (47) |
| Other (additions)/ deductions | 184 | (266) |
| Balance as of December 31: | (8,133) | (8,587) |

(a)    Amount related to income recognized pertaining to the sale of patents and patent applications that is not expected to be taxable to the Canadian Debtors.

88

Table of Contents

The following table shows the significant components included in deferred income taxes as of December 31:

|  | 2011 | 2010 |
|---|---|---|
| Assets: |  |  |
| Unrealized capital losses on cost investments | $ 5,393 | $ 5,577 |
| Tax benefit of loss carryforwards | 991 | 1,177 |
| Investment tax credits, net of deferred tax liabilities | 904 | 923 |
| Other tax credits | 145 | 138 |
| Provisions and reserves | 160 | 149 |
| Post-retirement benefits other than pensions | 143 | 156 |
| Plant and equipment | 9 | 84 |
| Pension plan liabilities | 387 | 404 |
| Deferred compensation | 1 | - |
| Unrealized foreign exchange | (23) | (51) |
| Other | 23 | 30 |
|  | 8,133 | 8,587 |
| Valuation allowance | (8,133) | (8,587) |
|  | - | - |
| Liabilities: |  |  |
| Withholding tax on investments | 7 | - |
| Net deferred income tax liabilities | $ 7 | $ - |

Prior to 2010, deferred tax assets relating to the outside basis differences of the subsidiaries that were controlled were not recorded as it was not apparent that the differences would reverse in the foreseeable future. As described in note 1, certain Nortel subsidiaries are now accounted for under the cost method of accounting. As a result of this change the deferred tax asset relating to the unrealized capital losses on cost investments of $5,393 (2010 - $5,577) was recognized in 2011 with a full valuation allowance against it. In addition a deferred tax liability on withholding taxes on undistributed earnings of $7 was also recognized. In Canada, realized capital losses can not be utilized against ordinary income. However, capital losses can be applied against capital gains or can be utilized against future debt forgiveness in Canada.

As of December 31 2011, Nortel has $141 capital loss carry-forwards, which do not expire, and had the following net operating losses and investment tax credits which are scheduled to expire in the following years:

|  | Net Operating Losses | Investment Tax Credits [a] |
|---|---|---|
| 2011 - 2012 | $ 31 | $ - |
| 2013 - 2015 | 336 | - |
| 2016 - 2021 | 25 | 641 |
| 2022 - 2031 | 1,284 | 263 |
| Indefinitely | 3,638 | - |
|  | $ 5,314 | $ 904 |

## 11. Employee benefit plans

### Plan Description

Nortel maintains various investment plans covering substantially all of its employees, and acts as the plan sponsor for its defined benefit and defined contribution plans. Below is a list of relevant plans discussed in this note and their status as of December 31, 2011 and the basis for which they are being accounted for as of December 31, 2011. Note that although these plans represent Nortel's major retirement plans, Nortel also has smaller pension plan arrangements in other countries.

89

Table of Contents

| Plan Name | Status | Current Accounting |
|---|---|---|
| Canadian Retirement Savings Plan | Ongoing | Defined Contribution |
| Canadian Defined Contribution Pension Plan ("DCPP") | Closed 9/30/2010 | Defined Contribution |
| Canadian Post Employment obligation | Terminated 12/31/2010 | Estimated Allowed Claim |
| Canadian Post Retirement obligation | Terminated 12/31/2010 | Estimated Allowed Claim |
| Canadian Defined Benefit Plans | | |
| Managerial and Non-Negotiated Pension Plan (registered) | Plan sponsor only | Defined Benefit |
| Negotiated Pension Plan (registered) | Plan sponsor only | Defined Benefit |
| Transitional Retiring Allowance ("TRA") & Retirement Allowance ("RAP") Pension Plans | Plan sponsor only | Defined Benefit |
| Nortel Networks Supplementary Executive Retirement Plan ("SERP") | Terminated 12/31/2010 | Estimated Allowed Claim |
| Nortel Networks Limited Excess Pension Plan ("Excess") | Terminated 12/31/2010 | Estimated Allowed Claim |
| US LTIP (Long-Term Incentive Plan) | Deconsolidated 10/1/2010 | Deconsolidated |
| US Post Retirement obligation | Deconsolidated 10/1/2010 | Deconsolidated |

### Employee Compensation Claims Motion

On October 6, 2011, the Canadian Court approved a methodology and procedure for compensation related claims in Canada. As a result, Nortel adjusted the recorded obligations to reflect the approved methodology for pension plans other than the registered defined benefit plans, but including post-retirement and post-employment plans. For pension plans other than the Canadian Pension Plans and the TRA and RAP plans, an adjustment of $28 was recorded to pension obligations with the corresponding expense recorded in reorganization items. Similarly, adjustments of $63 and $17, for the post-retirement and post-employment plans, respectively, were recorded as a charge in reorganization items. The court approved claim amounts will be updated for continuing service related to active employees. The approval on October 6, 2011 also included a bar date of January 6, 2012 for the submission of any requests for corrections to personal data and/or additional claims related to their respective claims. Nortel continues to review the submissions received and has not identified any significant adjustments to the court approved claim amounts to date.

### Defined Contribution Plans

Nortel has defined contribution plans available to substantially all of its Canadian employees. Under the terms of the Retirement Savings Plan, eligible employees may contribute a portion of their compensation to the plan. Based on the specific program in which the employee is enrolled, Nortel matches a percentage of the employee's contributions up to a specified limit. The U.S. LTIP Plan operated under similar parameters as the Retirement Savings Plan. Under the DCPP, Nortel contributed a fixed percentage of employees' eligible earnings to a defined contribution plan arrangement; this plan was closed to new contributions on September 30, 2010. The employer contribution cost of these defined contribution plans was $2 and $12 for the years ended December 31, 2011 and 2010, respectively.

### Defined Benefit Plans

### Settlement Agreement with Former and Disabled Canadian Employee Representatives

On February 8, 2010, the Canadian Debtors entered into the Settlement Agreement in relation to the Canadian Pension Plans, post-retirement benefits and post-employment benefits. The Settlement Agreement, as amended, was approved by the Canadian Court on March 31, 2010. On September 30, 2010, the administration of the Canadian Pension Plans was transferred to Morneau Sheppell Ltd. (formerly known as Morneau Sobeco Limited Partnership) (appointed by the Ontario Superintendent of Financial Services) and contributions ceased on that same date. Nortel remains as plan sponsor and, in its capacity, amended the plans to cease service accruals effective September 30, 2010. Benefit coverage in the Canadian post-retirement benefit plan and the Canadian LTD plan ceased on December 31, 2010.

As a result of the approved cessation of post-retirement benefit payments with an effective date of December 31, 2010, Nortel recorded the impacts of the Settlement Agreement in accordance with FASB ASC 715-60 "Defined Benefit Plans — Other Post Retirement" ("ASC 715-60"), which required a de-recognition of the liability and deferred actuarial gains totaling $432 in the first quarter of 2010 recognized as part of reorganization items. Nortel has recorded a charge of $443 in reorganization items representing its best estimate of the expected allowed claim amount in accordance with ASC 852 in relation to the participant claims for future years' benefits that they will no longer receive due to the cessation of the plans. In 2011, in connection with the October 6, 2011 Court Order referred to above, this liability was adjusted by $63. To the extent that information available in the future indicates a difference from the recognized amounts, the provision will be adjusted.

As a result of the amendments to cease future service accruals for the Canadian Pension Plans, Nortel triggered a plan curtailment. As a result of the curtailment, on September 30, 2010, Nortel remeasured the Canadian Pension Plans using assumptions consistent with a wind-up basis of accounting as this is Nortel's best estimate of current assumptions and recorded the impacts of this remeasurement in third quarter of 2010 in accordance with FASB ASC 715-30 "Defined Benefit Plans — Pension" (ASC 715-30). In addition, as a result of the remeasurement, Nortel was required to adjust the liability for impacts from the curtailment loss and changes

90

Table of Contents

in assumptions at the re-measurement date. The effect of these adjustments and the related foreign currency translation adjustment was to record, in the third quarter of 2010, a curtailment loss of $490 in reorganization items, so as to increase pension liabilities by $579 and accumulated other comprehensive loss by $89. The Plans were remeasured on December 31, 2010 as part of the ongoing pension accounting under ASC 715-30. Refer to the discussion below regarding the wind-up order of the Canadian funded pension plans for information related to a further remeasurement in 2011.

### Wind-up Order of the Canadian funded pension plans

On March 8, 2011, the Ontario Superintendent of Financial Services ordered the wind-up for the Canadian Pension Plans with an effective date of October 1, 2010. Nortel's net pension liability for the Canadian Pension Plans is based on the pension assets and liabilities as of this wind-up date. As such, the 2011 pension expense for the Canadian Pension Plans was limited to the amortization of accumulated other comprehensive income. As a result of this order, Nortel remeasured the pension obligations under the plans in the first quarter of 2011 using wind-up assumptions as of the effective date, resulting in a reduction to pension liabilities and OCI of $96 as compared to the remeasurement as of December 31, 2010. The settlement process for the Canadian Pension Plans has not been finalized, and as such the assumptions used to calculate the Canadian Pension Plans' pension obligations could be subject to change. There were no advancements in the settlement process for the Canadian Pension Plans during 2011 and as a result no impacts to the liability.

### Termination of Canadian unregistered defined benefit plans – SERP and Excess

As at December 31, 2010, the SERP and Excess plans were both terminated. Nortel recognized settlement accounting for these plans, and recorded a curtailment loss of $6 and a plan settlement gain of $201 in reorganization items, representing the consolidated liabilities for these two plans. At December 31, 2010, Nortel has recorded in reorganization items a charge of $168 representing its current best estimate of the expected allowed claim amount in accordance with ASC 852 in relation to the participant claims for future years' benefits they will no longer receive due to the cessation of these two plans. To the extent that information available in the future indicates a difference from the recognized amounts, the provision will be adjusted. Refer to the Employee Compensation Claims Motion section above for additional information regarding adjustments to SERP and Excess. As a result of the motion, SERP and Excess were adjusted by $3 and $14, respectively.

### Impact of U.S. deconsolidation

As a result of the deconsolidation of the U.S. Subsidiaries on October 1, 2010, Nortel recorded a reduction in its pension obligation, post-retirement obligation, and accumulated other comprehensive income of $427, $225 and $25, respectively.

### Pension and Post Retirement Benefits

As a result of the above actions taken by the Company, there were no longer any post-retirement programs in effect on December 31, 2010. The following discussion includes activity during the year ended December 31, 2011 for pension and post-retirement plans and only information related to year-end balances and forward-looking information for the pension plans

In the first quarter of 2011, a remeasurement of the Canadian Pension Plans was completed followed by a year end measurement of the TRA and RAP pension plans. The effect of the net actuarial gain adjustment and the related foreign currency translation adjustment was to decrease accumulated other comprehensive loss including foreign currency translation adjustment by $129. The unfunded status of its defined benefit plans decreased to $1,352 as of December 31, 2011 from $1,490 as of December 31, 2010 primarily as a result of an actuarial gain due to the remeasurement of the Canadian Pension Plans and the TRA and RAP plans of $47, the partial settlement of the RAP of $8 related to payments made by Flextronics to former Nortel employees, settlement in the Taiwan plan $2 and foreign exchange movements on the Canadian plans of $86. The net impact to plan assets as of December 31, 2011 was an increase of $55 resulting from investment income, offset by $55 related to foreign exchange fluctuations.

See note 2 regarding changes to the funding of Canadian registered defined benefit pension plans, post-retirement and post-employment benefits. Pension and other post-retirement benefit costs reflected in the consolidated statements of operations are based on the projected benefit method of valuation.

91

Table of Contents

The following details the unfunded status of the defined benefit plans and post-retirement benefits other than pensions, and the associated amounts recognized in the consolidated balance sheets as of December 31:

| | Defined Benefit Pension Plans | | | Post - Retirement Benefits |
|---|---|---|---|---|
| | 2011 | | 2010 | 2010 |
| **Change in benefit obligation:** | | | | |
| Benefit obligation - beginning | $ 3,997 | $ | 3,473 | $ 569 |
| Impact of deconsolidations of EMEA Subsidiaries and U.S. Subsidiaries | - | | (94) | (219) |
| Service cost | 1 | | 8 | 1 |
| Interest cost | 4 | | 196 | 14 |
| Plan participants' contributions | - | | - | 7 |
| Actuarial loss | (47) | | 292 | 31 |
| Special and contractual termination benefits [a] | - | | 2 | - |
| Curtailments and settlements [a] | (10) | | 273 | (370) |
| Benefits paid | - | | (334) | (43) |
| Foreign exchange | (86) | | 181 | 10 |
| Benefit obligation - ending | $ 3,859 | $ | 3,997 | $ |
| **Change in plan assets:** | | | | |
| Fair value of plan assets - beginning | $ 2,507 | $ | 2,459 | $ |
| Actual return on plan assets | 55 | | 236 | - |
| Employer contributions | - | | 26 | 36 |
| Plan participants' contributions | - | | - | 7 |
| Plan settlements | - | | (2) | - |
| Benefits paid | - | | (334) | (43) |
| Foreign exchange | (55) | | 122 | - |
| Fair value of plan assets - ending | $ 2,507 | $ | 2,507 | $ - |
| Net amount recognized | $ (1,352) | $ | (1,490) | $ - |
| Amounts recognized in the accompanying consolidated balance sheets consist of: | | | | |
| Liabilities subject to compromise | $ (1,357) | $ | (1,493) | $ - |
| Other assets | 5 | | 3 | - |
| Net amount recognized | $ (1,352) | $ | (1,490) | $ - |
| Amounts recognized in accumulated other comprehensive income (loss) - before tax - consist of: | | | | |
| Net actuarial loss | $ 674 | $ | 803 | $ - |
| Net amount recognized | $ 674 | $ | 803 | $ - |

(a) Curtailments, settlements, and special and contractual termination benefits resulted from the plan terminations, plan amendments, 2008 Restructuring Plan, 2009 Restructuring Plan, and Post-Petition Date Cost Reduction Activities in conjunction with divestiture activities in 2009 and 2010, as set out in notes 8 and 9.

The accumulated benefit obligation for all defined benefit plans was $3,859 and $3,976 as of December 31, 2011 and 2010, respectively. The following details selected information for defined benefit plans, all of which have accumulated benefit obligations in excess of the fair value of plan assets as of December 31:

| | 2011 | 2010 |
|---|---|---|
| Projected benefit obligation | $3,859 | $3,974 |
| Accumulated benefit obligation | $3,859 | $3,974 |
| Fair value of plan assets | $2,503 | $2,502 |

92

Table of Contents

The following details the amounts recognized in other comprehensive income (loss), including foreign currency translation adjustments, including the other comprehensive income (loss) related to the EMEA Subsidiaries, for the years ended December 31:

| | Defined Benefit Pension Plans | | Post-Retirement Benefits |
| --- | --- | --- | --- |
| | 2011 | 2010 | 2010 |
| Prior service cost | $ - | $ - | $ 2 |
| Amortization of prior service cost | - | (2) | - |
| Net actuarial gain (loss) | (84) | 201 | 34 |
| Amortization of net actuarial gain (loss) | (43) | (66) | 3 |
| Curtailment | - | (14) | 70 |
| Settlement | (2) | 27 | - |
| Impact of deconsolidations of EMEA Subsidiaries and U.S. Subsidiaries | - | (993) | 1 |
| Net recognized in other comprehensive income (loss) | $ (129) | $ (847) | $ 110 |

The estimated amounts in accumulated other comprehensive income (loss) to be recognized as components of pension expense during the next fiscal year are as follows:

| | Defined Benefit Pension Plan | Post-Retirement Benefits | Total |
| --- | --- | --- | --- |
| Net actuarial loss | $ 42 | $ - | $ 42 |

The following details the net pension expense for the defined benefit plans for the following periods:

| | 2011 | 2010 |
| --- | --- | --- |
| **Pension expense:** | | |
| Service cost | $ 1 | $ 8 |
| Interest cost | 4 | 196 |
| Expected return on plan assets | - | (151) |
| Amortization of prior service cost | - | - |
| Amortization of net losses | 51 | 43 |
| Settlement and curtailment losses | (7) | 467 |
| Special and contractual termination benefits | - | 2 |
| Net pension expense | $ 49 | $ 567 |
| **Weighted-average assumptions used to determine benefit obligations as of December 31:** | | |
| Discount rate | 4.2% | 4.3% |
| Rate of compensation increase | N/A | 0.2% |
| **Weighted-average assumptions used to determine net pension expense for years ended December 31:** | | |
| Discount rate | 4.1% | 5.5% |
| Expected rate of return on plan assets | N/A | 6.3% |
| Rate of compensation increase | 3.4% | 3.5% |

Table of Contents

The following details the net cost components of post-retirement benefits other than pensions for the following periods:

| | 2010 |
|---|---|
| **Post-retirement benefit cost:** | |
| Service cost | $ 1 |
| Interest cost | 14 |
| Amortization of prior service cost | (3) |
| Amortization of net losses gains | (3) |
| Curtailment & Settlement losses gains | (450) |
| Net post-retirement benefit cost | $ (441) |
| **Weighted-average assumptions used to determine benefit obligations as of December 31:** | |
| Discount rate | N/A |
| **Weighted-average assumptions used to determine net post-retirement benefit cost for years ended December 31:** | |
| Discount rate | 6.0% |
| Weighted-average health care cost trend rate | 7.8% |
| Weighted-average ultimate health care cost trend rate | 4.9% |

As a result of the transfer of administration of the Canadian Pension Plans, Nortel is no longer the administrator of the assets for the Canadian Pension Plans. Accordingly, Nortel is not in a position to set target investment allocations or dictate investment strategies. Further, changes in the plan assets no longer impact Nortel's net pension liability as a result of the order to wind-up the Canadian Pension Plans with an effective date of October 1, 2010. Consequently, disclosure information of the Canadian Pension Plan's assets has not been included in these financial statements.

## 12. Long-term debt

### Long-term debt

The following table shows the components of long-term debt included as liabilities subject to compromise as of December 31 prior to the Creditor Protection Proceedings (see notes 1 and 2):

| | 2011 | 2010 |
|---|---|---|
| LIBOR + 4.25% Floating rate Notes due July 15, 2011 [a] | $1,000 | $1,000 |
| 1.75% Convertible Senior Notes due April 15, 2012 | 575 | 575 |
| 10.125% Fixed rate Notes due July 15, 2013 | 550 | 550 |
| 2.125% Convertible Senior Notes due April 15, 2014 | 575 | 575 |
| 10.75% Fixed rate Notes due July 15, 2016 | 1,119 | 1,119 |
| 6.875% Notes due September 1, 2023 | 200 | 200 |
| 7.875% Notes due June 15, 2026 [b] | - | - |
| Fair value adjustment attributable to hedged debt obligations | 23 | 37 |
| | 4,042 | 4,056 |
| Less: Long-term debt subject to compromise | 4,042 | 4,056 |
| Long-term debt | $ - | $ - |

(a)   Notes not repaid on due date as a result of pending Creditor Protection Proceedings.
(b)   Notes were issued by Nortel Networks Capital Corporation, an indirect wholly owned finance subsidiary of NNI, and are fully and unconditionally guaranteed by NNL. See note 14.

## 13. Financial instruments and hedging activities

### Risk management

Nortel's net earnings (loss) and cash flows may be negatively impacted by fluctuation in interest rates, foreign exchange rates and equity prices. To effectively manage these market risks, in prior years Nortel had entered into foreign currency forwards, foreign currency swaps, foreign currency option contracts, interest rate swaps and equity forward contracts. Nortel did not hold or issue derivative financial instruments for trading purposes. As a result of the Creditor Protection Proceedings the financial institutions that

Table of Contents

were counterparties in respect of these transactions terminated the related instruments. Consequently, Nortel no longer has any such financial instruments outstanding and is now fully exposed to these interest rate and foreign currency risks and is expected to stay exposed until the conclusion of the Creditor Protection Proceedings.

*Fair value*

The estimated fair values of the financial instruments in the table below reflect approximate amounts at which they could be exchanged in a current transaction between willing parties. The fair values are based on estimates using present value and other valuation techniques that are significantly affected by the assumptions used concerning the amount and timing of estimated future cash flows and discount rates that reflect varying degrees of risk. Specifically, the fair value of long-term debt instruments reflected a current yield valuation based on observed market prices as of December 31, 2011 and 2010. Accordingly, the fair value estimates are not necessarily indicative of the amounts that Nortel could potentially realize in a current market exchange.

| | 2011 | | 2010 | |
|---|---|---|---|---|
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| **Financial liabilities:** | | | | |
| Long-term debt including amounts subject to compromise (a) | $    4,019 | $ 4,097 | $    4,019 | $ 3,203 |

(a)    Excludes capital leases.

*Concentrations of risk*

Nortel limits its credit risk by dealing with counterparties that are considered to be of reputable credit quality. Nortel's cash and cash equivalents are maintained with several financial institutions in the form of short- term money market instruments, the balances of which, at times, may exceed the amount of insurance provided on such deposits. Generally, these deposits may be redeemed upon demand and are maintained with financial institutions with reputable credit and therefore are expected to bear minimal credit risk. Nortel seeks to mitigate such risks by spreading its risk across multiple counterparties and monitoring the risk profiles of these counterparties. However, as a consequence of Creditor Protection Proceedings, Nortel is more reliant on a limited number of financial institutions for cash management, thereby increasing its counterparty credit risk.

**14. Guarantees**

Nortel's requirement to make payments (either in cash, financial instruments, other assets, NNC common shares or through the provision of services) to a third party will be triggered as a result of changes in an underlying economic characteristic (such as interest rates or market value) that is related to an asset, a liability or an equity security of the guaranteed party or a third party's failure to perform under a specified agreement.

95

Table of Contents

The following table provides a summary of Nortel's guarantees as of December 31, 2011:

| | Carrying Amount of Liability | Maximum Potential Liability [p] |
|---|---|---|
| **Business sale and business combination agreements** | | |
| Third party claims [a] | $ 1 | $ 4 |
| Specified annual sales volume [b] | 9 | 9 |
| Intellectual property indemnification obligations [c] | - | NQ |
| Lease agreements [d] | - | 8 |
| Receivable securitizations [e] | - | NQ |
| **Other indemnification agreements** | | |
| EDC Support Facility [f] | 20 | 23 |
| Global Class Action Settlement [g] | - | NQ |
| Sale lease-back [h] | - | 4 |
| Bankruptcy [i] | - | 1 |
| Real estate residual value guarantee [j] | 22 | 22 |
| Environmental indemnifications [k] | 8 | NQ |
| **U.K. Defined Benefit Plan guarantee [l]** | | |
| Funding guarantee | 515 | NQ |
| Insolvency guarantee | 150 | 150 |
| U.S. debt guarantee [m] | 150 | NQ |
| NNL lease guarantees [n] | 125 | NQ |
| NNL grant guarantee [o] | 7 | 7 |
| Total | $ 1,007 | $ 228 |

(a)   Includes guarantees in connection with agreements for the sale of all or portions of an investment or a Nortel business, including certain discontinued operations and guarantees related to the escrow of shares as part of business combinations in prior periods. Nortel has indemnified the purchaser of an investment or a Nortel business in the event that a third party asserts a claim against the purchaser that relates to a liability retained by Nortel relating to business events occurring prior to the sale, such as tax, environmental, litigation and employment matters. In certain agreements, Nortel also indemnifies counterparties for losses incurred from litigation that may be suffered by counterparties arising under guarantees related to the escrow of shares in business combinations. Some of these types of guarantees have indefinite terms while others have specific terms extending to no later than 2012. As of December 31, 2011, Nortel has not made any payments to settle such obligations and does not expect to do so in the future. However, an amount has been accrued for these guarantees, based on the probability of payout and expected payout, if required.

(b)   In conjunction with the sale of a subsidiary to a third party, Nortel guaranteed to the purchaser that specified annual sales volume levels would be achieved by the business sold over a ten-year period ended March 31, 2007. Nortel's guarantee to the purchaser was governed by the laws of the purchaser's jurisdiction. As such, the purchaser has the right to claim such payments under the volume guarantee until January 31, 2018, under the statute of limitations of such jurisdiction. As of December 31, 2011, Nortel has not made any payments to settle such obligations and does not expect to do so in the future.

(c)   Nortel has periodically entered into agreements with customers and suppliers that include intellectual property indemnification obligations that are customary in the industry. These agreements generally require Nortel to compensate the other party for certain damages and costs incurred as a result of third party intellectual property obligations arising from these transactions. These types of guarantees typically have indefinite terms; however, under some agreements, Nortel has provided specific terms extending to February 2011. As of December 31, 2011, Nortel has not made any payments to settle such obligations and does not expect to do so in the future.

(d)   Nortel has entered into agreements with its lessors to guarantee the lease payments of certain assignees of its facilities. Generally, these lease agreements relate to facilities Nortel vacated prior to the end of the term of its lease. These lease agreements require Nortel to make lease payments throughout the lease term if the assignee fails to make scheduled payments. Most of these lease agreements also require Nortel to pay for facility restoration costs at the end of the lease term if the assignee fails to do so. These lease agreements have expiration dates through June 2015. As of December 31, 2011, Nortel has not made any payments to settle such obligations and does not expect to do so in the future. However, an immaterial amount has been accrued for this liability, based on the probability of payout and expected payout, if required.

(e)   Nortel has agreed to indemnify certain of its counterparties in certain receivables securitization transactions. Certain receivables securitization transactions include indemnifications requiring the repurchase of the receivables, under certain conditions, if the receivable is not paid by the obligor. The indemnification provisions generally expire upon the earlier of either expiration of the securitization agreements, which extended through 2009, or collection of the receivable amounts by the purchaser. As of December 31, 2011, Nortel has not made any payments to settle such obligations and does not expect to do so in the future. However, an amount has been accrued for this liability, based on the probability of payout and expected payout, if required.

(f)   Nortel has also agreed to indemnify Export Development Canada ("EDC") under the EDC support facility against any legal action brought against EDC that relates to the provision of support previously provided under the EDC support facility. Approximately $20 has been paid to third party beneficiaries by EDC under guarantees supporting Nortel performance obligations. Nortel has reimbursement obligations to EDC for such payments. As of December 31, 2011, Nortel has not made any payments to settle such obligations and does not expect to do so during the pendency of the Creditor Protection Proceedings.

Table of Contents

(g) On March 17, 2006, in connection with the agreements to settle two significant U.S. and all but one Canadian class action lawsuits, which became effective on March 20, 2007 following approval of the agreements by the appropriate courts (Global Class Action Settlement), Nortel announced that it had reached an agreement with the lead plaintiffs on the related insurance and corporate governance matters, including Nortel's insurers agreeing to pay $229 in cash towards the settlement and Nortel agreeing with its insurers to certain indemnification obligations. Nortel believes that it is unlikely that these indemnification obligations will materially increase its total cash payment obligations under the Global Class Action Settlement. As of December 31, 2011, Nortel has not made any significant payments to settle such obligations.

(h) On June 27, 2007, NNL entered into a sale lease-back agreement where it agreed to provide an indemnity to the purchaser with respect to union and employee termination matters. The sale agreement requires NNL to compensate the purchaser for any costs in the event that NNL fails to effectively satisfy termination obligations to union employees; if a reinstatement application is brought by the union or non-union employees; or if the purchaser is required to re-hire selected union employees. The indemnification provision expires upon the retirement of the last former employee. The nature of the indemnification prevents Nortel from making a reasonable estimate of the maximum term of the indemnification. As of December 31, 2011, Nortel has not made any payments to settle such obligations and does not expect to do so in the future. However, an amount has been accrued for this liability, based on the probability of payout and expected payout, if required.

(i) On February 28, 2008, NNL entered into a guarantee agreement in which it agreed to repay to the bankruptcy estate of a certain debtor, any interim dividends paid from the bankruptcy estate that NNL is not entitled to in the event that a creditor steps forward with a claim that requires a re-distribution of funds between the creditors. The nature of the indemnification prevents Nortel from making a reasonable estimate of the maximum term of the indemnification. As of December 31, 2011, Nortel has not made any payments to settle such obligations and does not expect to do so in the future. However, an amount has been accrued for this liability, based on the probability of payout and expected pay-out, if required.

(j) On July 15, 1999, NNL entered into a guarantee and sales agency agreement whereby it agreed to provide the landlord of a property a residual value guarantee upon the termination of the related property lease. The amount of the guarantee became fixed upon termination of the lease on the property as of June 30, 2010.

(k) Nortel has agreed to provide an indemnity to the purchasers of certain properties with respect to certain environmental matters. An estimated amount has been accrued for this liability, based on the probability of payout and expected payout, if required. Certain purchasers of its certain properties have filed claims related to the environmental matters for an amount of $172, which amount continues to be assessed by the Canadian Debtors. To the extent that the claim is finalized in the future, the provision will be adjusted.

(l) NNL has irrevocably and unconditionally guaranteed NNUK's punctual performance of certain payment obligations under the U.K. defined benefit pension plan funding agreement ("Pension Guarantee"). Pursuant to a further guarantee agreement NNL has guaranteed NNUK's payment obligations arising upon the wind-up, dissolution or liquidation of NNUK and consequent windup of such plan to the lesser of (a) $150 and (b) the amount of the plan's buy out deficit. Nortel has recorded liabilities of $515 and $150 for the Pension Guarantee and the further guarantee, respectively, representing Nortel's current assumption of the expected claim amount in accordance with ASC 852 in relation to each claim. The Pensions Regulator and Trustee of the Plan have filed a claim related to the Pension Guarantee for an amount of $795 and related to the further guarantee of $150. To the extent that more reliable information becomes available in the future indicates a difference from the recognized amounts, the provision will be adjusted.

(m) NNL has unconditionally guaranteed $150 debt obligation of Nortel Networks Capital Corporation, an indirect wholly owned finance subsidiary of NNI. Nortel has recorded a corresponding liability of $150 for this guarantee. Nortel has not accrued interest related to this debt obligation on the basis it does not believe it will be an allowed claim.

(n) NNL has guaranteed the payments required under the lease agreements entered into by certain of its U.S. Subsidiaries and EMEA Subsidiaries. These guarantees require NNL to make lease payments throughout the lease term if and when a subsidiary fails to make scheduled payments. The landlords of these properties have filed claims totaling $287 related to these guarantees, which amount continues to be assessed by the Canadian Debtors. The maximum potential liability is subject to the ongoing real estate claims process.

(o) NNL has guaranteed certain grants provided by the Industrial Development Agency ("IDA") of Ireland to Nortel Ireland to support in-country research and development activities. Nortel has recorded a liability of $7, representing the claim amount in accordance with ASC 852.

(p) The nature of some guarantees and indemnification arrangements generally prevents Nortel from making a reasonable estimate of the maximum potential amount it could be required to pay under such agreements. For this reason, no amount has been included in the disclosure in these circumstances and such items have been denoted as non-quantifiable (NQ).

*Product warranties*

The following summarizes the accrual for product warranties that was recorded as part of other accrued liabilities in the consolidated balance sheet as of December 31.

|  | 2010 |
|---|---|
| Balance at the beginning of the year | $ 58 |
| Impact of EMEA Subsidiaries deconsolidation | - |
| Payments | (20) |
| Warranties issued | 20 |
| Revisions | (55) |
| Transferred to liabilities held for sale | (1) |
| Balance at the end of the year | $ 2 |

97

Table of Contents

**15. Fair Value**

ASC 820 defines fair value, establishes a consistent framework for measuring fair value and expands disclosure requirements about fair value measurements. ASC 820, among other things, requires Nortel to maximize the use of observable inputs and minimize the use of unobservable inputs when measuring fair value.

*Fair value hierarchy*

ASC 820 provides a hierarchy of valuation techniques based on whether the inputs to those valuation techniques are observable or unobservable. Observable inputs reflect market data obtained from independent sources, while unobservable inputs reflect Nortel's assumptions with respect to how market participants would price an asset or liability. These two inputs used to measure fair value fall into the following three different levels of the fair value hierarchy:

*Level 1*: Quoted prices for identical instruments in active markets that are observable.

*Level 2*: Quoted prices for similar instruments in active markets; quoted prices for identical or similar instruments in markets that are non-active; inputs other than quoted prices that are observable, and derived from or corroborated by observable market data.

*Level 3*: Valuations derived from valuation techniques in which one or more significant inputs are unobservable. This hierarchy requires the use of observable market data when available.

*Determination of fair value*

When available, Nortel uses quoted market prices to determine fair value of items classified in Level 1 of the fair value hierarchy. Refer to note 13 for information on fair value of Nortel's long term debt.

**16. Commitments**

*Bid, performance-related and other bonds*

Nortel has entered into bid, performance-related and other bonds associated with various contracts. Bid bonds generally have a term of less than twelve months, depending on the length of the bid period for the applicable contract. Other bonds primarily relate to warranty, rental, real estate and customs contracts. Performance-related and other bonds generally have a term consistent with the term of the underlying contract. The various contracts to which these bonds apply generally have terms ranging from one to five years. Any potential payments which might become due under these bonds would be related to Nortel's non-performance under the applicable contract. Historically, Nortel has not made material payments under these types of bonds, and as a result of the Creditor Protection Proceedings, does not anticipate that it will be required to make such payments during the pendency of the Creditor Protection Proceedings.

The following table sets forth the maximum potential amount of future payments under bid, performance-related and other bonds, net of the corresponding restricted cash and cash equivalents:

|  | 2011 | 2010 |
|---|---|---|
| Bid and performance-related bonds [a] | $ 3 | $ 26 |
| Other bonds [b] | - | - |
| Total bid, performance-related and other bonds | $ 3 | $ 26 |

(a)   Net of restricted cash and cash equivalent amounts of $6 and $5 as of December 31, 2011 and 2010, respectively.
(b)   Net of restricted cash and cash equivalent amounts of $1 and $15 as of December 31, 2011 and 2010, respectively.

*Operating leases and other commitments*

As of December 31, 2011, the future minimum payments under operating leases and lease costs and related sublease recoveries under contractual agreements consisted of:

|  | 2011 |
|---|---|
| 2012 | 2 |
| 2013 | 1 |
| Total future minimum payments | $ 3 |

Rental expense on operating leases for the years ended December 31, 2011 and 2010, net of applicable sublease income, amounted to $10 and $28, respectively.

98

Table of Contents

Expenses related to outsourcing contracts for the years ended December 31, 2011 and 2010 amounted to $1 and $14, respectively, and were for services provided to Nortel primarily related to a portion of its information services function. The amount payable under Nortel's outsourcing contracts is variable to the extent that Nortel's workforce fluctuates from the baseline levels contained in the contracts.

### 17. Capital stock

*Common shares*

Nortel is authorized to issue an unlimited number of NNC common shares without nominal or par value. There was no activity involving common shares in the years ended December 31, 2011 and 2010. Nortel had 498 million NNC common shares valued at $35,604 outstanding and included in shareholders' equity as at the beginning and end of the years ended December 31, 2011 and 2010.

*Preferred shares*

Nortel is authorized to issue an unlimited number of class A preferred shares, which rank senior to the class B preferred shares and the NNC common shares upon a distribution of capital or assets, and an unlimited number of class B preferred shares, which rank junior to the class A preferred shares and senior to the NNC common shares upon a distribution of capital or assets, in each case without nominal or par value. Each of the class A and class B preferred shares is issuable in one or more series, each series having such rights, restrictions and provisions as determined by Nortel's board of directors at the time of issue. None of the class A or class B preferred shares of Nortel have been issued.

### 18. Earnings (loss) per common share

The following table details the weighted-average number of NNC common shares outstanding for the purposes of computing basic and diluted earnings (loss) per common share for the following periods:

|  | 2011 | 2010 [a] |
|---|---|---|
|  | *(Number of common shares in millions)* | |
| Net earnings (loss) from continuing operations | $ 3,671 | $ (4,224) |
| Net earnings (loss) from discontinued operations | (1) | 24 |
| Net earnings (loss) attributable to Nortel Networks Corporation | $ 3,670 | $ (4,200) |
| Basic weighted-average shares outstanding: | | |
| Issued and outstanding | 499 | 499 |
| Weighted-average shares dilution adjustments: | | |
| 1.75% Convertible Senior Notes | 18 | - |
| 2.125% Convertible Senior Notes | 18 | - |
| Diluted weighted-average shares outstanding | 535 | 499 |
| Weighted-average shares dilution adjustments - exclusions | | |
| 1.75% Convertible Senior Notes | - | 18 |
| 2.125% Convertible Senior Notes | - | 18 |
| Basic earnings (loss) per common share: | | |
| from continuing operations | $ 7.36 | $ (8.47) |
| from discontinued operations | $ - | $ 0.05 |
| Diluted earnings (loss) per common share: | | |
| from continuing operations | $ 6.91 | $ (8.47) |
| from discontinued operations | $ - | $ 0.05 |

(a)   As a result of the net loss for the year ended December 31, 2010, all potential dilutive securities in this period are considered anti-dilutive.

99

Table of Contents

**19. Accumulated other comprehensive income (loss)**

The following are the components of comprehensive loss, net of tax, for the following periods:

|  | 2011 | 2010 |
|---|---|---|
| **Accumulated foreign currency translation adjustment** | | |
| Balance at the beginning of the year | 441 | 394 |
| Impact of deconsolidation of EMEA Subsidiaries | - | 30 |
| Impact of other deconsolidations | - | 77 |
| Impact of discontinued operations | - | 46 |
| Change in foreign currency translation adjustment [a] | 90 | (106) |
| Balance at the end of the year | 531 | 441 |
| **Unrealized gain (loss) on investments - net** | | |
| Balance at the beginning of the year | - | 21 |
| Change in unrealized gain (loss) on investments | - | (21) |
| Balance at the end of the year [b] | - | - |
| **Unamortized Pension and Post-Retirement Plan actuarial losses and prior service cost - net** | | |
| Balance at the beginning of the year | (803) | (1,539) |
| Impact of deconsolidation of EMEA Subsidiaries | - | 31 |
| Impact of other deconsolidations | - | 992 |
| Change in unamortized pension actuarial losses and prior service cost [c] | 129 | (287) |
| Balance at the end of the year | (674) | (803) |
| **Accumulated other comprehensive loss** | $(143) | $ (362) |

(a)   The change in the foreign currency translation adjustment was not adjusted for income taxes since it related to indefinite term investments in subsidiaries that are unlikely to reverse in the foreseeable future.

(b)   Certain securities deemed available-for-sale by Nortel were measured at fair value. Unrealized holding gains (losses) related to these securities were excluded from net earnings (loss) and were included in accumulated other comprehensive income (loss) until realized. Unrealized gain (loss) on investments was net of tax of nil, for the year ended December 31, 2010. During the year ended December 31, 2010, realized (gains) losses on investments of $20 were reclassified to other income (expense) — net in the consolidated statements of operations.

(c)   Represents non-cash charges to shareholders' deficit related to the change in unamortized pension and post-retirement actuarial losses and prior service cost (see note 11). The charge is presented net of tax of nil for the years ended December 31, 2011 and 2010. The charge relating to EMEA Subsidiaries was nil for the year ended December 31, 2010.

**20. Liabilities subject to compromise**

As a result of the Creditor Protection Proceedings, pre-petition liabilities may be subject to compromise or may otherwise be affected by a court-approved plan and generally, actions to enforce or otherwise effect payment of pre-petition liabilities are stayed. Although pre-petition claims are generally stayed, under the Creditor Protection Proceedings, the Debtors are permitted to undertake certain actions designed to stabilize the Debtors' operations including, among other things, payment of employee wages and benefits, maintenance of Nortel's cash management system, satisfaction of customer obligations, payments to suppliers for goods and services received after the Petition Date and retention of professionals. The Debtors have been paying and intend to continue to pay undisputed post-petition claims in the ordinary course of business. Under the Creditor Protection Proceedings, the Debtors have certain rights, which vary by jurisdiction, to reject, repudiate or no longer continue to perform various types of contracts or arrangements. Damages resulting from rejecting, repudiating or no longer continuing to perform a contract or arrangement are treated as general unsecured claims and will be classified as liabilities subject to compromise. ASC 852 requires pre-petition liabilities of the debtor that are subject to compromise to be reported at the claim amounts expected to be allowed, even if they may be settled for lesser amounts.

Nortel accounted for its EMEA Subsidiaries under the equity method of accounting from the Petition Date to May 31, 2010, being the date at which Nortel deconsolidated its equity investment. Also, as of October 1, 2010 Nortel has accounted for the U.S. Subsidiaries, and the subsidiaries they control, under the cost method of accounting. Accordingly, the liabilities of the EMEA Subsidiaries and U.S. Subsidiaries that are subject to compromise are not included in the consolidated financial statements as of December 31, 2011.

100

Table of Contents

Liabilities subject to compromise consist of the following:

|  | 2011 | 2010 |
|---|---|---|
| Trade and other accounts payable | $   164 | $   147 |
| Payable to U.S. Subsidiaries | 2,151 | 2,158 |
| Restructuring liabilities | 180 | 84 |
| Long-term debt | 4,042 | 4,056 |
| U.S. debt guarantee (note 14) | 150 | 150 |
| Interest on long-term debt | 1,018 | 692 |
| Notes payable | 175 | 175 |
| Pension obligations | 1,557 | 1,660 |
| Post-retirement obligations other than pensions | 578 | 555 |
| U.K. pension guarantees (note 14) | 665 | 667 |
| EDC support facility (note 14) | 20 | 22 |
| NNL lease guarantees (note 14) | 125 | 125 |
| Real estate residual value guarantee (note 14) | 22 | 23 |
| NNL grant guarantee (note 14) | 7 | - |
| Other accrued liabilities | 51 | 51 |
| Total liabilities subject to compromise | $10,905 | $10,565 |

As of December 31, 2011, the Canadian Debtors have received approximately 1,047 claims asserting approximately $29,503 (calculated utilizing exchange rates as of the petition date for presentation purposes) in aggregate outstanding liquidated claims. Some of these claims are unliquidated and are therefore not reflected in the aggregate claim amount above. The Canadian Debtors continue to investigate differences between the claim amounts filed by creditors and claim amounts determined by the Canadian Debtors. Certain claims filed may be duplicative (particularly given the multiple jurisdictions and Canadian debtors involved in the Creditor Protection Proceedings), based on contingencies that have not occurred, or may be otherwise overstated, and would therefore be subject to revision or disallowance. Nortel believes the variance between total claims and total liabilities subject to compromise is primarily related to duplicative claims. The determination of Nortel's liabilities subject to compromise considers these factors, and these liabilities are subject to change as a result of the ongoing investigation by the Canadian Debtors of filed proofs of claim. A number of proofs of claim, for which Nortel has not accrued any amount or accrued significantly less than the amounts in the proofs of claim, continue to be reviewed by the Canadian Debtors and may result in significant changes in future periods once these reviews are complete.

An additional approximate 16,000 claims related to the employee compensation claims process totaling CAD$1.06 billion have been received by the Canadian Debtors. Refer to note 2 for more information.

As of December 31, 2011, the Canadian Debtors have resolved 588 claims, reducing the aggregate amount claimed against the Canadian Debtors by approximately $5,711. Although the Canadian Court has established a bar date, subject to certain excluded claims, by which certain proofs of claim against the relevant Canadian Debtors were required to be filed if the claimants were to receive any distribution under the Creditor Protection Proceedings, certain further claims may be permitted. In addition, the Canadian Debtors anticipate that additional proofs of claim will be the subject of future objections as such proofs of claim are reconciled. Accordingly, the ultimate number and amount of allowed claims is not determinable at this time.

The amounts currently classified as liabilities subject to compromise may be subject to future adjustments depending on actions of the applicable courts, further developments with respect to disputed claims, determinations of the secured status of certain claims, if any, the values of any collateral securing such claims, or other events. In addition, a number of proofs of claim, for which Nortel has not accrued any amount or accrued significantly less than the amounts in the proofs of claim, continue to be reviewed by the Canadian Debtors and may result in significant changes in future periods once these reviews are complete.

Classification for purposes of these financial statements of any pre-petition liabilities on any basis other than liabilities subject to compromise is not an admission of fact or legal conclusion by Nortel as to the manner of classification, treatment, allowance, or payment in the Creditor Protection Proceedings, including in connection with any plan that may be approved by any relevant court and that may become effective pursuant to a court's order.

## 21. Investment in EMEA Subsidiaries

As discussed in note 1, Nortel accounted for its interest in the EMEA Subsidiaries under the equity method of accounting in accordance with ASC 323, from the Petition Date to May 31, 2010. Only certain of the entities included in the EMEA Subsidiaries have filed for creditor protection at March 31, 2010. Under the equity method of accounting, Nortel recorded its initial investments at their estimated fair value as of the Petition Date, being the date the entities that comprise the EMEA Subsidiaries were deconsolidated by Nortel. Nortel subsequently recognized its interests in the losses and capital transactions of the EMEA Subsidiaries and gave effect to the elimination of unrealized intercompany profits and losses arising from transactions between Nortel and its consolidated subsidiaries and the EMEA Subsidiaries.

101

Table of Contents

At March 31, 2010, Nortel's net investment in the EMEA Subsidiaries was in a net liability position. Until May 31, 2010, in accordance with ASC 323, Nortel had continued to recognize losses in excess of its net investment in the EMEA Subsidiaries as it had concluded that it was committed to provide non-financial support to the investees. On commencement of the application of the cost method, however, Nortel concluded that this was no longer applicable. Accordingly, Nortel recognized a loss for the net impact of the cessation of equity accounting – reflecting the net carrying value of its investments, which was classified in reorganization items. This loss is presented separately from the recognition of NNL's estimated fair value of its obligations under certain guarantees it has provided for the previously equity accounted for investees. Refer to note 14 for details.

The following table summarizes financial information for the EMEA Subsidiaries operations for the year ended December 31, 2010:

|  | **2010** |
| --- | --- |
| Revenues from continued operations | $ 243 |
| Revenues from discontinued operations | 4 |
| Total revenues | $ 247 |
| Gross profit | 49 |
| Selling, general and adminstrative expense | 116 |
| Research and development expense | 8 |
| Reorganization items | 13 |
| Investments and other income | (44) |
| Other | 6 |
| Net loss | $ (50) |

## 22. Contingencies

### Creditor Protection Proceedings

On January 14, 2009, the Canadian Debtors obtained an order from the Canadian Court for creditor protection and commenced ancillary proceedings under Chapter 15 of the U.S. Bankruptcy Code, the U.S. Debtors filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code, and each of the EMEA Debtors obtained an administration order from the English Court. After the Petition Date, the Israeli Debtors initiated similar proceedings in Israel. One of Nortel's French subsidiaries, Nortel Networks SA, was placed into secondary proceedings in France and NNC filed a voluntary petition for relief under Chapter 11 in the U.S. Court and became a party to the Chapter 11 Proceedings. Generally, as a result, all actions to enforce or otherwise effect payment or repayment of liabilities of any Debtor arising prior to the Petition Date, and substantially all pending claims and litigation against any Debtor, are stayed as of the Petition Date. Absent further order of the applicable courts and subject to certain exceptions and, in Canada, potential time limits, no party may take any action to recover on pre-petition claims against any Debtor.

### The Pensions Regulator Financial Support Directions

According to various claims filed by the trustee of the U.K. defined benefit pension plan and the PPF against certain Debtors, the U.K. defined benefit pension plan had a purported deficit estimated (on a buy-out basis) of £2,100 or $3,300 as at January 2009. In January 2010, the Pensions Regulator, purporting to act under the *Pensions Act 2004* (U.K.) ("U.K. Statute") issued a "warning notice" ("Warning Notice") to certain Nortel entities, including, among others, the Canadian Debtors and the U.S. Debtors. The Pensions Regulator is a statutory agency charged with responsibility for regulating the operations and administration of occupational pension schemes in the U.K., such as the U.K. defined benefit pension plan. The Warning Notice is the first step in a process set forth under the U.K. Statute to enable the Pensions Regulator to issue a financial support direction ("FSD") under the U.K. Statute directing affiliates of NNUK to provide financial support to eliminate the purported deficit. If a company to which a FSD is issued fails to comply with it, the Pensions Regulator may issue a contribution notice ("Contribution Notice") to any one or more persons to whom the FSD was addressed stating that the person is liable to pay to the trustees of the pension scheme the sum specified in the Contribution Notice, where the Pensions Regulator considers it reasonable to impose the liability on the person to pay the specified sum. The sum specified may be the whole or a portion of the actual or estimated deficit of the pension scheme. In the Warning Notice, the Pensions Regulator identified certain Nortel entities, including, among others, NNC, NNL, NNI and NNCI, as targets of a procedure before the determinations panel of the Pensions Regulator ("Determinations Panel") to determine whether to issue a FSD ("U.K. Pension Proceeding"). On February 26, 2010, the Canadian Debtors obtained an order of the Canadian Court, which included, among other things, (i) a declaration that the purported commencement of proceedings and exercise of rights by the Pensions

102

Table of Contents

Regulator breaches the Initial Order; and (ii) a declaration that any result obtained in the U.K. in breach of the stay under the CCAA Proceedings would not be recognized in the Canadian claims process. Also on February 26, 2010, the U.S. Debtors obtained an order of the U.S. Court enforcing the automatic stay under the U.S. Bankruptcy Code against the trustee of the U.K. defined benefit pension plan ("U.K. Pension Trustee") and the PPF, which is fully applicable to the U.K. Pension Trustee's and PPF's participation against the U.S. Debtors in the U.K. Pension Proceeding. In addition, the order of the U.S. Court provided that with respect to the U.S. Debtors, such proceedings are deemed void and without force or effect. The Pensions Regulator appealed the decision of the Canadian Court which appeal was heard and dismissed on June 16, 2010, by the Ontario Court of Appeal. The Pensions Regulator submitted an application for leave to appeal the decision of the Ontario Court of Appeal to the Supreme Court of Canada, which application was dismissed on January 27, 2011. In addition, the U.K. Pension Trustee brought a motion before the Canadian Court to have the stay lifted, to allow the U.K. Pension Proceeding to go forward as a "permitted proceeding", which motion was initially set for hearing on May 31, 2010, but was subsequently adjourned without date on the consent of all interested parties. The U.K. Pension Trustee and the PPF also appealed the decision of the U.S. Court enforcing the stay. That appeal was denied by the U.S. Court of Appeals for the Third Circuit ("U.S. Appeals Court") on December 29, 2011 and on January 24, 2012 the U.S. Appeals Court denied a petition by the U.K. Pension Trustee and the PPF for a rehearing of the appeal. Notwithstanding the orders of the Canadian Court and the U.S. Court and the dismissal of the Pension Regulator's appeal by the Ontario Court of Appeal, the FSD proceedings commenced in the U.K. on June 2, 2010, and on June 25, 2010, the Determinations Panel issued a determination notice ("Determination Notice") indicating that a FSD would be issued against certain Debtors including, among others, NNC, NNL, NNI and NNCI. On April 1, 2011, the Determinations Panel issued FSDs to NNC, NNL, NNI and NNCI requiring each of them to secure that financial support be put in place for the U.K. defined benefit pension plan within six calendar months of the date of the FSDs. The other Debtors that received the Determination Notice have exercised their right under the U.K. Statute to refer the Determinations Panel's determination to the Pensions Regulator Tribunal established under the U.K. Statute for a further determination of the matter. Nortel is of the view that the Determination Notice and the FSD issued to NNC, NNL, NNI and NNCI are null and void given the court decisions noted above.

In September 2010, the U.K. Administrators applied to the English Court for directions concerning the application and effect of the FSD regime contained in the U.K. Statute upon those EMEA Debtors that were identified in the Warning Notice. On December 10, 2010, the English Court ruled that the Pensions Regulator could pursue FSDs and Contribution Notices against the target Debtors in accordance with the provisions of the U.K. Statute. Further, the English Court held that the debt created by any Contribution Notice that may be issued constitutes an administration or liquidation expense of an insolvent target company, rather than a provable debt in the insolvency proceedings, thereby giving it "super priority" status over the claims of other creditors of the insolvent target company. The U.K. Administrators appealed this decision to the Court of Appeal of England and Wales ("U.K. Appeal Court") and, on October 14, 2011, the U.K. Appeal Court upheld the English Court's decision. The U.K. Administrators have been granted leave to appeal the U.K. Appeal Court's decision to the Supreme Court. Nortel is of the view that these court decisions in the U.K. have no authoritative application in the CCAA Proceedings or the Chapter 11 Proceedings and that the validity and relative riority of claims filed in those proceedings are matters to be determined by the Canadian Court and the U.S. Court, as applicable

Pursuant to an intercompany guarantee agreement relating to the U.K. defined benefit pension plan, NNL has guaranteed certain payment obligations of NNUK under a Funding Agreement executed on November 2, 2006. Pursuant to a further intercompany guarantee agreement, NNL has guaranteed NNUK's payment obligations arising upon the wind up, dissolution or liquidation and consequent windup of such plan to the lesser of (a) $150 and (b) the amount of the plan's buyout deficit. See note 14.

### Communications Test Design, Inc. (CTDI)

On September 21, 2010, NNI filed a complaint in the U.S. Court against CTDI asserting claims for misappropriation of trade secrets, fraud, breach of contract, breach of the implied duty of good faith and fair dealing, and unjust enrichment. NNL also filed a complaint on the same date and asserting the same claims against CTDI, plus claims for trademark infringement, trademark dilution and false designation of origin. NNI and NNL each sought compensatory, exemplary, and punitive damages, which together exceeded $130, and NNL sought treble damages and attorneys' fees, in an amount to be determined, with respect to the trademark claims. On January 3, 2011, CTDI answered the complaints and asserted counterclaims of breach of contract against both NNI and NNL, based on allegations that Nortel purportedly did not sufficiently assist CTDI in expanding its repair business. Further, NNC was joined as counterclaim defendant on March 18, 2011. CTDI alleged that it suffered more than $68 in lost revenues, and approximately $28 in lost profits, and wasted certain investments. NNI (joined by NNL) and CTDI both filed motions to dismiss the allegations against them, which motions were denied by the U.S. Court on March 22, 2011. NNC moved to dismiss CTDI's counterclaims against it or, in the alternative, for summary judgment of no liability. A special master was appointed to put the matter to mediation.

As a result of the mediation, the parties reached a settlement on all matters related to this action, which settlement was approved by the U.S. Court on October 17, 2011. The settlement provides that CTDI will pay a total of $19 million, from which plaintiffs' costs will be reimbursed and the remainder will be apportioned between NNL and NNI on a 25%/75% basis, as set out under the settlement agreement. Thus, NNL received $4.85 in total in November 2011. This receipt has been recorded as part of Other operating income –net in Consolidated Statements of Operations for the year ended December 31, 2011. The settlement also provides for the withdrawal of all counterclaims by CTDI and recognition of an allowed claim of approximately $1.

103

Table of Contents

### Securities Class Action Claim against former CEO and former CFO

On May 18, 2009, a complaint was filed in the U.S. District Court for the Southern District of New York alleging violations of federal securities law between the period of May 2, 2008 through September 17, 2008, against Mike Zafirovski (Nortel's former President and Chief Executive Officer) and Pavi Binning (Nortel's former Executive Vice President, Chief Financial Officer and Chief Restructuring Officer). Although Nortel is not a named defendant, this lawsuit has been stayed as a result of the Creditor Protection Proceedings. Messrs Zafirovski and Binning have filed claims in the U.S. Court for indemnification and contribution for potential liability arising out of this matter in amounts to be determined. As of November 8, 2010, the United States District Court for the Southern District of New York ordered that the matter be placed on the suspense docket pending developments in the Creditor Protection Proceedings.

### ERISA Lawsuit

As previously reported, beginning in December 2001, NNC, NNL and NNI, together with certain of its then-current and former directors, officers and employees, were named as defendants in several purported class action lawsuits pursuant to ERISA. These lawsuits were consolidated into a single proceeding in the U.S. District Court for the Middle District of Tennessee (the "U.S. District Court"). This lawsuit is on behalf of participants and beneficiaries of the Nortel Networks Inc. Long-Term Investment Plan, who held shares of the Nortel Networks Stock Fund during the class period. The lawsuit alleged, among other things, material misrepresentations and omissions to induce participants and beneficiaries to continue to invest in and maintain investments in NNC common shares through the investment plan. As a result of the Creditor Protection Proceedings, on September 25, 2009, the U.S. District Court ordered the case administratively closed. The parties to the action agreed to a final form of Stipulation of Settlement ("the Stipulation") whereby the defendants will cause their underwriter, Chubb Insurance Company of Canada ("Chubb"), to pay $21.5 into an escrow account on behalf of the defendants as full and final settlement of the action and in consideration for the releases and discharges provided under the Stipulation. Such settlement amount will be distributed in accordance with the terms of the Stipulation. In a side agreement, NNC, NNL, NNI and Chubb stipulated that existing claims filed by Chubb in the Creditor Protection Proceedings in Canada and in the U.S. will be reduced and allowed as general unsecured claims upon deposit by Chubb of the final settlement payments. The Stipulation and the side agreement were approved by the Canadian Court and the U.S. Court. The U.S. District Court also granted preliminary approval of the Stipulation. A fairness hearing for final approval was held on January 11, 2012 and the Stipulation was approved. Nortel has recorded a provision to reflect its best estimate of an allowed claim amount.

### Canadian Pension Class Action

On June 24, 2008, a purported class action lawsuit was filed against Nortel and NNL in the Ontario Superior Court of Justice in Ottawa, Canada alleging, among other things, that certain recent changes related to Nortel's pension plan did not comply with the *Pension Benefits Act* (Ontario) c common law notification requirements. The plaintiffs seek declaratory and equitable relief, and unspecified monetary damages. As a result of tl Creditor Protection Proceedings, this lawsuit has been stayed.

### Nortel Statement of Claim Against its Former Officers

In January 2005, NNC and NNL filed a Statement of Claim in the Ontario Superior Court of Justice against Messrs. Frank Dunn, Douglas Beatty and Michael Gollogly, Nortel's former senior officers who were terminated for cause in April 2004, seeking the return of payments made to them under Nortel's bonus plan in 2003. One-half of any recovery from this litigation is subject to the Global Class Action Settlement. See note 14.

### Former Officers' Statements of Claim Against Nortel

In April 2006, Mr. Dunn filed a Notice of Action and Statement of Claim in the Ontario Superior Court of Justice against NNC and NNL asserting claims for wrongful dismissal, defamation and mental distress, and seeking punitive, exemplary and aggravated damages, out-of-pocket expenses and special damages, indemnity for legal expenses incurred as a result of civil and administrative proceedings brought against him by reason of his having been an officer or director of the defendants, pre-judgment interest and costs. Mr. Dunn has further brought an application before the Ontario Superior Court of Justice against Nortel and NNL seeking an order that, pursuant to its by-laws, Nortel reimburse him for all past and future defense costs he has incurred as a result of proceedings commenced against him by reason of his being or having been a director or officer of Nortel.

In May and October 2006, respectively, Messrs Gollogly and Beatty filed Statements of Claim in the Ontario Superior Court of Justice against Nortel and NNL asserting claims for, among other things, wrongful dismissal and seeking compensatory, aggravated and punitive damages, and pre-and post-judgment interest and costs.

As a result of the Creditor Protection Proceedings, these lawsuits have been stayed.

### Environmental matters

Nortel is exposed to liabilities and compliance costs arising from its past generation, management and disposal of hazardous substances and wastes. As of December 31, 2011, accruals for environmental matters were $8. Based on information available as of December 31, 2011, management believes that the existing accruals are sufficient to satisfy probable and reasonably estimable environmental liabilities related to known environmental matters. Any additional liabilities that may result from these matters, and any additional liabilities that may result in connection with other locations, are not expected to have a material adverse effect on the business, results of operations, financial condition and liquidity of Nortel.

104

Table of Contents

Nortel has remedial activities under way at five sites that are either currently or previously owned. An estimate of Nortel's anticipated remediation costs associated with all such sites, to the extent probable and reasonably estimable, is included in the environmental accruals referred to in the paragraph directly above. See note 2.

Except as otherwise described herein, in each of the matters described above, the plaintiffs are seeking an unspecified amount of monetary damages. Nortel is unable to ascertain the ultimate aggregate amount of monetary liability or financial impact to Nortel of the above matters, which, unless otherwise specified, seek damages from the defendants of material or indeterminate amounts or could result in fines and penalties. Except as noted above, Nortel cannot determine whether these actions, suits, claims and proceedings will, individually or collectively, have a material adverse effect on its business, results of operations, financial condition or liquidity. Except as otherwise described herein, Nortel intends to defend the above actions, suits, claims and proceedings in which it is a defendant, litigating or settling cases where in management's judgment it would be in the best interest of stakeholders to do so. Nortel will continue to cooperate fully with all authorities in connection with the regulatory and criminal investigations.

Nortel is also a defendant in various other suits, claims, proceedings and investigations that arise in the normal course of business.

## 23. Subsequent events

In addition to the events identified in note 2, the Company has evaluated subsequent events through the filing date and determined that no other significant events occurred which require disclosure.

105

Table of Contents

**ITEM 9.        Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

None.

**ITEM            9A. Controls and Procedures**

Capitalized terms used in this Item 9A of Part II and not otherwise defined, have the meaning set forth for such terms in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section of this report.

*Management Conclusions Concerning Disclosure Controls and Procedures*

We carried out an evaluation under the supervision and with the participation of management, including the Chief Financial Officer (CFO), Allan Bifield, pursuant to Rule 13a-15 under the Securities Exchange Act of 1934 (Exchange Act), of the effectiveness of our disclosure controls and procedures as at December 31, 2011. Based on this evaluation, management, including the CFO, has concluded that our disclosure controls and procedures as at December 31, 2011 were effective to provide reasonable assurance that information required to be disclosed in the reports we file and submit under the Exchange Act is recorded, processed, summarized and reported as and when required and that it is accumulated and communicated to our management, including the CFO, as appropriate, to allow timely decisions regarding required disclosure.

*Management's Report on Internal Control Over Financial Reporting*

Management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) under the Exchange Act. Our internal control over financial reporting is intended to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. GAAP. Our internal control over financial reporting includes those policies and procedures that:

- pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets;

- provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with U.S. GAAP, and that receipts and expenditures are being made only in accordance with authorizations of management and the Board of Directors; and

- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of an evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In making its assessment of internal control over financial reporting, management used the criteria issued by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control-Integrated Framework. Management, including the CFO, assessed the effectiveness of our internal control over financial reporting, and concluded that we maintained effective internal control over financial reporting as at December 31, 2011.

This report does not include an attestation report of Nortel's independent registered public accounting firm regarding internal control over financial reporting. As a non-accelerated filer (as defined in SEC Rules), management's report was not subject to attestation by Nortel's independent registered public accounting firm pursuant to SEC Rules that permit Nortel to provide only management's report in this report.

*Changes in Internal Control Over Financial Reporting*

On January 14, 2009, we commenced the Creditor Protection Proceedings and adopted ASC 852. In connection with these events, during the first quarter of 2009, we introduced processes to: (1) determine the Debtors' pre- and post-petition liabilities and identify those liabilities subject to compromise; (2) assess certain claims received from creditors; and (3) determine the proper accounting treatment required for contracts, liabilities and operating expenses, including restructuring activities and reorganization expenses during the pendency of the Creditor Protection Proceedings. Complexities exist in introducing such processes given the multiple-jurisdiction element of our Creditor Protection Proceedings. From 2009 through 2011, we completed the sale of all of our business as well as the sale of our remaining patents and patent applications and streamlined our business infrastructure and implemented processes to separate and track financial performance in connection with our transition services obligations associated with these divestitures. These changes materially affected our internal control over financial reporting throughout 2009 and 2010 and into 2011 and are reasonably likely to continue to materially affect our internal control over financial reporting. In the fourth quarter of 2011, we continued to streamline our business infrastructure mainly in response to the substantial completion of the TSA obligations. Management continues to take actions necessary to address the resources, processes and controls related to these changes, and to take any remaining actions pertaining to the realignment of certain work between the Canadian Debtors and U.S. Debtors as part of the separation of various corporate functions, while maintaining effective control over financial reporting. Additional process changes may be necessary in the future.

106

Table of Contents

**ITEM 9B.    Other Information**

We have established a 2012 Retention Plan. See "Nortel 2012 Retention Plan" in the Executive and Director Compensation section of this report.

107

Table of Contents

# PART III

While references to dollar amounts in other Parts of this report are in millions of U.S. Dollars, dollar amounts in this Part III are as stated herein. Capitalized terms used in this Part III and not otherwise defined, have the meaning set forth for such terms in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section of this report.

**ITEM 10.    Directors, Executive Officers and Corporate Governance**

Set forth below is information concerning the current members of the Boards of Directors of NNC and NNL (the Nortel Boards) and the current executive officers of NNC and NNL.

**Board of Directors**

| Name and Age | Position Currently Held | Date of Appointment to the Nortel Boards |
|---|---|---|
| Jalynn H. Bennett, C.M. (68) | Director | June 29, 2005 |
| Gregory R. Cote (46) | Director | September 27, 2010 |
| David I. Richardson (70) | Chair | March 27, 2009 |

- Jalynn H. Bennett, C.M. is a corporate director. She was President of Jalynn H. Bennett and Associates Ltd., a consulting firm in strategic planning and organizational development in both the public and private sectors, from 1989 to July 2010. Prior to establishing that firm, Mrs. Bennett was associated for nearly 25 years with Manulife Financial. Mrs. Bennett is a member of the Lawrence National Centre for Policy and Management Advisory Council of the Richard Ivey School of Business at the University of Western Ontario, the Toronto Society of Financial Analysts and the Toronto Association of Business Economists. She is also a Director of Cadillac Fairview Corporation Limited, Teck Resources Limited and the Sick Kids Foundation, and a Fellow of the Institute of Corporate Directors in Canada. Mrs. Bennett has many years of audit committee service, including past membership on the audit committees of Canadian Imperial Bank of Commerce, Teck Resources Limited, Ontario Power Generation, Bombardier Inc., CanWest Global Communications and Sears Canada. Mrs. Bennett is past Commissioner of the Ontario Securities Commission and was a member of the Toronto Stock Exchange and Canadian Institute of Chartered Accountants' Joint Committee on Corporate Governance (The Saucier Committee). She earned a Bachelor of Arts in economics from the University of Toronto. Mrs. Bennett's extensive experience in corporate governance and finance matters has been and continues to be a valuable resource for the Nortel Boards.

  *Public Board Membership in the Past Five Years*: Canadian Imperial Bank of Commerce (1994 – 2011), Teck Resources Limited (2005 – present)

  *Current Audit Committee Membership*: Cadillac Fairview Corporation (Chair)

- Gregory R. Cote is a corporate director. He was Senior Vice President, Corporate Finance and Strategy for ACE Aviation Holdings Inc. (ACE) from 2005 to 2008. Prior to joining ACE, Mr. Cote was a Partner in the insolvency practice at Ernst & Young since 1997. He was also a Senior Vice President of Ernst & Young's corporate finance business, and was formerly a trustee in bankruptcy. Mr. Cote has a Chartered Accountant designation from the Institute of Chartered Accountants of Ontario, and holds a Bachelor of Commerce degree from McMaster University.

  *Public Board Membership in the Past Five Years*: none

  *Current Audit Committee Membership*: none

- David I. Richardson is a corporate director. He is Chairman of the Board of Directors of Air Canada, and a Director and the Chair of the Audit, Finance and Risk Committee of ACE Aviation Holdings Inc. Mr. Richardson is the former Chairman of Ernst & Young Inc. (Canada) and a former Executive Partner of Ernst & Young LLP. Mr. Richardson joined its predecessor, Clarkson, Gordon & Co., in 1963 and was appointed President of The Clarkson Company Limited in 1982. Mr. Richardson was also a member of the Management and Executive Committees of Ernst & Young LLP, national managing partner of that firm's Corporate Finance practice and senior partner in the Corporate Recovery and

108

Table of Contents

Restructuring practice until his retirement from the partnership in 2002. He is also a Governor and Vice-Chairman of the Board of Governors of Upper Canada College. He holds a Bachelor of Commerce degree from the University of Toronto, is a member and a Fellow of the Institute of Chartered Accountants of Ontario, and a life member of the Canadian Association of Insolvency and Restructuring Professionals. Mr. Richardson's background in finance, particularly in the area of corporate recovery and restructuring, is particularly valuable to the Nortel Boards in light of the Creditor Protection Proceedings.

*Public Board Membership in the Past Five Years*: Air Canada (2004 – present), ACE Aviation Holdings Inc. (2004 – present), Jazz Air Holding GP Inc. (2005 – 2008), Aeroplan Income Fund, now known as AIMIA (2005 – 2008), and Husky Injection Moulding Systems (2004 – 2007)

*Current Audit Committee Membership*: ACE Aviation Holdings Inc. (Chair)

### Executive Officers

The NNC Board of Directors appoints and may remove executive officers of NNC. Generally, such officers hold their position until a successor is appointed or until the officer resigns. Set forth below are the names of our current executive officers, their ages, offices currently held and year of appointment. The executive officers are also officers of NNL.

| Name and Age | Office and Position Currently Held | Year of Appointment |
|---|---|---|
| Allan Bifield (55) | Senior Vice-President, Corporate Services and Chief Financial Officer | 2011 |
| Clarke Edward Glaspell (45) | Controller | 2009 |

- A. Bifield was appointed Senior Vice-President, Corporate Services and Chief Financial Officer effective December 17, 2011, prior to which he was the Chief Financial Officer and Senior Vice-President for Nortel's NBS organization since 2010, and previously held various positions in the Finance organization of the Company for over 25 years.

- C.E. Glaspell was appointed Controller effective October 10, 2009. Mr. Glaspell is a chartered accountant with over 15 years of finance work experience. Since joining Nortel in April of 2000, Mr. Glaspell has held various positions and has gained significant expertise in several areas including corporate consolidations, corporate control and external reporting. Prior to joining Nortel, Mr. Glaspell earned his chartered accountancy designation while employed by Deloitte & Touche.

### Section 16(a) Beneficial Ownership Reporting Compliance

Section 16(a) of the Exchange Act requires directors and executive officers of Nortel to file reports concerning their ownership of equity securities of Nortel with the SEC and Nortel. Based solely on a review of the information received and written representations from the persons subject to Section 16(a), we believe that all of Nortel's directors and executive officers filed their required reports, [if any], on a timely basis during 2011.

### Corporate Governance

The following corporate governance report has been reviewed and approved by the Nortel Boards. Copies of the joint mandate of the Nortel Boards, which include our standards for director independence (Independence Standards), the joint mandate of the Audit Committees of NNC and NNL and our Code of Business Conduct, as well as any future amendments to these documents, are available free of charge on our website at www.nortel-Canada.com or by writing to our Corporate Secretary at Nortel Networks Corporation, 5945 Airport Road, Suite 360, Mississauga, Ontario L4V 1R9.

Table of Contents

### *Nortel Boards*

On August 10, 2009, Nortel announced a number of leadership changes and a new organizational structure designed to work towards the completion of the sales of its businesses and other restructuring activities. At such time each of the Nortel Boards was reduced from nine directors to three directors, with the same directors serving on each Nortel Board. Further, the Nortel Boards assumed direct responsibility for matters previously overseen by their Board Committees other than their Audit Committees. Accordingly, the Nominating and Governance Committee of NNC, the joint Compensation and Human Resources Committee of NNC and NNL (CHRC), the Litigation Committee of NNC and the Pension Fund Policy Committee of NNL were dissolved.

The Nortel Boards subsequently determined that their mandates should be revised to reflect more accurately the current role and function of the Nortel Boards taking into account the following considerations:

- NNC and NNL was in the process of selling their businesses to external parties and they did not expect and continue not to expect that the holders of NNC common shares and NNL preferred shares will receive any value from the Creditor Protection Proceedings, and they expect that the Creditor Protection Proceedings will ultimately result in the cancellation of these equity interests;

- the Canadian Monitor is responsible for the oversight of the business, sales processes, claims processes and other restructuring activities of NNC, NNL and the other Canadian Debtor subsidiaries. In the U.S., the U.S. Principal Officer has been appointed by the U.S. Court for each of the U.S. Debtors to work in conjunction with creditors and the Canadian Monitor;

- a court order was obtained in Canada relieving NNC and NNL from the obligation to call and hold annual meetings until after the termination of the stay period under the CCAA Proceedings; and

- NNC common shares and NNL preferred shares no longer trade on any stock exchange.

A new joint mandate of the Nortel Boards was therefore approved effective February 26, 2010. At such time, the mandates of the NNC Board, the NNL Board, the Nominating and Governance Committee of NNC, the CHRC, the Litigation Committee of NNC and the Pension Fund Policy Committee of NNL, as well as the Statement of Governance Guidelines of NNC and NNL, were repealed.

Under their joint mandate, the Nortel Boards review, discuss and approve, as appropriate, various matters relating to remaining restructuring work, sales processes, creditor claims process, corporate group services and other restructuring activities of NNC and NNL with a view to the best interests of NNC, NNL and their creditors and shareholders generally.

Each of the Nortel Boards has the same non-executive chair and is comprised of three directors. The Nortel Boards do not anticipate making any further changes to the composition of the Nortel Boards during the continuance of the Creditor Protection Proceedings. However, in the event of another vacancy, a similar process will be carried out to identify a candidate. Continuing education is provided to directors in the form of presentations from senior management regarding Nortel's business, including Nortel's restructuring activities and the Creditor Protection Proceedings, at each regularly scheduled meeting of the Nortel Boards.

The joint mandate of the Nortel Boards requires that the Nortel Boards be comprised of not less than the number of "independent" directors as required by applicable law. For this purpose, "independent" has the meaning defined under applicable securities laws in force from time to time and having regard to our Independence Standards, as amended by the Nortel Boards from time to time, and includes the independence definitions under the NYSE Listing Standards (although such standards ceased to be applicable to Nortel when the NNC common shares were delisted from the NYSE). In accordance with our Independence Standards, the independence definitions under the NYSE listing standards and applicable SEC and Canadian Securities Administrators (CSA) rules, the Nortel Boards have determined, based on information provided by each director as to their personal and professional circumstances, that each of Mrs. Bennett and Messrs. Cote and Richardson is independent.

The ability of the Nortel Boards to exercise independent supervision over management is facilitated by the fact that the Chair and each of the other directors on the Nortel Boards is independent. In addition, the directors meet in executive sessions at meetings of the Nortel Boards and the Audit Committees. Overseeing the ability of the Nortel Boards to operate in a manner that is independent of management is also a specific responsibility of the Chair.

Table of Contents

The Chair of the Nortel Boards is responsible for overseeing the Nortel Boards' relationship to management, including the Nortel Boards' ability to operate in a manner that is independent of management, and is responsible for managing meeting schedules and setting agendas, chairing the meetings of the Nortel Boards, acting as a liaison between senior management and the Nortel Boards, and providing direction from the Nortel Boards to senior management on various matters.

Regularly scheduled meetings of the Nortel Boards are held at such time or times as the Chair may determine. Special meetings of the Nortel Boards may be called by, or by the order of, the Chair or any two directors of NNC and NNL. For a summary of 2011 director attendance, see "Number of Meetings Attended in 2011" in this section of this report.

The Nortel Boards periodically review the adequacy and form of director compensation in light of the risks and responsibilities of serving as a director during the continuance of the Creditor Protection Proceedings, court orders issued in connection with such proceedings and market practice. All compensation for the directors must be approved by the Nortel Boards. Director compensation is described under "Director Compensation for Fiscal Year 2011" in the "Executive and Director Compensation" section of this report.

During the continuance of the Creditor Protection Proceedings, the assessment of whether the Nortel Boards, the Audit Committees and individual directors are performing effectively is conducted informally among the directors. A formal annual evaluation is not conducted.

### Audit Committees

A joint mandate of the Audit Committees was approved effective February 26, 2010. The mandate provides that the Committees must be composed of not less than three directors, each of whom must meet any applicable securities law requirement to be "independent" and/or "financially literate" as such terms are defined under applicable securities laws and our Independence Standards. Each of Mrs. Bennett and Messrs. Cote and Richardson is a member of the Audit Committees and Mr. Cote is the Chair of the Audit Committees. The Nortel Boards have determined, based on information provided by each director as to their personal and professional circumstances, that each director is independent as defined in our Independence Standards and the independence definitions for audit committee service under the NYSE listing standards and applicable SEC and CSA rules. The Nortel Boards have also determined that, based on information provided by each director as to their personal and professional credentials, all of the members of the Audit Committees are financially literate in accordance with the financial literacy definitions under the NYSE listing standards and the applicable rules of the SEC and the CSA. Since the NNC common shares were delisted from the NYSE, we have ceased to designate any member of our Audit Committees as an "audit committee financial expert". As described above under "Board of Directors", each Audit Committee member brings significant skill, education and experience to their responsibilities.

The Audit Committees assist the Nortel Boards in the oversight of:

- the reliability and integrity of the accounting principles and practices, financial statements and other financial reporting, and disclosure principles and practices followed by management of NNC, NNL and their consolidated subsidiaries;
- the establishment by management of an adequate system of internal controls and procedures;
- the effectiveness of the internal controls and procedures;
- the compliance by Nortel with legal and regulatory requirements; and
- the qualifications, independence, compensation, retention and oversight of the work of any registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for NNC/NNL, and for making recommendations to the Nortel Boards respecting the appointment of the independent auditors of NNC/NNL.

The independent auditors report directly to the Audit Committees and are ultimately responsible to the Audit Committees and the Nortel Boards. In accordance with applicable laws, the Audit Committees of NNC and NNL must pre-approve all audit and non-audit services to be provided by the independent auditors.

The Audit Committees have direct access to the internal auditor and independent auditors to discuss and review specific issues as appropriate. The Audit Committees have established complaint procedures, through our

111

Table of Contents

compliance group, as well as a hiring policy for current and former employees of the independent auditors. In addition to the executive session held at each meeting with the Audit Committees, separate executive sessions are held by the Audit Committees on a periodic basis with the independent auditors, the internal auditor and other members of senior management.

### Number of Meetings Attended in 2011[1]

| Director | Boards[2] | | Audit Committees[2] | |
|---|---|---|---|---|
| | NNC | NNL | NNC | NNL |
| Jalynn H. Bennett | 16/16 | 16/16 | 7/7 | 7/7 |
| Gregory R. Cote | 16/16 | 16/16 | 7/7 | 7/7 |
| David I. Richardson | 16/16 | 16/16 | 7/7 | 7/7 |

(1)  Table indicates meetings held at any time during 2011 and attendance of individual directors only while such individual was a director of the Nortel Boards or a member of the Audit Committees, as applicable. Table does not include actions taken by written resolutions of the Nortel Boards or Audit Committees.

(2)  All meetings of the Nortel Boards were held together as joint meetings. All meetings of the Audit Committees were held together as joint meetings.

### Code of Ethics

Nortel's Code of Business Conduct, which is our code of ethical business conduct, provides detailed guidelines on Nortel's approach to competition in the marketplace, the standards of conduct expected of all Nortel directors, officers and employees and the central role integrity must play in daily conduct at Nortel, with an emphasis on honesty and compliance with all applicable laws. On November 9, 2011, Nortel's officers and employees (except those on leave) were asked to certify or recertify, as applicable, that they have read the Code of Business Conduct, understand it and will comply with its provisions, and that they will contact the Ethics Office to report known or suspected violations. In the fourth quarter of 2011, Nortel's directors certified that they have read, understood and will comply with the terms of the Code of Business Conduct. Any future amendments to our Code of Business Conduct will be posted on our website at www.nortel-Canada.com. Any waiver of a requirement of our Code of Business Conduct, if granted by the Nortel Boards or any Board Committee, will be posted on our website at www.nortel-Canada.com as required by law.

The Chief Compliance Officer is responsible for security, business ethics and compliance, which includes: periodically reporting to the Nortel Boards regarding ethics and compliance matters; preparing periodic communications to employees regarding compliance and ethical business practices; and developing and monitoring policies and procedures relating to business ethics and compliance. The Chief Compliance Officer report to the Senior Vice-President, Corporate Services and Chief Financial Officer; and the Chair of the Audit Committees.

### Use of Material Non-Public Information and Insider Trading Policy

All employees, officers, and members of Nortel Boards are subject to insider trading laws generally. In accordance with applicable corporate policy, there are certain individuals who, by virtue of their role, are "deemed insiders". Because they may have knowledge of, or access to, material information, the trading activities of these individuals are restricted by Nortel. Such individuals may not engage in any trading activity for specified periods of time throughout the year, known as "black out periods". These deemed insiders may only trade during prescribed "window periods", and even then, only if they do not have knowledge of any Nortel material non-public information at that time.

### Shareholder Communication

Nortel communicates regularly with stakeholders through press releases, annual and quarterly reports and through our website at www.nortel-Canada.com. Stakeholders may communicate directly with the Nortel Boards, non-management directors, the Chair of the Nortel Boards or any other individual directors by writing care of the Corporate Secretary, Nortel Networks Corporation, 5945 Airport Road, Suite 360, Mississauga, Ontario L4V 1R9. All correspondence, with the exception of solicitations for the purchase or sale of products and services, communications of an inappropriate nature or similar types of communications, will be forwarded to the directors to

112

Table of Contents

whom such correspondence is addressed. In addition, any such communication that relates to accounting, internal accounting controls or auditing matters will also be referred to the Chair of the Audit Committees of NNC and NNL, if not already addressed to him.

### ITEM 11.    Executive and Director Compensation

#### Summary Compensation Table for Fiscal Year 2011

The following table sets forth the compensation awarded to, earned by, or paid to each of Nortel's named executive officers for services rendered by them to Nortel during the 2011 fiscal year. Nortel's obligations concerning named executive officer compensation will continue to be reviewed in the context of Creditor Protection Proceedings.

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) | Non-Stock Incentive Plan Compensation ($) | Nonqualified Deferred Compensation Earnings ($) | All Other Compensation ($)[1] | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| A. Bifield | 2011 | 404,449[3] | 400,404[3][4] | — | — | 945,925[3][5] | — | 15,984[3] | 1,766,762 |
| Senior Vice-President, Corporate Services and Chief Financial Officer[2] | | | | | | | | | |
| C.E. Glaspell | 2011 | 252,781[3] | 303,337[3][6] | — | — | 169,641[3][7] | — | 21,265[3] | 747,024 |
| Controller | | | | | | | | | |
| G.A. Riedel | 2011 | 399,231 | — | — | — | 3,992,000[9] | — | 104,788 | 4,496,019 |
| Former Chief Strategy Officer and President, Business Units[8] | 2010 | 563,654 | 1,000,000 | — | — | 1,134,000 | — | 13,274 | 2,710,928 |
| C.S. Ricaurte | 2011 | 450,000 | 618,750[11] | — | — | 1,483,250[12] | — | 80,924 | 2,632,924 |
| Former President, Nortel Business Services[10] | 2010 | 586,538 | 206,250 | — | — | 1,788,500 | — | 12,250 | 2,593,538 |

(1)  In accordance with the SEC rules, for each named executive officer, these amounts represent contributions to defined contribution plans and accrued vacation, as set out below. No named executive officer received any perquisite with a value exceeding the greater of $25,000 or 10% of his total perquisites.

    A. Bifield     •  Nortel contributions under the Nortel Networks 2010 Retirement Savings Plan for Employees–Canada
    C.E. Glaspell     •  Nortel contributions under the Nortel Networks 2010 Retirement Savings Plan for Employees–Canada
    G.A. Riedel     •  Nortel contributions under the Nortel Networks Long-Term Investment Plan
      •  Payment for accrued and unused vacation in accordance with Company policy
    C.S. Ricaurte     •  Nortel contributions under the Nortel Networks Long-Term Investment Plan
      •  Payment for accrued and unused vacation in accordance with Company policy

(2)  Mr. Bifield was appointed Senior Vice-President, Corporate Services and Chief Financial Officer effective December 17, 2011.
(3)  Represents the U.S. Dollar equivalent of certain payments actually earned or paid in local currency. Compensation paid in Canadian Dollars has been converted using the average of the exchange rates in effect during 2011 equal to US$1.00=CAD$0.9890 and during 2010 equal to US$1.00=CAD$1.0349, respectively.
(4)  Represents a payment under the special incentive arrangement pursuant to a letter agreement entered into on February 22, 2010.
(5)  Consists of an award of $403,963 pursuant to the Incentive Plan, as described below under "Non-Equity Incentive Plan Compensation and Other Bonus Arrangements", and an award of $541,962 under the special incentive arrangement pursuant to a letter agreement dated February 22, 2010.
(6)  Represents a payment under the Nortel Special Incentive Plan (the NSIP), as described below under "Non-Equity Incentive Plan Compensation and Other Bonus Arrangements".
(7)  Represents an award pursuant to the Incentive Plan.
(8)  Mr. Riedel departed from the Company effective August 31, 2011, in accordance with the amendment to his Employment Agreement dated March 2, 2011.
(9)  Consists of an award of $522,000 pursuant to the Incentive Plan and an award of $3,470,000 under the special incentive bonus pursuant to a letter agreement entered into on April 29, 2010.
(10)  Mr. Ricaurte departed from the Company effective September 30, 2011.
(11)  Represents a payment under the special incentive arrangement pursuant to a letter agreement entered into on February 1, 2010.
(12)  Consists of an award of $645,750 pursuant to the Incentive Plan and an award of $837,500 under the special incentive arrangement pursuant to a letter agreement entered into on February 1, 2010.

Table of Contents

**Material Terms of Employment Agreements and Arrangements with Named Executive Officers**

The following is a summary of the material terms of the employment agreements for the named executive officers. Obligations of Nortel or NNI, as applicable, under these agreements will continue to be reviewed and considered in the course of the Creditor Protection Proceedings. For more information regarding the named executive officers' pension benefits and other post-employment compensation, see "Pension Benefits for Fiscal Year 2011" and "Potential Payments upon Termination or Change in Control" below in this section of this report.

*Mr. Bifield*

Mr. Bifield has been employed by Nortel in various capacities since March 1980. The terms and conditions of Mr. Bifield's employment with Nortel are currently governed by an employment agreement dated February 22, 2010 that was entered into in connection with his appointment as Senior Vice-President Finance, Nortel Business Services. This agreement amended, restated and superseded his previous employment agreement with the Company. Under the terms of this agreement Mr. Bifield's base salary remained at CAD$400,000 per annum and the Incentive Plan annual target increased from 75% to 80%. Mr. Bifield is also eligible to participate in certain employee benefit plans in accordance with the generally applicable terms of such plans. Pursuant to his employment agreement, Mr. Bifield is also eligible for a special incentive arrangement as follows: (a) subject to his continued employment until December 31, 2011, a performance incentive of CAD$1,072,000 upon achievement of target level performance objectives, eligible to be earned in two parts as follows: (i) for the period January 1, 2010 to December 31, 2010, CAD$536,000, at target and (ii) for the period January 1, 2011 to December 31, 2011, up to CAD$536,000, at target (such amounts to be paid no later than March 15, 2012); and (b) an amount of CAD$528,000 to be earned in two parts as follows: (i) subject to his continued employment through December 31, 2010, CAD$132,000 (to be paid no later than March 15, 2011); and (ii) subject to his continued employment through December 31, 2011, CAD$396,000 (to be paid no later than March 15, 2012).

The metrics applicable to Mr. Bifield for 2011 were as follows: (1) 2011 Full Year NBS Net Cash/Cost defined as Global net Transition Services Agreement (TSA) income statement (P&L), less: (i) non-cash items (ie. depreciation), and (ii) Real Estate sub-leases, (2) NBS Bad Debt to Sales defined as Percentage of uncollectable buyer service sales (aggregate of January 1, 2011 Accounts Receivable plus 2011 Service Billings) through the end of the transition service period, excluding Real Estate, and (3) Service Level Agreement Contract Penalties on TSAs, defined as the number of times a Contract Penalty occurs over 2011. The weighting of these metrics applicable to the achievement of Mr. Bifield's performance was 40%, 40% and 20% respectively for metrics 1, 2 and 3. As the target level performance objectives for 2010 and 2011 were met, the performance incentive of CAD$1,072,000 will be paid in accordance with the terms of Mr. Bifield's agreement.

Mr. Bifield was appointed Senior Vice-President, Corporate Services and Chief Financial Officer effective December 17, 2011, and continued to receive the same base salary and Incentive Plan described above.

Mr. Bifield is participating in the Nortel 2012 Retention Plan (the Retention Plan), as described below under "Non-Equity Incentive Plan Compensation and Other Bonus Arrangements".

*Mr. Glaspell*

Nortel entered into an employment agreement with Mr. Glaspell, dated March 20, 2000, in connection with his hiring as Senior Analyst, External Reporting & Accounting. The agreement specified the terms of Mr. Glaspell's employment, including his base salary and his eligibility to participate in certain employee benefit plans in accordance with the generally applicable terms of such plans. Mr. Glaspell's current base salary is CAD$250,000 per annum. For 2011, Mr. Glaspell was also eligible to participate in the Incentive Plan with an annual target of 60% of his base salary, as well as the NSIP. Effective January 1, 2012, Mr. Glaspell's annual target under the Incentive Plan was increased to 75%. Mr. Glaspell is also participating in the Retention Plan, as described below under "Non-Equity Incentive Plan Compensation and Other Bonus Arrangements".

*Mr. Riedel*

NNI originally entered into an employment agreement dated January 27, 2006 with Mr. Riedel in connection with his hiring as Chief Strategy Officer. The agreement specified the terms of Mr. Riedel's employment, including

114

Table of Contents

his base salary, Incentive Plan eligibility, a cash sign-on bonus and primary business office. NNI entered into a new employment agreement dated June 12, 2008 with Mr. Riedel in connection with the change of his primary business office from Toronto, Ontario to Billerica, Massachusetts effective June 23, 2008. His primary business location was changed after considering both the needs of Nortel and Mr. Riedel's personal situation. This agreement updated and replaced the terms and conditions of the letter agreement dated January 27, 2006. All benefits for which Mr. Riedel was eligible as a result of his business office being in Toronto, Ontario, including tax equalization, ceased upon the commencement of his primary business office in Billerica, Massachusetts on June 23, 2008. Under the terms of the agreement, Mr. Riedel was eligible to participate in certain employee benefit plans in accordance with the generally applicable terms of such plans. Mr. Riedel waived any entitlement under the CIC Plan upon becoming eligible to participate in the Key Executive Incentive Plan (the KEIP).

NNI entered into a new employment agreement dated April 29, 2010 with Mr. Riedel in connection with his appointment as Chief Strategy Officer and President, Business Units effective April 12, 2010, subject to U.S. Court approval, which was subsequently obtained on May 3, 2010. This agreement amended, restated and superseded the agreement dated January 27, 2006 and the supplemental agreement dated June 12, 2008. Under the terms of the new agreement, Mr. Riedel's base salary increased to $600,000 per annum effective April 1, 2010 and he continued to participate in the Incentive Plan with an annual target award of 100% of base annual salary. Mr. Riedel was also eligible to receive a special incentive bonus of up to $3.47 million, subject to Mr. Riedel's continued employment with NNI until January 1, 2011 (or such later date as follows). On November 10, 2010, Nortel amended the above described employment agreement with Mr. Riedel dated April 29, 2010, extending his termination date to March 31, 2011. On March 2, 2011, Nortel further amended the above described employment agreement with Mr. Riedel dated April 29, 2010, further extending his termination date to August 31, 2011. Mr. Riedel's eligibility to receive the special incentive bonus was also subject to his achievement of certain performance goals by no later than March 15, 2012. $600,000 of the special incentive bonus was to be earned upon the occurrence of either (i) the closing of a sale of all or substantially all of Nortel's IP assets or (ii) the substantial implementation of an alternative business strategy for monetizing Nortel's IP assets. $2.87 million of the special incentive bonus was to be earned to the extent Nortel realized certain dollar amounts in regard of Nortel's IP assets through the sale and/or monetization process described above with the bonus amount being directly proportionate to the dollar amount realized by Nortel. These performance goals were fully achieved, and Mr. Riedel received payment of the $3.47 million special incentive bonus at the time of his departure from the Company on August 31, 2011. The agreement originally provided that Mr. Riedel's employment with NNI would be terminated by NNI on, but not prior to, January 1, 2011, unless the U.S. Principal Officer, together with the Monitor, in consultation with the U.S. Creditors Committee and the Bondholder Group, elected to continue Mr. Riedel's employment beyond January 1, 2011, in which case Mr. Riedel would be entitled to continue to receive the same base salary and Incentive Plan described above. Mr. Riedel forfeited his right to any benefit pursuant to the Nortel Enhanced Severance Allowance Plan or any other right in connection with a claim for severance upon execution of the agreement. Mr. Riedel remained eligible to participate in certain employee benefit plans in accordance with the generally applicable terms of such plans.

### Mr. Ricaurte

NNI originally entered into an employment agreement dated December 26, 2006 with Mr. Ricaurte in connection with his hiring as Vice President, Financial Planning & Analysis, Global Operations. The agreement specified the terms of Mr. Ricaurte's employment, including his base salary and Incentive Plan eligibility and a cash sign-on bonus and equity grant. Mr. Ricaurte was also eligible to participate in certain employee benefit plans in accordance with the generally applicable terms of such plans. The agreement was modified by further letter agreements dated March 27, 2009 and September 18, 2009, which modified the terms of Mr. Ricaurte's base salary and Incentive Plan participation.

NNI entered into a new employment agreement dated February 1, 2010 with Mr. Ricaurte in connection with his appointment as President, Nortel Business Services effective February 2, 2010, which agreement was approved by the U.S. Court on March 4, 2010. This agreement amended, restated and superseded the employment agreement dated December 26, 2006 and supplement agreements dated March 27, 2009 and September 18, 2009. In connection with the new agreement, Mr. Ricaurte's salary increased to $600,000 per annum effective February 1, 2010 and he continued to participate in the Incentive Plan with an annual target of 100% of his base salary. Mr. Ricaurte was also eligible for a special incentive arrangement as follows: (a) subject to his continued employment until December 31, 2011, a performance incentive of $1,675,000 upon achievement of target level performance objectives as determined

115

Table of Contents

by the U.S. Principal Officer of NNI (described in more detail below), eligible to be earned in two parts as follows: (i) for the period January 1, 2010 to December 31, 2010, $837,500, at target; and (ii) for the period January 1, 2011 to December 31, 2011, up to $837,500 at target (such amounts to be paid no later than March 15, 2012); and (b) an amount of $825,000 to be earned in two parts as follows: (i) subject to continued employment until December 31, 2010, $206,250 (to be paid no later than March 15, 2011); and (ii) subject to continued employment until December 31, 2011, $618,750 (to be paid no later than March 15, 2012).

Mr. Ricaurte's performance objectives determined by the U.S. Principal Officer of NNI were similar to those used under the NSIP, in order to align Mr. Ricaurte's objectives with those of other NBS employees participating in the NSIP. The metrics applicable to Mr. Ricaurte for 2011 were as follows: (1) 2011 Full Year NBS Net Cash/Cost defined as Global net Transition Services Agreement (TSA) income statement (P&L), less: (i) non-cash items (ie. depreciation), and (ii) Real Estate sub-leases, (2) NBS Bad Debt to Sales defined as Percentage of uncollectable buyer service sales (aggregate of January 1, 2011 Accounts Receivable plus 2011 Service Billings) through the end of the transition service period, excluding Real Estate, and (3) Service Level Agreement Contract Penalties on TSAs, defined as the number of times a Contract Penalty occurs over 2011. The weighting of these metrics applicable to the achievement of Mr. Ricaurte's performance was 40%, 40% and 20% respectively for metrics 1, 2 and 3. However, due to Mr. Ricaurte's departure from the Company effective September 30, 2011, at the time of his departure and pursuant to the terms of his special incentive arrangement, he received an accelerated payment of $2,500,000 reduced by all amounts of the special incentive arrangement previously paid to him.

While employed by the Company, Mr. Ricaurte remained eligible to participate in certain employee benefit plans in accordance with the generally applicable terms of such plans. In addition, at the end of his employment, he was to receive assistance with the sale of his home in Raleigh, NC and Mr. Ricaurte was eligible for Nortel's Guaranteed Home Sale Provision as well as Home Equity Loss Protection offered to certain employees (unless he resigned or was otherwise reimbursed for similar amounts by his new employer). These benefits include assistance to market and sell Mr. Ricaurte's home to a qualified buyer within a specified time period, including real estate commissions, attorney's fees, inspection fees and other standard home sale expenses incurred. If a qualified buyer is not identified within the specified marketing period, NNI will establish a guaranteed price offer to purchase Mr. Ricaurte's home, based on independent market appraisals. If the guaranteed price offer is less than the original purchase price of the property, NNI, through the Home Equity Loss Protection program, will guarantee Mr. Ricaurte a maximum of up to the lower of: (i) 10% of the original purchase price of the property, or (ii) $50,000.

**Non-Equity Incentive Plan Compensation and Other Bonus Arrangements**

*Annual Incentive Plan*

The Nortel Networks Limited Annual Incentive Plan (the Incentive Plan) is a short-term, incentive bonus plan that provides the potential for eligible employees to receive cash awards based on their contributions to the success of the relevant "Business Unit" of the Company, conditione on the relevant Business Unit meeting its objectives. The Incentive Plan's terms vary for different employee groups and geographic locations within Nortel. For employees in the IP Business Unit and employees in Asia Region (which does not include any of the named executive officers), Incentive Plan award determinations and payouts are made on a quarterly basis. For other Nortel employees, award determinations and payouts for senior management are made on an annual basis and for all other eligible employees the award determinations and payouts are made on a semi-annual basis, with 50% of any approved first half payment held back from payment until after the second half is evaluated. Each of the named executive officers participated in the Incentive Plan on the terms described below. During 2011, the Nortel Boards approved a change in the Incentive Plan's participation structure such that participants were no longer grouped by business unit and were instead grouped by geographic location. Due to structural changes within Nortel over the course of 2011, the Nortel Boards felt that the metrics to be used for measuring performance under the Incentive Plan were best delineated based on geographic location rather than business unit.

Prior to his departure, Mr. Ricaurte was eligible to participate in the Incentive Plan for NBS for the first half 2011 and the US for the second half 2011. Prior to his departure, Mr. Riedel was eligible to participate in the Incentive Plan for Corporate Group for the first half 2011 and the US for the second half 2011. Mr. Bifield was eligible to participate in the Incentive Plan for NBS for the first half 2011 and Canada for the second half 2011. Mr. Glaspell was eligible to participate in the Incentive Plan for Corporate Group for the first half 2011 and Canada for the second half 2011.

116

Table of Contents

Messrs. Ricaurte, Riedel and Bifield received award determination and payout on an annual basis. The amount of their annual cash bonus awards under the Incentive Plan was determined by the following formula:

| Annual Base Salary | X | Target % for each named executive officer | X | Blended Applicable 1H2011 and 2H2011 Business Unit Performance Factors (Board discretion to adjust upward/downward) |
|---|---|---|---|---|

Messrs. Ricaurte and Riedel each had a target percentage for 2011 of 100%. Mr. Bifield had a target percentage for 2011 of 80%.

Mr. Glaspell received award determination and payout on a semi-annual basis. The amount of his cash bonus award under the Incentive Plan was determined by the following formula:

| 50% of Annual Base Salary | X | Target % | X | Business Unit Performance Factor for First Half or Second Half, as Applicable |
|---|---|---|---|---|

Mr. Glaspell had a target percentage for 2011 of 60%.

On March 3, 2011, the Nortel Boards approved a mix of financial and operational metrics for the first half of 2011 under the Incentive Plan for NBS and Corporate Group business units. With respect to the Corporate Group, the metrics included cash, cost management and numerous asset management and corporate operational milestones. With respect to NBS, the metrics included NBS net cash, Average Days Sales Outstanding, and numerous operational milestones. On August 9, 2011, the Nortel Boards approved a mix of financial and operational metrics for the second half of 2011 under the Incentive Plan for the Canada/CALA business unit. With respect to the Canada/CALA business unit, the metrics included cash, cost management and numerous asset management and operational milestones. On August 3, 2011, NNI approved the metrics for the second half of 2011 for the US business unit. With respect to the US business unit, the second half metrics included numerous operational milestones including resolution of supplier contract exposure, disposition of leave behind inventory, data retention and others.

Further, during 2011, the Nortel Boards approved a mix of financial and non-financial metrics on a quarterly basis for employees in the IP Business Unit and employees in Asia Region.

On August 9, 2011, the Nortel Boards approved the first half performance factors. For the first half of 2011, based on performance relative to the metrics described above, the NBS performance factor was 137% and the Corporate Group performance factor was 111%. On March 7, 2012, the Nortel Boards approved the second half performance factor for Canada/CALA of 112.7%. On January 31, 2012, NNI approved the second half performance factor for the US of 150%. Mr. Ricaurte's performance factor was based on an average of the NBS and US performance factors and payout was prorated for 9 months, while Mr. Riedel's performance factor was based on an average of the Corporate Group and US performance factors and payout was prorated for 8 months. Mr. Bifield's performance factor was based on an average of the NBS and Canada/CALA performance factors. Mr. Glaspell's performance factor was 111% for the first half and 112.7% for the second half. Therefore, on January 31, 2012, NNI approved Mr. Ricaurte's blended performance factor of 143.5% and Mr. Riedel's blended performance factor of 130.5%. On March 7, 2012, the Nortel Boards approved Mr. Bifield's blended performance factor of 124.85%, and Mr. Glaspell's semi-annual performance factor of 112.7%. Messrs. Ricaurte, Riedel, Bifield and Glaspell will receive payment of their 2011 awards under the Incentive Plan as soon as practicable following NNI's and the Nortel Boards' approval of the applicable performance factors, in accordance with plan terms.

*Nortel Special Incentive Plan*

On March 4, 2010, we obtained U.S. Court approval and on March 8, 2010 we obtained Canadian Court approval of the Nortel Special Incentive Plan (the NSIP). The NSIP was developed by Nortel (excluding the EMEA Debtors) in conjunction with Mercer as well as a number of its significant stakeholders. The NSIP was designed to provide cash incentive payments to certain employees (other than those domiciled in EMEA or employed by the Company's joint ventures) holding positions with NBS or Corporate Group to encourage the achievement of certain performance targets and other business goals important to Nortel, including the successful conclusion of the CCAA

117

Table of Contents

Proceedings and the Chapter 11 Proceedings, the compliance with Nortel's obligations under various transaction agreements and the wind down of various Nortel entities. Mr. Glaspell is the only named executive officer who was a participant in the NSIP.

As a participant in the NSIP, Mr. Glaspell is eligible for a time-based completion payment of CAD$200,000 with respect to each of calendar years 2010 and 2011. According to the terms of the plan, 50% of the 2010 completion payment, in the amount of CAD$100,000 was paid on March 25, 2011. The remaining 50% of the 2010 completion payment and 100% of the 2011 completion payment will be paid to Mr. Glaspell in a lump sum cash payment as soon as practicable following March 1, 2012, but in no event later than April 30, 2012, subject to his continued employment through such payment date. In the event that Mr. Glaspell's employment is terminated other than for cause or due to his death prior to the applicable payment date, Mr. Glaspell would receive an accelerated payment of any then-unpaid NSIP award.

### Nortel 2012 Retention Plan

In connection with the conclusion of the final NSIP performance period at the end of 2011, we obtained Canadian Court approval of the Nortel 2012 Retention Plan (the Retention Plan) on December 14, 2011. The Retention Plan was designed to provide cash incentive payments to certain employees of NNL and its subsidiaries and affiliates to encourage the achievement of certain business goals important to Nortel and its stakeholders, including (1) general ongoing compliance, (2) wind down of various Nortel entities during the 2012 calendar year, and (3) a conclusion of the CCAA proceedings. Both Messrs. Bifield and Glaspell participate in the Retention Plan.

According to the terms of the Retention Plan, Messrs. Bifield and Glaspell are eligible to receive an award payment of CAD$800,000 and CAD$200,000, respectively, upon their ultimate termination of employment with Nortel (unless such termination is due to a termination for cause or voluntary resignation for any reason). The plan provides for the possibility of both downward and upward adjustments to the payment amount based on when the named executive officer's termination date ultimately occurs; provided, however, that, unless otherwise forfeited (e.g., as the result of a termination for cause or voluntary resignation for any reason), Messrs. Bifield's and Glaspell's Retention Plan awards will not be less than CAD$533,333 and CAD$133,333, respectively.

### Outstanding Equity Awards at End of Fiscal Year 2011 and Option Exercises and Stock Vested in Fiscal Year 2011

Under the equity termination order dated February 27, 2009, our equity-based compensation plans (the 2005 SIP, the 1986 Plan and the 2000 Plan) and the equity plans assumed in prior acquisitions, including all outstanding equity under these plans (stock options, SARs, RSUs and PSUs), whether vested or unvested, have been terminated.

### Pension Benefits for Fiscal Year 2011

For information on obligations under the Company's U.S. and Canadian pension plans, see the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section of this report and note 11, "Employee benefit plans" of the accompanying audited consolidated financial statements.

### Nortel Networks UK Pension Plan

The Nortel Networks UK Pension Plan, which was closed to new participants effective June 1, 2000, is a defined benefit pension plan for UK employees and executives. Mr. Bifield is a member of the Nortel Networks UK Pension Plan.

The Nortel Networks UK Pension Plan is set up under a Trust Deed and Rules, and provides benefits in accordance with these rules from a separate fund of assets managed by the Trustee.

The Nortel Networks UK Pension Plan provides defined benefits which are linked to a member's service and average pensionable pay in the final years of service prior to retirement or earlier leaving service. Pensionable pay is usually determined by reference to a participant's base salary. Normal retirement age for drawing pension benefits is age 65, and an early retirement reduction applies for retirement before age 60. The member has the option to convert part of the pension benefit at retirement for a UK tax free cash sum. Benefits are also provided to a member's spouse and eligible dependants following a member's death.

118

Table of Contents

On January 14, 2009, as a result of the UK Administration Proceedings, the Nortel Networks UK Pension Plan entered the Pension Protection Fund (PPF) assessment process and all further service cost accruals and contributions ceased. Benefits will therefore be impacted as a result of the Plan entering the PPF process. Employees who were enrolled in the Nortel Networks UK Pension Plan were given the option of participating in the UK defined contribution scheme. Mr. Bifield accepted that option.

**Potential Payments upon Termination or Change in Control**

*Termination of CIC Plan and Equity Compensation Plans*

The Canadian Court in the CCAA Proceedings granted an order for the termination of the CIC Plan on March 20, 2009. We had established the CIC Plan to provide certain arrangements, including cash payments, accelerated vesting of equity awards, and continuation of health and other benefits, for certain executives whose employment with Nortel was terminated as a result of change in control. In order to reinforce and encourage the continued attention and commitment of executives under potentially disruptive business circumstances, the CIC Plan provided the arrangements noted above to certain executives where both of the following conditions were met: (i) a change in control of NNC; and (ii) the participant's employment has been terminated or his or her roles and responsibilities have been substantially altered.

Notwithstanding the termination of the CIC Plan, all our named executive officers were required to waive any entitlement to any claim they may have had under the CIC Plan before they became eligible to participate in the KEIP. Additionally, as noted above, our equity-based compensation plans were terminated on February 27, 2009. Therefore, none of our named executive officers is currently eligible for any payment as a result of a change in control.

*Employment Agreements and Enhanced Severance Allowance Plan (ESAP)*

While Nortel's obligations arising under the Nortel Networks Enhanced Severance Allowance Plan (the ESAP) will continue to be considered in the context of the Creditor Protection Proceedings, currently Nortel is not making payments or benefits under this plan.

The ESAP provides for a select group of management and highly compensated employees of NNI or any other U.S. subsidiary or U.S. affiliate of Nortel to receive severance benefits upon the termination of their employment. Employees with at least three months of service and at the vice-president level or above as of the date of termination, are eligible to receive benefits if their employment is terminated:

· involuntarily for any reason other than for conduct that was not in the best interests of the company or for failure to submit to or to pass a background check required by a customer

· by voluntary resignation in direct response to a reclassification of his or her current position, unless the employee is offered and voluntarily accepts a different position with the company or a subsidiary or is offered and refuses a comparable position

· as part of a reduction in workforce, other than where the employee is offered and accepts another position with the company or an affiliate, or where the employee is offered and refuses a comparable position

Severance benefits under the ESAP are not available to employees who are transferred to new entities as part of a divestiture or spin-off of a business, or to employees who are eligible for severance benefits under other Nortel severance plans or individual written agreements. Under the ESAP, qualified participants receive a severance allowance of at least twelve months' base monthly salary (in each case offset by any statutorily required payments), distributed in bi-weekly payments over the duration of the severance allowance period, commencing after termination of employment. Additional severance allowance payments may be paid at the sole discretion of Nortel. The employee is also eligible to continue his or her coverage under the group term life insurance, accidental death and dismemberment insurance, FLEX benefits, and health insurance, all at the contribution rate of active employees.

In order to receive the severance benefits, unless otherwise waived by NNI or Nortel, as applicable, the employee must execute a release of all claims against the company related to his or her employment, and must agree to comply with certain restrictive covenants. If the employee is subsequently reemployed by NNI or Nortel while receiving severance benefits, any remaining unpaid benefits cease.

119

Table of Contents

Mr. Ricaurte was eligible to participate in the ESAP. Any future termination of a named executive officer during the Creditor Protection Proceedings will be dealt with in the course of those proceedings.

### Mr. Bifield

In the event that Mr. Bifield's employment had terminated in 2011, Mr. Bifield was eligible to receive certain benefits pursuant to his employment agreement upon a termination of employment not for cause or due to death or disability. If such a termination had occurred in 2011, Mr. Bifield would have been eligible to receive an accelerated payment in respect of the special incentive arrangement in the amount of CAD$1,600,000 reduced by all amounts of the special incentive arrangement previously paid to him. Effective as of January 1, 2012, Mr. Bifield is also eligible to receive payment upon any termination of employment (other than for cause or due to his voluntary resignation) pursuant to the terms of his Retention Plan award, as described above under "Non-Equity Incentive Plan Compensation and Other Bonus Arrangements – 2012 Retention Plan."

In addition, pursuant to the terms of the Incentive Plan, in the event that Mr. Bifield's employment was terminated without cause or due to death or disability, he would be eligible to receive an award at the same time as all other participants in the Incentive Plan who receive payouts on an annual basis, prorated based on the amount of time worked in the year in which the termination occurred.

### Mr. Glaspell

Mr. Glaspell is eligible to receive certain accelerated payments under the NSIP upon his termination of employment other than for cause or due to his death, as described above under "Non-Equity Incentive Plan Compensation and Other Bonus Arrangements – Nortel Special Incentive Plan." Effective as of January 1, 2012, Mr. Glaspell is also eligible to receive payment upon any termination of employment (other than for cause or due to his voluntary resignation) pursuant to the terms of his Retention Plan award, as described above under "Non-Equity Incentive Plan Compensation and Other Bonus Arrangements – 2012 Retention Plan."

In addition, pursuant to the terms of the Incentive Plan, in the event that Mr. Glaspell's employment had been terminated without cause or due to death or disability during 2011, he would have been eligible to receive payment of one or more Incentive Plan awards in the same manner as other Incentive Plan participants who received award determinations and payout on a semi-annual basis. Therefore, if Mr. Glaspell's employment had been terminated without cause or due to death or disability during the first half of 2011, he would have received full payment of his Incentive Plan award with respect to such first half (but no payment in respect of the second half of 2011). If Mr. Glaspell's employment had been terminated without cause or due to death or disability during the second half of 2011, he would have received full payment of his Incentive Plan award with respect to such second half (in addition to any payment made in respect of the first half of 2011).

### Mr. Riedel

Mr. Riedel did not receive any payments in connection with his termination of employment with the Company other than payment for accrued and unused vacation in accordance with Company-wide policy and payment in respect of his annual award under the Incentive Plan in accordance with the terms of the Incentive Plan. This Incentive Plan award is payable at the same time as all other participants in the Incentive Plan who receive payouts on an annual basis and prorated based on the amount of time worked in the year in which the termination occurred.

### Mr. Ricaurte

As noted above, Mr. Ricaurte was eligible to participate in the ESAP. Therefore, upon his termination of employment, Mr. Ricaurte was eligible to receive the equivalent of no less than 12 months' base salary paid bi-weekly and the opportunity to continue health, life insurance and AD&D benefits coverage in which he is enrolled for 12 months following employment termination, at active employee rates, conditional upon Mr. Ricaurte's execution of a separation agreement, which he did not execute at the time of his termination. However, while NNI's obligations arising under the ESAP will continue to be considered in the context of Creditor Protection Proceedings, currently NNI is not making payments or benefits under this plan and did not make any payments to Mr. Ricaurte pursuant thereto.

120

Table of Contents

Additionally, as noted above, Mr. Ricaurte became eligible for certain payments and benefits pursuant to his employment agreement upon his termination of employment, including in respect of his special incentive arrangement, an accelerated payment of $2,500,000 reduced by all amounts of the special incentive arrangement previously paid to him. In addition, Mr. Ricaurte is eligible to receive assistance with the sale of his home in Raleigh, NC and for Nortel's Guaranteed Home Sale Provision as well as Home Equity Loss Protection offered to certain employees (unless he is otherwise reimbursed for similar amounts by his new employer).

Upon his termination of employment, Mr. Ricaurte also received payment for accrued and unused vacation in accordance with Company-wide policy and payment in respect of his annual award under the Incentive Plan in accordance with the terms of the Incentive Plan. This Incentive Plan award is payable at the same time as all other participants in the Incentive Plan who receive payouts on an annual basis and prorated based on the amount of time worked in the year in which the termination occurred.

## Director Compensation for Fiscal Year 2011

The following table sets forth information regarding the compensation of each non-employee director of NNC and NNL for the fiscal year ended December 31, 2011.

| Name | Fees Earned or Paid in Cash ($)(1)(2) | Nonqualified Deferred Compensation Earnings[4] ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|
| J.H. Bennett[1] | 225,000 | — | — | 225,000 |
| G.R. Cote[2] | 240,000 | — | — | 240,000 |
| D.I. Richardson[3] | 325,000 | — | — | 325,000 |

(1)    Mrs. Bennett became a member of the Audit Committees effective January 29, 2009.
(2)    Mr. Cote was appointed to the Nortel Boards and appointed Chair of the Audit Committees effective September 27, 2010.
(3)    Mr. Richardson was appointed to the Nortel Boards effective March 27, 2009. He was appointed Chair of the Nortel Boards and appointed a member of the Audit Committees effective August 11, 2009.
(4)    Prior to the commencement of the Creditor Protection Proceedings, each non-employee director of NNC and NNL had the right to elect to receive all or a portion of compensation for services rendered as a member of the Nortel Boards, any Committees thereof, and as Board or Committee chair, in the form of share units, in cash or in a combination of share units and cash, under the Nortel Networks Corporation Directors' Deferred Share Compensation Plan and the Nortel Networks Limited Directors' Deferred Share Compensation Plan (DSC Plans). On the January 14, 2009 Petition Date, the Canadian Court in the CCAA Proceedings granted an order providing that, during the period in which the directors continue as directors in the CCAA Proceedings, they are entitled to receive remuneration in cash on a current basis at compensation levels then in effect, less an overall $25,000 reduction notwithstanding any outstanding elections to be paid in the form of share units made under the DSC Plans. Without this Court order, to the extent that they had elected to receive their compensation in the form of share units, the directors would have received no compensation for their services on a go-forward basis. In connection with the reduction in the size of the Nortel Boards from nine directors to three directors and the assumption by the Nortel Boards of additional roles and responsibilities previously discharged by certain committees thereof, the Nortel Boards amended the terms for director compensation effective August 11, 2009. For a summary of the applicable director fees during 2011, see "Annual Director Fees" below in this section of this report.

Prior to the commencement of the Creditor Protection Proceedings, share units were credited on a quarterly basis, and the number of share units received was equal to the amount of fees expressed in U.S. Dollars, converted to Canadian Dollars, divided by the market value expressed in Canadian Dollars (as determined in accordance with the DSC Plans) of NNC common shares on the last trading day of each quarter. Generally, share units were settled through open market purchases (net of taxes) on the fourth trading day following the release of Nortel's financial results after the director ceased to be a member of the applicable Board, and each share unit entitled the holder to receive one NNC common share. Prior to the commencement of the Creditor Protection Proceedings, the directors who served during 2011 had made the following elections:

| Director | Election — Board, Committee and Chair Fees | Election – Long- Term Incentive Fees |
|---|---|---|
| J.H. Bennett | 100% share units | 100% share units |

The following table sets forth the total number of share units (rounded down to the nearest whole number) currently held under the DSC Plans. On June 19, 2009, Nortel announced it did not expect that the holders of NNC common shares and NNL preferred shares would receive any value from the Creditor Protection Proceedings and that the proceedings would ultimately result in the cancellation of these equity interests. Since the Petition Date, share units

121

Table of Contents

credited under the DSC Plans have not been settled even though several directors have retired from the Nortel Boards. Nortel does not expect to settle any share units held under the DSC Plans in the future. Directors may have an unsecured claim in the CCAA Proceedings with respect to their share unit holdings.

| Director | Total Number of Share Units Held (#) |
|---|---|
| J.H. Bennett | 261,101 |
| G.R. Cote | — |
| D.I. Richardson | — |

### Annual Director Fees

On the Petition Date, upon the request of the Nortel Boards, the Canadian Court granted an order reducing overall director compensation by $25,000. As a result, the Nortel Boards' annual retainer fee of $50,000 and annual long-term incentive fee of $125,000 were converted to an annual cash retainer of $150,000 (paid on a quarterly basis in arrears). In recognition of the Creditor Protection Proceedings and the continued focus on cost reduction, Mr. Pearce, then Chair of the Nortel Boards, and Mr. MacNaughton, then Chair of the Audit Committees, voluntarily decreased the amount of the Board chair and Audit Committee chair fees, respectively. Effective the Petition Date, the annual fee for the non-executive chair of the Nortel Boards was reduced from an aggregate of $360,000 to $150,000 and the annual retainer for chairing the Audit Committees of NNC and NNL was reduced from an aggregate of $35,000 to $15,000 (to be the same as other Committee chair fees).

Effective August 11, 2009, annual director compensation was further modified to reflect circumstances surrounding the Creditor Protection Proceedings, changes in organization structure as the company works towards the completion of the sales of its businesses and other restructuring activities. Also taken into account were the reduction in size of Nortel Boards from nine directors to three, and the assumption by the Nortel Boards of additional roles and responsibilities previously discharged by certain Committees thereof. See "Corporate Governance" above in the "Directors, Executive Officers and Corporate Governance" section of this report. Directors of the Nortel Boards, and Chairs of the Nortel Boards and of the Audit Committees are now paid in advance on a pro-rata basis, in Canadian dollars rather than US dollars, based on an exchange rate of S$1.00 = Cdn$1.1853, which rate was set on August 11, 2009 based on the average of month end foreign exchange rates over an eight month period ending July 31, 2009, as follows:

| Annual Cash Retainer* | US$ | CAD$ |
|---|---|---|
| Directors | 225,000 | 266,693 |
| Board Chair | 100,000 | 118,530 |
| Audit Committee Chair | 15,000 | 17,780 |

\* These amounts reflect total annual amounts for service to both of the Nortel Boards and their respective Audit Committees. For example, the Chair of the Audit Committees of both NNC and NNL earns a total annual fee of US$15,000 for service to both companies, rather than US$30,000 for such service. Consistent with historical practice, director compensation was paid for 2011 on an annual fee basis and additional fees were not paid for board or committee meeting attendance.

Directors are also reimbursed for reasonable travel and living expenses properly incurred by them in attending any meetings of the Nortel Boards or the Audit Committees or for performing services as directors.

### Indemnification

Pursuant to indemnification agreements entered into between NNC, NNL and each non-employee director, Nortel has agreed to indemnify and reimburse each director for all injury, liability, loss, damage, charge, cost, expense, fine or settlement amount reasonably incurred by such director, including reasonable legal and other professional fees:

- in connection with a claim, action, suit, application, litigation, charge, complaint, prosecution, assessment, reassessment, investigation, inquiry, hearing or other proceeding of any nature or kind whatsoever, whether civil, criminal, administrative or otherwise, made, asserted against or affecting such director or in which such director is required by law to participate or in which such director

122

Table of Contents

participates at the request of Nortel or in which such director chooses to participate, if it relates to, arises from, or is based on such individual's service as a director or officer of Nortel or service as a director or officer of another entity at the request of Nortel; or

• otherwise related to, arising from or based on such individual's service as a director or officer of Nortel or service as a director or officer of another entity at the request of Nortel,

except if such indemnification or reimbursement would be prohibited by the CBCA or otherwise by law.

The Initial Order in the CCAA Proceedings ordered the Canadian Debtors to indemnify directors and officers of the Canadian Debtors for claims that may be made against them relating to failure of the Canadian Debtors to comply with certain statutory payment and remittance obligations. The Initial Order also included a charge against the property of the Canadian Debtors in an aggregate amount not exceeding CAD$90 million as security for such indemnification obligations. On February 26, 2010, the Nortel Boards approved the reduction in the amount of the charge to an aggregate amount not exceeding CAD$45 million on the condition that such reduction shall have been approved by an order of the Canadian Court which order shall provide for certain related releases in respect of such claims. The reduction in the amount of the charge was approved by the Canadian Court on March 31, 2010.

In addition, in conjunction with the Creditor Protection Proceedings, NNC established the D&O Trust in the amount of approximately CAD$12 million. The purpose of the D&O Trust is to provide a trust fund for the payment of liability claims (including defense costs) that may be asserted against individuals who serve as directors and officers of NNC, or as directors and officers of other entities at NNC's request (such as subsidiaries and joint venture entities), by reason of that association with NNC or other entity, to the extent that such claims are not paid or satisfied out of insurance maintained by NNC, and NNC is unable to indemnify the individual. Such liability claims would include claims for unpaid statutory payment or remittance obligations of NNC or such other entities for which such directors and officers have personal statutory liability, but will not include claims for which NNC is prohibited by applicable law from providing indemnification to such directors or officers. The D&O Trust also may be drawn upon to maintain directors' and officers' insurance coverage in the event NNC fails or refuses to do so. The D&O Trust will remain in place until the later of December 31, 2015 or three years after all known actual or potential claims have been satisfied or resolved, at which time any remaining trust funds will revert to NNC.

Certain Nortel entities have not filed for bankruptcy protection (Cascade Subsidiaries). Under the laws of various jurisdictions in which the Cascade Subsidiaries operate, the directors, officers and agents of the Cascade Subsidiaries may be subject to personal liability. In order to protect individuals serving as directors on the boards of the Cascade Subsidiaries and to facilitate participation by the Cascade Subsidiaries in our sales of businesses and assets, NNL and NNI have contributed to a trust (Trust), which will indemnify individuals serving as directors on the boards and as officers or agents of the Cascade Subsidiaries and their successors, if any, for any claims resulting from their service as a director, officer or agent of Cascade Subsidiary, subject to limited exceptions. The Trust was approved by the Canadian Court and the U.S. Court on March 31, 2010.

**Compensation Committee Interlocks and Insider Participation**

As described above under "Nortel Boards", the CHRC was dissolved on August 10, 2009 and the Nortel Boards assumed responsibility for matters previously overseen by it. The current directors of the Nortel Boards and changes to the Nortel Boards that occurred in 2010 are described above under "Nortel Boards" in the "Directors, Executive Officers and Corporate Governance" section of this report. No member of the Nortel Boards was an officer (within the meaning of applicable U.S. securities laws) or employee of Nortel, any U.S. Subsidiary, any EMEA Subsidiary, or any other Nortel subsidiary at any time during 2011.

No executive officer of NNC or NNL serves on the board of directors or compensation committee of any other entity that has or has had one or more of its executive officers serving as a member of the Nortel Boards.

123

Table of Contents

ITEM 12.    Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters

### Equity-Based Compensation Plans

Under the equity termination order dated February 27, 2009, our equity-based compensation plans (the 2005 SIP, the 1986 Plan and the 2000 Plan) and the equity plans assumed in prior acquisitions, including all outstanding equity under these plans (stock options, SARs, RSUs and PSUs), whether vested or unvested, have been terminated.

### Security Ownership of Directors and Management

The following table shows the number of NNC common shares beneficially owned as of February 29, 2012 by each of Nortel's directors and the individuals named as named executive officers in the "Executive and Director Compensation" section of this report, as well as by the directors and executive officers as a group. No director or executive officer has pledged any of his or her NNC common shares as security.

A person is deemed to be a beneficial owner of a common share if that person has, or shares, the power to direct the vote or investment of that common share. Under applicable U.S. securities laws, a person is also deemed to be a beneficial owner of a common share if such person has the right to acquire the share within 60 days (whether or not, in the case of a stock option, the current market price of the underlying common share is below the stock option exercise price). More than one person may be deemed a beneficial owner of a common share and a person need not have an economic interest in a share to be deemed a beneficial owner. Under the equity termination order dated February 27, 2009, our equity-based compensation plans (the 2005 SIP, the 1986 Plan and the 2000 Plan) and the equity plans assumed in prior acquisitions, including all outstanding equity under these plans (stock options, SARs, RSUs and PSUs), whether vested or unvested, have been terminated. As a result, the individuals named in the following table are not beneficial owners of any stock options or RSUs that would have become exercisable or would vest, respectively, within 60 days after February 29, 2012.

Share units, as referenced in the table below, represent share units issued under the DSC Plans. Each share unit represents the right to receive one NNC common share and is not considered beneficially owned under applicable U.S. securities laws. Since the Petition Date, share units credited under the DSC Plans have not been settled even though several directors have retired from the Nortel Boards. Nortel does not expect to settle any share units held under the DSC Plans in the future. The DSC Plans are described under "Director Compensation for Fiscal Year 2010" under the "Executive and Director Compensation" section of this report.

| Name of Beneficial Owner | Title of Class of Security | Amount and Nature of Beneficial Ownership (#) [1] |
|---|---|---|
| J.H. Bennett | NNC common shares | — |
|  | Share units | 261,101 |
| G.R. Cote | NNC common shares | — |
|  | Share units | — |
| D.I. Richardson | NNC common shares | — |
|  | Share units | — |
| A. Bifield | NNC common shares | 3,300 |
| C.E. Glaspell | NNC common shares | — |
| G.A. Riedel | NNC common shares | 44,135 [2] |
| C.S. Ricaurte | NNC common shares | 2,418 [2] |
| Directors and named executive officers as a group (consisting of 7 persons) | NNC common shares | 49,853 |
|  | Share units | 261,101 |

(1)   Each person has sole investment and voting power with respect to the NNC common shares beneficially owned by such person. As of February 29, 2012, each director and named executive officer individually, and the directors and executive officers as a group, beneficially owned less than 1.0% of the outstanding NNC common shares.

(2)   The above information is based solely on Nortel's records as of the cessation of Mr. Riedel's and Mr Ricaurte's employment with NNI, on August 31, 2011 and September 30, 2011, respectively.

Table of Contents

**Voting Shares**

On February 29, 2012, 498,206,366 common shares were issued and outstanding. Each common share entitles its holder to one vote. Based on public filings with the SEC, we are not aware of any person or company who, directly or indirectly, beneficially owns or has control or direction over more than 5% of NNC common shares.

**ITEM 13.    Certain Relationships and Related Transactions, and Board Independence**

**Transactions with Related Persons**

On January 19, 2007, the CHRC adopted a written policy regarding related party transactions and related procedures. Since the dissolution of the CHRC, this responsibility has been undertaken by the Nortel Boards. The related party policy imposes a duty on directors and senior executives of Nortel to disclose any interests they or their related parties have in certain interested transactions. The term "senior executives" as used in the policy means Board-appointed officers. The compliance committee, comprised of members of management, reviews all material facts of all interested transactions and approves or disapproves of the entry into such transactions (except transactions where the related party is a director). The compliance committee reports quarterly to the Audit Committees and the Nortel Boards on such approvals and disapprovals, if any. Interested transactions involving directors are reviewed by the Audit Committees. The related party policy contains standing approval for a list of certain transactions, which can be revised by the Audit Committees at any time. Violations of the related party policy can lead to disciplinary action up to and including termination of employment.

**Board Independence**

For a discussion of the independence of the members of the Nortel Boards and the Audit Committees, see "Nortel Boards" in the "Directors, Executive Officers and Corporate Governance" section of this report.

**ITEM 14.    Principal Accountant Fees and Services[1]**

KPMG LLP (KPMG) was appointed as the independent public accountants for NNC and NNL commencing with fiscal year 2007.

In accordance with applicable laws and the requirements of stock exchanges and securities regulatory authorities, the Audit Committees of NNC and NNL must pre-approve all audit and not-audit services to be provided by the independent auditors.

**Audit Fees**

NNC and NNL prepare consolidated financial statements in accordance with U.S. GAAP. KPMG billed NNC and its subsidiaries $3.4 million and $6.7 million for the following audit services related to fiscal year 2011 and 2010, respectively: (i) the audits of the annual consolidated financial statements of NNC and of NNL; (ii) reviews of the interim condensed consolidated financial statements of NNC and of NNL on Forms 10-Q; and (iii) audit and assurance services that are normally provided by the auditor in connection with statutory requirements and regulatory filings involving individual subsidiaries and other investments.

**Audit-Related Fees**

KPMG billed NNC and its subsidiaries $0.2 million and $6.2 million for the following audit-related services related to fiscal year 2011 and 2010, respectively: (i) audit of pension plan financial statements; (ii) audits of special purpose financial statements of businesses as required pursuant to purchase and sale agreements; (iii) assurance reports related to internal controls; and (iv) other regulatory and assurance services.

---

[1] Note that the fees disclosed above are exclusive of any fees billed for services provided after the dates of deconsolidation of Nortel's EMEA Subsidiaries and U.S. Subsidiaries, beginning on June 1, 2010 and October 1, 2010, respectively.

Table of Contents

**Tax Fees**

KPMG billed NNC and its subsidiaries nil and $0.4 million for tax compliance and advisory services related to fiscal year 2011 and 2010, respectively. Tax compliance services are services rendered based upon facts already in existence or transactions that have already occurred, to document, compute and obtain government approval for amounts to be included in tax filings. Such services consisted of the following in fiscal year 2011 and 2010: (i) transfer pricing documentation and analysis; (ii) requests for technical advice in respect of matters involving taxation authorities; (iii) assistance with the preparation of various value-added tax filings; and (iv) assistance with other subsidiary tax matters.

**All Other Fees**

KPMG billed NNC $0.05 million for advisory services related to the review of information technology vendor requirements in fiscal 2011. KPMG did not provide NNC and its subsidiaries any other services in 2011 or 2010.

126

Table of Contents

## PART IV

Capitalized terms used in this Part IV and not otherwise defined, have the meaning set forth for such terms in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section of this report.

ITEM 15.    **Exhibits and Financial Statement Schedules**

*1. Financial Statements*

The index to the Consolidated Financial Statements appears on page 49.

*2. Financial Statement Schedules*

All other schedules are omitted because they are inapplicable or not required.

Page

*3. Other Documents Filed as a Part of This Report*

Management's Report on Internal Control over Financial Reporting                    106

127

Table of Contents

*4. Exhibit Index*

Pursuant to the rules and regulations of the SEC, Nortel has filed certain agreements as exhibits to this report. These agreements may contain representations and warranties by the parties. These representations and warranties have been made solely for the benefit of the other party or parties to such agreements and (i) may have been qualified by disclosures made to such other party or parties, (ii) were made only as of the date of such agreements or such other date(s) as may be specified in such agreements and are subject to more recent developments, which may not be fully reflected in Nortel's public disclosure, (iii) may reflect the allocation of risk among the parties to such agreements and (iv) may apply materiality standards different from what may be viewed as material to investors. Accordingly, these representations and warranties may not describe Nortel's actual state of affairs at the date hereof and should not be relied upon.

The items listed as Exhibits 10.1 to 10.16, 10.19, 10.25 to 10.33, 10.35, 10.36, 10.38 to 10.43, 10.51 to 10.53, 10.56 to 10.61, 10.64 to 10.71, 10.73 to 10.77, 10.81 to 10.89, 10.103, 10.112 to 10.115, 10.119, 10.123 to 10.125, 10.129 to 10.131 relate to management contracts or compensatory plans or arrangements.

| Exhibit No | Description |
|---|---|
| *2.1 | Amended and Restated Arrangement Agreement involving BCE Inc., Nortel Networks Corporation, formerly known as New Nortel Inc., and Nortel Networks Limited, formerly known as Nortel Networks Corporation, made as of January 26, 2000, as amended and restated March 13, 2000 (including Plan of Arrangement under Section 192 of the *Canada Business Corporations Act*) (filed as Exhibit 2.1 to Nortel Networks Corporation's Current Report on Form 8-K dated May 1, 2000). |
| *3.1 | Restated Certificate and Articles of Incorporation of Nortel Networks Corporation dated October 1, 2000, amended and restated on November 9, 2006 (filed as Exhibit 3.3 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2006). |
| *3.2 | By-Law No. 1 of Nortel Networks Corporation (filed as Exhibit 3.2 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2006). |
| *4.5 | Third Supplemental Indenture dated as of May 28, 2008 to Indenture dated as of July 5, 2006 among Nortel Networks Limited as Issuer, Nortel Networks Corporation, Nortel Networks Inc. as Guarantors and The Bank of New York as Trustee (filed as Exhibit 4.1 to Nortel Networks Corporation's Current Report on Form 8-K dated May 28, 2008). |
| *4.6 | Second Supplemental Indenture dated as of May 1, 2007 to Indenture dated as of July 5, 2006 among Nortel Networks Limite Nortel Networks Corporation, Nortel Networks Inc. and The Bank of New York, as trustee (filed as Exhibit 4.2 to Nortel Network. Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2007). |
| *4.7 | First Supplemental Indenture dated as of July 5, 2006 to Indenture dated as of July 5, 2006 among Nortel Networks Limited, Nortel Networks Corporation, Nortel Networks Inc. and The Bank of New York, as trustee (filed as Exhibit 4.2 to Nortel Networks Corporation's Current Report on Form 8-K dated July 6, 2006). |
| *4.8 | Indenture dated as of July 5, 2006 among Nortel Networks Limited, Nortel Networks Corporation, Nortel Networks Inc. and The Bank of New York, as trustee (filed as Exhibit 4.1 to Nortel Networks Corporation's Current Report on Form 8-K dated July 6, 2006). |
| *4.9 | Purchase Agreement dated June 29, 2006 among Nortel Networks Limited, Nortel Networks Corporation, Nortel Networks Inc. and the representative of the initial purchasers with regards to U.S.$1,000,000,000 Floating Rate Senior Notes due 2011, U.S.$550,000,000 10.125% Senior Notes due 2013, U.S.$450,000,000 10.750% Senior Notes due 2016 (filed as Exhibit 10.1 to Nortel Networks Corporation's Current Report on Form 8-K dated July 6, 2006). |
| *4.10 | Registration Rights Agreement dated July 5, 2006 among Nortel Networks Limited, Nortel Networks Corporation, Nortel Networks Inc. and the representative of the initial purchasers with regards to U.S.$1,000,000,000 Floating Rate Senior Notes due 2011, U.S.$550,000,000 10.125% Senior Notes due 2013, U.S.$450,000,000 10.750% Senior Notes due 2016 (filed as Exhibit 10.2 to Nortel Networks Corporation's Current Report on Form 8-K dated July 6, 2006). |
| *4.11 | Indenture dated as of March 28, 2007 among Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc. and The Bank of New York, as trustee (filed as Exhibit 4.1 to Nortel Networks Corporation's Current Report on Form 8-K dated March 28, 2007). |

Table of Contents

| Exhibit No | Description |
|---|---|
| *4.12 | Purchase Agreement dated March 22, 2007 among Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc. and the representatives of initial purchasers (filed as Exhibit 10.1 to Nortel Networks Corporation's Current Report on Form 8-K dated March 28, 2007). |
| *4.13 | Registration Rights Agreement dated March 28, 2007 among Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc. and the representatives of the initial purchasers (filed as Exhibit 10.2 to Nortel Networks Corporation's Current Report on Form 8-K dated March 28, 2007). |
| *4.14 | Purchase Agreement dated May 21, 2008 among Nortel Networks Limited, Nortel Networks Corporation, Nortel Networks Inc. and a representative of the initial purchasers (filed as Exhibit 10.1 to Nortel Networks Corporation's Current Report on Form 8-K dated May 28, 2008). |
| *4.15 | Registration Rights Agreement dated May 28, 2008 among Nortel Networks Limited, Nortel Networks Corporation and Nortel Networks Inc. and a representative of the initial purchasers (filed as Exhibit 10.2 to Nortel Networks Corporation's Current Report on Form 8-K dated May 28, 2008). |
| *10.1 | Nortel Networks Supplementary Executive Retirement Plan, as Amended effective October 18, 2001 and October 23, 2002, as amended by Resolutions by the Pension Investment Committee dated December 19, 2007 and December 20, 2007 with effect from January 1, 2008 (filed as Exhibit 10.77 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2007). |
| *10.2 | Statement describing the retirement arrangements of the former President and Chief Executive Officer (filed as Exhibit 10.5 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2001). |
| *10.3 | Assumption Agreement between Nortel Networks Corporation and Nortel Networks Limited dated March 5, 2001, regarding the assumption and agreement by Nortel Networks Corporation to perform certain covenants and obligations of Nortel Networks Limited under the Nortel Networks Limited Executive Retention and Termination Plan (filed as Exhibit 10.25 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2000). |
| *10.4 | Nortel Networks Corporation Executive Retention and Termination Plan, as Amended and Restated, effective from June 26, 2002, Amended and Restated with effect from June 1, 2007 including the name change to Nortel Networks Corporation Change in Control Plan, as Amended and Restated with effect from January 18, 2008 (filed as Exhibit 10.3 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2008). |
| *10.5 | Nortel Networks Limited SUCCESS Plan approved on July 25, 2002, as Amended and Restated on July 28, 2003 with effect from January 1, 2003, as Amended on July 28, 2003 with effect from January 1, 2003, as Amended on February 26, 2004 with effect from January 1, 2004, as Amended March 9, 2006 with effect from January 1, 2006, as Amended March 15, 2007 with effect from January 1, 2007 including name change to Nortel Networks Limited Annual Incentive Plan, as Amended on February 22, 2008 with effect from January 1, 2008 (filed as Exhibit 10.2 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2008). |
| *10.6 | Supplementary Pension Credits Arrangement (filed as Exhibit 10.14 to Nortel Networks Corporation's Registration Statement dated August 28, 1975 on Form S-1 (No. 2-71087)). |
| *10.7 | Statements describing the right of certain executives in Canada to defer all or part of their short-term and long-term incentive awards (filed as Exhibit 10.4 to Nortel Networks Limited's Quarterly Report on Form 10-Q for the quarter ended June 30, 2000). |
| *10.8 | Statement describing eligibility for the Group Life Insurance Plan for directors who are not salaried employees of Nortel Networks Corporation (filed as Exhibit 10.30 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2002). |
| *10.9 | Amended general description of cash bonus for employees and executives of Nortel Networks Corporation and Nortel Networks Limited as originally filed as Exhibit 10.5 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2002 (filed as Exhibit 10.01 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2003). |

129

Table of Contents

| Exhibit No | Description |
|---|---|
| *10.10 | Nortel Networks Corporation Directors' Deferred Share Compensation Plan effective January 1, 2002, as Amended and Restated May 29, 2003, as Amended and Restated December 18, 2003 effective January 1, 2004, as Restated on June 29, 2005 and Amended December 7, 2005, as Amended and Restated on October 3, 2007 effective August 30, 2007 (filed as Exhibit 10.74 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2007). |
| *10.11 | Nortel Networks Limited Directors' Deferred Share Compensation Plan effective June 30, 1998, as Amended and Restated May 1, 2000, as further Amended and Restated effective January 1, 2002, as Amended and Restated May 29, 2003, as Amended and Restated December 18, 2003 effective January 1, 2004, as Restated on June 29, 2005 and Amended December 7, 2005, as Amended and Restated on October 3, 2007 effective August 30, 2007 (filed as Exhibit 10.75 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2007). |
| *10.12 | Nortel Networks Corporation 1986 Stock Option Plan, as Amended and Restated, as amended effective April 30, 1992, April 27, 1995, December 28, 1995, April 8, 1998, February 25, 1999, April 29, 1999, September 1, 1999, December 16, 1999, May 1, 2000 and January 31, 2002 (filed as Exhibit 10.1 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2002). |
| *10.13 | Nortel Networks Corporation 2000 Stock Option Plan, as Amended effective May 1, 2000 and January 31, 2002 (filed as Exhibit 10.2 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2002). |
| *10.14 | Nortel Networks/BCE 1985 Stock Option Plan (Plan of Arrangement 2000) (filed as Exhibit 10.5 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2000). |
| *10.15 | Nortel Networks/BCE 1999 Stock Option Plan (Plan of Arrangement 2000) (filed as Exhibit 10.6 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2000). |
| *10.16 | Nortel Networks U.S. Deferred Compensation Plan (filed as Exhibit 4.3 to Post-Effective Amendment No. 1 to Nortel Networks Corporation's Registration Statement dated May 16, 2000 on Form S-8 (No. 333-11558)), as amended by Resolutions dated January 18, 2008 (filed as Exhibit 10.7 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2008). |
| *10.17 | Master Facility Agreement dated as of February 14, 2003, and amended by Amending Agreement No. 1 dated July 10, 2003 between Nortel Networks Limited and Export Development Canada, and as further amended by letter agreements date March 29, 2004, May 28, 2004, August 20, 2004, September 29, 2004, October 29, 2004, November 19, 2004, December 10, 2004, January 14, 2005, February 15, 2005, March 15, 2005, April 29, 2005, May 31, 2005, amended and restated as of October 24, 2005 and further amended by Amendment No. 1 and Waiver dated May 9, 2006 and Amendment No. 2 dated December 12, 2006 and Waiver dated March 9, 2007 and further amended by Second Amended and Restated Master Facility Agreement dated December 14, 2007 (filed as Exhibit 99.1 to Nortel Networks Corporation's Current Report on Form 8-K dated December 18, 2007). |
| *10.18 | Master Indemnity Agreement dated as of February 14, 2003 between Nortel Networks Limited and Export Development Canada, amended and restated as of October 24, 2005 (filed as Exhibit 10.3 to Nortel Networks Corporation's Current Report on Form 8-K dated October 28, 2005). |
| *10.19 | Letter dated June 23, 2003 from the former President and Chief Executive Officer of Nortel Networks, to the Joint Leadership Resources Committee of the Board of Directors of Nortel Networks Corporation and Nortel Networks Limited regarding the voluntary return for cancellation of certain stock options to purchase common shares of Nortel Networks Corporation (filed as Exhibit 10.4 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2003). |
| *10.20 | Asset Purchase Agreement dated June 29, 2004 among Nortel Networks Limited, Flextronics International Ltd. and Flextronics Telecom Systems, Ltd., amended as of November 1, 2004, February 7, 2005, August 22, 2005 and further amended by the Fourth and Fifth Amending Agreements as of May 8, 2006 (filed as Exhibits 10.2 and 10.3 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2006). |
| **10.21 | Amended and Restated Master Contract Manufacturing Services Agreement dated June 29, 2004 between Nortel Networks Limited and Flextronics Telecom Systems, Ltd., amended as of November 1, 2004 and May 8, 2006 (most recently filed as Exhibit 99.1 to Nortel Networks Corporation's Current Report on Form 8-K dated June 4, 2007). |

Table of Contents

| Exhibit No | Description |
|---|---|
| **10.22 | Master Repair Services Agreement dated June 29, 2004 between Nortel Networks Limited and Flextronics Telecom Systems Limited, amended as of February 8, 2005 and May 8, 2006 (most recently filed as Exhibit 99.2 to Nortel Networks Corporation's Current Report on Form 8-K dated June 4, 2007). |
| **10.23 | Master Contract Logistics Services Agreement dated June 29, 2004 between Nortel Networks Limited and Flextronics Telecom Systems, Ltd., amended as of February 8, 2005 (most recently filed as Exhibit 99.3 to Nortel Networks Corporation's Current Report on Form 8-K dated June 4, 2007). |
| **10.24 | Letter Agreement dated June 29, 2004 among Nortel Networks Limited, Flextronics International Ltd. and Flextronics Telecom Systems, Ltd. amended and restated as of May 8, 2006 (filed as Exhibit 10.6 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2006). |
| *10.25 | Letter, dated January 10, 2005, to Mr. Lynton (Red) Wilson, the Chairman of the Board of Nortel Networks Corporation, and modified March 1, 2005 and delivered on August 11, 2005 from certain officers of Nortel Networks Corporation (filed as Exhibit 10.1 to Nortel Networks Corporation's Current Report on Form 8-K dated August 18, 2005). |
| *10.26 | Peter W. Currie, Executive Vice-President and Chief Financial Officer, Letter Agreement dated February 4, 2007 (filed as Exhibit 10.4 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2007). The Letter Agreement terminated the remuneration arrangement previously filed as Exhibit 10.2 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2005. |
| *10.27 | Summary statement of terms of the additional special pension benefits for the Vice-Chairman and Chief Executive Officer approved by the Joint Leadership Resources Committee of the Board of Directors of Nortel Networks Corporation and Nortel Networks Limited and the Independent members of the Board of Directors of Nortel Networks Corporation and Nortel Networks Limited on March 22, 2005 (filed as Exhibit 10.8 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2005). |
| *10.28 | The Nortel 2005 Stock Incentive Plan (as filed with the 2005 Proxy Statement), as Amended and Restated on November 6, 2006 with effect on December 1, 2006, as Amended and Restated on January 18, 2008, as Amended and Restated on February 22, 2008 (filed as Exhibit 10.1 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2008). |
| *10.29 | Summary statement of the interest payable on the special pension benefits for the Vice-Chairman and Chief Executive Officer of Nortel Networks Corporation and Nortel Networks Limited approved by the Joint Leadership Resources Committee of the Board of Directors of Nortel Networks Corporation and Nortel Networks Limited and the independent members of the Board of Directors of Nortel Networks Corporation and Nortel Networks Limited on May 27, 2005 (filed as Exhibit 10.2 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2005). |
| *10.30 | Form of Indemnity Agreement effective on or as of June 29, 2005 entered into between Nortel Networks Corporation and each of the following Directors: Harry J. Pearce, Ronald W. Osborne, Richard D. McCormick, John A. MacNaughton, James B. Hunt, Jr. and Jalynn H. Bennett (filed as Exhibit 10.4 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2005). |
| *10.31 | Summary of remuneration, retirement compensation and group life insurance of the Chairman of the Board, Directors and Chairman of Committees of Nortel Networks Corporation effective with effect from February 20, 2008 (filed as Exhibit 10.73 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2007). |
| *10.32 | Summary of remuneration, retirement compensation and group life insurance of the Chairman of the Board, Directors and Chairman of Committees of Nortel Networks Limited effective June 29, 2005, as amended with effect from January 1, 2008 and restated February 20, 2008 (filed as Exhibit 10.72 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2007). |
| *10.33 | Forms of Instruments of Grant generally provided to optionees granted options under the Nortel Networks Corporation 1986 Stock Option Plan, as Amended and Restated or the Nortel Networks Corporation 2000 Stock Option Plan (filed as Exhibit 10.9 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2005). |

131

Table of Contents

| Exhibit No | Description |
|---|---|
| *10.34 | Proxy Agreement effective as of July 29, 2005 with respect to Capital Stock of Nortel Government Solutions Inc. by and among Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc., Nortel Government Solutions Inc., James Frey, Thomas McInerney, Gregory Newbold, and the United States Department of Defense (filed as Exhibit 10.1 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2005). |
| *10.35 | Escrow Agreement dated as of March 1, 2005 and as entered into on August 11, 2005 between Nortel Networks Corporation, Computershare Trust Company of Canada and certain officers of Nortel Networks Corporation (filed as Exhibit 10.3 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2005). |
| *10.36 | Termination Agreement dated September 7, 2005 between Nicholas DeRoma, Chief Legal Officer and Nortel Networks Corporation (filed as Exhibit 10.06 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2005). The Agreement terminated the remuneration arrangement previously filed as Exhibits 10.3 and 10.4 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2001. |
| *10.37 | Agreement and Plan of Merger dated as of April 25, 2005, by and among Nortel Networks Inc., PS Merger Sub, Inc. and PEC Solutions, Inc. (filed as Exhibit 99(d)(1) to Nortel Networks Inc. Current Report on Form SC TO-T dated May 3, 2005 and filed as Exhibit 10.9 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2005). |
| *10.38 | William A. Owens letter agreement entered into on December 1, 2005, concerning the cessation of Mr. Owens' responsibilities as Vice-Chairman and Chief Executive Officer of Nortel Networks Corporation and Nortel Networks Limited effective November 15, 2005 (filed as Exhibit 10.68 to Nortel Network Corporation's Annual Report on Form 10-K/A for the year ended December 31, 2005). The letter agreement terminated the employment arrangements previously filed as Exhibit 10.1 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2004 and as Exhibit 10.2 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2004. |
| *10.39 | Nicholas DeRoma, former Chief Legal Officer, Letter Agreement dated December 20, 2005 amending the Termination Agreement dated September 7, 2005 (filed as Exhibit 10.69 to Nortel Networks Corporation's Annual Report on Form 10-K/A for the year ended December 31, 2005). |
| *10.40 | Steve Pusey, Executive Vice-President and President, Eurasia, Letter Agreement dated September 29, 2005 concerning a retention bonus (filed as Exhibit 10.70 to Nortel Networks Corporation's Annual Report on Form 10-K/A for the year ende December 31, 2005). |
| *10.41 | Mike Zafirovski, President and Chief Executive Officer, Indemnity Agreement dated January 18, 2006 with effect from October 31, 2005 (filed as Exhibit 10.72 to Nortel Networks Corporation's Annual Report on Form 10-K/A for the year ended December 31, 2005). |
| *10.42 | Pascal Debon letter agreement dated February 21, 2006, concerning the cessation of Mr. Debon's responsibilities as Senior Advisor of Nortel Networks Corporation and Nortel Networks Limited effective December 23, 2005 (filed as Exhibit 10.75 to Nortel Networks Corporation's Annual Report on Form 10-K/A for the year ended December 31, 2005). |
| *10.43 | Forms of Instruments of Award as amended on April 11, 2007 and subsequently on March 3, 2008 generally provided to recipients of Restricted Stock Units and Performance Stock Units, Form of Instrument of Grant as amended on April 4, 2007 generally provided to recipients of stock options subsequently amended effective March 3, 2008 generally provided to recipients of stock options and stock appreciation rights under the Nortel 2005 Stock Incentive Plan, As Amended and Restated (filed as Exhibit 10.6 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2008). |
| *10.44 | Stipulation and Agreement of Settlement, dated June 20, 2006, in the matter captioned *In re Nortel Networks Corp. Securities Litigation*, United States District Court for the Southern District of New York, Consolidated Civil Action No. 01 Civ. 1855 (RMB) (filed as Exhibit 99.1 to Nortel Networks Corporation's Current Report on Form 8-K dated December 12, 2007). |

Table of Contents

| Exhibit No | Description |
|---|---|
| *10.45 | Stipulation and Agreement of Settlement, dated June 20, 2006, in the matter captioned *In re Nortel Networks Corp. Securities Litigation*, United States District Court for the Southern District of New York, Master File No. 05-MD1659 (LAP) (filed as Exhibit 99.2 to Nortel Networks Corporation's Current Report on Form 8-K dated December 12, 2007). |
| *10.46 | Court Order, dated June 20, 2006, in the matter captioned Frohlinger et. al. v. Nortel Networks Corporation et. al., Ontario Superior Court of Justice, Court File No. 02-CL-4605 (Ont.Sup.Ct.J.) (filed as Exhibit 10.12 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2006). |
| *10.47 | Court Order, dated June 20, 2006, in the matter captioned *Association de Protection des Epargnants et. al. Investisseurs du Québec v. Corporation Nortel Networks*, Superior Court of Quebec, District of Montreal, No. 500-06-000126-017 (filed as Exhibit 10.13 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2006). |
| *10.48 | Court Order, dated June 20, 2006, in the matter captioned *Jeffery et. al. v. Nortel Networks Corporation et. al*, Supreme Court of British Columbia, Vancouver Registry Court File No. S015159 (B.C.S.C.) (filed as Exhibit 10.14 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2006). |
| *10.49 | Court Order, dated June 20, 2006, in the matter captioned *Gallardi v. Nortel Networks Corporation et. al.*, Ontario Superior Court of Justice, Court File No. 05-CV-285606CP (Ont.Sup.Ct.J.) (filed as Exhibit 10.15 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2006). |
| *10.50 | Court Order, dated June 20, 2006, in the matter captioned *Skarstedt v. Corporation Nortel Networks*, Superior Court of Quebec, District of Montreal, No. 500-06-000277-059 (filed as Exhibit 10.16 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2006). |
| *10.51 | Resolution effective June 28, 2006 for Mike Zafirovski, President and Chief Executive Officer of Nortel Networks Corporation and Nortel Networks Limited outlining acceptance by Boards of Directors of Nortel Networks Corporation and Nortel Networks Limited of the voluntary reduction by Mr. Zafirovski of a special lifetime annual pension benefit by 29% resulting in a payout of U.S.$355,000 per year rather than U.S.$500,000 per year (filed as Exhibit 10.17 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2006). |
| *10.52 | Form of indemnity agreement entered into between Nortel Networks Corporation and members of the Board of Directors of Nortel Networks Corporation on or after September 6, 2006 (filed as Exhibit 10.4 to Nortel Network Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2006). |
| *10.53 | Summary statement of employment terms and conditions for Mike Zafirovski, President and Chief Executive Officer, November 15, 2005 as approved by the Joint Leadership Resources Committee of the Board of Directors of Nortel Networks Corporation and Nortel Networks Limited and the Independent members of the Board of Directors of Nortel Networks Corporation and Nortel Networks Limited on October 16, 2005 and form of instrument of award for restricted stock units and form of instrument of award for stock options granted on November 15, 2005 under the Nortel 2005 Stock Incentive Plan to Mike Zafirovski, President and Chief Executive Officer (filed as Exhibit 10.5 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2006). |
| **10.54 | Agreement between Nortel Networks Limited and Flextronics Telecom Systems, Inc. dated October 13, 2006, amending the asset purchase agreement dated June 29, 2004 among Nortel, and Flextronics International Ltd., and Flextronics Telecom, which was filed as Exhibit 10.3 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2004, as amended from time to time, the amended and restated master contract manufacturing services agreement dated as of June 29, 2004, which was filed as Exhibit 10.4 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2004, as amended from time to time, and the letter agreement dated June 29, 2004, which was filed as Exhibit 10.7 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2004, as amended and restated (filed as Exhibit 10.88 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2006). |
| *10.55 | Share and Asset Sale Agreement between Nortel Networks Limited and Alcatel Lucent dated December 4, 2006, as amended December 29, 2006 and June 28, 2007 (filed as Exhibit 10.5 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2007). |
| *10.56 | Dion Joannou letter agreement dated July 27, 2007 concerning the cessation of Mr. Joannou's responsibilities as President, North America of Nortel Networks Corporation and Nortel Networks Limited effective August 31, 2007 (filed as Exhibit 10.1 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2007). |

Table of Contents

| Exhibit No | Description |
|---|---|
| *10.57 | Compensation and Human Resources Committee Policy on Company Aircraft dated July 31, 2007 (filed as Exhibit 10.2 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2007). |
| *10.58 | Paviter Binning, Executive Vice-President and Chief Financial Officer of Nortel Networks Corporation and Nortel Networks Limited, Employment Letter dated September 28, 2007 (filed as Exhibit 10.3 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2007). |
| *10.59 | Nortel Networks Corporation Share Purchase Plan for S. 16 Executive Officers dated November 8, 2007 (filed as Exhibit 10.71 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2007). |
| *10.60 | Joel Hackney, President, Enterprise Solutions, Employment Letter amended effective September 19, 2007 updating and replacing the terms and conditions in the offer letter dated December 13, 2005 (filed as Exhibit 10.76 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2007). |
| *10.61 | David Drinkwater, Chief Legal Officer, Employment Letter dated December 9, 2005 (filed as Exhibit 10.4 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2008) and Letter regarding special bonus dated October 4, 2007 (filed as Exhibit 10.79 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2007). |
| *10.62 | Pay-Off Letter dated July 5, 2006 under the Credit Agreement dated February 14, 2006 among Nortel Networks Inc. and JPMorgan Chase Bank, N.A., J.P. Morgan Securities Inc. and Citigroup Global Markets Inc., Citicorp USA, Inc., Royal Bank of Canada and Export Development Canada, the Lenders party thereto (filed as Exhibit 10.80 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2007). |
| *10.63 | Consent of Defendants Nortel Networks Corporation and Nortel Networks Limited, dated September 28, 2007, in the matter captioned *Securities and Exchange Commission v. Nortel Networks Corporation and Nortel Networks Limited,* United States District Court for the Southern District of New York, Civil Docket for Case No. 1:07-CV-08851-LAP (filed as Exhibit 10.81 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2007). |
| *10.64 | Nortel U.S. Stock Purchase Plan, As Amended and Restated, amended as of January 18, 2008, effective January 1, 2008 and amended and restated as of February 22, 2008 (filed as Exhibit 10.4 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2008). |
| *10.65 | Nortel Global Stock Purchase Plan, As Amended and Restated, amended as of January 18, 2008, effective January 1, 2008 and amended and restated as of February 22, 2008 (filed as Exhibit 10.5 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2008). |
| *10.66 | Nortel Stock Purchase Plan for Members of the Savings and Retirement Program, As Amended on February 22, 2008 (filed as Exhibit 10.6 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2008). |
| *10.67 | Dennis Carey, Executive Vice-President, Corporate Operations, Employment Letter amended effective June 23, 2008 updating and replacing the terms and conditions of the offer letter dated January 26, 2006 (filed as Exhibit 10.3 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2008). |
| *10.68 | Steve Slattery letter agreement concerning the cessation of Mr. Slattery's responsibilities as President, Enterprise Solutions of Nortel Networks Corporation and Nortel Networks Limited effective September 18, 2007 (filed as Exhibit 10.5 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2008). |
| *10.69 | Nortel Networks Enhanced Severance Allowance Plan, as Amended and Restated, effective January 1, 2008 (filed as Exhibit 10.1 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2008). |
| *10.70 | Form of indemnity agreement entered into between Nortel Networks Corporation and Board Appointed Officers of Nortel Networks Corporation on or after October 16, 2008 (filed as Exhibit 10.70 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2008). |
| *10.71 | David Drinkwater letter agreement dated November 11, 2008 concerning the cessation of Mr. Drinkwater's responsibilities as Chief Legal Officer of Nortel Networks Corporation and Nortel Networks Limited effective December 31, 2008, arrangements concerning appointment as Senior Advisor of Nortel Networks Corporation and Nortel Networks Limited effective January 1, 2009 and arrangements concerning the cessation of Mr. Drinkwater's employment effective close of business on February 28, 2009 (filed as Exhibit 10.71 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2008). |

Table of Contents

| Exhibit No | Description |
|---|---|
| *10.72 | Standstill and Waiver Agreement dated December 15, 2008 between Nortel Networks Limited and Export Development Canada (filed as Exhibit 10.1 to Nortel Networks Corporation's Current Report on Form 8-K dated December 17, 2008). |
| *10.73 | Form of indemnity agreement entered into between Nortel Networks Limited and members of the Board of Directors and Board Appointed Officers of Nortel Networks Limited on or after December 22, 2008 (filed as Exhibit 10.73 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2008). |
| *10.74 | William Nelson, Executive Vice-President, Global Sales, Employment Letter dated December 28, 2007 (filed as Exhibit 10.74 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2008). |
| *10.75 | William Nelson letter agreement dated November 27, 2008 concerning the cessation of Mr. Nelson's responsibilities as Executive Vice-President, Global Sales of Nortel Networks Corporation and Nortel Networks Limited effective December 31, 2008 (filed as Exhibit 10.75 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2008). |
| *10.76 | Steven Bandrowczak, Chief Information Officer, Employment Letter dated May 11, 2007 (filed as Exhibit 10.76 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2008). |
| *10.77 | Steven Bandrowczak letter agreement dated January 6, 2009 concerning his new role as Vice-President Enterprise Sales of Nortel Networks Inc. effective January 1, 2009 (filed as Exhibit 10.77 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2008). |
| *10.78 | Amending Agreement effective as of January 13, 2009 to the following agreements and any amendments from the effective date of each up to January 13, 2009: to the Amended and Restated Master Contract Manufacturing Services Agreement dated June 29, 2004 and October 13, 2006 between Nortel Networks Limited and Flextronics Telecom Systems Ltd.; to the Master Contract Manufacturing Services Agreement dated September 30, 2003 and October 13, 2006 between Nortel Networks Limited and Flextronics Corporation; to the Master Repair Services Agreement dated June 29, 2004 between Nortel Networks Limited and Flextronics Telecom Systems Ltd.; to the Master Contract Logistics Services Agreement dated June 29, 2004 between Nortel Networks Limited and Flextronics Telecom Systems Ltd.; and to the Master Contract Repair Services Agreement dated June 3, 2000 between Nortel Networks Limited and Flextronics Telecom Systems Ltd. (filed as Exhibit 10.78 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2008). |
| *10.79 | Agreement dated January 14, 2009 between Nortel Networks Limited and Export Development Canada ceasing the Standstill and Waiver Agreement dated December 15, 2008 and implementing a Temporary Facility (filed as Exhibit 10.79 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2008). |
| *10.80 | Amended and Restated Short-Term Support Agreement dated as of February 10, 2009 between Nortel Networks Limited and Export Development Canada (filed as Exhibit 10.80 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2008). |
| *10.81 | Amended and Restated summary of remuneration, retirement compensation and group life insurance of the Chairman of the Board, Directors and Chairman of Committees of Nortel Networks Corporation effective January 14, 2009 (filed as Exhibit 10.81 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2008). |
| *10.82 | Amended and Restated summary of remuneration and retirement compensation of the Chairman of the Board, Directors and Chairman of Committees of Nortel Networks Limited effective January 14, 2009 (filed as Exhibit 10.82 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2008). |
| *10.83 | Resolutions effective December 12, 2008 terminating the Nortel U.S. Stock Purchase Plan, As Amended and Restated, Nortel Global Stock Purchase Plan, As Amended and Restated and Nortel Stock Purchase Plan for Members of the Savings and Retirement Program, As Amended (filed as Exhibit 10.83 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2008). |
| *10.84 | Nortel Networks U.S. Deferred Compensation Plan, as amended by Resolutions dated December 23, 2008 with effect from January 1, 2009 (filed as Exhibit 10.84 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2008). |
| *10.85 | Resolution of the Compensation and Human Resources Committee of the Boards of Nortel Networks Corporation and Nortel Networks Limited extending the cessation of employment date for David Drinkwater, Senior Advisor to March 31, 2009 (filed as Exhibit 10.85 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2008). |

Table of Contents

| Exhibit No | Description |
|---|---|
| *10.86 | Resolution of the Compensation and Human Resources Committee of the Boards of Nortel Networks Corporation and Nortel Networks Limited dated February 19, 2009 revoking the Compensation and Human Resources Committee Policy on Company Aircraft effective January 22, 2009 (filed as Exhibit 10.1 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2009). |
| *10.87 | Nortel Networks Limited Annual Incentive Plan (AIP) as amended on February 20, 2009 with effect from January 1, 2009 (filed as Exhibit 10.2 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2009). |
| *10.88 | Nortel Networks Corporation Key Executive Incentive Plan effective as of March 6, 2009 (filed as Exhibit 10.3 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2009). |
| *10.89 | Form of Letter Agreement dated March 27, 2009 concerning participation of named executive officers in the Nortel Networks Corporation Key Executive Incentive Plan and Named Executive Officer Maximum Payout Range (filed as Exhibit 10.4 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2009). |
| *10.90 | Second Amended and Restated Short-Term Support Agreement dated as of April 24, 2009 between Nortel Networks Limited and Export Development Canada (filed as Exhibit 10.1 to Nortel Networks Corporation's Current Report on Form 8-K dated April 28, 2009). |
| *10.91 | Amendment to the Second Amended and Restated Short-Term Support Agreement between Nortel Networks Limited and Export Development Canada dated June 18, 2009 (filed as Exhibit 10.1 to Nortel Networks Corporation's Current Report on Form 8-K dated June 19, 2009). |
| *10.92 | Cash Collateral Agreement among Nortel Networks Limited and Export Development Canada dated June 18, 2009 (filed as Exhibit 10.2 to Nortel Networks Corporation's Current Report on Form 8-K dated June 19, 2009). |
| *10.93 | Asset Sale Agreement by and among Nortel Networks Corporation (NNC), Nortel Networks Limited and certain subsidiaries of NNC, including Nortel Networks Inc., as Sellers and Nokia Siemens Networks B.V. dated as of June 19, 2009 (filed as Exhibit 10.3 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2009). |
| *10.94 | Asset and Share Sale Agreement by and among Nortel Networks Corporation (NNC), Nortel Networks Limited and certain other subsidiaries of NNC, including Nortel Networks Inc., as Sellers and Avaya Inc. dated as of July 20, 2009 (filed as Exhibit 10.2 ' Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2009). |
| *10.95 | Escrow Agreement by and among Avaya Inc., Nortel Networks Limited, Nortel Networks Inc., Nortel Networks UK Limited, and Wells Fargo Bank, National Association dated as of July 20, 2009 (filed as Exhibit 10.3 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2009). |
| *10.96 | Asset Sale Agreement by and among Nortel Networks Corporation (NNC), Nortel Networks Limited and certain other subsidiaries of NNC, including Nortel Networks Inc., as Sellers and Telefonaktiebolaget LM Ericsson dated as of July 24, 2009 (filed as Exhibit 10.1 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2009). |
| *10.97 | Amended and Restated Asset and Share Sale Agreement by and among Nortel Networks Corporation, Nortel Networks Limited and certain other subsidiaries of NNC, including Nortel Networks Inc., as Sellers and Avaya Inc. dated as of September 14, 2009 (filed as Exhibit 10.4 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2009). |
| *10.98 | Amended and Restated Escrow Agreement by and among Avaya Inc., Nortel Networks Limited, Nortel Networks Inc., Nortel Networks UK Limited, and Wells Fargo Bank, National Association dated as of September 14, 2009 (filed as Exhibit 10.5 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2009). |
| *10.99 | Asset Sale Agreement by and among Nortel Networks Corporation (NNC), Nortel Networks Limited and certain other subsidiaries of NNC, including Nortel Networks Inc., as Sellers and Ciena Corp. dated as of October 7, 2009 (filed as Exhibit 10.99 to Nortel Networks Corporation's Annaul Report on Form 10-K for the year ended December 31, 2009). |

Table of Contents

| Exhibit No | Description |
|---|---|
| *10.100 | Amendment No. 1 dated October 16, 2009 to the Asset Sale Agreement by and among Nortel Networks Corporation (NNC), Nortel Networks Limited and certain other subsidiaries of NNC, including Nortel Networks Inc., as Sellers and Ciena Corp. dated as of October 7, 2009 (filed as Exhibit 10.100 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2009). |
| *10.101 | Amendment No. 1 dated as of October 30, 2009 to the Asset Sale Agreement by and among Nortel Networks Corporation (NNC), Nortel Networks Limited and certain other subsidiaries of NNC, including Nortel Networks Inc., as Sellers and Telefonaktiebolaget LM Ericsson dated as of July 24, 2009 (filed as Exhibit 99.3 to Nortel Networks Corporation's Current Report on Form 8-K dated November 18, 2009). |
| *10.102 | Amendment No. 2 dated as of November 13, 2009 to the Asset Sale Agreement by and among Nortel Networks Corporation (NNC), Nortel Networks Limited and certain other subsidiaries of NNC, including Nortel Networks Inc., as Sellers and Telefonaktiebolaget LM Ericsson dated as of July 24, 2009 (filed as Exhibit 99.4 to Nortel Networks Corporation's Current Report on Form 8-K dated November 18, 2009). |
| *10.103 | Nortel Networks Limited Annual Incentive Plan (Nortel Special Incentive Plan) as amended on November 13, 2009 with effect from October 1, 2009 (filed as Exhibit 10.103 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2009). |
| *10.104 | Amended and Restated Asset Sale Agreement by and among Nortel Networks Corporation (NNC), Nortel Networks Limited and certain other subsidiaries of NNC, including Nortel Networks Inc., as Sellers and Ciena dated as of November 24, 2009 (filed as Exhibit 10.104 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2009). |
| *10.105 | GSM Asset Sale Agreement by and among Nortel Networks Corporation (NNC), Nortel Networks Limited and certain other subsidiaries of NNC, including Nortel Networks Inc., as Sellers and Telefonaktiebolaget LM Ericsson dated as of November 24, 2009 (filed as Exhibit 10.105 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2009). |
| *10.106 | GSM Termination Fee Agreement by and among Nortel Networks Corporation (NNC), Nortel Networks Limited and certain other subsidiaries of NNC, including Nortel Networks Inc., as Sellers and Telefonaktiebolaget LM Ericsson dated as of November 24, 2009 (filed as Exhibit 10.106 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2009). |
| *10.107 | Amendment No. 1 dated December 3, 2009 to the Amended and Restated Asset Sale Agreement by and among Nortel Networks Corporation (NNC), Nortel Networks Limited and certain other subsidiaries of NNC, including Nortel Networks Inc., as Sellers and Ciena dated as of November 24, 2009 (filed as Exhibit 10.107 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2009). |
| *10.108 | Amendment No. 1 dated December 18, 2009 to the Amended and Restated Asset and Share Sale Agreement by and among Nortel Networks Corporation, Nortel Networks Limited and certain other subsidiaries of NNC, including Nortel Networks Inc., as Sellers and Avaya Inc. dated as of September 14, 2009 (filed as Exhibit 99.3 to Nortel Networks Corporation's Current Report on Form 8-K dated December 24, 2009). |
| *10.109 | Final Canadian Funding and Settlement Agreement by and among Nortel Networks Corporation (NNC), Nortel Networks Limited and certain other subsidiaries of NNC, including Nortel Networks Inc. dated as of December 23, 2009 (filed as Exhibit 10.109 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2009). |
| *10.110 | Amendment No. 2 dated December 23, 2009 to the Amended and Restated Asset Sale Agreement by and among Nortel Networks Corporation (NNC), Nortel Networks Limited and certain other subsidiaries of NNC, including Nortel Networks Inc., as Sellers and Ciena dated as of November 24, 2009 (filed as Exhibit 10.110 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2009). |
| *10.111 | Asset Sale Agreement by and among Nortel Networks Corporation (NNC), Nortel Networks Limited and certain other subsidiaries of NNC, including Nortel Networks Inc., as Sellers and GENBAND Inc. dated as of December 22, 2009 (filed as Exhibit 10.111 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2009). |

137

Table of Contents

| Exhibit No | Description |
|---|---|
| *10.112 | Nortel Networks Limited Special Incentive Plan with effect from January 1, 2010 (filed as Exhibit 10.1 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2010). |
| *10.113 | Nortel Networks Limited Annual Incentive Plan for Nortel Business Services and Corporate Group as amended on March 10, 2010 with effect from January 1, 2010 (filed as Exhibit 10.2 to Notel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2010). |
| *10.114 | Nortel Networks Limited Annual Incentive Plan for Business Units as amended on March 10, 2010 with effect from January 1, 2010 (filed as Exhibit 10.3 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2010). |
| *10.115 | John Doolittle letter agreement dated February 16, 2010 confirming position of Senior Vice-President, Finance and Corporate Services (filed as Exhibit 10.4 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended March 31, 2010). |
| *10.116 | Amendment No. 3 dated March 15, 2010 to the Amended and Restated Asset Sale Agreement by and among Nortel Networks Corporation (NNC), Nortel Networks Limited and certain other subsidiaries of NNC, including Nortel Networks Inc., as Sellers and Ciena dated as of November 24, 2009 (filed as Exhibit 99.6 to Nortel Networks Corporation's Current Report on Form 8-K dated March 25, 2010). |
| *10.117 | Amendment No. 4 dated march 15, 2010 to the Amended and Restated Asset Sale Agreement by and among Nortel Networks Corporation (NNC), Nortel Networks Limited and certain other subsidiaries of NNC, including Nortel Networks Inc., as Sellers and Ciena dated as of November 24, 2009 (filed as Exhibit 99.7 to Nortel Networks Corporation's Current Report on Form 8-K dated March 25, 2010). |
| *10.118 | Amendment No. 5 dated March 15, 2010 to the Amended and Restated Asset Sale Agreement by and among Nortel Networks Corporation (NNC), Nortel Networks Limited and certain other subsidiaries of NNC, including Nortel Networks Inc., as Sellers and Ciena dated as of November 24, 2009 (filed as Exhibit 99.8 to Nortel Networks Corporation's Current Report on Form 8-K dated March 25, 2010). |
| *10.119 | George Riedel Letter Agreement dated April 29 2010 (filed as Exhibit 10.1 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2010). |
| *10.120 | Share Purchase Agreement by and between Nortel Networks Limited and Telefonaktiebolaget LM Ericsson (PUBL) Relating 1 Shares of Capital Stock of LG-Nortel Co. LTD. dated April 21, 2010 (filed as Exhibit 99.1 to Nortel Networks Corporation's Current Report on Form 8-K dated July 6 2010). |
| *10.121 | Asset Sale Agreement by and among Nortel Networks Corporation (NNC), Nortel Networks Limited, Nortel Networks Inc. and certain other subsidiaries of NNC as Sellers and PSP Holding LLC dated August 26, 2010 (filed as Exhibit 10.2 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2010). |
| *10.122 | Asset Sale Agreement by and among Nortel Networks Corporation (NNC), Nortel Networks Limited, Nortel Networks Inc. and certain other subsidiaries of NNC as Sellers and Telefonaktiebolget LM Ericsson (PUBL) dated September 24, 2010 (filed as Exhibit 10.3 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended September 30, 2010). |
| *10.123 | George Riedel Letter Agreement Amendment dated November 10, 2010 (filed as Exhibit 10.123 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2010). |
| *10.124 | George Riedel Letter Agreement Amendment dated March 2, 2011 (filed as Exhibit 10.124 to Nortel Netowrks Corporation's Annual Report on Form 100K for the year ended December 31, 2010). |
| *10.125 | Nortel Networks Limited Annual Incentive Plan for Nortel Business Services and Corporate Group, as amended on March 3, 2011 with effect from January 1, 2011 (filed as Exhibit 10.125 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2010). |
| *10.126 | Asset Sale Agreement by and among Nortel Networks Corporation (NNC), Nortel Networks Limited, Nortel Networks Inc., Nortel Networks UK Limited, Nortel Networks (Ireland) Limited, Nortel Networks S.A. and certain other subsidiaires of NNC as Sellers and Ranger Inc. and Google Inc. dated April 4, 2011 (filed as Exhibit 10.1 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2011). |

138

Table of Contents

| Exhibit No | Description |
|---|---|
| *10.127 | Asset Sale Agreement by and among Nortel Networks Corporation (NNC), Nortel Networks Limited, Nortel Networks Inc., Nortel Networks UK Limited, Nortel Networks (Ireland) Limited, Nortel Networks S.A. and certain other subsidiaries of NNC as Sellers and Rockstar Bidco, LP, a single purpose entity formed by a consortium of six technology companies dated July 29, 2011 (filed as Exhibit 10.2 to Nortel Networks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2011). |
| *10.128 | Amendment to the Asset Sale Agreement by and among Nortel Networks Corporation (NNC), Nortel Networks Limited, Nortel Networks Inc., Nortel Networks UK Limited, Nortel Networks (Ireland) Limited, Nortel Netowrks S.A. and certain other subsidiaries of NNC as Sellers and Rockstar Bidco, LP, a single purpose entity formed by a consortium of six technoogy compaies dated July 29, 2011 (filed as Exhibit 10.3 to Nortel Netowrks Corporation's Quarterly Report on Form 10-Q for the quarter ended June 30, 2011). |
| 10.129 | Nortel 2012 Retention Plan effective January 1, 2012. |
| 10.130 | Nortel Networks Limited Annual Incentive Plan effective January 1, 2012. |
| 10.131 | Nortel Networks Limited Quarterly Incentive Plan for Business Units effective January 1, 2012. |
| 21. | Subsidiaries of the Registrant. |
| 23. | Consent of KPMG LLP. |
| 24. | Power of Attorney of certain directors. |
| 31. | Certification of the Senior Vice-President, Corporate Services and Chief Financial Officer pursuant to 18 U.S.C. Section 1350 as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32. | Certification of the Senior Vice-President, Corporate Services and Chief Financial Officer pursuant to 18 U.S.C. Section 1350 as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| *99. | Mandate of the Audit Committees of Nortel Networks Corporation and Nortel Networks Limited dated February 26, 2010 (filed as Exhibit 99 to Nortel Networks Corporation's Annual Report on Form 10-K for the year ended December 31, 2009). |
| 101 | Interactive Data File |

* Incorporated by Reference.

** Incorporated by Reference. Certain portions of this Exhibit have been omitted based upon a request for confidential treatment. These portions have been filed separately with the United States Securities and Exchange Commission.

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Mississauga, Ontario, Canada on the 8th day of March, 2012.

NORTEL NETWORKS CORPORATION

By:  _____/s/  ALLAN BIFIELD_____
**(ALLAN BIFIELD)**
**Senior Vice-President, Corporate Services**
**and Chief Financial Officer**

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities indicated on the 8th day of March, 2012.

| Signature | Title |
|---|---|
| Principal Executive Officer | |
| /s/  ALLAN BIFIELD<br>**(ALLAN BIFIELD)** | Senior Vice-President, Corporate Services<br>and Chief Financial Officer |
| Principal Financial Officer | |
| /s/  ALLAN BIFIELD<br>**(ALLAN BIFIELD)** | Senior Vice-President, Corporate Services<br>and Chief Financial Officer |
| Principal Accounting Officer | |
| /s/  CLARKE E. GLASPELL<br>**(CLARKE E. GLASPELL)** | Controller |

**Directors**

| J.H. BENNETT*<br>**(J.H. BENNETT)** | G.R. COTE*<br>**(G.R. COTE)** |
|---|---|

D.I. RICHARDSON*
**(D.I. RICHARDSON)**

By:*  /s/  ANNA VENTRESCA
**(ANNA VENTRESCA, AS ATTORNEY-IN-FACT**
**MARCH 8, 2012.)**

140

Exhibit 10.129

## NORTEL 2012 RETENTION PLAN

### PLAN OBJECTIVE

The Nortel 2012 Retention Plan (the "Plan") is designed to provide cash incentive payments (the "Retention Payments") to certain employees of Nortel Networks Limited ("NNL") and certain of its direct and indirect subsidiaries and affiliates participating in the Plan (each a "Participating Employer" and collectively, the "Company") to encourage the achievement of certain business goals important to the Company and its stakeholders, including a conclusion of NNL's and certain of its affiliates' proceedings under the *Companies' Creditors Arrangement Act* (Canada) (the "Proceedings") and the wind down of various Company entities during the Plan Period (as defined below).

II.  **PARTICIPATING EMPLOYEES**

(a)   Only those employees who will be actively employed by a Participating Employer for any portion of 2012 will be eligible to participate in the Plan, subject to the discretion of management.

(b)   Each employee of a Participating Employer selected for participation in the Plan shall receive a letter (each, a "Participation Letter") that sets forth the Annual Award Amount (as defined below) that he or she may be eligible to receive under the Plan with respect to the Plan Period. The Participation Letter will require such employee to agree to be bound by the terms and conditions of the Plan, including any amendments thereto, in order to obtain the benefits of the Plan. Upon execution and timely return of the Participation Letter in accordance with its terms, such selected employee shall become a participant in the Plan (a "Plan Participant") and will be eligible to receive a Retention Payment.

III.  **AWARD AMOUNTS**

(a)   Each Plan Participant's Participation Letter will designate an individual Annual Award Amount ("Annual Award Amount") that will have been determined by the Company in accordance with criteria approved by the Board of Directors of NNL (the "Board").

(b)   Each Plan Participant will be eligible to receive a Retention Payment in respect of the Plan Period in an amount determined in accordance with Section V (such Retention Payment, the "Award Payment Amount"). Retention Payments under this Plan are available to Plan Participants solely and exclusively in the form of Award Payment Amounts, to be paid in accordance with the terms of this Plan.

(c)   Except as required by applicable law or the terms of Company benefit plans or programs, Retention Payments will not be taken into account for purposes of Company benefits in which a Plan Participant may participate and will not be included in "eligible earnings" for purposes of capital accumulation and retirement plans offered in various jurisdictions by the Company. Where required, deductions will be made from the Retention Payments paid in accordance with the specific capital accumulation and retirement plan in which the Plan Participant participates.

## IV.    PLAN PERIOD

The Plan shall commence on January 1, 2012 and end on December 31, 2012 (the "Plan Period").

## V.    PAYMENT PROCESS

(a)    The intended termination date of the employment of a particular Plan Participant shall be set out in the Participation Letter provided to that Plan Participant (as may be adjusted in accordance with the terms of this Plan, the "Termination Date").

(b)    Subject to Section VII, the Plan Participant's Termination Date shall determine each Plan Participant's Award Payment Amount, as follows:

(i)    If the Plan Participant's Termination Date is in January 2012, the Plan Participant's Award Payment Amount will be one-twelfth ($^1/_{12}$) of his/her Annual Award Amount.

(ii)    If the Plan Participant's Termination Date is in February 2012, the Plan Participant's Award Payment Amount will be two-twelfths ($^2/_{12}$) of his/her Annual Award Amount.

(iii)    If the Plan Participant's Termination Date is in March 2012, the Plan Participant's Award Payment Amount will be three-twelfths ($^3/_{12}$) of his/her Annual Award Amount.

(iv)    If the Plan Participant's Termination Date is in April 2012, the Plan Participant's Award Payment Amount will be four twelfths ($^4/_{12}$) of his/her Annual Award Amount.

(v)    If the Plan Participant's Termination Date is in May or June 2012, the Plan Participant's Award Payment Amount will be sixty percent (60%) of his/her Annual Award Amount.

(vi)    If the Plan Participant's Termination Date is in July or August 2012, the Plan Participant's Award Payment Amount will be seventy-five percent (75%) of his/her Annual Award Amount.

(vii)    If the Plan Participant's Termination Date is in September or October 2012, the Plan Participant's Award Payment Amount will be ninety percent (90%) of his/her Annual Award Amount.

(viii)    If the Plan Participant's Termination Date is in November or December 2012, the Plan Participant's Award Payment Amount will be one hundred percent (100%) of his/her Annual Award Amount.

- 2 -

(c)     A Plan Participant's Termination Date may be changed upon at least ninety (90) days prior written notice of such change to that Plan Participant. Upon the provision to the Plan Participant of at least ninety (90) days written notice of the change of Termination Date, the Plan Participant's Award Payment Amount will be adjusted in accordance with section V(b), subject to section V(d), and the Termination Date of such Plan Participant shall be adjusted for all purposes of this Plan. For greater certainty, if a Plan Participant's Termination Date is adjusted in accordance with this section V(c) and such Plan Participant elects to terminate his or her employment with the Participating Employer prior to the adjusted Termination Date, then section VII(a) hereof shall apply to such termination of employment.

(d)     If the Plan Participant's Participation Letter provided for an original Termination Date between and including May 1, 2012 and December 31, 2012 and the Termination Date is changed in accordance with section V(c), the Plan Participant's adjusted Award Payment Amount will be the greater of: i) the entitlement described under section V(b) using the adjusted Termination Date, or ii) the entitlement described below:

   (i)     50% of the Plan Participant's Annual Award Amount, if the original Termination Date was in May or June 2012;

   (ii)    55% of the Plan Participant's Annual Award Amount, if the original Termination Date was in July or August 2012;

   (iii)   60% of the Plan Participant's Annual Award Amount, if the original Termination Date was in September or October 2012; or

   (iv)    66 2/3% of the Plan Participant's Annual Award Amount, if the original Termination Date was in November or December 2012.

(e)     Less than (90) days prior to a Plan Participant's Termination Date, a request may be made to a Plan Participant to extend his/her Termination Date. In such a case, the Plan Participant has the option to either accept or reject this request within the time period set out in the extension request received. If the Plan Participant accepts the requested extension by written notice to the applicable Participating Employer within the time period set in the extension request, his/her Termination Date will be adjusted accordingly and the revised Award Payment Amount determined in accordance with section V(b). If the Plan Participant rejects a requested extension made pursuant to this section V(e), there is no change to his/her Termination Date or Award Payment Amount.

(f)     Subject to Sections VII(a) through (c):

   (i)     for Plan Participants employed outside of Asia ("Non-Asia Plan Participants"), the Award Payment Amount shall be conclusively determined upon the Non-Asia Plan Participant's termination of employment with the Participating Employer and payment of a Non-Asia Plan Participant's entire Award Payment Amount shall be made as soon as practicable following such Non-Asia Plan Participant's Termination Date, but, in any event, no later than forty-five (45) days following such Termination Date.

- 3 -

(ii)  for Plan Participants employed in Asia (an "<u>Asia Plan Participant</u>"), the Award Payment Amount shall be conclusively determined upon the Asia Plan Participant's termination of employment with the Participating Employer, it being understood that:

    i.  the Award Payment Amount will be paid in installments (the "<u>Installment Payments</u>") on: (a) the first regularly scheduled pay date following the end of each calendar quarter that ends prior to the Asia Plan Participant's Termination Date; and (b) a date that is as soon as practicable following an Asia Plan Participant's Termination Date, but, in any event, no later than forty-five (45) days following such Termination Date; and

    ii.  the amount of a particular Installment Payment shall be calculated as follows:

        A.  the Asia Plan Participant's expected Award Payment Amount based upon the Asia Plan Participant's expected Termination Date as at the time of the particular Installment Payment, less the Installment Payments previously made to such Asia Plan Participant;

        divided by:

        B.  the number of Installment Payments remaining based upon the Asia Plan Participant's expected Termination Date as at the time of the particular Installment Payment.

(g)  Notwithstanding anything in the Plan to the contrary, if the Board, in its sole discretion, concludes that a Plan Participant has committed intentional misconduct, as defined in the Policy Regarding Recoupment of Incentive Compensation relating to the forfeiture and/or recoupment of incentive compensation, the Plan Participant will forfeit his/her entire Award Payment Amount and promptly reimburse his or her Participating Employer the amount of any Retention Payment received to date.

## VI.  PLAN ADMINISTRATION

The Board shall have full discretionary authority to administer the Plan, including discretionary authority to interpret and construe any and all provisions of the Plan.

## VII.  TERMINATION OF EMPLOYMENT

(a)  Notwithstanding anything in the Plan to the contrary, upon the involuntary termination of employment of a Plan Participant for Cause (as defined below) or the voluntary termination of employment by a Plan Participant for any reason, in each case during the Plan Period, the right to any unpaid portion of the Award Payment Amount of such Plan Participant will be forfeited on the date of such employment termination and such Plan Participant will have no further rights under the Plan.

- 4 -

(b)    Upon:

    (i)    the termination of employment of a Plan Participant during the Plan Period due to such Plan Participant's death; or

    (ii)    the involuntary termination of employment of a Plan Participant other than for Cause;

the Retention Payment shall be deemed to be the Award Payment Amount (as may have been adjusted in accordance with the provisions of Section V hereof prior to the termination of such Plan Participant's employment) and will be accelerated and any remaining balance thereof will be paid as soon as practicable, but, in any event, no later than forty-five (45) days following such Termination Date.

(c)    For the purposes of the Plan, "Cause" shall mean inappropriate actions or inactions, misconduct, breach of an agreement with the Company or unsatisfactory performance by a Plan Participant or cause (as "cause" is legally defined, if at all, in the relevant jurisdiction) as determined by the Board in its sole discretion.

(d)    Notwithstanding any other term or provision of this Plan, in the event a Plan Participant is on a voluntary or involuntary leave of absence for any portion of 2012, his/her Award Payment Amount will be adjusted. The revised Award Payment Amount will be calculated by multiplying the Award Payment Amount otherwise applicable by a fraction: i) the numerator of which is the number of calendar months during the Plan Period in which the Plan Participant was actively engaged in employment activities for the Participating Employer for at least one day during the month, and ii) the denominator of which is the number of calendar months (or part months) from the commencement of the Plan Period until such Plan Participant's Termination Date.

## VIII.    EFFECTIVE DATE; TERMINATION DATE OF THE PLAN

Subject to receiving the approval of the Ontario Superior Court of Justice (Commercial List), the Plan shall be effective as of January 1, 2012 and shall expire on the date on which all Retention Payments under the Plan have been made.

## IX.    NO PROMISE OF CONTINUED EMPLOYMENT

The Plan and any Plan Participant's selection as a participant in the Plan does not, and is in no manner intended to, constitute a promise of employment for any period of time or change a Plan Participant's employment status, if applicable, as an at will employee subject to employment termination at any time for any reason.

- 5 -

**X.      TAXES**

All payments made pursuant to the Plan shall be subject to applicable taxes and standard withholding and deductions as determined by the relevant Participating Employer. Neither the Company nor its officers or agents makes or has made any representation about the tax consequences of any payments made or offered to any Plan Participant under the Plan.

**XI.      CONFIDENTIALITY**

Subject to applicable law, a Plan Participant's participation in the Plan, the Participation Letter, the Award Payment Amount, the Retention Payment and any other documents contemplated to be delivered hereunder are confidential and a Plan Participant may not disclose, publicize or discuss his or her participation in the Plan, the Participation Letter, the Award Payment Amount, the Retention Payment or any other documents contemplated to be delivered hereunder with any current or former employee of the Company or any other person except a Plan Participant's spouse, accountant, financial advisor or attorney, who must be informed by the Plan Participant not to further disclose such confidential information. Notwithstanding the foregoing, the Company may disclose Participants' participation in the Plan, Participation Letter, Award Payment Amounts, Retention Payments and any other documents contemplated to be delivered hereunder as required under applicable law or as it deems necessary in the implementation and administration of the Plan and in the conduct of the Company's business.

**XII.      SEVERABILITY**

If any provision of the Plan is determined to be invalid or unenforceable, in whole or in part, this determination shall not affect any other provision of the Plan and the provision in question shall be modified so as to be rendered enforceable in a manner consistent with the intent of the parties insofar as possible. Any waiver of a breach of any of the terms of the Plan shall not operate or be construed as a waiver of any other breach of such terms or conditions or of any other terms and conditions, nor shall any failure to enforce any provision hereof operate or be construed as a waiver of such provision or of any other provision.

**XIII.      CHOICE OF LAW AND VENUE**

The Plan shall be governed by the laws of Ontario and the laws of Canada applicable therein. With respect to any Plan Participant who is an employee of a Participating Employer that is subject to the Proceedings, as a condition of such Plan Participant being entitled to participate in the Plan such Plan Participant (a) irrevocably and unconditionally consents to the exclusive jurisdiction of the Ontario Superior Court of Justice (Commercial List) with respect to any disputes arising from or connected to the Plan or any Retention Payment hereunder, (b) irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of or related to the Plan or any Retention Payment in such court and (c) irrevocably and unconditionally waives and agrees not to plead or claim that any such action, suit or proceeding brought in such court has been brought in an inconvenient forum.

- 6 -

XIV.    **ENTIRE AGREEMENT AND AMENDMENT**

This Plan document (together with the Participation Letters and any other document contemplated to be delivered hereunder) constitutes the complete, final and exclusive embodiment of the terms and conditions of the Plan. Any amendments or modifications of the Plan must be authorized by the Board or a person specifically authorized by the Board to take action with respect to the Plan; subject, in each case, to any approvals which may be required in light of the Proceedings. Any agreement between any Plan Participant and any Participating Employer with regard to the Plan and its subject matter is hereby superseded.

XV.    **NO ASSIGNMENT**

The rights of a Plan Participant or any other person to any payment or other benefits under the Plan may not be assigned, transferred, pledged or encumbered except by will or the laws of descent and distribution.

XVI.    **FUNDING**

The Plan is an unfunded plan and any and all amounts payable to a Plan Participant under the Plan shall be paid from the general assets of his or her Participating Employer. The obligation under the Plan with respect to any specific Plan Participant shall be the several obligation of his or her Participating Employer and will not be a joint obligation of any other Company entity.

- 7 -

Exhibit 10.130

## Nortel Networks Limited Annual Incentive Plan

### Section 1: Introduction

The Nortel Networks Limited Annual Incentive Plan ("AIP Plan") is a short-term, incentive bonus plan that provides the potential for "Eligible Employees" (as defined below) to receive cash awards based on their contributions to the success of the relevant "Business Unit"[1] of the Company[2], conditioned on the relevant Business Unit meeting its objectives.

The AIP Plan is intended to drive business performance by rewarding Eligible Employees for their contributions to the relevant Business Unit's overall success and the completion of their role. An Eligible Employee's contribution is determined by the following factors: (1) the impact of the employee's role on business results and (2) the employee's performance during the employee's active employment with the Company. The actual award received by an Eligible Employee will reflect (1) the scope, complexity, and responsibilities of the employee's role and the employee's performance during the applicable Plan Period[3] and (2) the relevant Business Unit's performance during the applicable Plan Period as indicated by the Business Unit Performance Factor, as described below.

---

[1] For purposes of the AIP Plan, the "Business Unit" is defined as any organization or reporting entity/function as defined and approved by the Board of Directors (as defined in Section 2).

[2] For purposes of the AIP Plan, the "Company" is defined as Nortel Networks Limited and its subsidiaries and affiliates and other entities, which it controls directly or indirectly and which have been approved for participation in the AIP Plan by the Board of Directors.

[3] The Plan Periods applicable to Group A and Group B Eligible Employees whose roles are other than JCI 55 in Groups A, B as of January 1st or, if later, their first day of AIP Plan participation in the relevant calendar year ("Semi-Annual Basis Eligible Employees") is January 1st through June 30th of the relevant calendar year ("First Half") and July 1st through December 31st of the relevant calendar year ("Second Half"). The Plan Period applicable to Eligible Employees who are in Group B JCI 55 roles as of January 1st or, if later, their first day of AIP Plan participation in the relevant calendar year ("Annual Basis Eligible Employees") is the relevant calendar year. For avoidance of doubt, subsequent changes in the JCI of an Eligible Employee's role during the relevant calendar year will not affect the Plan Period applicable to such Eligible Employee. Groups A and B are further defined in Appendix A. The Plan Period(s) may be changed and other Groups may be designated by the Board of Directors at any time.

**Section 2: AIP Plan Eligibility**

Generally, regular full-time and regular part-time[4] Company employees assigned to a Business Unit are eligible to participate in the AIP Plan Eligible Employees"), subject to the following:

(1)    Eligible Employees, who participate in other Company incentive plans for a full calendar month or the greater portion of a calendar month, as determined by the Company, are not eligible to participate in the AIP Plan during that calendar month. For purposes of the AIP Plan, "other incentive plans" mean any other incentive/bonus arrangements which the Company determines have been offered in lieu of the AIP Plan.

(2)    Subject to applicable law, employees who are covered under a collective labor agreement are not eligible unless that collective labor agreement provides for their participation in the AIP Plan.

(3)    Individuals determined by the Company to be students, co-op students, interns, temporary[5], or non-payroll workers (i.e., individuals who are not paid from a Company employee payroll) are ineligible to participate in the AIP Plan.

(4)    The Boards of Directors of Nortel Networks Corporation and Nortel Networks Limited (the "Board of Directors") may determine that certain Company employees (including employees who are not otherwise eligible for the AIP Plan) may be eligible to receive an award from a Discretionary Bonus Pool created pursuant to Section 5 hereof.

(5)    Subject to applicable law, to be eligible for an award for any relevant Plan Period an employee must be actively employed in a role that is eligible under the AIP Plan or other incentive plan ("Incentive Eligible Role") for at least one calendar month in that Plan Period[6] and (a) be employed by the Company on the applicable Payment Date, as defined in Section 4 hereof, or (b) if no longer employed as of the applicable date set out in sub-section 5(a) above, then be terminated from employment prior to the applicable Payment Date due to death, Transfer or involuntarily by the Company for a reason determined by the Company to be other than for Cause. For purposes of the AIP Plan, an employee will be considered to be "actively employed" on those

---

[4] For purposes of the AIP Plan, regular full-time and regular part-time Company employees are those employees who are eligible for participation in the Company health benefit plans based on their regularly scheduled hours.

[5] Where legally required, temporary full time employees on fixed term contracts with the Company may be included as Eligible Employees subject to the other conditions in Section 2 of the AIP Plan.

[6] The required period of active employment status may be changed by the Board of Directors at any time.

-2-

days when the employee is classified as "active" on the applicable Company payroll and one day of active employment in a calendar month is deemed to be active employment for that full calendar month. "Transfer" under the AIP Plan means an Eligible Employee's transfer to or hire by a new employer not affiliated with the Company that purchased one or more of the Company's business units or to which Company services have been outsourced with the advance written consent, including with respect to the Eligible Employee's transfer or hire date, of the Company and the new employer. "Cause" under the AIP Plan means the employee's inappropriate actions or inactions, misconduct, breach of an agreement with the Company or unsatisfactory performance or cause (as legally defined, if at all, in the relevant jurisdiction)(collectively, "Cause").

(6)  Pro-rated awards will be made as described below to employees who (a) transfer into or out of positions covered by other incentive plans, (b) move from or to a job within the Company that is ineligible for the AIP Plan, (c) are on a Company approved leave of absence or on "notice" of termination of employment and not actively employed for part of the Plan Period or (d) are terminated from employment due to death, Transfer or by the Company involuntarily for a reason determined by the Company to be other than for Cause prior to the end of the relevant Plan Period, provided that the employee meets the other AIP Plan requirements set out above. However, subject to applicable law, an employee is not eligible for an AIP Plan payout for any calendar month in which the employee is not actively employed in a position eligible under the AIP Plan for at least one day. Except as provided in the following sentence, if an employee meets the above AIP Plan requirements, but is actively employed in a position that is eligible under the AIP Plan for less than the full relevant Plan Period, the employee's AIP Plan award for the relevant Plan Period will be based on the number of months during the relevant Plan Period that the employee is actively employed in a AIP Plan eligible position for at least one calendar day divided by the number of months in the relevant Plan Period. For purposes of determining the amount of a pro-rata AIP Plan award, an employee will not be considered to be actively employed in an AIP Plan eligible position in a calendar month in which (x) the employee participates in another incentive plan for that full calendar month or (y) the employee participates in another incentive plan for the greater portion of the month, each as determined by the Company.

(7)  With respect to former employees who continue to be eligible for an AIP Plan award under Section 2(5) (b) of the AIP Plan, the Company may deny payment of that AIP Plan award to those former employees if they engage in conduct after their employment termination date and prior to the applicable Payment Date that constitutes Cause, as determined by the Company.

Notwithstanding the foregoing, any payment made after termination of employment to a "specified employee" that would be considered a "deferral

-3-

of compensation" within the meaning of, and subject to, Section 409A of the U.S. Internal Revenue Code and regulations thereunder ("Section 409A") will be paid on the later of the date which is six months and one day after (a) the termination date and (b) the date on which the award is otherwise payable under Section 4 of the AIP Plan. A "specified employee" means any U.S. taxpayer who is a key employee (as defined in Section 416(i) of the U.S. Internal Revenue Code without regard to paragraph 5 thereof) of the Company. (This is generally limited to employees who are (i) in the top 50 officers having an annual compensation greater than US$145,000, (ii) a 5-percent owner, or (iii) a 1-percent owner having an annual compensation of more than US$150,000.). For this purpose, termination of employment means "a separation from service" as defined in Section 409A.

(8)    An employee's Management Team[7] may, in consultation with the relevant Human Resources Business prime, make limited exceptions to the 'actively employed' requirement set out in Section 2(5) above where required by applicable law (e.g., as required under applicable maternity, paternity, parental, military, family, or medical leave laws). Notwithstanding anything in the foregoing to the contrary, nothing in the AIP Plan shall preclude the Company paying an employee an award under the AIP Plan for more than the number of months the employee was actively employed in an AIP Plan eligible role during the relevant Plan Period pursuant to an approved individual employee's employment termination agreement.

(9)    Company affiliates and joint ventures may choose to offer the AIP Plan or a similar plan subject to the approval of the Board of Directors.

## Section 3: Award Elements

An Eligible Employee's cash award for the relevant Plan Period under the AIP Plan will be based on the following formula[8]:

Formula Applicable to Semi-Annual Basis Eligible Employees:
50%[9] of <u>Annual Base Salary</u> x <u>Award %</u> x <u>Business Unit Performance Factor for First Half or Second Half, as applicable</u>

Formula Applicable to Annual Basis Eligible Employees:
100%[10] of <u>Annual Base Salary</u> x <u>Award %</u> x <u>Business Unit Performance Factor for Calendar Year</u>

---

[7]  The "Management Team" consists of the managers with whom the employee has a direct or indirect reporting relationship as set out in the Organization Structure Manager ("OSM") or its equivalent as maintained by the Company from time to time.

[8]  The AIP Plan award will be pro-rated as applicable under Section 2(6) and (8).

[9]  The percentage of Annual Base Salary that is applied to the formula may be changed by the Board of Directors at any time.

[10]  The percentage of Annual Base Salary that is applied to the formula may be changed by the Board of Directors at any time.

-4-

<u>Annual Base Salary</u> means the annualized regular compensation paid to an Eligible Employee, excluding any other compensation, such as, but not limited to, bonuses, commissions, overtime, and relocation benefits. The Annual Base Salary for these purposes will be measured for all Eligible Employees during the last calendar month of the relevant Plan Period on a uniform date.

<u>Award %</u> is the percentage determined for each Eligible Employee for purposes of the applicable formula above based on the scope, complexity, and responsibilities of the employee's role and that employee's performance during the applicable Plan Period. An Eligible Employee's Award % is subject to review, modification and approval by Senior Management and the Board of Directors as provided in Section 4.[11]

For Eligible Employees in Job Complexity Indicator ("JCI") 1-6 and 55, target Award %s ("Target Award %") ranging from 3.5% to 100% are established that reflect JCI level and assume that the Eligible Employee's performance is at a minimum satisfactory. The JCI level for these purposes will be measured concurrently with Annual Base Salary as described above. There is no guarantee that an Eligible Employee's Award % used in the formula above will equal the applicable Target Award %.

The total AIP Plan award for all Eligible Employees for a Business Unit is recommended by Senior Management for approval by the Board of Directors after the end of the relevant Plan Period. The Board of Directors will determine, in its sole discretion, whether all or any part of the recommended total AIP Plan award for a Business Unit for the relevant Plan Period will be paid and the amount of any total AIP Plan award for a Business Unit in respect of that Plan Period.

<u>Business Unit Performance Factor</u> applicable to each Business Unit shall be determined by the Board of Directors in its sole discretion based on its assessment of that Business Unit's achievements against performance metrics targets established for that Business Unit by the Board of Directors in its sole discretion for the First Half and the Second Half. The Business Unit Performance Factor may be based on one or more performance metrics, each with specific targets. The performance metrics may have equal or different weightings. Performance metrics are the general Business Unit objectives for the First Half or Second Half, as applicable. Targets will be based on objective and/or subjective criteria established to measure, directly or indirectly, the performance metrics. Weightings will be the relative weight or percentage accorded in the relevant Business Unit Performance Factor for achieving each specific target. After approval by the Board of Directors, the relevant Business Unit's objectives for the First Half and the Second Half will be communicated to Eligible Employees within that Business Unit. The

---

[11] For purposes of the Plan only, "Senior Management" shall consist of the person holding the most senior position in a Business Unit and any other position(s) as identified and approved by the Board of Directors (as defined in Section 2).

-5-

Business Unit Performance Factor for each Business Unit is deemed to be 1.0 (achievement) throughout the relevant Plan Period and is then adjusted by the Board of Directors based on its determination of each Business Unit's performance for (i) the First Half and Second Half, as applicable, with respect to the award calculation of Semi-Annual Basis Eligible Employees for the relevant Plan Period and (ii) the calendar year with respect to the award calculation of Annual Basis Eligible Employees for the relevant Plan Period; provided, however, that, the Business Unit Factor for the calendar year, which is used in the award calculation for Annual Basis Eligible Employees, will be equal to the average of the applicable Business Unit Factor for the First Half and the Second Half. Senior Management may, in its sole discretion, recommend to the Board of Directors that the applicable Business Unit Performance Factor be adjusted with respect to certain sub-units within a Business Unit, JCI levels or any other groups of employees and the Board can approve such adjustment to the relevant Business Unit Performance Factor, in its sole discretion, based on additional factors that Senior Management and Board of Directors determine in their sole discretion are relevant to the award including, without limitation, collective relative contribution to achievement of the key Business Unit objectives during the relevant Plan Period.

The Business Unit Performance Factor used in an Eligible Employee's Award calculation will be based on the Business Unit to which the Eligible Employee is aligned as of a uniform date in the last calendar month in the relevant Plan Period.

**Section 4: AIP Plan Awards**

Awards for each relevant Plan Period are calculated as described in Section 3. Notwithstanding any provision in the AIP Plan to the contrary, the maximum AIP Plan award payable to an Eligible Employee in the relevant Plan Period is a cash amount equal to (a) 100% of such Eligible Employee's Annual Base Salary multiplied by a percentage equal to one and one-half (1.5) times the Eligible Employee's Target Award % if such employee is an Annual Basis Eligible Employee or (b) 50% of such Eligible Employee's Annual Base Salary multiplied by a percentage equal to one and one-half (1.5) times the Eligible Employee's Target Award % if such employee is a Semi-Annual Basis Eligible Employee.

Any award under the AIP Plan to an Eligible Employee is subject to the discretion of the Eligible Employee's Management Team and Senior Management and the Board of Directors. That is, an Eligible Employee's Management Team determines, in its discretion, the Award % for an Eligible Employee subject to review, modification and approval by Senior Management. Specifically, Senior Management reserves the right, in its discretion, to review and adjust Eligible Employees' Award percentages, which are assigned to those Eligible Employees by their Management Team, to reflect its assessment of the employees' contributions, as reflected in their performance, to the Business Unit or the achievement of the Business Unit's key objectives, as well as to ensure that the final payouts, if any, are within appropriate budgetary guidelines. Finally, the Board of Directors reserves the right, in its discretion, to make a final determination of the Award % of any Eligible Employee. The Board of Directors determines, in its sole

- 6 -

discretion, the achievement of the targets for the performance metrics, the final calculation of the Business Unit Performance Factor (which may include a determination of a Business Unit Performance Factor of zero, even if certain of the performance metrics targets are achieved, and/or an adjustment to the relative weighting of the performance metrics) and whether AIP Plan awards will be paid in respect of a Plan Period. During the relevant Plan Period, the Board of Directors can review Business Unit objectives, performance measures, weightings, and targets to determine whether they remain appropriate. The Board of Directors may, at its sole discretion, adjust the Business Unit's objectives, performance measures, weightings, targets, and/or plan payouts for the relevant Plan Period, as it deems necessary, to reflect changes in business conditions or other circumstances.

Subject to applicable law, Senior Management, may approve the reduction of AIP Plan awards payable to Eligible Employees for a Plan Period by the full or partial amount of other bonuses or similar payments, including, without limitation, Company performance related payments required by applicable law, that are payable to such employees in respect of any part of such Plan Period. Senior Management, will have sole discretion to determine those bonuses or payments that are subject to the preceding sentence and the amount of any such reduction to the AIP Plan award.

Subject to applicable law, Senior Management may approve accelerated payments at target (Business Unit Performance Factor of 1.0) to Eligible Employees in entities designated for entity closure prior to the determination of a Business Unit Performance Factor for the Plan Period by the Board of Directors. These payments may be made on a pro-rated basis and as soon as practicable to Eligible Employees who are terminated from employment involuntarily (not for Cause) by the Company due to the entity closure action. Any accelerated payment shall be contingent upon the Eligible Employee executing and submitting to the Company a release in a form to be determined and provided by the Company (the "Release") of all claims related to the Plan.

If the Board of Directors approves the payment of a total AIP Plan award for a Business Unit for the relevant Plan Period in accordance with the provisions of the AIP Plan, any AIP Plan award approved for an Eligible Employee under the AIP Plan in that Business Unit will be payable as follows:

Semi-Annual Basis Group A Eligible Employees:
1. 100% of the award, if any, with respect to the First Half Plan Period following completion of the First Half;
2. 100% of the award, if any, with respect to the Second Half Plan Period following completion of the Second Half.

Semi-Annual Basis Group B Eligible Employees:
1. 50% of the award, if any, with respect to the First Half Plan Period following completion of the First Half;

- 7 -

2. 50% of the award, if any, with respect to the First Half Plan Period following completion of the Second Half; and

3. 100% of the award, if any, with respect to the Second Half Plan Period following completion of the Second Half.

Notwithstanding the foregoing, if the employment of a Group B Semi-Annual Basis Eligible Employee is terminated involuntarily by the Company for a reason determined by the Company to be other than for Cause or due to the Employee's death or Transfer and the employment termination occurs (a) on or before June 30th of the relevant calendar year, then 100% of the award with respect to the First Half Plan Period will be payable following completion of the First Half and no award will be payable with respect to the Second Half Plan Period or (b) on or after July 1st of the relevant calendar year, then (i) with respect to any First Half award that is payable, 50% will be paid following completion of the First Half and the remaining 50% will be paid within 90 days of such employment termination, but in no event earlier than such initial 50% payment, and (ii) with respect to any Second Half award that is payable, 100% will be paid following completion of the Second Half.

Annual Basis Eligible Employees:

100% of the award, if any, with respect to the calendar year Plan Period following the completion of the Second Half.

The payment of any award or portion of an award payable upon completion of the First Half, as provided above, will be made as soon as practicable following September 1st of that calendar year, but in no event later than October 31st of that calendar year. The payment of any award or portion of an award payable upon completion of the Second Half, as provided above, will be made as soon as practicable following March 1st of the following calendar year but in no event later than April 30th of the following calendar year.

The applicable date on which an award is paid as described above is the "Payment Date". AIP Plan awards are considered income and are therefore subject to national, state/provincial, and/or local taxes. All appropriate taxes and other withholdings will be deducted from any such awards and payments as required by applicable law. Each AIP Plan award for each separate Plan Period will be treated as a separate payment for purposes of Section 409A.

Depending on local laws and policies, AIP Plan awards may have an impact on some benefits and may or may not be included in the "eligible earnings" for purposes of capital accumulation and retirement plans offered in the various regions by the Company. Where appropriate, deductions may be made from AIP Plan awards in accordance with the specific capital accumulation and retirement plan in which the Eligible Employee participates.

Notwithstanding anything in the AIP Plan to the contrary, if the Board of Directors, in its sole discretion, upon consideration of facts and circumstances determined by the Board of Directors to be relevant, concludes that an Eligible Employee has committed

- 8 -

intentional misconduct, as defined in the Policy Regarding Recoupment of Incentive Compensation (the "Recoupment Policy") relating to the forfeiture and/or recoupment of incentive compensation, including AIP Plan award payments, the Eligible Employee will forfeit any planned but unpaid AIP Plan award and/or reimburse the Company the amount of the AIP Plan award received, as determined by the Board of Directors.

**Section 5: Discretionary Bonus Pool**

During a Plan Period, the Board of Directors may consider the creation of a separate Discretionary Bonus Pool under the AIP Plan to provide discretionary, incremental bonus awards. These awards may be made to all employees of the Company or employees of the Company who individually or in groups made a relative contribution that significantly added to the overall success of the Company, whether or not the employees are eligible to participate in the AIP Plan under the criteria set out in Section 2 of this document. The determination that a Company employee is eligible for a Discretionary Bonus Pool award does not otherwise entitle that employee to generally participate in the AIP Plan. The Board of Directors have complete discretion to determine: the establishment of the Discretionary Bonus Pool; the eligibility criteria for participation; any performance metrics, weightings and targets; the achievement, if any, of the targets for the performance metrics; and the amount of the awards, if any, paid from the Discretionary Bonus Pool. Whether or not an Eligible Employee receives a AIP Plan award shall have no effect on that employee's eligibility to receive a Discretionary Bonus Pool award.

Discretionary Bonus Pool awards will be considered income and therefore subject to national, state/provincial, and/or local taxes. All appropriate taxes and other withholdings will be deducted from the award as required by applicable law.

Depending on local laws and policies, Discretionary Bonus Pool awards may have an impact on some benefits and may or may not be included in the "eligible earnings" for purposes of capital accumulation and retirement plans offered in the various regions by the Company. Where appropriate, deductions may be made from the Discretionary Bonus Pool awards in accordance with the specific capital accumulation and retirement plan in which the employee participates.

**Section 6: Interpretations and Amendments**

This document, as amended from time to time, constitutes the "Nortel Networks Limited Annual Incentive". In the event of any conflicts or inconsistencies between the provisions of the AIP Plan and any other document or communication, written or oral, concerning the AIP Plan, the provisions of this document, as amended from time to time, will govern.

The Board of Directors will interpret the provisions of the AIP Plan and that interpretation will be final and binding on the Company, the Business Units and all AIP Plan participants. This document is also subject to interpretation to comply with applicable laws. It is not and shall not be construed as either an employment contract or

- 9 -

as a contract concerning the subject matter contained herein. There is no guarantee that any award under the AIP Plan will actually be paid. Any award is determined at the discretion of an Eligible Employee's Management Team, Senior Management and the Board of Directors, as the case may be. If any awards, however, are paid, they will be determined and paid in accordance with the provisions herein.

The AIP Plan can only be terminated or amended by the Board of Directors, which has the full authority, at any time, to terminate the AIP Plan or to delete, modify and/or add to any and all terms, conditions, and provisions of the AIP Plan.

As adopted by the Board of Directors of Nortel Networks Limited on July 25, 2002, as amended on January 23, 2003 with effect from January 1, 2003, as amended on July 28, 2003 with effect from January 1, 2003, as amended on February 26, 2004 with effect from January 1, 2004, as amended on March 9, 2006 with effect from January 1, 2006, as amended on March 15, 2007 with effect from January 1, 2007, as amended on February 22, 2008 with effect from January 1, 2008, as amended on February 20, 2009 with effect from January 1, 2009, as amended on November 13, 2009 with effect from October 1, 2009, as amended on March 10, 2010 with effect from January 1, 2010 and as amended on March 3, 2011 with effect from January 1, 2011 and as amended on May 12, 2011 with effect from January 1, 2011 and as amended on July 21, 2011 with effect from July 1, 2011, as amended on Feruary 16, 2012 with effect from January 1, 2012.

- 10 -

## APPENDIX A

**Group A Eligible Employees**

- Eligible Employees whose country of payroll is Mexico

**Group B Eligible Employees**

- Eligible Employees whose country of payroll is Canada
- Eligible Employees whose country of payroll is the United States

- 11 -

Exhibit 10.131

## Nortel Networks Limited Quarterly Incentive Plan for Business Units

### Section 1: Introduction

The Nortel Networks Limited Quarterly Incentive Plan for Business Units (the "Quarterly Plan") is a short-term, incentive bonus plan that provides the potential for "Eligible Employees" (as defined below) to receive cash awards based on their contributions to the success of the relevant "Business Unit"[1] of the Company[2], conditioned on the relevant Business Unit meeting its objectives.

The Quarterly Plan is intended to drive business performance by rewarding Eligible Employees for their contributions to the relevant Business Unit's overall success. An Eligible Employee's contribution is determined by two factors: (1) the impact of the employee's role on business results and (2) the employee's performance during the employee's active employment with the Company. The actual award received by an Eligible Employee will reflect (1) the scope, complexity, and responsibilities of the employee's role, and the employee's contribution and performance during the Plan Period[3] and (2) the relevant Business Unit's performance during the Plan Period as indicated by the Business Unit Performance Factor, as described below.

### Section 2: Quarterly Plan Eligibility

Generally, regular full-time and regular part-time[4] Company employees are eligible to participate in the Quarterly Plan ("Eligible Employees"), subject to the following:

(1)    Eligible Employees, who participate in other Company incentive plans for a full calendar month or the greater portion of a calendar month, as determined by the Company, are not eligible to participate in the Quarterly Plan during that calendar month. For purposes of this document, "other incentive plans" mean any other incentive/bonus arrangements which the Company determines have been offered in lieu of the Quarterly Plan.

---

[1] For purposes of the Quarterly Plan, the following organizations constitutes a "Business Unit": i) the Asia Region and ii) Any other organization (s) approved and defined by the Board of Directors (as defined in Section 2) as Business Units.

[2] For purposes of the Quarterly Plan, the "Company" is defined as Nortel Networks Limited and its subsidiaries and affiliates and other entities, which it controls directly or indirectly and which have been approved for participation in the Quarterly Plan by the Board of Directors.

[3] Each calendar year consists of four Plan Periods, which align with the Company's four fiscal quarters (i.e., January 1st through March 31st ("Q1 Plan Period"), April 1st through June 30th ("Q2 Plan Period"), July 1st through September 30th ("Q3 Plan Period") and October 1st through December 31st ("Q4 Plan Period"). The Plan Period(s) may be changed by the Board of Directors at any time.

[4] For purposes of the Quarterly Plan, regular full-time and regular part-time Company employees are those employees who are eligible for participation in the Company health benefit plans based on their regularly scheduled hours.

(2)    Subject to applicable law, employees who are covered under a collective labor agreement are not eligible unless that collective labor agreement provides for their participation in the Quarterly Plan.

(3)    Individuals determined by the Company to be students, co-op students, interns, temporary[5], or non-payroll workers (i.e., individuals who are not paid from a Company employee payroll) are ineligible to participate in the Quarterly Plan.

(4)    The Boards of Directors of Nortel Networks Corporation and Nortel Networks Limited (the "Board of Directors") may determine that certain Company employees (including employees who are not otherwise eligible for the Quarterly Plan) may be eligible to receive an award from a Discretionary Bonus Pool created pursuant to Section 5 hereof.

(5)    Subject to applicable law, to be eligible for an award for any given Plan Period an employee must be (a) actively employed in a role that is eligible under the Quarterly Plan or other incentive plan ("Incentive Eligible Role") for at least one calendar month in that Plan Period[6] and (b) employed by the Company on the last day of the applicable Plan Period or, if no longer employed as of that date, involuntarily terminated by the Company during that Plan Period for a reason determined by the Company to be other than for the employee's inappropriate actions or inactions, misconduct, breach of an agreement with the Company or unsatisfactory performance or cause (as legally defined, if at all, in the relevant jurisdiction)(collectively, "Cause"). For purposes of this document, an employee will be considered to be "actively employed" on those days when the employee is classified as "active" on the applicable Company payroll and one day of active employment in a calendar month is deemed to be active employment for that full calendar month.

(6)    Pro-rated awards will be made as described below to employees who (a) transfer into or out of positions covered by other incentive plans, (b) move from or to a job within the Company that is ineligible for the Quarterly Plan, (c) are on a Company approved leave of absence or on "notice" of termination of employment and not actively employed for part of the Plan Period or (d) are terminated from employment due to death, or by the Company involuntarily for a reason determined by the Company to be other than for Cause prior to the end of the relevant Plan Period, provided that the employee

---

[5] Where legally required, temporary full time employees on fixed term contracts with the Company may be included as Eligible Employees subject to the other conditions in Section 2 of the Plan.

[6] The required period of active employment status may be changed by the Board of Directors at any time.

-2-

meets the other Quarterly Plan requirements set out above. However, subject to applicable law, an employee is not eligible for a Quarterly Plan payout for any calendar month in which the employee is not actively employed in a position eligible under the Quarterly Plan for at least one day. Except as provided in the following sentence, if an employee meets the above Quarterly Plan requirements, but is actively employed in a position that is eligible under the Quarterly Plan for less than the full relevant Plan Period, the employee's Quarterly Plan award for the relevant Plan Period will be based on the number of months during the relevant Plan Period that the employee is actively employed in a Quarterly Plan eligible position for at least one calendar day divided by the number of months in the relevant Plan Period. For purposes of determining the amount of a pro-rata Quarterly Plan award, an employee will not be considered to be actively employed in a Quarterly Plan eligible position in a calendar month in which (x) the employee participates in another incentive plan for that full calendar month or (y) the employee participates in another incentive plan for the greater portion of the month, each as determined by the Company.

(7)   Employees who meet all of the Quarterly Plan eligibility requirements, but whose employment with the Company terminates between the end of the Plan Period and the payment date for the award for that Plan Period for reasons determined by the Company to be other than an involuntary termination for Cause, will be eligible for an award for the applicable Plan Period. With respect to former employees who continue to be eligible for a Quarterly Plan award under Section 2(5) (b) or this Section 2(7) of the Quarterly Plan, the Company may deny payment of that Quarterly Plan award to those former employees if they engage in conduct after their employment termination date and prior to the award payment date that constitutes Cause, as determined by the Company.

Notwithstanding the foregoing, any payment made after termination of employment to a "specified employee" that would be considered a "deferral of compensation" within the meaning of, and subject to, Section 409A of the U.S. Internal Revenue Code and regulations thereunder ("Section 409A") will be paid on the later of the date which is six months and one day after (a) the termination date and (b) the date on which the award is otherwise payable under Section 4 of the Quarterly Plan. A "specified employee" means any U.S. taxpayer who is a key employee (as defined in Section 416(i) of the U.S. Internal Revenue Code without regard to paragraph 5 thereof) of the Company. **(This is generally limited to employees who are (i) in the top 50 officers having an annual compensation greater than US$145,000, (ii) a 5-percent owner, or (iii) a 1-percent owner having an annual compensation of more than US$150,000.). For this purpose, termination of employment means "a separation from service" as defined in Section 409A.**

-3-

(8)    An employee's Management Team[7] may, in consultation with the relevant Human Resources Business prime, make limited exceptions to the 'actively employed' requirement set out in Section 2(5) above where required by applicable law (e.g., as required under applicable maternity, paternity, parental, military, family, or medical leave laws), or where the Management Team determines that circumstances clearly warrant an exception (e.g., disability, outsourcing, divestiture, or death). In such situations, if the employee has, while actively employed in a Quarterly Plan eligible role, substantially satisfied contribution and performance expectations for the Plan Period, the employee's Management Team may grant partial awards. If awards are paid in these circumstances, the awards will be pro-rated to reflect the period the employee was actively employed in a Quarterly Plan eligible role as defined in Section 2(5) above, and will be commensurate with the employee's contribution and performance. Notwithstanding anything in the foregoing to the contrary, nothing in the Quarterly Plan shall preclude the Company paying an employee an award under the Quarterly Plan for more than the number of months the employee was actively employed in a Quarterly Plan eligible role during the relevant Plan Period (up to a maximum of three (3) months) pursuant to that individual employee's employment termination agreement.

(9)    Company affiliates and joint ventures may choose to offer the Quarterly Plan or a similar plan subject to the approval of the Board of Directors.

## Section 3: Award Elements

An Eligible Employee's cash award for a Plan Period under the Quarterly Plan will be based on the following formula:

25%[8] of Annual Base Salary x Award % x Business Unit Performance Factor[9]

Annual Base Salary means the annualized regular compensation paid to an Eligible Employee, excluding any other compensation, such as, but not limited to, bonuses, commissions, overtime, and relocation benefits. The Annual Base Salary for these purposes will be measured for all Eligible Employees during the third calendar month of the relevant Plan Period on a uniform date.

Award % is the percentage determined for each Eligible Employee for purposes of the applicable formula above based on the scope, complexity, and responsibilities of the employee's role and that employee's performance during the applicable Plan Period. An Eligible Employee's Award % is subject to review, modification and approval by Senior Management and the Board of Directors as provided in Section 4.[10]

---

[7] The "Management Team" consists of the managers with whom the employee has a direct or indirect reporting relationship as set out in the Organization Structure Manager ("OSM") or its equivalent as maintained by the Company from time to time.

[8] The percentage of Annual Base Salary that is applied to the formula may be changed by the Board of Directors at any time.

[9] The Quarterly Plan award will be pro-rated as applicable under Section 2(6) and (8).

[10] For purposes of the Quarterly Plan only, "Senior Management" shall consist of: i) the person holding the most senior position in the applicable Business Unit and ii) the NNL Senior Vice-President Corporate Services and Chief Financial Officer.

-4-

For Eligible Employees in Job Complexity Indicator ("JCI") 1-6 and 55, target Award %s ("Target Award %") ranging from 3.5% to 100% are established that reflect JCI level and assume that the Eligible Employee's performance is at a minimum satisfactory. The JCI level for these purposes will be measured concurrently with Annual Base Salary as described above. There is no guarantee that an Eligible Employee's Award % used in the formula above will equal the applicable Target Award %.

The total Quarterly Plan award for all Eligible Employees for a Business Unit is recommended by Senior Management for approval by the Board of Directors after the end of the Plan Period. The Board of Directors will determine, in its sole discretion, whether all or any part of the recommended total Quarterly Plan award for a Business Unit for the Plan Period will be paid and the amount of any total Quarterly Plan award for a Business Unit in respect of that Plan Period.

Business Unit Performance Factor applicable to each Business Unit shall be determined by the Board of Directors in its sole discretion based on its assessment of that Business Unit's achievements against performance metrics targets established for that Business Unit by the Board of Directors in its sole discretion for the relevant Plan Period. The Business Unit Performance Factor may be based on one or more performance metrics, each with specific targets. The performance metrics may have equal or different weightings. Performance metrics are the general Business Unit objectives for the Plan Period. Targets will be based on objective and/or subjective criteria established to measure, directly or indirectly, the performance metrics. Weightings will be the relative weight or percentage accorded in the relevant Business Unit Performance Factor for achieving each specific target. After approval by the Board of Directors, the relevant Business Unit's objectives for the Plan Period will be communicated to Eligible Employees within that Business Unit. The Business Unit Performance Factor for each Business Unit is deemed to be 1.0 (achievement) throughout the Plan Period and is then adjusted by the Board of Directors based on its determination of each Business Unit's performance. Senior Management may, in its sole discretion, recommend to the Board of Directors that the Business Unit Performance Factor be adjusted with respect to certain sub-units within a Business Unit, JCI levels or any other groups of employees and the Board can approve such adjustment to the relevant Business Unit Performance Factor, in its sole discretion, based on additional factors that Senior Management and Board of Directors determine in their sole discretion are relevant to the award including, without limitation, collective relative contribution to achievement of the key Business Unit objectives during the Plan Period.

Except as otherwise required by applicable law, the Business Unit Performance Factor used in an Eligible Employee's Award calculation will be based on the Business Unit to which the Eligible Employee is aligned as of a uniform date in the third calendar month in the relevant Plan Period.

-5-

**Section 4: Quarterly Plan Awards**

Awards for each Plan Period are calculated based on 25%[11] of an Eligible Employee's Annual Base Salary, the Eligible Employee's Award % (which reflects the scope, complexity and responsibilities of the employee's role and the employee's contribution and performance during the Plan Period), and the Business Unit Performance Factor. Notwithstanding any provision in the Quarterly Plan to the contrary, the maximum Quarterly Plan award payable to a JCI 55 Eligible Employee in a Plan Period is a cash amount equal to 25% of such Eligible Employee's Annual Base Salary multiplied by a percentage equal to two (2) times the Eligible Employee's AIP Target Percentage.

Any award under the Quarterly Plan to an Eligible Employee is subject to the discretion of the Eligible Employee's Management Team and Senior Management and the Board of Directors. That is, an Eligible Employee's Management Team determines, in its discretion, the Award % for an Eligible Employee subject to review, modification and approval by Senior Management. Specifically, Senior Management reserves the right, in its discretion, to review and adjust Eligible Employees' Award percentages, which are assigned to those Eligible Employees by their Management Team, to reflect its assessment of the employees' contributions to the Business Unit or the achievement of the Business Unit's key objectives, as well as to ensure that the final payouts, if any, are within appropriate budgetary guidelines. Finally, the Board of Directors reserves the right, in its discretion, to make a final determination of the Award % of any Eligible Employee. The Board of Directors determines, in its sole discretion, the achievement of the targets for the performance metrics, the final calculation of the Business Unit Performance Factor (which may include a determination of a Business Unit Performance Factor of zero, even if certain of the performance metrics targets are achieved, and/or an adjustment to the relative weighting of the performance metrics) and whether Quarterly Plan awards will be paid in respect of a Plan Period. During the Plan Period, the Board of Directors can review Business Unit objectives, performance measures, weightings, and targets to determine whether they remain appropriate. The Board of Directors may, at its sole discretion, adjust the Business Unit's objectives, performance measures, weightings, targets, and/or plan payouts for the Plan Period, as it deems necessary, to reflect changes in business conditions or other circumstances.

Subject to applicable law, Senior Management may approve accelerated payments at target (Business Unit Performance Factor of 1.0) to Eligible Employees in entities designated for entity closure prior to the determination of a Business Unit Performance Factor for the Plan Period by the Board of Directors. These payments may be made on a pro-rated basis and as soon as practicable to Eligible Employees who are terminated from employment involuntarily (not for Cause) by the Company due to the entity closure action. Any accelerated payment shall be contingent upon the Eligible Employee executing and submitting to the Company a release in a form to be determined and provided by the Company (the "Release") of all claims related to the Plan.

---

[11] The percentage of Annual Base Salary that is applied to the formula may be changed by the Board of Directors at any time.

-6-

If the Board of Directors approves the payment of a total Quarterly Plan award for a Business Unit for a Plan Period in accordance with the provisions of the Quarterly Plan, the payment of any Quarterly Plan award approved for an Eligible Employee under the Quarterly Plan in that Business Unit in respect of such Plan Period will be made as follows: (i) with respect to Quarterly Plan awards approved for the Q1 Plan Period, Q2 Plan Period or Q3 Plan Period, as soon as practicable following the 1st day of the second calendar month following the end of the relevant Plan Period but in no event later than March 15th of the calendar year following the applicable Plan Period, and (ii) with respect to Quarterly Plan awards approved for the Q4 Plan Period, as soon as practicable following March 1st of the calendar year following the Q4 Plan Period, but in no event later than December 31st of the calendar year following the applicable Q4 Plan Period. Quarterly Plan awards are considered income and are therefore subject to national, state/provincial, and/or local taxes. All appropriate taxes and other withholdings will be deducted from any such awards and payments as required by applicable law. Each Quarterly Plan award for each separate Plan Period will be treated as a separate payment for purposes of Section 409A.

Depending on local laws and policies, Quarterly Plan awards may have an impact on some benefits and may or may not be included in the "eligible earnings" for purposes of capital accumulation and retirement plans offered in the various regions by the Company. Where appropriate, deductions may be made from Quarterly Plan awards in accordance with the specific capital accumulation and retirement plan in which the Eligible Employee participates.

Notwithstanding anything in the Quarterly Plan to the contrary, if the Board of Directors, in its sole discretion, upon consideration of facts and circumstances determined by the Board of Directors to be relevant, concludes that an Eligible Employee has committed intentional misconduct, as defined in the Policy Regarding Recoupment of Incentive Compensation (the "Recoupment Policy") relating to the forfeiture and/or recoupment of incentive compensation, including Quarterly Plan award payments, the Eligible Employee will forfeit any planned but unpaid Quarterly Plan award and/or reimburse the Company the amount of the Quarterly Plan award received, as determined by the Board of Directors.

**Section 5: Discretionary Bonus Pool**

During a Plan Period, the Board of Directors may consider the creation of a separate Discretionary Bonus Pool under the Quarterly Plan to provide discretionary, incremental bonus awards. These awards may be made to all employees of the Company or employees of the Company who individually or in groups made a relative contribution that significantly added to the overall success of the Company, whether or not the employees are eligible to participate in the Quarterly Plan under the criteria set out in Section 2 of this document. The determination that a Company employee is eligible for a

-7-

Discretionary Bonus Pool award does not otherwise entitle that employee to generally participate in the Quarterly Plan. The Board of Directors have complete discretion to determine: the establishment of the Discretionary Bonus Pool; the eligibility criteria for participation; any performance metrics, weightings and targets; the achievement, if any, of the targets for the performance metrics; and the amount of the awards, if any, paid for the Discretionary Bonus Pool. Whether or not an Eligible Employee receives a Quarterly Plan award shall have no effect on that employee's eligibility to receive a Discretionary Bonus Pool award.

Discretionary Bonus Pool awards will be considered income and therefore subject to national, state/provincial, and/or local taxes. All appropriate taxes and other withholdings will be deducted from the award as required by applicable law.

Depending on local laws and policies, Discretionary Bonus Pool awards may have an impact on some benefits and may or may not be included in the "eligible earnings" for purposes of capital accumulation and retirement plans offered in the various regions by the Company. Where appropriate, deductions may be made from the Discretionary Bonus Pool awards in accordance with the specific capital accumulation and retirement plan in which the employee participates.

## Section 6: Interpretations and Amendments

This document, as amended from time to time, constitutes the "Nortel Networks Limited Quarterly Incentive Plan for Business Units". In the event of any conflicts or inconsistencies between the provisions of the Quarterly Plan and any other document or communication, written or oral, concerning the Quarterly Plan, the provisions of this document, as amended from time to time, will govern.

The Board of Directors in certain cases, as it may specify, will interpret the provisions of the Quarterly Plan and that interpretation will be final and binding on the Company, the Business Units and all Quarterly Plan participants. This document is also subject to interpretation to comply with applicable laws. It is not and shall not be construed as either an employment contract or as a contract concerning the subject matter contained herein. There is no guarantee that any award under the Quarterly Plan will actually be paid. Any award is determined at the discretion of an Eligible Employee's Management Team, Senior Management and the Board of Directors, as the case may be. If any awards, however, are paid, they will be determined and paid in accordance with the provisions herein.

The Quarterly Plan can only be terminated or amended by the Board of Directors, which has the full authority, at any time, to terminate the Quarterly Plan or to delete, modify and/or add to any and all terms, conditions, and provisions of the Quarterly Plan.

As adopted by the Board of Directors of Nortel Networks Limited on July 25, 2002, as amended on January 23, 2003 with effect from January 1, 2003, as amended on July 28, 2003 with effect from January 1, 2003, as amended on February 26, 2004 with effect from January 1, 2004, as amended on March 9, 2006 with effect from January 1, 2006, as amended on March 15, 2007 with effect from

- 8 -

January 1, 2007, as amended on February 22, 2008 with effect from January 1, 2008, as amended on February 20, 2009 with effect from January 1, 2009, as amended on November 13, 2009 with effect from October 1, 2009 and as amended on March 10, 2010 with effect from January 1, 2010 and ; amended on July 21, 2011 with effect from July 1, 2011, as amended on February 16, 2012 with effect from January 1, 2012.

- 9 -

Exhibit 21

**Subsidiaries of the Registrant**

| | Organized under the laws of |
|---|---|
| 1328556 Ontario Inc. | Ontario |
| Architel Systems (U.S.) Corporation | Delaware |
| Architel Systems Corporation | Canada |
| Bay Networks Redes de Dados para Sistemas Informaticos, Lda. | Portugal |
| Capital Telecommunications Funding Corporation | Canada |
| CoreTek, Inc. | Delaware |
| CTFC Canada Inc. | Canada |
| Guangdong Nortel Telecommunications Equipment Co., Ltd. | China |
| Matra Communication Cellular Terminals GmbH | Germany |
| Nor.Web DPL Limited | United Kingdom |
| Nortel Altsystems Inc. | Delaware |
| Nortel Altsystems International Inc. | Delaware |
| Nortel Communications Holdings (1997) Limited | Israel |
| Nortel Communications Inc. | Ontario |
| Nortel de Mexico, S. de R. L. de C. V. | Mexico |
| Nortel GmbH | Germany |
| Nortel Networks (Asia) Limited | Hong Kong |
| Nortel Networks (Austria) GmbH | Austria |
| Nortel Networks (Bulgaria) EOOD | Bulgaria |
| Nortel Networks (CALA) Inc. | Florida |
| Nortel Networks (China) Limited | China |
| Nortel Networks (India) Private Limited | New Delhi, India |
| Nortel Networks (Ireland) Limited | Ireland |
| Nortel Networks (Northern Ireland) Limited | Northern Ireland |
| Nortel Networks (Photonics) Pty Ltd. | NSW, Australia |
| Nortel Networks (Shannon) Limited | Ireland |
| Nortel Networks (Thailand) Ltd. | Thailand |
| Nortel Networks AB | Sweden |
| Nortel Networks AG | Switzerland |
| Nortel Networks Applications Management Solutions Inc. | Delaware |
| Nortel Networks AS | Norway |
| Nortel Networks Australia Pty Limited | NSW, Australia |
| Nortel Networks BV | Netherlands |
| Nortel Networks Cable Solutions Inc. | Delaware |
| Nortel Networks Capital Corporation | Delaware |
| Nortel Networks Chile S.A. | Chile |
| Nortel Networks Communications (Israel) Limited | Israel |
| Nortel Networks Communications Engineering Ltd. | China |
| Nortel Networks de Argentina, S.A. | Argentina |
| Nortel Networks de Bolivia S.A. | Bolivia |
| Nortel Networks de Colombia, S.A.S. | Colombia |
| Nortel Networks de Guatemala, Ltda. | Guatemala |
| Nortel Networks de Mexico, S.A. de C.V. | Mexico |
| Nortel Networks de Venezuela, C.A. | Venezuela |
| Nortel Networks del Ecuador, S.A. | Ecuador |
| Nortel Networks del Paraguay S.A. | Paraguay |
| Nortel Networks del Uruguay, S.A. | Uruguay |
| Nortel Networks Eastern Mediterranean Ltd. | Israel |
| Nortel Networks Electronics Corporation | Canada |
| Nortel Networks Employee Benefit Trustee Company Limited | United Kingdom |
| Nortel Networks Engineering Service Kft. | Hungary |
| Nortel Networks Europe Sales Limited | Ireland |
| Nortel Networks Financial Services Limited Liability Company | Hungary |
| Nortel Networks France SAS | France |
| Nortel Networks Global Corporation | Canada |
| Nortel Networks Hispania, S.A. | Spain |
| Nortel Networks HPOCS Inc. | Delaware |
| Nortel Networks Inc. | Delaware |

| | |
|---|---|
| Nortel Networks India International Inc. | Delaware |
| Nortel Networks International Corporation | Canada |
| Nortel Networks International Finance & Holding BV | Netherlands |
| Nortel Networks International Inc. | Delaware |
| Nortel Networks Israel (Sales and Marketing) Limited | Israel |
| Nortel Networks Japan | Japan |
| Nortel Networks Korea Limited | Korea |
| Nortel Networks Limited | Canada |
| Nortel Networks Malaysia Sdn. Bhd. | Malaysia |
| Nortel Networks Mauritius Ltd. | Mauritius |
| Nortel Networks New Zealand Limited | New Zealand |
| Nortel Networks NV | Belgium |
| Nortel Networks O.O.O. | Russia |
| Nortel Networks Optical Components (Switzerland) GmbH | Switzerland |
| Nortel Networks Optical Components Inc. | Delaware |
| Nortel Networks Optical Components Limited | United Kingdom |
| Nortel Networks OY | Finland |
| Nortel Networks Peru S.A.C. | Peru |
| Nortel Networks Polska Sp. z o.o. | Poland |
| Nortel Networks Portugal, S.A. | Portugal |
| Nortel Networks Properties Limited | United Kingdom |
| Nortel Networks Romania Srl | Romania |
| Nortel Networks S.p.A. | Italy |
| Nortel Networks S.R.O. | Czech Republic |
| Nortel Networks SA | France |
| Nortel Networks Singapore Pte Ltd | Singapore |
| Nortel Networks Slovensko, s.r.o. | Slovak Republic |
| Nortel Networks South Africa (Proprietary) Limited | South Africa |
| Nortel Networks Southeast Asia Pte Ltd. | Singapore |
| Nortel Networks Technology (Thailand) Ltd. | Thailand |
| Nortel Networks Technology Corporation | Nova Scotia |
| Nortel Networks Technology K.K. | Japan |
| Nortel Networks Technology Ltd. | Cayman Islands |
| Nortel Networks Telecommunications Equipment (Shanghai) Co., Ltd. | China |
| Nortel Networks Telecomunicacoes do Brasil Ltda. | Brazil |
| Nortel Networks UK Limited | United Kingdom |
| Nortel Networks UK Pension Trust Limited | United Kingdom |
| Nortel Technology Excellence Centre Private Limited | Bangalore, India |
| Nortel Telecom International Limited | Nigeria |
| Nortel Trinidad and Tobago Limited | Trinidad and Tobago |
| Nortel Ventures LLC | Delaware |
| Nortel Vietnam Limited | Vietnam |
| Nortel-SE d.o.o. Beograd | Serbia |
| Northern Telecom Canada Limited | Canada |
| Northern Telecom France SA | France |
| Northern Telecom International Inc. | Delaware |
| Northern Telecom Maroc SA | Morocco |
| Northern Telecom PCN Limited | United Kingdom |
| PT Nortel Networks Indonesia | Jarkarta, Indonesia |
| Qtera Corporation | Delaware |
| Regional Telecommunications Funding Corporation | Canada |
| Sonoma Systems | California |
| Star 21 Facility Management GmbH & Co. KG | Germany |
| Star 21 Facility Management Verwaltung GmbH | Germany |
| Star 21 NETWORKS (Schweiz) AG | Switzerland |
| Star 21 NETWORKS Deutschland GmbH | Germany |
| Star 21 Networks GmbH | Germany |
| Star 21 Operations GmbH | Germany |
| TSFC Canada Inc. | Canada |
| Xros, Inc. | Delaware |

**Exhibit 23**

### CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We consent to the incorporation by reference in the following Registration Statements and Amendments in effect of our report dated March 8, 2012, with respect to the consolidated balance sheets of Nortel Networks Corporation and subsidiaries as of December 31, 2011 and 2010, and the related consolidated statements of operations, changes in deficit and comprehensive income (loss) and cash flows for each of the years in the two year period ended December 31, 2011, which report appears in the December 31, 2011 Annual Report on Form 10-K of Nortel Networks Corporation:

- Registration Statement on Form S-3
  (Nortel Networks/BCE 1985 Stock Option Plan and the
  Nortel Networks/BCE 1999 Stock Option Plan)
  (333-11888)

- Registration Statement on Form S-3 and all Post-Effective Amendments thereto
  (Qtera Corporation)
  (333-11454)

- Registration Statement on Form S-3 and all Post-Effective Amendments thereto
  (Dividend Reinvestment Plan)
  (33-62270)

- Registration Statement on Form S-8 and all Post-Effective Amendments thereto
  (Nortel Networks Stock Purchase Plan)
  (333-11270)

- Registration Statement on Form S-8 and all Post-Effective Amendments thereto
  (Nortel Networks NA Inc. 1998 Employee Stock Purchase Plan)
  (333-9570)

- Registration Statement on Form S-8 and all Post-Effective Amendments thereto
  (Nortel Networks NA Inc. 1994 Stock Option Plan)
  (333-9066)

- Registration Statement on Form S-8 and all Post-Effective Amendments thereto
  (Qtera Corporation Amended and Restated Stock Incentive Plan)
  (333-11452)

- Registration Statement on Form S-8 and all Post-Effective Amendments thereto
  (Periphonics Corporation 1995 Stock Option Plan, as Amended and
  Periphonics Corporation 1995 Non-Employee Director Stock Option Plan)
  (333-10980)

- Registration Statement on Form S-8 and all Post-Effective Amendments thereto
  (Clarify Inc. 1991 Stock Option/Stock Issuance Plan,
  Clarify Inc. 1999 Non-Executive Stock Option/Stock Issuance Plan,
  Clarify Inc. Amended and Restated 1995 Stock Option/Stock Issuance Plan,
  Clarify Inc. Non-Employee Directors Option Plan,
  OBJIX Systems Development, Inc. Stock Plan and
  Certain Separate Option Agreements)
  (333-11110)

- Registration Statement on Form S-8 and all Post-Effective Amendments thereto
  (Nortel Networks Corporation 1986 Stock Option Plan, as Amended and Restated)
  (333-11342)
- Registration Statement on Form S-8 and all Post-Effective Amendments thereto
  (Nortel Networks Corporation 1986 Stock Option Plan, as Amended and Restated)
  (333-6152)
- Registration Statement on Form S-8 and all Post-Effective Amendments thereto
  (Nortel Networks Corporation 1986 Stock Option Plan, as Amended and Restated)
  (33-88214)
- Registration Statement on Form S-8 and all Post-Effective Amendments thereto
  (Nortel Networks Corporation 1986 Stock Option Plan, as Amended and Restated)
  (33-61904)
- Registration Statement on Form S-8 and all Post-Effective Amendments thereto
  (Nortel Networks Corporation 1986 Stock Option Plan, as Amended and Restated)
  (33-11640)
- Registration Statement on Form S-8 and all Post-Effective Amendments thereto
  (Promatory Communications, Inc. 1997 Stock Plan and
  Promatory Communications, Inc. 1999 Stock Plan)
  (333-11798)
- Registration Statement on Form S-8 and all Post-Effective Amendments thereto
  (Nortel Networks Inc. Long-Term Investment Plan)
  (333-7366)
- Registration Statement on Form S-8 and all Post-Effective Amendments thereto
  (Nortel Networks Inc. Long-Term Investment Plan)
  (33-25333)
- Registration Statement on Form S-8 and all Post-Effective Amendments thereto
  (Nortel Networks Corporation 2000 Stock Option Plan)
  (333-11876)
- Registration Statement on Form S-8
  (Xros, Inc. 1999 Stock Plan)
  (333-12176)
- Registration Statement on Form S-8
  (Architel Systems Corporation 1994 Flexible Stock Incentive Plan,
  1996 Stock Option Plan of Architel Systems Corporation,
  Amended and Restated Accugraph Corporation 1996 Stock Option Plan,
  Accugraph Corporation Key Employee Stock Option Plan and
  Accugraph Corporation 1992 Directors and Officers Stock Option Plan)
  (333-12228)

- Registration Statement on Form S-8
  (CoreTek, Inc. 1998 Employee, Director and Consultant Stock Option Plan)
  (333-12286)

- Registration Statement on Form S-8
  (EPiCON, Inc. 1995 Stock Plan, as Amended)
  (333-12644)

- Registration Statement on Form S-8
  (Alteon WebSystems, Inc. 2000 Non Statutory Incentive Plan,
  1999 Equity Incentive Plan,
  1999 Stock Purchase Plan and
  Pharsalia Technologies, Inc. 2000 Equity Incentive Plan)
  (333-12760)

- Registration Statement on Form S-8
  (Sonoma Systems 1996 Stock Option Plan, as Amended and
  Sonoma Systems 1999 Stock Option Plan, as Amended)
  (333-49304)

- Registration Statement on Form S-8 and all Post-Effective Amendments thereto
  (Nortel Networks U.S. Deferred Compensation Plan)
  (333-11558)

- Registration Statement on Form S-3
  (JDS Uniphase Corporation)
  (333-57510)

- Registration Statement on Form S-8
  (Nortel Networks Stock Purchase Plan)
  (333-70482)

- Registration Statement on Form S-3
  (Shasta Networks, Inc.)
  (333-10310)

- Registration Statement on Form S-8
  (Nortel Networks Company Savings Plan)
  (333-70504)

- Registration Statement on Form S-8
  (Nortel Networks Stock Purchase Plan)
  (333-106633)

- Registration Statement on Form S-8
  (Long-Term Investment Plan)
  (333-106654)

- Registration Statement on Form S-8
  (Nortel Global Stock Purchase Plan, Nortel U.S. Stock Purchase Plan and Nortel Stock Purchase Plan for Members of the Nortel Savings and Retirement Program)
  (333-126250)

- Registration Statement on Form S-8
  (Nortel 2005 Stock Incentive Plan)
  (333-135768)
- Registration Statement on Form S-8
  (Nortel 2005 Stock Incentive Plan, As Amended and Restated,
  Nortel U.S. Stock Purchase Plan, As Amended and Restated
  Nortel Global Stock Purchase Plan, As Amended and Restated
  Nortel Stock Purchase Plans for Members of the Savings and Retirement Program, As Amended)
  (333-151901)

Our report dated March 8, 2012 contains an explanatory paragraph that states that the Company filed for creditor protection for itself and certain subsidiaries, which raises substantial doubt about the Company's ability to continue as a going concern. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

/s/ KPMG LLP

Chartered Accountants, Licensed Public Accountants

Toronto, Canada
March 8, 2012

EXHIBIT 24

## POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that each of the undersigned directors of NORTEL NETWORKS CORPORATION (the "Corporation"), which is about to file with the Securities and Exchange Commission (the "SEC"), Washington, D.C. 20549, under the provisions of the Securities Exchange Act of 1934, as amended, an Annual Report on Form 10-K (the "Annual Report") for the fiscal year ended December 31, 2011, hereby constitutes and appoints Anna Ventresca his or her true and lawful attorney-in-fact and agent, with full power to act for him or her and in his or her name, place and stead, in any and all capacities, to sign such Annual Report and any and all amendments thereto, and other documents related thereto, with power where appropriate to affix the corporate seal of the Corporation thereto and to attest said seal and to file such Annual Report and amendments thereto, with all exhibits thereto, and any and all other information and documents in connection therewith, with the SEC, hereby granting unto said attorney-in-fact and agent full power and authority to do and perform any and all acts and things requisite and necessary to be done in and about the premises, as fully as to all intents and purposes as he or she might or could do in person, hereby ratifying and confirming all that said attorney-in-fact and agent may lawfully do or cause to be done by virtue hereof.

IN WITNESS WHEREOF, the undersigned have signed this Power of Attorney this 8th day of March, 2012.

| /s/  J.H. BENNETT | /s/  G.R. COTE | /s/  D.I. RICHARDSON |
|---|---|---|
| J.H. Bennett | G.R. Cote | D.I. Richardson |

EXHIBIT 31

**Certification**

I, ALLAN BIFIELD, certify that:

    I have reviewed this Annual Report on Form 10-K for the year ended December 31, 2011 of Nortel Networks Corporation;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15 (e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    I have disclosed, based on my most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 8, 2012

/s/ ALLAN BIFIELD
_____
Allan Bifield
Senior Vice-President, Corporate Services and Chief
Financial Officer*


* As Senior Vice-President, Corporate Services and Chief Financial Officer, Mr. Bifield is performing the functions of a principal executive officer.

EXHIBIT 32

**Certification**
**Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**
**(Subsections (a) and (b) of Section 1350, Chapter 63 of Title 18, United States Code)**

Pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), the undersigned officer of Nortel Networks Corporation, a Canadian corporation (the "Company"), does hereby certify, to such officer's knowledge, that:

The Annual Report on Form 10-K for the year ended December 31, 2011 (the "Form 10-K") of the Company fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: March 8, 2012                                    /S/ ALLAN BIFIELD
_____
                                                       Allan Bifield
                                                       Senior Vice-President, Corporate Services and
                                                       Chief Financial Officer*

* As Senior Vice-President, Corporate Services and Chief Financial Officer, Mr. Bifield is performing the functions of a principal executive officer.