## **EXHIBIT 43**

(Part 1 of 3)

A

**EXHIBIT**

167

exhibitsticker.com

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 10-Q

☒  **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Quarterly Period Ended June 30, 2012

**OR**

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Transition Period From          to

Commission File Number: 001-07260

# Nortel Networks Corporation
#### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Canada** | **98-0535482** |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |
| **5945 Airport Road, Suite 360** | |
| **Mississauga, Ontario, Canada** | **L4V 1R9** |
| (Address of Principal Executive Offices) | (Zip Code) |

**Registrant's Telephone Number Including Area Code (905) 863-6840**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☒  No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).  Yes ☒  No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer", "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large accelerated filer ☐ | Accelerated filer ☐ |
| Non-accelerated filer ☐ (Do not check if a smaller reporting company) | Smaller reporting company ☒ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).  Yes ☐  No ☒

Indicate the number of shares outstanding of each of the issuer's classes of common stock as of June 30, 2012.

**498,206,366 shares of common stock without nominal or par value**



EXHIBIT
PENGAD 800-831-6989
Wertheim-2
10/22/14  MG

BHG0160712

A

## TABLE OF CONTENTS

PAGE

### PART I
### FINANCIAL INFORMATION

| | | |
|---|---|---|
| ITEM 1. | Condensed Consolidated Financial Statements (unaudited) | 1 |
| ITEM 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 33 |
| ITEM 4. | Controls and Procedures | 47 |

### PART II
### OTHER INFORMATION

| | | |
|---|---|---|
| ITEM 1. | Legal Proceedings | 48 |
| ITEM 1A. | Risk Factors | 49 |
| ITEM 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 50 |
| ITEM 6. | Exhibits | 50 |
| SIGNATURES | | 51 |

All dollar amounts in this document are in United States Dollars unless otherwise stated.

NORTEL, NORTEL (Logo), NORTEL NETWORKS, the Globemark, and NT are trademarks of Nortel Networks.

All other trademarks are the property of their respective owners.

BHG0160713

A

**PART 1**
**FINANCIAL INFORMATION**

ITEM 1.    Condensed Consolidated Financial Statements (unaudited)

**NORTEL NETWORKS CORPORATION**
(Under Creditor Protection Proceedings as of January 14, 2009 — note 2)
Condensed Consolidated Statements of Operations (unaudited)
(Millions of U.S. Dollars, except per share amounts)

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| | 2012 | 2011 | 2012 | 2011 |
|---|---|---|---|---|
| Revenues | $ — | $ 1 | $ 1 | $ 21 |
| Cost of revenues | 1 | 5 | 2 | 27 |
| Gross loss | (1) | (4) | (1) | (6) |
| Selling, general and administrative expense | 25 | 53 | 52 | 91 |
| Other operating income—net (note 5) | — | (18) | (1) | (42) |
| Operating loss | (26) | (39) | (52) | (55) |
| Other income (expense)—net (note 5) | (8) | 9 | (18) | (3) |
| Interest expense (contractual interest expense for the six months ended June 30, 2012 and 2011 was $175 and $159, respectively) | (86) | (80) | (172) | (159) |
| Loss from operations before reorganization items—net and income taxes | (120) | (110) | (242) | (217) |
| Reorganization items—net (note 4) | (6) | 7 | 62 | 11 |
| Loss from operations before income taxes | (126) | (103) | (180) | (206) |
| Income tax expense | (2) | (2) | (7) | (1) |
| Net loss | (128) | (105) | (187) | (207) |
| Income attributable to noncontrolling interests | (3) | (10) | (7) | (13) |
| Net loss attributable to Nortel Networks Corporation | $ (131) | $ (115) | $ (194) | $ (220) |
| Basic loss per common share | $ (0.26) | $ (0.23) | $ (0.39) | $ (0.44) |
| Diluted loss per common share | $ (0.26) | $ (0.23) | $ (0.39) | $ (0.44) |

*The accompanying notes are an integral part of these condensed consolidated financial statements*

1

BHG0160714

A

# NORTEL NETWORKS CORPORATION
## (Under Creditor Protection Proceedings as of January 14, 2009 — note 2)
### Condensed Consolidated Balance Sheets (unaudited)
### (Millions of U.S. Dollars, except share amounts)

| | June 30, 2012 | December 31, 2011 |
|---|---|---|
| **ASSETS** | | |
| **Current assets** | | |
| Cash and cash equivalents | $ 668 | $ 751 |
| Restricted cash and cash equivalents | 77 | 93 |
| Accounts receivable—net | 159 | 174 |
| Other current assets (note 5) | 71 | 79 |
| **Total current assets** | 975 | 1,097 |
| Restricted cash and cash equivalents | 7,566 | 7,479 |
| Other assets (note 5) | 41 | 52 |
| **Total assets** | $ 8,582 | $ 8,628 |
| **LIABILITIES AND SHAREHOLDERS' DEFICIT** | | |
| **Current liabilities** | | |
| Trade and other accounts payable | $ 290 | $ 320 |
| Payroll and benefit-related liabilities | 5 | 17 |
| Contractual liabilities | 17 | 19 |
| Other accrued liabilities (note 5) | 13 | 18 |
| **Total current liabilities** | 325 | 374 |
| **Long-term liabilities** | | |
| Deferred income taxes—net | 6 | 7 |
| Other liabilities (note 5) | 8 | 17 |
| **Total long-term liabilities** | 14 | 24 |
| Liabilities subject to compromise (note 15) | 11,109 | 10,939 |
| **Total liabilities** | 11,448 | 11,337 |
| Guarantees, commitments, contingencies and subsequent events (notes 2, 10, 12, 16, and 17 respectively) | | |
| **SHAREHOLDERS' DEFICIT** | | |
| Common shares, without par value—Authorized shares: unlimited; Issued and outstanding shares: 498,206,366 as of June 30, 2012 and December 31, 2011 | 35,604 | 35,604 |
| Additional paid-in capital | 3,597 | 3,597 |
| Accumulated deficit | (42,600) | (42,406) |
| Accumulated other comprehensive loss | (104) | (143) |
| **Total Nortel Networks Corporation shareholders' deficit** | (3,503) | (3,348) |
| Noncontrolling interests | 637 | 639 |
| **Total shareholders' deficit** | (2,866) | (2,709) |
| **Total liabilities and shareholders' deficit** | $ 8,582 | $ 8,628 |

*The accompanying notes are an integral part of these condensed consolidated financial statements*

2

BHG0160715

A

**NORTEL NETWORKS CORPORATION**

(Under Creditor Protection Proceedings as of January 14, 2009 — note 2)
Condensed Consolidated Statements of Comprehensive Loss (unaudited)
(Millions of U.S. Dollars)

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| | 2012 | 2011 | 2012 | 2011 |
|---|---|---|---|---|
| Net loss including noncontrolling interests | $ (128) | $ (105) | $ (187) | $ (207) |
| Other comprehensive loss adjustments: | | | | |
| Change in foreign currency translation adjustment | 93 | (5) | 22 | (64) |
| Unamortized pension and post-retirement actuarial losses and prior service cost—net | 8 | 10 | 17 | 98 |
| Comprehensive loss including noncontrolling interests | (27) | (100) | (148) | (173) |
| Comprehensive income·attributable to noncontrolling interests | (3) | (10) | (7) | (13) |
| Comprehensive loss attributable to Nortel Networks Corporation | $ (30) | $ (110) | $ (155) | $ (186) |

*The accompanying notes are an integral part of these condensed consolidated financial statements*

3

BHG0160716

A

## NORTEL NETWORKS CORPORATION

### (Under Creditor Protection Proceedings as of January 14, 2009 — note 2)
### Condensed Consolidated Statements of Cash Flows (unaudited)
### (Millions of U.S. Dollars)

| | Six Months Ended June 30, | |
| --- | --- | --- |
| | 2012 | 2011 |
| **Cash flows from (used in) operating activities** | | |
| Net loss attributable to Nortel Networks Corporation | $ (194) | $ (220) |
| Adjustments to reconcile net loss from operations to net cash used in operating activities, net of effects from acquisitions and divestitures of businesses: | | |
| Amortization and depreciation | 4 | 20 |
| Deferred income taxes | (1) | — |
| Pension and other accruals | 22 | 28 |
| Income attributable to noncontrolling interests—net of tax | 7 | 13 |
| Reorganization items—non cash | (88) | (60) |
| Other—net | 2 | (33) |
| Change in operating assets and liabilities (note 5) | 162 | 266 |
| Net cash from (used in) operating activities | (86) | 14 |
| **Cash flows from (used in) investing activities** | | |
| Change in restricted cash and cash equivalents | (71) | (151) |
| Proceeds from the sales of investments, businesses and assets—net | 88 | 107 |
| Net cash from (used in) investing activities | 17 | (44) |
| **Cash flows from (used in) financing activities** | | |
| Dividends paid, including paid by subsidiaries to noncontrolling interests | (8) | — |
| Net cash used in financing activities | (8) | — |
| **Effect of foreign exchange rate changes on cash and cash equivalents** | (6) | 13 |
| **Net decrease in cash and cash equivalents** | (83) | (17) |
| **Cash and cash equivalents at beginning of the period** | 751 | 807 |
| **Cash and cash equivalents at end of the period** | $ 668 | $ 790 |

*The accompanying notes are an integral part of these condensed consolidated financial statements*

4

BHG0160717

A

**NORTEL NETWORKS CORPORATION**

**(Under Creditor Protection Proceedings as of January 14, 2009 — note 2)**
**Notes to Condensed Consolidated Financial Statements (unaudited)**

**1. Basis of presentation**

All monetary amounts in these notes to the unaudited condensed consolidated financial statements are in millions, except per share amounts, and in United States ("U.S.") Dollars unless otherwise stated.

*Nortel Networks Corporation*

Prior to Nortel Networks Corporation's ("Nortel", "NNC" or the "Company") significant business divestitures, NNC was a global supplier of end-to-end networking products and solutions serving both service providers and enterprise customers. Nortel's technologies spanned access and core networks and support multimedia and business-critical applications. Nortel's networking solutions consisted of hardware, software and services. Nortel designed, developed, engineered, marketed, sold, licensed, installed, serviced and supported these networking solutions worldwide. As further discussed in note 2, Nortel is currently focused on the remaining work under the Creditor Protection Proceedings (as defined in note 2), including providing transitional services to the purchasers of Nortel's businesses, ongoing restructuring matters and the sale of any remaining assets.

As of June 30, 2012, Nortel has completed the sales of all of its businesses, and regarding these businesses, only the residual contracts not transferred to the various buyers remain. Commencing with the first quarter of 2011, Nortel has one reportable segment, being the consolidated entity, as its chief operating decision maker reviews financial and operating results on that basis.

Nortel Networks Limited ("NNL") is Nortel's principal direct operating subsidiary and its results are consolidated into Nortel's results. Nortel holds all of NNL's outstanding common shares but none of its outstanding preferred shares. NNL's preferred shares are reported in noncontrolling interests in the consolidated balance sheets and dividends accrued on preferred shares are reported in income attributable to noncontrolling interests in the statements of operations. Nortel does not expect to pay any of these cumulative dividends as a result of the Creditor Protection Proceedings.

*Basis of Presentation and Going Concern Considerations*

The unaudited condensed consolidated financial statements are prepared in accordance with U.S. Generally Accepted Accounting Principles ("U.S. GAAP") and do not include all the information and notes required in the preparation of annual consolidated financial statements. The accounting policies used in the preparation of the unaudited condensed consolidated financial statements are the same as those described in Nortel's audited consolidated financial statements prepared in accordance with U.S. GAAP for the year ended December 31, 2011. The unaudited condensed consolidated balance sheet as of December 31, 2011 is derived from the December 31, 2011 audited consolidated financial statements. Although Nortel is headquartered in Canada, the unaudited condensed consolidated financial statements are expressed in U.S. Dollars as the majority of Nortel's operating results and net assets are denominated in U.S. Dollars.

Nortel makes estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities as of the date of the unaudited condensed consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results may differ from those estimates. Estimates have been used for the periods reported when accounting for items and matters such as revenue recognition and accruals for losses on contracts, allowances for uncollectible accounts receivable, employee benefits including pensions, taxes and related valuation allowances and provisions, restructuring and other provisions, contingencies and pre-petition liabilities.

Nortel believes all adjustments necessary for a fair statement of the results for the periods presented have been made and all such adjustments were of a normal recurring nature unless otherwise disclosed. The financial results for the three and six months ended June 30, 2012 are not necessarily indicative of financial results for the full year or for any other quarter. The unaudited condensed consolidated financial statements should be read in conjunction with Nortel's Annual Report on Form 10-K for the year ended December 31, 2011 filed with the U.S. Securities and Exchange Commission ("SEC") and Canadian securities regulatory authorities ("2011 Annual Report") and this Quarterly Report on Form 10-Q for the three and six months ended June 30, 2012.

Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 852 "Reorganization" ("ASC 852"), which is applicable to companies that have filed petitions under applicable bankruptcy code provisions and as a result of the Creditor Protection Proceedings is applicable to Nortel, generally does not change the manner in which financial statements are prepared. However, it does require that the financial statements for periods subsequent to the filing of an applicable bankruptcy petition distinguish transactions and events that are directly associated with a reorganization from the ongoing operations of the business. For this reason, Nortel's revenues, expenses, realized gains and losses, and provisions for losses that can be directly associated with the Creditor Protection Proceedings must be reported separately as reorganization items in the statements of operations. The balance sheets must distinguish pre-petition liabilities subject to compromise from both those pre-petition liabilities that are not subject to compromise and from post-petition liabilities. Liabilities that may be affected by a plan of reorganization must

5

A

be reported at the amounts expected to be allowed, even if they may be settled for lesser amounts. In addition, reorganization items must be disclosed separately in the statements of cash flows. Nortel adopted ASC 852 effective on January 14, 2009 and has segregated those items outlined above for all reporting periods subsequent to such date.

After consideration of the guidance available in ASC 810 "Consolidation" ("ASC 810") and ASC 852, the unaudited condensed consolidated financial statements as of June 30, 2012 and December 31, 2011 and for three and six months ended June 30, 2012 and 2011 have been presented on the following basis with respect to Nortel subsidiaries:

- the subsidiaries in Europe, the Middle East and Africa ("EMEA"), Nortel Networks UK Ltd. ("NNUK"), Nortel Networks S.A. ("NNSA"), Nortel Networks (Ireland) Limited (collectively, "EMEA Debtors") and their subsidiaries (collectively, "EMEA Subsidiaries") were accounted for under the equity method from the Petition Date (as defined below) up to May 31, 2010 and as an investment under the cost method of accounting thereafter;

- the U.S. subsidiaries and their subsidiaries (collectively, "U.S. Subsidiaries") were accounted for as consolidated subsidiaries until September 30, 2010 and as an investment under the cost method of accounting thereafter; and

- other subsidiaries are consolidated throughout the periods presented consistent with the basis of accounting applied prior to the commencement of the Creditor Protection Proceedings with the exception of deconsolidated subsidiaries where there has been a deemed loss of control by Nortel once these subsidiaries were in applicable liquidation proceedings as noted in Nortel's 2011 Annual Report.

Nortel continues to exercise control over most of its subsidiaries located in Canada, Central America and Latin America ("CALA") and Asia (other than those entities that are EMEA Subsidiaries, U.S. Subsidiaries or have been placed in applicable liquidation proceedings), and its financial statements are prepared on a consolidated basis with respect to those subsidiaries.

Beginning on January 14, 2009 ("the Petition Date"), Nortel and certain of its subsidiaries in Canada, the U.S., and in certain EMEA countries filed for creditor protection under the relevant jurisdictions of Canada, the U.S., the United Kingdom ("U.K.") and subsequently commenced separate proceedings in Israel, followed by secondary proceedings in France. The unaudited condensed consolidated financial statements do not purport to reflect or provide for the consequences of the Creditor Protection Proceedings. In particular, such unaudited condensed consolidated financial statements do not purport to show: (a) as to assets, their realizable value on a liquidation basis or their availability to satisfy liabilities; (b) as to pre-petition liabilities, all amounts that may be allowed for claims or contingencies, or the status and priority thereof, or the amounts at which they may ultimately be settled; (c) as to shareholders' accounts, the effect of any changes that may be made in Nortel's capitalization; or (d) as to divestiture proceeds held in escrow and recorded by NNL solely for financial reporting purposes, the final allocation of these proceeds as between various Nortel legal entities, including entities that are not consolidated in these unaudited condensed consolidated financial statements, which will ultimately be determined either by joint agreement or through a dispute resolution proceeding (see note 2).

The ongoing Creditor Protection Proceedings and the divestitures of Nortel's businesses and assets, both completed and those asset sales that may arise in the future raise substantial doubt as to Nortel's ability to continue as a going concern. While the Debtors (as defined in note 2) have filed for and been granted creditor protection, the unaudited condensed consolidated financial statements continue to be prepared using the going concern basis, which assumes that Nortel will be able to realize its assets and discharge its liabilities in the normal course of business for the foreseeable future. However, it is not possible to predict the outcome of the Creditor Protection Proceedings and, as such, there is substantial doubt regarding the realization of assets and discharge of liabilities. When the going concern basis is no longer appropriate, adjustments may be necessary to the carrying amounts and/or classification of Nortel's assets and liabilities under a liquidation basis of accounting. Further, a court approved plan in connection with the Creditor Protection Proceedings could materially change the carrying amounts and classifications reported in the unaudited condensed consolidated financial statements. Nortel will continue to evaluate its remaining consolidated subsidiaries for the appropriateness of the accounting applied to these investments as the Creditor Protection Proceedings progress.

*Comparative Figures*

Certain immaterial amounts related to 2011 in the unaudited condensed consolidated financial statements have been reclassified to conform to Nortel's current period presentation.

## 2. Creditor protection proceedings

On the Petition Date, after extensive consideration of all other alternatives, with the unanimous authorization of the Nortel board of directors after thorough consultation with its advisors, certain Nortel entities, including NNC and NNL, initiated creditor protection proceedings in multiple jurisdictions under the respective restructuring regimes of Canada, under the Companies' Creditors Arrangement Act ("CCAA") ("CCAA Proceedings"), the U.S. under Chapter 11 of the U.S. Bankruptcy Code ("Chapter 11") ("Chapter 11 Proceedings"), U.K. under the Insolvency Act 1986 ("U.K. Administration Proceedings"), and subsequently, Israel under the Israeli Companies Law 1999 ("Israeli Administration Proceedings"). On May 28, 2009, one of Nortel's French subsidiaries,

6

BHG0160719

A

NNSA was placed into secondary proceedings ("French Secondary Proceedings"). The CCAA Proceedings, Chapter 11 Proceedings, U.K. Administration Proceedings, Israeli Administration Proceedings and French Secondary Proceedings are together referred to as the "Creditor Protection Proceedings". On July 14, 2009, Nortel Networks (CALA) Inc. ("NNCI"), a U.S. based subsidiary with operations in the CALA region, also filed a voluntary petition for relief under Chapter 11 in the U.S. Bankruptcy Court for the District of Delaware ("U.S. Court") and became a party to the Chapter 11 Proceedings. Nortel initiated the Creditor Protection Proceedings with a consolidated cash balance, as of December 31, 2008, of approximately $2,400, in order to preserve its liquidity and fund operations during the process.

As used herein: "Bondholder Group" means a group purporting to hold a portion of our publicly traded debt; "Canadian Monitor" means Ernst & Young Inc. as court-appointed monitor in the CCAA Proceedings; "Debtors" means: (i) Nortel, together with NNL and certain other Canadian subsidiaries (collectively, "Canadian Debtors") that filed for creditor protection pursuant to the provisions of the CCAA in the Ontario Superior Court of Justice ("Canadian Court"); (ii) Nortel Networks Inc. ("NNI"), Nortel Networks Capital Corporation ("NNCC"), NNCI and certain other U.S. subsidiaries (collectively, "U.S. Debtors") that have filed voluntary petitions under Chapter 11 in the U.S. Court; (iii) the EMEA Debtors that made consequential filings under the Insolvency Act 1986 in the High Court of England and Wales ("English Court") (including NNSA); and (iv) certain Israeli subsidiaries (collectively, "Israeli Debtors") that made consequential filings under the Israeli Companies Law 1999 in the District Court of Tel Aviv; "French Liquidator" means the liquidator appointed by the Versailles Commercial Court in secondary insolvency proceedings commenced by NNSA in France; "U.K. Administrators" means, collectively, a representative of Ernst & Young LLP (in the U.K.) and a representative of Ernst & Young Chartered Accountants (in Ireland) as court-appointed joint administrators of Nortel Networks (Ireland) Ltd. ("NNIL") and representatives of Ernst & Young LLP (in the U.K.) as court-appointed joint administrators of the EMEA Debtors other than NNIL; "U.S. Creditors' Committee" means the Official Committee of Unsecured Creditors of the U.S. Debtors appointed in the Chapter 11 Proceedings; "U.S. Principal Officer" means the principal officer of the U.S. Debtors appointed in the Chapter 11 Proceedings; and "U.S. Trustee" means the United States Trustee for the District of Delaware.

For further information regarding prior developments in connection with the Creditor Protection Proceedings, refer to Nortel's 2011 Annual Report.

*Discontinuance of Future Periodic Financial Reporting*

On August 9, 2012, Nortel announced that the Canadian Monitor (defined below), after taking into account several factors arising from the advanced stage of the CCAA Proceedings (defined below), has determined that the expense and resources required to comply with NNC's and NNL's quarterly and annual public reporting requirements can no longer be justified from the standpoint of the best interest of their creditors. Consequently, NNC and NNL will no longer be able to comply with their periodic reporting requirements and will discontinue preparing and filing quarterly and annual financial statements and all other periodic disclosure documents under applicable Canadian and U.S. securities laws effective as of the filing deadlines for their third quarter reporting obligations, being November 14, 2012 in the United States and November 29, 2012 in Canada.

Generally, when an issuer ceases to file its periodic disclosure documents in circumstances such as NNC's and NNL's the Canadian Securities Administrators will issue orders prohibiting trading in securities of the relevant issuer, effective from and after the filing deadlines under Canadian securities laws. NNC and NNL will be making submissions to the Canadian Securities Administrators that cease trade orders expected to be issued in respect of NNC's and NNL's securities include certain permitted trading exceptions. However, there can be no assurance that the regulatory authorities will make such orders on the terms requested by NNC and NNL and, in particular, permit any trading exceptions.

In light of the foregoing, the directors and officers of NNC and NNL have indicated that they will step down from their positions with NNC and NNL upon the issuance of a court order under the CCAA that the Monitor will be seeking to extend its powers. Such order would allow the Monitor to exercise any powers that may be properly exercised by a board of directors and to terminate the engagement of NNC and NNL's external auditors.

Following the third quarter 2012 filing deadlines, as a means of keeping the public informed of material developments during the remainder of the CCAA proceedings, and until otherwise determined by the Monitor, NNC and NNL will endeavour to continue to comply with the material change disclosure requirements under Canadian securities laws, to the extent practicable in the circumstances, and to file on SEDAR (the electronic filing system of the Canadian Securities Administrators) all court reports of the Monitor except for such reports, or portions thereof, in respect of which confidential treatment has been requested. All other continuous and current disclosure filings of NNC and NNL will be discontinued.

The materials filed in the CCAA Proceedings are also available on the Monitor's Restructuring Document Centre at www.ey.com/ca/nortel or by contacting the Monitor directly at 1-866-942-7177. Documents filed by the U.S. Debtors with the U.S. Court including monthly operating reports and other general information about the Chapter 11 Proceedings are available at http://chapter11.epiqsystems.com/nortel. The content of these websites is not a part of this report.

*Significant Business Divestitures*

BHG0160720

A

In June 2009, Nortel determined that selling its businesses was the best path forward. Nortel has completed divestitures of all of its businesses including: (i) the sale of substantially all of its Code Division Multiple Access ("CDMA") business and Long Term Evolution ("LTE") Access assets to Telefonaktiebolaget LM Ericsson ("Ericsson"); (ii) the sale of substantially all of the assets of its Enterprise Solutions ("ES") business globally, including the shares of Nortel Government Solutions Incorporated ("NGS") and DiamondWare, Ltd. ("Diamondware"), to Avaya Inc. ("Avaya"); (iii) the sale of the assets of its Wireless Networks ("WN") business associated with the development of Next Generation Packet Core network components ("Packet Core Assets") to Hitachi, Ltd. ("Hitachi"); (iv) the sale of certain portions of its Layer 4-7 data portfolio to Radware Ltd.; (v) the sale of substantially all of the assets of its Optical Networking and Carrier Ethernet businesses to Ciena Corporation ("Ciena"); (vi) the sale of substantially all of the assets of its Global System for Mobile communications ("GSM")/GSM for Railways ("GSM-R") business to Ericsson and Kapsch CarrierCom AG ("Kapsch"); (vii) the sale of substantially all of the assets of its Carrier VoIP and Application Solutions ("CVAS") business to GENBAND Inc. (now known as GENBAND U.S. LLC ("GENBAND")); (viii) the sale of NNL's 50% plus one share interest in LG-Nortel Co. Ltd. ("LGN"), its Korean joint venture with LG Electronics, Inc. ("LGE"), to Ericsson; (ix) the sale of substantially all of the assets of its global Multi Service Switch ("MSS") business to Ericsson; (x) the sale of substantially all of the assets of Guangdong-Nortel Telecommunications Equipment Co. Ltd. ("GDNT"), to Ericsson Mobile Data Applications Technology Research and Development Guangzhou Company Limited and Ericsson (Guangdong Shunde) Communications Company Limited (collectively, "Ericsson China"); (xi) the sale of its remaining patents and patent applications to a consortium consisting of Apple Inc., EMC Corporation, Ericsson, Microsoft Corporation, Research in Motion Limited and Sony Corporation (collectively, the "Consortium"); and (xii) the sale of a small number of its Internet Protocol version 4 addresses to various purchasers.

One of the key remaining matters under the Creditor Protection Proceedings is the determination of allocation of sale proceeds among the various Nortel legal entities that participated in the sales of Nortel's businesses, which include entities subject to the respective Creditor Protection Proceedings in the different jurisdictions.

### Divestiture Proceeds Received

As of June 30, 2012, approximately $7,803 in net proceeds have been generated and received through the completed sales of businesses and remaining patents and patent applications. These divestiture proceeds include the following approximate amounts:

(a) $1,120 from the sale of substantially all of Nortel's CDMA business and LTE Access assets;

(b) $18 from the sale of Nortel's Layer 4-7 data portfolio;

7

BHG0160721

A

(c)   $10 from the sale of Nortel's Packet Core Assets;

(d)   $932 from the sale of substantially all of the assets of Nortel's ES business, including the shares of DiamondWare and NGS;

(e)   $638 from the sale of substantially all of the assets of Nortel's Optical Networking and Carrier Ethernet businesses;

(f)   $79 from the sale of Nortel's North American GSM business;

(g)   $36 from the sale of Nortel's GSM business outside of North America (excluding its GSM business in CALA) and its global GSM-R business;

(h)   $156 from the sale of substantially all of Nortel's CVAS business;

(i)   $234 from the sale of Nortel's 50% plus one share interest in LGN;

(j)   $49 from the sale of substantially all of Nortel's MSS business;

(k)   $56 from the sale of substantially all of the GDNT assets (which proceeds are recorded in cash and cash equivalents);

(l)   $4,470 from the sale of Nortel's remaining patents and patent applications; and

(m)   $5 from the sale of various other business assets.

As of June 30, 2012, $7,323 of proceeds received from divestitures of businesses and remaining patents and patent applications is being held in escrow and an additional $229, representative of proceeds from the sale of LGN, is included in non-current restricted cash and cash equivalents, all of which is currently reported in NNL solely for financial reporting purposes (including with respect to any gain recorded on such divestitures). The difference between the net proceeds received and the amount in escrow at June 30, 2012 is as a result of amounts that, from time to time, have been distributed, with the consent of each of the Debtors' estates and court approvals, as applicable, from the escrow accounts to satisfy: 1) various obligations arising from the divestitures, whether through payments to third party vendors, or to reimburse the Debtors or non-consolidated subsidiaries for costs incurred, or 2) payments to the Debtors or non-consolidated subsidiaries related to settlements reached in respect of certain agreements involving proceeds allocation. The ultimate determination of the final allocation of such proceeds among the various Nortel legal entities, including entities that are not consolidated in these financial statements, has not yet occurred and may be materially different from the NNL classification and related amounts shown in these financial statements. The Interim Funding and Settlement Agreement ("IFSA") and the escrow agreements for sales divestiture proceeds entered into by NNL, NNI and other Nortel legal entities provide for the processes for determining the final allocation of divestiture proceeds among such entities, either through joint agreement or, failing such agreement, other dispute resolution proceedings. Adjustments to the NNL classification and any related amounts arising from the ultimate allocation will be recognized when finalized. The NNL classification and related amounts shown in these financial statements are not determinative of, and have not been accepted by any debtor estate, any party in interest in the Creditor Protection Proceedings or any court overseeing such proceedings, for purposes of deciding the final allocation of divestiture proceeds. See "Allocation of Divestiture Proceeds and Other Inter-Estate Matters" below for a discussion on the Allocation Settlement Agreement regarding the 4th Estate Entities, as defined below.

During the six months ended June 30, 2012, Nortel received additional proceeds of $73 that had been held in escrow subject to the successful completion of performance obligations under the transition services agreements ("TSAs") entered into in connection with the sale of substantially all of Nortel's CDMA business, LTE Access assets, and CVAS business, and its North American GSM business, all of which were recorded as gains on divestitures included in reorganization items – net. As of June 30, 2012, $24 in connection with the divestitures of substantially all of the assets of Nortel's Optical Networking and Carrier Ethernet businesses, CVAS business, and substantially all of the assets of Nortel's MSS business, is currently unrecorded, a portion of which will be recognized into income subject to agreement between Nortel and each of the various buyers that obligations under the TSAs have been completed. Such amounts, when and if received, will also be held in escrow until the final allocation of these proceeds as between various Nortel legal entities, including the U.S. and EMEA Subsidiaries, is ultimately determined.

*Allocation of Divestiture Proceeds and Other Inter-Estate Matters*

At various times during the second half of 2009 and the first quarter of 2010, the Canadian Debtors, the U.S. Debtors and the U.K. Administrators, with the involvement of the Canadian Monitor, the U.S. Principal Officer, the U.S. Creditors' Committee and the Bondholder Group engaged in negotiations regarding the scope and terms of a proposed protocol for resolving disputes concerning the allocation of sale proceeds ("Allocation Protocol"), as required by the terms of the IFSA. However, it became apparent that the parties had differing views concerning the allocation of the sale proceeds, inter-company claims and the scope of the Allocation Protocol. In order to address this impasse, the Canadian Debtors, the U.S. Debtors and the U.K. Administrators agreed to temporarily suspend negotiations on the Allocation Protocol and instead focused on a process to facilitate a comprehensive settlement to resolve all material outstanding inter-estate matters, including the allocation of the sale proceeds and the settlement of inter-company claims. To this end, the parties met on several occasions to outline, on a confidential and without prejudice basis, their respective allocation methodologies and potential inter-company claims that may be asserted.

BHG0160722

A

As a result of these meetings and the complexity of the issues that were raised, the Canadian Debtors, the U.S. Debtors, the EMEA Debtors, the U.K. Administrators, the Canadian Monitor, the U.S. Principal Officer, the U.S. Creditors' Committee, the Bondholder Group and certain other interested parties (collectively, the "Mediation Parties") agreed that these inter-estate negotiations would be aided by the appointment of a neutral mediator to review and mediate the issues. The parties selected Layn R. Phillips, a former U.S. federal district court judge and experienced commercial mediator, to serve as mediator and review the positions and viewpoints of the various parties on allocation and unresolved inter-estate matters. A confidential, non-binding mediation was held in November 2010. The mediation session did not result in the resolution of the issues presented.

As a result of the November 2010 mediation session, and positions taken in the CCAA Proceedings, it became apparent that the U.K. Administrators and certain other parties, who were also substantial creditors of the EMEA Debtors, were alleging a number of significant potential claims against the Canadian Debtors as well as the U.S. Debtors. These potential claims were integral to the allocation positions of these parties and included allegations of proprietary and trust-type claims. Consequently, the Canadian Monitor and the Canadian Debtors determined that, absent reaching a comprehensive settlement of allocation and inter-company claims issues, these specific claims needed to be resolved first. Accordingly, the Canadian Debtors obtained an order of the Canadian Court establishing a process for the calling of claims from EMEA creditors. Notwithstanding the commencement of this process, the Mediation Parties continued to engage in discussions regarding the resumption of mediation and another confidential, non-binding mediation was held in April 2011. On April 13, 2011, Nortel announced that the mediation process that had been commenced in respect of the allocation of sale proceeds of its various business and asset divestitures and other inter-estate matters, including inter-company claims, had ended without resolution of the matters in dispute. In light of the unsuccessful conclusion of the mediation process, Nortel announced that delays in the ultimate resolution of allocation and inter-company claims matters potentially could be significant, and that such delays would result in a corresponding significant delay in the timing of distributions to holders of validated claims of the various estates.

On April 25, 2011, the U.S. Debtors and the U.S. Creditors' Committee filed a joint motion for an order establishing an allocation protocol for the sale proceeds as between various Nortel legal entities ("Original Protocol Motion"), and for related relief. Subsequently, as a result of further discussions, the U.S. Debtors and the U.S. Creditors' Committee together with the Canadian Debtors jointly filed an amended and restated version of the Original Protocol Motion and agreed to collectively seek an order establishing an allocation protocol before the Canadian Court and the U.S. Court. The proposed order would have had the U.S. Court and the Canadian Court establish procedures and an expedited schedule for the cross-border resolution by the U.S. Court and the Canadian Court on the allocation of proceeds from the sales of Nortel's businesses and from the sale of its patent portfolio. The motion was heard at a joint hearing of the U.S. Court and Canadian Court on June 7, 2011. On June 20, 2011, Nortel announced that the Canadian Court and the U.S. Court had reserved their decisions on the motions heard by such courts on June 7, 2011, and directed NNC, NNL and the other Canadian Debtors, NNI and the other U.S. Debtors, the EMEA Debtors, as well as certain other parties, to participate in a joint mediation of the issues raised in the motions. The directions provided that the Canadian Court and the U.S. Court together would appoint a sole mediator by supplemental order and that the mediator would determine the time, date, place and protocol of the mediation.

On June 17, 2011, and as supplemented on June 29, 2011, the Canadian Court and the U.S. Court appointed The Honourable Warren K. Winkler, Chief Justice of Ontario, as the sole mediator (the "Mediator") for the mediation. The mediation was ordered because of both courts' concern that the time required to prepare their decisions would also delay allocation proceedings and, therefore, distributions to creditors of the various Nortel estates.

The Mediator has the authority, in consultation with the Mediation Parties, to determine the scope of the mediation, as he deems appropriate, including the issue of allocation of the sale proceeds of Nortel's various businesses and patent portfolio, and global issues relating to allocation and claims. Participation in this mediation is mandatory. The mediation process will be terminated (i) by a declaration by the Mediator that a settlement has been reached (any such settlement would be subject to the approval of the Canadian Court and the U.S. Court, on notice to parties in interest), (ii) by a declaration by the Mediator that further efforts at mediation are no longer considered worthwhile, or (iii) for any other reason as determined by the Mediator. At the request of the U.S. Court, the commencement of the mediation was delayed pending the outcome of the October 14, 2011 hearing (discussed in more detail below).

The Canadian Court approved a claims process with regard to the significant inter-company claims made by the EMEA Debtors against the Canadian Debtors, which process included a requirement that claims be filed by March 18, 2011. In response to this call for claims, representatives of the U.K. Administrators, on behalf of the EMEA Debtors, filed 84 proofs of claims against the Canadian Debtors and unspecified directors and officers of NNC and NNL (the "EMEA Claims"). The EMEA Claims contain broad ranging claims set out with limited specificity. The EMEA Claims also include a number of large priority claims, which if allowed, would significantly reduce the potential proceeds available for distribution to unsecured creditors of the Canadian Debtors. Nortel is currently unable to quantify the total potential amounts claimed under the EMEA Claims, as many of the claims were not quantified. The EMEA Claims that were quantified total approximately CAD$9.8 billion. In addition, the U.K. Pension Trust Limited and the Board of the Pension Protection Fund in the U.K. filed an estimated claim of CAD$3.7 billion in respect of an alleged deficit in the U.K. pension plan (the "U.K. Pension Claim"). Should the EMEA Claims and the U.K. Pension Claim ultimately be allowed in the CCAA Proceedings on the basis filed, they could have the effect of doubling (or more) the otherwise estimated CCAA claims pool and, accordingly, significantly reduce potential distributions to other unsecured creditors of the Canadian Debtors. Further, counsel for 131 former employees of NNSA have submitted a letter indicating they would file proofs of claims in connection with an action that is currently before the courts in France.

9

BHG0160723

A

On September 30, 2009, the EMEA Debtors and certain of their affiliates (collectively the "EMEA Original Claimants") filed over 350 proofs of claim against the U.S. Debtors and unspecified directors and officers of the U.S. Debtors in the U.S. Court. On May 10, 2011, the U.S. Court entered an order requiring the EMEA Original Claimants to file more definite statements of their previously-filed claims, and to file any other pre-petition claims against the U.S. Debtors, by June 1, 2011, absent which any of their pre-petition claims would be disallowed. The deadline for filing amended proofs of claim was later extended on request of certain of the EMEA Original Claimants to June 3, 2011 ("U.S. EMEA Claims Bar Date"). The EMEA Original Claimants filed 38 amended proofs of claim on June 3, 2011. The remaining proofs of claim that had been filed by the EMEA Original Claimants and were not amended on a timely basis have been disallowed and expunged pursuant to the terms of the U.S. Court's May 10, 2011 order.

On July 15 and 22, 2011, the U.S. Debtors and the U.S. Creditors' Committee filed joint objections and motions to dismiss the claims of NNUK, NNSA and NNIL and the French Liquidator (collectively, the "EMEA Claimants"). On August 3, 2011, the U.S. Court issued an order that set October 13 and 14, 2011 as the hearing dates for these motions. The order also requested the Mediator to consider postponing the mediation discussed above until after these hearings and the U.S. Court's decision on the motions to dismiss. On August 9, 2011, the Mediator advised the parties to the mediation that he was postponing the initial procedural meeting to a date to be determined after the U.S. Court releases its decision. The U.S. Court heard the motions on October 14, 2011. On March 20, 2012, the U.S. Court granted the U.S. Debtors' and U.S. Creditors' Committee's motion to dismiss these EMEA Claimants' breach of duty of care and other fiduciary duty claims, claims of mismanagement under French law, and the contingent claims arising from the issuance of any financial support direction with respect to the U.K. pension plan. The U.S. Court declined to dismiss the remaining claims of these EMEA Claimants at this stage of the proceedings and has scheduled a hearing on August 22, 2012 to set a schedule for discovery. However, the U.S. Court noted that the arguments raised in the motions were persuasive in showing the weakness and unlikelihood of success of these claims.

Following the U.S. Court's March 20, 2012 decision, pursuant to a letter dated March 26, 2012 from the Mediator to Mediation Parties, an introductory mediation session was held on April 24, 2012 whereby Mediation Parties had the opportunity to meet privately with the Mediator. The Mediator advised that he will continue to hold meetings with individual parties to the mediation in his efforts to work towards a resolution on allocation matters. The Mediator is posting updates of a general nature regarding the mediation, as appropriate, on a website at www.nortelmediation.com. The content of this website is not a part of this report.

On June 19, 2012, Nortel, NNL, and certain other Nortel entities including NNI, NNUK and NNSA entered into an Allocation Settlement Agreement (the "4th Estate Agreement") with Nortel entities in the Asia Pacific and CALA regions ("4th Estate Entities") providing for, among other matters, a final allocation to the 4th Estate Entities from the sale proceeds of Nortel's businesses. Under the terms of the 4th Estate Agreement, a total of $45 from the sale proceeds held in escrow will be allocated among the 4th Estate Entities that participated in the various global business sales. The 4th Estate Agreement further provides for acknowledgement and agreement on inter-company payables and receivables among the 4th Estate Entities as well as between the 4th Estate Entities and other Nortel entities party to the 4th Estate Agreement, as at a certain date. The 4th Estate Agreement was subject to court approvals in Canada and the U.S. which approvals were obtained on July 11, 2012 at a joint hearing. The 4th Estate Agreement closed on August 7, 2012.

The 4th Estate Agreement will enable the 4th Estate Entities to commence liquidation proceedings in their respective jurisdictions, as part of Nortel's global wind down. The 4th Estate Entities have no further claim to the sale proceeds held in escrow and are no longer a party to the mediation described above.

### Developments in the Creditor Protection Proceedings

Since the filing of Nortel's 2011 Annual Report, in addition to the matters described above, the following are the material developments in the sales of its assets and in the Creditor Protection Proceedings.

### CCAA Proceedings

On the Petition Date, the Canadian Debtors obtained an initial order from the Canadian Court for creditor protection for 30 days, pursuant to the provisions of the CCAA, which has since been extended from time to time and most recently to October 31, 2012 and is subject to further extensions by the Canadian Court.

On July 27, 2012, the Canadian Court approved a claims process with regard to inter-company claims by the 4th Estate Entities and other non-filed subsidiaries, but excluding the EMEA Debtors, U.S. Debtors and certain non-filed subsidiaries of the U.S. Debtors, against the Canadian Debtors as at September 30, 2011. Further, the Canadian Court confirmed that the claims of the 4th Estate Entities against the Canadian Debtors are as specified in the 4th Estate Agreement and barred any further claims of these entities against the Canadian Debtors. The bar date, to the extent applicable, for this claims process is September 7, 2012. The Canadian Debtors sought these orders so that they may achieve certainty regarding claims that may be asserted by certain of their affiliates not subject to prior inter-company claims processes.

10

BHG0160724

A

### Chapter 11 Proceedings

On June 21, 2010, the U.S. Debtors filed a motion seeking to terminate certain U.S. retiree and long-term disability ("LTD") benefits effective as of August 31. 2010. The U.S Debtors filed a notice of withdrawal of this motion with the U.S. Court on July 16. 2010. On June 21, 2011. upon the motion of the U.S. Debtors dated June 2. 2011, the U.S. Court entered an order directing the U.S. Trustee to establish a committee of retirees for the U.S. Debtors to consult with before undertaking any modification or termination of the U.S. retiree benefits. Additionally, on June 22. 2011, the U.S. Court entered an order directing the U.S Trustee to establish a committee of LTD employees for the U.S. Debtors to consult with before undertaking any modification or termination of the U.S. LTD benefits. On August 2. 2011. the U.S. Trustee appointed the members of these committees. Upon the motion of the U.S. Debtors dated March 28, 2012, on April 18, 2012. the U.S. Court appointed a neutral mediator to mediate discussions between the U.S Debtors. the U.S. Creditors' Committee, the Bondholder Group and the retiree and LTD committees regarding a future modification or termination of U.S. retiree and LTD benefits. On July 30, 2012, the U.S. Debtors filed motions for authorization to terminate the U.S. retiree benefits. LTD Benefits and employment of the LTD employees. Hearings in the termination motions are scheduled for early November 2012.

### Internet Protocol Addresses

Nortel commenced a process, approved by the Canadian Court, to sell certain residual IT assets primarily consisting of about 17 million Internet Protocol version 4 addresses ("IP Addresses") and IT hardware assets including 700 servers. Working together with the Canadian Monitor, Nortel's goal is to maximize the value of these residual IT assets in a timely manner. Any definitive sale agreement will require approval of the Canadian Court.

On February 17, 2012, the Canadian Court approved two sale agreements that NNL and Nortel Networks Technology Corporation ("NNTC") had entered into for the sale of rights in a small number of Nortel's IP Addresses. Under one sale agreement, CSC Holdings LLC, the operating subsidiary of Cablevision Systems Corporation, is the purchaser of a certain number of the IP Addresses, and under the other sale agreement, Salesforce.com Inc. is the purchaser of a certain number of the IP Addresses. The financial and other terms of each of the sale agreements, including the cash purchase price and the IP Addresses included in each sale, have been sealed by order of the Canadian Court because disclosure of such terms may be detrimental to the Canadian Debtors' interests in seeking to consummate these and other sales of IP Addresses. Both purchasers have obtained approval from the American Registry for Internet Numbers ("ARIN") with respect to the transfer and registration of the IP Addresses in the respective purchasers' name upon closing. Nortel closed these sales in the first quarter of 2012 and the proceeds from the transactions have been deposited into an NNL single purpose bank account. The Canadian Debtors and the U.S. Debtors have agreed that any dispute relating to the rights and claims, if any, of the U.S. Debtors in and to the IP Addresses, including to an allocation of such sale proceeds, will be subject to a joint hearing of the Canadian Court and the U.S. Court prior to the distribution of such sale proceeds and. if appropriate. orders of such courts approving such distributions.

On April 4. 2012, the Canadian Court approved a further sale agreement that NNL and NNTC had entered into with Bell Aliant Regional Communications. Limited Partnership ("Bell Aliant") for the sale of rights in certain small number of Nortel's IP Addresses, which sale closed on April 5, 2012. On May 7, 2012, the Canadian Court approved a further sale agreement between Nortel and Vodafone Americas Inc. for the sale of rights of certain Nortel's IP Addresses which sale closed on May 15, 2012. All proceeds from these sales have been deposited into NNL's single purpose bank account, and have been included in non-current restricted cash. Similar to the earlier sales described above, the financial and other terms of these two sale agreements, including the cash purchase price and the IP Addresses included in the sales, were sealed by order of the Canadian Court for the reasons set out above. Nortel continues to seek buyers for the remainder of its IP Addresses.

11

BHG0160725

A

*Other Developments*

Under the CCAA Proceedings, the Canadian Debtors filed a motion for an order authorizing and directing the Canadian Debtors to cease performing any environmental remediation at or in relation to five sites (Belleville, Brampton, Brockville, Kingston and London, Ontario), and that any claims in relation to such environmental remediation be subject to the court approved claims process under the CCAA Proceedings. Nortel brought the motion to disclaim any further obligation for such properties that are no longer owned or used by Nortel and that Nortel and its creditors derive no benefit from any further remediation. Subsequent to the filing of the motion, NNL entered into a transition agreement regarding the Brampton site that facilitated a gradual cessation of Nortel's environmental risk related tasks at that site, which tasks have now been completed. The Ministry of the Environment (the "MOE") made remediation orders with respect to the four other sites. The motion was heard in September 2011 in the Canadian Court, wherein the Canadian Debtors sought advice and direction that the MOE remediation orders were in breach of the CCAA stay. The MOE did not seek to enforce the remediation orders while the Canadian Court's decision was outstanding and Nortel continued to undertake environmental risk assessments and remediation related tasks at those sites. On March 9, 2012, the Canadian Court issued an order granting the Canadian Debtors motion, in particular agreeing that the MOE remediation orders are stayed under the CCAA Proceedings and authorizing Nortel to cease performing any remediation activities at or in relation to the five sites, and releasing Nortel from all contractual obligations to carry out remediation requirements at such sites. The order further stipulates that any claims in relation to any current or future remediation requirements by the MOE against Nortel or its current or former directors or officers are subject to resolution and determination in accordance with the claims procedure and claims resolution orders approved by the Canadian Court on July 30, 2009 and September 16, 2010, respectively. Nortel gave notice that, pursuant to the order, it is ceasing continued environmental remediation activities and all such activity has ceased. On March 23, 2012, Her Majesty the Queen in right of Ontario as represented by the MOE served a notice of motion for leave to appeal the March 9, 2012 Canadian Court order, which leave was granted on June 22, 2012. On July 3, 2012, the MOE served its notice of appeal, which appeal is still pending and no hearing date has yet been set.

*Condensed Combined Debtors Financial Statements*

The financial statements contained within this note have been prepared in accordance with the guidance of ASC 852 and represent the condensed combined financial statements of the Canadian Debtors ("Debtors' financial statements") that are included in the unaudited condensed consolidated financial statements for the three and six months ended June 30, 2012 and 2011. The condensed combined statements of operations exclude the Canadian Debtors' interests in the results of operations of non-Debtor subsidiaries.

*Intercompany Transactions*

Intercompany transactions and balances with Nortel's non-Debtor subsidiaries and affiliates have not been eliminated in the Debtors' financial statements.

*Contractual Interest Expense on Outstanding Long-Term Debt*

During the three and six months ended June 30, 2012, Nortel has continued to accrue for interest expense of $88 and $175 ($80 and $159 for the three and six months ended June 30, 2011) in its normal course of operations related to debt issued by NNC and NNL in Canada and will continue to do so until it obtains a claims determination order that adjudicates the claims. During the pendency of the Creditor Protection Proceedings Nortel generally has not made and does not expect to make payments to satisfy any of the interest obligations of the Debtors. Nortel has continued to accrue interest on the $1,000 floating rate notes that matured on July 15, 2011 and on the $575 fixed rate convertible notes that matured on April 15, 2012 until it obtains a claims determination order that adjudicates the claims.

12

BHG0160726

A

*Foreign Currency Denominated Liabilities*

ASC 852 requires pre-petition liabilities of the Canadian Debtors that are subject to compromise to be reported at the claim amounts expected to be allowed, even if they may be settled for lesser amounts. For foreign currency denominated liabilities, the CCAA requires allowable claims to be translated at the exchange rate in effect as of the Petition Date unless otherwise provided for in a court-approved plan. The claims process approved by the Canadian Court provides that foreign currency denominated claims must be calculated by the Canadian Monitor in Canadian dollars using a January 13, 2009 exchange rate. However, the claims process order specifically recognizes the ability of the Canadian Debtors to utilize a different exchange rate in any proposed plan. Therefore, given the impact that fixing exchange rates may have on the amounts ultimately settled, foreign currency denominated balances of Nortel entities in Canada, including Nortel's U.S. dollar denominated debt, will not be accounted for using the Petition Date exchange rate but rather will continue to be accounted for in accordance with FASB ASC 830 "Foreign Currency Matters ("ASC 830"). To date, the Canadian Debtors have not developed any plan or proposed an alternative exchange rate and any plan would be subject to the Canadian Court's approval.

*Cash Restrictions*

As a result of the Creditor Protection Proceedings, cash and cash equivalents are generally available to fund operations in particular jurisdictions, but generally are not available to be freely transferred between jurisdictions, regions, or outside joint ventures, other than for normal course post—Petition Date intercompany trade and pursuant to specific agreements approved by the Canadian Court.

Proceeds from the various business and asset divestitures, as discussed above, are being held in escrow until the applicable jurisdictions can determine the proceeds allocations and are not available to fund operations.

13

BHG0160727

A

**NORTEL NETWORKS CORPORATION**
(Under Creditor Protection Proceedings as of January 14, 2009 — note 2)
Notes to Condensed Consolidated Financial Statements (unaudited) — (Continued)

**CONDENSED COMBINED STATEMENTS OF OPERATIONS**
(Millions of U.S. Dollars)

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| Revenues: | | | | |
| Third party | $ — | $ — | $ — | $ — |
| Non-Debtors subsidiaries | — | — | — | 1 |
| Total revenues | — | — | — | 1 |
| Cost of revenues: | | | | |
| Third party | — | 1 | — | 6 |
| Non-Debtors subsidiaries | — | — | — | 1 |
| Total cost of revenues | — | 1 | — | 7 |
| Gross loss | — | (1) | — | (6) |
| Selling, general and administrative expense | 21 | 40 | 41 | 70 |
| Other operating income —net | — | (16) | — | (33) |
| Operating loss | (21) | (25) | (41) | (43) |
| Other income (expense)—net | 4 | 8 | (5) | 3 |
| Interest expense | (86) | (79) | (172) | (158) |
| Loss from operations before reorganization items and income taxes | (103) | (96) | (218) | (198) |
| Reorganization items—net | (8) | (18) | 55 | (12) |
| Loss from operations before income taxes | (111) | (114) | (163) | (210) |
| Income tax benefit (expense) | — | — | — | — |
| Net loss attributable to Debtors including noncontrolling interests | (111) | (114) | (163) | (210) |
| Income attributable to noncontrolling interests | (3) | (3) | (6) | (6) |
| Net loss attributable to Debtors | $ (114) | $ (117) | $ (169) | $ (216) |

14

BHG0160728

A

**NORTEL NETWORKS CORPORATION**
(Under Creditor Protection Proceedings as of January 14, 2009 — note 2)
Notes to Condensed Consolidated Financial Statements (unaudited)—(Continued)

**CONDENSED COMBINED BALANCE SHEETS**
(Millions of U.S. Dollars)

| | June 30, 2012 | December 31, 2011 |
|---|---|---|
| **ASSETS** | | |
| **Current assets** | | |
| Cash and cash equivalents | $    265 | $    306 |
| Restricted cash and cash equivalents | 57 | 59 |
| Accounts receivable—net: | | |
| Third parties | 3 | 12 |
| Non-Debtors subsidiaries | 389 | 387 |
| U.S. Debtors subsidiaries | 80 | 93 |
| EMEA Debtors subsidiaries | 9 | 9 |
| Other current assets | 27 | 30 |
| **Total current assets** | 830 | 896 |
| Restricted cash and cash equivalents | 7,566 | 7,479 |
| Investments in non-Debtors / Debtors subsidiaries | 62 | 62 |
| Other assets | 44 | 50 |
| **Total assets** | $ 8,502 | $ 8,487 |
| **LIABILITIES AND SHAREHOLDERS' DEFICIT** | | |
| **Current liabilities** | | |
| Trade and other accounts payable: | | |
| Third parties | $    — | $    2 |
| Non-Debtors subsidiaries | 141 | 134 |
| U.S. Debtors subsidiaries | — | 18 |
| EMEA Debtors subsidiaries | 10 | 10 |
| Payroll and benefit-related liabilities | 4 | 13 |
| Other accrued liabilities | 4 | 6 |
| **Total current liabilities** | 159 | 183 |
| **Long-term liabilities** | | |
| Deferred income taxes—net | 6 | 7 |
| Other liabilities | — | 7 |
| **Total long-term liabilities** | 6 | 14 |
| Liabilities subject to compromise | 11,729 | 11,561 |
| **Total liabilities** | 11,894 | 11,758 |
| **SHAREHOLDERS' DEFICIT** | | |
| Total shareholders' deficit of Debtors | (3,967) | (3,840) |
| Noncontrolling interests in Debtors | 575 | 569 |
| **Total shareholders' deficit** | (3,392) | (3,271) |
| **Total liabilities and shareholders' deficit** | $ 8,502 | $ 8,487 |

15

BHG0160729

A

## NORTEL NETWORKS CORPORATION
(Under Creditor Protection Proceedings as of January 14, 2009—note 2)
Notes to Condensed Consolidated Financial Statements (unaudited) – (Continued)

### CONDENSED COMBINED STATEMENTS OF CASH FLOWS
(Millions of U.S. Dollars)

|  | Six Months Ended June 30, | |
|---|---|---|
|  | 2012 | 2011 |
| **Cash flows from (used in) operating activities** | | |
| Net loss attributable to Debtors | $ (169) | $ (216) |
| Adjustments to reconcile net loss from operations to net cash used in operating activities: | | |
| Reorganization items—net | (84) | (38) |
| Other adjustments (a) | 211 | 302 |
| Net cash from (used in) operating activities | (42) | 48 |
| **Cash flows from (used in) investing activities** | | |
| Change in restricted cash and cash equivalents | (85) | (153) |
| Proceeds from the sales of investments, businesses and assets—net | 87 | 55 |
| Net cash from (used in) investing activities | 2 | (98) |
| **Cash flows from (used in) financing activities** | | |
| Net cash from (used in) financing activities | — | — |
| Effect of foreign exchange rate changes on cash and cash equivalents | (1) | 8 |
| **Net decrease in cash and cash equivalents** | (41) | (42) |
| **Cash and cash equivalents at beginning of the period** | 306 | 289 |
| **Cash and cash equivalents at end of the period** | $ 265 | $ 247 |

(a)   The operating section of the condensed combined statements of cash flows has been presented on a summarized basis and, as a result, Other adjustments represent all adjustments to reconcile net loss to net cash from (used in) operating activities, with the exception of Reorganization items—net.

16

BHG0160730

A

### 3. Accounting changes

#### (a) Presentation of Comprehensive Income

In June 2011, the FASB issued ASU No. 2011-05, "Presentation of Comprehensive Income" ("ASU 2011-5"), effective for interim periods and years beginning after December 15, 2011. The issuance of ASU 2011-5 is intended to improve the comparability, consistency and transparency of financial reporting and to increase the prominence of items reported in other comprehensive income. The guidance in ASU 2011-5 supersedes the presentation options in ASC Topic 220 and facilitates convergence of U.S. GAAP and International Financial Reporting Standards by eliminating the option to present components of other comprehensive income as part of the statement of changes in stockholders' equity and requiring that all non-owner changes in stockholders' equity be presented either in a single continuous statement of comprehensive income or in two separate but consecutive statements. In December 2011, the FASB issued an ASU to indefinitely defer the effective date of the provision pertaining only to the presentation of reclassification adjustments out of accumulated Other Comprehensive Income ("OCI") and reinstated the previous requirements to present reclassification adjustments either on the face of the statement in which OCI is reported or to disclose them in a note to the financial statements. Amendments to comprehensive income should be applied retrospectively and become effective for public entities for interim and annual periods beginning after December 15, 2011 with early adoption permitted. Nortel has historically disclosed comprehensive income in a separate note in its unaudited condensed consolidated interim financial statements, therefore the adoption of ASU 2011-05 has resulted in the inclusion of a separate statement in the financial statements, directly after condensed consolidated balance sheet, rather than in the notes to the financial statements.

### 4. Reorganization items—net

Reorganization items represent the net direct and incremental charges related to the Creditor Protection Proceedings such as revenues, expenses including professional fees directly related to the Creditor Protection Proceedings, realized gains and losses, and provisions for losses resulting from the reorganization and restructuring of the business. Reorganization items for the three and six months ended June 30, 2012 and 2011 consisted of the following:

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
|  | 2012 | 2011 | 2012 | 2011 |
|---|---|---|---|---|
| Professional fees [a] | $ (10) | $ (21) | $ (21) | $ (39) |
| Interest income [b] | 3 | 3 | 7 | 6 |
| Employee incentive plans [c] | (1) | (4) | (5) | (13) |
| Pension, post-retirement and post-employment plans [d] | — | — | — | 14 |
| Gain on divestitures—net [e] | 9 | 37 | 87 | 55 |
| Settlements [f] | (7) | — | (6) | — |
| Other—net [g] | — | (8) | — | (12) |
| Total reorganization items—net | $ (6) | $ 7 | $ 62 | $ 11 |

(a)    Includes financial, legal, real estate and valuation services directly associated with the Creditor Protection Proceedings.

17

BHG0160731

(b) Reflects interest earned due to the preservation of cash as a result of the Creditor Protection Proceedings.

(c) Relates to retention and incentive plans for certain key eligible employees deemed essential during the Creditor Protection Proceedings.

(d) Includes amounts related to the settlement agreement with former and disabled Canadian employee representatives and the termination of the Nortel Networks Supplementary Executive Retirement Plan ("SERP") defined benefit plan. See note 9.

(e) Relates to the gains on various divestitures, including escrow releases (net of direct and incremental costs). See note 2.

(f) Relates to adjustments to expected allowed claim amounts.

(g) Includes other miscellaneous items directly related to the Creditor Protection Proceedings.

Nortel received $61 relating to reorganization items—net in the six months ended June 30, 2012, attributable to $87 received from various divestitures and $7 for interest income, partially offset by $19 paid for professional fees and $14 paid for employee incentive plans.

Nortel received $57 relating to reorganization items in the six months ended June 30, 2011, attributable to $106 received for various divestitures and $6 for interest income, partially offset by $36 paid for professional fees, $3 paid for claims settlements and $16 paid for employee incentive plans.

See the unaudited condensed consolidated statements of cash flows for the non-cash portion of reorganization items, inclusive of gains reported on divestitures.

## 5. Condensed consolidated financial statement details

The following tables provide details of selected items presented in the unaudited condensed consolidated statements of operations and cash flows for the three and six months ended June 30, 2012 and 2011, and the unaudited condensed consolidated balance sheets as of June 30, 2012 and December 31, 2011.

### *Condensed consolidated statements of operations*

*Other operating income—net:*

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
|  | 2012 | 2011 | 2012 | 2011 |
|---|---|---|---|---|
| Royalty license income—net | $ — | $ — | $ — | $ (1) |
| Billings under TSAs | — | (19) | — | (44) |
| Other—net | — | 1 | (1) | 3 |
| Other operating income—net | $ — | $ (18) | $ (1) | $ (42) |

*Other income (expense) — net:*

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
|  | 2012 | 2011 | 2012 | 2011 |
|---|---|---|---|---|
| Rental income | $ — | $ 1 | $ — | $ 2 |
| Gain on sale and impairment of investments - net | — | 1 | — | 1 |
| Currency exchange gain (loss)—net | (8) | 10 | (14) | — |
| Other—net | — | (3) | (4) | (6) |
| Other income (expense)—net | $ (8) | $ 9 | $ (18) | $ (3) |

18

BHG0160732

A

*Condensed consolidated balance sheets*

*Accounts receivable — net:*

|  | June 30, 2012 | December 31, 2011 |
|---|---|---|
| Trade and other receivables [a] | $ 176 | $ 193 |
| Less: provisions for doubtful accounts | (17) | (19) |
| Accounts receivable—net | $ 159 | $ 174 |

(a)   Includes $141 and $155 as of June 30, 2012 and December 31, 2011. respectively, related to net accounts receivable from subsidiaries accounted for under the cost method, where settlement will occur as part of a plan of reorganization under the Creditor Protection Proceedings.

*Other current assets:*

|  | June 30, 2012 | December 31, 2011 |
|---|---|---|
| Prepaid expenses | $ 21 | $ 16 |
| Income taxes recoverable | 17 | 26 |
| Other | 33 | 37 |
| Other current assets | $ 71 | $ 79 |

*Plant and equipment — net:*

|  | June 30, 2012 | December 31, 2011 |
|---|---|---|
| Cost: |  |  |
| Buildings | $ 1 | $ 1 |
| Machinery and equipment | 88 | 91 |
|  | 89 | 92 |
| Less accumulated depreciation: |  |  |
| Buildings | (1) | (1) |
| Machinery and equipment | (88) | (91) |
|  | (89) | (92) |
| Plant and equipment—net | $ — | $ — |

19

BHG0160733

A

*Other assets:*

| | June 30, 2012 | December 31, 2011 |
|---|---|---|
| Debt issuance costs | $ 20 | $ 24 |
| Other | 21 | 28 |
| Other assets | $ 41 | $ 52 |

*Other accrued liabilities:*

| | June 30, 2012 | December 31, 2011 |
|---|---|---|
| Outsourcing and selling, general and administrative related provisions | $ 3 | $ 5 |
| Income taxes payable | 8 | 2 |
| Other | 2 | 11 |
| Other accrued liabilities | $ 13 | $ 18 |

*Other liabilities:*

| | June 30, 2012 | December 31, 2011 |
|---|---|---|
| Tax uncertainties | $ 8 | $ 9 |
| Other long-term provisions | — | 8 |
| Other liabilities | $ 8 | $ 17 |

**Condensed consolidated statements of cash flows**

*Change in operating assets and liabilities — net:*

| | Six Months Ended June 30, | |
|---|---|---|
| | 2012 | 2011 |
| Accounts and other receivables—net | $ 15 | $ 44 |
| Deferred costs | — | 4 |
| Income taxes | 15 | (1) |
| Trade and other payables | (27) | (24) |
| Payroll, accrued and contractual liabilities | 164 | 226 |

20

BHG0160734

A

| | | |
|---|---:|---:|
| Deferred revenue | — | (9) |
| Advance billings in excess of revenues recognized to date on contracts | — | (2) |
| Other Change in operating assets and liabilities [a] | (5) | 28 |
| | $162 | $266 |

_____

(a) The changes in liability amounts noted above include obligations that are subject to compromise, consistent with their designation as of, and subsequent to, the Petition Date.

*Taxes and reorganization items paid (received):*

| | Six Months Ended June 30, | |
|---|---:|---:|
| | 2012 | 2011 |
| Cash taxes paid (received)—net | $   (3) | $    3 |
| Net receipts from reorganization items (note 4) | $  (61) | $  (57) |

## 6. Pre-Petition Date cost reduction plans

As a result of the Creditor Protection Proceedings, Nortel ceased taking any further actions under the previously announced workforce and cost reduction plans as of January 14, 2009. Any revisions to actions taken up to that date under previously announced workforce and cost reduction plans have been accounted for under such plans. Nortel's contractual obligations are subject to re-evaluation in connection with the Creditor Protection Proceedings and, as a result, expected cash outlays disclosed below relating to contract settlement and lease costs are subject to change. As well, Nortel is not following its pre-Petition Date practices with respect to the payment of severance in jurisdictions under the Creditor Protection Proceedings.

During the three and six months ended June 30, 2012 and 2011, charges related to Nortel's pre-Petition Date cost reduction plans were immaterial. As of June 30, 2012, the pre-petition cost reduction provision of $33 represents $23 of accrued severance claims for former employees and $10 in contract settlement and lease costs. As of December 31, 2011, the pre-petition cost reduction provision was $34.

## 7. Post-Petition Date cost reduction activities

In connection with the Creditor Protection Proceedings, Nortel has implemented certain workforce and other cost reduction activities and will continue such activities during this process. The actions related to these activities are expected to occur as they are identified. The current estimated total charges to earnings and cash outlays are subject to change as a result of Nortel's ongoing review of applicable law. In addition, the current estimated total charges to earnings and cash outlays do not reflect all potential claims or contingency amounts that may be allowed under the Creditor Protection Proceedings and thus are also subject to change.

### *Workforce Reduction Activities*

*Three and six months ended June 30, 2012*

For the three and six months ended June 30, 2012, approximately $2 and $6, respectively, of the total charges relating to the net workforce reduction of 41 and 92 positions, respectively, were incurred. As Nortel continues to progress through the Creditor Protection Proceedings, Nortel expects to incur charges and cash outlays related to workforce and other cost reduction strategies.

*Three and six months ended June 30, 2011*

For the three and six months ended June 30, 2011, approximately $6 and $10, respectively, of the total charges relating to the net workforce reduction of 259 and 345 positions, respectively, were incurred as of June 30, 2011, which substantially completes the workforce and other cost reduction strategies discussed above.

21

BHG0160735

A

During the six months ended June 30, 2012, changes to the workforce provision balances were as follows:

| | |
|---|---:|
| Provision balance as of December 31, 2011 | $ 140 |
| Other charges | 6 |
| Cash drawdowns | — |
| Foreign exchange and other adjustments | (2) |
| Provision balance as of June 30, 2012 (a) | $ 144 |

(a)   Included in liabilities subject to compromise.

### Other Cost Reduction Activities

During the three and six months ended June 30, 2012, Nortel's real estate cost reduction activities resulted in charges of $3 and $3, respectively. During the three and six months ended June 30, 2011, Nortel's real estate cost reduction charges were nil.

As of June 30, 2012, Nortel's real estate and other cost reduction balances were approximately $9, which are classified as subject to compromise. As of December 31, 2011, Nortel's real estate and other cost reduction balances were approximately $6, which are classified as subject to compromise.

## 8. Income taxes

During the six months ended June 30, 2012, Nortel recorded a tax expense of $7 on loss from operations before income taxes of $180. The tax expense of $7 was comprised of $6 resulting from taxes on earnings in Asia, $1 of other taxes including withholding taxes, and $1 resulting from a provision for actual tax adjustments to the prior year balances, partially offset by decreases in uncertain tax positions of $1.

The ultimate determination of the final allocation of proceeds among the various Nortel legal entities has not yet occurred and may be materially different from the classification and related amounts shown in these unaudited condensed consolidated financial statements. Nortel expects that the final allocation of proceeds will mainly result in adjustments to existing loss carry-forward balances or other tax attributes, which will be offset with valuation allowance and have a nil impact to taxes payable.

During the six months ended June 30, 2011, Nortel recorded a tax expense of $1 on loss from operations before income taxes of $206. The tax expense of $1 was comprised of $3 resulting from taxes on earnings in Asia, offset by a recovery of $2 relating to changes in uncertain tax positions.

As of June 30, 2012, Nortel's net deferred tax liabilities were $6, representing the accrual of deferred tax liabilities associated with the expected withholding taxes relating to investments in CALA and Asia. There is significant uncertainty concerning the forecasted income or loss for 2012 and beyond and the uncertainty concerning the estimated final proceeds allocation by jurisdiction, and thus this significant negative evidence outweighs any positive evidence that may exist. Therefore, Nortel has concluded that a full valuation allowance continues to be necessary against Nortel's deferred tax assets in all jurisdictions as of June 30, 2012.

Nortel had approximately $1,477 and $1,487 of total gross unrecognized tax benefits as of June 30, 2012 and December 31, 2011, respectively. Of the total gross unrecognized tax benefits of $1,477, $10 represented the amount of unrecognized tax benefits, net of valuation allowance that would favorably affect the effective income tax rate in future periods, if recognized. The net decrease of $10 since December 31, 2011 resulted from $9 due to changes to foreign exchange rates, and a decrease in a prior year uncertain position of $1.

Nortel recognized interest and penalties accrued related to unrecognized tax benefits in income tax expense. During the six months ended June 30, 2012, Nortel recovered $1 related to interest, penalties and foreign exchange losses. Nortel has accrued approximately $6 and $7 for the payment of interest and penalties as of June 30, 2012 and December 31, 2011, respectively.

Nortel believes it is reasonably possible that its gross unrecognized tax benefit will decrease by $1,375 during the twelve months ending June 30, 2013, of which $636 relates to the deductibility of legal settlement expenses and $739 relates to investment tax credits with the resulting impact being the expiry of unutilized non capital losses from prior years.

22

BHG0160736

A

### 9. Employee benefit plans

#### Plan Description

Nortel maintains various investment plans covering substantially all of its employees, and acts as the plan sponsor for its defined benefit and defined contribution plans. Below is a list of relevant plans discussed in this note and their status as of June 30, 2012 and the basis for which they are being accounted for as of June 30, 2012. Note that although these plans represent Nortel's major retirement plans, Nortel also has smaller pension plan arrangements in other countries.

| Plan Name | Status | Current Accounting |
|---|---|---|
| Canadian Retirement Savings Plan | Ongoing | Defined Contribution |
| Canadian Defined Contribution Pension Plan ("DCPP") | Closed 9/30/2010 | Defined Contribution |
| Canadian Post Employment obligation | Terminated 12/31/2010 | Estimated Allowed Claim |
| Canadian Post Retirement obligation | Terminated 12/31/2010 | Estimated Allowed Claim |
| Canadian Defined Benefit Plans | | |
| Managerial and Non-Negotiated Pension Plan (registered) | Plan sponsor only | Defined Benefit |
| Negotiated Pension Plan (registered) | Plan sponsor only | Defined Benefit |
| Transitional Retiring Allowance ("TRA") & Retirement Allowance ("RAP") Pension Plans | Plan sponsor only | Defined Benefit |
| Nortel Networks Supplementary Executive Retirement Plan ("SERP") | Terminated 12/31/2010 | Estimated Allowed Claim |
| Nortel Networks Limited Excess Pension Plan ("Excess") | Terminated 12/31/2010 | Estimated Allowed Claim |
| US LTIP (Long-Term Incentive Plan) | Deconsolidated 10/1/2010 | Deconsolidated |
| US Post Retirement obligation | Deconsolidated 10/1/2010 | Deconsolidated |

#### Wind-up Order of the Canadian Funded Pension Plans

On March 8, 2011, the Ontario Superintendent of Financial Services ordered the wind-up of the Nortel Networks Limited Managerial and Non-Negotiated Pension Plan and the Nortel Networks Negotiated Pension Plan (collectively, the "Canadian Pension Plans") with an effective date of October 1, 2010. Nortel's net pension liability for the Canadian Pension Plans is based on the pension assets and liabilities as of this wind-up date. As such, the 2012 and 2011 pension expense for the Canadian Pension Plans was limited to the amortization of accumulated other comprehensive income. As a result of this order, Nortel remeasured the pension obligations under the plans in the first quarter of 2011 using wind-up assumptions as of the effective date, resulting in a reduction to pension liabilities and OCI of $96. The settlement process for the Canadian Pension Plans has not been finalized, and as such the assumptions used to calculate the Canadian Pension Plans' pension obligations could be subject to change. There were no advancements in the settlement process for the Canadian Pension Plans during the six months ended June 30, 2012, which would require an adjustment to the carrying amount of the liability.

#### Pension Benefits

The following details the net pension expense for the defined benefit plans for the following periods:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| **Pension expense:** | | | | |
| Interest cost | $    — | $    1 | $    — | $    2 |
| Amortization of net losses | 11 | 13 | 22 | 26 |
| Net pension expense | $    11 | $    14 | $    22 | $    28 |

23

BHG0160737

A

**10. Guarantees**

Nortel's requirement to make payments (either in cash, financial instruments, other assets, NNC common shares or through the provision of services) to a third party will be triggered as a result of changes in an underlying economic characteristic (such as interest rates or market value) that is related to an asset, a liability or an equity security of the guaranteed party or a third party's failure to perform under a specified agreement.

The following table provides a summary of Nortel's guarantees as of June 30, 2012:

| | Carrying Amount of Liability | Maximum Potential Liability[p] |
|---|---|---|
| Business sale and business combination agreements | | |
| Third party claims [a] | $    1 | $    4 |
| Specified annual sales volume [b] | 9 | 9 |
| Intellectual property indemnification obligation [c] | — | NQ |
| Lease agreements [d] | — | 7 |
| Receivable securitization [e] | — | NQ |
| Other indemnification agreements | | |
| EDC Support Facility [f] | 20 | 20 |
| Global Class Action Settlement [g] | — | NQ |
| Sale lease-back [h] | — | 4 |
| Bankruptcy [i] | — | 1 |
| Real estate residual value guarantee [j] | 21 | 21 |
| Environmental indemnifications [k] | 8 | NQ |
| U.K. Defined Benefit Plan guarantee [l] | | |
| Funding guarantee | 520 | NQ |
| Insolvency guarantee | 150 | 150 |
| U.S. debt guarantee [m] | 150 | NQ |
| NNL lease guarantees [n] | 126 | NQ |
| NNL grant guarantee [o] | 7 | 7 |
| Total | $  1,012 | $   223 |

24

A
_____

(a)  Includes guarantees in connection with agreements for the sale of all or portions of an investment or a Nortel business. including certain discontinued operations and guarantees related to the escrow of shares as part of business combinations in prior periods. Nortel has indemnified the purchaser of an investment or a Nortel business in the event that a third party asserts a claim against the purchaser that relates to a liability retained by Nortel relating to business events occurring prior to the sale, such as tax, environmental, litigation and employment matters. In certain agreements, Nortel also indemnifies counterparties for losses incurred from litigation that may be suffered by counterparties arising under guarantees related to the escrow of shares in business combinations. Some of these types of guarantees have indefinite terms while others have specific terms extending to no later than 2012. As of June 30, 2012, Nortel has not made any payments to settle such obligations and does not expect to do so in the future. However, an amount has been accrued for these guarantees, based on the probability of payout and expected payout, if required.

(b)  In conjunction with the sale of a subsidiary to a third party, Nortel guaranteed to the purchaser that specified annual sales volume levels would be achieved by the business sold over a ten-year period ended March 31, 2007. Nortel's guarantee to the purchaser was governed by the laws of the purchaser's jurisdiction. As such, the purchaser has the right to claim such payments under the volume guarantee until January 31, 2018, under the statute of limitations of such jurisdiction. As of June 30, 2012, Nortel has not made any payments to settle such obligations and does not expect to do so in the future.

(c)  Nortel has periodically entered into agreements with customers and suppliers that include intellectual property indemnification obligations that are customary in the industry. These agreements generally require Nortel to compensate the other party for certain damages and costs incurred as a result of third party intellectual property obligations arising from these transactions. These types of guarantees typically have indefinite terms; however, under some agreements, Nortel has provided specific terms extending to February 2011. As of June 30, 2012, Nortel has not made any payments to settle such obligations and does not expect to do so in the future.

(d)  Nortel has entered into agreements with its lessors to guarantee the lease payments of certain assignees of its facilities. Generally, these lease agreements relate to facilities Nortel vacated prior to the end of the term of its lease. These lease agreements require Nortel to make lease payments throughout the lease term if the assignee fails to make scheduled payments. Most of these lease agreements also require Nortel to pay for facility restoration costs at the end of the lease term if the assignee fails to do so. These lease agreements have expiration dates through June 2015. As of June 30, 2012, Nortel has not made any payments to settle such obligations and does not expect to do so in the future. However, an immaterial amount has been accrued for this liability, based on the probability of payout and expected payout, if required.

(e)  Nortel has agreed to indemnify certain of its counterparties in certain receivables securitization transactions. Certain receivables securitization transactions include indemnifications requiring the repurchase of the receivables, under certain conditions, if the receivable is not paid by the obligor. The indemnification provisions generally expire upon the earlier of either expiration of the securitization agreements, which extended through 2009, or collection of the receivable amounts by the purchaser. As of June 30, 2012, Nortel has not made any payments to settle such obligations and does not expect to do so in the future. However, an immaterial amount has been accrued for this liability, based on the probability of payout and expected payout, if required.

25

BHG0160739

A

(f) Nortel has also agreed to indemnify Export Development Canada ("EDC") under the EDC support facility against any legal action brought against EDC that relates to the provision of support previously provided under the EDC support facility. Approximately $20 has been paid to third party beneficiaries by EDC under guarantees supporting Nortel performance obligations. Nortel has reimbursement obligations to EDC for such payments. As of June 30, 2012, Nortel has not made any payments to settle such obligations and does not expect to do so during the pendency of the Creditor Protection Proceedings.

(g) On March 17, 2006, in connection with the agreements to settle two significant U.S. and all but one Canadian class action lawsuits, which became effective on March 20, 2007 following approval of the agreements by the appropriate courts ("Global Class Action Settlement"), Nortel announced that it had reached an agreement with the lead plaintiffs on the related insurance and corporate governance matters, including Nortel's insurers agreeing to pay $229 in cash towards the settlement and Nortel agreeing with its insurers to certain indemnification obligations. Nortel believes that it is unlikely that these indemnification obligations will materially increase its total cash payment obligations under the Global Class Action Settlement. As of June 30, 2012, Nortel has not made any significant payments to settle such obligations.

(h) On June 27, 2007, NNL entered into a sale lease-back agreement where it agreed to provide an indemnity to the purchaser with respect to union and employee termination matters. The sale agreement requires NNL to compensate the purchaser for any costs in the event that NNL fails to effectively satisfy termination obligations to union employees; if a reinstatement application is brought by the union or non-union employees; or if the purchaser is required to re-hire selected union employees. The indemnification provision expires upon the retirement of the last former employee. The nature of the indemnification prevents Nortel from making a reasonable estimate of the maximum term of the indemnification. As of June 30, 2012, Nortel has not made any payments to settle such obligations and does not expect to do so in the future. However, an immaterial amount has been accrued for this liability, based on the probability of payout and expected payout, if required.

(i) On February 28, 2008, NNL entered into a guarantee agreement in which it agreed to repay to the bankruptcy estate of a certain debtor, any interim dividends paid from the bankruptcy estate that NNL is not entitled to in the event that a creditor steps forward with a claim that requires a re-distribution of funds between the creditors. The nature of the indemnification prevents Nortel from making a reasonable estimate of the maximum term of the indemnification. As of June 30, 2012, Nortel has not made any payments to settle such obligations and does not expect to do so in the future. However, an immaterial amount has been accrued for this liability, based on the probability of payout and expected payout, if required.

(j) On July 15, 1999, NNL entered into a guarantee and sales agency agreement whereby it agreed to provide the landlord of a property a residual value guarantee upon the termination of the related property lease. The amount of the guarantee became fixed upon termination of the lease on the property as of June 30, 2010.

(k) Nortel has agreed to provide an indemnity to the purchasers of certain properties with respect to certain environmental matters. An estimated amount has been accrued for this liability, based on the probability of payout and expected payout, if required, which amount has been classified as liability subject to compromise. Certain purchasers of its certain properties have filed claims related to the environmental matters for an amount of $188, which amount continues to be assessed by the Canadian Debtors. To the extent that the claim is finalized in the future, the provision will be adjusted.

(l) NNL has irrevocably and unconditionally guaranteed NNUK's punctual performance of certain payment obligations under the U.K. defined benefit pension plan funding agreement ("Pension Guarantee"). Pursuant to a further guarantee agreement NNL has guaranteed NNUK's payment obligations arising upon the wind-up, dissolution or liquidation of NNUK and consequent windup of such plan to the lesser of (a) $150 and (b) the amount of the plan's buy out deficit. Nortel has recorded liabilities of $520 and $150 for the Pension Guarantee and the further guarantee, respectively, representing Nortel's current assumption of the expected claim amount in accordance with ASC 852 in relation to each claim. The Pensions Regulator and Trustee of the Plan have filed a claim related to the Pension Guarantee for an amount of $810 and related to the further guarantee of $150. To the extent that more reliable information becomes available in the future indicates a difference from the recognized amounts, the provision will be adjusted.

(m) NNL has unconditionally guaranteed $150 debt obligation of NNCC an indirect wholly owned finance subsidiary of NNI. Nortel has recorded a corresponding liability of $150 for this guarantee. Nortel has not accrued interest related to this debt obligation on the basis it does not believe it will be an allowed claim.

(n) NNL has guaranteed the contractual obligations under the lease agreements entered into by certain of its U.S. Subsidiaries and EMEA Subsidiaries. These guarantees require NNL to make all lease payments required pursuant to the lease terms if and when a subsidiary fails to make required payments. The current recorded amount of claims filed by the landlords of the properties related to these guarantees total $192, which amount continues to be assessed by the Canadian Debtors. The maximum potential liability is subject to the ongoing real estate claims process.

(o) NNL has guaranteed certain grants provided by the Industrial Development Agency of Ireland to NNIL to support in-country research and development activities. Nortel has recorded a liability of $7, representing the claim amount in accordance with ASC 852.

(p) The nature of some guarantees and indemnification arrangements generally prevents Nortel from making a reasonable estimate of the maximum potential amount it could be required to pay under such agreements. For this reason, no amount has been included in the disclosure in these circumstances and such items have been denoted as non-quantifiable (NQ).

## 11. Fair Value

FASB ASC 820 "Fair Value Measurement and Disclosures" ("ASC 820") defines fair value, establishes a consistent framework for measuring fair value and expands disclosure requirements about fair value measurements. ASC 820, among other things, requires Nortel to maximize the use of observable inputs and minimize the use of unobservable inputs when measuring fair value.

26

BHG0160740

A

*Fair value hierarchy*

ASC 820 provides a hierarchy of valuation techniques based on whether the inputs to those valuation techniques are observable or unobservable. Observable inputs reflect market data obtained from independent sources, while unobservable inputs reflect Nortel's assumptions with respect to how market participants would price an asset or liability. These two inputs used to measure fair value fall into the following three different levels of the fair value hierarchy:

*Level 1:* Quoted prices for identical instruments in active markets that are observable.

*Level 2:* Quoted prices for similar instruments in active markets; quoted prices for identical or similar instruments in markets that are non-active; inputs other than quoted prices that are observable, and derived from or corroborated by observable market data.

*Level 3:* Valuations derived from valuation techniques in which one or more significant inputs are unobservable. This hierarchy requires the use of observable market data when available.

*Determination of fair value*

When available, Nortel uses quoted market prices to determine fair value of items classified in Level 1 of the fair value hierarchy, more specifically Nortel's long-term debt including liabilities subject to compromise.

**12. Commitments**

*Bid, performance-related and other bonds*

Nortel has entered into bid, performance-related and other bonds associated with various contracts. Other bonds primarily relate to warranty contracts. Performance-related and other bonds generally have a term consistent with the term of the underlying contract. The various contracts to which these bonds apply generally have terms up to one year. Any potential payments which might become due under these bonds would be related to Nortel's non-performance under the applicable contract. Historically, Nortel has not made material payments under these types of bonds, and as a result of the Creditor Protection Proceedings, does not anticipate that it will be required to make such payments during the pendency of the Creditor Protection Proceedings.

The following table sets forth the maximum potential amount of future payments under bid, performance-related and other bonds, net of the corresponding restricted cash and cash equivalents:

| | June 30, 2012 | December 31, 2011 |
|---|---|---|
| Bid and performance-related bonds [a] | $ — | $ 3 |
| Other bonds [b] | — | — |
| Total bid, performance-related and other bonds | $ — | $ 3 |

(a)    Net of restricted cash and cash equivalent amounts of $5 and $6 as of June 30, 2012 and December 31, 2011, respectively.
(b)    Net of restricted cash and cash equivalent amounts of nil and $1 as of June 30, 2012 and December 31, 2011, respectively.

**13. Loss per common share**

The following table details the weighted-average number of NNC common shares outstanding for the purposes of computing basic and diluted loss per common share for the following periods:

27

BHG0160741

A

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2012 [a] | 2011 [a] | 2012 [a] | 2011 [a] |
| | *Number of common shares in millions;* | | *Number of common shares in millions;* | |
| Net loss attributable to Nortel Networks Corporation | $ (131) | $ (115) | $ (194) | $ (220) |
| Basic weighted-average shares outstanding: | | | | |
| Issued and outstanding | 499 | 499 | 499 | 499 |
| Weighted-average shares dilution adjustments: | | | | |
| 1.75% Convertible Senior Notes | — | — | — | — |
| 2.125% Convertible Senior Notes | — | — | — | — |
| Diluted weighted-average shares outstanding | 499 | 499 | 499 | 499 |
| Weighted-average shares dilution adjustments—exclusions | | | | |
| 1.75% Convertible Senior Notes | 18 | 18 | 18 | 18 |
| 2.125% Convertible Senior Notes | 18 | 18 | 18 | 18 |
| Basic and diluted loss per common share: | $ (0.26) | $ (0.23) | $ (0.39) | $ (0.44) |

(a) As a result of the net loss for the three and six months ended June 30, 2012 and 2011, all potential dilutive securities in these periods are considered anti-dilutive.

## 14. Shareholder's deficit

The following are the changes in shareholders' deficit during the six months ended June 30, 2012:

| | NNC Common Shares | Additional Paid-In Capital | Accumulated Deficit | Other Comprehensive Loss | Non-controlling Interests | Total |
|---|---|---|---|---|---|---|
| Balance as of December 31, 2011 | $35,604 | $ 3,597 | $ (42,406) | $ (143) | $ 639 | $(2,709) |
| Net loss | — | — | (194) | — | 7 | (187) |
| Foreign currency translation adjustment | — | — | — | 22 | — | 22 |
| Unamortized pension and post-retirement actuarial losses and prior service cost—net | — | — | — | 17 | — | 17 |
| Other | — | — | — | — | (9) | (9) |
| Balance as of June 30, 2012 | $35,604 | $ 3,597 | $ (42,600) | $ (104) | $ 637 | $(2,866) |

## 15. Liabilities subject to compromise

As a result of the Creditor Protection Proceedings, pre-petition liabilities may be subject to compromise or may otherwise be affected by a court-approved plan and generally, actions to enforce or otherwise effect payment of pre-petition liabilities are stayed. Although pre-petition claims are generally stayed, under the Creditor Protection Proceedings, the Debtors are permitted to undertake certain actions designed to stabilize the Debtors' operations including, among other things, payment of employee wages and benefits, maintenance of Nortel's cash management system, satisfaction of customer obligations, payments to suppliers for goods and services received after the Petition Date and retention of professionals. The Debtors have been paying and intend to continue to pay undisputed post-petition claims in the ordinary course of business. Under the Creditor Protection Proceedings, the Debtors have certain rights, which vary by jurisdiction, to reject, repudiate or no longer continue to perform various types of contracts or arrangements. Damages resulting from rejecting, repudiating or no longer continuing to perform a contract or arrangement are treated as general unsecured claims and will be classified as liabilities subject to compromise. ASC 852 requires pre-petition liabilities of the debtor that are subject to compromise to be reported at the claim amounts expected to be allowed, even if they may be settled for lesser amounts.

28

BHG0160742

A

Liabilities subject to compromise consist of the following:

| | June 30, 2012 | December 31, 2011 |
|---|---|---|
| Trade and other accounts payable | $    167 | $    164 |
| Payable to U.S. Subsidiaries | 2.151 | 2.151 |
| Restructuring liabilities | 186 | 180 |
| Long-term debt | 4,035 | 4,042 |
| U.S. debt guarantee (note 10) | 150 | 150 |
| Interest on long-term debt | 1,193 | 1,018 |
| Notes payable | 176 | 175 |
| Pension obligations | 1,548 | 1,557 |
| Post-retirement obligations other than pensions | 564 | 578 |
| U.K. pension guarantees (note 10) | 670 | 665 |
| EDC support facility (note 10) | 20 | 20 |
| NNL lease guarantees (note 10) | 126 | 125 |
| Real estate residual value guarantee (note 10) | 21 | 22 |
| NNL grant guarantee (note 10) | 7 | 7 |
| Environmental liabilities (note 10) | 8 | — |
| Liabilities of discontinued operations (a) | 34 | 34 |
| Other accrued liabilities | 53 | 51 |
| Total liabilities subject to compromise | $11,109 | $   10,939 |

(a)   Relates to pre-petition liabilities of the Enterprise Solutions business, which were classified as discontinued operations in 2009.

As of June 30, 2012, the Canadian Debtors have received approximately 1,065 claims asserting approximately $29,503 (calculated utilizing exchange rates as of the petition date for presentation purposes) in aggregate outstanding liquidated claims (excluding EMEA, employee compensation and other intercompany claims). Some of these claims are unliquidated and are therefore not reflected in the aggregate claim amount above. The Canadian Debtors continue to investigate differences between the claim amounts filed by creditors and claim amounts determined by the Canadian Debtors. Certain claims filed may be duplicative (particularly given the multiple jurisdictions and Canadian Debtors involved in the Creditor Protection Proceedings), based on contingencies that have not occurred, or may be otherwise overstated, and would therefore be subject to revision or disallowance. Nortel believes the variance between total claims and total liabilities subject to compromise is primarily related to duplicative claims. The determination of Nortel's liabilities subject to compromise considers these factors, and these liabilities are subject to change as a result of the ongoing investigation by the Canadian Debtors of filed proofs of claim. A number of proofs of claim, for which Nortel has not accrued any amount or accrued significantly less than the amounts in the proofs of claim, continue to be reviewed by the Canadian Debtors and may result in significant changes in future periods once these reviews are complete.

An additional approximate 14,000 claims related to the employee compensation claims process totaling CAD$1.06 billion have been received by the Canadian Debtors.

As of June 30, 2012. the Canadian Debtors have resolved 739 claims, reducing the aggregate amount claimed against the Canadian Debtors by approximately $7,224. Although the Canadian Court has established a bar date. subject to certain excluded claims, by which certain proofs of claim against the relevant Canadian Debtors were required to be filed if the claimants were to receive any distribution under the Creditor Protection Proceedings, certain further claims may be permitted. In addition, the Canadian Debtors anticipate that additional proofs of claim will be the subject of future objections as such proofs of claim are reconciled. Accordingly, the ultimate number and amount of allowed claims is not determinable at this time.

The amounts currently classified as liabilities subject to compromise may be subject to future adjustments depending on actions of the applicable courts, further developments with respect to disputed claims, determinations of the secured status of certain claims, if any, the values of any collateral securing such claims, or other events. In addition, a number of proofs of claim, for which Nortel has not accrued any amount or accrued significantly less than the amounts in the proofs of claim, continue to be reviewed by the Canadian Debtors and may result in significant changes in future periods once these reviews are complete.

Classification for purposes of these financial statements of any pre-petition liabilities on any basis other than liabilities subject to compromise is not an admission of fact or legal conclusion by Nortel as to the manner of classification, treatment, allowance, or payment in the Creditor Protection Proceedings, including in connection with any plan that may be approved by any relevant court and that may become effective pursuant to a court's order.

BHG0160743

A

### 16. Contingencies

*Creditor Protection Proceedings*

On January 14, 2009, the Canadian Debtors obtained an order from the Canadian Court for creditor protection and commenced ancillary proceedings under Chapter 15 of the U.S. Bankruptcy Code, the U.S. Debtors filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code, and each of the EMEA Debtors obtained an administration order from the English Court. After the Petition Date, the Israeli Debtors initiated similar proceedings in Israel. One of Nortel's French subsidiaries, NNSA, was placed into secondary proceedings in France and NNCI filed a voluntary petition for relief under Chapter 11 in the U.S. Court and became a party to the Chapter 11 Proceedings. Generally, as a result, all actions to enforce or otherwise effect payment or repayment of liabilities of any Debtor arising prior to the Petition Date, and substantially all pending claims and litigation against any Debtor, are stayed as of the Petition Date. Absent further order of the applicable courts and subject to certain exceptions and, in Canada, potential time limits, no party may take any action to recover on pre-petition claims against any Debtor.

*The Pensions Regulator Financial Support Directions*

According to various claims filed by the trustee of the U.K. defined benefit pension plan and the PPF against certain Debtors, the U.K. defined benefit pension plan had a purported deficit estimated (on a buy-out basis) of £2,100 or $3,300 as at January 2009. In January 2010, the Pensions Regulator, purporting to act under the *Pensions Act 2004* (U.K.) ("U.K. Statute") issued a "warning notice" ("Warning Notice") to certain Nortel entities, including, among others, the Canadian Debtors and the U.S. Debtors. The Pensions Regulator is a statutory agency charged with responsibility for regulating the operations and administration of occupational pension schemes in the U.K., such as the U.K. defined benefit pension plan. The Warning Notice is the first step in a process set forth under the U.K. Statute to enable the Pensions Regulator to issue a financial support direction ("FSD") under the U.K. Statute directing affiliates of NNUK to provide financial support to eliminate the purported deficit. If a company to which a FSD is issued fails to comply with it, the Pensions Regulator may issue a contribution notice ("Contribution Notice") to any one or more persons to whom the FSD was addressed stating that the person is liable to pay to the trustees of the pension scheme the sum specified in the Contribution Notice, where the Pensions Regulator considers it reasonable to impose the liability on the person to pay the specified sum. The sum specified may be the whole or a portion of the actual or estimated deficit of the pension scheme. In the Warning Notice, the Pensions Regulator identified certain Nortel entities, including, among others, NNC, NNL, NNI and NNCI, as targets of a procedure before the determinations panel of the Pensions Regulator ("Determinations Panel") to determine whether to issue a FSD ("U.K. Pension Proceeding"). On February 26, 2010, the Canadian Debtors obtained an order of the Canadian Court, which included, among other things, (i) a declaration that the purported commencement of proceedings and exercise of rights by the Pensions Regulator breaches the Initial Order; and (ii) a declaration that any result obtained in the U.K. in breach of the stay under the CCAA Proceedings would not be recognized in the Canadian claims process. Also on February 26, 2010, the U.S. Debtors obtained an order of the U.S. Court enforcing the automatic stay under the U.S. Bankruptcy Code against the trustee of the U.K. defined benefit pension plan ("U.K. Pension Trustee") and the PPF, which is fully applicable to the U.K. Pension Trustee's and PPF's participation against the U.S. Debtors in the U.K. Pension Proceeding. In addition, the order of the U.S. Court provided that with respect to the U.S. Debtors, such proceedings are deemed void and without force or effect. The Pensions Regulator appealed the decision of the Canadian Court which appeal was heard and dismissed on June 16, 2010, by the Ontario Court of Appeal. The Pensions Regulator submitted an application for leave to appeal the decision of the Ontario Court of Appeal to the Supreme Court of Canada, which application was dismissed on January 27, 2011. In addition, the U.K. Pension Trustee brought a motion before the Canadian Court to have the stay lifted, to allow the U.K. Pension Proceeding to go forward as a "permitted proceeding", which motion was initially set for hearing on May 31, 2010, but was subsequently adjourned without date on the consent of all interested parties. The U.K. Pension Trustee and the PPF also appealed the decision of the U.S. Court enforcing the stay. That appeal was denied by the U.S. Court of Appeals for the Third Circuit ("U.S. Appeals Court") on December 29, 2011 and on January 24, 2012 the U.S. Appeals Court denied a petition by the U.K. Pension Trustee and the PPF for a rehearing of the appeal. On April 20, 2012, the U.K. Pension Trustee and the PPF filed a petition for certiorari with the Supreme Court of the United States, requesting review of the U.S. Appeals Court's December 29, 2011 decision, which was denied on June 25, 2012. The U.S. Debtors filed an objection to the claims and motion for a more definitive statement of claim on June 11, 2012. The U.S. Bankruptcy Court granted the motion on July 11, 2012, and ordered that the U.K. Pension Trustee and the PPF file a more definitive statement of their claims on or before September 5, 2012. Notwithstanding the orders of the Canadian Court and the U.S. Court and the dismissal of the Pension Regulator's appeal by the Ontario Court of Appeal, the FSD proceedings commenced in the U.K. on June 2, 2010, and on June 25, 2010, the Determinations Panel issued a determination notice ("Determination Notice") indicating that a FSD would be issued against certain Debtors including, among others, NNC, NNL, NNI and NNCI. On April 1, 2011, the Determinations Panel issued FSDs to NNC, NNL, NNI and NNCI requiring each of them to secure that financial support be put in place for the U.K. defined benefit pension plan within six calendar months of the date of the FSDs. The other Debtors that received the Determination Notice have exercised their right under the U.K. Statute to refer the Determinations Panel's determination to the Pensions Regulator Tribunal established under the U.K. Statute for a further determination of the matter. Nortel is of the view that the Determination Notice and the FSD issued to NNC, NNL, NNI and NNCI are null and void given the court decisions noted above.

In September 2010, the U.K. Administrators applied to the English Court for directions concerning the application and effect of the FSD regime contained in the U.K. Statute upon those EMEA Debtors that were identified in the Warning Notice. On December 10, 2010, the English Court ruled that the Pensions Regulator could pursue FSDs and Contribution Notices against the target Debtors in accordance with the provisions of the U.K. Statute. Further, the English Court held that the debt created by any Contribution Notice that may be issued constitutes an administration or liquidation expense of an insolvent target company, rather than a provable debt in the insolvency proceedings, thereby giving it "super priority" status over the claims of other creditors of the insolvent target company.

30

BHG0160744

A

The U.K. Administrators appealed this decision to the Court of Appeal of England and Wales ("U.K. Appeal Court") and, on October 14. 2011. the U.K. Appeal Court upheld the English Court's decision. The U.K. Administrators have been granted leave to appeal the U.K. Appeal Court's decision to the Supreme Court. Nortel is of the view that these court decisions in the U.K. have no authoritative application in the CCAA Proceedings or the Chapter 11 Proceedings and that the validity and relative priority of claims filed in those proceedings are matters to be determined by the Canadian Court and the U.S. Court. as applicable.

Pursuant to an intercompany guarantee agreement relating to the U.K. defined benefit pension plan. NNL has guaranteed certain payment obligations of NNUK under a Funding Agreement executed on November 21. 2006. Pursuant to a further intercompany guarantee agreement. NNL has guaranteed NNUK's payment obligations arising upon the wind up. dissolution or liquidation and consequent windup of such plan to the lesser of (a) $150 and (b) the amount of the plan's buyout deficit. See note 10.

### Securities Class Action Claim against former CEO and former CFO

On May 18. 2009. a complaint was filed in the U.S. District Court for the Southern District of New York alleging violations of federal securities law between the period of May 2, 2008 through September 17. 2008, against Mike Zafirovski (Nortel's former President and Chief Executive Officer) and Pavi Binning (Nortel's former Executive Vice President. Chief Financial Officer and Chief Restructuring Officer). Although Nortel is not a named defendant. this lawsuit has been stayed as a result of the Creditor Protection Proceedings. Messrs Zafirovski and Binning have filed claims in the U.S. Court for indemnification and contribution for potential liability arising out of this matter in amounts to be determined. As of November 8. 2010. the United States District Court for the Southern District of New York ordered that the matter be placed on the suspense docket pending developments in the Creditor Protection Proceedings.

### ERISA Lawsuit

As previously reported, beginning in December 2001. NNC. NNL and NNI. together with certain of its then-current and former directors. officers and employees. were named as defendants in several purported class action lawsuits pursuant to ERISA. These lawsuits were consolidated into a single proceeding in the U.S. District Court for the Middle District of Tennessee (the "U.S. District Court"). This lawsuit is on behalf of participants and beneficiaries of the Nortel Networks Inc. Long-Term Investment Plan. who held shares of the Nortel Networks Stock Fund during the class period. The lawsuit alleged, among other things. material misrepresentations and omissions to induce participants and beneficiaries to continue to invest in and maintain investments in NNC common shares through the investment plan. As a result of the Creditor Protection Proceedings. on September 25, 2009. the U.S. District Court ordered the case administratively closed. The parties to the action agreed to a final form of Stipulation of Settlement (the "Stipulation") whereby the defendants will cause their underwriter. Chubb Insurance Company of Canada ("Chubb"). to pay $21.5 into an escrow account on behalf of the defendants as full and final settlement of the action and in consideration for the releases and discharges provided under the Stipulation. Such settlement amount will be distributed in accordance with the terms of the Stipulation. In a side agreement. NNC. NNL. NNI and Chubb stipulated that existing claims filed by Chubb in the Creditor Protection Proceedings in Canada and in the U.S. will be reduced and allowed as general unsecured claims upon deposit by Chubb of the final settlement payments. The Stipulation and the side agreement were approved by the Canadian Court and the U.S. Court. The U.S. District Court also granted preliminary approval of the Stipulation. A fairness hearing for final approval was held on January 11. 2012 and the Stipulation was approved. Nortel has recorded a provision to reflect its best estimate of an allowed claim amount.

### Canadian Pension Class Action

On June 24. 2008. a purported class action lawsuit was filed against Nortel and NNL in the Ontario Superior Court of Justice in Ottawa, Canada alleging. among other things. that certain recent changes related to Nortel's pension plan did not comply with the *Pension Benefits Act* (Ontario) or common law notification requirements. The plaintiffs seek declaratory and equitable relief. and unspecified monetary damages. As a result of the Creditor Protection Proceedings. this lawsuit has been stayed.

### Nortel Statement of Claim Against its Former Officers

In January 2005. NNC and NNL filed a Statement of Claim in the Ontario Superior Court of Justice against Messrs. Frank Dunn. Douglas Beatty and Michael Gollogly. Nortel's former senior officers who were terminated for cause in April 2004. seeking the return of payments made to them under Nortel's bonus plan in 2003. One-half of any recovery from this litigation is subject to the Global Class Action Settlement. See note 10.

### Former Officers' Statements of Claim Against Nortel

In April 2006. Mr. Dunn filed a Notice of Action and Statement of Claim in the Ontario Superior Court of Justice against NNC and NNL asserting claims for wrongful dismissal. defamation and mental distress. and seeking punitive. exemplary and aggravated damages. out-of-pocket expenses and special damages. indemnity for legal expenses incurred as a result of civil and administrative proceedings brought against him by reason of his having been an officer or director of the defendants. pre-judgment interest and costs. Mr. Dunn has further brought an application before the Ontario Superior Court of Justice against Nortel and NNL seeking an order that. pursuant to its by-laws, Nortel reimburse him for all past and future defense costs he has incurred as a result of proceedings commenced against him by reason of his being or having been a director or officer of Nortel.

BHG0160745

A

In May and October 2006, respectively, Messrs Gollogly and Beatty filed Statements of Claim in the Ontario Superior Court of Justice against Nortel and NNL asserting claims for, among other things, wrongful dismissal and seeking compensatory, aggravated and punitive damages, and pre-and post-judgment interest and costs.

As a result of the Creditor Protection Proceedings, these lawsuits have been stayed.

*Environmental matters*

Nortel is exposed to liabilities and compliance costs arising from its past generation, management and disposal of hazardous substances and wastes. As of June 30, 2012, accruals for environmental matters were $8 and have been recorded in liabilities subject to compromise. At December 31, 2011, Nortel had remedial activities under way at five sites that are either currently or previously owned. On March 19, 2012, the Canadian Court issued an order that, among other things, authorized Nortel to cease performing any remediation activities at or in relation to the five sites. See note 2 for further information on this order.

Except as otherwise described herein, in each of the matters described above, the plaintiffs are seeking an unspecified amount of monetary damages. Nortel is unable to ascertain the ultimate individual or aggregate amount of monetary liability or financial impact to Nortel of the above matters, which, unless otherwise specified, seek damages from the defendants of material or indeterminate amounts or could result in fines and penalties. Except as noted above, Nortel cannot determine whether these actions, suits, claims and proceedings will, individually or collectively, have a material adverse effect on its business, results of operations, financial condition or liquidity. Except as otherwise described herein, Nortel intends to defend the above actions, suits, claims and proceedings in which it is a defendant, litigating or settling cases where in management's judgment it would be in the best interest of stakeholders to do so. Nortel will continue to cooperate fully with all authorities in connection with the regulatory and criminal investigations.

Nortel is also a defendant in various other suits, claims, proceedings and investigations that arise in the normal course of business.

**17. Subsequent events**

In addition to the events identified in note 2, the Company has evaluated subsequent events through the filing date and determined that no other significant events occurred which require disclosure.

32

BHG0160746