**EXHIBIT 43**

(Part 2 of 3)

A

**ITEM 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

**TABLE OF CONTENTS**


| | |
|---|---|
| Executive Overview | 34 |
| Results of Operations | 40 |
| Liquidity and Capital Resources | 43 |
| Off-Balance Sheet Arrangements | 45 |
| Application of Critical Accounting Policies and Estimates | 45 |
| Outstanding Share Data | 46 |
| Cautionary Notice Regarding Forward-Looking Information | 46 |


*The following Management's Discussion and Analysis (MD&A) is intended to help the reader understand the results of operations and financial condition of Nortel Networks Corporation. As noted herein. we have completed the divestitures of all of our businesses as part of our Creditor Protection Proceedings. The MD&A should be read in combination with our unaudited condensed consolidated financial statements and the accompanying notes. All monetary amounts in this MD&A are in millions and in United States (U.S.) Dollars except per share amounts or unless otherwise stated.*

*Certain statements in this MD&A contain words such as "could". "expect". "may". "anticipate". "believe". "intend". "estimate". "plan". "envision". "seek" and other similar language and are considered forward-looking statements or information under applicable securities laws. These statements are based on our current expectations. estimates, forecasts and projections which we believe are reasonable but which are subject to important assumptions. risks and uncertainties and may prove to be inaccurate. Consequently. our actual results could differ materially from our expectations set out in this MD&A. In particular. see the Risk Factors section of this report as well as in our Annual Report on Form 10-K for the year ended December 31. 2011 filed with the U.S. Securities and Exchange Commission (SEC) and Canadian securities regulatory authorities (2011 Annual Report) for factors that could cause actual results or events to differ materially from those contemplated in forward-looking statements. Unless otherwise required by applicable securities laws. we disclaim any intention or obligation to update or revise any forward-looking statements. whether as a result of new information. future events or otherwise.*

Where we say "we", "us". "our", "Nortel" or "the Company", we mean Nortel Networks Corporation or Nortel Networks Corporation and its subsidiaries that continue to be consolidated, as applicable. Where we say NNC. we mean Nortel Networks Corporation.

A

## Executive Overview

### Creditor Protection Proceedings

On January 14, 2009 (Petition Date), after extensive consideration of all other alternatives, with the unanimous authorization of our board of directors after thorough consultation with our advisors, we initiated creditor protection proceedings in multiple jurisdictions under the respective restructuring regimes of Canada, under the Companies' Creditors Arrangement Act (CCAA) (CCAA Proceedings), the United States (U.S.) under Chapter 11 of the U.S. Bankruptcy Code (Chapter 11) (Chapter 11 Proceedings), the United Kingdom (U.K.) under the Insolvency Act 1986 (U.K. Administration Proceedings), and subsequently, Israel under the Israeli Companies Law 1999 (Israeli Administration Proceedings). On May 28, 2009, one of our French subsidiaries, Nortel Networks SA (NNSA) was placed into secondary proceedings (French Secondary Proceedings). The CCAA Proceedings, Chapter 11 Proceedings, U.K. Administration Proceedings, Israeli Administration Proceedings and French Secondary Proceedings are together referred to as the "Creditor Protection Proceedings". On July 14, 2009, Nortel Networks (CALA) Inc. (NNCI), a U.S. based subsidiary with operations in the Caribbean and Latin America (CALA) region, also filed a voluntary petition for relief under Chapter 11 in the U.S. Bankruptcy Court for the District of Delaware (U.S. Court) and became a party to the Chapter 11 Proceedings. We initiated the Creditor Protection Proceedings with a consolidated cash balance, as of December 31, 2008, of approximately $2,400, in order to preserve our liquidity and fund operations during the process.

As used herein: "Bondholder Group" means a group purporting to hold a portion of our publicly traded debt; "Canadian Monitor" means Ernst & Young Inc. as court-appointed monitor in the CCAA Proceedings; "Debtors" means: (i) us, together with our principal operating subsidiary Nortel Networks Limited (NNL) and certain other Canadian subsidiaries (collectively, Canadian Debtors) that filed for creditor protection pursuant to the provisions of the CCAA in the Ontario Superior Court of Justice (Canadian Court); (ii) Nortel Networks Inc. (NNI), Nortel Networks Capital Corporation (NNCC) and certain other U.S. subsidiaries (collectively, U.S. Debtors) that have filed voluntary petitions under Chapter 11 in the U.S. Court; (iii) certain Europe, Middle East and Africa (EMEA) subsidiaries that made consequential filings under the Insolvency Act 1986 in the High Court of England and Wales (English Court) (including NNSA) and certain Israeli subsidiaries (collectively, Israeli Debtors) that made consequential filings under the Israeli Companies Law 1999 in the District Court of Tel Aviv (collectively, EMEA Debtors); "French Liquidator" means the liquidator appointed by the Versailles Commercial Court in secondary insolvency proceedings commenced by Nortel Networks SA in France; "U.K. Administrators" means, collectively, a representative of Ernst & Young LLP (in the U.K.) and a representative of Ernst & Young Chartered Accountants (in Ireland) as court-appointed joint administrators of Nortel Networks (Ireland) Ltd. (NNIL) and representatives of Ernst & Young LLP (in the U.K.) as court-appointed joint administrators of the EMEA Debtors other than NNIL; "U.S. Creditors' Committee" means the Official Committee of Unsecured Creditors of the U.S. Debtors appointed in the Chapter 11 Proceedings; "U.S. Principal Officer" means the principal officer of the U.S. Debtors appointed in the Chapter 11 Proceedings; and "U.S. Trustee" means the United States Trustee for the District of Delaware.

For further information regarding prior developments in connection with the Creditor Protection Proceedings, refer to our 2011 Annual Report.

#### *Discontinuance of Future Periodic Financial Reporting*

On August 9, 2012, we announced that the Canadian Monitor, after taking into account several factors arising from the advanced stage of the CCAA Proceedings, has determined that the expense and resources required to comply with our and NNL's quarterly and annual public reporting requirements can no longer be justified from the standpoint of the best interest of their creditors. Consequently, we and NNL will no longer be able to comply with our periodic reporting requirements and will discontinue preparing and filing quarterly and annual financial statements and all other periodic disclosure documents under applicable Canadian and U.S. securities laws effective as of the filing deadlines for our third quarter reporting obligations, being November 14, 2012 in the United States and November 29, 2012 in Canada.

Generally, when an issuer ceases to file its periodic disclosure documents in circumstances such as our and NNL's, the Canadian Securities Administrators will issue orders prohibiting trading in securities of the relevant issuer effective from and after the filing deadline under Canadian securities laws (so-called cease trade orders). We and NNL will be making submissions to the Canadian Securities Administrators that cease trade orders expected to be issued in respect of our and NNL's securities include certain permitted trading exceptions. However, there can be no assurance that the regulatory authorities will make such orders on the terms requested by us and NNL and, in particular, permit any trading exceptions.

In light of the foregoing, the directors and officers of NNC and NNL have indicated that they will step down from their positions with NNC and NNL upon the issuance of a court order under the CCAA that the Monitor will be seeking to extend its powers. Such order would allow the Monitor to exercise any powers that may be properly exercised by a board of directors and to terminate the engagement of NNC and NNL's external auditors.

Following the third quarter 2012 filing deadlines, as a means of keeping the public informed of material developments during the remainder of the CCAA proceedings, and until otherwise determined by the Monitor, we and NNL will endeavour to continue to comply with the material change disclosure requirements under Canadian securities laws, to the extent practicable in the

A

circumstances, and to file on SEDAR (the electronic filing system of the Canadian Securities Administrators) all court reports of the Monitor except for such reports, or portions thereof, in respect of which confidential treatment has been requested. All other continuous and current disclosure filings of NNC and NNL will be discontinued.

The materials filed in the CCAA Proceedings are also available on the Monitor's Restructuring Document Centre at www.ey.com/ca/nortel or by contacting the Monitor directly at 1-866-942-7177. Documents filed by the U.S. Debtors with the U.S. Court including monthly operating reports and other general information about the Chapter 11 Proceedings are available at http://chapter11.epiqsystems.com/nortel. The content of these websites is not a part of this report.

***Significant Business Divestitures***

In June, 2009, we determined that selling our businesses was the best path forward. We have completed divestitures of all of our businesses including: (i) the sale of substantially all of our Code Division Multiple Access (CDMA) business and Long Term Evolution (LTE) Access assets to Telefonaktiebolaget LM Ericsson (Ericsson); (ii) the sale of substantially all of the assets of our Enterprise Solutions (ES) business globally, including the shares of Nortel Government Solutions Incorporated (NGS) and DiamondWare, Ltd. (Diamondware), to Avaya Inc. (Avaya); (iii) the sale of the assets of our Wireless Networks (WN) business associated with the development of Next Generation Packet Core network components (Packet Core Assets) to Hitachi, Ltd. (Hitachi); (iv) the sale of certain portions of our Layer 4-7 data portfolio to Radware Ltd.; (v) the sale of substantially all of the assets of our Optical Networking and Carrier Ethernet businesses to Ciena Corporation (Ciena); (vi) the sale of substantially all of the assets of our Global System for Mobile communications (GSM)/GSM for Railways (GSM-R) business to Ericsson and Kapsch CarrierCom AG (Kapsch); (vii) the sale of substantially all of the assets of our Carrier VoIP and Application Solutions (CVAS) business to GENBAND Inc. (now known as GENBAND U.S. LLC (GENBAND)); (viii) the sale of NNL's 50% plus one share interest in LG-Nortel Co. Ltd. (LGN), our Korean joint venture with LG-Electronics, Inc. (LGE), to Ericsson; (ix) the sale of substantially all of the assets of our global Multi Service Switch (MSS) business to Ericsson; (x) the sale of substantially all of the assets of Guangdong-Nortel Telecommunications Equipment Co. Ltd. (GDNT) to Ericsson Mobile Data Applications Technology Research and Development Guangzhou Company Limited and Ericsson (Guangdong Shunde) Communications Company Limited (collectively, Ericsson China); (xi) the sale of our remaining patents and patent applications to a consortium consisting of Apple Inc., EMC Corporation, Ericsson, Microsoft Corporation, Research in Motion Limited and Sony Corporation (colleetively, the Consortium); and (xii) the sale of a small number of our Internet Protocol version 4 addresses to various purchasers.

One of the key remaining matters under the Creditor Protection Proceedings is the determination of allocation of sale proceeds among the various Nortel legal entities that participated in the sales of our businesses, which include entities subject to the respective Creditor Protection Proceedings in the different jurisdictions.

***Divestiture Proceeds Received***

As of June 30, 2012, approximately $7,803 in net proceeds have been generated and received through the completed sales of businesses and remaining patents and patent applications. These divestiture proceeds include the following approximate amounts:

(a) $1,120 from the sale of substantially all of our CDMA business and LTE Access assets;

(b) $18 from the sale of our Layer 4-7 data portfolio;

(c) $10 from the sale of our Packet Core Assets;

(d) $932 from the sale of substantially all of the assets of our ES business, including the shares of DiamondWare and NGS;

(e) $638 from the sale of substantially all of the assets of our Optical Networking and Carrier Ethernet businesses;

(f) $79 from the sale of our North American GSM business;

(g) $36 from the sale of our GSM business outside of North America (excluding our GSM business in CALA) and our global GSM-R business;

(h) $156 from the sale of substantially all of our CVAS business;

(i) $234 from the sale of NNL's 50% plus one share interest in LGN;

(j) $49 from the sale of substantially all of our MSS business;

(k) $56 from the sale of substantially all of the GDNT assets (which proceeds are recorded in cash and cash equivalents);

(l) $4,470 from the sale of our remaining patents and patent applications; and

(m) $5 from the sale of various other business assets.

As of June 30, 2012, $7,323 of proceeds received from divestitures of businesses and remaining patents and patent applications is being held in escrow and an additional $229, representative of proceeds from the sale of LGN, is included in non-current restricted cash and cash equivalents, all of which is currently reported in NNL solely for financial reporting purposes (including with respect to any gain recorded on such divestitures). The difference between the net proceeds received and the amount in escrow at June 30, 2012

A

is as a result of amounts that, from time to time, have been distributed with the consent of each of the Debtors' estates and court approvals. as applicable, from the escrow accounts to satisfy: 1) various obligations arising from the divestitures, whether through payments to third party vendors, or to reimburse the Debtors or non-consolidated subsidiaries for costs incurred, or 2) payments to the Debtors or non-consolidated subsidiaries related to settlements reached in respect of certain agreements involving proceeds allocation. The ultimate determination of the final allocation of such proceeds among the various Nortel legal entities, including entities that are not consolidated in the accompanying unaudited condensed consolidated financial statements, has not yet occurred and may be materially different from the NNL classification and related amounts shown in these financial statements. The Interim Funding and Settlement Agreement (IFSA) and the escrow agreements for sales divestiture proceeds entered into by NNL, NNI and other Nortel legal entities provide for the processes for determining the final allocation of divestiture proceeds among such entities, either through joint agreement or, failing such agreement, other dispute resolution proceedings. Adjustments to the NNL classification and any related amounts arising from the ultimate allocation will be recognized when finalized. The NNL classification and related amounts shown in the accompanying unaudited condensed consolidated financial statements are not determinative of, and have not been accepted by any debtor estate, any party in interest in the Creditor Protection Proceedings or any court overseeing such proceedings, for purposes of deciding the final allocation of divestiture proceeds. See "Allocation of Divestiture Proceeds and other Inter-Estate Matters" below for a discussion on the Allocation Settlement Agreement regarding the 4th Estate Entities, as defined below.

During the six months ended June 30, 2012, we received additional proceeds of $73 that had been held in escrow subject to the successful completion of performance obligations under the transition services agreements (TSAs) entered into in connection with the sale of substantially all of our CDMA business, LTE Access assets, and CVAS business, and our North American GSM business, all of which were recorded as gains on divestitures included in reorganization items – net. As of June 30, 2012, $24 in connection with the divestitures of substantially all of the assets of our Optical Networking and Carrier Ethernet businesses, CVAS business, and substantially all of the assets of our MSS business is currently unrecorded, a portion of which will be recognized into income subject to agreement between Nortel and each of the various buyers that obligations under the TSAs have been completed. Such amounts, when and if received, will also be held in escrow until the final allocation of these proceeds as between various Nortel legal entities, including the U.S. and EMEA Subsidiaries, is ultimately determined.

*Allocation of Divestiture Proceeds and Other Inter-Estate Matters*

At various times during the second half of 2009 and the first quarter of 2010, the Canadian Debtors, the U.S. Debtors and the U.K. Administrators, with the involvement of the Canadian Monitor, the U.S. Principal Officer, the U.S. Creditors' Committee and the Bondholder Group engaged in negotiations regarding the scope and terms of a proposed protocol for resolving disputes concerning the allocation of sale proceeds (Allocation Protocol), as required by the terms of the IFSA. However, it became apparent that the parties had differing views concerning the allocation of the sale proceeds, inter-company claims and the scope of the Allocation Protocol. In order to address this impasse. the Canadian Debtors, the U.S. Debtors and the U.K. Administrators agreed to temporarily suspend negotiations on the Allocation Protocol and instead focused on a process to facilitate a comprehensive settlement to resolve all material outstanding inter-estate matters, including the allocation of the sale proceeds and the settlement of inter-company claims. To this end, the parties met on several occasions to outline, on a confidential and without prejudice basis, their respective allocation methodologies and potential inter-company claims that may be asserted.

As a result of these meetings and the complexity of the issues that were raised, the Canadian Debtors, the U.S. Debtors, the EMEA Debtors, the U.K. Administrators, the Canadian Monitor the U.S. Principal Officer, the U.S. Creditors' Committee, the Bondholder Group and certain other interested parties (collectively, the Mediation Parties) agreed that these inter-estate negotiations would be aided by the appointment of a neutral mediator to review and mediate the issues. The parties selected Layn R. Phillips, a former U.S. federal district court judge and experienced commercial mediator, to serve as mediator and review the positions and viewpoints of the various parties on allocation and unresolved inter-estate matters. A confidential, non-binding mediation was held in November 2010. The mediation session did not result in the resolution of the issues presented.

As a result of the November 2010 mediation session, and positions taken in the CCAA Proceedings, it became apparent that the U.K. Administrators and certain other parties, who were also substantial creditors of the EMEA Debtors, were alleging a number of significant potential claims against the Canadian Debtors as well as the U.S. Debtors. These potential claims were integral to the allocation positions of these parties and included allegations of proprietary and trust-type claims. Consequently, the Canadian Monitor and the Canadian Debtors determined that, absent reaching a comprehensive settlement of allocation and inter-company claims issues, these specific claims needed to be resolved first. Accordingly, the Canadian Debtors obtained an order of the Canadian Court establishing a process for the calling of claims from EMEA creditors. Notwithstanding the commencement of this process, the Mediation Parties continued to engage in discussions regarding the resumption of mediation and another confidential, non-binding mediation was held in April 2011. On April 13, 2011, we announced that the mediation process that had been commenced in respect of the allocation of sale proceeds of our various business and asset divestitures and other inter-estate matters, including inter-company claims, had ended without resolution of the matters in dispute. In light of the unsuccessful conclusion of the mediation process, we announced that delays in the ultimate resolution of allocation and inter-company claims matters potentially could be significant, and that such delays would result in a corresponding significant delay in the timing of distributions to holders of validated claims of the various estates.

A

On April 25, 2011, the U.S. Debtors and the U.S. Creditors' Committee filed a joint motion for an order establishing an allocation protocol for the sale proceeds as between various Nortel legal entities (Original Protocol Motion), and for related relief.

Subsequently, as a result of further discussions, the U.S. Debtors and the U.S. Creditors' Committee together with the Canadian Debtors jointly filed an amended and restated version of the Original Protocol Motion and agreed to collectively seek an order establishing an allocation protocol before the Canadian Court and the U.S. Court. The proposed order would have had the U.S. Court and the Canadian Court establish procedures and an expedited schedule for the cross-border resolution by the U.S. Court and the Canadian Court on the allocation of proceeds from the sales of our businesses and from the sale of our patent portfolio. The motion was heard at a joint hearing of the U.S. Court and Canadian Court on June 7, 2011. On June 20, 2011, we announced that the Canadian Court and the U.S. Court had reserved their decisions on the motions heard by such courts on June 7, 2011, and directed us, NNL and the other Canadian Debtors, NNI and the other U.S. Debtors, the EMEA Debtors, as well as certain other parties, to participate in a joint mediation of the issues raised in the motions. The directions provided that the Canadian Court and the U.S. Court together would appoint a sole mediator by supplemental order and that the mediator would determine the time, date, place and protocol of the mediation.

On June 17, 2011, and as supplemented on June 29, 2011, the Canadian Court and the U.S. Court appointed The Honourable Warren K. Winkler, Chief Justice of Ontario, as the sole mediator (the Mediator) for the mediation. The mediation was ordered because of both courts' concern that the time required to prepare their decisions would also delay allocation proceedings and, therefore, distributions to creditors of the various Nortel estates.

The Mediator has the authority, in consultation with the Mediation Parties, to determine the scope of the mediation, as he deems appropriate, including the issue of allocation of the sale proceeds of Nortel's various businesses and patent portfolio, and global issues relating to allocation and claims. Participation in this mediation is mandatory. The mediation process will be terminated (i) by a declaration by the Mediator that a settlement has been reached (any such settlement would be subject to the approval of the Canadian Court and the U.S. Court, on notice to parties in interest), (ii) by a declaration by the Mediator that further efforts at mediation are no longer considered worthwhile, or (iii) for any other reason as determined by the Mediator. At the request of the U.S. Court, the commencement of the mediation was delayed pending the outcome of the October 14, 2011 hearing (discussed in more detail below).

The Canadian Court approved a claims process with regard to the significant inter-company claims made by the EMEA Debtors against the Canadian Debtors, which process included a requirement that claims be filed by March 18, 2011. In response to this call for claims, representatives of the U.K. Administrators, on behalf of the EMEA Debtors, filed 84 proofs of claims against the Canadian Debtors and unspecified directors and officers of NNC and NNL (the EMEA Claims). The EMEA Claims contain broad ranging claims set out with limited specificity. The EMEA Claims also include a number of large priority claims, which if allowed, would significantly reduce the potential proceeds available for distribution to unsecured creditors of the Canadian Debtors. We are currently unable to quantify the total potential amounts claimed under the EMEA Claims, as many of the claims were not quantified. The EMEA Claims that were quantified total approximately CAD$9.8 billion. In addition, the U.K. Pension Trust Limited and the Board of the Pension Protection Fund in the U.K. filed an estimated claim of CAD$3.7 billion in respect of an alleged deficit in the U.K. pension plan (the U.K. Pension Claim). Should the EMEA Claims and the U.K. Pension Claim ultimately be allowed in the CCAA Proceedings on the basis filed, they could have the effect of doubling (or more) the otherwise estimated CCAA claims pool and, accordingly, significantly reduce potential distributions to other unsecured creditors of the Canadian Debtors. Further, counsel for 131 former employees of NNSA have submitted a letter indicating they would file proofs of claims in connection with an action that is currently before the courts in France.

On September 30, 2009, the EMEA Debtors and certain of their affiliates (collectively, the EMEA Original Claimants) filed over 350 proofs of claim against the U.S. Debtors and unspecified directors and officers of the U.S. Debtors in the U.S. Court. On May 10, 2011, the U.S. Court entered an order requiring the EMEA Original Claimants to file more definite statements of their previously-filed claims, and to file any other pre-petition claims against the U.S. Debtors, by June 1, 2011, absent which any of their pre-petition claims would be disallowed. The deadline for filing amended proofs of claim was later extended on request of certain of the EMEA Original Claimants to June 3, 2011 (U.S. EMEA Claims Bar Date). The EMEA Original Claimants filed 38 amended proofs of claim on June 3, 2011. The remaining proofs of claim that had been filed by the EMEA Original Claimants and were not amended on a timely basis have been disallowed and expunged pursuant to the terms of the U.S. Court's May 10, 2011 order.

On July 15 and 22, 2011, the U.S. Debtors and the U.S. Creditors' Committee filed joint objections and motions to dismiss the claims of Nortel Networks UK Limited (NNUK), NNSA and Nortel Networks (Ireland) Limited and the French Liquidator (collectively, the EMEA Claimants). On August 3, 2011, the U.S. Court issued an order that set October 13 and 14, 2011 as the hearing dates for these motions. The order also requested the Mediator to consider postponing the mediation discussed above until after these hearings and the U.S. Court's decision on the motions to dismiss. On August 9, 2011, the Mediator advised the parties to the mediation that he was postponing the initial procedural meeting to a date to be determined after the U.S. Court releases its decision. The U.S. Court heard the motions on October 14, 2011. On March 20, 2012, the U.S. Court granted the U.S. Debtors' and U.S. Creditors' Committee's motion to dismiss these EMEA Claimants' breach of duty of care and other fiduciary duty claims, claims of mismanagement under French law, and the contingent claims arising from the issuance of any financial support direction with respect to the U.K. Pension Plan. The U.S. Court declined to dismiss the remaining claims of these EMEA Claimants at this stage of the proceedings and has scheduled a hearing on August 22, 2012 to set a schedule for discovery. However, the U.S. Court noted that the arguments raised in the motions were persuasive in showing the weakness and unlikelihood of success of these claims.

A

Following the U.S. Court's March 20. 2012 decision. pursuant to a letter dated March 26. 2012 from the Mediator to Mediation Parties. an introductory mediation session was held on April 24. 2012 whereby Mediation Parties had the opportunity to meet privately with the Mediator. The Mediator advised that he will continue to hold meetings with individual parties to the mediation in his efforts to work towards a resolution on allocation matters. The Mediator is posting updates of a general nature regarding the mediation. as appropriate. on a website at www.nortelmediation.com. The content of this website is not a part of this report.

On June 19. 2012. we. NNL. and certain other Nortel entities including NNI. NNUK and NNSA entered into an Allocation Settlement Agreement (the 4th Estate Agreement) with Nortel entities in the Asia Pacific (APAC) and CALA regions (4th Estate Entities) providing for. among other matters. a final allocation to the 4th Estate Entities from the sale proceeds of our businesses. Under the terms of the 4th Estate Agreement. a total of $45 from the sale proceeds held in escrow will be allocated among the 4th Estate Entities that participated in the various global business sales. The 4th Estate Agreement further provides for acknowledgement and agreement on inter-company payables and receivables among the 4th Estate Entities as well as between the 4th Estate Entities and other Nortel entities party to the 4th Estate Agreement. as at a certain date. The 4th Estate Agreement was subject to court approvals in Canada and the U.S. which approvals were obtained on July 11. 2012 at a joint hearing. The 4th Estate Agreement closed on August 7. 2012.

The 4th Estate Agreement will enable the 4th Estate Entities to commence liquidation proceedings in their respective jurisdictions. as part of our global wind down and another important step toward the conclusion of the Creditor Protection Proceedings. The 4th Estate Entities have no further claim to the sale proceeds held in escrow and are no longer a party to the mediation described above.

***Developments in the Creditor Protection Proceedings***

Since the filing of Nortel's 2011 Annual Report. in addition to the matters described above. the following are the material developments in the sales of its assets and in the Creditor Protection Proceedings.

*CCAA Proceedings*

On the Petition Date. the Canadian Debtors obtained an initial order from the Canadian Court for creditor protection for 30 days. pursuant to the provisions of the CCAA. which has since been extended from time to time and most recently to October 31. 2012 and is subject to further extensions by the Canadian Court.

On July 27. 2012. the Canadian Court approved a claims process with regard to inter-company claims by the 4th Estate Entities and other non-filed subsidiaries. but excluding the EMEA Debtors. U.S. Debtors and certain non-filed subsidiaries of the U.S. Debtors. against the Canadian Debtors as at September 30. 2011. Further. the Canadian Court confirmed that the claims of the 4th Estate Entities against the Canadian Debtors are as specified in the 4th Estate Agreement and barred any further claims of these entities against the Canadian Debtors. The bar date. to the extent applicable. for this claims process is September 7. 2012. The Canadian Debtors sought these orders so that they may achieve certainty regarding claims that may be asserted by certain of their affiliates not subject to prior inter-company claims processes.

*Chapter 11 Proceedings*

On June 21. 2010. the U.S. Debtors filed a motion seeking to terminate certain U.S. retiree and long-term disability (LTD) benefits effective as of August 31. 2010. The U.S Debtors filed a notice of withdrawal of this motion with the U.S. Court on July 16. 2010. On June 21. 2011. upon the motion of the U.S. Debtors dated June 2, 2011. the U.S. Court entered an order directing the U.S. Trustee to establish a committee of retirees for the U.S. Debtors to consult with before undertaking any modification or termination of the U.S. retiree benefits. Additionally. on June 22, 2011. the U.S. Court entered an order directing the U.S Trustee to establish a committee of LTD employees for the U.S. Debtors to consult with before undertaking any modification or termination of the U.S. LTD benefits. On August 2. 2011. the U.S. Trustee appointed the members of these committees. Upon the motion of the U.S. Debtors dated March 28. 2012. on April 18. 2012. the U.S. Court appointed a neutral mediator to mediate discussions between the U.S Debtors. the U.S. Creditors' Committee. the Bondholder Group and the retiree and LTD committees regarding a future modification or termination of U.S. retiree and LTD benefits. On July 30. 2012. the U.S. Debtors filed motions for authorization to terminate the U.S. retiree benefits. LTD benefits and employment of the LTD employees. Hearings in the termination motions are scheduled for early November 2012.

*Internet Protocol Addresses*

We commenced a process, approved by the Canadian Court. to sell certain residual IT assets primarily consisting of about 17 million Internet Protocol version 4 addresses (IP Addresses). and IT hardware assets including 700 servers. Working together with the Canadian Monitor. our goal is to maximize the value of these residual IT assets in a timely manner. Any definitive sale agreement will require approval of the Canadian Court.

On February 17, 2012, the Canadian Court approved two sale agreements that NNL and Nortel Networks Technology Corporation (NNTC) had entered into for the sale of rights in a small number of our IP Addresses. Under one sale agreement CSC Holdings LLC. the operating subsidiary of Cablevision Systems Corporation. is the purchaser of a certain number of the IP Addresses.

A

and under the other sale agreement, Salesforce.com Inc. is the purchaser of a certain number of the IP Addresses. The financial and other terms of each of the sale agreements. including the cash purchase price and the IP Addresses included in each sale, have been sealed by order of the Canadian Court because disclosure of such terms may be detrimental to the Canadian Debtors' interests in seeking to consummate these and other sales of IP Addresses. Both purchasers have obtained approval from the American Registry for Internet Numbers (ARIN) with respect to the transfer and registration of the IP Addresses in the respective purchasers' name upon closing. We closed these sales in the first quarter of 2012 and the proceeds from the transactions have been deposited into an NNL single purpose bank account. The Canadian Debtors and the U.S. Debtors have agreed that any dispute relating to the rights and claims. if any. of the U.S. Debtors in and to the IP Addresses. including to an allocation of such sale proceeds. will be subject to a joint hearing of the Canadian Court and the U.S. Court prior to the distribution of such sale proceeds and. if appropriate. orders of such courts approving such distributions.

On April 4. 2012. the Canadian Court approved a further sale agreement that NNL and NNTC had entered into with Bell Aliant Regional Communications, Limited Partnership (Bell Aliant) for the sale of rights in a certain small number of our IP Addresses. which sale closed on April 5. 2012. On May 7. 2012. the Canadian Court approved a further sale agreement between us and Vodafone Americas Inc. for the sale of rights of certain our IP Addresses. which sale closed on May 15. 2012. All proceeds from these sales have been deposited into NNL's single purpose bank account. and have been included in non-current restricted cash. Similar to the earlier sales described above. the financial and other terms of these two sale agreements. including the cash purchase price and the IP Addresses included in the sales. were sealed by order of the Canadian Court for the reasons set out above. We continue to seek buyers for the remainder of our IP Addresses.

***Other Developments***

Under the CCAA Proceedings. the Canadian Debtors filed a motion for an order authorizing and directing the Canadian Debtors to cease performing any environmental remediation at or in relation to five sites (Belleville. Brampton. Brockville. Kingston and London. Ontario). and that any claims in relation to such environmental remediation be subject to the court approved claims process under the CCAA Proceedings. We brought the motion to disclaim any further obligation for such properties that are no longer owned or used by us and that we and our creditors derive no benefit from any further remediation. Subsequent to the filing of the motion. we entered into a transition agreement regarding the Brampton site that facilitated a gradual cessation of our environmental risk related tasks at that site. which tasks have now been completed. The Ministry of the Environment (the MOE) made remediation orders with respect to the four other sites. The motion was heard in September 2011 in the Canadian Court. wherein the Canadian Debtors sought advice and direction that the MOE remediation orders were in breach of the CCAA stay. The MOE did not seek to enforce the remediation orders while the Canadian Court's decision was outstanding and we continued to undertake environmental risk assessments and remediation related tasks at those sites. On March 9. 2012. the Canadian Court issued an order granting the Canadian Debtors motion. in particular agreeing that the MOE remediation orders are stayed under the CCAA Proceedings and authorizing us to cease performing any remediation activities at or in relation to the five sites, and releasing us from all contractual obligations to carry out remediation requirements at such sites. The order further stipulates that any claims in relation to any current or future remediation requirements by the MOE against us or our current or former directors or officers are subject to resolution and determination in accordance with the claims procedure and claims resolution orders approved by the Canadian Court on July 30. 2009 and September 16. 2010. respectively. We gave notice that. pursuant to the order. we are ceasing continued environmental remediation activities and all such activity has ceased. On March 23. 2012. Her Majesty the Queen in right of Ontario as represented by the MOE served a notice of motion for leave to appeal the March 9. 2012 Canadian Court order. which leave was granted on June 22. 2012. On July 3. 2012. the MOE served its notice of appeal. which appeal is still pending and no hearing date has yet been set.

***Basis of Presentation and Going Concern Considerations***

For periods ending after the Petition Date. we reflect adjustments to our financial statements in accordance with Financial Accounting Standards Board (FASB) Accounting Standards Codification (ASC) 852 "Reorganization" (ASC 852). on the basis that we will continue as a going concern.

After consideration of the guidance available in FASB ASC 810 "Consolidation" (ASC 810) and ASC 852, the accompanying unaudited condensed consolidated financial statements as of June 30. 2012 and December 31. 2011 and for the three and six months ended June 30. 2012 and 2011 have been presented on the following basis with respect to our subsidiaries:

- the EMEA Debtors and their subsidiaries (collectively. the EMEA Subsidiaries) were accounted for under the equity method from the Petition Date up to May 31. 2010 and as an investment under the cost method of accounting thereafter:
- the U.S. Debtors and their subsidiaries (collectively. the U.S. Subsidiaries) were accounted for as consolidated subsidiaries until September 30. 2010 and as an investment under the cost method of accounting thereafter: and
- our other subsidiaries are consolidated throughout the periods presented consistent with the basis of accounting applied prior to the commencement of the Creditor Protection Proceedings with the exception of deconsolidated subsidiaries where there has been a deemed loss of control by us once in applicable liquidation proceedings as discussed in our 2011 Annual Report.

A

We continue to exercise control over most of our subsidiaries located in Canada, CALA and APAC (other than those entities that are EMEA Subsidiaries or U.S. Subsidiaries or have been placed in liquidation proceedings), and our financial statements are prepared on a consolidated basis with respect to those subsidiaries.

See note 1 to the accompanying unaudited condensed consolidated financial statements for further information on our basis of presentation and going concern considerations.

***Reporting Requirements***

As a result of the Creditor Protection Proceedings, we are periodically required to file various documents with and provide certain information to the Canadian Court, the U.S. Court, the English Court, the Canadian Monitor, the U.S. Creditors' Committee, the U.S. Trustee, the U.K. Administrators and the bondholders and other stakeholders. Depending on the jurisdictions, these documents and information may include statements of financial affairs, schedules of assets and liabilities, monthly operating reports, information relating to forecasted cash flows, as well as certain other financial information. Such documents and information, to the extent they are prepared or provided by us, will be prepared and provided according to requirements of relevant legislation, subject to variation as approved by an order of the relevant court. Such documents and information may be prepared or provided on an unconsolidated, unaudited or preliminary basis, or in a format different from that used in the financial statements included in our periodic reports filed with the SEC. Accordingly, the substance and format of these documents and information may not allow meaningful comparison with our regular publicly-disclosed financial statements. Moreover, these documents and information are not prepared for the purpose of providing a basis for an investment decision relating to our securities, or for comparison with other financial information filed with the SEC.

For a full discussion of the risks and uncertainties we face as a result of the Creditor Protection Proceedings, including the risks mentioned above, see the Risk Factors section of this report. Further information pertaining to our Creditor Protection Proceedings may be obtained through our website at www.nortel.com. Certain information regarding the CCAA Proceedings, including the reports of the Canadian Monitor, is available at the Canadian Monitor's website at www.ey.com/ca/nortel. Documents filed with the U.S. Court and other general information about the Chapter 11 Proceedings are available at http://chapter11.epiqsystems.com/nortel. The content of the foregoing websites is not a part of this report.

**Our Business**

We have completed the sales of all of our businesses. We continue to oversee and fulfill the residual contracts not transferred to the various buyers. As a result, commencing with the first quarter of 2011, we have one reportable segment as our chief operating decision maker reviews financial and operating results and makes decisions on that basis.

**Results of Operations**

**Revenues**

Revenues in the first six months of 2012 were $1 as compared to $21 in the first six months of 2011 representing a decrease of $20. The decrease was due to the sale of the MSS business.

**SG&A Expense**

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2012 | 2011 | $ Change | % Change | 2012 | 2011 | $ Change | % Change |
| SG&A expense | $25 | $53 | $ (28) | (53) | $52 | $91 | $ (39) | (43) |

Selling, General and Administrative (SG&A) expense decreased to $25 in the second quarter of 2012 from $53 in the second quarter of 2011, a decrease of $28 or 53%. SG&A expense decreased to $52 in the first six months of 2012 from $91 in the first six months of 2011, a decrease of $39 or 43%. The decrease in SG&A expense was primarily due to headcount reductions and other cost reduction activities, partially offset by adjustments to provisions for doubtful accounts in respect of the recoverability of certain receivables.

**Pre-Petition Date Cost Reduction Plans**

In the second quarter and first six months of 2012, charges related to restructuring plans were minimal.

As a result of the Creditor Protection Proceedings, we ceased taking any further actions under our previously announced workforce and cost reduction plans as of January 14, 2009. Any revisions to actions taken up to that date under previously announced workforce and cost reduction plans have been accounted for under such plans. Our contractual obligations are subject to re-evaluation in connection with the Creditor Protection Proceedings and, as a result, expected cash outlays relating to contract settlement and lease costs are subject to change. As well, we are not following our pre-Petition Date practices with respect to the payment of severance in jurisdictions under the Creditor Protection Proceedings.

A

Recoveries primarily result from lease repudiations and other liabilities relinquished due to the Creditor Protection Proceedings and severance related accruals released from pre-Petition Date restructuring plans and re-established under post-Petition Date cost reduction activities. For further details, refer to note 6 to the accompanying unaudited condensed consolidated financial statements.

**Post-Petition Date Cost Reduction Activities**

In connection with the Creditor Protection Proceedings, we have taken and expect to take further workforce and other cost reduction actions. The actions related to these activities are expected to occur as they are identified. The following current estimated charges are based upon accruals made in accordance with U.S. GAAP. The current estimated total charges to earnings and cash outlays are subject to change as a result of our ongoing review of applicable law. In addition, the current estimated total charges to earnings and cash outlays do not reflect all potential claims or contingency amounts that may be allowed under the Creditor Protection Proceedings and thus are also subject to change.

***Workforce Reduction Activities***

For the three and six months ended June 30, 2012. approximately $2 and $6, respectively, of charges relating to the net workforce reduction of 41 and 92 positions, respectively, were incurred. As of June 30, 2012, our workforce reduction provision balances were approximately $144, which were classified as subject to compromise. As we continue to progress through the Creditor Protection Proceedings, we expect to incur charges and cash outlays related to workforce and other cost reduction strategies.

***Other Cost Reduction Activities***

For the three and six months ended June 30, 2012, our real estate cost reduction activities resulted in charges of $3 and $3, respectively. For the three and six months ended June 30, 2011 our real estate cost reduction charges were nil.

As of June 30. 2012, our real estate and other cost reduction balances were approximately $9, which are classified as liabilities subject to compromise. As of December 31, 2011. Nortel's real estate and other cost reduction balances were approximately $6. which are classified as subject to compromise.

**Other Operating Income — Net**

The components of other operating income — net were as follows:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| Royalty license income—net | $ — | $ — | $ — | $ (1) |
| Billings under TSAs | — | (19) | — | (44) |
| Other—net | — | 1 | (1) | 3 |
| Other operating income—net | $ — | $ (18) | $ (1) | $ (42) |

In the second quarter and first six months of 2012, other operating income — net was nil and $1, respectively.

In the second quarter and first six months of 2011, other operating income — net was $18 and $42, respectively, due primarily to billings related to TSAs.

A

**Other Income (Expense) — Net**

The components of other income (expense) — net were as follows:

| | Three Months Ended June 30, 2012 | 2011 | Six Months Ended June 30, 2012 | 2011 |
|---|---|---|---|---|
| Rental income | $ — | $ 1 | $ — | $ 2 |
| Gain on sale and impairment of investments—net | — | 1 | — | 1 |
| Currency exchange gain (loss)—net | (8) | 10 | (14) | — |
| Other—net | — | (3) | (4) | (6) |
| Other income (expense)—net | $ (8) | $ 9 | $ (18) | $ (3) |

In the second quarter of 2012, other income (expense) — net was an expense of $8, primarily comprised of a currency exchange loss of $8. In the second quarter of 2011, other income (expense) — net was income of $9, primarily due to a currency exchange gain of $10, partially offset by other – net of $3.

In the first six months of 2012, other income (expense) — net was an expense of $18, primarily comprised of a currency exchange loss of $14 and other—net of $4. In the first six months of 2011, other income (expense) — net was an expense of $3, primarily due to other – net of $6, partially offset by rental income of $2.

**Interest Expense**

We have continued to accrue for interest expense in our normal course of operations related to debt issued by NNC and NNL in Canada totaling $88 and $80 in the quarters ended June 30, 2012 and 2011, respectively and we will continue to do so until we obtain a claims determination order that adjudicates the claims. During the pendency of the Creditor Protection Proceedings, we generally have not made and do not expect to make payments to satisfy the interest obligations of the Debtors. We have continued to accrue interest on the $1,000 floating rate notes that matured on July 15, 2011 and on the $575 fixed rate convertible notes that matured on April 15, 2012, until we obtain a claims determination order that adjudicates the claims.

**Reorganization Items — net**

Reorganization items represent the net direct and incremental charges related to the Creditor Protection Proceedings such as revenues, expenses including professional fees directly related to the Creditor Protection Proceedings, realized gains and losses, and provisions for losses resulting from the reorganization and restructuring of the business. Reorganization items for the three and six months ended June 30, 2012 and 2011 consisted of the following:

| | Three Months Ended June 30, 2012 | 2011 | Six Months Ended June 30, 2012 | 2011 |
|---|---|---|---|---|
| Professional fees [a] | $ (10) | $ (21) | $ (21) | $ (39) |
| Interest income [b] | 3 | 3 | 7 | 6 |
| Employee incentive plans [c] | (1) | (4) | (5) | (13) |
| Pension, post-retirement and post-employment plans [d] | — | — | — | 14 |
| Gain on divestitures—net [e] | 9 | 37 | 87 | 55 |
| Settlements [f] | (7) | — | (6) | — |
| Other [g] | — | (8) | — | (12) |
| Total reorganization items—net | $ (6) | $ 7 | $ 62 | $ 11 |

(a) Includes financial, legal, real estate and valuation services directly associated with the Creditor Protection Proceedings.
(b) Reflects interest earned due to the preservation of cash as a result of the Creditor Protection Proceedings.
(c) Relates to retention and incentive plans for certain key eligible employees deemed essential during the Creditor Protection Proceedings.
(d) Includes amounts related to the settlement agreement with former and disabled Canadian employee representatives and the termination of the Nortel Networks Supplementary Executive Retirement Plan (SERP) defined benefit plan. See note 9 to the accompanying unaudited condensed consolidated financial statements for more information.
(e) Relates to the gains on various divestitures, including escrow releases (net of direct and incremental costs). See note 2 to the accompanying unaudited condensed consolidated financial statements for further information.
(f) Relates to adjustments to expected allowed claim amounts.
(g) Includes other miscellaneous items directly related to the Creditor Protection Proceedings.

**Income Tax Expense**

During the six months ended June 30, 2012, we recorded a tax expense of $7 on loss from operations before income taxes of $180. The tax expense of $7 was comprised of $6 resulting from taxes on earnings in Asia, $1 of other taxes including withholding taxes, and $1 resulting from a provision for actual tax adjustments to the prior year balances, partially offset by decreases in uncertain tax positions of $1.



BHG0160756

A

During the six months ended June 30, 2011, we recorded a tax expense of $1 on loss from operations before income taxes of $206. The tax expense of $1 was comprised of $3 resulting from taxes on earnings in Asia, offset by a recovery of $2 relating to changes in uncertain tax positions.

We continue to assess the valuation allowance recorded against our deferred tax assets on a quarterly and annual basis. The valuation allowance is in accordance with FASB ASC 740 "Income Taxes" (ASC 740), which requires us to establish a valuation allowance if, based on the weight of available evidence, it is more likely than not that some portion or all of a company's deferred tax assets will not be realized. Based on the available evidence, we have determined that a full valuation allowance continues to be necessary as of June 30, 2012 for all jurisdictions. For further information, see note 8 to the accompanying unaudited condensed consolidated financial statements.

## Liquidity and Capital Resources

### Overview

As of June 30, 2012, our cash and cash equivalents balance was $668.

Our consolidated cash is held globally in various Nortel consolidated entities and joint ventures as follows, as of June 30, 2012: $167 in APAC, $265 in Canada, $41 in CALA, $145 in joint ventures (including GDNT), $45 in China and $5 in EMEA. These amounts exclude restricted cash of $7,643, comprised of $7,638 accounted for in Canadian entities and $5 in Asia. See "Executive Overview — Creditor Protection Proceedings — Divestiture Proceeds Received" for further information regarding restricted cash held in Canadian entities. Cash balances related to the EMEA Subsidiaries and the U.S. Subsidiaries are no longer included in our consolidated cash balance as a result of the previously reported changes to cost accounting.

As of June 30, 2012, approximately $7,803 in net proceeds has been generated and received through the completed sales of our businesses and remaining patents and patent applications. As of June 30, 2012, $7,323 of the divestiture proceeds received is being held in escrow until the final allocation of these proceeds as between various Nortel legal entities is ultimately determined. An additional $229, reflecting proceeds from the sale of LGN, is included in restricted cash. During the six months ended June 30, 2012, we received additional proceeds of $73 that had been held in escrow subject to the successful completion of performance obligations under the TSAs entered into in connection with the sale of substantially all of our CDMA business, LTE Access assets, and CVAS business, and our North American GSM business, all of which were recorded as gain on divestitures included in reorganization items – net. As of June 30, 2012, a further $24 in aggregate was expected to be received in connection with the sales completed to date, subject to the satisfaction of various conditions. Such amount, when received, will also be held in escrow until the final allocation of these proceeds as between various Nortel legal entities is ultimately determined. See "Executive Overview — Creditor Protection Proceedings — Divestiture Proceeds Received".

Historically, we have deployed our cash throughout the corporate group, through a variety of intercompany borrowing and transfer pricing arrangements, which are largely no longer in effect. As a result of the Creditor Protection Proceedings, cash in the various jurisdictions is generally available to fund operations in that particular jurisdiction, but generally is not available to be freely transferred between jurisdictions, regions, or outside joint ventures, other than for normal course intercompany trade and pursuant to specific court-approved agreements as discussed below. Thus, there is pressure and reliance on cash balances in specific regions and jurisdictions.

We have established certain cash collateralized facilities in certain jurisdictions. Approximately $5 of cash collateral has been posted by Nortel in support of certain performance bonds and letter of credit facilities.

To enable certain Nortel subsidiaries (APAC Agreement Subsidiaries) in the APAC region to continue their respective business operations and to facilitate the business divestitures, the Debtors (other than the Israeli Debtors) entered into an Asia Restructuring Agreement (APAC Agreement). Under the APAC Agreement, the APAC Agreement Subsidiaries have paid a portion of the pre-petition intercompany debt to the Debtors (other than the Israeli Debtors). As of June 30, 2012, the Canadian Debtors, the U.S. Debtors and the EMEA Debtors have received to date approximately $37, $36 and $29, respectively, in aggregate in respect of the APAC Agreement. Further portions of the pre-petition intercompany debt continue to be repayable from time to time only to the extent of any such APAC Agreement Subsidiary's net cash balance at the relevant time, and subject to certain reserves and provisions.

We continue several initiatives to generate cost reductions and decrease the rate of cash outflow during the Creditor Protection Proceedings. Some of these initiatives include the workforce reduction plan announced on February 25, 2009 and other ongoing workforce and cost reduction activities and reviews of our real estate and other property leases, IT equipment agreements, supplier and customer contracts and general discretionary spending. With the completed sales of all of our businesses, we are focused on maximizing proceeds with respect to remaining assets. This includes the winding up of our remaining operations and subsidiaries globally, which can involve orderly wind-ups as well as commencement of liquidation proceedings, as the circumstances warrant.

A

Our current cash management system and consolidated cash on hand to fund our operations is subject to ongoing review and approval by the Canadian Monitor and may be impacted by the Creditor Protection Proceedings. The U.S. Principal Officer and the U.K. Administrators oversee the cash management system in their respective jurisdictions and those amounts are not included in our consolidated balance sheet as of June 30, 2012. There is no assurance that (i) we will be able to maintain our current cash management system; (ii) we will generate sufficient cash to fund and wind down our operations; (iii) cash collateralized facilities in certain jurisdictions will be sufficient for our business needs or that we will not have to provide further cash collateral; or (iv) the Debtors will be able to access proceeds in a timely manner from the divestitures as allocation of proceeds from the divestitures of our businesses and assets remains unresolved.

### Cash Flows

Our total consolidated cash and cash equivalents excluding restricted cash decreased by $83 during the six months ended June 30, 2012 to $668, primarily due to cash flows attributable to the net cash used in operations.

Our liquidity and capital resources are primarily impacted by: (i) current cash and cash equivalents, (ii) operating activities, (iii) investing activities, and (iv) foreign exchange rate changes. The following table summarizes our cash flows by activity and cash on hand as of June 30, 2012 and 2011:

| | Six Months Ended June 30, | | |
|---|---|---|---|
| | 2012 | 2011 | Change |
| Net loss attributable to NNC | $(194) | $(220) | $ 31 |
| Adjustments to net loss and working capital changes | 108 | 234 | (131) |
| Net cash from (used) in operating activities | (86) | 14 | (100) |
| Net cash from (used in) investing activities | 17 | (44) | 61 |
| Net cash used in financing activities | (8) | — | (8) |
| Effect of foreign exchange rate changes on cash and cash equivalents | (6) | 13 | (19) |
| **Net decrease in cash and cash equivalents** | **(83)** | **(17)** | **(66)** |
| **Cash and cash equivalents at beginning of period** | **751** | **807** | **(56)** |
| **Cash and cash equivalents at end of period** | **$ 668** | **$ 790** | **$(122)** |

#### *Operating Activities*

In the first six months of 2012, our net cash used in operating activities of $86 resulted from $54 from non-cash items and net loss attributable to NNC of $194, partially offset by changes in operating assets and liabilities of $162. Net cash from changes in operating assets and liabilities was mainly due to the decrease in accounts receivable of $15, change in payroll, contractual and accrued liabilities of $164 and increase in income taxes payable of $15, partially offset by the decrease in accounts payable of $27 and the change in other operating assets and liabilities of $5. The primary non-cash items were $88 in reorganization items under ASC 852, partially offset by pension and other accruals of $22, amortization and depreciation of $4, and income attributable to non-controlling interests of $7.

In the first six months of 2011, our net cash from operating activities of $14 resulted from changes in operating assets and liabilities of $266, partially offset by net loss attributable to NNC of $220 and non-cash items of $32. The net cash from changes in operating assets and liabilities was mainly due to the reduction of accounts receivable of $44, changes in deferred cost of $4, the change in payroll, accrued and contractual liabilities of $226, and the change in other operating assets and liabilities of $28, partially offset by the change in deferred revenues of $9, the decrease in accounts payable of $24, and the change in advanced billings of $2. The primary additions to our net loss for non-cash items were pension and other accruals of $28, amortization and depreciation of $20, income attributable to non-controlling interests of $13, more than offset by reorganization items under ASC 852 of $60 and other net of $33.

#### *Investing Activities*

In the first six months of 2012, net cash from investing activities was $17 primarily due to proceeds related to sale of businesses and assets of $88, which were reclassified to restricted cash and cash equivalents resulting in an increase in restricted cash and cash equivalents. The increase in restricted cash and cash equivalents related to proceeds was partially offset by decreases in restricted cash and cash equivalents of $17 primarily related to distributions from the Canadian Health and Welfare Trust.

In the first six months of 2011, net cash used in investing activities was $44 primarily due to an increase in restricted cash and cash equivalents of $151, partially offset by proceeds related to sale of businesses and assets of $107.



BHG0160758

A

*Financing Activities*

In the first six months of 2012, cash used in financing activities was $8, primarily due to dividends paid by subsidiaries to non-controlling interests.

In the first six months of 2011, cash used in financing activities was nil.

*Other Items*

In the first six months of 2012, our cash position was negatively impacted by $6 due to the unfavorable effects of changes in foreign exchange rates primarily from movements of the Canadian Dollar, Indian Rupee and Chinese Yuan against the U.S. Dollar.

In the first six months of 2011, our cash position was positively impacted by $13 due to the favorable effects of changes in foreign exchange rates.

*Fair Value Measurements*

We utilize observable (Level 1 and Level 2) inputs in determining the fair value of our long-term debt outstanding, as applicable.

**Future Uses of Liquidity**

The matters described below, to the extent that they relate to future events or expectations, may be significantly affected by our Creditor Protection Proceedings. Those proceedings will involve, or may result in, various restrictions on our activities and/or the need to obtain third party approvals for various matters.

Our cash requirements, excluding distributions from restricted cash which may occur from time to time, for the 12 months commencing July 1, 2012 are primarily expected to consist of funding for operations and the following items:

- professional fees in connection with the Creditor Protection Proceedings of approximately $60; and
- costs related to workforce reductions and real estate actions totaling approximately $1.

Professional fees are based on best estimates but are subject to uncertainties related to the length and complexity of the mediation and Creditor Protection Proceedings described in the "Executive Overview – Creditor Protection Proceedings – Divestiture Proceeds Received" section of this report.

## Off-Balance Sheet Arrangements

**Bid, Performance-Related and Other Bonds**

During the normal course of business, we have provided bid, performance, warranty and other types of bonds, which we refer to collectively as bonds, via financial intermediaries to various customers in support of commercial contracts, typically for the supply of telecommunications equipment and services. If we fail to perform under the applicable contract, the customer may be able to draw upon all or a portion of the bond as a remedy for our failure to perform. The contracts that these bonds support generally have terms up to one year. Bid bonds generally have a term of less than twelve months, depending on the length of the bid period for the applicable contract. Performance-related and other bonds generally have a term consistent with the term of the underlying contract. Historically, we have not made material payments under these types of bonds and as a result of the Creditor Protection Proceedings we do not anticipate that we will be required to make any such payments during the pendency of the Creditor Protection Proceedings.

The following table provides information related to these types of bonds as of:

| | June 30, 2012 | December 31, 2011 |
|---|---|---|
| Bid and performance-related bonds [(a)] | $ — | $ 3 |
| Other bonds [(b)] | — | — |
| Total bid, performance-related and other bonds | $ — | $ 3 |

(a) Net of restricted cash and cash equivalent amounts of $5 and $6 as of June 30, 2012 and December 31, 2011, respectively.
(b) Net of restricted cash and cash equivalent amounts of nil and $1 as of June 30, 2012 and December 31, 2011, respectively.

## Application of Critical Accounting Policies and Estimates

Our accompanying unaudited condensed consolidated financial statements are based on the selection and application of U.S. GAAP, which require us to make significant estimates and assumptions. We believe that the accounting policies and estimates as disclosed in our 2011 Annual Report, as well as the following accounting policies and estimates, may involve a higher degree of judgment and complexity in their application and represent our critical accounting policies and estimates.

A

We have discussed the application of these critical accounting policies and estimates with the audit committee of our board of directors.

### Creditor Protection Proceedings

Of the $7.803 in proceeds received from divestitures of businesses and remaining patents and patent applications as of June 30. 2012. $7.323 is being held in escrow and an additional $229, reflecting proceeds from the sale of LGN. is included in restricted cash. all of which is currently reported in NNL solely for financial reporting purposes. The ultimate determination of the final allocation of such proceeds among the various Nortel legal entities. including entities that are not consolidated in these financial statements. has not yet occurred and may be materially different from the NNL classification and related amounts shown in these financial statements. Adjustments to the NNL classification and any related amounts arising from the ultimate allocation will be recognized when finalized. The NNL classification and related amounts shown in these financial statements are not determinative of. and have not been accepted by any Debtor estate. any party in interest in the Creditor Protection Proceedings or any court overseeing such proceedings. for purposes of deciding the final allocation of divestiture proceeds.

ASC 852 requires pre-petition liabilities of the debtor that are subject to compromise to be reported at the claim amounts expected to be allowed. even if they may be settled for lesser amounts. The amounts currently classified as liabilities subject to compromise may be subject to future adjustments depending on actions of the applicable courts. further developments with respect to disputed claims. determinations of the secured status of certain claims. if any. the values of any collateral securing such claims. or other events. In addition. a number of proofs of claim, for which Nortel has not accrued any amount or accrued significantly less than the amounts in the proofs of claim. continue to be reviewed by the Canadian Debtors and may result in significant changes in future periods once these reviews are complete.

## Outstanding Share Data

As of August 3. 2012. we had 498.206.366 NNC common shares outstanding.

## Cautionary Notice Regarding Forward-Looking Information

Certain statements in this report may contain words such as "could", "expect". "may". "should". "will". "anticipate". "believe". "intend", "estimate". "target". "plan". "envision". "seek" and other similar language and are considered forward-looking statements or information under applicable securities laws. These statements are based on our current expectations. estimates. forecasts and projections about the operating environment. economies and markets in which we conduct our remaining business. These statements are subject to important assumptions. risks and uncertainties that are difficult to predict. and the actual outcome may be materially different. Our assumptions, although considered reasonable by us at the date of this report. may prove to be inaccurate and consequently our actual results could differ materially from the expectations set out herein.

Actual results or events could differ materially from those contemplated in forward-looking statements as a result of the following: (i) risks and uncertainties relating to the Creditor Protection Proceedings including: (a) risks associated with our ability to: obtain required approvals and successfully consummate remaining divestitures; successfully conclude ongoing discussions for the sale of our remaining assets: develop. obtain required approvals for. and implement a court-approved plan: allocation of the sale proceeds of our businesses and assets among the various Nortel entities participating in these sales may take considerable time to resolve: resolve ongoing issues with creditors and other third parties whose interests may differ from ours: maintain adequate cash on hand in each of our jurisdictions to fund our remaining work within the jurisdiction during the Creditor Protection Proceedings: obtain any further required approvals from the Canadian Monitor. the U.K. Administrators. the U.S. Principal Officer. the U.S. Creditors' Committee. or other third parties: utilize net operating loss carryforwards and certain other tax attributes in the future: avoid the substantive consolidation of NNI's assets and liabilities with those of one or more other U.S. Debtors; operate effectively. and in consultation with the Canadian Monitor. the Canadian creditors' committee. the U.S. Creditors' Committee. the U.S. Principal Officer. work effectively with the U.K. Administrators. and French Liquidator in their respective administration of the EMEA businesses subject to the Creditor Protection Proceedings: continue as a going concern: actively and adequately communicate on and respond to events. media and rumors associated with the Creditor Protection Proceedings: retain and incentivize key employees: obtain court orders or approvals with respect to motions filed from time to time; resolve claims made against us in connection with the Creditor Protection Proceedings for amounts not exceeding our recorded liabilities subject to compromise: prevent third parties from obtaining court orders or approvals that are contrary to our interests: and (b) risks and uncertainties associated with: limitations on actions against any Debtor during the Creditor Protection Proceedings; the values. if any. that will be ascribed pursuant to any court-approved plan to outstanding Nortel securities and. in particular. that we do not expect that any value will be prescribed to the NNC common shares or the NNL preferred shares in any such plan: the delisting of NNC common shares from the NYSE: the delisting of NNC common shares and NNL preferred shares from the TSX and: any cease trade orders that are expected to be issued by the Canadian Securities Administrators to prohibit trading in securities of NNC and NNL following the third quarter filing deadlines applicable to NNC and NNL's quarterly reporting obligations under Canadian securities laws: and (ii) risks and uncertainties relating to our remaining restructuring work including: fluctuations in foreign currency exchange rates: the sufficiency of workforce and cost reduction initiatives: any adverse legal judgments. fines. penalties or settlements related to any significant pending or future litigation actions: failure to maintain integrity of our information systems: and our potential inability to maintain an effective risk management strategy. For additional information with respect to certain of these and other factors. see the "Risk Factors" section of this report. Unless otherwise required by applicable securities laws. we disclaim any intention or obligation to update or revise any forward-looking statements. whether as a result of new information. future events or otherwise.

A

## ITEM 4. Controls and Procedures

Capitalized terms used in this Item 4 of Part I and not otherwise defined, have the meaning set forth for such terms in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section of this report.

### *Management Conclusions Concerning Disclosure Controls and Procedures*

We carried out an evaluation under the supervision and with the participation of management, including the Chief Financial Officer (CFO) Allan Bifield, pursuant to Rule 13a-15 under the Securities Exchange Act of 1934 (Exchange Act), of the effectiveness of our disclosure controls and procedures as at June 30, 2012. Based on this evaluation, management, including the CFO, have concluded that our disclosure controls and procedures as at June 30, 2012 were effective to provide reasonable assurance that information required to be disclosed in the reports we file and submit under the Exchange Act is recorded, processed, summarized and reported as and when required and that it is accumulated and communicated to our management, including the CFO, as appropriate, to allow timely decisions regarding required disclosure.

### *Internal Control Over Financial Reporting*

Management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) under the Exchange Act. Our internal control over financial reporting is intended to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. GAAP. Our internal control over financial reporting includes those policies and procedures that:

- pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets;
- provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with U.S. GAAP, and that receipts and expenditures are being made only in accordance with authorizations of management and the Board of Directors; and
- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

### *Changes in Internal Control Over Financial Reporting*

On January 14, 2009, we commenced the Creditor Protection Proceedings and adopted ASC 852. In connection with these events, during the first quarter of 2009, we introduced processes to: (1) determine the Debtor's pre- and post-petition liabilities and identify those liabilities subject to compromise; (2) assess certain claims received from creditors; and (3) determine the proper accounting treatment required for contracts, liabilities and operating expenses, including restructuring activities and reorganization expenses during the pendency of the Creditor Protection Proceedings. Complexities exist in introducing such processes given the multiple-jurisdiction element of our Creditor Protection Proceedings. From 2009 through 2011, we completed the sale of all of our business as well as the sale of our remaining patents and patent applications and streamlined our business infrastructure and implemented processes to separate and track financial performance in connection with our transition services obligations associated with these divestitures. These changes materially affected our internal control over financial reporting throughout 2009, 2010, 2011 and the first half of 2012. In the fourth quarter of 2011, we continued to streamline our business infrastructure mainly in response to the substantial completion of the TSA obligations. In the first quarter and second quarter of 2012, respectively, we implemented a new financial reporting system and replaced our human resources system with an applications database, both tailored to meet the simplified needs of our current business and modified our processes, where needed, to ensure appropriate internal controls over our financial reporting continue to exist. Management continues to take actions necessary to address the resources, processes and controls related to these changes, and to take any remaining actions pertaining to the realignment of certain work between the Canadian Debtors and U.S. Debtors as part of the separation of various corporate functions, while maintaining effective control over financial reporting.

A

## PART II
## OTHER INFORMATION

Capitalized terms used in this Part II and not otherwise defined, have the meaning set forth for such terms in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section of this report.

### ITEM 1. Legal Proceedings

Other than as described below, there have been no material developments in our material legal proceedings as previously reported in our 2011 Annual Report. For additional discussion of other material legal proceedings, see "Contingencies" in note 16 of the accompanying unaudited condensed consolidated financial statements.

#### Environmental Matters

Under the CCAA Proceedings, the Canadian Debtors have filed a motion for an order authorizing and directing the Canadian Debtors to cease performing any environmental remediation at or in relation to five sites (Belleville, Brampton, Brockville, Kingston and London, Ontario), and that any claims in relation to such environmental remediation be subject to the court approved claims process under the CCAA Proceedings. We brought the motion to disclaim any further obligation for such properties that are no longer owned or used by us and that we and our creditors derive no benefit from any further remediation. Subsequent to the filing of the motion, we entered into a transition agreement regarding the Brampton site that facilitated a gradual cessation of our environmental risk related tasks at that site, which tasks have now been completed. The Ministry of the Environment (the MOE) made remediation orders with respect to the four other sites. The motion was heard in September 2011 in the Canadian Court, wherein the Canadian Debtors sought advice and direction that the MOE remediation orders were in breach of the CCAA stay. The MOE did not seek to enforce the remediation orders while the Canadian Court's decision was outstanding and we continued to undertake environmental risk assessments and remediation related tasks at those sites. On March 9, 2012, the Canadian Court issued an order granting Nortel its motion, in particular agreeing that the MOE remediation orders are stayed under the CCAA Proceedings and authorizing us to cease performing any remediation activities at or in relation to the five sites, and releasing us from all contractual obligations to carry out remediation requirements at such sites. The order further stipulates that any claims in relation to any current or future remediation requirements by the MOE against us or our current or former directors or officers are subject to resolution and determination in accordance with the claims procedure and claims resolution orders approved by the Canadian Court on July 30, 2009 and September 16, 2010, respectively. We have given notice that, pursuant to the order, we are ceasing continued remediation activities. On March 23, 2012, Her Majesty the Queen in right of Ontario as represented by the MOE served a notice of motion for leave to appeal the March 9, 2012 Canadian Court order, which leave was granted on June 22, 2012. On July 3, 2012, the MOE served its notice of appeal, which appeal is still pending and no hearing date has yet been set.

A

**ITEM 1A. Risk Factors**

*Certain statements in this report may contain words such as "could", "expect", "may", "should", "will", "anticipate", "believe", "intend", "estimate", "target", "plan", "envision", "seek" and other similar language and are considered forward-looking statements or information under applicable securities laws. These statements are based on our current expectations, estimates, forecasts and projections. In addition, other written or oral statements that are considered forward-looking may be made by us or others on our behalf. These statements are subject to important assumptions, risks and uncertainties that are difficult to predict and actual outcomes may be materially different. The Creditor Protection Proceedings are having a direct impact on our business and are exacerbating these risks and uncertainties. In particular, the risks described herein and in our 2011 Annual Report could cause actual events to differ materially from those contemplated in forward-looking statements. Unless otherwise required by applicable securities laws, we do not have any intention or obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.*

In addition to the other information set forth in this report, you should carefully consider the factors discussed in the "Risk Factors" section in our 2011 Annual Report which could materially affect our business, results of operations, financial condition or liquidity. The risks described in our 2011 Annual Report are not the only risks we face. Additional risks and uncertainties not currently known to us or that we currently believe are immaterial also may materially adversely affect our business, results of operations, financial condition and liquidity. Apart from the risk described below, the risks described in our 2011 Annual Report have not materially changed.

*NNC and NNL will no longer be able to comply with their periodic reporting requirements; cease trade orders expected*

The Canadian Monitor, after taking into account several factors arising from the advanced stage of the CCAA proceedings. has determined that the expense and resources required to comply with NNC and NNL's quarterly and annual public reporting requirements can no longer be justified from the standpoint of the best interest of their creditors. Consequently. NNC and NNL will no longer be able to comply with their periodic reporting requirements and will discontinue preparing and filing quarterly and annual financial statements and all other periodic disclosure documents under applicable Canadian and U.S. securities laws effective as of the filing deadlines for their third quarter reporting obligations, being November 14, 2012 in the United States and November 29. 2012 in Canada.

Generally, when an issuer ceases to file its periodic disclosure documents in circumstances such as NNC and NNL's, the Canadian Securities Administrators will issue orders prohibiting trading in securities of the relevant issuer effective from and after the filing deadline under Canadian securities laws (so-called cease trade orders). NNC and NNL will be making submissions to the Canadian Securities Administrators that cease trade orders expected to be issued in respect of the securities of NNC and NNL include certain permitted trading exceptions. However, there can be no assurance that the regulatory authorities will make such orders on the terms requested by NNC and NNL and, in particular, permit any trading exceptions.

A

### ITEM 2. Unregistered Sales of Equity Securities and Use of Proceeds

*Global Class Action Settlement:* We entered into agreements to settle two significant U.S. and all but one Canadian class action lawsuits, collectively the Global Class Action Settlement, which became effective on March 20, 2007 following approval of the agreements by the appropriate courts. In accordance with the terms of the Global Class Action Settlement, a total of 62,866,775 NNC common shares were to be issued. During the three-month period ended June 30, 2012, no NNC common shares were issued in accordance with the settlement. Almost all of the NNC common shares issuable in accordance with the settlement have been distributed to claimants and plaintiffs' counsel, most of them in the second quarter of 2008. The issuance of the 62,866,775 NNC common shares is exempt from registration pursuant to Section 3(a)(10) of the Securities Act.

### ITEM 6. Exhibits

Pursuant to the rules and regulations of the SEC, we have filed certain agreements as exhibits to this Quarterly Report on Form 10-Q. These agreements may contain representations and warranties by the parties. These representations and warranties have been made solely for the benefit of the other party or parties to such agreements and (i) may have been qualified by disclosures made to such other party or parties, (ii) were made only as of the date of such agreements or such other date(s) as may be specified in such agreements and are subject to more recent developments, which may not be fully reflected in our public disclosure, (iii) may reflect the allocation of risk among the parties to such agreements and (iv) may apply materiality standards different from what may be viewed as material to investors. Accordingly, these representations and warranties may not describe our actual state of affairs at the date hereof and should not be relied upon.

| Exhibit No. | Description |
|---|---|
| 10.1 | 4th Estate Allocation Settlement Agreement among certain Nortel entities including Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc., Nortel Networks UK Limited (in administration), Nortel Networks S.A. and certain Nortel entities in the Asia Pacific and Caribbean and Latin America regions dated June 19, 2012. |
| 31 | Certification of the Senior Vice President, Corporate Services and Chief Financial Officer pursuant to 18 U.S.C. Section 1350 as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32 | Certification of the Senior Vice President, Corporate Services and Chief Financial Officer pursuant to 18 U.S.C. Section 1350 as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101.INS | XBRL Instance Document* |
| 101.SCH | XBRL Taxonomy Extension Schema Document* |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document* |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document* |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document* |
| 101.DEF | XBRL Definition Linkbase* |

* Incorporated by reference.

A

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**NORTEL NETWORKS CORPORATION**
**(Registrant)**

| Chief Financial Officer | Chief Accounting Officer |
| --- | --- |
| /s/ ALLAN BIFIELD | /s/ CLARKE GLASPELL |
| **Allan Bifield**<br>**Senior Vice-President, Corporate Services and Chief Financial Officer** | **Clarke Glaspell**<br>**Controller** |

Date: August 9, 2012

A

Exhibit 10.1

EXECUTION COPY

**ALLOCATION SETTLEMENT AGREEMENT**
**(APAC/CALA)**

This agreement (the **"Agreement"**) dated as of the 19th day of June, 2012 is entered into by and among the following parties:

(a) Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL") and the other entities set forth in **Schedule 1** attached hereto (the **"Canadian Debtors"**),

(b) Nortel Networks Inc. ("NNI") and the other entities set forth in **Schedule 2** attached hereto (the **"US Debtors"**),

(c) Nortel Networks UK Limited (In Administration) (**"NNUK"**) and the other entities set forth in **Schedule 3** attached hereto (the **"EMEA Debtors"**) which are acting by their joint administrators Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP of 1 More London Place, London SE1 2AF (other than Nortel Networks (Ireland) Limited (**"NNIR"**), for which David Hughes of Ernst & Young Chartered Accountants of Harcourt Centre, Harcourt Street, Dublin 2, Ireland and Alan Robert Bloom serve as joint administrators) (the **"Joint Administrators"**), who act as agents for the EMEA Debtors without any personal liability whatsoever,

(d) Nortel Networks (Northern Ireland) Limited (in liquidation) (**"NNNIR"**) and Nortel Networks Optical Components Limited (in liquidation) (**"NNOCL"**) (the **"EMEA Liquidation Debtors"**) which in the case of NNNIR, is acting by its joint liquidators Elizabeth Anne Bingham and Kerry Lynne Trigg of Ernst & Young LLP of 1 More London Place, London SE1 2AF and in the case of NNOCL is acting by its joint liquidators Samantha Keen and Kerry Lynne Trigg of Ernst & Young LLP of 1 More London Place, London SE1 2AF (the **"Joint Liquidators"**), who act as agents for the EMEA Liquidation Debtors without any personal liability whatsoever,

(e) Nortel Networks S.A. (In Administration and *liquidation judiciare*) (**"NNSA"**), a corporation incorporated under the laws of France, represented by the Joint Administrators and Maître Cosme Rogeau, 26, avenue Hoche, 78000 Versailles as the "Liquidateur Judiciaire" (the **"NNSA Office Holder"**), who act as agents for NNSA without any personal liability whatsoever,

(f) certain non-filed affiliates of NNC as set forth in **Schedule 4** attached hereto and identified as the APAC Entities, including their respective branch offices (the **"APAC Entities"**),

(g) certain non-filed affiliates of NNC as set forth in **Schedule 5** attached hereto and identified as the CALA Entities, including their respective branch offices (the **"CALA Entities"**, and together with the APAC Entities, the **"Non-Filed Entities"**),

A

(h) certain non-filed affiliates of the EMEA Debtors as set forth in **Schedule 6** hereto and identified as the EMEA NFEs (the **"EMEA NFEs"**).

(i) the Joint Administrators.

(j) the Joint Liquidators,

(k) the NNSA Office Holder.

(l) Ernst & Young Inc. in its capacity as monitor (the **"Monitor"**) in the Canadian Proceedings (defined below) of the Canadian Debtors. and

(m) The Creditors' Committee (as defined below).

The Canadian Debtors. the US Debtors. the EMEA Debtors. the EMEA Liquidation Debtors. NNSA. the Non-Filed Entities. the Joint Administrators. the Joint Liquidators. the NNSA Office Holder. the EMEA NFEs. the Monitor and the Creditors' Committee are referred to herein each as a **"Party"** and collectively as the **"Parties"**. The Canadian Debtors. the US Debtors. the EMEA Debtors. the EMEA Liquidation Debtors. NNSA. the EMEA NFEs. and the Non-Filed Entities are referred to herein each as a **"Nortel Party"** and collectively as **"Nortel"** or the **"Nortel Parties"**. The Joint Administrators and the Joint Liquidators. in their respective personal capacities. shall be party to this Agreement as provided in **Sections 8.5** and **8.6** respectively and solely for the purpose of obtaining the benefit of the provisions of this Agreement expressed to be conferred on or given to them and references to the Parties shall be construed accordingly.

**RECITALS:**

**WHEREAS.** on January 14. 2009 (the **"Filing Date"**). the Canadian Debtors commenced creditor protection proceedings before the Ontario Superior Court of Justice (Commercial List) (the **"Canadian Court"**) under the Companies' Creditors Arrangement Act (Canada). in connection with which Ernst & Young Inc. was appointed as Monitor (the **"Canadian Proceedings"**): and

**WHEREAS,** on the Filing Date, the US Debtors (other than Nortel Networks (CALA) Inc.. whose filing date was July 14, 2009) filed petitions in the United States Bankruptcy Court for the District of Delaware (the **"US Court"** and. together with the Canadian Court, the **"Courts"**) under chapter 11 of title 11 of the United States Code. (the **"US Proceedings"**) and the official committee of unsecured creditors (the **"Creditors' Committee"**) was appointed in such proceedings by the US Court on January 22. 2009: and

**WHEREAS.** on the Filing Date. NNUK, NNIR, NNSA and the other EMEA Debtors commenced administration proceedings before the High Court of Justice in London. England, represented by individuals from Ernst & Young LLP, and. in the case of NNIR only. Ernst & Young Chartered Accountants. serving as administrators in such proceedings: and

A

**WHEREAS**, on April 28, 2010, NNNIR commenced a members' voluntary liquidation with individuals from Ernst & Young LLP serving as liquidators in such liquidation; and

**WHEREAS**, on July 29, 2011, NNOCL commenced a creditors' voluntary liquidation with individuals from Ernst & Young LLP serving as liquidators in such liquidation; and

**WHEREAS**, while the administration proceedings in respect of NNSA under the United Kingdom Insolvency Act 1986 are continuing, subsequent to the Filing Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which the NNSA Office Holder and Maître Franck Michel were appointed by the Versailles Commercial Court (Docket No. 2009P00492) for NNSA (the **"NNSA Secondary Proceedings"**); and

**WHEREAS**, as of the date hereof, the Non-Filed Entities and the EMEA NFEs are not subject to any insolvency, bankruptcy or other creditor protection proceedings; and

**WHEREAS**, subsequent to the Filing Date, Nortel, in consultation with its various creditor constituencies, determined to divest its various businesses and assets to third party buyers (each such sale as listed on **Schedule 7** hereof, a **"Global Sale"**); and

**WHEREAS** the Global Sales have now been completed and the net proceeds (the **"Sale Proceeds"**) of the Global Sales have been or will be deposited into various escrow accounts pursuant to various escrow agreements (the **"Global Sales Escrow Agreements"**) executed in connection with the Global Sales; and

**WHEREAS** certain of the Non-Filed Entities and the EMEA NFEs are "Sellers" under the various Global Sales and "Depositors" under certain of the Global Sales Escrow Agreements, as listed on **Schedule 8** attached hereto, (the **"Escrow Agreements"**, and the related escrow accounts the **"Escrow Accounts"**): and

**WHEREAS** various of the Parties, together with certain creditor constituencies, have entered into negotiations with respect to the resolution of the allocation of Sale Proceeds among the Sellers; and

**WHEREAS** pursuant to various settlements, all applicable escrow agreements have been amended to remove all references to each of o.o.o. Nortel Networks, Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Ltd. as Depositors, such that none of those entities shall have any further rights or obligations under such escrow agreements and/or the rights and obligations of those entities under such Escrow Agreements have been assigned to certain of the Parties; and

**WHEREAS** pursuant to an order of the Canadian Court and the US Court, any term or condition of the MEN Distribution Escrow Agreement entered into as of March 19, 2010 that explicitly or implicitly requires the consent or participation of Nortel Networks de Colombia S.A. is now forever deemed not to require such consent or participation; and

A

**WHEREAS** the Parties wish to agree upon the aggregate allocation of Sale Proceeds attributable to the Non-Filed Entities on the terms and conditions set out herein and resolve certain other issues outstanding among them: and

**WHEREAS** the Parties further wish to settle and resolve various amounts and balances in respect of outstanding amounts owing among the Non-Filed Entities. *inter se.* or between a Non-Filed Entity and any other Nortel Party:

NOW THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION, THE RECEIPT AND SUFFICIENCY OF WHICH IS HEREBY ACKNOWLEDGED. THE PARTIES HEREBY AGREE AS FOLLOWS:

## ARTICLE I — ALLOCATION OF SALE PROCEEDS

1.1 **Allocation to the Non-Filed Entities**

(a) In full and final settlement of the claims of the Non-Filed Entities to the allocation of any Sale Proceeds, each of the Non-Filed Entities shall be entitled to an allocation of the Sale Proceeds in the amounts set forth on **Appendix A** attached hereto (each. a **"Settlement Share"**). which amounts for all the Non-Filed Entities aggregate to US$44.900.000 (the **"Settlement Amount"**). The Settlement Amount shall be drawn from the various Escrow Accounts as indicated on **Appendix A.**

1.2 Each Party acknowledges and agrees that. upon the Escrow Release Trigger Date (as defined below):

(a) JPMorgan Chase Bank. N.A., in its capacity as the distribution agent for the Escrow Accounts and the Intermediate Distribution Account (as defined below) (the **"Escrow Agent"**). will be authorized and directed by the applicable Depositors and the Estate Fiduciaries (as defined in the Escrow Agreements) (the Depositors and the Estate Fiduciaries collectively. the **"Escrow Parties"**) to (i) establish a non-interest bearing intermediate distribution account (the **"Intermediate Distribution Account"**). (ii) withdraw the Settlement Amount from the Escrow Accounts in accordance with **Appendix A** and deposit it in the Intermediate Distribution Account. and (iii) disburse the Settlement Amount from the Intermediate Distribution Account to the Non-Filed Entities and those other Nortel Parties receiving Net Cash Balance Payments (as defined below) (each such entity, an **"Intercompany Creditor"** and, collectively with the Non-Filed Entities receiving distributions hereunder. the **"Settlement Payment Parties"**) in the amounts indicated on **Appendix B** attached hereto (each amount to be transmitted to a Settlement Payment Party. as may be adjusted in accordance with **Section 3.5** hereof. an **"Aggregate Settlement Share"**). which disbursements shall. in the case of those made to Intercompany Creditors. satisfy the Net Cash Balance Payments.

A

(b) Each Party acknowledges and agrees that withdrawals by the Escrow Agent from the Escrow Accounts and the transmission by the Escrow Agent of the Aggregate Settlement Shares shall be made in accordance with the Escrow Release Instructions described in **Sections 6.2** and **6.3** hereof.

(c) Upon transmission by the Escrow Agent of all Aggregate Settlement Shares to each of the relevant Settlement Payment Parties (the date of such transmission, the "**Escrow Release Effective Date**"), the Escrow Agent shall have no further obligation or liability to the Parties for the allocation or division of the Settlement Amount among the Nortel Parties.

## ARTICLE II — FULL AND FINAL SETTLEMENT

2.1 The Parties hereby acknowledge and agree that **Appendix C-1** hereto lists both the pre-filing and post-filing intercompany payables and receivables among the Non-Filed Entities, inter se, and between a Non-Filed Entity and any other Nortel Party, as of September 30, 2011. The Parties further acknowledge and agree that, upon the Escrow Release Effective Date, (a) the pre-filing amounts set out in **Appendix C-1** under the heading "Net pre-filing balance as at September 30, 2011", are deemed partially or wholly satisfied to the extent paid through Net Cash Balance Payments as set forth on **Appendix C-1**, or to the extent otherwise paid under this Agreement; (b) the pre-filing amounts set out in **Appendix C-1** under the heading "Remaining Pre-filing balance", as such amounts may have been reduced by payments made after September 30, 2011, including, without limitation, the payments specified on **Appendix C-2** hereto, shall supersede (i) any amounts reflected in the schedules filed by the US Debtors in the US Proceedings with respect to pre-filing amounts owed to any Non-Filed Entity, (ii) any proofs of claim relating to a pre-filing Claim (as defined below) that have been or could have been filed by or on behalf of the Non-Filed Entities or any of their predecessors, successors and assigns, each in such capacities, in the US Proceedings, (iii) any assertion or allegation of a pre-filing Claim which any of the Non-Filed Entities or any of their predecessors, successors, and assigns, each in such capacities, may have against the Canadian Debtors whether filed pursuant to the Canadian Debtors' various claims procedures or otherwise, (iv) any assertion or allegation of a pre-filing Claim which any of the Non-Filed Entities or any of their predecessors, successors, and assigns, each in such capacities, may have against the EMEA Debtors whether filed pursuant to the EMEA Debtors' informal claims procedure or otherwise which could be the subject of a proof of claim in the administration or any subsequent insolvency process of the EMEA Debtors, and (v) any assertion or allegation of a pre-filing Claim which any of the Non-Filed Entities or any of their predecessors, successors, and assigns, each in such capacities, may have against NNSA in the administration proceedings whether filed pursuant to the EMEA Debtors' informal claims procedure or otherwise which could be the subject of a proof of claim in the administration or any subsequent insolvency process of NNSA, *provided that* any pre-filing Claim that has been or could have been filed by or on behalf of the Non-Filed Entities or any of their predecessors, successors, and assigns

A

in the NNSA Secondary Proceedings shall not be affected by this Agreement and shall only be admitted for proof in the NNSA Secondary Proceedings in the amount accepted by the NNSA Office Holder in the formal proof of debt process in the NNSA Secondary Proceedings (the "**NNSA Proof Process**") (as such amount may be adjusted in accordance with the applicable French law) and not to the extent any such pre-filing Claim has been rejected or disallowed or not previously filed or declared in such proceedings; (c) the post-filing amounts set out in **Appendix C-1** under the heading "Net post-filing position as at September 30, 2011", as such amounts may have been reduced by payments made after September 30, 2011, including, without limitation, the payments specified on **Appendix C-2** hereto, shall supersede (i) any proofs of claim relating to a post-filing Claim arising prior to September 30, 2011 that have been or could have been filed by or on behalf of the Non-Filed Entities or any of their predecessors, successors and assigns, each in such capacities, in the US Proceedings, (ii) any assertion or allegation of a post-filing Claim arising prior to September 30, 2011 which any of the Non-Filed Entities or any of their predecessors, successors and assigns, each in such capacities, may have against the Canadian Debtors whether filed pursuant to the Canadian Debtors' various claims procedures or otherwise, (iii) any assertion or allegation of a post-filing Claim arising prior to September 30, 2011 which any of the Non-Filed Entities or any of their predecessors, successors and assigns, each in such capacities, may have against the EMEA Debtors whether filed pursuant to the EMEA Debtors' informal claims procedure or otherwise which could be the subject of a proof of claim in the administration or any subsequent insolvency process of the EMEA Debtors and (iv) any assertion or allegation of a post-filing Claim arising prior to September 30, 2011 which any of the Non-Filed Entities or any of their predecessors, successors and assigns, each in such capacities, may have against NNSA in the administration proceeding whether filed pursuant to the EMEA Debtors' informal claims procedure or otherwise which could be the subject of a proof of claim in the administration or any subsequent insolvency process of NNSA, *provided that* any post-filing Claim that has been or could have been filed by or on behalf of the Non-Filed Entities or any of their predecessors, successors, and assigns in the NNSA Secondary Proceedings shall not be affected by this Agreement and shall only be admitted for proof in the NNSA Secondary Proceedings in the amount accepted by the NNSA Office Holder in the NNSA Proof Process (as such amount may be adjusted in accordance with applicable French law) and not to the extent any such post-filing Claim has been rejected or disallowed or not previously filed or declared in such proceedings; (d) that all such schedules, proofs of claim and allegations or assertions of such pre-filing and post-filing Claims are hereby (i) deemed amended such that they are superseded by the amounts set forth on **Appendix C-1** under the headings "Remaining pre-filing balance" and "Net post-filing position as at September 30, 2011", as the case may be, which shall be the only amounts owed by the US Debtors, the Canadian Debtors, the EMEA Debtors or NNSA to the Non-Filed Entities with respect to such Claims, and (ii) deemed (as so amended) approved, agreed, allowed or admitted (as applicable) in the amounts set forth on **Appendix C-1**, and otherwise deemed disallowed or rejected, *provided, however*, in each case, as such amounts on **Appendix C-1** are subject to reduction by payments made after September 30, 2011 including, without limitation, the payments specified on **Appendix C-2**, *provided, further, however*, in each case, that such pre-filing and post-filing Claims that

A

have been or could have been filed by or on behalf of the Non-Filed Entities or any of their predecessors, successors, and assigns in the NNSA Secondary Proceedings shall not be affected by this Agreement and shall only be admitted for proof in the NNSA Secondary Proceedings in the amount accepted by the NNSA Office Holder in the NNSA Proof Process (as such amount may be adjusted in accordance with applicable French law) and not to the extent any such post-filing Claim has been rejected or disallowed or not previously filed or declared in such proceedings, and *provided, further,* that nothing in this **Section 2.1** is intended to waive or release any Surviving Obligation (as defined below) or the US Estate Carve-Out (as defined below); and (e) that none of the Canadian Debtors, EMEA Debtors, US Debtors or other Nortel Parties will make, join or support in any objection to or rejection of all or any portion of the pre-filing and post-filing Claims in the amounts set forth on **Appendix C-1** or make, propose, file or support any plan, scheme of arrangement, or other arrangement, appeal, application, or request for relief in any court that is inconsistent with this Agreement.

2.2 In consideration of the obligations, covenants and rights of the Parties set forth in this Agreement, the Parties hereby agree that, upon transmission by the Escrow Agent of all Aggregate Settlement Shares to each of the relevant Settlement Payment Parties, this Agreement shall constitute a full and final settlement of any and all Claims (a) by the Non-Filed Entities as against the Releasees (as defined below) and (b) by each of the Parties to this Agreement as against the NFE Releasees (as defined below) in each case, up to the date of this Agreement, except for (i) the pre-filing amounts set forth on **Appendix C-1** under the heading "Remaining pre-filing balance", as such amounts may have been reduced by payments made after September 30, 2011, including, without limitation, the payments specified on **Appendix C-2** hereto, which for the avoidance of doubt constitutes only a partial and non-exhaustive listing of such payments (the "**Remaining Balances**"); (ii) the post-filing amounts set forth on **Appendix C-1** under the heading "Net post-filing position as at September 30, 2011", as such amounts may have been reduced by payments made after September 30, 2011, including, without limitation, the payments specified on **Appendix C-2** hereto, which for the avoidance of doubt constitutes only a partial and non-exhaustive listing of such payments, or increased by obligations arising in the ordinary course of business through the trading of goods or the provision of services occurring on or after October 1, 2011; (iii) obligations set forth on **Appendix C-3**; (iv) obligations arising under the APAC Restructuring Agreement (as defined below) as amended hereby; and (v) obligations arising under this Agreement ((i) through (v), collectively, the "**Surviving Obligations**") and subject to the US Estate Carve-Out (as defined below).

## ARTICLE III — APAC RESTRUCTURING AGREEMENT AMENDMENTS AND RELATED MATTERS

3.1 Each Party hereto that is also a "Party" to the Asia Restructuring Agreement dated as of November 5, 2009 (the "**APAC Restructuring Agreement**") among the Canadian Debtors, the US Debtors, the EMEA Debtors, NNSA, and the APAC Entities signatory thereto (collectively, the "**APAC Restructuring Agreement Parties**") acknowledges and agrees that the APAC Restructuring Agreement shall remain in full force and effect following the consummation of the transactions contemplated herein, except as expressly amended by this Agreement.

A

3.2 Upon transmission by the Escrow Agent of all Aggregate Settlement Shares to each of the relevant Settlement Payment Parties, the APAC Restructuring Agreement Parties acknowledge and agree that the APAC Debtors (as defined in the APAC Restructuring Agreement, the "**APAC Debtors**") have, to date, fully satisfied their obligations under **Sections 10** and **11** of the APAC Restructuring Agreement and that (i) such APAC Debtors shall have no further obligations under **Sections 10** and **11** of the APAC Restructuring Agreement, (ii) the obligations of such APAC Debtors to provide security interests in Collateral (as defined in the APAC Restructuring Agreement) in accordance with Section 13(c) of the APAC Restructuring Agreement shall be terminated and be of no further force and effect and (iii) (v) the Collateral Agency Agreement by and between the APAC Restructuring Agreement Parties, dated as of December 24, 2009, (w) the Security Agreement by and between certain APAC Entities and NNI, as Collateral Agent, dated as of December 24, 2009, (x) the Debenture by and between Nortel Networks (Asia) Limited as "Chargor" and NNI as "Chargee", dated as of December 24, 2009, (y) the Debenture by and between Nortel Networks Singapore Pte Ltd as "Chargor" and NNI as "Chargee", dated as of December 24, 2009, and (z) the General Security Deed by and between Nortel Networks New Zealand Limited and NNI as Secured Party, dated as of December 24, 2009, shall in each case be terminated and be of no further force and effect, and any and all security interests or liens on Collateral (as defined in the APAC Restructuring Agreement) pledged or granted thereunder shall be released. In connection with the foregoing, the APAC Restructuring Agreement Parties agree to execute such documents and instruments as may be reasonably requested by any such APAC Debtor for the purpose of releasing or evidencing the termination of any security interest imposed on the assets of such APAC Debtor in accordance with Section 13(c) of the APAC Restructuring Agreement.

3.3 Each APAC Restructuring Agreement Party acknowledges and agrees that all payments as set forth under the heading "4th Estate Settlement Net Cash Balance Payments" on **Appendix C-1** and as effected through **Section 1.2(a)** hereof, as may be adjusted in accordance with **Section 3.5** hereof (such payments, collectively, the "**Net Cash Balance Payments**"). made by an APAC Debtor represents payment of Net Cash Balances (as defined in the APAC Restructuring Agreement) on account of Subsequent Payment Amounts (as defined in the APAC Restructuring Agreement) in accordance with the APAC Restructuring Agreement. Each APAC Restructuring Agreement Party acknowledges and agrees that the intercompany balances outstanding as of September 30, 2011 and the amounts of such Net Cash Balance Payments with respect to each APAC Restructuring Agreement Party are as set forth on **Appendix C-1**. Each APAC Restructuring Agreement Party also acknowledges and agrees that, upon receipt of the Net Cash Balance Payments, the Remaining Balances related to such APAC Debtor are the outstanding balances of Pre-Filing Intercompany Debt (as defined in the APAC Restructuring Agreement).

3.4 Each APAC Restructuring Agreement Party acknowledges and agrees that execution of this Agreement (or with respect to the Bondholder Group (as hereinafter defined), the

A

delivery of a consent thereto) shall constitute prior written consent of the APAC Restructuring Agreement Parties, the Monitor, the Creditors' Committee, the Bondholder Group and the Joint Administrators to the APAC Restructuring Agreement Parties' entry into this Agreement, the performance of their obligations hereunder and all payments made and actions taken in accordance herewith.

3.5 **Post-Execution Claims against APAC Debtors**

(a) In the event that any APAC Debtor (a **"Designated APAC Debtor"**) making a Net Cash Balance Payment becomes aware of a claim after the date hereof but prior to the Effective Date (each such claim, a **"Post-Execution Claim"** and, collectively, the **"Post-Execution Claims"**) and (i) such Designated APAC Debtor had no knowledge of such claim prior to the date hereof, (ii) the Board of Directors of such Designated APAC Debtor determines in good faith that such Post-Execution Claim, either individually or in the aggregate with other Post-Execution Claims of such APAC Debtor, could give rise to a liability greater than the lesser of (x) US$1,000,000 and (y) ten percent (10%) of the working capital requirement reserve of such APAC Debtor as set out in the December 16, 2011 Restructuring Manager's Report, and (iii) the Board of Directors of the Designated APAC Debtor determines in good faith that a reduction of the Net Cash Balance Payment (the amount of such reduction being the **"Reduction Amount"**) to be paid by the Designated APAC Debtor to its Intercompany Creditors hereunder (each an **"Affected Creditor"**) is necessary to adequately reserve for such Post-Execution Claim(s), such Designated APAC Debtor shall (x) promptly, and in no event later than the Effective Date, provide written notice of such Post-Execution Claim to each Party, including sufficient detail regarding the nature of the Post-Execution Claim for each Party to understand the basis for the need to reserve additional funds and the quantum of the Reduction Amount and (y) use commercially reasonable efforts to mitigate the Post-Execution Claim and reduce the Reduction Amount.

(b) Upon the delivery of such notice, the Parties agree that (i) the Reduction Amount shall not be transmitted to any Affected Creditor but shall instead be transmitted to such Designated APAC Debtor and (ii) **Appendix B** and **Appendix C-1** hereto shall be amended to reflect the changes resulting from the preceding clause (i), including (x) the decrease in the Net Cash Balance Payments by the Designated APAC Debtor to its Affected Creditors and any resulting decreases (each, an **"Echo Decrease"**) in Net Cash Balance Payments payable by an Affected Creditor that is also an APAC Debtor (an **"Affected Creditor APAC Debtor"**) to its Intercompany Creditors (an **"Echo Affected Creditor"** and, with the Affected Creditors, the **"Affected Intercompany Creditors"**), (y) the increase in the Remaining Balances owing by the Designated APAC Debtor or the Affected Creditor APAC Debtor to their respective Affected Intercompany Creditors (such increased Remaining Balances to be governed by the provisions of the APAC Restructuring Agreement, as amended hereby) and (z) the decrease in the Aggregate Settlement Share payable to an Affected Intercompany Creditor; *provided that,* to the extent any Post-Execution Claim is mitigated in whole or in



BHG0160774

A

part, the mitigation amounts shall be included in the Designated APAC Debtor's next subsequent calculation of its Net Cash Balance and shall be treated in accordance with the provisions of the APAC Restructuring Agreement: *provided, further*, that any Affected Intercompany Creditor which has its Aggregate Settlement Share reduced pursuant to this **Section 3.5** by an amount that is equal to or greater than the greater of (x) $1,000,000 and (y) twenty percent (20%) of such Affected Intercompany Creditor's initial Aggregate Settlement Share shall have the right to terminate this Agreement prior to the Escrow Release Effective Date by providing written notice to each of the other Parties hereto, whereupon this Agreement shall terminate and each Party shall have no further rights or obligations hereunder. The Parties agree that the reduction in Net Cash Balance Payments resulting from any Reduction Amount or Echo Decrease shall be borne by the respective Affected Intercompany Creditors of such Designated APAC Debtor or Affected Creditor APAC Debtor on a pro rata basis based on each such Affected Intercompany Creditor's share of the total Net Cash Balance Payments to be made by the applicable Designated APAC Debtor or Affected Creditor APAC Debtor, with each Affected Intercompany Creditor's Aggregate Settlement Share being reduced accordingly.

## ARTICLE IV — RELEASES

### 4.1 Release

(a) Upon transmission by the Escrow Agent of all Aggregate Settlement Shares to each of the relevant Settlement Payment Parties, each of the Non-Filed Entities releases each of the other Parties to this Agreement and each of their respective directors, officers, employees, agents, attorneys, advisors, predecessors, successors and assigns (collectively, the **"Releasees"**) from (x) any and all claims, rights, debts, defenses, demands, liabilities, obligations, damages, actions, suits, causes of action, and setoffs, whether known or unknown, suspected or unsuspected, accrued or unaccrued, matured or unmatured, past or present, fixed or contingent, liquidated or unliquidated, whether sounding in contract, tort or otherwise (collectively, **"Claims"**), that such Non-Filed Entity now has, had, or may have against any of the Releasees up to the date of this Agreement other than the Surviving Obligations, including, without limitation, (i) in respect of Sale Proceeds, (ii) in respect of proceeds of sale arising from any other divestiture of assets by or on behalf of a Nortel Party or any of its affiliates including, without limitation, the transactions identified on **Schedule 9** hereto; (iii) obligations arising under that certain CDMA/LTE China Side Agreement entered into as of November 2, 2009 by and between Nortel Networks (China) Limited, NNL and NNI, and (iv) obligations arising under that certain Offer in connection with the payment of certain Sale Proceeds to Nortel Networks de Argentina S.A., dated as of March 19, 2010, and (y) any and all Claims in respect of any proceeds of sale of any future divestiture of assets by or on behalf of a Nortel Party or any of its affiliates other than those in which such Non-Filed Entity participates (collectively, the **"Released Claims"**) and agrees that it shall not allege, file or

A

otherwise assert any Released Claim against the Releasees or the Escrow Agent. or any of them, including in respect of an entitlement to or the allocation of Sale Proceeds or any other proceeds of sale in connection with any other divestiture of assets by or on behalf of a Nortel Party or any of its affiliates that has occurred or that may occur. or allege. file or otherwise assert a Claim against either the Releasees or any person which could result in a claim over or right of contribution or indemnity against any of the Releasees in respect of the Released Claims or that could otherwise impact upon a Releasee's entitlement to or the allocation of Sale Proceeds or any other proceeds of sale in connection with any other divestiture of assets by or on behalf of a Nortel Party or any of its affiliates that has occurred or that may occur: *provided, however,* that notwithstanding the foregoing. each of Nortel Networks Kabushiki Kaisha, Nortel Technology Excellence Centre Private Ltd.. Nortel Networks de Guatemala. Ltda. and Nortel Trinidad and Tobago Limited (each a **"NFE US Subsidiary"**. and collectively the **"NFE US Subsidiaries"**) does not hereby release any Claims against any US Debtor other than (i) Claims in respect of Sale Proceeds. (ii) Claims in respect of any other proceeds of sale in connection with any other divestiture of assets by or on behalf of a Nortel Party or any of its affiliates and (iii) Claims which could otherwise impact a US Debtor's entitlement to or the allocation of Sale Proceeds or any other proceeds of sale in connection with any other divestiture of assets by or on behalf of a Nortel Party or any of its affiliates (such retained Claims. the **"NFE US Subsidiary Carve-out"**). Upon transmission by the Escrow Agent of all Aggregate Settlement Shares to each of the relevant Settlement Payment Parties. each of the Non-Filed Entities agrees that it shall be prohibited from participating in any court proceeding. mediation. arbitration or other proceeding or discussion to resolve the allocation of Sale Proceeds or any other proceeds of sale in connection with any other divestiture of assets by or on behalf of a Nortel Party or any of its affiliates that has occurred or that may occur.

(b) Upon transmission by the Escrow Agent of all Aggregate Settlement Shares to each of the relevant Settlement Payment Parties. each of the Parties to this Agreement releases each of the Non-Filed Entities and each of their respective directors. officers. employees. agents. attorneys. advisors. predecessors. successors and assigns (the **"NFE Releasees"**) from any and all Claims that such Party now has. had or may have had against any of the NFE Releasees up to the date of this Agreement other than the Surviving Obligations. including. without limitation. (i) in respect of Sale Proceeds. (ii) obligations arising under that certain CDMA/LTE China Side Agreement entered into as of November 2. 2009 by and between Nortel Networks (China) Limited. NNL and NNI. and (iii) obligations arising under that certain Offer in connection with the payment of certain Sale Proceeds to Nortel Networks de Argentina S.A.. dated as of March 19. 2010: *provided, however*. that notwithstanding the foregoing. each of the US Debtors does not hereby release any Claims against any NFE US Subsidiary other than Claims in respect of Sale Proceeds (such retained Claims. the **"US Debtor Carve-out"**. and together with the NFE US Subsidiary Carve-out. the **"US Estate Carve-out"**). For the avoidance of doubt. the release provided in this **Section 4.1(b)** shall not impact the rights of the Parties against those Non-Filed Entities of



BHG0160776

A

which they are a holder of shares, stock, or other equity interests to the extent arising from the holding of such shares, stock or other equity interests in a Non-Filed Entity.

(c) For the avoidance of doubt, nothing in this Agreement constitutes a waiver of the Canadian Debtors', the US Debtors', the EMEA Debtors', NNSA's, the EMEA Liquidation Debtors', the EMEA NFEs', the Joint Administrators' (as joint administrators of the EMEA Debtors and NNSA), the Joint Liquidators' or the NNSA Office Holder's right to pursue, allege, file or otherwise assert any and all Claims that such Party now has, had or may have had against any Party other than the NFE Releasees, including any claims in which the NFE Releasees may be or have been jointly, severally or concurrently liable with another Party, nor shall it constitute a waiver of any Party's right to defend, disallow or dispute any such Claims.

4.2 Notwithstanding anything to the contrary in this Agreement, each of the Non-Filed Entities covenants and agrees, if requested to do so, to enter into any license termination agreement with respect to the licenses and rights granted by other Nortel Parties for no further consideration; *provided that*, such Non-Filed Entity shall, in exchange for such license termination, receive a sublicense from the relevant Nortel Party that provides reasonably equivalent rights to the terminated licenses and rights.

## ARTICLE V — REPRESENTATIONS AND WARRANTIES

### 5.1 Representations and Warranties of the Parties

Subject to satisfaction of the Conditions (as defined below), each Party (but not, for the avoidance of doubt, the Joint Administrators, the Joint Liquidators or the NNSA Office Holder in their personal capacities) hereby severally represents and warrants to each other that, as of the date hereof:

(a) it has the power and authority to enter into this Agreement and to carry out its obligations hereunder;

(b) the execution of this Agreement, and the consummation of the transactions contemplated herein, have been authorized by all necessary approvals, and no other act or proceeding on its part is necessary to authorize the execution of this Agreement; and

(c) this Agreement has been duly executed by it and constitutes a legal, valid and binding obligation of such Party that is enforceable against it under all applicable laws and regulations.

### 5.2 Representations and Warranties of the APAC Restructuring Agreement Parties

(a) Each of the APAC Restructuring Agreement Parties (but not, for the avoidance of doubt, the Joint Administrators, the Joint Liquidators or the NNSA Office Holder



BHG0160777

A

in their personal capacities) severally represents and warrants to each other and to the other Parties that, upon approval by the Canadian Court and the US Court, this Agreement will have been approved in accordance with the terms of the APAC Restructuring Agreement, and the APAC Restructuring Agreement Parties' execution of this Agreement and the performance of their obligations hereunder will not constitute a violation of any of the provisions of the APAC Restructuring Agreement.

5.3 **Representations and Warranties of the APAC Debtors**

(a) Each of the APAC Debtors severally represents and warrants to the APAC Restructuring Agreement Parties that the Net Cash Balance Payments made by it hereunder are payments of Net Cash Balances for the purposes of the APAC Restructuring Agreement.

(b) Each of the APAC Debtors severally represents and warrants to each other and to the other Parties that, as of the date hereof, each Net Cash Balance Payment made by it hereunder as described on **Appendix C-1** does not violate any foreign exchange control or other regulation, statute, rule or legal limitation applicable to the making of such Net Cash Balance Payment.

## ARTICLE VI — COVENANTS TO EXECUTE ESCROW AMENDMENTS AND RELEASE INSTRUCTIONS

6.1 Each of the Escrow Parties, the NNSA Office Holder, the Joint Administrators (acting on behalf of the EMEA Debtors and NNSA (as applicable)) and the Joint Liquidators (acting on behalf of the EMEA Liquidation Debtors (as applicable)) covenants and agrees to execute and deliver, no later than ten Business Days after the Effective Date (as defined below), an amendment, substantially in the form attached hereto as **Appendix E**, to each Escrow Agreement as necessary to remove all references to each of the Non-Filed Entities as a Depositor (as such term is defined in such Escrow Agreements) or otherwise, such that upon transmission by the Escrow Agent of all Aggregate Settlement Shares to each of the relevant Settlement Payment Parties none of the Non-Filed Entities shall have any further rights or obligations under such Escrow Agreement (the "**Escrow Amendments**"), and that any term or condition of an Escrow Agreement that explicitly or implicitly requires the consent or participation of a Non-Filed Entity shall be forever deemed not to require such consent or participation. For the avoidance of doubt, the Parties agree that the Escrow Agent is authorized to take all acts requiring the unanimous direction of the Depositors under the Escrow Agreements without the consent or participation of the Non-Filed Entities.

6.2 Each of the Escrow Parties covenants and agrees, no later than ten Business Days after the Effective Date, to execute and deliver to the Escrow Agent an escrow release instruction (each an "**Escrow Account Release Instruction**"), the form of which is attached hereto as **Appendix F**, directing the Escrow Agent to withdraw the Settlement Amount from each Escrow Account relating to each Escrow Agreement to which it is a party and for the Escrow Agent to deposit the Settlement Amount in the Intermediate Distribution Account.

A

6.3 Each of the Escrow Parties covenants and agrees, no later than ten Business Days after the Effective Date, to execute and deliver to the Escrow Agent an escrow release instruction (the "**Intermediate Distribution Account Release Instruction**" and together with the Escrow Account Release Instructions, the "**Escrow Release Instructions**"), the form of which is attached hereto as **Appendix G**, directing the Escrow Agent to transmit the Aggregate Settlement Share from the Intermediate Distribution Account to the Settlement Payment Parties in accordance with **Appendix B** attached hereto (the date on which all obligations of each of the specified Parties under **Sections 6.1, 6.2** and **6.3** have been satisfied, the "**Escrow Release Trigger Date**").

6.4 Without limiting those obligations in **Sections 6.1, 6.2**, and **6.3**, each of the Parties covenants and agrees to use commercially reasonable efforts to effect the outcomes described in **Sections 6.1, 6.2**, and **6.3** above including, without limitation, promptly executing and delivering any further documentation that may be required by the Escrow Agent.

6.5 For the purpose of this Article VI, "**Business Day**" shall mean a day that is not a Saturday, Sunday or national public holiday in Canada, the United States or any part of the United Kingdom

## ARTICLE VII — CONDITIONS TO EFFECTIVENESS

7.1 **Court Approval and Delivery of Release**

(a) No provision of this Agreement except the provisions of this **Article VII** and **Article VIII** shall be effective until the satisfaction of all of the following conditions in this **Section 7.1(a)** (each, a "**Condition**" and collectively, the "**Conditions**", and the date of the satisfaction of all Conditions, the "**Effective Date**"):

(i) the Canadian Court shall have granted an order approving the entirety of this Agreement and all provisions hereof including, without limitation, the amendments to the APAC Restructuring Agreement contemplated herein, and such order shall have become final and non-appealable;

(ii) the US Court shall have granted an order approving the entirety of this Agreement and all provisions hereof including, without limitation, the amendments to the APAC Restructuring Agreement contemplated herein, and such order shall have become final and non-appealable; and

(iii) Nortel Networks del Paraguay S.A. shall have executed and delivered (i) the Full and Final Acknowledgement and Release (Paraguay) to the Nortel Parties, the form of which is attached hereto as **Appendix H** and (ii) its signature pages to the Escrow Amendment, the Escrow Account Release Instructions for the Escrow Account of which it is a Depositor and the Intermediate Distribution Account Release Instruction.

A

(b) The Canadian Debtors and the US Debtors (as applicable) shall:

(i) use commercially reasonable efforts to satisfy the Conditions set forth in **Sections 7.1(a)(i)** and **7.1(a)(ii)** above in their respective Courts as soon as possible, taking into account the availability of the respective Courts to address the matters set forth in this Agreement; and

(ii) keep all other Parties and counsel and financial advisors to the ad hoc committee of bondholders (the "**Bondholder Group**") reasonably apprised of the progress of the satisfaction of the Conditions and provide such other information regarding the satisfaction of the Conditions as reasonably requested by other Parties.

(c) Each Party hereto shall not oppose the reasonable participation of any other Party or the Bondholder Group in connection with any proceedings in any Court related to the satisfaction of the Conditions to the extent such entity does not already have standing.

## ARTICLE VIII — MISCELLANEOUS

### 8.1 Reservation of Rights

(a) The Parties hereby acknowledge and agree that they are entering into this Agreement for settlement purposes only and nothing herein or the actions taken as a result hereof shall constitute an acknowledgment or admission as to the correct methodology for determining allocation of the Sale Proceeds of a particular Global Sale or the proceeds of any other transaction, including, without limitation, the sale of assets, business or intellectual property, that could be subject to allocation among any of the Parties or their affiliates, and shall not constitute an amendment, modification or waiver of rights of any Party (other than by or with respect to the Non-Filed Entities) or bar, prohibit, terminate or in any way hinder or enhance the rights of the Parties to this Agreement (other than by or with respect to the Non-Filed Entities) to present any arguments, methodologies, legal or factual theories in support of a proposed allocation of the Sale Proceeds or the proceeds of any other transaction, including, without limitation, the sale of assets, business or intellectual property, that could be subject to allocation amongst any of the Parties or their affiliates, and such presentation shall not, or otherwise be deemed to, constitute in any way a violation of a Party's rights under any existing agreement. The Parties agree that no Party shall use as evidence, or otherwise rely upon, this Agreement or any part hereof (including, without limitation, the amount and/or payment of the Settlement Amount or a Party's Settlement Share) in any way to support its right to a particular allocation of the Sale Proceeds or any other sale proceeds.

A

(b) The Parties hereby acknowledge and agree that, in the event the Escrow Release Effective Date does not occur or the Agreement is terminated pursuant to **Section 3.5**, nothing in this Agreement, including without limitation the provisions of **Section 2.1** hereof, shall constitute an acknowledgment, admission, amendment, modification or waiver of claims governed by this Agreement or any other rights or obligations of the Parties.

8.2 **Governing Law and Jurisdiction**

(a) This Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction.

(b) To the fullest extent permitted by applicable law, each Party (i) agrees to submit to the jurisdiction of the US and Canadian Courts (including for purposes of a joint hearing conducted under the cross-border insolvency protocol, as amended and as the same may be further amended, approved by the US and Canadian Courts in their respective proceedings (the "**Cross-Border Protocol**")), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement; (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters in this Agreement must be commenced in (v) a joint hearing of both the Canadian and US Courts conducted under the Cross-Border Protocol if such claim, action or proceeding would affect any of the Canadian Debtors and any of the US Debtors, (w) the US Court for any claim, action or proceeding if such claim, action or proceeding would affect the US Debtors and not affect the Canadian Debtors, (x) the Canadian Court if such claim, action or proceeding would affect the Canadian Debtors, but not affect the US Debtors, (y) the courts of England and Wales if such claim, action or proceeding would affect the main administration proceedings of NNSA any of the EMEA Debtors or the Joint Administrators (including as joint administrators of NNSA) and any of the EMEA Liquidation Debtors or the Joint Liquidators, but not affect the US Debtors or the Canadian Debtors, or (z) the courts of France if such claim, action or proceeding would affect the NNSA Office Holder or the NNSA Secondary Proceedings but not any of the EMEA Debtors, the Joint Administrators, the EMEA Liquidation Debtors, the Joint Liquidators, the US Debtors or the Canadian Debtors; (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a court or any claim that any such action brought in such a court has been brought in an inconvenient forum; (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof; and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law.

A

### 8.3 Amendments

This Agreement may be amended, by means of a written amendment signed by all Parties, which amendments, if material, must be approved by the US Court and the Canadian Court.

### 8.4 Counterparts

This Agreement may be executed in separate counterparts (which may include counterparts delivered by facsimile or other electronic transmission) and all of said counterparts taken together shall be deemed to be an original and shall be binding on the Party who signed the counterpart and all of which together shall constitute a single agreement.

### 8.5 Joint Administrators and NNSA Office Holder

(a) The Parties agree that the Joint Administrators and the NNSA Office Holder have negotiated and are entering into this Agreement as agents for the EMEA Debtors to which they are appointed and NNSA (as applicable) and that none of the Joint Administrators or the NNSA Office Holder, their respective firms, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Party to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations.

(b) The Joint Administrators are a Party to this Agreement:

(i) as agents of NNSA and the respective EMEA Debtors of which they are administrators: and

(ii) in their own capacities solely for taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the United Kingdom Insolvency Act 1986 and for the purposes of obtaining the benefit of the provisions of this Agreement expressed to be conferred on or given to the Joint Administrators and enforcing the obligations of certain other Parties to this Agreement.

### 8.6 Joint Liquidators

(a) The Parties agree that the Joint Liquidators have negotiated and are entering into this Agreement as agents for the EMEA Liquidation Debtors to which they are appointed and that none of the Joint Liquidators, their respective firms, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Party to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations.

(b) The Joint Liquidators are a Party to this Agreement:

(i) as agents of the respective EMEA Liquidation Debtors of which they are liquidators; and

A

(ii) in their own capacities solely for obtaining the benefit of the provisions of this Agreement expressed to be conferred on or given to the Joint Liquidators and enforcing the obligations of certain other Parties to this Agreement.

8.7 **Several Obligations**

Except as specifically set forth in this Agreement, the obligations of each Party hereunder are several, and not joint and several.

8.8 **Binding; Successors and Assigns**

Except as otherwise expressly provided in this Agreement, all representations, warranties, covenants and agreements set forth in this Agreement by or on behalf of the Parties hereto will be binding upon and inure to the benefit of such Parties and their respective successors and permitted assigns, including, without limitation, any administrator, liquidator, trustee, receiver appointed as a successor or assign of any Party.

8.9 **Specific Performance**

The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. Accordingly, in addition to any other remedies to which the Parties are entitled at law or in equity, each of the Parties shall be entitled to equitable relief to prevent or remedy breaches of this Agreement, without the proof of actual damages, including in the form of an injunction or injunctions or orders for specific performance in respect of such breaches.

8.10 **Entire Agreement**

(a) This Agreement constitutes the entire understanding and agreement between the signatories hereto in relation to the subject matter of this Agreement.

(b) Each Party acknowledges that it has not entered into this Agreement in reliance wholly or partly on any representation or warranty made by or on behalf of the other Party (whether orally or in writing) other than as expressly set out in this Agreement.

(c) The settlements contained in this Agreement are integrated and mutually dependent. In the event that any provision herein shall be illegal, invalid, or unenforceable, the entire Agreement shall be rendered null and void.

A

**8.11 Consent of the Creditors' Committee**

Consistent with Section 12(g)(i) of the Interim Funding and Settlement Agreement, dated June 9, 2009 among certain of the Parties, the US Debtors acknowledge that they have consulted with the Creditors' Committee and obtained its consent prior to entering into this Agreement, which consent is evidenced by the signature of the Creditors' Committee below.

**[SIGNATURE PAGES FOLLOW]**