**<u>EXHIBIT 46</u>**

(Part 1 of 2)

EXHIBIT

181

exhibitsticker.com

In the Matter Of:

# Nortel Trial

## DAY 22
## September 22, 2014



neesons

**WILCOX & FETZER LTD.**
FOR EXCELLENCE IN COURT REPORTING

```
1                UNITED STATES BANKRUPTCY COURT

2                  FOR THE DISTRICT OF DELAWARE

3        ----------------------------)

4        In Re                        )

5           NORTEL NETWORKS INC.,     ) Chapter 11

6             et al,                  ) Case No.

7                  Debtors.           ) 09-10138(KG)

8        ----------------------------)

9                        - and -

10               Court File No. 09-CL-7950

11                       ONTARIO

12               SUPERIOR COURT OF JUSTICE

13                  (COMMERCIAL LIST)

14         IN THE MATTER OF THE COMPANIES' CREDITORS

15     ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

16      AND IN THE MATTER OF A PLAN OF COMPROMISE OR

17       ARRANGEMENT OF NORTEL NETWORKS CORPORATION,

18     NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL

19       CORPORATION, NORTEL NETWORKS INTERNATIONAL

20       CORPORATION AND NORTEL NETWORKS TECHNOLOGY

21                     CORPORATION

22       APPLICATION UNDER PART IV OF THE COMPANIES'

23     CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36,

24                    AS AMENDED

25                     --------
```

```
 1
 2                              --------
 3
 4   --- This is the Day 22/Volume 22 of the transcript
 5   of proceedings in the above matter held
 6   simultaneously in:
 7   Superior Court of        United States Bankruptcy
 8   Ontario (Commercial      Court for the District of
 9   List)                    Delaware
10   Courtroom 8-1            Courtroom 3
11   330 University Avenue    824 Market Street
12   Toronto, Ontario         Wilmington, Delaware
13
14   on the 22nd day of September, 2014, commencing at
15   9:11 a.m.
16
17                              --------
18   B E F O R E:
19   The Honourable Judge Kevin Gross (United States)
20   The Honourable Mr. Justice Frank Newbould (Canada)
21
22                            ----------
23
24
25
```

```
 1    REPORTED BY:   Toronto - Deana Santedicola

 2                   RPR, CRR, CSR

 3              Delaware - Lorraine Marino

 4                   RDR, CRR, CSR

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    A P P E A R A N C E S:

 2

 3                    CANADIAN DEBTORS

 4

 5    FOR THE MONITOR, ERNST & YOUNG INC.

 6    GOODMANS LLP

 7    Bay Adelaide Centre

 8    333 Bay Street, Suite 3400

 9    Toronto, ON  M5H 2S7

10    PER:       Jay Carfagnini, Esq.

11               Joseph Pasquariello, Esq.

12               Ben Zarnett, Esq.

13               Alan Mark, Esq.

14               Peter Ruby, Esq.

15               Jessica Kimmel, Esq.

16               Julie Rosenthal, Esq.

17               Chris Armstrong, Esq.

18

19    ERNST & YOUNG INC.

20    Ernst & Young Tower

21    222 Bay Street, P.O. Box 251

22    Toronto, ON  M5K 1J7

23    PER:       Murray McDonald, Esq.

24               Brent Beekenkamp, Esq.

25
```

```
1    FOR THE APPLICANTS
2    GOWLING LAFLEUR HENDERSON LLP
3    Suite 1600, First Canadian Place
4    100 King Street West
5    Toronto, ON  M5X 1G5
6    PER:       Derrick Tay, Esq.
7               Jennifer Stam, Esq.
8
9    FOR THE CANADIAN DEBTORS
10   ALLEN & OVERY LLP
11   1221 Avenue of the Americas
12   New York, NY  10020
13   PER:       Jacob Pultman, Esq.
14              Ken Coleman, Esq.
15              Paul Keller, Esq.
16              Daniel Guyder, Esq.
17              Laura Hall, Esq.
18              Joseph Badtke-Berkow, Esq.
19              Jonathan Cho, Esq.
20              Nicolette Ward, Esq.
21
22   FOR THE CANADIAN DEBTORS
23   BUCHANAN INGERSOLL & ROONEY
24   1105 North Market Street
25   Suite 1900
```

```
 1   Wilmington, DE   19801-1054
 2   PER:         Kathleen A. Murphy, Esq.
 3                Mary F. Caloway, Esq.
 4
 5                         U.S. DEBTORS
 6
 7   FOR NORTEL NETWORKS INC.
 8   TORYS LLP
 9   79 Wellington Street West, Suite 3000
10   Box 270, TD Centre
11   Toronto, ON   M5K 1N2
12   PER:         Sheila Block, Esq.
13                Andrew Gray, Esq.
14
15   FOR THE U.S. DEBTORS
16   MORRIS, NICHOLS, ARSHT & TUNNELL LLP
17   1201 North Market Street, 16th Floor
18   P.O. Box 1347
19   Wilmington, DE   19899-1347
20   PER:         Derek Abbott, Esq.
21                Annie Cordo, Esq.
22
23   FOR NORTEL NETWORKS INC.
24   CLEARY GOTTLIEB STEEN & HAMILTON LLP
25   One Liberty Plaza
```

```
 1   New York, NY   10006
 2   PER:        James Bromley, Esq.
 3               Lisa Schweitzer, Esq.
 4               Howard Zelbo, Esq.
 5               Jeffrey Rosenthal, Esq.
 6               Avi Luft, Esq.
 7
 8                    EMEA DEBTORS
 9
10   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK
11   LIMITED
12   DAVIES WARD PHILLIPS & VINEBERG LLP
13   40th Floor
14   155 Wellington Street
15   Toronto, ON   M5V 3G7
16   PER:        Matthew Milne-Smith, Esq.
17               Robin B. Schwill, Esq.
18               Sean Campbell, Esq.
19               James Doris, Esq.
20               Louis Sarabia, Esq.
21
22   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK
23   LIMITED
24   LAX O'SULLIVAN SCOTT LISUS LLP
25   Suite 2750, 145 King Street West
```

```
 1   Toronto, ON  M5H 1J8
 2   PER:        Matthew P. Gottlieb, Esq.
 3               Tracy Wynne, Esq.
 4               Paul Michell, Esq.
 5   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK
 6   LIMITED
 7   HUGHES HUBBARD & REED
 8   One Battery Park Plaza
 9   New York, NY  10004-1482
10   PER:        Derek Adler, Esq.
11               Neil Oxford, Esq.
12               Fara Tabatabai, Esq.
13               Charles Huberty, Esq.
14
15   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK
16   LIMITED
17   YOUNG CONAWAY STARGATT & TAYLOR LLP
18   Rodney Square
19   1000 North King Street
20   Wilmington, DE  19801
21   PER:        Ed Harron, Esq.
22               John Dorsey, Esq.
23
24   FOR THE EMEA DEBTORS
25   HERBERT SMITH FREEHILLS LLP
```

```
 1   Exchange House
 2   Primrose Street
 3   London, England  EC2A 2EG
 4   PER:       James Norris-Jones, Esq.
 5              CANADIAN CREDITORS COMMITTEE
 6
 7   FOR THE FORMER EMPLOYEES OF NORTEL AND LTD
 8   BENEFICIARIES
 9   KOSKIE MINSKY
10   20 Queen Street West
11   Suite 900
12   Toronto, ON  M5H 3R3
13   PER:       Mark Zigler, Esq.
14              Susan Philpott, Esq.
15              Ari Kaplan, Esq.
16              Barbara Walancik, Esq.
17
18   FOR ALL ACTIVE AND RETIRED NORTEL EMPLOYEES
19   REPRESENTED BY THE CAW-CANADA
20   CAW-CANADA
21   Legal Department
22   205 Placer Court
23   Toronto, ON  M2H 3H9
24   PER:       Barry E. Wadsworth, Esq.
25              Lewis Gottheil, Esq.
```

```
 1
 2    FOR THE RECENTLY SEVERED CANADIAN NORTEL EMPLOYEES
 3    COMMITTEE
 4    SHIBLEY RIGHTON LLP
 5    250 University Avenue, Suite 700
 6    Toronto, ON  M5H 3E5
 7    PER:       Arthur O. Jacques, Esq.
 8               Thomas McRae, Esq.
 9
10    FOR THE SUPERINTENDENT OF FINANCIAL SERVICES AS
11    ADMINISTRATOR OF THE PENSION BENEFITS GUARANTEE
12    FUND
13    PALIARE ROLAND ROSENBERG ROTHSTEIN LLP
14    35th Floor
15    155 Wellington Street West
16    Toronto, ON  M5V 3H1
17    PER:       Kenneth T. Rosenberg, Esq.
18               Massimo (Max) Starnino, Esq.
19               Lily Harmer, Esq.
20               Karen Jones, Esq.
21               Tina Lie, Esq.
22               Michelle Jackson, Esq.
23
24    FOR THE STEERING COMMITTEE OF NORTEL CANADIAN
25    CONTINUING EMPLOYEES - POST CCAA AS AT JANUARY 14,
```

```
 1   2009
 2   NELLIGAN O'BRIEN PAYNE LLP
 3   50 O'Connor Street, Suite 1500
 4   Ottawa, ON   K1P 6L2
 5   PER:        Janice B. Payne, Esq.
 6               Steven Levitt, Esq.
 7               Christopher Rootham, Esq.
 8               Ainslie Benedict, Esq.
 9
10   FOR MORNEAU SHEPELL LIMITED
11   MCCARTHY TETRAULT LLP
12   Suite 5300, Toronto Dominion Bank Tower
13   Toronto, ON   M5K 1E6
14   PER:        Barbara J. Boake, Esq.
15               James D. Gage, Esq.
16               Elder C. Marques, Esq.
17               Paul Steep, Esq.
18               Byron Shaw, Esq.
19               Sharon Kour, Esq.
20               Kelly Peters, Esq.
21
22   FOR THE CANADIAN CREDITORS COMMITTEE
23   DLA PIPER
24   919 North Market Street, Suite 1500
25   Wilmington, DE   19801
```

```
1   PER:        Selinda A. Melnik, Esq.
2               Richard Hans, Esq.
3               Timothy Hoeffner, Esq.
4               Farah Lisa Whitley-Sebti, Esq.
5               INFORMAL NORTEL NOTEHOLDER GROUP
6
7   FOR THE INFORMAL NORTEL NOTEHOLDER GROUP
8   BENNETT JONES LLP
9   1 First Canadian Place
10  Suite 3400
11  Toronto, ON  M5X 1A4
12  PER:        Kevin Zych, Esq.
13              S. Richard Orzy, Esq.
14              Gavin Finlayson, Esq.
15              Richard Swan, Esq.
16              Sean Zweig, Esq.
17              Jonathan Bell, Esq.
18              Amanda McLachlan, Esq.
19
20  FOR THE INFORMAL NORTEL NOTEHOLDER GROUP
21  MILBANK, TWEED, HADLEY, MCCLOY LLP
22  1 Chase Manhattan Plaza
23  New York, NY  10005
24  PER:        Thomas R. Kreller, Esq.
25              Jennifer P. Harris, Esq.
```

```
 1                    Albert A. Pisa, Esq.

 2                    Samir Vora, Esq.

 3                    Andrew LeBlanc, Esq.

 4                    Michael Hirschfeld, Esq.

 5                    Atara Miller, Esq.

 6                    Tom Matz, Esq.

 7                    Nick Bassett, Esq.

 8                    Gabrielle Ruha, Esq.

 9                    Rachel Pojunas, Esq.

10

11        THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

12

13   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

14   CASSELS BROCK & BLACKWELL LLP

15   Suite 2100, Scotia Plaza

16   40 King Street West

17   Toronto, ON  M5H 3C2

18   PER:      Shayne Kukulowicz, Esq.

19             Michael Wunder, Esq.

20             Ryan Jacobs, Esq.

21

22   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

23   ASHURST LLP

24   Boardwalk House

25   5 Appold Street
```

```
 1   London, England  EC2A 2HA
 2   PER:        Angela Pearson, Esq.
 3               Antonia Croke, Esq.
 4
 5   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
 6   RICHARDS LAYTON & FINGER, P.A.
 7   920 North King Street
 8   Wilmington, DE  19801
 9   PER:        Christopher Samis, Esq.
10
11   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
12   AKIN GUMP STRAUSS HAUER & FELD LLP
13   One Bryant Park
14   New York, NY  10036
15   PER:        Fred S. Hodara, Esq.
16               David H. Botter, Esq.
17               Abid Qureshi, Esq.
18               Robert A. Johnson, Esq.
19               Brad M. Kahn, Esq.
20               Christine Doniak, Esq.
21               Joseph Sorkin, Esq.
22               Jacqueline Yecies, Esq.
23
24      UK PENSION PROTECTION FUND AND NORTEL NETWORKS
25               UK PENSION TRUST LIMITED
```

```
 1
 2    FOR THE UK PENSION PROTECTION FUND AND NORTEL
 3    NETWORKS UK PENSION TRUST LIMITED
 4    THORNTON GROUT FINNIGAN LLP
 5    Suite 3200, 100 Wellington Street West
 6    P.O. Box 329
 7    Toronto, ON  M5K 1K7
 8    PER:        Michael Barrack, Esq.
 9                D.J. Miller, Esq.
10                Rebecca Lewis, Esq.
11                Andrea McEwan, Esq.
12                John Finnigan, Esq.
13                Michael Shakra, Esq.
14
15    FOR THE UK PENSION PROTECTION FUND AND NORTEL
16    NETWORKS UK PENSION TRUST LIMITED
17    WILLKIE FARR & GALLAGHER LLP
18    787 Seventh Avenue
19    New York, NY  10019-6099
20    PER:        Brian O'Connor, Esq.
21                Sameer Advani, Esq.
22                Andrew Hanrahan, Esq.
23
24    FOR THE UK PENSION PROTECTION FUND AND NORTEL
25    NETWORKS UK PENSION TRUST LIMITED
```

```
 1   BAYARD, P.A.
 2   222 Delaware Avenue, Suite 900
 3   Wilmington, DE   19899
 4
 5   PER:        Charlene D. Davis, Esq.
 6               Justin Alberto, Esq.
 7
 8               THE BANK OF NEW YORK MELLON
 9
10   FOR THE BANK OF NEW YORK MELLON
11   MCMILLAN LLP
12   Brookfield Place
13   181 Bay Street, Suite 4400
14   Toronto, ON   M5J 2T3
15   PER:        Sheryl E. Seigel, Esq.
16
17   FOR THE BANK OF NEW YORK MELLON
18   LATHAM & WATKINS LLP
19   885 Third Avenue
20   New York, NY   10022-4834
21   PER:        Michael J. Riela, Esq.
22
23               WILMINGTON TRUST, NATIONAL ASSOCIATION
24
25   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION
```

```
 1   HEENAN BLAIKIE LLP
 2   Bay Adelaide Centre
 3   333 Bay Street, Suite 2900
 4   P.O. Box 2900
 5   Toronto, ON  M5H 2T4
 6   PER:      John Salmas, Esq.
 7             Kenneth Kraft, Esq.
 8             Sara-Ann Van Allen, Esq.
 9
10   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION
11   KATTEN MUCHIN ROSENMAN LLP
12   575 Madison Avenue
13   New York, NY  10022-2585
14   PER:      Craig A. Barbarosh, Esq.
15             David A. Crichlow, Esq.
16             Karen B. Dine, Esq.
17
18        LAW DEBENTURE TRUST COMPANY OF NEW YORK
19
20   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK
21   BORDEN LADNER GERVAIS LLP
22   40 King Street West
23   Toronto, ON  M5H 3Y4
24   PER:      Edmond F.B. Lamek, Esq.
25             James Szumski, Esq.
```

```
1
2    FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK
3    PATTERSON BELKNAP WEBB & TYLER LLP
4    1133 Avenue of the Americas
5    New York, NY  10036
6    PER:        Daniel A. Lowenthal, Esq.
7
8         BOARDS OF DIRECTORS OF NORTEL NETWORKS
9         CORPORATION AND NORTEL NETWORKS LIMITED
10
11   FOR THE BOARDS OF DIRECTORS OF NORTEL NETWORKS
12   CORPORATION AND NORTEL NETWORKS LIMITED
13   OSLER HOSKIN AND HARCOURT LLP
14   100 King Street West
15   1 First Canadian Place, Suite 6100
16   P.O. Box 50
17   Toronto, ON  M5X 1B8
18   PER:        Lyndon Barnes, Esq.
19               Edward Sellers, Esq.
20               Betsy Putnam, Esq.
21               Adam Hirsh, Esq.
22               Alexander Cobb, Esq.
23
24
25
```

```
 1                        I N D E X

 2

 3    CLOSING SUBMISSIONS:                      PAGE

 4

 5    BY MR. ZARNETT.......................... 5149

 6    BY MR. COLEMAN.......................... 5211

 7    BY MR. ZIGLER........................... 5224

 8    BY MR. HOEFFNER......................... 5239

 9    BY MR. CRICHLOW......................... 5267

10    BY MR. MAGUIRE.......................... 5278

11    BY MR. GOTTLIEB......................... 5296

12    BY MR. MAGUIRE.......................... 5358

13    BY MR. BARRACK.......................... 5380

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1    -- Upon commencing at 9:11 a.m.

2

3              THE US COURT:   Justice Newbould, we're

4    back.

5              THE CANADIAN COURT:   I am back.   Good

6    morning, Judge Gross.

7              THE US COURT:   Good morning, it is good

8    to see you again.   Mr. Abbott.

9              MR. ABBOTT:   Good morning, Your Honour.

10   It is almost like we never left.

11             THE US COURT:   Almost.   I'll tell you,

12   I lost 14 pounds during the trial, and gained five

13   of them back by reading all these briefs.

14             THE CANADIAN COURT:   They didn't take

15   away your appetite?

16             THE US COURT:   No, it didn't.

17             MR. ABBOTT:   Your Honour, I think we

18   are prepared to proceed, but I believe we are going

19   to proceed first in Canada.   So we'll pay attention

20   to what the folks do up there.

21             THE CANADIAN COURT:   Mr. Zarnett.

22             MR. ZARNETT:   Good morning, Judge

23   Gross, Justice Newbould.   Benjamin Zarnett for the

24   Monitor and Canadian Debtors.

25             I'm going to be leading off the
```

1    submissions this morning.  When I am done, my

2    colleague, Mr. Coleman, will have some submissions

3    in Delaware, on the issues arising from the

4    assertions about the Monitor's conduct.

5              But the focus of my submissions, given

6    the extensive written briefings that the Courts

7    both have, is going to be on the key legal

8    determinations that, in my submission, have to be

9    made to decide between the competing positions of

10   the Canadian, US and EMEA estates and the

11   implications of those determinations on the major

12   issues.

13             What you should have, to follow my

14   submission, are the initial and rebuttal briefs

15   that the Monitor has filed, your favourite version

16   of the MRDA, the most well-thumbed version.

17             THE US COURT:  I decided, by the way,

18   that stands for major reason for the dispute on

19   allocation.

20             MR. ZARNETT:  Yes.  Well, confirming

21   the centrality of that document, I also have

22   prepared and both Courts should have a compendium

23   of the authorities I'm going to refer to.  These

24   are not new authorities, but since there is a lot

25   less than in the large case books, I thought it

```
 1    would be easier to proceed that way.
 2               And that should be it.  We may call up
 3    a couple of --
 4               THE CANADIAN COURT:  Aren't you
 5    concerned I have already read all these three
 6    volumes?
 7               MR. ZARNETT:  Yes.
 8               To put the legal submission in context,
 9    the three competing characterizations of the
10    relevant interests and the most important asset
11    that affects allocation, the IP, I think can be
12    summarized as follows.
13               The Canadian position is NNL owned the
14    IP and the MRDA so provided.  The Canadian position
15    goes on.  NNI and the relevant EMEA Debtors, NNUK,
16    NN Ireland, NN France, which I'll just call the
17    EMEA Debtors for the rest of my submission, they
18    had licence rights granted to them by NNL pursuant
19    to the MRDA.
20               The Canadian position goes on.  The
21    licence rights were not unlimited.  They were
22    subject to a field of use or scope restriction,
23    were not transferable, and there were costs
24    associated with exercising the rights and deriving
25    the benefits under them.
```

```
 1                   And all those matters have to be taken
 2     into account to arrive at the value of those
 3     licence rights when they were surrendered.
 4                   Now, the US position is different.  It
 5     says that each, as they call them, IE, integrated
 6     entity, but the same NNL, NNI and the EMEA Debtors,
 7     they all held all of the rights to the IP in their
 8     respective exclusive territories; in other words,
 9     NNI had all the rights and all the value of Nortel
10     IP in its exclusive territory, the US.
11                   And that, they say, is beneficial
12     ownership of the IP in each territory.
13                   They go on, they say the right or the
14     beneficial ownership was subject to no scope or
15     field of use restriction.  All means all, no
16     exception.  And they say the value of the rights is
17     to be measured for these purposes without
18     consideration of the costs such as RPSM sharing
19     provided in the MRDA, primarily, therefore, by
20     revenue.
21                   And all that leads them to say that
22     except in Canada, NNL's legal title was bare or
23     nominal, valueless on its own.
24                   That is my encapsulation of their
25     position.
```

```
 1              Now, EMEA has a third position, which
 2  is also quite different.  They say that the IP was
 3  jointly owned by all of the entities we have been
 4  talking about in all of the territories.  In other
 5  words, in the US the owners were NNI, NNL, the EMEA
 6  Debtors, they jointly owned it.  They say the joint
 7  ownership is not created by the MRDA or affected by
 8  it.
 9              And they say except for the joint
10  ownership, NNL's title to the IP was bare, nominal,
11  valueless, and they say the proportions of
12  ownership, and therefore what has to be decided to
13  determine who gets what from the sale, is relative
14  contribution to R&D, but not according to the
15  methodology that the MRDA sets out.
16              So those are the competing positions,
17  and I say that gives rise to four essential issues
18  that the Courts will have to determine.
19              First, what is the nature of NNL's
20  interest in the IP?  Are we the owner?  Subject to
21  licenses, are we the owner, or is it that bare,
22  valueless legal title?
23              Second, what is the nature, critically,
24  what is the nature and what is the extent of the
25  NNI and EMEA interest in the IP?  Is it a licence
```

1   with restrictions?  Is it unrestricted?  Is it
2   ownership?
3              Third, can there be a theory of joint
4   ownership measured by relative contribution outside
5   and independent of the MRDA.  Is that a legally
6   permissible theory?
7              And then fourth, how do the other MRDA
8   terms, RPSM sharing, affect the value of the NNI
9   and EMEA Debtors' rights?
10             And those are all determinations which,
11  in my submission, are affected specifically by some
12  legal doctrine which I'm going to spend the
13  majority of my time on.
14             So the first proposition that I ask the
15  Courts to accept is that the MRDA, properly
16  interpreted, means NNL is the owner of the
17  intellectual property, with the corresponding
18  implication that the US and EMEA are wrong when
19  they say that NNL held bare, valueless legal title,
20  and they are wrong about beneficial and joint
21  beneficial ownership.
22             Now, it will be emblazoned in Your
23  Honours' minds the first recital of the MRDA at
24  Article 4(a) that speak of legal title, legal title
25  to NN Technology being held in the name of NNL, and

1    the words of Article 4(a) begin by saying:

2                    "Except as otherwise expressly

3                agreed, legal title to any and all

4                NN Technology shall be vested in

5                NNL".

6                    Now, the debate in part revolves around

7    the words "legal title".

8                    And I say as a general matter and in

9    the absence of the creation of a separate

10   beneficial title, legal title means ownership.

11   That is my proposition which I'm going to

12   demonstrate for you.

13                   I say that's true because we start with

14   title.  Title and ownership are not only equivalent

15   but they connote a legal arrangement, so the term

16   "legal", although it is sometimes used in

17   contra-distinction to beneficial, it often, most

18   often, is used to mean rightful, that which a Court

19   will recognize, et cetera.

20                   So if you take the first tab of the

21   compendium of authorities and take a look at

22   Black's Law Dictionary, some definitions, which is

23   a good place to start, but obviously not a place to

24   end.

25                   THE CANADIAN COURT:  I'm not sure that

```
 1   I have got that compendium.
 2              THE US COURT:  Incidentally, Mr.
 3   Zarnett, I am correct, am I not, that Ottawa law
 4   governs the MRDA?
 5              MR. ZARNETT:  Ontario law, yes.
 6              THE US COURT:  Ontario law, yes,
 7   forgive me.
 8              MR. ZARNETT:  Yes, it applies sometimes
 9   in Ottawa.
10              THE CANADIAN COURT:  You don't want to
11   get into Ottawa law, Judge Gross.
12              THE US COURT:  All right, thank you,
13   thank you for the warning.
14              MR. ZARNETT:  Justice Newbould, it
15   should be labelled "Case Book for Closing
16   Argument".
17              THE CANADIAN COURT:  I have it.
18              MR. ZARNETT:  If you go to the first
19   tab, the first definition I wanted to take you to
20   is the definition of "title" which is over on the
21   second or third page and it defines title as being:
22                   "The union of all elements (as
23                   ownership, possession, and custody)
24                   constituting the legal right to
25                   control and dispose of property, the
```

```
 1                    legal link between the person who
 2                    owns the property and the property
 3                    itself".
 4               So you see the word "legal" immediately
 5     as part of the idea of ownership and title.
 6               And then if you go back to the first
 7     page, to the word "own", you'll see that "own" is
 8     defined as:
 9                    "To rightfully have or possess
10                    as property".
11               And then:
12                    "To have legal title".
13               So legal title and own, according to
14     Black's, are in that sense equivalent.
15               And if you go over to the definition of
16     "vest", which is the last highlighted definition in
17     this excerpt, you will see that the word "vest",
18     which is what the MRDA uses when it talks about
19     giving legal title, it says:
20                    "Vest is to confer ownership on
21                    a person".
22               That is one of the definitions and that
23     is the word they used, a word commonly associated
24     with the transfer or conferring of ownership.
25               Now, what that means is that we can
```

1    talk sensibly of legal title as ownership without

2    really confusing anyone, and that is evidenced if

3    you go to the second tab from the excerpt from a

4    book called Falconbridge on Mortgages with

5    Falconbridge being one of the great legal scholars

6    in Ontario history.

7                And this excerpt and the reason that I

8    use it is this excerpt talks about the common law

9    effect of granting a mortgage and what it describes

10   is that, before some statutory changes in Ontario,

11   the granting of a mortgage conveyed legal title to

12   the mortgagee on the condition that the mortgage

13   was not paid.  If it was paid, that was it for the

14   legal title.  If it was not paid, and you'll see

15   this at the bottom of the first page of this

16   excerpt, if it wasn't paid, the mortgagee could

17   retain ownership of the property.  You'll see that

18   in the second-last line of the excerpt.

19                So the mortgagee gets legal title.  If

20   it keeps legal title, it has ownership.

21                And the excerpt goes on to explain the

22   right of redemption and how equity supported the

23   right of redemption by giving time to repay, but

24   the excerpt goes on to describe that the reason

25   that the mortgagee could have possession of the

1    property was because it had legal title and
2    possession was one of the indices of ownership.
3    You'll see that in the excerpt on page 22-2, about
4    in the middle of the page.
5              So you'll see the equivalence, in this
6    scholarly work, of the words "legal title" and
7    "ownership". If you have legal title, you can have
8    possession to property because you have ownership.
9              So that is why the transfer of legal
10   title can mean the transfer of ownership, and there
11   is no difficulty in generally equating the two.
12             So what that illustrates, I say, is
13   that absent the separate creation of legal and
14   equitable title, and equitable title has to be
15   separately created, the word "legal title" refers
16   to all rights in the property.
17             And that is authoritatively described
18   in a House of Lords decision you'll see at tab 3 of
19   this case book, Westdeutsche Landesbank et cetera,
20   which I will refer to as the German bank.  I know
21   I'm going out on a bit of a limb there.
22             But this was a case where the bank had
23   advanced money to a local authority, the great
24   English arrangement, a local authority which turned
25   out didn't have the power to enter into the

```
 1   transaction, and the bank, when the bank got the
 2   money back, they wanted it with compound interest
 3   which required them to establish certain rights to
 4   compound interest, including that the money had
 5   been deprived to them by a fiduciary.
 6                Now, in the course of the decision, if
 7   you go over to page 706, one of the ways that the
 8   bank was arguing that this money had gotten into
 9   the hands of someone who had a fiduciary duty to
10   them, was to say, well, our intention was to
11   transfer ownership only to someone who actually had
12   the power to create and enter into this transaction
13   with us.
14                And because they didn't, all we
15   actually gave them, when we gave them the money,
16   was our legal title, but we kept our beneficial
17   title.  It was always our money, even though it got
18   into their hands.
19                And on page 706, you will see Lord
20   Brown Wilkinson deals with that around line E by
21   saying:
22                      "I think this argument is
23                fallacious.  A person solely
24                entitled to the full beneficial
25                ownership of money or property, both
```

```
 1                at law and in equity, does not enjoy
 2                an equitable interest in that
 3                property.  The legal title carries
 4                with it all rights."
 5                     "The legal title carries with it
 6                all rights.  Unless and until there
 7                is a separation of the legal and
 8                equitable estates, there is no
 9                separate equitable title.
10                Therefore, to talk about the bank
11                retaining its equitable interest is
12                meaningless.  The only question is
13                whether the circumstances under
14                which the money was paid were such
15                as, in equity, to impose a trust on
16                the local authority.  If so, an
17                equitable interest arose for the
18                first time under that trust."
19                     So words "legal interest" or legal
20      title, or I give you legal title or I transfer
21      legal title means I transfer everything to you, I
22      vest everything in you, unless here the US Debtors
23      and EMEA Debtors could show the creation of a
24      separate beneficial or equitable interest.
25                     It is not enough for them to say, well,
```

1   it just legal title; there must be beneficial title

2   somewhere else.  The House of Lords decision I was

3   going to say scotches that idea, but maybe I should

4   say it rejects that idea.

5          THE US COURT:  Mr. Zarnett, if I may

6   just interrupt for a moment.

7          MR. ZARNETT:  Sure.

8          THE US COURT:  But the MRDA itself

9   provides that each Licensed Participant held and

10   enjoyed equitable and beneficial ownership.

11          MR. ZARNETT:  I'm going to come to

12   that.  I'm going to come to the terms of the MRDA

13   and address why there is no creation -- that

14   particular recital talks about, I say, ownership of

15   licence rights when you read the whole recital and

16   it is reference to an earlier agreement that

17   created licence rights.

18          THE US COURT:  All right, thank you.

19   I'm going to withhold my questions really I think

20   until the end.  I have a number of questions of

21   course, and others will arise, and Justice Newbould

22   will ask and probably prompt others.

23          But I don't want to interrupt your

24   argument any further.

25          MR. ZARNETT:  That is fine, Judge

1   Gross.  I only say that that is exactly the right
2   question, and that is, does the MRDA say they have
3   or does it create that separate title.
4               So that is the sense that Black's Law
5   Dictionary, if we visit it one more time back at
6   tab 1, that is the sense that Black's Law
7   Dictionary must mean when speaking of legal title,
8   which you will see on the second-last page of the
9   excerpt.  It says:
10                      "A title that evidences
11                  apparent ownership but does not
12                  necessarily signify full and
13                  complete title or a beneficial
14                  interest."
15              Does not necessarily signify it.  It
16  can signify, and it will signify it unless there is
17  a separate beneficial or equitable interest.
18              So that is, therefore, the nature of
19  the inquiry.
20              Now, none of this, none of what I have
21  said is affected by two cases that are cited, which
22  I want to deal with quite briefly.
23              One is the decision which is found at
24  tab 4 of the authorities book, the Francey case,
25  Francey v. Wawanesa Insurance, and the other is a

1   decision actually of Justice Newbould in the

2   Computershare case at tab 5.

3               So let me deal first with the Francey

4   case.   This is a case, was a claim on an insurance

5   policy.   There had been a theft of a motor home.

6   The plaintiff had given it to someone to sell for

7   her and he turned out to be a fraudster and

8   absconded with it.   The insurer tried to rely on an

9   exclusion in the insurance policy about

10  transferring title or ownership.   They said if you

11  transfer ownership or title voluntarily, then you

12  don't have coverage.

13              And the Court there, after looking at

14  the Black's Law Dictionary definitions, at least

15  some of them that we have discussed this morning,

16  said, well, that exclusion would be triggered by a

17  transfer of legal title or equitable title but

18  neither happened here, so the exclusion doesn't

19  apply.

20              The case didn't decide how you get a

21  separation of legal and equitable title, and it

22  didn't decide what the words "legal title" mean if

23  no equitable title exists.

24              And I have something similar to say

25  about a very different fact pattern in the

1   Computershare case, which is at tab 5.

2                   That was a case about a triggering

3   event in a bond, something that would be triggered

4   by a change of ownership, clause prohibited, it is

5   at page 32 of the decision, clause prohibited a

6   change of -- or ascribe consequences to a change of

7   control that meant a transaction as a result of

8   which the corporation ceased to beneficially own a

9   majority interest in a certain project.

10                  And the Court, in dealing with that,

11  said, well, of course, that clause would only be

12  triggered by a change in beneficial title; it

13  wouldn't be triggered if legal title was changed

14  but beneficial title was not, but the Court then

15  went on to hold that no change had occurred.

16                  So the Court didn't have to determine

17  whether any separate beneficial title was created

18  and what the effect of legal title is when there is

19  no separate beneficial title.

20                  So I say, against that legal backdrop,

21  we move to the question that is raised by Judge

22  Gross's question, which is what happens under the

23  MRDA.

24                  Now, in Article 4(a) of the MRDA, I say

25  the first thing that happens is something that is

```
 1   inconsistent with the idea that there is a separate
 2   beneficial interest, because Article 4(a)
 3   immediately after vesting legal title contemplates
 4   NNL in consideration for that agreeing to grant a
 5   licence.
 6                And in Article 5, it then goes on to
 7   grant a licence.
 8                So in the place where you would first
 9   expect the reservation of beneficial title, I give
10   you legal title for you to hold on my behalf as
11   beneficial owner, we see quite a different
12   transaction contemplated, which is legal title is
13   vested and a licence transaction is going to be
14   undertaken and is undertaken.  Now --
15                THE CANADIAN COURT:  Is your point that
16   you would expect, on your argument, you would
17   expect to see vesting of legal title in NNL except
18   for the beneficial title which is held by the IEs,
19   is that what your argument is?
20                MR. ZARNETT:  Yes.
21                THE CANADIAN COURT:  Is what you would
22   expect to see if they are right?
23                MR. ZARNETT:  If they are right, that
24   is what you would expect to see.
25                Now, instead what you see is, as I
```

1    said, the grant of a licence, but the grant of a

2    licence itself has an important implication for

3    this particular argument because the grant of a

4    licence implies ownership in the grantor, and that

5    is because of the way our law characterizes what a

6    licence is.

7               And if I could take you to tab 6 of the

8    authorities brief to the Eli Lilly case, the

9    Supreme Court of Canada, if you go over to

10   paragraph 49 of this decision, the Court begins by

11   adopting a quote from a text which includes the

12   statement which is in part of the underlined

13   portion of:

14                    "A licence prevents that from

15                being unlawful which, but for the

16                licence, would be unlawful; it is a

17                consent by an owner of a right

18                [...]"

19              And then if you go on to what the

20   Supreme Court's own words are, they say:

21                    "In other words, by the grant

22                of a licence, the patentee grants to

23                the licensee the right to act in a

24                certain way vis-à-vis the patented

25                article, a right which, but for the

1                    licence, the licensee would not

2                    enjoy.  The licensee's rights,

3                    however, are not necessarily

4                    equivalent to those of the patentee;

5                    rather, they are limited to, and

6                    qualified by, the express terms of

7                    the licence."

8              Now, all that is inconsistent with a

9    kind of transaction where the legal title of a

10   nominal valueless type is being put into NNL

11   because, if we follow the Supreme Court's words, a

12   right is being granted to act in a certain way but

13   the beneficial owners would have had that right in

14   the first place.

15             And then the rights granted by a

16   licence are not necessarily equivalent to the

17   patentee, so greater rights are in the owner than

18   in the licence holder if the rights are limited or

19   qualified by the terms of the licence, which is a

20   very unusual transaction and one that really

21   doesn't make any sense if the real owner, the

22   beneficial owner, is just putting nominal title in

23   someone else's name.

24             Now --

25             THE CANADIAN COURT:  Well, I mean, I

1  don't know which argument you are dealing with, but

2  this argument I assume is partly in answer to the

3  EMEA position?

4             MR. ZARNETT:  Yes.

5             THE CANADIAN COURT:  But isn't the US

6  position somewhat different?  It is just saying

7  that the US position is not so much about the

8  meaning of legal title in itself but rather the

9  effect of the licence and what that does?

10            MR. ZARNETT:  That is the position that

11 -- that is an important plank in the US position,

12 and Your Honour is quite right, that much of this

13 goes to the EMEA position.

14            But I don't think it only affects the

15 EMEA position because the US argument actually

16 interweaves the extent of the licence simply as

17 worded, which I think is certainly a legitimate --

18 is the legitimate plane on which we should be

19 arguing, how broad is that licence as a contractual

20 right, with the idea that legal title was nominal

21 and bare, and this is really beneficial ownership,

22 as a way of evidencing that the licence rights are

23 as broad as they claim them to be.  They are

24 effectively beneficial ownership.

25            So I say that it is important to denude

```
 1    the argument that is put against us of any
 2    beneficial ownership content so that we can get
 3    plainly to how broad is that licence, because I say
 4    that really is the only issue.
 5                Just to complete one point on this, in
 6    a series of cases, both before the Eli Lilly
 7    decision and after, the Supreme Court has remarked
 8    that a licence is not a property interest.  And the
 9    two cases are the Armstrong Cork case at tab 7 and
10    the Euro-Excellence case at tab 8.  I won't bother
11    reading the passages.
12                But it is in connection with a notional
13    transaction that the owner has vested only bare
14    title in NNL and takes back a licence which is not
15    a property interest, in my submission, makes the
16    proposition that is put against us that there is a
17    creation or a maintenance of a separate equitable
18    title, it makes that proposition even more
19    untenable.
20                Now, I think there are a couple of
21    reasons why the argument of the existence of an
22    equitable interest doesn't work.
23                The parties here would want an
24    effective licence.  The licence must come from
25    someone, as the German bank case said, someone with
```

1    all the rights or, as Falconbridge says, all the

2    incidents of ownership, so it has to come from

3    someone who can grant those rights and therefore

4    NNL must have had them.

5              And that was especially important

6    because rights that NNI, for example, were getting

7    to the US were rights that were, in whole or in

8    part, the result of R&D activity that took place in

9    the UK, for example, but NNUK is not granting any

10   licence and never granted a licence.

11             So how did NNI get any rights if

12   nothing was put into the name of NNL that was

13   effective ownership of those rights so that they

14   could be licensed.

15             And of course, that works vice versa,

16   how did NNUK get rights for things developed in the

17   United States.

18             It is not an answer to this to argue,

19   as EMEA does, that Trustees can give mortgages over

20   trust property, one of the positions they put

21   forward.

22             They say NNL isn't a Trustee and it

23   can't be because the agreement disclaims any

24   fiduciary duty, but Article 5(a), when the licence

25   is granted, Article 5(a) of the MRDA says that the

1    licence comes from NNL, to the extent of its legal

2    right.  To the extent of its legal right.

3                    And Article 13 says that no one, no

4    participant has the right to contract on behalf of

5    or bind another.

6                    So these licenses must come from the

7    sole power of NNL, from its rights, not on behalf

8    of anyone else, and that implies it must have had

9    the rights to grant.

10                   Now, let me say one last thing on the

11   operative provisions of the MRDA and why they are

12   inconsistent with the idea that NNL was anything

13   other than the owner.

14                   Everyone says and the MRDA in fact

15   acknowledges in a recital that NNL maintained

16   exclusive rights in Canada.  Where did those rights

17   come from?

18                   On the interpretation that I am

19   advancing, NNL owned it, gave up certain rights by

20   way of licence.  That is a standard licence

21   arrangement.  The owner gives up certain rights.

22   Anything it doesn't give up, it keeps.  So if it

23   didn't give a licence to anyone else from Canada,

24   it had exclusive rights in Canada.

25                   The MRDA doesn't grant any licence to

```
 1    NNL.
 2              But on the idea that all NNL had was,
 3    under Article 4, bare legal title and beneficial
 4    ownership in everything was shared, where did the
 5    exclusive right in Canada come from for NNL?
 6              There is no source for it.
 7              Another reason why that interpretation
 8    can't --
 9              THE CANADIAN COURT:  Well, people can
10    get together and we can say, well, Mr. Zarnett, you
11    own everything or you own these patents, but let's
12    make a deal, we'll write down that I get beneficial
13    ownership and you have legal title.  That can be
14    done, can't it?  The fact that that's done -- the
15    fact that that's done would not impinge on the fact
16    that you had it earlier but have given some away.
17              Isn't the issue was there separation of
18    the legal and beneficial ownership in the agreement
19    and, if there was, how was that done?  Isn't that
20    the real issue we are dealing with?
21              MR. ZARNETT:  It is the issue and the
22    point of my argument is that it is not only not
23    done expressly, but it is excluded by what actually
24    is done because the parties were very careful to
25    say for NNUK to have rights in the UK, they get a
```

```
 1    licence.  The same for the US.  Nothing for Canada.
 2             Yet everyone accepts Canada had
 3    exclusive rights in Canada.  That can only be by
 4    the retention --
 5             THE CANADIAN COURT:  Right, I
 6    understand.
 7             MR. ZARNETT:  -- of a right they didn't
 8    give up.
 9             THE CANADIAN COURT:  I understand.
10             MR. ZARNETT:  So let me then turn, and
11    I think in the written argument there are more
12    provisions of the MRDA that are cited and the
13    consistency of NNL being the owner, such as the
14    confidentiality provisions, et cetera, which are
15    consistent with NNL being the owner and the others
16    being licensees.
17             But let me turn to the provisions, the
18    only provisions that are raised in the MRDA that
19    are advanced on the beneficial title point to show
20    you why none of them create separate equitable
21    title in the licensees.
22             So the first one that is on the agenda
23    is the one that Judge Gross --
24             THE CANADIAN COURT:  Did you use that
25    verb "create" advisedly?  Does it matter whether
```

1    you change that to "reflect"?

2              MR. ZARNETT:  My argument would be no

3    different.

4              THE CANADIAN COURT:  All right.

5              MR. ZARNETT:  I agree that if there was

6    an equitable title that preexisted and that was

7    preserved, it would have to be, as the House of

8    Lords said in the German bank case, separate legal

9    title has to be created, so it had to be created

10   before and not taken away by the MRDA, the entire

11   agreement, or it had to be created in this

12   agreement.

13             Now, the recital, the second recital to

14   the agreement, speaks of each Licensed Participant

15   holding and enjoying equitable and beneficial

16   ownership of, and the "of" is important because the

17   "of", after the "of" it says certain exclusive

18   rights under NN Technology for a specified

19   territory pursuant to a 1992 agreement.

20             Now, if you contrast to Article 4(a)

21   for a moment, Article 4(a) speaks of legal title to

22   NN Technology, but the recital speaks of equitable

23   and beneficial ownership not of the technology but

24   of certain exclusive rights under a Cost Sharing

25   Agreement.  And that Cost Sharing Agreement has

1   been examined during that trial.  It says nothing

2   about equitable and beneficial ownership of the IP.

3   It grants exclusive licence rights, very similar to

4   the MRDA rights.

5           So it is possible to own licence

6   rights.  Dr. Reichert in his evidence and some of

7   the references to some of the transfer pricing OEC

8   documents talked about the ability to own a

9   licence.

10          THE CANADIAN COURT:  What does it mean,

11  I don't know why they used the word "under", but

12  whereas they held equitable and beneficial

13  ownership of certain exclusive rights under?  Would

14  the word "in" have been just as -- what does that

15  mean "under"?

16          MR. ZARNETT:  Actually, there is some

17  case law, and it is cited by the CCC, where the

18  Courts have said properly speaking, a licensee's

19  right is not of or in the technology; it is under

20  the technology.

21          THE CANADIAN COURT:  Okay.

22          MR. ZARNETT:  So that language

23  fortifies that this is a reference to the licence

24  rights.

25          So that is not the equitable interest

```
 1   in what was given to --
 2              THE CANADIAN COURT:  You are saying
 3   that certain exclusive rights under that were not
 4   ownership rights?
 5              MR. ZARNETT:  No.
 6              THE CANADIAN COURT:  That is your
 7   point?
 8              MR. ZARNETT:  That's right.  They owned
 9   licence rights.  They had equitable and beneficial
10   ownership of licence rights, but that is not an
11   equitable title to the technology itself, when that
12   is what we are talking about here.  We are talking
13   about ownership of the IP.  They had ownership of a
14   licence that gave them contractual, not property
15   rights in the IP.  That is the distinction and that
16   wording is consistent with that.
17              As well, it is a recital, and the law,
18   our law, gives very limited effect to a recital,
19   and you will see this discussed in the Re Elliott
20   case at tab 12 of my authorities which essentially
21   say, well, they are helpful but they can't create a
22   grant of something, and this is now in paragraph
23   11.  They can't create a grant.  They can't
24   contradict a grant.  They can't change the
25   operative words of the agreement.
```

```
 1               So if I'm right on the operative words,
 2    that there is no grant of an equitable interest and
 3    what is granted is inconsistent with that, the
 4    recital can't change that, but I say the recital,
 5    properly interpreted, is referring to a different
 6    set of historical rights, because this agreement
 7    then goes on, the MRDA, after reciting that those
 8    rights were in effect, it goes on to create the
 9    licence arrangement, recreate the licence
10    arrangement that we see in the MRDA and not to
11    grant an equitable or beneficial interest in the
12    IP.
13               And that is important.
14               Now, the second reference that is made
15    is found in Schedule A, and it gets repeated each
16    time Schedule A was updated, usually for
17    calculation purposes, but if you look at any
18    version of Schedule A, it has in it a third
19    paragraph that says:
20                    "The current transfer pricing
21                    methodology is the residual profit
22                    split method, RPSM, which was
23                    adopted by the participants at the
24                    request of the tax authorities as
25                    the most appropriate method for
```

1            determining the arm's length

2            compensation".

3                And it goes on to acknowledge R&D,

4    development of intellectual property as the key

5    profit driver and then it goes on to say:

6                "Accordingly, the compensation

7                provided to participants under the

8                RPSM reflects the fact that the

9                participants bear the full

10               entrepreneurial risk of the Nortel

11               business such as the risks attendant

12               with the substantial and continuous

13               development and ownership of the NN

14               Technology.  Mathematically, the

15               RPSM accords the participants all

16               the upside risk in the Nortel

17               business as well as the downside

18               risk in such business".

19               Now, that provision decidedly does not

20   say all the participants are joint owners or

21   equitable owners of the NN Technology.  In fact, it

22   doesn't tell you, looking at it on its own, which

23   participant owns it.

24               What it does say is we have an RPSM

25   method in place which is according the participants

1    upside risk and downside risk; in other words, the
2    sharing of payments as defined herein is according
3    upside and downside in the Nortel business.  It is
4    not creating ownership.  It is describing that the
5    RPSM is reflecting upside and downside risk.

6              But if the purpose of this provision
7    was to create specific ownership, contrary to the
8    Article 4 and 5, one would expect very different
9    language, not this language.

10             Now, the next reference --

11             THE CANADIAN COURT:  Well, I understand
12   what you are saying about the compensation, that
13   here is how you are going to measure it.  And I
14   suppose it reflects that the participants bear the
15   full entrepreneurial risk of the Nortel business,
16   such as the risks attendant with the substantial
17   and continuous development and ownership of the
18   technology.

19             Would you say that could be read to
20   reflect the licences or -- I'm not quite sure what
21   your argument is on this paragraph.

22             MR. ZARNETT:  In my submission, what it
23   means is the business is going to develop IP.  It
24   is going to be owned as Article 4 says, and
25   licensed as Article 5 says.

1            But we have a contractual arrangement

2    between ourselves to measure overall profit and to

3    make payments to each other as a result.  And what

4    that does is visit the risks and upside of that

5    activity, it shares it or distributes, as we have

6    discussed, but it doesn't affect who owns it.

7            I could enter into an agreement with

8    Mr. Ruby that says I own a business, but he is

9    going to be compensated if we make money, and he is

10   going to have to give up compensation or pay money

11   if we lose money, without ever giving up any

12   ownership, but he is going to bear the upside and

13   downside risk of what we do.  We develop and I own.

14           And in my submission, there is no

15   inconsistency with that.  In fact, that is exactly

16   what the RPSM model does, to the extent it does it,

17   without changing or affecting the ownership.

18           And as I say, it would be a strange

19   place to create an equitable ownership if in fact

20   -- given what Article 4 and 5 say.

21           THE CANADIAN COURT:  There is little

22   doubt that this language is driven by the transfer

23   pricing tax people.

24           MR. ZARNETT:  There is no doubt that,

25   yes, the RPSM was drafted obviously, as this says,

1    following a submission to the taxing authorities.

2             However, that doesn't determine who had

3    actual ownership.  It simply describes what the

4    RPSM is compensating for, upside and downside.

5             Now, the next provision that I wanted

6    to look at was the agreement with respect to NN

7    Technology.  This is TR46984, but it should be in

8    the -- if you have the original book of documents

9    with the MRDA which had several tabs, I think it

10   came up in the openings, it is at tab 2.

11             THE CANADIAN COURT:  I have to get

12   that.

13             MR. ZARNETT:  It refers -- it has a

14   recital that speaks --

15             THE CANADIAN COURT:  Hang on a second.

16             MR. ZARNETT:  All right, we have an

17   extra copy, Your Honour.

18             THE CANADIAN COURT:  I have got it

19   somewhere, but not in this room.

20             MR. ZARNETT:  This version might help.

21             THE CANADIAN COURT:  Well, I have got

22   that one.

23             MR. ZARNETT:  It should be then at tab

24   2.

25             THE CANADIAN COURT:  I beg your pardon,

1   yes, I have got it.

2            MR. ZARNETT:   So the second recital of

3   this, again, a recital, and this was around the

4   time of the famous Alcatel transaction, refers to

5   the disposition of a business beneficially owned by

6   the participants.   That is in the recital.   What

7   exactly was referred to in the business is not

8   further defined, but the agreement goes on then to

9   vest legal title to certain IP, and you will see

10  this in paragraph 4, in NNL and to grant licences

11  in paragraph 5 and 6, an exclusive and a

12  non-exclusive licence.

13           So we see exactly the same structure as

14  we saw in the MRDA of the vesting of legal title

15  and the granting of licences, so I say that recital

16  doesn't change the MRDA and the operative

17  provisions obviously mirror the MRDA, an

18  arrangement I say is inconsistent with equitable

19  separation of title.

20           Now --

21           THE CANADIAN COURT:   Well, at paragraph

22  4 basically it is just mirroring the language of

23  the MRDA, isn't it?

24           MR. ZARNETT:   Correct, and that is the

25  operative provision.

```
 1              THE CANADIAN COURT:  I beg your pardon?
 2              MR. ZARNETT:  That is the operative
 3   provision rather than a recital.  So if that is --
 4   if we are right in our submission that legal title
 5   means ownership in this context and the granting of
 6   licences is inconsistent with the idea of a
 7   retention of equitable title, then the result is
 8   that the recital has no effect on this argument.
 9              THE US COURT:  Why do you need it then
10   and why is it limited to the disposed intellectual
11   property?
12              MR. ZARNETT:  Yeah, this -- I'm not
13   sure I have a full answer for you, Judge Gross,
14   just a full historical answer for you on this.
15              It was meant to preserve certain rights
16   in intellectual property in a disposed business and
17   to keep them in effect exactly as they had been.
18              So the actual title and licensing
19   mirrored the MRDA for that set of intellectual
20   property.  The recital, in my submission, just
21   doesn't change that.  It just gives a little bit of
22   background without changing any of the ownership or
23   licensing regime.
24              Now, the next document that I wanted to
25   look at was at tab 3, which is an Addendum to the
```

```
 1   Master R&D Agreement, and the second recital of it
 2   says:
 3                    "Whereas each Participant holds
 4                    and enjoys equitable and beneficial
 5                    ownership of NN Technology as
 6                    defined in the Prior Agreement".
 7                    Now, is that sufficient to create or
 8   recognize equitable and beneficial ownership by the
 9   entire group, as EMEA contends or in the manner
10   that NNI contends?
11                    And I say it is not.
12                    First, it is not an operative grant, it
13   is not an operative provision, and therefore, it
14   must be treated as a recital in the limited way in
15   which our law recognizes recitals can be treated,
16   and that is that they are not grants; they are not
17   operative; and they don't override operative
18   provisions.
19                    Now, the recital ends, that particular
20   recital ends with "as defined in the Prior
21   Agreement", and then goes on to do certain specific
22   things to the prior agreement, to the MRDA in
23   certain specific ways, none of which are a grant of
24   equitable and beneficial ownership and some of
25   which reflect the licensing provisions of the
```

```
 1    earlier agreement, because they are not -- they
 2    don't amend them or change them.
 3              So in my submission, that language --
 4              THE CANADIAN COURT:  This provision,
 5    the second recital, says they hold equitable title
 6    "as defined in the Prior Agreement".  Your argument
 7    is in the prior agreement they didn't define any
 8    ownership of equitable title.  If there is an
 9    ambiguity in the prior agreement, in this recital
10    we looked at, to consider how the ambiguity should
11    be dealt with?
12              MR. ZARNETT:  If there is ambiguity in
13    the prior agreement, I believe you could look at
14    some elements of subsequent conduct and this might
15    be one of them, but there would --
16              THE CANADIAN COURT:  Well, this is not
17    conduct.  This is an agreement to be read together,
18    presumably.
19              MR. ZARNETT:  Right, right.  If there
20    were ambiguity.
21              THE CANADIAN COURT:  Yes.
22              MR. ZARNETT:  But you can't create the
23    ambiguity with this recital.
24              THE CANADIAN COURT:  I understand that.
25              MR. ZARNETT:  And it can't, if you are
```

1   going to use it, conflict as a recital with the

2   operative terms of the earlier agreement, and I say

3   once you hold it up against that standard, it

4   doesn't get anyone anywhere.

5                    THE CANADIAN COURT:   Okay.

6                    MR. ZARNETT:   That's fortified, because

7   if you go on to the next addendum, the Third

8   Addendum, which is at tab 4, which then makes

9   amendments to the MRDA itself, it then repeats and

10   restates, in part, definitions, Article 4, which is

11   the vesting of legal title, and Article 5, the

12   granting of the exclusive licences, and doesn't

13   grant any equitable and beneficial ownership,

14   doesn't incorporate that earlier recital, and keeps

15   up the structure that I say not only doesn't grant

16   equitable and beneficial ownership; it is

17   inconsistent with it.

18                    And it leaves in place, for example,

19   the no fiduciary duty provision of Article 13,

20   which is inconsistent with the idea that there is a

21   legal title holder holding in trust for others.

22                    So if that view is correct, there are

23   two other provisions --

24                    THE CANADIAN COURT:   Well, this was

25   made so that to take into account non-exclusive

```
 1   licences.
 2               MR. ZARNETT:  Correct.
 3               THE US COURT:  Well, if you don't mind,
 4   Mr. Zarnett, take a look at Article 4 on page 3,
 5   because this provision deletes in its entirety the
 6   text of Article 4(a) and gives to the Licensed
 7   Participants the rights that you would normally
 8   encounter in ownership of a patent, for example.
 9   Am I misreading that?
10               MR. ZARNETT:  Article 4 of this
11   addendum?
12               THE US COURT:  Yes, of addendum 3, the
13   Third Addendum.
14               MR. ZARNETT:  So Article 4(a) gives
15   legal title, vests -- repeats the same language as
16   we had in the original 4(a), legal title to any and
17   all NN Technology, whether now in existence or
18   hereafter acquired, shall be vested in NNL, and
19   then says:
20                       "In consideration for that, NNL
21                  agrees to enter into an exclusive
22                  and a non-exclusive licence".
23               It is the same formula as previously
24   existed, but now recognizes a non-exclusive licence
25   as well as an exclusive licence.
```

```
 1                    THE US COURT:  All right, I misread
 2   4(e), I'm sorry.
 3                    MR. ZARNETT:  Yes.
 4                    So there are two other provisions of
 5   the MRDA which the Court is well familiar with, but
 6   I just wanted to highlight them to move into the
 7   next branch of my argument and --
 8                    THE CANADIAN COURT:  I suppose your
 9   argument as well, you are at odds with the US
10   Debtors, but you say there is a limited field of
11   use or it really comes down to that they can -- the
12   licensee can sublicense to make products for use by
13   the licensee, by the participants, that is, to make
14   Nortel products.
15                    I suppose your argument would be as
16   well that if it were the case that they were the
17   owners of the -- the equitable owners of the IP,
18   there wouldn't be any room to negotiate the kind of
19   scope of use that we are talking about?
20                    MR. ZARNETT:  That's right.  Why would
21   the parties spend any time on a scope of use when
22   they all had exactly equal or ownership
23   entitlements?
24                    The entire licence makes no sense if
25   you are talking about a licence in favour of
```

```
 1 │ someone who already owns and has broader rights
 2 │ than the licence in fact confers.
 3 │          THE CANADIAN COURT:  All right.
 4 │          MR. ZARNETT:  Now, I wanted to say
 5 │ briefly something about Articles 2 and 3 of the
 6 │ MRDA which have something to do with this as well,
 7 │ and that has to do with the requirement that
 8 │ participants perform R&D activity, which is a
 9 │ defined term, and the RPSM, constitutes the RPSM,
10 │ the methodology for measuring the compensation for
11 │ that activity.  That is what you get for performing
12 │ R&D.  And then the agreement, paragraph 2(c) says
13 │ everybody has to pay for the R&D themselves.  So
14 │ you bear your own responsibility to pay for R&D,
15 │ you have to do it, and when you do do it, your
16 │ compensation is your share calculated under the
17 │ RPSM.
18 │          Now, if that view that I have expressed
19 │ to the Court is correct, it has a legal impact
20 │ first on EMEA's joint ownership case, and let me
21 │ tell you what I say it is.
22 │          The MRDA deals with each subject matter
23 │ that is an element of their claim.  Remember, they
24 │ say the MRDA says, it deals with the interests of
25 │ NNL in the IP and the interests of NNI and the EMEA
```

1   Debtors.  It deals with the activity that gives
2   rise to the creation of IP, R&D, and it deals with
3   the funding of it and it deals with what you get in
4   return, a share of RPSM. _

5              So when EMEA says on its joint
6   ownership theory the RPEs had a common
7   understanding that they would invest money in a
8   program to create R&D and the common understanding
9   was that they would each be the joint beneficial
10  ownerships of it forever until sold, that is
11  clearly setting up an arrangement that is
12  inconsistent with the MRDA, because the MRDA at
13  paragraph 14 makes it the entire agreement and
14  understanding between the participants.

15             And therefore, in law it precludes
16  inconsistent understandings and agreements.  And I
17  have included, and I won't take the Courts' time,
18  at tab 13 the Supreme Court of Canada's decision in
19  Bauer v. Bank of Montreal which will be familiar to
20  Justice Newbould, but it stands for the proposition
21  that an inconsistent lateral agreement cannot stand
22  where it contradicts the terms of a written
23  agreement, especially one that is expressed to be
24  the entire agreement.

25             THE CANADIAN COURT:  I have a question

1    while you are on the EMEA position on this.

2              MR. ZARNETT:    Sure.

3              THE CANADIAN COURT:    They say that the

4    IP belongs to the -- under a question of law, as a

5    matter of law, it belongs to the particular RPE.

6    One of the answers that you set up in your rebuttal

7    is the entire agreements clause, which I understand

8    that argument, but you also say, if I can ask you

9    to look at paragraph 206 of your rebuttal brief,

10   you say:

11              "The inventions and any

12              associated patents and patent

13              applications were assigned from the

14              inventor and/or his or her employer

15              to NNL."

16              And there is no reference to the

17   evidence, but was there any assignment from the RPE

18   to NNL or was it simply by the inventor?

19              MR. ZARNETT:    There are assignments by

20   the inventors and there is the MRDA.    So the MRDA

21   is the transaction, the CSA before it --

22              THE CANADIAN COURT:    All right, but on

23   one reading of this there is some assignment,

24   separate assignment by the RPE to NNL.

25              MR. ZARNETT:    There are, there are, for

```
 1   each patent, because you have to list the inventor.
 2               THE CANADIAN COURT:  For each patent
 3   there is a what?
 4               MR. ZARNETT:  There is an assignment by
 5   the inventor to NNL.
 6               THE CANADIAN COURT:  Right, but on the
 7   EMEA argument, that doesn't matter because the RPE
 8   has the rights, and I read this to say it may be
 9   the RPE also assigning the rights to NNL.
10               MR. ZARNETT:  Well, I'll have to check
11   if there were any additional assignments.
12               THE CANADIAN COURT:  Right, that is my
13   question.
14               MR. ZARNETT:  But we say the MRDA and
15   the CSAs before that contain that vesting.
16               So if we are right about what the MRDA
17   says, then even if the RPEs obviously did have
18   rights in what their employees did in some
19   jurisdictions, because that varies by jurisdiction,
20   not always the case as I understand in the United
21   States that an employer owns the work product of
22   the employee, but regardless of that, there are
23   assignments from the inventors and there are
24   assignments from the RPEs themselves.
25               Now --
```

```
 1                    THE CANADIAN COURT:   Well, are there
 2   assignments from the RPEs apart from what you say
 3   the effect of the MRDA is?  That is my question.
 4                    MR. ZARNETT:  No, I don't think so.  I
 5   think that it is the MRDA that gives that.
 6                    Now, as I say, the real question that
 7   the Courts have to look at is what is the scope of
 8   the licence, unaffected by these notions of
 9   beneficial ownership which I say are a distraction.
10                    And the lens to look at that through is
11   a statement that I have already taken you to from
12   the Eli Lilly case, which was back at tab 6, which
13   said licensee rights are not necessarily equivalent
14   to those of the patentee, they are limited and
15   qualified by the express terms of the licence.
16                    So they can be equivalent, but they are
17   not necessarily equivalent.  What matters is the
18   express terms of the licence.  And those terms have
19   a direct bearing on what the value of those rights
20   are because, as the Eli Lilly formulation sets out,
21   what the patentee does not grant in the licence it
22   retains and this is a question of contractual
23   interpretation.
24                    Now, Article 4(a), as we have seen, has
25   fairly clearly set out all NN Technology, "any and
```

1   all NN Technology now in existence or acquired or

2   developed pursuant to the terms of the agreement

3   shall be vested in NNL."

4           But the licence is not in those terms,

5   and one would expect, if someone was licensing back

6   exactly what NNL was getting, we would see words

7   that are just as broad, all rights to NN Technology

8   are hereby exclusively licensed to the licensees.

9           Those words don't appear.  Article 5 is

10  much longer, has more words, and those words

11  qualify the licence.

12          And the Courts have very detailed

13  arguments about why that is in our brief and in the

14  CCC briefs, but let me just tick off the three ways

15  that I say the rights are qualified.

16          They are qualified in Article 5 as a

17  right to make - I'm leaving out some of the words -

18  make, use or sell products using or embodying NN

19  Technology.

20          They are qualified by defining

21  "products" with the words "by or for the

22  participants".  And they are qualified by referring

23  to rights to patents in the second arm of Article 5

24  as rights necessary or appropriate in connection

25  with the first arm, which has to do with making,

1   using or selling capital "P" Products.

2           All those are a field of use or a scope

3   restriction, and they are discussed in our brief at

4   paragraphs 318 to 350, in our rebuttal paragraphs

5   15 to 22.

6           But the bottom line of it is the rights

7   do not extend to products designed, developed,

8   manufactured or marketed or proposed to be by

9   anyone else outside of the Nortel participants.

10  That is not a right the licensees had and it is not

11  a right they had the ability to create in a third

12  person.  Only the owner had that right, because it

13  wasn't granted, it was retained.

14          And that right, that retained right is

15  of obvious importance when one considers what a

16  purchaser of a business would pay for, wants to

17  make its own products as well as going on with what

18  Nortel was doing, or what a licensing business,

19  IPCo or Rockstar, would want when they want to go

20  out and license other people who want to make their

21  products and need or are told that they need a

22  licence to NN Technology to do that.

23          And those were rights, to encapsulate

24  it, beyond what were granted to the licensees and

25  that is the residual right that has to be taken

```
 1    into account.
 2                    THE US COURT:  Mr. Zarnett, look at the
 3    beginning of Article 5(a), the first few words say:
 4                         "To the extent of its legal
 5                    right to do so".
 6                    MR. ZARNETT:  Yes.
 7                    THE US COURT:  Why are those words
 8    necessary if there was a question of its ownership,
 9    NNL's ownership?
10                    MR. ZARNETT:  I think the reason that
11    they are there doesn't have anything to do with the
12    extent of NNL's ownership vis-à-vis the licensees.
13    It has to do with to what extent NNL was promising
14    or warranting to the people it was licensing that
15    as against third parties it had the right to do it.
16                    So instead of saying, look, no one else
17    in the world can interfere with what you are doing,
18    NNL is saying to the extent of all of our legal
19    rights, which as against you, licensees, is
20    everything, we license on these terms.  But I don't
21    think it is or can be read as reflecting some
22    retained additional right or ownership in the
23    licensees themselves.
24                    THE CANADIAN COURT:  The language says
25    "To the extent of its legal right to do so" and
```

```
 1    then it goes on to say "and subject to the rights
 2    of relevant third parties."
 3                 MR. ZARNETT:   Yes.
 4                 THE CANADIAN COURT:   Who are those
 5    relevant third parties?   To the extent they may
 6    have given away some rights to somebody else, is
 7    that the --
 8                 MR. ZARNETT:   Yes, they may have
 9    licensed someone else already.
10                 THE CANADIAN COURT:   Which would
11    perhaps be read together with "to the extent of its
12    legal right to do so"?
13                 MR. ZARNETT:   That's right, I think
14    they are of a piece, Your Honour.
15                 THE CANADIAN COURT:   Is there any
16    evidence of who those relevant third parties might
17    have been at the time?
18                 MR. ZARNETT:   There is evidence of
19    cross-licensing that had gone on between Nortel and
20    competitors where, in exchange for the Nortel Group
21    getting a licence to use a competitor's technology,
22    Nortel gave licences, so those people would have
23    rights.   I'm told there is a confidentiality issue
24    so I can't tell you the name of that person.
25                 But those would be the kind of
```

1    arrangements.

2              THE CANADIAN COURT:   Right.

3              MR. ZARNETT:   Now, there's a couple of

4    other terms of the MRDA.   We have talked about the

5    non-transferability provision, and we have talked

6    about the RPSM sharing obligations.

7              But one provision that I did want to

8    draw to your attention is that to exercise the

9    rights and continue to, Article 11 required certain

10   things to continue, and they are performing R&D

11   activity, and not being in breach of the agreement

12   and not curing it, as well as remaining an

13   affiliate of NNL, all of which is to say that

14   although the licence was perpetual, it could be

15   lost if payments weren't made as pursuant to the

16   obligations under the MRDA and, therefore, the

17   licence came with a cost and the cost was

18   associated, even though the licence is said to be

19   royalty-free, with the very continuation of the

20   exercise of rights --

21             THE CANADIAN COURT:   Before you get to

22   that, I'm just looking and every time I read this,

23   I read something else.   In Article 5(c) it says:

24                   "The rights granted under this

25             Article shall not relieve any

```
 1                   Participant from its obligations in

 2                   respect of royalty payments to third

 3                   parties".

 4             So that perhaps ties back into the

 5    question I was asking you where it says "To the

 6    extent of its legal right to do so" and "subject to

 7    the rights of relevant third parties."

 8             MR. ZARNETT:  Right, I think that is

 9    right, Your Honour.

10             THE CANADIAN COURT:  Sorry I

11    interrupted you.

12             MR. ZARNETT:  Now, I wanted to deal

13    briefly with one point of history, which then ties

14    into the next legal proposition that I wanted to

15    put to the Court, and that is there was some

16    history of sublicensing, licensing and sublicensing

17    and lawsuits, and these are described in our -- the

18    lawsuits are described in our initial brief,

19    paragraphs 356 to 359.  I'm sorry, it goes up to

20    362, actually.

21             And the point that is discussed there,

22    and I won't take you to it in any detail, but to

23    the extent there was litigation against others in

24    the United States, NNL was a party to that

25    litigation in all but one minor case, and so was
```

```
 1    NNI.
 2                 And the allegations in the claim were
 3    always NNL is the owner, NNI has a licence, they
 4    have both suffered damages.
 5                 And if you think about that for a
 6    moment, it is not consistent with a US position
 7    that all the rights in the United States under a
 8    patent and all of the value is NNL's.
 9                 There is also some sublicensing that
10    took place, and this is described in the CCC's
11    reply, paragraph 28, and again, the history of the
12    licensing is that NNL was always a party, sometimes
13    on its own, sometimes with NNI, and they were both
14    described as having rights, again not consistent
15    with the US position that it had all the rights and
16    NNL had none.
17                 So that is a segue --
18                 THE CANADIAN COURT:  Just a second.
19    You say that is in the CCC reply brief?
20                 MR. ZARNETT:  The CCC reply brief, yes,
21    paragraph 28 deals with --
22                 THE CANADIAN COURT:  Paragraph 28?
23                 MR. ZARNETT:  Yes, deals with the
24    licensing.  There is a list of licences attached to
25    the US rebuttal brief in Appendix A, and none of
```

```
 1    them recite that it was an NNI-only licence.  So --
 2                THE CANADIAN COURT:  Just a minute.
 3    Okay, there is a list of what, of the sublicenses?
 4                MR. ZARNETT:  Yes.
 5                THE CANADIAN COURT:  Pardon?
 6                MR. ZARNETT:  Of licences, sublicences,
 7    US licences to others.
 8                THE CANADIAN COURT:  I won't take the
 9    time to look it up.  You say none of them list --
10    what is your point, that NNL is a party to all of
11    them?
12                MR. ZARNETT:  Yes, NNI is not the sole
13    party, I'm told, in any of them.
14                THE CANADIAN COURT:  All right.
15                MR. ZARNETT:  Now, what that highlights
16    is what the Courts are to do with all of the
17    extrinsic evidence, the tidal wave, the tsunami of
18    extrinsic evidence that has been launched at us in
19    this case.
20                THE CANADIAN COURT:  I have seen the
21    allocation of time, and we are going to be fair to
22    everybody, so if we are going to have to sit
23    longer, we'll sit longer, but I think probably we
24    should take a morning break.
25                Is this a convenient time for you,
```

```
1    Judge Gross?
2              THE US COURT:  Any time, yes.
3              THE CANADIAN COURT:  Is it convenient
4    to you, Mr. Zarnett?
5              MR. ZARNETT:  Yes, thank you.
6              THE CANADIAN COURT:  So why don't we
7    take 20 minutes.
8              THE US COURT:  All right, counsel,
9    we'll be back slightly before 11:00, thank you.
10             -- RECESSED AT 10:36 A.M.
11             -- RESUMED AT 11:04 A.M.
12             THE CANADIAN COURT:  Mr. Zarnett.
13             MR. ZARNETT:  Thank you.
14             I want to turn now to the extrinsic,
15   the topic of extrinsic evidence, and my proposition
16   is that in this case extrinsic evidence is not
17   available to alter the conclusions that I have
18   asked this Court to reach on the wording of the
19   MRDA.
20             And that is so because of three
21   principles that flow out of Ontario's rules of
22   contractual interpretation.
23             The first one is what is known as the
24   cardinal presumption of the primacy of contractual
25   language that the parties' intent is determined by
```

```
 1   the words they use, the objective intention based
 2   on their words, not anything else.
 3              And that point has been made in every
 4   leading contractual interpretation case in Ontario
 5   and recently reaffirmed by the Supreme Court of
 6   Canada.
 7              So if I could take you --
 8              THE CANADIAN COURT:  Well, do you want
 9   to take that time?
10              MR. ZARNETT:  I don't want to take that
11   time, as I was saying.
12              The second principle, equally well
13   known, is that evidence of subjective intention is
14   inadmissible.
15              And subjective intention is evidence
16   about what a person thinks the document means,
17   understood it to mean or intended it to mean.
18              And this case has had no shortage of
19   that, and I'll give Your Honours just one example
20   which will probably bring to mind the wealth of
21   others.
22              Mr. Orlando in his declaration at
23   paragraph 23 said:
24                   "It was and is my
25                   understanding, as well as the
```

```
 1                    understanding of other tax personnel
 2                    and business people at Nortel, that
 3                    the MRDA was intended to provide
 4                    each of the IEs with economic and
 5                    beneficial ownership of Nortel's IP
 6                    in their exclusive territories".
 7              Just the classic subjective intention
 8    evidence.  It is all inadmissible.  It doesn't help
 9    the Courts at all, and should be ignored.
10              Now, the third principle is the
11    important limit on factual matrix evidence, factual
12    matrix being the kind of evidence that is used by
13    the Courts to provide some context to understand
14    what the contracting parties meant by their
15    language, and there are clear limits but the one
16    limit that I want to stress is the one that the
17    Supreme Court of Canada recently reaffirmed and
18    this was in the Sattva decision which is at tab 14
19    and I will go to that language.
20              Paragraph 57 the Court says:
21                    "While the surrounding
22                    circumstances will be considered in
23                    interpreting the terms of a
24                    contract, they must never be allowed
25                    to overwhelm the words of that
```

1               agreement.  The goal of examining

2               such evidence is to deepen a

3               decision-maker's understanding of

4               the mutual and objective intentions

5               of the parties as expressed in the

6               words of the contract.  The

7               interpretation of a written

8               contractual provision must always be

9               grounded in the text and read in

10              light of the entire contract.  While

11              the surrounding circumstances are

12              relied upon in the interpretive

13              process, courts cannot use them to

14              deviate from the text such that the

15              court effectively creates a new

16              agreement."

17          And in my submission, when you step

18  back from all the debates about what is factual

19  matrix and what isn't and whether it has been

20  accurately portrayed, whether this bit of history

21  is consistent with this party's position or that

22  party's position, when you step back from it all,

23  what it can't do is what the US Debtors and EMEA

24  Debtors need it to do.

25          It cannot turn a licence into an

1   ownership interest.  It can't turn legal title into

2   an administrative convenience.  It can't create a

3   collateral ownership arrangement outside the MRDA,

4   which is the entire agreement.  It can't,

5   importantly, it can't remove a scope or field of

6   use restriction and it can't remove the costs of

7   enforcing or exploiting the licence.

8               THE CANADIAN COURT:  Well, I guess you

9   rely upon paragraph 59 as well.

10              MR. ZARNETT:  Yes, the parol evidence

11  rule, absolutely.

12              So with the factual matrix, in summary

13  our position is it doesn't allow them to get there

14  where they want to get to from here.

15              So with that, with the correct

16  paradigm, with the question, the major question

17  being how do you value the licence that was given

18  up with the scope restriction that it had and the

19  costs that it carried with it, I say it must lead

20  these Courts to reject the valuation or allocation

21  of Mr. Kinrich and that put forward by Mr. Huffard

22  and Mr. Malackowski.  And there are many valuation

23  issues, pure valuation issues and they are

24  described in the briefs, but what I wanted to focus

25  on is there is just simply an underlying legal

1    basis why they are talking about the wrong points.

2                So let me start with Mr. Kinrich, and

3    this is a brief summary of what is in our initial

4    brief, paragraphs 508 to 540.

5                But Mr. Kinrich proceeded on the

6    assumption that NNL had nominal legal title other

7    than in Canada; in other words, no retained or

8    prospect of retained value because he proceeded on

9    the assumption that there was no scope or field of

10   use restriction.

11               He accepted that those matters could

12   affect value, if he had treated them differently,

13   but he didn't treat them differently and therefore

14   he didn't calculate value based on that.

15               So what was he measuring?  He wasn't

16   measuring the value of the licence as it stood and

17   as it was surrendered.  His revenue model, his

18   comparative revenue model in the business sales,

19   isn't valuing what people actually owned, even if

20   revenue could ever be a proper gauge of value,

21   which I say in this case it couldn't be.

22               But the assets were different than what

23   he was looking at.  The licence rights were less,

24   and NNL's ownership was more.

25               And he gave no recognition to the costs

1   that would have to be incurred to maintain the
2   licence rights to earn anything in the future.
3                So in my submission, his analysis
4   doesn't stand on the business sales, and for
5   similar reasons, in addition to the valuation
6   problems and discount rates and that sort of thing,
7   on the Rockstar transaction because again he was
8   assuming a licence right that was broader than it
9   was, no scope restriction.
10               No wrestling with the issue of what was
11  the value of this licence right in the context of a
12  proposed business that was going to do exactly what
13  isn't in the scope of the licence; in other words,
14  give other people the right to make their own
15  products.
16               And he didn't give any effect to the
17  RPSM sharing, even though if NNI was going to
18  exercise --
19               THE CANADIAN COURT:  We are faced here
20  with valuation issues of valuers who essentially
21  adopted the legal position taken by their client
22  and said, look, based upon that, here is how we are
23  going to value.
24               MR. ZARNETT:  Right.
25               THE CANADIAN COURT:  Which in the end

1    doesn't leave a whole lot for the Court, once

2    whatever the legal position is that we land on or I

3    land on or Judge Gross lands on.

4              MR. ZARNETT:  I think that is exactly

5    right.  Mr. Malackowski and Mr. Huffard are

6    following the -- the contribution theory flows from

7    the joint ownership theory.  Just as Mr. Kinrich is

8    a prisoner of his assumptions, their theory flows

9    from joint ownership.

10             And if you reject that, they don't have

11   much to tell you.

12             THE CANADIAN COURT:  It is your

13   valuation is a prisoner of --

14             MR. ZARNETT:  Well, that's right.

15             THE COURT:  At least, I was hoping that

16   I would say that.

17             MR. ZARNETT:  But my point, which I

18   would put slightly differently than Your Honour

19   has, but maybe to a similar effect is this:

20   Mr. Britven for the CCC and Mr. Green are the only

21   ones who approached, supported by the theory of

22   Mr. Berenblut and Mr. Cox, but they are the only

23   ones who approached the question on the basis of

24   the rights as I ask the Court to find them.

25             THE CANADIAN COURT:  I understand.

1          MR. ZARNETT:  And if you agree, as I

2     urge you to, then those are the tools that the

3     Court should use to come up with the allocations

4     because Mr. Green does look at the value of the

5     licence.  He does take into account the scope

6     restriction.  He does, therefore conclude that

7     there is a value to the owner based on the rights

8     that were retained in excess of the value the

9     licensees gave up, and that is, in my submission,

10    completely right on the right interpretation of who

11    owned what.

12          So I want to reserve time for

13    Mr. Coleman.  I want to reserve some time to

14    respond.

15          So subject to any questions that the

16    Courts had for me at this time, I was going to turn

17    it over to Mr. Coleman.

18          Thank you, Your Honour.

19          THE US COURT:  Mr. Coleman, good

20    morning, sir.  Good to see you.

21          MR. COLEMAN:  Good morning.  Good to see

22    you, Judge Gross.  Good morning, Justice Newbould.

23    Ken Coleman of Allen & Overy for the Monitor and the

24    Canadian Debtors.

25          Your Honors, our case focuses on the

1   words actually used in the MRDA.  The other estates
2   have argued theories that attempt to rewrite the
3   MRDA; and the evidence that they have put forward
4   in the trial has been intended to distract the
5   Courts from what the MRDA actually says.

6               And to take you further from that
7   critical agreement, there is also the argument that
8   the Courts should disregard the Monitor's position
9   in this case.  To put it another way, they argue
10  that even if the Courts agree with our position,
11  the Courts must nonetheless deprive the Canadian
12  Estates and their creditors of the benefit of their
13  property rights because the Monitor did not assert
14  its position in this trial prior to May 2013.

15              Now, based on the central theme in this
16  case, which was to sell assets collectively, to
17  maximize the value of the pot, and to sort out
18  allocation later, we submit that the argument that
19  we can lose even if we are right is absurd.  But
20  because that argument against us would have such
21  catastrophic impact on the creditors of the
22  Canadian Estate, and because, frankly, reputations
23  have been implicated, we think we have to address
24  it.

25              We think the record is clear in two

1   very fundamental respects.  First, May 2013 was

2   established as the date by which all parties were

3   to set forth their allocation positions and the

4   date by which all parties did that.  Second, it is

5   clear from the record that at all times prior to

6   May 2013 the parties had agreed and the Courts so

7   ordered that each party reserved all its rights to

8   make any arguments for allocation; and it was

9   agreed and it was so ordered that there were no

10  limitations on those reservation of rights.

11              So the US Debtors in particular would

12  ask these Courts to override the reservation of

13  rights contained in paragraph 12(f) of the IFSA.

14  The US Debtors would ask the Courts to override the

15  clear reservation of rights contained in Section 12

16  of the IP transaction side agreement.  They would

17  ask the Courts to disregard orders implementing the

18  allocation protocol, which expressly provide,

19  without condition, there shall be no restriction on

20  the ability of any core party to advance or oppose

21  any theory of allocation.

22              They would ask the Courts to ignore

23  that pursuant to the litigation time line and

24  discovery plan that was approved by the Courts,

25  that the parties to this litigation were not

1  required to submit their positions until May 2013.

2  They ask the Courts to ignore that all parties took

3  the same exact risk that they may ultimately

4  receive an allocation that is different from what

5  they thought they might get.

6              That was the deal that the parties made

7  at the inception of this case.  That was what was

8  necessary to get these sales done at the highest

9  possible price and promptly in order to preserve

10  value.  And it was understood quite clearly that

11  fighting over allocation would be

12  value-destructive.

13              Your Honor, it is simply not possible

14  to reconcile the US position on this issue with the

15  extensive record on the agreements and court orders

16  concerning reservation of rights.  In short, it

17  just doesn't make sense based on the reality of

18  this case.

19              So what they do is they try to dress it

20  up.  They add gratuitously offensive labels, like

21  "bad faith," "misrepresentation," "breach of the

22  duty of candor."  These are labels that are

23  intended to shock the Courts, and they repeat it

24  over and over and over again in the hope that you

25  will start to believe it.  But when you look behind

```
 1    the labels, there is no substance.
 2               And then they throw on an entire
 3    catalog of estoppel theories; by the way, none of
 4    which were pled in the initial responsive pleadings
 5    in this litigation, and therefore, all of which
 6    were waived.  And in any event, none of them stands
 7    up to scrutiny.
 8               I would like to take a few minutes to
 9    walk through what is behind some of these labels.
10    They first point to the Monitor's reports.  They
11    allege that the Monitor publicly filed reports
12    stating that NNL's ownership of intellectual
13    property is subject to licenses to its
14    subsidiaries.
15               That is a true statement.  As
16    Mr. Zarnett has just gone through, that is evident
17    from the face of the MRDA.  The Monitor and the
18    Canadian Debtors have never disputed that NNL's
19    ownership interests were subject to licenses.
20               The critical question that was deferred
21    to this trial is not whether the licenses existed
22    but what those license rights were and what they
23    were worth.  On that point, the Monitor's reports
24    never made any representations as to value.  In
25    fact, in every report there was the same recitation
```

1   that the allocation issue was deferred to later

2   agreement or resolution by the Courts.

3              They then cite to testimony to a

4   Canadian legislative committee, a Parliamentary

5   subcommittee of some sort, to the effect that the

6   existence of the licenses to NNL IP obligated the

7   Canadian Debtors to include the subsidiaries in the

8   sale process; again, an entirely correct statement.

9              The licenses to the subsidiaries

10  remained assets of their estates, and therefore,

11  the Monitor and the Canadian Debtors could not

12  unilaterally deal with those assets.  And they were

13  required to work within the various insolvency

14  processes that had been commenced in various

15  jurisdictions to obtain license termination

16  agreements, and that was what the sale process

17  entailed.  There is nothing false or misleading in

18  those statements.  It is not possible to read into

19  those statements any concession as to value.  And

20  again, the very issue of value and allocation is

21  the whole point of this trial, which was launched

22  in May 2013.

23              If you read what was said in those

24  comments before that legislative body and you read

25  what was said in the Monitor's report, you will see

1    that there is no substance to the claim.

2                     There is then reference to the

3    post-petition transfer pricing --

4                     THE CANADIAN COURT:  Mr. Coleman, was

5    that legislative committee what Mr. Tay said?  Is

6    that what you are referring to?

7                     MR. COLEMAN:  That is correct.  There

8    is also reference to the post-petition transfer

9    pricing report and the involvement of Sean Kruger

10   referring to, quote, economic ownership.  And the

11   allegation is that this is inconsistent with the

12   Monitor's position, and it is not.  And we think

13   that the evidence at the trial demonstrated that.

14   In a going-concern context for transfer pricing

15   purposes, the sharing of certain revenue from the

16   exploitation of IP constitutes economic ownership.

17   This does not conflict with the Monitor's position.

18                     And that brings us to the Rockstar

19   hearing.  There is much said in the briefs about

20   the Rockstar hearing.  The US Debtors suggest that

21   in light of the position taken at this trial, the

22   Monitor should have told Your Honor that it

23   believed that the Canadian Estate owned the

24   proceeds of the Rockstar transaction.

25                     Now, of course, the US Debtors said

```
 1    nothing to either Court about their position that
 2    NNL's ownership interest was worthless in that
 3    transaction.  That, for some reason, is a different
 4    matter and fully within bounds, whereas our
 5    position for some reason is out of bounds.  But the
 6    fact of the matter is that given the agreements in
 7    place, given the court orders in place, there was
 8    nothing for anyone to say at the Rockstar hearing
 9    about the allocation of value.  There was no
10    further need to reserve rights to argue for an
11    allocation.  That had been done numerous times
12    before and again specifically in connection with
13    the sale of the residual IP.
14                   The IP transaction side agreement in
15    Section 12 made it crystal clear that the
16    termination of the licenses as part of the sale of
17    the residual IP was without prejudice to any
18    party's right to present any arguments,
19    methodologies, legal or factual theories in support
20    of a proposed allocation of the IP sale proceeds or
21    the proceeds of any other transaction.  So if it
22    wasn't enough to have this history of reservation
23    of rights up to that point, it was done again
24    specifically in connection with that transaction.
25    There was nothing further that needed to be said
```

```
 1    about value and the allocation of value.  It
 2    couldn't have been clearer.  That hearing was not
 3    about what any single estate would realize or
 4    expect to realize from that transaction.  It was
 5    about whether the estates had collectively
 6    maximized value to create a pot against which they
 7    could ultimately assert an entitlement to proceeds
 8    and resolve it either consensually through a
 9    negotiation process or in a litigation.
10                And there is no doubt that the Rockstar
11    transaction achieved the best value possible and
12    that consummation of that transaction was in the
13    collective best interests of the estates.  That was
14    the deal.  That was the reality.  That was the
15    theme of this entire case up until May 2013, when
16    we moved into the dispute resolution phase
17    regarding allocation.  And there is nothing in the
18    record to support the position that some minimum
19    allocation value was guaranteed to any party at any
20    time.
21                That's what that hearing was about.
22    And frankly, given the reservation of rights that
23    was so abundantly clear, no purchaser would have
24    any involvement in this sort of transaction unless
25    both Courts were involved, unless both Courts
```

1   approved it.  So that's why we had the hearings
2   that we had.

3           This Court's very order approving the
4   Rockstar transaction follows the central theme in
5   the case.  Paragraph 45 of Your Honor's order says
6   that the proceeds of the sale were to be only
7   distributed in accordance with the process for
8   determining allocation provided for in the IFSA;
9   again, the very document where the parties agreed
10  to reserve all of their rights to future consensual
11  resolution or a litigated outcome before the
12  Courts.

13          Now that the IFSA process has achieved
14  its purpose and, frankly, there is enough money in
15  these estates to be talking about breathtaking sums
16  of post-petition interest, we want to change the
17  rules, somebody wants to change the rules on us.
18  Now the US Debtors say that the Monitor and the
19  Canadian Debtors and only the Monitor and the
20  Canadian Debtors had an obligation to put all their
21  cards on the table at some earlier date.  And
22  notably, the US and EMEA Debtors didn't feel
23  similarly obligated and didn't do so.  And in any
24  event, the testimony of Sharon Hamilton, Murray
25  McDonald, John Doolittle shows that the ownership

1   position of NNL was discussed and the implications
2   of that position were discussed in terms of
3   entitlement to proceeds.
4           THE CANADIAN COURT:  Was there also not
5   evidence that they didn't land on their position
6   until after the mediation before Justice Winkler
7   terminated?
8           MR. COLEMAN:  There is that statement,
9   yes, Your Honor, that's correct, until they were
10  required to do so under the agreements among the
11  parties that both Courts approved.
12          Now, just a word on prejudice, because
13  none of this matters, of course, at all.  But none
14  of it matters unless there is some prejudice here.
15  The US Debtors have identified none.  The issues
16  that are before these Courts in this trial would be
17  here whether IPCo was for some reason or another
18  deemed feasible and pursued, or whether it was
19  decided to fight first, sell later.  We would have
20  had to resolve these very issues.
21          Now, we have shown that IPCo was not
22  feasible.  But even if it were and even if it had
23  been pursued, we would be back to dealing with what
24  the MRDA provided for, who owns what and who is
25  entitled to what share of the IPCo profit.  So we

1   would have all these issues anyway, so where is the

2   prejudice?

3              THE US COURT:  I take it you will argue

4   that, in contrast, there would be substantial

5   prejudice to the Monitor?

6              MR. COLEMAN:  Indeed, Your Honor.  And

7   more importantly, it is not the Monitor.  It is the

8   creditors of the Canadian Estate.

9              Now, a quick word on estoppel.  It is

10  way too late in the game to raise it in pretrial

11  memorandum of law.  It needed to be raised, if at

12  all, in the initial responsive pleadings because

13  then we could have tested it in discovery.  We

14  didn't have that opportunity, and therefore, those

15  theories are waived.  In any event, there is no

16  substance to them.

17             Judicial estoppel.  There is no

18  evidence of any irreconcilably inconsistent

19  statements from the Monitor, no evidence -- there

20  is labels, there is accusations, but no evidence of

21  bad faith.

22             On equitable estoppel, there is no

23  evidence that there have been any representations

24  upon which the US Debtors had any right to rely,

25  given the agreements and court orders in place, and

```
 1   no injury.  And so all of these, all of this swirl
 2   of allegation at the end of the day is just
 3   defamatory.
 4              Estoppel by convention, which is a
 5   Canadian law doctrine and which was raised, I
 6   think, for the first time in a post-trial brief,
 7   suffers from all those infirmities plus two more.
 8   First, the full reservation of rights is actually
 9   fatal to that theory, and separately, the entire
10   agreement clause in the MRDA is likewise fatal to
11   that theory.
12              So when you think through the position
13   on this issue and you realize that even if some of
14   these suggested alternatives had been pursued,
15   IPCo, or let's get some kind of declaratory
16   judgment or have our litigation ahead of the sales,
17   and you realize that we would have gone through
18   this trial anyway, what did they give up?  You
19   realize that what they actually gave up was holdup
20   value.  What they gave up was that if they had
21   known before the sales the position that has
22   unfolded during the course of this trial, they
23   could have leveraged a better result.  But
24   everybody gave that up.  That was the genius behind
25   the IFSA.  Everybody knowingly gave that up because
```

```
 1   to do otherwise would have been value-destructive.
 2               So there is no prejudice here.   That
 3   was the deal.   That was the bargain.   There is now
 4   a substantial cash escrow that needs to be
 5   allocated, and it should be allocated on its
 6   merits.
 7               Thank you.
 8               THE US COURT:   Thank you, Mr. Coleman.
 9               MR. COLEMAN:   Unless there are any
10   questions, I think CCC is up next.
11               THE US COURT:   And I am reserving
12   questions, because I would like to hear from all of
13   the parties before I raise any substantial issues.
14   Thank you, Mr. Coleman.
15               THE CANADIAN COURT:   Is there any more
16   coming from the Monitor in-chief?
17               MR. COLEMAN:   I think not, Your Honor.
18               THE CANADIAN COURT:   Thank you.
19               Mr. Zigler.
20               THE US COURT:   Thank you, Mr. Coleman.
21               MR. ZIGLER:   Your Honour, Judge Gross,
22   if we could give our folks in Delaware a minute to
23   get set up and then we'll start.
24               THE US COURT:   Of course.
25               MR. ZIGLER:   There is also a
```

1   demonstrative set of slides we'll be using that

2   we'll be passing around to the Court and the others

3   while we wait.

4                THE CANADIAN COURT:  Go ahead.

5                MR. ZIGLER:  I hope we are set up in

6   Delaware and we have the demonstratives up for you

7   in both courtrooms.

8                THE US COURT:  Thank you.

9                MR. ZIGLER:  Your Honour, Judge Gross,

10  Mark Zigler for the Canadian Creditors Committee,

11  and with me, my co-counsel Mr. Steep, Ms. Walancik,

12  and Ms. Harmer in Toronto, and Mr. Hoeffner and Ms.

13  Melnick, Mr. Marques who has come from Canada down

14  to Delaware, and Ms. Whitley-Sebti.

15               We won't be referring much to our brief

16  and findings of fact and those of the Monitor, but

17  I do want to start out by saying we adopt the

18  findings of fact set out by the Monitor,

19  particularly in their reply, and that much of what

20  I will be saying pertains to those facts.

21               As a preamble, it has been of course a

22  privilege to appear before both Courts in this

23  unprecedented litigation.  It has been a long and

24  arduous road for well over a year.  It has been

25  five and a half years since the filing.

1           Regrettably, it has been a very
2    expensive process, and particularly for the 20,000
3    or so stakeholders which we represent and the tens
4    of thousands of others elsewhere, because no matter
5    what happens, they will suffer some loss.

6           But what I was asked to say by my
7    clients, and I think it is quite important, is that
8    they do not seek any special treatment here. Like
9    every other creditor, like every other party, they
10   would like a fair and prompt, reasonable decision.

11          But also importantly, they would like
12   something that accords with the type of Nortel and
13   the operation which they understood they worked
14   for, given the evidence that has come out at trial.

15          So to give you the outline for our
16   argument, I will give you a brief overview of the
17   CCC's position and deal with facts which we believe
18   are uncontroverted, that part of the matrix that
19   Mr. Zarnett said is admissible in accordance with
20   the Supreme Court of Canada's decision in Sattva.

21          My colleague, Mr. Hoeffner, will then
22   deal with some of the specifics and the outcomes
23   that arise from the ownership allocation theories
24   and the CCC's equitable pro rata allocation, and
25   we'll then conclude.

1              To go to the overview, the issue from
2    our perspective is that the Courts can only resolve
3    this in one of two ways.  Either we are dealing
4    with ownership lines pursuant to the MRDA and to
5    the extent there are any supporting documents and
6    the factual matrix to support it, or we are left
7    with no avenue other than the equitable pro rata
8    allocation to the estates, I would underscore,
9    based on global claims.

10             Because essentially once you get past
11   the ownership issues identified by Mr. Zarnett this
12   morning, you are in extra-contractual territory,
13   for want of a better term, and we will demonstrate
14   that in terms of not just the pro rata theory,
15   which is an equitable theory, but those that are
16   being posited by EMEA and the US interests.

17             The MRDA and the surrounding facts
18   support legal ownership, as do the outcomes based
19   on the legal ownership approaches.  The only issue
20   in dealing with the ownership theory is the value
21   that you accord to the licences.  In this respect,
22   we support the interpretation put forward by the
23   Monitor's counsel, and we will say no more.  You
24   won't hear me parsing the wording of the MRDA this
25   morning.  You won't hear me citing authorities on

1    how that wording should be parsed.

2                 What you will hear are the facts that

3    are consistent, the objective facts occurring at

4    the time that accord with such an interpretation,

5    but also accord with the pro rata interpretation.

6                 I should point out that even within the

7    ownership valuation of licences issue, there are

8    some business valuation issues, but ultimately it

9    comes down to the value that is ascribed to the

10   licences as part of the Rockstar sale, and the

11   Monitor has put forward to you an alternative

12   contained in Mr. Green's Appendix P which we

13   support as well.

14                 So what are the allocation positions?

15                 I think Mr. Zarnett left one out.

16                 THE CANADIAN COURT:  Well, you don't

17   have to go through all of this.  This demonstrative

18   is -- I don't know if you have to go through it

19   all.  We understand what the various theories are.

20                 MR. ZIGLER:  Oh, I didn't intend to

21   review them.  There are four in all.  The one that

22   Mr. Zarnett did not touch on was the pro rata

23   allocation alternative, which we say is legally

24   sustainable, just as the ownership one is, given

25   the nature of Nortel's operations and consistent

1    with both Courts' jurisdictions as Courts of law

2    and equity.

3              We also agree with the Monitor's

4    criticisms of the revenue and contribution theories

5    that were put forward and Mr. Hoeffner will add

6    some other points, but we'll also tell you that

7    they produce inequitable and extreme results and

8    require leaps that are outside the contract.  They

9    do not produce commercially sensible results based

10   on how Nortel operated.

11             The last part of our overview deals

12   with avoiding extreme results.  Everybody in this

13   litigation has said, we want to avoid extreme

14   results.  A rational position to take.

15             But you can't deal with that concept in

16   a vacuum.  This allocation dispute can't be viewed

17   in a vacuum.  It is at the heart of resolving

18   issues in a six-year-long major insolvency where

19   the objective at this stage is to resolve unsecured

20   creditor claims.  Nortel is dead.  There is no

21   business to continue.

22             THE CANADIAN COURT:  Well, you are

23   supporting the Monitor and the other side is saying

24   that that is an extreme result.

25             MR. ZIGLER:  Well, I think not, Your

1    Honour, and when you look at the waterfall, for
2    want of a better term, of where the money goes, you
3    will see that the result is not extreme at all, and
4    that is what the factual matrix takes you to.

5                    If you look at the nature of the claims
6    in Canada, if you look at the broad picture, then
7    the allocation dispute which is at the heart of
8    this whole insolvency produces outcomes that are
9    actually quite reasonable and defensible.

10                   We would be deluding ourselves if we
11   thought that the allocation just stopped at the
12   numbers and the black box, because in the context
13   of the 2 billion dollar intercompany claim,
14   noteholders who claim 4 billion dollars in two
15   jurisdictions, a UKP guarantee claim that is still
16   to be determined before Your Honour, in the context
17   of all of that, there is a much broader picture
18   than just how you allocate at the base level.

19                   The pensioners and disabled employees
20   are involuntary creditors.  They should be treated
21   fairly, and to do that you have to avoid lopsided
22   distributions to the different estates in terms of
23   their claims.  Otherwise, the recoveries to the
24   Canadian creditors, if you look at the US position,
25   you are down as little as 10 or 11 percent.  The

```
 1    EMEA position may be in the range of the low 20s,
 2    maybe up to 25, and you contrast that with others,
 3    and this was quite evident in the post-petition
 4    interest debate which is still out before the
 5    Courts, we have got parties seeking more than 100
 6    percent plus interest, and in the context of the
 7    facts of this case that would be an extreme
 8    outcome.
 9              So let's look at the facts.
10              THE CANADIAN COURT:   The waterfall you
11    are referring to, is that at paragraph 23 of your
12    brief?
13              MR. ZIGLER:   That is correct, it is the
14    chart that Mr. Britven produced and we will get
15    into it in greater detail later in our submissions,
16    but looking at paragraph 23 of our brief -- it is
17    actually paragraph 31 of our brief.
18              Paragraph 23 is the first step of the
19    waterfall.
20              THE CANADIAN COURT:   All right.
21              MR. ZIGLER:   Paragraph 31 takes it a
22    step further.
23              And I will deal with that in the
24    context of the facts that I am pointing Your Honour
25    to, because that is the factual matrix.   It is
```

1  objective.  It is not opinion evidence.  The

2  opinion evidence of the experts puts you all over

3  the map here, as Mr. Zarnett pointed out.  The

4  subjective views are not particularly helpful.  But

5  totally what we want to get to are the findings of

6  fact that help you interpret the MRDA or determine

7  whether it is applicable at all.

8             And there is one uncontroverted fact

9  that cannot be questioned I think by any party, and

10  that is there was one Nortel.  Nortel operated as

11  an integrated matrix organization in the technology

12  business.  It had three elements to the matrix.

13  There were the lines of business along which it did

14  its business planning and strategic planning, its

15  marketing, its business development, even much of

16  its research and development activity.  That was

17  the key driver of the business.  That was the

18  evidence you got.

19             THE US COURT:  Is that true for its

20  creditors as well, Mr. Zigler?

21             MR. ZIGLER:  That is true for

22  everybody, Your Honour.

23             The evidence of the creditors and the

24  people who gave evidence, whether they were senior

25  officers or lowly employees, all of their evidence

1   was quite consistent:  This business ran on a line

2   of business model.

3                    THE CANADIAN COURT:  Well, I think

4   Judge Gross's question really related to the

5   Bondholders.

6                    MR. ZIGLER:  I don't know if they

7   disagree with how Nortel ran, but the facts are the

8   facts.

9                    And the evidence before you from the

10  former office -- four of the more senior officers

11  of this company was pretty clear.  We ran along

12  lines of business.  We had head office global

13  services, which included treasury, finance, legal,

14  taxation, and the CEO's office, and we had regional

15  and geographic functions, primarily in the areas of

16  sale and accounting, and you can further break down

17  the regions by subsidiaries.

18                    And although the Courts in this case

19  are called upon to determine allocation by

20  subsidiaries, that is hardly the first tier by

21  which Nortel ran its operations.  It was in fact a

22  rather insignificant one in terms of how the

23  business was run.

24                    The evidence of Mr. Currie was pretty

25  clear that Nortel ran on this matrix.  Nobody

1    questioned it.  The evidence of Mr. Binning, who

2    was also the Chief Financial Officer, was pretty

3    clear.  The evidence of Mr. McFadden who ran one of

4    the lines of business as its president and was a

5    Chief Technology Officer, was very clear on these

6    points, and the evidence of Mr. Allen who was its

7    Chief Legal Officer and secretary.  They are the

8    most senior people who testified.  They are the

9    only ones who had a view of the entire operation,

10   maybe with a few exceptions, and they were not

11   restricted to the fields of transfer pricing or

12   people who actually did the inventing, but they had

13   the big picture.

14           And what was clear from Mr. Currie's

15   evidence in terms of subsidiaries, and this plays

16   right into the approach which NNI is taking, it had

17   no strategic purpose in the Nortel operation, and

18   that was his evidence.

19           Maybe he was a bit facetious by

20   likening it to NN Poland in that respect, but he

21   wasn't being disrespectful of the United States as

22   a market and he wasn't being disrespectful of

23   Nortel's activities in the United States or

24   anywhere else.  What he was saying, and you will

25   see in his deposition testimony, is that a

1   subsidiary is not a market.  In other words, NNI
2   could not do what it did if it were not for massive
3   support from Canada and from the UK in terms of
4   research and development.  Although the sales got
5   booked through NNI and that was the largest market,
6   and Canada was a small market, you wouldn't have
7   the resources of research and development and head
8   office and the expenditures in Canada just for that
9   small market.  It serviced a global market, and
10  clearly Mr. Allen gave you some -- and when he was
11  cross-examined, he gave you some clear evidence as
12  to the genesis of that.

13          And that situation worked right through
14  to the insolvency filing from the evidence of
15  Mr. Binning.

16          You can't argue with those facts.  That
17  is how it operated.  And you have to contrast that
18  with the rather limited view of extrinsic evidence
19  which we say is not admissible, and we agree with
20  Mr. Zarnett on this, of transfer pricing people,
21  and with all due respect to what they do and it is
22  valuable work in terms of transfer pricing, what is
23  clear from the transfer pricing evidence and
24  particularly that of all the experts, and I am
25  thinking of Mr. Reichert and Professor Eden, you

1    cannot translate what happens in the transfer
2    pricing world which pertains exclusively to a small
3    element of taxation to the way a business is run or
4    to any legal rights.
5              The second fact that I want to take you
6    to is that ownership of the IP vested in NNL.  That
7    is a rather obvious one.  Yes, the issue is what is
8    the value of the licences, but everybody
9    acknowledged that in their opening filings and in
10   IFSA, and really what you have to look at is how
11   far you want to go with valuing those licences.
12             The third fact is that NNL owned the IP
13   for valid business reasons.  It was not formality.
14   It was not administrative convenience.  It is not a
15   question of opinion either.  Ms. De Wilton and Ms.
16   Anderson from the EMEA who gave evidence on behalf
17   of EMEA were clear that there were business
18   reasons.  There had to be central control to deal
19   with licensing, cross-licensing, defending claims,
20   and dealing with the IP in all markets, not just
21   the individual ones of the subsidiaries.
22             The patents were developed worldwide on
23   a collaborative platform, everybody agrees to that,
24   but they were registered in NNL's name.
25             And you have the evidence of the

1   assignments.

2                   What other facts could we give you?

3   And I will conclude with these two particular

4   areas, because they are quite important.

5                   Nortel's leadership was based in and

6   employed in Canada, and why would a parent company

7   have licensed any more than it had to for transfer

8   pricing purposes if it was, as Mr. Allen testified,

9   a company based here in Canada that put huge

10  resources into dealing with a global business.   You

11  have to read the MRDA in that context.

12                  The last point which indicates

13  precisely why we are where we are in the insolvency

14  and does deal with this waterfall issue, is that

15  Canada was in fact a high-cost low-revenue

16  jurisdiction as a market for Nortel because Nortel

17  NNL and the other Canadian Debtors took on burdens

18  that were global in nature.

19                  It did so because the Canadian market

20  was small, and so the US, EMEA and other markets

21  had to be serviced.   And that is why Nortel, NNL

22  and NNC, were the borrowers on 4.2 billion dollars

23  worth of debt.   They are the primary borrowers.

24  The burden they took on before the filing was

25  servicing that debt, and that was not part of the

1   MRDA calculation, as evidenced by Mr. Currie.

2            The burden they took on involved

3   producing intellectual property at levels way more

4   than what would ever have been necessary to service

5   a Canadian market.  I think the inventorship

6   analysis of Mr. Malackowski showed you 50 percent,

7   and Mr. Bazelon, more than 50 percent of the

8   inventors were -- the patents were registered to

9   Canadian inventors.

10           It did so and undertook the burdens of

11  guaranteeing UK pension obligations in order to

12  make the entire operation run.

13           And as a result of transfer pricing,

14  very much tied to this case, it took on a 2 billion

15  dollar claim from the US Debtors because of events

16  between 2001 and 2005, to say nothing of the burden

17  it had to its own employees here in Canada, its

18  head office employees who helped run the operation.

19           At the end of the day, what you see

20  after five and a half years of this insolvency is

21  in fact that Canada has become, and I use this

22  euphemism, I have used it before, but I think it is

23  the only way you can describe it, it is the dumping

24  ground for claims worldwide and from Canada.  Yet

25  when you look at the key asset of this global

1   business, its intellectual property, those outside

2   of Canada are saying, well, you can't have that

3   asset, it is not yours, when the documents clearly

4   say it is.

5              And I think you have to read the MRDA

6   in that context, and that is where the waterfall

7   comes in.  That is where you realize that a dollar

8   paid into Canada in this allocation dispute doesn't

9   stay here.  In fact, most of it does not, given the

10  2 billion dollar claim, the Bondholder claim, the

11  UKP claims and the EMEA 125 million dollar

12  settlement that you have.

13             So based on that factual matrix, I

14  think you have the groundwork for the two positions

15  that we advocate, and at this point I'm going to

16  turn it over to Mr. Hoeffner in Delaware, unless

17  there are any further questions.

18             THE CANADIAN COURT:  Thank you.

19             THE US COURT:  Mr. Hoeffner.

20             MR. HOEFFNER:  11:59.

21             THE US COURT:  All right.  You are in

22  the morning.

23             MR. HOEFFNER:  So I can still say good

24  morning to Judge Gross and Justice Newbould.  Thank

25  you for having us.

1           THE US COURT:  Of course.

2           THE CANADIAN COURT:  Good morning.

3           MR. HOEFFNER:  I have had the pleasure

4   of sitting quietly in the back of this courtroom

5   for much of these proceedings.  And during the

6   course of the trial it has become increasingly

7   clear that critical to the outcome of this dispute

8   are two considerations which I would like to

9   discuss.

10          First, we believe it is important for

11  the Court to avoid extreme results, and I am going

12  to talk about that issue.  The possible solutions

13  for the Courts that we have structured will avoid

14  extreme results.

15          Second, we have been focused on how the

16  Third Circuit and the Ontario Court of Appeal would

17  review the arguments and the decisions in this

18  case.  And in that context in particular, I am

19  going to speak a bit about the pro rata theory and

20  try to clear up some of the misconceptions that may

21  be out there about that theory.

22          THE US COURT:  And how it differs from

23  substantive consolidation.

24          MR. HOEFFNER:  I sure am going to get

25  to that, yes.

1           Just briefly again, Mr. Zigler

2   mentioned this, but Mr. Zarnett and Mr. Coleman

3   were far more eloquent on the ownership theory than

4   I ever could be or ever want to be, frankly, and

5   did a great job covering those theories, so we are

6   not going to repeat those arguments.  We believe

7   they are fully supported by the MRDA and the law,

8   and we believe that the contractual ownership

9   theory is the one theory that focuses on the value

10  of the residual IP assets sold that clearly is

11  sustainable at the appellate level.

12          The CCC also supports the business

13  valuation in the line of business sales that was

14  presented by Mr. Britven in his expert testimony.

15  The PPAs, the purchase price allocations, that he

16  referred to provide the only objective measure of

17  the intellectual property and other assets that

18  were sold in the line of business sales.

19          Again, now I want to get to the

20  equitable results.  There is nothing inequitable or

21  extreme about the allocations that will occur under

22  the contractual ownership theory.  To put the issue

23  into focus, the Court should consider that Nortel's

24  operations led to significant claims into Canada by

25  NNI, $2 billion, and by EMEA, $125 million, as well

1   as the asserted UKP pension guarantee claim.

2                    If NNL must bear the burdens of

3   supporting Nortel's global operations and claims of

4   creditors of other estates, it should also be

5   allocated the values of what it owns contractually.

6   Otherwise, NNL is left holding the bag on claims

7   with no assets to pay for those claims.

8                    THE US COURT:  But didn't Canada

9   receive very substantial revenues?  I have heard a

10  lot of talk about burden to Canada, but I haven't

11  heard about the benefits to Canada.

12                   MR. HOEFFNER:  There were benefits.

13  Those were all taken into account in connection

14  with the MRDA and the RPSM provisions that are

15  built in there.  That is all factored in.  But

16  again, now we are focusing on the claims and the

17  method to pay the claims and recognizing all these

18  burdens that were taken on by Canada.  So that's

19  going to be the focus of what we are going to talk

20  about here.

21                   As the evidence shows, most of the

22  money under any scenario that will be allocated to

23  NNL in this case flows out of Canada.  So it goes

24  to Canada.  It doesn't stay in Canada.  Most of it

25  is going to go back to the creditors of the other

1   estates.  Under the contractual ownership theory,
2   the Bondholder and other US unsecured creditors
3   would essentially be made whole.  And again, the
4   chart from Mr. Britven is really the core
5   illustration of how this would all work and why we
6   are not going to have inequitable results under the
7   methods that we are proposing.

8              This chart shows clearly that equitable
9   outcomes would occur under the theories put forward
10  by the Monitor, by the Canadian Debtors, and by the
11  CCC.  In contrast, the chart demonstrates there
12  would be extreme results if the Courts were to
13  accept the US revenue theory or the EMEA license or
14  contribution theories.

15             We are going to focus on some specifics
16  here.  With respect to the contractual ownership
17  theory, the Bondholders would receive 100 cents on
18  the dollar, and the US unsecured creditors would
19  receive 95 cents on the dollar.  EMEA creditors
20  would obtain significant recoveries.

21             Canadian creditors -- namely, the
22  pensioners and former and disabled employees of
23  Nortel in Canada -- under this scenario would at
24  least receive a fair treatment.  They are not going
25  to receive everything by any stretch of the

```
 1   imagination, but at least they would receive a fair
 2   treatment.  Here we have got 59 percent going
 3   through Canada.
 4               So in short, the contractual ownership
 5   theory provides both a legitimate basis for
 6   allocation that is sustainable on appeal, and it
 7   also will not lead to extreme results for any
 8   party.
 9               The CCC's alternative pro rata theory
10   also is both legitimately grounded for reasons we
11   will talk about a little bit later and also leads
12   to an equitable result.  Each estate is allocated
13   sufficient funds to enable it to distribute to its
14   general unsecured creditors the same recovery on
15   their claims as that received by the general
16   unsecured creditors of the other estates.  And this
17   is an important point.  If the Courts were to
18   determine in proceedings in their own estates to
19   permit the crossover Bondholders to proceed with
20   the full amount of their claims in both Canada and
21   the United States, the crossover Bondholders would
22   receive recoveries from both estates of up to
23   100 percent of their pre-petition claims.
24               In this scenario -- and this is another
25   important point --
```

```
 1                THE CANADIAN COURT:  May I just ask you
 2   a question, please, Mr. Hoeffner.
 3                MR. HOEFFNER:  Yes, sure.
 4                THE CANADIAN COURT:  In this chart, you
 5   have got in Column 1 CCC ownership; No. 2, Canadian
 6   Debtors and Monitor.  What is the difference
 7   between CCC ownership in Column 1 and Canadian
 8   Debtors and Monitor in Column 2?
 9                MR. HOEFFNER:  There are two different
10   expert reports that were submitted independently
11   through the theories, and Mr. Green in his report
12   and Mr. Britven in his report came essentially --
13   most importantly, essentially to the same
14   conclusions, but there were some modest differences
15   between the two.
16                THE CANADIAN COURT:  All right.  I
17   understand that.  So the ownership, the CCC
18   ownership and the Canadian Debtors and Monitor are
19   both a contractual interpretation ownership; am I
20   correct?
21                MR. HOEFFNER:  Yes, sir.
22                THE CANADIAN COURT:  And the difference
23   between 1 and 2 is simply the experts?
24                MR. HOEFFNER:  Yes, sir.
25                THE CANADIAN COURT:  As to how they
```

1   value that?

2              MR. HOEFFNER:  Yes, sir, exactly.

3              THE CANADIAN COURT:  All right.  Thank

4   you.

5              MR. HOEFFNER:  So under the scenario I

6   was just describing, the results under the CCC's

7   pro rata theory are pretty much the same as the

8   results under the contractual ownership theory.  So

9   that is basically what I would call the double-dip

10  scenario.

11             And again, we are going to come back to

12  the Courts and the different estates being left

13  with the autonomy to deal with the different claims

14  in their estates.  But again, viewed this way, in

15  the end, the pro rata approach serves as a market

16  check on the ownership theory.  And I think it is

17  important in terms of, we have two theories that

18  could basically get you to the same conclusion,

19  both credible.  Both avoid extreme results.

20             In contrast, allocation by revenue is,

21  for all the reasons that have been talked about

22  earlier today by Mr. Zarnett, inequitable, and we

23  believe it would also importantly provide for

24  extreme results.

25             The 11 percent allocation to the

1   Canadian Estates that we have highlighted is

2   actually the most extreme result of all under any

3   of the scenarios that are proposed by any of the

4   parties.

5               The revenue theory simply maximizes

6   assets in the US, and it makes no effort to match

7   them against the costs and claims incurred to

8   create those assets.  It is not commercially

9   sensible to allow any single entity to shield

10  itself from the claims associated with the costs

11  incurred to develop the assets that reside in their

12  jurisdiction.

13              The result proposed by the United

14  States is even more extreme when you consider the

15  pre-allocation cash in NNI, which is on the bottom

16  of this chart and identified as approximately

17  $1.3 billion, that NNI would retain.  And I would

18  just note that we believe that this number has been

19  reduced fairly significantly due to the burn rate

20  in this proceeding over time.  But again, it is

21  $1.3 billion that they would retain, and that's the

22  number that essentially would be used to pay the

23  Bondholders the post-petition interest under the

24  settlement that they have proposed.

25              THE CANADIAN COURT:  What is the date

1    of that 1.3 billion?  That is as of when?

2                 MR. HOEFFNER:  This is as of the date

3    that Mr. Britven had submitted his initial report,

4    so we are going back to that point in time.  It is

5    really preceding the whole trial proceeding and

6    significant activities in this case.

7                 THE CANADIAN COURT:  Thank you.  All

8    right.  That's fine.

9                 MR. HOEFFNER:  So -- yes.  I mean, we

10   have estimates for that, and it would -- but it is

11   not in evidence.

12                The EMEA approach would also lead to

13   extreme results.  Under the two approaches that are

14   suggested by EMEA, the Canadian Debtors would

15   receive only 11 percent under the license approach

16   and 25 percent under the contribution approach.

17   And again, the contribution approach would retain

18   $536 million of pre-allocation undistributed cash

19   in NNI.

20                Let's talk about the CCC's pro rata

21   theory.  We believe that pro rata is a principled,

22   sustainable allocation methodology, and, most

23   significantly, it embodies how Nortel operated and

24   generated the assets that are being sold, that were

25   sold.  It is only a means of calculating the amount

1    of money to be allocated to each estate.  It is not

2    a means of calculating the ultimate payments on

3    claims the estates' creditors will receive.  That

4    role is retained by the authorities having the

5    jurisdiction to resolve those claims.

6                This is too many words on a slide.  I

7    understand that, and I apologize.  But it is a long

8    quote that we had taken out of our brief, so we

9    have included it.  But the points are really that

10   the CCC pro rata theory would generate an equitable

11   outcome for each estate because it appropriately

12   balances the assets available to each estate

13   against the risk of claims each bore in making

14   Nortel a global IP company.  So you are focusing on

15   the amount of claims, what those burdens were that

16   were taken on by each estate.

17                It provides the Courts with an

18   allocation solution if the Courts conclude that it

19   is not possible to answer with certainty the

20   question posed at the outset of the trial:  What

21   portion of the purchase price paid in the

22   bankruptcy sales was due to the transfer or

23   surrender of assets by each selling debtor.

24                To be clear, we are presenting the

25   pro rata theory as an alternative to the Courts.

 1   You have the other three theories.  If you make a
 2   decision that each of those theories are
 3   unsustainable, if the revenue theory is ridiculous
 4   because that's not the way any company operates;
 5   companies have revenues and expenses.  If the
 6   decision is made that the contribution theory is
 7   ridiculous because, based on the question from
 8   Judge Gross some time ago, if a company spends a
 9   million dollars to develop an iPhone and spends a
10   billion dollars to develop an unsuccessful product,
11   the value shouldn't be attributed solely to the
12   funds that are contributed to develop product.  You
13   have got to look deeper.

14              And if the Courts for some reason,
15   which, of course, we don't understand, decides that
16   the ownership theory does not apply, we are again
17   trying to give you a solution.  So we know that you
18   can't just throw your hands up in the air at the
19   end of this proceeding.  We are trying to give you
20   as much flexibility as possible.

21              So absent acceptance of clear ownership
22   of assets pursuant to the MRDA, it is not possible
23   to trace most of the assets sold to any one selling
24   debtor.  The assets are intangible and were
25   developed, managed, marketed and sold

1   collaboratively by one integrated, multinational
2   enterprise without regard for borders or corporate
3   entity.

4              As Mr. Zigler explained, the evidence
5   concerning the nature of Nortel's business and its
6   operations is really undisputed.  The nature of the
7   assets and the collaborative contribution of the
8   estates and their creditors to the proceeds
9   realized for them lead to only one fair method of
10  allocation apart from ownership.  That's the
11  allocation of the lockbox funds to the separate
12  estates under the supervision of these two Courts
13  based on the valid claims of their creditors.
14  Payments within the estates -- again, this is
15  critical -- will be determined by each estate
16  within its jurisdiction according to its laws and
17  processes.

18             It bears repeating that pro rata
19  appropriately balances the assets available to each
20  estate against the risk of claims each bore in
21  making Nortel a global IP company.

22             It is also important that the Courts
23  appreciate what the CCC's pro rata theory does and
24  what it is and not be misled by the
25  mischaracterizations that have been set forth in

```
1    some of the briefs about the pro rata theory.  CCC
2    pro rata allocation is not and does not affect
3    global substantive consolidation.  It bears none of
4    the badges of substantive consolidation.  It
5    respects the corporate separateness and the
6    self-determination of each Nortel entity, the
7    sovereignty and jurisdiction of each entity's laws
8    and courts, and the enforceable rights and
9    interests of their creditors.
10             It does not move assets among the
11   creditors -- I am sorry.  It does not move assets
12   among the estates.  It does not dictate creditor
13   recoveries or how they are to be determined.  It
14   does not restructure or revalue the rights of any
15   creditors.  And it does not determine the
16   enforceability of inter-entity guarantees,
17   intercompany claims, or Bondholder claims to
18   post-petition interest or to enhancements.
19             These issues all remain within the
20   purview of the individual estate's jurisdictions,
21   laws and courts.  Guarantee and intercompany claims
22   found enforceable and allowed by the Courts for
23   each of the estates will be recognized in the
24   calculation of funds allocated to those estates.
25             THE CANADIAN COURT:  How does that
```

1   work?  I mean, I know your brief -- I read your

2   brief, and it talks about lack of evidence of what

3   their expectations were and they bought at so many

4   cents on the dollar and the like.  I understand all

5   that.

6              But what you are saying is that if the

7   Court finds that they are entitled to 100 cents on

8   the dollar, disregarding interest for the moment,

9   then what do we do with the pro rata?  Just you

10  allocate 100 cents on the dollar to the Bondholders

11  and then that reduces the pot?

12             MR. HOEFFNER:  Yes, yes, exactly.  Yes.

13  And I think what Mr. Britven --

14             THE CANADIAN COURT:  What do we do with

15  the US Estate?  What is the size of the pot for the

16  US Estate?

17             MR. HOEFFNER:  Again, the funds would

18  be allocated to the Bondholders through the two

19  claims and, again, with the two different estates

20  making the determination on the Bondholder claims

21  in the two different jurisdictions.

22             THE CANADIAN COURT:  Yes.

23             MR. HOEFFNER:  Assuming that is taken

24  up to 100 cents on the dollar, again, that would

25  reduce the pot that is going to be paid to all the

1   other creditors, all the remaining other creditors

2   in the various estates, in the two estates.  So

3   there would be a modest -- well, there would be an

4   adjustment to basically modify the amounts.  So

5   instead of the 71 cents for each of the creditors,

6   there would be an accommodation to the Bondholders

7   where they would get to 100 percent.  That would

8   reduce the amount that is paid out to each of the

9   other creditors to a level somewhere -- I think it

10  is 63 percent or something like that.

11          Now, both of Your Honors have

12  jurisdiction and authority to order this pro rata

13  allocation and its implementation.  That is set

14  forth in our briefs in paragraphs 163 through 208.

15  And we believe the appellate courts in both

16  jurisdictions are more likely to sustain such

17  orders than they would be to sustain orders

18  adopting the US and EMEA proposals.

19          I want to talk a little bit about Owens

20  Corning, to go to your question, Judge Gross.

21          THE US COURT:  Yes, sir.

22          MR. HOEFFNER:  I am sure that some

23  people on the right side of the room here are going

24  to talk about the Owens Corning case, and they are

25  going to argue that it precludes adoption of the

1   pro rata theory.

2              We believe that the contention of the

3   US interests and the Bondholder group that the

4   Third Circuit's decision in Owens Corning applies

5   to Your Honors' consideration of CCC pro rata

6   allocation and precludes adoption of that theory

7   as, at best, seriously misguided.  And, again, we

8   believe that it ignores what the pro rata

9   allocation theory is and what it does.

10              As Your Honor is well aware, in Owens

11  Corning the Third Circuit addressed when a US

12  Bankruptcy Court may and when it may not approve a

13  Chapter 11 plan that provides for the substantive

14  consolidation of the affiliated US debtor estates.

15  Specifically, the Court of Appeals describes

16  substantive consolidation as a construct of US

17  federal common law emanating from equity which --

18  and I am going to read a long quote --

19                   "Treats separate legal entities

20                   as if they were merged into a single

21                   survivor, left with all of the

22                   cumulative assets and liabilities,

23                   save for inter-entity liabilities,

24                   which are erased.  The result is

25                   that the claims of creditors against

```
 1                   separate debtors morph to claims
 2                   against the consolidated survivor."
 3            Now, for the reasons we have been
 4   talking about, CCC pro rata allocation does none of
 5   this.  It does the opposite.  In the Owens Corning
 6   case the Third Circuit found that certain facts of
 7   the Owens Corning debtors prohibited their
 8   substantive consolidation.
 9            None of the facts in Owens Corning bear
10   any relationship to the facts in Nortel.  The Owens
11   debtors were subject to a loan agreement which
12   expressly bound them to maintain corporate
13   separateness.  No such provisions exist in the
14   Nortel indentures.  And the CCC pro rata allocation
15   does not in any way, shape or form impact the
16   corporate separateness or self-determination of any
17   Nortel entity.
18            The Owens plan eliminated inter-entity
19   claims and guarantees.  The CCC allocation does not
20   eliminate any claims of any creditors.  Allowance
21.  and enforcement of all claims asserted against each
22   Nortel estate, including intercompany and guarantee
23   claims, remain solely within the jurisdiction and
24   power of each estate's court.
25            Different entities within the Owens
```

1    corporate group had different purposes, performed
2    different functions and dealt with different
3    products and services.  Several were entirely
4    autonomous and independent, operated outside of
5    business units and had their own logos and trade
6    names.  But here, as the evidence has clearly
7    established, Nortel was a highly integrated matrix
8    organization that operated along business lines,
9    that spanned geographic borders and corporate
10   entities.  All Nortel entities were known as
11   Nortel.
12              Owens' unintegrated operation made it
13   easy for the Third Circuit to conclude that there
14   is no question which entity owns which assets.
15   Respectfully, if that were the case here, we
16   wouldn't have been in this courtroom for the last
17   three months.
18              Now, the Bondholder group, our friends,
19   submitted a lengthy brief discussing creditor
20   expectations in what appears to be a misplaced
21   effort to satisfy the Third Circuit's -- the first
22   prong of the test in Owens Corning for harm to
23   creditors occasioned by substantive consolidation.
24   But as I have explained, this case does not involve
25   substantive consolidation.  But despite this, since

1    the Bondholder group has put this at issue, it is
2    necessary to address the harm they allege that CCC
3    pro rata allocation will cause the crossover
4    Bondholders.  And in brief, there is no harm to
5    them.

6              The members of the Bondholder group
7    represent more than 50 percent of the outstanding
8    bonds.  They purchased their bonds after the
9    bankruptcy filing.  There is no evidence that their
10   purchases in the secondary market provided any
11   benefit to Nortel.  These and other current holders
12   of Nortel bonds are the creditors of the debtors.
13   The investors in the initial bond offerings are no
14   longer the creditors.

15             And the circumstances in Nortel at the
16   time the initial investors purchased the bonds are
17   vastly different from those with the current
18   Bondholders, that the current Bondholders confront
19   today.  Things have changed dramatically.  As the
20   UCC's expert acknowledged, expectations change as
21   circumstances change.  That is particularly true in
22   a bankruptcy case.  With changed circumstances, the
23   original expectations for recoveries arising from a
24   contract, here the indentures, of necessity must
25   change.  The expectation that all contractual

1    provisions will be capable of being satisfied are

2    no longer reasonable and sustainable.  These are

3    critical points that the sophisticated distressed

4    debt purchasers, who are members of the Bondholder

5    group, are more than well aware of.

6              Most notable in this case -- and this

7    is another huge distinction from Owens Corning --

8    there is zero evidence, zero evidence in the record

9    of the expectations of the members of the

10   Bondholder group.  Let me say that again.  There is

11   no evidence in the record before the Courts

12   regarding the expectations of the members of the

13   Bondholder group, nothing.  No member of the

14   Bondholder group appeared at trial.  No

15   documentation of the bond-trading

16   consideration-making process was offered into

17   evidence.  And the Bondholder group's expert,

18   Mr. Kilimnik, was pulled from testifying at the

19   last minute.

20             This is very different from Owens

21   Corning, where the banks, CSFB, the attorneys came

22   in for the banks, and they appeared in court and

23   they testified concerning their expectations that

24   they claimed would be impaired by the Owens Corning

25   debtors' plan.

```
 1              CCC pro rata allocation does not deny
 2   the Bondholders any rights that they are entitled
 3   to under their indentures.  Only the Courts having
 4   jurisdiction over the Bondholder claims have the
 5   power and authority to determine their validity and
 6   enforceability and their recovery.  The CCC
 7   pro rata allocation method does not make or dictate
 8   these determinations any more than do any of the
 9   other allocation methodologies proposed by the
10   other parties.
11              Now, the Bondholders cling dearly to
12   their contractual rights and in particular to the
13   guarantees.
14              THE US COURT:  Doesn't that
15   substantiate their expectations?
16              MR. HOEFFNER:  Again, there is no
17   evidence of what their expectations are.  You have
18   a contract term.  You have no evidence of what any
19   one member of that Bondholder group, what any one
20   Bondholder really expects.  It is not there;
21   nothing.  They didn't show up.
22              While they are focused so much on the
23   existence of the guarantees, at the same time they
24   ask these Courts to reject the ownership theory.
25   That ownership theory is grounded in contractual
```

1   rights under the MRDA. And the Bondholders'
2   rejection of the ownership theory is all the more
3   ironic inasmuch as it is one that would pay the
4   Bondholders 100 cents on the dollar.
5            Finally, contrary to the protestations
6   of the bondholders and the US interests, it is
7   really irrelevant that no court has ever before
8   ordered allocation of global asset sales proceeds
9   based on the justifications underpinning the CCC's
10  proposed pro rata allocation methodology.
11           I think everyone in the room would
12  agree this case is extraordinary, and no Court has
13  ever had to address the types of issues that are
14  before these Courts today. No court has upheld the
15  allocation of proceeds of a company in bankruptcy
16  based solely on a revenue theory. No court in a
17  bankruptcy context has allocated proceeds based
18  solely on a cherry-picked contribution theory such
19  as has been put forth here.
20           So in conclusion, I just want to wrap
21  up. Again, for all the reasons we have talked
22  about, the US revenue and EMEA contribution
23  theories we believe are unsustainable. They do not
24  accord with the MRDA or any theory of equity. They
25  are substantively flawed, and they yield extreme

1   and inequitable results.

2              We believe the CCC ownership approach

3   accords with the MRDA and produces an equitable

4   outcome.  The CCC pro rata approach is viable and

5   sustainable and produces a fair outcome similar to

6   that realized through the ownership approach.

7              CCC is in no means asking the Courts to

8   prefer one group of creditors over the other.  We

9   are taking -- we are asking the Courts to do the

10  polar opposite.  We are simply asking the Courts to

11  look to the competing interests to avoid an

12  inequitable result.

13             This case has garnered much public

14  attention worldwide, and particularly in Canada.

15  It affects tens of thousands of people.  While it

16  has resulted in extraordinary cooperation amongst

17  the multiple firms involved in multiple continents,

18  trailblazing levels of cooperation between the two

19  Courts in this case -- and we have got some pretty

20  fancy and snazzy technology to make it all

21  happen -- it has come at an incredibly high cost,

22  particularly to the involuntary creditors, the

23  pensioners and the former employees.

24             These people situated all around have

25  dedicated their lives to Nortel, and through their

1   efforts they built the business and the

2   intellectual property that is at issue in this

3   case.  In turn, they expected -- they expected --

4   to receive the retirement, health and disability

5   benefit compensation that they were promised.  They

6   face reductions in pensions and elimination of

7   health and disability benefits and should be fairly

8   compensated from the Nortel assets they produced.

9   They are not asking for everything.  They are

10  asking to be treated fairly.

11              Any allocation outcome must be legally

12  sustainable and accord with the reality of the

13  Nortel that they once knew.  A result that provides

14  only 11 to 25 percent recoveries to the Canadian

15  Estates and a full recovery plus interest to

16  distressed fund investors who purchased after this

17  proceeding was commenced based on a risky bet on

18  the outcome of a bankruptcy proceeding is clearly

19  inequitable.  It is an extreme result that is not

20  sustainable.

21              We do not need to encourage more

22  expensive cases in future insolvencies of

23  multinational companies where the courts are left

24  to try and allocate assets so that investors in

25  claims or debt can achieve a higher return.  We

```
 1   believe that courts serve a higher purpose, and we
 2   respectfully submit that any allocation
 3   consideration must treat all of the unsecured
 4   creditors fairly and equitably.
 5               We thank the Courts for their
 6   dedication in this case.  We all, on behalf of our
 7   enormous team, and everyone in the room, I am sure,
 8   thank everyone for the dedication of this Court.
 9   That concludes my submissions.
10               THE US COURT:  Thank you, Mr. Hoeffner.
11               THE CANADIAN COURT:  Mr. Hoeffner,
12   could I ask you a question, please?
13               MR. HOEFFNER:  Of course.
14               THE CANADIAN COURT:  Could you turn up
15   the chart which was page 14 of your demonstrative.
16   Under Column 3 US creditors are shown as
17   100 percent.  The Bondholders are shown as
18   100 percent.  And I am right, am I not, that that
19   100 percent reflects 100 percent of the principal,
20   but that doesn't reflect interest?
21               MR. HOEFFNER:  That's correct.
22               THE CANADIAN COURT:  All right.
23               MR. HOEFFNER:  This chart does not
24   address the post-petition interest issue.
25               THE CANADIAN COURT:  I understand.  I
```

1    understand.

2           Now, if you drop to the bottom of that

3    Column 3, you have got a billion three there, less

4    what has been burned.  If I am reading right what

5    has been burned, there is not much more than a

6    billion dollars there at the moment.

7           MR. HOEFFNER:  I mean, we could -- yes.

8           THE CANADIAN COURT:  So if the

9    Bondholders end up with a billion dollars on their

10   bonds before the interest, that would leave

11   virtually no money available for the equity holder

12   in Canada.  Do I read that right?

13          MR. HOEFFNER:  You are correct.  Again,

14   if they receive the 100 percent that is identified

15   towards the top of the chart and they receive -- I

16   mean, again, there is some quote/unquote settlement

17   amount of $1 million.  You reduce that 1.3 by the

18   burn rate, which, I mean, I could give you an

19   estimate which is well in excess of 100 million,

20   and then you also have a US tax claim.

21          It is all going to the Bondholders.  I

22   mean, that's the bottom line.

23          THE CANADIAN COURT:  Right.  Thank you.

24          THE US COURT:  Is there any evidence,

25   Mr. Hoeffner, in the record relating to at what

```
 1   price the Bondholders purchased their bonds and the
 2   like?
 3                MR. HOEFFNER:  The Bondholders declined
 4   to submit information showing the actual prices at
 5   which they purchased their bond.  We had provided a
 6   chart, Judge Gross, in connection with the
 7   examination of Mr. McConnell, their expert, which
 8   basically tracked the prices during the periods in
 9   which they did buy.  We have the changes from their
10   filings with the Court which show when their
11   positions changed at various points in time in the
12   bankruptcy proceeding, and we have what the public
13   market price was for those bonds.  We have that.
14   But again, they declined to provide the specific
15   information on their specific trading activity.
16                THE US COURT:  All right.  All right.
17   Thank you, Mr. Hoeffner.  I may have questions
18   later, but I am trying to let parties -- just ask a
19   few basic questions as we go along and ask parties
20   later.
21                MR. HOEFFNER:  We appreciate that, and
22   we will reserve whatever additional time we have
23   for rebuttal.
24                THE US COURT:  You bet.  Thank you.
25                MR. HOEFFNER:  Thank you.
```

1           THE US COURT:  Thank you, sir.

2           THE CANADIAN COURT:  Your brief,

3    Mr. Hoeffner, refers to some of this, doesn't it,

4    at page 69 and 70?  It deals with when they

5    acquired their bonds and some evidence about the

6    market range at the time.

7           MR. HOEFFNER:  Yes.  The information

8    that we were able to obtain from their filings with

9    the Court and from the public market information is

10   included in the brief.

11          THE CANADIAN COURT:  All right.  Thank

12   you.

13          THE US COURT:  Good afternoon.

14          MR. CRICHLOW:  Good afternoon, Judge

15   Gross.  Good afternoon, Justice Newbould.  I am

16   David Crichlow, on behalf of Wilmington Trust, on

17   behalf of the NNL Canada-issued bonds that are

18   nonguaranteed.

19          The good news I have for Your Honors is

20   the last time I was up here for openings, I was the

21   sole person standing between the conclusion of

22   opening, and I think now I am the sole person

23   standing between us and lunch.  So I have not been

24   allocated a lot of time, but I do have the

25   incentive to make sure that I am very efficient.

1           And the good news is much has been said
2   this morning from the Canadian interests that I
3   agree with, and I would like to start out by saying
4   that Mr. Zarnett did a wonderful job of marshaling
5   the issues on the law of interpretation of the MRDA
6   and marshaling some of the relevant evidence.   And
7   on behalf of Wilmington Trust, Your Honors, we
8   would adopt that argument in full.  And I think we
9   have already stated in our papers that we adopt
10  their proposed findings of fact and conclusions of
11  law.
12           I would like to start by simply stating
13  that at the beginning of this case I stood up and I
14  said and predicted that the Court would hear much
15  evidence, but at the end of the day, from my
16  respectful opinion, I thought this case turned on
17  the MRDA and its interpretation and that it would
18  mostly be about the MRDA.  And, Judge Gross, I like
19  your Major Reason for Dispute on Allocation acronym
20  because that is accurate.  That is why we are here.
21  And I am just going to take a few minutes to say
22  why it should not be so.
23           I am not going to go through all of the
24  provisions.  I think it is clear what the
25  provisions state and that in some respects I would

1  argue that its interpretation is a matter of law

2  for Justice Newbould under Ontario legal

3  principles. But what is not disputed with respect

4  to the MRDA -- and I don't think anyone really

5  mentioned this today -- is that no one has

6  testified and everyone says that the MRDA is the

7  only agreement that governs the rights and

8  obligations of the various parties with respect to

9  the licenses, and with respect to whatever

10  ownership theory any party has, they are pointing

11  to that agreement for those rights, and that's

12  where we disagree.

13           What we cannot disagree about is what

14  it says. And Mr. Zarnett took you through that in

15  painstakingly and very careful detail today. All I

16  want to add is what is not disputed is that it

17  says, and it has always said, that legal title to

18  any and all NN technology, whether now in existence

19  or acquired or developed later pursuant to the

20  terms of this agreement, shall be vested in NNL.

21           There were amendments to that

22  agreement. There has been language that has

23  changed. There has been some language that has

24  caused some confusion I will talk about very

25  briefly. But the one thing that did not change

1   through iterations, through amendments or the like

2   is that title, the ownership of that IP, the

3   property interests, were vested in and remain in

4   NNL until sold.

5              So that takes us to equitable,

6   beneficial ownership, which, Judge Gross, you

7   mentioned earlier today.  And we had testimony

8   about that.  And the testimony came from

9   Dr. Reichert, among others.  And I would argue and

10  respectfully submit to the Court that it should pay

11  very, very close attention to Dr. Reichert's

12  testimony in this case.  He testified that

13  ownership for tax purposes does not denote actual

14  ownership.  Transfer pricing regulations and

15  guidelines do not purport to dictate legal or

16  property interests either in insolvency or in a

17  going-concern context.  That was Dr. Reichert's

18  testimony.  And what we heard is that there were

19  some concerns about tax, transfer tax issues and

20  reasons to have language such as beneficial

21  ownership.

22             I think Mr. Zarnett hit the threshold

23  issue, which is when you look at the actual

24  language, it is an economic beneficial ownership in

25  the rights under licenses.  They have an equitable

1    beneficial ownership in rights.  But I cannot
2    ignore that the word "ownership" appears later.
3    And there is some discussion about, you know,
4    taking on the entrepreneurial risk and the like.
5    And what we heard from Dr. Reichert is those are
6    terms that resonate with tax authorities.  And the
7    testimony from all parties involved was that
8    despite the fact that the agreement may have been a
9    Canadian agreement, they were concerned about tax
10   consequences, transfer tax pricing in all of the
11   jurisdictions in which they operate.

12            Now, as triers of fact, just like a
13   jury, you are entitled to take into consideration
14   other places we see these types of issues that may
15   dictate to you which testimony is more credible,
16   because Dr. Reichert's testimony is one of the
17   testimonies that is not uncontroverted.  There are
18   people that take issue with it.  They suggest that
19   it would not be rational, which I'll get to in a
20   second, for the US interests to have agreed to that
21   strictly for tax purposes.  But where else do we
22   see these types of agreements?

23            And it is not just in a complicated
24   multinational transaction.  If you are living in
25   the United States at least in a jurisdiction where

 1   they have luxury taxes for expensive automobiles,
 2   boats and the like, and you are like me and you are
 3   unfortunate enough to learn it this way, if you
 4   lease a car and you do not own title in it, you are
 5   still the equitable beneficial owner of it for tax
 6   purposes only, and the leasing company holds title.
 7   You cannot sell it.  You cannot -- or if you do
 8   sell it, the leasing company is going to be
 9   entitled to the proceeds.  We all know that.  But
10   the fact is, as a lessee, in some instances you can
11   be a beneficial owner for tax purposes because you
12   have the right to use something, and it is the
13   fairest way to apply it.
14            The same is true here.  And I am sure
15   that the US interests would say, well, that is an
16   inapt analogy because, you know, we gave so much in
17   research and development.  We gave so much to the
18   enterprise.  Why would we do that?  That would be
19   irrational.  And that's one other subject that I
20   don't think was covered here that was covered
21   during the course of the trial, because
22   irrationality was also addressed by Dr. Reichert
23   and Clive Allen.  And we addressed it a little bit
24   in our brief.
25            The licensed participants initially

1   received the IP that they needed to start and grow

2   their one successful business.  We are here talking

3   about it now that it is not successful, but the US

4   interests in their opening statement talked about a

5   period of time when it was largely successful.  And

6   they were permitted by NNL to maintain operations

7   without paying any upfront costs or royalties for

8   extremely lucrative licenses that they received to

9   go out and market their products, book their sales

10  and profits, split pursuant to the RPSM agreement,

11  of course, but to do so with licenses that they

12  didn't have to pay for.  And Clive Allen testified

13  extensively about that, in addition to

14  Dr. Reichert.

15              They obtained a right to make and use

16  Nortel technology and sell products related to that

17  technology, all the while obtaining substantial

18  revenue as a result, at no cost for the relative

19  licenses and without respect to whether a

20  particular participant's R&D was responsible for

21  the technology supporting the products sold by that

22  participant.  Those are extremely valuable rights,

23  and that is the consideration they received for

24  that R&D contribution.

25              So it would not be irrational for them

```
 1   to have beneficial ownership for purposes of tax
 2   reasons if the parent and all of the entities
 3   agreed that it would be so.  It also would not be
 4   commercially unreasonable for them to enter into a
 5   transaction where they would commit so much to
 6   research and development because they were
 7   benefiting from others' research and development.
 8            There was an upside and a downside, as
 9   it turns out.  And what you have here is the
10   classic example that in a commercial agreement that
11   was not designed to anticipate the liquidation of
12   this company and the way proceeds would be
13   allocated, that you now have parties coming to the
14   Court, and I think in good faith and with good
15   hearts, saying, Well, this isn't what we intended,
16   Your Honors.  We would have never agreed to that.
17   And that happens quite frequently in commercial
18   transactions.  But the problem is, if the Courts
19   were to simply rewrite agreements and make it so
20   that in hindsight we get the fairest result, you
21   two would be even more burdened every day with
22   cases coming to court.
23            So I know in the United States, and I
24   understand from my colleagues in Canada, that's the
25   reason we go to the contract.  We look at what the
```

1    parties intended at the time, what their agreement

2    was, and if it is unambiguous, we don't look at

3    anything else.  And what is unambiguous is the

4    property rights and title vested in NNL, which gave

5    them the rights to sell it and receive the

6    proceeds.

7              Now, finally, in stating that we have

8    heard much from the US interests that it is simply

9    unfair for all of the allocation to go to the US

10   entity -- I am sorry -- to the Canadian entity.

11   And I think Mr. Zigler spoke on this extensively,

12   so I am not going to extend the thought.  But it is

13   absolutely clear, and the evidence was not

14   controverted, that if the Canadian allocation

15   process under the ownership allocation theory were

16   adopted by these courts, it would provide recovery

17   for the US creditors at or near par.

18              And I think you saw a chart that just

19   said the Bondholders would receive 100 cents on the

20   dollar.  It would provide other US creditors with

21   95 cents on the dollar.  And that was testified by

22   Mr. Britven, and it was not contradicted by

23   Mr. Ray.

24              He was asked this specific question on

25   cross-examination:

```
 1                        "So we can agree that no matter
 2                   what the outcome of this allocation
 3                   proceeding, whether the proceeds go
 4                   to Canada or the United States,
 5                   there will be a significant recovery
 6                   by the US and by the Bondholders."
 7             His answer was:
 8                        "There will be a recovery in
 9                   both estates."
10             He didn't buy the word "significant,"
11   but I want the Court to pay attention that he
12   didn't dispute it either, because he can't.  It is
13   accurate.  There is going to be a significant
14   recovery.
15             So any argument that this really
16   provided the US interests with nothing is
17   disingenuous.  What it does do is it would provide
18   a full and overwhelming majority of the allocation
19   proceeds in the first instance to go to the
20   Canadian Estate.  That does not mean it is not
21   fair.
22             Finally, I will end on this.  I join
23   Mr. Hoeffner's well-stated and eloquent argument on
24   pro rata.  It is an alternative theory for
25   Wilmington Trust also and not one that we simply
```

1   joined with the CCC.  We had independently come up
2   with the theory.  And I said at the beginning that
3   this was an unprecedented case in scope, magnitude
4   and process.  And I said it may require some
5   pragmatic sensibilities.  Mr. Hoeffner has laid out
6   all the reasons why, if this Court can't make a
7   determination on ownership, those pragmatic
8   sensibilities should lend itself to a pro rata
9   distribution.  It is in line with how the company
10  ran and how the business operated, and it would be
11  the fairest result.
12              With that, Your Honors, I will thank
13  you all for your time.  And if you have any
14  questions, I am happy to address.  Otherwise, I am
15  happy to sit down.
16              THE US COURT:  Mr. Crichlow, I will
17  reserve questions.
18              Justice Newbould?
19              THE CANADIAN COURT:  You may sit down,
20  Mr. Crichlow.  I have no questions at this time.
21              MR. CRICHLOW:  Thank you, Your Honor.
22              THE US COURT:  Thank you.
23              THE CANADIAN COURT:  This probably is
24  an appropriate time to take the lunch recess.  Come
25  back -- how is 2:00 with everybody?  Is that okay

```
 1    with you, Judge Gross?
 2              THE US COURT:   That's fine.   You live a
 3    more elegant lifestyle up in Canada.   We will be
 4    back at 2:00.
 5              THE CANADIAN COURT:   Elegant, that's
 6    what you call it?
 7              THE US COURT:   That's it.   Thank you,
 8    all.   We will stand in recess until 2:00.
 9              -- LUNCHEON RECESS TAKEN AT 12:45 P.M.
10              -- RESUMED AT 2:16 P.M.
11              THE US COURT:   Please be seated,
12    everyone.   Thank you.
13              THE CANADIAN COURT:   Good afternoon,
14    Judge Gross.
15              THE US COURT:   Good afternoon,
16    Mr. Justice Newbould.   Mr. Maguire, it is good to
17    see you again, sir.
18              MR. MAGUIRE:   Good afternoon, Judge
19    Gross.
20              THE US COURT:   Good afternoon.
21              MR. MAGUIRE:   Thank you, sir.   Good
22    afternoon, Justice Newbould.
23              THE CANADIAN COURT:   Mr. Maguire.
24              MR. MAGUIRE:   Again, it is Bill Maguire
25    for the EMEA Debtors.
```

```
 1              THE US COURT:  Yes.

 2              MR. MAGUIRE:  And if it please the

 3   Courts, our plan is that I will kick off our

 4   closing by addressing the question that you asked

 5   earlier today, Judge Gross, and which my friend

 6   Mr. Zarnett described as exactly the right

 7   question, which is where --

 8              THE US COURT:  No one has ever said

 9   that to me before.

10              MR. MAGUIRE:  It is a response with

11   which we heartily agree, and it is specifically to

12   those provisions in which the parties contractually

13   recognized the ownership, the joint ownership, of

14   the participants to the MRDA.

15              Then I will hand the baton to my

16   colleague Matthew Gottlieb in Toronto, who will

17   address certain Ontario law on three things:

18   First, how the MRDA vested NNL with legal title and

19   only legal title and not beneficial ownership,

20   which all of the parties shared; second, how the

21   parties owned NN technology by creating it; and

22   third, how evidence of joint ownership that we

23   presented at trial is admissible in various ways,

24   including as direct evidence of ownership.

25              Now, we have handed up a binder that I
```

```
 1    hope you have, Judge Gross.
 2                THE US COURT:  Yes.
 3                MR. MAGUIRE:  And hopefully, Justice
 4    Newbould, you have that as well.
 5                THE CANADIAN COURT:  I do.
 6                MR. MAGUIRE:  That contains our
 7    demonstratives.  And on the inside flap we have a
 8    demonstrative that some of my friends have unkindly
 9    called a menu.
10                THE US COURT:  I thought maybe it was a
11    brochure for your firm.
12                MR. MAGUIRE:  That's a special treat we
13    are holding for later.
14                THE US COURT:  All right.
15                MR. MAGUIRE:  This demonstrative is in
16    the form of a time line, and it covers the key
17    evidence of ownership and contribution over the
18    last decade of the life of Nortel.
19                Now, throughout the trial our Canadian
20    friends argued that extrinsic evidence of ownership
21    should be disregarded as so much Hamburger Helper
22    and rabbit holes.  So to address that point, we
23    have put all the -- and I will call it the
24    noncontractual evidence above the time line on the
25    chart.  So if we take the years and go up, or
```

1   north, we see what our friends would call the

2   Hamburger Helper or the rabbit holes.  Below the

3   time line we set forth what I will call the

4   contractual evidence, and that is what the parties

5   stated in their written agreements.

6          The irony here is that the Canadian

7   interests rely on the contract to deny shared

8   ownership, but the contract itself recognizes

9   shared ownership.  And I believe my friend

10  Mr. Zarnett had it exactly right when he brought

11  the Courts to the provision of the MRDA that

12  specifically addresses shared ownership.  And we

13  have it on our chart under the MRDA, under the year

14  2004, where we have the MRDA, and specifically

15  there we have Schedule A.  We also have it up on

16  our screen here.  This is the provision that, if I

17  remember right, Justice Newbould raised in opening

18  statements with the Canadian interests on the

19  subject of ownership.

20          The first and second lines of that

21  provision refer to the participants -- that is us,

22  all of the parties to the MRDA -- and to their

23  ownership of NN technology.  Now, we heard from

24  Mr. Zarnett this morning.  And in their main brief

25  the Canadian interests say, the Monitor says, that

1   provision, this provision of Schedule A says

2   nothing about who owns the NN technology.  Well,

3   that provision could hardly be more clear.  It

4   specifically refers to the ownership of the NN

5   technology, and it talks about participants.  It

6   doesn't talk about anyone else.  It talks about the

7   participants.  It talks about their compensation.

8   It talks about their risk.  It talks about their

9   development and their ownership of NN technology.

10             So the argument that Schedule A of the

11  contract says nothing about who owns NN technology

12  requires the Courts to ignore the words

13  "participants" and the words "ownership of NN

14  technology."  If we don't ignore "participants" and

15  "ownership," then this provision of Schedule A

16  clearly recognizes the participants' ownership of

17  NN technology.

18             Now, not to pile on, but if we take our

19  time line to the year 2007 and look below the line,

20  sticking with contractual statements, we have the

21  second addendum, where the parties referred to each

22  participant holding and enjoying equitable and

23  beneficial ownership of NN technology.  Nothing

24  unclear about the words "each participant."  No

25  wriggle room in the words "beneficial ownership of

 1   NN technology."
 2              And, Justice Newbould, I believe you
 3   raised the additional words at the end which say
 4   "as defined in the prior agreement."  And I suppose
 5   that could be read as a reference to beneficial
 6   ownership.
 7              I would submit another reading, perhaps
 8   even a better reading, would be a reference to the
 9   defined term "NN Technology," which, indeed, is a
10   defined term and, indeed, is defined in the MRDA in
11   Article 1.  And that definition, of course, is very
12   broad, and it includes all of the Rockstar patents
13   and all of the IP that was sold in the lines of the
14   business sales.  And so we have the parties here
15   specifically saying that each participant has
16   beneficial ownership in all of those patents and
17   all of that IP.
18              And if we go to the following year in
19   our time line, under 2008, we have the MOU, where
20   the parties refer to their respective ownership
21   interests in the NN technology.  Now, the MOU is
22   not binding, but it certainly is evidence, and it
23   confirms that provision of Schedule A.
24              Same, too, if we jump to 2009.  Here we
25   have the third addendum, where the parties

1   reenacted, so to speak, the very words of
2   Schedule A that we have been talking about,
3   recognizing the participants' ownership of NN
4   technology.

5               In fact, our chart shows below the line
6   the parties amended their MRDA five times over four
7   years, and every single time they kept those
8   critical words about the participants' ownership of
9   NN technology.

10              Another argument we hear is that
11  Schedule A does not purport to change Article 4's
12  vesting of legal title in NNL.  Well, of course
13  not.  As my colleague Mr. Gottlieb will explain,
14  legal title is just legal title, not beneficial
15  ownership.  It is only by misinterpreting the
16  vesting of legal title as if it were something
17  else, a grant of sole ownership, that our Canadian
18  colleagues say the contract somehow excludes
19  beneficial ownership.  And that misinterpretation
20  would create an irreconcilable conflict with
21  Schedule A, which clearly and repeatedly, time and
22  again, confirmed the parties' shared ownership of
23  NN technology.

24              There is no conflict if we give the
25  words of the contract their natural and obvious and

1   ordinary meaning. Article 4 vests legal title and
2   only legal title in NNL. And Schedule A confirms
3   the parties' joint beneficial ownership of NN
4   technology. No conflict, no ambiguity; just the
5   obvious distinction between legal title on the one
6   hand and beneficial ownership on the other.

7               With respect to the second addendum and
8   the MOU, we have heard our Canadian friends say
9   that the Courts can ignore their admissions in
10  those contracts because they are in recitals which
11  do not purport to change the existing rights of the
12  parties. That, with respect, misses the point,
13  which the Canadian Debtors never answer. The point
14  is why. Why would the participants repeatedly
15  recognize anywhere in a recital or, even worse, in
16  Schedule A joint ownership if they didn't intend
17  there to be any such thing? Why would they
18  repeatedly recognize beneficial ownership if their
19  intention was to vest sole and exclusive ownership
20  with NNL?

21              People confirm rights that already
22  exist, and that's --

23              THE CANADIAN COURT: Mr. Maguire, we
24  have certain rules of construction up here as to
25  the use of recitals. What do you say, taking those

1  principles into account, allows you to use the

2  recitals?

3          MR. MAGUIRE:  I would respectfully

4  submit, Your Honor, that those principles are

5  completely in accordance with EMEA's argument.

6          THE CANADIAN COURT:  Which particular

7  one?  I mean, which particular one?

8          MR. MAGUIRE:  Specifically, we are not

9  suggesting that these recitals should overwhelm or

10  override any express grant or any operative

11  provision in any contract.  We are showing here

12  that it makes perfect sense that the parties

13  recited their respective ownership interests which

14  they already had when they entered into the MRDA.

15  They were simply clarifying and making it available

16  for the reader of the contract to understand that,

17  when there was a grant of legal title and it was

18  described as legal title, there was, of course, a

19  separate beneficial ownership that was not affected

20  by that.  And so --

21          THE CANADIAN COURT:  Let me ask you one

22  more question.

23          MR. MAGUIRE:  Yes.

24          THE CANADIAN COURT:  Do you say that

25  there is some ambiguity in the language of the