# EXHIBIT 83

(Part 1 of 2)

EXHIBIT
220

| | |
|---|---|
| From: | Eckenrod, Russell D. <reckenrod@cgsh.com> |
| Sent: | Monday, July 21, 2014 12:41 PM |
| To: | Leblanc, Andrew <ALeblanc@milbank.com>; Harris, Jennifer <JHarris@milbank.com>; Dunne, Dennis <DDunne@milbank.com>; Pisa, Albert A. <APisa@milbank.com>; Kreller, Tom <TKreller@milbank.com>; Matz, Tom <TMatz@milbank.com> |
| Cc: | Schweitzer, Lisa M. <lschweitzer@cgsh.com> |
| Subject: | RE: NORTEL: revised US PPI Settlement Agreement |
| Attach: | 2925539_9(Nortel US PPI Settlement Agreement (CGSH DRAFT 7-21-14)).DOCX; Blackline v MTHM 7-18.pdf |

**SUBJECT TO FRE 408 AND ANY OTHER APPLICABLE PRIVILEGES**
**PRIVILEGED AND CONFIDENTIAL**

All:

I attach a revised draft of the settlement agreement, clean and blacklined against your Friday version. This draft remains subject to further internal and client review, but is being circulated now in the interests of time.

---

Russell D. Eckenrod
Cleary Gottlieb Steen & Hamilton LLP
Assistant: lpujals@cgsh.com
One Liberty Plaza, New York NY 10006
t: +1 212 225 2706 | f: +1 212 225 3999
www.clearygottlieb.com | reckenrod@cgsh.com

---

**From:** Leblanc, Andrew [mailto:ALeblanc@milbank.com]
**Sent:** Sunday, July 20, 2014 7:24 PM
**To:** Schweitzer, Lisa M.; JHarris@milbank.com
**Cc:** ddunne@milbank.com; apisa@milbank.com; tkreller@milbank.com; tmatz@milbank.com
**Subject:** RE: NORTEL: revised US PPI Settlement Agreement

Any update on the draft review? We would like to be in a position to get signatures tomorrow, if possible, but we need a final doc before that happens.

---

**From:** Schweitzer, Lisa M. [mailto:lschweitzer@cgsh.com]
**Sent:** Friday, July 18, 2014 4:30 PM
**To:** Harris, Jennifer
**Cc:** Dunne, Dennis; Pisa, Albert A.; Leblanc, Andrew; Kreller, Tom; Matz, Tom
**Subject:** RE: NORTEL: revised US PPI Settlement Agreement

Thanks Jennifer. We will review and come back to you on the draft.
Can you folks send us a summary of the holdings of your group members so we can get a ball park of how much of each series is represented if we sign? Many thanks.

---

Lisa M. Schweitzer
Cleary Gottlieb Steen & Hamilton LLP
Assistant: cverga@cgsh.com
One Liberty Plaza, New York NY 10006
t: +1 212 225 2629 | f: +1 212 225 3999 | m: +1 646 610 1096
www.clearygottlieb.com | lschweitzer@cgsh.com



**From:** Harris, Jennifer [mailto:JHarris@milbank.com]
**Sent:** Friday, July 18, 2014 2:59 PM
**To:** Schweitzer, Lisa M.
**Cc:** ddunne@milbank.com; apisa@milbank.com; aleblanc@milbank.com; tkreller@milbank.com; tmatz@milbank.com
**Subject:** NORTEL: revised US PPI Settlement Agreement

SUBJECT TO FRE 408 AND ANY OTHER APPLICABLE PRIVILEGES
PRIVILEGED AND CONFIDENTIAL

Lisa,

Enclosed please find a revised draft of the PPI Settlement Agreement, clean and blacklined against the version sent to you yesterday. Please note the draft remains subject to review by our clients and the indenture trustees in all respects.

Best regards,
Jennifer

---

**Jennifer P. Harris | Milbank**
601 South Figueroa Street | Los Angeles, CA 90017
T: +1 213.892.4344 | F: +1 213.892.4744
jharris@milbank.com | www.milbank.com

---

**From:** Matz, Tom
**Sent:** Thursday, July 17, 2014 8:26 AM
**To:** Schweitzer, Lisa M.
**Cc:** Dunne, Dennis; Pisa, Albert A.; Leblanc, Andrew; Kreller, Tom
**Subject:** NORTEL: US PPI Settlement Agreement

SUBJECT TO FRE 408 AND ANY OTHER APPLICABLE PRIVILEGES
PRIVILEGED AND CONFIDENTIAL

Lisa,

Further to our discussions on Tuesday, attached is a draft settlement agreement regarding PPI. This draft agreement is subject to ongoing client and internal review but in the interests of time, we wanted to get it to you for your review and consideration.

We would be pleased to continue our discussions this afternoon.

Tom

---

**Thomas J. Matz | Milbank**
One Chase Manhattan Plaza | New York, NY 10005
P: +1 212.530.5885 | F: +1 212.822.5885
tmatz@milbank.com | www.milbank.com

================================================================

BHG-PPI-0000083

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.
This message is being sent from a law firm and may contain confidential or privileged information. If you are not the
intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy.

Throughout this communication, "Cleary Gottlieb" and the "firm" refer to Cleary Gottlieb Steen & Hamilton LLP and
its affiliated entities in certain jurisdictions, and the term "offices" includes offices of those affiliated entities.

==============================================================

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.
This message is being sent from a law firm and may contain confidential or privileged information. If you are not the
intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy.

Throughout this communication, "Cleary Gottlieb" and the "firm" refer to Cleary Gottlieb Steen & Hamilton LLP and
its affiliated entities in certain jurisdictions, and the term "offices" includes offices of those affiliated entities.

*SUBJECT TO FRE 408 & ANY OTHER APPLICABLE PRIVILEGES*
*PRIVILEGED & HIGHLY CONFIDENTIAL*
CGSH DRAFT
7/21/2014

## AGREEMENT SETTLING THE US POST-PETITION INTEREST DISPUTE

This agreement (the "PPI Settlement Agreement") is entered into by and among Nortel Networks Inc. ("NNI"), Nortel Networks Capital Corporation ("NNCC" and, together with NNI, the "Nortel Parties"), the bondholders who are signatories hereto (each a "Supporting Bondholder" and, collectively, the "Supporting Bondholders") holding Guaranteed Bonds (defined *infra*), Law Debenture Trust Company of New York, as indenture trustee ("Law Debenture"), and The Bank of New York Mellon, as indenture trustee ("BNY" and, with the Law Debenture, the "Indenture Trustees,") (with the Nortel Parties, the Supporting Bondholders, and Indenture Trustees each being a "Party" and collectively, the "Parties").

### RECITALS

WHEREAS, on January 14, 2009 (the "Filing Date"), NNI, NNCC, and certain of their United States affiliates (the "US Debtors") other than Nortel Networks (CALA) Inc. ("NN CALA")[1] filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") (together with the NN CALA Case, the "US Proceedings") before the United States Bankruptcy Court for the District of Delaware (the "US Court"). On January 22, 2009, the Office of the United States Trustee for the District of Delaware appointed the official committee of unsecured creditors in respect of the US Debtors.

WHEREAS, on the Filing Date, the US Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL"), and certain of NNC's and NNL's Canadian affiliates commenced creditor protection proceedings before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (respectively, the "Canadian Proceedings" and "CCAA"), in connection with which Ernst & Young Inc. was appointed monitor (the "Monitor").

WHEREAS, prior to the Filing Date, the US Debtors, the EMEA Debtors,[2] the Canadian Debtors (collectively, the "Nortel Debtors"), and certain of their non-debtor affiliates around the world were part of the Nortel group of companies (the "Nortel Group"), of which NNC was the ultimate corporate parent.

---

[1] NN CALA filed its voluntary petition for protection under chapter 11 of the Bankruptcy Code on July 14, 2009 (the "NN CALA Case") [D.I. 1098].

[2] The EMEA Debtors are: Nortel Networks U.K. Ltd., Nortel Networks S.A. ("NNSA"), Nortel Networks (Ireland) Limited ("NNIR"), Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

*SUBJECT TO FRE 408 & ANY OTHER APPLICABLE PRIVILEGES*
*PRIVILEGED & HIGHLY CONFIDENTIAL*
CGSH DRAFT
7/21/2014

WHEREAS, pursuant to the Indenture dated as of July 5, 2006 (the "2006 Indenture"),[3] NNL issued multiple series of senior notes guaranteed by NNC and NNI, including two series of fixed rate 10.75% senior notes in the aggregate principal amounts of $450 million and $675 million due 2016 (together, the "10.75% Notes"), a series of fixed rate 10.125% senior notes in the aggregate principal amount of $550 million due 2013 (the "10.125% Notes"), and a series of floating rate senior notes in the aggregate principal amount of $1 billion due 2011 (the "Floating Rate Notes" and, together with the 10.75% Notes and the 10.125% Notes, the "2006 Indenture Notes").

WHEREAS, on September 25, 2009, The Bank of New York Mellon, under the 2006 Indenture, filed a timely proof of claim on behalf of the holders of the 2006 Indenture Notes preserving, among others, their claim for "an unliquidated amount for the continuing post-petition (a) accrual of interest (including interest upon the overdue installments of interest). . . ."[4]

WHEREAS, as provided in Section 1001 of the 2006 Indenture, "[t]he Issuer covenants and agrees for the benefit of each particular series of Debt Securities that it will duly and punctually pay the principal of (and premium, if any) and interest on the Debt Securities of such series in accordance with their terms and this Indenture." The 2006 Supplemental Indentures establish the applicable rate of interest for each series of 2006 Indenture Notes. Moreover, Section 312 of the 2006 Indenture provides for interest payable to noteholders and that interest not punctually paid or duly provided for on any interest payment date constitutes defaulted interest.

WHEREAS, pursuant to the Indenture dated as of March 28, 2007 (the "2007 Indenture"), NNC issued 2.125% convertible senior notes due 2014 (the "2.125% Notes") in an aggregate principal amount of $575 million and 1.75% convertible senior notes due 2012 (the "1.75% Notes" and, together with the 2.125% Notes, the "2007 Indenture Notes" and, together with the 2006 Indenture Notes, the "NNI Indenture Notes") in an aggregate principal amount of $575 million. The 2007 Indenture Notes are each guaranteed by NNI and NNL.

WHEREAS, on September 25, 2009, The Bank of New York Mellon, under the 2007 Indenture, filed a timely proof of claim on behalf of the holders of the 2007 Indenture Notes for, among others, "a claim in an unliquidated amount for the continuing post-petition (a) accrual of interest (including interest upon the overdue installments of interest). . . ."[5]

WHEREAS, pursuant to Section 4.01 of the 2007 Indenture, "[t]he Issuer shall pay the principal of and interest (including Additional Interest, if any) on the Notes on the dates and in the manner provided in the Notes . . . . To the extent lawful, the Issuer shall pay interest

---

[3] Supplemented by the First Supplemental Indenture, dated July 5, 2006, the Second Supplemental Indenture dated May 1, 2007, and the Third Supplemental Indenture dated May 28, 2008 (collectively the "2006 Supplemental Indentures").

[4] *See* Attachment to Claim No. 3972 ¶ 8.

[5] *See* Attachment to Claim No. 3971 ¶ 8.

Confidential

BHG-PPI-0000086

*SUBJECT TO FRE 408 & ANY OTHER APPLICABLE PRIVILEGES*
*PRIVILEGED & HIGHLY CONFIDENTIAL*
CGSH DRAFT
7/21/2014

(including post-petition interest in any proceeding under any bankruptcy, insolvency or other similar applicable law) on (i) overdue principal, at the rate borne by Notes; and (ii) overdue installments of interest (without regard to any applicable grace period) at the same rate." Additionally, pursuant to Section 2.11 of the 2007 Indenture, "[i]f the Issuer (and the Guarantors) fail to make a payment of interest on the Notes, it (and the Guarantors) shall pay such defaulted interest plus, to the extent lawful, any interest payable on the defaulted interest." The 2007 Indenture establishes the applicable rate of interest for each series of 2007 Indenture Notes.

WHEREAS, pursuant to the Indenture dated as of February 15, 1996 (the "1996 Indenture"), NNCC issued a series of fixed rate 7.875% senior notes guaranteed by NNL in an aggregate principal amount of $150 million due 2026 (the "7.875% Notes" and, with the 2006 Indenture Notes and the 2007 Indenture Notes, the "Guaranteed Bonds").[6]

WHEREAS, on September 28, 2009, the Law Debenture Trust Company of New York filed a timely proof of claim (the "Initial 7.875 Notes Proof of Claim") on behalf of the holders of the 7.875% Notes preserving, among others, their claim for "payment in full of all post-petition interest due and payable under the [1996] Indenture."[7] The Initial 7.875 Notes Proof of Claim was amended on January 10, 2013 through the filing of an amended proof of claim, which indicated that the amounts owed on account of the 7.875% Notes included "all amounts due on account of all post-petition interest due and payable."[8]

WHEREAS, pursuant to Section 1001 of the 1996 Indenture, "[t]he applicable Issuer covenants and agrees for the benefit of each particular series of Debt Securities that it will duly and punctually pay the principal of (and premium, if any) and interest on the Debt Securities in accordance with their terms and this Indenture." The 1996 Indenture established the applicable rate of interest for the 1996 Indenture Notes.

WHEREAS, the Indenture Trustees and the Supporting Bondholders each acknowledge and agree that they have not filed any proofs of claim in the US Proceedings against any US Debtor other than the Nortel Parties and do not hold any claims against any US Debtor other than the Nortel Parties.

WHEREAS, after the Filing Date, the Nortel Debtors entered into various agreements for the coordinated sale of the Nortel Group's businesses and assets. The various Nortel estates further agreed that all sale proceeds would be held in escrow accounts corresponding to each sale transaction, pending later agreement by the parties on allocation or a litigated resolution of any allocation dispute. This agreement among the US Debtors, the Canadian Debtors and certain of the EMEA Debtors was memorialized in the Interim Funding and Settlement Agreement, dated

---

[6] All holders of the Guaranteed Bonds are collectively defined as "Bondholders".

[7] *See* Attachment to Claim No. 3946 at 5.

[8] *See* Attachment to Claim No. 8446 at ¶ 4.

Confidential                                                                                              BHG-PPI-0000087

*SUBJECT TO FRE 408 & ANY OTHER APPLICABLE PRIVILEGES*
*PRIVILEGED & HIGHLY CONFIDENTIAL*
CGSH DRAFT
7/21/2014

as of June 9, 2009 (the "IFSA").[9] Following a joint hearing on June 29, 2009, the IFSA was approved by each of the US Court [D.I. 993] and the Canadian Court.

WHEREAS, from 2009 to 2011, the Nortel Debtors conducted a series of court-approved sale transactions that generated in excess of $7.3 billion in sale proceeds (together with accrued interest, the "Sale Proceeds"). Each Nortel Group entity that satisfied the definition of "Nortel Seller" (as defined in the IFSA) was entitled to participate in the distribution of the Sale Proceeds.

WHEREAS, after three failed mediation attempts regarding the allocation of the Sale Proceeds among the Nortel Sellers, litigation to resolve the allocation issues (the "Allocation Litigation") was ordered by the US Court by an Order dated April 3, 2013 [D.I. 9947] (as supplemented by further orders) and directed by endorsements of the Canadian Court dated March 8, 2013 and April 3, 2013.[10]

WHEREAS, after extensive fact and expert discovery, on May 12, 2014, the parties commenced joint hearings (together, the "Allocation Trial") before the US Court and the Canadian Court (collectively, the "Courts"). The evidentiary portion of the Allocation Trial concluded on June 24, 2014, and the litigation remains pending before each of the Courts.

WHEREAS, at the request of the Monitor in the Memorandum of the Monitor Regarding Bondholder Claims Issues, dated June 19, 2014 [D.I. 13880] (the "Monitor's Request"), the Courts issued an order directing briefing and argument (the "PPI Dispute") on two issues relating to post-petition interest ("PPI") on the Guaranteed Bonds:

i) whether the holders of the Guaranteed Bonds are legally entitled in each jurisdiction to claim or receive any amounts under the relevant indentures above and beyond the outstanding principal debt and pre-petition interest (namely, above and beyond the US $[4.092] billion); and

ii) if determined that the holders of the Guaranteed Bonds are so entitled, what additional amounts are such holders entitled to so claim and receive.

WHEREAS, on July 15, 2014, certain of the parties to the Allocation Litigation filed and exchanged opening briefs with respect to the PPI Dispute in the US Court and the Canadian Court. The briefs advance the parties' divergent and competing positions regarding the PPI Dispute. Depending on the resolution of the PPI Dispute, distributions to the U.S. Debtors' creditors could be materially different.

---

[9] See Exhibit B to the Motion Pursuant to 11 U.S.C. § 105(a), § 363, § 503 and Fed. R. Bankr. P. 9019 for an Order (A) Approving the Interim Funding and Settlement Agreement, and (B) Granting Related Relief [D.I. 874].

[10] See Exhibits C and D to Notice of Filing of Items Designated for Record on Appeal dated May 1, 2013 [D.I. 10414].

*SUBJECT TO FRE 408 & ANY OTHER APPLICABLE PRIVILEGES*
*PRIVILEGED & HIGHLY CONFIDENTIAL*
CGSH DRAFT
7/21/2014

WHEREAS, the PPI Dispute requires the determination of separate and distinct legal issues in the United States (the "US PPI Dispute") and Canada (the "Canada PPI Dispute"), and as such can and should be resolved independently in each jurisdiction. The PPI Settlement Agreement relates solely to the US PPI Dispute.

WHEREAS, the Parties all acknowledge and agree that the entry into any settlement of the US PPI Dispute shall not be deemed an acknowledgement or acceptance of the position of any party to the US PPI Dispute, the Canada PPI Dispute or the Allocation Litigation. The Parties also acknowledge and agree that the ultimate outcome of the US PPI Dispute is uncertain, that appeals in respect of such litigation are likely, that the cost of such litigation and associated delays may be both substantial and burdensome on the Parties and that such costs will continue to increase absent a final and binding resolution of the US PPI Dispute. The approval of the PPI Settlement Agreement would end a contentious and potentially costly litigation regarding the entitlement of Bondholders to PPI in the US Proceedings; resolve an issue which could have significantly delayed the confirmation of the US Debtors' chapter 11 plan(s) and the ultimate distribution of plan proceeds to the US Debtors' creditors; and further the efficient administration of the US Debtors' estates generally. As a result of the compromises embodied in this PPI Settlement Agreement, the US Debtors have substantially reduced the potential size of the PPI claim of the Bondholders and have mitigated the risk to their unsecured creditors and other parties in interest of a costly and protracted appeals process on these issues, thereby preserving significant value for all of the US Debtors' stakeholders.

NOW THEREFORE, IN LIGHT OF THE FOREGOING RECITALS, AND FOR GOOD AND VALUABLE CONSIDERATION, THE VALUE OF WHICH IS HEREBY AGREED, THE PARTIES HEREBY FURTHER AGREE, SUBJECT TO THE SATISFACTION OF ALL CONDITIONS SET FORTH HEREIN THAT:

1. **INTERPRETATION**

1.1. The Recitals set forth above form an integral part of this PPI Settlement Agreement and are incorporated fully herein.

2. **PPI SETTLEMENT**

2.1. Subject to Section 4.3[11], in the event that NNI at any time has more than sufficient funds to pay all of its allowed administrative, priority, secured, general unsecured and prepetition claims in full, holders of NNI Indenture Notes shall be entitled to payment from NNI of PPI in the PPI Settlement Amount corresponding to the NNI Indenture Notes and shall be paid PPI from such funds available for such distributions (together with any other creditors of NNI entitled to payments of PPI) in accordance with a confirmed chapter 11 plan until the PPI Settlement Amount, taking into account PPI payments made by NNCC to holders of the 7.875% Notes in accordance with Section 2.2 hereof, is paid in full.

---

[11] NTD: what claims are you trying to preserve through this reference in this and the next paragraph?

*SUBJECT TO FRE 408 & ANY OTHER APPLICABLE PRIVILEGES*
*PRIVILEGED & HIGHLY CONFIDENTIAL*
CGSH DRAFT
7/21/2014

2.2. Subject to Section 4.3, in the event that NNCC at any time has more than sufficient funds to pay all of its allowed administrative, priority, secured, general unsecured and prepetition claims in full, holders of 7.875% Notes shall be entitled to payment from NNCC of PPI in the PPI Settlement Amount corresponding to the 7.875% Notes and shall be paid PPI from such funds available for such distributions (together with any other creditors of NNCC entitled to payments of PPI) in accordance with a confirmed chapter 11 plan until the PPI Settlement Amount, taking into account PPI payments made by NNI to holders of NNI Indenture Notes in accordance with Section 2.1 hereof, is paid in full.

2.3. The "PPI Settlement Amount" shall be an amount equal to [$907 million].

2.4. The Indenture Trustees have asserted in the proofs of claim filed in the US Debtors' cases specific and varying contractual entitlements with respect to the Guaranteed Bonds, including, without limitation, entitlement to make-whole payments, no-call rights, different methods of calculating any post-petition amounts or rates (those claims and issues being referred to collectively herein as "Contractual Entitlements"). Nothing in this PPI Settlement Agreement shall constitute a release or waiver or discharge of any such Contractual Entitlements, other than the agreements with respect to the total PPI Settlement Amount contained in this Section 2 and the establishment of the amount of the allowed claims to which the Indenture Trustees and Bondholders are entitled to as against NNI and NNCC, as provided in Section 3.1 and Schedule A hereto. All such Contractual Entitlements are expressly reserved by the Supporting Bondholders and the Indenture Trustees; *provided, however*, that to the extent that any Bondholder or the Indenture Trustees are determined to be entitled to any Contractual Entitlement against any US Debtor (whether by order of the US Court or a settlement or plan approved by the US Court) (i) the sole source of funds available for distributions on behalf of such allowed Contractual Entitlement shall be funds available to make distributions to the Bondholders under Sections 2.1 and 2.2 hereof as applicable, and (ii) such allowed Contractual Entitlements shall be subject to and not added to the limitation on the total PPI Settlement Amount as defined in this Section 2.

3. **RESOLUTION OF US PPI DISPUTE AND GUARANTEED BOND CLAIMS**

3.1. The PPI Settlement Agreement is intended to be a full and final settlement of (i) the US PPI Dispute with respect to the Monitor's Request currently pending before the US Court and all of the related submissions and requests for relief, and (ii) the allowed claims for outstanding principal obligations and accrued prepetition interest obligations (each as set forth on Schedule A hereto), and any entitlement to PPI (calculated pursuant to Sections 2.1 and 2.2 herein) arising under the Guaranteed Bonds. For the avoidance of doubt, any additional amounts claimed by and allowed in favor of the Indenture Trustees or any Bondholders as against any of the US Debtors shall only be eligible for allowance or the right to receive distributions in accordance with Section 2.4 hereof. Nothing in this PPI Settlement Agreement is or shall be deemed to be a settlement of the Canada PPI Dispute or any part thereof or otherwise a settlement of any claim of the Indenture Trustees or any Bondholder against any of the Canadian Debtors' estates.

Confidential

BHG-PPI-0000090

*SUBJECT TO FRE 408 & ANY OTHER APPLICABLE PRIVILEGES*
*PRIVILEGED & HIGHLY CONFIDENTIAL*
CGSH DRAFT
7/21/2014

4. **RESERVATION OF RIGHTS**

4.1. Nothing in this PPI Settlement Agreement shall constitute a release or waiver or discharge (in whole or in part) of (i) any right of any Party to assert or defend against any allocation position or advance or defend against any arguments as to entitlement to Sale Proceeds in the Allocation Litigation, including in connection with any appeal(s) of any court ruling made in connection with the Allocation Litigation; or (ii) any claim, right or entitlement of any Party to Sale Proceeds in the Allocation Litigation.

4.2. Nothing in this PPI Settlement Agreement shall constitute a release or waiver or discharge (in whole or in part) of the ability of unsecured creditors of the US Debtors' estates (other than the Bondholders) to assert a claim for PPI with respect to the US Debtors' estates at the contract rate (if any) applicable to such creditor's claims or any alternative theories; *provided, however*, that if there are insufficient funds available to pay PPI to all unsecured creditors of the US Debtors' estates entitled to such amounts, then, solely for purposes of determining any allocation of available PPI among such creditors, the holders of the Guaranteed Bonds shall be deemed to have a claim for PPI equal to the amount of post-petition interest that would have accrued at the applicable contract rate of PPI set forth in the applicable indentures for each of the Guaranteed Bonds. Further, this PPI Settlement Agreement does not settle the manner in which any funds available for distribution shall be allocated among the creditors of the applicable US Debtors in the event that less than the full amount of PPI can be paid to all creditors owed such amounts and such application shall be determined by later agreement of the parties whether as part of the chapter 11 plan(s) of the US Debtors in the chapter 11 cases or by subsequent agreement among the relevant affected creditors.

4.3. For the avoidance of any doubt, nothing in this PPI Settlement Agreement shall constitute a release or waiver or discharge of any rights created under this PPI Settlement Agreement, any claim of any Party to enforce such rights, or a release of any claims for facts or events occurring or actions taken after the date of this PPI Settlement Agreement, nor shall this PPI Settlement Agreement be used, referred to or contended by any Party to have any relevance or probative value in connection with any claims not released herein.

5. **EFFECTIVENESS**

5.1. The agreements, acknowledgments and obligations contained herein (other than the obligations contained in Section 5.3 hereof) are expressly contingent upon, and shall become effective only upon the occurrence of all of the conditions to effectiveness below in this Section 5 (the "Effective Date").

5.2. Approval of the Nortel Parties' entry into and performance under this PPI Settlement Agreement by an order of the US Court in the US Proceedings, substantially in the form attached as Schedule B hereto (the "Approval Order"), [which binds all Bondholders and all other parties in interest in the US Debtors' cases to the terms of this PPI Settlement

Confidential

BHG-PPI-0000091

*SUBJECT TO FRE 408 & ANY OTHER APPLICABLE PRIVILEGES*
*PRIVILEGED & HIGHLY CONFIDENTIAL*
CGSH DRAFT
7/21/2014

Agreement][12], is a condition precedent to the effectiveness of this PPI Settlement Agreement. In the event that the US Court does not enter the Approval Order by September 15, 2014, the Parties may terminate this agreement by mutual consent.

5.3. The Nortel Parties will move promptly for, and use their commercially reasonable best efforts to obtain, approval of this PPI Settlement Agreement under Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (respectively, "Rule 9019(a)," and the "Bankruptcy Rules"). The other Parties agree to use their commercially reasonable best efforts to support the Nortel Parties in obtaining US Court approval of this PPI Settlement Agreement.

6. **BINDING EFFECT OF PPI SETTLEMENT AGREEMENT.**

6.1. Upon effectiveness, this PPI Settlement Agreement and the Approval Order shall be binding upon the Parties to this PPI Settlement Agreement and the Bondholders and any successors or assigns of the Parties.

6.2. Each Supporting Bondholder represents and warrants, severally and not jointly, that, (i) as of the date hereof, such Supporting Bondholder is the legal owner, beneficial owner and/or holder of investment and voting authority over, the aggregate amount of obligations outstanding under the Guaranteed Bonds as set forth on its signature pages hereto,[13] (ii) there are no claims against the Debtor Parties in respect of the Guaranteed Bonds of which it is the holder of record that are not part of its Initial Holdings unless such Supporting Bondholder does not possess the full power to vote and dispose of such claims, and (iii) the execution and delivery of this PPI Settlement Agreement and the performance of its obligations have been duly authorized by all necessary action on its part.

6.3. A Supporting Bondholder may (i) sell, transfer, assign, pledge, grant a participation interest in, or otherwise dispose of, directly or indirectly, its right, title, or interest in respect of any of such Supporting Bondholder's interest in a Guaranteed Bond, in whole or in part, or (ii) grant any proxies, deposit any of such Supporting Bondholder's interests in a Guaranteed Bond, into a voting trust, or enter into a voting agreement with respect to any such interest (collectively, the actions described in clauses (i) and (ii), a "Transfer"), *provided* that subject to the termination provisions contained in Section 5.2 hereof, the transferee thereof agrees in writing to be bound by the terms of this PPI Settlement Agreement.

7. **MISCELLANEOUS**

---

[12] NTD: to discuss.
[13] NTD: must list them by series of notes on the signature pages.

*SUBJECT TO FRE 408 & ANY OTHER APPLICABLE PRIVILEGES*
*PRIVILEGED & HIGHLY CONFIDENTIAL*
CGSH DRAFT
7/21/2014

7.1. **Acknowledgements**. Each Party acknowledges that that this PPI Settlement Agreement is not, and shall not be deemed to be, a solicitation of a vote for the acceptance of the Plan pursuant to section 1125 of the Bankruptcy Code.

7.2. **Confidentiality**. Unless otherwise agreed by the Parties, the substance and existence of this PPI Settlement Agreement shall be kept strictly confidential until the filing of a motion with the US Court to seek approval of this PPI Settlement Agreement.

7.3. **Further Assurances**. The Parties will cooperate in good faith to effectuate the terms of this PPI Settlement Agreement, including working in good faith to obtain the necessary court approvals. No Party shall take any action with the purpose or effect of evading the terms of this PPI Settlement Agreement.

7.4. **Governing Law**. This PPI Settlement Agreement shall be governed and construed in accordance with the laws of the State of New York without giving effect to the conflict of laws principles thereof.

7.5. **Integration**. This PPI Settlement Agreement constitutes the entire agreement between the Parties and supersedes all prior or contemporaneous written or oral communications, understandings, and agreements with respect to the subject matter hereof. This PPI Settlement Agreement may not be amended, supplemented or modified except by a written instrument executed by each of the Parties to this PPI Settlement Agreement.

7.6. **Jurisdiction**. The Parties agree to the exclusive jurisdiction of the US Court and, solely to the extent the US Court does not have jurisdiction, the United States District Court for the District of Delaware, in respect of any dispute arising out of or in connection with this PPI Settlement Agreement or its subject matter or formation.

7.7. **Manner of Execution**. The Parties may execute this PPI Settlement Agreement in counterparts, each of which shall be an original, and all executed counterparts shall collectively be deemed to be one and the same instrument. Facsimile or pdf signatures shall be deemed original signatures, and the Parties may exchange signature pages via mail, courier, facsimile or email.

7.8. **No Admissions**. This PPI Settlement Agreement shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever. Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert. No Party shall have, by reason of this PPI Settlement Agreement, a fiduciary relationship in respect of any other Party or any person or entity, and nothing in this PPI Settlement Agreement, expressed or implied, is intended to or shall be so construed as to impose upon any Party any obligations in respect of this PPI Settlement Agreement except as expressly set forth herein. This PPI Settlement Agreement are part of a proposed settlement of a dispute among the Parties. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this PPI

*SUBJECT TO FRE 408 & ANY OTHER APPLICABLE PRIVILEGES*
*PRIVILEGED & HIGHLY CONFIDENTIAL*
CGSH DRAFT
7/21/2014

Settlement Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding involving enforcement of the terms of this PPI Settlement Agreement.

7.9. **No Third-Party Beneficiaries**. The US Debtors that are not a Party to this PPI Settlement Agreement shall be beneficiaries hereof. This PPI Settlement Agreement is not intended to, and shall not, create rights in any other person or entity not a Party hereto.

7.10. **Non-Effectiveness**. In the event this PPI Settlement Agreement does not become effective, the Parties reserve all of their rights and defenses with respect to the US PPI Dispute resolved by this PPI Settlement Agreement and this proposed settlement shall not constitute an admission by any Party regarding the validity of the claims or defenses resolved by this PPI Settlement Agreement or that they have any liability in connection with such claims or defenses.

7.11. **Non-Severability**. Each of the provisions of this PPI Settlement Agreement is an integrated, essential and non-severable part of this PPI Settlement Agreement.

7.12. **Sophisticated Party**. Each Party represents and warrants that it has participated in preparation of this PPI Settlement Agreement and has been represented by sophisticated and experienced counsel in so doing. In any construction of this PPI Settlement Agreement, the PPI Settlement Agreement shall not be construed for or against any Party, but the same shall be construed fairly according to its plain meaning.

7.13. **Representative Capacity**. Each person executing this PPI Settlement Agreement in a representative capacity represents and warrants that he or she is empowered to do so.

7.14. **Simultaneous Occurrence**. All material acts provided hereunder that are to occur on the Effective Date are deemed to occur simultaneously.

7.15. **Successors and Assigns**. This PPI Settlement Agreement shall inure to the benefit of, and shall be binding upon, each Party and its respective agents, successors and assigns.

*[Signature Pages to Follow]*

Confidential

BHG-PPI-0000094

*SUBJECT TO FRE 408 & ANY OTHER APPLICABLE PRIVILEGES*
*PRIVILEGED & HIGHLY CONFIDENTIAL*
CGSH DRAFT
7/21/2014

IN WITNESS WHEREOF, and intending to be legally bound hereby, the Parties have executed this Settlement Agreement.

**NORTEL NETWORKS INC.**

By: _____
Name:  John Ray
Title:  Principal Officer

**NORTEL NETWORKS CAPITAL CORPORATION**

By: _____
Name:  John Ray
Title:  Principal Officer

Confidential

*SUBJECT TO FRE 408 & ANY OTHER APPLICABLE PRIVILEGES*
*PRIVILEGED & HIGHLY CONFIDENTIAL*
*CGSH DRAFT*
*7/21/2014*

**Aggregate Face Amounts Beneficially Owned or Managed on Account of:**

10.75% Notes: $_____
10.125% Notes: $_____
Floating Rate Notes: $_____
2.125% Notes: $_____
1.75% Notes: $_____
7.875% Notes: $_____

Name of Institution:

_____

By _____
    Name:
    Title:

For bondholders requiring a second signature line:

By _____
    Name:
    Title: