**<u>EXHIBIT 84</u>**

**EXHIBIT**

**221**

exhibitsticker.com

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re*: | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | (Jointly Administered) |

## NOTICE OF SERVICE OF DISCOVERY REQUESTS

**PLEASE TAKE NOTICE THAT**, the undersigned caused true and correct copies of (1) *The Monitor and The Canadian Debtors' Requests for The Production of Documents from The Supporting Bondholders In Connection with The U.S. Debtors' 9019 Motion; and (2) The Monitor and The Canadian Debtors' Requests for The Production of Documents from The U.S. Debtors In Connection With The U.S. Debtors' 9019 Motion*; to be served by First Class Mail and Hand Delivery on September 22, 2014 on the following parties in the manner indicated:

## AD HOC GROUP OF BONDHOLDERS

**FIRST CLASS MAIL**

**MILBANK, TWEED, HADLEY McCLOY LLP**
Thomas R. Kreller
Jennifer P. Harris
Albert A. Pisa
Samir Vora
Andrew LeBlanc
Michael Hirschfeld
Atara Miller
Tom Matz
Nick Bassett
Gabrielle Ruha
Rachel Pojunas
1 Chase Manhattan Plaza
New York, NY 10005

**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
James Bromley
Lisa Schweitzer
Jeremy Opolsky
Howard Zelbo
Jeffrey Rosenthal
Darryl Stein
Marla Decker
One Liberty Plaza
New York, NY 10006

**HAND DELIVERY**

**PACHULSKI STRANG ZIEHL & JONES**
Laura Davis Jones
Timothy P. Cairns
919 N. Market Street, 17th Floor
Wilmington, DE 19899-8705

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Derek Abbott
Annie Cordo
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, DE 19899-1347

Dated: September 22, 2014
Wilmington, Delaware

**BUCHANAN INGERSOLL & ROONEY PC**

/s/ Kathleen A. Murphy
Mary F. Caloway (No. 3059)
Kathleen A Murphy (No. 5215)
919 North Market Street, Suite 1500
Wilmington, Delaware 19801
(302) 552-4200 (telephone)
(302) 552-4295 (facsimile)
mary.caloway@bipc.com
kathleen.murphy@bipc.com

-and-

**ALLEN & OVERY LLP**

Jacob Pultman
Paul Keller
Laura Hall
1221 Avenue of the Americas
New York, NY  10020
(212) 610-6300 (telephone)
(212) 610-6399 (facsimile)
jacob.pultman@allenovery.com
paul.keller@allenovery.com
laura.hall@allenovery.com

*Attorneys for Ernst & Young Inc., as Monitor
and the Canadian Debtors*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re*: | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| | (Jointly Administered) |
| Debtors. | |

## THE MONITOR AND THE CANADIAN DEBTORS' REQUESTS FOR THE PRODUCTION OF DOCUMENTS FROM THE U.S. DEBTORS IN CONNECTION WITH THE U.S. DEBTORS' 9019 MOTION

PLEASE TAKE NOTICE that Ernst & Young Inc., the court-appointed monitor (the "**Monitor**") and foreign representative of Nortel Networks Corporation ("**NNC**") and certain of its Canadian direct and indirect subsidiaries, including Nortel Networks Limited ("**NNL**") (collectively, the "**Canadian Debtors**"), in proceedings (the "**Canadian Proceedings**") under Canada's Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended (the "**CCAA**"), pending before the Ontario Superior Court of Justice (Commercial List) (the "**Canadian Court**," and together with this Court, the "**Courts**"), together with the Canadian Debtors, hereby serve and request that the U.S. Debtors respond to the following requests for production of documents (the "**Requests for Production of Documents**") in connection with the *Debtors' Motion For Entry Of An Order Pursuant To Bankruptcy Rule 9019 Approving Settlement Agreement By And Among Nortel Networks Inc., The Supporting*

---

[1]     The debtors in the chapter 11 cases, along with the last four digits of each such debtor's tax identification number, are: Nortel Networks Inc. (6332); Nortel Networks Capital Corporation (9620); Nortel Altsystems Inc. (9769); Nortel Altsystems International Inc. (5596); Xros, Inc. (4181); Sonoma Systems (2073); Qtera Corporation (0251); CoreTek, Inc. (5722); Nortel Networks Applications Management Solutions Inc. (2846); Nortel Networks Optical Components Inc. (3545); Nortel Networks HPOCS Inc. (3546); Architel Systems (U.S.) Corporation (3826); Nortel Networks International Inc. (0358); Northern Telecom International Inc. (6286); Nortel Networks Cable Solutions Inc. (0567); and Nortel Networks (CALA) Inc. (4226) (collectively, the "**U.S. Debtors**")

*Bondholders, And The Bank Of New York Mellon With Respect To The NNI Post-Petition Interest Dispute And Related Issues*, filed on July 24, 2014 [D.I. 140763] (the "**9019 Motion**"), pursuant to the *Order Establishing Discovery Schedule And Other Procedures In Connection With The U.S. Debtors' 9019 Motion* (the "**Discovery Order**"), entered on September 2, 2014 [D.I. 14345], and in accordance with the Federal Rules of Civil Procedure, made applicable to this contested matter through Rules 7026, 9013, and 9014 of the Federal Rules of Bankruptcy Procedure and Rule 9013-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware.  Pursuant to the Discovery Order, the responses are to be provided to Jacob Pultman at Allen & Overy LLP, 1221 Avenue of the Americas, New York, NY 10020 by September 29, 2014 at 5:00pm (prevailing Eastern time).

## DEFINITIONS AND INSTRUCTIONS

Unless otherwise indicated, the definitions of the terms used in the "Definitions" section and the instructions outlined in the "Instructions" section of the Monitor and Canadian Debtors' *First Set Of Requests For Production*, served on May 22, 2013 [D.I. 10630], are incorporated herein by reference.

The term "Chilmark" means Chilmark Partners LLC, and any of its divisions, affiliates, subsidiaries, parents, departments, principals, owners, agents (including counsel), current or former employees, contractors, agents assignees, successors, trustees, investigators, accountants or other person(s) or entity(s) acting or purporting to act on its behalf.

The term "FTI" means FTI Consulting, Inc., and any of its divisions, affiliates, subsidiaries, parents, departments, principals, owners, agents (including counsel), current or former employees, contractors, agents assignees, successors, trustees, investigators, accountants or other person(s) or entity(s) acting or purporting to act on its behalf.

The term "NNI" means Nortel Networks Inc., any of the U.S. Debtors, and any of NNI and the U.S. Debtors' divisions, affiliates, subsidiaries, parents, departments, principals, owners, agents (including counsel), current or former employees, contractors, agents assignees, successors, trustees, investigators, accountants or other person(s) or entity(s) acting or purporting to act on their behalf.

The term "Statement[s] of Cash Receipts and Disbursements" has the same meaning as set forth in *Monthly Operating Report No. 60* filed with the Court by the U.S. Debtors on April 30, 2014 [D.I. 13431].

The term "Tax Liability" means the "tax liability" referred to, and estimated to be "between 400 million and a billion dollars," by counsel for NNI during opening statements on day 1 of the allocation trial held on May 12, 2014.  (*See* May 12, 2014 Trial Tr. at 171:12-172:5).

The following terms have the meaning ascribed to them in the 9019 Motion and Exhibit B to that motion, filed on July 24, 2014:

- "PPI Settlement Agreement"
- "Supporting Bondholders"

Unless otherwise indicated, the relevant time period for purposes of these Requests is between June 16, 2014, and the date of your responses to these Requests.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

### DOCUMENT REQUEST NO. 1

All documents and communications, including, but not limited to, analyses, projections, valuations, models, calculations, summaries, memoranda or reviews, that were created, relied upon, reviewed, discussed or consulted by John J. Ray III, NNI or Chilmark in reaching the conclusion that there are "certain outcomes" under which there could be residual value in the NNI estate for distribution to equity after satisfaction of the PPI Settlement Amount. (*See* Sept. 15, 2014 Transcript of the Deposition of John J. Ray III ("**Ray Tr.**") at 72:20-75:6, 96:17-98:18).

### DOCUMENT REQUEST NO. 2

All documents and communications, including, but not limited to, analyses, projections, valuations, models, calculations, summaries, memoranda or reviews, that were created, relied upon, reviewed, discussed or consulted by John J. Ray III, NNI or Chilmark in reaching the view that the Proposed Settlement was "beneficial for the creditor group at large" and the estate, including equity.  (*See* Ray Tr. at 70:21-71:10).

### DOCUMENT REQUEST NO. 3

All documents and communications relating to the meeting held at the New York offices of Cleary Gottlieb Steen & Hamilton LLP on July 15, 2014, including, but not limited to, any meeting minutes, summaries, memoranda, reviews or analyses, that were created, relied upon, reviewed, discussed or consulted in connection with the meeting.

### DOCUMENT REQUEST NO. 4

All documents and communications, including, but not limited to, analyses, projections, valuations, models, calculations, summaries, memoranda or reviews, that were

created, relied upon, reviewed, discussed or consulted by John J. Ray III, NNI or Chilmark in

attributing a value of under $100 million to the Tax Liability in assessing whether there are

outcomes under which there could be residual value in the NNI estate for distribution to equity

after satisfaction of the PPI Settlement Amount.  (*See* Ray Tr. at 98:19-22).

**DOCUMENT REQUEST NO. 5**

All operating reports, including any drafts, that have been prepared since *Monthly*

*Operating Report No. 60* was filed with the Court on April 30, 2014.

**DOCUMENT REQUEST NO. 6**

All Statements of Cash Receipts and Disbursements, projections of future cash

flows, cash position statements, or other statements or summaries of cash activity relating to the

NNI estate that were created, relied upon, reviewed, discussed or consulted by John J. Ray III,

NNI or Chilmark in assessing whether there are outcomes under which there could be residual

value in the NNI estate for distribution to equity after satisfaction of the PPI Settlement Amount.

(*See* Ray Tr. at 99:17-19).

**DOCUMENT REQUEST NO. 7**

All documents, including, but not limited to, financial data, models, valuations,

calculations, projections, analyses, memoranda or summaries, that were shared or discussed

between NNI (including Chilmark) and the Supporting Bondholders (including FTI) in

connection with the negotiation of the PPI Settlement Agreement.

**DOCUMENT REQUEST NO. 8**

All communications between John J. Ray III and any attorneys from Milbank,

Tweed, Hadley & McCloy LLP relating to the PPI Settlement Agreement.

Dated: September 22, 2014
Wilmington, Delaware

**BUCHANAN INGERSOLL & ROONEY PC**

/s/    *Kathleen A. Murphy*
Mary F. Caloway (No. 3059)
Kathleen A. Murphy (No. 5215)
919 North Market Street, Suite 1500
Wilmington, Delaware 19801
(302) 552-4200 (telephone)
(302) 552-4295 (facsimile)
mary.caloway@bipc.com
kathleen.murphy@bipc.com

-and-

**ALLEN & OVERY LLP**

Jacob Pultman
Paul Keller
Laura Hall
1221 Avenue of the Americas
New York, NY  10020
(212) 610-6300 (telephone)
(212) 610-6399 (facsimile)
jacob.pultman@allenovery.com
paul.keller@allenovery.com
laura.hall@allenovery.com

*Attorneys for Ernst & Young Inc., as Monitor*
*and the Canadian Debtors*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re*: | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| | (Jointly Administered) |
| Debtors. | |

## THE MONITOR AND THE CANADIAN DEBTORS'
## REQUESTS FOR THE PRODUCTION OF DOCUMENTS FROM THE SUPPORTING
## BONDHOLDERS IN CONNECTION WITH THE U.S. DEBTORS' 9019 MOTION

PLEASE TAKE NOTICE that Ernst & Young Inc., the court-appointed monitor (the "**Monitor**") and foreign representative of Nortel Networks Corporation ("**NNC**") and certain of its Canadian direct and indirect subsidiaries, including Nortel Networks Limited ("**NNL**") (collectively, the "**Canadian Debtors**"), in proceedings (the "**Canadian Proceedings**") under Canada's Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended (the "**CCAA**"), pending before the Ontario Superior Court of Justice (Commercial List) (the "**Canadian Court**," and together with this Court, the "**Courts**"), together with the Canadian Debtors, hereby serve and request that the Supporting Bondholders respond to the following requests for production of documents (the "**Requests for Production of Documents**") in connection with the *Debtors' Motion For Entry Of An Order Pursuant To Bankruptcy Rule 9019 Approving Settlement Agreement By And Among Nortel Networks Inc., The Supporting*

---

[1]       The debtors in the chapter 11 cases, along with the last four digits of each such debtor's tax identification number, are: Nortel Networks Inc. (6332); Nortel Networks Capital Corporation (9620); Nortel Altsystems Inc. (9769); Nortel Altsystems International Inc. (5596); Xros, Inc. (4181); Sonoma Systems (2073); Qtera Corporation (0251); CoreTek, Inc. (5722); Nortel Networks Applications Management Solutions Inc. (2846); Nortel Networks Optical Components Inc. (3545); Nortel Networks HPOCS Inc. (3546); Architel Systems (U.S.) Corporation (3826); Nortel Networks International Inc. (0358); Northern Telecom International Inc. (6286); Nortel Networks Cable Solutions Inc. (0567); and Nortel Networks (CALA) Inc. (4226) (collectively, the "**U.S. Debtors**")

*Bondholders, And The Bank Of New York Mellon With Respect To The NNI Post-Petition Interest Dispute And Related Issues*, filed on July 24, 2014 [D.I. 140763] (the "**9019 Motion**"), pursuant to the *Order Establishing Discovery Schedule And Other Procedures In Connection With The U.S. Debtors' 9019 Motion* (the "**Discovery Order**"), entered on September 2, 2014 [D.I. 14345], and in accordance with the Federal Rules of Civil Procedure, made applicable to this contested matter through Rules 7026, 9013, and 9014 of the Federal Rules of Bankruptcy Procedure and Rule 9013-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware.  Pursuant to the Discovery Order, the responses are to be provided to Jacob Pultman at Allen & Overy LLP, 1221 Avenue of the Americas, New York, NY 10020 by September 29, 2014 at 5:00pm (prevailing Eastern time).

## DEFINITIONS AND INSTRUCTIONS

Unless otherwise indicated, the definitions of the terms used in the "Definitions" section and the instructions outlined in the "Instructions" section of the Monitor and Canadian Debtors' *First Set Of Requests For Production*, served on May 22, 2013 [D.I. 10630], are incorporated herein by reference.

The term "Chilmark" means Chilmark Partners LLC, and any of its divisions, affiliates, subsidiaries, parents, departments, principals, owners, agents (including counsel), current or former employees, contractors, agents assignees, successors, trustees, investigators, accountants or other person(s) or entity(s) acting or purporting to act on its behalf.

The term "FTI" means FTI Consulting, Inc., and any of its divisions, affiliates, subsidiaries, parents, departments, principals, owners, agents (including counsel), current or former employees, contractors, agents assignees, successors, trustees, investigators, accountants or other person(s) or entity(s) acting or purporting to act on its behalf.

2

The term "NNI" means Nortel Networks Inc., any of the U.S. Debtors, and any of NNI and the U.S. Debtors' divisions, affiliates, subsidiaries, parents, departments, principals, owners, agents (including counsel), current or former employees, contractors, agents assignees, successors, trustees, investigators, accountants or other person(s) or entity(s) acting or purporting to act on their behalf.

The following terms have the meaning ascribed to them in the 9019 Motion and Exhibit B to that motion, filed on July 24, 2014:

- "PPI Settlement Agreement"
- "Supporting Bondholders"

Unless otherwise indicated, the relevant time period for purposes of these Requests is between June 16, 2014, and the date of your responses to these Requests.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

### DOCUMENT REQUEST NO. 1

All documents and communications relating to the meeting held at the New York offices of Cleary Gottlieb Steen & Hamilton LLP on July 15, 2014, including, but not limited to, any meeting minutes, summaries, memoranda, reviews or analyses that were created, relied upon, reviewed, discussed or consulted in connection with the meeting.

### DOCUMENT REQUEST NO. 2

All documents, including, but not limited to, financial data, models, valuations, calculations, projections, analyses, memoranda or summaries, that were shared or discussed between NNI (including Chilmark) and the Supporting Bondholders (including FTI) in connection with the negotiation of the PPI Settlement Agreement.

### DOCUMENT REQUEST NO. 3

All communications between John J. Ray III and any attorneys from Milbank, Tweed, Hadley & McCloy LLP relating to the PPI Settlement Agreement.

Dated: September 22, 2014
Wilmington, Delaware

**BUCHANAN INGERSOLL & ROONEY PC**

/s/  *Kathleen A. Murphy*
Mary F. Caloway (No. 3059)
Kathleen A. Murphy (No. 5215)
919 North Market Street, Suite 1500
Wilmington, Delaware 19801
(302) 552-4200 (telephone)
(302) 552-4295 (facsimile)
mary.caloway@bipc.com
kathleen.murphy@bipc.com

-and-

**ALLEN & OVERY LLP**

Jacob Pultman
Paul Keller
Laura Hall
1221 Avenue of the Americas
New York, NY  10020
(212) 610-6300 (telephone)
(212) 610-6399 (facsimile)
jacob.pultman@allenovery.com
paul.keller@allenovery.com
laura.hall@allenovery.com

*Attorneys for Ernst & Young Inc., as Monitor
and the Canadian Debtors*

**<u>EXHIBIT 85</u>**

EXHIBIT

222

exhibitsticker.com

# CLEARY GOTTLIEB STEEN & HAMILTON LLP

WASHINGTON, DC

PARIS

BRUSSELS

LONDON

FRANKFURT

COLOGNE

MOSCOW

ONE LIBERTY PLAZA

NEW YORK, NY 10006-1470

(212) 225-2000

FACSIMILE (212) 225-3999

WWW.CLEARYGOTTLIEB.COM

Writer's Direct Dial: +1 212 225 2706

E-Mail: reckenrod@cgsh.com

ROME

MILAN

HONG KONG

BEIJING

BUENOS AIRES

SÃO PAULO

ABU DHABI

SEOUL

September 29, 2014

Allen & Overy LLP
Jacob S. Pultman, Esq.
1221 Avenue of the Americas
New York, New York 10020
jacob.pultman@allenovery.com

<u>VIA EMAIL AND FEDEX</u>

Re: <u>In re Nortel Networks Inc., et al., Case No. 09-10038</u>

On behalf of the U.S. Debtors[1] and in accordance with the *Order Establishing Discovery Schedule And Other Procedures In Connection With The U.S. Debtors' 9019 Motion* [D.I. 14345], the U.S Debtors hereby serve the Monitor and the Canadian Debtors with the *Debtors' Responses And Objections To The Monitor And The Canadian Debtors' Requests For The Production Of Documents Directed From The U.S. Debtors In Connection With The U.S. Debtors' 9019 Motion.* The Debtors also include a production of documents, which is supplemental to the Debtors' prior production served on the Monitor and Canadian Debtors on September 2, 2014 and the letter accompanying such production.

The documents the U.S. Debtors are producing today are contained on a CD enclosed with this letter, which include documents Bates-stamped NNI-PPI-00000369 to NNI-PPI-00002097 (the "<u>Documents</u>"). The password to the CD is 09!P3r1sc0p3. A link to download the Documents also has been sent to you. The information contained in the Documents is made available without prejudice to any privileges that the U.S. Debtors may have, including but not limited to those based on attorney-client privilege and the work product doctrine, which

---

[1] The U.S. Debtors in these chapter 11 cases, along with the last four digits of each U.S. Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the U.S. Debtors can be found in the U.S. Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

Jacob S. Pultman, Esq., p. 2.

privileges are expressly reserved.  The U.S. Debtors reserve the right at any time to revise, supplement, withdraw, correct or clarify these Documents.  Any inadvertent production of any Document shall not be deemed or construed to constitute a waiver of any privilege or right of the U.S. Debtors, and the U.S. Debtors reserve their right to demand that the parties to whom the Documents are being produced return to them any such document and all copies thereof. Notwithstanding the foregoing, the Debtors have not produced communications between and among Cleary Gottlieb Steen & Hamilton LLP, Morris, Nichols, Arsht & Tunnell LLP, John Ray and Chilmark Partners, which are subject to various privileges.

Please do not hesitate to contact me at (212) 225-2706 should you have any questions regarding the foregoing.

Sincerely,

Russell D. Eckenrod

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
------------------------------------------------------X
                                                 :
In re                                            :      Chapter 11
                                                 :
Nortel Networks Inc., et al.,[1]                 :      Case No. 09-10138 (KG)
                                                 :
                         Debtors.                :      Jointly Administered
                                                 :
                                                 :
------------------------------------------------------X
```

**DEBTORS' RESPONSES AND OBJECTIONS TO THE MONITOR
AND THE CANADIAN DEBTORS' REQUESTS FOR THE
PRODUCTION OF DOCUMENTS DIRECTED FROM THE
U.S. DEBTORS IN CONNECTION WITH THE U.S. DEBTORS' 9019 MOTION**

Nortel Networks Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), by their undersigned attorneys, hereby respond pursuant to Rule 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") to the *Monitor and the Canadian Debtors' Requests for the Production of Documents From the U.S. Debtors In Connection with the U.S. Debtors' 9019 Motion*, dated September 22, 2014 (the "Document Requests" or, individually, a "Document Request"), served by Ernst & Young, as court-appointed monitor (the "Monitor") and foreign representative of Nortel Networks Corporation and certain of its Canadian direct and indirect subsidiaries, including Nortel Networks Limited (collectively, the "Canadian Debtors") as follows:

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

## <u>GENERAL OBJECTIONS</u>

Each of the Debtors' responses is subject to the following General Objections, and each such General Objection is incorporated by reference into each of the Debtors' responses to each individual Document Request as if fully set forth therein.

1.    The Debtors object to each definition, instruction and Document Request that purports to impose obligations beyond those required or permitted by the Federal Rules of Civil Procedure (the "<u>Civil Rules</u>"), the Bankruptcy Rules or the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), or that exceeds the scope of any applicable order entered by the Court, including, without limitation, the *Order Establishing Discovery Schedule and Other Procedures in Connection with the U.S. Debtors' 9019 Motion* as entered by the  Court on September 2, 2014 (D.I. 14345) (the "<u>Discovery Order</u>").

2.    The Debtors object to each Document Request to the extent that it seeks information, documents or electronically stored information ("<u>ESI</u>") that are not relevant to this contested matter nor reasonably calculated to lead to the discovery of admissible evidence.

3.    The Debtors object to each Document Request to the extent that it seeks information, documents or ESI that are outside the scope of the "targeted additional documents based on the documents produced by the Settling Parties" that may be requested by the Monitor and/or Canadian Debtors under paragraph 4 of the Discovery Order.

4.    The Debtors object to each Document Request to the extent that it is vague, ambiguous, overbroad, unduly burdensome, harassing or oppressive; to the extent it purports to require anything other than a reasonable search for readily accessible information from readily accessible sources; and to the extent it seeks information that is not relevant to any

claim, defense, counterclaim, cross-claim or other position asserted in, or the subject matter of, these proceedings.

5.      The Debtors object to each Document Request to the extent that it demands the production of "all" or "any" documents on requested subjects, because such requests are overbroad, unduly burdensome and improper.  A statement by the Debtors that they will produce documents in response to a particular Document Request means that the Debtors will conduct a reasonable search for documents responsive to the particular Document Request, subject to the Debtors' general and specific objections, and will produce any responsive non-privileged documents that they find, subject to withholding on other grounds specified herein.

6.      The Debtors object to each Document Request to the extent that it calls for the production of documents previously produced by the Debtors, and the Debtors incorporate in their responses to the Document Requests the materials previously provided by them in response to the prior requests of the Monitor and/or the Canadian Debtors to the extent that the previously produced materials are responsive to the Document Requests.

7.      The Debtors object to each Document Request to the extent that it calls for the production of information, documents or ESI that are not in the possession, custody or control of the Debtors, including information, documents or ESI in the possession of third parties or separate legal entities, whether or not affiliated with the Debtors.  The Debtors only will produce documents that are within their possession, custody or control.

8.      The Debtors object to each Document Request to the extent that it calls for the production of information, documents, materials or ESI already in the possession of the Monitor and/or the Canadian Debtors or that is otherwise available from public sources including

documents that are on file with the Court.  Such information, documents, materials and ESI are as available to the Monitor and Canadian Debtors as they are to the Debtors.

9.      The Debtors object to each Document Request to the extent that it seeks information, documents or ESI that are protected from disclosure by the attorney-client privilege, the work product doctrine, a joint defense or common interest privilege, or any other applicable privilege, protection, law, rule or immunity from discovery, or that were prepared in anticipation or because of litigation, that constitute or disclose the mental impressions, conclusions, opinions or legal theories of any attorney for the Debtors concerning any litigation or that are protected by any other applicable privilege or doctrine (such information or documents are hereinafter referred to as "Privileged Information")  or whose disclosure is prohibited by any law, regulation or order of any state, the United States or any other country or jurisdiction.  Any production, inadvertent or otherwise, of any Privileged Information shall not be deemed or construed to constitute a waiver of any rights or privileges or other protection, and shall not prejudice the right of the Debtors to object to any subsequent use of such Privileged Information.  The Debtors reserve the right to demand the return of any Privileged Information and the distribution of any materials that contain information derived from any such Privileged Information.

10.      The Debtors object to each Document Request to the extent that it seeks production of any trade secrets or any proprietary or non-public information, documents or ESI of a commercially, financially or personally sensitive nature, or that the Debtors obtained pursuant to an obligation of confidentiality.

11.      The Debtors object to each Document Request to the extent that it seeks cumulative or duplicative information.

12.     The Debtors object to each Document Request to the extent that the terms or phrases used therein are vague, ambiguous or lack sufficient precision to allow the Debtors to appropriately respond to such request.

13.     The Debtors object to each Document Request to the extent that it seeks the production of ESI from sources that are not reasonably accessible because of undue burden or cost.

14.     The Debtors object to each Document Request to the extent that it calls for the production of communications between the Debtors and their representatives and attorneys on the one hand and the Settling Parties and their attorneys and representatives on the other hand after the time they reached agreement upon the material terms of the PPI Settlement Agreement on the grounds that such communications are privileged.

## RESERVATION OF RIGHTS

1.     The Debtors' objections are based upon information now available to them and are made without in any way waiving or intending to waive but, on the contrary, intending to reserve and reserving:  (a) the right to object on any ground at any time to a demand for any further response to the Document Requests or any other discovery request; and (b) the right at any time to revise, supplement, withdraw, correct or clarify these objections and responses.

2.     Any responses by the Debtors to the Document Requests shall not be deemed or construed in any way to be an adoption, admission or agreement by the Debtors of or to any such definition or term used in the Document Requests, or the materiality, admissibility or relevance thereof.

3.     The Debtors reserve all objections to the use of these responses and of any documents or ESI they produce.  All such objections may be interposed by the Debtors at the

time of the hearing or other court appearance, or as otherwise required by the applicable rules or any other order of the Court.

4.      Insofar as the intentional production of any document or ESI by the Debtors pursuant to the Document Requests may be deemed to be a waiver of any privilege or right, such waiver shall be deemed to be a limited waiver with respect to that particular document or ESI only.  Any inadvertent production of any document or ESI shall not be deemed or construed to constitute a waiver of any privilege or right of the Debtors, and the Debtors reserve their right to demand that the Monitor and the Canadian Debtors return to them any such document or ESI and all copies thereof.

5.      The Debtors reserve the right to redact from the documents they produce any confidential research, development, commercial, financial, trade secret or personally sensitive information not relevant to the subject matter of this contested matter.

6.      The Debtors object to each Document Request to the extent that it seeks the production of ESI from sources that are not reasonably accessible because of undue burden or cost.

## SPECIFIC RESPONSES AND OBJECTIONS

The Debtors incorporate by reference the foregoing General Objections in each of the following specific responses and objections (the "Specific Objections") as if fully set forth therein.  To the extent specific objections appear in the response to a particular Document Request, they so appear because they are particularly applicable to that specific Document Request; this is not to be construed as a waiver or limitation of any general objection applicable to such Document Request.

Document Request No. 1

        **All documents and communications, including, but not limited to, analyses, projections, valuations, models, calculations, summaries, memoranda or reviews, that were created, relied upon, reviewed, discussed or consulted by John J. Ray III, NNI or Chilmark in reaching the conclusion that there are "certain outcomes" under which there could be residual value in the NNI estate for distribution to equity after satisfaction of the PPI Settlement Amount. (*See* Sept. 15, 2014 Transcript of the Deposition of John J. Ray III ("Ray Tr.") at 72:20-75:6, 96:17-98:18).**

Response to Document Request No. 1

        In addition to the General Objections, the Debtors object to Document Request

No. 1 to the extent that it is vague, ambiguous, overbroad, and unduly burdensome, seeks

information that is protected by the attorney-client privilege, the work product doctrine or any

other applicable privilege or immunity from discovery, seeks information beyond the scope of

the Discovery Order or other applicable orders of the Court, or documents that are already in the

possession of the Monitor and/or Canadian Debtors or otherwise available from public sources

including documents that are on file with the Court.  Subject to the foregoing Specific and

General Objections, the Debtors will produce non-privileged documents responsive to Document

Request No. 1 to the extent not previously produced.

Document Request No. 2

        **All documents and communications, including, but not limited to, analyses, projections, valuations, models, calculations, summaries, memoranda or reviews, that were created, relied upon, reviewed, discussed or consulted by John J. Ray III, NNI or Chilmark in reaching the view that the Proposed Settlement was "beneficial for the creditor group at large" and the estate, including equity. (*See* Ray Tr. at 70:21-71:10).**

Response to Document Request No. 2

        In addition to the General Objections, the Debtors object to Document Request

No. 2 to the extent that it is vague, ambiguous, overbroad, and unduly burdensome, seeks

information that is protected by the attorney-client privilege, the work product doctrine or any

other applicable privilege or immunity from discovery, seeks information beyond the scope of

the Discovery Order or other applicable orders of the Court, or documents that are already in the

possession of the Monitor and/or Canadian Debtors or otherwise available from public sources

including documents that are on file with the Court.   Subject to the foregoing Specific and

General Objections, the Debtors will produce non-privileged documents, if any, responsive to

Document Request No. 2 to the extent not previously produced.

Document Request No. 3

**All documents and communications relating to the meeting held at the New York offices of Cleary Gottlieb Steen & Hamilton LLP on July 15, 2014, including, but not limited to, any meeting minutes, summaries, memoranda, reviews or analyses, that were created, relied upon, reviewed, discussed or consulted in connection with the meeting.**

Response to Document Request No. 3

In addition to the General Objections, the Debtors object to Document Request

No. 3 to the extent that it is vague, ambiguous, overbroad, and unduly burdensome, seeks

information that is protected by the attorney-client privilege, the work product doctrine or any

other applicable privilege or immunity from discovery, seeks information beyond the scope of

the Discovery Order or other applicable orders of the Court, or is not in the possession, custody

or control of the Debtors, including information, documents or ESI in the possession of third

parties or separate legal entities, whether or not affiliated with the Debtors.  Subject to the

foregoing Specific and General Objections, no such further documents exist to be produced.

Document Request No. 4

**All documents and communications, including, but not limited to, analyses, projections, valuations, models, calculations, summaries, memoranda or reviews, that were created, relied upon, reviewed, discussed or consulted by John J. Ray III, NNI or Chilmark in attributing a value of under $100 million to the Tax Liability in assessing whether there are outcomes under which there could be residual value in the NNI estate for distribution to equity after satisfaction of the PPI Settlement Amount. (*See* Ray Tr. at 98:19-22).**

Response to Document Request No. 4

In addition to the General Objections, the Debtors object to Document Request No. 4 to the extent that it is vague, ambiguous, overbroad, and unduly burdensome, mischaracterizes testimony provided by Mr. Ray, seeks information that is protected by the attorney-client privilege, the work product doctrine or any other applicable privilege or immunity from discovery or seeks information beyond the scope of the Discovery Order or other applicable orders of the Court.  Subject to the foregoing Specific and General Objections, no such documents exist to be produced.

Document Request No. 5

**All operating reports, including any drafts, that have been prepared since Monthly Operating Report No. 60 was filed with the Court on April 30, 2014.**

Response to Document Request No. 5

In addition to the General Objections, the Debtors object to Document Request No. 5 to the extent that it seeks information that is protected by the attorney-client privilege, the work product doctrine or any other applicable privilege or immunity from discovery or seeks information beyond the scope of the Discovery Order or other applicable orders of the Court. Subject to the foregoing Specific and General Objections, the Debtors will produce any final versions of monthly operating reports as they are filed with the Court.

Document Request No. 6

**All Statements of Cash Receipts and Disbursements, projections of future cash flows, cash position statements, or other statements or summaries of cash activity relating to the NNI estate that were created, relied upon, reviewed, discussed or consulted by John J. Ray III, NNI or Chilmark in assessing whether there are outcomes under which there could be residual value in the NNI estate for distribution to equity after satisfaction of the PPI Settlement Amount. (*See* Ray Tr. at 99:17-19).**

Response to Document Request No. 6

In addition to the General Objections, the Debtors object to Document Request No. 6 to the extent that it is vague, ambiguous, overbroad, and unduly burdensome, duplicative of other Document Requests (including, without limitation, Document Request No. 5), seeks information that is protected by the attorney-client privilege, the work product doctrine or any other applicable privilege or immunity from discovery or seeks information beyond the scope of the Discovery Order or other applicable orders of the Court.  The Debtors further object to Document Request No. 6 to the extent it seeks documents that are already in the possession of the Monitor and/or Canadian Debtors or otherwise available from public sources including documents that are on file with the Court.  Subject to the foregoing Specific and General Objections, the Debtors will produce non-privileged documents responsive to Document Request No. 6.

Document Request No. 7

**All documents, including, but not limited to, financial data, models, valuations, calculations, projections, analyses, memoranda or summaries, that were shared or discussed between NNI (including Chilmark) and the Supporting Bondholders (including FTI) in connection with the negotiation of the PPI Settlement Agreement.**

Response to Document Request No. 7

In addition to the General Objections, the Debtors object to Document Request No. 7 to the extent that it is vague, ambiguous, overbroad, and unduly burdensome, seeks information that is protected by the attorney-client privilege, the work product doctrine or any other applicable privilege or immunity from discovery or seeks information beyond the scope of the Discovery Order or other applicable orders of the Court.  Subject to the foregoing Specific and General Objections, no such further documents exist to be produced.

Document Request No. 8

**All communications between John J. Ray III and any attorneys from Milbank, Tweed, Hadley & McCloy LLP relating to the PPI Settlement Agreement.**

Response to Document Request No. 8

In addition to the General Objections, the Debtors object to Document Request No. 8 to the extent that it is vague, ambiguous, overbroad, and unduly burdensome, seeks information that is protected by the attorney-client privilege, the work product doctrine or any other applicable privilege or immunity from discovery or seeks information beyond the scope of the Discovery Order or other applicable orders of the Court.  Subject to the foregoing Specific and General Objections, no such further documents exist to be produced.

*[Remainder of page intentionally left blank.]*

Dated: September 29, 2014
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

Howard S. Zelbo (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Jeffrey A. Rosenthal (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Ann C. Cordo*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile:  (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*

**EXHIBIT 86**

**EXHIBIT**

**223**

exhibitsticker.com

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

```
------------------------------------------------------------ x
                                            :
In re                                       :        Chapter 11
                                            :
Nortel Networks Inc., et al.,               :        Case No. 09-10138 (KG)
                                            :
                        Debtors.            :        (Jointly Administered)
                                            :
                                            :
------------------------------------------------------------ x
```

### THE *AD HOC* GROUP OF BONDHOLDERS' RESPONSES AND OBJECTIONS TO THE MONITOR AND CANADIAN DEBTORS' REQUESTS FOR PRODUCTION FROM THE SUPPORTING BONDHOLDERS IN CONNECTION WITH THE U.S. DEBTORS' 9019 MOTION

The *ad hoc* group of bondholders (the "Bondholder Group"),[1] by and through its

undersigned counsel, hereby responds and objects to the Monitor and Canadian Debtors'

Requests for Production from the Supporting Bondholders, dated September 22, 2014 (the

"Requests"), in connection with the Debtors' Motion For Entry Of An Order Pursuant To

Bankruptcy Rule 9019 Approving Settlement Agreement By and Among Nortel Networks Inc.,

The Supporting Bondholders, And The Bank Of New York Mellon With Respect To The NNI

Post-Petition Interest Dispute and Related Issues, as filed on July 24, 2014 [D.I. 140763] (the

"9019 Motion").

---

[1]     The Bondholder Group consists of bondholders that hold claims issued or guaranteed by Nortel Networks Corporation ("NNC" and together with its affiliates worldwide, "Nortel"), Nortel Networks Limited ("NNL" and together with NNC and certain of their subsidiaries, the "Canadian Debtors"), Nortel Networks Inc. ("NNI"), and Nortel Networks Capital Corporation ("NNCC" and together with NNI and certain of its subsidiaries, the "U.S. Debtors").

## GENERAL RESPONSES AND OBJECTIONS

The Bondholder Group responds to the Requests subject to, and without waiving, the following responses and objections (the "General Responses and Objections"). The Bondholder Group reserves the right to amend, revise, correct, supplement or clarify the responses and objections herein based on facts or other information gathered at any time subsequent to the date of these responses.

1.      The Bondholder Group objects to the Requests, including the definitions and instructions incorporated by reference therein, to the extent they seek to impose obligations on the Bondholder Group that are inconsistent with the requirements of the Federal Rules of Bankruptcy Procedure, the Federal Rules of Civil Procedure, or any other applicable rules, orders, or laws.

2.      The Bondholder Group objects to the Requests, including the definitions and instructions incorporated therein, to the extent they seek documents or information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege, or any other applicable privilege or protection. The inadvertent production of any document in response to the Requests shall not constitute a waiver of privilege or of any other ground for objection to discovery with respect to such document, the information contained therein, or the subject matter thereof.

3.      The Bondholder Group objects to the Requests to the extent they seek information that is not relevant to a claim or defense of any party and not reasonably calculated to lead to the discovery of admissible evidence relating to the 9019 Motion.

4.      The Bondholder Group objects to the Requests, including the definitions and instructions incorporated therein, to the extent they seek information that is not in the Bondholder Group's possession, custody or control.

2

## SPECIFIC RESPONSES AND OBJECTIONS

Without waiving or limiting, and subject to, the foregoing General Responses and Objections, which are hereby expressly incorporated into each response and objection below, the Bondholder Group objects and responds specifically to the Requests (the "Specific Responses and Objections") as follows:

**Request No. 1:**

All documents and communications relating to the meeting held at the New York offices of Cleary Gottlieb Steen & Hamilton LLP on July 15, 2014, including, but not limited to, any meeting minutes, summaries, memoranda, reviews or analyses that were created, relied upon, reviewed, discussed or consulted in connection with the meeting.

**Response to Request No. 1:**

The Bondholder Group will produce any non-privileged documents responsive to this request that it did not previously produce in connection with its September 2, 2014 production (the "September 2 Production").

**Request No. 2:**

All documents, including, but not limited to, financial data, models, valuations, calculations, projections, analyses, memoranda or summaries, that were shared or discussed between NNI (including Chilmark) and the Supporting Bondholders (including FTI) in connection with the negotiation of the PPI Settlement Agreement.

3

**Response to Request No. 2:**

The Bondholder Group responds that it has previously produced all non-privileged documents responsive to this request.  The Bondholder Group refers the Monitor and Canadian Debtors to the September 2 Production.

**Request No. 3:**

All communications between John J. Ray III and any attorneys from Milbank, Tweed, Hadley & McCloy LLP relating to the PPI Settlement Agreement.

**Response to Request No. 3:**

The Bondholder Group responds that it has previously produced all non-privileged documents responsive to this request.  The Bondholder Group refers the Monitor and Canadian Debtors to the September 2 Production.

Dated:  September 29, 2014

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Peter J. Keane*
Laura Davis Jones (No. 2436)
Peter J. Keane (No. 5503)
919 N. Market Street, 17th Floor
PO Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400

-and-

MILBANK, TWEED, HADLEY & McCLOY LLP
Dennis F. Dunne
Albert A. Pisa
Andrew M. Leblanc
Atara Miller
1 Chase Manhattan Plaza
New York, New York 10005-1413
Telephone:  (212) 530-5000

Facsimile:   (212) 530-5219

-and-

Thomas R. Kreller
601 S. Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone: (213) 892-4463
Facsimile: (213) 629-5063

 -and-

**BENNETT JONES LLP**
Richard B. Swan
Gavin H. Finlayson
3400 One First Canadian Place, P.O. Box 130
Toronto, Ontario, M5X 1A4
Telephone:  (416) 777-5762
Facsimile:  (416) 863-1716

***Attorneys for Ad Hoc Group of Bondholders***

**EXHIBIT 87**

Docket #3663  Date Filed: 7/16/2014

EXHIBIT

224

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

--------------------------------------------------------------------- X

|  |  |  |
|---|---|---|
| | : | |
| *In re* | : | Chapter 11 |
| | : | |
| Overseas Shipholding Group, Inc., *et al.*,[1] | : | Case No. 12- 20000 (PJW) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |

--------------------------------------------------------------------- X

## FIRST AMENDED JOINT PLAN OF REORGANIZATION
## OF OVERSEAS SHIPHOLDING GROUP, INC., *ET AL.*,
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

CLEARY GOTTLIEB STEEN & HAMILTON LLP
James L. Bromley (*admitted pro hac vice*)
Luke A. Barefoot (*admitted pro hac vice*)
Jane VanLare (*admitted pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

- and -

MORRIS NICHOLS, ARSHT & TUNNELL LLP

Derek C. Abbott (No. 3376)
Daniel B. Butz (No. 4227)
William M. Alleman, Jr. (No. 5449)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

Counsel for the Debtors and Debtors in Possession

Dated: July 16, 2014

1220000140716000000000025

# TABLE OF CONTENTS

**Page**

**ARTICLE I DEFINED TERMS AND RULES OF INTERPRETATION** ........................... 2

    **1.1**    **Defined Terms.** ................................................................. 2
    **1.2**    **Exhibits to this Plan.** ........................................................ 23
    **1.3**    **Rules of Interpretation and Computation of Time.** ....................... 23

**ARTICLE II CLASSIFICATION OF CLAIMS AND OLD OSG EQUITY INTERESTS** ................................................................ 24

    **2.1**    **Unclassified Claims Against All Debtors** ............................... 24
    **2.2**    **Classification of Claims Against All Debtors and Old OSG Equity Interests** ................................................................. 25

**ARTICLE III TREATMENT OF CLAIMS AND EQUITY INTERESTS** ...................... 26

    **3.1**    **Unclassified Claims** ...................................................... 26
    **3.2**    **Treatment of Claims** ..................................................... 28
    **3.3**    **Special Provision Regarding Unimpaired Claims** ...................... 35

**ARTICLE IV ACCEPTANCE OR REJECTION OF THE PLAN** ........................... 35

    **4.1**    **Impaired Classes of Claims and Interests Entitled to Vote** ............ 35
    **4.2**    **Acceptance by an Impaired Class** ....................................... 36
    **4.3**    **Presumed Acceptances by Unimpaired Classes** ....................... 36
    **4.4**    **Elimination of Vacant Classes; Deemed Acceptance by Non-Voting Classes** ................................................................. 36
    **4.5**    **Conversion or Dismissal of Certain of the Chapter 11 Cases** ......... 36
    **4.6**    **Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code** .... 37

**ARTICLE V MEANS FOR IMPLEMENTATION OF THE PLAN** ......................... 37

    **5.1**    **General Settlement of Claims and Interests** ............................ 37
    **5.2**    **Corporate Existence** ...................................................... 37
    **5.3**    **Reconciliation of IRS Claims** .......................................... 37
    **5.4**    **Issuance of the Plan Securities** ........................................ 38
    **5.5**    **Transfer Restrictions and Tendering** ................................. 38
    **5.6**    **Issuance of the New Warrants** ......................................... 40
    **5.7**    **Payment of Commitment Party Fees and Expenses** ................... 40
    **5.8**    **Post-Confirmation Property Sales** .................................... 40
    **5.9**    **Letter of Credit** ......................................................... 40
    **5.10**    **Effectuating Documents; Further Transactions** ...................... 41
    **5.11**    **Liquidation of Certain Debtors** ....................................... 41
    **5.12**    **Restructuring Transactions** ........................................... 42
    **5.13**    **Exit Financing** .......................................................... 42
    **5.14**    **Secured Vessels** ........................................................ 42
    **5.15**    **Revesting of Assets** ..................................................... 43

# TABLE OF CONTENTS
(continued)

**Page**

5.16    Guarantees.................................................................................... 43
5.17    Closing of the Chapter 11 Cases ................................................ 43
5.18    Corporate Governance, Directors, and Officers ........................ 43
5.19    Cancellation of Notes, Instruments and Debentures ................. 44
5.20    Exemptions from Securities Act Registration ............................ 44
5.21    Intercompany Claims and Intercompany Equity Interests ........ 46
5.22    Intercompany Account Settlement ............................................. 46

ARTICLE VI RIGHTS OFFERING AND COMMITMENT PARTY PURCHASES....... 46
6.1    Eligibility .................................................................................. 46
6.2    Record Date .............................................................................. 46
6.3    Rights Exercise Form ............................................................... 46
6.4    Issuance of Subscription Rights ............................................... 47
6.5    Rights Offering Period and Mailing ......................................... 48
6.6    Exercise of Subscription Rights ............................................... 48
6.7    Backstop Securities and Holdback Securities .......................... 50
6.8    Purchase of Plan Securities by Each of the Commitment Parties ................. 50
6.9    Commitment Premium .............................................................. 50
6.10    Issuance of Plan Securities ...................................................... 50

ARTICLE VII PROVISIONS GOVERNING DISTRIBUTIONS .................... 51
7.1    Distributions for Claims and Interests Allowed as of the Effective Date............................................................................... 51
7.2    Postpetition Interest on Claims Against Debtors ...................... 52
7.3    Disbursing Agent ...................................................................... 52
7.4    Delivery of Distributions and Undeliverable or Unclaimed Distributions .............................................................................. 53
7.5    Distribution Record Date .......................................................... 54
7.6    Cash Payments .......................................................................... 54
7.7    Limitation on Recovery ............................................................ 54
7.8    Withholding and Reporting Requirements ................................ 55
7.9    Setoffs ....................................................................................... 55
7.10    No Fractional Shares or Warrants ............................................ 55
7.11    Hart-Scott-Rodino Compliance ................................................ 55

ARTICLE VIII TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........................................................................ 56
8.1    Assumption, Rejection and Assignment of Executory Contracts and Unexpired Leases .............................................. 56
8.2    Cure of Defaults of Assumed Executory Contracts and Unexpired Leases ...................................................................... 57
8.3    Objections to Rejection, Assumption, Assignment or Cure....... 58

# TABLE OF CONTENTS
(continued)

| | | |
|---|---|---|
| 8.4 | Reservation of Rights | 59 |
| 8.5 | Compensation and Benefit Programs | 60 |
| 8.6 | Preexisting Obligations to the Debtors Under Rejected Contracts | 61 |
| 8.7 | Subsequent Modifications, Amendments, Supplements or Restatements. | 61 |

**ARTICLE IX PROCEDURES FOR RESOLVING DISPUTED CLAIMS** ........................ 62

| | | |
|---|---|---|
| 9.1 | Resolution of Disputed Claims | 62 |
| 9.2 | No Distributions Pending Allowance | 62 |
| 9.3 | Distributions on Account of Disputed Claims Once They Are Allowed | 63 |
| 9.4 | Estimation of Claims | 63 |
| 9.5 | Disputed Claims Reserves | 63 |
| 9.6 | No Amendments to Claims | 64 |
| 9.7 | No Late-Filed Claims | 65 |

**ARTICLE X CONFIRMATION AND CONSUMMATION OF THE FIRST AMENDED PLAN** .... 65

| | | |
|---|---|---|
| 10.1 | Conditions to Confirmation | 65 |
| 10.2 | Conditions to Effective Date | 66 |
| 10.3 | Conditions to Reinstatement | 66 |
| 10.4 | Waiver of Conditions | 66 |
| 10.5 | Notice of Effective Date | 67 |
| 10.6 | Consequences of Non-Occurrence of Effective Date | 67 |

**ARTICLE XI EFFECT OF PLAN CONFIRMATION** ...................................... 68

| | | |
|---|---|---|
| 11.1 | Binding Effect; Plan Binds All Holders of Claims and Equity Interests | 68 |
| 11.2 | Revesting of Assets. | 68 |
| 11.3 | Releases and Related Injunctions | 68 |
| 11.4 | Discharge of Claims | 71 |
| 11.5 | Preservation of Rights of Action | 71 |
| 11.6 | Exculpation and Limitation of Liability | 72 |
| 11.7 | Injunction | 73 |
| 11.8 | Term of Bankruptcy Injunction or Stays | 73 |
| 11.9 | Termination of Subordination Rights and Settlement of Related Claims | 74 |

**ARTICLE XII RETENTION OF JURISDICTION** ........................................ 74

**ARTICLE XIII MISCELLANEOUS PROVISIONS** ...................................... 76

| | | |
|---|---|---|
| 13.1 | Effectuating Documents and Further Transactions | 76 |
| 13.2 | Authority to Act | 76 |
| 13.3 | Insurance Preservation | 76 |

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| **13.4** | **Exemption from Transfer Taxes** ...................................................... | 76 |
| **13.5** | **Bar Dates for Administrative Expense Claims** .............................. | 77 |
| **13.6** | **Administrative Claims Reserve** ..................................................... | 77 |
| **13.7** | **Payment of Statutory Fees** ............................................................ | 78 |
| **13.8** | **Amendment or Modification of this Plan** ..................................... | 78 |
| **13.9** | **Severability of Plan Provisions** .................................................... | 78 |
| **13.10** | **Successors and Assigns** ................................................................ | 78 |
| **13.11** | **Subordinated Claims** .................................................................... | 79 |
| **13.12** | **Waivers and Certain Actions** ........................................................ | 79 |
| **13.13** | **Revocation, Withdrawal, or Non-Consummation** ........................ | 79 |
| **13.14** | **Notice** ............................................................................................ | 80 |
| **13.15** | **Governing Law** .............................................................................. | 81 |
| **13.16** | **Tax Reporting and Compliance** .................................................... | 81 |
| **13.17** | **Fees and Expenses** ........................................................................ | 81 |
| **13.18** | **No Admissions** .............................................................................. | 82 |
| **13.19** | **Dissolution of Committees** ........................................................... | 82 |
| **13.20** | **Filing of Additional Documents** ................................................... | 82 |
| **13.21** | **Preservation of Documents** .......................................................... | 82 |

## PLAN EXHIBITS

| | |
|---|---|
| Exhibit A | Amended and Restated Certificate of Incorporation and By-Laws of Reorganized OSG |
| Exhibit B | List of Officers and Directors of Reorganized Debtors |
| Exhibit C | Executory Contracts and Unexpired Leases Rejected by the Debtors |
| Exhibit D | Form of Release and Cooperation Agreement |
| Exhibit E | Personal Injury Claims |
| Exhibit F | Rights Offering Procedures |
| Exhibit G | Executory Contracts and Unexpired Leases Assumed and Assigned by the Debtors |
| Exhibit H | Liquidating Debtors |
| Exhibit I | Disputed Claims and Amounts Reserved for Disputed Claims |
| Exhibit J | Preserved Causes of Action |
| Exhibit K | Registration Rights Agreement |
| Exhibit L | Allowed and Reinstated amounts of SERP Claims |
| Exhibit M | Class B New Warrants Term Sheet |

## INTRODUCTION

Overseas Shipholding Group, Inc. ("OSG") and certain of its affiliates, as debtors and debtors in possession in the above-captioned cases (the "Debtors") propose this first

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number, are: Overseas Shipholding Group, Inc. (7623); OSG International, Inc. (7117); OSG Bulk Ships, Inc. (2600); 1372 Tanker Corporation (4526); Africa Tanker Corporation (9119); Alcesmar Limited (5306); Alcmar Limited (5307); Alpha Suezmax Corporation (1684); Alpha Tanker Corporation (6063); Amalia Product Corporation (3808); Ambermar Product Carrier Corporation (8898); Ambermar Tanker Corporation (7100); Andromar Limited (5312); Antigmar Limited (5303); Aqua Tanker Corporation (7408); Aquarius Tanker Corporation (9161); Ariadmar Limited (5301); Aspro Tanker Corporation (4152); Atalmar Limited (5314); Athens Product Tanker Corporation (9565); Atlas Chartering Corporation (8720); Aurora Shipping Corporation (5649); Avila Tanker Corporation (4155); Batangas Tanker Corporation (8208); Beta Aframax Corporation (9893); Brooklyn Product Tanker Corporation (2097); Cabo Hellas Limited (5299); Cabo Sounion Limited (5296); Caribbean Tanker Corporation (6614); Carina Tanker Corporation (9568); Carl Product Corporation (3807); Concept Tanker Corporation (9150); Crown Tanker Corporation (6059); Delphina Tanker Corporation (3859); Delta Aframax Corporation (9892); DHT Ania Aframax Corp. (9134); DHT Ann VLCC Corp. (9120); DHT Cathy Aframax Corp. (9142); DHT Chris VLCC Corp. (9122); DHT Rebecca Aframax Corp. (9143); DHT Regal Unity VLCC Corp. (9127); DHT Sophie Aframax Corp. (9138); Dignity Chartering Corporation (6961); Edindun Shipping Corporation (6412); Eighth Aframax Tanker Corporation (8100); Epsilon Aframax Corporation (9895); First Chemical Carrier Corporation (2955); First LPG Tanker Corporation (9757); First Union Tanker Corporation (4555); Fourth Aframax Tanker Corporation (3887); Front President Inc. (1687);  Goldmar Limited (0772); GPC Aframax Corporation (6064); Grace Chartering Corporation (2876); International Seaways, Inc. (5624); Jademar Limited (7939); Joyce Car Carrier Corporation (1737); Juneau Tanker Corporation (2863); Kimolos Tanker Corporation (3005); Kythnos Chartering Corporation (3263); Leo Tanker Corporation (9159); Leyte Product Tanker Corporation (9564); Limar Charter Corporation (9567); Luxmar Product Tanker Corporation (3136); Luxmar Tanker LLC (4675); Majestic Tankers Corporation (6635); Maple Tanker Corporation (5229); Maremar Product Tanker Corporation (3097); Maremar Tanker LLC (4702); Marilyn Vessel Corporation (9927); Maritrans General Partner Inc. (8169); Maritrans Operating Company L.P. (0496); Milos Product Tanker Corporation (9563); Mindanao Tanker Corporation (8192); Mykonos Tanker LLC (8649); Nedimar Charter Corporation (9566); Oak Tanker Corporation (5234); Ocean Bulk Ships, Inc. (6064); Oceania Tanker Corporation (9164); OSG 192 LLC (7638); OSG 209 LLC (7521); OSG 214 LLC (7645); OSG 215 Corporation (7807); OSG 242 LLC (8002); OSG 243 LLC (7647); OSG 244 LLC (3601); OSG 252 LLC (7501); OSG 254 LLC (7495); OSG 300 LLC (3602); OSG 400 LLC (7499); OSG America LLC (2935); OSG America L.P. (2936); OSG America Operating Company LLC (5493); OSG Car Carriers, Inc. (1608);OSG Clean Products International, Inc. (6056); OSG Columbia LLC (7528); OSG Constitution LLC (8003); OSG Courageous LLC (2871); OSG Delaware Bay Lightering LLC (4998); OSG Discovery LLC (8902); OSG Endeavor LLC (5138); OSG Endurance LLC (2876); OSG Enterprise LLC (3604); OSG Financial Corp. (8639); OSG Freedom LLC (3599); OSG Honour LLC (7641); OSG Independence LLC (7296); OSG Intrepid LLC (7294); OSG Liberty LLC (7530); OSG Lightering Acquisition Corporation (N/A); OSG Lightering LLC (0553); OSG Lightering Solutions LLC (5698); OSG Mariner LLC (0509); OSG Maritrans Parent LLC (3903); OSG Navigator LLC (7524); OSG New York, Inc. (4493); OSG Product Tankers AVTC, LLC (0001); OSG Product Tankers I, LLC (8236); OSG Product Tankers II, LLC (8114); OSG Product Tankers, LLC (8347); OSG Product Tankers Member LLC (4705); OSG Quest LLC (1964); OSG Seafarer LLC (7498);OSG Ship Management, Inc. (9004); OSG Valour Inc. (7765); Overseas Allegiance Corporation (7820); Overseas Anacortes LLC (5515); Overseas Boston LLC (3665); Overseas Diligence LLC (6681); Overseas Galena Bay LLC (6676); Overseas Houston LLC (3662); Overseas Integrity LLC (6682); Overseas Long Beach LLC (0724); Overseas Los Angeles LLC (5448); Overseas Martinez LLC (0729); Overseas New Orleans LLC (6680); Overseas New York LLC (0728); Overseas Nikiski LLC (5519); Overseas Perseverance Corporation (7817); Overseas Philadelphia LLC (7993); Overseas Puget Sound LLC (7998); Overseas Sea Swift Corporation (2868); Overseas Shipping (GR) Ltd. (5454); Overseas ST Holding LLC (0011); Overseas Tampa LLC (3656); Overseas Texas City LLC (5520); Pearlmar Limited (7140); Petromar Limited (7138); Pisces Tanker Corporation (6060); Polaris Tanker Corporation (6062); Queens Product Tanker Corporation (2093); Reymar Limited (7131); Rich Tanker Corporation (9147); Rimar Chartering Corporation (9346); Rosalyn Tanker Corporation (4557); Rosemar Limited (7974); Rubymar

amended joint plan of reorganization for the resolution of the outstanding Claims against and Equity Interests in the Debtors. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, projections for those operations, risk factors, a summary and analysis of this Plan and certain related matters including, without limitation, certain tax matters related to this Plan. Subject to certain restrictions and requirements set forth in 11 U.S.C. § 1127, Bankruptcy Rule 3019, and the Equity Commitment Agreement, the Debtors reserve the right to alter, amend, modify, revoke or withdraw this Plan prior to its substantial consummation.

# ARTICLE I
## DEFINED TERMS AND RULES OF INTERPRETATION

**1.1     Defined Terms**. Capitalized terms used and not otherwise defined in this Plan shall have the meanings set forth below. Any term that is used and not otherwise defined herein, but that is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to it in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

*7.500%  Notes* means those 7.5% unsecured notes due 2024 issued by OSG pursuant to the 7.500%  Notes Indenture.

*7.500% Notes Alternative Distribution* has the meaning set forth in <u>Section 3.2(h)(ii)</u> of this Plan.

*7.500%  Notes Claims* means Claims arising under the 7.500%  Notes Indenture, which, subject in all respects to <u>Section 3.2(h)</u> and <u>Section 7.2</u> hereof, will be Allowed at an outstanding balance as of the Petition Date of $146,000,000.00 in principal and $2,707,083.34 in accrued, but unpaid pre-petition interest, plus accrued postpetition interest at the applicable contractual rates (including interest on overdue interest to the extent agreed by the Debtors or Reorganized Debtors or ordered by Final Order of the Bankruptcy Court), and the reasonable fees, expenses, disbursements, and advances of the 7.500% Notes Trustee, its agents and counsel, (to the extent permitted under the 7.500% Notes Indenture), including with respect to post-Effective Date distributions.

*7.500%  Notes Indenture* means that certain indenture, dated as of March 7, 2003 between OSG and the 7.500%  Notes Trustee, as amended and supplemented by that certain First Supplemental Indenture dated as of February 19, 2004, between OSG and the 7.500% Notes Trustee.

---

Limited (0767); Sakura Transport Corp. (5625); Samar Product Tanker Corporation (9570); Santorini Tanker LLC (0791); Serifos Tanker Corporation (3004); Seventh Aframax Tanker Corporation (4558); Shirley Tanker SRL (3551); Sifnos Tanker Corporation (3006); Silvermar Limited (0766); Sixth Aframax Tanker Corporation (4523); Skopelos Product Tanker Corporation (9762); Star Chartering Corporation (2877); Suezmax International Agencies, Inc. (4053); Talara Chartering Corporation (3744); Third United Shipping Corporation (5622); Tokyo Transport Corp. (5626); Transbulk Carriers, Inc. (6070); Troy Chartering Corporation (3742); Troy Product Corporation (6969); Urban Tanker Corporation (9153); Vega Tanker Corporation (3860); View Tanker Corporation (9156); Vivian Tankships Corporation (7542); Vulpecula Chartering Corporation (8718); Wind Aframax Tanker Corporation (9562). The mailing address of the Debtors is: 1301 Avenue of the Americas, 42nd Floor, New York, NY 10019.

*7.500%  Notes Trustee* means Wilmington Trust Company, and its successors and assigns, as indenture trustee for the 7.500% Notes.

*8.125%  Notes* means those 8.125% unsecured notes due 2018 issued by OSG pursuant to the 8.125%  Notes Indenture,

*8.125%  Notes Claims* means Claims arising under the 8.125% Notes Indenture, which, subject in all respects to <u>Section 3.2(h)</u> and <u>Section 7.2</u> hereof, will be Allowed at an outstanding balance as of the Petition Date of $300,000,000.00 in principal and $2,979,166.67 in accrued, but unpaid pre-petition interest, plus accrued postpetition interest at the applicable contractual and default rates (including interest on overdue interest calculated at the default rate), and the reasonable fees, expenses, disbursements and advances of the 8.125% Notes Trustee, its agents and counsel, (in each case, to the extent permitted under the 8.125% Notes Indenture), including with respect to post-Effective Date distributions.

*8.125%  Notes Indenture* means that certain indenture, dated as of March 29, 2010, between OSG and the 8.125% Notes Trustee.

*8.125%  Notes Trustee* means The Bank of New York Mellon Trust Company, N.A., as indenture trustee for the 8.125% Notes, or any duly appointed successor thereto.

*8.75%  Debentures* means those 8.75% unsecured debentures due 2013 issued by OSG pursuant to that certain indenture, dated as of December 1, 1993, between OSG and the 8.75% Debentures Trustee.

*8.750%  Debentures Claims* means Claims arising under the 8.75%  Debentures, which, subject in all respects to <u>Section 3.2(g)</u> and <u>Section 7.2</u> hereof, will be Allowed at an outstanding balance as of the Petition Date of $63,603,000.00 in principal and $2,519,827.19 in accrued, but unpaid pre-petition interest, plus accrued postpetition interest at the applicable contractual rates (including interest on overdue interest to the extent agreed by the Debtors or Reorganized Debtors or ordered by Final Order of the Bankruptcy Court), and the reasonable fees, expenses, disbursement and advances of the 8.750% Debentures Trustee, and its agents and counsel, (in each case, to the extent permitted under the 8.750% Debentures Indenture), including with respect to post-Effective Date distributions.

*8.75%  Debentures Trustee* means The Bank of New York Mellon, as successor indenture trustee to The Chase Manhattan Bank (National Association) for the 8.75% Debentures, or any duly appointed successor thereto.

*Accept* means, with respect to the acceptance of the Plan by a Class of Claims or Equity Interests, votes cast (or deemed cast pursuant to an order of the Bankruptcy Court or the applicable provisions of the Bankruptcy Code) in favor of the Plan by the requisite number and principal amount of Allowed Claims or Equity Interests in such Class as set forth in section 1126 of the Bankruptcy Code.

*Accredited Investor* has the meaning given in Rule 501 of Regulation D under the Securities Act.

*Adjustment Distribution* has the meaning set forth in Section 9.5 of this Plan.

*Administrative and Disputed Claims Agent* means Greylock Partners LLC.

*Administrative Claims Reserve* means an escrow account held by the Administrative and Disputed Claims Agent for purposes of satisfying Allowed Administrative Expense Claims pursuant to Section 13.6 of this Plan.

*Administrative Expense Claim* means any Claim for costs and expenses of administration of the Chapter 11 Case that is assertable under section 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation: (a) any actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Debtors' Estates and operating the businesses of the Debtors prior to the Effective Date; (b) compensation for legal, financial, advisory, accounting, and other services and reimbursement of expenses Allowed by the Bankruptcy Court under section 327, 330, 331, 363, or 503(b) of the Bankruptcy Code to the extent incurred prior to the Effective Date; and (c) the ECA Professional Expenses incurred through and including the Effective Date not previously paid by the Debtors.

*Administrative Expense Claims Bar Date* means the Business Day that is thirty (30) days after the Effective Date or such other date as approved by order of the Bankruptcy Court.

*Admiralty Lien Claims* means Claims arising out of (1) maritime tort (including those Personal Injury Claims listed on Exhibit E attached hereto and other personal injury claims), (2) crew wage claims, (3) the supply of necessaries, (4) general average, (5) salvage, including contract salvage, (6) stevedore wage claims when employed directly by an authorized person; and (7) maritime contracts which create maritime liens, (a) as to which a proof of claim has been timely Filed before (i) the Bar Date, for those Claims arising prior to the Petition Date, or (ii) the Administrative Expense Claims Bar Date, for those Claims arising on or after the Petition Date and prior to the Effective Date, and (b) which relate to Claims that are not paid in full or otherwise satisfied pursuant to the terms of this Plan.

*Affidavit of Citizenship* has the meaning set forth in the Rights Offering Procedures.

*Affiliate* means, unless otherwise indicated, (A) an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the primary entity, other than an entity that holds such securities (i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or (ii) solely to secure a debt, if such entity has not in fact exercised such power to vote; (B) a corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the primary entity, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the primary entity, other than an entity that holds such securities (i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or (ii) solely to secure a debt, if such entity has not in fact exercised such power to vote.

-4-

*Allowed* means, with reference to any Claim, or any portion thereof, that is not a Disputed Claim and (a) that has been listed by the Debtors in the Schedules as liquidated in amount and not disputed, contingent or undetermined, and with respect to which no contrary proof of claim has been Filed, (b) has been specifically allowed under this Plan, (c) the amount or existence of which has been determined or allowed by a Final Order or (d) as to which a proof of claim has been timely Filed before the Bar Date in a liquidated, non-contingent amount that is not disputed or as to which no objection has been timely interposed in accordance with <u>Section 9.1</u> of this Plan or any other period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court; provided, <u>further</u> that any such Claims Allowed solely for the purpose of voting to Accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" for the purpose of distributions hereunder.

*Assigned Contract* means any executory contract or unexpired lease assumed and assigned by any of the Debtors under this Plan.

*Avoidance and Other Actions* means any and all avoidance, recovery, subordination or other actions or remedies that may be brought by and on behalf of the Debtors or their Estates under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, actions or remedies arising under sections 510 and 542-553 of the Bankruptcy Code.

*Backstop Commitment* has the meaning set forth in the Equity Commitment Agreement.

*Backstop Securities* has the meaning set forth in the Equity Commitment Agreement.

*Ballot* means each of the ballot forms distributed to each Holder of an Impaired Claim or Old OSG Equity Interest that is entitled to vote to Accept or reject this Plan and on which the Holder is to indicate, among other things, acceptance or rejection of this Plan.

*Bankruptcy Code* means title 11 of the United States Code, as now in effect or hereafter amended so as to be applicable in these Chapter 11 Cases.

*Bankruptcy Court* means the United States Bankruptcy Court for the District of Delaware, or any such other court having original and exclusive subject matter jurisdiction over these Chapter 11 Cases pursuant to 11 U.S.C. § 1334(a).

*Bankruptcy Rules* means the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended, so as to be applicable in these Chapter 11 Cases.

*Bar Date* means any deadline established by the Bankruptcy Court or the Bankruptcy Code for Filing proofs of Claim in these Chapter 11 Cases.

*Bar Date Order* means the Order (I) Establishing Bar Dates for Filing Proofs of Claim, (II) Approving Proof of Claim Form, Bar Date Notices, and Mailing and Publication Procedures, (III) Implementing Uniform Procedures Regarding 503(b)(9) Claims, and (IV) Providing Certain Supplemental Relief (D.I. 1146).

*Business Day* means any day, other than a Saturday, a Sunday, or a "legal holiday" (as defined in Bankruptcy Rule 9006(a)) or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

*Cash* means lawful currency of the United States of America, including, without limitation, bank deposits, checks and other similar items, including any U.S. Dollar Equivalent.

*Cash Collateral Agreement* has the meaning set forth in Section 5.9 of this Plan.

*Cash Management Order* means the Final Order Pursuant to 11 U.S.C. §§ 105(a), 345, 363(c)(1), 364(a), 364(c) and 503(b)(1), and Fed. R. Bankr. P. 6003: (A) Approving the Continued Use of the Cash Management System, Bank Accounts and Business Forms; (B) Permitting Continued Intercompany Transactions and Transfers and Granting Liens, Claims, and Other Relief in Connection Therewith; (C) Authorizing Banks to Honor Certain Transfers and Charge Certain Fees and Other Amounts; and (D) Approving Limited Waiver of Section 345 (D.I. 396).

*Causes of Action* means, without limitation, any and all Claims, causes of action, demands, rights, actions, suits, damages, injuries, remedies, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses and franchises of any kind or character whatsoever, known, unknown, accrued or to accrue, contingent or non-contingent, matured or unmatured, suspected or unsuspected, foreseen or unforeseen, whether arising before, on or after the Petition Date, in contract or in tort, in law or in equity, or under any other theory of law, whether asserted or assertable directly or derivatively in law or equity or otherwise by way of claim, counterclaim, cross-claim, third party action, action for indemnity or contribution or otherwise, including, without limitation, the Professional Liability Action and the Avoidance and Other Actions.

*CEXIM* means the Export-Import Bank of China, original Secured Lender and Agent under the CEXIM Loan Agreement.

*CEXIM Cash Collateral Order* means the Final Order (I) Authorizing Debtors to Use Cash Collateral, and (II) Granting Adequate Protection, entered by the Bankruptcy Court on February 5, 2013 (D.I. 459).

*CEXIM Claims* means Claims arising under the CEXIM Loan Agreement, to the extent unpaid.

*CEXIM DIP Loan Agreement* means that Debtor in Possession Loan Agreement dated February 6, 2013, as approved by the Bankruptcy Court pursuant to the CEXIM DIP Order.

*CEXIM DIP Order* means the Order (1) Approving Post-Petition Financing, (2) Granting Liens And Providing Superpriority Administrative Expense Claim Status Pursuant To 11 U.S.C. §§ 363 And 364, And (3) Modifying Automatic Stay Pursuant To 11 U.S.C. § 362, entered by the Bankruptcy Court on February 5, 2013 (D.I. 461).

*CEXIM Loan Agreement* means that certain loan agreement dated August 10, 2009 with CEXIM, as original lender and security agent, and OSG as guarantor (as amended, restated, supplemented or otherwise modified from time to time).

*Chapter 11 Cases* means the cases commenced under chapter 11 of the Bankruptcy Code by the Debtors in the Bankruptcy Court, styled *In re Overseas Shipholding Group, Inc., et al.,* Chapter 11 Case No. 12-20000 (PJW) (jointly administered), currently pending before the Bankruptcy Court.

*Charter Rejection Claim* means a Claim arising in connection with the Debtors' rejection of vessel charter contracts pursuant to section 365 of the Bankruptcy Code, including any Claim based on any Debtor's guarantee of a vessel charter contract.

*Chief Restructuring Officer* means John J. Ray, III, or any duly appointed successor thereto.

*Claim* has the meaning set forth in section 101(5) of the Bankruptcy Code.

*Claims Agent* means KCC.

*Claims Objection Deadline* has the meaning set forth in Section 9.1 of this Plan.

*Claims Register* means the official register of Claims against, and Equity Interests in, the Debtors, maintained by the Claims Agent.

*Class* means a category of Claims against or Equity Interests in the Debtors, as described in Article II hereof.

*Class A New Shares* has the meaning set forth in the Equity Commitment Agreement.

*Class A New Warrants* has the meaning set forth in the Equity Commitment Agreement.

*Class A New Securities* means the Class A New Shares and/or the Class A New Warrants, as applicable.

*Class B New Shares* has the meaning set forth in the Equity Commitment Agreement.

*Class B New Warrants* has the meaning set forth in the Equity Commitment Agreement.

*Class B New Securities* means the Class B New Shares and/or the Class B New Warrants , as applicable.

*Class Stipulation* means that certain Stipulation Resolving Anticipated Objections to the Debtors' Proposed Plan of Reorganization between counsel to the Debtors and counsel to

the Lead Plaintiffs, as approved by the Bankruptcy Court on May 23, 2014 and relating to the Allowance and payment of the Subordinated Class Plaintiff Claims.

*Commencement Date* has the meaning set forth in Section 6.4 of this Plan.

*Commitment Party* has the meaning set forth in the Equity Commitment Agreement.

*Commitment Percentage* means the Commitment Percentage as such term is defined in the Equity Commitment Agreement.

*Commitment Premium* has the meaning set forth in Section 6.9 of this Plan.

*Confirmation Date* means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

*Confirmation Hearing* means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

*Confirmation Objection Deadline* has the meaning set forth in Section 8.3 of this Plan.

*Confirmation Order* means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

*Consenting Lenders* means those Credit Agreement Lenders that are party to the Plan Support Agreement.

*Control Agreement* has the meaning set forth in Section 5.9 of this Plan.

*Credit Agreement* means that certain unsecured credit agreement dated as of February 9, 2006 among OSG, OBS and OIN, as joint and several borrowers, the Credit Agreement Agent, and the Credit Agreement Lenders.

*Credit Agreement Agent* means U.S. Bank National Association, as administrative agent under the Credit Agreement, or any predecessor or successor thereto, as applicable.

*Credit Agreement Claims* means, subject to Article III and Section 7.2 hereof, Claims arising under the Credit Agreement, which shall be Allowed in the aggregate amount of $1,490,261,803, plus (i) interest at the contractual default rate through the Effective Date, (ii) the LOC Fee, and (iii) the reasonable fees and expenses of the Credit Agreement Agent and the Credit Agreement Lenders (in each case, to the extent reimbursable under the Credit Agreement or a Final Order of the Bankruptcy Court), in each case, incurred and outstanding through the Effective Date and not previously paid by the Debtors pursuant to the Plan Support Agreement Approval Order, or as Allowed Administrative Expense Claims, including with respect to post-Effective Date distributions, if any.

*Credit Agreement Lenders* means lenders under the Credit Agreement from time to time.

*Creditor* has the meaning set forth in section 101(10) of the Bankruptcy Code.

*Cure Amount* has the meaning set forth in <u>Section 8.2</u> of this Plan.

*Cure Notice* has the meaning set forth in <u>Section 8.2</u> of this Plan.

*Debtors* has the meaning set forth in the preamble of this Plan.

*Disbursing Agent* means the Reorganized Debtors or any authorized agent appointed by the Reorganized Debtors to make distributions under the Plan.

*Disclosure Statement* means the written disclosure statement that relates to this Plan and is approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code as such disclosure statement may be amended, modified or supplemented (and all exhibits and schedules annexed thereto or referred to therein) and that is prepared and distributed in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3018, and which shall be in form and substance reasonably acceptable to each of the Commitment Parties and for which the Debtors shall consult with the Unsecured Creditors' Committee and the Equity Committee.

*Disputed Claim* means a Claim, or any portion thereof, that (i) has not been Scheduled by the Debtors or has been Scheduled at zero, or has been Scheduled as contingent, unliquidated, disputed or undetermined and for which, in each case, no proof of claim has been timely Filed, (ii) has been asserted in excess of the amount Scheduled or at a different priority than Scheduled, (iii) is the subject of a Filed objection or request for estimation and which objection or request for estimation has not been withdrawn or overruled by a Final Order, (iv) is a Subordinated Claim other than Claim 1547, (v) is a SERP Claim, (vi) is any counterclaim or indemnification arising in connection with the Professional Liability Action, and/or (vii) is otherwise disputed by the Debtors, including, without limitation, those Claims listed on <u>Exhibit I</u>, which dispute has not been withdrawn, resolved or overruled by a Final Order.

*Disputed Claims Reserve* means one or more escrow account(s) held by the Administrative and Disputed Claims Agent for purposes of satisfying Disputed Claims pursuant to <u>Section 9.5</u> of this Plan.

*Distribution Record Date* means the date for determining which Holders of Allowed Claims are eligible to receive distributions hereunder, which shall be (i) the Effective Date, or (ii) such other date as designated in a Bankruptcy Court order.

*District Court* means the district court presiding over the OSG Securities Class Action.

*Domestic Holder* means a Holder of a Claim or Old OSG Equity Interest who is a U.S. Citizen for Jones Act purposes, as demonstrated by evidence reasonably acceptable to the

Debtors, including, without limitation, the provision of an affidavit in accordance with the provisions of 46 C.F.R. part 355 from time to time upon request of the Debtors.

*DSF* means Danish Ship Finance A/S, agent under the DSF Loan Agreement.

*DSF Borrowers* means each of 1372 Tanker Corporation, Alcesmar Limited, Alcmar Limited, Andromar Limited, Antigmar Limited, Ariadmar Limited, Shirley Tanker SRL, Samar Product Tanker Corporation, Leyte Product Tanker Corporation, and Rosalyn Tanker Corporation.

*DSF Cash Collateral Order* means the Order Pursuant to Debtors' Motion for an Order under 11 U.S.C. §§ 105, 361, 363 and Fed. R. Bankr. P. 4001 (I) Authorizing Debtors to Use Prepetition Collateral, and (II) Granting Adequate Protection, entered by the Bankruptcy Court on February 5, 2013 (D.I. 460).

*DSF Claims* means Claims arising under the DSF Loan Agreement, to the extent unpaid.

*DSF DIP Loan Agreement* means that Senior Secured Superpriority Loan Agreement dated as of February 6, 2013, approved by the Bankruptcy Court pursuant to the DSF DIP Order.

*DSF DIP Order* means the Order (1) Approving Post-Petition Financing, (2) Granting Liens And Providing Superpriority Administrative Expense Claim Status Pursuant To 11 U.S.C. §§ 363 And 364, And (3) Modifying Automatic Stay Pursuant To 11 U.S.C. § 362, entered by the Bankruptcy Court on February 5, 2013 (D.I. 462).

*DSF Loan Agreement* means that certain loan agreement dated August 28, 2008 with certain banks and financial institutions, as lenders, DSF, as agent, and OSG, OBS, and OIN, as guarantors (as amended, restated, supplemented or otherwise modified from time to time.

*DTC* means The Depository Trust Company.

*ECA Professional Expenses* means the professional advisors' fees and expenses incurred by each of the Commitment Parties payable pursuant to the Equity Commitment Agreement.

*Effective Date* means the date of substantial consummation of the Plan, which shall be the first Business Day upon which all conditions precedent to the effectiveness of the Plan, specified in <u>Section 10.1</u> hereof, are satisfied or waived in accordance with the Plan.

*Election* means the valid completion of an Election Form by a Holder of a 7.500% Note.

*Election Form* means the form that a Holder of a 7.500% Note may complete in order to receive the 7.5% Notes Alternative Distribution, which form will provide the process for submission, including the deadline by which it must be duly submitted.

*Election 1 Note* means a note issued by Reorganized OSG to any Holder of a 7.500% Note who validly completes and delivers an Election Form on or before July 7, 2014 but fails to reaffirm its Election by July 22, 2014 at 5:00 p.m. (Prevailing Eastern Time) in order to receive the Election 2 Note, in exchange for such 7.500% Note, which Election 1 Note shall be on the same terms as the existing 7.500% Note and otherwise with an indenture and other documentation reasonably satisfactory to such Holder; provided, however, that the Election 1 Note shall mature on February 15, 2021, and shall provide for an interest rate of 7.500% per annum commencing on (but excluding) the Effective Date.

*Election 2 Note* means a note issued by Reorganized OSG to any Holder of a 7.500% Note who validly completes and delivers an Election Form (or reaffirms its prior Election made on or before July 7, 2014 in order to receive such Election 2 Notes) between July 11, 2014 and July 22, 2014 at 5:00 p.m. (Prevailing Eastern Time), in exchange for such 7.500% Note, on such terms and conditions as may be consistent with the Order Approving Stipulation Resolving Anticipated Objections to the Debtors' Proposed Plan of Reorganization (and any exhibit thereto) (D.I. 3633) but otherwise on the same terms as the Election 1 Notes and as otherwise may be reasonably satisfactory to such Holder.

*Election Notes* means the Election 1 Notes and Election 2 Notes.

*Electing Noteholder* means any Holder of 7.500% Notes that validly completes and timely submits an Election Form.

*Eligible OSG Equity Interestholder* has the meaning set forth in Section 6.1 of this Plan.

*Eligible Participant* has the meaning set forth in the Rights Offering Procedures.

*Entity* has the meaning set forth in section 101(15) of the Bankruptcy Code.

*Equity Commitment Agreement* means that certain equity commitment agreement, dated as of May 2, 2014, by and among OSG (on behalf of itself and the other Debtors), on one hand, and each of the Commitment Parties, on the other, filed as an exhibit to the Debtors' Motion For An Order (I) Authorizing The Debtors To (A) Enter Into And Perform Under An Equity Commitment Agreement Pursuant To A Proposed Plan Of Reorganization, (B) Commence A Rights Offering, And (C) Pay Certain Related Fees And Expenses; And (II) Approving The Rights Offering Procedures (D.I. 3105), as amended from time to time in accordance with the terms thereof.

*Equity Commitment Agreement Approval Order* means the Order Granting Debtors' Motion For An Order (I) Authorizing The Debtors To (A) Enter Into And Perform Under The Equity Commitment Agreement Pursuant To A Proposed Plan Of Reorganization, (B) Commence A Rights Offering, And (C) Pay Certain Related Fees And Expenses; And (II) Approving The Rights Offering Procedures (D.I. 3281).

*Equity Committee* means the statutory committee appointed by the United States Trustee to represent Old OSG Equity Interests in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

*Equity Interest* means any equity interest or related proxy, in any of the Debtors represented by duly authorized, validly issued and outstanding shares of preferred stock or common stock, stock appreciation rights, membership interests, partnership interests, or any other instrument evidencing a present ownership interest, inchoate or otherwise, in any of the Debtors, or right to convert into such an equity interest or acquire any equity interest of the Debtors, whether or not transferable, or an option, restricted stock unit, warrant or other right, contractual or otherwise, to acquire any such interest, including any such equity or equity-based interests issued pursuant to the Overseas Shipholding Group, Inc. 2004 Stock Incentive Plan, as amended, the Overseas Shipholding Group, Inc. 1999 Non-Employee Director Stock Option Plan and any other equity incentive plan maintained by the Debtors, which was in existence prior to or on the Petition Date, provided that, for the avoidance of doubt, Old OSG Equity Interests shall not include unvested Equity Interests issued pursuant to either the Overseas Shipholding Group, Inc. 2004 Stock Incentive Plan or any other agreement, policy, program or plan cancelled pursuant to Section 8.5(e) hereof.

*Escrow Funding Notice* has the meaning set forth in the Equity Commitment Agreement.

*Estate* means the estate of each of the Debtors created under section 541 of the Bankruptcy Code.

*Exchange Act* means the Securities Exchange Act of 1934, as amended, and the rules and regulation of the SEC thereunder.

*Exculpated Parties* means (i) each of the Debtors, their respective non-Debtor Affiliates, Reorganized Debtors, and all of their respective Affiliates, (ii) the Unsecured Creditors' Committee (in its capacity as such), (iii) members of the Unsecured Creditors' Committee (in their capacity as such), (iv) the Equity Committee (in its capacity as such), (v) members of the Equity Committee (in their capacity as such), (vi) each Commitment Party (in its capacity as such and in its capacity as a Credit Agreement Lender, and/or as a Holder of Old OSG Equity Interests, as applicable), (vii) the Exit Lenders (in their capacity as such); (viii) the Lead Plaintiffs; (ix) each Electing Noteholder (in its capacity as such) and (x) with respect to the foregoing, each of their respective officers, directors, employees, representatives, advisors, attorneys, notaries (pursuant to the laws of the United States and any other jurisdiction), auditors, agents and professionals, in each case acting in such capacity on or any time after the Petition Date, and any person claiming by or through any of them but excluding defendants in the Professional Liability Action and any other Causes of Action preserved by the Debtors.

*Exhibit* means an exhibit annexed to this Plan.

*Exit Financing* means the New OBS Exit Facility, the New OIN Exit Facility, the New OBS Exit Revolver, and the New OIN Exit Revolver.

*Exit Lenders* means the lenders, agents, and arrangers providing the Exit Financing, including Jefferies Finance LLC, Barclays Bank PLC, and UBS Securities LLC, in their capacity as such.

*Facing Fee* means any fee payable in connection with the LOC due and owing to the Issuing Bank pursuant to section 3.01(c) of the Credit Agreement.

*Federal Judgment Rate* means the U.S. federal judgment rate in effect as of the Petition Date.

*File, Filed or Filing* means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

*Final Order* means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction as to which the time to appeal, petition for certiorari, or move for re-argument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for re-argument or rehearing are then pending; or as to which any right to appeal, petition for certiorari, reargue, or rehear has been waived in writing in form and substance satisfactory to the Debtors or the Reorganized Debtors; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

*Foreign Holders* means those Holders of Claims or Old OSG Equity Interests who are not Domestic Holders.

*Foreign Participant* has the meaning set forth in Section 6.4 of this Plan.

*FSO Joint Venture* means two joint ventures between OSG and Euronav NV relating to the operation of two floating storage and offloading service vessels.

*Holdback Commitment* has the meaning set forth in the Equity Commitment Agreement.

*Holdback Securities* has the meaning set forth in the Equity Commitment Agreement.

*Holder* means a Person or an Entity who is the holder of a Claim or Equity Interest as of the applicable date of determination or an authorized agent of such Person or Entity.

*Impaired* means, when used in reference to a Claim or an Equity Interest, a Claim or an Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

*Initial Distribution Date* means the date as determined by Reorganized OSG upon which the initial distributions of property under this Plan will be made to Holders of Allowed Claims and Allowed Equity Interests, which date shall be as soon as practicable, but in no event

-13-

more than ten (10) Business Days, after the Effective Date unless otherwise extended by order of the Bankruptcy Court.

*Intercompany Claim* means any Claim against any Debtor by any other Debtor or non-Debtor Affiliate whether arising prior to, on or after the Petition Date.

*Intercompany Equity Interest* means any Equity Interest in any Debtor other than OSG.

*Intercompany Facility* means, as applicable (i) that certain Secured Loan Agreement, dated November 8, 2012, between OSG Ship Management (UK) Ltd. and OIN; (ii) that certain Secured Loan Agreement, dated November 8, 2012, between OSG and OIN, or (iii) that certain Secured Loan Agreement, dated November 8, 2012, between OBS and OSG.

*Intercompany Facility Claim* means any Claim against OBS or OIN arising under an Intercompany Facility.

*Interest on Interest Dispute* has the meaning set forth in <u>Section 13.19</u>.

*Investor Certification* has the meaning set forth in <u>Section 6.3</u> of this Plan.

*IRS Claims* means all of the Claims of the Internal Revenue Service for tax years 2012 and earlier against OSG and its Affiliates not otherwise expunged by order of the Bankruptcy Court as of the Effective Date.

*Issuing Bank* has the meaning set forth in <u>Section 5.9</u> of this Plan.

*Jones Act* means 46 U.S.C. § 12103, 46 U.S.C. § 50501, and related statutes and regulations respecting the United States coastwise trade, as the same may be amended from time to time.

*KCC* means Kurtzman Carson Consultants LLC.

*Lead Plaintiffs* means the named lead plaintiffs in the OSG Securities Class Action.

*Lien* has the meaning set forth in 11 U.S.C. § 101(37).

*LNG Joint Venture* means that certain joint venture between OIN and Qatar Gas Transport Company Limited (Nakilat) relating to the operation of four liquefied natural gas carriers.

*LOC* has the meaning set forth in <u>Section 5.9</u> of this Plan.

*LOC Collateral* has the meaning set forth in <u>Section 5.9</u> of this Plan.

*LOC Fee* means any fee payable in connection with the LOC to the extent due and owing to the Administrative Agent pursuant to section 3.01(b) of the Credit Agreement.

-14-

*MARAD* means the United States Maritime Administration.

*Management and Director Incentive Program* means the management and director incentive program to be determined by the Reorganized OSG Board, pursuant to which the Reorganized OSG Board may distribute to certain members of Reorganized OSG's directors and senior management up to 10% of the New Shares on a fully diluted basis.

*Net Litigation Recovery* has the meaning set forth in the Equity Commitment Agreement, including the exhibits thereto.

*New OBS Exit Facility* means the secured term loan facility to be entered into by OBS and certain of its subsidiaries as of and subject to the occurrence of the Effective Date in form and substance consistent with the Equity Commitment Agreement.

*New OBS Exit Revolver* means a secured revolving credit facility to be entered into by OBS and certain of its subsidiaries as of and subject to the occurrence of the Effective Date in form and substance consistent with the Equity Commitment Agreement.

*New OIN Exit Facility* means a secured term loan facility to be entered into by OIN and certain of its subsidiaries as of and subject to the occurrence of the Effective Date in form and substance consistent with the Equity Commitment Agreement.

*New OIN Exit Revolver* means a secured revolving credit facility to be entered into by OIN and certain of its subsidiaries as of and subject to the occurrence of the Effective Date in form and substance consistent with the Equity Commitment Agreement.

*New Securities and Documents* has the meaning set forth in Section 5.4 of this Plan.

*New Securities* means Class A New Securities and/or Class B New Securities, as applicable.

*New Shares* means the Class A New Shares and/or the Class B New Shares, as applicable.

*New Warrants* means the Class A New Warrants and/or the Class B New Warrants, as applicable.

*Non-Participating OSG Equity Interestholder* has the meaning set forth in Section 6.1 of this Plan.

*Notes Claims* means, collectively, the 7.500% Notes Claims, the 8.125% Notes Claims and/or the 8.75% Debentures Claims.

*Notes Trustees* means, collectively, the 7.500% Notes Trustee, 8.125% Notes Trustee, and/or 8.75% Debentures Trustee.

*Noteholders* means the Holders of the 7.500% Notes, 8.125% Notes, and/or the 8.75% Debentures from time to time.

*OBS* means OSG Bulk Ships, Inc.

*OIN* means OSG International, Inc

*Old OSG Equity Interests* means any shares of OSG's common stock, par value $1.00 per share, that are issued and outstanding as of the date of the Equity Commitment Agreement, provided, however, that Old OSG Equity Interests shall not include unvested Equity Interests issued pursuant to either the Overseas Shipholding Group, Inc. 2004 Stock Incentive Plan or any other agreement, policy, program or plan cancelled pursuant to Section 8.5(e) hereof.

*OSG* means Overseas Shipholding Group, Inc., as in existence prior to the Effective Date.

*OSG Equity Interestholder* means a Holder of an Old OSG Equity Interest on the Record Date.

*OSG Securities Class Action* means the consolidated securities case, number 12-07948 pending in the United States District Court for the Southern District of New York.

*Other Priority Claim* means any Claim against any Debtor, other than an Administrative Expense Claim or Priority Tax Claim, that is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code.

*Other Secured Claim* means any Secured Claim against any Debtor, including an Intercompany Facility Claim, other than an Admiralty Lien Claim, a Secured Vessel DIP Claim or a Secured Vessel Claim.

*Other Unsecured Claim* means any Claim against any Debtor that is not an Administrative Expense Claim, Priority Tax Claim, Priority Claim, Personal Injury Claim, Admiralty Lien Claim, Secured Vessel DIP Claim, Secured Vessel Claim, Other Secured Claim, Satisfied Noteholder Claim, Reinstated Noteholder Claim, Charter Rejection Claim, Credit Agreement Claim, or Subordinated Claim.

*Participating Eligible OSG Equity Interestholder* has the meaning set forth in Section 6.1 of this Plan.

*Pension Plan* means the Retirement Plan of Maritrans Inc., the American Maritime Officers Pension Plan, the Marine Engineers' Beneficial Association Defined Benefit Pension Plan, the Seafarers International Union Pension Plan, the Merchant Navy Officers Pension Fund, the Merchant Navy Ratings Pension Fund, and the OSG Ship Management (UK) Ltd. Retirement Benefits Plan.

*Person* means any natural person, corporation, general or limited partnership, limited liability company, firm, trust, association, government, governmental agency or other Entity, whether acting in an individual, fiduciary or other capacity.

*Personal Injury Claim* means Claims against certain of the Debtors, whether or not the subject of an existing lawsuit, arising from a personal injury or wrongful death allegation, listed in <u>Exhibit E</u> to this Plan.

*Petition Date* means November 14, 2012, the date on which the Debtors Filed their petitions for relief commencing the Chapter 11 Cases.

*Plan* means this First Amended Joint Plan of Reorganization of Overseas Shipholding Group, Inc., *et al.* Under Chapter 11 of the Bankruptcy Code, including, without limitation, all exhibits, supplements, appendices and schedules hereto or contained in the Plan Supplement, as the same may be amended or modified from time to time with the reasonable consent of each Commitment Party.

*Plan Securities* means New Securities that are issued pursuant to this Plan.

*Plan Supplement* means the compilation of documents and forms of documents as amended from time to time that constitute Exhibits to the Plan filed with the Bankruptcy Court no later than five (5) Business Days before the Voting Deadline, each of which shall be in form and substance reasonably acceptable to each Commitment Party, after consultation with the Unsecured Creditors' Committee and the Equity Committee.

*Plan Support Agreement* means that certain Plan Support Agreement, dated as of February 11, 2014, by and among the Debtors and the Consenting Lenders, filed as an exhibit to the Debtors' Motion for an Order Authorizing the Debtors' Entry Into and Performance Under a Plan Support Agreement (D.I. 2458), as amended from time to time in accordance with the terms thereof, and validly terminated on May 2, 2014.

*Plan Support Agreement Approval Order* means the Order Authorizing the Debtors' Entry Into and Performance Under a Plan Support Agreement (D.I. 2878).

*Postpetition Interest Rate Objection* has the meaning set forth in <u>Section 7.2</u> of this Plan.

*Presumed Postpetition Interest Rate* means 2.98% per annum or such other rate as may be determined by the Bankruptcy Court.

*Priority Tax Claim* means any Claim of a governmental unit of a kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code, including a Secured Tax Claim.

*Pro Rata* means, with respect to any Allowed Claim, the proportion that such Allowed Claim (in U.S. dollars or U.S. Dollar Equivalent) bears to the aggregate (in U.S. dollars or U.S. Dollar Equivalent) of all Allowed Claims in the applicable Class, <u>provided</u>, for the avoidance of doubt, that each Creditor that holds an Allowed Claim against multiple Debtors arising out of the same liability shall be entitled to a single recovery under the Plan on account of such collective Allowed Claims.

*Professional* means (a) any professional employed in the Chapter 11 Cases pursuant to section 327 or 1103 of the Bankruptcy Code or otherwise and (b) any professional or

other Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

*Professional Fees Bar Date* means the Business Day which is forty-five (45) days after the Effective Date or such other date as approved by order of the Bankruptcy Court.

*Professional Fees Claim* means an Administrative Expense Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date.

*Professional Liability Action* means any claims asserted against Proskauer Rose LLP and certain individual defendants in connection with certain credit agreements and the tax consequences of those agreements under Section 956 of the Internal Revenue Code that are the subject of adversary proceeding 13-52492 (Bankr. D. Del.) and the action captioned Overseas Shipholding Group, Inc. v. Proskauer Rose, LLP, et al., Index No. 650765/2014 (N.Y. Sup. Ct.) and any such claim which may be asserted in any other proceeding against Proskauer Rose LLP or its current or former partners or members by the Debtors.

*Purchase Commitment* has the meaning set forth in the Equity Commitment Agreement.

*Putative Class* means the class of plaintiffs proposed in the OSG Securities Class Action and on whose behalf the Subordinated Class Plaintiff Claims have been asserted.

*QIB* means "qualified institutional buyer" as defined in Rule 144A under the Securities Act.

*Record Date* means June 6, 2014, which date will be used to determine the Persons who will (1) receive Subscription Rights pursuant to the Rights Offering and (2) be eligible to vote to approve the Plan.

*Registration Rights Agreement* has the meaning set forth in the Equity Commitment Agreement.

*Reinstated* means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Equity Interest entitles the Holder of such Claim or Equity Interest so as to leave such Claim or Equity Interest not Impaired or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of a Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (ii) reinstating the maturity (to the extent such maturity has not otherwise accrued by the passage of time) of such Claim or Equity Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Equity Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Equity Interest arises from a failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensating the Holder of

-18-

such Claim or Equity Interest (other than the Debtor or an insider) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim or Equity Interest entitles the Holder.

*Reinstated Noteholder Claims* means, collectively, the 7.500% Note Claims and the 8.125% Note Claims.

*Rejected Contracts* means each of the executory contracts and unexpired leases listed on Exhibit C on the Effective Date.

*Related Person* means, with respect to any Person, such Person's predecessors, successors, assigns and present and former Affiliates (whether by operation of law or otherwise) and for each of the foregoing: (a) each of their present or former directors and officers, and any Person claiming by or through them (provided that a present or former officer or director of the Debtors is only a Related Person if such person executes and delivers to the Debtors prior to the Effective Date the Release and Cooperation Agreement substantially in the form attached to the Plan as Exhibit D, releasing prepetition indemnification Claims against the Debtors and Reorganized Debtors, and agreeing to cooperate with the Debtors in present and future litigation); and (b) each of their respective members, partners, equity-holders, officers, directors, employees, representatives, advisors, attorneys, notaries (pursuant to the laws of the United States and any other jurisdiction), auditors, agents and professionals, in each case acting in such capacity, and any Person claiming by or through any of them.

*Released Parties* means (i) each of the Debtors, (ii) the Unsecured Creditors' Committee (solely for post-petition events or occurrences and in its capacity as such), (iii) the Unsecured Creditors' Committee members (solely for post-petition events or occurrences and in their capacity as such), (iv) the Equity Committee (solely for post-petition events or occurrences and in its capacity as such), (v) the Equity Committee members (solely for post-petition events or occurrences and in their capacity as such), (vi) each Commitment Party (in its capacity as such and in its capacity as a Credit Agreement Lender, and/or as a Holder of Old OSG Equity Interests, as applicable), (vii) the Notes Trustees (in their capacity as such), (viii) the Exit Lenders (in their capacity as such); (ix) each Electing Noteholder (in its capacity as such) and (x) each of the respective Related Persons of each of the foregoing; provided that, the Released Parties shall expressly not include any defendant to the Professional Liability Action or any Cause of Action preserved hereunder.

*Reorganized Debtors* means the Debtors, in each case, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

*Reorganized OSG* means Overseas Shipholding Group, Inc., or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

*Reorganized OSG Board* means the board of directors of Reorganized OSG.

*Reorganized OSG Equity* means the Reorganized OSG Stock and the Reorganized OSG Jones Act Warrants.

*Reorganized OSG Jones Act Warrants* means the New Warrants.

*Reorganized OSG Stock* means the New Shares.

*Residual Director And Officer Insurance* means any proceeds remaining from any coverage available to the Debtors under director and officer insurance policies after giving effect to the priority of payment provisions therein and subject to and in accordance with the provisions of those policies.

*Restructuring Documents* means, collectively, this Plan, the Disclosure Statement, the Confirmation Order, the New OBS Exit Facility, the New OBS Exit Revolver, the New OIN Exit Facility, the New OIN Exit Revolver, and all other documents, agreements, and instruments, necessary or desirable to implement or consummate this Plan.

*Restructuring Transaction* has the meaning set forth in <u>Section 5.12</u> of this Plan.

*Rights Exercise Form* has the meaning set forth in the Equity Commitment Agreement.

*Rights Offering* has the meaning set forth in the Equity Commitment Agreement.

*Rights Offering Agent* has the meaning set forth in the Equity Commitment Agreement.

*Rights Offering Expiration Time* has the meaning set forth in the Equity Commitment Agreement.

*Rights Offering Procedures* means the procedures required to be followed by the OSG Equity Interestholders to validly exercise their Rights, attached as <u>Exhibit D</u> to the Equity Commitment Agreement, and approved by the Bankruptcy Court, which are subject to amendment in accordance with <u>Section 6.6</u> hereof, and concerning which the Debtors shall consult with the Equity Committee.

*Rights Offering Securities* means the Rights Offering Shares and Rights Offering Warrants.

*Rights Offering Shares* means the New Shares that are to be issued in connection with the Rights Offering.

*Rights Offering Warrants* means the New Warrants that are to be issued in connection with the Rights Offering.

*Satisfied Noteholder Claims* means the 8.75% Debentures Claims.

*Scheduled* means with respect to any Claim, the status and amount, if any, of such Claim as set forth in the Schedules.

*Schedules* means the schedules of assets and liabilities and the statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and the

Bankruptcy Rules, as such schedules have been or may be further modified, amended or supplemented in accordance with Bankruptcy Rule 1009 or orders of the Bankruptcy Court.

*Secured Claim* means any Claim against any Debtor that is secured by a Lien on property in which such Debtor's Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code.

*Secured Tax Claim* means any Secured Claim which, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code.

*Secured Vessel Claims* means the Secured Claims arising out of the CEXIM Loan Agreement and the DSF Loan Agreement.

*Secured Vessel DIP Claims* means Claims arising out of the CEXIM DIP Loan Agreement and the DSF DIP Loan Agreement.

*Securities Act* means the U.S. Securities Act of 1933, as amended, and the rules and regulations of the Securities and Exchange Commission thereunder.

*SERP Claim* means any claim arising under the OSG Ship Management, Inc. Supplemental Executive Savings Plan, as amended.

*Subordinated Claims* means the Subordinated Class Plaintiff Claims, Subordinated Debt Claims, and Subordinated Equity Claims.

*Subordinated Class Plaintiff Claims* means subordinated Claims asserted by Lead Plaintiffs for and on behalf of a Putative Class.

*Subordinated Debt Claim* means any Claim against any Debtor to the extent it is based on the purchase, sale or exchange of debt securities and is subordinated pursuant to section 510(b) or (c) of the Bankruptcy Code other than by a Lead Plaintiff or member of the Putative Class.

*Subordinated Equity Claim* means any Claim against any Debtor to the extent it is based on the purchase, sale or exchange of equity securities and is subordinated pursuant to section 510(b) or (c) of the Bankruptcy Code other than by a Lead Plaintiff or member of the Putative Class.

*Subscription Commitment* means the Purchase Commitment as such term is defined in the Equity Commitment Agreement.

*Subscription Right* means the right, distributed to each OSG Equity Interestholder of record on the Record Date pursuant to and in accordance with the Equity Commitment Agreement and the Rights Offering Procedures, each entitling an Eligible OSG Equity

Interestholder to purchase twelve (12) Class A New Securities at the purchase price of $3.00 per Class A New Security.

*Substantial Contribution Claim* means a Claim by any Professional or Creditor for reasonable compensation for services or reasonable expenses incurred in connection with the Chapter 11 Cases pursuant to sections 503(b)(3)(D) or (b)(4) of the Bankruptcy Code.

*Transfer* means, with respect to any security or the right to receive a security or to participate in any offering of any security, the sale, transfer, pledge, hypothecation, encumbrance, assignment, constructive sale, participation in or other disposition of such security or right or the beneficial ownership thereof, the offer to make such a sale, transfer, constructive sale or other disposition, and each option, agreement, arrangement or understanding, whether or not in writing and whether or not directly or indirectly, to effect any of the foregoing. The term "constructive sale" for purposes of this definition means (i) a short sale with respect to such security or right, (ii) entering into or acquiring an offsetting derivative contract with respect to such security or right, (iii) entering into or acquiring a futures or forward contract to deliver such security or right or (iv) entering into any transaction that has substantially the same effect as any of the foregoing. The term "beneficially owned" or "beneficial ownership" as used in this definition shall include, with respect to any security or right, the beneficial ownership of such security or right by a Person and by any direct or indirect subsidiary of such Person.

*Treatment Objection* has the meaning set forth in <u>Section 8.3</u> of this Plan.

*Unimpaired* means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is not Impaired within the meaning of section 1124 of the Bankruptcy Code.

*Unsecured Creditors' Committee* means the statutory committee of unsecured creditors of the Debtors appointed by the United States Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

*Unsubscribed Securities* has the meaning set forth in the Rights Offering Procedures.

*U.S. Citizen* means, in accordance with the meaning used in the Jones Act, (i) an individual who is a citizen of the United States; (ii) an association, trust, joint venture, or other entity if (x) each of its trustees or its members is a citizen of the United States, (y) at least 75% of the interest is owned by citizens of the United States, and (z) it is capable of holding title to a vessel under the laws of the United States or a State; (iii) a partnership if (x) each general partner is a citizen of the United States; and (y) at least 75% of the interest in the partnership is owned by citizens of the United States; (iv) a corporation if (w) it is incorporated under the laws of the United States or a State, (x) its chief executive officer, by whatever title, and the chairman of its board of directors are citizens of the United States, (y) no more of its directors are noncitizens than a minority of the number necessary to constitute a quorum, and (z) at least 75% of the interest in the corporation is owned by citizens of the United States determined as follows: (1) title to at least 75% of the stock of the corporation is vested in citizens of the United States free from any trust or fiduciary obligation in favor of a person not a citizen of the United States; (2) at

least 75% of the voting power in the corporation is vested in citizens of the United States; (3) there is no contract or understanding by which more than 25% of the voting power in the corporation may be exercised, directly or indirectly on behalf of a person not a citizen of the United States; and (4) there is no other means by which control of more than 25% of any interest in the corporation is given to or permitted to be exercised by a person not a citizen of the United States.

*U.S. Dollar Equivalent* means the amount of U.S. dollars obtained by converting any Claim not in U.S. dollars into U.S. dollars at the spot rate for the purchase of U.S. dollars as published in the *Financial Times* in the "Currency Rates" section (or, if the *Financial Times* is no longer published, or if such information is no longer available in the *Financial Times*, such sources as may be selected in good faith by the Debtors) on one of the following dates, as applicable: (i) with respect to an Allowed amount of a Claim or a Pro Rata share of Allowed Claims, the Petition Date; or (ii) with respect to a distribution on or after the Effective Date, one day before the date of such distribution.

*U.S. Trustee* means the United States Trustee appointed under section 581 of title 28 of the United States Code to serve in the District of Delaware.

*Voting Deadline* means 5:00 p.m. (Prevailing Eastern Time) on July 7, 2014.

*Voting Record Date* means June 6, 2014.

**1.2    Exhibits to this Plan**.  All Exhibits, including those in the Plan Supplement, are incorporated into and are a part of this Plan as if set forth in full herein.  Holders of Claims and Equity Interests may obtain a copy of the Exhibits, including those in the Plan Supplement, upon written request to the Debtors.  The Exhibits, including those in the Plan Supplement, may be inspected in the office of the clerk of the Bankruptcy Court or its designee during normal business hours, obtained by written request to counsel to the Debtors or obtained on the website of the Debtors' claims and noticing agent at http://www.kccllc.net/osg.

**1.3    Rules of Interpretation and Computation of Time**.  For purposes of this Plan, unless otherwise provided herein:

(a)    whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural;

(b)    unless otherwise provided in this Plan, any reference in this Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions;

(c)    any reference in this Plan to an existing document or schedule Filed or to be Filed means such document or schedule, as it may have been or may be amended, modified or supplemented pursuant to this Plan;

(d)    any reference to an Entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns;

-23-

(e)    all references in this Plan to Sections and Articles are references to Sections and Articles of or to this Plan;

(f)    the words "herein," "hereunder," "hereof" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan;

(g)    captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan;

(h)    subject to the provisions of any contract, certificates of incorporation, by-laws, instrument, release or other agreement or document entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and the Bankruptcy Rules;

(i)    the rules of construction set forth in section 102 of the Bankruptcy Code will apply to this Plan; and

(j)    in computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) will apply.

## ARTICLE II
## CLASSIFICATION OF CLAIMS AND OLD OSG EQUITY INTERESTS

All Claims, except Administrative Expense Claims, Priority Tax Claims, and Other Priority Claims, and all Old OSG Equity Interests are placed in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified as described below.

A Claim or an Old OSG Equity Interest is placed in a particular Class only to the extent that the Claim or Old OSG Equity Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Old OSG Equity Interest falls within the description of such other Classes.  A Claim or Old OSG Equity Interest is also placed in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim or Old OSG Equity Interest is an Allowed Claim or Old OSG Equity Interest in that Class and such Claim or Old OSG Equity Interest has not been paid, released or otherwise settled prior to the Effective Date.

**2.1    Unclassified Claims Against All Debtors**

The following constitute unclassified Claims that are Unimpaired and, therefore, not entitled to vote on the Plan:

(i)    Administrative Expense Claims against all Debtors.

(ii)    Priority Tax Claims against all Debtors.

(iii)     Priority Claims against all Debtors.

**2.2     Classification of Claims Against All Debtors and Old OSG Equity Interests**

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for the purposes of confirmation by acceptance of the Plan by an Impaired Class of Claims; provided, however, that in the event no holder of a Claim with respect to a specific Class for a particular Debtor timely submits a Ballot that complies with the order approving the Disclosure Statement indicating acceptance or rejection of this Plan, such Class will be deemed to have Accepted this Plan.  The Debtors may seek confirmation of this Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Equity Interests.

The following chart assigns a letter and number to each Class of Claims and Old Equity Interests for purposes of identifying such Class.  The classification and treatment of Classes of Claims and Old OSG Equity Interests is consistent for each Debtor, but for certain of the Debtors, there are no Claims or Equity Interests, as applicable, in one or more Classes of Claims or Old OSG Equity Interests.

| Summary of Classification of Claims and Old OSG Equity Interests | | | |
|---|---|---|---|
| Class | Claim | Status | Voting Rights |
| A1 | Personal Injury Claims | Unimpaired | Deemed to Accept |
| A2 | Admiralty Lien Claims | Unimpaired | Deemed to Accept |
| B1 | Secured Vessel DIP Claims | Unimpaired | Deemed to Accept |
| B2 | Secured Vessel Claims | Unimpaired | Deemed to Accept |
| C1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| D1 | Credit Agreement Claims | Unimpaired | Deemed to Accept |
| D2 | Satisfied Noteholder Claims | Unimpaired | Deemed to Accept |
| D3 | Reinstated Noteholder Claims | Unimpaired | Deemed to Accept |
| D4 | Charter Rejection Claims | Unimpaired | Deemed to Accept |
| D5 | Other Unsecured Claims | Unimpaired | Deemed to Accept |
| E1 | Subordinated Claims | Impaired | Entitled to Vote |
| E2 | Old OSG Equity Interests | Impaired | Entitled to Vote |

(a)  **Unimpaired Classes of Claims** (deemed to have Accepted this Plan and, therefore, not entitled to vote on this Plan under section 1126(f) of the Bankruptcy Code).

(i)     *Class A1*: Class A1 consists of Personal Injury Claims.
(ii)    *Class A2*: Class A2 consists of Admiralty Lien Claims.
(iii)   *Class B1*: Class B1 consists of Secured Vessel DIP Claims.

-25-

(iv)    *Class B2*: Class B2 consists of Secured Vessel Claims.

(v)    *Class C1*: Class C1 consists of Other Secured Claims.

(vi)    *Class D1*: Class D1 consists of Credit Agreement Claims.

(vii)    *Class D2*: Class D2 consists of all Satisfied Noteholder Claims.

(viii)    *Class D3*: Class D3 consists of all Reinstated Noteholder Claims.

(ix)    *Class D4*: Class D4 consists of all Charter Rejection Claims.

(x)    *Class D5*: Class D5 consists of all Other Unsecured Claims.

**(b)  Impaired Classes of Claims and Interests** (entitled to vote on this Plan).

(i)    *Class E1*: Class E1 consists of all Subordinated Claims.

(ii)    *Class E2*: Class E2 consists of Old OSG Equity Interests.

## ARTICLE III
## TREATMENT OF CLAIMS AND EQUITY INTERESTS

### 3.1    Unclassified Claims

(a)    *Administrative Expense Claims Generally*.  Subject to the provisions of sections 330(a), 331 and 503(b) of the Bankruptcy Code, each Allowed Administrative Expense Claim shall be paid in full by the Disbursing Agent, at the election of the Administrative and Disputed Claims Agent (i) in Cash, in such amount as is incurred in the ordinary course of business by the Debtors, or in such amount as such Administrative Expense Claim is Allowed by the Bankruptcy Court upon the later of the Initial Distribution Date or the date upon which there is a Final Order allowing such Administrative Expense Claim, (ii) upon such other terms as may exist in the ordinary course of the Debtors' business, or (iii) upon such other terms as may be agreed upon in writing between the Holder of such Allowed Administrative Expense Claim and the Administrative and Disputed Claims Agent, in each case in full satisfaction, settlement, discharge and release of, such Allowed Administrative Expense Claim; provided, however, that the ECA Professional Expenses shall be paid in full in Cash strictly in accordance with Section 5.7 of this Plan.

(i)    *Professional Fees*.  All final fee applications for Professional Fee Claims for services rendered during or in connection with the Chapter 11 Cases shall be Filed with the Bankruptcy Court and served on the Administrative and Disputed Claims Agent and its counsel, and the U.S. Trustee (844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Mark Kenney, Esq.) no later than the Professional Fees Bar Date.  If the Administrative and Disputed Claims Agent and any Professional cannot agree on the amount of fees and expenses to be paid to such Professional, the reasonableness of any such fees and expenses shall be determined by the Bankruptcy Court.  Holders of Professional Fees Claims that are required to File and serve applications for final allowance of their Professional Fees Claims and that do not File and serve such applications by the applicable deadline shall be forever barred from asserting such Professional Fees Claims against the Debtors, Reorganized Debtors or their respective properties, and such Professional Fees Claims shall be deemed discharged as of the Effective Date.  Objections to any Professional Fees Claims must be Filed and served on Reorganized OSG and its counsel, the United States Trustee and the requesting party no later than fifteen (15) days (or such longer period as may be allowed by the Administrative and

Disputed Claims Agent or by order of the Bankruptcy Court) after the date on which an application for final allowance of such Professional Fees Claims was Filed and served.

(ii)     *Substantial Contribution Claims.*  All requests for compensation or reimbursement of Substantial Contribution Claims shall be Filed with the Bankruptcy Court and served on Reorganized OSG and its counsel, the U.S. Trustee (844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Mark Kenney, Esq.), counsel to the Administrative and Disputed Claims Agent, and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or any other order(s) of the Bankruptcy Court, no later than forty-five (45) days after the Effective Date.  Unless such deadline is extended by agreement of the Administrative and Disputed Claims Agent, Holders of Substantial Contribution Claims that are required to File and serve applications for final allowance of their Substantial Contribution Claims and that do not File and serve such applications by the applicable deadline shall be forever barred from asserting such Substantial Contribution Claims against the Reorganized Debtors or their respective properties, and such Substantial Contribution Claims shall be deemed discharged as of the Effective Date.  Objections to any Substantial Contribution Claims must be Filed and served on Reorganized OSG and its counsel, the U.S. Trustee and the requesting party no later than fifteen (15) days (or such longer period as may be allowed by the Administrative and Disputed Claims Agent or by order of the Bankruptcy Court) after the date on which an application for final allowance of such Substantial Contribution Claims was Filed and served.

(b)     *Priority Tax Claims.*  The legal, equitable and contractual rights of the Holders of Allowed Priority Tax Claims are unaltered by this Plan.  On, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, in full satisfaction, settlement, discharge and release of, such Allowed Priority Tax Claim, at the election of the Administrative and Disputed Claims Agent with the consent of each of the Commitment Parties, each Holder of such Allowed Priority Tax Claim shall receive: (a) Cash equal to the amount of such Allowed Priority Tax Claim; (b) such other less favorable treatment as to which the Administrative and Disputed Claims Agent and the Holder of such Allowed Priority Tax Claim shall have agreed upon in writing; or (c) for every Priority Tax Claim except for the IRS Claims, such other treatment such that it will not be Impaired pursuant to section 1124 of the Bankruptcy Code.  On the Effective Date, the Liens (if any) securing any Priority Tax Claims shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

(c)     *Other Priority Claims.*  The legal, equitable and contractual rights of the Holders of Allowed Other Priority Claims are unaltered by this Plan.  On, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Other Priority Claim is an Allowed Other Priority Claim as of the Effective Date or (ii) the date on which such Other Priority Claim becomes an Allowed Claim, in full satisfaction, settlement, discharge and release of, such Allowed Other Priority Claim, at the election of the Administrative and Disputed Claims Agent with the consent of each of the Commitment Parties, each Holder of such Allowed Other Priority Claim shall receive: (x) Cash equal to the amount of such Allowed Other Priority Claim; or (y) such other less favorable treatment as to which the Administrative and Disputed

Claims Agent and the Holder of such Allowed Other Priority Claim shall have agreed upon in writing.

**3.2     Treatment of Claims**

(a)     *Class A1:  Personal Injury Claims.*

(i)     *Classification.*  Class A1 consists of all Personal Injury Claims.

(ii)     *Treatment.*  Effective as of the Effective Date, on, or as soon as reasonably practicable after, the Initial Distribution Date if such Class A1 Claim is Allowed on the Effective Date or otherwise the date on which such Class A1 Claim becomes Allowed, each Allowed Class A1 Claim shall be Reinstated.

(iii)     *Voting.*  Class A1 Claims are Unimpaired and the Holders of Allowed Class A1 Claims are deemed to have Accepted this Plan and are therefore not entitled to vote.

(b)     *Class A2:  Admiralty Lien Claims.*

(i)     *Classification.*  Class A2 consists of all Admiralty Lien Claims.

(ii)     *Treatment.*  Effective as of the Effective Date, on, or as soon as reasonably practicable after, the Initial Distribution Date if such Class A2 Claim is Allowed on the Effective Date or otherwise the date on which such Class A2 Claim becomes Allowed, each Allowed Class A2 Claim shall be Reinstated.

(iii)     *Voting.*  Class A2 Claims are Unimpaired and the Holders of Allowed Class A2 Claims are deemed to have Accepted this Plan and are therefore not entitled to vote.

(c)     *Class B1:  Secured Vessel DIP Claims.*

(i)     *Classification.*  Class B1 consists of all Secured Vessel DIP Claims.

(ii)     *Treatment.*  On, or as soon as reasonably practicable after, the Initial Distribution Date if such Class B1 Claim is Allowed on the Effective Date or otherwise the date on which such Class B1 Claim becomes Allowed, each Holder shall receive, in full satisfaction, settlement, discharge and release of its Allowed Class B1 Claim, at the election of the Administrative and Disputed Claims Agent with the consent of each of the Commitment Parties: (x) Cash equal to the amount of such Allowed Class B1 Claim; (y) such other less favorable treatment as to which the Administrative and Disputed Claims Agent and the Holder of such Allowed Class B1 Claim shall have agreed upon in writing; or (z) such other treatment such that the applicable Allowed Class B1 Claim will be rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code.

-28-

(iii)     *Voting*.  Class B1 Claims are Unimpaired and the Holders of Allowed Class B1 Claims are deemed to have Accepted this Plan and are therefore not entitled to vote.

(d)     <u>*Class B2*</u>*:  Secured Vessel Claims*.

(i)     *Classification*.  Class B2 consists of all Secured Vessel Claims.

(ii)     *Treatment*.  The CEXIM Claims shall be Allowed as Allowed Class B2 Claims in aggregate amount of $311,751,114.08 in principal, plus through and including the date on which the CEXIM Claims have been paid in full in cash (x) to the extent not previously paid, interest on the principal amount at the applicable non-default rate under the CEXIM Loan Documents, plus (y) default interest on the principal amount at 1% per annum from the Petition Date, plus (z) to the extent not previously paid, the reasonable fees and expenses of CEXIM and its attorneys, under the protocol set forth and pursuant to the limitations provided in the CEXIM Adequate Protection Order.  The DSF Claims shall be Allowed as Allowed Class B2 Claims in aggregate amount of $266,935,724.55 in principal, plus (b) through and including the date on which the DSF Claims have been paid in full in cash (x) to the extent not previously paid, interest on the principal amount at the applicable non-default rate under the DSF Loan Documents, plus (y) default interest on the principal amount at 1% per annum from the Petition Date, plus (z) to the extent not previously paid, the reasonable fees and expenses of DSF and its attorneys, under the protocol set forth and pursuant to the limitations provided in the DSF Adequate Protection Order.  On, or as soon as reasonably practicable after, the Initial Distribution Date, each Holder shall receive, in full satisfaction, settlement, discharge and release of its Allowed Class B2 Claim, Cash equal to the amount of such Allowed Class B2 Claim.

(iii)     *Voting*.  Class B2 Claims are Unimpaired and the Holders of Allowed Class B2 Claims are deemed to have Accepted this Plan and are therefore not entitled to vote.

(e)     <u>*Class C1*</u>*: Other Secured Claims*.

(i)     *Classification*.  Class C1 consists of all Other Secured Claims.

(ii)     *Treatment*.  On, or as soon as reasonably practicable after, the Initial Distribution Date if such Class C1 Claim is Allowed on the Effective Date or otherwise the date on which such Class C1 Claim becomes Allowed, each Holder shall receive, in full satisfaction, settlement, discharge and release of its Allowed Class C1 Claim, at the election of the Administrative and Disputed Claims Agent with the consent of each of the Commitment Parties: (x) Cash equal to the amount of such Allowed Class C1 Claim; (y) such other less favorable treatment as to which the Administrative and Disputed Claims Agent and the Holder of such Allowed Class C1 Claim shall have agreed upon in writing; or (z) such other treatment such that it will not be Impaired pursuant to section 1124 of the Bankruptcy Code.

(iii)     *Voting*.  Class C1 Claims are Unimpaired and the Holders of Allowed Class C1 Claims are deemed to have Accepted this Plan and are therefore not entitled to vote.

(f)     <u>Class D1</u>: *Credit Agreement Claims*.

(i)     *Classification*.  Class D1 consists of all Claims pursuant to the Credit Agreement.

(ii)     *Treatment*.  Class D1 Claims shall be Allowed in the aggregate amount of $ 1,490,261,803, plus applicable contractual and default interest through the Effective Date, and fees and expenses of the Credit Agreement Agent and Credit Agreement Lenders (in each case, to the extent reimbursable under the Credit Agreement), including with respect to post-Effective Date distributions.  On, or as soon as reasonably practicable after the Initial Distribution Date if such Class D1 Claim is Allowed on the Effective Date or otherwise on the date on which such Class D1 Claim becomes Allowed, each Holder of an Allowed Class D1 Claim shall receive, in full satisfaction, settlement, discharge and release of, its Allowed Class D1 Claim, Cash equal to the amount of such Allowed Class D1 Claim.  To the extent that any of the fees and expenses of the Credit Agreement Agent and Credit Agreement Lenders, in either case, reimbursable under the Credit Agreement and incurred through the Effective Date are not otherwise paid by the Debtors, such fees and expenses shall be paid in full in Cash on the later of (i) the Initial Distribution Date or (ii) ten (10) days after receipt by the Debtors or the Reorganized Debtors, as applicable, of invoices for such amounts.

(iii)     *Voting*.  Class D1 Claims are Unimpaired and the Holders of Allowed Class D1 Claims are deemed to have Accepted this Plan and are therefore not entitled to vote.

(g)     <u>Class D2</u>: *Satisfied Noteholder Claims*.

(i)     *Classification*.  Class D2 consists of all Satisfied Noteholder Claims.

(ii)     *Treatment*.  Class D2 Claims shall be Allowed in the aggregate amount of $63,603,000.00, plus (I) any applicable interest on the principal at the applicable contractual rate calculated pursuant to the 8.750% Debentures up to and including the date on which the Debtors or Reorganized Debtors make the distribution to the 8.75% Debentures Trustee and (II) interest on overdue interest, in accordance with the terms of the 8.750% Debentures Indenture and/or New York law, up to and including the date on which the Debtors or the Reorganized Debtors make the distribution to the 8.75% Debentures Trustee to the extent the payment of such interest on overdue interest is (x) agreed by the Debtors or the Reorganized Debtors or (y) determined by Final Order of the Bankruptcy Court in an order to be entered on or prior to August 15, 2014 or such other date as may be set by the Bankruptcy Court or mutually agreed by the Debtors or the Reorganized Debtors and the 8.75% Debentures Trustee, and the reasonable fees, expenses, disbursements, and advances of the 8.750% Debentures Trustee, and its agents and counsel, including with respect to post-Effective Date distributions and the Interest on Interest Dispute.

On, or as soon as reasonably practicable after, the date on which distribution is made to the 8.750% Debentures Trustee, the Debtors will pay the reasonable documented fees and expenses of the 8.750% Debentures Trustee (to the extent permitted under the 8.750%

-30-

Debentures Indenture), and each Holder of an Allowed Class D2 Claim shall receive, in full satisfaction, settlement, discharge and release of its Allowed Class D2 Claim, at the election of the Administrative and Disputed Claims Agent with the consent of each Commitment Party: (x) Cash equal to the amount of such Allowed Class D2 Claim; (y) such other less favorable treatment as to which the Administrative and Disputed Claims Agent and the Holder of such Allowed Class D2 Claim shall have agreed upon in writing; or (z) such other treatment such that the applicable Allowed Class D2 Claim will be rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code.  The Allowed Class D2 Claims shall not be subject to any legal or equitable defenses, setoff or recoupment.

(iii)     *Voting*.  Class D2 Claims are Unimpaired and the Holders of Allowed Class D2 Claims are deemed to have Accepted this Plan and are therefore not entitled to vote.

(h)     <u>Class D3</u>: *Reinstated Noteholder Claims*.

(i)     *Classification*.  Class D3 consists of all Reinstated Noteholder Claims.

(ii)     *Treatment*.  Class D3 Claims shall be allowed in the aggregate amount of $451,686,250.01, consisting of the principal and accrued but unpaid prepetition interest owed on the 7.500% Notes and the 8.125% Notes, plus all applicable interest (including (i) interest accrued through the Effective Date which, absent a default, would not yet be due for payment on a regular interest payment date, and (ii) interest on overdue interest, other than as may be attributable to 7.500% Notes being exchanged for Election 2 Notes, in accordance with the terms of the applicable indenture and/or New York law, up to and including the date on which the Debtors or the Reorganized Debtors make the distribution to the applicable Notes Trustee to the extent the payment of such interest on overdue interest is (x) agreed to by the Debtors or the Reorganized Debtors or (y) determined by the Bankruptcy Court in a Final Order to be entered on or prior to August 15, 2014 or such other date as may be set by the Bankruptcy Court or mutually agreed by the Debtors or the Reorganized Debtors and the applicable Notes Trustee), at the applicable contractual and/or default rates calculated pursuant to the 7.500% Notes Indenture and the 8.125% Notes Indenture (collectively, the "<u>Accrued and Unpaid Interest</u>"); the reasonable fees, expenses, disbursements, and advances of the 7.500% Notes Trustee, the 8.125% Notes Trustee, and their respective agents and counsel (and in the case of the 7.500% Notes Trustee and the 8.125% Notes Trustee, to the extent reimbursable by the Debtors under the 7.500% Notes Indenture or 8.125% Notes Indenture, as applicable), including with respect to post-Effective Date distributions and the Interest on Interest Dispute; and any reasonable documented fees and expenses of the counsel to the Holders of the 7.500% Notes identified in its verified statement filed under Bankruptcy Rule 2019, Sullivan & Cromwell LLP and Womble Carlyle Sandridge & Rice, LLP (amounts due to the 7.500% Notes Trustee, the 8.125% Notes Trustee, their respective agents and counsel ("<u>Trustee Fees and Expenses</u>"), and to Sullivan & Cromwell LLP and Womble Carlyle Sandridge & Rice, LLP (the "<u>Noteholder Counsel Fees</u>").

On, or as soon as reasonably practicable after, the date on which distribution on account of Allowed Class D3 Claims is made to the 7.500% Notes Trustee and the 8.125% Notes

Trustee, respectively, the Debtors will pay the Trustee Fees and Expenses to the 7.500% Notes
Trustee and the 8.125% Notes Trustee, as applicable, and the Noteholder Counsel Fees to
respective counsel, and the applicable Notes Trustee will distribute to each Holder of an Allowed
Class D3 Claim Cash equal to the amount of unpaid and overdue interest through the last coupon
payment date at the applicable contractual and/or default rates calculated pursuant to the 7.500%
Notes Indenture and the 8.125% Notes Indenture, respectively, plus interest on overdue interest
through the date on which distributions are made by the Debtors to the applicable Trustee but in
the case of the 7.500% Notes, only to the extent the payment of such interest on overdue interest
is (x) agreed to by the Debtors or the Reorganized Debtors or (y) determined by the Bankruptcy
Court in a Final Order to be entered on or prior to August 15, 2014 or such other date as may be
set by the Bankruptcy Court or mutually agreed by the Debtors or the Reorganized Debtors and
the applicable Notes Trustee.

The 7.500% Notes Indenture, the 7.500% Notes, the 8.125% Notes Indenture, and
the 8.125% Notes shall be deemed Reinstated such that the Class D3 Claims will be rendered
Unimpaired in accordance with section 1124 of the Bankruptcy Code; provided, however, that
the Debtors will cause to be delivered to the 7.500% Notes Trustee on behalf of each Electing
Noteholder the following distribution pursuant to the Plan (the "7.500% Notes Alternative
Distribution") in exchange for, and in full satisfaction, settlement, discharge and release of the
7.500% Notes owned by such Holder:

(I) for any Holder of a 7.500% Note who validly completes and delivers an
Election Form on or before July 7, 2014 but does not reaffirm its Election prior to 5:00
p.m. (Prevailing Eastern Time) on July 22, 2014 in order to receive Election 2 Notes (A)
on the Effective Date, (1) an aggregate amount of Election 1 Notes, in such
denominations as such Holder may reasonably request, subject to the existing minimum
denomination in the 7.500% Notes Indenture, equal to the aggregate principal amount of
7.500% Notes held by such Holder, (2) Cash equal to 1.0% of the aggregate principal
amount of the 7.500% Notes held by such Holder, and (3) Cash equal to such Holder's
pro rata portion, based on its holdings of 7.500% Notes, of Accrued and Unpaid Interest
and (B) to the extent any amount is due and unpaid to the 7.500% Notes Trustee which
amount (pursuant to the terms of the 7.500% Notes Indenture) is chargeable against or
secured by the 7.500% Notes Alternative Distribution with respect to the Election 1
Notes or otherwise directly or indirectly reimbursable by Holders receiving the 7.500%
Notes Alternative Distribution with respect to the Election 1 Notes, Cash equal to such
amount as and when due to the 7.500% Notes Trustee;

(II) for any Holder of a 7.500% Note who validly completes and delivers an
Election Form or reaffirms its prior Election prior to 5:00 p.m. (Prevailing Eastern Time)
on July 22, 2014, in either case to receive Election 2 Notes (A) on the Effective Date, (1)
an aggregate amount of Election 2 Notes, in such denominations as such Holder may
reasonably request, subject to the existing minimum denomination in the 7.500% Notes
Indenture, equal to the aggregate principal amount of 7.500% Notes held by such Holder,
(2) Cash equal to 3.0% of the aggregate principal amount of the 7.500% Notes held by
such Holder, and (3) Cash equal to such Holder's pro rata portion, based on its holdings
of 7.500% Notes, of the Accrued and Unpaid Interest not including any portion of the
Accrued and Unpaid Interest attributable to interest on overdue interest in respect of such

Holder's 7.500% Notes, and (B) to the extent any amount is due and unpaid to the 7.500% Notes Trustee which amount (pursuant to the terms of the 7.500% Notes Indenture) is chargeable against or secured by the 7.500% Notes Alternative Distribution with respect to the Election 2 Notes or otherwise directly or indirectly reimbursable by Holders receiving the 7.500% Notes Alternative Distribution with respect to the Election 2 Notes, Cash equal to such amount as and when due to the 7.500% Notes Trustee.

A Holder of a 7.500% Note must elect to exchange all or none of the 7.500% Notes owned by such Holder. If a Holder of 7.500% Notes does not timely submit a duly completed Election Form, its 7.500% Notes shall be Reinstated. The Allowed Class D3 Claims shall not be subject to any legal or equitable defenses, setoff or recoupment. For the avoidance of doubt, the 7.500% Notes and the 8.125% Notes shall not be cancelled on the Effective Date, provided, that any 7.500% Notes exchanged for the 7.500% Notes Alternative Distribution and other consideration shall be cancelled and retired.

(iii)    *Voting*. Class D3 Claims are Unimpaired and the Holders of Allowed Class D3 Claims are deemed to have Accepted this Plan and are therefore not entitled to vote.

(i)    *Class D4: Charter Rejection Claims.*

(i)    *Classification*. Class D4 consists of all Charter Rejection Claims.

(ii)    *Treatment*. On, or as soon as reasonably practicable after, the Initial Distribution Date if such Class D4 Claim is Allowed on the Effective Date or otherwise the date on which such Class D4 Claim becomes Allowed, each Holder shall receive, in full satisfaction, settlement, discharge and release of its Allowed Class D4 Claim, at the election of the Administrative and Disputed Claims Agent: (x) Cash equal to the amount of such Allowed Class D4 Claim, plus postpetition interest as set forth in Section 7.2 of this Plan; (y) such other less favorable treatment as to which the Administrative and Disputed Claims Agent and the Holder of such Allowed Class D4 Claim shall have agreed upon in writing; or (z) such other treatment such that the applicable Allowed Class D4 Claim will be rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code.

(iii)    *Voting*. Class D4 Claims are Unimpaired and the Holders of Allowed Class D4 Claims are deemed to have Accepted this Plan and are therefore not entitled to vote.

(j)    *Class D5: Other Unsecured Claims.*

(i)    *Classification*. Class D5 consists of all Other Unsecured Claims.

(ii)    *Treatment*. On, or as soon as reasonably practicable after, the Initial Distribution Date if such Class D5 Claim is Allowed on the Effective Date or otherwise the date on which such Class D5 Claim becomes Allowed, each Holder shall receive, in full satisfaction, settlement, discharge and release of its Allowed Class D5 Claim, at the election of the Administrative and Disputed Claims Agent: (x) Cash equal to the amount of such Allowed Class D5 Claim, plus postpetition interest as set forth in Section 7.2 of this Plan; (y) such other

less favorable treatment as to which the Administrative and Disputed Claims Agent and the Holder of such Allowed Class D5 Claim shall have agreed upon in writing; or (z) such other treatment such that the applicable Allowed Class D5 Claim will be rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code.

          (iii)    *Voting*. Class D5 Claims are Unimpaired and the Holders of Allowed Class D5 Claims are deemed to have Accepted this Plan and are therefore not entitled to vote.

          (k)    *Class E1: Subordinated Claims*

          (i)    *Classification*. Class E1 consists of all Subordinated Claims.

          (ii)    *Treatment*. Effective as of the Effective Date, on, or as soon as reasonably practicable after the Initial Distribution Date, each Holder of an Allowed Class E1 Claim (other than Claim 1547 or any other Subordinated Class Plaintiff Claim) that does not opt out of the releases described in Section 11.3(b) of this Plan shall receive, in full satisfaction, settlement, discharge and release of, its Allowed Class E1 Claim, Cash equal to the amount of its Allowed Class E1 Claim from and subject to the Disputed Claims Reserve for Class E1. Effective as of the Effective Date, and subject to Lead Plaintiffs' compliance with and satisfaction of the terms of the Class Stipulation, Claim 1547 shall be Allowed and Claim 1547 shall receive, in full, final and complete satisfaction, settlement, discharge and release of Claim 1547 and any other Claim the Lead Plaintiffs or any member of the Putative Class has or could assert against the Debtors: (a) $7 million in Cash payable on the Initial Distribution Date; (b) subject to entry of a Final Order resolving the Professional Liability Action, by settlement or otherwise, Cash equal to fifteen (15%) of the Net Litigation Recovery; (c) $5 million in Cash payable on the tenth business day after the earlier of (I) satisfaction (in whole or in part) of a judgment entered in respect of a Final Order resolving the Professional Liability Action, but in no event later than sixty (60) days after entry of such order, (II) payment of any settlement agreed in respect of the Professional Liability Action, or (III) entry of a Final Order otherwise resolving the Professional Liability Action; (d) $3 million in Cash payable by Reorganized OSG one year after the Effective Date; (e) proceeds of any Residual Director And Officer Insurance; and (f) any remaining Cash in the Disputed Claims Reserve for Class E1 following satisfaction or resolution of all Class E1 Claims other than Claim 1547. Distributions in respect of Claim 1547 shall be paid when due to an escrow account designated by counsel for the Lead Plaintiffs and held in said account pending an order or orders of the District Court providing for allocation and distribution of the Settlement Consideration (as defined in the Class Stipulation) to the members of the Putative Class. Allocations and distributions to members of the putative class shall be made pursuant to orders of the District Court. In the event the District Court determines that it will not or cannot provide for the distribution and allocation to the Putative Class, the Bankruptcy Court shall retain jurisdiction to provide for allocation and distribution of the Settlement Consideration (as defined in the Class Stipulation) to the members of the Putative Class and to provide for payment of legal fees and reimbursement of expenses to counsel for Lead Plaintiffs and the Putative Class from the Settlement Consideration (as defined in the Class Stipulation). For the avoidance of doubt, claimants holding Allowed Class E1 Claims shall have no right to seek payment under any Residual Director And Officer Insurance policies unless and until all claims of loss, as defined in such policies, made by the directors and officers who are

-34-

insureds under such policies have been finally resolved and such insureds no longer have any claim under such policies.

            (iii)     *Voting*.  Class E1 Claims are Impaired and the Holders of Allowed Class E1 Claims as of the Voting Record Date are entitled to vote to Accept or reject this Plan.

        (l)     <u>*Class E2*</u>*:  Old OSG Equity Interests*.

            (i)     *Classification*.  Class E2 consists of all Old OSG Equity Interests.

            (ii)     *Treatment*.  OSG will distribute to each OSG Equity Interestholder one (1) Subscription Right in respect of each Old OSG Equity Interest held by such Holder on the Record Date.  Each Participating Eligible OSG Equity Interestholder will be entitled, upon the exercise of each Subscription Right, to purchase twelve (12) Class A New Securities at the price of $3.00 per security.  Each Non-Participating OSG Equity Interestholder will receive, in exchange for the Old OSG Equity Interests held of record by such Non-Participating OSG Equity Interestholder on the Record Date, one (1) Class B New Security for each such Old OSG Equity Interest so held on the Record Date.  Any OSG Equity Interestholder that opts out of the releases described in <u>Section 11.3(b)</u> of this Plan will not receive any distributions.  Each Eligible OSG Equity Interestholder will be entitled to exercise all, or a portion of, the Subscription Rights distributed to such Eligible OSG Equity Interestholder; <u>provided that</u>, each Subscription Right must be exercised or not exercised in whole and not in part and in compliance with the Rights Offering Procedures.  On the closing date of the transactions contemplated by the Equity Commitment Agreement, all then-outstanding Old OSG Equity Interests shall automatically be cancelled and retired, and shall cease to exist.

            (iii)     *Voting*.  Class E2 Interests are Impaired and the Holders of Allowed Class E2 Interests as of the Voting Record Date are entitled to vote to Accept or reject this Plan.

**3.3**     **Special Provision Regarding Unimpaired Claims**

        Except as otherwise provided in this Plan, nothing under this Plan shall affect the Debtors' rights in respect of any Unimpaired Claims, including, without limitation, all rights with respect to legal and equitable defenses, including setoff or recoupment, against any such Unimpaired Claim.

**ARTICLE IV**
**ACCEPTANCE OR REJECTION OF THE PLAN**

**4.1**     **Impaired Classes of Claims and Interests Entitled to Vote**

        Holders of Claims and Interests in Class E1 and Class E2 are entitled to vote to Accept or reject this Plan as provided in such order as may be entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to Accept or reject the Plan, or any other order(s) of the Bankruptcy Court.  The votes of Holders of Claims and Interests who are entitled to vote and yet abstain from voting, return a Ballot with no boxes checked, or return a Ballot voting both to Accept and reject the Plan, will not be counted for

purposes of Accepting or rejecting the Plan.  Holders of Old OSG Equity Interests who validly exercise their Subscription Rights and either abstain from voting, return a Ballot with no boxes checked, or return a Ballot voting both to Accept and reject the Plan will be deemed to have Accepted the Plan.

### 4.2    Acceptance by an Impaired Class

(a)    In accordance with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have Accepted this Plan if this Plan is Accepted by the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class that have timely and properly voted to Accept or reject this Plan.

(b)    In accordance with section 1126(d) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Equity Interests shall have Accepted this Plan if this Plan is Accepted by the Holders of at least two-thirds (2/3) in amount of the Allowed Equity Interests of such Class that have timely and properly voted to Accept or reject this Plan.

### 4.3    Presumed Acceptances by Unimpaired Classes

Classes A1, A2, B1, B2, C1, D1, D2, D3, D4, and D5 are Unimpaired by this Plan.  Accordingly, under section 1126(f) of the Bankruptcy Code, Holders of such Claims and Interests are conclusively presumed to Accept this Plan, and the votes of the Holders of such Claims and Interests will not be solicited.

### 4.4    Elimination of Vacant Classes; Deemed Acceptance by Non-Voting Classes

(a)    Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018 shall be deemed eliminated from this Plan for purposes of voting to Accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

(b)    If no votes to Accept or reject this Plan are received with respect to a Class that is solicited in accordance with the Solicitation Procedures (other than a Class that is deemed eliminated pursuant to the foregoing Section 4.4(a)), such Class shall be deemed to have voted to Accept this Plan, unless the Court, for cause, orders otherwise.

### 4.5    Conversion or Dismissal of Certain of the Chapter 11 Cases

If the requisite Classes do not vote to Accept this Plan or the Bankruptcy Court does not confirm this Plan, the Debtors reserve the right to have each Debtor's Chapter 11 Case dismissed or converted, or to liquidate or dissolve such Debtor under applicable non-bankruptcy procedure or chapter 7 of the Bankruptcy Code, subject to the terms of the Equity Commitment Agreement.

**4.6     Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**

In the event that any Impaired Class of Claims or Equity Interests rejects this Plan, the Debtors reserve the right, without any delay in the occurrence of the Confirmation Hearing or Effective Date, to (a) request that the Bankruptcy Court confirm this Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to such non-accepting Class, in which case this Plan shall constitute a motion for such relief, and/or (b) amend this Plan in accordance with Section 13.8 of this Plan.

**ARTICLE V**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

**5.1     General Settlement of Claims and Interests**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under this Plan, on the Effective Date, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to this Plan.

**5.2     Corporate Existence**

Except as otherwise provided in this Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by this Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to this Plan and without any further notice to or action, order, or approval of the Bankruptcy Court or any other court of competent jurisdiction (other than any requisite filings required under applicable state, provincial, or federal law).

**5.3     Reconciliation of IRS Claims**

Upon the entry of the Confirmation Order, all of the IRS Claims shall be Allowed in full, including postpetition interest due and owing pursuant to Section 7.2 of this Plan.  This Plan shall constitute a good faith resolution between the Debtors and the Internal Revenue Service of the Debtors' federal tax liability for the tax years 2003 through 2012.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Allowance of the IRS Claims in full, and the Bankruptcy Court's findings shall constitute its determination that Allowing the IRS Claims in full is in the best interests of the Debtors, their Estates, Creditors, and other parties-in-interest, and that no other amounts are due and owing pursuant to the IRS Claims.  On or about the Initial Distribution Date, the Debtors or Reorganized Debtors shall pay the amount of the IRS Claims in Cash, which payment shall be in full, final and complete

-37-

satisfaction of the IRS Claims. No further distributions shall be made by the Debtors or Reorganized Debtors on account of federal tax liability for the tax years 2003 through 2012.

### 5.4 Issuance of the Plan Securities

On the Effective Date, Reorganized OSG is authorized to and shall issue and distribute, or cause to be distributed, the Plan Securities, including New Shares and New Warrants (including any New Shares issuable upon exercise of such New Warrants) and any and all other securities, notes (including the Election Notes), stock, instruments, certificates and other documents or agreements required to be issued, executed or delivered pursuant to this Plan (collectively, the "New Securities and Documents"). The issuance of the Plan Securities shall be authorized, as of the Effective Date, without further notice to or order of the Bankruptcy Court, any further corporate action, or any further act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person. In no event shall non-U.S. Citizens own more than 23% of the total number of New Shares outstanding on the Effective Date or following the consummation of the Rights Offering. Subject to Section 6.4(d) of this Plan and in accordance with the Rights Offering Procedures, the Debtors shall determine the pro rata allocation of New Shares and New Warrants between U.S. Citizens and non-U.S. Citizens. All the New Shares underlying the New Warrants (upon payment of the exercise price in accordance with the terms of such New Warrants) issued pursuant to this Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

### 5.5 Transfer Restrictions and Tendering

(a) Subscription Rights will be distributed to the OSG Equity Interestholders of record on the Record Date and will not be detachable or separately tradable from the Old OSG Equity Interests held by OSG Equity Interestholders as of such Record Date. Holders of Old OSG Equity Interests may only transfer their right to receive the Subscription Rights attached thereto by transferring such Old OSG Equity Interests at any time prior to the Record Date. In addition, the last date to execute trades which allowed a purchaser to become a Holder of record on the Record Date was June 3, 2014. From and after the Record Date, interests in the Subscription Rights may not be transferred in any manner and, if not exercised, the Subscription Rights will lapse. Such OSG Equity Interestholder that held Old OSG Equity Interests on the Record Date will be a Non-Participating OSG Equity Interestholder and will receive one (1) Class B New Security for each Old OSG Equity Interest held by such Holder as of the Record Date. From and after the Record Date, all trading of Old OSG Equity Interests (or beneficial interests therein) will be halted and any transfers of Old OSG Equity Interests (or beneficial interests therein on the Record Date) shall be disregarded for all purposes, including subsequent distributions by the Debtors. On the closing date of the transactions contemplated by the Equity Commitment Agreement, all then-outstanding Old OSG Equity Interests shall automatically be cancelled and retired, and shall cease to exist.

(b) Rights Offering Securities that are issued and sold upon exercise of any Subscription Rights have not been and will not be registered under the Securities Act and may only be offered or sold upon exercise of the Subscription Rights to holders who are Accredited Investors or QIBs in transactions not involving a public offering, or exempt from registration under the Securities Act, including pursuant to Section 4(a)(2) thereof or Regulation D

thereunder. Such Rights Offering Securities issued upon exercise of the Subscription Rights (including any New Shares issued upon exercise of Rights Offering Warrants that are "restricted securities" at the time of exercise) will therefore be "restricted securities" within the meaning of Rule 144 under the Securities Act and such restricted securities may only be reoffered, sold or otherwise transferred (i) to a QIB pursuant to and in compliance with Rule 144A or in another transaction not involving a public offering exempt from registration under U.S. state and U.S. federal securities laws, (ii) pursuant to an exemption from registration under the Securities Act provided by Rule 144 thereunder, (iii) pursuant to any effective registration statement under the Securities Act or (iv) to OSG, in each of cases (i) through (iv) in accordance with any applicable securities laws in any state of the United States, and provided that, in the case of any transfer by an Accredited Investor (who acquired such New Securities in the Rights Offering) pursuant to (i) or (ii) above, OSG may require the delivery of a written opinion of counsel, certifications and/or any other information it reasonably requires to confirm the Securities Act exemption for such transaction.

(c)     Class B New Securities distributed to any Non-Participating OSG Equity Interestholders will be offered, issued and sold in exchange for their Old OSG Equity Interests in reliance on the exemption from registration under the Securities Act provided by Section 1145 of the Bankruptcy Code ("Section 1145"). Any conversion of Class B New Securities to Class A New Securities and any exercise of Class B New Warrants for Class B New Shares shall be exempt from registration pursuant to Section 3(a)(9) of the Securities Act. As a result, such Class B New Securities distributed to each Non-Participating OSG Equity Interestholder (including any Class B New Shares issued upon exercise of any such Class B New Warrants, and any Class A New Securities upon conversion of any Class B New Securities) will not be subject to any Securities Act transfer restrictions, except for any such Class B New Securities issued to a Non-Participating OSG Equity Interestholder who is deemed to be an "underwriter" within the meaning of Section 1145 or is an affiliate (as such term is defined in Rule 405 of the Securities Act) of OSG at the time of transfer.

(d)     All Plan Securities may only be sold subject to transfer restrictions contained in Reorganized OSG's certificate of incorporation or bylaws, which transfer restrictions shall be designed to ensure compliance with the Jones Act (in the case of New Shares) and applicable state laws.

(e)     Old OSG Equity Interests held by Participating Old OSG Interestholders, non-Participating Old OSG Interestholders who are not U.S. Citizens, and Old OSG Equity Interestholders who opt out of the releases granted by the Plan, must be tendered into one or more accounts established at DTC for the purpose of effecting Plan distributions, and may not thereafter be withdrawn (subject to limited exceptions if the Plan is not confirmed within a specified period of time or at all).

(f)     Election Notes distributed to any Holders of 7.500% Notes shall be offered, issued and sold in exchange for their 7.500% Notes in reliance on the exemption from registration under the Securities Act provided by Section 1145. As a result, such Election Notes distributed to each Holder of 7.500% Notes will not be subject to any Securities Act transfer restrictions, except for any such Election Notes issued to a Holder of 7.500% Notes who is

deemed to be an "underwriter" within the meaning of Section 1145 or is an affiliate (as such term is defined in Rule 405 of the Securities Act) of OSG at the time of transfer.

### 5.6 Issuance of the New Warrants

(a) The issuance of the New Warrants is authorized without the need for any further corporate action.

(b) The Class A New Warrants shall have the following terms:

(1) the exercise price for the Class A New Warrants shall be $0.01 per share of Class A New Shares and shall be paid pursuant to a cashless exercise procedure;

(2) the Class A New Warrants shall expire on the twenty-fifth anniversary of the date of the warrant agreement;

(3) the Class A New Warrants may only be exercised by (i) an Entity that is a U.S. Citizen or (ii) a non-U.S. Citizen in compliance with the certificate of incorporation and by-laws of Reorganized OSG and shall be exercised when held by a U.S. Citizen; and

(4) the Class A New Warrants shall include antidilution protection in the event of stock dividend, recapitalization, stock split or reclassification of Class A New Shares, and as otherwise set forth in the terms of such Class A New Warrants.

(c) The Class B New Warrants shall have the terms set forth on the Class B Securities Term Sheet attached hereto as Exhibit M.

### 5.7 Payment of Commitment Party Fees and Expenses

The Debtors or Reorganized Debtors, as applicable, shall pay the ECA Professional Expenses in accordance with the Equity Commitment Agreement.

### 5.8 Post-Confirmation Property Sales

To the extent the Debtors or Reorganized Debtors, as applicable, purchase or sell any property prior to or including the date that is one year after the Confirmation Date, the Debtors or Reorganized Debtors, as applicable, may elect to purchase or sell such property pursuant to sections 363, 1123(a)(5)(D), 1141(c), and 1146(a) of the Bankruptcy Code.

### 5.9 Letter of Credit

OSG and OBS are party to a cash collateral agreement (the "Cash Collateral Agreement") related to an arbitration proceeding, pursuant to which the Debtors deposited $9,146,100 as cash collateral (the "LOC Collateral") in an account over which DNB Bank ASA (the "Issuing Bank") has a control agreement (the "Control Agreement") and the Issuing Bank

issued a letter of credit ("LOC") guarantee to the arbitration counterparty.  On the Effective Date, OSG and OBS shall be deemed to have assumed the Cash Collateral Agreement and the Control Agreement, which shall remain in full force and effect in accordance with their respective terms, and the Issuing Bank shall retain (and if the LOC remains undrawn, following the termination of the LOC, return) the LOC Collateral in accordance with the terms of the Cash Collateral Agreement and the Control Agreement.  In the event that the LOC is drawn before it is terminated, the Issuing Bank shall have recourse first to the LOC Collateral and second to Reorganized OSG, Reorganized OBS, and Reorganized Crown Tanker Corporation to satisfy any obligations owed pursuant to the Cash Collateral Agreement, the Control Agreement, or in respect of the LOC.  Under no circumstances shall the Credit Agreement Lenders have any obligations pursuant to the Cash Collateral Agreement, the Control Agreement, or in respect of the LOC.  On the Initial Distribution Date the Debtors shall pay in full in Cash to the Issuing Bank any amounts accrued and owed as a Facing Fee through the Effective Date and the Reorganized Debtors' obligation to pay any Facing Fee pursuant to the Cash Collateral Agreement shall continue after the Effective Date until the termination of the LOC. Notwithstanding anything to the contrary in the Cash Collateral Agreement, the Reorganized Debtors shall have no further obligation to pay any LOC Fee that would otherwise have accrued following the Effective Date pursuant to the Cash Collateral Agreement.

### 5.10   Effectuating Documents; Further Transactions

(a)       Each of the matters provided for by this Plan involving the corporate structure of the Debtors or corporate or related actions to be taken by or required of the Reorganized Debtors, whether taken prior to or as of the Effective Date, shall be authorized without the need for any further corporate action or without any further action by the Debtors or the Reorganized Debtors, as applicable.  Such actions may include (i) the appointment of the Reorganized OSG Board, (ii) the authorization, issuance and distribution of New Securities and any other securities to be authorized, issued and distributed pursuant to this Plan, and (iii) the consummation and implementation of the Exit Financing.

(b)       On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan and the securities issued pursuant to this Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to this Plan.

(c)       The Professional Liability Action shall re-vest in Reorganized OSG subject to the rights of Non-Participating OSG Equity Interestholders in respect of Class B New Securities.

### 5.11   Liquidation of Certain Debtors

On or after the Effective Date, the Debtors listed on <u>Exhibit H</u>, if any, will be liquidated pursuant to this Plan.  A certificate of cancellation or dissolution, as applicable for

each Debtor, will be filed with Delaware's Secretary of State or the appropriate authority immediately after the Effective Date.

### 5.12    Restructuring Transactions

(a)    On, prior to, or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may enter into the following transactions (each a "Restructuring Transaction") and take any actions as may be necessary or appropriate to effectuate a corporate restructuring of their respective businesses of the overall corporate structure of the Reorganized Debtors.

(b)    Such restructuring may include one or more mergers, consolidations, restructures, creation of new entities, dispositions, liquidations or dissolutions, as may be determined by the Reorganized Debtors to be necessary or appropriate, provided such Restructuring Transactions comply with the terms of (including applicable lender or shareholder consent requirements), and are not prohibited by, this Plan or the Equity Commitment Agreement.  In each case where the surviving, resulting or acquiring corporation in any such transaction is a successor to a Reorganized Debtor, such surviving, resulting or acquiring corporation will perform the obligations of the Reorganized Debtor pursuant to this Plan to pay or otherwise satisfy the Allowed Claims to the extent not already paid or satisfied.

(c)    The actions to effectuate the Restructuring Transactions may include (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation or dissolution containing terms that are consistent with the terms of this Plan and that satisfy the applicable requirements of applicable law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of this Plan and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation or dissolution pursuant to applicable law; (iv) pledging, granting of liens or security interests over, assuming or guarantying obligations or taking such similar actions as may be necessary to preserve the rights and collateral interests of the secured creditors of the Debtors and their subsidiaries at all times prior to the effectiveness and consummation of this Plan; and (v) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with such transactions.

### 5.13    Exit Financing

On the Effective Date, the New OBS Exit Revolver, the New OIN Exit Revolver, the New OBS Exit Facility and the New OIN Exit Facility shall become effective.  From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date financing, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the boards of directors of the applicable Reorganized Debtors deem appropriate.

### 5.14    Secured Vessels

-42-

The vessels securing the CEXIM Loan Agreement and the DSF Loan Agreement shall be retained by the Debtors and Reorganized Debtors.

### 5.15    Revesting of Assets

Except as otherwise set forth herein, in the Plan Supplement or in the Confirmation Order, as of the Effective Date, and subject to Section 5.10(c) hereof, all property of each of the Estates, including all Causes of Action (unless released pursuant to Section 11.3(a)) shall vest and re-vest in each of the appropriate Reorganized Debtors free and clear of all Claims, Liens, encumbrances and Old OSG Equity Interests.  From and after the Effective Date, the Reorganized Debtors may operate their businesses and use, acquire and dispose of property and settle and compromise Claims, Equity Interests, or Causes of Action without supervision by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by this Plan and the Confirmation Order.  Without limiting the generality of the foregoing, the Reorganized Debtors may, without application to or approval by the Bankruptcy Court, pay fees that they incur after the Effective Date for professional fees and expenses.

### 5.16    Guarantees

Reorganized OSG may issue such replacement guarantees in respect of the Reorganized Debtors' or their Affiliates' obligations as may be required (including without limitation, pension obligations of OSG Ship Management UK, and obligations of the FSO Joint Venture, LNG Joint Venture, and Alaska Tanker Joint Venture).

### 5.17    Closing of the Chapter 11 Cases

When all Disputed Claims against any Debtor or Reorganized Debtor either have become Allowed or have been disallowed by Final Order, and no contested matter (including, without limitation, the Professional Liability Action) remains outstanding, the Reorganized Debtors shall ask the Bankruptcy Court to close the applicable Debtor's Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

### 5.18    Corporate Governance, Directors, and Officers

(a)    *Certificates of Incorporation and By-Laws*.  The certificates or articles of incorporation and by-laws of Reorganized OSG shall be amended to satisfy the provisions of this Plan and the Bankruptcy Code, shall be included in the Plan Supplement, and shall (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code and (ii) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate this Plan and the transactions contemplated herein.

(b)    *Officers of Reorganized OSG After the Effective Date.*  Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, as of the Effective Date, the initial officers of the Reorganized Debtors following the Effective Date shall be as listed in Exhibit B.

(c)  *Directors of Reorganized Debtors*.  The Reorganized OSG Board shall have nine (9) members, who shall be nominated by the Chief Restructuring Officer, approved by the existing directors of OSG, and identified in <u>Exhibit B</u> (which shall constitute a Plan Supplement document).  No member of the current board of directors or any person affiliated therewith shall be appointed to be a director of Reorganized OSG.  The members of the Reorganized OSG Board shall meet the requirements of the Jones Act.  Members of the boards of directors of Reorganized Debtors other than Reorganized OSG, and the initial term of each member of any board of directors of any Reorganized Debtor, shall be as listed on <u>Exhibit B</u> (which shall constitute a Plan Supplement document).

### 5.19  Cancellation of Notes, Instruments and Debentures

On the Effective Date, except to the extent otherwise provided herein, all notes, instruments, certificates, and other documents evidencing Claims or Equity Interests shall be cancelled and the obligations of the Debtors or Reorganized Debtors and their non-Debtor Affiliates thereunder or in any way related thereto shall be discharged; <u>provided</u>, <u>however</u>, that notwithstanding confirmation of this Plan or the occurrence of the Effective Date, any indenture or agreement not otherwise Reinstated hereunder that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of (1) allowing Holders to receive distributions under this Plan, (2) allowing the 8.750% Debentures Trustee to exercise its charging lien against any distributions to the Holders of 8.750% Debentures for payment of its fees and expenses (to the extent permitted under the 8.750% Debentures Indenture), and (3) allowing and preserving the rights of the Credit Agreement Agent, the Notes Trustees, and OSG and OIN as lenders under an Intercompany Facility.  For the avoidance of doubt, the 8.125% Notes Indenture and the 7.500% Notes Indenture will not be cancelled on the Effective Date, <u>provided that</u> any 7.500% Notes exchanged for the 7.500% Notes Alternative Distribution and other consideration shall be cancelled and retired.

### 5.20  Exemptions from Securities Act Registration

(a)  Subscription Rights will be distributed to the Holders of record of Old OSG Equity Interests as of the Record Date.

(b)  Class A New Securities that are sold upon exercise of any Subscription Rights have not been and will not be registered under the Securities Act and may only be offered or sold upon exercise of the Subscription Rights to Holders who are Accredited Investors or QIBs in transactions not involving a public offering, exempt from registration under U.S. state and U.S. federal securities laws pursuant to Section 4(a)(2) of the Securities Act ("<u>Section 4(a)(2)</u>") and/or other available exemptions from registration under the Securities Act and state securities laws, as applicable, including Regulation D under the Securities Act.  Such Class A New Securities issued upon exercise of the Subscription Rights (including any Class A New Shares issued upon exercise of Class A New Warrants that are "restricted securities" at the time of exercise) will therefore be "restricted securities" within the meaning of Rule 144 under the Securities Act and will be subject to the restrictions on transfer described under "Transfer Restrictions" above.  Class A New Securities that are offered and sold to Accredited Investors upon exercise of Subscription Rights (including any Class A New Shares issued upon exercise of Class A New Warrants that are "restricted securities" at the time of exercise) will be issued, at

-44-

the discretion of the Debtors, in certificated form or non-certificated form. Class A New Securities issued in global form and those issued in certificated form will bear the following legend or be electronically coded to substantially the following effect:

> **"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS, AND ACCORDINGLY THE SECURITIES REPRESENTED BY THIS CERTIFICATE MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED EXCEPT (I) TO A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT ("RULE 144A")) PURSUANT TO AND IN COMPLIANCE WITH RULE 144A OR IN ANOTHER TRANSACTION NOT INVOLVING A PUBLIC OFFERING EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT, (II) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT PROVIDED BY RULE 144 UNDER THE SECURITIES ACT, (III) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT, OR (IV) TO OSG, IN EACH OF CASES (I) THROUGH (IV) IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS IN ANY STATE OF THE UNITED STATES, AND PROVIDED THAT, IN THE CASE OF ANY TRANSFER BY AN ACCREDITED INVESTOR PURSUANT TO (I) OR (II) ABOVE, OSG MAY REQUIRE THE DELIVERY OF A WRITTEN OPINION OF COUNSEL, CERTIFICATIONS AND/OR ANY OTHER INFORMATION IT REASONABLY REQUIRES TO CONFIRM THE SECURITIES ACT EXEMPTION FOR SUCH TRANSACTION."**

(c)     Upon the transfer, exchange or replacement of Class A New Securities (or a beneficial interest therein) bearing the above legend, the Transfer Agent shall deliver only Class A New Securities bearing such legend unless the Holder requesting the transfer, exchange or replacement delivers or causes to be delivered to the Transfer Agent an opinion of counsel and/or such other certifications and evidence as OSG may reasonably require in order to determine that the proposed transfer, exchange or replacement is being made (1) pursuant to an effective registration statement, or (2) in compliance with Rule 144, and that neither the above legend nor the related restrictions on transfer are required to be included on the common stock to be received following such transfer, exchange or replacement.

(d)     Class B New Securities distributed to any Non-Participating OSG Equity Interestholders will be offered, issued and sold in exchange for their Old OSG Equity Interests in reliance on the exemption from registration under the Securities Act provided by Section 1145 of the Bankruptcy Code. Any conversion of Class B New Securities to Class A New Securities and any exercise of Class B New Warrants for Class B New Shares shall be exempt from registration pursuant to Section 3(a)(9) of the Securities Act. As a result, such Class B New Securities distributed to each such Non-Participating OSG Equity Interestholder (including any Class B New Shares issued upon exercise of any such Class B New Warrants, and any Class A New Securities upon conversion of any Class B New Securities) will not be subject to any Securities

Act transfer restrictions, except for any such Class B New Securities issued to a Non-Participating OSG Equity Interestholder who is deemed to be an "underwriter" within the meaning of Section 1145 of the Bankruptcy Code or is an affiliate (as such term is defined in Rule 405 of the Securities Act) of OSG at the time of transfer. Any conversion of Class B New Securities to Class A New Securities and any exercise of Class A New Warrants for Class A New Shares or Class B New Warrants for Class B New Shares shall be exempt from registration pursuant to Section 3(a)(9) of the Securities Act.

### 5.21 Intercompany Claims and Intercompany Equity Interests

Notwithstanding anything in this Plan to the contrary, on the Effective Date, the Intercompany Claims shall be, at the option of Reorganized OSG, Reinstated or discharged and satisfied by contributions, distributions or otherwise.

Notwithstanding anything in this Plan to the contrary, on the Effective Date, the Intercompany Equity Interests shall be Reinstated.

### 5.22 Intercompany Account Settlement

The Debtors and the Reorganized Debtors, and their respective Affiliates, will be entitled to transfer funds between and among themselves consistent with the terms of the Cash Management Order. Any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the ordinary course intercompany account settlement practices and will not violate the terms of this Plan.

## ARTICLE VI
## RIGHTS OFFERING AND COMMITMENT PARTY PURCHASES

### 6.1 Eligibility

Only Eligible OSG Equity Interestholders may exercise the Subscription Rights. An "Eligible OSG Equity Interestholder" is an OSG Equity Interestholder who votes in favor or is deemed to vote in favor of this Plan, to the extent eligible to vote, does not file an objection to this Plan, does not opt out of the releases described in Section 11.3(b) of this Plan, and is an Accredited Investor or a QIB. A "Participating Eligible OSG Equity Interestholder" is an Eligible OSG Equity Interestholder who validly exercises its Subscription Rights in accordance with the Rights Offering Procedures. A "Non-Participating OSG Equity Interestholder" is an OSG Equity Interestholder who is not a Participating Eligible OSG Equity Interestholder.

### 6.2 Record Date

Only Holders of record of Old OSG Equity Interests on the Record Date will receive Subscription Rights.

### 6.3 Rights Exercise Form

In accordance with the terms of the Rights Offering Procedures, a Debtor will cause to be delivered to each OSG Equity Interestholder a Rights Exercise Form on which any

Eligible OSG Equity Interestholder may elect to exercise all or a portion of their Subscription Rights; provided that, each Subscription Right must be exercised in full and not in part. As described in more detail in Section 6.6 of this Plan, the Rights Exercise Form, which must be validly completed and executed in order to exercise the Subscription Rights, will include a certification (the "Investor Certification") in which the Participating Eligible OSG Equity Interestholder must confirm its eligibility by certifying, among other things, that it is either an Accredited Investor or a QIB and that it is purchasing the Class A New Securities for its own account, for investment purposes, and not with a view to the resale, distribution or other disposition thereof. All Eligible OSG Equity Interestholders shall be required to submit a duly completed and executed Affidavit of Citizenship with their Rights Exercise Form. In addition, the Old OSG Equity Interests held by such Eligible OSG Equity Interestholder must be "tendered" into one or more accounts established at DTC for the purpose of effectuating Plan distributions, and may not thereafter be withdrawn (subject to limited exceptions if the Plan is not confirmed within a specified period of time or at all).

### 6.4    Issuance of Subscription Rights

(a)    On the date on which the solicitation of votes to approve this Plan is commenced (the "Commencement Date"), OSG will distribute to each OSG Equity Interestholder one (1) Subscription Right in respect of each Old OSG Equity Interest held by such OSG Equity Interestholder as of the Record Date. Each Participating Eligible OSG Equity Interestholder will be entitled, upon the valid exercise of each Subscription Right, to purchase twelve (12) Class A New Securities at the price of $3.00 per security. Each Non-Participating OSG Equity Interestholder will receive one (1) Class B New Security in exchange for each Old OSG Equity Interest held by such OSG Equity Interestholder as of the Record Date. On the closing date of the transactions contemplated by the Equity Commitment Agreement, all then-outstanding Old OSG Equity Interests shall automatically be cancelled and retired, and shall cease to exist.

(b)    Each Eligible OSG Equity Interestholder who is not a Commitment Party shall have the right, but not the obligation, to exercise its Subscription Rights as set forth herein and in the Rights Offering Procedures. Each Eligible OSG Equity Interestholder who validly elects to exercise any of its Subscription Rights in accordance with the Rights Offering Procedures will, by such election, be deemed to have voted in favor of the Plan. To the extent that any OSG Equity Interestholder exercises fewer than all of its Subscription Rights, it will be treated as a Non-Participating OSG Equity Interestholder in regards to such Old OSG Equity Interests for which it elected not to exercise its Subscription Rights. Each Commitment Party shall have the obligation to fully and validly exercise its Subscription Rights.

(c)    Each Eligible OSG Equity Interestholder that validly exercises its Subscription Rights in accordance with the terms of the Rights Offering and is reasonably deemed a U.S. Citizen by OSG shall receive Class A New Shares in exchange for the exercise of its Subscription Rights.

(d)    Each Eligible OSG Equity Interestholder that validly exercises its Subscription Rights in accordance with the terms of the Rights Offering and who is a Foreign Holder (each, a "Foreign Participant"), will receive: (i) Class A New Shares in exchange for the

exercise of its Subscription Rights if Foreign Participants elect to purchase in the aggregate Rights Offering Securities that account for less than 23% of all of the Rights Offering Securities to be purchased pursuant to the Rights Offering, or (ii) if Foreign Participants elect to purchase in the aggregate Rights Offering Securities that account for 23% or more of all of the Rights Offering Securities to be purchased pursuant to the Rights Offering, then (1) a number of Class A New Shares equal to the product determined by multiplying (x) 23% of the total number of New Shares issued pursuant to the Rights Offering by (y) a fraction, the numerator of which is the number of Rights Offering Securities such Foreign Participant elects to purchase in accordance with the terms of the Rights Offering and the denominator of which is the aggregate number of Rights Offering Securities that all Foreign Participants elect to purchase in accordance with the terms of the Rights Offering, and (2) a number of Class A New Warrants equal to the number of Rights Offering Securities that such Foreign Participant elects to purchase in accordance with the terms of the Rights Offering minus the number of Class A New Shares, if any, issued to such Foreign Participant pursuant to subclause (1) above, upon the valid exercise of its Subscription Rights.

(e)    Each Non-Participating OSG Equity Interestholder that is reasonably deemed a Domestic Holder by OSG will receive one (1) Class B New Share in exchange for each Old OSG Equity Interest held by such Non-Participating OSG Equity Interestholder as of the Record Date.  Each Non-Participating OSG Equity Interestholder who is a Foreign Holder will receive one (1) Class B New Security in exchange for each Old OSG Equity Interest held by such Non-Participating OSG Equity Interestholder as of the Record Date.

### 6.5    Rights Offering Period and Mailing

The Rights Offering shall commence on the Commencement Date and shall expire at the Rights Offering Expiration Time, unless extended by OSG in accordance with the Rights Offering Procedures.  On the Commencement Date, the OSG Equity Interestholders will be mailed Rights Exercise Forms together with instructions for the proper completion, due execution, and timely delivery of such Rights Exercise Forms, as well as instructions for payment.

### 6.6    Exercise of Subscription Rights

(a)    In order to validly exercise its Subscription Rights during the Rights Offering Period, an Eligible OSG Equity Interestholder must, on or before the Rights Offer Expiration Time:

(i)    return the completed and signed Rights Exercise Form (including, the Investor Certification) electing to exercise its Subscription Rights to the Rights Offering Agent;

(ii)    if such Eligible OSG Equity Interestholder is not a Commitment Party, deliver, via wire transfer of immediately available funds in U.S. dollars to the escrow account indicated in the Rights Exercise Form (the "Subscription Escrow Account"), an amount (the "Funding Amount") equal to the product determined by multiplying (1) $3.00 and (2) the

number that is the product determined by multiplying (a) the number of Subscription Rights being exercised by such Eligible OSG Equity Interestholder and (b) twelve (12); and

        (iii)    direct or otherwise cause (or have caused on its behalf) the "tender" of the Old OSG Equity Interests held by such Eligible OSG Equity Interestholder into one or more accounts established at DTC for the purpose of effectuating Plan distributions.

        (b)    The duly completed and executed Rights Exercise Form (including the Investor Certification) must be received by the Rights Offering Agent prior to the Rights Offering Expiration Time. For all Eligible OSG Equity Interestholders who are not Commitment Parties, the Funding Amount also must be received by the Rights Offering Agent prior to the Expiration Time.

        (c)    Unexercised Subscription Rights will be cancelled at the Rights Offering Expiration Time. An Eligible OSG Equity Interestholder will be deemed to have relinquished and waived its Subscription Rights to the extent the Rights Offering Agent for any reason does not receive from such Eligible OSG Equity Interestholder, during the Rights Offering Period, (i) a duly completed and executed Rights Exercise Form (including the Investor Certification), and (ii) if such Eligible OSG Equity Interestholder is not a Commitment Party, the Funding Amount.

        (d)    Any attempt to exercise any Subscription Rights after the Rights Offering Expiration Time will be null and void and the Debtors are not required to honor any Rights Exercise Form, Investor Certification, or other documentation received by the Rights Offering Agent relating to any purported exercise of Subscription Rights after the Rights Offering Expiration Time, regardless of when such Rights Exercise Form or other documentation was sent.

        (e)    Any Eligible OSG Equity Interestholder of record on the Record Date that does not, for any reason, exercise its Subscription Rights will receive one Class B New Security for each Old OSG Equity Interest it held as of the Record Date.

        (f)    The payments made in accordance with the Rights Offering shall be deposited and held by the Rights Offering Agent in the Subscription Escrow Account. The Rights Offering Agent will maintain the Subscription Escrow Account for the purpose of holding the money for administration of the Rights Offering until the Effective Date. The Rights Offering Agent shall not use any funds held in the Subscription Escrow Account for any other purpose and shall not encumber or permit such funds to be encumbered with any Lien or similar encumbrance. Such funds shall be disbursed only in accordance with the procedures described in this Article, the Rights Offering Procedures, and the Equity Commitment Agreement.

        (g)    The Debtors, in consultation with each of the Commitment Parties and the Equity Committee, may adopt such additional detailed procedures consistent with the provisions of this Article, the Rights Offering Procedures, and the Equity Commitment Agreement to more efficiently administer the exercise of the Subscription Rights.

**6.7    Backstop Securities and Holdback Securities**

Each Commitment Party shall be obligated to purchase Backstop Securities in respect of its Backstop Commitment and Holdback Securities in respect of its Holdback Commitment, in each case on the terms and subject to the conditions set forth in the Equity Commitment Agreement.

**6.8    Purchase of Plan Securities by Each of the Commitment Parties**

(a)    Each Commitment Party that is an OSG Equity Interestholder has agreed to take all actions necessary to qualify as a Participating Eligible OSG Equity Interestholder and to validly exercise all of the Subscription Rights distributed to it.

(b)    Each Commitment Party that is not an OSG Equity Interestholder must complete and return an Affidavit of Citizenship along with its Rights Exercise Form and Investor Certification.

(c)    No later than ten (10) Business Days after the date of the Rights Offering Expiration Time and at least ten (10) Business Days prior to the Effective Date, the Rights Offering Agent will deliver to each Commitment Party a written notice setting forth (i) the number of Rights Offering Securities, the number of Holdback Securities and the number of Backstop Securities required to be purchased by such Commitment Party based on the Purchase Commitment of such Commitment Party; (ii) the aggregate purchase price for the number of such Plan Securities based on such Commitment Party's Purchase Commitment (the "Commitment Party Funding Amount"); and (iii) in reasonable detail the calculations used to determine the above-described numbers of Plan Securities and aggregate purchase price.

(d)    Following receipt of such notice, each Commitment Party shall deliver and pay its applicable Commitment Party Funding Amount by wire transfer in immediately available funds, in U.S. dollars, into the Subscription Escrow Account in satisfaction of such Commitment Party's commitment obligations no later than two (2) Business Days prior to the Effective Date.

**6.9    Commitment Premium**

Each Commitment Party shall receive (i) its share of a premium, allocated as provided in and subject to the terms and conditions of the Equity Commitment Agreement and paid on the Effective Date, in the form of Class A New Securities equal to 5% of the aggregate amount raised in the Rights Offering (the "Commitment Premium") subject to the terms of the Equity Commitment Agreement and (ii) the reimbursement of all applicable reasonable documented fees and expenses. Each Commitment Party that is a Foreign Holder will receive a combination of Class A New Shares and Class A New Warrants, as determined by the Debtors in consultation with each Commitment Party, in compliance with the Jones Act.

**6.10    Issuance of Plan Securities**

(a)    On the date on which all conditions to closing set forth in the Equity Commitment Agreement have been satisfied or duly waived, the amounts in the Subscription

-50-

Escrow Account will be released to Reorganized OSG and Reorganized OSG will issue (i) the Rights Offering Securities (which will be in the form of Class A New Securities) to the Participating Eligible OSG Equity Interestholders; (ii) the Rights Offering Securities (which will be in the form of Class B New Securities) to Non-Participating OSG Equity Interestholders; (iii) the Backstop Securities, the Holdback Securities and all other Plan Securities required to be issued to the Commitment Parties pursuant to the Equity Commitment Agreement (which will be in the form of the Class A New Securities); each in full and complete satisfaction of their Old OSG Equity Interests, if any.

(b)      Reorganized OSG shall, for so long as any of the New Securities issued under this Plan are "restricted securities" (within the meaning of Rule 144 under the Securities Act), (i) at all times to make and keep available adequate current public information with respect to the Reorganized Debtors as those terms are understood and defined for purposes of Rule 144(c) under the Securities Act; (ii) file with the U.S. Securities and Exchange Commission in a timely manner all reports and other documents required of Reorganized OSG under the Securities Act and the Exchange Act at any time after it has become subject to the reporting requirements under the Securities Act and the Exchange Act, respectively, and the rules and regulations adopted thereunder; (iii) submit electronically and post on its corporate website, if any, every interactive data file required to be submitted and posted pursuant to Rule 405 of Regulation S-T under the Exchange Act; and (iv) make available information otherwise necessary to comply with Rule 144 and Rule 144A promulgated under the Securities Act, as such rules may be amended from time to time, if available with respect to re-sales of the restricted New Securities, at all times, to the extent required from time to time to enable such holders to sell such New Securities without registration under the Securities Act within the limitation of the exemptions provided by (x) Rule 144 and Rule 144A promulgated under the Securities Act (if available with respect to re-sales of such New Securities), as such rules may be amended from time to time or (y) any other rules or regulations now existing or hereafter adopted by the U.S. Securities and Exchange Commission.  Upon the reasonable request of any OSG Equity Interestholder, Reorganized OSG will deliver to such Holder a written statement as to whether it has complied with such information requirements.

## ARTICLE VII
## PROVISIONS GOVERNING DISTRIBUTIONS

### 7.1      Distributions for Claims and Interests Allowed as of the Effective Date

(a)      Except as otherwise provided herein or as ordered by the Bankruptcy Court, distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on the Initial Distribution Date or as soon thereafter as is practicable.

(b)      Notwithstanding anything to the contrary herein, on the Initial Distribution Date, or as soon thereafter as is reasonably practicable, the Disbursing Agent will distribute to (i) each Holder of an Allowed Class B1, B2, C1, D4, D5, E1, and E2 Claim or Interest, as applicable, the treatment accorded to such Holder in Article III; (ii) the Notes Trustees, or other party or parties as applicable, cash sufficient to fund the treatment accorded to Holders of Allowed Class D2 and D3 Claims in Article III; and (iii) the Credit Agreement Agent or, if so

directed by the Credit Agreement Agent, to each Holder of an Allowed Class D1 Claim cash sufficient to fund the treatment accorded to Holders of Allowed Class D1 Claims in <u>Article III</u>.

(c)     Any distribution to be made pursuant to this Plan shall be deemed to have been made on the Effective Date. Any payment or distribution required to be made under this Plan on a day other than a Business Day shall be made on the next succeeding Business Day. Distributions on account of Disputed Claims that first become Allowed Claims after the Effective Date shall be made pursuant to <u>Article IX</u> of this Plan.

### 7.2     Postpetition Interest on Claims Against Debtors

(a)     Postpetition interest shall accrue and be paid on all Allowed Claims in Classes D1 through D5 and on the IRS Claims. Holders of Allowed Claims in Classes D1 through D5 will receive postpetition interest on their Allowed Claims, calculated from the Petition Date, at the contractual rate of interest, if any (including default interest, if any, to the extent expressly and explicitly provided in each of the agreements underlying the respective Claims). Postpetition interest shall accrue and be paid on the IRS Claims at the rate of interest specified in section 6621 of the Internal Revenue Code. Holders of Allowed Claims in Class D5 or in Class D4 whose relevant agreements do not entitle them to any contractual rate of interest or who do not file an objection (a "<u>Postpetition Interest Rate Objection</u>") by the Confirmation Objection Deadline, will receive postpetition interest on their Allowed Claims calculated from the Petition Date at the Presumed Postpetition Interest Rate. Any Holder of a Claim in Class D4 or D5 who wishes to opt out of the Presumed Postpetition Interest Rate must file a Postpetition Interest Rate Objection, specifying the postpetition interest rate such Holder believes it is entitled to receive and providing the basis for such an interest rate. Any Holder of a Claim in Class D4 or D5 who does not file a Postpetition Interest Rate Objection shall be deemed to accept the application of the Presumed Postpetition Interest Rate to such Holder's Allowed Claim.

(b)     Notwithstanding anything to the contrary set forth herein, in the event that any of Classes D1, D2, D3, D4 and D5 is determined by the Bankruptcy Court to be Impaired and such Class fails to Accept the Plan, Holders of Allowed Claims in such rejecting Class shall receive postpetition interest on their Allowed Claim or Claims in such Class through the Effective Date at the Federal Judgment Rate.

(c)     Notwithstanding the foregoing, each Electing Noteholder shall receive the 7.500% Notes Alternative Distribution.

### 7.3     Disbursing Agent

Except as otherwise provided herein, all Cash distributions and other distributions to be made by the Debtors or the Reorganized Debtors, under this Plan or otherwise in connection with the Chapter 11 Cases (including, without limitation, professional compensation and statutory fees) shall be made by the Disbursing Agent. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. The Disbursing Agent may employ or contract with other entities to assist in or make the distributions required by this Plan.

**7.4    Delivery of Distributions and Undeliverable or Unclaimed Distributions**

(a)     *Delivery of Distributions to Holders of Allowed Claims in General.*

(i)     Unless otherwise agreed to between the Debtors or the Reorganized Debtors, as applicable, and the Holder of an Allowed Claim, the Debtors shall make distributions to the Holders of Allowed Claims in the same manner and to the same addresses as such payments are made in the ordinary course of the Debtors' businesses, unless another address is listed on the Holder's proof of claim form, in which case such address will be used; provided, however, that, to the extent any distributions are made on account of the ECA Professional Expenses, they shall be made at the direction of counsel to each of the Commitment Parties, as identified in Section 13.14 hereof.

(ii)     No distributions shall be made on a Disputed Claim until and unless such Disputed Claim becomes an Allowed Claim.

(iii)     In order to permit distributions under this Plan, Reorganized OSG may, but will not be required to, establish reasonable reserves for Disputed Claims.

(iv)     Other than the evidentiary certificates referred to at the end of this paragraph, physical certificates representing Plan Securities will not be issued pursuant to this Plan.  The Plan Securities will be registered on the New York Stock Exchange.  A certificate shall be issued to evidence registration in these shareholder and warrants registers.

(b)     *Undeliverable, Unnegotiated and Unclaimed Distributions.*

(i)     *Holding of Undeliverable, Unnegotiated and Unclaimed Distributions.*  If the distribution to any Holder of an Allowed Claim is returned to the Disbursing Agent as undeliverable or is otherwise unclaimed or not negotiated, no further distributions shall be made to such Holder unless and until the Disbursing Agent is notified in writing of such Holder's then current address.

(ii)     *After Distributions Become Deliverable.*  The Disbursing Agent shall make all distributions that have become deliverable or have been claimed since the Initial Distribution Date as soon as practicable after such distribution has become deliverable or has been claimed.

(iii)     *Failure to Claim Undeliverable or Unnegotiated Distributions.*  Any Holder of an Allowed Claim (or any successor or assignee or other Person or Entity claiming by, through, or on behalf of, such Holder) that does not assert a claim pursuant to this Plan for an undeliverable or unclaimed distribution within six (6) months after the later of the Effective Date or the date such distribution was made shall be deemed to have forfeited its Claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such Claim for an undeliverable or unclaimed distribution against the Debtors or their Estates, the Reorganized Debtors or their property.  In such cases, (a) any Cash for distribution on account of such Claims for undeliverable or unclaimed distributions shall become the property of the Reorganized Debtors free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary and (b) any New Securities and Documents held for

-53-

distribution on account of such Claim shall be sold by the Administrative and Disputed Claims Agent and the proceeds of such sale shall become the property of the Reorganized Debtors free of any restrictions thereon. Nothing contained in this Plan shall require the Debtors, the Reorganized Debtors, the Disbursing Agent, or the Administrative and Disputed Claims Agent to attempt to locate any Holder of an Allowed Claim.

(iv) *No Effect on Cash Distributions*. Any Holder of an Allowed Claim (or any successor or assignee or other Person or Entity claiming by, through, or on behalf of, such Holder) entitled to receive both a distribution of Cash and a distribution of Plan Securities may receive such Cash distribution even if its distribution of Plan Securities has not yet occurred, is returned to the Disbursing Agent as undeliverable, or is otherwise unclaimed.

### 7.5 Distribution Record Date

On the Distribution Record Date, the Claims Register shall be closed and the Disbursing Agent shall be authorized and entitled to recognize only those Holders listed on the Claims Register as of the close of business on the Distribution Record Date. Notwithstanding the foregoing, if a Claim or Equity Interest is transferred less than 20 days before the Distribution Record Date, the Disbursing Agent shall make distributions to the transferee only to the extent practical and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

### 7.6 Cash Payments

Payments made pursuant to this Plan shall be made by the Disbursing Agent in Cash and by (i) checks drawn on or (ii) wire transfer from a domestic bank selected by the Disbursing Agent. Any Cash distributions required under this Plan to foreign Creditors may be made, at the option of the Disbursing Agent, by such means as are necessary or customary in a particular foreign jurisdiction. Any check issued by the Disbursing Agent shall be null and void if not negotiated within ninety (90) days. Any Cash distributions required under this Plan in respect of Allowed Notes Claims and the Allowed Credit Agreement Claims shall be paid by the Disbursing Agent to the applicable trustees or the Credit Agreement Agent by federal funds wire transfer on the Initial Distribution Date.

### 7.7 Limitation on Recovery

No Holder of an Allowed Claim shall receive in respect of such Claim any distribution in excess of the Allowed amount of such Claim including, without limitation, distributions from more than one Debtor due to guarantees, undertakings, or joint and several obligations. In the event that the sum of distributions from several Debtors' Estates with respect to an Allowed Claim would be in excess of one hundred percent (100%) of the applicable Holder's Allowed Claim, then the proceeds remaining to be distributed to such Holder in excess of such one hundred percent (100%) shall be redistributed to other Holders of Allowed Claims against such Debtor or Debtors, or shall re-vest in the Reorganized Debtors, in accordance with the provisions of this Plan and the Bankruptcy Code.

### 7.8 Withholding and Reporting Requirements

In connection with this Plan and all distributions hereunder, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any U.S. federal, state or local taxing authority or foreign taxing authority and all distributions hereunder shall be subject to any such withholding and reporting requirements. The Reorganized Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements. All Persons holding Claims shall be required to provide any information necessary to effectuate information reporting and the withholding of such taxes. Notwithstanding any other provision of this Plan to the contrary, (a) each Holder of an Allowed Claim shall be liable for any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution, (b) any amounts deducted or withheld from any distribution to a Holder by the Reorganized Debtors in respect of any tax shall be treated as if distributed to such Holder in connection with this Plan, and (c) at the discretion of the Reorganized Debtors, no distribution shall be made to or on behalf of such Holder pursuant to this Plan unless and until such Holder has made arrangements satisfactory to the Reorganized Debtors for the payment and satisfaction of such tax obligations. Any Cash, New Securities and Documents and/or other consideration or property to be distributed pursuant to this Plan shall, pending the implementation of such arrangements, be treated as an unclaimed distribution pursuant to Section 7.4(b) of this Plan.

### 7.9 Setoffs

The Reorganized Debtors may, pursuant to section 553 of the Bankruptcy Code and applicable non-bankruptcy law, but shall not be required to, set off against any payments or other distributions to be made pursuant to this Plan in respect of an Allowed Claim, claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the Holder of such Claim; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any claim that the Debtors or the Reorganized Debtors may have against such Holder.

### 7.10 No Fractional Shares or Warrants

There shall be no distribution of (i) fractional shares or (ii) fractional warrants. Where a fractional share, or fractional warrant would otherwise be called for, the actual issuance shall reflect a rounding down of such fraction.

### 7.11 Hart-Scott-Rodino Compliance

Any New Shares to be distributed under this Plan to any entity required to file a Premerger Notification and Report Form under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, or to meet any similar requirements under applicable non-U.S. law ("Antitrust Obligations"), shall not be distributed until the notification and waiting periods applicable under such law to such entity shall have expired or been terminated.

# ARTICLE VIII
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**8.1 Assumption, Rejection and Assignment of Executory Contracts and Unexpired Leases**

(a)     On the Effective Date, all executory contracts and unexpired leases of the Debtors will be deemed assumed, in accordance with and subject to the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, unless such executory contracts and unexpired leases are (i) identified on Exhibit C to be filed with the Plan Supplement as Rejected Contracts and not removed from such exhibit prior to the Effective Date, (ii) previously rejected by order of the Bankruptcy Court, (iii) the subject of a motion to reject filed with the Bankruptcy Court on or before the Effective Date, or (iv) rejected pursuant to the terms of this Plan, including, without limitation, Section 8.5 of this Plan.

(b)     Each Assigned Contract shall be listed on Exhibit G, along with the proposed counterparty to such Assigned Contract.

(c)     Each Rejected Contract shall be rejected only to the extent that it constitutes an executory contract or unexpired lease.

(d)     The proposed rejection damages for any Rejected Contract shall be zero dollars unless otherwise indicated in Exhibit C.

(e)     Any amounts owed as Allowed SERP Claims in Class D5 or SERP Claims to be Reinstated shall be indicated in Exhibit L.

(f)     Without amending or altering any prior order of the Bankruptcy Court approving the assumption, assignment or rejection of any executory contracts and unexpired leases, entry of the Confirmation Order shall constitute approval of the assumptions, assignments and rejections as applicable, provided herein, pursuant to sections 365(a), 365(f) and 1123 of the Bankruptcy Code.  To the extent any provision in any executory contracts and unexpired leases assumed or assigned pursuant to this Plan (including, without limitation, any "change of control" provision) conditions, restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the applicable assumption or assignment of such executory contract or unexpired lease, or that terminates or modifies such executory contract or unexpired lease or allows the counterparty to such executory contract or lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such assumption or assignment, then such provision shall be deemed void and of no force or effect such that the transactions contemplated by this Plan shall not entitle the non-debtor party thereto to terminate or modify such executory contract or unexpired lease or to exercise any other default-related rights with respect thereto.  Confirmation of this Plan and consummation of the transactions contemplated thereby shall not constitute a change of control under any executory contract or unexpired lease assumed by the Debtors on or prior to the Effective Date.

**8.2    Cure of Defaults of Assumed Executory Contracts and Unexpired Leases**

(a)    The proposed cure amount (the "Cure Amount") for any executory contract or unexpired lease that is assumed or assumed and assigned pursuant to this Plan (other than an indenture Reinstated pursuant to this Plan) shall be zero dollars unless otherwise indicated in a schedule to be filed with the Bankruptcy Court as part of the Plan Supplement or another pleading filed by the Debtors (the "Cure Notice"). All Cure Amounts shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment in Cash in the amounts set forth in the Cure Notice, or on such other terms as the parties to each such executory contract or unexpired lease may otherwise agree in writing, on or as soon as practicable following the Effective Date or on such other terms as the parties to each such executory contract or unexpired lease may otherwise agree. Pursuant to section 365(b)(2)(D) of the Bankruptcy Code, no counterparty to an executory contract or unexpired lease (other than an indenture Reinstated pursuant to this Plan) shall be allowed a Claim, as part of its cure Amount, for a default rate of interest or any other form of late payment penalty.

(b)    In the event of a dispute pertaining to assumption, assignment, or the Cure Amount set forth in the Cure Notice, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the resolution of the dispute in accordance with Section 8.3 of this Plan. Pending the resolution of such dispute, the executory contract or unexpired lease at issue shall be deemed conditionally assumed by the relevant Reorganized Debtor unless otherwise ordered by the Bankruptcy Court. To the extent that any Person fails to timely File an objection to the assumption, assumption and assignment, or the Cure Amount listed in the Cure Notice or otherwise as set forth in Section 8.3 hereof, such Person is deemed to have consented to such Cure Amounts and the assumption or assumption and assignment of such executory contracts or unexpired leases pursuant to this Plan. The Cure Amounts set forth in the Cure Notice shall be final and binding on all non-debtor parties (including any successors and designees) to such executory contracts or unexpired leases set forth in the Cure Notice, and shall not be subject to further dispute or audit based on performance prior to the time of assumption, irrespective of the terms and conditions of such executory contract or unexpired lease. Each counterparty to an assumed or assumed and assigned executory contract or unexpired lease, whether entered before or after the Petition Date, shall be forever barred, estopped, and permanently enjoined from (i) asserting against any Reorganized Debtor, or its property, any default existing as of the Effective Date or any counterclaim, defense, setoff or any other interest asserted or assertable against the Debtors; and (ii) imposing or charging against any Reorganized Debtor any accelerations, assignment fees, increases or any other fees as a result of any assumption or assignment pursuant to this Plan.

(c)    Upon the assignment of any Assigned Contract, no default shall exist thereunder and no counterparty to any such Assigned Contract shall be permitted to declare a default by the Debtors or the Reorganized Debtors thereunder or otherwise take action against the Reorganized Debtors or their property as a result of any of the Restructuring Transactions, or any Debtor's financial condition, bankruptcy or failure to perform any of its obligations under such Assigned Contract prior to the Effective Date. Any provision in any Assigned Contract that is assigned under this Plan which prohibits or conditions the assignment or allows the counterparty thereto to terminate, recapture, impose any penalty, condition on renewal or

-57-

extension, or modify any term or condition upon such assignment, constitutes an unenforceable anti-assignment provision that is void and of no force and effect.

**8.3    Objections to Rejection, Assumption, Assignment or Cure**

Except as provided by <u>Section 8.4</u> of this Plan regarding amendments to <u>Exhibit C</u> and <u>Exhibit G</u>, responses or objections (each a "<u>Treatment Objection</u>"), if any, to the (i) rejection, including any applicable rejection damages as listed on <u>Exhibit C</u>, (ii) assumption, (iii) assumption and assignment of Assigned Contracts as listed on <u>Exhibit G</u>, (iv) any Cure Amount related to any contracts or leases to be assumed or assumed and assigned under this Plan as identified on the Cure Notice, or (v) rejection, including any applicable rejection damages, of any contracts pursuant to <u>Section 8.5(e)</u> of this Plan, shall be Filed, together with proof of service, with the Clerk of the United States Bankruptcy Court, District of Delaware, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801, and served such that the responses or objections are actually received no later than **4:00 p.m. (ET) on July 11, 2014** (the "<u>Confirmation Objection Deadline</u>") by each of the following parties:

(a)    counsel to the Debtors, Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, New York 10006, Attention: James L. Bromley, Esq., and Luke A. Barefoot, Esq.; and Morris Nichols, Arsht & Tunnell LLP, 1201 North Market Street, P.O. Box 1347, Wilmington, Delaware 19801, Attention: Derek C. Abbott, Esq.;

(b)    the Office of the United States Trustee, U.S. Department of Justice, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attention: Mark Kenney, Esq.;

(c)    counsel to the Unsecured Creditors' Committee, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036, Attention: Daniel H. Golden, Esq., and Fred S. Hodara, Esq.;

(d)    counsel to the Equity Committee, Brown Rudnick LLP, One Financial Center, Boston, Massachusetts 02111, Attention: Steven D. Pohl, Esq.; and

(e)    Gibson, Dunn & Crutcher, LLP, 200 Park Avenue, New York, NY 10166-0193, Attention: David M. Feldman, Esq., John T. Gaffney, Esq., and Joshua P. Weisser, Esq.

Any objection to the Cure Amount set forth in the Cure Notice or to the proposed rejection damages shall state with specificity the cure amount or rejection damages amount, as applicable, the objecting party believes is required and provide appropriate documentation in support thereof.  If any Treatment Objection is not timely Filed and served before the Confirmation Objection Deadline, each counterparty to an assumed, assumed and assigned, or rejected executory contract or unexpired lease, whether entered before or after the Petition Date, shall be forever barred from (i) objecting to the rejection, assumption, assignment, rejection damages amount, and/or Cure Amount provided hereunder, and shall be precluded from being heard at the Confirmation Hearing with respect to such objection; (ii) asserting against any Reorganized Debtor, or its property, any default existing as of the Effective Date or any counterclaim, defense, setoff or any other interest asserted or assertable against the Debtors; and (iii) imposing or charging against any Reorganized Debtor any accelerations, assignment fees,

increases or any other fees as a result of any assumption or, assumption and assignment or rejection pursuant to this Plan.

On and after the Effective Date, the Reorganized Debtors may, in their sole discretion, settle Treatment Objections without any further notice to or action by the Bankruptcy Court or any other party (including by paying any agreed "cure" amounts).

For each executory contract or unexpired lease as to which a Treatment Objection is timely Filed and properly served and that is not otherwise resolved by the parties on or before the date of the Confirmation Hearing, the Debtors, subject to the availability of the Bankruptcy Court, may schedule a hearing on such Treatment Objection and provide at least twenty-one calendar days' notice of such hearing to the party filing such Treatment Objection. Unless the Bankruptcy Court expressly orders or the parties agree otherwise, any assumption, rejection, or assignment approved by the Bankruptcy Court notwithstanding a Treatment Objection shall be effective as of the effective date originally proposed by the Debtors or specified in the Plan or the Confirmation Order. Any cure shall be paid as soon as reasonably practicable following the entry of a Final Order resolving a Cure Amount or assumption or assignment dispute unless the Debtors elect to reject the executory contract or unexpired lease as described below.

### 8.4    Reservation of Rights

(a)    The Debtors reserve their right, on or before 3:00 p.m. (prevailing Eastern Time) on the Business Day immediately before the Confirmation Hearing, as may be rescheduled or continued, to (i) amend Exhibit C to delete or add any unexpired lease or executory contract, and (ii) amend Exhibit G to delete or add any Assigned Contracts, in each case subject to the consent of each of the Commitment Parties. The counterparty to any executory contracts or unexpired leases first listed on or removed from Exhibit C, or Exhibit G, as applicable, later than the date that is ten (10) calendar days before the Confirmation Hearing, shall have five (5) calendar days from the date of service of amended Exhibit C, or Exhibit G, as applicable, to file a Treatment Objection. The counterparty to any executory contract or unexpired lease first listed on or removed from Exhibit C, or Exhibit G, as applicable, later than the date that is five (5) calendar days before the Confirmation Hearing, shall have until the Confirmation Hearing to file a Treatment Objection. The counterparty to any executory contracts or unexpired leases first listed on or removed from Exhibit C, or Exhibit G, as applicable, on or after the date of the Confirmation Hearing, shall have ten (10) calendar days from the service of such amended Exhibit to file a Treatment Objection.

(b)    If the Debtors, in their discretion, determine that the amount asserted to be the necessary "cure" amount would, if ordered by the Bankruptcy Court, make the assumption and/or assignment of the executory contract or unexpired lease imprudent, then the Debtors may elect to (i) reject the relevant executory contract or unexpired lease or (ii) request an expedited hearing on the resolution of the "cure" dispute, exclude assumption or rejection of the contract or lease from the scope of the Confirmation Order, and retain the right to reject the executory contract or unexpired lease pending the outcome of such dispute.

(c)    If the Debtors, in their discretion, determine that the amount asserted to be the necessary rejection damages amount would, if ordered by the Bankruptcy Court, make the

rejection of the executory contract or unexpired lease imprudent, then the Debtors may elect to (i) assume the relevant executory contract or unexpired lease, (ii) assume and assign the relevant executory contract or unexpired lease, or (iii) request an expedited hearing on the resolution of the rejection damages dispute, exclude assumption or rejection of the contract or lease from the scope of the Confirmation Order, and retain the right to assume or assume and assign the executory contract or unexpired lease pending the outcome of such dispute.

(d)     Neither the exclusion nor inclusion of any contract or lease in <u>Exhibit C</u> or <u>Exhibit G</u>, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an executory contract or unexpired lease or that the Reorganized Debtors have any liability thereunder.

**8.5     Compensation and Benefit Programs**

(a)     Reorganized OSG shall administer the Management and Director Incentive Program. The Reorganized OSG Board shall determine the initial grants under the Management and Director Incentive Program.

(b)     Except as otherwise expressly provided in this Plan, including, without limitation, the limitations set forth herein with respect to the Management and Director Incentive Program and in Section 8.5(e) herein, or as otherwise provided in any motion to reject or notice of rejection filed with the Bankruptcy Court on or before the Effective Date, on and after the Effective Date, subject to any Final Order, the Reorganized Debtors shall have the sole discretion to (1) amend, adopt, assume, and/or honor, in the ordinary course of business or as otherwise provided for herein, any contracts, agreements, policies, programs, and plans for, among other things, compensation, pursuant to the terms thereof or hereof, including any incentive plan, as applicable, including health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation benefits, life insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity from and after the Petition Date, and (2) honor, in the ordinary course of business, any accrued vacation time arising prior to the Petition Date for employees employed as of the Effective Date.

(c)     As of the Effective Date, the Reorganized Debtors shall continue (and shall continue their obligations with respect to) the Pension Plans in accordance with, and subject to, their terms, ERISA, the Internal Revenue Code, and applicable law, and shall preserve all of their rights thereunder. All Proofs of Claim filed by the Pension Benefit Guarantee Corporation on account of Claims in connection with the termination of the Pension Plans shall be deemed withdrawn as of the Effective Date without any further action of the Pension Benefit Guaranty Corporation, the Debtors, or Reorganized Debtors and without any further action, order, or approval of the Bankruptcy Court. All other Proofs of Claims filed on account of Claims in connection with the termination of the Pension Plans shall be deemed disallowed and expunged as of the Effective Date without any further action of the Debtors or Reorganized Debtors and without any further action, order, or approval of the Bankruptcy Court. Notwithstanding anything to the contrary in this Plan, no provision in this Plan or the Confirmation Order, or proceeding within the Chapter 11 Cases, shall in any way be construed as discharging, releasing, or relieving the Debtors, the Reorganized Debtors, or any other party in any capacity, from any

liability with respect to the Pension Plans under any law, governmental policy, or regulatory provision, including for breach of fiduciary duty.

(d)     To the extent not previously assumed, collective bargaining agreements shall be treated as executory contracts under this Plan and shall be assumed on the Effective Date.

(e)     Notwithstanding anything to the contrary in this Plan, all contracts, agreements, policies, programs and plans in existence on the Petition Date that provided for the issuance of Equity Interests in the Debtors to current or former employees or directors of the Debtors, including, without limitation, any such agreements listed on Exhibit C, are, to the extent not previously terminated or rejected by the Debtors, rejected or otherwise terminated as of the Effective Date without any further action of the Debtors or Reorganized Debtors or any order of the Court, with rejection damages of zero dollars unless otherwise indicated in Exhibit C, and any unvested Equity Interests granted under any such agreements, policies, programs and plans in addition to any Equity Interests granted under such agreements previously terminated or rejected by the Debtors to the extent not previously cancelled shall be cancelled pursuant to Section 5.19 of this Plan.  Objections to the treatment of these plans or the amount of rejection or termination damages, if any, must be submitted and resolved in accordance with the procedures and subject to the conditions provided for in Section 8.3.  If any such objection is not timely Filed and served before the Confirmation Objection Deadline, each participant in or counterparty to any agreement describe in this Section shall be forever barred from (i) objecting to the rejection or termination provided hereunder, and shall be precluded from being heard at the Confirmation Hearing with respect to such objection; (ii) asserting against any Reorganized Debtor, or its property, any default existing as of the Effective Date or any counterclaim, defense, setoff or any other interest asserted or assertable against the Debtors; and (iii) imposing or charging against any Reorganized Debtor any accelerations, assignment fees, increases or any other fees as a result of any rejection pursuant to this Section.

### 8.6    Preexisting Obligations to the Debtors Under Rejected Contracts

Rejection of any Rejected Contract pursuant to the Plan shall not constitute a termination of pre-existing obligations owed to the applicable Debtor(s) under such Rejected Contract.  In particular, notwithstanding any nonbankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or Reorganized Debtors, as applicable, from counterparties to any Rejected Contract.

### 8.7    Subsequent Modifications, Amendments, Supplements or Restatements.

Unless otherwise provided by the Plan or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed, whether or not such executory contract or unexpired lease relates to the use, acquisition or occupancy of real property, shall include (a) all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such executory contract or unexpired lease and (b) all executory contracts or

unexpired leases appurtenant to the premises, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, and uses, unless any of the foregoing agreements has been or is rejected pursuant to an order of the Bankruptcy Court or is otherwise rejected as part of the Plan. Modifications, amendments, supplements and restatements to prepetition executory contracts and unexpired leases that have been executed by the Debtors during the Chapter 11 Cases and actions taken in accordance therewith (i) do not alter in any way the prepetition nature of the executory contracts and unexpired leases, or the validity, priority or amount of any Claims against the Debtors that may arise under the same, (ii) are not and do not create postpetition contracts or leases, (iii) do not elevate to administrative expense priority any Claims of the counterparties to the executory contracts and unexpired leases against any of the Debtors, and (iv) do not entitle any entity to a Claim under any section of the Bankruptcy Code on account of the difference between the terms of any prepetition executory contracts or unexpired leases and subsequent modifications, amendments, supplements or restatements.

## ARTICLE IX
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

### 9.1    Resolution of Disputed Claims

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, the Reorganized Debtors and the Administrative and Disputed Claims Agent shall have the exclusive right to make and File objections to Claims (other than Administrative Expense Claims and Professional Fees Claims to which other parties may object as set forth in Section 3.1 and Section 13.5 of this Plan) and shall serve a copy of each objection upon the Holder of the Claim to which the objection is made as soon as practicable, but in no event later than ninety (90) days after the Effective Date (the "Claims Objection Deadline") or such later date as is established by the filing of a notice by the Reorganized Debtors prior to the expiration of the then current Claims Objection Deadline. Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder thereof if service is effected in any of the following manners: (a) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; (b) by first class mail, postage prepaid, on the signatory on the proof of claim or interest or other representative identified in the proof of claim or interest or any attachment thereto; or (c) by first class mail, postage prepaid, on any counsel that has appeared on the Holder's behalf in the Chapter 11 Cases. The Reorganized Debtors and the Administrative and Disputed Claims Agent shall be authorized to, and shall, resolve all Disputed Claims by withdrawing or settling such objections thereto or by litigating to Final Order in the Bankruptcy Court the validity, nature and/or amount thereof.

### 9.2    No Distributions Pending Allowance

Notwithstanding any other provision of this Plan to the contrary, no payments or distributions of any kind or nature shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order and the Disputed Claim has become an Allowed Claim.

**9.3     Distributions on Account of Disputed Claims Once They Are Allowed**

If a Disputed Claim becomes an Allowed Claim after the Initial Distribution Date, the Administrative and Disputed Claims Agent shall be authorized to cause a distribution to be made on account of such Disputed Claim on the date of Allowance or as soon as reasonably practicable thereafter. Such distributions will be made pursuant to the applicable provisions of Article VII of this Plan.

**9.4     Estimation of Claims**

The Debtors or the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any contingent Claim, unliquidated Claim or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether any of the Debtors or the Reorganized Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent Claim, unliquidated Claim or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

**9.5     Disputed Claims Reserves**

(a)     On the Effective Date, the Administrative and Disputed Claims Agent shall hold in the Disputed Claims Reserves for every Class of Claims except Class E1 the amount of Cash that the Reorganized Debtors determine, in consultation with the Unsecured Creditors' Committee, the Equity Committee, and each Commitment Party, would likely have been distributed to the Holders of all Disputed Claims if such Disputed Claims had been Allowed on the Effective Date. The amount of such Disputed Claims is to be determined, solely for the purposes of establishing reserves and for maximum distribution purposes, to be the lesser of (a) the asserted amount of the Disputed Claim filed with the Bankruptcy Court as set forth in the non-duplicative Proof of Claim, or (if no proof of such Claim was filed) listed by the Debtors in the Schedules, (b) the amount, if any, estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code or ordered by other order of the Bankruptcy Court, or (c) the amount otherwise agreed to by the Debtors or the Reorganized Debtors, as applicable, in consultation with the Holder of such Disputed Claim for distribution purposes. With respect to all Disputed Claims that are unliquidated or contingent and/or for which no dollar amount is asserted on a Proof of Claim, the Debtors will reserve Cash equal to the amount reasonably determined by the Debtors or Reorganized Debtors.

(b)     The Debtors or the Reorganized Debtors will fund one Disputed Claims Reserve for Class E1 with up to $2 million in Cash once Class E1 Claims are Allowed. Furthermore, there shall be a reserve of up to a maximum of $5 million funded by the Reorganized Debtors to satisfy any liabilities on account of proof of Claim number 1581 filed by the Securities and Exchange Commission, solely to the extent and upon the entry of a Final Order providing that such Claim or any portion thereof is Allowed.

(c)     The Administrative and Disputed Claims Agent may, at the direction of the Debtors or the Reorganized Debtors, adjust the Disputed Claims Reserves to reflect all earnings thereon (net of any expenses relating thereto, and net of taxes calculated at the applicable combined highest marginal tax rates imposed on a corporation resident in New York for federal, state and local tax purposes on the amount of all such earnings recognized by the Debtors or Reorganized Debtors for federal, state or local tax purposes) to be distributed on the Distribution Dates, as required by the Plan.  The Administrative and Disputed Claims Agent shall hold in the Disputed Claims Reserves all dividends, payments and other distributions made on account of, as well as any obligations arising from, the property held in the Disputed Claims Reserves, to the extent that such property continues to be so held at the time such distributions are made or such obligations arise.

(d)     After any reasonable determination by the Reorganized Debtors that the Disputed Claims Reserves should be adjusted downward in accordance with this <u>Section 9.5</u>, the Administrative and Disputed Claims Agent shall, at the direction of the Debtors or the Reorganized Debtors, effect a distribution to the Reorganized Debtors in the amount of such adjustment as required by this Plan (an "<u>Adjustment Distribution</u>").

(e)     After all Disputed Claims have become either Allowed or disallowed and all distributions required pursuant to <u>Article VII</u> of this Plan have been made, the Administrative and Disputed Claims Agent shall, at the direction of the Reorganized Debtors, distribute the Cash remaining in the Disputed Claims Reserves to the Reorganized Debtors.

(f)     It is expected that the Disputed Claims Reserves will be treated as grantor trusts owned by the Reorganized Debtors for U.S. federal income tax purposes.  Absent definitive guidance from the IRS or a contrary determination by a court of competent jurisdiction, the Administrative and Disputed Claims Agent shall, to the extent permitted by applicable law, report consistently with the foregoing characterization for state and local income tax purposes.  All affected holders of Disputed Claims shall report, for income tax purposes, consistently with the foregoing.

**9.6     No Amendments to Claims**

A Claim may be amended before the Confirmation Date only as agreed upon by the Debtors and the holder of such Claim, with the consent of each of the Commitment Parties, or as otherwise permitted by the Bankruptcy Court, the Bankruptcy Rules or applicable non-bankruptcy law.  On or after the Confirmation Date, the holder of a Claim (other than an Administrative Expense Claim or a Professional Fees Claim) must obtain prior authorization from the Bankruptcy Court or Reorganized Debtors to file or amend a Claim.  Any new or amended Claim (other than Rejection Claims) filed after the Confirmation Date without such

-64-

prior authorization will not appear on the Claims Register and will be deemed disallowed in full and expunged without any action required of the Debtors or the Reorganized Debtors and without the need for any court order.

### 9.7 No Late-Filed Claims

(a) In accordance with the Bar Date Order and section 502(b)(9) of the Bankruptcy Code, any Entity that failed to file a proof of Claim by the applicable Bar Date or was not otherwise permitted to file a proof of Claim after the applicable Bar Date by a Final Order of the Bankruptcy Court is and shall be barred, estopped and enjoined from asserting any Claim against the Debtors (a) in an amount that exceeds the amount, if any, that is identified in the Schedules on behalf of such Entity as undisputed, noncontingent and liquidated; or (b) of a different nature or a different classification than any Claim identified in the Schedules on behalf of such Entity.

(b) The Debtors and the Reorganized Debtors shall be entitled, for the purposes of distributions, reserves and other similar purposes under this Plan, to treat all Claims Filed after the later of (a) the Effective Date and (b) the Claim's applicable Bar Date, as disallowed and expunged unless the Holder of such Claim Files a motion to have the late post-Effective Date Claim deemed timely Filed by the Bankruptcy Court. The Debtors or the Reorganized Debtors have no obligation to review or respond to any Claims Filed after the later of (a) the Effective Date and (b) the Claim's applicable Bar Date, unless: (y) the filer has obtained an order from the Bankruptcy Court authorizing it to file such Claim after the Bar Date; or (z) the Reorganized Debtors have consented to the filing of such Claim in writing, provided that if any such Claim is then Allowed, any amounts due will be payable only from the Disputed Claims Reserves and not by the Reorganized Debtors.

### ARTICLE X
### CONFIRMATION AND CONSUMMATION OF THE FIRST AMENDED PLAN

### 10.1 Conditions to Confirmation

(a) It shall be a condition precedent to the confirmation of this Plan that (i) each of the Plan, Disclosure Statement, and Plan Supplement (including, with respect to any amendments, modifications, supplements and exhibits thereto related to the foregoing) shall be in form and substance reasonably acceptable to the Debtors and each of the Commitment Parties; (ii) the Confirmation Order shall have been entered and not stayed, and shall be in form and substance reasonably acceptable to each of the Commitment Parties; and (iii) all governmental or other approvals required to effectuate the terms of this Plan shall have been obtained, including any approvals with respect to the Jones Act businesses.

(b) The Confirmation Order shall provide that (i) no incurable event of default occurred prior to the Petition Date; (ii) the consummation of the Plan does not create any incurable defaults under either the 7.500% Notes Indenture or the 8.125% Notes Indenture upon the Debtors' emergence from these Chapter 11 Cases; (iii) the consummation of the Plan will not trigger any note repurchase obligations under either the 7.500% Notes Indenture or the 8.125% Notes Indenture; (iv) all requirements for Reinstatement of the 7.500% Notes and the 8.125%

Notes under section 1124(2) of the Bankruptcy Code have been met; and (v) all Claims arising from the 8.125% Notes and the 7.500% Notes are Unimpaired.

(c)    The Confirmation Order shall provide that, effective as of the Effective Date, the Putative Class is certified for settlement purposes and the settlement embodied in the Class Stipulation and the Plan  is approved on a final basis pursuant to Fed. R. Civ. P. 23 and Bankruptcy Rules 7023 and 9019.

**10.2    Conditions to Effective Date**

Each of the following is a condition precedent to the occurrence of the Effective Date:

(a)    the Confirmation Order (including any amendment or modification thereof) shall (i) have been entered by the Bankruptcy Court in form and substance reasonably acceptable to the Debtors and each of the Commitment Parties, and (ii) not have been stayed, vacated or set aside;

(b)    all actions, documents, certificates, and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable government units in accordance with applicable law;

(c)    all of the conditions precedent for effectiveness of the Exit Financing and the Equity Commitment Agreement shall have been satisfied or waived in accordance with the terms thereof;

(d)    payment in Cash of all ECA Professional Expenses incurred through such date that is ten (10) Business Days prior to the Effective Date;

(e)    notice of the projected Effective Date shall have been provided to the Unsecured Creditors' Committee, the Equity Committee, and each Commitment Party, or their respective counsel, no later than five (5) Business Days prior to the projected Effective Date; and

(f)    receipt of all governmental approvals including the United States Coast Guard and MARAD of New Shares and New Warrants, substantially in the form attached to the Rights Offering Procedures.

**10.3    Conditions to Reinstatement**

It shall be a condition precedent to the Reinstatement of the 7.500% Notes and the 8.125% Notes that the Equity Commitment Agreement shall be terminated pursuant to Section 9.2(a) therein, excluding provisions therein which expressly survive termination.

**10.4    Waiver of Conditions**

Each of the conditions set forth in Sections 10.1 and 10.2 of this Plan may be waived in whole or in part by the Debtors, subject to notice to the Unsecured Creditors'

Committee and the Equity Committee and the consent of each of the Commitment Parties (which consent shall not be unreasonably withheld), without any other notice to parties in interest or notice to or order of the Bankruptcy Court and without a hearing.  The failure to satisfy or waive a condition to the Effective Date may be asserted by the Debtors regardless of the circumstances giving rise to the failure of such condition to be satisfied.  The failure of a Debtor to exercise any of the foregoing rights shall not be deemed a waiver of any other rights and each right shall be deemed an ongoing right that may be asserted at any time.

### 10.5    Notice of Effective Date

Upon satisfaction of all the conditions to the Effective Date set forth in <u>Section 10.2</u>, or if waivable, waiver pursuant to <u>Section 10.4</u>, or as soon thereafter as is reasonably practicable, the Reorganized Debtors shall File with the Bankruptcy Court the "Notice of Effective Date" in a form reasonably acceptable to the Reorganized Debtors in their sole discretion, which notice shall constitute appropriate and adequate notice that this Plan has become effective; <u>provided</u>, <u>however</u>, that the Debtors shall have no obligation to notify any Person other than counsel to the Unsecured Creditors' Committee, the Equity Committee and each Commitment Party of such fact.  This Plan shall be deemed to be effective as of 12:01 a.m., prevailing Eastern Standard Time, on the date of such filing. A courtesy copy of the Notice of Effective Date may be sent by United States mail, postage prepaid (or at the Debtors' option, by courier or facsimile) to those Persons who have Filed with the Bankruptcy Court requests for notices pursuant to Bankruptcy Rule 2002.

### 10.6    Consequences of Non-Occurrence of Effective Date

If, following the entry of the Confirmation Order, the Effective Date does not occur on or before August 31, 2014, or such later date as is agreed upon in writing by the Debtors and each of the Commitment Parties, then the Confirmation Order will be deemed vacated by the Bankruptcy Court without further notice or order.  If the Confirmation Order is vacated pursuant to this Section, (a) the Debtors shall File a notice to this effect with the Bankruptcy Court, (b) this Plan shall be null and void in all respects, (c) any settlement of Claims provided for hereby shall be null and void without further order of the Bankruptcy Court, and (d) the time within which the Debtors may assume, assume and assign or reject all executory contracts and unexpired leases shall be extended for a period of sixty (60) days after the date the Confirmation Order is vacated; <u>provided</u>, <u>however</u>, that the Debtors retain their rights to seek further extensions of such deadline in accordance with, and subject to, section 365 of the Bankruptcy Code, and nothing contained in this Plan or Disclosure Statement shall (x) constitute a waiver or release of any Claims, Equity Interests, or Causes of Action, (y) prejudice in any manner the rights of any Debtor or any other Entity or (z) constitute an admission, acknowledgement, offer or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE XI
## EFFECT OF PLAN CONFIRMATION

### 11.1    Binding Effect; Plan Binds All Holders of Claims and Equity Interests

(a)    On the Effective Date, and effective as of the Effective Date, the Plan shall, and shall be deemed to, be binding upon the Debtors and all present and former Holders of Claims against and Equity Interests in any Debtor, and their respective Related Persons, regardless of whether any such Holder of a Claim or Equity Interest has voted or failed to vote to accept or reject this Plan.

(b)    Further, pursuant to section 1142 of the Bankruptcy Code and in accordance with the Confirmation Order, the Debtors and any other necessary party shall execute, deliver and join in the execution or delivery (as applicable) of any instrument, document or agreement required to effect a transfer of property, a satisfaction of a Lien or a release of a Claim dealt with by the Plan, and to perform any other act, and the execution of documents necessary to effectuate the Restructuring Transactions and all other documents set forth or contemplated in the Plan, including in the Plan Supplement, that are necessary for the consummation of the Plan and the transactions contemplated herein.

### 11.2    Revesting of Assets.

Except as provided in this Plan, on the Effective Date, all property of the Estates, to the fullest extent provided by section 541 of the Bankruptcy Code, and any and all other rights and assets of the Debtors of every kind and nature shall revest in the Reorganized Debtors free and clear of all Liens, Claims and Interests other than (a) those Liens, Claims and Interests retained or created pursuant to this Plan or any document entered into in connection with the transactions described in this Plan and (b) Liens that have arisen subsequent to the Petition Date on account of taxes that arose subsequent to the Petition Date.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Equity Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### 11.3    Releases and Related Injunctions

(a)    ***Releases by the Debtors*.  As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including: (i) the settlement, release, and compromise of debt and all other good and valuable consideration paid pursuant hereto (including without limitation the obligations and releases contained in the Release and Cooperation Agreements); and (ii) the services of the Debtors' present and former officers, directors, managers, and advisors in facilitating the expedient implementation of the restructuring transactions contemplated hereby, each of the Debtors, the Reorganized Debtors, and any Person or Entity seeking to exercise the rights of the Debtors' Estates, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, the Unsecured Creditors' Committee, the Equity Committee and all of**

their respective Related Persons, the Notes Trustees, the Credit Agreement Agent and the Credit Agreement Lenders shall be deemed to forever release, waive, and discharge each of the Released Parties from any and all Claims, obligations, suits, judgments, damages, demands, debts, remedies, rights, Causes of Action (including Avoidance and Other Actions), rights of setoff and liabilities whatsoever (including any derivative claims asserted on behalf of the Debtors) in connection with or in any way relating to the Debtors, the Chapter 11 Cases, the Disclosure Statement, or this Plan (other than the rights of the Debtors, or the Reorganized Debtors to enforce the obligations under the Confirmation Order and this Plan and the contracts, instruments, releases, and other agreements or documents delivered, assumed, assigned, or Reinstated thereunder) whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date; provided, however, that nothing herein:

(i)     shall be deemed to prohibit the Reorganized Debtors from asserting and enforcing any Claims, obligations, suits, judgments, demands, debts, rights, causes of action or liabilities they may have against any employee (including directors and officers) for alleged breach of confidentiality, or any other contractual obligations owed to the Debtors or the Reorganized Debtors, including non-compete and related agreements or obligations;

(ii)    shall operate as a release, waiver, or discharge of any causes of action or liabilities unknown to the Debtors as of the Petition Date arising out of gross negligence, willful misconduct, fraud or criminal acts of such Released Party;

(iii)   shall operate as a release, waiver, or discharge of the Issuing Bank for any of its obligations pursuant to the Cash Collateral Agreement or the Control Agreement; or

(iv)    shall release any of the Causes of Actions preserved under this Plan in Exhibit J, including the Professional Liability Action.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing release by the Debtors, which includes by reference each of the related provisions and definitions contained herein or elsewhere in this Plan, and further, shall constitute the Bankruptcy Court's finding that the foregoing release by the Debtors is:  (1) in exchange for the good and valuable consideration provided by the released parties; (2) a good-faith settlement and compromise of the claims released by the foregoing by the Debtors; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or the Reorganized Debtors asserting any claim or cause of action released pursuant to the foregoing release by the Debtors.

(b)     *Releases by Holders of Claims and Equity Interests*.  Notwithstanding anything contained herein to the contrary, as of the Effective Date, for good and valuable

consideration, the adequacy of which is hereby confirmed, the Holders of Claims against and Equity Interests in the Debtors and the Reorganized Debtors who: (i) either vote to Accept this Plan or are presumed to have voted for this Plan under section 1126(f) of the Bankruptcy Code, or (ii) are entitled to vote to Accept or reject this Plan and reject this Plan or abstain from voting and do not mark their ballots to indicate their refusal to grant the releases provided in this sub-paragraph shall be deemed to forever release, waive, and discharge each of the Released Parties from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action (including Avoidance and Other Actions), rights of setoff (except for rights of setoff and subrogation that a Holder of a Claim or Equity Interest acted to preserve prior to confirmation including any surviving rights under the Equity Commitment Agreement) and liabilities whatsoever (including any derivative claims asserted on behalf of the Debtors) in connection with or in any way relating to the Debtors, the conduct of the Debtors' businesses, the Chapter 11 Cases, the Disclosure Statement, or this Plan (other than the rights of the Debtors, the Reorganized Debtors, or a Creditor holding an Allowed Claim, whether such Claim is Allowed as of the Effective Date or subsequently becomes Allowed, including without limitation claims that are contingent or unliquidated as of the Effective Date, to enforce the obligations under the Confirmation Order and this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered, assumed, assigned, or Reinstated thereunder) whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, whether for tort, contract, violation of federal or state securities law or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date; **provided, however,** that nothing herein shall:

(i)     operate as a release, waiver or discharge of any Causes of Action or liabilities unknown to such Holder as of the Petition Date arising out of gross negligence, willful misconduct, fraud or criminal acts of any such Released Party;

(ii)     operate as a release, waiver or discharge of any Causes of Action or claims for contribution or proportionate fault that any party other than the Debtors who is a named defendant in the OSG Securities Class Action may have against any other person other than the Debtors that arises from or is related to the liability claims asserted against them in that action;

(iii)     operate as a release, waiver or discharge of any Causes of Action held by Lead Plaintiffs or any member of the Putative Class against any non-Debtor party;

(iv)     operate as a release, waiver, compromise or discharge of any Causes of Action, claims or defenses held by Proskauer Rose LLP and/or any of its current or former partners, members or employees against any non-Debtor party that is a party or that may be joined as a party in the Professional Liability Action or any other proceeding that is related to or arising from the Professional Liability Action; or

(v) **operate as a release, waiver, or discharge of any Claims against the applicable Reorganized Debtor(s) or their property, as applicable, to the extent that such Claims are Reinstated pursuant to the Plan.**

**For the avoidance of doubt, nothing in this Section 11.3(b) shall have the effect of releasing any Claim against any of the Debtors (including any contingent or unliquidated claim), that has been scheduled by the Debtors or evidenced by a timely-filed Proof of Claim. Further, notwithstanding any language to the contrary contained in the Disclosure Statement or this Plan, no provision shall release any non-debtor, including any current and/or former officer and/or director of the Debtors and/or any non-debtor included in the Released Parties, from liability to the United States Securities and Exchange Commission, in connection with any legal action or claim brought by such governmental unit against such person(s).**

## 11.4 Discharge of Claims

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by this Plan or the Confirmation Order: (1) all consideration distributed under this Plan shall be in exchange for, and in complete satisfaction, settlement, discharge and release of, all Old OSG Equity Interests and all Claims of any kind or nature whatsoever against the Debtors or any of their assets or properties and regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Old OSG Equity Interests or Claims; (2) this Plan shall bind all Holders of Claims and Equity Interests, notwithstanding whether any such Holders failed to vote to Accept or reject this Plan or voted to reject this Plan; and (3) except as set forth herein all Persons and Entities shall be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, their successors and assigns, and their assets and properties any other Claims or Equity Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date; provided, however, that nothing herein shall release, waive, compromise, discharge, impair or otherwise limit in any way, any defense that has been or may be asserted by Proskauer Rose LLP and/or any of its current or former partners, members or employees against the Debtors in connection with the Professional Liability Action. Except as otherwise expressly provided by this Plan or the Confirmation Order, upon the Effective Date, the Debtors shall be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims of any kind or nature whatsoever, including, without limitation, demands and liabilities that arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code.

## 11.5 Preservation of Rights of Action

(a) Except as otherwise provided in this Plan, the Confirmation Order or in any document, instrument, release or other agreement entered into in connection with this Plan or approved by order of the Bankruptcy Court, in accordance with section 1123(b) of the Bankruptcy Code, the Debtors and their Estates shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including the Professional Liability Action (subject to Section 5.10(c)

hereof), the Avoidance and Other Actions, and any actions specifically enumerated on <u>Exhibit J</u> to this Plan, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date; provided that no Causes of Action released pursuant to <u>Section 11.3(a)</u> of this Plan against the Released Parties shall vest in the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in this Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them.** The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in this Plan.

(b)     Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in this Plan or a final order of the Bankruptcy Court, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the confirmation or consummation of this Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors.  The Reorganized Debtors may pursue such Causes of Action, or decline to do any of the foregoing, as appropriate, in accordance with the best interests of the Reorganized Debtors and without further notice to or action, order or approval of the Bankruptcy Court.

### 11.6    Exculpation and Limitation of Liability

**On the Effective Date, the Exculpated Parties shall neither have nor incur any liability to any Holder of Claim or Equity Interest, the Debtors, the Reorganized Debtors, or any other party-in-interest, or any of their Related Persons for any prepetition or postpetition act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, the formulation, negotiation, or implementation of the Disclosure Statement or this Plan, the solicitation of acceptances of this Plan, the pursuit of confirmation of this Plan, the confirmation of this Plan, the consummation of this Plan or the administration of this Plan, except for acts or omissions that are the result of willful misconduct, gross negligence, fraud or criminal acts; <u>provided</u>, <u>however,</u> that (i) the foregoing is not intended to limit or otherwise impact any defense of qualified immunity that may be available under applicable law; (ii) each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her, or its duties pursuant to, or in connection with, the Plan; and (iii) the foregoing exculpation shall not be deemed to release, affect, or limit any of the rights and obligations of the Exculpated Parties from, or exculpate the Exculpated Parties with respect to, any of the Exculpated Parties' obligations or covenants arising pursuant to this Plan or the Confirmation Order.  Notwithstanding anything to the contrary herein, nothing herein shall operate as a release, waiver, compromise or discharge of any Causes of Action, claims or defenses held by Proskauer Rose LLP and/or any of its current or former partners, members or employees against any non-Debtor party that is a party or that may be joined as a party in the Professional Liability Action or a related proceeding.**

**11.7    Injunction**

(a)    **Except as otherwise provided in this Plan or in any document, instrument, release or other agreement entered into in connection with this Plan or approved by order of the Bankruptcy Court, the Confirmation Order shall provide, among other things, that from and after the Effective Date all Persons or Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtors are (i) permanently enjoined from taking any of the following actions against the Estate(s) or any of their property on account of any such Claims or Equity Interests and (ii) permanently enjoined from taking any of the following actions against any of the Debtors, the Reorganized Debtors or their property on account of such Claims or Equity Interests:  (A) commencing or continuing, in any manner or in any place, any action or other proceeding; (B) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (C) creating, perfecting, or enforcing any Lien or encumbrance; (D) asserting a setoff or right of subrogation of any kind against any debt, liability or obligation due to the Debtors; and (E) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of this Plan; provided, however, that nothing contained herein shall:**

(i)    **preclude such Persons or Entities from exercising their rights pursuant to and consistent with the terms of this Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered or Reinstated under or in connection with this Plan;**

(ii)    **preclude any Lead Plaintiffs or any member of the Putative Class from continuing the OSG Securities Class Action against any non-Debtor or from seeking discovery from the Debtors or the Reorganized Debtors in connection with the OSG Securities Class Action, subject to the rights, defenses and objections of the Debtors and Reorganized Debtors; or**

(iii)    **preclude any Holders of Reinstated Claims from exercising their rights against the applicable Reorganized Debtor(s) or their property, as applicable, pursuant to and consistent with the terms of the Plan.**

(b)    **By accepting distributions pursuant to this Plan, each Holder of an Allowed Claim or Equity Interest will be deemed to have specifically consented to the injunctions set forth in this Section 11.7.**

**11.8    Term of Bankruptcy Injunction or Stays**

All injunctions or stays provided for in the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.  Upon the Effective Date, all injunctions or stays provided for in the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, shall be lifted and of no further force or effect—being replaced, to the extent applicable, by the injunctions, discharges, releases and exculpations of this Article XI.

**11.9    Termination of Subordination Rights and Settlement of Related Claims**

The classification and manner of satisfying all Claims and Equity Interests under this Plan take into consideration all subordination rights, whether arising by contract or under general principles of equitable subordination, section 510(b) or 510(c) of the Bankruptcy Code or otherwise.  All subordination rights that a Holder of a Claim or Equity Interest may have with respect to any distribution to be made pursuant to this Plan will be discharged and terminated and all actions related to the enforcement of such subordination rights will be permanently enjoined. Accordingly, distributions pursuant to this Plan to Holders of Allowed Claims will not be subject to payment to a beneficiary of such terminated subordination rights or to levy, garnishment, attachment or other legal process by a beneficiary of such terminated subordination rights; provided, however, that nothing contained herein shall preclude any Person or Entity from exercising their rights pursuant to and consistent with the terms of this Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered under or in connection with this Plan.

**ARTICLE XII**
**RETENTION OF JURISDICTION**

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain jurisdiction over all matters arising in, arising under or related to the Chapter 11 Cases and this Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)    allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any objections to the allowance or priority of Claims or Equity Interests;

(b)    resolve any matters related to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which any Debtor is a party or with respect to which any Debtor or any Reorganized Debtor may be liable and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

(c)    ensure that distributions to Holders of Allowed Claims and Equity Interest are accomplished pursuant to the provisions of this Plan;

(d)    decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

(e)    enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all contracts, instruments, releases and other agreements or documents created in connection with this Plan, the Disclosure Statement or the Confirmation Order;

-74-

(f)     resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of this Plan, including, without limitation, any other contract, instrument, release or other agreement or document that is executed or created pursuant to this Plan, or any Entity's rights arising from or obligations incurred in connection with this Plan or such documents, including, without limitation, the Jones Act citizenship status of the Holder of any Claim or Old OSG Equity Interest that receives New Securities;

(g)     modify this Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or modify the Confirmation Order, or any contract, instrument, release or other agreement or document created in connection with this Plan, the Disclosure Statement or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, this Plan, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with this Plan or the Confirmation Order, in such manner as may be necessary or appropriate to consummate this Plan;

(h)     hear and determine all applications for compensation and reimbursement of expenses of Professionals under sections 327, 330, 331, 363, 503(b), 1103 and 1129(c)(9) of the Bankruptcy Code; provided, however, that from and after the Effective Date the payment of fees and expenses of the Reorganized Debtors, including counsel fees, shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(i)     issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with consummation, implementation or enforcement of this Plan or the Confirmation Order;

(j)     hear and determine Causes of Action by or on behalf of the Debtors or the Reorganized Debtors;

(k)     hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(l)     hear and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated, or distributions pursuant to this Plan are enjoined or stayed;

(m)     determine any other matters that may arise in connection with or related to this Plan, the Confirmation Order or any contract, instrument, release (including the releases in favor of the Released Parties) or other agreement or document created in connection with this Plan or the Confirmation Order;

(n)     enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases;

(o)     hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under the Bankruptcy Code; and

(p)      enter orders closing the Chapter 11 Cases.

## ARTICLE XIII
## MISCELLANEOUS PROVISIONS

### 13.1    Effectuating Documents and Further Transactions

Each of the Debtors and the Reorganized Debtors are authorized to execute, deliver, file or record such contracts, instruments, releases, consents, certificates, resolutions, programs and other agreements or documents and take such acts and actions as may be reasonable, necessary or appropriate to effectuate, implement, consummate or further evidence the terms and conditions of this Plan, any notes or securities issued pursuant to this Plan, and any transactions described in or contemplated by this Plan.

### 13.2    Authority to Act

Prior to, on or after the Effective Date (as appropriate), all matters expressly provided for under this Plan that would otherwise require approval of the stockholders, security holders, officers, directors, partners, managers, members or other owners of one or more of the Debtors or Reorganized Debtors shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to the applicable law of the states or jurisdictions in which the Debtors or the members of Reorganized Debtors are formed, without any requirement of further vote, consent, approval, authorization or other action by such stockholders, security holders, officers, directors, partners, managers, members or other owners of such entities or notice to, order of or hearing before the Bankruptcy Court.

### 13.3    Insurance Preservation

Nothing in this Plan, including any releases, shall diminish or impair the enforceability of any insurance policies or other policies of insurance that may cover insurance Claims or other Claims against the Debtors or any other Person.

### 13.4    Exemption from Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, Transfer or exchange (or deemed issuance, Transfer or exchange) of the Plan Securities; (b) the creation of any mortgage, deed of trust, Lien, pledge or other security interest; (c) the making or assignment of any lease or sublease; or (d) the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Plan (including, without limitation, any merger agreements, agreements of consolidation, restructuring, disposition, liquidation, dissolution, deeds, bills of sale and transfers of tangible property) that occurs on or after confirmation of this Plan will not be subject to any stamp tax, recording tax, personal property tax, real estate transfer tax, transaction privilege tax, privilege taxes, or other similar taxes in the United States.  Unless the Bankruptcy Court orders otherwise, all sales, transfers and assignments of owned and leased property approved by the Bankruptcy Court on or prior to the Effective Date shall be deemed to have been in furtherance of or in connection with this Plan.

### 13.5    Bar Dates for Administrative Expense Claims

Holders of asserted Administrative Expense Claims (other than (i) Professional Fees Claims and (ii) the ECA Professional Expenses not paid prior to the Effective Date shall submit proofs of Claim on or before the Administrative Expense Claims Bar Date or forever be barred from doing so, unless such alleged Administrative Expense Claim is incurred in the ordinary course of business by any Debtor and is not yet past-due, in which case the applicable Administrative Expense Claims Bar Date shall be thirty (30) days after such due date or as otherwise ordered by the Bankruptcy Court.  The Debtors and the Reorganized Debtors shall have thirty (30) days (or such longer period as may be allowed by order of the Bankruptcy Court) following the Administrative Expense Claims Bar Date to review and File objections to such Administrative Expense Claims, if necessary.  In the event an objection is Filed as contemplated by this Section 13.5, the Bankruptcy Court shall determine the Allowed amount of such Administrative Expense Claim.

### 13.6    Administrative Claims Reserve

(a)    On the Effective Date, the Administrative and Disputed Claims Agent shall hold in the Administrative Claims Reserve the amount of Cash that the Debtors determine will be required after the Effective Date to satisfy Allowed Administrative Expense Claims (the "Administrative Claims Reserve").

(b)    The Administrative and Disputed Claims Agent may, at the direction of the Debtors or the Reorganized Debtors, adjust the Administrative Claims Reserve to reflect all earnings thereon (net of any expenses relating thereto, and net of taxes calculated at the applicable combined highest marginal tax rates imposed on a corporation resident in New York for federal, state and local tax purposes on the amount of all such earnings recognized by the Debtors or Reorganized Debtors for federal, state or local tax purposes), to be distributed on the Distribution Dates, as required by the Plan.  The Administrative and Disputed Claims Agent shall hold in the Administrative Claims Reserve all payments and other distributions made on account of, as well as any obligations arising from, the property held in the Administrative Claims Reserve, to the extent that such property continues to be so held at the time such distributions are made or such obligations arise.

(c)    After any reasonable determination by the Reorganized Debtors that the Administrative Claims Reserve should be adjusted downward in accordance with this Section 13.6, the Administrative and Disputed Claims Agent shall, at the direction of the Debtors or the Reorganized Debtors, effect an Adjustment Distribution, and any date of such distribution shall be an Interim Distribution Date.

(d)    After all Administrative Expense Claims have become either Allowed or disallowed and all distributions required pursuant to Article VII of this Plan have been made, the Administrative and Disputed Claims Agent shall, at the direction of the Reorganized Debtors, effect a final distribution of the Cash remaining in the Administrative Claims Reserve.  Any amounts remaining in such reserve or reserves shall revest in the Reorganized Debtors.

(e)    It is expected that the Administrative Claims Reserve will be treated as a grantor trust owned by the Reorganized Debtors for U.S. federal income tax purposes.  Absent definitive guidance from the IRS or a contrary determination by a court of competent jurisdiction, the Administrative and Disputed Claims Agent shall, to the extent permitted by applicable law, report consistently with the foregoing characterization for state and local income tax purposes.  All affected holders of Administrative Expense Claims shall report, for income tax purposes, consistently with the foregoing.

### 13.7    Payment of Statutory Fees

All fees payable pursuant to section 1930 of title 28, United States Code, as determined by the Bankruptcy Court, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first.

### 13.8    Amendment or Modification of this Plan

Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123 and 1125 of the Bankruptcy Code, the Debtors reserve the right to alter, amend or modify this Plan at any time prior to or after the Confirmation Date but prior to the substantial consummation of this Plan, with material modifications being subject to the consent of each of the Commitment Parties (it being understood that any modifications impacting the recoveries or the treatment of any Claims or Old OSG Equity Interests shall be considered to be material), and consultation with the Unsecured Creditors' Committee and the Equity Committee. A Holder of a Claim that has Accepted this Plan shall be deemed to have Accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

### 13.9    Severability of Plan Provisions

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation, provided, however, that, to the extent any alteration or interpretation of any term or provision of this Plan adversely affects each of the Commitment Parties, then the Debtors shall be required to obtain the consent of each of the Commitment Parties, with respect to such alteration or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 13.10    Successors and Assigns

This Plan shall be binding upon and inure to the benefit of the Debtors and their respective successors and assigns, including, without limitation, the Reorganized Debtors.  The

rights, benefits and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Person or Entity.

### 13.11  Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Equity Interests and the respective distributions and treatments under this Plan take into account and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise.  Except as otherwise provided in this Plan, pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Subordinated Claim in Classes D4, D5, E1 and/or E2 in accordance with any contractual, legal, or equitable subordination relating thereto.

### 13.12  Waivers and Certain Actions

If the consent of each Commitment Party is required under any provision of this Plan, and one or more Commitment Parties refuse to consent to any act taken pursuant to or in accordance with the Plan, then with respect to such act, if the Commitment Party or Commitment Parties which refuse to consent do not represent more than one-quarter of the aggregate Commitment Percentage represented by all of the Commitment Parties, each Commitment Party agrees that such act will be deemed to be waived, consented, or approved, as applicable.

### 13.13  Revocation, Withdrawal, or Non-Consummation

Subject to the terms of the Equity Commitment Agreement, the Debtors reserve the right to revoke or withdraw this Plan as to any or all of the Debtors prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw this Plan as to any or all of the Debtors, or if confirmation or consummation as to any or all of the Debtors does not occur, then, with respect to such Debtors only, except as otherwise provided by the Debtors, (a) this Plan shall be null and void in all respects, (b) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount certain any Claim or Equity Interest or Class of Claims or Equity Interests), assumption or rejection of executory contracts or leases affected by this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void and (c) nothing contained in this Plan shall (i) constitute a waiver or release of any Claims by or against, or any Equity Interests in, such Debtors or any other Person or Entity, (ii) prejudice in any manner the rights of such Debtors or any other Person or Entity or (iii) constitute an admission of any sort by the Debtors or any other Person or Entity.

### 13.14 Notice

All notices, requests and demands to or upon the Debtors or Reorganized OSG to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to any Debtor:

Overseas Shipholding Group, Inc.
1301 Avenue of the Americas, 42nd Floor
New York, NY 10019
Attn: Capt. Robert Johnston

If to Reorganized OSG:

Overseas Shipholding Group, Inc.
1301 Avenue of the Americas, 42nd Floor
New York, NY 10019
Attn: Capt. Robert Johnston

If to the counsel to one or more of the Commitment Parties:

Gibson, Dunn & Crutcher, LLP
200 Park Avenue
New York, NY 10166-0193
Attn: David M. Feldman and Joshua P. Weisser

If to the Unsecured Creditors' Committee, prior to its dissolution:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Attn: Fred S. Hodara

If to the Equity Committee, prior to its dissolution:

Brown Rudnick LLP
One Financial Center
Boston, Massachusetts 02111,
Attn: Steven D. Pohl, Esq

If to the United States Trustee:

Office of the United States Trustee for the District of Delaware
844 King Street, Suite 2207
Lockbox 35

Wilmington, DE 19801
Attn: Mark Kenney

in each case, with
copies (which shall
not constitute notice
hereunder) to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
Facsimile:  (212) 225-3999
Attention: James Bromley, Esq. and Luke Barefoot, Esq.

-and-

Morris Nichols, Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Facsimile: (302) 658-3989
Attention:  Derek Abbott, Esq.

### 13.15   Governing Law

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that a Restructuring Document or Exhibit provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of law of such jurisdiction.

### 13.16   Tax Reporting and Compliance

Reorganized OSG is hereby authorized, on behalf of each of the Debtors, to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtors for all taxable periods ending after the Petition Date through and including the Effective Date.

### 13.17   Fees and Expenses

From and after the Effective Date, the Reorganized Debtors may, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of Professionals employed by the Debtors or the Reorganized Debtors thereafter incurred, including those fees and expenses incurred in connection with the implementation and consummation of this Plan.

### 13.18   No Admissions

Notwithstanding anything herein to the contrary, nothing in the Plan shall be deemed as an admission by the Debtors with respect to any matter set forth herein, including liability on any Claim.

### 13.19   Dissolution of Committees

The Unsecured Creditors' Committee and the Equity Committee appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code shall both be dissolved on the Effective Date and each of their members shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code without need for a further order of the Bankruptcy Court; provided, however that obligations arising under confidentiality agreements, joint interest agreements and protective orders, if any, entered during the Chapter 11 Cases shall remain in full force and effect according to their terms; provided further that the Unsecured Creditors' Committee and the Equity Committee shall continue to prepare, prosecute, and respond to fee applications filed in compliance with this Plan; and provided further that in the event that the issue of whether interest on interest is payable under the 8.750% Notes Indenture and the 7.500% Notes Indenture (solely with respect to 7.500% Notes not exchanged for Election Notes pursuant to Section 3.2 of this Plan) (the "Interest on Interest Dispute") is unresolved as of the Effective Date, the Unsecured Creditors' Committee shall remain in existence after the Confirmation Hearing until the entry of a Final Order resolving the Interest on Interest Dispute  and solely for such purpose.  The Debtors and the Reorganized Debtors shall have no obligation to pay or reimburse any fees of any official or unofficial committee of creditors incurred after the Effective Date except with regard to the preparation and prosecution of fee applications and, with respect to the Unsecured Creditors' Committee, the Interest on Interest Dispute, if applicable.

### 13.20   Filing of Additional Documents

On or before substantial consummation of this Plan, the Debtors shall File such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

### 13.21   Preservation of Documents

The Reorganized Debtors shall take reasonable steps to retain and preserve originals or true copies of all documents, data compilations (including electronically recorded or stored data in its native format) and tangible objects that are in their possession, custody or control and can be reasonably identified as relevant to the allegations in the OSG Securities Class Action.

*[The Remainder of This Page is Intentionally Left Blank.]*

Dated: July 16, 2014
        New York, New York

Respectfully Submitted,

**OVERSEAS SHIPHOLDING GROUP, INC. (for
itself and all other Debtors)**

By: _____
Name:   John J. Ray, III
Title:    Chief Restructuring Officer

James Bromley
Luke A. Barefoot
Jane VanLare
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000

     - and -

Derek C. Abbott (No. 3376)
Daniel B. Butz (No. 4227)
William M. Alleman, Jr. (No. 5449)
Morris Nichols, Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors and Debtors-in-Possession*

**<u>EXHIBIT 88</u>**

**Pensyl, Bradley:LT (NY)**

| | |
|---|---|
| **From:** | Eckenrod, Russell D. <reckenrod@cgsh.com> |
| **Sent:** | Thursday, October 02, 2014 5:22 PM |
| **To:** | Pensyl, Bradley:LT (NY) |
| **Cc:** | Schweitzer, Lisa M. |
| **Subject:** | RE: Nortel PPI - Confidentiality of Discovery Materials |

**EXHIBIT**

**225**

exhibitsticker.com

Brad –

We confirm that we have completed our production in response to your document requests.

_____

Russell D. Eckenrod
Cleary Gottlieb Steen & Hamilton LLP
Assistant: lpujals@cgsh.com
One Liberty Plaza, New York NY 10006
t: +1 212 225 2706 | f: +1 212 225 3999
www.clearygottlieb.com | reckenrod@cgsh.com

**From:** Bradley.Pensyl@AllenOvery.com [mailto:Bradley.Pensyl@AllenOvery.com]
**Sent:** Thursday, October 02, 2014 2:54 PM
**To:** Eckenrod, Russell D.
**Subject:** RE: Nortel PPI - Confidentiality of Discovery Materials

Russell,

Thank you for confirming.

Also, my understanding based on our discussion yesterday is that the US Debtors have produced all non-privileged documents that are responsive to our document requests.  Please let me know as soon as possible if that is incorrect.

Thanks,

Brad

**From:** Eckenrod, Russell D. [mailto:reckenrod@cgsh.com]
**Sent:** Thursday, October 02, 2014 10:34 AM
**To:** Pultman, Jacob:LT (NY); Pensyl, Bradley:LT (NY)
**Cc:** Schweitzer, Lisa M.
**Subject:** Nortel PPI - Confidentiality of Discovery Materials

Jay and Brad:

The US Debtors are fine with your foregoing confidential treatment of those documents and deposition transcripts produced during the PPI settlement discovery for the purposes of your statement to be filed this Friday.  The US Debtors reserve all rights with respect to the confidentiality of any further discovery produced in respect of the PPI settlement motion.

_____

Russell D. Eckenrod
Cleary Gottlieb Steen & Hamilton LLP
Assistant: lpujals@cgsh.com
One Liberty Plaza, New York NY 10006

t: +1 212 225 2706 | f: +1 212 225 3999
www.clearygottlieb.com | reckenrod@cgsh.com

This message is being sent from a law firm and may contain confidential or privileged information. If you are not the
intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy.

Throughout this communication, "Cleary Gottlieb" and the "firm" refer to Cleary Gottlieb Steen & Hamilton LLP and
its affiliated entities in certain jurisdictions, and the term "offices" includes offices of those affiliated entities.

--------------------------------------------------------------------------------------------------------------------------------
-------

The foregoing e-mail may contain US tax advice. If so, please read the following carefully:

Unless otherwise expressly stated in the foregoing message, this advice was not intended or written to be used, and cannot be used, by any person for the purpose of avoiding US federal tax-related penalties that may be imposed with respect to the matters addressed. Some of this advice may have been written to support the promotion or marketing of the transactions or matters addressed to persons other than our client. For such advice, be advised that the advice was written to support the promotion or marketing of the transaction(s) or matter(s) addressed and if you are a person other than our client, you should seek advice based on your particular circumstances from an independent tax advisor. In addition, unless expressly stated to the contrary in the foregoing message, nothing herein shall be construed to impose a limitation on disclosure by any person of the tax treatment or tax structure of any transaction that is addressed herein.

_____

This email is confidential and may also be privileged. If you are not the intended recipient please delete it and notify us immediately by telephoning or e-mailing the sender. You should not copy it or use it for any purpose nor disclose its contents to any other person.

Allen & Overy LLP
1221 Avenue of the Americas
New York, New York 10020
Tel: 212 610 6300
Fax: 212 610 6399
http://www.allenovery.com

Allen & Overy LLP is a limited liability partnership registered in England and Wales with registered number OC306763. It is authorised and regulated by the Solicitors Regulation Authority of England and Wales. Allen & Overy LLP is a multi-jurisdictional legal practice with lawyers admitted to practice in a variety of jurisdictions.
The term partner is used to refer to a member of Allen & Overy LLP or an employee or consultant with equivalent standing and qualifications. A list of the members of Allen & Overy LLP and of the non-members
who are designated as partners is open to inspection at its registered office, One Bishops Square London
E1 6AD and at the above address.

For further information about how Allen & Overy LLP is regulated, please see our website at www.allenovery.com/aoweb/legal

This message is being sent from a law firm and may contain confidential or privileged information. If you are not the
intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy.

Throughout this communication, "Cleary Gottlieb" and the "firm" refer to Cleary Gottlieb Steen & Hamilton LLP and
its affiliated entities in certain jurisdictions, and the term "offices" includes offices of those affiliated entities.

**<u>EXHIBIT 89</u>**

Nortei Networks- NN APAC

Restructuring Manager's Report

31 July 2014
Reliance Restricted



Seshadri Rajagopalan
Partner
Transaction Advisory Services
T    +65 6309 6892
M   +65 9684 1004
E    rajagopalan.seshadri@sg.
     ey.com

Siamala Deakarajen
Manager
Transaction Advisory Services
T    +65 6309 6703
M   +65 9853 1069
E    siamala.deakarajen@sg.ey.com

Angela Ee
Partner
Transaction Advisory Services
T    +65 6309 6933
M   +65 9680 6963
E    angela.ee@sg.ey.com

Cynthia Andriana
Senior Associate
Transaction Advisory Services
T    +65 6309 6793
M   +65 9692 4264
E    cynthia.andriana@sg.ey.com



Building a better
working world

EXHIBIT

227

exhibitsticker.com

**CONFIDENTIAL**



Building a better
working world

Ernst & Young Solicitors LLP
One Raffles Quay, North Tower, Level 18
Singapore 048583

Mailing address
Robinson Road, PO Box 384
Singapore 900734

31 July 2014

**Reliance Restricted**

PT Nortel Networks Indonesia
Nortel Networks (India) Private Limited
Nortel Networks (Asia) Limited (including branches)
Nortel Networks Kabushiki Kaisha
Nortel Vietnam Ltd
Nortel Networks Australia Pty Limited
Nortel Networks Korea Limited
Nortel Networks Malaysia Sdn Bhd
Nortel Networks New Zealand Limited
Nortel Networks (Thailand) Limited
Nortel Networks Singapore Pte Ltd (including branch)
c/o 101 Thomson Road #06-01
    United Square
    Singapore 307591

Attention: Mr Allan Bifield

Dear Sirs

**Nortel Networks Singapore Pte Ltd ("the Company") and its key related entities (collectively known as "APAC Debtors")**

In accordance with your instructions, we have performed the work as set out in our engagement letter dated 3 December 2009.

The work has been performed solely to act as Restructuring Manager pursuant to the execution of the Asia Restructuring Agreement ("Agreement") entered into by APAC Debtors and its intercompany creditors.

**Scope and nature of work**

The scope and nature of our work, including the basis and limitations, are detailed in our engagement letters dated 3 December 2009 ("Transaction").

Our report to you is based on discussions with APAC Debtors' management and analytical procedures applied to the data provided.

We have not, except to such extent as you requested and we agreed to undertake, sought to verify the accuracy of the data or the information and explanations provided. Consequently, our work is substantially less in scope than an audit or review.

NNC-NNL-PPI000037



**EY**
Building a better
working world

## Our report

Whilst each part of the Report addresses different aspects of the work we have performed, the entire report should be read to gain a full understanding of our findings and recommendations.

Our work commenced on 3 December 2009. We have no obligation to update the report or to revise the information contained herein because of events and transactions occurring subsequent to the date of completion of our work, unless we are specifically directed by APAC Debtors to do so.

## Information received

All the information we have received is the responsibility of APAC Debtors' management. We have not sought to establish the reliability of information given to us.

Consequently, we give no assurance on such financial information. Where we have made adjustments to financial information provided to us they have been based on analytical procedures carried out on information supplied to us, on which we take no responsibility and which should be regarded as illustrative. Such analysis is necessarily subjective.

References to Ernst & Young Solutions LLP ('EY') in the report relate to our service, recommendations and analysis and do not indicate that we take any responsibility for the information concerned or are assembling or associating ourselves with any financial information including prospective financial information.

## Purpose of our report and restrictions on its use

This report was prepared for APAC Debtors and its intercompany creditors solely for the purpose of the Transaction and should not be used or relied upon for any other purposes.

Save as set out in our engagement letter dated 3 December 2009, the report should not be quoted, referred to or shown to any other parties.

The sections of the report as defined in clause 5 "Information and Confidentiality" of our Terms of Business, Appendix 1 of our engagement letter dated 3 December 2009 (such waiver therefore applying where there are certain US Tax implications or where SEC audit restrictions apply), is private and confidential.

By reading those sections, unauthorised persons must accept that they place reliance on such sections at their own risk and that EY, its partners, employees and agents neither owe nor accept any duty of care or responsibility to them and shall not be liable in respect of any loss, damage or expense of any nature which is caused by any use the authorised person may choose to make of the report.

If unauthorised persons choose to reply in any way on the contents of the report they do so entirely at their own risk and we assume no responsibility whatsoever in respect of or arising out of or in connection with the Report.

If you have any questions on the attached report, please do not hesitate to contact us.

Yours faithfully

*Ernst & Young Solutions LLP*

**CONFIDENTIAL**

# Contents

Abbreviations ........................................................... 5

Executive Summary ................................................. 8

Introduction ........................................................... 12

APAC Debtors ....................................................... 17

1.  NN Singapore Group ........................................ 18
2.  NN Asia Group .................................................. 22
3.  NN Korea ......................................................... 26
4.  NN India Pvt. ................................................... 27

Conclusion ............................................................ 30

Appendices ........................................................... 32

5.  Appendix A: List of APAC Debtors ..................... 33
6.  Appendix B: List of Filed Entities ...................... 34
7.  Appendix C: Breakdown of Net-Filing Debt of APAC .. 37
8.  Appendix D: Breakdown of Excluded Affiliate Pre-Filing Intercompany Debt .. 38

4    31 July 2014

Abbreviations

31 July 2014

CONFIDENTIAL

## Abbreviations

| | |
|---|---|
| 4ᵗʰ Estate Settlement Agreement | Allocation Settlement Agreement (APAC/CALA) entered into by APAC Debtors and its intercompany creditors dated 19 June 2012 |
| APAC Debtors | Name of entities listed in Appendix A |
| Agreement | Asia Restructuring Agreement entered into by APAC Debtors and its intercompany creditors dated 3 December 2009 |
| Cash flow or CF | Cash flow forecast as at 22 November 2009 |
| Category I Pre-Filing Intercompany Debt | Amount of such Pre-Filing Intercompany Debt to be repaid with the aggregate Initial Payment Amount |
| Category II Pre-Filing Intercompany Debt | Amount of such Pre-Filing Intercompany Debt to be repaid with the aggregate Subsequent Payment Amount |
| Category III Pre-Filing Intercompany Debt | Amount of such Pre-Filing Intercompany Debt to be subordinated |
| Excluded Affiliate Pre-Filing Intercompany Debt | Amount of loans, credits and obligations owing by APAC Debtors to the entities set out in Appendix D |
| Filed Entities | Name of entities listed in Appendix B |
| Filing date | 14 January 2009/15 January 2009 |
| GDNT | Guangdong-Nortel Telecommunications Company Ltd |
| M | Millions |
| Net Cash Balance | Cash and cash equivalents minus Excluded Affiliate Pre-Filing Intercompany Debt, Estimated Working Capital Requirements, Estimated Restructuring Costs, Estimated Premise Reinstatement Costs and Estimated Taxes |
| NN APAC | Nortel Networks Singapore Pte Ltd and its key related entities stated in the Agreement |
| NN Asia | Nortel Networks (Asia) Ltd |
| NN Asia Group | Nortel Networks (Asia) Ltd, Nortel Networks (Asia) Ltd (Taiwan branch), Nortel Networks (Asia) Ltd (Pakistan branch), Nortel Networks (Asia) Ltd (Offshore sales) |
| NN Asia Offshore | Nortel Networks (Asia) Ltd (Offshore sales) |
| NN Australia | Nortel Networks Australia Pty Ltd |
| NN China | Nortel Networks (China) Ltd |
| NN India (Pvt) | Nortel Networks (India) Pvt. Ltd |
| NN III | Nortel Networks India International Inc |

© 31 July 2014

**CONFIDENTIAL**

## Abbreviations

| Abbreviation | Meaning |
|---|---|
| NN Japan | Nortel Networks Kabushiki Kaisha |
| NN Korea | Nortel Networks Korea Ltd |
| NN Malaysia | Nortel Networks Malaysia Sdn Bhd |
| NN Mauritius | Nortel Networks Mauritius Ltd |
| NN Pakistan | Nortel Networks (Asia) Ltd (Pakistan branch) |
| NN Philippines | Nortel Networks Singapore Pte Ltd (Philippines branch) |
| NN Singapore | Nortel Networks Singapore Pte Ltd |
| NN Singapore Group | Nortel Networks Singapore Pte Ltd and Nortel Networks Singapore Pte Ltd ( Philippines branch) |
| NN Taiwan | Nortel Networks (Asia) Ltd (Taiwan branch) |
| NN Vietnam | Nortel Vietnam Ltd |
| NN UK | Nortel Networks UK Limited |
| NN Zealand | Nortel Networks New Zealand Ltd |
| NNL (Pakistan) | Nortel Networks Limited – Pakistan sales |
| NNL (Taiwan) | Nortel Networks Limited – Taiwan sales |
| Q | Quarter |
| U.S. | United States of America |
| UK | United Kingdom |
| USD | United States Dollar |
| WC | Working capital |

Executive Summary

**NNC-NNL-PPI000043**

Executive Summary

### Review by Restructuring Manager

◊ The following financials of APAC Debtors have been reviewed for the purpose of the Report:-

— Cash flow forecast for Q2 2014 to Q3 2014 dated 5 July 2014; and

— Cash balances as at 30 June 2014.

◊ The summary of cash balances is set out below:-

Summary of Cash Balances :
Currency: USD'm

| Name of Entities | Actual Cash Balance As at 10 July 2008 (As Per Agreement) | As at 30 May 2014 | As at 30 Jun 2014 | Forecast Cash Balance As at 30 Sep 2014 |
|---|---|---|---|---|
| NN Singapore | 67.83 | 15.39 | 15.26 | 15.23 |
| NN Asia Group | 92.69 | 36.63 | 36.54 | 36.54 |
| NN Korea | 0.35 | 0.09 | 0.08 | 0.07 |
| NN India Pvt | 54.32 | 61.68 | 61.74 | 49.10 |
| **Total** | **239.37** | **113.79** | **113.62** | **100.94** |

Source: Financial provided by management

### Asia Restructuring Agreement

◊ Entered into by APAC Debtors and its intercompany creditors on 3 December 2009.

◊ Agreement allows APAC Debtors to address applicable solvency issues so as to continue their respective business operations and to preserve their assets and businesses in order to facilitate and participate in any potential sale of the assets, undertakings or businesses of the Nortel Group entities.

CONFIDENTIAL

NNC-NNL-PPI000044

* To date, management has made the following Initial and Subsequent payments:-

Breakdown of Initial and Subsequent Payments made to date.
Currency US$m

| Entity Name | Actual Initial Payment made | Subsequent Payments | | | | | | Total Payments |
|---|---|---|---|---|---|---|---|---|
| | | 5 to 7th | 8th | 9th | 20th | 21st | 22nd | |
| NN Asia Group | 54.59 | 43.37 | 17.19 | 7.49 | 1.70** | 0.88** | 1.72** | 126.94 |
| NN Singapore Group | 23.26 | 25.61 | 5.45 | - | - | - | - | 54.32 |
| NN Japan | 12.22 | - | - | - | - | - | - | 12.22 |
| NN New Zealand | 1.78 | - | - | - | - | - | - | 1.78 |
| NN Malaysia | - | 6.25 | 0.22 | - | - | - | - | 6.47 |
| NN Indonesia | - | 0.12 | - | - | - | - | - | 0.12 |
| NN Australia | - | 16.54 | 12.71 | - | - | - | - | 29.25 |
| NN Korea | - | 9.19 | - | - | - | - | - | 9.19 |
| Total | 91.85 | 101.08 | 35.57 | 7.49 | 1.70 | 0.88 | 1.72 | 240.29 |

Source: Emerging company management

Notes:  *    Pursuant to the 4th Estate Settlement Agreement, US$236.57m was paid directly to intercompany creditors in the week of 6 August 2012. This amount is net of US$22.64m held back as payment to NN Korea.

        :    NN Asia Group made subsequent payments (US$24.51m) in the week of 13 August 2013, 27 September 2013 and 18 November 2013 out of which US$0.88m payable to NN Taiwan was held back by NN Asia. As NN Taiwan's liquidation was concluded on 24 July 2014, these monies will not be set aside.

Total recovery to Fixed Entities to date:-
Currency US$m

| Fixed Entities | Initial Payment | Subsequent Payments | | | | | | Total Recovery |
|---|---|---|---|---|---|---|---|---|
| Canada | 15.26 | 21.80 | 11.56 | 0.77 | 0.17 | 0.09 | 0.18 | 49.85 |
| U.S. | 17.69 | 18.56 | 7.50 | 2.46 | 0.56 | 0.29 | 0.57 | 47.63 |
| UK/EMEA | 14.89 | 14.20 | 6.13 | 1.92 | 0.44 | 0.23 | 0.44 | 38.25 |
| Total | 47.84 | 54.57 | 25.20 | 5.15 | 1.17 | 0.61 | 1.19 | 135.73 |

Source: Emerging company management

Executive Summary

16    31 July 2014

NNC-NNL-PPI000045

# Executive Summary

## Liquidation of APAC Debtors

◇ The following APAC Debtors have commenced liquidation and will no longer be included in the Report:-

### Liquidation Entities

| Entity Name | Commencement Date of Liquidation | Type of Liquidation | Close Date of Liquidation |
|---|---|---|---|
| NN Australia | 19-Oct-12 | Solvent Liquidation | - |
| NN Thailand | 19-Oct-12 | Solvent Liquidation | - |
| NN New Zealand | 23-Oct-12 | Solvent Liquidation | 28-Jun-13 |
| NN Vietnam | 22-Jan-13 | Solvent Liquidation | - |
| NN Malaysia | 2-Apr-13 | Solvent Liquidation | - |
| NN Indonesia | 1-May-13 | Solvent Liquidation | - |
| NN Taiwan | 14-May-13 | Court Liquidation | 21-Jul-14 |
| NN Japan | 2-Jul-13 | Solvent Liquidation | - |

Note: Table by management

◇ The liquidators of the above entities will be submitting their liquidation reports separately to management.

◇ The liquidation of NN Taiwan was completed on 21 July 2014 and the final balance of funds of USD0.62m was remitted back to NN Asia Group in the last week of July 2014.

## Recommendation

◇ NN Singapore Group and NN Asia Group are not in positions to make any subsequent payments due to their deficit net cash balance positions.

◇ Management informed that RBI has approved the netting of intercompany liabilities and given an extension of time for payments. Both the netting and intercompany payments are subject to providing supporting documents to Citibank. The payments will be made in batches over time based on availability of sufficient surplus cash and supporting documents.

◇ The remaining APAC debtors are not in a position to make any subsequent payments due to outstanding tax and foreign exchange issues.

Executive Summary

15   31 July 2014

Introduction

- Scope of Engagement

- Overview of Agreement

31 July 2014

Introduction

Role as Restructuring Manager

◦ Assist the APAC Debtors in the administration of the intercompany debt restructuring as contemplated by the Agreement;

◦ Provide consultation to any of the APAC Debtors in connection with the calculation of its Net Cash Balance, including determination of the amounts of its Excluded Affiliate Pre-Filing Intercompany Debt (or any re-calculation of such amounts in accordance with Section 5 of the Agreement);

◦ Provide consultation to any of the APAC Debtors in connection with any revision of the Annexes to the Agreement with Sections 1.c and 1.d of the Agreement;

◦ Review the rolling 13-week cash flow forecasts and reports on actual weekly cash flow results of each APAC Debtor and to participate in conference calls with the other Relevant Parties, if necessary;

◦ Review each APAC Debtor's calculation of its Net Cash Balance as of the relevant Subsequent Determination Date and issue a report on a monthly basis;

◦ Provide consultation to any of the APAC Debtors in relation to any proposed sale of its assets, undertakings or businesses; and

◦ Review any other documents and provide consultation on any other matters as may be contemplated by the Agreement or relating to the Agreement.

Limitations of scope

◦ We will not seek to verify the accuracy of data, information and explanations provided by directors, Finance and Treasury staff of APAC Debtors.

◦ We shall not be liable to any parties for any limitations to our report as a result of the lack of quality information.

◦ Procedures performed will not constitute an audit or a review made in accordance with Singapore Standards on Auditing or Singapore Standards on Review Engagements and, consequently, no assurance will be expressed.

◦ APAC Debtors will pay their respective third party and intercompany debts on the following basis:-

-- Payment of all 3rd party liabilities and post-filing intercompany debts on a pro-rata basis;
-- Payment of the Pre-Filing Intercompany Debt on a pro-rata basis.

Proposed Scope of Engagement

13    31 July 2014

NNC-NNL-PPI000048

Introduction

- Proposed that the net pre-filing intercompany debt of APAC be settled in the following manner;-
  - Category I Pre-Filing Intercompany Debt – repaid with the aggregate Initial Payment Amount;
  - Category II Pre-Filing Intercompany Debt – repaid with the aggregate Subsequent Payment Amount;
  - Category III Pre-Filing Intercompany Debt – subordinated

### Initial and Subsequent Payment

- To date, APAC Debtors have paid approximately USD240.29m being Initial and Subsequent Payments (including Subsequent Payments pursuant to the 4th Estate Settlement Agreement) to its intercompany creditors.

### Net pre-filing Intercompany debt of APAC Debtors

- Taking into account the Initial and Subsequent Payments (including Subsequent Payments pursuant to the 4th Estate Settlement Agreement) made to-date, the breakdown of the net pre-filing debt of APAC is as follows:-

| Entity Name | As per Agreement | | | | As at [Date] | | | |
|---|---|---|---|---|---|---|---|---|
| | Category I Pre-Filing Intercompany Debt | Category II Pre-Filing Intercompany Debt | Category III Pre-Filing Intercompany Debt | Total Holding Intercompany Debt | Category I Pre-Filing Intercompany Debt | Category II Pre-Filing Intercompany Debt | Category III Pre-Filing Intercompany Debt | Total Remaining Holding Intercompany Debt |
| NN Singapore Group | 23.26 | 20.06 | 128.27 | 171.59 | - | - | 117.27 | 117.27 |
| NN Asia Group | 54.59 | 76.79 | 28.21 | 159.59 | - | 4.44 | 28.21 | 32.65 |
| NN Japan | 12.22 | - | - | 12.22 | - | - | - | - |
| NN New Zealand | 1.78 | - | - | 1.78 | - | - | - | - |
| NN Korea | - | 13.35 | 5.04 | 18.39 | - | 4.16 | 5.04 | 9.20 |
| NN Malaysia | - | 4.26 | 3.49 | 7.75 | - | - | 1.28 | 1.28 |
| NN Thailand | - | 4.32 | 6.85 | 11.17 | - | 4.32 | 6.85 | 11.17 |
| NN Vietnam | - | 1.63 | 14.12 | 15.75 | - | 1.63 | 14.12 | 15.75 |
| NN Indonesia | - | 0.12 | - | 0.12 | - | - | - | - |
| NN Australia | - | 13.34 | 15.91 | 29.25 | - | - | - | - |
| Total | 91.85 | 133.87 | 201.91 | 427.61 | - | 14.55 | 172.77 | 187.32 |

CONFIDENTIAL

NNC-NNL-PPI000049

Introduction

Notes:

A    Initial Payment of USD98.06m made in December 2009 (including the withholding tax of USD0.61m held back previously).

B    Total subsequent payments of USD24m made by NN Singapore Group in December 2009 and January 2010.

C    Subsequent Payments of USD10m, USD20m, USD15m and USD8m, USD22m and USD16.86m (including withholding tax of USD0.04m held back and USD1.10m held back as payment to NN Korea) made by NN Asia Group in April 2010, June 2010, July 2010 and September 2011 respectively.

D    Subsequent Payments of USD4.41m and USD2.26m (we understand that the withholding tax of USD0.46m has been paid back on the net pre-filing balance set out in the Allocation Settlement Agreement) made by NN Malaysia in May 2010 and September 2011 respectively.

E    NN Indonesia settled its pre-filing liabilities of USD6.12m in full in June 2010.

F    Initial Payment of USD6.89m withheld in NN Asia Group made to NN Korea and Subsequent Payment of USD3.19m made by NN Korea in June 2011.

G    Subsequent Payments of USD1.81m made by NN Singapore Group and USD13.71m made by NN Australia in September 2011.

H    Subsequent Payments of USD22.83m made by NN Australia in February 2012.

J    Subsequent Payments of USD2.64m (inclusive of the USD0.80m being held back as payment to NN Korea), USD8.65m (inclusive of the USD0.17m being held back as payment to NN Korea) made by NN Asia Group in April 2012 and December 2012 respectively.

K    Subsequent Payment of USD6.46m made by NN Singapore Group, USD19.23m (including USD0.26m held back as payment to NN Korea, we understand from management that the withholding tax of USD0.26m held back previously had been paid out) made by NN Asia Group, USD0.22m made by NN Malaysia and USD0.71m made by NN Australia pursuant to the 4th Estate Settlement Agreement.

L    NN Asia Group's subsequent payment of USD1.78m (net of USD0.27m held back as payment to NN Korea) was made in the week of 12 August 2013 of which USD0.59m payable to NN Taiwan was held back by NN Asia. As NN Taiwan's liquidation was concluded on 24 July 2014, these monies will not be set aside.

M    NN Asia Group's subsequent payment of USD0.94m (net of USD0.14m held back as payment to NN Korea) was made on 27 September 2013 of which USD0.09m payable to NN Taiwan was held back by NN Asia. As NN Taiwan's liquidation was concluded on 24 July 2014, these monies will not be set aside.

N    NN Asia Group's subsequent payment of USD1.72m (net of USD0.27m held back as payment to NN Korea) was made in the week of 19 November 2013 of which USD0.08m payable to NN Taiwan was held back by NN Asia. As NN Taiwan's liquidation was concluded on 21 July 2014, these monies will not be set aside.

—    Please refer to Appendix C for the detailed breakdown of the net pre-filing debts of APAC.

Introduction: Overview of Agreement

15    31 July 2014

NNC-NNL-PPI000050

Introduction

Introduction. Overview of Agreement

21 July 2014

16

NNC-NNL-PPI000051

APAC Debtors

3. NN Singapore Group
4. NN Asia Group
5. NN Korea
6. NN India Pvt

APAC Debtors

**CONFIDENTIAL**

**NNC-NNL-PPI000052**

APAC Debtors

## NN Singapore Group

- Based on the cash balance as at 30 June 2014 and the cash balance set out in our earlier Report dated 30 June 2014, we set out below the comparison of the Net Cash Balance:-

Net Cash Balance

| Amounts (USD) | Basis Payments | As at 30 Jun 2014 | As at 30 Sep 2014 | | Notes |
|---|---|---|---|---|---|
| Cash & Cash Equivalents | 67.83 | 15.39 | 15.26 | | 1 |
| less: | | | | | |
| Excluded Affiliate Pre-filing Intercompany Debt | (30.42) | (2.45) | (2.45) | | 2 |
| Post-Filing Liability Payable to NN India Pvt | - | (3.70) | (3.70) | | 3 |
| Estimated Working Capital Requirements | (16.03) | (12.88) | (12.82) | (18.97) | 4 |
| | 21.38 | (3.64) | (19.03) | (3.71) | |
| add: | | | | | |
| Receipts based on Initial Payment | 1.88 | - | - | | |
| Net Cash Balance | 23.26 | (3.64) | | (3.71) | |
| Initial Payment | (23.26) | - | - | - | 5 |
| Surplus/deficit cash balance | - | (3.64) | | (3.71) | |

Notes:-

### 1  Cash & cash equivalents

... The decrease in cash balance from 31 May 2014 to 30 June 2014 of USD0.13m pertains to ongoing operating expenses.

### 2  Excluded Affiliate Pre-filing Intercompany Debt

... Pursuant to approval obtained from RBI, NN Singapore Group made partial payment of USD25m to NN India Pvt in the first week of April 2014.

### 3  Post-Filing Liability Payable to NN India Pvt

... It pertains to revised advanced management fee payable to NN India Pvt. As NN India Pvt did not sign the Agreement, payables to NN India Pvt are payable upon demand. Given that approval from RBI has been

APAC Debtor NN Singapore Group

18      31 July 2014

NNC-NNL-PPI000053

APAC Debtors

# NN Singapore Group

obtained, Management is looking into settling NN Singapore's liabilities to NN India Pvt subject to the availability of surplus cash.

## 4  Estimated Working Capital Requirements

... Based on the updated disbursements, working capital requirements have decreased by USD0.01m. The breakdown is set out below:-

### Working Capital Requirements

| Currency USD'm | Nearest Amount | WCR as at Q2 2014 | WCR as at Q3 2014 | Variance | Note |
|---|---|---|---|---|---|
| Estimated 4 Weeks' Disbursement | 10.43 | 0.01 | 0.01 | - | A |
| Estimated Severance Costs | 0.60 | - | - | - | B |
| Other Estimated Restructuring Costs | 3.00 | - | - | - | C |
| Estimated Taxes | 2.00 | 8.00 | 8.00 | - | D |
| Corporate Costs | - | 3.87 | 3.81 | 8.00 | E |
| Estimated Winding down/ Liquidation Costs | - | 1.00 | 1.00 | 3.81 | F |
| Total WCR | 16.03 | 12.88 | 12.82 | 12.82 | |

Source: Payments received by management

Note s:-

A   We note that the highest disbursements for the period from Q2 2014 to Q3 2014 amounts to USD0.01m.

B   Management informed that as there are currently no employees, there is no requirement to set aside employee severance costs.

C   Pertains to revised advanced management fee payable to NN India Pvt. This amount is now reflected under Post-Filing Liability Payable to NN India Pvt.

D   Pertains to revised potential tax assessments on Philippines branch and from tax exposure in India.

E   Pertains to revised corporate cost estimates up to Q4 2015 which includes estimated professional fees for the period July 2014 to December 2015.

F   Pertains to high level estimated costs of placing NN Singapore Group into liquidation. We understand that a tax audit of NN Philippines is currently ongoing and has to be completed before the liquidation of NN Philippines can commence.

NNC-NNL-PPI000054

APAC Debtors

NN Singapore Group

# NN Singapore Group

5. Net Cash Balances

- Management has informed that going forward NN Singapore Group expects a potential recovery of gross intercompany receivables of USD91m from NNL. At this juncture, management is unable to quantify the recovery amount.

Cash flow analysis

- We set out below a summary of net cash flow from Q2 2014 to Q3 2014:-

Cash Flow Forecast

| Currency USD'm | Actual | Forecast | Forecast | Forecast |
| | Jun 14 | Jul 14 | Aug 14 | Sep 14 |
|---|---|---|---|---|
| Total receipts | - | - | - | - |
| Total disbursements | (0.13) | (0.01) | (0.01) | (0.01) |
| Net cash flow | (0.13) | (0.01) | (0.01) | (0.01) |
| | | | | |
| Opening cash balance | 15.39 | 15.26 | 15.25 | 15.24 |
| Subsequent Payment receipt | - | - | - | - |
| Subsequent Payment amount | - | - | - | - |
| Adjustment - Forecast to actual | - | - | - | - |
| Net closing cash balance | 15.26 | 15.25 | 15.24 | 15.23 |

Source: Information provided by management

APAC Debtor: NN Singapore Group

30    31 July 2014

NN Singapore Group

APAC Debtors

# NN Singapore Group

Recommendation

- In view of the deficit net cash balance, no subsequent payment is proposed for NN Singapore Group.

:: The Management is looking to commence liquidation proceedings through Court Application by the end of Q3 2014

**CONFIDENTIAL**

APAC Debtors

# NN Asia Group

Based on the cash balance as at 30 June 2014 and the cash balance set out in our earlier Report dated 30 June 2014, we set out below the comparison of the Net Cash Balance:-

**Net Cash Balance**
*currency USDm*

| | As per Agreement | As at 31 May 2014 | As at 30 June 2014 | Notes |
|---|---|---|---|---|
| Cash & Cash Equivalents | 92.69 | 36.63 | 36.54 | 1 |
| less: | | | | |
| Excluded Affiliate Pre-filing Intercompany Debt | (0.32) | (0.37) | (0.37) | 2 |
| Estimated Working Capital Requirements | (54.27) | (40.93) | (36.37) | 3 |
| | (54.59) | (41.30) | (36.74) | |
| | 38.10 | (4.67) | (0.20) | |
| add: | | | | |
| Receipts based on Initial Payment | 16.50 | - | - | |
| Receipts from Subsequent Payment | - | - | - | |
| Net Cash Balance | 54.60 | (4.67) | (0.20) | |
| Initial Payment | (54.60) | | | |
| Subsequent Payment | - | (0.38) | (0.38) | |
| Surplus/deficit cash balance | - | (5.05) | (0.58) | 4 |

Notes:-

1  *Cash and Cash Equivalents*

-- The cash balances as at 30 June 2014 includes Pakistan's cash balance of approximately USD15.87m.

-- The decrease in cash balance from 31 May 2014 to 30 June 2014 of USD0.09m pertains mainly to net realised gain on foreign exchange losses and ongoing operating expenses.

2  *Excluded Affiliate Pre-Filing Intercompany Debt*

-- Refer to Appendix D for breakdown of the Excluded Affiliate Pre-Filing Intercompany Debt.

CONFIDENTIAL

NNC-NNL-PPI000057

APAC Debtors

# NN Asia Group

NN Asia Group

3   Estimated Working Capital Requirements

— Based on the updated disbursements, working capital requirements have decreased by USD4.56m. The breakdown is set out below:-

Working Capital Requirements

| Currency USD'm | WCR as per Agreement | WCR as at Jul 15 | Proposed | Notes |
|---|---|---|---|---|
| Estimated 4 Weeks' Disbursement | 11.62 | - | - | A |
| Estimated Severance Costs | 4.55 | - | - | B |
| Other Estimated Restructuring Costs | 37.20 | 15.91 | 15.91 | C |
| Estimated Premise Reinstatement Costs | 0.90 | - | - | D |
| Estimated Taxes | - | 9.48 | 5.00 | E |
| Corporate Costs | - | 7.12 | 7.08 | F |
| Initial & Subsequent Payments to NN Korea | - | 5.32 | 5.32 | G |
| Representative Fees in Hong Kong | - | 2.10 | 2.10 | H |
| Estimated Winding down/ Liquidation Costs | - | 1.00 | 1.00 | I |
| Total WCR | 54.27 | 40.93 | 36.37 | |

Source: Financials provided by management

Notes:-

A     We note that there are no disbursements for the period of Q2 to Q3 2014.

B     Management informed that as there are currently no employees, there is no requirement to set aside employee severance costs.

C     Breakdown of the Other Estimated Restructuring Costs is set out below.

D     We understand from management that the reinstatement costs are no longer required.

E     Based on revised tax estimates, NN Asia Group may face tax exposure in relation to NN Asia based on current being queries by the Tax Authority. NN Taiwan had obtained its tax clearance and completed its liquidation on 21 July 2014, as such, the estimated taxes has been reduced by USD4.48m.

F     Pertains to the revised corporate costs estimates up to Q4 2015 which includes professional fees for July 2014 to December 2015 and IT related costs for 2014.

G     Pertains to Subsequent Payments payable to NN Korea arising from the Subsequent Payments paid in September 2011, April 2012, August 2012 (pursuant to the 4th Estate Settlement Agreement), December 2012, August 2013, September 2013 and November 2013.

APAC Debtors: NN Asia Group

APAC Debtors

# NN Asia Group

**H**   Pertains to representatives hired by NN Asia Group to facilitate NN China's business. Management has informed that there is no requirement to keep the site representative fees in Hong Kong.

**I**   Pertains to estimated costs to place NN Asia Group into liquidation.

## 4   Subsequent Payment

NN Asia Group made subsequent payments (USD4.30m) in the week of 13 August 2013, 27 September 2013 and 10 November 2013 out of which USD0.38m payable to NN Taiwan was held back by NN Asia. As NN Taiwan's liquidation was concluded on 21 July 2014, these monies will not be set aside.

Breakdown of Other Estimated Restructuring Costs

| Category (USD) | WCR as per Agreement | WCR as at 30 Jun 13 | Revised |
|---|---|---|---|
| Cash balance in NN Pakistan | 18.70 | 15.91 | 15.87 |
| Performance bond for Vietnam VTN deal | 3.00 | - | - |
| Negative cash flow from VTN deal | 4.30 | - | - |
| Set aside for post-filing liabilities | 5.00 | - | - |
| Performance bond for GSM contracts in NN Taiwan | 1.20 | - | - |
| Negative cash flow from CHT GSM 5-5 project | 5.00 | - | - |
| Total WCR | 37.20 | 15.91 | 15.87 |

Source: Earnings provided by management

CONFIDENTIAL

APAC Debtors

NN Asia Group

## NN Asia Group

### Cash flow analysis

○ We set out below a summary of net cash flow from Q2 to Q3 2014:-

**Cash Flow Forecast**

| Currency: GBPm | Actual Jun-14 | Forecast Jul-14 | Forecast Aug-14 | Forecast Sep-14 |
|---|---|---|---|---|
| Total receipts | (0.05) | - | - | - |
| Total disbursements | - | - | - | - |
| Net cash flow | (0.05) | - | - | - |
| Opening cash balance | 36.59 | 36.54 | 36.54 | 36.54 |
| Subsequent Payment receipt | - | - | - | - |
| Subsequent Payment amount | - | - | - | - |
| Adjustment - Forecast to actual | - | - | - | - |
| Net closing cash balance | 36.54 | 36.54 | 36.54 | 36.54 |

Source: Entities liquidity management

### Recommendation

○ In view of the deficit net cash balance, no subsequent payment is proposed for NN Asia Group.

APAC Debtor: NN Asia Group

29   31 July 2014

NN Korea

## Net Cash Balance

❖ Based on the cash balance as at 30 June 2014 and the cash balance set out in our earlier Report dated 30 June 2014, we set out below the comparison of the Net Cash Balance:-

| Net Cash Balance | | | |
|---|---|---|---|
| Currency $'000 | As per Appointment | As at 31 May 2014 | As at 30 Jun 2014 | Notes |
| Cash & Cash Equivalents | 0.35 | 0.09 | 0.08 | 1 |
| less | | | | |
| Excluded Affiliate Pre-filing Intercompany Debt | - | - | - | |
| Estimated Working Capital Requirements | (0.20) | (0.20) | (0.20) | 2 |
| | 0.35 | (0.11) | (0.12) | |
| add | | | | |
| Receipts from Initial Payment | 5.80 | - | - | |
| Receipts from Subsequent Payment | - | - | - | |
| less: Subsequent payment | - | - | - | |
| Net Cash Balance | 6.15 | (0.11) | (0.12) | |

Source: Financials provided by management

Notes:-

1. **Cash & cash equivalent**
  - The decrease in cash balance from 31 May 2014 to 30 June 2014 pertains mainly to ongoing operating expenses.

2. **Estimated Working Capital Requirements**
  - USD0.20m pertains to estimated costs to place NN Korea into liquidation.

## Cash flow analysis

❖ As NN Korea is a dormant entity, there are no major movements in the cash flow forecast.

APAC Debtor NN Korea

NNC-NNL-PPI000061

APAC Debtors

NN India Pvt

◦ Based on the cash balance as at 30 June 2014 and the cash balance set out in our earlier Report dated 30 June 2014, we set out below the comparison of the Net Cash Balance:-

**Net Cash Balance**

| Figures USD'm | As per Agreement | | As at 31 May 2014 | | As at 31 May 2014 | | Notes |
|---|---|---|---|---|---|---|---|
| Cash & Cash Equivalents | | 54.32 | | 61.68 | | 61.74 | 1 |
| less | | | | | | | |
| Estimated Working Capital Requirements | (55.25) | (55.25) | (29.36) | (29.36) | (29.36) | (29.36) | 2 |
| | | (0.93) | | 32.32 | | 32.38 | |
| add | | | | | | | |
| Receipts based on Initial Payment | | - | | - | | - | |
| Net Cash Balance | | (0.93) | | 32.32 | | 32.38 | 3 |

Source: Firm's file provided by management

Notes:-

**1  Cash & cash equivalents**

... The decrease in cash from 31 May 2014 to 30 June 2014  of USD0.06m pertains mainly to ongoing operating expense.

-- USD0.22m being unrealised translational gain is not reflected in the cash balance.

APAC Debtors: NN India Pvt

27    31 July 2014

**CONFIDENTIAL**

APAC Debtors

NN India Pvt

## 2 Estimated Working Capital Requirements

- Based on the updated disbursements, working capital requirements have remained unchanged. The breakdown is set out below:-

### Working Capital Requirements
Currency USDm

| | WCR as per Agreement | WCR as at June 15 | Revised | Notes |
|---|---|---|---|---|
| Eighteen Months Estimated Disbursements | 5.50 | 3.00 | 3.00 | A |
| Estimated Severance Costs | 1.45 | 0.36 | 0.36 | B |
| Other Estimated Restructuring Costs | 6.00 | 1.00 | 1.00 | C |
| Estimated Premise Reinstatement Costs | 0.30 | - | - | D |
| Estimated Taxes | 42.00 | 20.00 | 20.00 | E |
| Corporate Costs | - | - | - | F |
| Estimated Winding down/ Liquidation Costs | - | 5.00 | 5.00 | G |
| Total WCR | 55.25 | 29.36 | 29.36 | |

Source: Financials provided by management

Notes:

A   This covers the ongoing running costs to the end of 2015.

B   Based on the latest headcount, estimates are USD0.36m.

C   This pertains to tax and legal advice.

D   Management confirms that there is no reinstatement costs required as NN India (Pvt) is now in Regus's facilities (3rd party serviced office).

E   Estimated taxes is revised to USD20m based on the latest estimates.

F   All corporate costs have been charged up to the estimated period of liquidation (end of 2015) and as such, Management informed that there is no requirement to set aside any more amount.

G   Pertains to estimated costs to place NN India Pvt into liquidation which includes potential corporate costs and tax professional fees that may be incurred (for an estimate of 5 years of liquidation process) during liquidation.

## 3 Net Cash Balance

- Management informed that RBI has approved the netting of intercompany liabilities and given extension of time for payments. Both the netting and intercompany payments are subject to providing supporting

APAC Debtors: NN India Pvt

28     31 July 2014

NNC-NNL-PPI000063

APAC Debtors

NN India Pvt

- documents to Citibank. The payments will be made via batches over time based on availability of sufficient surplus cash and supporting documents.

- Management has informed that to date, there are no outstanding post-filing amounts owing by NN India Pvt. As at April 2014, NN India Pvt made payments to its intercompany creditors amounting to USD10.18m relating to pre-filing liabilities.

- Management is processing additional payments of up to USD20m in Q3 2014. However, this payment is dependent on the certification by an Independent Chartered Accountant of the requisite paperwork and the subsequent ability of Citibank to process the payment.

Cash flow analysis

- We set out below a summary of net cash flow from Q2 to Q3 2014:-

Cash Flow Forecast

| Currency (USD'm) | Actual Jun 14 | Forecast Jul 14 | Forecast Aug 14 | Forecast Sep 14 |
|---|---|---|---|---|
| Total receipts | 0.59 | 0.02 | - | - |
| Total disbursements | (0.53) | (12.22) | (0.22) | (0.22) |
| Net cash flow | 0.06 | (12.20) | (0.22) | (0.22) |
| Opening cash balance | 61.68 | 61.74 | 49.54 | 49.32 |
| Subsequent Payment receipt | - | - | - | - |
| Subsequent Payment amount | - | - | - | - |
| Adjustment - Forecast to actual | - | - | - | - |
| Net closing cash balance | 61.74 | 49.54 | 49.32 | 49.10 |

CONFIDENTIAL

Conclusion

31 July 2014

36

Conclusion

∷ Based on our Report, we set out below a summary of APAC Debtors' surplus/deficit cash balances:-

| Entity ($'000) | 31-Jul-14 | 31-Jul-14 |
|---|---|---|
| Entity Names | Surplus/deficit Cash | Proposed Subsequent Payment |
| NN Singapore Group | (3.71) | N.A. |
| NN Asia Group | (0.58) | N.A. |
| NN Korea | (0.12) | N.A. |
| NN India Pvt | 32.38 | N.A. |
| Total | 27.97 | - |

Source: Financials provided by management

Proposed Subsequent Payment

∷ NN Singapore Group and NN Asia Group are not in positions to make any subsequent payments due to their deficit net cash balance positions.

∷ Management informed that RBI has approved the netting of intercompany liabilities and given an extension of time for payments. Both the netting and intercompany payments are subject to providing supporting documents to Citibank. The payments will be made in batches over time based on availability of sufficient surplus cash and supporting documents.

∷ The remaining APAC debtors are not in a position to make any subsequent payments due to outstanding tax and foreign exchange issues.

Conclusion

CONFIDENTIAL

NNC-NNL-PPI000066

## Appendices

1. Appendix A: List of APAC Debtors
2. Appendix B: List of Filed Entities
3. Appendix C: Breakdown of Net-Filing Debt of APAC
4. Appendix D: Breakdown of Excluded Affiliate Pre-Filing Intercompany Debt

**CONFIDENTIAL**

**NNC-NNL-PPI000067**

Appendices

List of APAC Debtors

Appendix A: List of APAC Debtors

| Entity Code | Name of Entities |
|---|---|
| 6200 | NN Philippines (branch) |
| 6210 | NN Singapore |
| 7100 | NN Asia |
| 6190 | NN Pakistan (branch) |
| 7110 | NN Taiwan (branch) |
| 7112 | NN Asia Offshore (branch) |
| 6100 | NN Australia |
| 6111 | NN India (Pvt) |
| 6120 | NN Indonesia |
| 6130 | NN Japan |
| 6140 | NN Korea |
| 6160 | NN Malaysia |
| 6180 | NN New Zealand |
| 6220 | NN Thailand |
| 6231 | NN Vietnam |

33    31 July 2014

Appendices

Appendix B: List of Filed Entities

## List of Filed Entities

| Company code | Date of filing | Name of entities | Type of filing | Incorporated |
|---|---|---|---|---|
| 1001 | 14-Jan-09 | Nortel Networks Corporation | CCAA | Canada |
| 1002 | 14-Jan-09 | Nortel Networks Limited | CCAA | Canada |
| 1003 | 14-Jan-09 | Nortel Networks Global Corporate Headquarters | CCAA | Canada |
| 1101 | 14-Jan-09 | Nortel Networks Technology Corporation | CCAA | Canada |
| 1102 | 14-Jan-09 | Nortel Networks International Corporation | CCAA | Canada |
| 1104 | 14-Jan-09 | Nortel Networks Global Corporation | CCAA | Canada |
| 2001 | 14-Jan-09 | Nortel Networks Inc. | Ch.11 | US |
| 2101 | 14-Jan-09 | Alteon Websystems International Inc. | Ch.11 | US |
| 2102 | 14-Jan-09 | XROS Inc. | Ch.11 | US |
| 2103 | 14-Jan-09 | Sonoma Systems | Ch.11 | US |
| 2104 | 14-Jan-09 | QTERA Corporation | Ch.11 | US |
| 2105 | 14-Jan-09 | CoreTek Inc. | Ch.11 | US |
| 2106 | 14-Jan-09 | Nortel Networks Applications Management Solutions Inc. | Ch.11 | US |
| 2107 | 14-Jan-09 | Alteon WebSystems, Inc. | Ch.11 | US |
| 2108 | 14-Jan-09 | Nortel Networks Optical Components Inc. | Ch.11 | US |
| 2110 | 14-Jan-09 | Nortel Networks Capital Corporation | Ch.11 | US |
| 2113 | 14-Jan-09 | Nortel Networks HPOCS Inc. | Ch.11 | US |
| 2114 | 14-Jan-09 | Architel Systems (U.S.) Corporation | Ch.11 | US |
| 2115 | 14-Jan-09 | Nortel Networks International Inc. | Ch.11 | US |
| 2117 | 14-Jan-09 | Northern Telecom International Inc. | Ch.11 | US |

**CONFIDENTIAL**

NNC-NNL-PPI000069

## List of Filed Entities

| Company code | Date of filing | Name of entities | Type of filing | Incorporated |
|---|---|---|---|---|
| 2121 | 14-Jan-09 | Nortel Networks Cable Solutions, Inc. | Ch.11 | US |
| 3230 | 14-Jan-09 | Nortel Networks Limited - CALA Sales | CCAA | Canada |
| 4002 | 15-Jan-09 | Nortel Networks International Finance & Holding B.V. | UK/EMEA | Netherlands |
| 4100 | 15-Jan-09 | Nortel Networks (Austria) GmbH | UK/EMEA | Austria |
| 4110 | 15-Jan-09 | Nortel Networks N.V. | UK/EMEA | Belgium |
| 4130 | 15-Jan-09 | Nortel Networks, s.r.o. | UK/EMEA | Czech Republic |
| 4142 | 15-Jan-09 | Nortel Networks AB - Denmark Branch | UK/EMEA | Denmark |
| 4150 | 15-Jan-09 | Nortel Networks Oy | UK/EMEA | Finland |
| 4160 | 15-Jan-09 | Nortel Networks S.A. | UK/EMEA | France |
| 4162 | 15-Jan-09 | Nortel Networks France S.A.S | UK/EMEA | France |
| 4175 | 15-Jan-09 | Nortel GmbH (merged with 4180 Nortel Networks Germany GmbH & Co KG) | UK/EMEA | Germany |
| 4180 | 15-Jan-09 | Nortel GmbH (formerly 4180 Nortel Network Germany GmbH & Co KG) | UK/EMEA | Germany |
| 4200 | 15-Jan-09 | Nortel Networks Engineering Service Kft. | UK/EMEA | Hungary |
| 4202 | 14-Jan-09 | Nortel Networks, Inc. (Hungary Branch) | Ch.11 | Hungary |
| 4210 | 15-Jan-09 | Nortel Networks (Ireland) Limited | UK/EMEA | Ireland |
| 4211 | 14-Jan-09 | Nortel Networks Limited - EMEA Sales | CCAA | Canada |
| 4220 | 15-Jan-09 | Nortel Networks S.p.A. | UK/EMEA | Italy |
| 4240 | 15-Jan-09 | Nortel Networks B.V. | UK/EMEA | Netherlands |
| 4260 | 15-Jan-09 | Nortel Networks Polska Sp. z o.o. | UK/EMEA | Poland |
| 4270 | 15-Jan-09 | Nortel Networks Portugal S.A. | UK/EMEA | Portugal |

CONFIDENTIAL

Appendices

Appendix B: List of Filed Entities

## List of Filed Entities

| Company code | Date of filing | Name of entities | Type of filing | Incorporated |
|---|---|---|---|---|
| 4280 | 15-Jan-09 | Nortel Networks Romania SRL | UK/EMEA | Romania |
| 4291 | 14-Jan-09 | Nortel Networks Global Corporation - Moscow Branch | CCAA | Russia |
| 4300 | 15-Jan-09 | Nortel Networks Slovensko, s.r.o. | UK/EMEA | Slovakia |
| 4310 | 15-Jan-09 | Nortel Networks Hispania, S.A. | UK/EMEA | Spain |
| 4320 | 15-Jan-09 | Nortel Networks AB | UK/EMEA | Sweden |
| 4360 | 15-Jan-09 | Nortel Networks UK Limited | UK/EMEA | UK |
| 5001 | 19-Jan-09 | Nortel Communication Holdings (1997) Limited | Israel | Israel |
| 5102 | 19-Jan-09 | Nortel Networks Israel (Sales and Marketing) Limited | Israel | Israel |
| 5110 | 14-Jan-09 | Nortel Networks Inc. (Egypt Branch) | Ch.11 | Egypt |
| 5120 | 14-Jan-09 | Nortel Networks Global Corporation - Lebanon Branch | CCAA | Lebanon |
| 5131 | 15-Jan-09 | Nortel Networks SA Branch office | UK/EMEA | Malta |
| 5135 | 15-Jan-09 | Nortel Networks SA (Representative/Branch Office in Algeria) | UK/EMEA | Algeria |
| 5150 | 15-Jan-09 | Nortel Networks UK Limited - Saudi Arabia Branch | UK/EMEA | Saudi Arabia |
| 5170 | 14-Jan-09 | Nortel Networks, Inc. (Tunisia Branch) | Ch.11 | Tunisia |
| 5180 | 14-Jan-09 | Nortel Networks International, Inc. (Dubai Branch) | Ch.11 | UAE / Dubai |
| 6191 | 14-Jan-09 | Nortel Networks Limited - Pakistan Sales | CCAA | Canada |
| 7111 | 14-Jan-09 | Nortel Networks Limited - Taiwan Sales | CCAA | Canada |

Source: Cleartoad - SAP Company listing

38    31 July 2014

CONFIDENTIAL

Appendices

Appendix C: Breakdown of Net-Filing Debt of APAC

# Breakdown of Net-Filing Debt of APAC

## 1. Entities under Debt Restructuring

| Code | Entity Name | 6100 NN Australia | 6120 NN Indonesia | 6130 NN Japan | 6140 NN Korea | 6160 NN Malaysia | 6180 NN New Zealand | 6220 NN Thailand | 6231 NN Vietnam | 6210-1 NN Singapore Group | 7100-1 NN Asia Group | Total AP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6100 | NN Australia | N.A. | - | - | - | - | - | - | - | - | 6.51 | 6.51 |
| 6120 | NN Indonesia | - | N.A. | - | 0.46 | 0.34 | - | - | - | 0.26 | 1.13 | 2.19 |
| 6130 | NN Japan | 0.00 | N.A. | N.A. | - | 0.00 | - | - | - | 4.51 | 0.01 | 4.52 |
| 6140 | NN Korea | N.A. | - | - | N.A. | - | - | 3.09 | 1.23 | - | 8.05 | 12.37 |
| 6160 | NN Malaysia | - | - | - | 0.03 | N.A. | - | - | - | 8.31 | - | 8.34 |
| 6180 | NN New Zealand | - | - | - | - | - | N.A. | - | - | - | 0.05 | 0.05 |
| 6220 | NN Thailand | - | - | - | - | - | - | N.A. | 0.00 | 9.63 | - | 9.63 |
| 6231 | NN Vietnam | - | - | - | 5.10 | 0.08 | - | 1.16 | N.A. | - | - | 6.34 |
| 6210-1 | NN Singapore Group | - | - | - | - | - | - | - | 1.82 | N.A. | - | 1.82 |
| 7100-1 | NN Asia Group | - | - | - | - | - | - | - | 9.64 | 83.19 | N.A. | 92.83 |
| | Subtotal | 0.00 | 0.00 | 0.00 | 5.59 | 0.42 | 0.00 | 4.25 | 12.70 | 105.89 | 15.74 | 144.60 |

## 2. Filed Entities

| Code | Entity Name | 6100 NN Australia | 6120 NN Indonesia | 6130 NN Japan | 6140 NN Korea | 6160 NN Malaysia | 6180 NN New Zealand | 6220 NN Thailand | 6231 NN Vietnam | 6210-1 NN Singapore Group | 7100-1 NN Asia Group | Total AP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1002-1 | NNL Group | 0.00 | - | - | 2.66 | 0.47 | - | 3.79 | 1.27 | - | 2.12 | 10.32 |
| 1101 | NN Tech Corp | - | - | - | 0.00 | - | - | - | - | - | - | 0.00 |
| 1102 | NN Int'l Corp | - | - | - | - | - | - | - | - | - | 0.33 | 0.33 |
| 1104 | NN Global Corp | - | - | - | - | - | - | - | - | - | 0.07 | 0.07 |
| 2001 | NN I | 0.00 | - | - | - | 0.39 | - | 2.45 | 1.53 | 6.98 | 8.08 | 19.43 |
| 2002 | NN CALA | - | - | - | - | - | - | - | 0.06 | - | - | 0.06 |
| 2106 | NN AMSI | - | - | - | - | - | - | - | - | 0.01 | - | 0.01 |
| 2107 | Alteon WebSystems | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 4180 | NN S.A. | 0.00 | - | - | 0.94 | - | - | - | - | 0.06 | - | 1.00 |
| 4162 | NN France | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 4180 | NN Germany | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 4210 | NN Ireland | - | - | - | 0.01 | - | - | - | - | - | - | 0.01 |
| 4220 | NN S.P.A. | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 4240 | NN B.V. | 0.00 | - | - | - | - | - | - | - | - | 2.66 | 2.86 |
| 4260 | NN Polska | - | - | - | - | - | - | - | - | - | - | 2.66 |
| 4310 | NN Hispania | - | - | - | - | - | - | - | - | - | - | 0.00 |
| 4380 | NN UK | 0.00 | - | - | - | - | - | 0.68 | 0.19 | 4.32 | 3.64 | 8.83 |
| 5102 | NN Israel | 0.00 | - | - | - | - | - | - | - | - | - | 0.00 |
| 5180 | NN Dubai | - | - | - | - | - | - | - | - | - | - | 0.00 |
| | | 0.00 | 0.00 | 0.00 | 3.61 | 0.86 | 0.00 | 6.92 | 3.05 | 11.38 | 16.91 | 42.73 |
| | | 0.00 | 0.00 | 0.00 | 9.20 | 1.28 | 0.00 | 11.17 | 15.75 | 117.27 | 32.65 | 187.32 |

**CONFIDENTIAL**

NNC-NNL-PPI000072

Appendices

Appendix D: Breakdown of Excluded Affiliate Pre-Filing Intercompany Debt

## Breakdown of Excluded Affiliate Pre-Filing Intercompany Debt

**Breakdown of Net Prefiling AP owing by entities below:**

| Code | Entity Name | 6140 NN Korea | 6160 NN Malaysia | 6220 NN Thailand | 6231 NN Vietnam | 6210-1 NN Singapore Group | 7100-1 NN Asia Group | Total Net AP |
|---|---|---|---|---|---|---|---|---|
| 3110 | NN TICL | - | - | - | - | - | 0.29 | 0.29 |
| 3171 | NN Mexico (R.L.) | - | - | - | - | - | 0.08 | 0.08 |
| 6111 | NN India Pvt | - | 0.05 | 0.02 | 0.01 | 2.44 | - | 2.52 |
| 6141 | NN LG | - | - | - | - | 0.01 | - | 0.01 |
| 7120 | NN China | 0.01 | 0.02 | - | 0.02 | 0.70 | - | 0.75 |
| | **TOTAL NET AP** | **0.01** | **0.07** | **0.02** | **0.03** | **3.16** | **0.37** | **3.65** |

31 July 2014



EY | Assurance | Tax | Transactions | Advisory

About EY

EY is a global leader in assurance, tax, transaction and advisory services. The insight and quality services we deliver help build trust and confidence in the capital markets and in economies the world over. We develop outstanding leaders who team to deliver on our promises to all of our stakeholders. In so doing, we play a critical role in building a better working world for our people, for our clients and for our communities.

EY refers to the global organization and may refer to one or more of the member firms of Ernst & Young Global Limited, each of which is a separate legal entity. Ernst & Young Global Limited, a UK company limited by guarantee, does not provide services to clients. For more information about our organization, please visit ey.com

© 2014 Ernst & Young Solutions LLP
All Rights Reserved.

www.ey.com

31 July 2014

CONFIDENTIAL

**<u>EXHIBIT 90</u>**



EDGAR Online

EXHIBIT

232

# NORTEL NETWORKS CORP

# FORM 10-Q
### (Quarterly Report)

## Filed 08/10/12 for the Period Ending 06/30/12

| | |
|---|---|
| Telephone | 9058637000 |
| CIK | 0000072911 |
| Symbol | NRTLQ |
| SIC Code | 3661 - Telephone and Telegraph Apparatus |
| Industry | Communications Equipment |
| Sector | Technology |
| Fiscal Year | 12/31 |



Powered By EDGAR Online

http://www.edgar-online.com

© Copyright 2014, EDGAR Online, Inc. All Rights Reserved.

Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Quarterly Period Ended June 30, 2012

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Transition Period From            to

Commission File Number: 001-07260

# Nortel Networks Corporation

**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Canada** | **98-0535482** |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |
| **5945 Airport Road, Suite 360** | |
| **Mississauga, Ontario, Canada** | **L4V 1R9** |
| (Address of Principal Executive Offices) | (Zip Code) |

**Registrant's Telephone Number Including Area Code (905) 863-6840**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒        No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).    Yes ☒        No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer", "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | | |
|---|---|---|
| Large accelerated filer ☐ | | Accelerated filer ☐ |
| Non-accelerated filer ☐ | (Do not check if a smaller reporting company) | Smaller reporting company ☒ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐    No ☒

Indicate the number of shares outstanding of each of the issuer's classes of common stock as of June 30, 2012.

**498,206,366 shares of common stock without nominal or par value**

Table of Contents

## TABLE OF CONTENTS

**PAGE**

**PART I**
**FINANCIAL INFORMATION**

**ITEM 1.**   Condensed Consolidated Financial Statements (unaudited)     1

**ITEM 2.**   Management's Discussion and Analysis of Financial Condition and Results of Operations     33

**ITEM 4.**   Controls and Procedures     47

**PART II**
**OTHER INFORMATION**

**ITEM 1.**   Legal Proceedings     48

**ITEM 1A.**   Risk Factors     49

**ITEM 2.**   Unregistered Sales of Equity Securities and Use of Proceeds     50

**ITEM 6.**   Exhibits     50

SIGNATURES     51

**All dollar amounts in this document are in United States Dollars unless otherwise stated.**

NORTEL, NORTEL (Logo), NORTEL NETWORKS, the Globemark, and NT are trademarks of Nortel Networks.

All other trademarks are the property of their respective owners.

Table of Contents

**PART 1**
**FINANCIAL INFORMATION**

**ITEM 1.    Condensed Consolidated Financial Statements (unaudited)**

**NORTEL NETWORKS CORPORATION**

**(Under Creditor Protection Proceedings as of January 14, 2009 — note 2)**
**Condensed Consolidated Statements of Operations (unaudited)**
**(Millions of U.S. Dollars, except per share amounts)**

| | Three Months Ended June 30, 2012 | 2011 | Six Months Ended June 30, 2012 | 2011 |
|---|---|---|---|---|
| Revenues | $ — | $ 1 | $ 1 | $ 21 |
| Cost of revenues | 1 | 5 | 2 | 27 |
| Gross loss | (1) | (4) | (1) | (6) |
| Selling, general and administrative expense | 25 | 53 | 52 | 91 |
| Other operating income—net (note 5) | — | (18) | (1) | (42) |
| Operating loss | (26) | (39) | (52) | (55) |
| Other income (expense)—net (note 5) | (8) | 9 | (18) | (3) |
| Interest expense (contractual interest expense for the six months ended June 30, 2012 and 2011 was $175 and $159, respectively) | (86) | (80) | (172) | (159) |
| Loss from operations before reorganization items—net and income taxes | (120) | (110) | (242) | (217) |
| Reorganization items—net (note 4) | (6) | 7 | 62 | 11 |
| Loss from operations before income taxes | (126) | (103) | (180) | (206) |
| Income tax expense | (2) | (2) | (7) | (1) |
| Net loss | (128) | (105) | (187) | (207) |
| Income attributable to noncontrolling interests | (3) | (10) | (7) | (13) |
| Net loss attributable to Nortel Networks Corporation | $ (131) | $ (115) | $ (194) | $ (220) |
| Basic loss per common share | $ (0.26) | $ (0.23) | $ (0.39) | $ (0.44) |
| Diluted loss per common share | $ (0.26) | $ (0.23) | $ (0.39) | $ (0.44) |

*The accompanying notes are an integral part of these condensed consolidated financial statements*

1

**Table of Contents**

**NORTEL NETWORKS CORPORATION**

**(Under Creditor Protection Proceedings as of January 14, 2009 — note 2)**
**Condensed Consolidated Balance Sheets (unaudited)**
**(Millions of U.S. Dollars, except share amounts)**

| | June 30, 2012 | December 31, 2011 |
|---|---|---|
| **ASSETS** | | |
| **Current assets** | | |
| Cash and cash equivalents | $ 668 | $ 751 |
| Restricted cash and cash equivalents | 77 | 93 |
| Accounts receivable—net | 159 | 174 |
| Other current assets (note 5) | 71 | 79 |
| **Total current assets** | 975 | 1,097 |
| Restricted cash and cash equivalents | 7,566 | 7,479 |
| Other assets (note 5) | 41 | 52 |
| **Total assets** | $ 8,582 | $ 8,628 |
| **LIABILITIES AND SHAREHOLDERS' DEFICIT** | | |
| **Current liabilities** | | |
| Trade and other accounts payable | $ 290 | $ 320 |
| Payroll and benefit-related liabilities | 5 | 17 |
| Contractual liabilities | 17 | 19 |
| Other accrued liabilities (note 5) | 13 | 18 |
| **Total current liabilities** | 325 | 374 |
| **Long-term liabilities** | | |
| Deferred income taxes—net | 6 | 7 |
| Other liabilities (note 5) | 8 | 17 |
| **Total long-term liabilities** | 14 | 24 |
| **Liabilities subject to compromise (note 15)** | 11,109 | 10,939 |
| **Total liabilities** | 11,448 | 11,337 |
| **Guarantees, commitments, contingencies and subsequent events (notes 2, 10, 12, 16, and 17 respectively)** | | |
| **SHAREHOLDERS' DEFICIT** | | |
| Common shares, without par value—Authorized shares: unlimited; Issued and outstanding shares: | | |
| 498,206,366 as of June 30, 2012 and December 31, 2011 | 35,604 | 35,604 |
| Additional paid-in capital | 3,597 | 3,597 |
| Accumulated deficit | (42,600) | (42,406) |
| Accumulated other comprehensive loss | (104) | (143) |
| **Total Nortel Networks Corporation shareholders' deficit** | (3,503) | (3,348) |
| Noncontrolling interests | 637 | 639 |
| **Total shareholders' deficit** | (2,866) | (2,709) |
| **Total liabilities and shareholders' deficit** | $ 8,582 | $ 8,628 |

*The accompanying notes are an integral part of these condensed consolidated financial statements*

2

**Table of Contents**

**NORTEL NETWORKS CORPORATION**

**(Under Creditor Protection Proceedings as of January 14, 2009 — note 2)**
**Condensed Consolidated Statements of Comprehensive Loss (unaudited)**
**(Millions of U.S. Dollars)**

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
|  | 2012 | 2011 | 2012 | 2011 |
| Net loss including noncontrolling interests | $ (128) | $ (105) | $ (187) | $ (207) |
| Other comprehensive loss adjustments: |  |  |  |  |
| Change in foreign currency translation adjustment | 93 | (5) | 22 | (64) |
| Unamortized pension and post-retirement actuarial losses and prior service cost—net | 8 | 10 | 17 | 98 |
| Comprehensive loss including noncontrolling interests | (27) | (100) | (148) | (173) |
| Comprehensive income attributable to noncontrolling interests | (3) | (10) | (7) | (13) |
| Comprehensive loss attributable to Nortel Networks Corporation | $ (30) | $ (110) | $ (155) | $ (186) |

*The accompanying notes are an integral part of these condensed consolidated financial statements*

3

Table of Contents

**NORTEL NETWORKS CORPORATION**

**(Under Creditor Protection Proceedings as of January 14, 2009 — note 2)**
**Condensed Consolidated Statements of Cash Flows (unaudited)**
**(Millions of U.S. Dollars)**

| | Six Months Ended June 30, | |
|---|---:|---:|
| | 2012 | 2011 |
| **Cash flows from (used in) operating activities** | | |
| Net loss attributable to Nortel Networks Corporation | $    (194) | $    (220) |
| Adjustments to reconcile net loss from operations to net cash used in operating activities, net of effects from acquisitions and divestitures of businesses: | | |
|     Amortization and depreciation | 4 | 20 |
|     Deferred income taxes | (1) | — |
|     Pension and other accruals | 22 | 28 |
|     Income attributable to noncontrolling interests—net of tax | 7 | 13 |
|     Reorganization items—non cash | (88) | (60) |
|     Other—net | 2 | (33) |
|     Change in operating assets and liabilities (note 5) | 162 | 266 |
| Net cash from (used in) operating activities | (86) | 14 |
| **Cash flows from (used in) investing activities** | | |
|     Change in restricted cash and cash equivalents | (71) | (151) |
|     Proceeds from the sales of investments, businesses and assets—net | 88 | 107 |
| Net cash from (used in) investing activities | 17 | (44) |
| **Cash flows from (used in) financing activities** | | |
|     Dividends paid, including paid by subsidiaries to noncontrolling interests | (8) | — |
| Net cash used in financing activities | (8) | — |
| **Effect of foreign exchange rate changes on cash and cash equivalents** | **(6)** | **13** |
| **Net decrease in cash and cash equivalents** | **(83)** | **(17)** |
| **Cash and cash equivalents at beginning of the period** | **751** | **807** |
| **Cash and cash equivalents at end of the period** | **$    668** | **$    790** |

*The accompanying notes are an integral part of these condensed consolidated financial statements*

4

**Table of Contents**

# NORTEL NETWORKS CORPORATION

## (Under Creditor Protection Proceedings as of January 14, 2009 — note 2)
### Notes to Condensed Consolidated Financial Statements (unaudited)

## 1. Basis of presentation

All monetary amounts in these notes to the unaudited condensed consolidated financial statements are in millions, except per share amounts, and in United States ("U.S.") Dollars unless otherwise stated.

### Nortel Networks Corporation

Prior to Nortel Networks Corporation's ("Nortel", "NNC" or the "Company") significant business divestitures, NNC was a global supplier of end-to-end networking products and solutions serving both service providers and enterprise customers. Nortel's technologies spanned access and core networks and support multimedia and business-critical applications. Nortel's networking solutions consisted of hardware, software and services. Nortel designed, developed, engineered, marketed, sold, licensed, installed, serviced and supported these networking solutions worldwide. As further discussed in note 2, Nortel is currently focused on the remaining work under the Creditor Protection Proceedings (as defined in note 2), including providing transitional services to the purchasers of Nortel's businesses, ongoing restructuring matters and the sale of any remaining assets.

As of June 30, 2012, Nortel has completed the sales of all of its businesses, and regarding these businesses, only the residual contracts not transferred to the various buyers remain. Commencing with the first quarter of 2011, Nortel has one reportable segment, being the consolidated entity, as its chief operating decision maker reviews financial and operating results on that basis.

Nortel Networks Limited ("NNL") is Nortel's principal direct operating subsidiary and its results are consolidated into Nortel's results. Nortel holds all of NNL's outstanding common shares but none of its outstanding preferred shares. NNL's preferred shares are reported in noncontrolling interests in the consolidated balance sheets and dividends accrued on preferred shares are reported in income attributable to noncontrolling interests in the statements of operations. Nortel does not expect to pay any of these cumulative dividends as a result of the Creditor Protection Proceedings.

### Basis of Presentation and Going Concern Considerations

The unaudited condensed consolidated financial statements are prepared in accordance with U.S. Generally Accepted Accounting Principles ("U.S. GAAP") and do not include all the information and notes required in the preparation of annual consolidated financial statements. The accounting policies used in the preparation of the unaudited condensed consolidated financial statements are the same as those described in Nortel's audited consolidated financial statements prepared in accordance with U.S. GAAP for the year ended December 31, 2011. The unaudited condensed consolidated balance sheet as of December 31, 2011 is derived from the December 31, 2011 audited consolidated financial statements. Although Nortel is headquartered in Canada, the unaudited condensed consolidated financial statements are expressed in U.S. Dollars as the majority of Nortel's operating results and net assets are denominated in U.S. Dollars.

Nortel makes estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities as of the date of the unaudited condensed consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results may differ from those estimates. Estimates have been used for the periods reported when accounting for items and matters such as revenue recognition and accruals for losses on contracts, allowances for uncollectible accounts receivable, employee benefits including pensions, taxes and related valuation allowances and provisions, restructuring and other provisions, contingencies and pre-petition liabilities.

Nortel believes all adjustments necessary for a fair statement of the results for the periods presented have been made and all such adjustments were of a normal recurring nature unless otherwise disclosed. The financial results for the three and six months ended June 30, 2012 are not necessarily indicative of financial results for the full year or for any other quarter. The unaudited condensed consolidated financial statements should be read in conjunction with Nortel's Annual Report on Form 10-K for the year ended December 31, 2011 filed with the U.S. Securities and Exchange Commission ("SEC") and Canadian securities regulatory authorities ("2011 Annual Report") and this Quarterly Report on Form 10-Q for the three and six months ended June 30, 2012.

Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 852 "Reorganization" ("ASC 852") **,** which is applicable to companies that have filed petitions under applicable bankruptcy code provisions and as a result of the Creditor Protection Proceedings is applicable to Nortel, generally does not change the manner in which financial statements are prepared. However, it does require that the financial statements for periods subsequent to the filing of an applicable bankruptcy petition distinguish transactions and events that are directly associated with a reorganization from the ongoing operations of the business. For this reason, Nortel's revenues, expenses, realized gains and losses, and provisions for losses that can be directly associated with the Creditor Protection Proceedings must be reported separately as reorganization items in the statements of operations. The balance sheets must distinguish pre-petition liabilities subject to compromise from both those pre-petition liabilities that are not subject to compromise and from post-petition liabilities. Liabilities that may be affected by a plan of reorganization must

**Table of Contents**

be reported at the amounts expected to be allowed, even if they may be settled for lesser amounts. In addition, reorganization items must be disclosed separately in the statements of cash flows. Nortel adopted ASC 852 effective on January 14, 2009 and has segregated those items outlined above for all reporting periods subsequent to such date.

After consideration of the guidance available in ASC 810 "Consolidation" ("ASC 810") and ASC 852 **,** the unaudited condensed consolidated financial statements as of June 30, 2012 and December 31, 2011 and for three and six months ended June 30, 2012 and 2011 have been presented on the following basis with respect to Nortel subsidiaries:

- the subsidiaries in Europe, the Middle East and Africa ("EMEA"), Nortel Networks UK Ltd. ("NNUK"), Nortel Networks S.A. ("NNSA"), Nortel Networks (Ireland) Limited (collectively, "EMEA Debtors") and their subsidiaries (collectively, "EMEA Subsidiaries") were accounted for under the equity method from the Petition Date (as defined below) up to May 31, 2010 and as an investment under the cost method of accounting thereafter;

- the U.S. subsidiaries and their subsidiaries (collectively, "U.S. Subsidiaries") were accounted for as consolidated subsidiaries until September 30, 2010 and as an investment under the cost method of accounting thereafter; and

- other subsidiaries are consolidated throughout the periods presented consistent with the basis of accounting applied prior to the commencement of the Creditor Protection Proceedings with the exception of deconsolidated subsidiaries where there has been a deemed loss of control by Nortel once these subsidiaries were in applicable liquidation proceedings as noted in Nortel's 2011 Annual Report.

Nortel continues to exercise control over most of its subsidiaries located in Canada, Central America and Latin America ("CALA") and Asia (other than those entities that are EMEA Subsidiaries, U.S. Subsidiaries or have been placed in applicable liquidation proceedings), and its financial statements are prepared on a consolidated basis with respect to those subsidiaries.

Beginning on January 14, 2009 ("the Petition Date"), Nortel and certain of its subsidiaries in Canada, the U.S., and in certain EMEA countries filed for creditor protection under the relevant jurisdictions of Canada, the U.S., the United Kingdom ("U.K.") and subsequently commenced separate proceedings in Israel, followed by secondary proceedings in France. The unaudited condensed consolidated financial statements do not purport to reflect or provide for the consequences of the Creditor Protection Proceedings. In particular, such unaudited condensed consolidated financial statements do not purport to show: (a) as to assets, their realizable value on a liquidation basis or their availability to satisfy liabilities; (b) as to pre-petition liabilities, all amounts that may be allowed for claims or contingencies, or the status and priority thereof, or the amounts at which they may ultimately be settled; (c) as to shareholders' accounts, the effect of any changes that may be made in Nortel's capitalization; or (d) as to divestiture proceeds held in escrow and recorded by NNL solely for financial reporting purposes, the final allocation of these proceeds as between various Nortel legal entities, including entities that are not consolidated in these unaudited condensed consolidated financial statements, which will ultimately be determined either by joint agreement or through a dispute resolution proceeding (see note 2).

The ongoing Creditor Protection Proceedings and the divestitures of Nortel's businesses and assets, both completed and those asset sales that may arise in the future raise substantial doubt as to Nortel's ability to continue as a going concern. While the Debtors (as defined in note 2) have filed for and been granted creditor protection, the unaudited condensed consolidated financial statements continue to be prepared using the going concern basis, which assumes that Nortel will be able to realize its assets and discharge its liabilities in the normal course of business for the foreseeable future. However, it is not possible to predict the outcome of the Creditor Protection Proceedings and, as such, there is substantial doubt regarding the realization of assets and discharge of liabilities. When the going concern basis is no longer appropriate, adjustments may be necessary to the carrying amounts and/or classification of Nortel's assets and liabilities under a liquidation basis of accounting. Further, a court approved plan in connection with the Creditor Protection Proceedings could materially change the carrying amounts and classifications reported in the unaudited condensed consolidated financial statements. Nortel will continue to evaluate its remaining consolidated subsidiaries for the appropriateness of the accounting applied to these investments as the Creditor Protection Proceedings progress.

*Comparative Figures*

Certain immaterial amounts related to 2011 in the unaudited condensed consolidated financial statements have been reclassified to conform to Nortel's current period presentation.

## 2. Creditor protection proceedings

On the Petition Date, after extensive consideration of all other alternatives, with the unanimous authorization of the Nortel board of directors after thorough consultation with its advisors, certain Nortel entities, including NNC and NNL, initiated creditor protection proceedings in multiple jurisdictions under the respective restructuring regimes of Canada, under the Companies' Creditors Arrangement Act ("CCAA") ("CCAA Proceedings"), the U.S. under Chapter 11 of the U.S. Bankruptcy Code ("Chapter 11") ("Chapter 11 Proceedings"), U.K. under the Insolvency Act 1986 ("U.K. Administration Proceedings"), and subsequently, Israel under the Israeli Companies Law 1999 ("Israeli Administration Proceedings"). On May 28, 2009, one of Nortel's French subsidiaries,

**Table of Contents**

NNSA was placed into secondary proceedings ("French Secondary Proceedings"). The CCAA Proceedings, Chapter 11 Proceedings, U.K. Administration Proceedings, Israeli Administration Proceedings and French Secondary Proceedings are together referred to as the "Creditor Protection Proceedings". On July 14, 2009, Nortel Networks (CALA) Inc. ("NNCI"), a U.S. based subsidiary with operations in the CALA region, also filed a voluntary petition for relief under Chapter 11 in the U.S. Bankruptcy Court for the District of Delaware ("U.S. Court") and became a party to the Chapter 11 Proceedings. Nortel initiated the Creditor Protection Proceedings with a consolidated cash balance, as of December 31, 2008, of approximately $2,400, in order to preserve its liquidity and fund operations during the process.

As used herein: "Bondholder Group" means a group purporting to hold a portion of our publicly traded debt; "Canadian Monitor" means Ernst & Young Inc. as court-appointed monitor in the CCAA Proceedings; "Debtors" means: (i) Nortel, together with NNL and certain other Canadian subsidiaries (collectively, "Canadian Debtors") that filed for creditor protection pursuant to the provisions of the CCAA in the Ontario Superior Court of Justice ("Canadian Court"); (ii) Nortel Networks Inc. ("NNI"), Nortel Networks Capital Corporation ("NNCC"), NNCI and certain other U.S. subsidiaries (collectively, "U.S. Debtors") that have filed voluntary petitions under Chapter 11 in the U.S. Court; (iii) the EMEA Debtors that made consequential filings under the Insolvency Act 1986 in the High Court of England and Wales ("English Court") (including NNSA); and (iv) certain Israeli subsidiaries (collectively, "Israeli Debtors") that made consequential filings under the Israeli Companies Law 1999 in the District Court of Tel Aviv; "French Liquidator" means the liquidator appointed by the Versailles Commercial Court in secondary insolvency proceedings commenced by NNSA in France; "U.K. Administrators" means, collectively, a representative of Ernst & Young LLP (in the U.K.) and a representative of Ernst & Young Chartered Accountants (in Ireland) as court-appointed joint administrators of Nortel Networks (Ireland) Ltd. ("NNIL") and representatives of Ernst & Young LLP (in the U.K.) as court-appointed joint administrators of the EMEA Debtors other than NNIL; "U.S. Creditors' Committee" means the Official Committee of Unsecured Creditors of the U.S. Debtors appointed in the Chapter 11 Proceedings; "U.S. Principal Officer" means the principal officer of the U.S. Debtors appointed in the Chapter 11 Proceedings; and "U.S. Trustee" means the United States Trustee for the District of Delaware.

For further information regarding prior developments in connection with the Creditor Protection Proceedings, refer to Nortel's 2011 Annual Report.

### *Discontinuance of Future Periodic Financial Reporting*

On August 9, 2012, Nortel announced that the Canadian Monitor (defined below), after taking into account several factors arising from the advanced stage of the CCAA Proceedings (defined below), has determined that the expense and resources required to comply with NNC's and NNL's quarterly and annual public reporting requirements can no longer be justified from the standpoint of the best interest of their creditors. Consequently, NNC and NNL will no longer be able to comply with their periodic reporting requirements and will discontinue preparing and filing quarterly and annual financial statements and all other periodic disclosure documents under applicable Canadian and U.S. securities laws effective as of the filing deadlines for their third quarter reporting obligations, being November 14, 2012 in the United States and November 29, 2012 in Canada.

Generally, when an issuer ceases to file its periodic disclosure documents in circumstances such as NNC's and NNL's the Canadian Securities Administrators will issue orders prohibiting trading in securities of the relevant issuer, effective from and after the filing deadlines under Canadian securities laws. NNC and NNL will be making submissions to the Canadian Securities Administrators that cease trade orders expected to be issued in respect of NNC's and NNL's securities include certain permitted trading exceptions. However, there can be no assurance that the regulatory authorities will make such orders on the terms requested by NNC and NNL and, in particular, permit any trading exceptions.

In light of the foregoing, the directors and officers of NNC and NNL have indicated that they will step down from their positions with NNC and NNL upon the issuance of a court order under the CCAA that the Monitor will be seeking to extend its powers. Such order would allow the Monitor to exercise any powers that may be properly exercised by a board of directors and to terminate the engagement of NNC and NNL's external auditors.

Following the third quarter 2012 filing deadlines, as a means of keeping the public informed of material developments during the remainder of the CCAA proceedings, and until otherwise determined by the Monitor, NNC and NNL will endeavour to continue to comply with the material change disclosure requirements under Canadian securities laws, to the extent practicable in the circumstances, and to file on SEDAR (the electronic filing system of the Canadian Securities Administrators) all court reports of the Monitor except for such reports, or portions thereof, in respect of which confidential treatment has been requested. All other continuous and current disclosure filings of NNC and NNL will be discontinued.

The materials filed in the CCAA Proceedings are also available on the Monitor's Restructuring Document Centre at www.ey.com/ca/nortel or by contacting the Monitor directly at 1-866-942-7177. Documents filed by the U.S. Debtors with the U.S. Court including monthly operating reports and other general information about the Chapter 11 Proceedings are available at http://chapter11.epiqsystems.com/nortel. The content of these websites is not a part of this report.

### *Significant Business Divestitures*

In June 2009, Nortel determined that selling its businesses was the best path forward. Nortel has completed divestitures of all of its businesses including: (i) the sale of substantially all of its Code Division Multiple Access ("CDMA") business and Long Term Evolution ("LTE") Access assets to Telefonaktiebolaget LM Ericsson ("Ericsson"); (ii) the sale of substantially all of the assets of its Enterprise Solutions ("ES") business globally, including the shares of Nortel Government Solutions Incorporated ("NGS") and DiamondWare, Ltd. ("Diamondware"), to Avaya Inc. ("Avaya"); (iii) the sale of the assets of its Wireless Networks ("WN") business associated with the

development of Next Generation Packet Core network components ("Packet Core Assets") to Hitachi, Ltd. ("Hitachi"); (iv) the sale of certain portions of its Layer 4-7 data portfolio to Radware Ltd.; (v) the sale of substantially all of the assets of its Optical Networking and Carrier Ethernet businesses to Ciena Corporation ("Ciena"); (vi) the sale of substantially all of the assets of its Global System for Mobile communications ("GSM")/GSM for Railways ("GSM-R") business to Ericsson and Kapsch CarrierCom AG ("Kapsch"); (vii) the sale of substantially all of the assets of its Carrier VoIP and Application Solutions ("CVAS") business to GENBAND Inc. (now known as GENBAND U.S. LLC ("GENBAND")); (viii) the sale of NNL's 50% plus one share interest in LG-Nortel Co. Ltd. ("LGN"), its Korean joint venture with LG Electronics, Inc. ("LGE"), to Ericsson; (ix) the sale of substantially all of the assets of its global Multi Service Switch ("MSS") business to Ericsson; (x) the sale of substantially all of the assets of Guangdong-Nortel Telecommunications Equipment Co. Ltd. ("GDNT"), to Ericsson Mobile Data Applications Technology Research and Development Guangzhou Company Limited and Ericsson (Guangdong Shunde) Communications Company Limited (collectively, "Ericsson China"); (xi) the sale of its remaining patents and patent applications to a consortium consisting of Apple Inc., EMC Corporation, Ericsson, Microsoft Corporation, Research in Motion Limited and Sony Corporation (collectively, the "Consortium"); and (xii) the sale of a small number of its Internet Protocol version 4 addresses to various purchasers.

One of the key remaining matters under the Creditor Protection Proceedings is the determination of allocation of sale proceeds among the various Nortel legal entities that participated in the sales of Nortel's businesses, which include entities subject to the respective Creditor Protection Proceedings in the different jurisdictions.

### Divestiture Proceeds Received

As of June 30, 2012, approximately $7,803 in net proceeds have been generated and received through the completed sales of businesses and remaining patents and patent applications. These divestiture proceeds include the following approximate amounts:

(a)    $1,120 from the sale of substantially all of Nortel's CDMA business and LTE Access assets;

(b)    $18 from the sale of Nortel's Layer 4-7 data portfolio;

7

**Table of Contents**

(c)   $10 from the sale of Nortel's Packet Core Assets;

(d)   $932 from the sale of substantially all of the assets of Nortel's ES business, including the shares of DiamondWare and NGS;

(e)   $638 from the sale of substantially all of the assets of Nortel's Optical Networking and Carrier Ethernet businesses;

(f)   $79 from the sale of Nortel's North American GSM business;

(g)   $36 from the sale of Nortel's GSM business outside of North America (excluding its GSM business in CALA) and its global GSM-R business;

(h)   $156 from the sale of substantially all of Nortel's CVAS business;

(i)   $234 from the sale of Nortel's 50% plus one share interest in LGN;

(j)   $49 from the sale of substantially all of Nortel's MSS business;

(k)   $56 from the sale of substantially all of the GDNT assets (which proceeds are recorded in cash and cash equivalents);

(l)   $4,470 from the sale of Nortel's remaining patents and patent applications; and

(m)   $5 from the sale of various other business assets.

As of June 30, 2012, $7,323 of proceeds received from divestitures of businesses and remaining patents and patent applications is being held in escrow and an additional $229, representative of proceeds from the sale of LGN, is included in non-current restricted cash and cash equivalents, all of which is currently reported in NNL solely for financial reporting purposes (including with respect to any gain recorded on such divestitures). The difference between the net proceeds received and the amount in escrow at June 30, 2012 is as a result of amounts that, from time to time, have been distributed, with the consent of each of the Debtors' estates and court approvals, as applicable, from the escrow accounts to satisfy: 1) various obligations arising from the divestitures, whether through payments to third party vendors, or to reimburse the Debtors or non-consolidated subsidiaries for costs incurred, or 2) payments to the Debtors or non-consolidated subsidiaries related to settlements reached in respect of certain agreements involving proceeds allocation. The ultimate determination of the final allocation of such proceeds among the various Nortel legal entities, including entities that are not consolidated in these financial statements, has not yet occurred and may be materially different from the NNL classification and related amounts shown in these financial statements. The Interim Funding and Settlement Agreement ("IFSA") and the escrow agreements for sales divestiture proceeds entered into by NNL, NNI and other Nortel legal entities provide for the processes for determining the final allocation of divestiture proceeds among such entities, either through joint agreement or, failing such agreement, other dispute resolution proceedings. Adjustments to the NNL classification and any related amounts arising from the ultimate allocation will be recognized when finalized. The NNL classification and related amounts shown in these financial statements are not determinative of, and have not been accepted by any debtor estate, any party in interest in the Creditor Protection Proceedings or any court overseeing such proceedings, for purposes of deciding the final allocation of divestiture proceeds. See "Allocation of Divestiture Proceeds and Other Inter-Estate Matters" below for a discussion on the Allocation Settlement Agreement regarding the 4th Estate Entities, as defined below.

During the six months ended June 30, 2012, Nortel received additional proceeds of $73 that had been held in escrow subject to the successful completion of performance obligations under the transition services agreements ("TSAs") entered into in connection with the sale of substantially all of Nortel's CDMA business, LTE Access assets, and CVAS business, and its North American GSM business, all of which were recorded as gains on divestitures included in reorganization items – net. As of June 30, 2012, $24 in connection with the divestitures of substantially all of the assets of Nortel's Optical Networking and Carrier Ethernet businesses, CVAS business, and substantially all of the assets of Nortel's MSS business, is currently unrecorded, a portion of which will be recognized into income subject to agreement between Nortel and each of the various buyers that obligations under the TSAs have been completed. Such amounts, when and if received, will also be held in escrow until the final allocation of these proceeds as between various Nortel legal entities, including the U.S. and EMEA Subsidiaries, is ultimately determined.

*Allocation of Divestiture Proceeds and Other Inter-Estate Matters*

At various times during the second half of 2009 and the first quarter of 2010, the Canadian Debtors, the U.S. Debtors and the U.K. Administrators, with the involvement of the Canadian Monitor, the U.S. Principal Officer, the U.S. Creditors' Committee and the Bondholder Group engaged in negotiations regarding the scope and terms of a proposed protocol for resolving disputes concerning the allocation of sale proceeds ("Allocation Protocol"), as required by the terms of the IFSA. However, it became apparent that the parties had differing views concerning the allocation of the sale proceeds, inter-company claims and the scope of the Allocation Protocol. In order to address this impasse, the Canadian Debtors, the U.S. Debtors and the U.K. Administrators agreed to temporarily suspend negotiations on the Allocation Protocol and instead focused on a process to facilitate a comprehensive settlement to resolve all material outstanding inter-estate matters, including the allocation of the sale proceeds and the settlement of inter-company claims. To this end, the parties met on several occasions to outline, on a confidential and without prejudice basis, their respective allocation methodologies and potential inter-company claims that may be asserted.

8

Table of Contents

As a result of these meetings and the complexity of the issues that were raised, the Canadian Debtors, the U.S. Debtors, the EMEA Debtors, the U.K. Administrators, the Canadian Monitor the U.S. Principal Officer, the U.S. Creditors' Committee, the Bondholder Group and certain other interested parties (collectively, the "Mediation Parties") agreed that these inter-estate negotiations would be aided by the appointment of a neutral mediator to review and mediate the issues. The parties selected Layn R. Phillips, a former U.S. federal district court judge and experienced commercial mediator, to serve as mediator and review the positions and viewpoints of the various parties on allocation and unresolved inter-estate matters. A confidential, non-binding mediation was held in November 2010. The mediation session did not result in the resolution of the issues presented.

As a result of the November 2010 mediation session, and positions taken in the CCAA Proceedings, it became apparent that the U.K. Administrators and certain other parties, who were also substantial creditors of the EMEA Debtors, were alleging a number of significant potential claims against the Canadian Debtors as well as the U.S. Debtors. These potential claims were integral to the allocation positions of these parties and included allegations of proprietary and trust-type claims. Consequently, the Canadian Monitor and the Canadian Debtors determined that, absent reaching a comprehensive settlement of allocation and inter-company claims issues, these specific claims needed to be resolved first. Accordingly, the Canadian Debtors obtained an order of the Canadian Court establishing a process for the calling of claims from EMEA creditors. Notwithstanding the commencement of this process, the Mediation Parties continued to engage in discussions regarding the resumption of mediation and another confidential, non-binding mediation was held in April 2011. On April 13, 2011, Nortel announced that the mediation process that had been commenced in respect of the allocation of sale proceeds of its various business and asset divestitures and other inter-estate matters, including inter-company claims, had ended without resolution of the matters in dispute. In light of the unsuccessful conclusion of the mediation process, Nortel announced that delays in the ultimate resolution of allocation and inter-company claims matters potentially could be significant, and that such delays would result in a corresponding significant delay in the timing of distributions to holders of validated claims of the various estates.

On April 25, 2011, the U.S. Debtors and the U.S. Creditors' Committee filed a joint motion for an order establishing an allocation protocol for the sale proceeds as between various Nortel legal entities ("Original Protocol Motion"), and for related relief. Subsequently, as a result of further discussions, the U.S. Debtors and the U.S. Creditors' Committee together with the Canadian Debtors jointly filed an amended and restated version of the Original Protocol Motion and agreed to collectively seek an order establishing an allocation protocol before the Canadian Court and the U.S. Court. The proposed order would have had the U.S. Court and the Canadian Court establish procedures and an expedited schedule for the cross-border resolution by the U.S. Court and the Canadian Court on the allocation of proceeds from the sales of Nortel's businesses and from the sale of its patent portfolio. The motion was heard at a joint hearing of the U.S. Court and Canadian Court on June 7, 2011. On June 20, 2011, Nortel announced that the Canadian Court and the U.S. Court had reserved their decisions on the motions heard by such courts on June 7, 2011, and directed NNC, NNL and the other Canadian Debtors, NNI and the other U.S. Debtors, the EMEA Debtors, as well as certain other parties, to participate in a joint mediation of the issues raised in the motions. The directions provided that the Canadian Court and the U.S. Court together would appoint a sole mediator by supplemental order and that the mediator would determine the time, date, place and protocol of the mediation.

On June 17, 2011, and as supplemented on June 29, 2011, the Canadian Court and the U.S. Court appointed The Honourable Warren K. Winkler, Chief Justice of Ontario, as the sole mediator (the "Mediator") for the mediation. The mediation was ordered because of both courts' concern that the time required to prepare their decisions would also delay allocation proceedings and, therefore, distributions to creditors of the various Nortel estates.

The Mediator has the authority, in consultation with the Mediation Parties, to determine the scope of the mediation, as he deems appropriate, including the issue of allocation of the sale proceeds of Nortel's various businesses and patent portfolio, and global issues relating to allocation and claims. Participation in this mediation is mandatory. The mediation process will be terminated (i) by a declaration by the Mediator that a settlement has been reached (any such settlement would be subject to the approval of the Canadian Court and the U.S. Court, on notice to parties in interest), (ii) by a declaration by the Mediator that further efforts at mediation are no longer considered worthwhile, or (iii) for any other reason as determined by the Mediator. At the request of the U.S. Court, the commencement of the mediation was delayed pending the outcome of the October 14, 2011 hearing (discussed in more detail below).

The Canadian Court approved a claims process with regard to the significant inter-company claims made by the EMEA Debtors against the Canadian Debtors, which process included a requirement that claims be filed by March 18, 2011. In response to this call for claims, representatives of the U.K. Administrators, on behalf of the EMEA Debtors, filed 84 proofs of claims against the Canadian Debtors and unspecified directors and officers of NNC and NNL (the "EMEA Claims"). The EMEA Claims contain broad ranging claims set out with limited specificity. The EMEA Claims also include a number of large priority claims, which if allowed, would significantly reduce the potential proceeds available for distribution to unsecured creditors of the Canadian Debtors. Nortel is currently unable to quantify the total potential amounts claimed under the EMEA Claims, as many of the claims were not quantified. The EMEA Claims that were quantified total approximately CAD$9.8 billion. In addition, the U.K. Pension Trust Limited and the Board of the Pension Protection Fund in the U.K. filed an estimated claim of CAD$3.7 billion in respect of an alleged deficit in the U.K. pension plan (the "U.K. Pension Claim"). Should the EMEA Claims and the U.K. Pension Claim ultimately be allowed in the CCAA Proceedings on the basis filed, they could have the effect of doubling (or more) the otherwise estimated CCAA claims pool and, accordingly, significantly reduce potential distributions to other unsecured creditors of the Canadian Debtors. Further, counsel for 131 former employees of NNSA have submitted a letter indicating they would file proofs of claims in connection with an action that is currently before the courts in France.

**Table of Contents**

On September 30, 2009, the EMEA Debtors and certain of their affiliates (collectively the "EMEA Original Claimants") filed over 350 proofs of claim against the U.S. Debtors and unspecified directors and officers of the U.S. Debtors in the U.S. Court. On May 10, 2011, the U.S. Court entered an order requiring the EMEA Original Claimants to file more definite statements of their previously-filed claims, and to file any other pre-petition claims against the U.S. Debtors, by June 1, 2011, absent which any of their pre-petition claims would be disallowed. The deadline for filing amended proofs of claim was later extended on request of certain of the EMEA Original Claimants to June 3, 2011 ("U.S. EMEA Claims Bar Date"). The EMEA Original Claimants filed 38 amended proofs of claim on June 3, 2011. The remaining proofs of claim that had been filed by the EMEA Original Claimants and were not amended on a timely basis have been disallowed and expunged pursuant to the terms of the U.S. Court's May 10, 2011 order.

On July 15 and 22, 2011, the U.S. Debtors and the U.S. Creditors' Committee filed joint objections and motions to dismiss the claims of NNUK, NNSA and NNIL and the French Liquidator (collectively, the "EMEA Claimants"). On August 3, 2011, the U.S. Court issued an order that set October 13 and 14, 2011 as the hearing dates for these motions. The order also requested the Mediator to consider postponing the mediation discussed above until after these hearings and the U.S. Court's decision on the motions to dismiss. On August 9, 2011, the Mediator advised the parties to the mediation that he was postponing the initial procedural meeting to a date to be determined after the U.S. Court releases its decision. The U.S. Court heard the motions on October 14, 2011. On March 20, 2012, the U.S. Court granted the U.S. Debtors' and U.S. Creditors' Committee's motion to dismiss these EMEA Claimants' breach of duty of care and other fiduciary duty claims, claims of mismanagement under French law, and the contingent claims arising from the issuance of any financial support direction with respect to the U.K. pension plan. The U.S. Court declined to dismiss the remaining claims of these EMEA Claimants at this stage of the proceedings and has scheduled a hearing on August 22, 2012 to set a schedule for discovery. However, the U.S. Court noted that the arguments raised in the motions were persuasive in showing the weakness and unlikelihood of success of these claims.

Following the U.S. Court's March 20, 2012 decision, pursuant to a letter dated March 26, 2012 from the Mediator to Mediation Parties, an introductory mediation session was held on April 24, 2012 whereby Mediation Parties had the opportunity to meet privately with the Mediator. The Mediator advised that he will continue to hold meetings with individual parties to the mediation in his efforts to work towards a resolution on allocation matters. The Mediator is posting updates of a general nature regarding the mediation, as appropriate, on a website at www.nortelmediation.com . The content of this website is not a part of this report.

On June 19, 2012, Nortel, NNL, and certain other Nortel entities including NNI, NNUK and NNSA entered into an Allocation Settlement Agreement (the "4 th Estate Agreement") with Nortel entities in the Asia Pacific and CALA regions ("4th Estate Entities") providing for, among other matters, a final allocation to the 4th Estate Entities from the sale proceeds of Nortel's businesses. Under the terms of the 4 th Estate Agreement, a total of $45 from the sale proceeds held in escrow will be allocated among the 4th Estate Entities that participated in the various global business sales. The 4 th Estate Agreement further provides for acknowledgement and agreement on inter-company payables and receivables among the 4th Estate Entities as well as between the 4th Estate Entities and other Nortel entities party to the 4 th Estate Agreement, as at a certain date. The 4 th Estate Agreement was subject to court approvals in Canada and the U.S, which approvals were obtained on July 11, 2012 at a joint hearing. The 4 th Estate Agreement closed on August 7, 2012.

The 4 th Estate Agreement will enable the 4th Estate Entities to commence liquidation proceedings in their respective jurisdictions, as part of Nortel's global wind down. The 4th Estate Entities have no further claim to the sale proceeds held in escrow and are no longer a party to the mediation described above.

### Developments in the Creditor Protection Proceedings

Since the filing of Nortel's 2011 Annual Report, in addition to the matters described above, the following are the material developments in the sales of its assets and in the Creditor Protection Proceedings.

### CCAA Proceedings

On the Petition Date, the Canadian Debtors obtained an initial order from the Canadian Court for creditor protection for 30 days, pursuant to the provisions of the CCAA, which has since been extended from time to time and most recently to October 31, 2012 and is subject to further extensions by the Canadian Court.

On July 27, 2012, the Canadian Court approved a claims process with regard to inter-company claims by the 4th Estate Entities and other non-filed subsidiaries, but excluding the EMEA Debtors, U.S. Debtors and certain non-filed subsidiaries of the U.S. Debtors, against the Canadian Debtors as at September 30, 2011. Further, the Canadian Court confirmed that the claims of the 4th Estate Entities against the Canadian Debtors are as specified in the 4 th Estate Agreement and barred any further claims of these entities against the Canadian Debtors. The bar date, to the extent applicable, for this claims process is September 7, 2012. The Canadian Debtors sought these orders so that they may achieve certainty regarding claims that may be asserted by certain of their affiliates not subject to prior inter-company claims processes.

**Table of Contents**

### Chapter 11 Proceedings

On June 21, 2010, the U.S. Debtors filed a motion seeking to terminate certain U.S. retiree and long-term disability ("LTD") benefits effective as of August 31, 2010. The U.S Debtors filed a notice of withdrawal of this motion with the U.S. Court on July 16, 2010. On June 21, 2011, upon the motion of the U.S. Debtors dated June 2, 2011, the U.S. Court entered an order directing the U.S. Trustee to establish a committee of retirees for the U.S. Debtors to consult with before undertaking any modification or termination of the U.S. retiree benefits. Additionally, on June 22, 2011, the U.S. Court entered an order directing the U.S Trustee to establish a committee of LTD employees for the U.S. Debtors to consult with before undertaking any modification or termination of the U.S. LTD benefits. On August 2, 2011, the U.S. Trustee appointed the members of these committees. Upon the motion of the U.S. Debtors dated March 28, 2012, on April 18, 2012, the U.S. Court appointed a neutral mediator to mediate discussions between the U.S Debtors, the U.S. Creditors' Committee, the Bondholder Group and the retiree and LTD committees regarding a future modification or termination of U.S. retiree and LTD benefits. On July 30, 2012, the U.S. Debtors filed motions for authorization to terminate the U.S. retiree benefits, LTD Benefits and employment of the LTD employees. Hearings in the termination motions are scheduled for early November 2012.

### Internet Protocol Addresses

Nortel commenced a process, approved by the Canadian Court, to sell certain residual IT assets primarily consisting of about 17 million Internet Protocol version 4 addresses ("IP Addresses") and IT hardware assets including 700 servers. Working together with the Canadian Monitor, Nortel's goal is to maximize the value of these residual IT assets in a timely manner. Any definitive sale agreement will require approval of the Canadian Court.

On February 17, 2012, the Canadian Court approved two sale agreements that NNL and Nortel Networks Technology Corporation ("NNTC") had entered into for the sale of rights in a small number of Nortel's IP Addresses. Under one sale agreement, CSC Holdings LLC, the operating subsidiary of Cablevision Systems Corporation, is the purchaser of a certain number of the IP Addresses, and under the other sale agreement, Salesforce.com Inc. is the purchaser of a certain number of the IP Addresses. The financial and other terms of each of the sale agreements, including the cash purchase price and the IP Addresses included in each sale, have been sealed by order of the Canadian Court because disclosure of such terms may be detrimental to the Canadian Debtors' interests in seeking to consummate these and other sales of IP Addresses. Both purchasers have obtained approval from the American Registry for Internet Numbers ("ARIN") with respect to the transfer and registration of the IP Addresses in the respective purchasers' name upon closing. Nortel closed these sales in the first quarter of 2012 and the proceeds from the transactions have been deposited into an NNL single purpose bank account. The Canadian Debtors and the U.S. Debtors have agreed that any dispute relating to the rights and claims, if any, of the U.S. Debtors in and to the IP Addresses, including to an allocation of such sale proceeds, will be subject to a joint hearing of the Canadian Court and the U.S. Court prior to the distribution of such sale proceeds and, if appropriate, orders of such courts approving such distributions.

On April 4, 2012, the Canadian Court approved a further sale agreement that NNL and NNTC had entered into with Bell Aliant Regional Communications, Limited Partnership ("Bell Aliant") for the sale of rights in certain small number of Nortel's IP Addresses, which sale closed on April 5, 2012. On May 7, 2012, the Canadian Court approved a further sale agreement between Nortel and Vodafone Americas Inc. for the sale of rights of certain Nortel's IP Addresses which sale closed on May 15, 2012. All proceeds from these sales have been deposited into NNL's single purpose bank account, and have been included in non-current restricted cash. Similar to the earlier sales described above, the financial and other terms of these two sale agreements, including the cash purchase price and the IP Addresses included in the sales, were sealed by order of the Canadian Court for the reasons set out above. Nortel continues to seek buyers for the remainder of its IP Addresses.

11

Table of Contents

### Other Developments

Under the CCAA Proceedings, the Canadian Debtors filed a motion for an order authorizing and directing the Canadian Debtors to cease performing any environmental remediation at or in relation to five sites (Belleville, Brampton, Brockville, Kingston and London, Ontario), and that any claims in relation to such environmental remediation be subject to the court approved claims process under the CCAA Proceedings. Nortel brought the motion to disclaim any further obligation for such properties that are no longer owned or used by Nortel and that Nortel and its creditors derive no benefit from any further remediation. Subsequent to the filing of the motion, NNL entered into a transition agreement regarding the Brampton site that facilitated a gradual cessation of Nortel's environmental risk related tasks at that site, which tasks have now been completed. The Ministry of the Environment (the "MOE") made remediation orders with respect to the four other sites. The motion was heard in September 2011 in the Canadian Court, wherein the Canadian Debtors sought advice and direction that the MOE remediation orders were in breach of the CCAA stay. The MOE did not seek to enforce the remediation orders while the Canadian Court's decision was outstanding and Nortel continued to undertake environmental risk assessments and remediation related tasks at those sites. On March 9, 2012, the Canadian Court issued an order granting the Canadian Debtors motion, in particular agreeing that the MOE remediation orders are stayed under the CCAA Proceedings and authorizing Nortel to cease performing any remediation activities at or in relation to the five sites, and releasing Nortel from all contractual obligations to carry out remediation requirements at such sites. The order further stipulates that any claims in relation to any current or future remediation requirements by the MOE against Nortel or its current or former directors or officers are subject to resolution and determination in accordance with the claims procedure and claims resolution orders approved by the Canadian Court on July 30, 2009 and September 16, 2010, respectively. Nortel gave notice that, pursuant to the order, it is ceasing continued environmental remediation activities and all such activity has ceased. On March 23, 2012, Her Majesty the Queen in right of Ontario as represented by the MOE served a notice of motion for leave to appeal the March 9, 2012 Canadian Court order, which leave was granted on June 22, 2012. On July 3, 2012, the MOE served its notice of appeal, which appeal is still pending and no hearing date has yet been set.

### Condensed Combined Debtors Financial Statements

The financial statements contained within this note have been prepared in accordance with the guidance of ASC 852 and represent the condensed combined financial statements of the Canadian Debtors ("Debtors' financial statements") that are included in the unaudited condensed consolidated financial statements for the three and six months ended June 30, 2012 and 2011. The condensed combined statements of operations exclude the Canadian Debtors' interests in the results of operations of non-Debtor subsidiaries.

### Intercompany Transactions

Intercompany transactions and balances with Nortel's non-Debtor subsidiaries and affiliates have not been eliminated in the Debtors' financial statements.

### Contractual Interest Expense on Outstanding Long-Term Debt

During the three and six months ended June 30, 2012, Nortel has continued to accrue for interest expense of $88 and $175 ($80 and $159 for the three and six months ended June 30, 2011) in its normal course of operations related to debt issued by NNC and NNL in Canada and will continue to do so until it obtains a claims determination order that adjudicates the claims. During the pendency of the Creditor Protection Proceedings Nortel generally has not made and does not expect to make payments to satisfy any of the interest obligations of the Debtors. Nortel has continued to accrue interest on the $1,000 floating rate notes that matured on July 15, 2011 and on the $575 fixed rate convertible notes that matured on April 15, 2012 until it obtains a claims determination order that adjudicates the claims.

**Table of Contents**

*Foreign Currency Denominated Liabilities*

ASC 852 requires pre-petition liabilities of the Canadian Debtors that are subject to compromise to be reported at the claim amounts expected to be allowed, even if they may be settled for lesser amounts. For foreign currency denominated liabilities, the CCAA requires allowable claims to be translated at the exchange rate in effect as of the Petition Date unless otherwise provided for in a court-approved plan. The claims process approved by the Canadian Court provides that foreign currency denominated claims must be calculated by the Canadian Monitor in Canadian dollars using a January 13, 2009 exchange rate. However, the claims process order specifically recognizes the ability of the Canadian Debtors to utilize a different exchange rate in any proposed plan. Therefore, given the impact that fixing exchange rates may have on the amounts ultimately settled, foreign currency denominated balances of Nortel entities in Canada, including Nortel's U.S. dollar denominated debt, will not be accounted for using the Petition Date exchange rate but rather will continue to be accounted for in accordance with FASB ASC 830 "Foreign Currency Matters ("ASC 830"). To date, the Canadian Debtors have not developed any plan or proposed an alternative exchange rate and any plan would be subject to the Canadian Court's approval.

*Cash Restrictions*

As a result of the Creditor Protection Proceedings, cash and cash equivalents are generally available to fund operations in particular jurisdictions, but generally are not available to be freely transferred between jurisdictions, regions, or outside joint ventures, other than for normal course post—Petition Date intercompany trade and pursuant to specific agreements approved by the Canadian Court.

Proceeds from the various business and asset divestitures, as discussed above, are being held in escrow until the applicable jurisdictions can determine the proceeds allocations and are not available to fund operations.

13

Table of Contents

**NORTEL NETWORKS CORPORATION**
**(Under Creditor Protection Proceedings as of January 14, 2009 — note 2)**
**Notes to Condensed Consolidated Financial Statements (unaudited) — (Continued)**

**CONDENSED COMBINED STATEMENTS OF OPERATIONS**
**(Millions of U.S. Dollars)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2012 | 2011 | 2012 | 2011 |
| Revenues: | | | | |
|     Third party | $ — | $ — | $ — | $ — |
|     Non-Debtors subsidiaries | — | — | — | 1 |
| Total revenues | — | — | — | 1 |
| Cost of revenues: | | | | |
|     Third party | — | 1 | — | 6 |
|     Non-Debtors subsidiaries | — | — | — | 1 |
| Total cost of revenues | — | 1 | — | 7 |
| Gross loss | — | (1) | — | (6) |
| Selling, general and administrative expense | 21 | 40 | 41 | 70 |
| Other operating income —net | — | (16) | — | (33) |
| Operating loss | (21) | (25) | (41) | (43) |
| Other income (expense)—net | 4 | 8 | (5) | 3 |
| Interest expense | (86) | (79) | (172) | (158) |
| Loss from operations before reorganization items and income taxes | (103) | (96) | (218) | (198) |
| Reorganization items—net | (8) | (18) | 55 | (12) |
| Loss from operations before income taxes | (111) | (114) | (163) | (210) |
| Income tax benefit (expense) | — | — | — | — |
| Net loss attributable to Debtors including noncontrolling interests | (111) | (114) | (163) | (210) |
| Income attributable to noncontrolling interests | (3) | (3) | (6) | (6) |
| Net loss attributable to Debtors | $ (114) | $ (117) | $ (169) | $ (216) |

14

Table of Contents

**NORTEL NETWORKS CORPORATION**
**(Under Creditor Protection Proceedings as of January 14, 2009 — note 2)**
**Notes to Condensed Consolidated Financial Statements (unaudited)—(Continued)**

**CONDENSED COMBINED BALANCE SHEETS**
**(Millions of U.S. Dollars)**

| | June 30, 2012 | December 31, 2011 |
|---|---|---|
| **ASSETS** | | |
| **Current assets** | | |
| Cash and cash equivalents | $ 265 | $ 306 |
| Restricted cash and cash equivalents | 57 | 59 |
| Accounts receivable—net: | | |
| Third parties | 3 | 12 |
| Non-Debtors subsidiaries | 389 | 387 |
| U.S. Debtors subsidiaries | 80 | 93 |
| EMEA Debtors subsidiaries | 9 | 9 |
| Other current assets | 27 | 30 |
| **Total current assets** | 830 | 896 |
| Restricted cash and cash equivalents | 7,566 | 7,479 |
| Investments in non-Debtors / Debtors subsidiaries | 62 | 62 |
| Other assets | 44 | 50 |
| **Total assets** | $ 8,502 | $ 8,487 |
| **LIABILITIES AND SHAREHOLDERS' DEFICIT** | | |
| **Current liabilities** | | |
| Trade and other accounts payable: | | |
| Third parties | $ — | $ 2 |
| Non-Debtors subsidiaries | 141 | 134 |
| U.S. Debtors subsidiaries | — | 18 |
| EMEA Debtors subsidiaries | 10 | 10 |
| Payroll and benefit-related liabilities | 4 | 13 |
| Other accrued liabilities | 4 | 6 |
| **Total current liabilities** | 159 | 183 |
| **Long-term liabilities** | | |
| Deferred income taxes—net | 6 | 7 |
| Other liabilities | — | 7 |
| **Total long-term liabilities** | 6 | 14 |
| **Liabilities subject to compromise** | 11,729 | 11,561 |
| **Total liabilities** | 11,894 | 11,758 |
| **SHAREHOLDERS' DEFICIT** | | |
| **Total shareholders' deficit of Debtors** | (3,967) | (3,840) |
| Noncontrolling interests in Debtors | 575 | 569 |
| **Total shareholders' deficit** | (3,392) | (3,271) |
| **Total liabilities and shareholders' deficit** | $ 8,502 | $ 8,487 |

15

**Table of Contents**

**NORTEL NETWORKS CORPORATION**

**(Under Creditor Protection Proceedings as of January 14, 2009—note 2)**
**Notes to Condensed Consolidated Financial Statements (unaudited) – (Continued)**

**CONDENSED COMBINED STATEMENTS OF CASH FLOWS**
**(Millions of U.S. Dollars)**

| | Six Months Ended June 30, | |
|---|---|---|
| | 2012 | 2011 |
| **Cash flows from (used in) operating activities** | | |
| Net loss attributable to Debtors | $ (169) | $ (216) |
| Adjustments to reconcile net loss from operations to net cash used in operating activities: | | |
| Reorganization items—net | (84) | (38) |
| Other adjustments (a) | 211 | 302 |
| Net cash from (used in) operating activities | (42) | 48 |
| **Cash flows from (used in) investing activities** | | |
| Change in restricted cash and cash equivalents | (85) | (153) |
| Proceeds from the sales of investments, businesses and assets—net | 87 | 55 |
| Net cash from (used in) investing activities | 2 | (98) |
| **Cash flows from (used in) financing activities** | | |
| Net cash from (used in) financing activities | — | — |
| Effect of foreign exchange rate changes on cash and cash equivalents | (1) | 8 |
| **Net decrease in cash and cash equivalents** | **(41)** | **(42)** |
| **Cash and cash equivalents at beginning of the period** | **306** | **289** |
| **Cash and cash equivalents at end of the period** | **$ 265** | **$ 247** |

(a)  The operating section of the condensed combined statements of cash flows has been presented on a summarized basis and, as a result, Other adjustments represent all adjustments to reconcile net loss to net cash from (used in) operating activities, with the exception of Reorganization items—net.

16

Table of Contents

### 3. Accounting changes

#### (a) Presentation of Comprehensive Income

In June 2011, the FASB issued ASU No. 2011-05, "Presentation of Comprehensive Income" ("ASU 2011-5"), effective for interim periods and years beginning after December 15, 2011. The issuance of ASU 2011-5 is intended to improve the comparability, consistency and transparency of financial reporting and to increase the prominence of items reported in other comprehensive income. The guidance in ASU 2011-5 supersedes the presentation options in ASC Topic 220 and facilitates convergence of U.S. GAAP and International Financial Reporting Standards by eliminating the option to present components of other comprehensive income as part of the statement of changes in stockholders' equity and requiring that all non-owner changes in stockholders' equity be presented either in a single continuous statement of comprehensive income or in two separate but consecutive statements. In December 2011, the FASB issued an ASU to indefinitely defer the effective date of the provision pertaining only to the presentation of reclassification adjustments out of accumulated Other Comprehensive Income ("OCI") and reinstated the previous requirements to present reclassification adjustments either on the face of the statement in which OCI is reported or to disclose them in a note to the financial statements. Amendments to comprehensive income should be applied retrospectively and become effective for public entities for interim and annual periods beginning after December 15, 2011 with early adoption permitted. Nortel has historically disclosed comprehensive income in a separate note in its unaudited condensed consolidated interim financial statements, therefore the adoption of ASU 2011-05 has resulted in the inclusion of a separate statement in the financial statements, directly after condensed consolidated balance sheet, rather than in the notes to the financial statements.

### 4. Reorganization items—net

Reorganization items represent the net direct and incremental charges related to the Creditor Protection Proceedings such as revenues, expenses including professional fees directly related to the Creditor Protection Proceedings, realized gains and losses, and provisions for losses resulting from the reorganization and restructuring of the business. Reorganization items for the three and six months ended June 30, 2012 and 2011 consisted of the following:

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
|  | 2012 | 2011 | 2012 | 2011 |
| Professional fees [a] | $ (10) | $ (21) | $ (21) | $ (39) |
| Interest income [b] | 3 | 3 | 7 | 6 |
| Employee incentive plans [c] | (1) | (4) | (5) | (13) |
| Pension, post-retirement and post-employment plans [d] | — | — | — | 14 |
| Gain on divestitures—net [e] | 9 | 37 | 87 | 55 |
| Settlements [f] | (7) | — | (6) | — |
| Other—net [g] | — | (8) | — | (12) |
| Total reorganization items—net | $ (6) | $ 7 | $ 62 | $ 11 |

(a)   Includes financial, legal, real estate and valuation services directly associated with the Creditor Protection Proceedings.

17

Table of Contents

(b)    Reflects interest earned due to the preservation of cash as a result of the Creditor Protection Proceedings.
(c)    Relates to retention and incentive plans for certain key eligible employees deemed essential during the Creditor Protection Proceedings.
(d)    Includes amounts related to the settlement agreement with former and disabled Canadian employee representatives and the termination of the Nortel Networks Supplementary Executive Retirement Plan ("SERP") defined benefit plan. See note 9.
(e)    Relates to the gains on various divestitures, including escrow releases (net of direct and incremental costs). See note 2.
(f)    Relates to adjustments to expected allowed claim amounts.
(g)    Includes other miscellaneous items directly related to the Creditor Protection Proceedings.

Nortel received $61 relating to reorganization items—net in the six months ended June 30, 2012, attributable to $87 received from various divestitures and $7 for interest income, partially offset by $19 paid for professional fees and $14 paid for employee incentive plans.

Nortel received $57 relating to reorganization items in the six months ended June 30, 2011, attributable to $106 received for various divestitures and $6 for interest income, partially offset by $36 paid for professional fees, $3 paid for claims settlements and $16 paid for employee incentive plans.

See the unaudited condensed consolidated statements of cash flows for the non-cash portion of reorganization items, inclusive of gains reported on divestitures.

## 5. Condensed consolidated financial statement details

The following tables provide details of selected items presented in the unaudited condensed consolidated statements of operations and cash flows for the three and six months ended June 30, 2012 and 2011, and the unaudited condensed consolidated balance sheets as of June 30, 2012 and December 31, 2011.

### Condensed consolidated statements of operations

*Other operating income—net:*

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
|  | 2012 | 2011 | 2012 | 2011 |
|---|---|---|---|---|
| Royalty license income—net | $ — | $ — | $ — | $ (1) |
| Billings under TSAs | — | (19) | — | (44) |
| Other—net | — | 1 | (1) | 3 |
| Other operating income—net | $ — | $ (18) | $ (1) | $ (42) |

*Other income (expense) — net:*

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
|  | 2012 | 2011 | 2012 | 2011 |
|---|---|---|---|---|
| Rental income | $ — | $ 1 | $ — | $ 2 |
| Gain on sale and impairment of investments - net | — | 1 | — | 1 |
| Currency exchange gain (loss)—net | (8) | 10 | (14) | — |
| Other—net | — | (3) | (4) | (6) |
| Other income (expense)—net | $ (8) | $ 9 | $ (18) | $ (3) |

18

Table of Contents

*Condensed consolidated balance sheets*

*Accounts receivable — net:*

| | June 30, | December 31, |
|---|---|---|
| | **2012** | **2011** |
| Trade and other receivables [a] | $ 176 | $ 193 |
| Less: provisions for doubtful accounts | (17) | (19) |
| Accounts receivable—net | $ 159 | $ 174 |

(a)   Includes $141 and $155 as of June 30, 2012 and December 31, 2011, respectively, related to net accounts receivable from subsidiaries accounted for under the cost method, where settlement will occur as part of a plan of reorganization under the Creditor Protection Proceedings.

*Other current assets:*

| | June 30, | December 31, |
|---|---|---|
| | **2012** | **2011** |
| Prepaid expenses | $ 21 | $ 16 |
| Income taxes recoverable | 17 | 26 |
| Other | 33 | 37 |
| Other current assets | $ 71 | $ 79 |

*Plant and equipment — net:*

| | June 30, | December 31, |
|---|---|---|
| | **2012** | **2011** |
| Cost: | | |
| Buildings | $ 1 | $ 1 |
| Machinery and equipment | 88 | 91 |
| | 89 | 92 |
| Less accumulated depreciation: | | |
| Buildings | (1) | (1) |
| Machinery and equipment | (88) | (91) |
| | (89) | (92) |
| Plant and equipment—net | $ — | $ — |

19

**Table of Contents**

*Other assets:*

|  | June 30, 2012 | December 31, 2011 |
|---|---|---|
| Debt issuance costs | $    20 | $    24 |
| Other | 21 | 28 |
| Other assets | $    41 | $    52 |

*Other accrued liabilities:*

|  | June 30, 2012 | December 31, 2011 |
|---|---|---|
| Outsourcing and selling, general and administrative related provisions | $    3 | $    5 |
| Income taxes payable | 8 | 2 |
| Other | 2 | 11 |
| Other accrued liabilities | $    13 | $    18 |

*Other liabilities:*

|  | June 30, 2012 | December 31, 2011 |
|---|---|---|
| Tax uncertainties | $    8 | $    9 |
| Other long-term provisions | — | 8 |
| Other liabilities | $    8 | $    17 |

***Condensed consolidated statements of cash flows***

*Change in operating assets and liabilities — net:*

|  | Six Months Ended June 30, | |
|---|---|---|
|  | 2012 | 2011 |
| Accounts and other receivables—net | $    15 | $    44 |
| Deferred costs | — | 4 |
| Income taxes | 15 | (1) |
| Trade and other payables | (27) | (24) |
| Payroll, accrued and contractual liabilities | 164 | 226 |

20

**Table of Contents**

| | | |
|---|---|---|
| Deferred revenue | — | (9) |
| Advance billings in excess of revenues recognized to date on contracts | — | (2) |
| Other Change in operating assets and liabilities (a) | (5) | 28 |
| | $162 | $266 |

(a)   The changes in liability amounts noted above include obligations that are subject to compromise, consistent with their designation as of, and subsequent to, the Petition Date.

*Taxes and reorganization items paid (received):*

| | Six Months Ended June 30, | |
|---|---|---|
| | 2012 | 2011 |
| Cash taxes paid (received)—net | $    (3) | $    3 |
| Net receipts from reorganization items (note 4) | $    (61) | $    (57) |

## 6. Pre-Petition Date cost reduction plans

As a result of the Creditor Protection Proceedings, Nortel ceased taking any further actions under the previously announced workforce and cost reduction plans as of January 14, 2009. Any revisions to actions taken up to that date under previously announced workforce and cost reduction plans have been accounted for under such plans. Nortel's contractual obligations are subject to re-evaluation in connection with the Creditor Protection Proceedings and, as a result, expected cash outlays disclosed below relating to contract settlement and lease costs are subject to change. As well, Nortel is not following its pre-Petition Date practices with respect to the payment of severance in jurisdictions under the Creditor Protection Proceedings.

During the three and six months ended June 30, 2012 and 2011, charges related to Nortel's pre-Petition Date cost reduction plans were immaterial. As of June 30, 2012, the pre-petition cost reduction provision of $33 represents $23 of accrued severance claims for former employees and $10 in contract settlement and lease costs. As of December 31, 2011, the pre-petition cost reduction provision was $34.

## 7. Post-Petition Date cost reduction activities

In connection with the Creditor Protection Proceedings, Nortel has implemented certain workforce and other cost reduction activities and will continue such activities during this process. The actions related to these activities are expected to occur as they are identified. The current estimated total charges to earnings and cash outlays are subject to change as a result of Nortel's ongoing review of applicable law. In addition, the current estimated total charges to earnings and cash outlays do not reflect all potential claims or contingency amounts that may be allowed under the Creditor Protection Proceedings and thus are also subject to change.

### *Workforce Reduction Activities*

*Three and six months ended June 30, 2012*

For the three and six months ended June 30, 2012, approximately $2 and $6, respectively, of the total charges relating to the net workforce reduction of 41 and 92 positions, respectively, were incurred. As Nortel continues to progress through the Creditor Protection Proceedings, Nortel expects to incur charges and cash outlays related to workforce and other cost reduction strategies.

*Three and six months ended June 30, 2011*

For the three and six months ended June 30, 2011, approximately $6 and $10, respectively, of the total charges relating to the net workforce reduction of 259 and 345 positions, respectively, were incurred as of June 30, 2011, which substantially completes the workforce and other cost reduction strategies discussed above.

21

Table of Contents

During the six months ended June 30, 2012, changes to the workforce provision balances were as follows:

| | |
|---|---|
| Provision balance as of December 31, 2011 | $ 140 |
| Other charges | 6 |
| Cash drawdowns | — |
| Foreign exchange and other adjustments | (2) |
| Provision balance as of June 30, 2012 (a) | $ 144 |

(a)    Included in liabilities subject to compromise.

### Other Cost Reduction Activities

During the three and six months ended June 30, 2012, Nortel's real estate cost reduction activities resulted in charges of $3 and $3, respectively. During the three and six months ended June 30, 2011, Nortel's real estate cost reduction charges were nil.

As of June 30, 2012, Nortel's real estate and other cost reduction balances were approximately $9, which are classified as subject to compromise. As of December 31, 2011, Nortel's real estate and other cost reduction balances were approximately $6, which are classified as subject to compromise.

## 8. Income taxes

During the six months ended June 30, 2012, Nortel recorded a tax expense of $7 on loss from operations before income taxes of $180. The tax expense of $7 was comprised of $6 resulting from taxes on earnings in Asia, $1 of other taxes including withholding taxes, and $1 resulting from a provision for actual tax adjustments to the prior year balances, partially offset by decreases in uncertain tax positions of $1.

The ultimate determination of the final allocation of proceeds among the various Nortel legal entities has not yet occurred and may be materially different from the classification and related amounts shown in these unaudited condensed consolidated financial statements. Nortel expects that the final allocation of proceeds will mainly result in adjustments to existing loss carry-forward balances or other tax attributes, which will be offset with valuation allowance and have a nil impact to taxes payable.

During the six months ended June 30, 2011, Nortel recorded a tax expense of $1 on loss from operations before income taxes of $206. The tax expense of $1 was comprised of $3 resulting from taxes on earnings in Asia, offset by a recovery of $2 relating to changes in uncertain tax positions.

As of June 30, 2012, Nortel's net deferred tax liabilities were $6, representing the accrual of deferred tax liabilities associated with the expected withholding taxes relating to investments in CALA and Asia. There is significant uncertainty concerning the forecasted income or loss for 2012 and beyond and the uncertainty concerning the estimated final proceeds allocation by jurisdiction, and thus this significant negative evidence outweighs any positive evidence that may exist. Therefore, Nortel has concluded that a full valuation allowance continues to be necessary against Nortel's deferred tax assets in all jurisdictions as of June 30, 2012.

Nortel had approximately $1,477 and $1,487 of total gross unrecognized tax benefits as of June 30, 2012 and December 31, 2011, respectively. Of the total gross unrecognized tax benefits of $1,477, $10 represented the amount of unrecognized tax benefits, net of valuation allowance that would favorably affect the effective income tax rate in future periods, if recognized. The net decrease of $10 since December 31, 2011 resulted from $9 due to changes to foreign exchange rates, and a decrease in a prior year uncertain position of $1.

Nortel recognized interest and penalties accrued related to unrecognized tax benefits in income tax expense. During the six months ended June 30, 2012, Nortel recovered $1 related to interest, penalties and foreign exchange losses. Nortel has accrued approximately $6 and $7 for the payment of interest and penalties as of June 30, 2012 and December 31, 2011, respectively.

Nortel believes it is reasonably possible that its gross unrecognized tax benefit will decrease by $1,375 during the twelve months ending June 30, 2013, of which $636 relates to the deductibility of legal settlement expenses and $739 relates to investment tax credits with the resulting impact being the expiry of unutilized non capital losses from prior years.

Table of Contents

### 9. Employee benefit plans

#### Plan Description

Nortel maintains various investment plans covering substantially all of its employees, and acts as the plan sponsor for its defined benefit and defined contribution plans. Below is a list of relevant plans discussed in this note and their status as of June 30, 2012 and the basis for which they are being accounted for as of June 30, 2012. Note that although these plans represent Nortel's major retirement plans, Nortel also has smaller pension plan arrangements in other countries.

| Plan Name | Status | Current Accounting |
|---|---|---|
| Canadian Retirement Savings Plan | Ongoing | Defined Contribution |
| Canadian Defined Contribution Pension Plan ("DCPP") | Closed 9/30/2010 | Defined Contribution |
| Canadian Post Employment obligation | Terminated 12/31/2010 | Estimated Allowed Claim |
| Canadian Post Retirement obligation | Terminated 12/31/2010 | Estimated Allowed Claim |
| Canadian Defined Benefit Plans | | |
|     Managerial and Non-Negotiated Pension Plan (registered) | Plan sponsor only | Defined Benefit |
|     Negotiated Pension Plan (registered) | Plan sponsor only | Defined Benefit |
|     Transitional Retiring Allowance ("TRA") & Retirement Allowance ("RAP") Pension Plans | Plan sponsor only | Defined Benefit |
|     Nortel Networks Supplementary Executive Retirement Plan ("SERP") | Terminated 12/31/2010 | Estimated Allowed Claim |
|     Nortel Networks Limited Excess Pension Plan ("Excess") | Terminated 12/31/2010 | Estimated Allowed Claim |
| US LTIP (Long-Term Incentive Plan) | Deconsolidated 10/1/2010 | Deconsolidated |
| US Post Retirement obligation | Deconsolidated 10/1/2010 | Deconsolidated |

#### Wind-up Order of the Canadian Funded Pension Plans

On March 8, 2011, the Ontario Superintendent of Financial Services ordered the wind-up of the Nortel Networks Limited Managerial and Non-Negotiated Pension Plan and the Nortel Networks Negotiated Pension Plan (collectively, the "Canadian Pension Plans") with an effective date of October 1, 2010. Nortel's net pension liability for the Canadian Pension Plans is based on the pension assets and liabilities as of this wind-up date. As such, the 2012 and 2011 pension expense for the Canadian Pension Plans was limited to the amortization of accumulated other comprehensive income. As a result of this order, Nortel remeasured the pension obligations under the plans in the first quarter of 2011 using wind-up assumptions as of the effective date, resulting in a reduction to pension liabilities and OCI of $96. The settlement process for the Canadian Pension Plans has not been finalized, and as such the assumptions used to calculate the Canadian Pension Plans' pension obligations could be subject to change. There were no advancements in the settlement process for the Canadian Pension Plans during the six months ended June 30, 2012, which would require an adjustment to the carrying amount of the liability.

#### Pension Benefits

The following details the net pension expense for the defined benefit plans for the following periods:

| | Three Months Ended June 30, 2012 | Three Months Ended June 30, 2011 | Six Months Ended June 30, 2012 | Six Months Ended June 30, 2011 |
|---|---|---|---|---|
| **Pension expense:** | | | | |
| Interest cost | $ — | $ 1 | $ — | $ 2 |
| Amortization of net losses | 11 | 13 | 22 | 26 |
| Net pension expense | $ 11 | $ 14 | $ 22 | $ 28 |

23

Table of Contents

**10. Guarantees**

Nortel's requirement to make payments (either in cash, financial instruments, other assets, NNC common shares or through the provision of services) to a third party will be triggered as a result of changes in an underlying economic characteristic (such as interest rates or market value) that is related to an asset, a liability or an equity security of the guaranteed party or a third party's failure to perform under a specified agreement.

The following table provides a summary of Nortel's guarantees as of June 30, 2012:

| | Carrying Amount of Liability | Maximum Potential Liability [p] |
|---|---|---|
| Business sale and business combination agreements | | |
|     Third party claims [a] | $ 1 | $ 4 |
|     Specified annual sales volume [b] | 9 | 9 |
|     Intellectual property indemnification obligation [c] | — | NQ |
| Lease agreements [d] | — | 7 |
| Receivable securitization [e] | — | NQ |
| Other indemnification agreements | | |
|     EDC Support Facility [f] | 20 | 20 |
|     Global Class Action Settlement [g] | — | NQ |
|     Sale lease-back [h] | — | 4 |
|     Bankruptcy [i] | — | 1 |
|     Real estate residual value guarantee [j] | 21 | 21 |
|     Environmental indemnifications [k] | 8 | NQ |
| U.K. Defined Benefit Plan guarantee [l] | | |
|     Funding guarantee | 520 | NQ |
|     Insolvency guarantee | 150 | 150 |
| U.S. debt guarantee [m] | 150 | NQ |
| NNL lease guarantees [n] | 126 | NQ |
| NNL grant guarantee [o] | 7 | 7 |
| **Total** | $ 1,012 | $ 223 |

24

**Table of Contents**

_____

(a)   Includes guarantees in connection with agreements for the sale of all or portions of an investment or a Nortel business, including certain discontinued operations and guarantees related to the escrow of shares as part of business combinations in prior periods. Nortel has indemnified the purchaser of an investment or a Nortel business in the event that a third party asserts a claim against the purchaser that relates to a liability retained by Nortel relating to business events occurring prior to the sale, such as tax, environmental, litigation and employment matters. In certain agreements, Nortel also indemnifies counterparties for losses incurred from litigation that may be suffered by counterparties arising under guarantees related to the escrow of shares in business combinations. Some of these types of guarantees have indefinite terms while others have specific terms extending to no later than 2012. As of June 30, 2012, Nortel has not made any payments to settle such obligations and does not expect to do so in the future. However, an amount has been accrued for these guarantees, based on the probability of payout and expected payout, if required.

(b)   In conjunction with the sale of a subsidiary to a third party, Nortel guaranteed to the purchaser that specified annual sales volume levels would be achieved by the business sold over a ten-year period ended March 31, 2007. Nortel's guarantee to the purchaser was governed by the laws of the purchaser's jurisdiction. As such, the purchaser has the right to claim such payments under the volume guarantee until January 31, 2018, under the statute of limitations of such jurisdiction. As of June 30, 2012, Nortel has not made any payments to settle such obligations and does not expect to do so in the future.

(c)   Nortel has periodically entered into agreements with customers and suppliers that include intellectual property indemnification obligations that are customary in the industry. These agreements generally require Nortel to compensate the other party for certain damages and costs incurred as a result of third party intellectual property obligations arising from these transactions. These types of guarantees typically have indefinite terms; however, under some agreements, Nortel has provided specific terms extending to February 2011. As of June 30, 2012, Nortel has not made any payments to settle such obligations and does not expect to do so in the future.

(d)   Nortel has entered into agreements with its lessors to guarantee the lease payments of certain assignees of its facilities. Generally, these lease agreements relate to facilities Nortel vacated prior to the end of the term of its lease. These lease agreements require Nortel to make lease payments throughout the lease term if the assignee fails to make scheduled payments. Most of these lease agreements also require Nortel to pay for facility restoration costs at the end of the lease term if the assignee fails to do so. These lease agreements have expiration dates through June 2015. As of June 30, 2012, Nortel has not made any payments to settle such obligations and does not expect to do so in the future. However, an immaterial amount has been accrued for this liability, based on the probability of payout and expected payout, if required.

(e)   Nortel has agreed to indemnify certain of its counterparties in certain receivables securitization transactions. Certain receivables securitization transactions include indemnifications requiring the repurchase of the receivables, under certain conditions, if the receivable is not paid by the obligor. The indemnification provisions generally expire upon the earlier of either expiration of the securitization agreements, which extended through 2009, or collection of the receivable amounts by the purchaser. As of June 30, 2012, Nortel has not made any payments to settle such obligations and does not expect to do so in the future. However, an immaterial amount has been accrued for this liability, based on the probability of payout and expected payout, if required.

25

Table of Contents

(f)    Nortel has also agreed to indemnify Export Development Canada ("EDC") under the EDC support facility against any legal action brought against EDC that relates to the provision of support previously provided under the EDC support facility. Approximately $20 has been paid to third party beneficiaries by EDC under guarantees supporting Nortel performance obligations. Nortel has reimbursement obligations to EDC for such payments. As of June 30, 2012, Nortel has not made any payments to settle such obligations and does not expect to do so during the pendency of the Creditor Protection Proceedings.

(g)    On March 17, 2006, in connection with the agreements to settle two significant U.S. and all but one Canadian class action lawsuits, which became effective on March 20, 2007 following approval of the agreements by the appropriate courts ("Global Class Action Settlement"), Nortel announced that it had reached an agreement with the lead plaintiffs on the related insurance and corporate governance matters, including Nortel's insurers agreeing to pay $229 in cash towards the settlement and Nortel agreeing with its insurers to certain indemnification obligations. Nortel believes that it is unlikely that these indemnification obligations will materially increase its total cash payment obligations under the Global Class Action Settlement. As of June 30, 2012, Nortel has not made any significant payments to settle such obligations.

(h)    On June 27, 2007, NNL entered into a sale lease-back agreement where it agreed to provide an indemnity to the purchaser with respect to union and employee termination matters. The sale agreement requires NNL to compensate the purchaser for any costs in the event that NNL fails to effectively satisfy termination obligations to union employees; if a reinstatement application is brought by the union or non-union employees; or if the purchaser is required to re-hire selected union employees. The indemnification provision expires upon the retirement of the last former employee. The nature of the indemnification prevents Nortel from making a reasonable estimate of the maximum term of the indemnification. As of June 30, 2012, Nortel has not made any payments to settle such obligations and does not expect to do so in the future. However, an immaterial amount has been accrued for this liability, based on the probability of payout and expected payout, if required.

(i)    On February 28, 2008, NNL entered into a guarantee agreement in which it agreed to repay to the bankruptcy estate of a certain debtor, any interim dividends paid from the bankruptcy estate that NNL is not entitled to in the event that a creditor steps forward with a claim that requires a re-distribution of funds between the creditors. The nature of the indemnification prevents Nortel from making a reasonable estimate of the maximum term of the indemnification. As of June 30, 2012, Nortel has not made any payments to settle such obligations and does not expect to do so in the future. However, an immaterial amount has been accrued for this liability, based on the probability of payout and expected payout, if required.

(j)    On July 15, 1999, NNL entered into a guarantee and sales agency agreement whereby it agreed to provide the landlord of a property a residual value guarantee upon the termination of the related property lease. The amount of the guarantee became fixed upon termination of the lease on the property as of June 30, 2010.

(k)    Nortel has agreed to provide an indemnity to the purchasers of certain properties with respect to certain environmental matters. An estimated amount has been accrued for this liability, based on the probability of payout and expected payout, if required, which amount has been classified as liability subject to compromise. Certain purchasers of its certain properties have filed claims related to the environmental matters for an amount of $188, which amount continues to be assessed by the Canadian Debtors. To the extent that the claim is finalized in the future, the provision will be adjusted.

(l)    NNL has irrevocably and unconditionally guaranteed NNUK's punctual performance of certain payment obligations under the U.K. defined benefit pension plan funding agreement ("Pension Guarantee"). Pursuant to a further guarantee agreement NNL has guaranteed NNUK's payment obligations arising upon the wind-up, dissolution or liquidation of NNUK and consequent windup of such plan to the lesser of (a) $150 and (b) the amount of the plan's buy out deficit. Nortel has recorded liabilities of $520 and $150 for the Pension Guarantee and the further guarantee, respectively, representing Nortel's current assumption of the expected claim amount in accordance with ASC 852 in relation to each claim. The Pensions Regulator and Trustee of the Plan have filed a claim related to the Pension Guarantee for an amount of $810 and related to the further guarantee of $150. To the extent that more reliable information becomes available in the future indicates a difference from the recognized amounts, the provision will be adjusted.

(m)    NNL has unconditionally guaranteed $150 debt obligation of NNCC an indirect wholly owned finance subsidiary of NNI. Nortel has recorded a corresponding liability of $150 for this guarantee. Nortel has not accrued interest related to this debt obligation on the basis it does not believe it will be an allowed claim.

(n)    NNL has guaranteed the contractual obligations under the lease agreements entered into by certain of its U.S. Subsidiaries and EMEA Subsidiaries. These guarantees require NNL to make all lease payments required pursuant to the lease terms if and when a subsidiary fails to make required payments. The current recorded amount of claims filed by the landlords of the properties related to these guarantees total $192, which amount continues to be assessed by the Canadian Debtors. The maximum potential liability is subject to the ongoing real estate claims process.

(o)    NNL has guaranteed certain grants provided by the Industrial Development Agency of Ireland to NNIL to support in-country research and development activities. Nortel has recorded a liability of $7, representing the claim amount in accordance with ASC 852.

(p)    The nature of some guarantees and indemnification arrangements generally prevents Nortel from making a reasonable estimate of the maximum potential amount it could be required to pay under such agreements. For this reason, no amount has been included in the disclosure in these circumstances and such items have been denoted as non-quantifiable (NQ).

## 11. Fair Value

FASB ASC 820 "Fair Value Measurement and Disclosures" ("ASC 820") defines fair value, establishes a consistent framework for measuring fair value and expands disclosure requirements about fair value measurements. ASC 820, among other things, requires Nortel to maximize the use of observable inputs and minimize the use of unobservable inputs when measuring fair value.

26

Table of Contents

### Fair value hierarchy

ASC 820 provides a hierarchy of valuation techniques based on whether the inputs to those valuation techniques are observable or unobservable. Observable inputs reflect market data obtained from independent sources, while unobservable inputs reflect Nortel's assumptions with respect to how market participants would price an asset or liability. These two inputs used to measure fair value fall into the following three different levels of the fair value hierarchy:

*Level 1* : Quoted prices for identical instruments in active markets that are observable.

*Level 2* : Quoted prices for similar instruments in active markets; quoted prices for identical or similar instruments in markets that are non-active; inputs other than quoted prices that are observable, and derived from or corroborated by observable market data.

*Level 3:* Valuations derived from valuation techniques in which one or more significant inputs are unobservable. This hierarchy requires the use of observable market data when available.

### Determination of fair value

When available, Nortel uses quoted market prices to determine fair value of items classified in Level 1 of the fair value hierarchy, more specifically Nortel's long-term debt including liabilities subject to compromise.

## 12. Commitments

### Bid, performance-related and other bonds

Nortel has entered into bid, performance-related and other bonds associated with various contracts. Other bonds primarily relate to warranty contracts. Performance-related and other bonds generally have a term consistent with the term of the underlying contract. The various contracts to which these bonds apply generally have terms up to one year. Any potential payments which might become due under these bonds would be related to Nortel's non-performance under the applicable contract. Historically, Nortel has not made material payments under these types of bonds, and as a result of the Creditor Protection Proceedings, does not anticipate that it will be required to make such payments during the pendency of the Creditor Protection Proceedings.

The following table sets forth the maximum potential amount of future payments under bid, performance-related and other bonds, net of the corresponding restricted cash and cash equivalents:

| | June 30, 2012 | December 31, 2011 |
|---|---|---|
| Bid and performance-related bonds [a] | $ — | $ 3 |
| Other bonds [b] | — | — |
| Total bid, performance-related and other bonds | $ — | $ 3 |

(a)   Net of restricted cash and cash equivalent amounts of $5 and $6 as of June 30, 2012 and December 31, 2011, respectively.

(b)   Net of restricted cash and cash equivalent amounts of nil and $1 as of June 30, 2012 and December 31, 2011, respectively.

## 13. Loss per common share

The following table details the weighted-average number of NNC common shares outstanding for the purposes of computing basic and diluted loss per common share for the following periods:

27

Table of Contents

| | Three Months Ended June 30, | | | Six Months Ended June 30, | |
| | 2012 (a) | 2011 (a) | | 2012 (a) | 2011 (a) |
| | *Number of common shares in millions;* | | | *Number of common shares in millions;* | |
| Net loss attributable to Nortel Networks Corporation | $ (131) | $ (115) | | $ (194) | $ (220) |
| Basic weighted-average shares outstanding: | | | | | |
|    Issued and outstanding | 499 | 499 | | 499 | 499 |
| Weighted-average shares dilution adjustments: | | | | | |
|    1.75% Convertible Senior Notes | — | — | | — | — |
|    2.125% Convertible Senior Notes | — | — | | — | — |
|    Diluted weighted-average shares outstanding | 499 | 499 | | 499 | 499 |
| Weighted-average shares dilution adjustments—exclusions | | | | | |
|    1.75% Convertible Senior Notes | 18 | 18 | | 18 | 18 |
|    2.125% Convertible Senior Notes | 18 | 18 | | 18 | 18 |
| Basic and diluted loss per common share: | $ (0.26) | $ (0.23) | | $ (0.39) | $ (0.44) |

(a)   As a result of the net loss for the three and six months ended June 30, 2012 and 2011, all potential dilutive securities in these periods are considered anti-dilutive.

## 14. Shareholder's deficit

The following are the changes in shareholders' deficit during the six months ended June 30, 2012:

| | NNC Common Shares | Additional Paid-in Capital | Accumulated Deficit | Other Comprehensive Loss | Non-controlling Interests | Total |
|---|---|---|---|---|---|---|
| Balance as of December 31, 2011 | $35,604 | $ 3,597 | $ (42,406) | $ (143) | $ 639 | $(2,709) |
| Net loss | — | — | (194) | — | 7 | (187) |
| Foreign currency translation adjustment | — | — | — | 22 | — | 22 |
| Unamortized pension and post-retirement actuarial losses and prior service cost—net | — | — | — | 17 | — | 17 |
| Other | — | — | — | — | (9) | (9) |
| Balance as of June 30, 2012 | $35,604 | $ 3,597 | $ (42,600) | $ (104) | $ 637 | $(2,866) |

## 15. Liabilities subject to compromise

As a result of the Creditor Protection Proceedings, pre-petition liabilities may be subject to compromise or may otherwise be affected by a court-approved plan and generally, actions to enforce or otherwise effect payment of pre-petition liabilities are stayed. Although pre-petition claims are generally stayed, under the Creditor Protection Proceedings, the Debtors are permitted to undertake certain actions designed to stabilize the Debtors' operations including, among other things, payment of employee wages and benefits, maintenance of Nortel's cash management system, satisfaction of customer obligations, payments to suppliers for goods and services received after the Petition Date and retention of professionals. The Debtors have been paying and intend to continue to pay undisputed post-petition claims in the ordinary course of business. Under the Creditor Protection Proceedings, the Debtors have certain rights, which vary by jurisdiction, to reject, repudiate or no longer continue to perform various types of contracts or arrangements. Damages resulting from rejecting, repudiating or no longer continuing to perform a contract or arrangement are treated as general unsecured claims and will be classified as liabilities subject to compromise. ASC 852 requires pre-petition liabilities of the debtor that are subject to compromise to be reported at the claim amounts expected to be allowed, even if they may be settled for lesser amounts.

28

**Table of Contents**

Liabilities subject to compromise consist of the following:

| | June 30, 2012 | December 31, 2011 |
|---|---|---|
| Trade and other accounts payable | $ 167 | $ 164 |
| Payable to U.S. Subsidiaries | 2,151 | 2,151 |
| Restructuring liabilities | 186 | 180 |
| Long-term debt | 4,035 | 4,042 |
| U.S. debt guarantee (note 10) | 150 | 150 |
| Interest on long-term debt | 1,193 | 1,018 |
| Notes payable | 176 | 175 |
| Pension obligations | 1,548 | 1,557 |
| Post-retirement obligations other than pensions | 564 | 578 |
| U.K. pension guarantees (note 10) | 670 | 665 |
| EDC support facility (note 10) | 20 | 20 |
| NNL lease guarantees (note 10) | 126 | 125 |
| Real estate residual value guarantee (note 10) | 21 | 22 |
| NNL grant guarantee (note 10) | 7 | 7 |
| Environmental liabilities (note 10) | 8 | — |
| Liabilities of discontinued operations (a) | 34 | 34 |
| Other accrued liabilities | 53 | 51 |
| Total liabilities subject to compromise | $11,109 | $ 10,939 |

(a)    Relates to pre-petition liabilities of the Enterprise Solutions business, which were classified as discontinued operations in 2009.

As of June 30, 2012, the Canadian Debtors have received approximately 1,065 claims asserting approximately $29,503 (calculated utilizing exchange rates as of the petition date for presentation purposes) in aggregate outstanding liquidated claims (excluding EMEA, employee compensation and other intercompany claims). Some of these claims are unliquidated and are therefore not reflected in the aggregate claim amount above. The Canadian Debtors continue to investigate differences between the claim amounts filed by creditors and claim amounts determined by the Canadian Debtors. Certain claims filed may be duplicative (particularly given the multiple jurisdictions and Canadian Debtors involved in the Creditor Protection Proceedings), based on contingencies that have not occurred, or may be otherwise overstated, and would therefore be subject to revision or disallowance. Nortel believes the variance between total claims and total liabilities subject to compromise is primarily related to duplicative claims. The determination of Nortel's liabilities subject to compromise considers these factors, and these liabilities are subject to change as a result of the ongoing investigation by the Canadian Debtors of filed proofs of claim. A number of proofs of claim, for which Nortel has not accrued any amount or accrued significantly less than the amounts in the proofs of claim, continue to be reviewed by the Canadian Debtors and may result in significant changes in future periods once these reviews are complete.

An additional approximate 14,000 claims related to the employee compensation claims process totaling CAD$1.06 billion have been received by the Canadian Debtors.

As of June 30, 2012, the Canadian Debtors have resolved 739 claims, reducing the aggregate amount claimed against the Canadian Debtors by approximately $7,224. Although the Canadian Court has established a bar date, subject to certain excluded claims, by which certain proofs of claim against the relevant Canadian Debtors were required to be filed if the claimants were to receive any distribution under the Creditor Protection Proceedings, certain further claims may be permitted. In addition, the Canadian Debtors anticipate that additional proofs of claim will be the subject of future objections as such proofs of claim are reconciled. Accordingly, the ultimate number and amount of allowed claims is not determinable at this time.

The amounts currently classified as liabilities subject to compromise may be subject to future adjustments depending on actions of the applicable courts, further developments with respect to disputed claims, determinations of the secured status of certain claims, if any, the values of any collateral securing such claims, or other events. In addition, a number of proofs of claim, for which Nortel has not accrued any amount or accrued significantly less than the amounts in the proofs of claim, continue to be reviewed by the Canadian Debtors and may result in significant changes in future periods once these reviews are complete.

Classification for purposes of these financial statements of any pre-petition liabilities on any basis other than liabilities subject to compromise is not an admission of fact or legal conclusion by Nortel as to the manner of classification, treatment, allowance, or payment in the Creditor Protection Proceedings, including in connection with any plan that may be approved by any relevant court and that may become effective pursuant to a court's order.

**Table of Contents**

## 16. Contingencies

### Creditor Protection Proceedings

On January 14, 2009, the Canadian Debtors obtained an order from the Canadian Court for creditor protection and commenced ancillary proceedings under Chapter 15 of the U.S. Bankruptcy Code, the U.S. Debtors filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code, and each of the EMEA Debtors obtained an administration order from the English Court. After the Petition Date, the Israeli Debtors initiated similar proceedings in Israel. One of Nortel's French subsidiaries, NNSA, was placed into secondary proceedings in France and NNCI filed a voluntary petition for relief under Chapter 11 in the U.S. Court and became a party to the Chapter 11 Proceedings. Generally, as a result, all actions to enforce or otherwise effect payment or repayment of liabilities of any Debtor arising prior to the Petition Date, and substantially all pending claims and litigation against any Debtor, are stayed as of the Petition Date. Absent further order of the applicable courts and subject to certain exceptions and, in Canada, potential time limits, no party may take any action to recover on pre-petition claims against any Debtor.

### The Pensions Regulator Financial Support Directions

According to various claims filed by the trustee of the U.K. defined benefit pension plan and the PPF against certain Debtors, the U.K. defined benefit pension plan had a purported deficit estimated (on a buy-out basis) of £2,100 or $3,300 as at January 2009. In January 2010, the Pensions Regulator, purporting to act under the *Pensions Act 2004* (U.K.) ("U.K. Statute") issued a "warning notice" ("Warning Notice") to certain Nortel entities, including, among others, the Canadian Debtors and the U.S. Debtors. The Pensions Regulator is a statutory agency charged with responsibility for regulating the operations and administration of occupational pension schemes in the U.K., such as the U.K. defined benefit pension plan. The Warning Notice is the first step in a process set forth under the U.K. Statute to enable the Pensions Regulator to issue a financial support direction ("FSD") under the U.K. Statute directing affiliates of NNUK to provide financial support to eliminate the purported deficit. If a company to which a FSD is issued fails to comply with it, the Pensions Regulator may issue a contribution notice ("Contribution Notice") to any one or more persons to whom the FSD was addressed stating that the person is liable to pay to the trustees of the pension scheme the sum specified in the Contribution Notice, where the Pensions Regulator considers it reasonable to impose the liability on the person to pay the specified sum. The sum specified may be the whole or a portion of the actual or estimated deficit of the pension scheme. In the Warning Notice, the Pensions Regulator identified certain Nortel entities, including, among others, NNC, NNL, NNI and NNCI, as targets of a procedure before the determinations panel of the Pensions Regulator ("Determinations Panel") to determine whether to issue a FSD ("U.K. Pension Proceeding"). On February 26, 2010, the Canadian Debtors obtained an order of the Canadian Court, which included, among other things, (i) a declaration that the purported commencement of proceedings and exercise of rights by the Pensions Regulator breaches the Initial Order; and (ii) a declaration that any result obtained in the U.K. in breach of the stay under the CCAA Proceedings would not be recognized in the Canadian claims process. Also on February 26, 2010, the U.S. Debtors obtained an order of the U.S. Court enforcing the automatic stay under the U.S. Bankruptcy Code against the trustee of the U.K. defined benefit pension plan ("U.K. Pension Trustee") and the PPF, which is fully applicable to the U.K. Pension Trustee's and PPF's participation against the U.S. Debtors in the U.K. Pension Proceeding. In addition, the order of the U.S. Court provided that with respect to the U.S. Debtors, such proceedings are deemed void and without force or effect. The Pensions Regulator appealed the decision of the Canadian Court which appeal was heard and dismissed on June 16, 2010, by the Ontario Court of Appeal. The Pensions Regulator submitted an application for leave to appeal the decision of the Ontario Court of Appeal to the Supreme Court of Canada, which application was dismissed on January 27, 2011. In addition, the U.K. Pension Trustee brought a motion before the Canadian Court to have the stay lifted, to allow the U.K. Pension Proceeding to go forward as a "permitted proceeding", which motion was initially set for hearing on May 31, 2010, but was subsequently adjourned without date on the consent of all interested parties. The U.K. Pension Trustee and the PPF also appealed the decision of the U.S. Court enforcing the stay. That appeal was denied by the U.S. Court of Appeals for the Third Circuit ("U.S. Appeals Court") on December 29, 2011 and on January 24, 2012 the U.S. Appeals Court denied a petition by the U.K. Pension Trustee and the PPF for a rehearing of the appeal. On April 20, 2012, the U.K. Pension Trustee and the PPF filed a petition for certiorari with the Supreme Court of the United States, requesting review of the U.S. Appeals Court's December 29, 2011 decision, which was denied on June 25, 2012. The U.S. Debtors filed an objection to the claims and motion for a more definitive statement of claim on June 11, 2012. The U.S. Bankruptcy Court granted the motion on July 11, 2012, and ordered that the U.K. Pension Trustee and the PPF file a more definitive statement of their claims on or before September 5, 2012. Notwithstanding the orders of the Canadian Court and the U.S. Court and the dismissal of the Pension Regulator's appeal by the Ontario Court of Appeal, the FSD proceedings commenced in the U.K. on June 2, 2010, and on June 25, 2010, the Determinations Panel issued a determination notice ("Determination Notice") indicating that a FSD would be issued against certain Debtors including, among others, NNC, NNL, NNI and NNCI. On April 1, 2011, the Determinations Panel issued FSDs to NNC, NNL, NNI and NNCI requiring each of them to secure that financial support be put in place for the U.K. defined benefit pension plan within six calendar months of the date of the FSDs. The other Debtors that received the Determination Notice have exercised their right under the U.K. Statute to refer the Determinations Panel's determination to the Pensions Regulator Tribunal established under the U.K. Statute for a further determination of the matter. Nortel is of the view that the Determination Notice and the FSD issued to NNC, NNL, NNI and NNCI are null and void given the court decisions noted above.

In September 2010, the U.K. Administrators applied to the English Court for directions concerning the application and effect of the FSD regime contained in the U.K. Statute upon those EMEA Debtors that were identified in the Warning Notice. On December 10, 2010, the English Court ruled that the Pensions Regulator could pursue FSDs and Contribution Notices against the target Debtors in accordance with the provisions of the U.K. Statute. Further, the English Court held that the debt created by a Contribution Notice that may be issued constitutes an administration or liquidation expense of an insolvent target company, rather than a provable debt in the insolvency proceedings, thereby giving it "super priority" status over the claims of other creditors of the insolvent target company.

**Table of Contents**

The U.K. Administrators appealed this decision to the Court of Appeal of England and Wales ("U.K. Appeal Court") and, on October 14, 2011, the U.K. Appeal Court upheld the English Court's decision. The U.K. Administrators have been granted leave to appeal the U.K. Appeal Court's decision to the Supreme Court. Nortel is of the view that these court decisions in the U.K. have no authoritative application in the CCAA Proceedings or the Chapter 11 Proceedings and that the validity and relative priority of claims filed in those proceedings are matters to be determined by the Canadian Court and the U.S. Court, as applicable.

Pursuant to an intercompany guarantee agreement relating to the U.K. defined benefit pension plan, NNL has guaranteed certain payment obligations of NNUK under a Funding Agreement executed on November 21, 2006. Pursuant to a further intercompany guarantee agreement, NNL has guaranteed NNUK's payment obligations arising upon the wind up, dissolution or liquidation and consequent windup of such plan to the lesser of (a) $150 and (b) the amount of the plan's buyout deficit. See note 10.

### Securities Class Action Claim against former CEO and former CFO

On May 18, 2009, a complaint was filed in the U.S. District Court for the Southern District of New York alleging violations of federal securities law between the period of May 2, 2008 through September 17, 2008, against Mike Zafirovski (Nortel's former President and Chief Executive Officer) and Pavi Binning (Nortel's former Executive Vice President, Chief Financial Officer and Chief Restructuring Officer). Although Nortel is not a named defendant, this lawsuit has been stayed as a result of the Creditor Protection Proceedings. Messrs Zafirovski and Binning have filed claims in the U.S. Court for indemnification and contribution for potential liability arising out of this matter in amounts to be determined. As of November 8, 2010, the United States District Court for the Southern District of New York ordered that the matter be placed on the suspense docket pending developments in the Creditor Protection Proceedings.

### ERISA Lawsuit

As previously reported, beginning in December 2001, NNC, NNL and NNI, together with certain of its then-current and former directors, officers and employees, were named as defendants in several purported class action lawsuits pursuant to ERISA. These lawsuits were consolidated into a single proceeding in the U.S. District Court for the Middle District of Tennessee (the "U.S. District Court"). This lawsuit is on behalf of participants and beneficiaries of the Nortel Networks Inc. Long-Term Investment Plan, who held shares of the Nortel Networks Stock Fund during the class period. The lawsuit alleged, among other things, material misrepresentations and omissions to induce participants and beneficiaries to continue to invest in and maintain investments in NNC common shares through the investment plan. As a result of the Creditor Protection Proceedings, on September 25, 2009, the U.S. District Court ordered the case administratively closed. The parties to the action agreed to a final form of Stipulation of Settlement (the "Stipulation") whereby the defendants will cause their underwriter, Chubb Insurance Company of Canada ("Chubb"), to pay $21.5 into an escrow account on behalf of the defendants as full and final settlement of the action and in consideration for the releases and discharges provided under the Stipulation. Such settlement amount will be distributed in accordance with the terms of the Stipulation. In a side agreement, NNC, NNL, NNI and Chubb stipulated that existing claims filed by Chubb in the Creditor Protection Proceedings in Canada and in the U.S. will be reduced and allowed as general unsecured claims upon deposit by Chubb of the final settlement payments. The Stipulation and the side agreement were approved by the Canadian Court and the U.S. Court. The U.S. District Court also granted preliminary approval of the Stipulation. A fairness hearing for final approval was held on January 11, 2012 and the Stipulation was approved. Nortel has recorded a provision to reflect its best estimate of an allowed claim amount.

### Canadian Pension Class Action

On June 24, 2008, a purported class action lawsuit was filed against Nortel and NNL in the Ontario Superior Court of Justice in Ottawa, Canada alleging, among other things, that certain recent changes related to Nortel's pension plan did not comply with the *Pension Benefits Act* (Ontario) or common law notification requirements. The plaintiffs seek declaratory and equitable relief, and unspecified monetary damages. As a result of the Creditor Protection Proceedings, this lawsuit has been stayed.

### Nortel Statement of Claim Against its Former Officers

In January 2005, NNC and NNL filed a Statement of Claim in the Ontario Superior Court of Justice against Messrs. Frank Dunn, Douglas Beatty and Michael Gollogly, Nortel's former senior officers who were terminated for cause in April 2004, seeking the return of payments made to them under Nortel's bonus plan in 2003. One-half of any recovery from this litigation is subject to the Global Class Action Settlement. See note 10.

### Former Officers' Statements of Claim Against Nortel

In April 2006, Mr. Dunn filed a Notice of Action and Statement of Claim in the Ontario Superior Court of Justice against NNC and NNL asserting claims for wrongful dismissal, defamation and mental distress, and seeking punitive, exemplary and aggravated damages, out-of-pocket expenses and special damages, indemnity for legal expenses incurred as a result of civil and administrative proceedings brought against him by reason of his having been an officer or director of the defendants, pre-judgment interest and costs. Mr. Dunn has further brought an application before the Ontario Superior Court of Justice against Nortel and NNL seeking an order that, pursuant to its by-laws, Nortel reimburse him for all past and future defense costs he has incurred as a result of proceedings commenced against him by reason of his being or having been a director or officer of Nortel.

**Table of Contents**

In May and October 2006, respectively, Messrs Gollogly and Beatty filed Statements of Claim in the Ontario Superior Court of Justice against Nortel and NNL asserting claims for, among other things, wrongful dismissal and seeking compensatory, aggravated and punitive damages, and pre-and post-judgment interest and costs.

As a result of the Creditor Protection Proceedings, these lawsuits have been stayed.

*Environmental matters*

Nortel is exposed to liabilities and compliance costs arising from its past generation, management and disposal of hazardous substances and wastes. As of June 30, 2012, accruals for environmental matters were $8 and have been recorded in liabilities subject to compromise. At December 31, 2011, Nortel had remedial activities under way at five sites that are either currently or previously owned. On March 19, 2012, the Canadian Court issued an order that, among other things, authorized Nortel to cease performing any remediation activities at or in relation to the five sites. See note 2 for further information on this order.

Except as otherwise described herein, in each of the matters described above, the plaintiffs are seeking an unspecified amount of monetary damages. Nortel is unable to ascertain the ultimate individual or aggregate amount of monetary liability or financial impact to Nortel of the above matters, which, unless otherwise specified, seek damages from the defendants of material or indeterminate amounts or could result in fines and penalties. Except as noted above, Nortel cannot determine whether these actions, suits, claims and proceedings will, individually or collectively, have a material adverse effect on its business, results of operations, financial condition or liquidity. Except as otherwise described herein, Nortel intends to defend the above actions, suits, claims and proceedings in which it is a defendant, litigating or settling cases where in management's judgment it would be in the best interest of stakeholders to do so. Nortel will continue to cooperate fully with all authorities in connection with the regulatory and criminal investigations.

Nortel is also a defendant in various other suits, claims, proceedings and investigations that arise in the normal course of business.

## 17. Subsequent events

In addition to the events identified in note 2, the Company has evaluated subsequent events through the filing date and determined that no other significant events occurred which require disclosure.

Table of Contents

**ITEM 2.**    **Management's Discussion and Analysis of Financial Condition and Results of Operations**

**TABLE OF CONTENTS**

Executive Overview                                                                34
Results of Operations                                                             40
Liquidity and Capital Resources                                                   43
Off-Balance Sheet Arrangements                                                    45
Application of Critical Accounting Policies and Estimates                         45
Outstanding Share Data                                                            46
Cautionary Notice Regarding Forward-Looking Information                           46

*The following Management's Discussion and Analysis (MD&A) is intended to help the reader understand the results of operations and financial condition of Nortel Networks Corporation. As noted herein, we have completed the divestitures of all of our businesses as part of our Creditor Protection Proceedings. The MD&A should be read in combination with our unaudited condensed consolidated financial statements and the accompanying notes. All monetary amounts in this MD&A are in millions and in United States (U.S.) Dollars except per share amounts or unless otherwise stated.*

*Certain statements in this MD&A contain words such as "could", "expect", "may", "anticipate", "believe", "intend", "estimate", "plan", "envision", "seek" and other similar language and are considered forward-looking statements or information under applicable securities laws. These statements are based on our current expectations, estimates, forecasts and projections which we believe are reasonable but which are subject to important assumptions, risks and uncertainties and may prove to be inaccurate. Consequently, our actual results could differ materially from our expectations set out in this MD&A. In particular, see the Risk Factors section of this report as well as in our Annual Report on Form 10-K for the year ended December 31, 2011 filed with the U.S. Securities and Exchange Commission (SEC) and Canadian securities regulatory authorities (2011 Annual Report) for factors that could cause actual results or events to differ materially from those contemplated in forward-looking statements. Unless otherwise required by applicable securities laws, we disclaim any intention or obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.*

Where we say "we", "us", "our", "Nortel" or "the Company", we mean Nortel Networks Corporation or Nortel Networks Corporation and its subsidiaries that continue to be consolidated, as applicable. Where we say NNC, we mean Nortel Networks Corporation.

33

**Table of Contents**

Executive Overview

**Creditor Protection Proceedings**

On January 14, 2009 (Petition Date), after extensive consideration of all other alternatives, with the unanimous authorization of our board of directors after thorough consultation with our advisors, we initiated creditor protection proceedings in multiple jurisdictions under the respective restructuring regimes of Canada, under the Companies' Creditors Arrangement Act (CCAA) (CCAA Proceedings), the United States (U.S.) under Chapter 11 of the U.S. Bankruptcy Code (Chapter 11) (Chapter 11 Proceedings), the United Kingdom (U.K.) under the Insolvency Act 1986 (U.K. Administration Proceedings), and subsequently Israel under the Israeli Companies Law 1999 (Israeli Administration Proceedings). On May 28, 2009, one of our French subsidiaries, Nortel Networks SA (NNSA) was placed into secondary proceedings (French Secondary Proceedings). The CCAA Proceedings, Chapter 11 Proceedings, U.K. Administration Proceedings, Israeli Administration Proceedings and French Secondary Proceedings are together referred to as the "Creditor Protection Proceedings". On July 14, 2009, Nortel Networks (CALA) Inc. (NNCI), a U.S. based subsidiary with operations in the Caribbean and Latin America (CALA) region, also filed a voluntary petition for relief under Chapter 11 in the U.S. Bankruptcy Court for the District of Delaware (U.S. Court) and became a party to the Chapter 11 Proceedings. We initiated the Creditor Protection Proceedings with a consolidated cash balance, as of December 31, 2008, of approximately $2,400, in order to preserve our liquidity and fund operations during the process.

As used herein: "Bondholder Group" means a group purporting to hold a portion of our publicly traded debt; "Canadian Monitor" means Ernst & Young Inc. as court-appointed monitor in the CCAA Proceedings; "Debtors" means: (i) us, together with our principal operating subsidiary Nortel Networks Limited (NNL) and certain other Canadian subsidiaries (collectively, Canadian Debtors) that filed for creditor protection pursuant to the provisions of the CCAA in the Ontario Superior Court of Justice (Canadian Court); (ii) Nortel Networks Inc. (NNI), Nortel Networks Capital Corporation (NNCC) and certain other U.S. subsidiaries (collectively, U.S. Debtors) that have filed voluntary petitions under Chapter 11 in the U.S. Court; (iii) certain Europe, Middle East and Africa (EMEA) subsidiaries that made consequential filings under the Insolvency Act 1986 in the High Court of England and Wales (English Court) (including NNSA) and certain Israeli subsidiaries (collectively, Israeli Debtors) that made consequential filings under the Israeli Companies Law 1999 in the District Court of Tel Aviv (collectively, EMEA Debtors); "French Liquidator" means the liquidator appointed by the Versailles Commercial Court in secondary insolvency proceedings commenced by Nortel Networks SA in France; "U.K. Administrators" means, collectively, a representative of Ernst & Young LLP (in the U.K.) and a representative of Ernst & Young Chartered Accountants (in Ireland) as court-appointed joint administrators of Nortel Networks (Ireland) Ltd. (NNIL) and representatives of Ernst & Young LLP (in the U.K.) as court-appointed joint administrators of the EMEA Debtors other than NNIL; "U.S. Creditors' Committee" means the Official Committee of Unsecured Creditors of the U.S. Debtors appointed in the Chapter 11 Proceedings; "U.S. Principal Officer" means the principal officer of the U.S. Debtors appointed in the Chapter 11 Proceedings; and "U.S. Trustee" means the United States Trustee for the District of Delaware.

For further information regarding prior developments in connection with the Creditor Protection Proceedings, refer to our 2011 Annual Report.

*Discontinuance of Future Periodic Financial Reporting*

On August 9, 2012, we announced that the Canadian Monitor, after taking into account several factors arising from the advanced stage of the CCAA Proceedings, has determined that the expense and resources required to comply with our and NNL's quarterly and annual public reporting requirements can no longer be justified from the standpoint of the best interest of their creditors. Consequently, we and NNL will no longer be able to comply with our periodic reporting requirements and will discontinue preparing and filing quarterly and annual financial statements and all other periodic disclosure documents under applicable Canadian and U.S. securities laws effective as of the filing deadlines for our third quarter reporting obligations, being November 14, 2012 in the United States and November 29, 2012 in Canada.

Generally, when an issuer ceases to file its periodic disclosure documents in circumstances such as our and NNL's, the Canadian Securities Administrators will issue orders prohibiting trading in securities of the relevant issuer effective from and after the filing deadline under Canadian securities laws (so-called cease trade orders). We and NNL will be making submissions to the Canadian Securities Administrators that cease trade orders expected to be issued in respect of our and NNL's securities include certain permitted trading exceptions. However, there can be no assurance that the regulatory authorities will make such orders on the terms requested by us and NNL and, in particular, permit any trading exceptions.

In light of the foregoing, the directors and officers of NNC and NNL have indicated that they will step down from their positions with NNC and NNL upon the issuance of a court order under the CCAA that the Monitor will be seeking to extend its powers. Such order would allow the Monitor to exercise any powers that may be properly exercised by a board of directors and to terminate the engagement of NNC and NNL's external auditors.

Following the third quarter 2012 filing deadlines, as a means of keeping the public informed of material developments during the remainder of the CCAA proceedings, and until otherwise determined by the Monitor, we and NNL will endeavour to continue to comply with the material change disclosure requirements under Canadian securities laws, to the extent practicable in the

circumstances, and to file on SEDAR (the electronic filing system of the Canadian Securities Administrators) all court reports of the Monitor except for such reports, or portions thereof, in respect of which confidential treatment has been requested. All other continuous and current disclosure filings of NNC and NNL will be discontinued.

The materials filed in the CCAA Proceedings are also available on the Monitor's Restructuring Document Centre at www.ey.com/ca/nortel or by contacting the Monitor directly at 1-866-942-7177. Documents filed by the U.S. Debtors with the U.S. Court including monthly operating reports and other general information about the Chapter 11 Proceedings are available at http://chapter11.epiqsystems.com/nortel. The content of these websites is not a part of this report.

### Significant Business Divestitures

In June, 2009, we determined that selling our businesses was the best path forward. We have completed divestitures of all of our businesses including: (i) the sale of substantially all of our Code Division Multiple Access (CDMA) business and Long Term Evolution (LTE) Access assets to Telefonaktiebolaget LM Ericsson (Ericsson); (ii) the sale of substantially all of the assets of our Enterprise Solutions (ES) business globally, including the shares of Nortel Government Solutions Incorporated (NGS) and DiamondWare, Ltd. (Diamondware), to Avaya Inc. (Avaya); (iii) the sale of the assets of our Wireless Networks (WN) business associated with the development of Next Generation Packet Core network components (Packet Core Assets) to Hitachi, Ltd. (Hitachi); (iv) the sale of certain portions of our Layer 4-7 data portfolio to Radware Ltd.; (v) the sale of substantially all of the assets of our Optical Networking and Carrier Ethernet businesses to Ciena Corporation (Ciena); (vi) the sale of substantially all of the assets of our Global System for Mobile communications (GSM)/GSM for Railways (GSM-R) business to Ericsson and Kapsch CarrierCom AG (Kapsch); (vii) the sale of substantially all of the assets of our Carrier VoIP and Application Solutions (CVAS) business to GENBAND Inc. (now known as GENBAND U.S. LLC (GENBAND)); (viii) the sale of NNL's 50% plus one share interest in LG-Nortel Co. Ltd. (LGN), our Korean joint venture with LG-Electronics, Inc. (LGE), to Ericsson; (ix) the sale of substantially all of the assets of our global Multi Service Switch (MSS) business to Ericsson; (x) the sale of substantially all of the assets of Guangdong-Nortel Telecommunications Equipment Co. Ltd. (GDNT) to Ericsson Mobile Data Applications Technology Research and Development Guangzhou Company Limited and Ericsson (Guangdong Shunde) Communications Company Limited (collectively, Ericsson China); (xi) the sale of our remaining patents and patent applications to a consortium consisting of Apple Inc., EMC Corporation, Ericsson, Microsoft Corporation, Research in Motion Limited and Sony Corporation (collectively, the Consortium); and (xii) the sale of a small number of our Internet Protocol version 4 addresses to various purchasers.

One of the key remaining matters under the Creditor Protection Proceedings is the determination of allocation of sale proceeds among the various Nortel legal entities that participated in the sales of our businesses, which include entities subject to the respective Creditor Protection Proceedings in the different jurisdictions.

### Divestiture Proceeds Received

As of June 30, 2012, approximately $7,803 in net proceeds have been generated and received through the completed sales of businesses and remaining patents and patent applications. These divestiture proceeds include the following approximate amounts:

(a)   $1,120 from the sale of substantially all of our CDMA business and LTE Access assets;

(b)   $18 from the sale of our Layer 4-7 data portfolio;

(c)   $10 from the sale of our Packet Core Assets;

(d)   $932 from the sale of substantially all of the assets of our ES business, including the shares of DiamondWare and NGS;

(e)   $638 from the sale of substantially all of the assets of our Optical Networking and Carrier Ethernet businesses;

(f)   $79 from the sale of our North American GSM business;

(g)   $36 from the sale of our GSM business outside of North America (excluding our GSM business in CALA) and our global GSM-R business;

(h)   $156 from the sale of substantially all of our CVAS business;

(i)   $234 from the sale of NNL's 50% plus one share interest in LGN;

(j)   $49 from the sale of substantially all of our MSS business;

(k)   $56 from the sale of substantially all of the GDNT assets (which proceeds are recorded in cash and cash equivalents);

(l)   $4,470 from the sale of our remaining patents and patent applications; and

(m)   $5 from the sale of various other business assets.

As of June 30, 2012, $7,323 of proceeds received from divestitures of businesses and remaining patents and patent applications is being held in escrow and an additional $229, representative of proceeds from the sale of LGN, is included in non-current restricted cash and cash equivalents, all of which is currently reported in NNL solely for financial reporting purposes (including with respect to any gain recorded on such divestitures). The difference between the net proceeds received and the amount in escrow at June 30, 2012

Table of Contents

is as a result of amounts that, from time to time, have been distributed with the consent of each of the Debtors' estates and court approvals, as applicable, from the escrow accounts to satisfy: 1) various obligations arising from the divestitures, whether through payments to third party vendors, or to reimburse the Debtors or non-consolidated subsidiaries for costs incurred, or 2) payments to the Debtors or non-consolidated subsidiaries related to settlements reached in respect of certain agreements involving proceeds allocation. The ultimate determination of the final allocation of such proceeds among the various Nortel legal entities, including entities that are not consolidated in the accompanying unaudited condensed consolidated financial statements, has not yet occurred and may be materially different from the NNL classification and related amounts shown in these financial statements. The Interim Funding and Settlement Agreement (IFSA) and the escrow agreements for sales divestiture proceeds entered into by NNL, NNI and other Nortel legal entities provide for the processes for determining the final allocation of divestiture proceeds among such entities, either through joint agreement or, failing such agreement, other dispute resolution proceedings. Adjustments to the NNL classification and any related amounts arising from the ultimate allocation will be recognized when finalized. The NNL classification and related amounts shown in the accompanying unaudited condensed consolidated financial statements are not determinative of, and have not been accepted by any debtor estate, any party in interest in the Creditor Protection Proceedings or any court overseeing such proceedings, for purposes of deciding the final allocation of divestiture proceeds. See "Allocation of Divestiture Proceeds and other Inter-Estate Matters" below for a discussion on the Allocation Settlement Agreement regarding the 4th Estate Entities, as defined below.

During the six months ended June 30, 2012, we received additional proceeds of $73 that had been held in escrow subject to the successful completion of performance obligations under the transition services agreements (TSAs) entered into in connection with the sale of substantially all of our CDMA business, LTE Access assets, and CVAS business, and our North American GSM business, all of which were recorded as gains on divestitures included in reorganization items – net. As of June 30, 2012, $24 in connection with the divestitures of substantially all of the assets of our Optical Networking and Carrier Ethernet businesses, CVAS business, and substantially all of the assets of our MSS business is currently unrecorded, a portion of which will be recognized into income subject to agreement between Nortel and each of the various buyers that obligations under the TSAs have been completed. Such amounts, when and if received, will also be held in escrow until the final allocation of these proceeds as between various Nortel legal entities, including the U.S. and EMEA Subsidiaries, is ultimately determined.

### Allocation of Divestiture Proceeds and Other Inter-Estate Matters

At various times during the second half of 2009 and the first quarter of 2010, the Canadian Debtors, the U.S. Debtors and the U.K. Administrators, with the involvement of the Canadian Monitor, the U.S. Principal Officer, the U.S. Creditors' Committee and the Bondholder Group engaged in negotiations regarding the scope and terms of a proposed protocol for resolving disputes concerning the allocation of sale proceeds (Allocation Protocol), as required by the terms of the IFSA. However, it became apparent that the parties had differing views concerning the allocation of the sale proceeds, inter-company claims and the scope of the Allocation Protocol. In order to address this impasse, the Canadian Debtors, the U.S. Debtors and the U.K. Administrators agreed to temporarily suspend negotiations on the Allocation Protocol and instead focused on a process to facilitate a comprehensive settlement to resolve all material outstanding inter-estate matters, including the allocation of the sale proceeds and the settlement of inter-company claims. To this end, the parties met on several occasions to outline, on a confidential and without prejudice basis, their respective allocation methodologies and potential inter-company claims that may be asserted.

As a result of these meetings and the complexity of the issues that were raised, the Canadian Debtors, the U.S. Debtors, the EMEA Debtors, the U.K. Administrators, the Canadian Monitor the U.S. Principal Officer, the U.S. Creditors' Committee, the Bondholder Group and certain other interested parties (collectively, the Mediation Parties) agreed that these inter-estate negotiations would be aided by the appointment of a neutral mediator to review and mediate the issues. The parties selected Layn R. Phillips, a former U.S. federal district court judge and experienced commercial mediator, to serve as mediator and review the positions and viewpoints of the various parties on allocation and unresolved inter-estate matters. A confidential, non-binding mediation was held in November 2010. The mediation session did not result in the resolution of the issues presented.

As a result of the November 2010 mediation session, and positions taken in the CCAA Proceedings, it became apparent that the U.K. Administrators and certain other parties, who were also substantial creditors of the EMEA Debtors, were alleging a number of significant potential claims against the Canadian Debtors as well as the U.S. Debtors. These potential claims were integral to the allocation positions of these parties and included allegations of proprietary and trust-type claims. Consequently, the Canadian Monitor and the Canadian Debtors determined that, absent reaching a comprehensive settlement of allocation and inter-company claims issues, these specific claims needed to be resolved first. Accordingly, the Canadian Debtors obtained an order of the Canadian Court establishing a process for the calling of claims from EMEA creditors. Notwithstanding the commencement of this process, the Mediation Parties continued to engage in discussions regarding the resumption of mediation and another confidential, non-binding mediation was held in April 2011. On April 13, 2011, we announced that the mediation process that had been commenced in respect of the allocation of sale proceeds of our various business and asset divestitures and other inter-estate matters, including inter-company claims, had ended without resolution of the matters in dispute. In light of the unsuccessful conclusion of the mediation process, we announced that delays in the ultimate resolution of allocation and inter-company claims matters potentially could be significant, and that such delays would result in a corresponding significant delay in the timing of distributions to holders of validated claims of the various estates.

**Table of Contents**

On April 25, 2011, the U.S. Debtors and the U.S. Creditors' Committee filed a joint motion for an order establishing an allocation protocol for the sale proceeds as between various Nortel legal entities (Original Protocol Motion), and for related relief.

Subsequently, as a result of further discussions, the U.S. Debtors and the U.S. Creditors' Committee together with the Canadian Debtors jointly filed an amended and restated version of the Original Protocol Motion and agreed to collectively seek an order establishing an allocation protocol before the Canadian Court and the U.S. Court. The proposed order would have had the U.S. Court and the Canadian Court establish procedures and an expedited schedule for the cross-border resolution by the U.S. Court and the Canadian Court on the allocation of proceeds from the sales of our businesses and from the sale of our patent portfolio. The motion was heard at a joint hearing of the U.S. Court and Canadian Court on June 7, 2011. On June 20, 2011, we announced that the Canadian Court and the U.S. Court had reserved their decisions on the motions heard by such courts on June 7, 2011, and directed us, NNL and the other Canadian Debtors, NNI and the other U.S. Debtors, the EMEA Debtors, as well as certain other parties, to participate in a joint mediation of the issues raised in the motions. The directions provided that the Canadian Court and the U.S. Court together would appoint a sole mediator by supplemental order and that the mediator would determine the time, date, place and protocol of the mediation.

On June 17, 2011, and as supplemented on June 29, 2011, the Canadian Court and the U.S. Court appointed The Honourable Warren K. Winkler, Chief Justice of Ontario, as the sole mediator (the Mediator) for the mediation. The mediation was ordered because of both courts' concern that the time required to prepare their decisions would also delay allocation proceedings and, therefore, distributions to creditors of the various Nortel estates.

The Mediator has the authority, in consultation with the Mediation Parties, to determine the scope of the mediation, as he deems appropriate, including the issue of allocation of the sale proceeds of Nortel's various businesses and patent portfolio, and global issues relating to allocation and claims. Participation in this mediation is mandatory. The mediation process will be terminated (i) by a declaration by the Mediator that a settlement has been reached (any such settlement would be subject to the approval of the Canadian Court and the U.S. Court, on notice to parties in interest), (ii) by a declaration by the Mediator that further efforts at mediation are no longer considered worthwhile, or (iii) for any other reason as determined by the Mediator. At the request of the U.S. Court, the commencement of the mediation was delayed pending the outcome of the October 14, 2011 hearing (discussed in more detail below).

The Canadian Court approved a claims process with regard to the significant inter-company claims made by the EMEA Debtors against the Canadian Debtors, which process included a requirement that claims be filed by March 18, 2011. In response to this call for claims, representatives of the U.K. Administrators, on behalf of the EMEA Debtors, filed 84 proofs of claims against the Canadian Debtors and unspecified directors and officers of NNC and NNL (the EMEA Claims). The EMEA Claims contain broad ranging claims set out with limited specificity. The EMEA Claims also include a number of large priority claims, which if allowed, would significantly reduce the potential proceeds available for distribution to unsecured creditors of the Canadian Debtors. We are currently unable to quantify the total potential amounts claimed under the EMEA Claims, as many of the claims were not quantified. The EMEA Claims that were quantified total approximately CAD$9.8 billion. In addition, the U.K. Pension Trust Limited and the Board of the Pension Protection Fund in the U.K. filed an estimated claim of CAD$3.7 billion in respect of an alleged deficit in the U.K. pension plan (the U.K. Pension Claim). Should the EMEA Claims and the U.K. Pension Claim ultimately be allowed in the CCAA Proceedings on the basis filed, they could have the effect of doubling (or more) the otherwise estimated CCAA claims pool and, accordingly, significantly reduce potential distributions to other unsecured creditors of the Canadian Debtors. Further, counsel for 131 former employees of NNSA have submitted a letter indicating they would file proofs of claims in connection with an action that is currently before the courts in France.

On September 30, 2009, the EMEA Debtors and certain of their affiliates (collectively, the EMEA Original Claimants) filed over 350 proofs of claim against the U.S. Debtors and unspecified directors and officers of the U.S. Debtors in the U.S. Court. On May 10, 2011, the U.S. Court entered an order requiring the EMEA Original Claimants to file more definite statements of their previously-filed claims, and to file any other pre-petition claims against the U.S. Debtors, by June 1, 2011, absent which any of their pre-petition claims would be disallowed. The deadline for filing amended proofs of claim was later extended on request of certain of the EMEA Original Claimants to June 3, 2011 (U.S. EMEA Claims Bar Date). The EMEA Original Claimants filed 38 amended proofs of claim on June 3, 2011. The remaining proofs of claim that had been filed by the EMEA Original Claimants and were not amended on a timely basis have been disallowed and expunged pursuant to the terms of the U.S. Court's May 10, 2011 order.

On July 15 and 22, 2011, the U.S. Debtors and the U.S. Creditors' Committee filed joint objections and motions to dismiss the claims of Nortel Networks UK Limited (NNUK), NNSA and Nortel Networks (Ireland) Limited and the French Liquidator (collectively, the EMEA Claimants). On August 3, 2011, the U.S. Court issued an order that set October 13 and 14, 2011 as the hearing dates for these motions. The order also requested the Mediator to consider postponing the mediation discussed above until after these hearings and the U.S. Court's decision on the motions to dismiss. On August 9, 2011, the Mediator advised the parties to the mediation that he was postponing the initial procedural meeting to a date to be determined after the U.S. Court releases its decision. The U.S. Court heard the motions on October 14, 2011. On March 20, 2012, the U.S. Court granted the U.S. Debtors' and U.S. Creditors' Committee's motion to dismiss these EMEA Claimants' breach of duty of care and other fiduciary duty claims, claims of mismanagement under French law, and the contingent claims arising from the issuance of any financial support direction with respect to the U.K. Pension Plan. The U.S. Court declined to dismiss the remaining claims of these EMEA Claimants at this stage of the proceedings and has scheduled a hearing on August 22, 2012 to set a schedule for discovery. However, the U.S. Court noted that the arguments raised in the motions were persuasive in showing the weakness and unlikelihood of success of these claims.

**Table of Contents**

Following the U.S. Court's March 20, 2012 decision, pursuant to a letter dated March 26, 2012 from the Mediator to Mediation Parties, an introductory mediation session was held on April 24, 2012 whereby Mediation Parties had the opportunity to meet privately with the Mediator. The Mediator advised that he will continue to hold meetings with individual parties to the mediation in his efforts to work towards a resolution on allocation matters. The Mediator is posting updates of a general nature regarding the mediation, as appropriate, on a website at www.nortelmediation.com. The content of this website is not a part of this report.

On June 19, 2012, we, NNL, and certain other Nortel entities including NNI, NNUK and NNSA entered into an Allocation Settlement Agreement (the 4 th Estate Agreement) with Nortel entities in the Asia Pacific (APAC) and CALA regions (4th Estate Entities) providing for, among other matters, a final allocation to the 4th Estate Entities from the sale proceeds of our businesses. Under the terms of the 4 th Estate Agreement, a total of $45 from the sale proceeds held in escrow will be allocated among the 4th Estate Entities that participated in the various global business sales. The 4 th Estate Agreement further provides for acknowledgement and agreement on inter-company payables and receivables among the 4th Estate Entities as well as between the 4th Estate Entities and other Nortel entities party to the 4 th Estate Agreement, as at a certain date. The 4 th Estate Agreement was subject to court approvals in Canada and the U.S, which approvals were obtained on July 11, 2012 at a joint hearing. The 4 th Estate Agreement closed on August 7, 2012.

The 4 th Estate Agreement will enable the 4th Estate Entities to commence liquidation proceedings in their respective jurisdictions, as part of our global wind down and another important step toward the conclusion of the Creditor Protection Proceedings. The 4th Estate Entities have no further claim to the sale proceeds held in escrow and are no longer a party to the mediation described above.

### Developments in the Creditor Protection Proceedings

Since the filing of Nortel's 2011 Annual Report, in addition to the matters described above, the following are the material developments in the sales of its assets and in the Creditor Protection Proceedings.

### CCAA Proceedings

On the Petition Date, the Canadian Debtors obtained an initial order from the Canadian Court for creditor protection for 30 days, pursuant to the provisions of the CCAA, which has since been extended from time to time and most recently to October 31, 2012 and is subject to further extensions by the Canadian Court.

On July 27, 2012, the Canadian Court approved a claims process with regard to inter-company claims by the 4th Estate Entities and other non-filed subsidiaries, but excluding the EMEA Debtors, U.S. Debtors and certain non-filed subsidiaries of the U.S. Debtors, against the Canadian Debtors as at September 30, 2011. Further, the Canadian Court confirmed that the claims of the 4th Estate Entities against the Canadian Debtors are as specified in the 4 th Estate Agreement and barred any further claims of these entities against the Canadian Debtors. The bar date, to the extent applicable, for this claims process is September 7, 2012. The Canadian Debtors sought these orders so that they may achieve certainty regarding claims that may be asserted by certain of their affiliates not subject to prior inter-company claims processes.

### Chapter 11 Proceedings

On June 21, 2010, the U.S. Debtors filed a motion seeking to terminate certain U.S. retiree and long-term disability (LTD) benefits effective as of August 31, 2010. The U.S Debtors filed a notice of withdrawal of this motion with the U.S. Court on July 16, 2010. On June 21, 2011, upon the motion of the U.S. Debtors dated June 2, 2011, the U.S. Court entered an order directing the U.S. Trustee to establish a committee of retirees for the U.S. Debtors to consult with before undertaking any modification or termination of the U.S. retiree benefits. Additionally, on June 22, 2011, the U.S. Court entered an order directing the U.S Trustee to establish a committee of LTD employees for the U.S. Debtors to consult with before undertaking any modification or termination of the U.S. LTD benefits. On August 2, 2011, the U.S. Trustee appointed the members of these committees. Upon the motion of the U.S. Debtors dated March 28, 2012, on April 18, 2012, the U.S. Court appointed a neutral mediator to mediate discussions between the U.S Debtors, the U.S. Creditors' Committee, the Bondholder Group and the retiree and LTD committees regarding a future modification or termination of U.S. retiree and LTD benefits. On July 30, 2012, the U.S. Debtors filed motions for authorization to terminate the U.S. retiree benefits, LTD benefits and employment of the LTD employees. Hearings in the termination motions are scheduled for early November 2012.

### Internet Protocol Addresses

We commenced a process, approved by the Canadian Court, to sell certain residual IT assets primarily consisting of about 17 million Internet Protocol version 4 addresses (IP Addresses), and IT hardware assets including 700 servers. Working together with the Canadian Monitor, our goal is to maximize the value of these residual IT assets in a timely manner. Any definitive sale agreement will require approval of the Canadian Court.

On February 17, 2012, the Canadian Court approved two sale agreements that NNL and Nortel Networks Technology Corporation (NNTC) had entered into for the sale of rights in a small number of our IP Addresses. Under one sale agreement CSC Holdings LLC, the operating subsidiary of Cablevision Systems Corporation, is the purchaser of a certain number of the IP Addresses,

Table of Contents

and under the other sale agreement, Salesforce.com Inc. is the purchaser of a certain number of the IP Addresses. The financial and other terms of each of the sale agreements, including the cash purchase price and the IP Addresses included in each sale, have been sealed by order of the Canadian Court because disclosure of such terms may be detrimental to the Canadian Debtors' interests in seeking to consummate these and other sales of IP Addresses. Both purchasers have obtained approval from the American Registry for Internet Numbers (ARIN) with respect to the transfer and registration of the IP Addresses in the respective purchasers' name upon closing. We closed these sales in the first quarter of 2012 and the proceeds from the transactions have been deposited into an NNL single purpose bank account. The Canadian Debtors and the U.S. Debtors have agreed that any dispute relating to the rights and claims, if any, of the U.S. Debtors in and to the IP Addresses, including to an allocation of such sale proceeds, will be subject to a joint hearing of the Canadian Court and the U.S. Court prior to the distribution of such sale proceeds and, if appropriate, orders of such courts approving such distributions.

On April 4, 2012, the Canadian Court approved a further sale agreement that NNL and NNTC had entered into with Bell Aliant Regional Communications, Limited Partnership (Bell Aliant) for the sale of rights in a certain small number of our IP Addresses, which sale closed on April 5, 2012. On May 7, 2012, the Canadian Court approved a further sale agreement between us and Vodafone Americas Inc. for the sale of rights of certain our IP Addresses, which sale closed on May 15, 2012. All proceeds from these sales have been deposited into NNL's single purpose bank account, and have been included in non-current restricted cash. Similar to the earlier sales described above, the financial and other terms of these two sale agreements, including the cash purchase price and the IP Addresses included in the sales, were sealed by order of the Canadian Court for the reasons set out above. We continue to seek buyers for the remainder of our IP Addresses.

*Other Developments*

Under the CCAA Proceedings, the Canadian Debtors filed a motion for an order authorizing and directing the Canadian Debtors to cease performing any environmental remediation at or in relation to five sites (Belleville, Brampton, Brockville, Kingston and London, Ontario), and that any claims in relation to such environmental remediation be subject to the court approved claims process under the CCAA Proceedings. We brought the motion to disclaim any further obligation for such properties that are no longer owned or used by us and that we and our creditors derive no benefit from any further remediation. Subsequent to the filing of the motion, we entered into a transition agreement regarding the Brampton site that facilitated a gradual cessation of our environmental risk related tasks at that site, which tasks have now been completed. The Ministry of the Environment (the MOE) made remediation orders with respect to the four other sites. The motion was heard in September 2011 in the Canadian Court, wherein the Canadian Debtors sought advice and direction that the MOE remediation orders were in breach of the CCAA stay. The MOE did not seek to enforce the remediation orders while the Canadian Court's decision was outstanding and we continued to undertake environmental risk assessments and remediation related tasks at those sites. On March 9, 2012, the Canadian Court issued an order granting the Canadian Debtors motion, in particular agreeing that the MOE remediation orders are stayed under the CCAA Proceedings and authorizing us to cease performing any remediation activities at or in relation to the five sites, and releasing us from all contractual obligations to carry out remediation requirements at such sites. The order further stipulates that any claims in relation to any current or future remediation requirements by the MOE against us or our current or former directors or officers are subject to resolution and determination in accordance with the claims procedure and claims resolution orders approved by the Canadian Court on July 30, 2009 and September 16, 2010, respectively. We gave notice that, pursuant to the order, we are ceasing continued environmental remediation activities and all such activity has ceased. On March 23, 2012, Her Majesty the Queen in right of Ontario as represented by the MOE served a notice of motion for leave to appeal the March 9, 2012 Canadian Court order, which leave was granted on June 22, 2012. On July 3, 2012, the MOE served its notice of appeal, which appeal is still pending and no hearing date has yet been set.

*Basis of Presentation and Going Concern Considerations*

For periods ending after the Petition Date, we reflect adjustments to our financial statements in accordance with Financial Accounting Standards Board (FASB) Accounting Standards Codification (ASC) 852 "Reorganization" (ASC 852), on the basis that we will continue as a going concern.

After consideration of the guidance available in FASB ASC 810 "Consolidation" (ASC 810) and ASC 852 , the accompanying unaudited condensed consolidated financial statements as of June 30, 2012 and December 31, 2011 and for the three and six months ended June 30, 2012 and 2011 have been presented on the following basis with respect to our subsidiaries:

- the EMEA Debtors and their subsidiaries (collectively, the EMEA Subsidiaries) were accounted for under the equity method from the Petition Date up to May 31, 2010 and as an investment under the cost method of accounting thereafter;

- the U.S. Debtors and their subsidiaries (collectively, the U.S. Subsidiaries) were accounted for as consolidated subsidiaries until September 30, 2010 and as an investment under the cost method of accounting thereafter; and

- our other subsidiaries are consolidated throughout the periods presented consistent with the basis of accounting applied prior to the commencement of the Creditor Protection Proceedings with the exception of deconsolidated subsidiaries where there has been a deemed loss of control by us once in applicable liquidation proceedings as discussed in our 2011 Annual Report.

Table of Contents

We continue to exercise control over most of our subsidiaries located in Canada, CALA and APAC (other than those entities that are EMEA Subsidiaries or U.S. Subsidiaries or have been placed in liquidation proceedings), and our financial statements are prepared on a consolidated basis with respect to those subsidiaries.

See note 1 to the accompanying unaudited condensed consolidated financial statements for further information on our basis of presentation and going concern considerations.

### Reporting Requirements

As a result of the Creditor Protection Proceedings, we are periodically required to file various documents with and provide certain information to the Canadian Court, the U.S. Court, the English Court, the Canadian Monitor, the U.S. Creditors' Committee, the U.S. Trustee, the U.K. Administrators and the bondholders and other stakeholders. Depending on the jurisdictions, these documents and information may include statements of financial affairs, schedules of assets and liabilities, monthly operating reports, information relating to forecasted cash flows, as well as certain other financial information. Such documents and information, to the extent they are prepared or provided by us, will be prepared and provided according to requirements of relevant legislation, subject to variation as approved by an order of the relevant court. Such documents and information may be prepared or provided on an unconsolidated, unaudited or preliminary basis, or in a format different from that used in the financial statements included in our periodic reports filed with the SEC. Accordingly, the substance and format of these documents and information may not allow meaningful comparison with our regular publicly-disclosed financial statements. Moreover, these documents and information are not prepared for the purpose of providing a basis for an investment decision relating to our securities, or for comparison with other financial information filed with the SEC.

For a full discussion of the risks and uncertainties we face as a result of the Creditor Protection Proceedings, including the risks mentioned above, see the Risk Factors section of this report. Further information pertaining to our Creditor Protection Proceedings may be obtained through our website at www.nortel.com. Certain information regarding the CCAA Proceedings, including the reports of the Canadian Monitor, is available at the Canadian Monitor's website at www.ey.com/ca/nortel. Documents filed with the U.S. Court and other general information about the Chapter 11 Proceedings are available at http://chapter11.epiqsystems.com/nortel. The content of the foregoing websites is not a part of this report.

## Our Business

We have completed the sales of all of our businesses. We continue to oversee and fulfill the residual contracts not transferred to the various buyers. As a result, commencing with the first quarter of 2011, we have one reportable segment as our chief operating decision maker reviews financial and operating results and makes decisions on that basis.

**Results of Operations**

## Revenues

Revenues in the first six months of 2012 were $1 as compared to $21 in the first six months of 2011 representing a decrease of $20. The decrease was due to the sale of the MSS business.

## SG&A Expense

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2012 | 2011 | $ Change | % Change | 2012 | 2011 | $ Change | % Change |
| SG&A expense | $25 | $53 | $ (28) | (53) | $52 | $91 | $ (39) | (43) |

Selling, General and Administrative (SG&A) expense decreased to $25 in the second quarter of 2012 from $53 in the second quarter of 2011, a decrease of $28 or 53%. SG&A expense decreased to $52 in the first six months of 2012 from $91 in the first six months of 2011, a decrease of $39 or 43%. The decrease in SG&A expense was primarily due to headcount reductions and other cost reduction activities, partially offset by adjustments to provisions for doubtful accounts in respect of the recoverability of certain receivables.

## Pre-Petition Date Cost Reduction Plans

In the second quarter and first six months of 2012, charges related to restructuring plans were minimal.

As a result of the Creditor Protection Proceedings, we ceased taking any further actions under our previously announced workforce and cost reduction plans as of January 14, 2009. Any revisions to actions taken up to that date under previously announced workforce and cost reduction plans have been accounted for under such plans. Our contractual obligations are subject to re-evaluation in connection with the Creditor Protection Proceedings and, as a result, expected cash outlays relating to contract settlement and lease costs are subject to change. As well, we are not following our pre-Petition Date practices with respect to the payment of severance in jurisdictions under the Creditor Protection Proceedings.

Table of Contents

Recoveries primarily result from lease repudiations and other liabilities relinquished due to the Creditor Protection Proceedings and severance related accruals released from pre-Petition Date restructuring plans and re-established under post–Petition Date cost reduction activities. For further details, refer to note 6 to the accompanying unaudited condensed consolidated financial statements.

**Post-Petition Date Cost Reduction Activities**

In connection with the Creditor Protection Proceedings, we have taken and expect to take further workforce and other cost reduction actions. The actions related to these activities are expected to occur as they are identified. The following current estimated charges are based upon accruals made in accordance with U.S. GAAP. The current estimated total charges to earnings and cash outlays are subject to change as a result of our ongoing review of applicable law. In addition, the current estimated total charges to earnings and cash outlays do not reflect all potential claims or contingency amounts that may be allowed under the Creditor Protection Proceedings and thus are also subject to change.

*Workforce Reduction Activities*

For the three and six months ended June 30, 2012, approximately $2 and $6, respectively, of charges relating to the net workforce reduction of 41 and 92 positions, respectively, were incurred. As of June 30, 2012, our workforce reduction provision balances were approximately $144, which were classified as subject to compromise. As we continue to progress through the Creditor Protection Proceedings, we expect to incur charges and cash outlays related to workforce and other cost reduction strategies.

*Other Cost Reduction Activities*

For the three and six months ended June 30, 2012, our real estate cost reduction activities resulted in charges of $3 and $3, respectively. For the three and six months ended June 30, 2011 our real estate cost reduction charges were nil.

As of June 30, 2012, our real estate and other cost reduction balances were approximately $9, which are classified as liabilities subject to compromise. As of December 31, 2011, Nortel's real estate and other cost reduction balances were approximately $6, which are classified as subject to compromise.

**Other Operating Income — Net**

The components of other operating income — net were as follows:

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
|  | 2012 | 2011 | 2012 | 2011 |
|---|---|---|---|---|
| Royalty license income—net | $    — | $    — | $    — | $    (1) |
| Billings under TSAs | — | (19) | — | (44) |
| Other—net | — | 1 | (1) | 3 |
| Other operating income—net | $    — | $    (18) | $    (1) | $    (42) |

In the second quarter and first six months of 2012, other operating income — net was nil and $1, respectively.

In the second quarter and first six months of 2011, other operating income — net was $18 and $42, respectively, due primarily to billings related to TSAs.

41

**Table of Contents**

**Other Income (Expense) — Net**

The components of other income (expense) — net were as follows:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2012 | 2011 | 2012 | 2011 |
| Rental income | $    — | $    1 | $    — | $    2 |
| Gain on sale and impairment of investments—net | — | 1 | — | 1 |
| Currency exchange gain (loss)—net | (8) | 10 | (14) | — |
| Other—net | — | (3) | (4) | (6) |
| Other income (expense)—net | $    (8) | $    9 | $    (18) | $    (3) |

In the second quarter of 2012, other income (expense) — net was an expense of $8, primarily comprised of a currency exchange loss of $8. In the second quarter of 2011, other income (expense) — net was income of $9, primarily due to a currency exchange gain of $10, partially offset by other – net of $3.

In the first six months of 2012, other income (expense) — net was an expense of $18, primarily comprised of a currency exchange loss of $14 and other—net of $4. In the first six months of 2011, other income (expense) — net was an expense of $3, primarily due to other – net of $6, partially offset by rental income of $2.

**Interest Expense**

We have continued to accrue for interest expense in our normal course of operations related to debt issued by NNC and NNL in Canada totaling $88 and $80 in the quarters ended June 30, 2012 and 2011, respectively and we will continue to do so until we obtain a claims determination order that adjudicates the claims. During the pendency of the Creditor Protection Proceedings, we generally have not made and do not expect to make payments to satisfy the interest obligations of the Debtors. We have continued to accrue interest on the $1,000 floating rate notes that matured on July 15, 2011 and on the $575 fixed rate convertible notes that matured on April 15, 2012, until we obtain a claims determination order that adjudicates the claims.

**Reorganization Items — net**

Reorganization items represent the net direct and incremental charges related to the Creditor Protection Proceedings such as revenues, expenses including professional fees directly related to the Creditor Protection Proceedings, realized gains and losses, and provisions for losses resulting from the reorganization and restructuring of the business. Reorganization items for the three and six months ended June 30, 2012 and 2011 consisted of the following:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2012 | 2011 | 2012 | 2011 |
| Professional fees [a] | $    (10) | $    (21) | $    (21) | $    (39) |
| Interest income [b] | 3 | 3 | 7 | 6 |
| Employee incentive plans [c] | (1) | (4) | (5) | (13) |
| Pension, post-retirement and post-employment plans [d] | — | — | — | 14 |
| Gain on divestitures—net [e] | 9 | 37 | 87 | 55 |
| Settlements [f] | (7) | — | (6) | — |
| Other [g] | — | (8) | — | (12) |
| Total reorganization items—net | $    (6) | $    7 | $    62 | $    11 |

(a)    Includes financial, legal, real estate and valuation services directly associated with the Creditor Protection Proceedings.
(b)    Reflects interest earned due to the preservation of cash as a result of the Creditor Protection Proceedings.
(c)    Relates to retention and incentive plans for certain key eligible employees deemed essential during the Creditor Protection Proceedings.
(d)    Includes amounts related to the settlement agreement with former and disabled Canadian employee representatives and the termination of the Nortel Networks Supplementary Executive Retirement Plan (SERP) defined benefit plan. See note 9 to the accompanying unaudited condensed consolidated financial statements for more information.
(e)    Relates to the gains on various divestitures, including escrow releases (net of direct and incremental costs). See note 2 to the accompanying unaudited condensed consolidated financial statements for further information.
(f)    Relates to adjustments to expected allowed claim amounts.
(g)    Includes other miscellaneous items directly related to the Creditor Protection Proceedings.

**Income Tax Expense**

During the six months ended June 30, 2012, we recorded a tax expense of $7 on loss from operations before income taxes of $180. The tax expense of $7 was comprised of $6 resulting from taxes on earnings in Asia, $1 of other taxes including withholding taxes, and $1 resulting from a provision for actual tax adjustments to the prior year balances, partially offset by decreases in uncertain tax positions of $1.

Table of Contents

During the six months ended June 30, 2011, we recorded a tax expense of $1 on loss from operations before income taxes of $206. The tax expense of $1 was comprised of $3 resulting from taxes on earnings in Asia, offset by a recovery of $2 relating to changes in uncertain tax positions.

We continue to assess the valuation allowance recorded against our deferred tax assets on a quarterly and annual basis. The valuation allowance is in accordance with FASB ASC 740 "Income Taxes" (ASC 740), which requires us to establish a valuation allowance if, based on the weight of available evidence, it is more likely than not that some portion or all of a company's deferred tax assets will not be realized. Based on the available evidence, we have determined that a full valuation allowance continues to be necessary as of June 30, 2012 for all jurisdictions. For further information, see note 8 to the accompanying unaudited condensed consolidated financial statements.

## Liquidity and Capital Resources

### Overview

As of June 30, 2012, our cash and cash equivalents balance was $668.

Our consolidated cash is held globally in various Nortel consolidated entities and joint ventures as follows, as of June 30, 2012: $167 in APAC, $265 in Canada, $41 in CALA, $145 in joint ventures (including GDNT), $45 in China and $5 in EMEA. These amounts exclude restricted cash of $7,643, comprised of $7,638 accounted for in Canadian entities and $5 in Asia. See "Executive Overview — Creditor Protection Proceedings — Divestiture Proceeds Received" for further information regarding restricted cash held in Canadian entities. Cash balances related to the EMEA Subsidiaries and the U.S. Subsidiaries are no longer included in our consolidated cash balance as a result of the previously reported changes to cost accounting.

As of June 30, 2012, approximately $7,803 in net proceeds has been generated and received through the completed sales of our businesses and remaining patents and patent applications. As of June 30, 2012, $7,323 of the divestiture proceeds received is being held in escrow until the final allocation of these proceeds as between various Nortel legal entities is ultimately determined. An additional $229, reflecting proceeds from the sale of LGN, is included in restricted cash. During the six months ended June 30, 2012, we received additional proceeds of $73 that had been held in escrow subject to the successful completion of performance obligations under the TSAs entered into in connection with the sale of substantially all of our CDMA business, LTE Access assets, and CVAS business, and our North American GSM business, all of which were recorded as gain on divestitures included in reorganization items – net. As of June 30, 2012, a further $24 in aggregate was expected to be received in connection with the sales completed to date, subject to the satisfaction of various conditions. Such amount, when received, will also be held in escrow until the final allocation of these proceeds as between various Nortel legal entities is ultimately determined. See "Executive Overview — Creditor Protection Proceedings — Divestiture Proceeds Received".

Historically, we have deployed our cash throughout the corporate group, through a variety of intercompany borrowing and transfer pricing arrangements, which are largely no longer in effect. As a result of the Creditor Protection Proceedings, cash in the various jurisdictions is generally available to fund operations in that particular jurisdiction, but generally is not available to be freely transferred between jurisdictions, regions, or outside joint ventures, other than for normal course intercompany trade and pursuant to specific court-approved agreements as discussed below. Thus, there is pressure and reliance on cash balances in specific regions and jurisdictions.

We have established certain cash collateralized facilities in certain jurisdictions. Approximately $5 of cash collateral has been posted by Nortel in support of certain performance bonds and letter of credit facilities.

To enable certain Nortel subsidiaries (APAC Agreement Subsidiaries) in the APAC region to continue their respective business operations and to facilitate the business divestitures, the Debtors (other than the Israeli Debtors) entered into an Asia Restructuring Agreement (APAC Agreement). Under the APAC Agreement, the APAC Agreement Subsidiaries have paid a portion of the pre-petition intercompany debt to the Debtors (other than the Israeli Debtors). As of June 30, 2012, the Canadian Debtors, the U.S. Debtors and the EMEA Debtors have received to date approximately $37, $36 and $29, respectively, in aggregate in respect of the APAC Agreement. Further portions of the pre-petition intercompany debt continue to be repayable from time to time only to the extent of any such APAC Agreement Subsidiary's net cash balance at the relevant time, and subject to certain reserves and provisions.

We continue several initiatives to generate cost reductions and decrease the rate of cash outflow during the Creditor Protection Proceedings. Some of these initiatives include the workforce reduction plan announced on February 25, 2009 and other ongoing workforce and cost reduction activities and reviews of our real estate and other property leases, IT equipment agreements, supplier and customer contracts and general discretionary spending. With the completed sales of all of our businesses, we are focused on maximizing proceeds with respect to remaining assets. This includes the winding up of our remaining operations and subsidiaries globally, which can involve orderly wind-ups as well as commencement of liquidation proceedings, as the circumstances warrant.

43

Our current cash management system and consolidated cash on hand to fund our operations is subject to ongoing review and approval by the Canadian Monitor and may be impacted by the Creditor Protection Proceedings. The U.S. Principal Officer and the U.K. Administrators oversee the cash management system in their respective jurisdictions and those amounts are not included in our consolidated balance sheet as of June 30, 2012. There is no assurance that (i) we will be able to maintain our current cash management system; (ii) we will generate sufficient cash to fund and wind down our operations; (iii) cash collateralized facilities in certain jurisdictions will be sufficient for our business needs or that we will not have to provide further cash collateral; or (iv) the Debtors will be able to access proceeds in a timely manner from the divestitures as allocation of proceeds from the divestitures of our businesses and assets remains unresolved.

**Cash Flows**

Our total consolidated cash and cash equivalents excluding restricted cash decreased by $83 during the six months ended June 30, 2012 to $668, primarily due to cash flows attributable to the net cash used in operations.

Our liquidity and capital resources are primarily impacted by: (i) current cash and cash equivalents, (ii) operating activities, (iii) investing activities, and (iv) foreign exchange rate changes. The following table summarizes our cash flows by activity and cash on hand as of June 30, 2012 and 2011:

| | Six Months Ended June 30, | | |
| --- | --- | --- | --- |
| | **2012** | **2011** | **Change** |
| Net loss attributable to NNC | $(194) | $(220) | $  31 |
| Adjustments to net loss and working capital changes | 108 | 234 | (131) |
| Net cash from (used) in operating activities | (86) | 14 | (100) |
| Net cash from (used in) investing activities | 17 | (44) | 61 |
| Net cash used in financing activities | (8) | — | (8) |
| Effect of foreign exchange rate changes on cash and cash equivalents | (6) | 13 | (19) |
| **Net decrease in cash and cash equivalents** | **(83)** | **(17)** | **(66)** |
| **Cash and cash equivalents at beginning of period** | **751** | **807** | **(56)** |
| **Cash and cash equivalents at end of period** | **$ 668** | **$ 790** | **$(122)** |

*Operating Activities*

In the first six months of 2012, our net cash used in operating activities of $86 resulted from $54 from non-cash items and net loss attributable to NNC of $194, partially offset by changes in operating assets and liabilities of $162. Net cash from changes in operating assets and liabilities was mainly due to the decrease in accounts receivable of $15, change in payroll, contractual and accrued liabilities of $164 and increase in income taxes payable of $15, partially offset by the decrease in accounts payable of $27 and the change in other operating assets and liabilities of $5. The primary non-cash items were $88 in reorganization items under ASC 852, partially offset by pension and other accruals of $22, amortization and depreciation of $4, and income attributable to non-controlling interests of $7.

In the first six months of 2011, our net cash from operating activities of $14 resulted from changes in operating assets and liabilities of $266, partially offset by net loss attributable to NNC of $220 and non-cash items of $32. The net cash from changes in operating assets and liabilities was mainly due to the reduction of accounts receivable of $44, changes in deferred cost of $4, the change in payroll, accrued and contractual liabilities of $226, and the change in other operating assets and liabilities of $28, partially offset by the change in deferred revenues of $9, the decrease in accounts payable of $24, and the change in advanced billings of $2. The primary additions to our net loss for non-cash items were pension and other accruals of $28, amortization and depreciation of $20, income attributable to non-controlling interests of $13, more than offset by reorganization items under ASC 852 of $60 and other net of $33.

*Investing Activities*

In the first six months of 2012, net cash from investing activities was $17 primarily due to proceeds related to sale of businesses and assets of $88, which were reclassified to restricted cash and cash equivalents resulting in an increase in restricted cash and cash equivalents. The increase in restricted cash and cash equivalents related to proceeds was partially offset by decreases in restricted cash and cash equivalents of $17 primarily related to distributions from the Canadian Health and Welfare Trust.

In the first six months of 2011, net cash used in investing activities was $44 primarily due to an increase in restricted cash and cash equivalents of $151, partially offset by proceeds related to sale of businesses and assets of $107.

44

Table of Contents

*Financing Activities*

In the first six months of 2012, cash used in financing activities was $8, primarily due to dividends paid by subsidiaries to non-controlling interests.

In the first six months of 2011, cash used in financing activities was nil.

*Other Items*

In the first six months of 2012, our cash position was negatively impacted by $6 due to the unfavorable effects of changes in foreign exchange rates primarily from movements of the Canadian Dollar, Indian Rupee and Chinese Yuan against the U.S. Dollar.

In the first six months of 2011, our cash position was positively impacted by $13 due to the favorable effects of changes in foreign exchange rates.

*Fair Value Measurements*

We utilize observable (Level 1 and Level 2) inputs in determining the fair value of our long-term debt outstanding, as applicable.

## Future Uses of Liquidity

The matters described below, to the extent that they relate to future events or expectations, may be significantly affected by our Creditor Protection Proceedings. Those proceedings will involve, or may result in, various restrictions on our activities and/or the need to obtain third party approvals for various matters.

Our cash requirements, excluding distributions from restricted cash which may occur from time to time, for the 12 months commencing July 1, 2012 are primarily expected to consist of funding for operations and the following items:

- professional fees in connection with the Creditor Protection Proceedings of approximately $60; and
- costs related to workforce reductions and real estate actions totaling approximately $1.

Professional fees are based on best estimates but are subject to uncertainties related to the length and complexity of the mediation and Creditor Protection Proceedings described in the "Executive Overview – Creditor Protection Proceedings – Divestiture Proceeds Received" section of this report.

## Off-Balance Sheet Arrangements

### Bid, Performance-Related and Other Bonds

During the normal course of business, we have provided bid, performance, warranty and other types of bonds, which we refer to collectively as bonds, via financial intermediaries to various customers in support of commercial contracts, typically for the supply of telecommunications equipment and services. If we fail to perform under the applicable contract, the customer may be able to draw upon all or a portion of the bond as a remedy for our failure to perform. The contracts that these bonds support generally have terms up to one year. Bid bonds generally have a term of less than twelve months, depending on the length of the bid period for the applicable contract. Performance-related and other bonds generally have a term consistent with the term of the underlying contract. Historically, we have not made material payments under these types of bonds and as a result of the Creditor Protection Proceedings we do not anticipate that we will be required to make any such payments during the pendency of the Creditor Protection Proceedings.

The following table provides information related to these types of bonds as of:

|  | June 30, 2012 | December 31, 2011 |
|---|---|---|
| Bid and performance-related bonds (a) | $ — | $ 3 |
| Other bonds (b) | — | — |
| Total bid, performance-related and other bonds | $ — | $ 3 |

(a) Net of restricted cash and cash equivalent amounts of $5 and $6 as of June 30, 2012 and December 31, 2011, respectively.
(b) Net of restricted cash and cash equivalent amounts of nil and $1 as of June 30, 2012 and December 31, 2011, respectively.

## Application of Critical Accounting Policies and Estimates

Our accompanying unaudited condensed consolidated financial statements are based on the selection and application of U.S. GAAP, which require us to make significant estimates and assumptions. We believe that the accounting policies and estimates as disclosed in our 2011 Annual Report, as well as the following accounting policies and estimates, may involve a higher degree of judgment and complexity in their application and represent our critical accounting policies and estimates.

45

**Table of Contents**

We have discussed the application of these critical accounting policies and estimates with the audit committee of our board of directors.

**Creditor Protection Proceedings**

Of the $7,803 in proceeds received from divestitures of businesses and remaining patents and patent applications as of June 30, 2012, $7,323 is being held in escrow and an additional $229, reflecting proceeds from the sale of LGN, is included in restricted cash, all of which is currently reported in NNL solely for financial reporting purposes. The ultimate determination of the final allocation of such proceeds among the various Nortel legal entities, including entities that are not consolidated in these financial statements, has not yet occurred and may be materially different from the NNL classification and related amounts shown in these financial statements. Adjustments to the NNL classification and any related amounts arising from the ultimate allocation will be recognized when finalized. The NNL classification and related amounts shown in these financial statements are not determinative of, and have not been accepted by any Debtor estate, any party in interest in the Creditor Protection Proceedings or any court overseeing such proceedings, for purposes of deciding the final allocation of divestiture proceeds.

ASC 852 requires pre-petition liabilities of the debtor that are subject to compromise to be reported at the claim amounts expected to be allowed, even if they may be settled for lesser amounts. The amounts currently classified as liabilities subject to compromise may be subject to future adjustments depending on actions of the applicable courts, further developments with respect to disputed claims, determinations of the secured status of certain claims, if any, the values of any collateral securing such claims, or other events. In addition, a number of proofs of claim, for which Nortel has not accrued any amount or accrued significantly less than the amounts in the proofs of claim, continue to be reviewed by the Canadian Debtors and may result in significant changes in future periods once these reviews are complete.

## Outstanding Share Data

As of August 3, 2012, we had 498,206,366 NNC common shares outstanding.

## Cautionary Notice Regarding Forward-Looking Information

Certain statements in this report may contain words such as "could", "expect", "may", "should", "will", "anticipate", "believe", "intend", "estimate", "target", "plan", "envision", "seek" and other similar language and are considered forward-looking statements or information under applicable securities laws. These statements are based on our current expectations, estimates, forecasts and projections about the operating environment, economies and markets in which we conduct our remaining business. These statements are subject to important assumptions, risks and uncertainties that are difficult to predict, and the actual outcome may be materially different. Our assumptions, although considered reasonable by us at the date of this report, may prove to be inaccurate and consequently our actual results could differ materially from the expectations set out herein.

Actual results or events could differ materially from those contemplated in forward-looking statements as a result of the following: (i) risks and uncertainties relating to the Creditor Protection Proceedings including: (a) risks associated with our ability to: obtain required approvals and successfully consummate remaining divestitures; successfully conclude ongoing discussions for the sale of our remaining assets; develop, obtain required approvals for, and implement a court-approved plan; allocation of the sale proceeds of our businesses and assets among the various Nortel entities participating in these sales may take considerable time to resolve; resolve ongoing issues with creditors and other third parties whose interests may differ from ours; maintain adequate cash on hand in each of our jurisdictions to fund our remaining work within the jurisdiction during the Creditor Protection Proceedings; obtain any further required approvals from the Canadian Monitor, the U.K. Administrators, the U.S. Principal Officer, the U.S. Creditors' Committee, or other third parties; utilize net operating loss carryforwards and certain other tax attributes in the future; avoid the substantive consolidation of NNI's assets and liabilities with those of one or more other U.S. Debtors; operate effectively, and in consultation with the Canadian Monitor, the Canadian creditors' committee, the U.S. Creditors' Committee, the U.S. Principal Officer, work effectively with the U.K. Administrators, and French Liquidator in their respective administration of the EMEA businesses subject to the Creditor Protection Proceedings; continue as a going concern; actively and adequately communicate on and respond to events, media and rumors associated with the Creditor Protection Proceedings; retain and incentivize key employees; obtain court orders or approvals with respect to motions filed from time to time; resolve claims made against us in connection with the Creditor Protection Proceedings for amounts not exceeding our recorded liabilities subject to compromise; prevent third parties from obtaining court orders or approvals that are contrary to our interests; and (b) risks and uncertainties associated with: limitations on actions against any Debtor during the Creditor Protection Proceedings; the values, if any, that will be ascribed pursuant to any court-approved plan to outstanding Nortel securities and, in particular, that we do not expect that any value will be prescribed to the NNC common shares or the NNL preferred shares in any such plan; the delisting of NNC common shares from the NYSE; the delisting of NNC common shares and NNL preferred shares from the TSX and; any cease trade orders that are expected to be issued by the Canadian Securities Administrators to prohibit trading in securities of NNC and NNL following the third quarter filing deadlines applicable to NNC and NNL's quarterly reporting obligations under Canadian securities laws; and (ii) risks and uncertainties relating to our remaining restructuring work including: fluctuations in foreign currency exchange rates; the sufficiency of workforce and cost reduction initiatives; any adverse legal judgments, fines, penalties or settlements related to any significant pending or future litigation actions; failure to maintain integrity of our information systems; and our potential inability to maintain an effective risk management strategy. For additional information with respect to certain of these and other factors, see the "Risk Factors" section of this report. Unless otherwise required by applicable securities laws, we disclaim any intention or obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

Table of Contents

**ITEM 4.    Controls and Procedures**

Capitalized terms used in this Item 4 of Part I and not otherwise defined, have the meaning set forth for such terms in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section of this report.

### *Management Conclusions Concerning Disclosure Controls and Procedures*

We carried out an evaluation under the supervision and with the participation of management, including the Chief Financial Officer (CFO) Allan Bifield, pursuant to Rule 13a-15 under the Securities Exchange Act of 1934 (Exchange Act), of the effectiveness of our disclosure controls and procedures as at June 30, 2012. Based on this evaluation, management, including the CFO, have concluded that our disclosure controls and procedures as at June 30, 2012 were effective to provide reasonable assurance that information required to be disclosed in the reports we file and submit under the Exchange Act is recorded, processed, summarized and reported as and when required and that it is accumulated and communicated to our management, including the CFO, as appropriate, to allow timely decisions regarding required disclosure.

### *Internal Control Over Financial Reporting*

Management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15 (f) under the Exchange Act. Our internal control over financial reporting is intended to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. GAAP. Our internal control over financial reporting includes those policies and procedures that:

- pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets;

- provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with U.S. GAAP, and that receipts and expenditures are being made only in accordance with authorizations of management and the Board of Directors; and

- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

### *Changes in Internal Control Over Financial Reporting*

On January 14, 2009, we commenced the Creditor Protection Proceedings and adopted ASC 852. In connection with these events, during the first quarter of 2009, we introduced processes to: (1) determine the Debtor's pre- and post-petition liabilities and identify those liabilities subject to compromise; (2) assess certain claims received from creditors; and (3) determine the proper accounting treatment required for contracts, liabilities and operating expenses, including restructuring activities and reorganization expenses during the pendency of the Creditor Protection Proceedings. Complexities exist in introducing such processes given the multiple-jurisdiction element of our Creditor Protection Proceedings. From 2009 through 2011, we completed the sale of all of our business as well as the sale of our remaining patents and patent applications and streamlined our business infrastructure and implemented processes to separate and track financial performance in connection with our transition services obligations associated with these divestitures. These changes materially affected our internal control over financial reporting throughout 2009, 2010, 2011 and the first half of 2012. In the fourth quarter of 2011, we continued to streamline our business infrastructure mainly in response to the substantial completion of the TSA obligations. In the first quarter and second quarter of 2012, respectively, we implemented a new financial reporting system and replaced our human resources system with an applications database, both tailored to meet the simplified needs of our current business and modified our processes, where needed, to ensure appropriate internal controls over our financial reporting continue to exist. Management continues to take actions necessary to address the resources, processes and controls related to these changes, and to take any remaining actions pertaining to the realignment of certain work between the Canadian Debtors and U.S. Debtors as part of the separation of various corporate functions, while maintaining effective control over financial reporting.

47

Table of Contents

# PART II
# OTHER INFORMATION

Capitalized terms used in this Part II and not otherwise defined, have the meaning set forth for such terms in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section of this report.

## ITEM 1.    Legal Proceedings

Other than as described below, there have been no material developments in our material legal proceedings as previously reported in our 2011 Annual Report. For additional discussion of other material legal proceedings, see "Contingencies" in note 16 of the accompanying unaudited condensed consolidated financial statements.

### Environmental Matters

Under the CCAA Proceedings, the Canadian Debtors have filed a motion for an order authorizing and directing the Canadian Debtors to cease performing any environmental remediation at or in relation to five sites (Belleville, Brampton, Brockville, Kingston and London, Ontario), and that any claims in relation to such environmental remediation be subject to the court approved claims process under the CCAA Proceedings. We brought the motion to disclaim any further obligation for such properties that are no longer owned or used by us and that we and our creditors derive no benefit from any further remediation. Subsequent to the filing of the motion, we entered into a transition agreement regarding the Brampton site that facilitated a gradual cessation of our environmental risk related tasks at that site, which tasks have now been completed. The Ministry of the Environment (the MOE) made remediation orders with respect to the four other sites. The motion was heard in September 2011 in the Canadian Court, wherein the Canadian Debtors sought advice and direction that the MOE remediation orders were in breach of the CCAA stay. The MOE did not seek to enforce the remediation orders while the Canadian Court's decision was outstanding and we continued to undertake environmental risk assessments and remediation related tasks at those sites. On March 9, 2012, the Canadian Court issued an order granting Nortel its motion, in particular agreeing that the MOE remediation orders are stayed under the CCAA Proceedings and authorizing us to cease performing any remediation activities at or in relation to the five sites, and releasing us from all contractual obligations to carry out remediation requirements at such sites. The order further stipulates that any claims in relation to any current or future remediation requirements by the MOE against us or our current or former directors or officers are subject to resolution and determination in accordance with the claims procedure and claims resolution orders approved by the Canadian Court on July 30, 2009 and September 16, 2010, respectively. We have given notice that, pursuant to the order, we are ceasing continued remediation activities. On March 23, 2012, Her Majesty the Queen in right of Ontario as represented by the MOE served a notice of motion for leave to appeal the March 9, 2012 Canadian Court order, which leave was granted on June 22, 2012. On July 3, 2012, the MOE served its notice of appeal, which appeal is still pending and no hearing date has yet been set.

48

Table of Contents

## ITEM 1A.    Risk Factors

*Certain statements in this report may contain words such as "could", "expect", "may", "should", "will", "anticipate", "believe", "intend", "estimate", "target", "plan", "envision", "seek" and other similar language and are considered forward-looking statements or information under applicable securities laws. These statements are based on our current expectations, estimates, forecasts and projections. In addition, other written or oral statements that are considered forward-looking may be made by us or others on our behalf. These statements are subject to important assumptions, risks and uncertainties that are difficult to predict and actual outcomes may be materially different. The Creditor Protection Proceedings are having a direct impact on our business and are exacerbating these risks and uncertainties. In particular, the risks described herein and in our 2011 Annual Report could cause actual events to differ materially from those contemplated in forward-looking statements. Unless otherwise required by applicable securities laws, we do not have any intention or obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.*

In addition to the other information set forth in this report, you should carefully consider the factors discussed in the "Risk Factors" section in our 2011 Annual Report which could materially affect our business, results of operations, financial condition or liquidity. The risks described in our 2011 Annual Report are not the only risks we face. Additional risks and uncertainties not currently known to us or that we currently believe are immaterial also may materially adversely affect our business, results of operations, financial condition and liquidity. Apart from the risk described below, the risks described in our 2011 Annual Report have not materially changed.

*NNC and NNL will no longer be able to comply with their periodic reporting requirements; cease trade orders expected*

The Canadian Monitor, after taking into account several factors arising from the advanced stage of the CCAA proceedings, has determined that the expense and resources required to comply with NNC and NNL's quarterly and annual public reporting requirements can no longer be justified from the standpoint of the best interest of their creditors. Consequently, NNC and NNL will no longer be able to comply with their periodic reporting requirements and will discontinue preparing and filing quarterly and annual financial statements and all other periodic disclosure documents under applicable Canadian and U.S. securities laws effective as of the filing deadlines for their third quarter reporting obligations, being November 14, 2012 in the United States and November 29, 2012 in Canada.

Generally, when an issuer ceases to file its periodic disclosure documents in circumstances such as NNC and NNL's, the Canadian Securities Administrators will issue orders prohibiting trading in securities of the relevant issuer effective from and after the filing deadline under Canadian securities laws (so-called cease trade orders). NNC and NNL will be making submissions to the Canadian Securities Administrators that cease trade orders expected to be issued in respect of the securities of NNC and NNL include certain permitted trading exceptions. However, there can be no assurance that the regulatory authorities will make such orders on the terms requested by NNC and NNL and, in particular, permit any trading exceptions.

49

Table of Contents

**ITEM 2.    Unregistered Sales of Equity Securities and Use of Proceeds**

   *Global Class Action Settlement:* We entered into agreements to settle two significant U.S. and all but one Canadian class action lawsuits, collectively the Global Class Action Settlement, which became effective on March 20, 2007 following approval of the agreements by the appropriate courts . In accordance with the terms of the Global Class Action Settlement, a total of 62,866,775 NNC common shares were to be issued. During the three-month period ended June 30, 2012, no NNC common shares were issued in accordance with the settlement. Almost all of the NNC common shares issuable in accordance with the settlement have been distributed to claimants and plaintiffs' counsel, most of them in the second quarter of 2008. The issuance of the 62,866,775 NNC common shares is exempt from registration pursuant to Section 3(a)(10) of the Securities Act.

**ITEM 6.    Exhibits**

   Pursuant to the rules and regulations of the SEC, we have filed certain agreements as exhibits to this Quarterly Report on Form 10-Q. These agreements may contain representations and warranties by the parties. These representations and warranties have been made solely for the benefit of the other party or parties to such agreements and (i) may have been qualified by disclosures made to such other party or parties, (ii) were made only as of the date of such agreements or such other date(s) as may be specified in such agreements and are subject to more recent developments, which may not be fully reflected in our public disclosure, (iii) may reflect the allocation of risk among the parties to such agreements and (iv) may apply materiality standards different from what may be viewed as material to investors. Accordingly, these representations and warranties may not describe our actual state of affairs at the date hereof and should not be relied upon.

| Exhibit No. | Description |
|---|---|
| 10.1 | 4 [th] Estate Allocation Settlement Agreement among certain Nortel entities including Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc., Nortel Networks UK Limited (in administration), Nortel Networks S.A. and certain Nortel entities in the Asia Pacific and Caribbean and Latin America regions dated June 19, 2012. |
| 31 | Certification of the Senior Vice President, Corporate Services and Chief Financial Officer pursuant to 18 U.S.C. Section 1350 as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32 | Certification of the Senior Vice President, Corporate Services and Chief Financial Officer pursuant to 18 U.S.C. Section 1350 as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101.INS | XBRL Instance Document* |
| 101.SCH | XBRL Taxonomy Extension Schema Document* |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document* |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document* |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document* |
| 101.DEF | XBRL Definition Linkbase* |

*   Incorporated by reference.

50

**Table of Contents**

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

### NORTEL NETWORKS CORPORATION
### (Registrant)

Chief Financial Officer                                     Chief Accounting Officer

| /s/ ALLAN BIFIELD | / S / C LARKE G LASPELL |
|---|---|
| **Allan Bifield**<br>**Senior Vice-President, Corporate Services and**<br>**Chief Financial Officer** | **Clarke Glaspell**<br>**Controller** |

Date: August 9, 2012

51

## ALLOCATION SETTLEMENT AGREEMENT
## (APAC/CALA)

This agreement (the **"Agreement"** ) dated as of the 19 th day of June, 2012 is entered into by and among the following parties:

(a)    Nortel Networks Corporation ( **"NNC"** ), Nortel Networks Limited ( **"NNL"** ) and the other entities set forth in **Schedule 1** attached hereto (the **"Canadian Debtors"** ),

(b)    Nortel Networks Inc. ( **"NNI"** ) and the other entities set forth in **Schedule 2** attached hereto (the **"US Debtors"** ),

(c)    Nortel Networks UK Limited (In Administration) ( **"NNUK"** ) and the other entities set forth in **Schedule 3** attached hereto (the **"EMEA Debtors"** ) which are acting by their joint administrators Alan Robert Bloom, Stephen John Harris, Alan Michael Hudson and Christopher John Wilkinson Hill of Ernst & Young LLP of 1 More London Place, London SE1 2AF (other than Nortel Networks (Ireland) Limited ( **"NNIR"** ), for which David Hughes of Ernst & Young Chartered Accountants of Harcourt Centre, Harcourt Street, Dublin 2, Ireland and Alan Robert Bloom serve as joint administrators) (the **"Joint Administrators"** ), who act as agents for the EMEA Debtors without any personal liability whatsoever,

(d)    Nortel Networks (Northern Ireland) Limited (in liquidation) ( **"NNNIR"** ) and Nortel Networks Optical Components Limited (in liquidation) ( **"NNOCL"** ) (the **"EMEA Liquidation Debtors"** ) which in the case of NNNIR, is acting by its joint liquidators Elizabeth Anne Bingham and Kerry Lynne Trigg of Ernst & Young LLP of 1 More London Place, London SE1 2AF and in the case of NNOCL is acting by its joint liquidators Samantha Keen and Kerry Lynne Trigg of Ernst & Young LLP of 1 More London Place, London SE1 2AF (the **"Joint Liquidators"** ), who act as agents for the EMEA Liquidation Debtors without any personal liability whatsoever,

(e)    Nortel Networks S.A. (In Administration and *liquidation judiciare* ) ( **"NNSA"** ), a corporation incorporated under the laws of France, represented by the Joint Administrators and Maître Cosme Rogeau, 26, avenue Hoche, 78000 Versailles as the " Liquidateur Judiciaire " (the **"NNSA Office Holder"** ), who act as agents for NNSA without any personal liability whatsoever,

(f)    certain non-filed affiliates of NNC as set forth in **Schedule 4** attached hereto and identified as the APAC Entities, including their respective branch offices (the **"APAC Entities"** ),

(g)    certain non-filed affiliates of NNC as set forth in **Schedule 5** attached hereto and identified as the CALA Entities, including their respective branch offices (the **"CALA Entities"** , and together with the APAC Entities, the **"Non-Filed Entities"** ),

(h)     certain non-filed affiliates of the EMEA Debtors as set forth in **Schedule 6** hereto and identified as the EMEA NFEs (the **"EMEA NFEs"** ),

(i)     the Joint Administrators,

(j)     the Joint Liquidators,

(k)     the NNSA Office Holder,

(l)     Ernst & Young Inc. in its capacity as monitor (the **"Monitor"** ) in the Canadian Proceedings (defined below) of the Canadian Debtors, and

(m)     The Creditors' Committee (as defined below).

The Canadian Debtors, the US Debtors, the EMEA Debtors, the EMEA Liquidation Debtors, NNSA, the Non-Filed Entities, the Joint Administrators, the Joint Liquidators, the NNSA Office Holder, the EMEA NFEs, the Monitor and the Creditors' Committee are referred to herein each as a **"Party"** and collectively as the **"Parties"** . The Canadian Debtors, the US Debtors, the EMEA Debtors, the EMEA Liquidation Debtors, NNSA, the EMEA NFEs, and the Non-Filed Entities are referred to herein each as a **"Nortel Party"** and collectively as **"Nortel"** or the **"Nortel Parties"** . The Joint Administrators and the Joint Liquidators, in their respective personal capacities, shall be party to this Agreement as provided in **Sections 8.5** and **8.6** respectively and solely for the purpose of obtaining the benefit of the provisions of this Agreement expressed to be conferred on or given to them and references to the Parties shall be construed accordingly.

## RECITALS:

**WHEREAS** , on January 14, 2009 (the **"Filing Date"** ), the Canadian Debtors commenced creditor protection proceedings before the Ontario Superior Court of Justice (Commercial List) (the **"Canadian Court"** ) under the Companies' Creditors Arrangement Act (Canada), in connection with which Ernst & Young Inc. was appointed as Monitor (the **"Canadian Proceedings"** ); and

**WHEREAS,** on the Filing Date, the US Debtors (other than Nortel Networks (CALA) Inc., whose filing date was July 14, 2009) filed petitions in the United States Bankruptcy Court for the District of Delaware (the **"US Court"** and, together with the Canadian Court, the **"Courts"** ) under chapter 11 of title 11 of the United States Code, (the **"US Proceedings"** ) and the official committee of unsecured creditors (the **"Creditors' Committee"** ) was appointed in such proceedings by the US Court on January 22, 2009; and

**WHEREAS** , on the Filing Date, NNUK, NNIR, NNSA and the other EMEA Debtors commenced administration proceedings before the High Court of Justice in London, England, represented by individuals from Ernst & Young LLP and, in the case of NNIR only, Ernst & Young Chartered Accountants, serving as administrators in such proceedings; and

2

**WHEREAS** , on April 28, 2010, NNNIR commenced a members' voluntary liquidation with individuals from Ernst & Young LLP serving as liquidators in such liquidation; and

**WHEREAS** , on July 29, 2011, NNOCL commenced a creditors' voluntary liquidation with individuals from Ernst & Young LLP serving as liquidators in such liquidation; and

**WHEREAS** , while the administration proceedings in respect of NNSA under the United Kingdom Insolvency Act 1986 are continuing, subsequent to the Filing Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which the NNSA Office Holder and Maître Franck Michel were appointed by the Versailles Commercial Court (Docket No. 2009P00492) for NNSA (the **"NNSA Secondary Proceedings"** ); and

**WHEREAS** , as of the date hereof, the Non-Filed Entities and the EMEA NFEs are not subject to any insolvency, bankruptcy or other creditor protection proceedings; and

**WHEREAS** , subsequent to the Filing Date, Nortel, in consultation with its various creditor constituencies, determined to divest its various businesses and assets to third party buyers (each such sale as listed on **Schedule 7** hereof, a **"Global Sale"** ); and

**WHEREAS** the Global Sales have now been completed and the net proceeds (the **"Sale Proceeds"** ) of the Global Sales have been or will be deposited into various escrow accounts pursuant to various escrow agreements (the **"Global Sales Escrow Agreements"** ) executed in connection with the Global Sales; and

**WHEREAS** certain of the Non-Filed Entities and the EMEA NFEs are " Sellers " under the various Global Sales and " Depositors " under certain of the Global Sales Escrow Agreements, as listed on **Schedule 8** attached hereto, (the **"Escrow Agreements"** , and the related escrow accounts the **"Escrow Accounts"** ); and

**WHEREAS** various of the Parties, together with certain creditor constituencies, have entered into negotiations with respect to the resolution of the allocation of Sale Proceeds among the Sellers; and

**WHEREAS** pursuant to various settlements, all applicable escrow agreements have been amended to remove all references to each of o.o.o. Nortel Networks, Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Ltd. as Depositors, such that none of those entities shall have any further rights or obligations under such escrow agreements and/or the rights and obligations of those entities under such Escrow Agreements have been assigned to certain of the Parties; and

**WHEREAS** pursuant to an order of the Canadian Court and the US Court, any term or condition of the MEN Distribution Escrow Agreement entered into as of March 19, 2010 that explicitly or implicitly requires the consent or participation of Nortel Networks de Colombia S.A. is now forever deemed not to require such consent or participation; and

3

**WHEREAS** the Parties wish to agree upon the aggregate allocation of Sale Proceeds attributable to the Non-Filed Entities on the terms and conditions set out herein and resolve certain other issues outstanding among them; and

**WHEREAS** the Parties further wish to settle and resolve various amounts and balances in respect of outstanding amounts owing among the Non-Filed Entities, *inter se* , or between a Non-Filed Entity and any other Nortel Party;

NOW THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION, THE RECEIPT AND SUFFICIENCY OF WHICH IS HEREBY ACKNOWLEDGED, THE PARTIES HEREBY AGREE AS FOLLOWS:

## ARTICLE I — ALLOCATION OF SALE PROCEEDS

1.1    **Allocation to the Non-Filed Entities**

(a)    In full and final settlement of the claims of the Non-Filed Entities to the allocation of any Sale Proceeds, each of the Non-Filed Entities shall be entitled to an allocation of the Sale Proceeds in the amounts set forth on **Appendix A** attached hereto (each, a **"Settlement Share"** ), which amounts for all the Non-Filed Entities aggregate to US$44,900,000 (the **"Settlement Amount"** ). The Settlement Amount shall be drawn from the various Escrow Accounts as indicated on **Appendix A** .

1.2    Each Party acknowledges and agrees that, upon the Escrow Release Trigger Date (as defined below):

(a)    JPMorgan Chase Bank, N.A., in its capacity as the distribution agent for the Escrow Accounts and the Intermediate Distribution Account (as defined below) (the **"Escrow Agent"** ), will be authorized and directed by the applicable Depositors and the Estate Fiduciaries (as defined in the Escrow Agreements) (the Depositors and the Estate Fiduciaries collectively, the **"Escrow Parties"** ) to (i) establish a non-interest bearing intermediate distribution account (the **"Intermediate Distribution Account"** ), (ii) withdraw the Settlement Amount from the Escrow Accounts in accordance with **Appendix A** and deposit it in the Intermediate Distribution Account, and (iii) disburse the Settlement Amount from the Intermediate Distribution Account to the Non-Filed Entities and those other Nortel Parties receiving Net Cash Balance Payments (as defined below) (each such entity, an **"Intercompany Creditor"** and, collectively with the Non-Filed Entities receiving distributions hereunder, the **"Settlement Payment Parties"** ) in the amounts indicated on **Appendix B** attached hereto (each amount to be transmitted to a Settlement Payment Party, as may be adjusted in accordance with **Section 3.5** hereof, an **"Aggregate Settlement Share"** ), which disbursements shall, in the case of those made to Intercompany Creditors, satisfy the Net Cash Balance Payments.

4

(b)    Each Party acknowledges and agrees that withdrawals by the Escrow Agent from the Escrow Accounts and the transmission by the Escrow Agent of the Aggregate Settlement Shares shall be made in accordance with the Escrow Release Instructions described in **Sections 6.2** and **6.3** hereof.

(c)    Upon transmission by the Escrow Agent of all Aggregate Settlement Shares to each of the relevant Settlement Payment Parties (the date of such transmission, the **"Escrow Release Effective Date"** ), the Escrow Agent shall have no further obligation or liability to the Parties for the allocation or division of the Settlement Amount among the Nortel Parties.

### ARTICLE II — FULL AND FINAL SETTLEMENT

2.1    The Parties hereby acknowledge and agree that **Appendix C-1** hereto lists both the pre-filing and post-filing intercompany payables and receivables among the Non-Filed Entities, inter se, and between a Non-Filed Entity and any other Nortel Party, as of September 30, 2011. The Parties further acknowledge and agree that, upon the Escrow Release Effective Date, (a) the pre-filing amounts set out in **Appendix C-1** under the heading " Net pre-filing balance as at September 30, 2011 " , are deemed partially or wholly satisfied to the extent paid through Net Cash Balance Payments as set forth on **Appendix C-1** , or to the extent otherwise paid under this Agreement; (b) the pre-filing amounts set out in **Appendix C-1** under the heading " Remaining Pre-filing balance " , as such amounts may have been reduced by payments made after September 30, 2011, including, without limitation, the payments specified on **Appendix C-2** hereto, shall supersede (i) any amounts reflected in the schedules filed by the US Debtors in the US Proceedings with respect to pre-filing amounts owed to any Non-Filed Entity, (ii) any proofs of claim relating to a pre-filing Claim (as defined below) that have been or could have been filed by or on behalf of the Non-Filed Entities or any of their predecessors, successors and assigns, each in such capacities, in the US Proceedings, (iii) any assertion or allegation of a pre-filing Claim which any of the Non-Filed Entities or any of their predecessors, successors, and assigns, each in such capacities, may have against the Canadian Debtors whether filed pursuant to the Canadian Debtors' various claims procedures or otherwise, (iv) any assertion or allegation of a pre-filing Claim which any of the Non-Filed Entities or any of their predecessors, successors, and assigns, each in such capacities, may have against the EMEA Debtors whether filed pursuant to the EMEA Debtors' informal claims procedure or otherwise which could be the subject of a proof of claim in the administration or any subsequent insolvency process of the EMEA Debtors, and (v) any assertion or allegation of a pre-filing Claim which any of the Non-Filed Entities or any of their predecessors, successors, and assigns, each in such capacities, may have against NNSA in the administration proceedings whether filed pursuant to the EMEA Debtors' informal claims procedure or otherwise which could be the subject of a proof of claim in the administration or any subsequent insolvency process of NNSA, *provided that* any pre-filing Claim that has been or could have been filed by or on behalf of the Non-Filed Entities or any of their predecessors, successors, and assigns

5

in the NNSA Secondary Proceedings shall not be affected by this Agreement and shall only be admitted for proof in the NNSA Secondary Proceedings in the amount accepted by the NNSA Office Holder in the formal proof of debt process in the NNSA Secondary Proceedings (the " **NNSA Proof Process** ") (as such amount may be adjusted in accordance with the applicable French law) and not to the extent any such pre-filing Claim has been rejected or disallowed or not previously filed or declared in such proceedings; (c) the post-filing amounts set out in **Appendix C-1** under the heading " Net post-filing position as at September 30, 2011 " , as such amounts may have been reduced by payments made after September 30, 2011, including, without limitation, the payments specified on **Appendix C-2** hereto, shall supersede (i) any proofs of claim relating to a post-filing Claim arising prior to September 30, 2011 that have been or could have been filed by or on behalf of the Non-Filed Entities or any of their predecessors, successors and assigns, each in such capacities, in the US Proceedings, (ii) any assertion or allegation of a post-filing Claim arising prior to September 30, 2011 which any of the Non-Filed Entities or any of their predecessors, successors and assigns, each in such capacities, may have against the Canadian Debtors whether filed pursuant to the Canadian Debtors' various claims procedures or otherwise, (iii) any assertion or allegation of a post-filing Claim arising prior to September 30, 2011 which any of the Non-Filed Entities or any of their predecessors, successors and assigns, each in such capacities, may have against the EMEA Debtors whether filed pursuant to the EMEA Debtors' informal claims procedure or otherwise which could be the subject of a proof of claim in the administration or any subsequent insolvency process of the EMEA Debtors and (iv) any assertion or allegation of a post-filing Claim arising prior to September 30, 2011 which any of the Non-Filed Entities or any of their predecessors, successors and assigns, each in such capacities, may have against NNSA in the administration proceeding whether filed pursuant to the EMEA Debtors' informal claims procedure or otherwise which could be the subject of a proof of claim in the administration or any subsequent insolvency process of NNSA, *provided that* any post-filing Claim that has been or could have been filed by or on behalf of the Non-Filed Entities or any of their predecessors, successors, and assigns in the NNSA Secondary Proceedings shall not be affected by this Agreement and shall only be admitted for proof in the NNSA Secondary Proceedings in the amount accepted by the NNSA Office Holder in the NNSA Proof Process (as such amount may be adjusted in accordance with applicable French law) and not to the extent any such post-filing Claim has been rejected or disallowed or not previously filed or declared in such proceedings; (d) that all such schedules, proofs of claim and allegations or assertions of such pre-filing and post-filing Claims are hereby (i) deemed amended such that they are superseded by the amounts set forth on **Appendix C-1** under the headings " Remaining pre-filing balance " and " Net post-filing position as at September 30, 2011 " , as the case may be, which shall be the only amounts owed by the US Debtors, the Canadian Debtors, the EMEA Debtors or NNSA to the Non-Filed Entities with respect to such Claims, and (ii) deemed (as so amended) approved, agreed, allowed or admitted (as applicable) in the amounts set forth on **Appendix C-1** , and otherwise deemed disallowed or rejected, *provided* , *however* , in each case, as such amounts on **Appendix C-1** are subject to reduction by payments made after September 30, 2011 including, without limitation, the payments specified on **Appendix C-2** , *provided* , *further, however* , in each case, that such pre-filing and post-filing Claims that

6

have been or could have been filed by or on behalf of the Non-Filed Entities or any of their predecessors, successors, and assigns in the NNSA Secondary Proceedings shall not be affected by this Agreement and shall only be admitted for proof in the NNSA Secondary Proceedings in the amount accepted by the NNSA Office Holder in the NNSA Proof Process (as such amount may be adjusted in accordance with applicable French law) and not to the extent any such post-filing Claim has been rejected or disallowed or not previously filed or declared in such proceedings, and *provided* , *further* , that nothing in this **Section 2.1** is intended to waive or release any Surviving Obligation (as defined below) or the US Estate Carve-Out (as defined below); and (e) that none of the Canadian Debtors, EMEA Debtors, US Debtors or other Nortel Parties will make, join or support in any objection to or rejection of all or any portion of the pre-filing and post-filing Claims in the amounts set forth on **Appendix C-1** or make, propose, file or support any plan, scheme of arrangement, or other arrangement, appeal, application, or request for relief in any court that is inconsistent with this Agreement.

2.2    In consideration of the obligations, covenants and rights of the Parties set forth in this Agreement, the Parties hereby agree that, upon transmission by the Escrow Agent of all Aggregate Settlement Shares to each of the relevant Settlement Payment Parties, this Agreement shall constitute a full and final settlement of any and all Claims (a) by the Non-Filed Entities as against the Releasees (as defined below) and (b) by each of the Parties to this Agreement as against the NFE Releasees (as defined below) in each case, up to the date of this Agreement, except for (i) the pre-filing amounts set forth on **Appendix C-1** under the heading " Remaining pre-filing balance " , as such amounts may have been reduced by payments made after September 30, 2011, including, without limitation, the payments specified on **Appendix C-2** hereto, which for the avoidance of doubt constitutes only a partial and non-exhaustive listing of such payments (the **"Remaining Balances"** ); (ii) the post-filing amounts set forth on **Appendix C-1** under the heading " Net post-filing position as at September 30, 2011 " , as such amounts may have been reduced by payments made after September 30, 2011, including, without limitation, the payments specified on **Appendix C-2** hereto, which for the avoidance of doubt constitutes only a partial and non-exhaustive listing of such payments, or increased by obligations arising in the ordinary course of business through the trading of goods or the provision of services occurring on or after October 1, 2011; (iii) obligations set forth on **Appendix C-3** ; (iv) obligations arising under the APAC Restructuring Agreement (as defined below) as amended hereby; and (v) obligations arising under this Agreement ((i) through (v), collectively, the **"Surviving Obligations"** ) and subject to the US Estate Carve-Out (as defined below).

### ARTICLE III — APAC RESTRUCTURING AGREEMENT
### AMENDMENTS AND RELATED MATTERS

3.1    Each Party hereto that is also a **" Party "** to the Asia Restructuring Agreement dated as of November 5, 2009 (the **"APAC Restructuring Agreement"** ) among the Canadian Debtors, the US Debtors, the EMEA Debtors, NNSA, and the APAC Entities signatory thereto (collectively, the **"APAC Restructuring Agreement Parties"** ) acknowledges and agrees that the APAC Restructuring Agreement shall remain in full force and effect following the consummation of the transactions contemplated herein, except as expressly amended by this Agreement.

7

3.2     Upon transmission by the Escrow Agent of all Aggregate Settlement Shares to each of the relevant Settlement Payment Parties, the APAC Restructuring Agreement Parties acknowledge and agree that the APAC Debtors (as defined in the APAC Restructuring Agreement, the " **APAC Debtors** ") have, to date, fully satisfied their obligations under **Sections 10** and **11** of the APAC Restructuring Agreement and that (i) such APAC Debtors shall have no further obligations under **Sections 10** and **11** of the APAC Restructuring Agreement, (ii) the obligations of such APAC Debtors to provide security interests in Collateral (as defined in the APAC Restructuring Agreement) in accordance with Section 13(c) of the APAC Restructuring Agreement shall be terminated and be of no further force and effect and (iii) (v) the Collateral Agency Agreement by and between the APAC Restructuring Agreement Parties, dated as of December 24, 2009, (w) the Security Agreement by and between certain APAC Entities and NNI, as Collateral Agent, dated as of December 24, 2009, (x) the Debenture by and between Nortel Networks (Asia) Limited as " Chargor " and NNI as " Chargee " , dated as of December 24, 2009, (y) the Debenture by and between Nortel Networks Singapore Pte Ltd as " Chargor " and NNI as " Chargee " , dated as of December 24, 2009, and (z) the General Security Deed by and between Nortel Networks New Zealand Limited and NNI as Secured Party, dated as of December 24, 2009, shall in each case be terminated and be of no further force and effect, and any and all security interests or liens on Collateral (as defined in the APAC Restructuring Agreement) pledged or granted thereunder shall be released. In connection with the foregoing, the APAC Restructuring Agreement Parties agree to execute such documents and instruments as may be reasonably requested by any such APAC Debtor for the purpose of releasing or evidencing the termination of any security interest imposed on the assets of such APAC Debtor in accordance with Section 13(c) of the APAC Restructuring Agreement.

3.3     Each APAC Restructuring Agreement Party acknowledges and agrees that all payments as set forth under the heading " 4th Estate Settlement Net Cash Balance Payments " on **Appendix C-1** and as effected through **Section 1.2(a)** hereof, as may be adjusted in accordance with **Section 3.5** hereof (such payments, collectively, the **"Net Cash Balance Payments"** ), made by an APAC Debtor represents payment of Net Cash Balances (as defined in the APAC Restructuring Agreement) on account of Subsequent Payment Amounts (as defined in the APAC Restructuring Agreement) in accordance with the APAC Restructuring Agreement. Each APAC Restructuring Agreement Party acknowledges and agrees that the intercompany balances outstanding as of September 30, 2011 and the amounts of such Net Cash Balance Payments with respect to each APAC Restructuring Agreement Party are as set forth on **Appendix C-1** . Each APAC Restructuring Agreement Party also acknowledges and agrees that, upon receipt of the Net Cash Balance Payments, the Remaining Balances related to such APAC Debtor are the outstanding balances of Pre-Filing Intercompany Debt (as defined in the APAC Restructuring Agreement).

3.4     Each APAC Restructuring Agreement Party acknowledges and agrees that execution of this Agreement (or with respect to the Bondholder Group (as hereinafter defined), the

8

delivery of a consent thereto) shall constitute prior written consent of the APAC Restructuring Agreement Parties, the Monitor, the Creditors' Committee, the Bondholder Group and the Joint Administrators to the APAC Restructuring Agreement Parties' entry into this Agreement, the performance of their obligations hereunder and all payments made and actions taken in accordance herewith.

3.5 **Post-Execution Claims against APAC Debtors**

(a) In the event that any APAC Debtor (a **"Designated APAC Debtor"** ) making a Net Cash Balance Payment becomes aware of a claim after the date hereof but prior to the Effective Date (each such claim, a **"Post-Execution Claim"** and, collectively, the **"Post-Execution Claims"** ) and (i) such Designated APAC Debtor had no knowledge of such claim prior to the date hereof, (ii) the Board of Directors of such Designated APAC Debtor determines in good faith that such Post-Execution Claim, either individually or in the aggregate with other Post-Execution Claims of such APAC Debtor, could give rise to a liability greater than the lesser of (x) US$1,000,000 and (y) ten percent (10%) of the working capital requirement reserve of such APAC Debtor as set out in the December 16, 2011 Restructuring Manager's Report, and (iii) the Board of Directors of the Designated APAC Debtor determines in good faith that a reduction of the Net Cash Balance Payment (the amount of such reduction being the **"Reduction Amount"** ) to be paid by the Designated APAC Debtor to its Intercompany Creditors hereunder (each an **"Affected Creditor"** ) is necessary to adequately reserve for such Post-Execution Claim(s), such Designated APAC Debtor shall (x) promptly, and in no event later than the Effective Date, provide written notice of such Post-Execution Claim to each Party, including sufficient detail regarding the nature of the Post-Execution Claim for each Party to understand the basis for the need to reserve additional funds and the quantum of the Reduction Amount and (y) use commercially reasonable efforts to mitigate the Post-Execution Claim and reduce the Reduction Amount.

(b) Upon the delivery of such notice, the Parties agree that (i) the Reduction Amount shall not be transmitted to any Affected Creditor but shall instead be transmitted to such Designated APAC Debtor and (ii) **Appendix B** and **Appendix C-1** hereto shall be amended to reflect the changes resulting from the preceding clause (i), including (x) the decrease in the Net Cash Balance Payments by the Designated APAC Debtor to its Affected Creditors and any resulting decreases (each, an **"Echo Decrease"** ) in Net Cash Balance Payments payable by an Affected Creditor that is also an APAC Debtor (an **"Affected Creditor APAC Debtor"** ) to its Intercompany Creditors (an **"Echo Affected Creditor"** and, with the Affected Creditors, the **"Affected Intercompany Creditors"** ), (y) the increase in the Remaining Balances owing by the Designated APAC Debtor or the Affected Creditor APAC Debtor to their respective Affected Intercompany Creditors (such increased Remaining Balances to be governed by the provisions of the APAC Restructuring Agreement, as amended hereby) and (z) the decrease in the Aggregate Settlement Share payable to an Affected Intercompany Creditor; *provided that* , to the extent any Post-Execution Claim is mitigated in whole or in

9

part, the mitigation amounts shall be included in the Designated APAC Debtor's next subsequent calculation of its Net Cash Balance and shall be treated in accordance with the provisions of the APAC Restructuring Agreement; *provided* , *further* , that any Affected Intercompany Creditor which has its Aggregate Settlement Share reduced pursuant to this **Section 3.5** by an amount that is equal to or greater than the greater of (x) $1,000,000 and (y) twenty percent (20%) of such Affected Intercompany Creditor's initial Aggregate Settlement Share shall have the right to terminate this Agreement prior to the Escrow Release Effective Date by providing written notice to each of the other Parties hereto, whereupon this Agreement shall terminate and each Party shall have no further rights or obligations hereunder. The Parties agree that the reduction in Net Cash Balance Payments resulting from any Reduction Amount or Echo Decrease shall be borne by the respective Affected Intercompany Creditors of such Designated APAC Debtor or Affected Creditor APAC Debtor on a pro rata basis based on each such Affected Intercompany Creditor's share of the total Net Cash Balance Payments to be made by the applicable Designated APAC Debtor or Affected Creditor APAC Debtor, with each Affected Intercompany Creditor's Aggregate Settlement Share being reduced accordingly.

## ARTICLE IV — RELEASES

4.1     **Release**

(a)     Upon transmission by the Escrow Agent of all Aggregate Settlement Shares to each of the relevant Settlement Payment Parties, each of the Non-Filed Entities releases each of the other Parties to this Agreement and each of their respective directors, officers, employees, agents, attorneys, advisors, predecessors, successors and assigns (collectively, the **"Releasees"** ) from (x) any and all claims, rights, debts, defenses, demands, liabilities, obligations, damages, actions, suits, causes of action, and setoffs, whether known or unknown, suspected or unsuspected, accrued or unaccrued, matured or unmatured, past or present, fixed or contingent, liquidated or unliquidated, whether sounding in contract, tort or otherwise (collectively, **"Claims"** ), that such Non-Filed Entity now has, had, or may have against any of the Releasees up to the date of this Agreement other than the Surviving Obligations, including, without limitation, (i) in respect of Sale Proceeds, (ii) in respect of proceeds of sale arising from any other divestiture of assets by or on behalf of a Nortel Party or any of its affiliates including, without limitation, the transactions identified on **Schedule 9** hereto; (iii) obligations arising under that certain CDMA/LTE China Side Agreement entered into as of November 2, 2009 by and between Nortel Networks (China) Limited, NNL and NNI, and (iv) obligations arising under that certain Offer in connection with the payment of certain Sale Proceeds to Nortel Networks de Argentina S.A., dated as of March 19, 2010, and (y) any and all Claims in respect of any proceeds of sale of any future divestiture of assets by or on behalf of a Nortel Party or any of its affiliates other than those in which such Non-Filed Entity participates (collectively, the **"Released Claims"** ) and agrees that it shall not allege, file or

10

otherwise assert any Released Claim against the Releasees or the Escrow Agent, or any of them, including in respect of an entitlement to or the allocation of Sale Proceeds or any other proceeds of sale in connection with any other divestiture of assets by or on behalf of a Nortel Party or any of its affiliates that has occurred or that may occur, or allege, file or otherwise assert a Claim against either the Releasees or any person which could result in a claim over or right of contribution or indemnity against any of the Releasees in respect of the Released Claims or that could otherwise impact upon a Releasee's entitlement to or the allocation of Sale Proceeds or any other proceeds of sale in connection with any other divestiture of assets by or on behalf of a Nortel Party or any of its affiliates that has occurred or that may occur; *provided* , *however* , that notwithstanding the foregoing, each of Nortel Networks Kabushiki Kaisha, Nortel Technology Excellence Centre Private Ltd., Nortel Networks de Guatemala, Ltda. and Nortel Trinidad and Tobago Limited (each a **"NFE US Subsidiary"** , and collectively the **"NFE US Subsidiaries"** ) does not hereby release any Claims against any US Debtor other than (i) Claims in respect of Sale Proceeds, (ii) Claims in respect of any other proceeds of sale in connection with any other divestiture of assets by or on behalf of a Nortel Party or any of its affiliates and (iii) Claims which could otherwise impact a US Debtor's entitlement to or the allocation of Sale Proceeds or any other proceeds of sale in connection with any other divestiture of assets by or on behalf of a Nortel Party or any of its affiliates (such retained Claims, the **"NFE US Subsidiary Carve-out"** ). Upon transmission by the Escrow Agent of all Aggregate Settlement Shares to each of the relevant Settlement Payment Parties, each of the Non-Filed Entities agrees that it shall be prohibited from participating in any court proceeding, mediation, arbitration or other proceeding or discussion to resolve the allocation of Sale Proceeds or any other proceeds of sale in connection with any other divestiture of assets by or on behalf of a Nortel Party or any of its affiliates that has occurred or that may occur.

(b)     Upon transmission by the Escrow Agent of all Aggregate Settlement Shares to each of the relevant Settlement Payment Parties, each of the Parties to this Agreement releases each of the Non-Filed Entities and each of their respective directors, officers, employees, agents, attorneys, advisors, predecessors, successors and assigns (the **"NFE Releasees"** ) from any and all Claims that such Party now has, had or may have had against any of the NFE Releasees up to the date of this Agreement other than the Surviving Obligations, including, without limitation, (i) in respect of Sale Proceeds, (ii) obligations arising under that certain CDMA/LTE China Side Agreement entered into as of November 2, 2009 by and between Nortel Networks (China) Limited, NNL and NNI, and (iii) obligations arising under that certain Offer in connection with the payment of certain Sale Proceeds to Nortel Networks de Argentina S.A., dated as of March 19, 2010; *provided* , *however* , that notwithstanding the foregoing, each of the US Debtors does not hereby release any Claims against any NFE US Subsidiary other than Claims in respect of Sale Proceeds (such retained Claims, the **"US Debtor Carve-out"** , and together with the NFE US Subsidiary Carve-out, the **"US Estate Carve-out"** ). For the avoidance of doubt, the release provided in this **Section 4.1(b)** shall not impact the rights of the Parties against those Non-Filed Entities of

11

which they are a holder of shares, stock, or other equity interests to the extent arising from the holding of such shares, stock or other equity interests in a Non-Filed Entity.

(c)     For the avoidance of doubt, nothing in this Agreement constitutes a waiver of the Canadian Debtors', the US Debtors', the EMEA Debtors', NNSA's, the EMEA Liquidation Debtors', the EMEA NFEs', the Joint Administrators' (as joint administrators of the EMEA Debtors and NNSA), the Joint Liquidators' or the NNSA Office Holder's right to pursue, allege, file or otherwise assert any and all Claims that such Party now has, had or may have had against any Party other than the NFE Releasees, including any claims in which the NFE Releasees may be or have been jointly, severally or concurrently liable with another Party, nor shall it constitute a waiver of any Party's right to defend, disallow or dispute any such Claims.

4.2     Notwithstanding anything to the contrary in this Agreement, each of the Non-Filed Entities covenants and agrees, if requested to do so, to enter into any license termination agreement with respect to the licenses and rights granted by other Nortel Parties for no further consideration; *provided that* , such Non-Filed Entity shall, in exchange for such license termination, receive a sublicense from the relevant Nortel Party that provides reasonably equivalent rights to the terminated licenses and rights.

## ARTICLE V — REPRESENTATIONS AND WARRANTIES

### 5.1     Representations and Warranties of the Parties

Subject to satisfaction of the Conditions (as defined below), each Party (but not, for the avoidance of doubt, the Joint Administrators, the Joint Liquidators or the NNSA Office Holder in their personal capacities) hereby severally represents and warrants to each other that, as of the date hereof:

(a)     it has the power and authority to enter into this Agreement and to carry out its obligations hereunder;

(b)     the execution of this Agreement, and the consummation of the transactions contemplated herein, have been authorized by all necessary approvals, and no other act or proceeding on its part is necessary to authorize the execution of this Agreement; and

(c)     this Agreement has been duly executed by it and constitutes a legal, valid and binding obligation of such Party that is enforceable against it under all applicable laws and regulations.

### 5.2     Representations and Warranties of the APAC Restructuring Agreement Parties

(a)     Each of the APAC Restructuring Agreement Parties (but not, for the avoidance of doubt, the Joint Administrators, the Joint Liquidators or the NNSA Office Holder

12

in their personal capacities) severally represents and warrants to each other and to the other Parties that, upon approval by the Canadian Court and the US Court, this Agreement will have been approved in accordance with the terms of the APAC Restructuring Agreement, and the APAC Restructuring Agreement Parties' execution of this Agreement and the performance of their obligations hereunder will not constitute a violation of any of the provisions of the APAC Restructuring Agreement.

5.3     **Representations and Warranties of the APAC Debtors**

(a)     Each of the APAC Debtors severally represents and warrants to the APAC Restructuring Agreement Parties that the Net Cash Balance Payments made by it hereunder are payments of Net Cash Balances for the purposes of the APAC Restructuring Agreement.

(b)     Each of the APAC Debtors severally represents and warrants to each other and to the other Parties that, as of the date hereof, each Net Cash Balance Payment made by it hereunder as described on **Appendix C-1** does not violate any foreign exchange control or other regulation, statute, rule or legal limitation applicable to the making of such Net Cash Balance Payment.

## ARTICLE VI — COVENANTS TO EXECUTE ESCROW
## AMENDMENTS AND RELEASE INSTRUCTIONS

6.1     Each of the Escrow Parties, the NNSA Office Holder, the Joint Administrators (acting on behalf of the EMEA Debtors and NNSA (as applicable)) and the Joint Liquidators (acting on behalf of the EMEA Liquidation Debtors (as applicable)) covenants and agrees to execute and deliver, no later than ten Business Days after the Effective Date (as defined below), an amendment, substantially in the form attached hereto as **Appendix E** , to each Escrow Agreement as necessary to remove all references to each of the Non-Filed Entities as a Depositor (as such term is defined in such Escrow Agreements) or otherwise, such that upon transmission by the Escrow Agent of all Aggregate Settlement Shares to each of the relevant Settlement Payment Parties none of the Non-Filed Entities shall have any further rights or obligations under such Escrow Agreement (the " **Escrow Amendments** "), and that any term or condition of an Escrow Agreement that explicitly or implicitly requires the consent or participation of a Non-Filed Entity shall be forever deemed not to require such consent or participation. For the avoidance of doubt, the Parties agree that the Escrow Agent is authorized to take all acts requiring the unanimous direction of the Depositors under the Escrow Agreements without the consent or participation of the Non-Filed Entities.

6.2     Each of the Escrow Parties covenants and agrees, no later than ten Business Days after the Effective Date, to execute and deliver to the Escrow Agent an escrow release instruction (each an " **Escrow Account Release Instruction** "), the form of which is attached hereto as **Appendix F** , directing the Escrow Agent to withdraw the Settlement Amount from each Escrow Account relating to each Escrow Agreement to which it is a party and for the Escrow Agent to deposit the Settlement Amount in the Intermediate Distribution Account.

13

6.3     Each of the Escrow Parties covenants and agrees, no later than ten Business Days after the Effective Date, to execute and deliver to the Escrow Agent an escrow release instruction (the " **Intermediate Distribution Account Release Instruction** " and together with the Escrow Account Release Instructions, the " **Escrow Release Instructions** "), the form of which is attached hereto as **Appendix G** , directing the Escrow Agent to transmit the Aggregate Settlement Share from the Intermediate Distribution Account to the Settlement Payment Parties in accordance with **Appendix B** attached hereto (the date on which all obligations of each of the specified Parties under **Sections 6.1** , **6.2** and **6.3** have been satisfied, the " **Escrow Release Trigger Date** ").

6.4     Without limiting those obligations in **Sections 6.1** , **6.2** , and **6.3** , each of the Parties covenants and agrees to use commercially reasonable efforts to effect the outcomes described in **Sections 6.1** , **6.2** , and **6.3** above including, without limitation, promptly executing and delivering any further documentation that may be required by the Escrow Agent.

6.5     For the purpose of this Article VI, " **Business Day** " shall mean a day that is not a Saturday, Sunday or national public holiday in Canada, the United States or any part of the United Kingdom

### ARTICLE VII — CONDITIONS TO EFFECTIVENESS

7.1     **Court Approval and Delivery of Release**

(a)     No provision of this Agreement except the provisions of this **Article VII** and **Article VIII** shall be effective until the satisfaction of all of the following conditions in this **Section 7.1(a)** (each, a " **Condition** " and collectively, the " **Conditions** ", and the date of the satisfaction of all Conditions, the " **Effective Date** "):

(i)     the Canadian Court shall have granted an order approving the entirety of this Agreement and all provisions hereof including, without limitation, the amendments to the APAC Restructuring Agreement contemplated herein, and such order shall have become final and non-appealable;

(ii)     the US Court shall have granted an order approving the entirety of this Agreement and all provisions hereof including, without limitation, the amendments to the APAC Restructuring Agreement contemplated herein, and such order shall have become final and non-appealable; and

(iii)     Nortel Networks del Paraguay S.A. shall have executed and delivered (i) the Full and Final Acknowledgement and Release (Paraguay) to the Nortel Parties, the form of which is attached hereto as **Appendix H** and (ii) its signature pages to the Escrow Amendment, the Escrow Account Release Instructions for the Escrow Account of which it is a Depositor and the Intermediate Distribution Account Release Instruction.

(b)     The Canadian Debtors and the US Debtors (as applicable) shall:

(i)     use commercially reasonable efforts to satisfy the Conditions set forth in **Sections 7.1(a)(i)** and **7.1(a)(ii)** above in their respective Courts as soon as possible, taking into account the availability of the respective Courts to address the matters set forth in this Agreement; and

(ii)    keep all other Parties and counsel and financial advisors to the ad hoc committee of bondholders (the " **Bondholder Group** ") reasonably apprised of the progress of the satisfaction of the Conditions and provide such other information regarding the satisfaction of the Conditions as reasonably requested by other Parties.

(c)     Each Party hereto shall not oppose the reasonable participation of any other Party or the Bondholder Group in connection with any proceedings in any Court related to the satisfaction of the Conditions to the extent such entity does not already have standing.

## ARTICLE VIII — MISCELLANEOUS

8.1   **Reservation of Rights**

(a)     The Parties hereby acknowledge and agree that they are entering into this Agreement for settlement purposes only and nothing herein or the actions taken as a result hereof shall constitute an acknowledgment or admission as to the correct methodology for determining allocation of the Sale Proceeds of a particular Global Sale or the proceeds of any other transaction, including, without limitation, the sale of assets, business or intellectual property, that could be subject to allocation among any of the Parties or their affiliates, and shall not constitute an amendment, modification or waiver of rights of any Party (other than by or with respect to the Non-Filed Entities) or bar, prohibit, terminate or in any way hinder or enhance the rights of the Parties to this Agreement (other than by or with respect to the Non-Filed Entities) to present any arguments, methodologies, legal or factual theories in support of a proposed allocation of the Sale Proceeds or the proceeds of any other transaction, including, without limitation, the sale of assets, business or intellectual property, that could be subject to allocation amongst any of the Parties or their affiliates, and such presentation shall not, or otherwise be deemed to, constitute in any way a violation of a Party's rights under any existing agreement. The Parties agree that no Party shall use as evidence, or otherwise rely upon, this Agreement or any part hereof (including, without limitation, the amount and/or payment of the Settlement Amount or a Party's Settlement Share) in any way to support its right to a particular allocation of the Sale Proceeds or any other sale proceeds.

15

(b)    The Parties hereby acknowledge and agree that, in the event the Escrow Release Effective Date does not occur or the Agreement is terminated pursuant to **Section 3.5** , nothing in this Agreement, including without limitation the provisions of **Section 2.1** hereof, shall constitute an acknowledgment, admission, amendment, modification or waiver of claims governed by this Agreement or any other rights or obligations of the Parties.

8.2    **Governing Law and Jurisdiction**

(a)    This Agreement shall be governed exclusively by the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction.

(b)    To the fullest extent permitted by applicable law, each Party (i) agrees to submit to the jurisdiction of the US and Canadian Courts (including for purposes of a joint hearing conducted under the cross-border insolvency protocol, as amended and as the same may be further amended, approved by the US and Canadian Courts in their respective proceedings (the " **Cross-Border Protocol** ")), for purposes of all legal proceedings to the extent relating to the matters agreed in this Agreement; (ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters in this Agreement must be commenced in (v) a joint hearing of both the Canadian and US Courts conducted under the Cross-Border Protocol if such claim, action or proceeding would affect any of the Canadian Debtors and any of the US Debtors, (w) the US Court for any claim, action or proceeding if such claim, action or proceeding would affect the US Debtors and not affect the Canadian Debtors, (x) the Canadian Court if such claim, action or proceeding would affect the Canadian Debtors, but not affect the US Debtors, (y) the courts of England and Wales if such claim, action or proceeding would affect the main administration proceedings of NNSA any of the EMEA Debtors or the Joint Administrators (including as joint administrators of NNSA) and any of the EMEA Liquidation Debtors or the Joint Liquidators, but not affect the US Debtors or the Canadian Debtors, or (z) the courts of France if such claim, action or proceeding would affect the NNSA Office Holder or the NNSA Secondary Proceedings but not any of the EMEA Debtors, the Joint Administrators, the EMEA Liquidation Debtors, the Joint Liquidators, the US Debtors or the Canadian Debtors; (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such action brought in such a court or any claim that any such action brought in such a court has been brought in an inconvenient forum; (iv) agrees that mailing of process or other papers in connection with any such action or proceeding or any other manner as may be permitted by law shall be valid and sufficient service thereof; and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law.

16

**8.3**    **Amendments**

This Agreement may be amended, by means of a written amendment signed by all Parties, which amendments, if material, must be approved by the US Court and the Canadian Court.

**8.4**    **Counterparts**

This Agreement may be executed in separate counterparts (which may include counterparts delivered by facsimile or other electronic transmission) and all of said counterparts taken together shall be deemed to be an original and shall be binding on the Party who signed the counterpart and all of which together shall constitute a single agreement.

**8.5**    **Joint Administrators and NNSA Office Holder**

(a)    The Parties agree that the Joint Administrators and the NNSA Office Holder have negotiated and are entering into this Agreement as agents for the EMEA Debtors to which they are appointed and NNSA (as applicable) and that none of the Joint Administrators or the NNSA Office Holder, their respective firms, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Party to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations.

(b)    The Joint Administrators are a Party to this Agreement:

  (i)    as agents of NNSA and the respective EMEA Debtors of which they are administrators; and

  (ii)    in their own capacities solely for taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B1 of the United Kingdom Insolvency Act 1986 and for the purposes of obtaining the benefit of the provisions of this Agreement expressed to be conferred on or given to the Joint Administrators and enforcing the obligations of certain other Parties to this Agreement.

**8.6**    **Joint Liquidators**

(a)    The Parties agree that the Joint Liquidators have negotiated and are entering into this Agreement as agents for the EMEA Liquidation Debtors to which they are appointed and that none of the Joint Liquidators, their respective firms, partners, employees, advisers, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Party to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations.

(b)    The Joint Liquidators are a Party to this Agreement:

  (i)    as agents of the respective EMEA Liquidation Debtors of which they are liquidators; and

17

(ii)    in their own capacities solely for obtaining the benefit of the provisions of this Agreement expressed to be conferred on or given to the Joint Liquidators and enforcing the obligations of certain other Parties to this Agreement.

8.7    **Several Obligations**

Except as specifically set forth in this Agreement, the obligations of each Party hereunder are several, and not joint and several.

8.8    **Binding; Successors and Assigns**

Except as otherwise expressly provided in this Agreement, all representations, warranties, covenants and agreements set forth in this Agreement by or on behalf of the Parties hereto will be binding upon and inure to the benefit of such Parties and their respective successors and permitted assigns, including, without limitation, any administrator, liquidator, trustee, receiver appointed as a successor or assign of any Party.

8.9    **Specific Performance**

The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. Accordingly, in addition to any other remedies to which the Parties are entitled at law or in equity, each of the Parties shall be entitled to equitable relief to prevent or remedy breaches of this Agreement, without the proof of actual damages, including in the form of an injunction or injunctions or orders for specific performance in respect of such breaches.

8.10    **Entire Agreement**

(a)    This Agreement constitutes the entire understanding and agreement between the signatories hereto in relation to the subject matter of this Agreement.

(b)    Each Party acknowledges that it has not entered into this Agreement in reliance wholly or partly on any representation or warranty made by or on behalf of the other Party (whether orally or in writing) other than as expressly set out in this Agreement.

(c)    The settlements contained in this Agreement are integrated and mutually dependent. In the event that any provision herein shall be illegal, invalid, or unenforceable, the entire Agreement shall be rendered null and void.

8.11   **Consent of the Creditors' Committee**

Consistent with Section 12(g)(i) of the Interim Funding and Settlement Agreement, dated June 9, 2009 among certain of the Parties, the US Debtors acknowledge that they have consulted with the Creditors' Committee and obtained its consent prior to entering into this Agreement, which consent is evidenced by the signature of the Creditors' Committee below.

**[SIGNATURE PAGES FOLLOW]**

19

NORTEL NETWORKS LIMITED

By:     / S / A NNA V ENTRESCA
Name:  Anna Ventresca
Title:    General Counsel-Corporate and
         Corporate Secretary

By:     / S / C LARKE G LASPELL
Name:  Clarke Glaspell
Title:    Controller

NORTEL NETWORKS INC.

By:     / S / J OHN J. R AY , III
Name:  John J. Ray, III
Title:    Principal Officer

ERNST & YOUNG INC. IN ITS
CAPACITY AS THE MONITOR OF
NORTEL NETWORKS CORPORATION
ET AL.,
AND NOT IN ITS PERSONAL
CAPACITY

By:     / S / S HARON H AMILTON
Name:  Sharon Hamilton
Title:    Senior Vice-President

NORTEL NETWORKS CORPORATION

By:     / S / A NNA V ENTRESCA
Name:  Anna Ventresca
Title:    General Counsel-Corporate and
         Corporate Secretary

By:     / S / C LARKE G LASPELL
Name:  Clarke Glaspell
Title:    Controller

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF NORTEL
NETWORKS INC., ET. AL.

By:  AKIN GUMP STRAUSS HAUER &
FELD LLP, as Counsel to the Committee
and authorized signatory and not in its
individual capacity

By:     / S / D AVID H. B OTTER
Name:  David H. Botter
Title:    Member of the Firm

S-1

*APAC/CALA Settlement Agreement – Signature Page*

**NORTEL NETWORKS TECHNOLOGY CORPORATION**

By:   / S / A NNA V ENTRESCA
Name:  Anna Ventresca
Title:  Director and Secretary

**NORTEL NETWORKS DE MEXICO, S.A. DE C.V.**

By:   / S / A LLAN B IFIELD
Name:  Allan Bifield
Title:  Legal Representative

By:   / S / A NNA V ENTRESCA
Name:  Anna Ventresca
Title:  Legal Representative

**NORTEL DE MEXICO, S. DE R.L. DE C.V.**

By:   / S / A LLAN B IFIELD
Name:  Allan Bifield
Title:  Legal Representative

By:   / S / A NNA V ENTRESCA
Name:  Anna Ventresca
Title:  Legal Representative

**NORTEL NETWORKS PERU S.A.C.**

By:   / S / L UIS G ASTAÑETA A LAYZA
Name:  Luis Gastañeta Alayza
Title:  Legal Representative

**NORTEL NETWORKS AUSTRALIA PTY. LIMITED**

By:   / S / A LLAN B IFIELD
Name:  Allan Bifield
Title:  Director

By:   / S / A NNA V ENTRESCA
Name:  Anna Ventresca
Title:  Director

S-2

*APAC/CALA Settlement Agreement – Signature Page*

**PT NORTEL NETWORKS INDONESIA**

By:      / S / A LLAN B IFIELD
Name:   Allan Bifield
Title:    Director


By:      / S / A NNA V ENTRESCA
Name:   Anna Ventresca
Title:    Director

**NORTEL NETWORKS MALAYSIA SDN. BHD.**

By:      / S / A LLAN B IFIELD
Name:   Allan Bifield
Title:    Director


By:      / S / A NNA V ENTRESCA
Name:   Anna Ventresca
Title:    Director

**NORTEL NETWORKS NEW ZEALAND LIMITED**

By:      / S / A LLAN B IFIELD
Name:   Allan Bifield
Title:    Director


By:      / S / A NNA V ENTRESCA
Name:   Anna Ventresca
Title:    Director

**NORTEL NETWORKS SINGAPORE PTE.
LIMITED**

By:      / S / A LLAN B IFIELD
Name:   Allan Bifield
Title:    Director


By:      / S / A NNA V ENTRESCA
Name:   Anna Ventresca
Title:    Director

**NORTEL NETWORKS SINGAPORE PTE.
LIMITED** on behalf of **NORTEL NETWORKS
SINGAPORE PTE. LIMITED – PHILIPPINES
BRANCH**

By:      / S / A LLAN B IFIELD
Name:   Allan Bifield
Title:    Director


By:      / S / A NNA V ENTRESCA
Name:   Anna Ventresca
Title:    Director

*APAC/CALA Settlement Agreement – Signature Page*

**NORTEL NETWORKS (ASIA) LIMITED**

By:     / S / A LLAN B IFIELD
Name:   Allan Bifield
Title:    Director

**NORTEL NETWORKS (ASIA) LIMITED** on behalf of **NORTEL NETWORKS (ASIA) LIMITED – PAKISTAN BRANCH**

By:     / S / A LLAN B IFIELD
Name:   Allan Bifield
Title:    Director

**NORTEL NETWORKS (ASIA) LIMITED** on behalf of **NORTEL NETWORKS (ASIA) LIMITED – TAIWAN BRANCH**

By:     / S / A LLAN B IFIELD
Name:   Allan Bifield
Title:    Director

**NORTEL NETWORKS (CHINA) LIMITED**

By:     / S / A LLAN B IFIELD
Name:   Allan Bifield
Title:    Legal Representative

**NORTEL NETWORKS (THAILAND) LIMITED**

By:     / S / A LLAN B IFIELD
Name:   Allan Bifield
Title:    Director

By:     / S / A NNA V ENTRESCA
Name:   Anna Ventresca
Title:    Director

**NORTEL NETWORKS KOREA LIMITED**

By:     / S / C HRISTOPHER N OEL V AUGHAN J OHN
Name:   Christopher Noel Vaughan John
Title:    Representative Director

S-4

*APAC/CALA Settlement Agreement – Signature Page*

**NORTEL VIETNAM LIMITED**

By:    / S / A LLAN B IFIELD
Name:  Allan Bifield
Title:    General Director

**NORTEL NETWORKS (INDIA) PRIVATE LIMITED**

By:    / S / A LLAN B IFIELD
Name:  Allan Bifield
Title:    Director

By:    / S / A NNA V ENTRESCA
Name:  Anna Ventresca
Title:    Director

**NORTEL NETWORKS TELECOMMUNICATIONS EQUIPMENT (SHANGHAI) CO. LIMITED**

By:    / S / A NNA V ENTRESCA
Name:  Anna Ventresca
Title:    Legal Representative

**NORTEL NETWORKS DE ARGENTINA S.A.**

By:    / S / J ORGE N UNEZ
Name:  Jorge Nuñez
Title:    Legal Representative

**NORTEL NETWORKS DEL ECUADOR S.A.**

By:    / S / A LLAN B IFIELD
Name:  Allan Bifield
Title:    General Manager

S-5

*APAC/CALA Settlement Agreement – Signature Page*

**NORTEL NETWORKS GLOBAL CORPORATION**

By:     / S / A LLAN B IFIELD
Name:  Allan Bifield
Title:   Director and President

By:     / S / A NNA V ENTRESCA
Name:  Anna Ventresca
Title:   Director and Secretary

**NORTEL NETWORKS INTERNATIONAL
CORPORATION**

By:     / S / A LLAN B IFIELD
Name:  Allan Bifield
Title:   Director and President

By:     / S / A NNA V ENTRESCA
Name:  Anna Ventresca
Title:   Director and Secretary

**NORTEL NETWORKS DEL URUGUAY S.A.**

By:     / S / A LLAN B IFIELD
Name:  Allan Bifield
Title:   President of the Board of Directors

**NORTEL NETWORKS CHILE S.A.**

By:     / S / A LLAN B IFIELD
Name:  Allan Bifield
Title:   Legal Representative

S-6

*APAC/CALA Settlement Agreement – Signature Page*

**NORTEL NETWORKS DE GUATEMALA LTDA.**

By:    / s / L uis -F ernando G uerra S anz
Name:  Luis-Fernando Guerra Sanz
Title:    Sole Administrator and Legal Representative

**NORTEL TRINIDAD & TOBAGO LIMITED**

By:    / s / L uis -F ernando G uerra S anz
Name:  Luis-Fernando Guerra Sanz
Title:    Director

**NORTEL NETWORKS KABUSHIKI KAISHA**

By:    / s / S tephen G ivens
Name:  Stephen Givens
Title:    Resident Director

**NORTEL TECHNOLOGY EXCELLENCE CENTRE PRIVATE LIMITED**

By:    / s / L uis -F ernando G uerra S anz
Name:  Luis-Fernando Guerra Sanz
Title:    Director

S-7

*APAC/CALA Settlement Agreement – Signature Page*

**NORTEL NETWORKS (CALA) INC.**

By:    / S / J OHN J R AY , III
Name:  John J Ray, III
Title:   Principal Officer

**QTERA CORPORATION**

By:    / S / J OHN J R AY , III
Name:  John J Ray, III
Title:   Principal Officer

**XROS, INC.**

By:    / S / J OHN J R AY , III
Name:  John J Ray, III
Title:   Principal Officer

**CORETEK, INC.**

By:    / S / J OHN J R AY , III
Name:  John J Ray, III
Title:   Principal Officer

**ARCHITEL SYSTEMS (U.S.) CORPORATION**

By:    / S / J OHN J R AY , III
Name:  John J Ray, III
Title:   Principal Officer

S-8

*APAC/CALA Settlement Agreement – Signature Page*

**NORTEL ALTSYSTEMS, INC. (previously "ALTEON WEBSYSTEMS, INC.")**

By:    / S / J OHN J R AY , III
Name:   John J Ray, III
Title:    Principal Officer

**NORTEL ALTSYSTEMS INTERNATIONAL INC. (previously "ALTEON WEBSYSTEMS INTERNATIONAL, INC.")**

By:    / S / J OHN J R AY , III
Name:   John J Ray, III
Title:    Principal Officer

**NORTEL NETWORKS APPLICATIONS MANAGEMENT SOLUTIONS INC.**

By:    / S / J OHN J R AY , III
Name:   John J Ray, III
Title:    Principal Officer

**NORTEL NETWORKS CABLE SOLUTIONS INC.**

By:    / S / J OHN J R AY , III
Name:   John J Ray, III
Title:    Principal Officer

**NORTEL NETWORKS CAPITAL CORPORATION**

By:    / S / J OHN J R AY , III
Name:   John J Ray, III
Title:    Principal Officer

**NORTEL NETWORKS HPOCS INC.**

By:    / S / J OHN J R AY , III
Name:   John J Ray, III
Title:    Principal Officer

S-9

*APAC/CALA Settlement Agreement – Signature Page*

**NORTEL NETWORKS INTERNATIONAL INC.**

By:    / S / J OHN J R AY , III
Name:  John J Ray, III
Title:   Principal Officer

**NORTEL NETWORKS OPTICAL COMPONENTS INC.**

By:    / S / J OHN J R AY , III
Name:  John J Ray, III
Title:   Principal Officer

**NORTHERN TELECOM INTERNATIONAL INC.**

By:    / S / J OHN J R AY , III
Name:  John J Ray, III
Title:   Principal Officer

**SONOMA SYSTEMS**

By:    / S / J OHN J R AY , III
Name:  John J Ray, III
Title:   Principal Officer

S-10

*APAC/CALA Settlement Agreement – Signature Page*

**SIGNED** for and on behalf of **Nortel Networks UK Limited** (in administration) by <u>C.J. Hill </u>as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)

/ S / W ILMA G RAHAM
Witness signature

)
)
)

Name: Wilma Graham
Address:

/ S / C.J. H ILL

**SIGNED** for and on behalf of **Nortel GmbH** (in administration) by <u>C.J. Hill </u>as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)

/ S / W ILMA G RAHAM
Witness signature

)
)

Name: Wilma Graham
Address:

/ S / C.J. H ILL

**SIGNED** for and on behalf of **Nortel Networks SpA** (in administration) by <u>C.J. Hill </u>as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)

/ S / W ILMA G RAHAM
Witness signature

)
)

Name: Wilma Graham
Address:

)

/ S / C.J. H ILL

S-11

*APAC/CALA Settlement Agreement – Signature Page*

**SIGNED** for and on behalf of **Nortel Networks Hispania S.A.** (in administration by <u>C.J. Hill</u> as Joint Administrator (acting (acting as agent and without personal liability) in the presence of:

)
)
)

/ s / W ɪʟᴍᴀ G ʀᴀʜᴀᴍ
Witness signature

)
)
)

Name: Wilma Graham
Address:

/ s / C.J. H ɪʟʟ

---

**SIGNED** for and on behalf of **Nortel Networks B.V.** (in administration) by <u>C.J. Hill</u> as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)

/ s / W ɪʟᴍᴀ G ʀᴀʜᴀᴍ
Witness signature

)
)
)

Name: Wilma Graham
Address:

/ s / C.J. H ɪʟʟ

---

**SIGNED** for and on behalf of **Nortel Networks AB** (in administration) by <u>C.J. Hill</u> as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)

/ s / W ɪʟᴍᴀ G ʀᴀʜᴀᴍ
Witness signature

)
)
)

Name: Wilma Graham
Address:

/ s / C.J. H ɪʟʟ

S-12

*APAC/CALA Settlement Agreement – Signature Page*

**SIGNED** for and on behalf of **Nortel Networks N.V.** (in administration) by <u>C.J. Hill</u> as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)

/ S / C.J. H ILL

/ S / W ILMA G RAHAM
Witness signature

)
)
)

Name: Wilma Graham
Address:

**SIGNED** for and on behalf of **Nortel Networks (Austria) GmbH** (in administration) by <u>C.J. Hill</u> as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)

/ S / C.J. H ILL

/ S / W ILMA G RAHAM
Witness signature

)
)
)

Name: Wilma Graham
Address:

**SIGNED** for and on behalf of **Nortel Networks Portugal S.A.** (in administration) by <u>C.J. Hill</u> as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)

/ S / C.J. H ILL

/ S / W ILMA G RAHAM
Witness signature

)
)
)

Name: Wilma Graham
Address:

S-13

*APAC/CALA Settlement Agreement – Signature Page*

**SIGNED** for and on behalf of **Nortel Networks s.r.o.** (in administration) by C.J. Hill as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)

/ S / W ILMA G RAHAM
Witness signature

)
)
)

Name: Wilma Graham
Address:

/ S / C.J. H ILL

**SIGNED** for and on behalf of **Nortel Networks Polska Sp. z.o.o.** (in administration) by C.J. Hill as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)

/ S / W ILMA G RAHAM
Witness signature

)
)
)

Name: Wilma Graham
Address:

/ S / C.J. H ILL

S-14

*APAC/CALA Settlement Agreement – Signature Page*

**SIGNED** for and on behalf of **Nortel Networks France S.A.S.** (in administration) by <u>Kerry Trigg</u> acting as authorized representative for the Joint Administrators (acting as agent and without personal liability) in the presence of:

)
)
)

/ S / K ERRY T RIGG

<u>/ S / L EISA H ARKIN</u>
Witness signature

)
)
)

Name: Leisa Harkin
Address: Ernst & Young LLP
1 More London Place
London, SE1 2AF
United Kingdom

S-15

*APAC/CALA Settlement Agreement – Signature Page*

**SIGNED** for and on behalf of **Nortel Networks Engineering Service kft** (in administration) by <u>C.J. Hill</u> as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)

/ S / C.J. H ILL

_____
/ S / W ILMA G RAHAM
Witness signature

)
)
)

Name: Wilma Graham
Address:

**SIGNED** for and on behalf of **Nortel Networks Slovensko, s.r.o.** (in administration) by <u>C.J. Hill</u> as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)

/ S / C.J. H ILL

_____
/ S / W ILMA G RAHAM
Witness signature

)
)
)

Name: Wilma Graham
Address:

**SIGNED** for and on behalf of **Nortel Networks Romania Srl** (in administration) by <u>C.J. Hill</u> as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)

/ S / C.J. H ILL

_____
/ S / W ILMA G RAHAM
Witness signature

)
)
)

Name: Wilma Graham
Address:

S-16

*APAC/CALA Settlement Agreement – Signature Page*

**SIGNED** for and on behalf of **Nortel Networks Oy** (in administration) by <u>C.J. Hill</u> as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)

/ s / C.J. H ILL

/ s / W ILMA G RAHAM

Witness signature

)
)
)

Name: Wilma Graham
Address:

**SIGNED** for and on behalf of **Nortel Networks International Finance & Holding B.V.** (in administration) by <u>C.J. Hill</u> as Joint Administrator (acting as agent and without personal liability) in the presence of:

)
)
)

/ s / C.J. H ILL

/ s / W ILMA G RAHAM

Witness signature

)
)

Name: Wilma Graham
Address:

)

S-17

*APAC/CALA Settlement Agreement – Signature Page*

**SIGNED** for and on behalf of **Nortel Networks Optical**
**Components Limited** (in liquidation) by <u>Kerry Trigg</u> as liquidator
(acting as agent and without personal liability), in the presence of:

)
)
)

/ S / K ERRY T RIGG

/ S / L EISA H ARKIN

Witness signature

)
)
)

Name: Leisa Harkin
Address: Ernst & Young LLP
1 More London Place
London, SE1 2AF
United Kingdom

S-18

*APAC/CALA Settlement Agreement – Signature Page*

**SIGNED** for and on behalf of **Nortel Networks (Ireland) Limited**
(in administration) by <u>David Hughes</u> as Joint Administrator (acting
as agent and without personal liability) in the presence of:

)
)
)

<u>/ s / D</u>avid H<small>UGHES</small>

<u>/ s / N</u>iall C<small>OVENEY</small>
Witness signature

)
)
)

Name: Niall Conveny
Address: c/o Ernst & Young
Harcourt Street
Dublin 2

S-19

*APAC/CALA Settlement Agreement – Signature Page*

**SIGNED** for and on behalf of **Nortel Networks (Northern Ireland) Limited** (in liquidation) by <u>Kerry Trigg</u>, as liquidator (acting as agent and without personal liability), in the presence of:

)
)
)

/ S / K ERRY T RIGG

/ S / L EISA H ARKIN
Witness signature

)
)
)

Name: Leisa Harkin
Address: Ernst & Young
1 More London Place
London SE1 2AF
United Kingdom

S-20

*APAC/CALA Settlement Agreement – Signature Page*

**SIGNED** for and on behalf of **Nortel Networks AG** by <u>Dave Quane</u> in the presence of:

)
)
)

/s/ Dave Quane

/ S / P ERIHAN Y AZICI
Witness signature

)
)
)

Name: Perihan Yazici
Address: Nortel
Fleming House
71 King Street
Maidenhead U.K.
SL6 1DU

S-21

*APAC/CALA Settlement Agreement – Signature Page*

**SIGNED** by Alan Bloom

In his own capacity and on behalf of the Joint Administrators without personal liability and solely for the benefit of the provisions of this Agreement expressed to be conferred on or given to the Joint Administrators:

)
)
)

/ s / A LAN B LOOM

/ s / W ILMA G RAHAM
Witness signature

)
)
)

Name: Wilma Graham
Address:

S-22

*APAC/CALA Settlement Agreement – Signature Page*

**SIGNED** by Kerry Trigg  ) / S / K ERRY T RIGG
  )
  )

In her own capacity and on behalf of the Joint Liquidators without personal liability and solely for the benefit of the provisions of this Agreement expressed to be conferred on or given to the Joint Liquidators:

/ S / L EISA H ARKIN
Witness signature

  )
Name: Leisa Harkin  )
Address: Ernst & Young LLP  )
1 More London Place
London SE1 2AF
United Kingdom

S-23

*APAC/CALA Settlement Agreement – Signature Page*

**SIGNED** for and on behalf of **Nortel Networks AS** by <u>Dave Quane</u> in the presence of:

)
)
)

/ S / D AVE Q UANE

/ S / P ERIHAN Y AZICI
Witness signature

)

Name: Perihan Yazici
Address: Nortel Fleming House
71 King Street, Maidenhead
SL6 1DU United Kingdom

)
)
)

**SIGNED** for and on behalf of **Nortel Networks South Africa (Pty) Limited** by <u>Dave Quane</u> in the presence of:

)
)
)

/ S / D AVE Q UANE

/ S / P ERIHAN Y AZICI
Witness signature

)

Name: Perihan Yazici
Address: Nortel Fleming House
71 King Street, Maidenhead
SL6 1DU United Kingdom

)
)
)

S-24

*APAC/CALA Settlement Agreement – Signature Page*

**SIGNED** for and on behalf of **NORTEL NETWORKS S.A.** (in administration and secondary proceedings) by Maître Cosme Rogeau, in his capacity as French Liquidator (Mandataire Liquidateur), acting as agent and without personal liability, in the presence of:

)
)
)
)

/ s / C osme R ogeau
_____
Cosme Rogeau

Witness signature

)
)
)

/ s / R ajeev S harma F okeer
_____
Name: Rajeev Sharma Fokeer
Address: Partner, FTPA
1 bis Avenue Foch
257116 Paris, France

S-25

*APAC/CALA Settlement Agreement – Signature Page*

**SIGNED** for and on behalf of **Nortel networks S.A. (in administration and secondary proceedings)** by <u>C.J. Hill</u> acting as authorised representative for the Joint Administrators (acting as agent and without personal liability) in the presence of:

)
)
)
)

/ S / C.J. H ILL

Witness signature

)
)
)

/ S / W ILMA G RAHAM
Name: Wilma Graham
Address: Ernst & Young LLP
1 More London Place
London SE1 2AF
United Kingdom

S-26

*APAC/CALA Settlement Agreement – Signature Page*

**Schedule 1**

**Canadian Debtors**

1.    Nortel Networks Corporation

2.    Nortel Networks Limited

3.    Nortel Networks Global Corporation

4.    Nortel Networks International Corporation

5.    Nortel Networks Technology Corporation

**Schedule 2**

**US Debtors**

1.   Nortel Networks Inc.

2.   Architel Systems (U.S.) Corporation

3.   CoreTek, Inc.

4.   Nortel Altsystems, Inc. (previously "Alteon WebSystems, Inc.")

5.   Nortel Altsystems International Inc. (previously "Alteon WebSystems International, Inc.")

6.   Nortel Networks Applications Management Solutions Inc.

7.   Nortel Networks Cable Solutions Inc.

8.   Nortel Networks Capital Corporation

9.   Nortel Networks (CALA) Inc.

10.   Nortel Networks HPOCS Inc.

11.   Nortel Networks International Inc.

12.   Nortel Networks Optical Components Inc.

13.   Northern Telecom International Inc.

14.   Qtera Corporation

15.   Sonoma Systems

16.   Xros, Inc.

**Schedule 3**

**EMEA Debtors**

1. Nortel Networks UK Limited (In Administration)
2. Nortel Networks (Ireland) Limited (In Administration)
3. Nortel Networks NV (In Administration)
4. Nortel Networks SpA (In Administration)
5. Nortel Networks BV (In Administration)
6. Nortel Networks Polska Sp z.o.o. (In Administration)
7. Nortel Networks Hispania, SA (In Administration)
8. Nortel Networks (Austria) GmbH (In Administration)
9. Nortel Networks sro (In Administration)
10. Nortel Networks Engineering Services Kft (In Administration)
11. Nortel Networks Portugal SA (In Administration)
12. Nortel Networks Slovensko, sro (In Administration)
13. Nortel Networks Romania Srl (In Administration)
14. Nortel GmbH (In Administration)
15. Nortel Networks Oy (In Administration)
16. Nortel Networks AB (In Administration)
17. Nortel Networks International Finance & Holding BV (In Administration)
18. Nortel Networks France S.A.S. (In Administration)

**Schedule 4**

**APAC Entities**

1. Nortel Networks (Asia) Limited
2. Nortel Networks Australia Pty. Limited
3. Nortel Networks (India) Private Limited
4. PT Nortel Networks Indonesia
5. Nortel Networks Japan (Japanese name is Nortel Networks Kabushiki Kaisha)
6. Nortel Networks Korea Limited
7. Nortel Networks Malaysia Sdn. Bhd.
8. Nortel Networks New Zealand Limited
9. Nortel Networks Singapore Pte Ltd
10. Nortel Networks (Thailand) Limited
11. Nortel Vietnam Limited
12. Nortel Networks (China) Limited
13. Nortel Networks Telecommunications Equipment (Shanghai) Co., Ltd
14. Nortel Technology Excellence Centre Private Limited

**Schedule 5**

**CALA Entities**

1.    Nortel Networks de Argentina S.A.

2.    Nortel Networks Chile S.A.

3.    Nortel Networks del Ecuador S.A.

4.    Nortel Networks de Guatemala Ltda.

5.    Nortel Networks de Mexico, S.A. de C.V.

6.    Nortel Networks Perú S.A.C.

7.    Nortel Networks del Uruguay S.A.

8.    Nortel de Mexico, S. de R.L de C.V.

9.    Nortel Trinidad and Tobago Limited

**Schedule 6**

**EMEA NFEs**

1.   Nortel Networks AS

2.   Nortel Networks AG

3.   Nortel Networks South Africa (Pty) Limited

**Schedule 7**

**List of Global Sales**

Those sales pertaining to the following sale agreements and any related sale agreements entered into by any of the EMEA Debtors:

1.  The Asset Purchase Agreement entered into among certain of the Nortel Parties and Radware Ltd., as of February 19, 2009, as may have been amended from time to time until such transaction closed on April 1, 2009 (the " **Layer 4-7 Sale Agreement** ")

2.  The Asset Sale Agreement entered into among certain of the Nortel Parties and Telefonaktiebolaget L M Ericsson (publ), as of July 24, 2009, as may have been amended from time to time until such transaction closed on November 13, 2009. (the " **CDMA Sale Agreement** ")

3.  The Amended and Restated Asset and Share Sale Agreement entered into among certain of the Nortel Parties and Avaya Inc., as of September 14, 2009, as may have been amended from time to time until such transaction closed on December 18, 2009 (the " **Enterprise Sale Agreement** ")

4.  The Asset Sale Agreement entered into among certain of the Nortel Parties and Ciena Corporation, as of November 24, 2009, as may have been amended from time to time until such transaction closed on March 31, 2010 (the " **MEN Sale Agreement** ")

5.  The Asset Sale Agreement entered into among certain of the Nortel Parties and Telefonaktiebolaget L M Ericsson (publ), as of November 24, 2009, as may have been amended from time to time until such transaction closed on March 31, 2010 (the " **GSM/GSM-R Sale Agreement** ")

6.  The Asset Sale Agreement entered into among certain of the Nortel Parties and Kapsch CarrierCom AG, as of November 24, 2009, as may have been amended from time to time until such transaction closed on March 31, 2010.

7.  The Asset Sale Agreement entered into among certain of the Nortel Parties and GENBAND Inc., as of December 22, 2009, as may have been amended from time to time until such transaction closed on May 28, 2010 (the " **CVAS Sale Agreement** ")

8.  The Asset Sale Agreement entered into among certain of the Nortel Parties and Telefonaktiebolaget L M Ericsson (publ), as of May 11, 2010, as may have been amended from time to time until such transaction closed on June 4, 2010 (the " **GSM Retained Contracts Sale Agreement** ")

9.  The Asset Sale Agreement entered into among certain of the Nortel Parties and Telefonaktiebolaget L M Ericsson (publ), as of September 24, 2010, as may have been amended from time to time until such transaction closed on March 11, 2011 (the " **MSS Sale Agreement** ")

10.   The Asset Sale Agreement entered into among certain of the Nortel Parties and Rockstar Bidco, LP, as of June 30, 2011, as may have been amended from time to time until such transaction closed on July 29, 2011 (the " **Global IP Sale Agreement** ")

11.   The Transaction Agreement entered into among certain of the Nortel Parties and Hitachi, Ltd., as of October 25, 2009, as may have been amended from time to time until such transaction closed on December 8, 2009 (the " **Packet Core Sale Agreement** ")

**Schedule 8**

**Escrow Agreements**

1. CDMA/LTE Access

   Escrow Agreement dated as November 11, 2009 by and among NNC, NNL, NNI, the EMEA Filed Entities, the Estate Fiduciaries and the Escrow Agent.

2. Enterprise Solutions

   Escrow Agreement dated as of December 18, 2009, and as amended from time to time, by and among NNC, NNL, NNI, the other entities identified therein as Sellers, the EMEA Filed Entities, the Estate Fiduciaries and the Escrow Agent.

3. Metro Ethernet Networks

   MEN Distribution Escrow Agreement dated as of March 19, 2010, and as amended from time to time, by and among NNC, NNL, NNI, the other entities identified therein as Sellers, the EMEA Sellers and certain of their Affiliates as identified therein, NNSA, the Estate Fiduciaries and the Escrow Agent.

4. GSM/GSM-R

   GSM/GSM-R Distribution Escrow Agreement dated as of March 31, 2010, and as amended from time to time, by and among NNC, NNL, NNI, the other entities identified therein as Sellers, the EMEA Sellers as identified therein, NNSA, Nortel Networks (Asia) Limited, the entities identified therein as North American ALT Selling Debtors, the entities identified therein as EMEA ALT Selling Debtors, the Estate Fiduciaries and the Escrow Agent.

5. Carrier Voice-Over IP and Application Solutions

   CVAS Distribution Escrow Agreement dated as of May 27, 2010, and as amended from time to time, by and among NNC, NNL, NNI, the other entities identified therein as Sellers, the EMEA Sellers and certain of their Affiliates as identified therein, NNSA, the Estate Fiduciaries and the Escrow Agent.

6. GSM Retained Contracts

   GSM Retained Contracts Distribution Escrow Agreement dated June 3, 2010, and as amended from time to time, by and among NNL, NNI, Nortel Networks (CALA) Inc., the other entities identified therein as Sellers, the Estate Fiduciaries and the Escrow Agent.

7.     Multi-Service Switch

MSS Distribution Escrow Agreement dated as of March 11, 2001, and as amended from time to time, by and among NNC, NNL, NNI, the other entities identified therein as Sellers, the EMEA Sellers and Certain of their Affiliates as identified therein, NNSA, the Israeli Company, the Estate Fiduciaries and the Escrow Agent.

8.     Layer 4-7

Escrow Agreement dated as of March 31, 2009 by and among NNI, NNL, those entities identified therein as EMEA Sellers, the Joint Administrators and the Escrow Agent.

**Schedule 9**

**Other Sales**

1.  The Asset Sale Agreement entered into among NNL, Nortel Networks Technology Corporation and 7522312 Canada Inc., as of June 17, 2010, as may have been amended from time to time until such transaction closed on June 30, 2010 (the " **Relay Sale Agreement** ")

2.  The Share Purchase Agreement entered into between NNL and Telefonaktiebolaget L M Ericsson (publ), as of April 21, 2010, as may have been amended from time to time until such transaction closed on June 29, 2010 (the " **LG-Nortel Sale Agreement** ")

3.  The Asset Sale Agreement entered into among NNL, Nortel Networks Technology Corporation and CSC Holdings, LLC, dated November 23, 2011 (the " **IP Address Cablevision Sale Agreement** ")

4.  The Asset Sale Agreement entered into among NNL, Nortel Networks Technology Corporation and Salesforce.com, Inc., dated December 1, 2011 (the " **IP Address Salesforce Sale Agreement** ")

5.  The Asset Sale Agreement entered into between NNI and Microsoft Cororation, as of March 16, 2011, as may have been amended from time to time until such transaction closed on May 11, 2011 (the " **US IP Address Sale Agreement** ")

6.  The Asset Sale Agreement entered into among Guangdong Nortel Telecommunications Equipment Company Ltd. (" **GDNT** ") and Ericsson (China) Communications Company Ltd., as of December 1, 2010, as may have been amended from time to time until such transaction closed on May 12, 2011 (the " **GDNT Sale Agreement** ") [1]

7.  The Asset Sale Agreement entered into among NNL, Nortel Networks Technology Corporation and Bell Aliant Regional Communications, Limited Partnership dated January 30, 2012

8.  The Asset Sale Agreement entered into among NNL, Nortel Networks Technology Corporation and Vodafone Americas Inc. dated February 9, 2012, as amended

---

[1]  Notwithstanding the release provided in Section 4.1(a) hereof, Nortel Networks (China) Ltd does not release any claim it may have to sale proceeds arising from the GDNT Sale Agreement in its capacity as a shareholder of GDNT.

**List of Appendices**

Appendix A      -    Allocation of Sale Proceeds to Non-Filed Entities by Escrow Account

Appendix B      -    Payment of Settlement Amount to Settlement Payment Parties

Appendix C-1    -    Outstanding Balances as of September 30, 2011

Appendix C-2    -    Certain Payments Made After September 30, 2011

Appendix C-3    -    Certain Surviving Obligations

Appendix D      -    [Reserved]

Appendix E      -    Form of Amendments to Escrow Agreements

Appendix F      -    Form of Escrow Account Release Instructions

Appendix G      -    Form of Intermediate Distribution Account Release Instruction

Appendix H      -    Form of Full and Final Acknowledgement and Release (Paraguay)

**Certification**

I, ALLAN BIFIELD, certify that:

1. I have reviewed this quarterly report on Form 10-Q for the second quarter of 2012 of Nortel Networks Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. I have disclosed, based on my most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 9, 2012

/ S / ALLAN BIFIELD
Allan Bifield
Senior Vice-President, Corporate Services and Chief
    Financial Officer*

* As Senior Vice-President, Corporate Services and Chief Financial Officer, Allan Bifield is performing the functions of a principal executive officer.

EXHIBIT 32

**Certification**
**Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**
**(Subsections (a) and (b) of Section 1350, Chapter 63 of Title 18, United States Code)**

Pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), the undersigned officer of Nortel Networks Corporation, a Canadian corporation (the "Company"), does hereby certify, to such officer's knowledge, that:

The Quarterly Report on Form 10-Q for the quarter ended June 30, 2012 (the "Form 10-Q") of the Company fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and information contained in the Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: August 9, 2012

/ S / A LLAN B IFIELD
Allan Bifield
Senior Vice-President, Corporate Services and Chief Financial
    Officer*

\*   As Senior Vice-President, Corporate Services and Chief Financial Officer, Allan Bifield is performing the functions of a principal executive officer.