**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NORTEL NETWORKS, INC., *et al.*, | ) | Case No. 09-10138 (KG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| _____ | ) | **Re: Dkt. No. 14076** |

**OPINION REGARDING DEBTORS' MOTION PURSUANT TO BANKRUPTCY
RULE 9019 APPROVING SETTLEMENT AGREEMENT BY AND AMONG
NORTEL NETWORKS INC., THE SUPPORTING BONDHOLDERS, AND
THE BANK OF NEW YORK MELLON WITH RESPECT TO THE NNI
<u>POST-PETITION INTEREST DISPUTE AND RELATED ISSUES</u>**

KEVIN GROSS
UNITED STATES BANKRUPCTY JUDGE

Wilmington, Delaware
December 18, 2014

The Court is deciding Debtors' Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 Approving Settlement Agreement by and Among Nortel Networks, Inc., the Supporting Bondholders, and the Bank of New York Mellon with Respect to the NNI Post-Petition Interest Dispute and Related Issues (the "Settlement Motion"). The proposed settlement resolves a major dispute in this long-running bankruptcy case regarding the amount of post-petition interest certain holders of what have come to be known as the "Crossover Bonds" are entitled to claim and receive. For the reasons set forth below, the Court finds that the proposed settlement is fair, reasonable, and in the best interest of the estates. Accordingly, the Court will approve the proposed settlement.

## JURISDICTION

The Court has jurisdiction over this matter and the judicial authority to issue a final order pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## BACKGROUND

A complete recitation of the events leading up to the petition date and the complex history of the nearly six-year[1] bankruptcy case itself is not necessary to the resolution of the matter before the Court, which turns on a relatively narrow set of facts. Further, as the Allocation Dispute (defined below) and myriad other plan issues are still pending at this juncture, it is vitally important that the Court avoid "pre-judging" any disputed legal

---

[1] The docket consists of nearly 15,000 docket entries.

issue or fact. Accordingly, the Court will limit the factual underpinning to only those facts which are both undisputed and strictly necessary to the resolution of the Settlement Motion.

### A.    Procedural Background and Allocation Dispute

Prior to the petition date, Nortel[2] operated as a global networking solutions and telecommunications enterprise, tracing its roots back more than a century. On January 14, 2009, Nortel Networks, Inc. ("NNI") and certain of its U.S.-based affiliates (collectively, the "U.S. Debtors")[3] filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code[4] (the "U.S. Proceedings"). On the same day, certain of the U.S. Debtors' foreign affiliates initiated two related insolvency proceedings abroad.

In Canada, Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), and certain of their Canada-based affiliates (collectively, the "Canadian Debtors") initiated an insolvency proceeding (the "Canadian Proceedings") in the Ontario Superior Court of Justice (the "Canadian Court") under Canada's Companies' Creditors Arrangement Act (the "CCAA"). As is required under the CCAA, at the outset

---

[2] "Nortel" shall refer to the entire, worldwide enterprise, as opposed to a single affiliate or subsidiary, many of which are alternatively defined *infra*.

[3] The Debtors in these Chapter 11 cases are Nortel Networks Inc., Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc.

[4] 11 U.S.C. § 101 *et seq.*

of the proceeding the Canadian Court appointed a monitor, Ernst & Young Inc. (the "Monitor").[5] For all intents and purposes, the Monitor is the sole fiduciary acting on behalf of the Canadian Debtors in the U.S. Proceedings. NNC is the U.S. Debtors' ultimate corporate parent, while NNL is NNI's direct corporate parent and 100% shareholder.

In the United Kingdom, the High Court of Justice of England and Wales placed certain of the U.S. Debtors' affiliates based in Europe, the Middle East, and Africa (collectively, the "EMEA Debtors") into administration, *i.e.* an insolvency proceeding (the "EMEA Proceedings"), under the supervision of court-appointed administrators and foreign representatives (the "Joint Administrators"). NNC is also the ultimate corporate parent of all EMEA Debtors.

Also pending before the Court are Chapter 15 cases under the caption *In re Nortel Networks Corporation, Foreign Applicants in Foreign Proceedings*, Case No. 09-10164 (Jointly Administered).  The Monitor filed the Chapter 15 cases to facilitate the Canadian Proceedings.  The Court entered an Order Granting Recognition and Related Relief on February 27, 2009, which recognized the Canadian Proceedings as foreign main

---

[5] As defined by the Office of the Superintendent of Bankruptcy Canada:

> "A monitor is a trustee licensed by the Office of the Superintendent of Bankruptcy who is appointed by the Court in the initial order. As an officer of the Court, the monitor's role is to monitor the company's business and financial affairs to ensure compliance with the law, the court orders and terms of the Plan. The monitor assists the company with the preparation of the Plan, prepares reports for the Court, provides information to the creditors regarding the claims process and creditors' meetings, etc. and oversees any voting at the meetings."

*You are Owed Money – The Companies' Creditors Arrangement Act (The Role of the Monitor)*, INDUSTRY CANADA, http://www.ic.gc.ca/eic/site/bsf-osb.nsf/eng/br02284.html#toc5 (last modified Oct. 9, 2014).

proceedings pursuant to Section 1520 of the Bankruptcy Code.  The subject matter of this Opinion relates only to the Chapter 11 cases.

Soon after the commencement of the various insolvency proceedings, Nortel entities across the globe proceeded with an orderly and coordinated sale of Nortel assets, generating several billion dollars in sale proceeds in the aggregate. Of particular note, from 2009 to 2011, the Nortel entities executed a series of sales which both the Court and the Canadian Court approved in joint hearings.  The sales have come to be known as the "Line of Business" and "Patent Portfolio" sales. The Line of Business and Patent Portfolio sales generated approximately $7.3 billion in proceeds. In order to facilitate speedy consummation of the sales, on June 9, 2009, the parties entered into and the Court and the Canadian Court approved the Interim Funding and Settlement Agreement (the "IFSA") [D.I. 874, 993]. As is relevant here, the parties to the IFSA agreed to allow the sales to proceed and save for another day how the Line of Business and Patent Portfolio sales proceeds would be allocated among the U.S., Canadian and EMEA Debtors (the "Allocation Dispute"). IFSA ¶ 20, Part C.

In the years since the Nortel entities consummated the Line of Business and Patent Portfolio sales, the U.S. Debtors, the Monitor (on behalf of the Canadian Debtors), the Joint Administrators (on behalf of the EMEA Debtors), and various creditor constituencies of each estate engaged in comprehensive settlement discussions. These discussions included three failed mediations. Ultimately, the Court, jointly with the Canadian Court, conducted a multi-week trial regarding the Allocation Dispute in May and June of 2014, and took the matter under advisement. To date, the parties have failed

to reach a consensual resolution and the Allocation Dispute remains pending before this Court and the Canadian Court. Neither the Debtors nor any other party has proposed a plan of reorganization in the U.S. Debtors' cases.

**B.    The Crossover Bonds**

Prior to the petition date, pursuant to an indenture dated July 5, 2006 (the "2006 Indenture"), NNL issued four series of senior notes which were guaranteed jointly and severally by both NNC and NNI. The 2006 Indenture notes carried interest rates of 10.125%, 10.75% (two series), and LIBOR plus 4.25%. Pursuant to the 2006 Indenture, Bank of New York Mellon, as Indenture Trustee ("BNY Mellon"), timely filed a proof of claim in the U.S. Proceedings on behalf of all 2006 Indenture noteholders in the amount of approximately $2.785 billion.

Similarly, pursuant to an indenture dated March 28, 2007 (the "2007 Indenture"), NNC issued two series of convertible senior notes which were guaranteed jointly and severally by NNL and NNI. The 2007 Indenture notes (together with the 2006 Indenture notes, the "Guaranteed Bonds") carried interest rates of 2.125% and 1.75%. Pursuant to the 2007 Indenture, BNY Mellon timely filed a proof of claim in the U.S. Proceedings on behalf of all 2007 Indenture noteholders (together with the 2006 Indenture noteholders, the "Supporting Bondholders") in the aggregate amount of approximately $1.156 billion.

Additionally, pursuant to an earlier indenture, dated February 15, 1996 (the "1996 Indenture"), NNL and Nortel Networks Capital Corporation ("NNCC") issued a series of senior notes which were guaranteed by NNL. NNI subsequently executed a "Support Agreement," dated February 15, 2006, in favor of NNCC which, as is relevant here,

essentially acts as a guarantee by NNI of the 1996 Indenture notes. The 1996 Indenture notes (together with the Guaranteed Bonds, the "Crossover Bonds") carried an interest rate of 7.875%. Pursuant to the 1996 Indenture, Law Debenture Trust Company of New York, as Successor Indenture Trustee, timely filed a proof of claim in the U.S. Proceedings on behalf of the 1996 Indenture noteholders (together with the Supporting Bondholders, the "Crossover Bondholders") in the amount of approximately $151 million.

The total pre-petition amount of the Crossover Bonds claims is approximately $4.092 billion. All three of the Crossover Bonds proofs of claim include accumulated but unpaid pre-petition interest and explicitly reserve the claimants' right to seek post-petition interest. The 2006 Indenture and 2007 Indenture noteholders, *i.e.* the Supporting Bondholders, are signatories to the Settlement Agreement while the 1996 Indenture noteholders are not.

### C.    The PPI Dispute and Settlement Agreement

While no party has yet disputed the Crossover Bondholders' entitlement to principal and pre-petition interest at the contract rate, the Crossover Bondholders, the Monitor, and certain Canadian creditor constituencies disagree sharply as to the rate at which the Crossover Bondholders may recover post-petition interest in the event that NNI is solvent (the "PPI Dispute").[6]  Based on evidence and expert testimony introduced during the Allocation Dispute trial, NNI could be solvent by more than $1 billion under

---

[6] As discussed in more detail *infra*, under the Bankruptcy Code unsecured creditors are generally entitled to post-petition interest only when the bankruptcy estate is solvent.

certain allocation theories, while it is likely that the Canadian Debtors will be insolvent under any allocation theory.[7] As is relevant here, the Monitor and Canadian creditor constituencies have argued that the Crossover Bondholders are entitled to post-petition interest from NNI at a rate of 0.44%, the Federal Judgment Rate ("FJR") applicable as of the petition date, based on Bankruptcy Code §§ 502(b)(2), 726(a)(5), 1129(a)(7), and 1129(b). Alternatively, the Crossover Bondholders have argued that they are entitled to post-petition interest from NNI at the contract rates set forth above based on the same Bankruptcy Code provisions.[8]

On October 25, 2013, Wilmington Trust, N.A., as successor trustee for a series of notes issued by NNL ("Wilmington Trust"),[9] filed an objection to the Crossover Bondholders' proofs by claim [D.I. 12116]. In its objection, Wilmington Trust asked the Court to disallow the Crossover Bondholders' claims to the extent they exceeded the sum of: (1) principal; (2) accrued but unpaid pre-petition interest; and (3) post-petition interest at the rate of 0.44% (the FJR). On November 15, 2013, after a status conference, the Court entered an order adjourning Wilmington Trust's objection, without date:

> [P]rincipally because the Objection would require the Court to issue an advisory opinion on an issue which may never arise and, if it does, only at a later date and perhaps in a

---

[7] This summary of evidence produced at the Allocation Dispute trial is meant to illustrate a range of possible outcomes set forth by certain parties to the Allocation Dispute and does not constitute a factual or legal finding by the Court as to any allocation theory or the solvency of any of the U.S. or Canadian Debtors.

[8] A more detailed summary of the legal bases for the parties' arguments regarding the rate of post-petition interest to which the Supporting Bondholders are entitled is set forth *infra*.

[9] Neither NNI nor any other U.S.-based debtor guaranteed these notes. Accordingly, Wilmington Trust is not a direct creditor of the U.S. Debtors.

> different context. The Objection will only be germane if the U.S. Debtors are found to be solvent and the solvency issue is far from decided. Courts do not have the power to render an advisory opinion, *i.e.*, based on a contingency and resulting in a contingent declaration.

[D.I. 12399] (citing *Pittsburgh Mack Sales & Service, Inc. v. Int'l Union of Operating Engineers, Local Union No. 66*, 580 F.3d 185, 191-193 (3d Cir. 2009)).

On June 19, 2014, several weeks into the Allocation Dispute trial but prior to its conclusion, after raising the matter in a conference with the Court and the Canadian Court at which all parties were present, the Monitor filed a memorandum asking this Court and the Canadian Court to hear and decide the PPI Dispute on an expedited basis [D.I. 13880]. The Monitor argued that the parties to the Allocation Dispute were unable to meaningfully analyze settlement proposals while the PPI Dispute remained pending due to the divergent positions of the Crossover Bondholders and the Monitor with respect to the post-petition interest rate. According to the Monitor, the Crossover Bondholders would be entitled to approximately $90 million in post-petition interest as of December 31, 2013 if the FJR applies, versus approximately $1.6 billion if the contract rate applies. The Monitor concluded that since the PPI Dispute must be resolved at some future date in any event, the Court and the Canadian Court should decide the issue sooner rather than later to facilitate a settlement of the Allocation Dispute.

On June 20, 2014, the U.S. Debtors and Supporting Bondholders filed a joint memorandum in response to the Monitor's memorandum [D.I. 13883]. The U.S. Debtors and Supporting Bondholders raised three objections in their response which are relevant here: (1) the PPI Dispute is not ripe for adjudication by this Court or the Canadian Court,

specifically noting this Court's order of November 15, 2013 with respect to the Wilmington Trust claim objection (quoted above); (2) the expedited process for resolving the PPI Dispute proposed by the Monitor violated due process; and (3) the Monitor's argument that resolving the PPI Dispute would facilitate settlement of the Allocation Dispute was both a violation of the confidentiality of settlement discussions and factually incorrect. Accordingly, the U.S. Debtors and Supporting Bondholders asked the Court and the Canadian Court to deny the Monitor's request to hear and decide the PPI Dispute on an expedited basis.

On June 23, 2014, the Monitor filed a reply memorandum. [D.I. 13886]. The Monitor argued that the PPI Dispute was ripe for adjudication because it was a purely legal issue, the resolution of which would assist in the negotiation of a consensual resolution to the Allocation Dispute. The Monitor further argued that its proposed expedited briefing schedule raised no due process concerns as the parties had been aware of the issues surrounding the PPI Dispute since the consummation of the Line of Business and Patent Portfolio sales and should have no difficulty preparing for argument in short order.

On June 30, 2014, the Court entered a scheduling order for the PPI Dispute, setting deadlines for opening and reply briefs and scheduling oral argument for July 25, 2014 (the "PPI Dispute Scheduling Order"). The Canadian Court did likewise. Pursuant to the Court's order, the parties were to address the following questions:

> (1) whether the holders of the crossover bonds claims are
> legally entitled in each jurisdiction to claim or receive any
> amounts under the relevant indentures, above and

beyond the outstanding principal debt and prepetition interest; and

(2) if determined that the holders of the crossover bonds claims are so entitled, what additional amounts are such holders entitled to so claim and receive . . . .

[D.I. 13910]. The U.S. Debtors, Supporting Bondholders, Monitor, and various other Canadian and U.S. creditor constituencies subsequently filed opening and reply briefs regarding the merits of the PPI Dispute in accordance with the PPI Dispute Scheduling Order. The Monitor and Canadian creditor constituencies argued in favor of a post-petition interest rate equal to the FJR (0.44%), while the Crossover Bondholders and certain other U.S. creditor constituencies argued in favor the applicable contract rate.[10]  A joint hearing with the Canadian Court was scheduled to begin on July 25, 2014.

On July 24, 2014, the U.S. Debtors filed the Settlement Motion seeking approval of a settlement of the PPI Dispute reached with the Supporting Bondholders (the "Settlement Agreement" or the "Settlement") [D.I. 14076]. The Settlement Agreement resolves the PPI Dispute with respect to all of the Guaranteed Bonds, which constitute over 95% of the Crossover Bonds by principal amount. The core terms of the Settlement Agreement are as follows:

(1) The Supporting Bondholders shall be allowed a general unsecured claim against NNI in the aggregate amount of $3,934,521,442.00;

(2) In the event that the NNI bankruptcy estate has more than sufficient funds to pay all administrative, priority,

---

[10] The U.S. Debtors' brief did not address the merits of the PPI Dispute but instead addressed "certain procedural issues" related to the PPI Dispute [D.I. 14019].

secured, and general unsecured claims, the Supporting Bondholders shall be entitled to payment of post-petition interest from NNI in accordance with a confirmed chapter 11 plan until the PPI Dispute settlement amount is paid in full. The PPI Dispute settlement amount is an amount equal to:

    (a) $876 million for the period from the petition date up to and including June 30, 2014; and

    (b) An "additional amount," not to exceed $134 million, which shall accrue at a rate equal to 3.5% per annum from June 1, 2014 until the earlier of June 30, 2015 and the date of the final distribution with respect to the Guaranteed Bonds (thus setting a total cap on post-petition interest with respect to the Guaranteed Bonds of $1.01 billion);

(3) While the Settlement Agreement does not constitute a release, waiver, or discharge of other "contractual entitlements," such as make-whole payments, recovery of those contractual entitlements is subject to the $1.01 billion post-petition interest cap;

(4) The indenture trustee (*i.e.* BNY Mellon) and certain other parties shall be entitled to seek reimbursement from NNI of certain costs, up to an aggregate cap of $6 million, which shall constitute an advance against any distribution to which the Supporting Bondholders are entitled; and

(5) In the event that there are insufficient funds in the U.S. debtors' estates to pay each unsecured creditor the full amount of post-petition interest owed, then, solely for purposes of allocating funds available for post-petition interest, the Supporting Bondholders shall be deemed to have a claim for post-petition interest equal to the full amount of post-petition interest which would have accrued at the applicable contract rate. The Settlement Agreement does not settle the manner in which available funds will be distributed among unsecured creditors in the event there are insufficient funds to pay each unsecured creditor the full amount of post-petition interest owed. (the "Reservation of Rights").

In light of the Settlement Motion, the Court adjourned the hearing on the PPI Dispute scheduled for the next day. The Official Committee of Unsecured Creditors in the U.S. Proceedings (the "UCC") and the 1996 Indenture noteholders[11] each subsequently filed statements in support of the Settlement Motion [D.I. 14189, 14340]

The Canadian Court proceeded alone with the hearing on the PPI Dispute. The Canadian Court later issued its ruling that under Canadian law, the Canadian Debtors were not obligated to pay post-petition interest. In its Endorsement, dated August 19, 2014, the Canadian Court held that although the Crossover Bondholders have a contractual right to interest, they are not entitled to receive post-petition interest under Canadian law. The Canadian Court thus ruled on the merits of the PPI Dispute, as the Monitor had insisted.

Neither the Monitor nor the Canadian Debtors, nor any other Canadian creditor constituency which filed a brief pursuant to the PPI Dispute Scheduling Order was a signatory to the Settlement Agreement. On July 30, 2014, the Monitor[12] filed a preliminary objection to the Settlement Motion along with a motion to adjourn the objection deadline in order to allow for expedited discovery [D.I. 14117]. On September 2, 2014, the Court

---

[11] While the 1996 Indenture noteholders support the Settlement Agreement, they state that given the intricacies of the relationship between NNI and NNCC which arise due to the 2006 Support Agreement, their notes require "bespoke treatment."

[12] Unless otherwise noted, with respect to the Settlement Motion the Monitor is acting on its own behalf as well as for the Canadian Debtors.

entered an order establishing an expedited discovery schedule and scheduling a hearing on the Settlement Motion for November 4, 2014.

On October 3, 2014, the Monitor filed a supplemental objection to the Settlement Motion, setting forth its substantive objections [D.I. 14496]. In support of its objection, the Monitor also filed notice of the expert report of Dr. Paul Wertheim [D.I. 14499]. Additionally, Wilmington Trust filed a separate objection to the Settlement Motion [D.I. 14498] and Nortel Networks UK Pension Trust Limited, the Board of the UK Pension Protection Fund, and the Canadian Creditors Committee (collectively, the "Joinder Parties") filed joinders to Wilmington Trust's and the Monitor's objection [D.I. 14534, 14564].[13]

On October 30, 2014, the U.S. Debtors and Supporting Bondholders each filed reply briefs in support of the Settlement Motion [D.I. 14652, 14653]. The UCC additionally filed a statement in further support of the Settlement Agreement and adopted the U.S. Debtors' and Supporting Bondholders' reply briefs [D.I. 14656].

On November 4, 2014, the Court heard testimony from three witnesses and admitted into evidence approximately 250 documentary exhibits regarding the Settlement Motion. The U.S. Debtors called John Ray, the principal officer of NNI, to testify in support of the Settlement Motion. The Supporting Bondholders called Michael Katzenstein, a senior managing director with FTI Consulting and financial advisor to the Supporting Bondholders, to testify in support of the Motion. Mr. Ray represented the U.S.

---

[13] See *infra* note 16.

Debtors and Mr. Katzenstein represented the Supporting Bondholders in the negotiations leading to the Settlement Agreement. Both witnesses were intimately involved in the settlement negotiations and provided substantially consistent testimony regarding the events leading up to the filing of the Settlement Motion, which follows.

## FACTS

In mid-June 2014, around the time the Monitor filed its June 19, 2014, memorandum asking the Court to hear and decide the PPI Dispute on an expedited basis, counsel for the Supporting Bondholders and counsel for the U.S. Debtors began to discuss the possibility of a settlement of the PPI Dispute with respect to the U.S. Debtors. Settlement Transcript of the Hearing on the Motion held on November 4, 2014 ("Tr."), 8, 95. Over the next several weeks, settlement discussions became more serious and on July 15, 2014, various representatives of the U.S. Debtors and Supporting Bondholders met in person to discuss a settlement. Tr. 9, 97. Neither the Monitor, nor the Canadian Debtors, nor any other U.S. or Canadian creditor constituency was present at the July 15, 2014 meeting. Tr. 9, 97. At the meeting, the Supporting Bondholders initially proposed to settle the PPI Dispute with respect to the U.S. Debtors for 70% of the applicable contract rate. Tr. 11, 97. The U.S. Debtors countered with an offer of 30%. Tr. 11, 97. After several hours of give-and-take, the meeting ended with the U.S. Debtors at 40% and the Supporting Bondholders at 60%.  Tr. 11, 98.

Over the course of the next several days, the parties continued to negotiate and eventually settled on 55% of the applicable contract rate, which would mean that the Supporting Bondholders were entitled to $876 million as of June 30, 2014. Tr. 11-12, 101-

102. The parties further negotiated a continued accruals cap of 55% of the applicable contract rate for one year from June 30, 2014, or $134 million, for a total post-petition interest cap on the Guaranteed Bonds of $1.01 Billion. Tr. 12-13, 101. The Supporting Bondholders had sought uncapped continued post-petition accruals. Tr. 12, 101. The parties agreed to convert the percentages stated above to specific dollar amounts in the Settlement Agreement for the avoidance of doubt. Tr. 13. The other core terms of the Settlement Agreement, as set forth above, were negotiated during this time period as well. Tr. 15-16. The U.S. Debtors specifically consulted the UCC regarding the Reservation of Rights, which was included with the intention of "leaving open" the question of how the Supporting Bondholders and other unsecured creditors resolve allocation of amounts available for post-petition interest on an intra-creditor basis in the event that there are insufficient funds to pay all unsecured creditors the full amount of post-petition interest owed. Tr. 16. Neither the Monitor, nor the Canadian Debtors, nor any other U.S. or Canadian creditor constituency (aside from the UCC) was consulted during the post-July 15, 2014 settlement discussions. Tr. 26-27, 61-62.

On July 24, 2014, the U.S. Debtors and Supporting Bondholders executed the Settlement Agreement and filed the Settlement Motion with the Court. Both Mr. Ray and Mr. Katzenstein described the settlement negotiations as "vigorous" and adversarial in nature, with both sides making concessions. Tr. 9, 24, 107-108. Mr. Ray testified that the impetus for commencing the settlement discussions was the Monitor's statement that resolution of the PPI Dispute would facilitate settlement of the Allocation Dispute. Tr. 18-19. Mr. Ray further testified that he did not ask for any financial modeling or specific legal

advice regarding the PPI Dispute prior to the July 15, 2014 meeting. Tr. 28, 42-44, 68. According to Mr. Ray, financial modeling to determine the potential amount available for post-petition interest was futile due to the many unresolved issues, variables, and possible outcomes in the U.S. Proceedings, the Canadian Proceedings, and the EMEA Proceedings. Tr. 29, 69.

With respect to consulting the Monitor and other Canadian interests prior to and during the discussions of the terms of the Settlement Agreement, Mr. Ray remarked in his testimony that discussions regarding the PPI Dispute between all parties involved have been going on for years. Tr. 26-27, 62, 88-89. Mr. Ray testified that he was fully aware of the details of the Monitor's and other Canadian interests' positions on the PPI Dispute. Tr. 26-27, 62, 88-89. Mr. Ray excluded the Canadian parties from the June and July 2014 settlement discussions because, in his view, they were not necessary signatories to the Settlement Agreement and their inclusion would only serve to stall and perhaps completely derail settlement discussions. Tr. 27. Mr. Katzenstein generally concurred, noting colorfully in response to a question from the Court that if he "had a dollar for each time [the PPI Dispute was discussed with the Canadian interests], [he] could pay off the bonds." Tr. 126.

The Monitor and Canadian Debtors did not dispute Mr. Ray's and Mr. Katzenstein's testimony from a factual standpoint but did ask a number of question on cross-examination of both witnesses regarding the expedited nature of the June and July 2014 settlement discussions, the fact that Mr. Ray had not sought any specific legal advice or financial modeling prior to the commencement of the settlement discussions, the fact

that Mr. Ray did not consult NNI's board of directors prior to executing the Settlement Agreement on the Debtors' behalf, and the fact that the Monitor and other Canadian interests were not consulted prior to or during the settlement discussions. *See generally* Tr. 32-81, 108-125.

The Monitor and Canadian Debtors called Dr. Wertheim to testify in support of their objection. Dr. Wertheim, among numerous other credentials, is a certified public accountant and professor of accounting at Abilene Christian University. Tr. 130-31. The crux of Dr. Wertheim's testimony and report, which was submitted in conjunction with the Monitor's objection, is that even under the best case scenario, the maximum amount of cash available to pay post-petition interest from NNI would be $971 million. Tr. 135. Accordingly, Dr. Wertheim concluded that the Supporting Bondholders gave up no real value under the terms of Settlement Agreement since $971 million is less than the $1.01 billion cap set forth therein. Tr. 138, 176.

In reaching his conclusion, Dr. Wertheim relied solely on a limited set of documents provided to him by the Monitor and did not conduct interviews or any other sort of independent investigation. Wertheim Rep. App. B. [D.I. 14499-1]; Tr. 181-83. Dr. Wertheim repeatedly stated that his mandate was to focus on the "big picture" and that he did not conduct a "detailed analysis" of the minutiae of the various Nortel insolvency proceedings currently under way across the globe. Tr. 141, 172-73, 212-13, 219, 235-36. Consequently, Dr. Wertheim's calculation of the potential cash available to pay post-petition interest from NNI is based on a series of assumptions with respect to a limited set of variables which Dr. Wertheim deemed to be "material." Tr. 141, 173-74. These

assumptions, all toggled in such a way as to maximize cash available to pay post-petition interest from NNI, include: (1) accepting the U.S. Debtors' position in the Allocation Dispute; (2) assuming that the Crossover Bonds are paid first by the Canadian Debtors and then by NNI; (3) favorable assumptions with respect to the U.S. Debtors' potential tax liability; (4) favorable assumptions with respect to certain claims filed against the U.S. Debtors and Canadian Debtors; and (5) favorable assumptions with respect to the cash burn rate of both the U.S. Debtors and Canadian Debtors. Wertheim Rep. 7-9; Tr. 144-51. Dr. Wertheim testified that it is conceivable that certain other variables could align such that a larger amount of cash could be available to pay post-petition interest from NNI, but those variables were either immaterial or unlikely to align favorably. Tr. 174, 186-88, 239. All told, Dr. Wertheim spent approximately 100 hours preparing his expert report. Tr. 287-88. [14]

Dr. Wertheim's testimony was subject to vigorous cross-examination by counsel for both the U.S. Debtors and the Supporting Bondholders. Cross-examination focused on three main areas: (1) the limited scope of the documents and other information considered by Dr. Wertheim, Tr. 179, 181-83, 201-205, 209-210, 255-56; (2) the limited scope of the variables considered by Dr. Wertheim when making assumptions to maximize cash available to pay post-petition interest from the NNI estate, Tr. 206, 210, 230-31; and (3) Dr. Wertheim's expertise, or lack thereof, and qualifications to make value

---

[14] Dr. Wertheim also conducted a "sensitivity analysis," the details of which are not necessary to the resolution of this matter.

judgments with respect to the materiality of certain variables, Tr. 191-98, 220. Examples of specific areas the Debtors and Supporting Bondholders questioned Dr. Wertheim about include his lack of analysis: (1) to support assigning a zero value to 17 million internet protocol addresses owned by NNL, Tr. 206, 266-67; (2) to support assigning a zero value to all intercompany receivables, Tr. 206-210; (3) regarding repatriation of cash held abroad, Tr. 210-11; (4) to support assigning a zero value to certain amounts held in trust that could flow to NNI, Tr. 220-22; (5) to support assigning a zero value to NNI's equity interests in certain foreign affiliates, Tr. 226-33, 269-72; (6) to assume substantive consolidation of the Canadian Debtors, Tr. 245-46; and (7) to support assuming that all claims against the Canadian Debtors will be allowed at their face amount, Tr. 246-56.  Dr. Wertheim's analysis to support assumptions with respect to the U.S. Debtors' potential tax liability and certain claims filed against the U.S. Debtors was also faulty or lacking, Tr. 179, 278-84.

On the morning of November 5, 2014, the Court heard closing arguments from counsel for the U.S. Debtors, Supporting Bondholders, and Monitor[15] and took the matter under advisement. Although there was no direct testimony or documentary evidence on the subject, the parties do not dispute the dollar amounts at issue, which are summarized in the chart attached to this Opinion as Exhibit A. For example, as of November 4, 2014, the first day of the hearing on the Settlement Motion, the Supporting Bondholders were

---

[15] Wilmington Trust and the Joinder Parties did not present evidence or argument at the November 4 and 5, 2014 hearing on the Settlement Motion.

potentially entitled to approximately $99 million in post-petition interest at the FJR, approximately $923 million under the Settlement Agreement, and approximately $1.694 billion at the applicable contract rate.

## ANALYSIS

The Court is mindful that this is a decision on a settlement pursuant to Bankruptcy Rule 9019.  It is not a decision on the merits.  Under Rule 9019, "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." "To obtain approval of a settlement, the Debtors must demonstrate the settlement satisfies, by a preponderance of the evidence, the requirements imposed by Bankruptcy Rule 9019 and the Third Circuit's decision in *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996)." *See In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 509 (Bankr. D. Del. 2010).

In the PPI Dispute Scheduling Order, the Court and the Canadian Court instructed the parties to the PPI Dispute to address the following two questions:

> (1) whether the holders of the crossover bonds claims are legally entitled in each jurisdiction to claim or receive any amounts under the relevant indentures, above and beyond the outstanding principal debt and prepetition interest; and

> (2) if determined that the holders of the crossover bonds claims are so entitled, what additional amounts are such holders entitled to so claim and receive . . . .

[D.I. 13910]. The Settlement Agreement answers both questions with respect to the U.S. Debtors' and the Guaranteed Bonds, which constitute the vast majority of the Crossover Bonds. In simple terms, in the Settlement Agreement the U.S. Debtors and Supporting Bondholders have agreed that the answer to the first question is "yes" and the answer to

21

the second question is "55% of the contract rate, capped at $1.01 billion." The U.S. Debtors now seek approval of the Settlement Agreement pursuant to Rule 9019.

The Monitor objects to approval of the Settlement Agreement on several grounds, each of which the Court will address in turn. The Monitor's standing to object, and to be heard generally in the PPI Dispute, is based on the Canadian Debtors' 100% equity ownership interest in NNI. Thus, under the Bankruptcy Code's priority scheme, the Canadian Debtors could possibly recover excess funds that a solvent NNI does not pay towards post-petition interest to the Crossover Bondholders and other unsecured creditors. As set forth above, there is considerable likelihood that NNI could be solvent based on certain hypothetical outcomes of the Allocation Dispute.[16]

In *Capmark*, when faced with a similar slate of objections to a pre-plan settlement agreement, Judge Sontchi divided his analysis into a two-part inquiry: (1) *Can* the Court approve the proposed settlement agreement?; and (2) *Should* the Court approve the proposed settlement agreement? *See Capmark*, 438 B.R. at 509-20. The answer to both questions is "Yes."

---

[16] As set forth above, Wilmington Trust and the Joinder Parties also object to approval of the Settlement Agreement. For the reasons set forth in the U.S. Debtors' and Supporting Bondholders' reply briefs, the Court observes that the standing of Wilmington Trust and the Joinder Parties, each of which is a creditor of the Canadian Debtors only and not of the U.S. Debtors, to object to the Settlement Motion is, at best, doubtful. *See* U.S. Debtors' Reply Br. ¶¶ 52-55 [D.I. 14652]; Supporting Bondholders' Reply Br. ¶¶78-83 [D.I. 14653]. A full discussion on standing is unnecessary as Wilmington Trust's and the Objecting Joinder Parties' objections are aligned with the Monitor's objection. Accordingly, the Court's analysis, while explicitly addressing only the arguments raised in the Monitors' objection, fully addresses Wilmington Trust's and the Joinder Parties' arguments as well.

A.    <u>*Can* the Court Approve the Settlement Agreement?</u>

As an initial matter, the Monitor argues that the Court may not consider a settlement of the type embodied by the Settlement Agreement outside of the plan confirmation process of chapter 11 of the Bankruptcy Code and so the Court may not even reach the Rule 9019 analysis. The Monitor gives two reason for this conclusion. First, the Monitor argues that the Settlement Agreement improperly abrogates the Canadian Debtors' rights under Bankruptcy Code § 1129(a)(7) without their consent. Second, the Monitor argues that the Settlement Agreement constitutes an improper *sub rosa* plan of reorganization. For the reasons that follow, the Court finds that the Settlement Agreement is properly the subject of a Rule 9019 motion.

**1.    *The Settlement Agreement Does Not Violate Bankruptcy Code § 1129(a)(7).***

As one of a number of requirements for confirmation of a chapter 11 plan of reorganization, Bankruptcy Code § 1129(a)(7) provides:

(7) With respect to each impaired class of claims or interests—

(A) each holder of a claim or interest of such class—

(i) has accepted the plan; or

(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date . . . .

Section 1129(a)(7) guarantees that creditors and equity holders receiving less than a full recovery under the terms of a chapter 11 plan recover at least what they would have in a

23

chapter 7 liquidation. While Bankruptcy Code § 502(b)(2) generally disallows any claim for "unmatured interest" as of the petition date, Bankruptcy Code § 726(a)(5) allows for payment of post-petition interest to unsecured creditors "at the legal rate" after all allowed claims have been satisfied but before any distribution to equity holders. Thus, since Section 1129(a)(7) essentially makes Section 726(a)(5) applicable in a Chapter 11 case, unsecured creditors are entitled to post-petition interest at the legal rate under the terms of a Chapter 11 plan to the same extent they would be in the context of a Chapter 7 distribution.

A major point of contention in the PPI Dispute is the exact meaning of "the legal rate" in Section 726(a)(5). The Monitor contends that the legal rate refers to the FJR, and that any higher rate would violate the Bankruptcy Code's priority scheme. The Crossover Bondholders argue that the phrase refers to the applicable contract rate. There is no direct, binding Third Circuit authority to guide the parties or the Court on this point.

As an initial matter, the Supporting Bondholders argue that the Monitor should be estopped from arguing that Section 1129 prevents the Court from approving the Settlement Agreement. The Monitor has argued repeatedly, first in its June 19, 2014 memorandum and subsequently in its opening and reply briefs filed pursuant to the PPI Dispute Scheduling Order, that the PPI Dispute is ripe for the Court's immediate consideration. Now the Monitor argues that a motion seeking approval of the PPI Dispute Settlement Agreement is not ripe for the Court's consideration and may only be considered in connection with plan confirmation. The Supporting Bondholders argue

24

that these two positions are so irreconcilably inconsistent as to warrant application of the doctrine of judicial estoppel.

Judicial estoppel "is a judge-made doctrine that seeks to prevent a litigant from asserting a position inconsistent with one that she has previously asserted in the same or in a previous proceeding." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir. 1996). "The basic principle . . . is that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory." *Id.* The Third Circuit has developed a three-part test to determine if judicial estoppel is warranted: "[(1) t]he two legal positions taken by the party must be irreconcilably inconsistent, [(2)] bad faith must be the basis for the change in position, and [(3)] judicial estoppel is not to be used unless that remedy is 'tailored to address the harm identified' and no lesser sanction is adequate for that purpose." *Yetter v. Wise Power Sys., Inc.*, 929 F. Supp. 2d 329, 331 (D. Del. 2013) (citing *Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 777-78 (3d Cir. 2001)).

The Court recognizes the incongruity of the Monitor's arguments and there is little doubt that the Supporting Bondholders' have presented a strong case for judicial estoppel. It strains reason and good faith that the Monitor now argues unabashedly that the Court cannot consider the Settlement Motion.  It was the Monitor, over the objection of the parties to the Settlement Agreement, which successfully urged the Court and the Canadian Court to decide expeditiously the merits of the PPI Dispute.  The Court agreed to hear the PPI Dispute despite ruling previously that it would not.  It is highly significant

that after the U.S. Debtors informed the Court of the Settlement Agreement, the Monitor, without any of the concerns raised in its objection to the Settlement Motion, argued the merits of the PPI Dispute before the Canadian Court and obtained a favorable ruling.  But because, for the reasons set forth below, the Monitor's argument with respect to Section 1129(a)(7) fails on its merits and recognizing that judicial estoppel is an "extraordinary remed[y] to be invoked when a party's inconsistent behavior will otherwise result in a miscarriage of justice," *Ryan Operations*, 81 F.3d at 365, the Court will not premise its ruling on the Supporting Bondholders' estoppel argument.

Now, to the merits of the Monitor's Section 1129(a)(7) argument. In *Capmark*, addressing an objection to a pre-plan settlement agreement based on Section 1129(a)(7), Judge Sontchi found that "[a]s a matter of law, Section 1129(a)(7) does not apply to the decision whether to approve a settlement outside of a chapter 11 plan." *Capmark*, 438 B.R. at 513. Judge Sontchi further commented that:

> [A]pproval of the Settlement outside a chapter 11 plan also does not deprive unsecured claimholders of any protection they have from section 1129(a)(7) if the Settlement were embodied in a chapter 11 plan. The reason is that if a claim is settled in a chapter 11 plan, once the court determines that the settlement should be approved, the court will assume the same settlement would be made in chapter 7 for purposes of applying section 1129(a)(7). *See In re Enron Corp.*, Ch. 11 Case No. 01–16034, 2004 Bankr.LEXIS 2549, at *117–20 (Bankr.S.D.N.Y. July 15, 2004) (observing that section 1129(a)(7) requires an "apples to apples" comparison that contains the same settlement, and "assuming common legal issues are resolved the same way [in chapter 7 and chapter 11]").

*Id.* The Court is persuaded by Judge Sontchi's reasoning in *Capmark*.

The Settlement Agreement is not an attempt by the U.S. Debtors and Supporting Bondholders to contract around the priority scheme otherwise mandated by the Bankruptcy Code. The rate at which a solvent estate must pay post-petition interest to unsecured creditors is an open question in the Third Circuit and the subject of heated debate in this case. The U.S. Debtors and Supporting Bondholders have come to an agreement on the PPI Dispute in hopes of moving towards a resolution of the Allocation Dispute and these cases as a whole, as the Monitor urged. While the economic impact of the Settlement Agreement on the Canadian Debtors is sufficient to grant the Monitor standing to object, the Canadian Debtors and Monitor are not necessary signatories to the Settlement Agreement. As discussed in greater detail below, it is for this very reason that under the Rule 9019 standards set forth in the Third Circuit's *Martin* decision, the Court is duty-bound to consider the affect of the Settlement Agreement on non-settling parties. *See Will v. Northwestern Univ.* (*In re Nutraquest*), 434 F.3d 639, 645 (3d. Cir. 2006).

Because, for the reasons discussed below, the Court will approve the Settlement Agreement based on the standards set forth in *Martin* and its progeny, the Court must assume that a Chapter 7 trustee would reach the same settlement. Thus, the Court finds that, to the extent the statute applies at all in the pre-plan settlement context, the terms of the Settlement Agreement do not violate Section 1129(a)(7).[17]

---

[17] While not raised in the Monitor's objection, the Court also finds that, to the extent the rule applies at all in the pre-plan settlement context, the Settlement Agreement does not violate the "absolute priority rule" as codified in Bankruptcy Code § 1129(b)(2)(B). Whether the absolute priority rule mandates payment of post-petition interest by a solvent debtor at the FJR versus the applicable contract rate is an open question in the Third Circuit as well. As with the Section 1129(a)(7) inquiry, the U.S. Debtors and Supporting

### 2.    *The Settlement Agreement is Not An Impermissible Sub Rosa Plan.*

A settlement agreement proposed outside of the plan confirmation process which has the practical effect of dictating the terms of a prospective Chapter 11 plan constitutes an improper *sub rosa* plan and may not be approved. *See Capmark*, 438 B.R. at 513. Settlement agreements which dispose of all claims against the estate, restrict creditors' right to vote as they see fit on a proposed Chapter 11 plan, or dispose of substantially all of a debtor's assets have been found to constitute improper *sub rosa* plans. *See Id.*; *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc.* (*In re Cajun Elec. Power Coop., Inc.*), 119 F.3d 349, 355 (5th Cir. 1997); *Pension Benefit Guar. Corp. v. Braniff Airways, Inc.* (*In re Braniff Airways, Inc.*), 700 F.2d 935, 940 (5th Cir. 1983); *In re Louise's, Inc.*, 211 B.R. 798, 802 (D. Del. 1997). "Taken together, these cases show that major pre-confirmation transactions, such as use, sale or lease of estate property under Section 363(b), settlement, abandonment of property under Section 554, or a transaction out of the ordinary course of business under Section 1108, raise the concern that the scheme of Chapter 11 will be distorted." *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 885 (Bankr. S.D.N.Y. 1990).

On the other hand, a settlement agreement which is a "necessary step toward, or building block of, a plan of reorganization" does not constitute in improper *sub rosa* plan. *Id. See also Cajun Elec. Power Coop.*, 119 F.3d at 355; *Official Comm. of Unsecured Creditors v. Debtors & Debtors in Possession* (*In re Tower Automotive Inc.*), 241 F.R.D. 162, 169-70 (S.D.N.Y. 2006). The Court finds the Settlement Agreement is in furtherance of a plan

---

Bondholders have come to an agreement on this question and the Court finds that this agreement passes muster under the Rule 9019 standards set forth in *Martin*.

process, not a *sub rosa* plan. Despite the Monitor's assertion that the PPI Dispute is "the principal plan issue," Monitor's Supp. Obj. ¶ 15 [D.I. 14496], the Court observes that countless other plan issues remain outstanding. The PPI Dispute is a contentious issue which will impede a plan, but that is certainly no reason to deny approval of the Settlement Agreement. Further, no funds are going "out the door" pursuant to the Settlement Agreement as the amounts may only be paid "in accordance with a confirmed chapter 11 plan." Settlement Agreement § 2.1 [D.I. 14076-2]. Thus, the Monitor and other parties in interest will be given a full opportunity to vote on a plan of reorganization which incorporates the terms of the Settlement Agreement as one of many terms.

The Settlement Agreement resolves a singular dispute with respect to a certain subset of creditors and provides a basis upon which to move toward consensual resolution of the Allocation Dispute, a plan of reorganization in these Chapter 11 proceedings, and final resolution of the Nortel insolvency proceedings spread across the globe. The Settlement Agreement is not a *sub rosa* plan. The cases cited by the Monitor are factually distinguishable. *See Braniff Airways*, 700 F.2d at 940 ("Were this transaction approved, and considering the properties proposed to be transferred, little would remain save fixed based equipment and little prospect or occasion for further reorganization."); *Louise's*, 211 B.R. at 802 (describing the proposed settlement agreement as a "*de facto* transfer of control of the Debtor to a creditor outside the plan confirmation process").

In any event, the Court is convinced that the *sub rosa* inquiry is wholly academic in this instance. There is no real prejudice to the Monitor or Canadian Debtors in considering the Settlement Agreement in the context of a Rule 9019 motion as opposed

to plan confirmation. The Monitor brought the PPI Dispute to the forefront in the first place in its June 19, 2014 memorandum, insisting that the dispute was ripe for the Court's consideration. A settlement was surely foreseeable as the Court cannot conceive of a dispute which is ripe for adjudication but not for settlement. The Monitor could have chosen to engage in settlement discussions. The Monitor was given full notice and opportunity to oppose the Settlement Motion. At least with respect to the Monitor, the Settlement Agreement was essentially considered in the same fashion here as it would have been in the plan confirmation context. For these reasons, the Court rejects the Monitor's *sub rosa* argument.

### B.    *Should* the Court Approve the Settlement?

Having determined that the Court *can* approve the Settlement Agreement, the question now becomes whether the Court *should* approve the Settlement Agreement under the principles set forth in the Third Circuit's *Martin* decision and its progeny.

### 1.    *The Settlement Satisfies the Martin Factors.*

"To minimize litigation and expedite the administration of a bankruptcy estate, '[c]ompromises are favored in bankruptcy.'" *Myers v. Martin* (*In re Martin*), 91 F.3d 389, 393 (3d Cir. 1996) (quoting 9 *Collier on Bankruptcy* ¶ 9019.03[1] (15th ed. 1993)). This principle rings especially true with respect to the Nortel insolvency proceedings. Given the vast complexities involved in winding down Nortel's multi-national operations, coordinating asset sales, and determining how to allocate sale proceeds among multi-national insolvency proceedings, compromise is perhaps the only way to efficiently bring these cases to their end.

The Court must not be blinded by the complexities of the case. Given "the unique nature of the bankruptcy process . . . judges must carefully examine settlements before approving them." *Nutraquest*, 434 F.3d at 644. "This particular process of bankruptcy court approval requires a bankruptcy judge to assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." *Martin*, 91 F.3d at 393. In striking this balance the Court must "apprise[ ] itself of all facts necessary to form an intelligent and objective opinion of the probabilities of ultimate success should the claims be litigated, and estimate[ ] the complexity, expense and likely duration of such litigation, and other factors relevant to a full and fair assessment of the [claims]." *Capmark*, 438 B.R. at 514 (quoting *In re Penn Cent. Transp. Co.*, 596 F.2d 1127, 1146 (3d Cir. 1979)).

In *Martin*, the Third Circuit identified four factors a court must consider in assessing a Rule 9019 motion: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Martin*, 91 F.3d at 393. Other courts have considered additional factors, including, as is relevant here, "the extent to which the settlement is truly the product of 'arms-length' bargaining, and not of fraud or collusion." *See, e.g.*, *In re Texaco, Inc.*, 84 B.R. 893, 902 (Bankr. S.D.N.Y. 1988). At base, the Rule 9019 inquiry is one of fairness and equity, including, and perhaps especially, fairness "to other persons, *i.e.,* the parties who did not settle." *Nutraquest*, 434 F.3d at 645.

Ultimately, the decision whether or not to approve a settlement agreement lies within the sound discretion of the Court. *Capmark*, 438 B.R. at 515. The Court "need not be convinced that the settlement is the best possible compromise. The Court need only conclude that the settlement falls within the reasonable range of litigation possibilities somewhere above the lowest point in the range of reasonableness." *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 833 (Bankr. D. Del. 2008). *See also In re W.R. Grace & Co.*, 475 B.R. 34, 77-78 (Bankr. D. Del. 2012) ("In analyzing the compromise or settlement agreement under the *Martin* factors, courts should not have a 'mini-trial' on the merits, but rather should canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness.")

### a.     Probability of Success on the Merits

As discussed in some detail above, the PPI Dispute revolves around the meaning of "the legal rate" as it appears in Section 726(a)(5), made applicable in Chapter 11 by Section 1129(a)(7), as well as the interplay between Section 726(a)(5) and the "fair and equitable" standard set forth in Bankruptcy Code § 1129(b). The Monitor, U.S. Debtors, and Supporting Bondholders, as well as various other Canadian and U.S. creditor constituencies, fully briefed the merits of the PPI Dispute pursuant to the PPI Dispute Scheduling Order prior to the date the U.S. Debtors filed the Settlement Motion. While there is no binding Third Circuit authority regarding the appropriate rate of post-petition interest, the parties to the PPI Dispute cited a number of non-binding authorities in their briefs, some of which found the FJR to the appropriate post-petition interest rate and some of which found in favor of the applicable contract rate.

32

Perhaps most frequently cited by the Monitor and Canadian creditor constituencies in favor of the FJR is *Washington Mutual*, a decision penned by Judge Walrath of this Court. *See In re Washington Mutual, Inc.*, 461 B.R. 200, 241-44 (Bankr. D. Del. 2011). In *Washington Mutual*, Judge Walrath concluded that, in the context of the Section 1129(a)(7) best-interests-of-creditors test, "the better view is that the federal judgment rate is the appropriate rate to be applied under Section 726(a)(5), rather than the contract rate." *Id*. at 242. First, Judge Walrath found that the reference in Section 726(a)(5) to *the* legal rate as opposed to *a* legal rate is indicative of Congress's intent that there be a single source for calculation of the post-petition interest rate, *i.e.* the FJR. *Id*. Second, Judge Walrath observed that post-petition interest is procedural in nature and thus dictated by federal as opposed to state law and so the federal as opposed to state judgment rate should apply. *Id*. at 242-43. Finally, Judge Walrath found that use of the FJR "promotes two important bankruptcy goals: fairness among creditors and administrative efficiency." *Id*. at 243 (quotation omitted). *See also*, *e.g.*, *Onink v. Cardelucci* (*In re Cardelucci*), 285 F.3d 1231, 1234-36 (9th Cir. 2002); *In re Chiapetta*, 159 B.R. 152, 160 (Bankr. E.D. Pa. 1993).

On the other side of the issue, the most significant line of authority cited by the Crossover Bondholders in favor of the contract rate is the *Dow Corning* decisions. *See Official Comm. of Unsecured Creditors v. Dow Corning Corp.* (*In re Dow Corning Corp.*), 456 F.3d 668, 678-80 (6th Cir. 2006) ("*Dow III*"); *In re Dow Corning Corp.*, 244 B.R. 678, 685-95 (Bankr. E.D. Mich. 1999) ("*Dow II*"). In *Dow II*, the court found that in Chapter 11, Section 726(a)(5) merely establishes a minimum post-petition interest rate and that Congress did

not intend to preclude a higher rate. *Dow II*, 244 B.R. at 686. The *Dow II* court went on to find that Section 1129(b)'s "fair and equitable" standard, in particular the absolute priority rule, requires that a solvent debtor pay post-petition interest at the contract rate. *Id.* at 695 ("In this context, the rationale for use of the contract rate of interest is straightforward: A debtor with the financial wherewithal to honor its contractual commitments should be required to do so."). In *Dow III*, after several more years of litigation and appeals, the United States Court of Appeals for the Sixth Circuit found that under Section 1129(b)'s fair and equitable standard, when a debtor is solvent the court's primary role is to enforce the contractual rights as written, including, if applicable, any default interest rate provisions. *Dow III*, 456 F.3d at 679. *See also, e.g., In re Fast*, 318 B.R. 183, 191-92 (Bankr. D. Colo. 2004); *In re Carter*, 220 B.R. 411, 414-17 (Bankr. D.N.M. 1998).

Again, it is not the Court's responsibility to ensure that every settlement is the best possible compromise for all affected parties. *Nutritional Sourcing*, 398 B.R. at 833. The Court has had ample opportunity to review the briefs filed by all parties to the PPI Dispute as well as the authorities cited therein and by no means is the PPI Dispute a certain favorable outcome for either side of the issue. The Court finds that there are persuasive arguments and authorities on both sides and is convinced that the Settlement Agreement, which effectively splits the PPI dispute down the middle, falls within the "reasonable range of litigation possibilities." *See id.* Accordingly, the first *Martin* factor weighs in favor of approving the Settlement Agreement.

b.      **Likely Difficulties in Collection.**

The Monitor, U.S. Debtors, and Supporting Bondholders agree that the second *Martin* factor is inapplicable here.

c.      **Complexity of the Litigation Involved, and the Expense, Inconvenience and Delay Necessarily Attending it.**

With respect to the third *Martin* factor, the Monitor argues that the PPI Dispute presents a discrete, legal issue which has been fully briefed and is primed for immediate consideration by the Court. As such, the Monitor contends that all that is left is for the Court to decide the issue. Thus, according to the Monitor, very little expense, inconvenience, or delay will be avoided by approving the Settlement Agreement. Moreover, the Monitor continues, the Settlement Agreement only resolves the PPI Dispute with respect to the Supporting Bondholders, a subset of the U.S. Debtors' unsecured creditor body and so any expense, inconvenience, or delay the Settlement Motion purports to avoid is illusory since the PPI Dispute must be resolved with respect to other unsecured creditors in any event.

The Monitor's arguments pre-suppose that the PPI Dispute does in fact present a discrete legal issue, ready for the Court's easy consideration. The Court does not agree with the Monitor. First, even if the PPI Dispute presents only a legal question, to answer that question is no simple endeavor. The PPI Dispute is certainly complex and the result uncertain.

Second, the Court is not convinced that the PPI Dispute presents a pure question of law, ready for the Court's consideration. Some courts consider the equities of the case

when determining the post-petition interest rate. *See, e.g.*, *Dow Corning*, 244 B.R. at 694-95. If the Court were to follow suit, it could become necessary for the Court to conduct a full-blown evidentiary hearing which, based on the U.S. Proceedings to this point, would give rise to considerable administrative expense.

Third, it is possible that the Court could find that the PPI Dispute is not ripe for consideration at all, as it did when ruling on the October 25, 2013, Wilmington Trust claim objection. If the Court were to so find, the PPI Dispute would continue to cast its shadow over the U.S. Proceedings until plan confirmation, which may not occur in the foreseeable future. The Allocation Dispute has yet to be decided by the Court or the Canadian Court and there will be undoubtedly be appeals from those decisions.  The Court therefore finds the cases cited by the Monitor to be both factually distinguishable and unpersuasive. *See Porter Drywall Co. v. Haven, Inc.* (*In re Haven, Inc.*), 2005 Bankr. LEXIS 541, at *5 (B.A.P. 6th Cir. 2005) ("The adversary proceeding was not complex . . . the prosecution of the litigation to its conclusion would involve little or no additional 'expense, inconvenience and delay.'"); *Martinson v. Michael* (*In re Michael*), 183 B.R. 230, 238-39 (Bankr. D. Mont. 1995) (addressing an exemption dispute in a consumer chapter 7 case where the trustee was "almost certain to prevail," the court observed that "[t]his litigation is near its end, and little complexity remains. The facts are simple and stipulated.").

Finally, the Court is unpersuaded by the Monitor's argument that approval of the Settlement Agreement does not forestall any expense, inconvenience, or delay because it binds only the Supporting Bondholders and not the general unsecured creditor body as a whole. The Supporting Bondholders hold over 95% of the Crossover Bonds and

constitute at least a plurality of the unsecured creditor body in the U.S. Proceedings. In other words, the Supporting Bondholders are the most powerful unsecured creditor constituency in the U.S. Proceedings. The Settlement Agreement removes a significant voice and obstacle standing in the way of plan confirmation and perhaps even settlement of the Allocation Dispute. The Settlement Agreement will further act as a model for settlement agreements between the U.S. Debtors and other U.S. unsecured creditor constituencies. In sum, the fact that the Settlement Agreement does not bind all unsecured creditors is far outweighed by the significant savings of expense, inconvenience, and delay that comes from resolving the PPI Dispute as to the Supporting Bondholders. Accordingly, the Court finds that the third *Martin* factor weighs in favor of approving the Settlement Agreement.

### d.    Paramount Interest of the Creditors.

The focus of the fourth *Martin* factor is not on the fairness of the settlement to those who signed the agreement, but to those affected by the agreement, including in this case the equity holder, who did not settle. *See Nutraquest*, 434 F.3d at 645; *In re RNI Wind Down Corp.*, 348 B.R. 286, 298 (Bankr. D. Del. 2006) ("the Court can and should consider the interest of equity holders in applying the fourth *Martin* factor"). The fourth *Martin* factor recognizes that every constituency affected by a proposed settlement agreement may not be a signatory to the agreement or even involved in the settlement negotiations and so requires that the Court conduct an independent review of the fairness of the proposed settlement agreement. *See, e.g.*, *Capmark*, 438 B.R. at 519-20. While the Court must give the views of objecting parties-in-interest, in this case NNI's 100% equity holder, some

deference, these views are not dispositive and "cannot be permitted to predominate over the best interests of the estate as a whole." *In re Key3Media Grp., Inc.*, 336 B.R. 87, 97 (Bankr. D. Del. 2005). *See also Capmark*, 438 B.R. at 519 ("There is no *per se* rule that the views of a committee or other creditors are dispositive on the reasonableness of a settlement.").

The Monitor's objections with respect to the fourth *Martin* factor revolve around (1) the value, or asserted lack thereof, of the concessions made by the Supporting Bondholders in the Settlement Agreement (the "value-based argument") and (2) the process by which the U.S. Debtors and Supporting Bondholders negotiated the Settlement Agreement (the "process-based argument"). For the reasons set forth below, the Court rejects both arguments.

The Monitor's value-based argument is two pronged. The first prong is based on Dr. Wertheim's conclusion that in agreeing to the $1.01 billion post-petition interest cap, the Supporting Bondholders gave up no real value because, according to Dr. Wertheim, the maximum amount that would be available to pay post-petition interest from the NNI estate in the best case scenario would be only $971 million. The second prong is based on the Reservation of Rights provision in the Settlement Agreement, a brief summary of which is set forth above.

As a preliminary matter, with respect to the first prong of the Monitor's value-based argument, the Supporting Bondholders argue that the Monitor should be judicially estopped from attempting to characterize the PPI Dispute as only a $971 million issue. The Supporting Bondholders correctly point out that the Monitor repeatedly characterized the PPI Dispute as a $1.6 billion, and growing, issue in its June 19, 2014,

memorandum and in argument leading up to the Court's issuance of the PPI Dispute Scheduling Order. Based on the judicial estoppel principals set forth above, the Court will again comment that the Supporting Bondholders' have made a strong case for judicial estoppel. But, because, for the reasons set forth below, the Court is unpersuaded by and will give no weight to Dr. Wertheim's report, and recognizing that judicial estoppel is harsh in its preclusion of a decision on the merits, the Court will not rest its determination on the Supporting Bondholders' judicial estoppel arguments in arriving at its decision.

As to the merits of the first prong of the Monitor's value-based argument, the U.S. Debtors and Supporting Bondholders correctly point out a number of deficiencies in the analysis supporting Dr. Wertheim's conclusions. These deficiencies have nothing to do with Dr. Wertheim's qualifications, which speak for themselves. The deficiencies have to do with the narrow scope of Dr. Wertheim's inquiry, the responsibility for which falls squarely on the shoulders of the Monitor. The Court agrees with the U.S. Debtors and Supporting Bondholders that Dr. Wertheim: (1) failed to value or improperly valued certain assets of both NNI and the Canadian estate which could increase the cash available in the NNI estate to pay post-petition interest; (2) improperly examined only a narrow set of documents to support his analysis; (3) considered too narrow a set of variables and assumptions in coming up with his "best case scenario"; and (4) was asked to make value judgments about what is likely or unlikely to occur which are outside the scope of his qualifications.

Analysis of the kind attempted by Dr. Wertheim relies on a number of factors which are unknown and perhaps unknowable at this point in time. Due to the global

nature of the Nortel enterprise, the analysis depends on a vast array of moving variables and to perform a proper analysis, if possible at all, would take a team of analysts a great many hours. In short, a proper analysis would be a far greater undertaking than Dr. Wertheim could have realistically completed within the scope of the Monitor's mandate. Accordingly, the Court is unmoved by Dr. Wertheim's $971 million figure and will give no weight to his expert report and testimony related thereto.

In any event, the Court need not be convinced that the funds available for payment of post-petition interest from the NNI estate are greater than the $1.01 billion post-petition interest cap set forth in the Settlement Agreement. The Court is fully aware of the possibility that the amount ultimately available to pay post-petition from the NNI estate could very well be greater than or less than $1.01 billion. In assessing the reasonableness of the terms contained in the Settlement Agreement, the Court is less concerned with the potential amount available to *pay* post-petition interest from the NNI estate than the amount the NNI estate could potentially *owe* the Supporting Bondholders in post-petition interest. As set forth in the chart attached to this Opinion, the amount of post-petition interest owed to the Supporting Bondholders, calculated at the applicable contract rate, grows to well over $2 billion by the end of the year 2015, more than double the $1.01 billion cap.

Despite the possibility that there will not be sufficient funds available to exceed the post-petition $1.01 billion cap, given the massive potential amount of post-petition interest which could be owed if calculated at the contract rate, the Court is convinced that the terms of the Settlement Agreement are reasonable, even with respect to the Canadian

Debtors' equity interest. The Settlement Agreement confers a great benefit on the estate in terms of resolving a major dispute, providing certainty with respect to the maximum amount of post-petition interest owed to the Supporting Bondholders, and providing a building block on which parties-in-interest could perhaps construct a resolution to these cases as a whole.  Resolution was the Monitor's stated purpose for raising the PPI Dispute in June 2014.

The Court is similarly unmoved by the second prong of the Monitor's value-based argument, which is based on the Reservation of Rights provision contained in the Settlement Agreement. The Reservation of Rights only comes into play if there are insufficient funds in the NNI estate to pay the full amount of post-petition interest owed to all unsecured creditors, in which case the Supporting Bondholders will be deemed to have a claim for post-petition interest at the full contract-rate amount for purposes of allocating the funds which are available to pay post-petition interest. The Monitor argues that since it is highly unlikely, based on Dr. Wertheim's report, that there will be sufficient funds to pay all of NNI's unsecured creditors the full amount of post-petition interest owed (assuming the $1.01 billion cap is approved), the "deemed claim" for the full amount of contract-rate post-petition interest means that the Supporting Bondholders are essentially giving up nothing at all in the settlement.

As is borne out by the language of the Reservation of Rights itself, as well as Mr. Ray's testimony, the Reservation of Rights is simply meant to reserve for another day the question of how funds available to pay post-petition interest will be distributed among NNI's creditors on an intra-creditor basis in the event there are insufficient funds to pay

all unsecured creditors the full amount of post-petition interest owed. Telling of this intent is the fact that the UCC filed two statements in support of the Settlement Agreement. Additionally, the Reservation of Rights does not prejudice the Monitor in any way. The Reservation of Rights only comes into play if there are insufficient funds to reach the $1.01 billion post-petition interest cap. In that case, the Canadian Debtors' equity interest in NNI would essentially be worthless and the manner in which NNI's creditors divide funds available for post-petition interest on an intra-creditor basis has no effect on the Monitor. For this reason, and based on the support of the UCC and the other benefits conferred on the U.S. Debtors' estates by the Settlement Agreement discussed above, the Court rejects the Monitor's value-based argument.

The Monitor's process-based argument is based on its assertion that the manner in which the U.S. Debtors and Supporting Bondholders negotiated the terms of the Settlement Agreement was so lacking in vigor and sincerity that the Court should doubt the *bona fides* of the Settlement Agreement. The Monitor comes to this conclusion based on the following facts, which the U.S. Debtors and Supporting Bondholders do not dispute: (1) the U.S. Debtors and Supporting Bondholders negotiated the terms of the Settlement Agreement in the 10-day period between the July 15, 2014 settlement meeting and July 24, 2014, the date the U.S. Debtors filed the Settlement Motion; (2) Mr. Ray made no presentation to NNI's board of directors regarding the Settlement Agreement; (3) the U.S. Debtors took no formal position regarding the PPI Dispute prior to filing the Settlement Motion; (4) Mr. Ray sought no legal advice or financial modeling prior to the July 15, 2014 settlement meeting; and (5) the parties to the Settlement Agreement did not

include the Monitor in discussions of the terms of the Settlement Agreement. For the reasons that follow, the Court finds that none of these facts provide a basis upon which to deny approval of the Settlement Agreement.

First, while the Settlement Agreement itself was negotiated over only ten days, for the Monitor to insinuate that the totality of the PPI Dispute settlement negotiations was merely a ten-day affair strikes the Court as disingenuous. The PPI Dispute has been a live issue with respect to the U.S. Debtors' case since the Line of Business and Patent Portfolio sales were consummated between 2009 and 2011, raising the possibility that NNI's estate could be solvent. Over the course of the past three years the parties to the PPI Dispute, including the Monitor, have engaged in extensive settlement negotiations in conjunction with the Allocation Dispute, including three failed mediations. The Court is satisfied that the various parties' positions with respect to the PPI Dispute were discussed extensively during that time period. In any event, the Court finds that ten days, in this instance, is sufficient time in which to negotiate a settlement agreement, even regarding a matter as multi-faceted as the PPI Dispute. The Monitor's action, requesting the Court and the Canadian Court to decide the PPI Dispute on an expedited basis, clearly prompted the urgency of the settlement discussions.  Therefore, the Court is not concerned that the timing of the settlement negotiations between the U.S. Debtors and Supporting Bondholders weighs against approving the Settlement Agreement.

Second, there has been no indication by the Monitor or any other party that Mr. Ray was under any legal obligation to make a presentation to NNI's board of directors regarding the Settlement Agreement. Further, the Court finds that not making such a

presentation is not indicative of a lack of proper consideration of the Settlement Agreement on his part. The Court rejects the absence of a presentation as a basis to deny approval of the Settlement Agreement.

Third, the Court recognizes that the U.S. Debtors previously took no formal position on the PPI Dispute in the briefing completed pursuant to the PPI Dispute Scheduling Order. But the Court also observes that the U.S. Debtors, as debtors in possession, have a fiduciary duty to act in the best interest of all creditors and equity holders. *See, e.g.*, *LaSalle Nat. Bank v. Perelman*, 82 F. Supp. 2d 279, 292 (D. Del. 2000) ("The debtor in a Chapter 11 bankruptcy has a fiduciary duty to act in the best interest of the estate as a whole, including its creditors, equity interest holders and other parties in interest."). In their testimony, Mr. Ray and Mr. Katzenstein described the settlement negotiations as both vigorous and adversarial. There is nothing in the record to refute the U.S. Debtors' assertion that they sought to secure the best deal for all parties-in-interest, including the Canadian Debtors as equity holders. Thus, the Court finds that merely because the U.S. Debtors did not previously take a formal position in the PPI Dispute does not detract from the validity and *bona fides* of the Settlement Agreement.

Fourth, the Court agrees with Mr. Ray that it was not necessary for him to seek specific legal advice or financial modeling prior to the July 15, 2014 settlement meeting. The Court is persuaded that Mr. Ray did not need any further legal advice with respect to the likely outcome of the PPI Dispute as he has been intimately involved with the U.S. Debtors' cases for years and was personally involved in prior settlement discussions and mediations regarding both the Allocation Dispute and the PPI Dispute. The Court is

44

convinced that Mr. Ray fully understood the Monitor's position on the PPI Dispute and each side's relative probability of success. Further, the Court agrees with Mr. Ray that financial modeling to determine the potential amounts available to pay post-petition interest from the NNI estate would be futile at this stage in the U.S. Proceedings for the reasons set forth above in the Court's comments with respect to Dr. Wertheim's expert report.

Finally, while there is no *per se* requirement that the Monitor have been involved in the negotiations regarding the terms of the Settlement Agreement, *see Capmark*, 438 B.R. at 520, the Court is aware that some courts have found that in certain circumstances excluding significant parties in interest from settlement negotiations weighs against approval of a settlement agreement, *see, e.g.*, *Nutritional Sourcing*, 398 B.R. at 836-37. In *Nutritional Sourcing*, Judge Walsh of this Court examined a settlement agreement included in a Chapter 11 plan which, as is relevant here, divided trade creditors between "goods" and "non-goods" based on negotiated definitions. *Id.* at 821-22. Based on the settlement agreement, goods trade creditors would receive a 100% recovery while non-goods trade creditors would receive a recovery of only 13.2%. *Id.* at 822. No non-goods trade creditor was present for the settlement negotiations. *Id.* at 822. Judge Walsh noted that the first and third *Martin* factors[18] weighed "marginally" in favor of approval of the settlement agreement but denied approval based on the fourth *Martin* factor based on the severe treatment of non-goods trade creditors and the fact that non-goods trade creditors

---

[18] In *Nutritional Sourcing*, as here, Judge Walsh deemed the second *Martin* factor to be inapplicable.

were "not at the negotiating table and [ ] were not adequately represented in their absence." *Id*. at 835.

The Court finds *Nutritional Sourcing* to be factually distinguishable. First, the severity of the treatment of the non-present party in *Nutritional Source* was far more striking than here. In *Nutritional Sourcing*, disparate treatment was afforded creditors in the same class. Non-goods trade creditors' recovery in *Nutritional Source* was reduced by almost 77%. Here, the Supporting Bondholders simply agreed to a post-petition interest cap that is almost exactly in the middle of the settlement range. Second, the non-goods trade creditors in *Nutritional Source* were not represented or even consulted prior to or during settlement negotiations. Here, the Monitor has had ample opportunity over the course of several years to fully voice its position with respect to the PPI Dispute. There is no doubt that the U.S. Debtors were fully aware of the Monitor's position entering the July 15, 2014 settlement meeting and, as set forth above, the Court is convinced that the U.S. Debtors fulfilled their fiduciary duty to maximize the value of the Canadian Debtors' equity interest.  The cap on interest evidences the U.S. Debtors' concern for equity. *See Capmark*, 438 B.R. at 520 ("While it is certainly true that the settlement affects the Debtors' unsecured creditors, there is no requirement that those creditors be actively involved in the settlement negotiations. . . . Moreover, there is no support for the Official Committee's insinuation that the Debtors' professionals were conflicted in their negotiations with the secured lenders."); *In re Coram Healthcare Corp.*, 315 B.R. 321, 332 (Bankr. D. Del. 2004) ("The Trustee met with both the Equity Committee and the Noteholders and asked both

to give him their best case against the other. This process was not 'fundamentally unfair' as suggested by the Equity Committee.").

For the reasons set forth above, the Court concludes that the fact that the Monitor did not participate in the negotiations leading to the Settlement Agreement does not provide a basis for denying approval of the Settlement Agreement. Accordingly, the Court rejects the Monitor's process-based argument and finds that the Settlement Agreement is in the Debtors' best interest.

> **2.      *Additional Factor: Extent to which the Settlement is Truly the Product of 'Arm's Length' Bargaining, and not Fraud or Collusion.***

Finally, the Monitor argues that the U.S. Debtors failed to conduct an arm's length negotiation in arriving at the terms of the Settlement Agreement, a factor some courts find weighs against approval of a proposed settlement agreement. *See, e.g.*, *Texaco*, 84 B.R. at 902. Consideration of the arm's length nature of the settlement negotiations essentially falls under the umbrella of the fourth *Martin* factor, although the issue was raised separately by the Monitor. *See, e.g.*, *Nutritional Sourcing*, 398 B.R. at 835-37 (discussed above). The evidence the proponents of the Settlement produced, in particular the testimony of Mr. Ray and Mr. Katzenstein, clearly support the Court's finding that the Settlement was the result of arm's length negotiations.  The parties are sophisticated, the roles clearly defined and the stakes are enormous.  For the reasons set forth above, the Court is satisfied that the U.S. Debtors were fully aware of the Monitor's position with respect to the PPI Dispute and, by obtaining the interest cap, fulfilled their fiduciary duty to protect the value of the Canadian Debtors' equity interest. Thus, the Court finds that,

to the extent the arm's length factor is not subsumed in the fourth *Martin* factor, it has been met.

## CONCLUSION

For the reasons set forth above and given the circumstances of this case, the Court finds that the Settlement Agreement is eminently fair, reasonable, and in the best interests of the U.S. Debtors' Estates, and satisfies the Rule 9019 standards set forth in the Third Circuit's *Martin* decision. Accordingly, the Court will grant the Settlement Motion and approve the Settlement Agreement.

Dated:  December 18, 2014

KEVIN GROSS, U.S.B.J.

48

# EXHIBIT A

# Post-Petition Interest



Settlement Agreement Section 2.2 (PPI Settlement Amount); NNI-PPI-00000119-121 (basis for calculation of PPI at contract rate and federal judgment rate) [1]