**<u>EXHIBIT A-1</u>**

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**ONE HUNDRED AND TWELFTH REPORT OF THE MONITOR**
**DATED FEBRUARY 3, 2015**

**INTRODUCTION**

1.    On January 14, 2009 (the "**Filing Date**"), Nortel Networks Corporation ("**NNC**" and collectively with all its subsidiaries "**Nortel**" or the "**Company**"), Nortel Networks Limited ("**NNL**"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively the "**Canadian Debtors**") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("**CCAA**").  Pursuant to the Order of this Court dated January 14, 2009, as amended and restated (the "**Initial Order**"), Ernst & Young Inc. was appointed as the Monitor of the Canadian Debtors (the "**Monitor**") in the CCAA proceedings.  A stay of proceedings against the Canadian Debtors and their property (the "**CCAA Stay**") was granted in the Initial Order, which stay was extended to April 3, 2015 by this Court in its Order dated October 1, 2014.

2.    Nortel Networks Inc. ("**NNI**") and certain of its U.S. subsidiaries and affiliates concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "**Code**") in the United States Bankruptcy Court for the District of Delaware (the "**U.S. Court**" and together with this Court, the "**Courts**") on January 14, 2009 (the "**Chapter 11**

**Proceedings**").  As required by U.S. law, an official committee of unsecured creditors was established in January, 2009.

3.  An ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "**Bondholder Group**").  In addition, pursuant to Orders of this Court, representative counsel ("**Representative Counsel**") was appointed on behalf of the former employees of the Canadian Debtors (the "**Former Employees**"), the continuing employees of the Canadian Debtors and the LTD Beneficiaries, and each of these groups is participating in the CCAA proceedings.

4.  Nortel Networks (CALA) Inc. filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009.

5.  Nortel Networks UK Limited ("**NNUK**") and certain of its affiliates located in EMEA were granted administration orders (the "**UK Administration Orders**") by the High Court of England and Wales on January 14, 2009 (collectively the "**EMEA Debtors**").  The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as administrators of the various EMEA Debtors, except for Nortel Networks (Ireland) Limited, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed.

6.  Subsequent to the Filing Date, Nortel Networks S.A. commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

7.  The CCAA proceedings and the UK Administration proceedings of NNUK and the other EMEA Debtors have been recognized by the U.S. Court as foreign main proceedings under Chapter 15 of the Code.

8.  Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection or bankruptcy proceedings in the local jurisdiction in which they are located.

**PURPOSE AND OVERVIEW**

9.   The purpose of this One Hundred and Twelfth Report of the Monitor (the "**One Hundred and Twelfth Report**") is to provide this Court with information and background with respect to the Monitor's and Canadian Debtors' motion seeking an order approving:

   a) a protocol ("**Protocol**") to set forth binding procedures for: (i) in the case of this Court, determining the several liability of the Canadian Debtors, if any, to SNMP Research, Inc. and SNMP Research International, Inc. (together, "**SNMPRI**") for all claims of SNMPRI against the Canadian Debtors, whether arising prior to, on or after January 14, 2009 (the "**Canadian SNMPRI Claims**"); and (ii) in the case of the U.S. Court, determining the several liability of the U.S. Debtors, if any, to SNMPRI for all claims of SNMPRI against the U.S. Debtors, whether arising prior to, on or after January 14, 2009 (the "**U.S. SNMPRI Claims**", and with the Canadian SNMPRI Claims, the "**SNMPRI Claims**");

   b) a litigation timetable for the adjudication of the SNMPRI Claims; and

   c) a discovery plan to govern certain procedural steps in respect of the resolution of the SNMPRI Claims.[1]

10.  The SNMPRI Claims include both pre-Filing Date claims as well as significant post-Filing Date claims. Of particular note, SNMPRI seeks to recover "no less" than $86 million on an "administrative expense" basis from the Canadian Debtors and U.S. Debtors, including an alleged entitlement to damages calculated based on the sale proceeds of the Nortel line of business sales.[2]

11.  The SNMPRI Claims have also been the subject of a number of prior motions in both these CCAA proceedings and the Chapter 11 Proceedings, protracted negotiations among the

---

[1] References to the Protocol herein are intended to refer to the Protocol as a whole, including the appended litigation timetable and discovery plan.

[2] Generally speaking, administrative expense claims in the context of Chapter 11 cases are claims that are alleged not to be subject to compromise and required to be paid in full.

parties and a failed mediation that was terminated at the end of March 2014. Notwithstanding these efforts, to date, SNMPRI, the Canadian Debtors, the Monitor and the U.S. Debtors, have made no progress in progressing resolution of the SNMPRI Claims on a consensual basis such that the parties now require the intervention of the Courts to advance their resolution.

12.    Timely resolution of the SNMPRI Claims is required for purposes of progressing these CCAA proceedings generally, including so as to fix creditor entitlements.

13.    There is also an urgent need to commence the discovery and litigation process to resolve the SNMPRI Claims in order to permit the Canadian Debtors to shutdown portions of their remaining IT infrastructure by the end of 2015 and stop incurring costs in support of that infrastructure. The Monitor estimates those costs at approximately CAD $1.6 million per year.

14.    In light of the foregoing, the Monitor and Canadian Debtors have brought a motion seeking to have this Court approve the Protocol and impose a litigation timetable and discovery plan for resolution of the Canadian SNMPRI Claims. The Monitor understands the U.S. Debtors have or will file a parallel motion with the U.S. Court seeking to have the U.S. Court approve the Protocol to provide for resolution of the U.S. SNMPRI Claims.

15.    The process proposed in the Protocol, a copy of which is attached as Appendix "A" hereto, recognizes the exclusive jurisdiction of this Court to resolve the Canadian SNMPRI Claims and provides for the fair, efficient and expeditious resolution of such claims on a coordinated basis with the U.S. SNMPRI Claims in a matter that balances the interests of the Canadian Debtors, their stakeholders and SNMPRI and serves the purposes of the CCAA by assisting in advancing these proceedings to their conclusion.

**TERMS OF REFERENCE**

16.    In preparing this One Hundred and Twelfth Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by

the Company and discussions with the Company. The Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of this information.

17.    Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

## BACKGROUND TO SNMPRI CLAIMS

### *SNMPRI, the License Agreement with Nortel and the Original Proofs of Claim*

18.    SNMP Research, Inc. and SNMP Research International, Inc. are corporations based in Knoxville, Tennessee that are in the business of producing and distributing software for the simple network management protocol ("**SNMP**").    The Monitor understands the basic purpose of SNMP is to manage and monitor attached devices in computer networks such as servers, printers and routers. SNMPRI is not the only company that develops and markets SNMP technologies and products.

19.    Prior to the commencement of the CCAA proceedings, SNMPRI licensed its software to NNC and approximately sixty other Nortel entities for use in a variety of Nortel products. This licensing arrangement was governed by a license agreement between NNC and SNMP Research International, Inc., dated December 23, 1999 (the "**License Agreement**"), a copy of which is attached as Confidential Appendix "B" hereto.[3]

20.    At the time of Nortel's insolvency filings, the Canadian Debtors and the U.S. Debtors owed SNMPRI certain royalty payments for Q4 2008.    SNMPRI filed proofs of claim for approximately $22,000 in the claims processes established in the CCAA proceedings as well as in the Chapter 11 Proceedings on account of these stayed royalty claims.[4] A copy

---

[3] The License Agreement is filed on a confidential basis at present as SNMPRI has previously requested it be sealed. The Monitor takes no position on the appropriateness of sealing the License Agreement at this time and expects this issue to be addressed in due course.

[4] Copies of the Claims Procedure Order dated July 30, 2009, the Claims Resolution Order dated September 16, 2010 and the Order Approving Cross-Border Claims Protocol dated September 16, 2010 are attached as Appendices "C", "D" and "E", respectively.

of SNMPRI's original CCAA proof of claim filed against NNC dated September 25, 2009 is attached as Appendix "F" hereto.[5]

***SNMPRI's Unsuccessful Objections to the Nortel Line of Business Transactions***

21.    From mid-2009 through the end of 2010, the Canadian Debtors, the U.S. Debtors, the EMEA Debtors and certain other Nortel entities entered into sale transactions to sell Nortel's various lines of business. These sales included:

  a)  the sale of Nortel's Layer 4-7 Application Delivery Business and Alteon product families to Radware Ltd. ("**Radware**");

  b)  the sale of Nortel's Code Division Multiple Access business and Long Term Evolution Access assets to Telefonaktiebolaget LM Ericsson ("**Ericsson**");

  c)  the sale of Nortel's Enterprise Solutions business as well as the shares of Nortel Government Solutions Inc. and DiamondWare, Ltd. to Avaya Inc. ("**Avaya**");

  d)  the sale of Nortel's Next Generation Packet Core technology to Hitachi Ltd.;

  e)  the sale of Nortel's MEN business to Ciena Corporation ("**Ciena**");

  f)  the sale of Nortel's GSM/GSM-R business to Ericsson and Kapsch CarrierCom AG;

  g)  the sale of substantially all of the assets of Nortel's Carrier VoIP and Applications Solutions business to GENBAND, Inc. ("**Genband**"); and

  h)  the sale of substantially all the assets of Nortel's Multi-service Switch business (i.e. the "**Passport**" business) to Ericsson.

22.    Each of the aforementioned transactions was subject to the approval of both this Court and the U.S. Court, and joint hearings were held between the Courts pursuant to the Cross-

---

[5] The balance of SNMPRI's original proofs of claim against the other Canadian Debtors are substantially similar and claim for the same amount.

Border Insolvency Protocol (the "**Cross-Border Protocol**") approved by both Courts, a copy of which is attached as Appendix "G" hereto, to consider approval of the transactions.

23. This Court issued an Approval and Vesting Order in respect of each one of the above noted transactions that, *inter alia*, approved the Canadian Debtors entry into the transaction and vested the purchased assets of the Canadian Debtors in the purchaser.[6] Similarly, the U.S. Court issued sale orders approving the U.S. Debtors' entry into the transactions and vesting the purchased assets of the U.S. Debtors in the purchasers.

24. With the exception of the Radware transaction, SNMPRI filed objections, copies of which are attached at Appendix "I" hereof, to each of the U.S. Debtors' motions seeking approval of the above noted transactions. SNMPRI's objections were heard and considered by the U.S. Court in the context of the joint hearings with this Court to approve the transactions described above.

25. In each of its objections, SNMPRI objected to, among others things, any transfer of SNMPRI's intellectual property or a license to such intellectual property to the purchasers, and in some cases sought the ability to audit Nortel's use of SNMPRI's software. Nortel worked with SNMPRI and the purchasers at the time to attempt to address SNMPRI's concerns, including by facilitating discussions and accession agreements between SNMPRI and the line of business purchasers.[7]

26. Ultimately, each of SNMPRI's objections was either overruled or addressed on a consent basis between SNMPRI and the U.S. Debtors by inserting language in the sale orders of the U.S. Court which made clear that, among other things, no contracts or intellectual property rights to SNMPRI's intellectual property were being transferred to the purchasers. In addition, other transaction documents made clear that no SNMPRI intellectual property rights or licenses to intellectual property rights were being conveyed, and that purchasers of the Nortel lines of business were responsible for obtaining and paying for any necessary

---

[6] A copy of the Approval and Vesting Orders for each of the aforementioned transactions is attached at Appendix "H" hereof.

[7] The Monitor does not at this time purport to set out an exhaustive account of Nortel's efforts to work with SNMPRI to resolve its objections and alleged claims in connection with the line of business sales.

third party software, technology and intellectual property rights that Nortel was not entitled to transfer. Copies of the U.S. Court's sale orders that address SNMPRI's objections are attached at Appendix "J" hereof.

***The Passport Audit***

27.    The Monitor understands that in July 2010 the U.S. Debtors objected to certain of SNMPRI's proofs of claim filed in the Chapter 11 Proceedings. In response, SNMPRI alleged, for the first time, unlicensed use of SNMPRI software and again sought discovery and audit rights regarding Nortel's use of SNMPRI software.

28.    In an attempt to resolve SNMPRI's request, the U.S. Debtors, with the assistance of certain personnel of the Canadian Debtors and in consultation with the Canadian Debtors and the Monitor, agreed to perform an audit (the "**Passport Audit**") of the computer source code used in the Passport business (then Nortel's only remaining line of business) to determine whether there was any unlicensed use of SNMPRI's software.

29.    The Passport Audit was time consuming and costly, requiring 500 - 600 hours of work by approximately ten Nortel employees, and found only two actual instances of use of SNMPRI software in the products searched. It was ultimately confirmed that Nortel held valid licenses for all SNMPRI software used in the Passport business and had paid all required fees and royalties in connection therewith.[8]

30.    Notwithstanding these efforts, SNMPRI continued to seek discovery from the U.S. Debtors and filed an amended proof of claim against NNI on October 19, 2010, for approximately $1.5 million for, *inter alia*, alleged unlicensed use of SNMPRI software. The U.S. Debtors ultimately filed a motion with the U.S. Court seeking a protective order in respect of the discovery sought by SNMPRI.

31.    The Monitor filed a statement in support of the U.S. Debtors' protective order motion and a request for a joint hearing to consider the motion insofar as the discovery requests directed

---

[8] Attached as Appendix "K" is the U.S. Debtors' motion for protective order dated April 1, 2011, including the Declarations of Stephen Kenkel in support thereof, that describe the Passport Audit in further detail.

at NNI also sought discovery from the Canadian Debtors (in breach of the CCAA Stay), and the Canadian Debtors had a proprietary interest in the information SNMPRI sought discovery of. The Canadian Debtors also filed a motion with this Court dated June 7, 2011, which, *inter alia*, sought to confirm the application of the deemed undertaking rule to any discovery received by SNMPRI from the U.S. Debtors with respect to any claims of SNMPRI against the Canadian Debtors. A copy of the Canadian Debtors' motion record, including a copy of the Monitor's statement in support of the U.S. Debtors' protective order motion and request for joint hearing, is attached as Appendix "L" hereto.

32.    These motions were ultimately adjourned as a result of the Canadian Debtors, U.S. Debtors and SNMPRI's agreement to mediate, as discussed in further detail below.

*The Complaint and the Amended CCAA Proofs of Claim*

33.    During the course of discussions among the Canadian Debtors, the Monitor, the U.S. Debtors and SNMPRI in respect of the above noted motions, SNMPRI advised it intended to commence proceedings before the U.S. Court by filing a complaint (the "**Complaint**") against the Canadian Debtors, the U.S. Debtors, certain of the Nortel line of business purchasers and certain other parties alleging unauthorized use and transfer of SNMPRI's software in the post-filing  period.

34.    On August 30, 2011, the Canadian Debtors, supported by the Monitor, advised SNMPRI that any such proceeding was properly the subject of a joint hearing between this Court and the U.S. Court, and that the filing of the Complaint solely with the U.S. Court would require leave of this Court in light of the CCAA Stay.[9] A copy of counsel to the Canadian Debtors' email to counsel to SNMPRI setting out this position is attached as Appendix "N" hereto.

---

[9] A copy of the Initial Order is attached as Appendix "M" hereto. The CCAA proceedings have been recognized as "foreign main proceedings" and the Initial Order and the CCAA Stay have been recognized and given full force and effect in the United States pursuant to an Order Granting Recognition and Related Relief of the U.S. Court dated February 27, 2009, granted in the Canadian Debtors proceedings pursuant to Chapter 15 of the Code.

35.     On September 21, 2011, SNMPRI served a motion in these proceedings seeking to lift the CCAA Stay to permit the filing of the Complaint with the U.S. Court and to proceed to litigate the claims in the Complaint against the Canadian Debtors before the U.S. Court.

36.     On the same date, SNMPRI filed amended proofs of claim in the CCAA proceedings against each of the Canadian Debtors in the amount of $7,549,323 plus "unspecified damages". In addition to the original stayed royalty claim of approximately $22,000, the amended CCAA proofs of claim allege an entitlement to approximately $7.5 million on account of alleged unauthorized pre-filing use of SNMPRI's software ($5.3 million of which represents a claim for compounding interest due on account of such alleged unauthorized pre-filing use). A copy of SNMPRI's amended CCAA proofs of claim against the Canadian Debtors are attached as Appendix "O" hereto. Similarly increased amended proofs of claim have been filed in the Chapter 11 Proceedings against the U.S. Debtors.

### *The Letter Agreement and the Consent Order*

37.     Following negotiations among the Canadian Debtors, the Monitor, the U.S. Debtors and SNMPRI in respect of the above noted motions, the parties entered into a letter agreement dated October 25, 2011 (the "**Letter Agreement**"), a copy of which is attached as Appendix "P" hereto. Pursuant to the Letter Agreement, the Canadian Debtors, the U.S. Debtors and SNMPRI agreed to:

    a)   non-binding mediation of the pre-filing claim, discovery and liability issues among them;

    b)   a lifting of the CCAA Stay on the basis of a consent order of this Court to permit the filing of the Complaint with the U.S. Court solely for the purpose of tolling any limitations period relating to SNMPRI's claims;

    c)   the tolling of any limitations period relating to any claims between or among the parties from the date of the filing of the Complaint until 30 days after SNMPRI, the Canadian Debtors or the US Debtors declares that the mediation has reached an impasse; and

d)  adjourn the discovery related and lift stay motions described above.

38. The Letter Agreement expressly provides that the consent lifting of the CCAA Stay to permit the filing of the Complaint with the U.S. Court was on a "…without prejudice basis as to any and all matters that are or may be at issue between [the Canadian Debtors and the US Debtors] and [SNMPRI], *including, without limitation, the merits of the lift stay motion and the appropriate forum(s) for the hearing and determination of [SNMPRI's] claims…*" [emphasis added].

39. On October 26, 2011, this Court granted a Consent Order (the "**Consent Order**"), a copy of which is attached as Appendix "Q" hereto, lifting the CCAA Stay solely to permit the filing and service of the Complaint on the terms outlined above. The Consent Order includes substantially the same without prejudice language as described above and goes on to provide that the CCAA Stay otherwise,

> remains in full force and effect and no further steps may be taken by [SNMPRI] against the [Canadian Debtors] without further order of this Court. For the avoidance of doubt, absent a further order of this Court granting leave from the [CCAA Stay], none of the [Canadian Debtors] shall be required to respond to, or otherwise answer, the Complaint and all rights of the [Canadian Debtors] in relation to the Complaint are fully preserved.

### *Overview of the Complaint*

40. On November 2, 2011, SNMPRI filed the Complaint with the U.S. Court. The Complaint alleges breach of contract, misappropriation of trade secrets, copyright infringement and fraudulent misrepresentation claims against, among others, the Canadian Debtors and the U.S. Debtors, including allegations of unauthorised use, distribution, license and sale of SNMPRI software in the post-filing period and in connection with the line of business sales described above.

41. SNMPRI seeks to recover no less than $86 million (on an "administrative expense" basis) from the Canadian Debtors and U.S. Debtors pursuant to the Complaint, including an alleged entitlement to damages calculated based on the sale proceeds of the Nortel line of business sales.

42. On or about October 30, 2013, SNMPRI filed notice of its intent to "withdraw the reference" with the U.S. Court. The Monitor understands this filing indicates SNMPRI's intention to seek to have the venue for the Complaint transferred from the U.S. Court to the United States District Court for the District of Delaware (the "**District Court**"), and US counsel to SNMPRI has confirmed to US counsel to the Monitor and Canadian Debtors it intends to seek to have the Complaint heard and determined in the District Court rather than the U.S. Court. On October 31, 2013, counsel to the Monitor wrote to counsel to SNMPRI reserving the Canadian Debtors and the Monitor's rights as to whether or not such filing constituted a breach of the CCAA Stay and Consent Order, and reiterated the Monitor's view that this Court had exclusive jurisdiction to determine any of SNMPRI's claims against the Canadian Debtors. A copy of this letter is attached as Appendix "R" hereto.

43. On or about December 27, 2013, SNMPRI filed a First Amended Complaint with the U.S. Court on the same terms as provided for in the Consent Order. The First Amended Complaint contains additional allegations relating to Nortel's line of business sales and alleged copyright infringement, removes certain non-Nortel defendants from the Complaint, and also demands a jury trial of SNMPRI's claims.[10]

44. Based on Court filings, the Monitor understands SNMPRI has reached settlements with Radware and Genband (being two of the Nortel line of business purchasers who were originally defendants to the Complaint). The Monitor also understands that SNMPRI has entered into license agreements with Ericsson and Ciena, two of the other Nortel line of business purchasers. The Monitor does not believe SNMPRI is asserting claims against any other Nortel purchaser at present other than Avaya, such that the only remaining defendants to the Complaint are the Canadian Debtors, the U.S. Debtors and Avaya.

45. Except for the filing and service of the Complaint and the other filings made by SNMPRI described above, no steps have been taken in respect of the Complaint.

---

[10] A copy of the First Amended Complaint is attached as Confidential Appendix "S" hereto. The First Amended Complaint is filed on a confidential basis at present as it is currently subject to a sealing order by the U.S. Court.

**THE MEDIATION**

46.    The parties agreed to appoint the Honourable James L. Garrity Jr., a former U.S. bankruptcy judge, to serve as mediator (the "**Mediator**") pursuant to the Letter Agreement.

47.    Following further efforts at direct negotiation among SNMPRI, the Canadian Debtors, the Monitor and the U.S. Debtors, the mediation took place over the course of much of 2013 and into early 2014.

48.    No resolution was reached and the Mediator declared the mediation over on March 14, 2014.

**EFFORTS TO DEVELOP THE PROTOCOL**

49.    Following termination of the mediation, on July 31, 2014, counsel to the Monitor wrote to counsel to SNMPRI confirming the termination of the tolling arrangement agreed to under the Letter Agreement, inquiring as to whether SNMPRI intended to bring its lift-stay motion back on, affirming the Monitor's continuing view that this Court had the exclusive jurisdiction to determine any claims of SNMPRI against the Canadian Debtors and that the Monitor intended to oppose any motion by SNMPRI to lift the stay, and inviting SNMPRI to discuss a timetable and process to resolve its claims before this Court. A copy of this letter is attached as Appendix "T" hereto.

50.    On August 22, 2014, counsel to SNMPRI advised it was seeking instructions, but ultimately did not advise the Monitor whether SNMPRI intended to bring its lift-stay motion back on or attempt to discuss a timetable or process to resolve SNMPRI's claims against the Canadian Debtors.

51.    Over the course of the fall of 2014, the Monitor, in consultation with the U.S. Debtors, worked to develop the proposed Protocol.

52.    On December 23, 2014, counsel to the Monitor wrote to counsel to SNMPRI enclosing a draft of the Protocol and advising the Monitor and Canadian Debtors intended to seek approval of the Protocol at a joint hearing in late January or early February 2015. SNMPRI was also advised of the urgency of having the Protocol approved and commencing the

discovery and litigation process, as the Canadian Debtors continue to incur significant costs maintaining the technology infrastructure and support that would allow them to conduct the types of searches necessary in connection with the discovery process involving the SNMPRI Claims. A copy of counsel to the Monitor's email is attached as Appendix "U" hereto.

53. In response to the above email, on December 30, 2014, counsel to SNMPRI advised counsel to the Monitor that SNMPRI intended to proceed with its lift-stay motion.

## PROPOSED SNMPRI CLAIMS RESOLUTION PROTOCOL

### *Overview of the Protocol, Discovery Plan and Litigation Timetable*

54. The Monitor and Canadian Debtors propose a process for resolving SNMPRI's pre-filing and post-filing claims against the Canadian Debtors in a fair, transparent and efficient manner, and on a coordinated basis with the resolution of SNMPRI's claims against the U.S. Debtors.  In brief, the Protocol:

a) recognizes this Court's exclusive jurisdiction to determine the Canadian SNMPRI Claims and all matters related thereto, and the U.S. Court's exclusive jurisdiction to determine the U.S. SNMPRI Claims and all matters related thereto;

b) sets forth binding procedures for, in the case of this Court, determining the several liability of the Canadian Debtors, if any, to SNMPRI for all claims of SNMPRI against the Canadian Debtors, whether arising prior to, on or after January 14, 2009, and in the case of the U.S. Court, determining the several liability of the U.S. Debtors, if any, to SNMPRI for all claims of SNMPRI against the U.S. Debtors, whether arising prior to, on or after January 14, 2009;

c) recognizes the right of each of the U.S. Debtors, the Canadian Debtors, the Monitor and SNMPRI to participate fully in any and all hearings before the U.S. Court or Canadian Court relating to the SNMPRI Claims, and any and all discovery conducted in connection with the SNMPRI Claims;

d) establishes a litigation timetable which provides for the discovery and litigation process in respect of the SNMPRI Claims to take place over the course of 2015 (concluding in November 2015), which timetable provides the parties with more than sufficient time to conduct a comprehensive discovery and litigation process and ensures that the SNMPRI Claims will be resolved in an appropriate timeframe having regard to other priorities in the CCAA proceedings (certain of which are described below);

e) establishes a discovery plan that, in the case of the Canadian SNMPRI Claims, is consistent with the *Rules of Civil Procedure* (Ontario) and the practice directions of this Court, and will be conducted on a coordinated basis with discovery in respect of the U.S. SNMPRI Claims such that the parties avoid duplication of efforts and achieve efficiencies. The discovery plan provides significant flexibility to the parties to work to achieve agreement on discovery specifics, while preserving the parties' access to the Court(s) to resolve any discovery disputes; and

f) provides for this Court to determine the merits of the Canadian SNMPRI Claims, and for the U.S. Court to determine the merits of the U.S. SNMPRI Claims, and contemplates – but does not automatically provide for – the possibility of joint hearings if so agreed or ordered by the Courts.

55. The substance of the Protocol is informed by the coordinated nature of these CCAA proceedings and the Chapter 11 Proceedings, circumstances specific to the Canadian Debtors and the CCAA Proceedings, and the nature of SNMPRI's claims. In particular, the Monitor notes as follows with respect to the various facts and issues impacting the content of the Protocol:

a) this Court has exclusive jurisdiction over any claims against the Canadian Debtors, while the U.S. Court has exclusive jurisdiction over any claims against the U.S. Debtors. Consistent with the Cross-Border Protocol and the Cross-Border Claims Protocol previously approved by the Courts, the Protocol provides a coordinated process to resolve SNMPRI's claims against the Canadian Debtors and U.S. Debtors, respectively, including the possibility of joint hearings between the

Courts to address discovery disputes and the merits, while preserving the exclusive jurisdiction of the Courts over their respective debtors (and the claims against those debtors);

b) the jurisdiction of the Canadian Court over SNMPRI's pre-filing claims against the Canadian Debtors has been conclusively established by the Claims Procedure Order and the Claims Resolution Order, and SNMPRI has attorned to the jurisdiction of the Canadian Court in filing its various proofs of claim in the CCAA proceedings. Further, the subject matter of SNMPRI's alleged pre-filing claims (e.g. for unauthorized use or unpaid royalties) is the same as many of SNMPRI's post-filing claims. The balance of SNMPRI's alleged post-filing claims relate to alleged wrongful conduct by the Canadian Debtors while under CCAA protection and in the context of CCAA Court-approved transactions that this Court, having approved those transactions (and recently completed a lengthy trial in respect of them) is well familiar with. Accordingly, judicial efficiency, fairness and the purposes of the CCAA are served by having both SNMPRI's pre-filing and post-filing claims determined by this Court;

c) given that SNMPRI alleges post-filing "administrative expense" damages of no less than $86 million and an alleged entitlement to damages calculated based on the proceeds of the Nortel lines of business sales, the possibility that any of the Canadian Debtors or U.S. Debtors may be determined to be liable in respect of any such claims carries the potential for significant effects on these CCAA proceedings and the Chapter 11 Proceedings, in particular the quantum of claims that will be proven and the purported priority of those claims. Accordingly, it is appropriate and necessary for this Court and the U.S. Court to oversee the resolution of the SNMPRI Claims given the potential impact of the SNMPRI Claims on these cases, and so that the process for their resolution can be coordinated with any developments in the wider CCAA proceedings and Chapter 11 Proceedings, respectively; and

> d) similar and overlapping facts underlie the U.S. SNMPRI Claims and the Canadian SNMPRI Claims. In order for the Courts to determine the claims made against the Canadian Debtors and the U.S. Debtors, respectively, they will have to make determinations on common and overlapping questions of fact, particularly in respect of the extent of Nortel's pre-filing and post-filing use of SNMPRI intellectual property and whether such intellectual property, or Nortel's rights in it, were improperly transferred to purchasers of Nortel's lines of business.

***Timing and Other Concerns Relating to Resolution of the SNMPRI Claims***

56.    The Protocol (and in particular the litigation timetable and discovery plan) is also informed by significant concerns the Monitor has regarding the impact of the discovery process for the SNMPRI Claims on the Canadian Debtors, including with respect to the extent and cost of such discovery, as well as the litigation timetable more generally.

57.    Much of the information and source code that SNMPRI has indicated it wishes to have searched in connection with the SNMPRI Claims, including the ClearCase (as defined below) database, is located on the Canadian Debtors' computers and servers. Of particular note, the Monitor understands that, at this stage of the wind-down of the estates, only the Canadian Debtors retain the ability to access the systems necessary to conduct the ClearCase searches that are described below.[11]

58.    The servers that host the applications that are potentially relevant to the SNMPRI Claims, including the ClearCase database, are located in Ottawa at Nortel's former Carling Campus. The Carling Campus was sold to the Government of Canada in December 2010 in a transaction that was approved by this Court. Since that time, NNL has leased portions of the Carling Campus from the Government of Canada as necessary to maintain portions of its IT infrastructure required in connection with the Canadian Debtors' wind-down and restructuring activities, including the allocation and claims litigation that took place over 2013 and 2014.

---

[11] These searches are described below at paragraphs 65 to 75.

59.    NNL's lease of its remaining space at the Carling Campus has been extended for a one-year period until December 31, 2015 (which is already two years longer than the lease term originally agreed with the Government of Canada). NNL has no right of renewal under the lease and no guarantee the Government of Canada will agree to extend the lease beyond that date.[12] As a result of this uncertainty as well as the cost issues described below, the Monitor believes it is prudent and necessary for the Canadian Debtors to exit the Carling Campus by the end of 2015.

60.    In order for NNL to vacate its Carling Campus premises by the end of 2015, it will have to begin the process of shutting down the servers and removing them from the premises by no later than fall 2015.  The Monitor is advised by NNL's IT employees that these servers are old, in poor condition and at high risk of breaking down and failing.  If a server fails, there is a high risk it could not be replaced with a new server, as new devices may not be compatible with the highly customized old operating systems and R&D software tools (many of which are proprietary to Nortel) that are needed to perform the ClearCase searches.  Similarly, if disks were damaged, data would have to be recovered from backup tapes that have not been written to or restored for several years, which in itself presents a high risk of failure. There is also no guarantee the servers will remain functional if they are shut down and moved to another location. Further, the Monitor understands that the costs associated with attempting such a move or attempting to host these applications elsewhere would be significant.

61.    A significant reason for NNL continuing to lease the premises at the Carling Campus is simply to preserve the four servers necessary to perform ClearCase searches, as well as the 19 additional servers and 11 supporting applications that may be required in connection with those searches. The annual cost to NNL of leasing the Carling Campus premises is approximately CAD $500,000.  In addition, NNL continues to employ various IT employees whose responsibility is to maintain and operate the servers located at the

---

[12] As has been widely reported in the media, the Monitor understands the Government of Canada intends to consolidate a large part of the Department of National Defence's headquarters function at the Carling Campus and has being working to retrofit the Carling Campus to that end. A Public Works and Government Services Canada bulletin detailing the status of those efforts and advising of a targeted first phase migration of personnel to the Carling Campus in late 2015 is attached as Appendix "V" hereto.

Carling Campus. The annual cost to NNL to continue to employ these employees is approximately CAD $1,100,000.

62.    In light of the foregoing, the Monitor is of the view that it is critical that the aforementioned ClearCase searches be fully and finally completed and discovery in respect of the SNMPRI Claims otherwise completed by no later than the fall of 2015 such that NNL (and its creditors) no longer have to bear the costs associated with maintaining and housing the servers and can shut down the servers and vacate the Carling Campus in an orderly fashion by the end of 2015.

63.    Further, and as this Court well knows, the Canadian Debtors, and by extension their creditors, have expended considerable resources on discovery and litigation matters over the course of the past several years given NNC and NNL's unique position as the repository of much of the documentation relevant to Nortel's former global business and operations. The Monitor has previously advised this Court of its significant concern with respect to the extent of such costs.

64.    In light of this, and in light of the situation described above with respect to the servers at the Carling Campus, the Canadian Debtors may bear a significant portion of the discovery burden for the SNMPRI Claims and (at least in the first instance) its attendant costs. The Monitor further expects that disputes (in respect of, for instance, discovery matters) may arise between SNMPRI, on the one hand, and the Canadian Debtors and their general body of creditors, on the other, as the process to resolve the SNMPRI Claims moves forward and these CCAA proceedings otherwise progress towards the ultimate goal of distributions to creditors. This Court is uniquely situated to balance the competing interests of the parties and resolve any such disputes as and when they may arise having regard to the interests of all stakeholders.

*Concerns Regarding the Scope of Discovery Previously Requested by SNMPRI and Efforts to Develop Appropriate Search Parameters*

65.    As described above, in connection with the proofs of claim it filed in the Chapter 11 Proceedings, SNMPRI sought extensive discovery in respect of the software source code

that is stored in Nortel's electronic database ("**ClearCase**").[13] The discovery SNMPRI sought included access to all of the software source code made available by Nortel to third parties since 1999 and extended well beyond the comprehensive searches completed in the Passport Audit (which, as noted above, were themselves burdensome, time consuming and costly).

66.    As noted above, the U.S. Debtors, supported by the Monitor, disputed these discovery demands at the time on the basis they extended well beyond the issues raised by the proofs of claim and were grossly and unfairly burdensome, and sought a protective order against such discovery demands.

67.    Despite negotiation and mediation efforts, the parties have been unable to resolve SNMPRI's discovery demands on a consensual basis.

68.    For the reasons discussed below, it is not possible for Nortel to conduct the kind of search and audit that would be required to provide SNMPRI with the information it has previously sought, and even if it were, such searches would not be reasonable or proportionate in the circumstances.[14]

69.    First, to provide SNMPRI with the information it has previously sought, Nortel would have to start by searching through all of the source code databases contained in ClearCase, called "versioned object bases" ("**VOBs**"), in order to determine which of the databases contain SNMPRI's intellectual property.   There are more than 3,700 VOBs in ClearCase. Based on the experience of the Passport Audit which examined only 53 VOBs, it is estimated that it would take approximately 5,000 person-hours to execute a similar comprehensive search through all VOBs.

---

[13] The first set of interrogatories and requests for production of documents made by SNMPRI in this regard are attached as Appendix "W" hereto.

[14] Given the Nortel line of business divestitures, the Canadian Debtors no longer have any employees with the technical expertise necessary to perform the ClearCase searches required in connection with the SNMPRI Claims. Accordingly, in 2012 NNL engaged Seanna Watson, a former Software Development Environment, Security, and Export Control employee at NNL to assist with these matters. Ms. Watson was employed by NNL and its predecessors for 32 years, was involved with SNMPRI Claim related  matters while still employed by NNL and has the necessary technical knowledge and familiarity with ClearCase to perform the required searches. She also has familiarity with the Passport Audit. Paragraphs 68 to 75 of this One Hundred and Twelfth Report as they relate to technical matters are based on the Monitor's consultations with Ms. Watson.

70.  Even if Nortel was to perform such VOB searches, they would have little utility to the parties in terms of identifying to what extent SNMPRI's software was used in a particular Nortel product or line or business. The primary function of ClearCase was to store versions of software products as they progressed through the development phases.  Accordingly, large portions of the source code and files contained in any VOB may not actually have been used in the final version of a Nortel product.  Additionally, neither was data stored in the VOBs, nor the VOBs organized, in accordance with particular lines of business or product families.  Therefore, the existence of SNMPRI's code in a given VOB does not itself indicate if such code was used in any particular Nortel product or by any particular line of business.

71.  Moreover, identifying SNMP-related code in a VOB does not automatically establish that such code originated with SNMPRI, as software to implement the SNMP protocol may have been acquired from one of SNMPRI's competitors, or written by Nortel employees. Thus, source code "hits" relating to such searches may, in fact, result from a source other than SNMPRI.

72.  Additionally, identifying what software from what VOBs was used in any Nortel product created by a particular line of business would require the software build architecture used by the employees responsible for building the relevant Nortel products. The build architecture code was not systematically stored in ClearCase or in any other central repository.  Rather, the software build architecture was stored in the manner preferred by each product team, and may have been stored in ClearCase, on Nortel servers, or on the laptops or desktops of the individual architects.  In many cases, such servers, desktop computers and laptops transferred with the relevant employees to the purchaser of the relevant line of business.

73.  Even if Nortel currently had access to all of the software build architecture, such access would nonetheless not allow Nortel to trace which SNMPRI software ended up in what Nortel products. This task would require significant consultation with the product development team for each of the Nortel products, as only these individuals would be sufficiently familiar with the build and release process for each product.  Nortel no longer

employs any of these individuals, many of whom, along with other employees of any given line of business, transferred to the purchaser that acquired the business, with the balance having their employment with Nortel terminated at or about the same time.

74. In light of the difficulties associated with the VOB searches as described above, the Canadian Debtors, in consultation with the U.S. Debtors, have worked to develop a method to search ClearCase that would involve:

   a) conducting searches of file names in ClearCase using SNMPRI related search terms;

   b) doing a sample search of VOBs in order to test for false positives and false negatives arising from the search terms being used, and consulting with SNMPRI in order to refine the search terms as necessary; and

   c) using the final list of search terms to search VOB file history in ClearCase.

75. These search parameters and techniques were developed in consultation with Ms. Watson and reflect her view of the best and most efficient way to conduct searches that will generate results that will allow identification of the VOBs that may contain SNMPRI source code. These results can then be correlated with the listing of VOBs transferred to the line of business purchasers in an attempt to ascertain what, if any, SNMPRI software was transferred to the line of business purchasers (although, as noted, this will still not identify to what extent, if any, SNMPRI software was incorporated in a particular Nortel product or used in a particular Nortel line of business).

76. In addition, the proposed discovery plan also looks to leverage off any discovery, documentation or other information received by SNMPRI in its litigation or negotiations with the business line purchasers by requiring SNMPRI to produce that information.

77. Finally, the proposed discovery plan  provides significant flexibility to the parties to work to agree to various discovery particulars, failing which recourse may be sought from the Court(s).

## MONITOR'S RECOMMENDATIONS

78.   For the reasons described above, the Monitor is of the view that:

    a)  the Protocol represents a fair, transparent and efficient means of resolving the SNMPRI Claims in a manner that is consistent with prior Orders of this Court designed to coordinate these CCAA proceedings with the Chapter 11 Proceedings while at the same time preserving the exclusive jurisdiction of this Court and the U.S. Court over the Canadian Debtors and the U.S. Debtors, respectively;

    b)  it is necessary to progress the resolution of the Canadian SNMPRI Claims before this Court on the timetable contemplated by the Protocol:

        i.  such that the Canadian Debtors will not have to incur real estate and personnel costs required to maintain the ability to conduct the ClearCase searches past the end of 2015; and

        ii.  given the risk that the Canadian Debtors may be required to vacate the Carling Campus at the end of 2015, which in turn may jeopardize their ability to conduct the ClearCase searches; and

    c)  it is otherwise necessary to progress the SNMPRI Claims on a timely basis and in the manner contemplated by the Protocol insofar as they represent a significant remaining issue in each of the CCAA proceedings and the Chapter 11 Proceedings, resolution of which is required to progress the proceedings to their conclusion.

- 24 -

79.    In light of the foregoing, the Monitor supports approval of the Protocol in the form presented.

All of which is respectfully submitted this 3rd day of February, 2015.

**ERNST & YOUNG INC.**
**in its capacity as Monitor of**
**Nortel Networks Corporation** *et al*.
**and not in its personal capacity**

Per:

Murray A. McDonald
President

6408525



# SNMPRI CLAIMS RESOLUTION PROTOCOL

1.  Purpose.  The purpose of this SNMPRI Claims Resolution Protocol ("**Protocol**") is for each of the U.S. Court[1] and Canadian Court to set forth binding procedures for: (i) in the case of the U.S. Court, determining the several liability of the U.S. Debtors to SNMPRI for all claims of SNMPRI against the U.S. Debtors, whether arising prior to, on or after January 14, 2009 (the "**U.S. SNMPRI Claims**"); and (ii) in the case of the Canadian Court, determining the several liability of the Canadian Debtors to SNMPRI for all claims of SNMPRI against the Canadian Debtors, whether arising prior to, on or after January 14, 2009 (the "**Canadian SNMPRI Claims**" and with the U.S. SNMPRI Claims, the "**SNMPRI Claims**"). This Protocol recognizes the U.S. Court's exclusive jurisdiction to determine the U.S. SNMPRI Claims and all matters related thereto, and the Canadian Court's exclusive jurisdiction to determine the Canadian SNMPRI Claims and all matters related thereto.  It is understood that the efficient and cost-effective resolution of the SNMPRI Claims are served by a coordinated process as provided by this Protocol.

2.  Participants.  Each of the U.S. Debtors, the Canadian Debtors, the Monitor and SNMPRI (collectively, the "**Parties**," and each individually, a "**Party**") and their authorized representatives shall have the right to participate fully in (a) any and all hearings before the U.S. Court or Canadian Court relating to the SNMPRI Claims, and (b) any and all discovery conducted in connection with the SNMPRI Claims.

3.  Procedures.  The Litigation Timetable and Discovery Plan, attached hereto as Schedules "A" and "B" respectively, shall govern with respect to the pleadings, discovery, interlocutory matters and hearing in respect of the SNMPRI Claims. The U.S. Court and Canadian Court shall have residual discretion to determine any and all other matters pertaining to the litigation and resolution of the U.S. SNMPRI Claims and the Canadian SNMPRI Claims, respectively. The U.S. Court and Canadian Court shall be available for joint conferences to resolve any discovery disputes among the Parties and to receive updates on the status of the proceedings. Following good faith efforts to resolve a discovery dispute, which efforts prove unsuccessful, any Party may seek the assistance of either or both of the U.S. Court and the Canadian Court in the implementation of this Protocol or the Litigation Timetable and Discovery Plan, or to compel adherence to other steps provided by the usual rules and practices of their respective jurisdictions. For the avoidance of doubt, the Parties shall not seek the U.S. Court's or the Canadian Court's assistance without first taking good faith steps to resolve any discovery or other dispute under or in connection with this Protocol.

4.  Hearings.  The U.S. Court will determine the merits of the U.S. SNMPRI Claims and the Canadian Court will determine the merits of the Canadian SNMPRI Claims.  The hearings for the SNMPRI Claims will commence on November 17, 2015. These hearings shall, subject to the usual rights of appeal, fully and finally resolve all of the SNMPRI Claims.  For the avoidance of doubt, the claims resolution processes in place in the U.S.

---

[1] Capitalized terms used herein and not otherwise defined have the meaning given to them in Appendix "A" hereto.

Debtors' Chapter 11 proceedings and  in the Canadian Debtors' CCAA proceedings will not apply to the resolution of the proofs of claim SNMPRI has filed against the U.S. Debtors and the Canadian Debtors, respectively, it being the intent of this Protocol that all of the SNMPRI Claims shall be resolved as contemplated by this Protocol.

The Parties shall meet and confer to discuss whether all or any portion of the aforementioned hearings before the U.S. Court and the Canadian Court shall be conducted as joint hearings pursuant to the Cross-Border Protocol.  In the absence of agreement on this matter, any Party may seek the direction of the U.S. Court and the Canadian Court with respect to whether or not all or any portion of such hearings shall be conducted as joint hearings.

5.    <u>Appeals</u>.  The Parties shall have their usual rights of appeal from all interlocutory and final decisions of the U.S. Court and Canadian Court.

6.    <u>Cross-Border Protocol</u>.  Any and all hearings in respect of the SNMPRI Claims shall proceed in accordance with the Cross-Border Protocol, unless otherwise ordered by both the U.S. Court and Canadian Court. Nothing herein is intended to limit or modify the terms of the Cross-Border Protocol or the Cross-Border Claims Protocol.

## Appendix "A"

**Canadian Court**:  Ontario Superior Court of Justice (Commercial List).

**Canadian Debtors**:  Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation.

**Chapter 11**: Chapter 11 of Title 11 of the United States Code.

**CCAA:** *Companies' Creditors Arrangement Act*, R.S.C., 1985, c. C-36.

**Commercial List Practice Direction:** Consolidated Practice Direction Concerning the Commercial List of the Ontario Superior Court of Justice.

**Cross-Border Protocol**:  Schedule "A" to the Fifth Amended and Restated Initial Order of the Canadian Court dated February 15, 2011 and Exhibit "B" to the Order Approving Stipulation of the Debtors and the Official Committee of Unsecured Creditors of Nortel Networks Inc., et al., Amending the Cross-Border Court-to-Court Protocol entered by the U.S. Court on June 29, 2009.

**Cross-Border Claims Protocol**:  Schedule "A" to the Order Approving Cross-Border Claims Protocol of the Canadian Court dated September 16, 2010 and Schedule "B" to the Debtors' Motion for Entry of an Order Approving a Cross-Border Protocol on the Resolution of Claims, granted by the U.S. Court on September 16, 2010 pursuant to the Order Pursuant to 11 U.S.C. §§ 105(a) and 502 Approving a Cross-Border Court-to-Court Claims Protocol.

**Federal Rules of Bankruptcy Procedure:** Fed. R. Bankr. P.

**Local Rules for United States Bankruptcy Court for the District of Delaware:** D. Del. Bankr. L. R.

**Monitor**:  Ernst & Young Inc. in its capacity as the Canadian Court-appointed monitor of the Canadian Debtors in their proceedings under the CCAA (Canada).

**Rules of Civil Procedure for Ontario:** R.R.O. 1990, Regulation 194.

**SNMPRI**: SNMP Research International, Inc. and SNMP Research, Inc.

**U.S. Court**:  United States Bankruptcy Court for the District of Delaware.

**U.S. Debtors**:  Nortel Networks Inc., Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc.

**Schedule "A" - Litigation Timetable - Resolution of Claims asserted by SNMPRI against the Nortel U.S. Debtors and Canadian Debtors[1]**

| Date | Step in U.S. Claims | Step in Canadian Claims |
|---|---|---|
| February 27, 2015 | Joint hearing for approval of SNMPRI Claims Resolution Protocol, Discovery Plan and Litigation Timetable. | |
| March 16, 2015 | Within 17 days of U.S. Court Approval of the SNMPRI Claims Resolution Protocol, SNMPRI shall file and serve its amended adversary proceeding/claim, which will particularize the relief sought, material facts relied upon and legal bases for their claims against the U.S. Debtors. In this amended adversary proceeding/claim, SNMPRI shall remove the Canadian Debtors as named defendants to the SNMPRI U.S. Claims. | Within 17 days of Canadian Court Approval of the SNMPRI Claims Resolution Protocol, SNMPRI shall deliver its affirmative claims pleading which will particularize the relief sought, material facts relied upon and legal bases for their claims against the Canadian Debtors. |
| March 30, 2015 | Deadline for reaching agreement on a Confidentiality Stipulation and Protective Order.  To the extent an agreement cannot be reached, each Party will file its desired version of a Confidentiality Stipulation and Protective Order with the Courts.  A joint hearing between the Courts may be necessary to settle the Orders as applicable to the U.S. SNMPRI Claims and Canadian SNMPRI Claims. | |
| April 6, 2015 | Deadline for the U.S. Debtors to file and serve their response to SNMPRI's amended adversary proceeding complaint. | Deadline for Canadian Debtors to serve their response to SNMPRI's Affirmative Claims Pleading. |
| April 17, 2015 | Rule 26(a) initial disclosures. | Deadline for identification by each Party to Canadian SNMPRI Claims of persons likely to have discoverable information relevant to claims or defences. |
| April 24, 2015 | Meet and confer between SNMPRI, U.S. Debtors, Canadian Debtors to discuss particulars of the discovery process, as contemplated by the Discovery Plan.  This will include discussion and agreement regarding the scope of the documentary and electronic searches conducted by each Party and how third-party confidentiality issues (such as confidentiality agreements between the U.S. Debtors or Canadian Debtors and the purchasers of their former assets) may be addressed in accordance with the Discovery Plan.  This will also include discussion of witnesses to be examined/deposed, examination/deposition procedures and other issues. | |

---

[1] Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the SNMPRI Claims Resolution Protocol or the Discovery Plan attached thereto.

| May 22, 2015 | Deadline for the Parties to comply with their documentary production obligations. | |
| --- | --- | --- |
| June 26, 2015 | Deadline for SNMPRI to identify any expert(s) and the subject matter of its expert report(s). | |
| July 24, 2015 | Deadline to complete fact and representative witness examinations/depositions. Representative witness examinations/depositions will not occur until after fact witness examinations/depositions are completed. | |
| July 24, 2015 | Deadline for service of any expert report(s) by SNMPRI. The same expert report(s) may be proffered for use in the U.S. SNMPRI Claims trial and the Canadian SNMPRI Claims trial, subject to compliance with the requirements of both U.S. and Canadian law. | |
| August 21, 2015 | Deadline for U.S. Debtors to serve any responding expert report(s). | Deadline for Canadian Debtors to serve any responding expert report(s). |
| September 4, 2015 | Deadline for completion of expert depositions. | |
| September 18, 2015 | Deadline for service of dispositive motions. | |
| October 9, 2015 | Deadline for replies to dispositive motions. | |
| October 9, 2015 | Deadline to file a list of all witnesses and exhibits that each Party intends to rely upon as part of its direct case. | |
| October 9, 2015 | Deadline for filing of pre-trial evidence in both courts. This will include:<br><br>• all exhibits to be used in a Party's direct case; and<br><br>• all deposition testimony to be used in a Party's direct case. | |
| October 9, 2015 | Deadline for SNMPRI to serve affidavits to serve as evidence in chief of their respective witnesses. | |
| October 23, 2015 | Hearing date for dispositive motions. | |

| | |
|---|---|
| **October 23, 2015** | Deadline to file any pre-trial motions. |
| **October 23, 2015** | Deadline for U.S. Debtors and Canadian Debtors to serve responding affidavits to serve as evidence in chief of their respective witnesses. |
| **October 30, 2015** | Deadline for SNMPRI to serve any reply affidavits. |
| **October 30, 2015** | Deadline for filing objections/replies to pre-trial motions. |
| **November 9, 2015** | Pre-trial conference. |
| **November 17, 2015** | The U.S. and Canadian Courts will hold i) hearings before the U.S. Court on the merits of any remaining U.S. SNMPRI Claims, and (ii) hearings before the Canadian Court on the merits of any remaining Canadian SNMPRI Claims. |
| | Any date in this Litigation Timetable may be amended by the written agreement of the Parties, submitted to the U.S. Court through the filing of a certification of counsel and to the Canadian Court through the filing of a letter from the Monitor to the Canadian Court on notice to the parties. Any Party may also file a motion with the applicable Court(s) to modify this Litigation Timetable upon a showing of good cause. |

**Schedule "B"  -  Discovery Plan  -  Resolution of Claims asserted by SNMPRI against the Nortel U.S. Debtors and Canadian Debtors**

| Definitions | Capitalized terms used herein and not otherwise defined shall have the meaning ascribed in the Protocol or the Litigation Timetable attached thereto. |
|---|---|
| Applicable Procedural Regime | The following procedural regimes apply:<br><br>With respect to U.S. SNMPRI Claims, the Protocol, this Discovery Plan, the Federal Rules of Bankruptcy Procedure and the Local Rules for the United States Bankruptcy Court for the District of Delaware apply.<br><br>With respect to Canadian SNMPRI Claims, the Protocol, this Discovery Plan, the Rules of Civil Procedure for Ontario and the Commercial List Practice Direction apply.<br><br>The usual rules and practices of the U.S. Court and the Canadian Court governing examinations/depositions conduct shall apply, including regarding compelling a witness, cost-sharing and answers to undertakings.<br><br>A Party that conducts an examination/deposition or seeks the assistance of a court outside of its primary jurisdiction shall not be deemed to attorn or consent to that court's jurisdiction. |
| Scope of Documentary Discovery | a) Reasonably Accessible Documents and Proportionality<br><br>The Parties will produce all documents relevant to the SNMPRI Claims and prepare privilege logs as applicable.<br><br>Production of a document by any Party shall not be deemed to be an admission of relevance, nor an automatic waiver of privilege where a document has been, or is, produced inadvertently.<br><br>All documents produced by any Party and all documents produced in response to any subpoena, notice or other process served in relation to either of the Canadian SNMPRI Claims or U.S. SNMPRI Claims shall be deemed to be produced in both proceedings.<br><br>Without limiting the normal production obligations of the U.S. Debtors and the Canadian Debtors respectively, but having regard to the principle of proportionality, electronic discovery of software databases of the Canadian Debtors and the U.S. Debtors will be reasonably limited.  It will consist of file-name searches of the ClearCase software configuration management system historically used by the U.S. Debtors and the Canadian Debtors to store every version of every element related to a software project.  The search procedure will be |

as follows:

- The U.S. Debtors and the Canadian Debtors will conduct a search of file names in ClearCase using the search terms listed in Appendix "A".

- The U.S. Debtors and the Canadian Debtors shall cooperate to search a small sample of versioned object bases ("**VOBs**") in order to test for false positive and false negatives arising from the search terms being used.  The U.S. Debtors and the Canadian Debtors shall consult with SNMPRI in order to refine search terms as necessary.

- The U.S. Debtors and the Canadian Debtors shall use the final list of search terms to search VOB file history in ClearCase.

The U.S. Debtors and the Canadian Debtors will not search any source code contained in ClearCase.  Documentary discovery of the U.S. Debtors and the Canadian Debtors will not include searching the PLS system or using the eBuild tool.

Without limiting the production obligations of SNMPRI under the Federal Rules of Bankruptcy Procedure, the Local Rules for the United States Bankruptcy Court for the District of Delaware and the Rules of Civil Procedure for Ontario, SNMPRI production obligation will include:

- Documents (including, without limitation, communications, license agreements and settlement agreements) related to the litigation, negotiation or settlement of claims between SNMPRI and each of Avaya Inc., GENBAND Inc., Performance Technologies, Inc. and Radware Ltd.

- License agreements entered into between SNMPRI and former customers of the U.S. Debtors, the Canadian Debtors, any other Nortel entity or any purchaser of Nortel's former assets or businesses.

- Information regarding SNMPRI's disclosure or license of its product code to parties other than the U.S. Debtors or the Canadian Debtors.

- Any discovery that SNMPRI has received in its litigation against parties other than the U.S. Debtors and the Canadian Debtors, including, but to limited to Avaya Inc., GENBAND Inc., Performance Technologies, Inc. and Radware Ltd., for breach of license or intellectual property obligations that arise out of facts similar or related to the facts that underlie SNMPRI's claims against the Canadian Debtors and the U.S. Debtors.

- All documents relating to any theory of damages.

|  |  |
|---|---|
| | •     All documents tending to prove or disprove that SNMPRI information has the status of a trade secret.<br><br>•     All documents tending to prove or disprove that SNMPRI information is protected by copyright.<br><br>•     All documents relating to SNMPRI's notice of and objections to the sales of Nortel's lines of business within the CCAA proceedings and the Chapter 11 proceedings.<br><br>The Parties will work in good faith to eliminate duplication and redundancy between U.S. SNMPRI Claims and Canadian SNMPRI Claims productions.<br><br>All Nortel and SNMP documents produced by a Party will be deemed admissible without proof of authenticity, integrity of the chain of possession or the integrity of the system of storage and retrieval unless objected to by this date on a particularized and document-by-document basis. |
| Retention of Electronic Data | The majority of active Nortel servers, including the servers that host ClearCase, are located at 3500 Carling Avenue, Ottawa, ON. Nortel's lease for this location will expire on December 31, 2015. This impending deadline will require Nortel to commence the process of shutting down and decommissioning the servers located at the Carling Facility by no later than September 2015. The process for decommissioning the servers that host the applications relevant to the SNMPRI Claims (including ClearCase) can commence no later than November 2015. In the event a Party seeks the preservation of the servers beyond this date, it may, on the basis of just cause, seek to obtain such direction from the Court(s); any Party who seeks such preservation will bear the attendant cost of moving and maintaining the servers. Any such motion must be brought by no later than August 31, 2015, to accommodate for technical and logistical requirements. |
| Format of Production of Electronic Records | For each electronic document produced, the responding Party shall provide the metadata as may be agreed between the parties, but only to the extent such data can reasonably be extracted or otherwise provided in a delimited text file.<br><br>The U.S. Debtors and the Canadian Debtors will collectively develop a list reflecting the asset purchasers who are believed to have received the VOBs in files in which there were hits following searches that were conducted in accordance with this Discovery Plan. Upon consent being obtained from the relevant asset purchasers or the Court, this list will be provided to SNMPRI. |
| Witness Identification | Each Party shall identify any persons likely to have discoverable or relevant information with respect to the U.S. SNMPRI Claims or the Canadian SNMPRI Claims. |

| | |
|---|---|
| | A Party may seek leave of the Court(s) or consent of all Parties to identify at a later date trial witnesses not previously identified. |
| Oral Examinations or Depositions | The Parties shall attempt to agree on the witnesses to be examined/deposed and on the examination/deposition schedule.  All Parties shall have the right to attend and ask questions at such examinations/depositions, even of the notice, subpoena or other process was served only with respect to one of the Courts

The Parties agree that that the examination/deposition time for each representative or fact witness shall be no more than two days.

a) Examinations/Depositions of Representative Witnesses

The examination/deposition of each Party's representative witness(es) will be limited to a total of 7 hours per examining Party, for a total of no more than 14 hours of representative witness examinations/depositions per proffering Party.  Evidence of each of the three representative witnesses may be used in both the U.S. SNMPRI Claims trial and the Canadian SNMPRI Claims trial.

The Canadian Debtors and the U.S. Debtors may, but need not, jointly designate representative witness(es) for the U.S. SNMPRI Claims and the Canadian SNMPRI Claims to provide for a single examination/deposition of this witness.

SNMPRI may designate one individual to be its representative witness for both the U.S. SNMPRI Claims and the Canadian SNMPRI Claims.

b) Examination/Depositions of Fact Witnesses

The fact witnesses examinations/depositions shall be as follows:

- No more than 7 hours of examination/deposition of the fact witnesses of each of the Parties, for a total of no more than 21 hours of fact witness examination/deposition by each Party

- A total of no more than 50 hours of examination/deposition of non-party witnesses by each Party, including purchasers of the Nortel assets or businesses, former Nortel customers and current or former customers of SNMPRI

All Parties agree to cooperate in good faith in attempts to locate and obtain testimony from persons not under the control of any Party; however, no Party shall be required to commence proceedings or pursue other procedures to secure testimony from witnesses that are |

| | |
|---|---|
| | not in its control and from which that Party does not seek testimony.<br><br>c) Use of Discovery Answers at Trial<br><br>Subject to the usual rules that apply in the Canadian and U.S. Courts respectively, the examination/deposition evidence of representatives may be used as evidence at trial only by a Party whose interests are adverse to those of the proffering Party on the issue for which the evidence is being used. |
| Experts | a) Reports/Affidavits<br><br>SNMPRI shall identify intended expert(s) and the subject matter of their expertise and intended evidence.  SNMPRI shall deliver an affidavit or report from their identified expert(s) containing the content and disclosures required by the Applicable Procedural Regime set forth in section 2.  SNMPRI may file the same report from an intended expert for use in both the U.S. SNMPRI Claims litigation and the Canadian SNMPRI Claims litigation.<br><br>The U.S. Debtors and the Canadian Debtors may deliver rebuttal expert affidavits or expert reports.<br><br>Absent leave of the Court(s) or the consent of all of the Parties the affidavit or report of any expert who does not appear at trial cannot be filed as trial evidence. |
| General Procedure Applicable to All Oral Examinations / Depositions | Coordinating Oral Examinations/Depositions<br><br>The Parties will work in good faith to avoid duplication of questions.<br><br>Transcripts and videotaping:<br><br>All examinations/depositions shall be taken under oath in the presence of a Canadian or U.S. certified court reporter and transcribed and the transcripts made available to all parties. The examination/deposition may be video-taped but the use to which the video tape may be put shall be entirely in the discretion of the Court(s). |

**Appendix "A"**

1        "SNMP Research" or "SNMP RESEARCH" "snmp research" or "egrep -i";

2        The strings *_sr* or *sr_*, and *snmpri*  -

3        The strings *mib, emanate, seclib, snmp.c, snmp.h* etc -



**[CONFIDENTIAL]**



53

File No. 09-CL-7950

## ONTARIO
## SUPERIOR COURT OF JUSTICE- COMMERCIAL LIST

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | THURSDAY, THE 30TH |
| | ) | |
| JUSTICE MORAWETZ | ) | DAY OF JULY, 2009 |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION (the "Applicants")

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

*AMENDED AND RESTATED*
## CLAIMS PROCEDURE ORDER

THIS MOTION, made by the Applicants for an Order substantially in the form included

in the Applicants' Motion Record was heard this day at 330 University Avenue, Toronto,

Ontario.

ON READING the Applicants' Notice of Motion, the affidavit of John Doolittle sworn

on July 24, 2009, the Sixteenth report of Ernst & Young Inc. (the "Monitor") dated July 24,

2009, and on hearing the submissions of counsel for the Applicants, the Monitor, and those other

parties present, no one appearing for the other parties served with the Applicants' Motion

Record, although duly served as appears from the affidavit of service of Marna McGeorge sworn

July 24, 2009, filed:

**SERVICE**

1.      THIS COURT ORDERS that the time for service of the Notice of Motion and the Motion

        Record filed by the Applicants in support of this Motion be and it is hereby abridged such

        that the Motion is properly returnable today.


**MONITOR'S ROLE**

2.      THIS COURT ORDERS that the Monitor, in addition to its prescribed rights and

        obligations under the CCAA (as hereinafter defined) and under the Third Amended and

        Restated Initial Order of this Court dated January 14, 2009 (such Order, as further

        supplemented, amended or varied from time to time, is referred to herein as the "Initial

        Order"), is hereby directed and empowered to take such other actions and fulfill such

        other roles as are authorized by this Order, and that in taking such other actions and in

        fulfilling such other roles, the Monitor shall have the protections given to it in the Initial

        Order and this Order, including without limitation the protections provided in paragraph

        21 of this Order.


**DEFINITIONS**

3.      The following terms shall have the following meanings ascribed thereto:

        (a)      "Bond" means a bond, note or debenture issued pursuant to any of the Bondholder

                 Trust Indentures and any bonds, notes or debentures issued in substitution or

                 replacement thereof;

        (b)      "Bondholder" means a registered or beneficial holder of a Bond;

        (c)      "Bondholder Trustee" means a trustee in respect of any issue of Bonds, being The

                 Bank of New York Mellon with respect to the first three Bondholder Trust

- 3 -

Indentures identified in paragraph 3(d) below and Law Debenture Trust Company of New York with respect to the fourth of such Bondholder Trust Indentures;

(d)    "Bondholder Trust Indentures" means collectively (i) the Indenture dated as of March 28, 2007 governing the 1.75% Convertible Senior Notes due 2012 and the 2.125% Convertible Senior Notes due 2014 issued by Nortel Networks Corporation and guaranteed by Nortel Networks Limited and Nortel Networks Inc.; (ii) the Indenture dated as of July 5, 2006, as supplemented by the First Supplemental Indenture dated as of July 5, 2006, the Second Supplemental Indenture dated as of May 1, 2007, and the Third Supplemental Indenture dated as of May 28, 2008, governing the Floating Rate Senior Notes due 2011, the 10.125% Senior Notes due 2013 and the 10.750% Senior Notes due 2016 issued by Nortel Networks Limited and guaranteed by Nortel Networks Corporation and Nortel Networks Inc.; (iii) the Indenture dated as of November 30, 1988, governing the 6.875% Notes due 2023 issued by Northern Telecom Limited (now Nortel Networks Limited); and (iv) the Indenture dated as of February 15, 1996, governing the 7.875% Notes due 2026 issued by Northern Telecom Capital Corporation (now Nortel Networks Capital Corporation) and guaranteed by Northern Telecom Limited (now Nortel Networks Limited);

(e)    "Business Day" means a day, other than a Saturday or a Sunday, on which banks are generally open for business in Toronto, Ontario;

(f)    "CCAA" means *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended;

- 4 -

(g)    "Chapter 11 Cases" means the proceedings commenced by Nortel Networks Inc. and others in the United States Bankruptcy Court for the District of Delaware, lead case number 09-10138;

(h)    "Charges" means the Charges as defined in the Initial Order, <u>other than</u> the Directors' Charge, as defined in the Initial Order;

(i)    "Claim" means each of:

    (i)    any right of any Person against the Applicants, or any of them, in connection with any indebtedness, liability or obligation of any kind of the Applicants, or any of them, whether liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, unsecured, present, future, known or unknown, by guarantee, surety or otherwise and whether or not such right is executory in nature, including the right or ability of any Person to advance a claim for contribution or indemnity or otherwise with respect to any matter, action, cause or chose in action, whether existing at present or commenced in the future, which indebtedness, liability or obligation (A) is based in whole or in part on facts existing prior to the Filing Date, (B) relates to a time period prior to the Filing Date, or (C) would have been a claim provable in bankruptcy had the Applicants become bankrupt on the Filing Date (each, a "Prefiling Claim", and collectively, the "Prefiling Claims"),

    (ii)    any indebtedness, liability or obligation of any kind arising out of the restructuring, termination, repudiation or disclaimer of any lease, contract,

or other agreement or obligation on or after the Filing Date and whether such restructuring, termination, repudiation or disclaimer took place or takes place before or after the date of this Order (each, a "Restructuring Claim", and collectively, the "Restructuring Claims"); and

(iii)    any right of any Person against the Directors or Officers of the Applicants, or any of them, that relates to a Prefiling Claim or a Restructuring Claim for which the Directors or Officers of the Applicants are by law liable to pay in their capacity as Directors or Officers or in any other capacity, including without limitation, any capacity relating to the administration, management or oversight of any of the pension plans or employee benefit plans administered or sponsored by the Applicants or their subsidiaries (each, a "Director/Officer Claim", and collectively, the "Directors/Officers Claims"),

provided however, that "Claim" shall not include an Excluded Claim;

(j)    "Claims Bar Date" means the Prefiling Claims Bar Date or the Restructuring Claims Bar Date, as the case may be;

(k)    "Claims Resolution Order" has the meaning ascribed to that term in paragraph 17 of this Order;

(l)    "Compensation Claims" has the meaning ascribed to that term in paragraph 3(t)(iii) of this Order;

(m)    "Court" means the Ontario Superior Court of Justice (Commercial List);

(n)     "Creditor" means any Person having a Claim;

(o)     "Creditors' Guide to Completing the Proof of Claim form" means the guide to completing the Proof of Claim form, in substantially the form attached as Schedule "C" hereto;

(p)     "Creditors' Meeting" means the meeting or meetings of Creditors scheduled pursuant to further Order of this Court, or by a Plan if and when filed with this Court;

(q)     "Cross Border Claims Protocol" means a protocol for the resolution of cross-border claims filed in these CCAA proceedings and/or in the Chapter 11 Cases, once approved by the courts presiding in these CCAA proceedings and in the Chapter 11 Cases;

(r)     "Directors" means all current and former directors of the Applicants, and "Director" means any one of them;

(s)     "Directors/Officers Claim" has the meaning ascribed to that term in paragraph 3(i)(iii) of this Order;

(t)     "Excluded Claim" means the following claims, whether liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, unsecured, present, future, known or unknown:

    (i)     claims secured by any of the Charges;

    (ii)    inter-company claims , as between any of the Applicants (and any person appointed in respect of any of the Applicants), and as between any of the

- 7 -

Applicants and any of the Applicants' direct or indirect subsidiaries or affiliates (and any person appointed in respect of such subsidiaries or affiliates of the Applicants), including, for greater certainty, claims by such entities against the Directors and Officers, other than claims by any Joint Venture;

(iii)    claims of (A) any current or former employee of any of the Applicants, for amounts owing to him or her in his or her capacity as a current or former employee of any of the Applicants, including without limitation claims on account of wages, salaries, any other form of compensation (whether sales-based, incentive-based, deferred, retention-based, share-based, or otherwise), severance or termination pay, employee benefits (including, but not limited to, medical and similar benefits, disability benefits, relocation or mobility benefits, and benefits under employee assistance programs), pension and retirement benefits, vacation pay, and employee expenses, (B) any current or former employee of any of the Applicants arising from the administration, management or oversight of any of the pension plans or employee benefit plans administered or sponsored by the Applicants or their subsidiaries, and (C) any Director for compensation for acting as a Director, including without limitation fees, deferred share-based compensation, benefits and Director expenses (collectively, including employee and Director claims of the above nature, "Compensation Claims");

- 8 -

    (iv)    grievances under any collective agreements to which the Applicants, or any of them, are a party; and

    (v)    claims of any Director or Officer for indemnification and/or contribution arising from such Director's or Officer's service to any Applicant;

(u)    "Filing Date" means January 14, 2009, the date of the Initial Order;

(v)    "Initial Order" has the meaning ascribed to that term in paragraph 2 of this Order;

(w)    "Joint Venture" means each of Nortel Networks Netas Telekomunikasyon A.S., L-G Nortel Co. Ltd., Senyang Nortel Telecommunications Co. Ltd., Guangdong-Nortel Telecommunications Equipment Company Ltd., and Nortel Networks Communications Engineering Ltd.;

(x)    "Known Creditors" means:

    (i)    those Creditors which, to the knowledge of the Applicants and the Monitor, were owed monies by any Applicant as of the Filing Date and which monies remain unpaid in whole or in part;

    (ii)    any Person who commenced a legal proceeding against the Applicants, or any of them, which legal proceeding was commenced and served upon an Applicant prior to the Filing Date, and which legal proceeding is known to the Monitor;

    (iii)    any Person who is party to a lease, contract, or other agreement or obligation of any Applicant which was (to the knowledge of the Applicants and the Monitor) restructured, terminated, repudiated or

disclaimed by such Applicant between the Filing Date and the date of this Order; and

    (iv)    any other Creditor actually known to the Applicants and the Monitor as of the date of this Order;

(y)    "Monitor" means Ernst & Young Inc. in its capacity as monitor pursuant to the Initial Order;

(z)    "Notice to Creditors" means the notice to Creditors for publication in substantially the form attached as Schedule "A" hereto;

(aa)    "Officers" means all current and former officers of the Applicants, and "Officer" means any one of them;

(bb)    "Person" includes any individual, partnership, joint venture, trust, corporation, unlimited liability company, unincorporated organization, government body or agency or instrumentality thereof, or any other juridical entity howsoever designated or constituted;

(cc)    "Plan" means any plan of compromise and arrangement by one or more of the Applicants, if and when filed and approved by this Court, as revised, amended, modified or supplemented from time to time in accordance with its terms;

(dd)    "Prefiling Claim" has the meaning ascribed to that term in paragraph 3(i)(i) of this Order;

(ee)    "Prefiling Claims Bar Date" means 4:00 p.m. (prevailing Eastern Time) on September 30, 2009;

(ff)     "Proof of Claim" means the form of Proof of Claim in substantially the form attached as Schedule "B" hereto;

(gg)     "Proof of Claim Document Package" means a document package that includes a copy of the Notice to Creditors, the Creditors' Guide to Completing the Proof of Claim form, a Proof of Claim, and such other materials as the Monitor may consider appropriate or desirable;

(hh)     "Proven Claim" means a Claim as finally determined, including for the purposes of voting and distribution under the Plan;

(ii)     "Restructuring Claim" has the meaning ascribed to that term in paragraph 3(i)(ii) of this Order; and

(jj)     "Restructuring Claims Bar Date" means, in respect of each Restructuring Claim and each Person having a Restructuring Claim, 4:00 p.m. (prevailing Eastern Time) on the later of (i) September 30, 2009, and (ii) the date that is 30 days after the date on which the Monitor sends a Proof of Claim Document Package to the Person with respect to a Restructuring Claim that arose or that may have arisen by virtue of the restructuring, termination, repudiation or disclaimer of any lease, contract, or other agreement or obligation on or after the Filing Date.

## NOTICE TO CREDITORS

4.     THIS COURT ORDERS that:

- 11 -

(a)    the Monitor shall no later than five (5) days following the making of this Order, post a copy of the Proof of Claim Document Package on its website at "www.ey.com/ca/nortel";

(b)    the Monitor shall no later than five (5) days following the making of this Order, send on behalf of the Applicants to each Bondholder Trustee a copy of the Proof of Claim Document Package;

(c)    the Monitor shall no later than ten (10) days following the making of this Order, send on behalf of the Applicants to each of the Known Creditors (for which it has an address) a copy of the Proof of Claim Document Package, provided however that the Monitor is not required to send Proof of Claim Document Packages to Bondholders or to the current or former employees of any Applicant;

(d)    the Monitor shall cause to be published, on or before August 15, 2009, the Notice to Creditors in *The Globe and Mail* (National Edition) and *The Wall Street Journal* (national and global editions);

(e)    with respect to Restructuring Claims arising from the restructuring, termination, repudiation or disclaimer of any lease, contract, or other agreement or obligation, the Monitor shall send to the counterparty(ies) to such lease, contract, or other agreement or obligation a Proof of Claim Document Package no later than ten (10) days following the time that the Monitor becomes aware of the restructuring, termination, repudiation or disclaimer of any such lease, contract, or other agreement or obligation; and

- 12 -

(f)     the Monitor shall, provided such request is received by the Monitor prior to the applicable Claims Bar Date, deliver as soon as reasonably possible following receipt of a request therefor a copy of the Proof of Claim Document Package to any Person claiming to be a Creditor and requesting such material.

5.     THIS COURT ORDERS that neither the Applicants nor the Monitor are under any obligation to give notice to or deal with any Person other than the Creditor holding a Claim, and without limitation shall have no obligation to give notice to or deal with any Person having a security interest in the Claim (including the holder of a security interest created by way of a pledge or a security interest created by way of an assignment of the Claim), and such Persons shall be bound by any notices given to the Creditor and any steps taken in respect of such Claim in accordance with this Order.

6.     THIS COURT ORDERS that a separate process shall be established by further Order of this Court, to deal with Compensation Claims, and that this Order shall be without prejudice to any matter relating to any Compensation Claims now existing or arising in the future, and without prejudice to any claims that now exist or that may in the future exist against the Ontario Pension Benefits Guarantee Fund.

**CLAIMS BAR DATES**

7.     THIS COURT ORDERS that Proofs of Claim with respect to (i) a Prefiling Claim, shall be filed with the Monitor on or before the Prefiling Claims Bar Date, (ii) a Restructuring Claim, shall be filed with the Monitor on or before the Restructuring Claims Bar Date, and (iii) a Directors/Officers Claim, shall be filed on or before the Prefiling Claims Bar Date, except to the extent that the Directors/Officers Claim relates to a Restructuring

- 13 -

Claim, in which case such Directors/Officers Claim shall be filed with the Monitor on or before the applicable Restructuring Claims Bar Date.

8.    THIS COURT ORDERS that any Creditor that does not file a Proof of Claim as provided for herein such that such Proof of Claim is received by the Monitor on or before the applicable Claims Bar Date (a) shall be and is hereby forever barred from making or enforcing any Claim against the Applicants, or any of them, or the Directors or Officers, or any of them; (b) shall not be entitled to vote at the Creditors' Meeting in respect of the Plan or to receive any distribution thereunder; and (c) shall not be entitled to any further notice in, and shall not be entitled to participate as a creditor in, these proceedings.

**PROOFS OF CLAIM**

9.    THIS COURT ORDERS that each Creditor shall file a separate Proof of Claim for each Applicant against whom it asserts a Claim and, if the Claim is also being asserted against the Directors or Officers of that Applicant, such Claim against those Directors or Officers shall be included in the same Proof of Claim.

10.    THIS COURT ORDERS that each Creditor shall include any and all Claims it asserts against an Applicant in a single Proof of Claim, provided however that where a Creditor has taken an assignment or transfer of a Claim after the Filing Date, that Creditor shall file a separate Proof of Claim for each such assigned or transferred Claim.

11.    THIS COURT ORDERS that where a Claim against any Applicant is based on that Applicant's guarantee of the repayment of a debt of another Applicant or the debt of any other Person, the Proof of Claim in respect of such Claim shall clearly state that it is based on such a guarantee, and that where any Applicant has guaranteed the repayment of

- 14 -

the debt of any other Applicant, a Proof of Claim in respect of that debt shall be filed against each such Applicant.

12.    THIS COURT ORDERS that if any Claim arose in a currency other than Canadian dollars, then the Creditor making the Claim shall complete its Proof of Claim indicating the amount of the Claim in such currency, rather than in Canadian dollars or any other currency. The Monitor shall subsequently calculate the amount of such Claim in Canadian dollars, using the Reuters closing rate on January 13, 2009, without prejudice to the ability of the Applicants to utilize a different exchange rate in any Plan.

13.    THIS COURT ORDERS that each Bondholder Trustee is authorized and directed to file one or more Proofs of Claim on or before the Prefiling Claims Bar Date in respect of all of the Bonds for which such Bondholder Trustee acts, indicating the amount owing on an aggregate basis for each separate series of Bonds issued under each Bondholder Trust Indenture. Notwithstanding any other provisions of this Order, Bondholders are not required to file individual Proofs of Claim in respect of Claims relating solely to the debt evidenced by their Bonds. The Applicants and the Monitor may disregard any Proof of Claim filed by any individual Bondholder claiming the debt evidenced by the Bonds, or any of them, and such Proofs of Claims shall be ineffective for all purposes. The process for determining each individual Bondholder's Claim for voting purposes with respect to the Plan will be established by further order of the Court.

14.    THIS COURT ORDERS that the Monitor may, where it is satisfied that a Claim has been adequately filed, waive strict compliance with the requirements of this Order as to completion and execution of Proofs of Claim.

- 15 -

**REVIEW OF PROOFS OF CLAIM**

15.    THIS COURT ORDERS that the Monitor, in consultation with the Applicants, shall

review all Proofs of Claims that are filed on or before the applicable Claims Bar Date. At

any time, the Monitor or the Applicants may request additional information from a

Creditor with respect to a Claim, and the Monitor may request that the Creditor file a

revised Proof of Claim.

16.    THIS COURT ORDERS that a Claim shall not be a Proven Claim unless and until the

Claim has been allowed or otherwise finally determined in accordance with the claims

dispute and resolution procedures to be set out in the Claims Resolution Order and the

Cross Border Claims Protocol.

**DETERMINATION OF PROVEN CLAIM**

17.    THIS COURT ORDERS that the Proven Claim of a Creditor shall be as allowed or as

finally determined in accordance with the other forms and claim procedures to be

authorized by further Order of this Court (the "Claims Resolution Order") and in the

Cross Border Claims Protocol, provided however that no Claim may be allowed or may

be established as a Proven Claim unless a Proof of Claim with respect to that Claim is

filed in accordance with this Order, on or prior to the applicable Claims Bar Date.

**NOTICE OF TRANSFEREES**

18.    THIS COURT ORDERS that neither the Applicants nor the Monitor shall be obligated to

give notice to or to otherwise deal with a transferee or assignee of a Claim as the Creditor

in respect thereof unless and until (i) actual written notice of transfer or assignment,

together with satisfactory evidence of such transfer or assignment, shall have been

received by the Monitor, and (ii) the Monitor shall have acknowledged in writing such

transfer or assignment, and thereafter such transferee or assignee shall for the purposes hereof constitute the "Creditor" in respect of such Claim. Any such transferee or assignee of a Claim, and such Claim, shall be bound by any notices given or steps taken in respect of such Claim in accordance with this Order prior to the written acknowledgement by the Monitor of such transfer or assignment.

19.    THIS COURT ORDERS that if the holder of a Claim has transferred or assigned the whole of such Claim to more than one Person or part of such Claim to another Person or Persons, such transfer or assignment shall not create a separate Claim or Claims and such Claim shall continue to constitute and be dealt with as a single Claim notwithstanding such transfer or assignment, and the Applicants and the Monitor shall in each such case not be bound to acknowledge or recognize any such transfer or assignment and shall be entitled to give notices to and to otherwise deal with such Claim only as a whole and then only to and with the Person last holding such Claim in whole as the Creditor in respect of such Claim. Provided that a transfer or assignment of the Claim has taken place in accordance with paragraph 18 of this Order and the Monitor has acknowledged in writing such transfer or assignment, the Person last holding such Claim in whole as the Creditor in respect of such Claim may by notice in writing to the Monitor direct that subsequent dealings in respect of such Claim, but only as a whole, shall be with a specified Person and, in such event, such Creditor, such transferee or assignee of the Claim and the whole of such Claim shall be bound by any notices given or steps taken in respect of such Claim by or with respect to such Person in accordance with this Order.

20.    THIS COURT ORDERS that the transferee or assignee of any Claim (i) shall take the Claim subject to the rights and obligations of the transferor/assignor of the Claim, and

subject to the rights of any Applicant against any such transferor or assignor, including any rights of set-off which any Applicant had against such transferor or assignor, and (ii) cannot use any transferred or assigned Claim to reduce any amount owing by the transferee or assignee to any Applicant, whether by way of set off, application, merger, consolidation or otherwise.

## PROTECTIONS FOR MONITOR

21. THIS COURT ORDERS that (i) in carrying out the terms of this Order, the Monitor shall have all of the protections given to it by the CCAA and the Initial Order or as an officer of this Court, including the stay of proceedings in its favour, (ii) the Monitor shall incur no liability or obligation as a result of the carrying out of the provisions of this Order, (iii) the Monitor shall be entitled to rely on the books and records of the Applicants, and any information provided by the Applicants, all without independent investigation, and (iv) the Monitor shall not be liable for any claims or damages resulting from any errors or omissions in such books, records or information.

## DIRECTIONS

22. THIS COURT ORDERS that any Applicant or the Monitor may, at any time, and with such notice as this Court may require, seek directions from the Court with respect to this Order and the Claims process set out herein, including the forms attached as Schedules hereto.

- 18 -

**SERVICE AND NOTICE**

23.    THIS COURT ORDERS that the Monitor or the Applicants, as the case may be, are at

liberty to deliver the Proof of Claim Document Package, and any letters, notices or other

documents to Creditors or other interested Persons, by forwarding true copies thereof by

prepaid ordinary mail, courier, personal delivery or electronic or digital transmission to

such Persons at the address as last shown on the records of the Applicants and that any

such service or notice by courier, personal delivery or electronic or digital transmission

shall be deemed to be received on the next Business Day following the date of

forwarding thereof, or if sent by prepaid ordinary mail, on the fourth Business Day after

mailing.

24.    THIS COURT ORDERS that any notice or other communication (including, without

limitation, Proofs of Claim) to be given under this Order by a Creditor to the Monitor

shall be in writing in substantially the form, if any, provided for in this Order and will be

sufficiently given only if given by prepaid ordinary mail, courier, personal delivery or

electronic or digital transmission addressed to:

> ERNST & YOUNG INC.
> Court-appointed Monitor of Nortel Networks Corporation & others
> 222 Bay Street, Suite 1600
> Toronto, Ontario
> Canada M5K 1J7
>
> Attention:    Nortel Claims
> Telephone:    1-416-943-4439 or 1-866-942-7177
> E-mail         nortel.monitor@ca.ey.com
> Fax:            1-416-943-2808

Any such notice or other communication by a Creditor shall be deemed received only

upon actual receipt thereof during normal business hours on a Business Day.

- 19 -

**MISCELLANEOUS**

25.    THIS COURT ORDERS AND REQUESTS the aid and recognition of any court of any

judicial, regulatory or administrative body in any province or territory of Canada

(including the assistance of any court in Canada pursuant to Section 17 of the CCAA)

and any court or any judicial, regulatory or administrative body of the United States of

America, the United Kingdom, the French Republic, the State of Israel, and the Republic

- 20 -

of Korea, and of any other nation or state, to act in aid of and to be complementary to this

Court in carrying out the terms of this Order.

ENTERED AT / INSCRIT A TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

OCT 0 7 2009

PER / PAR: N

SCHEDULE "A"

## NOTICE TO CREDITORS
### of NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION
(hereinafter referred to as the "Debtors")

**RE:  NOTICE OF CLAIMS PROCEDURE FOR THE DEBTORS PURSUANT TO THE** *COMPANIES' CREDITORS ARRANGEMENT ACT* **(the "CCAA")**

**PLEASE TAKE NOTICE** that this notice is being published pursuant to an Order of the Superior Court of Justice of Ontario made July 30, 2009 (the "Order"). Pursuant to the Order, Proof of Claim packages will be sent to creditors by mail, on or before August 15, 2009, if those creditors are known to the Debtors, and if the Debtors have a current address.  Creditors may also obtain the Order and a Proof of Claim package from the website of Ernst & Young Inc., Court-appointed monitor of the Debtors, at "www.ey.com/ca/nortel", or by contacting the Monitor by telephone (1-416-943-4439 or 1-866-942-7177) or by fax (1-416-943-2808).

Proofs of Claim must be submitted to the Monitor for any claim against any Debtor, whether unliquidated, contingent or otherwise, or a claim against any current or former officer or director of the Debtors, or any of them, in each case where the claim (i) arose prior to January 14, 2009, or (ii) arose on or after January 14, 2009 as a result of the restructuring, termination, repudiation or disclaimer of any lease, contract, or other agreement or obligation.  Please consult the Proof of Claim package for more details.

**Completed Proofs of Claim must be received by the Monitor by 4:00 p.m. (prevailing Eastern Time) on the applicable Claims Bar Date, as set out in the Order.  The Claims Bar Date for most claims is SEPTEMBER 30, 2009.  It is your responsibility to ensure that the Monitor receives your Proof of Claim by the applicable Claims Bar Date.**

**Certain Creditors are exempted from the requirement to file a Proof of Claim.  Among those creditors who do not need to file a Proof of Claim are (i) current or former employees of the Debtors, for amounts owing to him or her in his or her capacity as a current or former employee of any of the Debtors, and (ii) individual bondholders in respect of Claims relating solely to the debt evidenced by their bonds.  Please consult the Claims Procedure Order made on July 30, 2009 for details with respect to these and other exemptions.**

**PLEASE NOTE that these procedures apply ONLY to claims filed against the Debtors in the CCAA proceedings. Several of the Debtors' affiliates are subject to creditor protection proceedings in other jurisdictions, including in the United States.  Separate proceedings and deadlines have been or will be established in those cases for the filing of claims.  With respect to the U.S. proceedings, a general bar date of September 30, 2009 at 4:00 p.m. (prevailing Eastern Time) has been established by the U.S. Court.  If you believe you have claims against the U.S. Debtors, any such claims must be filed in, and only in, the U.S.**

- 2 -

proceedings with the U.S. Debtors' claims agent. A list of the U.S. Debtors and procedures for filing such claims in the U.S. Proceedings can be found by going to the following internet link: www.chapter11.epiqsystems.com/nortel.

**CLAIMS WHICH ARE NOT RECEIVED BY THE APPLICABLE CLAIMS BAR DATE WILL BE BARRED AND EXTINGUISHED FOREVER.**

**DATED** at Toronto this ● day of ●, 2009.

## SCHEDULE "B"

**(form of Proof of Claim attached)**

- 2 -

## SCHEDULE "C"

## GUIDE TO COMPLETING THE PROOF OF CLAIM FORM

This Guide has been prepared to assist Creditors in filling out the Proof of Claim form with respect to the Debtors listed in Section 1, below. If you have any additional questions regarding completion of the Proof of Claim form, please consult the Monitor's website at www.ey.com/ca/nortel or contact the Monitor, whose contact information is shown below.

Additional copies of the Proof of Claim form may be found at the Monitor's website address noted above.

Please note that this is a guide only, and that in the event of any inconsistency between the terms of this guide and the terms of the Claims Procedure Order made on July 30, 2009, the terms of the Claims Procedure Order will govern.


**Section 1 – Name of Debtor:**
- A separate Proof of Claim form must be filed for each Debtor against whom a claim is being asserted.
- The following is a list of Debtor companies against whom a claim may be asserted in this claims process:
  - Nortel Networks Corporation
  - Nortel Networks Limited
  - Nortel Networks Global Corporation
  - Nortel Networks International Corporation
  - Nortel Networks Technology Corporation.
- Please note that these procedures apply ONLY to claims filed against the five Debtor companies listed above. Several of the Debtors' affiliates are subject to creditor protection proceedings in other jurisdictions, including in the United States. Separate proceedings and deadlines have been or will be established in those cases for the filing of claims. With respect to the U.S. proceedings, a general bar date of September 30, 2009 at 4:00 p.m. (prevailing Eastern Time) has been established by the U.S. Court. If you believe you have claims against the U.S. Debtors,[1] any such claims must be filed in, and only in, the U.S. proceedings with the U.S. Debtors' claims agent. Procedures for filing such claims in the U.S. Proceedings can be found by going to the following internet link: www.chapter11.epiqsystems.com/nortel.

---

[1] The U.S. Debtors are: Nortel Networks Inc.; Nortel Networks Capital Corporation; Nortel Altsystems Inc.; Nortel Altsystems International Inc.; Xros Inc.; Sonoma Systems; Qtera Corporation; CoreTek, Inc.; Nortel Networks Applications Management Solutions Inc.; Nortel Networks Optical Components Inc.; Nortel Networks HPOCS Inc.; Nortel Networks (CALA) Inc.; Architel Systems (U.S.) Corporation; Nortel Networks International Inc.; Northern Telecom International Inc.; and Nortel Networks Cable Solutions Inc.

- 3 -

## Section 2 – Original Creditor

- A separate Proof of Claim form must be filed by each legal entity or person asserting a claim against a Debtor listed in Section 1.
- The Creditor shall include any and all Claims it asserts against a single Debtor in a single Proof of Claim[2].
- The full legal name of the Creditor must be provided.
- If the Creditor operates under a different name, or names, please indicate this in a separate schedule in the supporting documentation.
- If the Claim has been assigned or transferred to another party, Section 3 must also be completed.
- Unless the Claim is assigned or transferred, all future correspondence, notices, etc. regarding the Claim will be directed to the address and contact indicated in this section.
- Certain Creditors are exempted from the requirement to file a Proof of Claim. Among those creditors who do not need to file a Proof of Claim are (i) current or former employees of the Debtors, for amounts owing to him or her in his or her capacity as a current or former employee of any of the Debtors, and (ii) individual bondholders in respect of Claims relating solely to the debt evidenced by their bonds. Please consult the Claims Procedure Order made on July 30, 2009 for details with respect to these and other exemptions.

## Section 3 – Assignee

- If the Creditor has assigned or otherwise transferred its Claim, then Section 3 must be completed.
- The full legal name of the Assignee must be provided.
- If the Assignee operates under a different name, or names, please indicate this in a separate schedule in the supporting documentation.
- If the Monitor is satisfied that an assignment or transfer has occurred, all future correspondence, notices, etc. regarding the Claim will be directed to the Assignee at the address and contact indicated in this section.

## Section 4 – Amount of Claim of Creditor against Debtor

- Indicate the amount the Debtor / Officer(s) or Director(s) was, and still is indebted to the Creditor

*Currency, Original Currency Amount*

- The amount of the Claim must be provided in the currency in which it arose.
- Indicate the appropriate currency in the Currency column.
- If the Claim is denominated in multiple currencies, use a separate line to indicate the Claim amount in each such currency. If there are insufficient lines to record these amounts, attach a separate schedule indicating the required information.

---

[2] Paragraph 10 of the Claims Procedure Order made on [DATE] provides that: "THIS COURT ORDERS that each Creditor shall include any and all Claims it asserts against an Applicant in a single Proof of Claim, provided however that where a Creditor has taken an assignment or transfer of a Claim after the Filing Date, that Creditor shall file a separate Proof of Claim for each such assigned or transferred Claim."

- 4 -

- Claims denominated in a currency other than Canadian dollars will be converted into Canadian dollars by the Monitor using the exchange rates set out in Appendix A.

*Secured*
- Check the Secured box ONLY if the Claim recorded on that line is secured. Do not check this box if your Claim is unsecured
- If the value of the collateral securing your Claim is less than the amount of your Claim, enter the shortfall portion on a separate line as an unsecured claim
- Evidence supporting the security you hold must be submitted with the Proof of Claim form. Provide full particulars of the nature of the security, including the date on which the security was given and the value you attribute to the collateral securing your Claim. Attach a copy of all related security documents.

*S. 136 Priority*
- Check this box ONLY if the amount of your Claim has a right to priority pursuant to Section 136 of the Bankruptcy and Insolvency Act (Canada) (the "BIA") or would be entitled to claim such a priority if this Proof of Claim were being filed in accordance the provisions of the BIA.
- If a priority claim is being asserted, please provide details as to the nature of the claim being asserted, and the basis for priority on which you rely.

*Restructuring*
- Check this box ONLY if the amount of the Claim against the Debtor arose out of the restructuring, termination, repudiation or disclaimer of a lease, contract, or other agreement or obligation on or after January 14, 2009.

*Officers and Directors*
- Check this box only if the Claim you are making is also being asserted against a current or former officer or director of the Debtor.
- You must identify the individual officer(s) or director(s) against whom you are asserting the Claim.


**Section 5 – Documentation**
- Attach to the claim form all particulars of the Claim and supporting documentation, including amount, description of transaction(s) or agreement(s) giving rise to the Claim, name of any guarantor which has guaranteed the Claim[3], and amount of invoices, particulars of all credits, discounts, etc. claimed, description of the security, if any, granted by the debtor or any officer or director to the Creditor and estimated value of such security, and particulars of any restructuring claim.


**Section 6 – Certification**
- The person signing the Proof of Claim form should

---

[3] If the guarantor is another of the Debtors listed in Section 1, or one of the U.S. Debtors, a Proof of Claim against that Debtor or U.S. Debtor, as the case may be, must also be filed in these Canadian Proceedings or (in the case of U.S. Debtors) in the U.S. proceedings.

- 5 -

    o   Be the Creditor, or authorized Representative of the Creditor.
    o   Have knowledge of all the circumstances connected with this Claim.
- By signing and submitting the Proof of Claim, the Creditor is asserting the claim against the Debtor and / or the indicated officer(s) or director(s)


## Section 7 – Filing of Claim

- This Proof of Claim **must be received** by the Monitor by no later than 4:00 p.m. (prevailing Eastern Time) on SEPTEMBER 30, 2009. Proofs of Claim should be send by prepaid ordinary mail, courier, personal delivery or electronic or digital transmission to the following address:

    Ernst & Young Inc.
    Court-appointed Monitor of Nortel Networks Corporation & others
    222 Bay Street, Suite 1600
    Toronto, Ontario
    Canada M5K 1J7
    Attention:    Nortel Claims

    Telephone:   1-866.942-7177  or  416-943-4439
    E-mail:         Nortel.monitor@ca.ey.com
    Fax:             416-943-2808

**Failure to file your Proof of Claim so that it is received by the Monitor by 4:00 p.m., on the Claims Bar Date of September 30, 2009 will result in your claim being barred and you will be prevented from making or enforcing a Claim against the Debtor or any current or former officer or director of any of the Debtors. In addition, you shall not be entitled to further notice in and shall not be entitled to participate as a creditor in these proceedings.**

- 6 -

## Appendix A

Currency conversion factors
Source: Reuters, January 14, 2009

**This Appendix is for information only. You are to make your claim in the currency in which it arose. The Monitor will calculate all currency conversions.**

|     |                      | CAD per unit of Currency |
| --- | -------------------- | ------------------------ |
| CAD | Canadian Dollar      | 1                        |
| USD | United States Dollar | 1.22025                  |
| EUR | Euro                 | 1.6170753                |
| GBP | United Kingdom: Pnd Ster | 1.77741615           |
| JPY | Japan: Yen           | 0.01362647               |

| Code | Currency | CAD per unit | Code | Currency | CAD per unit |
| --- | --- | --- | --- | --- | --- |
| AED | United Arab Emir.: Dirham | 0.33221709 | LTL | Lithuanian Litas | 0.46830925 |
| ARS | Argentine Peso | 0.35410621 | LVL | Latvian Lats | 2.29456567 |
| AUD | Australian Dollar | 0.82275356 | MAD | Moroccan Dirham | 0.14500201 |
| BBD | Barbados Dollar | 0.61319095 | MXN | Mexican Peso | 0.08842392 |
| BDT | Bangladeshi Taka | 0.01772331 | MYR | Malaysian Ringgit | 0.34156754 |
| BGN | Bulgaria: New Lev | 0.82683968 | NGN | Nigerian Naira | 0.00816494 |
| BOB | Bolivian Boliviano | 0.17345416 | NOK | Norwegian Krone | 0.17167276 |
| BRL | Brazilian Real | 0.52726527 | NZD | New Zealand Dollar | 0.6711375 |
| CHF | Swiss Franc | 1.09468915 | OMR | Oman: Rial Omani | 3.16980987 |
| CLP | Chilean Peso | 0.0019827 | PAB | Panama: Balb0A | 1.22025 |
| CNY | China: Yuan Renminbi | 0.17854268 | PEN | Peru: Nuevo Sol | 0.3889243 |
| COP | Colombian Peso | 0.00054867 | PGK | Papua New Guinea Kina | 0.4671117 |
| CRC | Costa Rican Colon | 0.00219273 | PHP | Philippine Peso | 0.02592415 |
| CZK | Czech Koruna | 0.06004872 | PKR | Pakistan Rupee | 0.015414 |
| DKK | Danish Krone | 0.21701242 | PLN | Poland: Zloty | 0.39077386 |
| DOP | Dominican Peso | 0.03444601 | PYG | Paraguay: Guarani | 0.0002498 |
| DZD | Algerian Dinar | 0.01682672 | QAR | Qatar: Qatari Rial | 0.33516446 |
| EEK | Estonian Kroon | 0.10334226 | RON | New Romania Leu | 0.37703348 |
| EGP | Egyptian Pound | 0.22086973 | RUB | Russian Ruble | 0.03847246 |
| FJD | Fiji Dollar | 0.67418812 | SAR | Saudi Arabia: Saudi Riyal | 0.32539566 |
| GTQ | Guatemala: Quetzal | 0.15495238 | SEK | Swedish Krona | 0.14788041 |
| HKD | Hong Kong Dollar | 0.15732068 | SGD | Singapore Dollar | 0.82052921 |
| HUF | Hungary: Forint | 0.00583154 | THB | Thailand: Baht | 0.03495417 |
| IDR | Indonesia: Rupiah | 0.00010993 | TND | Tunisian Dinar | 0.89144172 |
| ILS | Israel: Shekel | 0.31449742 | TRY | New Turkish Lira | 0.76914592 |
| INR | Indian Rupee | 0.02499872 | TTD | Trinidad & Tobago Dollar | 0.19524 |
| ISK | Iceland Krona | 0.00966994 | UAH | Ukraine: Hryvnia | 0.13945714 |
| JMD | Jamaican Dollar | 0.01515838 | UYU | Uruguay: Peso | 0.05016444 |
| JOD | Jordanian Dinar | 1.72084329 | VEF | Bolivar Fuerte | 0.56827178 |
| KPW | North Korean Won | 0.00853023 | VND | Vietnam: Dong | 0.00006981 |
| KRW | Republic Of Korea: Won | 0.00090543 | XCD | East Caribbean Dollar | 0.4587406 |
| KWD | Kuwaiti Dinar | 4.28157891 | ZAR | South Africa: Rand | 0.12249969 |
| LBP | Lebanese Pound | 0.00080945 | ZMK | Zambia: Kwacha | 0.00024601 |
| LKR | Sri Lanka Rupee | 0.01072276 |  |  |  |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, C. C-36, AS AMENDED
AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION
APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, C. C-36, AS AMENDED

Court File No: 09-CL-7950

---

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

Proceeding commenced at Toronto

---

## CLAIMS PROCEDURE ORDER

---

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel:  (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte  LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com

Fax: (416) 216-3930

Lawyers for the Applicants



File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE- COMMERCIAL LIST**

|                          |   |                          |
|--------------------------|---|--------------------------|
| THE HONOURABLE MR.       | ) | THURSDAY, THE 16TH       |
|                          | ) |                          |
| JUSTICE MORAWETZ         | ) | DAY OF SEPTEMBER, 2010   |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION (the "Applicants")

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**CLAIMS RESOLUTION ORDER**

THIS MOTION, made by the Applicants for an Order substantially in the form included
in the Applicants' Amended Motion Record, was heard this day at 393 University Avenue,
Toronto, Ontario.

ON READING the Applicants' Notice of Motion dated June 8, 2010, the Applicant's
Amended Notice of Motion dated September 10, 2010, the affidavit of John Doolittle sworn on
June 7, 2010, the supplemental affidavit of John Doolittle dated September 10, 2010, the forty-
eighth report of the Monitor dated June 8, 2010, the fifty-third report of the Monitor dated
September 13, 2010, and on hearing the submissions of counsel for the Applicants, the Monitor,
and those other parties present, no one appearing for the other parties served with the Applicants'

1

Motion Record and the Applicants' Amended Motion Record, although duly served as appears from the affidavit of service of Marna McGeorge sworn September 13, 2010, filed:

**SERVICE**

1.    THIS COURT ORDERS that the time for service of the Notice of Motion, the Amended Notice of Motion and the Motion Records filed by the Applicants in support of this Motion be and it is hereby abridged and validated such that the Motion is properly returnable today.

**PURPOSE OF THIS ORDER**

2.    THIS COURT ORDERS that this Order is the "Claims Resolution Order" as defined in the Amended and Restated Claims Procedure Order dated July 30, 2009 made in these proceedings, as such Claims Procedure Order may be further amended from time to time by order of this Court (the "Claims Procedure Order"), and that the purpose of this Order, together with the Cross-Border Claims Protocol, is to establish mechanisms to determine the Proven Claims of Creditors, including Protocol Claims.

3.    THIS COURT ORDERS that this Order shall apply to all Claims as defined in and governed by the Claims Procedure Order, including Protocol Claims.  For the avoidance of doubt, the provisions of this Order dealing with Specific Claims, Same-Creditor Claims and Overlapping Claims and the reporting requirement in paragraph 11 hereof, shall not be construed as limited to Claims as defined in the Claims Procedure Order.

4.    THIS COURT ORDERS that in the event of a conflict between the terms of this Order and the terms of the Claims Procedure Order, the terms of this Order shall govern.

2

- 3 -

**MONITOR'S ROLE**

5.      THIS COURT ORDERS that the Monitor, in addition to its prescribed rights and

obligations pursuant to the CCAA, the Initial Order, the Order of this Court made on

August 14, 2009, the Claims Procedure Order and the Cross-Border Claims Protocol, is

hereby directed and empowered to take such other actions and fulfill such other roles as

are authorized by this Order and the Cross-Border Claims Protocol, and that in taking

such other actions and in fulfilling such other roles, the Monitor shall have the

protections given to it in the Initial Order, the August 14, 2009 Order, the Claims

Procedure Order and this Order, including without limitation the protections provided in

paragraph 24 of this Order.

**DEFINITIONS**

6.      Unless otherwise defined herein, all capitalized terms used in this Order shall have the

meanings ascribed to those terms in the Claims Procedure Order.   In addition, the

following terms shall have the following meanings ascribed thereto:

(a)     "Bond Claims" means any claims arising from or related to the Bondholder Trust

        Indentures including claims filed by the indenture trustees;

(b)     "Chapter 11 Cases" means the reorganization cases under chapter 11 of the United

        States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, commenced by the U.S.

        Debtors in the U.S. Court, and consolidated under Case No. 09-10138 (KG).

(c)     "Claims Officer" means the person or persons so designated by the Monitor and

        approved by the Court, or designated by the Court, as the case may be;

DOCSTOR: 2010978\3

(d)     "Claims Procedure Order" has the meaning ascribed to that term in paragraph 2 of this Order;

(e)     "Cross-Border Claims Protocol" means the Cross-Border Claims Protocol approved by this Court and the U.S. Court on September 16, 2010, as such Cross Border Claims Protocol may be amended from time to time in accordance with its terms;

(f)     "Dispute Notice" means a written notice to the Monitor, in substantially the form attached as Schedule "B" hereto, delivered to the Monitor by a Creditor who has received a Notice of Disallowance, of its intention to dispute such Notice of Disallowance;

(g)     "EMEA Debtor" means Nortel Networks S. A. (in Administration) ("NNSA") and the "EMEA Debtors" as defined in that certain Interim Funding and Settlement Agreement dated June 9, 2009 ("IFSA") among the Applicants, the U.S. Debtors, the Joint Administrators (as defined in the IFSA) and as acceded to by NNSA;

(h)     "Notice of Disallowance" means a notice, in substantially the form attached as Schedule "A" hereto, advising a Creditor that the Monitor, in consultation with the Applicants, has revised or disallowed all or part of such Creditor's Claim set out in the Creditor's Proof of Claim;

(i)     "Overlapping Claims" shall have the meaning ascribed to that term in the Cross-Border Claims Protocol;

4

- 5 -

(j)    "Protocol Claims" means the Claims governed by the Cross-Border Claims Protocol, being Overlapping Claims and Same-Creditor Claims;

(k)    "Proven Claim" has the meaning ascribed to that term in paragraph 12 of this Order;

(l)    "Same-Creditor Claims" shall have the meaning ascribed to that term in the Cross-Border Claims Protocol;

(m)    "Secured Claim" means any Claim or portion thereof that is secured by a security interest, pledge, mortgage, lien, hypothec or charge on any property of any Applicant, or any Claim of a Secured Creditor as defined in the CCAA, but only to the extent of the value of the security in respect of the Claim;

(n)    "Specific Claims" shall have the meaning ascribed to that term in paragraph 7 of this Order;

(o)    "U.S. Court" means the United States Bankruptcy Court for the District of Delaware, acting in the Chapter 11 Cases; and

(p)    "U.S. Debtors" means Nortel Networks Inc.; Nortel Networks Capital Corporation; Nortel Altsystems Inc.; Nortel Altsystems International Inc.; Xros Inc.; Sonoma Systems; Qtera Corporation; CoreTek, Inc.; Nortel Networks Applications Management Solutions Inc.; Nortel Networks Optical Components Inc.; Nortel Networks HPOCS Inc.; Architel Systems (U.S.) Corporation; Nortel Networks International Inc.; Northern Telecom International Inc.; Nortel

Networks Cable Solutions Inc.; and Nortel Networks (CALA) Inc., and "U.S. Debtor" means any one of them.

## SPECIFIC CLAIMS

7.    THIS COURT ORDERS that, in addition to complying with the requirements set forth in paragraph 8 below, the Monitor or the Applicants, as applicable, shall seek and obtain this Court's approval prior to the acceptance, stipulation or settlement of any of the following categories of claims or related procedures as noted below (each, a "Specific Claim", and collectively "Specific Claims"):

(a)    U.K. pension claims (including but not limited to, funding guarantee claims, insolvency guarantee claims, Financial Support Direction liability claims and claims by Nortel Networks U.K. Pension Trust Limited, the U.K. Pension Protection Fund, the Pensions Regulator under The Pensions Act 2004 (U.K.) and the joint administrators of the various EMEA Debtors related to the foregoing);

(b)    claims in respect of the determination of liabilities and funded status of the Nortel Networks Negotiated Pension Plan and the Nortel Networks Limited Managerial and Non-Negotiated Pension Plan and in respect of the Ontario Pension Benefits Guarantee Fund;

(c)    Bond Claims;

(d)    the following employee-related matters: (i) any procedure, protocol or methodology for calculating termination and severance pay claims and any process for any resolution of disagreements regarding contract obligations and

6

qualifications for eligibility of such claims (including the calculation of benefits or liabilities), (ii) the actuarial methods and assumptions that will be used to determine non-registered pension claims, LTD claims and benefit claims and any process for any resolution of disagreements regarding the interpretation or application of plan criteria for such claims (including the calculation of benefits or liabilities), (iii) the form of a an order approving procedures related to Compensation Claims (including, proposed procedures relating to any bar date for claims of employees and retirees), (iv) deferred compensation claims relating to the Nortel Networks U.S. Deferred Compensation Plan (to the extent not otherwise addressed by the Cross-Border Claims Protocol), (v) the Calgary employee claims contemplated by the action bearing court file number 0901-10504 in the Alberta Court of Queen's Bench, (vi) proposed allowance of any claims provided to executives relating to their retention or compensation for an amount over $5 million and (vii) proposed allowance of any claim for an amount over $10 million relating to an insurance policy that covers director and officer claims;

(e)     pre-filing U.K. and other EMEA Debtor intercompany claims against any Applicant; and

(f)     any other claim to be allowed for an amount over $50 million (CDN);

provided however that, subject to complying with the requirements of paragraph 8 below, in a Notice of Disallowance the Monitor may provisionally accept, stipulate, settle, disallow, modify or revise any Specific Claim, so long as such acceptance, stipulation,

7

- 8 -

settlement, disallowance, modification or revision is expressly subject to the approval of the Court.

8.     THIS COURT ORDERS that, prior to agreeing on a proposed allowed amount of any Specific Claim (or procedures related thereto) with any claimant(s) and prior to seeking Court approval thereof as set forth in paragraph 7, the Monitor and the Applicants shall first consult with the U.S. Debtors regarding the applicable Specific Claim (or procedures, as the case may be) and the proposed allowed amount of such claim.

## CROSS BORDER CLAIMS PROTOCOL AND PROTOCOL CLAIMS

9.     THIS COURT ORDERS that with respect to Protocol Claims:

(a)     such claims shall be finally determined in accordance with the Cross-Border Claims Protocol, this Order and the Claims Procedure Order;

(b)     in the event of a conflict between the terms of this Order or the Claims Procedure Order, on the one hand, and the Cross-Border Claims Protocol, on the other hand, the terms of the Cross-Border Claims Protocol shall govern in all such cases; and

(c)     the provisions of this Order (including provisions applying to the determination of Proven Claims, review of Proofs of Claim, issuance of Notices of Disallowance, Dispute Notices, and the resolution of Claims), shall be subject in all cases to the terms of the Cross-Border Claims Protocol and the procedures set out therein.

8

**GENERAL PROVISIONS - SPECIFIC CLAIMS AND PROTOCOL CLAIMS**

10.    THIS COURT ORDERS that with respect to Specific Claims and Protocol Claims:

(a)    information exchanged between the Monitor, the Applicants and the U.S. Debtors as contemplated in this Order or in the Cross-Border Claims Protocol may be shared by such parties with their respective stakeholders, subject to appropriate written confidentiality agreements, and the Monitor, the Applicants and the U.S. Debtors may consult with their respective stakeholders with respect to all such information;

(b)    the Applicants, the U.S. Debtors, the Creditors' Committee (as defined in the Cross-Border Claims Protocol) and the Bondholder Group (also as defined in the Cross-Border Claims Protocol) shall have the right to support or object and to be heard at any hearing provided for in this Order or in the Cross-Border Claims Protocol with respect to Specific Claims or Protocol Claims, where such hearing is in either this Court or in a joint hearing of both this Court and the U.S. Court; and

(c)    that for any matter with respect to which this Order or the Cross-Border Claims Protocol requires the Monitor to seek and obtain this Court's approval, the Monitor shall serve its request for such approval along with its report on the Service List herein (which shall include the affected claimant in respect of the matter in question and its counsel if known) no less than 10 calendar days prior to the proposed hearing.

9

**PERIODIC CLAIMS REPORTING**

11.     THIS COURT ORDERS that the Monitor will report as to the status of claims, including

without limitation the Specific Claims and the Protocol Claims, filed in Canada (a) on a

monthly basis, such reports to be posted on the Monitor's website in the form attached

hereto as Schedule "C"; and (b) to the Applicants and the U.S. Debtors, on not less than a

monthly basis, such reports to be in the form attached hereto as Schedule "D".

**DETERMINATION OF PROVEN CLAIM**

12.     THIS COURT ORDERS that the amount and status of every Claim of a Creditor as

finally determined in accordance with the forms and procedures authorized in the Claims

Procedure Order, this Order and the Cross-Border Claims Protocol, including any

determination as to the nature, amount, value, priority or validity of any Claim, including

any Secured Claim (each, a "Proven Claim"), shall be final for all purposes, including for

voting on and distributions made to Creditors of the Applicants pursuant to the Plan.

**REVIEW OF PROOFS OF CLAIM**

13.     THIS COURT ORDERS that the Monitor, subject to the terms of this Order, in

consultation with the Applicants, shall review all Proofs of Claims filed, and at any time:

        (a)     may request additional information from a Creditor, in accordance with paragraph

                15 of the Claims Procedure Order;

        (b)     may request that the Creditor file a revised Proof of Claim, in accordance with

                paragraph 15 of the Claims Procedure Order;

- 11 -

    (c)      may attempt to resolve and settle any issue arising in the Proof of Claim or in respect of the Claim;

    (d)      may accept (in whole or in part) the amount and/or status of any Claim; and

    (e)      may by notice in writing revise or disallow (in whole or in part) the amount and/or status of any Claim.

14.      THIS COURT ORDERS that where a Claim has been accepted by the Monitor, such Claim shall constitute such Creditor's Proven Claim for all purposes, including for the purposes of voting and distribution under any Plan.

15.      THIS COURT ORDERS that where a Claim is revised or disallowed (in whole or in part, and whether as to amount and/or as to status), the Monitor shall deliver to the Creditor a Notice of Disallowance, attaching the form of Dispute Notice.

16.      THIS COURT ORDERS that where a Claim has been disallowed (in whole or in part, and whether as to amount and/or as to status), the disallowed Claim (or disallowed portion thereof) shall not be a Proven Claim unless the Creditor has disputed the disallowance and proven the disallowed Claim (or disallowed portion thereof) in accordance with paragraphs 17 to 22 of this Order, or as otherwise ordered by this Court.

**DISPUTE NOTICE**

17.      THIS COURT ORDERS that a Creditor who intends to dispute a Notice of Disallowance shall file a Dispute Notice with the Monitor as soon as reasonably possible but in any event such that such Dispute Notice shall be received by the Monitor on or before 4:00 p.m. (prevailing time in Toronto) on the day that is fourteen (14) days after the Creditor is

11

deemed to have received the Notice of Disallowance in accordance with paragraph 25 of this Order. The filing of a Dispute Notice with the Monitor within the fourteen (14) day period specified in this paragraph shall constitute an application to have the amount or status of such Claim determined as set out in paragraphs 19 to 22 hereof.

18.    THIS COURT ORDERS that where a Creditor that receives a Notice of Disallowance fails to file a Dispute Notice with the Monitor within the time period provided therefore in paragraph 17 above, the amount and status of such Creditor's Claim shall be deemed to be as set out in the Notice of Disallowance and such amount and status, if any, shall constitute such Creditor's Proven Claim.

**RESOLUTION OF CLAIMS**

19.    THIS COURT ORDERS that as soon as practicable after the delivery of the Dispute Notice to the Monitor, the Creditor and the Monitor, in consultation with the Applicants, shall attempt to resolve and settle the Creditor's Claim.

20.    THIS COURT ORDERS that in the event that a dispute raised in a Dispute Notice is not settled within a time period or in a manner satisfactory to the Monitor, the Monitor may refer the dispute to a Claims Officer for determination, or in the alternative may in its sole discretion bring the dispute before the Court for determination. If the Monitor refers the dispute to a Claims Officer for determination, then (i) the Claims Officer shall determine the manner, if any, in which evidence may be brought before the Claims Officer by the parties as well as any other matters, procedural or substantive, which may arise in respect of the Claims Officer's determination of a Creditor's Claim, and (ii) the provisions of paragraphs 21 and 22 of this Order shall apply to the determination of the

Claims Officer.   For greater certainty, the Claims Officer may require written submissions, and may limit submissions to written submissions, at the Claims Officer's discretion.

21.   THIS COURT ORDERS that the Claims Officer shall as soon as is practicable, and in any event by no later than (i) thirty (30) days from the closing of submissions (whether written or oral or both), or (ii) such other date as the Claims Officer may order, notify the Creditor, the Monitor and the Applicants in writing of the Claims Officer's determination of the amount and status of such Creditor's Claim.

22.   THIS COURT ORDERS that the Claims Officer's determination of any Creditor's Proven Claim shall be final and binding, unless within ten (10) days of the delivery of the Claims Officer's determination, the Applicants, the Monitor or the Creditor has filed with this Court an appeal, by way of Notice of Motion, of the Claims Officer's determination.

23.   THIS COURT ORDERS that with respect to Specific Claims, the procedures set out in paragraphs 13 through 22 hereof are expressly subject to paragraphs 7 and 8 of this Order.

**PROTECTIONS FOR MONITOR**

24.   THIS COURT ORDERS that (i) in carrying out the terms of this Order and the Cross-Border Claims Protocol, the Monitor shall have all of the protections given to it by the CCAA, the Initial Order, the August 14, 2009 Order and the Claims Procedure Order or as an officer of this Court, including without limitation the stay of proceedings in its favour, (ii) the Monitor shall incur no liability or obligation as a result of the carrying out

of the provisions of this Order, except for its own wilful misconduct or gross negligence, (iii) the Monitor shall be entitled to rely on the books and records of the Applicants and any information provided by the Applicants, all without independent investigation, and (iv) the Monitor shall not be liable for any claims or damages resulting from any errors or omissions in such books, records and information.

**SERVICE AND NOTICE**

25.    THIS COURT ORDERS that the Monitor or the Applicants, as the case may be, are at liberty to deliver any letters, notices or other documents relating to Claims to Creditors or other interested Persons, by forwarding true copies thereof by prepaid ordinary mail, registered mail, courier, personal delivery or electronic or digital transmission to such Persons (i) at the address shown on the Proof of Claim filed by that Person, or (ii) if a Proof of Claim has not been filed by that Person or does not contain a valid address, then at the address last shown on the records of the Applicants, and that any such service or notice by courier, personal delivery or electronic or digital transmission shall be deemed to be received on the next Business Day following the date of forwarding thereof, or if sent by prepaid ordinary mail or by registered mail, on the fourth Business Day after mailing.  Notwithstanding anything to the contrary in this paragraph 25, Notices of Disallowance shall be sent only by (i) facsimile to a number that has been provided in writing by the Creditor, (ii) registered mail, or (iii) courier.

26.    THIS COURT ORDERS that any notice or other communication to be given under this Order by a Creditor to the Monitor shall be in writing and will be sufficiently given only if given by prepaid ordinary mail, courier, personal delivery or electronic or digital transmission addressed to:

14

- 15 -

ERNST & YOUNG INC.
Court-appointed Monitor of Nortel Networks Corporation & others
222 Bay Street, Suite 1600
Toronto, Ontario
Canada M5K 1J7

Attention:    David Saldanha
Telephone:   1-416-943-4431
E-mail        david.saldanha@ca.ey.com
Fax:          1-416-943-3300

Any such notice or other communication by a Creditor shall be deemed received only upon actual receipt thereof during normal business hours on a Business Day. Where the communication is to be by way of a form attached as a Schedule to this Order, such communication shall be in substantially the form of the attached Schedule.

## MISCELLANEOUS

27.    THIS COURT ORDERS AND REQUESTS the aid and recognition of any court or any judicial, regulatory or administrative body in any province or territory of Canada (including the assistance of any court in Canada pursuant to Section 17 of the CCAA) and any court or any judicial, regulatory or administrative body of the United States of America, the United Kingdom, the French Republic, the State of Israel, and the Republic of Korea, and of any other nation or state, to act in aid of and to be complementary to this Court in carrying out the terms of this Order.

ENTERED AT / INSCRIT À TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

SEP 17 2010

15    PER / PAR:

## SCHEDULE "A"

### NOTICE OF DISALLOWANCE

**For creditors of Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation (each a "CCAA Applicant" and collectively, the "CCAA Applicants") and/or their respective Officers and Directors**

Claim Reference Number: _____

Name of CCAA Applicant: _____

TO: _____
        *(Name of Creditor)*

Defined terms not defined in this Notice of Disallowance have the meaning ascribed in the Orders of the Ontario Superior Court of Justice dated July 30, 2009 and September 16, 2010 (the "Claims Procedure Order" and "Claims Resolution Order" respectively). **All dollar values contained herein are in Canadian dollars unless otherwise noted.**

Pursuant to paragraph 15 of the Claims Resolution Order, Ernst & Young Inc., in its capacity as Court-appointed Monitor of the CCAA Applicant, hereby gives you notice that it has reviewed your Proof of Claim in conjunction with the CCAA Applicant and has disallowed all or part of your Claim. Subject to further dispute by you in accordance with the Claims Resolution Order, your Claim will be allowed as follows:

| | Proof of Claim amount as submitted | | Amount allowed by Monitor |
|---|---|---|---|
| | (original currency amount) | (in Canadian dollars) | (in Canadian dollars) |
| A. Unsecured Prefiling Claim | | $ | $ |
| B. Secured Prefiling Claim | | $ | $ |
| C. Section 136 Prefiling Claim | | $ | $ |
| D. Restructuring Claim | | $ | $ |

1

| | Proof of Claim amount as submitted | | Amount allowed by Monitor |
|---|---|---|---|
| | (original currency amount) | (in Canadian dollars) | (in Canadian dollars) |
| E. Directors/Officers Claim | | $ | $ |
| F. Total Claim | | $ | $ |

**Reasons for Disallowance:**

_____

_____

_____

## SERVICE OF DISPUTE NOTICES

**If you intend to dispute this Notice of Disallowance, you must, no later than 4:00 pm (prevailing time in Toronto) on the day that is fourteen (14) days after this Notice of Disallowance is deemed to have been received by you (in accordance with paragraph 25 of the Claims Resolution Order), deliver a Notice of Dispute to the Monitor by prepaid ordinary mail, registered mail, courier, personal delivery or electronic or digital transmission to the address below.** In accordance with the Claims Resolution Order, notices shall be deemed to be received upon actual receipt thereof by the Monitor during normal business hours on a Business Day, or if delivered outside of normal business hours, on the next Business Day. The form of Dispute Notice is enclosed and can also be accessed on the Monitor's website at www.ey.com/ca/nortel.

ERNST & YOUNG INC.
Court-appointed Monitor of Nortel Networks Corporation & others
222 Bay Street, Suite 1600
Toronto, Ontario
Canada M5K 1J7

Attention:     David Saldanha
Telephone:    1-416-943-4431
E-mail         david.saldanha@ca.ey.com
Fax:           1-416-943-3300

DOCSTOR: 2010978\3

- 3 -

**IF YOU FAIL TO FILE A DISPUTE NOTICE WITHIN THE PRESCRIBED TIME PERIOD, THIS NOTICE OF DISALLOWANCE WILL BE BINDING UPON YOU.**

**DATED** at Toronto, this          day of                              , 2010.

**ERNST & YOUNG INC.**, in its capacity as Court-appointed Monitor of Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation.

Per:

3

## SCHEDULE "B"

### DISPUTE NOTICE

**For Voting And/Or Distribution Purposes with respect to Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation (each a "CCAA Applicant" and collectively, the "CCAA Applicants") and/or their respective Officers and Directors**

Claim Reference Number: _____

Name of CCAA Debtor against
which a Claim is asserted: _____

**1.    Particulars of Creditor:**

Full Legal Name of Creditor (include trade name, if different):

_____

_____

*(the "Creditor").*

Full Mailing Address of the Creditor:

_____

_____

Other Contact Information of the Creditor:

Telephone Number: _____

Email Address: _____

Facsimile Number: _____

Attention (Contact Person): _____

1

- 2 -

2.      **Particulars of original Creditor from whom you acquired the Claim, if applicable:**

Have you acquired this Claim by assignment?

Yes: ☐      No: ☐

If yes and if not already provided, attach documents evidencing assignment.

Full Legal Name of original Creditor(s): _____

3.      **Dispute of Disallowance of Claim:**

*For the purposes of the Claims Procedure Order and Claims Resolution Order only (and without prejudice to the terms of any plan of arrangement or compromise) claims in a foreign currency will be converted to Canadian dollars at the exchange rates approved by the Claims Procedure Order. A copy of the applicable exchange rate can be found on the Monitor's website at www.ey.com/ca/nortel.*

The Creditor hereby disagrees with the value of its Claim as set out in the Notice of Disallowance and asserts a Claim as follows:

| | Amount allowed by Monitor: (Notice of Disallowance) (in Canadian dollars) | Amount claimed by Creditor: (in Canadian Dollars) |
|---|---|---|
| A. Unsecured Prefiling Claim | $ | $ |
| B. Secured Prefiling Claim | $ | $ |
| C. Section 136 Prefiling Claim | $ | $ |
| D. Restructuring Claim | $ | $ |
| E. Directors/Officers Claim | $ | $ |
| F. Total Claim | $ | $ |

**REASON(S) FOR THE DISPUTE:**

*(You must include a list of reasons as to why you are disputing your Claim as set out in the Notice of Disallowance.)*

_____

_____

_____

_____

2

**SERVICE OF DISPUTE NOTICES**

**If you intend to dispute the Notice of Disallowance, you must by no later than the date that is fourteen (14) days after the Notice of Disallowance is deemed to have been received by you (in accordance with paragraph 25 of the Claims Resolution Order) deliver to the Monitor this Dispute Notice by prepaid ordinary mail, registered mail, courier, personal delivery or electronic or digital transmission to the address below.** In accordance with the Claims Resolution Order, notices shall be deemed to be received upon actual receipt thereof by the Monitor during normal business hours on a Business Day, or if delivered outside of normal business hours, on the next Business Day.

ERNST & YOUNG INC.
Court-appointed Monitor of Nortel Networks Corporation & others
222 Bay Street, Suite 1600
Toronto, Ontario
Canada M5K 1J7

Attention:     David Saldanha
Telephone:    1-416-943-4431
E-mail        david.saldanha@ca.ey.com
Fax:          1-416-943-3300


DATED this _____ day of _____, 2010.

Name of Creditor: _____

_____          Per: _____
Witness                                   Name:
                                          Title:
                                          *(please print)*

3

- 4 -

# SCHEDULE "C"

## FORM OF REPORT TO BE POSTED ON MONITOR'S WEBSITE MONTHLY

### (NEXT PAGE)

DOCSTOR: 2010978\3

[NOT ACTUAL AMOUNTS - FOR ILLUSTRATIVE PURPOSES ONLY]

Schedule C

## Nortel Networks - CCAA Applicants Overall Claims Status

(Date)
All amounts in CAD $ millions

| Debtor | Claim Category | Filed Proof of Claim # | Filed Proof of Claim $ | Current claim value - most recent stage [1][2] Under Review # | Under Review $ | Accepted or Reviewed and unadjusted # | Accepted or Reviewed and unadjusted $ | Value per Notice of Disallowance # | Value per Notice of Disallowance $ | Value per Notice of Dispute # | Value per Notice of Dispute $ | Valued by Claims Officer # | Valued by Claims Officer $ | Valued by Court # | Valued by Court $ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Debtor A** | | | | | | | | | | | | | | | |
| | Trade | 10 | 1,000 | .5 | 500 | 5 | 500 | | | | | | | | |
| | Bonds | 5 | 25,000 | | | | | | | 5 | 25,000 | | | | |
| | Term. & Severance | 30 | 10,000 | 10 | 1,000 | 5 | 1,000 | 5 | 3,000 | 10 | 3,000 | | | | |
| | Pension & Benefits | 40 | 25,000 | 25 | 2,000 | 5 | 5,000 | | | | | | | 10 | 15,000 |
| | Other | 50 | 10,000 | | | | | | | 10 | 2,000 | 40 | 7,000 | | |
| | Total | 135 | 71,000 | 40 | 3,500 | 15 | 6,500 | 5 | 3,000 | 25 | 30,000 | 40 | 7,000 | 10 | 15,000 |
| **Debtor B** | | | | | | | | | | | | | | | |
| | Trade | 5 | 25,000 | | | 2 | 1,000 | 3 | 10,000 | | | | | | |
| | Bonds | 5 | 10,000 | | | | | | | | | | | 5 | 10,000 |
| | Term. & Severance | 30 | 150,000 | 20 | 10,000 | 10 | 100,000 | | | | - | | | | |
| | Pension & Benefits | 10 | 30,000 | | | 2 | 5,000 | 5 | 10,000 | 3 | 10,000 | | | | |
| | Other | 10 | 45,000 | | | | | | | 5 | 10,000 | 5 | 10,000 | | |
| | Total | 60 | 260,000 | 20 | 10,000 | 14 | 106,000 | 8 | 20,000 | 8 | 20,000 | 5 | 10,000 | 5 | 10,000 |
| **Debtor C** | | | | | | | | | | | | | | | |
| | Trade | 10 | 45,000 | | | 5 | 5,000 | 1 | 10,000 | 4 | 15,000 | | | | |
| | Bonds | 5 | 50,000 | | | | | | | | | | | 5 | 50,000 |
| | Term. & Severance | 5 | 75,000 | 1 | 10,000 | 4 | 50,000 | | | | | | | | |
| | Pension & Benefits | 5 | 100,000 | | | | | 5 | 100,000 | | | 9 | 10,000 | | |
| | Other | 20 | 50,000 | 10 | 15,000 | | | 1 | 10,000 | | | | | | |
| | Total | 45 | 320,000 | 11 | 25,000 | 9 | 55,000 | 7 | 120,000 | 4 | 15,000 | 9 | 10,000 | 5 | 50,000 |

**Notes:**

Note 1: The estimated value of individual claims by category is aggregated and shown in one claim stage only.

Note 2: All amounts (other than Accepted) are subject to potential material change (i.e., negotiation, appeal, etc.) as the process for the determination of claims proceeds.

Internal purposes only:
Trade claims include: Contract rejection Non-Real Estate, Tax & Governmental and Late Claims
Other claims include: Employee, Equity, Litigation, Treasury and Real Estate Claims

- 5 -

## SCHEDULE "D"

## FORM OF REPORT TO APPLICANTS AND U.S. DEBTORS

## (NEXT PAGE)

[NOT ACTUAL AMOUNTS - FOR ILLUSTRATIVE PURPOSES ONLY]

Schedule D

## Nortel Networks - CCAA Applicants Individual Claims Status
(Date)
All amounts in CAD $

| | As filed per proof of claim | | | | | | | Current and previous to current claim stages | | | | | | |
| Claim ID | Creditor Name | Debtor | Claim Category | Pref./ Sec. | Duplicate | Cross-Border | Proof of claim amount | Under Review | Accepted or Reviewed and unadjusted | Value per Notice of Disallowance | Value per Notice of Dispute | Valued by Claims Officer | Valued by Court | Estimated value based on current claim stage |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Creditor A | Debtor A | Trade | P | | X | 1,000 | 1,000 | 1,000 | - | | - | | 1,000 |
| 2 | Creditor B | Debtor A | Other | | D | | 10,000 | 10,000 | | 5,000 | - | | - | 5,000 |
| 3 | Creditor C | Debtor B | Trade | | | | 10,000 | | | 5,000 | 10,000 | - | - | 10,000 |
| 4 | Creditor D | Debtor C | Trade | | | | 5,000 | 5,000 | | 1,500 | | - | - | 1,500 |
| 5 | Creditor E | Debtor C | Contract Repudiation | | D | | 10,000 | | | 2,500 | 5,000 | - | - | 5,000 |
| 6 | Creditor F | Debtor C | Treasury | | | X | 1,015,000 | 1,015,000 | | 515,000 | - | | - | 515,000 |
| 7 | Creditor G | Debtor D | Trade | S | | | 20,000 | | | - | - | 18,000 | 10,000 | 10,000 |
| 8 | Creditor H | Debtor D | Treasury | | | | 5,000 | | | - | | 2,500 | 5,000 | 5,000 |
| 9 | Creditor I | Debtor D | Employee | P | | X | 10,000 | | | - | | 10,000 | 8,000 | 8,000 |
| 10 | Creditor J | Debtor E | Trade | | | | 12,000 | 12,000 | 12,000 | - | | | | 12,000 |
| | | | | | | | 1,098,000 | | | | | | | 572,500 |

Notes:
Note 1  The claim values disclosed are as of the current and previous to current stages of claims determination. No further historic stage values of claims are presented.
Note 2  All amounts (other than Accepted) are subject to potential material change (i.e., negotiation, appeal, etc.) as the process for the determination of claims proceeds.
Note 3  All employee claims will be reported in aggregate with the exception of certain executive claims that are Specific Claims which will be reported individually.
Note 4  The Claim Categories will consist of: Contract Repudiation - Non Real Estate, Employee, Equity, Late Claims; Litigation; Pension & Benefits; Real Estate; Tax and Governmental; Trade Payables, Bonds, Treasury and Other.

Schedules to be provided by Monitor:
1) The form above sorted by Claim ID
2) The form above sorted by Claim Category / Debtor / Creditor Name
3) The form above sorted by Debtor / Claim Category / Creditor Name

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

Court File No:  09-CL-7950

---

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

---

**ORDER**
**(CLAIMS RESOLUTION ORDER)**

---

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Jennifer Stam LSUC#: 46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com

Fax: (416) 216-3930

Lawyers for the Applicants



File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE- COMMERCIAL LIST**

THE HONOURABLE MR.       )     THURSDAY, THE 16TH
                                  )
JUSTICE MORAWETZ          )     DAY OF SEPTEMBER, 2010

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION (the "Applicants")

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, c. C-36, AS AMENDED

**ORDER APPROVING CROSS-BORDER CLAIMS PROTOCOL**

THIS MOTION, made by the Applicants for an Order substantially in the form included

in the Applicants' Motion Record, was heard this day at 393 University Avenue, Toronto,

Ontario.

ON READING the Applicants' Notice of Motion, the affidavit of John Doolittle sworn on

September 10, 2010, the Fifty-Third Report of the Monitor dated September 13, 2010 (the

"Monitor's Report"), and on hearing the submissions of counsel for the Applicants, the Monitor,

and those other parties present, no one appearing for the other parties served with the Applicants'

Motion Record, although duly served as appears from the affidavit of service of Marna

McGeorge sworn September 13, 2010, filed:

1

- 2 -

**SERVICE**

1.    THIS COURT ORDERS that the time for service of the Notice of Motion and the Motion

Record filed by the Applicants in support of this Motion be and it is hereby abridged and

validated such that the Motion is properly returnable today.


**APPROVAL OF CROSS-BORDER CLAIMS PROTOCOL**

2.    THIS COURT ORDERS that the Cross-Border Claims Protocol attached hereto as

Schedule "A" is hereby approved, and that the Cross-Border Claims Protocol shall

become effective upon approval by the United States Bankruptcy Court for the District of

Delaware (the "U.S. Court") acting in the reorganization cases commenced by the U.S.

Debtors[1] under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et

seq.*


3.    THIS COURT ORDERS that references in this Order to the Cross-Border Claims

Protocol shall mean the Cross-Border Claims Protocol attached as Schedule "A", as such

Cross-Border Claims Protocol may be amended from time to time in accordance with its

terms.  Other capitalized terms used in paragraphs 4 through 6 of this Order shall have

the meanings given to them in the Cross-Border Claims Protocol.

---

[1] As defined in the Cross-Border Claims Protocol, being Nortel Networks Inc.; Nortel Networks Capital Corporation; Nortel Altsystems Inc.; Nortel Altsystems International Inc.; Xros Inc.; Sonoma Systems; Qtera Corporation; CoreTek, Inc.; Nortel Networks Applications Management Solutions Inc.; Nortel Networks Optical Components Inc.; Nortel Networks HPOCS Inc.; Architel Systems (U.S.) Corporation; Nortel Networks International Inc.; Northern Telecom International Inc.; Nortel Networks Cable Solutions Inc.; and Nortel Networks (CALA) Inc.

## CROSS-BORDER CLAIMS PROTOCOL TO GOVERN CERTAIN CLAIMS

4.      THIS COURT ORDERS that the Cross-Border Claims Protocol shall govern the coordination and resolution of Overlapping Claims and Same-Creditor Claims filed in the Canadian Proceedings and the Chapter 11 Cases, in accordance with the terms of the Cross-Border Claims Protocol.  Any and all claims resolution procedures which have been or may be approved by this Court, including those contained in the Claims Resolution Order that this Court may approve today, as they relate to Overlapping Claims and Same-Creditor Claims, shall be subject to the provisions and requirements of the Cross-Border Claims Protocol.

## AGGREGATE DISTRIBUTIONS NOT TO EXCEED 100%

5.      THIS COURT ORDERS that no claimant holding an Overlapping Claim or Same-Creditor Claim shall receive aggregate distributions from the Debtors on account of such claim(s) in excess of 100% of the amount of such allowed claim(s) (including any post-filing interest or other amounts permitted under applicable law).

## GENERAL

6.      THIS COURT ORDERS that resolution of any Overlapping Claims and Same-Creditor Claims in the Canadian Proceedings shall be without prejudice to the rights and defenses of the U.S. Debtors with respect to such Overlapping Claims and Same-creditor Claims in the Chapter 11 Cases.

7.      THIS COURT ORDERS AND REQUESTS the aid and recognition of any court or any judicial, regulatory or administrative body in any province or territory of Canada (including the assistance of any court in Canada pursuant to Section 17 of the CCAA)

3

- 4 -

and any court or any judicial, regulatory or administrative body of the United States of America, the United Kingdom, the French Republic, the State of Israel, and the Republic of Korea, and of any other nation or state, to act in aid of and to be complementary to this Court in carrying out the terms of this Order.

ENTERED AT / INSCRIT A TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

SEP 17 2010

PER / PAR:

4

Schedule "A" A)

**Final Version**

## TABLE OF CONTENTS

PART I - BACKGROUND ..........................................................................................................1
  Canadian and U.S. Proceedings..........................................................................................1
  Cross-Border Insolvency Protocol......................................................................................3
  Notice of Deadline and of Procedures for Filing Claims....................................................4
PART II – SCOPE OF THIS CLAIMS PROTOCOL...........................................................5
PART III – COOPERATION AND CONSULTATION .......................................................7
PART IV – APPLICABLE PROCEDURES FOR RESOLVING CLAIMS ........................7
  Resolution of Overlapping Claims .....................................................................................7
  Resolution of Same-Creditor Claims................................................................................10
PART V – THE COURTS AND THIS CLAIMS PROTOCOL ..........................................11
  Comity and Independence of the Courts............................................................................11
  Effectiveness; Modification...............................................................................................12
  Procedure for Resolving Disputes under the Claims Protocol..........................................12
PART VI - GENERAL..........................................................................................................13
  Distributions on Overlapping Claims and Same-Creditor Claims....................................13
  Rights to Appear and Be Heard ........................................................................................13
  Preservation of Rights ......................................................................................................14
  Discharge, Removal or Dissolution of the Creditors' Committee or the Bondholders' Committee.......................16

## CROSS-BORDER PROTOCOL ON THE
## RESOLUTION OF CLAIMS

This cross-border claims protocol (the "**Claims Protocol**") is intended to supplement the procedures established by each of the U.S. Court and the Canadian Court with respect to the resolution of claims filed against the U.S. Debtors and the Canadian Debtors in the Insolvency Proceedings (each as defined herein).

## PART I - BACKGROUND

### *Canadian and U.S. Proceedings*

1.    On January 14, 2009, Nortel Networks Corporation and certain of its subsidiaries and affiliates (collectively, the "**Canadian Debtors**")[1] commenced reorganization proceedings (the "**Canadian Proceedings**") by filing an application under Canada's *Companies' Creditors Arrangement Act* (the "CCAA") with the Ontario Superior Court of Justice, Commercial List (the "**Canadian Court**") and an Order (as amended, the "CCAA Order") has been granted under which (a) the Canadian Debtors have been determined to be entitled to relief under the CCAA, and (b) Ernst & Young Inc. was appointed as monitor (the "**Monitor**") in the Canadian Proceedings.

2.    On January 14, 2009, Nortel Networks Inc. and certain of its subsidiaries and affiliates (collectively, the "**U.S. Debtors**")[2] commenced reorganization cases (collectively, the

---

[1]    The Canadian Debtors are:  Nortel Networks Corporation; Nortel Networks Limited; Nortel Networks Technology Corporation; Nortel Networks Global Corporation; and Nortel Networks International Corporation.

[2]    The U.S. Debtors are:  Nortel Networks Inc.; Nortel Networks Capital Corporation; Nortel Altsystems Inc.; Nortel Altsystems International Inc.; Xros Inc.; Sonoma Systems; Qtera Corporation; CoreTek, Inc.; Nortel Networks Applications Management Solutions Inc.; Nortel Networks Optical Components Inc.; Nortel Networks HPOCS Inc.; Architel Systems (U.S.) Corporation; Nortel Networks International Inc.; Northern Telecom

"**Chapter 11 Cases**") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware (the "**U.S. Court**"), and such cases have been consolidated (for procedural purposes only) under Case No. 09-10138 (KG). The U.S. Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Chapter 11 Cases. An official committee of unsecured creditors (the "**Creditors' Committee**") was appointed by the United States Trustee (the "**U.S. Trustee**") in these Chapter 11 Cases on January 22, 2009. An ad hoc group of bondholders whose members have executed or in the future will execute confidentiality agreements with the Debtors (the "**Bondholder Group**") has also been organized.

3.    By Order dated January 15, 2009, the U.S. Court approved the U.S. Debtors' retention of Epiq Bankruptcy Solutions, LLC as the claims and noticing agent in the Chapter 11 Cases.

4.    The Monitor filed petitions and obtained an Order in the U.S. Court granting recognition of the Canadian Proceedings under chapter 15 of the Bankruptcy Code. Nortel Networks Inc. also filed an application and obtained an Order in the Canadian Court pursuant to section 18.6 of the CCAA recognizing the Chapter 11 Cases as "foreign proceedings" in Canada and giving effect to the automatic stay thereunder in Canada. None of the U.S.

---

International Inc.; Nortel Networks Cable Solutions Inc.; and Nortel Networks (CALA) Inc. Nortel Networks (CALA) Inc. commenced its Chapter 11 Case on July 14, 2009.

Debtors or Canadian Debtors are applicants in both the Chapter 11 Cases and Canadian Proceedings.

5.    For convenience, (i) the U.S. Debtors and the Canadian Debtors shall be referred to herein collectively as the **"Debtors"**, (ii) the Chapter 11 Cases and the Canadian Proceedings shall be referred to herein collectively as the **"Insolvency Proceedings"**, (iii) the U.S. Court and the Canadian Court shall be referred to herein collectively as the **"Courts"**, and (iv) an order of the U.S. Court or the Canadian Court is referred to herein as an **"Order"**.

**Cross-Border Insolvency Protocol**

6.    An amended Cross-Border Insolvency Protocol (the **"Insolvency Protocol"**) was approved by the U.S. Court and Canadian Court pursuant to separate Orders entered by the Courts on June 29, 2009 and June 30, 2009, respectively. Nothing herein is intended to waive any party's rights under the Insolvency Protocol. To the extent of any direct and irreconcilable conflict between the Insolvency Protocol and this Claims Protocol with respect to any matter concerning claims administration and claims adjudication procedures, the term(s) of this Claims Protocol shall govern.

7.    The purpose of this Claims Protocol is to supplement the procedures established by the Courts in the Bar Date Orders (as defined herein) and in any subsequent Orders related to claims (including the claims resolution order sought by the Canadian Debtors from the Canadian Court concurrently with such Court's approval of this Claims Protocol, the **"Claims Resolution Order"**), including Excluded Claims (as defined herein), to

3

establish an efficient and consistent procedure to address the filing and resolution of claims in the Insolvency Proceedings.

### *Notice of Deadline and of Procedures for Filing Claims*

8.      By Orders dated July 30, 2009 (as has been or may be supplemented, the **"Canadian Bar Order"**) and August 4, 2009 (as has been or may be supplemented, the **"U.S. Bar Order"** and together with the Canadian Bar Order, the **"Bar Date Orders"**), the Canadian Court and U.S. Court each set a deadline of September 30, 2009 at 4:00 p.m. prevailing Eastern Time (as has been or may be supplemented, the **"Bar Date"**)[3] for the filing and receipt of claims in the Insolvency Proceedings, other than (i) certain claims that were subject to a later bar date and (ii) certain claims exempted from the provisions of the Bar Date Orders (**"Excluded Claims"**).

9.      As the Debtors' collective corporate structure includes 21 separate Debtor entities, the Debtors propose to implement this Claims Protocol to facilitate the resolution of claims that have been or may be filed in the Canadian Proceedings and the Chapter 11 Cases. Nothing in this Claims Protocol is intended to waive or modify the Bar Date or the protections afforded to the Debtors under the Bar Date Orders.  To the extent of any direct and irreconcilable conflict between the Bar Date Orders and this Claims Protocol with respect to any matter concerning Overlapping Claims or Same-Creditor Claims, the term(s) of this Claims Protocol shall govern.

---

[3]      In the case of Nortel Networks (CALA) Inc., by an Order dated December 2, 2009, the U.S. Court set a deadline of January 25, 2010 at 4:00 p.m. prevailing Eastern Time for the filing and receipt of claims against Nortel Networks (CALA) Inc. in the Chapter 11 Cases.

**PART II – SCOPE OF THIS CLAIMS PROTOCOL**

10.   This Claims Protocol establishes procedures that shall govern the coordination and resolution of Overlapping Claims and Same-Creditor Claims (each as defined below) filed in the Canadian Proceedings and the Chapter 11 Cases.

11.   For the purposes of this Claims Protocol, an **"Overlapping Claim"** is a claim or portion thereof that (i) has been filed in both the Canadian Proceedings and the Chapter 11 Cases; (ii) by the same party or by the same affiliated parties; and (iii) arises from the same underlying claim, action, liability, property, agreement, lease, debt or transaction. For the avoidance of doubt, the definition of Overlapping Claims shall include, but not be limited to, any (i) guarantee and indemnity claims where the direct claim is filed against a debtor in one jurisdiction and the guarantee or indemnity claim is filed against a debtor in the other jurisdiction; and (ii) duplicate claims filed in both jurisdictions (claims filed in both jurisdictions by the same or affiliated party asserting the same amount and underlying liability).

12.   For the purposes of this Claims Protocol, **"Same-Creditor Claims"** are claims or portions thereof that: (i) have been filed in both the Canadian Proceedings and the Chapter 11 Cases; (ii) by the same party or by the same affiliated parties; and (iii) are not an Overlapping Claim (each such claim, a **"Same-Creditor Claim"**).

13.   For the purposes of this Claims Protocol, the following categories of claims shall not constitute Overlapping Claims or Same-Creditor Claims regardless of whether they would otherwise fall within the definitions of Overlapping Claims or Same-Creditor Claims:

(a)    U.K. pension claims (including, funding guarantee claims, insolvency guarantee claims, Financial Support Direction liability claims and claims by Nortel Networks U.K. Pension Trust Limited, the U.K. Pension Protection Fund, the Pensions Regulator under *The Pensions Act 2004* (U.K.) and the joint administrators of the various EMEA Debtors related to the foregoing);

(b)    claims in respect of the determination of liabilities and funded status of the Nortel Networks Negotiated Pension Plan and the Nortel Networks Limited Managerial and Non-Negotiated Pension Plan and in respect of the Ontario Pension Benefits Guarantee Fund; and

(c)    the following employee-related matters:

(i)    any procedure, protocol or methodology for calculating termination and severance pay claims and any process for any resolution of disagreements regarding contract obligations and qualifications for eligibility of such claims (including the calculation of benefits or liabilities),

(ii)    the actuarial methods and assumptions that will be used to determine non-registered pension claims, Long Term Disability claims and benefit claims and any process for any resolution of disagreements regarding the interpretation or application of plan criteria for such claims (including the calculation of benefits or liabilities),

(iii)    the form of an order related to Compensation Claims (including, proposed procedures relating to any bar date for claims of employees and retirees),

(iv)    deferred compensation claims relating to the Nortel Networks U.S. Deferred Compensation Plan (to the extent not otherwise addressed by the Cross-Border Claims Protocol), and

(v)    the Calgary employee claims contemplated by the action bearing court file number 0901-10504 in the Alberta Court of Queen's Bench.

14.     For purposes of this Claims Protocol, a **"Bond Claim"** is any claim arising from or
        related to the Bondholder Trust Indenture (as defined in the Canadian Bar Order),
        including claims filed by the indenture trustees.

## PART III – COOPERATION AND CONSULTATION

15.     The Canadian Debtors, the Monitor, and the U.S. Debtors shall share information with
        respect to any Overlapping Claims and Same-Creditor Claims, including without
        limitation by meeting on a monthly basis to review these claims. The Canadian Debtors,
        the Monitor and the U.S. Debtors shall cooperate and coordinate the collection of
        information regarding Overlapping Claims and Same-Creditor Claims from the Canadian
        Debtors, the U.S. Debtors and the claimants.

16.     Information exchanged between the Monitor, the Canadian Debtors and the U.S. Debtors
        pursuant to this Claims Protocol may be shared by such parties with their respective
        stakeholders, subject to appropriate written confidentiality agreements, and the Monitor,
        the Canadian Debtors and the U.S. Debtors may consult with their respective
        stakeholders with respect to all such information. In the case of the U.S. Debtors, for the
        avoidance of doubt, such stakeholders include the Creditors' Committee and the
        Bondholder Group.

## PART IV – APPLICABLE PROCEDURES FOR RESOLVING CLAIMS

### *Resolution of Overlapping Claims*

17.     The following procedures shall apply with respect to the resolution of Overlapping
        Claims (other than the Bond Claims, to which Paragraph 17(e) shall apply):

7

(a)    For Overlapping Claims that either (i) assert an amount greater than $500,000 in both jurisdictions or (ii) are wholly or partially unliquidated and the Monitor and the U.S. Debtors each propose to seek to allow, stipulate or settle for an amount greater than $500,000 in their respective jurisdictions: the Canadian Debtors, the Monitor and the U.S. Debtors shall not respond to or resolve an Overlapping Claim without first complying with the consultation procedures set forth in Paragraph 15 (and in the case of the U.S. Debtors, Paragraph 16) above.

(b)    For Overlapping Claims that either (i) assert an amount less than $1 million in both jurisdictions or (ii) are wholly or partially unliquidated and the Monitor and the U.S. Debtors each propose to seek to allow, stipulate or settle for an amount less than $1 million in their respective jurisdictions:  following satisfaction of Paragraph 17(a) above, the Monitor, the Canadian Debtors and the U.S. Debtors shall be entitled to respond to the Overlapping Claim and seek resolution of such claim in compliance with their respective claims resolution orders and procedures (including, in the case of the Canadian Debtors and the Monitor, the Claims Resolution Order).

(c)    For Overlapping Claims that either (i) assert an amount equal to or greater than $1 million in either jurisdiction or (ii) are wholly or partially unliquidated and the Monitor or the U.S. Debtors propose to seek to allow, stipulate or settle for an amount equal to or greater than $1 million in their respective jurisdictions (the "**Material Overlapping Claims**"):  if the Monitor, the Canadian Debtors and the U.S. Debtors (in the case of the U.S. Debtors, after consultation with the Creditors' Committee and the Bondholder Group) agree on the appropriate

8

resolution (in each jurisdiction) with respect to any Material Overlapping Claim, then such Material Overlapping Claim can be dealt with in accordance with the agreed-upon approach (which may include utilizing the claims resolution procedures applicable in each jurisdiction).

(d)     If the Monitor, the Canadian Debtors and the U.S. Debtors in accordance with the terms hereof cannot agree on the appropriate resolution of Material Overlapping Claims in each jurisdiction, then the Monitor, the Canadian Debtors and the U.S. Debtors shall seek joint direction from the Judges of both the Canadian Court and the U.S. Court regarding the resolution of the claims, absent other agreement by the Canadian Debtors, the Monitor and the U.S. Debtors.  Written notice of the request for court resolution of such Material Overlapping Claims along with the materials in support of such relief shall be served no less than 10 calendar days prior to the proposed hearing.[4]

(e)     If the Monitor and the Canadian Debtors, on the one hand, or the U.S. Debtors, on the other hand, proposes to allow, stipulate or settle the Bond Claims (the "**Settlement**") and, after consulting with the other party with respect to such Settlement as provided in Paragraph 15 (and in the case of the U.S. Debtors, Paragraph 16), the party not proposing such Settlement does not agree with such Settlement, such party may request that the hearing to allow the Bond Claims in the Settlement be a joint hearing.

*Resolution of Same-Creditor Claims*

18.   The following procedures shall apply with respect to the resolution of Same-Creditor Claims (except with respect to the Bond Claims):

    (a)   For Same-Creditor Claims that either (i) assert an amount greater than $500,000 in both jurisdictions or (ii) are wholly or partially unliquidated and the Monitor and the U.S. Debtors each propose to seek to allow, stipulate or settle for an amount greater than $500,000 in their respective jurisdictions:   the Canadian Debtors, the Monitor and the U.S. Debtors shall not respond to or resolve a Same-Creditor Claim without first complying with the consultation procedures set forth in Paragraph 15 (and in the case of the U.S. Debtors, Paragraph 16) above.

    (b)   For Same-Creditor Claims that either (i) assert an amount less than $1 million in both jurisdictions or (ii) are wholly or partially unliquidated and the Monitor and the U.S. Debtors each propose to seek to allow, stipulate or settle for an amount less than $1 million in their respective jurisdictions:   following satisfaction of Paragraph 18(a) above, the Monitor, the Canadian Debtors and the U.S. Debtors shall be entitled to respond to the Same-Creditor Claim and seek resolution of such claim in compliance with their respective claims resolution orders and procedures (including, in the case of the Canadian Debtors and the Monitor, the Claims Resolution Order).

---

[4]   In Canada, (i) such materials shall include the Monitor's Report, if any, being filed with respect to the motion, and (ii) service shall be made on the Service List as posted on the Monitor's website (the "**Service List**") and on the party that filed the affected claim (and their counsel, if known).

(c)     For Same-Creditor Claims that either (i) assert an amount equal to or greater than $1 million in either jurisdiction or (ii) are wholly or partially unliquidated and the Monitor or the U.S. Debtors propose to seek to allow, stipulate or settle for an amount equal to or greater than $1 million in their respective jurisdictions (the **"Material Same-Creditor Claims"**):  if the Monitor, the Canadian Debtors and the U.S. Debtors (in the case of the U.S. Debtors, after consultation with the Creditors' Committee and the Bondholder Group) agree on the appropriate resolution (in each jurisdiction) with respect to any Material Same-Creditor Claim, then such claim can be dealt with in accordance with the agreed-upon approach (which may include utilizing the claims resolution procedures applicable in each jurisdiction).

(d)     If the Monitor, the Canadian Debtors and the U.S. Debtors (in the case of the U.S. Debtors, after consultation with the Creditors' Committee and the Bondholder Group) cannot agree on the appropriate resolution of Material Same-Creditor Claims in each jurisdiction, then such claims can be resolved in each jurisdiction in accordance with applicable claims resolution orders and procedures (including, in the case of the Canadian Debtors and the Monitor, the Claims Resolution Order).

## PART V – THE COURTS AND THIS CLAIMS PROTOCOL

### Comity and Independence of the Courts

19.    The approval and implementation of this Claims Protocol shall not divest or diminish the U.S. Court's and the Canadian Court's respective independent jurisdiction over the

subject matter of the Chapter 11 Cases and the Canadian Proceedings, respectively. By approving and implementing this Claims Protocol, none of the U.S. Court, the Canadian Court, the Debtors nor any creditor or any other party in interest shall be deemed to have approved or engaged in any infringement on the sovereignty of the United States or Canada.

### *Effectiveness; Modification*

20.    This Claims Protocol shall become effective only upon its approval by both the U.S. Court and the Canadian Court.

21.    This Claims Protocol may not be supplemented, modified, terminated or replaced in any manner except upon approval of such modifications by both the U.S. Court and the Canadian Court after appropriate notice to all parties in interest as required under the rules of the Courts and a hearing in both Courts. Notice of any legal proceeding to supplement, modify, terminate or replace this Claims Protocol shall be given in accordance with paragraph 28 of the Insolvency Protocol, provided that, the party giving notice shall provide no less than 10 calendar days prior written notice of such proceeding and its materials in support of such relief.[5]

### *Procedure for Resolving Disputes under the Claims Protocol*

22.    Disputes relating to the terms, intent or application of this Claims Protocol may be addressed by interested parties to the U.S. Court, the Canadian Court or both Courts upon notice in accordance with paragraph 28 of the Insolvency Protocol. In rendering a

---

[5]    In Canada, (i) such materials shall include the Monitor's Report, if any, being filed with respect to the motion, and (ii) service shall be made on the Service List.

decision or Order in any such dispute, the Court to which the issue is addressed: (a) shall consult with the other Court; and (b) may, in its sole and exclusive discretion, either: (i) render a binding decision or Order after such consultation; (ii) defer to the other Court by transferring the matter, in whole or in part, to such other Court; or (iii) seek a Joint Hearing of both Courts in accordance with paragraph 12 of the Insolvency Protocol. Notwithstanding the foregoing, in making a decision or Order under this paragraph, each Court shall give due consideration to the independence, comity and inherent jurisdiction of the other Court established under existing law.

## PART VI - GENERAL

### Distributions on Overlapping Claims and Same-Creditor Claims

23.     No claimant holding an Overlapping Claim or Same-Creditor Claim shall receive aggregate distributions from the Debtors on account of such claim(s) in excess of 100% of the amount of such allowed claim(s) (including any post-petition interest or other amounts permitted under applicable law).

### Rights to Appear and Be Heard

24.     The Canadian Debtors, the Monitor, the U.S. Debtors, the Creditors' Committee and the Bondholder Group shall have the right to support or object and to be heard at any hearing provided for herein in either or both of the Canadian and U.S. Courts with respect to Specific Claims (as defined in the Claims Resolution Order), Overlapping Claims or Same-Creditor Claims.

**Preservation of Rights**

25. The resolution of an Overlapping Claim or a Same-Creditor Claim in one of the Chapter 11 Cases or the Canadian Proceedings shall be without prejudice to the rights and defenses of the Canadian Debtors, the Monitor or the U.S. Debtors with respect the Overlapping Claim or Same-Creditor Claim in the other jurisdiction (subject to any applicable limitations on distributions to which a creditor may be allowed to recover for its claim).

26. Nothing in this Claims Protocol shall prejudice the right, if any, of any Debtor, the Monitor, the Creditors' Committee, the Bondholder Group or any other party in interest to dispute or assert set-offs or other defenses to any claim filed in the Insolvency Proceedings.

27. Nothing in this Claims Protocol shall prejudice the right of any Debtor to seek, in compliance with any other Orders of the Courts and/or agreements between the Debtors, and after consultation with and prior notice to the U.S. Debtors in the case of relief sought by the Monitor or the Canadian Debtors and after consultation with and prior notice to the Canadian Debtors, the Creditors' Committee and Bondholder Group in the case of relief sought by the U.S. Debtors, a further Order or Orders of the applicable Courts (i) fixing a date by which holders of claims or interests not subject to the Bar Date Orders or the Bar Date established therein must file a proof of claim or interest or be barred from doing so, or (ii) establishing further claims procedures, including claims procedures relating to Excluded Claims and claims resolution procedures, *provided, however*, that any motion or application brought by any of the Debtors, the Monitor or any other party in interest, as applicable, with respect to the subject matter of (ii), shall

14

not be heard on less than ten (10) business days notice to the other Debtors, the Monitor, the Creditors' Committee and the Bondholder Group, unless otherwise ordered by the applicable Court. This Claims Protocol shall apply to all such claims unless a Court orders otherwise in accordance with the terms hereof.

28.     Nothing in this Claims Protocol shall prejudice the right of the Monitor to perform its responsibilities and obligations as required under the Canadian Proceedings, pursuant to any applicable Order of the Canadian Court including, without limitation, the Fourth Amended and Restated Initial Order dated January 14, 2009 and the Order of the Canadian Court dated August 14, 2009, or otherwise under applicable law, and the provisions of this Claims Protocol are intended by the parties and the Courts to facilitate the performance of such responsibilities and obligations by the Monitor.

29.     Except as specifically provided herein (including all deeming provisions) and except as agreed in accordance with this Claims Protocol, neither the terms of this Claims Protocol nor any actions taken pursuant to this Claims Protocol shall: (i) prejudice or affect the powers, rights, claims and defenses of the Debtors and their respective estates, the Creditors' Committee, the U.S. Trustee, the Monitor, the Bondholder Group, any of the Debtors' creditors or any of the foregoing parties' representatives or professionals under applicable law, including, without limitation, the Bankruptcy Code, the CCAA and Orders of the Courts; (ii) preclude or prejudice the rights of any person to assert or pursue such person's substantive rights against any other person under the applicable laws of Canada or the United States or any other applicable laws; (iii) preclude or prejudice the rights of any person (including the Debtors) to contest the validity, amount or priority of any claim, or (iv) preclude or prejudice an assertion to the Court adjudicating the claim

15

that the Court does not have jurisdiction to adjudicate the claim, or that the laws of another jurisdiction govern or affect the validity, amount or priority of a claim.

### *Discharge, Removal or Dissolution of the Creditors' Committee or the Bondholder Group*

30.    If the Creditors' Committee shall cease to exist following the effective date of a plan of reorganization and the plan does not designate a successor to the Creditors' Committee, the consent of or consultation with the Creditors' Committee shall no longer be required for any purposes under this Claims Protocol and thereafter the Creditors' Committee will no longer be entitled to receive notices under this Claims Protocol or otherwise enforce or have any rights pursuant to this Claims Protocol.

31.    If at any time, the Bondholder Group is disbanded, the consent of or consultation with the Bondholder Group shall no longer be required for any purposes under this Claims Protocol and thereafter the Bondholder Group will no longer be entitled to receive notices under this Claims Protocol, or otherwise enforce or have any rights pursuant to this Claims Protocol.

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

Court File No: 09-CL-7950

---

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

---

**ORDER**
**(APPROVING CROSS-BORDER**
**CLAIMS PROTOCOL)**

---

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Jennifer Stam LSUC#: 46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com

Fax: (416) 216-3930

Lawyers for the Applicants



133

1477

**CANADIAN CCAA Proof of Claim** re Nortel Networks Corporation and others

**❶    Name of Debtor (the "Debtor")**
Debtor: | Nortel Networks Corporation

**❷    Original Creditor Identification (the "Creditor")**

Legal Name of Creditor: | SNMP Research International, Inc

Name of Contact: | Mary L Case, CEO

Address: | 3001 Kimberlin Heights Road

Phone #: | +1 865 579 3311
Fax #: | +1 865 579 6565

City: | Knoxville
Prov / State: | TN, USA
Postal/Zip code: | 37920-9716
e-mail: | mary@snmp.com

**❸    Assignee, if claim has been assigned**

Full Legal Name of Assignee:

Name of Contact:

Address:

Phone #:

Fax #:

City: | Prov / State: | Postal/Zip code: | e-mail:

**❹    Amount of Claim**

The Debtor / Officer(s) / Director(s) was/were and still is/are indebted to the Creditor as follows:

*Claims will be recorded as "Unsecured" unless the "Secured" box is checked*

| Currency | Original Currency Amount | Secured | S. 136 Priority *(Check only if applicable)* | Restructuring | If you are making a claim against an Officer or Director(s) check the box below, and list the Officer(s) and Director(s) against whom you assert your claim |
|----------|--------------------------|---------|----------------------------------------------|---------------|---|
| US Dollars | $ 22,281 | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |

**❺    Documentation**

Provide all particulars of the Claim and supporting documentation, including amount, description of transaction(s) or agreement(s) giving rise to the Claim, name of any guarantor which has guaranteed the Claim, and amount of invoices, particulars of all credits, discounts, etc. claimed, description of the security, if any, granted by the affected Debtor to the Creditor and estimated value of such security, particulars of any restructuring claim. | Please see attached.

**❻    Certification**

I hereby certify that:

• I am the Creditor, or authorized Representative of the Creditor.
• I have knowledge of all the circumstances connected with this Claim.
• The Creditor asserts this claim against the Debtor; and the Officer(s) and Director(s) as indicated above.
• Complete documentation in support of this claim is attached.

Signature: *Mary L Case, CEO*

Name: | Mary L. Case
Title: | CEO

Dated at: | September 25, 2009
Signed at: | 5:00 PM Knoxville, TN USA

Received
SEP 2 8 2009

**❼    Filing of Claim**

This Proof of Claim must be received by the Monitor by no later than 4:00 p.m. (prevailing Eastern Time) on **SEPTEMBER 30, 2009**, by prepaid ordinary mail, courier, personal delivery or electronic or digital transmission at the following address:

Ernst & Young Inc.
222 Bay St., P.O. Box 251
Toronto-Dominion Centre
Toronto, ON  M5K 1J7
CANADA
Attention: Nortel Claims

Fax: 416-943-2808
Tel: 1-866-942-7177 or 416-943-4439
e-mail: nortel.monitor@ca.ey.com

An electronically fillable version of this form is available at www.ey.com/ca/nortel

## ATTACHMENT TO PROOF OF CLAIM

SNMP Research International, Inc. ("SNMP") asserts this general unsecured claim against each debtor in the Nortel Networks Corporation cases (collectively, the "Debtors") in the amount of $22,281 (US Dollars) plus any and all additional amounts associated with royalties that have not been reported by the Debtors to date and are owed to SNMP. SNMP reserves the right to modify or amend this proof of claim and to assert additional claims as they arise.

To the extent that any portion of this claim is paid by one or more other Nortel entities, this claim will be reduced accordingly.

Date: Wed, 11 Feb 2009 14:11:58 -0500
From: Lisane Fuoco <lfuoco@nortel.com>
To: kerrie@snmp.com, royalty@snmp.com
Cc: Software Royalties <software.royalties@nortel.com>
Subject: Nortel Q4-2008 Software Royalty Report - SNMP -

Dear all,
á

As previously communicated, Nortel filed for credit protection under
CCAA, Chapter 11 and the UK Administrativeáproceedings on 14 January
2009.á As such, you do understand by now we areánot permitted by the
court monitor to make any payments for goods and services delivered prior
to 14 January 2009, the date of the filing.ááI do regret this immensely,
but this is not a decision we can reverse, this is the law and we are
bound by it.ááAs such, we are providing you with the attached Q4 2008
royalty report, which is all stayed, for your information but also to
allow you to file a claim once the claim process is in place (to be
communicated at a later date by the court monitor).á We look forward to
keeping our relationship intact with you and continue doing business in
the future.á

Best Regards,

Michel Cote
Nortel 3rd PartyáSW License process Leader
Phone 613.763.8388 (ESN 393)

Fax 613.763.5771 (ESN 393)

á
á
Please find enclosed the subjectáQ4-2008 Royalty report.

Nortel Software Royalties Reports invoices':

You are identified as the point of contact to whom we will be sending the
quarterly software royalty reports. Please note that invoices associated
with those royalty reports (and only royalty reports) should not be sent
to Nortel Accounts Payable Department but rather to this inbox
(SWRYLTS@nortel.com). The invoice should clearly state the amounts
indicated on the report have been duly paid. If there are differences
between what the report states, including the amount owed, and what your
records may indicate, please contactáme directly to discuss before
issuing an invoice. Please pass this message along to anyone within your
Company who may be affected.

Regards,

á
Lisane Fuoco
Software Supply Manager
3500 Carling Ave,
Ottawa, Ontario K2E 8E9
613-765-6231 ESN 395-6231
lfuoco@nortel.com
á
á
á

**SNMP Research International Inc**  dor id # 315822          PO # 4320063543

3001 Kimberlin Heights Road
Knoxville, Tennessee
USA 37920-9716

**Q4 2008**
**Reporting Period**          Oct 1, 2008 to Dec 31, 2008                    Date issued:        3-Sep-09

| Nortel Networks Project | Schedule # | Contact | SNMP Product Name | Target OS | Royalty Calculation | Royalty Due | |
|---|---|---|---|---|---|---|---|
| Periphonics/Portal Sltns. | A | John Mahon | EMANATE Master and Sub-Agent | Solaris 2.x | See Sched A Tab | $4,545 | Periphonics |
| Shasta | B | Farha Sukhia | EMANATE Lite | VxWorks | See Sched B Tab | $3 | Shasta |
| DMS-100 - Centrex IP SCU Gateway Cntrl | 27 | Brian - NGN | EMANATE Master and Sub-Agent | Solaris & NT | See Sched 27 Tab | $1,260 | Succession |
| Alteon | 51 | Brian EDN | EMANATE Master and Sub-Agent | RH Linux 6.x | See Sched 51 Tab | $4,320 | Alteon |
| Optical Networks-OME 6500 & 6500B | 67 | Lucy Gauthier | EMANATE Lite | pSOS | See Sched 67 Tab | $1,443 | Optical |
| Optical Networks - CPL | 69 | Lucy Gauthier | EMANATE Lite | pSOS | See Sched 69 Tab | $21 | Optical |

                                                            TOTAL amount due Q3-08 (US$):    $11,592

**Legend:**          Royalty Stream Terminated
                     Royalty Stream under Investigation

                                                            Total amount due Q4-08    $11,592

**Note:**
The amount of $1500.00 was received on Dec 03, 2007 (email sent on Jan 28, 2008).
Credit will be applied on Q4-07          1,500.00 Under Alteon Account
Supplier will send a refund cheque of the amount of 1,500.00 - don't need to credit on the next quarter. Nov 23, 2007

Prepared by : Lisane Fuoco
Nortel Networks - Software Supply Management
613-765-6231 lfuoco@nortel.com

Hardcopy Signature & Date:

**Supplier Contact:**
Jonathan Southwood or Martha Hopper @ SNMP Research  (865) 579-3311

Kerrie Calhoun                    rrie@snmp.com
                                  royalty@snmp.com'

Path: G:\  Filename: Nortel SNMP Q4 08.xls  Tab: Summary

SNMP Research International Inc    Vendor Id # 315822                PO # 4320063543
3001 Kimberlin Heights Road
Knoxville, Tennessee
USA 37920-9716

Q1 2009
Reporting Period          Jan 1, 2009 to Jan 13, 2009                        Date issued:          25-Sep-09

| Nortel Networks Project | Schedule # | Contact | SNMP Product Name | Target OS | Royalty Calculation | Royalty Due |
|---|---|---|---|---|---|---|
| Periphonics/Portal Sltns. | A | John Mahon | EMANATE Master and Sub-Agent | Solaris 2.x | See Sched A Tab | $0 |
| Shasta | B | Farha Sukhia | EMANATE Lite | VxWorks | See Sched B Tab | $0 |
| Succession - UAS | 6 | Mark Lee | EMANATE Master and Sub-Agent | NT/2000 | See Sched 6 Tab | $0 |
| Universal Signaling Point | 10 | Mark Lee | EMANATE-Lite Agent | VxWorks | Yearly Buy-out | $0 |
| DMS-100 - Centrex IP SCU Gateway Cntrl | 27 | Brian - NGN | EMANATE Master and Sub-Agent | Solaris & NT | See Sched 27 Tab | $0 |
| Access Care I/F to DSLAM | 35 | Myron Grueneich | EMANATE Subagent | HPUX 10.20, 11 (32 bits), 11 (64 | See Sched 35 Tab | $0 |
| Alteon | 51 | Brian EDN | EMANATE Master and Sub-Agent | RH Linux 6.x | See Sched 51 Tab | $0 |
| Optivity Policy Services | 52, 55, 60 and 64 | Stephanie Martin | EMANATE Master and Sub-Agent | Solaris | See Sched 52 & 55 Tab | $0 |
| Access Care I/F to DSLAM | 54 | Joseph Keung | BRASS Server and Mgmt App | HP-UX | Schedule 54 not yet signed | |
| Dolphin(Secure Router 6000) | 56 and 58 | Pat Roper | EMANATE Master and Sub-Agent | Linux | See Sched 56 & 58 Tab | $0 |
| Multiservice Provider Edge (MPE) | 57 | Phil Dresch | EMANATE Master and Sub-Agent | Linux | See Sched 57 Tab | $0 |
| Optical Networks-OME 6500 & 6500B | 67 | Lucy Gauthier | EMANATE Lite | pSOS | See Sched 67 Tab | $189 |
| Optical Networks - CPL | 69 | Lucy Gauthier | EMANATE Lite | pSOS | See Sched 69 Tab | $0 |
| Baystack (wlan) | 74 | Tilak Ravi | EMANATE Master and Sub-Agent | Linux | See Sched 74 Tab | $0 |

TOTAL amount stayed Q1-09 (US$):          $189

Legend:          Royalty Stream Terminated
                 Royalty Stream Still under Investigation

                                                                Total amount stayed Q1-09          $189

Note:

Prepared by : Eric Hamelin
Nortel Networks - Software Supply Management
613-763-1805 ehamelin@nortel.com

Hardcopy Signature & Date:

Supplier Contact:
John Southwood or Martha Hopper @ SNMP Research  (865) 579-3311

Kerrie Calhoun          kerrie@snmp.com
                        royalty@snmp.com'

138

# Invoice

SNMP Research International, Inc.
3001 Kimberlin Heights Road
Knoxville, TN 37920-9716
USA

Invoice Number:
0810SR035

Invoice Date:
Oct 1, 2008

Voice: +1 865 579 3311
Fax:   +1 865 579 6565

Page:
1

Duplicate

Ship to:

NORTEL NETWORKS TECHNOLOGY CORPORATION
3500 CARLING AVENUE
OTTAWA, ON K2H 8E9
CANADA

Bill To:

NORTEL NETWORKS, INC.
P.O. BOX 280510
NASHVILLE, TN 37228

| Customer ID | Customer PO | Payment Terms | |
|---|---|---|---|
| NORTEL0068 | 4320058051 | Net 30 Days | |
| Sales Rep ID | Shipping Method | Ship Date | Due Date |
| | N/A | | 10/31/08 |

| Quantity | Item | Description | Unit Price | Extension |
|---|---|---|---|---|
| 1.00 | 0248ELINUX | SOFTWARE SERVICE AGREEMENT ON INTELLECTUAL PROPERTY FOR A ONE YEAR PERIOD ON NATIVE SUBAGENT ADAPTER ON LINUX BEGINNING DECEMBER 16, 2008 - SCHEDULE 68. | 2,000.00 | 2,000.00 |

|  |  |
|---|---|
| Subtotal | 2,000.00 |
| Sales Tax | |
| Total Invoice Amount | 2,000.00 |
| Payment Received | |
| **TOTAL** | 2,000.00 |

Check No:

139

# N🜹RTEL   **Purchase Order**

| Purchase Order No: 4320058051 | Order Date: 10/15/2008 | |
|---|---|---|
| This number must appear on all invoices, packages, packing slips and customs forms. | Last Change Date: 10/15/2008 | Page 1 of 7 |
| Supplier Contact: SALES TEAM | Supplier No: 315822 Contract No: SIGNED DEC, 23/99 | |

**Supplier:** SNMP Research International Inc
3001 Kimberlin Heights Road
KNOXVILLE TN  37920-9716
USA
Telephone No: 423-579-3311
Fax No: 423-579-6565

Ship to:  NN
Nortel
Lise Arden
3500 CARLING AVENUE
OTTAWA ON  K2H 8E9
CANADA

Bill to:  Nortel Networks Technology Corporation (1101)
Attention:  Accounts Payable
P.O. Box 280510
Nashville, TN 37228

| Carrier Number/Carrier Name: | | Incoterms: FCA ORIGIN | | Payment Terms: Net 45 Days | | Buyer: Fernando Williams | | Telephone No: ESN: 470-848 Fax: | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Item No. | Qty | UOM | Part No | Description | | Ship Date | UnitPrice | Tax Code | Tax Value | Extended Total |
| | PO Delivery Date - 10/15/2008 | | | | | | | | | |
| | **Header text** | | | | | | | | | |
| | PO TOTAL NOT TO EXCEED $2,000,00 USD REFER TO QUOTE 0810QU017 FOR PROCE CONFIRMATION ONLY NORTEL CONTACT: Cunningham S.  Susan suecun@nortel.com 613-763-8002 | | | | | | | | | |
| | **Header note** | | | | | | | | | |
| | Mail invoices to: Nortel Networks Inc., Att: Accounts Payable, P.O. Box 280510, Nashville, TN 37228 Email invoices to:  naapexpl@nortel.com Fax invoice: 615-432-5936 Check invoice and payment status at: www.nortel.com/naapinquiry | | | | | | | | | |
| | | | | | | Page Total | | | USD | 0.00 |

Nortel Networks Technology Corporation
c/o Stewart McKelvey Sterling Scales
Suite 800, 1959 Upper Water St
Halifax, NS B3J 2X2
Canada

*Will.cung~*

Fernando Williams
BUYER

# NORTEL

**Purchase Order**

| Purchase Order No: 4320058051<br>This number must appear on all invoices, packages,<br>packing slips and customs forms. | Order Date: 10/15/2008<br>Last Change Date: 10/15/2008 | Page 2 of 7 |
| --- | --- | --- |
| Supplier Contact:<br>SALES TEAM | Supplier No: 315822<br>Contract No: SIGNED DEC. 23/99 | |

Supplier: SNMP Research International Inc
3001 Kimberlin Heights Road
KNOXVILLE TN 37920-9716
USA
Telephone No: 423-579-3311
Fax No: 423-579-6565

Ship to: NN
Nortel
Lise Arden
3500 CARLING AVENUE
OTTAWA ON  K2H 8E9
CANADA

Bill to: Nortel Networks Technology Corporation (1101)
Attention: Accounts Payable
P.O. Box 280510
Nashville, TN 37228

| Carrier Number/Carrier Name: | Incoterms:<br>FCA ORIGIN | Payment Terms:<br>Net 45 Days | Buyer:<br>Fernando Williams | Telephone No: ESN: 470-848<br>Fax: |
| --- | --- | --- | --- | --- |

| Item No. | Qty | UOM | Part No | Description | Ship Date | UnitPrice | Tax Code | Tax Value | Extended Total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | **Terms of delivery** | | | | | | | | |

PLEASE SEND ONE ORIGINAL INVOICE WITH PO COPY TO NORTEL CONTROL DEPARTMENT FOR PAYMENT
NORTEL IS NOT OBLIGATED TO PAY FOR GOODS OR SERVICES EXCEEDING THE NOT TO EXCEED AMOUNT. ALL PRICING SHALL
BE HELD FIRM FOR THE EFFECTIVE PERIOD OF THIS AGREEMENT.
IT IS IMPERATIVE THAT ALL INVOICES SUBMITTED FOR PAYMENT AGAINST THIS PURCHASE REFERENCE THIS PURCHASE ORDER
NUMBER AND THE ASSOCIATED PURCHASE ORDER LINE ITEM, QUANTITY, DESCRIPTION AND PRICE THAT IS BEING INVOICED
FOR AS DISPLAYED ON THE FACE OF THIS PURCHASE ORDER.
NORTEL NETWORKS RESERVES THE RIGHT TO CANCEL THIS ORDER AT ANY TIME, IN THE EVENT THAT NORTEL, IN ITS SOLE
DISCRETION, IS NOT SATISFIED WITH THE QUALITY OF SERVICES OR PRODUCTS TO BE PROVIDED AND COVERED BY THIS
PURCHASE ORDER.
THIS PURCHASE ORDER IS SUBJECT TO NORTEL STANDARD TERMS AND CONDITIONS.  THESE STANDARD TERMS AND CONDITIONS
HAVE BEEN INCLUDED WITH THIS TRANSMISSION.  ANY CHANGES (ADDITIONS, DELETIONS, RATES, DOLLARS, TERMS, ETC.)
WILL NOT BE HONORED UNLESS CONFIRMED BY THE BUYER AS IDENTIFIED HEREIN.
THIS PURCHASE ORDER IS GOVERNED BY THE TERMS AND CONDITIONS OF THE MASTER SERVICE AGREEMENT REFERENCED
HEREIN.
SOFTWARE AGREEMENTS ARE SUBJECT TO APPROVAL BY NORTEL AND SUPPLIER LEGAL DEPARTMENTS.
LICENSOR SHALL INDEMNIFY AND SAVE EACH NORTEL COMPANY AND ITS SUBSIDIARIES AND AFFILIATES HARMLESS FROM
LIABILITY OR CLAIM (INCLUDING, WITHOUT LIMITATION, THE COSTS AND REASONABLE ATTORNEY FEES IN CONNECTION
THEREWITH) THAT MAY BE MADE ALLEGING THAT SOFTWARE OR THE USE OF SUCH SOFTWARE INFRINGES ANY PATENT,
TRADEMARK, TRADE SECRET, COPYRIGHT, OR ANY OTHER PROPRIETARY OR INTELLECTUAL RIGHT.
FOR ALL SOFTWARE PURCHASES AND SOFTWARE DEVELOPMENT:  (A) LICENSOR/SUPPLIER WARRANTS THAT ALL PRODUCTS AND
RELATED DOCUMENTATION CONFORMS TO ALL AGREED UPON SPECIFICATION(S) AS STATED BELOW AND SHALL CONTAIN NO
"VIRUSES", "TIME BOMBS",LOCK-UP DEVICES, "BACK DOORS", OR SIMILAR DESIGN PATHS THAT ALLOW UNAUTHORIZED
ACCESS TO THE SYSTEM(S) THAT ARE LOADED WITH SAID SOFTWARE.(B) SOFTWARE PATCHES, WHEN REQUIRED, SHALL

| | | Page Total | USD | 0.00 |
| --- | --- | --- | --- | --- |

Nortel Networks Technology Corporation
c/o Stewart McKelvey Sterling Scales
Suite 800, 1959 Upper Water St
Halifax, NS B3J 2X2
Canada

Fernando Williams
BUYER

# NORTEL

## Purchase Order

| Order Date: | 10/15/2008 | Page 3 of 7 |
|---|---|---|
| Last Change Date: 10/16/2008 | | |

| Purchase Order No. 4320058051 | |
|---|---|
| This number must appear on all invoices, packages, packing slips and customs forms. | |

| Supplier Contact: | Supplier No: 315662 |
|---|---|
| SALES TEAM | Contract No: SIGNED DEC 2399 |

**Supplier:**
SNMP Research International Inc
3001 Kimberlin Heights Road
KNOXVILLE TN 37920-9716
USA
Telephone No: 423-579-3311
Fax No: 423-579-6565

**Ship to:**
NN
Nortel
Ilse Arden
3500 CARLING AVENUE
OTTAWA ON    K2H 8E9
CANADA

**Bill to:**
Nortel Networks Technology Corporation (1101)
Attention: Accounts Payable
P.O. Box 280510
Nashville, TN 37228

Telephone No: ESN: 470-848
Fax:

| Carrier Number/Carrier Name: | | Incoterms: FCA ORIGIN | | | Payment Terms: Net 45 Days | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|

| Item No. | Qty | UOM | Part No | Description | Buyer: Fernando Williams | Ship Date | UnitPrice | Tax Code | Tax Value | Extended Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 00010 | 1 | EA | part # - 0248ELINIX | Software Service Agreement - sch 68 | | 10/15/2008 | 2,000.00 | A4 | 0.00 | 2,000.00 |

INCLUDE DOCUMENTATION THAT DESCRIBES PROCEDURES FOR TESTING, INSTALLING, AND APPLYING SAID PATCHES. BUYER
RESERVES THE RIGHT TO REJECT SOFTWARE THAT DOES NOT COMPLY WITH THESE REQUIREMENTS WITHOUT FURTHER.
OBLIGATION OR LIABILITY (INCLUDING PAYMENT).
SOFTWARE AGREEMENTS ARE SUBJECT TO APPROVAL BY NORTEL AND SUPPLIER LEGAL DEPARTMENTS.
LICENSOR SHALL INDEMNIFY AND SAVE EACH NORTEL COMPANY AND ITS SUBSIDIARIES AND AFFILIATES HARMLESS FROM
LIABILITY OR CLAIM (INCLUDING, WITHOUT LIMITATION, THE COSTS AND REASONABLE ATTORNEY FEES IN CONNECTION
THEREWITH) THAT MAY BE MADE ALLEGING THAT SOFTWARE OR THE USE OF SUCH SOFTWARE INFRINGES ANY PATENT,
TRADEMARK, TRADE SECRET, COPYRIGHT, OR ANY OTHER PROPRIETARY OR INTELLECTUAL RIGHT.
FOR ALL SOFTWARE PURCHASES AND SOFTWARE DEVELOPMENT: (A) LICENSOR/SUPPLIER WARRANTS THAT ALL PRODUCTS AND
RELATED DOCUMENTATION CONFORMS TO ALL AGREED UPON SPECIFICATIONS(S) AS STATED BELOW AND SHALL CONTAIN NO
"BACK DOORS", "TIME BOMBS", "LOCK-UP DEVICES", SIMILAR DESIGNS THAT ALLOW UNAUTHORIZED
ACCESS TO, OR THE SYSTEM(S) THAT ARE LOADED WITH SAID SOFTWARE. (B) SOFTWARE PATCHES, WHEN REQUIRED, SHALL
INCLUDE DOCUMENTATION THAT DESCRIBES PROCEDURES FOR TESTING, INSTALLING, AND APPLYING SAID PATCHES. BUYER
RESERVES THE RIGHT TO REJECT SOFTWARE THAT DOES NOT COMPLY WITH THESE REQUIREMENTS WITHOUT FURTHER
OBLIGATION OR LIABILITY (INCLUDING PAYMENT).
ONTARIO RETAIL SALES TAX PURCHASE EXEMPTION CERTIFICATE - UNDER THE PROVISIONS OF THE RETAIL SALES TAX ACT,
NORTEL CLAIMS EXEMPTION FROM TAX ON THE PURCHASE OF THE TANGIBLE PERSONAL PROPERTY ORDERED HEREIN. VENDORS
PERMIT NO. 02743442.

| | Page Total | | 2,000.00 |
|---|---|---|---|
| | | USD | 2,000.00 |

Nortel Networks Technology Corporation
c/o Stewart McKelvey Sterling Scales
Suite 800, 1959 Upper Water St
Halifax, NS B3J 2X2
Canada

Fernando Williams
BUYER

*[signature]*

Nortel Networks TP/2007-077/EN          Nortel is an Equal Opportunity / Affirmative Action Employer

## PURCHASE ORDER TERMS & CONDITIONS OF PURCHASE OF GOODS/SERVICES

Provincial Sales Tax Vendor Permit Number and Certifications
NNL
British Columbia R001048
Manitoba 635112-3
Ontario (see note) 7947-0009 0274-3442
Prince Edward Island 133532
Saskatchewan 0944447
Quebec 1001830151-TQ 1000242965-TQ
Note: Under the provisions of the Ontario Retail Sales Tax Act, we claim exemption from tax on the purchase of tangible personal property and taxable services ordered herein.

### Terms and conditions

#### 1. Disclosure of Information
All information, materials, specifications, tools, drawings or data, including computer software programs in source code or object code form, which is conveyed in connection with this order, including the terms hereof, or becomes available or made known to Supplier, shall be deemed proprietary and confidential to Nortel Networks, shall not be disclosed to any third party, and shall be used exclusively for the purpose of manufacturing or supplying the specified goods or services pursuant to this Purchase Order (herein the "Deliverables"), for the benefit of Nortel Networks and its affiliated companies, being Nortel Networks Limited and its subsidiaries and such fixed items shall be returned to Nortel Networks on demand. Supplier shall not make use of any trademarks or trade names of Nortel Networks or its affiliated companies without the prior written consent of Nortel Networks.

#### 2. Ownership of Intellectual Property
Nortel Networks shall own all technical information, written reports, visual or audio recordings, computer software programs in source code or object code form, plans, models, and other items, and all patents, copyrights, know-how, and other technological or intellectual property resulting from, or developed pursuant to the creation and provision of Deliverables hereunder. Supplier hereby sells, transfers, assigns, and conveys to Nortel Networks all the right, title, and interest to all the results and/or items produced or to be produced by performance of the services, including, without limitation all copyrights, right to create derivative works, patents, trademarks, trade secrets, mask works, and any other intellectual property rights pertaining thereto, and agrees to execute, and to have its employees and subcontractors execute, without additional charge to Nortel Networks, any documents required to evidence and/or secure Nortel Networks exclusive ownership therein in any and all countries.

#### 3. Special Products
Unless otherwise provided on the face of this order, any drawings, special dies, tools, patterns or equipment required for the manufacture of the Deliverables shall be furnished by and at the expense of the Supplier. Nortel Networks may, at its option at any time, reimburse Supplier for Supplier's reasonable cost of such drawings, dies, tools, or patterns, or any part thereof, and upon payment thereof shall become the owner and entitled to possession of the same.

#### 4. Indemnification and Insurance

Supplier warrants that the Deliverables furnished hereunder may be freely used, sold, or otherwise dealt with by Nortel Networks and any other person without infringement of patents, copyrights, trademarks, trade secrets, or other technological or intellectual property rights. Supplier shall indemnify, defend, and hold harmless Nortel Networks, and its affiliated companies, their employees, customers, transferees, licensees, invitees and those for whom they may act as agent, against any claims, demands, losses, costs or damages (including costs and attorneys fees) whatsoever in the event of any actual or alleged infringement of a third party intellectual property right. Supplier shall indemnify, defend and save harmless Nortel Networks, its affiliated companies and their employees, customers, transferees, licensees and those for whom they may act as agent, from and against all claims, demands, losses, costs, damages including, but not limited to, those arising from bodily injury (including death) or property damage, of whatsoever kind or nature arising out of incidental to the Deliverables. Supplier shall, prior to commencement of performance, transmit to Nortel Networks a certificate of insurance affirming that Supplier has the following types of insurance and minimum coverage amounts:

(a) Statutory worker's compensation and occupational disease;

(b) Employer's liability - $1,000,000.00,

(c) General liability, including contractor's protective liability and blanket contractual liability for both personal injury and property damage - $5 million; and

(d) Automobile liability, including non-owner automobile liability for both personal injury and property damage - $1 million.

This certificate of insurance shall name Nortel Networks as an additional insured.

#### 5. Price/Additional Charges/Quantity
Supplier agrees that this order must not be filled at prices higher than stated on the face of this order without obtaining the prior written consent of Nortel Networks Purchasing Department. Supplier represents that the prices charged hereunder are the lowest prices charged by Supplier to buyers of a class similar to Nortel Networks under similar terms. Any price reduction made in Deliverables covered by this order which is instituted before delivery of goods or commencement of services shall be applicable to this order. No charges additional to those set out on the face of this order will be allowed unless agreed to and specifically recited and included in this order. Nortel Networks shall not be obligated to accept any shipment less than or in excess of the quantity of Deliverables specified herein.

Notwithstanding, a reasonable handling fee shall be borne by Supplier for the handling of shipments less than the quantity of Deliverables specified. Risk of loss, return shipping charges and a reasonable handling fee for excess quantity shall be borne by Supplier. Payment terms are 70 days (Payment Period) measured from the later of Nortel Networks' acceptance of the goods and/or services or Nortel of an undisputed invoice therefor. Notwithstanding the preceding, conditioned upon the advance approval of Nortel Networks' finance group, on the face of this purchase order Nortel Networks may agree with Supplier to a special term of payment that will apply to this purchase order only. Such different payment term will supersede the Payment Period but will not supersede any payment term in a master agreement, if any, between the parties under which this purchase order is being issued

#### 6. Set-Off
Upon notice to Supplier, Nortel Networks may deduct from the amount due to Supplier, under this order, either damages for any breach of this order or amounts

otherwise due Nortel Networks by Supplier, irrespective of whether the deduction is related to the Deliverables covered by this order.

### 7. Title, Risk of Loss

Unless expressly stated to the contrary on the face of this order, title, risk of loss and/or damage to all Deliverables shall remain in Supplier until delivery to, and off-loading at, Nortel Networks premises at which time title, risk of loss and/or damage shall pass to Nortel Networks.

### 8. Approval by Relevant Authorities

All electrical power, or related equipment systems, included in this order, shall comply with any requirements prescribed by the Canadian Standards Association and by the applicable federal, provincial or municipal authority prior to acceptance by Nortel Networks. Supplier shall be responsible for making all modifications required to effect such compliance and for the costs thereof.

### 9. Master Contract/Additional Terms

Subject to any master contract between Nortel Networks and the Supplier, this order constitutes the entire agreement between the parties on the subject matter hereof and supersedes all prior agreements, communications and understandings of any nature whatsoever, oral or written. No other terms or conditions shall be binding upon Nortel Networks unless reduced to writing and signed by a duly authorized representative of Nortel Networks. Supplier's furnishing of Deliverables hereunder shall be deemed to be an acceptance of these terms and conditions notwithstanding the communication to Nortel Networks by Supplier of any other terms and conditions. In the event the terms of this Order conflict with the terms of any master purchase and sale agreement or master services agreement between Nortel Networks, the parent of Nortel Networks or any affiliate or subsidiary of Nortel Networks and Supplier for the purchase of the goods or services ordered hereunder, the terms of the master purchase and sale agreement or master services agreement shall take precedence.

### 10. Warranty/Inspection

Supplier warrants that Supplier is duly qualified to provide Deliverables and that the Deliverables to be furnished hereunder conform with Nortel Networks specification, description or drawings, shall be free from defects in material and/or workmanship, free from any liens or encumbrances, and, unless otherwise specified herein, shall be merchantable quality, fit for their intended purpose, and shall be supplied in a professional and workmanlike manner conforming with the generally accepted practices. This warranty shall survive acceptance of the Deliverables. The Supplier shall bear the cost of inspection and return to Supplier of Deliverables rejected. The Supplier shall, at Nortel Networks option, repair, correct or replace defective or non-conforming Deliverables.

### 11. Assignment

Supplier shall not assign this order, any interest herein, or any rights hereunder, or subcontract any obligation to be performed hereunder, without the prior written consent of Nortel Networks.

### 12. Termination

At any time, Nortel Networks may cancel this order in whole or in part, upon notice to the Supplier. If this order is terminated for Nortel Networks convenience, any claim of the Supplier shall be settled on the basis of the reasonable cost it has documented as having been incurred in the performance of this order, which will not exceed the price(s). If, however, cancellation is occasioned by Supplier's breach of any term, provision or condition hereof, including Supplier's delay in delivery, Supplier shall not be entitled to reimbursement for any cost and Nortel Networks shall have against the Supplier all remedies available hereunder, or at law or in equity, including the right to

purchase substitute materials elsewhere and charge Supplier with any additional costs or expenses incurred. In no event shall Nortel Networks be liable for any incidental, indirect, consequential, special, or punitive damages of any nature whatsoever, including loss of profit, use, goodwill, or income, for any reason whatsoever.

### 13. Force Majeure

Nortel Networks reserves the right, at its option, either to suspend or cancel shipment or provision of Deliverables covered by this order, in whole or in part, at any time, without incurring any costs or damages whatsoever, where such suspension or cancellation is caused by force majeure, including, but not limited to, acts of God, the public enemy or the government, fires, floods, freight embargoes, unusually severe weather or other contingencies beyond the control of Nortel Networks and/or the Supplier.

### 14. Time of the Essence

Time is of the essence in all matters relating to this order. Time shall remain of the essence in all cases of force majeure.

### 15. Regulations

Supplier shall be responsible for packaging, labeling, handling, transportation, storage or otherwise providing and performing Deliverables, in accordance with the applicable laws relating to customs and export control, and provide all information necessary for compliance or to permit compliance with all legislation relevant to hazardous or dangerous goods.

### 16. EU Environmental Regulations

Supplier will comply with all applicable laws and government regulations (including the marking of products such as any required labels or symbols required) governing hazardous and toxic materials and the protection of the environment (including, but not limited to the following European Union Environmental Directives: Eco-design of Energy Using Product (EuP), Waste from Electrical and Electronic Equipment (WEEE) directive and Restriction on Use of Certain Hazardous Substances (RoHS). With respect to the RoHS Directive, Supplier must be able to demonstrate to Nortel Network's satisfaction that no lead, hexavalent chromium cadmium, mercury or polybrominated biphenyls (PBB)/polybrominated diphenyl ethers (PBDE) are present in any product covered by the ROHS Directive used or provided by Supplier in providing the Products in the EU, except where exemptions allowing the use of such substances apply under applicable law.

Nortel Networks reserves the right to inspect the Supplier's facilities to ensure compliance with directives. Supplier hereby indemnifies, defends, and holds Nortel Networks harmless from all losses, liabilities, fines, penalties, costs and expenses (including reasonable legal fees) in connection with any claim or proceeding made by any customer, governmental body or other third party resulting from any non-compliance by Supplier with the WEEE and RoHS directives. Supplier understands that failure by Supplier to follow the requirements may expose Nortel Networks and Nortel Networks' employees to criminal liability and as a consequence any failure may therefore be considered as a material breach of this Contract.

### 17. Compliance with laws

Supplier warrants that it has complied, and will continue to comply, during the performance of this order, with the provisions of all applicable federal, provincial and municipal laws and regulations, rules and orders including those from which liability may accrue to Nortel Networks from any violations thereof, laws and regulations relating to health and safety and those which may be applicable to this order by reason of Nortel Networks status as a government contractor and/or

## Terms and Conditions

Supplier's status as a government subcontractor. As required, Supplier shall abide by all Nortel Networks regulations and policies relating to health and safety. By acceptance hereof, Supplier shall abide by all Nortel Networks regulations licenses and permits required by, and the Deliverables shall be in conformance with, all applicable laws and governmental orders and regulations in effect at the time of the shipment of the Deliverables. Supplier shall determine eligibility of all goods for preferential treatment under any applicable trade treaty, including but not limited to the North American Free Trade Agreement (NAFTA). Supplier shall prepare and provide a certificate of origin or other appropriate documentation to Nortel Networks. Nortel Networks may withhold payment of Supplier's invoices pending receipt of such documentation for eligible goods.

**18. Governing Law**
This Order shall be interpreted and construed in accordance with the laws of the state/province and country in which the goods are delivered or services are performed, notwithstanding its rules on conflict of laws. The parties agree that this order shall not be subject to the United Nations International Sale of Goods Contracts Convention.

**19. Publicity**
Supplier shall have no right to use the name and trademarks or trade names of Nortel Networks and its subsidiaries and its affiliated companies in connection with any products, promotion, public statement, press releases, or publication without the prior written approval of Nortel Networks.

**20. Acceptance**
Supplier's acceptance of this Purchase Order ("Order") shall be evidenced by the returning of a signed copy of this Order to Purchase, the shipment of goods or the commencement of services to be performed hereunder. Nortel Networks shall not be bound by any provision, printed or otherwise, at variance or in addition to the terms of this Order, that may appear on any quotation, acknowledgement or other form used by Supplier unless any such provision is expressly accepted in writing by Nortel Networks.

**21. Changes**
Nortel Networks may, at any time by written amendment to this Order, increase or decrease the ordered quantities of the goods or services or make a change in any one or more of the following:
(a) applicable drawings, designs and/or specifications when the goods to be furnished are to be specifically manufactured by Supplier in accordance with Nortel Networks provided drawings, designs and/or specifications; and/or
(b) method of shipment or packaging; and/or
(c) place or time of delivery or performance.
If such change causes an increase or decrease in the cost of performance or the time required for performance of this Order, an equitable adjustment shall be made and this Order shall be modified in writing accordingly. Supplier shall be deemed to have waived any claim for adjustment unless asserted in writing by an estimate of the cost of the additional time required for performance of the change within 20 days from receipt by Supplier of notification of the change.

**22. Notice**
Any notice to be given hereunder shall be given in writing, postage prepaid and shall be effective when deposited in the Canada Post.

**23. Waiver**

The failure of a party to claim a breach of any term of this Order shall not constitute a waiver of such breach or the right of such party to enforce any subsequent breach of such term.

**Company policy prohibits Nortel Networks employees from accepting gifts from suppliers.**

Nortel Networks Technology Corporation and its parent company Nortel Networks Limited are hereinafter referred to as Nortel Networks. The person, firm or corporation from whom the goods or services have been ordered is hereinafter referred to as Supplier.

These terms and conditions apply to the following Purchase Order issued on the date referenced:



## CROSS-BORDER INSOLVENCY PROTOCOL

This cross-border insolvency protocol (the "Protocol") shall govern the conduct of all parties in interest in the Insolvency Proceedings (as such term is defined herein).

The Guidelines Applicable to Court-to-Court Communications in Cross-Border Cases (the "Guidelines") attached as Schedule "A" hereto, shall be incorporated by reference and form part of this Protocol. Where there is any discrepancy between the Protocol and the Guidelines, this Protocol shall prevail.

A.    **Background**

1.    Nortel Networks Inc. ("NNI") is the wholly owned U.S. subsidiary of Nortel Networks Limited ("NNL"), the principal Canadian operating subsidiary of Nortel Networks Corporation ("NNC"). NNC is a telecommunications company headquartered in Toronto, Ontario, Canada. NNI is incorporated under Delaware law and is headquartered in Richardson, Texas.

2.    NNI and certain of its affiliates (collectively, the "U.S. Debtors"),[1] have commenced reorganization proceedings (the "U.S. Proceedings") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq*. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court"), and such cases have been consolidated (for procedural purposes only) under Case No. 09-10138 (KG). The U.S. Debtors are continuing in possession of their respective properties and are operating and managing their businesses, as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the U.S. Proceedings. On January 22, 2009,

---

[1]    The Debtors in the U.S. Proceedings (as defined herein) are: NNI, Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., XROS, Inc., Sonoma Systems, QTERA Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc. and Nortel Networks Cable Solutions Inc.

the Office of United States Trustee (the "U.S. Trustee") appointed an official committee of

unsecured creditors (the "Creditors Committee") in the U.S. Proceeding. An ad hoc committee

of bondholders (the "Bondholders Committee") has also been organized.

   3.  On January 14, 2009, the U.S. Debtors' ultimate corporate parent NNC,

NNI's direct corporate parent NNL (together with NNC and their affiliates, including the U.S.

Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian

Debtors")[2] filed an application with the Ontario Superior Court of Justice (the "Canadian Court")

under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from

their creditors (collectively, the "Canadian Proceedings"). The Canadian Debtors have obtained

an initial order of the Canadian Court (as amended and restated, the "Canadian Order"), under

which, inter alia: (a) the Canadian Debtors have been determined to be entitled to relief under

the CCAA; (b) Ernst & Young Inc. has been appointed as monitor (the "Monitor") of the

Canadian Debtors, with the rights, powers, duties and limitations upon liabilities set forth in the

CCAA and the Canadian Order; and (c) a stay of proceedings in respect of the Canadian Debtors

has been granted.

   4.  The Monitor filed petitions and obtained an order in the U.S. Court

granting recognition of the Canadian Proceedings under chapter 15 of the Bankruptcy Code (the

"Chapter 15 Proceedings"). NNI also filed an application and obtained an order in the Canadian

Court pursuant to section 18.6 of the CCAA recognizing the U.S. Proceedings as "foreign

proceedings" in Canada and giving effect to the automatic stay thereunder in Canada. None of

the U.S. Debtors or Canadian Debtors are applicants in both the U.S. Proceedings and Canadian

Proceedings.

---

[2] The Canadian Debtors include the following entities: NNC, NNL, Nortel Networks Technology Corporation,
Nortel Networks Global Corporation and Nortel Networks International Corporation.

3

5.      For convenience, (a) the U.S. Debtors and the Canadian Debtors shall be referred to herein collectively as the "Debtors," (b) the U.S. Proceedings and the Canadian Proceedings shall be referred to herein collectively as the "Insolvency Proceedings," and (c) the U.S. Court and the Canadian Court shall be referred to herein collectively as the "Courts", and each individually as a "Court."

B.    **Purpose and Goals**

6.      Though full and separate plenary proceedings are pending in the United States for the U.S. Debtors and in Canada for the Canadian Debtors, the implementation of administrative procedures and cross-border guidelines is both necessary and desirable to coordinate certain activities in the Insolvency Proceedings, protect the rights of parties thereto, ensure the maintenance of the Courts' respective independent jurisdiction and give effect to the doctrines of comity.  Accordingly, this Protocol has been developed to promote the following mutually desirable goals and objectives in the Insolvency Proceedings:

a.    harmonize and coordinate activities in the Insolvency Proceedings before the Courts;

b.    promote the orderly and efficient administration of the Insolvency Proceedings to, among other things, maximize the efficiency of the Insolvency Proceedings, reduce the costs associated therewith and avoid duplication of effort;

c.    honor the independence and integrity of the Courts and other courts and tribunals of the United States and Canada, respectively;

d.    promote international cooperation and respect for comity among the Courts, the Debtors, the Creditors Committee, the Estate Representatives (which include the Chapter 11 Representatives and the Canadian Representatives as such terms are defined below) and other creditors and interested parties in the Insolvency Proceedings;

e.    facilitate the fair, open and efficient administration of the Insolvency Proceedings for the benefit of all of the Debtors' creditors and other interested parties, wherever located; and

4

  f.  implement a framework of general principles to address basic administrative issues arising out of the cross-border nature of the Insolvency Proceedings.

As the Insolvency Proceedings progress, the Courts may also jointly determine that other cross-border matters that may arise in the Insolvency Proceedings should be dealt with under and in accordance with the principles of this Protocol. Subject to the provisions of this Protocol, including, without limitation, those included in paragraph 15 hereof, where an issue is to be addressed only to one Court, in rendering a determination in any cross-border matter, such Court may: (a) to the extent practical or advisable, consult with the other Court; and (b) in its sole discretion and bearing in mind the principles of comity, either (i) render a binding decision after such consultation; (ii) defer to the determination of the other Court by transferring the matter, in whole or in part to the other Court; or (iii) seek a joint hearing of both Courts.

**C. Comity and Independence of the Courts**

  7.  The approval and implementation of this Protocol shall not divest nor diminish the U.S. Court's and the Canadian Court's respective independent jurisdiction over the subject matter of the U.S. Proceedings and the Canadian Proceedings, respectively. By approving and implementing this Protocol, neither the U.S. Court, the Canadian Court, the Debtors nor any creditors or interested parties shall be deemed to have approved or engaged in any infringement on the sovereignty of the United States of America or Canada.

  8.  The U.S. Court shall have sole and exclusive jurisdiction and power over the conduct of the U.S. Proceedings and the hearing and determination of matters arising in the U.S. Proceedings. The Canadian Court shall have sole and exclusive jurisdiction and power over the conduct of the Canadian Proceedings and the hearing and determination of matters arising in the Canadian Proceedings.

9.      In accordance with the principles of comity and independence recognized herein, nothing contained herein shall be construed to:

a.    increase, decrease or otherwise modify the independence, sovereignty or jurisdiction of the U.S. Court, the Canadian Court or any other court or tribunal in the United States or Canada, including the ability of any such court or tribunal to provide appropriate relief on an ex parte or "limited notice" basis to the extent permitted under applicable law;

b.    require the U.S. Court to take any action that is inconsistent with its obligations under the laws of the United States;

c.    require the Canadian Court to take any action that is inconsistent with its obligations under the laws of Canada;

d.    require the Debtors, the Creditors Committee, the Estate Representatives or the U.S. Trustee to take any action or refrain from taking any action that would result in a breach of any duty imposed on them by any applicable law;

e.    authorize any action that requires the specific approval of one or both of the Courts under the Bankruptcy Code or the CCAA after appropriate notice and a hearing (except to the extent that such action is specifically described in this Protocol); or

f.    preclude the Debtors, the Creditors Committee, the Monitor, the U.S. Trustee, any creditor or other interested party from asserting such party's substantive rights under the applicable laws of the United States, Canada or any other relevant jurisdiction including, without limitation, the rights of parties in interest to appeal from the decisions taken by one or both of the Courts.

10.  The Debtors, the Creditors Committee, the Estate Representatives and their respective employees, members, agents and professionals shall respect and comply with the independent, non-delegable duties imposed upon them, if any, by the Bankruptcy Code, the CCAA, the Canadian Order and other applicable laws.

**D.    Cooperation**

11.      To assist in the efficient administration of the Insolvency Proceedings and in recognizing that the U.S. Debtors and Canadian Debtors may be creditors of the others'

6

estates, the Debtors and their respective Estate Representatives shall, where appropriate: (a) cooperate with each other in connection with actions taken in both the U.S. Court and the Canadian Court and (b) take any other appropriate steps to coordinate the administration of the Insolvency Proceedings for the benefit of the Debtors' respective estates.

12.     To harmonize and coordinate the administration of the Insolvency Proceedings, the U.S. Court and the Canadian Court each may coordinate activities and consider whether it is appropriate to defer to the judgment of the other Court. In furtherance of the foregoing:

a.     The U.S. Court and the Canadian Court may communicate with one another, with or without counsel present, with respect to any procedural matter relating to the Insolvency Proceedings.

b.     Where the issue of the proper jurisdiction of either Court to determine an issue is raised by an interested party in either of the Insolvency Proceedings with respect to a motion or application filed in either Court, the Court before which such motion or application was initially filed may contact the other Court to determine an appropriate process by which the issue of jurisdiction will be determined; which process shall be subject to submissions by the Debtors, the Creditors Committee, the Monitor, the Bondholders Committee (collectively the "Core Parties"), the U.S. Trustee and any interested party prior to a determination on the issue of jurisdiction being made by either Court.

c.     The Courts may, but are not obligated to, coordinate activities in the Insolvency Proceedings such that the subject matter of any particular action, suit, request, application, contested matter or other proceeding is determined in a single Court.

d.     The U.S. Court and the Canadian Court may conduct joint hearings (each a "Joint Hearing") with respect to any cross-border matter or the interpretation or implementation of this Protocol where both the U.S. Court and the Canadian Court consider such a Joint Hearing to be necessary or advisable, or as otherwise provided herein, to, among other things, facilitate or coordinate proper and efficient conduct of the Insolvency Proceedings or the resolution of any particular issue in the Insolvency Proceedings. With respect to any Joint Hearing, unless otherwise ordered, the following procedures will be followed:

7

(i)    A telephone or video link shall be established so that both the U.S. Court and the Canadian Court shall be able to simultaneously hear and/or view the proceedings in the other Court.

(ii)    Submissions or applications by any party that are or become the subject of a Joint Hearing (collectively, "Pleadings") shall be made or filed initially only to the Court in which such party is appearing and seeking relief. Promptly after the scheduling of any Joint Hearing, the party submitting such Pleadings to one Court shall file courtesy copies with the other Court. In any event, Pleadings seeking relief from both Courts shall be filed in advance of the Joint Hearing with both Courts.

(iii)    Any party intending to rely on any written evidentiary materials in support of a submission to the U.S. Court or the Canadian Court in connection with any Joint Hearing (collectively, "Evidentiary Materials") shall file or otherwise submit such materials to both Courts in advance of the Joint Hearing. To the fullest extent possible, the Evidentiary Materials filed in each Court shall be identical and shall be consistent with the procedural and evidentiary rules and requirements of each Court.

(iv)    If a party has not previously appeared in or attorned or does not wish to attorn to the jurisdiction of a Court, it shall be entitled to file Pleadings or Evidentiary Materials in connection with the Joint Hearing without, by the mere act of such filings, being deemed to have appeared in or attorned to the jurisdiction of such Court in which such material is filed, so long as such party does not request any affirmative relief from such Court.

(v)    The Judge of the U.S. Court and the Justice of the Canadian Court who will preside over the Joint Hearing shall be entitled to communicate with each other in advance of any Joint Hearing, with or without counsel being present, (1) to establish guidelines for the orderly submission of Pleadings, Evidentiary Materials and other papers and for the rendering of decisions by the Courts; and (2) to address any related procedural, administrative or preliminary matters.

(vi)    The Judge of the U.S. Court and the Justice of the Canadian Court, shall be entitled to communicate with each other during or after any joint hearing, with or without counsel present, for the purposes of (1) determining whether consistent rulings can be made by both Courts; (2) coordinating the terms upon of the Courts' respective rulings; and (3) addressing any other procedural or administrative matters.

8

13.    Notwithstanding the terms of the paragraph 12 above, this Protocol recognizes that the U.S. Court and the Canadian Court are independent courts. Accordingly, although the Courts will seek to cooperate and coordinate with each other in good faith, each of the Courts shall be entitled at all times to exercise its independent jurisdiction and authority with respect to: (a) the conduct of the parties appearing in matters presented to such Court; and (b) matters presented to such Court, including, without limitation, the right to determine if matters are properly before such Court.

14.    Where one Court has jurisdiction over a matter which requires the application of the law of the jurisdiction of the other Court, such Court may, without limitation, hear expert evidence of such law or, subject to paragraph 15 herein, seek the written advice and direction of the other Court which advice may in the discretion of the receiving Court, be made available to parties in interest.

15.    Notwithstanding anything to the contrary herein contained, to the extent any motion is filed or relief is sought (collectively, "Requested Relief") in either Court relating to: (i) the proposed sale of assets for gross proceeds in excess of U.S. $30 million and where at least one U.S. Debtor and one Canadian Debtor are parties to the related sale agreement or that involves assets owned by at least one U.S. Debtor and one Canadian Debtor; (ii) any motion to allocate sale proceeds which are in the aggregate more than U.S. $30 million and where at least one U.S. Debtor and one Canadian Debtor are parties to the related sale agreement or that involves assets owned by at least one U.S. Debtor and one Canadian Debtor; (iii) matters relating to the advanced pricing agreement involving both the United States and Canadian taxing authorities; (iv) matters regarding transfer pricing methodology relating to an obligation for the transfer of goods and services between one or more U.S. Debtors and one or more Canadian

9

Debtors; (v) any matter relating to alleged fraudulent conveyance or preference claims in excess of U.S. $30 million and which may have a material impact on both one or more U.S. Debtors and one or more Canadian Debtors; (vi) matters relating to any proposal or approval of a disclosure statement, information circular, plan of reorganization or plan of compromise and arrangements in either the U.S. Proceedings or the Canadian Proceedings; (vii) any motion to appoint a Trustee or Examiner in the U.S. Proceedings, any motion to convert the U.S. Proceedings to a Chapter 7 proceeding, any motion to appoint a Receiver in the Canadian Proceedings, or any motion to convert the Canadian Proceedings to a bankruptcy or proposal proceeding under the Bankruptcy and Insolvency Act (Canada); (viii) any motion to substantively consolidate the Debtors' estates; (ix) matters impacting the material tax attributes of the U.S. Debtors, including the net operating losses of the U.S. Debtors in any prior fiscal year; (x) any motion to amend the terms of any of the Debtors' registered pension plans the effect of which would increase the liability of any Debtor thereunder; (xi) any motion to assume, ratify, reject, repudiate, modify or assign executory contracts having a material impact on the assets, operations, obligations, rights, property or business of both the U.S. and Canadian estates and accounting for annual gross revenue in excess of U.S. $30 million ("Material Contracts"); (xii) any motion seeking relief from the automatic stay in the U.S. Proceedings and/or the stay of proceedings in the Canadian Proceedings (1) involving any Material Contract or (2) to pursue actions having a material impact on the assets, operations, obligations, rights, property or business of at least one U.S. Debtor and one Canadian Debtor and involving damages in excess of U.S. $30 million; (xiii) any motion seeking to create or extend any program, plan, proposal or scheme relating to or authorizing payments to employees where the consideration relates to non-ordinary course incentive performance, retention, severance, termination or such like payments; and (xiv) any

10

motion regarding any program, plan proposal, scheme or similar course of action related to the

wind-down of one or more of the Debtors' businesses;

Then the following procedures shall be followed:

    a.    unless otherwise consented to by the Core Parties, any and all documents, other than any Monitor's report related to the Requested Relief, shall be filed (as applicable) and served on the Core Parties on not less than seven days notice prior to the proposed hearing date for such Requested Relief in the Court of the forum country where the party seeking the Requested Relief intends the Requested Relief to be heard; *provided, however,* that to the extent the Requested Relief is necessary to avoid irreparable harm to the Debtors and/or the Debtors' bankruptcy estates, as may be determined by the Court of the forum country where the Requested Relief is being sought or such Court otherwise determines, such documents related to the Requested Relief shall be served on the Core Parties on such reasonable notice as such Court may determine;

    b.    upon notice of such Requested Relief being provided to the Core Parties, each of the Core Parties will have not less than two business days from receipt of such notice (or such shorter period as the Court of the forum country where the Requested Relief is being sought shall determine, as set forth in paragraph 15(a) herein) to request, in writing, that the filing party seek a Joint Hearing for the Requested Relief;

    c.    if the filing party agrees to seek a Joint Hearing, the Requested Relief shall be heard at a Joint Hearing conducted by the Courts in accordance with the procedures set forth in paragraph 12 herein; and

    d.    if the filing party does not agree to seek a Joint Hearing, the party seeking to have the Requested Relief heard at a Joint Hearing may file a notice of Joint Hearing dispute in both the Court of the forum country and the Court of the non-forum country and serve notice thereof on the remaining Core Parties, whereupon the respective Courts of the forum country and the non-forum country may consult with one another in accordance with paragraphs 6 and 12 hereof, in order to determine whether a Joint Hearing is necessary or may otherwise consult with the Core Parties prior to any party proceeding with the underlying Requested Relief in the original proposed forum country.

E.    **Recognition of Stays of Proceedings**

    16.    The Canadian Court hereby recognizes the validity of the stay of

proceedings and actions against the U.S. Debtors and their property under section 362 of the

Bankruptcy Code (the "U.S. Stay"). In implementing the terms of this paragraph, the Canadian Court may consult with the U.S. Court regarding: (i) the interpretation, extent, scope and applicability of the U.S. Stay and any orders of the U.S. Court modifying or granting relief from the U.S. Stay; and (ii) the enforcement of the U.S. Stay in Canada.

17.    The U.S. Court hereby recognizes the validity of the stay of proceedings and actions against the Canadian Debtors and their property under the Canadian Order (the "Canadian Stay"). In implementing the terms of this paragraph, the U.S. Court may consult with the Canadian Court regarding: (i) the interpretation, extent, scope and applicability of the Canadian Stay and any orders of the Canadian Court modifying or granting relief from the Canadian Stay; and (ii) the enforcement of the Canadian Stay in the United States.

18.    Nothing contained herein shall affect or limit the Debtors' or other parties' rights to assert the applicability or nonapplicability of the U.S. Stay or the Canadian Stay to any particular proceeding, property, asset, activity or other matter, wherever pending or located. Subject to paragraph 15, herein, motions brought respecting the application of the stay of proceedings with respect to assets or operations of the Canadian Debtors shall be heard and determined by the Canadian Court. Subject to paragraph 15 herein, motions brought respecting the application of the stay of proceedings with respect to assets or operations of the U.S. Debtors shall be heard and determined by the U.S. Court.

F.    Rights to Appear and Be Heard

19.    The Debtors, the Core Parties, and any other committee that may be appointed by the U.S. Trustee, and the professionals and advisors for each of the foregoing, shall have the right and standing: (i) to appear and to be heard in either the U.S. Court or Canadian Court in the U.S. Proceedings or Canadian Proceedings, respectively, to the same extent as creditors and other interested parties domiciled in the forum country, subject to any local rules or

12

regulations generally applicable to all parties appearing in the forum; and (ii) to file notices of appearance or other papers with the clerk of the U.S. Court or the Canadian Court in respect of the U.S. Proceedings or Canadian Proceedings, respectively; provided, however, that any appearance or filing may subject a creditor or interested party to the jurisdiction of the Court in which the appearance or filing occurs; provided further, that an appearance by the Creditors Committee in the Canadian Proceedings shall not form a basis for personal jurisdiction in Canada over the members of the Creditors Committee. Notwithstanding the foregoing, and in accordance with the policies set forth above, including, inter alia, paragraph 12 above; (i) the Canadian Court shall have jurisdiction over the Chapter 11 Representatives (as defined below) solely with respect to the particular matters as to which the Chapter 11 Representatives appear before the Canadian Court; and (ii) the U.S. Court shall have jurisdiction over the Canadian Representatives (as defined below) solely with respect to the particular matters as to which the Canadian Representatives appear before the U.S. Court.

20.    In connection with any matter in the Canadian Proceedings in which the Creditors Committee seeks to become involved and which would otherwise require the Creditors Committee to execute a confidentiality agreement, the Creditors Committee, its individual members and professionals shall not be required to execute confidentiality agreements but instead the Creditors Committee and its members shall be bound by the confidentiality provisions contained in the Creditors Committee bylaws, and the Creditors Committee's professionals shall be bound by the terms of the confidentiality agreement with the Debtors dated February 2, 2009.

G.    **Claims Protocol**

21.    The Debtors anticipate that it will be necessary to implement a specific claims protocol to address, among other things and without limitation, the timing, process,

jurisdiction and applicable governing law to be applied to the resolution of intercompany claims filed by the Debtors' creditors in the Canadian Proceedings and the U.S. Proceedings. In such event, and in recognition of the inherent complexities of the inter-company claims that may be asserted in the Insolvency Proceedings, the Debtors shall use commercially reasonable efforts to negotiate a specific claims protocol, in form and substance satisfactory to the Debtors, the Monitor, and the Creditors Committee, which protocol shall be submitted to the Canadian Court and the U.S. Court for approval. In the event that the Debtors fail to reach agreement among such parties, the Debtors shall file a motion in both the Canadian Court and the U.S. Court seeking approval of such claims protocol as the Debtors shall determine to be in the best interest of the Debtors and their creditors.

H.    **Retention and Compensation of Estate Representative and Professionals**

22.    The Monitor, its officers, directors, employees, counsel and agents, wherever located, (collectively the "Monitor Parties") and any other estate representatives appointed in the Canadian Proceedings (collectively, the "Canadian Representatives") shall (subject to paragraph 19) be subject to the sole and exclusive jurisdiction of the Canadian Court with respect to all matters, including: (a) the Canadian Representatives' tenure in office; (b) the retention and compensation of the Canadian Representatives; (c) the Canadian Representatives' liability, if any, to any person or entity, including the Canadian Debtors and any third parties, in connection with the Insolvency Proceedings; and (d) the hearing and determination of any other matters relating to the Canadian Representatives arising in the Canadian Proceedings under the CCAA or other applicable Canadian law. The Canadian Representatives shall not be required to seek approval of their retention in the U.S. Court for services rendered to the Debtors. Additionally, the Canadian Representatives: (a) shall be compensated for their services to the Canadian Debtors solely in accordance with the CCAA, the Canadian Order and other applicable

14

Canadian law or orders of the Canadian Court; and (b) shall not be required to seek approval of their compensation in the U.S Court.

23.    The Monitor Parties shall be entitled to the same protections and immunities in the United States as those granted to them under the CCAA and the Canadian Order. In particular, except as otherwise provided in any subsequent order entered in the Canadian Proceedings, the Monitor Parties shall incur no liability or obligations as a result of the Canadian Order, the appointment of the Monitor, the carrying out of its duties or the provisions of the CCAA and the Canadian Order by the Monitor Parties, except any such liability arising from actions of the Monitor Parties constituting gross negligence or willful misconduct.

24.    Any estate representative appointed in the U.S. Proceedings, including without limitation any examiners or trustees appointed in accordance with section 1104 of the Bankruptcy Code (collectively, the "Chapter 11 Representatives") shall (subject to paragraph 19) be subject to the sole and exclusive jurisdiction of the U.S. Court with respect to all matters, including: (a) the Chapter 11 Representatives' tenure in office; (b) the retention and compensation of the Chapter 11 Representatives; (c) the Chapter 11 Representatives' liability, if any, to any person or entity, including the U.S. Debtors and any third parties, in connection with the Insolvency Proceedings; and (d) the hearing and determination of any other matters relating to the Chapter 11 Representatives arising in the U.S. Proceedings under the Bankruptcy Code or other applicable laws of the United States. The Chapter 11 Representatives shall not be required to seek approval of their retention in the Canadian Court and (a) shall be compensated for their services to the U.S. Debtors solely in accordance with the Bankruptcy Code and other applicable laws of the United States or orders of the U.S. Court; and (b) shall not be required to seek

approval of their compensation for services performed for the U.S. Debtors in the Canadian Court.

25.    Any professionals (i) retained by and being compensated solely by, or (ii) being compensated solely by, the Canadian Debtors including in each case, without limitation, counsel and financial advisors (collectively, the "Canadian Professionals"), shall be subject to the sole and exclusive jurisdiction of the Canadian Court. Such Canadian Professionals: (a) shall be subject to the procedures and standards for retention and compensation applicable in the Canadian Court under the CCAA, the Canadian Order and any other applicable Canadian law or orders of the Canadian Court with respect to services performed on behalf of the Canadian Debtors; and (b) shall not be required to seek approval of their retention or compensation in the U.S. Court.

26.    Any professionals (i) retained by, or (ii) being compensated by, the U.S. Debtors including in each case, without limitation, counsel and financial advisors (collectively, the "U.S. Professionals") shall be subject to the sole and exclusive jurisdiction of the U.S. Court. Such U.S. Professionals: (a) shall be subject to the procedures and standards for retention and compensation applicable in the U.S. Court under the Bankruptcy Code and any other applicable laws of the United States or orders of the U.S. Court; and (b) shall not be required to seek approval of their retention or compensation in the Canadian Court.

27.    Subject to paragraph 19 herein, any professional retained by the Creditors Committee, including in each case, without limitation, counsel and financial advisors (collectively, the "Committee Professionals") shall be subject to the sole and exclusive jurisdiction of the U.S. Court. Such Committee Professionals: (a) shall be subject to the procedures and standards for retention and compensation applicable in the U.S. Court under the

16

Bankruptcy Code and any other applicable laws of the United States or orders of the U.S. Court; and (b) shall not be required to seek approval of their retention or compensation in the Canadian Court or any other court.

**L.    Notice**

28.     Notice of any motion, application or other Pleading or paper (collectively the "Court Documents") filed in one or both of the Insolvency Proceedings involving or relating to matters addressed by this Protocol and notice of any related hearings or other proceedings shall be given by appropriate means (including, where circumstances warrant, by courier, telecopier or other electronic forms of communication) to the following:  (a) all creditors and interested parties, in accordance with the practice of the jurisdiction where the papers are filed or the proceedings are to occur; and (b) to the extent not otherwise entitled to receive notice under clause (a) of this sentence, counsel to the Debtors; the U.S. Trustee; the Monitor; the Creditors Committee; the Bondholders Committee and any other statutory committees appointed in the Insolvency Proceedings and such other parties as may be designated by either of the Courts from time to time.  Notice in accordance with this paragraph shall be given by the party otherwise responsible for effecting notice in the jurisdiction where the underlying papers are filed or the proceedings are to occur.  In addition to the foregoing, upon request, the U.S. Debtors or the Canadian Debtors shall provide the U.S. Court or the Canadian Court, as the case may be, with copies of any orders, decisions, opinions or similar papers issued by the other Court in the Insolvency Proceedings.

29.     When any cross-border issues or matters addressed by this Protocol are to be addressed before a Court, notices shall be provided in the manner and to the parties referred to in paragraph 28 above.

**J.**    **Effectiveness; Modification**

30.    This Protocol shall become effective only upon its approval by both the U.S. Court and the Canadian Court.

31.    This Protocol may not be supplemented, modified, terminated, or replaced in any manner except upon the approval of both the U.S. Court and the Canadian Court after notice and a hearing. Notice of any legal proceeding to supplement, modify, terminate or replace this Protocol shall be given in accordance with the notice provisions set forth above.

**K.**    **Procedure for Resolving Disputes Under this Protocol**

32.    Disputes relating to the terms, intent or application of this Protocol may be addressed by interested parties to the U.S. Court, the Canadian Court or both Courts upon notice in accordance with the notice provisions outlined in paragraph 28 above. In rendering a determination in any such dispute, the Court to which the issue is addressed: (a) shall consult with the other Court; and (b) may, in its sole and exclusive discretion, either: (i) render a binding decision after such consultation; (ii) defer to the determination of the other Court by transferring the matter, in whole or in part, to such other Court; or (iii) seek a Joint Hearing of both Courts in accordance with paragraph 12 above. Notwithstanding the foregoing, in making a determination under this paragraph, each Court shall give due consideration to the independence, comity and inherent jurisdiction of the other Court established under existing law.

33.    In implementing the terms of this Protocol, the U.S. Court and the Canadian Court may, in their sole, respective discretion, provide advice or guidance to each other with respect to legal issues in accordance with the following procedures:

a.    the U.S. Court or the Canadian Court, as applicable, may determine that such advice or guidance is appropriate under the circumstances;

b.    the Court issuing such advice or guidance shall provide it to the non-issuing Court in writing;

18

c.    copies of such written advice or guidance shall be served by the applicable Court in accordance with paragraph 28 hereof;

d.    the Courts may jointly decide to invite the Debtors, the Creditors Committee, the Estate Representatives, the U.S. Trustee and any other affected or interested party to make submissions to the appropriate Court in response to or in connection with any written advice or guidance received from the other Court; and

e.    for clarity, the provisions of this paragraph shall not be construed to restrict the ability of either Court to confer as provided in paragraph 12 above whenever it deems it appropriate to do so.

**L.    Preservation of Rights**

34.    Except as specifically provided herein, neither the terms of this Protocol nor any actions taken under the terms of this Protocol shall: (a) prejudice or affect the powers, rights, claims and defenses of the Debtors and their estates, the Creditors Committee, the Estate Representatives, the U.S. Trustee or any of the Debtors' creditors under applicable law, including, without limitation, the Bankruptcy Code the CCAA, and the orders of the Courts; or (b) preclude or prejudice the rights of any person to assert or pursue such person's substantive rights against any other person under the applicable laws of Canada or the United States.

19



Court File No:  09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

| | | |
|---|---|---|
| THE HONOURABLE | ) | MONDAY,  THE 30th DAY |
| | ) | |
| JUSTICE MORAWETZ | ) | OF MARCH, 2009 |

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**APPROVAL AND VESTING ORDER**
**(Layer 4-7 Application Delivery)**

THIS MOTION, made by Nortel Networks Corporation, Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Applicants") for an order approving the sale transaction (the "Transaction") contemplated by an asset purchase agreement dated as of February 19, 2009 (as the same may be amended, the "Sale Agreement") among Radware Ltd. (the "Purchaser"), as buyer, and NNL, Nortel Networks Inc. ("NNI"), the Joint Administrators and the EMEA Sellers (as both terms are defined in the Sale Agreement), as vendors in respect of the sale of certain assets relating to Nortel's enterprise "Layer 4-7" application delivery business and as appended to the Affidavit of George Riedel, sworn March 25, 2009 (the "Riedel Affidavit"), and vesting in the Purchaser the Applicants' right, title and interest in and to the

Acquired Assets (as defined in the Sale Agreement), was heard this day at 330 University Avenue, Toronto, Ontario.

ON READING the Riedel Affidavit, the Fifth Report of Ernst & Young Inc. in its capacity as monitor (the "Monitor") dated March 26, 2009 (the "Fifth Report") and on hearing the submissions of counsel for the Applicant and for the Monitor and those other parties present, no one appearing for any other person on the service list, although properly served as appears from the affidavit of Katie Legree sworn March 26, 2009 and filed:

1.      THIS COURT ORDERS that the time for the service of the Notice of Motion, the Fifth Report and the Motion Record is hereby abridged so that this Motion is properly returnable today and hereby dispenses with further service thereof.

2.      THIS COURT ORDERS that capitalized terms used herein and not otherwise defined shall have the meaning given to them in the Sale Agreement.

3.      THIS COURT ORDERS AND DECLARES that the Transaction is hereby approved, and that the Sale Agreement is commercially reasonable and in the best interests of the Applicants and their stakeholders. The execution of the Sale Agreement by NNL is hereby authorized and approved, and the Applicants and the Monitor are hereby authorized and directed to take such additional steps and execute such additional documents as may be necessary or desirable for the completion of the Transaction and for the conveyance of the Applicants' right, title and interest in and to the Acquired Assets to the Purchaser.

4.      THIS COURT ORDERS AND DECLARES that the Escrow Agreement substantially in the form attached as Appendix A to the Fifth Report associated with the Transaction by and among Nortel Networks Inc., NNL, the EMEA Sellers on the signature pages thereto, Ernst & Young LLP, and JP Morgan Chase Bank, N.A. is hereby authorized and approved and NNL is directed to comply with its obligations thereunder.

5.      THIS COURT ORDERS AND DECLARES that upon the delivery of a Monitor's certificate to the Purchaser substantially in the form attached as Schedule A hereto (the "Monitor's Certificate"), all of the Applicants' right, title and interest in and to the Acquired Assets shall vest absolutely in the Purchaser, free and clear of and from any and all security interests (whether contractual, statutory, or otherwise), hypothecs, mortgages, trusts or deemed

- 3 -

trusts (whether contractual, statutory, or otherwise), liens, executions, levies, charges, or other financial or monetary claims, whether or not they have attached or been perfected, registered or filed and whether secured, unsecured or otherwise (collectively, the "Claims"), including, without limiting the generality of the foregoing: (i) any encumbrances or charges created by the Order of the Honourable Justice Morawetz dated January 14, 2009 (as amended and restated); (ii) all charges, security interests or claims evidenced by registrations pursuant to the *Personal Property Security Act* (Ontario) or any other personal property registry system, excluding Permitted Liens and those expressly assumed by the Purchaser under the Sale Agreement.  For greater certainty, this Court orders that all of the Claims affecting or relating to the Acquired Assets are hereby expunged and discharged as against the Acquired Assets.

6.      THIS COURT ORDERS that for the purposes of determining the nature and priority of Claims, the net proceeds from the sale of the Applicants' right, title and interest in and to the Acquired Assets shall stand in the place and stead of the Acquired Assets, and that from and after the delivery of the Monitor's Certificate all Claims shall attach to the net proceeds from the sale of the Applicants' right, title and interest in and to the Acquired Assets with the same priority as they had with respect to the Acquired Assets immediately prior to the sale, as if the Applicants' right, title and interest in and to the Acquired Assets had not been sold and remained in the possession or control of the person having that possession or control immediately prior to the sale.

7.      THIS COURT ORDERS AND DIRECTS the Monitor to file with the Court a copy of the Monitor's Certificate, forthwith after delivery thereof.

8.      THIS COURT ORDERS that, notwithstanding:

        (a)     the pendency of these proceedings;

        (b)     any applications for a bankruptcy order now or hereafter issued pursuant to the *Bankruptcy and Insolvency Act* (Canada) in respect of the Applicants and any bankruptcy order issued pursuant to any such applications; and

        (c)     any assignment in bankruptcy made in respect of the Applicants;

the vesting of the Applicants' right, title and interest in and to the Acquired Assets in the Purchaser pursuant to this Order shall be binding on any trustee in bankruptcy that may be appointed in respect of any of the Applicants and shall not be void or voidable by creditors of the Applicants, nor shall it constitute nor be deemed to be a settlement, fraudulent preference, assignment, fraudulent conveyance or other reviewable transaction under the *Bankruptcy and Insolvency Act* (Canada) or any other applicable federal or provincial legislation, nor shall it constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation.

9.      THIS COURT ORDERS AND DECLARES that the Transaction is exempt from the application of the *Bulk Sales Act* (Ontario).

10.     THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

11.     THIS COURT ORDERS that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

ENTERED AT / INSCRIT A TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

MAR 3 0 2009

PER / PAR:

DOCSTOR: 1659842\3A

**Schedule A – Form of Monitor's Certificate**

Court File No. 09-CL-7950

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

**COMMERCIAL LIST**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION
AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**MONITOR'S CERTIFICATE**
**(Layer 4-7 Application Delivery)**

**RECITALS**

A.      Pursuant to an Order of the Honourable Justice Morawetz of the Ontario Superior Court of Justice (the "Court") dated January 14, 2009 (as amended and restated), Nortel Networks Limited ("NNL") and certain of its Canadian affiliates (collectively, the "Applicants") commenced proceedings pursuant to the *Companies' Creditors Arrangement Act* (Canada) and Ernst & Young Inc. was appointed as monitor (the "Monitor") in those proceedings.

B.      Pursuant to an Order of the Court dated March 30, 2009, the Court approved an asset purchase agreement dated as of February 19, 2009 (the "Sale Agreement") among Radware Ltd. (the "Purchaser"), as buyer, and NNL, Nortel Networks Inc., the Joint Administrators and the EMEA Sellers (as both terms are defined in the Sale Agreement), as vendors in respect of the sale of certain assets relating to Nortel's enterprise "Layer 4-7" application delivery business and provided for the vesting in the Purchaser of the Applicants' right, title and interest in and to the Acquired Assets, which vesting is to be effective with respect to the Acquired Assets upon the delivery by the Monitor to the Purchaser of

a certificate confirming (i) the payment by the Purchaser of the Purchase Price for the Acquired Assets; (ii) that the conditions to Closing as set out in Article 8 of the Sale Agreement have been satisfied or waived by the Applicants and the Purchaser; and (iii) the Applicants have advised the Monitor that the Transaction has been completed to the satisfaction of the Applicants.

C.      Unless otherwise indicated herein, terms with initial capitals have the meanings set out in the Sale Agreement.

THE MONITOR CERTIFIES the following:

1.      NNL has advised the Monitor that the Purchaser has paid and the Escrow Agent has received the Purchase Price for the Acquired Assets payable on the Closing Date pursuant to the Sale Agreement;

2.      NNL has advised the Monitor that the conditions to Closing as set out in Article 8 of the Sale Agreement have been satisfied or waived by the Applicants and the Purchaser; and

3.      NNL has advised the Monitor that the Transaction has been completed to the satisfaction of the Applicants.

4.      This Certificate was delivered by the Monitor at _____ [TIME] on _____ [DATE].

DATED this ● day of March, 2009.

> **ERNST & YOUNG INC. in its capacity as monitor in the Applicants' CCAA proceedings and not in its personal capacity**
>
> Per: _____
>
>      Name:
>      Title:

DOCSTOR: 1659842\3A

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

Court File No:  09-CL-7950

---

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

---

**APPROVAL AND VESTING ORDER**
**(Layer 4-7 Application Delivery)**

---

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4, Canada

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte  LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930
Lawyers for the Applicants

# BLUE SHEET

Court File No.: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

THE HONOURABLE MR.        )     TUESDAY, THE 28th

                                      )

JUSTICE MORAWETZ             )     DAY OF JULY, 2009

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**APPROVAL AND VESTING ORDER**
(CDMA & LTE Business Sale Transaction)

**THIS MOTION**, made by Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Applicants") for an order approving the sale transaction (the "Transaction") contemplated by an asset sale agreement dated as of July 24, 2009 (the "Sale Agreement") among NNC, NNL and Nortel Networks Inc. ("NNI") and certain of their affiliates, as vendors (the "Sellers"), and Telefonaktiebolaget L M Ericsson (publ), as purchaser (the "Purchaser"), in respect of the sale of certain assets relating to Nortel's CDMA business and LTE business and as appended to the Seventeenth Report of Ernst & Young Inc, in it capacity as court-appointed monitor (the "Monitor") dated July 27, 2009 (the "Seventeenth Report"), and vesting in the Purchaser the Applicants' right, title and interest in and to the Assets (as defined in the Sale Agreement), was heard this day at 393 University Avenue, Toronto, Ontario.

- 2 -

**ON READING** the Affidavit of George Riedel, sworn July 25, 2009 (the "Riedel Affidavit"), the Seventeenth Report and on hearing the submissions of counsel for the Applicants and for the Monitor and those other parties present, and from no one appearing for any other person on the service list, although properly served as appears from the affidavit of service of Jennifer Stam sworn July 28, 2009 and filed:

1.      **THIS COURT ORDERS** that the time for the service of the Notice of Motion, the Seventeenth Report and the Motion Record is hereby abridged so that this Motion is properly returnable today and hereby dispenses with further service thereof.

2.      **THIS COURT ORDERS** that capitalized terms used herein and not otherwise defined shall have the meaning given to them in the Sale Agreement.

3.      **THIS COURT ORDERS AND DECLARES** that the Transaction is hereby approved and that the execution of the Sale Agreement by NNC and NNL is hereby authorized and approved, and the Applicants and the Monitor are hereby authorized and directed to take such additional steps and execute such additional documents, including without limitation the Ancillary Agreements, as may be necessary or desirable for the completion of the Transaction and for the conveyance of the Applicants' right, title and interest in and to the Assets to the Purchaser.

4.      **THIS COURT ORDERS** that in the event that the Transaction contemplated by the Sale Agreement cannot be consummated, the Alternate Bid (as defined in the Riedel Affidavit) be and is here by approved and the execution of the asset sale agreement pursuant to the Alternate Bid by the Applicants is approved and the Applicants and the Monitor shall be authorized and directed to take such additional steps and execute such additional documents, including without limitation the Ancillary Agreements, as may be necessary or desirable for the completion of the Transaction and for the conveyance of the Applicants' right, title and interest in and to the Assets to the Alternative Bidder.

5.      **THIS COURT ORDERS AND DECLARES** that the Applicants are authorized and directed to perform their obligations under the Sale Agreement and each of the Ancillary Agreements.

- 3 -

6.  **THIS COURT ORDERS AND DECLARES** that the Intellectual Property License Agreement substantially in the form attached as Confidential Appendix D to the Seventeenth Report and the Trademark License Agreement substantially in the form attached as Appendix D to the Seventeenth Report (the "IP Licenses") are hereby authorized and approved and NNL is directed to comply with its obligations thereunder.

7.  **THIS COURT ORDERS AND DECLARES** that the Ancillary Agreements, including the IP Licenses, shall be binding on the Applicants that are party thereto, and shall not be repudiated, disclaimed or otherwise compromised in these proceedings, and that intellectual property subject to the IP Licenses shall not be sold, transferred, conveyed or assigned by any of the Applicants unless the buyer or assignee of such intellectual property assumes all of the obligations of NNL under the IP Licenses and executes an assumption agreement in favour of the Purchaser in a form satisfactory to the Purchaser.

8.  **THIS COURT ORDERS AND DECLARES** that upon the delivery of a Monitor's certificate to the Purchaser substantially in the form attached as Schedule "A" hereto (the "Monitor's Certificate"), all of the Applicants' right, title and interest in and to the Assets shall vest absolutely in the Purchaser, free and clear of and from any and all security interests (whether contractual, statutory, or otherwise), hypothecs, mortgages, trusts or deemed trusts (whether contractual, statutory, or otherwise), liens, executions, levies, charges, or other financial or monetary claims, whether or not they have attached or been perfected, registered or filed and whether secured, unsecured or otherwise (collectively, the "Claims"), including, without limiting the generality of the foregoing: (i) any encumbrances or charges created by the Order of the Honourable Mr. Justice Morawetz dated January 14, 2009 (as amended and restated); and (ii) all charges, security interests or claims evidenced by registrations pursuant to the *Personal Property Security Act* (Ontario) or any other personal property registry system, excluding only Permitted Encumbrances and those Claims expressly assumed in writing by the Purchaser under the Sale Agreement.  For greater certainty, this Court orders that all of the Claims affecting or relating to the Assets are hereby expunged and discharged as against the Assets.

9.  **THIS COURT ORDERS** that for the purposes of determining the nature and priority of Claims, the net proceeds from the sale of the Applicants' right, title and interest in and to the

- 4 -

Assets shall stand in the place and stead of the Assets, and that from and after the delivery of the Monitor's Certificate all Claims shall attach to the net proceeds from the sale of the Applicants' right, title and interest in and to the Assets with the same priority as they had with respect to the Assets immediately prior to the sale, as if the Applicants' right, title and interest in and to the Assets had not been sold and remained in the possession or control of the person having that possession or control immediately prior to the sale.

10.    **THIS COURT ORDERS AND DIRECTS** the Monitor to file with the Court a copy of the Monitor's Certificate, forthwith after delivery thereof.

11.    **THIS COURT ORDERS** that, provided that the Purchaser is not in default (beyond any period given under the Occupancy Agreements (as defined below) to cure such default) in the payment and performance of its material obligations under each of the license agreement and the sub-lease (collectively, the "Occupancy Agreements") to be entered into between NNL and the Purchaser in respect of the Carling Property, the Charges (other than the Carling Facility Charges) will, in no event, adversely affect the rights of possession, use and occupation to be granted to the Purchaser pursuant to the Occupancy Agreements and that no steps shall be taken under, pursuant to or in connection with the Charges (other than the Carling Facility Charges) that adversely affect, diminish, interfere with or disturb such rights of possession, use and occupation. The Carling Facility Charges and the rights of enforcement thereunder shall be subject to a non-disturbance agreement between the Purchaser and NNI, in the form agreed by the Purchaser and NNI and filed with the Court. For the purposes of this paragraph 11, the terms Carling Property, Charges and Carling Facility Charges have the meanings given to them in the Initial Order granted on January 14, 2009, as subsequently amended and restated.

12.    **THIS COURT ORDERS** that, to the extent permitted by law, neither the Purchaser nor any relevant Designated Purchaser shall be a successor to any of the Applicants and neither the Purchaser nor any Designated Purchaser shall assume any liability of the Applicants, other than as expressly provided for in the Sale Agreement.

13.    **THIS COURT ORDERS** that in connection with the Stalking Horse Agreement and the Bidding Procedures (as both terms are defined in the Riedel Affidavit):

- 5 -

(a)    without limiting the relief granted in the Nokia Siemens Networks BV bidding procedures order of this Court granted on June 29, 2009, NNL is hereby authorized to pay 50% of the Bid Protections (as defined in the Bidding Procedures), it being acknowledged that Nortel Networks Inc. ("NNI") has agreed to pay the other 50% of the Bid Protections, if, as and when such Bid Protections become due and payable to Nokia Siemens Networks B.V. ("NSN") pursuant to and in accordance with the terms of the NSN Agreement and the Bidding Procedures Order;

(b)    in the event the Closing occurs, amounts paid to the Sellers in accordance with Section 2.3.2(b)(i) of the Sale Agreement shall be applied first to reimburse NNI and NNL for any amounts paid to NSN pursuant to clause (a) above and the remainder of such payment and all remaining Sale Proceeds (as defined in the Interim Funding and Settlement Agreement entered into on June 9, 2009 (the "IFA")) arising out of the Transaction shall be deposited into an escrow account pursuant to an escrow agreement to be negotiated and agreed to by all of the Sellers and in accordance with Section 12.g. of the IFA, and such Sale Proceeds shall not be distributed in advance of either (i) agreement by all of the Main Sellers as to the distribution of such Sale Proceeds (in accordance with Section 12.g. of the IFA) or (ii) in the case where the Main Sellers fail to reach such agreement, determination by the relevant dispute resolver(s) in accordance with the terms of the Interim Sales Protocol (as such term is defined in the IFA and subject to the requirements of Section 12.g of the IFA), which Interim Sales Protocol shall be approved by this Court;

(c)    in the event the Closing does not occur and the Sale Agreement is terminated as a result of the breach thereof by one or more of the Sellers, the payment of the Bid Protections as set out herein shall be without prejudice to any and all rights that may be asserted by such parties with respect to the allocation of the liability for payment of the Bid Protections; and

- 6 -

(d)     The Main Sellers agree that this agreement in respect of the Bid Protections (a) is being made only with respect to the initial allocation of the Bid Protections among the Main Sellers, and that nothing herein (i) shall, or be deemed to, determine, ratify, or adopt, or have any impact whatsoever on, the allocation or distribution of Sale Proceeds (other than reimbursement of the Bid Protections contemplated in clause (b) above) or (ii) shall be precedental for any other sale transaction that has occurred or may occur in the future.

14.     **THIS COURT ORDERS** that, notwithstanding:

(a)     the pendency of these proceedings;

(b)     any applications for a bankruptcy order now or hereafter issued pursuant to the *Bankruptcy and Insolvency Act* (Canada) (the "BIA") in respect of the Applicants and any bankruptcy order issued pursuant to any such applications; and

(c)     any assignment in bankruptcy made in respect of the Applicants;

each of (i) the vesting of the Applicants' right, title and interest in and to the Assets in the Purchaser pursuant to this Order, and (ii) IP Licenses shall be binding on any trustee-in-bankruptcy that may be appointed in respect of any of the Applicants and shall not be void or voidable by creditors of the Applicants, nor shall they constitute nor be deemed to be a settlement, fraudulent preference, assignment, fraudulent conveyance or other reviewable transaction under the BIA or any other applicable federal or provincial legislation, nor shall they constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation.

15.     **THIS COURT ORDERS AND DECLARES** that the Transaction is exempt from the application of the *Bulk Sales Act* (Ontario).

16.     **THIS COURT ORDERS** that the confidential appendices to the Seventeenth Report be and are hereby sealed pending further Order of this Court.

17.     **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United

Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representatives status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

18.    **THIS COURT ORDERS** that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

ENTERED AT / INSCRIT À TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

**JUL 2 8 2009**

PER / PAR:

**Schedule "A"**
**Form of Monitor's Certificate**

Court File No.:  09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**MONITOR'S CERTIFICATE**
(CDMA & LTE Business Sale Transaction)

**RECITALS**

A.      Pursuant to an Order of the Honourable Mr. Justice Morawetz of the Ontario Superior

Court of Justice (the "Court") dated January 14, 2009 (as amended and restated), Nortel

Networks Corporation ("NNC") and Nortel Networks Limited ("NNL") and certain of their

Canadian affiliates (collectively, the "Applicants") commenced proceedings pursuant to the

*Companies' Creditors Arrangement Act* (Canada) and Ernst & Young Inc., was appointed as

monitor (the "Monitor") in those proceedings.

B.      Pursuant to an Order of the Court dated July 28, 2009, the Court approved an asset sale

agreement dated as of July 28, 2009 (the "Sale Agreement") among NNC, NNL and Nortel

Networks Inc. ("NNI") and certain of their affiliates, as vendors (the "Sellers"), and

Telefonaktiebolaget L M Ericsson (publ), as purchaser (the "Purchaser"), in respect of the sale of

certain assets relating to Nortel's CDMA business and LTE business and provided for the vesting

in the Purchaser of the Applicants' right, title and interest in and to the Assets, which vesting is to be effective with respect to the Assets upon the delivery by the Monitor to the Purchaser of a certificate confirming (i) the payment by the Purchaser of the Purchase Price for the Assets; (ii) that the conditions to closing as set out in Article ■ of the Sale Agreement have been satisfied or waived by the Applicants and the Purchaser; and (iii) the Applicants have advised the Monitor that the Transaction has been completed to the satisfaction of the Applicants.

C.      Unless otherwise indicated herein, terms with initial capital have the meanings set out in the Sale Agreement.

        **THE MONITOR CERTIFIES** the following:

1.      NNC and NNL have advised the Monitor that the Purchaser has paid and the Applicants **[NTD: unless paid to an escrow agent]** have received the Purchase Price for the Assets payable on the Closing Date pursuant to the Sale Agreement;

2.      NNC and NNL have advised the Monitor that the conditions to Closing as set out in Article ■ of the Sale Agreement have been satisfied or waived by the Applicants and the Purchaser; and

3.      NNC and NNL have advised the Monitor that the Transaction has been completed to the satisfaction of the Applicants.

**THIS CERTIFICATE** was delivered by the Monitor at _____ [time] on _____ _____ [date].

**DATED** this _____ day of _____, 2009.

                              **ERNST & YOUNG Inc., in its capacity as**
                              **Monitor in the Applicants' CCAA proceedings**
                              **and not in its personal capacity**

                              Per:  _____

                                    Name:
                                    Title:

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

Court File No: 09-CL-7950

---

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

---

**APPROVAL AND VESTING ORDER**
(CDMA & LTE Business Sale Transaction)

---

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

# BLUE SHEET

Court File No.: 09-CL-7950



**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | WEDNESDAY, THE 28ᵗʰ |
| | ) | |
| JUSTICE MORAWETZ | ) | DAY OF OCTOBER, 2009 |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**AMENDMENT TO APPROVAL AND VESTING ORDER**
(CDMA & LTE Business Sale Transaction)

**THIS MOTION**, made by Nortel Networks Corporation ("NNC"), Nortel Networks
Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International
Corporation and Nortel Networks Global Corporation (collectively, the "Applicants") for an
order amending the Court's order dated July 28, 2009 (the "Approval and Vesting Order") as it
relates to the vesting of assets under the sale transaction (the "Transaction") contemplated by an
asset sale agreement dated as of July 24, 2009 (the "Sale Agreement") among NNC, NNL and
Nortel Networks Inc. ("NNI") and certain of their affiliates, as vendors (the "Sellers"), and
Telefonaktiebolaget L M Ericsson (publ), as purchaser (the "Purchaser"), in respect of the sale of
certain assets relating to Nortel's CDMA business and LTE business, was heard this day at 330
University Avenue, Toronto, Ontario.

12327602.5

ON CONSENT of the Applicants, the Monitor and the Purchaser and no other party opposing;

1.    THIS COURT ORDERS that the time for the service of the Notice of Motion and the Motion Record is hereby abridged so that this Motion is properly returnable today and hereby dispenses with further service thereof.

2.    THIS COURT ORDERS that capitalized terms used herein and not otherwise defined shall have the meaning given to them in the Sale Agreement.

3.    THIS COURT ORDERS that paragraph 8 of the Approval and Vesting Order shall be amended to read as follows:

8.    THIS COURT ORDERS AND DECLARES that upon the delivery of a Monitor's certificate to the Purchaser substantially in the form attached as Schedule "A" hereto (the "Monitor's Certificate"), all of the Applicants' right, title and interest in and to the Assets shall vest absolutely in the Purchaser or any Designated Purchaser (as defined below), as more particularly set out in the conveyance documents delivered by the Purchaser or any Designated Purchaser at Closing pursuant to the Sale Agreement, free and clear of and from any and all security interests (whether contractual, statutory, or otherwise), hypothecs, mortgages, trusts or deemed trusts (whether contractual, statutory, or otherwise), liens, executions, levies, charges, or other financial or monetary claims, whether or not they have attached or been perfected, registered or filed and whether secured, unsecured or otherwise (collectively, the "Claims"), including, without limiting the generality of the foregoing: (i) any encumbrances or charges created by the Order of the Honourable Mr. Justice Morawetz dated January 14, 2009 (as amended and restated); and (ii) all charges, security interests or claims evidenced by registrations pursuant to the *Personal Property Security Act* (Ontario) or any other personal property registry system, excluding only Permitted Encumbrances and those Claims expressly assumed in writing by the Purchaser under the Sale Agreement. For greater certainty, this Court orders that all of the Claims affecting or relating to the Assets are hereby expunged and discharged as against the Assets.

- 3 -

4.    **THIS COURT ORDERS** that the Approval and Vesting Order shall be amended to include the following paragraph 10A:

>   10A.    **THIS COURT ORDERS** that, the Purchaser is hereby authorized in connection with the consummation of the Transaction to allocate the Assets among its affiliates, designees, assignees, and/or successors, including any Designated Purchaser (each, for the purposes of this Order, a "Designated Purchaser"), in a manner as it in its sole discretion deems appropriate and to assign, lease, sublease, license, sublicense, transfer or otherwise dispose of any of the Assets to any Designated Purchaser, in each case with all of the rights and protections accorded to the Purchaser under this Order and the Sale Agreement as if it were the named Purchaser under the Sale Agreement, and the Applicants shall cooperate with and take all actions reasonably requested by the Purchaser or any Designated Purchaser to effectuate any of the foregoing; provided, however, the Applicants shall be reimbursed by the Purchaser for any reasonable expenses in connection therewith.

5.    **THIS COURT ORDERS** that paragraph 14 of the Approval and Vesting Order shall be amended to read as follows:

>   14.    **THIS COURT ORDERS** that, notwithstanding:
>
>   (a)    the pendency of these proceedings;
>
>   (b)    any applications for a bankruptcy order now or hereafter issued pursuant to the *Bankruptcy and Insolvency Act* (Canada) (the "BIA") in respect of the Applicants and any bankruptcy order issued pursuant to any such applications; and
>
>   (c)    any assignment in bankruptcy made in respect of the Applicants;
>
>   each of (i) the vesting of the Applicants' right, title and interest in and to the Assets in the Purchaser or any Designated Purchaser, as applicable, pursuant to this Order, and (ii) IP Licenses shall be binding on any trustee-in-bankruptcy that may be appointed in respect of any of the Applicants and shall not be void or voidable by creditors of the Applicants,

- 4 -

nor shall they constitute nor be deemed to be a settlement, fraudulent preference, assignment, fraudulent conveyance or other reviewable transaction under the BIA or any other applicable federal or provincial legislation, nor shall they constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation.

6.      **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representatives status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

7.      **THIS COURT ORDERS** that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

ENTERED AT / INSCRIT À TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

OCT 2 8 2009

PER / PAR: JV

12327602.5

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

Court File No: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**AMENDMENT TO APPROVAL AND VESTING ORDER**
(CDMA & LTE Business Sale Transaction)

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4, Canada

**Derrick Tay LSUC#: 21152A**
Tel:  (416) 216-4832
Email: dtay@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930
Lawyers for the Applicants

# BLUE SHEET



Court File No.: 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | WEDNESDAY, THE 16th |
| | ) | |
| JUSTICE MORAWETZ | ) | DAY OF SEPTEMBER, 2009 |

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**APPROVAL AND VESTING ORDER**
**(Enterprise Solutions Business)**

THIS MOTION, made by Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation (collectively, the "Applicants") for the relief set out in the Applicants' Notice of Motion dated September 15, 2009 including, the approval of a transaction (the "Transaction") to sell Assets and Shares (as such terms are defined in the Sale Agreement) (collectively, the "Assets") pursuant to an amended and restated asset and share sale agreement dated as of September 14, 2009 (the "Sale Agreement") among NNC, NNL, Nortel Networks Inc. (collectively the "Main Sellers") and the affiliates of the Main

Sellers identified in the Sale Agreement as Other Sellers (and together with the Main Sellers and the EMEA Sellers (as defined in the Sale Agreement), the "Sellers"), as sellers and Avaya Inc., as purchaser (the "Purchaser") was heard this day at 393 University Avenue, Toronto, Ontario.

ON READING the affidavit of George Riedel sworn September 15, 2009 and the twentieth report of Ernst & Young Inc. in its capacity as monitor (the "Monitor") dated September 15, 2009 (the "Twentieth Report") and on hearing the submissions of counsel for the Applicant, the Monitor and those other parties present, no one appearing for any other person on the service list, although properly served as appears from the affidavit of Katie Legree sworn September 15, 2009, filed:

1.      THIS COURT ORDERS that the time for the service of the Notice of Motion, the Twentieth Report and the Motion Record is hereby abridged so that this Motion is properly returnable today and hereby dispenses with further service thereof

2.      THIS COURT ORDERS AND DECLARES that the Transaction is hereby approved. The execution, delivery and performance of the Sale Agreement by the Applicants is hereby authorized and approved, and the Applicants are hereby authorized and directed to take such additional steps and execute such additional documents as may be necessary or desirable for the completion of the Transaction and for the conveyance of the Assets to the Purchaser.

3.      THIS COURT ORDERS AND DECLARES that upon the delivery of a Monitor's certificate to the Purchaser substantially in the form attached as Schedule A hereto (the "Monitor's Certificate"), all of the Applicants' right, title and interest in and to their Assets shall vest absolutely in the Purchaser or the Designated Purchaser (as such term is defined in the Sale Agreement) free and clear of and from any and all security interests (whether contractual, statutory, or otherwise), hypothecs, mortgages, trusts or deemed trusts (whether contractual, statutory, or otherwise), liens, executions, levies, charges, or other financial or monetary claims, whether or not they have attached or been perfected, registered or filed and whether secured, unsecured or otherwise (collectively, the "Claims") including, without limiting the generality of the foregoing:  (i) any encumbrances or charges created by the Orders made in these proceedings including the Order of the Honourable Justice Morawetz dated January 14, 2009 (as amended and restated); (ii) all charges, security interests or claims evidenced by registrations pursuant to the *Personal Property Security Act* (Ontario) or any other personal property registry system; and

- 3 -

(iii) to the extent permitted by law, all Excluded Liabilities (all of which are collectively referred to as the "Encumbrances", but excluding Permitted Encumbrances (other than those specifically contemplated to be discharged by virtue of this Order) and Assumed Liabilities). For greater certainty, this Court orders that all of the Encumbrances affecting or relating to the Assets are hereby expunged and discharged as against the Assets.

4.    THIS COURT ORDERS that for the purposes of determining the nature and priority of Claims, the net proceeds from the sale of the Assets shall stand in the place and stead of the Assets, and that from and after the delivery of the Monitor's Certificate all Claims and Encumbrances shall attach to the net proceeds from the sale of the Assets with the same priority as they had with respect to the Assets immediately prior to the sale, as if the Assets had not been sold and remained in the possession or control of the person having that possession or control immediately prior to the sale.

5.    THIS COURT ORDERS that all proceeds of the Transaction, subject to the price adjustments and the Purchaser's rights under the Sale Agreement and less applicable or value added taxes incurred by the Sellers, shall be deposited into an escrow account pursuant to an escrow agreement to be negotiated and agreed to by all of the Sellers and in accordance with Section 12.g. of the Interim Funding and Settlement Agreement entered into on June 9, 2009 (the "IFA"), and such proceeds shall not be distributed in advance of either (i) agreement by all of the Sellers as to the distribution of such proceeds (in accordance with Section 12.g. of the IFA) or (ii) in the case where the Sellers fail to reach such agreement, determination by the relevant dispute resolver(s) in accordance with the terms of the Interim Sales Protocol (as such term is defined in the IFA and subject to the requirements of Section 12.g of the IFA), which Interim Sales Protocol shall be approved by this Court.

6.    THIS COURT ORDERS AND DIRECTS the Monitor to file with the Court a copy of the Monitor's Certificate, forthwith after delivery thereof.

7.    THIS COURT ORDERS that, notwithstanding:

    (a)    the pendency of these proceedings;

- 4 -

(b)    any applications for a bankruptcy order now or hereafter issued pursuant to the
*Bankruptcy and Insolvency Act* (Canada) in respect of any of the Applicants and
any bankruptcy order issued pursuant to any such applications; and

(c)    any assignment in bankruptcy made in respect of any of the Applicants;

the provisions of the Transaction Documents and vesting of the Assets in the Purchaser or the
Designated Purchaser, as the case may be pursuant to this Order shall be binding on any trustee
in bankruptcy that may be appointed in respect of the Applicants and shall not be void or
voidable by creditors of the Applicants, nor shall it constitute nor be deemed to be a settlement,
fraudulent preference, assignment, fraudulent conveyance or other reviewable transaction under
the *Bankruptcy and Insolvency Act* (Canada) or any other applicable federal or provincial
legislation, nor shall it constitute oppressive or unfairly prejudicial conduct pursuant to any
applicable federal or provincial legislation.

8.    THIS COURT ORDERS AND DECLARES that the Transaction is exempt from the
application of the *Bulk Sales Act* (Ontario).

9.    THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal,
regulatory or administrative body having jurisdiction in Canada, the United States, the United
Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and
their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory
and administrative bodies are hereby respectfully requested to make such orders and to provide
such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be
necessary or desirable to give effect to this Order, to grant representative status to the Monitor in
any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in
carrying out the terms of this Order.

10.    THIS COURT ORDERS that each of the Applicants and the Monitor be at liberty and is
hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative
body, wherever located, for the recognition of this Order and for assistance in carrying out the
terms of this Order.

- 5 -

11.   THIS COURT ORDERS:

(i)      the Sale Agreement and related agreements do not involve a "back to back" arrangement with the Purchaser, by which the Applicants would continue operating under the MCMSAs but stand as a mere conduit between Flextronics and the Purchaser under the Sale Agreement with respect to the MCMSAs, where "MCMSAs" refers to the (a) the Amended and Restated Master Contract Manufacturing Services Agreement, dated as of June 29, 2004, between NNL and Flextronics Telecom Systems Ltd. and (b) the Master Contract Manufacturing Services Agreement, dated as of September 30, 2003, between NNL and Flextronics Corporation (f/k/a Solectron Corporation) ("Flextronics") and their ancillary agreements;

(ii)     the MCMSAs and any of the Applicants' contractual rights thereunder as they relate to the Business, shall not be assigned to the Purchaser in connection with the Sale Agreement;

(iii)    upon closing of the Transaction, the Applicants shall cease placing forecasts or purchase orders under the MCMSAs for products or services related solely to the Business, *provided* that the Applicants shall not be prohibited from providing administrative services to Purchaser, including placing forecasts or purchase orders on behalf of the Purchaser pursuant to one or more agreements between the Purchaser and Flextronics;

(iv)     the Applicants, the Purchaser and Flextronics shall promptly begin good faith negotiations regarding a three way inventory purchase agreement as contemplated in the term sheet attached as Exhibit E to the Sale Agreement;

(v)      the Purchaser and Flextronics shall promptly begin good faith negotiations regarding an agreement which shall apply to any purchase orders issued to Flextronics by the Purchaser (or any of its designated affiliates) in connection with and following Purchaser's acquisition of the Business; and

- 6 -

    (vi)    the Applicants and Flextronics shall each use commercially reasonable efforts to provide each other and to the Purchaser, no later than October 5, 2009, a list of all equipment owned by the Applicants or the affiliates of the Applicants that is in the possession of Flextronics related to the Business. Based on these two lists, the Applicants and Flextronics shall cooperate in good faith to compile a complete list of all equipment related to the Business that is owned by the Applicants or the affiliates of the Applicants and is in the possession of Flextronics (the "Equipment List") by 5:00 pm (EST) on October 10, 2009, and shall provide a copy of the Equipment List to the Purchaser. Upon finalization of the Equipment List, Flextronics shall provide the Applicants and the Purchaser with a list of their interests (if any) with regard to each item of equipment set forth in the Equipment List no later than October 15, 2009, or within five (5) business days of the finalization of the Equipment List (the "Flex Interests"). Notwithstanding any of the foregoing, the Flex Interests shall be resolved with consent of the Applicants, Flextronics, the Purchaser and the Monitor, or failing which, further Order of the Court, prior to the Closing.

    (vii)    The Applicants, Flextronics and the Purchaser reserve their rights regarding the matters set forth in this paragraph 11. The Applicants and Flextronics may, upon the written consent of Purchaser, agree to amend any date in this paragraph.

12.    THIS COURT ORDERS that nothing in the foregoing paragraph shall serve as a precedent with respect to any future Orders or transactions made in these proceedings.

13.    THIS COURT ORDERS that the Confidential Appendix "D" to the Twentieth Report be and is hereby sealed pending further Order of this Court.

ENTERED AT / INSCRIT À TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

SEP 17 2009

PER / PAR: *TV*

Schedule A – Form of Monitor's Certificate

Court File No.: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**MONITOR'S CERTIFICATE**
**(Enterprise Solutions Business)**

**RECITALS**

A.      Pursuant to an Order of the Honourable Justice Morawetz of the Ontario Superior Court of Justice (the "Court") dated January 14, 2009 (as amended and restated), Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation (collectively, the "Applicants") commenced proceedings pursuant to the *Companies' Creditors Arrangements Act* (Canada) and Ernst & Young Inc. was appointed as monitor (the "Monitor") in these proceedings.

B.      Pursuant to an Order of the Court dated September 16, 2009, the Court approved an amended and restated asset and share sale agreement dated as of September 14, 2009 (the "Sale Agreement") among NNC, NNL, Nortel Networks Inc. (collectively the "Main Sellers") and the affiliates of the Main Sellers identified in the Sale Agreement as Other Sellers, as sellers (the Other Sellers and the

Main Sellers together the "Sellers") and Avaya Inc., as purchaser (the "Purchaser") and provided for the vesting in the Purchaser of the Applicants' right, title and interest in and to the Assets, which vesting is to be effective with respect to the Assets upon the delivery by the Monitor to the Purchaser of a certificate confirming (i) the payment by the Purchaser of the Purchase Price; (ii) that the conditions to Closing as set out in Article 8 of the Sale Agreement have been satisfied or waived by the Main Sellers and the Purchaser, as applicable; and (iii) the Monitor has been advised that the Transaction has been completed to the satisfaction of the Applicants.

C.      Unless otherwise indicated herein, terms with initial capitals have the meanings set out in the Sale Agreement.

THE MONITOR CERTIFIES the following:

1.      NNC, NNL and the Purchaser have advised the Monitor that the Purchaser has paid and [●] has received the Purchase Price payable on the Closing Date pursuant to the terms of the Sale Agreement;

2.      NNC, NNL and the Purchaser have advised the Monitor that the conditions to Closing as set out in Article 8 of the Sale Agreement have been satisfied or waived by the Applicants and the Purchaser, as applicable; and

3.      NNC, NNL and the Purchaser have advised the Monitor that the Transaction has been completed to the satisfaction of the Applicants.

This Certificate was delivered by the Monitor at _____ [TIME] on _____ 200●.


                              **ERNST & Young Inc. in its capacity as**
                              **monitor in the CCAA proceedings of Nortel**
                              **Networks Corporation, et. al. and not in its**
                              **personal capacity**

                              Per:    _____

                                      Name:
                                      Title:

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

Court File No:  09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**APPROVAL AND VESTING ORDER**
**Enterprise Solutions Business**

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel:  (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte  LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

# BLUE SHEET

Court File No.: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | WEDNESDAY, THE 28th |
| | ) | |
| JUSTICE MORAWETZ | ) | DAY OF OCTOBER, 2009 |



IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, c. C-36, AS AMENDED

**AMENDED APPROVAL AND VESTING ORDER**
**(Next Generation Packet Core Business)**

THIS MOTION, made by Nortel Networks Corporation ("NNC"), Nortel Networks
Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC" and with NNL, the
"Canadian Sellers") Nortel Networks Global Corporation and Nortel Networks International
Corporation (collectively, the "Applicants") for the relief set out in the Applicants' Notices of
Motion dated October 26, 2009 and November 25, 2009 including, the approval of a transaction
(the "Transaction") to sell certain assets pursuant to a transaction agreement dated October 25,
2009 as amended by amendment no. 1 to the transaction agreement dated November 27, 2009
(the "Sale Agreement") among the Sellers, as sellers and Hitachi, Ltd., as purchaser (the

- 2 -

"Purchaser") was heard on October 28, 2009 at 330 University Avenue, Toronto, Ontario and, solely for the purpose of amendments, on December 2, 2009.

ON READING the affidavit of George Riedel sworn October 26, 2009, the affidavit of John Doolittle sworn November 25, 2009, the twenty-sixth report of Ernst & Young Inc. in its capacity as monitor (the "Monitor") dated October 26, 2009 (the "Twenty-Sixth Report") and on hearing the submissions of counsel for the Applicants, the Monitor and those other parties present, no one appearing for any other person on the service list, although properly served as appears from the affidavit of Katie Legree sworn October 27, 2009 and November 26, 2009, filed:

1.     THIS COURT ORDERS that the time for the service of the Notice of Motion, the Twenty-Sixth Report and the Motion Record is hereby abridged so that this Motion is properly returnable today and hereby dispenses with further service thereof.

2.     THIS COURT ORDERS that capitalized terms used herein and not otherwise defined will have the meaning given to them in the Sale Agreement.

3.     THIS COURT ORDERS AND DECLARES that, subject to the approval of the Transaction and Sale Agreement by the United States Bankruptcy Court for the District of Delaware in the Chapter 11 Cases of the U.S. Debtors, the Transaction is hereby approved. The execution, delivery and performance of the Sale Agreement by the Canadian Sellers and the Intellectual Property License Agreement by NNL is hereby authorized and approved (with such alterations and amendments as the parties thereto may agree, subject to obtaining Monitor consent prior to making any material alterations or amendments to the Sale Agreement or Intellectual Property License Agreement), and the Canadian Sellers are hereby authorized and directed to take such additional steps and execute such additional documents, including without limitation the Ancillary Agreements, as may be necessary or desirable for the completion of the Transaction and for the conveyance of the Assets to the Purchaser or its Designated Purchaser, if applicable.

4.     THIS COURT ORDERS AND DECLARES that upon the delivery of a Monitor's certificate to the Purchaser substantially in the form attached as Schedule "A" hereto (the "Monitor's Certificate"), all of the Canadian Sellers' right, title and interest in and to the Assets

shall vest absolutely in the Purchaser or, to the extent designated by the Purchaser in accordance with the Sale Agreement, its Designated Purchaser, free and clear of and from any and all security interests (whether contractual, statutory, or otherwise), hypothecs, mortgages, trusts or deemed trusts (whether contractual, statutory, or otherwise), liens, executions, levies, charges, or other financial or monetary claims, whether or not they have attached or been perfected, registered or filed and whether secured, unsecured or otherwise (collectively, the "Claims") including, without limiting the generality of the foregoing: (i) any encumbrances or charges created by the Orders made in these proceedings, including the Initial Order of the Honourable Justice Morawetz dated January 14, 2009 (as amended and restated); and (ii) all charges, security interests or claims evidenced by registrations pursuant to the *Personal Property Security Act* (Ontario) or any other personal property registry system; excluding only those Seller Encumbrances, Assumed Liabilities and licenses expressly permitted or assumed under the Sale Agreement.    For greater certainty, this Court orders that all Liens, other than Seller Encumbrances and licenses expressly permitted under the Sale Agreement, affecting or relating to the Assets, are hereby expunged and discharged as against the Assets.

5.      THIS COURT ORDERS that, except as otherwise expressly permitted by and in accordance with the terms of the Ancillary Agreements, the Canadian Sellers shall not revoke, disclaim, terminate or resiliate the Ancillary Agreements and notwithstanding any such action by the Canadian Sellers, the Purchaser or its Designated Purchaser, as the case may be, shall be entitled to use the Licensed Intellectual Property in accordance with the Intellectual Property License Agreement as though such action had not occurred. For greater certainty, nothing in this paragraph 5 shall prohibit the Canadian Sellers from exercising any and all rights and remedies (including any termination rights) available to them pursuant to and in accordance with the express terms of the Ancillary Agreements, or applicable law outside any insolvency or bankruptcy proceeding.

6.      THIS COURT ORDERS that for the purposes of determining the nature and priority of Claims, the net proceeds from the sale of the Assets shall stand in the place and stead of the Assets, and that from and after the delivery of the Monitor's Certificate all Claims and Encumbrances shall attach to the net proceeds from the sale of the Assets with the same priority as they had with respect to the Assets immediately prior to the sale, as if the Assets had not been

sold and remained in the possession or control of the person having that possession or control immediately prior to the sale.

7.    THIS COURT ORDERS that all proceeds of the Transaction, subject to the Purchaser's rights under the Sale Agreement and less applicable transfer or value added taxes incurred by the Sellers, and, to the extent agreed by the Sellers, any transaction costs, shall be deposited by the Sellers upon receipt from the Purchaser into an Escrow Account (as such term is defined in the Interim Funding and Settlement Agreement entered into on June 9, 2009 (the "IFA")), and such proceeds shall not be distributed in advance of either (i) agreement by all of the Selling Debtors (as defined in the IFA) as to the distribution of such proceeds (in accordance with Section 12.g. of the IFA) or (ii) in the case where the Selling Debtors fail to reach such agreement, determination by the relevant dispute resolver(s) in accordance with the terms of the Interim Sales Protocol (as such term is defined in the IFA

and subject to the requirements of Section 12.g of the IFA), which Interim Sales Protocol shall be approved by this Court.

8.    THIS COURT ORDERS AND DIRECTS the Monitor to file with the Court a copy of the Monitor's Certificate, forthwith after delivery thereof.

9.    THIS COURT ORDERS that, notwithstanding:

    (a)    the pendency of these proceedings;

    (b)    any applications for a bankruptcy order now or hereafter issued pursuant to the *Bankruptcy and Insolvency Act* (Canada) in respect of any of the Applicants and any bankruptcy order issued pursuant to any such applications; and

    (c)    any assignment in bankruptcy made in respect of any of the Applicants;

the vesting of the Assets in the Purchaser or its Designated Purchaser, as the case may be, pursuant to this Order and all the terms of the Sale Agreement and the Ancillary Agreements shall be binding on any trustee in bankruptcy that may be appointed in respect of any of the Applicants and shall not be void or voidable by creditors of any of the Applicants, nor shall they

- 5 -

constitute nor be deemed to be a settlement, fraudulent preference, assignment, fraudulent conveyance, transfer at under value or other reviewable transaction under the *Bankruptcy and Insolvency Act* (Canada) or any other applicable federal or provincial legislation, nor shall they constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation.

10.    THIS COURT ORDERS that any sale or transfer of the Licensed Intellectual Property by NNL or a bankruptcy trustee or receiver appointed in respect of NNL, whether by vesting order or otherwise, shall be made subject to the Intellectual Property License Agreement, and the Purchaser and Designated Purchaser, as the case may be, shall be permitted to continue to use the Licensed Intellectual Property in accordance with the Intellectual Property License Agreement following and notwithstanding any such sale or transfer of the Licensed Intellectual Property. For greater certainty, nothing in this paragraph 10 shall prohibit a purchaser of NNL's interest in the Licensed Intellectual Property or an assignee of the Intellectual Property License Agreement (if assigned in accordance with the Intellectual Property License Agreement) from exercising any and all rights and remedies (including any termination rights) available to such party pursuant to and in accordance with express terms of the Intellectual Property License Agreement, or applicable law outside any insolvency or bankruptcy proceeding.

11.    THIS COURT ORDERS AND DECLARES that the Transaction is exempt from the application of the *Bulk Sales Act* (Ontario).

12.    THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order.  All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

13.    THIS COURT ORDERS that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative

- 6 -

body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

14.    THIS COURT ORDERS that the Confidential Appendix "B" to the Twenty-Sixth Report be and is hereby sealed pending further Order of this Court.

ENTE ... A. INSCRIT A TORONTO
ON / BOOK NO
LE / DANS LE REGISTRE NO.

DEC 0 3 2009

PER / PAR

Schedule A – Form of Monitor's Certificate

Court File No.:  09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT,***
**R.S.C. 1985, c. C-36, AS AMENDED**

**MONITOR'S CERTIFICATE**
**(Next Generation Packet Core Business)**

**RECITALS**

A.      Pursuant to an Order of the Honourable Justice Morawetz of the Ontario Superior Court of Justice (the "Court") dated ●, 2009 (as amended and restated), Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation ("NNTC" and, with NNL, the "Canadian Sellers") (collectively, the "Applicants") commenced proceedings pursuant to the *Companies' Creditors Arrangement Act* (Canada) and Ernst & Young Inc. was appointed as monitor (the "Monitor") in these proceedings.

B.      Pursuant to an Order of the Court dated ●, 2009, the Court approved a transaction  (the "Transaction") to sell certain assets pursuant to a transaction agreement dated October 25, 2009, as amended by amendment no 1 to the transaction agreement dated November ●, 2009 (the "Sale

- 2 -

Agreement") among the Sellers and Hitachi, Ltd., as purchaser (the "Purchaser") and provided for the vesting in the Purchaser or Designated Purchaser of the Canadian Sellers' right, title and interest in and to the Assets, which vesting is to be effective with respect to the Assets upon the delivery by the Monitor to the Purchaser of a certificate confirming receipt of confirmation from the Canadian Sellers (i) the Purchaser has paid the Purchase Price; (ii) the conditions to Closing as set out in Article 8 of the Sale Agreement have been satisfied or waived by the Sellers and the Purchaser, as applicable; and (iii) the Transaction has been completed to the satisfaction of the Canadian Sellers.

C.      Unless otherwise indicated herein, terms with initial capitals have the meanings set out in the Sale Agreement.

THE MONITOR CERTIFIES the following:

1.      The Canadian Sellers have advised the Monitor that the Purchaser has paid and JPMorgan Chase Bank, N.A., as escrow agent, has received the Purchase Price payable on the Closing Date pursuant to the terms of the Sale Agreement;

2.      The Canadian Sellers have advised the Monitor that the conditions to Closing as set out in Article 8 of the Sale Agreement have been satisfied or waived by the Sellers and/or the Purchaser, as applicable; and

3.      The Canadian Sellers have advised the Monitor that the Transaction has been completed to the satisfaction of the Sellers.

This Certificate was delivered by the Monitor at _____ [TIME] on _____ 2009.

**Ernst & Young Inc. in its capacity as monitor in the CCAA proceedings of Nortel Networks Corporation, et. al. and not in its personal capacity**

Per: _____

          Name:
          Title:

DOCSTOR: 1818185\3

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

Court File No:  09-CL-7950

---

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

---

**AMENDED APPROVAL AND VESTING ORDER**
**(Next Generation Packet Core Business)**

---

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street, P.O. Box 84
Toronto, Ontario  M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

# BLUE SHEET

Court File No:  09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | WEDNESDAY, THE 2nd |
| | ) | |
| JUSTICE MORAWETZ | ) | DAY OF DECEMBER, 2009 |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**APPROVAL AND VESTING ORDER**
**(Metro Ethernet Networks Business)**

THIS MOTION, made by Nortel Networks Corporation ("NNC"), Nortel Networks
Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International
Corporation and Nortel Networks Global Corporation (collectively, the "Applicants") for an
order approving the sale transaction (the "Transaction") contemplated by an amended and
restated asset sale agreement dated as of November 24, 2009 (the "Sale Agreement") among
Ciena Corporation (the "Purchaser"), as buyer, and NNC, NNL and Nortel Networks Inc.
(collectively, the "Main Sellers") and the affiliates of the Main Sellers identified in the Sale
Agreement as Other Sellers (and together with the Main Sellers, the "Sellers") as vendors, in
respect of the sale of certain assets relating to Nortel's Metro Ethernet Networks business, and as
appended to the Twenty-Eighth Report of Ernst & Young Inc., in its capacity as court-appointed

Monitor (the "Monitor") dated November 27, 2009 (the "Twenty-Eighth Report"), and vesting in the Purchaser or the appropriate Designated Purchaser, as the case may be, the Applicants' right, title and interest in and to the Assets (as defined in the Sale Agreement), was heard this day at 393 University Avenue, Toronto, Ontario.

ON READING the affidavit of George Riedel sworn November 25, 2009, the Twenty-Eighth Report and on hearing the *viva voce* evidence of Murray McDonald in his capacity as President of the Monitor and the submissions of counsel for the Applicant and for the Monitor and those other parties present, no one appearing for any other person on the service list, although properly served as appears from the affidavit of Katie Legree sworn November 26, 2009 and filed:

1.     THIS COURT ORDERS that the time for the service of the Notice of Motion, the Twenty-Eighth Report and the Motion Record is hereby abridged so that this Motion is properly returnable today and hereby dispenses with further service thereof.

2.     THIS COURT ORDERS that capitalized terms used herein and not otherwise defined shall have the meaning given to them in the Riedel Affidavit or the Sale Agreement as applicable.

3.     THIS COURT ORDERS AND DECLARES that the Transaction is hereby approved. The execution of the Sale Agreement and the Ancillary Agreements by the Applicants party thereto is hereby authorized and approved, and the Applicants and the Monitor are hereby authorized and directed to take such additional steps and execute such additional documents as may be necessary or desirable for the completion of the Transaction and for the conveyance of the Applicants' right, title and interest in and to the Assets to the Purchaser.

4.     THIS COURT ORDERS that in the event that the Transaction contemplated by the Sale Agreement cannot be consummated in accordance with the Sale Agreement, the Alternate Bid (as defined in the Riedel Affidavit) be and is hereby approved and the execution of the asset sale agreement pursuant to the Alternate Bid by the Applicants is approved and the Applicants and the Monitor shall be authorized to take such additional steps and execute such additional documents, as may be necessary or desirable for the completion of the transaction contemplated

by the Alternate Bidder and for the conveyance of the Applicants' right, title and interest in and to the Assets to the Alternative Bidder.

5.    THIS COURT ORDERS that the Applicants are authorized and directed to perform their obligations under the Sale Agreement and each of the Ancillary Agreements.

6.    THIS COURT ORDERS AND DECLARES that upon the delivery of a Monitor's certificate to the Purchaser substantially in the form attached as Schedule "A" hereto (the "Monitor's Certificate"), all of the Applicants' right, title and interest in and to the Assets shall vest absolutely in the Purchaser or the appropriate Designated Purchaser, as the case may be, free and clear of and from any and all security interests (whether contractual, statutory, or otherwise), hypothecs, mortgages, pledges, deeds of trust, trusts or deemed trusts (whether contractual, statutory, or otherwise), liens (statutory or otherwise), executions, levies, charges, or other financial or monetary claims, options, rights of use, rights of first offer or first refusal, real property licenses but only in respect of the Montreal Premises (which, for greater certainty, does not include any rights of sublease or occupation which may be in the Montreal Premises Restructured Lease), encumbrances, conditional sale arrangements or other similar restrictions of any kind, whether or not they have attached or been perfected, registered or filed and whether secured, unsecured or otherwise (collectively, the "Claims"), including, without limiting the generality of the foregoing: (i) any encumbrances or charges created by the Order of the Honourable Justice Morawetz dated January 14, 2009 (as amended and restated); and (ii) all charges, security interests or claims evidenced by registrations pursuant to the *Personal Property Security Act* (Ontario) or any other personal property registry system, excluding present zoning, entitlement, building and land use regulations, covenants, minor defects of title, easements, rights of way, development agreements, restrictions and other similar charges or encumbrances, and Assumed Liabilities. For greater certainty, this Court orders that all of the Claims affecting or relating to the Assets are hereby expunged and discharged as against the Assets.

7.    THIS COURT ORDERS that for the purposes of determining the nature and priority of Claims, the net proceeds from the sale of the Applicants' right, title and interest in and to the Assets shall stand in the place and stead of the Assets, and that from and after the delivery of the Monitor's Certificate all Claims shall attach to the net proceeds from the sale of the Applicants' right, title and interest in and to the Assets with the same priority as they had with respect to the

Assets immediately prior to the sale, as if the Applicants' right, title and interest in and to the Assets had not been sold and remained in the possession or control of the person having that possession or control immediately prior to the sale.

8.      THIS COURT ORDERS that all proceeds of the Transaction, subject to the price adjustments and the Purchaser's rights under the Sale Agreement and less applicable transfer or value added taxes incurred by the Sellers, shall be deposited into an Escrow Account (as defined in the Interim Funding and Settlement Agreement entered into on June 9, 2009 (the "IFA")) pursuant to an escrow agreement to be negotiated and agreed to by all of the Sellers and in accordance with Section 12.g of the IFA, and such proceeds shall not be distributed in advance of either (i) agreement by all of the Selling Debtors (as defined in the IFA) as to the distribution of such proceeds (in accordance with the IFA and subject to the requirements of Section 12(g) of the IFA) or (ii) in the case where the Selling Debtors (as defined in the IFA) fail to reach such agreement, determination by the relevant dispute resolver(s) in accordance with the terms of the Interim     Sales     Protocol     (as     such     term     is     defined     in     the     IFA and subject to the requirements of Section 12.g of the IFA), which Interim Sales Protocol shall be approved by this Court.

9.      THIS COURT ORDERS AND ACKNOWLEDGES the Applicants and the U.S. Debtors (together, the "North American Debtors") recognize that the provision of transition services by each of the North American Debtors under the transition services agreements related to the Sale of the MEN Business and the sales of the other principal lines of Nortel's business are and will be provided by a business organization that operates on a cross-jurisdictional basis using personnel and assets of several of the North American Debtors, including, without limitation NNL and NNI. In light of the foregoing and in order to address certain concerns raised by the official committee of unsecured creditors of NNI (the "Committee") and the Monitor, the North American Debtors have agreed to allocate certain risks and costs of providing such transition services, acting reasonably, including, without limitation, consent fees and segregation costs, sunset costs, indemnification claims and under-recoveries from the respective purchasers, in the same proportion as the "Sales Proceeds" of such sales to each of the North American Debtors are allocated  (as determined in accordance with the "Interim Sale Protocol" contemplated by the IFA or mutual agreement of the relevant "Selling Debtors" (as such terms are defined in the IFA)), and that the side agreement reflecting the foregoing shall be on such terms and conditions

- § -

as the North American Debtors may agree not inconsistent with the foregoing, acting promptly and in good faith and subject to the consent of the Committee and the Monitor.

10.    THIS COURT ORDERS that the Applicants are hereby authorized to execute any agreements, instruments, applications, consents, or other documents, including without limitation an indenture or any amendment thereto, an underwriting agreement, purchase agreement, sale agreement, or similar agreement, which may include provisions with respect to the payment of underwriting discounts, sales commissions, or brokerage fees, and provisions relating to indemnification and contribution, that may be necessary or appropriate to effectuate Section 2.2.1(a) of the Sale Agreement subject, in each case, to the consent of the Monitor. The Applicants are further authorized to take any action the Sellers may deem necessary or advisable in order to sell, replace or redeem the Convertible Notes at any time for cash pursuant to the Sale Agreement, in each case without further order of this Court subject, in each case, to the consent of the Monitor.

11.    THIS COURT ORDERS AND DIRECTS the Monitor to file with the Court a copy of the Monitor's Certificate, forthwith after delivery thereof.

12.    THIS COURT ORDERS that, notwithstanding:

   (a)    the pendency of these proceedings;

   (b)    any applications for a bankruptcy order now or hereafter issued pursuant to the *Bankruptcy and Insolvency Act* (Canada) in respect of the Applicants and any bankruptcy order issued pursuant to any such applications; and

   (c)    any assignment in bankruptcy made in respect of the Applicants;

the provisions of the Transaction Documents, the vesting of the Applicants' right, title and interest in and to the Assets in the Purchaser pursuant to this Order shall be binding on any trustee in bankruptcy that may be appointed in respect of any of the Applicants and shall not be void or voidable by creditors of the Applicants, nor shall it constitute oppressive conduct nor constitute or be deemed to be a preference, fraudulent conveyance, transfer at undervalue, or

- 6 -

other challengeable or voidable transaction under the *Bankruptcy and Insolvency Act* (Canada) or any other applicable federal or provincial legislation, nor shall it constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation.

13.    THIS COURT ORDERS that the Sale Agreement and the Ancillary Agreements shall not be repudiated, disclaimed or otherwise compromised in these proceedings.

14.    THIS COURT ORDERS AND DECLARES that the Transaction is exempt from the application of the *Bulk Sales Act* (Ontario).

15.    THIS COURT ORDERS that confidential appendix "D" to the Twenty-Eighth Report be and is hereby sealed pending further Order of the Court.

16.    THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

17.    THIS COURT ORDERS that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

**Christina Irwin**
Registrar, Superior Court of Justice

ENTERED AT / INSCRIT A TORONTO
ON / BOOK NO.
LE / DANS LE REGISTRE NO.

DEC 0 3 2009

PER / PAR

Schedule A – Form of Monitor's Certificate

Court File No. 09-CL-7950

### ONTARIO

### SUPERIOR COURT OF JUSTICE

### COMMERCIAL LIST

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION
AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

### MONITOR'S CERTIFICATE
(Metro Ethernet Networks Business)

RECITALS

A.      Pursuant to an Order of the Honourable Justice Morawetz of the Ontario Superior Court of Justice (the "Court") dated January 14, 2009 (as amended and restated), Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL") and certain of their Canadian affiliates (collectively, the "Applicants") commenced proceedings pursuant to the *Companies' Creditors Arrangement Act* (Canada) and Ernst & Young Inc. was appointed as monitor (the "Monitor") in those proceedings.

B.      Pursuant to an Order of the Court dated ●, 2009, the Court approved an amended and restated asset sale agreement dated as of November 22, 2009 (the "Sale Agreement") among Ciena Corporation (the "Purchaser"), as buyer, and NNC, NNL and Nortel Networks Inc. (collectively, "Main Sellers"), affiliates of the Main Sellers identified as Other Sellers in the Sale Agreement and the EMEA Sellers, as vendors, in respect of the sale of certain assets relating to Nortel's Metro Ethernet Networks business and provided for the vesting in the Purchaser or a Designated Purchaser, as the case may be, of the Applicants' right, title and interest in and to the Assets, which vesting is to be effective with respect to

the Assets upon the delivery by the Monitor to the Purchaser of a certificate confirming receipt of confirmation from NNC and NNL that (i) the Purchaser has paid the Purchase Price as set out in the Sale Agreement; (ii) that the conditions to Closing as set out in Article IX of the Sale Agreement have been satisfied or waived by the Sellers and/or the Purchaser, as applicable; and (iii) the Transaction has been completed to the satisfaction of the Applicants.

C.    Unless otherwise indicated herein, terms with initial capitals have the meanings set out in the Sale Agreement.

THE MONITOR CERTIFIES the following:

1.    NNC and NNL have advised the Monitor that the Purchaser has paid **[and the Escrow Agent]** has received the Purchase Price payable on the Closing Date pursuant to the Sale Agreement;

2.    NNC and NNL have advised the Monitor that the conditions to Closing as set out in Article IX of the Sale Agreement have been satisfied or waived by the Sellers and/or the Purchaser, as applicable; and

3.    NNC and NNL have advised the Monitor that the Transaction has been completed to the satisfaction of the Applicants.

This Certificate was delivered by the Monitor at _____ [TIME] on _____ [DATE].

**ERNST & YOUNG INC. in its capacity as monitor in the Applicants' CCAA proceedings and not in its personal capacity**

Per:    _____

        Name:

        Title:

**IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

Court File No: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**APPROVAL AND VESTING ORDER**
**(Metro Ethernet Networks Business)**

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4, Canada

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte  LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930
Lawyers for the Applicants

# BLUE SHEET

Court File No.:  09-CL-7950

***ONTARIO***
### SUPERIOR COURT OF JUSTICE
### COMMERCIAL LIST

| THE HONOURABLE MR. | ) | WEDNESDAY, THE 2nd |
|---|---|---|
| | ) | |
| JUSTICE MORAWETZ | ) | DAY OF DECEMBER, 2009 |



IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

### APPROVAL AND VESTING ORDER
### (GSM/GSM-R Business)

THIS MOTION, made by Nortel Networks Corporation ("NNC"), Nortel Networks
Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks Global
Corporation and Nortel Networks International Corporation (collectively, the "Applicants") for
the relief set out in the Applicants' Notice of Motion dated November 27, 2009 including, the
approval of the sale transaction (the "Transaction") contemplated by an asset sale agreement
dated as of November 24, 2009 (the "Sale Agreement") amongst NNC, NNL and Nortel
Networks Inc. ("NNI" and collectively, the "Main Sellers") and the affiliates of the Main Sellers
identified in the Sale Agreement as "Other Sellers" (and together with the Main Sellers (as

- 2 -

defined in the Sale Agreement), the "Sellers"), as vendors, and Telefonaktiebolaget L M Ericsson (publ), as purchaser (the "Purchaser"), in respect of the sale of certain assets relating to the Sellers' GSM and GSM-R business, and as appended to the Twenty-Ninth Report of Ernst & Young Inc., in its capacity as court-appointed monitor (the "Monitor") dated November 27, 2009 (the "Twenty-Ninth Report"), and vesting in the Purchaser or any Designated Purchaser (as defined below), as applicable, all of the Applicants' right, title and interest in and to the Assets (as defined in the Sale Agreement) was heard this day at 393 University Avenue, Toronto, Ontario.

ON READING the affidavit of George Riedel sworn November 27, 2009 and the Twenty-Ninth Report and on hearing the submissions of counsel for the Applicants, the Monitor and those other parties present, no one appearing for any other person on the service list, although properly served as appears from the affidavits of Katie Legree sworn November 27, 2009 and November 30, 2009, filed:

1.      THIS COURT ORDERS that the time for the service of the Notice of Motion, the Twenty-Ninth Report and the Motion Record is hereby abridged so that this Motion is properly returnable today and hereby dispenses with further service thereof.

2.      THIS COURT ORDERS that capitalized terms used herein and not otherwise defined shall have the meaning given to them in the Sale Agreement.

3.      THIS COURT ORDERS AND DECLARES that subject to the approval of the Transaction and the Sale Agreement by the US Bankruptcy Court, the Transaction is hereby approved. The execution, delivery and performance of the Sale Agreement and the Ancillary Agreements by the Applicants party thereto is hereby authorized and approved, and the Applicants and the Monitor are hereby authorized and directed to take such additional steps and execute such additional documents as may be necessary or desirable for the completion of the Transaction and for the conveyance of the Applicants' right, title and interest in and to the Assets to the Purchaser or any Designated Purchaser (as defined below), as applicable.

4.      THIS COURT ORDERS AND DECLARES that the Applicants are authorized and directed to perform their obligations under the Sale Agreement and each of the Ancillary Agreements.

- 3 -

5.     THIS COURT ORDERS AND DECLARES that the Sale Agreement and the Ancillary Agreements shall be binding on the Applicants that are party thereto, and shall not be repudiated, disclaimed or otherwise compromised in these proceedings.

6.     THIS COURT ORDERS AND DECLARES that upon the delivery of a Monitor's certificate to the Purchaser substantially in the form attached as Schedule "A" hereto (the "Monitor's Certificate"), all of the Applicants' right, title and interest in and to the Assets shall vest absolutely in the Purchaser or any Designated Purchaser, as more particularly set out in the conveyance documents delivered by the Purchaser or any Designated Purchaser at Closing pursuant to the Sale Agreement, free and clear of and from any and all security interests (whether contractual, statutory, or otherwise), hypothecs, mortgages, trusts or deemed trusts (whether contractual, statutory, or otherwise), liens, executions, levies, charges, or other financial or monetary claims, whether or not they have attached or been perfected, registered or filed and whether secured, unsecured or otherwise (collectively, the "Claims") including, without limiting the generality of the foregoing: (i) any encumbrances or charges created by the Orders made in these proceedings including the Order of the Honourable Justice Morawetz dated January 14, 2009 (as amended and restated); (ii) all charges, security interests or claims evidenced by registrations pursuant to the *Personal Property Security Act* (Ontario) or any other personal property registry system; excluding only Permitted Encumbrances and those Claims expressly assumed in writing by the Purchaser under the Sale Agreement.

7.     THIS COURT ORDERS that for the purposes of determining the nature and priority of Claims, the net proceeds from the sale of the Applicants' right, title and interest in and to the Assets shall stand in the place and stead of the Assets, and that from and after the delivery of the Monitor's Certificate all Claims shall attach to the net proceeds from the sale of the Applicants' right, title and interest in and to the Assets with the same priority as they had with respect to the Assets immediately prior to the sale, as if the Assets had not been sold and remained in the possession or control of the person having that possession or control immediately prior to the sale.

8.     THIS COURT ORDERS that all proceeds of the Transaction, subject to the entry into definitive documentation memorializing the agreement in principle set forth in the TSA term sheet among NNC, NNL, NNI, Nortel Networks UK Limited, and Nortel Networks (Ireland)

Limited, dated November 24, 2009, and subject to the price adjustments and the Purchaser's rights under the Sale Agreement and less applicable transfer or value added taxes incurred by the Sellers, and, to the extent agreed by the Sellers, any transaction costs, shall be deposited into an Escrow Account (as such term is defined in the Interim Funding and Settlement Agreement entered into on June 9, 2009 (the "IFA")) pursuant to an escrow agreement to be negotiated and agreed to by all of the Sellers and in accordance with Section 12.g of the IFA, and such proceeds shall not be distributed in advance of either (i) agreement by all of the Selling Debtors(as defined in the IFA) as to the distribution of such proceeds (in accordance with the IFA and subject to the requirements of Section 12(g) of the IFA) or (ii) in the case where the Selling Debtors (as defined in the IFA) fail to reach such agreement, determination by the relevant dispute resolver(s) in accordance with the terms of the Interim Sales Protocol (as such term is defined in the IFA and subject to the requirements of Section 12.g of the IFA), which Interim Sales Protocol shall be approved by this Court.

9.      THIS COURT ORDERS AND DIRECTS the Monitor to file with the Court a copy of the Monitor's Certificate, forthwith after delivery thereof.

10.     THIS COURT ORDERS that the Purchaser is hereby authorized in connection with the consummation of the Transaction to allocate the Assets among its affiliates, designees, assignees, and/or successors, including any Designated Purchaser as defined in the Sale Agreement (each, for the purposes of this Order, a "Designated Purchaser"), in a manner as it in its sole discretion deems appropriate and to assign, lease, sublease, license, sublicense, transfer or otherwise dispose of any of the Assets to any Designated Purchaser, in each case with all of the rights and protections accorded to the Purchaser under this Order and the Sale Agreement as if it were the named Purchaser under the Sale Agreement, and the Applicants shall cooperate with and take all actions reasonably requested by the Purchaser or any Designated Purchaser to effectuate any of the foregoing; provided, however, the Applicants shall be reimbursed by the Purchaser for any reasonable expenses in connection therewith.

11.     THIS COURT ORDERS that, to the extent permitted by law, neither the Purchaser nor any Designated Purchaser shall be a successor to any of the Applicants, and neither the Purchaser nor any Designated Purchaser shall assume any liability of the Applicants, other than as expressly provided for in the Sale Agreement.

- 5 -

12.    THIS COURT ORDERS that, notwithstanding:

    (a)    the pendency of these proceedings;

    (b)    any applications for a bankruptcy order now or hereafter issued pursuant to the *Bankruptcy and Insolvency Act* (Canada) in respect of any of the Applicants and any bankruptcy order issued pursuant to any such applications; and

    (c)    any assignment in bankruptcy made in respect of any of the Applicants;

the vesting of the Assets in the Purchaser or any Designated Purchaser, as applicable, pursuant to this Order shall be binding on any trustee in bankruptcy that may be appointed in respect of the Applicants and shall not be void or voidable by creditors of the Applicants, nor shall it constitute nor be deemed to be a settlement, fraudulent preference, preference, assignment, fraudulent conveyance, transfer at undervalue or other reviewable transaction under the *Bankruptcy and Insolvency Act* (Canada) or any other applicable federal or provincial legislation, nor shall it constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation.

13.    THIS COURT ORDERS AND DECLARES that the Transaction is exempt from the application of the *Bulk Sales Act* (Ontario).

14.    THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

- 6 -

15.     THIS COURT ORDERS that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

16.     THIS COURT ORDERS that the Confidential Appendix "C" to the Twenty-Ninth Report be and are hereby sealed pending further Order of this Court.

ENTERED AT / INSCRIT A TORONTO
ON / BOOK NO.
LE / DANS LE REGISTRE NO..

DEC 0 3 2009

PER / PAR

**Schedule A – Form of Monitor's Certificate**

Court File No.:  09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### COMMERCIAL LIST

### IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

### APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### MONITOR'S CERTIFICATE
### (GSM/GSM-R Business)

## RECITALS

A.      Pursuant to an Order of the Honourable Justice Morawetz of the Ontario Superior Court of Justice (the "Court") dated January 14, 2009 (as amended and restated), Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL" ), Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation (collectively, the "Applicants") commenced proceedings pursuant to the *Companies' Creditors Arrangements Act* (Canada) and Ernst & Young Inc. was appointed as monitor (the "Monitor") in these proceedings.

B.      Pursuant to an Order of the Court dated December 2, 2009, the Court approved an asset sale agreement dated as of November 24, 2009 (the "Sale Agreement") amongst NNC, NNL and Nortel Networks Inc. (collectively, the "Main Sellers") and the affiliates of the Main Sellers identified in the Sale Agreement as "Other Sellers" (and together with the Main Sellers (as defined in the Sale

Agreement), the "Sellers"), and Telefonaktiebolaget L M Ericsson (publ), as purchaser (the "Purchaser"), and provided for the vesting in the Purchaser or any Designated Purchaser (as defined in the Sale Agreement), as applicable, of all of the Applicants' right, title and interest in and to the Assets, which vesting is to be effective with respect to the Applicants' Assets upon the delivery by the Monitor to the Purchaser of a certificate confirming (i) the payment by the Purchaser of the Purchase Price as set out in the Sale Agreement; (ii) that the conditions to Closing as set out in Article VIII of the Sale Agreement have been satisfied or waived by the Applicants and the Purchaser; and (iii) the Applicants have advised the Monitor that the Transaction has been completed to the satisfaction of the Applicants.

C.    Unless otherwise indicated herein, terms with initial capitals have the meanings set out in the Sale Agreement.

THE MONITOR CERTIFIES the following:

1.    NNC and NNL have advised the Monitor that the Purchaser has paid and [the Escrow Agent] has received the Purchase Price payable on the Closing Date pursuant to the terms of the Sale Agreement;

2.    NNC and NNL have advised the Monitor that the conditions to Closing as set out in Article VIII of the Sale Agreement have been satisfied or waived by the Applicants and the Purchaser; and

3.    NNC and NNL have advised the Monitor that the Transaction has been completed to the satisfaction of the Applicants.

This Certificate was delivered by the Monitor at _____ [TIME] on _____ 20••.

> **Ernst & Young Inc. in its capacity as monitor in the CCAA proceedings of Nortel Networks Corporation, et. al. and not in its personal capacity**
>
> Per: _____
>
>       Name:
>
>       Title:

**IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

Court File No: 09-CL-7950

---

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

Proceeding commenced at Toronto

---

### APPROVAL AND VESTING ORDER
### GSM/GSM-R Business

---

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel:  (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte  LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

# BLUE SHEET



Court File No.:  09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | WEDNESDAY, THE 3rd |
| | ) | |
| JUSTICE MORAWETZ | ) | DAY OF MARCH, 2010 |

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**APPROVAL AND VESTING ORDER**
**(CVAS)**

THIS MOTION, made by Nortel Networks Corporation ("NNC"), Nortel Networks
Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks Global
Corporation and Nortel Networks International Corporation (collectively, the "Applicants") for
the relief set out in the Applicants' Notice of Motion dated February 26, 2010 including, the
approval of a transaction (the "Transaction") to sell Assets pursuant to an asset sale agreement
dated as of December 22, 2009 (the "Sale Agreement") among NNC, NNL, Nortel Networks Inc.
("NNI") and certain other entities identified therein as sellers (together, the "Sellers") and
GENBAND Inc., as purchaser ("GENBAND" or the "Purchaser") for the sale (the "Sale") of

certain assets of the Sellers' Carrier Voice Over IP and Application Solutions business (the "CVAS Business") as described therein (the "Assets") was heard this day at 393 University Avenue, Toronto, Ontario.

ON READING the affidavit of George Riedel sworn February 26, 2010 and the thirty-fourth report of Ernst & Young Inc. in its capacity as monitor (the "Monitor") dated January 3, 2010 and the fortieth report of the Monitor dated February 26, 2010 (the "Fortieth Report") and on hearing the submissions of counsel for the Applicant, the Monitor and those other parties present, no one appearing for any other person on the service list, although properly served as appears from the affidavit of Katie Legree sworn March 1, 2010, filed:

1.      THIS COURT ORDERS that the time for the service of the Notice of Motion, the Fortieth Report and the Motion Record is hereby abridged so that this Motion is properly returnable today and hereby dispenses with further service thereof.

2.      THIS COURT ORDERS AND DECLARES that capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Sale Agreement.

3.      THIS COURT ORDERS AND DECLARES that the Transaction is hereby approved. The execution, delivery and performance of the Sale Agreement by the Applicants is hereby authorized and approved, and the Applicants are hereby authorized and directed to take such additional steps and execute such additional documents as may be necessary or desirable for the completion of the Transaction and for the conveyance of the Assets to the Purchaser.

4.      THIS COURT ORDERS AND DECLARES that upon the delivery of a Monitor's certificate to the Purchaser substantially in the form attached as Schedule "A" hereto (the "Monitor's Certificate"), all of the Applicants' right, title and interest in and to the Assets shall vest absolutely in the Purchaser or the Designated Purchaser (as such term is defined in the Sale Agreement) free and clear of and from any and all security interests (whether contractual, statutory, or otherwise), hypothecs, mortgages, trusts or deemed trusts (whether contractual, statutory, or otherwise), liens, executions, levies, charges, or other financial or monetary claims, whether or not they have attached or been perfected, registered or filed and whether secured, unsecured or otherwise (collectively, the "Claims") including, without limiting the generality of the foregoing:  (i) any encumbrances or charges created by the Orders made in these proceedings

- 3 -

including the Order of the Honourable Justice Morawetz dated January 14, 2009 (as amended and restated);   and (ii) all charges, security interests or claims evidenced by registrations pursuant to the *Personal Property Security Act* (Ontario) or any other personal property registry system (all of which are collectively referred to as the "Encumbrances", but excluding Permitted Encumbrances (other than those specifically contemplated to be discharged by virtue of this Order) and Assumed Liabilities).   For greater certainty, this Court orders that all of the Encumbrances affecting or relating to the Assets are hereby expunged and discharged as against the Assets.

5.     THIS COURT ORDERS that for the purposes of determining the nature and priority of Claims, the net proceeds from the sale of the Assets shall stand in the place and stead of the Assets, and that from and after the delivery of the Monitor's Certificate all Claims and Encumbrances shall attach to the net proceeds from the sale of the Assets with the same priority as they had with respect to the Assets immediately prior to the sale, as if the Assets had not been sold and remained in the possession or control of the person having that possession or control immediately prior to the sale.

6.     THIS COURT ORDERS that all proceeds of the Transaction, subject to the price adjustments and the Purchaser's rights under the Sale Agreement and less applicable transfer or value added taxes incurred by the Sellers, shall be deposited into an Escrow Account (as defined in the Interim Funding and Settlement Agreement entered into on June 9, 2009 (the "IFA")) pursuant to an escrow agreement to be negotiated and agreed to by all of the Sellers and in accordance with Section 12.g of the IFA, and such proceeds shall not be distributed in advance of either (i) agreement by all of the Selling Debtors (as defined in the IFA) as to the distribution of such proceeds (in accordance with the IFA and subject to the requirements of Section 12.g of the IFA) or (ii) in the case where the Selling Debtors (as defined in the IFA) fail to reach such agreement, determination by the relevant dispute resolver(s) in accordance with the terms of the Interim Sales Protocol (as such term is defined in the IFA and subject to the requirements of Section 12.g of the IFA), which Interim Sales Protocol shall be approved by this Court.

7.     THIS COURT ORDERS AND ACKNOWLEDGES that the Applicants and the U.S. Debtors (together, the "North American Debtors") recognize that the provision of transition services by each of the North American Debtors under the transition services agreement[s]

related to the sale of the CVAS Business and the sales of the other principal lines of Nortel's business are and will be provided by a business organization that operates on a cross-jurisdictional basis using personnel and assets of several of the North American Debtors, including, without limitation Nortel Networks Inc. and NNL. In light of the foregoing and in order to address certain concerns raised by official committee of unsecured creditors of NNI (the "Committee") and the Monitor, the North American Debtors have agreed to allocate certain risks and costs of providing such transition services, acting reasonably, including, without limitation, consent fees and segregation costs, sunset costs, indemnification claims and under-recoveries from the respective purchasers, in the same proportion as the "Sales Proceeds" of such sales to each of the North American Debtors are allocated  (as determined in accordance with the "Interim Sale Protocol" contemplated by the IFA or mutual agreement of the relevant "Selling Debtors" (as such terms are defined in the IFA)), and that the side agreement reflecting the foregoing shall be on such terms and conditions as the North American Debtors may agree not inconsistent with the foregoing, acting promptly and in good faith and subject to the consent of the Committee, the Bondholders' Committee (as defined in the IFA) and the Monitor.

8.      THIS COURT ORDERS AND DIRECTS the Monitor to file with the Court a copy of the Monitor's Certificate, forthwith after delivery thereof.

9.      THIS COURT ORDERS that, notwithstanding:

> (a)    the pendency of these proceedings;

> (b)    any applications for a bankruptcy order now or hereafter issued pursuant to the *Bankruptcy and Insolvency Act* (Canada) in respect of any of the Applicants and any bankruptcy order issued pursuant to any such applications; and

> (c)    any assignment in bankruptcy made in respect of any of the Applicants;

the provisions of the Transaction Documents, the vesting of the Applicants' right, title and interest in and to the Assets in the Purchaser pursuant to this Order shall be binding on any trustee in bankruptcy that may be appointed in respect of any of the Applicants and shall not be void or voidable by creditors of the Applicants, nor shall it constitute oppressive conduct nor

- 5 -

constitute or be deemed to be a preference, fraudulent conveyance, transfer at undervalue, or other challengeable or voidable transaction under the *Bankruptcy and Insolvency Act* (Canada) or any other applicable federal or provincial legislation, nor shall it constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation.

10.     THIS COURT ORDERS AND DECLARES that the Transaction is exempt from the application of the *Bulk Sales Act* (Ontario).

11.     THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order.  All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

12.     THIS COURT ORDERS that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

ENTERED AT / INSCRIT À TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

MAR 0 4 2010

PER / PAR:              Joanne Nicoara
Registrar, Superior Court of Justice

**Schedule A – Form of Monitor's Certificate**

Court File No.: 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**MONITOR'S CERTIFICATE**
**(CVAS)**

**RECITALS**

A.    Pursuant to an Order of the Honourable Justice Morawetz of the Ontario Superior Court of Justice (the "Court") dated January 14, 2009 (as amended and restated), Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation (collectively, the "Applicants") commenced proceedings pursuant to the *Companies' Creditors Arrangement Act* (Canada) and Ernst & Young Inc. was appointed as monitor (the "Monitor") in these proceedings.

B.    Pursuant to an Order of the Court dated ●, 2010, the Court approved an asset sale transaction (the "Transaction") contemplated by an asset sale agreement dated as of December 22, 2009 (the "Sale Agreement") among NNC, NNL, Nortel Networks Inc. and certain other entities identified therein as sellers (together, the "Sellers") and GENBAND Inc., as purchaser ("GENBAND" or the "Purchaser") and provided for the vesting in the Purchaser or a Designated Purchaser of the Applicants' right, title and interest in and to the Assets, which vesting is to be effective with respect to the Assets upon the

delivery by the Monitor to the Purchaser of a certificate confirming receipt of confirmation from each of NNC, NNL and the Purchaser, as applicable, that: (i) the Purchaser has paid the Purchase Price for the Assets as set out in the Sale Agreement; (ii) that the conditions to Closing as set out in Article ● of the Sale Agreement have been satisfied or waived by the Sellers and/or the Purchaser, as applicable; and (iii) the Transaction has been completed to the satisfaction of the Applicants and the Purchaser.

C.      Unless otherwise indicated herein, terms with initial capitals have the meanings set out in the Sale Agreement.

THE MONITOR CERTIFIES the following:

1.      NNC, NNL and the Purchaser have advised the Monitor that the Purchaser has paid and [●] has received the Purchase Price payable for the Assets on the Closing Date pursuant to the terms of the Sale Agreement;

2.      NNC, NNL and the Purchaser have advised the Monitor that the conditions to Closing as set out in Article ● of the Sale Agreement have been satisfied or waived by the Applicants and/or the Purchaser, as applicable;

3.      NNC, NNL and the Purchaser have advised the Monitor that the Transaction has been completed to the satisfaction of the Applicants; and

4.      The Purchaser has advised the Monitor that the Transaction ahs been completed to the satisfaction of the Purchaser.

This Certificate was delivered by the Monitor at _____ [TIME] on _____ 2010.

**ERNST & YOUNG INC. in its capacity as monitor in the CCAA proceedings of Nortel Networks Corporation, et. al. and not in its personal capacity**

Per: _____

        Name:

        Title:

237

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

Court File No:  09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**APPROVAL AND VESTING ORDER**
**(CVAS)**

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel:  (416) 216-4832
Email: dtay@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com

Fax: (416) 216-3930

Lawyers for the Applicants

# BLUE SHEET

Court File No.: 09-CL-7950



**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | THURSDAY, THE 30TH |
| | ) | |
| JUSTICE MORAWETZ | ) | DAY OF SEPTEMBER, 2010 |

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**APPROVAL AND VESTING ORDER**
**(MSS Business)**

THIS MOTION, made by Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation (collectively, the "Applicants") for the relief set out in the Applicants' Notice of Motion dated September 27, 2010 including, the approval of a transaction (the "Transaction") to sell Assets pursuant to an asset sale agreement dated as of September 24, 2010 (the "Sale Agreement") among NNC, NNL, Nortel Networks Inc. ("NNI", collectively with NNC and NNL, the "Main Sellers") and the affiliates of the Main Sellers identified in the Sale Agreement as Other Sellers (together with the Main Sellers, the "Sellers") and Telefonaktiebolaget L M Ericsson (publ), as purchaser (the "Purchaser") for the

- 2 -

sale (the "Sale") of certain assets of the Sellers' MSS business (the "MSS Business") as described therein (the "Assets"), and vesting in the Purchaser or any Designated Purchaser (as defined below), as applicable, all of the Applicants' right, title and interest in and to the Assets, was heard this day at 393 University Avenue, Toronto, Ontario.

ON READING the affidavit of Khush Dadyburjor sworn September 27, 2010 and the fifty-fourth report of Ernst & Young Inc. in its capacity as monitor (the "Monitor") dated September 28, 2010 (the "Fifty-Fourth Report") and on hearing the submissions of counsel for the Applicant, the Monitor and those other parties present, no one appearing for any other person on the service list, although properly served as appears from the affidavit of Katie Legree sworn September 28, 2010, filed:

1.      THIS COURT ORDERS that the time for the service of the Notice of Motion, the Fifty-Fourth Report and the Motion Record is hereby abridged so that this Motion is properly returnable today and hereby dispenses with further service thereof.

2.      THIS COURT ORDERS AND DECLARES that capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Sale Agreement.

3.      THIS COURT ORDERS AND DECLARES that the Transaction is hereby approved. The execution, delivery and performance of the Sale Agreement by the Applicants is hereby authorized and approved, and the Applicants and the Monitor are hereby authorized and directed to take such additional steps and execute such additional documents as may be necessary or desirable for the completion of the Transaction and for the conveyance of the Applicants' right, title and interest in and to the Assets to the Purchaser or any Designated Purchaser, as applicable.

4.      THIS COURT ORDERS that in the event that the Transaction contemplated by the Sale Agreement cannot be consummated, the Alternate Bid (as defined in the Fifty-Fourth Report) be and is here by approved and the execution of the asset sale agreement pursuant to the Alternate Bid by the Applicants is approved and the Applicants and the Monitor shall be authorized and directed to take such additional steps and execute such additional documents, including without limitation the Ancillary Agreements, as may be necessary or desirable for the completion of the Transaction and for the conveyance of the Applicants' right, title and interest in and to the Assets to the Alternative Bidder (as defined in the Fifty-Fourth Report).

5.     THIS COURT ORDERS AND DECLARES that the Applicants are authorized and directed to perform their obligations under the Sale Agreement and each of the Ancillary Agreements.

6.     THIS COURT ORDERS AND DECLARES that the Intellectual Property License Agreement substantially in the form included in Confidential Appendix D to the Fifty-Fourth Report and the Trademark License Agreement substantially in the form included in Confidential Appendix D to the Fifty-Fourth Report (the "IP Licenses") are hereby authorized and approved and NNL is directed to comply with its obligation thereunder.

7.     THIS COURT ORDERS AND DECLARES that the Sale Agreement and the Ancillary Agreements, including the IP Licenses, shall be binding on the Applicants that are party thereto, and shall not be repudiated, disclaimed or otherwise compromised in these proceedings, and that any sale or transfer of the intellectual property licensed to the Purchaser pursuant to the IP Licenses shall be made subject to the IP Licenses.'  For greater certainty, nothing in this paragraph 7 shall prohibit the Applicants from exercising any and all rights and remedies (including any termination rights) available to them pursuant to the Sale Agreements or the Ancillary Agreements or, except as agreed otherwise or waived in the Sale Agreements or the Ancillary Agreements, pursuant to applicable law outside any bankruptcy or insolvency proceeding.

8.     THIS COURT ORDERS AND DECLARES that upon the delivery of a Monitor's certificate to the Purchaser substantially in the form attached as Schedule "A" hereto (the "Monitor's Certificate"), all of the Applicants' right, title and interest in and to the Assets shall vest absolutely in the Purchaser or the Designated Purchaser (as such term is defined in the Sale Agreement) as more particularly set out in the conveyance documents delivered by the Purchaser or any Designated Purchaser at Closing pursuant to the Sale Agreement, free and clear of and from any and all security interests (whether contractual, statutory, or otherwise), hypothecs, mortgages, trusts or deemed trusts (whether contractual, statutory, or otherwise), liens, executions, levies, charges, or other financial or monetary claims, whether or not they have attached or been perfected, registered or filed and whether secured, unsecured or otherwise (collectively, the "Claims") including, without limiting the generality of the foregoing: (i) any encumbrances or charges created by the Orders made in these proceedings including the Order of

the Honourable Justice Morawetz dated January 14, 2009 (as amended and restated); and (ii) all charges, security interests or claims evidenced by registrations pursuant to the *Personal Property Security Act* (Ontario) or any other personal property registry system (all of which are collectively referred to as the "Encumbrances", but excluding Permitted Encumbrances (other than those specifically contemplated to be discharged by virtue of this Order) and Assumed Liabilities). For greater certainty, this Court orders that all of the Encumbrances affecting or relating to the Assets are hereby expunged and discharged as against the Assets.

9.      THIS COURT ORDERS that for the purposes of determining the nature and priority of Claims, the net proceeds from the sale of the Assets shall stand in the place and stead of the Assets, and that from and after the delivery of the Monitor's Certificate all Claims and Encumbrances shall attach to the net proceeds from the sale of the Assets with the same priority as they had with respect to the Assets immediately prior to the sale, as if the Assets had not been sold and remained in the possession or control of the person having that possession or control immediately prior to the sale.

10.     THIS COURT ORDERS that all proceeds of the Transaction, subject to the price adjustments and the Purchaser's rights under the Sale Agreement and less applicable transfer or value added taxes incurred by the Sellers, shall be deposited into an Escrow Account (as defined in the Interim Funding and Settlement Agreement entered into on June 9, 2009 (the "IFA")) pursuant to an escrow agreement to be negotiated and agreed to by all of the Sellers and in accordance with Section 12.g of the IFA, and such proceeds shall not be distributed in advance of either (i) agreement by all of the Selling Debtors (as defined in the IFA) as to the distribution of such proceeds (in accordance with the IFA and subject to the requirements of Section 12.g of the IFA) or (ii) in the case where the Selling Debtors (as defined in the IFA) fail to reach such agreement, determination by the relevant dispute resolver(s) in accordance with the terms of the Interim Sales Protocol (as such term is defined in the IFA and subject to the requirements of Section 12.g of the IFA), which Interim Sales Protocol shall be approved by this Court.

11.     THIS COURT ORDERS AND DIRECTS the Monitor to file with the Court a copy of the Monitor's Certificate, forthwith after delivery thereof.

12.     THIS COURT ORDERS that the Purchaser is hereby authorized in connection with the consummation of the Transaction to allocate the Assets among its affiliates, designees, assignees

and/or successors, including any Designated Purchaser as defined in the Sale Agreement (each, for purposes of this Order, a "Designated Purchaser") in a manner as it in its sole discretion deems appropriate and to assign, lease, sublease, licence, sublicence, transfer or otherwise dispose of any of the Assets to any Designated Purchaser, in each case with all of the rights and protections accorded to the Purchaser under this Order and the Sale Agreement as if it were the named Purchaser under the Sale Agreement, and the Applicants shall cooperate with and take all actions reasonably requested by the Purchaser or any Designated Purchaser to effectuate any of the foregoing; provided, however, the Applicants shall be reimbursed by the Purchaser for any reasonable expenses in connection therewith.

13.     THIS COURT ORDERS AND DECLARES that, to the extent permitted by law, neither the Purchaser nor any relevant Designated Purchaser shall be a successor to any of the Applicants and neither the Purchaser nor any Designated Purchaser shall assume any liability of the Applicants, other than as expressly provided for in the Sale Agreement.

14.     THIS COURT ORDERS that, notwithstanding:

    (a)     the pendency of these proceedings;

    (b)     any applications for a bankruptcy order now or hereafter issued pursuant to the *Bankruptcy and Insolvency Act* (Canada) in respect of any of the Applicants and any bankruptcy order issued pursuant to any such applications; and

    (c)     any assignment in bankruptcy made in respect of any of the Applicants;

the provisions of the Transaction Documents and the vesting of the Applicants' right, title and interest in and to the Assets in the Purchaser or any Designated Purchaser, as applicable, pursuant to this Order shall be binding on any trustee in bankruptcy that may be appointed in respect of any of the Applicants and shall not be void or voidable by creditors of the Applicants, nor shall it constitute oppressive conduct nor constitute or be deemed to be a preference, fraudulent conveyance, transfer at undervalue, or other challengeable or voidable transaction under the *Bankruptcy and Insolvency Act* (Canada) or any other applicable federal or provincial

legislation, nor shall it constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation.

15.    THIS COURT ORDERS AND DECLARES that the Transaction is exempt from the application of the *Bulk Sales Act* (Ontario).

16.    THIS COURT ORDERS that Confidential Appendix "D" to the Fifty-Fourth Report be and is hereby sealed pending further Order of the Court.

17.    THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order.  All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

18.    THIS COURT ORDERS that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

ENTERED AT / INSCRIT À TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

OCT 1 - 2010

PER / PAR:

**Schedule A – Form of Monitor's Certificate**

Court File No.:  09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**MONITOR'S CERTIFICATE**
**(MSS Business)**

## RECITALS

A.     Pursuant to an Order of the Honourable Justice Morawetz of the Ontario Superior Court of Justice (the "Court") dated January 14, 2009 (as amended and restated), Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation (collectively, the "Applicants") commenced proceedings pursuant to the *Companies' Creditors Arrangement Act* (Canada) and Ernst & Young Inc. was appointed as monitor (the "Monitor") in these proceedings.

B.     Pursuant to an Order of the Court dated ●, 2010, the Court approved an asset sale transaction (the "Transaction") contemplated by an asset sale agreement dated as of ●, 2010 (the "Sale Agreement") among NNC, NNL, Nortel Networks Inc. and certain other entities identified therein as sellers (together, the "Sellers") and ●, as purchaser ("●" or the "Purchaser") and provided for the vesting in the Purchaser or a Designated Purchaser of the Applicants' right, title and interest in and to the Assets, which vesting is to be effective with respect to the Assets upon the delivery by the Monitor

to the Purchaser of a certificate confirming receipt of confirmation from each of NNC, NNL and the Purchaser, as applicable, that: (i) the Purchaser has paid the Purchase Price for the Assets as set out in the Sale Agreement; (ii) that the conditions to Closing as set out in Article ● of the Sale Agreement have been satisfied or waived by the Sellers and/or the Purchaser, as applicable; and (iii) the Transaction has been completed to the satisfaction of the Applicants and the Purchaser.

C.    Unless otherwise indicated herein, terms with initial capitals have the meanings set out in the Sale Agreement.

THE MONITOR CERTIFIES the following:

1.    NNC, NNL and the Purchaser have advised the Monitor that the Purchaser has paid and [●] has received the Purchase Price payable for the Assets on the Closing Date pursuant to the terms of the Sale Agreement;

2.    NNC, NNL and the Purchaser have advised the Monitor that the conditions to Closing as set out in Article ● of the Sale Agreement have been satisfied or waived by the Sellers and/or the Purchaser, as applicable;

3.    NNC and NNL have advised the Monitor that the Transaction has been completed to the satisfaction of the Applicants; and

4.    The Purchaser has advised the Monitor that the Transaction has been completed to the satisfaction of the Purchaser.

This Certificate was delivered by the Monitor at _____ [TIME] on _____ 2010.

**ERNST & YOUNG INC. in its capacity as monitor in the CCAA proceedings of Nortel Networks Corporation, et. al. and not in its personal capacity**

Per:    _____

         Name:
         Title:

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

Court File No: 09-CL-7950

---

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

Proceeding commenced at Toronto

---

### APPROVAL AND VESTING ORDER
### (MSS Business)

---

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com

Fax: (416) 216-3930

Lawyers for the Applicants

DOCSTOR: 2026647\3



IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : | Case No. 09-10138 (KG) |
| Nortel Networks Inc., *et al.*, | : |  |
|  | : | Jointly Administered |
| Debtors. | : |  |
|  | : | Re: Docket No. 931 |

**PRELIMINARY OBJECTION AND RESERVATION OF RIGHTS OF SNMP
RESEARCH INTERNATIONAL, INC. TO DEBTORS' MOTION TO APPROVE THE
SALE OF CERTAIN ASSETS OF THE DEBTORS' CDMA AND LTE BUSINESS FREE
AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES AND THE
ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS**

SNMP Research International, Inc. ("SNMPRI"), through undersigned counsel, hereby

files this preliminary objection and reservation of rights (the "Objection") to the motion of the

above-captioned debtors and debtors in possession (collectively, the "Debtors") to approve the

sale of certain of the Debtors' CDMA and LTE assets free and clear of all liens, claims and

encumbrances and the assumption and assignment of certain contracts [Docket No. 931] (the

"Sale Motion"), and in support hereof, respectfully represents as follows:

**The License Agreement**

1.      SNMPRI and Nortel Networks Corporation ("NNC"), a Canadian corporation, are

parties to a certain license agreement (the "License Agreement") executed prior to the Petition

Date (defined herein) governing NNC's use of certain intellectual property described as source

code and binary license code licensed by SNMPRI to NNC.  The License Agreement contains

over 70 schedules that each list one or more specific products, development software, and run-

time software licensed to NNC.  Section 7.1 of the License Agreement permits NNC to assign

the License Agreement as follows:

> [u]pon prior written notice of such to SNMPRI, NNC may assign
> this Agreement, in its entirety only, and only in conjunction with a

> change of ownership, merger, acquisition, sale or transfer of all of substantially all of its business or assets. Such assignment shall only be valid as to NNC's business units as of the date of such assignment, and the rights and licenses of this Agreement shall not be enlarged to encompass the entirety of the new entity, if larger, or the entirety of the new entity's product line, if larger. The terms and conditions of this Agreement shall bind and inure to each party's successors and assigns.

License Agreement at 7.1.

2.      Should NNC desire to assign only a portion of the License Agreement, section 7.2

of the License Agreement provides:

> [u]pon prior written notice of such to SNMPRI, execution of a fresh copy of this Agreement, and payment of an Adoption Fee, a Specified Entity previously licensed under one or more Schedules A that is to be made an independent entity by NNC may adopt this Agreement as an agreement separate from NNC ("New Agreement"). The Adoption Fee shall be equal to the amount that SNMP would have charged the Specified Entity under the relevant Schedule A if the Specified Entity had not been a Nortel Networks Company (Standard Value), minus the amount previously paid under the relevant Schedule A. SNMP's liability under the New Agreement shall be limited to a straight line three year depreciation of the Standard Value, starting from the execution date of the new agreement. The scope of the new license shall be to the named Specified Entity only, and shall not include the possibility of addition of any other "Specified Entities" at a later point in time.

License Agreement at 7.2.

3.      SNMPRI and NNC were parties to the License Agreement on the Petition Date

(defined herein).

### Background

4.      On January 14, 2009 (the "Petition Date"), the Debtors filed voluntary petitions

for relief under chapter 11 of the United States Code (the "Bankruptcy Code").

5.      On June 19, 2009, the Debtors filed the Sale Motion. The Sale Motion, among

other things, seeks the approval of: (i) the sale, free and clear of all liens, claims and

encumbrances, certain of the Debtors' CDMA and LTE assets (the "Sale") pursuant to the terms of the Asset Sale Agreement by and among NNC, Nortel Networks Limited, Nortel Networks Inc. and the other Entities Defined Herein as Sellers (collectively, the "Sellers") and Nokia Siemens Networks B.V. (collectively, the "Purchasers") dated as of June 19, 2009 (the "Asset Purchase Agreement"), (ii) the assumption and assignment certain executory contracts pursuant to procedures set forth in the Sale Motion (the "Assumption and Assignment Procedures"), and (iii) the assignment of certain Non-365 Contracts (as defined in the Asset Purchase Agreement). The sale to the Purchasers is subject to higher and better offers.

     6.     Pursuant to the Assumption and Assignment Procedures, the Debtors allegedly served notice to counterparties to the executory contracts that are proposed to be assumed and assigned should the Sale to the Purchasers be approved. SNMPRI did not receive such a notice. The Debtors, through counsel, have informed SNMPRI that the License Agreement is not an executory contract to be assumed and assigned in the Sale.

     7.     Pursuant section 2.1.6 to the Asset Purchase Agreement, the Sellers will disclose a list (the "Non-365 Contract List") of certain contracts that the Purchasers have elected to have the relevant Seller assign to the Purchasers, or any other purchaser if the Purchaser is outbid, at Closing (as defined in the Asset Purchase Agreement). SNMPRI has not received notice that they are included in the Non-365 Contract List. The Debtors, through counsel, have been informed by the Debtors that they are not included in the Non-365 Contract List.

     8.     Although SNMPRI has not received notice that the License Agreement will be assumed and assigned in the Sale or that the License Agreement is included in the Non-365 Contract List, certain employees of NNC have advised SNMPRI that portions of the intellectual

property licensed under the License Agreement will be "transferred" to Nokia Siemens Networks, one of the Purchasers.

### Preliminary Objection and Reservation of Rights

9.     Based on conflicting representations regarding the Sale, SNMPRI files this preliminary objection and reservation of rights. Although none of the Debtors are a party to the License Agreement, NNC, the counterparty to the License Agreement, is party to Canadian bankruptcy proceedings related to the above-captioned cases. SNMPRI files this objection because NNC is a party to the Asset Purchase Agreement proposed to be approved in the Sale.

10.     SNMPRI has made multiple attempts to determine if its intellectual property or the License Agreement are involved in the Sale; however, the information received to date has been conflicting and ambiguous. SNMPRI files this objection to request that the Debtors clarify, by inclusion any order to be entered by the Court approving the Sale, the Debtors' and Purchasers' intentions with respect to the License Agreement. If the parties to the Sale will agree, and the Court will make it a part of the record, that no intellectual property and no intellectual property rights belonging to SNMPRI and its suppliers are included in the Sale, then SNMPRI will withdraw its objection to the Sale.

11.     If, however, SNMPRI's intellectual property or the License Agreement are involved in the Sale: (i) any assumption or assignment of the License Agreement must be made pursuant to the terms of the License Agreement, (ii) any outstanding obligations owed to SNMPRI must be cured, and (iii) SNMPRI must receive adequate assurance of future performance.

12.     The terms of the License Agreement govern the procedure for the assignment of the agreement and require it to be assigned in its entirety. If the License Agreement is not

assigned in its entirety, all parties must comply with the procedure and obligations set forth in section 7.2 of the License Agreement, including the execution of a new agreement and the payment of an adoption fee.

13.    Section 365(b) of the Bankruptcy Code requires a debtor to cure any defaults and provide adequate assurance of future performance before an executory contract can be assumed. 11 U.S.C. § 365(b).  To the extent the any parties to the Sale seek to assume and assign the License Agreement, any defaults under the agreement must be cured and adequate assurance must be provided.  SNMPRI uses royalty reports provided by NNC to determine amounts owed to SNMPRI for royalties.  NNC has not yet provided royalty reports to SNMPRI for the second quarter of 2009.  SNMPRI estimates that approximately $22,092 (US dollars) plus any/all amounts associated with royalties that have not been reported by NNC to date are owed to SNMPRI.  Such outstanding amounts must be paid.

14.    Finally, SNMPRI demands adequate assurance of future performance should the stalking horse bidder be outbid.

15.    At this juncture, it is possible that the Debtors will receive higher and better offers, and that the Purchasers may not ultimately purchase the Debtors' assets.  The purchaser of the Debtors' assets has not been finally identified, and the schedule of contracts and leases that the Debtors propose to include in the Sale is not finally determined.  SNMPRI reserves all rights to object to the Sale and the assumption, assignment or rejection of any agreements affecting SNMPRI and the intellectual property of SNMPRI and SNMPRI's suppliers.

16.    SNMPRI reserves all rights to supplement or amend the objections raised herein and to seek discovery regarding sale issues, including, but not limited to, cure amounts, and the Debtors' rights and abilities to assume and assign the License Agreement.

WHEREFORE, SNMPRI requests that the Court deny the Sale Motion as set forth herein and reserves all rights.

Dated: July 20, 2009             CIARDI CIARDI & ASTIN
      Wilmington, Delaware

                                    */s/ Mary E. Augustine*
                                    Daniel K. Astin (No. 4068)
                                    Anthony M. Saccullo (No. 4141)
                                    Mary E. Augustine (No. 4477)
                                    919 N. Market Street, Suite 700
                                    Wilmington, Delaware 19801
                                    (302) 658-1100 telephone
                                    (302) 658-1300 facsimile
                                    dastin@ciardilaw.com
                                    asaccullo@ciardilaw.com
                                    maugustine@ciardilaw.com

                                    *Attorneys for SNMP Research*
                                    *International, Inc.*

# BLUE SHEET

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : | Case No. 09-10138 (KG) |
| Nortel Networks Inc., *et al.,* | : |  |
|  | : | Jointly Administered |
| Debtors. | : |  |
|  | : | Re: Docket No. 1131 |

**PRELIMINARY OBJECTION AND RESERVATION OF RIGHTS OF SNMP
RESEARCH INTERNATIONAL, INC. TO DEBTORS' MOTION TO APPROVE THE
SALE OF CERTAIN ASSETS OF THE DEBTORS' ENTERPRISE SOLUTIONS
BUSINESS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES
AND THE ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS**

SNMP Research International, Inc. ("SNMPRI"), through undersigned counsel, hereby

files this preliminary objection and reservation of rights (the "Objection") to the motion of the

above-captioned debtors and debtors in possession (collectively, the "Debtors") to approve the

sale of certain of the Debtors' Enterprise Solutions Business assets free and clear of all liens,

claims and encumbrances and the assumption and assignment of certain contracts [Docket No.

1131] (the "Sale Motion"), and in support hereof, respectfully represents as follows:

**The License Agreement**

1.      SNMPRI and Nortel Networks Corporation ("NNC"), a Canadian corporation, are

parties to a certain license agreement (the "License Agreement") executed prior to the Petition

Date (defined herein) governing NNC's use of certain intellectual property described as source

code and binary license code licensed by SNMPRI to NNC.  The License Agreement contains

over 70 schedules that each list one or more specific products, development software, and run-

time software licensed to NNC.  Section 7.1 of the License Agreement permits NNC to assign

the License Agreement as follows:

1

> [u]pon prior written notice of such to SNMPRI, NNC may assign this Agreement, in its entirety only, and only in conjunction with a change of ownership, merger, acquisition, sale or transfer of all of substantially all of its business or assets. Such assignment shall only be valid as to NNC's business units as of the date of such assignment, and the rights and licenses of this Agreement shall not be enlarged to encompass the entirety of the new entity, if larger, or the entirety of the new entity's product line, if larger. The terms and conditions of this Agreement shall bind and inure to each party's successors and assigns.

License Agreement at 7.1.

2.    Should NNC desire to assign only a portion of the License Agreement, section 7.2 of the License Agreement provides:

> [u]pon prior written notice of such to SNMPRI, execution of a fresh copy of this Agreement, and payment of an Adoption Fee, a Specified Entity previously licensed under one or more Schedules A that is to be made an independent entity by NNC may adopt this Agreement as an agreement separate from NNC ("New Agreement"). The Adoption Fee shall be equal to the amount that SNMP would have charged the Specified Entity under the relevant Schedule A if the Specified Entity had not been a Nortel Networks Company (Standard Value), minus the amount previously paid under the relevant Schedule A. SNMP's liability under the New Agreement shall be limited to a straight line three year depreciation of the Standard Value, starting from the execution date of the new agreement. The scope of the new license shall be to the named Specified Entity only, and shall not include the possibility of addition of any other "Specified Entities" at a later point in time.

License Agreement at 7.2.

3.    SNMPRI and NNC were parties to the License Agreement on the Petition Date (defined herein).

### Background

4.    On January 14, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the United States Code (the "Bankruptcy Code").

2

5.　　On July 20, 2009, the Debtors filed the Sale Motion. The Sale Motion, among other things, seeks the approval of: (i) the sale, free and clear of all liens, claims and encumbrances, certain of the Debtors' Enterprise Solutions Business assets (the "Sale") pursuant to the terms of the Asset and Share Sale Agreement by and among NNC, Nortel Networks Limited, Nortel Networks Inc. and the other Entities Defined therein as Sellers (the "North American Sellers"), certain other entities defined therein as EMEA Sellers (the "EMEA Sellers," collectively with the North American Sellers, the "Sellers") and Avaya Inc. (together with its designees, "Avaya" or "Purchasers") dated as of July 20, 2009 (the "Asset Purchase Agreement"), (ii) the assumption and assignment certain executory contracts pursuant to procedures set forth in the Sale Motion (the "Assumption and Assignment Procedures"), and (iii) the assignment of certain Non-365 Contracts (as defined in the Asset Purchase Agreement). The sale to the Purchasers is subject to higher and better offers.

6.　　Pursuant to the Assumption and Assignment Procedures, the Purchasers may not be able to identify the executory contracts and unexpired leases that the Debtors will assume and assign to the Purchasers until after the closing date of the sale.

7.　　Pursuant sections 2.1.5 and 2.1.6 to the Asset Purchase Agreement, the Sellers will disclose a certain contracts that the Purchasers have elected to have the relevant Seller assign to the Purchasers, or any other purchaser if the Purchaser is outbid (as defined in the Asset Purchase Agreement). Upon information from the Debtors, the list of contracts designated for assumption and assignment and the list of non-365 contracts designated for assignment have not yet been finally determined, and no notices have been served on any contract counterparties.

3

## Preliminary Objection and Reservation of Rights

8.     Since SNMPRI cannot yet determine if its intellectual property or the License

Agreement are involved in the Sale, SNMPRI files this objection to request that the Debtors

clarify, by inclusion in any order to be entered by the Court approving the Sale, the Sellers' and

Purchasers' intentions with respect to the License Agreement. Specifically, if the parties to the

Sale determine that the License Agreement will not be assumed and assigned, SNMPRI requests

that the Debtors include the following language in any order approving the Sale:

> Nothing in this Order or in the Sale Agreement or Ancillary
> Agreements provides for the assumption and/or assignment,
> whether under section 365 of the Bankruptcy Code or otherwise, of
> any contract with SNMP Research International, Inc. ("SNMP"),
> and no intellectual property rights or intellectual property licensed
> *via* contracts with SNMP are being conveyed or otherwise
> transferred pursuant to the Order, Sale Agreement or Ancillary
> Agreements. To the extent the Purchaser elects to have the Sellers
> assign to the Purchaser any contract with or intellectual property
> right of SNMP relating to the Assets, the Sellers and Purchaser will
> do so in accordance with the terms of such contract or applicable
> license, which terms may include, *inter alia*, the written consent of
> SNMP. To the extent the Purchaser discovers they have received
> SNMP's intellectual property or intellectual property rights, the
> Purchaser will make reasonable efforts to enter into a new license
> agreement with SNMP within a reasonable time after such
> discovery.

9.     If, however, SNMPRI's intellectual property or the License Agreement are

involved in the Sale: (i) any assumption or assignment of the License Agreement must be made

pursuant to the terms of the License Agreement, (ii) any outstanding obligations owed to

SNMPRI must be cured, and (iii) SNMPRI must receive adequate assurance of future

performance.

10.     The terms of the License Agreement govern the procedure for the assignment of

the agreement and require it to be assigned in its entirety. If the License Agreement is not

assigned in its entirety, all parties must comply with the procedure and obligations set forth in section 7.2 of the License Agreement, including the execution of a new agreement and the payment of an adoption fee.

11.     Section 365(b) of the Bankruptcy Code requires a debtor to cure any defaults and provide adequate assurance of future performance before an executory contract can be assumed. 11 U.S.C. § 365(b).  To the extent that any parties to the Sale seek to assume and assign the License Agreement, any defaults under the agreement must be cured and adequate assurance must be provided.  SNMPRI uses royalty reports provided by NNC to determine amounts owed to SNMPRI for royalties.  SNMPRI estimates that approximately $22,092 (US dollars) plus any/all amounts associated with royalties that have not been reported by NNC to date are owed to SNMPRI.  Such outstanding amounts must be paid.

12.     Finally, SNMPRI demands adequate assurance of future performance should the stalking horse bidder be outbid.

13.     At this juncture, it is possible that the Debtors will receive higher and better offers, and that the Purchasers may not ultimately purchase the Debtors' assets.  The purchaser of the Debtors' assets has not been finally identified, and the schedule of contracts and leases that the Debtors propose to include in the Sale is not finally determined.  SNMPRI reserves all rights to object to the Sale and the assumption, assignment or rejection of any agreements affecting SNMPRI and the intellectual property of SNMPRI and SNMPRI's suppliers.

14.     SNMPRI reserves all rights to supplement or amend the objections raised herein and to seek discovery regarding sale issues, including, but not limited to, cure amounts, and the Debtors' rights and abilities to assume and assign the License Agreement.

WHEREFORE, SNMPRI objects to the Sale Motion and reserves all rights.

Dated: September 4, 2009          CIARDI CIARDI & ASTIN
       Wilmington, Delaware

                                  /s/ Mary E. Augustine
                                  Daniel K. Astin (No. 4068)
                                  Anthony M. Saccullo (No. 4141)
                                  Mary E. Augustine (No. 4477)
                                  919 N. Market Street, Suite 700
                                  Wilmington, Delaware 19801
                                  (302) 658-1100 telephone
                                  (302) 658-1300 facsimile
                                  dastin@ciardilaw.com
                                  asaccullo@ciardilaw.com
                                  maugustine@ciardilaw.com

                                  *Attorneys for SNMP Research*
                                  *International, Inc.*

6

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : | Case No. 09-10138 (KG) |
| Nortel Networks Inc., *et al.*, | : |  |
|  | : | Jointly Administered |
| Debtors. | : |  |
|  | : | Re: Docket No. 1525 |

**PRELIMINARY OBJECTION AND RESERVATION OF RIGHTS OF SNMP
RESEARCH INTERNATIONAL, INC. TO DEBTORS' MOTION TO APPROVE THE
SALE OF CERTAIN ASSETS OF THE DEBTORS' NEXT GENERATION SERVICE
PACKET CORE NETWORK COMPONENTS FREE AND CLEAR OF ALL LIENS,
CLAIMS AND ENCUMBRANCES**

SNMP Research International, Inc. ("SNMPRI"), through undersigned counsel, hereby files this preliminary objection and reservation of rights (the "Objection") to the motion of the above-captioned debtors and debtors in possession (collectively, the "Debtors") to approve the sale of certain of the Debtors' Next Generation Service Packet Core Network Components free and clear of all liens, claims and encumbrances [Docket No. 1525] (the "Sale Motion"), and in support hereof, respectfully represents as follows:

**The License Agreement**

1.      SNMPRI and Nortel Networks Corporation ("NNC"), a Canadian corporation, are parties to a certain license agreement (the "License Agreement") executed prior to the Petition Date (defined herein) governing NNC's use of certain intellectual property described as source code and binary license code licensed by SNMPRI to NNC. The License Agreement contains over 70 schedules that each list one or more specific products, development software, and run-time software licensed to NNC. Section 7.1 of the License Agreement permits NNC to assign the License Agreement as follows:

1

> [u]pon prior written notice of such to SNMPRI, NNC may assign this Agreement, in its entirety only, and only in conjunction with a change of ownership, merger, acquisition, sale or transfer of all of substantially all of its business or assets. Such assignment shall only be valid as to NNC's business units as of the date of such assignment, and the rights and licenses of this Agreement shall not be enlarged to encompass the entirety of the new entity, if larger, or the entirety of the new entity's product line, if larger. The terms and conditions of this Agreement shall bind and inure to each party's successors and assigns.

License Agreement at 7.1.

2.      Should NNC desire to assign only a portion of the License Agreement, section 7.2

of the License Agreement provides:

> [u]pon prior written notice of such to SNMPRI, execution of a fresh copy of this Agreement, and payment of an Adoption Fee, a Specified Entity previously licensed under one or more Schedules A that is to be made an independent entity by NNC may adopt this Agreement as an agreement separate from NNC ("New Agreement"). The Adoption Fee shall be equal to the amount that SNMP would have charged the Specified Entity under the relevant Schedule A if the Specified Entity had not been a Nortel Networks Company (Standard Value), minus the amount previously paid under the relevant Schedule A. SNMP's liability under the New Agreement shall be limited to a straight line three year depreciation of the Standard Value, starting from the execution date of the new agreement. The scope of the new license shall be to the named Specified Entity only, and shall not include the possibility of addition of any other "Specified Entities" at a later point in time.

License Agreement at 7.2.

3.      SNMPRI and NNC were parties to the License Agreement on the Petition Date

(defined herein).

### Background

4.      On January 14, 2009 (the "Petition Date"), the Debtors filed voluntary petitions

for relief under chapter 11 of the United States Code (the "Bankruptcy Code").

5.      On September 21, 2009, the Debtors filed the Sale Motion. The Sale Motion, among other things, seeks the approval of: (i) the sale, free and clear of all liens, claims and encumbrances (the "Sale"), of certain of the Debtors' Next Generation Service Packet Core Network Components (the "Assets"), (ii) the transfer of the Debtors' interests in certain non-patent intellectual property included in the Assets, (iii) the granting of a nonexclusive license to patent intellectual property included in the Assets, (iv) the transfer of equipment and other tangible assets included in the Assets to the purchaser, and (v) the entry into certain ancillary agreements with the purchaser, in particular an Intellectual Property License Agreement and a Transition Services Agreement, which have not been disclosed.

6.      The Sale Motion indicates that a stalking horse bidder will not be identified for this Sale. To date, no purchaser has been identified, and no specific intellectual property or licenses have been identified as being transferred in the Sale.

7.      Pursuant section 2.1.1 of the Asset Purchase Agreement, the Debtors seek to sell intellectual property of the type licensed by SNMPRI and, specifically, software predominately used in the Debtors' Next Generation Service Packet Core Network Components.

### Preliminary Objection and Reservation of Rights

8.      Since SNMPRI cannot yet determine if its intellectual property or the License Agreement are involved in the Sale, SNMPRI files this objection to request that the Debtors clarify, by inclusion in any order to be entered by the Court approving the Sale, the Sellers' and Purchasers' intentions with respect to the License Agreement. Specifically, if the parties to the Sale determine that the License Agreement or SNMPRI's intellectual property will not be transferred, SNMPRI requests that the Debtors include the following language in any order approving the Sale:

3

> Nothing in this Order or in the Sale Agreement or Ancillary Agreements provides for or approves the transfer, assumption and/or assignment, whether under sections 363 or 365 of the Bankruptcy Code or otherwise, of any intellectual property or license agreement with SNMP Research International, Inc. ("SNMPRI"). To the extent the Purchaser elects to have the Sellers assign to the Purchaser any contract with or intellectual property right of SNMPRI, the Sellers and Purchaser will do so in accordance with the terms of such contract or applicable license, which terms may include, *inter alia*, the written consent of SNMPRI. To the extent the Purchaser discovers they have received SNMPRI's intellectual property or intellectual property rights, the Purchaser will make reasonable efforts to enter into a new license agreement with SNMPRI within a reasonable time after such discovery.

9.    If SNMPRI's intellectual property or the License Agreement are involved in the Sale: (i) any transfer, assumption, or assignment of the License Agreement and SNMPRI's intellectual property must be made pursuant to the terms of the License Agreement, (ii) any outstanding obligations owed to SNMPRI must be cured, and (iii) SNMPRI must receive adequate assurance of future performance.

10.    The terms of the License Agreement govern the procedure for the assignment of the agreement and require it to be assigned in its entirety. If the License Agreement is not assigned in its entirety, all parties must comply with the procedure and obligations set forth in section 7.2 of the License Agreement, including the execution of a new agreement and the payment of an adoption fee.

11.    Section 365(b) of the Bankruptcy Code requires a debtor to cure any defaults and provide adequate assurance of future performance before an executory contract can be assumed. 11 U.S.C. § 365(b). To the extent that any parties to the Sale seek to assume and assign the License Agreement or transfer SNMPRI's intellectual property, any defaults under the agreement must be cured and adequate assurance must be provided. SNMPRI uses royalty reports provided

4

by NNC to determine amounts owed to SNMPRI for royalties. SNMPRI estimates that approximately $20,781 (US dollars) plus any/all amounts associated with royalties that have not been reported by NNC to date are owed to SNMPRI. Such outstanding amounts must be paid.

12.     Finally, SNMPRI demands adequate assurance of future performance once the purchaser is identified.

13.     At this juncture, the purchaser of the Debtors' assets has not been identified, and the specific intellectual property that the Debtors propose to include in the Sale has not been disclosed. SNMPRI reserves all rights to object to the Sale and the transfer, assumption, assignment or rejection of any agreements affecting SNMPRI and the intellectual property of SNMPRI and SNMPRI's suppliers.

14.     SNMPRI reserves all rights to supplement or amend the objections raised herein and to seek discovery regarding sale issues, including, but not limited to, cure amounts, and the Debtors' rights and abilities to assume and assign the License Agreement.

WHEREFORE, SNMPRI objects to the Sale Motion and reserves all rights.

Dated: October 21, 2009          CIARDI CIARDI & ASTIN
       Wilmington, Delaware

                                 /s/ Mary E. Augustine
                                 Daniel K. Astin (No. 4068)
                                 Anthony M. Saccullo (No. 4141)
                                 Mary E. Augustine (No. 4477)
                                 919 N. Market Street, Suite 700
                                 Wilmington, Delaware 19801
                                 (302) 658-1100 telephone
                                 (302) 658-1300 facsimile
                                 dastin@ciardilaw.com
                                 asaccullo@ciardilaw.com
                                 maugustine@ciardilaw.com

                                 *Attorneys for SNMP Research*
                                 *International, Inc.*

**BLUE SHEET**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | Case No. 09-10138 (KG) |
| Nortel Networks Inc., *et al.,* | : | |
| | : | Jointly Administered |
| Debtors. | : | |
| | : | Re: Docket Nos. 1627, 1685 |

**PRELIMINARY OBJECTION AND RESERVATION OF RIGHTS OF SNMP
RESEARCH INTERNATIONAL, INC. TO DEBTORS' MOTION FOR ORDER
AUTHORIZING AND APPROVING (A) THE SALE OF CERTAIN
ASSETS OF DEBTORS' METRO ETHERNET NETWORKS BUSINESS FREE
AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES AND (B) THE
ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS**

SNMP Research International, Inc. ("SNMPRI"), through undersigned counsel, hereby

files this preliminary objection and reservation of rights (the "Objection") to the motion of the

above-captioned debtors and debtors in possession (collectively, the "Debtors") to approve: (i)

the sale of certain of the Debtors' Metro Ethernet Networks Business free and clear of all liens,

claims and encumbrances, and (ii) the assumption and assignment of certain executory contracts

[Docket No. 1627] (the "Sale Motion"). In support of this Objection, SNMPRI respectfully

represents as follows:

**The License Agreement**

1.      SNMPRI and Nortel Networks Corporation ("NNC"), a Canadian corporation, are

parties to a certain license agreement (the "License Agreement") executed prior to the Petition

Date (defined herein) governing NNC's use of certain intellectual property described as source

code and binary license code licensed by SNMPRI to NNC. The License Agreement contains

over 70 schedules that each list one or more specific products, development software, and run-

time software licensed to NNC. Section 7.1 of the License Agreement permits NNC to assign

1

the License Agreement as follows:

> [u]pon prior written notice of such to SNMPRI, NNC may assign this Agreement, in its entirety only, and only in conjunction with a change of ownership, merger, acquisition, sale or transfer of all of substantially all of its business or assets. Such assignment shall only be valid as to NNC's business units as of the date of such assignment, and the rights and licenses of this Agreement shall not be enlarged to encompass the entirety of the new entity, if larger, or the entirety of the new entity's product line, if larger. The terms and conditions of this Agreement shall bind and inure to each party's successors and assigns.

License Agreement at 7.1.

2. Should NNC desire to assign only a portion of the License Agreement, section 7.2

of the License Agreement provides:

> [u]pon prior written notice of such to SNMPRI, execution of a fresh copy of this Agreement, and payment of an Adoption Fee, a Specified Entity previously licensed under one or more Schedules A that is to be made an independent entity by NNC may adopt this Agreement as an agreement separate from NNC ("New Agreement"). The Adoption Fee shall be equal to the amount that SNMP would have charged the Specified Entity under the relevant Schedule A if the Specified Entity had not been a Nortel Networks Company (Standard Value), minus the amount previously paid under the relevant Schedule A. SNMP's liability under the New Agreement shall be limited to a straight line three year depreciation of the Standard Value, starting from the execution date of the new agreement. The scope of the new license shall be to the named Specified Entity only, and shall not include the possibility of addition of any other "Specified Entities" at a later point in time.

License Agreement at 7.2.

3. SNMPRI and NNC were parties to the License Agreement on the Petition Date

(defined herein).

## Background

4. On January 14, 2009 (the "Petition Date"), the Debtors filed voluntary petitions

for relief under chapter 11 of the United States Code (the "Bankruptcy Code").

5.    On October 7, 2009, the Debtors filed the Sale Motion. The Sale Motion, among other things, seeks the approval of: (i) the sale, free and clear of all liens, claims and encumbrances (the "Sale"), of certain of the Debtors' Metro Ethernet Networks Business (the "Assets") pursuant to section 363 of the Bankruptcy Code, except as set forth in the Stalking Horse Agreement (as defined in the Sale Motion), (ii) the assumption and assignment of certain executory contracts pursuant to section 365 of the Bankruptcy Code, and (iii) the assignment of "other vendor contracts" and "other customer contracts." Section 2.1.1(e) of the Stalking Horse Agreement also provides for the sale of certain intellectual property. The specific contracts, executory or otherwise, and intellectual property contemplated by the Sale Motion and the Stalking Horse Agreement have not been disclosed—although such items are contemplated to be included as exhibits to the Stalking Horse Agreement.

6.    Moreover, the Debtors are conducting an ongoing auction, and it is possible that the Ciena Corporation, the stalking horse bidder, will be outbid.

### Preliminary Objection and Reservation of Rights

7.    Since SNMPRI cannot yet determine if its intellectual property or the License Agreement are involved in the Sale, SNMPRI files this objection to request that the Debtors clarify, by inclusion in any order to be entered by the Court approving the Sale, the Sellers' and purchasers' intentions with respect to the License Agreement. Specifically, if the parties to the Sale determine that the License Agreement or SNMPRI's intellectual property will not be transferred, SNMPRI requests that the Debtors include the following language in any order approving the Sale:

Nothing in this Order or in the Sale Agreement or Ancillary

3

Agreements provides for or approves the transfer, assumption and/or assignment, whether under sections 363 or 365 of the Bankruptcy Code or otherwise, of any intellectual property or license[i] agreement with SNMP Research International, Inc. ("SNMPRI"). To the extent the Purchaser elects to have the Sellers assign to the Purchaser any contract with or intellectual property right of SNMPRI, the Sellers and Purchaser will do so in accordance with the terms of such contract or applicable license, which terms may include, *inter alia*, the written consent of SNMPRI. To the extent the Purchaser discovers they have received SNMPRI's intellectual property or intellectual property rights, the Purchaser will make reasonable efforts to enter into a new license agreement with SNMPRI within a reasonable time after such discovery.

8.      If SNMPRI's intellectual property or the License Agreement are involved in the Sale: (i) any transfer, assumption, or assignment of the License Agreement and SNMPRI's intellectual property must be made pursuant to the terms of the License Agreement, (ii) any outstanding obligations owed to SNMPRI must be cured, and (iii) SNMPRI must receive adequate assurance of future performance.

9.      The terms of the License Agreement govern the procedure for the assignment of the agreement and require it to be assigned in its entirety. If the License Agreement is not assigned in its entirety, all parties must comply with the procedure and obligations set forth in section 7.2 of the License Agreement, including the execution of a new agreement and the payment of an adoption fee.

10.     Section 365(b) of the Bankruptcy Code requires a debtor to cure any defaults and provide adequate assurance of future performance before an executory contract can be assumed. 11 U.S.C. § 365(b). To the extent that any parties to the Sale seek to assume and assign the License Agreement or transfer SNMPRI's intellectual property, any defaults under the agreement must be cured and adequate assurance must be provided. SNMPRI uses royalty reports provided

by NNC to determine amounts owed to SNMPRI for royalties. SNMPRI estimates that approximately $20,781 (US dollars) plus any/all amounts associated with royalties that have not been reported by NNC to date are owed to SNMPRI. Such outstanding amounts must be paid.

11.    Finally, SNMPRI demands adequate assurance of future performance once the purchaser is identified.

12.    At this juncture, the purchaser of the Debtors' assets has not been identified, and the specific intellectual property and contracts that the Debtors propose to include in the Sale have not been disclosed. SNMPRI reserves all rights to object to the Sale and the transfer, assumption, assignment or rejection of any agreements affecting SNMPRI and the intellectual property of SNMPRI and SNMPRI's suppliers.

13.    SNMPRI reserves all rights to supplement or amend the objections raised herein and to seek discovery regarding sale issues, including, but not limited to, cure amounts, and the Debtors' rights and abilities to assume and assign the License Agreement.

WHEREFORE, SNMPRI objects to the Sale Motion and reserves all rights.

Dated: November 6, 2009          CIARDI CIARDI & ASTIN
      Wilmington, Delaware

                            */s/ Mary E. Augustine*
                            Daniel K. Astin (No. 4068)
                            Anthony M. Saccullo (No. 4141)
                            Mary E. Augustine (No. 4477)
                            919 N. Market Street, Suite 700
                            Wilmington, Delaware 19801
                            (302) 658-1100 telephone
                            (302) 658-1300 facsimile
                            dastin@ciardilaw.com
                            asaccullo@ciardilaw.com
                            maugustine@ciardilaw.com

                            *Attorneys for SNMP Research*
                            *International, Inc.*

# BLUE SHEET

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | Case No. 09-10138 (KG) |
| Nortel Networks Inc., *et al.*, | : | |
| | : | Jointly Administered |
| Debtors. | : | |
| | : | Re: Docket Nos. 1587, 1686 |

**PRELIMINARY OBJECTION AND RESERVATION OF RIGHTS OF SNMP
RESEARCH INTERNATIONAL, INC. TO DEBTORS' MOTION FOR ORDERS (I)(A)
AUTHORIZING AND APPROVING THE BIDDING PROCEDURES, (B) APPROVING
THE NOTICE PROCEDURES, AND (C) SETTING A DATE FOR THE SALE
HEARING, AND (II) AUTHORIZING AND APPROVING THE SALE OF CERTAIN
ASSETS OF DEBTORS' GSM/GSM-R BUSINESS**

SNMP Research International, Inc. ("SNMPRI"), through undersigned counsel, hereby

files this preliminary objection and reservation of rights (the "Objection") to the motion of the

above-captioned debtors and debtors in possession (collectively, the "Debtors") for orders (I)(a)

Authorizing and Approving the Bidding Procedures, (b) Approving the Notice Procedures, and

(c) Setting a Date for the Sale Hearing, and (II) Authorizing and Approving the Sale of Certain

Assets of Debtors' GSM/GSM-R Business [Docket No. 1587] (the "Sale Motion"). In support of

this Objection, SNMPRI respectfully represents as follows:

**The License Agreement**

1.      SNMPRI and Nortel Networks Corporation ("NNC"), a Canadian corporation, are

parties to a certain license agreement (the "License Agreement") executed prior to the Petition

Date (defined herein) governing NNC's use of certain intellectual property described as source

code and binary license code licensed by SNMPRI to NNC. The License Agreement contains

over 70 schedules that each list one or more specific products, development software, and run-

time software licensed to NNC. Section 7.1 of the License Agreement permits NNC to assign

the License Agreement as follows:

> [u]pon prior written notice of such to SNMPRI, NNC may assign this Agreement, in its entirety only, and only in conjunction with a change of ownership, merger, acquisition, sale or transfer of all of substantially all of its business or assets. Such assignment shall only be valid as to NNC's business units as of the date of such assignment, and the rights and licenses of this Agreement shall not be enlarged to encompass the entirety of the new entity, if larger, or the entirety of the new entity's product line, if larger. The terms and conditions of this Agreement shall bind and inure to each party's successors and assigns.

License Agreement at 7.1.

2.    Should NNC desire to assign only a portion of the License Agreement, section 7.2

of the License Agreement provides:

> [u]pon prior written notice of such to SNMPRI, execution of a fresh copy of this Agreement, and payment of an Adoption Fee, a Specified Entity previously licensed under one or more Schedules A that is to be made an independent entity by NNC may adopt this Agreement as an agreement separate from NNC ("New Agreement"). The Adoption Fee shall be equal to the amount that SNMP would have charged the Specified Entity under the relevant Schedule A if the Specified Entity had not been a Nortel Networks Company (Standard Value), minus the amount previously paid under the relevant Schedule A. SNMP's liability under the New Agreement shall be limited to a straight line three year depreciation of the Standard Value, starting from the execution date of the new agreement. The scope of the new license shall be to the named Specified Entity only, and shall not include the possibility of addition of any other "Specified Entities" at a later point in time.

License Agreement at 7.2.

3.    SNMPRI and NNC were parties to the License Agreement on the Petition Date

(defined herein).

### Background

4.    On January 14, 2009 (the "Petition Date"), the Debtors filed voluntary petitions

for relief under chapter 11 of the United States Code (the "Bankruptcy Code").

5.     On September 30, 2009, the Debtors filed the Sale Motion. The Sale Motion, among other things, seeks the approval of the sale of certain assets of Debtors' GSM/GSM-R Business. The bidding procedures, attached to the Notice of (I) Solicitation of Initial Bids for Nortel's GSM/GSM-R Business; (II) Bidding Procedures; (III) Sale Hearing; and (IV) Related Relief and Dates [Docket No. 1686] as Exhibit A, describe the assets proposed to be sold by the Sale Motion as follows:

> The sellers are offering for sale certain of the Sellers' assets pertaining to the GSM/GSM-R business unit of Nortel (collectively, the "Transaction"), or, as set forth in the relevant sale agreements with respect to a Successful Bidder (as defined below), and related schedules and in an information memorandum made available by the Sellers to potential bidders that have executed a confidentiality agreement with the Sellers (the "Assets").

6.     The totality of the assets to be sold, including any related specific contracts, executory or otherwise, and intellectual property contemplated by the sale through the Sale Motion have not been disclosed.

### Preliminary Objection and Reservation of Rights

7.     Since SNMPRI cannot yet determine if its intellectual property or the License Agreement are involved in the sale, SNMPRI files this objection to request that the Debtors clarify, by inclusion in any order to be entered by the Court approving the sale, the Sellers' and purchasers' intentions with respect to the License Agreement. Specifically, if the parties to the sale determine that the License Agreement or SNMPRI's intellectual property will not be transferred, SNMPRI requests that the Debtors include the following language in any order approving the sale:

> Nothing in this Order or in the Sale Agreement or Ancillary Agreements provides for or approves the transfer, assumption and/or assignment, whether under sections 363 or 365 of the Bankruptcy Code or otherwise, of any intellectual property or license agreement with SNMP Research International, Inc.

("SNMPRI"). To the extent the Purchaser elects to have the Sellers assign to the Purchaser any contract with or intellectual property right of SNMPRI, the Sellers and Purchaser will do so in accordance with the terms of such contract or applicable license, which terms may include, *inter alia*, the written consent of SNMPRI. To the extent the Purchaser discovers they have received SNMPRI's intellectual property or intellectual property rights, the Purchaser will make reasonable efforts to enter into a new license agreement with SNMPRI within a reasonable time after such discovery.

8.    If SNMPRI's intellectual property or the License Agreement are involved in the sale: (i) any transfer, assumption, or assignment of the License Agreement and SNMPRI's intellectual property must be made pursuant to the terms of the License Agreement, (ii) any outstanding obligations owed to SNMPRI must be cured, and (iii) SNMPRI must receive adequate assurance of future performance.

9.    The terms of the License Agreement govern the procedure for the assignment of the agreement and require it to be assigned in its entirety. If the License Agreement is not assigned in its entirety, all parties must comply with the procedure and obligations set forth in section 7.2 of the License Agreement, including the execution of a new agreement and the payment of an adoption fee.

10.    Section 365(b) of the Bankruptcy Code requires a debtor to cure any defaults and provide adequate assurance of future performance before an executory contract can be assumed. 11 U.S.C. § 365(b). To the extent that any parties to the sale seek to assume and assign the License Agreement or transfer SNMPRI's intellectual property, any defaults under the agreement must be cured and adequate assurance must be provided. SNMPRI uses royalty reports provided by NNC to determine amounts owed to SNMPRI for royalties. SNMPRI estimates that approximately $20,781 (US dollars) plus any/all amounts associated with royalties that have not been reported by NNC to date are owed to SNMPRI. Such outstanding amounts must be paid.

4

11.    Finally, SNMPRI demands adequate assurance of future performance once the purchaser is identified.

12.    At this juncture, there is no "stalking horse" bidder, and the specific intellectual property and contracts that the Debtors propose to include in the sale have not been disclosed. SNMPRI reserves all rights to object to the sale and the transfer, assumption, assignment or rejection of any agreements affecting SNMPRI and the intellectual property of SNMPRI and SNMPRI's suppliers.

13.    SNMPRI reserves all rights to supplement or amend the objections raised herein and to seek discovery regarding sale issues, including, but not limited to, cure amounts, and the Debtors' rights and abilities to assume and assign the License Agreement.

WHEREFORE, SNMPRI objects to the Sale Motion and reserves all rights.

Dated: November 12, 2009
       Wilmington, Delaware

CIARDI CIARDI & ASTIN

*/s/ Mary E. Augustine* _____
Daniel K. Astin (No. 4068)
Anthony M. Saccullo (No. 4141)
Mary E. Augustine (No. 4477)
Carl D. Neff (No. 4895)
919 N. Market Street, Suite 700
Wilmington, Delaware 19801
(302) 658-1100 telephone
(302) 658-1300 facsimile
dastin@ciardilaw.com
asaccullo@ciardilaw.com
maugustine@ciardilaw.com
cneff@ciardilaw.com

*Attorneys for SNMP Research*
*International, Inc.*