**<u>EXHIBIT A-2</u>**

# BLUE SHEET

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | Case No. 09-10138 (KG) |
| Nortel Networks Inc., *et al.*, | : | |
| | : | Jointly Administered |
| Debtors. | : | |
| | : | Re: Docket No. 2193 |

**PRELIMINARY OBJECTION AND RESERVATION OF RIGHTS OF SNMP
RESEARCH INTERNATIONAL, INC. TO DEBTORS' MOTION FOR APPROVAL OF
THE SALE OF CERTAIN ASSETS OF DEBTORS' CARRIER VOICE OVER IP AND
APPLICATION SOLUTIONS BUSINESS**

SNMP Research International, Inc. ("SNMPRI"), through undersigned counsel, hereby

files this preliminary objection and reservation of rights (the "Objection") to the motion of the

above-captioned debtors and debtors in possession (collectively, the "Debtors") for orders (I)(A)

authorizing the Debtors' entry into the stalking horse agreement, (B) authorizing and approving

the bidding procedures and bid protections, (C) approving payment of an incentive fee, (D)

approving the notice procedures and the assumption and assignment procedures, (E) authorizing

the filing of certain documents under seal and (F) setting a date for the sale hearing, and (II)

authorizing and approving (A) the sale of certain assets of the Debtors' Carrier Voice Over IP

and Application Solutions Business free and clear of all liens, claims and encumbrances and (B)

the assumption and assignment of certain executory contracts [Docket No. 2193] (the "Sale

Motion"). In support of this Objection, SNMPRI respectfully represents as follows:

**The License Agreement**

1.      SNMPRI and Nortel Networks Corporation ("NNC"), a Canadian corporation, are

parties to a certain license agreement (the "License Agreement") executed prior to the Petition

Date (defined herein) governing NNC's use of certain intellectual property described as source

code and binary license code licensed by SNMPRI to NNC. The License Agreement contains

over 70 schedules that each list one or more specific products, development software, and run-time software licensed to NNC. Section 7.1 of the License Agreement permits NNC to assign the License Agreement as follows:

> [u]pon prior written notice of such to SNMPRI, NNC may assign this Agreement, in its entirety only, and only in conjunction with a change of ownership, merger, acquisition, sale or transfer of all of substantially all of its business or assets. Such assignment shall only be valid as to NNC's business units as of the date of such assignment, and the rights and licenses of this Agreement shall not be enlarged to encompass the entirety of the new entity, if larger, or the entirety of the new entity's product line, if larger. The terms and conditions of this Agreement shall bind and inure to each party's successors and assigns.

License Agreement at 7.1.

2.    Should NNC desire to assign only a portion of the License Agreement, section 7.2 of the License Agreement provides:

> [u]pon prior written notice of such to SNMPRI, execution of a fresh copy of this Agreement, and payment of an Adoption Fee, a Specified Entity previously licensed under one or more Schedules A that is to be made an independent entity by NNC may adopt this Agreement as an agreement separate from NNC ("New Agreement"). The Adoption Fee shall be equal to the amount that SNMP would have charged the Specified Entity under the relevant Schedule A if the Specified Entity had not been a Nortel Networks Company (Standard Value), minus the amount previously paid under the relevant Schedule A. SNMP's liability under the New Agreement shall be limited to a straight line three year depreciation of the Standard Value, starting from the execution date of the new agreement. The scope of the new license shall be to the named Specified Entity only, and shall not include the possibility of addition of any other "Specified Entities" at a later point in time.

License Agreement at 7.2.

3.    SNMPRI and NNC were parties to the License Agreement on the Petition Date (defined herein).

2

**Background**

4.      On January 14, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the United States Code (the "Bankruptcy Code").

5.      On December 23, 2009, the Debtors filed the Sale Motion.  The Sale Motion, among other things, seeks the approval of: (i) sale of certain assets of Debtors' Voice Over IP and Application Solutions Business free and clear of all liens, claims and encumbrances (the "Sale") pursuant to section 363 of the Bankruptcy Code, (ii) the assumption and assignment of certain executory contracts pursuant to section 365 of the Bankruptcy Code, and (iii) the assignment of contracts not otherwise assignable under section 365 of the Bankruptcy Code. The Stalking Horse Agreement also provides for the sale of certain intellectual property.  The specific contracts, executory or otherwise, and intellectual property contemplated by the Sale Motion and the Stalking Horse Agreement have not been disclosed—although such items are contemplated to be included as exhibits to the Stalking Horse Agreement.

6.      Moreover, the Debtors are conducting an ongoing auction, and it is possible that GENBAND Inc., the stalking horse bidder, will be outbid.

**Preliminary Objection and Reservation of Rights**

7.      Since SNMPRI cannot yet determine if its intellectual property or the License Agreement are involved in the sale, SNMPRI files this objection to request that the Debtors clarify, by inclusion in any order to be entered by the Court approving the sale, the Sellers' and purchasers' intentions with respect to the License Agreement.  Specifically, if the parties to the sale determine that the License Agreement or SNMPRI's intellectual property will not be transferred, SNMPRI requests that the Debtors include the following language in any order approving the sale:

> Nothing in this Order or in the Sale Agreement or Ancillary Agreements provides for or approves the transfer, assumption and/or assignment, whether under sections 363 or 365 of the Bankruptcy Code or otherwise, of any intellectual property or license agreement with SNMP Research International, Inc. ("SNMPRI"). To the extent the Purchaser elects to have the Sellers assign to the Purchaser any contract with or intellectual property right of SNMPRI, the Sellers and Purchaser will do so in accordance with the terms of such contract or applicable license, which terms may include, *inter alia*, the written consent of SNMPRI. To the extent the Purchaser discovers they have received SNMPRI's intellectual property or intellectual property rights, the Purchaser will make reasonable efforts to enter into a new license agreement with SNMPRI within a reasonable time after such discovery.

8.     If SNMPRI's intellectual property or the License Agreement are involved in the sale: (i) any transfer, assumption, or assignment of the License Agreement and SNMPRI's intellectual property must be made pursuant to the terms of the License Agreement, (ii) any outstanding obligations owed to SNMPRI must be cured, and (iii) SNMPRI must receive adequate assurance of future performance.

9.     The terms of the License Agreement govern the procedure for the assignment of the agreement and require it to be assigned in its entirety. If the License Agreement is not assigned in its entirety, all parties must comply with the procedure and obligations set forth in section 7.2 of the License Agreement, including the execution of a new agreement and the payment of an adoption fee.

10.     Section 365(b) of the Bankruptcy Code requires a debtor to cure any defaults and provide adequate assurance of future performance before an executory contract can be assumed. 11 U.S.C. § 365(b). To the extent that any parties to the sale seek to assume and assign the License Agreement or transfer SNMPRI's intellectual property, any defaults under the agreement must be cured and adequate assurance must be provided. SNMPRI uses royalty reports provided

4

by NNC to determine amounts owed to SNMPRI for royalties.   SNMPRI estimates that approximately $20,781 (US dollars) plus any/all amounts associated with royalties that have not been reported by NNC to date are owed to SNMPRI.  Such outstanding amounts must be paid.

11.    Finally, SNMPRI demands adequate assurance of future performance once the purchaser is identified.

12.    At this juncture, the specific intellectual property and contracts that the Debtors propose to include in the sale have not been disclosed.  SNMPRI reserves all rights to object to the sale and the transfer, assumption, assignment or rejection of any agreements affecting SNMPRI and the intellectual property of SNMPRI and SNMPRI's suppliers.

13.    SNMPRI reserves all rights to supplement or amend the objections raised herein and to seek discovery regarding sale issues, including, but not limited to, cure amounts, and the Debtors' rights and abilities to assume and assign the License Agreement.

WHEREFORE, SNMPRI objects to the Sale Motion and reserves all rights.

Dated: February 17, 2010
       Wilmington, Delaware

CIARDI CIARDI & ASTIN

*/s/ Mary E. Augustine*
Daniel K. Astin (No. 4068)
Anthony M. Saccullo (No. 4141)
Mary E. Augustine (No. 4477)
Carl D. Neff (No. 4895)
919 N. Market Street, Suite 700
Wilmington, Delaware 19801
(302) 658-1100 telephone
(302) 658-1300 facsimile
dastin@ciardilaw.com
asaccullo@ciardilaw.com
maugustine@ciardilaw.com
cneff@ciardilaw.com

*Attorneys for SNMP Research*
*International, Inc.*

5

# BLUE SHEET

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | Case No. 09-10138 (KG) |
| Nortel Networks Inc., *et al.*, | : | |
| | : | Jointly Administered |
| Debtors. | : | |
| | : | Re: Docket No. 2962 |

## PRELIMINARY OBJECTION AND RESERVATION OF RIGHTS OF SNMP RESEARCH INTERNATIONAL, INC. TO DEBTORS' MOTION FOR AN ORDER (I) AUTHORIZING THE SALE OF CERTAIN ASSETS OF DEBTORS' GSM/GSM-R BUSINESS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES; (II) AUTHORIZING AND APPROVING THE ASSET SALE AGREEMENT; (III) AUTHORIZING AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS; AND (IV) AUTHORIZING THE FILING OF CERTAIN DOCUMENTS UNDER SEAL

SNMP Research International, Inc. ("SNMPRI"), through undersigned counsel, hereby files this preliminary objection and reservation of rights (the "Objection") to the motion of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for an order (I) authorizing the sale of certain assets of Debtors' GSM/GSM-R business free and clear of all liens, claims and encumbrances; (II) authorizing and approving the asset sale agreement; (III) authorizing and approving the assumption and assignment of certain executory contracts; and (IV) authorizing the filing of certain documents under seal [Docket No. 2962] (the "Sale Motion"). In support of this Objection, SNMPRI respectfully represents as follows:

### The License Agreement

1.      SNMPRI and Nortel Networks Corporation ("NNC"), a Canadian corporation, are parties to a certain license agreement (the "License Agreement") executed prior to the Petition Date (defined herein) governing NNC's use of certain intellectual property described as source code and binary license code licensed by SNMPRI to NNC.  The License Agreement contains over 70 schedules that each list one or more specific products, development software, and run-

time software licensed to NNC. Section 7.1 of the License Agreement permits NNC to assign

the License Agreement as follows:

> [u]pon prior written notice of such to SNMPRI, NNC may assign
> this Agreement, in its entirety only, and only in conjunction with a
> change of ownership, merger, acquisition, sale or transfer of all of
> substantially all of its business or assets.  Such assignment shall
> only be valid as to NNC's business units as of the date of such
> assignment, and the rights and licenses of this Agreement shall not
> be enlarged to encompass the entirety of the new entity, if larger,
> or the entirety of the new entity's product line, if larger.  The terms
> and conditions of this Agreement shall bind and inure to each
> party's successors and assigns.

License Agreement at 7.1.

2.      Should NNC desire to assign only a portion of the License Agreement, section 7.2

of the License Agreement provides:

> [u]pon prior written notice of such to SNMPRI, execution of a
> fresh copy of this Agreement, and payment of an Adoption Fee, a
> Specified Entity previously licensed under one or more Schedules
> A that is to be made an independent entity by NNC may adopt this
> Agreement as an agreement separate from NNC ("New
> Agreement").  The Adoption Fee shall be equal to the amount that
> SNMP would have charged the Specified Entity under the relevant
> Schedule A if the Specified Entity had not been a Nortel Networks
> Company (Standard Value), minus the amount previously paid
> under the relevant Schedule A.  SNMP's liability under the New
> Agreement shall be limited to a straight line three year depreciation
> of the Standard Value, starting from the execution date of the new
> agreement.  The scope of the new license shall be to the named
> Specified Entity only, and shall not include the possibility of
> addition of any other "Specified Entities" at a later point in time.

License Agreement at 7.2.

3.      SNMPRI and NNC were parties to the License Agreement on the Petition Date

(defined herein).

## Background

4.      On January 14, 2009 (the "Petition Date"), the Debtors filed voluntary petitions

for relief under chapter 11 of the United States Code (the "Bankruptcy Code").

5.    On May 11, 2010, the Debtors filed the Sale Motion. The Sale Motion, among other things, seeks the approval of: (i) the sale of certain assets of Debtors' GSM/GSM-R Business free and clear of all liens, claims and encumbrances (the "Sale") pursuant to section 363 of the Bankruptcy Code, (ii) the Asset Sale Agreement; and (iii) the assumption and assignment of certain executory contracts pursuant to section 365 of the Bankruptcy Code. The Asset Sale Agreement also provides for the sale of certain intellectual property. The specific contracts, executory or otherwise, and intellectual property contemplated by the Sale Motion and the Asset Sale Agreement have not been disclosed.

## Preliminary Objection and Reservation of Rights

6.    Since SNMPRI cannot yet determine if its intellectual property or the License Agreement are involved in the sale, SNMPRI files this objection to request that the Debtors clarify, by inclusion in any order to be entered by the Court approving the sale, the Sellers' and purchasers' intentions with respect to the License Agreement. Specifically, if the parties to the sale determine that the License Agreement or SNMPRI's intellectual property will not be transferred, SNMPRI requests that the Debtors include the following language in any order approving the sale:

> Nothing in this Order or in the Sale Agreement or Ancillary Agreements provides for or approves the transfer, assumption and/or assignment, whether under sections 363 or 365 of the Bankruptcy Code or otherwise, of any intellectual property or license agreement with SNMP Research International, Inc. ("SNMPRI"). To the extent the Purchaser elects to have the Sellers assign to the Purchaser any contract with or intellectual property right of SNMPRI, the Sellers and Purchaser will do so in accordance with the terms of such contract or applicable license, which terms may include, *inter alia*, the written consent of SNMPRI. To the extent the Purchaser discovers they have received SNMPRI's intellectual property or intellectual property

3

rights, the Purchaser will make reasonable efforts to enter into a new license agreement with SNMPRI within a reasonable time after such discovery.

7.    If SNMPRI's intellectual property or the License Agreement are involved in the sale: (i) any transfer, assumption, or assignment of the License Agreement and SNMPRI's intellectual property must be made pursuant to the terms of the License Agreement, (ii) any outstanding obligations owed to SNMPRI must be cured, and (iii) SNMPRI must receive adequate assurance of future performance.

8.    The terms of the License Agreement govern the procedure for the assignment of the agreement and require it to be assigned in its entirety. If the License Agreement is not assigned in its entirety, all parties must comply with the procedure and obligations set forth in section 7.2 of the License Agreement, including the execution of a new agreement and the payment of an adoption fee.

9.    Section 365(b) of the Bankruptcy Code requires a debtor to cure any defaults and provide adequate assurance of future performance before an executory contract can be assumed. 11 U.S.C. § 365(b). To the extent that any parties to the sale seek to assume and assign the License Agreement or transfer SNMPRI's intellectual property, any defaults under the agreement must be cured and adequate assurance must be provided. SNMPRI uses royalty reports provided by NNC to determine amounts owed to SNMPRI for royalties. SNMPRI estimates that approximately $20,781 (US dollars) plus any/all amounts associated with royalties that have not been reported by NNC to date are owed to SNMPRI. Such outstanding amounts must be paid.

10.    Finally, SNMPRI demands adequate assurance of future performance once the purchaser is identified.

4

11.    At this juncture, the specific intellectual property and contracts that the Debtors propose to include in the sale have not been disclosed.  SNMPRI reserves all rights to object to the sale and the transfer, assumption, assignment or rejection of any agreements affecting SNMPRI and the intellectual property of SNMPRI and SNMPRI's suppliers.

12.    SNMPRI reserves all rights to supplement or amend the objections raised herein and to seek discovery regarding sale issues, including, but not limited to, cure amounts, and the Debtors' rights and abilities to assume and assign the License Agreement.

WHEREFORE, SNMPRI objects to the Sale Motion and reserves all rights.

Dated: May 17, 2010
        Wilmington, Delaware

CIARDI CIARDI & ASTIN

Daniel K. Astin (No. 4068)
Carl D. Neff (No. 4895)
919 N. Market Street, Suite 700
Wilmington, Delaware 19801
(302) 658-1100 telephone
(302) 658-1300 facsimile
dastin@ciardilaw.com
cneff@ciardilaw.com

*Attorneys for SNMP Research
International, Inc.*

5

# BLUE SHEET

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | Case No. 09-10138 (KG) |
| Nortel Networks Inc., *et al.*, | : | |
| | : | Jointly Administered |
| Debtors. | : | |
| | : | Re: Docket No. 3832 |

**PRELIMINARY OBJECTION AND RESERVATION OF RIGHTS OF SNMP
RESEARCH INTERNATIONAL, INC. TO DEBTORS' MOTION FOR ORDERS (I)(A)
AUTHORIZING DEBTORS ENTRY INTO THE STALKING HORSE ASSET SALE
AGREEMENT, (B) AUTHORIZING AND APPROVING THE BIDDING PROCEDURES
AND BID PROTECTIONS, (C) APPROVING THE NOTICE PROCEDURES AND THE
ASSUMPTION AND ASSIGNMENT PROCEDURES, (D) APPROVING A SIDE
AGREEMENT, (E) AUTHORIZING THE FILING OF CERTAIN DOCUMENTS
UNDER SEAL AND (F) SETTING A DATE FOR THE SALE HEARING, AND (II)
AUTHORIZING AND APPROVING (A) THE SALE OF CERTAIN ASSETS OF
DEBTORS MULTI-SERVICE SWITCH (FORMERLY KNOWN AS PASSPORT)
BUSINESS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES
AND (B) THE ASSUMPTION AND ASSIGNMENT
OF CERTAIN EXECUTORY CONTRACTS**

SNMP Research International, Inc. ("SNMPRI"), through undersigned counsel, hereby

files this preliminary objection and reservation of rights (the "Objection") to the Motion of the

above-captioned debtors and debtors in possession (collectively, the "Debtors") For Orders

(I)(A) Authorizing Debtors Entry Into The Stalking Horse Asset Sale Agreement, (B)

Authorizing And Approving The Bidding Procedures And Bid Protections, (C) Approving The

Notice Procedures And The Assumption And Assignment Procedures, (D) Approving A Side

Agreement, (E) Authorizing The Filing Of Certain Documents Under Seal And (F) Setting A

Date For The Sale Hearing, And (II) Authorizing And Approving (A) The Sale Of Certain Assets

Of Debtors Multi-Service Switch (Formerly Known As Passport) Business Free And Clear Of

All Liens, Claims And Encumbrances And (B) The Assumption And Assignment Of Certain

Executory Contracts [Docket No. 3832] (the "Sale Motion"). In support of this Objection, SNMPRI respectfully represents as follows:

## The License Agreement

1.      SNMPRI and Nortel Networks Corporation ("NNC"), a Canadian corporation, are parties to a certain license agreement with an effective date of December 23, 1999 (the "License Agreement") executed prior to the Petition Date (defined herein) governing NNC's use of certain intellectual property described as source code and binary code licensed by SNMPRI to NNC. The License Agreement contains over 70 schedules that each list one or more specific products, development software, and run-time software licensed to NNC. Section 7.1 of the License Agreement permits NNC to assign the License Agreement as follows:

> [u]pon prior written notice of such to SNMPRI, NNC may assign this Agreement, in its entirety only, and only in conjunction with a change of ownership, merger, acquisition, sale or transfer of all of substantially all of its business or assets. Such assignment shall only be valid as to NNC's business units as of the date of such assignment, and the rights and licenses of this Agreement shall not be enlarged to encompass the entirety of the new entity, if larger, or the entirety of the new entity's product line, if larger. The terms and conditions of this Agreement shall bind and inure to each party's successors and assigns.

License Agreement at 7.1.

2.      Should NNC desire to assign only a portion of the License Agreement, section 7.2 of the License Agreement provides:

> [u]pon prior written notice of such to SNMPRI, execution of a fresh copy of this Agreement, and payment of an Adoption Fee, a Specified Entity previously licensed under one or more Schedules A that is to be made an independent entity by NNC may adopt this Agreement as an agreement separate from NNC ("New Agreement"). The Adoption Fee shall be equal to the amount that SNMP would have charged the Specified Entity under the relevant Schedule A if the Specified Entity had not been a Nortel Networks Company (Standard Value), minus the amount previously paid

> under the relevant Schedule A. SNMP's liability under the New
> Agreement shall be limited to a straight line three year depreciation
> of the Standard Value, starting from the execution date of the new
> agreement. The scope of the new license shall be to the named
> Specified Entity only, and shall not include the possibility of
> addition of any other "Specified Entities" at a later point in time.

License Agreement at 7.2.

     3.     SNMPRI and NNC were parties to the License Agreement on the Petition Date (defined herein).

### Background

     4.     On January 14, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the United States Code (the "Bankruptcy Code").

     5.     On August 27, 2010, the Debtors filed the Sale Motion. The Sale Motion, among other things, seeks the approval of: (i) authorizing and approving (a) the sale of the Assets (as defined in the Sale Motion), free and clear of all liens, claims and encumbrances, as provided in the Stalking Horse Agreement (as defined in the Sale Motion), and (b) the assumption and assignment of certain executory contracts pursuant to section 365 of the Bankruptcy Code. The Stalking Horse Agreement also provides for the sale of certain intellectual property. The specific contracts, executory or otherwise, and intellectual property contemplated by the Sale Motion and the Stalking Horse Agreement have not been disclosed.

     6.     The Debtors have sold parts of its business pursuant to (i) an Asset Sale Agreement, dated as of July 24, 2009, by and among various Debtors and Telefonaktiebolaget L M Ericsson, (ii) an Asset Sale Agreement, dated as of November 2, 2009, by and among various Debtors and GENBAND Inc., ("GENBAND Sale") (iii) an Amended and Restated Asset and Share Sale Agreement, dated as of September 14, 2009, by and among various Debtors and Avaya, Inc., (iv) an Asset Sale Agreement, dated as of November 24, 2009, by and among

3

various Debtors and Telefonaktiebolaget L M Ericsson, (v) an Asset Sale Agreement, dated as of February 19, 2009, by and among various Debtors and Radware Ltd., (vi) an Amended and Restated Asset Sale Agreement, dated as of November 24, 2009, by and among various Debtors and Ciena Corporation, and (vii) a Transaction Agreement, dated as of October 24, 2009, by and among various Debtors and Hitachi, Ltd. (collectively "Previous Sales").

7.    As a result of the Previous Sales, the Debtors transferred SNMPRI intellectual property licensed to the Debtors under the License Agreement to the purchasers ("Previous Purchasers") in the Previous Sales.  The Debtors did not transfer all or part of the License Agreement as a part of the Previous Sales.  Simultaneously with the Previous Sales, SNMPRI has entered into a temporary license agreement with most of the Previous Purchasers who received SNMPRI intellectual property as a result of the Previous Sales, which authorizes the use of the SNMPRI intellectual property while a permanent license agreement is negotiated between SNMPRI and the Previous Purchasers.

8.    As a result of the GENBAND Sale the Debtors knowingly transferred to GENBAND Inc.: (i) SNMPRI intellectual property licensed to the Debtors under the License Agreement; and (ii) SNMPRI intellectual property not licensed to the Debtors in any manner, both in violation of Paragraph 44 of the Order Authorizing and Approving (A) The Sale of Certain Assets of The Debtors' Carrier Voice Over IP and Communications Solutions Business Free and Clear of all Liens, Claims, and Encumbrances, and (B) The Assumption and Assignment of Certain Executory Contracts.  As of the date hereof, SNMPRI has not entered into a license agreement with GENBAND Inc. authorizing the use of SNMPRI intellectual property transferred from the Debtors.

9.    Because the Debtors have transferred SNMPRI intellectual property licensed

4

under the License Agreement to various Previous Purchasers, the Debtors cannot assign the entire License Agreement to the purchaser. Therefore, pursuant to Section 7.2 of the License Agreement, the purchaser must enter into a new license agreement with SNMPRI in order to use SNMPRI intellectual property.

### Preliminary Objection and Reservation of Rights

10.    Since SNMPRI cannot determine if the Debtors intend to transfer SNMPRI intellectual property as a part of the sale and because the Debtors have knowingly transferred SNMPRI intellectual property without authorization previously, SNMPRI requests that the Debtors perform an audit, as a condition of the sale, to determine if SNMPRI intellectual property will be transferred to the purchaser as a part of the sale.

11.    Since the License Agreement cannot be assigned in its entirety to the purchaser, SNMPRI requests that the Debtors include the following language in any order approving the sale:

> Nothing in this Order or in the Sale Agreement or Ancillary Agreements provides for or approves the transfer, assumption and/or assignment, whether under sections 363 or 365 of the Bankruptcy Code or otherwise, of any intellectual property or license agreement with SNMP Research International, Inc. ("SNMPRI"). Accordingly, no SNMPRI intellectual property and no SNMPRI intellectual property rights licensed to Nortel via contracts between Nortel and SNMPRI are conveyed or otherwise transferred by this Order or in the Sale Agreement or Ancillary Agreements. To the extent the Purchaser discovers they have improperly received SNMPRI's intellectual property or intellectual property rights, the Purchaser will make reasonable efforts to enter into a new license agreement with SNMPRI within a reasonable time after such discovery.

12.    Section 365(b) of the Bankruptcy Code requires a debtor to cure any defaults and provide adequate assurance of future performance before an executory contract can be

assumed. 11 U.S.C. § 365(b). To the extent that any parties to the sale seek to transfer SNMPRI's intellectual property, any defaults under the License Agreement must be cured and adequate assurance must be provided. The Debtors have acknowledged not having a license for, and not paying for SNMPRI intellectual property used in the Debtors business since 1999 ("Unauthorized Use") and subsequently transferred to GENBAND Inc. as a part of the GENBAND SALE. SNMPRI estimates that approximately $1,517,038 (US dollars) plus amounts associated with licensing fees, royalties, and maintenance fees that have not been reported by NNC to date are owed to SNMPRI as a result of the Unauthorized Use. Such outstanding amounts must be paid.

13.     Finally, SNMPRI demands adequate assurance of future performance once the purchaser is identified.

14.     At this juncture, the specific intellectual property and contracts that the Debtors propose to include in the sale have not been disclosed. SNMPRI reserves all rights to object to the sale and the transfer, assumption, assignment or rejection of any agreements affecting SNMPRI and the intellectual property of SNMPRI and SNMPRI's suppliers.

15.     SNMPRI reserves all rights to supplement or amend the objections raised herein and to seek discovery regarding sale issues, including, but not limited to, cure amounts, and the Debtors' rights and abilities to assume and assign the License Agreement.

WHEREFORE, SNMPRI objects to the Sale Motion and reserves all rights.

Dated: September 22, 2010              CIARDI CIARDI & ASTIN
       Wilmington, Delaware

                                       Daniel K. Astin (No. 4068)
                                       John D. McLaughlin, Jr. (No. 4123)
                                       Joseph J. McMahon, Jr. (No. 4819)
                                       Carl D. Neff (No. 4895)
                                       919 N. Market Street, Suite 700

Wilmington, Delaware 19801
(302) 658-1100 telephone
(302) 658-1300 facsimile
dastin@ciardilaw.com
jmclaughlin@ciardilaw.com
jmcmahon@ciardilaw.com
cneff@ciardilaw.com

*Attorneys for SNMP Research*
*International, Inc.*



## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
----------------------------------------------------X
                                                    :
                                                    :   Chapter 11
                                                    :
In re                                               :   Case No. 09-10138 (KG)
                                                    :
Nortel Networks Inc., et al.,[1]                    :
                                                    :   Jointly Administered
                    Debtors.                        :
                                                    :   RE: D.I. 931, 1012, 1106, 1129
                                                    :
----------------------------------------------------X
```

### ORDER AUTHORIZING AND APPROVING (A) THE SALE OF CERTAIN ASSETS OF THE DEBTORS' CDMA AND LTE BUSINESS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES, (B) THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND (C) THE ASSUMPTION AND SUBLEASE OF CERTAIN LEASES

Upon the motion (the "Motion")[2] of Nortel Networks Inc. ("NNI") and its affiliated

debtors, as debtors and debtors in possession in the above-captioned (collectively, the

"Debtors"), for entry of orders under Bankruptcy Code sections 105, 107(b)(1), 363 and 365,

Bankruptcy Rules 6004, 6006, 9014 and 9018 and Local Rules 6004-1 and 9018-1 Orders (I)(A)

Authorizing Debtors' Entry into the Asset Sale Agreement, (B) Authorizing and Approving the

Bidding Procedures, (C) Authorizing and Approving a Break-Up Fee and Expense

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion, or if not defined in the Motion, shall have the meanings ascribed to such terms in the Sale Agreement (as defined herein).

Reimbursement, (D) Approving the Notice Procedures, (E) Approving the Assumption and

Assignment Procedures, (F) Authorizing the Filing of Certain Documents under Seal, and

(G) Setting a Date for the Sale Hearing, and (II) Authorizing and Approving (A) the Sale of

Certain of Debtors' CDMA and LTE Assets Free and Clear of All Liens, Claims and

Encumbrances, (B) the Assumption and Assignment of Certain Contracts, and (C) the

Assumption and Sublease of Certain Leases [D.I. 931]; and the Court having entered an order

approving, among other things, the Bidding Procedures (the "Bidding Procedures Order") based

upon the evidence presented at the bidding procedures hearing held on June 29, 2009 (the

"Bidding Procedures Hearing") [D.I. 1012]; and a supplemental order having been entered

joining Nortel Networks (CALA) Inc. ("NN CALA") as a debtor party to the Motion, extending

the relief in the Bidding Procedures Order to NN CALA and establishing further procedures in

furtherance of the proposed sale [D.I. 1129]; and the Auction (as defined below) having been

held in accordance with the Bid Procedures Order; and at the conclusion of said Auction

Telefonaktiebolaget LM Ericsson (publ) (the "Purchaser") was chosen as the Successful Bidder

in accordance with the Bid Procedures; and the Court having conducted a hearing on the Motion

on [July 28], 2009 (the "Sale Hearing"); and all parties in interest having been heard, or having

had the opportunity to be heard, regarding the asset sale agreement attached hereto as Exhibit A

(the "Sale Agreement"), by and among certain of the Debtors, certain foreign debtor affiliates

and certain non-debtor affiliates (collectively, the "Sellers") and the Purchaser and the

transactions contemplated thereby (the "Transactions"); and the Court having reviewed and

considered the Motion, and the arguments of counsel made, and the evidence adduced, at the

Bidding Procedures Hearing and the Sale Hearing; and upon the record of the Bidding

Procedures Hearing and the Sale Hearing and these chapter 11 cases, and after due deliberation

thereon, and good cause appearing therefore it is hereby

FOUND AND DETERMINED THAT:[3]

      A.      The Court has jurisdiction to hear and determine the Motion and to grant

the relief requested in the Motion pursuant to 28 U.S.C. § 157(b)(1) and 1334(b).

      B.      Venue of these cases and the Motion in this district is proper under 28

U.S.C. §§ 1408 and 1409. This is a core proceeding within the meaning of 28 U.S.C. §

157(b)(2).

      C.      The statutory predicates for the relief requested in the Motion are

Bankruptcy Code sections 105, 107(b)(1), 363 and 365, Bankruptcy Rules 6004, 6006, 9014 and

9018, and Local Rules 6004-1 and 9018-1.

      D.      Notice of the Motion and the Sale Hearing has been provided to (A) (i) all

entities reasonably known to have expressed an interest in a transaction with respect to the

Assets (as defined in the NSN Agreements referred to below) during the past nine (9) months,

(ii) all entities reasonably known to have asserted any interest in the Assets, (iii) the attorneys

general for all states in which Purchased Assets (as defined below) are located, all federal and

state taxing authorities, the SEC, the EPA, state environmental protection agencies, the IRS, and

the Department of Labor and similar state labor or employment agencies, (iv) all parties entitled

to notice pursuant to Local Rule 2002-1(b), (v) all counterparties to the Assumed and Assigned

Contracts and the Assumed and Subleased Real Estate Leases (together, the "Assumed

Agreements"), (vi) all known or potential creditors of the Debtors and (viii) the Official

---

[3]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings
of fact when appropriate. See Fed. R. Bankr. P. 7052.

Committee of Unsecured Creditors (the "Committee"); and (B) other parties through publication of the Sale Notice, all in accordance with and as provided by the Bidding Procedures Order.

   E.  As evidenced by affidavit of publication filed with the Court, notice of the Sale Hearing was published in The Wall Street Journal and The Globe and Mail on July 6, 2009.

   F.  Based upon the affidavits of service and publication filed with the Court: (a) notice of the Motion and the Sale Hearing was adequate and sufficient under the circumstances of these chapter 11 cases and these proceedings and complied with the various applicable requirements of the Bankruptcy Code, the Bankruptcy Rules and the Bidding Procedures Order; and (b) a reasonable opportunity to object and be heard with respect to the Motion and the relief requested therein was afforded to all interested persons and entities.

   G.  The Assets (as defined in the Sale Agreement) sought to be transferred and/or assigned by the Debtors to the Purchaser pursuant to the Sale Agreement (the "Purchased Assets") are property of the Debtors' estates and title thereto is vested in the Debtors' estates.

   H.  The Debtors and their professionals marketed the Purchased Assets and conducted the marketing and sale process as set forth in and in accordance with the Motion. Based upon the record of these proceedings, all creditors and other parties in interest and all prospective purchasers have been afforded a reasonable and fair opportunity to bid for the Purchased Assets.

   I.  On June 19, 2009, the Debtors entered into an Asset Sale Agreement (the "NSN Agreement") with respect to the "Assets" provided for therein by and among the Sellers and Nokia Siemens Networks B.V., as the purchaser, subject to higher and better offers.

J.       The Bidding Procedures were substantively and procedurally fair to all parties. The Debtors conducted the sale process (including the Auction) in accordance with the Bidding Procedures.

K.       After the conclusion of the auction held on July 24, 2009 (the "Auction"), the Debtors determined that the highest and best Qualified Bid (as defined in the Bid Procedures Order) was that of the Purchaser and the next highest and best Qualified Bid (the "Alternate Bid") was that of Nokia Siemens Networks B.V. (the "Alternate Bidder").

L.       Subject to the entry of this Order, each Debtor that is a Seller (i) has full power and authority to execute the Sale Agreement, the Ancillary Agreements (as defined in the Sale Agreement) and all other documents contemplated thereby, (ii) has all of the power and authority necessary to consummate the Transactions contemplated by the Sale Agreement and (iii) has taken all company action necessary to authorize and approve the Sale Agreement, the Ancillary Agreements, the sale of the Purchased Assets (the "Sale") and the consummation by the Debtors of the Transactions. No consents or approvals, other than those expressly provided for in the Sale Agreement or this Order, are required for the Debtors to close the Sale and consummate the Transactions.

M.       The Sale Agreement and the Transactions were negotiated and have been and are undertaken by the Debtors and the Purchaser at arms' length without collusion or fraud, and in good faith within the meaning of Bankruptcy Code section 363(m). As a result of the foregoing, the Debtors and the Purchaser are entitled to the protections of section 363(m) of the Bankruptcy Code.

N.       The total consideration provided by the Purchaser for the Purchased Assets is the highest and best offer received by the Debtors, and the Purchase Price (as defined in

the Sale Agreement) constitutes (a) reasonably equivalent value under the Bankruptcy Code and Uniform Fraudulent Transfer Act, (b) fair consideration under the Uniform Fraudulent Conveyance Act, and (c) reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession, or the District of Columbia, for the Purchased Assets.

O.    The Purchaser would not have entered into the Sale Agreement and would not consummate the Transactions if the sale of the Purchased Assets to the Purchaser was not free and clear of all liens, claims and interests pursuant to Bankruptcy Code section 363(f), or if the Purchaser would, or in the future could, be liable for any of such liens, claims and interest. A sale of the Purchased Assets other than one free and clear of all Claims and Interests (each as defined herein) would yield substantially less value for the Debtors' estates, with less certainty, than the Sale. Therefore, the Sale contemplated by the Sale Agreement is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

P.    The Debtors may sell the Purchased Assets free and clear of all Interests, because, with respect to each creditor asserting a Claim or Interest, one or more of the standards set forth in Bankruptcy Code § 363(f)(1)-(5) has been satisfied. Those holders of Claims and Interests who did not object or who withdrew their objections to the Sale or the Motion are deemed to have consented to the Motion and Sale pursuant to Bankruptcy Code § 363(f)(2). Those holders of Claims or Interests who did object fall within one or more of the other subsections of Bankruptcy Code section 363(f).

Q.    Neither the Debtors nor the Purchaser engaged in any conduct that would cause or permit the Sale Agreement or the consummation of the Transactions to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

R.    The Purchaser is not holding itself out to the public as a continuation of the Debtors and is not an "insider" or "affiliate" of any of the Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors or stockholders existed between the Purchaser and any of the Debtors.  Pursuant to the Sale Agreement, the Purchaser is not purchasing all of the Debtors' assets in that Purchaser is not purchasing any of the Excluded Assets (as defined in the Sale Agreement), and Purchaser is not holding itself out to the public as a continuation of the Debtors.  The conveyance of the Assets pursuant to the Transactions does not amount to a consolidation, merger or *de facto* merger of the Purchaser and the Debtors and/or Debtors' estates, there is not substantial continuity between the Purchaser and the Debtors, there is no continuity of enterprise between the Debtors and the Purchaser, the Purchaser is not a mere continuation of the Debtors or the Debtors' estates, and the Purchaser does not constitute a successor to the Debtors or the Debtors' estates.  Upon the Closing (as defined in the Sale Agreement), the Purchaser shall be deemed to have assumed only the Assumed Liabilities (as defined in the Sale Agreement).  Except for the Assumed Liabilities, the Purchaser's acquisition of the Purchased Assets shall be free and clear of any "successor liability" claims of any nature whatsoever, whether known or unknown and whether asserted or unasserted as of the Closing.  The Purchaser's operations shall not be deemed a continuation of the Debtors' business as a result of the acquisition of the Assets purchased.  The Court finds that the Purchaser would not have acquired the Purchased Assets but for the foregoing protections against potential claims based upon "successor liability" theories.

S.    The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Assumed and Assigned Contracts to the Purchaser and to assume the Assumed and Subleased Real Estate Leases and Sublease the same to the

Purchaser, in each case, in connection with the consummation of the Sale, and (i) the assumption, assignment, and sale of Assumed and Assigned Contracts to the Purchaser and (ii) the assumption of the Assumed and Subleased Real Estate Leases and the Sublease of the same to the Purchaser, in each case, is in the best interests of the Debtors, their estates, their creditors, and all parties in interest. The Assumed and Assigned Contracts being assigned to the Purchaser and the Assumed and Subleased Real Estate Leases being assumed by the Debtors and subleased to the Purchaser are an integral part of the Purchased Assets being purchased by the Purchaser, and accordingly, such assumption, assignment, and sale of the Assumed and Assigned Contracts and such assumption and sublease of the Assumed and Subleased Real Estate Leases are reasonable and enhance the value of the Debtors' estates. The cure amounts required to be paid by the Debtors pursuant to section 365(b) that are mutually agreed to be paid by the Debtors and the counterparty to the applicable Assumed and Assigned Contract or, as applicable, the Assumed and Subleased Real Estate Lease or as ordered to be paid by this Court pursuant to a final order (the "Cure Amounts") are deemed the entire cure obligation due and owing under the Assumed Agreements under Bankruptcy Code section 365.

T.      Each and every provision of the Assumed and Assigned Contracts or, as applicable, the Assumed and Subleased Real Estate Leases or applicable non-bankruptcy law that purport to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any Assumed and Assigned Contract or, as applicable, the Assumed and Subleased Real Estate Leases have been satisfied or are otherwise unenforceable under Bankruptcy Code section 365.

U.      Upon the payment of the Cure Amount, there are no outstanding defaults of the Debtors and their estates under the Assumed and Assigned Contracts or, as applicable, the Assumed and Subleased Real Estate Leases.

V.      The Purchaser has demonstrated adequate assurance of future performance of all Assumed and Assigned Contracts within the meaning of Bankruptcy Code section 365.

W.      Upon the assignment and sale to the Purchaser, the Assumed and Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Order.

X.      Entry into the Sale Agreement and consummation of the Transactions constitute the exercise by the Debtors of sound business judgment, and such acts are in the best interests of the Debtors, their estates and creditors, and all parties in interest. The Court finds that the Debtors have articulated good and sufficient business reasons justifying the Sale of the Purchased Assets to the Purchaser. Additionally, (i) the Sale Agreement constitutes the highest and best offer for the Purchased Assets; (ii) the Sale Agreement and the closing thereon will present the best opportunity to realize the value of the Purchased Assets and avoid further decline and devaluation of the Purchased Assets; (iii) there is risk of deterioration of the value of the Purchased Assets if the Sale is not consummated promptly; and (iv) the Sale Agreement and the closing thereon will provide a greater recovery for the Debtors' creditors than would be provided by any other presently available alternative.

Y.      The transfer of the Purchased Assets to the Purchaser will be a legal, valid and effective transfer of the Purchased Assets, and will vest the Purchaser with all of the Debtors' right, title and interest of, in and to the Purchased Assets, free and clear of (i) all Claims and Interests of any kind or nature whatsoever (other than the Assumed Liabilities and the Permitted

Encumbrances (as defined in the Sale Agreement)), and (ii) all Excluded Liabilities (as defined in the Sale Agreement), claims as defined in 11 U.S.C. § 101(5), rights or causes of action (whether in law or in equity), obligations, demands, restrictions, interests and matters of any kind or nature whatsoever, whether arising prior to or subsequent to the commencement of these cases, and whether imposed by agreement, understanding, law, equity or otherwise , including any "Claims" as defined in the Sale Agreement (collectively, the "Claims"), other than Assumed Liabilities and the Permitted Encumbrances.

Z.      The Sale does not constitute a *sub rosa* chapter 11 plan.

AA.     Time is of the essence in consummating the Sale. In order to maximize the value of the Debtors' assets, it is essential that the sale of the Purchased Assets occur within the time constraints set forth in the Sale Agreement. Accordingly, there is a cause to lift the stay contemplated by the Bankruptcy Rules 6004(h) and 6006(d).

BB.     The Sale contemplated by the Sale Agreement is in the best interests of the Debtors and their estates, creditors, interest holders and all other parties in interest; and it is therefore:

ORDERED, ADJUDGED AND DECREED THAT:

1.      The relief requested in the Motion is GRANTED.

2.      All objections with regard to the relief sought in the Motion that have not been withdrawn, waived, settled or otherwise dealt with as expressly provided herein, are hereby overruled on the merits.

3.      Pursuant to Bankruptcy Code sections 105 and 363, the Sale Agreement, the Ancillary Agreements, the Sale of the Purchased Assets, and consummation of the Transactions are hereby approved and authorized, and the Alternate Bid submitted by the

Alternate Bidder is hereby approved and authorized as an Alternate Bid and shall remain binding as an Alternate Bid pursuant to the terms of the Bidding Procedures Order and the bid terms submitted at the Auction. In the event that the Transactions contemplated by the Sale Agreement cannot be consummated, the Alternate Bid shall be and is hereby approved, and the execution of the asset sale agreement pursuant to the Alternate Bid by the Debtors is approved and the Debtors are authorized to take such additional steps and execute such additional documents, including without limitation the ancillary agreements contemplated by the Alternate Bid, as may be necessary or desirable for the completion of the Transactions and for the conveyance of the Debtors' right, title and interest in and to the Assets to the Alternative Bidder.

4.    Pursuant to section 365 of the Bankruptcy Code, notwithstanding any provision of any Assumed Agreement or applicable non-bankruptcy law that prohibits, restricts, or conditions the assignment of the Assumed and Assigned Contracts, under section 365 of the Bankruptcy Code, the Debtors are authorized to assume the Assumed Agreements and to assign the Assumed and Assigned Contracts to the Purchaser, which assignment shall take place on and be effective as of the Closing.

5.    The Debtors' assumption of the Assumed Agreements is subject to Court approval and consummation of the sale of the Assets to the Purchaser, and, solely as it relates to the Assumed and Subleased Real Estate Leases, the Debtors' and Purchaser's entry into Subleases pursuant to section 5.27 of the Sale Agreement. To the extent that an objection by a Counterparty to any Assumed Agreement is not resolved prior to the Closing Date (as defined in the Sale Agreement) or Debtors and Purchasers have failed to enter into a Sublease regarding any Assumed and Subleased Real Estate Lease pursuant to section 5.27 of the Sale Agreement, the Debtors, in consultation with the Purchaser, may elect to (i) not assume such Assumed

Agreement, (ii) postpone the assumption of such Assumed Agreement until the resolution of such objection or (iii) if the dispute relates solely to the amount of the Cure Amount, at the time of the assumption, Debtors may pay to the Counterparty any undisputed portion of the proposed Cure Amount and place any disputed portion into a segregated interest-bearing account such that, upon any resolution by the Court of the Cure Amount dispute, or other agreement between the Debtors and the Counterparty, the Counterparty will be entitled to payment from the segregated account of any disputed portion and interest earned thereon to which the Court finds, or the Debtors and Counterparty agree, it is entitled. Any Cure Amounts outstanding on the Closing Date shall be paid to the appropriate Counterparty as a condition subsequent to such assumption and/or assumption and assignment of the relevant Assumed Agreement.

6. Upon the Closing, (a) the Debtors are hereby authorized and directed to consummate, and shall be deemed for all purposes to have consummated, the sale, transfer and assignment of the Purchased Assets to the Purchaser free and clear of any and all interests pursuant to section 363 of the Bankruptcy Code, including (without limitation) all liens, including any lien (statutory or otherwise), mortgage, pledge, security interest, charge, right of first refusal, hypothecation, encumbrance on real property, easement, encroachment, right-of-way, restrictive covenant on real property, real property license, lease or conditional sale arrangement (collectively, including "Liens" as defined in the Sale Agreement, the "Liens") and debts, liabilities and obligations, whether accrued or fixed, direct or indirect, liquidated or unliquidated, absolute or contingent, matured or unmatured or determined or undeterminable, known or unknown, including those arising under any Law or Action and those arising under any Contract or otherwise, including any Tax liability (other than Assumed Liabilities and the Permitted Encumbrances) (collectively, the "Liabilities" and together with the Liens, the

"Interests"), with such Interests to attach to the sale proceeds in the same validity, extent and priority as immediately prior to the sale transactions, subject to any rights, claims and defenses of the Debtors and other parties in interest, and (b) except as otherwise expressly provided in the Sale Agreement, all such Interests (other than Assumed Liabilities and the Permitted Encumbrances) shall be and hereby are released, terminated and discharged as to the Purchaser and the Purchased Assets.

7.    The transfer of the Purchased Assets to the Purchaser pursuant to the Agreement shall be, and hereby is deemed to be, a legal, valid and effective transfer of the Purchased Assets, and vests with or will vest in the Purchaser all right, title and interest of the Debtors in the Purchased Assets, free and clear of all Claims and Interests of any kind or nature whatsoever (other than the Permitted Encumbrances and the Assumed Liabilities), with any Interests (including, but not limited to, the Interests, if any, of Fairfax County, Virginia asserted in its objection to the Motion) attaching to the sale proceeds in the same validity, extent and priority as immediately prior to the transaction, subject to any rights, claims and defenses of the Debtors and other parties in interest.

8.    Upon the Closing, and except as otherwise expressly provided in the Sale Agreement, the Purchaser shall not be liable for any claims against, and Liabilities and obligations of, the Debtors or any of the Debtors' predecessors or affiliates. Without limiting the generality of the foregoing, and except as otherwise provided in the Sale Agreement, (a) the Purchaser shall have no liability or obligation to pay wages, bonuses, severance pay, benefits (including, without limitation, contributions or payments on account of any under-funding with respect to any pension plans) or make any other payment to employees of the Debtors, (b) the Purchaser, shall have no liability or obligation in respect of any employee pension plan,

employee health plan, employee retention program, employee incentive program or any other similar agreement, plan or program to which any Debtors are a party (including, without limitation, liabilities or obligations arising from or related to the rejection or other termination of any such plan, program agreement or benefit), (c) the Purchaser shall in no way be deemed a party to or assignee of any such employee benefit, agreement, plan or program, and (d) all parties to any such employee benefit, agreement, plan or program are enjoined from asserting against the Purchaser any Claims arising from or relating to such employee benefit, agreement, plan or program.

9.      As of the Closing, subject to the provisions of this Order, the Purchaser shall succeed to the entirety of Debtors' rights and obligations in the Assumed and Assigned Contracts first arising and attributable to the time period occurring on or after the Closing and shall have all rights thereunder.

10.      Upon the entry of this Order, (i) all defaults (monetary and non-monetary) under the Assumed Agreements through the Closing shall be deemed cured through the payment of the Cure Amounts; with respect to the Assumed and Assigned Contracts to which Airvana, Inc. is the Counterparty, which Assumed and Assigned Contracts are identified on Schedule 1 attached hereto, the Cure Amounts for each such Assumed and Assigned Contracts shall be as set forth on Schedule 1, (ii) no other amounts will be owed by the Debtors, their estates or the Purchaser with respect to amounts first arising or accruing during, or attributable or related to, the period before Closing with respect to the Assumed Agreements, (iii) any and all persons or entities shall be forever barred and estopped from asserting a claim against the Debtors, their estates, or the Purchaser that any additional amounts are due or defaults exist under the Assumed Agreements that arose or accrued, or relate to or are attributable to the period before the Closing.

11.     Pursuant to section 365(f) of the Bankruptcy Code, notwithstanding any provision to the contrary in the Assumed and Assigned Contracts, or in applicable non-bankruptcy law, that prohibits, restricts, or conditions the assignment of the Assumed and Assigned Contracts, the Debtors may assign the Assumed and Assigned Contracts to the Purchaser.

12.     Upon assumption of the Assumed and Assigned Contracts by the Debtors and assignment to the Purchaser, the Assumed and Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Order.

13.     Pursuant to section 365(f) of the Bankruptcy Code, notwithstanding any provision to the contrary in the Subleased Real Estate Leases, or in applicable non-bankruptcy law, that prohibits, restricts, or conditions the assumption and Sublease of the Assumed and Subleased Real Estate Leases, the Debtors may assume the Assumed and Subleased Real Estate Leases and Sublease the Assumed and Subleased Real Estate Leases to the Purchaser.

14.     Upon the assumption of the Assumed and Subleased Real Estate Leases by the Debtors and the sublease of same to the Purchaser, the Assumed and Subleased Real Estate Leases shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Order.

15.     The Transactions have been undertaken by the Purchaser in good faith and the Purchaser is a good faith purchaser of the Purchased Assets as that term is used in Bankruptcy Code section 363(m). The Purchaser is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

16.     Pursuant to sections 105 and 363 of the Bankruptcy Code, the Debtors and

the Purchaser are each hereby authorized to take any and all actions necessary or appropriate to:
(i) consummate the Sale of the Purchased Assets to the Purchaser and the Closing of the Sale in
accordance with the Motion, the Agreement and this Order; (ii) assume and assign the Assumed
and Assigned Contracts; (iii) assume and sublease the Assumed and Subleased Real Estate
Leases; and (iv) perform, consummate, implement and close fully the Sale Agreement together
with all additional instruments and documents that may be reasonably necessary or desirable to
implement the Sale Agreement.

            17.     The Purchaser is hereby authorized in connection with the consummation
of the Sale to allocate the Purchased Assets, including the Assumed Agreements, among its
affiliates, designees, assignees, and/or successors, including any Designated Purchaser (as
defined in the Sale Agreement), in a manner as it in its sole discretion deems appropriate and to
assign, lease, sublease, license, sublicense, transfer or otherwise dispose of any of the Purchased
Assets, including the Assumed Agreements, to its affiliates, designees, assignees, and/or
successors with all of the rights and protections accorded to the Purchaser under this Order and
the Sale Agreement, and the Debtors shall cooperate with and take all actions reasonably
requested by the Purchaser to effectuate any of the foregoing; provided, however the Debtors
shall be reimbursed by the Purchaser for any reasonable expenses in connection therewith.

            18.     No bulk sales law or any similar law of any state or other jurisdiction shall
apply in any way to the Sale and the Transactions. Except as provided in the Sale Agreement, no
brokers were involved in consummation of the Sale or the Transactions, and no brokers'
commissions are due to any Person in connection with the Sale or the Transactions.

            19.     The consideration provided by the Purchaser for the Purchased Assets
under the Agreement shall be deemed for all purposes to constitute value and fair consideration

under the Bankruptcy Code and any other applicable law, and the Sale may not be avoided, or costs or damages imposed or awarded, under section 363(n) or any other provision, of the Bankruptcy Code.

20.     On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of all of the Purchased Assets or a bill of sale transferring good and marketable title in such Purchased Assets to the Purchaser on the Closing Date pursuant to the terms of the Agreement, free and clear of all Liens, Claims and Interests (other than Assumed Liabilities).

21.     Except as otherwise provided in the Sale Agreement, any and all Purchased Assets in the possession or control of any person or entity, including, without limitation, any vendor, supplier or employee of the Debtors shall be transferred to the Purchaser free and clear of all Liens, Claims and Interests (other than Assumed Liabilities) and shall be delivered at the time of Closing to the Purchaser.

22.     Upon the Closing, all creditors, employees and equity holders of the Debtors are permanently and forever barred, restrained and enjoined from asserting any Liens, Claims or Interests or enforcing remedies, or commencing or continuing in any manner any action or other proceeding of any kind, against the Purchaser or the Purchased Assets on account of any of the Liens, Claims, Interests, Excluded Liabilities or Excluded Assets (other than Assumed Liabilities and Permitted Encumbrances).

23.     The Transactions do not amount to a consolidation, merger or *de facto* merger of the Purchaser and the Debtors and/or the Debtors' estates, there is not substantial continuity between the Purchaser and the Debtors, there is no continuity of enterprise between the Debtors and the Purchaser, the Purchaser is not a mere continuation of the Debtors or the

Debtors' estates, and the Purchaser does not constitute a successor to the Debtor or the Debtors'
estates. Upon the Closing, the Purchaser shall be deemed to have assumed only the Assumed
Liabilities. Except for the Assumed Liabilities and Permitted Encumbrances, the Purchaser's
acquisition of the Purchased Assets shall be free and clear of any "successor liability" claims of
any nature whatsoever, whether known or unknown and whether asserted or unasserted as of the
time of Closing. The Purchaser's operations shall not be deemed a continuation of the Debtors'
business as a result of the acquisition of the Assets purchased.

    24. This Order (a) is and shall be effective as a determination that other than
Permitted Encumbrances and Assumed Liabilities, all Liens, Claims and Interests of any kind or
nature whatsoever existing as to the Purchased Assets prior to the Closing have been
unconditionally released, discharged and terminated, and that the conveyances described herein
have been effected, and (b) is and shall be binding upon and shall authorize all entities,
including, all filing agents, filing officers, title agents, title companies, recorders of mortgages,
recorders of deeds, registrars of deeds, administrative agencies or units, governmental
departments or units, secretaries of state, federal, state and local officials and all other persons
and entities who may be required by operation of law, the duties of their office, or contract, to
accept, file, register or otherwise record or release any documents or instruments, or who may be
required to report or insure any title or state of title in or to the Purchased Assets conveyed to the
Purchaser. All such entities described above in this paragraph are authorized and specifically
directed to strike all recorded Interests against the Purchased Assets from their records, official
and otherwise.

    25. If any person or entity which has filed statements or other documents or
agreements evidencing Liens on, or Interests in, the Purchased Assets shall not have delivered to

the Debtors before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Liens which the person or entity has or may assert with respect to the Purchased Assets, the Debtors and the Purchaser are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Purchased Assets.

26.    All counterparties to the Assumed and Assigned Contracts and, as applicable, the Assumed and Subleased Real Estate Leases shall cooperate and expeditiously execute and deliver, upon the reasonable requests of the Purchaser, and shall not charge the Purchaser for, any instruments, applications, consents, or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Transactions.

27.    Each and every federal, state and governmental agency or department, and any other person or entity, is hereby authorized to accept any and all documents and instruments in connection with or necessary to consummate the Transactions contemplated by the Agreement.

28.    No governmental unit may revoke or suspend any right, license, trademark or other permission relating to the use of the Purchased Assets sold, transferred or conveyed to the Purchaser on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale.

29.    To the extent this Order is inconsistent with any prior order or pleading with respect to the Motion in these chapter 11 cases, the terms of this Order shall govern. To the extent there is any inconsistency between the terms of this Order and the terms of the Sale

Agreement (including all ancillary documents executed in connection therewith), the terms of the Order shall govern.

30.     This Order applies only to assets owned by the Debtors.  Consequently, notwithstanding any other provision of this Order or the Sale Agreement to the contrary, the portions of this Order that approve the transfer of assets to the Purchaser free and clear of all liens and other encumbrances, or that modify, enjoin, release or otherwise limit the rights of creditors of entities transferring assets, apply only to assets owned by the Debtors and do not apply to any assets owned by non-debtor entities.

31.     In full and final resolution and settlement of the informal comments received from the Pension Benefit Guaranty Corporation (the "PBGC"), the Debtors are authorized to enter into the Stipulation attached as Exhibit B hereto with the PBGC and perform all obligations thereunder.

32.     Nothing in this Order shall be deemed to waive, release or extinguish any valid claim with respect to setoff that Verizon (as defined in the Sale Agreement) or the wholly owned subsidiaries of Verizon Communications Inc. may have against the Debtors.

33.     Conditioned upon and subject to the consent by iStar CTL North Glenville – Richardson LLC ("iStar") to the sublease of the Assumed and Subleased Real Estate Lease under which iStar is the landlord, Purchaser shall pay iStar $5000 in full satisfaction of iStar's claim (pursuant to section 365 of the Bankruptcy Code or otherwise) for payment of attorneys' fees and expenses.

34.     Nothing in this Order provides for the assumption and assignment of any contract or license with OSS Noklava, Inc., successor to Open Systems Solutions, Inc. ("OSS") pursuant to section 365 of the Bankruptcy Code.  To the extent that the Purchaser elects to have

the Debtors assign to the Purchaser any contract with OSS relating to the Assets, in whole or in part, the Debtors and Purchaser will do so in accordance with the terms of such contract or license, which terms include, *inter alia*, the written consent of OSS.

35.      Nothing in this Order authorizes or provides for the assumption and assignment of any contract or license to which Motorola, Inc. ("Motorola") is a party, whether pursuant to section 365 of the Bankruptcy Code or otherwise. Motorola shall provide a list of its affiliates (the "Motorola Affiliates") that it believes have contracts with the Debtors on or before August 3, 2009. Within three business days of receiving such list, the Debtors shall notify Motorola, with a copy to Motorola's counsel of record in this proceeding, whether there are any contracts with any of the Motorola Affiliates that are proposed to be Assumed and Assigned Contracts. Motorola and/or the Motorola Affiliates shall have five business days after Motorola and its counsel have received such notification to file and serve a supplemental objection to the assumption and assignment of any such proposed Assumed and Assigned Contracts, which supplemental objection shall be heard at the next scheduled omnibus hearing. Notwithstanding the entry of this Order, any and all objections of Motorola and the Motorola Affiliates to the proposed assignment of the Motorola Affiliates' agreements are expressly preserved. If no such supplemental objection is filed and served in a timely manner, all Assumed and Assigned Contracts to which any Motorola Affiliate is a counterparty shall be deemed to be assumed and assigned pursuant to the terms of this Order (the "Deemed Assigned Affiliate Contracts"). To the extent that the Purchaser elects, subsequent to the date of this Order, to have the Sellers assign to the Purchaser any agreement or license with Motorola, Inc. or any of the Motorola Affiliates relating to the Assets, in whole or in part, other than the Deemed Assigned Affiliate Contracts, such assignment will be subject to Motorola's consent, to the extent required by the

terms of such contract and applicable law.

36.    To the extent that Sprint Nextel Corporation ("Sprint") and its affiliates, respective partners, directors, officers, agents and employees (the "Sprint Indemnitees") have a valid indemnification claim against the Sellers under the Fourth Amended and Restated PCS CDMA Product Supply Contract (the "Fourth Amended Supply Contract") between Sprint and NNI, Purchaser shall be responsible for indemnifying and holding harmless the Sprint Indemnitees from and against all Liabilities due after the Closing Date and Sellers shall be responsible for (a) attorneys fees and expenses arising before the Closing Date; and (b) those finally determined Liabilities (settlements and final judgments) due between the date of entry of this Order and the Closing Date, in each case pursuant to the terms of and solely to the extent such Liabilities are entitled to indemnification under the Fourth Amended Supply Contract. Any such claim by Sprint against NNI arising under this section shall be allowed and paid as an administrative claim pursuant to section 503(b) of the Bankruptcy Code.

37.    Nothing in this Order or in the Sale Agreement or Ancillary Agreements provides for the assumption and/or assignment, whether under section 365 of the Bankruptcy Code or otherwise, by the Debtors, of any contract with SNMP Research International, Inc. ("SNMP"), and no intellectual property rights or intellectual property licensed via contracts with SNMP and Nortel are being conveyed or otherwise transferred by the Debtors pursuant to the Order, Sale Agreement or Ancillary Agreements. To the extent that the Purchaser elects to have the Debtors assign to the Purchaser any contract with or intellectual property right of SNMP relating to the Assets, the Debtors and Purchaser will do so in accordance with the terms of such contract or applicable license, which terms, may include, inter alia, the written consent of SNMP.

38.    The Main Sellers have agreed that (i) NNI, on the one hand, and NNL, on

the other hand, each shall pay 50% of the Bid Protections, if, as and when such Bid Protections

become due and payable to Nokia Siemens Networks B.V. pursuant to and in accordance with

the terms of the NSN Agreement and the Bidding Procedures Order; (ii) in the event the Closing

occurs, amounts paid to the Sellers in accordance with Section 2.3.2(b)(i) of the Sale Agreement

shall be applied first to reimburse NNI and NNL for any amounts paid to NSN pursuant to (i)

above and the remainder of such Sales Proceeds (as defined in the Interim Funding and

Settlement Agreement, dated as of June 9, 2009 (the "IFSA"), entry into and performance under

which was approved by this Court's Order dated June 29, 2009 [D.I. 874]) arising out of the Sale

shall be, in accordance with Section 12.g. of the IFSA, (a) deposited into an Escrow Account (as

defined in the IFSA); (b) not be distributed in advance of either (1) agreement of all of the Main

Sellers as to the distribution of such Sale Proceeds (subject to the prior consent of the Committee

and the Bondholder Group acting in good faith), or (2) in the case where the Main Sellers fail to

reach agreement, determination by the relevant dispute resolver(s) in accordance with the terms

of the Interim Sales Protocol (as defined in the IFSA and in such form as approved by this

Court); and (iii) in the event the Closing does not occur and the Sale Agreement is terminated as

a result of the breach thereof by one or more of the Sellers, the Main Sellers reserve their rights

with respect to the allocation of the liability for payment of the Bid Protections. The Main

Sellers have agreed that this agreement in respect of the Bid Protections is being made only with

respect to the initial allocation of the Bid Protections among the Main Sellers, and that nothing

herein (a) shall, or be deemed to, determine, ratify, or adopt, or have any impact whatsoever on,

the allocation or distribution of Sale Proceeds (other than reimbursement of the Bid Protections

contemplated in (ii) above), or (b) shall be precedental for any other sale transaction that has

occurred or may occur in the future. Other than with respect to the payment and reimbursement

of amounts in respect of the Bid Protections, nothing this Order is meant to modify or vary any of the Selling Debtors' (as such term is defined in the IFSA) rights and obligations under the IFSA.

39.    In connection with the Sale Agreement, the Debtors are authorized to enter into and execute the nondisturbance agreement attached hereto as Exhibit C.

40.    Except as expressly provided in the Sale Agreement or the Ancillary Agreements, nothing in this Order shall be deemed to waive, release, extinguish or estop the Debtors or their estates from asserting or otherwise impair or diminish any right (including without limitation any right of recoupment), claim, cause of action, defense, offset or counterclaim in respect of any asset that is not a Purchased Asset.

41.    Any amounts that become payable by the Debtors to the Purchaser pursuant to the Sale Agreement or any of the documents delivered by the Debtors pursuant to or in connection with the Sale Agreement shall (a) constitute administrative expenses of the Debtors' estates within the meaning of section 503(b) of the Bankruptcy Code, and (b) be paid by the Debtors in the time and manner as provided in the Sale Agreement without further order of this Court.

42.    This Order shall not be modified by any chapter 11 plan confirmed in these chapter 11 cases or subsequent order of this Court unless expressly consented to in writing by the Purchaser.

43.    This Order and the Sale Agreement shall be binding in all respects upon all creditors and interest holders of any of the Debtors, all non-debtor parties to the Assumed Agreements, the Committee, all successors and assigns of the Debtors and their affiliates and subsidiaries, and any trustees, examiners, "responsible persons" or other fiduciaries appointed in

the Debtors' bankruptcy chapter 11 cases or upon a conversion to chapter 7 under the

Bankruptcy Code, and the Sale Agreement shall not be subject to rejection or avoidance under

any circumstances.

     44.    The failure specifically to include or make reference to any particular

provisions of the Sale Agreement or any Ancillary Agreement in this Order shall not diminish or

impair the effectiveness of such provision, it being the intent of the Court that the Sale

Agreement and the Ancillary Agreements are authorized and approved in their entirety.

     45.    The Court retains jurisdiction with respect to all matters arising from or

related to the implementation of this Order, including, without limitation, the authority to:  (1)

interpret, implement and enforce the terms and provisions of this Order (including the injunctive

relief provided in this Order) and the terms of the Sale Agreement, the Ancillary Agreements, all

amendments thereto and any waivers and consents thereunder; (2) protect the Purchaser, or the

Purchased Assets, from and against any of the Claims or Interests; (3) compel delivery of all

Purchased Assets to the Purchaser; and (4) resolve any disputes arising under or related to the

Sale Agreement, the Ancillary Agreements, the Sale or the Transactions.

     46.    The Sale Agreement, the Ancillary Agreements and any related

agreements, documents or other instruments may be modified, amended, or supplemented

through a written document signed by the parties in accordance with the terms thereof without

further order of the Court; provided, however, that any such modification, amendment or

supplement is neither material nor materially changes the economic substance of the transactions

contemplated hereby (it being understood, for the sake of clarity, that no such modification,

amendment or supplement shall be deemed to be material or shall be deemed to materially

change the economic substance of the transactions to the extent that the impact does not exceed

two percent of the Purchase Price (as defined in the Sale Agreement); and provided further that

no such modifications, amendments, or supplements may be made except following two (2) days

written notice to, or with the prior consent of, the Committee, c/o Akin Gump Strauss Hauer &

Feld LLP, One Bryant Park, New York, NY 10036 (Attention: Fred S. Hodara, Stephen Kuhn,

and Kenneth Davis).

47.    The Debtors are hereby authorized to perform each of their covenants and

undertakings as provided in the Sale Agreement, the Assumed and Subleased Real Estate Leases

and the Ancillary Agreements prior to or after closing without further order of the Court.

48.    This Order shall be effective immediately upon entry, and any stay of

orders provided for in Bankruptcy Rules 6004 or 6006 or any other provision of the Bankruptcy

Code or Bankruptcy Rules is expressly lifted.

49.    Notwithstanding any provision in the Bankruptcy Rules to the contrary,

(i) the terms of this Order shall be immediately effective and enforceable upon its entry, (ii) the

Debtors are not subject to any stay in the implementation, enforcement or realization of the relief

granted in this Order, and (iii) the Debtors may, in their discretion and without further delay, take

any action and perform any act authorized under this Order.

50.    The provisions of this order are nonseverable and mutually dependent.

Dated: _____, 2009
         Wilmington, Delaware

_____
THE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE

# BLUE SHEET

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------X

*In re*                                  ⋮     Chapter 11

Nortel Networks Inc., *et al.,*[1]       ⋮     Case No. 09-10138 (KG)

　　　　　　　　　　Debtors.           ⋮     Jointly Administered

　　　　　　　　　　　　　　　　　　⋮

　　　　　　　　　　　　　　　　　　⋮     **RE: D.I. 1131, 1278**

-------------------------------------------------------X

## ORDER AUTHORIZING AND APPROVING (A) THE SALE OF CERTAIN ASSETS OF, AND EQUITY INTERESTS IN, DEBTORS' ENTERPRISE SOLUTIONS BUSINESS, (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS AND LEASES AND (C) THE ASSUMPTION AND SUBLEASE OF CERTAIN LEASES

Upon the motion, dated July 20, 2009 [D.I. 1131] (the "Motion"), of Nortel Networks

Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession (collectively, the

"Debtors") for orders pursuant to sections 105, 107(b)(1), 363 and 365 of chapter 11 of title 11

of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9014 and 9018 of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 6004-1 and

9018-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy

Court for the District of Delaware (the "Local Rules") (i)(a) approving the Debtors' entry into

that certain Asset and Share Sale Agreement dated as of July 20, 2009 among Nortel Networks

Corporation ("NNC"), Nortel Networks Limited ("NNL"), NNI and certain other entities

---

[1]　　　The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

identified therein as sellers (the "Sellers") and Avaya Inc. as purchaser (together with its

designees, the "Purchaser") for the sale of certain assets of, and equity interests in, the Debtors'

Enterprise Solutions Business, attached hereto as Exhibit A (the "Agreement"),[2] (b) authorizing

and approving the bidding procedures (as appended to the Bidding Procedures Order (as defined

below, the "Bidding Procedures") for the sale of substantially all of the assets ("Assets") of

Nortel's Enterprise Solutions Business, (c) authorizing and approving the terms and conditions

of the Break-Up Fee and Expense Reimbursement (each as defined in the Agreement), (d)

approving the form and manner of sale notices (the "Notice Procedures"), (e) approving the

procedures as set forth below for the assumption and assignment of certain contracts and leases

and the assumption and sublease of certain leases (the "Assignment Procedures") and (f)

authorizing the Debtors to file certain documents under seal, and (g) setting the time, date and

place of a hearing to consider the sale of certain assets and equity interests relating to the

Debtors' Enterprise Solutions Business (the "Transaction") and the assumption and assignment

or assumption and sublease, as the case may be, of certain pre-petition contracts and leases of the

Debtors (the "Sale Hearing"), and (ii) authorizing and approving (a) the sale of certain assets of,

and equity interests in, the Debtors' Enterprise Solutions Business, (b) the assumption and

assignment of certain contracts and leases of the Debtors pursuant to section 365 of the

Bankruptcy Code and (c) the assumption and sublease of certain leases of the leases pursuant to

section 365 of the Bankruptcy Code; and (iii) granting them such other relief as the Court deems

just and proper; and the Court having entered an order on August 4, 2009 [D.I. 1278] (the

"Bidding Procedures Order") (i)(a) authorizing the Debtors' entry into the Agreement, (b)

---

[2]        Capitalized terms used herein but not defined herein shall have the meaning ascribed to such terms in the
Agreement.

2

authorizing and approving the Bidding Procedures, (c) authorizing and approving the terms and

conditions of the Break-Up Fee and Expense Reimbursement, (d) approving the Notice

Procedures, (e) approving the Assignment Procedures, (f) authorizing the Debtors to file certain

documents under seal and (g) setting the time, date, and place of the Sale Hearing; and the

Auction having been held from September 11, 2009 to September 15, 2009 for the consideration

of Qualified Bids and the selection of a Successful Bidder (each as defined in the Bidding

Procedures Order); and upon the Court's consideration of the Motion and any objections to the

Motion presented to the Court and the record of the bidding procedures hearing held on August

4, 2009 and the Sale Hearing held on September 16, 2009 with respect to the Motion, including

the testimony and evidence admitted at the Sale Hearing; and after due deliberation thereon, and

sufficient cause appearing therefor,

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS:

A.      **Jurisdiction and Venue**. This Court has jurisdiction to consider this Motion

under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue

of these cases and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

B.      **Statutory Predicates**. The statutory predicates for the relief sought in the Motion

are Bankruptcy Code sections 105, 107(b)(1), 363 and 365, Bankruptcy Rules 2002, 6004, 6006,

9014 and 9018 and Rules 6004-1 and 9018-1 of the Local Rules of Bankruptcy Practice and

Procedure for the United States Bankruptcy Court for the District of Delaware (the "Local

Rules"). Pursuant to Bankruptcy Rule 7052, findings of fact shall be construed as conclusions of

law and conclusions of law shall be construed as findings of fact to the fullest extent of the law.

C.      **Notice**. As evidenced by the affidavits of service filed with this Court that notice

was provided as required under the Bidding Procedures Order: (i) due, proper, timely, adequate

3

and sufficient notice of the Motion, the Sale Hearing, and the Transaction has been provided to all parties entitled thereto; (ii) it appearing that no other or further notice need be provided; (iii) such notice was and is good, sufficient and appropriate under the circumstances of the Debtors' chapter 11 cases; and (iv) no other or further notice of the Motion, the Auction, the Sale Hearing, or the Transaction is or shall be required.

        D.    **Opportunity to Object**.  A reasonable opportunity to object and to be heard with respect to the Transaction, the Motion and the relief requested therein has been given to all interested persons and entities, including, without limitation, the following:  (i) the Office of the United States Trustee for the District of Delaware, (ii) counsel for the Purchaser, (iii) counsel for the Official Committee of Unsecured Creditors appointed in these chapter 11 cases (the "Committee"), (iv) counsel for the ad hoc group of bondholders holding claims against certain of the Debtors (the "Bondholder Group"), (v) all entities known to have a claim, lien, interest or encumbrance against the Debtors' interest in the Assets, the Shares, the Assumed and Assigned Contracts and the Assumed and Subleased Real Estate Leases (the Debtors' interest in such property, the "Transferred Property"), (vi) all counterparties to the Assumed and Assigned Contracts and Assumed and Subleased Real Estate Leases, (vii) the Monitor appointed in the cases of certain of the Sellers that have commenced proceedings under the Canadian Companies' Creditors Arrangement Act, (viii) the Administrators appointed by the English High Court of Justice in the proceedings commenced by certain of the Sellers under the U.K. Insolvency Act of 1986, (ix) the Internal Revenue Service and applicable federal and state taxing authorities, (x) the Securities and Exchange Commission, (xi) the Pension Benefit Guaranty Corporation and all regulatory authorities of the Sellers' pension plans in Canada and the United Kingdom, (xii) all

4

persons, if any, who have filed objections to the Motion, and (xiii) all persons who have filed a notice of appearance in these cases.

E.    **Auction**.  The Sellers extensively marketed Nortel's Enterprise Solutions Business and the Assets related to such business.  The process created by the Bidding Procedures Order provided potential bidders with a full and fair opportunity to submit bids and participate in the Auction.  The Auction was conducted fairly and in good faith, without collusion and in accordance with the Bidding Procedures Order.  At the Auction, Purchaser was selected as the Successful Bidder.  The Debtors' determination that the Agreement constitutes the highest and best offer for the Transferred Property constitutes a valid and sound exercise of the Debtors' business judgment.

F.    **Arm's-Length Sale**.  The Transaction contemplated by the Agreement, the Ancillary Agreements and this Order is being undertaken by the Sellers and the Purchaser in good faith and at arm's-length, without collusion and in good faith within the meaning of section 363(m) of the Bankruptcy Code, and such parties are entitled to the protection of section 363(m) of the Bankruptcy Code.  Neither the Purchaser nor any of its Affiliates or their respective representatives is an "insider" of any of the Sellers, as that term is defined in Bankruptcy Code section 101(31).  None of the Sellers, the Purchaser or their respective Affiliates or representatives has engaged in any conduct that would cause or permit the Agreement or any Ancillary Agreement to be avoided under Bankruptcy Code section 363(n) or has acted in any improper or collusive manner with any person.  The terms and conditions of the Agreement, the Ancillary Agreements and the Transaction, including without limitation the consideration provided in respect thereof, is fair and reasonable and shall not be avoided under Bankruptcy Code section 363(n).

G.     **Good Faith Purchaser**.  The Purchaser, its Affiliates and their respective representatives have all proceeded in good faith and without collusion in all respects in connection with the Transaction and this proceeding.  Such persons are therefore entitled to all of the benefits and protections of Bankruptcy Code section 363(m).  Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Transaction shall not affect the validity of the Transaction unless, prior to the Closing, such authorization is duly stayed pending such appeal.

H.     **Corporate Authority**.  The Debtors (i) have full corporate power and authority to execute the Agreement, the Ancillary Agreements and all other documents contemplated thereby, and, with respect to the Debtors, the Transaction has been duly and validly authorized by all necessary corporate action, (ii) have all of the corporate power and authority necessary to consummate their obligations with respect to the Transaction, (iii) have taken all corporate action necessary to authorize and approve their entry into and performance in respect of the Agreement, the Ancillary Agreements and the Transaction, and (iv) require no consents or approvals to consummate the Transaction, other than those expressly provided for in the Agreement and the Ancillary Agreements and the entry of this Order.

I.     **Sale in Best Interests**.  Good and sufficient reasons for approval of the Agreement, the Ancillary Agreements and the Transaction have been articulated, and the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and all other parties in interest.

J.     **Business Justification**.  The Debtors have demonstrated both (i) good, sufficient and sound business purposes and justifications and (ii) compelling circumstances for the Transaction other than in the ordinary course of business under Bankruptcy Code section 363(b)

before, and outside of, a plan of reorganization in that, among other things, the immediate approval by this Court of the Transaction is necessary and appropriate to maximize the value of the Debtors' estates. Entry of an order approving the Agreement and the Ancillary Agreements, and all the provisions thereof, is a necessary condition precedent to the Purchaser's consummation of the Transaction.

      K.    **Consideration**. The consideration to be provided by the Purchaser to the Sellers pursuant to the Agreement will, upon delivery, constitute reasonably equivalent value or fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act and the laws of the United States, any state, territory, possession thereof or the District of Columbia. The Agreement represents a fair and reasonable offer to effectuate the terms of the Transaction under these circumstances. Other than the Purchaser, no other person or entity or group of persons or entities has offered to purchase the Transferred Property for an amount that would provide greater value to the Sellers. The Court's approval of the Motion, the Agreement, the Ancillary Agreements and the Transaction is in the best interests of the Debtors, their estates, their creditors and all other parties in interest.

      L.    **Free and Clear**. The conveyance of the Transferred Property in accordance with the Agreement and Ancillary Agreements will be a legal, valid, and effective transfer of such Transferred Property, and vests or will vest the Purchaser with all right, title, and interest of the Debtors in and to the Transferred Property pursuant to section 363(f) and 365 of the Bankruptcy Code free and clear of all Liens, Claims (as defined in section 101(5) of the Bankruptcy Code), encumbrances, obligations, liabilities, demands, guarantees, options, rights, restrictions, contractual commitments, rights of first refusal, rights of setoff, or interests of any kind or nature that have been, are or could be asserted against the Debtors whether known or unknown, legal or

7

equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of these chapter 11 cases, whether imposed by agreement, understanding, law, equity or otherwise, (collectively, the "Interests"), including, but not limited to, (i) those that purport to give to any party a right or option to effect a setoff against or any forfeiture, modification or termination of the Debtors' interests in the Transferred Property, or any similar rights, (ii) all Excluded Liabilities, including without limitation, any liability relating to or arising from any Seller Employee Plans of the Debtors (the "Debtor Employee Plans"), except as provided in the Agreement, or any tax liability of the Debtors arising under or out of, in connection with, or in any way relating to the cancellation of debt, (iii) those arising under all mortgages, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, liens, judgments, demands, encumbrances, rights of first refusal or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, and (iv) those arising in connection with any agreements, acts, or failures to act, of any of the Debtors or any of the Debtors' predecessors, affiliates, or representatives including, but not limited to, Interests arising under any bulk-transfer laws, doctrines of successor liability or similar theories. For the avoidance of doubt, without limiting the effect of the foregoing, the assumption and assignment of any Assumed and Assigned Contract and the assumption and sublease of any Assumed and Subleased Real Estate Lease, whether in accordance with this Order or any other Order of this Court, are also free and clear of all Interests. Notwithstanding anything else to the contrary set forth in this paragraph L, the term "Interests" shall not include any Permitted Encumbrances, any Assumed Liabilities (as defined in the Agreement) and any Liens created by or through the Purchaser or any of its Affiliates or

8

any license that covers intellectual property included within the Transferred Property. Furthermore, for the purposes of this Order, "Permitted Encumbrances" shall have the same meaning as set forth in the Agreement but excluding clauses (i), (ii) and (iv) of such definition.

M.     **Free and Clear Findings Required by Purchaser**.  The Purchaser represents that it would not have entered into the Agreement and would not consummate the Transaction, thus adversely affecting the Debtors, their estates and their creditors, if the Transferred Property is not being conveyed to the Purchaser free and clear of all Interests of any kind or nature as set forth in this Order, or if the Purchaser would, or in the future could, be liable for any of the Interests.

N.     **Satisfaction of Section 363(f) Standards**.  The Debtors may sell their interest in the Transferred Property free and clear of any Interests of any kind or nature as set forth in this Order because in each instance, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Each person or entity with any Interest in the Transferred Property:  (i) has, subject to the terms and conditions of this Order, consented to the Transaction, is deemed to have consented to the Transaction, or has had its objections to the Transaction considered and overruled by this Court; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Interest; or (iii) otherwise is subject to the provisions of section 363(f) of the Bankruptcy Code.  Those holders of Interests who did not object to the Motion are deemed, subject to the terms of this Order, to have consented to the relief sought in the Motion pursuant to section 363(f)(2) of the Bankruptcy Code.  All holders of Interests are adequately protected by having their Interests attach to the proceeds ultimately attributable to the Transferred Property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of

9

priority, which such Interests now have against the Transferred Property or their proceeds, subject to any rights, claims and defenses the Sellers or their estates, as applicable, may possess with respect thereto.

      O.    **No Liability Findings Needed by Purchaser**. Purchaser represents that it will not consummate the Transaction unless the Agreement specifically provides, and the Court specifically orders, that none of the Purchaser Releasees (as defined below) or the Transferred Property will have any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any Interest or Excluded Liability.

      P.    **No Fraudulent Transfer**. The Agreement and Ancillary Agreements were not entered into for the purpose of hindering, delaying or defrauding present or future creditors of the Sellers under the Bankruptcy Code and under the laws of the United States, any state, territory, possession thereof, or the District of Columbia. Neither Sellers nor Purchaser are entering into the Transaction contemplated by the Agreement fraudulently for the purpose of such statutory and common law fraudulent conveyance and fraudulent transfer claims.

      Q.    **No Successor Liability**. Except as provided under the Agreement regarding the Assumed Liabilities, the Debtors' conveyance of the Transferred Property to the Purchaser under the Agreement shall not result in the Purchaser Releasees or Transferred Property being subject to any liability or responsibility of any kind (i) for any Interest or other Excluded Liability of any of the Debtors, or (ii) for any Claim against the Debtors or any insider of the Debtors, or (iii) for the satisfaction in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, of any Interest or Excluded Liability of any of the Debtors, or (iv) to third parties or the Debtors, except as is expressly set forth in the Agreement; and, without

10

limiting the effect or scope of the foregoing, the transfer of the Transferred Property from the

Debtors to the Purchaser does not and will not subject the Purchaser Releasees or their respective

properties (including the Transferred Properties) to any liability or responsibility for Interests

against the Debtors or the Debtors' Interests in such Transferred Property by reason of such

transfer under the laws of the United States or any state, territory, possession thereof, or the

District of Columbia applicable to the Transaction, including, without limitation, any bulk-

transfer laws, successor liability or similar theories.

    R.    **Cure/Adequate Assurance**.  The assumption and assignment of the Assumed

and Assigned Contracts and the assumption and the sublease of the Assumed and Subleased Real

Estate Leases, all pursuant to the terms of this Order, are integral to the Agreement, do not

constitute unfair discrimination, and are in the best interests of the Debtors, their estates, their

creditors and all other parties in interest, and represent the reasonable exercise of sound and

prudent business judgment by the Debtors.  Purchaser has demonstrated adequate assurance of

future performance with respect to the Assumed and Assigned Contracts and Assumed and

Subleased Real Estate Leases and has satisfied the requirements of the Bankruptcy Code,

including, without limitation, sections 365(b)(1) and 365(f)(2)(B), to the extent applicable.

Among other things, the contractual obligation to pay the Cure Amounts (as defined below) and

the Purchaser's contractual obligation to perform the obligations, after the Closing, under the

Assumed and Assigned Contracts and Assumed and Subleased Real Estate Leases shall

constitute adequate assurance of future performance.

    NOW, THEREFORE, IT IS ORDERED THAT:

    1.    **Motion is Granted**.  The Motion and the relief requested therein is GRANTED

and APPROVED, as set forth herein.

11

2.    **Objections Overruled**. Any objections to the entry of this Order or the relief granted herein and requested in the Motion that have not been withdrawn, waived, or settled, or not otherwise resolved pursuant to the terms hereof, if any, hereby are denied and overruled on the merits, with prejudice.

3.    **Approval**. The Agreement and the Ancillary Agreements and all of the terms and conditions thereto as applicable to the Debtors are hereby approved. Debtors are hereby authorized to (i) execute and perform the Agreement, the Transition Services Agreement and the other Ancillary Agreements, along with any additional instruments or documents that may be reasonably necessary or appropriate to implement the Agreement, *provided* that such additional documents do not materially change its terms in a manner adverse to the Debtors; (ii) consummate the Transaction in accordance with the terms and conditions of the Agreement, the Ancillary Agreements, and the other agreements contemplated thereby; (iii) assume and assign the Assumed and Assigned Contracts to Purchaser, either as of the Closing Date or such later date as contemplated by the Agreement; (iv) assume and sublease the Assumed and Subleased Real Estate Leases to Purchaser, either as of the Closing Date or such later date as contemplated by the Agreement; and (v) take all other and further actions as may be reasonably necessary to implement the Transaction.

4.    **Valid Transfer**. Upon consummation of the Closing, (i) the Transaction effects a legal, valid, enforceable and effective sale and transfer of the Debtors' interests in Transferred Property to Purchaser, and shall vest Purchaser with title to such Transferred Property free and clear of all Interests of any kind whatsoever, except as expressly provided in this Order and the Agreement, and (ii) the Agreement, the Ancillary Agreements, the Transaction and any

12

instruments contemplated thereby shall be enforceable against and binding upon, and not subject to rejection or avoidance by, the Debtors or any successor trustee appointed with respect thereto.

5.        **General Assignment**. Effective as of the Closing, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Debtors' interests in the Transferred Property. Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the Transaction.

6.        **Exculpation and Release**. None of the Purchaser or their affiliates, successors and assigns (collectively, the "Purchaser Releasees") shall have or incur any liability to, or be subject to any action by any Debtor or any of their predecessors, successors and assigns, arising out of the negotiation, investigation, preparation, execution, delivery of the Agreement and Ancillary Agreements and the entry into and consummation of the Transaction, except as expressly provided in the Agreement, the other Transaction Documents, and this Order.

7.        **Injunction**. Except as expressly provided in the Agreement or by this Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, vendors, suppliers, employees, trade creditors, litigation claimants and other persons, holding Interests of any kind or nature whatsoever against or in the Debtors or the Debtors' interests in the Transferred Property (whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of these chapter 11 cases, whether imposed by agreement, understanding, law, equity or otherwise), including, without limitation, the nondebtor party or parties to each Assumed and Assigned Contract and to each Assumed and Subleased Real Estate

13

Lease, arising under or out of, in connection with, or in any way relating to, the Debtors, the Transferred Property, the operation of the Debtors' businesses before the Closing, before or after the Closing regarding the operation of the Debtors' businesses not subject to the Transaction, or the transfer of the Debtors' interests in the Transferred Property to the Purchaser, including, without limitation, any default existing as of the Closing Date and any objection to the assumption and assignment of the Assumed and Assigned Contracts or the assumption and sublease of the Assumed and Subleased Real Estate Leases, shall be and hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing Interests against the Purchaser Releasees, the Transferred Property, or the interests of the Debtors in such Transferred Property. Following the Closing, no holder of an Interest against the Debtors shall interfere with the Purchaser's title to or use and enjoyment of the Debtors' interests in the Transferred Property based on or related to such Interests, and all such Interests, if any, shall be, and hereby are transferred and attached to the proceeds from the Transaction in the order of their priority, with the same validity, force and effect which they have against such Transferred Property as of the Closing, subject to any rights, claims and defenses that the Debtors' estates and Debtors, as applicable, may possess with respect thereto.

8.    **No Successor Liability**.  No Purchaser Releasee shall, as a result of transfer, possession or operation of the Transferred Property:  (i) be a successor to any of the Debtors or the Debtors' estates by reason of any theory of law or equity; (ii) have, de facto or otherwise, merged or consolidated with or into any of the Debtors or the Debtors' estates; or (iii) be a continuation or substantial continuation of any of the Debtors or any enterprise of the Debtors. Except as provided in the Agreement regarding the Assumed Liabilities, the conveyance of the Debtors' Interest in the Transferred Property to Purchaser under the Agreement shall not result in

14

(i) any Purchaser Releasee or the Transferred Property having any liability or responsibility for any Interest against any of the Debtors or against any insider of the Debtors, (ii) any Purchaser Releasee or the Transferred Property having any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any Interest or Excluded Liability, including without limitation, any liability relating to or arising from any Debtor Employee Plans, except as is expressly set forth in the Agreement, (iii) Purchaser or the Transferred Property, having any liability or responsibility to any of the Debtors except as is expressly set forth in the Agreement or (iv) successor or vicarious liabilities of any kind or character, including, but not limited to, federal, state or other tax liabilities, U.S. or foreign pension liabilities, or liabilities based on any theory of antitrust, environmental, labor law, alter ego, veil piercing, continuity of enterprise, mere continuation, product line, de facto merger or substantial continuity, whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of these chapter 11 cases, whether imposed by agreement, understanding, law, equity or otherwise with respect to any of the Debtors or any obligations of the Debtors, including, but not limited to, in the case of liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Debtors' business prior to the Closing or any taxes in connection with, or in any way relating to the cancellation of debt of the Debtors or their Affiliates.

9.     **Assumption and Assignment or Assumption and Sublease**. Pursuant to Bankruptcy Code sections 105(a), 363 and 365, and subject to, conditioned on, and effective either as of the Closing Date or such later date as contemplated by the Agreement, the Debtors'

15

assumption and assignment to the Purchaser of the Assumed and Assigned Contracts, and the assumption and sublease to the Purchaser of the Assumed and Subleased Real Estate Leases, and the Purchaser's acceptance of such assignments and subleases on the terms set forth in the Agreement, are hereby approved.  On the Closing Date or such later date as contemplated by the Agreement, the Assumed and Assigned Contracts and Assumed and Subleased Real Estate Leases, whether entered into or amended before or after the Petition Date, shall be assumed and assigned or subleased, as the case may be, to the Purchaser, free and clear of all Interests of any kind or nature whatsoever other than the Assumed Liabilities on the terms set forth in the Agreement, and shall remain in full force and effect for the benefit of the Purchaser in accordance with their respective terms, notwithstanding any provision in any such Assumed and Assigned Contracts (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, limits or conditions such assignment.  Pursuant to Bankruptcy Code section 365(k), the Debtors shall be relieved from any further liability with respect to the Assumed and Assigned Contracts following assignment to the Purchaser.  Debtors are hereby authorized, at Closing or such later date as contemplated by the Agreement, to execute and perform under any other agreement executed in connection with the transfer of the Transferred Property to the Purchaser, and to execute and deliver to the Purchaser such documents or other instruments as may be necessary to assign to Purchaser the Assumed and Assigned Contracts or sublease to Purchaser the Assumed and Subleased Real Estate Leases.

10.    **Payment of Cure Amounts.**  In accordance with the allocation of responsibility set forth in the Agreement, the Purchaser or Debtors shall be obligated to pay or cause to be paid any and all amounts accrued or otherwise owed (collectively, the "Cure Amounts") under any Assumed and Assigned Contract or Assumed and Subleased Real Estate Lease, as soon as

16

reasonably practicable on or after Closing in the amount as to which (i) the contracting counterparty consents in writing, (ii) the counterparty is deemed to have consented, or (iii) the Court enters an order determining the Cure Amount. The Purchaser and Debtors' respective obligations to pay the Cure Amounts and the Purchaser's promise to perform the future obligations under the Assumed and Assigned Contracts and the Assumed and Subleased Real Estate Leases after the Closing shall constitute adequate assurance of future performance within the meaning of Bankruptcy Code sections 365(b)(1)(C) and 365(f)(2)(B).

     11.    **Cure Amounts for Assumed and Assigned Contracts.**  As set forth in the Bidding Procedures Order, the Cure Amounts with respect to each Assumed and Assigned Contract  and Assumed and Subleased Real Estate Lease shall be determined in accordance with the Assignment Procedures and, upon such determination, shall constitute findings of the Court and shall be final and binding on parties to such Assumed and Assigned Contracts or Assumed and Subleased Real Estate Leases (and their successors and designees), and shall not be subject to further dispute or audit based on performance prior to the time of assumption and assignment or sublease, irrespective of the terms and conditions of such Assumed and Assigned Contracts or Assumed and Subleased Real Estate Leases.  Upon assumption and assignment of Assumed and Assigned Contract or assumption and sublease of Assumed and Subleased Real Estate Lease in accordance with the Assignment Procedures, each counterparty to an Assumed and Assigned Contract or Assumed and Subleased Real Estate Lease shall be forever barred, estopped and permanently enjoined from (i) asserting against the Debtors or the Purchaser, or the property of either of them, any default existing as of Closing; or, against the Purchaser, any counterclaim, defense, setoff or any other Interest asserted or assertable against the Debtors; and (ii) imposing or charging against the Purchaser Releasees any accelerations, assignment fees, increases or any

17

other fees as a result of the Debtors' assumption and assignments to Purchaser of the Assumed and Assigned Contracts or assumption and sublease to Purchaser of the Assumed and Subleased Real Estate Leases. To the extent that any counterparty failed to object to the Cure Amount with respect to an Assumed and Assigned Contract or an Assumed and Subleased Real Estate Lease in accordance with the Assignment Procedures, such counterparty shall be deemed to have consented to the applicable Cure Amount, and the assignments to Purchaser of such Assumed and Assigned Contract and the sublease to Purchaser of such Assumed and Subleased Real Estate Lease.

12.    **Security Deposits.** The Debtors are hereby authorized to establish a depositary account and shall deposit therein all security deposits paid by Purchaser or any Designated Purchaser to any Debtor that is a sub-landlord under any Assumed and Subleased Real Estate Lease. Such security deposits shall not constitute property of any Debtor's estate unless and until applied in accordance with the applicable Assumed and Subleased Real Estate Lease, shall be segregated from the property of each Debtor's estate, and shall not be subject to disbursement, transfer or setoff, or other use or application by any Debtor except as set forth in the relevant Assumed and Subleased Real Estate Lease or otherwise agreed to by the Purchaser or Designated Purchaser.

13.    **Assignment and Transfer of Intangible Property.** The Debtors are hereby authorized to assign and transfer to the Purchaser all of the Debtors' right, title, and interest (including common law rights) to all of their intangible property included in the Transferred Property, subject to the Debtors' obtaining actual or deemed Consents (defined in the Agreement) to the extent required by applicable law.

18

14.     **Ipso Facto Clauses Ineffective**. Upon the Debtors' assignment to Purchaser of

the Assumed and Assigned Contracts and the sublease to Purchaser of the Assumed and

Subleased Real Estate Leases under the provisions of this Order, no default by a Debtor or

Purchaser shall exist under any Assumed and Assigned Contract or Assumed and Subleased Real

Estate Lease, and no counterparty to any Assumed and Assigned Contract or Assumed and

Subleased Real Estate Lease shall be permitted to declare a default by any of the Debtors or

Purchaser thereunder or otherwise take action against the Purchaser as a result of any Debtor's

financial condition, bankruptcy or failure to perform any of its obligations under the relevant

Assumed and Assigned Contract or Assumed and Subleased Real Estate Lease. Any provision

in an Assumed and Assigned Contract that prohibits or conditions the assignment of such

Assumed and Assigned Contract (including, without limitation, the granting of a lien thereon) or

allows the counterparty thereto to terminate, recapture, impose any penalty, condition on renewal

or extension, or modify any term or condition upon such assignment or sublease, constitutes an

unenforceable anti-assignment provision that is void and of no force and effect as against the

Debtors. The failure of the Debtors or the Purchaser to enforce at any time one or more terms or

conditions of any Assumed and Assigned Contract or Assumed and Subleased Real Estate Lease

shall not be a waiver of such terms or conditions, or of the rights of the Debtors or Purchaser to

enforce every term and condition of the Assumed and Assigned Contract or Assumed and

Subleased Real Estate Lease.

15.     **Binding Effect of Order**. This Order shall be binding upon and shall govern the

acts of all entities, including without limitation all filing agents, filing officers, title agents, title

companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative

agencies, governmental departments, secretaries of state, federal, state and local officials, and all

19

other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Assets. The terms and provisions of the Agreement, the Ancillary Agreements and this Order shall be binding in all respects upon the Debtors, the Debtors' estates, all creditors of (whether known or unknown) and holders of equity interests in the Debtors and the Purchaser and their respective affiliates, successors and assigns, and any third parties, notwithstanding any subsequent appointment of any trustee of any of the Debtors under any chapter of the Bankruptcy Code.

16.    **Intellectual Property License Agreement and Trademark Licensing Agreement**. The Intellectual Property License Agreement and Trademark Licensing Agreement shall be binding on the Debtors, any chapter 11 trustee or chapter 7 trustee appointed in any of the bankruptcy cases of the Debtors. Further, all Intellectual Property and Trademarks licensed to Purchaser under the Intellectual Property License Agreement or Trademark Licensing Agreement shall not be sold, transferred, conveyed or assigned unless such sale, transfer, conveyance and assignment is made subject to the licenses granted to Purchaser under the Intellectual Property License Agreement or Trademark Licensing Agreement and subject to all other applicable obligations set forth in the Intellectual Property License Agreement or Trademark Licensing Agreement with respect to such Intellectual Property.

17.    **Release of Interests**. This Order (i) shall be effective as a determination that, on the Closing, all Interests of any kind or nature whatsoever existing as to the Transferred Property of the Debtors prior to the Closing have been unconditionally released and terminated as to the Transferred Property, except as otherwise provided in the Agreement and this Order, and that the conveyances described herein have been effected, and (ii) shall be binding upon and shall govern

the acts of all entities including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Transferred Property of the Debtors. Upon the occurrence of the Closing, the Debtors and persons holding an Interest in the Transferred Property of the Debtors immediately prior to the Closing are authorized to execute such documents and take all other actions as may be reasonably necessary to release their Interests in the Transferred Property of the Debtors, if any, as such Interests may have been recorded or may otherwise exist.

18.    **Retention of Jurisdiction**. This Court retains exclusive jurisdiction to interpret, construe, implement, and enforce the terms and provisions of, and to resolve any and all disputes that may arise under or in connection with this Order, all amendments thereto and any waivers and consents thereunder, including, but not limited to, retaining jurisdiction to (i) compel delivery of the Transferred Property of the Debtors to Purchaser; (ii) interpret, implement and enforce the provisions of this Order and any related order; (iii) protect Purchaser Releasees against any Interests against the Debtors or the Transferred Property of any kind or nature whatsoever, attaching to the proceeds of the Transaction, and (iv) resolve any and all disputes that may arise under or in connection with the assumption and assignment of any Assumed and Assigned Contract or the assumption and sublease of any Assumed and Subleased Real Estate Lease or under the Agreement, the Ancillary Agreements, or the Order, in all respects, and further to hear and determine any and all disputes among the Sellers, the Sellers' Affiliates, the

21

Purchaser or its Affiliates, as the case may be, that may arise in connection the Excluded Liabilities of the Debtors.

19.     **Retention of Rights By the Government**. Nothing in this Order or in the Agreement (i) releases, nullifies, or enjoins the enforcement of any liability to a governmental unit of the United States or any state or municipality of the United States under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date of entry of this Order; or (ii) should be construed to give Purchaser any more protection against any governmental unit of the United States or any state or municipality of the United States than Purchaser is otherwise entitled to under 11 U.S.C. § 363(f). Nothing in this paragraph should be construed to create for any governmental unit any substantive right that does not otherwise exist under law.

20.     **Fees, Expenses and Other Obligations**. All obligations to be paid by the Debtors or their Affiliates to the Purchaser or to be borne by any Debtors or their Affiliates under the Agreement, the other Transaction Documents, including, but not limited to the any price adjustments under the Agreement, the Break-Up Fee and the Expense Reimbursement, shall be paid in the manner provided in the Agreement, the other Transaction Documents and the Bidding Procedures Order, and shall be immediately payable if and when any Debtor's obligation to pay or bear such amount may arise under the relevant agreement or order, without further order of this Court. Until satisfied, all such obligations shall continue to have the protections provided in the Bidding Procedures Order and this Order, and shall not be discharged, modified or otherwise affected by any reorganization plan for the Debtors, except by an express agreement with Purchaser, its successors, or assigns.

22

21.    **Sale Proceeds**. All Interests in the Transferred Property of the Debtors shall
attach to any proceeds of such Transferred Property immediately upon receipt of such proceeds
by the Sellers (or any party acting on any Seller's behalf) in the order of priority, and with the
same validity, force and effect which such Interests now have against such Transferred Property,
subject to any rights, claims and defenses the Sellers, the Debtors' estates or any trustee for any
Debtor, as applicable, may possess with respect thereto, in addition to any limitations on the use
of such proceeds pursuant to any provision of this Order.

22.    **No Material Modifications**. The Agreement, the Ancillary Agreements and any
related agreements, documents or other instruments may be modified, amended or supplemented
by the parties thereto, in a writing signed by such parties, and in accordance with the terms
thereof, without further order of the Court; *provided* that any such modification, amendment or
supplement does not have a material adverse effect on the Debtors' estates and has been agreed
to between the Debtors and the Purchaser; and *provided* further that no such modifications,
amendments, or supplements may be made except following two (2) days written notice to, or
the prior consent of (i) the Committee, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park,
New York, New York 10036 (Attention: Fred S. Hodara, Stephen Kuhn, and Kenneth Davis)
and (ii) the Bondholder Group, Milbank, Tweed, Hadley & McCloy, One Chase Manhattan
Plaza, New York, New York, 10006 (Attention: Roland Hlawaty).

23.    **Subsequent Orders and Plan Provisions**. Nothing contained in any subsequent
order of this Court or any court of competent jurisdiction in these or other chapter 11 cases
(including without limitation, an order authorizing the sale of assets pursuant to sections 363,
365 or any other provision of the Bankruptcy Code or any order entered after any conversion of a
chapter 11 case of the Debtors to a case under chapter 7 of the Bankruptcy Code) or any chapter

23

11 plan of reorganization confirmed in any of the Debtors' bankruptcy cases or any order

confirming any such plan shall nullify, alter, conflict with or derogate from the provisions of this

Order, and the provisions of this Order shall survive and remain in full force and effect.

24.    **Failure to Specify Provisions**. The failure specifically to include any particular

provisions of the Agreement in this Order shall not diminish or impair the effectiveness of such

provisions, it being the intent of the Court that the Agreement be authorized and approved in its

entirety.

25.    **No Stay of Order**. Notwithstanding the provisions of Bankruptcy Rule 6004 and

Bankruptcy Rule 6006 or any applicable provisions of the Local Rules, this Order shall not be

stayed for ten (10) days after the entry hereof, but shall be effective and enforceable immediately

upon entry. Time is of the essence in approving the Transaction, and the Debtors and the

Purchaser intend to close the Transaction as soon as practicable. Any party objecting to this

Order must exercise due diligence in filing an appeal and pursuing a stay, or risk its appeal being

foreclosed as moot.

26.    **Inconsistencies with Prior Orders, Pleadings or Agreement**. To the extent this

Order is inconsistent with any prior order or pleading with respect to the Motion in these chapter

11 cases, the terms of this Order shall govern. To the extent there is any inconsistency between

the terms of this Order and the terms of the Agreement (including all ancillary documents

executed in connection therewith), the terms of the Order shall govern.

27.    **Reservation of Rights Regarding Certain Contracts**. Nothing in this Order

authorizes or otherwise provides for the assumption, assignment or rejection, in whole or in part,

of any Objecting Party Agreement. Other than the rights and obligations between the parties to

the Agreement, nothing herein or in the Agreement shall affect the rights of any party regarding

24

an Objecting Party Agreement, all of which such rights of the Objecting Parties are hereby

preserved, including without limitation the right to seek, oppose or support (a) any assumption,

assignment or rejection of any Objecting Party Agreement on any legal or factual basis, (b)

adequate assurance of future performance, (c) the estimation or assertion of any proposed cure

amount, (d) the assumption by the Purchaser of all obligations and liabilities under any Objecting

Party Agreement by virtue of the assumption and assignment of the Objecting Party Agreement

under Section 365 and other applicable law, including contingent, unmatured, or unliquidated

claims and whether such claims arise or arose pre- or post-closing, and (e) adequate assurance

for payment of such contingent, unmatured, or unliquidated claims. For the purposes of this

Order, "Objecting Party Agreement" means any written contract, agreement, license or any other

document that creates binding contractual obligations between an Objecting Party and one or

more Debtors; "Objecting Party" means Motorola, Inc. ("Motorola"), Macro 4, Inc., Freescale

Semiconductor, Inc., Intoto LLC, Oracle USA, Inc., AT&T Corp., Anixter Inc., Telstra

Corporation Limited, SNMP Research International Inc., the affiliates of Verizon

Communications, Inc. ("Verizon") and DiamondWare Former Shareholders and, in the case of

an Objecting Party that is not an individual, such Objecting Party's respective affiliates; and

"DiamondWare Former Shareholders" means Keith Weiner, Rudy Mathieu, Wendell Allen Neff,

Charles Rowe, Neal Shact, Fred Scott, Jac Goudsmit, Dwayne Roberts, William Weidner and

Price Paschall. Nothing in this Order or the Agreement shall prejudice, estop, bar, impair or

otherwise limit in any respect any party's rights under Section 365 of the Bankruptcy Code with

respect to the Objecting Party Agreements, including, without limitation, the rights set forth

above in subparts (a) through (e). The Objection of Motorola to the Debtors' Motion for Orders

(I)(A) Authorizing Debtors' Entry Into the Asset and Share Sale Agreement, (B) Authorizing and

25

Approving the Bidding Procedures, (C) Authorizing and Approving a Break-up Fee and Expense Reimbursement, (D) Approving the Notice Procedures, (E) Approving the Assumption and Assignment Procedures, (F) Authorizing the Filing of Certain Documents Under Seal, and (G) Setting a Date for the Sale Hearing and (II) Authorizing and Approving (A) the Sale of Certain Assets of, and Equity Interest in, Debtors' Enterprise Solutions Business, (B) the Assumption and Assignment of Certain Contracts and Leases and (C) the Assumption and Sublease of Certain Leases [D.I. 1316] (the "Motorola Objection") shall be deemed to constitute a timely and properly served objection on the basis of the arguments set forth in the Motorola Objection to the service of any Initial Notice (as defined in the Bidding Procedures Order) on Motorola.

28.    **Resolution of Flextronics' Objection.** The Limited Objection and Reservation of Rights filed with this Court by Flextronics Corporation and Flextronics Telecom Systems Ltd. (collectively, "Flextronics") on September 4, 2009 [D.I. 1435] has been resolved pursuant to the following representations and terms:

    (i)    the Agreement and related agreements do not involve a "back to back" arrangement with the Purchaser, by which the Debtors would continue operating under the MCMSAs but stand as a mere conduit between Flextronics and the Purchaser under the Agreement with respect to the MCMSAs, where "MCMSAs" refers to the (a) the Amended and Restated Master Contract Manufacturing Services Agreement, dated as of June 29, 2004, between NNL and Flextronics Telecom Systems Ltd. and (b) the Master Contract Manufacturing Services Agreement, dated as of September 30, 2003, between NNL and Flextronics Corporation (f/k/a Solectron Corporation) and their ancillary agreements;

    (ii)    the MCMSAs and any of the Debtors' contractual rights thereunder as they relate to Enterprise Solutions Business, shall not be assigned to the Purchaser in connection with the Agreement (for the avoidance of doubt, nothing in this Order shall constitute an assumption by the Debtors of the MCMSAs, to the extent they are capable of assumption, and all rights and remedies of the Debtors, the Purchaser and Flextronics are expressly reserved);

(iii)     upon closing of the Transaction, the Debtors shall cease placing forecasts or purchase orders under the MCMSAs for products or services related solely to the Enterprise Solutions Business, *provided* that the Debtors shall not be prohibited from providing administrative services to Purchaser, including placing forecasts or purchase orders on behalf of the Purchaser pursuant to one or more agreements between the Purchaser and Flextronics;

(iv)     the Debtors, the Purchaser and Flextronics shall promptly begin good faith negotiations regarding a three way inventory purchase agreement as contemplated in the term sheet attached as Exhibit E to the Agreement;

(v)     the Purchaser and Flextronics shall promptly begin good faith negotiations regarding an agreement which shall apply to any purchase orders issued to Flextronics by the Purchaser (or any of its designated affiliates) in connection with and following Purchaser's acquisition of the Enterprise Solutions Business; and

(vi)     the Debtors and Flextronics shall each use commercially reasonable efforts to provide each other and to the Purchaser, no later than October 5, 2009, a list of all equipment owned by the Debtors or the affiliates of the Debtors that is in the possession of Flextronics related to the Enterprise Solutions Business.  Based on these two lists, the Debtors and Flextronics shall cooperate in good faith to compile a complete list of all equipment related to the Enterprise Solutions Business that is owned by the Debtors or the affiliates of the Debtors and is in the possession of Flextronics (the "Equipment List") by 5:00 pm (EST) on October 10, 2009, and shall provide a copy of the Equipment List to the Purchaser.  Upon finalization of the Equipment List, Flextronics shall provide the Debtors and the Purchaser with a list of their interests (if any) with regard to each item of equipment set forth in the Equipment List no later than October 15, 2009, or within five (5) business days of the finalization of the Equipment List and any demands of adequate protection with regards to such interests (the "Flex Interests and Adequate Protection Submission").  To the extent that the Debtors or the Purchaser have any objections regarding the Flex Interests and Adequate Protection Submission, the Debtors and/or the Purchaser shall file such objections with this Court no later than 5:00 pm (EST) on October 30, 2009 (the "Objection").  Flextronics shall serve their responsive papers to the Objection no later than 5:00 pm (EST) on November 15, 2009, and the Objection shall be heard during the scheduled November 19, 2009 omnibus hearing.  Notwithstanding any of the foregoing, a decision resolving the Objection (if any) shall be entered prior to the Closing.  The Debtors, Flextronics and the Purchaser reserve their rights regarding the matters set forth in this paragraph 28.  The Debtors

27

and Flextronics may, upon the written consent of Purchaser, agree to amend any date in this paragraph.

29.    **Assets of Non-Debtors**. This Order applies only to assets owned by the Debtors, including, without limitation, all of the Debtors' equity interests in Nortel Government Solutions Incorporated and DiamondWare, Ltd. Consequently, notwithstanding any other provision of this Order or the Agreement to the contrary, the portions of this Order that approve the transfer of assets to the Purchaser free and clear of all liens and other encumbrances, or that modify, enjoin, release or otherwise limit the rights of any creditor of entities transferring assets, apply only to assets owned by the Debtors and do not apply to any assets owned by non-debtor entities, except to the extent otherwise agreed by such creditor in writing (out of abundance of caution, the Debtors agree that the Pension Benefit Guaranty Corporation has not agreed to permit the transfer of any assets of such non-debtor selling entity free and clear of any liens or encumbrances, or to modify, enjoin, release or otherwise limit its rights against any such non-debtor selling entity, including, without limitation, Nortel Government Solutions Incorporated and DiamondWare, Ltd. or any of their respective assets).

30.    **Reservation of Setoff Rights.** Nothing in this Order shall be deemed to waive, release or extinguish any valid claim with respect to setoff that Verizon may have against the Debtors.

31.    **Allocation**. The Purchaser shall deposit proceeds of the Transaction, subject to the price adjustments and Purchaser's rights under the Agreement and less applicable or value-added taxes incurred by the ~~Sellers~~ and the EMEA Sellers, and, to the extent agreed by the ~~Sellers~~ and the EMEA Sellers, any transaction costs, into an Escrow Account (as defined in the Interim Funding and Settlement Agreement, dated June 9, 2009 (the "IFA"). In accordance with this Court's order approving and authorizing the transactions contemplated by the IFA, the

main Sellers, the other Sellers which join the agreement

28

proceeds in the Escrow Account shall not be distributed in advance of either (a) agreement of all of the Main Sellers, the other Sellers which join the Agreement and the EMEA Sellers as to the distribution of such proceeds (subject to the prior consent of the Committee and the Bondholder Group acting in good faith in accordance with Section 12.g. of the IFA) or (b) in the case where the Main Sellers, the other Sellers which join the Agreement and the EMEA Sellers fail to reach agreement, determination by the relevant dispute resolver(s) in accordance with the terms of the Interim Sales Protocol (as such term is defined in the IFA and subject to the requirements of Section 12.g of the IFA), which Interim Sales Protocol shall be approved by the Court.

Dated:    Wilmington, Delaware
          September 16, 2009

HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE

# BLUE SHEET

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------X
                                            :
                                            :    Chapter 11
                                            :
*In re*                                     :    Case No. 09-10138 (KG)
                                            :
Nortel Networks Inc., *et al.*, [1]         :
                                            :    Jointly Administered
                    Debtors.                :
                                            :    **RE: D.I. 1525, 1584, 1723**
                                            :
---------------------------------------------------------X

**ORDER AUTHORIZING AND APPROVING**
**SALE OF DEBTORS' NEXT GENERATION**
**PACKET CORE NETWORK COMPONENTS**
**FREE AND CLEAR OF ALL LIENS, CLAIMS AND INTERESTS**

Upon the motion dated September 21, 2009 (the "Motion"),[2] of Nortel Networks Inc. and

certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), for

entry of an order, as more fully described in the Motion, authorizing and approving sale or

license, as applicable, of the Debtors' right, title and interest in the Next Generation Packet Core

network components (the "Assets") to the Successful Bidder, free and clear of all liens, claims,

and interests, pursuant to section 363 of the Bankruptcy Code, and the Debtors having filed a

Notice of Successful Bidder designating Hitachi, Ltd. (the "Purchaser") as the purchaser of the

Assets pursuant to the Transaction Agreement executed with the Purchaser on October 25, 2009

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems, Inc. (9769), Nortel Altsystems International, Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

[2]     Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Sale Motion or the Transaction Agreement, as the case may be.

(the "Transaction Agreement"), a copy of which is attached hereto as Exhibit A; and the Court

having reviewed and considered the Motion, and the arguments of counsel made, and the

evidence adduced, at the Sale Procedures Hearing and the Sale Hearing; and upon the record of

the Sale Procedures Hearing and the Sale Hearing and these chapter 11 cases, and after due

deliberation thereon, and good cause appearing therefore it is hereby

FOUND AND DETERMINED THAT:[3]

A.      The Court has jurisdiction to hear and determine the Motion and to grant

the relief requested in the Motion pursuant to 28 U.S.C. § 157(b)(1) and 1334(b);

B.      Venue of these cases and the Motion in this district is proper under 28

U.S.C. §§ 1408 and 1409. This is a core proceeding within the meaning of 28 U.S.C. §

157(b)(2);

C.      Adequate notice of the Motion has been given as set forth therein to all

relevant parties, and no other or further notice is necessary;

D.      The legal and factual bases set forth in the Motion and the record in these

proceedings establish just cause for the relief requested therein, and that such relief is in the best

interests of the Debtors, their estates, their creditors and the parties in interest;

E.      Based upon the affidavits of service and publication filed with the Court:

(a) notice and service of the Motion and the Sale Hearing was adequate and sufficient under the

circumstances of these chapter 11 cases and these proceedings and complied with the various

applicable requirements of the Bankruptcy Code, the Bankruptcy Rules and the Sale Procedures

Order; and (b) a reasonable opportunity to object and be heard with respect to the Motion and the

---

[3]      Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Fed. R. Bankr. P. 7052.

relief requested therein was afforded to all interested persons and entities;

F.    The Debtors and their professionals marketed the Assets and conducted the marketing and sale process as set forth in and in accordance with the Motion.  Based upon the record of these proceedings, all creditors and other parties in interest and all prospective purchasers have been afforded a reasonable and fair opportunity to bid for the Assets.

G.    The Sale Procedures were substantively and procedurally fair to all parties.  The Debtors conducted the Sale process in accordance with the Sale Procedures;

H.    The Transaction Agreement and the Sale were negotiated and have been and are undertaken by the Debtors and the Purchaser at arms' length without collusion or fraud, and in good faith within the meaning of Bankruptcy Code section 363(m).  As a result of the foregoing, the Debtors and the Purchaser are entitled to the protections of section 363(m) of the Bankruptcy Code;

I.    The total consideration provided by the Purchaser for the assets being conveyed or licensed by the Debtors pursuant to the Transaction Agreement (the "Purchased Assets") is the highest and best offer received by the Debtors, and the purchase price constitutes fair consideration and fair value for the Purchased Assets.  Any such sale, license or other transfer pursuant to the Transaction Agreement is herein referred to as a "Sale";

J.    A sale of the Purchased Assets other than one free and clear of all interests (as defined in the Bankruptcy Code) would yield substantially less value for the Debtors' estates than the Transaction.  Therefore, the Sale contemplated by the Transaction Agreement is in the best interests of the Debtors, their estates and creditors, and all other parties in interest;

K.    The Debtors may sell the Purchased Assets free and clear of all interests to the extent provided in the Transaction Agreement or Bankruptcy Code section 363(f), because,

3

with respect to each creditor asserting an interest, one or more of the standards set forth in

Bankruptcy Code § 363(f)(1)-(5) has been satisfied. Those holders of interests or claims who did

not object or who withdrew their objections to the Sale or the Motion are deemed to have

consented to the Motion and Sale pursuant to Bankruptcy Code § 363(f)(2). Any holders of

interests or claims who did object fall within one or more of the other subsections of Bankruptcy

Code section 363(f);

  L. Neither the Debtors nor the Purchaser engaged in any conduct that would

cause or permit the Agreement or the consummation of the Transactions to be avoided, or costs

or damages to be imposed, under section 363(n) of the Bankruptcy Code;

  M. No bulk sales law or any similar law of any state or other jurisdiction shall

apply in any way to the Sale. No brokers were involved in consummation of the Sale, and no

brokers' commissions are due to any Person in connection with the Sale;

  N. The Sale contemplated by the Agreement is in the best interests of the

Debtors and their estates, creditors, interest holders and all other parties in interest; and therefore:

  IT IS HEREBY ORDERED THAT:

  1. The relief requested in the Motion is GRANTED.

  2. All objections with regard to the relief sought in the Motion that have not

been withdrawn, waived, or settled, are hereby overruled on the merits.

  3. Pursuant to sections 105 and 363 of the Bankruptcy Code and subject to

the approval of the Sale by the Ontario Superior Court of Justice in the Canadian Proceedings

regarding the Canadian Debtors, the Debtors and the Purchaser are each hereby authorized to

take any and all actions necessary or appropriate to: (i) consummate the Sale of the Purchased

Assets to the Purchaser or its Designated Purchaser, as applicable, and the Closing of the Sale in

accordance with the Motion, the Transaction Agreement and this Order; and (ii) perform, consummate, implement and close fully the Transaction Agreement and the Ancillary Agreements, together with all additional instruments and documents, including but not limited to license agreements, that may be reasonably necessary or desirable to implement the Transaction Agreement.

4.      The Sale of the Purchased Assets pursuant to this Order will vest the Purchaser or its Designated Purchaser, as applicable, with all rights, title and interest of the Debtors to the Purchased Assets and will be a legal, valid and effective transfer of the Purchased Assets free and clear of all liens, claims and interests, whether known or unknown, fixed, liquidated, contingent or otherwise, including any claims held by any of the Debtors' or their affiliates' creditors, vendors, suppliers, employees, licensees, licensors, or lessors, and any other person, except as expressly provided by the Transaction Agreement or Sale Procedures.

5.      Except as expressly provided in the Transaction Agreement pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, upon the closing, the Purchased Assets shall be sold, transferred or otherwise conveyed or licensed to Purchaser, or its Designated Purchaser, as applicable, free and clear of all liens, claims and interests, with all such liens, claims and interests to attach to the proceeds of Sale of the Purchased Assets in the order of their priority, and with the same validity, priority, force and effect which they now have as against the Purchased Assets, subject to the rights, claims, defenses, and objections, if any, of the Debtors and all parties in interest with respect to such liens, claims and interests. All persons or entities holding liens, licenses, claims and interests in, to or against the Purchased Assets shall be, and they hereby are, forever barred from asserting such liens, licenses, claims and interests against the Purchaser, or its Designated Purchaser, as applicable, and their successors and assigns or

5

such Purchased Assets after closing, except as expressly provided in the Transaction Agreement and to the extent permitted by applicable law.

6.    Except as otherwise provided in the Transaction Agreement, any and all Purchased Assets in the possession or control of any person or entity, including, without limitation, any vendor, licensee, supplier or employee of the Debtors shall be transferred to the Purchaser or a Designated Purchaser, as applicable, free and clear of all liens, licenses, claims and interests and shall be delivered at the time of Closing to the Purchaser or a Designated Purchaser, as applicable.

7.    The consideration to be paid by the Purchaser, or its Designated Purchaser, as applicable, for the Purchased Assets under the Transaction Agreement and the terms and conditions thereunder constitute transfers for reasonably equivalent value and fair consideration and may not be avoided under section 363(n) of the Bankruptcy Code.

8.    This Order (a) is and shall be effective as a determination that, upon the closing, except as expressly provided in the Transaction Agreement or Sale Procedures, all licenses, liens, interests, and claims existing as to the Purchased Assets prior to the closing have been unconditionally released, discharged and terminated in each case as to the Purchased Assets and (b) shall authorize all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of fees, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities, who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments that reflect that the Purchaser or its Designated Purchaser, as applicable, is the assignee of the Purchased Assets free and clear of all licenses, liens, interests, and claims except

as expressly provided in the Transaction Agreement or Sale Procedures.

9.    Nothing in this Order shall be deemed to waive, release, extinguish or estop the Debtors or their estates from asserting or otherwise impair or diminish any right (including without limitation any right of recoupment), claim, cause of action, defense, offset or counterclaim in respect of any asset that is not an Purchased Asset.

10.    Except with respect to enforcing the terms of the Transaction Agreement, the Sale Procedures, the Sale Procedures Order and/or this Order, absent a stay pending appeal, no person shall take any action to prevent, enjoin or otherwise interfere with consummation of the transactions contemplated in or by the Transaction Agreement, the Sale Procedures or this Order.

11.    The Transaction Agreement, Sale Procedures and any related agreements, documents or other instruments may be modified, amended, or supplemented through a written document signed by the parties in accordance with the terms thereof without further order of the Court; provided, however, that any such modification, amendment or supplement is neither material nor materially changes the economic substance of the transactions contemplated hereby (it being understood, for the sake of clarity, that no such modification, amendment or supplement shall be deemed to be material or shall be deemed to materially change the economic substance of the transactions to the extent that the impact does not exceed two percent of the Purchase Price as defined in the Transaction Agreement); and provided further that no such modifications, amendments, or supplements may be made except following two (2) days written notice to, or the prior consent of, the Official Committee, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036 (Attention: Fred S. Hodara, Stephen Kuhn, and Kenneth Davis) and the counsel to the Bondholder Group, Milbank, Tweed, Hadley & McCloy, One Chase

7

Manhattan Plaza, New York, New York, 10006 (Attention: Roland Hlawaty).

12.     In the absence of a stay of the effectiveness of this Order, in the event that the Purchaser and the Debtors consummate the transactions contemplated by the Transaction Agreement at any time after entry of this Order, then with respect to the transactions approved and authorized herein, the Purchaser or its Designated Purchaser, as applicable, as arm's-length purchasers in good faith within the meaning of section 363(m) of the Bankruptcy Code, shall be entitled to all of the protections of section 363(m) of the Bankruptcy Code in the event this Order or any authorization contained herein is reversed or modified on appeal.

13.     Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Transaction Agreement and Sale Procedures.

14.     Until these cases are closed or dismissed, the Court shall retain exclusive jurisdiction, subject to the permanent jurisdiction in the Canadian Court as to the Canadian Debtors also before that court: (a) to enforce and implement the terms and provisions of the Transaction Agreement, all amendments thereto, any waivers and consents thereunder, and each of the agreements, documents and instruments executed in connection therewith; (b) to compel transfer or license of the Purchased Assets to the Purchaser or its Designated Purchaser, as applicable; (c) to compel the Purchaser to perform all of its obligations under the Transaction Agreement; (d) to resolve any disputes, controversies or claims arising out of or relating to the Transaction Agreement; and (e) to interpret, implement and enforce the provisions of this Order.

15.     The terms of this Order and the Transaction Agreement shall be binding on and inure to the benefit of the Debtors, the Purchaser and the Debtors' creditors and all other

8

parties in interest, and any successors of the Debtors, the Purchaser and the Debtors' creditors, including any trustee or examiner appointed in these cases or any subsequent or converted cases of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.

16.     The failure to include any particular provision of the Transaction Agreement in this Order shall not diminish or impair the effectiveness of that provision, it being the intent of the Court and the parties that the Transaction Agreement be approved and authorized in its entirety.

17.     Any conflict between the terms and provisions of this Order and the Transaction Agreement shall be resolved in favor of this Order.

18.     The Debtors are hereby authorized to perform each of their covenants and undertakings as provided in the Transaction Agreement prior to closing without further order of the Court.

19.     As provided by Bankruptcy Rule 7062, this Order shall be effective and enforceable immediately. The provisions of Bankruptcy Rules 6004(g) and 6006(d) staying the effectiveness of this Order for ten (10) days are hereby waived, and this Order shall be effective, and the parties may consummate the transactions contemplated by the Transaction Agreement immediately upon entry of this Order. Time is of the essence in closing the transaction and parties to the Transaction Agreement shall be authorized to close the sale as soon as possible consistent with the terms of this Order.

20.     Notwithstanding any provision in the Federal Rules of Bankruptcy Procedure to the contrary: (i) the terms of this Order shall be immediately effective and enforceable upon its entry; (ii) the Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order; and (iii) the Debtors may, in their

9

discretion and without further delay, take any action and perform any act authorized under this Order.

21.     The provisions of this Order are nonseverable and mutually dependent.

22.     The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

23.     The Purchaser shall deposit proceeds of the Sale, subject to the Purchaser's rights under the Transaction Agreement and less applicable transfer or value-added taxes incurred by the Sellers, and, to the extent agreed by the Sellers, any transaction costs, into an Escrow Account (as defined in the Interim Funding and Settlement Agreement, dated June 9, 2009 (the "IFSA")). In accordance with this Court's order approving and authorizing the transactions contemplated by the IFSA, the proceeds in the Escrow Account shall not be distributed in advance of either (a) agreement of all of the Selling Debtors as to the distribution of such proceeds (subject to the prior consent of the Committee and the Bondholder Group acting in good faith in accordance with Section 12.g. of the IFSA) or (b) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) in accordance with the terms of the Interim Sales Protocol (as such term is defined in the IFSA and subject to the requirements of Section 12.g of the IFSA), which Interim Sales Protocol shall be approved by the Court.

24.     Nothing in this Order authorizes or otherwise provides for the assumption, assignment or rejection, in whole or in part, of any supply agreement, intellectual property or license agreement, (each, an "Objecting Party Agreement") with Motorola, Inc., Oracle USA, Inc., or SNMP Research International, Inc. (each, an "Objecting Party"), including but not limited to that certain Supply, Installation and Service Agreement by and between Nortel

10

Networks, Inc. and Motorola, Inc., as amended. Nothing herein or in the Transaction Agreement

shall affect the rights of any party regarding any Objecting Party Agreement, including but not

limited to the right to proper notice of any proposed assumption, assignment, rejection or other

disposition of such Objecting Party Agreement. All of the rights of each Objecting Party are

hereby preserved, including without limitation, the right to seek, oppose or support (a) any

assumption, assignment or rejection of any Objecting Party Agreement on any legal or factual

basis, (b) adequate assurance of future performance, (c) the estimation or assertion of any

proposed cure amount, (d) the assumption by the Purchaser of all obligations and liabilities under

any Objecting Party Agreement by virtue of the assumption and assignment of the Objecting

Party Agreement under Section 365 and other applicable law, including contingent, unmatured,

or unliquidated claims and whether such claims arise or arose pre- or post-closing, and (e)

adequate assurance for payment of such contingent, unmatured, or unliquidated claims. Nothing

in this Order or the Transaction Agreement shall prejudice, estop, bar, impair or otherwise limit

in any respect any party's rights under Section 365 of the Bankruptcy Code with respect to the

Objecting Party Agreements, including, without limitation, the rights set forth above in subparts

(a) through (e).

25.    Nothing in this Order provides for the assumption and assignment of any

contract or license with Open Systems Solutions, Inc. ("OSS") pursuant to section 365 of the

Bankruptcy Code. To the extent that the Purchaser elects to have the Debtors assign to the

Purchaser any contract with OSS relating to the Purchased Assets, in whole or in part, the

Debtors and Purchaser will do so in accordance with the terms of such contract or license, which

terms include, *inter alia*, the written consent of OSS. In addition, nothing in this Order permits

or may be construed to permit Purchaser any right to access or to use or to have the right to use

11

OSS' license and/or software in connection with the Assets purchased.

Dated: October 28, 2009
      Wilmington, Delaware

                                  THE HONORABLE KEVIN GROSS
                                  UNITED STATES BANKRUPTCY JUDGE

# BLUE SHEET

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------X

|  |  |
|---|---|
| *In re* | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |
|  | **RE: D.I. 1587** |

------------------------------------------------------X

## ORDER AUTHORIZING AND APPROVING SALE OF DEBTORS' GSM/GSM-R
## FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES

Upon the motion dated September 30, 2009 (the "Motion"),[2] of Nortel Networks Inc. and

certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), for

entry of an order, as more fully described in the Motion, authorizing and approving sale of the

Debtors' right, title and interest in the GSM/GSM-R Business (the "Subject Assets") to the

Successful Bidder, free and clear of all liens, claims, and interests, pursuant to sections 105 and

363 of title 11 of the Bankruptcy Code [D.I. 1587]; and the Court having entered an order (the

"Bidding Procedures Order") approving, among other things, the Bidding Procedures (attached

as Exhibit 1 to the Bidding Procedures Order) on October 15, 2009 based upon the evidence

presented at the bidding procedures hearing held on October 15, 2009 (the "Bidding Procedures

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems, Inc. (9769), Nortel Altsystems International, Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

[2]    Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Motion, or if not defined in the Motion, shall have the meanings ascribed to such terms in the North American Purchase Agreement (as defined herein).

Hearing") [D.I. 1676]; and an Auction (as defined in the Bidding Procedures Order) having been held on November 24, 2009 in accordance with the Bidding Procedures Order; and at the conclusion of said Auction the joint bid submitted by Telefonaktiebolaget LM Ericsson (publ) ("Ericsson" or the "Purchaser") and Kapsch Carriercom AG ("Kapsch") was chosen as the Successful Bidder in accordance with the Bidding Procedures for certain of the Subject Assets; and the Debtors having filed a Notice of Successful Bid designating the Purchaser as the purchaser of the Assets (as defined in the North American Purchase Agreement referred to below) pursuant to that certain Asset Sale Agreement, dated as of November 24, 2009, a copy of which is attached hereto as Exhibit A (the "North American Purchase Agreement"), by and among the Purchaser and certain of the Debtors, certain foreign debtor affiliates and certain non-debtor affiliates (collectively, the "Sellers"); and the Court having reviewed and considered the Motion and conducted a hearing on the Motion on December 2, 2009 (the "Sale Hearing"); and all parties in interest having been heard, or having had the opportunity to be heard, regarding the North American Purchase Agreement and the transactions contemplated thereby (the "Transactions"); and the Court having reviewed and considered the Motion, and the arguments of counsel made, and the evidence adduced, at the Bidding Procedures Hearing and the Sale Hearing; and upon the record of the Bidding Procedures Hearing and the Sale Hearing and these chapter 11 cases, and after due deliberation thereon, and good cause appearing therefore it is hereby

FOUND AND DETERMINED THAT:[3]

A.     The Court has jurisdiction to hear and determine the Motion and to grant the relief requested in the Motion pursuant to 28 U.S.C. § 157(b)(1) and 1334(b);

---

[3]     Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Fed. R. Bankr. P. 7052.

B.      Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2);

C.      The statutory predicates for the relief requested in the Motion are Bankruptcy Code sections 105, 107(b)(1), 363 and 365, Bankruptcy Rules 6004, 6006, 9014 and 9018, and Local Rules 6004-1 and 9018-1;

D.      Notice of the Motion and the Sale Hearing has been provided to (A) (i) all entities reasonably known to have expressed an interest in a transaction with respect to the Purchased Assets (as defined below) during the past nine (9) months, (ii) all entities reasonably known to have asserted any interest in the Purchased Assets, (iii) the attorneys general for all states in which Purchased Assets are located, all federal and state taxing authorities, the SEC, the IRS, and the Department of Labor and similar state labor or employment agencies, (iv) all parties entitled to notice pursuant to Local Rule 2002-1(b), (v) substantially all counterparties to the Assumed and Assigned Contracts, (vi) all known or potential creditors of the Debtors and (viii) the Official Committee of Unsecured Creditors (the "Committee"); and (B) other parties through publication of the Sale Notice, all in accordance with and as provided by the Bidding Procedures Order;

E.      As evidenced by affidavit of publication filed with the Court, notice of the Sale Hearing was published in The Wall Street Journal (National Edition), The Globe and Mail (National Edition) and The Financial Times (International Edition) on October 21, 2009;

F.      Based upon the affidavits of service and publication filed with the Court: (a) notice of the Motion and the Sale Hearing was adequate and sufficient under the circumstances of these chapter 11 cases and these proceedings and complied with the various

3

applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the

Bidding Procedures Order and no other or further notice is necessary; and (b) a reasonable

opportunity to object and be heard with respect to the Motion and the relief requested therein was

afforded to all interested persons and entities;

G.      The legal and factual bases set forth in the Motion and the record in these

proceedings establish just cause for the relief requested therein, and that such relief is in the best

interests of the Debtors, their estates, their creditors and the parties in interest;

H.      The Assets (as defined in the North American Purchase Agreement)

sought to be transferred and/or assigned by the Debtors to the Purchaser pursuant to the North

American Purchase Agreement (the "Purchased Assets") are property of the Debtors' estates and

title thereto is vested in the Debtors' estates;

I.      The Debtors and their professionals marketed the Purchased Assets and

conducted the marketing and sale process as set forth in and in accordance with the Motion.

Based upon the record of these proceedings, all creditors and other parties in interest and all

prospective purchasers have been afforded a reasonable and fair opportunity to bid for the

Assets;

J.      The Bidding Procedures were substantively and procedurally fair to all

parties. The Debtors conducted the sale process (including the Auction) in accordance with the

Bidding Procedures;

K.      After the conclusion of the Auction, which was held on November 24,

2009, the Debtors, along with other Sellers under the North American Purchase Agreement and

the EMEA Agreement, determined that the highest and best Qualified Bid (as defined in the Bid

Procedures Order) for the Assets was that of the Purchaser;

4

L.    Subject to the entry of this Order, each Debtor that is a Seller (i) has full power and authority to execute the North American Purchase Agreement, the Ancillary Agreements (as defined in the North American Purchase Agreement) and all other documents contemplated thereby, (ii) has all of the power and authority necessary to consummate the Transactions contemplated by the North American Purchase Agreement and (iii) has taken all company action necessary to authorize and approve the North American Purchase Agreement, the Ancillary Agreements, the sale of the Purchased Assets (the "Sale") and the consummation by the Debtors of the Transactions. No consents or approvals, other than those expressly provided for in the North American Purchase Agreement or this Order, are required for the Debtors to close the Sale and consummate the Transactions;

M.    The North American Purchase Agreement and the Sale were negotiated and have been and are undertaken by the Debtors and the Purchaser at arm's length without collusion or fraud, and in good faith within the meaning of Bankruptcy Code section 363(m). As a result of the foregoing, the Debtors and the Purchaser are entitled to the protections of section 363(m) of the Bankruptcy Code;

N.    The total consideration provided by the Purchaser for the Purchased Assets is the highest and best offer received by the Debtors, and the Purchase Price (as defined in the North American Purchase Agreement) constitutes (a) reasonably equivalent value under the Bankruptcy Code and Uniform Fraudulent Transfer Act, (b) fair consideration under the Uniform Fraudulent Conveyance Act, and (c) reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession, or the District of Columbia, for the Purchased Assets;

O.    The Purchaser would not have entered into the North American Purchase

5

Agreement and would not consummate the Transactions if the sale of the Purchased Assets to the Purchaser was not free and clear of all liens, claims and interests pursuant to Bankruptcy Code section 363(f), or if the Purchaser would, or in the future could, be liable for any of such liens, claims and interest. A sale of the Purchased Assets other than one free and clear of all Claims and Interests (each as defined herein) would yield substantially less value for the Debtors' estates, with less certainty, than the Sale. Therefore, the Sale contemplated by the North American Purchase Agreement is in the best interests of the Debtors, their estates and creditors, and all other parties in interest;

P.      The Debtors may sell the Purchased Assets free and clear of all Interests to the extent provided in the North American Purchase Agreement because, with respect to each creditor asserting an Interest, one or more of the standards set forth in Bankruptcy Code § 363(f)(1)-(5) has been satisfied. Those holders of Interests who did not object or who withdrew their objections to the Sale or the Motion are deemed to have consented to the Motion and Sale pursuant to Bankruptcy Code § 363(f)(2). Any holders of Interests who did object fall within one or more of the other subsections of Bankruptcy Code section 363(f);

Q.      Neither the Debtors nor the Purchaser engaged in any conduct that would cause or permit the North American Purchase Agreement or the consummation of the Transactions to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code;

R.      The Purchaser is not holding itself out to the public as a continuation of the Debtors and is not an "insider" or "affiliate" of any of the Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors or stockholders existed between the Purchaser and any of the Debtors. Pursuant to the North American Purchase

6

Agreement, the Purchaser is not purchasing all of the Debtors' assets in that Purchaser is not

purchasing any of the Excluded Assets (as defined in the North American Purchase Agreement),

and Purchaser is not holding itself out to the public as a continuation of the Debtors. The

conveyance of the Purchased Assets pursuant to the Sale does not amount to a consolidation,

merger or *de facto* merger of the Purchaser and the Debtors and/or Debtors' estates, there is not

substantial continuity between the Purchaser and the Debtors, there is no continuity of enterprise

between the Debtors and the Purchaser, the Purchaser is not a mere continuation of the Debtors

or the Debtors' estates, and the Purchaser does not constitute a successor to the Debtors or the

Debtors' estates. Upon the Closing (as defined in the North American Purchase Agreement), the

Purchaser shall be deemed to have assumed only the Assumed Liabilities (as defined in the

North American Purchase Agreement). Except for the Assumed Liabilities, the Purchaser's

acquisition of the Purchased Assets shall be free and clear of any "successor liability" claims of

any nature whatsoever, whether known or unknown and whether asserted or unasserted as of the

Closing. The Purchaser's operations shall not be deemed a continuation of the Debtors' business

as a result of the acquisition of the Purchased Assets purchased. The Court finds that the

Purchaser would not have acquired the Purchased Assets but for the foregoing protections

against potential claims based upon "successor liability" theories;

   S. The Debtors have demonstrated that it is an exercise of their sound

business judgment to assume and assign the Assumed and Assigned Contracts to the Purchaser

(or a Designated Purchaser) and to assume the Assumed and Subleased Real Estate Leases and

Assumed and Licensed Real Estate Leases and sublease or license, as appropriate, same to the

Purchaser (or a Designated Purchaser), in each case, in connection with the consummation of the

Sale and the assumption, assignment, and sale of Assumed and Assigned Contracts to the

Purchaser and the assumption and sublease or license, as appropriate, the Assumed and

Subleased Real Estate Leases and Assumed and Licensed Real Estate Leases to the Purchaser (or

a Designated Purchaser) is in the best interests of the Debtors, their estates, their creditors, and

all parties in interest. The Assumed and Assigned Contracts being assigned to the Purchaser are

an integral part of the Purchased Assets being purchased by the Purchaser, and accordingly, such

assumption, assignment, and sale of the Assumed and Assigned Contracts is reasonable and

enhances the value of the Debtors' estates. The cure amounts required to be paid pursuant to

section 365(b) that are mutually agreed to be paid by the Debtors and/or the Purchaser, as

applicable, and the counterparty to the applicable Assumed and Assigned Contract, the Assumed

and Subleased Real Estate Lease or Assumed and Licensed Real Estate Lease or as ordered to be

paid by this Court pursuant to a final order (the "Cure Amounts") are deemed the entire cure

obligation due and owing under the Assumed and Assigned Contracts under Bankruptcy Code

section 365;

      T.     Each and every provision of the Assumed and Assigned Contracts, the

Assumed and Subleased Real Estate Leases or Assumed and Licensed Real Estate Leases or

applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be

construed as prohibiting, restricting, or conditioning assignment of any Assumed and Assigned

Contract, Assumed and Subleased Real Estate Lease or Assumed and Licensed Real Estate Lease

has been satisfied or is otherwise unenforceable under Bankruptcy Code section 365;

      U.     Upon the payment of the Cure Amount, there are no outstanding defaults

of the Debtors and their estates under the Assumed and Assigned Contracts, the Assumed and

Subleased Real Estate Leases or Assumed and Licensed Real Estate Leases;

      V.     The Purchaser has demonstrated adequate assurance of future performance

8

of all Assumed and Assigned Contracts within the meaning of Bankruptcy Code section 365;

W.      Upon the assignment and sale to the Purchaser, the Assumed and Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Order;

X.      Entry into the North American Purchase Agreement and consummation of the Transactions constitute the exercise by the Debtors of sound business judgment, and such acts are in the best interests of the Debtors, their estates and creditors, and all parties in interest. The Court finds that the Debtors have articulated good and sufficient business reasons justifying the Sale of the Purchased Assets to the Purchaser. Additionally, (i) the North American Purchase Agreement constitutes the highest and best offer for the Purchased Assets; (ii) the North American Purchase Agreement and the closing thereon will present the best opportunity to realize the value of the Purchased Assets and avoid further decline and devaluation of the Purchased Assets; (iii) there is risk of deterioration of the value of the Purchased Assets if the Sale is not consummated promptly; and (iv) the North American Purchase Agreement and the closing thereon will provide a greater recovery for the Debtors' creditors than would be provided by any other presently available alternative.

Y.      The transfer of the Purchased Assets to the Purchaser will be a legal, valid and effective transfer of the Purchased Assets, and will vest the Purchaser with all of the Debtors' right, title and interest of, in and to the Purchased Assets, free and clear of (i) all Claims and Interests of any kind or nature whatsoever (other than the Assumed Liabilities and the Permitted Encumbrances (as defined in the North American Purchase Agreement)), and (ii) all Excluded Liabilities (as defined in the North American Purchase Agreement), claims as defined in 11 U.S.C. § 101(5), rights or causes of action (whether in law or in equity), obligations,

9

demands, restrictions, interests and matters of any kind or nature whatsoever, whether arising prior to or subsequent to the commencement of these cases, and whether imposed by agreement, understanding, law, equity or otherwise , including any "Claims" as defined in the North American Purchase Agreement (collectively, the "Claims"), other than the Assumed Liabilities and the Permitted Encumbrances;

Z.    The Sale does not constitute a *sub rosa* chapter 11 plan;

AA.    Time is of the essence in consummating the Sale. In order to maximize the value of the Debtors' assets, it is essential that the sale of the Purchased Assets occur within the time constraints set forth in the North American Purchase Agreement. Accordingly, there is a cause to lift the stay contemplated by the Bankruptcy Rules 6004(h) and 6006(d);

BB.    The Sale contemplated by the North American Purchase Agreement is in the best interests of the Debtors and their estates, creditors, interest holders and all other parties in interest; and

THEREFORE, IT IS HEREBY ORDERED THAT:

1.    The relief requested in the Motion is GRANTED.

2.    All objections with regard to the relief sought in the Motion that have not been withdrawn, waived, settled or otherwise dealt with as expressly provided herein, are hereby overruled on the merits.

3.    Pursuant to sections 105 and 363 of the Bankruptcy Code and subject to the approval of the sale by the Ontario Superior Court of Justice in the Canadian Proceedings regarding the Canadian Debtors and the satisfaction (or waiver, if permitted under the North American Purchase Agreement) of each condition under the North American Purchase Agreement, (a) the North American Purchase Agreement and the Ancillary Agreements, (b) the

10

Sale of the Purchased Assets, and (c) consummation of the Transactions are hereby approved and authorized.

4.     Pursuant to section 365 of the Bankruptcy Code, notwithstanding any provision of any Assumed and Assigned Contracts or applicable non-bankruptcy law that prohibits, restricts, or conditions the assignment of the Assumed and Assigned Contracts, under section 365 of the Bankruptcy Code, to the extent not already assumed, the Debtors are authorized to assume the Assumed and Assigned Contracts and to assume and assign the Assumed and Assigned Contracts to the Purchaser, which assignment shall take place on and be effective as of the Closing.

5.     To the extent not already assumed, the Debtors' assumption of the Assumed and Assigned Contracts is subject to Court approval and consummation of the sale of the Assets to the Purchaser, and, solely as it relates to the Assumed and Subleased Real Estate Leases and Assumed and Licensed Real Estate Leases, the Debtors' and the Purchaser's entry into subleases and licenses, as appropriate, as set forth in the North American Purchase Agreement. To the extent that an objection by a Counterparty to any Assumed and Assigned Contract is not resolved prior to the Closing Date (as defined in the North American Purchase Agreement) or the Debtors and the Purchaser have failed to enter into a sublease or license with respect to any Assumed and Subleased Real Estate Lease or Assumed and Licensed Real Estate Lease, the Debtors, in consultation with the Purchaser, but subject in all respects to the terms and conditions of the North American Purchase Agreement, may elect to (i) not assume such Assumed and Assigned Contract, (ii) postpone the assumption of such Assumed and Assigned Contract until the resolution of such objection or (iii) if the dispute relates solely to the amount of the Cure Amount, at the time of the assumption, subject to the sharing provisions in section

11

2.1.7 of the North American Purchase Agreement with respect to Cure Amounts, Debtors or

Purchaser in accordance with the terms of the North American Purchase Agreement shall pay to

the Counterparty any undisputed portion of the proposed Cure Amount and place any disputed

portion into a segregated interest-bearing account such that, upon any resolution by the Court of

the Cure Amount dispute, or other agreement between the Debtors and the Counterparty, the

Counterparty will be entitled to payment from the segregated account of any disputed portion

and interest earned thereon to which the Court finds, or the Debtors and Counterparty agree, it is

entitled. Any Cure Amounts outstanding on the Closing Date shall be paid to the appropriate

Counterparty as a condition subsequent to such assumption and assignment of the relevant

Assumed and Assigned Contract.

    6.  Upon the Closing, (a) the Debtors are hereby authorized and directed to

consummate, and shall be deemed for all purposes to have consummated, the sale, transfer and

assignment of the Purchased Assets to the Purchaser free and clear of any and all interests

pursuant to section 363 of the Bankruptcy Code, including (without limitation) all liens,

including any lien (statutory or otherwise), mortgage, pledge, security interest, charge, right of

first refusal, hypothecation, encumbrance on real property, easement, encroachment, right-of-

way, restrictive covenant on real property, real property license, lease or conditional sale

arrangement (collectively, including "Liens" as defined in the North American Purchase

Agreement, the "Liens") and debts, liabilities and obligations, whether accrued or fixed, direct or

indirect, liquidated or unliquidated, absolute or contingent, matured or unmatured or determined

or undeterminable, known or unknown, including those arising under any Law or Action and

those arising under any Contract or otherwise, including any Tax liability (other than Assumed

Liabilities and the Permitted Encumbrances) (collectively, the "Liabilities" and together with the

Liens, the "Interests"), with such Interests to attach to the sale proceeds in the same validity,

extent and priority as immediately prior to the sale transactions, subject to any rights, claims and

defenses of the Debtors and other parties in interest, and (b) except as otherwise expressly

provided in the North American Purchase Agreement, all such Interests (other than Assumed

Liabilities and the Permitted Encumbrances) shall be and hereby are released, terminated and

discharged as to the Purchaser and the Purchased Assets.

      7.     The transfer of the Purchased Assets to the Purchaser pursuant to the

Agreement shall be, and hereby is deemed to be, a legal, valid and effective transfer of the

Purchased Assets, and vests with or will vest in the Purchaser all right, title and interest of the

Debtors in the Purchased Assets, free and clear of all Claims and Interests of any kind or nature

whatsoever (other than the Permitted Encumbrances and the Assumed Liabilities), with any

Interests attaching to the sale proceeds in the same validity, extent and priority as immediately

prior to the transaction, subject to any rights, claims and defenses of the Debtors and other

parties in interest.

      8.     Upon the Closing, and except as otherwise expressly provided in the North

American Purchase Agreement, the Purchaser shall not be liable for any claims against, and

Liabilities and obligations of, the Debtors or any of the Debtors' predecessors or affiliates.

Without limiting the generality of the foregoing, and except as otherwise provided in the North

American Purchase Agreement, (a) the Purchaser shall have no liability or obligation to pay

wages, bonuses, severance pay, benefits (including, without limitation, contributions or

payments on account of any under-funding with respect to any pension plans) or make any other

payment to employees of the Debtors, (b) the Purchaser shall have no liability or obligation in

respect of any employee pension plan, employee health plan, employee retention program,

13

employee incentive program or any other similar agreement, plan or program to which any

Debtors are a party (including, without limitation, liabilities or obligations arising from or related

to the rejection or other termination of any such plan, program agreement or benefit), (c) the

Purchaser shall in no way be deemed a party to or assignee of any such employee benefit,

agreement, plan or program, and (d) all parties to any such employee benefit, agreement, plan or

program are enjoined from asserting against the Purchaser any Claims arising from or relating to

such employee benefit, agreement, plan or program.

9.    As of the Closing, subject to the provisions of this Order, the Purchaser

shall succeed to the entirety of Debtors' rights and obligations in the Assumed and Assigned

Contracts first arising and attributable to the time period occurring on or after the Closing and

shall have all rights thereunder.

10.    Upon the entry of this Order, (i) all defaults (monetary and non-monetary)

under the Assumed and Assigned Contracts through the Closing shall be deemed cured through

the payment of the Cure Amounts; (ii) no other amounts will be owed by the Debtors, their

estates or the Purchaser with respect to amounts first arising or accruing during, or attributable or

related to, the period before Closing with respect to the Assumed and Assigned Contracts, (iii)

any and all persons or entities shall be forever barred and estopped from asserting a claim against

the Debtors, their estates, or the Purchaser that any additional amounts are due or defaults exist

under the Assumed and Assigned Contracts that arose or accrued, or relate to or are attributable

to the period before the Closing.

11.    Pursuant to section 365(f) of the Bankruptcy Code, notwithstanding any

provision to the contrary in the Assumed and Assigned Contracts, or in applicable non-

bankruptcy law, that prohibits, restricts, or conditions the assignment of the Assumed and

14

Assigned Contracts, the Debtors may assign the Assumed and Assigned Contracts to the

Purchaser. Upon assumption of the Assumed and Assigned Contracts by the Debtors and

assignment to the Purchaser, the Assumed and Assigned Contracts shall be deemed valid and

binding, in full force and effect in accordance with their terms, subject to the provisions of this

Order.

            12.      Pursuant to section 365(f) of the Bankruptcy Code, notwithstanding any

provision to the contrary in any of the Assumed and Subleased Real Estate Leases and Assumed

and Licensed Real Estate Leases or in applicable non-bankruptcy law that prohibits, restricts or

conditions the assumption and sublease or license of same, the Debtors may assume the

Assumed and Subleased Real Estate Leases and Assumed and Licensed Real Estate Leases and

sublease or license same to the Purchaser. Upon the assumption of the Assumed and Subleased

Real Estate Leases and Assumed and Licensed Real Estate Leases and the sublease or license of

same to the Purchaser, the Assumed and Subleased Real Estate Leases and Assumed and

Licensed Real Estate Leases shall be deemed valid and binding, in full force and effect in

accordance with their terms, subject to the provisions of this Order.

            13.      The Transactions have been undertaken by the Purchaser in good faith and

the Purchaser is a good faith purchaser of the Purchased Assets as that term is used in

Bankruptcy Code section 363(m). The Purchaser is entitled to all of the protections afforded by

section 363(m) of the Bankruptcy Code.

            14.      Pursuant to sections 105 and 363 of the Bankruptcy Code and subject to

the approval of the sale by the Ontario Superior Court of Justice in the Canadian Proceedings

regarding the Canadian Debtors and the satisfaction (or waiver, if permitted under the North

American Purchase Agreement) of each condition under the North American Purchase

15

Agreement, the Debtors and the Purchaser are each hereby authorized to take any and all actions necessary or appropriate to: (i) consummate the Sale of the Purchased Assets to the Purchaser and the Closing of the Sale in accordance with the Motion, the Agreement and this Order; (ii) assume and assign the Assumed and Assigned Contracts; (iii) assume and sublease or license, as applicable, the Assumed and Sublease Real Estate Leases and Assumed and Licensed Real Estate Leases and (iv) perform, consummate, implement and close fully the North American Purchase Agreement together with all additional instruments and documents that may be reasonably necessary or desirable to implement the North American Purchase Agreement.

15.    The Debtors and the Purchaser are each hereby authorized to take any and all actions necessary or appropriate to: (i) consummate the Sale of the Purchased Assets to the Purchaser and the Closing of the Sale in accordance with the Motion, the North American Purchase Agreement and this Order; and (ii) perform, consummate, implement and close fully the North American Purchase Agreement together with all additional instruments and documents that may be reasonably necessary or desirable to implement the North American Purchase Agreement.

16.    The Purchaser is hereby authorized in connection with the consummation of the Sale to allocate the Purchased Assets, including the Assumed and Assigned Contracts, among its affiliates, designees, assignees, and/or successors, including any Designated Purchaser (as defined in the North American Purchase Agreement), in a manner as it in its sole discretion deems appropriate and to assign, license, sublicense, transfer or otherwise dispose of any of the Purchased Assets, including the Assumed and Assigned Contracts, to its affiliates, designees, assignees, and/or successors with all of the rights and protections accorded to the Purchaser under this Order and the North American Purchase Agreement, and the Debtors shall cooperate

16

with and take all actions reasonably requested by the Purchaser to effectuate any of the foregoing; provided, however, subject to the terms of the North American Purchase Agreement, the Debtors shall be reimbursed by the Purchaser for any reasonable expenses in connection therewith.

17.     No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Sale and the Transactions. Except as provided in the North American Purchase Agreement, no brokers were involved in consummation of the Sale or the Transactions, and no brokers' commissions are due to any Person in connection with the Sale or the Transactions.

18.     The consideration provided by the Purchaser for the Purchased Assets under the Agreement shall be deemed for all purposes to constitute value and fair consideration under the Bankruptcy Code and any other applicable law, and the Sale may not be avoided, or costs or damages imposed or awarded, under section 363(n) or any other provision, of the Bankruptcy Code.

19.     On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of all of the Purchased Assets or a bill of sale transferring good and marketable title in such Purchased Assets to the Purchaser on the Closing Date pursuant to the terms of the Agreement, free and clear of all Liens, Claims and Interests (other than Assumed Liabilities and the Permitted Encumbrances).

20.     Except as otherwise provided in the North American Purchase Agreement and to the extent permitted by applicable law, any and all Purchased Assets in the possession or control of any person or entity, including, without limitation, any vendor, supplier or employee

17

of the Debtors shall be transferred to the Purchaser free and clear of all Liens, Claims and Interests (other than Assumed Liabilities and the Permitted Encumbrances) and shall be delivered at the time of Closing to the Purchaser.

21.      Upon the Closing, all creditors, employees and equity holders of the Debtors are permanently and forever barred, restrained and enjoined from asserting any Liens, Claims or Interests or enforcing remedies, or commencing or continuing in any manner any action or other proceeding of any kind, against the Purchaser or the Purchased Assets on account of any of the Liens, Claims, Interests, Excluded Liabilities or Excluded Assets (other than Assumed Liabilities and Permitted Encumbrances).

22.      The Transactions do not amount to a consolidation, merger or *de facto* merger of the Purchaser and the Debtors and/or the Debtors' estates, there is not substantial continuity between the Purchaser and the Debtors, there is no continuity of enterprise between the Debtors and the Purchaser, the Purchaser is not a mere continuation of the Debtors or the Debtors' estates, and the Purchaser does not constitute a successor to the Debtor or the Debtors' estates. Upon the Closing, the Purchaser shall be deemed to have assumed only the Assumed Liabilities. Except for the Assumed Liabilities and Permitted Encumbrances, the Purchaser's acquisition of the Purchased Assets shall be free and clear of any "successor liability" claims of any nature whatsoever, whether known or unknown and whether asserted or unasserted as of the time of Closing. The Purchaser's operations shall not be deemed a continuation of the Debtors' business as a result of the acquisition of the Assets purchased.

23.      This Order (a) is and shall be effective as a determination that other than the Permitted Encumbrances and Assumed Liabilities, all Liens, Claims and Interests of any kind or nature whatsoever existing as to the Purchased Assets prior to the Closing have been

18

unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (b) is and shall be binding upon and shall authorize all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state, and local officials, and all other persons and entities, who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Purchased Assets conveyed to the Purchaser. All such entities described above in this paragraph are authorized and specifically directed to strike all recorded Interests against the Purchased Assets from their records, official and otherwise.

24.    If any person or entity which has filed statements or other documents or agreements evidencing Liens on, or Interests in, the Purchased Assets shall not have delivered to the Debtors before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Liens which the person or entity has or may assert with respect to the Purchased Assets, the Debtors and the Purchaser are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Purchased Assets.

25.    All counterparties to the Assumed and Assigned Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable requests of the Purchaser, and shall not charge the Purchaser for, any instruments, applications, consents, or other documents which may be required or requested by any public or quasi-public authority or other party or entity to

19

effectuate the applicable transfers in connection with the Transactions.

26.     Each and every federal, state and governmental agency or department, and any other person or entity, is hereby authorized to accept any and all documents and instruments in connection with or necessary to consummate the Transactions contemplated by the Agreement.

27.     No governmental unit may revoke or suspend any right, license, trademark or other permission relating to the use of the Purchased Assets sold, transferred or conveyed to the Purchaser on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale.

28.     To the extent this Order is inconsistent with any prior order or pleading with respect to the Motion in these chapter 11 cases, the terms of this Order shall govern.  To the extent there is any inconsistency between the terms of this Order and the terms of the North American Purchase Agreement (including all ancillary documents executed in connection therewith), the terms of the Order shall govern.

29.     This Order applies only to assets owned by the Debtors.  Consequently, notwithstanding any other provision of this Order or the North American Purchase Agreement to the contrary, the portions of this Order that approve the transfer of assets to the Purchaser free and clear of all liens and other encumbrances, or that modify, enjoin, release or otherwise limit the rights of creditors of entities transferring assets, apply only to assets owned by the Debtors and do not apply to any assets owned by non-debtor entities except to the extent otherwise agreed by such creditor in writing.

30.     Except as expressly provided in the North American Purchase Agreement or the Ancillary Agreements, nothing in this Order shall be deemed to waive, release, extinguish

20

or estop the Debtors or their estates from asserting or otherwise impair or diminish any right

(including, without limitation, any right of recoupment), claim, cause of action, defense, offset or

counterclaim in respect of any asset that is not a Purchased Asset.

31.     Any amounts that become payable by the Debtors to the Purchaser

pursuant to the North American Purchase Agreement or any of the documents delivered by the

Debtors pursuant to or in connection with the North American Purchase Agreement shall (a)

constitute administrative expenses of the Debtors' estates within the meaning of section 503(b)

of the Bankruptcy Code, and (b) be paid by the Debtors in the time and manner as provided in

the North American Purchase Agreement without further order of this Court.

32.     This Order shall not be modified by any chapter 11 plan confirmed in

these chapter 11 cases or subsequent order of this Court unless expressly consented to in writing

by the Purchaser.

33.     This Order and the North American Purchase Agreement shall be binding

in all respects upon and inure to the benefit of the Debtors, the Purchaser, and all creditors and

interest holders of any of the Debtors, all non-debtor parties to the Assumed and Assigned

Contracts, the Committee, all successors and assigns of the Debtors and their affiliates and

subsidiaries, and any trustees, examiners, "responsible persons" or other fiduciaries appointed in

the Debtors' bankruptcy chapter 11 cases or upon a conversion to chapter 7 under the

Bankruptcy Code, and the North American Purchase Agreement shall not be subject to rejection

or avoidance under any circumstances.

34.     Except with respect to enforcing the terms of the North American

Purchase Agreement, the Bidding Procedures, the Bidding Procedures Order and/or this Order,

absent a stay pending appeal, no person shall take any action to prevent, enjoin or otherwise

interfere with consummation of the transactions contemplated in or by the North American Purchase Agreement, the Bidding Procedures or this Order to the maximum extent permitted by law.

35.    The failure specifically to include or make reference to any particular provisions of the North American Purchase Agreement or any Ancillary Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the North American Purchase Agreement and the Ancillary Agreements are authorized and approved in their entirety.

36.    Subject to Section 10.6 of the North American Purchase Agreement, until these cases are closed or dismissed, the Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

37.    The North American Purchase Agreement, Ancillary Agreements and any related agreements, documents or other instruments may be modified, amended, or supplemented through a written document signed by the parties in accordance with the terms thereof without further order of the Court; *provided, however*, that any such modification, amendment or supplement is neither material nor materially changes the economic substance of the transactions contemplated hereby (it being understood, for the sake of clarity, that no such modification, amendment or supplement shall be deemed to be material or shall be deemed to materially change the economic substance of the transactions to the extent that the impact does not exceed two percent of the Purchase Price (as defined in the North American Purchase Agreement)); and *provided further* that no such modifications, amendments, or supplements may be made except following two (2) days written notice to, or with the prior consent of, the Official Committee, c/o Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036 (Attention:

22

Fred S. Hodara, Stephen Kuhn, and Kenneth Davis).

    38.    The Debtors are hereby authorized to perform each of their covenants and undertakings as provided in the North American Purchase Agreement prior to or after closing without further order of the Court.

    39.    Nothing in this Order authorizes or otherwise provides for the assumption, assignment or rejection, in whole or in part, of any Objecting Party Agreement. Other than the rights and obligations between the parties to the North American Purchase Agreement, nothing herein or in the North American Purchase Agreement shall affect the rights of any party to an Objecting Party Agreement, all of which rights are hereby preserved, including, without limitation, the right of any Objecting Party to seek, oppose or support (a) any assumption, assignment or rejection of an Objecting Party Agreement on any legal or factual basis, (b) adequate assurance of future performance, (c) the estimation or assertion of any proposed cure amounts, (d) the assumption by the Purchaser of all obligations and liabilities under any Objection Party Agreement by virtue of the assumption and assignment of the Objecting Party Agreement under Section 365 and other applicable law, including, to the extent applicable, contingent, unmatured, or unliquidated claims, warranties, non-cash incentives, credits, indemnifications, requests to provide product support and maintenance services, and whether such arise or arose pre- or post-closing, (e) adequate assurance for payment of such obligations and liabilities, and (f) any right to challenge any rejection of or to preserve the intellectual property rights provided by a license under which the Debtors are licensors, whether pursuant to 11 U.S.C. section 365(n) or otherwise. For purposes of this Order, "Objecting Party Agreement" means any written contract, agreement, license or other document that creates binding contractual obligations between an Objecting Party and one or more of the Debtors; "Objecting

Party" means AT&T Corp. and its subsidiaries and affiliates, SNMP Research International, Inc.,

OSS Nokalva, Inc., Oracle USA, Inc. and its affiliates, and Motorola, Inc. ("Motorola").

Nothing in this Order or the North American Purchase Agreement shall prejudice, estop, bar,

impair or otherwise limit in any respect any party's rights under Section 365 of the Bankruptcy

Code with respect to the Objecting Party Agreements, including, without limitation, the rights set

forth above in subparts (a) through (f).

      40.    The Objection of Motorola to Debtors' Motion for Orders (I)(A)

Authorizing and Approving the Bidding Procedures, (B) Approving the Notice Procedures, and

(C) Setting a Date for the Sale Hearing, and (II) Authorizing and Approving the Sale of Certain

Assets of Debtors' GSM/GSM-R Business [D.I. 2005] (the "Motorola Objection") shall be

deemed to constitute a timely and properly served objection on the basis of the arguments set

forth in the Motorola Objection to the service of any Customer Notice (as defined in the Debtors'

Motion for an Order (A) Approving the Assumption and Assignment Procedures in Connection

with the Sale of Nortel's GSM/GSM-R Business and (B) Authorizing the Filing of Certain

Documents Under Seal [D.I. 2022]) on Motorola.

      41.    As provided by Bankruptcy Rule 7062, this Order shall be effective and

enforceable immediately upon entry. The provisions of Bankruptcy Rules 6004(g) and 6006(d)

staying the effectiveness of this Order for ten (10) days are hereby waived, and this Order shall

be effective, and the parties may consummate the transactions contemplated by the North

American Purchase Agreement immediately upon entry of this Order. Time is of the essence in

closing the transaction and parties to the North American Purchase Agreement shall be

authorized to close the sale as soon as possible consistent with the terms of this Order.

      42.    Notwithstanding any provision in the Bankruptcy Rules or Local Rules to

24

the contrary: (i) the terms of this Order shall be immediately effective and enforceable upon its entry; (ii) the Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order; and (iii) the Debtors may, in their discretion and without further delay, take any action and perform any act authorized under this Order.

   43. The provisions of this Order are nonseverable and mutually dependent.

   44. The Purchaser shall deposit proceeds of the Sale, subject to the entry into definitive documentation memorializing the agreement in principle set forth in the TSA term sheet among Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc., Nortel Networks UK Limited, and Nortel Networks (Ireland) Limited, dated November 24, 2009, and, subject to the price adjustments and Purchaser's rights under the North American Purchase Agreement and less applicable transfer or value-added taxes incurred by the Main Sellers (as such term is defined in the North American Purchase Agreement) and the Other Sellers (as such term is defined in the North American Purchase Agreement) party to the North American Purchase Agreement, and, to the extent agreed by the Sellers, any transaction costs, into an Escrow Account (as defined in the Interim Funding and Settlement Agreement, dated June 9, 2009 (the "IFA")). In accordance with this Court's order approving and authorizing the transactions contemplated by the IFA, the proceeds in the Escrow Account shall not be distributed in advance of either (a) agreement of all of the Selling Debtors (as defined in the IFA) as to the distribution of such proceeds (subject to the prior consent of the Committee and the Bondholder Group acting in good faith in accordance with Section 12.g. of the IFA) or (b) in the case where the Selling Debtors (as defined in the IFA) fail to reach agreement, determination by the relevant dispute resolver(s) in accordance with the terms of the Interim Sales Protocol (as such term is defined in the IFA and subject to the requirements of Section 12.g of the IFA),

which Interim Sales Protocol shall be approved by the Court.  The Debtors are hereby authorized to enter into an escrow agreement, on terms and conditions reasonably satisfactory to the Committee and the Monitor acting in good faith, with an escrow agent to establish an Escrow Account without further order of this Court.

Dated: ~~December 2~~, 2009
    Wilmington, Delaware

_____
THE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE

# BLUE SHEET

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------X
                                                      :
                                                      :    Chapter 11
*In re*                                               :
                                                      :    Case No. 09-10138 (KG)
Nortel Networks Inc., *et al.*,[1]                    :
                                                      :    Jointly Administered
                        Debtors.                      :
                                                      :    **RE: D.I. 1627**
                                                      :
-------------------------------------------------------X

### ORDER AUTHORIZING AND APPROVING (A) SALE OF CERTAIN ASSETS OF THE DEBTORS' METRO ETHERNET NETWORKS BUSINESS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES AND (B) ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS

Upon the motion [D.I. 1627] (the "Motion")[2] of Nortel Networks Inc. ("NNI") and its

affiliated debtors, as debtors and debtors in possession (collectively, the "Debtors"), for entry of

orders under Bankruptcy Code sections 105, 107(b)(1), 363 and 365, Bankruptcy Rules 2002,

6004, 6006, 9014 and 9018 and Local Rules 6004-1 and 9018-1 (I)(A) authorizing Debtors'

entry into that certain asset sale agreement dated as of October 7, 2009, among Nortel Networks

Corporation ("NNC"), Nortel Networks Limited ("NNL"), NNI and certain other entities

identified therein as Sellers (the "Sellers") and Ciena Corporation as purchaser ("Ciena," or the

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.
[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion, or if not defined in the Motion, shall have the meanings ascribed to such terms in the Sale Agreement (as defined herein).

"Stalking Horse Purchaser") for the sale of certain assets of the Sellers' Metro Ethernet

Networks Business as described therein (the "Purchased Assets") as a "stalking-horse" purchase

agreement (as appended to the Motion as Exhibit A, the "Stalking Horse Agreement"), (B)

authorizing and approving the bidding procedures (as appended to the Bidding Procedures Order

(as defined below), the "Bidding Procedures"), (C) authorizing and approving the terms and

conditions of the Break-Up Fee and Expense Reimbursement (as each is defined in the Stalking

Horse Agreement), (D) approving the form and manner of sale and publication notices (the

"Notice Procedures"), (E) approving the Assumption and Assignment Procedures as set forth in

the Motion for the assumption and assignment of certain executory contracts (the "Assumed and

Assigned Contracts," and together with the "Purchased Assets", the "Assets"), (F) authorizing

the Debtors to file certain documents under seal, and (G) setting the time, date and place for a

hearing to consider the sale of the Purchased Assets and the assumption and assignment of the

Assumed and Assigned Contracts (the "Sale Hearing"); (II) authorizing and approving (A) the

sale of the Assets free and clear of all liens, claims and encumbrances, and (B) the assumption

and assignment of the Assumed and Assigned Contracts; and (III) granting such other and further

relief as the Court deems just and proper; and the Court having entered an order approving,

among other things, the Bidding Procedures (the "Bidding Procedures Order") [D.I. 1685] based

upon the evidence presented at the hearing held on October 15, 2009 (the "Bidding Procedures

Hearing"); and the Auction (as defined below) having been held in accordance with the Bidding

Procedures Order; and at the conclusion of said Auction Ciena having been chosen as the

Successful Bidder in accordance with the Bidding Procedures (the "Purchaser"); and the Court

having conducted the Sale Hearing on December 2, 2009; and all parties in interest having been

heard or having had the opportunity to be heard regarding the asset sale agreement attached

2

hereto as Exhibit A (the "Sale Agreement"), by and among the Sellers and the Purchaser; and the

Court having reviewed and considered the Motion, and the arguments of counsel made and the

evidence adduced at the Bidding Procedures Hearing and the Sale Hearing; and upon the record

of the Bidding Procedures Hearing and the Sale Hearing and these chapter 11 cases, and after

due deliberation thereon, and good cause appearing therefor, it is hereby

### FOUND AND DETERMINED THAT:[3]

A.    Jurisdiction. The Court has jurisdiction to hear and determine the Motion and to

grant the relief requested in the Motion pursuant to 28 U.S.C. § 157(b)(1) and 1334(b).

B.    Venue. Venue of these cases and the Motion in this district is proper under 28

U.S.C. §§ 1408 and 1409. This is a core proceeding within the meaning of 28 U.S.C. §

157(b)(2).

C.    Statutory Predicates. The statutory and legal predicates for the relief requested in

the Motion are Bankruptcy Code sections 105, 107(b)(1), 363 and 365, Bankruptcy Rules 2002,

6004, 6006, 9014 and 9018, and Local Rules 6004-1 and 9018-1.

D.    Notice. Notice of the Motion and the Sale Hearing has been provided to (A) (i)

all entities reasonably known to have expressed an interest in a transaction with respect to the

Assets during the past nine (9) months, (ii) all entities reasonably known to have asserted any

claim, lien, interest or encumbrance against the Debtors' right, title and interest in the Assets,

(iii) the attorneys general for all states in which Purchased Assets owned by the Debtors are

located, all federal and state taxing authorities including, without limitation, the SEC, the EPA,

state environmental protection agencies, the IRS, and the Department of Labor and similar state

labor or employment agencies, (iv) all counterparties to the Assumed and Assigned Contracts,

---

[3]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact to the fullest extent of the law. See Fed. R. Bankr. P. 7052.

(v) all known or potential creditors of the Debtors, and (vi) the general service list established in these chapter 11 cases pursuant to Bankruptcy Rule 2002 and Local Rule 2002-1, including, but not limited to, the Official Committee of Unsecured Creditors (the "Committee"); and (B) other parties through publication of the Publication Notice (as defined in the Motion), all in accordance with and as provided by the Bidding Procedures Order. As evidenced by affidavits of publication filed with the Court [D.I.'s 1774, 1775, 1777], the Publication Notice was published in The Wall Street Journal (National Edition), The Globe and Mail (National Edition), and The Financial Times (International Edition) on October 29, 2009.

  E. Notice Sufficient. Based upon the affidavits of service and publication filed with the Court [D.I. 1747, 1774, 1775, 1777]: (a) notice of the Motion and the Sale Hearing was adequate and sufficient under the circumstances of these chapter 11 cases and these proceedings and complied with the various applicable requirements of the Bankruptcy Code, the Bankruptcy Rules and the Bidding Procedures Order; and (b) a reasonable opportunity to object and be heard with respect to the Motion and the relief requested therein was afforded to all interested persons and entities.

  F. Assets Property of the Estates. The Assets sought to be transferred and/or assigned by the Debtors to the Purchaser pursuant to the Sale Agreement are property of the Debtors' estates and title thereto is vested in the Debtors' estates.

  G. Sufficiency of Marketing. The Debtors and their professionals marketed the Assets and conducted the marketing and sale process as set forth in and in accordance with the Motion. Based upon the record of these proceedings, all creditors and other parties in interest and all prospective purchasers have been afforded a reasonable and fair opportunity to bid for the Assets.

4

H.    Stalking Horse Agreement. On October 7, 2009, the Debtors entered into the Stalking Horse Agreement subject to higher and better offers. Simultaneously with the execution of the Stalking Horse Agreement, the EMEA Sellers, the Joint Administrators, the Joint Israeli Administrators and the Purchaser entered into a separate agreement (the "EMEA Asset Sale Agreement") providing for the sale to the Purchaser of the EMEA Assets (as defined in the EMEA Asset Sale Agreement).

I.    Bidding Procedures. The Bidding Procedures were substantively and procedurally fair to all parties and all potential bidders. The Debtors conducted the sale process (including the Auction, as defined below) without collusion and in accordance with the Bidding Procedures.

J.    Auction. After the conclusion of the auction held from November 20, 2009 until November 24, 2009 (the "Auction"), the Debtors determined in a valid and sound exercise of their business judgment that the highest and best Qualified Bid (as defined in the Bidding Procedures Order) was that of the Purchaser and the next highest and best Qualified Bid (the "Alternate Bid") was that of MEN Acquisition LLC (the "Alternate Bidder").

K.    Corporate Authority. Subject to the entry of this Order, each Debtor that is a Seller (i) has full power and authority to execute the Sale Agreement, the Ancillary Agreements (as defined in the Sale Agreement) and all other documents contemplated thereby, (ii) has all of the power and authority necessary to consummate the transactions contemplated by the Sale Agreement, and (iii) has taken all company action necessary to authorize and approve the Sale Agreement, the Ancillary Agreements, the sale of the Assets (the "Sale"), and any actions required to be performed by the Debtors in order to consummate the transactions contemplated in

5

the Sale Agreement. No consents or approvals, other than those expressly provided for in the Sale Agreement or this Order, are required for the Debtors to consummate the Sale.

L.    Arms'-Length Sale. The Sale Agreement and the Ancillary Agreements were negotiated and have been and are undertaken by the Debtors and the Purchaser at arms' length without collusion or fraud, and in good faith within the meaning of Bankruptcy Code section 363(m). As a result of the foregoing, the Debtors and the Purchaser are entitled to the protections of section 363(m) of the Bankruptcy Code.

M.    Sale Highest and Best Offer. The total consideration provided by the Purchaser for the Assets and the EMEA Assets is the highest and best offer received by the Sellers, and the Purchase Price (as defined in the Sale Agreement) constitutes reasonably equivalent value under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act and any other applicable laws, and may not be avoided under section 363(n) of the Bankruptcy Code. Other than the Purchaser, no other person or entity or group of persons or entities has offered to purchase the Assets for an amount that would provide greater value to the Debtors. The Court's approval of the Motion, the Sale Agreement and the Ancillary Agreements is in the best interests of the Debtors, their estates, their creditors and all other parties in interest.

N.    Free and Clear Findings Required by Purchaser. The Purchaser would not have entered into the Sale Agreement and would not consummate the Sale if the sale of the Assets to the Purchaser were not free and clear of all liens, claims and interests pursuant to Bankruptcy Code section 363(f), including all Claims and Interests (each as defined below), or if the Purchaser would, or in the future could, be liable for any of such Claims and Interests. A sale of the Assets other than one free and clear of all Claims and Interests would yield substantially less value for the Debtors' estates, with less certainty, than the Sale as contemplated. Therefore, the

Sale contemplated by the Sale Agreement is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

O.      Satisfaction of Section 363(f) Standards. The Debtors may sell the Assets free and clear of all Claims and Interests because, with respect to each creditor asserting a Claim or Interest, one or more of the standards set forth in Bankruptcy Code § 363(f)(1)-(5) has been satisfied. Those holders of Claims and Interests who did not object or who withdrew their objections to the Sale or the Motion are deemed to have consented to the Motion and Sale pursuant to Bankruptcy Code § 363(f)(2). Those holders of Claims and Interests who did object fall within one or more of the other subsections of Bankruptcy Code section 363(f).

P.      No Liability under Section 363(n). Neither the Debtors nor the Purchaser engaged in any conduct that would cause or permit the Sale Agreement or the consummation of the Sale to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

Q.      No Fraudulent Transfer. The Sale Agreement and Ancillary Agreements were not entered into, and the Sale is not consummated, for the purpose of hindering, delaying or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law. Neither the Debtors nor the Purchaser has entered into the Sale Agreement or the Ancillary Agreements or is consummating the Sale with any fraudulent or otherwise improper purpose.

R.      No Successor Liability. The Purchaser is not holding itself out to the public as a continuation of the Debtors and is not an "insider" or "affiliate" of any of the Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors or

7

stockholders existed between the Purchaser and any of the Debtors. Pursuant to the Sale Agreement, the Purchaser is not purchasing all of the Debtors' assets in that the Purchaser is not purchasing any of the Excluded Assets (as defined in the Sale Agreement), and the Purchaser is not holding itself out to the public as a continuation of the Debtors. The conveyance of the Assets does not amount to a consolidation, merger or *de facto* merger of the Purchaser and the Debtors and/or Debtors' estates, there is not substantial continuity between the Purchaser and the Debtors, there is no continuity of enterprise between the Debtors and the Purchaser, the Purchaser is not a mere continuation of the Debtors or the Debtors' estates, and the Purchaser does not constitute a successor to the Debtors or the Debtors' estates. Upon the Closing (as defined in the Sale Agreement), the Purchaser shall be deemed to have assumed only the Assumed Liabilities (as defined in the Sale Agreement). Except for the Assumed Liabilities, the Purchaser's acquisition of the Assets shall be free and clear of any "successor liability" claims of any nature whatsoever, whether known or unknown and whether asserted or unasserted as of the Closing. The Purchaser's operations shall not be deemed a continuation of the Debtors' business as a result of the acquisition of the Assets purchased. The Court finds that the Purchaser would not have acquired the Assets but for the foregoing protections against potential claims based upon "successor liability" theories.

S.      Sale as Exercise of Business Judgment. Entry into the Sale Agreement and Ancillary Agreements constitute the exercise by the Debtors of sound business judgment, and such acts are in the best interests of the Debtors, their estates and creditors, and all parties in interest. The Court finds that the Debtors have articulated good and sufficient business reasons justifying the Sale of the Assets to the Purchaser. Additionally, (i) the Sale Agreement constitutes the highest and best offer for the Assets; (ii) the Sale Agreement and the closing

8

thereon will present the best opportunity to realize the value of the Assets and avoid further decline and devaluation of the Assets; (iii) there is risk of deterioration of the value of the Assets if the Sale is not consummated promptly; and (iv) the Sale Agreement and the closing thereon will provide a greater recovery for the Debtors' creditors than would be provided by any other presently available alternative.

T.      Assumption and Assignment as Exercise of Business Judgment. The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Assumed and Assigned Contracts to the Purchaser in connection with the consummation of the Sale, and the assumption, assignment, and sale of the Assumed and Assigned Contracts to the Purchaser is in the best interests of the Debtors, their estates, their creditors, and all parties in interest. The Assumed and Assigned Contracts being assigned to the Purchaser are an integral part of the Assets being purchased by the Purchaser, and accordingly, such assumption, assignment, and sale of the Assumed and Assigned Contracts are reasonable and enhance the value of the Debtors' estates. The cure amounts required to be paid pursuant to Bankruptcy Code section 365(b), whether agreed or judicially resolved (the "Cure Amounts"), are deemed to be the entire cure obligation due and owing under the Assumed and Assigned Contracts under Bankruptcy Code section 365(b).

U.      Contracts Assignable. Each and every provision of the Assumed and Assigned Contracts or applicable non-bankruptcy law that purport to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any Assumed and Assigned Contract have been satisfied or are otherwise unenforceable under Bankruptcy Code section 365.

9

V.    Cure Amounts Sufficient. Upon the payment of the Cure Amount to the relevant Counterparty, there are no outstanding defaults of the Debtors and their estates under the Assumed and Assigned Contracts.

W.    Adequate Assurance. The Purchaser has demonstrated adequate assurance of future performance of all Assumed and Assigned Contracts within the meaning of Bankruptcy Code section 365.

X.    Contracts Binding upon Purchaser. Upon the assignment and sale to the Purchaser, the Assumed and Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Order.

Y.    No *Sub Rosa* Plan. The Sale does not constitute a *sub rosa* chapter 11 plan.

**ORDERED, ADJUDGED AND DECREED THAT:**

1.    Motion is Granted. The relief requested in the Motion is GRANTED.

2.    Objections Overruled. All objections with regard to the relief sought in the Motion that have not been withdrawn, waived, settled or otherwise dealt with as expressly provided herein or on the record at the Sale Hearing, are hereby overruled on the merits, with prejudice.

3.    Approval. Pursuant to Bankruptcy Code sections 105 and 363, the Sale Agreement, the Ancillary Agreements, and the Sale of the Assets are hereby approved and the Debtors are authorized to comply with the Sale Agreement and the Ancillary Agreements, and the Alternate Bid submitted by the Alternate Bidder with a cash purchase price of $710,000,000 pursuant to the terms submitted therewith, is hereby approved and authorized as an Alternate Bid and shall remain binding as an Alternate Bid pursuant to the terms of the Bidding Procedures Order and the bid terms submitted at the Auction. Pursuant to sections 105 and 363 of the

10

Bankruptcy Code, the Debtors and the Purchaser are each hereby authorized to take any and all actions necessary or appropriate to: (i) consummate the Sale of the Assets to the Purchaser and the Closing of the Sale in accordance with the Motion, the Sale Agreement and this Order; (ii) assume and assign the Assumed and Assigned Contracts; and (iii) perform, consummate, implement and close fully the Sale Agreement together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Sale Agreement. The Debtors are hereby authorized to perform each of their covenants and undertakings as provided in the Sale Agreement and the Ancillary Agreements prior to or after closing without further order of the Court. In the event that the Sale contemplated by the Sale Agreement cannot be consummated, the Alternate Bid shall be and is hereby approved, the execution of the asset sale agreement pursuant to the Alternate Bid by the Debtors is approved and the Debtors are authorized to take such additional steps and execute such additional documents, including without limitation the ancillary agreements contemplated by the Alternate Bid, as may be necessary or desirable for the completion of the Sale and for the conveyance of the Debtors' right, title and interest in and to the Assets to the Alternative Bidder.

4.    Authority to Effectuate Section 2.2.1(a) of the Sale Agreement. The Debtors are hereby authorized to execute any agreements, instruments, applications, consents, or other documents, including without limitation an indenture or any amendment thereto, an underwriting agreement, purchase agreement, sale agreement, or similar agreement, which may include provisions with respect to the payment of underwriting discounts, sales commissions, or brokerage fees, and provisions relating to indemnification and contribution, that may be necessary or appropriate to effectuate Section 2.2.1(a) of the Sale Agreement, subject in each case to the consent of the Committee and Bondholder Group acting in good faith. The Debtors

11

are further authorized to take any action the Sellers may deem necessary or advisable in order to sell, replace or redeem the Convertible Notes (as defined in the Sale Agreement) at any time for cash pursuant to the Sale Agreement, in each case without further order of this Court, subject in each case to the consent of the Committee and Bondholder Group acting in good faith.

5.      Authorization to Assume and Assign.  Pursuant to section 365(f) of the Bankruptcy Code, notwithstanding any provision of any Assumed and Assigned Contract or applicable non-bankruptcy law that prohibits, restricts, or conditions the assignment of the Assumed and Assigned Contracts, the Debtors are authorized to assume the Assumed and Assigned Contracts and to assign the Assumed and Assigned Contracts to the Purchaser, which assignment shall take place on and be effective as of the Closing or as otherwise provided by order of this Court.

6.      Assumption Conditioned upon Closing.  The Debtors' assumption of the Assumed and Assigned Contracts is subject to the consummation of the Sale of the Assets to the Purchaser.  To the extent that an objection by a Counterparty to any Assumed and Assigned Contract, including all objections related to Cure Amounts, is not resolved prior to the Closing Date (as defined in the Sale Agreement), the Debtors, in consultation with the Purchaser, may elect to (i) not assume such Assumed and Assigned Contract or (ii) postpone the assumption of such Assumed and Assigned Contract until the resolution of such objection.  Any Cure Amounts outstanding on the Closing Date shall be paid to the appropriate Counterparty as a condition subsequent to such assumption and assignment of the relevant Assumed and Assigned Contract.

7.      Transfer Free and Clear.  Upon the Closing, (a) the Debtors are hereby authorized and directed to consummate, and shall be deemed for all purposes to have consummated, the sale, transfer and assignment of all of the Debtors' right, title and interest in the Assets to the

12

Purchaser free and clear of (i) any and all interests pursuant to section 363 of the Bankruptcy

Code, including (without limitation) all liens, including any lien (statutory or otherwise),

mortgage, pledge, security interest, charge, deed of trust, deemed trust, option, right of use, right

of first offer or first refusal, right of setoff, hypothecation, servitude, encumbrance on real

property, easement, encroachment, right-of-way, restrictive covenant on real property, real

property license, prior claim, lease, conditional sale arrangement or other similar restriction of

any kind (collectively, including "Liens" as defined in the Sale Agreement, the "Liens"), (ii) any

and all debts, guarantees, options, contractual commitments, liabilities and obligations, whether

accrued or fixed, direct or indirect, liquidated or unliquidated, absolute or contingent, matured or

unmatured or determined or undeterminable, known or unknown, including any tax liability

(other than Assumed Liabilities and the Permitted Encumbrances[4]) (collectively, the "Liabilities"

and together with the Liens, the "Interests"), and (iii) any and all claims as defined in 11 U.S.C.

§ 101(5), rights or causes of action (whether in law or in equity), obligations, demands,

restrictions, interests and matters of any kind or nature whatsoever, whether arising prior to or

subsequent to the commencement of these cases, and whether imposed by agreement,

understanding, law, equity or otherwise, including any "Claims" as defined in the Sale

Agreement (collectively, the "Claims"), in each case other than Assumed Liabilities and the

Permitted Encumbrances, with such Claims and Interests to attach to the sale proceeds in the

same validity, extent and priority as immediately prior to the Sale, subject to any rights, claims

and defenses of the Debtors and other parties in interest, and (b) except as otherwise expressly

provided in the Sale Agreement, all such Claims and Interests (other than Assumed Liabilities

and the Permitted Encumbrances) shall not be enforceable as against the Purchaser or the Assets.

---

[4]     For purposes of this Order, "Permitted Encumbrances" shall have the same meaning as set forth in the
Stalking Horse Agreement, but excluding clauses (i) through (iv) of such definition.

8.      Valid Transfer; Attachment to Sale Proceeds. The transfer to the Purchaser of the Debtors' right, title and interest in the Assets pursuant to the Sale Agreement shall be, and hereby is deemed to be, a legal, valid and effective transfer of the Debtors' right, title and interest in the Assets, and vests with or will vest in the Purchaser all right, title and interest of the Debtors in the Assets, free and clear of all Claims and Interests of any kind or nature whatsoever (other than the Permitted Encumbrances and the Assumed Liabilities), with such Claims and Interests attaching to the sale proceeds in the same validity, extent and priority as immediately prior to the Sale, subject to any rights, claims and defenses of the Debtors and other parties in interest.

9.      Exculpation and Release. None of the Purchaser or their affiliates, successors and assigns (collectively, the "Purchaser Releasees") shall have or incur any liability to, or be subject to any action by any Debtor or any of their predecessors, successors or assigns, arising out of the negotiation, investigation, preparation, execution, delivery of the Sale Agreement and the Ancillary Agreements and the entry into and consummation of the Sale, except as expressly provided in the Sale Agreement, the Ancillary Agreements, and this Order.

10.     Injunction. Except as expressly provided in the Sale Agreement or by this Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, vendors, suppliers, employees, trade creditors, litigation claimants and other persons, holding Claims and Interests of any kind or nature whatsoever against or in the Debtors or the Debtors' interests in the Assets (whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of these chapter 11 cases, whether imposed by agreement, understanding, law,

14

equity or otherwise), including, without limitation, the nondebtor party or parties to each Assumed and Assigned Contract, arising under or out of, in connection with, or in any way relating to, the Debtors, the Assets, the operation of the Debtors' businesses before the Closing, before or after the Closing regarding the operation of the Debtors' businesses not subject to the Sale, or the transfer of the Debtors' interests in the Assets to the Purchaser, including, without limitation, any default existing as of the Closing Date and any objection to the assumption and assignment of the Assumed and Assigned Contracts, shall be and hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing Claims and Interests against the Purchaser or their affiliates, successors and assigns, the Assets, or the interests of the Debtors in such Assets. Following the Closing, no holder of an Interest against the Debtors shall interfere with the Purchaser's title to or use and enjoyment of the Debtors' interests in the Assets based on or related to such Claims and Interests, and all such Claims and Interests, if any, shall be, and hereby are transferred and attached to the proceeds from the Sale in the order of their priority, with the same validity, force and effect which they have against such Assets as of the Closing, subject to any rights, claims and defenses that the Debtors' estates and Debtors, as applicable, may possess with respect thereto.

11.     Obligations for Assumed and Assigned Contracts.  Upon assumption of the Assumed and Assigned Contracts by the Debtors and assignment to the Purchaser, the Assumed and Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Order. As of the Closing, subject to the provisions of this Order, the Purchaser shall succeed to the entirety of Debtors' rights and obligations in the Assumed and Assigned Contracts first arising and attributable to the time period occurring on or after the Closing and shall have all rights thereunder.

15

12.     <u>Cure Amounts for Assumed and Assigned Contracts</u>.  Upon the Closing, (i) all defaults (monetary and non-monetary) under the Assumed and Assigned Contracts through the Closing shall be deemed cured and satisfied through the payment of the Cure Amounts, (ii) no other amounts will be owed by the Debtors, their estates or the Purchaser with respect to amounts first arising or accruing during, or attributable or related to, the period before Closing with respect to the Assumed and Assigned Contracts, (iii) any and all persons or entities shall be forever barred and estopped from asserting a claim against the Debtors, their estates, or the Purchaser that any additional amounts are due or defaults exist under the Assumed and Assigned Contracts that arose or accrued, or relate to or are attributable to the period before the Closing.

13.     <u>Good Faith Purchaser</u>.  The Sale Agreement and Ancillary Agreements have been entered into by the Purchaser in good faith and the Purchaser is a good faith purchaser of the Assets as that term is used in Bankruptcy Code section 363(m). The Purchaser is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

14.     <u>No Bulk Sales</u>.  No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Sale.  Except as provided in the Sale Agreement, no brokers were involved in consummation of the Sale, and no brokers' commissions are due to any Person in connection with the Sale.

15.     <u>Fair and Equivalent Value</u>.  The consideration provided by the Purchaser for the Assets under the Sale Agreement and the EMEA Assets under the EMEA Asset Sale Agreement shall be deemed for all purposes to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law, and the Sale may not be avoided, or costs or damages imposed or awarded under section 363(n) or any other provision of the

Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act or any other similar state laws.

16.    Transfer of Marketable Title.  On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of all of the Debtors' right, title and interest in the Assets or a bill of sale transferring good and marketable title in such Assets to the Purchaser on the Closing Date pursuant to the terms of the Sale Agreement, free and clear of all Claims and Interests (other than Assumed Liabilities).

17.    Transfer Free and Clear.  Except as otherwise provided in the Sale Agreement, any and all Assets in the possession or control of any person or entity, including, without limitation, any vendor, supplier or employee of the Debtors shall be transferred to the Purchaser free and clear of all Claims and Interests (other than Assumed Liabilities) and shall be delivered at the time of Closing to the Purchaser.

18.    No Successor Liability.  The consummation of the Sale does not amount to a consolidation, merger or *de facto* merger of the Purchaser and the Debtors and/or the Debtors' estates, there is not substantial continuity between the Purchaser and the Debtors, there is no continuity of enterprise between the Debtors and the Purchaser, the Purchaser is not a mere continuation of the Debtors or the Debtors' estates, and the Purchaser does not constitute a successor to the Debtor or the Debtors' estates.  Upon the Closing, the Purchaser shall be deemed to have assumed only the Assumed Liabilities.  Except for the Assumed Liabilities and Permitted Encumbrances, the Purchaser's acquisition of the Assets shall be free and clear of any "successor liability" claims of any nature whatsoever, whether known or unknown and whether asserted or

17

unasserted as of the time of Closing. The Purchaser's operations shall not be deemed a continuation of the Debtors' business as a result of the acquisition of the Assets purchased.

19.    Examples of No Successor Liability. Upon the Closing, and except as otherwise expressly provided in the Sale Agreement, the Purchaser shall not be liable for any Claims against, and Liabilities and obligations of, the Debtors or any of the Debtors' predecessors or affiliates. Without limiting the generality of the foregoing, and except as otherwise provided in the Sale Agreement, the Ancillary Agreements or this Order, (a) the Purchaser shall have no liability or obligation to pay wages, bonuses, severance pay, benefits (including, without limitation, contributions or payments on account of any under-funding with respect to any pension plans) or make any other payment to employees of the Debtors, (b) the Purchaser, shall have no liability or obligation in respect of any employee pension plan, employee health plan, employee retention program, employee incentive program or any other similar agreement, plan or program to which any Debtors are a party (including, without limitation, liabilities or obligations arising from or related to the rejection or other termination of any such plan, program agreement or benefit), (c) the Purchaser shall in no way be deemed a party to or assignee of any such employee benefit, agreement, plan or program, and (d) all parties to any such employee benefit, agreement, plan or program are enjoined from asserting against the Purchaser any Claims or Interests arising from or relating to such employee benefit, agreement, plan or program.

20.    Release of Claims and Interests. This Order (a) is and shall be effective as a determination that other than Permitted Encumbrances and Assumed Liabilities, all Claims and Interests of any kind or nature whatsoever existing as to the Assets prior to the Closing have been unconditionally released, discharged and terminated, and that the conveyances described

18

herein have been effected, and (b) is and shall be binding upon and shall authorize all entities,

including, all filing agents, filing officers, title agents, title companies, recorders of mortgages,

recorders of deeds, registrars of deeds, administrative agencies or units, governmental

departments or units, secretaries of state, federal, state and local officials and all other persons

and entities who may be required by operation of law, the duties of their office, or contract, to

accept, file, register or otherwise record or release any documents or instruments, or who may be

required to report or insure any title or state of title in or to the Assets conveyed to the Purchaser.

All recorded Claims and Interests against the Assets from their records, official and otherwise

shall be deemed stricken.

21.    Approval to Release Claims and Interests.  If any person or entity which has filed

statements or other documents or agreements evidencing Liens on, or Claims or Interests in, the

Assets shall not have delivered to the Debtors before the Closing, in proper form for filing and

executed by the appropriate parties, termination statements, instruments of satisfaction, releases

of liens and easements, and any other documents necessary for the purpose of documenting the

release of all Liens which the person or entity has or may assert with respect to the Assets, the

Debtors and the Purchaser are hereby authorized to execute and file such statements,

instruments, releases and other documents on behalf of such person or entity with respect to the

Assets.

22.    Cooperation from Counterparties.  All Counterparties to the Assumed and

Assigned Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable

requests of the Purchaser, and shall not charge the Debtor or the Purchaser for, any instruments,

applications, consents, or other documents which may be required or requested by any public or

19

quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Sale.

23.    Governmental Authorization to Effectuate Sale and Assignments. Each and every federal, state and governmental agency or department, and any other person or entity, is hereby authorized to accept any and all documents and instruments in connection with or necessary to consummate the Transactions contemplated by the Sale Agreement.

24.    No Suspension by Governmental Units. No governmental unit may revoke or suspend any right, license, trademark or other permission relating to the use of the Assets sold, transferred or conveyed to the Purchaser on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale.

25.    Resolution of SNMP Objection. Nothing in this Order or in the Sale Agreement or Ancillary Agreements provides for the assumption and/or assignment, whether under section 365 of the Bankruptcy Code or otherwise, by the Debtors, of any contract with SNMP Research International, Inc. ("SNMP"), and no intellectual property rights or intellectual property licensed via contracts with SNMP and Nortel are being conveyed or otherwise transferred by the Debtors pursuant to the Order, Sale Agreement or Ancillary Agreements. To the extent that the Purchaser elects to have the Debtors assign to the Purchaser any contract with or intellectual property right of SNMP relating to the Assets, the Debtors and Purchaser will do so in accordance with the terms of such contract or applicable license.

26.    Resolution of Qwest Objection. Notwithstanding anything in this Order or the Sale Agreement to the contrary, Purchaser shall remain liable for any and all obligations that fall due after the Closing under the Assumed and Assigned Contracts to which Qwest Communications Company, LLC or its predecessor(s) in interest or affiliate(s) (collectively,

"Qwest") is a counterparty, regardless of whether such obligations accrued, relate to, or are attributable to the period prior to the Closing. Nothing in this Order or the Sale Agreement shall enjoin or restrict Qwest from enforcing its rights under such Assumed and Assigned Contracts against Purchaser after the Closing. In addition, nothing in this Order or the Sale Agreement shall relieve the Debtor from its obligations arising under the Assumed and Assigned Contracts to which Qwest is a counterparty through the Closing and any defaults shall be cured by the Debtor prior to Closing.

27.    Resolution of Verizon Objection. For the avoidance of doubt, and notwithstanding anything to the contrary in this Order, the Purchaser has agreed to be, and shall be, responsible for obligations arising after the Closing with respect to any Assumed and Assigned Contracts (as defined in the Sale Agreement) between Nortel and the affiliates of Verizon Communications Inc. (collectively, "Verizon") to which Verizon is a Counterparty (together, the "Verizon Contracts"), and shall have the same rights after Closing with respect to the Verizon Contracts that Nortel had with respect to the Verizon Contracts prior to Closing. In addition, for the avoidance of doubt, the Purchaser has agreed to be, and shall be, responsible for any warranties, non-cash incentives, credits, indemnifications (including for third-party intellectual property infringement claims), requirements to provide product support and maintenance services and other liabilities, in each case either arising under or relating to the Verizon Contracts, whether such duties, obligations or liabilities arose prior to, contemporaneous with or after the Closing. Furthermore, nothing in this Order shall be deemed to waive, release or extinguish any valid claim with respect to setoff that Verizon may have against the Debtors.

28.    Resolution of Motorola Objection. Nothing in this Order authorizes or otherwise provides for the assumption, assignment or rejection, in whole or in part, of any Objecting Party

Agreement. Other than the rights and obligations between the parties to the Agreement, nothing

herein or in the Agreement shall affect the rights of any party regarding an Objecting Party

Agreement, all of which such rights of the Objecting Parties are hereby preserved, including

without limitation the right to seek, oppose or support (a) any assumption, assignment or

rejection of any Objecting Party Agreement on any legal or factual basis, (b) adequate assurance

of future performance, (c) the estimation or assertion of any proposed cure amount, (d) the

assumption by the Purchaser of all obligations and liabilities under any Objecting Party

Agreement by virtue of the assumption and assignment of the Objecting Party Agreement under

Section 365 and other applicable law, including contingent, unmatured, or unliquidated claims

and whether such claims arise or arose pre- or post-closing, and (e) adequate assurance for

payment of such contingent, unmatured, or unliquidated claims. For the purposes of this Order,

"Objecting Party Agreement" means any written contract, agreement, license or any other

document that creates binding contractual obligations between an Objecting Party and one or

more Debtors; "Objecting Party" means Motorola, Inc. ("Motorola"). Nothing in this Order or

the Agreement shall prejudice, estop, bar, impair or otherwise limit in any respect any party's

rights under Section 365 of the Bankruptcy Code with respect to the Objecting Party.

Agreements, including, without limitation, the rights set forth above in subparts (a) through (e).

     29.     Resolution of AT&T Objection. For the avoidance of doubt, and notwithstanding

anything to the contrary in this Order, the Purchaser has agreed to be, and shall be, responsible

for obligations arising after the Closing with respect to any Assumed and Assigned Contracts (as

defined in the Sale Agreement) between Nortel and AT&T Corp. and its affiliates and

subsidiaries (collectively, "AT&T") to which AT&T is a Counterparty (together, the "AT&T

Contracts"), and shall have the same rights after Closing with respect to the AT&T Contracts that

the Debtors had with respect to the AT&T Contracts prior to Closing. In addition, for the avoidance of doubt, the Purchaser has agreed to be, and shall be, responsible for any warranties, non-cash incentives, credits, indemnifications (including for third-party intellectual property infringement claims), requirements to provide product support and maintenance services and other liabilities, in each case either arising under or relating to the AT&T Contracts, whether such duties, obligations or liabilities arose prior to, contemporaneous with or after the Closing.

30.    Resolution of HP Objection. Nothing in this Order provides for the assumption and assignment of any contract or license with Hewlett Packard, Inc. ("HP") pursuant to section 365 of the Bankruptcy Code. To the extent that the Purchaser elects to have the Debtors assume and assign to the Purchaser any contract with HP relating to the Assets, in whole or in part, the Debtors and Purchaser will do so in accordance with the terms of such contract or license or in any manner otherwise in accordance with applicable law, including section 365 of the Bankruptcy Code.

31.    Resolution of Concerns Expressed by OSS. Nothing in this Order provides for the assumption and assignment of any contract or license with Open Systems Solutions, Inc. ("OSS") pursuant to section 365 of the Bankruptcy Code. To the extent that the Purchaser elects to have the Debtors assign to the Purchaser any contract with OSS relating to the Purchased Assets, in whole or in part, the Debtors and Purchaser will do so in accordance with the terms of such contract or license, which terms include, inter alia, the written consent of OSS. In addition, nothing in this Order permits or may be construed to permit Purchaser any right to access or to use or to have the right to use OSS' license and/or software in connection with the Purchased Assets.

32.    <u>Resolution of the MatlinPatterson Objection.</u> The Sellers and the Purchaser have

agreed to amend and restate Section 2.2.1(a) of the Sale Agreement as follows:

> (a) Pursuant to the terms and subject to the conditions set forth in this Agreement,
> in consideration of the purchase, sale, assignment and conveyance of the Sellers'
> and EMEA Sellers' right, title and interest in, to and under the Assets and the
> EMEA Assets, respectively, pursuant to the terms hereof and pursuant to the
> terms of the EMEA Asset Sale Agreement, respectively, and of the rights granted
> by certain Sellers and the EMEA Sellers under the Intellectual Property License
> Agreement and the Trademark License Agreement, the Purchaser, on its own
> behalf and as agent for the relevant Designated Purchasers, shall (i) assume and
> become obligated to pay, perform and discharge, when due, the Assumed
> Liabilities and the EMEA Assumed Liabilities, (ii) subject to adjustment
> following the Closing in accordance with Section 2.2.4.2, pay to the Distribution
> Agent an amount of cash (the "**Cash Purchase Price**") equal to Five Hundred
> Thirty Million dollars ($530,000,000) (the "**Base Cash Purchase Price**") less the
> Escrow Amount and as adjusted pursuant to Sections 2.2.2 and 2.2.4 and Section
> 5.28 of the Sellers Disclosure Schedule or as otherwise expressly provided herein,
> in the Real Estate Terms and Conditions or in the EMEA Asset Sale Agreement,
> and (iii) subject to Section 2.2.7, issue to the Distribution Agent, as agent for the
> Sellers and the EMEA Sellers, $239,000,000 aggregate principal amount (the
> "**Aggregate Principal Amount**") of 6.0% Senior Notes due June 15, 2017 (the
> "**Convertible Notes**", and together with the Cash Purchase Price, as adjusted, the
> "**Purchase Price**") convertible at the holder's option into Common Stock at a
> conversion price equal to $16.4625 (the "**Conversion Price**"), subject to
> adjustments contemplated in the Indenture; <u>provided</u>, <u>however</u>, that the Purchaser
> may, by written notice to the Sellers on or before the Closing Date, elect to
> increase the Cash Purchase Price and the Base Cash Purchase Price payable
> pursuant to clause (ii) above by ~~up to the Aggregate Principal Amount~~<u>an amount
> equal to $1,020.00 in cash</u> in lieu of issuing ~~the~~<u>each</u> corresponding ~~face~~<u>$1,000.00
> in principal</u> amount of the Convertible Notes (such election, if exercised, the
> "**Cash Replacement Election**"); <u>provided further</u>, that if the Market Value of the
> Common Stock on the date of the notice of such election (or in the case the
> replacement is made with the proceeds of a simultaneous convertible security
> offering the most recent closing price per share of the Common Stock on the
> NASDAQ Global Select Market at the time such convertible security offering is
> priced) is equal to or greater than $17.00 per share of Common Stock, then in lieu
> of increasing the Cash Purchase Price ~~by the Aggregate Principal Amount~~<u>as
> provided above</u> such increase will equal the Optional Redemption Price
> corresponding to such Aggregate Principal Amount.

33.    <u>Inconsistencies with Prior Orders, Pleadings or Agreements.</u> To the extent this

Order is inconsistent with any prior order or pleading with respect to the Motion in these chapter

11 cases, the terms of this Order shall govern. To the extent there is any inconsistency between

the terms of this Order and the terms of the Sale Agreement (including all ancillary documents executed in connection therewith), the terms of this Order shall govern.

34.    Assets of Non-Debtors. This Order applies only to Assets owned by the Debtors. Consequently, notwithstanding any other provision of this Order or the Sale Agreement to the contrary, the portions of this Order that approve the transfer of Assets to the Purchaser free and clear of all liens and other encumbrances, or that modify, enjoin, release or otherwise limit the rights of creditors of entities transferring Assets, apply only to Assets owned by the Debtors and do not apply to any Assets owned by non-debtor entities.

35.    Effect upon Property of the Estates other than Assets. Except as expressly provided in the Sale Agreement or the Ancillary Agreements, nothing in this Order shall be deemed to waive, release, extinguish or estop the Debtors or their estates from asserting or otherwise impair or diminish any right (including without limitation any right of recoupment), claim, cause of action, defense, offset or counterclaim in respect of any asset that is not a Purchased Asset.

36.    Fees, Expenses, and other Obligations. Any amounts that become payable by the Debtors to the Purchaser pursuant to the Sale Agreement or any of the documents delivered by the Debtors pursuant to or in connection with the Sale Agreement, including any indemnity obligations under the Sale Agreement shall (a) constitute administrative expenses of the Debtors' estates within the meaning of section 503(b) of the Bankruptcy Code, and (b) be paid by the Debtors in the time and manner as provided in the Sale Agreement without further order of this Court.

37.    _Subsequent Orders and Plan Provisions_.  This Order shall not be modified by any

chapter 11 plan confirmed in these chapter 11 cases or subsequent order of this Court unless

expressly consented to in writing by the Purchaser.

38.    _Binding Effect of Order_.  This Order and the Sale Agreement shall be binding in

all respects upon all creditors and interest holders of any of the Debtors, all non-debtor parties to

the Assumed and Assigned Contracts, the Committee, all successors and assigns of the Debtors

and their affiliates and subsidiaries, and any trustees, examiners, "responsible persons" or other

fiduciaries appointed in the Debtors' bankruptcy chapter 11 cases or upon a conversion to

chapter 7 under the Bankruptcy Code, and the Sale Agreement shall not be subject to rejection or

avoidance under any circumstances.

39.    _Failure to Specify Provisions_.  The failure specifically to include or make

reference to any particular provisions of the Sale Agreement or any Ancillary Agreement in this

Order shall not diminish or impair the effectiveness of such provision, it being the intent of the

Court that the Sale Agreement and the Ancillary Agreements are authorized and approved in

their entirety.

40.    _Retention of Jurisdiction_.  The Court retains jurisdiction with respect to all

matters arising from or related to the implementation of this Order, including, without limitation,

the authority to:  (i) interpret, implement and enforce the terms and provisions of this Order

(including the injunctive relief provided in this Order) and the terms of the Sale Agreement, the

Ancillary Agreements, all amendments thereto and any waivers and consents thereunder; (ii)

protect the Purchaser, or the Assets, from and against any of the Claims or Interests; (iii) compel

delivery of all Assets to the Purchaser; (iv) compel the Purchaser to perform all of its obligations

under the Sale Agreement; and (v) resolve any disputes arising under or related to the Sale Agreement, the Ancillary Agreements, or the Sale.

41.     No Material Modifications. The Sale Agreement, the Ancillary Agreements and any related agreements, documents or other instruments may be modified, amended, or supplemented through a written document signed by the parties thereto in accordance with the terms thereof without further order of the Court; provided, however, that any such modification, amendment or supplement is neither material nor materially changes the economic substance of the transactions contemplated hereby (it being understood, for the sake of clarity, that no such modification, amendment or supplement shall be deemed to be material or shall be deemed to materially change the economic substance of the transactions to the extent that the impact does not exceed two percent of the Purchase Price (as defined in the Sale Agreement)); and provided further that no such modifications, amendments, or supplements may be made except following two (2) days written notice to, or with the prior consent of, the Committee, c/o Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036 (Attention: Fred Hodara, Stephen Kuhn, and Kenneth Davis).

42.     Immediate Effect. Notwithstanding any provision in the Bankruptcy Rules to the contrary, (i) the terms of this Order shall be immediately effective and enforceable upon its entry, (ii) the Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order, and (iii) the Debtors may, in their discretion and without further delay, take any action and perform any act authorized under this Order.

43.     Provisions Non-Severable. The provisions of this order are nonseverable and mutually dependent.

44.    <u>Allocation of Risks and Costs of Providing Transition Services.</u> The U.S. Debtors and the Canadian Debtors (together, the "<u>North American Debtors</u>") recognize that the provision of transition services by each of the North American Debtors under the transition services agreements related to the Sale of the MEN Business and the sales of the other principal lines of Nortel's business are and will be provided by a business organization that operates on a cross-jurisdictional basis using personnel and assets of several of the North American Debtors, including, without limitation NNI and NNL. In light of the foregoing and in order to address certain concerns raised by the Committee and the Monitor, the North American Debtors have agreed to allocate certain risks and costs of providing such transition services, acting reasonably, including, without limitation, consent fees and segregation costs, sunset costs, indemnification claims and under-recoveries from the respective purchasers, in the same proportion as the "<u>Sales Proceeds</u>" of such sales to each of the North American Debtors are allocated (as determined in accordance with the "<u>Interim Sale Protocol</u>" contemplated by the Interim Funding and Settlement Agreement or mutual agreement of the relevant "<u>Selling Debtors</u>" (as such terms are defined in the Interim Funding and Settlement Agreement)), and that the side agreement reflecting the foregoing shall be on such terms and conditions as the North American Debtors may agree not inconsistent with the foregoing, acting promptly and in good faith and subject to the consent of the Committee, the Bondholder Group and the Monitor.

45.    <u>Allocation.</u> The Purchaser shall deposit proceeds of the Sale, subject to the price adjustments and Purchaser's rights under the Sale Agreement and less applicable transfer or value-added taxes incurred by the Sellers and the EMEA Sellers, and, to the extent agreed by the Sellers and the EMEA Sellers, any transaction costs, into an Escrow Account (as such term is defined in the Interim Funding and Settlement Agreement, dated June 9, 2009 (the "<u>IFSA</u>")). In

accordance with this Court's order approving and authorizing the transactions contemplated by the IFSA, the proceeds in the Escrow Account shall not be distributed in advance of either (a) agreement of all of the Selling Debtors (as defined in the IFSA) as to the distribution of such proceeds (subject to the prior consent of the Committee and the Bondholder Group acting in good faith in accordance with the IFSA and subject to the requirements of Section 12.g of the IFSA) or (b) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) in accordance with the terms of the Interim Sales Protocol (as such term is defined in the IFSA and subject to the requirements of Section 12.g of the IFSA), which Interim Sales Protocol shall be approved by the Court. The Debtors are hereby authorized to negotiate and enter into an escrow agreement, on terms and conditions reasonably satisfactory to the Committee and the Monitor acting in good faith, with an escrow agent to establish an Escrow Account without further order of this Court.

Dated: December 3, 2009
     Wilmington, Delaware

THE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE

29

# BLUE SHEET