**<u>EXHIBIT A-3</u>**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------X
                     :

*In re*:                       :      Chapter 11

                      :

Nortel Networks Inc., *et al.*[1],    :      Case No. 09-10138 (KG)

                      :

          Debtors.     :      Jointly Administered

                      :

                      :      **RE: D.I. 2193**

------------------------------------------------------------X

### ORDER AUTHORIZING AND APPROVING (A) THE SALE OF CERTAIN ASSETS OF THE DEBTORS' CARRIER VOICE OVER IP AND COMMUNICATIONS SOLUTIONS BUSINESS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES, AND (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS

Upon the motion (the "Motion")[2] of Nortel Networks Inc. ("NNI") and its affiliated

debtors, as debtors and debtors in possession in the above-captioned (collectively, the

"Debtors"), for entry of orders under Bankruptcy Code sections 105, 107(b)(1), 363 and 365,

Bankruptcy Rules 2002, 6004, 6006, 9014 and 9018 and Local Rules 6004-1 and 9018-1

(I)(A) authorizing Debtors' entry into the Stalking Horse Agreement, (B) authorizing and

approving the Bidding Procedures and Bid Protections, (C) approving payment of an Incentive

Fee, (D) approving the Notice Procedures and the Assumption and Assignment Procedures,

(E) authorizing the filing of certain documents under seal, and (F) setting a date for the sale

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/Nortel.

hearing, and (II) authorizing and approving (A) the sale of certain assets of Debtors' Carrier

Voice Over IP and Application Solutions business (the "CVAS Business") free and clear of all

liens, claims and encumbrances and (B) the assumption and assignment of certain executory

contracts [D.I. 2193]; and the Court having entered an order approving, among other things, the

Bidding Procedures (the "Bidding Procedures Order") based upon the evidence presented at the

bidding procedures hearing held on January 6, 2010 (the "Bidding Procedures Hearing") [D.I.

2259]; and the Auction (as defined in the Bidding Procedures) having been cancelled in

accordance with the Bidding Procedures; and GENBAND Inc. (the "Purchaser") was chosen as

the Successful Bidder in accordance with the Bidding Procedures; and the Court having

conducted a hearing on the Motion on March 3, 2010 (the "Sale Hearing"); and all parties in

interest having been heard, or having had the opportunity to be heard, regarding the asset sale

agreement attached hereto as Exhibit A (the "Sale Agreement"), by and among NNI, Nortel

Networks Limited ("NNL"), Nortel Networks Corporation ("NNC") and certain other entities

identified therein as sellers (collectively, the "Sellers"), and the Purchaser and the transactions

contemplated thereby (the "Transactions"); and the Court having reviewed and considered the

Motion, and the arguments of counsel made, and the evidence adduced, at the Bidding

Procedures Hearing and the Sale Hearing; and upon the record of the Bidding Procedures

Hearing and the Sale Hearing and these chapter 11 cases, and after due deliberation thereon, and

good cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:[3]**

---

[2]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion, or if not defined in the Motion, shall have the meanings ascribed to such terms in the Sale Agreement (as defined herein).

[3]     Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Fed. R. Bankr. P. 7052.

2

A.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(b).

B.      Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

C.      The statutory predicates for the relief sought in the Motion are sections 105, 107(b)(1), 363 and 365 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.*, as amended (the "Bankruptcy Code"), and Rules 2002, 6004, 6006, 9014 and 9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 6004-1 and 9018-1.

D.      Notice of the Motion and the Sale Hearing has been provided to (a)(i) all entities reasonably known to have expressed an interest in a transaction with respect to the Assets (as defined in the Sale Agreement) during the past nine (9) months, (ii) all entities reasonably known to have asserted any claim, lien, encumbrance or interest in the Assets, (iii) the attorneys general for all states in which Purchased Assets (as defined below) owned by the Debtors are located, all federal and state taxing authorities, the Securities and Exchange Commission, the Environmental Protection Agency, state environmental protection agencies, the Internal Revenue Service, and the Department of Labor and similar state labor or employment agencies, (iv) all parties entitled to notice pursuant to Local Rule 2002-1(b), (v) all counterparties to the Assumed and Assigned Contracts, (vi) all known or potential creditors of the Debtors, the (vii) the Official Committee of Unsecured Creditors (the "Committee"), and (viii) the Bondholders Group; and (b) through publication of the Publication Notice, all in accordance with and as provided by the Bidding Procedures Order.

3

E.    As evidenced by affidavits of publication filed with the Court [D.I.'s 2335, 2336, 2337], notice of the Sale Hearing was published in The Wall Street Journal (National Edition), The Globe and Mail (National Edition), and The Financial Times (International Edition) on January 14, 2010.

F.    Based upon the affidavits of service and publication filed with the Court [D.I.'s 2193, 2260, 2269, 2335, 2336, 2337]: (a) notice of the Motion and the Sale Hearing was adequate and sufficient under the circumstances of these chapter 11 cases and these proceedings and complied with the various applicable requirements of the Bankruptcy Code, the Bankruptcy Rules and the Bidding Procedures Order; and (b) a reasonable opportunity to object and be heard with respect to the Motion and the relief requested therein was afforded to all interested persons and entities.

G.    The Assets sought to be transferred and/or assigned by the Debtors to the Purchaser pursuant to the Sale Agreement (the "Purchased Assets") are property of the Debtors' estates and title thereto is vested in the Debtors' estates.

H.    The Debtors and their professionals marketed the Purchased Assets and conducted the marketing and sale process as set forth in and in accordance with the Motion. Based upon the record of these proceedings, all creditors and other parties in interest and all prospective purchasers have been afforded a reasonable and fair opportunity to bid for the Purchased Assets.

I.    On December 22, 2009, NNI, NNL and NNC and the Purchaser entered into the Stalking Horse Agreement, subject to higher and better offers. Simultaneously with the execution of the Stalking Horse Agreement, on December 23, 2009 the EMEA Sellers, the Joint Administrators, the Joint Israeli Administrators and the Purchaser entered into a separate agreement (the "EMEA Asset Sale Agreement") providing for the sale to the Purchaser of the

4

EMEA Assets (as defined in the EMEA Asset Sale Agreement).

J.    The Bidding Procedures were substantively and procedurally fair to all parties and all potential bidders. The Debtors conducted the sale process without collusion and in accordance with the Bidding Procedures.

K.    No Qualified Bid (as defined in the Bidding Procedures Order) other than the Qualified Bid submitted by the Purchaser was received on or prior to February 23, 2010 at 4:00 p.m. and therefore the Debtors in accordance with the Bidding Procedures cancelled the Auction. The Debtors determined in a valid and sound exercise of their business judgment that the highest and best Qualified Bid was that of the Purchaser.

L.    Subject to the entry of this Order, each Debtor that is a Seller (i) has full power and authority to execute the Sale Agreement, the Ancillary Agreements (as defined in the Sale Agreement) and all other documents contemplated thereby, (ii) has all of the power and authority necessary to consummate the Transactions contemplated by the Sale Agreement and (iii) has taken all company action necessary to authorize and approve the Sale Agreement, the Ancillary Agreements, the sale of the Purchased Assets (the "Sale") and the consummation by the Debtors of the Transactions. No consents or approvals, other than those expressly provided for in the Sale Agreement or this Order, are required for the Debtors to close the Sale and consummate the Transactions.

M.    The Sale Agreement and the Transactions were negotiated and have been and are undertaken by the Debtors and the Purchaser at arms' length without collusion or fraud, and in good faith within the meaning of Bankruptcy Code section 363(m). As a result of the foregoing, the Debtors and the Purchaser are entitled to the protections of section 363(m) of the Bankruptcy Code.

5

N.    The total consideration provided by the Purchaser for the Purchased Assets and the EMEA Assets is the highest and best offer received by the Sellers, and the Purchase Price constitutes (a) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (b) fair consideration under the Uniform Fraudulent Conveyance Act, and (c) reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession, or the District of Columbia, for the Purchased Assets, and may not be avoided under section 363(n) of the Bankruptcy Code. Other than the Purchaser, no other person or entity or group of persons or entities has offered to purchase the Assets and the EMEA Assets for an amount that would provide greater value to the Sellers and EMEA Sellers. The Court's approval of the Motion, the Sale Agreement, and the Ancillary Agreements is in the best interests of the Debtors, their estates, their creditors and all other parties in interest.

O.    The Purchaser would not have entered into the Sale Agreement and would not consummate the Transactions if the sale of the Purchased Assets to the Purchaser was not free and clear of all liens, claims and interests pursuant to Bankruptcy Code section 363(f), or if the Purchaser would, or in the future could, be liable for any of such liens, claims and interests. A sale of the Purchased Assets other than one free and clear of all Claims and Interests (each as defined herein) would yield substantially less value for the Debtors' estates, with less certainty, than the Sale. Therefore, the Sale contemplated by the Sale Agreement is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

P.    The Debtors may sell the Purchased Assets free and clear of all Claims and Interests, because, with respect to each creditor asserting a Claim or Interest, one or more of the standards set forth in Bankruptcy Code § 363(f)(1)-(5) has been satisfied. Those holders of

6

Claims and Interests who did not object or who withdrew their objections to the Sale or the Motion are deemed to have consented to the Motion and Sale pursuant to Bankruptcy Code § 363(f)(2). Those holders of Claims or Interests who did object fall within one or more of the other subsections of Bankruptcy Code section 363(f).

Q.      Neither the Debtors nor the Purchaser engaged in any conduct that would cause or permit the Sale Agreement or the consummation of the Transactions to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

R.      The Sale Agreement and Ancillary Agreements were not entered into, and the Sale is not being consummated, for the purpose of hindering, delaying or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law. Neither the Debtors nor the Purchaser has entered into the Sale Agreement or the Ancillary Agreements or is consummating the Sale with any fraudulent or otherwise improper purpose.

S.      The Purchaser is not holding itself out to the public as a continuation of the Debtors and is not an "insider" or "affiliate" of any of the Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors or stockholders existed between the Purchaser and any of the Debtors. Pursuant to the Sale Agreement, the Purchaser is not purchasing all of the Debtors' assets in that the Purchaser is not purchasing any of the Excluded Assets (as defined in the Sale Agreement), and the Purchaser is not holding itself out to the public as a continuation of the Debtors. The conveyance of the Purchased Assets pursuant to the Transactions does not amount to a consolidation, merger or de facto merger of the Purchaser and the Debtors and/or Debtors' estates, there is not substantial continuity between the Purchaser and the Debtors, there is no continuity of enterprise between the Debtors and the Purchaser, the

7

Purchaser is not a mere continuation of the Debtors or the Debtors' estates, and the Purchaser does not constitute a successor to the Debtors or the Debtors' estates. Upon the Closing (as defined in the Sale Agreement), the Purchaser shall be deemed to have assumed only the Assumed Liabilities (as defined in the Sale Agreement). Pursuant to sections 363 and 365 of the Bankruptcy Code, except for the Assumed Liabilities, the Purchaser's acquisition of the Purchased Assets shall be free and clear of any "successor liability" claims of any nature whatsoever, whether known or unknown and whether asserted or unasserted as of the Closing. The Purchaser's operations shall not be deemed a continuation of the Debtors' business as a result of the acquisition of the Purchased Assets. The Court finds that the Purchaser would not have acquired the Purchased Assets but for the foregoing protections against potential claims based upon "successor liability" theories.

T.    The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Assumed and Assigned Contracts to the Purchaser in connection with the consummation of the Sale, and the assumption, assignment and sale of the Assumed and Assigned Contracts to the Purchaser is in the best interests of the Debtors, their estates, their creditors, and all parties in interest. The Assumed and Assigned Contracts being assigned to the Purchaser are an integral part of the Purchased Assets being purchased by the Purchaser, and accordingly, such assumption, assignment, and sale of the Assumed and Assigned Contracts are reasonable and enhance the value of the Debtors' estates. The Cure Costs required to be paid pursuant to Bankruptcy Code section 365(b) to the Counterparty to the applicable Assumed and Assigned Contract, or as ordered to be paid by this Court pursuant to a final order, are deemed to be the entire cure obligation due and owing under the Assumed and Assigned Contracts under Bankruptcy Code section 365.

8

U.      Each and every provision of the Assumed and Assigned Contracts or applicable non-bankruptcy law that purport to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any Assumed and Assigned Contract have been satisfied or are otherwise unenforceable under Bankruptcy Code section 365.

V.      Upon the payment of the Cure Cost, if any, to the relevant Counterparty, there are no outstanding defaults of the Debtors and their estates under the Assumed and Assigned Contracts.

W.      The Purchaser has demonstrated adequate assurance of future performance of all Assumed and Assigned Contracts within the meaning of Bankruptcy Code section 365.

X.      Upon the assignment and Sale to the Purchaser, the Assumed and Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Order.

Y.      Entry into the Sale Agreement, the Ancillary Agreements and consummation of the Transactions constitute the exercise by the Debtors of sound business judgment, and such acts are in the best interests of the Debtors, their estates and creditors, and all parties in interest. The Court finds that the Debtors have articulated good and sufficient business reasons justifying the Sale of the Purchased Assets to the Purchaser.  Additionally, (i) the Sale Agreement constitutes the highest and best offer for the Purchased Assets; (ii) the Sale Agreement and the closing thereof will present the best opportunity to realize the value of the Purchased Assets and avoid further decline and devaluation of the Purchased Assets; (iii) there is risk of deterioration of the value of the Purchased Assets if the Sale is not consummated promptly; and (iv) the Sale Agreement and the closing thereof will provide a greater recovery for the Debtors' creditors than would be provided by any other presently available alternative.

9

Z.      The transfer of the Debtors' right, title and interest in the Purchased Assets to the Purchaser will be a legal, valid and effective transfer of the Purchased Assets, and will vest the Purchaser with all of the Debtors' right, title and interest of, in and to the Purchased Assets, pursuant to sections 363 and 365 of the Bankruptcy Code, free and clear of (i) all Claims and Interests of any kind or nature whatsoever (other than the Assumed Liabilities and the Permitted Encumbrances (as defined in the Sale Agreement)), and (ii) all Excluded Liabilities (as defined in the Sale Agreement), claims as defined in 11 U.S.C. § 101(5), rights or causes of action (whether in law or in equity), obligations, demands, restrictions, interests and matters of any kind or nature whatsoever, whether arising prior to or subsequent to the commencement of these cases, and whether imposed by agreement, understanding, law, equity or otherwise (collectively, the "Claims"), other than Assumed Liabilities, the Permitted Encumbrances.

AA.    The Sale does not constitute a *sub rosa* chapter 11 plan.

BB.    Time is of the essence in consummating the Sale. In order to maximize the value of the Debtors' assets, it is essential that the sale of the Purchased Assets occur within the time constraints set forth in the Sale Agreement. Accordingly, there is a cause to lift the stay contemplated by the Bankruptcy Rules 6004(h) and 6006(d).

CC.    The Schedules to the Sale Agreement contain substantial sensitive commercial information, which would be damaging to the Debtors and the Purchaser if it were to be disclosed to their competitors. Filing the Schedules to the Sale Agreement under seal is in the best interests of the Debtors, their estates, creditors and other parties-in-interest.

DD.    The Sale contemplated by the Sale Agreement is in the best interests of the Debtors and their estates, creditors, interest holders and all other parties in interest; and it is therefore:

10

**ORDERED ADJUDGED AND DECREED THAT:**

1.    The relief requested in the Motion is **GRANTED**.

2.    All objections with regard to the relief sought in the Motion that have not been withdrawn, waived, settled or otherwise dealt with as expressly provided herein or on the record at the Sale Hearing, are hereby overruled on the merits, with prejudice.

3.    Pursuant to Bankruptcy Code sections 105, 363 and 365, and subject to the approval of the Sale by the Ontario Superior Court of Justice in the Canadian Proceedings with respect to the Canadian Debtors, the Sale Agreement, the Ancillary Agreements, the Sale of the Purchased Assets, and consummation of the Transactions are hereby approved and the Debtors are authorized to comply with the Sale Agreement and the Ancillary Agreements.

4.    Pursuant to section 365 of the Bankruptcy Code, notwithstanding any provision of any Assumed and Assigned Contracts or applicable non-bankruptcy law that prohibits, restricts, or conditions the assignment of the Assumed and Assigned Contracts, the Debtors are authorized to assume and to assign the Assumed and Assigned Contracts to the Purchaser, which assignment shall take place on and be effective as of the Closing, or as otherwise provided by order of this Court.

5.    The Debtors' assumption of the Assumed and Assigned Contracts is subject to the consummation of the Sale of the Assets to the Purchaser. To the extent that an objection by a Counterparty to any Assumed and Assigned Contracts, including objections related to Cure Amounts, is not resolved prior to the Closing Date, the Debtors, in consultation with the Purchaser, may elect to (i) not assume such Assumed and Assigned Contracts, or (ii) postpone the assumption of such Assumed and Assigned Contracts until the resolution of such objection. Any Cure Costs outstanding on the Closing Date shall be paid to the appropriate Counterparty as

a condition subsequent to such assumption and/or assumption and assignment of the relevant Assumed and Assigned Contracts.

6.    Upon the Closing, (a) the Debtors are hereby authorized and directed to consummate, and shall be deemed for all purposes to have consummated, the sale, transfer and assignment of the Debtors' right, title and interest in the Purchased Assets to the Purchaser free and clear of any and all interests pursuant to sections 363 and 365 of the Bankruptcy Code, including (without limitation) all liens, including any lien (statutory or otherwise), mortgage, pledge, security interest, charge, right of first refusal, hypothecation, encumbrance on real property, easement, encroachment, right-of-way, restrictive covenant on real property, real property license, lease or conditional sale arrangement (collectively, including "Liens" as defined in the Sale Agreement, the "Liens") and debts, liabilities and obligations, whether accrued or fixed, direct or indirect, liquidated or unliquidated, absolute or contingent, matured or unmatured or determined or undeterminable, known or unknown, including those arising under any Law or Action and those arising under any Contract or otherwise, including any Tax liability (other than Assumed Liabilities and the Permitted Encumbrances) (collectively, the "Liabilities" and together with the Liens, the "Interests"), with such Interests to attach to the sale proceeds in the same validity, extent and priority as immediately prior to the sale transactions, subject to any rights, claims and defenses of the Debtors and other parties in interest, and (b) except as otherwise expressly provided in the Sale Agreement, all such Interests (other than Assumed Liabilities and the Permitted Encumbrances) shall be and hereby are released, terminated and discharged as to the Purchaser and the Purchased Assets.

7.    The transfer of the Debtors' right, title and interest in the Purchased Assets to the Purchaser pursuant to the Sale Agreement shall be, and hereby is deemed to be, a legal, valid and

12

effective transfer of the Debtors' right, title and interest in the Purchased Assets, and vests with

or will vest in the Purchaser all right, title and interest of the Debtors in the Purchased Assets,

pursuant to sections 363 and 365 of the Bankruptcy Code, free and clear of all Claims and

Interests of any kind or nature whatsoever (other than the Permitted Encumbrances and the

Assumed Liabilities), with any Interests attaching to the sale proceeds in the same validity,

extent and priority as immediately prior to the transaction, subject to any rights, claims and

defenses of the Debtors and other parties in interest.

      8.     Upon the Closing, and except as otherwise expressly provided in the Sale

Agreement, the Purchaser shall not be liable for any claims against, and Liabilities and

obligations of, the Debtors or any of the Debtors' predecessors or affiliates.  Without limiting the

generality of the foregoing, and except as otherwise provided in the Sale Agreement, (a) the

Purchaser shall have no liability or obligation to pay wages, bonuses, severance pay, benefits

(including, without limitation, contributions or payments on account of any under-funding with

respect to any pension plans) or make any other payment to employees of the Debtors, (b) the

Purchaser shall have no liability or obligation in respect of any employee pension plan, employee

health plan, employee retention program, employee incentive program or any other similar

agreement, plan or program to which any Debtors are a party (including, without limitation,

liabilities or obligations arising from or related to the rejection or other termination of any such

plan, program agreement or benefit), (c) the Purchaser shall in no way be deemed a party to or

assignee of any such employee benefit, agreement, plan or program, and (d) all parties to any

such employee benefit, agreement, plan or program are enjoined from asserting against the

Purchaser any Claims arising from or relating to such employee benefit, agreement, plan or

program.

13

9.      As of the Closing, subject to the provisions of this Order, the Purchaser shall succeed to the entirety of Debtors' rights and obligations in the Assumed and Assigned Contracts first arising and attributable to the time period occurring on or after the Closing and shall have all rights thereunder.

10.      Upon the entry of this Order, (i) all defaults (monetary and non-monetary) under the Assumed and Assigned Contracts through the Closing shall be deemed cured and satisfied through the payment of the Cure Costs; (ii) no other amounts will be owed by the Debtors, their estates or the Purchaser with respect to amounts first arising or accruing during, or attributable or related to, the period before Closing with respect to the Assumed and Assigned Contracts, (iii) any and all persons or entities shall be forever barred and estopped from asserting a claim against the Debtors, their estates, or the Purchaser that any additional amounts are due or defaults exist under the Assumed and Assigned Contracts that arose or accrued, or relate to or are attributable to the period before the Closing.

11.      Upon assumption of the Assumed and Assigned Contracts by the Debtors and assignment to the Purchaser, the Assumed and Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Order.

12.      The Transactions have been undertaken by the Purchaser in good faith and the Purchaser is a good faith purchaser of the Purchased Assets as that term is used in Bankruptcy Code section 363(m). The Purchaser is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

13.      Pursuant to sections 105 and 363 of the Bankruptcy Code, the Debtors and the Purchaser are each hereby authorized to take any and all actions necessary or appropriate to:

14

(i) consummate the Sale of the Purchased Assets to the Purchaser and the Closing of the Sale in

accordance with the Motion, the Sale Agreement and this Order; (ii) assume and assign the

Assumed and Assigned Contracts; (iii) enter into a Sublease (as defined in the Stalking Horse

Agreement) of the 365 Real Estate Leases (as defined in the Stalking Horse Agreement) to the

extent permitted by, and in accordance with, the terms of the related 365 Real Estate Lease and

applicable Law (as defined in the Stalking Horse Agreement); and (iv) perform, consummate,

implement and close fully the Sale Agreement together with all additional instruments and

documents that may be reasonably necessary or desirable to implement the Sale Agreement. The

Debtors are hereby authorized to perform each of their covenants and undertakings as provided

in the Sale Agreement and the Ancillary Agreements prior to or after Closing without further

order of the Court.

14.     The Purchaser is hereby authorized in connection with the consummation of the

Sale to designate one or more Affiliates to purchase specified Purchased Assets, including the

Assumed and Assigned Contracts, to the extent permitted under the Sale Agreement and with all

the rights and protections accorded to the Purchaser under this Order and the Sale Agreement,

and the Debtors shall cooperate with and take all actions reasonably requested by the Purchaser

to effectuate any of the foregoing.

15.     No bulk sales law or any similar law of any state or other jurisdiction shall apply

in any way to the Sale and the Transactions.  Except as provided in the Sale Agreement, no

brokers were involved in consummation of the Sale or the Transactions, and no brokers'

commissions are due to any Person in connection with the Sale or the Transactions.

16.     The consideration provided by the Purchaser for the Purchased Assets under the

Sale Agreement and the EMEA Assets under the EMEA Agreement shall be deemed for all

purposes to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law, and the Sale may not be avoided, or costs or damages imposed or awarded, under section 363(n) or any other provision of the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act or any other similar state laws.

17.    On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of all of the Debtors' right, title and interest in the Purchased Assets or a bill of sale transferring good and marketable title in such Purchased Assets to the Purchaser on the Closing Date pursuant to the terms of the Sale Agreement, free and clear of all Claims and Interests (other than Assumed Liabilities and Permitted Encumbrances) pursuant to section 363 and 365 of the Bankruptcy Code.

18.    Except as otherwise provided in the Sale Agreement, any and all Purchased Assets in the possession or control of any person or entity, including, without limitation, any vendor, supplier or employee of the Debtors shall be transferred to the Purchaser free and clear of all Claims and Interests (other than Assumed Liabilities) pursuant to section 363 and 365 of the Bankruptcy Code and shall be delivered at the time of Closing to the Purchaser.

19.    Upon the Closing, all creditors, employees and equity holders of the Debtors are permanently and forever barred, restrained and enjoined from asserting any Claims or Interests or enforcing remedies, or commencing or continuing in any manner any action or other proceeding of any kind, against the Purchaser or the Purchased Assets on account of any of the Claims, Interests, Excluded Liabilities or Excluded Assets (other than Assumed Liabilities and Permitted Encumbrances).

16

20.     The Transactions do not amount to a consolidation, merger or *de facto* merger of the Purchaser and the Debtors and/or the Debtors' estates, there is not substantial continuity between the Purchaser and the Debtors, there is no continuity of enterprise between the Debtors and the Purchaser, the Purchaser is not a mere continuation of the Debtors or the Debtors' estates, and the Purchaser does not constitute a successor to the Debtor or the Debtors' estates. Upon the Closing, the Purchaser shall be deemed to have assumed only the Assumed Liabilities. Except for the Assumed Liabilities and Permitted Encumbrances, the Purchaser's acquisition of the Purchased Assets shall be free and clear of any "successor liability" claims of any nature whatsoever, whether known or unknown and whether asserted or unasserted as of the time of Closing. The Purchaser's operations shall not be deemed a continuation of the Debtors' business as a result of the acquisition of the Assets purchased.

21.     This Order (a) is and shall be effective as a determination that other than Permitted Encumbrances and Assumed Liabilities, all Claims and Interests of any kind or nature whatsoever existing as to the Purchased Assets prior to the Closing have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (b) is and shall be binding upon and shall authorize all entities, including, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Purchased Assets conveyed to the Purchaser. All such entities described above in this paragraph are authorized and specifically directed to strike all

17

recorded Interests against the Purchased Assets from their records, official and otherwise.

22.    If any person or entity which has filed statements or other documents or agreements evidencing Liens on, or other Interests in, the Purchased Assets shall not have delivered to the Debtors before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Liens or other Interests which the person or entity has or may assert with respect to the Purchased Assets, the Debtors and the Purchaser are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Purchased Assets.

23.    All counterparties to the Assumed and Assigned Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable request of the Purchaser, and shall not charge the Purchaser for, any instruments, applications, consents, or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Transactions.

24.    Each and every federal, state and governmental agency or department, and any other person or entity, is hereby authorized to accept any and all documents and instruments in connection with or necessary to consummate the Transactions contemplated by the Sale Agreement.

25.    No governmental unit may revoke or suspend any right, license, trademark or other permission relating to the use of the Purchased Assets sold, transferred or conveyed to the Purchaser on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale.

18

26.     To the extent this Order is inconsistent with any prior order or pleading with respect to the Motion in these chapter 11 cases, the terms of this Order shall govern. To the extent there is any inconsistency between the terms of this Order and the terms of the Sale Agreement (including all ancillary documents executed in connection therewith), the terms of the Order shall govern.

27.     Except as expressly provided in the Sale Agreement or the Ancillary Agreements, nothing in this Order shall be deemed to waive, release, extinguish or estop the Debtors or their estates from asserting or otherwise impair or diminish any right (including without limitation any right of recoupment), claim, cause of action, defense, offset or counterclaim in respect of any asset that is not a Purchased Asset.

28.     Any amounts that become payable by the Debtors to the Purchaser pursuant to the Sale Agreement or any of the documents delivered by the Debtors pursuant to or in connection with the Sale Agreement shall (a) constitute administrative expenses of the Debtors' estates within the meaning of section 503(b) of the Bankruptcy Code, and (b) be paid by the Debtors in the time and manner as provided in the Sale Agreement without further order of this Court.

29.     This Order shall not be modified by any chapter 11 plan confirmed in these chapter 11 cases or subsequent order of this Court unless expressly consented to in writing by the Purchaser.

30.     This Order and the Sale Agreement shall be binding in all respects upon all creditors and interest holders of any of the Debtors, all non-debtor parties to the Assumed and Assigned Contracts, the Committee, all successors and assigns of the Debtors and their affiliates and subsidiaries, and any trustees, examiners, "responsible persons" or other fiduciaries appointed in the Debtors' bankruptcy chapter 11 cases or upon a conversion to chapter 7 under

the Bankruptcy Code, and the Sale Agreement shall not be subject to rejection or avoidance under any circumstances.

31.     The failure specifically to include or make reference to any particular provisions of the Sale Agreement or any Ancillary Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Sale Agreement and the Ancillary Agreements are authorized and approved in their entirety.

32.     The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order, including, without limitation, the authority to: (1) interpret, implement and enforce the terms and provisions of this Order (including the injunctive relief provided in this Order) and the terms of the Sale Agreement, the Ancillary Agreements, all amendments thereto and any waivers and consents thereunder; (2) protect the Purchaser, or the Purchased Assets, from and against any of the Claims or Interests; (3) compel delivery of all Purchased Assets to the Purchaser; (4) compel the Purchaser to perform all of its obligations under the Sale Agreement; and (5) resolve any disputes arising under or related to the Sale Agreement, the Ancillary Agreements, the Sale or the Transactions.

33.     The Sale Agreement, the Ancillary Agreements and any related agreements, documents or other instruments may be modified, amended, or supplemented through a written document signed by the parties in accordance with the terms thereof without further order of the Court; provided, however, that any such modification, amendment or supplement is neither material nor materially changes the economic substance of the transactions contemplated hereby (it being understood, for the sake of clarity, that no such modification, amendment or supplement shall be deemed to be material or shall be deemed to materially change the economic substance of the transactions to the extent that the impact does not exceed two percent of the Purchase

20

Price); and provided further that no such modifications, amendments, or supplements may be made except following two (2) days written notice to, or with the prior consent of, the Committee, c/o Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036 (Attention: Fred S. Hodara, Stephen Kuhn, and Kenneth Davis). The Debtors are hereby authorized to perform each of their covenants and undertakings as provided in the Sale Agreement and the Ancillary Agreements prior to or after closing without further order of the Court.

34.     This Order shall be effective immediately upon entry, and any stay of orders provided for in Bankruptcy Rules 6004 or 6006 or any other provision of the Bankruptcy Code or Bankruptcy Rules is expressly lifted.

35.     Notwithstanding any provision in the Bankruptcy Rules to the contrary, (i) the terms of this Order shall be immediately effective and enforceable upon its entry, (ii) the Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order, and (iii) the Debtors may, in their discretion and without further delay, take any action and perform any act authorized under this Order.

36.     The provisions of this order are nonseverable and mutually dependent.

37.     This Order applies only to Assets owned by the Debtors. Consequently, notwithstanding any other provision of this Order or the Sale Agreement to the contrary, the portions of this Order that approve the transfer of the Purchased Assets to the Purchaser free and clear of all liens and other encumbrances, or that modify, enjoin, release or otherwise limit the rights of creditors of entities transferring Purchased Assets, apply only to Purchased Assets owned by the Debtors and do not apply to any Purchased Assets owned by non-debtor entities.

38.     The Purchaser shall deposit proceeds of the Sale, subject to the price adjustments

21

and Purchaser's rights under the Sale Agreement and less applicable transfer or value-added taxes incurred by the Sellers, and, to the extent agreed by the Sellers, any transaction costs, into an Escrow Account (as defined in the Interim Funding and Settlement Agreement, dated June 9, 2009 (the "IFSA")).  In accordance with this Court's order approving and authorizing the transactions contemplated by the IFSA, the proceeds in the Escrow Account shall not be distributed in advance of either (a) agreement of all of the Selling Debtors (as such term is defined in the IFSA) as to the distribution of such proceeds (subject to the prior consent of the Committee and the Bondholder Group acting in good faith in accordance with Section 12.g of the IFSA) or (b) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) in accordance with the terms of the Interim Sales Protocol (as such term is defined in the IFSA and subject to the requirements of Section 12.g of the IFSA), which Interim Sales Protocol shall be approved by the Court.  The Debtors are hereby authorized to negotiate and enter into an escrow agreement, on terms and conditions reasonably satisfactory to the Committee and the Monitor acting in good faith, with an escrow agent to establish an Escrow Account without further order of this Court.

39.    The Schedules delivered to the Court by the Debtors shall be kept segregated and under seal by the Clerk of Court and shall not be made publicly available pursuant to sections 105(a) and 107(b) of the Bankruptcy Code, Bankruptcy Rule 9018 and Local Rule 9081-1(b).

40.    The Debtors and the Canadian Debtors (together, the "North American Debtors") recognize that the provision of transition services by each of the North American Debtors under the transition services agreement(s) related to the Sale of the CVAS Business and the sales of the other principal lines of Nortel's business are and will be provided by a business organization that operates on a cross-jurisdictional basis using personnel and assets of several of the North

American Debtors, including, without limitation NNI and NNL. In light of the foregoing and in order to address certain concerns raised by the Committee and the Monitor, the North American Debtors have agreed to allocate certain risks and costs of providing such transition services, acting reasonably, including, without limitation, consent fees and segregation costs, sunset costs, indemnification claims and under-recoveries from the respective purchasers, in the same proportion as the "Sales Proceeds" of such sales to each of the North American Debtors are allocated (as determined in accordance with the Interim Sale Protocol contemplated by the IFSA or mutual agreement of the relevant Selling Debtors), and that the side agreement reflecting the foregoing shall be on such terms and conditions as the North American Debtors may agree not inconsistent with the foregoing, acting promptly and in good faith and subject to the consent of the Committee, the Bondholder Group and the Monitor.

41.    Nothing in this Order authorizes or provides for the assumption and assignment of any contract or license to which Motorola, Inc. ("Motorola") is a party, pursuant to section 365 of the Bankruptcy Code. To the extent that the Purchaser elects, subsequent to the date of this Order, to have the Sellers assign to the Purchaser any agreement or license with Motorola, Inc. or any of Motorola's affiliates relating to the Assets, in whole or in part (hereinafter, a "Motorola Agreement"), the Debtors shall provide notice to Motorola of such proposed assumption and assignment in accordance with the Assumption and Assignment Procedures, if assumed pursuant to section 365 of the Bankruptcy Code, or, with Motorola's consent (to the extent that the Motorola Agreement requires Motorola's consent to any assignment) under the applicable terms of the contract or license for any assignment not subject to section 365. In the event that the Debtors provide notice of a proposed assumption and assignment under the Assumption and Assignment Procedures, the Objection Of Motorola, Inc. To Debtors' Motion For Orders (I)(A)

23

Authorizing Debtors' Entry Into The Stalking Horse Agreement, (B) Authorizing And Approving

The Bidding Procedures And Bid Protections, (C) Approving The Payment Of An Incentive Fee,

(D) Approving The Notice Procedures And The Assumption And Assignment Procedures, (E)

Authorizing The Filing Of Certain Documents Under Seal, And (F) Setting A Date For The Sale

Hearing And (II) Authorizing And Approving (A) The Sale Of Certain Assets Of Debtors' Voice

Over IP And Application Solutions Business Free And Clear Of All Liens, Claims And

Encumbrances And (B) The Assumption And Assignment Of Certain Executory Contracts [D.I.

2437] shall be deemed to be a timely filed objection to such assumption and assignment, and all

arguments, objections and defenses contained in the Objection with respect to such assumption

and assignment are expressly preserved.

42.    Nothing in this Order provides for the assumption and assignment of any contract

or license with Open Systems Solutions, Inc. ("OSS") pursuant to section 365 of the Bankruptcy

Code.  To the extent that the Purchaser elects to have the Debtors assign to the Purchaser any

contract with OSS relating to the Assets, in whole or in part, the Debtors and Purchaser will do

so in accordance with the terms of such contract or license, which terms if required by such

contract or license may include, *inter alia*, the written consent of OSS.

43.    The Debtors' Motion as it relates to the proposed assumption and assignment of

executory contracts with AT&T Services, Inc., and its subsidiaries and affiliates, and the Limited

Objection to Debtors' Motion for Orders (I)(A) Authorizing Debtors' Entry Into the Stalking

Horse Agreement, (B) Authorizing and Approving the Bidding Procedures and Bid Protections,

(C) Approving Payment of an Incentive Fee, (D) Approving the Notice Procedures and the

Assumption and Assignment Procedures, (E) Authorizing the Filing of Certain Documents

Under Seal and (F) Setting a Date for the Sale Hearing, and (II) Authorizing and Approving (A)

24

the Sale of Certain Assets of Debtors' Carrier Voice Over IP and Application Solutions Business

Free and Clear of all Liens, Claims and Encumbrances and (B) the Assumption and Assignment

of Certain Executory Contracts [D.I. 2436] (the "Limited Objection") filed by AT&T Services,

Inc., on its own behalf and as agent on behalf of AT&T Corp. and its subsidiaries and affiliates

(collectively, "AT&T"), in opposition to the assumption and assignment of such contracts are

adjourned to March 17, 2010 at 11:00 a.m. For the avoidance of doubt and notwithstanding

anything to the contrary in this Order or the Sale Agreement, all arguments, objections and

defenses put forth by AT&T in its Limited Objection, and all of the Debtors' defenses thereto are

hereby expressly preserved.

44.    Nothing in this Order or in the Sale Agreement or Ancillary Agreements provides

for the assumption and/or assignment by the Debtors of any contract or license with SNMP

Research International, Inc. ("SNMP") under section 365 of the Bankruptcy Code. To the extent

that the Purchaser elects to have the Debtors assign or sublicense to the Purchaser any contract

with or license of SNMP relating to the Assets, the Debtors and Purchaser will do so in

accordance with the terms of such contract or applicable license, which may include entering

into a new license agreement.

45.    Nothing in this Order provides for the assumption and assignment of any contract

or license with Oracle America, Inc., Oracle USA, Inc., Oracle Corporation, PeopleSoft or

Metasolv (collectively "Oracle") pursuant to section 365 of the Bankruptcy Code. To the extent

that the Purchaser elects under the Sale Agreement and/or the Ancillary Agreements to have the

Debtors assign to the Purchaser any contract with Oracle relating to the Assets, in whole or in

part, the Debtors and Purchaser will do so in accordance with the terms of such contract or

license and applicable law, which may include, *inter alia*, the written consent of Oracle.

46.     The Debtors' Motion as it relates to the proposed assumption and assignment of executory contracts with the affiliates of Verizon Communications Inc. (collectively, "Verizon"), and the Objection of the Affiliates of Verizon Communications Inc. to Debtors' Motion For Order Authorizing and Approving the Sale of Certain Assets of Debtors' Carrier Voice Over IP and Application Solutions Business Free and Clear of all Liens, Claims and Encumbrances and the Assumption and Assignment of Certain Executory Contracts [D.I. 2595] (the "Verizon Objection") filed by Verizon in opposition to the assumption and assignment of such contracts are adjourned to March 17, 2010 at 11:00 a.m. For the avoidance of doubt and notwithstanding anything to the contrary in this Order or the Sale Agreement, all arguments, objections and defenses put forth by Verizon in the Verizon Objection, and all of the Debtors' defenses thereto are hereby expressly preserved. Furthermore, nothing in this Order shall be deemed to waive, release or extinguish any valid claim with respect to setoff that Verizon may have against the Debtors.

47.     The Assumed and Assigned Contracts (as defined in the Sale Agreement) to which Qwest Communications Company, LLC or its predecessor(s) in interest or affiliate(s) (collectively, "Qwest") is a counterparty (collectively, the "Qwest Contracts") are being assumed and assigned under section 365 of the Bankruptcy Code and Qwest and Purchaser shall have all of the rights, duties and obligations with respect to each other with respect to the Qwest Contracts provided with respect to a contract assigned under section 365 of the Bankruptcy Code. There is no cure amount due or owed under the Qwest Contracts through February 28, 2010. In addition, nothing in this Order or the Sale Agreement shall relieve the Debtors from their obligation to cure defaults arising from March 1, 2010 to the Closing under the Assumed and Assigned Contracts to which Qwest is a counterparty, provided that Qwest shall notify the

Debtors in writing of any such defaults prior to the date of the Closing.  To facilitate Qwest's ability to give such notice, the Debtors shall give Qwest two (2) business days written notice of the expected date of Closing.  If any such cure amounts are asserted, the Debtors retain the right to elect not to assume and assign the respective contract or postpone such assumption and assignment until any such dispute is resolved.  Nothing in this paragraph modifies or limits the Debtors' or Purchaser's right to withdraw their request for the assumption and assignment of any or all of the Qwest Contracts at any time prior to Closing.  For the avoidance of doubt, nothing herein is intended or shall be interpreted to expand or restrict the Debtors' rights under Section 365(k) of the Bankruptcy Code with respect to the Qwest Contracts.

DATED: MARCH 8 , 2010

THE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE

27

# BLUE SHEET

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------X
                                          :
                                          :    Chapter 11
                                          :
In re                                     :    Case No. 09-10138 (KG)
                                          :
Nortel Networks Inc., et al.,[1]          :
                                          :    Jointly Administered
                    Debtors.              :
                                          :    RE: D.I. 2962
                                          :
                                          :
-------------------------------------------------------X
```

### ORDER (I) AUTHORIZING THE SALE OF CERTAIN ASSETS OF DEBTORS' GSM/GSM-R BUSINESS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES; (II) AUTHORIZING AND APPROVING THE ASSET SALE AGREEMENT; (III) AUTHORIZING AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS; AND (IV) AUTHORIZING THE FILING OF CERTAIN DOCUMENTS UNDER SEAL

Upon the motion dated May 11, 2010 (the "Motion"),[2] of Nortel Networks Inc. ("NNI")

and certain of its affiliated debtors, as debtors and debtors in possession in the above-captioned

cases (the "Debtors"), for entry of an order, as more fully described in the Motion, (i) authorizing

the sale of certain assets of the Debtors' GSM/GSM-R Business to Telefonaktiebolaget L M

Ericsson (publ) (together with any Designated Purchaser (as defined in the Agreement referred to

below), "Ericsson" or the "Purchaser") free and clear of all liens, claims, and encumbrances,

pursuant to sections 105 and 363 of the Bankruptcy Code, (ii) authorizing and approving that

certain asset sale agreement dated as of May 11, 2010 among Nortel Networks Limited ("NNL"),

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

[2]     Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Motion, or if not defined in the Motion, shall have the meanings ascribed to such terms in the Agreement (as defined herein).

NNI, Nortel Networks (CALA) Inc. ("NN CALA", together with NNL, NNI and certain other entities identified therein as sellers, the "Sellers") and Ericsson for the sale of the Assets (as defined in the Agreement) as described therein (the "Agreement"), (iii) authorizing and approving the assumption and assignment of the Assumed and Assigned Contracts, and (iv) authorizing the Debtors to file certain documents under seal; and the Court having reviewed and considered the Motion; and all parties in interest having been heard, or having had the opportunity to be heard, regarding the Agreement and the transactions contemplated thereby (the "Transactions"); and after due deliberation thereon, and good cause appearing therefore,

IT IS HEREBY FOUND AND DETERMINED THAT:[3]

A.    The Court has jurisdiction to hear and determine the Motion and to grant the relief requested in the Motion pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(b);

B.    Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2);

C.    The statutory predicates for the relief requested in the Motion are sections 105, 107(b)(1), 363 and 365 of the Bankruptcy Code, and Rules 6004, 6006, 9014 and 9018 of the Bankruptcy Rules, and Local Rules 6004-1 and 9018-1;

D.    Notice of the Motion has been provided to (i) counsel to the Purchaser; (ii) the Office of the U.S. Trustee; (iii) the Monitor; (iv) counsel to the Committee; (v) counsel to the Bondholder Group; (vi) the non-debtor parties to the Assumed and Assigned Contracts; (vii) all taxing authorities or recording offices which have a reasonably known interest in the relief requested, (viii) all United States federal, state, and local regulatory authorities with jurisdiction

---

[3]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Fed. R. Bankr. P. 7052.

over the Debtors, (ix) each of the entities that had received an invitation from the Sellers to

acquire the Purchased Assets (as defined below), (x) all entities reasonably known by the

Debtors to have asserted a lien against the Purchased Assets (as defined below), and (xi) the

general service list established in these chapter 11 cases pursuant to Bankruptcy Rule 2002;

     E.    Based upon the affidavit of service filed with the Court:  (a) notice of the

Motion and the Sale Hearing was adequate and sufficient under the circumstances of these

chapter 11 cases and these proceedings and complied with the various applicable requirements of

the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice

is necessary; and (b) a reasonable opportunity to object and be heard with respect to the Motion

and the relief requested therein was afforded to all interested persons and entities;

     F.    The legal and factual bases set forth in the Motion and the record in these

proceedings establish just cause for the relief requested therein, and that such relief is in the best

interests of the Debtors, their estates, their creditors and the parties in interest;

     G.    The Assets (as defined in the Agreement) sought to be transferred and/or

assigned by the Debtors to the Purchaser pursuant to the Agreement (the "Purchased Assets") are

property of the Debtors' estates and title thereto is vested in the Debtors' estates;

     H.    The Debtors marketed the Purchased Assets and conducted the marketing

and sale process as set forth in the Motion.  The marketing process for the Purchased Assets was

adequate and reasonable;

     I.    Subject to the entry of this Order, each Debtor that is a Seller (i) has full

power and authority to execute Agreement, the Ancillary Agreements (as defined in the

Agreement) and all other documents contemplated thereby, (ii) has all of the power and authority

necessary to consummate the Transactions contemplated by the Agreement and (iii) has taken all

3

company action necessary to authorize and approve the Agreement, the Ancillary Agreements, the sale of the Purchased Assets (the "Sale") and the consummation by the Debtors of the Transactions. No consents or approvals, other than those expressly provided for in the Agreement or this Order, are required for the Debtors to close the Sale and consummate the Transactions;

    J.  The Agreement and the Sale were negotiated and have been and are undertaken by the Debtors and the Purchaser at arm's length without collusion or fraud, and in good faith within the meaning of Bankruptcy Code section 363(m). As a result of the foregoing, the Debtors and the Purchaser are entitled to the protections of section 363(m) of the Bankruptcy Code;

    K.  The total consideration provided by the Purchaser for the Purchased Assets is the highest or otherwise best offer received by the Debtors, and the Purchase Price (as defined in Agreement) constitutes (a) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (b) fair consideration under the Uniform Fraudulent Conveyance Act, and (c) reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession, or the District of Columbia, for the Purchased Assets;

    L.  The Purchaser would not have entered into the Agreement and would not consummate the Transactions if the sale of the Purchased Assets to the Purchaser was not free and clear of all liens, claims and interests pursuant to Bankruptcy Code section 363(f), or if the Purchaser would, or in the future could, be liable for any of such liens, claims and interests. A sale of the Purchased Assets other than one free and clear of all Claims and Interests (each as defined herein) would yield substantially less value for the Debtors' estates, with less certainty,

4

than the Sale. Therefore, the Sale contemplated by the Agreement is in the best interests of the Debtors, their estates and creditors, and all other parties in interest;

        M.      The Debtors may sell the Purchased Assets free and clear of all Interests to the extent provided in the Agreement because, with respect to each creditor asserting a Claim or Interest, one or more of the standards set forth in Bankruptcy Code § 363(f)(1)-(5) has been satisfied. Those holders of Claims and Interests who did not object or who withdrew their objections to the Sale or the Motion are deemed to have consented to the Motion and Sale pursuant to Bankruptcy Code § 363(f)(2). Those holders of Claims or Interests who did object fall within one or more of the other subsections of Bankruptcy Code section 363(f);

        N.      Neither the Debtors nor the Purchaser engaged in any conduct that would cause or permit the Agreement or the consummation of the Transactions to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code;

        O.      The Purchaser is not holding itself out to the public as a continuation of the Debtors and is not an "insider" or "affiliate" of any of the Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors or stockholders existed between the Purchaser and any of the Debtors. Pursuant to the Agreement, the Purchaser is not purchasing all of the Debtors' assets in that the Purchaser is not purchasing any of the Excluded Assets (as defined in the Agreement), and the Purchaser is not holding itself out to the public as a continuation of the Debtors. The conveyance of the Purchased Assets pursuant to the Sale does not amount to a consolidation, merger or *de facto* merger of the Purchaser and the Debtors and/or Debtors' estates, there is not substantial continuity between the Purchaser and the Debtors, there is no continuity of enterprise between the Debtors and the Purchaser, the Purchaser is not a mere continuation of the Debtors or the Debtors' estates, and the Purchaser

does not constitute a successor to the Debtors or the Debtors' estates. Upon the Closing (as defined in the Agreement), the Purchaser shall be deemed to have assumed only the Assumed Liabilities (as defined in the Agreement). Pursuant to sections 363 and 365 of the Bankruptcy Code, except for the Assumed Liabilities, the Purchaser's acquisition of the Purchased Assets shall be free and clear of any "successor liability" claims of any nature whatsoever, whether known or unknown and whether asserted or unasserted as of the Closing. The Purchaser's operations shall not be deemed a continuation of the Debtors' business as a result of the acquisition of the Purchased Assets. The Court finds that the Purchaser would not have acquired the Purchased Assets but for the foregoing protections against potential claims based upon "successor liability" theories;

P.      The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Assumed and Assigned Contracts to the Purchaser (or a Designated Purchaser) in connection with the consummation of the Sale, and the assumption, assignment, and sale of the Assumed and Assigned Contracts to the Purchaser is in the best interests of the Debtors, their estates, their creditors, and all parties in interest. The Assumed and Assigned Contracts being assigned to the Purchaser are an integral part of the Purchased Assets being purchased by the Purchaser, and accordingly, such assumption, assignment, and sale of the Assumed and Assigned Contracts are reasonable and enhance the value of the Debtors' estates. The Cure Costs required to be paid pursuant to section 365(b) of the Bankruptcy Code by the Debtors to the counterparty to the applicable Assumed and Assigned Contract, or as ordered to be paid by this Court pursuant to a final order (the "Cure Amounts") are deemed to be the entire cure obligation due and owing under the Assumed and Assigned Contracts under Bankruptcy Code section 365;

Q.     Each and every provision of the Assumed and Assigned Contracts or applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any Assumed and Assigned Contract has been satisfied or is otherwise unenforceable under Bankruptcy Code section 365;

R.     Upon the payment of the Cure Amount, if any, to the relevant counterparty, there are no outstanding defaults of the Debtors and their estates under the Assumed and Assigned Contracts;

S.     The Purchaser has demonstrated adequate assurance of future performance of all Assumed and Assigned Contracts within the meaning of Bankruptcy Code section 365;

T.     Upon the assignment and sale to the Purchaser, the Assumed and Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Order;

U.     Entry into the Agreement, the Ancillary Agreements and consummation of the Transactions constitute the exercise by the Debtors of sound business judgment, and such acts are in the best interests of the Debtors, their estates and creditors, and all parties in interest. The Court finds that the Debtors have articulated good and sufficient business reasons justifying the Sale of the Purchased Assets to the Purchaser. Additionally, (i) the Agreement constitutes the highest or otherwise best offer for the Purchased Assets; (ii) the Agreement and the closing thereon will present the best opportunity to realize the value of the Purchased Assets and avoid further decline and devaluation of the Purchased Assets; (iii) there is risk of deterioration of the value of the Purchased Assets if the Sale is not consummated promptly; (iv) proceeding by private sale and not pursuant to an auction is justified under the circumstances; and (v) the Agreement and the closing thereon will provide a greater recovery for the Debtors' creditors than

7

would be provided by any other presently available alternative.

        V.     The transfer of the Purchased Assets to the Purchaser will be a legal, valid and effective transfer of the Purchased Assets, and (except as otherwise provided in the Agreement) will vest the Purchaser with all of the Debtors' right, title and interest of, in and to the Purchased Assets, pursuant to sections 363 and 365 of the Bankruptcy Code, free and clear of all claims (as defined in § 101(5) of the Bankruptcy Code) and interests of any kind or nature whatsoever, rights or causes of action (whether in law or in equity), obligations, demands, restrictions, interests and matters of any kind or nature whatsoever, whether arising prior to or subsequent to the commencement of these cases, and whether imposed by agreement, understanding, law, equity or otherwise (collectively, the "Claims");

        W.    The Sale does not constitute a *sub rosa* chapter 11 plan;

        X.    Time is of the essence in consummating the Sale.  In order to maximize the value of the Debtors' assets, it is essential that the sale of the Purchased Assets occur within the time constraints set forth in the Agreement.  Accordingly, there is a cause to lift the stay contemplated by the Bankruptcy Rules 6004(h) and 6006(d);

        Y.    The Schedules to the Agreement contain substantial sensitive commercial information, which would be damaging to the Debtors and the Purchaser if it were to be disclosed to their competitors.  Filing the Schedules to the Agreement under seal is in the best interests of the Debtors, their estates, creditors and other parties in interest.

        Z.    The lists of customer counterparties to the Assumed and Assigned Contracts constitute commercially sensitive information, which would be damaging to the Debtors if it were to be disclosed to their competitors.  Filing the lists of customer counterparties to the Assumed and Assigned Contracts, including certificates of service and Exhibit C to the

Motion, under seal is in the best interests of the Debtors, their estates, creditors and other parties in interest.

AA.    The Sale contemplated by the Agreement is in the best interests of the Debtors and their estates, creditors, interest holders and all other parties in interest; and it is therefore:

ORDERED ADJUDGED AND DECREED THAT:

1.    The relief requested in the Motion is GRANTED.

2.    All objections with regard to the relief sought in the Motion that have not been withdrawn, waived, settled or otherwise dealt with as expressly provided herein or on the record at the Sale Hearing, are hereby overruled on the merits, with prejudice.

3.    Pursuant to Bankruptcy Code sections 105, 363 and 365 and subject to the satisfaction (or waiver, if permitted under the Agreement) of each condition under the Agreement, (a) the Debtors' entry into the Agreement and the Ancillary Agreements, (b) the Sale of the Purchased Assets, and (c) consummation of the Transactions are hereby approved and the Debtors are authorized to comply with the Motion, the Agreement and the Ancillary Agreements.

4.    Pursuant to section 365 of the Bankruptcy Code, notwithstanding any provision of any Assumed and Assigned Contracts or applicable non-bankruptcy law that prohibits, restricts, or conditions the assignment of the Assumed and Assigned Contracts, the Debtors are authorized to assume and to assign the Assumed and Assigned Contracts to the Purchaser, which assignment shall take place on and be effective as of the Closing; provided, however, that nothing in the Motion, the Agreement, Ancillary Agreements or this Order shall preclude the Debtors and the Purchaser from seeking the assumption and assignment of any

9

further contracts after the Closing.

     5.    The Debtors' assumption of the Assumed and Assigned Contracts is subject to the consummation of the sale of the Assets to the Purchaser. To the extent that an objection by a Counterparty to any Assumed and Assigned Contract, including any objection related to a Cure Amount, is not resolved prior to the Closing Date (as defined in the Agreement), the Debtors, in consultation with the Purchaser, but subject in all respects to the terms and conditions of the Agreement, may elect to (i) not assume such Assumed and Assigned Contract, (ii) postpone the assumption of such Assumed and Assigned Contract until the resolution of such objection or (iii) if the dispute relates solely to the amount of the Cure Amount, at the time of the assumption, pay to the Counterparty any undisputed portion of the proposed Cure Amount and place any disputed portion into a segregated interest-bearing account such that, upon any resolution by the Court of the Cure Amount dispute, or other agreement between the Debtors and the counterparty, the counterparty will be entitled to payment from the segregated account of any disputed portion and interest earned thereon to which the Court finds, or the Debtors and Counterparty agree, it is entitled. Any Cure Amount outstanding on the Closing Date shall be paid to the appropriate counterparty as a condition subsequent to such assumption and assignment of the relevant Assumed and Assigned Contract.

     6.    Upon the Closing, (a) except as otherwise provided in the Agreement, the Debtors are hereby authorized and directed to consummate, and shall be deemed for all purposes to have consummated, the sale, transfer and assignment of the Purchased Assets to the Purchaser free and clear of any and all interests pursuant to sections 363 and 365 of the Bankruptcy Code, including (without limitation) all liens, including any lien (statutory or otherwise), mortgage, pledge, security interest, charge, right of first refusal, hypothecation, encumbrance on real

10

property, easement, encroachment, right-of-way, restrictive covenant on real property, real

property license, lease or conditional sale arrangement (collectively, including "Liens" as

defined in the Agreement, the "Liens") and debts, liabilities and obligations, whether accrued or

fixed, direct or indirect, liquidated or unliquidated, absolute or contingent, matured or unmatured

or determined or undeterminable, known or unknown, including those arising under any Law or

Action and those arising under any Contract or otherwise, including any Tax liability

(collectively, the "Liabilities" and together with the Liens, the "Interests"), with such Interests to

attach to the sale proceeds in the same validity, extent and priority as immediately prior to the

sale transactions, subject to any rights, claims and defenses of the Debtors and other parties in

interest, and (b) except as otherwise expressly provided in the Agreement, all such Interests shall

be and hereby are released, terminated and discharged as to the Purchaser and the Purchased

Assets.

       7.     Except as otherwise provided in the Agreement, the transfer of the

Purchased Assets to the Purchaser pursuant to the Agreement shall be, and hereby is deemed to

be, a legal, valid and effective transfer of the Purchased Assets, and vests with or will vest in the

Purchaser all right, title and interest of the Debtors in the Purchased Assets, pursuant to sections

363 and 365 of the Bankruptcy Code, free and clear of all Claims and Interests of any kind or

nature whatsoever, with any Interests attaching to the sale proceeds in the same validity, extent

and priority as existed with respect to the Purchased Assets immediately prior to the transaction,

subject to any rights, claims and defenses of the Debtors and other parties in interest.

       8.     Upon the Closing, and except as otherwise expressly provided in

Agreement, the Purchaser shall not be liable for any claims against, and Liabilities and

obligations of, the Debtors or any of the Debtors' predecessors or affiliates. Without limiting the

generality of the foregoing, and except as otherwise provided in the Agreement, (a) the Purchaser

shall have no liability or obligation to pay wages, bonuses, severance pay, benefits (including,

without limitation, contributions or payments on account of any under-funding with respect to

any pension plans) or make any other payment to employees of the Debtors, (b) the Purchaser

shall have no liability or obligation in respect of any employee pension plan, employee health

plan, employee retention program, employee incentive program or any other similar agreement,

plan or program to which any Debtors are a party (including, without limitation, liabilities or

obligations arising from or related to the rejection or other termination of any such plan, program

agreement or benefit), (c) the Purchaser shall in no way be deemed a party to or assignee of any

such employee benefit, agreement, plan or program, and (d) all parties to any such employee

benefit, agreement, plan or program are enjoined from asserting against the Purchaser any

Claims arising from or relating to such employee benefit, agreement, plan or program.

        9.     As of the Closing, subject to the provisions of this Order, the Purchaser

shall succeed to the entirety of Debtors' rights and obligations in the Assumed and Assigned

Contracts first arising and attributable to the time period occurring on or after the Closing and

shall have all rights thereunder.

        10.    Upon the entry of this Order, (i) all defaults (monetary and non-monetary)

under the Assumed and Assigned Contracts through the Closing shall be deemed cured and

satisfied through the payment of the Cure Amounts; (ii) no other amounts will be owed by the

Debtors, their estates or the Purchaser with respect to amounts first arising or accruing during, or

attributable or related to, the period before Closing with respect to the Assumed and Assigned

Contracts, (iii) any and all persons or entities shall be forever barred and estopped from asserting

a claim against the Debtors, their estates, or the Purchaser that any additional amounts are due or

defaults exist under the Assumed and Assigned Contracts that arose or accrued, or relate to or are attributable to the period before the Closing.

11.    Pursuant to section 365(f) of the Bankruptcy Code, notwithstanding any provision to the contrary in the Assumed and Assigned Contracts, or in applicable non-bankruptcy law, that prohibits, restricts, or conditions the assignment of the Assumed and Assigned Contracts, the Debtors may assign the Assumed and Assigned Contracts to the Purchaser. Upon assumption of the Assumed and Assigned Contracts by the Debtors and assignment to the Purchaser, the Assumed and Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Order.

12.    The Transactions have been undertaken by the Purchaser in good faith and the Purchaser is a good faith purchaser of the Purchased Assets as that term is used in Bankruptcy Code section 363(m). The Purchaser is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

13.    Pursuant to sections 105 and 363 of the Bankruptcy Code and subject to the satisfaction (or waiver, if permitted under the Agreement) of each condition under the Agreement, the Debtors and the Purchaser are each hereby authorized to take any and all actions necessary or appropriate to: (i) consummate the Sale of the Purchased Assets to the Purchaser and the Closing of the Sale in accordance with the Motion, the Agreement and this Order; (ii) assume and assign the Assumed and Assigned Contracts; and (iii) perform, consummate, implement and close fully the Agreement together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Agreement. The Debtors are hereby authorized to perform each of their covenants and undertakings as provided in the

13

Agreement and the Ancillary Agreements prior to or after Closing without further order of the Court.

14.    The Debtors and the Purchaser are each hereby authorized to take any and all actions necessary or appropriate to: (i) consummate the Sale of the Purchased Assets to the Purchaser and the Closing of the Sale in accordance with the Motion, the Agreement and this Order; and (ii) perform, consummate, implement and close fully the Agreement together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Agreement.

15.    The Purchaser is hereby authorized in connection with the consummation of the Sale to allocate the Purchased Assets, including the Assumed and Assigned Contracts, among its affiliates, designees, assignees, and/or successors, including any Designated Purchaser (as defined in the Agreement), in a manner as it in its sole discretion deems appropriate and to assign, license, sublicense, transfer or otherwise dispose of any of the Purchased Assets, including the Assumed and Assigned Contracts, to its affiliates, designees, assignees, and/or successors with all of the rights and protections accorded to the Purchaser under this Order and the Agreement, and the Debtors shall cooperate with and take all actions reasonably requested by the Purchaser to effectuate any of the foregoing; provided, however, subject to the terms of the Agreement, the Debtors shall be reimbursed by the Purchaser for any reasonable expenses in connection therewith.

16.    No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Sale and the Transactions. Except as provided in the Agreement, no brokers were involved in consummation of the Sale or the Transactions, and no brokers' commissions are due to any Person in connection with the Sale or the Transactions.

14

17.     The consideration provided by the Purchaser for the Purchased Assets under the Agreement shall be deemed for all purposes to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law, and the Sale may not be avoided, or costs or damages imposed or awarded, under section 363(n) or any other provision of the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act or any other similar state laws.

18.     On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of all of the Purchased Assets or a bill of sale transferring good and marketable title in such Purchased Assets to the Purchaser on the Closing Date pursuant to the terms of the Agreement, free and clear of all Liens, Claims and Interests (except as otherwise provided in the Agreement) pursuant to sections 363 and 365 of the Bankruptcy Code.

19.     Except as otherwise provided in the Agreement and to the extent permitted by applicable law, any and all Purchased Assets in the possession or control of any person or entity, including, without limitation, any vendor, supplier or employee of the Debtors shall be transferred to the Purchaser free and clear of all Liens, Claims and Interests (except as otherwise provided in the Agreement) pursuant to section 363 and 365 of the Bankruptcy Code and shall be delivered at the time of Closing to the Purchaser.

20.     Upon the Closing, all creditors, employees and equity holders of the Debtors are permanently and forever barred, restrained and enjoined from asserting any Liens, Claims or Interests or enforcing remedies, or commencing or continuing in any manner any action or other proceeding of any kind, against the Purchaser or the Purchased Assets on account of any of the Liens, Claims, Interests, Excluded Liabilities or Excluded Assets (except as

15

otherwise provided in the Agreement).

21.     The Transactions do not amount to a consolidation, merger or *de facto*
merger of the Purchaser and the Debtors and/or the Debtors' estates, there is not substantial
continuity between the Purchaser and the Debtors, there is no continuity of enterprise between
the Debtors and the Purchaser, the Purchaser is not a mere continuation of the Debtors or the
Debtors' estates, and the Purchaser does not constitute a successor to the Debtors or the Debtors'
estates. Upon the Closing, the Purchaser shall be deemed to have assumed only the Assumed
Liabilities. Except as otherwise provided in the Agreement, the Purchaser's acquisition of the
Purchased Assets shall be free and clear of any "successor liability" claims of any nature
whatsoever, whether known or unknown and whether asserted or unasserted as of the time of
Closing. The Purchaser's operations shall not be deemed a continuation of the Debtors' business
as a result of the acquisition of the Assets purchased.

22.     This Order (a) is and shall be effective as a determination that other than
as provided in the Agreement, all Liens, Claims and Interests of any kind or nature whatsoever
existing as to the Purchased Assets prior to the Closing have been unconditionally released,
discharged and terminated, and that the conveyances described herein have been effected, and
(b) is and shall be binding upon and shall authorize all entities, including, without limitation, all
filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of
deeds, registrars of deeds, administrative agencies or units, governmental departments or units,
secretaries of state, federal, state and local officials, and all other persons and entities who may
be required by operation of law, the duties of their office, or contract, to accept, file, register or
otherwise record or release any documents or instruments, or who may be required to report or
insure any title or state of title in or to the Purchased Assets conveyed to the Purchaser. All such

16

entities described above in this paragraph are authorized and specifically directed to strike all recorded Interests against the Purchased Assets from their records, official and otherwise.

23.    If any person or entity which has filed statements or other documents or agreements evidencing Liens on, or Interests in, the Purchased Assets shall not have delivered to the Debtors before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Liens or Interests which the person or entity has or may assert with respect to the Purchased Assets, the Debtors and the Purchaser are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Purchased Assets.

24.    All counterparties to the Assumed and Assigned Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable request of the Purchaser, and shall not charge the Purchaser for, any instruments, applications, consents, or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Transactions.

25.    Each and every federal, state and governmental agency or department, and any other person or entity, is hereby authorized to accept any and all documents and instruments in connection with or necessary to consummate the Transactions contemplated by the Agreement.

26.    No governmental unit may revoke or suspend any right, license, trademark or other permission relating to the use of the Purchased Assets sold, transferred or conveyed to the Purchaser on account of the filing or pendency of these chapter 11 cases or the

17

consummation of the Sale.

28.      27.     This Order applies only to assets owned by the Debtors. Consequently, notwithstanding any other provision of this Order or the Agreement to the contrary, the portions of this Order that approve the transfer of assets to the Purchaser free and clear of all liens and other encumbrances, or that modify, enjoin, release or otherwise limit the rights of creditors of entities transferring assets, apply only to assets owned by the Debtors and do not apply to any assets owned by non-debtor entities except to the extent otherwise agreed by such creditor in writing.

28.     Except as expressly provided in the Agreement or the Ancillary Agreements, nothing in this Order shall be deemed to waive, release, extinguish or estop the Debtors or their estates from asserting or otherwise impair or diminish any right (including without limitation any right of recoupment), claim, cause of action, defense, offset or counterclaim in respect of any asset that is not a Purchased Asset.

29.     Any amounts that become payable by the Debtors to the Purchaser pursuant to the Agreement or any of the documents delivered by the Debtors pursuant to or in connection with the Agreement shall (a) constitute administrative expenses of the Debtors' estates within the meaning of section 503(b) of the Bankruptcy Code, and (b) be paid by the Debtors in the time and manner as provided in the Agreement without further order of this Court.

30.     This Order shall not be modified by any chapter 11 plan confirmed in these chapter 11 cases or subsequent order of this Court unless expressly consented to in writing by the Purchaser.

31.     This Order and the Agreement shall be binding in all respects upon and inure to the benefit of the Debtors, the Purchaser, and all creditors and interest holders of any of

18

the Debtors, all non-debtor parties to the Assumed and Assigned Contracts, the Committee, all successors and assigns of the Debtors and their affiliates and subsidiaries, and any trustees, examiners, "responsible persons" or other fiduciaries appointed in the Debtors' bankruptcy chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code, and the Agreement shall not be subject to rejection or avoidance under any circumstances.

32.    The failure specifically to include or make reference to any particular provisions of the Motion, the Agreement or any Ancillary Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Motion, the Agreement and the Ancillary Agreements are authorized and approved in their entirety.

33.    Subject to Section 10.6 of the Agreement, until these cases are closed or dismissed, the Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order, including, without limitation, the authority to: (1) interpret, implement and enforce the terms and provisions of this Order (including the injunctive relief provided in this Order) and the terms of the Agreement, the Ancillary Agreements, all amendments thereto and any waivers and consents thereunder; (2) protect the Purchaser, or the Purchased Assets, from and against any of the Claims or Interests; (3) compel delivery of all Purchased Assets to the Purchaser; (4) compel the Purchaser to perform all of its obligations under the Sale Agreement; and (5) resolve any disputes arising under or related to the Motion, the Agreement, the Ancillary Agreements, the Sale or the Transactions.

34.    The Agreement, the Ancillary Agreements and any related agreements, documents or other instruments may be modified, amended, or supplemented through a written document signed by the parties in accordance with the terms thereof without further order of the

19

Court; *provided, however*, that any such modification, amendment or supplement is neither material nor materially changes the economic substance of the transactions contemplated hereby; and *provided further* that no such modifications, amendments, or supplements may be made except following two (2) days written notice to, or with the prior consent of, the Committee, c/o Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036 (Attention: Fred S. Hodara, Stephen Kuhn, and Kenneth Davis).

35.    Notwithstanding any provision in the Bankruptcy Rules (including Bankruptcy Rules 6004 and 6006) or Local Rules to the contrary: (i) the terms of this Order shall be immediately effective and enforceable upon its entry; (ii) the Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order; and (iii) the Debtors may, in their discretion and without further delay, take any action and perform any act authorized under this Order.

36.    The provisions of this Order are nonseverable and mutually dependent.

37.    The Purchaser shall deposit proceeds of the Sale, subject to Purchaser's rights under the Agreement and less applicable transfer or value-added taxes incurred by the Sellers (as such term is defined in the Agreement), and, to the extent agreed by the Sellers, any transaction costs, into an escrow account designated by the Sellers (the "Escrow Account"). The proceeds in the Escrow Account shall be governed by an escrow agreement that, among other things, shall provide that the proceeds only may be released from the Escrow Account upon either (a) written instruction delivered by all of the Sellers as to the distribution of such proceeds (subject to the prior consent of the Committee, the Monitor and the Bondholder Group acting in good faith) or (b) upon order of this Court and the Canadian Court (as defined in the Agreement) after notice and a joint hearing. The Debtors are hereby authorized to negotiate and enter into an

escrow agreement, on terms and conditions reasonably satisfactory to the Committee and the Monitor acting in good faith, with an escrow agent to establish the Escrow Account without further order of this Court.

38.     The Schedules delivered to the Court by the Debtors shall be kept segregated and under seal by the Clerk of Court and shall not be made publicly available pursuant to sections 105(a) and 107(b) of the Bankruptcy Code, Bankruptcy Rule 9018 and Local Rule 9018-1(b).

39.     The lists of customer counterparties to the Assumed and Assigned Contracts, including the certificates of service and Exhibit C to the Motion, delivered to the Court by the Debtors shall be kept segregated and under seal by the Clerk of Court and shall not be made publicly available pursuant to sections 105(a) and 107(b) of the Bankruptcy Code, Bankruptcy Rule 9018 and Local Rule 9018-1(b).

40.     Nothing in this Order provides for the assumption and/or assignment by the Debtors of any contract or license with Motorola, Inc. ("Motorola") under section 365 of the Bankruptcy Code. To the extent that the Purchaser elects to have the Debtors assign to the Purchaser any contract with or license with Motorola relating to the Assets, the Debtors and Purchaser will do so in accordance with the terms of such contract or applicable license or, to the extent assignable under section 365 of the Bankruptcy Code, in accordance with the procedures set forth in the Motion, with all rights of Motorola, the Debtors and the Purchaser fully reserved with respect thereto. In the event that the Debtors provide notice of a proposed assumption and assignment of such contract under section 365 of the Bankruptcy Code, the Amended Objection Of Motorola, Inc. To Debtors' Motion For Orders (I) Authorizing The Sale Of Certain Assets Of Debtors' GSM/GSM-R Business Free And Clear Of All Liens, Claims And Encumbrances; (II)

21

Authorizing And Approving The Asset Sale Agreement; (III) Authorizing And Approving The Assumption And Assignment Of Certain Executory Contracts; And (IV) Authorizing The Filing Of Certain Documents Under Seal (the "Objection") shall be deemed to be a timely filed objection to such assumption and assignment, and all arguments, objections and defenses contained in the Objection with respect to such assumption and assignment shall be expressly preserved with respect thereto.

41.    Nothing in this Order or in the Agreement or Ancillary Agreements provides for the assumption and/or assignment, whether under section 365 of the Bankruptcy Code or otherwise, by the Debtors, of any contract with SNMP Research International, Inc. ("SNMP") at this time, and no intellectual property rights or intellectual property licensed via contracts between SNMP and Nortel are being conveyed or otherwise transferred by the Debtors pursuant to the Order, Agreement or Ancillary Agreements at this time. To the extent that the Purchaser elects to have the Debtors assign to the Purchaser any contract with or intellectual property right of SNMP relating to the Assets, the Debtors and Purchaser will do so in accordance with the terms of this Order, including the assumption procedures described in the Motion and such contract or applicable license, as applicable, and which may include, inter alia, the written consent of SNMP.

Dated:  May 24, 2010
        Wilmington, Delaware

THE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE

22

# BLUE SHEET

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
----------------------------------------------------------X
                                              :
                                              :    Chapter 11
                                              :
In re                                         :    Case No. 09-10138 (KG)
                                              :
Nortel Networks Inc., et al.,[1]              :    Jointly Administered
                                              :
              Debtors.                        :
                                              :    RE: D.I. 3832
                                              :
----------------------------------------------------------X
```

## ORDER AUTHORIZING AND APPROVING (A) THE SALE OF CERTAIN ASSETS OF DEBTORS' MULTI-SERVICE SWITCH (FORMERLY KNOWN AS 'PASSPORT') BUSINESS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES AND (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS

Upon the motion (the "Motion")[2] of Nortel Networks Inc. ("NNI") and its affiliated

debtors, as debtors and debtors in possession in the above-captioned Chapter 11 Cases

(collectively, the "Debtors"), for entry of orders under Bankruptcy Code sections 105, 107(b)(1),

363 and 365, Bankruptcy Rules 2002, 6004, 6006, 9014 and 9018 and Local Rules 6004-1 and

9018-1 (I)(A) authorizing Debtors' entry into the Stalking Horse Agreement, (B) authorizing and

approving the Bidding Procedures and Bid Protections, (C) approving the Notice Procedures and

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion, or if not defined in the Motion, shall have the meanings ascribed to such terms in the Sale Agreement (as defined herein).

the Assumption and Assignment Procedures, (D) approving a Side Agreement, (E) authorizing

the filing of certain documents under seal, and (F) setting a date for the sale hearing, and (II)

authorizing and approving (A) the sale of certain assets of Debtors' Multi-Service Switch

business (the "MSS Business") free and clear of all liens, claims and encumbrances and (B) the

assumption and assignment of certain executory contracts [D.I. 3832]; and the Court having

entered an order approving, among other things, the Bidding Procedures (the "Bidding

Procedures Order") based upon the evidence presented at the bidding procedures hearing held on

September 1, 2010 (the "Bidding Procedures Hearing"); and the Auction (as defined below)

having been held in accordance with the Bidding Procedures Order; and at the conclusion of said

Auction Telefonaktiebolaget LM Ericsson (publ) (the "Purchaser") was chosen as the Successful

Bidder in accordance with the Bidding Procedures; and the Court having conducted a hearing on

the Motion on September 30, 2010 (the "Sale Hearing"); and all parties in interest having been

heard, or having had the opportunity to be heard, regarding the asset sale agreement attached

hereto as Exhibit A (the "Sale Agreement"), by and among NNI, Nortel Networks Limited

("NNL"), Nortel Networks Corporation ("NNC") and certain other entities identified therein as

sellers (collectively, the "Sellers"), and the Purchaser and the transactions contemplated thereby

(the "Transactions"); and the Court having reviewed and considered the Motion, and the

arguments of counsel made, and the evidence adduced, at the Bidding Procedures Hearing and

the Sale Hearing; and upon the record of the Bidding Procedures Hearing and the Sale Hearing

and these chapter 11 cases, and after due deliberation thereon, and good cause appearing

therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:[3]**

---

[3]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Fed. R. Bankr. P. 7052.

A.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157(b)(1)
and 1334(b).

B.      Venue of these cases and the Motion in this district is proper under 28 U.S.C.
§§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

C.      The statutory predicates for the relief sought in the Motion are sections 105,
107(b)(1), 363 and 365 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.*, as
amended (the "Bankruptcy Code"), and Rules 2002, 6004, 6006, 9014 and 9018 of the Federal
Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 6004-1 and 9018-1.

D.      Notice of the Motion and the Sale Hearing has been provided (a) to (i) all entities
reasonably known to have expressed an interest in a transaction with respect to the Assets (as
defined in the Sale Agreement) during the past nine (9) months, (ii) all entities reasonably known
to have asserted any claim, lien, encumbrance or interest in the Assets, (iii) the attorneys general
for all states in which Purchased Assets (as defined below) owned by the Debtors are located, all
federal and state taxing authorities, the Securities and Exchange Commission, the Environmental
Protection Agency, state environmental protection agencies, the Internal Revenue Service, and
the Department of Labor and similar state labor or employment agencies, (iv) all parties entitled
to notice pursuant to Local Rule 2002-1(b), (v) all counterparties to the Assumed and Assigned
Contracts, (vi) all known creditors of the Debtors, (vii) counsel to the Committee, and (viii)
counsel to the Bondholder Group; and (b) through publication of the Publication Notice, all in
accordance with and as provided by the Bidding Procedures Order.

E.      As evidenced by affidavits of publication filed with the Court D.I.'s 3932, 3931
and 3930, notice of the Sale Hearing was published in The Wall Street Journal (National
Edition), The Globe and Mail (National Edition), and The Financial Times (International

3

Edition) on September 8, 2010.

F.      Based upon the affidavits of service and publication filed with the Court D.I.'s 3856, 3930, 3931, 3932 and 3950: (a) notice of the Motion and the Sale Hearing was adequate and sufficient under the circumstances of these chapter 11 cases and these proceedings and complied with the various applicable requirements of the Bankruptcy Code, the Bankruptcy Rules and the Bidding Procedures Order, and (b) a reasonable opportunity to object and be heard with respect to the Motion and the relief requested therein was afforded to all interested persons and entities.

G.      The Assets sought to be transferred and/or assigned by the Debtors to the Purchaser pursuant to the Sale Agreement (the "Purchased Assets") are property of the Debtors' estates and title thereto is vested in the Debtors' estates.

H.      The Debtors and their professionals marketed the Purchased Assets and conducted the marketing and sale process as set forth in and in accordance with the Motion. Based upon the record of these proceedings, all creditors and other parties in interest and all prospective purchasers have been afforded a reasonable and fair opportunity to bid for the Purchased Assets.

I.      On August 26, 2010, NNI, NNL and NNC and PSP Holding LLC (the "Stalking Horse Purchaser") entered into the Stalking Horse Agreement, subject to higher and better offers. Simultaneously with the execution of the Stalking Horse Agreement, the EMEA Sellers, the Joint Administrators, the Joint Israeli Administrators and the Stalking Horse Purchaser entered into a separate agreement (the "EMEA Asset Sale Agreement") providing for the sale to the Stalking Horse Purchaser of the EMEA Assets (as defined in the EMEA Asset Sale Agreement).

J.      The Bidding Procedures were substantively and procedurally fair to all parties and all potential bidders. The Debtors conducted the sale process (including the Auction) without

4

collusion and in accordance with the Bidding Procedures.

K.       After the conclusion of the auction held on September 24, 2010 (the "Auction"),

the Debtors determined in a valid and sound exercise of their business judgment that the highest

and best Qualified Bid (as defined in the Bidding Procedures Order) was that of the Purchaser.

L.       Subject to the entry of this Order, each Debtor that is a Seller (i) has full power

and authority to execute the Sale Agreement, the Ancillary Agreements (as defined in the Sale

Agreement) to which it is a party and all other documents contemplated thereby, (ii) has all of

the power and authority necessary to consummate the Transactions contemplated by the Sale

Agreement and (iii) has taken all company action necessary to authorize and approve the Sale

Agreement, the Ancillary Agreements, the sale of the Purchased Assets (the "Sale") and the

consummation by the Debtors of the Transactions. No consents or approvals, other than those

expressly provided for in the Sale Agreement or this Order, are required for the Debtors to close

the Sale and consummate the Transactions.

M.       The Sale Agreement and the Transactions were negotiated and have been and are

undertaken by the Debtors and the Purchaser at arm's length without collusion or fraud, and in

good faith within the meaning of Bankruptcy Code section 363(m). The Purchaser is purchasing

the Purchased Assets in good faith and has otherwise proceeded in good faith in connection with

these proceedings in that *inter alia*: (i) the Debtors were free to deal with any other party in

connection with the sale of the Purchased Assets; (ii) the Purchaser complied with the provisions

in the Bidding Procedures Order; (iii) the Purchaser agreed to subject its bid to the competitive

bidding process set forth in the Bidding Procedures Order; and (iv) no common identity of

directors or controlling stockholders exists between the Purchaser and any of the Debtors. As a

result of the foregoing, the Debtors and the Purchaser are entitled to the protections of section

5

363(m) of the Bankruptcy Code.

N.     The total consideration provided by the Purchaser for the Assets and the EMEA

Assets is the highest and best offer received by the Sellers, and the Purchase Price constitutes (a)

reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer

Act, (b) fair consideration under the Uniform Fraudulent Conveyance Act, and (c) reasonably

equivalent value, fair consideration and fair value under any other applicable laws of the United

States, any state, territory or possession, or the District of Columbia, and may not be avoided

under section 363(n) of the Bankruptcy Code. The Court's approval of the Motion, the Sale

Agreement, and the Ancillary Agreements is in the best interests of the Debtors, their estates,

their creditors and all other parties in interest.

O.     The transfer of the Debtors' right, title and interest in the Purchased Assets to the

Purchaser will be a legal, valid and effective transfer of the Purchased Assets, and will vest the

Purchaser with all of the Debtors' right, title and interest of, in and to the Purchased Assets, free

and clear of (i) all Claims and Interests (each as defined herein) of any kind or nature whatsoever

(other than the Assumed Liabilities and the Permitted Encumbrances (each as defined in the Sale

Agreement)), and (ii) all Excluded Liabilities (as defined in the Sale Agreement), claims as

defined in 11 U.S.C. § 101(5), rights or causes of action (whether in law or in equity),

obligations, demands, restrictions, interests and matters of any kind or nature whatsoever,

whether arising prior to or subsequent to the commencement of these cases, and whether

imposed by agreement, understanding, law, equity or otherwise (collectively, the "Claims"),

other than Assumed Liabilities and Permitted Encumbrances.

P.     The Purchaser would not have entered into the Sale Agreement and would not

consummate the Transactions if the sale of the Purchased Assets to the Purchaser was not free

6

and clear of all liens, claims and interests pursuant to Bankruptcy Code section 363(f), or if the Purchaser would, or in the future could, be liable for any of such liens, claims and interests. A sale of the Purchased Assets other than one free and clear of all Claims and Interests would yield substantially less value for the Debtors' estates, with less certainty, than the Sale. Therefore, the Sale as contemplated by the Sale Agreement is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

Q.      The Debtors may sell the Purchased Assets free and clear of all Claims and Interests, because, with respect to each creditor asserting a Claim or Interest, one or more of the standards set forth in Bankruptcy Code § 363(f)(1)-(5) has been satisfied. Those holders of Claims and Interests who did not object or who withdrew their objections to the Sale or the Motion are deemed to have consented to the Motion and Sale pursuant to Bankruptcy Code § 363(f)(2). Those holders of Claims or Interests who did object fall within one or more of the other subsections of Bankruptcy Code section 363(f).

R.      Neither the Debtors nor the Purchaser engaged in any conduct that would cause or permit the Sale Agreement or the consummation of the Transactions to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

S.      The Sale Agreement and Ancillary Agreements were not entered into, and the Sale is not being consummated, for the purpose of hindering, delaying or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law. Neither the Debtors nor the Purchaser has entered into the Sale Agreement or the Ancillary Agreements or is consummating the Sale with any fraudulent or otherwise improper purpose.

T.      The Purchaser is not holding itself out to the public as a continuation of the

7

Debtors and is not an "insider" or "affiliate" of any of the Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors or stockholders existed between the Purchaser and any of the Debtors. Pursuant to the Sale Agreement, the Purchaser is not purchasing all of the Debtors' assets in that the Purchaser is not purchasing any of the Excluded Assets (as defined in the Sale Agreement), and the Purchaser is not holding itself out to the public as a continuation of the Debtors. The conveyance of the Purchased Assets pursuant to the Transactions does not amount to a consolidation, merger or de facto merger of the Purchaser and the Debtors and/or Debtors' estates, there is not substantial continuity between the Purchaser and the Debtors, there is no continuity of enterprise between the Debtors and the Purchaser, the Purchaser is not a mere continuation of the Debtors or the Debtors' estates, and the Purchaser does not constitute a successor to the Debtors or the Debtors' estates. Upon the Closing (as defined in the Sale Agreement), the Purchaser shall be deemed to have assumed only the Assumed Liabilities. Except for the Assumed Liabilities, the Purchaser's acquisition of the Purchased Assets shall be free and clear of any "successor liability" claims of any nature whatsoever, whether known or unknown and whether asserted or unasserted as of the Closing. The Purchaser's operations shall not be deemed a continuation of the Debtors' business as a result of the acquisition of the Purchased Assets. The Court finds that the Purchaser would not have acquired the Purchased Assets but for the foregoing protections against potential claims based upon "successor liability" theories.

U.      The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Assumed and Assigned Contracts to the Purchaser (or a Designated Purchaser (as defined in the Sale Agreement)) in connection with the consummation of the Sale, and the assumption, assignment and sale of the Assumed and Assigned Contracts to

8

the Purchaser is in the best interests of the Debtors, their estates, their creditors, and all parties in interest. The Assumed and Assigned Contracts being assigned to the Purchaser are an integral part of the Purchased Assets being purchased by the Purchaser, and accordingly, such assumption, assignment, and sale of the Assumed and Assigned Contracts are reasonable and enhance the value of the Debtors' estates. The Cure Costs required to be paid pursuant to Bankruptcy Code section 365(b) to the Counterparty to the applicable Assumed and Assigned Contract, or as mutually agreed, or as ordered to be paid by this Court pursuant to a final order, are deemed to be the entire cure obligation due and owing under the Assumed and Assigned Contracts under Bankruptcy Code section 365 and no further amounts will be required to be paid.

V.      Each and every provision of the Assumed and Assigned Contracts or applicable non-bankruptcy law that purport to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any Assumed and Assigned Contract have been satisfied or are otherwise unenforceable under Bankruptcy Code section 365.

W.      Upon the payment of the Cure Cost, if any, to the relevant Counterparty, there are no outstanding defaults of the Debtors and their estates under the Assumed and Assigned Contracts.

X.      The Purchaser has demonstrated adequate assurance of future performance of all Assumed and Assigned Contracts within the meaning of Bankruptcy Code section 365.

Y.      Upon the assignment and Sale to the Purchaser, the Assumed and Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Order.

Z.      Entry into the Sale Agreement, the Ancillary Agreements and consummation of

9

the Transactions constitute the exercise by the Debtors of sound business judgment, and such acts are in the best interests of the Debtors, their estates and creditors, and all parties in interest. The Court finds that the Debtors have articulated good and sufficient business reasons justifying the Sale of the Purchased Assets to the Purchaser. Additionally, (i) the Sale Agreement constitutes the highest and best offer for the Purchased Assets; (ii) the Sale Agreement and the closing thereof will present the best opportunity to realize the value of the Purchased Assets and avoid further decline and devaluation of the Purchased Assets; (iii) there is risk of deterioration of the value of the Purchased Assets if the Sale is not consummated promptly; and (iv) the Sale Agreement and the closing thereof will provide a greater recovery for the Debtors' creditors than would be provided by any other presently available alternative.

AA.    The sale and assignment of the Purchased Assets outside of a plan of reorganization pursuant to the Agreement neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a liquidating plan for the Debtors. The Sale does not constitute a *sub rosa* chapter 11 plan.

BB.    Time is of the essence in consummating the Sale. In order to maximize the value of the Debtors' assets, it is essential that the sale of the Purchased Assets occur within the time constraints set forth in the Sale Agreement. Accordingly, there is a cause to lift the stay contemplated by the Bankruptcy Rules 6004(h) and 6006(d).

CC.    The Schedules to the Sale Agreement contain substantial sensitive commercial information, which would be damaging to the Debtors and the Purchaser if it were to be disclosed to their competitors. Filing the Schedules to the Sale Agreement under seal is in the best interests of the Debtors, their estates, creditors and other parties-in-interest; and it is therefore:

10

**ORDERED ADJUDGED AND DECREED THAT:**

1.     The relief requested in the Motion is **GRANTED.**

2.     All objections with regard to the relief sought in the Motion that have not been withdrawn, waived, settled or otherwise dealt with as expressly provided herein or on the record at the Sale Hearing, are hereby overruled on the merits, with prejudice.

3.     Pursuant to Bankruptcy Code sections 105, 363 and 365, and subject to the approval of the Sale by the Ontario Superior Court of Justice in the Canadian Proceedings with respect to the Canadian Debtors, the Sale Agreement, the Ancillary Agreements, the Sale of the Purchased Assets, and consummation of the Transactions are hereby approved and the Debtors are authorized to comply with the Sale Agreement and the Ancillary Agreements; and the Alternate Bid submitted by the Alternate Bidder with a cash purchase price of $60,000,000 pursuant to the terms submitted therewith, is hereby approved and authorized as an Alternate Bid and shall remain open as an Alternate Bid pursuant to the terms of the Bidding Procedures Order and the bid terms submitted at the auction.

4.     Pursuant to section 365 of the Bankruptcy Code, notwithstanding any provision of any Assumed and Assigned Contracts or applicable non-bankruptcy law that prohibits, restricts, or conditions the assignment of the Assumed and Assigned Contracts, the Debtors are authorized to assume and to assign the Assumed and Assigned Contracts to the Purchaser, which assignment shall take place on and be effective as of the Closing, or as otherwise provided by order of this Court.

5.     In the event that the Sale contemplated by the Sale Agreement cannot be consummated, the Alternate Bid shall be and is hereby approved, the execution of the asset sale agreement pursuant to the Alternate Bid by the Debtors is approved and the Debtors are

11

authorized to take such additional steps and execute such additional documents, including without limitation the ancillary agreements contemplated by the Alternate Bid, as may be necessary or desirable for the completion of the Sale and for the conveyance of the Debtors' right, title and interest in and to the Assets to the Alternate Bidder.

6.    The Debtors' assumption of the Assumed and Assigned Contracts is subject to the consummation of the Sale of the Assets to the Purchaser. To the extent that an objection by a Counterparty to any Assumed and Assigned Contract, including an objection related to the applicable Cure Amount, is not resolved prior to the Closing Date, subject to the terms and conditions of the Sale Agreement and without limiting the Debtors' obligations thereunder, the Debtors, in consultation with the Purchaser, may elect to (i) not assume such Assumed and Assigned Contract or (ii) postpone the assumption of such Assumed and Assigned Contract until the resolution of such objection. Any Cure Costs outstanding on the Closing Date shall be paid as provided in the Sale Agreement to the appropriate Counterparty as a condition subsequent to such assumption and/or assumption and assignment of the relevant Assumed and Assigned Contract.

7.    Upon the Closing, (a) the Debtors are hereby authorized and directed to consummate, and shall be deemed for all purposes to have consummated, the sale, transfer and assignment of the Debtors' right, title and interest in the Purchased Assets to the Purchaser free and clear of any and all interests, including (without limitation) all liens, including any lien (statutory or otherwise), mortgage, pledge, security interest, charge, right of first refusal, hypothecation, encumbrance on real property, easement, encroachment, right-of-way, restrictive covenant on real property, real property license, lease or conditional sale arrangement (collectively, including "Liens" as defined in the Sale Agreement, the "Liens") and debts,

12

liabilities and obligations, whether accrued or fixed, direct or indirect, liquidated or unliquidated, absolute or contingent, matured or unmatured or determined or undeterminable, known or unknown, including those arising under any Law or Action and those arising under any Contract or otherwise, including any Tax liability (other than Assumed Liabilities and the Permitted Encumbrances) (collectively, the "Liabilities" and together with the Liens, the "Interests"), with such Interests to attach to the sale proceeds in the same validity, extent and priority as immediately prior to the sale transactions, subject to any rights, claims and defenses of the Debtors and other parties in interest, and (b) except as otherwise expressly provided in the Sale Agreement, all such Interests (other than Assumed Liabilities and the Permitted Encumbrances) shall be and hereby are released, terminated and discharged as to the Purchaser and the Purchased Assets.

8.      The transfer of the Debtors' right, title and interest in the Purchased Assets to the Purchaser pursuant to the Sale Agreement shall be, and hereby is deemed to be, a legal, valid and effective transfer of the Debtors' right, title and interest in the Purchased Assets, and vests with or will vest in the Purchaser all right, title and interest of the Debtors in the Purchased Assets, free and clear of all Claims and Interests of any kind or nature whatsoever (other than the Permitted Encumbrances and the Assumed Liabilities), with any Interests attaching to the sale proceeds in the same validity, extent and priority as immediately prior to the transaction, subject to any rights, claims and defenses of the Debtors and other parties in interest.

9.      Upon the Closing, and except as otherwise expressly provided in the Sale Agreement, the Purchaser shall not be liable for any claims against, and Liabilities and obligations of, the Debtors or any of the Debtors' predecessors or affiliates. Without limiting the generality of the foregoing, and except as otherwise provided in the Sale Agreement, (a) the

13

Purchaser shall have no liability or obligation to pay wages, bonuses, severance pay, benefits (including, without limitation, contributions or payments on account of any under-funding with respect to any pension plans) or make any other payment to employees of the Debtors, (b) the Purchaser shall have no liability or obligation in respect of any employee pension plan, employee health plan, employee retention program, employee incentive program or any other similar agreement, plan or program to which any Debtors are a party (including, without limitation, liabilities or obligations arising from or related to the rejection or other termination of any such plan, program agreement or benefit), (c) the Purchaser shall in no way be deemed a party to or assignee of any such employee benefit, agreement, plan or program, and (d) all parties to any such employee benefit, agreement, plan or program are enjoined from asserting against the Purchaser any Claims arising from or relating to such employee benefit, agreement, plan or program.

10. As of the Closing, subject to the provisions of this Order, the Purchaser shall succeed to the entirety of Debtors' rights and obligations in the Assumed and Assigned Contracts first arising and attributable to the time period occurring on or after the Closing and shall have all rights thereunder.

11. Upon Closing, (i) all defaults (monetary and non-monetary) under the Assumed and Assigned Contracts through the Closing shall be deemed cured and satisfied through the payment of the Cure Costs; (ii) other than Cure Costs payable in accordance with the Sale Agreement, no other amounts will be owed by the Debtors, their estates or the Purchaser with respect to amounts first arising or accruing during, or attributable or related to, the period before Closing with respect to the Assumed and Assigned Contracts, (iii) any and all persons or entities shall be forever barred and estopped from asserting a claim against the Debtors, their estates, or

14

the Purchaser that any additional amounts are due or defaults exist under the Assumed and Assigned Contracts that arose or accrued, or relate to or are attributable to the period before the Closing.

12.    Pursuant to section 365(f) of the Bankruptcy Code, notwithstanding any provision to the contrary in the Assumed and Assigned Contracts, or in applicable non-bankruptcy law, that prohibits, restricts, or conditions the assignment of the Assumed and Assigned Contracts, the Debtors may assign the Assumed and Assigned Contracts to the Purchaser. Upon assumption of the Assumed and Assigned Contracts by the Debtors and assignment to the Purchaser, the Assumed and Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Order.

13.    The Transactions have been undertaken by the Purchaser in good faith and the Purchaser is a good faith purchaser of the Purchased Assets as that term is used in Bankruptcy Code section 363(m). The Purchaser is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

14.    Pursuant to sections 105 and 363 of the Bankruptcy Code, the Debtors and the Purchaser are each hereby authorized to take any and all actions necessary or appropriate to: (i) consummate the Sale of the Purchased Assets to the Purchaser and the Closing of the Sale in accordance with the Motion, the Sale Agreement and this Order; (ii) assume and assign the Assumed and Assigned Contracts; (iii) enter into a Sublease (as defined in the Sale Agreement) of the Subleased Real Estate Leases (as defined in the Sale Agreement) to the extent permitted by, and in accordance with, the terms of the related Subleased Real Estate Leases and applicable Law (as defined in the Sale Agreement); and (iv) perform, consummate, implement and close fully the Sale Agreement together with all additional instruments and documents that may be

15

reasonably necessary or desirable to implement the Sale Agreement. The Debtors are hereby authorized to perform each of their covenants and undertakings as provided in the Sale Agreement and the Ancillary Agreements prior to or after Closing without further order of the Court.

15.     For the avoidance of doubt, the transactions authorized herein shall be of full force and effect, regardless of any Debtor's lack of good standing in any jurisdiction in which such Debtor is formed or authorized to transact business.

16.     Subject to the terms of the Sale Agreement, the Purchaser is hereby authorized in connection with the consummation of the Sale to allocate the Purchased Assets, including the Assumed and Assigned Contracts, among its affiliates, designees, assignees and/or successors, including any Designated Purchaser, in a manner as it in its sole discretion deems appropriate and to assign, license, sublicense, transfer or otherwise dispose of any of the Purchased Assets, including the Assumed and Assigned Contracts, to its affiliates, designees, assignees and/or successors, including any Designed Purchaser, with all of the rights and protections accorded to the Purchaser under this Order and the Sale Agreement being afforded to such affiliate, designee, assignee and/or successor in such capacity, including any Designed Purchaser, and the Debtors shall use commercially reasonable efforts to cooperate with and take all actions reasonably requested by the Purchaser to effectuate any of the foregoing.

17.     No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Sale and the Transactions. Except as provided in the Sale Agreement, no brokers were involved in consummation of the Sale or the Transactions, and no brokers' commissions are due to any Person in connection with the Sale or the Transactions.

18.     The consideration provided by the Purchaser for the Assets under the Sale

16

Agreement and the EMEA Assets under the EMEA Asset Sale Agreement shall be deemed for all purposes to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law, and the Sale may not be avoided, or costs or damages imposed or awarded, under section 363(n) or any other provision of the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act or any other similar state laws.

19.    On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of all of the Debtors' right, title and interest in the Purchased Assets or a bill of sale transferring good and marketable title in such Purchased Assets to the Purchaser on the Closing Date pursuant to the terms of the Sale Agreement, free and clear of all Claims and Interests (other than Assumed Liabilities and Permitted Encumbrances).

20.    Except as otherwise provided in the Sale Agreement and to the extent permitted by applicable law, any and all Purchased Assets in the possession or control of any person or entity, including, without limitation, any vendor, supplier or employee of the Debtors shall be transferred to the Purchaser free and clear of all Liens, Claims and Interests (other than Assumed Liabilities and the Permitted Encumbrances) and shall be delivered at the time of Closing to the Purchaser.

21.    Upon the Closing, all creditors, employees and equity holders of the Debtors are permanently and forever barred, restrained and enjoined from asserting any Claims or Interests or enforcing remedies, or commencing or continuing in any manner any action or other proceeding of any kind, against the Purchaser or the Purchased Assets on account of any of the Claims, Interests, Excluded Liabilities or Excluded Assets (other than Assumed Liabilities and

17

Permitted Encumbrances). Except with respect to enforcing the terms of the Sale Agreement and this Order, absent a stay pending appeal, no person shall take any action to prevent, enjoin or otherwise interfere with the consummation of the Sale and the Transactions to the maximum extent permitted by law.

22.    The Transactions do not amount to a consolidation, merger or *de facto* merger of the Purchaser and the Debtors and/or the Debtors' estates, there is not substantial continuity between the Purchaser and the Debtors, there is no continuity of enterprise between the Debtors and the Purchaser, the Purchaser is not a mere continuation of the Debtors or the Debtors' estates, and the Purchaser does not constitute a successor to the Debtor or the Debtors' estates. Upon the Closing, the Purchaser shall be deemed to have assumed only the Assumed Liabilities. Except for the Assumed Liabilities and Permitted Encumbrances, the Purchaser's acquisition of the Purchased Assets shall be free and clear of any "successor liability" claims of any nature whatsoever, whether known or unknown and whether asserted or unasserted as of the time of Closing. The Purchaser's operations shall not be deemed a continuation of the Debtors' business as a result of the acquisition of the Assets purchased.

23.    This Order (a) is and shall be effective as a determination that other than Permitted Encumbrances and Assumed Liabilities, all Claims and Interests of any kind or nature whatsoever existing as to the Purchased Assets prior to the Closing have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (b) is and shall be binding upon and shall authorize all entities, including, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be

18

required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Purchased Assets conveyed to the Purchaser. All such entities described above in this paragraph are authorized and specifically directed to strike all recorded Interests against the Purchased Assets from their records, official and otherwise.

24.     If any person or entity which has filed statements or other documents or agreements evidencing Liens on, or other Interests in, the Purchased Assets shall not have delivered to the Debtors before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Liens or other Interests which the person or entity has or may assert with respect to the Purchased Assets, the Debtors and the Purchaser are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Purchased Assets.

25.     All counterparties to the Assumed and Assigned Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable request of the Purchaser, and shall not charge the Debtors or the Purchaser for, any instruments, applications, consents, or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Transactions.

26.     Each and every federal, state and governmental agency or department, and any other person or entity, is hereby authorized to accept any and all documents and instruments in connection with or necessary to consummate the Transactions contemplated by the Sale Agreement.

19

27.     No governmental unit may revoke or suspend any right, license, trademark or other permission relating to the use of the Purchased Assets sold, transferred or conveyed to the Purchaser on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale.

28.     To the extent this Order is inconsistent with any prior order or pleading with respect to the Motion in these chapter 11 cases, the terms of this Order shall govern.  To the extent there is any inconsistency between the terms of this Order and the terms of the Sale Agreement (including all ancillary documents executed in connection therewith), the terms of the Order shall govern.

29.     Except as expressly provided in the Sale Agreement or the Ancillary Agreements, nothing in this Order shall be deemed to waive, release, extinguish or estop the Debtors or their estates from asserting or otherwise impair or diminish any right (including without limitation any right of recoupment), claim, cause of action, defense, offset or counterclaim in respect of any asset that is not a Purchased Asset.

30.     Any amounts that become payable by the Debtors to the Purchaser arising from, related to, or in connection with, the Sale Agreement or any of the documents delivered by the Debtors pursuant to or in connection with the Sale Agreement shall (a) constitute administrative expenses of the Debtors' estates within the meaning of section 503(b) of the Bankruptcy Code, and (b) be paid by the Debtors in the time and manner as provided in the Sale Agreement without further order of this Court.

31.     This Order shall not be modified by any chapter 11 plan confirmed in these chapter 11 cases or subsequent order of this Court unless expressly consented to in writing by the Purchaser.

20

32.     This Order and the Sale Agreement shall be binding in all respects upon all creditors and interest holders of any of the Debtors, all non-debtor parties to the Assumed and Assigned Contracts, the Committee, all successors and assigns of the Debtors and their affiliates and subsidiaries, and any trustees, examiners, "responsible persons" or other fiduciaries appointed in the Debtors' bankruptcy chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code, and the Sale Agreement shall not be subject to rejection or avoidance under any circumstances.

33.     The failure specifically to include or make reference to any particular provisions of the Sale Agreement or any Ancillary Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Sale Agreement and the Ancillary Agreements are authorized and approved in their entirety.

34.     The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order, including, without limitation, the authority to: (1) interpret, implement and enforce the terms and provisions of this Order (including the injunctive relief provided in this Order) and the terms of the Sale Agreement, the Ancillary Agreements, all amendments thereto and any waivers and consents thereunder; (2) protect the Purchaser, or the Purchased Assets, from and against any of the Claims or Interests; (3) compel delivery of all Purchased Assets to the Purchaser; (4) compel the Purchaser to perform all of its obligations under the Sale Agreement; and (5) resolve any disputes arising under or related to the Sale Agreement, the Ancillary Agreements, the Sale or the Transactions.

35.     The Sale Agreement, the Ancillary Agreements and any related agreements, documents or other instruments may be modified, amended, or supplemented through a written document signed by the parties in accordance with the terms thereof without further order of the

Court; provided, however, that any such modification, amendment or supplement is neither material nor materially changes the economic substance of the transactions contemplated hereby (it being understood, for the sake of clarity, that no such modification, amendment or supplement shall be deemed to be material or shall be deemed to materially change the economic substance of the transactions to the extent that the impact does not exceed two percent of the Purchase Price); and provided further that no such modifications, amendments, or supplements may be made except following two (2) days written notice to, or with the prior consent of, the Committee, if one is still constituted, c/o Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036 (Attention: Fred S. Hodara, Stephen Kuhn, and Kenneth Davis). The Debtors are hereby authorized to perform each of their covenants and undertakings as provided in the Sale Agreement and the Ancillary Agreements prior to or after closing without further order of the Court.

36.   This Order shall be effective immediately upon entry, and any stay of orders provided for in Bankruptcy Rules 6004 or 6006 or any other provision of the Bankruptcy Code or Bankruptcy Rules is expressly lifted.

37.   Notwithstanding any provision in the Bankruptcy Rules or Local Rules to the contrary, (i) the terms of this Order shall be immediately effective and enforceable upon its entry, (ii) the Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order, and (iii) the Debtors may, in their discretion and without further delay, take any action and perform any act authorized under this Order.

38.   The provisions of this Order are nonseverable and mutually dependent.

39.   This Order applies only to Assets owned by the Debtors. Consequently, notwithstanding any other provision of this Order or the Sale Agreement to the contrary, the

22

portions of this Order that approve the transfer of the Purchased Assets to the Purchaser free and clear of all liens and other encumbrances, or that modify, enjoin, release or otherwise limit the rights of creditors of entities transferring Purchased Assets, apply only to Purchased Assets owned by the Debtors and do not apply to any Purchased Assets owned by non-debtor entities.

40.    The Purchaser shall deposit proceeds of the Sale, subject to the price adjustments and Purchaser's rights under the Sale Agreement and less applicable transfer or value-added taxes incurred by the Sellers, and, to the extent agreed by the Sellers, any transaction costs, into an Escrow Account (as defined in the Interim Funding and Settlement Agreement, dated June 9, 2009 (the "IFSA")). In accordance with this Court's order approving and authorizing the transactions contemplated by the IFSA, the proceeds in the Escrow Account shall not be distributed in advance of either (a) agreement of all of the Selling Debtors (as such term is defined in the IFSA) as to the distribution of such proceeds (subject to the prior consent of the Committee and the Bondholder Group acting in good faith in accordance with Section 12.g of the IFSA) or (b) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) in accordance with the terms of the Interim Sales Protocol (as such term is defined in the IFSA and subject to the requirements of Section 12.g of the IFSA), which Interim Sales Protocol shall be approved by the Court. The Debtors are hereby authorized to negotiate and enter into an escrow agreement, on terms and conditions reasonably satisfactory to the Committee and the Monitor acting in good faith, with an escrow agent to establish an Escrow Account without further order of this Court.

41.    The Schedules delivered to the Court by the Debtors shall be kept segregated and under seal by the Clerk of Court and shall not be made publicly available pursuant to sections 105(a) and 107(b) of the Bankruptcy Code, Bankruptcy Rule 9018 and Local Rule 9081-1(b).

23

42.    Nothing in this Order authorizes or otherwise provides for the assumption,

assignment or rejection, in whole or in part, of any Objecting Party Agreement. Other than the

rights and obligations between the parties to the Sale Agreement, nothing herein or in the Sale

Agreement shall affect the rights of any party to an Objecting Party Agreement, all of which

rights are hereby preserved, including, without limitation, the right of any Objecting Party to

seek, oppose or support (a) any assumption, assignment or rejection of an Objecting Party

Agreement on any legal or factual basis, (b) adequate assurance of future performance, (c) the

estimation or assertion of any proposed cure amounts, (d) the assumption by the Purchaser of all

obligations and liabilities under any Objecting Party Agreement by virtue of the assumption and

assignment of the Objecting Party Agreement under Section 365 and other applicable law,

including, to the extent applicable, contingent, unmatured, or unliquidated claims, warranties,

non-cash incentives, credits, indemnifications, requests to provide product support and

maintenance services, and whether such arise or arose pre- or post-closing, (e) adequate

assurance for payment of such obligations and liabilities, and (f) any right to challenge any

rejection of or to preserve the intellectual property rights provided by a license under which the

Debtors are licensors, whether pursuant to 11 U.S.C. section 365(n) or otherwise. For purposes

of this Order, "Objecting Party Agreement" means any written contract, agreement, license or

other document that creates binding contractual obligations between an Objecting Party and one

or more of the Debtors; "Objecting Party" means OSS Nokalva, Inc., AT&T Services, Inc. and

its subsidiaries and affiliates, the affiliates of Verizon Communications Inc. and Motorola, Inc.

Nothing in this Order or the Sale Agreement shall prejudice, estop, bar, impair or otherwise limit

in any respect any party's rights under Section 365 of the Bankruptcy Code with respect to the

Objecting Party Agreements, including, without limitation, the rights set forth above in subparts

24

(a) through (f).

43.     Nothing in this Order shall be deemed to waive, release or extinguish any valid claim with respect to setoff that the affiliates of Verizon Communications Inc. may have against the Debtors.

44.     Nothing in this Order provides for the assumption and assignment of any contract or license with Qwest Communications Company, LLC ("Qwest") or SNMP Research International, Inc. ("SNMPRI") pursuant to section 365 of the Bankruptcy Code. If the Purchaser elects to have the Debtors assign to the Purchaser any contract or license with Qwest or SNMPRI relating to the Assets, in whole or in part, any rights Qwest or SNMPRI may have to object to such assignment are expressly preserved. Nothing in this Order or the Sale Agreement shall prejudice, estop, bar, impair or otherwise limit in any respect any party's rights under Section 365 of the Bankruptcy Code with respect to any contract or license between any of the Debtors and Qwest or SNMPRI.

DATED: September 30, 2010

THE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE

25



## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------X
                                          :
In re                                     :    Chapter 11
                                          :
Nortel Networks Inc., et al.,¹            :    Case No. 09-10138 (KG)
                                          :
                       Debtors.           :    Jointly Administered
                                          :
                                          :    Hearing Date: May 24, 2011 at 9:30 a.m. (ET)
                                          :    Objections Due: May 17, 2011 at 4:00 p.m. (ET)
-------------------------------------------------------X
```

### DEBTORS' MOTION FOR PROTECTIVE ORDER LIMITING DISCOVERY REQUESTS PROPOUNDED BY SNMP RESEARCH INTERNATIONAL, INC.

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), hereby move this Court (the "Motion"), for the entry of an order substantially in the form attached hereto as Exhibit A, pursuant to Rules 7026(c) and 9014(c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 7026-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") limiting the discovery sought by SNMP Research International, Inc. ("SNMP RI") in Creditor SNMP Research International, Inc's First Set of Interrogatories and Requests for Production of Documents Directed to the Debtors (the "Demands")²; and granting them such other and further relief as the Court deems just and proper.

---

¹    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

²    See Notice of Service of Discovery of Creditor SNMP Research International, Inc.'s First Set of Interrogatories and Requests for Production of Documents Directed to the Debtors [D.I. 5040]. A true

In support of this Motion, the Debtors rely on the Declaration of Steven Kenkel submitted in connection with this Motion (the "Kenkel Declaration" or "Kenkel Decl."), and further respectfully represent as follows:

## PRELIMINARY STATEMENT

During these bankruptcy proceedings, SNMP RI objected to nearly every sale of the Debtors' business lines on the basis that SNMP RI did not have information as to whether its software would be conveyed through the sales. The Court rejected SNMP RI's argument that it was entitled to an audit or had any other basis for holding up the sales.

Having lost at the sale hearings, SNMP RI now seeks to use the claims objection process to get the discovery it was denied – an audit of all of the Debtors' sold business lines – as well as access to all of the software source code of global Nortel that was ever used in a released product or otherwise made available to third parties over the past 11 years. But SNMP RI's Amended Claim is for to the unreported and unpaid royalties and other fees arising from the Debtors' use of a piece of SNMP RI's software in one business line pursuant to an unsigned license. The Federal Rules of Civil Procedure do not permit the type of boundless fishing expedition, regarding issues beyond to SNMP RI's Amended Claim, on which SNMP RI plainly seeks to embark here.

Not only do SNMP RI's discovery requests extend well beyond its Amended Claim, but they are also grossly burdensome. Prior to the service of SNMP RI's Demands, the Debtors consensually undertook an audit of the one business line, the Passport business, the sale of which had not yet closed or personnel been hired away or laid off. That audit, which revealed that there had been no unlicensed use of any SNMP RI software by the Debtors, took approximately 500 to

---

and correct copy of the Demands is attached as Exhibit A to the Certification of Jane Kim, dated April 1, 2011 (the "Kim Cert.") which is being filed concurrently herewith.

600 hours of work by about ten individuals. The discovery that SNMP RI requires of the Debtors here would require personnel with expertise and knowledge of the Debtors' businesses – personnel who no longer work for the Debtors following the completion of the sales of the Debtors' business lines – and dwarf the time spent to conduct the Passport audit by many multiples.

Finally, SNMP RI does not simply ask for the Debtors to conduct an audit, but SNMP RI also seeks to perform its own audit of all of Nortel's software based on a collection of data the Debtors are to provide. To do so would require the Debtors to search through the Nortel software repository in a manner far more invasive and time-consuming than even the business line audits described above. Moreover, SNMP RI would then have the Debtors give it access to all of its source code extracted in this manner – an unprecedented level of access to highly confidential trade secrets that the Debtors have worked hard to protect. SNMP RI's discovery requests are beyond the realm of anything permitted under the Federal Rules of Civil Procedure, and the Debtors respectfully request that they be stricken.

## JURISDICTION

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are Rule(s) 7026(c) and 9014(c) of the Bankruptcy Rules and Rule 7026-1 of the Local Rules.

## BACKGROUND

3.      On December 23, 1999, SNMP RI and the Debtors' ultimate corporate parent, Nortel Networks Corporation ("NNC"), entered into a licensing agreement (the "Agreement") under which SNMP RI granted NNC, and certain of its subsidiaries, including NNI (all together

3

with NNC, "Nortel"), the right to use certain software, including source code and binary code (the "SNMP RI Software"), in products produced by Nortel. NNI and each of the subsidiaries listed in Attachment 1 to the Agreement were able to issue purchase orders under Schedule A of the Agreement and receive access to the SNMP RI Software.

4.      On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel Networks (CALA) Inc.,[3] filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code and the cases were consolidated for procedural purposes only. The Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") in respect of the U.S. Debtors [D.I.s 141, 142]. Also on the Petition Date, NNC and NNI's direct corporate parent, Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[4] commenced proceedings under the Companies' Creditors Arrangement Act (Canada) (the "CCAA").

5.      On September 29, 2009, SNMP RI filed fifteen proofs of claim (the "Original Claims") against the Debtors, all of which were identical.[5] Each of the Original Claims asserted general unsecured claims totaling $22,281, plus an unliquidated amount for unpaid license royalties. Specifically, each of the Claims consisted of $11,781 of unpaid royalties, $10,500 of yearly software maintenance fees and unspecified additional amounts associated with royalties allegedly not reported.

_____

[3]      Nortel Networks (CALA) Inc. filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes [D.I. 1098].

[4]      The Canadian Debtors include the following entities: NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[5]      See Proofs of Claim Nos. 4624-4638. SNMP also filed six identical proofs of claim against the Canadian Debtors (the "Canadian Claims").

4

6.     On July 9, 2010, the Debtors filed their 12th Omnibus Claims Objection (the "Objection") [D.I. 3507]. In the Objection, the Debtors sought to (i) reduce and allow SNMP RI Claim No. 4625 filed against NNI from $22,281 to $11,781; (ii) disallow the remaining claim for maintenance fees in Claim No. 4625 as duplicative of the Canadian Claims; and (iii) disallow and expunge the other fourteen proofs of claim[6] filed by SNMP RI against the other Debtors on the basis that they are duplicates of Claim No. 4625.

7.     On August 4, 2010, SNMP RI filed a response to the Objection (the "Response") [D.I. 3759]. The Response alleged for the first time that the Debtors had used SNMP RI software without a license in connection with the operation of the Carrier Voice Over IP and Communications Solutions business. Response ¶ 7. The Response requested, *inter alia*, a scheduling order "to allow SNMP to take [unspecified] discovery for the purpose of justifying his [sic] claim." Response ¶ 10. In an attempt to resolve SNMP RI's request for discovery, the Debtors entered into discussions with SNMP RI.

8.     In a good faith effort to resolve SNMP RI's request for discovery, the Debtors agreed to perform an audit (the "Passport Audit") of the only remaining business line in which a sale had not already closed and for which Nortel still had the necessary personnel to conduct such an audit: the Multi-Service Switch/Passport ("Passport") business. As described further in the Kenkel Declaration, the Passport Audit used certain broad search terms provided by SNMP RI and required the Debtors and other Nortel entities around the world to undertake several time-consuming steps, including: (1) compiling a list of all the source code databases (known as Versioned Object Bases or "VOBs") related to the various product lines in the Passport business; (2) developing precise and relevant search scripts to allow a computer program to crawl through the VOBs and find any of the search terms contained in the search scripts; and (3) reviewing and

---

[6]     Claim Nos. 4624 and 4626-4638.

interpreting the results of the search to determine whether the source code "hits" generated by

the search belonged to the Debtors, to SNMP RI or to third parties. See Kenkel Decl. ¶ 10-13.

After an estimated 500 to 600 hours of work by a total of approximately ten individuals, the

Passport Audit was completed on December 22, 2010. See Kenkel Decl. ¶ 16. The results of the

Passport Audit confirmed that all SNMP RI software used in the Passport business was used

pursuant to valid licenses for which the Debtors paid royalties in connection with such use. See

Kenkel Decl. ¶ 16.

9.    While the Passport Audit was in progress, on October 19, 2010, SNMP RI filed

an amended proof of claim (the "Amended Claim")[7] for $1,517,038, consisting of $22,092

asserted in the Original Claims plus an additional $1,494,946 related to unpaid royalties,

licensing and maintenance fees and late payment penalties associated with the alleged

unauthorized use by the Debtors of a certain software product owned by SNMP RI, as well as

"any and all additional amounts associated with licensing fees, royalties, and maintenance fees

that have not been reported by the Debtors to date and are owed to SNMP." Amended Claim at ¶

1.

10.    Discussions between the Debtors, the Canadian Debtors and SNMP RI regarding

SNMP RI's request for discovery have been ongoing since the conclusion of the Passport Audit.

In the course of those discussions, the Debtors were dismayed at the breadth of SNMP RI's

requests. Specifically, SNMP RI demanded that the Debtors perform separate audits of each of

the seven other businesses that have been sold in the Chapter 11 cases, in order to ascertain

whether any SNMP RI software had been transferred to the purchasers. The Debtors informed

SNMP RI that such an undertaking would be impossible, given the cost and the lack of available

personnel with sufficient knowledge of the product lines in each business. Given the parties'

---

[7]    See Proof of Claim No. 7471.

6

inability to reach agreement on a narrowed request, the Debtors and SNMP RI agreed to a form

of scheduling order [D.I. 4782], which the Court entered on February 1, 2011. SNMP RI

subsequently served the Demands pursuant to the Court scheduling order, consisting of five

interrogatories (each, an "Interrogatory") and four requests for documents (each, a "Request").

11.    Interrogatories Nos. 3 and 5, and Request Nos. 3 and 4 are subject to this motion.

As set forth below, these Demands are irrelevant to the Amended Claim and grossly

burdensome.

- Interrogatory No. 3 demands that the Debtors "Identify the Persons known to Nortel who have knowledge of the Nortel Software source code transferred or made available to each buyer in the Bankruptcy Sales."[8]

- Interrogatory No. 5 demands that the Debtors "Identify all Creditor Software used or distributed by Nortel that was transferred or made available to a buyer as a part of the Bankruptcy Sales and Identify the Nortel Software that required the use of or was distributed with such Creditor Software."

- Request No. 3 demands "all Documents, including but not limited to any Documents or Communications that list or discuss any Creditor Software imbedded in, used in the development of, or distributed with Nortel Software that was transferred or made available in the Bankruptcy Sales."

- Request No. 4 demands that the Debtor "provide Creditor access to all Nortel Software, on a computer or computers of Nortel's choosing in source code format as extracted from the Nortel source code repository, that is or was shipped to customers or otherwise made available to customers, potential customers of Nortel, or other third parties, including but not limited to as a direct or indirect result of the Bankruptcy Sales, during the Relevant Period. Creditor's access to the Nortel source code must allow Creditor to run specific scripts that search the Nortel source code for the presence of Creditor Software."

---

[8]    "Bankruptcy Sales" means the sale of Nortel business line assets to (1) Radware Ltd. pursuant to a March 26, 2009 sale order [D.I. 539]; (2) Telefonaktiebolaget L M Ericsson (publ) pursuant to a July 28, 2009 sale order [D.I. 1205]; (3) Avaya Inc. pursuant to a September 16, 2009 sale order [D.I. 1514]; (4) Hitachi, Ltd. pursuant to an October 28, 2009 sale order [D.I. 1760]; (5) Telefonaktiebolaget L M Ericsson (publ) and Kapsch Carriercom AG pursuant to a December 2, 2009 sale order [D.I. 2065]; (6) Ciena Corp. pursuant to a December 3, 2009 sale order [D.I. 2070]; (7) GENBAND Corp. pursuant to a March 3, 2010 sale order [D.I. 2632]; and (8) Telefonaktiebolaget L M Ericsson (publ) pursuant to a September 30, 2010 sale order [D.I. 4054].

12.     Furthering the vast scope of the Demands, SNMP RI defines the relevant period of time related to the Demands as December 1, 1999 to the present, a stretch of over eleven years.  Similarly broad is SNMP RI's definition of "Nortel," which includes "Nortel Networks Inc. and any affiliate, subsidiary, member, officer, principal, employee, representative, or agent of Nortel as well as any person or any entity acting on behalf of Nortel."

13.     Concurrently with the filing of this Motion, the Debtors served on SNMP RI objections and responses to the Demands (the "Objections and Responses").  The Debtors have responded to the Interrogatories, to the extent not objectionable, and will produce documents in response to the Requests to the extent not objectionable.  The parties engaged in a telephonic meet and confer on March 30, 2011, but were unable to resolve the Debtors' objections to Interrogatories 3 and 5 and Requests 3 and 4.  See Kim Cert. ¶ 3.  A copy of the Objections and Responses is attached to the Kim Cert. as Exhibit B.

## RELIEF REQUESTED

14.     The Debtors request a protective order striking Interrogatories Nos. 3 and 5 and Requests Nos. 3 and 4 in their entirety.  The Debtors reserve the right to request further relief from this Court in the event that disputes arise from the Objections and Responses.

15.     The Debtors understand that the Canadian Debtors and the Monitor for the Canadian Debtors will be filing a request for a joint hearing before the Ontario Superior Court of Justice (Commercial List) and this Court to consider this Motion.  The Debtors agree that a joint hearing is appropriate under the Cross-Border Insolvency Protocol approved by the Court on June 29, 2009 (D.I. 990) and support the request for a joint hearing on this Motion.

8

## ARGUMENT

## A PROTECTIVE ORDER SHOULD BE ENTERED TO STRIKE
## INTERROGATORIES NOS. 3 AND 5 AND REQUESTS NOS. 3 AND 4

16.     The Amended Claim asserts claims for $1,500,000, all but $22,000 of which

refers to unpaid licensing fees, royalties and maintenance fees relating to one piece of software.

As described further below, the Demands include broad discovery requests far beyond what is

relevant to the Amended Claim.  In particular, the Demands seek broad discovery regarding

software transfers pursuant to Court-ordered sales that have no bearing on the claims alleged in

the Amended Claim.

**I.     Interrogatories Nos. 3 and 5 and Request Nos. 3 and 4 Should Be
        Stricken As Wholly Irrelevant to the Amended Claim**

**A.     Interrogatories Nos. 3 and 5 and Request No. 3
        Improperly Seek Details Regarding the Bankruptcy Sales**

17.     The Amended Claim asserts a claim for unpaid, reported royalties and

maintenance fees outstanding of $22,281 at the time of the filing, plus a claim for $1,494,946 for

alleged unreported royalties and fees relating to one piece of software used by the Debtors in

connection with one business line.[9]  The latter claim for unreported royalties and fees appears to

serve as the basis for SNMP RI's all-inclusive Demands.  But the claim for alleged unreported

royalties and fees does not support the vast scope of the discovery sought regarding <u>all</u> the

software of global Nortel and the Bankruptcy Sales.  SNMP RI apparently provided the Debtors

---

[9] Specifically, the Amended Claim states the following:  "SNMP Research International, Inc. ('SNMLP')
asserts this general unsecured claim against each debtor in the Nortel Networks Inc. cases (collectively,
the 'Debtors') in the amount of $1,517,038, which consists of the following: (i) an amount of $1,494,946
due to licensing fees, royalties, and maintenance fees associated with the unauthorized and illegal usage
by the Debtors of EMANATE®/Lite with EPIC . . .; (ii) an amount of $22,092 previously asserted in
SNMP's original proof of claim derived from unpaid royalties from the fourth quarter of 2008 through the
portion of the first quarter of 2009 prior to the Debtors' filing for bankruptcy protection, along with yearly
software maintenance fees; and (iii) any and all additional amounts associated with licensing fees,
royalties, and  maintenance fees that have not been reported by the Debtors to date and are owed to
SNMP."  Proof of Claim No. 7471.

with Emanate Lite software pursuant to a license agreement that was never signed between the parties. In good faith and in reliance on the parties' mutual mistake, the Debtors used the Emanate Lite software on no more than 3,475 cards in the MG9000 system in the Carrier Voice IP and Applications Solutions business line from 2002 to 2008. In total, the Debtors believe that the royalties due as a result of the sale of the 3,475 cards would be approximately $10,425. See Objections and Responses, Interrogatory 4.

18.    Interrogatories Nos. 3 and 5 and Request No. 3 (collectively the "Sale Audit Demands") seek information wholly unrelated to this software or its use, and instead seek information about SNMP RI software and the software of global Nortel transferred or made available to the buyers in the Bankruptcy Sales, which is not the subject of any claims asserted in the Amended Claim. The requests are not relevant to the Amended Claim, and SNMP RI, thus, cannot justify any entitlement to discovery on such requests, much less the grossly overbroad and burdensome requests that it has made here. See, e.g., Iseley v. Talaber, No. 1: CV-05-0444, 2007 U.S. Dist. LEXIS 76891, at *7 (M.D. Pa. Sept. 28, 2007) (finding that "documents sought are not relevant or likely to lead to the discovery of admissible evidence" where subject matter of documents sought was not at issue in action).

19.    Under Fed. R. Civ. Pro. 26(b)(1), parties are only entitled to obtain "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." The discovery of information and material that is relevant only to the broader subject matter of the action may be ordered by the court only upon a showing of good cause by the requesting party. Id. The current structure of Rule 26(b)(1) is the result of an amendment in 2000, which narrowed the scope of discovery. Prior to 2000, parties were entitled to discover nonprivileged matters relevant to the subject matter of the action without a court order for good cause shown.

10

"The rule change signal[ed] to the court that it has the authority to confine discovery to the claims and defenses asserted in the pleadings, and signals to the parties that they have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings." Advisory Committee Note to 2000 Amendment, FRCP 26(b)(1).

20.    In fact, rather than being relevant to the Amended Claim, the Sale Audit Demands are clear attempts by SNMP RI to re-tread the same arguments it raised in its objections to nearly every Bankruptcy Sale and which were already squarely rejected by this Court at the Passport sale hearing. There, SNMP argued that the Debtors should be required to perform an audit and determine whether any of SNMP RI's software was transferred to the purchasers as part of the Bankruptcy Sales. See Passport Sale Objection, attached to the Kim Cert. as Exhibit C.  At the Passport sale hearing, the Court refused SNMP RI's request to require the Debtors to perform an audit of the business line being sold or to require the inclusion of language in the sale order disclaiming the transferring of SNMP RI software. See Excerpt of September 30, 2010 Hearing Transcript, attached as Exhibit D to the Kim Cert.[10] Its sale objections having been denied,

---

[10]    Prior to the Court finding that no audit or disclaimer language was required, the Court and counsel for the Debtors had the following exchange:

MR. BROMLEY [for the Debtors]: When I look at the objection it says SNMP RI requests that the debtors perform an audit as a condition of the sale to determine if SNMP RI intellectual property will be transferred to the purchaser as part of the sale.
. . .
So what we're saying is that we have a license to use this intellectual property it relates to the business. We have told Mr. Ralston now that two of the licenses do relate to this business. We have told Ericsson, as the purchaser, that these two licenses relate to the business, along with others that are on that list, and that they need to deal with it, all right.  So it would seem to me --
THE COURT: That you're not assigning those licenses.
MR. BROMLEY: I'm not assigning those licenses.
. . .
So post-closing, Ericsson will not have a right to use those licenses . . . . So what Ericsson and what SNMP need to do is to go in and actually work on getting a new agreement, all right.  And if Ericsson uses SNMP intellectual property after the closing and they're not allowed to, Ericsson is not supposed to do that, and they would have a claim against Ericsson.
THE COURT: Correct.

11

SNMP RI now uses its Amended Claim as a pretext by which to get the same discovery the

Court refused to give it in the context of the Passport sale, even though the Amended Claim has

nothing to do with the transfer of software through the Bankruptcy Sales. Such irrelevant

requests are invalid under Rule 26(b)(1), justifying the protective relief sought here.

> **B.      Request No. 4 Improperly Seeks a Premises Inspection for Transfers of
> Software**

21.     Request No. 4, which seeks that the Debtors provide SNMP RI "access to all

Nortel Software . . . that is or was shipped to customers or otherwise made available to

customers, potential customers of Nortel, or other third parties," should also be stricken because

it goes far beyond the Amended Claim.  SNMP RI seeks physical access to the global Nortel

software repository by requiring the Debtors to provide access to a specially created database so

that SNMP can inspect and survey all of the Nortel source code shipped or otherwise made

available to customers and potential customers of Nortel or other third parties. But SNMP RI

cannot justify Request No. 4 as either a premises inspection under Rule 34(a)(2) or a document

demand.  In either case, the Demand is controlled by Fed. R. Civ. Pro. 26(b).  See Fed. R. Civ.

Pro. 34(a)(2).  As explained above, Rule 26(b) limits discovery to matters that are relevant to a

party's claims.  See Fed. R. Civ. Pro. 26(b)(1).  Courts decline to allow a premises inspection

when the inspection is irrelevant to any party's claims in the action.  See, e.g., Ehrlich v. Inc.

Vill. of Sea Cliff, CV 04-4025 (LDW) (AKT), 2007 U.S. Dist. LEXIS 39824, at *19-21

(E.D.N.Y. May 31, 2007) (denying plaintiff's request to inspect a property where the property

was not "similarly situated" and thus irrelevant to plaintiff's equal protection claim); see also

---

MR. BROMLEY: Not against us.
THE COURT: Correct.
Id. at 56:8-13, 56:18-57:3, 57:5-6, 57:21-58:3.

Iseley, 2007 U.S. Dist. LEXIS 76891, at *7 (holding document request to be irrelevant to claims asserted).

22.    Request No. 4 seeks access to all of global Nortel's software source code shipped or otherwise made available to customers and potential customers of Nortel. The Amended Claim asserts a liquidated claim of $1.49 million for unreported and unpaid licensing fees, royalties and maintenance fees relating to one piece of SNMP RI's software and an unliquidated claim of an unspecified amount with an unspecified basis. But the filing of a conclusory, unliquidated claim does not provide carte blanche to take discovery to determine whether such a clam can be justified. Request No. 4 goes far beyond SNMP's claim that the Debtors failed to pay the necessary royalties, as actually asserted in the Amended Claim, and is instead an inquiry into every piece of Nortel software that was ever used in a product that was made available to customers over the past 11 years. Such a fishing expedition is simply not permitted by Rule 26. See, e.g., Ethypharm S.A. France v. Abbott Labs., No. 08-126-SLR-MPT, 2010 U.S. Dist. LEXIS 116156, at *17 (D. Del. Nov. 2, 2010) (where action was brought with respect to the prosecution of two patents, permitting discovery regarding an unrelated third patent "would authorize a fishing expedition beyond that which is nominally permitted by the Federal Rules").

## II.    Interrogatories Nos. 3 and 5 and Requests Nos. 3 and 4 Should Be Stricken As Unduly Burdensome

23.    In addition to their irrelevance to the Amended Claim, the Sale Audit Demands and Request No. 4 are each grossly burdensome. Request No. 4 is uniquely burdensome as it requires the Debtors to provide complete, unfettered and unprecedented physical access to the software of global Nortel.

24.    The court must limit discovery where "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in

controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." Fed. R. Civ. Pro. 26(b)(2)(C)(iii). Where a discovery request imposes "undue burden or expense" and the non-requesting party can show good cause, the court can issue a protective order to prevent the discovery. Fed. R. Civ. Pro. 26(c)(1)(A). Good cause for a protective order is established when the moving party "demonstrate[s] a particular need for protection" by articulating the significant harm it will face in the absence of such an order. See Cipollone v. Liggett Group, Inc., 785 F.2d 1108, 1121 (3d Cir. 1986).

 25. As set forth above, the Demands go far beyond the bounds of relevance to the Amended Claim. The Demands are not only irrelevant, however, but also would be grossly burdensome if not impossible for the Debtors to fulfill.

### A. The Sale Audit Demands improperly require the Debtors to undertake a grossly burdensome and unreasonable audit of their software

 26. The Sale Audit Demands seek to require the Debtors to conduct a broad internal investigation and audit of complex software questions that go far beyond the Amended Claim. Even assuming that SNMP RI could satisfy the threshold question of relevance – which it cannot – the software audit that it seeks through these Demands plainly exceeds the boundaries of reasonableness given the burden imposed on the Debtors.

 27. Interrogatory No. 5 demands the identification of "all [SNMP RI] Software used or distributed by Nortel that was transferred or made available to a buyer as a part of the Bankruptcy Sales." Request No. 3 similarly demands all documents that list or discuss any such software. Interrogatory No. 3 demands that the Debtors identify all Persons who have knowledge of, not just SNMP RI's software, but all Nortel software transferred or made available to the purchasers in the Bankruptcy Sales. Together, these Demands would require an

audit of all of the software source code related to the business lines sold by the Debtors through the Bankruptcy Sales and of all people who had any involvement with the software in connection with those sales.

28.     Conducting an audit of all of the code related to the sold businesses (much less the people involved in the sales) would be impossible to perform and unduly burdensome to attempt. The Debtors would face a significant depletion of their already limited resources if they were required to spend the time and expense even to try to conduct such an audit. This depletion would be especially harmful considering the Debtors' ongoing attempt to wind down and would come at the cost of other creditors. This burden is especially objectionable since SNMP RI is in the best position to determine if they provided software to the Debtors and then failed to receive any royalties from the Debtors.

29.     The excessive burden caused by the Passport Audit proves this point. In an effort to resolve SNMP RI's concerns, the Debtors conducted an audit of the Passport Business because it was the only sale that had not closed at the time SNMP RI requested discovery in its Response and, thus, was the only business for which Nortel still had the necessary personnel to conduct such an audit. Because the other business sales have closed and personnel with technical expertise and knowledge of the relevant Nortel products are no longer at Nortel, SNMP RI's requested audits of the closed sales cannot be performed. See Kenkel Decl. ¶ 18. Moreover, even if the necessary personnel were available, the time and resources required to perform such an audit would be so great as to be prohibitive. See Kenkel Decl. ¶ 19.

30.     As further described in the Kenkel Declaration , ClearCase is a Software Configuration Management system that houses "every version (including both test and release versions of products) of every element related to a software project as it evolves over time."

15

Kenkel Decl. ¶ 4. It contains over 3,700 databases of software source code. Kenkel Decl. ¶ 6.

Those databases, collectively, hold "millions of files, each with multiple versions, and many

millions of lines of source code." Kenkel Decl. ¶ 6. Conducting an audit of each sold business

line would require the Debtors to conduct a detailed search of this repository using the very few

(if any) employees with the expertise to search through and evaluate the information in the

ClearCase repository.

31.    As further detailed in the Kenkel Declaration, the Passport Audit alone required

approximately 500-600 person hours to perform a search of approximately eighteen gigabytes of

code. See Kenkel Decl. ¶ 16. A search of all of the seven other business lines sold through the

Bankruptcy Sales would entail searching approximately eight terabytes of code. See Kenkel

Decl. ¶ 6. If the search time is related to the amount of data searched, then based on the amount

of time spent on the Passport Audit, an audit of all the businesses would require as many as

200,000 person hours. Kenkel Decl. ¶ 19.

**B.     Request No. 4 improperly requires the Debtors to create a special database of
software to run their own audit and allow SNMP to view confidential trade
secrets**

32.    Not satisfied with requiring the Debtors to perform an audit, SNMP RI seeks to

conduct their own audit of all of Nortel's software source code. SNMP RI does not seek

documents in Request No. 4. Rather, it seeks to require the Debtors to comb through all of the

software in Nortel's ClearCase repository from December 1999 to the present. After reviewing

over 11 years of software use for all the different business lines, SNMP RI would then have the

Debtors place massive quantities of the software source code in a database that would need to be

created specifically to answer Request No. 4. Any such database necessarily would be filled

16

with confidential and proprietary property. This unprecedented demand is grossly burdensome and intrusive and improper on its face.

33.      To respond to Request No. 4, the Debtors would first have to comb through the entire ClearCase software repository to identify which source code related to released products. See Kenkel Decl. ¶ 22. The Debtors would then need to manually investigate whether each of the lines of code had ever actually been shipped or otherwise made available to customers, potential customers or other third parties. See Kenkel Decl. ¶ 22. The Debtors cannot even begin to estimate the massive cost and hours required to respond to SNMP RI's demand, but certainly it would be many times that which was required for the Passport Audit. See Kenkel Decl. ¶ 22.

34.      Beyond the tremendous drain on the Debtors' financial and human resources, responding to Request No. 4 would require the Debtors to have the appropriate personnel available to conduct such an investigation. To accurately determine which of the lines of source code in the ClearCase databases were made available to customers, potential customers or other third parties, a reviewer would need to have multiple training classes in the use of ClearCase, as well as possess "detailed knowledge of Nortel's software development process." Kenkel Decl. ¶ 8-9. As mentioned above, the Debtors have completed the sales of all of the individual business lines and lack employees who have the requisite training and knowledge to carry out the investigation required by Request No. 4. Accordingly, it is not possible for the Debtors to respond to Request 4.

35.      Even if the Debtors were able to identify the relevant source code and create a special database to house it, such a request would require the Debtors to expose highly confidential trade secrets. The Federal Rules specifically contemplate protecting the disclosure

17

of trade secrets in the discovery process. Under Fed. R. Civ. Pro. 26(c)(1)(G), upon a showing

of good cause, the court can issue a protective order "requiring that a trade secret or other

confidential research, development, or commercial information not be revealed." A protective

order is appropriate where the value and secrecy of source code outweighs the need for its

disclosure. See Viacom Int'l Inc. v. YouTube Inc., 253 F.R.D. 256, 260-61 (S.D.N.Y. 2008)

(finding that a protective order was needed where the plaintiff sought access to the defendants'

source code to "allay [its] speculation" that the defendants' search software was identifying and

promoting copyright infringing video clips on their website).

36.     That Nortel's software source code constitutes trade secrets, the disclosure of

which would cause harm, is without question. Indeed, the Debtors have always gone to great

lengths to protect this source code, including throughout these bankruptcy proceedings. In fact,

the access to the Nortel computer systems and servers that the Nortel sellers provided to the

purchasers of the business lines, who paid billions of dollars for these assets, is far more

restrictive than the access that SNMP RI demands from the Debtors.

37.     For example, in every transition services agreement (each, a "TSA") entered into

with the buyers, the Nortel sellers:

> (1) restricted access to only those representatives of the buyers "with a bona fide
> need to have such access in connection with the Services"[11];
>
> (2) required that the buyers "limit such access solely to the use of such systems
> for purposes of the Services and shall not access or attempt to access any other
> Party's computer systems, files, software or services other than those agreed to by

---

[11]     See, e.g., Excerpt of TSA, dated November 13, 2009, with Telefonaktiebolaget LM Ericsson
(publ), attached to the Kim Cert. as Ex. E ("CDMA TSA"), at § 9(a). The other TSAs, attached in
relevant excerpts to the Kim Cert., contain similar provisions to the CDMA TSA provisions cited in this
section. "Services" is defined in each of the TSAs as those services that the sellers agree to provide the
purchaser pursuant to the relevant TSA. See, e.g., CDMA TSA at § 2(a).

the Parties as being required for the Services, or those that are publicly available"[12];

(3) prohibited purchasers from "attempt[ing] to reverse engineer, disassemble, reverse translate, decompile or in any other manner decode any element of the Providers Information Systems, or mak[ing] copies of any element of the Providers Information Systems"[13]

(4) required that the purchasers maintain firewalls and "implement procedures to segregate all Seller information, data and communications" from those employees of the buyers who were not authorized to access the Nortel sellers' systems;[14] and

(5) to the extent third-party consents were required to use or access software licensed by the Nortel sellers from a third party, required that the buyers acquire any necessary licenses and indemnify and hold harmless the Nortel sellers and their affiliates "from any and all claims and liabilities (including legal fees and expenses) arising out of Purchaser's use of such third party software."[15]

38.     The Nortel sellers, including the Debtors, understood the importance of preventing the disclosure of Nortel's software source code and appropriately set up highly restrictive conditions to any access by the purchasers, even where such access was necessary for the purchasers to transition the operation of their purchased business lines from Nortel. Thus, the unfettered access to Nortel's software source code that SNMP demands is unprecedented, grossly burdensome and highly inappropriate.

---

[12]     See, e.g, CDMA TSA at § 9(a).
[13]     See, e.g., id. at Ex. C, § 5.
[14]     See, e.g., id. at Ex. C, §§ 6(a), (b).
[15] See, e.g., id. at Ex. C § 8 ("Third-Party Technology: Purchaser acknowledges that access to the Permitted Systems may require that Purchaser have access to software licensed by the Providers from a third party. Purchaser acknowledges that third-party consents may be required in connection with the use or access to certain elements of the Permitted Systems and such use or access shall be conditional upon such consents being obtained by Purchaser . . . Purchaser shall indemnify and hold harmless the Providers from any and all claims and liabilities (including legal fees and expenses) arising out of Purchaser's use of such third-party software. Additionally, Purchaser acknowledges that it may be required to acquire a license for certain third-party software in order to utilize certain elements for the Permitted Systems, or to carry out the Purpose, in which case Purchaser shall be responsible for acquiring such license, and for any fees associated therewith.").

## NOTICE

Notice of the Motion has been given via first class mail or hand delivery to (i) the U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the Bondholder Group; (iv) counsel to SNMP; and (v) the general service list established in these chapter 11 cases. The Debtors submit that under the circumstances no other or further notice is necessary.

## No Prior Request

39.    No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated: April 1, 2011     CLEARY GOTTLIEB STEEN & HAMILTON LLP
Wilmington, Delaware

          Deborah M. Buell (admitted *pro hac vice*)
          James L. Bromley (admitted *pro hac vice*)
          Lisa M. Schweitzer (admitted *pro hac vice*)
          One Liberty Plaza
          New York, New York 10006
          Telephone:  (212) 225-2000
          Facsimile:  (212) 225-3999

           - and -

          MORRIS, NICHOLS, ARSHT & TUNNELL LLP

          */s/ Ann C. Cordo*_____
          Derek C. Abbott (No. 3376)
          Eric D. Schwartz (No. 3134)
          Ann C. Cordo (No. 4817)
          1201 North Market Street
          P.O. Box 1347
          Wilmington, Delaware 19801
          Telephone:  (302) 658-9200
          Facsimile: (302) 658-3989

          *Counsel for the Debtors*
          *and Debtors in Possession*

**EXHIBIT A**

**Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
-------------------------------------------------------X
                                                       :
                                                       :
In re                                                  :
                                                       :
Nortel Networks Inc., et al.,[1]                       :
                                                       :
                              Debtors.                 :
                                                       :
                                                       :
-------------------------------------------------------X
```

Chapter 11

Case No. 09-10138 (KG)

Jointly Administered

**RE: D.I. _____**

**ORDER LIMITING DISCOVERY REQUESTS
PROPOUNDED BY SNMP RESEARCH INTERNATIONAL, INC.**

Upon the motion dated April 1, 2011 (the "Motion"),[2] of Nortel Networks Inc. and

certain of its affiliates, as debtors and debtors in possession in the above-captioned cases (the

"Debtors"), for entry of an order, as more fully described in the Motion, Limiting Discovery

Requests Propounded by SNMP Research International, Inc. and adequate notice of the Motion

having been given as set forth in the Motion; and it appearing that no other or further notice is

necessary; and the Court having jurisdiction to consider the Motion and the relief requested

therein pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having determined that

consideration of the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax
identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620),
Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma
Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications
Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks
HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc.
(0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567) and
Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions,
which are available at http://dm.epiq11.com/nortel.

[2]     Capitalized terms used but not defined herein shall have the meaning ascribed to them in the
Motion.

Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief requested in the Motion, and that such relief is in the best interests of the Debtors, their estates, their creditors and the parties in interest; and upon the record in these proceedings; and after due deliberation;

IT IS HEREBY ORDERED THAT:

1.    The Motion is GRANTED.

2.    Interrogatories Nos. 3 and 5 are stricken in their entirety.

3.    Requests Nos. 3 and 4 are stricken in their entirety.

4.    Notwithstanding any provision in the Federal Rules of Bankruptcy Procedure to the contrary, (i) the terms of this Order shall be immediately effective and enforceable upon its entry, (ii) the Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order, and (iii) the Debtors may, in their discretion and without further delay, take any action and perform any act authorized under this Order.

5.    The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: _____, 2011
      Wilmington, Delaware

                                      _____
                                        THE HONORABLE KEVIN GROSS
                                        UNITED STATES BANKRUPTCY JUDGE

# BLUE SHEET

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------X
                                          :
                                          :    Chapter 11
*In re*                                   :
                                          :    Case No. 09-10138 (KG)
Nortel Networks Inc., *et al.*, [1]       :
                                          :    Jointly Administered
                    Debtors.              :
                                          :
---------------------------------------------------------X

### DECLARATION OF STEPHEN KENKEL IN SUPPORT OF DEBTORS' MOTION FOR PROTECTIVE ORDER LIMITING DISCOVERY REQUESTS PROPOUNDED BY SNMP RESEARCH INTERNATIONAL, INC.

I, Stephen Kenkel, declare under penalty of perjury as follows:

1.      I am a Senior ClearCase Administrator/Analyst at Nortel Networks Inc. ("NNI").

I manage the transitioning of software to purchasers of the Debtors' businesses. During my 14

years with Nortel,[2] I have specialized in Software Development Environment (SDE) support,

primarily involving the ClearCase product described below. Until recently I was the team leader

for a group of engineers providing around-the-clock support to Nortel's ClearCase environment

which was, at the time, the most extensive centrally administered ClearCase/MultiSite

environment in existence. In earlier positions as a software engineer and a Unix system

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

[2]      "Nortel" is used herein to refer to the Debtors, their non-Debtor parents and their subsidiaries and affiliates. Nortel consists of Nortel Networks Corporation ("NNC"), the ultimate parent company; Nortel Networks Limited, NNC's principal Canadian operating subsidiary; NNI, the principal U.S. operating subsidiary and over 140 affiliates around the world.

administrator I acquired expertise in all of the standard Unix tools used for text searches.

2.    I have reviewed SNMP Research International Inc.'s ("SNMP RI") First Set of Interrogatories and Requests for Production of Documents Directed to the Debtors (the "Discovery Demands"), dated March 1, 2011 and hereby submit this declaration in support of the Debtors' Motion for Protective Order Limiting Discovery Requests Propounded by SNMP Research International, Inc.

3.    Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, information supplied to me by other employees of the Debtors or their affiliates and professionals retained by the Debtors, or learned from my review of relevant documents or upon my opinion based on my experience and knowledge of the Debtors' operations.  I am authorized to submit this declaration.

## I.  Size, Scope and Use of Nortel's ClearCase Repository

4.    For approximately the last 15 years, most new software source code developed by Nortel has been stored in ClearCase.  ClearCase is produced by IBM and is a Software Configuration Management system.  Its primary function is to store every version (including both test and release versions of products) of every element related to a software project as it evolves over time.  ClearCase also allows for the tracking of changes to each element of software projects (e.g., source code module, document, binary file) over the various versions of a product. For the last ten years, I have been primarily responsible for ClearCase and ClearCase/Multisite at Nortel.[3]

5.    The basic unit of ClearCase is a single Versioned Object Base or "VOB."  Each VOB contains a database, which stores all of the information necessary for the tracking of

---

[3]  ClearCase/Multisite is an add-on to base ClearCase which allows data to be replicated between sites.

changes to software elements described above. In particular, each VOB contains a directory structure that allows access to any desired version of any software element. I have administrator access to all Nortel VOBs on ClearCase as well as database administrator access to the in-house database used by Nortel to track the VOBs. There is no fixed size for a single VOB, but Nortel's VOBs typically range from multiple megabytes up to a few gigabytes in size. As an example, a fairly large Nortel VOB is /clearlib/pp_23. It is 21 gigabytes in size and contains approximately 30,000 distinct files and 300,000 distinct versions of files. In other words, there is an average of 10 versions of each file in this VOB.

6.    As of 2007, I understand that Nortel had the largest distributed ClearCase configuration in the world, used by over 20,000 research and development designers. Within Nortel there are more than 3,700 different VOBs containing software source code. These VOBs occupy more than 8 terabytes of space. Nortel does not have metrics on files or line counts but I can safely estimate that there are millions of files, each with multiple versions, and many millions of lines of source code.

7.    The Nortel ClearCase-based Software Development Environment (SDE) was designed to maximize collaboration among design groups, whether in different business units, different countries, or even different companies (in the case of contracted development partners). Because the Nortel ClearCase-based SDE was not designed to allocate intellectual property among specific business lines and their purchasers, it is difficult to find and/or track the location, ownership, and history of any particular piece of code.

## II. Complexities of Searching in a ClearCase Environment

8.    Searching for strings and file names is considerably more complex in a ClearCase environment than in a simple archive or collection of files. To begin with, technical expertise is

3

required. At a minimum, training equivalent to a user course offered by IBM is needed, followed by a ClearCase administration training course.

9.      This general training in ClearCase would need to be supplemented by specific details of Nortel's design environment specific to particular Nortel products. ClearCase has many features, such as branching and labeling, that can be used in different ways by different design groups. Very detailed knowledge of Nortel's software development process and products is required to select the exact version of each file that was used in a released product. Moreover, detailed knowledge of Nortel's software development process is needed to verify that a specific version of a file was ever used in a released Nortel product.

## III.  The Debtors' Review of the Passport Business' Code

### The Search Process

10.     SNMP RI previously demanded that the Debtors perform a review of code used in Nortel's Passport business. I was personally involved in this review, which required the cooperation and participation of various non-Debtor Nortel entities and their employees. During this exercise, which was conducted at the end of 2010 and early 2011, scripts were written to implement the searches described below in the Passport business' code base. These scripts made heavy use of the Unix and ClearCase "find" command, which locates specific files and directories based on name, combined with commands used to search for strings within files. Test cases were developed to validate the search scripts. Specifically, a test set of files was created which contained both files that matched the search conditions and similar files that did not. The test search confirmed that the scripts located only the files matching the search conditions.

11.     Next, the Debtors, directly and through other Nortel entities, consulted designers familiar with the Passport products to generate a list of VOB names which contained the Passport code to be examined. The search used the ClearCase "view" facility, which makes

4

visible only specific versions of files. The scripts were run in ClearCase views associated with the product releases and generated several thousand search "hits" (instances of code satisfying the broad search criteria used).

12.    The list of hits was then filtered to eliminate duplicates. The final list was inspected manually, using product knowledge and the history data built into ClearCase to determine whether any code from SNMP RI had been included. Below is the list of search tests that Nortel performed at SNMP RI's request:

a) files containing "SNMP research" or "SNMP RESEARCH" or "snmp research" (or "egrep -i");

b) c-language source code with a "#include" on snmp.h;

c) files with a name starting with "sr_" (e.g., sr_event.h, sr_snmpio.h, sr_msg.c, etc.);

d) data types starting with "sr_" (e.g., sr_int32, sr_int64, etc.);

e) subdirectories named "engine", "seclib", or "devkit";

f) files beginning with k_ or v_ (e.g., k_system.c, v_system.c, v_icmp.c); and

g) files with snmpd or agt in the name (e.g., snmpd.c, snmpd.o, snmpd.lib, snmpd, snmpd.exe, rmonagt.*, mib2agt.*, etc.).

*Evaluation of Search Results*

13.    The automated searches described above produced "hits" in the VOBs that satisfied the broad search criteria used. Each hit was manually inspected by Nortel employees with design and product knowledge for accuracy and relevance. That is, each hit was inspected for accuracy to ensure that the hit was a true instance of inclusion of SNMP RI code rather than a false positive. The tests for specific names of files were particularly likely to produce such false positives. As an example, the term "SNMP" is a generic term meaning "Simple Network Management Protocol." SNMP is an industry standard method (protocol) by which devices are administered over a network. Any software developed to implement this protocol might

5

naturally choose filenames containing "SNMP." Thus, hits for the term SNMP needed to be further reviewed to assess the presence of SNMP RI code because of the general use of the term SNMP among various third parties.

14.      Completion of the detailed review of the Passport business required at least nine individuals employed by various Nortel entities. Even with true positive hits for SNMP RI code, a further determination of relevance needed to be made as to whether the hits related to software used in a final, released product. Because ClearCase stores all versions of files, including test and development versions, it includes lines of code that were never part of any released product.

15.      Evaluation of accuracy requires inspection of the code and, at a minimum, knowledge of the coding language. The relevance determination can only be made by someone familiar with the build and release process for the specific Nortel products related to each VOB. The combination of expertise needed to make sense of the data requires skill sets specific to each product, such as the following: system architecture, build architecture, product design, software development expertise and ClearCase administration and end user expertise. Accordingly, we needed a large number of trained individuals to complete the Passport review described above.

*Time Necessary to Perform A Detailed Review*

16.      In conducting the Passport review, tests were run on 53 VOBs, totaling 18 gigabytes. Each hit was examined by a Nortel employee and the determination was made by Nortel employees with design and product knowledge that only two of the products searched included software from SNMP RI, the use of which other Nortel personnel confirmed were subject to licenses with SNMP RI and for which other Nortel personnel confirmed royalties were paid by Nortel. At that time, Nortel had access to people with design expertise in those products who verified the results. The combined search and evaluation of each hit took between

6

approximately 500 to 600 person hours to perform. Approximately 80 to 90 percent of this time was spent on the evaluation phase, which required Nortel product and software expertise.

## IV. SNMP RI's Discovery Demands

*Interrogatory 3*

17.    Interrogatory 3 of the Discovery Demands requests that the Debtors "[i]dentify the persons known to Nortel who have knowledge of the Nortel Software source code transferred or made available to each buyer in the Bankruptcy Sales, at the time the Bankruptcy Sale closed." It would be virtually impossible to identify all persons who have knowledge of all Nortel software (and not just SNMP RI software) transferred or made available to buyers in the various sales, because (i) nearly every employee of the Debtors worked on the Bankruptcy Sales at different times, in different locations and in different capacities, and (ii) nearly all of the individuals involved in the sales are no longer at Nortel, thus making it difficult, if not impossible, to determine whether such individuals have knowledge of the software transferred in the Bankruptcy Sales.

*Interrogatory 5 and Document Request 3*

18.    Interrogatory 5 and Document Request 3 request information and documents regarding any SNMP RI software that was "transferred or made available" to a buyer as part of the Bankruptcy Sales. Identifying which SNMP RI software was transferred or made available through the Bankruptcy Sales, and producing all documents that list or discuss such software, would require the Debtors to review all of the software code relating to each of the business lines sold during the Debtors' bankruptcy cases to identify whether any such software is owned or licensed by SNMP RI. As an initial matter, such an audit cannot be performed because the personnel with the required expertise are no longer with the Debtors, or indeed, any Nortel

7

entity. As Nortel business units were sold to buyers, nearly all of the knowledge related to product architecture and design and software build architecture was divested at the same time. In addition, the Subject Matter Experts for software development environment architecture, deployment, and support, including experts in the administration of ClearCase and its integration into the development process, were either transferred to the buyers or are otherwise no longer at Nortel. Therefore, the Debtors no longer have the requisite expertise to evaluate a particular file or segment of code to determine which business units or products incorporate SNMP RI code or its derivatives (compiled object code)

19. Even if the Debtors had access to the necessary personnel, it would take a significant amount of time to attempt to perform an audit of each sold business line. For instance, if we assume that search time is related to the amount of data searched, then based on the amount of time required to complete the Passport review, a similar search of the entire Nortel software repository could require, at a minimum, as many as 200,000 person hours (500 hrs *8 terabytes/18 gigabytes). In reality the effort depends on the number of expected "hits", which cannot be estimated a priori.

*Document Request 4*

20. Document Request 4 of the Discovery Demands requests that the Debtors provide SNMP RI with access to "all Nortel Software . . . in source code format as extracted from the Nortel source code repository, that is or was shipped to customers or otherwise made available to customers, potential customers of Nortel, or other third parties, including but not limited to as a direct results of the bankruptcy Sales, during the Relevant Period." The request further requires that such access "must allow [SNMP RI] to run specific scripts that search the Nortel source code for the presence of Creditor Software."

8

21.     It would be impossible for the Debtors to create and provide SNMP RI with a new repository containing all Nortel software source code that "is or was shipped to customers or otherwise made available to customers, potential customers of Nortel, or other third parties." As discussed above, Nortel's ClearCase repository is extensive and, as of 2007, was the largest distributed ClearCase configuration in the world. ClearCase contains code relating to both released and unreleased products and does not indicate whether code was provided or made available to third parties. Constructing a new repository of all source code shipped or made available to third parties would require the Debtors to audit every line of code in the ClearCase repository and then investigate whether the code was made available to any third parties for any reason.

22.     ClearCase does not indicate whether code was transferred to third parties and it was not designed for such a purpose. Thus, individuals with technical expertise and knowledge of Nortel's products would need to manually review every line of code in the ClearCase repository to determine whether the code was transferred to third parties. As explained above, as a result of the divestitures, the Debtors do not have personnel with the expertise and product knowledge necessary to determine whether code in the ClearCase repository was used or made available to third parties. Even if such resources were available, the time needed to review and interpret all of the code to determine whether it was ever made available to third parties and then construct a database for SNMP RI to run search scripts cannot be estimated, but would certainly dwarf the time required to perform the Passport review.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: April 1, 2011
         Raleigh, North Carolina

_____
Stephen Kenkel

11

# BLUE SHEET

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------X
                                          :
                                          :    Chapter 11
                                          :
In re                                     :    Case No. 09-10138 (KG)
                                          :
Nortel Networks Inc., et al.,[1]          :
                                          :    Jointly Administered
                            Debtors.      :
                                          :
                                          :
------------------------------------------------------------X
```

## SUPPLEMENTAL DECLARATION OF STEPHEN KENKEL IN SUPPORT OF DEBTORS' REPLY IN FURTHER SUPPORT OF THEIR MOTION FOR PROTECTIVE ORDER LIMITING DISCOVERY REQUESTS PROPOUNDED BY SNMP RESEARCH INTERNATIONAL, INC.

I, Stephen Kenkel, declare under penalty of perjury as follows:

1.       I am a Senior ClearCase Administrator/Analyst at Nortel Networks Inc. ("NNI").

I manage the transitioning of software to purchasers of the Debtors' businesses. During my 14

years with Nortel,[2] I have specialized in Software Development Environment (SDE) support,

primarily involving the ClearCase product. Until recently I was the team leader for a group of

engineers providing around-the-clock support to Nortel's ClearCase environment which was, at

the time, the most extensive centrally administered ClearCase/MultiSite environment in

existence. In earlier positions as a software engineer and a Unix system administrator I acquired

expertise in all of the standard Unix tools used for text searches. I previously submitted a

---

[1]       The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

declaration in support of the Debtors' Motion for Protective Order Limiting Discovery Requests Propounded by SNMP Research International, Inc., dated April 1, 2011 (the "Motion").[3]  I hereby submit this supplemental declaration in further support of the Motion.

2.      Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, information supplied to me by other employees of the Debtors or their affiliates and professionals retained by the Debtors, or learned from my review of relevant documents or upon my opinion based on my experience and knowledge of the Debtors' operations.

3.      The Version Object Bases (source code folders) contained in ClearCase incorporate the source code of Nortel's proprietary software (much of which is now owned by the purchasers of Nortel's business lines), as well as numerous third party software vendors (the "Third Party Vendors"), as permitted by virtue of license agreements between such purchasers and Third Party Vendors and Nortel.  I understand that Nortel licensed from Third Party Vendors other than SNMP RI software providing comparable or the same functions (or some of the same functions) as the software licensed by Nortel from SNMP RI.  In my review of material stored in ClearCase, I have seen information regarding the software of such other Third Party Vendors.

---

[2]    "Nortel" is used herein to refer to the Debtors, their non-Debtor parents and their subsidiaries and affiliates. Nortel consists of Nortel Networks Corporation ("NNC"), the ultimate parent company; Nortel Networks Limited, NNC's principal Canadian operating subsidiary; NNI, the principal U.S. operating subsidiary and over 140 affiliates around the world.

[3]    Capitalized terms used, but not defined herein, shall have the meaning ascribed to them in the Motion.

I declare under penalty of perjury under the laws of the United States that the foregoing is
true and correct to the best of my knowledge, information and belief.

Dated: June 1, 2011
      Raleigh, North Carolina

_____
Stephen Kenkel

No. 0466   P. 2

Nortel   5:51PM   Jun. 1. 2011

543



Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION
APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

MOTION RECORD OF NORTEL
SNMP R1 DISCOVERY MOTION
(returnable June 7, 2011)

June 1, 2011

**NORTON ROSE OR LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto Ontario  M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: derrick.tay@nortonrose.com

**Jennifer Stam LSUC#: 46735J**
Tel: (416) 216-2327
Email: jennifer.stam@nortonrose.com

Fax: (416) 216-3930

Lawyers for the Applicants

DOCSTOR: 2187123\1

# INDEX

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

## TABLE OF CONTENTS

| TAB | DOCUMENT | PAGE |
|-----|----------|------|
| 1. | Notice of Motion returnable June 7, 2011 | 1 |
| 2. | Affidavit Catherine Ma sworn June 1, 2011 | 29 |
| A | U.S. Debtors' Motion for Protective Order Limiting Discovery Requests Propounded by SNMP Research International, Inc., dated April 1, 2011 | 31 |
| B | Creditor SNMP Research International, Inc.'s First Set of Interrogatories and Requests for Production of Documents Directed to the U.S. Debtors, dated March 1, 2011 | 53 |
| C | Monitor's (I) Statement in Support of the U.S. Debtors' Motion for Protective Order Limiting Discovery Requests Propounded by SNMP Research International, Inc., and (II) Request for Join Hearing on Such Motion, dated April 1, 2011 | 65 |
| 3. | Draft Order | 73 |

# TAB 1

1

Court File No.  09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

### IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
### R.S.C. 1985, c. C-36, AS AMENDED

### AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
### NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
### NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
### INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
### CORPORATION

### APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
### R.S.C. 1985, c. C-36, AS AMENDED

### NOTICE OF MOTION
### SNMP RI DISCOVERY MOTION
### (returnable June 7, 2011)

Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, "Nortel Canada" or the "Applicants") will make a motion to Justice Morawetz of the Superior Court of Ontario (Commercial List) on **Tuesday, June 7, 2011** at 10:00 a.m., or as soon after that time as the motion can be heard, at 393 University Avenue, Toronto, Ontario.

PROPOSED METHOD OF HEARING: The motion is to be heard:

☐  in writing under subrule 37.12.1(1) because it is on consent or unopposed or made without notice;

☐  in writing as an opposed motion under subrule 37.12.1(4);

☒  orally.

THE MOTION IS FOR:

(a)    An order abridging the time for service so that this Motion is properly returnable today and hereby dispensing with further service thereof;

(b)     A declaration that SNMP Research International, Inc. ("SNMP RI") has not sought relief against Nortel Canada or in the CCAA Court in the within proceedings with regard to production by Nortel Canada of any documents, materials, information or source code;

(c)     A declaration that Nortel Canada has a proprietary interest in and had historical ownership of certain documents, materials, information and source code of which SNMP RI seeks discovery from Nortel Networks Inc. ("NNI"), Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc. (collectively, the "U.S. Debtors") as being in the power, possession or control of the U.S. Debtors (the "Production Demands") in the context of the claims process in the bankruptcy proceedings commenced by the U.S. Debtors in the United States under Chapter 11 of Title 11 of the United States Code (the "U.S. Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "U.S. Bankruptcy Court") (the "Chapter 11 Proceedings"), and that Nortel Canada will suffer prejudice by any disclosure of such documents, materials, information and source code;

(d)     An order that, in the event the U.S. Bankruptcy Court orders the U.S. Debtors to make productions pursuant to or as a result of the Production Demands, any documents, materials, information or source code so produced by the U.S. Debtors that are proprietary to the Applicants or in which the Applicants have an interest shall be subject to the deemed undertaking rule in Canada and may not be used for, against or in any way related to any claim or action against the Applicants without leave of this Court; and

(e)  Such further and other relief as counsel may advise and this Honourable Court may deem just.

**3**

THE GROUNDS FOR THE MOTION ARE:

(a)  On January 14, 2009, this Honourable Court made an order (the "Initial Order") placing the Applicants into protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, C. C-36 ("CCAA") (the "CCAA Proceedings");

(b)  The Initial Order granted, *inter alia,* a stay of proceedings (the "Stay") and appointed Ernst & Young Inc. as monitor of the Applicants (the "Monitor");

(c)  On that same day, insolvency and restructuring proceedings were commenced by Nortel's worldwide affiliates and subsidiaries[1] in their respective jurisdictions, including the Chapter 11 Proceedings;

(d)  SNMP RI has filed a claim against the U.S. Debtors in the Chapter 11 Proceedings. It claims for allegedly unreported and unpaid royalties and other fees arising from Nortel's use of some of SNMP RI's software;

(e)  SNMP RI has also filed a proof of claim in the CCAA Proceeding;

(f)  Throughout the worldwide insolvency proceedings, Nortel has been disposing of a number of its lines of businesses. In the sales processes in the Chapter 11 Proceedings SNMP RI attempted to seek a right to audit the software included in the lines of business that were sold. The U.S. Bankruptcy Court rejected such attempts;

(g)  SNMP RI now seeks to use the discovery process in the claims process in the Chapter 11 Proceedings in order to gain access to, *inter alia,* all of the software source code used in all products released by Nortel in the past 11 years;

---

[1] Nortel Canada together with its worldwide affiliates and subsidiaries are hereinafter referred to as "Nortel".

4

(h)    The U.S. Debtors now seek an order from the U.S. Bankruptcy Court limiting the discovery sought by SNMP RI in the Chapter 11 Proceedings;

(i)    Nortel was organised such that its lines of business crossed over throughout its various geographical entities. Accordingly, proprietary information of one Nortel entity, including documents, software source code and other such materials and information used in the products of a given line of business may be in the possession of a different Nortel entity even though the latter would not have owned such information;

(j)    Nortel Canada has an interest in various documents, materials, information and source code in the U.S. Debtors' possession and on computers owned by the U.S. Debtors;

(k)    Discovery of such documents, materials, information and source code could seriously prejudice Nortel Canada's rights in intellectual property in which it has an interest;

(l)    SNMP RI should not be allowed to make use of information and evidence about Nortel Canada obtained through a discovery process that may occur outside of Ontario in a manner that would not be allowed were similar discovery to occur within Ontario;

(m)    Rules 30.1.01 and 37 of the Rules of Civil Procedure; and

(n)    Such further and other grounds as counsel may advise and this Honourable Court permit.

THE FOLLOWING DOCUMENTARY EVIDENCE will be used at the hearing of the motion:

(a)    The Affidavit of Catherine Ma, sworn June 1, 2011; and

(b)    Such other material that is filed.

DOCSTOR: 2182918\4

June 1, 2011

**NORTON ROSE OR LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto Ontario  M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel:  (416) 216-4832
Email: derrick.tay@nortonrose.com

**Jennifer Stam LSUC#: 46735J**
Tel: (416) 216-2327
Email: jennifer.stam@nortonrose.com

Fax: (416) 216-3930

TO:      Attached Service List

553

*June 1, 2011*

6

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, c. c-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, c. C-36, AS AMENDED

**SERVICE LIST**

TO:      **NORTON ROSE OR LLP**
         Royal Bank Plaza, South Tower
         200 Bay Street, Suite 3800
         Toronto, Ontario M5J 2Z4

         Derrick Tay
         Tony Reyes
         Jennifer Stam

         Email:    derrick.tay@nortonrose.com
                   tony.reyes@nortonrose.com
                   jennifer.stam@nortonrose.com

         Tel:      416.216.4000
         Fax:      416.216.3930

         Lawyers for the Applicants

- 2 -

TO:  **ERNST & YOUNG INC.**
Ernst & Young Tower
222 Bay Street, P.O. Box 251
Toronto, Ontario  M5K 1J7

Murray McDonald
Brent Beekenkamp

Email:  nortel.monitor@ca.ey.com

Tel:    416.943.3016
Fax:   416.943.3300

AND
TO:  **GOODMANS LLP**
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, Ontario  M5H 2S7

Jay Carfagnini
Joseph Pasquariello
Gail Rubenstein
Fred Myers
Chris Armstrong

Email:  jcarfagnini@goodmans.ca
jpasquariello@goodmans.ca
grubenstein@goodmans.ca
fmyers@goodmans.ca
carmstrong@goodmans.ca

Tel:    416.597.4107
Fax:   416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

AND
TO:  **OSLER HOSKIN AND HARCOURT
LLP**
100 King Street West
1 First Canadian Place
Suite 6100
P.O. Box 50
Toronto, Ontario  M5X 1B8

Lyndon Barnes
Rupert Chartrand
Edward Sellers
Betsy Putnam

Email:  lbarnes@osler.com
rchartrand@osler.com
esellers@osler.com
eputnam@osler.com

Tel:    416.362.2111
Fax:   416.862.6666

Lawyers for the Boards of Directors of
Nortel Networks Corporation and Nortel
Networks Limited

AND
TO:  **FASKEN MARTINEAU DUMOULIN LLP**
66 Wellington Street West
Toronto Dominion Bank Tower
P.O. Box 20, Suite 4200
Toronto, Ontario  M5K 1N6

Donald E. Milner
Aubrey Kauffman
Edmond Lamek
Jon Levin

Email:  dmilner@fasken.com
akauffman@fasken.com
elamek@fasken.com
jlevin@fasken.com

Tel:    416.868.3538
Fax:   416.364.7813

Lawyers for Export Development Canada

| AND TO: | **EXPORT DEVELOPMENT CANADA**<br>151 O'Connor Street<br>Ottawa, Ontario  K1A 1K3 | AND TO: | **THORNTON GROUT FINNIGAN LLP**<br>3200-100 Wellington Street West<br>Toronto-Dominion Centre, Canadian Pacific Tower<br>Toronto, Ontario  M5K 1K7 |
|---|---|---|---|

AND TO: **EXPORT DEVELOPMENT CANADA**
151 O'Connor Street
Ottawa, Ontario  K1A 1K3

Jennifer Sullivan

Email:  jsullivan@edc.ca

Tel:    613.597.8651
Fax:   613.598.3113

AND TO: **THORNTON GROUT FINNIGAN LLP**
3200-100 Wellington Street West
Toronto-Dominion Centre, Canadian Pacific Tower
Toronto, Ontario  M5K 1K7

Leanne M. Williams

Email:  lwilliams@tgf.ca

Tel:    416.304.1616
Fax:   416.304.1313

Lawyers for Flextronics Telecom Systems Ltd.

AND TO: **McINNES COOPER**
Purdy's Wharf Tower II
1300 – 1969 Upper Water Street
Halifax, NS  B3J 2V1

John Stringer, Q.C.
Stephen Kingston

Email:  john.stringer@mcinnescooper.com
        stephen.kingston@mcinnescooper.com

Tel:    902.425.6500
Fax:   902.425.6350

Lawyers for Convergys EMEA Limited

AND TO: **MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, Ontario  M5H 3S1

Jeffrey Carhart

Email:  jcarhart@millerthomson.com

Tel:    416.595.8615/8577
Fax:   416.595.8695

Lawyers for Toronto-Dominion Bank

AND TO: **CAW-CANADA**
Legal Department
205 Placer Court
Toronto, Ontario M2H 3H9

Barry E. Wadsworth
Lewis Gottheil

Email:  barry.wadsworth@caw.ca
        lewis.gottheil@caw.ca

Tel.:   416.495.3776
Fax:   416.495.3786

Lawyers for all active and retired Nortel employees represented by the CAW-Canada

AND TO: **BOUGHTON LAW CORPORATION**
Suite 700
595 Burrard Street
Vancouver, BC  V7X 1S8

R. Hoops Harrison

Email:  hharrison@boughton.ca

Tel:    604.687.6789
Fax:   604.683.5317

Lawyers for Tonko Realty Advisors (BC) Ltd., in its capacity as duly authorized agent for Holdings 1506 Enterprises Ltd.

- 4 -

| | | | |
|---|---|---|---|
| AND TO: | **BORDEN LADNER GERVAIS LLP**<br>Scotia Plaza, 40 King Street West<br>Toronto, Ontario  M5H 3Y4 | AND TO: | **McMILLAN LLP**<br>Brookfield Place<br>181 Bay Street, Suite 4400<br>Toronto, Ontario  M5J 2T3 |

AND TO:

**BORDEN LADNER GERVAIS LLP**
Scotia Plaza, 40 King Street West
Toronto, Ontario  M5H 3Y4

Michael J. MacNaughton
Roger Jaipargas
Sam P. Rappos

Email:  mmacnaughton@blgcanada.com
Tel:    416. 367.6646
Fax:    416. 682.2837

Email:  rjaipargas@blgcanada.com
Tel:    416.367.6266
Fax:    416.361.7067

Email:  srappos@blgcanada.com
Tel:    416.367.6033
Fax:    416.361.7306

Lawyers for Bell Canada

AND TO:

**SISKINDS LLP**
680 Waterloo Street
London, Ontario  N6A 3V8

Raymond F. Leach
A. Dimitri Lascaris
Monique L. Radlein
Emilie E. M. Maxwell

Email:  ray.leach@siskinds.com
        dimitri.lascaris@siskinds.com
        emilie.maxwell@siskinds.com

Tel:    519.672.2121
Fax:    519.672.6065

Lawyers for Indiana Electrical Workers
Pension Trust Fund IBEW, Laborers Local
100 and 397 Pension Fund, and Bruce
William Lapare

AND TO:

**McMILLAN LLP**
Brookfield Place
181 Bay Street, Suite 4400
Toronto, Ontario  M5J 2T3

John Contini
Aaron Rousseau

Email   john.contini@mcmillan.ca
Tel:    416.307.4148
Fax:    416.304.3767

Email   aaron.rousseau@mcmillan.ca
Tel:    416.307.4081
Fax:    416.365.1719

Lawyers for ABN AMRO Bank N.V.

AND TO:

**BENNETT JONES LLP**
1 First Canadian Place
Suite 3400
Toronto, Ontario  M5X 1A4

Kevin Zych
S. Richard Orzy
Gavin Finlayson
Richard Swan

Email:  zychk@bennettjones.com
Tel:    416.777.5738
Fax:    416.863.1716

Email:  orzyr@bennettjones.com
Tel:    416.777.5737
Fax:    416.863.1716

Email:  finlaysong@bennettjones.com
Tel:    416.777.5762
Fax:    416.863.1716

Email:  swanr@bennettjones.com
Tel:    416.777.7479
Fax:    416.863.1716

Canadian Lawyers for The Informal Nortel
Noteholder Group

- 5 -

10

| AND TO: | **KOSKIE MINSKY** 20 Queen Street West Suite 900 Toronto, Ontario  M5H 3R3 | AND TO: | **KOSKIE MINSKY** 20 Queen Street West Suite 900 Toronto, Ontario  M5H 3R3 |

Mark Zigler
Susan Philpott
Demetrios Yiokaris
Andrea McKinnon
Celeste Poltak

Email:  mzigler@kmlaw.ca
Tel:    416.595.2090
Fax:    416.204.2877

Email:  sphilpott@kmlaw.ca
Tel:    416.595.2104
Fax:    416.204.2882

Email:  dyiokaris@kmlaw.ca
Tel:    416.595.2130
Fax:    416.204.2810

Email:  amckinnon@kmlaw.ca
Tel:    416.595.2150
Fax:    416.204.2874

Email:  cpoltak@kmlaw.ca
Tel:    416.595.2701
Fax:    416.204.2909

Lawyers for the Former Employees of Nortel

Mark Zigler
Susan Philpott
Demetrios Yiokaris
Andrea McKinnon
Celeste Poltak

Email:  mzigler@kmlaw.ca
Tel:    416.595.2090
Fax:    416.204.2877

Email:  sphilpott@kmlaw.ca
Tel:    416.595.2104
Fax:    416.204.2882

Email:  dyiokaris@kmlaw.ca
Tel:    416.595.2130
Fax:    416.204.2810

Email:  amckinnon@kmlaw.ca
Tel:    416.595.2150
Fax:    416.204.2874

Email:  cpoltak@kmlaw.ca
Tel:    416.595.2701
Fax:    416.204.2909

Lawyers for the LTD Beneficiaries

<table>
<tr><td>

AND
TO:

**MILLER THOMSON LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, Ontario  M5H 3S1

Jeffrey Carhart
Margaret Sims
James Klotz

Email:    jcarhart@millerthomson.com
Tel:      416.595.8615
Fax:      416.595.8695

Email:    msims@millerthomson.com
Tel:      416.595.8577
Fax:      416.595.8695

Email:    jmklotz@millerthomson.com
Tel:      416.595.4373
Fax:      416.595.8695

Lawyers for LG Electronics Inc.

</td><td>

AND
TO:

**MILLER THOMSON LLP**                 11
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, Ontario  M5H 3S1

Jeffrey Carhart
Margaret Sims

Email:    jcarhart@millerthomson.com
Tel:      416.595.8615
Fax:      416.595.8695

Email    msims@millerthomson.com
Tel:      416.595.8577
Fax:      416.595.8695

Canadian Lawyers for Telmar Network
Technology, Inc. and Precision
Communication Services, Inc.

</td></tr>
</table>

AND
TO:

**LG ELECTRONICS INC.**
11/F, LG Twin Towers (West)
20 Yeouido-dong, Yeongduengpo-gu
Seoul 150-721, Korea

Joseph Kim

Email:   joseph.kim@lge.com

Tel:      +82.2.3777.3171
Fax:      +82.2.3777.5345

AND
TO:

**CHAITONS LLP**
185 Sheppard Avenue West
Toronto, Ontario  M2N 1M9

Harvey G. Chaiton

Email:   harvey@chaitons.com

Tel:      416.218.1129
Fax:      416.218.1849

Lawyers for IBM Canada Limited

| | |
|---|---|
| AND TO: | **PALIARE ROLAND ROSENBERG ROTHSTEIN LLP**<br>Suite 501<br>250 University Avenue<br>Toronto, Ontario  M5H 3E5 |

Kenneth T. Rosenberg
Massimo (Max) Starnino
Lily Harmer
Tina Lie

Email:   ken.rosenberg@paliareroland.com
Tel:      416.646.4304
Fax:     416.646.4301

Email:   max.starnino@paliareroland.com
Tel:      416.646.7431
Fax:     416.646.4301

Email:   lily.harmer@paliareroland.com
Tel:      416.646.4326
Fax:     416.646.4301

Email:   tina.lie@paliareroland.com
Tel:      416.646.4332
Fax:     416.646.4301

Lawyers for the Superintendent of Financial Services as Administrator of the Pension Benefits Guarantee Fund

AND TO: **FRASER MILNER CASGRAIN LLP**
1 First Canadian Place
100 King Street West
Toronto, Ontario  M5X 1B2

R. Shayne Kukulowicz
Alex MacFarlane
Michael J. Wunder
Ryan Jacobs

Email:   Shayne.kukulowicz@fmc-law.com
             Alex.macfarlane@fmc-law.com
             Michael.wunder@fmc-law.com
             ryan.jacobs@fmc-law.com

Tel:      416.863.4511
Fax:     416.863.4592

Canadian Lawyers for the Official Committee of Unsecured Creditors

AND TO: **GOWLING LAFLEUR HENDERSON LLP**
Suite 1600, First Canadian Place
100 King Street West
Toronto, Ontario  M5X 1G5

E. Patrick Shea

Email:   patrick.shea@gowlings.com

Tel:      416.369.7399
Fax:     416.862.7661

Lawyers for Westcon Group

AND TO: **MINDEN GROSS LLP**
145 King Street West, Suite 2200
Toronto, Ontario  M5H 4G2

Raymond M. Slattery
David T. Ullmann

Email:   rslattery@mindengross.com
             dullmann@mindengross.com
Tel:      416.369.4149
Fax:     416.864.9223

Lawyers for Verizon Communications Inc.

AND TO: **AIRD & BERLIS**
Brookfield Place
181 Bay Street, Suite 1800
Toronto, Ontario  M5J 2T9

Harry Fogul
Peter K. Czegledy

Email:  hfogul@airdberlis.com
Tel:    416.865.7773
Fax:    416.863.1515

Email:  pczegledy@airdberlis.com
Tel:    416.865.7749
Fax:    416.863.1515

Lawyers for Microsoft Corporation

AND TO: **AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, Ontario  M5J 2T9

D. Robb English
Sanjeev P. R. Mitra

Email:  renglish@airdberlis.com
        smitra@airdberlis.com

Tel:    416.863.1500
Fax:    416.863.1515

Lawyers for Tata Consultancy Services
Limited and Tata America International
Corporation

AND TO: **ALEXANDER HOLBURN BEAUDIN & LANG LLP**
Barristers and Solicitors
700 West Georgia Street
Suite 2700
Vancouver, British Columbia  V7Y 1B8

Sharon M. Urquhart

Email:  surquhart@ahbl.ca
Tel:    604.484.1757
Fax:    604.484.1957

Lawyers for Algo Communication Products
Ltd.

AND TO: **GARDINER ROBERTS LLP**
Suite 3100, Scotia Plaza
40 King Street West
Toronto, Ontario  M5H 3Y2

Jonathan Wigley
Vern W. DaRe

Email:  jwigley@gardiner-roberts.com
Tel:    416.865.6655
Fax:    416.865.6636

Email:  vdare@foglers.com
Tel:    416.865.6641
Fax:    416.865.6636

Lawyers for Andrew, LLC

AND TO: **AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, Ontario  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:  sgraff@airdberlis.com
Tel:    416.865.7726
Fax:    416.863.1515

Email:  iaversa@airdberlis.com
Tel:    416.865.3082
Fax:    416.863.1515

Canadian Lawyers for Tellabs, Inc.

AND TO: **MILLER THOMSON LLP**
Scotia Plaza
40 King Street, West, Suite 5800
P.O. Box 1011
Toronto, Ontario  M5H 3S1

Maurice Fleming

Email:  mfleming@millerthomson.com
Tel:    416.595.8686
Fax:    416.595.8695

Lawyers for Verint Americas Inc. and Verint
Systems, Inc.

| AND TO: | DAVIS LLP |
|---|---|

**DAVIS LLP**
1 First Canadian Place
Suite 5600
100 King Street West
Toronto, Ontario  M5X 1E2

Bruce Darlington
Jonathan Davis-Sydor

Email:  bdarlington@davis.ca
Tel:    416.365.3529
Fax:    416.369.5210

Email:  jdavissydor@davis.ca
Tel:    416.941.5397
Fax:    416.365.7886

Lawyers for Brookfield LePage Johnson
Controls Facility Management Services

**AND TO:  AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, Ontario M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:  sgraff@airdberlis.com
Tel:    416.865.7726
Fax:    416.863.1515

Email:  iaversa@airdberlis.com
Tel:    416.865.3082
Fax:    416.863.1515

Lawyers for Perot Systems Corporation

**AND TO:  McMILLAN LLP**
Brookfield Place, Suite 4400
181 Bay Street
Toronto, Ontario M5J 2T3

Andrew F. Kent
Tushara Weerasooriya
Hilary E. Clarke

Email:  andrew.kent@mcmillan.ca
Tel:    416.865.7160
Fax:    416.865.7048

Email:  hilary.clarke@mcmillan.ca
Tel:    416.865.7286
Fax:    416.865.7048

Email:  tushara.weerasooriya@mcmillan.ca
Tel:    416.865.7262
Fax:    416.865.7048

Lawyers for Royal Bank of Canada

**AND TO:  McMILLAN LLP**
Brookfield Place, Suite 4400
181 Bay Street
Toronto, Ontario M5J 2T3

Lawrence J. Crozier
Adam C. Maerov

Email:  lawrence.crozier@mcmillan.ca
Tel:    416.865.7178
Fax:    416.865.7048

Email:  adam.maerov@mcmillan.ca
Tel:    416.865.7285
Fax:    416.865.7048

Lawyers for Citibank

| | | | | |
|---|---|---|---|---|
| AND TO: | **CASSELS BROCK & BLACKWELL LLP**<br>40 King Street West,<br>Suite 2100<br>Toronto, Ontario  M5H 3C2 | | AND TO: | **BLANEY McMURTRY LLP**<br>Barristers and Solicitors<br>1500 – 2 Queen Street East<br>Toronto, Ontario  M5C 3G5 |

Deborah S. Grieve

Email:   dgrieve@casselsbrock.com
Tel:      416.860.5219
Fax:     416.350.6923

Lawyers for Alvarion Ltd.

Domenico Magisano

Email:   dmagisano@blaney.com
Tel:      416.593.2996
Fax:     416.593.5437

Lawyers for Expertech Network Installation Inc.

AND TO:   **GARDINER ROBERTS LLP**
Suite 3100, Scotia Plaza
40 King Street West
Toronto, ON  M5H 3Y2

Jonathan Wigley
Vern W. DaRe

Email:   jwigley@gardiner-roberts.com
Tel:      416.865.6655
Fax:     416.865.6636

Email:   vdare@foglers.com
Tel:      416.865.6641
Fax:     416.865.6636

Lawyers for Amphenol Corporation

AND TO:   **McMILLAN LLP**
Brookfield Place
181 Bay Street, Suite 4400
Toronto, Ontario  M5J 2T3

Aaron Rousseau

Email:   aaron.rousseau@mcmillan.ca
Tel:      416.307.4081
Fax:     416.365.1719

Lawyer for Right Management Inc.

AND TO:   **AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, Ontario  M5J 2T9

Sanjeev P.R. Mitra

Email:   smitra@airdberlis.com

Tel:      416.863.1500
Fax:     416.863.1515

Lawyers for Enbridge Gas Distribution Inc.

AND TO:   **CASSELS BROCK & BLACKWELL LLP**
2100 Scotia Plaza
40 King Street West
Toronto, Ontario  M5H 3C2

E. Bruce Leonard
David S. Ward
Michael Casey

Email:   bleonard@casselsbrock.com
             dward@casselsbrock.com
             mcasey@casselsbrock.com

Tel:      416.860.6455
Fax:     416.640.3054

Lawyers for the UK Pension Protection Fund and Nortel Networks UK Pension Trust Limited

AND
TO:

**McFARLANE LEPSOE**
Barristers & Solicitors
70 Gloucester Street, Third Floor
Ottawa, Ontario  K2P 0A2

Paul K. Lepsoe

Email:  pklepsoe@mcfarlanelaw.com

Tel:      613.233.2679
Fax:     613.233.3774

Lawyers for Iron Mountain Canada
Corporation and Iron Mountain Information
Management, Inc.

AND
TO:

**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, Ontario  M5K 1E6

Thomas G. Heintzman
Junior Sirivar

Email:  theintzm@mccarthy.ca
Tel:      416.601.7627
Fax:     416.868.0673

Email:  jsirivar@mccarthy.ca
Tel:      416.601.7750
Fax:     416.868.0673

Lawyers for Frank Andrew Dunn

AND
TO:

**IRVING MITCHELL KALICHMAN LLP**
Place Alexis Nihon, Tour 2
3500 Boulevard De Maisonneuve Ouest
Bureau 1400
Montreal, Quebec  H3Z 3C1

Kurt A. Johnson

Email :  kjohnson@imk.ca
Tel:       514.935.5755
Fax :      514.935.2999

Lawyers for GFI INC., a division of Thomas &
Betts Manufacturing Inc.

AND
TO:

**NELLIGAN O'BRIEN PAYNE LLP**
Barristers and Solicitors
50 O'Connor Street
Suite 1500
Ottawa, Ontario  K1P 6L2

Janice B. Payne
Steven Levitt
Christopher Rootham

Email:  janice.payne@nelligan.ca
          steven.levitt@nelligan.ca
          christopher.rootham@nelligan.ca

Tel:      613.231.8245
Fax:     613.788.3655

Lawyers for the Steering Committee of Nortel
Canadian Continuing Employees – Post
CCAA as at January 14, 2009

| AND TO: | **BAKER & McKENZIE LLP**<br>Brookfield Place, P.O. Box 874<br>181 Bay Street, Suite 2100<br>Toronto, Ontario  M5J 2T3 | AND TO: | **BENNETT JONES LLP**<br>1 First Canadian Place<br>Suite 3400<br>Toronto, Ontario  M5X 1A4 |

AND
TO:
**BAKER & McKENZIE LLP**
Brookfield Place, P.O. Box 874
181 Bay Street, Suite 2100
Toronto, Ontario  M5J 2T3

Chris Besant
Lydia Salvi

Email:  chris.besant@bakernet.com

Tel:     416.865.2318
Fax:    416.863.6275

Email:  lydia.salvi@bakernet.com

Tel:     416.865.6944
Fax:    416.863.6275

Lawyers for Jabil Circuit Inc.

AND
TO:
**SCHNEIDER & GAGGINO**
375 Lakeshore Drive
Dorval, Quebec  H9S 2A5

Dan Goldstein
Marco Gaggino

Email:  dgoldstein@schneidergaggino.com
           mgaggino@schneidergaggino.com

Tel:     514.631.8787
Fax:    514.631.0220

Lawyers for the Teamsters Quebec Local
1999

AND
TO:
**EURODATA**
2574 Sheffield Road
Ottawa, Ontario  K1B 3V7

Nanci Shore

Email:  nanci@eurodata.ca
Tel:     613.745.0921
Fax:    613.745.1172

AND
TO:
**BENNETT JONES LLP**
1 First Canadian Place
Suite 3400
Toronto, Ontario  M5X 1A4

Robyn M. Ryan Bell
Mark Laugesen

Email:  ryanbellr@bennettjones.com
           laugesenm@bennettjones.com

Tel:     416.863.1200
Fax:    416.863.1716

Lawyers for Tel-e Connect Systems Ltd. and
Tel-e Connect Systems (Toronto) Ltd.

AND
TO:
**MINDEN GROSS LLP**
145 King Street West, Suite 2200
Toronto, Ontario  M5H 4G2

Timothy R. Dunn

Email:  tdunn@mindengross.com
Tel:     416.369.4335
Fax:    416.864.9223

Lawyers for 2748355 Canada Inc.

AND
TO:
**BALDWIN LAW PROFESSIONAL
CORPORATION**
54 Victoria Avenue
Belleville, Ontario K8N 5J2

Ian W. Brady

Email:  ibrady@baldwinlaw.ca
Tel:     613.771.9991
Fax:    613.771.9998

Lawyers for Sydney Street Properties Corp.

AND TO:

**AETL TESTING, INC.**
130 Chaparral Court, Suite 250
Anaheim, California 92808

Raffy Lorentzian

Email:  raffy.lorentzian@ntscorp.com
Tel:     714.998.4351
Fax:     714.998.7142

Lawyers for AETL Testing, Inc.

AND TO:

**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:  sgraff@airdberlis.com
Tel:     416.865.7726
Fax:     416.863.1515

Email:  iaversa@airdberlis.com
Tel:     416.865.3082
Fax:     416.863.1515

Lawyers for Huawei Technologies Co. Ltd.

AND TO:

**SHIBLEY RIGHTON LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, Ontario M5H 3E5

Arthur O. Jacques
Thomas McRae

Email:  arthur.jacques@shibleyrighton.com
Tel:     416.214.5213
Fax:     416.214.5413

Email :  thomas.mcrae@shibleyrighton.com
Tel :    416.214.5206
Fax :    416.214.5400

Lawyers for The Recently Severed
Canadian Nortel Employees Committee

AND TO:

**SHIBLEY RIGHTON LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, Ontario M5H 3E5

Arthur O. Jacques
Thomas McRae

Email:  arthur.jacques@shibleyrighton.com
Tel:     416.214.5213
Fax:     416.214.5413

Email :  thomas.mcrae@shibleyrighton.com
Tel :    416.214.5206
Fax :    416.214.5400

Co-Counsel for the Steering Committee of
Nortel Canadian Continuing Employees –
Post CCAA as at January 14, 2009

AND TO:

**NATIONAL TECHNICAL SYSTEMS**
130 Chaparral Ct., Suite 250
Anaheim, California, U.S.A.
92808

Raffy Lorentzian

Email:  raffy.lorentzian@ntscorp.com
Tel:     714.998.4351

AND TO:

**GOWLING LAFLEUR HENDERSON LLP**
Suite 1600, First Canadian Place
100 King Street West
Toronto, ON  M5X 1G5

David F.W. Cohen

Email:  david.cohen@gowlings.com

Tel:     416.369.6667
Fax:     416.862.7661

Lawyers for General Electric Canada
Equipment Finance G.P. and GE Capital
Canada Leasing Services Inc.

DOCSTOR: 1600901\15

| | |
|---|---|
| AND TO: | **DAVIS LLP** |
| | 1 First Canadian Place |
| | Suite 5600 |
| | 100 King Street West |
| | Toronto, ON  M5X 1E2 |

Bruce Darlington
Jonathan Davis-Sydor

Email:  bdarlington@davis.ca
Tel:    416.365.3529
Fax:    416.369.5210

Email:  jdavissydor@davis.ca
Tel:    416.941.5397
Fax:    416.365.7886

Lawyers for Computershare Trust Company
of Canada

AND TO:    **DAVIES WARD PHILLIPS & VINEBERG LLP**
44th Floor
1 First Canadian Place
Toronto, ON  M5X 1B1

Robin B. Schwill
Matthew P. Gottlieb

Email:  rschwill@dwpv.com
Tel:    416.863.0900
Fax:    416.863.0871

Email:  mgottlieb@dwpv.com
Tel:    416.863.0900
Fax:    416.863.0871

Lawyers for Nortel Networks UK Limited (In
Administration)

AND TO:    **LAX O'SULLIVAN SCOTT LLP**
Counsel
Suite 1920, 145 King Street West
Toronto, Ontario  M5H 1J8

Terrence O'Sullivan
Shaun F. Laubman

E-mail:  tosullivan@counsel-toronto.com
Tel:    416.598.1744
Fax:    416.598.3730

Email:  slaubman@counsel-toronto.com
Tel:    416.598.1744
Fax:    416.598.3730

Lawyers for William A. Owens

AND TO:    **BAKER & McKENZIE LLP**
Brookfield Place, P.O. Box 874
181 Bay Street, Suite 2100
Toronto, Ontario  M5J 2T3

Lydia Salvi

Email:  lydia.salvi@bakernet.com

Tel:    416.865.6944
Fax:    416.863.6275

Lawyers for Wipro Limited

AND TO:
**AIRD & BERLIS LLP**
Barristers & Solicitors
Brookfield Place, P.O. Box 754
181 Bay Street, Suite 1800
Toronto, ON  M5J 2T9

Steven L. Graff
Ian E. Aversa

Email:   sgraff@airdberlis.com
Tel:      416.865.7726
Fax:      416.863.1515

Email:   iaversa@airdberlis.com
Tel:      416.865.3082
Fax:      416.863.1515

Lawyers for the Current and Former
Employees of Nortel Networks Inc. who are
or were Participants in the Long-Term
Investment Plan Sponsored by Nortel
Networks Inc.

AND TO:
**McMILLAN LLP**
Brookfield Place
181 Bay Street, Suite 4400
Toronto, Ontario, M5J 2T3

Sheryl E. Seigel

Email:  sheryl.seigel@mcmillan.ca
Tel:      416.307.4063
Fax:      416.365.1719

Lawyers for The Bank of New York Mellon

AND TO:
**BLAKE, CASSELS & GRAYDON LLP**
199 Bay Street, Suite 2800
Commerce Court West
Toronto, Ontario  M5L 1A9

Susan M. Grundy
Marc Flynn

Email:  susan.grundy@blakes.com
Tel:      416.863.2572
Fax:      416.863.2653

Email:  marc.flynn@blakes.com
Tel:      416.863.2685
Fax:      416.863.2653

Lawyers for Telefonaktiebolaget L M
Ericsson (publ)

AND TO:
**McCARTHY TETRAULT LLP**
Suite 5300, TD Bank Tower
Toronto Dominion Centre
Toronto, Ontario  M5K 1E6

Heather Meredith

Email:   hmeredith@mccarthy.ca
Tel:      416.601.8342
Fax:      416.868.0673

Lawyers for Hitachi Communications
Technologies, Ltd.

AND TO:
**DEPARTMENT OF JUSTICE**
Ontario Regional Office
The Exchange Tower, Box 36
130 King Street W., Suite 3400
Toronto, Ontario  M5X 1K6

Diane Winters

Email:  dwinters@justice.gc.ca
Tel:      416.973.3172
Fax:      416.973.0810

AND TO:
**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, Ontario  M5K 1E6

Kevin P. McElcheran
Ryan Stabile

Email:   kmcelcheran@mccarthy.ca
Tel:      416.601.7730
Fax:      416.868.0673

Email:   rstabile@mccarthy.ca
Tel:      416.601.8335
Fax:      416.868.0673

Lawyers for Avaya Inc.

DOCSTOR: 1600901\15

AND TO:

**BLAKE, CASSELS & GRAYDON LLP**
199 Bay Street, Suite 2800
Commerce Court West
Toronto, Ontario  M5L 1A9

Pamela Huff
Milly Chow
Hugh DesBrisay
Craig Thorburn

Email:  pamela.huff@blakes.com
Tel:    416.863.2958
Fax:    416.863.2653

Email:  milly.chow@blakes.com
Tel:    416.863.2594
Fax:    416.863.2653

Email:  hugh.desbrisay@blakes.com
Tel:    416.863.2426
Fax:    416.863.2653

Email:  craig.thorburn@blakes.com
Tel:    416.863.2965
Fax:    416.863.2653

Lawyers for MatlinPatterson Global
Advisers LLC, MatlinPatterson Global
Opportunities Partners III L.P. and
MatlinPatterson Opportunities Partners
(Cayman) III L.P.

AND TO:

**FOGLER, RUBINOFF LLP**
Barristers and Solicitors
Suite 1200
Toronto-Dominion Centre
95 Wellington Street West
Toronto, Ontario  M5J 2Z9

Jeffrey K. Spiegelman

Email:  jspiegelman@foglers.com
Tel:    416.864.9700
Fax:    416.941.8852

Lawyers for Belden (Canada) Inc.

AND TO:

**SACK GOLDBLATT MITCHELL LLP**
20 Dundas Street West
Suite 1100
Toronto, Ontario  M5G 2G8

James McDonald
Darrell Brown

Email:  jmcdonald@sgmlaw.com
Tel:    416.979.6425
Fax:    416.591.7333

Email:  dbrown@sgmlaw.com
Tel:    416.979.4050
Fax:    416.591.7333

Lawyers for Edmund Fitzgerald

AND TO:

**VINCENT DAGENAIS GIBSON LLP/s.r.l**
Barristers and Solicitors
600-325 Dalhousie Street
Ottawa, ON  K1N 7G2

Thomas Wallis

E-mail:  thomas.wallis@vdg.ca
Tel:    613.241.2701
Fax:    613.241.2599

Lawyers for La Regle des Rentes du Quebec

| | |
|---|---|
| AND TO: | **STIKEMAN ELLIOTT LLP**<br>5300 Commerce Court West<br>199 Bay Street<br>Toronto, ON  M5L 1B9 |

Sean F. Dunphy

Email:  sdunphy@stikeman.com
Tel:  416.869.5662
Fax:  416.947.0866

Lawyers for GENBAND Inc.

| | |
|---|---|
| AND TO: | **STIKEMAN ELLIOTT LLP**<br>445 Park Avenue, 7th Floor<br>New York, NY  10022 |

Gordon Cameron
Ron Ferguson

Email:  gncameron@stikeman.com
Tel:  212.845.7464
Fax:  212.371.7087

Email:  rferguson@stikeman.com
Tel:  212.845.7477
Fax:  212.371.7087

Lawyers for GENBAND Inc.

| | |
|---|---|
| AND TO: | **BORDEN LADNER GERVAIS LLP**<br>Barristers and Solicitors<br>Scotia Plaza, Suite 4400<br>40 King Street West<br>Toronto, ON  M4H 3Y4 |

John D. Marshall
Craig J. Hill

Email:  jmarshall@blgcanada.com
Tel:  416.367.6024
Fax:  416.361.2763

Email:  chill@blgcanada.com
Tel:  416.367.6156
Fax:  416.631.7301

Lawyers for the U.K. Pensions Regulator

| | |
|---|---|
| AND TO: | **BLAKE, CASSELS & GRAYDON**<br>Box 25, Commerce Court West<br>199 Bay Street, Suite 2800<br>Toronto, Ontario  M5L 1A9 |

Pamela J. Huff
J. Jeremy Forgie

Email:  pamela.huff@blakes.com
Tel:  416.863.2958
Fax:  416.863.2653

Email:  jeremy.forgie@blakes.com
Tel:  416.863.3888
Fax:  416.863.2653

Lawyers for The Northern Trust Company, Canada

| | |
|---|---|
| AND TO: | **ROCHON GENOVA LLP**<br>121 Richmond Street West<br>Suite 900<br>Toronto, ON  M5H 2K1 |

Joel P. Rochon

Email:  jrochon@rochongenova.com
Tel:  416.363.1867
Fax:  416.363.0263

Lawyers for the Opposing LTD Employees

| | |
|---|---|
| AND TO: | **LERNERS LLP**<br>130 Adelaide St. West<br>Suite 2400<br>Toronto, ON  M5H 3P5 |

William E. Pepall

Email:  wpepall@lerners.ca
Tel:  416.601.2352
Fax:  416.867.2415

Lawyers for the Former Employees in Respect of the Distribution of the Corpus of the Health and Welfare Trust

AND
TO:
**MACLEOD DIXON LLP**
3700 Canterra Tower
400 Third Avenue SW
Calgary, Alberta
T2P 4H2

Kyle D. Kashuba

Email: kyle.kashuba@macleoddixon.com
Tel: 403.267.8399
Fax: 403.264.5973

Constellation NewEnergy Canada Inc.

AND
TO:
**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
One Liberty Plaza
New York, NY 10006

James Bromley
Lisa Schweitzer
Martin N. Kostov

Email: jbromley@cgsh.com
lschweitzer@cgsh.com
mkostov@cgsh.com
Tel: 212.225.2000
Fax: 212.225.3999

Lawyers for Nortel Networks Inc.

AND
TO:
**McMILLAN LLP**
Brookfield Place
181 Bay Street, Suite 4400
Toronto, ON  M5J 2T3

D. Brent McPherson

Email: brent.mcpherson@mcmillan.ca
Tel: 416.307.4103
Fax: 416.304.3769

Lawyers for Wells Fargo Bank, National
Association, as successor by merger to
Wachovia Bank, N.A., in its capacity as
Servicer for the Nortel Networks Pass-
Through Trust, Series 1-1

AND
TO:
**SACK GOLDBLATT MITCHELL**
500 – 30 rue Metcalfe St.
Ottawa, ON  K1P 5L4

Peter Engelmann
Fiona Campbell

Email: pengelmann@sgmlaw.com
Tel: 613-482-2452
Fax: 613-235-3041

Email: fcampbell@sgmlaw.com
Tel: 613-482-2451
Fax: 613-235-3041

Lawyers for the LTD Beneficiaries in Respect of
the Distribution of the Corpus of the Health and
Welfare Trust

AND
TO:
**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, Ontario  M5K 1E6

Barbara J. Boake
James D. Gage

E-mail: bboake@mccarthy.ca
Tel: 416.601.7557
Fax: 416.868.0673

Email: jgage@mccarthy.ca
Tel: 416.601.7539
Fax: 416.686.0673

Lawyers for Morneau Shepell Ltd.

AND
TO:
**DAVID STEER**
10 Cypress Court
Nepean, ON  K2H 8Z8

E-mail: davidsteer127@sympatico.ca

AND TO: **FOGLER, RUBINOFF LLP**
Barristers and Solicitors
Suite 1200
Toronto-Dominion Centre
95 Wellington Street West
Toronto, Ontario  M5J 2Z9

Jeffrey K. Spiegelman

Email:  jspiegelman@foglers.com

Tel:    416.864.9700
Fax:    416.941.8852

Lawyers for Apex Logistics Inc.

AND TO: **TORYS LLP**
79 Wellington St. W., Suite 3000
Box 270, TD Centre
Toronto, Ontario  M5K 1N2

Tony DeMarinis
Scott Bomhof
Sheila Block
Andrew Gray

Email:  tdemarinis@torys.com
        sbomhof@torys.com
        sblock@torys.com
        agray@torys.com
Tel:    416.865.0040
Fax:    416.865.8730

Lawyers for Nortel Networks Inc.

AND TO: **TORYS LLP**
79 Wellington St. W., Suite 3000
Toronto-Dominion Centre
Toronto, Ontario  M5K 1N2

Michael Rotsztain
Adam M. Slavens

Email:  mrotsztain@torys.com
Tel:    416.865.7508
Fax:    416.865.7380

Email:  aslavens@torys.com
Tel:    416.865.7333
Fax:    416.865.7380

Lawyers for Ranger, Inc.

AND TO: **TEMPLEMAN MENNINGA LLP**
401-366 King Street East
Kingston, Ontario  K7K 6Y3

Harold Van Winssen
R. Benjamin Mills

Email:  hvw@tmlegal.ca
        rbm@tmlegal.ca

Tel:    613.542.1889
Fax:    613.542.8202

Lawyers for The Corporation of the City of Belleville

AND TO: **MACLEOD DIXON LLP**
3700 Canterra Tower
400, 3rd Avenue N.W.
Calgary, Alberta  T2P 4H2

Andrew Robertson

Email :
andrew.robertson@macleoddixon.com

Tel :   403.267.8222
Fax :   403.264.5973

Lawyers for Recently Severed Calgary Employees

AND TO: **McMILLAN LLP**
Brookfield Place
181 Bay Street, Suite 4400
Toronto, Ontario M5J 2T3

Brett Harrison

Email:  brett.harrison@mcmillan.ca
Tel :   416.865.7932
Fax :   416.865.7048

Lawyers for Rogers Communications Inc.

AND TO: **ATTORNEY GENERAL FOR ONTARIO**
Crown Law Office – Civil
720 Bay Street, 8th Floor
Toronto, Ontario  M7A 2S9

Leonard Marsello
William MacLarkey

Email:   leonard.marsello@ontario.ca
Tel:      416.326.4939
Fax:      416.326.4181

Email:   William.MacLarkey@ontario.ca
Tel:      416.326.4082
Fax:      416.326.4181

Lawyers for Her Majesty the Queen in right
of Ontario, as represented by the Ministry of
the Environment

AND TO: **TEMPLEMAN MENNINGA LLP**
401-366 King Street East
Kingston, Ontario  K7K 6Y3

Harold Van Winssen
R. Benjamin Mills

Email:   hvw@tmlegal.ca
             rbm@tmlegal.ca

Tel:      613.542.1889
Fax:      613.542.8202

Lawyers for Algonquin and Lakeshore
Catholic District School Board

AND TO: **BLAKE, CASSELS & GRAYDON LLP**
199 Bay Street, Suite 2800
Commerce Court West
Toronto, Ontario  M5L 1A9

Steven J. Weisz
Jackie Moher

Email:   steven.weisz@blakes.com
Tel:      416.863.2616
Fax:      416.863.2653

Email:   jackie.moher@blakes.com
Tel:      416.863.3174
Fax:      416.863.2653

Lawyers for the American Registry for Internet
Numbers

AND TO: **McMILLAN LLP**
Brookfield Place
181 Bay Street, Suite 4400
Toronto, Ontario M5J 2T3

Andrew J. F. Kent
Wael Rostom

Email:   andrew.kent@mcmillan.ca
Tel :     416.865.7160
Fax :     416.865.7048

Email:   wael.rostom@mcmillan.ca
Tel :     416.865.7790
Fax :     416.865.7048

Lawyers for the Norpax LLC and RPX
Corporation, in its capacity as Managing
Member of Norpax LLC

**COURTESY COPIES:**

AND
TO:

**LEWIS AND ROCA**
40 North Central Avenue
Phoenix, Arizona
USA 85004-4429

Scott K. Brown

Email:   sbrown@lrlaw.com

Tel:      602.262.5321
Fax:     602.734.3866

Lawyers for The Prudential Insurance
Company of America

AND
TO:

**CURTIS, MALLET-PREVOST, COLT &
MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061

Steven J. Reisman
James V. Drew

E-mail: sreisman@curtis.com
          jdrew@curtis.com

Tel:      212.696.6000
Fax:     212-697-1559

Lawyers for Flextronics International

AND
TO:

**AKIN GUMP STRAUSS HAUER &
FELD LLP**
One Bryant Park
New York, NY  10036

Fred S. Hodara

Email:   fhodara@akingump.com

Tel:      212.872.1000
Fax:     212.872.1002

U.S. Lawyers for the Official Committee
of Unsecured Creditors

AND
TO:

**MILBANK, TWEED, HADLEY
McCLOY LLP**
1 Chase Manhattan Plaza
New York, NY  10005

Dennis F. Dunne
Andrew M. Leblanc
Albert A. Pisa

Email:   DDunne@milbank.com
Tel:      212.530.5770
Fax:     212.530.5219

Email:   ALeblanc@milbank.com
Tel:      212.835.7574
Fax:     212.530.5219

Email:   APisa@milbank.com
Tel:      212.530.5319
Fax:     212.530.5219

U.S. Lawyers for The Informal Nortel
Noteholder Group

AND
TO:
**VEDDER PRICE P.C.**
1633 Broadway, 47th Floor
New York, New York 10019

Michael L. Schein

Email:  mschein@vedderprice.com

Tel:    212.407.6920
Fax:    212.407.7799

U.S. Lawyers for Telmar Network
Technology, Inc. and Precision
Communication Services, Inc.

AND
TO:
**MACLEOD DIXON LLP**
3700 Canterra Tower
400, 3rd Avenue N.W.
Calgary, Alberta  T2P 4H2

Andrew Robertson
Caylee M. Rieger

Email :
andrew.robertson@macleoddixon.com
caylee.rieger@macleoddixon.com

Tel :    403.267.8222
Fax :    403.264.5973

Agent for Nelligan O'Brien Payne LLP,
lawyers for the Steering Committee of
Recently Severed Canadian Nortel
Employees and lawyers for the Steering
Committee of Nortel Canadian Continuing
Employees – Post CCAA as at January 14,
2009

AND
TO:
**BRYAN CAVE LLP**
161 North Clark Street, Suite 4300
Chicago, Illinois 60601

Eric S. Prezant

Email:   eric.prezant@bryancave.com
Tel:     312.602.5033
Fax:     312.602.5050

U.S. Lawyers for Tellabs, Inc.

AND
TO:
**LATHAM & WATKINS LLP**
885 Third Avenue
New York, NY 10022-4834

Michael J. Riela

Email: michael.riela@lw.com

Tel :    212.906.1373
Fax :    212.751.4864

U.S. Lawyers for The Bank of New York
Mellon

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

Court File No:  09-CL-7950

Applicants

---

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**

Proceeding commenced at Toronto

---

**NOTICE OF MOTION
(RETURNABLE JUNE 7, 2011)**

---

Norton Rose OR LLP
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street, P.O. Box 84
Toronto, Ontario  M5J 2Z4
CANADA

**Derrick Tay LSUC#: 21152A**
Tel:  (416) 216-4832
Email: derrick.tay@nortonrose.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jennifer.stam@nortonrose.com
Fax: (416) 216-3930

Lawyers for the Applicants

# TAB 2

577
-    2 9

Court File No: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**


IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**


**AFFIDAVIT OF CATHERINE MA**

I, Catherine Ma, of the Town of Markham, in the Province of Ontario, **MAKE OATH
AND SAY:**

1.    I am a Law Clerk with the law firm of Norton Rose OR LLP, lawyers for Nortel
Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks
Technology Corporation, Nortel Networks International Corporation and Nortel Networks
Global Corporation (collectively, "Nortel Canada"), and as such, have knowledge of the
matters herein disposed to.    I swear this affidavit in support of Nortel Canada's motion
returnable June 7, 2011.

2.    Attached hereto as Exhibit "A" is the U.S. Debtors'[1] Motion for Protective Order
Limiting Discovery Requests Propounded by SNMP Research International, Inc., dated April

---

[1] Nortel Network Inc, Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems
International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications
Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel

1, 2011, (U.S. Debtors' Motion"), which contains and refers to evidence and argument of the U.S. Debtors that has been filed in the United States Bankruptcy Court for the District of Delaware (the "U.S. Bankruptcy Court").

3.      Attached hereto as Exhibit "B" is the Creditor SNMP Research International, Inc.'s First Set of Interrogatories and Requests for Production of Documents Directed to the U.S. Debtors, dated March 1, 2011, which was filed in the U.S. Bankruptcy Court.

4.      Attached hereto as Exhibit "C" is the Monitor's (I) Statement in Support of the U.S. Debtors' Motion for Protective Order Limiting Discovery Requests Propounded by SNMP Research International, Inc., and (II) Request for Join Hearing on Such Motion, dated April 1, 2011, which was filed in the U.S. Bankruptcy Court.

SWORN BEFORE ME at the
City of Toronto, on June 1, 2011

_____
Commissioner for Taking Affidavits
YASMIN SINHA

_____
Catherine Ma

---

Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc. are collectively the "U.S. Debtors".

TAB A

580

31

This is Exhibit _____ "A" _____ referred to
in the affidavit of _CATHERINE MA_
sworn before me, this ___ i ___
day of _____ June _____, 20 _11_

VASUDA SINHA

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------X
                                          :
In re                                     :        Chapter 11
                                          :
Nortel Networks Inc., et al.,[1]          :        Case No. 09-10138 (KG)
                                          :
                        Debtors.          :        Jointly Administered
                                          :
                                          :        Hearing Date: May 24, 2011 at 9:30 a.m. (ET)
                                          :        Objections Due: May 17, 2011 at 4:00 p.m. (ET)
                                          :
------------------------------------------------------X
```

## DEBTORS' MOTION FOR PROTECTIVE ORDER LIMITING DISCOVERY REQUESTS PROPOUNDED BY SNMP RESEARCH INTERNATIONAL, INC.

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in

possession (collectively, the "Debtors"), hereby move this Court (the "Motion"), for the entry of

an order substantially in the form attached hereto as Exhibit A, pursuant to Rules 7026(c) and

9014(c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 7026-

1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy

Court for the District of Delaware (the "Local Rules") limiting the discovery sought by SNMP

Research International, Inc. ("SNMP RI") in Creditor SNMP Research International, Inc's First

Set of Interrogatories and Requests for Production of Documents Directed to the Debtors (the

"Demands")[2]; and granting them such other and further relief as the Court deems just and proper.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.
[2]     See Notice of Service of Discovery of Creditor SNMP Research International, Inc.'s First Set of Interrogatories and Requests for Production of Documents Directed to the Debtors [D.I. 5040]. A true

In support of this Motion, the Debtors rely on the Declaration of Steven Kenkel submitted in connection with this Motion (the "Kenkel Declaration" or "Kenkel Decl."), and further respectfully represent as follows:

## PRELIMINARY STATEMENT

During these bankruptcy proceedings, SNMP RI objected to nearly every sale of the Debtors' business lines on the basis that SNMP RI did not have information as to whether its software would be conveyed through the sales. The Court rejected SNMP RI's argument that it was entitled to an audit or had any other basis for holding up the sales.

Having lost at the sale hearings, SNMP RI now seeks to use the claims objection process to get the discovery it was denied -- an audit of all of the Debtors' sold business lines -- as well as access to all of the software source code of global Nortel that was ever used in a released product or otherwise made available to third parties over the past 11 years. But SNMP RI's Amended Claim is for to the unreported and unpaid royalties and other fees arising from the Debtors' use of a piece of SNMP RI's software in one business line pursuant to an unsigned license. The Federal Rules of Civil Procedure do not permit the type of boundless fishing expedition, regarding issues beyond to SNMP RI's Amended Claim, on which SNMP RI plainly seeks to embark here.

Not only do SNMP RI's discovery requests extend well beyond its Amended Claim, but they are also grossly burdensome. Prior to the service of SNMP RI's Demands, the Debtors consensually undertook an audit of the one business line, the Passport business, the sale of which had not yet closed or personnel been hired away or laid off. That audit, which revealed that there had been no unlicensed use of any SNMP RI software by the Debtors, took approximately 500 to

---

and correct copy of the Demands is attached as Exhibit A to the Certification of Jane Kim, dated April 1, 2011 (the "Kim Cert.") which is being filed concurrently herewith.

600 hours of work by about ten individuals. The discovery that SNMP RI requires of the Debtors here would require personnel with expertise and knowledge of the Debtors' businesses – personnel who no longer work for the Debtors following the completion of the sales of the Debtors' business lines – and dwarf the time spent to conduct the Passport audit by many multiples.

Finally, SNMP RI does not simply ask for the Debtors to conduct an audit, but SNMP RI also seeks to perform its own audit of all of Nortel's software based on a collection of data the Debtors are to provide. To do so would require the Debtors to search through the Nortel software repository in a manner far more invasive and time-consuming than even the business line audits described above. Moreover, SNMP RI would then have the Debtors give it access to all of its source code extracted in this manner – an unprecedented level of access to highly confidential trade secrets that the Debtors have worked hard to protect. SNMP RI's discovery requests are beyond the realm of anything permitted under the Federal Rules of Civil Procedure, and the Debtors respectfully request that they be stricken.

## JURISDICTION

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are Rule(s) 7026(c) and 9014(c) of the Bankruptcy Rules and Rule 7026-1 of the Local Rules.

## BACKGROUND

3.      On December 23, 1999, SNMP RI and the Debtors' ultimate corporate parent, Nortel Networks Corporation ("NNC"), entered into a licensing agreement (the "Agreement") under which SNMP RI granted NNC, and certain of its subsidiaries, including NNI (all together

3

with NNC, "Nortel"), the right to use certain software, including source code and binary code (the "SNMP RI Software"), in products produced by Nortel. NNI and each of the subsidiaries listed in Attachment 1 to the Agreement were able to issue purchase orders under Schedule A of the Agreement and receive access to the SNMP RI Software.

4.      On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel Networks (CALA) Inc.,[3] filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code and the cases were consolidated for procedural purposes only. The Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") in respect of the U.S. Debtors [D.I.s 141, 142]. Also on the Petition Date, NNC and NNI's direct corporate parent, Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[4] commenced proceedings under the Companies' Creditors Arrangement Act (Canada) (the "CCAA").

5.      On September 29, 2009, SNMP RI filed fifteen proofs of claim (the "Original Claims") against the Debtors, all of which were identical.[5] Each of the Original Claims asserted general unsecured claims totaling $22,281, plus an unliquidated amount for unpaid license royalties. Specifically, each of the Claims consisted of $11,781 of unpaid royalties, $10,500 of yearly software maintenance fees and unspecified additional amounts associated with royalties allegedly not reported.

---

[3]      Nortel Networks (CALA) Inc. filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes [D.I. 1098].
[4]      The Canadian Debtors include the following entities: NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.
[5]      See Proofs of Claim Nos. 4624-4638. SNMP also filed six identical proofs of claim against the Canadian Debtors (the "Canadian Claims").

4

6.      On July 9, 2010, the Debtors filed their 12th Omnibus Claims Objection (the

"Objection") [D.I. 3507]. In the Objection, the Debtors sought to (i) reduce and allow SNMP RI

Claim No. 4625 filed against NNI from $22,281 to $11,781; (ii) disallow the remaining claim for

maintenance fees in Claim No. 4625 as duplicative of the Canadian Claims; and (iii) disallow

and expunge the other fourteen proofs of claim[6] filed by SNMP RI against the other Debtors on

the basis that they are duplicates of Claim No. 4625.

7.      On August 4, 2010, SNMP RI filed a response to the Objection (the "Response")

[D.I. 3759]. The Response alleged for the first time that the Debtors had used SNMP RI software

without a license in connection with the operation of the Carrier Voice Over IP and

Communications Solutions business. Response ¶ 7. The Response requested, *inter alia*, a

scheduling order "to allow SNMP to take [unspecified] discovery for the purpose of justifying

his [sic] claim." Response ¶ 10. In an attempt to resolve SNMP RI's request for discovery, the

Debtors entered into discussions with SNMP RI.

8.      In a good faith effort to resolve SNMP RI's request for discovery, the Debtors

agreed to perform an audit (the "Passport Audit") of the only remaining business line in which a

sale had not already closed and for which Nortel still had the necessary personnel to conduct

such an audit: the Multi-Service Switch/Passport ("Passport") business. As described further in

the Kenkel Declaration, the Passport Audit used certain broad search terms provided by SNMP

RI and required the Debtors and other Nortel entities around the world to undertake several time-

consuming steps, including: (1) compiling a list of all the source code databases (known as

Versioned Object Bases or "VOBs") related to the various product lines in the Passport business;

(2) developing precise and relevant search scripts to allow a computer program to crawl through

the VOBs and find any of the search terms contained in the search scripts; and (3) reviewing and

---

[6]      Claim Nos. 4624 and 4626-4638.

interpreting the results of the search to determine whether the source code "hits" generated by the search belonged to the Debtors, to SNMP RI or to third parties. See Kenkel Decl. ¶ 10-13. After an estimated 500 to 600 hours of work by a total of approximately ten individuals, the Passport Audit was completed on December 22, 2010. See Kenkel Decl. ¶ 16. The results of the Passport Audit confirmed that all SNMP RI software used in the Passport business was used pursuant to valid licenses for which the Debtors paid royalties in connection with such use. See Kenkel Decl. ¶ 16.

9.     While the Passport Audit was in progress, on October 19, 2010, SNMP RI filed an amended proof of claim (the "Amended Claim")[7] for $1,517,038, consisting of $22,092 asserted in the Original Claims plus an additional $1,494,946 related to unpaid royalties, licensing and maintenance fees and late payment penalties associated with the alleged unauthorized use by the Debtors of a certain software product owned by SNMP RI, as well as "any and all additional amounts associated with licensing fees, royalties, and maintenance fees that have not been reported by the Debtors to date and are owed to SNMP." Amended Claim at ¶ 1.

10.     Discussions between the Debtors, the Canadian Debtors and SNMP RI regarding SNMP RI's request for discovery have been ongoing since the conclusion of the Passport Audit. In the course of those discussions, the Debtors were dismayed at the breadth of SNMP RI's requests. Specifically, SNMP RI demanded that the Debtors perform separate audits of each of the seven other businesses that have been sold in the Chapter 11 cases, in order to ascertain whether any SNMP RI software had been transferred to the purchasers. The Debtors informed SNMP RI that such an undertaking would be impossible, given the cost and the lack of available personnel with sufficient knowledge of the product lines in each business. Given the parties'

---

[7]     See Proof of Claim No. 7471.

6

inability to reach agreement on a narrowed request, the Debtors and SNMP RI agreed to a form

of scheduling order [D.I. 4782], which the Court entered on February 1, 2011. SNMP RI

subsequently served the Demands pursuant to the Court scheduling order, consisting of five

interrogatories (each, an "Interrogatory") and four requests for documents (each, a "Request").

11.    Interrogatories Nos. 3 and 5, and Request Nos. 3 and 4 are subject to this motion.

As set forth below, these Demands are irrelevant to the Amended Claim and grossly

burdensome.

- Interrogatory No. 3 demands that the Debtors "Identify the Persons known to Nortel who have knowledge of the Nortel Software source code transferred or made available to each buyer in the Bankruptcy Sales."[8]

- Interrogatory No. 5 demands that the Debtors "Identify all Creditor Software used or distributed by Nortel that was transferred or made available to a buyer as a part of the Bankruptcy Sales and Identify the Nortel Software that required the use of or was distributed with such Creditor Software."

- Request No. 3 demands "all Documents, including but not limited to any Documents or Communications that list or discuss any Creditor Software imbedded in, used in the development of, or distributed with Nortel Software that was transferred or made available in the Bankruptcy Sales."

- Request No. 4 demands that the Debtor "provide Creditor access to all Nortel Software, on a computer or computers of Nortel's choosing in source code format as extracted from the Nortel source code repository, that is or was shipped to customers or otherwise made available to customers, potential customers of Nortel, or other third parties, including but not limited to as a direct or indirect result of the Bankruptcy Sales, during the Relevant Period. Creditor's access to the Nortel source code must allow Creditor to run specific scripts that search the Nortel source code for the presence of Creditor Software."

---

[8]      "Bankruptcy Sales" means the sale of Nortel business line assets to (1) Radware Ltd. pursuant to a March 26, 2009 sale order [D.I. 539]; (2) Telefonaktiebolaget L M Ericsson (publ) pursuant to a July 28, 2009 sale order [D.I. 1205]; (3) Avaya Inc. pursuant to a September 16, 2009 sale order [D.I. 1514]; (4) Hitachi, Ltd. pursuant to an October 28, 2009 sale order [D.I. 1760]; (5) Telefonaktiebolaget L M Ericsson (publ) and Kapsch Carriercom AG pursuant to a December 2, 2009 sale order [D.I. 2065]; (6) Ciena Corp. pursuant to a December 3, 2009 sale order [D.I. 2070]; (7) GENBAND Corp. pursuant to a March 3, 2010 sale order [D.I. 2632]; and (8) Telefonaktiebolaget L M Ericsson (publ) pursuant to a September 30, 2010 sale order [D.I. 4054].

12.     Furthering the vast scope of the Demands, SNMP RI defines the relevant period of time related to the Demands as December 1, 1999 to the present, a stretch of over eleven years.  Similarly broad is SNMP RI's definition of "Nortel," which includes "Nortel Networks Inc. and any affiliate, subsidiary, member, officer, principal, employee, representative, or agent of Nortel as well as any person or any entity acting on behalf of Nortel."

13.     Concurrently with the filing of this Motion, the Debtors served on SNMP RI objections and responses to the Demands (the "Objections and Responses").  The Debtors have responded to the Interrogatories, to the extent not objectionable, and will produce documents in response to the Requests to the extent not objectionable.  The parties engaged in a telephonic meet and confer on March 30, 2011, but were unable to resolve the Debtors' objections to Interrogatories 3 and 5 and Requests 3 and 4.  See Kim Cert. ¶ 3.  A copy of the Objections and Responses is attached to the Kim Cert. as Exhibit B.

### RELIEF REQUESTED

14.     The Debtors request a protective order striking Interrogatories Nos. 3 and 5 and Requests Nos. 3 and 4 in their entirety.  The Debtors reserve the right to request further relief from this Court in the event that disputes arise from the Objections and Responses.

15.     The Debtors understand that the Canadian Debtors and the Monitor for the Canadian Debtors will be filing a request for a joint hearing before the Ontario Superior Court of Justice (Commercial List) and this Court to consider this Motion.  The Debtors agree that a joint hearing is appropriate under the Cross-Border Insolvency Protocol approved by the Court on June 29, 2009 (D.I. 990) and support the request for a joint hearing on this Motion.

## ARGUMENT

### A PROTECTIVE ORDER SHOULD BE ENTERED TO STRIKE
### INTERROGATORIES NOS. 3 AND 5 AND REQUESTS NOS. 3 AND 4

16.    The Amended Claim asserts claims for $1,500,000, all but $22,000 of which

refers to unpaid licensing fees, royalties and maintenance fees relating to one piece of software.

As described further below, the Demands include broad discovery requests far beyond what is

relevant to the Amended Claim.  In particular, the Demands seek broad discovery regarding

software transfers pursuant to Court-ordered sales that have no bearing on the claims alleged in

the Amended Claim.

I.    **Interrogatories Nos. 3 and 5 and Request Nos. 3 and 4 Should Be
      Stricken As Wholly Irrelevant to the Amended Claim**

   A.    **Interrogatories Nos. 3 and 5 and Request No. 3
         Improperly Seek Details Regarding the Bankruptcy Sales**

17.    The Amended Claim asserts a claim for unpaid, reported royalties and

maintenance fees outstanding of $22,281 at the time of the filing, plus a claim for $1,494,946 for

alleged unreported royalties and fees relating to one piece of software used by the Debtors in

connection with one business line.[9]  The latter claim for unreported royalties and fees appears to

serve as the basis for SNMP RI's all-inclusive Demands.  But the claim for alleged unreported

royalties and fees does not support the vast scope of the discovery sought regarding <u>all</u> the

software of global Nortel and the Bankruptcy Sales.  SNMP RI apparently provided the Debtors

---

[9] Specifically, the Amended Claim states the following:  "SNMP Research International, Inc. ('SNMLP')
asserts this general unsecured claim against each debtor in the Nortel Networks Inc. cases (collectively,
the 'Debtors') in the amount of $1,517038, which consists of the following: (i) an amount of $1,494,946
due to licensing fees, royalties, and maintenance fees associated with the unauthorized and illegal usage
by the Debtors of EMANATE®/Lite with EPIC . . .; (ii) an amount of $22,092 previously asserted in
SNMP's original proof of claim derived from unpaid royalties from the fourth quarter of 2008 through the
portion of the first quarter of 2009 prior to the Debtors' filing for bankruptcy protection, along with yearly
software maintenance fees; and (iii) any and all additional amounts associated with licensing fees,
royalties, and  maintenance fees that have not been reported by the Debtors to date and are owed to
SNMP."  Proof of Claim No. 7471.

9

with Emanate Lite software pursuant to a license agreement that was never signed between the parties. In good faith and in reliance on the parties' mutual mistake, the Debtors used the Emanate Lite software on no more than 3,475 cards in the MG9000 system in the Carrier Voice IP and Applications Solutions business line from 2002 to 2008. In total, the Debtors believe that the royalties due as a result of the sale of the 3,475 cards would be approximately $10,425. See Objections and Responses, Interrogatory 4.

18.    Interrogatories Nos. 3 and 5 and Request No. 3 (collectively the "Sale Audit Demands") seek information wholly unrelated to this software or its use, and instead seek information about SNMP RI software and the software of global Nortel transferred or made available to the buyers in the Bankruptcy Sales, which is not the subject of any claims asserted in the Amended Claim. The requests are not relevant to the Amended Claim, and SNMP RI, thus, cannot justify any entitlement to discovery on such requests, much less the grossly overbroad and burdensome requests that it has made here. See, e.g., Iseley v. Talaber, No. 1: CV-05-0444, 2007 U.S. Dist. LEXIS 76891, at *7 (M.D. Pa. Sept. 28, 2007) (finding that "documents sought are not relevant or likely to lead to the discovery of admissible evidence" where subject matter of documents sought was not at issue in action).

19.    Under Fed. R. Civ. Pro. 26(b)(1), parties are only entitled to obtain "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." The discovery of information and material that is relevant only to the broader subject matter of the action may be ordered by the court only upon a showing of good cause by the requesting party. Id. The current structure of Rule 26(b)(1) is the result of an amendment in 2000, which narrowed the scope of discovery. Prior to 2000, parties were entitled to discover nonprivileged matters relevant to the subject matter of the action without a court order for good cause shown.

10

"The rule change signal[ed] to the court that it has the authority to confine discovery to the claims and defenses asserted in the pleadings, and signals to the parties that they have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings." Advisory Committee Note to 2000 Amendment, FRCP 26(b)(1).

20.    In fact, rather than being relevant to the Amended Claim, the Sale Audit Demands are clear attempts by SNMP RI to re-tread the same arguments it raised in its objections to nearly every Bankruptcy Sale and which were already squarely rejected by this Court at the Passport sale hearing. There, SNMP argued that the Debtors should be required to perform an audit and determine whether any of SNMP RI's software was transferred to the purchasers as part of the Bankruptcy Sales. See Passport Sale Objection, attached to the Kim Cert. as Exhibit C. At the Passport sale hearing, the Court refused SNMP RI's request to require the Debtors to perform an audit of the business line being sold or to require the inclusion of language in the sale order disclaiming the transferring of SNMP RI software. See Excerpt of September 30, 2010 Hearing Transcript, attached as Exhibit D to the Kim Cert.[10] Its sale objections having been denied,

---

[10]    Prior to the Court finding that no audit or disclaimer language was required, the Court and counsel for the Debtors had the following exchange:

MR. BROMLEY [for the Debtors]: When I look at the objection it says SNMP RI requests that the debtors perform an audit as a condition of the sale to determine if SNMP RI intellectual property will be transferred to the purchaser as part of the sale.
. . .
So what we're saying is that we have a license to use this intellectual property it relates to the business. We have told Mr. Ralston now that two of the licenses do relate to this business. We have told Ericsson, as the purchaser, that these two licenses relate to the business, along with others that are on that list, and that they need to deal with it, all right. So it would seem to me --
THE COURT: That you're not assigning those licenses.
MR. BROMLEY: I'm not assigning those licenses.
. . .
So post-closing, Ericsson will not have a right to use those licenses . . . . So what Ericsson and what SNMP need to do is to go in and actually work on getting a new agreement, all right. And if Ericsson uses SNMP intellectual property after the closing and they're not allowed to, Ericsson is not supposed to do that, and they would have a claim against Ericsson.
THE COURT: Correct.

SNMP RI now uses its Amended Claim as a pretext by which to get the same discovery the Court refused to give it in the context of the Passport sale, even though the Amended Claim has nothing to do with the transfer of software through the Bankruptcy Sales. Such irrelevant requests are invalid under Rule 26(b)(1), justifying the protective relief sought here.

**B.    Request No. 4 Improperly Seeks a Premises Inspection for Transfers of Software**

21.    Request No. 4, which seeks that the Debtors provide SNMP RI "access to all Nortel Software . . . that is or was shipped to customers or otherwise made available to customers, potential customers of Nortel, or other third parties," should also be stricken because it goes far beyond the Amended Claim. SNMP RI seeks physical access to the global Nortel software repository by requiring the Debtors to provide access to a specially created database so that SNMP can inspect and survey all of the Nortel source code shipped or otherwise made available to customers and potential customers of Nortel or other third parties. But SNMP RI cannot justify Request No. 4 as either a premises inspection under Rule 34(a)(2) or a document demand. In either case, the Demand is controlled by Fed. R. Civ. Pro. 26(b). See Fed. R. Civ. Pro. 34(a)(2). As explained above, Rule 26(b) limits discovery to matters that are relevant to a party's claims. See Fed. R. Civ. Pro. 26(b)(1). Courts decline to allow a premises inspection when the inspection is irrelevant to any party's claims in the action. See, e.g., Ehrlich v. Inc. Vill. of Sea Cliff, CV 04-4025 (LDW) (AKT), 2007 U.S. Dist. LEXIS 39824, at *19-21 (E.D.N.Y. May 31, 2007) (denying plaintiff's request to inspect a property where the property was not "similarly situated" and thus irrelevant to plaintiff's equal protection claim); see also

MR. BROMLEY: Not against us.
THE COURT: Correct.
Id. at 56:8-13, 56:18-57:3, 57:5-6, 57:21-58:3.

Iseley, 2007 U.S. Dist. LEXIS 76891, at *7 (holding document request to be irrelevant to claims asserted).

22.    Request No. 4 seeks access to all of global Nortel's software source code shipped or otherwise made available to customers and potential customers of Nortel. The Amended Claim asserts a liquidated claim of $1.49 million for unreported and unpaid licensing fees, royalties and maintenance fees relating to one piece of SNMP RI's software and an unliquidated claim of an unspecified amount with an unspecified basis. But the filing of a conclusory, unliquidated claim does not provide carte blanche to take discovery to determine whether such a claim can be justified. Request No. 4 goes far beyond SNMP's claim that the Debtors failed to pay the necessary royalties, as actually asserted in the Amended Claim, and is instead an inquiry into every piece of Nortel software that was ever used in a product that was made available to customers over the past 11 years. Such a fishing expedition is simply not permitted by Rule 26. See, e.g., Ethypharm S.A. France v. Abbott Labs., No. 08-126-SLR-MPT, 2010 U.S. Dist. LEXIS 116156, at *17 (D. Del. Nov. 2, 2010) (where action was brought with respect to the prosecution of two patents, permitting discovery regarding an unrelated third patent "would authorize a fishing expedition beyond that which is nominally permitted by the Federal Rules").

II.    **Interrogatories Nos. 3 and 5 and Requests Nos. 3 and 4 Should Be Stricken As Unduly Burdensome**

23.    In addition to their irrelevance to the Amended Claim, the Sale Audit Demands and Request No. 4 are each grossly burdensome. Request No. 4 is uniquely burdensome as it requires the Debtors to provide complete, unfettered and unprecedented physical access to the software of global Nortel.

24.    The court must limit discovery where "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in

13

controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." Fed. R. Civ. Pro. 26(b)(2)(C)(iii). Where a discovery request imposes "undue burden or expense" and the non-requesting party can show good cause, the court can issue a protective order to prevent the discovery. Fed. R. Civ. Pro. 26(c)(1)(A). Good cause for a protective order is established when the moving party "demonstrate[s] a particular need for protection" by articulating the significant harm it will face in the absence of such an order. See Cipollone v. Liggett Group, Inc., 785 F.2d 1108, 1121 (3d Cir. 1986).

25.     As set forth above, the Demands go far beyond the bounds of relevance to the Amended Claim. The Demands are not only irrelevant, however, but also would be grossly burdensome if not impossible for the Debtors to fulfill.

### A.     The Sale Audit Demands improperly require the Debtors to undertake a grossly burdensome and unreasonable audit of their software

26.     The Sale Audit Demands seek to require the Debtors to conduct a broad internal investigation and audit of complex software questions that go far beyond the Amended Claim. Even assuming that SNMP RI could satisfy the threshold question of relevance – which it cannot – the software audit that it seeks through these Demands plainly exceeds the boundaries of reasonableness given the burden imposed on the Debtors.

27.     Interrogatory No. 5 demands the identification of "all [SNMP RI] Software used or distributed by Nortel that was transferred or made available to a buyer as a part of the Bankruptcy Sales." Request No. 3 similarly demands all documents that list or discuss any such software. Interrogatory No. 3 demands that the Debtors identify all Persons who have knowledge of, not just SNMP RI's software, but all Nortel software transferred or made available to the purchasers in the Bankruptcy Sales. Together, these Demands would require an

14

audit of all of the software source code related to the business lines sold by the Debtors through the Bankruptcy Sales and of all people who had any involvement with the software in connection with those sales.

28.    Conducting an audit of all of the code related to the sold businesses (much less the people involved in the sales) would be impossible to perform and unduly burdensome to attempt. The Debtors would face a significant depletion of their already limited resources if they were required to spend the time and expense even to try to conduct such an audit. This depletion would be especially harmful considering the Debtors' ongoing attempt to wind down and would come at the cost of other creditors. This burden is especially objectionable since SNMP RI is in the best position to determine if they provided software to the Debtors and then failed to receive any royalties from the Debtors.

29.    The excessive burden caused by the Passport Audit proves this point. In an effort to resolve SNMP RI's concerns, the Debtors conducted an audit of the Passport Business because it was the only sale that had not closed at the time SNMP RI requested discovery in its Response and, thus, was the only business for which Nortel still had the necessary personnel to conduct such an audit. Because the other business sales have closed and personnel with technical expertise and knowledge of the relevant Nortel products are no longer at Nortel, SNMP RI's requested audits of the closed sales cannot be performed. See Kenkel Decl. ¶ 18. Moreover, even if the necessary personnel were available, the time and resources required to perform such an audit would be so great as to be prohibitive. See Kenkel Decl. ¶ 19.

30.    As further described in the Kenkel Declaration , ClearCase is a Software Configuration Management system that houses "every version (including both test and release versions of products) of every element related to a software project as it evolves over time."

15

Kenkel Decl. ¶ 4. It contains over 3,700 databases of software source code. Kenkel Decl. ¶ 6. Those databases, collectively, hold "millions of files, each with multiple versions, and many millions of lines of source code." Kenkel Decl. ¶ 6. Conducting an audit of each sold business line would require the Debtors to conduct a detailed search of this repository using the very few (if any) employees with the expertise to search through and evaluate the information in the ClearCase repository.

31.    As further detailed in the Kenkel Declaration, the Passport Audit alone required approximately 500-600 person hours to perform a search of approximately eighteen gigabytes of code. See Kenkel Decl. ¶ 16. A search of all of the seven other business lines sold through the Bankruptcy Sales would entail searching approximately eight terabytes of code. See Kenkel Decl. ¶ 6. If the search time is related to the amount of data searched, then based on the amount of time spent on the Passport Audit, an audit of all the businesses would require as many as 200,000 person hours. Kenkel Decl. ¶ 19.

**B.    Request No. 4 improperly requires the Debtors to create a special database of software to run their own audit and allow SNMP to view confidential trade secrets**

32.    Not satisfied with requiring the Debtors to perform an audit, SNMP RI seeks to conduct their own audit of all of Nortel's software source code. SNMP RI does not seek documents in Request No. 4. Rather, it seeks to require the Debtors to comb through all of the software in Nortel's ClearCase repository from December 1999 to the present. After reviewing over 11 years of software use for all the different business lines, SNMP RI would then have the Debtors place massive quantities of the software source code in a database that would need to be created specifically to answer Request No. 4. Any such database necessarily would be filled

with confidential and proprietary property. This unprecedented demand is grossly burdensome and intrusive and improper on its face.

33.    To respond to Request No. 4, the Debtors would first have to comb through the entire ClearCase software repository to identify which source code related to released products. See Kenkel Decl. ¶ 22. The Debtors would then need to manually investigate whether each of the lines of code had ever actually been shipped or otherwise made available to customers, potential customers or other third parties. See Kenkel Decl. ¶ 22. The Debtors cannot even begin to estimate the massive cost and hours required to respond to SNMP RI's demand, but certainly it would be many times that which was required for the Passport Audit. See Kenkel Decl. ¶ 22.

34.    Beyond the tremendous drain on the Debtors' financial and human resources, responding to Request No. 4 would require the Debtors to have the appropriate personnel available to conduct such an investigation. To accurately determine which of the lines of source code in the ClearCase databases were made available to customers, potential customers or other third parties, a reviewer would need to have multiple training classes in the use of ClearCase, as well as possess "detailed knowledge of Nortel's software development process." Kenkel Decl. ¶ 8-9. As mentioned above, the Debtors have completed the sales of all of the individual business lines and lack employees who have the requisite training and knowledge to carry out the investigation required by Request No. 4. Accordingly, it is not possible for the Debtors to respond to Request 4.

35.    Even if the Debtors were able to identify the relevant source code and create a special database to house it, such a request would require the Debtors to expose highly confidential trade secrets. The Federal Rules specifically contemplate protecting the disclosure

17

of trade secrets in the discovery process. Under Fed. R. Civ. Pro. 26(c)(1)(G), upon a showing

of good cause, the court can issue a protective order "requiring that a trade secret or other

confidential research, development, or commercial information not be revealed." A protective

order is appropriate where the value and secrecy of source code outweighs the need for its

disclosure. See Viacom Int'l Inc. v. YouTube Inc., 253 F.R.D. 256, 260-61 (S.D.N.Y. 2008)

(finding that a protective order was needed where the plaintiff sought access to the defendants'

source code to "allay [its] speculation" that the defendants' search software was identifying and

promoting copyright infringing video clips on their website).

    36.    That Nortel's software source code constitutes trade secrets, the disclosure of

which would cause harm, is without question. Indeed, the Debtors have always gone to great

lengths to protect this source code, including throughout these bankruptcy proceedings. In fact,

the access to the Nortel computer systems and servers that the Nortel sellers provided to the

purchasers of the business lines, who paid billions of dollars for these assets, is far more

restrictive than the access that SNMP RI demands from the Debtors.

    37.    For example, in every transition services agreement (each, a "TSA") entered into

with the buyers, the Nortel sellers:

> (1) restricted access to only those representatives of the buyers "with a bona fide
> need to have such access in connection with the Services"[11];
>
> (2) required that the buyers "limit such access solely to the use of such systems
> for purposes of the Services and shall not access or attempt to access any other
> Party's computer systems, files, software or services other than those agreed to by

---

[11]    See, e.g., Excerpt of TSA, dated November 13, 2009, with Telefonaktiebolaget LM Ericsson
(publ), attached to the Kim Cert. as Ex. E ("CDMA TSA"), at § 9(a). The other TSAs, attached in
relevant excerpts to the Kim Cert., contain similar provisions to the CDMA TSA provisions cited in this
section. "Services" is defined in each of the TSAs as those services that the sellers agree to provide the
purchaser pursuant to the relevant TSA. See, e.g., CDMA TSA at § 2(a).

the Parties as being required for the Services, or those that are publicly available"[12];

(3) prohibited purchasers from "attempt[ing] to reverse engineer, disassemble, reverse translate, decompile or in any other manner decode any element of the Providers Information Systems, or mak[ing] copies of any element of the Providers Information Systems"[13]

(4) required that the purchasers maintain firewalls and "implement procedures to segregate all Seller information, data and communications" from those employees of the buyers who were not authorized to access the Nortel sellers' systems;[14] and

(5) to the extent third-party consents were required to use or access software licensed by the Nortel sellers from a third party, required that the buyers acquire any necessary licenses and indemnify and hold harmless the Nortel sellers and their affiliates "from any and all claims and liabilities (including legal fees and expenses) arising out of Purchaser's use of such third party software."[15]

38.    The Nortel sellers, including the Debtors, understood the importance of preventing the disclosure of Nortel's software source code and appropriately set up highly restrictive conditions to any access by the purchasers, even where such access was necessary for the purchasers to transition the operation of their purchased business lines from Nortel. Thus, the unfettered access to Nortel's software source code that SNMP demands is unprecedented, grossly burdensome and highly inappropriate.

---

[12]    See, e.g, CDMA TSA at § 9(a).

[13]    See, e.g., id. at Ex. C, § 5.

[14]    See, e.g., id. at Ex. C, §§ 6(a), (b).

[15] See, e.g., id. at Ex. C § 8 ("Third-Party Technology: Purchaser acknowledges that access to the Permitted Systems may require that Purchaser have access to software licensed by the Providers from a third party. Purchaser acknowledges that third-party consents may be required in connection with the use or access to certain elements of the Permitted Systems and such use or access shall be conditional upon such consents being obtained by Purchaser . . . Purchaser shall indemnify and hold harmless the Providers from any and all claims and liabilities (including legal fees and expenses) arising out of Purchaser's use of such third-party software. Additionally, Purchaser acknowledges that it may be required to acquire a license for certain third-party software in order to utilize certain elements for the Permitted Systems, or to carry out the Purpose, in which case Purchaser shall be responsible for acquiring such license, and for any fees associated therewith.").

## NOTICE

Notice of the Motion has been given via first class mail or hand delivery to (i) the U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the Bondholder Group; (iv) counsel to SNMP; and (v) the general service list established in these chapter 11 cases. The Debtors submit that under the circumstances no other or further notice is necessary.

## No Prior Request

39.    No prior request for the relief sought herein has been made to this or any other court.

601

52

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated: April 1, 2011
      Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

Deborah M. Buell (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Ann C. Cordo*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*

21

602

# TAB B

53

This is Exhibit _____ "B" _____ referred to

in the affidavit of _CATHERINE MA_

sworn before me, this __1__

day of ___June___ , 20 _11_

VASUDA SINHA

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | : | Chapter 11 |
| | : | |
| Nortel Networks Inc., *et al.* | : | Case No. 09-10138 (KG) |
| | : | |
| Debtors | : | |
| | : | |

### CREDITOR SNMP RESEARCH INTERNATIONAL, INC.'S FIRST
### SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF
### DOCUMENTS DIRECTED TO THE DEBTORS

COMES now the Creditor, SNMP Research International, Inc., by and through counsel, and serves the following Interrogatories and Requests for Production of Documents on the Debtors pursuant to Rules 26, 33, and 34 of the Federal Rules of Civil Procedure as incorporated by Rules 9014, 7026, 7033 and 7034 of the Federal Rules of Bankruptcy Procedure.

### DEFINITIONS AND GENERAL INSTRUCTIONS

1.    For purposes of these discovery requests, the following words and phrases shall have the meaning ascribed to them as follows:

a.    **"Bankruptcy Sales"** means the sale of Nortel assets to (i) Radware Ltd. pursuant to a sale order dated  March 26, 2009, (ii) Telefonaktiebolaget LM Ericsson (Publ)  pursuant to a sale order dated July 28, 2009, (iii) Avaya Inc. pursuant to a sale order dated September 16, 2009, (iv) Hitachi, Ltd. pursuant to a sale order dated October 28, 2009, (v) Telefonaktiebolaget LM Ericsson (Publ) and Kapsch Carriercom AG pursuant to a sales order dated December 2, 2009, (vi) Ciena Corporation pursuant to a sales order dated December 3, 2009, (vii) GENBAND Inc. pursuant to a sales order dated March 4, 2010, and (viii) Telefonaktiebolaget LM Ericsson (Publ) pursuant to a sales order dated September 30, 2010.

1

b.    **"Communicate"** and **"Communication"** means every disclosure, transfer, or exchange of information in any manner, means, or medium, including but not limited to the following: by telephone, text, mail, personal delivery, facsimile, electronic mail, internet messaging, electronic transmission, face-to-face, or any other form of transmitting information, whether orally, electronically, or written;

c.    **"Creditor"** means SNMP Research International, Inc.

d.    **"Creditor Software"** means any software owned by Creditor or licensed to Creditor and any derivative works thereof, whether in binary or source form.   The definition of Creditor Software includes software developed through the use of Creditor Software.

e.    **"Date"** means the exact date requested, but if the exact date is not known and cannot be determined using due diligence, then it means the applicable time period as specifically as possible, i.e. month, season, year, or range of years;

f.    **"Describe"** when used in reference to

i.    A relationship between two Persons means to explain how the Persons became affiliated, the nature of the affiliation (business associates, social acquaintances, etc), approximately how often the Persons communicated with each other, and the length of the affiliation;

ii.    An event or occurrence means to explain the characteristics of the event or occurrence as they appeared to Nortel.

g.    **"Document"** or **"documents"** have the meaning ascribed to them in  Federal Rule of Civil Procedure 34 and include, without limitation, the original and any non-identical copies, regardless of origin or location, and regardless of whether it exists in hard print or electronic media, of any book, pamphlet, periodical, advertisement, catalog, letter,

opinion, report, form, electronic mail message, facsimile, telegram, cable, telex correspondence, report, record, notebook, writing, drawing, sketch, blueprint, manual, handwritten note, contract agreement, manuscript, minutes, intracorporate communication, bulletin, brochure, circular, instruction, memorandum, notice, working paper, diary, chart, paper, graph, laboratory record, computer printout, magnetic or optical media, work assignment, print tracing, survey, photograph, sound recording, image, phonorecord, microfilm, index, data sheet, data processing card, audio or video recording, or notes of or relating to any telephone or other conversation, or any other written, recorded, transcribed, filmed, or graphic material, however produced or reproduced, which is or has been in Nortel's possession, custody, or control or of which Nortel has knowledge;

h.    "Identify," "identity," "identifying," or "identification," when used in reference to a

    i.    **Natural Person** means to state the person's full name, employer, occupation, job title, and position, present or last known residence address and telephone number, present or last known business address and telephone number, and the Person's relation to Nortel;

    ii.    **Person other than a Natural Person** means to state the full name, type of entity, business address, telephone number, and name and telephone number of the agent(s), employee(s), or representative(s) who acted on behalf of the Person in connection with the event, instance, occurrence, or circumstance described or referred to in the discovery request;

    iii.    **Document** means to state the type of Document (e.g., letter, electronic mail, chart, etc.) and its title, date, time sent or received, author, addressee, subject

3

matter, present location, and custodian, whether any drafts preceded the final version of the Document, all known recipients of the Document and any drafts, and, if the Document was but is no longer in Nortel's possession, state what disposition was made of it and the facts or reasons for such disposition;

iv.     **Software** means to state the name and version number or version numbers of the Software, and where applicable the Nortel product on which such Software resides and the operating system and processor for the Nortel product.

i.     **"Nortel"** means the Debtor, Nortel Networks, Inc, and any affiliate, subsidiary, member, officer, principal, employee, representative, or agent of Nortel as well as any person or entity acting on behalf of Nortel;

j.     **"Person"** or **"persons"** means any natural person, firm, proprietorship, partnership, joint venture, corporation, association, or other business entity and all present and former officers, directors, agents, employees, and others acting for or purporting to act on behalf of such natural person, firm proprietorship, partnership, joint venture, corporation, association, or other business entity;

k.     **"Proof of Claim"** means the Amended Proof of Claim filed by SNMP Research International, Inc. dated October 19, 2010;

2.     **"Rule"** means the applicable Federal Rule of Civil Procedure.

3.     Rule 26 provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense—including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter."  Information is relevant if it "appears reasonably calculated to lead to the discovery of admissible evidence."

4

4.      Rule 26(e) imposes a duty to supplement or correct a response to a discovery request under the following circumstances:

    i.      When a party learns that the disclosure or response is incomplete or incorrect in some material respect, "if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing" or

    ii.      When an expert's report must be disclosed pursuant to Rule 26(a)(2)(B) and the information in the report or in the expert's deposition has changed in some respect by the time the party's Rule 26(a)(3) disclosures are due.

5.      If a party withholds information that is otherwise discoverable by asserting that the information is "privileged or subject to protection as trial preparation material," Rule 26(b)(5) requires that the party make the claim expressly and "describe the nature of the documents, communications, or things not produced or disclosed . . . in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim."

## INTERROGATORIES

### Instructions

1.      As required by Rule 33(b)(3), please answer each Interrogatory separately and fully in writing under oath, unless objected to.

2.      If Nortel objects to an Interrogatory, please answer as much of the Interrogatory as can be answered without objection and state with specificity the grounds for objection, as required by Rule 33(b)(3), (b)(4).

3.      Please serve a copy of the answers and objections, if any, to the Interrogatories within 30 days after the service of these Interrogatories, as required by Rule 33.

5

## INTERROGATORIES

1.    Please Identify all Persons answering these Interrogatories or requests for production of Documents and all Persons who assisted or provided information for such answers or Documents.

**RESPONSE:**

2.    Please Identify all Persons known to Nortel who have knowledge of the facts or allegations in the Proof of Claim.

**RESPONSE:**

3.    Please Identify the Persons known to Nortel who have knowledge of the Nortel Software source code transferred or made available to each buyer in the Bankruptcy Sales, at the time the Bankruptcy Sale closed, categorized by each buyer;

**RESPONSE:**

4.    Please Identify all Creditor Software used or distributed by Nortel without a license from Creditor authorizing such use or distribution from December 1, 1999 to the present.  In addition to the

610

60

Identification of the Creditor Software, Identify the (i) dates on which such use or distribution started and ended, (ii) Nortel Software that required the use of, or was distributed with the Creditor Software, (iii) each calendar quarter in which such Creditor Software was used or distributed, and (iv) amounts of such Creditor Software distributed by Nortel;

**RESPONSE:**

5.    Please Identify all Creditor Software used or distributed by Nortel that was transferred or made available to a buyer as a part of the Bankruptcy Sales and Identify the Nortel Software that required the use of or was distributed with such Creditor Software.

**RESPONSE:**

7

## REQUESTS FOR PRODUCTION OF DOCUMENTS

### Instructions

1.      Unless otherwise indicated, the date range applicable for all Requests for Production of Documents is from December 1, 1999 to the present. (the "Relevant Period")

2.      With respect to each Document or thing that is responsive to any Request for Production of Documents, please state whether Nortel will produce the Documents or things requested or its objection to the Request, as required by Rule 34.

3.      If Nortel is unable to completely answer a Request, please respond as fully as possible and then state a reason or reasons why Nortel cannot make a complete response.

4.      If Nortel objects to any of these Requests, please state the reasons for the objection, as required by Rule 34.

5.      If any Document or thing that is responsive to any Request for Production of Documents has been lost or destroyed, please identify the Document or thing, state the Request to which it would otherwise be responsive, and state, in detail, the circumstances of the loss or destruction of the document or thing.

6.      If any Document or thing that is responsive to any Request for Production of Documents is within Nortel's control but is not within Nortel's possession or custody, please Identify the Person who has possession or custody of the Document or thing.

7.      If any Document or thing that is responsive to any Request for Production of Documents was within Nortel's possession, custody, or control, but is not longer within Nortel's possession, custody or control, please state the disposition of the Document or thing, the Date or date range on or in which the disposition occurred, the reason or reasons for the disposition, and the Person who disposed of the Document or thing.

8

8.      These Requests for Production of Documents are not seeking the production of any Document or information protected by the attorney-client privilege, or trial preparation materials covered by Rule 26(b)(3).  If Nortel claims that a privilege or protection prevents it from producing a Document, please state (1) the privilege or protection claimed, (2) the Documents or information protected by the privilege or protection, and (3) the basis for asserting the privilege or protection, as required by Rule 26(b)(5).

9.      Please serve upon Creditor a written response to these Requests for Production of Documents within 30 days after service of the Requests, as required by Rule 34(b)(2)(A).

10.     These Requests for Production of Documents shall be deemed continuing, and supplemental answers or responsive Documents shall be produced as required by Rule 26(e) if further responsive information is obtained subsequent to the time the responses are served.

### REQUESTS FOR PRODUCTION OF DOCUMENTS

1.      **Request No. 1:** Please produce all Documents, including but not limited to, Nortel's internal notes, email Communications, or other written Communications, containing any information relating to the Proof of Claim.

**RESPONSE:**

2.      **Request No. 2:** Please produce all Documents, including but not limited to, Nortel's internal notes, email Communications, or other written Communications, containing any information relating to the use or distribution of Creditor Software in any manner by Nortel without a license authorizing such use or distribution during the Relevant Period..

**RESPONSE:**

9

3.    **Request No. 3:** Please produce all Documents, including but not limited to any Documents or Communications that list or discuss any Creditor Software imbedded in, used in the development of, or distributed with Nortel Software that was transferred or made available in the Bankruptcy Sales.

**RESPONSE:**

4.    **Request No. 4:** Please provide Creditor access to all Nortel Software, on a computer or computers of Nortel's choosing in source code format as extracted from the Nortel source code repository, that is or was shipped to customers or otherwise made available to customers, potential customers of Nortel, or other third parties, including but not limited to as a direct or indirect result of the Bankruptcy Sales, during the Relevant Period. Creditor's access to the Nortel source code must allow Creditor to run specific scripts that search the Nortel source code for the presence of Creditor Software.

**RESPONSE:**

Dated: March 1, 2011

CIARDI CIARDI & ASTIN

Daniel K. Astin (No. 4068)
Joseph J. McMahon, Jr. (No. 4819)
919 N. Market Street, Suite 700
Wilmington, Delaware 19801
Telephone: (302) 658-1100
Facsimile: (302) 658-1300
dastin@ciardilaw.com
jmcmahon@ciardilaw.com

and

Mark H. Ralston
2603 Oak Lawn Avenue
Suite 200
Dallas, TX 75219
Phone: (214) 295-6416
Fax: (214) 602-1250

*Attorneys for SNMP Research International, Inc.*

11

615

# TAB C