**<u>EXHIBIT A-4</u>**



This is Exhibit _____ "C" _____ referred to
in the affidavit of CATHERINE MA
sworn before me this _____ 1
day of _____ June _____ , 20 11

VASUDA SINHA

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re*: | Chapter 11 |
| | Case No. 09-10138 (KG) |
| Nortel Networks Inc., *et al.*,[1] | (Jointly Administered) |
| | RE: Dkt. No. 5196 |
| Debtors. | **Hearing Date: May 24, 2011 at 9:30 a.m.**<br>**Objection Deadline: May 17, 2011 at 4:00 p.m.** |

### THE MONITOR'S (I) STATEMENT IN SUPPORT OF DEBTORS' MOTION FOR PROTECTIVE ORDER LIMITING DISCOVERY REQUESTS PROPOUNDED BY SNMP RESEARCH INTERNATIONAL, INC., AND (II) REQUEST FOR JOINT HEARING ON SUCH MOTION

Ernst & Young Inc., the court-appointed monitor (the "**Monitor**") and authorized foreign representative of Nortel Networks Corporation and certain of its direct and indirect subsidiaries, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks Global Corporation, and Nortel Networks International Corporation (the "**Canadian Nortel Group**") in proceedings (the "**Canadian Proceedings**") under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended, pending before the Ontario Superior Court of Justice (Commercial List) (the "**Ontario Court**"), hereby files this statement in support of the Debtors' Motion for Protective Order Limiting Discovery Requests Propounded by SNMP Research International, Inc., dated April 1, 2011 [Dkt. No. 5196] (the "**Motion**")[2] and request for a joint hearing to consider such Motion (and any objections thereto) pursuant to

---

[1] The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332); Nortel Networks Capital Corporation (9620); Nortel Altsystems Inc. (9769); Nortel Altsystems International Inc. (5596); Xros, Inc. (4181); Sonoma Systems (2073); Qtera Corporation (0251); CoreTek, Inc. (5722); Nortel Networks Applications Management Solutions Inc. (2846); Nortel Networks Optical Components Inc. (3545); Nortel Networks HPOCS Inc. (3546); Architel Systems (U.S.) Corporation (3826); Nortel Networks International Inc. (0358); Northern Telecom International Inc. (6286); Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

section 12(d) of the Protocol (defined below). In support hereof, the Monitor respectfully represents as follows:

As outlined more fully in the Motion, SNMP Research International, Inc.'s ("**SNMP RI**"), Demands arise in the context of the chapter 11 claims process in which SNMP RI has asserted certain claims against the Debtors and seeks through its Demands certain information from the Debtors. The Canadian Nortel Group companies are not parties to the contested proceedings regarding allowance of SNMP RI's asserted claims against the Debtors in these chapter 11 cases. The Demands appear not to be directed at the Canadian Nortel Group since SNMP RI has not served the Demands on the Canadian Nortel Group or obtained the required relief from the Ontario Court to make such Demands against the Canadian Nortel Group.[3]

Nonetheless, SNMP RI by its Demands seeks documents and other information from "Nortel", which is defined in the Demands as "the Debtor, Nortel Networks, Inc. [*sic*] and any affiliate, subsidiary, member, officer, principal, employee, representative, or agent of Nortel as well as any person or entity acting on behalf of Nortel," and defined to include the Canadian Nortel Group. Merely defining "Nortel" to include the Canadian Nortel Group, however, does not obligate the Canadian Nortel Group to respond to the Demands, unless directed by the Ontario Court to do so. SNMP RI cannot use Rules 26, 33 and 34 of the Federal Rules of Civil Procedure, as incorporated by Bankruptcy Rules 9014, 7026, 7033 and 7034 in a contested matter with the Debtors to obtain discovery of information from entities who are not parties to the contested matter. *See, e.g. Novartis Pharm. Corp. v. Eon Labs Mfg.*, 206 F.R.D. 392, 395 (D.

---

[3] *See Order Granting Recognition and Related Relief* [Case No. 09-10164, Dkt. No. 40] incorporating the *Amended and Restated Initial Order* of the Ontario Court: "This [Ontario] Court orders that . . . no proceeding or enforcement process in any court or tribunal shall be commenced or continued against or in respect of any of the Applicants or the Monitor, or affecting the Business or the Property, except . . . with leave of this [Ontario] Court . . ." *See Amended and Restated Initial Order* at paragraph 15 (capitalized terms in this footnote as defined in the *Amended and Restated Initial Order*).

2

619

68

Del. 2002) (court denied motion to compel all documents in a file owned by a non-party German corporate affiliate who had a licensing agreement with defendant for defendant to use the technical information, holding absent a showing that the business operations are "so intertwined as to render meaningless their separate identities," the motion to compel was outside the scope of discovery); *Pennwalt Corp. v. Plough, Inc.*, 85 F.R.D. 257, 263 (D. Del. 1979) (where a related corporation is a separate legal entity from the litigant and its rights could not be determined *in absentia*, the other litigant was not entitled to discovery through production of documents by the related, non-party corporation).

SNMP RI also seeks access to software source code and information that is proprietary to the Canadian Nortel Group that may be in possession, custody or control of the Debtors. To the extent SNMP RI seeks documents or software source code in the sole or shared possession, custody or control of the Canadian Nortel Group or documents or software source code protected under applicable privileges available to the Canadian Nortel Group that are nonetheless responsive to SNMP RI's Demands, such requests must be also made in the Canadian Proceedings and adjudicated by the Ontario Court.

If the Court denies the Debtors' Motion, and the Debtors must turn over materials or provide access to software source code in which the Canadian Nortel Group has an interest, the Canadian Nortel Group will be harmed. SNMP RI in effect will obtain from the Debtors that which SNMP RI otherwise would have had to obtain through the Ontario Court in connection with its claim against the Canadian Nortel Group in the claims process established in the Canadian Proceedings, and SNMP RI has made no attempt to do so. Permitting this end run would adversely impact the Canadian Nortel Group and the Canadian estates.

**Joint Hearing on the Motion is Appropriate**

This Court and the Ontario Court have approved a Cross-Border Insolvency Protocol (the "**Protocol**")[4] to, among other things, harmonize and coordinate activities in these proceedings and the Canadian Proceedings. Pursuant to the Protocol, this Court and the Ontario Court may conduct a joint hearing with respect to any cross-border matter, and any interested party in either such proceedings may seek a joint hearing with respect to such matter.[5] The Motion relates to the Demands which seek documents and shared software source code that may be in the possession, custody or control of the Debtors but in which the Canadian Nortel Group has an interest. The Motion and Demands clearly raise cross-border issues which are properly the subject of a joint hearing. To be clear, the Monitor does not suggest that this Court does not have the jurisdiction to grant the relief requested by the Debtors, but rather that the nature of the Demands as to both the type of information requested as well as the entities against whom the Demands are directed results in the Canadian Nortel Group having a unique interest in the disposition of the Motion. The Canadian Nortel Group and their stakeholders have an interest in the proprietary software source code that is partially the subject of the Protective Order Motion, some of which may be produced to SNMP RI if this Court denies the Protective Order Motion. The potential clearly exists that the proprietary software of the Canadian Nortel Group could be produced to SNMP RI without the Canadian Nortel Group being party to the contested

---

[4] The Protocol was approved by this Court in its Order Approving Stipulation of the Debtors and the Official Committee of Unsecured Creditors of Nortel Networks Inc., et al., Amending the Cross-Border Court-to-Court Protocol dated June 29, 2009 [Dkt. No. 990], and by the Ontario Court in its Fifth Amended and Restated Initial Order dated January 14, 2009.

[5] "Where the issue of the proper jurisdiction of either Court to determine an issue is raised by an interested party (as it is by the Monitor here) in either of the Insolvency Proceedings with respect to a motion or application filed in either Court, the Court before which such motion or application was initially filed may contact the other Court to determine an appropriate process by which the issue of jurisdiction will be determined, which process shall be subject to submissions by the Debtors, the Creditors Committee, the Monitor, the Bondholders Committee, the U.S. Trustee and any interested party prior to a determination on the issue of jurisdiction being made by either Court." (Capitalized terms in this footnote as defined in the Protocol). *See* para. 12(b) of the Protocol.

4

proceeding allowing such production. Put differently, the extent to which the Debtors must comply with the Demands may affect the Canadian Nortel Group without it being party to the underlying contested matter between SNMP RI and the Debtors, and necessitates that the Monitor, on behalf of the Canadian Nortel Group, seek relief from this Court in order to address those concerns. Given the cross-border issues raised by the Motion and the Demands, and potential harm to the Canadian estates, it is appropriate for a joint hearing on the Motion, even if the Canadian Nortel Group is not a party to the underlying dispute between SNMP RI and the Debtors.

The Monitor therefore requests a joint hearing before this Court and the Ontario Court to consider the Motion. The Monitor on behalf of the Canadian Nortel Group reserves the right to submit a substantive response in connection with any joint hearing before this Court and the Ontario Court, and reserves all rights to object to the Demands to the extent that SNMP RI eventually properly serves the Demands on the Canadian Nortel Group pursuant to an Order of the Ontario Court in the Canadian Proceedings.

*[Remainder of Page Intentionally Left Blank]*

5

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Monitor supports the Motion and entry of a Protective Order as described therein, and respectfully requests that this Court and the Ontario Court schedule a joint hearing on May 24, 2011 to consider such Motion, and, at such joint hearing, the Court grant the Motion and grant such other and further relief as this Court deems just and proper.

Dated: April 1, 2011          **BUCHANAN INGERSOLL & ROONEY PC**
       Wilmington, Delaware

                              /s/ Mona A. Parikh
                              Mary F. Caloway (No. 3059)
                              Mona A. Parikh (No. 4901)
                              1105 North Market Street
                              Suite 1900
                              Wilmington, Delaware 19801
                              (302) 552-4200 (telephone)
                              (302) 552-4295 (facsimile)
                              mary.caloway@bipc.com
                              mona.parikh@bipc.com

                                   - and -

                              Daniel J. Guyder
                              Jessica D. Lubarsky
                              **ALLEN & OVERY LLP**
                              1221 Avenue of the Americas
                              New York, NY  10020
                              (212) 610-6300 (telephone)
                              (212) 610-6399 (facsimile)
                              daniel.guyder@allenovery.com
                              jessica.lubarsky@allenovery.com

                              *Attorneys for Ernst & Young Inc., as Monitor*
                              *and Foreign Representative of the Canadian Nortel*
                              *Group*

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION
AND NORTEL NETWORKS TECHNOLOGY CORPORATION

Court File No:  09-CL-7950

---

***ONTARIO***
**SUPERIOR COURT OF JUSTICE
COMMERCIAL LIST**

Proceeding commenced at Toronto

---

**AFFIDAVIT OF CATHERINE MA**

---

**NORTON ROSE OR LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: derrick.tay@nortonrose.com

**Jennifer Stam LSUC#: 46735J**
Tel: (416) 216-2327
Email: jennifer.stam@nortonrose.com

Fax: (416) 216-3930

Lawyers for the Applicants

624

# TAB 3

625

**73**

Court File No. 09-CL-7950

## *ONTARIO*
## SUPERIOR COURT OF JUSTICE
## COMMERCIAL LIST

THE HONOURABLE MR.                    )            TUESDAY, THE 7th
                                      )
JUSTICE MORAWETZ                      )            DAY OF JUNE, 2011

### IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

### APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### ORDER
### (SNMP RI DISCOVERY MOTION)

**THIS MOTION**, made by Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation (collectively, "Nortel Canada" or the "Applicants") for the relief set out in the Applicants' notice of motion dated June 1, 2011 was heard this day at 393 University Avenue, Toronto, Ontario.

**ON READING** the Affidavit of Catherine Ma sworn June 1, 2011 (the "Affidavit") and on hearing submissions of counsel for the Applicants, Ernst & Young

Inc. as monitor of the Applicants (the "Monitor"), and those other parties present, no one appearing for any other person on the service list, although served as appears from the Affidavit of Service of Catherine Ma, sworn June 1, 2011, filed.

1.    **THIS COURT ORDERS** that the time for service of this Motion is hereby abridged such that this Motion is properly returnable today and hereby dispenses with further service thereof.

2.    **THIS COURT DECLARES** that SNMP Research International, Inc. ("SNMP RI") has not sought relief against Nortel Canada or in the CCAA Court in the within proceedings with regard to production by Nortel Canada of any documents, materials, information or source code.

3.    **THIS COURT DECLARES** that Nortel Canada has a proprietary interest in and had historical ownership of certain documents, materials, information and source code of which SNMP RI seeks discovery from Nortel Networks Inc. ("NNI"), Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc. (collectively, the "U.S. Debtors") as being in the power, possession or control of the U.S. Debtors (the "Production Demands") in the context of the claims process in the bankruptcy proceedings commenced by the U.S. Debtors in the United States under Chapter 11 of Title 11 of the United States Code (the "U.S. Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware

(the "U.S. Bankruptcy Court") (the "Chapter 11 Proceedings"), and that Nortel Canada will suffer prejudice by any disclosure of such documents, materials, information and source code.

4.    **THIS COURT ORDERS** that in the event the U.S. Bankruptcy Court orders the U.S. Debtors to make productions pursuant to or as a result of the Production Demands, any documents, materials, information or source code so produced by the U.S. Debtors that are proprietary to the Applicants or in which the Applicants have an interest shall be subject to the deemed undertaking rule in Canada and may not be used for, against or in any way related to any claim or action against the Applicants without leave of this Court.

5.    **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

6.    **THIS COURT ORDERS** that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal,

regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

_____    _____

DOCSTOR: 2159487\2

| IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION | ***ONTARIO***<br>**SUPERIOR COURT OF JUSTICE**<br>**(COMMERCIAL LIST)**<br><br>Proceeding commenced at Toronto |
|---|---|
| | **ORDER**<br>**(SNMP RI DISCOVERY MOTION)** |
| | **NORTON ROSE OR LLP**<br>Suite 3800<br>Royal Bank Plaza, South Tower<br>200 Bay Street<br>P.O. Box 84<br>Toronto, Ontario  M5J 2Z4, Canada<br><br>**Derrick Tay LSUC#: 21152A**<br>Tel:  (416) 216-4832<br>Email: derrick.tay@nortonrose.com<br><br>**Jennifer Stam LSUC #46735J**<br>Tel: (416) 216-2327<br>Email: jennifer.stam@nortonrose.com<br>Fax: (416) 216-3930<br><br>Lawyers for the Applicants |

DOCSTOR: 21594872

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

Court File No: 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**MOTION RECORD OF NORTEL**
**(SNMP RI DISCOVERY MOTION)**
**(returnable June 7, 2011)**

**NORTON ROSE OR LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: derrick.tay@nortonrose.com

**Jennifer Stam LSUC#: 46735J**
Tel: (416) 216-2327
Email: jennifer.stam@nortonrose.com

Fax: (416) 216-3930

Lawyers for the Applicants





Court File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**

THE HONOURABLE          )   WEDNESDAY, THE 14TH
                                )
MR. JUSTICE MORAWETZ     )   DAY OF JANUARY, 2009

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION (the
"Applicants")

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**FIFTH AMENDED AND RESTATED INITIAL ORDER**

THIS APPLICATION, made by the Applicants, pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA") was heard this day at 330 University Avenue, Toronto, Ontario.

ON READING the affidavit of John Doolittle sworn January 14, 2009 (the "Doolittle Affidavit") and the Exhibits thereto, the affidavit of John Doolittle sworn June 22, 2009 (the "June Affidavit") and the Exhibits thereto, the report dated January 14, 2009 of Ernst & Young Inc. ("E&Y"), the proposed monitor, and on hearing the submissions of counsel for the Applicants, counsel for the boards of directors of Nortel Networks Corporation and Nortel Networks Limited, counsel for E&Y, counsel for Export Development Canada ("EDC"), Flextronics

Telecom Systems Ltd., no one else appearing on this Application and on reading the consent of E&Y to act as the Monitor,

**SERVICE**

1.     THIS COURT ORDERS that the time for service of the Notice of Application and the Application Record is hereby abridged so that this Application is properly returnable today and hereby dispenses with further service thereof.

**APPLICATION**

2.     THIS COURT ORDERS AND DECLARES that each of the Applicants is a "debtor company" to which the CCAA applies.

**PLAN OF ARRANGEMENT**

3.     THIS COURT ORDERS that each of the Applicants shall have the authority to file and may, subject to further order of this Court, file with this Court a plan of compromise or arrangement (hereinafter referred to as the "Plan") between, *inter alia*, such Applicant and one or more classes of its secured and/or unsecured creditors as it deems appropriate.

**POSSESSION OF PROPERTY AND OPERATIONS**

4.     THIS COURT ORDERS that each of the Applicants shall remain in possession and control of its current and future assets, undertakings and properties of every nature and kind whatsoever, and wherever situate including all proceeds thereof (the "Property"). Subject to further Order of this Court, each of the Applicants shall continue to carry on business in a manner consistent with the preservation of its business (the "Business") and Property. Each of the Applicants shall be authorized and empowered to continue to retain and employ the employees, consultants, agents, experts, brokers, accountants, legal counsel, financial advisors and such other persons (collectively "Assistants") currently retained or employed by such Applicant, with liberty to retain such further Assistants as such Applicant deems reasonably necessary or desirable for the Business or to carry out the terms of this Order or for the purposes of the Plan.

5.      THIS COURT ORDERS that the Applicants shall be entitled to continue to utilize the central cash management system currently in place as described in the Doolittle Affidavit or replace it with another substantially similar central cash management system (the "Cash Management System") and that any present or future bank or banks providing the Cash Management System shall not be under any obligation whatsoever to inquire into the propriety, validity or legality of any transfer, payment, collection or other action taken under the Cash Management System, or as to the use or application by the Applicants of funds transferred, paid, collected or otherwise dealt with in the Cash Management System; shall be entitled to provide the Cash Management System without any liability in respect thereof to any Person (as hereinafter defined) other than the Applicants, pursuant to the terms of the documentation applicable to the Cash Management System; and shall be, in its capacity as provider of the Cash Management System, an unaffected creditor under the Plan with regard to any claims or expenses it may suffer or incur in connection with the provision of the Cash Management System.

6.      THIS COURT ORDERS that each of the Applicants, either on its own behalf or on behalf of another Applicant, shall be entitled but not required to pay the following expenses whether incurred prior to, on or after the date of this Order:

(a)      all outstanding and future wages, salaries and employee benefits (including, but not limited to, employee medical and similar benefit plans, relocation and tax equalization programs, the Incentive Plan (as defined in the Doolittle Affidavit) and employee assistance programs), current service, special and similar pension benefit payments, vacation pay, commissions and employee and director expenses, in each case incurred in the ordinary course of business and consistent with existing compensation policies and arrangements;

(b)      compensation to employees in respect of any payments made to employees prior to the date of this Order by way of the issuance of cheques or electronic transfers, which are subsequently dishonoured due to the commencement of proceedings under the CCAA;

(c)     all outstanding and future amounts owing to or in respect of individuals working as independent contractors in connection with the Business;

(d)     the fees and disbursements of any Assistants retained or employed in accordance with paragraph 4 hereof;

(e)     subject to the consent of the Monitor, amounts owing by one of more of the Applicants in respect of its Customer Programs (as defined in the Doolittle Affidavit);

(f)     subject to consent of the Monitor, amounts owing by one or more of the Applicants to any other Nortel Company (as defined in the Doolittle Affidavit) in order to settle their inter-company accounts and make inter-company loans in the ordinary course of business, including as a result of the Nortel Companies' Transfer Pricing Model (as defined in the Doolittle Affidavit); and

(g)     subject to the consent of the Monitor, amounts owing to the Applicants' carriers and warehousemen.

7.     THIS COURT ORDERS that, except as otherwise provided to the contrary herein, each of the Applicants shall be entitled but not required to pay all reasonable expenses incurred by it in carrying on the Business in the ordinary course on and after the date of this Order, and in carrying out the provisions of this Order, which expenses shall include, without limitation:

(a)     all expenses and capital expenditures reasonably necessary for the preservation of the Property or the Business including, without limitation, payments on account of insurance (including directors and officers insurance) and maintenance and security services;

(b)     payment for goods or services actually supplied to the Applicants on or after the date of this Order;

(c)     with the written approval of the Monitor, the posting of additional cash collateral into existing cash collateral accounts (collectively, and together with the cash collateral posted as at February 10, 2009, the "LC Cash Collateral") held by either

or both of ABN AMRO Bank N.V., Canada Branch ("ABN") and Royal Bank of Canada ("RBC") as additional and continuing security for existing, renewed and new letters of credit, letters of guarantee, surety bonds, and similar instruments (collectively, "LCs") issued (whether before or after January 14, 2009) for the account of or requested by the Applicants or any of them to third parties pursuant to the existing letter of credit agreements between the Applicants and ABN and RBC and any amendments thereto made with the written approval of the Monitor, and for any foreign exchange losses incurred by ABN and its correspondent banks, if any, under LCs issued in currencies other than Canadian dollars, U.S. dollars, British pounds sterling and Euros, on the following basis:

(i)     the posting of such additional cash collateral is for the purposes of paragraph 10 hereof specifically permitted herein and authorized hereby and shall not and will not constitute a fraudulent preference, fraudulent conveyance, oppressive conduct, settlement or other challengeable, voidable or reviewable transaction under any applicable law;

(ii)    the aggregate of all cash collateral that may be posted (inclusive of the cash collateral posted as at February 10, 2009) in respect of LCs issued in Canadian dollars, U.S. dollars, British pounds sterling and Euros shall not exceed the amount of U.S.$40 million (converting Canadian dollars at the Bank of Canada's Noon spot exchange rate for any day), provided that the LC Banks shall have no liability in the event that cash collateral is posted in an amount that exceeds such maximum and the validity of their claims with respect to any or all of the LC Cash Collateral shall not be limited, lessened or otherwise impaired in any way as a result of such excess; and

(iii)   cash collateral may be posted in respect of  LCs issued by ABN in any other currencies in such amounts as are required by the provisions of the applicable letter of credit agreement, including any amendments thereto made with the written approval of the Monitor as security for ABN's exposure to foreign exchange losses;

(d)  if the same is not guaranteed by EDC, payment of any indebtedness of the Applicants to the LC Banks (as defined in paragraph 10A hereof) when due under the LC Agreements (as defined in paragraph 10A hereof) by way of set-off and transfer of LC Cash Collateral posted as at January 14, 2009 or posted thereafter pursuant to the LC Agreements and subparagraph (c) above;

(e)  without limiting (d), payment of costs and expenses of the LC Banks in connection with the amendment and enforcement of rights under the LC Agreements and any related guarantee bonds issued by EDC if so provided for under an applicable LC Agreement, whether incurred before or after February 10, 2009, including by way of set-off and transfer of LC Cash Collateral;

(f)  the posting of cash collateral in favour of Export Development Canada ("EDC") (collectively, the "EDC Cash Collateral") pursuant to the second amended and restated short-term support agreement between Nortel Networks Limited ("NNL") and EDC dated April 24, 2009, as amended by the amending agreement between NNL and EDC dated June 18, 2009, and the cash collateral agreement between NNL and EDC dated June 18, 2009 and any further amendments to the foregoing made with the written approval of the Monitor (collectively, the "EDC Support Agreements"), on the basis that the EDC Support Agreements are hereby ratified and approved and the posting of such cash collateral is for the purposes of paragraph 10 hereof specifically permitted herein and authorized hereby and shall not and will not constitute a fraudulent preference, fraudulent conveyance, oppressive conduct, settlement or other challengeable, voidable or reviewable transaction under any applicable law;

(g)  payment of any indebtedness of NNL to EDC under the EDC Support Agreements by way of set-off or transfer of EDC Cash Collateral posted as at June 29, 2009 or posted thereafter pursuant to the EDC Support Agreements and subparagraph (f) above; and

(h)     without limiting (g), payment of costs and expenses of EDC provided for under the EDC Support Agreements by way of set-off or transfer of EDC Cash Collateral, to the extent provided for in the EDC Support Agreements.

7A.     THIS COURT ORDERS that no provision of this Order shall require EDC to provide its approval for any proposed amendments to any of the LC Agreements pursuant to any agreement between EDC and any of the LC Banks.

8.     THIS COURT ORDERS that the each of the Applicants shall remit, in accordance with legal requirements, or pay:

(a)     any statutory deemed trust amounts in favour of the Crown in right of Canada or of any Province thereof or any other taxation authority which are required to be deducted from employees' wages, including, without limitation, amounts in respect of (i) employment insurance, (ii) Canada Pension Plan, (iii) Quebec Pension Plan, and (iv) income taxes;

(b)     all goods and services or other applicable sales taxes (collectively, "Sales Taxes") required to be remitted by such Applicant in connection with the sale of goods and services by such Applicant, but only where such Sales Taxes are accrued or collected after the date of this Order, or where such Sales Taxes were accrued or collected prior to the date of this Order but not required to be remitted until on or after the date of this Order; and

(c)     any amount payable to the Crown in right of Canada or of any Province or Territory thereof or any political subdivision thereof or any other taxation authority in respect of municipal realty, municipal business or other taxes, assessments or levies of any nature or kind which are entitled at law to be paid in priority to claims of secured creditors and which are attributable to or in respect of the carrying on of the Business by such Applicant.

9.     THIS COURT ORDERS that until such time as an Applicant delivers a notice in writing to repudiate a real property lease in accordance with paragraph 11(c) of this Order (a "Notice of Repudiation"), each Applicant shall pay all amounts constituting rent or payable as rent under

real property leases (including, for greater certainty, common area maintenance charges, utilities and realty taxes and any other amounts payable to the landlord under the lease) or as otherwise may be negotiated by such Applicant and the landlord from time to time ("Rent"), for the period commencing from and including the date of this Order, monthly on the first day of each month, in advance (but not in arrears). On the date of the first of such payment, any arrears relating to the period commencing from and including the date of this Order shall also be paid. Upon delivery of a Notice of Repudiation, such Applicant shall pay all Rent due for the notice period stipulated in paragraph 11(c) of this Order, to the extent that Rent for such period has not already been paid.

10.    THIS COURT ORDERS that, except as specifically permitted herein, each of the Applicants is hereby directed, until further Order of this Court: (a) to make no payments of principal, interest thereon or otherwise on account of amounts owing by such Applicant to any of its creditors as of this date unless such payments have been approved by the Monitor; (b) to grant no security interests, trust, liens, charges or encumbrances upon or in respect of any of its Property; and (c) to not grant credit or incur liabilities except in the ordinary course of business unless such obligation has been approved by the Monitor.

10A.    THIS COURT ORDERS that, notwithstanding paragraph 10 hereof,

(a)    the existing letter of credit agreements between the Applicants and ABN, RBC and Citibank, N.A. acting through its Canadian branch ("Citibank") and any amendments thereto made after January 14, 2009 with the written approval of the Monitor, together with any agreements entered into by the Applicants or any of them with any other lenders with the written approval of the Monitor providing letter of credit facilities or similar facilities to the Applicants or any of them (including those which may be the subject of EDC guarantee bonds issued pursuant to the EDC Support Facility) (collectively, the "LC Agreements"), and the issuance or renewal of LC's pursuant thereto by ABN, RBC, Citibank and any other lenders (collectively, the "LC Banks"), together with any payments made by the Applicants or EDC with respect thereto; and

(b)     the EDC Support Agreements and any amendments thereto made after June 18, 2009 with the written consent of the Monitor, together with any payments made by NNL with respect thereto,

are specifically permitted herein and authorized hereby and shall not and will not constitute fraudulent preferences, oppressive conduct, settlements or other challengeable, voidable or reviewable transactions under any applicable law

10B.     THIS COURT ORDERS that, notwithstanding any other provision in this Order, no LC Bank shall be required to issue a letter of credit to the Applicants or any of them and EDC shall not be required to provide any Secured Support to the Applicants or any of them.

**RESTRUCTURING**

11.     THIS COURT ORDERS that each of the Applicants shall, have the right to:

(a)     permanently or temporarily cease, downsize or shut down any of its business or operations and to dispose of redundant or non-material assets not exceeding CDN$10,000,000 in any one transaction or CDN$50,000,000 in the aggregate, subject to paragraph (c), if applicable;

(b)     terminate the employment of such of its employees or temporarily lay off such of its employees as it deems appropriate and to deal with the consequences thereof in the Plan or on further order of the Court;

(c)     in accordance with paragraphs 12 and 13, vacate, abandon or quit the whole but not part of any leased premises and/or repudiate any real property lease and any ancillary agreements relating to any leased premises, on not less than seven (7) days notice in writing to the relevant landlord on such terms as may be agreed upon between the Applicant and such landlord, or failing such agreement, to deal with the consequences thereof in the Plan;

(d)     repudiate such of its arrangements or agreements of any nature whatsoever, including, without limitation, any of its deferred compensation, or bonus plans, change of control plans, stock options or restructured stock unit plans and

shareholder rights plans whether oral or written, as such Applicant may deem appropriate on such terms as may be agreed upon between such Applicant or any one of them and such counter-parties, or failing such agreement, to deal with the consequences thereof in the Plan; and

(e)     pursue all avenues of refinancing and offers for material parts of its Business or Property, in whole or part, subject to prior approval of this Court being obtained before any material refinancing or any sale (except as permitted by subparagraph (a), above);

all of the foregoing to permit the Applicants to proceed with an orderly restructuring of the Business (the "Restructuring").

12.     THIS COURT ORDERS that each of the Applicants shall provide each of the relevant landlords with notice of such Applicant's intention to remove any fixtures from any leased premises at least seven (7) days prior to the date of the intended removal. The relevant landlord shall be entitled to have a representative present in the leased premises to observe such removal and, if the landlord disputes such Applicant's entitlement to remove any such fixture under the provisions of the lease, such fixture shall remain on the premises and shall be dealt with as agreed between any applicable secured creditors, such landlord and such Applicant, or by further Order of this Court upon application by such Applicant on at least two (2) days notice to such landlord and any such secured creditors. If such Applicant repudiates the lease governing such leased premises in accordance with paragraph 11(c) of this Order, it shall not be required to pay Rent under such lease pending resolution of any such dispute (other than Rent payable for the notice period provided for in paragraph 11(c) of this Order), and the repudiation of the lease shall be without prejudice to such Applicant's claim to the fixtures in dispute.

13.     THIS COURT ORDERS that if a Notice of Repudiation is delivered, then (a) during the notice period prior to the effective time of the repudiation, the landlord may show the affected leased premises to prospective tenants during normal business hours, on giving the Applicants and the Monitor 24 hours' prior written notice, and (b) at the effective time of the repudiation, the relevant landlord shall be entitled to take possession of any such leased premises without waiver of or prejudice to any claims or rights such landlord may have against the Applicants in

respect of such lease or leased premises and such landlord shall be entitled to notify the Applicants of the basis on which it is taking possession and to gain possession of and re-lease such leased premises to any third party or parties on such terms as such landlord considers advisable, provided that nothing herein shall relieve such landlord of its obligation to mitigate any damages claimed in connection therewith.

## NO PROCEEDINGS AGAINST THE APPLICANTS OR THE PROPERTY

14.    THIS COURT ORDERS that until and including February 13, 2009 or such later date as this Court may order (the "Stay Period"), no proceeding or enforcement process in any court or tribunal (each, a "Proceeding") shall be commenced, or continued against or in respect of any of the Applicants or the Monitor, or affecting the Business or the Property, except with the written consent of the affected Applicant and the Monitor, or with leave of this Court, and any and all Proceedings currently under way against or in respect of the affected Applicant or affecting the Business or the Property are hereby stayed and suspended pending further Order of this Court.

## NO EXERCISE OF RIGHTS OR REMEDIES

15.    THIS COURT ORDERS that during the Stay Period, all rights and remedies of any individual, firm, corporation, governmental body or agency, or any other entities (all of the foregoing, collectively being "Persons" and each being a "Person") against or in respect of the Applicants or the Monitor, or affecting the Business or the Property, are hereby stayed and suspended except with the written consent of the affected Applicant and the Monitor, or leave of this Court, provided that nothing in this Order shall (i) empower the Applicants to carry on any business which the Applicants are not lawfully entitled to carry on, (ii) exempt the Applicants from compliance with statutory or regulatory provisions relating to health, safety or the environment, (iii) prevent the filing of any registration to preserve or perfect a security interest, or (iv) prevent the registration of a claim for lien.

## NO INTERFERENCE WITH RIGHTS

16.    THIS COURT ORDERS that during the Stay Period, no Person shall discontinue, fail to honour, alter, interfere with, repudiate, terminate or cease to perform any right, renewal right,

contract, agreement, licence or permit in favour of or held by the Applicants, except with the written consent of the Applicants and the Monitor, or leave of this Court.

## CONTINUATION OF SERVICES

17.    THIS COURT ORDERS that during the Stay Period, all Persons having oral or written agreements with the Applicants or with third parties on behalf of the Applicants, or statutory or regulatory mandates for the supply of goods and/or services, including without limitation all computer software, communication and other data services, centralized banking services, payroll services, employment agency services, insurance, transportation services, utility, leasing or other services to the Business or to any of the Applicants, are hereby restrained until further Order of this Court from discontinuing, altering, interfering with or terminating the supply of such goods or services as may be required by the applicable Applicant and that such Applicant shall be entitled to the continued use of its current premises, telephone numbers, facsimile numbers, internet addresses and domain names, provided in each case that the normal prices or charges for all such goods or services received after the date of this Order are paid by such Applicant, in accordance with normal payment practices of such Applicant, as applicable, or such other practices as may be agreed upon by the supplier or service provider and the affected Applicant and the Monitor, or as may be ordered by this Court.

## NON-DEROGATION OF RIGHTS

18.    THIS COURT ORDERS that, notwithstanding anything else contained herein, no creditor of the Applicants shall be under any obligation after the making of this Order to advance or re-advance any monies or otherwise extend any credit to the Applicants.  Nothing in this Order shall derogate from the rights conferred and obligations imposed by the CCAA.

## PROCEEDINGS AGAINST DIRECTORS AND OFFICERS

19.    THIS COURT ORDERS that during the Stay Period, and except as permitted by subsection 11.5(2) of the CCAA, no Proceeding may be commenced or continued against any of the former, current or future directors or officers of the Applicants with respect to any claim against the directors or officers that arose before the date hereof and that relates to any obligations of the Applicants whereby the directors or officers are alleged under any law to be

liable in their capacity as directors or officers for the payment or performance of such obligations, until a compromise or arrangement in respect of the Applicants, if one is filed, is sanctioned by this Court or is refused by the creditors of the Applicants or this Court.

## DIRECTORS AND OFFICERS

20.    THIS COURT ORDERS that each of the Applicants shall indemnify its directors and officers from all claims, costs, charges and expenses relating to the failure of such Applicant, after the date hereof, to make payments of the nature referred to in subparagraphs 6(a), 6(b), 8(a), 8(b) and 8(c) of this Order or for the Applicants' failure to make payments in respect of employer health tax or workers' compensation which they sustain or incur by reason of or in relation to their respective capacities as directors and/or officers except to the extent that, with respect to any officer or director, such officer or director has actively participated in the breach of any related fiduciary duties or has been grossly negligent or guilty of wilful misconduct.

21.    THIS COURT ORDERS that the directors and officers of the Applicants shall be entitled to the benefit of and are hereby granted a charge (the "Directors' Charge") on the Property, which charge shall not exceed an aggregate amount of CDN $45 million, as security for the indemnities provided in paragraph 20 of this Order as well as for fees and disbursements of their legal counsel. The Directors' Charge shall have the priority set out in paragraphs 42 and 44 herein.

21A.    THIS COURT ORDERS that, to the extent that any one or more of proven Claims (as defined below), together with the fees and disbursements of legal counsel to the directors and officers of the Applicants, individually or in the aggregate, exceed the amount of CDN $45 million, each such proven Claim against such directors and officers shall be reduced *pro rata* so that the aggregate of all such proven Claims, together with the fees and disbursements of legal counsel to such directors and officers, shall not exceed the amount of CDN $45 million and such excess amounts of all such proven Claims and any other Claims are hereby and shall be forever barred, disallowed, enjoined, released, discharged and extinguished as against the directors and officers of the Applicants. Provided, however, that nothing in this paragraph 21A shall operate to release any director or officer of an Applicant in respect of such excess amount of any such Claim where, in respect of such Claim, such director or officer has actively participated in the

breach of any related fiduciary duties or has been grossly negligent or guilty of wilful misconduct.

In this paragraph 21A, "Claim" shall mean any claim (contingent, liquidated or unliquidated, proven or unproven, known or unknown) or any legal proceeding or action of any nature or kind, in these proceedings or any subsequent receivership or bankruptcy proceedings or in any other proceedings or in any other forum whatsoever, against one or more of the directors or officers of any one or more of the Applicants relating to the failure of any of the Applicants, after the date of this Order, to make payments of the nature referred to in subparagraphs 6(a), 6(b), 8(a), 8(b) and 8(c) of this Order or the Applicants' failure to make payments in respect of employer health tax or workers' compensation, which are or may be directly or indirectly advanced, asserted, re-asserted, refiled or made by any person, governmental or regulatory authority or other entity against one or more of the directors or officers of any one or more of the Applicants, to the extent that such Claim is not covered under any directors' and officers' insurance policy, or to the extent that such coverage is insufficient to pay amounts indemnified in accordance with paragraph 20 of this Order

22.     THIS COURT ORDERS that, notwithstanding any language in any applicable insurance policy to the contrary, (a) no insurer shall be entitled to be subrogated to or claim the benefit of the Directors' Charge, and (b) each of the Applicants' directors and officers shall only be entitled to the benefit of the Directors' Charge to the extent that they do not have coverage under any directors' and officers' insurance policy, or to the extent that such coverage is insufficient to pay amounts indemnified in accordance with paragraph 20 of this Order.

23.     THIS COURT ORDERS that each of NNC's and NNL's directors shall be entitled to receive remuneration in cash on a current basis at current compensation levels (less an overall U.S.$25,000 reduction) notwithstanding the terms of, or elections made under, the Directors' Compensation Plan.

**APPOINTMENT OF MONITOR**

24.     THIS COURT ORDERS that E&Y is hereby appointed pursuant to the CCAA as the Monitor, an officer of this Court, to monitor the Property and the Applicants' conduct of the

Business with the powers and obligations set out in the CCAA or set forth herein and that each of the Applicants and its officers, directors, and Assistants shall advise the Monitor of all material steps taken by such Applicant pursuant to this Order, and shall co-operate fully with the Monitor in the exercise of its powers and discharge of its obligations.

25.      THIS COURT ORDERS that the Monitor, in addition to its prescribed rights and obligations under the CCAA, is hereby directed and empowered to:

  (a)      monitor the Applicants' receipts and disbursements;

  (b)      provide the consents contemplated herein;

  (c)      report to this Court at such times and intervals as the Monitor may deem appropriate with respect to matters relating to the Property, the Business, and such other matters as may be relevant to the proceedings herein;

  (d)      advise the Applicants in their preparation of the Applicants' cash flow statements and any other reporting to the Court or otherwise;

  (e)      advise the Applicants in their development of the Plan or Plans and any amendments to such Plan or Plans;

  (f)      assist the Applicants, to the extent required by the Applicants, with the Restructuring;

  (g)      assist the Applicants, to the extent required by the Applicants, with the holding and administering of creditors' or shareholders' meetings for voting on the Plan or Plans;

  (h)      have full and complete access to the books, records and management, employees and advisors of the Applicants and to the Business and the Property to the extent required to perform its duties arising under this Order;

  (i)      be at liberty to engage independent legal counsel or such other persons as the Monitor deems necessary or advisable respecting the exercise of its powers and

performance of its obligations under this Order including, without limitation, one or more entities related to or affiliated with the Monitor;

(j)     consider, and if deemed advisable by the Monitor, prepare a report and assessment on the Plan or Plans;

(k)     assist the Applicants with respect to any insolvency proceedings commenced by or with respect to any other Nortel Company (as defined in the Doolittle Affidavit) in any foreign jurisdiction (collectively, "Foreign Proceedings") and report to this Court, as it deems appropriate, on the Foreign Proceedings with respect to matters relating to the Applicants;

(l)     apply as the foreign representative of the Applicants, for recognition of these proceedings as "Foreign Main Proceedings", pursuant to Chapter 15 of the United States Bankruptcy Code, 11 U.S.C. §101 (the "U.S. Bankruptcy Code") or similar legislation in any other jurisdiction; and

(m)     perform such other duties as are required by this Order or by this Court from time to time.

26.     THIS COURT ORDERS that the Monitor shall not take possession of the Property and shall take no part whatsoever in the management or supervision of the management of the Business and shall not, by fulfilling its obligations hereunder, be deemed to have taken or maintained possession or control of the Business or Property, or any part thereof.

27.     THIS COURT ORDERS that nothing herein contained shall require the Monitor to occupy or to take control, care, charge, possession or management (separately and/or collectively, "Possession") of any of the Property that might be environmentally contaminated, might be a pollutant or a contaminant, or might cause or contribute to a spill, discharge, release or deposit of a substance contrary to any federal, provincial or other law respecting the protection, conservation, enhancement, remediation or rehabilitation of the environment or relating to the disposal of waste or other contamination including, without limitation, the *Canadian Environmental Protection Act*, the *Ontario Environmental Protection Act*, the *Ontario Water Resources Act*, or the *Ontario Occupational Health and Safety Act* and regulations

thereunder (the "Environmental Legislation"), provided however that nothing herein shall exempt the Monitor from any duty to report or make disclosure imposed by applicable Environmental Legislation. The Monitor shall not, as a result of this Order or anything done in pursuance of the Monitor's duties and powers under this Order, be deemed to be in Possession of any of the Property within the meaning of any Environmental Legislation, unless it is actually in possession.

28.    THIS COURT ORDERS that that the Monitor shall provide any creditor of the Applicants with information provided by the Applicants in response to reasonable requests for information made in writing by such creditor addressed to the Monitor. The Monitor shall not have any responsibility or liability with respect to the information disseminated by it pursuant to this paragraph. In the case of information that the Monitor has been advised by the Applicants is confidential, the Monitor shall not provide such information to creditors unless otherwise directed by this Court or on such terms as the Monitor and the Applicants may agree.

29.    THIS COURT ORDERS that, in addition to the rights and protections afforded the Monitor under the CCAA or as an officer of this Court, the Monitor shall incur no liability or obligation as a result of its appointment and the fulfilment of its duties or the carrying out of the provisions of this Order, save and except for any gross negligence or wilful misconduct on its part. Nothing in this Order shall derogate from the protections afforded the Monitor by the CCAA or any applicable legislation.

30.    THIS COURT ORDERS that the Monitor, counsel to the Monitor, counsel to the Applicants and counsel to directors shall be paid their reasonable fees and disbursements incurred both before and after the making of the Order, in each case at their standard rates and charges, by the Applicants as part of the costs of these proceedings. Each of the Applicants is hereby authorized and directed to pay the accounts of the Monitor, counsel for the Monitor, counsel for the Applicants and counsel to directors on a weekly basis and, in addition, each of the Applicants is hereby authorized to pay to: (a) the Monitor and its Canadian and U.S. counsel a retainer in the aggregate amount of CDN$750,000; and (b) counsel to the Applicants a retainer in the amount of CDN$750,000 (collectively, the "Retainers") to be held by them as security for payment of their respective fees and disbursements outstanding from time to time.

31.    THIS COURT ORDERS that the Monitor and its legal counsel shall pass their accounts from time to time, and for this purpose the accounts of the Monitor and its legal counsel are hereby referred to a judge of the Commercial List of the Ontario Superior Court of Justice.

32.    THIS COURT ORDERS that the Monitor, counsel to the Monitor, if any, and the Applicants' counsel shall be entitled to the benefit of and are hereby granted a charge (the "Administration Charge") on the Property, which charge shall not exceed an aggregate amount of $5,000,000, as security for their professional fees and disbursements incurred at the standard rates and charges of the Monitor and such counsel, both before and after the making of this Order in respect of these proceedings.  The Administration Charge shall have the priority set out in paragraphs 42 and 44 hereof.

EDC

33.    Intentionally Deleted.

**INTERCOMPANY LOANS**

34.    THIS COURT ORDERS to the extent that an Applicant receives a post-filing inter-company loan or other transfer (including goods and services) from a Chapter 11 Entity (as defined in the Doolittle Affidavit) (including as a result of the Applicants' cash management system or otherwise) (each such Applicant, a "Beneficiary Applicant"), and such post-filing inter-company loan or other transfer is made (each an "Advance") by a Chapter 11 Entity (together with NNL for the purposes of paragraph 34A below, a "Protected Entity"), then, subject to the limitations set forth in this paragraph:

(a)    the Protected Entity shall have a proven and valid claim against such Beneficiary Applicant for the amount of such Advance (each, an "Inter-company Reimbursement Claim"), which Inter-company Reimbursement Claim shall bear interest at a rate agreed between the applicable Beneficiary Applicant and Protected Entity from time to time for the period in accordance with past practice; and

(b) all of the Property of the Beneficiary Applicant, is hereby charged by a mortgage, lien and security interest (such mortgage, lien and security interest, "Inter-company Charge") in favour of each of the Protected Entities as security for payment of the Inter-company Reimbursement Claim (including principal, interest and expenses) by the applicable Beneficiary Applicant to the corresponding Protected Entity.

34A.    THIS COURT ORDERS that the Inter-Company Charge shall also secure any Advances made by NNL to Nortel Networks Technology Corporation ("NNTC") on or after January 14, 2009 and that NNL shall be a "Protected Entity" and NNTC shall be a "Beneficiary Applicant" in respect of such Advances.

35.    THIS COURT ORDERS that the Inter-company Charge shall also secure the Remaining Revolver Claim (as defined in the Final Canadian Funding and Settlement Agreement dated as of December 22, 2009 among, *inter alia*, the Applicants and NNI) as also evidenced by the Secured Promissory Note dated as of February 16, 2010 in the principal amount of U.S.$62,700,000 given by NNL to NNI.

36.    THIS COURT ORDERS the Inter-company Charge shall be junior, subject and subordinate only to the other Charges (defined below), and any other future charges against such Beneficiary Applicant that, by the Court order creating them, are expressly stated to be senior to the Inter-company Charges entered after notice and a hearing.

37.    THIS COURT ORDERS that pending further order of this Court, an Inter-company Charge shall be a "silent" charge and the Protected Entity shall forbear from exercising, and shall not be entitled to exercise, any right or remedy relating to any Inter-company Reimbursement Claim held by such party, including, without limitation, as to seeking relief from the stay granted hereunder, or seeking any sale, foreclosure, realization upon repossession or liquidation of any Property of a Beneficiary Applicant, or taking any position with respect to any disposition of the Property, the business operations, or the reorganization of a Beneficiary Applicant. An Inter-company Charge automatically, and without further action of any person or entity of any kind, shall be released or otherwise terminated to the extent that Property subject to such Inter-company Charge is sold or otherwise disposed of in accordance with the terms of this Order or

further order of this Court after notice and a hearing, with respect to the effect of an Inter-company Charge on any sale of Property by any Beneficiary Applicant.

38.    THIS COURT ORDERS that the Beneficiary Applicants may sell Property, in accordance with the terms of this Order or further order of this Court after notice and a hearing, in each case free and clear of any Inter-company Charge, with such Inter-company Charge attaching to the proceeds of sale in the same priority and subject to the same limitations and restrictions as existed in respect of the Property sold.

**INTERIM GROUP SUPPLIER PROTOCOL AGREEMENT**

39.    THIS COURT ORDERS that the Applicants be and are hereby authorized to enter into a group supplier protocol agreement (the "Interim GSPA") substantially in the form attached as Exhibit "C" to the Doolittle Affidavit which agreement shall be effective upon the appointment of the Administrators in the United Kingdom, and the Applicants are hereby authorized to perform each of their obligations, if any, under the Interim GSPA.  The obligations of the Applicants under the Interim GSPA shall be secured by the Inter-Company Charge.

**NNI LOAN**

40.    THIS COURT ORDERS that the amended and restated loan agreement entered into between NNL, as borrower, NNTC and the other Applicants as guarantors, and Nortel Networks Inc. ("NNI") as lender (the "NNI Loan Agreement"), substantially in the form attached as Exhibit "B" to the Affidavit of John Doolittle sworn March 27, 2009 providing for a revolving loan facility of up to U.S.$200 million is hereby approved and each of the Applicants is hereby directed to execute and to comply with its obligations under the NNI Loan Agreement.

41.    Intentionally deleted.

41A.    Intentionally deleted.

41B.    Intentionally deleted.

41C.    Intentionally deleted.

**EXCESS FUNDING CHARGE**

41D.   THIS COURT ORDERS that as security for NNL's obligation to repay to NNI the Contingent Payment (as defined in the Interim Funding Agreement, as defined in the June Affidavit) along with interest, if any, NNI shall be entitled to the benefit of and is hereby granted a charge on the Property (the "Excess Funding Charge"). The Excess Funding Charge shall have the priority set out in paragraphs 42 and 44 hereof.

**SHORTFALL CHARGE**

41E.   THIS COURT ORDERS that as security for any obligation of NNL to make the Shortfall Payments (as defined in the Interim Funding Agreement, as defined in the June Affidavit), Nortel Networks UK Limited shall be entitled to the benefit of and is hereby granted a charge on the Property (the "Shortfall Charge"). The Shortfall Charge shall have the priority set out in paragraphs 42 and 44 hereof.

**VALIDITY AND PRIORITY OF CHARGES CREATED BY THIS ORDER**

42.   THIS COURT ORDERS that the priorities of the Administration Charge, the Excess Funding Charge, the Directors' Charge, the Inter-company Charge, the Shortfall Charge, the Payments Charge and the Nortel Special Incentive Plan Charge on all Property shall be as follows:

First – the Administration Charge;

Second – the Excess Funding Charge

Third – the Directors' Charge; and

Fourth -

(a)     the Inter-Company Charge;

(b)     the Shortfall Charge,

which Inter-company Charge and Shortfall Charge shall rank *pari passu* with one another.

Fifth -

(a)     the Payments Charge (as defined in the employee Settlement Approval Order of this Court made on March 31, 2010); and

(b)     the Nortel Special Incentive Plan Charge (as defined in the order approving the Nortel Special Incentive Plan of this Court made on March 8, 2010),

which Payments Charge and Nortel Special Incentive Plan Charge shall rank *pari passu* with one another.

43.     THIS COURT ORDERS that the filing, registration or perfection of the Administration Charge, Excess Funding Charge, the Directors' Charge, the Inter-company Charge, the Shortfall Charge, the Payments Charge and the Nortel Special Incentive Plan Charge (collectively, the "Charges") shall not be required, and that the Charges shall be valid and enforceable for all purposes, including as against any right, title or interest filed, registered, recorded or perfected subsequent to the Charges coming into existence, notwithstanding any such failure to file, register, record or perfect. Notwithstanding anything herein, the Charges shall not attach to the Retainers.

44.     THIS COURT ORDERS that each of the Charges (all as constituted and defined herein), shall subject to this paragraph 44 and to paragraph 46 herein constitute a charge on the Property secured thereunder, and such Charges shall rank in priority to all other security interests, trusts, liens, charges and encumbrances, statutory or otherwise (collectively, "Encumbrances") in favour of any Person. For greater certainty,

(a)     the Charges shall attach to the LC Cash Collateral junior in priority to any rights or Encumbrances in favour of LC Banks in respect of LC Cash Collateral and only to the extent of the rights of the Applicants to the return of any LC Cash Collateral from the LC Banks following the exercise of the rights of the LC Banks

as against any such LC Cash Collateral pursuant to the LC Agreements or section 18.1 of the CCAA, and

(b)     the Charges shall attach to the EDC Cash Collateral junior in priority to any rights or Encumbrances in favour of EDC in respect of EDC Cash Collateral and only to the extent of the rights of NNL to the return of any EDC Cash Collateral from EDC following the exercise of the rights of EDC as against any such EDC Cash Collateral pursuant to the EDC Support Agreements or section 18.1 of the CCAA

notwithstanding anything to the contrary contained in this Order.

45.     THIS COURT ORDERS that except as otherwise expressly provided for herein, or as may be approved by this Court, the Applicants shall not grant any Encumbrances over any Property that rank in priority to, or *pari passu* with, any of the Charges charging such Property, unless the Applicants also obtain the prior written consent of the Monitor and the beneficiaries of such Charges, or by further Order of this Court.

46.     THIS COURT ORDERS that none of the Charges, the LC Agreements and the EDC Support Agreements shall be rendered invalid or unenforceable and the rights and remedies of the chargees entitled to the benefit of the Charges (collectively, the "Chargees") thereunder, the rights of the LC Banks under LC Agreements and the rights of EDC under the EDC Support shall not otherwise be limited or impaired in any way by (a) the pendency of these proceedings and the declarations of insolvency made herein; (b) any application(s) for bankruptcy order(s) issued pursuant to BIA, or any bankruptcy order made pursuant to such applications; (c) the filing of any assignments for the general benefit of creditors made pursuant to the BIA; (d) the provisions of any federal or provincial statutes; or (e) any negative covenants, prohibitions or other similar provisions with respect to borrowings, incurring debt or the creation of Encumbrances, contained in any existing loan documents, lease, sublease, offer to lease or other agreement (collectively, an "Agreement") which binds the Applicants, and notwithstanding any provision to the contrary in any Agreement:

(a)     the creation of the Charges, the entering into of the LC Agreements and the issuance or renewal of LC's thereunder and the entering into of the EDC Support

Agreements and the provision of Secured Support, as defined and contemplated thereunder, shall not create or be deemed to constitute a breach by any of the Applicants of any Agreement to which it is a party;

(b)    none of the Chargees, the LC Banks and EDC shall have any liability to any Person whatsoever as a result of any breach of any Agreement caused by or resulting from, the creation of the Charges, the entering into of the LC Agreements or the issuance or renewal of LC's thereunder or the entering into of the EDC Support Agreements and the provision of Secured Support; and

(c)    the payments made by the Applicants pursuant to this Order and the granting of the Charges and the entering into of the LC Agreements and the EDC Support Agreements do not and will not constitute fraudulent preferences, fraudulent conveyances, oppressive conduct, settlements or other challengeable, voidable or reviewable transactions under any applicable law.

47.    THIS COURT ORDERS that any Charge created by this Order over leases of real property in Canada shall only be a Charge in the Applicants' interest in such real property leases.

**FLEXTRONICS AMENDING AGREEMENT**

48.    THIS COURT ORDERS that the Flextronics Amending Agreement in the form attached as Exhibit "B" to the Doolittle Affidavit be and is hereby approved and NNL is hereby authorized and directed to comply with its obligations thereunder.

**CROSS-BORDER PROTOCOL**

49.    THIS COURT ORDERS that the cross-border protocol, as amended, in the form attached as Schedule "A" hereto be and is hereby approved and shall become effective upon its approval by the United States Bankruptcy Court for the District of Delaware and the parties to these proceedings and any other Person shall be governed by it and shall comply with the same.

**FOREIGN PROCEEDINGS**

50.      THIS COURT ORDERS that the Monitor is hereby authorized and directed to apply for recognition of these proceedings as "Foreign Main Proceedings" in the United States pursuant to Chapter 15 of the U.S. Bankruptcy Code.

51.      THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

52.      THIS COURT ORDERS that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

**SERVICE AND NOTICE**

53.      THIS COURT ORDERS that the Monitor shall, within ten (10) business days of the date of entry of this Order, send notice of this Order and the commencement of the within proceedings to the Applicants' known creditors, other than employees and creditors to which the Applicants owe less than $5,000, at their addresses as they appear on the Applicants' records, and shall promptly send a copy of this Order (a) to all parties filing a Notice of Appearance in respect of this Application, and (b) to any other interested Person requesting a copy of this Order, and the Monitor is relieved of its obligation under Section 11(5) of the CCAA to provide similar notice, other than to supervise this process. The Monitor, on behalf of the Applicants, shall, in its discretion, be entitled to engage a third party mailing service in order to assist or complete the mailing. Any such service provider shall be considered an "Assistant" hereunder.

54.     THIS COURT ORDERS that the Applicants and the Monitor be at liberty to serve this Order, any other materials and orders in these proceedings, and any notices or other correspondence, by forwarding true copies thereof by prepaid ordinary mail, courier, personal delivery or electronic transmission to the Applicants' creditors or other interested parties at their respective addresses as last shown on the records of the Applicants and that any such service or notice by courier, personal delivery or electronic transmission shall be deemed to be received on the next business day following the date of forwarding thereof, or if sent by ordinary mail, on the third business day after mailing.

55.     THIS COURT ORDERS that the Applicants, the Monitor, and any party who has filed a Notice of Appearance may serve any court materials in these proceedings by e-mailing a PDF or other electronic copy of such materials to counsels' email addresses as recorded on the Service List from time to time, in accordance with the E-filing protocol of the Commercial List to the extent practicable, and the Monitor may post a copy of any or all such materials on its website at http://www.ey.com/ca/nortel.

**GENERAL**

56.     THIS COURT ORDERS that any of the Applicants or the Monitor may from time to time apply to this Court for advice and directions in the discharge of its powers and duties hereunder.

57.     THIS COURT ORDERS that nothing in this Order shall prevent the Monitor from acting as an interim receiver, a receiver, a receiver and manager, or a trustee in bankruptcy of the Applicants, the Business or the Property.

58.     THIS COURT ORDERS that any interested party (including the Applicants and the Monitor) may apply to this Court to vary or amend this Order on not less than seven (7) days notice to any other party or parties likely to be affected by the order sought or upon such other notice, if any, as this Court may order.

59.     THIS COURT ORDERS that this Order and all of its provisions are effective as of 12:01 a.m. Eastern Standard Time on the date of this Order.

ENTERED AT / INSCRIT À TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

FEB 25 2011

PER / PAR: NB

# SCHEDULE "A" – CROSS-BORDER PROTOCOL

**Attached.**

## CROSS-BORDER INSOLVENCY PROTOCOL

This cross-border insolvency protocol (the "Protocol") shall govern the conduct of all parties in interest in the Insolvency Proceedings (as such term is defined herein).

The Guidelines Applicable to Court-to-Court Communications in Cross-Border Cases (the "Guidelines") attached as Schedule "A" hereto, shall be incorporated by reference and form part of this Protocol. Where there is any discrepancy between the Protocol and the Guidelines, this Protocol shall prevail.

### A. Background

1. Nortel Networks Inc. ("NNI") is the wholly owned U.S. subsidiary of Nortel Networks Limited ("NNL"), the principal Canadian operating subsidiary of Nortel Networks Corporation ("NNC"). NNC is a telecommunications company headquartered in Toronto, Ontario, Canada. NNI is incorporated under Delaware law and is headquartered in Richardson, Texas.

2. NNI and certain of its affiliates (collectively, the "U.S. Debtors"),[1] have commenced reorganization proceedings (the "U.S. Proceedings") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court"), and such cases have been consolidated (for procedural purposes only) under Case No. 09-10138 (KG). The U.S. Debtors are continuing in possession of their respective properties and are operating and managing their businesses, as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the U.S. Proceedings. On January 22, 2009,

---

[1] The Debtors in the U.S. Proceedings (as defined herein) are: NNI, Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., XROS, Inc., Sonoma Systems, QTERA Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc. and Nortel Networks Cable Solutions Inc.

the Office of United States Trustee (the "U.S. Trustee") appointed an official committee of

unsecured creditors (the "Creditors Committee") in the U.S. Proceeding.  An ad hoc committee

of bondholders (the "Bondholders Committee") has also been organized.

       3.     On January 14, 2009, the U.S. Debtors' ultimate corporate parent NNC,

NNI's direct corporate parent NNL (together with NNC and their affiliates, including the U.S.

Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian

Debtors")[2] filed an application with the Ontario Superior Court of Justice (the "Canadian Court")

under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from

their creditors (collectively, the "Canadian Proceedings").  The Canadian Debtors have obtained

an initial order of the Canadian Court (as amended and restated, the "Canadian Order"), under

which, inter alia:  (a) the Canadian Debtors have been determined to be entitled to relief under

the CCAA; (b) Ernst & Young Inc. has been appointed as monitor (the "Monitor") of the

Canadian Debtors, with the rights, powers, duties and limitations upon liabilities set forth in the

CCAA and the Canadian Order; and (c) a stay of proceedings in respect of the Canadian Debtors

has been granted.

       4.     The Monitor filed petitions and obtained an order in the U.S. Court

granting recognition of the Canadian Proceedings under chapter 15 of the Bankruptcy Code (the

"Chapter 15 Proceedings").  NNI also filed an application and obtained an order in the Canadian

Court pursuant to section 18.6 of the CCAA recognizing the U.S. Proceedings as "foreign

proceedings" in Canada and giving effect to the automatic stay thereunder in Canada.  None of

the U.S. Debtors or Canadian Debtors are applicants in both the U.S. Proceedings and Canadian

Proceedings.

---

[2]  The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

3

5.      For convenience, (a) the U.S. Debtors and the Canadian Debtors shall be referred to herein collectively as the "Debtors," (b) the U.S. Proceedings and the Canadian Proceedings shall be referred to herein collectively as the "Insolvency Proceedings," and (c) the U.S. Court and the Canadian Court shall be referred to herein collectively as the "Courts", and each individually as a "Court."

B.    **Purpose and Goals**

6.      Though full and separate plenary proceedings are pending in the United States for the U.S. Debtors and in Canada for the Canadian Debtors, the implementation of administrative procedures and cross-border guidelines is both necessary and desirable to coordinate certain activities in the Insolvency Proceedings, protect the rights of parties thereto, ensure the maintenance of the Courts' respective independent jurisdiction and give effect to the doctrines of comity.  Accordingly, this Protocol has been developed to promote the following mutually desirable goals and objectives in the Insolvency Proceedings:

a.    harmonize and coordinate activities in the Insolvency Proceedings before the Courts;

b.    promote the orderly and efficient administration of the Insolvency Proceedings to, among other things, maximize the efficiency of the Insolvency Proceedings, reduce the costs associated therewith and avoid duplication of effort;

c.    honor the independence and integrity of the Courts and other courts and tribunals of the United States and Canada, respectively;

d.    promote international cooperation and respect for comity among the Courts, the Debtors, the Creditors Committee, the Estate Representatives (which include the Chapter 11 Representatives and the Canadian Representatives as such terms are defined below) and other creditors and interested parties in the Insolvency Proceedings;

e.    facilitate the fair, open and efficient administration of the Insolvency Proceedings for the benefit of all of the Debtors' creditors and other interested parties, wherever located; and

4

f.    implement a framework of general principles to address basic administrative issues arising out of the cross-border nature of the Insolvency Proceedings.

As the Insolvency Proceedings progress, the Courts may also jointly determine that other cross-border matters that may arise in the Insolvency Proceedings should be dealt with under and in accordance with the principles of this Protocol.  Subject to the provisions of this Protocol, including, without limitation, those included in paragraph 15 hereof, where an issue is to be addressed only to one Court, in rendering a determination in any cross-border matter, such Court may:  (a) to the extent practical or advisable, consult with the other Court; and (b) in its sole discretion and bearing in mind the principles of comity, either (i) render a binding decision after such consultation; (ii) defer to the determination of the other Court by transferring the matter, in whole or in part to the other Court; or (iii) seek a joint hearing of both Courts.

**C.    Comity and Independence of the Courts**

7.    The approval and implementation of this Protocol shall not divest nor diminish the U.S. Court's and the Canadian Court's respective independent jurisdiction over the subject matter of the U.S. Proceedings and the Canadian Proceedings, respectively.  By approving and implementing this Protocol, neither the U.S. Court, the Canadian Court, the Debtors nor any creditors or interested parties shall be deemed to have approved or engaged in any infringement on the sovereignty of the United States of America or Canada.

8.    The U.S. Court shall have sole and exclusive jurisdiction and power over the conduct of the U.S. Proceedings and the hearing and determination of matters arising in the U.S. Proceedings.  The Canadian Court shall have sole and exclusive jurisdiction and power over the conduct of the Canadian Proceedings and the hearing and determination of matters arising in the Canadian Proceedings.

5

9.    In accordance with the principles of comity and independence recognized herein, nothing contained herein shall be construed to:

    a.    increase, decrease or otherwise modify the independence, sovereignty or jurisdiction of the U.S. Court, the Canadian Court or any other court or tribunal in the United States or Canada, including the ability of any such court or tribunal to provide appropriate relief on an ex parte or "limited notice" basis to the extent permitted under applicable law;

    b.    require the U.S. Court to take any action that is inconsistent with its obligations under the laws of the United States;

    c.    require the Canadian Court to take any action that is inconsistent with its obligations under the laws of Canada;

    d.    require the Debtors, the Creditors Committee, the Estate Representatives or the U.S. Trustee to take any action or refrain from taking any action that would result in a breach of any duty imposed on them by any applicable law;

    e.    authorize any action that requires the specific approval of one or both of the Courts under the Bankruptcy Code or the CCAA after appropriate notice and a hearing (except to the extent that such action is specifically described in this Protocol); or

    f.    preclude the Debtors, the Creditors Committee, the Monitor, the U.S. Trustee, any creditor or other interested party from asserting such party's substantive rights under the applicable laws of the United States, Canada or any other relevant jurisdiction including, without limitation, the rights of parties in interest to appeal from the decisions taken by one or both of the Courts.

10.    The Debtors, the Creditors Committee, the Estate Representatives and their respective employees, members, agents and professionals shall respect and comply with the independent, non-delegable duties imposed upon them, if any, by the Bankruptcy Code, the CCAA, the Canadian Order and other applicable laws.

**D.    Cooperation**

11.    To assist in the efficient administration of the Insolvency Proceedings and in recognizing that the U.S. Debtors and Canadian Debtors may be creditors of the others'

6

estates, the Debtors and their respective Estate Representatives shall, where appropriate: (a) cooperate with each other in connection with actions taken in both the U.S. Court and the Canadian Court and (b) take any other appropriate steps to coordinate the administration of the Insolvency Proceedings for the benefit of the Debtors' respective estates.

12. To harmonize and coordinate the administration of the Insolvency Proceedings, the U.S. Court and the Canadian Court each may coordinate activities and consider whether it is appropriate to defer to the judgment of the other Court. In furtherance of the foregoing:

    a. The U.S. Court and the Canadian Court may communicate with one another, with or without counsel present, with respect to any procedural matter relating to the Insolvency Proceedings.

    b. Where the issue of the proper jurisdiction of either Court to determine an issue is raised by an interested party in either of the Insolvency Proceedings with respect to a motion or application filed in either Court, the Court before which such motion or application was initially filed may contact the other Court to determine an appropriate process by which the issue of jurisdiction will be determined; which process shall be subject to submissions by the Debtors, the Creditors Committee, the Monitor, the Bondholders Committee (collectively the "Core Parties"), the U.S. Trustee and any interested party prior to a determination on the issue of jurisdiction being made by either Court.

    c. The Courts may, but are not obligated to, coordinate activities in the Insolvency Proceedings such that the subject matter of any particular action, suit, request, application, contested matter or other proceeding is determined in a single Court.

    d. The U.S. Court and the Canadian Court may conduct joint hearings (each a "Joint Hearing") with respect to any cross-border matter or the interpretation or implementation of this Protocol where both the U.S. Court and the Canadian Court consider such a Joint Hearing to be necessary or advisable, or as otherwise provided herein, to, among other things, facilitate or coordinate proper and efficient conduct of the Insolvency Proceedings or the resolution of any particular issue in the Insolvency Proceedings. With respect to any Joint Hearing, unless otherwise ordered, the following procedures will be followed:

(i)     A telephone or video link shall be established so that both the U.S. Court and the Canadian Court shall be able to simultaneously hear and/or view the proceedings in the other Court.

(ii)     Submissions or applications by any party that are or become the subject of a Joint Hearing (collectively, "Pleadings") shall be made or filed initially only to the Court in which such party is appearing and seeking relief. Promptly after the scheduling of any Joint Hearing, the party submitting such Pleadings to one Court shall file courtesy copies with the other Court. In any event, Pleadings seeking relief from both Courts shall be filed in advance of the Joint Hearing with both Courts.

(iii)     Any party intending to rely on any written evidentiary materials in support of a submission to the U.S. Court or the Canadian Court in connection with any Joint Hearing (collectively, "Evidentiary Materials") shall file or otherwise submit such materials to both Courts in advance of the Joint Hearing. To the fullest extent possible, the Evidentiary Materials filed in each Court shall be identical and shall be consistent with the procedural and evidentiary rules and requirements of each Court.

(iv)     If a party has not previously appeared in or attorned or does not wish to attorn to the jurisdiction of a Court, it shall be entitled to file Pleadings or Evidentiary Materials in connection with the Joint Hearing without, by the mere act of such filings, being deemed to have appeared in or attorned to the jurisdiction of such Court in which such material is filed, so long as such party does not request any affirmative relief from such Court.

(v)     The Judge of the U.S. Court and the Justice of the Canadian Court who will preside over the Joint Hearing shall be entitled to communicate with each other in advance of any Joint Hearing, with or without counsel being present, (1) to establish guidelines for the orderly submission of Pleadings, Evidentiary Materials and other papers and for the rendering of decisions by the Courts; and (2) to address any related procedural, administrative or preliminary matters.

(vi)     The Judge of the U.S. Court and the Justice of the Canadian Court, shall be entitled to communicate with each other during or after any joint hearing, with or without counsel present, for the purposes of (1) determining whether consistent rulings can be made by both Courts; (2) coordinating the terms upon of the Courts' respective rulings; and (3) addressing any other procedural or administrative matters.

8

13.     Notwithstanding the terms of the paragraph 12 above, this Protocol recognizes that the U.S. Court and the Canadian Court are independent courts. Accordingly, although the Courts will seek to cooperate and coordinate with each other in good faith, each of the Courts shall be entitled at all times to exercise its independent jurisdiction and authority with respect to: (a) the conduct of the parties appearing in matters presented to such Court; and (b) matters presented to such Court, including, without limitation, the right to determine if matters are properly before such Court.

14.     Where one Court has jurisdiction over a matter which requires the application of the law of the jurisdiction of the other Court, such Court may, without limitation, hear expert evidence of such law or, subject to paragraph 15 herein, seek the written advice and direction of the other Court which advice may in the discretion of the receiving Court, be made available to parties in interest.

15.     Notwithstanding anything to the contrary herein contained, to the extent any motion is filed or relief is sought (collectively, "Requested Relief") in either Court relating to: (i) the proposed sale of assets for gross proceeds in excess of U.S. $30 million and where at least one U.S. Debtor and one Canadian Debtor are parties to the related sale agreement or that involves assets owned by at least one U.S. Debtor and one Canadian Debtor; (ii) any motion to allocate sale proceeds which are in the aggregate more than U.S. $30 million and where at least one U.S. Debtor and one Canadian Debtor are parties to the related sale agreement or that involves assets owned by at least one U.S. Debtor and one Canadian Debtor; (iii) matters relating to the advanced pricing agreement involving both the United States and Canadian taxing authorities; (iv) matters regarding transfer pricing methodology relating to an obligation for the transfer of goods and services between one or more U.S. Debtors and one or more Canadian

9

Debtors; (v) any matter relating to alleged fraudulent conveyance or preference claims in excess of U.S. $30 million and which may have a material impact on both one or more U.S. Debtors and one or more Canadian Debtors; (vi) matters relating to any proposal or approval of a disclosure statement, information circular, plan of reorganization or plan of compromise and arrangements in either the U.S. Proceedings or the Canadian Proceedings; (vii) any motion to appoint a Trustee or Examiner in the U.S. Proceedings, any motion to convert the U.S. Proceedings to a Chapter 7 proceeding, any motion to appoint a Receiver in the Canadian Proceedings, or any motion to convert the Canadian Proceedings to a bankruptcy or proposal proceeding under the Bankruptcy and Insolvency Act (Canada); (viii) any motion to substantively consolidate the Debtors' estates; (ix) matters impacting the material tax attributes of the U.S. Debtors, including the net operating losses of the U.S. Debtors in any prior fiscal year; (x) any motion to amend the terms of any of the Debtors' registered pension plans the effect of which would increase the liability of any Debtor thereunder; (xi) any motion to assume, ratify, reject, repudiate, modify or assign executory contracts having a material impact on the assets, operations, obligations, rights, property or business of both the U.S. and Canadian estates and accounting for annual gross revenue in excess of U.S. $30 million ("Material Contracts"); (xii) any motion seeking relief from the automatic stay in the U.S. Proceedings and/or the stay of proceedings in the Canadian Proceedings (1) involving any Material Contract or (2) to pursue actions having a material impact on the assets, operations, obligations, rights, property or business of at least one U.S. Debtor and one Canadian Debtor and involving damages in excess of U.S. $30 million; (xiii) any motion seeking to create or extend any program, plan, proposal or scheme relating to or authorizing payments to employees where the consideration relates to non-ordinary course incentive performance, retention, severance, termination or such like payments; and (xiv) any

10

motion regarding any program, plan proposal, scheme or similar course of action related to the

wind-down of one or more of the Debtors' businesses;

Then the following procedures shall be followed:

    a.    unless otherwise consented to by the Core Parties, any and all documents, other than any Monitor's report related to the Requested Relief, shall be filed (as applicable) and served on the Core Parties on not less than seven days notice prior to the proposed hearing date for such Requested Relief in the Court of the forum country where the party seeking the Requested Relief intends the Requested Relief to be heard; *provided, however,* that to the extent the Requested Relief is necessary to avoid irreparable harm to the Debtors and/or the Debtors' bankruptcy estates, as may be determined by the Court of the forum country where the Requested Relief is being sought or such Court otherwise determines, such documents related to the Requested Relief shall be served on the Core Parties on such reasonable notice as such Court may determine;

    b.    upon notice of such Requested Relief being provided to the Core Parties, each of the Core Parties will have not less than two business days from receipt of such notice (or such shorter period as the Court of the forum country where the Requested Relief is being sought shall determine, as set forth in paragraph 15(a) herein) to request, in writing, that the filing party seek a Joint Hearing for the Requested Relief;

    c.    if the filing party agrees to seek a Joint Hearing, the Requested Relief shall be heard at a Joint Hearing conducted by the Courts in accordance with the procedures set forth in paragraph 12 herein; and

    d.    if the filing party does not agree to seek a Joint Hearing, the party seeking to have the Requested Relief heard at a Joint Hearing may file a notice of Joint Hearing dispute in both the Court of the forum country and the Court of the non-forum country and serve notice thereof on the remaining Core Parties, whereupon the respective Courts of the forum country and the non-forum country may consult with one another in accordance with paragraphs 6 and 12 hereof, in order to determine whether a Joint Hearing is necessary or may otherwise consult with the Core Parties prior to any party proceeding with the underlying Requested Relief in the original proposed forum country.

E.    **Recognition of Stays of Proceedings**

    16.    The Canadian Court hereby recognizes the validity of the stay of

proceedings and actions against the U.S. Debtors and their property under section 362 of the

11

Bankruptcy Code (the "U.S. Stay"). In implementing the terms of this paragraph, the Canadian Court may consult with the U.S. Court regarding: (i) the interpretation, extent, scope and applicability of the U.S. Stay and any orders of the U.S. Court modifying or granting relief from the U.S. Stay; and (ii) the enforcement of the U.S. Stay in Canada.

17.     The U.S. Court hereby recognizes the validity of the stay of proceedings and actions against the Canadian Debtors and their property under the Canadian Order (the "Canadian Stay"). In implementing the terms of this paragraph, the U.S. Court may consult with the Canadian Court regarding: (i) the interpretation, extent, scope and applicability of the Canadian Stay and any orders of the Canadian Court modifying or granting relief from the Canadian Stay; and (ii) the enforcement of the Canadian Stay in the United States.

18.     Nothing contained herein shall affect or limit the Debtors' or other parties' rights to assert the applicability or nonapplicability of the U.S. Stay or the Canadian Stay to any particular proceeding, property, asset, activity or other matter, wherever pending or located. Subject to paragraph 15, herein, motions brought respecting the application of the stay of proceedings with respect to assets or operations of the Canadian Debtors shall be heard and determined by the Canadian Court. Subject to paragraph 15 herein, motions brought respecting the application of the stay of proceedings with respect to assets or operations of the U.S. Debtors shall be heard and determined by the U.S. Court.

F.     **Rights to Appear and Be Heard**

19.     The Debtors, the Core Parties, and any other committee that may be appointed by the U.S. Trustee, and the professionals and advisors for each of the foregoing, shall have the right and standing: (i) to appear and to be heard in either the U.S. Court or Canadian Court in the U.S. Proceedings or Canadian Proceedings, respectively, to the same extent as creditors and other interested parties domiciled in the forum country, subject to any local rules or

12

regulations generally applicable to all parties appearing in the forum; and (ii) to file notices of appearance or other papers with the clerk of the U.S. Court or the Canadian Court in respect of the U.S. Proceedings or Canadian Proceedings, respectively; provided, however, that any appearance or filing may subject a creditor or interested party to the jurisdiction of the Court in which the appearance or filing occurs; provided further, that an appearance by the Creditors Committee in the Canadian Proceedings shall not form a basis for personal jurisdiction in Canada over the members of the Creditors Committee. Notwithstanding the foregoing, and in accordance with the policies set forth above, including, inter alia, paragraph 12 above; (i) the Canadian Court shall have jurisdiction over the Chapter 11 Representatives (as defined below) solely with respect to the particular matters as to which the Chapter 11 Representatives appear before the Canadian Court; and (ii) the U.S. Court shall have jurisdiction over the Canadian Representatives (as defined below) solely with respect to the particular matters as to which the Canadian Representatives appear before the U.S. Court.

20.    In connection with any matter in the Canadian Proceedings in which the Creditors Committee seeks to become involved and which would otherwise require the Creditors Committee to execute a confidentiality agreement, the Creditors Committee, its individual members and professionals shall not be required to execute confidentiality agreements but instead the Creditors Committee and its members shall be bound by the confidentiality provisions contained in the Creditors Committee bylaws, and the Creditors Committee's professionals shall be bound by the terms of the confidentiality agreement with the Debtors dated February 2, 2009.

**G.    Claims Protocol**

21.    The Debtors anticipate that it will be necessary to implement a specific claims protocol to address, among other things and without limitation, the timing, process,

13

jurisdiction and applicable governing law to be applied to the resolution of intercompany claims filed by the Debtors' creditors in the Canadian Proceedings and the U.S. Proceedings. In such event, and in recognition of the inherent complexities of the inter-company claims that may be asserted in the Insolvency Proceedings, the Debtors shall use commercially reasonable efforts to negotiate a specific claims protocol, in form and substance satisfactory to the Debtors, the Monitor, and the Creditors Committee, which protocol shall be submitted to the Canadian Court and the U.S. Court for approval. In the event that the Debtors fail to reach agreement among such parties, the Debtors shall file a motion in both the Canadian Court and the U.S. Court seeking approval of such claims protocol as the Debtors shall determine to be in the best interest of the Debtors and their creditors.

**H.    Retention and Compensation of Estate Representative and Professionals**

22.    The Monitor, its officers, directors, employees, counsel and agents, wherever located, (collectively the "Monitor Parties") and any other estate representatives appointed in the Canadian Proceedings (collectively, the "Canadian Representatives") shall (subject to paragraph 19) be subject to the sole and exclusive jurisdiction of the Canadian Court with respect to all matters, including: (a) the Canadian Representatives' tenure in office; (b) the retention and compensation of the Canadian Representatives; (c) the Canadian Representatives' liability, if any, to any person or entity, including the Canadian Debtors and any third parties, in connection with the Insolvency Proceedings; and (d) the hearing and determination of any other matters relating to the Canadian Representatives arising in the Canadian Proceedings under the CCAA or other applicable Canadian law. The Canadian Representatives shall not be required to seek approval of their retention in the U.S. Court for services rendered to the Debtors. Additionally, the Canadian Representatives: (a) shall be compensated for their services to the Canadian Debtors solely in accordance with the CCAA, the Canadian Order and other applicable

14

Canadian law or orders of the Canadian Court; and (b) shall not be required to seek approval of their compensation in the U.S Court.

23.     The Monitor Parties shall be entitled to the same protections and immunities in the United States as those granted to them under the CCAA and the Canadian Order.  In particular, except as otherwise provided in any subsequent order entered in the Canadian Proceedings, the Monitor Parties shall incur no liability or obligations as a result of the Canadian Order, the appointment of the Monitor, the carrying out of its duties or the provisions of the CCAA and the Canadian Order by the Monitor Parties, except any such liability arising from actions of the Monitor Parties constituting gross negligence or willful misconduct.

24.     Any estate representative appointed in the U.S. Proceedings, including without limitation any examiners or trustees appointed in accordance with section 1104 of the Bankruptcy Code (collectively, the "Chapter 11 Representatives") shall (subject to paragraph 19) be subject to the sole and exclusive jurisdiction of the U.S. Court with respect to all matters, including:  (a) the Chapter 11 Representatives' tenure in office; (b) the retention and compensation of the Chapter 11 Representatives; (c) the Chapter 11 Representatives' liability, if any, to any person or entity, including the U.S. Debtors and any third parties, in connection with the Insolvency Proceedings; and (d) the hearing and determination of any other matters relating to the Chapter 11 Representatives arising in the U.S. Proceedings under the Bankruptcy Code or other applicable laws of the United States.  The Chapter 11 Representatives shall not be required to seek approval of their retention in the Canadian Court and (a) shall be compensated for their services to the U.S. Debtors solely in accordance with the Bankruptcy Code and other applicable laws of the United States or orders of the U.S. Court; and (b) shall not be required to seek

approval of their compensation for services performed for the U.S. Debtors in the Canadian Court.

25.     Any professionals (i) retained by and being compensated solely by, or (ii) being compensated solely by, the Canadian Debtors including in each case, without limitation, counsel and financial advisors (collectively, the "Canadian Professionals"), shall be subject to the sole and exclusive jurisdiction of the Canadian Court. Such Canadian Professionals: (a) shall be subject to the procedures and standards for retention and compensation applicable in the Canadian Court under the CCAA, the Canadian Order and any other applicable Canadian law or orders of the Canadian Court with respect to services performed on behalf of the Canadian Debtors; and (b) shall not be required to seek approval of their retention or compensation in the U.S. Court.

26.     Any professionals (i) retained by, or (ii) being compensated by, the U.S. Debtors including in each case, without limitation, counsel and financial advisors (collectively, the "U.S. Professionals") shall be subject to the sole and exclusive jurisdiction of the U.S. Court. Such U.S. Professionals: (a) shall be subject to the procedures and standards for retention and compensation applicable in the U.S. Court under the Bankruptcy Code and any other applicable laws of the United States or orders of the U.S. Court; and (b) shall not be required to seek approval of their retention or compensation in the Canadian Court. .

27.     Subject to paragraph 19 herein, any professional retained by the Creditors Committee, including in each case, without limitation, counsel and financial advisors (collectively, the "Committee Professionals") shall be subject to the sole and exclusive jurisdiction of the U.S. Court. Such Committee Professionals: (a) shall be subject to the procedures and standards for retention and compensation applicable in the U.S. Court under the

16

Bankruptcy Code and any other applicable laws of the United States or orders of the U.S. Court; and (b) shall not be required to seek approval of their retention or compensation in the Canadian Court or any other court.

**I.    Notice**

28.    Notice of any motion, application or other Pleading or paper (collectively the "Court Documents") filed in one or both of the Insolvency Proceedings involving or relating to matters addressed by this Protocol and notice of any related hearings or other proceedings shall be given by appropriate means (including, where circumstances warrant, by courier, telecopier or other electronic forms of communication) to the following: (a) all creditors and interested parties, in accordance with the practice of the jurisdiction where the papers are filed or the proceedings are to occur; and (b) to the extent not otherwise entitled to receive notice under clause (a) of this sentence, counsel to the Debtors; the U.S. Trustee; the Monitor; the Creditors Committee; the Bondholders Committee and any other statutory committees appointed in the Insolvency Proceedings and such other parties as may be designated by either of the Courts from time to time. Notice in accordance with this paragraph shall be given by the party otherwise responsible for effecting notice in the jurisdiction where the underlying papers are filed or the proceedings are to occur. In addition to the foregoing, upon request, the U.S. Debtors or the Canadian Debtors shall provide the U.S. Court or the Canadian Court, as the case may be, with copies of any orders, decisions, opinions or similar papers issued by the other Court in the Insolvency Proceedings.

29.    When any cross-border issues or matters addressed by this Protocol are to be addressed before a Court, notices shall be provided in the manner and to the parties referred to in paragraph 28 above.

**J.**     <u>Effectiveness; Modification</u>

30.     This Protocol shall become effective only upon its approval by both the U.S. Court and the Canadian Court.

31.     This Protocol may not be supplemented, modified, terminated, or replaced in any manner except upon the approval of both the U.S. Court and the Canadian Court after notice and a hearing. Notice of any legal proceeding to supplement, modify, terminate or replace this Protocol shall be given in accordance with the notice provisions set forth above.

**K.**     <u>Procedure for Resolving Disputes Under this Protocol</u>

32.     Disputes relating to the terms, intent or application of this Protocol may be addressed by interested parties to the U.S. Court, the Canadian Court or both Courts upon notice in accordance with the notice provisions outlined in paragraph 28 above. In rendering a determination in any such dispute, the Court to which the issue is addressed:  (a) shall consult with the other Court; and (b) may, in its sole and exclusive discretion, either:  (i) render a binding decision after such consultation; (ii) defer to the determination of the other Court by transferring the matter, in whole or in part, to such other Court; or (iii) seek a Joint Hearing of both Courts in accordance with paragraph 12 above. Notwithstanding the foregoing, in making a determination under this paragraph, each Court shall give due consideration to the independence, comity and inherent jurisdiction of the other Court established under existing law.

33.     In implementing the terms of this Protocol, the U.S. Court and the Canadian Court may, in their sole, respective discretion, provide advice or guidance to each other with respect to legal issues in accordance with the following procedures:

      a.     the U.S. Court or the Canadian Court, as applicable, may determine that such advice or guidance is appropriate under the circumstances;

      b.     the Court issuing such advice or guidance shall provide it to the non-issuing Court in writing;

18

c.  copies of such written advice or guidance shall be served by the applicable Court in accordance with paragraph 28 hereof;

d.  the Courts may jointly decide to invite the Debtors, the Creditors Committee, the Estate Representatives, the U.S. Trustee and any other affected or interested party to make submissions to the appropriate Court in response to or in connection with any written advice or guidance received from the other Court; and

e.  for clarity, the provisions of this paragraph shall not be construed to restrict the ability of either Court to confer as provided in paragraph 12 above whenever it deems it appropriate to do so.

L.  <u>Preservation of Rights</u>

34.    Except as specifically provided herein, neither the terms of this Protocol nor any actions taken under the terms of this Protocol shall:  (a) prejudice or affect the powers, rights, claims and defenses of the Debtors and their estates, the Creditors Committee, the Estate Representatives, the U.S. Trustee or any of the Debtors' creditors under applicable law, including, without limitation, the Bankruptcy Code the CCAA, and the orders of the Courts; or (b) preclude or prejudice the rights of any person to assert or pursue such person's substantive rights against any other person under the applicable laws of Canada or the United States.

19

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

Court File No: 09-CL-7950

---

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

---

**FIFTH AMENDED AND RESTATED INITIAL
ORDER**

---

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4, Canada

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte  LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

DOCSTOR: 2112105\1A



| From: | Merskey, Alan <Alan.Merskey@nortonrose.com> |
| Sent: | Tuesday, August 30, 2011 9:40 AM |
| To: | 'Harvey G. Chaiton' |
| Cc: | Armstrong, Christopher; 'Daniel.Guyder@newyork.allenovery.com'; 'Jane Kim'; 'David H Herrington'; 'Deborah M BUELL'; Hunter, Christopher |
| Subject: | Nortel - SNMP |

Harvey,

I have reviewed SNMP's proposed complaint (the "Complaint") with the Monitor, and Clearys, NNI's Ch 11 counsel.

It the position of the Canadian debtors that:

1.     the Complaint is properly the subject matter of joint hearing proceedings before the CCAA and Chapter 11 Courts;
2.     the Complaint overlaps with the production SNMP has been seeking in the Chapter 11 claims litigation discovery, and as a result, further discovery, and the related motion scheduled Sept 22, must be adjourned until the question of how the Complaint will proceed is resolved; and
3.     the Complaint as framed requires the leave of the CCAA court to proceed, which leave the Canadian debtors oppose.

I understand that NNI holds a similar view with respect to the requirement for joint hearings and the effect of the Complaint on SNMP's existing discovery requests, as well as the impropriety of such claims on various procedural and substantive bases.

If SNMP wishes to proceed with the Complaint I suggest we have a call to discuss a hearing date and schedule for materials, as well as particulars as to the relief SNMP wishes to seek from the CCAA and/or Chapter 11 courts at this juncture. I am happy to facilitate a call with you and SNMP's counsel if that is of assistance. The people copied on this email are variously involved as counsel on behalf of the Canadian or US debtors and monitor.

Best regards

**Alan B. Merskey**

**Norton Rose OR** LLP / S.E.N.C.R.L., s.r.l.
Royal Bank Plaza, South Tower, Suite 3800
200 Bay Street, P.O. Box 84, Toronto, Ontario, CANADA M5J 2Z4
T +1 416.216.4805  F +1 416.216.3930
alan.merskey@nortonrose.com

*Ogilvy Renault has joined Norton Rose Group.*
More information on Norton Rose Group's capabilities in Canada is available at nortonrose.com.

*Ogilvy Renault s'est joint au Groupe Norton Rose.*
De plus amples renseignements sur l'offre de services du Groupe Norton Rose au Canada sont disponibles sur nortonrose.com.

*CONFIDENTIALITY NOTICE: This email, including any attachments, is confidential and may be privileged. If you are not the intended recipient please notify the sender immediately, and please delete it; you should not copy it or use it for any purpose or disclose its contents to any other person. Norton Rose OR LLP and its affiliates reserve the right to monitor all email communications through their networks.*

Norton Rose OR LLP is a limited liability partnership established in Canada. Norton Rose OR LLP together with Norton

Rose LLP, Norton Rose Australia, Norton Rose South Africa (incorporated as Deneys Reitz Inc) and their respective affiliates constitute Norton Rose Group, an international legal practice with offices worldwide, details of which, with certain regulatory information, are at nortonrose.com.

*AVIS DE CONFIDENTIALITÉ : Ce courriel, ainsi que ses pièces jointes, est confidentiel et peut être protégé par le secret professionnel. Si vous n'en êtes pas le destinataire visé, veuillez en aviser l'expéditeur immédiatement et le supprimer; vous ne devez pas le copier, ni l'utiliser à quelque fin que ce soit, ni divulguer son contenu à qui que ce soit. Norton Rose OR S.E.N.C.R.L., s.r.l. et ses sociétés affiliées se réservent le droit de contrôler le contenu de tous les courriels qui passent par leurs réseaux.*

Norton Rose OR S.E.N.C.R.L., s.r.l. est une société en nom collectif à responsabilité limitée établie au Canada. Norton Rose OR S.E.N.C.R.L., s.r.l. et Norton Rose LLP, Norton Rose Australia, Norton Rose South Africa (constituée sous le nom de Deneys Reitz Inc) et leurs sociétés affiliées respectives constituent le Groupe Norton Rose, une pratique juridique internationale qui a des bureaux dans le monde entier au sujet desquels on peut obtenir des renseignements généraux et réglementaires à l'adresse nortonrose.com.

682



AMENDED
**CANADIAN CCAA Proof of Claim**      re Nortel Networks Corporation and others

**❶   Name of Debtor (the "Debtor")**
Debtor: Nortel Networks Corporation

**❷   Original Creditor Identification (the "Creditor")**

| Legal Name of Creditor | | | Name of Contact |
|---|---|---|---|
| SNMP Research International, Inc. | | | Mary L. Case, CEO |

| Address | | | Phone # |
|---|---|---|---|
| 3001 Kimberlin Heights Road | | | +1 865 579 3311 |
| | | | **Fax #** |
| | | | +1 865 579 6565 |

| City | Prov / State | Postal/Zip code | e-mail |
|---|---|---|---|
| Knoxville | TN, USA | 37920-9716 | mary@snmp.com |

**❸   Assignee, if claim has been assigned**

| Full Legal Name of Assignee | Name of Contact |
|---|---|
| | |
| Address | Phone # |
| | **Fax #** |
| City | Prov / State | Postal/Zip code | e-mail |

**❹   Amount of Claim**

The Debtor / Officer(s) / Director(s) was/were and still is/are indebted to the Creditor as follows:

| | | | *(Check only if applicable)* | | If you are making a claim against an Officer or Director check the box below, and list the Officer(s) and Director(s) against whom you assert your claim |
|---|---|---|---|---|---|
| Currency | Original Currency Amount | Secured | S. 136 Priority | Restructuring | |
| USD (United States Dollar) | 7,549,323.00 plus unspecified damages | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |

*Claims will be recorded as "unsecured" unless the "Secured" box is checked*

**❺   Documentation**

Provide all particulars of the Claim and supporting documentation, including amount, description of transaction(s) or agreement(s) giving rise to the Claim, name of any guarantor which has guaranteed the Claim, and amount of invoices, particulars of all credits, discounts, etc. claimed, description of the security, if any, granted by the affected Debtor to the Creditor and estimated value of such security, particulars of any restructuring claim.

**❻   Certification**

I hereby certify that:
 • I am the Creditor, or authorized Representative of the Creditor.
 • I have knowledge of all the circumstances connected with this Claim
 • The Creditor asserts this claim against the Debtor, and the Officer(s) and Director(s) as indicated above.
 • Complete documentation in support of this claim is attached.

| Signature | Name |
|---|---|
| *Mary L Case* | Mary L. Case |
| | **Title** CEO |
| **Dated at** *Sept 15, 2011* | **Signed at** Knoxville, TN USA |

**❼   Filing of Claim**

This Proof of Claim must be received by the Monitor by no later than 4:00 p.m. (prevailing Eastern Time) on **SEPTEMBER 30, 2009**, by prepaid ordinary mail, courier, personal delivery or electronic or digital transmission at the following address:

Ernst & Young Inc.
222 Bay St., P.O. Box 251
Toronto-Dominion Centre
Toronto, ON  M5K 1J7
CANADA
Attention: Nortel Claims

Fax: 416-943-2808
Tel: 1-866-942-7177 or 416-943-4439
e-mail: nortel.monitor@ca.ey.com

An electronically fillable version of this form is available at www.ey.com/ca/nortel

AMENDED
**CANADIAN CCAA Proof of Claim**     **re Nortel Networks Corporation and others**

**❶ Name of Debtor (the "Debtor")**
Debtor: Nortel Networks International Corporation

**❷ Original Creditor Identification (the "Creditor")**

| Legal Name of Creditor | Name of Contact |
|---|---|
| SNMP Research International, Inc. | Mary L. Case, CEO |

| Address | Phone # |
|---|---|
| 3001 Kimberlin Heights Road | +1 865 579 3311 |
| | Fax # |
| | +1 865 579 6565 |

| City | Prov / State | Postal/Zip code | e-mail |
|---|---|---|---|
| Knoxville | TN, USA | 37920-9716 | mary@snmp.com |

**❸ Assignee, if claim has been assigned**

| Full Legal Name of Assignee | Name of Contact |
|---|---|
| | |

| Address | Phone # |
|---|---|
| | Fax # |

| City | Prov / State | Postal/Zip code | e-mail |
|---|---|---|---|
| | | | |

**❹ Amount of Claim**

The Debtor / Officer(s) / Director(s) was/were and still is/are indebted to the Creditor as follows:

| Currency | Original Currency Amount | Secured | S. 136 Priority | Restructuring | If you are making a claim against an Officer or Director check the box below, and list the Officer(s) and Director(s) against whom you assert your claim |
|---|---|---|---|---|---|
| | | Claims will be recorded as "Unsecured" unless the "Secured" box is checked | (Check only if applicable) | | |
| USD (United States Dolla | 7,549,323.00 plus unspecified damages | ☐ | ☐ | ☐ | |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |

**❺ Documentation**

Provide all particulars of the Claim and supporting documentation, including amount, description of transaction(s) or agreement(s) giving rise to the Claim, name of any guarantor which has guaranteed the Claim, and amount of invoices, particulars of all credits, discounts, etc. claimed, description of the security, if any, granted by the affected Debtor to the Creditor and estimated value of such security, particulars of any restructuring claim.

**❻ Certification**

I hereby certify that
- I am the Creditor, or authorized Representative of the Creditor.
- I have knowledge of all the circumstances connected with this Claim.
- The Creditor asserts this claim against the Debtor; and the Officer(s) and Director(s) as indicated above
- Complete documentation in support of this claim is attached.

| Signature | Name |
|---|---|
| *Mary L Case* | Mary L. Case |
| | Title |
| | CEO |
| Dated at | Signed at |
| Sept. 15, 2011 | Knoxville, TN USA |

**❼ Filing of Claim**

This Proof of Claim must be received by the Monitor by no later than 4:00 p.m. (prevailing Eastern Time) on **SEPTEMBER 30, 2009**, by prepaid ordinary mail, courier, personal delivery or electronic or digital transmission at the following address:

Ernst & Young Inc.
222 Bay St., P.O. Box 251
Toronto-Dominion Centre
Toronto ON M5K 1J7
CANADA
Attention: Nortel Claims

Fax: 416-943-2808
Tel: 1-866-942-7177 or 416-943-4439
e-mail: nortel.monitor@ca.ey.com

An electronically fillable version of this form is available at www.ey.com/ca/nortel

AMENDED
**CANADIAN CCAA Proof of Claim**       re Nortel Networks Corporation and others

**❶  Name of Debtor (the "Debtor")**
Debtor Nortel Networks Technology Corporation

**❷  Original Creditor Identification (the "Creditor")**

| Legal Name of Creditor | Name of Contact |
|---|---|
| SNMP Research International, Inc. | Mary L. Case, CEO |

| Address | Phone # |
|---|---|
| 3001 Kimberlin Heights Road | +1 865 579 3311 |
| | Fax # |
| | +1 865 579 6565 |

| City | Prov / State | Postal/Zip code | e-mail |
|---|---|---|---|
| Knoxville | TN, USA | 37920-9716 | mary@snmp.com |

**❸  Assignee, if claim has been assigned**

| Full Legal Name of Assignee | Name of Contact |
|---|---|
| | |

| Address | Phone # |
|---|---|
| | |
| | Fax # |
| | |

| City | Prov / State | Postal/Zip code | e-mail |
|---|---|---|---|
| | | | |

**❹  Amount of Claim**

The Debtor / Officer(s) / Director(s) was/were and still is/are indebted to the Creditor as follows:

| | | Claims will be recorded as "Unsecured" unless the "Secured" box is checked | (Check only if applicable) | | If you are making a claim against an Officer or Director check the box below, and list the Officer(s) and Director(s) against whom you assert your claim |
|---|---|---|---|---|---|
| Currency | Original Currency Amount | Secured | S -136 Priority | Restructuring | |
| USD (United States Dolla | 7,549,323.00 plus unspecified damages | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |

**❺  Documentation**

Provide all particulars of the Claim and supporting documentation, including amount, description of transaction(s) or agreement(s) giving rise to the Claim, name of any guarantor which has guaranteed the Claim, and amount of invoices, particulars of all credits, discounts, etc. claimed, description of the security, if any, granted by the affected Debtor to the Creditor and estimated value of such security, particulars of any restructuring claim.

**❻  Certification**

I hereby certify that:
- I am the Creditor, or authorized Representative of the Creditor.
- I have knowledge of all the circumstances connected with this Claim.
- The Creditor asserts this claim against the Debtor; and the Officer(s) and Director(s) as indicated above
- Complete documentation in support of this claim is attached

| Signature | Name |
|---|---|
| *Mary L Case* | Mary L. Case |
| | Title |
| | CEO |
| Dated at | Signed at |
| *Sept. 15, 2011* | Knoxville, TN USA |

**❼  Filing of Claim**

This Proof of Claim must be received by the Monitor by no later than 4:00 p.m. (prevailing Eastern Time) on **SEPTEMBER 30, 2009,** by prepaid ordinary mail, courier, personal delivery or electronic or digital transmission at the following address:

Ernst & Young Inc.
222 Bay St., P.O. Box 251
Toronto-Dominion Centre
Toronto, ON  M5K 1J7
CANADA
Attention: Nortel Claims

Fax: 416-943-2808
Tel: 1-866-942-7177 or 416-943-4439
e-mail: nortel.monitor@ca.ey.com

An electronically fillable version of this form is available at www.ey.com/ca/nortel

**AMENDED**
**CANADIAN CCAA Proof of Claim      re Nortel Networks Corporation and others**

**❶  Name of Debtor (the "Debtor")**
Debtor: Nortel Networks Global Corporation

**❷  Original Creditor Identification (the "Creditor")**

| Legal Name of Creditor | | | Name of Contact |
|---|---|---|---|
| SNMP Research International, Inc. | | | Mary L. Case, CEO |

| Address | | | Phone # |
|---|---|---|---|
| 3001 Kimberlin Heights Road | | | +1 865 579 3311 |
| | | | Fax # |
| | | | +1 865 579 6565 |

| City | Prov / State | Postal/Zip code | e-mail |
|---|---|---|---|
| Knoxville | TN, USA | 37920-9716 | mary@snmp.com |

**❸  Assignee, if claim has been assigned**

| Full Legal Name of Assignee | Name of Contact |
|---|---|
| | |

| Address | Phone # |
|---|---|
| | |
| | Fax # |
| | |

| City | Prov / State | Postal/Zip code | e-mail |
|---|---|---|---|
| | | | |

**❹  Amount of Claim**

The Debtor / Officer(s) / Director(s) was/were and still is/are indebted to the Creditor as follows:

| Claims will be recorded as "Unsecured" unless the "Secured" box is checked | | (Check only if applicable) | | | If you are making a claim against an Officer or Director check the box below, and list the Officer(s) and Director(s) against whom you assert your claim |
|---|---|---|---|---|---|
| Currency | Original Currency Amount | Secured | S. 136 Priority | Restructuring | |
| USD (United States Dolla | 7,549,323.00 plus unspecified damages | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |

**❺  Documentation**

Provide all particulars of the Claim and supporting documentation, including amount, description of transaction(s) or agreement(s) giving rise to the Claim, name of any guarantor which has guaranteed the Claim, and amount of invoices, particulars of all credits, discounts, etc. claimed, description of the security, if any, granted by the affected Debtor to the Creditor and estimated value of such security, particulars of any restructuring claim.

**❻  Certification**

I hereby certify that,
- I am the Creditor, or authorized Representative of the Creditor.
- I have knowledge of all the circumstances connected with this Claim.
- The Creditor asserts this claim against the Debtor; and the Officer(s) and Director(s) as indicated above.
- Complete documentation in support of this claim is attached

| Signature | Name |
|---|---|
| *Mary L Case* | Mary L. Case |
| | Title |
| | CEO |
| Dated at | Signed at |
| *Sept 15, 2011* | Knoxville, TN USA |

**❼  Filing of Claim**

This Proof of Claim must be received by the Monitor by no later than 4:00 p.m. (prevailing Eastern Time) on **SEPTEMBER 30, 2009**, by prepaid ordinary mail, courier, personal delivery or electronic or digital transmission at the following address:

Ernst & Young Inc.
222 Bay St., P.O. Box 251
Toronto-Dominion Centre
Toronto, ON  M5K 1J7
CANADA
Attention: Nortel Claims

Fax: 416-943-2808
Tel: 1-866-942-7177 or 416-943-4439
e-mail: nortel.monitor@ca.ey.com

An electronically fillable version of this form is available at www.ey.com/ca/nortel

**AMENDED**
**CANADIAN CCAA Proof of Claim**    re Nortel Networks Corporation and others

**❶ Name of Debtor (the "Debtor")**
Debtor: Nortel Networks Limited

**❷ Original Creditor Identification (the "Creditor")**

| | |
|---|---|
| Legal Name of Creditor<br>SNMP Research International, Inc. | Name of Contact<br>Mary L. Case, CEO |
| Address<br>3001 Kimberlin Heights Road | Phone #<br>+1 865 579 3311 |
| | Fax #<br>+1 865 579 6565 |

| City | Prov / State | Postal/Zip code | e-mail |
|---|---|---|---|
| Knoxville | TN, USA | 37920-9716 | marys@snmp.com |

**❸ Assignee, if claim has been assigned**

| | |
|---|---|
| Full Legal Name of Assignee | Name of Contact |
| Address | Phone # |
| | Fax # |

| City | Prov / State | Postal/Zip code | e-mail |
|---|---|---|---|
| | | | |

**❹ Amount of Claim**

The Debtor / Officer(s) / Director(s) was/were and still is/are indebted to the Creditor as follows:

| | | Claims will be recorded as "Unsecured" unless the "Secured" box is checked | (Check only if applicable) | | If you are making a claim against an Officer or Director check the box below and list the Officer(s) and Director(s) against whom you assert your claim |
|---|---|---|---|---|---|
| Currency | Original Currency Amount | Secured | S. 136 Priority | Restructuring | |
| USD (United States Dolla | 7,549,323.00<br>plus unspecified damages | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |

**❺ Documentation**

Provide all particulars of the Claim and supporting documentation, including amount, description of transaction(s) or agreement(s) giving rise to the Claim, name of any guarantor which has guaranteed the Claim, and amount of invoices, particulars of all credits, discounts, etc. claimed, description of the security, if any, granted by the affected Debtor to the Creditor and estimated value of such security, particulars of any restructuring claim.

**❻ Certification**

I hereby certify that:
- I am the Creditor, or authorized Representative of the Creditor.
- I have knowledge of all the circumstances connected with this claim.
- The Creditor asserts this claim against the Debtor; and the Officer(s) and Director(s) as indicated above.
- Complete documentation in support of this claim is attached

| Signature<br><br>*Mary L Case* | Name<br>Mary L. Case |
|---|---|
| | Title<br>CEO |
| Dated at<br>Sept 15, 2011 | Signed at<br>Knoxville, TN USA |

**❼ Filing of Claim**

This Proof of Claim must be received by the Monitor by no later than 4:00 p.m. (prevailing Eastern Time) on **SEPTEMBER 30, 2009**, by prepaid ordinary mail, courier, personal delivery or electronic or digital transmission at the following address:

Ernst & Young Inc.
222 Bay St., P.O. Box 251
Toronto-Dominion Centre
Toronto, ON  M5K 1J7
CANADA
Attention: Nortel Claims

Fax: 416-943-2808
Tel: 1-866-942-7177 or 416-943-4439
e-mail: nortel.monitor@ca.ey.com

An electronically fillable version of this form is available at www.ey.com/ca/nortel

## SUMMARY OF AMENDED PROOF OF CLAIM

### I.  Claim Summary

SNMP Research International, Inc. ("SNMP") asserts this general unsecured claim against each debtor in the Nortel Networks Corporation cases (collectively, "Nortel" or the "Debtors") in the estimated amount of $7,549,323, which consists of the following:

(i)      $22,092 (the "Unpaid Pre-Bankruptcy Royalties") for unpaid royalty and license fees from the fourth quarter of 2008 through the portion of the first quarter of 2009 prior to the Debtors' filing for CCAA protection, along with yearly software maintenance fees, and pre-filing interest thereon;[1]

(ii)     $3,673,675 ("MG9000 Fees") due for licensing fees, royalties, and maintenance fees, and pre-filing interest thereon associated with the unauthorized and illegal usage by the Debtors of EMANATE with EPIC/EAL (the "SNMP-MG9000 Software") used in the MG9000, and including pre-filing interest;[2]

(iii)    $3,853,309 ("Bay Fees") due for licensing fees and royalties, and pre-filing interest thereon associated with the known unauthorized and illegal usage by the Debtors of EMANATE® and EMANATE®/Lite (the "SNMP-Bay Software") in association with products in the Bay Stack line of products of the Debtors ("Bay Products"); and

---

[1] The Unpaid Pre-Bankruptcy Royalties were specifically claimed by SNMP in its proof of claim filed on or about September 29, 2009, against Nortel and various related Debtors (collectively, the "Original SNMP Claim").

[2] Since the filing of the SNMP Claim, GENBAND US, LLC and GENBAND Inc. (collectively, "GENBAND") represented to SNMP that the MG9000 product received from Nortel contains EMANATE instead of EMANATE/Lite.  EMANATE is priced differently from EMANATE/Lite and thus the MG9000 Fees have changed.
547217v2

1

(iv)      $247 for unpaid royalties for the use of SNMP software in the Universal Signaling Point, and including pre-filing interest thereon.

SNMP further claims amounts to be determined (a) under the United States Copyright Act of 1976 as amended, applicable trade secret law, and other intellectual property law for unauthorized use and distribution of SNMP software with the MG9000, Bay Products, and other products of the Debtors,[3] and (b) any and all additional amounts associated with licensing fees, royalties, and maintenance fees for the Bay Products and any other products of the Debtors that have not been reported by the Debtors to date and are owed to SNMP.[4]  SNMP has prepared a draft adversary proceeding complaint which seeks damages and injunctive relief against the Debtors and numerous known and unknown parties.  The draft complaint has been provided to Debtors counsel and the Canadian monitor.  SNMP reserves all rights to amend this proof of claim based on the facts and allegations contained in the complaint, as well as anything which becomes known in the course of mediation or litigation.  Because SNMP's investigation is ongoing, many relevant facts are unknown at this time and accordingly, SNMP reserves all rights to amend the proof of claim.

**II.  Unpaid Royalty Fees**

The Debtors have failed to pay certain royalty and license fees arising 4Q2008 and 1Q2009 in the total amount of $22,092, arising under the License Agreement.  *See* Exhibit 1 (Schedule of unpaid fees arising under the License Agreement and related documents).

---

[3] The Debtors have informed SNMP in its response to interrogatories in the US proceedings that the Debtors used SNMP software in the Debtors' VSS products.  SNMP is not able to specify the license fees, royalties, and maintenance fees owed for the Debtors' use of SNMP software in the VSS products because the Debtors have not informed SNMP of the extent of such use.  GENBAND has requested a license for the use of SNMP software in the SP2000 transferred from Nortel to GENBAND.  SNMP never granted Nortel a license for the use of SNMP software with the SP2000.  SNMP is not able to specify the license fees, royalties, and maintenance fees owed for the Debtors' use of SNMP software in the SP2000 because the Debtors have not informed SNMP of the extent of such use.
[4] *Id.*
547217v2

2

### III. MG9000 Fees

The MG9000 Fees arise from the Debtors' unlicensed use of the SNMP-MG9000 Software in its MG9000 product line. *See* Exhibit 2 (copies of electronic correspondence from a former employee and current employees of the Debtors admitting to the unauthorized usage of SNMP's software, without payment to SNMP of the relevant royalties and other fees). SNMP transferred the SNMP-MG9000 Software to Nortel on multiple occasions in 1999. Nortel did not execute a license agreement that allowed Nortel to use and distribute the SNMP-MG9000 Software with the MG9000.

Despite the Debtors' representation to the contrary, the Debtors used the SNMP-MG9000 Software on at *least* four different cards within the MG9000 – NTNY45AA, NTNY45BA, NTNY45CA, and NTNY45FA. *See* Exhibit 2, Electronic Mail #2 (electronic mail from Tim Gaiser to Kevin Rossi, *et al.*, dated May 18, 2010).[5] All four cards shipped by Nortel included the SNMP-MG9000 Software, and each separate use of the software in each card used in the MG9000 product required a separate license. The Debtors would have been required to pay the below-listed amounts in 1999 for licenses to use the SNMP-MG9000 Software:

|  | License Fee for 1 product | License Fees for all 4 products |
|---|---|---|
| EMANATE® | $20,000 | $80,000 |
| EPIC/EAL | $5,000 | $20,000 |
| Royalty Buy Out EMANATE® | $100,000 | $400,000 |

---

[5] SNMP believes that Nortel installed the SNMP-MG9000 Software on a fifth card used in the MG9000 product, referenced as NTNY45OA. The MG9000 Fees do not currently reflect any claim for license fees, royalties, or maintenance fees should it be determined that the SNMP-MG9000 Software was installed on the NTNY45OA cards, and SNMP reserves all rights to amend its proof of claim accordingly.

547217v2

3

| Royalty Buy Out EPIC/EAL | $15,000 | $60,000 |
|---|---|---|
| Maintenance EMANATE® | $4,000 | $16,000 |
| Maintenance EPIC/EAL | $1,000 | $4,000 |
| **Total Initial Fees** | | **$580,000** |

Additionally, commencing in 2000, the Debtors would have owed yearly maintenance fees of $5,000 per license, or $20,000 for the four products. The maintenance fees for the nine-year period between 2000 and 2009, when the Debtors filed for CCAA protection, total $180,000.

## IV. Bay Fees

The Bay Fees are comprised of the unpaid fees owed by the Debtors for the SNMP-Bay Software that was contained in the Bay Products. SNMP is aware that the Debtors conveyed to Avaya Inc. ("Avaya") at least eleven (11) of the Bay Products' product lines. *See* Exhibit 3 (Email from Roy J. Weldon to Barry Marcus, Jeff Case, et al. dated April 14, 2011). Under Schedule 1A of the License Agreement dated December 23, 1999, between Debtors and SNMP (the "License Agreement"), the Debtors' right to possess, use, or distribute the SNMP-Bay Software in any Bay Products ceased on June 20, 2003. In 2004 the Debtors used the SNMP-Bay Software in all of the 20 different product lines then produced as part of the Bay Products. *See* Exhibit 4 (affidavit of James Reeves ¶¶ 8, 9 (the "Reeves Affidavit")). Thus, SNMP believes that the Bay Fees do not reflect claims for the use and distribution of the SNMP-Bay Software in at least nine (9) products. SNMP reserves all rights to amend its claim for the Bay Fees after further investigation to reflect additional license fees, royalties, or maintenance fees that may be due and owing.

Based on the usage of the SNMP-Bay Software in the Bay Products as represented by the eleven (11) product lines that the Debtors conveyed to Avaya, the Debtors would have been required to pay SNMP $464,000 in license fees and $1,000,000 in royalty buyouts in 2003 for licenses to use and distribute SNMP software in the Bay Products based on SNMP's standard pricing schedule in effect in 2003. See Exhibit 5 (Schedule of Bay Products license and royalty fee charges).[6]

## V. Universal Signaling Point

The Debtors owed SNMP $100 a year for royalties for the distribution of SNMP software with the Universal Signaling Point, pursuant to Schedule 10 to the License Agreement. The Debtors did not pay royalties for the Universal Signaling Point for the years 2007 and 2008. *See* Case Declaration attached to the Response to the Motion for Protective Order as Exhibit 2.

## VI. Interest

Furthermore, pursuant to Section 3.2(b) on page 7 of the License Agreement, "[p]ayments made late shall be assessed a late payment penalty of 1.5% for each month that the payment is late, or the maximum amount allowable by law, whichever is less." The interest due on the unpaid principal amounts claimed by SNMP totals the sum of $5,303,031, and as to each specific claim is as follows:

| | | |
|---|---|---|
| (i) | MG9000 Fees: | $2,913,675 |
| (ii) | Bay Fees: | $2,389,309 |
| (iii) | Universal Signaling: | $        47 |

---

[6] The eleven Bay Products transferred from Nortel to Avaya were not all used and distributed by Nortel in 2003, but the eleven Bay Products do provide a conservative basis on which to calculate the Bay Fees. SNMP's investigation continues into the misappropriation of its intellectual property. Additional facts and discovery are required to fully assess the scope and damages resulting from the Debtor's conduct. SNMP reserves the right to amend its proofs of claim and specifically to add claims and increase amounts based upon information and documents that are obtained.
547217v2

Therefore, with the addition of interest, the MG9000 Fees total $3,673,675, the Bay Fees total $3,853,309, and the royalties owed for the Universal Signaling Point total $247. *See* Exhibit 6 (Interest Calculations Schedules).

## VII. Conclusion

SNMP has also been informed that the Debtors used SNMP software in the SP2000 and as a part of the VSS products. Once SNMP learns the full extent of the unauthorized use and distribution of SNMP software related to the SP2000, VSS products, and other products of the Debtors, SNMP intends to amend this proof of claim for the additional amounts and reserves the right to do so.

## VIII. Reservation of Rights

The filing of this proof of claim:

(a) does not constitute a waiver or release of any of SNMP's rights against any other person or entity or its rights to elect remedies or choice of law, including, but not limited to, legal action against others, and nothing in this proof of claim shall limit SNMP's right to seek payment against any third parties, in any other jurisdiction as SNMP expressly reserves all rights regarding its claims in any such case or cases against any third parties;

(b) does not constitute consent by SNMP to the jurisdiction of this Court with respect to the subject matter of the claims set forth in this Proof of Claim, any objection or other proceeding commenced with respect thereto;

(c) does not alter any right SNMP had prior to filing this proof of claim or any other right unrelated to the proof of claim.

547217v2

6

# EXHIBIT 1

Amounts Due to SNMP Research International, Inc.

| Royalties | | |
|---|---|---|
| | Q4 2008 (Oct 1, 2008 thru Dec 31, 2008) | $11,592 |
| | Q1 2009 (Jan 1, 2009 thru Jan 13, 2009) [not including post bankruptcy portion of the quarter] | $189 |
| Yearly Software Maintenance Fees | | $10,500 |
| | | |
| Total Claim | Please Note:  All amounts in US Dollars (USD) | $22,281 |

696

Date: Wed, 11 Feb 2009 14:11:58 -0500
From: Lisane Fuoco <lfuoco@nortel.com>
To: kerrie@snmp.com, royalty@snmp.com
Cc: Software Royalties <software.royalties@nortel.com>
Subject: Nortel Q4-2008 Software Royalty Report - SNMP -

Dear all,
á

As previously communicated, Nortel filed for credit protection under
CCAA, Chapter 11 and the UK Administrativeáproceedings on 14 January
2009.á As such, you do understand by now we areánot permitted by the
court monitor to make any payments for goods and services delivered prior
to 14 January 2009, the date of the filing.ááI do regret this immensely,
but this is not a decision we can reverse, this is the law and we are
bound by it.ááAs such, we are providing you with the attached Q4 2008
royalty report, which is all stayed, for your information but also to
allow you to file a claim once the claim process is in place (to be
communicated at a later date by the court monitor).á We look forward to
keeping our relationship intact with you and continue doing business in
the future.á

Best Regards,

Michel Cote
Nortel 3rd PartyáSW License process Leader
Phone 613.763.8388 (ESN 393)

Fax 613.763.5771 (ESN 393)

á
á
Please find enclosed the subjectáQ4-2008 Royalty report.

Nortel Software Royalties Reports invoices':

You are identified as the point of contact to whom we will be sending the
quarterly software royalty reports. Please note that invoices associated
with those royalty reports (and only royalty reports) should not be sent
to Nortel Accounts Payable Department but rather to this inbox
(SWRYLTS@nortel.com). The invoice should clearly state the amounts
indicated on the report have been duly paid. If there are differences
between what the report states, including the amount owed, and what your
records may indicate, please contactáme directly to discuss before
issuing an invoice. Please pass this message along to anyone within your
Company who may be affected.

Regards,

á
Lisane Fuoco
Software Supply Manager
3500 Carling Ave,
Ottawa, Ontario K2E 8E9
613-765-6231 ESN 395-6231
lfuoco@nortel.com
á
á
á

SNMP Research International Inc.  dor id # 315822          PO # 4320063543

3001 Kimberlin Heights Road
Knoxville, Tennessee
USA 37920-9716

Q4 2008
**Reporting Period**          Oct 1, 2008 to Dec 31, 2008                    Date issued:          3-Sep-09

| Nortel Networks Project | Schedule # | Contact | SNMP Product Name | Target OS | Royalty Calculation | Royalty Due | |
|---|---|---|---|---|---|---|---|
| Periphonics/Portal Sltns. | A | John Mahon | EMANATE Master and Sub-Agent | Solaris 2.x | See Sched A Tab | $4,545 | Periphonics |
| Shasta | B | Farha Sukhia | EMANATE Lite | VxWorks | See Sched B Tab | $3 | Shasta |
| DMS-100 - Centrax IP SCU Gateway Cntrl | 27 | Brian - NGN | EMANATE Master and Sub-Agent | Solaris & NT | See Sched 27 Tab | $1,260 | Succession |
| Alteon | 51 | Brian EDN | EMANATE Master and Sub-Agent | RH Linux 6.x | See Sched 51 Tab | $4,320 | Alteon |
| Optical Networks-OME 6500 & 6500B | 67 | Lucy Gauthier | EMANATE Lite | pSOS | See Sched 67 Tab | $1,443 | Optical |
| Optical Networks - CPL | 69 | Lucy Gauthier | EMANATE Lite | pSOS | See Sched 69 Tab | $21 | Optical |

TOTAL amount due Q3-08 (US$):    $11,592

**Legend:**          Royalty Stream Terminated.
                     Royalty Stream under Investigation

                                                                        Total amount due Q4-08      $11,592

**Note:**
The amount of $1500.00 was received on Dec 03, 2007 (email sent on Jan 28, 2008).
Credit will be applied on Q4-07          1,500.00 Under Alteon Account
Supplier will send a refund cheque of the amount of 1,500.00 – don't need to credit on the next quarter. Nov 23, 2007

Prepared by : Lisane Fuoco
Nortel Networks - Software Supply Management
613-765-6231 lfuoco@nortel.com

Hardcopy Signature & Date:

**Supplier Contact:**
Jonathan Southwood or Martha Hopper @ SNMP Research  (865) 579-3311

Kerrie Calhoun                    rrie@snmp.com
                                  royalty@snmp.com'

SNMP Research International Inc      Vendor Id # 315822              PO # 4320063543
3001 Kimberlin Heights Road
Knoxville, Tennessee
USA 37920-9716

Q1 2009
Reporting Period          Jan 1, 2009 to Jan 13, 2009                    Date issued:          25-Sep-09

| Nortel Networks Project | Schedule # | Contact | SNMP Product Name | Target OS | Royalty Calculation | Royalty Due |
|---|---|---|---|---|---|---|
| Periphonics/Portal Sltns. | A | John Mahon | EMANATE Master and Sub-Agent | Solaris 2.x | See Sched A Tab | $0 |
| Shasta | B | Farha Sukhia | EMANATE Lite | VxWorks | See Sched B Tab | $0 |
| Succession - UAS | 6 | Mark Lee | EMANATE Master and Sub-Agent | NT/2000 | See Sched 6 Tab | $0 |
| Universal Signaling Point | 10 | Mark Lee | EMANATE-Lite Agent | VxWorks | Yearly Buy-out | $0 |
| DMS-100 - Centrex IP SCU Gateway Cntrl | 27 | Brian - NGN | EMANATE Master and Sub-Agent | Solaris & NT | See Sched 27 Tab | $0 |
| Access Care I/F to DSLAM | 35 | Myron Grueneich | EMANATE Subagent | HPUX 10.20, 11 (32 bits), 11 (64 | See Sched 35 Tab | $0 |
| Alteon | 51 | Brian EDN | EMANATE Master and Sub-Agent | RH Linux 6.x | See Sched 51 Tab | $0 |
| Optivity Policy Services | 52, 55, 60 and 64 | Stephanie Martin | EMANATE Master and Sub-Agent | Solaris | See Sched 52 & 55 Tab | $0 |
| Access Care I/F to DSLAM | 54 | Joseph Keung | BRASS Server and Mgmt App | HP-UX | Schedule 54 not yet signed | |
| Dolphin(Secure Router 6000) | 56 and 58 | Pat Roper | EMANATE Master and Sub-Agent | Linux | See Sched 56 & 58 Tab | $0 |
| Multiservice Provider Edge (MPE) | 57 | Phil Dresch | EMANATE Master and Sub-Agent | Linux | See Sched 57 Tab | $0 |
| Optical Networks-OME 6500 & 6500Bi | 67 | Lucy Gauthier | EMANATE Lite | pSOS | See Sched 67 Tab | $189 |
| Optical Networks - CPL | 69 | Lucy Gauthier | EMANATE Lite | pSOS | See Sched 69 Tab | $0 |
| Baystack (wlan) | 74 | Tilak Ravi | EMANATE Master and Sub-Agent | Linux | See Sched 74 Tab | $0 |

TOTAL amount stayed Q1-09 (US$):    $189

Legend:              Royalty Stream Terminated
                     Royalty Stream Still under investigation

                                                                 Total amount stayed Q1-09      $189

Note:

Prepared by : Eric Hamelin
Nortel Networks - Software Supply Management
613-763-1805 ehamelin@nortel.com

Hardcopy Signature & Date:

Supplier Contact:
John Southwood or Martha Hopper @ SNMP Research  (865) 579-3311

Kerrie Calhoun              kerrie@snmp.com
                            royalty@snmp.com'

699

# Invoice

SNMP Research International, Inc.
3001 Kimberlin Heights Road
Knoxville, TN 37920-9716
USA

Invoice Number
0810SR035

Invoice Date
Oct 1, 2008

Voice:   +1 865 579 3311
Fax:     +1 865 579 6565

Page
1

Duplicate

Ship to:

NORTEL NETWORKS TECHNOLOGY CORPORATION
3500 CARLING AVENUE
OTTAWA, ON K2H 8E9
CANADA

Bill To:

NORTEL NETWORKS, INC.
P.O. BOX 280510
NASHVILLE, TN 37228

| Customer ID | Customer PO | | Payment Terms |
|---|---|---|---|
| NORTEL0068 | 4320058051 | | Net 30 Days |

| Sales Rep ID | Shipping Method | Ship Date | Due Date |
|---|---|---|---|
| N/A | | | 10/31/08 |

| Quantity | Item | Description | Unit Price | Extension |
|---|---|---|---|---|
| 1.000 | 248ELINUX | SOFTWARE SERVICE AGREEMENT ON INTELLECTUAL PROPERTY FOR A ONE YEAR PERIOD ON NATIVE SUBAGENT ADAPTER ON LINUX BEGINNING DECEMBER 16, 2008 - SCHEDULE 68. | 2,000.00 | 2,000.00 |

Check No:

| | |
|---|---|
| Subtotal | 2,000.00 |
| Sales Tax | |
| Total Invoice Amount | 2,000.00 |
| Payment Received | |
| **TOTAL** | 2,000.00 |

700

# NORTEL

**Purchase Order**

| Purchase Order No: 4320058051<br>This number must appear on all invoices, packages,<br>packing slips and customs forms. | Order Date: 10/15/2008<br>Last Change Date: 10/15/2008 | Page 1 of 7 |
| --- | --- | --- |
| Supplier Contact:<br>SALES TEAM | Supplier No: 315822<br>Contract No: SIGNED DEC. 23/99 | |

Supplier: SNMP Research International Inc
3001 Kimberlin Heights Road
KNOXVILLE TN 37920-9716
USA
Telephone No: 423-579-3311
Fax No: 423-579-6565

Ship to: NN
Nortel
Lise Arden
3500 CARLING AVENUE
OTTAWA ON  K2H 8E9
CANADA

Bill to: Nortel Networks Technology Corporation (1101)
Attention: Accounts Payable
P.O. Box 280510
Nashville, TN 37228

| Carrier Number/Carrier Name: | | Incoterms:<br>FCA ORIGIN | Payment Terms:<br>Net 45 Days | | Buyer:<br>Fernando Williams | | Telephone No: ESN: 470-848<br>Fax: | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Item<br>No. | Qty | UOM | Part No | Description | Ship Date | UnitPrice | Tax<br>Code | Tax<br>Value | Extended Total |

| Item<br>No. | Qty | UOM | Part No | Description | Ship Date | UnitPrice | Tax Code | Tax Value | Extended Total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | PO Delivery Date - 10/15/2008 | | | | | | | | |
| | **Header text** | | | | | | | | |
| | PO TOTAL NOT TO EXCEED $2,000.00 USD | | | | | | | | |
| | REFER TO QUOTE 0810QU017 FOR PROCE CONFIRMATION ONLY | | | | | | | | |
| | NORTEL CONTACT: Cunningham S. Susan | | | | | | | | |
| | suecun@nortel.com | | | | | | | | |
| | 613-763-8002 | | | | | | | | |
| | **Header note** | | | | | | | | |
| | Mail invoices to: Nortel Networks Inc., Att: Accounts Payable, P.O. | | | Box 280510, | Nashville, | TN 37228 | | |
| | Email invoices to: naapexp1@nortel.com | | | | | | | | |
| | Fax invoice to: 615-432-5936 | | | | | | | | |
| | Check invoice and payment status at: www.nortel.com/naapinquiry | | | | | | | | |

| | | | | Page Total | | USD | | 0.00 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |

Nortel Networks Technology Corporation
c/o Stewart McKelvey Sterling Scales
Suite 800, 1959 Upper Water St
Halifax, NS B3J 2X2
Canada

*[signature]*

Fernando Williams
BUYER

701

# N🅞RTEL   **Purchase Order**

| Purchase Order No: 4320058051 <br> This number must appear on all invoices, packages, packing slips and customs forms. | Order Date: 10/15/2008 <br> Last Change Date: 10/15/2008 | Page 2 of 7 |
|---|---|---|
| Supplier Contact: <br> SALES TEAM | Supplier No: 315822 <br> Contract No: SIGNED DEC. 23/99 | |

**Supplier:** SNMP Research International Inc
3001 Kimberlin Heights Road
KNOXVILLE TN 37920-9716
USA
Telephone No: 423-579-3311
Fax No: 423-579-6565

**Ship to:** NN
Nortel
Lise Arden
3500 CARLING AVENUE
OTTAWA ON   K2H 8E9
CANADA

**Bill to:** Nortel Networks Technology Corporation (1101)
Attention: Accounts Payable
P.O. Box 280510
Nashville, TN 37228

| Carrier Number/Carrier Name: | | Incoterms: <br> FCA ORIGIN | Payment Terms: <br> Net 45 Days | Buyer: <br> Fernando Williams | | Telephone No: ESN: 470-848 <br> Fax: | |
|---|---|---|---|---|---|---|---|

| Item No. | Qty | UOM | Part No | Description | Ship Data | UnitPrice | Tax Code | Tax Value | Extended Total |
|---|---|---|---|---|---|---|---|---|---|
| **Terms of delivery** <br> PLEASE SEND ONE ORIGINAL INVOICE WITH PO COPY TO NORTEL CONTROL DEPARTMENT FOR PAYMENT NORTEL IS NOT OBLIGATED TO PAY FOR GOODS OR SERVICES EXCEEDING THE NOT TO EXCEED AMOUNT. ALL PRICING SHALL BE HELD FIRM FOR THE EFFECTIVE PERIOD OF THIS AGREEMENT. IT IS IMPERATIVE THAT ALL INVOICES SUBMITTED FOR PAYMENT AGAINST THIS PURCHASE REFERENCE THIS PURCHASE ORDER NUMBER AND THE ASSOCIATED PURCHASE ORDER LINE ITEM, QUANTITY, DESCRIPTION AND PRICE THAT IS BEING INVOICED FOR AS DISPLAYED ON THE FACE OF THIS PURCHASE ORDER. NORTEL NETWORKS RESERVES THE RIGHT TO CANCEL THIS ORDER AT ANY TIME  IN THE EVENT THAT NORTEL, IN ITS SOLE DISCRETION, IS NOT SATISFIED WITH THE QUALITY OF SERVICES OR PRODUCTS TO BE PROVIDED AND COVERED BY THIS PURCHASE ORDER. THIS PURCHASE ORDER IS SUBJECT TO NORTEL STANDARD TERMS AND CONDITIONS.  THESE STANDARD TERMS AND CONDITIONS HAVE BEEN INCLUDED WITH THIS TRANSMISSION. ANY CHANGES (ADDITIONS, DELETIONS, RATES, DOLLARS, TERMS, ETC.) WILL NOT BE HONORED UNLESS CONFIRMED BY THE BUYER AS IDENTIFIED HEREIN. THIS PURCHASE ORDER IS GOVERNED BY THE TERMS AND CONDITIONS OF THE MASTER SERVICE AGREEMENT REFERENCED HEREIN. SOFTWARE AGREEMENTS ARE SUBJECT TO APPROVAL BY NORTEL AND SUPPLIER LEGAL DEPARTMENTS. LICENSOR SHALL INDEMNIFY AND SAVE EACH NORTEL COMPANY AND ITS SUBSIDIARIES AND AFFILIATES HARMLESS FROM LIABILITY OR CLAIM (INCLUDING, WITHOUT LIMITATION, THE COSTS AND REASONABLE ATTORNEY FEES IN CONNECTION THEREWITH) THAT MAY BE MADE ALLEGING THAT SOFTWARE OR THE USE OF SUCH SOFTWARE INFRINGES ANY PATENT, TRADEMARK, TRADE SECRET, COPYRIGHT, OR ANY OTHER PROPRIETARY OR INTELLECTUAL RIGHT. FOR ALL SOFTWARE PURCHASES AND SOFTWARE DEVELOPMENT:  (A) LICENSOR/SUPPLIER WARRANTS THAT ALL PRODUCTS AND RELATED DOCUMENTATION CONFORMS TO ALL AGREED UPON SPECIFICATION(S) AS STATED BELOW AND SHALL CONTAIN NO "VIRUSES", "TIME BOMBS",LOCK-UP DEVICES, "BACK DOORS", OR SIMILAR DESIGN PATHS THAT ALLOW UNAUTHORIZED ACCESS TO THE SYSTEM(S) THAT ARE LOADED WITH SAID SOFTWARE.(B) SOFTWARE PATCHES  WHEN REQUIRED, SHALL | | | | | | | | | |
| | | | | | **Page Total** | | USD | | 0.00 |

Nortel Networks Technology Corporation
c/o Stewart McKelvey Sterling Scales
Suite 800, 1959 Upper Water St
Halifax, NS B3J 2X2
Canada

*Will.Ewary*

Fernando Williams
**BUYER**

# N∅RTEL

**Purchase Order**

| Purchase Order No: 4320058051 This number must appear on all invoices, packages, packing slips and customs forms. | Order Date: 10/15/2008 Last Change Date: 10/15/2008 | Page 3 of 7 |
|---|---|---|
| Supplier Contact: SALES TEAM | Supplier No: 315822 Contract No: SIGNED DEC. 23/99 | |

Supplier: SNMP Research International Inc
3001 Kimberlin Heights Road
KNOXVILLE TN 37920-9716
USA
Telephone No: 423-579-3311
Fax No: 423-579-6565

Ship to: NN
Nortel
Lise Arden
3500 CARLING AVENUE
OTTAWA ON  K2H 8E9
CANADA

Bill to: Nortel Networks Technology Corporation (1101)
Attention:  Accounts Payable
P.O. Box 280510
Nashville, TN 37228

| Carrier Number/Carrier Name: | | | Incoterms: FCA ORIGIN | Payment Terms: Net 45 Days | | Buyer: Fernando Williams | | Telephone No: ESN: 470-848 Fax: | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Item No. | Qty | UOM | Part No | Description | | Ship Date | UnitPrice | Tax Code | Tax Value | Extended Total |
| | | | INCLUDE DOCUMENTATION THAT DESCRIBES PROCEDURES FOR TESTING, INSTALLING, AND APPLYING SAID PATCHES.   BUYER RESERVES THE RIGHT TO REJECT SOFTWARE THAT DOES NOT COMPLY WITH THESE REQUIREMENTS WITHOUT FURTHER OBLIGATION OR LIABILITY (INCLUDING PAYMENT). SOFTWARE AGREEMENTS ARE SUBJECT TO APPROVAL BY NORTEL AND SUPPLIER LEGAL DEPARTMENTS. LICENSOR SHALL INDEMNIFY AND SAVE EACH NORTEL COMPANY AND ITS SUBSIDIARIES AND AFFILIATES HARMLESS FROM LIABILITY OR CLAIM (INCLUDING, WITHOUT LIMITATION, THE COSTS AND REASONABLE ATTORNEY FEES IN CONNECTION THEREWITH) THAT MAY BE MADE ALLEGING THAT SOFTWARE OR THE USE OF SUCH SOFTWARE INFRINGES ANY PATENT, TRADEMARK,TRADE SECRET, COPYRIGHT, OR ANY OTHER PROPRIETARY OR INTELLECTUAL RIGHT. FOR ALL SOFTWARE PURCHASES AND SOFTWARE DEVELOPMENT:   (A) LICENSOR/SUPPLIER WARRANTS THAT ALL PRODUCTS AND RELATED DOCUMENTATION CONFORMS TO ALL AGREED UPON SPECIFICATION(S) AS STATED BELOW AND SHALL CONTAIN NO "VIRUSES", "TIME BOMBS",LOCK-UP DEVICES, "BACK DOORS", OR SIMILAR DESIGN PATHS THAT ALLOW UNAUTHORIZED ACCESS TO THE SYSTEM(S) THAT ARE LOADED WITH SAID SOFTWARE.(B) SOFTWARE PATCHES   WHEN REQUIRED, SHALL INCLUDE DOCUMENTATION THAT DESCRIBES PROCEDURES FOR TESTING, INSTALLING, AND APPLYING SAID PATCHES.   BUYER RESERVES THE RIGHT TO REJECT SOFTWARE THAT DOES NOT COMPLY WITH THESE REQUIREMENTS WITHOUT FURTHER OBLIGATION OR LIABILITY (INCLUDING PAYMENT). ONTARIO RETAIL SALES TAX PURCHASE EXEMPTION CERTIFICATE - UNDER THE PROVISIONS OF THE RETAIL SALES TAX ACT, NORTEL CLAIMS EXEMPTION FROM TAX ON THE PURCHASE OF THE TANGIBLE PERSONAL PROPERTY ORDERED HEREIN. VENDORS PERMIT NO. 02743442. | | | | | | | |
| 00010 | 1 | EA | part # - 0248ELINUX | Software Service Agreement - sch 68 | | 10/15/2008 | 2,000.00 | A4 | 0.00 | 2,000.00 |
| | | | | **Page Total** | | | USD | | | 2,000.00 |

Nortel Networks Technology Corporation
c/o Stewart McKelvey Sterling Scales
Suite 800, 1959 Upper Water St
Halifax, NS B3J 2X2
Canada

*[signature]*

Fernando Williams
BUYER



# Purchase Order

| Purchase Order No: 4320058051 | Order Date: 10/15/2008 | |
|---|---|---|
| This number must appear on all invoices, packages, packing slips and customs forms. | Last Change Date: 10/15/2008 | Page 4 of 7 |
| Supplier Contact: SALES TEAM | Supplier No: 315822 | |
| | Contract No: SIGNED DEC. 23/99 | |

Supplier: SNMP Research International Inc
3001 Kimberlin Heights Road
KNOXVILLE TN 37920-9716
USA
Telephone No: 423-579-3311
Fax No: 423-579-6565

Ship to: NN
Nortel
Lise Arden
3500 CARLING AVENUE
OTTAWA ON  K2H 8E9
CANADA

Bill to: Nortel Networks Technology Corporation (1101)
Attention:  Accounts Payable
P.O. Box 280510
Nashville, TN 37228

| Carrier Number/Carrier Name: | Incoterms: FCA ORIGIN | Payment Terms: Net 45 Days | Buyer: Fernando Williams | Telephone No: ESN: 470-848 Fax: |
|---|---|---|---|---|

| Item No. | Qty | UOM | Part No | Description | Ship Date | Unit Price | Tax Code | Tax Value | Extended Total |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Goods Recipient: CUNNINGHAM SUSAN This Purchase order is subject to the Nortel Networks Standard PO Terms& Conditions unless specified by Nortel. | | | | | |
| | | | | Page Total | | USD | | | 0.00 |
| | | | | Tax Amount | | USD | | | 0.00 |
| | | | | Total Amount | | USD | | | 2,000.00 |

Nortel Networks Technology Corporation
c/o Stewart McKelvey Sterling Scales
Suite 800, 1959 Upper Water St
Halifax, NS B3J 2X2
Canada

Fernando Williams
BUYER

# Terms and Conditions

## PURCHASE ORDER TERMS & CONDITIONS OF PURCHASE OF GOODS/SERVICES

Provincial Sales Tax Vendor Permit Number and Certifications
NNL
British Columbia R001048
Manitoba 635112-3
Ontario (see note) 7947-0009 0274-3442
Prince Edward Island 133532
Saskatchewan 0944447
Quebec 1001830151-TQ 1000242965-TQ
Note: Under the provisions of the Ontario Retail Sales Tax Act, we claim exemption from tax on the purchase of tangible personal property and taxable services ordered herein.

**Terms and conditions**
**1. Disclosure of Information**
All information, materials, specifications, tools, drawings or data, including computer software programs in source code or object code form, which is conveyed in connection with this order, including the terms hereof, or becomes available or made known to Supplier, shall be deemed proprietary and confidential to Nortel Networks, shall not be disclosed to any third party, and shall be used exclusively for the purpose of manufacturing or supplying the specified goods or services pursuant to this Purchase Order (herein the "Deliverables"), for the benefit of Nortel Networks and its affiliated companies, being Nortel Networks Limited and its subsidiaries and such fixed items shall be returned to Nortel Networks on demand. Supplier shall not make use of any trademarks or trade names of Nortel Networks or its affiliated companies without the prior written consent of Nortel Networks.
**2. Ownership of Intellectual Property**
Nortel Networks shall own all technical information, written reports, visual or audio recordings, computer software programs in source code or object code form, plans, models, and other items, and all patents, copyrights, know-how, and other technological or intellectual property resulting from, or developed pursuant to the creation and provision of Deliverables hereunder. Supplier hereby sells, transfers, assigns, and conveys to Nortel Networks all the right, title, and interest to all the results and/or items produced or to be produced by performance of the services, including, without limitation all copyrights, right to create derivative works, patents, trademarks, trade secrets, mask works, and any other intellectual property rights pertaining thereto, and agrees to execute, and to have its employees and subcontractors execute, without additional charge to Nortel Networks, any documents required to evidence and/or secure Nortel Networks exclusive ownership therein in any and all countries.
**3. Special Products**
Unless otherwise provided on the face of this order, any drawings, special dies, tools, patterns or equipment required for the manufacture of the Deliverables shall be furnished by and at the expense of the Supplier. Nortel Networks may, at its option at any time, reimburse Supplier for Supplier's reasonable cost of such drawings, dies, tools, or patterns, or any part thereof, and upon payment thereof shall become the owner and entitled to possession of the same.
**4. Indemnification and Insurance**

Supplier warrants that the Deliverables furnished hereunder may be freely used, sold, or otherwise dealt with by Nortel Networks and any other person without infringement of patents, copyrights, trademarks, trade secrets, or other technological or intellectual property rights. Supplier shall indemnify, defend, and hold harmless Nortel Networks, and its affiliated companies, their employees, customers, transferees, licensees, invitees and those for whom they may act as agent, against any claims, demands, losses, costs or damages (including costs and attorneys fees) whatsoever in the event of any actual or alleged infringement of a third party intellectual property right. Supplier shall indemnify, defend and save harmless Nortel Networks, its affiliated companies and their employees, customers, transferees, licensees and those for whom they may act as agent, from and against all claims, demands, losses, costs, damages including, but not limited to, those arising from bodily injury (including death) or property damage, of whatsoever kind or nature arising out of incidental to the Deliverables. Supplier shall, prior to commencement of performance, transmit to Nortel Networks a certificate of insurance affirming that Supplier has the following types of insurance and minimum coverage amounts:
(a) Statutory worker's compensation and occupational disease;
(b) Employer's liability - $1,000,000.00,
(c) General liability, including contractor's protective liability and blanket contractual liability for both personal injury and property damage - $5 million; and
(d) Automobile liability, including non-owner automobile liability for both personal injury and property damage - $1 million.
This certificate of insurance shall name Nortel Networks as an additional insured.
**5. Price/Additional Charges/Quantity**
Supplier agrees that this order must not be filled at prices higher than stated on the face of this order without obtaining the prior written consent of Nortel Networks Purchasing Department. Supplier represents that the prices charged hereunder are the lowest prices charged by Supplier to buyers of a class similar to Nortel Networks under similar terms. Any price reduction made in Deliverables covered by this order which is instituted before delivery of goods or commencement of services shall be applicable to this order. No charges additional to those set out on the face of this order will be allowed unless agreed to and specifically recited and included in this order. Nortel Networks shall not be obligated to accept any shipment less than or in excess of the quantity of Deliverables specified herein.
Notwithstanding, a reasonable handling fee shall be borne by Supplier for the handling of shipments less than the quantity of Deliverables specified. Risk of loss, return shipping charges and a reasonable handling fee for excess quantity shall be borne by Supplier. Payment terms are 70 days (Payment Period) measured from the later of Nortel Networks' acceptance of the goods and/or services or Nortel of an undisputed invoice therefor. Notwithstanding the preceding, conditioned upon the advance approval of Nortel Networks' finance group, on the face of this purchase order Nortel Networks may agree with Supplier to a special term of payment that will apply to this purchase order only. Such different payment term will supersede the Payment Period but will not supersede any payment term in a master agreement, if any, between the parties under which this purchase order is being issued
**6. Set-Off**
Upon notice to Supplier, Nortel Networks may deduct from the amount due to Supplier, under this order, either damages for any breach of this order or amounts

# Terms and Conditions

otherwise due Nortel Networks by Supplier, irrespective of whether the deduction is related to the Deliverables covered by this order.

**7. Title, Risk of Loss**
Unless expressly stated to the contrary on the face of this order, title, risk of loss and/or damage to all Deliverables shall remain in Supplier until delivery to, and off-loading at, Nortel Networks premises at which time title, risk of loss and/or damage shall pass to Nortel Networks.

**8. Approval by Relevant Authorities**
All electrical power, or related equipment systems, included in this order, shall comply with any requirements prescribed by the Canadian Standards Association and by the applicable federal, provincial or municipal authority prior to acceptance by Nortel Networks. Supplier shall be responsible for making all modifications required to affect such compliance and for the costs thereof.

**9. Master Contract/Additional Terms**
Subject to any master contract between Nortel Networks and the Supplier, this order constitutes the entire agreement between the parties on the subject matter hereof and supersedes all prior agreements, communications and understandings of any nature whatsoever, oral or written. No other terms or conditions shall be binding upon Nortel Networks unless reduced to writing and signed by a duly authorized representative of Nortel Networks. Supplier's furnishing of Deliverables hereunder shall be deemed to be an acceptance of these terms and conditions notwithstanding the communication to Nortel Networks by Supplier of any other terms and conditions. In the event the terms of this Order conflict with the terms of any master purchase and sale agreement or master services agreement between Nortel Networks, the parent of Nortel Networks or any affiliate or subsidiary of Nortel Networks and Supplier for the purchase of the goods or services ordered hereunder, the terms of the master purchase and sale agreement or master services agreement shall take precedence.

**10. Warranty/Inspection**
Supplier warrants that Supplier is duly qualified to provide Deliverables and that the Deliverables to be furnished hereunder conform with Nortel Networks specification, description or drawings, shall be free from defects in material and/or workmanship, free from any liens or encumbrances, and, unless otherwise specified herein, shall be merchantable quality, fit for their intended purpose, and shall be supplied in a professional andworkmanlike manner conforming with the generally accepted practices. This warranty shall survive acceptance of the Deliverables. The Supplier shall bear the cost of inspection and return to Supplier of Deliverables rejected. The Supplier shall, at Nortel Networks option, repair, correct or replace defective or non-conforming Deliverables.

**11. Assignment**
Supplier shall not assign this order, any interest herein, or any rights hereunder, or subcontract any obligation to be performed hereunder, without the prior written consent of Nortel Networks.

**12. Termination**
At any time, Nortel Networks may cancel this order in whole or in part, upon notice to the Supplier. If this order is terminated for Nortel Networks convenience, any claim of the Supplier shall be settled on the basis of the reasonable costs it had documented as having been incurred in the performance of this order, which will not exceed the price(s). If, however, cancellation is occasioned by Supplier's breach of any term, provision or condition hereof, including Supplier's delay in delivery, Supplier shall not be entitled to reimbursement for any cost and Nortel Networks shall have against the Supplier all remedies available hereunder, or at law or in equity, including the right to

purchase substitute materials elsewhere and charge Supplier with any additional costs or expenses incurred. In no event shall Nortel Networks be liable for any incidental, indirect, consequential, special, or punitive damages of any nature whatsoever, including loss of profit, use, goodwill, or income, for any reason whatsoever.

**13. Force Majeure**
Nortel Networks reserves the right, at its option, either to suspend or cancel shipment or provision of Deliverables covered by this order, in whole or in part, at any time, without incurring any costs or damages whatsoever, where such suspension or cancellation is caused by force majeure, including, but not limited to, acts of God, the public enemy or the government, fires, floods, freight embargoes, unusually severe weather or other contingencies beyond the control of Nortel Networks and/or the Supplier.

**14. Time of the Essence**
Time is of the essence in all matters relating to this order. Time shall remain of the essence in all cases of force majeure.

**15. Regulations**
Supplier shall be responsible for packaging, labeling, handling, transportation, storage or otherwise providing and performing Deliverables, in accordance with the applicable laws relating to customs and export control, and provide all information necessary for compliance or to permit compliance with all legislation relevant to hazardous or dangerous goods.

**16. EU Environmental Regulations**
Supplier will comply with all applicable laws and government regulations (including the marking of products such as any required labels or symbols required) governing hazardous and toxic materials and the protection of the environment (including, but not limited to the following European Union Environmental Directives: Eco-design of Energy Using Product (EuP), Waste from Electrical and Electronic Equipment (WEEE) directive and Restriction on Use of Certain Hazardous Substances (RoHS). With respect to the RoHS Directive, Supplier must be able to demonstrate to Nortel Network's satisfaction that no lead, hexavalent chromium cadmium, mercury or polybrominated biphenyls (PBB)/polybrominated diphenyl ethers (PBDE) are present in any product covered by the ROHS Directive used or provided by Supplier in providing the Products in the EU, except where exemptions allowing the use of such substances apply under applicable law.
Nortel Networks reserves the right to inspect the Supplier's facilities to ensure compliance with directives. Supplier hereby indemnifies, defends, and holds Nortel Networks harmless from all losses, liabilities, fines, penalties, costs and expenses (including reasonable legal fees) in connection with any claim or proceeding made by any customer, governmental body or other third party resulting from any non-compliance by Supplier with the WEEE and RoHS directives. Supplier understands that failure by Supplier to follow the requirements may expose Nortel Networks and Nortel Networks' employees to criminal liability and as a consequence any failure may therefore be considered as a material breach of this Contract.

**17. Compliance with laws**
Supplier warrants that it has complied, and will continue to comply, during the performance of this order, with the provisions of all applicable federal, provincial and municipal laws and regulations, rules and orders including those from which liability may accrue to Nortel Networks from any violations thereof, laws and regulations relating to health and safety and those which may be applicable to this order by reason of Nortel Networks status as a government contractor and/or

# Terms and Conditions

Supplier's status as a government subcontractor. As required, Supplier shall abide by all Nortel Networks regulations and policies relating to health and safety. By acceptance hereof, Supplier shall abide by all Nortel Networks regulations licenses and permits required by, and the Deliverables shall be in conformance with, all applicable laws and governmental orders and regulations in effect at the time of the shipment of the Deliverables. Supplier shall determine eligibility of all goods for preferential treatment under any applicable trade treaty, including but not limited to the North American Free Trade Agreement (NAFTA). Supplier shall prepare and provide a certificate of origin or other appropriate documentation to Nortel Networks. Nortel Networks may withhold payment of Supplier's invoices pending receipt of such documentation for eligible goods.

## 18. Governing Law

This Order shall be interpreted and construed in accordance with the laws of the state/province and country in which the goods are delivered or services are performed, notwithstanding its rules on conflict of laws. The parties agree that this order shall not be subject to the United Nations International Sale of Goods Contracts Convention.

## 19. Publicity

Supplier shall have no right to use the name and trademarks or trade names of Nortel Networks and its subsidiaries and its affiliated companies in connection with any products, promotion, public statement, press releases, or publication without the prior written approval of Nortel Networks.

## 20. Acceptance

Supplier's acceptance of this Purchase Order ("Order") shall be evidenced by the returning of a signed copy of this Order to Purchase, the shipment of goods or the commencement of services to be performed hereunder. Nortel Networks shall not be bound by any provision, printed or otherwise, at variance or in addition to the terms of this Order, that may appear on any quotation, acknowledgement or other form used by Supplier unless any such provision is expressly accepted in writing by Nortel Networks.

## 21. Changes

Nortel Networks may, at any time by written amendment to this Order, increase or decrease the ordered quantities of the goods or services or make a change in any one or more of the following:

(a) applicable drawings, designs and/or specifications when the goods to be furnished are to be specifically manufactured by Supplier in accordance with Nortel Networks provided drawings, designs and/or specifications; and/or

(b) method of shipment or packaging; and/or

(c) place or time of delivery or performance.

If such change causes an increase or decrease in the cost of performance or the time required for performance of this Order, an equitable adjustment shall be made and this Order shall be modified in writing accordingly. Supplier shall be deemed to have waived any claim for adjustment unless asserted in writing by an estimate of the cost of the additional time required for performance of the change within 20 days from receipt by Supplier of notification of the change.

## 22. Notice

Any notice to be given hereunder shall be given in writing, postage prepaid and shall be effective when deposited in the Canada Post.

## 23. Waiver

The failure of a party to claim a breach of any term of this Order shall not constitute a waiver of such breach or the right of such party to enforce any subsequent breach of such term.

Company policy prohibits Nortel Networks employees from accepting gifts from suppliers.

Nortel Networks Technology Corporation and its parent company Nortel Networks Limited are hereinafter referred to as Nortel Networks. The person, firm or corporation from whom the goods or services have been ordered is hereinafter referred to as Supplier.

These terms and conditions apply to the following Purchase Order issued on the date referenced:

# EXHIBIT 2

708

**ELECTRONIC MAIL # 1**

From pierre.tremblay@nortel.com Fri May 28 11:05:37 2010
Date: Fri, 28 May 2010 11:04:28 -0400
From: Pierre Tremblay <pierre.tremblay@nortel.com>
To: Jeff Case <case@private.snmp.com>
Cc: Baiju Dalal <dalal@nortel.com>
Subject: RE: Genband - SNMP RI Accession Agreement

Thank you Jeff and frankly, once I discovered that CVAS had been shipping your software under
schedule 19 without paying the associated royalties, I realized that it would be hard for me
to ever refer to your concerns as paranoia. ;-)  I will send to Baiju all the emails I have
on SNMP RI to help him out as he works with you through all your concerns.
I suspect we will bump into each other again as I will be responsible for all software
licensing activities at GENBAND.

Pierre

-----Original Message-----
From: Jeff Case [mailto:case@private.snmp.com]
Sent: Friday, May 28, 2010 10:59 AM
To: Tremblay, Pierre (CAR:0700)
Cc: Dalal, Baiju (PGP:4155)
Subject: RE: Genband - SNMP RI Accession Agreement

1

hello

ok, i will be prepared to work with Mr Dalal (pleased to meet you) and his team

i wish you best of luck with your new career at genband

thank you for your explanation of VOB ... it is helpful

we do not use clearcase, so i am not familiar with their lingo, but we do use a similar tool (actually one that clearcase was based upon long ago) so i am somewhat familiar with the concepts, if not the lingo

thank you also for your explanation of schedule 18

perhaps it will help you to understand that there were two additional problems in the background of our discussions of which you may have been only tangentially aware:

1) schedule 18 was preceded by a test license which, despite repeated attempts, we were never able to get that team to either license or certify destruction, as was required of them by the terms of the test license agreement, plus, they asked questions about why they should have to destroy the software they had developed and how the test software differed from the software under the new license

2) this is not the first time there as been confusion about what portions of our software are in what portions of nortel's products ... i know you think i may be "paranoid" but i think you also now know that sometimes these concerns are, in fact, true and appropriate

   for example, we continue to think it is very very likely that nortel sent avaya portions of our software that are beyond what was agreed upon in the accession agreement and if true, that is a problem for everyone concerned

this is just to help you to understand our position and i hope i don't sound too defensive about not being "paranoid"

however, as of midnight, my paranoia will be, at least for you personally:
     SNMP:  Simply Not My Problem
since you will no longer have to deal with any remaining issues moving forward as it will fall to Mr Dalal and myself to do so

thank you for your business over the years

2

i hope genband will be a good new "home" for you

best wishes,
jdc


On Fri, 28 May 2010, Pierre Tremblay wrote:

> Hello Jeff.   This is likely my last day as a Nortel employee.  If
> everything works according to plan, at 23:59.59 tonight I will become
a
> Genband employee.  Going forward, your Nortel point of contact will be
> Baiju Dalal (Cced).  He heads the software licensing team that will
> remain part of Nortel until "the end".  I have already forwarded to
him
> all the information he will need to work with you to resolve the
> outstanding issues that were discovered as a result of the CVAS
detailed
> review. Baiju or a representative from his team will contact you
shortly
> to initiate discussions on the findings of this review.  Meanwhile, I
do
> have some answers to your questions. VOB stands for Versioned Object
> Base.  It is a term used by the ClearCase configuration management
tool
> to represent a repository where all the source code is stored for a
> particular product/project.  In other words, the review that was
> performed by the CVAS team was a review of all their source code
> repositories.  This allowed them to identify all the VOBs where SNMP
RI
> software was stored and compiled into Nortel products.  In parallel to
> this code search, I provided the CVAS team with a copy of all the
> schedules that were ever discussed with SNMP RI (whether they were
shown
> as signed or not) and which might relate to CVAS (the only ones I did
> not provide them were those that were clearly not CVAS).  This allowed
> for a second layer of checks based on the product descriptions in each
> schedule.  Schedule 18 was looked at again as part of this review.
The
> final result of this detailed review were provided in my email
response
> to you (i.e. 3 schedules are still relevant to the CVAS business Unit:
> #19, #27 and #29).
>
> I will remain accessible to Baiju and his team should they need my
> knowledge of the SNMP RI relationship, so don't worry about the
> outstanding issues falling into a black hole.
>
> P.S. I do realize that from your perspective, schedule 18 looks very
> suspicious.  For the longest time, I insisted that it was still
relevant
> and then, after both of us failed to locate a signed copy of the
> schedule, I indicated that it was not relevant after all.  The
confusion
> originated from me.  All along, I was proceeding based on MY
> understanding that Schedule 18 was relevant.  It's only when I

3

, contacted
> the product team in question that it was confirmed to me that while they
> did consider using EMANATE for a while, the eventually decided not to
> use the technology.  In hindsight, I should have gone to them in the
> first place. :(
>
> Pierre
>
> -----Original Message-----
> From: Jeff Case [mailto:case@private.snmp.com]
> Sent: Tuesday, May 25, 2010 7:30 PM
> To: Tremblay, Pierre (CAR:0700)
> Subject: RE: Genband - SNMP RI Accession Agreement
>
>
> hi pierre:
>
> thank you for your note
>
> i will look forward to receiving the materials you reference
> so that we can discuss next steps
>
> relatedly, in the analysis of the snmp IP, did schedule 18 get
> a re-look? (i am not familiar with what a VOB is)  if there are
> any issues with schedule 18, as i suspect there probably are,
> we should discuss those at the same time as the other issues
>
> thanks again for the update
>
> best,
> jdc
>
>
>
>
> On Tue, 25 May 2010, Pierre Tremblay wrote:
>
>> Hello Jeff.  Sorry for taking this long to get back to you.  Your
> email
>> generated a LOT of discussion both at, and between Nortel and
Genband.
>> Since the beginning of the stalking horse process, Genband have made
> it
>> very clear that they had absolutely no interest in inheriting any of
>> Nortel's prior issues: they want to start with a completely clean
> slate.
>> Your email raised concerns on their side as to whether Nortel had
> clean
>> title to your technology and the issue was escalated to the CVAS
>> Director of Product Line Management who immediately instructed all
his
>> product leaders to go through their VOBs to confirm whether or not
> they
>> were using your Intellectual Property.  Below is a summary of the
>> findings of this thorough analysis:
>>

4

>> Schedule 19 - The MG9000 still uses Emanate Lite.  According to our
>> records, Nortel never paid royalties for this use.  Nortel will
> provide
>> you a report of all the prior shipments that were missed along with a
>> calculation of the amount owed.
>>
>> Schedule 27 - CICM still uses Emanate.  Nortel has been reporting and
>> paying royalties for this product.
>>
>> Schedule 29 - GWC still uses Emanate.  This schedule includes a
> royalty
>> buy-out so no shipment reports were required.  Note that John
> Southwood
>> and I both erroneously concluded that this schedule was no longer
>> required.
>>
>> Once the above findings were shared with Genband, they indicated that
>> they were not comfortable with the LOA approach and instead, they
will
>> be engaging SNMP RI directly to negotiate their own license for the
>> above products, to be effective on the divestiture closing date.  You
>> can expect to be contacted by them shortly.  Meanwhile, Nortel will
> work
>> with you to rectify its non-compliance.
>>
>> Pierre
>>
>> -----Original Message-----
>> From: Jeff Case [mailto:case@private.snmp.com]
>> Sent: Thursday, May 13, 2010 5:19 PM
>> To: Tremblay, Pierre (CAR:0700)
>> Subject: RE: Genband - SNMP RI Accession Agreement
>>
>>
>> Pierre
>>
>> this should not shock you in the least ... the contents of
>> the document are the direct result of actions taken
>>
>> based on prior practice, Nortel was well aware that Nortel is
>> expected to offset our administrative and legal costs
>>
>> the costs we are passing on to GENBAND are higher than the
>> costs to Ciena because our costs are higher for GENBAND than
>> they were for Ciena
>>
>> our administrative and legal costs have been significant as a
>> result of a wild goose chase initiated by Nortel's
>> unsubstantiated assertions that Nortel had a valid license
>> to use the software licensed in schedule 18a, when, in fact,
>> Nortel does not have such a license
>>
>> as a result of multiple, repeated, but unsuccessful attempts to
>> move nortel off of its position that it had and was using such
>> a license, our firm incurred significant expenses, both internally,
>> and with outside counsel
>>

```
>> we had no less than 8 staff members researching the missing
>> schedule 18 including trips to another building to access
>> documents in deep archival storage
>>
>> based on what we found, we are not entirely convinced that
>> the engineering teams for the dms-10 never developed using
>> our emanate/lite product and tools ... contemporaneous emails
>> might lead to a different conclusion
>>
>> some of the language in our proposal was added because
>> of lessons learned by breaches of prior accession
>> agreements ... i am not comfortable naming names
>> but nortel should not expect us to continue to agree
>> to accession agreement terms that have been routinely
>> breached in prior accession agreements ... rather,
>> nortel should expect that we would tighten the
>> language based on those lessons learned instead
>> of repeating past failures
>>
>> for example, what should we do when one accession
>> agreement was signed last year, with net 45 day terms,
>> but the rights granted didn't start until payment was
>> received by us, and we still have not received that
>> payment?
>>
>> if the acquiror didn't have the right to receive our
>> intellectual property without making payment, did
>> nortel have the right to disclose it to the acquiror?
>> are you sure that nortel is fully in compliance with
>> all of its license obligations?
>>
>> based on lessons learned about non-payment, and rights
>> being used in the absense of payment, the contract
>> language was tightened accordingly
>>
>> further, we presently suspect that nortel has sent our
>> portions of snmp research intellectual property to third
>> parties without a proper license to disclose it and while
>> those sins of the past are outside the present conversation,
>> we would be foolish to let it happen again, hence the
>> contract language is tightened accordingly
>>
>> so far, we have not gotten the required sales tax
>> forms ... and while those sins of the past are outside
>> the present conversation, we would be foolish to let it
>> happen again, and learning from that lesson, that portion
>> of the contract language was tightened accordingly
>>
>> you still think i'm just paranoid?
>>
>> i don't want to argue with you, i don't want to debate
>> you ... this is not a negotiation
>>
>> i've told you what we are willing to do
>>
>> it is NOT over the top
>>
```

6

>> i received a pager message while typing this that you wish
>> to speak this evening but i am unable to do so because i
>> have two appointments this evening
>>
>> i welcome your thoughts on the above
>>
>>
>> regards,
>> jdc
>>
>>
>> On Thu, 13 May 2010, Pierre Tremblay wrote:
>>
>>> Jeff, I must admit that I am in a complete state of shock.  Out of
>>> respect for the limited legal resources that you have, I made sure
>> that
>>> the language in the Accession Agreement was perfectly in line with
> the
>>> language you approved for Ciena yet I see that numerous paragraphs
>> were
>>> added. Not only that but the Administration fees that are being
>> charged
>>> to Genband are significantly higher than those you charged them.
How
>>> can it be that the Genband divestiture, with the benefits of all the
>>> prior divestitures, ends up being charged more?  All the language
>> added
>>> in the agreement seems to originate from an extreme paranoia about
>>> license non-compliance.  I can assure you that we are fully
compliant
>>> with our license obligations.  The requirement to hire a 3rd party
to
>>> perform a scan of all the materials received from Nortel is
> completely
>>> over the top.  Clearly something major has happened that I am not
>> aware
>>> of.  When can I call you to discuss all this?
>>>
>>> Pierre
>>> -----Original Message-----
>>> From: Jeff Case [mailto:case@private.snmp.com]
>>> Sent: Thursday, May 13, 2010 4:02 PM
>>> To: Tremblay, Pierre (CAR:0700)
>>> Subject: RE: Genband - SNMP RI Accession Agreement
>>>
>>>
>>> Pierre:
>>>
>>> please find, in the attachments, 2 documents, one "clean" and one
>>> indicating changes from the version you sent named
>>>     GENBAND_SNMP_ACCESSION (approved by Genband).docx
>>>
>>> these documents indicate what we are willing to do at this time
>>>
>>> this constitutes an offer which is good until the lesser of 5 days
>> from
>>> today, or until withdrawn, replaced, and superseded by a new offer

7

```
' >>>
>>> please let me know if you have any difficulty receiving, opening, or
>>> reading these documents
>>>
>>> best,
>>> jdc
>>>
>>>
>>> On Wed, 12 May 2010, Pierre Tremblay wrote:
>>>
>>>> Hello Jeff, any progress on this?
>>>>
>>>> Pierre
>>>>
>>>> -----Original Message-----
>>>> From: Jeff Case [mailto:case@private.snmp.com]
>>>> Sent: Thursday, May 06, 2010 10:56 AM
>>>> To: Tremblay, Pierre (CAR:0700)
>>>> Subject: RE: Genband - SNMP RI Accession Agreement
>>>>
>>>>
>>>> pierre
>>>>
>>>> i have a query out to external counsels to determine how much of a
>>>> balance has accrued with them with respect to this matter so that i
>>> can add that to our internal adminstrative costs and can calculate
a
>>>> fair, reasonable, and appropriate administrative fee
>>>>
>>>> i expect that i will probably have something for you by no later
> than
>>>> early next week, perhaps yet today, but i do not know their
> calendars
>>>> and they may be away from their offices
>>>>
>>>> best,
>>>> jdc
>>>>
>>>>
>>>>
>>>>
>>>> On Thu, 6 May 2010, Pierre Tremblay wrote:
>>>>
>>>>> Hello Jeff!  When can I expect to receive a new version of the
>> Letter
>>>> of
>>>>> Accession?
>>>>>
>>>>> Pierre
>>>>>
>>>>> -----Original Message-----
>>>>> From: Tremblay, Pierre (CAR:0700)
>>>>> Sent: Tuesday, May 04, 2010 10:58 AM
>>>>> To: 'Jeff Case'
>>>>> Subject: RE: Genband - SNMP RI Accession Agreement
>>>>>
>>>>> Your records are definitely better than ours!  :)  I went back to
```

8

```
    th
 >> the
 >>>
 >>>>> product team and asked them to confirm whether or not they were
 >> using
 >>>
 >>>>> Emanate.  It turns out that only Schedule 27 applies to CVAS.  The
 >>>>> DMS-10 never went ahead with Emanate and as a result, schedule 18
 >> was
 >>>
 >>>>> never executed (which explains a lot).  You had a couple of small
 >>>>> changes that you wanted to make to the Letter of Accession.  Would
 >>>>> you please send those to me (along with the removal of Schedule 18
 >>>>> and the administration fee)?  I'll have a quick look at it and
 >>>>> hopefully we
 >>>> are
 >>>>> ready to sign.
 >>>>>
 >>>>> Pierre
 >>>>>
 >>>>> -----Original Message-----
 >>>>> From: Jeff Case [mailto:case@private.snmp.com]
 >>>>> Sent: Wednesday, April 28, 2010 6:47 PM
 >>>>> To: Tremblay, Pierre (CAR:0700)
 >>>>> Subject: RE: Genband - SNMP RI Accession Agreement
 >>>>>
 >>>>>
 >>>>> hi pierre
 >>>>>
 >>>>> i asked our accounting department to look up the invoice
 referenced
 >>>>> in your last mail gram ... it was not for our agent software
 > product
 >>>>> for your DMS 100 EMS product project on the Chorus embedded
 >> operating
 >>>> system
 >>>>> like Sch 18; rather, it was a partial payment for royalties for
 our
 >>>> ARL
 >>>>> software on four open operating systems originally licensed to Bay
 >>>>> Networks before they were acquired by Nortel ... (i have attached
 a
 >>>> copy
 >>>>> for your convenience)
 >>>>>
 >>>>> if you have any other documentation, we are happy to look at it
 ...
 >>>> but
 >>>>> i will also tell you that we have been researching schedule 18
 >>>> carefully
 >>>>> from our end, and we are now confident that nortel never purchased
 > a
 >>>>> license under schedule 18
 >>>>>
 >>>>> going back to my earlier question, what has nortel been doing with
 >>>>> the schedule 18 technology?  i can't make an informed decision
 > about
 >>>>> the accession agreement unless i know that
```

9

```
 >>>>>
 >>>>> please advise, thanks in advance
 >>>>>
 >>>>> best,
 >>>>> jdc
 >>>>>
 >>>>>
 >>>>>
 >>>>> On Wed, 28 Apr 2010, Pierre Tremblay wrote:
 >>>>>
 >>>>>> Jeff, our PO records don't go far enough to locate the subject
 PO.
 >>>>>> I asked our Accounts Payable team to see if they could dig out
 all
 >>>>>> the payments we made to SNMP RI in the 1999-2000 timeframe.  They
 >>>>>> don't have
 >>>>>> 1999 data, but they were able to produce the 2000 data.  Below is
 >>>>>> one line item from this report which I hope relates to this
 >> buy-out.
 >>>
 >>>>>> Let me know what you think.
 >>>>>>
 >>>>>>
 >>>>>>
 >>>>>> reqno
 >>>>>>
 >>>>>> reqline
 >>>>>>
 >>>>>> ponumber
 >>>>>>
 >>>>>> lot_no
 >>>>>>
 >>>>>> lot_status
 >>>>>>
 >>>>>> lot_desc
 >>>>>>
 >>>>>> lot_desc2
 >>>>>>
 >>>>>> qty_to_order
 >>>>>>
 >>>>>> received_qty
 >>>>>>
 >>>>>> received_cost
 >>>>>>
 >>>>>> invoice_cost
 >>>>>>
 >>>>>> po_cost
 >>>>>>
 >>>>>> po_unit_cost
 >>>>>>
 >>>>>> commodity_code
 >>>>>>
 >>>>>> ship_on_date
 >>>>>>
 >>>>>> current_dock_date
 >>>>>>
 >>>>>> family_code
```

```
>>>>>>
>>>>>> super_family_code
>>>>>>
>>>>>> date_received
>>>>>>
>>>>>> rec_indicator
>>>>>>
>>>>>> part_no
>>>>>>
>>>>>> lot_desc3
>>>>>>
>>>>>> lot_desc4
>>>>>>
>>>>>> lot_desc5
>>>>>>
>>>>>> stock_no
>>>>>>
>>>>>> position group
>>>>>>
>>>>>> term_start_date
>>>>>>
>>>>>> term_end_date
>>>>>>
>>>>>> capital_flag
>>>>>>
>>>>>> mand_close_date
>>>>>>
>>>>>> term_confirm_date
>>>>>>
>>>>>> 1102332
>>>>>>
>>>>>> 01
>>>>>>
>>>>>> 008101228
>>>>>>
>>>>>> 1
>>>>>>
>>>>>> CLOSED
>>>>>>
>>>>>> ROYALTY BUYOUT PAYMENT  PER SNMP RESEARCH
>>>>>>
>>>>>> CONTRACT.  Ref: Invoice #0002RO042
>>>>>>
>>>>>> 1
>>>>>>
>>>>>> 1
>>>>>>
>>>>>> 22,624.00
>>>>>>
>>>>>> 22,624.00
>>>>>>
>>>>>> 22,624.00
>>>>>>
>>>>>> 22,624.00
>>>>>>
>>>>>> SOIA
>>>>>>
```

```
        ..
 ' >>>>>>
   >>>>>>
   >>>>>>
   >>>>>>
   >>>>>> SOIA
   >>>>>>
   >>>>>> SO
   >>>>>>
   >>>>>>
   >>>>>>
   >>>>>> N
   >>>>>>
   >>>>>>
   >>>>>>
   >>>>>>
   >>>>>>
   >>>>>>
   >>>>>>
   >>>>>>
   >>>>>>
   >>>>>>
   >>>>>>
   >>>>>> 0
   >>>>>>
   >>>>>> 2/10/2000
   >>>>>>
   >>>>>> 2/10/2000
   >>>>>>
   >>>>>> N
   >>>>>>
   >>>>>> 8/10/2001
   >>>>>>
   >>>>>> 2/14/2000
   >>>>>>
   >>>>>>
   >>>>>>
   >>>>>>
   >>>>>>
   >>>>>> Pierre
   >>>>>>
   >>>>>>
   >>>>>>
   >>>>>> -----Original Message-----
   >>>>>> From: Tremblay, Pierre (CAR:0700)
   >>>>>> Sent: Wednesday, April 28, 2010 8:48 AM
   >>>>>> To: 'Jeff Case'
   >>>>>> Subject: RE: Genband - SNMP RI Accession Agreement
   >>>>>>
   >>>>>>
   >>>>>>
   >>>>>> Yikes, this is a fairly old agreement and we have changed our
   >>>>>> purchasing system since then.  I will see what I can dig up.
   >>>>>> Meanwhile, I can tell you that we have been paying the royalties
 > on
   >>>>>> schedule 27 which is the only royalty-bearing CVAS schedule (all
  >> the
   >>>
```

```
' >>>>>> others being covered by a buy-out).
  >>>>>>
  >>>>>>
  >>>>>>
  >>>>>> Pierre
  >>>>>>
  >>>>>>
  >>>>>>
  >>>>>> -----Original Message-----
  >>>>>>
  >>>>>> From: Jeff Case [mailto:case@private.snmp.com]
  >>>>>>
  >>>>>> Sent: Tuesday, April 27, 2010 4:37 PM
  >>>>>>
  >>>>>> To: Tremblay, Pierre (CAR:0700)
  >>>>>>
  >>>>>> Subject: RE: Genband - SNMP RI Accession Agreement
  >>>>>>
  >>>>>>
  >>>>>>
  >>>>>>
  >>>>>>
  >>>>>> hi again pierre
  >>>>>>
  >>>>>>
  >>>>>>
  >>>>>> my staff and i did some more digging after my last mailgram and
  we
  >>>>> were
  >>>>>>
  >>>>>> unable to find any indication that nortel ever signed or paid for
  >>>>>>
  >>>>>> schedule 18 ... if you have either a signed copy of the schedule
  > or
  >>>>>>
  >>>>>> a proof of payment, i am hoping you will send them along so that
  > we
  >>>>>>
  >>>>>> can put this to rest
  >>>>>>
  >>>>>>
  >>>>>>
  >>>>>> if nortel does not have a signed copy or proof of payment, then i
  >> am
  >>>
  >>>>>> going
  >>>>>>
  >>>>>> to need some more information from you about what nortel has been
  >>>>>> doing
  >>>>>>
  >>>>>> with the schedule 18 technology so that i can make a decision
  > about
  >>>>>> how
  >>>>>>
  >>>>>> to proceed with the draft accession agreement ... not
  > surprisingly,
  >>>>>> i have
```

13

```
' >>>>>>
>>>>>> a problem with letting nortel "lend" genband rights that nortel
> did
>>>>>> not
>>>>>>
>>>>>> pay for, especially if i don't know what nortel has been doing
> with
>>>>>> those
>>>>>>
>>>>>> rights
>>>>>>
>>>>>>
>>>>>>
>>>>>> please advise, thanks in advance
>>>>>>
>>>>>>
>>>>>>
>>>>>> best,
>>>>>>
>>>>>> jdc
>>>>>>
>>>>>>
>>>>>>
>>>>>>
>>>>>>
>>>>>>
>>>>>>
>>>>>> On Tue, 20 Apr 2010, Pierre Tremblay wrote:
>>>>>>
>>>>>>
>>>>>>
>>>>>>> Jeff, are you waiting for additional information from me?  I
want
>>>>>>> to
>>>>>>
>>>>>>> make I don't end up delaying progress without realizing it.
>>>>>>
>>>>>>>
>>>>>>
>>>>>>> Pierre
>>>>>>
>>>>>>>
>>>>>>
>>>>>>> -----Original Message-----
>>>>>>
>>>>>>> From: Tremblay, Pierre (CAR:0700)
>>>>>>
>>>>>>> Sent: Friday, April 16, 2010 12:43 PM
>>>>>>
>>>>>>> To: 'Jeff Case'
>>>>>>
>>>>>>> Subject: RE: Genband - SNMP RI Accession Agreement
>>>>>>
>>>>>>>
>>>>>>
>>>>>>> Jeff, unfortunately what I sent you is all I was able to locate.
>>>>>>> We
```

```
>>>>>>
>>>>>>> have been operating under the Schedule 18A that I sent you for
>>>> years.
>>>>>>
>>>>>>> When I first took over the SNMP RI file 9 years ago, I went
>> through
>>>>>>> all
>>>>>>
>>>>>>> the schedules with John to figure out which ones were still
> active
>>>>>>> and
>>>>>>
>>>>>>> which ones were not.  Schedule 18A was identified as a buy-out.
>>>>>>> The
>>>>>>
>>>>>>> other two Chorus-related schedules are for products that never
> saw
>>>>>>> the
>>>>>>
>>>>>>> light of day (Terabit interceptor and project blue).
>>>>>>
>>>>>>>
>>>>>>
>>>>>>> Pierre
>>>>>>
>>>>>>>
>>>>>>
>>>>>>> -----Original Message-----
>>>>>>
>>>>>>> From: Jeff Case [mailto:case@private.snmp.com]
>>>>>>
>>>>>>> Sent: Friday, April 16, 2010 12:05 PM
>>>>>>
>>>>>>> To: Tremblay, Pierre (CAR:0700)
>>>>>>
>>>>>>> Subject: RE: Genband - SNMP RI Accession Agreement
>>>>>>
>>>>>>>
>>>>>>
>>>>>>>
>>>>>>
>>>>>>> hi again
>>>>>>
>>>>>>>
>>>>>>
>>>>>>> thanks for the copy of schedule 18 ... it looks like my copy of
a
>>>>>>
>>>>>>> document we sent to nortel for signature ... i was hoping you
>> could
>>>>>>
>>>>>>> send me a *_signed_* copy of schedule 18 ... i cannot find one
>>>>>>
>>>>>>>
>>>>>>
>>>>>>> here is my dilemma with respect to schedule 18 ... i can see in
>> our
```

```
 >>>>>>
>>>>>>> records where our john southwood sent your colleague, dave
> hyslop,
>>>>>>
>>>>>>> three different versions of schedule 18a, one on november 29,
> 1999
>>>>>>
>>>>>>> which called for per-copy royalties, an updated version sent on
>>>>>>
>>>>>>> december 7, 1999, and another on december 20, 1999 which
included
>>>>>>
>>>>>>> a royalty buy-out ... i believe there were for your internal
>>>>>>
>>>>>>> customers Dave Shipe and Bill Greene
>>>>>>
>>>>>>
>>>>>>
>>>>>>> hyslop was going to check with them to see what they wanted
>>>>>>
>>>>>>
>>>>>>
>>>>>>> however, so far, and i am still looking, i cannot find where
>> nortel
>>>>>>
>>>>>>> ever signed and returned either the per copy royalty schedule 18
>> or
>>>>>> the
>>>>>>
>>>>>>> paid-up royalty schedule 18 and i have not yet found where
nortel
>>>>>>> paid
>>>>>>
>>>>>>> for either one ... if i can find the payment, then, since the
>>>> amounts
>>>>>>
>>>>>>> were different, that could/would tell us which one is in place
>>>>>>
>>>>>>
>>>>>>
>>>>>>> at present, it looks like neither is in place
>>>>>>
>>>>>>
>>>>>>
>>>>>>> it appears that the first Nortel purchase for a chorus product
> was
>>>>>>
>>>>>>> later the following year (april 10, 2000), via schedule 25, for
>>>>>>
>>>>>>> "project blue or OPC" which called for per-copy royalties until
>>>>>>
>>>>>>> it was suspended/terminated/discontinued on or about july 11,
> 2002
>>>>>>
>>>>>>
>>>>>>
>>>>>>> and it appears that the second Nortel purchase for a chorus
```

16

```
>>>>>>
>>>>>>> product was via schedule 46 for terabit intercepter april 12,
> 2001
>>>>>>
>>>>>>> which called for per-copy royalties until the project was
> canceled
>>>>>>
>>>>>>> and schedule 46 was suspended on 4/17/2003
>>>>>>
>>>>>>>
>>>>>>
>>>>>>> so far, i can't find where nortel has any active license rights
>>>>>>
>>>>>>> to our products on chorus that could be "loaned" to genband via
>>>>>>
>>>>>>> an accession agreement for their use during the transition
period
>>>>>>
>>>>>>>
>>>>>>
>>>>>>>
>>>>>>
>>>>>>> ... still looking ...
>>>>>>
>>>>>>>
>>>>>>
>>>>>>> please let me know if you find something and i'll do the same
>>>>>>
>>>>>>>
>>>>>>
>>>>>>> is there an anticipated closing date schedule?
>>>>>>
>>>>>>>
>>>>>>
>>>>>>> best,
>>>>>>
>>>>>>> jdc
>>>>>>
>>>>>>>
>>>>>>
>>>>>>>
>>>>>>
>>>>>>>
>>>>>>
>>>>>>> On Fri, 16 Apr 2010, Pierre Tremblay wrote:
>>>>>>
>>>>>>>
>>>>>>
>>>>>>>> Hello Jeff. You are correct to assume that I would be OK with
>>>>>> cosmetic
>>>>>>
>>>>>>>> changes.  :)  As far as which schedule is appropriate, I must
>>>>>>>> admit
>>>>>>
>>>>>>> that
>>>>>>
>>>>>>>> it is not a trivial exercise.  People and product names have
```

17

```
  ''
' >>>> changed
  >>>>>>
  >>>>>>>> numerous times since the effective date of most of our
  schedules
  >>>>>> which
  >>>>>>
  >>>>>>>> makes it very difficult to pin down the right schedules.  For
  >> now,
  >>>> I
  >>>>>>
  >>>>>>>> am
  >>>>>>
  >>>>>>>> sending you a copy of Schedules 18 and 27.  I am also
  >>>>>>>> double-checking
  >>>>>>
  >>>>>>>> with R&D to make sure that I have captured all the relevant
  >>>>>> schedules.
  >>>>>>
  >>>>>>>> I'll let you know as soon as I have completed by research.
  > Sorry
  >>>>>>
  >>>>>> about
  >>>>>>
  >>>>>>>> that.
  >>>>>>
  >>>>>>>>
  >>>>>>
  >>>>>>>> Pierre
  >>>>>>
  >>>>>>>>
  >>>>>>
  >>>>>>>> -----Original Message-----
  >>>>>>
  >>>>>>>> From: Jeff Case [mailto:case@private.snmp.com]
  >>>>>>
  >>>>>>>> Sent: Thursday, April 15, 2010 6:02 PM
  >>>>>>
  >>>>>>>> To: Tremblay, Pierre (CAR:0700)
  >>>>>>
  >>>>>>>> Subject: Re: Genband - SNMP RI Accession Agreement
  >>>>>>
  >>>>>>>>
  >>>>>>
  >>>>>>>>
  >>>>>>
  >>>>>>>> greetings, yes, it has been a long time
  >>>>>>
  >>>>>>>>
  >>>>>>
  >>>>>>>> sorry for the delay in responding ... today is my first day
  >>>>>>
  >>>>>>>> in the office since you sent your note
  >>>>>>
  >>>>>>>>
  >>>>>>
  >>>>>>>> first, i think that your approach of using the ciena accession
  >>>>>>
```

18

```
>>>>>>>> agreement is a good one that will save both of us time and
>>>>>>
>>>>>>>> therefore money (thank you)
>>>>>>
>>>>>>>>
>>>>>>
>>>>>>>> i have gone through your document and it mostly looks good
>>>>>>
>>>>>>>>
>>>>>>
>>>>>>>> after using "accept changes" to remove the strikethroughs and
to
>>>> get
>>>>>>
>>>>>>>> a "clean" copy, some minor cosmetic things showed through that
>>>>>>
>>>>>>>> were not obvious before:
>>>>>>
>>>>>>>>
>>>>>>
>>>>>>>>        corrected the spelling in one instance of "GENDBAND" to
>>>>>>
>>>>>>>> "GENBAND"
>>>>>>
>>>>>>>>        removed some highlighting
>>>>>>
>>>>>>>>        trimmed a spurious leading blank in one field
>>>>>>
>>>>>>>>
>>>>>>
>>>>>>>> all cosmetic stuff that i have no doubt will be ok with you
>>>>>>
>>>>>>>>
>>>>>>
>>>>>>>>
>>>>>>
>>>>>>>>
>>>>>>
>>>>>>>> i do have one outstanding question ... i have been unable to
>>>>>>>> locate
>>>>>>
>>>>>>>> a copy of schedule 18 here, perhaps because nancy knowles, our
>>>>>>
>>>>>>>> office manager, is out this week, and perhaps i am not
>> competently
>>>>>>
>>>>>>>> looking in the right place(s)
>>>>>>
>>>>>>>>
>>>>>>
>>>>>>>> so far, i have not been able to find very much about it at all
> in
>>>>>>
>>>>>>>> either nancy's records or our accounting system
>>>>>>
>>>>>>>>
>>>>>>
```

19

>>>>>>> do you have a copy you could send to me as a .pdf rather than
my
>>>>>>
>>>>>>> waiting for nancy to return? (she returns early next week)
>>>>>>
>>>>>>>
>>>>>>
>>>>>>> thinking it might be a typo, i also looked for chorus-based
>>>> products
>>>>>>
>>>>>>> licensed to nortel and found
>>>>>>
>>>>>>>      schedule 25 dated 4/10/2000 but it was terminated 7/11/2002
>> and
>>>>>>
>>>>>>>      schedule 46 dated 4/2/2001 but it was terminated 4/17/2003
>>>>>>
>>>>>>>
>>>>>>
>>>>>>> accordingly, our records don't show nortel continuing to use
>>>>>>> chorus
>>>>>>
>>>>>>> at this point, so i am confused
>>>>>>
>>>>>>>
>>>>>>
>>>>>>> can you please straighten out my confusion?
>>>>>>
>>>>>>>
>>>>>>
>>>>>>> finally, what is the scheduled closing date?  that is, how much
>>>> time
>>>>>>
>>>>>>> do we have on this one?
>>>>>>
>>>>>>>
>>>>>>
>>>>>>> please advise, thanks in advance
>>>>>>
>>>>>>>
>>>>>>
>>>>>>> best,
>>>>>>
>>>>>>> jdc
>>>>>>
>>>>>>>
>>>>>>
>>>>>>>
>>>>>>
>>>>>>>
>>>>>>
>>>>>>>
>>>>>>
>>>>>>>
>>>>>>
>>>>>>>
>>>>>>
>>>>>>> On Wed, 7 Apr 2010, Pierre Tremblay wrote:
>>>>>>

```
>>>>>>>>
>>>>>>
>>>>>>>>> Hello Jeff, it has been a loooong time since we last talked to
>>>> each
>>>>>>
>>>>>>>>> other.  Much has happened since then, especially at Nortel!
> ;-)
>>>> I
>>>>>>
>>>>>>>> had
>>>>>>
>>>>>>>>> a good chat with Nancy Scott where she explained the heavy
>> burden
>>>>>>
>>>>>>> that
>>>>>>
>>>>>>>>> all the Nortel divestitures were placing on your company with
>> all the
>>>>>> the
>>>>>>
>>>>>>>>> Accession Agreements.  In order to minimize the amount of work
>> on
>>>>>>
>>>>>>> your
>>>>>>
>>>>>>>>> end, I convinced Genband to use the Ciena Accession Agreement
> as
>>>>>>>>> a
>>>>>>
>>>>>>>>> starting point and kept the changes required to a bare
minimum.
>>>>>>>>> The
>>>>>>
>>>>>>>>> enclosed Genband agreement was drafted using the Ciena final
>>>>>>
>>>>>>> Accession
>>>>>>
>>>>>>>>> Agreement as a starting point. I used Track Changes so that
you
>>>>>> could
>>>>>>
>>>>>>>>> easily spot the changes.  The great majority of changes are
> just
>>>>>>
>>>>>>>>> substitutions from Ciena to Genband.  There is only one
> material
>>>>>>
>>>>>>> change
>>>>>>
>>>>>>>>> to the Ciena language. In the Ciena agreement, the Accession
>>>>>>
>>>>>>> Agreement
>>>>>>
>>>>>>>>> becomes effective upon the issuance of a PO by Genband under
> the
>>>>>>
>>>>>>> Nortel
```

21

```
>>>>>>
>>>>>>>>> agreement, and this, in our opinion, does not work for Day 1.
>>>>>>>>> For
>>>>>>
>>>>>>>>> Genband, we have changed the language such that the Effective
>>>>>>>>> Date
>>>>>> is
>>>>>>
>>>>>>>>> the closing date of the divestiture.  That way, Genband will
be
>>>>>>
>>>>>>>> entitled
>>>>>>
>>>>>>>>> to continue to embed Emanate on Day 1 under the Nortel
> agreement
>>>>>>>>> (it
>>>>>>
>>>>>>>> is
>>>>>>
>>>>>>>>> very likely that Genband would operate for a while before a PO
>> is
>>>>>>
>>>>>>>> issued
>>>>>>
>>>>>>>>> by them to Genband).  I would be more than happy to discuss
the
>>>>>> logic
>>>>>>
>>>>>>>>> behind this change.  Just let me know what is the next step
you
>>>>>>>>> want
>>>>>>
>>>>>>>> to
>>>>>>
>>>>>>>>> take.
>>>>>>
>>>>>>>>>
>>>>>>
>>>>>>>>> P.S.  I also replaced the administrative fee with ???, hoping
>>>>>>>>> that
>>>>>>
>>>>>>>> given
>>>>>>
>>>>>>>>> the very limited number of changes Genband requested, the fee
>>>>>>>>> will
>>>>>> be
>>>>>>
>>>>>>>>> much lower.  :-)
>>>>>>
>>>>>>>>> <<GENBAND_SNMP_Accession (approved by Genband).docx>>
>>>>>>
>>>>>>>>> Pierre Tremblay
>>>>>>
>>>>>>>>> Supplier Relationship Manager
>>>>>>
>>>>>>>>> Nortel
>>>>>>
```

```
>>>>>>>>> 613-763-1332
>>>>>>
>>>>>>>>>
>>>>>>
>>>>>>>>>
>>>>>>
>>>>>>>>>
>>>>>>
>>>>>>>>
>>>>>>
>>>>>>>
>>>>>>
>>>>>>
>>>>>
>>>>
>>>
>>
>
```

**ELECTRONIC MAIL # 2**

**From:** Baiju Dalal [mailto:dalal@nortel.com]
**Sent:** Wednesday, August 04, 2010 7:18 AM
**To:** John L. Wood
**Subject:** FW: Background info on missed SNMP RI royalties

John:

Please find the report from Pierre as requested.


Regards,
Baiju Dalal
**Leader: OEM Direct Procurement**
Nortel Business Services
Email: dalal@nortel.com
Office: (972) 684 0354 ESN: 444 0354
Fax:    (972) 684 0322 ESN: 444 0322
Mobile (India): +91 9821048481



**From:** Tremblay, Pierre (CAR:0700) [mailto:IMCEAEX-
_O=NORTEL_OU=AMERICASM01_CN=RECIPIENTS_CN=EXCHANGE_CN=0532936@genband.com]
**Sent:** Friday, May 28, 2010 7:32 PM
**To:** Dalal, Baiju (PGP:4155)
**Subject:** Background info on missed SNMP RI royalties

1

Baiju, below is the shipment data that was NEVER reported to SNMP RI. These shipments fall under schedule #19 and the per-unit royalty is $3.00. Of course, most of it is stayed. If you have any questions on this, please don't hesitate to contact me.

Pierre

**From:** Gaiser, Tim (CAR:4435)
**Sent:** May 18, 2010 4:51 PM
**To:** Rossi, Kevin (CAR:KR00); Briggs, Chris (CAR:4435)
**Cc:** Skillman, Robert (GWRTP:2245); Humphreys, Anthony (GWRTP:2752)
**Subject:** RE: License Requirement for Emanate Tool

The Emanate software was used on the following cards, which were shipped at the following quantities over the years:

| PEC | Desc | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|
| NTNY45AA | NTNY45AA ATM CONTROLLER | 113 | 340 | 745 | 210 | 133 | 32 | |
| NTNY45BA | NTNY45BA UE-MG DS1-IMA CON | 20 | 80 | 169 | 102 | 68 | 1 | 3 |
| NTNY45CA | NTNY45CA OC-3 IR STS-3C/ST | | | 120 | 408 | 157 | 137 | 14 |
| NTNY45FA | NTNY45FA GIGE ATM CONTROLL | | | | 102 | 190 | 127 | 88 |
| Grand Total | | 133 | 420 | 1034 | 822 | 548 | 297 | 105 |

But I noticed that the software is licensed per system (which I assume to mean MG9K system), so we'll have to map this to systems. Bob is going to drill down to that level of detail.

The forecast for the same cards over the next 12 months is 10 for the GigE card, although the 10 figure is suspect. This maps to 40 frames.

Regards,
    Tim

**From:** Rossi, Kevin (CAR:KR00)
**Sent:** May 18, 2010 2:44 PM
**To:** Briggs, Chris (CAR:4435); Gaiser, Tim (CAR:4435)
**Subject:** FW: License Requirement for Emanate Tool

Regards,

*Kevin Rossi*
**Carrier VoIP and Applications Solutions**
**Director, Softswitch Product Line Management**
**ESN 395 x5205  (613-765-5205)**
**Cell 613-795-9247**
**krossi@nortel.com**

**From:** Tremblay, Pierre (CAR:0700)
**Sent:** Monday, May 17, 2010 5:26 PM
**To:** Murray, Michael (GWRTP:3Z00); Rossi, Kevin (CAR:KR00); Alfan, Ersan NETAS (NORTELTR:NTTR:T0611)
**Cc:** Brownridge, Glen (CAR:4435)
**Subject:** License Requirement for Emanate Tool

Enclosed are two more SNMP RI schedules which might cover the MG9000. Do any of them seem to relate to MG9000's use of SNMP RI software?

Pierre

**From:** Alfan, Ersan NETAS (NORTELTR:NTTR:T0611)
**Sent:** Monday, May 17, 2010 11:04 AM
**To:** Alfan, Ersan NETAS (NORTELTR:NTTR:T0611); Humphreys, Anthony (GWRTP:2752)
**Cc:** Durucasugil, Riza NETAS (NORTELTR:NTTR:T06); Mcmillan, Vadi (GWRTP:2752); Evans, Chuck (GWRTP:4435);
Gaiser, Tim (CAR:4435); Brownridge, Glen (CAR:4435); Gulsev Nurhan KARABIYIK; Gopalakrishna, Manjunatha WIPRO
(External:WBNG:WT45); Ali TASKIRAN; Lyon, Joyce (GWRTP:2752); Alfan, Ersan NETAS (NORTELTR:NTTR:T0611)
**Subject:** RE: License Requirement for Emanate Tool

Hi,

For Enamate tool, when we checked briefly SNMP codes, we saw highly integrated in to the SNMP codes
but there are some codes that can enable or disable these Emanate tools.

We need to test these codes after it is disabled. If all SNMP functions work fine after Emanate is disabled
then we can remove emanate tool.

We need to check deeply to determine the impacts of SNMP connections.


Regards,


**Ersan Alfan**
**Nortel Networks Netas**
**MG9000 Manager Architect**

**Tel : +90 216 522 2161 / ESN : 882 2161**
**SIP: ealfan@techtrial.com**
**Yahoo IM : ersanalfan**


**From:** Ersan ALFAN
**Sent:** Monday, May 17, 2010 11:37 AM
**To:** Anthony Humphreys-JD30
**Cc:** Riza Durucasugil; Vadi Mcmillan-2752; Chuck Evans; Tim Gaiser-4435; Glen Brownridge-4435; Gulsev Nurhan
KARABIYIK; Manjunatha Gopalakrishna-WT45; Ali TASKIRAN; Ersan ALFAN
**Subject:** RE: License Requirement for Emanate Tool

Hi,

Both tools are required for MG9K software.

a) Emanate Tool

    This tool is serving API functions for SNMP connections. MG9K uses SNMP connections to communicate
with MG9KEM software.

b) Emweb (Embedded Web server)

3

This 3rd party software serves API functions to form a web server on MG9K DCC cards. This software enables LCI functionality of MG9K.


Regards,

**Ersan Alfan**
**Nortel Networks Netas**
**MG9000 Manager Architect**

**Tel : +90 216 522 2161 / ESN : 882 2161**
**SIP: ealfan@techtrial.com**
**Yahoo IM : ersanalfan**

---

**From:** Anthony Humphreys [mailto:cnc430@nortel.com]
**Sent:** Monday, May 17, 2010 3:53 AM
**To:** Ersan ALFAN; Manjunatha Gopalakrishna-WT45; Gulsev Nurhan KARABIYIK
**Cc:** Riza Durucasugil; Vadi Mcmillan-2752; Chuck Evans; Tim Gaiser-4435; Glen Brownridge-4435
**Subject:** License Requirement for Emanate Tool

Ersan,

   We need to determine if the MG9K design guys in Istanbul or the MG9K EM design guys are currently using the Emanate tool and whether this tool is required to support the MG9K product. I need everyone to respond by COB Monday May 17th in order to evaluate any license requirement that we will have going forward.

   Also it appears that we have another 3rd party software in the mMG9K. It appears that we have software from Virata  used in the MG9K load as I see it listed in the "/clearcase/VOBS/MG5000/Common/3rdParty/EmWeb"  directory and also see a license reference as follows:

/clearcase/VOBS/MG5000/Common/Tools/Setup

 more emweb_license.dat

# Pick up emweb license from RTP

SERVER znc0s0nu 80a9b85c 7274

SERVER znc0s0nw 80b020b0 7274

SERVER znc0s0nx 80a7c68e 7274

FEATURE EmWeb agranat 1.0 permanent uncounted XXXXXXXXXXXX HOSTID=ANY ck=149

I am assuming that we also need to determine if we need license for EmWeb application as well as the Emanate software. If we do not believe that the Emanate software is needed then do we need to remove it from our software builds?

Thanks for your assistance,

Tony Humphreys

MG9K GPS Lead Engineer

738

# EXHIBIT 3

EXHIBIT B

**From:** Roy, J Weldon (Weldon)
**Sent:** Thursday, April 14, 2011 11:52 AM
**To:** Marcus, Barry P. (Barry); Mead, John (John)
**Cc:** Cote, Michel (Michel); La-Anyane, Michael N (Nana); Ravi, Tilak (Tilak); Jeff Case
**Subject:** RE: Requst for help in order to complete the SNMP Product matrix report (BCM information broken out)

Hi Barry,

I have completed the spreadsheet for each of our Stackable (formally Baystack) products. Let me know if you have any questions. Note, I am not sure about who handles Royalty since we have never had to pay it for this s/w.

Weldon

**From:** Marcus, Barry P. (Barry)
**Sent:** Wednesday, April 13, 2011 8:36 AM
**To:** Mead, John (John)
**Cc:** Cote, Michel (Michel); Roy, J Weldon (Weldon); La-Anyane, Michael N (Nana); Ravi, Tilak (Tilak); Jeff Case
**Subject:** Re: Requst for help in order to complete the SNMP Product matrix report (BCM information broken out)
**Importance:** High

Hi John,

I am working with Jeff Case (SNMP – whom I copied on this e-mail) whom I believe you know and Jeff gives his regards.

Can you please help me complete the enclosed spread sheet for the Bay Network products (provided the products use SNMP software). I only captured the WLAN products in the spread sheet and we need your help adding the other Baystack (Bay Network - Synoptics) products to the list.

Please provide the requisite information so that we can complete all of the columns. This information will be used to help us create a new pricing schedule for our master agreement. The SNMP licenses were not assignable from Nortel to Avaya (FYI).

Thank you,

Barry Marcus
Avaya

1

740

(908) 953.5512

| Avaya Product Family | Avaya Product (Child Name) | Avaya Product Version | License Rights Required (i) Development, or (ii) Distribution or (iii) Development & Distribution | SNMP Product | SNMP Product Version | Development Operating System | Target Operating System | Target Micro-processor | Licensed Modules Development Location | Technical Contact or Product Manager | Royalty Contact |
|---|---|---|---|---|---|---|---|---|---|---|---|
| BCM | BCM50 | R1, R2, R3, R5, R6 (current shipping version) | iii | Emanate | 16.1.0.27 | Linux 32 bit | Linux 32 bit | PPC | Ottawa, ON Bangalore, India | Brian Egan | Rosemary Della |
| BCM | BCM450 | R1.0, R5.0, R6.0 (current shipping version) | iii | Emanate | 16.1.0.27 | Linux 32 bit | Linux 32 bit | PPC | Ottawa, ON Bangalore, India | Brian Egan | Rosemary Della |
| BCM | BCM200/400 | R4.0 (new systems EoS but upgrades still sold) | iii | Emanate | 16.1.0.42 | Linux 32 bit | Linux 32 bit | x86 | Ottawa, ON Bangalore, India | Brian Egan | Rosemary Della |
| MPS | MFS (500, 1000) same product just different scalability | 2.1 (EOL),3.0, 3.5 | iii | EMANATE | 17.1.0.12 | Windows, Solaris | Windows, Solaris | Sparc, X86 | Bohemia, NY | Roy Gulli | Rosemary Della |
| Baystack (? | Wireless WLAN 8800 | 8180 1.0 | iii | EMANATE Master Agent and Subagent Development Kit on Linux 2.6 | 17.1.0.15 | Linux | Linux, VxWorks | Power PC, MIPS | Banglore, India, Santa Clara, CA | Tilak Ravi | Rosemary Della |
| Stackable | ERS 2500 | R4.x | iii | Emanate Lite | 15.3.1.15 | Solaris, Linux | VxWorks | Power PC | Santa Clara, CA, Bucharest, Romania | John Mead | |
| Stackable | ERS 3500 | R5.x | iii | Emanate Lite | 15.3.1.15 | Solaris, Linux | VxWorks | Power PC | Santa Clara, CA, Bucharest, Romania | John Mead | |
| Stackable | ERS 4500/4800 | R5.x | iii | Emanate Lite | 15.3.1.15 | Solaris, Linux | VxWorks | Power PC | Santa Clara, CA, Bucharest, Romania | John Mead | |
| Stackable | ERS 55/5600/5800 | R5.X, R6.x | iii | Emanate Lite | 15.3.1.15 | Solaris, Linux | VxWorks | Power PC | Santa Clara, CA, Bucharest, Romania | John Mead | |
| Stackable | VSP 7000 | R10.x | iii | Emanate Lite | 15.3.1.15 | Solaris, Linux | VxWorks | Power PC | Santa Clara, CA, Bucharest, Romania | John Mead | |
| Stackable | ES 460/470 | R3.x | iii | Emanate Lite | 15.3.1.15 | Solaris, Linux | VxWorks | Power FC | Santa Clara, CA, Bucharest, Romania | John Mead | |
| MCP | Product was discontinued and never sold by Avaya | | | | | | | | | | |
| Alteon (sold to Radware- was never Avaya, SNMP should contact Nortel (need to remove from the Avaya list) | | | | | | | | | | | |

# EXHIBIT 4

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : | Case No. 09-10138 (KG) |
| Nortel Networks Inc., *et al.*, | : |  |
|  | : | Jointly Administered |
| Debtors. | : |  |
|  | : | Re: Docket No. 3832 |

## AFFIDAVIT OF JAMES REEVES IN SUPPORT OF
## SNMP RESEARCH INTERNATIONAL, INC.'S AMENDED PROOF OF CLAIM

The Affiant, James Reeves, being duly sworn in accordance with the law deposes and says as follows:

1.    My name is James Reeves.

2.    I am over the age of 18, have personal knowledge of the statements contained herein, and I am competent to testify to the matters stated in this affidavit.

3.    I am a citizen and resident of the State of California.

4.    From 1995 – 1998 I worked at Bay Networks and had responsibility for the BayStack product line among other product lines.

5.    Nortel acquired Bay Networks and as a result acquired the BayStack product line in 1998.

6.    From 1998 through 2004 I was an employee of Nortel Networks Inc. ("Nortel") and had titles during that period reflective of increasing responsibilities and corporate reorganizations. These titles included, among others: Engineering Director; Vice President, Technology & Product Development; and Vice President of Engineering for Data Networking.

7.    During my tenure at Nortel I managed the engineering organization responsible for development of the BayStack product line and other product lines within Nortel.

7317.2.537290

8.   The BayStack product line consisted of approximately 20 separate products in 2004.

9.   As of 2004, Nortel used and distributed software from SNMP Research International, Inc. with each product in the BayStack product line to enable the management of the product.

**FURTHER AFFIANT SAITH NOT.**

See Below for California Jurat Stamp

James Reeves, Affiant

STATE OF _____
COUNTY OF _____

Sworn and subscribed before me
this _____ day of _____, 2011.

_____
Notary Public

My Commission Expires: _____

**State of California        Contra Costa County**
**Subscribed and sworn to (or affirmed) before me**
**on this** 12 **day of** May **, 20** 11 **, by** _____
_____ James Reeves _____,
**proved to me on the basis of satisfactory evidence**
**to be the person(s) who appeared before me.**
**Notary** ___Patricia A. Rivera____ **(Seal)**



PATRICIA A. RIVERA
COMM. # 1793505
NOTARY PUBLIC - CALIFORNIA
CONTRA COSTA COUNTY
My Comm. Exp. Apr. 10, 2012

EXHIBIT 5

| Avaya Product Family | Avaya Product (Child Name) | SNMP Product | Development Operating System | Target Operating System | Target Microprocessor | Licensed Modules Development Location | Technical Contact or Product Manager | Royalty Contact | | Emanate | Emanate Lite | 2nd Cross Development Tools | 2nd Location | 2nd Location 2nd Cross Development Tools | RBO | RBO 2nd Operating System | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Baystack (n | Wireless WLAN 8800 | EMANATE Master Agent and Subagent Development Kit on Linux 2.6 | Linux | Linux, VxWorks | Power PC | Banglore, India, Santa Clara, CA | Tilak Ravi | Rosemary Delia | | 40,000 | - | - | 20,000 | - | 125,000 | | 185,000 | |
| Baystack (n | Wireless WLAN 8800 | EMANATE Master Agent and Subagent Development Kit on Linux 2.6 | Linux | Linux, VxWorks | MIPS | Banglore, India, Santa Clara, CA | Tilak Ravi | Rosemary Delia | | 36,000 | - | - | 18,000 | - | 125,000 | - | 179,000 | |
| Stackable | ERS 2500 | Emanate Lite | Solaris, Linux | VxWorks | Power PC | Santa Clara, CA, Bucharest, Romania | John Mead | | | - | 12,000 | 10,000 | 8,000 | 5,000 | 37,500 | 37,500 | 110,000 | |
| Stackable | ERS 3500 | Emanate Lite | Solaris, Linux | VxWorks | Power PC | Santa Clara, CA, Bucharest, Romania | John Mead | | | - | 12,000 | 10,000 | 8,000 | 5,000 | 37,500 | 37,500 | 110,000 | |
| Stackable | ERS 4500 | Emanate Lite | Solaris, Linux | VxWorks | Power PC | Santa Clara, CA, Bucharest, Romania | John Mead | | | - | 12,000 | 10,000 | 8,000 | 5,000 | 37,500 | 37,500 | 110,000 | |
| Stackable | ERS 4800 | Emanate Lite | Solaris, Linux | VxWorks | Power PC | Santa Clara, CA, Bucharest, Romania | John Mead | | | - | 12,000 | 10,000 | 8,000 | 5,000 | 37,500 | 37,500 | 110,000 | |
| Stackable | ERS 5500 | Emanate Lite | Solaris, Linux | VxWorks | Power PC | Santa Clara, CA, Bucharest, Romania | John Mead | | | - | 12,000 | 10,000 | 8,000 | 5,000 | 37,500 | 37,500 | 110,000 | |
| Stackable | ERS 5600 | Emanate Lite | Solaris, Linux | VxWorks | Power PC | Santa Clara, CA, Bucharest, Romania | John Mead | | | - | 12,000 | 10,000 | 8,000 | 5,000 | 37,500 | 37,500 | 110,000 | |
| Stackable | ERS 5800 | Emanate Lite | Solaris, Linux | VxWorks | Power PC | Santa Clara, CA, Bucharest, Romania | John Mead | | | - | 12,000 | 10,000 | 8,000 | 5,000 | 37,500 | 37,500 | 110,000 | |
| Stackable | VSP 7000 | Emanate Lite | Solaris, Linux | VxWorks | Power PC | Santa Clara, CA, Bucharest, Romania | John Mead | | | - | 12,000 | 10,000 | 8,000 | 5,000 | 37,500 | 37,500 | 110,000 | |
| Stackable | ES 460 | Emanate Lite | Solaris, Linux | VxWorks | Power PC | Santa Clara, CA, Bucharest, Romania | John Mead | | | - | 12,000 | 10,000 | 8,000 | 5,000 | 37,500 | 37,500 | 110,000 | |
| Stackable | ES 470 | Emanate Lite | Solaris, Linux | VxWorks | Power PC | Santa Clara, CA, Bucharest, Romania | John Mead | | | - | 12,000 | 10,000 | 8,000 | 5,000 | 37,500 | 37,500 | 110,000 | |
| MCP | Product was discontinued and never sold by Avaya | | | | | | | | | 76,000 | 120,000 | 100,000 | 118,000 | 50,000 | 625,000 | 375,000 | 1,464,000 | 1,464,000 |

add at least 3 footnotes

1. lower bound estimate ... These are product families, not products, and royalty buyouts are per product, not per product family. Will need discovery to compute correct (larger) amount.

2. no way to compute MCP ... Insufficient information

3. only info on development locations is from a nd for avaya ... Nortel's locations may or may not have been the same ... Using assumption the quantity of locations is the same, and may need to be adjusted accordingly with information gleaned at discovery

4. pricing in effect in 2002/2003

5. Baystack license for Linux was paid.

2003 prices - use

# EXHIBIT 6

MG9000

| year | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 1st part of 2009 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EMANATE® with  EPIC/EAL | | | | | | | | | | | | | |
| license fee x4 | 100000 | | | | | | | | | | | | |
| rbo | 460000 | | | | | | | | | | | | |
| maintenance | 20000 | | | | | | | | | | | | |
| 5/12/1999 | 580000 | | | | | | | | | | | | |
| old fees to date | 580000 | 580000 | 600000 | 620000 | 640000 | 660000 | 680000 | 700000 | 720000 | 740000 | 760000 | 760000 | 772000 |
| continued maintenance fee | | 20000 | 20000 | 20000 | 20000 | 20000 | 20000 | 20000 | 20000 | 20000 | 0 | 12000 | 12000 |
| fees running total | 580000 | 600000 | 620000 | 640000 | 660000 | 680000 | 700000 | 720000 | 740000 | 760000 | 760000 | 772000 | 784000 |
| 1 may | 0 | 10548 | 12912 | 15737 | 19116 | 23155 | 27985 | 33759 | 40663 | 48917 | 0 | 58667 | 70323 |
| 2 june | 8700 | 10706 | 13105 | 15973 | 19403 | 23503 | 28405 | 34266 | 41273 | 49651 | 0 | 59547 | 71378 |
| 3 july | 8831 | 10867 | 13302 | 16213 | 19694 | 23855 | 28831 | 34779 | 41892 | 50396 | 0 | 60440 | 72448 |
| 4 aug | 8963 | 11030 | 13501 | 16456 | 19989 | 24213 | 29263 | 35301 | 42520 | 51152 | 0 | 61346 | 73535 |
| 5 sept | 9097 | 11195 | 13704 | 16703 | 20289 | 24576 | 29702 | 35831 | 43158 | 51919 | 0 | 62267 | 74638 |
| 6 oct | 9234 | 11363 | 13909 | 16954 | 20593 | 24945 | 30148 | 36368 | 43806 | 52698 | 0 | 63201 | 75758 |
| 7 nov | 9372 | 11534 | 14118 | 17208 | 20902 | 25319 | 30600 | 36914 | 44463 | 53488 | 0 | 64149 | 76894 |
| 8 dec | 9513 | 11707 | 14330 | 17466 | 21216 | 25699 | 31059 | 37467 | 45130 | 54291 | 0 | 65111 | 78047 |
| 9 jan of next year | 9656 | 11882 | 14545 | 17728 | 21534 | 26084 | 31525 | 38029 | 45807 | 0 | 55105 | 66087 | 79218 |
| 10 feb | 9800 | 12061 | 14763 | 17994 | 21857 | 26475 | 31998 | 38600 | 46494 | 0 | 55932 | 67079 | 80406 |
| 11 mar | 9947 | 12242 | 14984 | 18264 | 22185 | 26873 | 32477 | 39179 | 47191 | 0 | 56771 | 68085 | 81613 |
| 12 apr | 10097 | 12425 | 15209 | 18538 | 22517 | 27276 | 32965 | 39767 | 47899 | 0 | 57622 | 69106 | 82837 |
| new late fees | 103210 | 137561 | 168382 | 205234 | 249293 | 301972 | 364955 | 440260 | 530295 | 412513 | 225430 | 765083 | 917095 |
| add prior late fees | 0 | 103210 | 240771 | 409154 | 614387 | 863680 | 1165652 | 1530608 | 1970868 | 2501163 | 2913675 | 3139105 | 3904188 |
| late fee running balance | 103210 | 240771 | 409154 | 614387 | 863680 | 1165652 | 1530608 | 1970868 | 2501163 | 2913675 | 3139105 | 3904188 | 4821283 |
| total running total | 683210 | 840771 | 1029154 | 1254387 | 1523680 | 1845652 | 2230608 | 2690868 | 3241163 | 3673675 | 3899105 | 4676188 | 5605283 |

prebankruptcy numbers
prebankruptcy total    3673675

bankruptcy date 1/14/09

total due  total due to SNMP    5605283

545038_1

Bay

1.50% late payment penalty
1,464,000 due
Schedule expired June 20, 2003

Total Amount Due at the End of Each Month

| | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|---|---|
| jan | | 1,600,801 | 1,913,947 | 2,288,349 | 2,735,992 | 3,271,202 | 3,911,109 | 4,676,192 | 5,590,941 |
| feb | | 1,624,813 | 1,942,656 | 2,322,675 | 2,777,032 | 3,320,270 | 3,969,775 | 4,746,335 | 5,674,805 |
| mar | | 1,649,185 | 1,971,796 | 2,357,515 | 2,818,688 | 3,370,074 | 4,029,322 | 4,817,530 | 5,759,927 |
| apr | | 1,673,923 | 2,001,373 | 2,392,878 | 2,860,968 | 3,420,625 | 4,089,762 | 4,889,793 | 5,846,326 |
| may | | 1,699,032 | 2,031,393 | 2,428,771 | 2,903,882 | 3,471,935 | 4,151,108 | 4,963,140 | 5,934,021 |
| jun | | 1,724,517 | 2,061,864 | 2,465,202 | 2,947,441 | 3,524,014 | 4,213,375 | 5,037,587 | 6,023,031 |
| jul | | 1,750,385 | 2,092,792 | 2,502,180 | 2,991,652 | 3,576,874 | 4,276,575 | 5,113,151 | 6,113,376 |
| aug | 1,485,960 | 1,776,641 | 2,124,184 | 2,539,713 | 3,036,527 | 3,630,527 | 4,340,724 | 5,189,848 | 6,205,077 |
| sept | 1,508,249 | 1,803,290 | 2,156,047 | 2,577,809 | 3,082,075 | 3,684,985 | 4,405,835 | 5,267,696 | 6,298,153 |
| oct | 1,530,873 | 1,830,340 | 2,188,387 | 2,616,476 | 3,128,306 | 3,740,260 | 4,471,922 | 5,346,712 | 6,392,625 |
| nov | 1,553,836 | 1,857,795 | 2,221,213 | 2,655,723 | 3,175,231 | 3,796,363 | 4,539,001 | 5,426,912 | 6,488,515 |
| dec | 1,577,144 | 1,885,662 | 2,254,531 | 2,695,559 | 3,222,859 | 3,853,309 | 4,607,086 | 5,508,316 | 6,585,843 |

| | |
|---|---|
| Pre-bankruptcy Total | 3,853,309 |
| less LA fees | (1,464,000) |
| | 2,389,309 |

| | |
|---|---|
| Total due if paid on Dec 31, 2011 | 6,585,843 |

| | |
|---|---|
| post petition | 2,732,534 |
| add LA fees | 1,464,000 |
| | 4,196,534 |

6/20/2003 Schedule expired
45 due within 45 days
8/4/2003 begin charging at the end of the first month

bankruptcy date 1/14/09

Exhibit_6b.xls

USP

| year | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 1st part of 2009 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EMANATE®/Lite license fee rbo maintenance | 0 | | | | | | | | | | | | | |
| old fees to date | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 100 | 200 | 200 | 300 | 400 |
| continued royalty fee each july | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 100 | 100 | 0 | 100 | 100 | 100 |
| fees running total | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 100 | 200 | 200 | 300 | 400 | 500 |
| 1 may | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 3 | 0 | 5 | 8 | 11 |
| 2 june | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 3 | 0 | 6 | 8 | 11 |
| 3 july | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 3 | 0 | 6 | 8 | 11 |
| 4 aug | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 3 | 0 | 6 | 8 | 12 |
| 5 sept | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 3 | 0 | 6 | 8 | 12 |
| 6 oct | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 4 | 0 | 6 | 9 | 12 |
| 7 nov | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 4 | 0 | 6 | 9 | 12 |
| 8 dec | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 4 | 0 | 6 | 9 | 12 |
| 9 jan of next year | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 4 | 6 | 9 | 12 |
| 10 feb | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 4 | 6 | 9 | 13 |
| 11 mar | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 4 | 6 | 9 | 13 |
| 12 apr | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 4 | 6 | 9 | 13 |
| new late fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20 | 28 | 15 | 71 | 104 | 144 |
| add prior late fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20 | 47 | 63 | 133 | 238 |
| late fee running balance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20 | 47 | 63 | 133 | 238 | 382 |
| total running total | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 120 | 247 | 263 | 433 | 638 | 882 |

prebankruptcy numbers

prebankruptcy total    247

bankruptcy date 1/14/09

total due  total due to SNMP                882



William W. Davis
Joe Ment McAfee
Lewis C. Foster, Jr.
Stephen A. McSween
Wm. E. McClamroch, III
Rockforde D. King
Jonathan D. Reed
Ronald T. Hill
Reuben N. Pelot, IV
Norman G. Templeton

# EGERTON McAFEE

Egerton McAfee Armistead & Davis, P.C.

ATTORNEYS AT LAW

*CLIENT DRIVEN SINCE 1912*

Cheryl G. Rice
R. Christopher Trump
Nicholas J. Chase
James M. Cornelius, Jr
P. Newman Bankston
John L. Wood
Charlotte K. Tatum
James P. Moneyhun, Jr
William H. Kittrell
Melissa B. Carrasco

October 25, 2011

VIA EMAIL

David Herrington
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006

Nortel Canada
c/o Alan Merskey, Norton Rose
Suite 3800 Royal Bank Plaza, South Tower
200 Bay Street, P.O. Box 84
Toronto Ontario M5J 2Z4

Re: SNMP Research International, Inc. and SNMP Research, Inc. (collectively, "SNMP Research") v. Nortel Canada and Nortel US[1] (collectively, "Nortel")

Dear Alan and David,

After careful consideration of Nortel's Proposal One and Alternative Proposal Two submitted on October 12, 2011, we do not believe that we will be able to come to an agreement on the search process prior to the lift stay motion scheduled for October 26, 2011. As a way forward, SNMP Research accepts Nortel's agreement to mediate the pre-filing claim, discovery and liability issues in good faith (and any other issues the parties mutually agree to mediate), including the procedures for searching Nortel's Clearcase database. The mediator to be jointly selected by the parties, or appointed by the US and Canadian Courts, would be an individual with expertise in intellectual property law or have access to an expert in the area. The fees and disbursements of the mediator only will be split equally between SNMP Research, on the one hand, and Nortel, on the other. The mediation shall be non-binding. All offers, promises, conduct and statements, whether written or oral, made in the course of the mediation proceedings, are inadmissible in any court or other proceeding. The parties may notify the U.S. and Canadian courts as to the fact that the parties participated in mediation and whether the mediation was

---

[1] "Nortel US" means the following entities Nortel Networks Inc., Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek,Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc.    "Nortel Canada" means the following entities Nortel Networks, Corporation,    Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation.

548977v6

successful or not. The parties shall not subpoena or otherwise require the mediator or any advisor to the mediator to testify or produce records, notes or work product in any future proceedings, and no recording will be made of the mediation session. Evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the mediation session. In the event that the parties do reach a settlement agreement, the terms of that settlement will be admissible in any court proceedings required to enforce it, unless the parties agree otherwise.

As you are aware, SNMP Research is concerned that the passage of time may cause a limitation period to lapse. We understand that Nortel Canada is not prepared to consent to the lift stay motion. Accordingly, in order to preserve SNMP Research's existing claims (if any) from becoming statute barred, SNMP Research proposes that, on the basis of a Consent Order of the Canadian Court and US Court to be agreed between Nortel Canada and SNMP Research, it be permitted to file the Complaint in substantially the same form as the Complaint attached to the affidavit of Dr. Jeffrey D. Case sworn September 15, 2011, in the US Bankruptcy Court, on a without prejudice basis as to any and all matters that are or may be at issue between Nortel and SNMP Research, including, without limitation, the merits of the lift stay motion and the appropriate forum(s) for the hearing and determination of SNMP Research's claims, provided that Nortel and SNMP Research simultaneously file a motion to file the Complaint under seal. Immediately following the filing of the Complaint, the claims among SNMP Research and Nortel will be referred to non-binding mediation, and any limitations period relating to any claims between or among the parties will be tolled from the date of the filing of the Complaint until 30 days after the date that SNMP Research, Nortel Canada or Nortel US declares that the mediation has reached an impasse and is deemed to be terminated. In the event mediation proves unsuccessful, SNMP Research would be required to seek and obtain leave of the Canadian Court to continue the action against the Nortel Canada and Nortel would be entitled to raise any objection to the lift stay motion. If the mediation fails and SNMP Research continues its action against Nortel, SNMP Research does not want the mediation to result in prejudice to SNMP Research in case it files a motion to withdraw the reference. Therefore as a condition of this proposal, Nortel agrees not to raise a delay argument (in relation to the period from and after the date of this agreement through a decision by the Canadian Court on the lift stay motion) in response to a motion to withdraw the reference because of the mediation.

Notwithstanding the foregoing, nothing in this agreement bars SNMP Research from pursuing its claims against the non-Nortel defendants in the Complaint. This agreement does not stay the proceedings against the non-Nortel defendants or require SNMP Research to mediate its claims against the non-Nortel defendants.

Notwithstanding the filing of the Complaint, litigation of the Complaint as against Nortel US will be stayed pending the release of a decision on the lift stay motion by the Canadian Court. In the event mediation proves unsuccessful, Nortel agrees not to oppose any request by SNMP Research to have its lift stay motion heard at the next hearing date available to the Canadian Court (and the US Court, if the Canadian and US Courts determine that a joint hearing is appropriate). Nortel further agrees not to raise a delay argument (in relation to the period from and after the date of this agreement through the end of the mediation) in response to the lift stay motion.

Finally, the discovery and lift stay motions in the US and Canadian Courts scheduled for October 26, 2011, will be adjourned pending the outcome of the mediation.  We look forward to receipt of Nortel's agreement to proceed in accordance with the above.

SNMP Research International, Inc.

By: _Mary L Case_

Name/Title: __CEO__


SNMP Research, Inc.

By: _Jeffrey D Case_

Name/Title: __President__


Acknowledged and agreed:

Nortel NS

By: _____

Name/Title: __Principal Officer__


Nortel Canada

By: _____
Anna Ventresca

Name/Title: _____
General Counsel - Corporate
and Corporate Secretary



Court File No.: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | WEDNESDAY, THE 26TH |
| | ) | |
| JUSTICE MORAWETZ | ) | DAY OF OCTOBER, 2011 |

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**CONSENT ORDER**

THIS MOTION, made by SNMP Research International, Inc. and SNMP Research, Inc. (collectively, **"SNMP Research"**) for the relief set out in SNMP Research's Notice of Motion dated September 21, 2011, was heard this day at 330 University Avenue, Toronto, Ontario.

ON READING the affidavit of Dr. Jeffrey D. Case sworn September 15, 2011 (the **"Case Affidavit"**) and on hearing the submissions of counsel for SNMP Research, Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation (collectively, the **"Applicants"**), Ernst & Young Inc. in its capacity as monitor and those other parties present, no one appearing for any other person on the service list, although properly served as appears from the affidavit of Aldona Cybulski sworn September 22, 2011, filed:

1. THIS COURT ORDERS that the time for the service of the Notice of Motion is hereby abridged so that this motion is properly returnable today and hereby dispenses with further service thereof.

- 2 -

2.    THIS COURT ORDERS that SNMP Research is granted leave, and the stay of proceedings granted in favour of the Applicants in this Court's Initial Order dated January 14, 2009 (as amended and restated, and as such stay has been extended from time to time by Order of this Court) (the "**Stay of Proceedings**") is lifted solely for the purpose of permitting SNMP Research (a) to move for relief in the United States Bankruptcy Court for the District of Delaware (the "**U.S. Court**") to file a complaint substantially in the form attached as Exhibit "A" to the Case Affidavit (the "**Complaint**") under seal, (b) to simultaneously file the Complaint with the U.S. Court, and (c) to complete service of the Complaint on the Applicants, it being understood that such relief is granted (i) in order to permit SNMP Research to seek to preserve its existing claims (if any) from becoming statute barred, and (ii) on a without prejudice basis as to any and all matters that are or may be at issue between Nortel and SNMP Research, including, without limitation, the merits of SNMP Research's lift stay motion and the appropriate forum(s) for the hearing and determination of SNMP Research's claims.

3.    THIS COURT ORDERS that, except as expressly provided in paragraph 2 above, the Stay of Proceedings remains in full force and effect and no further steps may be taken by SNMP Research against the Applicants without further order of this Court. For the avoidance of doubt, absent a further order of this Court granting leave from the Stay of Proceedings, none of the Applicants shall be required to respond to, or otherwise answer, the Complaint and all rights of the Applicants in relation to the Complaint are fully preserved.

4.    THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance as may be necessary or desirable to give effect to this Order.

ENTERED AT / INSCRIT A TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

\6015387.4

OCT 2 6 2011


PER/PAR:

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

Court File No: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**CONSENT ORDER**

**CHAITONS LLP**
Barristers and Solicitors
5000 Yonge Street, 10th Floor
Toronto, Ontario
M2N 7E9

**Harvey G. Chaiton (LSUC #21592F)**
**Doug Bourassa (LSUC #50315C)**

Tel: 416-218-1129
Fax: 416-218-1849

Lawyers for SNMP Research International, Inc. and SNMP
Research, Inc.



# Goodmans LLP

Barristers & Solicitors

Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, Ontario M5H 2S7

Telephone: 416.979.2211
Facsimile: 416.979.1234
goodmans.ca

Direct Line: 416. 849.6013
carmstrong@goodmans.ca

October 31, 2013

Chaitons LLP
5000 Yonge Street
10th Floor
Toronto, ON    M2N 7E9

**Attention: Harvey Chaiton**

Dear Harvey:

**Re:    CCAA Proceedings of Nortel Networks Corporation et al. – SNMP Litigation**

We are in receipt of certain filings by your client on October 30, 2013, with the U.S. Bankruptcy Court for the District of Delaware (the "**US Bankruptcy Court**") regarding moving your client's litigation against various Nortel entities to the Delaware District Court. We reserve all rights as to whether such filings constitute a violation of the CCAA stay of proceedings, including as it has been recognized and given force and effect by the US Bankruptcy Court in the Canadian Debtors' Chapter 15 proceedings. We do note there is no return date for the motion and that your client's US counsel has acknowledged to our US counsel that lifting the stay in the within CCAA proceedings is a prerequisite to progressing any such motion.

However, so there is no uncertainty, we wish to reiterate that only the Ontario Superior Court of Justice (the "**Canadian Court**") presiding in Nortel's CCAA proceeding has jurisdiction to determine any claim against the Canadian Debtors, whether pre-filing or post filing.

Numerous orders of the Ontario Court confirm this view, including the Claims Procedure Order, the Claims Resolution Order, the EMEA Claims Procedure Order, the Intercompany Claims Procedure Order, the Allocation Protocol Order and the various post-filing sale approval Orders relevant to the dispute with your client. The Consent Order of the Canadian Court dated October 26, 2011, permitting your client to file its claim with the US Court and the related letter agreement between your client, the Canadian Debtors and US Debtors dated October 25, 2011, make clear that the lifting of the CCAA stay was granted solely for the purpose of preserving whatever claims your client held at that time from being barred and that a necessary first step in any litigation your client intends to seek to progress against the Canadian Debtors outside the Canadian Court is a lifting of the stay. Bearing this in mind, your client's filings indicating a desire to change venue (from a Court that itself does not have jurisdiction) are extraordinarily premature at best.

# Goodmans LLP

We continue to reserve all rights of the Canadian Debtors and the Monitor as regards these matters, including, without limitation, to seek cost awards against your client on any motions necessary to deal with these matters.

Yours truly,

**Goodmans LLP**

Christopher Armstrong
CA/dm
cc:     Tom Ayres, *Ernst & Young Inc.*
        Alan Mersky, *Norton Rose Fulbright LLP*
        Paul Keller, *Allen & Overy LLP*
        David Herrington, *Cleary, Gottlieb, Steen & Hamilton LLP*



**[CONFIDENTIAL]**



Goodmans LLP

Barristers & Solicitors

Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, Ontario M5H 2S7

Telephone: 416.979.2211
Facsimile: 416.979.1234
goodmans.ca

Direct Line: 416. 849.6013
carmstrong@goodmans.ca

July 31, 2014

Chaitons LLP
5000 Yonge Street
10th Floor
Toronto, ON   M2N 7E9

**Attention:     Harvey Chaiton**

Dear Harvey:

Re:    **CCAA Proceedings of Nortel Networks Corporation** *et al.* **(the "Canadian Debtors")
        – SNMP Litigation**

We write further to the letter agreement among, *inter alia*, the Canadian Debtors, SNMP
Research International, Inc. and SNMP Research, Inc. (collectively, "**SNMP**") dated October 25,
2011 (the "**Letter Agreement**"), the Consent Order of the Ontario Superior Court of Justice
dated October 26, 2011, our correspondence to you of October 31, 2013, and the unsuccessful
conclusion of the mediation among the Canadian Debtors, US Debtors and SNMP on March 14,
2014.

In accordance with the Letter Agreement, we confirm the termination of the tolling arrangement
agreed to in the Letter Agreement.

In terms of next steps, please advise if SNMP wishes to pursue its lift stay motion before the
Canadian Court, in which case we can arrange a telephone conference to discuss and agree to a
hearing date and timetable for delivery of materials. Consistent with our earlier discussions and
our correspondence of October 31, 2013, the Monitor remains of the view that the Ontario
Superior Court of Justice (the "**Canadian Court**") has exclusive jurisdiction to determine any
claims by SNMP against the Canadian Debtors and intends to oppose any lift stay motion by
SNMP.

In the alternative, if SNMP is prepared to withdraw its lift stay motion and claims filed in the US
against the Canadian Debtors and pursue its claims against the Canadian Debtors before the
Canadian Court (including in the claims process established by the Canadian Court for SNMP's
pre-filing claims, which SNMP has already attorned to through the filing of proofs of claim), we
would be prepared to meet to discuss a timetable and process to resolve those claims.

I am out of the office August 2 through August 17 (inclusive) but look forward to hearing from
you in the interim and advancing discussions to move these matters forward upon my return.

# Goodmans^{LLP}

We continue to reserve all rights of the Canadian Debtors and the Monitor as regards these matters.

Yours truly,

**Goodmans LLP**

Christopher Armstrong
CAG
cc:     Tom Ayres, *Ernst & Young Inc.*
        Alan Mersky, *Norton Rose Fulbright LLP*
        Paul Keller, *Allen & Overy LLP*
        David Herrington, *Cleary Gottlieb Steen & Hamilton LLP*

6261700



| From: | Armstrong, Christopher |
|---|---|
| Sent: | Tuesday, December 23, 2014 11:36 AM |
| To: | 'harvey@chaitons.com' |
| Cc: | 'Merskey, Alan (Alan.Merskey@nortonrosefulbright.com)'; 'Sinha, Vasuda (Vasuda.Sinha@nortonrosefulbright.com)'; 'Paul.Keller@AllenOvery.com'; "laura.hall@allenovery.com' (laura.hall@allenovery.com)'; 'dherrington@cgsh.com' |
| Subject: | Nortel/SNMP |
| Attachments: | DOCSTOR-#5065976-v2-SNMPRI_Claims_Litigation_Timetable.doc; DOCSTOR-# 5065757-v2-SNMPRI_Claims_Discovery_Plan.docx; DOCSTOR-#5065980-v1-SNMPRI_Claims_Resolution_Protocol.docx |

Harvey,

As you know, despite the Canadian Debtors', the Monitor's, the US Debtors' and your client's efforts, there has been no positive progress in resolving your client's claims to date. The time has now come where the Monitor requires that SNMP's claims against the Canadian Debtors be progressed and resolved. To that end, and further to our discussion and exchange of correspondence in late August, the Monitor and Canadian Debtors have worked with the US Debtors to develop a proposed form of claim resolution protocol (including litigation timetable and discovery plan) to resolve SNMP's claims against the Canadian Debtors and US Debtors, respectively. A copy of that protocol is attached for your consideration.

We would appreciate receiving any comments from you on the protocol as soon and possible and would propose a meet and confer (telephonically) to discuss the protocol on January 5, 6 or 7. Please let us know your availability for such a call.

We plan to seek the Canadian Court's approval of this protocol at a hearing in late January or early February, and understand the US Debtors will seek approval of the protocol from the US Court at the same time. The two prospective joint hearing Court dates available are January 20 and February 3. There is urgency for the protocol being approved and the discovery and litigation process commencing and proceeding on the timeline contemplated by the protocol as, among other reasons, the Canadian Debtors continue to incur significant costs maintaining the technology infrastructure that would allow them to conduct the types of searches we have previously discussed and are contemplated by the protocol.

I understand that David Herrington of Cleary, cc'd, will be forwarding the protocol to your client's US counsel.

I'm available to discuss any of this at your convenience.

Regards.

**Chris Armstrong**

Goodmans LLP

416.849.6013
carmstrong@goodmans.ca

769

Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7
goodmans.ca

Asst: Jennifer Messier
416.979.2211 x. 3886

## SNMPRI CLAIMS RESOLUTION PROTOCOL

1. <u>Purpose</u>. The purpose of this SNMPRI Claims Resolution Protocol ("**Protocol**") is for each of the U.S. Court[1] and Canadian Court to set forth binding procedures for: (i) in the case of the U.S. Court, determining the several liability of the U.S. Debtors to SNMPRI for all claims of SNMPRI against the U.S. Debtors, whether arising prior to, on or after January 14, 2009 (the "**U.S. SNMPRI Claims**"); and (ii) in the case of the Canadian Court, determining the several liability of the Canadian Debtors to SNMPRI for all claims of SNMPRI against the Canadian Debtors, whether arising prior to, on or after January 14, 2009 (the "**Canadian SNMPRI Claims**" and with the U.S. SNMPRI Claims, the "**SNMPRI Claims**"). This Protocol recognizes the U.S. Court's exclusive jurisdiction to determine the U.S. SNMPRI Claims and all matters related thereto, and the Canadian Court's exclusive jurisdiction to determine the Canadian SNMPRI Claims and all matters related thereto.  It is understood that the efficient and cost-effective resolution of the SNMPRI Claims are served by a coordinated process as provided by this Protocol.

2. <u>Participants</u>. Each of the U.S. Debtors, the Canadian Debtors, the Monitor and SNMPRI (collectively, the "**Parties**," and each individually, a "**Party**") and their authorized representatives shall have the right to participate fully in (a) any and all hearings before the U.S. Court or Canadian Court relating to the SNMPRI Claims, and (b) any and all discovery conducted in connection with the SNMPRI Claims.

3. <u>Procedures</u>. The Litigation Timetable and Discovery Plan, attached hereto as Schedules "A" and "B" respectively, shall govern with respect to the pleadings, discovery, interlocutory matters and hearing in respect of the SNMPRI Claims. The U.S. Court and Canadian Court shall have residual discretion to determine any and all other matters pertaining to the litigation and resolution of the U.S. SNMPRI Claims and the Canadian SNMPRI Claims, respectively. The U.S. Court and Canadian Court shall be available for joint conferences to resolve any discovery disputes among the Parties and to receive updates on the status of the proceedings. Following good faith efforts to resolve a discovery dispute, which efforts prove unsuccessful, any Party may seek the assistance of either or both of the U.S. Court and the Canadian Court in the implementation of this Protocol or the Litigation Timetable and Discovery Plan, or to compel adherence to other steps provided by the usual rules and practices of their respective jurisdictions. For the avoidance of doubt, the Parties shall not seek the U.S. Court's or the Canadian Court's assistance without first taking good faith steps to resolve any discovery or other dispute under or in connection with this Protocol.

4. <u>Hearings</u>. The U.S. Court will determine the merits of the U.S. SNMPRI Claims and the Canadian Court will determine the merits of the Canadian SNMPRI Claims.   The hearings for the SNMPRI Claims will commence on October 12, 2015. These hearings shall, subject to the usual rights of appeal, fully and finally resolve all of the SNMPRI Claims.  For the avoidance of doubt, the claims resolution processes in place in the U.S.

---

[1] Capitalized terms used herein and not otherwise defined have the meaning given to them in Appendix "A" hereto.

Debtors' Chapter 11 proceedings and in the Canadian Debtors' CCAA proceedings will not apply to the resolution of the proofs of claim SNMPRI has filed against the U.S. Debtors and the Canadian Debtors, respectively, it being the intent of this Protocol that all of the SNMPRI Claims shall be resolved as contemplated by this Protocol.

The Parties shall meet and confer to discuss whether all or any portion of the aforementioned hearings before the U.S. Court and the Canadian Court shall be conducted as joint hearings pursuant to the Cross-Border Protocol. In the absence of agreement on this matter, any Party may seek the direction of the U.S. Court and the Canadian Court with respect to whether or not all or any portion of such hearings shall be conducted as joint hearings.

5. <u>Appeals</u>. The Parties shall have their usual rights of appeal from all interlocutory and final decisions of the U.S. Court and Canadian Court.

6. <u>Cross-Border Protocol</u>. Any and all hearings in respect of the SNMPRI Claims shall proceed in accordance with the Cross-Border Protocol, unless otherwise ordered by both the U.S. Court and Canadian Court. Nothing herein is intended to limit or modify the terms of the Cross-Border Protocol or the Cross-Border Claims Protocol.

## Appendix "A"

**Canadian Court**: Ontario Superior Court of Justice (Commercial List).

**Canadian Debtors**: Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation.

**Chapter 11**: Chapter 11 of Title 11 of the United States Code.

**CCAA**: *Companies' Creditors Arrangement Act*, R.S.C., 1985, c. C-36.

**Commercial List Practice Direction:** Consolidated Practice Direction Concerning the Commercial List of the Ontario Superior Court of Justice.

**Cross-Border Protocol**: Schedule "A" to the Fifth Amended and Restated Initial Order of the Canadian Court dated February 15, 2011 and Exhibit "B" to the Order Approving Stipulation of the Debtors and the Official Committee of Unsecured Creditors of Nortel Networks Inc., et al., Amending the Cross-Border Court-to-Court Protocol entered by the U.S. Court on June 29, 2009.

**Cross-Border Claims Protocol**: Schedule "A" to the Order Approving Cross-Border Claims Protocol of the Canadian Court dated September 16, 2010 and Schedule "B" to the Debtors' Motion for Entry of an Order Approving a Cross-Border Protocol on the Resolution of Claims, granted by the U.S. Court on September 16, 2010 pursuant to the Order Pursuant to 11 U.S.C. §§ 105(a) and 502 Approving a Cross-Border Court-to-Court Claims Protocol.

**Federal Rules of Bankruptcy Procedure:** Fed. R. Bankr. P.

**Local Rules for United States Bankruptcy Court for the District of Delaware:** D. Del. Bankr. L. R.

**Monitor**: Ernst & Young Inc. in its capacity as the Canadian Court-appointed monitor of the Canadian Debtors in their proceedings under the CCAA (Canada).

**Rules of Civil Procedure for Ontario:** R.R.O. 1990, Regulation 194.

**SNMPRI**: SNMP Research International, Inc. and SNMP Research, Inc.

**U.S. Court**: United States Bankruptcy Court for the District of Delaware.

**U.S. Debtors**: Nortel Networks Inc., Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc.

773

**Schedule "A" - Litigation Timetable - Resolution of Claims asserted by SNMPRI against the Nortel U.S. Debtors and Canadian Debtors[1]**

| Date | Step in U.S. Claims | Step in Canadian Claims |
|------|---------------------|-------------------------|
| [January 20, 2015] | Joint hearing for approval of SNMPRI Claims Resolution Protocol, Discovery Plan and Litigation Timetable. | |
| [February 5, 2015] | Within 16 days of U.S. Court Approval of the SNMPRI Claims Resolution Protocol, SNMPRI shall file and serve its amended adversary proceeding/claim, which will particularize the relief sought, material facts relied upon and legal bases for their claims against the U.S. Debtors. In this amended adversary proceeding/claim, SNMPRI shall remove the Canadian Debtors as named defendants to the SNMPRI U.S. Claims. | Within 16 days of Canadian Court Approval of the SNMPRI Claims Resolution Protocol, SNMPRI shall deliver its affirmative claims pleading which will particularize the relief sought, material facts relied upon and legal bases for their claims against the Canadian Debtors. |
| February 20, 2015] | Deadline for reaching agreement on a Confidentiality Stipulation and Protective Order. To the extent an agreement cannot be reached, each Party will file its desired version of a Confidentiality Stipulation and Protective Order with the Courts. A joint hearing between the Courts may be necessary to settle the Orders as applicable to the U.S. SNMPRI Claims and Canadian SNMPRI Claims. | |
| [February 27, 2015] | Deadline for the U.S. Debtors to file and serve their response to SNMPRI's amended adversary proceeding complaint. | Deadline for Canadian Debtors to serve their response to SNMPRI's Affirmative Claims Pleading. |
| [March 10, 2015] | Rule 26(a) initial disclosures. | Deadline for identification by each Party to Canadian SNMPRI Claims of persons likely to have discoverable information relevant to claims or defences. |
| [March 20, 2015] | Meet and confer between SNMPRI, U.S. Debtors, Canadian Debtors to discuss particulars of the discovery process, as contemplated by the Discovery Plan. This will include discussion and agreement regarding the scope of the documentary and electronic searches conducted by each Party and how third-party confidentiality issues (such as confidentiality agreements between the U.S. Debtors or Canadian Debtors and the purchasers of their former assets) may be addressed in accordance with the Discovery Plan. This will also include discussion of witnesses to be examined/deposed, examination/deposition procedures and other issues. | |

[1] Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the SNMPRI Claims Resolution Protocol or the Discovery Plan attached thereto.

| [March 31, 2015] | Deadline for completion of discovery concerning SNMPRI's claim based on the alleged transfer of its software to buyers of the Nortel lines of business (the **"Transfer Claim"**).<br><br>This discovery will include:<br><br>• all evidence relating to SNMPRI's contention that it suffered damages as a result of such alleged transfers and that any alleged damage has not been compensated for by SNMPRI's settlements with purchasers of the relevant former Nortel lines of business;<br><br>• without limitation, documents (including, communications, license agreements and settlement agreements) related to the litigation, negotiation or settlement of claims between SNMPRI and each of Avaya Inc., GENBAND Inc., Performance Technologies, Inc., Radware Ltd. and any other purchaser of Nortel's former assets or lines of business;<br><br>• license agreements entered into between SNMPRI and former customers of the U.S. Debtors, the Canadian Debtors, any other Nortel entity or any purchaser of Nortel's former assets or businesses; and<br><br>• any discovery that SNMPRI has received in its litigation against parties other than the U.S. Debtors and the Canadian Debtors, including, but to limited to Avaya Inc., GENBAND Inc., Performance Technologies, Inc. and Radware Ltd., for breach of license or intellectual property obligations that arise out of facts similar or related to the facts that underlie SNMPRI's claims against the Canadian Debtors and the U.S. Debtors. |
| [April 17, 2015] | Deadline for the Parties to comply with their remaining documentary production obligations. |
| [April 23, 2015] | Deadline for service by the U.S. Debtors and the Canadian Debtors for motions for summary judgment in respect of the Transfer Claim. |
| [May 14, 2015] | Deadline for service of SNMPRI's response(s) to the motions for summary judgment in respect of the Transfer Claim. |
| [May 20, 2015] | Deadline for SNMPRI to identify any expert(s) and the subject matter of its expert report(s). |
| [May 28, 2015] | Deadline for service of the replies of the U.S. Debtors and Canadian Debtors in respect of the Transfer Claim summary judgment motion. |
| [June 19, 2015] | Deadline to complete fact and representative witness examinations/depositions. Representative witness examinations/depositions will not occur until after fact witness examinations/depositions are completed. |

| [June 19, 2015] | Deadline for service of any expert report(s) by SNMPRI. The same expert report(s) may be proffered for use in the U.S. SNMPRI Claims trial and the Canadian SNMPRI Claims trial, subject to compliance with the requirements of both U.S. and Canadian law. | |
|---|---|---|
| [July 17, 2015] | Deadline for U.S. Debtors to serve any responding expert report(s). | Deadline for Canadian Debtors to serve any responding expert report(s). |
| [July 31, 2015] | Deadline for completion of expert depositions. | |
| [August 14, 2015] | Deadline for service of dispositive motions. | |
| [August 31, 2015] | Deadline for replies to dispositive motions. | |
| [August 31, 2015] | Deadline to file a list of all witnesses and exhibits that each Party intends to rely upon as part of its direct case. | |
| [August 31, 2015] | Deadline for filing of pre-trial evidence in both courts. This will include:<br><br>• all exhibits to be used in a Party's direct case; and<br><br>• all deposition testimony to be used in a Party's direct case. | |
| [August 31, 2015] | Deadline for SNMPRI to serve affidavits to serve as evidence in chief of their respective witnesses. | |
| [September 15, 2015] | Hearing date for dispositive motions. | |
| [September 15, 2015] | Deadline to file any pre-trial motions. | |
| [September 15, 2015] | Deadline for U.S. Debtors and Canadian Debtors to serve responding affidavits to serve as evidence in chief of their respective witnesses. | |
| [September 22, 2015] | Deadline for SNMPRI to serve any reply affidavits. | |

| [September 22, 2015] | Deadline for filing objections/replies to pre-trial motions. |
|---|---|
| [October 1, 2015] | Pre-trial conference. |
| [October 12, 2015] | The U.S. and Canadian Courts will hold i) hearings before the U.S. Court on the merits of any remaining U.S. SNMPRI Claims, and (ii) hearings before the Canadian Court on the merits of any remaining Canadian SNMPRI Claims. |
| | Any date in this Litigation Timetable may be amended by the written agreement of the Parties, submitted to the U.S. Court through the filing of a certification of counsel and to the Canadian Court through the filing of a letter from the Monitor to the Canadian Court on notice to the parties. Any Party may also file a motion with the applicable Court(s) to modify this Litigation Timetable upon a showing of good cause. |

**Schedule "B"  -  Discovery Plan  -  Resolution of Claims asserted by SNMPRI against the Nortel U.S. Debtors and Canadian Debtors**

| Definitions | Capitalized terms used herein and not otherwise defined shall have the meaning ascribed in the Protocol or the Litigation Timetable attached thereto. |
| --- | --- |
| Applicable Procedural Regime | The following procedural regimes apply:<br><br>With respect to U.S. SNMPRI Claims, the Protocol, this Discovery Plan, the Federal Rules of Bankruptcy Procedure and the Local Rules for the United States Bankruptcy Court for the District of Delaware apply.<br><br>With respect to Canadian SNMPRI Claims, the Protocol, this Discovery Plan, the Rules of Civil Procedure for Ontario and the Commercial List Practice Direction apply.<br><br>The usual rules and practices of the U.S. Court and the Canadian Court governing examinations/depositions conduct shall apply, including regarding compelling a witness, cost-sharing and answers to undertakings.<br><br>A Party that conducts an examination/deposition or seeks the assistance of a court outside of its primary jurisdiction shall not be deemed to attorn or consent to that court's jurisdiction. |

| Scope of Documentary Discovery | a) Reasonably Accessible Documents and Proportionality |
|---|---|
| | The Parties will produce all documents relevant to the SNMPRI Claims and prepare privilege logs as applicable. |
| | Production of a document by any Party shall not be deemed to be an admission of relevance, nor an automatic waiver of privilege where a document has been, or is, produced inadvertently. |
| | All documents produced by any Party and all documents produced in response to any subpoena, notice or other process served in relation to either of the Canadian SNMPRI Claims or U.S. SNMPRI Claims shall be deemed to be produced in both proceedings. |
| | Without limiting the normal production obligations of the U.S. Debtors and the Canadian Debtors respectively, but having regard to the principle of proportionality, electronic discovery of software databases of the Canadian Debtors and the U.S. Debtors will be reasonably limited. It will consist of file-name searches of the ClearCase software configuration management system historically used by the U.S. Debtors and the Canadian Debtors to store every version of every element related to a software project. The search procedure will be as follows: |
| | • The U.S. Debtors and the Canadian Debtors will conduct a search of file names in ClearCase using the search terms listed in Appendix "A". |
| | • The U.S. Debtors and the Canadian Debtors shall cooperate to search a small sample of versioned object bases ("**VOBs**") in order to test for false positive and false negatives arising from the search terms being used. The U.S. Debtors and the Canadian Debtors shall consult with SNMPRI in order to refine search terms as necessary. |
| | • The U.S. Debtors and the Canadian Debtors shall use the final list of search terms to search VOB file history in ClearCase. |
| | The U.S. Debtors and the Canadian Debtors will not search any source code contained in ClearCase. Documentary discovery of the U.S. Debtors and the Canadian Debtors will not include searching the PLS system or using the eBuild tool. |
| | Without limiting the production obligations of SNMPRI under the Federal Rules of Bankruptcy Procedure, the Local Rules for the United States Bankruptcy Court for the District of Delaware and the Rules of Civil Procedure for Ontario, SNMPRI production obligation will include: |
| | • Documents (including, without limitation, communications, license agreements and settlement agreements) related to the litigation, negotiation or settlement of claims between SNMPRI and each of Avaya Inc., GENBAND Inc., Performance |

| | |
|---|---|
| | Technologies, Inc. and Radware Ltd. |
| | • License agreements entered into between SNMPRI and former customers of the U.S. Debtors, the Canadian Debtors, any other Nortel entity or any purchaser of Nortel's former assets or businesses. |
| | • Information regarding SNMPRI's disclosure or license of its product code to parties other than the U.S. Debtors or the Canadian Debtors. |
| | • Any discovery that SNMPRI has received in its litigation against parties other than the U.S. Debtors and the Canadian Debtors, including, but to limited to Avaya Inc., GENBAND Inc., Performance Technologies, Inc. and Radware Ltd., for breach of license or intellectual property obligations that arise out of facts similar or related to the facts that underlie SNMPRI's claims against the Canadian Debtors and the U.S. Debtors. |
| | • All documents relating to any theory of damages. |
| | • All documents tending to prove or disprove that SNMPRI information has the status of a trade secret. |
| | • All documents tending to prove or disprove that SNMPRI information is protected by copyright. |
| | • All documents relating to SNMPRI's notice of and objections to the sales of Nortel's lines of business within the CCAA proceedings and the Chapter 11 proceedings. |
| | The Parties will work in good faith to eliminate duplication and redundancy between U.S. SNMPRI Claims and Canadian SNMPRI Claims productions. |
| | All Nortel and SNMP documents produced by a Party will be deemed admissible without proof of authenticity, integrity of the chain of possession or the integrity of the system of storage and retrieval unless objected to by this date on a particularized and document-by-document basis. |
| Retention of Electronic Data | Nortel servers, including the servers that host ClearCase, are located at 3500 Carling Avenue, Ottawa, ON. Nortel's lease for this location will expire on December 31, 2015. This impending deadline will require Nortel to commence the process of shutting down and decommissioning those servers by no later than November 2015. In the event a Party seeks the preservation of the servers beyond this date, it may, on the basis of just cause, seek to obtain such direction from the Court(s); any Party who seeks such preservation will bear the attendant cost of moving and maintaining the servers. Any such motion must be brought by no later than August 31, 2015, to |

| | |
|---|---|
| | accommodate for technical and logistical requirements. |
| Format of Production of Electronic Records | For each electronic document produced, the responding Party shall provide the metadata as may be agreed between the parties, but only to the extent such data can reasonably be extracted or otherwise provided in a delimited text file.<br><br>The U.S. Debtors and the Canadian Debtors will collectively develop a list reflecting the asset purchasers who are believed to have received the VOBs in files in which there were hits following searches that were conducted in accordance with this Discovery Plan. Upon consent being obtained from the relevant asset purchasers or the Court, this list will be provided to SNMPRI. |
| Witness Identification | Each Party shall identify any persons likely to have discoverable or relevant information with respect to the U.S. SNMPRI Claims or the Canadian SNMPRI Claims.<br><br>A Party may seek leave of the Court(s) or consent of all Parties to identify at a later date trial witnesses not previously identified. |
| Oral Examinations or Depositions | The Parties shall attempt to agree on the witnesses to be examined/deposed and on the examination/deposition schedule.  All Parties shall have the right to attend and ask questions at such examinations/depositions, even of the notice, subpoena or other process was served only with respect to one of the Courts<br><br>The Parties agree that that the examination/deposition time for each representative or fact witness shall be no more than two days.<br><br>a) Examinations/Depositions of Representative Witnesses<br><br>The examination/deposition of each Party's representative witness(es) will be limited to a total of 7 hours per examining Party, for a total of no more than 14 hours of representative witness examinations/depositions per proffering Party.  Evidence of each of the three representative witnesses may be used in both the U.S. SNMPRI Claims trial and the Canadian SNMPRI Claims trial.<br><br>The Canadian Debtors and the U.S. Debtors may, but need not, jointly designate representative witness(es) for the U.S. SNMPRI Claims and the Canadian SNMPRI Claims to provide for a single examination/deposition of this witness.<br><br>SNMPRI may designate one individual to be its representative witness for both the U.S. SNMPRI Claims and the Canadian SNMPRI Claims. |

| | |
|---|---|
| | b) Examination/Depositions of Fact Witnesses |
| | The fact witnesses examinations/depositions shall be as follows: |
| | • No more than 7 hours of examination/deposition of the fact witnesses of each of the Parties, for a total of no more than 21 hours of fact witness examination/deposition by each Party |
| | • A total of no more than 50 hours of examination/deposition of non-party witnesses by each Party, including purchasers of the Nortel assets or businesses, former Nortel customers and current or former customers of SNMPRI |
| | All Parties agree to cooperate in good faith in attempts to locate and obtain testimony from persons not under the control of any Party; however, no Party shall be required to commence proceedings or pursue other procedures to secure testimony from witnesses that are not in its control and from which that Party does not seek testimony. |
| | c) Use of Discovery Answers at Trial |
| | Subject to the usual rules that apply in the Canadian and U.S. Courts respectively, the examination/deposition evidence of representatives may be used as evidence at trial only by a Party whose interests are adverse to those of the proffering Party on the issue for which the evidence is being used. |
| Experts | a) Reports/Affidavits |
| | SNMPRI shall identify intended expert(s) and the subject matter of their expertise and intended evidence. SNMPRI shall deliver an affidavit or report from their identified expert(s) containing the content and disclosures required by the Applicable Procedural Regime set forth in section 2. SNMPRI may file the same report from an intended expert for use in both the U.S. SNMPRI Claims litigation and the Canadian SNMPRI Claims litigation. |
| | The U.S. Debtors and the Canadian Debtors may deliver rebuttal expert affidavits or expert reports. |
| | Absent leave of the Court(s) or the consent of all of the Parties the affidavit or report of any expert who does not appear at trial cannot be filed as trial evidence. |
| General | Coordinating Oral Examinations/Depositions |

| Procedure Applicable to All Oral Examinations / Depositions | The Parties will work in good faith to avoid duplication of questions.<br><br>Transcripts and videotaping:<br><br>All examinations/depositions shall be taken under oath in the presence of a Canadian or U.S. certified court reporter and transcribed and the transcripts made available to all parties. The examination/deposition may be video-taped but the use to which the video tape may be put shall be entirely in the discretion of the Court(s). |

**Appendix "A"**

1       "SNMP Research" or "SNMP RESEARCH" "snmp research" or "egrep -i";

2       The strings _sr or sr_, and snmpri  -

3       The strings mib, emanate, seclib, snmp.c, snmp.h etc -





**Government    Gouvernement
of Canada    du Canada**

# Public Works and Government Services Canada

Home
> PWGSC Services
> Property and Buildings
> Real Property
> Construction projects
> Carling Campus Initiative

## Carling Campus Initiative

Public Works and Government Services Canada (PWGSC) is collaborating with the Department of National Defence (DND) and Shared Services Canada (SSC) on consolidating a large part of the Department of National Defence's (DND) headquarters function at Nortel's former Carling Campus. This consolidation will achieve more than $900M in net savings for Canadian taxpayers.

Defence personnel are currently distributed in over 40 locations across the National Capital Area, mainly located in downtown, commercial leased spaces. These locations are costly to lease, refit, secure and renew on a recurring basis. The consolidation will see DND moving from over 40 offices to 7 major locations in the NCA, achieving $750 million in net savings in accommodations costs over a 25 year period, plus an additional $160 million for DND in cost avoidance.

These savings will be based on the reduction of higher cost leased accommodation in the Ottawa downtown core and the movement to a crown-owned suburban location. It will also allow PWGSC and SSC to provide DND with the safe, healthy, and affordable facilities it needs to efficiently deliver its programs and services in Canada and around the world.

This major consolidation project also represents an exciting milestone for the DND's renewal strategy - aimed at finding efficiencies to be reinvested in operational capabilities and readiness.

Not only will it dramatically reduce the number of locations for National Defence Headquarters, but it will also position DND Defence Team to successfully meet future roles and responsibilities by facilitating the modernization of headquarters operations. The additional $160 million savings for DND in cost avoidance achieved from this consolidation will help bolster renewal efforts aimed at reinvesting in front-line services as opposed to corporate overhead.

As custodian, PWGSC is the lead on the project to ensure that the Campus meets DND's long-term office accommodation requirements. SSC will ensure that the DND has reliable, efficient and secure information technology infrastructure, for the best price possible. When completed, 8,500 Defence personnel will occupy the Carling Campus.

Following the 2010 purchase of the Campus, and with the creation of Shared Services Canada in August 2011, PWGSC, DND and SSC have completed a thorough analysis of DND's IT and occupation requirements and have found additional savings from those originally identified. The soundness of the business case to purchase and re-fit the campus was validated by third party professional advisory services firms.

The cost to re-fit the Campus is expected to be approximately $506M over 6 years. This includes pre-planning studies, design and the construction of the necessary base building upgrades, special purpose space, IT, security, and re-fit of the buildings. The total cost of this consolidation is estimated at $755.5M (GST/HST excluded). This includes the purchase price of the Campus ($208.3M), re-fit costs ($506M) and the transition costs ($41.2M).

Before personnel can be consolidated, we need to design and refit the spaces. The design and re-fit work will start in early 2014. The consolidation of Defence personnel is expected to be complete within approximately six years. The first phase of migration is currently targeted for late 2015. PWGSC, DND and SSC are committed to remain on scope, on budget and on time through the duration of this project.

Carling Campus Initiative - Construction projects - Real Property - PWGSC

787

Date modified: 2014-11-20



## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In Re: | Chapter 11 |
| Nortel Networks Inc., *et al.* | Case No. 09-10138 (KG) |
| Debtors | |

## CREDITOR SNMP RESEARCH INTERNATIONAL, INC.'S FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS DIRECTED TO THE DEBTORS

COMES now the Creditor, SNMP Research International, Inc., by and through counsel, and serves the following Interrogatories and Requests for Production of Documents on the Debtors pursuant to Rules 26, 33, and 34 of the Federal Rules of Civil Procedure as incorporated by Rules 9014, 7026, 7033 and 7034 of the Federal Rules of Bankruptcy Procedure.

### DEFINITIONS AND GENERAL INSTRUCTIONS

1.      For purposes of these discovery requests, the following words and phrases shall have the meaning ascribed to them as follows:

a.      **"Bankruptcy Sales"** means the sale of Nortel assets to (i) Radware Ltd. pursuant to a sale order dated  March 26, 2009, (ii) Telefonaktiebolaget LM Ericsson (Publ) pursuant to a sale order dated July 28, 2009, (iii) Avaya Inc. pursuant to a sale order dated September 16, 2009, (iv) Hitachi, Ltd. pursuant to a sale order dated October 28, 2009, (v) Telefonaktiebolaget LM Ericsson (Publ) and Kapsch Carriercom AG pursuant to a sales order dated December 2, 2009, (vi) Ciena Corporation pursuant to a sales order dated December 3, 2009, (vii) GENBAND Inc. pursuant to a sales order dated March 4, 2010, and (viii) Telefonaktiebolaget LM Ericsson (Publ) pursuant to a sales order dated September 30, 2010.

1

b.    **"Communicate"** and **"Communication"** means every disclosure, transfer, or exchange of information in any manner, means, or medium, including but not limited to the following: by telephone, text, mail, personal delivery, facsimile, electronic mail, internet messaging, electronic transmission, face-to-face, or any other form of transmitting information, whether orally, electronically, or written;

c.    **"Creditor"** means SNMP Research International, Inc.

d.    **"Creditor Software"** means any software owned by Creditor or licensed to Creditor and any derivative works thereof, whether in binary or source form.  The definition of Creditor Software includes software developed through the use of Creditor Software.

e.    **"Date"** means the exact date requested, but if the exact date is not known and cannot be determined using due diligence, then it means the applicable time period as specifically as possible, i.e. month, season, year, or range of years;

f.    **"Describe"** when used in reference to

    i.    A relationship between two Persons means to explain how the Persons became affiliated, the nature of the affiliation (business associates, social acquaintances, etc), approximately how often the Persons communicated with each other, and the length of the affiliation;

    ii.    An event or occurrence means to explain the characteristics of the event or occurrence as they appeared to Nortel.

g.    **"Document"** or **"documents"** have the meaning ascribed to them in  Federal Rule of Civil Procedure 34 and include, without limitation, the original and any non-identical copies, regardless of origin or location, and regardless of whether it exists in hard print or electronic media, of any book, pamphlet, periodical, advertisement, catalog, letter,

opinion, report, form, electronic mail message, facsimile, telegram, cable, telex correspondence, report, record, notebook, writing, drawing, sketch, blueprint, manual, handwritten note, contract agreement, manuscript, minutes, intracorporate communication, bulletin, brochure, circular, instruction, memorandum, notice, working paper, diary, chart, paper, graph, laboratory record, computer printout, magnetic or optical media, work assignment, print tracing, survey, photograph, sound recording, image, phonorecord, microfilm, index, data sheet, data processing card, audio or video recording, or notes of or relating to any telephone or other conversation, or any other written, recorded, transcribed, filmed, or graphic material, however produced or reproduced, which is or has been in Nortel's possession, custody, or control or of which Nortel has knowledge;

h.    **"Identify," "identity," "identifying," or "identification,"** when used in reference to a

   i.    **Natural Person** means to state the person's full name, employer, occupation, job title, and position, present or last known residence address and telephone number, present or last known business address and telephone number, and the Person's relation to Nortel;

   ii.    **Person other than a Natural Person** means to state the full name, type of entity, business address, telephone number, and name and telephone number of the agent(s), employee(s), or representative(s) who acted on behalf of the Person in connection with the event, instance, occurrence, or circumstance described or referred to in the discovery request;

   iii.    **Document** means to state the type of Document (e.g., letter, electronic mail, chart, etc.) and its title, date, time sent or received, author, addressee, subject

matter, present location, and custodian, whether any drafts preceded the final version of the Document, all known recipients of the Document and any drafts, and, if the Document was but is no longer in Nortel's possession, state what disposition was made of it and the facts or reasons for such disposition;

iv.    **Software** means to state the name and version number or version numbers of the Software, and where applicable the Nortel product on which such Software resides and the operating system and processor for the Nortel product.

i.    **"Nortel"** means the Debtor, Nortel Networks, Inc, and any affiliate, subsidiary, member, officer, principal, employee, representative, or agent of Nortel as well as any person or entity acting on behalf of Nortel;

j.    **"Person"** or **"persons"** means any natural person, firm, proprietorship, partnership, joint venture, corporation, association, or other business entity and all present and former officers, directors, agents, employees, and others acting for or purporting to act on behalf of such natural person, firm proprietorship, partnership, joint venture, corporation, association, or other business entity;

k.    **"Proof of Claim"** means the Amended Proof of Claim filed by SNMP Research International, Inc. dated October 19, 2010;

2.    **"Rule"** means the applicable Federal Rule of Civil Procedure.

3.    Rule 26 provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense—including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter." Information is relevant if it "appears reasonably calculated to lead to the discovery of admissible evidence."

4

4.      Rule 26(e) imposes a duty to supplement or correct a response to a discovery request under the following circumstances:

    i.      When a party learns that the disclosure or response is incomplete or incorrect in some material respect, "if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing" or

    ii.     When an expert's report must be disclosed pursuant to Rule 26(a)(2)(B) and the information in the report or in the expert's deposition has changed in some respect by the time the party's Rule 26(a)(3) disclosures are due.

5.      If a party withholds information that is otherwise discoverable by asserting that the information is "privileged or subject to protection as trial preparation material," Rule 26(b)(5) requires that the party make the claim expressly and "describe the nature of the documents, communications, or things not produced or disclosed . . . in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim."

## INTERROGATORIES

### Instructions

1.      As required by Rule 33(b)(3), please answer each Interrogatory separately and fully in writing under oath, unless objected to.

2.      If Nortel objects to an Interrogatory, please answer as much of the Interrogatory as can be answered without objection and state with specificity the grounds for objection, as required by Rule 33(b)(3), (b)(4).

3.      Please serve a copy of the answers and objections, if any, to the Interrogatories within 30 days after the service of these Interrogatories, as required by Rule 33.

5

## INTERROGATORIES

1.      Please Identify all Persons answering these Interrogatories or requests for production of Documents and all Persons who assisted or provided information for such answers or Documents.

**RESPONSE:**


2.      Please Identify all Persons known to Nortel who have knowledge of the facts or allegations in the Proof of Claim.

**RESPONSE:**


3.      Please Identify the Persons known to Nortel who have knowledge of the Nortel Software source code transferred or made available to each buyer in the Bankruptcy Sales, at the time the Bankruptcy Sale closed, categorized by each buyer;

**RESPONSE:**


4.      Please Identify all Creditor Software used or distributed by Nortel without a license from Creditor authorizing such use or distribution from December 1, 1999 to the present. In addition to the

6

Identification of the Creditor Software, Identify the (i) dates on which such use or distribution started and ended, (ii) Nortel Software that required the use of, or was distributed with the Creditor Software, (iii) each calendar quarter in which such Creditor Software was used or distributed, and (iv) amounts of such Creditor Software distributed by Nortel;

**RESPONSE:**

5.      Please Identify all Creditor Software used or distributed by Nortel that was transferred or made available to a buyer as a part of the Bankruptcy Sales and Identify the Nortel Software that required the use of or was distributed with such Creditor Software.

**RESPONSE:**

7

## REQUESTS FOR PRODUCTION OF DOCUMENTS

### Instructions

1.      Unless otherwise indicated, the date range applicable for all Requests for Production of Documents is from December 1, 1999 to the present. (the "Relevant Period")

2.      With respect to each Document or thing that is responsive to any Request for Production of Documents, please state whether Nortel will produce the Documents or things requested or its objection to the Request, as required by Rule 34.

3.      If Nortel is unable to completely answer a Request, please respond as fully as possible and then state a reason or reasons why Nortel cannot make a complete response.

4.      If Nortel objects to any of these Requests, please state the reasons for the objection, as required by Rule 34.

5.      If any Document or thing that is responsive to any Request for Production of Documents has been lost or destroyed, please identify the Document or thing, state the Request to which it would otherwise be responsive, and state, in detail, the circumstances of the loss or destruction of the document or thing.

6.      If any Document or thing that is responsive to any Request for Production of Documents is within Nortel's control but is not within Nortel's possession or custody, please Identify the Person who has possession or custody of the Document or thing.

7.      If any Document or thing that is responsive to any Request for Production of Documents was within Nortel's possession, custody, or control, but is not longer within Nortel's possession, custody or control, please state the disposition of the Document or thing, the Date or date range on or in which the disposition occurred, the reason or reasons for the disposition, and the Person who disposed of the Document or thing.

8.    These Requests for Production of Documents are not seeking the production of any Document or information protected by the attorney-client privilege, or trial preparation materials covered by Rule 26(b)(3).  If Nortel claims that a privilege or protection prevents it from producing a Document, please state (1) the privilege or protection claimed, (2) the Documents or information protected by the privilege or protection, and (3) the basis for asserting the privilege or protection, as required by Rule 26(b)(5).

9.    Please serve upon Creditor a written response to these Requests for Production of Documents within 30 days after service of the Requests, as required by Rule 34(b)(2)(A).

10.    These Requests for Production of Documents shall be deemed continuing, and supplemental answers or responsive Documents shall be produced as required by Rule 26(e) if further responsive information is obtained subsequent to the time the responses are served.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1.    **Request No. 1:** Please produce all Documents, including but not limited to, Nortel's internal notes, email Communications, or other written Communications, containing any information relating to the Proof of Claim.

**RESPONSE:**

2.    **Request No. 2:** Please produce all Documents, including but not limited to, Nortel's internal notes, email Communications, or other written Communications, containing any information relating to the use or distribution of Creditor Software in any manner by Nortel without a license authorizing such use or distribution during the Relevant Period..

**RESPONSE:**

9

3.      **Request No.** 3: Please produce all Documents, including but not limited to any Documents or Communications that list or discuss any Creditor Software imbedded in, used in the development of, or distributed with Nortel Software that was transferred or made available in the Bankruptcy Sales.

      **RESPONSE:**

4.      **Request No.** 4: Please provide Creditor access to all Nortel Software, on a computer or computers of Nortel's choosing in source code format as extracted from the Nortel source code repository, that is or was shipped to customers or otherwise made available to customers, potential customers of Nortel, or other third parties, including but not limited to as a direct or indirect result of the Bankruptcy Sales, during the Relevant Period. Creditor's access to the Nortel source code must allow Creditor to run specific scripts that search the Nortel source code for the presence of Creditor Software.

      **RESPONSE:**

Dated: March 1, 2011

CIARDI CIARDI & ASTIN

Daniel K. Astin (No. 4068)
Joseph J. McMahon, Jr. (No. 4819)
919 N. Market Street, Suite 700
Wilmington, Delaware 19801
Telephone: (302) 658-1100
Facsimile: (302) 658-1300
dastin@ciardilaw.com
jmcmahon@ciardilaw.com

and

Mark H. Ralston
2603 Oak Lawn Avenue
Suite 200
Dallas, TX 75219
Phone: (214) 295-6416
Fax: (214) 602-1250

*Attorneys for SNMP Research International, Inc.*

11

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | : | Chapter 11 |
| | : | |
| Nortel Networks Inc., et al. | : | Case No. 09-10138 (KG) |
| | : | |
| Debtors | : | |

## NOTICE OF SERVICE OF DISCOVERY

PLEASE TAKE NOTICE that on March 1, 2011, SNMP Research International, Inc.

served **SNMP Research International, Inc.'s First Set of Interrogatories and Request for**

**Production of Documents** on the following parties as indicated:


*Via Hand Delivery*

Derek C. Abbott, Esq.
Morris Nichols Arsht & Tunnell
1201 N. Market Street
Wilmington, DE 19899


*Via First Class U.S. Mail*

Salvatore Bianca, Esq.
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York NY 10006


Dated: March 1, 2011                        CIARDI CIARDI & ASTIN


Daniel K. Astin (No. 4068)
Joseph J. McMahon, Jr. (No. 4819)
919 N. Market Street, Suite 700
Wilmington, Delaware 19801
Telephone: (302) 658-1100
Facsimile: (302) 658-1300
dastin@ciardilaw.com
jmcmahon@ciardilaw.com

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

Court File No:  09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**ONE HUNDRED AND TWELFTH REPORT**
**OF THE MONITOR DATED**
**FEBRUARY 3, 2015**

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

Jay A. Carfagnini  (LSUC#: 22293T)
jcarfagnini@goodmans.ca
Joseph Pasquariello (LSUC# 38390C)
jpasquariello@goodmans.ca
Christopher G. Armstrong (LSUC# 55148B)
carmstrong@goodmans.ca

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

Court File No.  09-CL-7950

| |
|---|
| ***ONTARIO***<br>**SUPERIOR COURT OF JUSTICE**<br>**(COMMERCIAL LIST)**<br><br>**Proceeding commenced at Toronto** |
| **MOTION RECORD OF THE MONITOR AND**<br>**CANADIAN DEBTORS**<br>**(SNMPRI Claims Resolution Protocol)**<br>**(returnable February 27, 2015)** |
| **GOODMANS LLP**<br>Bay Adelaide Centre<br>333 Bay Street, Suite 3400<br>Toronto, ON  M5H 2S7<br>**Jay A. Carfagnini**  LSUC#: 22293T<br>jcarfagnini@goodmans.ca<br>**Joseph Pasquariello**  LSUC# 38390C<br>jpasquariello@goodmans.ca<br>**Christopher G. Armstrong**  LSUC# 55148B<br>carmstrong@goodmans.ca<br>Tel: 416.979.2211<br>Fax: 416.979.1234<br>Lawyers for the Monitor, Ernst & Young Inc.<br><br>**NORTON ROSE FULBRIGHT CANADA LLP**<br>Suite 3800, Royal Bank Plaza, South Tower<br>200 Bay Street, P.O. Box 84<br>Toronto, ON  M5J 2Z4<br>**Alan Merskey**  LSUC#: 41377I<br>alan.merskey@nortonrosefulbright.com<br>**Vasuda Sinha** LSUC#: 55005B<br>Vasuda.sinha@nortonrosefulbright.com<br>Tel:  416.216.4000<br>Fax:  416.216.3930<br>Lawyers for the Canadian Debtors |

6418717