**<u>EXHIBIT A</u>**

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**SUPPLEMENT TO THE ONE HUNDRED AND TWELFTH  REPORT**
**OF THE MONITOR DATED FEBRUARY 24, 2015**

## INTRODUCTION

1.     On January 14, 2009 (the "**Filing Date**"), Nortel Networks Corporation ("**NNC**" and collectively with all its subsidiaries "**Nortel**" or the "**Company**"), Nortel Networks Limited ("**NNL**"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively the "**Canadian Debtors**") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("**CCAA**").  Pursuant to the Order of this Court dated January 14, 2009, as amended and restated (the "**Initial Order**"), Ernst & Young Inc. was appointed as the Monitor of the Canadian Debtors (the "**Monitor**") in the CCAA proceedings.  A stay of proceedings against the Canadian Debtors and their property (the "**CCAA Stay**") was granted in the Initial Order, which stay was extended to April 3, 2015 by this Court in its Order dated October 1, 2014.

2.     Nortel Networks Inc. ("**NNI**") and certain of its U.S. subsidiaries and affiliates (collectively, including NN CALA (as defined below), the "**U.S. Debtors**") concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "**Code**") in the United States Bankruptcy Court for the District of Delaware (the "**U.S. Bankruptcy Court**" and together with this Court, the "**Courts**") on January 14, 2009 (the "**Chapter 11**

**Proceedings**").  As required by U.S. law, an official committee of unsecured creditors was established in January, 2009.

3.   An ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "**Bondholder Group**").   In addition, pursuant to Orders of this Court, representative counsel ("**Representative Counsel**") was appointed on behalf of the former employees of the Canadian Debtors (the "**Former Employees**"), the continuing employees of the Canadian Debtors and the LTD Beneficiaries, and each of these groups is participating in the CCAA proceedings.

4.   Nortel Networks (CALA) Inc. ("**NN CALA**") filed a voluntary petition under Chapter 11 of the Code in the U.S. Bankruptcy Court on July 14, 2009.

5.   Nortel Networks UK Limited ("**NNUK**") and certain of its affiliates located in EMEA were granted administration orders (the "**UK Administration Orders**") by the High Court of England and Wales on January 14, 2009 (collectively the "**EMEA Debtors**").  The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as administrators of the various EMEA Debtors, except for Nortel Networks (Ireland) Limited, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed.

6.   Subsequent to the Filing Date, Nortel Networks S.A. commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

7.   The CCAA proceedings and the UK Administration proceedings of NNUK and the other EMEA Debtors have been recognized by the U.S. Bankruptcy Court as foreign main proceedings under Chapter 15 of the Code.

8.   Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection or bankruptcy proceedings in the local jurisdiction in which they are located.

**PURPOSE**

9.  The purpose of this Supplement to the One Hundred and Twelfth Report of the Monitor (the "**Supplement to the One Hundred and Twelfth Report**") is to provide this Court with further information and background with respect to matters relating to the SNMPRI Claims[1], including:

    a)  events since the service of the One Hundred and Twelfth Report;

    b)   SNMPRI's motion to lift the CCAA Stay returnable February 27, 2015; and

    c)  the Canadian Debtors' and Monitor's Amended Notice of Motion seeking approval of a discovery plan and litigation timetable for resolution of the Canadian SNMPRI Claims only.

**TERMS OF REFERENCE**

10.  In preparing this Supplement to the One Hundred and Twelfth Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with the Company. The Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of this information.

11.  Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

**OVERVIEW**

12.  Like thousands of other creditors, SNMPRI has filed CCAA proofs of claim against the Canadian Debtors. Those claims, originally for unpaid royalties for Q4 2008 of approximately $22,000, have since grown to claims for nearly $8 million plus "unspecified

---

[1] Capitalized terms used herein and not otherwise defined have the meaning given to them in the One Hundred and Twelfth Report.

- 4 -

damages" for alleged unauthorized use of SNMPRI software by NNC and NNL. SNMPRI appears to accept that this Court (or a claims officer appointed thereby) has the exclusive jurisdiction to determine and resolve these CCAA proofs of claim.

13.    SNMPRI also seeks to pursue what it characterizes as an $86 million "administrative expense" claim against the Canadian Debtors, including an alleged entitlement to damages calculated based on the sale proceeds of the Nortel line of business sales. These claims encompass claims for unauthorized use of SNMPRI software that arise out of the same facts and circumstances as SNMPRI's CCAA proofs of claim (and may, in whole or part, also be "Claims" within the meaning of the Claims Procedure Order[2]) and also encompass claims that are alleged to have arisen out of the Nortel line of business sales – transactions that were approved by this Court and that are at the heart of these CCAA proceedings.

14.    Since SNMPRI makes substantially similar if not identical claims against the U.S. Debtors, the Canadian Debtors and Monitor worked with the U.S. Debtors to develop a coordinated discovery plan and litigation timetable to resolve the SNMPRI Claims consistent with, and relying upon, the mechanisms used to coordinate these cross-border insolvency proceedings since their inception. These proposed procedures provided for a fair and efficient resolution of SNMPRI's claims over the course of 2015, served the interests of the Canadian Debtors and their creditors in fully and finally resolving the Canadian SNMPRI Claims in a timely and efficient manner, and also provided SNMPRI with a full opportunity to seek to prove its claims with a minimum of overlapping proceedings.

15.    SNMPRI has rejected this approach.

16.    Instead, and in contrast to the thousands of other creditors asserting claims against the Canadian Debtors who have acknowledged the jurisdiction of this Court, rather than working with the Monitor to implement an agreed procedure, SNMPRI has renewed its motion to lift the CCAA Stay (some six months after the Monitor invited it to do so) and asks this Court to exercise its discretion to allow it to proceed against the Canadian Debtors

---

[2] Capitalized terms used herein and not otherwise defined have the meaning given to them in the One Hundred and Twelfth Report.

- 5 -

in a U.S. litigation process in which SNMPRI will seek to litigate against not only the Canadian Debtors and the U.S. Debtors, but also Avaya and up 100 John Doe defendants.

17.    SNMPRI proposes that this litigation take place in the United States District Court for the District of Delaware (the "**Delaware District Court**") – not the U.S. Bankruptcy Court – on an open-ended timetable, and to ultimately be resolved by a jury trial. It has indicated that in addition to pursuing the Canadian Debtors, the U.S. Debtors and Avaya, it may seek to add other defendants, including other Nortel asset purchasers, re-sellers and significant end-users as defendants in this litigation. Although refusing to propose a deadline for completion, it is apparent that SNMPRI's proposed process would take at least a year to complete, and likely considerably longer if SNMPRI follows through on its stated intent to seek to add other defendants.

18.    In sum, SNMPRI proposes nothing which recognizes the circumstances of these CCAA proceedings, including the fact that the Canadian Debtors are insolvent, this Court's familiarity with the business and operations of Nortel, and the close connection between SNMPRI's allegations and the Nortel asset sales approved by this Court.

19.    Granting SNMPRI relief from the CCAA Stay to pursue its claims against the Canadian Debtors in this manner would give SNMPRI a leg-up over other creditors by placing them beyond the reach of this Court, and trigger a lengthy, open-ended and expensive foreign litigation process that is wholly at odds with the interests of the Canadian Debtors (and their general body of creditors) in pursuing a timely and efficient resolution of the outstanding claims against them.

20.    For this reason, the Monitor opposes SNMPRI's motion to lift the CCAA Stay and asks that this court approve and implement the Canadian SNMPRI Claims Protocol (as defined and discussed below) so that the Canadian SNMPRI Claims can be fully and finally resolved in a fair, efficient and timely process that balances the interests of the Canadian Debtors, their general body of creditors and SNMPRI.

- 6 -

**EVENTS SINCE THE SERVICE OF THE ONE HUNDRED AND TWELFTH REPORT**

21.     On February 3, 2015, the Canadian Debtors and Monitor served their motion seeking approval of the Protocol as it relates to resolution of the Canadian SNMPRI Claims. On the same date, the U.S. Debtors filed a motion seeking approval of the Protocol as it relates to resolution of the U.S. SNMPRI Claims. Both motions were intended to be heard at a joint hearing between this Court and the U.S. Bankruptcy Court scheduled for February 27, 2015, the same date SNMPRI's motion to lift the CCAA Stay would be heard by this Court.

22.     The selection of, and agreement to, the February 27, 2015 joint hearing date followed extensive consultation among counsel to each of the Canadian Debtors, Monitor, the U.S. Debtors and SNMPRI over the course of much of January regarding the scheduling of hearings for this Court and the U.S. Bankruptcy Court to consider the Protocol motions, and for the Canadian Court to consider SNMPRI's motion to lift the CCAA Stay.

23.     The agreed joint hearing date of February 27, 2015 reflected a compromise on the part of the Canadian Debtors and Monitor, who had initially sought a hearing date of either January 20 or February 3, 2015 for their Protocol motion in light of the timing considerations for progressing resolution of the Canadian SNMPRI Claims as outlined in the One Hundred and Twelfth Report. Attached as Appendix "A" hereto is a copy of email correspondence between (among others) U.S. counsel to the Monitor and Canadian Debtors and U.S. counsel to SNMPRI in which the February 27, 2015 joint hearing date was agreed to among counsel and U.S. counsel to SNMPRI advised "We agree that it makes sense for the courts to take up your joint protocol motion at the same hearing the Canadian lift-stay motion will be considered."

24.     Notwithstanding its prior agreement, following the filing of the U.S. Debtors' Protocol motion, SNMPRI took the position that the filing of the U.S. Debtors' motion seeking approval of the Protocol was a breach of the stay of the adversary proceeding ordered by the U.S. Bankruptcy Court pending resolution of SNMPRI's motion to lift the CCAA Stay. A copy of U.S. counsel to SNMPRI's email to counsel to the Canadian Debtors, Monitor and U.S. Debtors outlining this position is included at Exhibit "I" to the Affidavit of Dr.

Jeffrey D. Case sworn February 20, 2015 (the "**Case Affidavit**"). The U.S. Debtors subsequently agreed to stay their motion to the U.S. Bankruptcy Court seeking approval of the Protocol.

25.   In light of SNMPRI's actions, a joint hearing with the U.S. Bankruptcy Court will not proceed on February 27. The Monitor understands the U.S. Bankruptcy Court will hold a status conference on the afternoon of February 27 to receive an update on the status of the U.S. Debtors' Protocol motion, including any developments resulting from the motions to be heard by this Court.

*The Canadian SNMPRI Claims Protocol*

26.   The Protocol originally filed contemplated coordinated – but separate – processes to resolve the Canadian SNMPRI Claims and the U.S. SNMPRI Claims that recognized the exclusive jurisdiction of this Court and the U.S. Bankruptcy Court over their respective debtors and the claims against them.

27.   The intended purpose of the Protocol was to provide a process for resolution of the Canadian SNMPRI Claims in accordance with Ontario practice, and the resolution of the U.S. SNMPRI Claims in accordance with U.S. litigation procedure, with some degree of hybridization of the two procedural regimes for purposes of efficiency and coordination. Joint hearings between the Courts pursuant to the Cross-Border Protocol to consider interlocutory motions and  the merits were contemplated – although not mandated – to the extent agreed or ordered by the Courts.

28.   The Protocol sought to advance resolution of the Canadian SNMPRI Claims in a transparent, fair and efficient manner that balanced the interests of SNMPRI in being given a full and fair opportunity to prove its claims with the interests of the Canadian Debtors and their stakeholders in achieving an efficient and timely resolution of the Canadian SNMPRI Claims, and to do so on a coordinated basis with resolution of the U.S. SNMPRI Claims consistent with the manner in which all other cross-border matters (for instance, the allocation dispute and EMEA Claims litigation, the Nortel post-filing sales and cross-

- 8 -

border claims) have been dealt with in these CCAA proceedings and the Chapter 11 Proceedings to date.

29.     SNMPRI has apparently rejected such a balanced approach and has taken steps to attempt to frustrate the Canadian Debtors and U.S. Debtors ability to adopt a cross-border process. In particular, SNMPRI's filings with this Court and the U.S. Bankruptcy Court evidence its desire to:

a)     remove its Amended Complaint from the U.S. Bankruptcy Court to enable it to pursue its U.S. based litigation against the U.S. Debtors and Avaya (and, to the extent the CCAA Stay is lifted, the Canadian Debtors) in a jury trial in the Delaware District Court;

b)     potentially add numerous defendants to its U.S. litigation, including other Nortel asset buyers, resellers of sold Nortel products, and/or significant end-users; and

c)     seek an open-ended litigation schedule that would not see the end of discovery until November 2015 and, although not expressly stated, would not provide for a hearing on the merits of the SNMPRI Claims until 2016.

30.     In short, notwithstanding its prior representation to the Court that, "*[SNMPRI] is willing to proceed with the intended litigation on an expedited basis, in order to minimize any delay in the administration of the Nortel estates*"[3] [emphasis added], SNMPRI's current positions appear to approach these matters as if it were pursuing a normal piece of civil litigation, and demonstrate no regard for the circumstances of these insolvency cases (be they the CCAA proceedings or the Chapter 11 Proceedings) or the interests of the debtors and their stakeholders in pursuing the efficient and timely resolution of the SNMPRI Claims.

31.      In light of the foregoing positions of SNMPRI, the Monitor considers that there is realistic possibility there will be significant, time-consuming and costly jurisdictional and procedural litigation in the U.S. that may impair the progress of the litigation of the U.S.

---

[3] Affidavit of Dr. Jeffrey D. Case sworn September 15, 2011.

- 9 -

SNMPRI Claims, and, as such, that it may not be possible or practical to pursue a coordinated resolution of the Canadian SNMPRI Claims and the U.S. SNMPRI Claims.

32.    Accordingly, the Canadian Debtors and Monitor have filed an Amended Notice of Motion seeking approval of a discovery plan and litigation timetable for the Canadian SNMPRI Claims only (the "**Canadian SNMPRI Claims Protocol**"). Except for the changes discussed at paragraphs 46 to 48, below, the Canadian SNMPRI Claims Protocol is substantially similar to the Protocol as it relates to discovery process and timetable for resolution of the Canadian SNMPRI Claims; the key difference is that the revised discovery plan and litigation timetable only contemplates steps in respect of the Canadian SNMPRI Claims.[4]

33.    To be clear, to the extent practicable, the Monitor intends to work with the U.S. Debtors and SNMPRI to coordinate the process to resolve the Canadian SNMPRI Claims with the process to resolve the U.S. SNMPRI Claims, and the Canadian SNMPRI Claims Protocol contemplates the possibility of the parties seeking direction from the Court to implement a joint protocol at a later date. Further, in the event SNMPRI's motion to withdraw the reference is denied, joint hearings between this Court and the U.S. Bankruptcy Court to consider the SNMPRI Claims can be held pursuant to the Cross-Border Protocol as may be agreed among the parties or ordered by the Courts.

34.    However, neither the Canadian Debtors nor the Monitor (nor this Court) can control SNMPRI's actions in its U.S. based litigation. The proposed Canadian Protocol will ensure that the resolution of the Canadian SNMPRI Claims can be advanced to conclusion in a timely and efficient fashion irrespective of whatever course of action SNMPRI ultimately pursues in its U.S. litigation.

---

[4] The Case Affidavit devotes significant argument to alleged procedural faults with the U.S. Debtors' Protocol motion (see Case Affidavit, paras. 49 – 51). Irrespective of the merits of SNMPRI's positions, they are irrelevant for purposes of this Court's consideration of these matters insofar as the Canadian Debtors and Monitor only seek, and this Court only has jurisdiction to deal with, a discovery plan and litigation timetable for the Canadian SNMPRI Claims.

## SNMPRI's MOTION TO LIFT THE CCAA STAY

35. On February 20, 2015, SNMPRI served a motion seeking to lift the CCAA Stay to pursue the Canadian SNMPRI Claims in the United States. As noted previously, SNMPRI intends to pursue its claims against the Canadian Debtors (as well as its claims against the U.S. Debtors, Avaya and various unspecified asset buyers, re-sellers and end-users) in a jury trial in the Delaware District Court.

*The Appropriate Forum for the Hearing of the SNMPRI Claims*

36. The Case Affidavit points to the forum selection clause in the License Agreement in support of SNMPRI's motion, which provision provides that the venue for any disputes arising under or in respect of the License Agreement shall be Knoxville, Tennessee. However, SNMPRI itself does not abide by this provision: it seeks to pursue its claims against the Canadian Debtors in the Delaware District Court, not in the courts of Knoxville, Tennessee.

37. Further, the Monitor notes that agreements related to many of the significant claims advanced against the Canadian Debtors (for instance, most of the bond claims, the UK pension guarantee claims and certain other material trade and guarantee claims) contain forum selection clauses for venues other than the Ontario Courts, including the courts of New York, the courts of London, England, the courts of the Republic of Ireland and arbitration under the International Chamber of Commerce rules in London, England. Were these provisions to be given effect in the CCAA proceedings, the Canadian Debtors would be forced to litigate claims against them in a variety of different forums, including foreign courts and arbitration proceedings. Such a result would be unduly costly, burdensome and inconsistent with the purpose of the CCAA to consolidate all claims against a debtor into a single forum.

38. Finally, only a relatively narrow portion of SNMPRI's claims appear to arise under or in respect of the License Agreement. Most of its claims are statutory or tortious in nature (for instance, copyright infringement, misappropriation of trade secrets, conversion and misrepresentation), with the alleged wrongful acts having been committed in the context of

the CCAA proceedings. Although SNMPRI currently pleads its claims under U.S. law, given that, in the case of the Canadian Debtors, the alleged infringement and torts occurred in Canada, it is not apparent to the Monitor why U.S. law, and not Canadian law, would govern the Canadian SNMPRI Claims.

39.    The Monitor also notes the following additional factors that weigh in favour of the Canadian SNMPRI Claims being subject to the jurisdiction of this Court:

    a)    Many of the claims arise from alleged wrongful conduct of the Canadian Debtors while under CCAA protection, and relate in particular to the alleged wrongful transfer of intellectual property by the Canadian Debtors by way of transactions approved by this Court.

    b)    This Court has heard many weeks of evidence about the operations of the Nortel group of companies and the Nortel line of business transactions. It would be inefficient to have to educate the Delaware District Court about such matters.

    c)    The Canadian Debtors' business and operations are and were primarily conducted in Canada, principally Toronto and Ottawa, with Ottawa (the Carling Campus) being the Canadian Debtors' principal site of R&D efforts. Accordingly, to the extent there was any unauthorized use or transfer of SNMPRI's software by the Canadian Debtors, presumptively that use or transfer occurred in Canada.

    d)    The majority of the documentary evidence potentially relevant to the Canadian SNMPRI Claims is in Ontario. As noted in the One Hundred and Twelfth Report, the servers that host the ClearCase systems that will be used to perform searches potentially relevant to the SNMPRI Claims are located at the Carling Campus in Ottawa. Further, other potential sources of documentary evidence (e.g. business and financial records of the Canadian Debtors) are located in Ontario.

    e)    The Canadian Debtors' employees and independent contractor with technical knowledge related to the ClearCase searches to be conducted  in respect of the SNMPRI Claims are located in Ottawa.

f)   The Monitor and its employees who will direct the litigation on behalf of the Canadian Debtors are located in Toronto.

g)   The Canadian Debtors' largest stakeholder group (by number) is the Former Employee group, most of whom are resident in Canada and many of whom are located in the Greater Toronto Area or Ottawa. Hearings in the CCAA proceedings are held in Toronto, and each significant stakeholder in the CCAA proceedings is represented by counsel located in Toronto. Accordingly, resolving the Canadian SNMPRI Claims in this Court will facilitate stakeholders access to proceedings in respect of the Canadian SNMPRI Claims.

*Multiplicity of Proceedings*

40.   Lifting the CCAA Stay to permit SNMPRI to pursue its claims against the Canadian Debtors in the United States in fact *promotes* a multiplicity of proceedings and the possibility of inconsistent findings, rather than the opposite.

41.   SNMPRI acknowledges that its First Amended Complaint only encompasses alleged post-filing claims against the Canadian Debtors, and does not (and cannot) encompass SNMPRI's CCAA proofs of claim filed against each of NNC and NNL for $7,549,323 plus "unspecified damages" for alleged pre-filing unauthorized use. These proofs of claim are conclusively subject to the jurisdiction of this Court pursuant to the Claims Procedure Order and the Claims Resolution Order, and SNMPRI has attorned to the jurisdiction of this Court by filing such claims. If not subject to resolution pursuant to the proposed SNMPRI Canadian Claims Protocol, these CCAA proofs of claim, following disallowance or partial disallowance by the Monitor, will be subject to resolution by a claims officer or this Court pursuant to the Claims Resolution Protocol. Accordingly, if the CCAA Stay were to be lifted, resolution of SNMPRI's CCAA proofs of claim in Canada pursuant to the Claims Resolution Order would still have to proceed in any event. The result would be two separate yet overlapping proceedings to resolve SNMPRI's claims against the Canadian Debtors.

- 13 -

42. In contrast, the proposed SNMPRI Canadian Claims Protocol provides for the resolution of *all of SNMPRI's claims against the Canadian Debtors in one forum, in one piece of litigation*. Given that the facts relating to SNMPRI's CCAA proofs of claim are likely to be substantially similar to whatever claims SNMPRI would seek to pursue against the Canadian Debtors in its U.S. litigation,  determining all of SNMPRI's claims against the Canadian Debtors pursuant to the Canadian SNMPRI Claims Protocol serves judicial efficiency and avoids the possibility of conflicting findings.

43. Further, SNMPRI's arguments of efficiency in pursuing its claims against Avaya and any other third-party defendants in the Delaware District Court are a contrived problem of its own design. Notably, this is not a case where there was a pending multi-party lawsuit that was well advanced at the time of an insolvency filing. Rather SNMPRI, having actively participated in these cross-border insolvency proceedings since their outset and having alleged and filed proofs of claim against both the Canadian Debtors and the U.S. Debtors in those proceedings, has added a non-debtor defendant (Avaya) to its claims and may seek to add more as a means of seeking to extricate itself from litigating in the very insolvency proceedings out of which many of its alleged claims arise.

44. In any event, it is not apparent why Avaya (or any other party) is a necessary party to SNMPRI's claims against the Canadian Debtors. By definition, SNMPRI's "Nortel-related" claims against Avaya start at the very moment its claims against the Canadian Debtors' stop, i.e. the closing of the sale of Nortel's Enterprise business from Nortel to Avaya. Aside from whatever (if any) transfer of SNMPRI intellectual property took place between the Canadian Debtors and Avaya, there is no core factual liability overlap between SNMPRI's claims against the Canadian Debtors and SNMPRI's claims against Avaya as the latter will be focused on what, if any, improper use Avaya made of SNMPRI intellectual property following Avaya's acquisition of the Enterprise business. Further, the SNMPRI Canadian Claims Protocol contemplates the possibility of SNMPRI   (with appropriate consent or permission) using discovery it receives in these proceedings in pursuing its U.S. claims, thereby promoting the efficient resolution of any related litigation SNMPRI intends to pursue in the United States. In short, enforcing the CCAA Stay will not prevent SNMPRI from pursuing whatever claims it wishes to pursue against Avaya or

- 14 -

any other non-Canadian Debtor defendant, and will not prejudice SNMPRI's ability to progress those claims. With the cooperation of all parties, discovery can be done efficiently for use in separate Canadian and U.S. proceedings.

*"Right" to a Jury Trial*

45.    While the Monitor believes that SNMPRI's alleged U.S. constitutional right to a jury trial proceeds from a false premise (i.e. that a U.S. court is the appropriate venue for SNMPRI's claims against the Canadian Debtors), the Monitor notes that in a similar case involving claims asserted by a U.S. plaintiff against a CCAA debtor in a cross-border insolvency proceeding, the U.S. Bankruptcy Court for the Southern District of New York held that it was not a violation of U.S. plaintiffs' jury trial rights to have their claims resolved in a CCAA claims process.[5]

## THE CANADIAN SNMPRI CLAIMS PROTOCOL

46.    The Canadian SNMPRI Claims Protocol is substantially similar to the previous Protocol, except that it no longer addresses the process for the resolution of the U.S. SNMPRI Claims. Further, to the extent hybrid Ontario/U.S. procedural steps were contemplated, the Canadian SNMPRI Claims Protocol has been amended to default to Ontario practice. For example, whereas the Protocol contemplated the examination of multiple party representatives subject to overall time limits, the Canadian SNMPRI Claims Protocol provides for one representative witness examination per party only, unless otherwise agreed. In addition, certain U.S. procedural steps have been removed to the extent they are not consistent with Ontario procedure. For instance, the Canadian SNMPRI Claim Protocol no longer anticipates fact witness examinations as a matter of right aside from representative witness examinations.

---

[5] See *In re Ephedra Products Liability Litigation*, 349 B.R. 333 (S.D.N.Y. 2006) (aka the "Muscletech" case), a copy of which is attached as Appendix "B". The Court held no "…law prevents a United States court from giving recognition and enforcement to a foreign insolvency procedure for liquidating claims simply because the procedure alone does not include a right to jury." (Id. at 335-36), and "[T]he notion that a fair and impartial verdict cannot be rendered in the absence of a jury trial defies the experience of most of the civilized world." (Id. at 337).

47.  Following service of the Protocol motions, the Canadian Debtors, the Monitor, the U.S. Debtors and SNMPRI have held a telephone conference regarding the substance of the discovery plan and litigation timetable with a view to resolving any disagreements to the extent possible. The Canadian SNMPRI Claims Protocol reflects certain comments received by the Canadian Debtors and Monitor from SNMPRI regarding the scope of SNMPRI's discovery obligation under the discovery plan. In particular, after being advised by SNMPRI that certain provisions of the discovery plan could be interpreted as requiring SNMPRI to produce all license agreements in respect of its software (which, SNMPRI advised, constituted substantially all documents in SNMPRI's possession), the Canadian Debtors and Monitor have instead requested an initial list of all persons to which SNMPRI has disclosed or licensed its product code and documents regarding its policies and practices for maintaining the confidentiality of its software and products.

48.  The Monitor expects to continue to work with SNMPRI to reach agreement on the Canadian SNMPRI Claims Protocol to the extent possible; however, based on discussions to date (and leaving aside the fundamental issue of the appropriate forum to consider the Canadian SNMPRI Claims), the Monitor expects that two continuing areas of disagreement will be the nature and scope of the ClearCase searches and the litigation timetable.

*ClearCase Searches*

49.  SNMPRI has provided no specific critique of the Canadian Debtors and Monitor's proposed ClearCase searches and, in particular, no evidence as to why the Canadian Debtors' and Monitor's proposal is not reasonable and proportionate in the circumstances. Rather, SNMPRI's response to the Canadian Debtors' and Monitor's proposal has been to seek direct access to ClearCase to conduct its own searches, at its own cost.

50.  In the absence of any specific evidence establishing why the Canadian Debtors' and Monitor's proposal is unreasonable, SNMPRI's request can only be viewed as a request to conduct a fishing expedition in ClearCase.

51. Further, in addition to being inconsistent with standard practice in intellectual property disputes and discovery practice generally, the Monitor does not believe giving SNMPRI access to ClearCase will in any way lessen the discovery burden on the Canadian Debtors.

52. First, ClearCase contains proprietary "Nortel" software and source code. Ownership of most of this proprietary software was conveyed to the Nortel business line purchasers and, as such, now constitutes proprietary software of a particular purchaser (e.g. Ericsson, Avaya, Ciena, Genband, Radware, Hitachi, etc.) that the Canadian Debtors are obligated to hold confidential. SNMPRI cannot be given access to ClearCase without the agreement of these parties or order of this Court on notice to those parties. Based on the Monitor's experience in dealing with the confidentiality concerns of these and similarly situated parties in the context of the allocation dispute, and the fact that SNMPRI has pursued litigation against many of the Nortel asset purchasers, the Monitor expects that the confidentiality regime that would be required in order to give SNMPRI access to ClearCase would be unduly time consuming, costly and burdensome for the Canadian Debtors and the Monitor to negotiate, implement and administer.

53. Second, ClearCase also contains hundreds (if not thousands) of instances of third-party software source code, including source code of SNMPRI competitors, that the Canadian Debtors may be obligated to hold confidential. Attempting to identity all of the relevant third-party software providers and putting them on notice of SNMPRI being given access to their proprietary information is not reasonable or practical in the circumstances. Even if it were, dealing with resulting confidentiality issues would be unduly time-consuming, costly and burdensome.

54. Third, even if SNMPRI were to conduct ClearCases searches, the Canadian Debtors' and Monitor's employees (and potentially professionals) would still need to participate in the searching process to ensure SNMPRI complied with whatever parameters were agreed or ordered, and also to ensure that the Canadian Debtors and Monitor understood what types of searches were being conducted from a substantive perspective for purposes of defending the Canadian SNMPRI Claims. In other words, representatives of the Canadian Debtors and the Monitor would need to be "looking over the shoulder" of SNMPRI's

representatives at all times. As such, there would be no actual cost savings for the Canadian Debtors. In fact, there would be a likelihood of increased expense to the extent SNMPRI was inclined to use its own resources to pursue searches that would otherwise be unreasonable and not proportionate.

55.   In short, the Monitor believes that permitting SNMPRI to perform the ClearCase searches itself (even at its own expense) would in fact give rise to a greater burden on, and expense to, the Canadian Debtors relative to the Canadian Debtors doing reasonable and proportionate searches themselves.

56.   In an effort to attempt to resolve this matter, following further consultation with Seanna Watson (the independent contractor and former NNL employee engaged by the Canadian Debtors to assist with these matters), the Canadian Debtors and Monitor have proposed additional search string terms in the Canadian SNMPRI Claims Protocol based on a further review of the Passport Audit and a review of publically available information in respect of SNMPRI software. In addition, as provided in the discovery plan, the Canadian Debtors and Monitor expect to consult with SNMPRI regarding search parameters once discovery has commenced. Further, to the extent SNMPRI proposes further reasonable and proportionate search parameters beyond those being proposed by the Canadian Debtors and the Monitor, the Canadian Debtors will agree to conduct those searches provided SNMPRI bears the incremental costs of the Canadian Debtors in conducting those searches.

*Litigation Timetable*

57.   The Canadian Protocol contemplates a timetable that will (subject to the Court's availability) see a hearing to resolve the SNMPRI Canadian Claims by November 17, 2015, in effect giving the parties' eight and a half months to conduct a discovery process and prepare for trial. In the circumstances of these CCAA proceedings (and in the context of resolution of an insolvency claim generally), the proposed discovery plan and timetable contemplated in connection with the SNMPRI Canadian Claims can only be described as exceedingly fair and reasonable, and will provide SNMPRI with the opportunity to prove whatever claims it asserts against the Canadian Debtors.

58.    In contrast, SNMPRI's counter-proposal contemplates an open-ended timetable that would not fix dates for pre-trial motions or a hearing, and would only see the discovery process conclude by November 2015. While left unstated, it is apparent that under SNMPRI's timetable, its claims will remain unresolved until at least early 2016 (if not later), meaning at a minimum the process will take approximately one year. SNMPRI has also indicated its intent to potentially add further non-debtors defendants which would undoubtedly delay the litigation timetable even further.

59.    Further, in a limited objection filed with the U.S. Bankruptcy Court, Avaya has indicated it will seek a fact discovery period of at least nine months, followed by a further three month period for expert discovery, "…with the remaining dates to flow from the deadline for conclusion of all discovery under the Court's normal scheduling parameters."[6] Under Avaya's proposed timetable, the trial of SNMPRI's claims would not proceed until mid-2016.

60.    Notwithstanding its prior representations to this Court that it was prepared to proceed with its litigation on an expedited basis in order to minimize any delay in the administration of these proceedings, SNMPRI now conducts itself as if it were pursuing a normal piece of civil litigation, rather than an insolvency claim for which there is significant precedent for truncated procedure and timing. Specifically, the Monitor notes as follows with respect to SNMPRI's proposed litigation timetable:

a)    SNMPRI's proposed one-year timetable is the same length of time as was originally ordered by the Court for the process to resolve the $7.5 billion allocation dispute and the billions of dollars of claims asserted by the EMEA Debtors and UK pension claimants against the Canadian Debtors.[7] Other disputed claims against the Canadian Debtors have been resolved, or are contemplated to be resolved, through processes that have taken no longer than two to three months.

---

[6] Attached hereto as Appendix "C" is the Limited Objection of Avaya Inc. to the U.S. Debtors' Protocol Motion (at para. 18).

[7] Ultimately, following various Court-approved extensions, the  allocation trial started approximately 13 months after the litigation process commenced, with the evidentiary portions of the allocation and UK pension claims trial concluding approximately 15 months after the litigation process commenced.

- 19 -

Having regard to these comparables and the over-arching status of SNMPRI's claims as claims in an insolvency proceeding, a one-year (or greater) timetable for the Canadian SNMPRI Claims is not reasonable or proportionate.

b) As has been previously reported, the Monitor has significant concerns regarding the litigation and discovery expenses incurred by the Canadian Debtors over the past two years. A longer litigation process for the Canadian SNMPRI Claims will undoubtedly lead to greater expenses being incurred by the Canadian Debtors.

c) There still remains significant work to be accomplished in these proceedings, including the divestiture of remaining assets, the resolution of remaining unresolved claims, and distributions to creditors. The Monitor and Canadian Debtors have limited resources to accomplish these objectives. The longer the Canadian SNMPRI Claims remain unresolved, the longer the Canadian Debtors and Monitor will have to devote resources to them and away from accomplishing these other objectives.

61. Although SNMPRI seems to acknowledge and accept the fact that the Canadian Debtors ought to be in position to vacate the Carling Campus by the end of 2015, it mistakenly assumes that is the only factor that necessitates its claims being resolved in a timely fashion. However, vacating the Carling Campus is just a sub-set of a wider issue, namely that the Canadian Debtors and Monitor need to take all steps necessary to progress these proceedings to their conclusion.

62. One of the most significant remaining steps is to fully and finally resolve all disputed claims against the Canadian Debtors so that certainty (or as close thereto as possible) can be achieved with respect to the quantum of claims that will ultimately be proven for distribution in these proceedings. Resolving outstanding disputed claims in a timely fashion will in turn ensure that maximum distributions can be made to creditors as and when funds become available to distribute. Given SNMPRI alleges an "administrative expense" claim of "no less" than $86 million (and presumably will allege an entitlement to 100% recovery on that claim irrespective of the ultimate distribution to be made to other creditors of the Canadian Debtors), the SNMPRI Canadian Claims represent one of the

most significant remaining claims in these proceedings that has yet to be dealt with. Following years of attempted negotiation and mediation, the time has come for SNMPRI to prove its claims in this Court in a process that is fair and reasonable and balances the interests of all stakeholders.

## RECOMMENDATION OF THE MONITOR

63.    For the foregoing reasons, the Monitor respectfully recommends that:

a)    SNMPRI's motion to lift the CCAA Stay be dismissed; and

b)    this Court approve the SNMPRI Canadian Claims Protocol.

All of which is respectfully submitted this 24th day of February, 2015.

**ERNST & YOUNG INC.**
**in its capacity as Monitor of**
**Nortel Networks Corporation *et al*.**
**and not in its personal capacity**

Per:

Murray A. McDonald
President

6424933

**APPENDIX "A"**

**[ATTACHED]**

**From:** Dean, David [mailto:DDean@coleschotz.com]
**Sent:** Thursday, January 15, 2015 3:51 PM
**To:** Paul.Keller@AllenOvery.com
**Cc:** skaufman@cgsh.com; Laura.Hall@AllenOvery.com; rbusch@kingballow.com; acoffman@KingBallow.com; Harvey@chaitons.com; Pernick, Norman; Armstrong, Christopher; Vasuda.Sinha@nortonrosefulbright.com; Alan.Merskey@nortonrosefulbright.com; dherrington@cgsh.com; JWood@emlaw.com
**Subject:** RE: Call about the joint protocol

Paul,

It was not SNMP's intention to delay the filing of your joint protocol motion. We assumed that you would likely file it even if we were able to work out an initial schedule. We agree that it makes sense for the courts to take up your joint protocol motion at the same hearing the Canadian lift-stay motion will be considered. Our intention was to permit discovery to commence in the interim, while SNMP's motions in the U.S. proceed on the same track, given the Debtors' desire to get the case moving as soon as possible. In other words, our proposal was intended to accommodate the debtors' economic and timing concerns expressed in your e-mail below. The proposed joint protocol, timeline and discovery schedule each assume that the Canadian court will deny the motion for relief and order the cases to be jointly tried by the U.S. and Canadian bankruptcy courts – a result that runs contrary to our motion for relief and goal to have the reference withdrawn in the adversary proceeding, as we discussed in detail last week. Accordingly, if you file a motion to approve the joint protocol, you should expect an objection from us. With that said, we recognize that, regardless of how the Canadian court rules on the lift-stay motion and joint protocol motion, the case should move forward. In an effort to work out as much as we can in advance of the hearing, we will provide you with comments to the timeline and discovery plan attached to the protocol. Our comments will, among other things, eliminate deadlines and language that assume this case will be conducted and tried under a joint protocol, as that is obviously contrary to our present position.



**G. David Dean**
Member
300 E. Lombard Street | Suite 2000 | Baltimore, MD | 21202
Direct 410.528.2972 | Firm 410.230.0660 | Fax 410.528.9402 | Cell 443.255.2190 | ddean@coleschotz.com
New Jersey    |    New York    |    Delaware    |    Maryland    |    Texas

vCard   |   bio   |   website

Legal Secretary: Jennifer Donaghy | 410.230.0660 x2870 | JDonaghy@coleschotz.com

---

**From:** Paul.Keller@AllenOvery.com [mailto:Paul.Keller@AllenOvery.com]
**Sent:** Tuesday, January 13, 2015 12:04 PM
**To:** Dean, David
**Cc:** skaufman@cgsh.com, Laura.Hall@AllenOvery.com, rbusch@kingballow.com; acoffman@KingBallow.com,
Harvey@chaitons.com, Pernick, Norman; carmstrong@goodmans.ca, Vasuda.Sinha@nortonrosefulbright.com,
Alan.Merskey@nortonrosefulbright.com, dherrington@cgsh.com, JWood@emlaw.com
**Subject:** RE: Call about the joint protocol

Dear David

Thanks for your email.  Although we appreciate your counterproposal, we still have some distance between us.

As an initial matter, it appears that SNMPRI hopes that the US and Canadian Debtors will not file their protocol motion with the Courts at all, but rather wait until certain SNMPRI motions are filed (and ruled upon) and negotiations among the parties fail.  That does not work for the Debtors. We are not sure you are appreciating the time and cost pressures on the Debtors. As discussed on last week's call, the servers necessary to perform the ClearCase searches we have previously discussed are located at leased premises at NNL's former Carling Campus in Ottawa, Canada. The Carling Campus was sold to the Government of Canada in 2010 and they are in the process of transforming it into the Canadian Department of Defence's National Headquarters. The current lease (already twice extended) expires at the end of 2015 and it is uncertain whether it could be extended given the government's plans for the Carling Campus. It's also highly uncertain from a technical standpoint whether the servers could be moved (either physically or electronically) given their age and various technical challenges, and in any event such attempt would be costly and burdensome. Finally, it's costing the Canadian Debtors approximately $1.6 million per year to maintain these servers, and the Monitor will be recommending to the Canadian Court that the continuation of those expenses post-2015 is not justified in the circumstances of the CCAA proceedings. In light of this, all discovery must come to a close by early fall 2015 so NNL can vacate the Carling Campus in an orderly fashion by the end of the year. Our timetable has been crafted with these realities in mind, including to allow time for any necessary follow-up searches, and physical wind-down.  This is why it is necessary to push the litigation forward on the timetable proposed, and we expect that doing so is in the best interests of SNMPRI as well.

Because of these issues, as well as the efficiency of having the protocol motion and Canadian lift-stay motion heard together and the need for a litigation schedule regardless of where the cases are pending, the Debtors believe that it is necessary to approach the Courts now with an entire proposal covering all of the key case dates.  As such, we again request that SNMP provide its views on the proposed schedule so that we may identify at least the dates on which we agree   Regardless, we have now confirmed that both courts are available on February 27 to hear motions, and we will proceed to schedule hearings with the Courts that day to have the protocol motion heard.  Additional responses to your individual points are below in red.

1.  Schedule a hearing on the motion for relief from stay in Canada on February 27th.  We have confirmed our side's availability for that date.
    Response:  Thank you.  We will proceed with scheduling those hearings.
2.  In the interim, promptly attempt to negotiate a consensual Schedule B to the proposed protocol (the discovery plan), as well as commensurate discovery deadlines set forth in a negotiated version of Schedule A or other stipulation.  Discovery would commence as soon as the courts approve our agreement (and we conduct the required conference under Federal Rule 26(f) to commence discovery in the U.S.).  The agreement would be presented in advance of the February 27th hearing, if possible.  With the exception of discovery deadlines, we should defer agreeing to deadlines on other aspects of the litigation, such as summary judgment/dispositive

motions deadlines, until the motion to withdraw the reference is resolved.  This will not delay discovery, which will continue to proceed regardless of whether the reference is withdrawn.  If the district court withdraws the reference, however, the parties would need to consider how possible consolidation of the other two federal litigations would affect the schedule, and of course the district court could impose its own schedule on us notwithstanding our agreement to the contrary, but these are issues we can defer and reserve rights on until and if the reference is withdraw.  The point at this stage would be to get discovery started in a meaningful way without further delay.

Response:  Please let us know SNMP's thoughts on the proposed schedule.  Please know, however, that absent agreement, we will seek entry of the schedule as proposed.

3.  The SNMP parties would be permitted to file their non-core v. core motion and motion to withdraw the reference upon approval of our agreement to proceed with discovery and schedule the core v. non-core motion for an hearing with the Bankruptcy Court.  As I mentioned on the call, we intend to modify the motions before they are formally filed with the bankruptcy court.

Response:  As you know, the Debtors oppose these motions, but look forward to seeing the proposed modifications that SNMP intends to make. For the avoidance of doubt, the Canadian Debtors and Monitor do not consent to the filing of these motions and confirm that, as a previously agreed and ordered by the Canadian Court, a lifting of the CCAA stay by the Canadian Court would be required to file them. In the interim, we would be prepared to discuss a timetable for filing/scheduling these motions post February 27 once the CCAA lift-stay motion has been resolved.

4.  The Nortel debtors would be required by an agreed date certain to respond to the complaint.

Response:  There is  a date for this currently set forth in the Debtors' proposed schedule.

5.  The Nortel debtors agree that they will not use the commencement of discovery as a basis to deny the motion to withdraw the reference.

Response:  If agreement can be reached on the schedule, this is acceptable to the Debtors.


Best,

Paul

**APPENDIX "B"**

**[ATTACHED]**

Westlaw.UK

349 B.R. 333, 56 Collier Bankr.Cas.2d 734
**(Cite as: 349 B.R. 333)**

United States District Court,
S.D. New York.
In re EPHEDRA PRODUCTS LIABILITY
LITIGATION.
In re Muscletech Research and Development
Inc., et al.; Foreign Applicants in Foreign
Proceedings.
In re RSM Richter Inc., as Foreign Repre-
sentative of Muscletech Research and De-
velopment Inc. and Its Subsidiaries, Plaintiff,
v.
Sharon Aguilar, an individual; et al., De-
fendants.

Nos. 04 MD 1598(JSR), 06 Civ. 538(JSR),
06 Civ. 539(JSR).
Aug. 11, 2006.

**Background:** In multi-district products lia-
bility litigation brought by consumers of
products that contained ephedra, monitor
appointed in insolvency proceeding in Ca-
nadian court for Canadian company that
marketed products containing ephedra in the
United States moved for recognition and
enforcement of Canadian court's order,
which approved claims resolution procedure
designed to speedily assess and value all
claims of Canadian company's creditors, in-
cluding the consumers.

**Holding:** The District Court, Rakoff, J., held
that Canadian court's order was entitled to

recognition and enforcement.
  Motion granted.

West Headnotes

**Bankruptcy 51 ☞2341**

51 Bankruptcy
  51III The Case
    51III(H) Cases Ancillary to Foreign
Proceedings
      51k2341 k. In General. Most Cited
Cases

  Canadian court's order in insolvency
proceeding, which approved claims resolu-
tion procedure designed to speedily assess
and value all claims of Canadian company's
creditors, was entitled to recognition and
enforcement in multi-district products liabil-
ity litigation in the United States against
Canadian company, where the order fell
within purview of Bankruptcy Code sections
providing for appropriate relief upon the
recognition of a foreign proceeding and is-
suance of any necessary or appropriate order,
and the procedure afforded claimants a fair
and impartial proceeding. 11 U.S.C.A. §§
105(a), 1521(a).

**\*333** Daniel Joseph Guyder, Allen & Overy,
LLP, New York, NY, for Muscletech Re-
search and Development, Inc.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

349 B.R. 333, 56 Collier Bankr.Cas.2d 734
**(Cite as: 349 B.R. 333)**

Ken Coleman, Allen & Overy LLP, New York, NY, Daniel Joseph Guyder, Allen & Overy, LLP, New York, NY, Barry Edward Newman, Spohrer Wilner, Maxwell, **\*334** and Matthews, Jacksonville, FL, for Plaintiffs.

John D. Goldsmith, Tampa, FL, Angela L. Milch, Smith Mazure, New York City, NY, for Defendants.

*OPINION AND ORDER*
RAKOFF, District Judge.

Before the substance known as ephedra was banned by the U.S. Food and Drug Administration in 2004, a Canadian-based company named Muscletech Research and Development, Inc. (here referred to, along with its subsidiaries, as "Muscletech") marketed products containing ephedra in the United States. Some of the consumers suffered severe injuries, such as heart attacks and strokes, and eventually more than thirty civil actions for personal injuries and wrongful deaths allegedly caused by ephedra were filed against Muscletech in state and federal courts in the United States. As part of the *In re Ephedra Products Liability Litigation,* the federal cases were subsequently transferred to this Court.

Early in 2006, Muscletech commenced an insolvency proceeding in Ontario Superior Court pursuant to **Canada's** Companies' Creditors Arrangement Act. The Ontario Court appointed RSM Richter, Inc. as Monitor, and the Monitor, in turn, appeared in this Court as the designated foreign representative of the Ontario Court. Acting pursuant to the recently enacted Chapter 15 of the Bankruptcy Code, 11 U.S.C. §§ 1501 *et seq.,*[FN1] this Court eventually granted, following several hearings, the Monitor's motion for an order recognizing the Canadian proceeding as a "foreign main proceeding," *i.e.,* "a foreign proceeding pending in the country where the debtor has the center of its main interests." 11 U.S.C. § 1502; *see* Order, Mar. 2, 2006. Thereafter, the state cases against Muscletech were transferred to this Court pursuant to 28 U.S.C. § 157(b)(5) and consolidated with the previously transferred federal cases. *See* Case Management Order No. 25 ¶ 4, May 22, 2006.

> FN1. Chapter 15, which took effect in October 2005, was derived from the Model Law on Cross–Border Insolvency drafted by the United Nations Commission on International Trade Law ("UNCITRAL").

Meanwhile, in **Canada**, the Monitor and other interested parties negotiated a Claims Resolution Procedure (the "Procedure") designed to speedily assess and value all creditor claims, including the claims of the plaintiffs in the Muscletech actions in the United States, who by this time had filed claims and otherwise appeared in the Ontario insolvency proceeding. The Procedure was

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

349 B.R. 333, 56 Collier Bankr.Cas.2d 734
**(Cite as: 349 B.R. 333)**

approved by the Ontario Court, with the consent of the vast majority of claimants, on June 8, 2006 (the "June 8 Order"). On June 16, 2006, the Monitor moved pursuant to 11 U.S.C. §§ 105(a) and 1521 for an order recognizing and enforcing the June 8 Order within the United States. Four claimants filed papers in opposition. On July 12, 2006, after briefing and oral argument, the Court granted the Monitor's motion, contingent on the Ontario Court's approving certain amendments to the Procedure designed to assure greater clarity and procedural fairness. The Ontario Court approved these amendments on August 1, 2006 (the "August 1 Order"). Accordingly, this Court now grants the Monitor's motion to recognize and enforce in the United States the August 1 Order approving the amended Procedure. The reasons for this ruling are as follows:

Section 1521(a) of the Bankruptcy Code permits this Court, "[u]pon the recognition **\*335** of a foreign proceeding," to grant, at the foreign representative's request, "any appropriate relief" "necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors." 11 U.S.C. § 1521(a). Section 105(a) of the Bankruptcy Code similarly provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." *Id.* § 105(a). In the instant application, the Monitor asks the Court to recognize and enforce a foreign

procedure that implements a claims resolution process that easily falls within the purview of §§ 105(a) and 1521(a).

Section 1506 of the Bankruptcy Code provides, however, that "[n]othing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States." The June 8 Order and the August 1 Order embodying the amended Procedure provide for mandatory mediation and, if the mediation results in a plan approved by specified majorities of creditors, for the estimation and liquidation of the remaining claims by a Claims Officer appointed by the Ontario Court. *See* Notice of Motion, Jun. 16, 2006, Exh. B (the June 8 Order); Notice of Entry, Aug. 1, 2006, Exh. A (the August 1 Order). Primarily on the basis of § 1506, the four objectors ask this Court to refuse to recognize and enforce the Procedure, arguing that it is manifestly contrary to the public policy of the United States in that it deprives the objectors of due process and trial by jury.

As to due process, while most of the objectors' objections are frivolous, there were various paragraphs of the June 8 Order that conceivably could have been read as permitting the Claims Officer to refuse to receive evidence and to liquidate claims without granting interested parties an opportunity to be heard. At this Court's initiative, the Monitor proposed amendments to the June 8 Or-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

349 B.R. 333, 56 Collier Bankr.Cas.2d 734
**(Cite as: 349 B.R. 333)**

der that entirely cured these problems. The Ontario Court promptly adopted these amendments in its August 1 Order, and it is only as a result that this Court now gives its approval to recognition and enforcement of the Procedure.

As for the objection that enforcement of the Procedure effectively denies the objecting plaintiffs the right to jury trial that they would have retained if their cases went to trial in the United States, it may well be the case, as the Monitor argues, that the objectors waived this objection when they filed their claims in the Ontario Court and appeared there to argue the same objections they here make.[FN2] *See* Reply Mem. of Law of RSM Richter Inc. 7; Tr. 7/6/2006, at 54, 57–58. But the Court does not reach the waiver issue because it finds that, in any event, neither § 1506 nor any other law [FN3] prevents a United States **\*336** court from giving recognition and enforcement to a foreign insolvency procedure for liquidating claims simply because the procedure alone does not include a right to jury.

> FN2. Although it might also be argued that the objection to the denial of a jury trial is premature because, at this stage, the Claims Officer has not begun the liquidation process, the Court agrees with the objectors that denial of a jury trial impacts their bargaining position at every stage of the implementation of the Procedure.

FN3. The objectors also purport to rely on 11 U.S.C. § 1507, which, however, adds nothing to the arguments made under § 1506. Although none of the objectors relied on, or even cited, 28 U.S.C. § 1411–which provides that, except in the case of involuntary bankruptcies, "this chapter and *title 11* do not affect any right to trial by jury that an individual has under applicable nonbankruptcy law with regard to a personal injury or wrongful death tort claim," 28 U.S.C. § 1411(a) (emphasis added)-nevertheless, the Court, *sua sponte,* raised § 1411 at the time of oral argument and gave the objectors ample opportunity to address its relevance. *See* Tr., 7/6/2006, at 9–75.

In adopting Chapter 15, Congress instructed the courts that the exception provided therein for refusing to take actions "manifestly contrary to the public policy of the United States" should be "narrowly interpreted," as "[t]he word 'manifestly' in international usage restricts the public policy exception to the most fundamental policies of the United States." H.R.Rep. No. 109–31(I), at 109, *as reprinted in* 2005 U.S.C.C.A.N. 88, 172. This is the standard meaning accorded the word "manifestly" in international law when it refers to a nation's public policy. Indeed, the official Guide to the Enactment of the Model Law on Cross–Border Insol-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

349 B.R. 333, 56 Collier Bankr.Cas.2d 734
**(Cite as: 349 B.R. 333)**

vency (from which Chapter 15 derives) expressly states that

> [t]he purpose of the expression "manifestly," used also in many other international legal texts as a qualifier of the expression "public policy," is to emphasize that public policy exceptions should be interpreted restrictively and that article 6 [FN4] is only intended to be invoked under exceptional circumstances concerning matters of fundamental importance for the enacting State.

> FN4. "Article 6" refers to Article 6 of the Model Law, from which section 1506 is taken virtually verbatim.

United Nations General Assembly, Guide to Enactment of the UNCITRAL Model Law on Cross–Border Insolvency, ¶ 89, U.N. Doc A/CN.9/442 (1997). This takes on even added relevance when one recognizes that the House Judiciary Committee, in enacting Chapter 15, specifically indicated that the Guide "should be consulted for guidance as to the meaning and purpose of [Chapter 15's] provisions." H.R.Rep. No. 109–31(I), at 106 n. 101, *as reprinted in* 2005 U.S.C.C.A.N. 169 n. 101.

Determining what foreign procedures are "manifestly contrary to the public policy of the United States" is, moreover, familiar territory to federal courts, who have long had to confront similar issues when determining whether or not to enforce foreign judgments rendered on the basis of foreign proceedings that were plainly fair but that did not include some commonplace of American practice. As early as 1895, in the leading case of *Hilton v. Guyot,* 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895), the Supreme Court determined that a foreign judgment should generally be accorded comity if "its proceedings are according to the course of a civilized jurisprudence," *i.e.,* fair and impartial. *Hilton,* 159 U.S. at 205–06, 16 S.Ct. 139. More recently, in *Ackermann v. Levine,* 788 F.2d 830 (2d Cir.1986), the Second Circuit expressly reaffirmed "[t]he narrowness of the public policy exception to enforcement [of foreign judgments]," adding that, "[a]s Judge Cardozo so lucidly observed: 'We are not so provincial as to say that every solution of a problem is wrong because we deal with it otherwise at home.' " *Ackermann,* 788 F.2d at 842 (quoting *Loucks v. Standard Oil Co.,* 224 N.Y. 99, 110–11, 120 N.E. 198 (1918) (Cardozo, J.)).

Accordingly, federal courts have enforced against U.S. citizens foreign judgments rendered by foreign courts for whom the very idea of a jury trial is foreign. Only last year, for example, the district court for the Northern District of Ohio granted summary judgment to a plaintiff seeking to enforce against a U.S. company a foreign judgment given by the Supreme Court of the Republic of Korea. **\*337** *See Samyang Food Co. v. Pneumatic Scale Corp.,* No. 05 Civ. 636, 2005 WL 2711526 (N.D.Ohio Oct. 21,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

349 B.R. 333, 56 Collier Bankr.Cas.2d 734
**(Cite as: 349 B.R. 333)**

2005). Against defendant's argument that the Korean judgment should not be recognized because South Korea did not afford defendant a jury trial, the district court held that all that was required was a fair and impartial hearing and that, despite the absence of jury trial, the Korean procedure was eminently fair. *Samyang Food,* 2005 WL 2711526, at *6–*7. As the district court noted, "[t]he Korean judicial system provides substantially the same substantive and procedural due process protections as those afforded by Ohio," *viz.,* "notice, the right to ... legal counsel, the right to present evidence and witnesses and to examine evidence offered against them, and a right to appeal to a higher court." *Samyang Food,* 2005 WL 2711526, at *6. All these protections are likewise present in the Ontario Court.

Similarly, federal courts, in the Second Circuit and elsewhere, have regularly dismissed U.S. cases in favor of foreign forums despite the objection that the foreign forum provides no trial by jury. *See, e. g., Lockman Found. v. Evangelical Alliance Mission,* 930 F.2d 764, 768 (9th Cir.1991) (finding, in affirming forum non conveniens dismissal, that fact that Japan would not conduct jury trial to resolve dispute "does not render Japanese courts an inadequate forum"); *In re Union Carbide Corp. Gas Plant Disaster at Bhopal,* 809 F.2d 195, 199, 202 (2d Cir.1987) (affirming district court's forum non conveniens dismissal based on finding that Indian courts were adequate forum despite, *inter alia,* absence of juries).

Obviously, the constitutional right to a jury trial is an important component of our legal system, and § 1411 stresses its importance in the context of personal injury cases. But the notion that a fair and impartial verdict cannot be rendered in the absence of a jury trial defies the experience of most of the civilized world. Indeed, England, where the jury concept originated, has long since limited jury trials in civil proceedings to only those cases involving allegations of libel, slander, malicious prosecutions, fraud, and false imprisonment. *See* Richard L. Marcus, *Putting American Procedural Exceptionalism Into a Globalized Context,* 53 Am. J. Comp. L. 709, 712–13 (2005) (internal quotation omitted). The historic function of the jury to stand as a bulwark against government abuse plainly has limited application in the civil arena, and it is difficult to detect what unfairness a plaintiff suffers from having a civil case decided by a judge rather than a jury. Here, the objectors' primary claim of "prejudice" from the absence of a right to jury trial is simply that it will give them less of a bargaining position in negotiating a settlement of their claims than they would have if a jury—which, unlike the Claims Officer, would have no knowledge of competing claims—were asked to value their claims. *See* Tr., 7/6/2006, at 37, 40. Deprivation of such bargaining advantage hardly rises to the level of imposing on plaintiffs some fundamental unfairness.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

349 B.R. 333, 56 Collier Bankr.Cas.2d 734
**(Cite as: 349 B.R. 333)**

In any event, the Procedure here in issue, as amended, plainly affords claimants a fair and impartial proceeding. Nothing more is required by § 1506 or any other law.

Accordingly, for the foregoing reasons, the Court hereby recognizes and enforces the Claims Resolution Procedure initially promulgated by the Ontario Superior Court on June 8, 2006 and amended and adopted by the Ontario Superior Court on August 1, 2006.

S.D.N.Y.,2006.
In re Ephedra Products Liability Litigation
349 B.R. 333, 56 Collier Bankr.Cas.2d 734

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

**APPENDIX "C"**

**[ATTACHED]**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Nortel Networks Inc., *et al.*, | ) | Case No. 09-10138 (KG) |
| | ) | (Jointly Administered) |
| _____Debtors._____ | ) | |
| SNMP Research International, Inc. and | ) | |
| SNMP Research, Inc., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adv. No. 11-53454 (KG) |
| | ) | |
| Nortel Networks Inc., *et al.*, | ) | **Re: D.I. 137** |
| Nortel Networks Corporation, | ) | |
| Nortel Networks Limited, | ) | |
| Nortel Networks Global Corporation, | ) | |
| Nortel Networks International Corporation, | ) | |
| Nortel Networks Technology Corporation, | ) | |
| Avaya Inc. | ) | |
| Radware, Ltd., and | ) | |
| John Doe Defendants 1 – 100, | ) | |
| | ) | |
| Defendants. | ) | |

## LIMITED OBJECTION OF AVAYA INC. TO DEBTOR'S MOTION FOR AN ORDER ESTABLISHING (A) A CLAIMS RESOLUTION PROTOCOL (B) A LITIGATION TIMETABLE AND (C) A DISCOVERY PLAN

Avaya Inc. ("Avaya"), by and through its undersigned counsel, hereby respectfully submits this limited objection to *Debtors' Motion for Entry of an Order Establishing (A) a Claims Resolution Protocol (B) a Litigation Timetable and (C) a Discovery Plan* (the "Motion"). In support of its limited objection, Avaya states as follows:

### SUMMARY OF AVAYA'S LIMITED OBJECTION

1.     Debtors' Motion as drafted addresses a timetable for resolution of the claims made by Plaintiffs SNMP Research International, Inc., and SNMP Research, Inc. (collectively, "Plaintiffs") against the named Debtor entities (the "Nortel Defendants"). It does not address the

1

claims that Plaintiffs have asserted against Avaya,[1] and the Motion specifically uses the defined term "<u>Parties</u>" to include Debtors and Plaintiffs, but not Avaya (which is defined as an "<u>Other Defendant</u>").  Yet, with respect to the Proposed Litigation Timetable[2] set forth in the Motion, footnote 5 states that "[t]o the extent applicable, provisions and dates applicable to the debtors and/or the Canadian Nortel Parties shall also apply to defendant Avaya Inc."  This reference is far too vague to meaningfully define the obligations of Avaya under the schedule included as the Proposed Litigation Timetable.

2.      Avaya agrees that a schedule approved by the Court should include the claims against Avaya (and any other remaining defendants).  Avaya also understands that Debtors' proposed schedule largely is driven by the fact that the Canadian Debtors must decommission their servers and vacate their leased space at Carling Campus by December 31, 2015.  That being said, the timetable proposed by the Debtors is too narrow for litigation of the claims involving Avaya, and it is premature to enter a discovery plan binding Avaya before a discovery meet and confer takes place.

3.      Avaya notes that on February 11, 2015, the U.S. Debtors filed a Notice purporting to adjourn the hearing and briefing on the Motion before this Court and scheduling a status conference in place of the previously scheduled hearing.  Nevertheless, the Canadian Debtors apparently plan to go forward with a separate motion to the Canadian Court to be heard on the same day as the status conference to approve the proposed discovery protocol and schedule as it applies to those Debtors.  Although it understands that the Motion will not be heard on February 27 and that all briefing has been adjourned, Avaya files this Limited Objection in an abundance of

---

[1] Upon information and belief, Avaya is the only remaining named defendant in this adversary proceeding other than the Nortel Defendants.

[2] Defined terms used in this Limited Objection, to the extent not defined herein, are defined in the Motion.

caution, to make its position known to this Court in advance of the status conference and reserves all rights to file additional objections if Debtors reschedule the hearing on the Motion.

### Background

4.      Plaintiffs filed the *Complaint* in this adversary proceeding on November 2, 2011. [D.I. 1].

5.      On March 2, 2012, Avaya filed its *Answer to Complaint*. [D.I. 33]

6.      On December 27, 2013, following the entry of the Court's *Memorandum Opinion* [D.I. 113] and *Order* [D.I. 114] dismissing Defendant Radware, Ltd., without prejudice, plaintiffs filed their *First Amended Complaint*. [D.I. 115]

7.      On February 20, 2014, this Court entered Orders extending the time for Avaya [D.I. 126] and the Nortel Defendants [D.I. 125] to respond to the *First Amended Complaint*, until the Ontario Superior Court of Justice releases a decision on Plaintiffs' motion to lift the Stay of Proceedings with respect to the *First Amended Complaint.*

8.      Plaintiffs and the Nortel Defendants mediated their respective claims before the Honorable James L. Garrity, Jr., but that mediation concluded unsuccessfully as of May 8, 2014. [D.I. 131.]

9.      On August 13, 2014, Plaintiffs stipulated to the dismissal of the *First Amended Complaint* against Radware, Ltd., with prejudice. [D.I. 134].

### Plaintiffs' Claims Against Avaya

10.     As set forth in the *First Amended Complaint* (hereinafter, the "Complaint"), Plaintiffs' claims against Avaya arise out of Avaya's purchase of Nortel's Enterprise Solutions

Business assets pursuant to a Section 363 sale approved by this Court on September 16, 2009. [Complaint, ¶ 166].[3]

11.   The Complaint includes counts against Avaya for copyright infringement (Count IV), misappropriation of trade secrets (Count IX), breach of contract (Count XII), fraudulent misrepresentation (Count XII) and conversion (Count XVII).

12.   Undersigned counsel entered their appearance on behalf of Avaya in this adversary proceeding on January 9, 2015 (D.I. 135).

13.   Avaya is not aware of any discovery that has occurred to date with respect to the claims between Plaintiffs and Avaya.  Indeed, the litigation largely has been stayed while Debtors and Plaintiffs engaged in mediation.

### Debtors Proposed Litigation Timetable and Discovery Protocol

14.   In broad strokes, Debtors' proposed litigation timetable, as potentially applicable to Avaya, provides for the following schedule:

- Initial Disclosures:                                     April 17, 2015

- Discovery Meet and Confer:                    April 24, 2015

- Document Production Deadline:              May 22, 2015

- Completion of Fact Witness depositions:     July 24, 2015

- Completion of Expert Discovery:           September 4, 2015

- Dispositive Motion Deadline:                 September 18, 2015

- Pre-Trial Witness and Exhibit Lists:  October 9, 2015

- Trial:                                                     November 17, 2015 or thereafter

---

[3] The First Amended Complaint was filed under seal.

15.     The Proposed Discovery Plan, by its terms, does not specifically apply to Plaintiffs'
claims against Avaya, since it relates to the "SNMPRI Claims," which the Motion defines as the
claims Plaintiffs have against either the Canadian or U.S. Debtors.    However, the Proposed
Discovery Plan does include a requirement that Plaintiffs produce documents "related to the
litigation, negotiation or settlement of claims between Plaintiffs and each of Avaya, Inc.,
GENBAND, Inc., Performance Technologies, Inc., and Radware Ltd." [Motion, ¶ 20(d)(i)].

## LIMITED OBJECTION

16.     Plaintiffs' Complaint asserts significant claims against Avaya, including breach of
contract, copyright infringement and misappropriation of trade secrets.    Yet, the Proposed
Litigation Timetable presents a schedule that is wholly inadequate for Avaya to develop its
defenses to these claims.    While the joint document production obligations contained in the
Discovery Proposal may assist in streamlining the schedule, the present schedule provides a mere
***28 days*** for Avaya to complete its document production after the discovery meet and confer.  This
timetable is not reasonable for a case involving claims of this nature, and in particular does not
appear to allow any time for follow up after an initial document production.

17.     In fact, the schedule does not provide Avaya (or any other party) with a reasonable
period to serve and respond to document requests, interrogatories or other written discovery.
Rather, it assumes that each party will simply produce all of its documents at the outset, without
follow up and without any indication as to which documents are relevant to the issues in the case.
This process is contrary to discovery under the Federal Rules of Civil and Bankruptcy Procedure
that are applicable to this case and frankly make no sense given that the parameters of Plaintiffs'
claims against Avaya and Avaya's defenses remain largely undefined.

18.     A schedule that is more reasonable would provide for a fact discovery period of at least *nine* months, followed by a *three* month period for expert discovery, with the remaining dates to flow from the deadline for conclusion of all discovery under the Court's normal scheduling parameters.  Given that the litigation of the case has been stayed for more than three years with no discovery conducted, a period of 12 months to complete fact and expert discovery is appropriate under the circumstances.

19.     Avaya recognizes Debtors' interest in resolving its claims promptly.  However, Debtors' concerns about decommissioning their computer servers and wrapping up the administration of its estates can be addressed without unfairly prejudicing the rights of Avaya.

20.     The Discovery Plan as proposed has only limited applicability to Avaya, and to the extent it is approved with respect to the claims between Plaintiffs and Debtors, it should **not** be binding on Avaya as to:

(a) the scope of Plaintiffs' obligations for document production to Avaya;

(b) Plaintiffs' witness identification obligations;

(c) the methods for production of documents or electronic information; and

(d) the limitations on fact witness *(21 hours per party)*, representative witness (*14 hours per party*) and non-party witness depositions (*50 hours per party*).

While Avaya believes that limits are appropriate, it would expect such limits to be developed by the parties and confirmed through the meet and confer discovery conference (and any subsequent follow up with the Court).

21.     Absent further discussions and resolution of issues with Debtors, Debtor's Proposed Litigation Timetable and Discovery Protocol, as applied to Avaya, should be rejected in its entirety.  The Motion generally leaves Avaya out of the defined terms relating to the relief

requested.  Where Avaya has been incorporated by reference (through footnote 5), the Motion does not provide an adequate description of which deadlines or which elements of the Discovery Protocol should be applicable and binding as to Avaya.

22.     Debtors' entire business has been reduced to resolving the bankruptcy claims against it.  That is not the case for Avaya.  This Court therefore should enter an Order approving a schedule that balances the need to efficiently manage the case while at the same time not imposing inappropriately short and unnecessarily burdensome deadlines upon Avaya.

WHEREFORE, for the foregoing reasons, Avaya respectfully requests that the Court deny the proposed relief requested in the Debtors' Motion except to the extent such relief is modified consistent with this Limited Objection, and for such other relief as is just and proper.

Date:   February 13, 2015
        Wilmington, DE                         SULLIVAN · HAZELTINE · ALLINSON LLC

                                               /s/ William D. Sullivan
                                               William D. Sullivan (No. 2820)
                                               William A. Hazeltine (No. 3294)
                                               Elihu E. Allinson III (No. 3476)
                                               901 North Market Street, Suite 1300
                                               Wilmington, DE 19801
                                               Tel: (302) 428-8191

                                               John J. Monaghan, Esq.
                                               Joshua C. Krumholz, Esq.
                                               Holland & Knight
                                               10 St. James Avenue, 11th Floor
                                               Boston, MA  02116
                                               Tel: (617) 523-2700

                                               Barbra R. Parlin, Esq.
                                               Holland & Knight
                                               31 West 52nd Street
                                               New York, NY  10019
                                               Tel: (212) 513-3200

                                               Attorneys for Avaya Inc.

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

Court File No:  09-CL-7950

---

### *ONTARIO* SUPERIOR COURT OF JUSTICE (COMMERCIAL LIST)

Proceeding commenced at Toronto

---

### SUPPLEMENT TO THE ONE HUNDRED AND TWELFTH REPORT OF THE MONITOR DATED FEBRUARY 24, 2015

---

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

Jay A. Carfagnini  (LSUC#: 22293T)
jcarfagnini@goodmans.ca
Joseph Pasquariello (LSUC# 38390C)
jpasquariello@goodmans.ca
Christopher G. Armstrong (LSUC# 55148B)
carmstrong@goodmans.ca

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.