# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------- X
                 :

*In re*                       :     Chapter 11

                             :

Nortel Networks Inc., *et al.*,[1]     :     Case No. 09-10138 (KG)

                             :

            Debtors.     :     Jointly Administered

                             :

                             :     **Hearing date: March 26, 2015 at 10:00 a.m. (ET)**
                             :     **Objections due: February 24, 2015 at 4:00 p.m. (ET)**
                             :     **Reply due: March 13, 2015 at 4:00 p.m. (ET)**

                             :     **RE: D.I. 9362, 9412, 9418, 9441, 9451, 9641, 10016, 10484, 11201, 11821, 12504, 13237, 13240, 13250**

-------------------------------------------------------- X

# U.S. DEBTORS' SUPPLEMENTAL OBJECTION TO THE MOTION OF THE AD HOC COMMITTEE OF CANADIAN EMPLOYEES TERMINATED PRE-PETITION FOR ENTRY OF AN ORDER ALLOWING LATE FILED CLAIMS

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession, (collectively, the "U.S. Debtors"), hereby respectfully submit this supplemental objection (the "Supplemental Objection"),[2] in further opposition[3] to the *Motion of the Ad Hoc Committee of Canadian Employees Terminated Pre-Petition for Entry of an Order Allowing Late Filed Claims* [D.I. 9362] (the "Motion") filed by the Ad Hoc Committee Of Canadian

---

[1]     The U.S. Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Contact information for the U.S. Debtors and their petitions are available at http://dm.epiq11.com/nortel.

[2]     This brief and the accompanying Declaration of Michelle J. Parthum are being filed under seal pursuant to the *Order Approving Stipulation and Agreement Governing Production, Exchange and Filing of Confidential Materials Related to the Motion of the Ad Hoc Committee of Canadian Employees Terminated Pre-Petition for Entry of an Order Allowing Filing of Claims After the Bar Date* [D.I. 9641], in light of Movants' confidentiality designations with respect to documents produced and testimony provided, pending agreement by Movants with respect to redactions or further relief from the Court if necessary.

[3]     The U.S. Debtors' initial objection is contained in the *U.S. Debtors' Objection to the Motion of the Ad Hoc Committee of Canadian Employees Terminated Pre-Petition for Entry of an Order Allowing Late Filed Claims* [D.I. 9412].

Employees Terminated Pre-Petition (the "Ad Hoc Committee" and each of the members of the

Ad Hoc Committee seeking relief under the Motion, a "Movant").  In further support of their

objection to the Motion, the U.S. Debtors represent as follows:

**PRELIMINARY STATEMENT**

1.      Movants, former employees of the Canadian Debtors,[4] seek to obtain the

right to pursue claims against the U.S. Debtors in the U.S. Debtors' chapter 11 proceedings (the

"U.S. Proceedings") years after the court-ordered Bar Date (as defined below), without coming

close to satisfying any requirement of the excusable neglect standard, let alone all of them.

Indeed, the discovery taken demonstrates the very opposite of excusable neglect – Movants knew

all of the facts supporting their purported contractual claims prior to the commencement of the

U.S. Proceedings, but they did not file claims by the September 30, 2009 deadline because they

knew they had no claim against any of the U.S. Debtors.  Movants were certainly aware of the

Bar Date set in the U.S. Proceedings – Movants' Canadian counsel, Koskie Minsky LLP,

repeatedly warned them of the Bar Date, a warning that spread like wildfire among Movants

through their internet chat group and their counsel's website and news bulletins.  There is but

one reason none of the Movants filed a claim (or even inquired of counsel whether they had a

potential claim):  none believed he or she had a claim against the U.S. Debtors based on his or

her severance agreement with the Canadian Debtors.

2.      Faced with significant evidence of their actual or constructive notice of the

Bar Date, Movants attempt to place the blame for their delay on Koskie Minsky, their counsel in

---

[4]      The "Canadian Debtors" include the following entities:  Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.  The Canadian Debtors have commenced proceedings under the Companies' Creditors Arrangement Act (Canada) (the "CCAA," such proceedings collectively, the "Canadian Proceedings") before the Ontario Superior Court of Justice (the "Canadian Court").  Ernst & Young Inc. has been appointed as the Monitor in the Canadian Proceedings (the "Monitor").

the Canadian Proceedings, arguing that they were advised to "do nothing" and to "wait for the special claims process that was going to be created for former employees." *Supplemental Memorandum in Support of Motion for Ad Hoc Committee of Canadian Employees Terminated Pre-Petition for Entry of an Order Allowing Claims to Be Filed After the Bar Date* [D.I. 13240] (the "Supplemental Memorandum" or "Supp. Mem.") at 5. The evidence, however, establishes that Koskie Minsky advised Movants before the Bar Date that claims against the U.S. Debtors needed to be filed "urgently." Nevertheless, believing (correctly) that they had no claims against the U.S. Debtors, Movants took no action to investigate the possibility of filing claims in the U.S. Proceedings, and instead deliberately chose to focus exclusively on asserting their claims in the Canadian Proceedings. And in any event, even if Movants' assertions about the advice provided by Koskie Minsky were supported by the evidence, under the law any negligence on the part of counsel is imputed to the Movant and is no excuse for filing an untimely claim.

3.     Years later, Movants now claim to have come to the "realization" that their severance agreements granted them the right to pursue severance claims not only against their Canadian employer, but against any and all Nortel[5] affiliates (whether or not they worked for such affiliates), and even against any other past or present employees of their Canadian employer or its affiliates. To succeed on their Motion, Movants seek to open not one but two Pandora's boxes. First, they ask the Court to declare the U.S. Debtors' bar date notice "confusing" to all Canadian creditors, and therefore effectively re-open the door, six years into these cases, to new claims from any Canadian creditors, and potentially claims from individuals around the globe. Second, and substantively, they seek a declaration from this Court that the U.S. Debtors should also be liable whenever the Canadian Debtors loosely defined the corporate

---

[5]     As referenced herein, "Nortel" refers to the U.S. Debtors, the Canadian Debtors and their worldwide debtor and non-debtor affiliates.

group in their private agreements.  This argument, developed and pursued by Koskie Minsky, should be seen for what it is – a self-admitted effort by counsel to a member of the Canadian Creditors' Committee (the "CCC") to advance its goal of effectively substantively consolidating the Nortel estates on a cross-border basis.

4.      Even after the supposed discovery of Movants' claims in or around June 2012, and in spite of the fact that two and a half years had already elapsed since the Bar Date, Movants waited at least another eight months before finally filing the Motion.  Permitting Movants to file their extremely belated claims would cause extraordinary prejudice to the U.S. Debtors and their creditors – such relief could open the door to similar claims from other foreign employees and creditors, forcing the U.S. Debtors to assume the role of guarantors for Nortel's worldwide obligations based on promises made by foreign debtor affiliates.  Accordingly, the U.S. Debtors respectfully request that the Court deny the Motion with prejudice.

## STATEMENT OF FACTS

**A.      Movants' Termination Letters**

5.      Movants consist of a group of former employees of the Canadian Debtors who were terminated by the Canadian Debtors.  With few exceptions, Movants never had any employment relationship with the U.S. Debtors, were not terminated by the U.S. Debtors, had never been paid severance by the U.S. Debtors and had not received any promises from the U.S. Debtors.  Movants were the Canadian Debtors' employees and that is what Movants always knew and understood.

6.      When their employment was terminated by the Canadian Debtors, Movants each received a letter (the "Termination Letter") that defined "Corporation" as "Nortel Networks Corporation, its subsidiaries and affiliates, their successors and assigns, and all of their past and present officers, directors, employees and agents (in their individual and representative

4

capacities), in every case, individually and collectively."  Ex. 21 to the Declaration of Michelle J.

Parthum, dated Feb. 24, 2015 ("Parthum Decl.") at 1.  The word "Corporation" was then used

throughout the Termination Letter, including in each employee's release, references to the

employer, with respect to severance payments and even as the superseding assignee of all

intellectual property regardless of any prior agreement.  Plainly this was not anyone's intent or

understanding since reading the Termination Letter as incorporating as broad a definition of

"Corporation" as Movants now urge would mean the following:

- every past or present employee of any Nortel entity worldwide – including Movants – is "individually" liable for the severance of every recipient of a Termination Letter, id.;

- the Termination Letters were intentionally drafted with redundancies, such as in the references to the release of the "Corporation, its directors, officers, employees, and representatives," id. at 3;

- former employees – ostensibly within the definition of "Corporation" – are authorized to amend the Termination Letter, which may be modified by "a written instrument duly executed by you and an authorized representative of the Corporation," id.; and

- the "entire right, title and interest to all intellectual property as generally described in such agreement[] with the Corporation" is assigned to every person or entity subsumed within the definition of Corporation – thus to the U.S. Debtors, according to Movants – "regardless of the exact terms in, or the existence of, such an agreement between you and the Corporation," id.

Further confirming that nobody intended or understood that the Termination

Letters imposed any liability on the U.S. Debtors, Movants generally testified that upon receipt

of their Termination Letters, they did not believe that any non-Canadian subsidiary or affiliate of

the Canadian Debtors, any past or present employee or any other person or entity other than the

Canadian Debtors had any rights or obligations relating to the Termination Letters.[6]  Neither did

the Monitor or the CCC – whose counsel has been advising Movants – believe it, as they spent

---

[6] See infra ¶¶ 17-19, 36.

many months arguing in the context of the allocation dispute that these same former Canadian employees had assigned their intellectual property rights solely to the Canadian Debtors, not to every Nortel subsidiary or affiliate "regardless of the exact terms in, or the existence of," any prior agreement with a Canadian Debtor.  See, e.g., *Pre-Trial Brief of the Monitor and Canadian Debtors – Allocation* [D.I. 13553]; *Trial Brief of the Canadian Creditors' Committee ("CCC")* [D.I. 13552]; *Initial Post-Trial Brief (Allocation) of the Monitor and Canadian Debtors* [D.I. 14252]; *Closing Brief of the Canadian Creditors' Committee ("CCC")* [D.I. 14259].  To accept Movants' interpretation of the Termination Letters would be to eviscerate the Monitor's and the CCC's most fundamental argument in the allocation litigation as to the Canadian Debtors' ownership of intellectual property; instead, it would require inquiry into the identity of every inventor of every Nortel patent and whether his or her termination letter has a superseding assignment of intellectual property rights to the U.S. Debtors.

## B.    The U.S. Bar Date Order

7.    On August 4, 2009, this Court entered an order (the "Bar Date Order") establishing September 30, 2009 at 4:00 p.m. (Eastern Time) (the "Bar Date") as the last date for all creditors holding a "claim" against the U.S. Debtors to file and serve a written proof of claim [D.I. 1280].[7]  Notice of the Bar Date was published the same day.  See *Notice of Deadline Requiring Filing of Proofs of Claim on or Before September 30, 2009* [D.I. 1281] (the "Bar Date Notice").  The Bar Date Notice was served on all known creditors of the U.S. Debtors,[8] see *Affidavits of Service* [D.I.s 1352, 1354 and 1580],  and was published in each of The Globe and

---

[7]    The Bar Date Order was made subject to certain exceptions enumerated therein.  A separate bar date of January 25, 2010 was ordered for NN CALA [D.I. 2059], which filed its chapter 11 case on July 14, 2009.  Pursuant to the authority set forth in the Bar Date Orders, the U.S. Debtors have established certain supplemental bar dates for discrete sets of claims to which the original bar date order did not apply.  This Court also entered a separate order setting November 15, 2011 at 4:00 p.m. (Eastern Time) as the bar date for filing proofs of claim in respect of certain Non-Canadian intercompany and director and officer claims [D.I. 6464].

[8]    Other than creditors of NN CALA, which had a separate bar date.  See supra note 7.

Mail and The Wall Street Journal (national and global editions).  See *Affidavit of Publication of*

*the Bar Date Notice in The Globe and Mail* [D.I. 1368]; *Affidavit of Publication of the Bar Date*

*Notice in The Wall Street Journal* [D.I. 1369].

        8.    The Bar Date Order was recognized by the Canadian Court in the U.S.

Debtors' proceedings under Section 18.6 of the CCAA, Court File No.: 09-CL-7951.  See

Parthum Decl. Ex. 110 (Recognition of the U.S. Claims Bar Order, dated Aug. 14, 2009).  Such

recognition relief was obtained on notice to various parties, including the law firm of Koskie

Minsky, counsel for former Canadian Nortel employees, including Movants.  See Parthum Decl.

Ex. 111 (Motion Record – Recognition of Various Orders, dated Aug. 11, 2009) at 12, 16

(Service List).  The existence of the Bar Date also was well publicized in the Canadian Debtors'

CCAA proceedings, including as noted in various publicly filed documents in the Canadian

Proceedings.  See, e.g., Parthum Decl. Ex. 112 (Claims Procedure Order, dated July 30, 2009) at

Schedules A and C.  The Bar Date also was disclosed on the Monitor's website for the CCAA

proceedings via a link to the website maintained by Epiq Systems, the U.S. Debtors' Claims,

Noticing and Balloting Agent.  See Ernst & Young Inc., Restructuring Document Centre, Nortel

Networks Corp. [CCAA Monitor],

http://documentcentre.eycan.com/Pages/Main.aspx?SID=89&Redirect=1 (last visited Feb. 18,

2015); Parthum Decl. Ex. 113 (Screen shot of Ernst & Young Inc., Restructuring Document

Centre, Nortel Networks Corp. [CCAA Monitor] website, dated Feb. 18, 2015); Epiq Systems,

Nortel Networks, Inc., http://dm.epiq11.com/NNI/Project# (last visited Feb. 18, 2015); Parthum

Decl. Ex. 114 (Screen shot of Epiq Systems, Nortel Networks, Inc. website, dated Feb. 18,

2015).

9.      In addition to the foregoing, Movants were provided with timely notice by Koskie Minsky that the U.S. claims process was underway and that a Bar Date had been set.  For example, Koskie Minsky informed Movants through weekly news bulletins issued on July 15 and 22, August 5, 12, and 19, and September 29, 2009 that "[a] U.S. claims process has been released."[9]  In the August 12 bulletin, Koskie Minsky also informed Movants that Justice Morawetz had granted an order recognizing the U.S. Claims Bar Order.[10]  An update posted on Koskie Minsky's website on July 23, 2009 also referred Movants to the "establishment of a Claims Process in the U.S. Bankruptcy Court."[11]  In addition, on July 16, 2009, Koskie Minsky conveyed to Movants through a LinkedIn group for Recently Severed Nortel Canada Employees (the "LinkedIn Group")[12] that "a claims process will be announced for US creditors tomorrow with a 'claims bar' date of September 30, 2009."[13]

---

[9]      See Parthum Decl. Ex. 115 (Koskie Minsky Pensioners and Former Employees News Bulletin, dated July 15, 2009) at 3; Parthum Decl. Ex. 116 (Koskie Minsky Pensioners and Former Employees News Bulletin, dated July 22, 2009) at 3; Parthum Decl. Ex. 43 (Koskie Minsky Pensioners, Former Employees and Disabled Employees News Bulletin, dated Aug. 5, 2009) at 3; Parthum Decl. Ex. 58 (Koskie Minsky Pensioners, Former Employees and Disabled Employees News Bulletin, dated Aug. 12, 2009) at 3; Parthum Decl. Ex. 44 (Koskie Minsky Pensioners, Former Employees and Disabled Employees News Bulletin, dated Aug. 19, 2009) at 3; Parthum Decl. Ex. 45 (Koskie Minsky Pensioners, Former Employees and Disabled Employees News Bulletin, dated Sept. 29, 2009) at 4.

[10]     Parthum Decl. Ex. 58 (Koskie Minsky Pensioners, Former Employees and Disabled Employees News Bulletin, dated Aug. 12, 2009) at 2.

[11]     Parthum Decl. Ex. 57 (Koskie Minsky LLP website, "Nortel Networks Corporation > Developments") at JL-00061.

[12]     The LinkedIn Group was created and administered by Movant Paula Klein and served as the "main tool" for updates pertaining to the severance claims of severed Nortel Canada employees and related subjects.  See Motion Ex. B (Affidavit of Michael Campbell, dated Feb. 1, 2013) ("Campbell Aff.") ¶¶ 11-12.  Discovery revealed that 143 of the approximately 156 Movants were members of the LinkedIn Group, meaning that they were aware of, signed up for and had access to all of the discussions posted on the group.  See Parthum Decl. Ex. 117 (E-mail from Rachel B. Mersky, Esq., to Lisa M. Schweitzer et al., attaching "Additional Nortel Discovery Chart" (additional attachments omitted), dated Sept. 29, 2014).  Michael Campbell, one of three people appointed by the Canadian Court to act as a representative for former Nortel employees, explained in his affidavit accompanying the Motion that the LinkedIn Group was "one of the main tools that I and the other Representatives have used to reach out to our group by posting updates, and also to ensure our group's concerns are addressed."  Campbell Aff. ¶ 11.  The U.S. Debtors were not invited to join the LinkedIn Group, or consulted regarding the accuracy of the information posted and shared on the LinkedIn Group.

[13]     Parthum Decl. Ex. 11, LI00915-18 (LinkedIn Discussion titled "July 16 – Update on Activities with KM," dated July 16, 2009) at LI00916.

10.    In spite of this timely notice of the Bar Date, not one of the Movants investigated whether he or she was eligible to file a proof of claim in the U.S. Proceedings.[14] While Movants took no action during this period of time to investigate potential claims against the U.S. Debtors, they were not dormant with respect to the claims they intended to file against the Canadian Debtors; indeed, Michael Campbell (one of three Canadian Court-appointed employee representatives) acknowledged that he and the other Canadian employee representatives discussed potential employee compensation claims processes with the Monitor on several occasions between fall 2009 and early spring 2011 and that the Monitor notified former employees of their potential claims against Nortel Canada in the fall of 2011.  See Campbell Aff. ¶¶ 15, 17.

**C.    Movants Decide to Pursue Claims Against the U.S. Debtors**

11.    Several years later, seemingly as a result of a strategic decision by the CCC with respect to the allocation litigation, Movants' Canadian counsel at Koskie Minsky crafted a theory to hold the U.S. Debtors liable under the Termination Letters.  They discussed their theory with at least several Movants and began the solicitation process to find more former Canadian employees to join their cause.  But they failed to file the Motion for at least eight more months.

12.    Finally, on February 1, 2013, a week after the unsuccessful conclusion of the final allocation mediation and more than three years after the Bar Date, Movants filed the Motion seeking permission to file late claims in the U.S. Proceedings.  Movants and the U.S. Debtors negotiated a discovery schedule, whereby the U.S. Debtors served targeted document

---

[14]    See infra notes 44, 48.  While Movant Ernie Briard filed a proof of claim in the U.S. Proceedings for his U.S. pension benefits, see Parthum Decl. Ex. 38 (Ernie Briard Proof of Claim, dated Sept. 29, 2009), he failed to investigate whether he would be eligible to file a proof of claim in the U.S. Proceedings for his severance prior to retaining U.S. counsel in connection with the Motion, see Parthum Decl. Ex. 118 (Dep. of Ernie Briard, dated Feb. 4, 2014) ("Briard Dep.") at 113:7-15.

requests on each of the Movants on April 5, 2013.  See *Order Approving the Stipulated Protocol Regarding Discovery with Respect to the Issue of "Excusable Neglect"* [D.I. 10016].  On Movants' request, the deadline to produce responsive documents was extended several times, with a final deadline of December 31, 2013.  See D.I.s 10484, 11201, 11821, 12504.[15]  The U.S. Debtors and the Official Committee of Unsecured Creditors then deposed a sample of 14 of the 156 Movants, including the affiant to the Motion and employee representative Michael Campbell, while reserving all rights to obtain additional discovery as to any and all of the Movants consistent with the burden that each Movant bears individually to establish excusable neglect.[16]  Depositions were completed on February 14, 2014, and on March 27, 2014, Movants filed the Supplemental Memorandum and a Re-Notice of Motion purporting to notice a hearing on the matter for April 22, 2014 (despite having been made aware of the imminent allocation trial scheduled to commence in early May).  On March 31, this Court denied the hearing request pending the conclusion of the allocation trial.  See *Order Denying Request for Oral Argument at this Time* [D.I. 13250].

13.     The allocation trial concluded on September 24, 2014.  On October 3, 2014, the U.S. Debtors requested limited additional discovery from Koskie Minsky pertaining to several subjects that had been placed squarely in issue by the depositions and the Supplemental Memorandum, including (i) the advice provided by Koskie Minsky to Movants with respect to

---

[15]      Discovery was not complete even as of December 31, 2013, because (i) certain agreed-upon discovery had not yet been provided, and (ii) depositions revealed that certain Movants had made incomplete searches for and productions of relevant documents.  Movants continued to produce responsive documents on a rolling basis after the conclusion of the depositions, and did not finish producing responsive documents until September 29, 2014.  See Parthum Decl. Ex. 117 (E-mail from Rachel B. Mersky, Esq., to Lisa M. Schweitzer et al., attaching "Additional Nortel Discovery Chart" (additional attachments omitted), dated Sept. 29, 2014).

[16]      As explained in greater detail herein, each of the Movants has failed to make the requisite individualized showing of excusable neglect.  The arguments made in this brief establish that based upon common facts alleged and discovered, none of the Movants can satisfy this standard, but to the extent the Court disagrees, the U.S. Debtors reserve the right to hold each of the Movants to establish that his or her failure to timely file a proof of claim was the result of his or her excusable neglect.

the U.S. Proceedings, (ii) Koskie Minsky's involvement in identifying the legal basis for the

Motion and pursuing the Motion, including by identifying U.S. counsel, and (iii)

communications produced by Movants that indicated that the Motion was being used for

strategic advantage in the allocation trial.  See Parthum Decl. Ex. 119 (Letter from Jeffrey A.

Rosenthal to Susan Philpott, Esq., Koskie Minsky, dated Oct. 3, 2014).  Koskie Minsky

responded three weeks later, refusing to comply with the discovery requests on account of

alleged overbreadth and privilege, without articulating any specific objection or the basis for any

claim of privilege.  See Parthum Decl. Ex. 120 (Letter from Timothy E. Hoeffner, Esq., DLA

Piper, to Jeffrey A. Rosenthal, dated Oct. 22, 2014); Parthum Decl. Ex. 121 (E-mail from

Barbara Walancik, Esq., Koskie Minsky, to Jeffrey A. Rosenthal, dated Oct. 22, 2014).  After the

U.S. Debtors expressed their intention to seek an adverse inference if Koskie Minsky persisted in

its refusal to cooperate, Koskie Minsky produced less than two dozen self-selected documents,

failing to indicate the basis upon which the selected documents were chosen for production or to

which requests the documents were responsive.  See Parthum Decl. Ex. 122 (Letter from Jeffrey

A. Rosenthal to Barbara Walancik, Esq., dated Oct. 30, 2014); Parthum Decl. Ex. 123 (E-mail

(Parts I and II) from Barbara Walancik, Esq., to Jeffrey A. Rosenthal, attaching Letter from Mark

Zigler, Esq., Koskie Minsky (additional attachments omitted), dated Nov. 7, 2014); Parthum

Decl. Ex. 124 (E-mail from Barbara Walancik, Esq., to Jeffrey A. Rosenthal, attaching Letter

from Mark Zigler, Esq., (additional attachments omitted), dated Nov. 26, 2014); Parthum Decl.

Ex. 125 (Letter from Jeffrey A. Rosenthal to Mark Zigler, Esq., dated Dec. 3, 2014); Parthum

Decl. Ex. 126 (Letter from Mark Zigler, Esq., to Jeffrey A. Rosenthal, dated Dec. 9, 2014).

       14.     Reaching a dead end in their direct efforts to obtain Koskie Minsky's

compliance, the U.S. Debtors solicited the assistance of Movants' U.S. counsel to obtain Koskie

Minsky's voluntary cooperation (or have Movants demand their Canadian counsel comply), but Movants' counsel and presumably Movants themselves refused to provide such assistance.  See Parthum Decl. Ex. 127 (Letter from Jeffrey A. Rosenthal to Rachel B. Mersky, Esq., dated Nov. 12, 2014); Parthum Decl. Ex. 128 (Letter from Rachel B. Mersky, Esq., to Jeffrey A. Rosenthal, dated Nov. 21, 2014).  When it became clear that Koskie Minsky (which is beyond the subpoena power of any U.S. Court) would not cooperate with the discovery requests and Movants would not assist in obtaining such cooperation, the U.S. Debtors proposed that a hearing be scheduled on the Motion.  See Parthum Decl. Ex. 129 (Letter from Jeffrey A. Rosenthal to Rachel B. Mersky, Esq., dated Nov. 25, 2014).  After Movants' counsel eventually responded, the parties negotiated a schedule for further briefing and a hearing, which this Court so ordered on February 9, 2015.  See Scheduling Order for Hearing on Motion of Ad Hoc Committee of Canadian Employees Terminated Pre-Petition for Entry of an Order Allowing Late Filed Claims [D.I. 15163].

## ARGUMENT

### I.  MOVANTS RECEIVED THE REQUISITE CONSTRUCTIVE NOTICE OF THE BAR DATE

15.    A preliminary question for the Court is whether Movants were "known" creditors entitled to actual notice of the Bar Date or "unknown" creditors whom the Debtors could not have been expected to notify directly.  The evidence clearly establishes that to the extent they were creditors of the U.S. Debtors at all, Movants were unknown creditors at the time the Bar Date was set.

16.    An unknown creditor "is one whose 'interests are either conjectural or future or, although they could be discovered upon investigation, do not in due course of business come to knowledge [of the debtor].'"  Chemetron Corp. v. Jones, 72 F.3d 341, 346 (3d Cir.

1995) (alteration in original); see also id. at 347 ("'[T]hose creditors who hold only conceivable,

conjectural or speculative claims' are unknown." (quoting Trump Taj Mahal Assocs. v. O'Hara

(In re Trump Taj Mahal Assocs.), Civ. A. No. 93-3571 (JEI) Adv. No. 93-2056, 1993 WL

534494, at *3 (D.N.J. Dec. 13, 1993)).  Because Movants have not established any basis to

conclude that a termination claim that would be asserted against the U.S. Debtors would have

come into the U.S. Debtors' knowledge in due course of business, and because Movants' claims

are conjectural and speculative, Movants were unknown to the U.S. Debtors.[17]  Indeed, there is

perhaps no better demonstration that these claims were unknown to the U.S. Debtors than the

fact that they were unknown to Movants themselves.

       17.     Movants had no employment or other contractual relationship with the

U.S. Debtors at the Petition Date or when they were terminated by the Canadian Debtors pre-

petition.  It is undisputed that Movants were not employees of any U.S. Debtor entity at the time

of their terminations.  In fact, nearly all of the Movants were never employees of the U.S.

Debtors at all.  Rather, they were employed by one of the Canadian Debtors – this is conceded

throughout the Motion, the title of which refers to Movants as "Canadian Employees."[18]  No

Movant produced any employment agreement or other contract establishing employment with

the U.S. Debtors at the time of their termination.  Movants' own deposition testimony confirms

their lack of any employment relationship with the U.S. Debtors.  Several of them testified that,

among other things:

---

[17]    It is important to note that the entire legal framework for determining the notice to which creditors are entitled assumes that the "creditors" are legitimate creditors with legitimate claims against the debtors.  People and entities that have no claims against a debtor are not entitled to any type of notice of the claims bar date.  The U.S. Debtors dispute that Movants are in fact creditors, because their purported claims are baseless.  As such, Movants were not entitled to any notice of the Bar Date whatsoever.  However, for the limited purposes of this argument, the U.S. Debtors will assume that Movants were creditors entitled to some type of notice.

[18]    See Motion ¶¶ 8-9, 22; Campbell Aff. ¶ 24 ("For the purpose of this motion, each moving party is, to the best of my knowledge, one of these 300 former employees of Nortel Canada terminated prior to the Filing Date . . . .").

- they were employed by a Canadian Debtor and their paychecks were issued by a Canadian Debtor;[19]

- they did not believe that their termination agreement gave them any rights against the U.S. Debtors or that they had any other contractual agreement with the U.S. Debtors;[20] and

- from the time they were terminated through September 2009 and beyond, they had no reason to believe that the U.S. Debtors would be liable for their severance and had no reason to believe that they had any type of claim against the U.S. Debtors whatsoever.[21]

    18.    Movants' own belief that they did not have any claims against the U.S.

Debtors for severance demonstrates that they were not known creditors of the U.S. Debtors.  As

this Court has observed, "if the Claimant did not know that it had a claim against the Debtor,

then the Debtor could not have been expected to know and, therefore, could not have been

expected to provide actual notice."  In re Smidth & Co., 413 B.R. 161, 168 n.26 (Bankr. D. Del.

2009); see also White v. New Century TRS Holdings, Inc. (In re New Century TRS Holdings,

Inc.), 450 B.R. 504, 513 (Bankr. D. Del. 2011) ("The [claimants] themselves admit that they

were not aware of their claims against the Debtors . . . . Therefore, the [claimants] were unknown

creditors . . . .").

---

[19]    See, e.g., Parthum Decl. Ex. 130 (Dep. of Pierre Pierre Blais, dated Feb. 10, 2014) ("Blais Dep.") at 33:23-34:25; Parthum Decl. Ex. 131 (Dep. of Chris Buchanan, dated Feb. 13, 2014) ("Buchanan Dep.") at 26:19-28:8; Parthum Decl. Ex. 132 (Dep. of Michael Campbell, dated Feb. 6, 2014) ("Campbell Dep.") at 30:13-31:13, 31:25-32:4; Parthum Decl. Ex. 133 (Dep. of Jane Longchamps, dated Feb. 12, 2014) ("Longchamps Dep.") at 109:4-25; Parthum Decl. Ex. 134 (Dep. of Julia Piggott, dated Feb. 5, 2014) ("Piggott Dep.") at 50:10-22, 51:11-17.

[20]    See, e.g., Piggott Dep. at 108:19-109:22 ("Q: Well, do you believe that you ever entered into some sort of a contract with a Nortel U.S. entity related to your prior employment with Nortel?  A: I never signed anything specifically with Nortel U.S.  A contract normally requires a signature.").  See also Parthum Decl. Ex. 135 (Dep. of Paul Roddick, dated Feb. 12, 2014) ("Roddick Dep.") at 71:10-17; Parthum Decl. Ex. 136 (Dep. of Paula Klein, dated Feb. 11, 2014) ("Klein Dep.") at 101:3-24; Parthum Decl. Ex. 137 (Dep. of John Paul Ruprecht, dated Feb. 10, 2014) ("Ruprecht Dep.") at 144:10-13; Longchamps Dep. at 91:10-23.

[21]    See, e.g., Blais Dep. at 36:2-6; Klein Dep. at 132:16-21; Piggott Dep. at 110:21-111:19; Ruprecht Dep. at 49:10-50:24; Parthum Decl. Ex. 138 (Dep. of Shirley Trowbridge, dated Feb. 3, 2014) ("Trowbridge Dep.") at 37:12-38:2, 97:14-25.  See also Parthum Decl. Ex. 139 (Dep. of Anthony Law, dated Feb. 3, 2014) ("Law Dep.") at 113:20-114:5 ("But I never work in the U.S.  My whole employment in Nortel, as far as I am concerned, because nobody ever told me that I have ever been on the U.S. payroll, I am a Canadian on the Canadian payroll so I follow the Canadian process.  So why would I go and file in the U.S.?  What's my basis?  I have absolutely no basis to file.").

19.     These facts also establish the conjectural and speculative nature of Movants' claims, an independent reason for the Court to conclude that Movants were unknown creditors.  Movants' testimony underscores this point:

- One Movant testified that when he was first contacted by Koskie Minsky in 2013 about filing a claim in the United States, he "thought it was a scam" because he "didn't believe [h]e had a claim against the U.S."[22]

- Another Movant testified that when she received her termination letter, she did not believe that it gave her the basis of a claim against the U.S., and that she "wouldn't even know why it would."[23]

- Another Movant conceded that Movants' interpretation of the Termination Letters – that liability for severance extends to all persons and entities encompassed by the definition of "Corporation," which includes employees in addition to subsidiaries – "doesn't make sense."[24]

20.     Movants assert without explanation that a search of the U.S. Debtors' books and records should have revealed the Termination Letters upon which Movants' claims are based.  But not only were these Termination Letters not sent to employees of the U.S. Debtors, Movants make no effort to articulate why they believe the U.S. Debtors would have, in due course of business, had occasion to search their books and records for termination letters pertaining to employees who were employed and terminated by foreign entities.  While they argue that certain Movants had supervisors or reports based in the United States, Movants do not claim that they were employed by the U.S. Debtors on the date of their terminations (they were not), or that the U.S. Debtors had any reason to suspect they were so employed and thus investigate the circumstances of their terminations.[25]

---

[22]     See Ruprecht Dep. at 49:10-50:24.
[23]     See Trowbridge Dep. at 97:14-25.
[24]     See Klein Dep. at 177:19-178:10; see also Ruprecht Dep. at 47:16-22; Trowbridge Dep. at 110:11-22.
[25]     In support of this assertion, Movants attached a chart purportedly compiling the results of a "Survey of Ad Hoc Committee Members" as Exhibit D to their Supplemental Memorandum.  See Supp. Mem. at 3-4, Ex. D.  This exhibit may not be considered for numerous reasons.  First, it is unabashed hearsay – it purportedly compiles survey responses provided by Movants that are plainly offered for the truth of the matters asserted therein (if not, they are irrelevant).  See Fed. R. Evid. 801(c).  Second, it was never produced during discovery and given the timing of its

21.     Movants' argument that they were reasonably ascertainable because HR Shared Services "had their mailing addresses available," Supp. Mem. at 8, also misses the point. The issue is not whether Movants were ascertainable as *former employees* of the *Canadian Debtors*, but rather whether they were ascertainable as *creditors* of the *U.S. Debtors*.  See, e.g., In re New Century, 450 B.R. at 512 ("The [claimants] argue that, as customers of the Debtors, they are 'known' creditors because their identity could have been ascertained easily from the Debtors' own books and records.  The availability of the [claimants'] names and address in the Debtors' loan files may have reflected that the [claimants] were known *customers*, but without more, it did not make them 'known *creditors*.'" (emphasis in original)).  The mere ability to obtain Movants' mailing addresses does nothing to inform the U.S. Debtors of Movants' alleged status as creditors of the U.S. Debtors.  While Movants currently include 156 former Canadian employees – down from 176 individuals originally listed in the Motion[26] – under their logic, the U.S. Debtors would have been required to serve every current and former employee of every Nortel affiliate (indeed, every creditor and trade counterparty of any Nortel affiliate as well) because of the possibility that any of them might later want to file a claim against the U.S. Debtors upon a realization that his or her Nortel employer or contractual counterparty does not have sufficient assets to pay its claims in full.  The Bankruptcy Code simply does not place such a burden on the U.S. Debtors.

22.     Because Movants were unknown creditors, it is beyond reasonable dispute that the U.S. Debtors provided sufficient notice by publishing notice of the Bar Date in widely

---

submission, the U.S. Debtors have not had any opportunity to cross-examine Movants on this information or otherwise confirm its veracity.

[26]     The Motion stated that 176 individuals had elected to participate in the Ad Hoc Committee.  See Motion ¶ 10.  It appears that since that time, the number of Movants has decreased; when Movants' counsel produced a discovery list in September 2014, only 156 individuals were listed.  See Parthum Decl. Ex. 117 (E-mail from Rachel B. Mersky, Esq., to Lisa M. Schweitzer et al., attaching "Additional Nortel Discovery Chart" (additional attachments omitted), dated Sept. 29, 2014).  Despite the U.S. Debtors' requests, Movants' U.S. counsel has failed to file an updated Rule 2019 statement with a current listing of all Movants.

circulated national and global editions of <u>The Globe and Mail</u> and <u>The Wall Street Journal</u>, which publication notices this Court approved in the Bar Date Order.  <u>See</u> Bar Date Order ¶ 15.[27] Indeed, while arguing that they were known, Movants do not challenge the sufficiency of these publications to satisfy the U.S. Debtors' notice obligations to unknown creditors.

23.     Although they do not challenge the U.S. Debtors' choice of publications, Movants argue that the Bar Date Notice was misleading because it allegedly instructed claimants with claims against both the U.S. and Canadian estates that they should only file claims in Canada.  Motion ¶ 18; Supp. Mem. at 9.  This argument has no merit.

24.     First, <u>not one</u> of the Movants testified that he or she was misled or confused by reading the published Bar Date Notice.  To the contrary, the evidence establishes that the Movants who read the notice interpreted it correctly and did not file proofs of claim with the U.S. Court because they believed their claims were exclusively against the Canadian Debtors. As one of Movants' leaders Paula Klein testified, she saw the Bar Date Notice posted on the Epiq website, but did not file a claim in the United States because she "did not believe at that time that [she] had a claim in the U.S."  Klein Dep. at 122:19-123:4, 129:20-130:2.  Ms. Klein later confirmed that she was not misled by the Bar Date Notice but fully recognized that claims should be filed in the jurisdiction of the Debtor against which they were being asserted:

> Q: Well, just because you have a claim against the U.S. in 2013, did anybody explain to you why that claim should be filed in the U.S.?
>
> A: Well, where else would it be filed?
>
> Q: What do you mean?

---

[27]     As explained <u>supra</u> ¶ 8, the establishment of the Bar Date also was repeatedly disclosed in documents that were publicly filed in the Canadian Proceedings, and a link to the U.S. Debtors' Claims, Noticing and Balloting Agent's website, which website prominently discloses information about the Bar Dates, was provided on the Monitor's website.

A: Well, *if I have got a claim in the U.S., file in the U.S.* I wouldn't file it in the U.K. against the U.S.

Q: Why wouldn't you file it in Canada?

A: Because that is for my claim in Canada.

Id. at 163:22-164:10 (emphasis added).

25.     Second, the language of the Bar Date Notice is clear and is not susceptible to Movants' strained after-the-fact interpretation.  The notice stated that for those persons who believed that they had claims against the Canadian Debtors, "any such claims" – clearly referring to any claims against the Canadian Debtors – should be filed in the Canadian Proceedings.  This sentence nowhere suggested that claims against the U.S. Debtors be filed in the Canadian Proceedings; to the contrary, the remainder of the notice is unequivocal that such claims must be filed in the U.S. Proceedings, before the Bar Date, to avoid being "forever barred."[28]  Notably, Koskie Minsky was served with the Bar Date Notice and did not oppose recognition of the Bar Date order in Canada as either being confusing or providing inadequate notice to Canadian employees.[29]  Moreover, none of the Movants have suggested that they sought confirmation about their specific circumstances or were in any way misled by the U.S. Debtors regarding the applicable Bar Date.

26.     Third, the question of whether the constructive notice was adequate is irrelevant as to the many Movants who had *actual notice* of the Bar Date from the various sources of information in which the Bar Date was contained.  As discussed in more detail herein,

---

[28]     While Movants seek to downplay the potential consequences of the relief they seek (addressed below), were the Court to accept Movants' argument that the Bar Date Notice was misleading, the finality of the Bar Date would be jeopardized and it would incentivize other individuals and entities with claims against non-U.S. Nortel affiliates who did not file timely claims in the U.S. Proceedings to advance similar claims of "confusion."

[29]     See supra ¶ 8.  In addition, the bar date notice in the CCAA Proceedings contained the identical language that Movants claim to be confusing, and yet Koskie Minsky did not object to this language when the CCAA bar date notice was issued.  See Parthum Decl. Ex. 140 (Notice to Creditors re: Notice of Claims Procedure for the Debtors Pursuant to the Companies' Creditors Arrangement Act, dated July 30, 2009) ("If you believe you have claims against the U.S. Debtors, any such claims must be filed in, and only in, the U.S. proceedings with the U.S. Debtors' claims agent.").

Movants had actual notice of the Bar Date through numerous communications from their

Canadian counsel, as well as through various notices and pleadings filed in the Canadian

Proceedings.

        27.    The Bar Date Notice was legally sufficient, and accordingly Movants were

on notice of the Bar Date and should have filed timely claims.  Because they failed to do so, their

claims are barred.

## II.    MOVANTS' DELAY WAS NOT CAUSED BY EXCUSABLE NEGLECT

        28.    Because Movants were unknown, and the U.S. Debtors properly provided

constructive notice of the Bar Date, Movants' claims are barred unless they can prove that their

failure to timely file their claims was the result of "excusable neglect."  Chemetron Corp., 72

F.3d at 349.  The test for excusable neglect is an "equitable inquiry into the totality of the

relevant circumstances," Jones v. Chemetron Corp., 212 F.3d 199, 203 n.4 (3d Cir. 2000),

including "the danger of prejudice to the debtor, the length of the delay and its potential impact

on judicial proceedings, the reason for the delay, including whether it was within the reasonable

control of the movant, and whether the movant acted in good faith," Manus Corp. v. NRG

Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 188 F.3d 116, 125 (3d Cir. 1999) (quoting

Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380 (1993)); see also

Netversant-S. Cal., Inc. v. Johnson Controls, Inc. (In re Netversant Solutions, Inc.), 426 B.R.

503, 509 (Bankr. D. Del. 2010).  Many courts also conduct a threshold inquiry into "whether

failure to file a claim was due to neglect, not a conscious or deliberate decision," because

excusable neglect does not encompass "conscious disregard of the bar date."  In re Global

Aviation Holdings Inc., 459 B.R. 60, 64 (Bankr. E.D.N.Y. 2013).

        29.    "The burden of proving excusable neglect lies with the late-claimant."

E.g., Jones, 212 F.3d at 205; Hayes Lemmerz Int'l, Inc. v. Emmons (In re Hayes Lemmerz, Int'l,

Inc.), Civ. No. 11-143-SLR, 2012 WL 1203731, at *2-3 (D. Del. Apr. 9, 2012); In re Cable &

Wireless USA, Inc., 338 B.R. 609, 613 (Bankr. D. Del. 2006).  Here, irrespective of their

membership in an "ad hoc committee," each of the Movants individually bears the burden to

establish that the failure by such Movant to assert his or her claim prior to the applicable bar date

was the product of excusable neglect.  Not one of the Movants has even attempted to do so

individually, and even in the aggregate, they have utterly failed to meet this burden.

### A.    The Length of Movants' Delay Weighs Heavily in Favor of the U.S. Debtors

30.    The amount of time between the Bar Date and the filing of the Motion is

staggering, and granting Movants relief in the face of such tremendous delay would be

inconsistent with the weight of Third Circuit authority.  This alone compels denial of the Motion.

31.    Nearly three and a half years elapsed after the Bar Date before Movants

filed their motion seeking permission to file late claims.  "Pioneer teaches that we should

consider the length of the delay in absolute terms."  In re O'Brien, 188 F.3d at 130.  Many courts

in this district – including this Court – have found far shorter delays to be "substantial,"

"significant," "lengthy," and "weigh[ing] heavily against" movants.  See, e.g., In re Majestic

Holdco, LLC, No. 09-14142 (KG), 2013 WL 653091, at *3 (Bankr. D. Del. Feb. 21, 2013)

(Gross, J.) (finding that a delay of twenty months after the bar date is "lengthy" and "weighs

heavily against" the claimant); In re Cable & Wireless, 338 B.R. at 616 (a fourteen-month delay

is "substantial"); In re New Century TRS Holdings, Inc., 465 B.R. 38, 52 (Bankr. D. Del. 2012)

(a four-year delay is "significant" and "weighs heavily" against the claimant); compare In re

Garden Ridge Corp., 348 B.R. 642, 646 (Bankr. D. Del. 2006) (a delay of just one week weighs

in favor of the late claimant).

32.    What is particularly compelling here is not merely the length of delay in

absolute terms, but the fact that it continued for nearly a year *after* the supposed discovery of

20

Movants' claims by Koskie Minsky.  (As discussed below, to the extent that Movants' purported claims rely on their reading of their Termination Letters, received pre-petition, it strains credulity that they first "discovered" such claims in 2012.)  Indeed, the delay after the alleged discovery of the claims was roughly equal to, and perhaps exceeded, the aggregate amount of time creditors had to file claims *from the commencement of these chapter 11 proceedings* until the Bar Date and was quadruple the amount of time that creditors had to file claims after receipt of the Bar Date Notice.   As this Court recently observed in connection with a significantly shorter delay (five months), such a delay between the late claimants' discovery of their claims and the filing of their motion to enlarge "add[ed] insult to injury" and was "especially egregious" when compared to the 45-day time-period established for the filing of pre-petition claims.  In re Majestic Holdco, 2013 WL 653091, at *3 (Gross, J.); accord In re New Century TRS Holdings, Inc., 465 B.R. at 53.

33.     Here, the employee representatives were made aware of the basis for the Motion as early as June 2012,[30] and the evidence suggests that their counsel, Koskie Minsky, was aware even earlier.[31]  Nevertheless, Movants failed to file the Motion until February 2013 – at least *eight months* after they determined that they had viable claims, and compared to a period of less than 60 days given to parties who filed timely claims.  See Bar Date Order.  In light of the fact that two and a half years had already elapsed since the Bar Date, as well as the fact that the

---

[30]     See Campbell Aff. ¶ 26 ("In or around June 2012, counsel advised the Representatives of the status of the potential claims and size of the group of Affected Employees."); Campbell Dep. at 136:19-137:12; Klein Dep. at 147:19-23.

[31]     See Campbell Aff. ¶¶ 21-22 ("[I]n the spring of 2012 the Monitor identified a sub-group of claimants in the Canadian Compensation Claims Process who had also filed claims in the U.S. claims process.  I am advised by our counsel that the Monitor drew these claimants to their attention . . . ."); Campbell Dep. at 239:4-11 ("Q: My question to you, sir, is are you aware of any communications that Koskie Minsky had with Goodmans concerning the possibility of former Nortel Canada employees pursuing claims in the U.S. court?  A: When we were notified in June they had told -- Koskie had told me that there had been previous communications."); Parthum Decl. Ex. 63 (July 12, 2012 E-mail from Michael Campbell, attaching July 10, 2012 Letter from Susan Philpott, Koskie Minsky, to Gale Rubenstein, Goodmans LLP) ("We write in respect of the above matter [Severance Claims of Canadian Employees against the US Debtor], which *we have discussed with you on a number of occasions* recently." (emphasis added)).

Bar Date Notice afforded creditors less than two months to file their claims, Movants' decision

to sit on their hands for eight additional months before filing the Motion is inexcusable.[32]

> **B.    Movants' Significant Delay Resulted from Their Conscious and Repeated Decisions Not to Investigate or Pursue Their Purported Claims Against the U.S. Debtors**

34.    Independently, Movants cannot satisfy the "excusable neglect" standard

for the fundamental reason that the Third Circuit has explicitly rejected their claimed excuse –

ignorance of their claims: "[I]gnorance of one's own claim does not constitute excusable

neglect."  Jones, 212 F.3d at 205; accord Pacificorp & Vancott Bagley Cornwall & McCarthy v.

W.R. Grace, Civil Action No. 05-764, 2006 WL 2375371, at *14 (D. Del. Aug. 16, 2006).

35.    The record is clear that beginning in the summer of 2009, Movants and

their counsel Koskie Minsky all knew about the Bar Date.  The record is also undisputed that at

that time, all Movants possessed the documents – their own Termination Letters – upon which

they exclusively base their claims.  Further, they were expressly advised by Koskie Minsky to

engage U.S. counsel (which Koskie Minsky was prepared to refer) if they wished to pursue a

claim against the U.S. Debtors.  It is also worth noting that Movants are not seeking to assert

claims that were latent or somehow undiscoverable by them at an earlier time.  Indeed, the

evidence suggests that Movants were focused on preserving and asserting their severance claims

as early as 2009.[33]  That Movants either concluded that they did not have claims to pursue

against the U.S. Debtors or chose not to review their severance agreements at that time is not an

excusable ground for their prolonged delay.

---

[32]    Although Movants note that Koskie Minsky sought a tolling agreement with respect to their claims from the U.S. Debtors in fall 2012, see Motion ¶ 28; Campbell Aff. ¶¶ 29-31, this does not excuse Movants' extreme delay in filing the Motion.  A request for a tolling agreement to which the U.S. Debtors never agreed does not absolve Movants of the duty to promptly file their belated claims, particularly given how much time had passed since the Bar Date.

[33]    See, e.g., Parthum Decl. Ex. 9, LI02784-85 (LinkedIn Discussion titled "Creditor Submissions," dated Apr. 7, 2009) at LI02784 (posting from Movant Chris Buchanan asking, "Any news on how and when we submit our claim and why this is delayed in Canada versus US").

36.     In the face of the foregoing, the only reason Movants offer for failing to file a claim prior to the Bar Date is that they "had no knowledge that [they] had any basis for a claim in the U.S."[34] or had not considered it one way or the other[35] until their Canadian lawyers raised this possibility in 2012.

37.     The law is clear that this claimed ignorance falls far short of satisfying the excusable neglect standard.  Notably, in <u>Jones</u>, plaintiffs' far stronger claim of ignorance was rejected by the Third Circuit.  There, the plaintiffs had sought leave to file claims four years after the bar date, arguing that "they were unaware of the degree of risk posed to their health and safety by the contaminated site until after reading about a . . . federal lawsuit" filed against the debtor.  212 F.3d at 203.  The plaintiffs argued that "they had no way of knowing that they had a claim against [the debtor] prior to the . . . bar date, and therefore the delay was beyond their control."  <u>Id.</u> at 205.  The Third Circuit refused to allow plaintiffs to file late claims, citing the plaintiffs' "delay of four years" as well as their "failure to specifically investigate the cause of their illnesses, even though the danger . . . generally was known in the community" as reasons that they had not satisfied the excusable neglect standard.  <u>Id.</u>; <u>see also</u> <u>In re Global Aviation</u>, 459 B.R. at 66 ("Failure to file due to inadvertence or ignorance of the rules does not usually constitute excusable neglect.").

1.     *Movants had all information at their disposal to bring timely claims*

38.      It is undisputed that Movants had all of the necessary information in their possession to assert timely claims before the Bar Date.  The entire predicate for Movants' asserted claims are the Termination Letters that each of them received in late 2008 and early

---

[34]     <u>See, e.g.</u>, Campbell Dep. at 187:14-24; <u>see also</u> Klein Dep. at 101:3-24, 132:16-21; Blais Dep. at 103:10-15; Piggott Dep. at 110:21-111:19; Ruprecht Dep. at 49:10-50:24.

[35]     <u>See, e.g.</u>, Parthum Decl. Ex. 141 (Dep. of Anthony Cinicolo, dated Feb. 14, 2014) ("<u>Cinicolo Dep.</u>") at 113:10-14 ("Q: Did you consider at this point whether you might have a basis for a claim in the U.S.?  A: No, I wasn't looking or even considering that . . . ."); Trowbridge Dep. at 110:5-10.

2009 prior to the Petition Date, nearly a year before the Bar Date and four years before Movants filed the Motion.  Many Movants who were deposed testified that they read their Termination Letters carefully,[36] some even with counsel,[37] and neither they nor their counsel believed they had any claims against the U.S. Debtors.  In addition, the employee representatives (including Movant Michael Campbell) and the Monitor were actively discussing potential employee compensation claims processes starting in 2009,[38] which certainly should have involved a careful review and analysis by Koskie Minsky or Movants of the Termination Letters giving rise to their potential claims.[39]  Other Movants testified that they "skip[ped] over" and "didn't focus" on the language in their Termination Letters upon which their claims now rely.[40]  Whether each Movant's failure to timely file his or her claim stems from a decision not to carefully review the Termination Letter or a failure to perceive the inventive legal argument that their attorneys concocted several years later, in either case Movants were in possession of the Termination Letters almost a year before the Bar Date and had the exact same ability in 2009 to ascertain their potential claims as they did in 2012.  See In re Majestic Holdco, 2013 WL 653091, at *3 (Gross, J.) (where the claimant was in the best position to realize the facts that give rise to the claim, it weighs against finding excusable neglect); In re Cable & Wireless, 338 B.R. at 616-17 ("The reason for the delay weighs against a finding of excusable neglect, as [the claimant] . . . was in

---

[36]      See, e.g., Cinicolo Dep. at 46:15-19; Campbell Dep. at 64:13-65:8; Blais Dep. at 29:2-19.

[37]      See, e.g., Cinicolo Dep. at 46:20-47:21; Piggott Dep. at 54:15-55:19; Campbell Dep. at 47:6-21, 65:9-19; Blais Dep. at 29:20-25.

[38]      See Campbell Aff. ¶ 15.

[39]      See also Parthum Decl. Ex. 142, LI02864-65 (LinkedIn Discussion titled "Would anyone be willing to send KM a copy of their termination package to help out with the negotiations for the claims process?," dated July 29, 2009) at LI02864 ("KM has a meeting with the Monitor to start the discussions around the employee claims process. They (KM) would like to take a look at the termination packages in order to get a sense of what Nortel typically was giving as severance.").

[40]      See, e.g., Buchanan Dep. at 36:25-37:21; Roddick Dep. at 38:8-17; see also Law Dep. at 38:11-12 ("[F]rankly, at the time I did not read this carefully, okay?").

possession of [the] information" that should have alerted it to its claim.).[41]  Also, to the extent

that Movants' purported claims are for severance, and they stopped receiving severance

payments from the Canadian Debtors upon the commencement of the CCAA proceedings,[42] they

had every reason to consider such claims as early as January 2009.

39.    In fact, a few Movants testified that they *did* believe they had a basis for a

claim against the U.S. Debtors upon receiving their Termination Letters.  For example, when

asked what he understood the word "Corporation" to mean in his Termination Letter, Anthony

Cinicolo testified that he thought it meant Nortel Networks Corporation, its subsidiaries and its

affiliates.[43]  Yet despite concluding that the U.S. Debtors were included within the definition of

"Corporation" and thus liable for the "Corporation's" obligation to pay severance in their

opinions, these Movants consciously elected not to pursue their claims against the U.S. Debtors

prior to the Bar Date.[44]

40.    Movants' argument that they were not aware of their claims does not

excuse their inaction.  "It is not the duty of the Debtors to make . . . any of its creditors aware of

every potential claim they may have against the Debtors.  To the contrary, it was [the claimant's]

responsibility to explore, investigate and file a proof of claim against the Debtors, not the other

way around . . . ."  In re Cable & Wireless, 338 B.R. at 617 (citation omitted).  Indeed, Movants'

counsel, Koskie Minsky, warned Movants of the Bar Date for claims against the U.S. Debtors,

---

[41]    Indeed, a review of the claims filed in the U.S. Proceedings reveals proofs of claim filed in late 2009 by similarly situated Canadian employees represented by Movants' U.S. counsel.  See, e.g., Parthum Decl. Ex. 143 (Selected proofs of claim).  Where it appears that other creditors similarly situated to the late claimant filed timely claims, it weighs against the late claimant with respect to the reason for the delay, see In re Goody's Family Clothing, Inc., 443 B.R. 5, 17-18 (Bankr. D. Del. 2010); although these claims were not filed by the Bar Date, they were nevertheless filed more than three years before the Motion.  (The U.S. Debtors reserve all rights and defenses with respect to the aforementioned claims, including without limitation those related to the timeliness of the claims).

[42]    See Parthum Decl. Ex. 4 (Letter from Elena King, dated Jan. 28, 2009); Campbell Dep. at 39:5-8.

[43]    Cinicolo Dep. at 49:18-50:14; see also Parthum Decl. Ex. 144 (Dep. of Daniel Jin-Ming Leung, dated Feb. 5, 2014) ("Leung Dep.") at 33:1-24; Longchamps Dep. at 34:10-20.

[44]    See, e.g., Cinicolo Dep. at 137:15-138:6, 150:22-152:2; Leung Dep. at 65:10-13; Longchamps Dep. at 64:19-65:18.

which certainly should have triggered an inquiry into whether they had claims that could be submitted in the U.S. Proceedings.  Yet, each of the Movants failed to diligently conduct such an inquiry.  In addition, one discussion on the LinkedIn Group (among a number relating to the Bar Date) contained a posting made in 2009 stating that the following advice had been provided by Koskie Minsky:  "You only need to file a claim in the US as per the information you received in the mail if you were on US payroll for Nortel or if you believe you have a claim against the US Estate (NNI) because of some contractual agreement related to your employment."[45]  For those who believed that they might have a claim against the U.S. Debtors on account of a contractual agreement relating to their employment, another posting in the discussion stated that Koskie Minsky would put them in touch with a Delaware lawyer who could assist them with filing such claims.[46]  Several Movants conceded in their depositions that they had seen this posting,[47] but all of them testified that they did not bother to contact Koskie Minsky, accept a referral to U.S. counsel or otherwise investigate whether they might have a claim against the U.S. Debtors because of some contractual agreement related to their employment, the precise basis upon which they now seek to file claims years after the Bar Date.[48]

---

[45]    See Parthum Decl. Ex. 13, LI01851-54 (LinkedIn Discussion titled "Claims in the US Court – Some People Received a Letter…," dated Nov. 25, 2009) at LI01851 (emphasis added).

[46]    Id.

[47]    See, e.g., id. at LI01851-52 (Movants Paula Klein, Pierre Pierre Blais, Betsy Hung, and Chris Buchanan participated in this discussion thread); Buchanan Dep. at 126:6-18, 128:4-9; Ruprecht Dep. at 141:19-142:24.

[48]    See, e.g., Blais Dep. at 103:16-104:8; Buchanan Dep. at 130:16-23, 131:10-16 ("Q: At the time around this posting when you learned that certain former Canadian employees may have some sort of contractual arrangement with Nortel U.S. that might give rise to a claim, did you do anything to investigate whether you had any such contractual arrangement with Nortel U.S.?  A: No."); Ruprecht Dep. 144:14-145:8.  Paula Klein, who posted this information to LinkedIn on behalf of Koskie Minsky, testified that she "assumed" at the time she posted this information that she did not have a contractual agreement with the U.S. estates related to her employment, but that she "never asked Mr. Zigler [of Koskie Minsky] for clarification at the time because, for whatever reason, I made that assumption."  Klein Dep. at 141:15-142:2.

    See also Longchamps Dep. at 92:13-93:11; Trowbridge Dep. at 79:12-23, 109:23-110:4; Cinicolo Dep. at 117:9-21, 137:15-138:6; Campbell Dep. at 187:14-188:17; Leung Dep. at 52:20-23, 65:10-13; Piggott Dep. at 91:5-93:14; Ruprecht Dep. at 109:5-19, 140:8-141:18; Roddick Dep. at 72:9-11, 76:13-24 ("Q: Did you ever ask anyone on the NRPC steering committee whether or not you could pursue claims outside of Canada?  A: No.  Q: Did you ever ask anybody at Ernst & Young about whether or not you could pursue claims outside of Canada?  A: No.  Q: And did you ever ask anybody at Koskie Minsky whether you could pursue claims outside of Canada?  A: No.").

2.      *Notice of the Bar Date was irrelevant to Movants' decision not to file timely claims*

41.      In addition to having the information necessary to file the instant claims before the Bar Date, the record reveals that notice of the Bar Date was irrelevant to Movants' decision not to file timely claims.  Movants either (a) knew about the Bar Date and failed to act, or (b) knew how to obtain information about the Bar Date and simply failed to do so.

42.      Several Movants had actual knowledge of the Bar Date, enabling them to file timely claims had they so desired.  For example, not only did Movant Paula Klein have notice, but on July 16, 2009, she posted a notice to the LinkedIn Group warning that "a claims process will be announced for US creditors tomorrow with a 'claims bar' date of September 30, 2009."[49]  Several of the Movants who were deposed recalled even five years later that they had seen this post and were accordingly aware of the Bar Date.[50]  Two deponent-Movants, Anthony Law and Chris Buchanan, responded to Ms. Klein's posting with their own comments.[51]  Given most Movants' participation in the LinkedIn Group, most others presumably saw it as well.

43.      Based on these and other sources, a majority of the fourteen deponents admitted at their depositions that they were aware of the Bar Date at or around the time it was ordered;[52] one of them actually filed a timely Proof of Claim in the U.S. Bankruptcy Court for

---

[49]      Parthum Decl. Ex. 11, LI00915-18 (LinkedIn Discussion titled "July 16 – Update on Activities with KM," dated July 16, 2009) at LI00916.

[50]      See, e.g., Law Dep. at 87:4-15; Ruprecht Dep. at 139:2-24; Trowbridge Dep. at 101:12-15.

[51]      Parthum Decl. Ex. 11, LI00915-18 (LinkedIn Discussion titled "July 16 – Update on Activities with KM," dated July 16, 2009) at LI00916-17.

[52]      See supra notes 49-51 and infra note 53; see also Law Dep. at 87:8-15; Roddick Dep. at 61:22-64:14 ("Q: At some point did you become aware that there was a deadline set for the U.S. Chapter 11 process?  A: I became aware, I think in the middle of the summer.  There was either a KM or a Paula note or an NRPC note about -- that had something about the U.S. claims process finishing up in the fall, and -- Q: And that was the summer of 2009?  A: Yes. . . .  Q: Do you remember if you were aware that September 30th, 2009, or thereabouts, was approximately the deadline?  A: I recall it being in around that time, the fall of 2009."); Campbell Dep. at 170:5-11 ("Q: At what point do you recall first learning of the existence of a bar date in the United States by which claims needed to be filed?  A: I received an email in November of 2009 from Paula Klein that indicated that there was such a thing as the bar date in the U.S., and that it had passed because it was September the 30th.").

pension benefits.[53]  As Movant Paula Klein, the founder of the LinkedIn Group, was forced to

concede, it "was fairly well publicized among the LinkedIn group members that . . . there was a

U.S. bar date."[54]

           44.    Even had any Movants not known about the Bar Date either directly or

through reading LinkedIn Group postings, timely notice of the Bar Date was also provided to

Movants through several other sources of which they were or should have been aware.  For

example, Koskie Minsky repeatedly notified Movants that a claims process had been

implemented in the United States and that the Bar Date had been set.  Koskie Minsky issued

weekly news bulletins to the former Nortel Canada employees it was representing, including

Movants – on each of July 15 and 22, August 5, 12, and 19 and September 29, 2009, the Koskie

Minsky news bulletins informed readers that "[a] U.S. claims process has been released."[55]  The

news bulletin issued on August 12, 2009 provided even more detail, announcing that Justice

Morawetz had granted an order recognizing the U.S. Claims Bar Order.[56]  In addition to these

news bulletins, Koskie Minsky's website contains a section called "Nortel Networks Corporation

> Developments;" on July 23, 2009, Koskie Minsky posted an update about the U.S. claims

process, making clear that only claims against Nortel in Canada were unaffected by the U.S.

claims process.  That update – which remained on Koskie Minsky's website through the Bar

Date, and even today – stated, "[t]here has been recent discussion surrounding the establishment

---

[53]    See Parthum Decl. Ex. 38 (Ernie Briard Proof of Claim, dated Sept. 29, 2009).

[54]    See Klein Dep. at 102:9-103:13.

[55]    See Parthum Decl. Ex. 115 (Koskie Minsky Pensioners and Former Employees News Bulletin, dated July 15, 2009) at 3; Parthum Decl. Ex. 116 (Koskie Minsky Pensioners and Former Employees News Bulletin, dated July 22, 2009) at 3; Parthum Decl. Ex. 43 (Koskie Minsky Pensioners, Former Employees and Disabled Employees News Bulletin, dated Aug. 5, 2009) at 3; Parthum Decl. Ex. 58 (Koskie Minsky Pensioners, Former Employees and Disabled Employees News Bulletin, dated Aug. 12, 2009) at 3; Parthum Decl. Ex. 44 (Koskie Minsky Pensioners, Former Employees and Disabled Employees News Bulletin, dated Aug. 19, 2009) at 3; Parthum Decl. Ex. 45 (Koskie Minsky Pensioners, Former Employees and Disabled Employees News Bulletin, dated Sept. 29, 2009) at 4.

[56]    See Parthum Decl. Ex. 58 (Koskie Minsky Pensioners, Former Employees and Disabled Employees News Bulletin, dated Aug. 12, 2009) at 2.

of a Claims Process in the U.S. Bankruptcy Court. The U.S. Claims Process does not affect

Former Employees in respect of their potential claims *against Nortel in Canada*."[57] In the face

of this repeated information from their lawyers, the only excuse offered by certain Movants was

that they did not bother to take the time to review the information that was provided to them by

Koskie Minsky.[58]

        45.     Other sources of information about the U.S. Bar Date included the

Canadian Monitor Reports,[59] the Monitor's website and the Epiq website,[60] sources of

information of which the deponents were aware,[61] but which they uniformly testified that they

failed to monitor;[62] one deponent testified that he "didn't care" whether his failure to monitor

these sources might cause him to miss out on relevant information.[63] More generally, deponents

testified that they "disconnected" from following the developments in the claims process,

---

[57]     Parthum Decl. Ex. 57 (Koskie Minsky LLP website, "Nortel Networks Corporation > Developments") at JL-00061 (emphasis added). See also Longchamps Dep. at 95:3-21 ("Q: . . . Were you aware in July 2009 that there was discussion surrounding a claims process having been established in the U.S. Bankruptcy Court? A: I probably read something like this about the U.S. claims process. Q: Did you ask anyone at that time whether you were able to file a claim in the U.S. claims process? A: No.").

[58]     See, e.g., Trowbridge Dep. at 81:13-17 ("Q: Did you ever review [Koskie Minsky's] news bulletins? A: No. Q: Why not? A: I don't know. I just didn't."); id. at 104:2-7 ("Q: Did you ever look at KM's website for information about Nortel? A: No. Q: Why not? A: It was just timing. I didn't go through all the websites and links."); Campbell Dep. at 196:19-22, 197:11-18 ("Q: . . . [Y]ou testified earlier that you did not regularly review update bulletins prepared by Koskie Minsky, correct? A: That is absolutely correct."); Blais Dep. at 77:6-16 ("I disconnected and stopped generally being involved in reading up all of the details and staying up to speed as to what was going on and so on."); Buchanan Dep. at 76:22-25 ("Q: . . . Do you recall whether the Koskie Minsky website was a source of information that you regularly used? A: Definitely not."); id. at 147:19-148:2 ("I certainly was not reading those [Koskie Minsky] weekly bulletins."); Leung Dep. at 58:4-9, 58:21-59:7; Law Dep. at 76:9-11; Parthum Decl. Ex. 145 (Dep. of Betsy Hung, dated Feb. 4, 2014) ("Hung Dep.") at 76:4-11.

[59]     See Parthum Decl. Ex. 146 (Sixteenth Report of the Monitor, dated July 24, 2009) ¶ 63(c); Parthum Decl. Ex. 49 (Twenty-Second Report of the Monitor, dated Sept. 25, 2009) ¶ 54(c).

[60]     See supra ¶ 8. Notice of the U.S. Bar Date was also provided in the bar date notice sent to creditors in the CCAA proceedings. See Parthum Decl. Ex. 140 (Notice to Creditors re: Notice of Claims Procedure for the Debtors Pursuant to the Companies' Creditors Arrangement Act, dated July 30, 2009) ("With respect to the U.S. proceedings, a general bar date of September 30, 2009 at 4:00 p.m. (prevailing Eastern time) has been established by the U.S. Court.").

[61]     See, e.g., Cinicolo Dep. at 105:14-16; Klein Dep. at 53:9-14; Campbell Dep. at 224:11-14; Blais Dep. at 114:13-21; Ruprecht Dep. at 60:16-61:2, 121:20-25.

[62]     See, e.g., Cinicolo Dep. at 112:12-25, 132:5-25; Klein Dep. at 53:23-54:11; Campbell Dep. at 224:15-18; Blais Dep. at 114:22-25, 115:22-116:11; Ruprecht Dep. at 61:9-23, 122:2-9; Trowbridge Dep. at 110:23-111:22; Longchamps Dep. at 60:7-61:7; Piggott Dep. at 95:13-96:10; Hung Dep. at 72:10-18.

[63]     Blais Dep. at 114:22-25.

"w[ere]n't totally invested in it" and behaved "passive[ly]," and accordingly failed to monitor the sources of information about the claims process that they had available.[64]

46.    Lastly, and importantly, although the majority of the Movants deposed testified that they had actual knowledge of the Bar Date at or around the time of the Bar Date, several Movants who claimed to have been unaware of the Bar Date admitted that even had they been aware and able to timely file claims in the U.S. Proceedings, they nevertheless would not have done so.[65]

3.    *Movants cannot justify their failure to file claims on bad advice from their counsel Koskie Minsky because counsel's negligence is imputed to the claimant*

47.    In their Supplemental Memorandum in support of the Motion, Movants advance a new argument, blaming their failure to file timely claims on the advice of their counsel, Koskie Minsky.[66]  In support, they cite the testimony of several Movants who stated that they failed to pursue their claims because they relied on Koskie Minsky to alert them of the claims and appropriate process for asserting such claims.  See Supp. Mem. at 14.

48.    This argument fails as a matter of law for a number of reasons.  First, as the Supreme Court has held, the negligence of counsel is imputed to the late claimant.  Pioneer, 507 U.S. at 397 (holding that it is error not to attribute the fault of counsel to the claimant and

---

[64]    See, e.g., Blais Dep. at 38:7-25; Leung Dep. at 70:14-23, 72:22-73:10.  See also Cinicolo Dep. at 127:17-128:15, 132:5-25.

[65]    See, e.g., Cinicolo Dep. at 146:14-148:10 ("Q: If you had seen information relating to the U.S. bar date, what do you think you would have done? . . . Q: . . . I have lawyers there looking out for me.  If they thought it was important for me to do something, I would have expected them to say it. . . . I wasn't going to try and figure it out if the experts weren't telling me I should be concerned. . . . Q: But seeing a notice of the bar date or seeing a Koskie Minsky bulletin, would that have led you to investigate whether the bar date was relevant to you?  A: . . . I am very selective on what I could focus my time on, and if the lawyers didn't raise the flag and say that you guys need to focus on this, I didn't have the time or the patience to start looking at it."); Blais Dep. at 105:21-106:19; Leung Dep. at 69:11-70:23; Hung Dep. at 147:22-149:21.  See also Trowbridge Dep. at 74:18-25, 108:9-14, 126:5-16; Campbell Dep. at 135:20-136:8, 187:14-188:17.

[66]    In the initial Motion, the sole reason that Movants gave for their delay was that the Bar Date Notice confused them into not filing their claims in the U.S. Proceedings, going so far as to assert that they were "in effect estopped from filing a claim."  Motion ¶ 27.  Depositions have proven this allegation to be baseless.  See supra ¶ 24.

noting, "respondents [must] be held accountable for the acts and omissions of their chosen counsel.  Consequently, in determining whether respondents' failure to file their proofs of claim prior to the bar date was excusable, the proper focus is upon whether the neglect of respondents *and their counsel* was excusable." (emphasis in original)).  Similarly, the Third Circuit has held that where a delay "was the direct result of the negligence of . . . counsel," the delay was "entirely avoidable and within [the claimant's] control."  Hefta v. Official Comm. Of Unsecured Creditors (In re Am. Classic Voyages Co.), 405 F.3d 127, 134 (3d Cir. 2005) (claim disallowed where late filing was due to counsel's negligence).  Thus, any negligent failure by Koskie Minsky to properly advise Movants of any potential claims or urge them to comply with the Bar Date must be attributed to Movants and cannot be grounds for relief.

49.    Second, even if Movants could theoretically rely on Koskie Minsky's failure to alert them of potential claims against the U.S. Debtors, any such reliance was unreasonable.  Koskie Minsky is Canadian counsel not authorized to practice in the United States, a fact of which Movants not only were made aware repeatedly, but which many of them acknowledged having known.  In August 2009, Koskie Minsky prepared a question-and-answer document for its former Nortel Canada employee clients, including Movants, which stated unequivocally that "Koskie Minsky's representation for pensioners and former employees is limited to the Canadian Courts."[67]  Michael Campbell, one of three Court-appointed representatives for all former employees in the CCAA proceedings and a Movant here, posted similar information to the LinkedIn Group:  "[Koskie Minsky] are not paid to represent us in US proceedings, as they have no legal ability to practice in the US;" "The appointment text [in the

---

[67]    See Parthum Decl. Ex.18 ("Questions from Listeners – Koskie Minsky Webcast," dated Aug. 25, 2009) at 31.  One deponent testified that he did not recall reading this disclaimer because "typically anything that was to do with the U.S. I kind of flitted over, to be honest, I, sorry, skipped."  Buchanan Dep. at 159:4-160:3.  See also Law Dep. at 122:20-23 ("[A]gain, as soon as I read U.S., my mind turn[s] off.  It's none of my business.  Right?  As soon as -- I see U.S. court proceedings, forget it, right?").

CCAA representation order for Koskie Minsky] is for Canada, endorsed by a Canadian Judge, in the Canadian legal process.  By definition, Morewetz [sic] cannot appoint anyone to represent us in the US legal system.  They are not representing all employees, just those in Canada;" "The US proceedings are not in KM's legal mandate nor are they qualified to make legal plea[d]ing and opinions for the US."[68]  Unsurprisingly, several deponents admitted that they understood Koskie Minsky's representation to be limited to the Canadian Proceedings.[69]

50.    While some Movants testified as to their belief that Koskie Minsky would represent them in respect of potential claims against other Nortel estates, in fact, none could point to a single instance in which Koskie Minsky communicated that its representation extended beyond the CCAA proceedings,[70] nor has any Movant produced any document to this effect. Instead, these Movants testified that notwithstanding Koskie Minsky's repeated admonitions to the contrary, they simply "assumed"[71] that Koskie Minsky would represent them in claims against other Nortel estates, but none of these Movants ever took any steps to confirm their mistaken assumptions.[72]  Others testified that they "never thought about" whether Koskie

---

[68]    See Parthum Decl. Ex. 46, LI00619-52 (LinkedIn Discussion, dated approx. Jan. 2013) at LI00628, LI00631; see also id. at LI00624, LI00633 (Paula Klein posting that "the representation orders [for Koskie Minsky] are limited to CANADA.  We have that statement from KM already.  They are not paid to do any work for us relative to activities in the US."); Parthum Decl. Ex. 16 (Letter from Nortel Retirees and Former Employees Protection Canada, dated approx. Jan. 2013) at 4 ("Koskie Minsky LLP was appointed by the Canadian court to represent former Nortel employees in Canadian courts only.").

[69]    See, e.g., Piggott Dep. at 123:15-127:3; Trowbridge Dep. at 102:9-103:2, 124:24-125:19; Campbell Dep. at 74:7-12, 219:13-23; Klein Dep. at 116:20-118:9; Law Dep. at 116:5-117:3; Briard Dep. at 100:8-24.

[70]    See, e.g., Cinicolo Dep. at 139:4-21; Longchamps Dep. at 106:5-25; Leung Dep. at 74:13-24; Buchanan Dep. at 142:4-10; Blais Dep. at 121:5-25.  In addition, Paula Klein, who played a leadership role for severed Nortel Canada employees on account of creating and administering the LinkedIn Group, see supra note 12, and who communicated regularly with numerous Movants, testified that she was not aware of any Movants requesting U.S. legal advice from Koskie Minsky in 2009 or of Koskie Minsky providing such advice.  See Klein Dep. at 107:23-110:5.  Nor did any Movant ever tell Ms. Klein in 2009 that he or she believed that Koskie Minsky was providing advice with respect to the U.S. Proceedings.  Id. at 111:7-14.

[71]    See, e.g., Cinicolo Dep. at 142:9-21; Longchamps Dep. at 107:2-11; Buchanan Dep. at 73:14-74:14, 141:4-17; Roddick Dep. at 64:24-65:16; Law Dep. at 119:13-18.

[72]    See, e.g., Longchamps Dep. at 107:2-109:3; Piggott Dep. at 119:14-120:4 ("Q: Well, did you ever believe that Koskie Minsky was representing anybody specifically in connection with the U.S. bankruptcy proceedings? A: I didn't ask that question. Q: You never asked that question? A: No. Q: Did anybody ever tell you that Koskie

Minsky was undertaking to represent them in jurisdictions other than Canada.[73]  Thus with respect to those Movants who did not recall seeing Koskie Minsky's admonitions that they were not counsel in the U.S. Proceedings, their reliance on their unfounded assumptions as to the scope of Koskie Minsky's representation, coupled with their failure to diligently determine its true scope, cannot satisfy the standards for excusable neglect.

51.     Third, even were counsel's conduct not imputed to Movants, and even were Movants' reliance on Canadian counsel for U.S. legal advice reasonable despite Koskie Minsky's disclaimers, they have offered no evidence of erroneous advice from Koskie Minsky that they followed.[74]  To the contrary, Koskie Minsky expressly warned Movants who "believe[ed they had] a claim against the US Estate (NNI) because of some contractual agreement related to [their] employment" that they would "need to file a claim in the US."[75] Furthermore, in August 2009, Koskie Minsky repeatedly advised that any claims against the U.S. Debtors needed to be filed "urgently."[76]  Given these facts, Movants cannot possibly attribute their failure to file timely claims in the U.S. Proceedings to any advice provided to them by Koskie Minsky.

52.     Fourth, as discussed in more detail below, despite serving as Movants' counsel and having its advice placed directly at issue by Movants, Koskie Minsky has refused to cooperate voluntarily with discovery requests and Movants have refused to take steps to ensure

---

Minsky was representing former Nortel Canadian employees in connection specifically with the U.S. bankruptcy proceedings?  A: I don't recall.").

[73]     See, e.g., Buchanan Dep. at 74:15-22, 80:3-9.

[74]     Paula Klein claimed that she had "ask[ed] Koskie Minsky" about former Nortel Canada employees' "ability to file claims in the U.S.," and that she was told that such employees "have to wait for the Canadian claims process"; however, she could not recall any details of this alleged oral conversation, including whom she spoke with or when, and she admitted that until 2012 she did not believe that she had any claim against the U.S. Debtors whatsoever.  See Klein Dep. at 131:13-132:21.

[75]     See Parthum Decl. Ex. 13, LI01851-54 (LinkedIn Discussion titled "Claims in the US Court – Some People Received a Letter…," dated Nov. 25, 2009) at LI01851.

[76]     See Parthum Decl. Ex. 18 ("Questions from Listeners – Koskie Minsky Webcast," dated Aug. 25, 2009) at 16, 26, 30, 31.

the cooperation of their agents.[77]   As a result, the Court should not consider Movants' untested

factual allegations concerning Koskie Minsky.  See Indem. Ins. Co. of N. Am. v. Electrolux

Home Prods., Inc., 520 F. App'x 107, 111 (3d Cir. 2013).

### C.  Movants' Claims Were Not Brought in Good Faith

53.    While irrelevant in light of Movants' failure to establish the other prongs

of the excusable neglect standard, these claims are not being pursued in good faith.  Discovery

has unearthed the real basis for Movants' attempt to late-file spurious claims – they are being

pursued to advance the CCC's position in the pending sales proceeds allocation dispute.  The

evidence establishes that even though the factual underpinnings of Movants' supposed claims

were known from the outset of these chapter 11 proceedings in January 2009, the idea to pursue

them – and the timing of their filing – was the brainchild of Koskie Minsky, counsel to Movants,

as well as to a member of the CCC.[78]   Koskie Minsky had access to Movants' Termination

Letters – and the "Corporation" language upon which the instant Motion is based – in July

2009[79] (and possibly earlier), and could have analyzed the relevant language and explored the

possibility of filing claims in other bankruptcy proceedings before any bar dates had passed, but

never did so.  Then, in July 2012, after the allocation litigation was underway, Koskie Minsky

wrote to counsel for the Monitor and discussed the "value" the assertion of these severance

claims against the U.S. Debtors could have on the "allocation discussions and mediation,"

specifically the CCC's effort to achieve effective cross-border substantive consolidation of the

Canadian and U.S. Debtors (or "pro rata distribution," as the CCC has called it).  In Koskie

Minsky's own words to the Monitor:

---

[77]    Given that Koskie Minsky is outside the subpoena power of this Court (and the courts of any other district in the country), the U.S. Debtors are unable practically to obtain this discovery without the cooperation of either Koskie Minsky or Movants.  See infra ¶ 66.

[78]    See Campbell Aff. ¶¶ 21-26.

[79]    See Parthum Decl. Ex. 142, LI02864-65 (LinkedIn Discussion titled "Would anyone be willing to send KM a copy of their termination package to help out with the negotiations for the claims process?," dated July 29, 2009).

**Impact on Mediation and Claims Process:** We are open to discussion with you as to how best to approach the US Debtor about these Claims. We also note that the existence and pursuit of the claims under the Severance Agreements against the US entities is another indication and further evidence of the global integration of the Nortel companies, and ***will be of value in the allocation discussions and mediation as it affirms the validity of a substantive consolidation and sharing of Nortel's assets***.[80]

54.    Employee representative Michael Campbell confessed at his deposition to his belief that if Movants' claims are allowed, it "will affect the way the allocation is split up." Indeed, Mr. Campbell explained that he had discussed this issue with others "as part of the discussions about the general allocation process."[81]

55.    Further demonstrating the bad faith behind the Motion are the inconsistent positions Koskie Minsky and the CCC have taken to describe the scope of their representation depending on their litigation goals at the moment. In the context of the allocation litigation, counsel to the CCC described that committee, of which Koskie Minsky is counsel to a member, as a "group of officially authorized representatives of employee and employee benefits creditors asserting direct claims *solely against the Canadian parent and certain Canadian affiliates*."[82] However, with respect to the instant Motion, Koskie Minsky identified the legal basis for the Motion, vetted that legal theory with U.S. counsel, identified U.S. counsel to pursue the Motion, collected the retainer fees and agreements for that counsel, and participated in depositions of Movants.[83] Moreover, despite having admitted that "Koskie Minsky's representation for pensioners and former employees is limited to the Canadian Courts,"[84] when soliciting the

---

[80]    See Parthum Decl. Ex. 63 (July 12, 2012 E-mail from Michael Campbell, attaching July 10, 2012 Letter from Susan Philpott, Koskie Minsky, to Gale Rubenstein, Goodmans LLP) at 5.

[81]    Campbell Dep. at 247:24-248:14.

[82]    See *Amended Verified Statement Pursuant to Bankruptcy Rule 2019 of DLA Piper LLP(US)* [D.I. 10761] (emphasis added).

[83]    See supra ¶ 33; infra ¶ 65.

[84]    See Parthum Decl. Ex. 18 ("Questions from Listeners – Koskie Minsky Webcast," dated Aug. 25, 2009) at 31.

cooperation of the Monitor on the Motion, Koskie Minsky suddenly asserted that "the terms of

the Representation Order are sufficiently broad to include" efforts "to pursue claims of their

constituents in the US proceedings."[85]

56.     Despite the open discussion of these claims among Movants, their

Canadian counsel and counsel for the Monitor in July 2012 – and their knowledge that the Bar

Date had already passed and thus time was of the essence if leave of this Court were to be sought

– Movants waited another *eight* months before filing the Motion.  The timing of the filing of the

Motion is telling – it was filed one week after the end of the allocation mediation overseen by the

Honorable Chief Justice Winkler.

57.     In sum, that Movants' claims were manufactured by the CCC's counsel

with the intent – by their own admission – of using them to advance their "substantive

consolidation" allocation theory demonstrates that these claims have not been asserted in good

faith.[86]

> **D.     The U.S. Debtors and Their Creditors Would Be Prejudiced if Movants Were Permitted to File Late Claims**

58.     While Movants understandably downplay the impact that granting their

relief would have on the U.S. Debtors, such impact would be significant.  "[T]he party seeking to

file a late claim[] carries the burden of proving a lack of prejudice to the Debtor."  In re Cable &

Wireless, 338 B.R. at 614.  Movants have failed to meet their burden of proof.

59.     Although Movants argue that the aggregate amount of their claims is

"insignificant" relative to the total lockbox proceeds, Supp. Mem. at 10-11, the argument misses

the point.  The magnitude of Movants' claims is not to be compared against the total lockbox

---

[85]     See Parthum Decl. Ex. 63 (July 12, 2012 E-mail from Michael Campbell, attaching July 10, 2012 Letter from Susan Philpott, Koskie Minsky, to Gale Rubenstein, Goodmans LLP) at 5.

[86]     The U.S. Debtors reserve all rights to seek any and all relief related to the costs and burdens imposed by the bad-faith manufacture and pursuit of these claims.

proceeds, which will be allocated among several different estates,[87] and moreover, the quantum

of Movants' claims is but one factor for the Court to consider in determining the prejudice to the

U.S. Debtors.  Indeed, the prejudice is not measured by the economic impact of allowance of a

single creditor's (or group of creditors) claim, but in the precedent that allowing the filing of

Movants' claims would have on the rest of the U.S. Proceedings.  Allowing Movants to file late

claims would severely prejudice the U.S. Debtors because it would open the floodgates to similar

late claims.  See In re Smidth & Co., 413 B.R. at 166.  Movants argue without basis that "there is

little likelihood that other, similar claims will be raised" if they are permitted to file late claims

because the ad hoc committee "is the unified block of former Canadian Employees with claims

against the Debtors who have elected to proceed."  Supp. Mem. at 13.  This is untrue in several

material respects.  For one, the "ad hoc" group does not purport to comprise all of the Canadian

employees who received the severance letter that forms the basis for their claim; rather, it is

admittedly only a subset of those Canadian employees who agreed to contribute toward their

counsel's retainer.  See Motion ¶ 10.  Even the Motion acknowledges that Movants comprise

barely more than half of the Canadian employees known to Movants who received this letter.  Id.

¶¶ 8, 10.  The parties have no idea how many are unknown to Movants.

          60.    Of significantly greater threat to the U.S. Debtors, the entire basis for

Movants' claims is the happenstance definition of the word "Corporation" in the Canadian

Debtors' form severance letter.  Should this Court conclude that any time the Canadian Debtors

used the word "Corporation" expansively to include affiliates – the entire basis of the desired

claims here – the U.S. Debtors, along with all of the Canadian Debtors' other subsidiaries,

affiliates, successors, assigns, and past and present officers, directors, employees, and agents

---

[87]      Indeed, while Movants refer to the size of their claims compared to the lockbox proceeds, the Monitor and
CCC have argued that the U.S. Debtors should receive only a minute fraction of those proceeds.

would be exposed to full liability even if they were unaware of the underlying contract, then the U.S. Debtors could be forced to defend against late-filed claims not only of employees of the Canadian Debtors but of many of their other creditors.  Not having been party to these contracts and correspondence in the first place, the U.S. Debtors have no idea of the Pandora's box that could be opened by such a ruling.   Movants have "introduced no evidence concerning the number of [such] *potential* claimants who might [be] prompted to file late claims in the wake of a ruling in [their] favor," In re Global Aviation, 459 B.R. at 67 (internal quotations omitted), and thus they have failed to carry their burden of proving that their late claims would not prejudice the U.S. Debtors.

61.     This prejudice is compounded by the fact that the relief sought by Movants is broad and unclear – they just ask for "leave to file proofs of claim for termination benefits" against the U.S. Debtors.  See Motion at 1, 12.  Movants' request does not limit them to filing only claims for unpaid severance (and even if it did, other potential late claimants could attempt to rely upon Movants' rationale to advance any type of claim).  Moreover, to the extent that Movants urge an interpretation of "Corporation" that includes all affiliates, they would presumably seek to file their claims against each of the U.S. Debtors – Movants give no reason why they would seek relief against only one of the U.S. Debtors – giving them effectively sixteen additional guarantors of their claims.

62.     Also posing a significant threat of prejudice to the U.S. Debtors is the degree to which Movants' arguments rest upon their claim of purported confusion from the Bar Date Notice.  While, for the reasons set forth above, the Bar Date Notice was not confusing and Movants themselves were not confused, if the Court were to accept Movants' assertion that the Bar Date Notice unfairly confused creditors of the Canadian Debtors, the U.S. Debtors could be

38

inundated by late-filed claims of other Canadian Debtors who similarly wish to dip into the U.S. Debtors' asset pools to improve their recoveries on their claims.  The sheer cost to defend against such requests and claims, even if all ultimately are found to be non-meritorious, could be oppressive to the U.S. Debtors and erode their own creditors' recoveries.  The Bar Date Notice should not be found insufficient so cavalierly.

63.    Movants place the greatest focus in their excusable neglect analysis on the degree of prejudice to the U.S. Debtors, see Motion ¶¶ 22-26, Supp. Mem. at 10-13, seemingly believing this factor to weigh in their favor (though it does not) and hoping that it can overcome the other three factors weighing against them.  For example, Movants emphasize the fact that a plan of reorganization has not yet been confirmed, see Motion ¶¶ 25-26, Supp. Mem. at 11.  However, the excusable neglect analysis "does not stand for the proposition 'no harm, no foul.'" In re Global Aviation, 459 B.R. at 68 (citation omitted).  In fact, as discussed above, permitting Movants' late claims to be filed would harm the U.S. Debtors by imposing unquantified additional claims on the U.S. Debtors years after the Bar Date and risking that countless more baseless late claims will be filed.  Certainly when all four factors of the excusable neglect analysis are considered and weighed together, it is clear that Movants' failure to file timely claims was not the result of excusable neglect.

## III.    THIS COURT SHOULD DRAW AN ADVERSE INFERENCE FROM KOSKIE MINSKY'S REFUSAL TO COOPERATE IN DISCOVERY

64.    From the discovery conducted by the U.S. Debtors, it is clear that Movants' representatives, Koskie Minsky, have played a significant role in the Motion and have material, non-privileged information pertaining to the Motion.  This includes:

- When Movants and/or their representatives first believed they had potential claims against the U.S. Debtors;

- Why Movants waited at least eight months – and perhaps significantly longer – from the alleged discovery of their claims until filing their Motion;

- Movants' good faith, including the degree to which this Motion is being pursued to advance a different agenda, namely the CCC's substantive consolidation theory;

- Movants' knowledge of the Bar Date and alleged confusion about the Bar Date Notice; and

- Whether Movants' alleged reliance on Koskie Minsky's advice with respect to potential U.S. claims was reasonable.

65.     There can be no dispute that Koskie Minsky has played a material behind-the-scenes role in assisting Movants in filing and prosecuting the Motion.  Not only did they actively advise Movants, but they were the sole intermediary between Movants and their U.S. counsel.  Indeed, Movants were directed to make their retainer payments to Koskie Minsky.[88] Koskie Minsky attorneys also attended depositions.[89]

66.     The U.S. Debtors recognized that Koskie Minsky is beyond the subpoena power of this Court and, therefore, absent a costly and time-consuming process to obtain foreign discovery, the U.S. Debtors were dependent on either Koskie Minsky's voluntary cooperation or a direction from their clients to cooperate.  Unfortunately, the U.S. Debtors have received neither.

67.     The U.S. Debtors devoted considerable effort without success to persuade Koskie Minsky and Movants to cooperate.  The U.S. Debtors served a narrow set of document requests and, when met with a blanket objection that such requests were overbroad, urged Koskie Minsky to identify their objections so the parties could meet and confer.  Parthum Decl. Ex. 119 (Letter from Jeffrey A. Rosenthal to Susan Philpott, Esq., dated Oct. 3, 2014); Parthum Decl. Ex.

---

[88]     See Parthum Decl. Ex. 16 (Letter from Nortel Retirees and Former Employees Protection Canada, dated approx. Jan. 2013) at 6-7.  See also Campbell Aff. ¶ 32 (stating that Koskie Minsky "facilitate[d] a process by which the 300 Affected Employees would receive notice of a potential claim against Nortel U.S." and "identif[ied] counsel in the U.S.").

[89]     See Campbell Dep. at 3; Briard Dep. at 3; Klein Dep. at 3.

120 (Letter from Timothy E. Hoeffner, Esq., to Jeffrey A. Rosenthal, dated Oct. 22, 2014);

Parthum Decl. Ex. 121 (E-mail from Barbara Walancik, Esq., to Jeffrey A. Rosenthal, dated Oct.

22, 2014); Parthum Decl. Ex. 122 (Letter from Jeffrey A. Rosenthal to Barbara Walancik, Esq.,

dated Oct. 30, 2014).   Koskie Minsky refused.   With respect to the U.S. Debtors' request for a

deposition, Koskie Minsky cited authority that courts are loath to order the deposition of

opposing counsel, even though Koskie Minsky does not claim to be (and cannot be) counsel on

the present Motion.   See Parthum Decl. Ex. 120 (Letter from Timothy E. Hoeffner, Esq., to

Jeffrey A. Rosenthal, dated Oct. 22, 2014); cf. Johnston Dev. Grp. Inc. v. Carpenters Local

Union No. 1578, 130 F.R.D. 348, 352 (D.N.J. 1990) ("In cases where the attorney's conduct

itself is the basis of a claim or defense, there is little doubt that the attorney may be examined as

any other witness.").

        68.     After several requests from the U.S. Debtors for the production of

documents, Koskie Minsky produced a small number of self-selected documents.   See Parthum

Decl. Ex. 123 (E-mail (Parts I and II) from Barbara Walancik, Esq., to Jeffrey A. Rosenthal,

attaching Letter from Mark Zigler, Esq., (additional attachments omitted), dated Nov. 7, 2014);

Parthum Decl. Ex. 124 (E-mail from Barbara Walancik, Esq., to Jeffrey A. Rosenthal, attaching

Letter from Mark Zigler, Esq., (additional attachments omitted), dated Nov. 26, 2014).   Koskie

Minsky provided no explanation for the basis upon which these documents were selected, no

indication of which requests they were purporting to respond to, and no information about the

existence of any documents that were withheld.   This self-serving production of cherry-picked

documents is wholly insufficient to avoid an adverse inference on this issue.   Although Koskie

Minsky indicated that documents were withheld on the basis of attorney-client privilege, it

cannot use a claim of privilege to shield from production documents that are material to the

merits of the Motion and would (i) evidence the scope of the attorney-client relationship, (ii)

establish the timeline of relevant events, or (iii) confirm or refute representations made by

Movants about advice they received from Koskie Minsky, particularly where these are each

topics that Movants themselves placed in issue.

       69.    "The unexplained failure or refusal of a party to judicial proceedings to

produce evidence that would tend to throw light on the issue authorizes, under certain

circumstances, an inference or presumption unfavorable to such party." Indem. Ins. Co., 520 F.

App'x at 111 (quoting Gumbs v. Int'l Harvester, Inc., 718 F.2d 88, 96 (3d Cir. 1983)).  An

adverse inference may be allowed where (i) the unproduced evidence "was in the party's

control," (ii) "the evidence is relevant to the claims or defenses in the case," (iii) there has been

"actual suppression or withholding of evidence," and (iv) "the duty to preserve the evidence was

reasonably foreseeable." Id. (quoting Bull v. UPS, Inc., 665 F.3d 68, 73 (3d Cir. 2012)).  Given

that (i) the unproduced evidence was within the control of Koskie Minsky, and by extension its

Movant-clients, who have the ability to direct Koskie Minsky to cooperate but have refused to do

so, (ii) material facts concerning Koskie Minsky's role and advice have been placed at issue by

Movants themselves, (iii) despite the U.S. Debtors' repeated requests, the evidence has been

withheld, and (iv) it was foreseeable that Koskie Minksy's advice and conduct in shepherding

the Motion would be subject to a duty to preserve, the U.S. Debtors respectfully request that the

Court draw an adverse inference against Movants with respect to the evidence that Koskie

Minsky has refused to provide.

## CONCLUSION

      Based on the totality of the facts and circumstances, the U.S. Debtors respectfully

submit that this Court should deny the Motion.  "The bar date means just that; it is a 'drop-dead

date' that bars all prepetition claimants who received the required notice." Berger v. Trans

World Airlines, Inc. (In re Trans World Airlines, Inc.), 96 F.3d 687, 690 (3d Cir. 1996). If

claimants "fail[] to assert their prepetition claims by the bar date and fail[] to show excusable

neglect, those claims are legally dead." Id. Movants seek to file baseless claims more than three

years after the Bar Date, and have no excuse for their delay other than their deliberate decision

not to pursue these claims in a timely fashion when they had all of the information necessary to

do so. Accordingly, Movants' claims should be barred.

For the reasons set forth above, the U.S. Debtors respectfully request that the

Court deny the Motion with prejudice, enter the proposed order attached hereto as Exhibit A, and

grant such other relief as the Court deems just and proper.

Dated: February 24, 2015
      Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

Jeffrey A. Rosenthal (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Ann C. Cordo*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Tamara K. Minott (No. 5643)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*