# EXHIBIT 18



# Questions from Listeners
# Koskie Minsky Webcast
# August 25, 2009

**Prepared By:**

**Nortel Retirees' and former employees Protection Committee (NRPC)**
**Koskie Minsky LLP**

**Version 9 Final**

Disclaimer: This document has not been subject to a legal review. The answers to questions contained in this document are based on current knowledge and best information at the time of writing and will be subject to change. You should consult financial and legal advice before making any decisions based on this information.

# Table of Contents

.............................................................................................................................................................2

Asset Sales and the Canadian Estate.....................................................................................................................3

BIA & CCAA Amendments....................................................................................................................................9

Bonus Payments and Motions..............................................................................................................................10

Claim Amounts.....................................................................................................................................................11

Claims Process......................................................................................................................................................15

Government Intervention......................................................................................................................................18

Koskie Minsky and Legal Questions...................................................................................................................20

Life Insurance, Medical (including LTD) and Dental Benefits...........................................................................24

Miscellaneous.......................................................................................................................................................28

Impacts for Workers Outside Ontario and Non-Residents of Ontario.................................................................30

Ontario Pension Benefit Guarantee Fund (PBGF)...............................................................................................32

Pension Plan Commuted Value Payout................................................................................................................33

Pension Plan Present Value..................................................................................................................................35

Pension Plan Windup............................................................................................................................................37

Representation Order.............................................................................................................................................42

Survivor Benefits (Pension Plan).........................................................................................................................43

117
JP

## Asset Sales and the Canadian Estate

1. How many "Stalking Horse" bids will there be? How long will it be before everything gets sold?

   It is difficult to provide a definitive answer at this time. We would like Nortel to get the best deal for each of the businesses that are being sold, and the Stalking Horse process seems to be working well to maximize the sale value of the various businesses. How many will actually be realized depends on the businesses being sold and whether Nortel can set up auctions for all its businesses.

2. What equitable process is used to allocate sale funds amongst creditors, including pensioners and terminated employees, in the 3 jurisdictions (Canada, US, EMEA)? Who has control and determines the actual distribution of the sale of Nortel assets?

   There is an agreed negotiation process in place to work out a distribution process for the assets of Nortel between the Monitor, the Unsecured Creditors Committee (UCC) and the Bondholders. This process will be worked out as the CCAA and Bankruptcy processes unfold. The Ernst &Young website has great deal on the overall process. The negotiation process is starting and will take some time to work through. Depending on how the asset sales proceed, there may be several distributions.

3. Is it true that the majority of Nortel proceeds from the sale of its divisions will remain in the US and the UK, where government agencies have priority on Nortel cash for their citizens' pension plans?

   No. The division of assets among the jurisdictions has not yet been decided on. There will be a process to determine allocation in which stakeholders will participate, and over which the courts will have oversight.

4. What steps have been taken and are planned to be taken at court by Koskie Minsky to protect Nortel's Canadian estate from being depleted while the USA and UK estates keep growing?

   Koskie Minsky are the court appointed lawyers who take direction from the Court Appointed Representatives. We are working closely with our Business Advisors, RSM Richter to work out and implement strategy to keep as much cash in the Canadian Estate as possible. This includes working closely with the Monitor, in the courts and in the political process to move our agenda forward.

5. How does this process differ from auction to auction?

   We have the opportunity to work within the auction process to identify legal issues and objections to each of the auctions and apply to the courts for relief in any objections that we raise.

6. Will our pensioners' "share" of the liquidation be added to our existing Canadian Pension fund assets before our funds are converted to annuities?

   This is the outcome that we are looking for in the end. What will ultimately happen depends on the timing of the asset sales and what the Ontario Government and the pension regulator (FSCO) can be convinced to do in the windup process.

7. I understand the payments for asset sales go into a trust fund. Where is the money physically - in Canada or the US? Who administers the trust fund? Under the laws of which country does it operate? Where can I find its governing articles of inception?

   The proceeds from the sales of assets are kept in a "lockbox" and monitors in the US and Canada will hold the cash, depending on where the assets are sold. These are funds being held "in trust"; it is not a trust fund per se. The actual location of the money is not relevant.

8. Can these funds earn interest until they are dispersed?

   Yes.

9.  Why is the IFSA governed by New York State law and not Ontario law? (I thought Nortel was a Canadian company)? Why are the asset auctions being held in New York City and not Toronto?

    The Legal Jurisdiction for an agreement is often a part of the negotiations. In this case, the negotiations provided for the State of New York. The asset proceeds are kept in the country where the asset is primarily located.

10. What is the Ontario appeal process for decisions of the Commercial Court, and is Koskie Minsky planning any appeals to address the shortfall of funds and lack of Canadian creditor (e.g. pensioners) representation in the Canadian estate?

    Appeals are usually raised on a point of law that we feel has been incorrectly applied. We have appealed the lack of severance payments to the Ontario Superior court and have been granted leave to appeal. We will continue to appeal the points of law through the appeals process as needed.

    As a point of clarification, the Monitor represents the Canadian creditors under the CCAA process and as one of the larger group of creditors we are working closely with the Monitor.

11. Is Koskie Minsky front and centre during the decision making and discussions on how the Sale funds will be allocated or just taking us through a process?

    Koskie Minsky are the court appointed lawyers who take direction from the Court Appointed Representatives. We are working closely with our Business Advisors, RSM Richter to work out and implement strategy to keep as much cash in the Canadian Estate as possible. This includes working closely with the Monitor, in the courts and in the political process to move our agenda forward.

12. Does Koskie Minsky agree with Diane Urquhart's position as outlined in her document of July 6th called "INTERVENTIONS TO PROTECT NORTEL'S CANADA ESTATE FOR CANADIANS"? If they do not agree with this then what is their position? If they agree with this then what action are they taking?

    Koskie Minsky is our legal firm and is responsible to the Legal Representatives. Koskie Minsky takes direction from the Legal Representatives who work with the NRPC to promote and manage our strategy in the Legal Process as well as the Political Process.

    The NRPC is very much aware of the work that Ms. Urquhart is doing on behalf of the Pensioners and Severed Employees and we are monitoring her efforts closely. We have asked our business advisors and legal team to analyze her information to best understand how to use them in our efforts to maximize the assets in Canada.

13. Rumour has it that the break fee for the stalking horse bid for the Wireless division was split between Nortel Canada and the rest of the corporation. Will Koskie Minsky attest to this and if so why were not members of the NRPC informed (and even polled)? If this 50% break fee cost was charged to the Canadian operations then does this mean that Koskie Minsky feels that the Canadian operations will get 50% of all and any proceeds from the liquidation of Nortel's assets? If Koskie Minsky does not agree with this then what did they do to oppose the initial charge of 50% on the break fees? As a side note does the NRPC steering committee agree with Koskie Minsky's stand (and possibly lack of action)?

    The break fee will ultimately come out of the proceeds of the sale of wireless business to Ericsson. The ultimate distribution of the assets from the sales process will be determined via a negotiated process.

14. If after the sales are completed Nortel remains a going concern and viable company to some or any extent, even a minor one, what would be the implications for pensioners, etc.?

    There is a possibility that the process of selling all the assets may take some time to complete. This may mean that a full distribution will take some time or that there may be a number of distributions over time as assets are sold. The NRPC will determine how we proceed once Nortel's direction is decided.

15. If Nortel emerges as an IP licensing company, will they pick up the liability for the underfunded pensions, severance payments and LTD payments and associated health care and life insurance benefits owed to employees?

> The unfunded liabilities will be claimed as claims against the Nortel Canadian estate. As the CCAA and Bankruptcy process proceeds, payouts will occur to pay some percentage of the claims, including these amounts. We are anticipating that these amounts will be paid at some percentage of the amounts claimed.

16. When does Ericsson hand over the money? Who receives and gets initial control of these funds?

> Ericsson provides the cash payment when the overall deal closes. This money is paid to the in-country Monitor and is held in trust until the final distribution deals are agreed to and sanctioned by the courts.

17. How the various courts collaborate (or not) in the allocation of funds to the various jurisdictions?

> There will be a court approved process to determine how the funds will ultimately be allocated.

18. What principles/case law (if any) have been developed/applied in other similar multi-jurisdictional proceedings for global companies?

> This is new ground for all of the legal processes in the multi-jurisdictional arena.

19. If Ericsson is going to hire a number of Nortel employees, will Ericsson get any money from the Pension Fund related to those employees they hire? If so, who will control how much money they get from the Fund?

> The Ericsson deal does not contemplate any pension transfers, although there may be some scope for terminated Nortel employees to move the commuted value of their pensions if Ericsson maintains a pension plan. Pension plan transfers are governed by the *Pension Benefits Act* and that statute and the Regulation passed under it dictate the basis upon which transfers may be made.

20. Are foreign subsidiaries being obliged to pay a fair share of HQ expenses such as costs of lawsuits, director's liability insurance, liquidation costs, etc?

> There is an interim funding agreement in place to provide for the cash needed to run the Canadian corporation under the CCAA process.

21. It has been stated that the Nortel assets held in the US would cover 60% of obligations to US creditors, but the Nortel assets held in Canada would cover just 20% of the obligations to creditors in Canada. Also, the assets in Canada are declining for various reasons and the assets in the US are increasing. Is this true? If so, does this mean that US claim payouts will be higher than Canadian, or is there some kind of re-balancing of assets that occurs before claims are settled in each jurisdiction?

> It is quite true that the Nortel assets are held in various jurisdictions globally. The actual distribution and the percentages paid out in each jurisdiction will depend on the negotiated agreement and blessing from the respective courts. We really do not have anything other than speculation at this point as to the actual payouts.

22. What contribution can the pension plan expect from the proposed sale of Nortel assets?

> We would expect that as part of the sales process and subsequent negotiated distribution process, there will be a topping up of the funds in the Pension plan. How much and timing of this is uncertain at this time.

23. Is there any legal way or recourse available to us to block the sale of Nortel assets until the pension plan shortfall is funded?

> There are a number of methods that the NRPC is using to influence the negotiations around the distributions. We are scrutinizing each and every sale process to attempt to get the best possible outcome.

120
JP

24. How much cash is there in the Canadian Estate? What are the chances of improving the situation?

   The Canadian estate holds relatively little cash. We are working strategy with Koskie Minsky and RSM Richter to get as much cash into Canada as possible.

25. Who will own the Northern patents in case of liquidation? Who would benefit in case of potential licensing or sales revenue?

   Nortel owns and will continue to the Intellectual Property until it is sold. Any cash generated from the IP sales will go into the estate to ultimately pay further distributions.

26. What is the implication to us of the various "estates" in different places?

   The location of the estates is not as important as the final negotiated distribution agreement as to the ultimate distributions to the creditors.

27. Are Patents considered Canadian assets?

   Our view is that the Canadian Estate owns all the patents. Other Creditors disagree with this and this will likely end up in the courts for resolution.

28. Why are US courts in charge if disposing of assets where the assets are in many countries (e.g. wireless)

   The disposition of an asset is done where the majority of the asset is located. Canadian courts are responsible for the sale of the Canadian assets, the US courts for the US assets, and so on.

29. I did not know that some portions of Nortel are not in bankruptcy. How will the asset values of those entities be dispersed to the creditors?

   These assets will ultimately be sold and the proceeds dispersed per the negotiated distribution agreements that are worked out and agree to in the courts.

30. It seems the CDMA and Enterprise asset sales fall under US jurisdiction. How does this help us in Canada?

   The assets sales all end up in a "lockbox" that will contain the proceeds of the sales until the distribution agreements are worked out completely.

31. Why is it thought that "time is on our side" regarding negotiating for better allocation of asset proceeds to Canada? I am concerned that while this may benefit negotiations, there is cash burn associated with delay (e.g. remaining asset operating costs and also the substantial legal costs). Can you comment on this?

   Strategically, time is on our side for a number of reasons, some of which we can not discuss publicly. Please contact a member of the NRPC who can help answer this for you.

32. How about the existing cash (not from the sales) where is it held and what proportion is allocated to the Canadian estate?

   Cash is managed as part of the CCAA process, and Nortel via the Monitor publishes a regular update on the cash position of the corporation on the Ernst and Young website.

33. What is the best scenario for distribution and what is the worst scenario?

   Given the number of variables including the actual amounts of the asset sales, the timing of the sales, the time to close the deals for each sale, this is virtually impossible to determine at this point. Theoretically the range could be from near 0 to near 100 percent, although neither extreme is likely as all.

34. Is Nortel's existing cash held throughout the world to be added to the lockbox at the appropriate time?

    Yes.

35. If the Ontario FSCO decides to take over our plan soon because of its underfunded state, will time still "be on our side" in the asset allocation process?

    Yes.

36. If Nortel is discontinued, how can Nortel collect Patent moneys owing?

    There are a number of discussions underway to see what Nortel will do around managing a patent business. Once that is determined, the process for collection will be put in place.

37. What is being done with the Accumulated Canadian tax credit? It's a large number from what I hear. Is any one pushing for using this credit for ex-employees dues, pension, severance and disability benefits?

    There are specific Income Tax Act rules around how the Investment Tax Credits (ITC) can be used by other corporations. We expect that Nortel and the Monitor will be exploring how to convert these credits into cash and this cash will be subject to the same distribution process as all of the proceeds from the assets sales.

38. Are Investment Tax Credits and Net operating losses considered as assets that can be monetised and made available to the Canadian Estate?

    Potentially yes. There are specific Income Tax Act rules around how the ITCs can be used by other corporations. We expect that Nortel and the Monitor will be exploring how to convert these credits into cash and this cash will be subject to the same distribution process as all of the proceeds from the assets sales.

39. What is the expectation for the dollar recovery for employee claims to the Canadian estate?

    There are various articles around on internet and in emails around the distributions. At this point, this is all speculation.

40. How much is in the Lockbox now?

    There have been no completed asset sales yet and no cash in the lockbox at this point.

41. If patents belong to Canada, then what is the mechanism for the Canadian estate to get paid for the patents that were sold with the businesses that were sold?

    Each of the Sales Processes detail how the patents will be licensed to each of the purchasers. We are seeing that Nortel is selling relatively few patents and is primarily licensing the patents.

42. Why isn't the distribution going to be based on "total claims" across all entities and countries versus "total proceeds" across all entities and countries?

    The ultimate distribution will depend on the negotiated agreement.

43. When the real estate in Ottawa is sold will the assets stay in Canada?

    We believe that most of the Canadian Real Estate is leased or has already been sold. Any proceeds from assets that are being sold by the Canadian Estate in Canada will remain in Canada.

44. Could RIM still be a factor in blocking the sale to Ericsson?

    Not likely. RIM did not bid in the Auction process.

45. Has Koskie Minsky received any information from Nortel on pending patents made by severed employees?

No, not at this point.

# BIA & CCAA Amendments

46. If we are successful in getting the BIA amended to give pensioners, terminated employees and the long term disabled preferred status over the other unsecured creditors in September, would Nortel and the court be obliged to honour it in time to save us?

    It is doubtful that an amendment can be passed by government so quickly. However once it becomes law, Nortel and the courts would be obliged to honour it. The timeframe for such a change could extend well into 2010 based upon the pace of the sales process.

47. What is probability of the government passing the BIA amendment to put employees ahead of general creditors?

    This is difficult to answer. If our petition spurs the Government into action they may take other measures to help us at the same time as the BIA amendment is proceeding through the usual Government bureaucratic process.

48. Are there changes to creditor priority as we transition to BIA from the CCAA; specifically to severance claims?

    No. Even in BIA such claims have no higher priority. This is why we want the BIA changed.

49. Would it help us / Koskie Minsky if pension funds were to be defined as "secure creditors" in the CCAA?

    Not necessarily. It would also need to be changed in the BIA.

124
JP

# Bonus Payments and Motions

50. What was the decision made by Judge Morawetz to the question raised in Court by CAW and Koskie Minsky, reported in the Bloomberg news article of April 20, 2009 *"Nortel Can't Pick Opposing Firm, Lawyer Tells Judge (Update1)"?* The article states: *"Tomorrow, the CAW and Koskie Minsky will ask the judge to order Nortel to pay the fired workers their severance and to resume supplemental pension payments to retirees."*
http://www.bloomberg.com/apps/news?pid=20601082&sid=adeB5JEd5Csg&refer=canada '

    The Judge decided that Koskie Minsky should represent all retirees and former employees. The motion to pay fired workers and resume supplemental pension payments was denied. However, Koskie Minsky has successfully sought Leave to Appeal the payment motion in the Ontario Court of Appeal. The appeal motion will be heard in the Ontario Court of Appeal on October 1, 2009.

51. The Nortel executives recently gave themselves court approved huge "retention" bonuses. Now it's clear that the intent is not the restructuring of the company, but its liquidation. Therefore, the "retention" argument makes no more sense. Will Koskie Minsky try to get from the court a reversal of the decision to allocate these bonuses, so that this money can be used where it should be, namely paying the retired and terminated employees what has been unjustly retained from them (such as severance payments, TRA, etc.)?

    The bonuses were structured to be paid out primarily based upon success in restructuring the company, not just for retention so the bonuses will be not be fully paid out.

52. How can Nortel continue to make bonus payments?

    The bonus payments to employees are intended to keep the businesses fully functional in an environment where no one knows if they will have a job. Without the employees the businesses that are up for sale are worthless.

53. Why are there so few objections to what appear obvious motions to oppose?

    Koskie Minsky can only oppose based upon legal arguments. Constant objections to motions without the basis of law would cause us to lose credibility in Court.

54. As a Nortel pensioner, are there any class action law suits against former Nortel executives that we should be concerned about? If so, where can this information be found?

    No lawsuits can be brought against former executives or Board of Directors members while a company is under the protection of the CCAA.

55. Is anyone objecting to senior executives and Board Members getting bonuses and lucrative salaries and other forms of payment?

    The CEO has resigned and the Board has been reduced from 12 to 3 members (all Canadian) so there are no such concerns. Any claims being made by former executives will get paid cents on the dollar just like the rest of us.

125
JP

# Claim Amounts

56. Do people who were receiving a pension and a TRA on January 14, 2009 get priority for the assets over those who currently were not or chose to take a reduced commuted value?

    No. Currently we all have the same priority.

57. What is the likely payback on the dollar for pension plan, TRA, severance and medical benefits? What progress has been made to give any or all preferential treatment?

    The payback depends on many factors including the sale proceeds, the allocation of assets between jurisdictions, and whether government can intervene to give us priority. At this point it is impossible to speculate on a number.

58. Is 10 cents on the dollar realistic for Canadian claims?

    It is not possible to speculate on a realistic percentage until the sales of all business units have completed. In the meantime, it is imperative that we continue to pressure for government help to raise our priority and for the other jurisdictions agree to share the proceeds of the asset sales equally.

59. Our pension fund it currently sitting at 31% funded and many former employees are sitting without one penny of severance. With representation by Koskie Minsky, is it reasonable to expect that there will be some funds allocated to top up the pension plan and to provide severed employees with at least minimum employment standards severance and some relief given to LTD employees?

    Yes, it is reasonable to expect that some money will be allocated to top up the pension plan, provide for severance benefits and relief to LTD employees. However, it is not possible to predict how much money that will be or when that money will be available until all assets are sold and an agreement is reached on asset allocation.

60. When all this first started in January, I read that Nortel at that time had roughly $2 billion in assets and $4 billion in debts. If, when Nortel has finished selling everything and has paid off lawyers' bills etc., they end up with equal assets and debts, would this mean that all creditors including pensioners, severed employees and LTD employees would get everything owing to them, such as RAP/TRA, Health Benefits, full Pension, severance pay and LTD payments? Is there any or much chance of this happening?

    It is unlikely that Nortel will end up with equal assets and debts. However, it is reasonable to expect that some money will be allocated to top up the pension plan, provide for severance benefits and relief to LTD employees. It is not possible to predict how much money that will be or when that money will be available until all assets are sold and an agreement is reached on asset allocation. As few assets are in Canada, we must continue to fight to get a fair allocation for the Canadian estate.

61. Are the managers' pensions in a separate "pot" or account than the pensions for the Union members? In other words are all the pensions being looked as a whole?

    The negotiated (union) and non-negotiated pension funds are separate. However, both are underfunded to approximately the same level. Koskie Minsky is representing both and both have the same issues so there is no harm in looking at them as a whole.

62. I would appreciate confirmation (or otherwise) of my belief that the Pension Fund is a single creditor for all of our 'normal' continuing pension plans. I recognize that the 'excess pension' and other payments already stopped generate individual claims for each of us so affected.

    A placeholder claim will be made by the plan administrator in the regular claims process for the unfunded liability in the Plan. It is not possible to determine the quantum of that claim at this point as no wind up has been declared and all required contributions continue to be made. It remains to be determined how the impact on individual pensioners is treated in the CCAA process.

63. Is there anything being done regarding SERP?

Individuals whose SERP payments have stopped are entitled to file claims for repayment under the CCAA claims process and will be given the same priority as all other unsecured creditors.

64. When I was laid off, in my pension package I was supposed to get a TRA payment. With CCAA proceedings this was put on-hold for all people. Can we expect a removal of this hold soon?

No these payments will not be reinstated. However, individuals whose TRA payments have stopped are entitled to file claims for repayment under the CCAA claims process and will be given the same priority as all other unsecured creditors.

65. Can you explain how the Canadian claim process will work for employees terminated after January 14, 2009 and is there anything other than severance that can be claimed? If so, what supporting documentation is required?

There will be a claim process for employment related claims that is separate from other claims (e.g. suppliers, bondholders, etc.). See question 92 for details.

66. What happens to the employees that lost their RAP, that just recently retired and took it over a five year or longer period is there a chance to ever get that back?

Individuals whose RAP, TRA and other non-registered supplemental pension payments have stopped are entitled to file claims for repayment under the CCAA claims process and will be given the same priority as all other unsecured creditors.

67. Do pensioners have claim against Nortel's assets for lost TRA payments and the cost of going forward health care insurance?

Yes.

68. My excess pension was terminated in January. Is there any chance that we will get a portion of this back?

Yes. See question 66.

69. Were you informed that former Nortel employees that were working for Flextronics have lost their RAP and is there any way this will be returned after all is settled?

Yes we have been advised that RAP payments for Flextronics employees have stopped. Our lawyers are exploring how best to make a claim for those lost benefits. See question 66.

70. For those of us who were terminated after the January 14, 2009 announcement of Nortel entering creditor protection, we received no notice, no severance and no promise of either from Nortel. What will our claim consist of? Will we be limited by the Ontario minimums or will our claims reflect the common severance amounts received by those terminated earlier?

Koskie Minsky is in the process of negotiating the claims process with the lawyers for Nortel and the court appointed Monitor, Ernst and Young. More details on the process and timeframes should be known within the next 60 days or so but part of this process will be to get agreement on a methodology for calculating severance entitlements. The intent is that the agreed to methodology will take into account both common law and statutory entitlements received by those terminated prior to the CCAA filing. Koskie Minsky will then assist you in filing your claim by calculating your losses for you based on employment related information provided by Nortel and actuarial advice from Segal. You will have an opportunity to review the calculations and the data upon which they were based, and provide any corrections / additions before Koskie Minsky submits the claim on your behalf.

71. I'm a severed employee who "successfully" commuted the value of my Pension at the 86% level. Is there any possibility of any legally based claw back of monies already received i.e. court ordered return of some portion funds received?

    No, we don't think so.

72. Could we claim for the loss of Nortel stock values?

    No. However, you may be able to claim a capital loss on your income tax return.

73. Are TRA funds outstanding to all employees eligible, known and are they handled as a separate file to the standard pension?

    Yes, the amounts are all known and they are handled separately to the registered pension plans.

74. How will the unpaid portion TRA Monthly payments be treated in the claims process?

    See question 66.

75. Am I correct in inferring that the Present Value of our benefit plans will also be taken into account as an unsecured creditor?

    Yes, that is the expectation.

76. Will the claims calculation consider spouse and dependents?

    Yes, to the extent that the Nortel plans covered them.

77. Do we need to submit employment claims relating to the pension fund if it is kept as an ongoing concern (i.e. do not wind it up)?

    The claims are intended to compensate for the deficit position and loss of supplementary pension and health care benefits. This is a separate issue from whether the pension fund is wound up.

78. My pension is divided in three categories according to my statement summary (NNLBASIC, NNLADDL and NNLNOADJ). Each category bears a certain amount that makes up my pension payment. Is each category treated equally or is one or more categories not protected as much as the others?

    Each is treated equally. The differences between the components are based upon the partial indexing of your pension and the original method of calculating it.

79. Will employees who qualified for a pension and TRA payment prior to CCAA filing but are still currently employed, be eligible for a claim for their TRA payment once they are laid off?

    Yes.

80. Will the individual claim estimate include LTD, Life Insurance etc. as well as outstanding monthly pension and TRA?

    Yes.

81. Is TRA part of the omnibus process?

    Yes.

82. Is it possible that there will be no loss of money for pensioners?

    This is possible but not likely.

83. When claims are finally paid will there be significant tax implications that will also have to be addressed at that time?

> Tax will need to be paid on any retroactive payment of pension income.

84. Will I be taxed on the amount I receive for the claim concerning my RAP?

> Tax will need to be paid on any retroactive payment of pension income.

85. Can a claim be made during the claims process for the additional 14% that is owing for the pension commuted value payout?

> Yes.

86. Can we make any claim for the grief and psychological suffering that Nortel has inflicted on us?

> No.

87. Is there in chance that I will receive my remaining 2 years of RAP payments owed or is this part of the claims process?

> See question 66.

88. Can the potential loss of pension or severance recovered be converted to a tax loss that can be applied to a future capital gain or against another source of income?

> This is an issue that we are taking up with the Government. Currently this is not the case.

89. Does a 30 year pensioner have more of a claim than 28 year pensioner, i.e. is there a larger decrease for less years of service? Also if service was bridged is there less of a claim?

> There will be calculations done for all individuals to determine the commuted value of their pensions. These will all be used to determine what the shortfall is for the plan. We expect the resulting percentage shortfall will be used for each to determine the claim amounts. There are many factors that are used in the actuarial calculations so one cannot provide simple answers to these questions.

90. If I were terminated and were forced into early retirement (which I am qualified), am I still legally entitled to receive severance and termination pays because I indeed am terminated?

> Yes unless you waived that right in order to take retirement.

91. TRAs could have been taken as a lump sum. If invested with Nortel the portion not rolled into an RRSP is an investment with Nortel at a certain interest rate (i.e. 6% / year). In a sense the unpaid portion is a capital loss on a loan for tax purposes. Please comment.

> You cannot claim a capital loss on a loan.

# Claims Process

92. What is the claims process?

The claims process for employment related claims (e.g. unpaid notice and severance, lost TRA, SERP and SPLA payments, loss of health, dental and life insurance benefits, etc.) has not yet been established by the Court. Koskie Minsky is in the process of negotiating this process with the lawyers for Nortel and the court appointed Monitor, Ernst and Young. More details on the process and timeframes should be known within the next 60 days or so.

If any action is required on your part, you will be informed by Koskie Minsky of the details once the claims process has been defined and published. It is likely that Koskie Minsky will assist you in filing your claim by calculating your losses for you based on employment related information provided by Nortel and actuarial advice from Sega . You will have an opportunity to review their calculations and provide any corrections / additions before Koskie Minsky submits the claim on your behalf.

93. When is the deadline for Nortel pensioners and former employees to file a claim and where do I retrieve the forms? Are we going to get any assistance in filing our claims?

The claims process for employment related claims (see question 92) has not yet been established. Therefore, the forms for filing a claim have not yet been created or published. Once the process has been defined and published, Koskie Minsky will contact all eligible pensioners and former employees in order to provide them with the required assistance in filing their claims.

94. What can we expect the turn round time for former employees to claim will be?

The turnaround time for filing claims will be defined and published as part of the claims process. See question 92.

95. Is Segal going to assist us in filing our claims?

Assistance will be provided by Koskie Minsky for filing your claims. Segal will be advising Koskie Minsky as appropriate during this process.

96. How do I calculate my losses?

It is likely that Koskie Minsky will assist you in filing your claim by calculating your losses for you based on employment related information provided by Nortel and actuarial advice from Segal. You will have an opportunity to review their calculations and provide any corrections / additions before Koskie Minsky submits the claim on your behalf.

97. Is there any timeline when we would expect to receive payment?

There is not yet a timeline for when you should expect to receive payment.

98. I assume that my claim should be mailed to the appropriate Court agency (the Monitor Ernst & Young?) by registered mail. Is this assumption correct?

Details for where to submit any required information will be provided as part of the claims process when it is published. See question 92.

99. Will Koskie Minsky make the claim on my behalf? Is there action of any kind required by me to ensure that my pension claim is recognized and accepted by the Ontario Court?

It is likely that Kosky Minsky will file the claim on your behalf. If any action is required on your part, you will be informed by Koskie Minsky of the details once the claims process has been defined and published. See question 92..

100. Will it be up to each individual to compile and submit their own claim?

It is likely that Kosky Minsky will file the claim on your behalf. See question 92.

130
JP

101. Will the Canadian claim process be as confusing as the US one appears to be?

Koskie Minsky is in the process of negotiating the claims process with the lawyers for Nortel and the court appointed Monitor, Ernst and Young. Their goal is to make the process as simple as possible for everyone. More details on the process and timeframes should be known within the next 60 days or so.

102. Do I need to submit separate claims for my pension and retiree benefits (medical, LT care, life insurance, etc.)? Also do I need to submit both in Canadian and US courts?

It is likely that you will only have to submit one claim for the loss of all benefits earned as a result of employment in Canada. You will need to urgently file a separate claim with the US Court for the loss of any benefits earned as a result of employment in the USA.

103. What do I do now, or should I have done by now, if I am owed a severance package?

There is nothing that you should have done or need to do immediately if you are owed a severance package since the claims process has not yet been defined or published. However, if you have not done so already, you should register yourself on the Nortel Retirees' and Former Employees' Protection Committee (NRPC) website. The NRPC is the overall group that has been formed to represent the interests of former employees in the CCAA process. By signing up on the website, you will receive regular email updates on the status of the CCAA proceedings and on the political lobbying we are doing to further our cause. To register, go to www.nortelpensioners.ca.

You may also want to join the LinkedIn group that has been set up called Recently Severed Canadian Nortel Employees. The group has been set up for the purpose of information sharing between terminated Nortel employees. In case you have never heard of it, LinkedIn is a social networking site, a bit like Facebook, but it is targeted at professionals who want to network for job searching reasons. You can go to www.linkedin.com and get yourself a user account set up. Once you have done that, you can click on the link below to generate an automated request to join the Recently Severed Canadian Nortel Employees (RSCNE) group.

http://www.linkedin.com/groupRegistration?gid=1770226&trk=anetsrch_join&goback=%2Egdr_1244570995393_1

Another site of interest that you may want to visit regularly is the Koskie Minsky web site http://kmlaw.ca/Case-Central/Overview/?rid=107. Koskie Minsky are our court appointed lawyers and they post weekly updates in the "News Releases and Reports" section.

104. How will you be collecting information on the various claims components (i.e. I have a TRA claim plus my continuing pension)?

Koskie Minsky will calculate your losses for you based on employment related information provided by Nortel and actuarial advice from Segal. You will have an opportunity to review their calculations and provide any corrections / additions before Koskie Minsky submits the claim on your behalf.

105. How do I confirm that I am covered by the Koskie Minsky process for claims recovery and that you have been provided our own individual claim information by Nortel – both pension and severance?

The best way to ensure that you are covered by the Koskie Minsky process for claims recovery is to register yourself on the Nortel Retirees' and Former Employees' Protection Committee (NRPC) website. The NRPC is the overall group that has been formed to represent the interests of former employees in the CCAA process. By signing up on the website, you will also receive regular email updates on the status of the CCAA proceedings and on the political lobbying we are doing to further our cause. You will also have access through the NRPC and KM websites to information about the timing of the claims process, and if you don't receive the mailings sent out during that process, you will be provided contact information to notify KM and the Monitor that you have been missed. To register, go to www.nortelpensioners.ca.

106. What is the order of payment of unsecured creditors?

There is no order of payment for unsecured creditors. All unsecured creditors have the same status and will be allocated the same percentage distribution of the estate.

107. How do I file a claim on part of the pension which was lost in January following Nortel's bankruptcy filing? Should I file individually or will it be as a class?

Your losses will be calculated for you based on your employment and personal data provided by Nortel, and actuarial methodology that will be negotiated with advice from Segal. You will have an opportunity to review the calculations and the data upon which they are based, and provide any corrections / additions before Koskie Minsky submits the claim on your behalf.

108. September 30, 2009 has been advertised as the date for submitting claims by creditors of Nortel. Has that date changed?

The claims process that has already been announced with a claims bar date of September 30, 2009 specifically excludes employment related claims. There will be separate claims process for employment related claims which has not yet been defined. See question 92.

109. Do the pensioners have equal status with other claimants such as the bond holders?

Yes, all unsecured creditors such as pensioners, terminated employees and bond holders have equal status under the CCAA.

110. Why do we need a separate claim process?

Due to the large number of pensioners and former employees who have claims, the complex nature of some of the actuarial calculations required to compute many of their claims, and the need to have a common and accepted methodology for those calculations it is not practical, useful or cost-effective to require individuals to file their own claims, or for the Monitor to process claims on that basis.

111. What happens to a claim if a person dies over the claim period as I understand most retirees are about 70 years of age?

It depends on the nature of the claim and when the death occurs, but some will be subject to claimable by the surviving spouse or the estate.

112. Are there any disadvantages to us having a separate claim process?

We expect the separate claims process for employment-based claims to be advantageous to employees, and know of no disadvantages to having a separate claims process.

# Government Intervention

113. The government has been bailing out General Motors of Canada with millions / billions of dollars which the company has been in return making contributions directly to their pension fund. What is the government's reasoning for not helping out the Nortel pension fund?

> The Government claims that they only provided loans to GM and then it was GM who applied a significant portion to the pension plan deficit. In terms of Nortel, the Federal Government says that it is a Provincial responsibility, not theirs. The Provincial Government says that the PBGF is in deficit so can't afford to help. However there may be some legislative changes that will be coming in the fall and the Government doesn't want to pre-announce anything. So we continue to apply pressure and we'll see what happens.

114. There have been statements to the effect that the Ontario Pension Benefit Guarantee Fund (PBGF) is insufficiently funded, and Premier McGuinty has indicated reluctance to bail it out. Are there other alternatives to fund it (e.g. province loans it money) and what are we doing to try to get it topped up?

> We have been pressuring the Provincial Government to top it up as well as to prevent wind-up of our pension plan.

115. In the UK and the USA, there is some sort of protection for pension funds assumed by the government. These two governments will try to retrieve from Nortel as much as they can to cover their citizens. Is there a way that the Canadian government could manage to keep Nortel Canadian sales out of the picture for these UK and USA folks?

> The Federal Government can intervene and set conditions for the sales that favour pensioners. So far they have not shown any inclination to do so.

116. Why can we not motivate our Federal or Provincial MP/MPPs to take action on our behalf? Everything I hear from them is "we can't do anything". Is this a case where our laws are ineffective to safe guard our pensions?

> Our laws are inadequate. Changing them takes a long time. Unfortunately, our Governments have been asleep at the switch for years whereas in the US and UK pensioners have had protection for many years.

117. Which governing body allowed Nortel to short fund the pension plan and what are our current action plans in that regard?

> The Ontario Government allowed it under the so-called "too big to fail" provision. We have been pressuring the Ontario Government to do something.

118. Diane Urquhart pointed out in April 2009 that there are over $2billion in unused tax credits that still belong to Nortel. What is being done to work with the Canadian government to have those tax credits included in the sales and auctions of Nortel's businesses, so that the credits can be sold and the proceeds used to help fund the Canadian pension and other trust funds?

> The problem with tax credits is that they are only useable to offset tax on profits made in Canada. Unfortunately only companies that operate in Canada and generate profits here can use them. So far only foreign companies have been bidding on the Nortel assets.

119. The Canadian government topped off the pensions for General Motors, Chrysler and Air Canada. Is there a possibility that they will do the same for Nortel because it is a Canadian company?

> We have been pressuring the Government to come up with a creative solution for Nortel pensioners as they did for those companies.

133
JP

120.The government put money into the CAW pension fund as part of the GM bailout. If they don't support Nortel pensioners could this not be challenged under the Charter of Rights?

The Government technically only provided a loan and bought a stake in the company. It was the company that put the money into the pension fund. This is a 'creative' solution that we have been asking them for.

121.The media reported that the US and UK governments are topping up Nortel pension funds in their countries. Is the Canadian government planning to do the same here in Canada?

No. There is no indication to date that this will happen.

122.What is being organized by pensioners, former and LTD employees to protest on Parliament Hill to reinforce the need for BIA amendments?

There was one demonstration on Parliament Hill several weeks ago. There may be a demonstration organized for September 14th but that has not yet been decided.

123.I have expensive drug costs. Will the Provincial government assist my situation?

Not unless you are over 65. Some people may also be eligible for a grant through the Trillium Foundation. Please check www.trilliumfoundation.org for details.

124.We are trying to change BIA legislation to ensure former employees obtain preferred creditor status over other unsecured creditors. If the Canadian Parliament is to change this legislation before the final date when Nortel is bankrupt, would that be applicable to us or would the change only be applicable to the future bankruptcies?

If Nortel has not yet exited the CCAA process then it would apply.

125.What is your answer if a politician says that as long as the case is under CCAA they cannot help us?

We are going to politicians for political intervention, not interference in the court process. There is no good reason for politicians to refuse to get involved to help such a large constituency.

126.Don mentioned that amendments to CCAA & BIA might be too late for us. What do we have at our disposal to make a case that this decision should be retroactive and should include the NRPC?

We must continue to put pressure on the Government to take actions to support our case.

127.If Nortel's technologies, patents and assets are so valuable, why would the Canadian government not wish to help this Canadian company, once downsized, remain solvent and continue operating?

The Government doesn't want to own or run the company. They had the opportunity last fall to do just that with a loan guarantee but they said Nortel did not present them with a credible business plan. Right now if the Government were to intervene in the asset sales and try to resurrect the company it would be viewed negatively as Government interference.

134
JP

# Koskie Minsky and Legal Questions

128. Please explain what was meant by the phrase "Conflict of Interest" quoted from a news article published by Bloomberg News, *"Ontario Court to Expedite Nortel Severance Appeal (Update2)"* on July 22, 2009: *"Koskie Minsky LLP, the firm initially named to represent all workers, said it had a conflict of interest in speaking for current and former workers as Nortel sells its businesses. Current workers are interested in saving their jobs while former workers want to see the assets sold for the best possible price."*
http://www.bloomberg.com/apps/news?pid=newsarchive&sid=afBVINsEGZCE "

   Kosky Minsky did not want to be in a position to have to adjudicate between the interests of the pensioners and former employees versus existing employees.

129. Is the above statement reported on July 22, 2009, consistent with this following Toronto Star article of April 20, 2009? *"Mark Zigler, a lawyer for the firm Koskie Minsky, told the court it made no sense to have multiple groups of lawyers representing different groups of former employees of the insolvent telecommunications equipment maker""* http://www.thestar.com/Business/article/621353

   Yes. The intent of that discussion was to minimize as much as possible the legal costs to Nortel and its estate

130. What opportunity/requirement is there for each of us to influence Koskie Minsky's strategy, especially when it comes down to approval/disapproval votes on specific measures?

   There is no voting process in place from an individual level for a number of valid reasons. Please address your input to the NPRC and Legal Representatives who are in place to help take the interests for the larger group forward.

131. Is Koskie Minsky restricted in any way from performing any and all work necessary to aggressively represent our interests in this bankruptcy?

   Not to our knowledge.

132. How many votes do we get in the deciding of debt payment proposals? Is it 1 per pensioner or 1 for the entire plan? Is it 1 vote per TRA holder? Can we use this to deliver messages to the court?

   We do have a lot of clout in the process based on the value of our aggregate claims and our sheer numbers.

133. What is the incentive for Koskie Minsky to get more for its clients? Do they get more money?

   Koskie Minsky has fiduciary obligations as lawyers to act in the best interests of their clients.

134. I would guess that Canadian law may be better for Canadian pensioners, employees. And, it seems that Canadian claims would do better in Canada. Was the case made to transfer the bankruptcy process to Canadian courts? Is there anything to be gained by doing so at this point? If this case was not made, why not?

   The Bankruptcy process is managed in each jurisdiction that Nortel is located and has applied to the courts for protection. There is no process for a Canadian Court to manage a US bankruptcy and vice versa.

135. Is there a point of diminishing returns where legal costs born by pensioners outstrip claims recovery (e.g. patent claims or the health fund)? Have alternate processes been discussed?

   The pensioners are not paying any legal fees at this point. All fees are paid out of the Nortel Estate.

136. How is Koskie Minsky being compensated?

   All fees are paid out of the Nortel Estate.

135
JP

137. Many people ask what Koskie Minsky is doing to lobby government for legislative change. Our answer has been that Koskie Minsky is not retained to lobby govt. but to rep us in CCAA. There are areas in which Koskie Minsky deals with government departments on issues within the CCAA process. Can you quickly list the things you are doing and not doing in these areas?

> Koskie Minsky is our legal representative, and takes direction from our Legal Representatives. The NRPC is the organization that has been set up for Political action on the CCAA and the BIA. Please visit the NRPC website for more details on the various activities underway.

138. Nortel covers Koskie Minsky's cost. Is not it a conflict interest?

> No.

139. Can Koskie Minsky definitely state that we are better protected now than on January 14? If yes then what are the protections acquired since? If not, then why not?

> Yes. We are represented in court during all key sessions and have the ability to raise our objections to the CCAA Judge directly. We have the ability to appeal decisions that we believe are inconsistent with current law. We have the ability to work with the Monitor via the legal process. This is all more that we had prior to the Court order appointing Kosky Minsky as our legal representative.

140. Koskie Minsky promised in their January meeting with Nortel pensioners that the CCAA judge has leeway for creative solutions. What creative solutions have been contemplated and which ones have been taken to the stage of fruition?

> Koskie Minsky and the NPRC are taking various options to our Business advisors as part of our strategy to maximize the amount of assets in Canada. These are employed at the appropriate point in the CCAA process.

141. Why is there a US-based Unsecured Creditors Committee (which includes the US Pension Benefit Guarantee Fund) but no similar committee in Canada?

> In the CCAA process, the role of the court appointed Monitor is to represent the interests of all creditors.

142. The June 17 Doolittle Affidavit (paragraph 17) says most of the IPR is owned by NNL (i.e. in Canada). What strategies can be employed to withhold licensing of this IPR in support of more equitable funding for Canada? The US bondholders may have the money, but Nortel Canada (NNL) has the IPR. There should be a negotiating position here.

> We have a number of actions underway to attempt to retain the maximum amount of cash in the Canadian Estate. Withholding of the licensing for the IPR would dramatically impact the ability of Nortel to sell its assets and therefore it is not to our advantage to do this.

143. What section of the Income Tax Act defines the max benefits that can be paid from a Defined Benefit Pension Plan?

> Koskie Minsky and the NRPC are not Tax experts. Copies of the ITA are available on the internet or you could contact the CRA with your question.

144. How much is the US liquidator getting paid? Is it capped?

> For information on the U.S. Chapter 11 proceedings, contact the U.S. claims agent, Epiq Bankruptcy Solutions at http://chapter11.epiqsystems.com/nortel.

145. Why is double dipping by bond holders permitted by the courts? Is this not grossly unfair?

> The Bond holders own bonds issued by Nortel in the various jurisdictions and have as much of a right to claim for repayment as anyone else under the current legislation. That is one of the key reasons that we are urging everyone to speak to your Member of Parliament to request changes via the political process to the CCAA and BIA acts

146. Who is attending court proceedings in Canada, the US and UK to represent the Province of Ontario? What Ministry / Ministries do they represent? What is/are their agenda(s)? Are they being effective?

The court proceedings that have taken place thus far are documented and each judgement or endorsement from the judge indicates what parties were in attendance, and who represents them. Ernst and Young maintains a website http://documentcentre.eycan.com/Pages/Overview.aspx?SID=89 on which all court documents are posted, including the "service list" which identifies all of the parties involved and their counsel.

147. Who is attending court proceedings in Canada, the US and UK to represent the Federal Government of Canada? What Ministry / Ministries do they represent? What is/are their agenda(s)? Are they being effective?

See question 146.

148. Who is attending Canadian Court proceedings representing their US and UK interests? What are their agendas?

See question 146.

149. Are Canadian pensioners at a disadvantage to US / UK pensioners whose governments have taken on an active role in the claims process on behalf of their citizens

Potentially. Please speak to your MP and MPP regarding this issue to help highlight it in the political arena

150. Do the commitments of 100% pension support from the UK and US governments change what the Canadian pension plan should receive?

No.

151. Has Koskie Minsky questioned when Nortel and Ernst & Young started discussions in 2008 (September, I believe) about options - including filing for bankruptcy protection? Were the severance packages offered in good faith (or with full knowledge that bankruptcy protection was the option of choice being discussed)? Can meeting minutes be subpoenaed? Do they exist? Were there funds to pay severance prior to January 14, 2009? What record is there of yay or nay to funds availability/existence?

It is impossible to know what options Nortel was exploring at the time. The decision to stop severance payments was the taken by Nortel given the cash position in Canada when the CCAA process was initiated.

152. Have any of the payments from NNI to NTL ordered by the US court actually been received? We are only a month away from the Sept 30 final payment date.

Yes.

153. Is it possible for me to sue a third party (Sun Life, Trustees) with another lawyer even tough I am currently represented by Koskie Minsky? Is it possible to have more than one court representative for LTD? I have a claim against Nortel regarding contributions in my defined pension plan that were missed and COLA on my LTD payments that were not done for 5 of the 7 years I have been on LTD. If this happened way before NN went under CCAA do I have a way of solving that now?

You can opt out of the Koskie Minsky Representation Order and retain alternate legal council at your own cost. However, prior to doing that, we suggest that you contact Koskie Minsky directly for guidance on your specific case as it seems to be somewhat unique.

154. Are we striving to get our pension to be treated as 'deferred wages'? As I understand it, wages receive priority status in bankruptcy proceedings. My neighbour is pretty convinced it's not the case. Please provide status and complement of info.

No. There were some recent changes to the BIA related to employee wages, but the protections are very minor. Pensions are Pensions and are clearly not deferred wages.

# Life Insurance, Medical (including LTD) and Dental Benefits

155. When the pension benefits are wound up will that include our life insurance?

Health benefits, life insurance and LTD payments are all made out of the Health & Welfare Trust. There are a number of legal uncertainties how this trust will be operated when Nortel ceases to make payments. It is not known when Nortel will stop payments or what will happen when they do.

156. As part of the CCAA, Koskie Minsky will be submitting our pension debt; will they also be including the cost of replacing our health benefits and life insurance over our lives?

The pension fund administrator will claim for the pension plan shortage. Claims for all other losses such as termination payments, health & life benefits, various excess pensions, TRAs, LTD payments, etc. over the relevant period will be made by Koskie Minsky.

157. Is the Nortel Death Benefit Insurance still solvent?

The death benefit is paid out of the Health & Welfare Trust. Nortel currently is still making payments in to the Trust and all Trust obligations are being honoured. It is not known how long this will continue. See question 155.

158. Has the health benefit plan been officially cancelled? If yes and you have claims in process, will they be honoured?

Currently, no pensioner health & life benefits have been cancelled. It is not known when these benefits will cease.

159. Is there a health care plan provider that would collectively best serve the pensioners? Are there any negotiations active regarding a replacement for the Nortel medical plan?

The NRPC has had discussions with insurance companies regarding an optional group insurance plan and a number of companies could step up to offer optional health and/or life coverage if Nortel ceases to offer these benefits. Obviously there are various options for replacement group coverage paid for by individuals, for example whether to offer identical or modified coverage.

160. One of the benefits that have been given very little attention is the group life insurance which is paid for by Nortel and treated as a taxable benefit. The applicable premium is shown as a taxable benefit on each monthly pension record. What will happen to the Group Insurance?

See the answer to question 155.

161. Will retirees be able to continue the life insurance by paying the monthly premium? What are my options going forward?

See question 159.

162. How long will Nortel continue to pay for my medical and dental benefits? What options do I have after Nortel ceases to fund medical/dental bills?

As mentioned in question 155, it is not known how long Nortel will continue to honour health benefits. As discussed in See question 159, the NRPC are investigating options for an optional group plan funded by individuals.

163. When we lose our benefits – dental and prescriptions, etc., will there be an attempt to create a group policy (up to 20,000 pensioners) with a new provider?

See question 159.

139
JP

164.If the company is liquidated will there be funds set aside to pay for retirement benefits like medical coverage, annual Health Care Spending Account amount, life insurance coverage, etc.?

Currently, how the termination of the Health & Welfare Trust will be handled is a major topic of discussion between the Monitor, Nortel and Koskie Minsky. There are many possibilities and nothing has yet been decided. See question 155.

165.Is there any 'creditor' value generated by the life insurance currently provided to retirees, i.e., is any funding for continued life insurance coverage a part of the obligations of Nortel Networks?

As best as we understand, Nortel can decide to cease making contributions to the Health & Welfare Trust. As mentioned in question 164, no decisions have been taken on how this will be handled when it happens.

166.When my pension plan was defined to me and when I retired I was told that my health, dental and life insurance were part of my pension. I realize that Nortel paid the cost for this but that does not matter regarding my entitlement. As a creditor how do I determine how much to claim? Is there a formula or do I use the amount shown in my taxable benefits?

With the Monitor, Koskie Minsky are deciding in general how to calculate the various former employee claims. Nortel will supply Koskie Minsky with data for all individual former employees and Koskie Minsky will compute the claim for each former employee. Claims will then be sent to each individual, giving them an opportunity to correct any errors in the data supplied by Nortel.

167.Does Sun Life have to give us notice before cutting off our health, dental and life insurance? If so, do they also have to allow us to maintain these policies without a new medical, etc.?

We are told we will have sufficient notice of the cancellation of the health & life benefits. Most insurance companies we have spoken to say they will maintain life coverage under a group policy if the former employee signs within 60 days.

168.A recent notice from Nortel makes reference to "funds in the registered pension plans and the health and welfare trust are trust funds..." What is a "health trust fund"? Does this imply that health benefits will not cease but will continue at a reduced level instead?

The Health & Welfare Trust is mentioned in question 155. Nothing has yet been decided on what happens when Nortel ceases to contribute to this trust, see question 164.

169.How long can we expect Health Care benefits to continue? What about the life insurance portion of this benefit? How are these benefits funded?

As covered in question 162, we do not know how long these benefits will continue. Nortel makes payments into the Health & Welfare Trust that they deem are required. Health benefits, life insurance and LTD payments are all made out of the trust

170.What is being done to protect our health care benefits?

Koskie Minsky is negotiating with the Monitor on how the Health & Welfare Trust, which funds health and life benefits and LTD payments, will be handled going forward.

171.What funds remain in the Health and Welfare Trust?

Koskie Minsky have been informed of the investments in the trust under a non disclosure agreement, and so cannot reveal the current funding.

172.Are health benefits still available? Is group life insurance still in force?

Health and life benefits are still being paid, but we do not know how long this will continue, see question 155.

173. What event or events in the CCAA process will cause my LTD obligations from Nortel to terminate?

A decision by the Monitor and Nortel to stop making contributions to the Health & Welfare Trust will precipitate alternate actions to manage the trust, including possible windup. How this will happen and what the impact will be is still to be decided, see question 155.

174. How much longer can the LTD members expect to receive their cheques?

See question 155.

175. I retired in the US and receive health benefits from Cigna and my monthly payment from Canada. Do I need to immediately pursue securing alternative health benefits either from Cigna or another health service provider? Will there be any help getting Cigna to recognize the situation and roll our health benefits into an individual plan that I would pay directly? Will I be a candidate for Cobra health coverage? What steps do I need to take now to ensure health coverage continuity (especially if preconditions exist)?

Cigna and Cobra both refer to US Pensions benefits. If all of your Nortel service was in US, you will be covered by the terms of Chapter 11 and the excellent US pension plan guarantees. Other claims against Nortel US should be made urgently. If you have any service with Nortel Canada, you would normally be receiving some of your pension and benefits from Canada.

176. What is the estimated total actuarial value of the LTD employees?

The Monitor and Nortel have not released the details of the LTD claim.

177. Do LTD employees share the same trust account with Medical and Health Care trust? For example, does the money come out of the same trust fund to pay for people on disability and people with dental claims?

As mentioned in question 155, health benefits, life insurance and LTD payments are all made out of the Health & Welfare Trust

178. Will the claims of an employee on LTD include accruement into the pension plan until the person reaches the age of 65?

We will ask Koskie Minsky to consider whether this can be included in the claim.

179. Will people on LTD be offered, a choice for the wind up of LTD and then a second one for their retirement (i.e. a lump sum for LTD and reduced retirement pension)?

We are engaged in discussions with the Monitor and Nortel regarding the future treatment of the Health and Welfare Trust and with those same parties and the Government regarding future treatment of the Pension Plan. Depending upon what happens with those plans, disabled employees will have both an LTD benefit claims and a pension claim.

180. When I retired Sun Life offered me more insurance without any medical tests and it certainly appeared that Sun Life had the policy. Why would Sun Life not offer the potential to take over the policy if we paid for it when the Nortel trust disappears or was Sun Life trying to get us to pay more funds into the Nortel Trust and never told us?

A number of companies can offer life coverage when Nortel coverage ceases. You will be able to take out an individual policy, or you may have the opportunity to join and contribute to a group policy arranged by NRPC. The type of coverage, for example a declining life amount to a fixed minimum, may not be offered by one or the other.

141
JP.

181. I was terminated in May and they immediately cut off my Medical and Dental benefits, life insurance etc. Can I claim the out-of-pocket money I paid?  If so, how?

> We are not sure yet. The claims process for employment based claims is not yet established. We will, however, ask Koskie Minsky to ensure that the methodology that best maximizes the value of the losses suffered by terminated employees who lost benefits coverage is arranged.

182. Will I continue receiving disability payments during the entire (Nortel) asset sale process? I cannot live without income for years.

> LTD payments are all made out of the Health & Welfare Trust. There are a number of legal uncertainties how this trust will be operated when Nortel ceases to make payments. It is not known when Nortel will stop payments or what will happen when they do.

# Miscellaneous

183. When is Koskie Minsky going to refund the $150 to those who sent in cheques?

Koskie Minsky has started the refund process. However, since there are over 2000 refund cheques that must be cut and mailed back to the originators, the process will take several weeks to complete. It is anticipated that everyone should have received their $150 refund by the end of September.

184. Is our NRPC board being compensated for all their hard work? How? Surely, they're not doing this out of the goodness of their hearts!

All members of the NRPC, including the National and Regional committee members, are volunteers.

185. How are the former Nortel employees who do not have high speed internet or no internet at all going to receive this information? I would like a print copy of the information sent to me.

Essential information will be sent to you by mail. Non-essential status information will be posted on Koskie Minsky and NRPC web sites. For people without Internet, the sites can be accessed at most public libraries. In case of continued difficulty, former employees can discuss the problem with their local NRPC committee.

186. I would like the chance to ask my questions to a French speaking lawyer. I have many questions and speaking English is problematic for me. Would it be possible to meet and speak to a lawyer in Montreal?

Access to French speaking NRPC members and a French speaking attorney can be arranged through the Quebec Regional NRPC primes. The following link can be used to contact them:
http://nortelpensioners.ca/index.php?option=com_contact&task=view&contact_id=11&Itemid=3

187. Are not the Directors of companies liable for the Statutory Severance Claims if the company does not pay under law? Is the committee pursuing claims against the directors?

Board of Directors of companies are only liable for six months' worth of unpaid wages and twelve months of vacation pay. Amounts owed in respect severance and termination pay are not considered wages under the existing law in respect of Directors' liability.

188. Nortel France spokesman said "Ernst & Young will release funds as a result of Thursday's court decision to allow severance payments, Ms. Tadmoury said." What does this really mean?

We are not tracking decisions of the French courts.

189. Will you be sending out the URL for the replay of this presentation?

The playback is now available on the NRPC website for registered users. If you have not registered already, you can do so at the following link:
http://nortelpensioners.ca/index.php?option=com_content&task=view&id=264&Itemid=170

Once you are registered and have logged into the system, you can access the playback at the following link:
http://nortelpensioners.ca/index.php?option=com_content&task=blogcategory&id=155&Itemid=204.

190. I have not signed for or authorized any changes to my pension since I quit to go work for another company (I was with Nortel from 1981 to 2001). Is my pension now locked in with Sunlife Canada and not affected by this settlement? Also, I have not updated my address information with Sunlife since my departure. How can I find out what the status of my pension is, how much is in the fund, and who to contact in order to update my contact information with them?

It is best to check the status of your pension for yourself in order to ensure that all individual factors are assessed while proving an answer to this question. Mercer administers the Nortel Defined Benefit Pension Plans (a.k.a. Traditional Part 1 and 2). They can be reached at 1-866-667-8358. SunLife administers the Nortel Defined Contribution Pension

Plans. They can be reached at 1-866-733-8612. If you are not sure which pension plan you are a member of, you can contact Nortel HR Shared Services at 1-800-676-4636.

191. How many are there hardship cases so far?

Information on hardship claim applications has been released to the NRPC under NDA and so we are not at liberty to disclose this information. What we can tell everyone is that Ernst and Young have received applications and they have also approved a number of them.

192. If you are returning the $150 retainer, how is the legal representation by Koskie Minsky funded?

As part of the Representation Order approved by the Court, Nortel was ordered to pay our reasonable legal costs and therefore pays our legal bills from Koskie Minsky.

193. I don't recall providing a $150 retainer. Can you provide some explanation of what that is, and an assurance that my claims (retiree health and life insurance) are valid despite that I didn't provide a $150 retainer?

Prior to the Court granting the Representation Order to Koskie Minsky, the NRPC asked that people provide a $150 retainer to Koskie Minsky in order to cover the costs of our legal activities. Koskie Minsky agreed that should the representation order be granted, and their legal bills paid for by Nortel, they would refund the $150 to those who paid it. Since Koskie Minsky has now been granted the Representation Order by the Court and Nortel is paying for the cost of our legal bills from Koskie Minsky, the $150 retainer is being refunded. Regardless of whether or not you paid the $150, all Canadian Nortel pensioners and former employees (subject to a few exceptions) are automatically covered by the Representation Order and are entitled to legal representation by Koskie Minsky, paid for by Nortel.

194. Will people who sent $200 retainer to Nelligan O'Brien Payne be able to get it back?

Some of the terminated employees signed retainers with Nelligan O'Brien Payne prior to the Representation Order being granted to Koskie Minsky. This $200 covered the initial costs associated with seeking a representation order for the terminated employees with Nelligan O'Brien Payne. This $200 fee was not refundable. However, Nelligan O'Brien Payne did agree to give people credit for the $200 against the cost of providing legal services in connection with the preparation of personal Claims in the CCAA proceedings, should they wish to have such assistance.

195. Are more webcasts being considered and if so when another might be expected?

We were pleased that the webcast helped many former employees better understand the current situation. We are open to using a webcast again to share new information when necessary.

# Impacts for Workers Outside Ontario and Non-Residents of Ontario

196. What is the status of Nortel pensioners who live in the U.S. and receive a pension from both, the US, company and the Canadian company? How do we make claims regarding our Canadian pensions? Are we required to take any different action than pensioners who are Canadian residents and receive their pension from the Canadian company only?

Claims for the loss of all benefits earned as a result of employment in Canada (including the loss of any Canadian pension income and benefits) need to be made using the claims process referred to in question 92. You will need to urgently file a separate claim with the US Court for the loss of any benefits earned as a result of employment in the USA. For information on the U.S. Chapter 11 proceedings, contact the U.S. claims agent, Epiq Bankruptcy Solutions at http://chapter11.epiqsystems.com/nortel. The Canadian claims process will be the same for all Canadian pensioners and former employees, regardless of their country or province of residence.

197. As a Canadian ex-pat living in the US who worked for Nortel in Quebec (17 years) and Ontario (2 years) I would like to know what the process will be for protection of my Nortel Canada pension. Will my pension be administered by Ontario, or will part of it be administered by Quebec? Do I qualify for any support from the Ontario FSCO?

Claims for the loss of all benefits earned as a result of employment in Canada (including the loss of any Canadian pension income and benefits) need to be made using the claims process referred to in question 92. The Canadian claims process will be the same for all Canadian pensioners and former employees, regardless of their country or province of residence. The Nortel Defined Benefit Pension Plan is registered and therefore administered in Ontario. You will qualify for support from the Ontario Pension Benefit Guarantee Fund (PBGF) for the portion of your service that you worked in Ontario.

198. I have 20 years service in Canada and 13 years in USA. My medical benefits are from the US and my Pension is from both. How does today's presentation affect US based employees health benefits? If not you who do I call?

The Webcast presentation contents are applicable only to Canada and do not address the issues associated with the potential or actual loss of US health or other benefits. For information on the U.S. Chapter 11 proceedings, contact the U.S. claims agent, Epiq Bankruptcy Solutions at http://chapter11.epiqsystems.com/nortel.

199. How can we who are currently US residents help with Federal Government petitions?

Non residents of Canada who wish to more information on how to get involved with NRPC activities can contact the Non resident NRPC Committee prime at http://nortelpensioners.ca/index.php?option=com_contact&task=view&contact_id=15&Itemid=3 .

200. I worked in the US as well as Canada and now reside in Canada. Will the claims process also handle my US claims? How do I assure I am a claimant in the US?

Claims for the loss of all benefits earned as a result of employment in Canada need to be made using the claims process referred to in question 92. You will need to urgently file a separate claim with the US Court for the loss of any benefits earned as a result of employment in the USA. For information on the U.S. Chapter 11 proceedings, contact the U.S. claims agent, Epiq Bankruptcy Solutions at http://chapter11.epiqsystems.com/nortel.

201. As a previous Quebec employee, now living in Ontario; do I fall under the Québec rules, or the Ontario rules?

Your place of service determines how your pension is treated, and where you now reside is immaterial.

202. Would the Ontario Pension Benefit Guarantee Fund apply to former Ottawa employees now living in the US or other provinces?

The Ontario Pension Benefit Guarantee Fund (PBGF) will provide assistance for the portion of your pension that is applicable to your service worked in Ontario, regardless of your country or province of residence.

145
JP

203. There seems to be most of the focus on Ontario and Quebec. What about the rest of the provinces?

> The vast majority of former Nortel employees who are affected by the CCAA worked in Ontario or Quebec, but there are groups of Former Employees who worked in Calgary and the Atlantic region. To the extent that their claims are affected by the laws of their jurisdiction of employment or residence, those laws will be taken into account.

204. Is there any risk to the group RRSP plan / 401K in US and should any action be taken to move these funds?

> The Webcast presentation contents are applicable only to Canada and do not address the issues associated with the potential or actual loss of US health or other benefits. For information on the U.S. Chapter 11 proceedings, contact the U.S. claims agent, Epiq Bankruptcy Solutions at http://chapter11.epiqsystems.com/nortel.

205. My first 13 years with Nortel were in Quebec and my last 26 years were in Ontario. Am I considered an Ontario pensioner for the PBGF?

> The Ontario Pension Benefit Guarantee Fund (PBGF) will provide assistance for the portion of your pension that is applicable to your service worked in Ontario.

206. Has the US court granted a similar deadline (and process) exemption for the employees' pension/benefit claims? Is Koskie Minsky's focus on the Canadian court? If so, who is representing the US portion of my pension claim?

> The Webcast presentation contents are applicable only to Canada and do not address the issues associated with the potential or actual loss of US health or other benefits. Koskie Minsky's representation for pensioners and former employees is limited to the Canadian Courts. To the best of our knowledge, there is no law firm performing a similar function in the US Courts. You will need to urgently file a separate claim with the US Court for the loss of any benefits earned as a result of employment in the USA. For information on the U.S. Chapter 11 proceedings, contact the U.S. claims agent, Epiq Bankruptcy Solutions at http://chapter11.epiqsystems.com/nortel.

# Ontario Pension Benefit Guarantee Fund (PBGF)

207. Is it likely that the Ontario government will come through with PBGF support for pensioners who spent all or part of their careers with Nortel in Ontario?

Koskie Minsky and the NRPC are doing everything possible to ensure that the Ontario Government lives up to its obligations to Nortel with regards to the PBGF.

208. Will the FSCO provide a top up to our pensions?

The Financial Services Commission of Ontario (FSCO) regulates co-operatives, credit unions, caisses popula res, insurance, loan and trust companies, mortgage brokers and pensions. Their mandate is to provide regulatory services that protect the public interest and enhance public confidence in these regulated sectors. Under bankruptcy situations, FSCO will appoint an administrator to protect the interests of the pension plan members. The administrator will take control of the pension plan and pension fund and will wind up the plan. Where there are not sufficient assets to provide all benefits, limited protection is provided by the Ontario Pension Benefits Guarantee Fund.

# Pension Plan Commuted Value Payout

209. I can cash in my pension and at present I would get 69% of the commuted value. When does the fund get re-valued and any clues on which way that will go? I read that as the current pensions are being paid a full pension and Nortel has stopped contributing then it is likely to now be more underfunded than the 69%?

> A new valuation for the pension plan is required by law every 3 years. The next valuation is due effective December 31, 2009. Due to the constant fluctuation in the investment markets, it is not possible to say whether or not this valuation will be higher or lower than the current estimate of 69%.

210. If I pull the money out now and then the fund gets a further contribution or for other reasons gets more funds will I get the other 31% of my entitlement?

> If you are eligible to take a commuted value (CV) lump sum for your defined benefit pension, the current transfer ratio is set at 69%. This means that you can receive 69% of your eligible CV immediately and Nortel is required to pay back the remaining 31% over the next 5 years, subject to the outcome of the CCAA filing. This means that if the pension plan is wound up during the 5 year repayment period, you would receive the balance of what is owed you up to a maximum of the windup ratio. For example, if the windup ratio is set to 72%, you would receive an additional 3% (72%-69%). If the windup ratio is set to 62%, you would receive nothing (since 62% < 69% that you received).

211. I received 86% of my pension payout already. For the remaining 14% owed to me what can I expect to receive and when? If the pension fund is at 69% how much of the 14% owed to me can I expect to receive?

> Nortel is required to pay back the remaining 14% you are owed over the next 5 years, subject to the outcome of the CCAA filing. This means that if the pension plan is wound up during the 5 year repayment period, you would receive the balance of what is owed you up to a maximum of the windup ratio. For example, if the windup ratio is set to 90%, you would receive an additional 4% (90%-86%). If the windup ratio is set to 69%, you would receive nothing (since 69% < 86% you received).

212. I am a former employee who was laid off in March 2009. As you know, I did not get any severance but I was offered to take my pension or withdraw my commuted value. I decided to withdraw with a commuted value of 86%. The remaining commuted value of 14% as per the documents, Nortel could take up to 5 years for payment. What happens if Nortel is totally dismantled (almost done) before this 5 years? Is it totally lost?

> Nortel is required to pay back the remaining 14% you are owed over the next 5 years, subject to the outcome of the CCAA filing. This means that if the pension plan is wound up during the 5 year repayment period, you would receive the balance of what is owed you up to a maximum of the windup ratio. For example, if the windup ratio is set to 90%, you would receive an additional 4% (90%-86%). If the windup ratio is set to 69%, you would receive nothing (since 69% < 86% you received).

213. What specifically are you doing or plan to do to address the unfair tax treatment of CV Lump Sum retirement payments that cannot be entirely transferred into a tax deferred LIRA, and are taxed as income in year?

> Koskie Minsky are engaged in discussions with the CCRA, FSCO and Nortel's counsel about this concern. We have taken the position that adjustments should be made to the commuted value transfers in order to maximize tax sheltering. We will advise in due course of the outcome of those discussions.

214. Why is some of the CV paid in cash and 30% income tax withheld?

> The Pension Act defines the maximum contribution to a locked in registered savings vehicle that can be transferred from a commuted value (CV) payout. The portion of the CV that is in excess of that maximum must be paid in cash and a 30% withholding tax is required by law.

148
JP

215. My husband and I would have started receiving Nortel pension in 2 and 4 years respectively. Do you recommend we proceed with requesting lump sum or wait and see?

    Neither the NRPC, nor Koskie Minsky can provide you with financial advice. You should seek advice from a financial advisor.

# Pension Plan Present Value

216. Is it true that the pension fund is now estimated to be 74% funded, up from 69% a few months ago?

This is possible since the stock markets are up about 20%. The pension fund is 53% invested in stocks. However 75% of the stocks are global (not Canadian) and our pensions are paid in Canadian dollars which has risen vs. the US dollar. So 74% may be a reasonable number currently relative to the 69% for the end of 2008.

217. We have recently been warned by the NRPC that our pension payments may soon be cut by as much as 30%. Lately the markets have been on the rise. Are we sure that the deficit in the pension plan is still 30%? Can Koskie Minsky LLP ask the bankruptcy court to request from Nortel an evaluation of the pension fund before a 30% cut is implemented?

Yes, a new valuation will be done before any cuts are implemented.

218. Has the recent up swing in the markets improved the shortfall in the Canadian pension plan?

Yes, we expect so. See question 216.

219. What is the current actual funding status of the managerial pension plan? If not available, when will the real status be known?

The final status will be known before wind-up. See question 216.

220. What percentage of our pension can we expect to receive?

See questions 216 and 217. If the pension is wound up and annuities purchased there may be further reductions.

221. Since the market has improved since the 69% (that is bouncing around) was determined and the fund should have increased would the wrap-up value for us be based on 69% or the current value?

It will be based upon the current value.

222. If indeed our pensions will be cut and our benefits cancelled can no one give us an approximate timeline and reduction estimate so we can at least plan ahead?

In our view you should plan on a 30% reduction and no benefits.

223. What is your best estimate of when we will lose our benefits and stop receiving 100% of our pension?

It is impossible to say at this point. As soon as we have an estimate or something more concrete to report, we will post the information on the NRPC and Koskie Minsky websites.

224. How long will the Nortel Canadian pension last based on the current payout level?

The current payout level will be reduced to match the funds available when the pension plan is taken over.

225. The 69% funding level we heard about, is that based on the cost of annuity at that point in time (i.e. December 2008)?

No assumptions on annuity cost have been made. If an annuity is purchased the reduction would be more severe.

226. How will the cost of annuities affect the 69% (estimate) of the pension fund?

The current pension is based upon an investment program that is expected to return approx 6-8% annually. If an annuity is purchased the best rate that we could get now is probably in the 4-6% range. So there would be a further reduction.

227. Why is Nortel not obligated to top up the pension fund? How were they allowed to underfund the plan for so long?

> The pension fund undergoes a valuation once every 3 years. The last full valuation was December 2006. In that valuation, the fund was valued at 103% on an ongoing basis. They would pay a penalty if they had contributed more than 110%. The Government also doesn't want companies to overfund pension plans since they are tax deductible. So companies get contribution holidays when the fund is doing well and when it isn't they are given 3-5 years to top it up. Unfortunately we don't have 3-5 years.

228. Aren't the trustees supposed to calculate the amount required for the future needs of the trust? Are they not responsible if the fund is not solvent?

> See question 229.

151
JP

# Pension Plan Windup

229. Is Nortel still contributing to the pension fund?  If yes how come it is underfunded?  Did Nortel stop contributing or are they under contributing?

Nortel is still contributing to the pension plan for any employees still in the defined benefit plan.  Most employees were required to move to a defined contribution plan about two years ago.  A small number of older employees only were allowed to remain in the defined benefit plan.

The pension plan is underfunded for two reasons, pension plan windup costs and the fall in the equity market.  When a company is a going concern, the pension fund is valued on an ongoing basis.  Valuations take place every 3 years.  At the last normal valuation, the Pension Plan was valued at 103%, while Nortel would be penalized if it contributed more than 110%.

When Nortel entered CCAA, the relevant valuation is a wind-up valuation.  This valuation is typically 10-20% below the ongoing valuation, due to the additional costs and assumptions of wind up.  To compound the problem, since 2006, the stock market sustained a record drop in equities.  Like most pension plans, about half of Nortel's plan was invested in equities, so this drop added to the drop due to windup valuation.

Unlike many other companies with pension plan exposures, Nortel was not a delinquent pension plan operator.  The root cause of our 31% shortfall as of December 2008 was Federal tax regulations, where the over contribution limit did not match the equity exposure allowed by pension regulations.

230. Will we be advised of our reduced pensions before it shows up on our monthly income?

Notifications are expected to be posted on Koskie Minsky and NRPC web sites.

231. I have been told that if Nortel goes bankrupt or ceases to exist, the pension plan must be wound up.  Is this true?

Yes, at an agreed point the Ontario Superintendent will take over responsibility for the management of the pension plan, and will appoint an administrator.

It is in pensioners' interests to delay the windup of the plan, as a delay will allow the equity market to recover to some extent and will allow bond interest rates to rise.  Both effects will ultimately result in improved pensions.  There are two aspects of the Nortel plan which make it very atypical and unsuited to the normal windup process.  Firstly, the plan is very large compared to the size of the Canadian equity market.  It will therefore take a number of years to purchase enough annuities.  The second factor is the limited cost of living incorporated in to the plan  This again makes the purchase of annuities more difficult.  To find the best solution for pensioners, the NRPC and Koskie Minsky have asked the Ontario Government to appoint a Facilitator.  A facilitator could allow changes to the normal process to better suit our circumstances.  We hope one factor will include a delay in the start of the purchase of annuities.

232. Can the pension plan windup be delayed such that market recovery can occur, raising the value of the pension plan's assets before winding it up?

Yes, see question 231.

233. If the pension plan does not need to be wound up, can we as pensioners take it over, say by creating a legal entity linked to the pension plan and having the pension plan professionally managed?

The regulations only allow the Ontario Superintendant to take over a pension plan, if the sponsoring employer is unable to continue.

234. Assuming the pension fund is wound up; does each pensioner receive a lump sum, which would presumably be a % of the commuted value of the pension plan?

No.  If the plan is wound up under the standard process, an annuity must be provided which matches all the aspects of the pension plan, other than the reduction in amount.

152
JP

235. If each pensioner receives a lump sum at pension plan windup, what is the flexibility that pensioners have with this money?

> Pensioners cannot take a lump sum on the windup of the pension plan, see question 234. Former employees will receive lump sums for other Nortel obligations, such as termination benefits, excess pensions, TRAs, LTD payments, etc. How these various amounts will be taxed is under investigation and may require rulings from the CRA.

236. Please explain the wind-up process and the likely estimated schedule leading to a reduction in pension payments.

> When Nortel can no longer manage the pension plan, the Ontario Superintendent of Pensions will assume responsibility. There may be a period of negotiation, controlled by a Facilitator, see question 231. Eventually the pension will be wound up and annuities purchased in a number of tranches. In the normal process, one of the new pension administrator's actions is to prepare a current valuation of the plan. This is used as the basis for an interim reduction in pensions. Due to the many uncertainties, we are unable to say when pensions will be reduced.

237. The recent letter and email from NRPC seemed to indicate that Nortel could reduce the payments by 31% anytime now and add this to the creditor debt. If this is possible what are the indications that this is being planned and what is Koskie Minsky doing to convince the judge not to do this so prematurely?

> The pension plan take over is controlled by the Ontario Superintendent of Pensions, rather than by the CCAA judge. The NRPC and Koskie Minsky are pressing the Ontario Government for a Facilitator to modify the standard process for pension plan windup.

238. Also we were told earlier that by law the pension payments can not be decreased until the pension is wound up. So how can Nortel do this at this stage when the law does not permit it?

> See question 236.

239. Once Nortel is no more what options do individual pensioner have (i.e. annuity, commuted value to be rolled over to RRSP, etc.)?

> See question 234.

240. All we hear lately around us is that we will lose all our benefits (e.g. insurance, medical etc.) plus more then 30% of our pension. Can you give us some explanation please? Is it true and if so, when will it happen?

> At some point, the pensions paid from the pension plan will be reduced to match the pension plan valuation, see question 236. Pension plan benefits will be stopped when the Monitor and Nortel determine the company can no longer fund the payments. The Superintendent of Pensions will submit a claim for the pension plan deficit. A claim will be submitted for each former employee as an unsecured creditor for other obligations (such as termination benefits, excess pensions, TRAs, LTD payments, etc) and a percentage will be paid as a lump sum, depending on the assets of the Canadian estate. It cannot be predicted when pensions will be reduced. The final settlement of the Canadian estate is will take place slowly, in part due to the complexities of determining how to distribute assets between Canadian, US and UK estates.

241. As it appears that Nortel will cease to be a solvent company, what is Koskie Minsky doing to prevent the FSCO from winding up the pension plan? In the January meeting they presented themselves as "working outside of the box when needed" but so far I have not seen any evidence of this. Are they prepared to suggest alternatives to the FSCO and provincial Government to avoid a wind-up?

> See question 237.

242. Is Koskie Minsky tying to get the FSCO to take an active role in the court proceedings that will help to eliminate the erosion of our pensions?

> The FSCO is a government agency and follows its standard operating procedures. Where ever possible, Koskie Minsky approaches the FSCO for support on court motions.

243. Given that Quebec's Bill 1 applies to companies in bankruptcy, assuming a wind-up directly from the CCAA process, would FSCO be likely to delay the wind-up in order to given the underlying investments time to recover? If so, would the recovery period be likely to be comparable to Bill 1 (i.e. up to 5 years)?

> See question 231. The period of a possible delay is not currently known.

244. Will these annuities have a survivor option?

> Yes, the pension will match your current pension, other than the amount paid.

245. Is it true that when the pension plan is "wound up", it has to be turned into annuities? If so, what are we doing to try to change that, including by political pressure? It would seem to me to be better if the plan could continue in a normal pension investment mode.

> See question 231.

246. What impact does the US and UK have over of the related pension plans have on the Canadian position?

> The US and UK pension guarantors become Nortel creditors, rather than the pension plan administrators.

247. Has any progress been made with the Provincial Government on stopping the pension fund from being put into annuities? If not, what type of annuities will they be put into (Fixed vs. Variable)? Do we get to decide? If progress has been made, what are our options?

> See question 231. Pensioners will not have any decisions to make. They will receive regular payments as now, but at a reduced level.

248. What corporation, institute or body will have responsibility for the Canadian pension benefit distribution after Nortel is totally dissolved?

> The Ontario Superintendent of Pensions will appoint an administrator, often from one of the big accountancy companies.

249. Could the pension be a lump sum instead of reducing the monthly payments?

> No, see question 235.

250. How about a flat rate pension across the board for everyone at a much reduced rate of say 20-25K$ per annum? Maybe the pension fund and med. benefits could last a lot longer. Most retirees should have no debts by this stage of life.

> By law, your replacement pension details must be the same as now, with the only change being the amount.

251. I have already been approached by Scotia McLeod to attend a pension seminar to discuss setting up an annuity. What gives?

> Scotia McLeod has no connection with Nortel or your pension. They see an opportunity for new business.

252. Will employees already retired be afforded any better pension benefits than those who retire now or after their division is sold off? In other words is there any advantage to retiring before Nortel s demise?

> No. All pensioners will receive the same percentage of the pension earned.

253. Are the pensions currently unchanged at this time?

> Pensions paid from the pension plan are currently unaffected. Pensions for people who earned a pension greater than an amount specified in the Income Tax Act (a function of salary and years of service) received a pension in two parts. One component was paid from the pension plan. The other component (called an excess pension) was paid from Nortel's current funds. All excess pensions stopped when Nortel entered CCAA.

254. When will the pension payments to the pensioners be changed?

> We are unable to predict when the Superintendent of Pensions will take over the plan.

255. Payment of our pensions comes out from our pension funds. What is Nortel's contribution to this? Is Nortel topping up the fund on a 5 year time frame now?

> Nortel is currently making payments into the fund for any current employees still in the defined benefit plan, see question 229. Nortel is also making required payments as a result of the last formal valuation of 2006. This valuation does not take account of windup costs or the 2008 drop in the financial markets.

256. I have a defined benefit contribution pension plan. So far I have been advised the amount in total belongs to me. Is this true?

> Nortel has an obligation to pay your pension, but entered CCAA because it could not meet all of its obligations. The actions in CCAA will resolve how different creditors will be compensated.

257. Who would make the decision to wind up the pension plan? What would the impact be if that decision was made before all claims can be made?

> The Ontario Superintendent of Pensions, see question 231.

258. Will the annuity I receive instead of my pension be indexed to the CPI and will my wife receive survivor benefits?

> Unless a Facilitator negotiates changes to the terms of your pension, your annuity will have a CPI component. The survivor benefit will continue, but again at a reduced level.

259. What happens to the Nortel pension plan for employees on LTD?

> When you reach retirement age, your reduced pension for years earned will be paid.

260. Why do we have to wind up the pension plan; can we not merge with another pension plan?

> The standard process requires the plan be wound up and reduced annuities paid. Other arrangements may be negotiated with a Facilitator, if one is appointed, see question 231.

261. Will the annuity payment be indexed for inflation?

> Unless a Facilitator negotiates changes to the terms of your pension, your annuity will have a CPI component. The survivor benefit will continue, but again at a reduced level.

262. Going forward who will manage the pension fund once Nortel assets have been sold?

> The Ontario Superintendent of Pensions will appoint a pension fund administrator.

263. Until the windup is complete we will be receiving the pension we are receiving today?

> No, see question 236.

264.Who is managing the fund now that Nortel is bankrupt?

The board of directors are currently responsible for the pension fund. The Monitor, however, is taking increased control of Nortel operations.

265.How can a pension wind-up value be determined until all the assets are sold, a process which could take considerable time?

The final pension value cannot be determined until all assets are sold and an agreement reached on the distribution of assets between Canadian, US and UK creditors. Although this will take a considerable time, an interim value can be used, see question 236.

266.One of the slides showed the solvency ratio adding 10%. Can you explain this?

The solvency ratio represents the percentage to which the pension plan is able to service the pension obligations on an ongoing basis as compared to on a wind up basis.

# Representation Order

267.Why would a person choose to "opt out" of Koskie Minsky representation?

The legal process allows for anyone to "opt out" of the representation order granted to Koskie Minsky if they wish to hire and pay for their own lawyers to represent them in Court. For most individuals, this is cost prohibitive and not a realistic option. However, there may be situations where groups of people with similar interests decide that they want and can afford to do this.

268.If you do not opt out of the representation orders and you are not part of the exclusions then are you represented by Koskie Minsky?

Yes.

269.Are the pensioners who lost their retirement allowance represented by Koskie Minsky?

Yes.

# Survivor Benefits (Pension Plan)

270. Will survivor pensions will be treated the same as retired employee pensions?

    Yes. All pensions will be treated the same.

271. Under the existing Nortel pension, my wife would receive a reduced pension of 60% upon my death. If the pension plan is wound up, will the replacement annuity work the some way?

    Yes.

272. When my husband retired, there was an understanding that should he pass away first I (his wife) would receive 60% of his pension until I die. Is this still going to happen?

    Yes. The survivor percentage will still apply to the reduced pension.

273. My wife would get 60% of my pension if I die first. Does it mean that 60% would be based on a possible reduced pension or the pension I get now?

    It would be based on the reduced pension.

274. I am a Northern Telecom pensioner, retired November 1993. My husband, who is deceased, retired in 1990. He set it up so that I would receive his pension too. I was told that they are registered and it would not affect me. Is this true?

    You would be currently receiving a survivor pension which is a percentage, likely 60%, of his original pension. All pensions that come out of the pension fund are registered. Any reduction in pension would apply to both regular pensions and survivor pensions.

158
JP