# EXHIBIT 130

*In Re:*
*NORTEL NETWORKS INC., et al*

*PIERRE PIERRE BLAIS*
*February 10, 2014*
*Confidential*



126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 106217A.TXT*
*Min-U-Script® with Word Index*

```
 1                BLAIS - CONFIDENTIAL
 2           A.   Correct.  He nonetheless gave me
 3  -- he said think over it over the weekend.  And I
 4  said, I don't need to.  And he insisted, and
 5  instead of waiting on the Monday, I actually called
 6  him back on the Saturday and said no, I'm leaving.
 7           Q.   Was that the moment when he put
 8  your name on the list to be terminated or was there
 9  additional time that had passed?
10           A.   I do not know.  I presume it
11  happened the following week, but I would not know
12  when he actually did it.
13           Q.   I would like to mark an exhibit,
14  Exhibit 65.
15                NNI EXHIBIT NO. 65:  Letter dated
16                December 11, 2008, to Pierre Pierre
17                Blais.
18                BY MS. PARTHUM:
19           Q.   Is this the letter that you
20  received when your position was terminated?
21           A.   It is.
22           Q.   Do you recall when you received
23  this letter?
24           A.   A few days prior to signing,
25  December 11.
```

```
 1                  BLAIS - CONFIDENTIAL
 2            Q.    You mentioned before that you had
 3   an initial meeting with your manager?
 4            A.    Yes.
 5            Q.    Did you later have a second
 6   meeting with your manager during which you received
 7   this letter?
 8            A.    Yes, I did.
 9            Q.    Do you remember about how much
10   time passed between those two meetings?
11            A.    A few days.
12            Q.    Was anyone else at the meeting
13   when you received this letter?
14            A.    Yes.
15            Q.    Who else was there?
16            A.    There was a representative from
17   HR.
18            Q.    Were you given an opportunity to
19   read through the letter during that meeting?
20            A.    I was.
21            Q.    Did you read it at that time?
22            A.    I do not recall.
23            Q.    But you mentioned that you signed
24   it a few days after receiving it?
25            A.    That is correct.
```

```
 1                  BLAIS - CONFIDENTIAL
 2              Q.   So you had an opportunity between
 3   the meeting and when you signed it to look it over?
 4              A.   I did.
 5              Q.   Do you remember if you read it
 6   through?
 7              A.   I did.
 8              Q.   Do you think that you read it --
 9              A.   Oh, sorry, I do not remember if I
10   read it through.  I definitely must have read it
11   through, because I read these documents myself in
12   detail.
13              Q.   Do you think that you would have
14   perceived this letter as important at the time that
15   you received it?
16              A.   Indeed.
17              Q.   Do you expect that you would have
18   read it carefully?
19              A.   Yes.
20              Q.   Did you have anyone else read this
21   letter on your behalf?
22              A.   Yes, I did.
23              Q.   Who else read it?
24              A.   An attorney that I retained to
25   review the content to make sure that it was fair.
```

```
 1                  BLAIS - CONFIDENTIAL
 2   working for Nortel, one of those companies or all
 3   of them or -- Nortel.
 4            Q.    So you understood that you were
 5   working for Nortel, and you understood that Nortel
 6   had various subsidiaries and affiliates, but you
 7   weren't quite sure which of those was your
 8   employer?
 9            A.    I did not understand the
10   financial, corporate, legal relationship of all of
11   those various groups.  I report to one of them, but
12   probably to many of them because they are probably
13   not flat.  There is a structure, but you know,
14   eventually is there a Nortel at the top?  I would
15   expect there is one.  And so to me that is the
16   Nortel.  Nortel Canada is just part of Nortel.  So
17   that was --
18            Q.    Did you --
19            A.    That was --
20            Q.    Oh, I'm sorry, go ahead.
21            A.    That at least was my understanding
22   or is my understanding.
23            Q.    Did you understand that you worked
24   for some Nortel entity that was based in Canada?
25            A.    Yes.
```

```
1                    BLAIS - CONFIDENTIAL
2           Q.    And did you understand that your
3    paycheque was paid by a Nortel entity that was
4    based in Canada?
5           A.    My paycheque for a long time came
6    from Bell Northern Research, which was my original
7    employer at Nortel, and through all of the changes
8    over the years, even though I became a Nortel
9    employee, my paycheque for a long time was still
10   coming from Bell Northern Research.
11                At some point, the paystubs I was
12   receiving changed to a Nortel paystub, but it
13   doesn't necessarily mean that the entity that was
14   paying my salary was different.  It might have
15   remained to be Bell Northern Research.  I never
16   looked into that to determine exactly where the
17   money was coming from.
18          Q.    So when your paycheque was coming
19   from Bell Northern Research, you understood that
20   that entity was based in Canada?
21          A.    Yes.
22          Q.    And after your paystubs started to
23   say Nortel, you knew that you were still based in
24   Canada?
25          A.    Yes.
```

```
 1                  BLAIS - CONFIDENTIAL
 2             Q.    But you weren't quite sure what
 3   the particular entity was?
 4             A.    Correct.
 5             Q.    So at the time that you signed
 6   this letter, who did you expect would be
 7   responsible for paying the amount that is listed
 8   here as the severance payment?
 9             A.    I don't believe that I had any
10   specific expectation as to who would be paying it.
11   I expected it would be paid, but not by whom.  It
12   is quite possible that these packages are done by
13   other arrangements and so on, so I do not know.  I
14   had no expectation.
15             Q.    Do you think if you had considered
16   it, you would have assumed that it was the same
17   entity that had been paying your paycheque that
18   would pay your severance payment?
19             A.    I can't conjecture.  I don't know.
20             Q.    So you didn't have a clear
21   understanding at the time that you signed the
22   letter of exactly who the corporation would be that
23   would be responsible for paying your letter?
24             A.    That would be a correct
25   assessment.
```

```
1              BLAIS - CONFIDENTIAL
2              Q.   Was there anything in this letter
3    that gave you a reason to believe at the time that
4    your severance would be paid by a Nortel entity
5    based in the United States?
6              A.   No, not specifically.
7              Q.   Have you ever received any
8    payments under this letter?
9              A.   I -- under this letter?  I
10   received a payment of -- under this letter, under
11   the letter directly, no.
12             Q.   Have you received some other
13   payment?
14             A.   A number of individuals with a
15   claim received a $3,000 amount at some point during
16   the --
17             Q.   And that was a settlement payment?
18             A.   It is a partial settlement payment
19   is my understanding.
20             Q.   Have you received any other amount
21   meant to be in payment of severance aside from that
22   $3,000?
23             A.   As part of this settlement, there
24   is vacation gets paid and there is a certain
25   minimum amount and so on, so some of that actually
```

```
 1                 BLAIS - CONFIDENTIAL
 2    started talking about this like your answer may
 3    have changed over time.  Have you more recently
 4    started to turn to other news sources to learn
 5    about Nortel's bankruptcy proceedings?
 6            A.   I have not.
 7            Q.   So still television news and
 8    LinkedIn are the principal sources of information
 9    for you?
10            A.   Not anymore, no.  I disconnected.
11    I'm not as interested anymore.  It is all out of my
12    hands, so, yeah.
13            Q.   Do you have a sense about around
14    what time you disconnected?
15            A.   Yes.
16            Q.   When was that?
17            A.   Roughly sometime in 2009, so
18    mid-year.
19            Q.   Was there something in particular
20    that happened that caused you to disconnect at that
21    point?
22            A.   Yes.
23            Q.   What was it?
24            A.   The assignment of Koskie Minsky as
25    our counsel.
```

```
 1                 BLAIS - CONFIDENTIAL
 2    go back to or not.
 3              Q.   So this will be Exhibit 69.
 4              NNI EXHIBIT NO. 69:  LinkedIn posting
 5              with the subject "Koskie Minsky
 6              Newsletter - Update on Nortel".
 7              BY MS. PARTHUM:
 8              Q.   The subject of this first posting
 9    is:
10              "Koskie Minsky Newsletter - Update
11              on Nortel".
12              Posted by someone named Lynda Farant on
13    July 1st, 2009, and she writes:
14              "There is a good summary of what
15              KM has been doing with respect to
16              the Nortel situation and our case on
17              their website.  The link is below.
18              Apparently this is issued weekly by
19              KM.  You may want to bookmark the
20              site."
21              And she provides a link.
22              And if you look a little further down
23    in the page, there is two postings by Paula --
24    well, I guess three.  A second posting by Paula
25    Klein says in the first sentence:
```

```
 1            BLAIS - CONFIDENTIAL
 2            "KM has agreed today to provide
 3       this sort of weekly newsletter until
 4       such time as the claims process is
 5       published."
 6            Does reviewing this conversation at all
 7   refresh your recollection that Koskie Minsky issued
 8   weekly newsletters during this period of time?
 9            A.   I don't recall seeing this, and by
10   looking at the dates and understanding that at that
11   time Koskie Minsky was basically representing us,
12   this would align with the rough -- now that I have
13   dates in front of me -- the rough period when I
14   disconnected and stopped generally being involved
15   in reading up all of the details and staying up to
16   speed as to what was going on and so on.
17            Q.   Do you know whether you understood
18   that Koskie Minsky issued a weekly newsletter?
19            A.   I do not, no.
20            Q.   So you mentioned earlier that the
21   primary source that you relied on for information
22   about Nortel's insolvency proceedings was your
23   counsel?
24            A.   My --
25            Q.   Was your counsel?
```

```
 1                BLAIS - CONFIDENTIAL
 2   time?
 3           A.   I -- it is hard to go back and I
 4   wouldn't think so, though.  It is not a question of
 5   confusion as much as nobody is -- my attorneys have
 6   not told me that this is applicable to me.  I don't
 7   recognize this as being applicable to me, and
 8   therefore, I wouldn't have understood that this was
 9   applicable to me.
10           Q.   So at this time, you did not
11   believe that you had a claim against the U.S.
12   estate because of a contractual agreement related
13   to your employment?
14           A.   I did not understand that I have a
15   claim, that I might have a claim against, correct.
16           Q.   Did you ask anyone at Koskie
17   Minsky whether you might have had a claim at this
18   point in time?
19           A.   I did not ask, to my recollection.
20           Q.   Underneath that paragraph Paula
21   writes:
22                "If you need help in filing this
23                claim, you can contact Andrea
24                McKinnon (from Koskie Minsky) at
25                [...]", and she provides her email
```

1                BLAIS - CONFIDENTIAL
2           address, "who can in turn put you in
3           touch with a lawyer in Delaware who
4           can help you with the filing."
5           Did you ever reach out to Koskie Minsky
6  at this point in time and ask them to put you in
7  touch with a Delaware lawyer?
8           A.   I did not.
9           Q.   I'm going to show you what has
10 been marked as Exhibit 11.
11          MR. ROSENTHAL:  I'm sorry.  I'm asleep
12 at the switch here.
13          THE WITNESS:  Thank you.
14          BY MS. PARTHUM:
15          Q.   You can see this is a LinkedIn
16 conversation with the subject heading "July 16 -
17 Update on Activities with KM" posted by Paula
18 Klein, and you actually have to go to the second
19 page to find the date.  She posted it on July 16th,
20 2009, which is at the very top of the page.
21          A.   Understood.
22          Q.   And if you look at her second
23 posting, the heading says "2) Claims Process"?  I
24 guess it is the first posting on that page, so at
25 the top of the page, "2) Claims Process?"

```
 1              BLAIS - CONFIDENTIAL
 2          A.   Yes.
 3          Q.   And she writes there:
 4              "KM has informed us that a claims
 5          process will be announced for U.S.
 6          creditors tomorrow with a 'claims
 7          bar' date of September 30, 2009.
 8          This includes U.S. pensioner and
 9          employee claims as well."
10          Were you made aware around this time
11  that there had been a bar date announced in the
12  United States?
13          A.   Not to my knowledge.  That there
14  was a bar date, I don't remember this.  If I was --
15  I didn't realize that this would be applicable to
16  me.
17          Q.   So if you had been aware of the
18  bar date at this point in time --
19          A.   I don't know when I became aware
20  of the bar date.
21          Q.   If you had been aware of the bar
22  date at this point in time, what do you think you
23  would have done?
24          A.   I do not know.  That is
25  speculation.  I don't know what I would have done
```

```
 1              BLAIS - CONFIDENTIAL
 2   at that time.
 3            Q.   Do you think you would have taken
 4   any action had you known about the announcement of
 5   a U.S. bar date?
 6            A.   Clearly, if I had thought and
 7   understood that this was applicable to me, I would
 8   have taken action.
 9            Q.   And I think we discussed, as of
10   November 2009, you did not think that the U.S.
11   proceedings were applicable to you?
12            A.   I did not understand that the U.S.
13   claims, yes, would be applicable to me.
14            Q.   So is it reasonable to say that
15   several months earlier, in July of 2009, you would
16   not have believed at that point in time the U.S.
17   proceedings were applicable to you?
18            A.   I did not understand that those
19   might be of importance to me, correct.
20            Q.   Did you ever ask Koskie Minsky
21   whether the U.S. process was at all applicable to
22   you?
23            A.   I did not ask Koskie Minsky, to my
24   recollection.
25            Q.   Did Koskie Minsky ever tell you
```

```
 1            BLAIS - CONFIDENTIAL
 2            And you provide a link to documents
 3   filed by Nortel that are available on the Monitor's
 4   website?
 5            A.    Yes.
 6            Q.    Did you continue monitoring this
 7   website as the proceedings unfolded?
 8            A.    In the early days, I was, yes.
 9            Q.    What do you mean by the "early
10   days"?
11            A.    Up until Koskie Minsky was
12   appointed.
13            Q.    So you knew that the Monitor's
14   website posted information about Nortel's
15   insolvency proceedings?
16            A.    In general, yes.
17            Q.    And you knew how to access it?
18            A.    I'm sorry?
19            Q.    You knew how to access the
20   website?
21            A.    Yes.
22            Q.    Were you ever concerned that once
23   you stopped monitoring the website, you might miss
24   out on information that would be relevant to you?
25            A.    I didn't care as much.  Whether I
```

```
 1              BLAIS - CONFIDENTIAL
 2   was concerned -- I stayed connected to the extent
 3   that I had mentioned earlier, which is in case
 4   there is something of importance to me that I need
 5   to react to and so on.
 6              Again, my expectation by then was that
 7   the attorneys that were representing me were going
 8   to be informing me and so on and that anything that
 9   is truly important would be coming directly to me.
10              But there is always some information on
11   the side going on and so on, so keeping track of
12   that to a certain extent, yes, so that I am not
13   completely in the dark.  But yeah, certainly with
14   nowhere near the same level of interest and
15   involvement and concern as I was in the early days,
16   yes.
17         Q.   So you think that you may have
18   still checked in on the Monitor's website
19   occasionally, even after Koskie Minsky's
20   appointment?
21         A.   It is speculation.  Possibly.
22         Q.   Do you think you may have reviewed
23   Monitor reports after Koskie Minsky's appointment?
24         A.   Unlikely.
25         Q.   Why is that unlikely?
```

```
 1                BLAIS - CONFIDENTIAL
 2          A.    Like I said, the Monitor reports
 3   weren't of direct interest to me or necessarily
 4   directly important because of the expectation that
 5   if there is something important to me, from my
 6   counsel, that they'll be in touch with me.
 7          Q.    Did Koskie Minsky tell you that
 8   they would provide you with any information that
 9   you would need to know?
10          A.    I don't recall them specifically
11   telling -- making a promise of that nature, no.
12          Q.    We spoke earlier on today about
13   the NRPC?
14          A.    Yes.
15          Q.    And I think you said at that time
16   that you never paid a fee to become a member of
17   that organization?
18          A.    Correct, to my recollection.  And
19   as -- if I understand correctly, it is the
20   pensioners, as well, and I am not a pensioner, and
21   therefore, I wouldn't have joined.
22          Q.    Did you ever visit their website
23   to get information on Nortel's insolvency
24   proceedings?
25          A.    Specifically, I don't recall.  As
```

```
 1              BLAIS - CONFIDENTIAL
 2  claim.  They had all of my information.  The
 3  expectation is that they are going to inform me of
 4  something.
 5            Q.   Did Koskie Minsky ever tell you
 6  that they were assuming the responsibility of
 7  identifying claims that you may be able to bring in
 8  different jurisdictions?
 9            A.   Directly, specifically, no.
10            Q.   Did they tell you that in a
11  general way?
12            A.   Not by telling me, but by me
13  putting my claim through them, they are basically
14  responsible for dealing with it.  Like I said, if I
15  had retained my own counsel, maybe I would have had
16  discussions where these kinds of things would have
17  come out, I don't know how that would have worked.
18                 With them, the expectation is that they
19  are taking care of everything.  I don't have
20  anything to say.  The judge said these guys are
21  going to represent you.  Okay.  I don't have a
22  choice.  Then it is in their hand, right.
23                 So my expectation is they are going to
24  do whatever is needed for -- to deal with me, like
25  with my claim, sorry.
```