# EXHIBIT 131

*In Re:*

*NORTEL NETWORKS INC., et al*

---

*CHRIS BUCHANAN*

*February 13, 2014*

*Confidential*

---



**Ellen Grauer**
**COURT REPORTING** Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 106220.TXT*
*Min-U-Script® with Word Index*

```
 1                    BUCHANAN - CONFIDENTIAL
 2              Q.    Portfolio Strategy Leader for
 3    Enterprise, okay.  And how long prior to your
 4    departure did you have that title?
 5              A.    That was the last year.
 6              Q.    Just the last year?
 7              A.    Yeah.
 8              Q.    Okay.  And you said throughout
 9    your time at Nortel you were always based in
10    Ottawa; is that right?
11              A.    Yeah.
12              Q.    And as Portfolio Strategy Leader,
13    who did you report to?
14              A.    A guy called Moni Manor, based in
15    somewhere, the U.S. somewhere, I can't remember.
16              Q.    And did you have people reporting
17    to you?
18              A.    At that stage, no, no.
19              Q.    At the time, sir, that your tenure
20    with Nortel came to an end, did you have an
21    understanding as to the entity that employed you?
22              A.    Yes and no.  I was employed -- I
23    knew that I was employed by Nortel Canada.
24              Q.    Okay.
25              A.    But in terms of payroll, for sure,
```

BUCHANAN - CONFIDENTIAL

1   BUCHANAN - CONFIDENTIAL

2   yeah, because I have moved around the company and

3   so my company payroll changed each time, but it

4   was -- I got a Canadian paycheque.

5            Q.    Okay.  So as you understood it at

6   the time of your departure, you were employed by a

7   Nortel Canadian entity?

8            A.    Yes, but only in the sense that

9   legally and financially you have to be employed by

10  a company, and I have travelled around Nortel a lot

11  internationally, so I know that there are different

12  companies have to be set up in each country.  I

13  understand that.

14           Q.    Right.

15           A.    But in terms of in that sense,

16  yes.

17           Q.    Right, so you understood that in

18  terms of your employment, you were employed by a

19  Canadian legal entity?

20           A.    Yes.

21           Q.    And even though you travelled a

22  great deal for Nortel over the years, it is your

23  understanding that you were always employed by a

24  Canadian legal entity?  You were always based in --

25           A.    Me personally, yeah, yes, because

1                   BUCHANAN - CONFIDENTIAL

2    my paycheque -- I never worked abroad on a

3    secondment or anything.   I was always based here,

4    yeah.

5                   Q.   So throughout your career at

6    Nortel, you were always paid by a Canadian Nortel

7    entity?

8                   A.   Yeah.

9                   Q.   Did any relatives of yours work

10   for Nortel?

11                  A.   No.

12                  Q.   Any close friends work for Nortel?

13                  A.   That is a good question.  I don't

14   know how to answer that.

15                  Q.   Okay, well, let me ask --

16                  A.   Can you be more specific, because

17   yes, that was a --

18                  Q.   Sure, let me ask it slightly

19   differently.  Since the demise of Nortel and since

20   you left the company --

21                  A.   Yeah.

22                  Q.   -- have you been communicating,

23   other than as part of the LinkedIn group, have you

24   been communicating with any other former Nortel

25   employees about Nortel's bankruptcy?

1                    BUCHANAN - CONFIDENTIAL

2    entity that was paying you your regular paycheque

3    would be the entity that would pay you the

4    severance amounts?

5                    A.   Well, yes, I assume.  I assume

6    they would have to be, yeah.

7                    Q.   At the time that you signed this

8    letter, did you have any reason to believe that any

9    Nortel legal entities outside of Canada would be

10   obligated to pay you any of the severance amounts

11   referred to in the letter?

12                   A.   I never considered that issue,

13   either way.

14                   Q.   I would like to refer you to the

15   third paragraph of the letter, if you could.  It is

16   the one that says:

17                    "As used in this letter, the term

18                    'Corporation' shall mean [...]"

19                   A.   Yeah.

20                   Q.   And it goes on from there.  Just

21   take a moment and read that to yourself, that

22   paragraph, and let me know when you are done.

23                   A.   (Witness Reviews Document.)

24                   Yeah.

25                   Q.   Is that a paragraph that you read

1                BUCHANAN - CONFIDENTIAL
2    and understood at the time that you signed the
3    letter?
4                A.   I'll be really honest.  Not
5    really.  When you see those, I tend to skip over
6    them.  You know, I just assumed in general I saw
7    Nortel as Nortel.  I understood the legal entities,
8    but at the same time, as far as I was concerned, it
9    is one company.  So I didn't particularly -- I
10   didn't analyze this and --
11               Q.   Do you happen to recall whether
12   that paragraph of the letter was the subject matter
13   of any of the discussions you had with the lawyers
14   at Nelligan Payne?
15               A.   It definitely wasn't.
16               Q.   It definitely was not?
17               A.   It was not a discussion, no.
18               Q.   Did you have any understanding at
19   the time of what the term "corporation" as used in
20   that paragraph meant, or did you not focus on that?
21               A.   I just didn't focus on it, no.
22               Q.   In the next paragraph there is a
23   reference to a lump sum payment of $211,770; do you
24   see that?
25               A.   I do.

1                  BUCHANAN - CONFIDENTIAL

2    the negotiations would always tend to be biassed

3    towards the biggest group.

4              Q.    Okay.

5              A.    You know, it is their percentage

6    of conversation, and their issues, they had their

7    sort of issues that were a little bit different

8    from the issues we had.

9              And so the feeling was that we would

10   be, you know, a very -- we would be like ten

11   percent, so it would be -- our issues wouldn't get

12   the weight that we felt that -- that I felt that

13   there should be in those.

14              Q.    Okay.  At the time that Koskie

15   Minsky was retained to represent the severed

16   employees, among others, what did you understand

17   the scope of their representation to be?

18              A.    My understanding is they were

19   representing my needs in terms of my claims onto

20   Nortel in its entirety.

21              Q.    When you say "Nortel in its

22   entirety", are you --

23              A.    No, I'm sorry, my claim in its

24   entirety.  Apologies if I wasn't clear.

25              Q.    When you say your claim "in its

BUCHANAN - CONFIDENTIAL

1                    BUCHANAN - CONFIDENTIAL

2  entirety", can you tell me more specifically what

3  you mean by that?

4            A.    Well, yes, severance; there was

5  some residual pay they owed me that they never paid

6  me; there was the whole pension system; there was a

7  transitional allowance to pension which actually

8  wound up as coming out of Nortel and not the

9  pension fund.  And there were a bunch of other

10  smaller issues.

11            So I assumed, if I have got a lawyer

12  representing me in the case of Nortel going into

13  CCAA, that they were representing me in the

14  entirety.

15            Q.    Did you have an understanding one

16  way or the other at the time they were retained

17  whether Koskie Minsky were only Canadian lawyers?

18            A.    I never analyzed that, never

19  thought about that.  I just saw them as a legal

20  company representing Nortel Canada.  Canadian

21  employees was the way it was positioned, was I'm a

22  Canadian employee, these are my lawyers.

23            Q.    When you needed advice from Koskie

24  Minsky, how did you get it?  How did you

25  communicate with them?

```
 1                    BUCHANAN - CONFIDENTIAL
 2                 "This news update is prepared by
 3              Koskie Minsky LLP in their capacity
 4              as representative counsel to all
 5              pensioners and former employees of
 6              Nortel."
 7              Do you recall, sir, setting aside this
 8    specific one for a moment, do you recall generally
 9    receiving news bulletins that were prepared by
10    Koskie Minsky?
11              A.   I don't remember.
12              Q.   Okay.
13              A.   I don't remember.
14              Q.   If such news bulletins were sent
15    to you, would they be something that you would have
16    read?
17              A.   Yes.  Yes, I mean, I read many,
18    many documents coming past me, and I admit to not
19    being able to remember all of them, so -- and in
20    some cases you tune out because the information is
21    not relevant.
22              Q.   Well, fair enough.  Do you recall
23    whether the Koskie Minsky website was a source of
24    information that you regularly used?
25              A.   Definitely not.
```

1    BUCHANAN - CONFIDENTIAL

2    claims on behalf of all former employees.

3              Q.    And around this time frame, late

4    June, early July of 2009, did you believe Koskie

5    Minsky's role to be limited to filing claims in

6    Nortel's CCAA proceedings?

7              A.    I never thought about it either

8    way.  I didn't think they were; I didn't think they

9    weren't.  I didn't know how that part worked.

10             Q.    Mr. Buchanan, I'm going to hand

11   you what we have previously marked as Exhibit 23,

12   which is another LinkedIn exchange, and you'll see

13   from the first posting it reads:

14             "NOP March 11 Ottawa Information

15             Session Notes."

16             Do you see that?

17             A.    Yeah.

18             Q.    Who is NOP?

19             A.    That is Nelligan Payne.  What does

20   the "O" stand for?  O'Brien.

21             Q.    Right, okay, so that is the law

22   firm you talked about previously?

23             A.    Yes.

24             Q.    Do you recall whether this

25   information session that is being reported on is

```
 1                  BUCHANAN - CONFIDENTIAL
 2   part of that process.
 3                  Q.   And that was your assumption at
 4   the time too?
 5                  A.   Yeah.
 6                  Q.   Let's look at Exhibit 13.  There
 7   you go.
 8                  A.   Thank you.
 9                  Q.   Exhibit 13 is again a LinkedIn
10   chain, and just to place this for you, you'll see
11   there is a post from you, Mr. Buchanan, on the
12   second page.  Why don't you take a minute and just
13   look at this and tell me if you recall this
14   particular thread?
15                  A.   (Witness Reviews Document.)
16                  Well, of course, yes, I do.  I mean, I
17   do vaguely recollect this one and obviously because
18   I commented.
19                  Just give me a second.
20                  Q.   Sure.
21                  A.   I need to read further.
22                  Q.   Sure.
23                  A.   (Witness Reviews Document.)
24                  Sorry.
25                  Q.   No problem.
```

1               BUCHANAN - CONFIDENTIAL

2               A.   I am being slightly sarcastic at

3    the end of my posting, but yes, okay.

4               Q.   In the very first posting from

5    Paula Klein, there is a reference to certain people

6    receiving a letter encouraging employee claims,

7    employees to file claims in the U.S. even though

8    they were on the Canadian payroll.  Sir, did you

9    receive such a letter?

10              A.   I definitely did not.

11              Q.   Okay.  Look at the posting from

12   Ms. Klein at the bottom of this same first page.

13              A.   Yes.

14              Q.   And she reports there on a

15   conversation she had with Mark Zigler of Koskie,

16   and she reports as follows:

17                   "You only need to file a claim in

18                   the U.S. as per the information you

19                   received in the mail if you were on

20                   U.S. payroll for Nortel or if you

21                   believe that you have a claim

22                   against the U.S. Estate (NNI)

23                   because of some contractual

24                   agreement related to your

25                   employment."

```
1                    BUCHANAN - CONFIDENTIAL
2               Do you see that sentence?
3          A.    I do.
4          Q.    And do you recall this particular
5     part of the post?
6          A.    Not word for word.  If you --
7          Q.    Okay.
8          A.    No, I don't have an identic
9     memory, but the general gist of it I remember.
10          Q.    Well, was it, if you can recall,
11    consistent with your understanding at the time that
12    you did not need to file a claim in the U.S.
13    because you were not on the U.S. payroll?
14          A.    That is correct.
15          Q.    Did you believe at the time of
16    this posting, which is again November the 26th of
17    2009, that you had any kind of a claim against
18    Nortel U.S. because of any contractual agreement
19    related to your employment with Nortel Canada?
20          A.    I didn't consider it.
21          Q.    When you say you didn't consider
22    it, you mean you didn't consider that issue one way
23    or the other whether --
24          A.    Well, I kind of -- to be honest,
25    when I read this, I was thinking that maybe there
```

1                    BUCHANAN - CONFIDENTIAL

2     was some employees had a very specific clause in

3     their employment relating to some other part of

4     Nortel, so I didn't particularly think it was

5     relevant.

6                    Q.   So when you read this second part

7     of Ms. Klein's posting that talks about the

8     potential for people to have a claim against the

9     U.S. estate because of a contractual agreement

10    related to their employment, you did not think that

11    had any application to you?

12                   A.   Correct.  And as it says in there,

13    it again reiterates here that if you are a Canadian

14    employee, you wait for the Canadian process.

15                   Q.   Right.  Let's go to Exhibit 30.

16    Mr. Buchanan, Exhibit 30 is a filing from the U.S.

17    bankruptcy case, and my question is simply have you

18    ever seen it?

19                   A.   I didn't see this, no.

20                   Q.   Can you go back for a minute to

21    the previous exhibit.  It is Exhibit 13.

22                   A.   13?

23                   Q.   Yes.  I just want to show you one

24    more part of Ms. Klein's post on the first page.

25                   A.   Okay.

```
 1                    BUCHANAN - CONFIDENTIAL
 2              Q.    This is the second part of it.
 3              A.    Which one?
 4              Q.    The lower one on the page.
 5              A.    Okay.
 6              Q.    In the second-to-last paragraph
 7     she writes:
 8                    "If you need help in filing this
 9                    claim", and I believe that is a
10                    reference to filing a claim in the
11                    U.S., "you can contact Andrea
12                    McKinnon (from Koskie Minsky) [...]
13                    who can in turn put you in touch
14                    with a lawyer in Delaware who can
15                    help you with the filing."
16              Did you ever talk to Ms. McKinnon from
17     Koskie Minsky?
18              A.    No.  It wasn't relevant to me at
19     the time.
20              Q.    And again, at this time you didn't
21     think that you had any need for a Delaware lawyer;
22     correct?
23              A.    Exactly, I did not.
24              Q.    Okay.  And at the time you learned
25     that some Canadian employees might have some
```

```
 1              BUCHANAN - CONFIDENTIAL
 2  contractual arrangement with the U.S. estate, with
 3  Nortel U.S. that entitled them to --
 4              MS. MERSKY:  Just pay attention to --
 5              THE WITNESS:  I am listening.  Sorry, I
 6  am listening to you.
 7              BY MR. QURESHI:
 8              Q.   All right, let me restate the
 9  question.
10              At the time around this posting when
11  you learned that certain former Canadian employees
12  may have some sort of contractual arrangement with
13  Nortel U.S. that might give rise to a claim, did
14  you do anything to investigate whether you had any
15  such contractual arrangement with Nortel U.S.?
16              A.   No.
17              Q.   Okay, now you can put that aside
18  for good.
19              We'll just do a couple more documents
20  before we break for lunch, if that is okay with
21  you.
22              A.   Sure.
23              MR. QURESHI:  Actually, no, why don't
24  we just stop here.  This is a good spot to take the
25  lunch break.
```

BUCHANAN - CONFIDENTIAL

1

2          A.    Yeah, you have asked me that a few

3    times, and yes, yeah.

4          Q.    And was it your expectation that

5    there was anybody on your behalf who was

6    investigating whether it would be possible for you

7    to file a claim for your severance benefits in the

8    U.S. bankruptcy case?

9          A.    At the time, I assumed my legal

10   representation was Koskie Minsky, and I saw Nortel,

11   even though it had separate companies, as one

12   overall entity.  So I just assumed that was all

13   covered, shall we say, on behalf of all the

14   employees.  And that is what the question was here,

15   was really not so much had they made a mistake, but

16   should we be paying for the extra legal work or

17   should they.

18          Q.    Is it fair to say, Mr. Buchanan,

19   that you assumed that Koskie Minsky as part of its

20   representation of former Canadian employees would

21   have been looking into, prior to this date, the

22   possibility of filing a claim in the U.S. but

23   nobody from Koskie ever expressly told you that

24   they were?

25          A.    Can you restate that?

```
 1                    BUCHANAN - CONFIDENTIAL
 2             Q.    Sure.   Why don't I break it into
 3    two parts.
 4             Did anybody from Koskie Minsky ever
 5    directly tell you that Koskie would undertake to
 6    investigate the question of whether you could file
 7    a claim for severance benefits in Nortel's U.S.
 8    bankruptcy proceedings?
 9             A.    There was no discussion of that
10    that I know of until all of this came to light.
11             Q.    Okay.   Was it your expectation,
12    based upon your understanding of Koskie Minsky's
13    role, that Koskie Minsky would in fact be
14    undertaking such an investigation?
15             A.    I don't have a view.   So far as I
16    understand, they went on the information they had,
17    which was a whole lot of severance letters and most
18    of them were worded in this case in a very specific
19    way that was Nortel Canada, and this only came to
20    light out of somebody noticed the wording on a few
21    of the letters was different.   So in that sense,
22    those things happen.
23             So I guess up until that time, a U.S.
24    claim was not particularly seen, and I'm talking up
25    to 2009.
```

```
 1              BUCHANAN - CONFIDENTIAL
 2              Q.   Let's hand you Exhibit 57.  There
 3   you go.  Mr. Buchanan, just take a look at this
 4   exhibit which I will represent to you is a printout
 5   from the Koskie Minsky website.  Is this a section
 6   of the website that you have seen before?
 7              A.   In the past, yes.
 8              Q.   Is that a website that you visited
 9   from time to time to follow developments in the
10   case?
11              A.   Initially, quite a few times, and
12   then after that only if somebody specifically said
13   I should go and look at something.
14              Q.   Turn, if you look at the bottom
15   page numbers, to the page numbered 60?
16              A.   60?
17              Q.   Yeah.
18              A.   Okay.
19              Q.   And you will see in the middle of
20   the page beside August 19th, August 12th and August
21   the 5th there are links to a KM weekly news
22   bulletin.  Would those bulletins have been released
23   around the time that you were frequenting the
24   Koskie Minsky website?
25              A.   I certainly was not reading those
```

1           BUCHANAN - CONFIDENTIAL
2    weekly bulletins.
3           Q.   Okay, Exhibit 43.  Mr. Buchanan,
4    take a look, if you would, please, at what we have
5    previously marked as Exhibit 43, and could you just
6    tell me, this is another Koskie Minsky news
7    bulletin.
8           A.   Yes.
9           Q.   Can you tell me if this is one you
10   recall seeing?
11          A.   I don't specifically remember.
12          Q.   Is there any particular reason
13   that you at this time were not reading the Koskie
14   Minsky weekly updates as a source of information
15   about the proceedings?
16          A.   Because in general those
17   documents, like this one, there is just an enormous
18   amount of information in there and 95 percent of
19   which is not relevant to me.
20          So typically, that stuff was being
21   filtered and I would find out either through NRPC
22   or through LinkedIn if there was something of
23   interest.
24          Q.   Okay.  I'm going to show you one
25   more update, and this one is Exhibit 58.  It is

```
 1                    BUCHANAN - CONFIDENTIAL
 2              Q.   And --
 3              A.   I'm reading.
 4              Q.   Sure.  And in the answer, the
 5    first sentence reads:
 6                   "The Webcast presentation contents
 7                   are applicable only to Canada and do
 8                   not address the issues associated
 9                   with the potential or actual loss of
10                   U.S. health or other benefits.
11                   Koskie Minsky's representation for
12                   pensioners and former employees is
13                   limited to the Canadian Courts."
14                   Did you understand at this time, sir,
15    which is August of 2009, that Koskie's
16    representation of former employees was limited to
17    the Canadian courts?
18              A.   As stated there.  Other than that,
19    I didn't think about it because I saw Nortel as one
20    company and my conduit into Nortel was through
21    Nortel Canada.
22              Q.   Well, do you recall reviewing this
23    particular Q&A or a webinar that covered this
24    aspect of the Q&A?
25              A.   No, because typically anything
```

1       BUCHANAN - CONFIDENTIAL

2       that was to do with the U.S. I kind of flitted

3       over, to be honest, I, sorry, skipped.

4                Q.    And why did you skip anything in

5       these webinars that had to do with the U.S.?

6                A.    Because my understanding was that

7       Koskie Minsky represented me as a Canadian employee

8       or former employee, and they were dealing with my

9       interests, whatever they may be.

10               Q.    Well, do you have a specific

11      recollection of Koskie telling you at this time,

12      August of 2009, as they have restated in the answer

13      to question 206, that Koskie Minsky's

14      representation of former employees is limited to

15      the Canadian courts?

16               A.    Sorry, can you repeat the

17      question?

18               Q.    Sure.  The question is whether you

19      recall being told by Koskie around August of 2009

20      that their role was limited to -- their role on

21      behalf of former employees was limited to the

22      Canadian courts?

23               A.    I don't recollect them saying it.

24      It is not a surprise, but I don't recollect them

25      saying it, yeah.