# EXHIBIT 132

*In Re:*

*NORTEL NETWORKS INC., et al*

---

*MICHAEL CAMPBELL*

*February 6, 2014*

*Confidential*

---



**126 East 56th Street, Fifth Floor New York, New York 10022**

**PHONE: (212) 750-6434   FAX: (212) 750-1097**

**www.ELLENGRAUER.com**

*Original File 106215.TXT*

*Min-U-Script® with Word Index*

```
 1  A P P E A R A N C E S: (Cont'd)

 2

 3  MONZACK MERSKY MCLAUGHLIN AND BROWDER

 4  Counsel for the Ad Hoc Committee of Canadian

 5  Employees Terminated Pre-Petition

 6       400 - 1201 N. Orange Street

 7       Wilmington, DE  19801

 8  BY:  RACHEL B. MERSKY, ESQ.

 9       Tel.  302.656.8162

10

11

12  KOSKIE MINSKY, LLP

13  Counsel for the Canadian Former Employees

14  and the Canadian Creditors Committee

15       20 Queen Street West

16       Suite 900, Box 52

17       Toronto, Ontario  M5H 3R3

18  BY:  SUSAN PHILPOTT, ESQ.

19       Tel.  416.977.8353

20

21

22

23

24

25
```

CAMPBELL - CONFIDENTIAL

1

2  where those 10 were located?

3          A.    I had some located in Toronto, I

4  had some located in Ottawa and I had some located

5  in Raleigh, North Carolina.

6          Q.    And, generally speaking, what kind

7  of functions did your direct reports perform?

8          A.    They were in the same line of

9  business as I was, so they were in the CVAS

10  business.  They did tasks that I directed them

11  relative to product management roles within that

12  business.

13          Q.    As of the time, sir, that your

14  employment with Nortel came to an end, did you have

15  any understanding of which Nortel entity employed

16  you?

17          A.    Yes, I was employed by Nortel

18  Canada.

19          Q.    And did you know whether that was

20  NNC, Nortel Networks Canada, or NNL, Nortel

21  Networks Limited?

22          A.    I did not distinguish between

23  them.  I worked for Nortel and I happened to work

24  in the Canadian locations.

25          Q.    But you understood that the entity

```
 1              CAMPBELL - CONFIDENTIAL
 2   that employed you was a Nortel Canada entity?
 3              A.   Yes.
 4              Q.   And as far as you understood
 5   through the course of your entire career at Nortel,
 6   were you always employed by a Nortel Canada entity?
 7              A.   Yes.  That's where my paycheque
 8   came from.  I worked for various organizations
 9   around the world.
10              Q.   Well, when you say you worked for
11   various organizations around the world, you were
12   always based in Canada, correct?
13              A.   Yes.
14              Q.   But the organizations within
15   Nortel that you worked for, I gather, had global
16   responsibilities?
17              A.   Yes, and indeed within Nortel we
18   didn't distinguish really where we worked.  It was
19   a matter we worked for lines of business that were
20   global, and we always looked at it as a total
21   Nortel, not individual organizations.
22              So I didn't feel that I had to defend
23   Nortel Canada against Nortel U.S.  We were one
24   company.
25              Q.   Understood.  But as far as you
```

1              CAMPBELL - CONFIDENTIAL

2    were aware, though, you were never employed by a

3    Nortel U.S. legal entity?

4              A.    No, no.

5              Q.    Did any of your family members

6    work for Nortel?

7              A.    Unfortunately yes.

8              Q.    And tell me who that was?

9              A.    My wife was a former employee of

10   Nortel.  She was transferred to Avaya Corporation

11   as part of the sale of that asset during the asset

12   sale process.

13             Q.    And is your wife a member of the

14   NRPC?

15             A.    No, she is not, much to my

16   chagrin.

17             Q.    Has your wife, if you know, filed

18   a claim in the CCAA proceedings?

19             A.    I believe she has, yes.

20             Q.    And do you know what that claim is

21   on account of?

22             A.    Her claim is related to her

23   transitional retirement allowance.

24             Q.    And do you know the amount of that

25   claim?

1        CAMPBELL - CONFIDENTIAL

2   in October because Nortel put me on a couple of

3   weeks of short leave -- short-term disability

4   before we proceeded to the termination process.

5              I was put on SPLA, which is basically

6   special leave of absence, prior to retirement and

7   told that I would be proceeding to pension in June

8   of 2009.

9              Q.   And what did that mean to you in

10  terms of the benefits that you were to receive,

11  being put on SPLA?

12             A.   Well, that's why I was mad for 15

13  milliseconds because basically I was transitioned

14  to a pension which I thought was a very positive

15  outcome under the circumstances.

16             Q.   So you would -- what type of

17  benefits would you receive prior to June of 2009

18  under this arrangement?

19             A.   I was going to receive my

20  termination payments in equal payments similar to a

21  salary and I would get my health benefits continued

22  until that point.

23             Q.   So on the first page of the letter

24  in the fourth paragraph, right after the sentence

25  that refers to SPLA, there is a reference to a

```
 1              CAMPBELL - CONFIDENTIAL
 2   termination payment of $161,000 and change.  Do you
 3   see that?
 4            A.    Yes.
 5            Q.    Do you recall how much, if any, of
 6   that amount you actually received?
 7            A.    Yes.   I received payments up until
 8   the beginning of January in 2009.
 9            Q.    And do you know in rough numbers
10   how much that would be?
11            A.    I'd have to go look at my math.   I
12   have a spreadsheet on it but I don't have that with
13   me.
14            Q.    At the time -- well, strike that.
15            Does any other aspect of what you were
16   being offered in Exhibit 50 constitute what you
17   refer to as a special arrangement?
18            A.    No.
19            Q.    Okay.
20            A.    Not to my knowledge.
21            Q.    When you were provided with this
22   letter, did any aspect of the letter surprise you?
23            A.    I had learned enough over my
24   tenure at Nortel firing people that I should not
25   sign anything or discuss anything about this with
```

```
 1                    CAMPBELL - CONFIDENTIAL
 2                    close of business on November 19,
 3                    2007."
 4                    I returned it on that date.  That's the
 5      reason why it's the 19th.
 6                    Q.    Okay.  Fair to say, sir, that you
 7      had the opportunity to discuss with your counsel
 8      that you retained in Ottawa at the time any
 9      questions that you may have had surrounding this
10      termination letter?
11                    A.    I'd say we reviewed it, yes.
12                    Q.    Okay.  And reasonable to assume
13      that on the date you signed the letter on November
14      the 19th, that by that time you fully understood
15      its terms?
16                    A.    I had been given advice by my
17      lawyer that it was a reasonable offer.  I am not a
18      legal counsel, I have no legal training.  I relied
19      on their advice and they told me that this was an
20      acceptable offer and that I should sign it and
21      submit it.
22                    Q.    At the time that you signed the
23      letter, did you have any understanding of which
24      Nortel entity it was that was undertaking the
25      obligation to pay you the termination and the other
```

1              CAMPBELL - CONFIDENTIAL

2    that those benefits would be paid to you by the

3    same entity that employed you?

4              A.    That had given me my paycheque,

5    yes.

6              Q.    And did that understanding change

7    at all as of the time that Nortel Canada commenced

8    its CCAA proceedings?

9              A.    It didn't enter into my

10   conversation at that time.  We were trying to

11   understand what was going on with us and our -- the

12   whole process.

13             Q.    Refer for a moment, if you could,

14   please, back to your termination letter.

15             A.    Sure.

16             Q.    Which is Exhibit 50.

17             A.    Yes.

18             Q.    And I'd like you to look at on the

19   first page there is a paragraph that begins, "As

20   used in this letter, the term 'Corporation' shall

21   mean."  Do you see that?

22             A.    Yes.

23             Q.    Can you just read that passage to

24   yourself for a moment and let me know when you're

25   done?

```
1                    CAMPBELL - CONFIDENTIAL
2                    A.    (Witness reads document).  Okay,
3     I've read it.
4                    Q.    Is that a paragraph that you
5     believe you read at the time that you signed the
6     termination letter?
7                    A.    I am sure I read the letter in
8     detail at that time, yes.
9                    Q.    And do you recall if you had an
10    understanding of what the word "corporation" meant?
11                   A.    I would say at that time no, that
12    was not something that my lawyer brought to my
13    attention that I should be aware of.
14                   Q.    That was my next question.  Do you
15    recall whether you discussed that particular
16    paragraph with the lawyer that you retained at the
17    time?
18                   A.    As I recall, this did not come up
19    in any conversations.
20                   Q.    Okay.  That same paragraph of your
21    severance letter:
22                         "The term 'Corporation'," as
23                    you will read, it says, "shall mean
24                    Nortel Networks Corporation, its
25                    subsidiaries and affiliates, their
```

```
1                  CAMPBELL - CONFIDENTIAL
2    claims on your behalf against any Nortel entities?
3              A.    Yes, they were appointed in the
4    same motion as court representatives for the
5    employees.   Representative counsel I believe is the
6    term that was used.
7              Q.    So what responsibility, if any,
8    did you believe that Koskie Minsky had to pursue
9    claims that you, Mike Campbell, may have had
10   against any Nortel entities?
11             A.    Koskie Minsky was appointed by the
12   Canadian courts to represent us in Canada.
13             Q.    And do you believe the scope of
14   that representation to include representing you in
15   connection with any claims you believe you may have
16   against Nortel Canada?
17             A.    Sorry, could you repeat that for
18   me?
19             Q.    Sure.  Do you believe the scope of
20   Koskie Minsky's representation to include matters
21   related to claims you believe you may have against
22   Nortel Canada?
23             A.    Yes.  So subsequent to the
24   appointment, as we understood how the process was
25   going to unfold, as one of the court-appointed
```

```
 1                  CAMPBELL - CONFIDENTIAL
 2    bankruptcy proceedings?
 3              A.    Yes, in November of 2009 I learned
 4    through a communication that there was such a thing
 5    as a bar date in the U.S.
 6              Q.    Do you recall what communication
 7    you learned that from?
 8              A.    It was an email from Paula.
 9              Q.    Was it part of a LinkedIn
10    discussion or was it a separate email from Paula?
11              A.    It was a separate email.
12              Q.    And do you know if that's an email
13    that you produced?
14              A.    I did.
15              Q.    And at the time that you received
16    that email, was that the first time you had heard
17    of a bar date in the U.S. proceedings?
18              A.    I don't recall but it was probably
19    around that time, yes.
20              Q.    And did your learning of a bar
21    date in the U.S. proceedings around November of
22    2009 have any relevance at that time to your duties
23    as a representative?
24              A.    No.
25              Q.    Why not?
```

1                    CAMPBELL - CONFIDENTIAL

2                    A.    I wasn't aware that there was an

3     opportunity to file any claims in the U.S.  We were

4     focused on understanding what we needed to do in

5     Canada, for the Canadian claims process, and we

6     were instructed by both Koskie Minsky and our --

7     and Ernst & Young to wait for the Canadian process

8     to unfold.

9                    Q.    When you say you were instructed

10    by Koskie Minsky and Ernst & Young to wait for the

11    Canadian process to unfold, can you elaborate on

12    what you mean by that?

13                   A.    Sure.  Through various

14    communications, informal, as well as webinars that

15    everybody presented at that time.

16                   Q.    Turn to paragraph 21 of your

17    affidavit, please.

18                   A.    Geez, I wrote a lot.

19                   Q.    Indeed.  Paragraph 21 reads:

20                         "As part of the review of

21                    claims by the Monitor, in the spring

22                    of 2012 the Monitor identified a

23                    sub-group of claimants in the

24                    Canadian compensation claims process

25                    who had also filed claims in the

```
 1              CAMPBELL - CONFIDENTIAL
 2              U.S. claims process."
 3              My question to you, sir, is at what
 4    point in time did you first become aware that the
 5    Monitor identified claimants in the Canadian
 6    compensation claims process who had also filed
 7    claims in the U.S. claims process?
 8              A.    I think if you look in paragraph
 9    26, we were informed around June 12 of 2012 that
10    there were potential claims, and at that time we
11    were told that the reason we were being notified
12    was because of this group.
13              Q.    When you say because of this
14    group?
15              A.    Sorry, the group that is
16    identified in paragraph 21.
17              Q.    The Canadian --
18              A.    The sub-group of claimants that
19    you mentioned earlier.
20              Q.    I see, okay.  And did you
21    personally have any communications with the Monitor
22    or any of the Monitor's representatives concerning
23    those claimants who had filed claims both in Canada
24    and the United States?
25              A.    I did not directly.  It was
```

1                    CAMPBELL - CONFIDENTIAL

2    Nortel employees filing claims in the U.S. around

3    the middle of 2012, correct?

4              A.    Yes.

5              Q.    At what point do you recall first

6    learning of the existence of a bar date in the

7    United States by which claims needed to be filed?

8              A.    I received an email in November of

9    2009 from Paula Klein that indicated that there was

10   such a thing as a bar date in the U.S. and that it

11   had passed because it was September the 30th.

12             Q.    And in July, or I should say the

13   middle of 2012, when you first learned of the

14   possibility of filing claims on behalf of former

15   Canadian employees in the U.S. case, did you

16   consider the possibility of immediately seeking

17   leave to file such a claim?

18             A.    So we learned in June of 2012 that

19   there was a possibility and I instructed counsel to

20   instigate a process to understand how we would do

21   that, yes.

22             Q.    And you are aware that your

23   counsel eventually filed its motion seeking leave

24   to file these claims in the U.S. case in February

25   of 2013?

```
 1              CAMPBELL - CONFIDENTIAL
 2     there is an extension to the bar date.  I didn't
 3     understand why the extension was there.  I later
 4     found that it was for a different class of claims.
 5              Q.   Okay.
 6              A.   That's the entire content of the
 7     email.
 8              Q.   Do you know why Ms. Klein would
 9     have been writing to you concerning extensions of a
10     bar date in the U.S.?
11              A.   I believe she put a query into
12     Koskie Minsky about a piece of information she had
13     received.
14              Q.   Upon learning in that email
15     exchange with Ms. Klein that a bar date had been
16     set in the U.S. of September 30th of 2009, did you,
17     on your personal behalf, take any steps to
18     investigate the possibility of whether you
19     personally should be seeking to file a claim in the
20     U.S.?
21              A.   So there were two items.  One was
22     that it was after the claim date.  The second one
23     was that at that time I had no knowledge that I had
24     any basis for a claim in the U.S.
25              Q.   Can I assume therefore that you
```

1              CAMPBELL - CONFIDENTIAL
2    took no steps to investigate whether you should
3    seek to file a claim in the U.S. at that time?
4              A.    I took no steps at that point in
5    time because I was given advice by my counsel that
6    none was needed.
7              Q.    Okay.  And would that also hold
8    true in your capacity as the representative; that
9    is that as representative you took no steps at that
10   time to investigate the question of whether any
11   action should be taken on behalf of former
12   employees in Canada to pursue claims in the United
13   States?
14             A.    My counsel advised me that action
15   was not required.
16             Q.    And therefore none was taken?
17             A.    Yes.
18             Q.    My apologies, another LinkedIn.
19             A.    Number 13?
20             Q.    Yes, Mr. Campbell, I've handed you
21   what's been marked as Exhibit 13, it's another
22   LinkedIn thread.  If you look at the top posting it
23   reads, "Claims in the U.S. court - some people
24   received a letter."  That's a posting from Ms.
25   Klein and you will see the date to be November 25th

```
 1                  CAMPBELL - CONFIDENTIAL
 2                  website."
 3                  Do you recall at or around this time,
 4    July of 2009, there having been recent discussion
 5    concerning the claims process in the U.S.
 6    bankruptcy court?
 7                  A.   No.
 8                  Q.   Do you recall having been involved
 9    in any discussions concerning the U.S. claims
10    process around July of 2009?
11                  A.   I don't recall.
12                  Q.   Do you have any understanding of
13    what Koskie Minsky is referring to in this
14    particular posting on its website when they write
15    "there has been recent discussion surrounding the
16    establishment of a claims process in the U.S.
17    bankruptcy court"?
18                  A.   No.
19                  Q.   Mr. Campbell, that has been marked
20    as Exhibit 43.   It is -- well, can you identify it?
21                  A.   It appears to be a communication
22    from Koskie Minsky.
23                  Q.   And take a moment and look at the
24    document and just tell me if you recall seeing it
25    before.   It is similar in format to --
```

```
 1                    CAMPBELL - CONFIDENTIAL
 2              A.    I was going to say 14.
 3              Q.    Yes, it's similar in format to 14.
 4    It's not a duplicate and this time it has a date on
 5    it.
 6              A.    Excellent.  Clearly we fixed that.
 7              MS. MERSKY:  And this is readable.
 8              THE WITNESS:  Okay.  I've read through
 9    it.
10              BY MR. QURESHI:
11              Q.    So do you recall ever having
12    reviewed this document before?
13              A.    No.
14              Q.    I think we've covered earlier and
15    you testified earlier that you did not regularly
16    review update bulletins prepared by Koskie Minsky,
17    correct?
18              A.    That is absolutely correct.
19              Q.    On the last page of this update
20    there is a heading "Claims Process."  Do you see
21    that?
22              A.    What's the first sentence?
23              Q.    Under the heading the first
24    sentence is:
25                    "A U.S. claims process has been
```

1                    CAMPBELL - CONFIDENTIAL

2                    A.    It is.

3                    Q.    And in your posting, I guess the

4        third paragraph down you write:

5                         "First, KM identified to us

6                    that this was a possibility."

7                    I assume that by "this" you are

8        referring to the filing of the claim in the U.S.?

9                    A.    I was referring to the material

10       that was covered at the beginning of the LinkedIn

11       post which was the email and the information that

12       was in there.

13                    Q.    Then you write:

14                         "This is a U.S. claim, and they

15                    are not paid to represent us in U.S.

16                    proceedings, as they have no legal

17                    ability to practice in the U.S."

18                    That statement, sir, was that always

19       your understanding with respect to Koskie Minsky's

20       role?

21                    A.    I was under the understanding that

22       they were a Canadian law firm licensed to practice

23       in Canada, yes.

24                    Q.    Did you personally, sir, feel any

25       frustration that the possibility of filing a claim

```
 1                  CAMPBELL - CONFIDENTIAL
 2   the U.S. and had received the notice from the U.S.
 3   debtor.  That's the reason why.
 4              Q.   Okay.
 5              A.   I was going to suggest a break, if
 6   we could.
 7              MR. QURESHI:  Sure, no problem.
 8              -- RECESS AT 2:55 --
 9              -- UPON RESUMING AT 3:05 --
10              BY MR. QURESHI:
11              Q.   Mr. Campbell, are you aware that
12   the Monitor files periodic reports concerning the
13   CCAA proceedings?
14              A.   Yes, I am.
15              Q.   And in the course of your role as
16   the court-appointed representative, do you
17   undertake to review the reports of the Monitor?
18              A.   No, I don't.
19              Q.   Is there any reason you don't?
20              A.   I rely on counsel to point out
21   ones that are appropriate or ones that I should
22   look at.  I don't get every one and I don't see
23   every one.
24              Q.   Have you reviewed some of the
25   Monitor's reports?
```

1              CAMPBELL - CONFIDENTIAL

2     the LinkedIn sites about him filing this.  That's

3     the extent of my knowledge.

4              Q.    But when you became aware of

5     Mr. Zafirovski having filed a claim in the U.S., it

6     did not cause you to take any further steps in

7     pursuing the possibility of filing a claim on your

8     own behalf in the U.S., correct?

9              A.    I had no idea of the circumstances

10    around Mr. Zafirovski's employment.  I brought it

11    to the attention of the affected individuals once I

12    was made aware of the fact that we could

13    potentially file a claim.

14              NNI EXHIBIT NO. 63:  Email chain.

15              BY MR. QURESHI:

16              Q.    I've marked as Exhibit 63 an

17    email.  The top email in this chain is from Mike

18    Campbell to Paula, and there is an attachment to

19    it.  And if you'd go into the document, the

20    attachment is a July 12th, 2012 letter addressed

21    from Koskie Minsky to Gale Rubenstein at Goodmans.

22              Can you tell me, first of all, if this

23    is your email on the front page of the document?

24              A.    I can't tell you that.

25              Q.    Well, why don't you go to the

1          CAMPBELL - CONFIDENTIAL

2    second page of the email and you'll see it is an

3    email from Mary Pitt at kmlaw.ca to a number of

4    people, and then on the cc line there is a

5    michael.campbell@sympatico.ca.  Is that you?

6          A.   Yes, that's my email.

7          Q.   Do you recall receiving this

8    email?

9          A.   Absolutely I do.

10         Q.   And then going back to the first

11   page, there is a response from Ms. Rubenstein at

12   Goodmans, and if you look at the cc line of that

13   email, your email address appears again?

14         A.   Yes, that's correct.

15         Q.   Am I right that that's your email

16   address?

17         A.   It is.

18         Q.   And then --

19         A.   Clearly they have a wrong one up

20   for me, though.  Oh, that one's correct.

21         Q.   And then the next email in the

22   chain, and this is the format obviously in which it

23   was produced to us, it appears that the email was

24   forwarded and it just has your name and then to

25   Paula.

1                    CAMPBELL - CONFIDENTIAL

2                    A.    Yes.

3                    Q.    Might that be you forwarding this

4    email to Paula Klein?

5                    A.    I can't tell without an actual

6    email address on there.  I know several Paulas.

7                    Q.    Well, looking at the attachment,

8    the letter from Koskie to Goodmans, is this the

9    type of communication that you would have forwarded

10   to Ms. Klein?

11                   A.    It's possible, but I can't

12   identify the individual, given that email address.

13                   Q.    Fair enough.  Do you recall seeing

14   the letter that's attached?

15                   A.    Yes, I do.

16                   Q.    Did you have any hand in drafting

17   this letter?

18                   A.    I did not.  I instructed counsel

19   to send this letter once they had raised the

20   possibility.

21                   Q.    The possibility of what?

22                   A.    Of a claim in the U.S.

23   proceedings.

24                   Q.    You from time to time shared

25   communications that you had with Koskie Minsky with

1                 CAMPBELL - CONFIDENTIAL

2    Ms. Klein, correct?

3                A.   Ms. Klein was on representative

4    councils with me and was a client of Koskie Minsky

5    at the time.  And still is.

6                Q.   And you said there are a number of

7    Paulas that you know.  Are any of those other

8    Paulas that you know represented by Koskie Minsky?

9                A.   I would have to check my phone

10   book, to be honest with you.

11               Q.   Are any of the other Paulas that

12   you know former Nortel employees?

13               A.   Yes.

14               Q.   Do you think it's likely that you

15   forwarded this to some other Paula other than Paula

16   Klein?

17               A.   This was well over two years ago.

18   I don't want to speculate at this point.

19               Q.   Fair enough.  So let's look at the

20   letter itself for a moment.

21               A.   Sure.

22               Q.   The first line of the letter

23   reads:

24                    "We write in respect of the

25                    above matter which we have discussed

1                     CAMPBELL - CONFIDENTIAL

2                     with you on a number of occasions

3                     recently."

4                     My question to you, sir, is are you

5      aware of any communications that Koskie Minsky had

6      with Goodmans concerning the possibility of former

7      Nortel Canada employees pursuing claims in the U.S.

8      court?

9                     A.    When we were notified in June they

10     had told -- Koskie had told me that there had been

11     previous communications.

12                    Q.    And do you know previous to what

13     point in time?

14                    A.    I wasn't aware at the point.  This

15     was the first time that I had seen any

16     communications from Koskie on this matter to anyone

17     else.

18                    Q.    Did you ever ask Koskie what the

19     substance of their previous communications with the

20     Monitor or the Monitor's counsel may have been?

21                    A.    I wrote in my affidavit that I

22     knew that they had gone to Goodmans and Ernst &

23     Young to discuss the process, but this was the

24     first communication that I received.

25                    Q.    Turn to the second page of the

1              CAMPBELL - CONFIDENTIAL

2    estates concerning how to allocate the proceeds

3    that have been realized from the sale of Nortel's

4    assets?

5              A.   I know that there's an allocation

6    trial process underway that will decide how the

7    assets are broken up amongst the various groups.

8              Q.   So the allocation trial that you

9    testified will occur later this year, you

10   understand that to be the trial concerning how the

11   various Nortel estates in the U.S., Canada and

12   Europe will divide up the sale proceeds?

13             A.   I think it's an allocation of the

14   assets of the corporation into various

15   jurisdictions around the word.  I don't think it's

16   just those three.

17             Q.   And do you believe there to be any

18   relationship at all between the claims that you and

19   other former employees are seeking to pursue in the

20   U.S. court, and allocation?

21             A.   No, my understanding is that we

22   have an opportunity to go forward with a claim in

23   the U.S., and we're taking that opportunity.

24             Q.   Have you had any conversations,

25   sir, with anybody concerning the general subject

```
 1               CAMPBELL - CONFIDENTIAL
 2     area of whether the claims you and others seek to
 3     pursue in the U.S. court has any relationship at
 4     all with allocation?
 5               A.    I know that the claims we put in,
 6     if allowed, will affect the way the allocation is
 7     split up.  We will be a claimant in a couple of
 8     companies -- or countries, and that could
 9     ultimately affect the way the money gets
10     distributed.
11               Q.    Have you ever had any discussions
12     with anybody concerning that matter?
13               A.    Only as part of the discussions
14     about the general allocation process itself.
15               Q.    Other than the claims that you and
16     others are seeking to pursue in the U.S. through
17     your representation by Ms. Mersky, are you aware of
18     any other claims that you or any other former
19     Canadian employees could pursue in the U.S.
20     bankruptcy case?
21               A.    I don't have any knowledge one way
22     or the other.
23               Q.    Other than reserving the ability
24     to follow up on any questions Ms. Mersky may ask,
25     I'm done for now.
```