# EXHIBIT 133

*In Re:*

*NORTEL NETWORKS INC., et al*

---

*JANE LONGCHAMPS*

*February 12, 2014*

*Confidential*

---



**126 East 56th Street, Fifth Floor New York, New York 10022**

**PHONE: (212) 750-6434   FAX: (212) 750-1097**

**www.ELLENGRAUER.com**

*Original File 106219A.TXT*

*Min-U-Script® with Word Index*

1              LONGCHAMPS - CONFIDENTIAL

2    correct?

3              A.   I wouldn't quite say that.  I knew

4    I was employed by a Canadian entity.  I worked for

5    what I would call the broader Nortel.  I had many

6    dealings, shared much information with all of

7    Nortel.

8              Q.   So your specific employer that

9    issued your paycheque was a Canadian entity?

10             A.   Yes.  Well, let me just qualify

11   that.  The specific entity I was employed by was a

12   Canadian entity.  I don't know who issued my

13   paycheque.

14             Q.   Understood.  I would like to

15   direct your attention to the third paragraph in

16   this letter beginning "As used [...]"; do you see

17   what I am referring to?

18             A.   Yes.

19             Q.   It states:

20                  "As used in this letter, the term

21                  'Corporation' shall mean Nortel

22                  Networks Corporation, its

23                  subsidiaries and affiliates, their

24                  successors and assigns, and all of

25                  their past and present officers,

```
1                    LONGCHAMPS - CONFIDENTIAL
2                    directors, employees and agents (in
3                    their individual and representative
4                    capacities), in every case,
5                    individually and collectively."
6           A.    Yes.
7           Q.    Did you read that paragraph before
8    signing the letter?
9           A.    Yes.
10          Q.    At the time that you read this
11   paragraph, who did you understand would be
12   responsible for paying your severance?
13          A.    I understood this to be that the
14   liability was with the whole of Nortel.  Who was
15   actually paying me in terms of cutting a cheque, I
16   don't really know.  One of them.
17          Q.    So you understood that all of the
18   Nortel entities were liable for your severance
19   amount?
20          A.    Yes.
21          Q.    When did you first learn that
22   Nortel was declaring bankruptcy?
23          A.    I had heard rumours in the
24   beginning of January from some friends that were
25   still there who were very concerned.  I first
```

1        LONGCHAMPS - CONFIDENTIAL

2            Q.    So you think when you reviewed

3    this document and saw that Ainslie Benedict said

4    that they were separate processes, that you would

5    have disagreed with that?

6            A.    I don't think I would have really

7    noticed it, or it would have really clued into me.

8            Q.    Were you aware that there were

9    bankruptcy proceedings going on in the United

10   States?

11           A.    Yes.

12           Q.    I'm going to hand you what has

13   been previously marked as Exhibit 48.  And I'll

14   represent to you that this is one of the documents

15   that you included in your production to us, but we

16   have previously marked it as an exhibit so that is

17   why we are using this copy.

18           So is this something that you received

19   in the mail?

20           A.    I think I received it in the mail

21   with the Ernst & Young letter, but I'm not exactly

22   sure if the two were together or not.

23           Q.    And it states at the top of this

24   notice, it says:

25               "Please take notice that on

1          LONGCHAMPS - CONFIDENTIAL

2               January 14, 2009, Ernst & Young

3               Inc., the court-appointed monitor

4               and authorized foreign

5               representative of Nortel Networks

6               Corporation and certain of its

7               direct and indirect subsidiaries

8               [...]"

9          And then it lists several of the

10   subsidiaries and defines them as the Canadian

11   Nortel Group.

12          And this document refers at the bottom

13   to the Honorable Kevin Gross of the United States

14   Bankruptcy Court and provides information on the

15   United States bankruptcy proceedings.

16          So as you said, you understood at the

17   time that there were bankruptcy proceedings

18   happening in the United States?

19          A.   Yes.

20          Q.   And this notice, which is

21   addressed at the very top from the Bankruptcy Court

22   from the District of Delaware, is a notice

23   pertaining to those United States bankruptcy

24   proceedings?

25          A.   I'm sorry, I don't understand the

```
 1              LONGCHAMPS - CONFIDENTIAL
 2   question.
 3              Q.   Well, this refers to the
 4   bankruptcy proceedings that were going on in the
 5   United States?
 6              A.   Yes, it references those.
 7              Q.   If you just look at the second
 8   page, the last paragraph says:
 9                   "Copies of the Chapter 15
10              Petitions and other filings in this
11              case are available [...]"
12              And it mentions a few different
13   locations where they are available.  Number one
14   says on the Bankruptcy Court's electronic filing
15   system, and number two, from the Monitor through
16   its website, and number three, upon written request
17   to the Monitor's counsel.
18              Did you ever try to access any of those
19   resources to see what was happening in the United
20   States bankruptcy proceeding?
21              A.   It is highly unlikely.
22              Q.   Why do you say that?
23              A.   Because this document was fairly
24   technical legally, I guess, so what I understood
25   this to mean was that our Monitor was working with
```

1        LONGCHAMPS - CONFIDENTIAL
2   the U.S. side with respect to our claims.
3                It was just, you know, Chapter 15
4   petitions, et cetera, et cetera.  It was a little
5   too involved technically that I don't think I would
6   have tried to understand it more than what was
7   here.
8                Q.   I would like you to take a look at
9   your own production -- that would be the thicker
10  document, Exhibit 85.  And would you turn to the
11  page that is marked at the bottom with number 1 and
12  your initials.  Can you tell me what this is?
13               A.   I think it came from Koskie
14  Minsky.  Oh, yeah, sorry, it is prepared by them,
15  so it is an update from Koskie Minsky.
16               Q.   Is this something that you would
17  have received via email or by regular post?
18               A.   I'm not sure how I would have
19  received it.  It would have been by email or post,
20  I think, but I'm not sure which.
21               Q.   Did your communications from
22  Koskie Minsky tend to come via one particular --
23               A.   I really don't remember.
24               MS. MERSKY:  Once again, let Michelle
25  finish the question.

```
 1              LONGCHAMPS - CONFIDENTIAL
 2    claims process?
 3              A.   Yes.
 4              Q.   Did you ever review the Monitor's
 5    reports to get more information on things like this
 6    that were of interest to you?
 7              A.   I might have reviewed some of
 8    them.  I don't remember which ones.
 9              Q.   If you look at the last sentence
10    within that same section titled "Compensation
11    Claims Process", it states:
12                   "The U.S. claims process extension
13                   does not apply to Former Employees
14                   in Canada, unless they have a valid
15                   claim against one of Nortel's U.S.
16                   entities."
17                   Do you see where I have read?
18              A.   Yes.
19              Q.   So in 2009 did you ever take any
20    steps to investigate whether you had a valid claim
21    against one of Nortel's U.S. entities?
22              A.   No.
23              Q.   Why not?
24              A.   Because I thought that the Monitor
25    and our lawyers were taking care of all our
```

LONGCHAMPS - CONFIDENTIAL

1   interests with respect to Nortel globally, and I

2   understood from the Ernst & Young filing in the

3   States that they were talking with the States, so I

4   understood that -- I expected that they were

5   dealing with them on these types of matters.

6            Q.    Did you ever receive a

7   communication from the Monitor telling you that

8   they were representing your interests in

9   proceedings happening in other jurisdictions aside

10  from Canada?

11           A.    I don't believe there was that,

12  no.

13           Q.    Did you ever receive a

14  communication from Koskie Minsky telling you that

15  they were representing your interests in

16  proceedings in other jurisdictions?

17           A.    No, I don't think so.

18           Q.    If you look at page 4 of this same

19  document, it says 4 at the bottom, there is a

20  heading that says "January 2010 Upcoming Webcasts".

21  Did you participate in the webcasts put on by

22  Koskie Minsky?

23           A.    I did participate in some, but not

24  all, and I don't remember which ones specifically.

1              LONGCHAMPS - CONFIDENTIAL

2                  Q.   And she writes below that:

3                      "KM has informed us that a claims

4                      process will be announced for U.S.

5                      [...]"  --

6                  Do you want me to start over?

7                  A.   Yes, please.

8                  Q.

9                      "KM has informed us that a claims

10                     process will be announced for U.S.

11                     creditors tomorrow with a 'claims

12                     bar' date of September 30, 2009.

13                     This includes U.S. pensioner and

14                     employee claims as well."

15                 And this posting is also dated July

16     16th, 2009.

17                 Did you investigate in July 2009 the

18     possibility of filing a claim in the United States?

19                 A.   No.

20                 Q.   So I would like to turn now to

21     Exhibit 13.  This is another LinkedIn conversation

22     posted by Paula Klein entitled "Claims in the U.S.

23     Court - Some People Received a Letter..." and she

24     posted this topic on November 25th, 2009.

25                 If you take a look at her first

```
 1              LONGCHAMPS - CONFIDENTIAL
 2    posting, she writes:
 3                   "It has come to my attention that
 4                   some of you received in the mail a
 5                   letter containing the information in
 6                   Docket 1919 (which can be found at
 7                   [...]"
 8                   And she provides a link to the Chapter
 9    11 Epiq systems website.
10                   "This letter encouraged you to
11                   file your employee claims in the USA
12                   even though you are on Canadian
13                   Payroll.
14                    I have sent an email to KM asking
15                   them to clarify the criteria for
16                   receiving such a letter and a
17                   recommendation on what you should do
18                   about it."
19                   And then Paula -- that is dated
20    November 25th, 2009.  Paula makes a second posting
21    down below on the page dated November 26th, 2009.
22    And if you look at the second paragraph of her
23    posting, she writes:
24                   "At the legal call today, I asked
25                   about this letter that some of you
```

1            LONGCHAMPS - CONFIDENTIAL

2                    received.  Mark Zigler (Koskie

3                    Minsky) advised me the following.

4                    You only need to file a claim in the

5                    U.S. as per the information you

6                    received in the mail if you were on

7                    U.S. payroll for Nortel or if you

8                    believe you have a claim against the

9                    U.S. Estate (NNI) because of some

10                   contractual agreement related to

11                   your employment."

12                   So first, did you receive the letter

13   that Paula Klein is referring to here?

14           A.    No.

15           Q.    Now, you mentioned your

16   expectation that Koskie Minsky would represent you

17   in any jurisdiction in which you needed to be

18   represented?

19           A.    Yes.

20           Q.    But here Paula writes that some

21   Canadians would need to file claims in the United

22   States if they were on U.S. payroll, or if they

23   believed they had a claim against the U.S. estate.

24   Do you see that?

25           A.    I do, but it also says "because of

```
 1              LONGCHAMPS - CONFIDENTIAL
 2   some contractual agreement related to your
 3   employment".
 4              Q.   Right.  So in 2009, you knew that
 5   you hadn't been on the U.S. payroll?
 6              A.   Right.
 7              Q.   So that wouldn't be a basis for
 8   filing a claim in the United States?
 9              A.   That is true.
10              Q.   Did you believe at that time in
11   2009 that you had a claim against the U.S. estate
12   because of a contractual agreement related to your
13   employment?
14              A.   I would not have said that, yes --
15   I would have said that I did not have a contractual
16   agreement related to my employment.  If it had said
17   "termination", I might have looked a little harder.
18              Q.   Okay, okay.  So in 2009 you would
19   have understood that this did not apply to you
20   because you did not believe at that time that you
21   had a contractual agreement related to your
22   employment with the U.S. estate?
23              A.   That is right.
24              Q.   Has that view changed?
25              A.   Well, I mean, if you are looking
```

```
 1              LONGCHAMPS - CONFIDENTIAL
 2    at the wording, I don't know if I had a contractual
 3    agreement related to my employment.  I think I had
 4    a contractual agreement related to my termination,
 5    apparently.
 6              Q.    So today, you don't think that you
 7    had a contractual agreement related to your
 8    employment with the U.S. estate?
 9              A.    I'm not sure how to answer that
10    question, because it sounds like a statement of
11    fact and I am not sure how that employment term
12    would be interpreted.
13              Q.    Back in 2009, did you seek any
14    legal advice on whether you had a right to file a
15    claim in the United States?
16              A.    No.  I thought our legal interests
17    were being represented by the Monitor and Koskie
18    Minsky.
19              Q.    If you look just underneath the
20    paragraphs that I read to you, Paula Klein writes:
21                   "If you need help in filing this
22                   claim, you can contact Andrea
23                   McKinnon (from Koskie Minsky) at
24                   amckinnon@kmlaw.ca who can in turn
25                   put you in touch with a lawyer in
```

1          LONGCHAMPS - CONFIDENTIAL
2              Delaware who can help you with the
3              filing."
4              So here Paula Klein is telling LinkedIn
5    members in 2009 that if they had claims in the
6    United States, they would need to be put in touch
7    with a United States lawyer to file those claims?
8          A.    Uhm-hmm, yes.
9          Q.    Did you ever ask to be put in
10   contact with a United States lawyer?
11         A.    No.
12         Q.    Now, we spoke a little bit earlier
13   about the newsletter from Koskie Minsky that you
14   submitted in your production?
15         A.    Yes.
16         Q.    Were you aware in 2009 that Koskie
17   Minsky was issuing those newsletters on a weekly
18   basis?
19         A.    I don't know if I was aware it was
20   on a weekly basis.
21         Q.    Did you make the practice of
22   reviewing all of the newsletters that you received
23   from Koskie Minsky?
24         A.    I would look through -- anything I
25   received, I would scan and see if it seemed

```
 1              LONGCHAMPS - CONFIDENTIAL
 2   see if there was anything relevant.
 3              Q.    If you look at the update for July
 4   23rd, 2009, it is a little hard to see where it
 5   begins, but maybe two lines above it, it begins
 6   "There has been [...]"
 7              A.    Uhm-hmm.
 8              Q.    It says:
 9                 "There has been recent discussion
10              surrounding the establishment of a
11              Claims Process in the U.S.
12              Bankruptcy Court."
13              Were you aware in July 2009 that there
14   was discussion surrounding a claims process having
15   been established in the U.S. Bankruptcy Court?
16              A.    I probably read something like
17   this about a U.S. claims process.
18              Q.    Did you ask anyone at that time
19   whether you were able to file a claim in the U.S.
20   claims process?
21              A.    No.
22              Q.    Okay.  And if you turn to just, I
23   guess, one page earlier, page 60, you will see that
24   there is several links where it says "KM releases
25   Weekly News Bulletin.  To review this document
```

```
 1              LONGCHAMPS - CONFIDENTIAL
 2   the exact nature of other documents, I wouldn't
 3   know.  This order seems -- had I read it, I think I
 4   would have understood that.
 5                Q.   Did anyone ever tell you that
 6   Koskie Minsky was representing you anywhere other
 7   than Canada?
 8                A.   I don't think they mentioned one
 9   way or the other, you know.  Because Koskie Minsky
10   were imposed upon us, we expected that they were
11   representing all of us -- or sorry, all of our
12   interests, with respect to all of Nortel.
13                Q.   So as far as you are aware sitting
14   here today, no one ever expressly told you that
15   Koskie Minsky would represent you in jurisdictions
16   other than Canada; is that right?
17                A.   Can you restate the question?
18   Sorry.
19                Q.   Of course, of course.
20                A.   I'm more a paper person.
21                Q.   I am too.  No one ever told you
22   that Koskie Minsky would be representing you in
23   jurisdictions other than Canada?
24                A.   I don't think anybody specifically
25   ever said that.
```

```
 1                LONGCHAMPS - CONFIDENTIAL
 2                    Q.    Did you ever ask anyone to confirm
 3     your assumption that Koskie Minsky was, in fact,
 4     representing you in jurisdictions other than
 5     Canada?
 6                    A.    No, I probably assumed that from
 7     -- I knew there were joint proceedings going on
 8     between Canada and the U.S., and I knew that the
 9     Monitor, you know, was supposed to be taking care
10     of the Canadian interests, as I mentioned, as I
11     thought they related to both sides.
12                    Q.    Did the Monitor ever communicate
13     to you that the Monitor was taking care of your
14     interests as they related to Canada and the United
15     States?
16                    A.    The communication I had from the
17     Monitor led me to believe that they were.  They
18     didn't say that they were, but they didn't say that
19     they weren't either.
20                    Q.    What communication from the
21     Monitor are you referring to?
22                    A.    The January 14th notice.
23                    Q.    Is that Exhibit 3?
24                    A.    It is Exhibit 3, and then there is
25     the other --
```

```
1              LONGCHAMPS - CONFIDENTIAL
2                   Q.    And Exhibit 48?
3                   A.    I can't find 48.  Oh, yes.
4                   Q.    So these two documents caused you
5    to believe that the Monitor was taking action on
6    your behalf in the Canadian courts and the United
7    States courts?
8                   A.    Yes.
9                   Q.    But as you said, the Monitor never
10   expressly communicated to you that it would be
11   representing your interests in the United States?
12                  A.    No, well, not in that clarity, no.
13                  Q.    Did you ever contact the Monitor
14   to confirm your assumption that the Monitor was
15   representing you in the United States proceedings?
16                  A.    I would never consider contacting
17   the Monitor.
18                  Q.    Why would you never consider that?
19                  A.    Well, it seems like it is a pretty
20   high level to go up.  I can't imagine that they
21   would answer any questions that any individual
22   person would have.
23                  Q.    Sure, so did you ever contact
24   anyone other than the Monitor to confirm your
25   understanding that the Monitor was representing
```

1              LONGCHAMPS - CONFIDENTIAL

2    your interests in the United States?

3              A.    No.

4              Q.    And I would like to take a step

5    back to something that we discussed earlier today.

6    You said that when you were first hired by an

7    entity that ultimately became part of the Nortel

8    family, that was Bell Northern?

9              A.    Uhm-hmm.

10             Q.    And you understood that Bell

11   Northern was a Canadian company?

12             A.    Yes.

13             Q.    And you understood that Bell

14   Northern was issuing your paycheque?

15             A.    At the time, yes.

16             Q.    Then at some later point in time

17   you understood that your employment fell under the

18   umbrella of a different Canadian entity?

19             A.    I believe it did at the end, yes.

20             Q.    And you understood that that

21   entity that was employing you was paying your

22   paycheque?

23             A.    No, I said that I understood that

24   I was employed by them.  I didn't know who was

25   cutting the cheques.