# EXHIBIT 134

*In Re:*

*NORTEL NETWORKS INC., et al*

---

*JULIA PIGGOTT*

*February 5, 2014*

*Confidential*

---



**126 East 56th Street, Fifth Floor New York, New York 10022**

**PHONE: (212) 750-6434   FAX: (212) 750-1097**

**www.ELLENGRAUER.com**

*Original File 106214A.TXT*

*Min-U-Script® with Word Index*

```
 1                 PIGGOTT - CONFIDENTIAL
 2    in your mouth, I'm obviously interested in your
 3    answer, so what I think you're saying, and correct
 4    me if I'm wrong, is that you considered yourself to
 5    be an employee of Nortel without distinction to
 6    what legal entity within Nortel that might have
 7    been?
 8              A.   Can you repeat the question,
 9    please?
10              Q.   Sure.  As I understand your
11    testimony, you're not aware of the specific legal
12    entity that employed you during your time at
13    Nortel.  From your perspective, you considered
14    yourself to be employed by Nortel without any
15    specific legal entity in mind?
16              A.   No, I considered myself to be
17    employed by Nortel Canada.  That's who hired me,
18    the Nortel Canadian entity.
19              Q.   And do you consider yourself to
20    have been employed by Nortel Canada throughout your
21    career at Nortel?
22              A.   Yes.
23              Q.   And you understood that it was
24    Nortel Canada, the entity that employed you, that
25    was also the entity that paid you?
```

```
 1                PIGGOTT - CONFIDENTIAL
 2              A.    Nortel was a global company.
 3              Q.    I understand that Nortel was a
 4   global company.  I'm not asking about its
 5   operations.  Look, Ms. Piggott, these are not trick
 6   questions.  I'm just trying to get your
 7   understanding.
 8              A.    I didn't think.  I didn't think
 9   about it.  I get a paycheque, it goes in my bank
10   account.
11              Q.    Well, is it your testimony that
12   you understood that your employer was Nortel
13   Canada?
14              A.    I believe, yes.
15              Q.    And did you understand that it was
16   Nortel Canada that was paying you?
17              A.    Yes.
18              Q.    And did you also understand that
19   the same entity that was paying you was the entity
20   that would be obligated to pay you your severance
21   as set forth in your termination letter which is
22   Exhibit 40?
23              A.    Who would make the payment to me?
24   Yes.
25              Q.    I mean, you had no reason to
```

```
 1                  PIGGOTT - CONFIDENTIAL
 2   proceedings?
 3              A.   They are called the Monitor.  I
 4   don't understand exactly what that means.
 5              Q.   Do you understand whether Ernst &
 6   Young has a role in Canada or in the U.S. or both
 7   or neither?
 8              A.   I don't know the scope of their
 9   role.
10              Q.   When you say you've been following
11   their guidance in the case, can you be more
12   specific as to what you mean?
13              A.   They send letters and I do what
14   they ask me to do in those letters.
15              Q.   Did there come a point in time
16   where you had a conversation with a lawyer about
17   your termination letter, which is Exhibit 40?
18              A.   I believe right at the beginning I
19   took this letter to a lawyer and -- I believe at
20   the beginning I took this letter to a lawyer.
21              Q.   When you say "at the beginning,"
22   can you be more specific?
23              A.   Soon after I received the letter.
24              Q.   Did you consult a lawyer before
25   signing the letter?
```

```
 1                PIGGOTT - CONFIDENTIAL
 2              A.    No, I don't think so.
 3              Q.    Do you know if you consulted with
 4    a lawyer before or after Nortel's CCAA proceedings
 5    began?
 6              A.    After.
 7              Q.    Do you recall approximately how
 8    long after?
 9              A.    Probably within the first month.
10              Q.    Why did you consult a lawyer about
11    this letter?
12              A.    I had a letter with a lot of
13    commitments and the company went into CCAA.   No
14    idea what that means.
15              Q.    So you wanted to know what would
16    happen with the commitments in this letter?   Right?
17              A.    Um-hmm.
18              Q.    Yes?
19              A.    Yes, sorry.   Yes.
20              Q.    And who is the lawyer that you
21    consulted?
22              A.    I have no idea.  I don't remember.
23              Q.    Was it a lawyer -- well, where
24    were you living at the time?
25              A.    Brampton.
```

```
1                 PIGGOTT - CONFIDENTIAL
2              -- LUNCHEON RECESS AT 11:53 --
3              -- UPON RESUMING AT 12:30 --
4          BY MR. QURESHI:
5              Q.   Ms. Piggott, you testified earlier
6    that upon understanding that there was going to be
7    a bar date in Canada, you thought it reasonable to
8    assume that there might also be a bar date set in
9    the U.S.  Do you recall that testimony?
10             A.   Yes.
11             Q.   My question to you is what steps,
12   if any, did you take to try to find out when or if
13   there would be a bar date set in the United States?
14             A.   I didn't believe that applied to
15   me.  I was following the instructions that I was
16   given about our claims process.
17             Q.   Do I understand that answer to
18   mean that you then took no steps to try to find out
19   when or whether there would be a bar date set in
20   the U.S.?
21             A.   At that time I took no steps
22   because the process that was handed to me I was
23   following.
24             Q.   And did there ever come a time
25   where you did take steps to try to determine if
```

                    PIGGOTT - CONFIDENTIAL

 1

 2   there was a bar date in the U.S.?

 3                    A.    At some point after I got the

 4   notice in January of 2013.

 5                    Q.    When you say "got the notice,"

 6   what notice?

 7                    A.    I believe the first notice I got

 8   was the NRPC notice and that I might have a claim

 9   on the U.S.

10                    Q.    So prior to receiving that notice

11   in January of 2013, you made no effort to try to

12   determine if there was a bar date for filing claims

13   in the U.S. proceedings; is that right?

14                    A.    That's correct.

15                    Q.    And do I understand your testimony

16   to be that the reason you took no steps to try to

17   find out if there was a bar date is that nobody

18   advised you that you might need to file a claim in

19   the U.S.?

20                    A.    That's correct.  Ernst & Young,

21   Koskie Minsky did not advise me to do that.  They

22   advised that my process was coming.

23                    Q.    Did you ever specifically ask

24   anybody from Ernst & Young if you needed to file a

25   claim in the United States?

                        PIGGOTT - CONFIDENTIAL
1
2                       A.    No, I did not.
3                       Q.    Did you ever specifically ask
4    anybody from Koskie Minsky if you ever needed to
5    file a claim in the United States?
6                       A.    No, I did not.
7                       Q.    Did you ever ask any other former
8    employees of Nortel if you needed to file a claim
9    in the United States?
10                      A.    No, I did not.
11                      Q.    Did you ever ask any
12   representatives of the NRPC whether you needed to
13   file a claim in the U.S.?
14                      A.    No, no.
15                      Q.    Are you aware that in fact there
16   were notices filed in various newspapers in both
17   Canada and the U.S. advising creditors of a bar
18   date in the U.S. proceedings?
19                      A.    No, we don't get -- we don't
20   subscribe to any Canadian newspaper.
21                      Q.    You never looked in the newspaper
22   to see if there was ever an announcement of any bar
23   date in the U.S.?
24                      A.    No.
25                      Q.    Did you ever consider talking to

```
 1                    PIGGOTT - CONFIDENTIAL
 2                Q.    And do you believe that was a
 3   bulletin prepared by Koskie Minsky?
 4                A.    I would have to look at it.  I
 5   think it came from the NRPC.  I would have to look
 6   at it.
 7                Q.    So when you -- at some point soon
 8   after the CCAA proceedings commenced, you I think
 9   testified earlier that you did become aware that
10   there was a bankruptcy proceeding going on in the
11   United States as well, correct?
12                A.    Yes.
13                Q.    And is it a fair characterization
14   that at least up until the time that you received
15   the NRPC notice in January of 2013 you didn't take
16   any steps to monitor what was going on in the U.S.
17   proceedings?
18                A.    No, I did not.  I was following
19   the official documents and instructions that were
20   given to me.
21                Q.    Did you know that if you did have
22   an interest in following what was going on in the
23   U.S. bankruptcy proceedings that there were places
24   to go to get information about those proceedings?
25                A.    It would seem logical that there
```

1                  PIGGOTT - CONFIDENTIAL

2     would be places people could go to, much like there

3     were places that we could go to in Canada, but I

4     did not proceed with that.

5                  Q.    Did you ever try to find out if

6     Ernst & Young's website, the Monitor's website,

7     contained any information about the U.S. bankruptcy

8     proceedings?

9                  A.    I did not go to Ernst & Young's

10    website on any sort of regular basis.

11                 Q.    Did you ever become aware of the

12    existence of a website in the United States that

13    was specifically for information related to the

14    U.S. bankruptcy proceedings?

15                 A.    Sorry, the question is was I aware

16    that there was one?

17                 Q.    Yes.

18                 A.    No, I wasn't aware.

19                 Q.    Now, at the time you submitted the

20    information to the Monitor that was necessary in

21    order for the Monitor to take steps to pursue your

22    claim in Canada --

23                 MS. MERSKY:  Objection to the form of

24    the question in that the claimant did not submit

25    anything to the Monitor.  The Monitor submitted

```
 1              PIGGOTT - CONFIDENTIAL
 2              Do you recall reading this post at or
 3  around the time it was posted, which is November
 4  the 26th of 2009?
 5         A.   No, I don't.
 6         Q.   Did you, around this time, come to
 7  form a view that only those employees who were on
 8  the U.S. payroll or had some contractual agreement
 9  related to their employment with the U.S. estate
10  needed to file claims in the U.S.?
11         A.   Around this time I was not
12  thinking about any sort of U.S.  I had a letter
13  saying your claims process is coming, it has to be
14  approved by the court, it's not defined yet.
15         Q.   Am I correct in understanding that
16  you never believed you were on the U.S. payroll for
17  Nortel?
18         A.   That's correct.
19         Q.   At any time prior to January the
20  -- strike that.
21              At any point prior to January of 2013
22  did you ever have a belief that you had some sort
23  of contractual agreement with the U.S. Nortel
24  entity related to your employment at Nortel?
25         A.   No, I don't -- I think what you
```

1                    PIGGOTT - CONFIDENTIAL

2    asked me was do I ever -- did I ever believe I had

3    a contractual agreement with Nortel U.S.  Is that

4    what you're asking me?

5                    Q.    That is what I'm asking you.

6                    A.    No.

7                    Q.    And with that regard, when I asked

8    you the question just now I prefaced it with at any

9    point prior to January of 2013.  Now without regard

10   to date, did you ever come to form a view as to

11   whether you have some sort of contractual agreement

12   related to your employment with the Nortel U.S.

13   entity?

14                   A.    I don't know what you mean by

15   contractual agreement.

16                   Q.    Well, do you believe that you ever

17   entered into some sort of a contract with a Nortel

18   U.S. entity related to your prior employment with

19   Nortel?

20                   A.    I never signed anything

21   specifically with Nortel U.S.  A contract normally

22   requires a signature.

23                   Q.    So is it therefore your

24   understanding that you don't have any sort of a

25   contractual agreement with the Nortel U.S. entities

```
 1                    PIGGOTT - CONFIDENTIAL
 2    related to your prior employment with Nortel?
 3                 MS. MERSKY:  Objection to the extent it
 4    seeks a legal conclusion.  She can testify as to
 5    what her understanding is.
 6                 MR. QURESHI:  She is not a lawyer.  I'm
 7    not asking her for a legal conclusion.
 8                 BY MR. QURESHI:
 9                 Q.   Just your understanding as a lay
10    person?
11                 A.   I have a termination agreement
12    which I now understand, post January of 2013, that
13    is -- where is it?  It's telling me that this term
14    "corporation" is all of these entities after it.
15                 Q.   Do you recall ever looking at any
16    documents that were filed in the U.S. bankruptcy
17    case?
18                 A.   No.
19                 Q.   I assume, but correct me if I'm
20    wrong, that you never -- well, let's break it up.
21                 In 2009 did you ever seek the
22    assistance of U.S. counsel in connection with the
23    possibility of filing a claim in the U.S.?
24                 A.   No.
25                 Q.   And is that because at that time
```

1                    PIGGOTT - CONFIDENTIAL

2    in 2009 you didn't believe that you had any claim

3    against the Nortel U.S. entities?

4                    A.    At that time in 2009 I was

5    following the instructions, I wasn't thinking

6    broadly.   I was following the instructions on the

7    official letter that came from Nortel, from Ernst &

8    Young, Koskie Minsky.

9                    Q.    And so based on those

10   instructions, is it fair to assume that you had no

11   reason to believe at that time that you had any

12   claim against any of Nortel's U.S. entities?

13                   A.    At that time I was following the

14   instructions that I was given.

15                   Q.    Right.   Based on those

16   instructions, is it fair to say that you had no

17   reason to believe that you would have needed to

18   file a claim in Nortel's U.S. bankruptcy cases?

19                   A.    I guess the answer is yes.

20                   Q.    In the 2009 timeframe did you

21   regularly visit the Koskie Minsky website for

22   information about Nortel's bankruptcy proceedings?

23                   A.    No.   Periodically.

24                   Q.    I'm sorry?

25                   A.    Periodically, yes, but not

```
 1                    PIGGOTT - CONFIDENTIAL
 2     Minsky explaining what needed to be done in the
 3     sales process?
 4                    A.    In the?
 5                    Q.    I'm sorry, in the claims process.
 6                    A.    Not a one-on-one discussion.
 7                    Q.    Did you understand Koskie Minsky
 8     to be Canadian lawyers?
 9                    A.    At this time in 2009?
10                    Q.    Yes.
11                    A.    I understood them to be the
12     lawyers that were assigned by somebody, the court
13     maybe, to represent us.
14                    Q.    But did you know one way or the
15     other whether Koskie were Canadian lawyers?
16                    A.    Whether they were headquartered in
17     Canada?  I didn't ask that question.
18                    Q.    Well, did you ever believe that
19     Koskie Minsky was representing anybody specifically
20     in connection with the U.S. bankruptcy proceedings?
21                    A.    I didn't ask that question.
22                    Q.    You never asked that question?
23                    A.    No.
24                    Q.    Did anybody ever tell you that
25     Koskie Minsky was representing former Nortel
```

1                    PIGGOTT - CONFIDENTIAL
2    Canadian employees in connection specifically with
3    the U.S. bankruptcy proceedings?
4                    A.    I don't recall.
5                    Q.    You don't recall one way or the
6    other whether that was ever said?  Okay.  Did you
7    ever participate in a webinar hosted by Koskie
8    Minsky?
9                    A.    Yes.
10                   Q.    And do you recall if that's
11   something you did more than once?
12                   A.    Possibly.
13                   Q.    Did you ever submit any questions
14   to the webinar?
15                   A.    I don't recall.
16                   Q.    Did you understand that if you did
17   have any questions about the claims process, you
18   could ask those questions of Koskie Minsky?
19                   A.    Yes.
20                   Q.    You don't recall ever asking
21   Koskie Minsky any questions concerning the U.S.
22   claims process or whether you should file a claim
23   in the U.S.; is that right?
24                   A.    I did not ask them any questions
25   about the U.S. claims process.

1              PIGGOTT - CONFIDENTIAL

2      "you will need to urgently file a separate claim

3      with the U.S. court for the loss of any benefits

4      earned as a result of employment in the U.S.A.,"

5      did you take any steps to file a claim in the U.S.?

6              A.    I was not -- I never worked for

7      Nortel and lived in the U.S.A.

8              Q.    Did you therefore believe at the

9      time that this answer to question 102 had no

10     applicability to your situation?

11             A.    I believe that the first

12     statement, submit one claim for the loss of all my

13     benefits earned as a result of employment in

14     Canada, applied to me.

15             Q.    Take a look at question 206, if

16     you would, please.  This is on page 36 of 43.  And

17     you'll see the question in 206 is:

18                     "Has the U.S. court granted a

19                     similar deadline (and process)

20                     exemption for the employees'

21                     pension/benefits claims?  Is Koskie

22                     Minsky's focus on the Canadian

23                     court?  If so, who is representing

24                     the U.S. portion of my pension

25                     claim?"

PIGGOTT - CONFIDENTIAL

Fair to assume that this is a question and the answer that follows that you would have read at or around the time that you received this?

A.   It's fair to say that I received this and probably read it.

Q.   And if you look in the answer to question 206, it reads, starting from the second -- well, I'll read the whole thing:

"The webcast presentation contents are applicable only to Canada and do not address the issues associated with the potential or actual loss of U.S. health or other benefits.  Koskie Minsky's representation for pensioners and former employees is limited to the Canadian Courts.  To the best of our knowledge, there is no law firm performing a similar function in the U.S. Courts.  You will need to urgently file a separate claim with the U.S. Court for the loss of any benefits earned as a result of employment in the U.S.A.  For

1                   PIGGOTT - CONFIDENTIAL

2                   information on the U.S. Chapter 11

3                   proceedings, contact the U.S. claims

4                   agent, Epiq Bankruptcy Solutions..."

5                   And then it gives the URL for the

6       Epiq website.

7                   Did you at or around the time you

8       received this document, come to understand that

9       Koskie Minsky did not represent pensioners or

10      former employees in connection with Nortel's U.S.

11      bankruptcy proceedings?

12                  A.   Well, given what it says here, it

13      would be reasonable to think that that's what I

14      understood.

15                  Q.   I see.  So you understood that

16      Koskie Minsky -- that Koskie Minsky's role was

17      limited to the Canadian bankruptcy proceedings and

18      that they were not representing you or other former

19      employees in connection with the U.S. bankruptcy

20      proceedings, correct?

21                  A.   I'm reading this right now and

22      that's what I would say would be the understanding.

23                  Q.   So you believe, again just so the

24      record is clear, that this statement, the answer to

25      206, was consistent with what your understanding

```
 1                    PIGGOTT - CONFIDENTIAL
 2    would have been at the time in terms of the role of
 3    Koskie Minsky?
 4                   A.    Yes, they are talking about U.S.
 5    health and benefits and I did not have any U.S.
 6    health or benefits.
 7                   Q.    Well, let me try to rephrase the
 8    question again so the record is precise as to your
 9    testimony.
10                   In the second sentence of the answer to
11    206 it says:
12                        "Koskie Minsky's representation
13                        for pensioners and former employees
14                        is limited to the Canadian courts."
15                   Do you see that sentence?
16                   A.    Yes.
17                   Q.    Is that consistent with what your
18    understanding was at the time of Koskie Minsky's
19    role?
20                   A.    Yes.  Do I remember that?
21                   Q.    I'm not asking if you remember it,
22    I'm asking you if it was consistent with your
23    understanding at the time?
24                   A.    At the time when I read this,
25    whenever that time was, I would have understood
```

1                    PIGGOTT - CONFIDENTIAL

2        that to mean that it is limited to the Canadian

3        courts.

4                    Q.    Okay.  The next sentence reads:

5                          "To the best of our knowledge,

6                    there is no law firm performing a

7                    similar function in the U.S.

8                    courts."

9                    Is it also consistent with your

10       understanding that at or around the time you read

11       this document there was no law firm in the U.S.

12       representing former Canadian pensioners and

13       employees?

14                   A.    Yes.

15                   Q.    After learning at or around --

16       strike that.

17                   After understanding at or around the

18       time that you received this document that Koskie

19       Minsky's role on behalf of former employees of

20       Nortel in Canada was limited to the Canadian

21       bankruptcy case, did you take any steps to seek

22       legal representation in the United States?

23                   A.    Understand that this whole

24       paragraph is in the context of pension and

25       benefits.  I did not have a pension and health