# EXHIBIT 135

*In Re:*

*NORTEL NETWORKS INC., et al*

---

*PAUL RODDICK*

*February 12, 2014*

*Confidential*

---



**126 East 56th Street, Fifth Floor New York, New York 10022**

**PHONE: (212) 750-6434   FAX: (212) 750-1097**

**www.ELLENGRAUER.com**

*Original File 106219B.TXT*

*Min-U-Script® with Word Index*

1                    RODDICK - CONFIDENTIAL

2    therefore, not to be concerned one way or the other

3    about it.

4                Q.   And they had gone to see lawyers

5    and so you thought you could rely on --

6                A.   Yes.

7                Q.   -- the advice that their lawyers

8    had given them?

9                A.   Yes, well, and especially what

10   seemed to be it is as good as you are going to get,

11   you know, don't sweat it.

12               Q.   Did you have any questions about

13   this letter before you signed it?

14               A.   Did I have any questions?  Not

15   that I recall.

16               Q.   I would like to ask you to look at

17   paragraph 3 of this letter.

18               A.   Uhm-hmm.

19               Q.   It says:

20                    "As used in this letter, the term

21                    'Corporation' shall mean Nortel

22                    Networks Corporation, its

23                    subsidiaries and affiliates, their

24                    successors and assigns, and all of

25                    their past and present officers,

```
1                 RODDICK - CONFIDENTIAL
2                 directors, employees and agents (in
3                 their individual and representative
4                 capacities), in every case,
5                 individually and collectively."
6                 Do you see that language?
7                 A.   I do.
8                 Q.   What did you understand the word
9      "corporation" to mean in 2009?
10                A.   I actually didn't focus on that
11     particular part or pay much attention to that
12     particular paragraph at the time I was terminated.
13     I was concerned about what the terms of the
14     agreement were in terms of what my amount of
15     severance would be.
16                And certainly at the end of 2008 I
17     thought Nortel was a going concern.
18                Q.   So in 2008, who did you think owed
19     you your severance?
20                A.   Nortel.
21                Q.   And by that, do you mean all of
22     Nortel's entities?
23                A.   I honestly didn't spend a lot of
24     time focusing on that thought, but I didn't
25     distinguish.
```

```
 1                RODDICK - CONFIDENTIAL
 2           A.   Yes.
 3           Q.   Do you remember approximately when
 4    you became aware that there were claims that were
 5    submitted by employees in the Chapter 11 proceeding
 6    relating to Nortel?
 7            A.   I recall notices.  I recall
 8    Paula's first, but there may have been others,
 9    including Koskie Minsky presentations that said a
10    claim process will be defined for Canada, and it
11    would mention that there was a claim process that
12    had been defined for the States.  And I admit that
13    I -- okay -- where is my claim process?
14            Q.   You were frustrated that the
15    Canadian process was not going as fast as the U.S.
16    process?
17            A.   I guess I wasn't frustrated at
18    that point.  It was good to know that there was a
19    claim process being defined for us, and I was --
20    wanted to be sure that I was aware of any deadline
21    for that claim process for us.
22            Q.   At some point did you become aware
23    that there was a deadline set for the U.S. Chapter
24    11 process?
25            A.   I became aware, I think, in the
```

```
 1              RODDICK - CONFIDENTIAL
 2    middle of the summer.  There was either a KM or a
 3    Paula note or an NRPC note about -- that had
 4    something about the U.S. claims process finishing
 5    up in the fall, and --
 6              Q.   And that was the summer of 2009?
 7              A.   Yes.  I have to say I didn't -- I
 8    tended to, if there was things associated with the
 9    U.S. process and all that, the way the
10    communications came out tended to be, but you
11    should worry about the process for Canadian
12    residents, and we are working on it.
13              And I was definitely in favour of not
14    focusing my attention on things that I didn't need
15    to be involved in.  There was enough going on.
16              Q.   And it would have taken effort to
17    pay attention to the U.S. process in addition to
18    what you were doing for the Canadian process?
19              A.   It would have taken time and
20    effort and, based on what I was reading and that,
21    it would have not been profitable at all.
22              In fact, it would be a distraction,
23    since the -- I think that some of the KM, was it,
24    or NRPC notes sort of were in the tone, you know,
25    be patient and, you know, we will definitely have a
```

```
 1              RODDICK - CONFIDENTIAL
 2  really good claim process and we will let you know
 3  everything you need to know.  Okay.
 4              Q.   I would like to next turn to
 5  Exhibit 11.  This is another LinkedIn discussion,
 6  and the title of the discussion is "July 16 -
 7  Update on Activities with KM".  It is a post by
 8  Paula Klein; do you see that?
 9              A.   Yes.
10              Q.   And it actually continues on to
11  the second page, where you can see that it is dated
12  July 16th, 2009; do you see that?
13              A.   Yes.
14              Q.   If I could ask you to look at the
15  top of the second page, it says "Claims Process",
16  and it says:
17                  "KM has informed us that a claims
18                  process will be announced for U.S.
19                  creditors tomorrow with a 'claims
20                  bar' date of September 30, 2009.
21                  This includes U.S. pensioner and
22                  employees claims as well."
23                  Do you see that?
24              A.   Yes.
25              Q.   So was this type of post a post
```

1                  RODDICK - CONFIDENTIAL
2    that you had referred to a few minutes ago that you
3    may have seen relating to the U.S. deadline for
4    submitting claims?
5              A.   Yes.
6              Q.   Do you remember if you were aware
7    that September 30th, 2009, or thereabouts, was
8    approximately the deadline?
9              A.   I recall it being in around that
10   time, the fall of 2009.
11             Q.   At this point, did you consider
12   whether you might have a claim against one of the
13   Nortel U.S. entities?
14             A.   No.
15             Q.   Did you speak to a lawyer about
16   whether you might have a claim against the U.S.
17   Nortel entities?
18             A.   I felt at this point I had a
19   lawyer and that I -- we are in July, right?  That I
20   had representation and that I would use that
21   representation that I had.
22             Q.   And who was that lawyer?
23             A.   Koskie Minsky.
24             Q.   And did you talk to Koskie Minsky
25   about whether you might have a claim against one of

1                    RODDICK - CONFIDENTIAL
2        the Nortel U.S. entities?
3                    A.    No, I didn't.   I made sure to keep
4        up with the Koskie Minsky updates or the NRPC
5        updates and Paula's updates, and my understanding
6        was they would, as they indicated they would, keep
7        me on the right path.
8                    Q.    Can you recall anything specific
9        where they told you that they were reviewing
10       whether or not you might have a claim against the
11       U.S. Nortel entities?
12                   A.    No, I don't recall that.
13                   Q.    So this was an assumption you had
14       formed based on general communications that you
15       received from them?
16                   A.    Yes.   I mean, if we go back to my
17       understanding of my termination agreement was that
18       it was a stock agreement.   I didn't have any
19       special conditions or terms in it.
20              The folks who were running the steering
21       committee had the same agreements, as far as I
22       knew, I was no different from them.   And all of the
23       information was in the hands of them and Koskie
24       Minsky and the Monitor.
25              And it would not be useful for me to

1                    RODDICK - CONFIDENTIAL

2   all.

3            Q.    I would like to show you Exhibit

4   13.   This is another LinkedIn discussion.   It is

5   entitled "Claims in the U.S. Court - Some People

6   Received a Letter..."; do you see that?

7            A.    Yes.

8            Q.    And it is another post by Paula

9   Klein, yes?

10           A.    Yes.

11           Q.    And it is dated November 25th,

12   2009?

13           A.    Yes.

14           Q.    She writes at the top of the post:

15               "It has come to my attention that

16               some of you received in the mail a

17               letter containing the information in

18               Docket 1919 (which can be found at

19               [...]"

20           And then there is a hyperlink to the

21   Epiq Chapter 11 website:

22                "This letter encouraged you to

23               file your employee claims in the USA

24               even though you were on the Canadian

25               Payroll."

1                    RODDICK - CONFIDENTIAL

2                    Did you receive any letters?

3              A.    No.

4              Q.    And then, towards the bottom of

5     that same first page, there is another post by Ms.

6     Klein.  The second paragraph reads:

7                         "At the legal call today, I asked

8                    about this letter that some of you

9                    received.  Mark Zigler (Koskie

10                   Minsky) advised me the following.

11                   You only need to file a claim in the

12                   U.S. as per the information you

13                   received in the mail if you were on

14                   U.S. payroll for Nortel or if you

15                   believe you have a claim against the

16                   U.S. Estate (NNI) because of some

17                   contractual agreement related to

18                   your employment."

19                   Earlier you had said that at the time

20    that you received your termination letter, you were

21    not sure which entity -- which specific Nortel

22    entity had employed you.

23                   Did you believe that you had been on

24    the U.S. payroll at any point in time?

25              A.    I -- at the time, I wasn't

1              RODDICK - CONFIDENTIAL

2    concerned, so I didn't actually -- it wasn't that I

3    thought about not knowing who was paying me or who

4    would be the source.

5              It wasn't a thought in my mind about

6    what entity does this come from.  I'm sorry, the

7    last part of the question?

8              Q.   Sure.  So I think when you

9    received the termination letter, Nortel had not yet

10   filed for insolvency proceedings, and so you had

11   mentioned that at that point you weren't concerned

12   about which entity would be responsible for your

13   severance.

14             After Nortel filed insolvency

15   proceedings, this became more important; is that

16   fair to say?

17             A.   Well, I guess in a general sense

18   it is fair to say, yeah.  If you are asking me did

19   this cause me a concern about the entity, I would

20   say no.

21             When I looked at this, I probably -- my

22   recollection is I glanced at it, as I did with a

23   few of the other references to the U.S., and in

24   general they tended to be don't be distracted by

25   this.

1    RODDICK - CONFIDENTIAL

2              This is another distraction about

3    people going to databases and seeking information

4    that is just going to take you off the path that

5    you are on.  And that is how I read actually

6    Paula's input on this as well.

7              Q.   I'm asking a slightly different

8    question, which is, after Nortel had filed for

9    insolvency proceedings, so let's say the summer or

10   the fall of 2009, did you believe that you had been

11   on the U.S. payroll?

12             A.   I didn't -- did I believe I had

13   been on the U.S. payroll?  I don't know that I ever

14   actually thought of it in that terms at all.

15             Q.   Well, would you -- if you read

16   something that applied to those who were on the

17   U.S. payroll, would you have thought that that

18   applied to you?

19             A.   No, I guess I wouldn't have

20   thought that.  That if it talked about a U.S.

21   payroll, that I would be a Nortel employee of

22   Canada forever.

23             Q.   And next I would just like to

24   point you to the second part of the sentence, which

25   says -- well, again, the sentence is:

1         RODDICK - CONFIDENTIAL

2              "You only need to file a claim in

3              the U.S. [...] if you were on the

4              U.S. payroll for Nortel", which we

5              just discussed, "or if you believe

6              you have a claim against the U.S.

7              Estate (NNI) because of some

8              contractual agreement related to

9              your employment."

10             Did you believe at the time in the fall

11   of 2009 that you had a contractual agreement

12   related to your employment that would have led you

13   to believe that you had a claim against the U.S.

14   estate?

15             A.   No, I wasn't aware of any, well,

16   contractual agreement that related to the U.S.

17   estate at that point.

18             Q.   And then the next paragraph reads:

19              "If you need help in filing this

20              claim, you can contact Andrea

21              McKinnon (from Koskie Minsky) at

22              amckinnon@kmlaw.ca who can in turn

23              put you in touch with a lawyer in

24              Delaware who can help you with the

25              filing."

```
 1                    RODDICK - CONFIDENTIAL
 2                    Do you see that?
 3            A.    Yes.
 4            Q.    Did you ever contact Andrea
 5      McKinnon to --
 6            A.    No.
 7            Q.    Just let me finish.
 8            A.    Sorry.
 9            Q.    Did you ever contact Ms. McKinnon
10      to inquire about hiring a lawyer in Delaware?
11            A.    No.
12            Q.    Why not?
13            A.    Because I felt that I was watching
14      the main focus of the efforts of the steering
15      committee and Koskie Minsky and the Monitor towards
16      a path for a claims process for Canadian residents,
17      and there were regular references to not being
18      distracted, which I took to heart.
19            Q.    But by telling you here that you
20      needed to contact a Delaware lawyer if you thought
21      you might have claims against the U.S., weren't
22      they telling you that there were some things that
23      they weren't going to represent you with respect
24      to?
25                    In other words, weren't they telling
```

```
 1              RODDICK - CONFIDENTIAL
 2   believe there was a sentence that said "do not file
 3   in the U.S." I would have to go back and look, to
 4   be honest, in case there was one like that.
 5              But there were definitely tones that
 6   said do not be distracted by other information and
 7   in relation to U.S. claims, in part because they
 8   seemed to be happening there faster.
 9              Here is what we are doing for you.  We
10   in the steering committee, we in the NRPC, we at
11   Koskie Minsky are working with the Monitor.  Pay
12   attention to us.
13              Q.   Did you ever ask anyone on the
14   NRPC steering committee whether or not you could
15   pursue claims outside of Canada?
16              A.   No.
17              Q.   Did you ever ask anybody at Ernst
18   & Young about whether or not you could pursue
19   claims outside of Canada?
20              A.   No.
21              Q.   And did you ever ask anybody at
22   Koskie Minsky whether you could pursue claims
23   outside of Canada?
24              A.   No.
25              Q.   Why don't we take a break now.
```