# EXHIBIT 136

*IN RE: NORTEL NETWORKS INC., et al*

---

*PAULA KLEIN*
*February 11, 2014*
*HIGHLY CONFIDENTIAL*

---



126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 106218.TXT*
*Min-U-Script® with Word Index*

 1   A P P E A R A N C E S (Cont'd):

 2

 3   COUNSEL FOR THE CANADIAN FORMER EMPLOYEES

 4   AND THE CANADIAN CREDITORS COMMITTEE:

 5   KOSKIE MINSKY, LLP

 6   Per:   Susan Philpott, Esq.

 7   20 Queen Street West

 8   Suite 900, Box 52

 9   Toronto, Ontario  M5H 3R3

10   Tel.  416.977.8353

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              KLEIN - HIGHLY CONFIDENTIAL
 2              Q.   Were you aware that Ernst & Young
 3    was appointed as Monitor of NNL and its affiliates?
 4              A.   I was aware --
 5              Q.   Or strike that.  Of Nortel Canada.
 6              A.   I was aware, yes, I was aware that
 7    they were.  I don't know when I became aware, but I
 8    don't dispute that.
 9              Q.   Okay.  And did you know that the
10    Monitor had set up a website?
11              A.   Yes.
12              Q.   Did you ever go look at the
13    website?
14              A.   Yes.
15              Q.   And did you from time to time get
16    information from the website to post on LinkedIn?
17              A.   I might have done.
18              Q.   Do you know if others did as well?
19              A.   I'm sure they did.
20              Q.   Now, let's just talk about maybe
21    the first few months after the CCAA filing.
22              A.   Okay.
23              Q.   Any idea how often you would check
24    out the Monitor's website?
25              A.   In the early days post-CCAA filing
```

```
 1                KLEIN - HIGHLY CONFIDENTIAL
 2    I would say I certainly went to the website when
 3    the Monitor -- when I found out that the Monitor
 4    had published reports.  And probably for the first
 5    two or three reports that were published, I
 6    actually went and downloaded those reports and read
 7    parts of them, at least.
 8                As the time has passed, I go less and I
 9    find I went less and less frequently.  In fact, it
10    has probably been close to two years since I have
11    been to that website.
12                Q.   Is it fair to say that membership
13    in your LinkedIn group has grown significantly from
14    the day you formed it?
15                A.   Yes.
16                Q.   Do you know how many members there
17    were at its peak, let's say?
18                A.   There are approximately 900 people
19    at the moment.
20                Q.   And is that the peak?
21                A.   Yes.
22                Q.   And is it fair to say that you
23    have heard over the years that many people on the
24    LinkedIn website are grateful to you for setting up
25    the LinkedIn website as a way to distribute
```

```
1              KLEIN - HIGHLY CONFIDENTIAL
2         A.    That's okay.
3              Q.    But so up until May of 2009, had
4   the LinkedIn group ever sought any advice with
5   respect to whether it had any rights in connection
6   with the U.S. proceedings?
7              A.    No.  We believed -- it is my
8   recollection that we believed that we only had the
9   right -- that we only -- that the way that we were
10  to file our claims was limited to the Canadian
11  proceedings, that we had a right to file our claims
12  in Canada and we did not believe that we had a
13  right to file anywhere else or take action in any
14  other jurisdiction.
15             Q.    When you say "we believed", that
16  was your own personal belief?
17             A.    Sorry, yes, I believed, I believed
18  and I believe others shared my view, that the only
19  option we had was to proceed in the Canadian
20  proceedings.
21             Q.    And my question was did you ever
22  ask anybody, any U.S. lawyer whether you had rights
23  with respect to the U.S.?
24             A.    Never asked a U.S. lawyer.
25             Q.    And Nelligan was always clear to
```

```
 1              KLEIN - HIGHLY CONFIDENTIAL
 2   you that their advice was only with respect to the
 3   Canadian proceedings; correct?
 4              A.   I don't know that that was ever
 5   explicitly stated, but it was certainly implied.
 6              Q.   Okay, and that was your perception
 7   as well?
 8              A.   Yes.
 9              Q.   Now, there came a time later in
10   2009 when you learned that there was a bar date in
11   the United States; correct?
12              A.   Correct.
13              Q.   And you learned that what, around
14   July or so of 2009?  Best recollection.
15              A.   I don't know when it was, but I do
16   know it would have been very quickly after it was
17   made public.
18              Q.   And in fact, there were
19   discussions within the LinkedIn group on the board
20   letting people know in case it affected them that
21   there was a U.S. bar date, right?
22              A.   Yes.
23              Q.   Would you say that that was fairly
24   well publicized among the LinkedIn group members
25   that the U.S. bar date issue was -- that there was
```

1                  KLEIN - HIGHLY CONFIDENTIAL

2    a U.S. bar date?

3                  A.    Yes.

4                  Q.    Now, with respect to the U.S. bar

5    date, it was your understanding that it only

6    applied to people who had claims against Nortel

7    U.S.; correct?

8                  A.    Yes.

9                  Q.    And that is something that you

10   also publicized on the LinkedIn group, that if you

11   have claims against the U.S., there is a U.S. bar

12   date; correct?

13                 A.    Yes.

14                 Q.    Now, at this point in time that

15   the bar date was established, Koskie Minsky was

16   formally the representative of the group?

17                 A.    I believe so.

18                 Q.    Okay.  Who were your contacts at

19   Koskie Minsky at this time?

20                 A.    Susan Philpott, Mark Zigler and

21   Andrea McKinnon.  I can't remember when Andrea

22   joined.  It was primarily Ms. Philpott.

23                 Q.    And when you were working with

24   Nelligan, you said that people had signed a form

25   noting that you and I think Ms. Read would be kind

```
 1              KLEIN - HIGHLY CONFIDENTIAL
 2              Q.    And in terms of the functions,
 3    there were functions that were directed towards the
 4    CCAA proceedings of Nortel Canada; there were
 5    functions directed towards dealing with the wind-up
 6    of the pension generally here in Canada; and there
 7    was government lobbying functions?
 8              A.    Yes.
 9              Q.    Those were three of the main ones?
10              A.    Those were three of the main ones,
11    yes.
12              Q.    Were any of the NRPC's functions
13    at all U.S.-directed?
14              A.    Not that I can think of.
15              Q.    And is it fair to say that like
16    the Nelligan firm, Koskie Minsky's advice was
17    always with respect to either the Canadian CCAA
18    proceeding or the Canadian pension issues or
19    Canadian lobbying or other activities here in
20    Canada?
21              A.    Well, insofar -- sorry, repeat
22    that again?
23              Q.    Sure.  Is it fair to say that
24    Koskie Minsky's activities were all directed
25    towards either the Canadian CCAA proceedings, the
```

1                KLEIN - HIGHLY CONFIDENTIAL

2    Canadian pension issues, Canadian lobbying or other

3    Canadian activities?

4              A.   Well, they did -- yeah, I guess

5    so.  Yeah, I mean, there were -- from time to time

6    there were discussions about interacting with the

7    U.S., you know, with the U.S. activities, but that

8    was I think in -- that was in the larger sort of

9    cross-jurisdictional activities that were taking

10   place.

11             Q.   In other words, you are aware that

12   when major events happened in Nortel's bankruptcy,

13   there would be joint hearings between the U.S.

14   court and the Canadian court, right?

15             A.   That's correct, yes.

16             Q.   And therefore, Koskie Minsky

17   appearing in the Canadian court with respect to

18   these proceedings, there would be -- it would be a

19   joint proceeding and so the U.S. judge would hear

20   what they were presenting, for example?

21             A.   Yes.

22             Q.   But they never did activities

23   specifically directed at the U.S. court, did they,

24   that you are aware of?

25             A.   Not that I am -- not that I can

```
 1              KLEIN - HIGHLY CONFIDENTIAL
 2    remember.
 3              Q.    And with respect to the severed
 4    employee group, you knew that they were not giving
 5    you any U.S. law advice; correct?
 6              A.    When -- so up until --
 7              Q.    Why don't we talk about only 2009,
 8    just to be simple, up until December 31st.
 9              A.    In 2009, no, there was no -- we
10    never asked them -- I never heard a request for
11    advice for U.S.-related activities.
12              Q.    Or about the U.S. processes?
13              A.    I mean, other than just general,
14    other than general questions, you know, what is
15    going on with this thing.  Like so, for example, if
16    there were particular rulings that happened in the
17    U.S. court that pertained to employees, pensioners
18    or former employees in the U.S., sometimes in the
19    legal meetings there were questions about, well,
20    what does that mean for our situation here in
21    Canada.
22              Q.    But other than that, you are not
23    aware of them ever giving advice with regard to the
24    U.S. proceedings; correct?
25              A.    No, that's correct.
```

1              KLEIN - HIGHLY CONFIDENTIAL
2                   Q.   And in fact, the mandate that you
3     understood from the representation order was
4     Canada?
5                   A.   Yes.
6                   Q.   So we spoke a minute ago about
7     being aware of the bar date in the U.S. and you
8     wanted to make sure that anybody who might have
9     claims against Nortel U.S. knew that they needed to
10    seek out U.S. counsel; correct?
11                  A.   Yes.
12                  Q.   And in fact, on the LinkedIn
13    website you publicized if you may have claims
14    against the U.S., let us know and we'll help you
15    find a U.S. lawyer; correct?
16                  A.   Yes, I believe I posted something
17    like that.
18                  Q.   And let's talk about just 2009.
19    Did you ever hear any severed employee of Nortel
20    express the view either to you or in writing or on
21    the phone or in person that they thought Koskie
22    Minsky was evaluating any potential claims they
23    might have that they needed to file in the U.S.?
24                  A.   I can't recall.  I do recall that
25    there were certainly -- I don't recall exactly the

```
 1              KLEIN - HIGHLY CONFIDENTIAL
 2   dates, but I mean, I do recall over the course of
 3   the last five years that there have been -- there
 4   certainly have been examples of employees who have
 5   had claims in the U.S. and who have filed claims in
 6   the U.S.
 7              Q.   What I was just asking was did
 8   you, and let's talk about the period of time in
 9   2009, did you ever hear any employee say or write
10   that they believed that Koskie Minsky was providing
11   them advice with respect to what they needed to do
12   in the United States?
13              A.   No, I don't remember anybody
14   saying that.
15              Q.   And like you said before with
16   regards to Nelligan, had you heard somebody express
17   that view, it would have been your practice to
18   correct that mistaken impression; correct?
19              A.   Well, if somebody had posted
20   something that said, Koskie Minsky is advising me
21   on what to do for the U.S., I wouldn't have
22   corrected them.
23              Q.   Of course, but --
24              A.   They are stating --
25              Q.   Well, what I meant is if somebody
```

```
 1              KLEIN - HIGHLY CONFIDENTIAL
 2          A.    Yes.
 3          Q.    So if I'm a severed Nortel
 4   employee and I want to find out what is going on
 5   with Nortel that may affect me, and I don't want to
 6   read through some of the mountains of documents
 7   that are out there in court filings, one source I
 8   can go to is I can join the LinkedIn group;
 9   correct?
10          A.    Yes.
11          Q.    Another source I can go to is I
12   can check the Koskie Minsky website regularly;
13   correct?
14          A.    Yes.
15          Q.    And in fact, on the LinkedIn page
16   you encouraged people to bookmark the Koskie Minsky
17   website because of the valuable information they
18   had?
19          A.    Yes.
20          Q.    So if we just look on page 146 in
21   the bottom right-hand corner, and if we look at
22   206, the second sentence says:
23                "Koskie Minsky's representation
24                for pensioners and former employees
25                is limited to the Canadian Courts."
```

1                    KLEIN - HIGHLY CONFIDENTIAL

2                    Do you see that sentence?

3               A.   Yes.

4               Q.   And as you have testified, that is

5    consistent with what your view was at the time;

6    correct?

7               A.   Yes.

8               Q.   And had you ever in 2009 heard

9    Koskie Minsky say anything to the contrary?

10              A.   No.

11              Q.   Is the fact that Koskie Minsky's

12   representation of former employees was limited to

13   the Canadian courts, is that something that you

14   ever felt that they hid from any former employee?

15              A.   No.

16              Q.   They were pretty open about it;

17   correct?

18              A.   I don't know if they were open.

19   It just never came up.  It wasn't something that

20   came up.

21              Q.   But when it came up, you always

22   found that they were up front and honest about what

23   their representation is limited to; fair to say?

24              A.   Yes, but there was a reason for

25   that, and the reason for that is that for the vast

```
 1             KLEIN - HIGHLY CONFIDENTIAL
 2   majority of pensioners and former employees, we had
 3   no reason to believe that we had any claim outside
 4   of Canada.
 5             So there wasn't really -- with very few
 6   exceptions, for example, somebody who may have
 7   worked in both Canada and the U.S., there was no
 8   real reason for them to think that that was
 9   required in any way.
10             Q.   At this point in time -- well,
11   let's just talk about 2009 generally.
12             A.   Yes.
13             Q.   The Nelligan firm had a copy of
14   your termination letter because you showed it to
15   them --
16             A.   Yes.
17             Q.   -- you know, right when you got
18   it?
19             A.   Uhm-hmm.
20             Q.   Did Koskie Minsky in 2009 have
21   your termination letter?
22             A.   I can't remember when I supplied
23   them my letter.
24             Q.   At some point in time they asked
25   for it from you?
```

```
 1              KLEIN - HIGHLY CONFIDENTIAL
 2    you cited.  I don't remember if there was a third
 3    because I don't have the transcript here.  But I'm
 4    showing you Exhibit 39 which is a copy of the U.S.
 5    bar date notice that was published in The Globe and
 6    Mail.
 7              A.   Yes.
 8              Q.   In 2009 did you ever see Exhibit
 9    39?
10              A.   In The Globe and Mail?
11              Q.   Well, let's start out with in The
12    Globe and Mail?
13              A.   No, I don't read The Globe and
14    Mail.
15              Q.   Okay.  Did you ever see it in any
16    other publication?
17              A.   I don't recall reading it in any
18    publication.
19              Q.   Do you recall going to the Epiq
20    website for the U.S. and seeing the bar date
21    notice?
22              A.   Yes.
23              Q.   And you did that in 2009?
24              A.   Yes.
25              Q.   Prior to the bar date itself?
```

1                    KLEIN - HIGHLY CONFIDENTIAL

2                    A.    Yes.

3                    Q.    And you read it?

4                    A.    Yes.

5                    Q.    And did you understand it at the

6       time?

7                    A.    Not all of it, no.

8                    Q.    Did you talk to Koskie Minsky

9       about it afterwards?

10                   A.    I don't remember.

11                   Q.    And I realize that this is -- the

12      print is a little small on here.  I presume the

13      print in the version that you looked at on the web

14      was a little bit easier to read?

15                   A.    I remember seeing not this.  It

16      wasn't in this format.  What I saw was a document

17      that looked more like those -- it looked more like

18      one of these documents.

19                   Q.    It had a court caption?

20                   A.    Yes.

21                   Q.    Okay, and when you said it looked

22      like "these", you were referring to Exhibit 78?

23                   A.    Yes.

24                   Q.    But Exhibit 78 is a Canadian

25      caption.

```
 1              KLEIN - HIGHLY CONFIDENTIAL
 2    that if you have a claim against the Canadian
 3    Debtors, you file your claim against the Canadian
 4    Debtors only in the Canadian court; correct?
 5              A.    Not quite.
 6              Q.    Okay.
 7              A.    And only in a Canadian court.  So
 8    my claim, my claim, I was employed by one of the
 9    Canadian companies; therefore, I have a severance
10    claim against those -- against that entity, I
11    guess, and my understanding is that the only
12    recourse I had was to file that claim in the
13    Canadian system.
14              All through this we were told if you
15    have a Canadian claim, you have to wait for the
16    Canadian claims process to come out, file it in the
17    Canadian court, and that was the end of it.  There
18    was nothing else that we needed or action we could
19    take, in fact, to get our money.
20              Q.    And in fact, at this point in time
21    in 2009 you did not believe that you had any claim
22    against Nortel U.S.; correct?
23              A.    Yes, that is correct.  I did not
24    believe at that time that I had a claim in the U.S.
25    because my claim was in -- my claim was in Canada
```

1          KLEIN - HIGHLY CONFIDENTIAL

2     against the Canadian estate.

3                    Q.   So I would like to look at a

4     couple of your LinkedIn postings.

5                    MS. MERSKY:  Whenever you are at the

6     right place to take a break.

7                    MR. ROSENTHAL:  Do you want to take

8     lunch now?

9                    MS. MERSKY:  Well, whenever you are

10    ready.  I'm not trying to --

11                   MR. ROSENTHAL:  Yes, I think that is

12    fine.

13                   -- RECESSED AT 12:09 P.M.

14                   -- RESUMED AT 1:05 P.M.

15                   BY MR. ROSENTHAL:

16                   Q.   So right before the lunch break we

17    spoke about your review of the bar date notice and

18    the reasons why you concluded from it that you did

19    not need to file a claim in the United States.

20                   You had also mentioned, when I asked

21    you to tell me sources of information, you had

22    mentioned Koskie Minsky was a source of information

23    for you.  And my first question is, is the

24    information that you got from Koskie Minsky the

25    same as what you learned from when you read the bar

```
 1           KLEIN - HIGHLY CONFIDENTIAL
 2   date notice or was there something additional?
 3                A.   The same in general, like in
 4   general terms?  Like just as it related to the bar
 5   date you mean the information I got from Koskie
 6   Minsky?
 7                Q.   Correct, as it relates to the U.S.
 8   bar date and whether or not you might need to file
 9   a claim in the United States, is there anything
10   additional that they told you that helped you that
11   was different than what you learned when you read
12   the notice?
13                A.   I don't specifically remember -- I
14   don't specifically remember discussing the bar
15   date, per se, with Koskie Minsky.  However,
16   whenever on the occasions that I did ask Koskie
17   Minsky about filing -- about our ability to file
18   claims in the U.S., the advice I was always given
19   was we were Canadian employees; therefore, we have
20   to wait for the Canadian claims process to be
21   published and then we would file our claim in
22   Canada and only in Canada.
23                And that as Canadian employees, as a
24   Canadian employee who never worked in Canada -- or
25   never worked in the U.S., I did not have a claim in
```

HIGHLY CONFIDENTIAL                                        132

1                    KLEIN - HIGHLY CONFIDENTIAL

2      the U.S. to file, and therefore, that bar date was

3      irrelevant to me.

4                    Q.    Do you remember who at Koskie

5      Minsky told you that?

6                    A.    No.

7                    Q.    Was it oral advice or written

8      advice?

9                    A.    Oral.

10                   Q.    Do you remember when it was?

11                   A.    Not specifically, but I recall

12     that the message has been quite consistent through

13     the years that we -- up until, you know, up until

14     mid-2012 that the claims process would be published

15     in Canada and we were to file in Canada.

16                   Q.    Is it fair to say that up until

17     sometime in 2012 you had been of the view that you

18     don't have a claim against any of the U.S. Debtors?

19                   A.    I never viewed that I had --

20     that's correct, I never viewed that I had a claim

21     in the U.S.

22                   Q.    So besides Koskie Minsky and

23     besides you reading the bar date notice, were there

24     any other sources of information that you recall

25     sitting here today for your conclusion that you

```
 1              KLEIN - HIGHLY CONFIDENTIAL
 2   Canadian claims with documents that had a
 3   termination letter with that same language.
 4              Q.   And at some point in the
 5   process -- well, did you realize at that time that
 6   you had the contractual language in question that
 7   you just referred to?
 8              A.   Not right at that meeting, but
 9   subsequently I went back to check my letter and to
10   see whether that language existed.
11              Q.   And if we could look at Exhibit
12   80, is the language that you are referring to the
13   third paragraph of Exhibit 80?
14              A.   Yes.
15              Q.   And sitting here today, is it your
16   belief that tab 80 is a contractual agreement
17   relating to your employment?
18              A.   No.
19              Q.   Okay.
20              A.   When I wrote the statement
21   "contractual agreement related to the employment",
22   I at the time assumed it somehow related to people
23   who were on contract, people who were contract
24   workers with the company.  I never asked Mr. Zigler
25   for clarification at the time because, for whatever
```

1          KLEIN - HIGHLY CONFIDENTIAL

2     reason, I made that assumption.

3               Q.    Putting aside Exhibit 13, do you

4     consider Exhibit 80 to be a contractual agreement

5     relating to your employment?

6               A.    A contractual?  I consider it to

7     be a -- do I consider it?  Yes, I suppose in a way

8     I do.  It is a termination agreement, and insofar

9     as it is termination of my employment, I suppose

10    one could say it is a contractual agreement of

11    employment.

12              Q.    Well, isn't it fair to say that --

13              A.    It is not an agreement about

14    employment.  It is an agreement about

15    non-employment.

16              Q.    But it relates to your employment,

17    right?

18              A.    Or my cessation thereof.

19              Q.    Is it your belief today that

20    that's a contractual agreement that gives rise to a

21    claim that you want to pursue against the U.S.

22    Nortel?

23              A.    Yes.

24              Q.    So at some point in January of

25    2013, were you involved in making other employees

```
 1              KLEIN - HIGHLY CONFIDENTIAL
 2   further.
 3              So we wanted to have people take action
 4   quickly, and we were acting to try to do that, to
 5   try to be as quick as possible to do the things
 6   that we -- you know, when we knew that there was
 7   a -- when the opportunity -- you know, when
 8   information came to light, we wanted to act as
 9   quickly as possible on that action, on that
10   information.
11              Q.   Were you concerned that people's
12   claims might not be accepted by the court if they
13   didn't move quickly after learning about the
14   possibility of a claim?
15              A.   Well, we didn't really discuss
16   that explicitly.  We just felt that we want -- that
17   it was the right thing to do was to act as quickly
18   as possible.
19              Q.   Now, by the time the notice went
20   out to people, you personally had been aware of the
21   possibility of a claim for you in the U.S. for
22   about six months; is that right?
23              A.   Yes.
24              Q.   And Mr. Campbell had known about a
25   possible claim that he had in the U.S. for about
```

```
 1                KLEIN - HIGHLY CONFIDENTIAL
 2    filed in the U.S.
 3              So I don't know -- I don't think it is
 4    that I didn't know I had a claim or didn't believe
 5    I had a claim back in 2009.
 6              Q.   Okay, but let's focus on the where
 7    to file issue.  If in 2009 you are of the view that
 8    you don't file in the U.S., what changed in 2012 to
 9    2013 to make you say, okay, now you do file in the
10    U.S.?
11              A.   Well, the fact that I was told by
12    a U.S. lawyer that this language in my letter means
13    that I should file a claim in the U.S. --
14              Q.   Well --
15              A.   -- or seek to file a claim in the
16    U.S.
17              Q.   Well, did anybody ever tell you
18    why it was appropriate to file in the U.S. and not
19    just in Canada, even if you had a claim against the
20    U.S.?
21              A.   Why?  Say that again?
22              Q.   Well, just because you have a
23    claim against the U.S. in 2013, did anybody explain
24    to you why that claim should be filed in the U.S.?
25              A.   Well, where else would it be
```

HIGHLY CONFIDENTIAL                               164

1                     KLEIN - HIGHLY CONFIDENTIAL

2    filed?

3                   Q.    What do you mean?

4                   A.    Well, if I have got a claim in the

5    U.S., file in the U.S.  I wouldn't file it in the

6    UK against the U.S.

7                   Q.    Why wouldn't you file it in

8    Canada?

9                   A.    Because that is for my claim in

10   Canada.

11                  Q.    And that is why you decided to

12   file it in the U.S.?

13                  A.    No, as I said before, I was

14   advised that I had a claim that could -- that I

15   would have to seek to file -- you know, that I

16   could seek to try to file in the U.S. because of

17   this language in my letter.

18                  To me, it was a way -- it was simply

19   following the instructions that I had been given.

20   I have a claim.  I'm trying to follow the process

21   for filing my claim to get compensated for the

22   money I'm owed.

23                  Q.    And your understanding today is

24   that the process to pursue a claim against Nortel

25   U.S. is to file a claim in the U.S.?

```
 1                KLEIN - HIGHLY CONFIDENTIAL
 2   hadn't passed yet?
 3              A.   No.  It never -- I mean, the fact
 4   that the -- no.
 5              Q.   Do you see in Exhibit 80 that
 6   there is a reference to "corporation" also
 7   including officers, directors and employees?
 8              A.   Uhm-hmm.
 9              Q.   You have to answer --
10              A.   Yes.
11              Q.   Have you given any thought to
12   suing other employees for your severance?
13              A.   No.
14              Q.   Why not?
15              A.    I don't have the money to pursue
16   lots of different things, so I have to decide where
17   to spend my money.  I don't have an unlimited
18   budget.
19              Q.   Are you of the view that other
20   employees who have that language in their letter
21   would have the right to sue you for their
22   severance?
23              A.   Me personally?
24              Q.   Correct.
25              A.   I don't believe that that's -- I
```

1       KLEIN - HIGHLY CONFIDENTIAL

2    do not interpret that statement to mean that

3    anybody could sue me for their severance, nor do I

4    believe that that statement allows me to sue Sally

5    XYZ who also worked at the company for my

6    severance.

7                Q.    Why not?

8                A.    Because it doesn't make sense that

9    it would, how a co-op student would be liable for

10   my severance pay.

11               Q.    If we look at the language,

12   though, of the term "corporation", it means "Nortel

13   Networks Corporation, its subsidiaries and

14   affiliates, their successors and assigns, and all

15   of their past and present officers, directors,

16   employees and agents"; do you see that?

17               A.    Yes.

18               Q.    Do you understand there to be any

19   difference in the definition between an affiliate

20   of Nortel Networks Corporation and an employee of

21   Nortel Networks Corporation?

22               A.    Well, I don't really understand

23   what affiliate means in the legal context, so I

24   assume there is a difference, but I don't

25   understand what it is.