# EXHIBIT 137

*In Re:*
*NORTEL NETWORKS INC., et al*

*JOHN PAUL RUPRECHT*
*February 10, 2014*
*Confidential*



126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
**www.ELLENGRAUER.com**

*Original File 106217B.TXT*
*Min-U-Script® with Word Index*

```
 1              RUPRECHT - CONFIDENTIAL
 2              Where is it possible that -- you know,
 3  where is the most cost-effective, if you will?  I
 4  would say Nortel U.S. appears to be the most.  You
 5  know, if you have to put your money to pursue this,
 6  it would be Nortel U.S.
 7              Q.   But you haven't investigated how
 8  much it might cost elsewhere?
 9              A.   No, I have not, no.
10              Q.   It also says here, if you could
11  turn to the third paragraph again, that the term
12  "corporation" shall mean all of their past and
13  present officers, directors, employees and agents;
14  do you see where it says that?
15              A.   Yes, I do, yes.
16              Q.   Have you considered whether to
17  pursue any claims against any past or present
18  officers, directors, employees and agents?
19              A.   No, I haven't considered that.
20  You know, going after individuals for this sort of
21  thing, just -- it doesn't seem like it would make
22  sense to me.
23              Q.   Why not?
24              A.   Who would I go after?  I have no
25  idea.  Like I would need -- I couldn't figure this
```

```
 1                 RUPRECHT - CONFIDENTIAL
 2   one out myself.
 3             I would have to retain a lawyer to look
 4   at that, and then I would have to pay a lawyer to
 5   do that.  And so there is incremental costs
 6   associated with that as well.
 7        Q.   So because you had received this
 8   letter from -- well, let me ask --
 9        A.   Actually, you know what, this
10   phrase here, I think that when we signed the 3K,
11   the 3K deal, we signed away our right actually to
12   pursue this.
13        Q.   When you say "this", what do you
14   mean?
15        A.   There was a 3,000 -- I believe it
16   is one of the artifacts.  Can I request to see
17   something I submitted to you?
18             MS. MERSKY:  Just testify as to what
19   you know.  They'll submit the documents.
20             THE WITNESS:  Okay.  So there was a
21   $3,000, I can't remember what it was called, a deal
22   of some sort.  You have the document from me as to
23   a payout.
24             And I can't recall, but I think we may
25   have signed away the right to pursue the officers
```

```
 1              RUPRECHT - CONFIDENTIAL
 2   and directors at that point.  I don't know.  I
 3   don't understand it well enough.
 4              BY MS. VANLARE:
 5              Q.   Did you go back and look?
 6              A.   As a result of this?  No, no.
 7              Q.   Why not?
 8              A.   It is not something I even
 9   contemplated.
10              Q.   You refer to a letter that you
11   received in 2013.  Do you remember who sent that
12   letter?
13              A.   I believe I received it as an
14   email first and then it was posted in the LinkedIn
15   group, or was it -- I think it was in the LinkedIn
16   group, yeah, something like that.  I don't recall
17   now.  It should be in the documents I provided.
18              Q.   What was your understanding of the
19   source of that information?
20              A.   Well, at first I thought it was a
21   scam.  I couldn't make the connection between that
22   we had a -- because there had been lots of bond
23   things that had been going on and people being
24   approached, so I just thought this was another
25   trying to pursue, you know, a scam of some sort.
```

```
 1                    RUPRECHT - CONFIDENTIAL
 2                    But as I read through the letter, it
 3    seemed to -- like this would have been a very
 4    sophisticated scam, so I started thinking maybe
 5    there was some, you know, validity to this.
 6                    And then I looked at the LinkedIn
 7    group, and then, you know, somebody else was asking
 8    the same thing, and then it was, yeah, this is
 9    correct.  And then, yeah --
10              Q.   Why did you think that it was a
11    scam?
12              A.   Well, I didn't believe we had a
13    claim against the U.S.  It is like we are
14    submitting through a Canadian process.  We have got
15    representatives and whatever claims we have got,
16    these folks are taking care of it.  That is the way
17    I looked at it.
18                   And you know, to see this, it is like,
19    what do you mean?  There is, you know -- like we
20    have got Koskie Minsky.  They would have -- you
21    know, this would have been a long time ago.
22                   Anyways, that is part of the reason I
23    thought it was a scam, because it is like, yeah,
24    sure, you know.  Anyways, I'm sorry.
25              Q.   So you didn't seem like -- it
```

```
 1                  RUPRECHT - CONFIDENTIAL
 2   didn't seem like it was legitimate?
 3          A.   I felt the process we had gone
 4   through would have captured this sort of
 5   opportunity or thing or whatever you want to call
 6   it.  And that is why my first thought was no, you
 7   know, we have followed the process and I can't
 8   believe that this was missed by -- yeah.
 9          Q.   Can you believe it today?
10          A.   Yeah, absolutely, obviously.  Yes.
11          Q.   So at some point, were you
12   convinced that this was worth pursuing, despite --
13          A.   Yes.
14          Q.   -- despite initially thinking that
15   it was --
16          A.   Yes, and that is why I paid the
17   retainer.  I didn't do it initially, right away.  I
18   wanted to poke into the details around it, feel
19   comfortable with -- at least to the level that I
20   could understand it.
21               I certainly am not a lawyer, and I
22   certainly don't understand a lot of the
23   terminology.  It is something that's generally
24   beyond me, but I wanted to at least feel
25   comfortable with understanding it as best as I
```

```
 1                 RUPRECHT - CONFIDENTIAL
 2   they find -- don't look at my Exhibit 3.  Wait
 3   until you get the official Exhibit 3.
 4             MR. ROSENTHAL:  Maybe it is just put
 5   out of order.  Bear with us.
 6             (DISCUSSION OFF THE RECORD.)
 7             MR. ROSENTHAL:  There you go.
 8             THE WITNESS:  Thank you.  I'm sorry,
 9   the question was?
10             BY MS. VANLARE:
11        Q.    Do you recognize this document?
12        A.    Yes, I do recognize it.
13        Q.    Do you remember receiving it?
14        A.    Yes, I do.  This was in my hard
15   copy files.
16        Q.    A few minutes ago you testified
17   about visiting the E&Y website.  If you look at
18   paragraph 3, there is a link to an Ernst & Young
19   website dealing with the Canadian proceedings in
20   Nortel; do you see that hyperlink?
21        A.    Yes, I do.
22        Q.    Is this the website you visited?
23        A.    I believe this is the same one
24   that the human resources person indicated to me, so
25   I already had previously visited this on the day of
```

1                    RUPRECHT - CONFIDENTIAL
2     the bankruptcy.
3              This letter was received physically
4     several days after the bankruptcy, like in physical
5     mail, so it was -- it was -- because I had
6     submitted the email, I got a response from them
7     email-wise, and then this came in the mail several
8     days later.
9              Q.   Did you visit this website later
10    on to follow what was happening in the proceedings?
11             A.   This is the Monitor website where
12    they have all of the various reports?
13             Q.   Yes.
14             A.   You know, the Monitor reports,
15    those hundred-page documents?  Occasionally, yeah,
16    depending on if, you know, we heard something was
17    going on or somebody on the LinkedIn group -- but
18    it is not -- it was not a regular sort of stop for
19    me and, like, look at all the Monitor reports.
20             They were just far too complex and
21    large for me to -- I was working and, you know, I
22    have four kids.  I have a life I have to live,
23    sorry.
24             Q.   Could I have Exhibit 23.
25             A.   Thank you.

```
 1                  RUPRECHT - CONFIDENTIAL
 2   representing us in any way, shape or form.  As far
 3   as I was concerned, they were taking care of us,
 4   and anyways, I'll leave it at that.
 5              Q.   At this time did you take any
 6   steps to investigate whether you might have any
 7   claims against Nortel U.S.?
 8              A.   No.
 9              Q.   At any time did you take any steps
10   to investigate whether you had any claims against
11   Nortel U.S.?
12              A.   January 2013 I did.  I do not
13   recall any time -- there may be a post or something
14   I did, but honestly I do not recall looking at that
15   because it wasn't a question for me.  It was --
16   this wasn't a factor or consideration.
17              Q.   And in January 2013, that was in
18   response to the letter that you received; correct?
19              A.   That is correct, yes.
20              MS. MERSKY:  When she turns pages, that
21   is a good thing.
22              BY MS. VANLARE:
23              Q.   She is referring to me.
24              A.   Okay.
25              Q.   Exhibit 6.
```

```
 1              RUPRECHT - CONFIDENTIAL
 2         A.   I see the question, and I see the
 3   answer.
 4         Q.   Okay.  Do you recall this or any
 5   other statements by Koskie Minsky that they only
 6   represented employees in the Canadian courts?
 7         A.   No, and reading the front part of
 8   the question, I wouldn't even have read the fine
 9   print, if I had read this.  I honestly do not
10   recall reading this huge document.  I don't even
11   recognize it, as I say.
12              But you know, the front part there
13   talks about the U.S. pension claim.  Well, I have
14   nothing to do with a U.S. pension claim.  I don't
15   even know why -- you know, I wouldn't read that.
16              I would speculate that if I had read
17   that, I wouldn't even read anything further.  In
18   fact, by this time, I had received my pension
19   money.
20         Q.   Are you familiar with the Epiq
21   Bankruptcy Solutions website?  It is at the end of
22   the answer there.  There is a link to it.
23         A.   Oh, oh, yes, I think that is the,
24   yeah, Chapter 11, so this must be the U.S. site,
25   yes.
```

```
1                 RUPRECHT - CONFIDENTIAL
2              Q.   Did you ever visit the Epiq
3    website?
4              A.   I don't recall specifically going
5    there.  If it was referred to in the LinkedIn group
6    and it was a topic of interest to me, it is
7    possible that at that point I did, but it was not a
8    regular -- you know, it is not a kind of a site
9    that I would look at.
10             Q.   I would like to show you Exhibit
11   7.
12             A.   Thank you.
13             Q.   This is a post dated February 18,
14   2009; do you see that?
15             A.   Uhm-hmm, yes.
16             Q.   And it is a post by Betsy Hung?
17             A.   I see that.
18             Q.   Do you know Ms. Hung?
19             A.   I had worked with Betsy.  She was
20   in a different business unit.  I don't know her on
21   a personal level, but I do know her as a colleague
22   at Nortel.
23             Q.   Her post reads "Go to [...]" and
24   then it gives a URL for the Chapter 11 Epiq
25   website.  And then it follows with:
```

```
 1                    RUPRECHT - CONFIDENTIAL
 2               process being worked on in Canada."
 3               At this time, which was middle of 2010,
 4   were you aware that there was a claims process in
 5   the U.S. that was separate and different from the
 6   one that was taking place in Canada?
 7          A.   Yes, I would have -- I read this
 8   and I may have known before this, not much more
 9   before this, but yeah, yeah.
10          Q.   Okay, I would like to turn to a
11   different exhibit, Exhibit 11.
12          A.   Do you want this one back?
13          Q.   Sure.
14               MR. ROSENTHAL:  Okay, yeah, we'll take
15   it.
16               MS. VANLARE:  Or you can keep it.
17               MS. MERSKY:  I don't want him to get
18   confused.
19               BY MS. VANLARE:
20          Q.   This is yet another LinkedIn
21   discussion; do you see that?
22          A.   Yes, I do.
23          Q.   This one is entitled "July 16 -
24   Update on Activities with KM"; do you see that?
25          A.   Yes, I do.
```

```
 1                   RUPRECHT - CONFIDENTIAL
 2              Q.    And the post actually continues on
 3    to the next page, and you can see the date is July
 4    16, 2009; do you see that?
 5              A.    Yes, I do.
 6              Q.    If I could ask you to stay on the
 7    second page, which is page 916.
 8              A.    Yes.
 9              Q.    At the top of the page Ms. Klein
10    posts:
11                   "Claims process.
12                    KM has informed us that a claims
13                    process will be announced for U.S.
14                    creditors tomorrow with a 'claims
15                    bar' date of September 30, 2009.
16                    This includes U.S. pensioner and
17                    employees claims as well."
18              Do you see that?
19              A.    Yes, I do.
20              Q.    Were you aware that there was a
21    claims bar date in the U.S. claims process?
22              A.    Yes.  Yes, I'm looking at this,
23    and I would have read this for sure.  So in 2009,
24    July, yes, I would have -- yes.
25              Q.    At this point in time --
```

```
 1              RUPRECHT - CONFIDENTIAL
 2              A.   Sorry, could I just elaborate on
 3    that?  Okay, this includes U.S. pensioners and
 4    employee claims, as well, so I -- you know, like,
 5    we weren't thinking about U.S. claims that, you
 6    know, there is -- anyways, go ahead, ask your
 7    question.  Sorry.
 8              Q.   Well, my next question was, this
 9    time, which was, you know, about July of 2009, you
10    know, you said you knew that there was the bar date
11    of September 30th.  Did you take any steps to
12    investigate whether you had a potential claim
13    against the U.S. estate?
14              A.   No.  We had Koskie Minsky and they
15    would let us know and find out through the recently
16    severed -- you know, Paula would let us know if
17    there was anything that we had to do.
18              As far as we were explained and
19    understood, there is the U.S. process and that is
20    for employees in the U.S.  There is a Canadian
21    process.
22              I don't recall if already by this time
23    it had been determined that we weren't going to be
24    part of the Canadian process, the regular process.
25    They were creating one just for us.  And you know,
```

```
1                  RUPRECHT - CONFIDENTIAL
2    so that is --
3              Q.   Did anyone tell you that you were
4    somehow precluded from filing a claim in the U.S.?
5              A.   It was never a topic, so, you
6    know, there was no discussions around filing a
7    claim in the U.S., so that would not have been a
8    discussion point.
9              Q.   Did you ask anybody whether you
10   were allowed to file a claim in the U.S.?
11             A.   I do not recall doing that at all.
12   I don't even -- as I have repeatedly said, and I'm
13   sorry to sound like a broken record -- you know,
14   Koskie was taking care of our claim as employees in
15   Canada.
16                  I mean, I guess we were all programmed
17   at Nortel, you know, a certain way, and this is the
18   way it is.
19             Q.   Exhibit 13.
20             A.   Thank you.
21             Q.   This is a LinkedIn discussion
22   entitled "Claims in the U.S. Court - Some People
23   Received a Letter...", and the top post is by Paula
24   Klein, and it is dated November 25th, 2009; do you
25   see that?
```

```
 1                    RUPRECHT - CONFIDENTIAL
 2              A.    Yes, I do.
 3              Q.    And the first -- the post begins
 4    where she says:
 5                    "It has come to my attention that
 6                    some of you received in the mail a
 7                    letter containing the information in
 8                    Docket 1919 (which can be found at
 9                    [...]"
10                    And then there is a link to the Chapter
11    11 Epiq website; do you see that?
12              A.    Yes, I do.
13              Q.    And she says:
14                    "This letter encouraged you to
15                    file your employee claims in the USA
16                    even though you were on Canadian
17                    Payroll."
18                    Did you ever receive such a letter?
19              A.    No.
20              Q.    Do you recall hearing that others
21    had received a letter?
22              A.    No, but I'm sure I read this, this
23    LinkedIn group or this -- or I'm sorry, this
24    discussion in this LinkedIn group.
25              Q.    Later on, just further down on
```

```
 1            RUPRECHT - CONFIDENTIAL
 2   this page, there is another post by Ms. Klein.  The
 3   second paragraph of that post -- do you see where I
 4   am, by the way?
 5            A.   Sorry, on the first page?
 6            Q.   On the first page.
 7            A.   Oh, sorry, sorry, I changed pages.
 8   Second paragraph?
 9            Q.   The second sentence says:
10               "You only need to file a claim in
11               the U.S. as per the information you
12               received in the mail if you were on
13               the U.S. payroll for Nortel or if
14               you believe you have a claim against
15               the U.S. Estate (NNI) because of
16               some contractual agreement related
17               to your employment."
18               Do you see that?
19            A.   Yes, I do, yeah.
20            Q.   And then it says:
21               "If you need help in filing this
22               claim, you can contact Andrea
23               McKinnon (from Koskie Minsky) at
24               amckinnon@kmlaw.ca who can in turn
25               put you in touch with a lawyer in
```

```
 1                RUPRECHT - CONFIDENTIAL
 2            Delaware who can help you with the
 3            filing."
 4            Do you see that?
 5       A.   Yes, I do.
 6       Q.   So to go back to the second
 7   paragraph I was just reading, were you ever on the
 8   U.S. payroll for Nortel?
 9       A.   No.
10       Q.   Did you believe that you had a
11   claim against the U.S. estate because of some
12   contractual agreement related to your employment?
13       A.   No.
14       Q.   At this time, which was November
15   2009, did you take any steps to consider whether
16   you might have any claims relating to a contractual
17   agreement relating to your employment?
18       A.   No.  I -- as I say, I felt that it
19   was being addressed by Koskie Minsky, whatever
20   claim I had, and there was a Canadian employees in
21   Canada process that -- yeah, I'm sorry to sound
22   like a broken record, but the same response.
23       Q.   The next paragraph, as I read
24   earlier, encourages you to contact Andrea McKinnon
25   at Koskie Minsky, who can put you in touch with a
```

```
 1                  RUPRECHT - CONFIDENTIAL
 2   lawyer in Delaware.  Did you ever contact Andrea
 3   McKinnon?
 4            A.   No.
 5            Q.   Did you contact anybody else at
 6   Koskie Minsky regarding potentially hiring a lawyer
 7   in Delaware?
 8            A.   No.
 9            Q.   At this time, did Koskie Minsky
10   have a copy of your termination letter?
11            A.   I believe so.  I believe they got
12   that directly from Nortel.  I could be wrong, but
13   there was a point in time, because we never -- I
14   don't recall us actually having to provide it to
15   them, and they were working with Nortel to -- I
16   think that was -- I don't remember if it was at
17   this time, but at some point they did.
18            Q.   And what led you to believe that
19   they received a copy of your letter from the
20   company?
21            A.   I seem to recall that being part
22   of the process that was laid out in terms of how we
23   were going to receive -- you know, this is two
24   years later, once they had established the process,
25   we would receive the document you have where my
```