# EXHIBIT 138

*In Re:*

*NORTEL NETWORKS INC., et al*

---

*SHIRLEY TROWBRIDGE*

*February 3, 2014*

*Confidential*

---



126 East 56th Street, Fifth Floor New York, New York 10022

PHONE: (212) 750-6434   FAX: (212) 750-1097

www.ELLENGRAUER.com

*Original File 106212A.TXT*

*Min-U-Script® with Word Index*

```
 1              TROWBRIDGE - CONFIDENTIAL
 2    to who was going to pay you the amount of your
 3    severance?
 4              A.   Say that again, please?
 5              Q.   Did you have any understanding as
 6    to who would pay you your severance?
 7              A.   My understanding is that Nortel
 8    would be paying it to me.
 9              Q.   The same entity that had been
10    paying your salary each week?
11              A.   That's correct.
12              Q.   Did you have any understanding at
13    the time you signed the letter that Nortel U.S.
14    would be paying you anything under the terms of
15    this letter?
16              A.   No.
17              Q.   No, that wasn't your
18    understanding?
19              A.   I didn't have -- I didn't have any
20    -- ask me the question again, sorry?
21              Q.   Let me rephrase it.  Did you have
22    any belief --
23              A.   That it would come from the U.S.?
24              Q.   That it would come from Nortel
25    U.S.?
```

```
 1              TROWBRIDGE - CONFIDENTIAL
 2              A.    No.
 3              Q.    So if we look at the third
 4    paragraph down of the letter, it says:
 5                    "As used in this letter, the
 6              term 'Corporation' shall mean Nortel
 7              Networks Corporation, its
 8              subsidiaries and affiliates, their
 9              successors and assigns, and all of
10              their past and present officers,
11              directors, employees and agents (in
12              their individual and representative
13              capacities), in every case,
14              individually and collectively."
15              Do you see that that I just read?
16              A.    Yes.
17              Q.    Do you recall reading that
18    language at the time that you -- at any time prior
19    to you signing this letter?
20              A.    Yes, I would have read it.
21              Q.    Do you have any specific
22    recollection about that language, sitting here
23    today?
24              A.    Not really, no.
25              Q.    Did you at the time that you
```

1               TROWBRIDGE - CONFIDENTIAL

2               Q.   Yes.

3               A.   No, no, I don't think I posted

4    anything.

5               Q.   You think that was your only one?

6               A.   Pretty much except maybe where I

7    might have said I've sent my money or something

8    into a common --

9               Q.   You didn't consider yourself to be

10   an active poster?

11              A.   Not at all, no.

12              Q.   Any reason why?

13              A.   It's just not my style.

14              MR. ROSENTHAL:  Let's mark as Exhibit

15   11 a document LI915 to 918.

16              NNI EXHIBIT NO. 11:  LinkedIn posting

17              dated July 16, 2009, stamped LI915 to

18              LI918.

19              BY MR. ROSENTHAL:

20              Q.   So this is a July 16th, 2009

21   update on activities with KM from Paula Klein.  Do

22   you see that?

23              A.   Yes.

24              Q.   Was it your understanding that

25   Ms. Klein was one of the people who was interacting

```
1              TROWBRIDGE - CONFIDENTIAL
2     with the lawyers?
3              A.    Yes.
4              Q.    Since you had no direct
5     communications with the lawyers, were you reading
6     Ms. Klein's information bulletins to find out what
7     the lawyers were recommending to the employees?
8              A.    Yes.
9              Q.    So if we look on the second page
10    of this document, 916, she says:
11                   "Claims process:  KM has
12                   informed us that a claims process
13                   will be announced for U.S. creditors
14                   tomorrow with a claims bar date of
15                   September 30th, 2009.  This includes
16                   U.S. pensioner and employee claims
17                   as well."
18                   Do you see that?
19              A.    Yes.
20              Q.    At this period of time, this is
21    July 16th, 2009, is it fair to say that at this
22    point in time as well you had no interest in filing
23    a U.S. claim because you didn't think you had a
24    claim against the U.S.?
25              A.    Exactly, yes.
```

```
 1              TROWBRIDGE - CONFIDENTIAL
 2              Q.   And if you look down below that,
 3    Mr. Law right below Ms. Klein's entry says:
 4                  "Thanks for the update and your
 5                  continuous excellent leadership.
 6                  From the reading of the update the
 7                  U.S. process includes employees and
 8                  pensioners but the Canadian one does
 9                  not and a separate process is being
10                  created."
11              Do you see that?
12              A.   Yes.
13              Q.   Is that consistent with your
14    understanding at the time, that there was a U.S.
15    process that included employees and pensioners and
16    then a separate process for Canadian claims?
17              A.   Yes.
18              Q.   Is it fair to say that even as of
19    the bar date of September 30th, 2009 that's
20    referred to in Ms. Klein's posting at the top, even
21    as of that date you weren't concerned about a U.S.
22    bar date because as of that point in time you
23    didn't think you had any claims against Nortel
24    U.S.?
25              A.   Correct.
```

```
 1              TROWBRIDGE - CONFIDENTIAL
 2              A.   I knew I had never been on it,
 3      yes.
 4              Q.   And you also did not believe that
 5      you had a claim against the U.S. estate because of
 6      any contractual arrangement, correct?
 7              A.   Correct.
 8              Q.   And as a result, you also formed
 9      the conclusion that you didn't need to worry about
10      any U.S. deadline, correct?
11              A.   Correct.
12              Q.   Ms. Klein says:
13                   "If you need help in filing a
14              claim, you can contact Andrea
15              McKinnon from Koskie Minsky who can
16              put you in touch with a lawyer in
17              Delaware who can help you with a
18              filing."
19              Do you see that?
20              A.   Yes.
21              Q.   And you didn't ask for any
22      assistance with finding a Delaware lawyer, did you?
23              A.   No.
24              Q.   By the way, I'm happy to keep
25      going but if you want to take a break, you know,
```

1              TROWBRIDGE - CONFIDENTIAL

2     it's also a good breaking point.  It's totally up

3     to you.

4              A.   I'll just get some more water

5     maybe.

6              Q.   I just don't want you to feel like

7     you have to sit here without a break if you need

8     one.

9              -- OFF THE RECORD --

10             -- RECESS AT 2:50 --

11             MR. ROSENTHAL:  I want to mark as

12     Exhibit 14 a document JP101 to 105.

13             MS. MERSKY:  JP?

14             MR. ROSENTHAL:  JP is the stamp on it.

15             NNI EXHIBIT NO. 14:  Document entitled

16             "Pensioners and Former Employees News

17             Bulletin," stamped JP101 to JP105.

18             BY MR. ROSENTHAL:

19             Q.   This is entitled "Pensioners and

20     Former Employees News Bulletin."  It says that:

21             "This bulletin provides a

22             weekly summary of Nortel's CCAA

23             proceedings.  This news update is

24             prepared by Koskie Minsky LLP (KM)

25             in their capacity as representative

```
1              TROWBRIDGE - CONFIDENTIAL
2                   counsel to all pensioners and former
3                   employees of Nortel."
4                   So as we saw from some of the LinkedIn
5      postings before, you were aware from LinkedIn that
6      Koskie Minsky was appointed as a representative to
7      former employees, correct?
8              A.   Correct.
9              Q.   And you are aware that Ms. Klein
10     had mentioned that their website is an excellent
11     source of information, correct?
12             A.   Right.
13             Q.   Did you ever review their news
14     bulletins?
15             A.   No.
16             Q.   Why not?
17             A.   I don't know.  I just didn't.
18             Q.   Did you have any interest in
19     keeping informed about the issues that the employee
20     representatives wanted to advise the former
21     employees on?
22             A.   I was interested and I just would
23     read the LinkedIn.  I didn't go into a lot of the
24     other documents.
25             Q.   You were satisfied that you were
```

1            TROWBRIDGE - CONFIDENTIAL

2    Let's go see if this is the letter that you're

3    referring to then.

4                 A.   Okay.

5                 MR. ROSENTHAL:  So let's mark as

6    Exhibit -- are we up to 16?

7                 THE REPORTER:  Yes.

8                 MR. ROSENTHAL:  A document TP1 to TP7.

9                 NNI EXHIBIT NO. 16:  Letter, stamped

10                TP1 to TP7.

11                BY MR. ROSENTHAL:

12                Q.   Again I'll represent to you that I

13   believe that in your documents is a copy of the

14   same letter but just with a stamp with your

15   initials on it, but I have marked this one here

16   just because yours is part of a bigger document

17   that was put together.

18                Do you recognize this letter here that

19   I have marked?

20                A.   I do, yes.

21                Q.   Is this the letter that you were

22   just referring to?

23                A.   Yes, it is.

24                Q.   And this is what caused you to

25   change your view about your eligibility to have a

```
 1              TROWBRIDGE - CONFIDENTIAL
 2   claim against the U.S.?
 3              A.   Yes.
 4              Q.   Why don't you take a look at this
 5   letter, take as much time as you need, and tell me
 6   if this refreshes your recollection.
 7              A.   Yes, because it says, this is the
 8   clause here, that if we had this clause in our
 9   letter that we would be eligible for it.
10              Q.   And when you say "this clause,"
11   you're talking about the top of page 2?
12              A.   Correct.
13              Q.   When you read this -- strike that.
14              When you first read this after you were
15   advised of your severance from Nortel back in 2008,
16   did you believe that this gave you a basis for a
17   claim against the U.S.?
18              A.   In 2008?
19              Q.   Yeah.
20              A.   No.
21              Q.   Why didn't you believe that it
22   gave you a basis for a claim against the U.S. at
23   that time?
24              A.   I would not have thought of it.  I
25   wouldn't even know why it would.
```

1                TROWBRIDGE - CONFIDENTIAL

2                Q.   Did you understand in 2012 or 2013

3    why somebody was advising you that it, in fact, did

4    give you a basis for a claim?

5                A.   I don't -- I don't know exactly

6    why it does, but our lawyers have told us that it

7    does so I am assuming that they understand why it

8    does.

9                Q.   When you say your lawyers, you're

10   talking about Ms. Mersky and her firm?

11               A.   Correct.

12               Q.   Have you got any advice --

13               MS. MERSKY:  Objection --

14               THE WITNESS:  Not Ms. Mersky, I'm

15   sorry, no.

16               MS. MERSKY:  Objection to the extent

17   that it asks for attorney/client privilege.

18               BY MR. ROSENTHAL:

19               Q.   I'm just trying to get into when

20   you refer to lawyers --

21               A.   Koskie.

22               Q.   Of the Koskie Minsky firm?

23               A.   Yes.

24               Q.   So the Koskie Minsky firm has

25   advised you that this may give you a basis for a

1                    TROWBRIDGE - CONFIDENTIAL

2                    Q.    You are aware, for example, that

3      we're here today because your lawyers filed a

4      motion to ask the court to allow you to file --

5                    A.    Yes.

6                    Q.    -- a late claim?

7                    A.    Yes.

8                    MS. MERSKY:  Let him finish his

9      question.

10                   BY MR. ROSENTHAL:

11                   Q.    You're aware -- strike that.

12                   As we saw from the LinkedIn postings,

13     you were aware back in 2009 that there had been a

14     deadline then for U.S. claims, correct?

15                   A.    Yes.

16                   Q.    Were you at all upset that it took

17     until years after the deadline for anybody to give

18     you any advice that you might have a basis for a

19     claim?

20                   A.    I was upset to the point maybe

21     that I didn't know about it, like why did nobody

22     know upfront, why did it take that long, yes.

23                   Q.    And did you express that opinion

24     to anybody?

25                   A.    No, because then I was -- once we

```
 1              TROWBRIDGE - CONFIDENTIAL
 2    knew that we could do it, they were working on it.
 3              Q.    Did you ever ask anybody why it
 4    took so long after the deadline to provide you with
 5    this advice that you might have a claim?
 6              A.    No, but as soon as we were told
 7    that we could do this, that's when they hired a
 8    lawyer for us and action has been taking place.
 9              Q.    You're aware that Koskie Minsky is
10    a Canadian law firm, correct?
11              A.    Yes.
12              Q.    You are aware that they are not
13    U.S. lawyers, correct?
14              A.    I don't know.  Sorry, no, I don't
15    know if they are or they aren't.
16              Q.    Do you recall that Paula Klein had
17    numerous postings on the LinkedIn website about
18    Koskie Minsky only providing Canadian law advice?
19              A.    Yes.
20              Q.    You weren't counting on Koskie
21    Minsky to provide you with any U.S. law advice,
22    correct?  Fair to say?
23              A.    No.
24              Q.    No, you weren't?
25              A.    No, I don't think I was expecting
```

1              TROWBRIDGE - CONFIDENTIAL

2      any.

3              Q.   Do you know whether -- strike

4      that.

5              Let's just turn to a different source

6      of information.  We looked at LinkedIn and I have

7      asked you some questions about the Koskie Minsky

8      newsletters.  I've also referred you to the U.S.

9      website and the Monitor's website.

10             Let me ask you about the Koskie Minsky

11     website and I'd like to show you what we'll mark as

12     Exhibit 17 and it's going to be a document that's

13     LI2793 to 2795.

14                  NNI EXHIBIT NO. 17:  LinkedIn posting

15                  dated June 2, 2009, stamped LI2793 to

16                  LI2795.

17             BY MR. ROSENTHAL:

18             Q.   So this is a posting from June

19     2nd, 2009 where Ms. Klein, the heading is "Good

20     summary on KM website of legal motions," and she

21     writes:

22                  "This might be a good website

23                  to bookmark.  KM seems to be doing a

24                  fairly good job of keeping this page

25                  up to date."

TROWBRIDGE - CONFIDENTIAL

1

2          Did you ever look at KM's website for

3   information about Nortel?

4          A.    No.

5          Q.    Why not?

6          A.    It was just timing.  I didn't go

7   through all the websites and links.

8          Q.    Sitting here today, besides

9   LinkedIn are there any other websites that you

10  remember looking at?

11         A.    No.

12         Q.    Why don't we mark as Exhibit --

13  we've already marked as Exhibit 6 - do you have it

14  there? - the posting that Ms. Klein writes:  "New

15  members read this."

16         A.    Yes.

17         Q.    And in this notice to new members

18  she refers to the KM website in the third

19  paragraph.  In the fifth paragraph she refers to

20  the Monitor's repository of official court

21  documents, and towards the bottom she has the link

22  to the NRPC membership group.  Do you see those

23  three?

24         A.    Yes.

25         Q.    And she also, if we look at the

1              TROWBRIDGE - CONFIDENTIAL

2              NNI EXHIBIT NO. 18:  Document,

3              "Questions from Listeners, Koskie

4              Minsky webcast, August 25, 2009,"

5              stamped JP116 to JP158.

6        BY MR. ROSENTHAL:

7              Q.   If you could just flip through

8   this and tell me whether this webcast, Questions

9   from Listeners, looks familiar to you.

10             A.   Yes, it does.  This might be the

11  one that I was thinking of.

12             Q.   Why don't we take a look at page

13  16 out of 43.  Number 102 says:

14              "Do I need to submit separate

15              claims for my pension and retiree

16              benefits, medical, LT care, life

17              insurance, et cetera?  Also do I

18              need to submit both in Canadian and

19              U.S. courts?

20              Answer:  It is likely that you

21              will only have to submit one claim

22              for the loss of all benefits earned

23              as a result of employment in Canada.

24              You will need to urgently file a

25              separate claim with the U.S. court

1              TROWBRIDGE - CONFIDENTIAL

2                    for the loss of any benefits earned

3                    as a result of employment in the

4                    U.S."

5                    Do you recall, whether it's in this

6    webcast or a different one, receiving that advice?

7                    A.   I don't recall ever reading that

8    or hearing it.

9                    Q.   At this point in time, back in

10   August of 2009, you weren't concerned about the

11   urgent need to file a claim in the U.S. because you

12   didn't believe you had any entitlement to a claim

13   against the U.S., correct?

14                   A.   That's correct.

15                   Q.   Let's turn to number 206 which is

16   on page 31 of 43, and it says:

17                    "Has the U.S. court granted a

18                    similar deadline and process

19                    exemption for the employees' pension

20                    benefit claims?  Is Koskie Minsky's

21                    focus on the Canadian court?  If so,

22                    who is representing the U.S. portion

23                    of my pension claim?"

24                    And the answer says:

25                    "The webcast presentation

```
 1                TROWBRIDGE - CONFIDENTIAL
 2                contents are applicable only to
 3                Canada and do not address the issues
 4                associated with the potential or
 5                actual loss of U.S. health or other
 6                benefits.  Koskie Minsky's
 7                representation for pensioners and
 8                former employees is limited to the
 9                Canadian courts.  To the best of our
10                knowledge there is no law firm
11                performing a similar function in the
12                U.S. courts.  You will need to
13                urgently file a separate claim with
14                the U.S. court for loss of any
15                benefits earned as a result of
16                employment in the U.S."
17                Do you see that?
18                A.   Yes.
19                Q.   At any point in time did anybody
20    ever advise you that Koskie Minsky had any
21    representation relating to the U.S. proceedings?
22                A.   No.
23                Q.   Is it fair to say that up until
24    the time you received that letter that we had
25    previously marked as Exhibit 16 that you had not
```

1              TROWBRIDGE - CONFIDENTIAL

2    yourself taken any steps to ascertain whether or

3    not you had a claim against the U.S.?

4              A.   That's correct.

5              Q.   And is it fair to say that up

6    until the time when you received Exhibit 16, you

7    did not believe you had a claim against the U.S.?

8              A.   I didn't even think about it one

9    way or the other.  I wasn't employed in the U.S. so

10   I would not have thought of that.

11             Q.   Up until the time you received

12   Exhibit 16 had you considered whether or not you

13   had a claim against any former employees of Nortel?

14             A.   No, I would not have considered

15   that.

16             Q.   Sitting here today, do you believe

17   you have any claims against --

18             A.   Against former employees?

19             Q.   Yeah.

20             A.   No.

21             Q.   You don't believe you do?

22             A.   No, I don't believe I do.

23             Q.   Have you ever read any of the

24   Monitor reports in connection with the Nortel

25   bankruptcy?

```
 1              TROWBRIDGE - CONFIDENTIAL
 2              A.   No.
 3              Q.   Are you aware that Ernst & Young
 4  was appointed as the Monitor over Nortel in Canada?
 5              A.   Yes.
 6              Q.   Are you aware that they
 7  periodically file publicly filed reports?
 8              A.   No, I'm not aware.
 9              Q.   So I take it you've never read any
10  of their reports previously?
11              A.   No.
12              Q.   I think earlier we had seen that
13  Ms. Klein had posted the link to the Monitor
14  reports in one of the LinkedIn.  Is there any
15  particular reason why you never looked at those
16  reports?
17              A.   No.
18              Q.   Just weren't interested or didn't
19  have time?
20              A.   It was probably the time.  I had
21  other things going on in my life at that time as
22  well.
23              MR. ROSENTHAL:  Why don't we take a
24  five-minute break.  We may be close to finishing.
25  I want to look at my notes.
```

1               TROWBRIDGE - CONFIDENTIAL

2               THE WITNESS:  Okay.

3               BY MR. ROSENTHAL:

4               Q.   And remember the paragraph I read

5    to you earlier that says "The webcast presentation

6    contents are applicable only to Canada."

7               And it says that Koskie Minsky's --

8               MS. MERSKY:  Objection as to the form

9    of the question as it is misleading because --

10              MR. ROSENTHAL:  I will read the entire

11   answer.

12              BY MR. ROSENTHAL:

13              Q.   The webcast presentation --

14              MS. MERSKY:  Objection as to form of

15   the question because it doesn't reflect as asked

16   what that response is related to.

17              MR. ROSENTHAL:  Can I finish my

18   question?

19              MS. MERSKY:  You reflected on the

20   record that you would read the entire question.

21   The question starts with number 204 and that is

22   what I am directing you to.

23              BY MR. ROSENTHAL:

24              Q.   Feel free to read any portion of

25   this that you wish, but my question is much simpler

```
 1              TROWBRIDGE - CONFIDENTIAL
 2    though.  Earlier when I was asking you questions
 3    and I directed you to this, you testified that it
 4    was your recollection as well that Koskie Minsky
 5    was only representing former employees with respect
 6    to Canada, correct?
 7              A.   Yes.
 8              Q.   Is that still your recollection?
 9              A.   Yes.
10              Q.   And it was your recollection that
11    Koskie Minsky had advised you that there was no law
12    firm performing that function with respect to the
13    U.S. proceedings, correct?
14              A.   Yes.
15              Q.   But you weren't concerned about
16    getting a law firm to help you with the U.S.
17    because you believed you had no claims against the
18    U.S., correct?
19              A.   Correct.
20              Q.   That remains your truthful
21    testimony?
22              A.   Yes.
23              Q.   Ms. Mersky asked you whether you
24    would have filed -- what you would have done if you
25    had gotten a claim form from the U.S. and you said
```

1                    TROWBRIDGE - CONFIDENTIAL

2    you would have filed it.  Do you recall that a few

3    moments ago?

4              A.    Yes, yes.

5              Q.    In 2009 if you had gotten a claim

6    form from the U.S. --

7              A.    Yes.

8              Q.    -- you had believed at that point

9    in time that you had no claim against the U.S.,

10   correct?

11             A.    That's correct.

12             Q.    Would you have filed a claim form

13   in 2009 against the U.S. even if you believed you

14   had no claim?

15             A.    Well, if I didn't believe I had a

16   claim, then no, I wouldn't have filed.

17             MR. ROSENTHAL:  I have no further

18   questions.  Thank you.

19   -- Whereupon the deposition adjourned at 3:58 p.m.

20

21

22

23

24

25