# EXHIBIT 141

*In Re:*

*NORTEL NETWORKS INC., et al*

---

*ANTHONY CINICOLO*

*February 14, 2014*

*Confidential*

---



**126 East 56th Street, Fifth Floor New York, New York 10022**

**PHONE: (212) 750-6434   FAX: (212) 750-1097**

**www.ELLENGRAUER.com**

*Original File 106221.TXT*

*Min-U-Script® with Word Index*

1              CINICOLO - CONFIDENTIAL

2              Q.    What happened on that phone call?

3              A.    I was on the phone with my manager

4    and I believe an HR representative, and they had

5    sent me something to my email account, which I

6    believe is this PDF document.  And it was a very

7    short discussion.  They basically said that they

8    were sorry that they had to lay me off and to

9    review the document and that I was to be provided

10   the severance indicated, to return any materials

11   back to Nortel prior to the -- I think I was given

12   a date here somewhere, early January, January 9th,

13   yeah, with a signature on the document by that

14   date.

15             Q.   Did you review the letter during

16   the phone meeting?

17             A.   Which meeting?

18             Q.   This, the phone conversation --

19             A.   Oh, with HR and my --

20             Q.   Yes.

21             A.   Yes, because we went through the

22   dollar amount and what they wanted from me and I

23   had to return my -- I had a PC, a laptop, and those

24   types of details, as well as when I would be

25   getting my severance.

1                    CINICOLO - CONFIDENTIAL

2                    Q.    Was it your manager or the HR rep

3    that explained the letter to you?

4                    A.    More the HR rep.

5                    Q.    Who was your manager at this time?

6    You said you had gotten a new one.

7                    A.    Yeah, it was like a two -- he had

8    just recently moved in.  Bob Fizzard had changed

9    roles, so it was maybe a month or two.  His name

10   was Tom Jenz, J-e-n-z.

11                   Q.    And where was Tom Jenz based?

12                   A.    Based out of Ottawa.

13                   Q.    On the last page of this letter,

14   it is marked 20 on the bottom, there is a signature

15   and a date January 6th, 2009.  Does that look like

16   your signature?

17                   A.    Yeah.

18                   Q.    And is the date the date that you

19   signed the letter?

20                   A.    It is the date I signed it and the

21   date I faxed a copy to HR Shared Services, I

22   believe, in -- I believe it was in Raleigh, yeah.

23                   Q.    After this phone conversation took

24   place, do you remember what you did?

25                   A.    Pretty much sat there in shock

```
 1                CINICOLO - CONFIDENTIAL
 2   after, you know, 23 years of working for this
 3   company.
 4             Well, yeah, I know what I was doing.  I
 5   was in the process of going for my PMP at that time
 6   as well, for the Project Management, and I said,
 7   you know what, I can't deal with this right now
 8   because I have to take this certification.  And I
 9   just focussed on getting that certification over
10   the next couple of weeks.  I think I had another
11   week or two of study.
12             Q.  And you completed that in December
13   I think you mentioned, right?
14             A.  Yeah.
15             Q.  Did you read the letter after the
16   meeting?
17             A.  Yes.
18             Q.  Did you read it carefully?
19             A.  Yes, I did.
20             Q.  Did you retain any legal counsel
21   before you signed the letter?
22             A.  Yes, I did.
23             Q.  And who was that counsel?
24             A.  It was Nelligan Power [sic], one
25   building over.
```

```
1                    CINICOLO - CONFIDENTIAL

2                    Q.    There is a law firm that is

3    mentioned in the documents by the name of Nelligan

4    O'Brien, is that --

5                    A.    NOP, sorry.

6                    Q.    Is that the same law firm that you

7    retained?

8                    A.    Yes, it is.

9                    Q.    And why did you retain Nelligan?

10                   A.    I wanted to know if what they were

11   offering me in terms of the financial severance was

12   in line with, you know, standards as well as the

13   amount of time I had spent with the corporation and

14   the position I had.   I just wanted to have someone

15   look at that and provide some guidance on, you

16   know, was it reasonable, right.   And that is what

17   really it was for, more just to review the

18   document.

19                   Q.    And did they review the document

20   on your behalf?

21                   A.    Yes, they did.

22                   Q.    And what did they tell you -- or,

23   excuse me, were you satisfied with whatever you

24   were told by Nelligan?

25                   A.    Satisfied?  No.  But I accepted
```

```
 1              CINICOLO - CONFIDENTIAL
 2    paragraph, it is the paragraph that reads:
 3                  "As used in this letter, the term
 4                  'Corporation' shall mean Nortel
 5                  Networks Corporation, its
 6                  subsidiaries and affiliates, their
 7                  successors and assigns, and all of
 8                  their past and present officers,
 9                  directors, employees and agents (in
10                  their individual and representative
11                  capacities), in every case,
12                  individually and collectively."
13              Is that the paragraph you read before
14    you signed the letter?
15              A.   Yeah, I read every paragraph and
16    everywhere else it talked about the corporation, so
17    yeah.
18              Q.   What did you understand
19    "corporation" to mean when you read this paragraph?
20              A.   You know, again, I thought it
21    meant and what I believed it always meant was the
22    Nortel as a whole, the corporation, the big mother
23    ship we called it, right, was providing me the
24    severance out of whatever vaults of dollars,
25    whatever they put aside for us to pay the
```

```
 1                  CINICOLO - CONFIDENTIAL
 2    severance.
 3                  Q.    And so it would mean Nortel
 4    Networks Corporation, its subsidiaries and
 5    affiliates?
 6                  A.    Yes.
 7                  Q.    And that would include all of its
 8    subsidiaries and affiliates regardless of where
 9    they were located?
10                  A.    Yes, I guess.   You know, again, I
11    knew that the main U.S. component was driving
12    everything else, but I didn't care about the
13    subsidiary in Australia and other parts of the
14    world, right.
15                  Q.    Other than Nelligan, did you --
16                  MS. MERSKY:   Sorry, I'm just directing
17    him to listen to the question.
18                  THE WITNESS:   No, I'm listening, sorry.
19                  BY MS. VANLARE:
20                  Q.    Other than Nelligan O'Brien, did
21    you discuss this termination letter with any other
22    attorney before you signed it?
23                  A.    Yes, I did.
24                  Q.    Who was that?
25                  A.    My wife.
```

CINICOLO - CONFIDENTIAL

1

2          Q.   Did you share in that frustration?

3          A.   I may not have written it in

4    LinkedIn, but I think all the folks shared, you

5    know, personally, privately.

6          Q.   Did you at any point ask why the

7    U.S. process was proceeding more quickly than the

8    Canadian process?

9          A.   Personally, no.

10         Q.   I would like to next show you

11   Exhibit 7.  This is another LinkedIn discussion,

12   and the first post is dated February 18th, 2009,

13   and it is by Betsy Hung.  Do you know Ms. Hung?

14         A.   No.

15         Q.   She writes:

16              "Go to [...]"

17         And then she provides a hyperlink for

18   the Chapter 11 Epiq website, and then she said:

19              "Click on 'Filed Claims &

20              Schedules' on top.

21               In the Debtor box, type NORTEL

22              then hit RETURN key.

23               You should see all claims

24              submitted against Nortel (265

25              claims).  If you want to see a

```
 1                    CINICOLO - CONFIDENTIAL
 2                    particular claim detail, click on
 3                    the blue image button on the right
 4                    to see the scanned document.
 5                        Even City of Richardson claims
 6                    $1.8M property tax.  I recognize
 7                    some of the managers from Richardson
 8                    or RTP.  Some of the claims were
 9                    submitted by currently employed
10                    employees for the deferred
11                    salary/bonus."
12                    Do you see that?
13                    A.   Yes.
14                    Q.   Did you ever visit the Epiq
15          website?
16                    A.   Yes.
17                    Q.   And do you remember what prompted
18          you to visit the Epiq website?
19                    A.   I believe that the Epiq website
20          also may have had information relating to bonuses
21          that were being provided to executives.
22                    Q.   And actually, let me show you
23          another exhibit --
24                    A.   Okay.
25                    Q.   -- which is Exhibit 8.
```

```
 1              CINICOLO - CONFIDENTIAL
 2   the question to the extent that it is misleading as
 3   to which discussion.
 4              BY MS. VANLARE:
 5              Q.   Do you recall going to the Epiq
 6   website to read any of the documents on the docket
 7   that are referred to in this LinkedIn discussion?
 8              A.   Yeah, I must have because I
 9   referred to it and, like I said earlier, around
10   that time with the bonuses I definitely was trying
11   to find more information.
12              Q.   I may have asked you this already,
13   but did you -- so this is around March of 2009.
14   Did you subsequently go back to the Epiq website
15   periodically to check to see if there was any new
16   information posted?
17              A.   I don't believe I did.  You know,
18   maybe a few times within 2009, but definitely not
19   after that.
20              Q.   Why not after 2009?
21              A.   You know, at that point I think
22   the message was wait for the claim process, you
23   know, wait to hear from KM what the next steps are.
24   And I was, you know, busy working, and you know,
25   that was it.
```

```
 1                    CINICOLO - CONFIDENTIAL
 2                Q.    If I could ask you to turn back to
 3    Exhibit 7, which I handed to you a few minutes ago.
 4                A.    7, okay.
 5                Q.    This was -- and I'll just refresh
 6    your memory.  This was the post by Ms. Hung where
 7    she talks about seeing filed claims on the Epiq
 8    website; do you see that?
 9                A.    Yes.
10                Q.    Did you consider at this point
11    whether you might have a basis for a claim in the
12    U.S.?
13                A.    No, I wasn't looking or even
14    considering that.  Again, waiting for my lawyers to
15    get back to me.  What interested me about this was
16    that I worked in Richardson for a month, so I
17    thought it was kind of funny and I had been to that
18    facility many times.  But other than that, that is
19    not what I took away.
20                Q.    She mentions that she had seen
21    claims filed by employees for the deferred salary
22    and bonus; do you see that?
23                A.    Yes.
24                Q.    Did you consider at any point that
25    as an employee, you could have filed claims in the
```

```
 1                CINICOLO - CONFIDENTIAL
 2   figured out, then we'll -- you know what I am
 3   saying?  It wasn't like, well, that is the U.S.
 4   estate.  I never really looked at it that way,
 5   because we were so global and we were so big and we
 6   had so many employees around the world, it was
 7   unreal.  You don't have companies like that, you
 8   know.
 9                Q.   But you know, given that you
10   weren't even sure which payroll you were on, right,
11   it may have been Canada and it may have been the
12   U.S., did you do anything to figure out whether
13   that might mean that you might have a claim in the
14   U.S.?
15                A.   I never went and investigated, and
16   like I said, other than waiting to hear back from
17   the legal team on what would be the process, like
18   regardless of where the money is coming from, me
19   living here, like how do I get what is owed to me
20   based on what the corporation promised in the
21   letter of severance.
22                Q.   And again, by "corporation" you
23   are talking about, you know, Nortel Networks and
24   all --
25                A.   The big Nortel.
```

1                    CINICOLO - CONFIDENTIAL

2                    Q.    And who was Mike Z.?

3                    A.    Mike Zafirovski, the CEO of

4      Nortel, former.

5                    Q.    And two posts down Paula Klein

6      responds:

7                         "The claims process in the U.S. is

8                         totally different to the claims

9                         process being worked on in Canada.

10                        Although it is true that in the U.S.

11                        the 'first' claims window has come

12                        and gone and 'some' people have

13                        submitted their claims, the U.S.

14                        claims process is far from over."

15                   Do you see that?

16                   A.    Yes.

17                   Q.    Do you remember having an

18     understanding in the middle of 2010, so

19     approximately June or so of 2010, that the U.S.

20     claims process had been over?

21                   A.    In June 2010 I was working on my

22     second job and not following LinkedIn as much or

23     even the issues with Nortel as much, just because,

24     again, I was focussed on my next career there.  And

25     so honestly, I didn't spend much time thinking

1              CINICOLO - CONFIDENTIAL

2     about the claims process.

3              Q.    Well, what were you doing in 2010

4     to follow what is happening at this point in the

5     Canadian proceedings and the U.S. proceedings?

6              A.    You know, I was just waiting to

7     hear.  Once KM I guess became our legal

8     representative, I was waiting to hear what we

9     needed to do to file our claims.  And even, you

10    know, in 2009 it was like the process is being

11    figured out, wait and see, and I just kind of

12    waited and see'd, you know.  I could not invest

13    more time and effort than I already had done to try

14    and understand what was going on because I needed

15    to focus on my new job.

16             Q.    How would you find out that there

17    was a new post on LinkedIn?

18             A.    I believe for anything that I

19    might have commented on or originated I would have

20    gotten a notification, but since I probably hadn't

21    gone back to LinkedIn for -- I'm pretty sure after

22    2009.  In 2010 I probably didn't do much.  In 2011

23    I think the federal government election was

24    starting up and I might have gone in a little bit

25    on that.  But you know, so unless I posted

CINICOLO - CONFIDENTIAL

1

2          A.    At the time of this posting, and

3    that is what this is about, yeah, I didn't know

4    that there was anything going on with the bar date.

5          Q.    You mentioned that you figured

6    that a deadline would be set for the claims process

7    in the U.S.  At any point did you go and try to

8    find out when that deadline would be?

9          A.    No, and not just the U.S., even

10   for Canada.  I just assumed, whatever the process

11   was, there would be some terms, dates or, you know,

12   that would be kind of the line in the sand and just

13   waiting to hear what those dates were.

14         Q.    Did you ever go on the Epiq

15   website to check when the claims bar date might be?

16         A.    No, no, I don't -- like I said,

17   whatever I did with Epiq was focussed on the

18   previous stuff we talked about.

19         Q.    Did you ever contact Koskie Minsky

20   to ask them about the U.S. process?

21         A.    No.

22         Q.    How about the Monitor, did you

23   ever contact the Monitor or Ernst & Young to ask

24   about the U.S. process?

25         A.    No.

```
1                  CINICOLO - CONFIDENTIAL
2              filing."
3              Do you see that?
4         A.    Yes.
5         Q.    Do you recall hearing in the fall
6   of 2009 or at any point in 2009 that if you were on
7   the U.S. payroll for Nortel or if you believed you
8   had a claim against the U.S. estate because of some
9   contractual agreement relating to your employment,
10  you may need to file a claim in the U.S.?
11        A.    No.
12        Q.    Do you recall reading this
13  discussion?
14        A.    Not at all.
15        Q.    Did you ever consider, given that
16  you were not sure whether or not you were on the
17  Canadian payroll or the U.S. payroll, that you
18  might need to file a claim in the U.S.?
19        A.    I didn't think I needed to do
20  anything.  Again, I thought it was all going to get
21  squared away with the lawyer, with the Monitor, if
22  they figure out who is -- you know, where the claim
23  should go.
24        Q.    Did you ever at any point contact
25  any lawyers in the U.S. to find out whether you
```

1                    CINICOLO - CONFIDENTIAL

2      needed to submit a claim in the U.S.?

3                    A.    No.

4                    Q.    So you didn't contact Koskie

5      Minsky to put you in touch with a Delaware lawyer?

6                    A.    Not at all.

7                    Q.    Did you at any point hear that

8      some Canadians had received letters telling them to

9      file claims in the U.S.?

10                   A.    At some point, yes, I mean, much

11     later.

12                   Q.    Do you remember when?

13                   A.    Well, I think right since we have

14     been looking at our claim now into the U.S., that I

15     don't know if it came up or where I heard it, but

16     someone had gotten something from the U.S. but it

17     was a mistake or -- that is what I heard.

18                   Q.    And that was in late 2012, early

19     2013, or earlier?

20                   A.    No, yeah, 2013 period.

21                   Q.    You mentioned earlier -- and you

22     can put the exhibit aside.  You mentioned earlier

23     that you didn't take any steps to investigate

24     whether or not you might have a claim in the U.S.

25     because Koskie Minsky had been appointed as the

1          CINICOLO - CONFIDENTIAL

2    legal representative; correct?

3          A.    Correct.

4          Q.    Did Koskie Minsky ever communicate

5    to you directly or indirectly that they would

6    represent your interests in the U.S. proceeding?

7          A.    The only communication I believe

8    related to that was only when we got that notice

9    saying we might have a claim in the U.S. and that

10   Rachel was being -- you know, looking like KM was

11   going to deal with Rachel and looking at the

12   possibilities of that claim.  And other than that,

13   that was about it.

14         Q.    And that was in early 2013?

15         A.    2013, yes.

16         Q.    So prior to that time, they

17   didn't, as far as you can recall, they never said

18   that they were representing you in the U.S.

19   bankruptcy proceeding?

20         A.    No, I don't believe I received

21   anything specifically indicating that.

22         Q.    Did you receive anything from the

23   Monitor or did you hear anything from the Monitor

24   directly or indirectly that the Monitor was looking

25   after your interests in the U.S. proceeding?

1              CINICOLO - CONFIDENTIAL

2                  Q.    Do you recall at the time that

3      Koskie Minsky was appointed hearing from anyone or

4      from anywhere that they would pursue your claims

5      against all of Nortel's subsidiaries and

6      affiliates?

7                  A.    Sorry, could you repeat the

8      question?

9                  Q.    At the time that Koskie Minsky was

10     appointed, did you hear from any source that Koskie

11     Minsky would pursue your claims against all of

12     Nortel's subsidiaries and affiliates?

13                 A.    I assumed that that's what they

14     were going to do since, again, the letter we were

15     using as our contract with the corporation, you

16     know, they were taking and representing us based on

17     that information, so which was much later, once we

18     got the claim information back.  But when they were

19     appointed, I said, okay, Koskie Minsky is going to

20     look after us now and work whatever the process

21     required to get us our claim.

22                 Q.    Did you know that they were

23     Canadian lawyers?

24                 A.    I knew they were based out of

25     Toronto, but a lot of law firms are multinational,

```
 1              CINICOLO - CONFIDENTIAL
 2   different, which is whether you recall seeing
 3   information about the U.S. claims bar date in any
 4   Koskie Minsky bulletins, and it was a little bit
 5   unclear whether you think that you did see
 6   information and thought that it didn't apply or
 7   whether you don't recall seeing any information
 8   relating to the bar date in Koskie Minsky's
 9   bulletins?
10              A.   I don't recall seeing any
11   information related to the U.S. bar date until I
12   saw it from NRPC, like I said, back in January
13   2013.
14              Q.   If you had seen information
15   relating to the U.S. bar date, what do you think
16   you would have done?
17              A.   That is speculative, right?  I
18   don't know.
19              Q.   Do you think you may have looked
20   into it or you don't -- or you think you would have
21   thought that this doesn't apply to me?
22              A.   In my mind, I had -- again, I have
23   lawyers there looking out for me.  If they thought
24   it was important for me to do something, I would
25   have expected them to say it.  You know, I don't --
```

1                    CINICOLO - CONFIDENTIAL

2    I know cross-border stuff is complicated and,

3    again, in this case, this case is a very

4    complicated case, so I wasn't going to try and

5    figure it out if the experts weren't telling me I

6    should be concerned.

7                    Q.    So if you got information, other

8    than from Koskie Minsky, but if from somewhere else

9    you got information telling you that a U.S. bar

10   date had been set for September 30, do you think

11   you would have done anything?

12                   A.    You know, if another lawyer would

13   have said, hey, you know, there is a bar date here

14   and maybe you should be interested in this, maybe I

15   would have gone and asked Koskie Minsky and said,

16   hey, someone told me there is something I should be

17   interested in here, can you guys clarify.  But I

18   never received such correspondence.

19                   Q.    But seeing a notice of the bar

20   date or seeing a Koskie Minsky bulletin, would that

21   have led you to investigate whether the bar date

22   was relevant to you?

23                   A.    Again, it didn't trigger anything

24   because, you know, bar date U.S., bar date England,

25   you know, lawyers, you guys need to tell me if I

1                CINICOLO - CONFIDENTIAL

2   need to be concerned with it, and I was relying on

3   them for their expertise to help me navigate

4   through the process.

5                So you know, especially at that time,

6   again, I am focussed on a new job and I am very

7   selective on what I could focus my time on, and if

8   the lawyers didn't raise the flag and say that you

9   guys need to focus on this, I didn't have the time

10  or the patience to start looking at it.

11               Q.   And by "lawyers", are you

12  referring to Koskie Minsky?

13               A.   Yes.

14               Q.   At some point you formed the view

15  that you might be able to have claims against the

16  U.S. estate; correct?

17               A.   Yes, in January 2013.

18               Q.   And do you remember what prompted

19  that?

20               A.   I believe it could have been

21  something on LinkedIn or -- I don't remember

22  exactly how I got the information.  It could have

23  been a colleague mentioning it to me.

24               Q.   I would like to show you Exhibit

25  16.  Do you recognize this document?

1              CINICOLO - CONFIDENTIAL

2    to why you might be able to file a claim against

3    the U.S. estate?

4              A.   Well, I think it is because we

5    have this agreement that specifies Nortel, the

6    corporation, which supercedes I believe, you know,

7    the references of the different subsidiaries, and

8    that is why we have a claim.

9              Q.   And if I could ask you to turn to

10   the second page of this letter, on the top there,

11   there is a reference to a clause in termination

12   letters and it begins:

13               "As used in this agreement, the

14               term 'Corporation' shall mean [...]"

15               etc.

16          Do you see that?

17          A.   Correct, yes.

18          Q.   And this was the same provision

19   that we had talked about earlier that appears in

20   your termination letter; correct?

21          A.   Yes.

22          Q.   And as we talked about before,

23   "corporation" is defined broadly to include its

24   subsidiaries and affiliates; correct?

25          A.   Yes.

1                    CINICOLO - CONFIDENTIAL
2                    Q.    This language was in your
3    termination letter in 2008; correct?
4                    A.    Yes.
5                    Q.    So given that it was in the letter
6    in 2008 and that you are seeking to file a claim in
7    the U.S. now in 2014, or I guess at the time that
8    you were submitting this letter in 2013, why didn't
9    you seek to file a claim back in 2009, given that
10   this language appeared in your termination letter?
11                   A.    I was clearly relying on my legal
12   counsel to provide me direction on where to file
13   the claim and how to file the claim against the
14   corporation.  I had a lawyer look at it prior to
15   the time they declared bankruptcy, and you know,
16   they didn't indicate anything, you know, oh, you
17   should go after Nortel U.S. or Nortel England or
18   whatever.  And then when Koskie Minsky -- or when
19   NOP was continuing to be involved, it was never
20   brought up.  And when KM took over, you know, I
21   only found out about it, you know, in January 2013.
22                   So two different law firms, and I don't
23   want to put my wife in this thing because she is
24   not a contract lawyer, but we can say three lawyers
25   had a look at the terms of what was written and no

1    CINICOLO - CONFIDENTIAL

2    one picked up on the fact.  And I am not a lawyer.

3              Q.   If you read this provision, the

4    term "corporation" includes not only subsidiaries

5    and affiliates, but it goes on to include:

6                   "[...] their successors and

7                   assigns, and all of their past and

8                   present officers, directors,

9                   employees and agents (in their

10                  individual and representative

11                  capacities), in every case,

12                  individually and collectively."

13             Do you see that?

14             A.   Yes.

15             Q.   Have you considered pursuing

16   claims against any of Nortel's past and present

17   officers, directors, employees and agents?

18             A.   If I had the financial capability,

19   I would have loved to put claims against every one

20   of them.  And off the record, I would have done

21   more than just put a claim against Mike Zafirovski,

22   if you know what I mean, off the record.  But yeah,

23   if I had the financial capabilities, sure.

24             Q.   Have you investigated the costs

25   associated with --