# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>NORTEL NETWORKS, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 09-10138 (KG)<br>Jointly Administered<br><br>Re: D.I.'s 9362, 9412, 9418, 9441, 9451, 9641, 10016, 10484,<br>11201, 11821, 12504, 13237, 13240,<br>13250,15228,15229,15234, 15334<br><br>**Hearing Date: March 26, 2014 at 10 a.m.** |

**SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION OF AD HOC COMMITTEE OF CANADIAN EMPLOYEES TERMINATED PRE-PETITION FOR ENTRY OF AN ORDER ALLOWING CLAIMS TO BE FILED AFTER THE BAR DATE**

## I.    SUMMARY OF THE PROCEEDINGS

The Ad Hoc Committee of Former Canadian Employees Terminated Pre-Petition ("Movants") is comprised of a discrete, quantified group of 170 individuals that worked tirelessly for Nortel as dedicated employees.[2] Many of the members of the group devoted nearly their entire professional careers to making Nortel the substantial company it became. Movants are all former employees of Nortel who were employed in Canada at the time they were terminated. They made significant contributions that allowed Nortel to be liquidated for over 7.3 billion dollars. The Movants viewed Nortel as a global company with locations throughout the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Alteon WebSystems, Inc. (9769), Alteon WebSystems International, Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

[2] A list of Movants was attached to Doc. #13240 as Exhibit A. The list remains unchanged and is attached as Exhibit 1.

world.[3] Movants worked directly with colleagues in the U.S. without any notion of borders or corporate distinctions.[4]

The narrow issue before this Court is the right of Movants to file claims against the Debtors after the expiration of the U.S. bar date. The claims are limited to termination benefits earned by the claimants prior to the Petition Date and, if ultimately allowed in full, an issue not yet before this Court, would total less than $18,000,000. Each of the termination agreement letters (the "Termination Agreements") was produced to the Debtors shortly after the filing of this Motion.

Contrary to the aspersions cast by the Debtors, the claims are being made in good faith and in a reasonable and timely fashion. The Movants are all former Nortel employees that worked in Canada and that have a right to assert a claim for termination benefits against the Debtors. Movants were first identified in the spring of 2012.[5] And, as will be described in detail herein, in the summer and fall of 2012, KM LLP, the Court Appointed Counsel for the Canadian Nortel pensioners, disabled employees and terminated employees notified the Debtors of approximately 300 individuals that each had a claim against Debtors.[6] In an effort to resolve the limited extension of the bar date for these specified individuals without incurring unnecessary and costly litigation, KM LLP tried to negotiate a narrow extension of the bar date.[7] During a conference call on or about September 24, 2012, between KM LLP and Debtors', Debtors' counsel requested that KM LLP identify the affected individuals, and KM LLP timely replied

---

[3] *See* Exhibit 2, comprised of deposition testimony of Pierre Blais at 33-36; Ernie Briard at 30-32, 53-55; Michael Campbell at 31; Anthony Cinicola at 30, 80-81,116-117; Betsy Hung at 27-28, 56; Daniel Jin-Ming Leung at 22, 33-34, 66, 80-81; Anthony Law at 22-24, 39-40; Julia Piggott at 30, 42-43; Paul Roddick at 30-31.
[4] *Id.*
[5] *See* Exhibit 3, Affidavit of Michael Campbell dated February 1, 2013 at ¶¶21-24; *see also* Exhibit 4, July 2012 emails between the Monitor and Koskie Minsky LLP ("KM LLP") including a carbon copy to Michael Campbell.
[6] *See* Exhibit 5, Email string between Debtors' counsel and KM LLP, dated October 5, 2012 through December 7, 2012.
[7] *Id.*

with a complete list.[8] After these reasoned efforts to avoid wasteful litigation were exhausted, U.S. counsel was retained and promptly notified all possible parties of their rights and the process necessary to file their claims after the U.S. bar date.[9] The Motion was expeditiously filed as soon as all documentation of the right to file such claims was compiled. There was no undue delay and the timing of the filing of the Motion was unrelated to anything else that may have been taking place in the cross border proceedings.

It is undisputed that the Debtors did not serve actual notices of the proof of claim bar date upon Movants. It is further a matter of public record that the bar date notice published in Canada expressly warned, "If you believe that you have a claim against Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation or Nortel Networks Technology Corporation (the "Canadian Debtors") any such claims shall be filed in and only in, the Canadian proceedings with the Court appointed Monitor."[10] While the admonishment in the published notice was undoubtedly, in hindsight, intended only to prevent redundant filings, it was, at a minimum, ambiguous as to the obligations of parties that may have a right to assert the same claim against both the Debtors and the Canadian estate. Finally, under any circumstances, the Movants, at most, committed excusable neglect and should be allowed to file their claims after the U.S. bar date.

---

[8] *Id.*
[9] *See* Exhibit 3, Affidavit of Michael Campbell dated February 1, 2013 at ¶¶30-33; *see also* Exhibit 6, NRPC Notice Regarding Filing a Proof of Claim in US after the Bar Date.
[10] *See* Exhibit 7, Notice of Proof of Claim Deadline Published in Canada.

## II.     IDENTIFYING THE RED HERRINGS AND ADDRESSING THE TRUTHS

In an effort to distract from the substantive issues which Movants address in the Motion, the Debtors and the Creditor's Committee assert unsubstantiated and misguided allegations of bad faith. They decry that Movants can demonstrate no right to assert a claim against the Debtors and that the language in the Termination Agreements upon which Movants rely for their claims against the Debtors is the equivalent of mere surplusage and should be given no effect. Such spurious accusations are particularly onerous to Movants since they were the very people that created value to the Debtors' estates. The Movants are all former Nortel employees that worked in Canada alongside their American counterparts and earned the rights to their claims. They proceeded in a timely and efficient manner to pursue their claims. Furthermore, the assertions of bad faith are offensive, inaccurate, and without foundation.

### A.  THE ALLEGATIONS OF BAD FAITH ARE FALSE AND MERITLESS

As this Court is aware, the Canadian insolvency process is not precisely parallel to U.S. bankruptcy law. In this case, the Canadian Court appointed KM LLP to represent approximately 20,000 Nortel employees which include pensioners, disabled employees and terminated employees.[11] While the Canadian Monitor ("Monitor") in this case serves a function similar to that which a Trustee would provide in the U.S., the role is not precisely parallel. And, in this case, there is no officially sanctioned Canadian Creditors' Committee. There is, however an Ad Hoc Canadian Creditors Committee (the "CCC") to which KM LLP is counsel for one of the five CCC members and serves to represent the pensioners, former employees and disabled employees. To be clear, KM LLP is just one member of an Ad Hoc Creditor's Committee and the Movants are a very small subset of the group represented by KM LLP.

---

[11] *See* Exhibit 8, Canadian Order Retaining KM LLP.

While Debtors were establishing bar dates for proofs of claims, Nortel employees in Canada were being told that a separate claims process was being created for employee issues in Canada and that they must wait for that process to be created and completed.[12] They were repeatedly told that there was nothing for them to do and that they needed to wait for the process to be established and completed.[13]

In the U.S. case, however, any party that had a claim against Nortel was required to file a proof of claim by the bar date, unless the claim was scheduled for the correct amount. While a similar process was underway in Canada, that process did not apply to employees. A special process was created for employees in Canada in which the Monitor first evaluated employee claims and then provided a detailed letter to each employee specifying his or her claim. This employee process for former employees in Canada did not begin until well after the Canadian and the U.S. bar date had passed. Employees in Canada were repeatedly admonished to wait for the Monitor to determine their employee claim.[14] Once the Monitor sent the employee the evaluation of the employee claim nothing further needed to be done unless the employee disputed the amount calculated by the Canadian Monitor.

In the spring of 2012, the Canadian Monitor informed KM LLP that several employees had filed claims in the United States.[15] Those claimants included Dietmar Wendt, Lauren Flaherty and John Roese.[16] It was determined that each of the employees from Canada that had

---

[12] *See* Exhibit 9, Deposition Transcripts of Ernie Briard at 87-88, 125; Chris Buchanan at 113; Michael Campbell at 188; Paula Klein at 124-25; Jane Longchamps at 52-53; *see also* Exhibit 10, July 15, 2009 Pensioner and Former Employees News Bulletin at "The Claims Process" at 3.
[13] *See id.*
[14] *See* Exhibit 11, Transcript of August 2009 Questions from Listeners, Koskie Minksy Webcast at 15-17; *see also* Exhibit 12, August 5, 2009 Pensioners, Former Employees News Bulletin.
[15] *See* Exhibit 3, Affidavit of Michael Campbell dated February 1, 2013 at ¶¶21-24.
[16] *See* Exhibit 13, Filed Proofs of Claims of Dietmar Wendt, Lauren Flaherty and John Roese.

filed a claim in the U.S. had a termination agreement giving rise to a claim against the Debtors.[17] (As will be addressed below Dietmar Wendt, Lauren Flaherty and John Roese were each served with actual notice of the U.S. Bar Date.[18]) Upon further review of other claims of employees located in Canada the Monitor identified an additional 300 individuals with provisions in their Termination Agreements giving rise to a claim against the Debtors.[19] This information was provided to KM LLP, Michael Campbell, an employee representatives appointed by the Court to represent terminated employees and Paula Klein, a member of the Nortel Retiree and Former Employee Protection Canada "NRPC" legal committee proving input for terminated employee concerns.[20]

Michael Campbell and Paula Klein, worked with KM LLP to have the U.S. bar date extended for the limited group identified by the Monitor through a consensual process with the Debtors. Emails and calls were exchanged during the summer and fall of 2012.[21] On October 5, 2012, at Debtors' request, KM LLP provided a complete list of all individuals at issue.[22] Delays in responses from the Debtors were explained when Debtors' counsel asked for an extension to respond due to among other things, hurricane Sandy, however ultimately Debtors did not provide a response to the request.[23] After trying to negotiate a reasonable and limited extension of the bar date and ultimately getting no response from Debtors' counsel, it became clear to Mr. Campbell and Ms. Klein that this matter needed to be pursued through litigation.[24] It was determined that

---

[17] See id.
[18] See Doc. #1919 - Notice of Supplemental Bar Date.
[19] See Exhibit 3, Affidavit of Michael Campbell dated February 1, 2013 at ¶¶23-24; and Exhibit 4, July 2012 emails between the Monitor and KM LLP including a carbon copy to Michael Campbell.
[20] See id.
[21] See Exhibit 5, email string between the Debtors' counsel and KM LLP, dated October 5, 2012 through December 7, 2012.
[22] See id.
[23] See id.; See also Exhibit 3, Affidavit of Michael Campbell dated February 1, 2013 at ¶30.
[24] See Exhibit 3, Affidavit of Michael Campbell dated February 1, 2013 at ¶¶31-33.

the appropriate course of action was to retain counsel in the U.S.[25] In late December 2012 or early January 2013, Rachel Mersky of Monzack Mersky McLaughlin and Browder was selected as counsel in the U.S.[26] A notice and retention process was completed in less than four weeks.[27] Ms. Mersky required that each employee retaining her as counsel confirm that they did not receive notice of the U.S. bar date and that they had language in their Termination Agreements that provided for the right to pursue a claim against the Debtors.[28] On February 1, 2013, the Motion was filed and it has been vigorously pursued culminating in the pending hearing before this Court.

At no time was there any motivation other than justice and fairness that prompted the timing and process of pursuit of the right to file these claims after the U.S. bar date. Contrary to the after the fact, fictionalized allegations of conspiratorial conduct alleged by the Creditors Committee and the Debtors, the decision to seek approval to file claims after the U.S. bar date and the timing of that process had nothing to do with the cross-border negotiations and litigation. As set forth above, it was the timely discovery of these claims during the Canadian claims process that spurred the Movants to action. And, any delay between the discovery of these separate claims against the Debtors and the filing of the Motion was the direct result of trying to proceed in an orderly and non-litigious fashion with counsel for the Debtors to allow an extension of the bar date for a small, well quantified group of former Canadian employees with termination benefit claims.

Movants' claims are based upon releases and responsibilities in their Termination Agreements. Movants believed that, as employees located in Canada, they had to proceed for

---

[25] *See id.*
[26] *See id.; see also* Exhibit 6, NRPC Notice Regarding Filing a Proof of Claim in US after the Bar Date.
[27] *See id.*
[28] *See id.*

benefits through the Canadian process.[29] They understood that Nortel was a global company and that their claims were global claims.[30] They did not distinguish between borders and they thought that by proceeding as directed in Canada their claims would be fully protected against all estates.[31] As soon as they were told, contrary to their earlier understanding, that they had to actually file a separate claim against the Debtors and that they had to seek leave of the Court to file a claim after the bar date, they moved with unbridled speed. The Debtors and the Committee allege that the decision to pursue these claims and the timing of the action was an effort to somehow influence the mediation process or to advance a theory promoted by one member of the CCC in the allocation dispute. This allegation, however, is an allegory intended to mislead the Court and misrepresents the genuine motivations and legitimate rights of Movants. There was no manipulation or bad faith and the manufacturing of that argument by the Debtors and the Creditors Committee is a fictional tale.

### B. MOVANTS PROVIDED SIGNIFICANT CONSIDERATION TO DEBTORS FOR THE    BENEFITS PROVIDED BY THE DEBTORS UNDER THE TERMINATION AGREEMENTS

While the Motion only addresses the right to file a claim after the bar date, the Debtors proceed further and address the underlying claims. As a matter of law, if the claims are permitted to be filed after the bar date, this will not prejudice the Debtors rights to object to the claims. Nonetheless, the Movants claims are based on specific contractual rights against the Debtors and the precise amount of the termination benefit has already been calculated by the Monitor. The language in the Termination Agreements provides, "As used in this letter, the term "Corporation" shall mean Nortel Networks Corporation, its subsidiaries and affiliates, their

---

[29] *See* Exhibit 14, redacted Termination Agreement.
[30] *See* Exhibit 2, deposition transcripts of Pierre Blais at 33-36; Ernie Briard at 30-32, 53-55; Michael Campbell at 31; Anthony Cinicolo at 30, 80-81,116-117; Betsy Hung at 27-28, 56; Daniel Jin-Ming Leung at 22, 33-34, 66, 80-81; Anthony Law at 22-24, 39-40; Julia Piggott at 30, 42-43; Paul Roddick at 30-31.
[31] *See id.*

successors and assigns, and all past and present officers, directors, employees and agents (in their individual capacities) in every case individually and collectively."[32] Of the 170 Movants, over twenty-five percent (25%) were terminated by their U.S. supervisors.[33] And, while none of the Movants received actual notice of the Proof of Claim deadline, all of those forty-three (43) U.S.-named supervisors in the Termination Agreements were given actual notice of the U.S. bar date.[34] Crucially, all of the Movants Termination Agreements, whether by a U.S. Supervisor or a Canadian Supervisor had the same identification under the name of the supervisor, "Manager, Nortel Networks" without any Inc. or Corporation. There is no way to distinguish if this is Nortel Networks, Inc. (U.S.), or Nortel Networks Corp. (Canada).[35] And, the Termination Agreements concluded with: "We wish to express our appreciation for your efforts during your employment with the Corporation."[36] This is how the Movants looked at their employer. In their view, they worked for a global corporation without borders.[37] They were supervised and had employees across borders without distinguishing that they worked for one corporation and that their U.S. counterparts worked for another corporation.[38] Finally, the Termination Agreement directed that the signed Termination Agreement be returned to the HR Shared Service Center which was

---

[32] *See* Exhibit 14, redacted Termination Agreement.

[33] *See* Exhibit 15, forty-three (43) Termination Agreements with U.S. Supervisors' names on signature block and Summary Chart with confirmation of their addresses in the U.S. compiled from the Debtors' Service List for the Notice of Bar Date *Doc.* # 1354.

[34] *See* Doc. #1354 Affidavit/Declaration of Bar Date Notice.

[35] *See, e.g.*, Exhibit 14, redacted Termination Agreement and Exhibit 15, forty-three (43) Termination Agreements with U.S. Supervisors' names on signature block and Summary Chart with confirmation of their addresses in the U.S. compiled from the Debtors' Service List for the Notice of Bar Date Doc. #1354.

[36] *See id.*

[37] *See* Exhibit 2, deposition testimony of Pierre Blais at 33-36; Ernie Briard at 30-32, 53-55; Michael Campbell at 31; Anthony Cinicolo at 30, 80-81,116-117; Betsy Hung at 27-28, 56; Daniel Jin-Ming Leung at 22, 33-34, 66, 80-81; Anthony Law at 22-24, 39-40; Julia Piggott at 30, 42-43; Paul Roddick at 30-31.

[38] *See id.*

located in Triangle Park, North Carolina.[39] The Movants believed that they worked for an international company, and that the work they performed benefitted and was part of the whole.[40]

The reason for the broad definition of "Corporation" in the Termination Agreements is consistent with Nortel's self-image. In fact, one of the Movants, Wes Mundy, was a significant witness in a U.S. patent case where the U.S. Court of Appeals for the Federal Circuit Court identified him as a Northern Telecom Wireless Networks ("NTI") engineer and his testimony was critical to upholding valuable rights for NTI.[41] Furthermore, NTI's counsel, Robert Neuner of Baker & Botts, L.L.P. personally wrote to Mr. Mundy and noted, "The decision is particularly noteworthy because it makes you an official part of American patent jurisprudence."[42]

The Movants provided actual and valuable consideration to the Debtors in exchange for the Termination Agreements. Movants confirmed in the Termination Agreements that any right title and interest to all intellectual property was assigned to the Corporation.[43] And, in consideration for the release in the Termination Agreement, Movants, "release and forever discharge the Corporation from any and every type of claim against the Corporation, its directors, officers, employees and representatives of and from all manner of actions, causes of action, suits, debts, accounts, covenants, contracts, claims including without limitation claims under applicable employment standards and human rights legislation, and demands

---

[39] *See* Exhibit 14, redacted Termination Agreement and Exhibit 15, forty-three (43) Termination Agreements with U.S. Supervisors' names on signature block and Summary Chart with confirmation of their addresses in the U.S. compiled from the Debtors' Service List for the Notice of Bar Date Doc. #1354.

[40] *See* Exhibit 2, deposition testimony of Pierre Blais at 33-36; Ernie Briard at 30-32, 53-55; Michael Campbell at 31; Anthony Cinicolo at 30, 80-81,116-117; Betsy Hung at 27-28, 56; Daniel Jin-Ming Leung at 22, 33-34, 66, 80-81; Anthony Law at 22-24, 39-40; Julia Piggott at 30, 42-43; Paul Roddick at 30-31.

[41] *See* Exhibit 17, p. 5, *Octel Communications Corporation and Northern Telecom, Inc. et. al v. Theis Research, Inc.*, 132 F. 3d 51 (Fed. Cir. 1997).

[42] *See* Exhibit 18, November 10, 1997 Letter from Robert Neunen to Wes Mundy.

[43] *See* Exhibit 14, redacted Termination Agreement and Exhibit 15 forty-three (43) Termination Agreements with U.S. Supervisors' names on signature block and Summary Chart with confirmation of their addresses in the U.S. compiled from the Debtors' Service List for the Notice of Bar Date Doc. #1354.

whatsoever."[44] Since many of the Movants had supervisors or employees in the U.S., these releases provided real and valuable consideration, not only in regard to patent claims, but all possible employment law or human rights claims they had or may have had.[45] The Termination Agreements provided the precise kind of consideration and releases you would expect from such an agreement. The Termination Agreements also expressly prohibited Movants from recruiting or soliciting employees of the Corporation.[46] Consequently, the Termination Agreements benefitted the entire Corporation, as defined in the Termination Agreements and prevented Movants from soliciting their colleagues in Canada and the U.S. to work with them in future endeavors. The Debtors suggestion that the language defining Corporation should be ignored as mere surplusage is completely meritless.

### III.    LEGAL STANDARD FOR ALLOWING CLAIMS TO BE FILED AFTER THE BARDATE

#### A.  MOVANTS WERE KNOWN CREDITORS THAT WERE REQUIRED TO RECEIVE ACTUAL NOTICE OF THE BAR DATE.

Due process necessitates that known creditors receive actual notice of the bankruptcy proceedings. *Chemetron Corp. I v. Jones*, 72 F3d. 341 (3rd Cir 1995); *City of New York v. New York, N.H. & H.R. Co.*, 344 U.S. 293, 296, 73 S.Ct. 299, 301, 97 L.Ed. 333 (1953). A known creditor is one whose identity is either known or reasonably ascertainable by the debtor[47].. "Reasonable diligent efforts" are required to ascertain a creditor's identity. A creditor's identity is reasonably ascertainable if the creditor can be identified through reasonably diligent efforts and the requisite search is focused on the debtor's own books and records. *In re New Century TRS Holdings*, 465 B.R. 38 (Bankr. D. DE 2012); *Mennonite Bd. of Missions v. Adams*, 462 U.S.

---

[44] *See id.*
[45] *See id.*
[46] *See id.*
[47] *See id.*

791, 798 n. 4, 103 S.Ct. 2706, 2711 n. 4, 77 L.Ed.2d 180 (1983). Furthermore, the reasonably ascertainable standard requires an analysis of the facts of each case. *Chemetron I*, 72 F.3d at 346.

The total number of employees terminated pre-Petition with Termination Agreements was determined by the Monitor to be 300 of which 170, after notice and an opportunity to participate, continue to be Movants. Movants are a defined and limited group of individuals that are prosecuting the right to pursue claims at their own expense. "It is important to note that there is no bright-line rule to be applied in determining whether a particular creditor is known or unknown to a debtor for constitutional notice purposes. Rather, the known creditor analysis must properly focus on the totality of the circumstances in each case." *In re J.A. Jones, Incorporated*, 492 F.3d 242 (4th Cir. 2007). Movants' Termination Agreements had a signature block for Movants' direct supervisors.[48] Debtors consequently knew, or should have known of Movants since Debtors employees terminated many of the Movants. The signature block in the Termination Agreement, whether by a U.S. supervisor or a Canadian supervisor, identified the terminating supervisor as "Manager, Nortel Networks" (and not Nortel Networks Corporation or Nortel Networks, Inc.).[49] The Termination Agreements themselves reflect that they were prepared by HR Shared Services and Movants were directed to return the executed Termination Agreements to the HR Shared Service Center which was located in Triangle Park, North Carolina.[50] Movants were advised that if they had questions about the Termination Agreement they should call HR Shared Service Center in Triangle Park, North Carolina.[51] In the present case there are numerous factors establishing that this distinct group of former employees

---

[48] *See* Exhibit 14, redacted Termination Agreement and Exhibit 15 forty-three (43) Termination Agreements with U.S. Supervisors' names on signature block and Summary Chart with confirmation of their addresses in the U.S. compiled from the Debtors' Service List for the Notice of Bar Date Doc. # 1354.
[49] *See id.*
[50] *See id.*
[51] *See* Exhibit 19, January 28, 2009 Letter from Nortel to James Carew.

terminated pre-petition were known or reasonably ascertainable to the Debtors and should have been given actual notice of the bar date.

Furthermore, all forty-three (43) managers located in the United States and named as a signatory to Termination Agreements received actual notice of the U.S. bar date.[52] In addition, Debtors identify Dietmar Wendt, Lauren Flagherty and John Roese, all clients of Movant's counsel, as "similarly situated Canadian employees" that filed Proofs of Claim in late 2009. Debtors even go so far as attaching their claims as exhibits to their Supplemental Objection. What Debtors fail to reveal is that each of these individuals received actual notice of the supplemental proof of claim bar date.[53] And, only after receipt of that actual notice did they file proofs of claim. Since Debtors were able to identify what they themselves describe as "similarly situated Canadian employees" and to provide them with actual notice of the U.S. bar date, it seems incumbent upon Debtors to provide actual notice to Movants. Debtors were required to give actual notice to all known creditors and failure to give such notice to Movants is a fatal flaw requiring extension of the bar date for Movants.

### B. EVEN IF MOVANTS ARE NOT TREATED AS KNOWN CREDITORS, THE PUBLISHED NOTICE AS IT RELATES TO THIS DISTINCT AND LIMITED GROUP OF CLAIMANTS, WAS DEFECTIVE

Even if Movants are treated as unknown creditors they must be provided with adequate constructive notice through publication. *Pacificorp and Vancott Bagley Cornwall & McCarthy v. W.R. Grace*, 2006 WL 2375371 (D. Del. 2006). The bar date notice published in Canada expressly warned: "If you believe that you have a claim against Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation or Nortel Networks Technology Corporation (the "Canadian Debtors") any such claims shall be filed in, and only in, the

---

[52] *See* Doc. #1354 and Doc. #1919.
[53] *See* Doc. #1919.

Canadian proceedings with the Court appointed Monitor."[54] While the purpose of this admonishment may have been intended to keep claims against only the Canadian estates from being filed against the Debtors, the language, at a minimum, is ambiguous to Movants with claims against both the Canadian and U.S. Estates. The Notice validates the Movants belief, that as Canadians they were to file claims in Canada and only in Canada and then, only if they disagreed with the Monitor's analysis.

Due process requires notice that must be, reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action, afford them an opportunity to present their objections and reasonably convey all required information. *In re Freedom Communications, Inc.*, 472 B.R. 257 (Bankr. D. Del. 2012) *citing Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306,314 (1950); *Greyhound Lines, Inc. v. Rogers (In re Eagle Bus Mfg., Inc.)*, 62 F.3d 730, 735 (5th Cir.1995). And, failure to meet that standard is a serious procedural irregularity such that the bar date notice is inapplicable. *In re Freedom*, 472 B.R. 257; *Jones v. Chemtron Corp II*, 212 F.3d 199, 210(3rd Cir. 2000). The Notice by Publication of the bar date was significantly ambiguous and mislead Movants, a distinct and limited group, from receiving adequate notice and, consequently, the bar date must be lifted to allow them to file claims.

Debtors also cite to LinkedIn conversations involving some Movants about the existence of a U.S. bar date and to other references in KM LLP bulletins posted on the KM LLP website that mention a U.S. bar date. First, Debtors cannot rely on social media and website postings to provide notice of a bar date. Creditors are entitled to adequate notice of bar dates and are not themselves required to make independent inquiry to ascertain their existence. *Fed. R. Bankr. P.*

---

[54] *See* Exhibit 7, Notice of Proof of Claim Deadline Published in Canada.

2002(a)(7), 3003(c); *In re Wireless Data, Inc.*,547 F.3d 484 (2nd Cir. 2008). More importantly, however, even if some Movants independently learned about the existence of a U.S. bar date they were told that their claims, as former employees located in Canada, would be addressed in the special Canadian process.[55]

Movants did not understand that the Canadian process limited their rights to a separate Canadian estate and they were repeatedly admonished to wait for the Canadian process. Movants understanding, and the bar date notice published by Debtors all aligned to confirm that, as employment related claimants in Canada there was nothing further they should do.

### C. UNDER ANY CIRCUMSTANCES THE MOVANTS MEET THE STANDARDS OF EXCUSABLE NEGLECT AND SHOULD BE PERMITTED TO FILE THEIR CLAIMS AFTER THE BAR DATE

#### 1. THE MAZE OF DEBTORS AND THE AMBIGUOUS NOTICE INDEPENDENTLY ESTABLISH EXCUSABLE NEGLECT

It is black letter law that the Court can enlarge the time for filing a proof of claim where the failure to act was the result of "excusable neglect." *See, e.g., Pioneer Inv. Servs. Corp. v. Brunswick Assoc. Ltd. P'ship,* 507 U.S. 380, 113 S.Ct. 1489 (1993). And, even if this Honorable Court determines that Movants were not ascertainable and that the Published Notice was not so defective as to be inapplicable to Movants, the notice was at a very minimum, ambiguous or so confusing as to merit an extension as a "simple, faultless omission," which qualifies as excusable neglect.  *See Pioneer*, 507 U.S. at 388; *see also In re Spring Ford Indus., Inc.*, 2003 WL 21785960, at *2 (Bankr. E.D. Pa. July 25, 2003).

This is anything but a run of the mill late filed claim scenario. This case involves multiple Debtors, in multiple jurisdictions, with multiple liabilities running to the Movants. It is

---

[55] *See* Exhibit 10, July 15, 2009 Pensioner and Former Employees News Bulletin at "The Claims Process" at 3; *see also* Exhibit 11, Transcript of August 2009 Questions from Listeners, Koskie Minksy Webcast at 15-17.

undisputed that Movants participated, as required, in the special Canadian claims process created to address Movants claims against Nortel's Canadian entities. Movants were not recalcitrant and they did not sit on their rights, they proceeded as they were directed through a complex maze. Since Movants believed that their claims were against "Nortel" and that their claims were been processed through "Nortel" they were taking action as directed. And, to the extent that there was constructive notice through publication of the U.S. bar date, the ambiguity in the publication directing that a claim in Canada should be filed only in Canada contributed to what, at most, could be deemed excusable neglect. *See, e.g., Pioneer*, 507 U.S. 380 (finding counsel's failure to file a proof of claim before the bar date was attributable to excusable neglect partly due to the fact that the notice of claims bar date was not prominently announced and accompanied by an explanation of its significance). A finding of excusable neglect is based on equity and depends on the particular circumstances and facts of the case. *Pioneer*, 507 U.S. at 395. Accordingly, excusable neglect is not "limited to situations where the failure to timely file is due to circumstances beyond the control of the filer." *Id.* at 391. This is a case where a multitude of issues and confusion between cross border filings resulted in a delay in understanding regarding the need to file a separate proof of claim against Debtors. Movants should not be prejudiced, by facts which, in at least some part, were exacerbated by the Notice by Publication.

## 2. ANY DELAY WAS NOT SO LENGTHY AS TO HAVE ANY ADVERSE EFFECT ON DEBTORS AND MOVANTS PROCEEDED DILIGENTLY

The first prong of the excusable neglect analysis is a multi-faceted examination to determine the prejudice to the debtor. This test includes an evaluation of the size of the claim with respect to the rest of the estate, the impact on judicial administration of the estate, the existence of a filed or confirmed plan and the effect on that plan, the disruptive effect that the

late filed claim would have on the plan or the economic model upon which the plan is based, and whether the plan would open the floodgates of litigation to other similar claims. *In re O'Brien Environmental Energy, Inc.*, 1888 F.3d 116 (3rd Cir. 1999). A review of these factors weighs overwhelmingly in favor of allowance of the filing of the claims. The maximum size of the total claim sought to be filed by Movants is less than $18,000,000. This is insignificant to an estate which holds more than $7,300,000,000 in its lock box for allocation and distribution. The total percentage is marginal to the Estate.

The second and third prongs of the analysis relate to the judicial administration of the estate and the effect on a plan of reorganization. While the Estate at issue here has been liquidated, there can be no plan of reorganization until the allocation is completed. The Debtors have been aware of the Movants since at least the summer of 2012 when counsel for the Debtors was contacted by KM LLP[56] and has had more than two years since the filing of the Motion to collect extensive discovery regarding the claims. The Debtors will be able to take the claims into consideration when drafting a plan of reorganization.

Furthermore, the *de minimis* amount constituting the entirety of Movant's claims, in proportion to the entire estate, will mean that the allowance of these claims will have little, if any, effect on the plan of reorganization. Similarly, there can be no adverse effect on the economic model upon which a future plan is formalized for the reasons addressed above. Furthermore, even if the Debtors express concern about the potential economic impact of these claims, which would only be minimal, that factor does not constitute prejudice for determining allowance to file a claim after the bar date. *Manousoff v. Macy's Northeast, Inc. (In re R.H. Macy & Co.)*, 166 B.R. 799, 802 (S.D.N.Y.1994).

---

[56] *See* Exhibit 3, Affidavit of Michael Campbell dated February 1, 2013 at ¶¶29-30; and Exhibit 5, email string between the Debtors' counsel and KM LLP, dated October 5, 2012 through December 7, 2012.

The Movants' claims are for termination benefits, which have been vetted, analyzed and approved by the Canadian Monitor, such that once the claims are permitted to be filed, there should be no need for further analysis.  The Debtors have been provided with the documentation for the claims during the extensive period of discovery. Debtors' argument regarding the alleged "opening of the flood gates" is misguided. The Movants are a quantified group of 170 individuals who have claims against both the Canadian Estates and Debtors. Their claims arise from the special circumstances of the business relationship between Movants and the Debtors as reflected in the Termination Agreements. The confusion regarding the claims processes applicable to the Movants arose, in pertinent part, as a result of the parallel proceedings in the U.S. and Canada, as well as the disparate representations made in the U.S. and Canada. Movants' have always understood that they were proceeding against Nortel for benefits owed to them by the Corporation. Allowing Movants to file their claims after the bar date will not open the flood gates and cause undefined injuries to Debtors. Movants are a distinct, well defined group of specialized claimants with individual rights under specific Termination Agreements. Movants have engaged in this costly David versus Goliath battle using their own limited resources to compel equity for a right to assert a claim that they earned through their commitment to Nortel. This group of dedicated employees pursuing specific claims that arose during their tenure at Nortel will have no further effect upon Debtors.

The Debtors expend considerable efforts decrying the lapse of time from the bar date to the filing of the Motion and wish to penalize Movants for this process by seeking to deny them the opportunity to file claims against the Debtors. To start with, this is an extraordinarily complex multi-jurisdictional case with different processes applicable in different jurisdictions and parallel actions being played out simultaneously. As set forth in detail earlier, as soon as the

independent claims against the Debtors were discovered by the Monitor, KM LLP diligently proceeded in a reasoned and expeditious manner to work out an appropriate cross border resolution of a relatively small matter.[57] Unfortunately, Debtors even attack the usual and customary efforts to resolve things through counsel without the necessity of vexatious litigation. The Debtors themselves initially engaged in discussions with KM LLP and requested that KM LLP identify the effected individuals.[58] KM LLP responded in a timely manner. Unfortunately the discussions were ultimately one sided and the Debtors never responded to the request for a minimal extension of the bar date for this limited group of people.[59] As a result of Debtors' refusal to address this in a cost effective, non- litigious manner, the individual claimants were each contacted and given the opportunity to join Movants to litigate this matter. And, as set forth in detail earlier, the Motion has been prosecuted with all due speed and diligence. In the context of these cases the absolute time is not significant and poses no prejudice to the Debtors.

### 3. MOVANTS HAVE ACTED IN GOOD FAITH

The final component of the excusable neglect analysis is whether Movants are acting in good faith. Debtors have cast unfounded aspersions upon the motivation and timing of the filing of the Motion, but when their claims are tested they fall flat. Debtors also seek a finding of adverse inferences against KM LLP's actions because Debtors demanded additional discovery and a deposition of KM LLP. KM LLP represented that they had responded to the discovery requests and were not prepared to sit for a deposition. Movants provided Debtors with all discovery responses within their control and have timely and expeditiously responded to all of Debtors' numerous requests, including costly weeks of depositions, reviews of thousands of

---

[57] *See* Exhibit 5, email string between the Debtors' counsel and KM LLP, dated October 5, 2012 through December 7, 2012.
[58] *See id.*
[59] *See id.*

pages of LinkedIn files and individual reviews of each of Movants files and records. However, Movants do not now, nor have they ever, controlled KM LLP and/or the CCC. Had Debtors truly believed that KM LLP was an essential witness, and that their testimony would not have been shielded by attorney client privilege as a member of the CCC and as Court Appointed counsel; they could have proceeded, as they have in numerous other matters, and used international protocols to compel their attendance at a deposition. This, however, is not an issue for Movants. Allegations of Movants control of an independent Canadian law firm are without merit and defy logic. The Movants are innocent parties whose legitimate and rightful claims should be allowed to be filed against the Debtors. Movants have given independent consideration in exchange for their Termination Agreements and this consideration has inured to Debtors' benefit.

Debtors incorrectly assert that the timing of the Motion was somehow motivated by the early mediation attempts between the Debtors and the other estates in regards to allocation. To the contrary, the only relationship between these two events – and efforts to proceed before the first, unsuccessful mediation – was Movant's counsel's concern that waiting until after the mediation might constitute an avoidable delay that would impact the excusable neglect analysis.

## IV.    CONCLUSION

The Debtors knew, or upon reasonable review of their records should have discovered, the existence of Movants' Termination Agreements stored in the United States at HR Shared Services. Indeed, Debtors provided actual notice of the proof of claim deadline to all forty-three (43) U.S. managers that were signatories to forty-three (43) of the 170 Termination Agreements.[60] The Termination Agreements were signed by "Manager, Nortel Networks" whether the manager was a U.S. employee or a Canadian employee. Debtors also provided actual

---

[60] *See* Exhibit 15 forty-three (43) Termination Agreements with U.S. Supervisors' names on signature block and Summary Chart with confirmation of their addresses in the U.S. compiled from the Debtors' Service List for the Notice of Bar Date Doc. #1354.

notice to three former Canadian Employees that the Debtors describe as "similarly situated" claimants. Debtors' failure to give actual notice to Movants should result in an automatic extension of the bar date for this limited group of Movants.

Even if Debtors were not required to give actual notice of the bar date to Movants they were compelled to provide a clear and unequivocal notice through publication. The actual published notice provided that: "If you believe that you have a claim against Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation or Nortel Networks Technology Corporation (the "Canadian Debtors") any such claims shall be filed in, and only in, the Canadian proceedings with the Court appointed Monitor."[61] Unfortunately, this notice left a gap of clarity for those Movants that had claims against Debtors as well as the Canadian Debtors. The notice also was consistent with the Movants understanding that, as Canadians, they filed in Canada and that the rest would be worked out through the international legal system. However, this ambiguity, which only applies only in the very narrow circumstances asserted by Movants, necessitates allowing Movants to file their claims after the bar date.

Even if this Honorable Court is disinclined to extend the bar date, based upon the absence of personal notice and the ambiguous notice, these facts can be considered when applying an equitable analysis to the excusable neglect standard. Contrary to the unfound aspersions launched *ad seriatum* by Debtors, Movants proceeded in good faith and in a timely manner. There is no Plan of Reorganization and significant steps must be completed before a Plan can be unfurled, consequently there is no negative effect upon Debtors. Movants are a quantified, limited group and there is no flood gate that would be opened if the limited circumstances applicable here provided for an extension of the bar date. Movants, as the hard-working, dedicated employees that brought value to the Debtors, were granted claims in their Termination

---

[61] *See* Exhibit 7, Notice of Proof of Claim Deadline Published in Canada.

Agreements and they should be able to pursue those claims.

**MONZACK MERSKY McLAUGHLIN
AND BROWDER, P.A.**

_/s/ Rachel B. Mersky_
Rachel B. Mersky, Esquire (DE #2049)
Michael C. Hochman, Esquire (DE #4265)
1201 N. Orange Street, Suite 400
Wilmington, DE 19801-1155
Telephone: (302) 656-8162
Facsimile:  (302) 656-2769
E-mail:      rmersky@monlaw.com

**ATTORNEYS FOR AD HOC COMMITTEE OF FORMER
CANADIAN   EMPLOYEES   TERMINATED   PRE-
PETITION**