IN  THE  UNITED  STATES  BANKRUPTCY  COURT

FOR  THE  DISTRICT  OF  DELAWARE


In re:                          )  OFFICIAL
                                )  TRANSCRIPT
NORTEL NETWORKS, INC.,          )
et al.,                         )  Case No. 09-10138
                                )  (KG)
            Debtors.            )


                        U. S. Bankruptcy Court
                        Courtroom No.  3
                        824 Market Street
                        Wilmington, Delaware
                        Thursday, March 26, 2015
                        10:07 a.m.


                    - - -



BEFORE: THE HONORABLE KEVIN GROSS
        United States Bankruptcy Judge



                    - - -



HEARING ON MOTION OF AD HOC COMMITTEE OF CANADIAN
  EMPLOYEES TERMINATED PRE-PETITION FOR ENTRY OF
 ORDER ALLOWING CLAIMS TO BE FILED AFTER BAR DATE


_____
                WILCOX & FETZER
  1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477
                www.wilfet.com



**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

1                   THE COURT:  Good morning,

2    everyone.  Thank you.  Please be seated.  It is

3    good to see you all.  And Ms. Mersky, good

4    morning.

5                   MS. MERSKY:  Good morning, Your

6    Honor.  It is a pleasure to be in your

7    courtroom again.

8                   THE COURT:  Nice to have you here.

9                   MS. MERSKY:  Thank you.  Since the

10   sole matter on the agenda today is the motion

11   that I had brought on behalf of the former

12   Nortel employees from Canada who were

13   terminated pre-petition, I will be first

14   addressing the Court, and I would like to start

15   with a brief opening statement.

16                   I am proud to represent the

17   talented and dedicated group of 170 former

18   Nortel employees that worked in Canada and

19   devoted a very significant part of their entire

20   professional careers to Nortel.  They worked

21   tirelessly to make Nortel the company it

22   became, and their efforts contributed to the

23   very substantial value, much more than anyone

24   ever expected, that became the result of the

```
 1    liquidation in billions and billions of

 2    dollars.  These individuals are engineers,

 3    scientists and business professionals.  They

 4    are not lawyers.

 5              In addition to the three witnesses

 6    which I will call live today, Paula Klein,

 7    Michael Campbell and Jane Longchamps.  I would

 8    like to introduce you to six individuals who

 9    have come all the way from Ottawa and Toronto

10    to see the American justice system and to hear

11    the legal process that will define their rights

12    in the US court.  I would like them to stand,

13    and I will identify them.

14              First is Ann McRuvie.  As was so

15    common at Nortel, Ann went directly from

16    university to Nortel.  This was the practice

17    that, if you heard in different parts of the

18    trial, this is what happened.  People led their

19    lives at Nortel.  She spent 18 years in a

20    variety of roles in switching wireless

21    enterprise business at Nortel.

22              Laurier Dumas worked for 11 years

23    in various software verification groups.  These

24    are the people that made the product that
```

```
 1    created the value.
 2                    Diane Mignault.  Diane devoted 32
 3    years of her life, her whole professional life
 4    so far, to Nortel.  She is one of the true
 5    success stories.  She started as a mailroom
 6    clerk and worked her way up all the way to a
 7    management position.  And she wants to see this
 8    all the way through, and this was her life.
 9                    Julia Piggott.  Julia worked at
10    Nortel for almost 30 years in various roles of
11    increasing seniority in research and
12    development, network operations, marketing and
13    sales.
14                    Ernie Briard.  Ernie worked for 20
15    years for 20 years in finance at Nortel and was
16    a devoted employee.
17                    Cathy Deevey.  Cathy worked 28
18    years as a global products performance
19    specialist.
20                    Chris Winnicki is not yet here.
21    He apparently has come down from Canada but is
22    apparently still in traffic, but he wanted you
23    to know that he intends to be here.  I hope he
24    does, in fact, make it here.  And he was part
```

1    of the business for 11 years.

2              These are the people that made the

3    company.

4              THE COURT:  Thank you all for

5    being here, and welcome.

6              MS. MERSKY:  I explained to these

7    individuals who could come that this was a very

8    welcoming court, and they really wanted to see

9    the process unfold.

10             So the proceedings here today have

11   been in process for over two years.  I know

12   that's a small part of the total six to seven

13   years of the Nortel odyssey, but it has been a

14   very important two and a half years for these

15   individuals.  But what they presented to this

16   Court today is an extremely narrow issue.  All

17   the events leading up to the filing of the US

18   bankruptcy and the Canadian insolvency

19   proceedings had a direct and significant impact

20   on each of these individuals in the courtroom

21   and their colleagues all over Canada.  They

22   worked different business units of a Nortel

23   without borders.  They worked alongside their

24   US colleagues in some business units as part of

1    a global business.  Their plight must not be

2    viewed in hindsight but has to be looked at

3    with fresh eyes as it unfolded.

4              This journey for these people

5    started with a wonderful, long, dedicated

6    career at Nortel, a place they wanted to work

7    the rest of their lives.  Mass groups of

8    individuals went, directly recruited from

9    university, worked their way into the

10   scientific community.  They thought as

11   engineers and scientists and they worked as

12   engineers and scientists.  But there came a day

13   when each of these individuals was called in to

14   be terminated.

15             By the time they were terminated

16   some or all of them expected it, some of them

17   even wanted it, as they had watched their

18   colleagues one by one being terminated.  But

19   they were called in by their supervisors.  Many

20   times the supervisors were on the phone from

21   the United States.  Other times you will hear

22   that US supervisors were actually present in

23   Canada to terminate them.  And they were

24   terminated, and they took their termination

1    letters and left.  And most of them went not

2    directly to look at the termination letter but

3    directly to share some of the misery with their

4    colleagues at local watering holes.

5                    But when they got these

6    termination letters, at that point none of them

7    imagined what was going to unfold a little bit

8    later.  These termination letters were from

9    Nortel.  And as sad as they were to be leaving

10   Nortel, they didn't think about money.  They

11   knew Nortel was going to pay them.  Nortel had

12   taken care of them for 30 years, right from the

13   university.  Nortel had been their parent, had

14   worked with them, had grown their thought

15   process, and they believed in Nortel and the

16   products that they had created.

17                   But what happened was petitions

18   were filed, and many of these people found out

19   about this on TV, from colleagues, in ways that

20   no one wanted.  People went to their cars and

21   cried.  This was a tragedy that no one

22   expected.  This was a huge issue for them.  And

23   no one knew what to do because these were

24   engineers.  They had incredibly literal thought

1    processes as engineers and scientists, very,

2    very different than most -- engineers think

3    very differently than most lawyers.  It is a

4    process -- I have a husband and a son who are

5    engineers, and it can be incredibly

6    frustrating, because their thought processes

7    are unique.  They are different.  It is their

8    training, and it makes them what they are.  So

9    they proceeded as best they could with who they

10   were.

11              And ultimately counsel was

12   appointed by the Canadian Court not to

13   represent one group of Canadian employees

14   terminated pre-petition but to represent all

15   Canadian employees.  And this was something you

16   will hear that was upsetting to some people

17   because the biggest issue at the time

18   initially, when all this happened, is what is

19   going to happen to the pension money.

20   Everything was a disaster.  People were

21   terrified.  I know you hear in this court all

22   the time the fears of people losing their

23   disability, the fears of people losing their

24   pension.  That was the big uber picture out

1   there, and these were a smaller group of

2   people, because they had those interests, some

3   of them, but their big issue, their issue was

4   their termination benefits.

5              So they were a small subset of the

6   total employee group that the law firm Koskie

7   Minsky, which we will talk about as KM -- I

8   know you are fully familiar with Koskie Minsky

9   and KM.  They were assigned to represent all

10  employees.  And their counsel appropriately

11  initially focused on the plight of pensioners,

12  because that was the critical component issue.

13  Pensioners, disability insurance, this is what

14  this Court hears time and time again.  "I can't

15  pay for my wife's cancer surgery."  That was

16  the focus.  That had to be the focus.

17             And as this process was unfolded

18  and Koskie Minsky, who are employment lawyers

19  in Canada, dealt with these issues, my group,

20  the former terminated people, were told

21  don't -- "Wait.  Don't worry.  You can wait.

22  There are bar dates in Canada.  There are bar

23  dates, but they are not going to apply to you,

24  because we are creating this special process.

1    Sit back and wait."  They were told that by

2    their law firm, and it wasn't just their

3    individual law firm.  It was the

4    court-appointed attorney who had the complete

5    duty to represent them.  They were told a

6    process will be created for you, a unique

7    process.  The word "Canadian bar date" was

8    known to some, but it was known because it

9    didn't apply to them, because in every single

10   bulletin it said, "Don't worry; it doesn't

11   apply to you."

12          Some people were aware that there

13   was such a thing as a US bar date.  The US bar

14   date to these people, as you will hear both

15   from the deposition testimony and from the live

16   testimony of three dedicated employees, you

17   will hear that that didn't apply to them either

18   because they thought this was a global company.

19   They thought their needs were being met by what

20   they were supposed to be doing, which was

21   sitting back and waiting.  They weren't

22   employed in the US.  In the case of one

23   employee who was briefly employed in the US, he

24   understood, Ernie Briard, that for US benefits

1    he had to file in the US, and that when they

2    say US benefits, they mean for the things he

3    earned when he was physically in the United

4    States.

5                    That's what they understood.  When

6    you were working in Canada, you had to follow

7    the Canadian process.  When you were working in

8    the United States, you had to follow the United

9    States process.  It didn't matter where the

10   global money was coming from.  Nortel owed them

11   the money.  They were doing what they were told

12   when they were told, in the best possible way

13   they could proceed.  And they did everything

14   they could.  These are very educated people who

15   followed the process as they understood and

16   they were told primarily as linear thinkers,

17   which, as I have worked with these individuals,

18   it is a very different thought process than I

19   would have.  They don't look at the world

20   exactly the same way, but thank God for that,

21   because we have the technologies created that

22   many lawyers would never be able to create.

23                    And, you know, while there were

24   corporate distinctions in Canada, they may have

1    been employed by one corporate entity that was

2    a Canadian entity or another corporate entity,

3    that was all treated the same to them, too.  So

4    they were doing what they were told.  They were

5    sitting back and waiting for a process to be

6    created.  They weren't sitting on their rights

7    because they kept on wanting to do the right

8    thing.  They were doing what their

9    court-appointed attorneys told them to do.

10                   And between 2009 and 2012 they

11    waited.  And they were anxious.  And you have

12    been presented with a lot of documents from

13    LinkedIn that were created that they definitely

14    were anxious and they wanted to move forward

15    and they wanted to do the right thing, but they

16    understood they were doing the right thing.

17    And then in 2012 the process unfolded, the

18    process they were promised for, the process

19    that was created.  And that process was a

20    process where the Monitor in Canada would

21    evaluate their claims and send them a letter,

22    and that letter would tell them what they were

23    entitled to, and then and only then did they

24    have to do anything.

```
 1                    And in that process and in the
 2    process that followed, the Monitor and Koskie
 3    Minsky discovered that there were approximately
 4    three individuals, four individuals, who had
 5    filed claims in the United States, and they
 6    would also be part of the Canadian process.  So
 7    someone investigated.  Well, those claims have
 8    to be withdrawn, until they discovered there
 9    was a reason for those claims.
10                    Now, from the employees'
11    perspective, they understood things, and you
12    will hear and you have seen the deposition
13    testimony, and you have read the briefs, I am
14    sure, but from their perspective, they were
15    dealing with this globally.  They didn't
16    understand the process the way the process is
17    understood in the United States.  And quite
18    frankly, in the United States and in Canada,
19    processes are different, even though they use
20    the exact same words.  And I know I have
21    experienced that by talking to a Canadian
22    lawyer thinking we were saying the same thing
23    and we weren't.  Using a word that means
24    something in this court doesn't always mean the
```

1  same thing in that court.

2            So these people were discovered,

3  and it was further investigated that there were

4  a total of I believe 311 individuals that had

5  language in their termination agreements that

6  gave cause to claims in the United States.  And

7  these clauses were important because they were

8  earned benefits, and they were consistent with

9  the way each of these employees looked at their

10 employment and looked at how this process would

11 unfurl.

12           And what happened then in the

13 spring and fall of 2012 was a process whereby

14 Koskie Minsky, who is the court-appointed

15 representative of all these people, got the

16 agreements together, and they did what I think

17 reasoned lawyers do.  They contacted Debtors'

18 counsel, and they identified these people.  And

19 Debtors' counsel said, you know, "Who are these

20 people?  What are their claims?"  And Koskie

21 Minsky got a list through the Monitor of all of

22 the people and all of the potential, maximum

23 potential claims of these people.

24                THE COURT:  When you say Debtors'



1    counsel, do you mean US Debtors or Canadian

2    Debtors?

3                    MS. MERSKY:  US Debtors' counsel,

4    yes.  Cleary Gottlieb was having direct

5    communication with Koskie Minsky.  There were a

6    phone call or two.  There were emails.  There

7    was a request from Cleary Gottlieb to give them

8    a list of these people.  This was in the fall

9    of 2012.  And that was --

10                    THE COURT:  Fall of 2009?

11                    MS. MERSKY:  No.  2012.

12                    THE COURT:  '12.

13                    MS. MERSKY:  This occurred in

14    2012.  And in the fall of 2012 Koskie Minsky

15    tried to create a reasoned process to have a

16    very limited lifting of the bar date for these

17    newly identified individuals.

18                    THE COURT:  Did they file proofs

19    of claim in the Canadian proceeding?

20                    MS. MERSKY:  That's just it, Your

21    Honor.  That's the whole crux of the problem.

22    In the Canadian proceeding they were told not

23    to file proofs of claim because a special

24    procedure was created for them, a unique



1    procedure, whereby they didn't do anything.

2    They were told not to file claims because the

3    Monitor reviewed the documentation.  They

4    didn't submit it.  The Monitor had it from the

5    company.  The Monitor evaluated it.  It is

6    entirely different than anything we have ever

7    had here.  And the Monitor would then in 2012,

8    not 2009, '10, '11, but in 2012, the Monitor

9    sent them a letter identifying their claim and

10   their amount, and then and only then, if they

11   disagreed with the Monitor, then they would

12   have to do something.  And that's why they were

13   waiting.

14              They were not sitting on their

15   rights.  They were doing what they were told.

16   They were doing what they understood.  And they

17   understood this is a global company, and they

18   understood this is a global process.  And their

19   court-appointed attorneys, the attorneys that

20   were created for all former Canadian employees,

21   told them that this was their process.  And

22   yes, there were other processes going on.

23   There was confusion.  There were differences in

24   language, but these people were doing what they

1    thought was right.

2                  THE COURT:  Had they moved to

3    enlarge the bar date in Canada?

4                  MS. MERSKY:  They didn't have to

5    move to enlarge the bar date in Canada because

6    in Canada the bar date did not apply to them.

7    It applied to other creditors, and that's what

8    part of this confusion is.  It applied to

9    contract creditors.  They had a bar date for

10   contract creditors and they were specifically

11   told, "Don't worry about it.  It does not apply

12   to you, because we are creating something that

13   is entirely different."  It is not parallel to

14   here.  And it was created because this was a

15   special case in Canada involving a huge

16   percentage of employees in Canada.

17                  So this special process was

18   created.  And that's why they didn't -- they

19   didn't have to file claims, except in 2012.  If

20   they got a letter from the Monitor and the

21   Monitor and they disagreed about what the

22   correct amount was, then and only then did they

23   have to act.  So it wasn't like they needed a

24   bar date to be lifted.  There was no bar date



1    in Canada for employees.  And they understood,

2    as you will hear, that if you worked in Canada,

3    it didn't matter who owed you money.  If you

4    worked in Canada, you filed in, and only in,

5    Canada.

6              So Cleary Gottlieb as Debtors' US

7    counsel requested and received the list of 311

8    individuals, itemized the maximum possible

9    claims that could be made.  And there was

10   additional communication by email, not many; a

11   couple, and they are exhibits before Your

12   Honor.  There was a Hurricane Sandy that

13   interfered with phone calls that were

14   scheduled.  Everyone understood that being

15   delayed.  But the delay continued, and no one

16   got back to it from Cleary to Koskie Minsky.

17             And the court-appointed individual

18   representatives who will testify today, who

19   were then advised and were aware of what was

20   going on and thought that there was going to be

21   an ordinary process for a lifting of the bar

22   date as to these small group of people, they

23   said, "We can't wait."  And the Monitor and

24   Koskie Minsky discussed whether Koskie Minsky

1    could go beyond the letters and the calls to

2    Debtors' counsel, and it was determined that

3    these individuals had to take money out of

4    their own pocket and file, but they couldn't

5    just file claims.  They had to get a bar date

6    lifted first.

7              So they retained US counsel, and

8    that occurred in December of 2012.  And they

9    retained my firm.  And upon retaining my firm,

10   we created a process where all 311 individuals

11   could be contacted, and all 311 individuals who

12   had possible claims based upon language in

13   their contracts about the definition of

14   "Corporation" could retain me and my firm

15   should they choose.  A letter had to be

16   comprised explaining that nothing was a

17   guarantee.  Their copy of the notice that was

18   sent out from the NRPC is one of the exhibits,

19   which I am sure Your Honor has seen.  Well,

20   that letter went out.  And between the end of

21   December and February 1 everyone was contacted,

22   everyone had to decide if they wanted to retain

23   me.  I had to confirm when receiving the

24   documentation that, yes, in fact, these people

1    were certifying that they had what they were

2    supposed to have and that they could, in fact,

3    be part of an ad hoc group such as this,

4    because I had to make good-faith

5    representations to the Court.  And in that very

6    short time, on February 1, 2013, this motion

7    was filed.

8                    And between February 1, 2013 and

9    today I had no idea that this process would

10   unfold the way it has, because from my

11   perspective, with the status of where the

12   Debtors' case was with this limited group, I

13   rather foolishly thought that this would be a

14   relatively simple enterprise, and it was not.

15   Discovery was collected from all 170

16   individuals.  Discovery had to be reviewed.

17   Discovery had to be checked for privilege.

18   Twelve depositions for two weeks were taken in

19   Canada.  Additional discovery and enormous

20   volumes of LinkedIn documentation, which was

21   very difficult to acquire, was produced.

22                    So we are now finally here on a

23   fight about whether or not these people, which

24   are now down from 311 to 170 because not

1   everyone wanted to spend their own money.  Some

2   spent their own money to come here.  Some spent

3   their own money to retain me.  Not everyone

4   wanted to take that risk or had the money,

5   because they were terminated employees.  They

6   weren't all employed individuals.  So they came

7   here.  And we are here for the right for them

8   to file claims after the bar date.

9              Should, in fact, this Court lift

10   the bar date, we would request 30 days so that

11   we can put together all individual claims,

12   because each individual claimant must sign that

13   proof of claim form.

14              And the law is clear here, and you

15   will hear some very interesting testimony,

16   because we know that if a debtor has actual

17   knowledge of a creditor or can reasonably

18   ascertain the existence of a creditor, they

19   have to give notice, and that's the end of it.

20   If they had actual knowledge, it was reasonably

21   ascertainable, then the bar date is lifted.  It

22   is over.

23              You will hear that many of these

24   employees were terminated by US supervisors,

1    that the letters they received were all

2    required to be sent to North Carolina.  And

3    when we are talking the letters they received,

4    we are talking about a total of 311 employees.

5    The Debtors gave notice of the bar date in two

6    separate major notices.  One notice, Docket No.

7    1354, there were 300 pages of notice, and I

8    think there were at least 30 to 50 people on

9    each -- I am sorry.  Not 300.  I made an error.

10   There were 700 pages, with at least 30 to 50

11   people.  So they gave a lot of notice.  They

12   could have added these 311 people.

13              And they are going to claim they

14   weren't reasonably ascertainable, but over 40

15   of the letters had signature lines from

16   supervisors who were in the United States.  And

17   those signature lines said, "Manager, Nortel

18   Networks."  It didn't say, "Manager, Nortel

19   Networks Ltd.; Manager, Nortel Networks Corp."

20   It said, "Manager, Nortel Networks."  And that

21   same signature was for the US-based managers

22   and the Canadian-based managers.  And there was

23   no indication anywhere of anything different.

24   So they were required to send those letters to

1    North Carolina.  And they were given the

2    opportunity if they had questions to have a

3    phone number even after the filing of the

4    bankruptcy to call North Carolina, where their

5    documents were stored and where their questions

6    were answered.

7               So from the perspective of the Ad

8    Hoc Committee, we believe that these

9    individuals were known creditors, that the

10   failure to give notice opens the door on a

11   mandatory basis, not on a permissive basis.

12              But then we have something else.

13   We have, okay, maybe this Court will find that

14   they were not known creditors.  We believe they

15   are, but maybe they weren't.  But if they were

16   not known creditors, then the Court dictates --

17   the rules dictate that they have constructive

18   notice, notice by publication.  Well, notice by

19   publication is never ideal, but it is the best

20   we can do when we don't know every creditor and

21   we are trying very hard to provide adequate

22   notice.

23              But the constructive notice in

24   this case, the constructive notice, everyone



1    tried very hard to create the best possible

2    language in that constructive notice.

3    Unfortunately, in that constructive notice it

4    failed as to these people, because in that

5    constructive notice, which was published in

6    papers in Canada and which was published on the

7    websites and was published by the Monitor, that

8    constructive notice said if you have claims

9    against, and they named all the Canadian

10   Debtors, file those claims in, and only in,

11   Canada.

12                Now, it was the intent, I am

13   certain, that if you had a claim against the

14   Canadian case and only the Canadian case, file

15   just in Canada.  But if you have a claim

16   against Canada and potentially the United

17   States or if you viewed your claims as global,

18   which these people did, you were told to file

19   in, and only in, Canada.  At the time this is

20   happening your court-appointed representative

21   is saying, "Sit back.  We haven't created your

22   procedure.  You are going to have a special

23   procedure.  Don't do anything.  Wait.  Sit."

24                Now, that Monitor also said in

1    certain publications, which not everyone read,

2    but there were publications, that if you have a

3    claim against the United States, do something

4    about it.  But what it asked further is if you

5    were employed in the United States or you had a

6    contract with the United States.  Now, these

7    linear thinkers looked at "employed."  Did I

8    work in the United States?  No, I did not work

9    in the United States.  Did I have an employment

10    contract with the United States?  No, I did not

11    have an employment contract with the United

12    States.

13                The termination agreements which

14    these people signed were not subcontractor

15    agreements with the United States.  That's what

16    they understood.  If it was a mistake, it was a

17    reasonable mistake.  I don't think it was a

18    mistake.  But I think that clearly the notice

19    as to these people unintentionally but in

20    reality was defective.  And if that notice did

21    not adequately apprise them, then as a matter

22    of law their claim must be allowed after the

23    bar date.

24                But even if you don't find that



1   actual notice was required or constructive

2   notice was defective, the standard of law is

3   excusable neglect.  And you can take one and

4   two, the actual notice question and

5   constructive notice question, and say those two

6   things, I don't find that they are that big to

7   be separate, but you can put them together and

8   find that that in and of itself is excusable

9   neglect.

10                  And, in fact, in Pioneer, the main

11  case on excusable neglect, where the bar date

12  notice did not predominantly enough announce

13  the terms and the effects of the bar date, that

14  was the excusable neglect.  Now, here, the

15  standard language post-Pioneer is there, and

16  you have to file a claim or it is barred

17  forever, that stuff is in this bar date notice,

18  but it only applies if you are filing a claim

19  in Canada, in, and only in, Canada.

20                  And this you have to understand

21  from the perspective is -- and you know way too

22  well this point probably -- this is a

23  cross-border case of a level of complication

24  that rarely faces any court in Canada or the

1    United States, with vitriolic fights between

2    parties that are unknown to these former

3    employees.  They created the value.  They

4    didn't, they would say probably, create the

5    destruction.  From their perspective, they

6    built the company, and they don't understand

7    why that company was destroyed by businesses

8    who didn't understand the great value that they

9    created.

10                   So was there a delay.  And was

11    that lengthy?  Yes, it was a lengthy delay,

12    2009 to 2012.  But one, put in perspective of

13    this entire case is insignificant.  Two, this

14    is not a case which is very common in motions

15    to lift the bar date.  This is not a case where

16    there is a confirmed plan and there is problems

17    in distribution.  We are so far from that, and

18    unfortunately, Your Honor has decisions that

19    have to take place way before any of that can

20    happen.  And the total value of these claims is

21    less than 18 million, which sounds like a huge

22    amount of money, except when you put it in the

23    context of this case, when it is really

24    insignificant.



1            And, in fact, the Monitor has

2     already evaluated each of these claims.  The

3     proof of claims when they are filed will have

4     an attachment of what the Monitor has already

5     said the value is.  And it only is for the

6     termination benefits.  It is not for all

7     pension rights.  It is for the termination

8     benefits.

9            So when put in context, there is

10    no prejudice to the Debtor.  And I took

11    great -- I read the brief that the Debtors

12    submitted at 1:00 in the morning, and I saw the

13    words "bad faith, good faith, bad faith,"

14    because they were asserting that there was bad

15    faith, because that's an element for excusable

16    neglect.  And when you see the word "bad faith"

17    associated with your name and what you are

18    doing, you take that very seriously.  And I

19    took it immensely seriously, and I took it so

20    seriously for these people who have worked so

21    hard and have done everything they know they

22    could do and followed every rule that they

23    understood that they should be following.

24    There was no bad faith here.



1           The timing of this, while it may

2    have coincided with other things that were

3    going on in this case, because a lot of other

4    things were going on in this case all the time,

5    has absolutely nothing to do with anything

6    other than that these things were discovered in

7    2012 during the process that the Monitor

8    created to have their claims evaluated and

9    claims permitted in Canada.

10          These people acted in good faith.

11   And in fairness and in honesty, you have to

12   keep the concepts of the differences of the

13   processes and the difference of the thoughts of

14   these individuals; reasonable, reasoned

15   thoughts.  There are no floodgates that are

16   about to commence.  These are 170 people with

17   very well-defined claims that the Monitor has

18   already fully vetted.  And should the claims be

19   allowed to be filed after the bar date, the

20   Debtors will be able to vet that even further.

21          But this is a fight, and it is a

22   fight for a small group of deserving people.

23   And if anyone else was going to open these

24   giant floodgates in the over two years since

1    the filing of this motion, you would have seen

2    floodgates.  There are no floodgates.

3              So you have here a group of

4    individuals, and all they are asking is to let

5    the justice system in this country apply to

6    them, because they believed they worked for a

7    global company.  They have letters from their

8    company that say that the corporation, which

9    includes the US subsidiaries, are liable for

10   their payment.  And it is what they always

11   understood.  And you will hear that testimony

12   today.

13             And, Your Honor, we believe we are

14   here in the best of faith and the most of

15   fairness, representing people who suffered the

16   most and are here at their own cost to see how

17   the system plays out.

18             Thank you very much.

19             THE COURT:  All right.  Thank you,

20   Ms. Mersky, for the opening.

21             Mr. Rosenthal, welcome back.

22             MR. ROSENTHAL:  Thank you, Your

23   Honor.

24             THE COURT:  I am listening.  I am



1    not asking a lot of questions or saying much,

2    because I do want to hear the evidence.  And

3    then at the end I will certainly have some

4    questions.

5                    MR. ROSENTHAL:  I think the last

6    time I was in this courtroom I raced out to

7    catch the beginning of Rosh Hashanah and the

8    train.

9                    THE COURT:  Yes, yes.

10                   MR. ROSENTHAL:  That was a

11   memorable day.

12                   THE COURT:  Absolutely.

13                   MR. ROSENTHAL:  Your Honor, I want

14   to briefly introduce a couple of my colleagues

15   who are going to be helping me at the hearing

16   today who are appearing before Your Honor for

17   the first time.  Jane VanLare is one of my

18   associates.

19                   THE COURT:  Nice to have you here.

20                   MR. ROSENTHAL:  And another

21   associate, Michelle Parthum, is acutally making

22   her first court appearance in any court and is

23   happy to be here.

24                   THE COURT:  Congratulations.



```
 1    Ms. Schweitzer and Mr. Abbott.
 2                    MR. ROSENTHAL:  Ms. Schweitzer and
 3    Mr. Abbott need to no introduction at all, Your
 4    Honor.
 5                    Your Honor, you have obviously
 6    read the briefs.
 7                    THE COURT:  Yes.
 8                    MR. ROSENTHAL:  We did not believe
 9    that opening statements were necessary, but
10    given movants had requested it, we are happy to
11    make a few preliminary observations.  And I
12    would like to respond briefly to some of the
13    things that Ms. Meersky just said.
14                    THE COURT:  All right.
15                    MR. ROSENTHAL:  One of the things
16    I want to be very clear on in starting out is
17    Ms. Mersky made a comment saying we will
18    probably blame these people for the destruction
19    of Nortel.  There is no doubt that what
20    happened here not just to these employees but
21    to the tens of thousands of Nortel employees in
22    Canada, in the United States, everywhere else
23    in the world, is tragic.  There is no question
24    about that.  People who worked their lives for
```



1    this company around the world lost their jobs,

2    had their pensions imperiled and suffered other

3    consequences, and Your Honor has heard about

4    that over the course of many years.  And we are

5    not saying that these people are any

6    differently situated whatsoever.

7              But what this motion actually

8    seeks is special treatment, not to be treated

9    as every other Nortel employee who thought they

10   were working for a global Nortel, as the

11   movants had said, who contributed to the

12   $7.3 billion in asset sales that has been

13   discussed both here and in the allocation

14   trial.  They want to be treated differently in

15   several very material respects.

16             First of all, they want special

17   treatment to say that the bar date, which

18   applies in the United States to everyone,

19   doesn't apply to them.  And they come and make

20   this motion three and a half years, three and a

21   half years.  I haven't seen in their brief a

22   single case where a late claim was allowed

23   three and a half years after a bar date.  They

24   said treat us specially.

1                   They also want special treatment

2      versus every other Canadian employee.  And we

3      heard Ms. Mersky say they thought they worked

4      for a global Nortel, they contributed to the

5      value of Nortel, but they are not saying --

6      and, in fact, while Ms. Mersky's opening

7      paragraph and her supplemental memorandum

8      focuses all about that, while her opening

9      statement focused all about that, that's not

10     the basis for their claim, because were that

11     the case, we would have tens of thousands of

12     Canadian employees saying, "I thought I worked

13     for a global company.  Why should I only get a

14     claim against the Canadian Debtors?"

15                  No.  The basis for their claim is

16     that these 300 people, three or four years

17     later somebody, some lawyer in Canada came up

18     to them and said, "You know, we have got a

19     creative argument that says that this

20     termination letter turns upside down everything

21     you thought about your termination, and you

22     didn't investigate it back in 2009, but we have

23     got an argument that distinguishes you from the

24     person sitting in the cubicle on your right,

1    from the person sitting in the cubicle on your

2    left, from almost every other person in your

3    office.  We can make an argument that you get

4    to dip in every other Debtors' pool," 16 times

5    here in the United States.  So they are not

6    asking for treatment comparable to their

7    Canadian colleagues who had the same thought.

8    They are asking for special treatment.

9              And finally, they are asking for

10   special treatment versus every single US

11   employee of NNI or the other 15 Debtors here,

12   because the employees of NNI and the other US

13   Debtors have claims against the entity that

14   employed them.  What these people are saying is

15   "Treat me better than that.  Let me have my

16   claim against my Canadian employer and let me

17   have my claim not just against NNI but 16 US

18   Debtors.  And if I want to, let me go make a

19   claim against every EMEA Debtor."

20             So they are asking for favorable

21   treatment, and it is not just innocent, no

22   harm-no foul, because we are talking about a

23   finite pot of money that was collected that is

24   being allocated by the Courts.  And every

1    dollar that goes out to compensate people who

2    had no relationship to the US Debtors comes out

3    of the recovery of US creditors.  And in this

4    case of these employees, it comes out 16 times

5    and all the other creditors.

6                So let's not lose sight of the

7    fact that the real basis for the relief is that

8    they want special treatment and not that they

9    are looking to be treated in the way that their

10   global expectations were.

11               Now, throughout her opening

12   statement Ms. Mersky used the passive voice in

13   many, many areas:  They understood this, they

14   were told this.  And, Your Honor, in fact, at

15   one time kind of asked for clarification:  Who

16   was the one who said this?  Was it the US

17   Debtors?  Was it the Monitor?  It is very, very

18   important here, because when we look at the

19   actual evidence, what these people knew, what

20   they did, why they did things, and we look at

21   it with an active voice, who did what, we don't

22   come close to meeting the standards for

23   excusable neglect.

24               For starters, as I noted, this



1    motion was filed three and a half years after

2    the bar date.  In the Third Circuit courts have

3    called shorter amounts of time substantial,

4    significant, lengthy, weighing heavily against

5    movants.  As I said, I have not seen in

6    movants' papers a single case where a late

7    claim was filed this amount of time after.

8                    And Your Honor in the Magestic

9    Holdco case involving a delay less than half of

10   the amount of time here -- it was 20 months --

11   you said that it is lengthy and weighs heavily

12   against the claimants.

13                   And again, we heard through

14   passive voice Ms. Mersky saying about, well,

15   they reached out to the US Debtors; there was

16   delays, Hurricane Sandy.  That first step

17   didn't happen for three years.  And even so,

18   from the time the movants first supposedly

19   learned of their claims until they actually

20   filed them, eight months passed.  Now, maybe

21   they can blame a month or two saying, well,

22   they thought the US Debtors were going to get

23   back to them or they had a dialogue or anything

24   like that.  But eight months passed.



1            Now, in contrast, Your Honor, the
2    entire amount of time from the bar date notice
3    being published and sent to the bar date was
4    two months or a little bit less than two
5    months.  So they knew that when you are dealing
6    with bar dates, you don't have eight months to
7    sit around after you know of a claim.
8            And I say eight months, and this
9    actually leads a little bit into the bad faith
10   thing, because I also want to correct a
11   misperception that we are accusing these
12   individual people of acting in bad faith.  We
13   have no such view.  We have never made any
14   accusation.  But they have representatives
15   here, and they are tagged with the conduct of
16   their agents.  Just like if their agents are at
17   fault, as Ms. Mersky essentially said in her
18   opening, if their agents are at fault back in
19   2009 for dropping the ball, focusing on the
20   pension claims, not focusing on their severance
21   claims, they have a remedy against the agents.
22   But the jurisprudence is clear, there is no
23   remedy against the debtors if their failure to
24   file is because of the fault of their agents.

1    We haven't seen any contrary authority from the

2    movants, but the law in the Third Circuit is

3    crystal clear.  The remedy is not against us.

4              And Koskie Minsky were their

5    representatives back in 2009, they are heavily

6    involved in the litigation before this Court.

7    Even though they are not physically in your

8    courtroom today, they are on the phone.  We

9    have a sign-in sheet on the phone.  They were

10   at the depositions.  They were involved in

11   collecting the money to hire counsel, in

12   referring this to Ms. Mersky, and behind the

13   scenes throughout this process.

14             And the reason why that is so

15   important beyond the fact that whatever Koskie

16   Minsky may be accused by movants of having done

17   wrong in 2009 is the consequences of which are

18   borne by Koskie Minsky, not the Debtors.  The

19   reason why that is important is we tried to

20   find out how long really was this delay after

21   they found out about the claims, because that

22   is a key factor that the Court needs to rely

23   upon or consider in deciding whether it is

24   excusable neglect.

1           Now, we think eight months is

2     already and the three and a half years is

3     already in and of itself dispositive.  But even

4     to the extent that the Court wants to entertain

5     the notion that during these eight months they

6     were diligent and that that could overcome the

7     three and a half years, we are entitled to know

8     and the Court is entitled to consider is it

9     really eight months or is it longer.  Did they

10    back in 2009 know about this?  And that's where

11    the bad faith comes into account, because the

12    timing of when it was filed, the timing of when

13    Koskie Minsky, from the documents we have of

14    when Koskie Minsky and how they are raising it,

15    indicates very clearly that they are using

16    these potential claims for different purposes,

17    and that's to gain leverage and to either

18    influence the Debtors or influence the Court in

19    connection with allocation.

20           And we all know about the CCC's

21    theories regarding substantive consolidation,

22    and we have put it in before the Court so I

23    don't need to repeat it, but there are emails

24    that they are saying to the Monitor there are

1    these claims.  We think that they should be

2    used to advance the bigger goal here.  And then

3    the filing of it is right after the end of the

4    last mediation.

5              So we sought discovery:  What did

6    you know and when did you know it, and we were

7    thwarted.  We were told, "No, we are not giving

8    you that."

9              Now, Koskie Minsky, they are not

10   present here.  We can't get discovery from them

11   if it is not voluntary.  They refused.  So we

12   went to the movants and we said they are your

13   agent.  You have the ability to compel

14   production of these documents on issues that

15   you have put into play that are necessary

16   predicates for the excusable neglect standard.

17   And movants came back to us and said, "No, we

18   don't control them."It is fundamentally untrue,

19   untrue.  The lawyer is the agent of the client,

20   and if the client says I need to establish this

21   element as part of my claim and asks the lawyer

22   and instructs the lawyer give me the documents

23   relating to that, the lawyer has ethical

24   obligations to comply.  But they didn't want

1    to, "they" meaning Koskie Minsky and "they"

2    meaning the movants.  So they said no.

3                And Ms. Mersky on the last page of

4    her brief talks all about we didn't -- we don't

5    control a law firm, we don't control Koskie

6    Minsky.  That's just plain not true.  Had they

7    picked up the phone and said, "You have to give

8    us this stuff," they would have gotten it.

9                So I just want to be clear that we

10   are not accusing these individual people of

11   having acted in bad faith, but the conduct of

12   their representatives is material to those

13   considerations.

14                Now, there is a Third Circuit

15   case, Your Honor, it is on all fours here, and,

16   in fact, it is a far more compelling situation,

17   in which the Third Circuit says it doesn't meet

18   the excusable neglect standard.  And that's

19   Jones vs. Chemetron.  It is at 212 F.3rd 199.

20   And in that case you had people in Ohio located

21   also far from the bankruptcy court here, and

22   they were sick, and they didn't know why they

23   were sick.  And four years after the bar date,

24   almost the exact amount of time as here, they

1    saw other people had filed lawsuits against

2    Chemetron saying your contamination of a site

3    caused the illnesses.  And they said, "Wow, if

4    these people are claiming it, we have got the

5    same symptoms and problems Chemetron must have

6    caused us."  It is exactly parallel to here,

7    except for one key distinction I will talk

8    about in a minute.  But here they said, "Well,

9    we were alerted that other people with our

10   letter had filed a proof of claim.  So we are

11   now in the same situation.  We now want to file

12   a claim, too."

13           And the Third Circuit said you

14   didn't investigate your illness back before the

15   bar date.  So even though these people are

16   sick, some of them were very sick, the Third

17   Circuit said your failure to investigate

18   whether you had -- and they didn't get notice

19   either.  And one could say in hindsight, well,

20   they are just 21 people.  They gave thousands

21   of people notice of the bar date.  Twenty-one,

22   why couldn't they give these 21 people notice?

23   Well, Chemetron had no idea these people had

24   potential claims.

1                    NNI, 300 employees, how does NNI

2     know that out of the tens of thousands of

3     former Nortel Canadian employees it should go

4     find these 300 who might claim to have a claim

5     here?  Exact same situation.  And if the Third

6     Circuit found that these very, very sympathetic

7     plaintiffs do not have an excusable neglect

8     claim because they didn't investigate in

9     Chemetron, they certainly don't have it here.

10                    And there are two very real issues

11     that the evidence could not be clearer on here.

12     One is did these people know about the bar

13     date.  We heard a lot of actual notice,

14     constructive notice, did we mail it to them or

15     not, did the constructive notice, did it trick

16     them.  Did they know?  And almost to a person

17     the testimony was yes, we knew.

18                    This is not an isolated creditor

19     out in the middle of the Yukon Territory who

20     had no idea that there was a proceeding going

21     on, didn't get notice and just, you know, now

22     finds out that these proceedings are happening.

23     This is one of the most vibrant online

24     communities discussing these issues that Your

1    Honor will find.  They had websites.  They had

2    a LinkedIn group.  And every time things were

3    happening, people were posting it and people

4    were commenting.  And one of the witnesses

5    today, Ms. Paula Klein, she was going through

6    the record telling people in advance, there is

7    going to be a bar date in the United States.

8    There was a bar date, she said.  Here is our

9    lawyers' website.  Here are links to the things

10   on the website that matter to you.  They were

11   getting weekly notices from Koskie Minsky.  And

12   the message to them was consistent, and it was

13   consistent with the US notice.

14                 And the US bar date notice did not

15   say if you thought you worked for a global

16   Nortel and you are Canadian, file in Canada.

17   That's not what it said.  It said if you have

18   claims against the Canadian Debtors, such

19   claims, your claims against the Canadian

20   Debtors should be filed in Canada.  In fact,

21   the Canadian bar date notice said the same

22   thing.  If you have claims against the US

23   Debtors, such claims must be filed in the

24   United States.  It doesn't say if you are

1    Canadian.  We have lots of Canadians who filed

2    claims here.  In fact, Mr. Briard in the

3    courtroom here, one of the people in the group,

4    he is Canadian.  He filed a claim here.

5              So they knew about the bar date,

6    and they had an active and lively discussion

7    among them that said and warned people if you

8    have a claim against the US Debtors, such as if

9    you are on the US payroll ever, such as if you

10   have any contractual relationship with the US,

11   which is what they are claiming now.  They are

12   saying my contract, my termination of my

13   employment gives me a contractual claim.  If

14   you have a contractual relationship, you must

15   file.  And they knew about the bar date.

16             What they didn't do is they did

17   not investigate whether their termination

18   letters gave rise to a claim.  Classic neglect,

19   not excusable.  Classic neglect.

20             And with regard to the notion that

21   they were told wait for the process, wait for

22   the process, again, we are talking passive

23   voice that you heard in Ms. Mersky's opening.

24   They were never told that by the US Debtors.

1    In fact, these people, none of them picked up

2    the phone and asked.  They didn't call Debtors'

3    counsel.  They didn't call the Debtors.  They

4    didn't ask their own lawyers.  They just

5    assumed, and they assumed that the US process

6    was irrelevant to them even though they were

7    warned repeatedly if you have claims in the US,

8    you do need to file them.

9                  And, in fact, there is a reason

10   why none of them cared about the US bar date,

11   because when they looked at their termination

12   letter, the inventive argument that their

13   lawyers have come up with in 2012, they never

14   thought they had a claim.  That's why they

15   didn't file.

16                  Mr. Pierre Pierre Blais testified

17   in his deposition:  "Was there anything in this

18   letter that gave you a reason to believe at the

19   time that your severance would be paid by a

20   Nortel entity based in the United States?

21                  "No, not specifically."

22                  Ms. Shirley Trowbridge:  "When you

23   first read this, your termination letter, after

24   you were advised of your severance from Nortel

1  back in 2008, did you believe that this gave

2  you a basis for a claim against the US?

3                "In 2008?

4                "Yeah.

5                "No.

6                "Why didn't you believe that it

7  gave you a basis for a claim against the US at

8  that time?

9                "I would not have thought of it.

10  I wouldn't even know why it would."

11                Mr. Buchanan:  "Right.  And at the

12  time Nortel commenced its CCAA proceedings, did

13  you have any reason to believe that you would

14  be paid by some different entity as a result of

15  the insolvency?

16                "That wouldn't be logical.

17                "So no?

18                "So no, no."

19                And finally, Ms. Klein.  I asked

20  her at her deposition:  "Is it fair to say that

21  up until sometime in 2012 you had been of the

22  view that you don't have a claim, not that you

23  were dissuaded from filing by anybody, that you

24  don't have a claim against any of the US



1    Debtors?

2                    "I never viewed that I had.

3    That's correct.  I never viewed that I had a

4    claim in the US."

5                    So we are not talking about

6    anything that the US Debtors, we are not

7    talking about anything that the Monitor or any

8    non-US person ever advised them that somehow

9    caused these people not to file by the bar

10   date.  We are talking about claims that they

11   never thought they had and that they never took

12   a single step to investigate.  And the law in

13   the Third Circuit is crystal clear that that

14   doesn't meet the excusable neglect standard.

15                   The second real issue besides did

16   they know about the bar date, like I said, is

17   did they do anything to investigate whether

18   they had a claim, because you have to do that.

19   And the answer is virtually nothing.  And, in

20   fact, as I noted, many of them just didn't file

21   because they believed that they had no claim.

22                   One last thing I want to point

23   out, and the Monitor actually made a submission

24   to the Court on this subject, is Ms. Mersky has



1    repeatedly made statements here and in her

2    papers implying, if not stronger, that the

3    Monitor is behind and supports these claims,

4    that the Monitor has already determined that

5    there is -- "You don't have to worry about

6    this, Judge Gross.  If they are allowed to file

7    claims, there is no need for litigation,

8    because the Monitor has always made the

9    determination of the validity of these claims

10   here."  That could not be further from the

11   truth.  I will let the Monitor's own pleadings

12   speak for itself, but they said they have not

13   given any advice.  All they have done is they

14   have said here are people who had letters like

15   the people who had filed proofs of claim here.

16                  The one last thing I want to

17   address is this notion of what is the harm in

18   allowing $18 million more in claims from these

19   people.  Is it really going to dent the claim

20   pool that significantly.  Putting aside the

21   Third Circuit said no harm-no foul is not the

22   standard for excusable neglect, for Your Honor

23   to accept the arguments, you would open a huge

24   Pandora's box, because what you would have to

1    find is that the bar date notice was inadequate

2    to advise Canadian creditors of the need to

3    file in the United States, because that's the

4    argument.  We were told file our Canadian

5    claims in Canada, so we just assumed global

6    claims, Canada.  If Your Honor finds that, then

7    why would we not have numerous -- I mean, we

8    wouldn't even begin to know -- Canadian

9    creditors who come here and say, "Well, Your

10   Honor, I filed my claim in Canada because

11   that's what you said the bar date notice said,

12   that it wasn't properly written."

13               And secondly, the notion that this

14   would just apply to these specific individuals,

15   well, what about all of the other creditors of

16   one of the Canadian entities who also can say,

17   okay, whether it is an employment agreement or

18   something else, and you know what; I can

19   construe my contract as a guarantee, but every

20   single Nortel -- that one is 16 claims here.

21               So just because only 300 people

22   have come forward so far, it is the argument

23   that they are making that is of unknowable

24   scope and therefore the potential for

1    prejudice.  And the courts have also found just

2    the mere fact of having to spend the time and

3    money litigating, litigating claims that you

4    wouldn't have to litigate, that's also

5    prejudice in itself.

6                So with that, I will cede the

7    microphone and allow the hearing to start and

8    look forward to coming back to you at the end.

9                One request I would make, Your

10   Honor, is most of the employees that are in the

11   courtroom today are not testifying.  For those

12   that are testifying, we believe that there

13   should be sequestration until after they have

14   testified.

15               THE COURT:  Ms. Mersky, any

16   objection to the sequestration request?

17               MS. MERSKY:  No, Your Honor.

18               THE COURT:  Okay.  Thank you.

19   Yes.  Does anyone else wish to make a brief

20   opening here?

21               MR. QURESHI:  Very briefly, Your

22   Honor, good morning.  For the record, Abid

23   Qureshi, Akin Gump, on behalf of the official

24   committee.  And I have little to add to what



1    Your Honor heard from Mr. Rosenthal, but just a

2    couple of points I would like to make.

3              Your Honor, the committee as the

4    fiduciary representative of all unsecured

5    creditors in the United States, of course, gave

6    careful thought to all of the issues that have

7    been raised here, careful thought back in 2013

8    when the motion was first filed and where we

9    joined in the Debtors' objection to the motion,

10   and again careful thought after the discovery

11   which we actively participated in, where we

12   again filed a joinder.  And just a couple of

13   points I want to reiterate, Your Honor.

14             We in our joinder specifically

15   talked about the bad faith.  And that's not

16   something, Your Honor, that we would do lightly

17   in any circumstance.  And again, I, too, want

18   to be clear that that is in no way directed at

19   any of the employees that are in the courtroom

20   today.  I took depositions of several of them.

21   They are a great group of people and the people

22   whom we all have to thank for the tremendous

23   amount of value that was created in this

24   estate.

1                    But what Your Honor will see in

2       the evidence I think makes it very difficult to

3       come to any conclusion.  Your Honor heard me

4       several times during the allocation trial

5       address issues that were advocated by the CCCs

6       about what we referred to at times as global

7       substantive consolidation, the notion of a

8       global Nortel.  And that comes through very

9       clearly in these proceedings as well.  And

10      that's why I don't think the timing can

11      reasonably be construed as accidental.

12                   In July of 2012, Your Honor, when

13      we were in the midst of the mediation -- I

14      think that was the third mediation -- Koskie

15      Minsky writes a letter to the Monitor and says,

16      "Well, hey, these late-filed claims that we

17      have all of a sudden stumbled upon after three

18      years, that would be great evidence in the

19      allocation discussions.  It would be great

20      evidence in the mediation."  And lo and behold,

21      Your Honor, eight months passes and they do

22      nothing because the mediation was ongoing then.

23      And a couple of weeks after the mediation is

24      declared to be at an end, in the beginning of

```
1    2013, the motion gets filed.

2               Not for a moment would I suggest

3    that any of the individual employees had

4    anything to do with that, had any knowledge of

5    that.  It is perhaps more accurate to suggest

6    that they were victims of that.

7               At the end of the day, Your Honor,

8    this is an equitable motion, and it is highly

9    inequitable for all of the reasons that you

10   heard from Mr. Rosenthal.  It is unfair

11   vis-a-vis other Canadian employees.  It

12   constitutes special treatment.  And it is

13   certainly unfair vis-a-vis all of the US

14   creditors who timely filed their claims and did

15   so by the bar date.

16               Thank you, Your Honor.

17               THE COURT:  Thank you.

18               Just a few others want to be

19   heard, brief openings, I am assuming.

20               MR. BASSETT:  Good morning, Your

21   Honor nick Bassett from Milbank Tweed Hadley &

22   McCloy, on behalf of the Ad Hoc Group of

23   Bondholders.

24               THE COURT:  Yes, good to see you.
```



 1                    MR. BASSETT:  Your Honor, the

 2      Bondholder group primary in an effort to

 3      conserve costs has not been involved in a lot

 4      of the discovery and the other build-up to this

 5      hearing today, and I don't envision myself

 6      doing any of the questioning of witnesses.  But

 7      we did file two joinders.  We filed a joinder

 8      in the initial objection that was filed by the

 9      US Debtors and also a joinder in the

10      supplemental objection.  And for all of the

11      reasons set forth in both of those papers by

12      the Debtors and for the reasons that

13      Mr. Rosenthal discussed and Mr. Qureshi, we

14      also support the relief that they are seeking

15      and ask that the Court deny the motion.

16                    Thank you very much.

17                    THE COURT:  Thank you,

18      Mr. Bassett.

19                    Mr. Melnick, good morning.

20                    MS. MELNIK:  Good morning, Your

21      Honor.  I will just take a few minutes, Your

22      Honor, and if necessary would like to reserve a

23      little time at the end.

24                    THE COURT:  Yes.  You are here for



1    the CCC, of course.

2              MS. MELNIK:   I am here for the

3    Canadian Creditors' Committee.

4              THE COURT:   Yes.

5              MS. MELNIK:   I just briefly wanted

6    to correct for Your Honor for the record that

7    the allegations that the CCC was engaged in a

8    conspiracy or had anything to do with the

9    filing of these claims is completely,

10   unequivocally wrong, offensive.  These claims

11   have nothing to do, I think Your Honor can tell

12   from the evidence, with the allocation issue.

13   These claims were not discussed with the CCC

14   before they were put forward.  I received a

15   copy of the motion in the ordinary course from

16   the E-filing notifications in this case and

17   forwarded it to the CCC.  This is not part of a

18   master plan.

19              Your Honor has all of the

20   allocation evidence before Your Honor.  This

21   evidence was not put forward as part of that

22   evidence.  There was far stronger evidence

23   available and put forward to Your Honor with

24   respect to what Mr. Qureshi highlighted.  It is



1    offensive, in my view personally, to these

2    claimants to try to distract Your Honor from

3    the basis for which they are asserting these

4    claims by cloaking it in what has been

5    attempted to cloak other things with in this

6    case.

7                    And just finally, briefly, Your

8    Honor, no evidence, no facts have been asserted

9    whatsoever, no basis, no justification, no

10   legitimacy, no evidentiary support to sustain

11   the allegation that has been put forward by the

12   US Debtors, the UCC and the Bondholders with

13   respect to the CCC or anything that has to do

14   with the putting forward of these claims for

15   reasons that have anything to do with the

16   allocation trial.

17                    Thank you, Your Honor.

18                    THE COURT:  Thank you,

19   Ms. Melnick.

20                    Well, it is time for evidence.

21   And I don't know that the witnesses quite

22   appreciate the concept of sequestration, but

23   what that means is whoever is going to testify

24   should remain outside the courtroom so as not



```
1    to hear the testimony that is being provided to
2    the Court.  And I am not sure in what order you
3    are testifying, but other than the first
4    witness, the other two witnesses ought to step
5    outside.
6                    And I will also say that witnesses
7    who testify should not discuss their testimony
8    with those witnesses who have not.  Thank you
9    very much.
10                   MS. MERSKY:  I call as my first
11   witness Paula Klein.
12                   THE COURT:  All right, Ms. Klein.
13   Please come forward.  If you will step into the
14   witness stand and remain standing while you are
15   sworn, Ms. Klein.
16                   PAULA DENISE KLEIN, having been
17   first duly sworn, was examined and testified as
18   follows:
19                   THE COURT:  Thank you, Ms. Klein.
20   There is water in that water pitcher if you
21   would like some.
22                   THE WITNESS:  Thank you.
23                   THE COURT:  Ms. Mersky.
24
```



                    DIRECT EXAMINATION

1

2    BY MS. MERSKY:

3        Q.   Ms. Klein, can I call you Paula?

4        A.   Yes.

5        Q.   Paula, can you please tell me what your

6    educational background is?

7        A.   Yes, I have a bachelor in mathematics

8    with a major in computer science from the

9    University of Waterloo.

10       Q.   And did you go right from your studies

11   at the University of Waterloo to Nortel?

12       A.   I did.

13       Q.   In fact, were you an intern at Nortel

14   before you started there?

15       A.   I was.

16       Q.   And how many years were you employed by

17   Nortel?

18       A.   Just about 21 years.

19       Q.   So from the time you graduated college

20   through till termination?

21       A.   Yes.

22       Q.   Can you give me a brief history of the

23   last five years of what you did for Nortel?

24       A.   In the last five years I was working at



1    Nortel.  I had various roles as director of R&D

2    groups, leader of large R&D projects, and

3    director of product management roles.

4        Q.  And did you have employees and

5    supervisors in the United States as well as in

6    Canada during this timeframe?

7        A.  I did.

8        Q.  And how did that work, having employees

9    all over the country?

10       A.  So when I had large R&D groups, I would

11   have employees in Ottawa, I had employees in

12   Raleigh, North Carolina, and I had people

13   reporting into me who were in Richardson,

14   Texas.  But the team that I was responsible for

15   operated as one large team.  We worked on

16   projects together, and that would mean that a

17   software developer working on one piece of code

18   could be doing so right side by side or at

19   least virtually side by side with somebody in

20   Ottawa, with somebody in Dallas, or somebody in

21   Raleigh.

22       Q.  How did you differentiate between

23   different operating business units that you

24   were working for?



1      A.  When we were working on a project, the

2  project was run as a complete entity, no matter

3  where the people were situated, and it just

4  didn't matter where in the world those people

5  were located.  We had -- we would have weekly

6  project meetings.  Those were always done with

7  a telephone dial-in as well as a web conference

8  so that printed material could be shared and

9  the issues discussed.  It was very common

10  practice at Nortel.  Every meeting always had a

11  dial-in.

12      Q.  And in your last position, was your

13  supervisor from the United States or from

14  Canada?

15      A.  My last position, my direct supervisor

16  was Anthony Pirih.  He was located in the

17  United States.

18      Q.  And how did you learn that you were

19  going to be terminated?

20      A.  I learned -- the very last project I

21  worked on started around June of 2008, was

22  really -- although I had a supervisor in the

23  United States, Tony Pirih, most of my

24  day-to-day direction was from Mr. John Roese,

1   who was the chief technology officer of the

2   company at the time.  And from June 2008 I was

3   asked to work on a project, a special project

4   for John, to help decide how to break up the

5   people working in the chief technology office

6   into various business groups and to decide

7   which people would be sold or could be sold,

8   let's say, with each of those business units,

9   and then which people would be ultimately laid

10  off, and --

11      Q.  When you were making that determination

12  of how business groups were to be sold, did you

13  make any distinction between Canadian employees

14  and US employees or was it just the business

15  group?  How was it done?

16      A.   It was just the business groups as a

17  whole.  We didn't really look at where the

18  people were located.  We just looked at what

19  their skills were, what their knowledge was,

20  and where best they could add value to that

21  particular business group.

22               Ultimately, it had been eight long

23  years for me of many, many rounds of layoffs,

24  and I had put my heart and soul into this

1   company, and I just decided that the time was

2   right for me to leave.  John did ask me several

3   times to stay and put my name on a list for one

4   of the groups of people that would, you know,

5   ultimately be sold off.  But I just didn't have

6   the stomach for it.  And I thought that now was

7   a good time to go and start a new career or

8   start something new.  And I asked to have my

9   name put -- I actually put my name on the list

10  of people to be laid off.

11      Q.  And did there come a time when you

12  actually learned that you were going to be

13  terminated?

14      A.  Yes, there was.

15      Q.  Can I direct you to the exhibit

16  notebook, Exhibit 205.

17              MS. MERSKY:  May I approach the

18  witness?

19              THE COURT:  You certainly may.

20              MS. MERSKY:  Exhibit 205, and at

21  the bottom it says page 453.  May I approach,

22  Your Honor?

23              THE COURT:  Yes, you may.

24              MS. MERSKY:  It will make it



1    easier for the witness.

2                    THE COURT:  Yes, certainly.

3                    MS. MERSKY:  And at the bottom,

4    Your Honor, have you located the page?

5                    THE COURT:  Yes, I have.  If I may

6    just ask, what is the situation with the

7    exhibits?  Have they all been agreed upon at

8    this point or is that subject to objections or

9    were they subject to objections?

10                   MS. MERSKY:  My understanding is

11   they are all agreed to, Your Honor.

12                   MR. ROSENTHAL:  With a couple of

13   exceptions.

14                   THE COURT:  Okay.  That's fine.

15                   MR. ROSENTHAL:  Starting with the

16   first page of 205.

17                   THE COURT:  Oh.

18                   MR. ROSENTHAL:  In fact, because

19   while we don't object to the remaining

20   documents, the first two pages are just a

21   spreadsheet, my understanding is prepared by

22   counsel, I don't think prepared by this

23   witness, and certainly something that has not

24   been authenticated or a foundation through this



1    witness has been established.

2                    THE COURT:  And you are talking

3    about, Mr. Rosenthal, the two pages with all

4    the names on them?

5                    MR. ROSENTHAL:  Exactly, Your

6    Honor.

7                    THE COURT:  All right.

8                    MR. ROSENTHAL:  I don't think the

9    witness has anything to do with those.  But we

10   can find out.

11                   But the remainder of 205 we have

12   no objection to.

13                   THE COURT:  Very well.

14                   MS. MERSKY:  Your Honor, for the

15   record, the first two pages of that exhibit are

16   a summary exhibit under Rule 1006, I believe,

17   and they come from the actual docket of the

18   United States court.  They identify each

19   supervisor whose name is at the bottom of each

20   letter, which they don't object to the letter.

21   So it is a signator from each letter and then

22   the address of that person in the United

23   States, based upon the US service docket,

24   because each of these US supervisors were, in



1    fact, served with actual notice.  The dockets

2    where they were served are also an exhibit that

3    has been provided to the Court.

4              THE COURT:  Well, I guess the

5    question at the moment is whether Ms. Klein is

6    the appropriate person to, in effect,

7    authenticate this document.

8              MS. MERSKY:  Ms. Klein is only

9    testifying as to her termination letter that

10   was signed -- I am sorry.  That has a signature

11   block of her US supervisor.  And she will

12   testify to that.  The address of the US

13   supervisor and the fact that the US supervisor

14   was served with actual notice is, in fact, an

15   exhibit from -- first of all, it is from the US

16   docket, but it is also copies of his name and

17   the certificate of service are exactly attached

18   as an exhibit.

19             THE COURT:  All right.

20             MR. ROSENTHAL:  We have no

21   objection to Ms. Klein talking about her

22   specific situation.

23             THE COURT:  Right.

24             MR. ROSENTHAL:  I don't think the



1    first two pages of Exhibit 205 are Ms. Klein's

2    situation.  If she wants to talk about her one

3    supervisor, that's fine.  But I don't think it

4    is appropriate for her to talk about this

5    document otherwise.  It is not her document.

6                    THE COURT:  Go on.

7                    MS. MERSKY:  For one thing, Your

8    Honor, I believe it is admissible under Rule

9    1006.  It is a summary classification both of

10   all the actual termination letters where from

11   the signature of the termination letter you

12   have a name, signature block, and then you have

13   the docket entry in which the US Debtors

14   docketed service of notice of the proof of

15   claim deadline.  As to --

16                    MR. ROSENTHAL:  Your Honor, just

17   one last point on this subject and then I will

18   sit down.

19                    First of all, whatever point

20   Ms. Mersky is seeking to make, I don't know how

21   it stands for anything beyond an address to

22   which something was mailed.  If she is trying

23   to say where these people worked, in fact,

24   Nortel did not have offices in many of these



```
1    locations where they were actually physically

2    mailed their proof of claims.  So to the extent

3    that it is meant to say these were employees of

4    a particular entity, this document and the

5    supporting documents don't show that.

6              Secondly, as a summary document,

7    that we could argue admissibility separately.

8    It is not a summary document prepared by

9    Ms. Klein in the first place.

10             THE COURT:  Well, it certainly

11   can't be admitted through Ms. Klein's

12   testimony.

13             MS. MERSKY:  And we are not

14   seeking that, Your Honor.  We can move on, Your

15   Honor.

16             THE COURT:  Yes.

17             MS. MERSKY:  But just for the

18   record, to let the Court understand how this

19   docket item was created, it was created from

20   the Debtors' dockets which show that they gave

21   actual service to each of the people identified

22   in these letters.  And those docket entries are

23   attached as a separate exhibit showing the name

24   of the person and where they were served and
```



1    the fact that they were given the proof of

2    claim notice.

3                    Let's move on to Ms. Klein.

4    BY MS. MERSKY:

5        Q.   Can you tell me a little bit about the

6    day you were terminated, Paula?

7        A.   Sure.  So on it was around November 12,

8    I was called into the office of a human

9    resources manager, and I knew that it was

10   coming.  That day they were laying off a number

11   of people in the same general area as me.  And

12   she sat down and she gave me my termination

13   letter.  She thanked me for my contribution to

14   Nortel and told me I should, you know, take the

15   package, read it over at my leisure and, when I

16   was ready, to sign one copy of the document,

17   return it to HR Shared Services in Raleigh,

18   North Carolina, and then introduced me to

19   someone from Right Management, who was the

20   outplacement services that Nortel had employed

21   at the time.

22                    So I did that.  I didn't really

23   have any questions for Right Management.  And

24   then later on that morning, once all of the



1    terminations for the people around me were

2    done, a number of us went out for lunch, had a

3    few beers, and then I went home.

4        Q.  Did your immediate supervisor speak to

5    you that day, Mr. Pirih?

6        A.  Yes, he did later.  Later that morning

7    he did phone me.  He couldn't be in Ottawa at

8    the time, but he did phone me to thank me for

9    my service.

10       Q.  Who did you think employed you?

11       A.  Nortel.  I worked -- I considered that I

12   worked for Nortel globally.  I worked on

13   projects that were global in nature.

14       Q.  Is there anything on the termination

15   agreement letter that tells you which Nortel

16   was terminating you?

17       A.  No, there isn't.

18       Q.  Is your manager's name on the signature

19   line, Anthony Pirih, it says, "Manager, Nortel

20   Networks"; is that correct?

21       A.  Yes.

22       Q.  And is there any other identification as

23   to Mr. Pirih?

24       A.  Just that he was a manager at Nortel



1    Networks.

2        Q.    And you did not -- is there anything

3    further on here that says anything other than

4    what you understood, that you worked for global

5    Nortel and global Nortel was terminating you?

6        A.    Just that it was -- just that the

7    document itself was prepared by HR Shared

8    Services, which was standard practice from what

9    I had seen in terminating people myself.    HR

10   Shared Services was located in the United

11   States.

12       Q.    The last line of the letter, where it

13   says, "We wish to express our appreciation for

14   your efforts during your employment with the

15   Corporation," what did you think that meant?

16       A.    I think it was a recognition by Nortel

17   globally that I had contributed to the

18   corporation as a whole, to that global entity.

19       Q.    Did you ever call North Carolina about

20   this agreement?

21       A.    I did.    A couple of weeks after I signed

22   the agreement and mailed it in, I phoned to

23   verify that they had received a copy.

24       Q.    Okay.    How did you learn about the



1    bankruptcy and insolvency proceedings?

2        A.   I learned about it on the radio, on TV,

3    the day, hours after it was announced publicly.

4    I had dozens of emails from colleagues and

5    friends expressing shock about what had

6    happened.

7        Q.   At the time did you think about your

8    termination agreement?

9        A.   Oh, absolutely.  I didn't know what the

10   announcement of the CCAA filing and the Chapter

11   11 file in the US, I didn't know what that

12   meant to me about the severance that I was

13   owed.  And there was just in those early days a

14   lot of confusion.  Nobody really knew -- nobody

15   really knew what was truly happening or what it

16   truly meant.

17       Q.   I would like you to turn to Exhibit

18   No. 209.  Do you remember receiving a letter

19   from Elena King, senior vice president,

20   regarding the insolvency proceeding?

21       A.   Yes, I do.  It came to me in the mail,

22   in the regular mail.

23       Q.   Did this tell you what you were supposed

24   to do or give you any guidance on what was your



**Paula D. Klein - Direct**                                            74

```
1   next step?
2       A.   It did.  It talked about the fact that
3   there would be a claims process forthcoming and
4   that that claims process had to be approved by
5   the Canadian Court.  As a Canadian employee, I
6   assumed I would follow that claims process and
7   that if I had questions, I could contact -- you
8   know, it gave various phone numbers and so on
9   that I could contact if I had questions.
10      Q.   Did the letter reflect where it was
11  coming from?
12      A.   The letter itself at the bottom of it
13  indicated that it was coming from Chapel Hill,
14  again, the location where HR Shared Services
15  was.
16      Q.   At this point after you learned of the
17  bankruptcy, you received something from Elena
18  King or reviewed something of that nature, what
19  did you next think you should do?
20      A.   Well, even prior to receiving this
21  letter, because, in fact, this letter came
22  quite a number of weeks after the CCAA filing
23  was.  I can't remember exactly, but I believe
24  it came sometime in February or March.  So I
```

1    remember being surprised at the date of January

2    28 being so far in the past.

3              But immediately after the CCAA

4    announcement, I was being inundated by emails

5    from people, asking if I knew information and

6    just trying to share with one another what was

7    going on, so I decided to set a -- make use of

8    social media, LinkedIn.  And I set up a group

9    on LinkedIn where all of us who were affected,

10   terminated employees, we could all post our

11   questions and help one another understand what

12   was going on and help not just with the

13   Nortel -- with the severance issues, but also

14   at that point it became possible for us to

15   claim for unemployment insurance benefits, so

16   we would help one another navigate through some

17   of those government red tape to make sure we

18   could at least get some money while we were

19   looking for jobs.  Many of us were still

20   looking for jobs.  It was kind of at the height

21   of the 2008 recession.

22        Q.  And did you do anything further to try

23   and obtain counsel or figure out what your

24   rights were?



1      A.   Yes, yes.   There was a group of about

2    ten of us who got together, met one evening at

3    someone's house, and we discussed the fact that

4    we should really try and find legal counsel of

5    our own to represent us in whatever legal

6    proceedings were going to take place.   And we

7    talked about, you know, looking at a few

8    different law firms.   And ultimately several of

9    us had had dealings with Nelligan O'Brien Payne

10   in Ottawa.   They were known to be a very

11   reputable employment law firm, and so we went

12   to them and asked if they would be willing to

13   take us on as clients.

14              They did agree, and I spoke with

15   Janice Payne, and we organized a way where

16   people could sort of sign up, pay a modest

17   retainer fee towards Nelligan O'Brien Payne,

18   and then subsequently Ms. Payne said that she

19   would put a motion before the Court in Canada

20   to get our -- to be appointed, formally

21   appointed as representatives for us as the

22   terminated employees.

23      Q.   Were other law firms also interested in

24   that opportunity?



1      A.   Yes.   Koskie Minsky had already -- it

2    was my understanding that Koskie Minsky had

3    already been involved with a group of

4    pensioners, and they also put forward a motion

5    to be named as court representatives.   Their

6    motion -- they asked to be -- I can't remember,

7    but I believe they asked to be representative

8    for all former employees, irrespective of

9    whether they were terminated, pensioners,

10   long-term disability.

11     Q.   I will ask you to look at Exhibit 54 in

12   the other book.   Was, in fact, Koskie Minsky

13   appointed as counsel for the former employees?

14     A.   They were, yes.

15     Q.   Do you have Exhibit 54?   Paula, do you

16   have Exhibit 54?

17     A.   Sorry.   Yes.

18     Q.   Have you ever seen the order appointing

19   Koskie Minsky as representative?

20     A.   Yes.

21     Q.   And is this what ultimately -- how they

22   ultimately were ordered to become your

23   representative, I mean be the representative of

24   all former Canadian employees?



1    A.   Yes.

2    Q.   I will ask you to turn to the signature

3    line page of that.

4    A.   Yes.

5    Q.   I refer you to paragraph 11.  I think

6    you heard in the opening statements an issue

7    about, as a sideline, and I don't know if you

8    were familiar with it, but there was a

9    statement in the opening statements about

10   liabilities and if you don't have a cause of

11   action here, if the Court does not open up the

12   bar date, that you would have the opportunity

13   to bring an action against your counsel should

14   you believe that's appropriate.

15             In paragraph 11, are you familiar

16   with whether or not you have that right or the

17   Court gave you that right?  If you will look at

18   paragraph 11.

19   A.   It is my understanding from paragraph 11

20   that I would not have that right.

21   Q.   Did you maintain an active interest in

22   this process?

23   A.   I did, absolutely.

24   Q.   And I know you worked on LinkedIn



1    extensively.  Did you then after Koskie Minsky

2    was appointed seek to be involved in the Koskie

3    Minsky process?

4        A.  I did.  I very much wanted to make sure

5    that the concerns of terminated employees did

6    not get overshadowed by the larger issues of

7    the pensioners.  There were many, many more

8    pensioners than terminated employees at that

9    point, and so I asked to be part of the legal

10   committee of the NRPC.

11              So the NRPC was formed to kind of

12   be, you know, a group of us who wanted to stay

13   active with understanding and influence,

14   helping to influence the court-appointed

15   representatives.  I didn't have any real legal

16   standing in that sense to do so, but I asked to

17   join the legal committee.  So that was a subset

18   of us who were interested in some of the legal

19   issues at hand to represent terminated

20   employees.

21       Q.  And did you attend -- what did you do in

22   that position?

23       A.  So in that position, certainly in the

24   early days there was a call once a week with



1    Koskie Minsky.  And I attended those

2    teleconference calls and actively worked with

3    predominantly Susan Philpott and Andrea

4    McKinnon at the time in the early days on

5    any -- you know, if there were questions, or I

6    helped -- often I would help gather

7    information.  So if Koskie Minsky had questions

8    about, you know, is this a concern, I would use

9    LinkedIn maybe to solicit opinions, so that I

10   really tried to make sure that I was not just

11   voicing my own opinion when offering that up to

12   Koskie Minsky; that I really was representing

13   the views of the larger terminated group.

14       Q.  And who did you think -- what did you

15   think the role of Koskie Minsky was in

16   representing you?

17       A.  I thought that their role was to

18   represent the interests of all employees in the

19   bankruptcy proceedings.

20       Q.  What did that mean to you?

21       A.  It meant that they were looking after my

22   interests and ensuring that when there were

23   things that we had to do to preserve our rights

24   and our claims, that they would tell us to do



1    those things.

2        Q.  Did you understand that there were

3    limitations as to what they could do on behalf

4    of you?

5        A.  Yes, I understood there were

6    limitations.  There were definitely times when

7    people would post things on LinkedIn or send an

8    email saying, well, I think Koskie Minsky

9    should do X for us, and it was clearly way out

10   in left field.  So I understood that there were

11   boundaries of sorts.

12           But anytime there seemed to be a

13   reasonable request that came my way or got

14   posted, I always made sure I went back to

15   Koskie Minsky to ask the question, you know, is

16   this something that we have to do, that we have

17   to be concerned about, because I am not a

18   lawyer myself, and I recognize that it is

19   important to ask when you are unsure.

20       Q.  What did you perceive the difference

21   between claims in Canada and claims anywhere

22   else as it was related to Nortel?

23       A.  At that time, let's say in 2009

24   certainly, to me and to many of us as former

```
1    Canadian employees, we really viewed that -- we
2    didn't really understand the significance of
3    the different legal proceedings.  And we viewed
4    it very much it is a process.  And to us it was
5    so black and white.  If you are a Canadian
6    employee, you follow this process.  If you are
7    a US employee, you follow this process.  And we
8    didn't really understand the implications, the
9    fact that by only following one of those two
10   processes, that that somehow would limit us.
11   And it just was -- it was emphasized to us time
12   and time again by Nelligan O'Brien Payne in the
13   very beginning, even before the court order, by
14   Koskie Minsky, by the Monitor, by the Elena
15   King letter, by even words that were
16   subsequently in documentation from the US
17   Court, that if we were Canadian, we followed
18   this Canadian process.
19                   And, you know, in the early days,
20   even when the Canadian bar date was published,
21   there was very clear language that said, you
22   know, employee claims are excluded.  There is
23   going to be this special process that gets set
24   up for you, so, you know, wait for that special
```

1   process.  And, you know, as someone that

2   follows -- that for a living I followed --

3   like, my job was to follow process for a

4   living, it just was so -- it just was so

5   obvious.  Like, we wait for that process.  That

6   process will come, and then we will follow that

7   process, and all will be taken care of.

8       Q.  I would like you to look, for example,

9   at Exhibit 43.

10      A.  Yes.

11      Q.  And can you tell me what this is?

12      A.  This is a news bulletin that Koskie

13  Minsky published to give an update to former

14  employees.

15      Q.  And were you familiar with the fact that

16  bulletins were being published?

17      A.  I knew that the bulletins were being

18  published.  I didn't always read them.

19      Q.  Can I ask you to turn to page 3 of the

20  bulletin?

21      A.  Yes.

22      Q.  And on page 3 of the bulletin it says,

23  "The Claims Process."

24      A.  Yes.



1      Q.   And did that get your attention?  Would

2    you look at something that talks about the

3    claims process?

4      A.   Yes, oh, absolutely I would.

5      Q.   And this says, "The Claims Process.  A

6    US claims process has been released.  A

7    Canadian process for creditors who are not

8    employees or former employees was approved on

9    June 30, 2009.  However, Representative

10   Counsel, the NRPC, the Company and the Monitor

11   are still conducting discussions to establish a

12   separate employee and former employee claims

13   process which must then be approved by the

14   Court.  You need not take any steps in this

15   process for now.  Once finalized, we will

16   notify everyone about the claims process and

17   how it will take place."

18               Did this announce to you that you

19   should do anything, or how did you respond to

20   something like this?

21     A.   Well, to me it was very clear there was

22   nothing to do right now.  We were to just wait,

23   and a special claims process was going to be

24   set up, and that would be published to us, and

1    then there would be, you know, potentially

2    action to take.

3        Q.   But doesn't it say in the first

4    sentence, "A US claims process has already been

5    released"?  If you thought you had global

6    claims, why did that not mean anything to you?

7        A.   Because we were Canadian, we were

8    Canadian employees, and so, you know, the

9    Canadian process for us, we were -- the

10   Canadian process was going to be published, and

11   we would follow that process.

12       Q.   Did you think that that in any way

13   affected what your rights were or did you think

14   of it as procedural?

15       A.   I viewed that -- I guess naively I

16   viewed that that was just the way things were

17   going to be done, that this was just a very

18   complicated -- I understood that it was a

19   complicated cross-border activity but that in

20   order to somehow simplify, you know, the

21   collecting and the filing of all of these

22   claims, that it was going to be done very

23   orderly.  If you were Canadian, you used this

24   process.  If you were US, you used this



1    process.  And I assumed, you know, similar

2    would be done in other legal entities around

3    the world.

4        Q.  After you learned about the US bar date,

5    did you receive notices on LinkedIn that some

6    Canadian employees had received a notice of US

7    bar date?

8        A.  Yes.

9        Q.  Did you know why that took place?

10       A.  I didn't.  At the time I did not know

11   why that was the case, and I specifically asked

12   Koskie Minsky why that might have been the

13   case.  And I urged anybody who had received

14   such notice to follow up with the Monitor and

15   with HR Shared Services to find out why that

16   would have been the case.  I assumed that if

17   you got notice of something, you know, a letter

18   that came to you directly, there must have been

19   a reason why and that, you know, maybe it was

20   an error, but at least if they got it directly,

21   they should absolutely follow up to find out

22   why that was.

23       Q.  Did you indicate anything about it

24   potentially being an error on your LinkedIn



1    post?

2         A.   Yes, I believe I did.

3         Q.   But you still advised to get counsel?

4         A.   Yes, I still advised to double-check.

5         Q.   Did you also advise people that, if they

6    worked in the United States, to do something?

7         A.   Yes.  So again, as someone -- I advised

8    that if you worked in the United States, that

9    might give -- that might be a reason for why

10   you should follow the US claims process to file

11   a claim for the time that you worked in the

12   United States.

13        Q.   Did you further address the issue about

14   having a contract with the United States?

15        A.   Yes.  There was -- I believe the

16   response I got back when I asked Koskie Minsky,

17   you know, why people might be receiving that

18   notice, part of the response was that if you

19   had a contractual obligation, something, words

20   to that effect, in the US.  And at that time I

21   very much viewed that that would mean, well, if

22   you were, say, a contract worker with the

23   company, you would have a contract that, you

24   know, described how much you would get paid and

1   the terms of that employment.  And so, you

2   know, perhaps people, some people might have

3   been contract employees and therefore would be

4   entitled to some sort of claim.

5       Q.  Did you yourself receive a notice of

6   proof of claim?

7       A.  No.

8       Q.  You specified that while your supervisor

9   was Tony Pirih in the United States and while

10  he called you to share the news after the fact,

11  that your direct supervisor was John Roese in

12  Canada?

13      A.  Yes.  From the day-to-day activities,

14  John, being in the same physical location as I

15  was, really gave me direction.

16      Q.  And have you subsequently become aware

17  that he actually did receive a proof of claim

18  notice from the United States?

19              MR. ROSENTHAL:  Your Honor, I am

20  going to object to that being hearsay.

21              THE COURT:  Yes, I will sustain

22  that objection.

23  BY MS. MERSKY:

24      Q.  Did you know anything further -- as this



1    process continued, did you think there was

2    anything you were supposed to do?

3        A.   No.   I thought I was doing everything I

4    was supposed to do to protect my rights.

5        Q.   Did there come a time that you learned

6    that there was something further you were

7    supposed to have done in 2012?

8        A.   Yes.   In 2012 I was made aware that

9    there was language in my termination letter

10   that might give me the right to file or would

11   have given me a right to file a claim prior to

12   the bar date.

13       Q.   And how did you learn that?

14       A.   I learned that from Koskie Minsky.

15       Q.   And previously you testified that you

16   thought that your claims were being covered,

17   that you were following the process in Canada.

18   Why would you want to file a claim in the

19   United States then if you were following the

20   process in Canada?

21       A.   Why was it of interest to me to do that?

22       Q.   Yes.

23       A.   Because ultimately I wanted to try to

24   ensure that I would be paid the money that I



1    viewed I was owed.  I had a termination

2    agreement that was signed in good faith by both

3    myself and the company, and I wanted to do

4    everything I could to make sure I would get

5    paid that amount of money.

6        Q.  As soon as you learned of that in 2012,

7    what did you do?

8        A.  So as soon as I learned of that, I

9    myself worked with Mike Campbell and had

10   discussions with Koskie Minsky and asked them

11   to investigate, you know, how we might go about

12   asserting that claim.  Koskie Minsky I believe

13   reached out and had discussions with the

14   Monitor and discussions, I believe, with Nortel

15   US legal counsel to discuss the possibility of

16   us --

17                MR. ROSENTHAL:  Your Honor, I am

18   going to object just to the part -- she can

19   talk about her own direct conversations but,

20   she can't talk about what Koskie Minsky told

21   her they discussed with others.

22                MS. MERSKY:  Your Honor, as to

23   what she understood as opposed to the truth of

24   the matter asserted, but what her state of mind

1    was at the time, what she understood was going

2    on, I think it is irrelevant and admissible.

3                    MR. ROSENTHAL:  I think it is

4    being offered for the fact that these

5    conversations happened, which is classic

6    hearsay.  Her state of mind on that issue is,

7    frankly, irrelevant.

8                    MS. MERSKY:  I think it is

9    relevant as to what she understood was being

10    done and how timely and quickly she was

11    proceeding.  What she understood the process,

12    using the Canadian language, was and how timely

13    and expeditiously she understood she was doing

14    things, I think it would be admissible.

15                    THE COURT:  For that limited

16    purpose I will overrule the objection.

17    BY MS. MERSKY:

18      Q.  So you understood there were discussions

19    going forward?

20      A.  I understood there were discussions

21    going forward, yes.

22      Q.  Did you decide at some point that you

23    needed to proceed further on behalf of the

24    group that you represented?



1       A.   So in December of 2012 it appeared that

2    the discussions that Koskie Minsky had been

3    attempting to have, or so I believed, had sort

4    of come to a halt.  And in discussion with Mike

5    Campbell, the two of us decided that the time

6    had come to hire legal counsel for ourselves to

7    try to ensure that we were proceeding as

8    quickly as we possibly could.  We felt we had

9    given enough time to allow the various legal

10   people to talk amongst themselves, and we

11   wanted to take things into our own hands, so we

12   contacted Ms. Mersky's firm and asked if they

13   would take us on as clients.

14       Q.   At that time were you advised that

15   Ms. Mersky's firm had recently obtained in 2012

16   late-filed claims for other people?

17       A.   Yes, we were, and that was one of the

18   reasons why we decided to employ Ms. Mersky's

19   firm.

20       Q.   And how quickly -- what did you do after

21   you chose to employ my firm?

22       A.   So we very quickly, I set about trying

23   to make sure that all -- we understood that

24   there were approximately 300 people that were

1    in a similar situation.  I didn't know -- I

2    wasn't privy to the specific list at that

3    point, but we made arrangements to have a

4    letter sent out -- Koskie Minsky did that on

5    our behalf -- to those 300 or so people,

6    informing them of the situation, informing them

7    if they wished to join the group of us who were

8    going to pay to have legal counsel of our own,

9    that they should do so very quickly.

10             Koskie Minsky agreed to kind of be

11   the broker to collect the money and the money

12   for the initial retainer.  But in terms of sort

13   of organizing that and taking care of the

14   administrative aspect, I did the bulk of that

15   work, you know, answering questions from people

16   and ultimately being assistance to the Mersky

17   firm to collect the names.

18      Q.   And from sometime in late December 2012,

19   did, in fact, the full process complete and the

20   motion was filed on January 1, 2013?

21      A.   Yes.  So between the end of the year

22   2012 or early January and basically the end of

23   January, within that month we had gathered,

24   rallied our troops, figured out who was wishing



1    to participate, collected all the money and

2    filed the motion.

3        Q.  Did you believe and understand that

4    Debtors' counsel had previously been provided

5    with a list of all these people?  Is that your

6    understanding?

7                    MR. ROSENTHAL:  I am going to

8    object to that again as being hearsay, her

9    understanding on this issue.  Completely

10   irrelevant.  This is clearly for the truth of

11   the matter.

12                    MS. MERSKY:  It is not for the

13   truth of the matter asserted.  It is, in fact,

14   for her understanding.  And I would like to

15   have her reflect and review Document No. 202,

16   which reflects email correspondence by and

17   between Koskie Minsky and Cleary Gottlieb.

18   Exhibit 202 includes an email from Koskie

19   Minsky to Cleary Gottlieb at the specific

20   request of Cleary Gottlieb, identifying all 311

21   people and the maximum amount of their claims.

22   And further, the email chain reflects from

23   Cleary Gottlieb the delay process and including

24   the fact that Cleary Gottlieb couldn't get back



1    to them because of Hurricane Sandy.

2                THE COURT:  Well, Ms. Klein was

3    not copied on any of these documents.  Is that

4    correct?

5                MS. MERSKY:  Ms. Klein was advised

6    of the existence of these documents, and most

7    importantly, she believed these things were

8    being done.  And this is consistent with and

9    supportive of her understanding of what was

10   happening during that timeframe.

11               MR. ROSENTHAL:  I guess I still

12   don't understand, Your Honor, how Ms. Klein

13   testifying about communications between other

14   parties, if it is not for the truth of the

15   matter, why is it relevant in terms of her

16   state of mind?  Nobody is challenging her state

17   of mind on this issue.  We are saying that this

18   delay from their counsel being apprised of it

19   until the filing is the relevant period of

20   time.  I don't know why her state of mind is

21   relevant.  It is certainly not something that

22   we have raised in our papers.

23               MS. MERSKY:  The delay issue is an

24   issue that has been directly raised by the



1    Debtors.  The claimants, not Koskie Minsky, are

2    the people who are affected by this motion.

3    The claimants' representatives understood and

4    were provided references which are supported by

5    the emails from Debtors' counsel, at Debtors'

6    counsel request, that things happen which

7    further delayed the process, the normal process

8    of counsel, consulting counsel to try to work

9    something out before involving the Court in

10   litigation.

11             This is a delay issue which

12   Ms. Klein was directly affected by and which

13   she understood things were happening and it

14   wasn't an undue delay.  They are having a

15   request to have a prejudice of my clients, not

16   Koskie Minsky.  It is not going to affect

17   Koskie Minsky one way or the other.  But I

18   think it is very important for this Court to

19   understand what the witness thought, why the

20   witness thought it, and the fact that the

21   witness' beliefs were consistent with the

22   documents at the time.

23             MR. ROSENTHAL:  Your Honor, I

24   think this actually brings us back to the issue



```
1    that we had mentioned earlier of Koskie Minsky
2    refusing to provide us with information and the
3    movants refusing to direct their
4    representatives to provide us with information.
5             What Ms. Mersky is showing you and
6    arguing is that from sometime in October there
7    were discussions and a dialogue that they
8    attempted to have with Cleary Gottlieb that
9    they concluded about six weeks later were not
10   going to go anywhere.  It is a six-week period,
11   that one period.
12            We know from Mr. Campbell's
13   affidavit that back in June, if not earlier,
14   Koskie Minsky had identified -- we saw the
15   emails with the Monitor and Koskie Minsky about
16   how do we best use this.  There is other
17   evidence in the record that says that this
18   could have been as early as the beginning of
19   2012.  We don't know if it is earlier.  We
20   don't know because they won't give us this
21   information.
22            So to say that there is particular
23   relevance going through her state of mind about
24   the reason for six weeks out of this
```



1    eight-plus-month period and that the Court

2    should be drawing conclusions from that, in the

3    absence of their willingness to actually

4    produce the full record on this, I think is

5    both improper hearsay and insufficient to meet

6    whatever burden they have to justify this

7    period of delay.  We could have gotten the full

8    record.

9              MS. MERSKY:  Your Honor, I take

10   great umbrage with the representations made of

11   counsel, who I respect greatly.  First of all,

12   the record reflects from the letter exchange

13   which are part of this record and are

14   introduced that, first of all, as counsel to

15   these committee members, I have no power

16   whatsoever to compel Koskie Minsky to attend a

17   deposition.  But Koskie Minsky did, as

18   reflected in these letters, respond to their

19   document request.  There may be a dispute as to

20   whether or not the document request was

21   complete.  It is my understanding from the

22   record that it was.

23              However, should Koskie Minsky have

24   been important for in deposition and should



```
1     that deposition not be otherwise

2     attorney-client privilege, this lawyer and

3     counsel, who has issued subpoenas for

4     attendance of depositions all over the world in

5     this case, could very easily have proceeded

6     with that process.  It was not any lack of

7     diligence on my part or, most importantly, on

8     my clients' part.

9                    THE COURT:  We have gotten far

10    afield.

11                   MS. MERSKY:  And I apologize.

12    But, Your Honor, I believe these emails are

13    important to understand that my clients, who

14    are asked to be directly affected by an alleged

15    delay, my clients' understanding is important.

16    And these documents, which are just emails from

17    the Debtors' counsel's law firm --

18                   MR. ROSENTHAL:  Your Honor, one

19    point.

20                   THE COURT:  Mr. Rosenthal.

21                   MR. ROSENTHAL:  I do believe

22    Ms. Mersky misspoke insofar as the record is

23    very clear that Koskie Minsky told us what we

24    could do with our document requests.  If
```



**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

1    Ms. Mersky wants to show a response that

2    produces the documents that we requested on the

3    subject, I would love to see it.  I presume the

4    Court would love to see it, because it is not

5    there and it is not in the record, because they

6    didn't.  We asked them specifically when did

7    you learn of these claims and kind of what

8    happened during that period of time.  We got

9    nothing on that subject whatsoever.

10                I just want -- because of the

11    representation she made, if there is something

12    that she wants to point to in the record

13    without just saying it is in the record that

14    they did comply, it is just not there.  It is

15    not true.

16                THE COURT:  Well, strictly as

17    relating to the question that was asked of the

18    witness, that is, I will sustain the hearsay

19    objection.  It is hearsay.

20                As far as the implications of

21    Koskie Minsky not participating in discovery,

22    that we will have to talk more about, I think.

23    You know, I think that it is problematic that

24    certain documents are being introduced from

1    Koskie Minsky without a full record of

2    documents and the like.  So that does trouble

3    me some.  But I am not -- as to this particular

4    question, I am just sustaining the objection on

5    the basis of hearsay as to the question itself.

6              MS. MERSKY:  Your Honor, and we

7    kind of got a little -- I want to get back to

8    the main story here.

9              THE COURT:  Yes, that's right.

10             MS. MERSKY:  But I want this Court

11   to understand that there were actions in good

12   faith by all parties.  There is a document of

13   letters back and forth and what those letters

14   mean.  However, as counsel to 170 individuals,

15   I have no power over Koskie Minsky.  I made

16   requests consistent.  And should the Debtors

17   have believed that this was an incomplete

18   record or they needed more, they had options

19   open to them which they have used on numerous

20   occasions.

21             THE COURT:  I agree you didn't

22   have any control over Koskie Minsky.  The

23   question, though, is whether your clients had

24   control over Koskie Minsky.  That's a different

```
 1    question.

 2                    But let me ask you a question,

 3    because we have been going for about two hours.

 4    How much longer do you think you might have

 5    with Ms. Klein?

 6                    MS. MERSKY:  This witness is just

 7    a few more minutes, Your Honor.

 8                    THE COURT:  Okay.  All right.

 9                    MS. MERSKY:  And I would also like

10    to request a brief recess.

11                    THE COURT:  You bet.

12    BY MS. MERSKY:

13        Q.  Okay.  Getting back to this whole

14    process that started back and your retention of

15    counsel, how quickly did you act once you knew

16    of this process that needed to be done?

17        A.  Once I knew, I acted very quickly.  I

18    urged speed and tried to instill a sense of

19    urgency when communicating to the broader group

20    at all times.  I really felt that any delay on

21    our part would be viewed as -- you know, where

22    we could control it, I felt any delay that we

23    caused ourselves would be viewed unfavorably

24    for any undertaking that we might have.
```



1      Q.   And how quickly from the time that you

2   retained counsel to the time the motion was

3   filed?

4      A.   Approximately one month.

5      Q.   And during that one month can you

6   describe what occurred to notify the 311 people

7   and what they had to do should they retain

8   counsel?

9      A.   So a letter was drafted, was mailed out

10   and also emailed out to individuals.  I posted

11   notices on LinkedIn about the instructions

12   people had to -- I requested that if you wanted

13   to sign up, you had to sign -- fill out and

14   sign a form saying that you did, in fact,

15   receive a termination letter that had the

16   language that we were looking for in it.  You

17   had to send payment to Koskie Minsky, to Mersky

18   firm care of Koskie Minsky, and contact

19   yourself as well.

20      Q.   Was Koskie Minsky's address used just to

21   process Canadian credit cards, do you know, or

22   were they actually contributing to this

23   process?

24      A.   Their address was used simply to process



1    the credit card payments, to make it easier for

2    the individuals.

3        Q.  From your perspective years later, is

4    there anything you could have done more at the

5    time based upon what you knew at each stage of

6    the game?

7        A.  At each -- I don't believe there is

8    anything more that I could have done given the

9    information that I knew at every step of the

10   way.

11       Q.  And did that understanding as far as

12   what you knew at every step of the way, did

13   that change as the process unfolded a little

14   bit?

15       A.  Yes, absolutely.  You know, when I

16   started, I know nothing about bankruptcy law

17   and claims processes and so on.

18       Q.  Are you a very diligent person in

19   following up on things?

20       A.  Yes.

21       Q.  This emphasis on the employment

22   agreements, when you first got your termination

23   letter, did any of this language mean anything

24   to you?



1        A.   No, not when I first got my termination

2    agreement.   To be honest, I was really focused

3    on how much money were they offering me,

4    because I no longer had a job.   And I actually

5    went to Nelligan O'Brien Payne to have them

6    review the letter, to advise me as to whether

7    or not the amount that was being offered me was

8    commensurate with my years of service and my

9    level of seniority within the company.

10                  My primary concern was ensuring

11   that I had money to live on while I sought a

12   new job.

13       Q.   Did you at that time understand what

14   company, what entity was going to be paying you

15   for the severance?

16       A.   I understood that there was a legal

17   entity that was going to pay me, but it was not

18   significant in my thinking, in that I just

19   thought, yes, okay, that's the legal entity

20   that pays my paycheck.   From my perspective, I

21   work for a global Nortel company.

22       Q.   And the definition in your employment

23   agreement -- go back to Exhibit I think it is

24   205, page 254, page 453, your employment

1    agreement.

2        A.  Yes.

3        Q.  That definition of company, it is a

4    definition that says the term "Corporation."

5    Do you see that?

6        A.  Yes.

7                MR. ROSENTHAL:  I am just going to

8    object.  I think Ms. Mersky misspoke in calling

9    this document an employment agreement.

10               THE COURT:  She did.

11               MS. MERSKY:  Oh, I absolutely did,

12   and I apologize, Your Honor.

13   BY MS. MERSKY:

14       Q.  What is this agreement to you?

15       A.  This is a termination agreement.

16       Q.  And did you think the termination

17   agreement was the same thing as an employment

18   agreement?

19       A.  No, I did not.

20       Q.  And so this termination agreement, were

21   you being terminated, as far as you

22   understood -- was this definition in here of

23   "Corporation," which is, "As used in this

24   letter the term 'Corporation' shall mean Nortel



**Paula D. Klein - Direct**                    107

1    Networks Corporation, its subsidiaries and

2    affiliates, their successors and assigns, and

3    all other past and present officers and

4    directors, employees and agents," is that what

5    you understood was the big picture of Nortel

6    that you were employed by?

7                    MR. ROSENTHAL:  I am going to

8    object to form on that.

9                    THE COURT:  I thought the witness

10   had already sort of answered that question.

11   But I will sustain the objection, and it is

12   probably leading, at the very least.

13   BY MS. MERSKY:

14      Q.  Did you believe you were giving up

15   anything to the global corporation in signing

16   this termination agreement?

17      A.  Yes, I did.  I believed that there were

18   certain things like intellectual property, any

19   patents that I might have -- I didn't in my

20   case, but I believe had I filed patents on

21   behalf of the company, I was giving up any

22   rights to those.  I believe that I was not

23   allowed -- as part of the agreement I was not

24   allowed to solicit former co-workers to come



1    work for me in any subsequent employment I

2    might have.  So there were a number of things

3    that I was agreeing to abide by that were

4    documented in that agreement.

5        Q.  And in connection with things like the

6    employees, did you distinguish between Canadian

7    employees and employees who were located in the

8    United States?

9        A.  No, I didn't.  I viewed that I was not

10   allowed to solicit anyone:  Canada, US, UK,

11   anywhere around the world.  I was not allowed

12   to solicit them.

13       Q.  From your perspective, have you done

14   everything you can to pursue your claims?

15       A.  I believe so.

16               MS. MERSKY:  Thank you.

17               THE COURT:  Let's take a 12-minute

18   recess, if that is sufficient time for

19   everybody.  All right.  And we will be back

20   here about 25 after.

21               I will just ask you, Ms. Klein,

22   not to discuss your testimony with anyone

23   during the recess.  Thank you.

24               (Recess taken.)



1               THE COURT:  Thank you, everyone.

2     Please be seated.  Just from a sort of

3     logistics standpoint, it is 12:30.  I do like

4     to get through a witness before we take a lunch

5     break.  And will your examination be fairly

6     lengthy?  I assume it will take, what, about an

7     hour, do you think, Mr. Rosenthal?

8               MR. ROSENTHAL:  It all depends,

9     Your Honor.  Sometimes witnesses go faster than

10    you think and sometimes not as fast.

11              THE COURT:  All right.

12              MR. ROSENTHAL:  I am going to try

13    not to spend too much if I can.

14              THE COURT:  All right.  Well, you

15    spend whatever time you need.  I was just

16    trying to think in terms of scheduling.

17              MR. ROSENTHAL:  But I think

18    candidly, we view Ms. Klein as the main

19    witness, and probably her examination will be

20    longer than either of the others.

21              THE COURT:  All right.  Whatever

22    it is, it is.

23              MR. ROSENTHAL:  Before I start,

24    Your Honor, again, because the issue that



1    really, as you pointed out, is really more for

2    argument later, but Ms. Mersky had mentioned

3    that she and her firm did all that they could

4    to try to get Koskie Minsky to cooperate.  I

5    would just direct the Court to Exhibit 128,

6    which is Ms. Mersky's response to me after we

7    asked for their assistance.

8                     THE COURT:  Yes.

9                     MR. ROSENTHAL:  And I don't think

10   you will find a single reference in there to

11   any request that they ever made.  They just

12   told us no and justified why they were telling

13   us no.  If I misread that letter, then

14   Ms. Mersky will point you to something in her

15   letter to me that says that she told Koskie

16   Minsky on behalf of her clients to cooperate.

17                     THE COURT:  Okay.

18                     CROSS-EXAMINATION

19   BY MR. ROSENTHAL:

20     Q.   Good afternoon, Ms. Klein.  We have

21   heard a lot about this morning and also in the

22   papers, the judge has read about the LinkedIn

23   group of recently severed Canadian Nortel

24   employees.  And you are familiar with that



1    group; right?

2        A.   Yes.

3        Q.   And in fact, you are the founder of that

4    group?

5        A.   I guess so, yes.

6        Q.   And what happened was right after Nortel

7    filed for CCAA protection in Canada, you had

8    been receiving hundreds of emails, and you

9    wanted to set up a site where severed employees

10   could share information; right?

11       A.   Correct.

12       Q.   And you set up the LinkedIn site as a

13   result the day after the CCAA filing?

14       A.   Yes.

15       Q.   And since that time you have been the

16   administrator of the LinkedIn site; correct?

17       A.   Yes.

18       Q.   And it is a closed site, so I can't just

19   log on and read all of the threads; correct?

20       A.   Correct.

21       Q.   So for some of the members of the site,

22   you actually sent email invitations inviting

23   them to join; correct?

24       A.   The very first week, yes.



1      Q.   And then others learned about it through

2    word of mouth, and they would send a request

3    that would go to you to add them as members,

4    and you would click to approve them; right?

5      A.   They would, through the LinkedIn

6    website, they would click on a link that would

7    generate an automated request to me, which I

8    would subsequently review and approve or not.

9      Q.   And since you founded it, the membership

10   in the LinkedIn group has grown significantly;

11   correct?

12     A.   Correct.

13     Q.   And, in fact, a year ago there were

14   approximately 900 members of this LinkedIn

15   group?

16     A.   Yes.

17     Q.   You have, in fact, heard over the years

18   that many people on the LinkedIn website are

19   grateful to you for setting up the website as a

20   way to distribute information?

21     A.   Yes.

22     Q.   If we were to look at the Monitor's

23   website and other potential sources of

24   information about the Nortel bankruptcy, you

1    would agree that there is a huge amount of

2    information out there, most of which doesn't

3    have anything to do with retired or severed

4    employees; correct?

5        A.   I would agree.

6        Q.   And it is fair to say that one of the

7    values of the LinkedIn group that you founded

8    and administer is to help distill the wealth of

9    information and provide the key information

10    that is of interest to its members?

11        A.   I don't -- it is a way for people to

12    share information and opinions and ask

13    questions.  I don't view that its primary

14    purpose is to -- I don't pretend that it is a

15    source of information where people should go

16    and only go.

17        Q.   Well, but one of the things that it does

18    is it helps distill all of the wealth of

19    information that is out there to help focus

20    people on some of the core information of

21    importance to them; correct?

22        A.   Yes.

23        Q.   And you have been an active contributor

24    to the LinkedIn website as well in addition to



1    being an administrator; correct?

2        A.   Correct.

3        Q.   And when you have come across relevant

4    information from others like the Koskie Minsky

5    law firm, you have posted summaries of that

6    information on the LinkedIn website; right?

7        A.   Yes.

8        Q.   And, in fact, in one of the posts you

9    also provided a link to Koskie Minsky's website

10   on the Nortel bankruptcy and advised people to

11   bookmark that website as a valuable source of

12   information?

13       A.   Yes.

14       Q.   And we will come back to LinkedIn a

15   little bit later, but I want to talk a little

16   bit now about your situation.

17                    At the time that you were

18   terminated, you were employed by a Nortel

19   Canada entity?

20       A.   Yes.

21       Q.   You worked in Canada?

22       A.   I did.

23       Q.   You were paid in Canadian dollars?

24       A.   Yes.



1      Q.   And when you signed your termination

2    letter, your understanding was that a Nortel

3    Canadian entity had obligations to you as a

4    recently severed employee; correct?

5      A.   I understood that Nortel globally had

6    obligations to me and those would be fulfilled

7    through the Canadian corporation.

8      Q.   And your salary up till that point in

9    time was paid by the Nortel Canadian

10   corporation; correct?

11     A.   Yes.

12     Q.   And at the time of your termination you

13   believed that you were entitled to your

14   nonworking notice payments from a Canadian

15   Nortel entity; right?

16     A.   Yes.

17     Q.   And at the time you believed that you

18   were entitled to your severance payments from a

19   Canadian Nortel entity; right?

20     A.   Yes.

21     Q.   At the time that you were terminated,

22   you were not employed by any Nortel US entity;

23   correct?

24     A.   Correct.



1        Q.   So we looked before -- Ms. Mersky showed

2    you your termination letter.  You received that

3    in November of 2008?

4        A.   Yes.

5        Q.   You read the letter when you received

6    it?

7        A.   No, not right at that moment.

8        Q.   You took it home and read it?

9        A.   Yes.

10       Q.   Before you signed it you took it to a

11   lawyer; right?

12       A.   Yes.

13       Q.   That was Nelligan O'Brien Payne, that

14   law firm?

15       A.   Yes.

16       Q.   And you selected Nelligan because they

17   had a reputation of being the best in

18   employment lawyers in Ottawa; right?

19       A.   Yes.

20       Q.   And you gave Ainslie Benedict of

21   Nelligan a copy of your termination letter?

22       A.   I did.

23       Q.   And then you sat down with her in person

24   and reviewed it with her; right?



1      A.   Yes.   As I said before, my primary

2   interest was to make sure that the money they

3   were offering was commensurate with what my

4   experience and years of service.

5      Q.   Well, that was your interest, but you

6   gave her your letter, which it is not a very

7   long letter; right?  It is a few pages?

8      A.   Yes.

9      Q.   And you asked her to review the letter

10   to be able to give you advice; correct?

11      A.   I asked her whether what they were

12   offering me was fair.

13      Q.   Did you tell her that you did not want

14   advice on anything else?

15      A.   No, I didn't say no, I don't want advice

16   on anything else.  But I did ask -- you know, I

17   said I wanted to speak with her about whether

18   this was a fair severance offer.

19      Q.   And, in fact, you had communications

20   about your severance with Ms. Benedict of the

21   Nelligan firm after the CCAA proceedings were

22   commenced as well; correct?

23      A.   I went back to her to ask what the CCAA

24   filing meant for the payments that I was owed.

```
 1        Q.  I would like to turn now and talk a
 2   little bit about; in fact, spend most of our
 3   time talking today about your desire to file a
 4   late claim against the US Debtors.  And you
 5   understand here that nobody is disputing your
 6   right to have a claim against the Canadian
 7   Debtors for your severance, don't you?
 8        A.  Yes.
 9        Q.  And you understand that the issue here
10   just concerns your right as an employee of the
11   Canadian Debtors to pursue a claim against the
12   US Debtors years after the bar date.  You
13   understand that that's what this proceeding is
14   about?
15        A.  Yes.
16        Q.  I would like to focus on two particular
17   issues, and I will tell you what they are.  One
18   is I want to talk about what you knew about the
19   US claims process as it was unfolding and
20   specifically about the bar date in 2009, and
21   second, I want to talk about what you did in
22   2009 to investigate whether you had a possible
23   claim against the US Debtors.
24                  So with those issues in mind, let
```



1     me just ask, shortly after you received your

2     termination letter, you learned that Nortel

3     Canada filed for bankruptcy?

4         A.   Yes.  Well, sorry.  They filed for

5     creditor protection in Canada.

6         Q.   And the day after that is when the

7     LinkedIn group was founded by you?

8         A.   Yes.

9         Q.   And shortly thereafter you were part of

10    a steering committee of retired and severed

11    Canadian Nortel employees?

12        A.   Yes.

13        Q.   And you formed that committee to, among

14    other things, find a law firm that would

15    represent you and other similarly situated

16    employees in the CCAA proceedings?

17        A.   I didn't personally form that committee,

18    but I was part of that.  I am not sure if you

19    are connecting the committee with the LinkedIn

20    group.  But they were two separate things.

21        Q.   Well, you were one of the founders of

22    the steering committee as well?

23        A.   Yes.

24        Q.   And one of your motivations in being one



1    of the founders for the committee was to help

2    find legal counsel to help represent you and

3    other employees in the CCAA proceedings;

4    correct?

5        A.   Yes.

6        Q.   And one of the law firms that was being

7    considered for that role was Nelligan O'Brien?

8        A.   Yes.

9        Q.   Prior to your first meeting with

10   Nelligan O'Brien after the CCAA proceedings

11   were commenced, you compiled a list of

12   questions from members of your LinkedIn group

13   that you wanted to ask the lawyers; right?

14       A.   Yes.

15       Q.   And you wanted to make sure that these

16   questions would be answered by the lawyers as

17   part of your consideration of what to do;

18   right?

19       A.   Yes, for the meeting that I was

20   attending, yes.

21       Q.   Let's take a look at Exhibit 67.

22               MR. ROSENTHAL:  Your Honor, I

23   don't know if it is easier for you.  I have got

24   copies of these I can hand up, or if you want



1    to just work with the binder you have in front

2    of you.

3                    THE COURT:  I will work with the

4    binder.  That's fine.  But thank you,

5    Mr. Rosenthal.

6    BY MR. ROSENTHAL:

7        Q.  Ms. Klein, do you have all the documents

8    there as well or --

9        A.  Yes.

10       Q.  -- do you want --

11       A.  No.  I am good.

12       Q.  If we could turn to page 6 of this

13   document, this reflects questions that your

14   group had and answers that were given by

15   Nelligan when you met with them; correct?

16       A.  These are the notes that I typed up

17   after my meeting with Nelligans to summarize

18   answers to specific questions that I may have

19   had.  In some cases it was questions that were

20   forwarded to me.  But it was a way for me to

21   organize my thoughts after that meeting.

22       Q.  And, in fact, what you did at the

23   meeting was you came in with a list of

24   questions, and you took handwritten notes



1    during the meeting and then typed them up

2    afterwards?

3        A.   Yes.

4        Q.   So you learned at the meeting that there

5    were separate insolvency proceedings in the US

6    and Canada; correct?

7        A.   Yes.

8        Q.   As well as the UK?

9        A.   I can't recall that specifically.

10       Q.   And you wanted to understand at this

11   meeting the legal ties between the Canadian and

12   the US proceedings; correct?

13       A.   I don't remember if that was

14   specifically one of the questions.

15       Q.   Well, maybe if you can refresh your

16   recollection, can you look at 33 on page 6,

17   "How does the Bankruptcy Protection process in

18   Canada relate to the one in the USA (and

19   potentially UK)?  Is there a legal, binding tie

20   between the two?"

21              Does that refresh your

22   recollection as one of the issues that you

23   wanted advice on?

24       A.   Yes.



**Paula D. Klein - Cross**

1      Q.   And that was important because you

2    wanted to understand what the implications were

3    for your severance; correct?

4      A.   Yes.

5      Q.   And you understood that, in fact, there

6    are two separate proceedings going on in the US

7    and in Canada; correct?

8      A.   Yes.

9      Q.   Now, at the time you understood that the

10   US and the Canadian proceedings had very

11   different processes from an employment law

12   perspective; correct?

13     A.   That was what was communicated to us.

14     Q.   Now, from early 2009 until May of 2009

15   Nelligan's mandate from the steering committee

16   was never anything other than to give advice

17   with respect to the Canadian process; right?

18     A.   Correct.

19     Q.   And that was clear among all the members

20   of the LinkedIn group; correct?

21     A.   I can't speak to what other people

22   thought.

23     Q.   Your belief at the time was that was

24   made clear to all of the members of the

1    LinkedIn group; correct?

2        A.   I recall making statements to that

3    effect.

4        Q.   On LinkedIn?

5        A.   On LinkedIn, yes.

6        Q.   And there came a point in time when

7    there was a court hearing in Canada to select

8    which law firm would represent the severed

9    employees with respect to the Canadian

10   proceedings; correct?

11       A.   Yes.

12       Q.   And I think Ms. Mersky showed you

13   Exhibit 54?

14       A.   Yes.

15       Q.   Is this the Canadian order that came out

16   of that court hearing?

17       A.   Yes.

18       Q.   And going into that court hearing, you

19   and others were advocating the selection of the

20   Nelligan firm, and the Court picked Koskie

21   Minsky; is that right?

22       A.   To be for the terminated employees.

23   That's what we wished, to have Nelligans be our

24   representative.



1        Q.  You understood quite clearly that this

2    representation was specifically with respect to

3    the Canadian proceedings; correct?

4        A.  I understood that.  But I also at that

5    time did not believe that I had an option to

6    follow any other process for -- as a Canadian

7    employee, I believed that that was the way to

8    file my claim, was going to be in the Canadian

9    court.

10       A.  Well, we will talk about the claim

11   specifically when we talk about the bar date in

12   a few moments, but I just want to get an idea

13   of you understood at this time that Koskie

14   Minsky was being appointed as counsel for the

15   Canadian proceedings specifically; correct?

16       A.  Yes.

17       Q.  By the way, Ms. Mersky asked you to look

18   at paragraph 11, where it says that they will

19   have no liability except for any gross

20   negligence or unlawful misconduct on their

21   part.  When you gave your testimony in response

22   to Ms. Mersky's questions on that subject, was

23   that just your own interpretation or did

24   somebody expressly advise you that if they

1    committed malpractice, that this provision

2    would exonerate them?

3         A.   That's my interpretation of that clause.

4         Q.   Have you sought legal counsel on that

5    question, whether your interpretation is right?

6         A.   No.

7         Q.   Let's now talk about the bar date

8    specifically, the US bar date.  Now, one of the

9    arguments we have heard your counsel make this

10   morning is that you were never mailed notice of

11   the US bar date.  You heard that?

12        A.   Yes.

13        Q.   Now, at some point in time around July

14   of 2009 you learned in advance even that there

15   was going to be a bar date set in the United

16   States; correct?

17        A.   Yes.

18        Q.   And, in fact, you then learned that

19   there had been a bar date set in the United

20   States very quickly after it was made public;

21   right?

22        A.   Yes.

23        Q.   And there were discussions on your

24   LinkedIn group about the US bar date



1    specifically; correct?

2        A.   Correct.

3        Q.   And you personally publicized on the

4    LinkedIn group that a US bar date had been set;

5    correct?

6        A.   Correct.

7        Q.   So is it fair to say that every single

8    movant who was reading your posts on LinkedIn

9    also knew of the US bar date, whether or not

10   they received an actual notice?

11       A.   I can't comment as to what they --

12       Q.   But if they read your posts, then they

13   would have known that there was a US bar date;

14   correct?

15       A.   Yes, if they read my posts.

16       Q.   And you understood back in 2009 that the

17   US bar date applied to people who had claims

18   against Nortel US; correct?

19       A.   At that time I understood that if you

20   were a US employee you -- if you were a US

21   employee, the bar date in the US would apply to

22   you.  And if you had, you know, other specific

23   claims as a creditor, as a general creditor,

24   that US bar date would apply to you.

1      Q.   So you understood that one category of

2   people for whom the US bar date applied were US

3   employees; correct?

4      A.   Yes.

5      Q.   And another category of people for whom

6   the US bar date applied was people who were not

7   US employees but had claims against the US

8   Debtor; correct?

9      A.   Yes.

10      Q.   And you publicized that to your LinkedIn

11   group; correct?

12      A.   Yes.

13      Q.   And while we use the term "bar date"

14   that we are all used to as lawyers talking

15   about here in Bankruptcy Court in Delaware, you

16   even as a lay person understood that by "bar

17   date," that was a deadline to file claims?

18      A.   Yes.

19      Q.   And you knew in July of 2009 that that

20   US deadline was September 30, 2009?

21      A.   Yes.

22      Q.   And as a consequence, you actually

23   posted on the LinkedIn site there is a US bar

24   date of September 30, 2009; right?

1    A.   Yes.

2    Q.   And you also knew and personally posted

3  that the US bar date of September 30, 2009

4  applied to employee claims; correct?

5    A.   Applied to employee claims, yes, but at

6  the time -- you have to understand that at the

7  time, the way I was thinking was that it was

8  referring to employee claims for people who had

9  worked in the United States.

10    Q.   In addition to the other categories you

11  had previously defined -- correct? -- of

12  creditors?  People had worked in the United

13  States as well as the other categories of

14  creditors that you had described earlier?

15    A.   Other -- yes.

16    Q.   Now, not only did you want to make sure

17  that all of your colleagues knew of the US bar

18  date but you publicized to them that if they

19  may have claims against a US debtor, they

20  should let you know and you will help give them

21  assistance in finding a US lawyer; right?

22    A.   That I would find a US lawyer?  No.

23    Q.   Well, that they should let you know and

24  you will refer that to Koskie Minsky to help



1    find a US lawyer; right?

2        A.   That Koskie Minsky could help find them

3    a US lawyer, yes.

4        Q.   And you posted something on LinkedIn to

5    let people know, hey, let us know if you may

6    have a claim against the US so we can get you

7    counsel there; right?

8        A.   Yes.

9        Q.   And in addition to what you heard and

10   read about the US bar date, you actually

11   reviewed the bar date notice itself; right?

12       A.   Yes, I reviewed some of the documents,

13   some of the documents for that -- I don't know

14   the right term.  Not the motion.  The order.

15       Q.   The bar date order you actually read;

16   right?

17       A.   I read -- I remember, for whatever

18   reason, only looking at Exhibit B, but Exhibit

19   B of that order.

20       Q.   And Exhibit B you listed was the one

21   that said order for the bar date; correct?

22            I am going to hand you a document

23   that I believe in your errata you identified as

24   what you reviewed, and you can just confirm



1    that for us.  Why don't we mark this as a new

2    number.  Just give me a number that is past --

3                    MS. PARTHUM:   151.

4                    MR. ROSENTHAL:   We will call this

5    151.  May I approach, Your Honor?

6                    THE COURT:   Yes, you may,

7    Mr. Rosenthal.  You may approach the witness as

8    well.

9                    (Exhibit No. 151 was marked for

10   identification.

11   BY MR. ROSENTHAL:

12       Q.   Ms. Klein, Exhibit 151 is the document

13   that you actually reviewed; right?

14       A.   Correct.

15       Q.   And that was prior to September 30, 2009

16   you reviewed this; correct?

17       A.   I believe so.

18       Q.   Now, I want to go back in time now to

19   let's say January 1, 2012.  So let's put

20   yourself back in what you knew and thought at

21   that time, a little over two years after the

22   bar date had passed.  You had your termination

23   letter at that point in time; correct?

24       A.   Yes.



1      Q.  You had received it years earlier;

2   correct?

3      A.  Yes.

4      Q.  And you had an interpretation of your

5   termination letter back on January 1, 2012 that

6   is different from how you interpret it sitting

7   here in court today; correct?

8      A.  Yes.

9      Q.  And, in fact, at the time, back in

10  January 2012 and prior to then, so on

11  January 1, 2012, you had an understanding that

12  there were lockbox proceeds from the sale of

13  the Nortel Group's assets; right?

14     A.  Yes.

15     Q.  And you understood that some of those

16  lockbox proceeds would be given to the Canadian

17  Estate, some would be given to the US Estate,

18  and some would be given to the EMEA Estates;

19  correct?

20     A.  Yes.

21     Q.  And back in January of 2012, your

22  expectation was that you would get a portion of

23  the Canadian Estate's allocation of those

24  proceeds; correct?



1        A.    Yes.

2        Q.    And, in fact, while your counsel and you

3    have spoken today about one global Nortel and

4    working for a global company, back in January

5    of 2012 you knew that you had no entitlement to

6    the US or the EMEA portions of the lockbox

7    proceeds; right?

8        A.    At that time I did not believe I had an

9    entitlement to either of those.

10       Q.    And by trying to file a claim now in the

11   United States, you are hoping to get a portion

12   of the US share of the lockbox proceeds;

13   correct?

14       A.    Yes.

15       Q.    And you base that attempt to do so on

16   the existence of a clause in your termination

17   agreement?

18       A.    Yes.

19       Q.    Prior to you receiving advice in 2012

20   about your agreement allegedly obligating the

21   US Debtors to pay severance, you believed that

22   the US Debtors had no obligations with respect

23   to any of your severance; correct?

24       A.    I didn't look at it quite so black and



1    white.  Again, it was -- I guess I didn't

2    understand the legalities of how everything

3    would be -- let me take that back.

4              Can you repeat the question again?

5        Q.  Sure.  Let's say on January 1, 2012, you

6    believed that the US Debtors had no obligations

7    with respect to any of your severance; correct?

8        A.  At that time, correct.

9        Q.  Even though you didn't receive a claim

10   form directly from the US Debtors, you were

11   aware that some Canadian employees did?

12       A.  Yes, I was told.  I was told that some

13   people did.

14       Q.  And, in fact, you spoke to Mark Zigler

15   of Koskie Minsky and were advised that any

16   Canadian employee who was on the US payroll or

17   who had a claim against the US Debtors was

18   required to file a proof of claim in the United

19   States; correct?

20       A.  Yes, that was what he told me.

21       Q.  And you publicized that advice on the

22   LinkedIn site; correct?

23       A.  Yes.

24       Q.  And you urged anybody who might have a



1  claim and fell in those categories to contact

2  Andrea McKinnon at Koskie Minsky so they could

3  be put in touch with a Delaware lawyer to help

4  advise them; correct?

5      A.  Yes.

6      Q.  So while you have spoken today about

7  your view that Canadian employees just followed

8  the Canadian process, you were crystal clear

9  back in 2009 that Canadian employees who also

10  had a claim against the US Debtor needed

11  Delaware counsel in order to pursue that claim;

12  correct?

13      A.  I understood that.  But, you know,

14  again, there would have been -- I guess the

15  reasons for why they might have a claim,

16  primarily what was in my mind at that time was

17  if they had a claim, it was likely because they

18  worked at some point in the United States.

19      Q.  But whatever the basis for a potential

20  claim against the US Debtors, it was very

21  important for them to consult with a Delaware

22  lawyer to help give them advice, and that's

23  what you knew and advised people; correct?

24      A.  Yes.



1       Q.  So I want to talk about what you did to

2    investigate the filing of a possible claim back

3    in 2009.  No question, you did not file a claim

4    back in 2009 against any US debtor; correct?

5       A.  Correct.

6       Q.  And it wasn't until sometime in 2012

7    that you came to believe that you might have a

8    claim against a US debtor; correct?

9       A.  Correct.

10      Q.  And you are not basing that on anything

11   other than the specific language in your

12   termination letter; correct?

13      A.  Correct.

14      Q.  When you got advice from Nelligan

15   regarding your termination letter back in

16   2008-2009, did they tell you that the

17   termination letter gave you any right to pursue

18   a claim against the US Debtors?

19      A.  Do you mean when I was first laid off?

20      Q.  Either back in 2008, when you were laid

21   off, or after the CCAA proceedings were filed?

22      A.  Well, when I was first laid off, as I

23   mentioned before, my primary concern was about

24   the amount that was being offered to me.

1    Subsequent to the CCAA filing, when I went back

2    to talk to Ms. Benedict, the focus of that

3    discussion was what do we have to do to have

4    the agreement, my agreement honored.

5        Q.   And my question is:   In any of your

6    conversations with the Nelligan firm at any

7    time in 2008 or 2009 were you ever told that

8    your termination letter gave you any rights

9    against the US Debtors?

10       A.   No.

11       Q.   And Koskie Minsky was also advising

12   severed employees before the US bar date;

13   right?

14       A.   Before the US bar date.

15       Q.   Before September of 2009 Koskie Minsky

16   was advising severed employees?

17       A.   Yes.

18       Q.   Did Koskie Minsky ever advise you in

19   2009 that you had a right to pursue a claim

20   against the US Debtors?

21       A.   No.

22       Q.   And you are aware that Koskie Minsky did

23   collect termination letters so that it could

24   analyze them before the US bar date; correct?



1      A.   They collected them for the purpose

2   of -- they collected them for the purpose of

3   looking at the dollar amounts that were

4   offered.   That's one instance when I know they

5   collected them, because there were many Nortel

6   employees who were laid off who did not have

7   termination letters, so anybody laid off

8   post-CCAA filing didn't have a letter.

9      Q.   But you don't know what -- strike that.

10               You do know that they collected

11   termination letters; right?

12      A.   Yes.

13      Q.   You helped publicize the fact that they

14   wanted termination letters; right?

15      A.   Yes.   That was for -- it was my

16   understanding that that was for the purpose of

17   analyzing the severance values that were

18   typically offered by Nortel.

19      Q.   Did they tell you that they conducted no

20   other analysis of these three-page letters that

21   you got?

22      A.   They didn't tell me they didn't analyze

23   them in any other way, no.

24      Q.   They are smart lawyers at Koskie Minsky?



1      A.    I assume so.

2      Q.    Inventive, creative, you believe?

3      A.    I don't really have basis to offer an

4   opinion.

5      Q.    But after sending them these termination

6   letters, nobody from Koskie Minsky ever told

7   you or any other severed employee, to your

8   knowledge, that they believed that these

9   letters provided a basis for a claim against

10  the US Debtors; correct?

11     A.    Not at that time.

12     Q.    Now, when Koskie Minsky ultimately

13  advised you in 2012 that they thought you might

14  have a basis for a claim against the US

15  Debtors, is there any information that they had

16  to support a claim that they didn't have in

17  2009?

18     A.    The only thing I could think of was that

19  they at that point knew that there had been

20  some Canadian employees who had filed in the US

21  and they were -- I understand they were

22  notified by Ernst & Young of that fact.

23     Q.    Other than that they heard that other

24  employees had filed claims, do you know of any

1    information that Koskie Minsky had to reach

2    their conclusion that you could file a claim

3    here that they didn't have back in 2009?

4        A.  No.

5        Q.  Is there anything that they had that the

6    Nelligan firm didn't have back in 2009, when

7    they were providing you with legal advice?

8        A.  I don't know all the details.

9        Q.  Now, when you learned of the US bar date

10   and were telling Canadian employees, warning

11   them about the possible need to consult with US

12   counsel, did you go back and reread your own

13   termination letter?

14       A.  I did.

15       Q.  And after rereading your own termination

16   letter, did you see anything that would lead

17   you to investigate whether you might have a

18   claim in the US?

19       A.  Yes.  Sorry, can you repeat?  2009?

20       Q.  Back in 2009.

21       A.  Sorry.  I --

22       Q.  Do you want me to ask the prior question

23   again?

24       A.  Yes, please, because I am losing track.



1      Q.  So in 2009, when you heard about the US

2   bar date, when you were warning people about

3   the possible need to get US counsel, at that

4   point in time did you go back and reread your

5   own termination letter to see if you might have

6   a claim against the US Debtors?

7      A.  No, I did not.  At that time I was very

8   much led to believe that as a Canadian

9   employee, there was going to be a process

10  published that I would follow.

11     Q.  But you warned other Canadian employees

12  that even though they are Canadian employees,

13  there might be circumstances in which they had

14  to go get US counsel; right?

15     A.  Right, such as they could have been

16  terminated as a Canadian employee but in prior

17  years perhaps they were US employees.

18     Q.  That's one such example; right?  So --

19     A.  But as someone who never, ever worked

20  in -- you know, was never a US employee, I had

21  no reason to believe that I would need to

22  consult a lawyer or look at the US claims bar

23  date.

24     Q.  Because you had no idea at the time that



**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

1    you even had a possible claim; right?

2        A.   Right.

3        Q.   So is it fair to say that you didn't ask

4    for a referral to a US lawyer to look at your

5    termination letter?

6        A.   No, I did not.

7        Q.   You didn't call Ernst & Young, did you?

8        A.   No.

9        Q.   You didn't contact any of the US Debtors

10   or their representatives?

11       A.   No.

12       Q.   Now, you have heard your counsel make

13   arguments this morning about the fact that

14   Canadian employees like yourself always

15   considered themselves as having worked for one

16   Nortel.  You heard that?

17       A.   Yes.

18       Q.   And you would agree with me, though,

19   that your late-filed claim is not based upon

20   your belief that you worked for one Nortel;

21   right?

22       A.   Based on --

23       Q.   That's not why you are one of the people

24   who filed a motion to file a late claim.  It is



1    not because you thought you worked for one

2    Nortel but because you say that you have a

3    particular clause in your termination letter;

4    right?

5        A.   Yes.

6        Q.   And you know that nearly or your

7    understanding is that nearly all of your other

8    colleagues did not have termination letters

9    with that particular clause; correct?

10       A.   What other colleagues have, colleagues.

11       Q.   Well, your understanding from being one

12   of the representatives on this committee here

13   is that there is about 300 people who worked

14   for the Canadian Debtors who had this clause in

15   their letters; correct?

16       A.   It is my understanding that every

17   termination letter that Nortel in Canada ever

18   in, say, recent years ever issued had that

19   clause in it.  It was a standard clause that

20   was always in termination letters.  So, for

21   example, in the years 2000 through 2008, where

22   I personally laid off dozens, if not scores, of

23   individuals, that clause was always in those

24   letters.  It was a standard clause.



1      Q.   Well, let me rephrase then.   Your

2    LinkedIn group you said earlier in your

3    testimony had about 900 people?

4      A.   That is correct.

5      Q.   And is it fair to say that a majority of

6    the people, the severed employees in the

7    LinkedIn group, you understand do not have a

8    claim based upon the same argument that you are

9    making?  Correct?

10     A.   That is true, but that is because they

11   don't actually have termination letters.

12   Anybody laid off post-CCAA filing didn't

13   actually get a termination letter.

14     Q.   Do you believe that you worked for one

15   global Nortel any more than any of those other

16   employees did?

17     A.   No.

18     Q.   And is it your view that you are

19   entitled to a claim against every other Nortel

20   debtor worldwide but that all of these other

21   colleagues, including the other 600 people on

22   the LinkedIn group, are not?

23     A.   I actually believe that they should be

24   allowed, but they don't have documentation to

1    support that.  I have a termination letter that

2    I signed in good faith, that the company signed

3    in good faith.

4        Q.  So --

5        A.  So I assume it becomes a matter of law,

6    not about what I believe ethically should have

7    been done or not done.

8              Ethically, and from what I

9    believe, I believe the company should have paid

10   our severance.  But from a legal perspective,

11   they were allowed not to.

12       Q.  And when you are talking about the

13   company, you are talking about the Canadian

14   Debtors who were paying it up until the time

15   they notified you that they were not going to;

16   correct?

17       A.  Yes.

18       Q.  Are you aware that there are more than a

19   dozen US Debtors?

20       A.  Yes.

21       Q.  Are you pursuing a claim against each

22   and every one of them?

23       A.  No.

24       Q.  Well, which one are you pursuing a claim



1    against?

2        A.   I don't know, to be honest.  I rely on

3    my counsel to specify.  I assume it is the -- I

4    don't know the exact, whatever the exact legal

5    name is of the main entity.

6        Q.   Do you think it is fair if you were to

7    be granted a claim against each and every one

8    of the 16 US Debtors but people who worked for

9    a US debtor would only get a claim against one?

10       A.   To be honest, I don't think it is about

11   fairness at this point.  I think what we are

12   discussing here today is what is legal.

13       Q.   Well, to the extent the Court decides

14   that it wants to take into account any

15   equitable considerations, do you think it is

16   fair that you and some other Canadian employees

17   would have a right to make a claim against 16

18   US Debtors but employees of US Debtors would

19   only be able to claim against one particular

20   one, if the Court decides that it wants to take

21   that into consideration?

22       A.   Yes, yes.

23       Q.   You do think it is?

24       A.   Yes.



1      Q.   Why?

2      A.   Because I have an agreement that gives

3   me that right.

4      Q.   Any other reason?

5      A.   That's the primary reason.

6      Q.   And is there anything that you could

7   think of about your employment with Nortel

8   Canada from the time you started until the time

9   you left that you think merits special

10   treatment for you and your 170 colleagues who

11   are filing this motion relative to all of the

12   other Nortel employees worldwide?

13      A.   No, but you have twisted -- you know,

14   you have created an argument that really twists

15   the intent of what we are trying to do.

16   Fundamentally, all I want and what the other

17   170 people want is to be paid the severance

18   that is owed us.  We are not asking to be paid

19   twice in two places.  We are just being asked

20   to be paid what was promised to us.

21      Q.   Is there anything that you think, based

22   on your employment by Nortel Canada, entitles

23   you to a higher percentage of payment of

24   severance claims than any other Nortel



1    employees worldwide?

2       A.   No, but again, it is all about what --

3    why should I have -- I will give another

4    example.  Why should I have only received

5    86 percent of the commuted value of my pension

6    when hundreds, if not thousands, of people

7    before me, just by virtue of the timing of when

8    they got laid off, got 100 percent of theirs?

9    And why should my neighbor only get 50 percent

10   of theirs?

11               There are inequities --

12   unfortunately, there are inequities, and that's

13   just the reality.  So do I think that it is

14   right and fair, you know, if I could wave my

15   magic wand?  No.  But that's just the way it

16   is.  I only got 86 percent of my pension.

17   Others only got 50.  Others got 100.  I don't

18   see it any different than that example.

19               MR. ROSENTHAL:  I have no further

20   questions.  Thank you, Ms. Klein.

21               THE COURT:  Does anyone else on

22   the US Debtors' side have any questions?

23               (There was no response.)

24               THE COURT:  All right.



1    Ms. Mersky, would you like to redirect?

2                    MS. MERSKY:  Just a brief

3    redirect.

4                    REDIRECT EXAMINATION

5    BY MS. MERSKY:

6        Q.  First of all, Paula, I would like to ask

7    you to take a look at what has been marked as

8    Exhibit 151.

9                    THE COURT:  151 you said?  I am

10   sorry.

11                   MS. MERSKY:  Yes, Your Honor.

12   That was the new exhibit just submitted.

13                   THE COURT:  Oh, yes.

14   BY MS. MERSKY:

15       Q.  Paula, I believe you said that you went

16   to the US website --

17       A.  Yes.

18       Q.  -- and looked at this document; is that

19   correct?

20       A.  I did.

21       Q.  And did this document affect the way you

22   thought about the US bar date?

23       A.  It did.

24       Q.  Tell me why.



1       A.   On the top of page 2 of the document

2    there was in big bold letters "Please Take

3    Notice That," and then the second paragraph, it

4    talked about if you believe you have claims

5    against, you know, and it gives a big long list

6    of the Canadian Debtors, "any such claims shall

7    be filed in, and only in, the Canadian

8    proceedings."

9            So at the point in time when I

10   read this document in 2009, I interpreted that

11   to mean I am a Canadian employee; therefore, I

12   have a claim against the Canadian Debtors, so I

13   should file that claim only in Canada.

14       Q.   Did you think you had a right to file

15   your claim anywhere else even if you thought

16   that there were other pots you might be

17   entitled to?

18       A.   No, I did not.  I did not.

19       Q.   Going back to the time -- and as things

20   progress, our understandings develop.  But I am

21   taking you back to 2009, when you read this.

22   Did you receive it?

23       A.   No.  I can't remember how I was made

24   aware that it existed, but something, and I



1    can't remember what, prompted me to go to that

2    website, and I downloaded that document and

3    looked at it.

4        Q.  Even after looking at this and even

5    knowing in hindsight what this says, if you had

6    received this, how would you have reacted?

7                    MR. ROSENTHAL:  Objection, Your

8    Honor.  This is complete speculation.

9                    THE COURT:  Yes, I sustain that

10   objection.

11   BY MS. MERSKY:

12       Q.  Did you believe that this limited your

13   rights even if you had received this?

14                   MR. ROSENTHAL:  Objection, Your

15   Honor.  Again, this is speculation.  She has

16   already testified she didn't think she had a

17   claim.

18                   THE COURT:  Yes.

19   BY MS. MERSKY:

20       Q.  You have just heard my learned colleague

21   say that you have already testified that you

22   didn't have a claim.  Back in 2009 and 2010

23   what did you understand about what a claim

24   meant?



1      A.   I understood that if I wanted to be --

2   if I wanted to get the money that was owed me,

3   that I had to follow the Canadian claims

4   process, and that was -- like I said before,

5   that was just really ingrained by all of the

6   different lawyers and law firms I spoke to, the

7   Monitor, the Elena King letter.  Everything led

8   me to believe that the only way that I had to

9   pursue the money that was owed me was to

10  follow -- was to wait and follow the Canadian

11  claims process for employees when it was

12  published.

13     Q.   At that time --

14     A.   At that time.

15     Q.   -- in 2009 and 2010, did you understand

16  that there were going to be different buckets

17  divided up, or did you understand that there

18  was a global bucket?

19     A.   In 2009?

20     Q.   Yes.

21     A.   I can't honestly remember at what point

22  I understood that there were different buckets

23  of money.

24     Q.   When you were terminated, did you



1    understand that there was some bucket that was

2    going to pay you, and did you care about what

3    bucket?

4        A.   When I was terminated, I thought that

5    because I was a Canadian employee, the same

6    entity that paid my paycheck would pay my

7    severance, but I thought that was an

8    accounting -- I looked at it as an accounting

9    thing.

10                  You have to understand that the

11   way I did my job and the way that many of us at

12   Nortel did our jobs, we didn't -- who paid

13   which bills was really viewed as an

14   administrative detail, because we didn't run --

15   we didn't do our day-to-day jobs and run the

16   projects in a way that really differentiated

17   between who was paying the bills.  So to me I

18   viewed it strictly as an administrative thing

19   and that -- and quite frankly, in 2009, I

20   really saw the various bar dates and claims

21   processes, I saw those -- I wasn't thinking for

22   whatever reason that it had legal implications

23   on my rights.  I thought that it was very much

24   a process thing, a way of --



1        Q.   To lawyers "process" means something

2    very different than I believe what it means to

3    you, and I think that all of us are kind of

4    rubbing our eyes.  What are you distinguishing?

5    When you say a "process," can you just help us

6    understand why it is a big distinction for you?

7        A.   So to me a process is just the way that

8    you go about -- the rules you follow, the steps

9    you follow in order to get you to an end goal.

10   And to me "process" didn't have a legal

11   meaning.  So when we were being told there is a

12   claims process coming, claims process to us

13   meant or to me anyway meant these are the steps

14   that you follow to make sure that your claim is

15   registered in this large cross-border

16   insolvency situation.

17       Q.   Did you understand at the time that by

18   filing your claim in the Canadian process, you

19   were limiting yourself to a Canadian pot at

20   that time?

21       A.   In 2009 --

22       Q.   Yes.

23       A.   -- that that would be the case?  No.   In

24   2009, right after the insolvency, we had no



1    concept of how this would all unfold.

2        Q.  From your perspective, did you do

3    everything you could to protect your full

4    rights?

5        A.  I believed I was doing everything I

6    could.

7                    MS. MERSKY:  No further questions.

8                    THE COURT:  Thank you.  Thank you,

9    Ms. Mersky.

10                   MR. ROSENTHAL:  No further

11   questions, Your Honor.

12   BY THE COURT:

13       Q.  I have at least one question for you,

14   Ms. Klein, if I may, and that's this.

15       A.  Yes.

16       Q.  You have testified, of course, about the

17   bar notice in the United States.  That's

18   Exhibit 151.  Did you actually receive the

19   Canadian bar notice, the one with the Canadian

20   companies listed?

21       A.  When you say did I receive, like did I

22   get a mailing or something?

23       Q.  Yes.

24       A.  No.



1      Q.   Never got a mailing of that?

2      A.   No.

3      Q.   How did you learn about the US bar

4    notice, Exhibit No. 151, about the existence of

5    that bar notice?

6      A.   I believe it was brought to my attention

7    by someone -- a colleague or somebody heard

8    about it and said did you -- you know, I can't

9    remember exactly if they sent me an email or if

10   they posted something on LinkedIn, but it was

11   through some sort of electronic communication

12   with a colleague.

13     Q.   Okay.  And when you testified earlier

14   about what you understood was going to be a

15   special process for employees, I believe you

16   testified that that came from the Monitor; is

17   that right?

18     A.   Yes.  And also, that also in the letter

19   each of the Canadian employees received from

20   Nortel that was signed by Elena King and dated

21   January 28, it talked about the employee claims

22   process that was going to be set up as well.

23               THE COURT:  All right.  Thank you

24   very much, Ms. Klein.  Do you have anything on



1    follow-up there?

2                    MR. ROSENTHAL:  No, Your Honor.

3                    THE COURT:  All right.  Ms. Klein,

4    thank you for your testimony.  You may step

5    down now and be excused.

6                    THE WITNESS:  Thank you.

7                    (Witness excused.)

8                    THE COURT:  I know we have a good

9    bit more to do.  I am hoping to finish today.

10   And I think it would be appropriate for people

11   to take a break and have something to eat.  So

12   what do you think is the quickest you can do

13   that, because I know it is not easy.

14                   MR. ROSENTHAL:  As fast as Your

15   Honor wants.

16                   (Discussion off the record.)

17                   THE COURT:  So we will be back

18   here at ten after 2:00.  Thank you.

19        (Luncheon recess taken at 1:25 p.m.)

20                  AFTERNOON SESSION

21                  (Reconvened at 2:15 p.m.)

22                   THE COURT:  Thank you, everyone.

23   Please be seated.  We begin the afternoon.

24   Ms. Mersky.



1           MS. MERSKY:  Good afternoon, Your

2    Honor.  First, just to let the Court know that

3    after consulting, we believe -- and lawyers

4    make these promises all the time, but we

5    believe that this will be completed by today.

6    The remaining testimony is expected by both

7    sides to be shorter.

8                 THE COURT:  Okay.

9           MS. MERSKY:  But I would also like

10   to introduce a gentleman, Chris Winnicki, who

11   was on his way here earlier, and he worked for

12   more than 11 years in carrier grade businesses,

13   and he has come down here to see how the system

14   works for him.  And this American system is

15   very, very different from the Canadian system.

16   And these people as engineers weren't familiar

17   with the Canadian system before this.  But it

18   is a very interesting process for them, and I

19   know you invite them to your courtroom.

20                 THE COURT:  I am pleased to have

21   him here.  Thank you.

22           MS. MERSKY:  I call as my next

23   witness Jane Longchamps.

24                 THE COURT:  Yes.



```
 1              JENNIFER JANE LONGCHAMPS, having
 2   been first duly sworn, was examined and
 3   testified as follows:
 4                   DIRECT EXAMINATION
 5              THE COURT:  Thank you.  Is the S
 6   silent?
 7              THE WITNESS:  Yes, normally.
 8              THE COURT:  Very well.  We will
 9   get that right.  Thank you.
10  BY MS. MERSKY:
11      Q.  Ms. Longchamps, would you agree that I
12   will call you Jane during our conversation?
13      A.  Yes.  I go by my middle name, yes.
14      Q.  Thank you.  Jane, would you please state
15   for the record your educational background?
16      A.  Yes.  I have a bachelor of
17   administration, a bachelor of commerce.  I am a
18   chartered professional accountant under the
19   Institute of Chartered Accountants of Canada.
20   And I am also -- I have a master in social
21   work.
22      Q.  That is a little divergent, is it not?
23   Was that earned later in life?
24      A.  It was.  But I maintain that it is the
```



1   same skill set.  It is just a different

2   audience.

3       Q.  How many years were you employed at

4   Nortel?

5       A.  Just a little over 18.

6       Q.  And during the last five years of your

7   employment at Nortel can you explain in the

8   least technical terms you can what you did at

9   Nortel?

10      A.  Yes.  During that time I worked

11  primarily as what they call business

12  operations.  My role was to support the vice

13  president of product development solutions.

14  Product development solutions, or PDS, was a

15  central global organization that provided the

16  design tools, software, licenses and processes

17  to the designers globally that worked on

18  products.

19          My role was quite varied.  I did

20  everything from consolidation of various topics

21  for directors.  I also -- one of my main roles

22  was the procurement of design tools, most of

23  which had global license terms.  I prepared the

24  business cases for the vice president so that

1    he could understand in simple terms what he was

2    buying and if he wished to make that decision.

3              In product development solutions,

4    it was a group of several hundred people that

5    were located globally within the various Nortel

6    entities, and it had specialized teams.  So the

7    team I worked very closely with was design tool

8    distribution, which provided the mechanism to

9    distribute the licenses or share the licenses

10   amongst the designers.  There was also a

11   configuration management team, a mechanical

12   engineering team, ASIC development team.  And

13   each of those teams would have a representative

14   that would be intimately knowledgeable about

15   each one of the software products used by the

16   designers so that they could provide

17   specialized information to anybody who needed

18   it.

19       Q.  When you were first notified of your

20   termination, was your supervisor located in

21   Canada?

22       A.  She was in Canada, yes.

23       Q.  And who did she work for?

24       A.  She was a VP, product development



1    solutions.  I am not sure exactly who she

2    worked for.

3        Q.  How did you learn that you were to be

4    terminated?

5        A.  I think it was mid to late October when

6    I was part of a small group that was brought in

7    to start dividing up the PDS organization.

8    They were planning to sell various lines of

9    business, so they were trying to determine

10   where the employees would go.  And at that time

11   there were a number of employees that would not

12   be carved out for any particular line of

13   business.  I would be one of them.  And they

14   asked if I could stay on for several weeks to

15   help them sort things out with respect to the

16   licenses and the people, which I agreed to do

17   that.

18       Q.  Did you do that?

19       A.  Yes, I did.

20       Q.  And did that actually inure to your

21   detriment?

22       A.  In hindsight, yes, it did, because I

23   would have been laid off a month earlier, which

24   would have made a big difference.



1      Q.  I would like to direct you to Exhibit

2   No. 210.  Turn to page 521, and ask you if you

3   remember this letter.

4      A.  Sorry.  Exhibit 210, page 521?

5      Q.  521 at the bottom.

6      A.  Yes, I have it.

7      Q.  This is your termination letter?

8      A.  Yes, it is.

9      Q.  Do you remember if you were given this

10   termination letter in a meeting or if it was

11   just delivered to you?

12      A.  I don't know if it was delivered in a

13   meeting or if I got the envelope with a note

14   to, you know, call somebody if I wanted to.

15   Because I knew it was coming, it was not maybe

16   the same process that other people had.

17      Q.  And on this letter is there anything as

18   far as, for instance, the paragraph where it

19   talks about "As used in this letter, the term

20   'Corporation' shall mean Nortel Networks

21   Corporation, its affiliates, subsidiaries,

22   successors and assigns, and" et cetera.  And

23   that phrase, is that a phrase that you were

24   familiar with at Nortel?

1      A.   I was very familiar with it because I

2  worked with the global licensing area.  Most of

3  our contracts contained language similar to

4  this, specifically corporations, subsidiaries

5  and affiliates.

6      Q.   And did you understand -- who did you

7  understand was going to be responsible for

8  paying this termination debt?

9      A.   To me I guess it is a difference between

10  paying.  I didn't know who was going to pay, so

11  I didn't know if the place where they cut the

12  checks was in The States or in Canada, so I

13  don't know who was going to pay me.  I knew

14  that Nortel somewhere was going to pay me.

15  Because I was used to working with the global

16  organization, I don't know where all the

17  various entities or activities actually

18  happened.

19      Q.   The signature line of your letter, it

20  says Shauna Gamble, manager, Nortel Networks.

21  Was she your supervisor?

22      A.   She was the VP that I supported.  I

23  actually technically reported to somebody else.

24      Q.   And that individual, was she employed in



1    the United States or in Canada?

2        A.  She was in Canada.

3        Q.  Were you directed what to do with this

4    letter?

5        A.  No.  I don't know if I was directed what

6    to do with it, but I took it and read it and

7    completed the forms that I had to fill out.

8        Q.  Where did you return it to?

9        A.  I believe I had to mail it, and I would

10   have sent it registered to the Shared Services

11   location.

12       Q.  Which was where?

13       A.  I believe it was in North Carolina.

14       Q.  Did you ever have an occasion to call HR

15   Shared Services in North Carolina in connection

16   with your severance?

17       A.  Yes, I did.  At one time there was a

18   problem with my pay where they had put -- this

19   was after the bankruptcy date, where they put

20   some money in my account and then they took it

21   out of the bank account.  And so I called to

22   find out why that happened and to try to get

23   that rectified.

24       Q.  And that call was made to North



1    Carolina?

2        A.   Yes, the initial call.

3        Q.   And where were subsequent calls made to?

4        A.   They called me, and I am not sure who

5    the person was that called me.  I don't

6    remember her name.

7        Q.   Okay.  Can you tell me how you learned

8    about the filing of the bankruptcy?

9        A.   Initially I heard about it from friends

10   who were still -- actually, I think she had

11   been terminated also shortly before the filing.

12   And I heard about it from them.

13       Q.   And what did you think when you found

14   out about the filing?

15       A.   I was sick.  It made me sick.

16       Q.   After you learned about the filing, what

17   did you do?

18       A.   I did several things.  We were very

19   concerned about what was going to happen with

20   our pensions, so I made some inquiries about

21   what we were supposed to do there.  I found out

22   that Nortel was supposed to send us a statement

23   within a certain number of weeks, and that

24   didn't come, so I had to follow up and get that

1    statement.

2              I joined the LinkedIn group, and I

3    also retained counsel.  I joined the group that

4    was retaining Nelligan O'Brien Payne, and I

5    paid some money to retain those lawyers.

6        Q.  Did you ever receive a letter, and I

7    will refer you to Exhibit 3, from Ernst & Young

8    about the bankruptcy?  I refer you to Exhibit

9    3, which is a January 14, 2009 letter from

10   Ernst & Young.  Did you receive that?

11       A.  Yes, I did.

12       Q.  Did that letter alert you that you had

13   to do anything?  How did that letter affect

14   you?

15       A.  I can't remember exactly when I received

16   it, but it was the same kind of sinking

17   feeling, I guess.  But it did say here that we

18   should wait; there wasn't a process in place at

19   the time.  We didn't need to file a proof of

20   claim and that they would advise us when a

21   process was ready.

22       Q.  Now, when you say "they" would advise

23   us, who was the "they" that you understood was

24   to advise you?



1      A.   Well, this is from Ernst & Young, so at

2    the time I don't think lawyers had been

3    appointed.  I knew that there was a process

4    where they were going to decide what lawyers

5    would be representing us, so I assumed that

6    Ernst & Young would tell us, but I assumed as

7    well that our lawyers would tell us.

8      Q.   In addition to receiving this notice,

9    did you receive any notices about the

10   international proceeding?

11     A.   I did have a note in my file or a paper

12   in my file related to the -- I am trying to

13   remember what it was called -- notice of

14   filing, and it was a notice of filing in

15   Delaware, Chapter 15, and it said that there

16   was -- it was foreign participants in foreign

17   proceedings, and it talked about the joint

18   administration.

19     Q.   What did that mean to you?

20     A.   Well, it meant to me that Canada and US

21   were talking.  I assumed that the lawyers in

22   the proceedings were somewhat enjoined.

23     Q.   Was Koskie Minsky appointed as counsel

24   at that point?

1      A.   I don't believe they were, no.

2      Q.   You said that you had supported the

3    concept of Nelligan being counsel.  Did there

4    come a time when you learned that Nelligan was

5    not going to be the court-appointed counsel?

6      A.   Yes.

7      Q.   What did you understand the

8    court-appointed counsel's responsibility once

9    Koskie Minsky was appointed?

10     A.   Well, I assumed that they were taking

11   care of the employees' claims, so I had assumed

12   that they were our lawyers for all of our

13   claims, and "our" being all the employees, the

14   pensioners and the people who were under the

15   disability.

16     Q.   You said that you understood because you

17   got this international notice that there were

18   proceedings in the United States and

19   proceedings in Canada.  Is there a reason that

20   you didn't take any action in connection with

21   the proceedings in the United States?

22     A.   Well, there was the Ernst & Young letter

23   that I referred to that said that we did not

24   need to file a proof of claim and that a



1    process would be set up for us.

2        Q.  Did you come to learn that there was a

3    process that was set up for you?

4        A.  Yes.  Eventually -- it took several

5    years, but eventually they sent us forms with

6    the amount of our severance, and we had to

7    agree that that was the correct amount or not.

8        Q.  Who sent you those forms?

9        A.  I don't remember if it was Koskie Minsky

10   or Ernst & Young.

11       Q.  And when you got those forms, was that

12   in 2011, 2012?  When was it?

13       A.  I think it was 2012.  I don't recall the

14   specific date.

15       Q.  And after you got those forms did you

16   inquire further if there was anything else you

17   had to do?

18       A.  No, I didn't make any inquiries.  I

19   mean, there were many times over the course of

20   those years where I would think, gee, it is

21   kind of quiet, and I would go back, or I would

22   see something and I would go back and say am I

23   supposed to do something.  And invariably I

24   would look through my papers and they said no



1    positive action is required, we will file a

2    claim on your behalf, don't do anything at this

3    time.  And I remember looking at things and

4    saying okay, I guess it is pretty clear; I just

5    wait.

6                    MS. MERSKY:  No further questions.

7                    MS. VanLARE:  Good afternoon,

8    Ms. Longchamps.  Good afternoon, Your Honor.

9                    THE COURT:  Good afternoon.

10                   CROSS-EXAMINATION

11   BY MS. VanLARE:

12       Q.  Ms. Longchamps, over the course of your

13   career at Nortel, you were always located in

14   Canada; correct?

15       A.  Yes.

16       Q.  And at the time that your employment at

17   Nortel terminated, you knew that you were

18   employed by a Nortel Canada entity; correct?

19       A.  Yes.

20       Q.  In early 2009, you were aware that aside

21   from Nortel Canada, there were other parts of

22   Nortel located in other parts of the world,

23   such as the US and the UK?

24       A.  Yes, that's true.



1      Q.   And also in 2009, you knew that you were

2    not on the US payroll; correct?

3      A.   That's true, yes.

4      Q.   I would like to ask you a few questions

5    about your termination.  You received your

6    termination letter in 2008?

7      A.   Yes.

8      Q.   You read the letter after you received

9    it?

10     A.   Yes.

11     Q.   Let's take a look at that letter.  It is

12   Claimants' Exhibit 84.  You are aware that your

13   counsel has --

14     A.   I am sorry.  You said --

15     Q.   Exhibit 84.

16     A.   I think I have that number, but the one

17   we looked at before was --

18               MS. VanLARE:  May I, Your Honor?

19               THE COURT:  Yes, you may.  I don't

20   think I have Exhibit 84 in my book.

21   BY MS. VanLARE:

22     Q.   Do you have that now, Ms. Longchamps?

23     A.   Yes.

24     Q.   You are aware that your counsel has



1    asserted that you may have a claim potentially

2    against the US Debtors based on certain

3    language in your termination letter; correct?

4        A.   Yes.

5        Q.   And you testified earlier about the

6    definition of the word "Corporation."

7        A.   Yes.

8        Q.   And if we look, that's in paragraph 3 of

9    this letter.  It says, "As used in this letter,

10   the term 'Corporation' shall mean Nortel

11   Networks Corporation, its subsidiaries and

12   affiliates, their successors and assigns, and

13   all of their past and present officers,

14   directors, employees and agents (in their

15   individual and representative capacities), in

16   every case, individually and collectively."  Do

17   you see that?

18       A.   Yes, I do.

19       Q.   At the time that you read this paragraph

20   in 2008, you understood that all of the Nortel

21   entities were liable for your severance;

22   correct?

23       A.   As it is written here, yes.  At the time

24   I read it, I probably wouldn't have remarked on



1    it because the language was similar, and it

2    wasn't an issue until they declared bankruptcy.

3        Q.   After Nortel declared bankruptcy, did

4    you go back and read this language in your

5    letter?

6        A.   No, not until it came -- we were

7    notified that some of our letters contained

8    certain language.

9        Q.   Earlier in the testimony you said that

10   you were familiar with the word "corporation"

11   and the term "corporation, its subsidiaries and

12   affiliates"; correct?

13       A.   Yes.

14       Q.   And you said that you didn't understand

15   who would be responsible for paying your

16   severance; correct?

17       A.   I don't think that's exactly what I

18   said.  There is a difference between who was

19   responsible to pay and who paid.  Like, I am

20   saying who cut the check could be anybody.

21       Q.   So you weren't sure who would be cutting

22   the check?

23       A.   Right.

24       Q.   But in terms of who was responsible for



1   your severance, you believed that all of the

2   Nortel entities were responsible for your

3   severance; is that fair to say?

4       A.   Yes.

5       Q.   And when we are talking about all of

6   Nortel's subsidiaries and affiliates, that

7   would include the US Debtors as well?

8       A.   Yes, the US corporations, yes.

9       Q.   You mentioned earlier that in early 2009

10  you were aware that Nortel had filed for

11  insolvency in Canada; correct?

12      A.   Well, I said that they had gone

13  bankrupt, so I assume they filed in Canada, and

14  I had the notice that they filed in The States

15  as well.

16      Q.   So you knew that they had filed in

17  Canada; that's right?

18      A.   I guess so, yes.  I didn't really think

19  much about it, to be honest.  I mean, they

20  declared bankruptcy.  You don't always hear

21  about filing for bankruptcy, so --

22      Q.   You were aware that they had entered

23  bankruptcy in Canada and that Nortel US

24  entities entered into insolvency proceedings in



1   the US?

2      A.  Yes, I think I was.

3      Q.  During the summer of 2009 you were

4   generally aware that there was a claims process

5   going on in the United States; correct?

6      A.  No.

7      Q.  You were aware that there were

8   proceedings that were insolvency proceedings in

9   the United States; correct?

10     A.  Is there a time period associated with

11  that?

12     Q.  In 2009.

13     A.  I don't know that I -- in the summer of

14  2009 I don't know if I was aware of what

15  proceedings were going on where.  I mean, I

16  knew they filed, but I don't know anything

17  about the process.

18     Q.  I am just asking if you knew -- you knew

19  that they had filed for bankruptcy in the US?

20     A.  Yes.

21     Q.  And you mentioned -- so did you know

22  that there was a claims process that was

23  happening in the US at some point in 2009?

24     A.  I know I saw something in December 2009.



1    It would have been in one of the Koskie reports

2    that there was a process in the US.  I don't

3    know if I had noticed it earlier in 2009.  I

4    might have.

5       Q.  Ms. Longchamps, do you remember giving a

6    deposition in this case?

7       A.  Yes, I do.

8       Q.  Let me just refresh your recollection,

9    if it is okay.

10      A.  Sure.

11      Q.  Ms. Longchamps, I am going to read you a

12   question and an answer.  The question was:

13   "There has been recent discussion surrounding

14   the establishment of a claims process in the US

15   Bankruptcy Court.  Were you aware in July 2009

16   that there was discussion surrounding a claims

17   process having been established in the US

18   Bankruptcy Court?"

19              And you answered, "I probably read

20   something like this about the US claims

21   process."

22              Do you remember my colleague

23   asking you that question and answering?

24      A.  Well, not specifically, but I do



1    remember giving the responses, and I did read

2    the deposition and I agreed to it.

3        Q.   So does that refresh your recollection

4    as to whether in July of 2009 you were aware

5    that there was a US claims process that was

6    happening in the US?

7        A.   Honestly, no, it doesn't really help my

8    recollection.  If you are asking me again and I

9    were to state at this time, I don't remember.

10   If you showed me some paperwork, then it might

11   jog my memory, but I don't remember off the

12   top.

13       Q.   You were a member of the LinkedIn group

14   for severed employees; correct?

15       A.   Yes.

16       Q.   You joined the LinkedIn group shortly

17   after Nortel filed for bankruptcy?

18       A.   Yes, I did.

19       Q.   And you viewed the LinkedIn group as a

20   way to stay informed about Nortel's bankruptcy;

21   is that fair to say?

22       A.   Yes.

23       Q.   And, in fact, you believed it to be a

24   key way that you would keep informed about the



1    bankruptcy?

2        A.  Yes, it was a key communication tool.

3        Q.  You paid particular attention to posts

4    written by Paula Klein; correct?

5        A.  Yes.

6        Q.  I would like to show you now an exhibit,

7    Exhibit 11, please.  If you would turn to

8    Exhibit 11 in your binder.  Do you have that in

9    front of you?

10       A.  I do, yes.

11               MS. VanLARE:  Your Honor, do you

12   have that as well?

13               THE COURT:  I do, thank you.

14   BY MS. VanLARE:

15       Q.  If I can ask you to please turn to the

16   first page.  This is a conversation on

17   LinkedIn?

18       A.  Yes.

19       Q.  Do you recognize that?  And if you look

20   at the top of the next page, there is a date

21   there July 16, 2009.  Do you see that?

22       A.  Yes.

23       Q.  So around this time in July 2009 there

24   were discussions on LinkedIn about the US bar



1    date; correct?

2        A.   I understand that's true.

3        Q.   In 2008 you didn't take any actions to

4    investigate whether or not the US bar date was

5    applicable to you; is that correct?

6        A.   In 2008?

7        Q.   2009.

8        A.   In 2009.  Not specifically, no.  I

9    would -- if I read anything about the US claims

10   process and I was unsure, I would have gone

11   back and consulted my documents.  I remember

12   specifically on occasion feeling very confused

13   and saying what am I supposed to do and looking

14   at my documents and thinking, okay, I am to do

15   nothing.

16               So I don't know what triggered

17   that action.  I don't know if it was something

18   I read in LinkedIn or something that a friend

19   called me.  But I remember specifically being

20   concerned and looking at my documents.

21       Q.   So you remember reading something about

22   the US process, US bar date, and you weren't

23   sure what it meant for you?

24       A.   No, I don't remember specifically.  I do



1    remember in December 2009, because I have

2    papers and I looked at them again, and it says

3    that there was a US claim.  But I can't tell

4    you honestly that in July time period that I

5    knew that there was a US claim or a US bar

6    date.

7        Q.   So in December, was that 2009 that you

8    were just describing --

9        A.   Yes.

10       Q.   -- a process where you went and you

11   looked and you thought you might have a US

12   claim?

13       A.   No.

14       Q.   The date?

15       A.   No.  There is the document from Koskie

16   Minsky, I believe, an update in December 2009,

17   and it mentioned -- it alluded to a US claims

18   process.  I don't think it mentioned a bar

19   date.  And in that same document it said either

20   no positive action is required by you or there

21   is nothing for you to do at this time.

22       Q.   At that point did you consult a lawyer

23   about a US process?

24       A.   No.  I had already consulted a lawyer



1    and retained a lawyer in January, February, and

2    that it was determined by the Canadian process

3    that we were to use the court-appointed lawyer.

4       Q.  And you are referring to the firm

5    Nelligan O'Brien Payne?

6       A.  Yes.

7       Q.  We can come back to that.

8       A.  Sure.

9       Q.  But I just want to focus on December

10   2009 and this notice that you received from

11   Koskie Minsky.  It was talking about a US

12   claims process.  Did you at that point call

13   Koskie Minsky to inquire about whether it might

14   have applicability to your claim?

15      A.  I assumed that Koskie Minsky was taking

16   care of all of our interests, wherever they

17   were.  The fact that they mentioned that there

18   was a US claims process, I assumed they were

19   involved.  The fact that I had a document that

20   said that there were foreign participants to

21   foreign proceedings, I thought that meant they

22   were involved.  I thought that they were taking

23   care of our full interests.

24      Q.  But you didn't call them to verify --



1     A.   No.

2     Q.   -- whether that was true?

3     A.   No.

4     Q.   At that point did you call Ernst & Young

5   to inquire about the US claims process?

6     A.   No.  I wouldn't have called them.

7     Q.   A moment ago you mentioned the firm

8   Nelligan O'Brien.  Did you go back to Nelligan

9   and speak with any of those lawyers as to

10  whether the US claims process might be

11  relevant?

12    A.   If there had been any clarity in my mind

13  that there was something I was supposed to do,

14  I definitely would have gone to them, because I

15  had already paid them money.  I had money on

16  credit with them.  I had used them.  I was

17  happy with them.  If I had thought that there

18  was something I would have to do, I definitely

19  would have contacted them.

20    Q.   So did I understand correctly that at

21  this time you were under the impression that

22  Nelligan was looking after your US claims?

23    A.   No.  Koskie Minsky.

24    Q.   And you didn't go back to Nelligan and



1    inquire separately "Do I need to worry about

2    the US claims process"?

3        A.   No.   There was no clarity in my mind

4    that it was not being taken care of for me.

5        Q.   I would like to now ask you to look at

6    Exhibit 13.   Let me know if you can't find it.

7        A.   I have got it.

8        Q.   I would like to direct your attention to

9    the page -- you see there are page numbers at

10   the bottom right-hand corner?

11       A.   Yes.

12       Q.   The page number that ends with 1851.   Do

13   you see that?

14       A.   Yes.

15       Q.   And the first post is by Paula Klein.

16   It says, "Claims in the US Court - Some People

17   Received a Letter."   Do you see that?

18       A.   Yes.

19       Q.   And then later there is a post by Pierre

20   Pierre Blais and after that there is another

21   post by Paula Klein?

22       A.   Yes.

23       Q.   I would like to focus on that second

24   post by Paula Klein.   In the second paragraph



**J. Jane Longchamps - Cross**                   185

1    she writes, "At the legal call today, I asked

2    about this letter that some of you received.

3    Mark Zigler (Koskie Minsky) advised me the

4    following.  You only need" --

5                  MS. MERSKY:  Excuse me.  I am

6    going to object unless this witness can testify

7    that she read it, she knew it.  She is not one

8    of the posters to this site.  So to the extent

9    that she read it or was aware of it, obviously,

10   that's a relevant question.  But since she

11   didn't post to it and we don't know yet if she

12   has read it, I think that is a relevant

13   question.

14                  THE COURT:  Perhaps we need a

15   little foundation.

16                  MS. VanLARE:  Sure.

17   BY MS. VanLARE:

18     Q.  I am just going to ask you a few

19   questions about this time period and what you

20   were aware of at this time.  And again, this is

21   in 2009.

22                  So just to finish where I was

23   reading, just to make sure that you are

24   following with me in the document, it says --



1           MS. MERSKY:  Objection once again

2    to the foundation.  If she is familiar --

3           THE COURT:  Ms. Mersky, I am

4    sorry.  There is a microphone.  You can

5    certainly stand at the table and use that

6    microphone.

7           MS. MERSKY:  Your Honor, if this

8    witness posted this or was aware of it, which

9    has not yet been determined at the time --

10          THE COURT:  Right.

11          MS. MERSKY:  -- then these

12   questions are relevant.  But there is no

13   foundation to say that she was.  And so leading

14   with a question that she may or may not be

15   aware of is inappropriate.

16          MS. VanLARE:  Your Honor, I

17   haven't ask asked the question yet.  I am just

18   trying to orient the witness as to what I am

19   going to be asking about.

20          THE COURT:  All right.  And it

21   might first be helpful to determine whether the

22   witness read this particular exhibit.

23   BY MS. VanLARE:

24     Q.  Ms. Longchamps, I don't know if you have



1    had a chance to look at it.  Do you recall

2    reading posts such as this one about some

3    people having received letters relating to the

4    US process?

5        A.  It is unlikely I would have read it

6    because I probably would have stopped at the

7    point where it said some people received

8    letters, since I didn't receive a letter.

9        Q.  You weren't curious to see why some

10   people were receiving letters?

11       A.  There was so much going on.  If it was a

12   posting about the pensioners, I didn't read it.

13   If it was a posting about the disabilities, I

14   didn't read it.  If it was a posting about

15   people venting about the process, I didn't read

16   it.

17       Q.  But this looks like it is a posting

18   about severance.  Would you have not read posts

19   about severance?

20       A.  It says, "Some People Received a

21   Letter," and I didn't receive a letter, so I

22   don't think I would have dug into it.  I can't

23   say honestly if I read it or not.  I don't

24   recall.



1      Q.   So if there was a post that said some

2   people received a letter, at that point you

3   would have stopped reading?

4      A.   No.   I would go a little bit farther and

5   find out what kind of letter and make sure I

6   didn't get it.   This letter encouraged you to

7   file your employee claims in the US even though

8   you were on the Canadian payroll.   I didn't

9   receive that kind of letter, so I would not

10   have probably gone through it.   I can't say

11   honestly if I read it or not.

12      Q.   Did you ask why some people may have

13   received a letter and you didn't?

14      A.   No.   I don't think I would have thought

15   it was relevant.

16      Q.   Do you recall asking Koskie Minsky why

17   it was that some people were receiving letters

18   that you hadn't received?

19      A.   No.   I wouldn't have thought that was

20   relevant.

21      Q.   Now, Ms. Klein posts here that you need

22   to file --

23            MS. MERSKY:   Objection, Your

24   Honor.   This witness has repeatedly stated she



1    did not read this.  She certainly did not post

2    as to it.  There is no foundation for

3    questioning this witness about things she

4    didn't know at the time.

5              THE COURT:  Yes.

6              MS. VanLARE:  Your Honor, if

7    opposing counsel would just let me ask the

8    question.

9              THE COURT:  All right.  Why don't

10   we do this.  I think you should ask the

11   question, and then if you have an objection,

12   Ms. Mersky, you can certainly raise it at that

13   time.

14   BY MS. VanLARE:

15      Q.  In 2009 do you recall seeing posts on

16   LinkedIn that were discussing the US claim?

17      A.  I think at some point in time early on,

18   which could have been 2009, 2010, I had

19   probably seen something about US claims.  I

20   couldn't say for sure if I saw it 2009.

21      Q.  There were posts such as this one

22   talking about if you have claims against the

23   US, you should contact a Delaware lawyer.

24              MS. MERSKY:  Your Honor,



1    objection.  She testified what she saw and what

2    she remembered.  Now she is asking her about

3    things that she has already said aren't --

4                    THE COURT:  I don't think the

5    question has been completely asked, Ms. Mersky.

6    BY MS. VanLARE:

7        Q.  So, Ms. Longchamps, did you at any point

8    in time in 2009 contact a Delaware lawyer

9    regarding US claims?

10       A.  No.

11       Q.  Did you ask anybody at that point why

12   certain Canadian employees were directed to

13   contact a US attorney?

14       A.  Could you rephrase the question or

15   restate it?

16                   MS. MERSKY:  Objection.  Objection

17   as to the question, because she said -- I think

18   her earlier testimony was that she didn't read

19   that.

20                   THE COURT:  I don't think we are

21   picking you up, Ms. Mersky.  I am sorry.  If

22   you would just repeat that for the record.

23                   MS. MERSKY:  I am sorry, Your

24   Honor.  At least the way I heard the



1    question -- I apologize if I misheard it, but

2    the way I heard the question, it went back to

3    information that this witness said she didn't

4    read.

5              MS. VanLARE:  Your Honor, I am not

6    asking about information she didn't read.  I am

7    asking generally in 2009.

8              THE COURT:  I think the way the

9    question was asked, it assumes something that

10   is not in evidence, and that is that the

11   witness, Ms. Longchamps, knew that certain

12   parties had been advised.  And I don't know

13   whether she knew that or not based upon her

14   previous answers.

15   BY MS. VanLARE:

16       Q.  Ms. Longchamps, in 2009 you mentioned

17   earlier that a group of employees had been

18   trying to retain Nelligan O'Brien to represent

19   the recently severed employees; correct?

20       A.  Yes.

21       Q.  And this group included yourself?

22       A.  Yes.

23       Q.  You also alluded earlier in your

24   testimony that you had retained -- privately



**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

1    you had retained somebody from Nelligan O'Brien

2    Payne regarding a payment that Nortel had made

3    you; correct?

4        A.   Yes.

5        Q.   At any point in time after Nortel filed

6    for insolvency did you go back to that attorney

7    and ask him or her to review your termination

8    letter?

9        A.   No, I did not.

10       Q.   I would like to ask you to turn to

11   Exhibit 67.  Just let me know when you are

12   there.

13       A.   I am there.

14       Q.   In the top, in the "to" box, the very

15   last email address reads

16   longchampsfamily@simpatico.ca.  Is that your

17   email address?

18       A.   Yes, it is.

19       Q.   Is it fair to say you received this

20   email?

21       A.   I think that's fair to say.

22       Q.   I would like to ask you to turn to

23   Question 33.  And the question reads, "How does

24   the Bankruptcy Protection process in Canada



1    relate to the one in the US (and potentially

2    UK)?  Is there a legal, binding tie between the

3    two?"

4              And the answer, it says Paula in

5    brackets, "Ainslie indicated they are separate

6    processes and that from an Employment Law

7    perspective they are very different."  Do you

8    see that?

9        A.  Yes, I do.

10       Q.  Ainslie is referring to Ainslie Benedict

11   of Nelligan O'Brien Payne?

12       A.  Is that a statement or a question?

13       Q.  Is that correct?

14       A.  I don't know Ainslie, so it says it is

15   from Ainslie Benedict of Nelligan O'Brien

16   Payne, so I assume that's correct.

17       Q.  Do you recall receiving this email?

18       A.  No, I don't recall receiving it, but --

19       Q.  But you received it?

20       A.  I assume I did, yes.

21       Q.  So in January of 2009, Ms. Benedict was

22   telling the group that from an employment law

23   perspective, the bankruptcy in Canada is

24   different from the bankruptcy in the US?



1              MS. MERSKY:  Your Honor,

2    objection.  I think that --

3              THE COURT:  Speak into that mic,

4    Ms. Mersky, so we get you.

5              MS. MERSKY:  Once again, I am

6    sorry, Your Honor.  Objection.  I think that is

7    a mischaracterization of the document.  And

8    this is a summary prepared by Paula Klein of a

9    conversation that took place between parties,

10   in which the witness was not present.  So I

11   think we are going far astray, and, in fact,

12   the way this document is being described to

13   this witness is not accurate for the record.

14             Also, Your Honor, could we request

15   a brief recess shortly?

16             THE COURT:  We certainly may.

17   Anytime anyone needs a recess, don't hesitate

18   to ask.

19             MS. MERSKY:  Can we approach the

20   bench first, Your Honor.

21             THE COURT:  Yes, please.

22             (There was a side-bar conference.)

23             THE COURT:  Five-minute recess,

24   everyone.



```
 1                 (Recess taken.)
 2                 THE COURT:  Thank you, everyone.
 3    Please be seated.  I am going to ask an
 4    embarrassing question.  I can't read your name
 5    on my list.  Is it Kive?
 6                 MS. VanLARE:  My name?
 7                 THE COURT:  Yes.
 8                 MS. VanLARE:  Is Jane VanLare.
 9                 THE COURT:  Okay.  Thank you.  Now
10    I see it.  When you are ready to proceed, you
11    certainly may.
12    BY MS. VanLARE:
13       Q.  Ms. Longchamps, in 2009 were you aware
14    that there was a process going on to try to
15    divide Nortel's assets among estates based in
16    different jurisdictions?
17       A.  Yes.
18       Q.  And at this point did you investigate
19    whether you should take any actions to pursue
20    your claim in the US?
21       A.  No.  My understanding was that our
22    lawyers were taking care of all of our
23    interests.
24       Q.  At that point did you call Koskie Minsky
```



1    to confirm that understanding?

2        A.   No.   When I looked at information that

3    was provided to me, there was nothing that

4    indicated to me that they weren't, and there

5    were indications to me that they were.

6        Q.   And when you are talking about

7    information that was provided to you, was there

8    any information that came from the US Debtors

9    that indicated -- that discouraged you from

10   filing a claim in the US?

11       A.   I don't think I received anything from

12   the US Debtors.

13       Q.   And what information from Koskie Minsky

14   indicated to you that they were representing

15   you in the US?

16       A.   So there was the Koskie Minsky.   So

17   Ernst & Young had -- there was a filing in The

18   State, the notice of filing in The State, so

19   that led me to believe that the Canadian and US

20   sides were working together.   And then in some

21   of the bulletins that I read they would mention

22   that there was a claims process.   And then in

23   the same bulletin they would say no action was

24   required.



1        Q.   Do you ever recall reading anything from

2    Koskie Minsky saying that you should not

3    investigate whether you have a US claim?

4        A.   I am not very good hearing things.  I am

5    more a paper person.

6        Q.   Sure.   I am happy to repeat.

7        A.   Could you repeat that?   Thank you.

8        Q.   Sure.   You mentioned you received

9    communications from Koskie Minsky?

10       A.   Yes.

11       Q.   And those communications mentioned the

12   US claims process?

13       A.   They were mentioned sometimes, yes.

14       Q.   In any of those communications can you

15   think of any communication that told you that

16   Koskie Minsky was representing you with respect

17   to the US proceeding?

18       A.   They never said they weren't, and I

19   don't think they -- they didn't specifically

20   say they were.   I thought by the presence of

21   the mention that the process existed, that they

22   were taking care of all our interests and they

23   would have been taking care of that process as

24   well.

1      Q.  But you never asked them to confirm

2    this?

3      A.  No, I did not.

4      Q.  I would like to ask you to turn to

5    Exhibit 15.

6                MS. VanLARE:  Your Honor, do you

7    have this?

8                THE COURT:  I do.  Thank you,

9    Ms. VanLare.

10   BY MS. VanLARE:

11     Q.  Ms. Longchamps, this particular document

12   has been redacted.  All of the confidential

13   information has been removed from this.  But if

14   you could just take a minute and look over it,

15   does this look like the letter that you

16   received, other than obviously your letter has

17   your specific information?

18     A.  May I just have a minute?  (Pause) Okay.

19   So it seems like this was the package that we

20   would have received when we had to make our

21   statement as to whether the amount was correct

22   or not.

23     Q.  And when you are talking about the

24   amount, you are talking about your Canadian



1    claim; correct?

2        A.   I am talking about my termination

3    payment.

4        Q.   So you recall receiving a letter just

5    like this, but it was addressed to you?

6        A.   I don't recall receiving a letter just

7    like this, so I don't recall what it looked

8    like.   I know I received the letter that asked

9    me to validate what my claim was.

10       Q.   Now, if you look at the first page of

11   this letter, the third paragraph says, "Nortel

12   Canada's records indicate you have a

13   Compensation Claim against Nortel Canada."  Do

14   you see that?

15       A.   Yes.

16       Q.   And the next paragraph begins, "Since

17   Nortel Canada is insolvent you will receive

18   only a percentage of the full value of your

19   Compensation Claim. . . ."  Do you see that?

20       A.   Yes, I do.

21       Q.   So the letter is talking about your

22   Canadian claim.  At this point did you consider

23   whether you needed to do anything about your

24   claim, potential claim against the US Debtors?



```
 1        A.   Do you remember the date of this?
 2        Q.   Do you recall receiving this letter --
 3   so the very first page, the box says that if
 4   corrections are required, you must take the
 5   actions by January 6, 2012.
 6        A.   Okay.
 7        Q.   Do you see that?
 8        A.   Yes, I do.
 9        Q.   So is it fair to say you probably
10   received it at some point --
11        A.   Some time prior to that.
12        Q.   Prior to that.
13        A.   Okay.  Thank you.
14        Q.   So having received a letter that is
15   telling you to verify your claim against Nortel
16   Canada, at that point did you ask --
17              MS. MERSKY:  Excuse me.
18   Objection.  This is a letter to PR, which is --
19              THE COURT:  I am sorry.
20              MS. MERSKY:  Excuse me.  This was
21   a letter produced on behalf of one of the
22   claimants whose initials is PR.  I have
23   absolutely no idea -- it is my understanding
24   that the witness has testified that she
```



1    received a similar letter.

2                    THE COURT:  Yes.

3                    MS. MERSKY:  I do know that these

4    letters were sent out over a period of time.

5    So to the extent we are blocking in times

6    through somebody else's letter, I am not

7    certain if she did or did not receive it in the

8    same timeframe.  My understanding, Your Honor,

9    is that, in fact, these letters were sent out

10   over a period of time for different claimants.

11   In fact, some -- so I just don't know, and I

12   don't think they have laid a foundation to

13   establish as to when she received this letter.

14   BY MS. VanLARE:

15       Q.  When you received a letter talking about

16   your claim --

17                    THE COURT:  I understand your

18   concern, and I think we can address it through

19   further questioning.

20                    MS. MERSKY:  Thank you, Your

21   Honor.

22   BY MS. VanLARE:

23       Q.  When you received a letter telling you

24   this is the amount of your severance claim, did



1    you ask anybody is this my claim against just

2    Nortel Canada or does it also cover my claims

3    against other Nortel entities?

4        A.  No, I didn't.  I didn't assume that was

5    my job to do that.  I assumed that I had

6    representation that was taking care of my

7    claims against Nortel, and they were my

8    lawyers, so I would expect them to do that.  I

9    would not ask that.

10       Q.  And just to be clear, when you are

11   talking about your lawyers, you are talking

12   about Koskie Minsky?

13       A.  Yes.

14       Q.  But you never called Koskie Minsky when

15   you got this claim letter to confirm that

16   assumption; is that fair to say?

17       A.  That's true.

18       Q.  Ms. Longchamps, you testified earlier

19   that shortly after receiving your termination

20   letter, you understood that all of the Nortel

21   entities were responsible for paying that

22   severance; correct?

23       A.  No, I didn't say that.  Not shortly

24   after I received my termination letter.



1       Q.   When?

2       A.   Because when I received my termination

3    letter, it was pretty much irrelevant.

4       Q.   So after Nortel had filed for

5    bankruptcy --

6       A.   Yes.

7       Q.   -- and you knew that Nortel had filed

8    for bankruptcy, at that point --

9       A.   I think the only time I realized, that I

10   went back and looked at the wording in the

11   letter and understood the significance, was

12   when it was pointed out in 2012, I think.

13      Q.   Well, just before break you testified

14   earlier that when you had -- after Nortel had

15   filed for bankruptcy and you had reviewed your

16   letter, your understanding was, even though you

17   didn't know who was paying your severance, you

18   believed that all of the Nortel entities were

19   liable for your severance.

20      A.   That's true.  It is just the time period

21   that I am not -- that maybe we are

22   differentiating on.  Sometime after that.  When

23   I realized what the language says, it is quite

24   clear that Nortel, its subsidiaries and

1   affiliates have this liability.  So yes,

2   sometime after I got my letter, yes, I realized

3   that.

4       Q.   And so I understand you are unable to

5   point to a specific date, but sometime in 2009?

6       A.   As I mentioned earlier, this language

7   was something I was very familiar with.  It

8   didn't strike me as unremarkable.  So I don't

9   think I really differentiated or noticed or

10  whatever until it was pointed out to me in

11  about 2012.

12      Q.   I am sorry.  I didn't hear you.

13      A.   I think it was 2012.

14      Q.   Ms. Longchamps, we are just trying to

15  make sure that the record is clear, and

16  everybody is --

17      A.   That's fine.

18      Q.   So in your deposition, after you were

19  shown the paragraph that we are talking about

20  with the definition of the word "Corporation,"

21  the question was:  "At the time that you read

22  this paragraph, who did you understand would be

23  responsible" --

24               So with respect to the paragraph



1        "Corporation," the question is:  "Did you read

2    that paragraph before signing the letter?"

3                    And you answered yes.

4                    "Question:  At the time that you

5    read this paragraph, who did you understand

6    would be responsible for paying your severance?

7                    "Answer:  I understood this to be

8    that the liability was with the whole Nortel.

9    Who was actually paying me in terms of cutting

10   a check, I don't really know.  One of them.

11                   "Question:  So you understood that

12   all of the Nortel entities were liable for your

13   severance amount?

14                   "Answer:  Yes."

15                   So was this testimony accurate?

16       A.   I believe it was.  Is it possible for me

17   to see it, because I have a hard time --

18       Q.   Sure.

19       A.   Thank you.

20                   MS. VanLARE:  So, Ms. Longchamps,

21   Your Honor, Ms. Mersky, I was just reading page

22   34, line 7 through 20.

23                   THE WITNESS:  Okay.

24



```
 1   BY MS. VanLARE:

 2       Q.  Do you recall --

 3       A.  Can you give me the question again?

 4       Q.  Do you recall testifying to these facts

 5    in your deposition?

 6       A.  Yes, I do.

 7       Q.  And was your testimony accurate?

 8       A.  Yes, I believe it was.

 9       Q.  So before you signed the letter, you

10    read the paragraph that defined the term

11    "Corporation"; correct?

12       A.  Yes.

13       Q.  And at that point in 2009 I believe,

14    before you signed the letter, you understood

15    that all of Nortel's entities would be liable

16    for your severance; correct?

17       A.  Yes.  And as I mentioned, the language

18    was very unremarkable to me because it was

19    something I had seen a lot.  So I wouldn't have

20    dwelt on it or spent much time on it.  It was

21    normal language, that all of Nortel.

22       Q.  So when we are talking about all of

23    Nortel's entities, you testified obviously that

24    that also includes the US entities.  So before
```



1    you signed the letter, you knew that the US

2    entities were responsible for your severance.

3    How long before you filed or sought to file a

4    claim in the US for that severance?

5        A.  So it wasn't just that the US Nortel was

6    liable for me.  Nortel globally had a liability

7    to me.  And my understanding was that our

8    lawyers were taking care of my claim with

9    respect to Nortel, all of Nortel.

10       Q.  Did you receive at any point --

11   Ms. Longchamps, I just want to stay for a

12   little bit longer on the question I posed.

13       A.  Sure.

14       Q.  So how much time passed between the time

15   that you saw that paragraph and you understood

16   that the US entities were liable for your

17   severance and the time that you sought to file

18   a claim in the US for your severance?

19       A.  I am not sure that it is correct to say

20   I saw the letter and thought that Nortel US was

21   responsible for it.  I saw the letter and felt

22   that Nortel globally was responsible for it.

23   And how much time passed between there and

24   2012, so I think it was three and a half years,

1   because it was the end of 2008, and I think it

2   was sort of mid-2012.

3        Q.  So during this time, this three-and-a-

4   half-year period, did you receive anything from

5   the US Debtors or their representatives telling

6   you that you shouldn't file a claim in the US?

7        A.  No, I don't think I received anything

8   one way or the other from them.

9                    MS. VanLARE:  I have nothing

10  further.

11                   THE COURT:  All right,

12  Ms. VanLare.  Thank you.

13                   Ms. Mersky, redirect?

14                   MS. MERSKY:  Just one question, I

15  hope, Jane.

16                   REDIRECT EXAMINATION

17  BY MS. MERSKY:

18       Q.  You said you didn't receive anything

19  from the US Debtors, but you had previously

20  testified, I believe, that you did receive a

21  notice of a joint proceedings; is that correct?

22       A.  It was a notice of filing in the

23  Delaware court for Chapter 15, and I don't know

24  if I received it by mail or if I went on a



1   website and found it and copied it for my

2   records.

3       Q.  And this was back in 2009; correct?

4       A.  Yes, early on, mid-January to

5   mid-February.

6       Q.  And what did this filing lead you to

7   believe then?

8       A.  Well, it led me to believe that there

9   was cross-border activity related to the

10  proceedings.  It referred to foreign

11  participants in foreign jurisdictions.  It

12  referred to joint administration.  It mentioned

13  Canada, and it was filing in The States.  So

14  all of these things taken together led me to

15  believe that there was more of a consolidated

16  approach, I guess.

17              MS. MERSKY:  No further questions.

18              THE COURT:  Thank you, Ms. Mersky.

19  Anyone else?

20              MS. VanLARE:  Nothing further.

21              THE COURT:  All right,

22  Ms. VanLare, thank you.

23              Favorite words to a witness:  You

24  are excused.  Thank you, thank you,



1    Ms. Longchamps.

2                      (Witness excused.)

3                      THE COURT:  Ms. Mersky.

4                      MS. MERSKY:  Your Honor, my

5    witness, Michael Campbell, is outside the

6    courtroom, so we will have to go get him.

7                      THE COURT:  All right.

8                      MS. MERSKY:  Your Honor, I call

9    Michael Campbell.

10                     THE COURT:  Thank you.

11   Mr. Campbell, come forward, sir, and if you

12   will stand in the witness stand and be sworn.

13                     MICHAEL ALEXANDER CAMPBELL, having

14   been first duly sworn, was examined and

15   testified as follows:

16                     THE COURT:  Thank you,

17   Mr. Campbell.  Welcome.

18                     THE WITNESS:  Thank you, Judge

19   Gross.  I would just like to say I have seen

20   you on television many times.  And I have an

21   honor to be in your courtroom today.

22                     THE COURT:  It is good to have you

23   here.

24



```
1                    DIRECT EXAMINATION
2    BY MS. MERSKY:
3        Q.  Mr. Campbell, is it okay if I call you
4    Michael?
5        A.  It certainly is, or you can call me
6    Mike.
7        Q.  Okay.  Or Mack?
8        A.  Mack will work as well.
9        Q.  Mike, can you please tell me what your
10   educational background is?
11       A.  Yes.  I have a degree in electrical
12   engineering in computers from the University of
13   Toronto.
14       Q.  And when did you first start working at
15   Nortel?
16       A.  I actually started working at Nortel
17   fresh out of school.  I was recruited off the
18   university campus, started in 1979.
19       Q.  Is that recruiting from the campus and
20   working a significant part of your work life,
21   was that normal at Nortel?
22       A.  It was.  I actually was involved in a
23   number of recruiting campaigns myself, going to
24   campuses, looking for early, young engineers to
```



1    bring into Nortel.

2        Q.   And what jobs, positions did you have

3    during the last five years of your work at

4    Nortel?

5        A.   I had a couple of positions at the end

6    of my career with Nortel.   One was I was a

7    general manager of a business unit called Axis

8    Care.   We did computer software for test and

9    development in our clients' networks.   And I

10    was recently -- when I left, I was the director

11    of OA&M for their VoIP business unit, CVAS

12    business.

13                  Sorry.   We used a lot of

14    four-letter acronyms at Nortel.

15        Q.   I think this Court is laughing because I

16    suspect that they have learned a lot of those

17    acronyms in the last several years.

18                  In your last position at Nortel,

19    how long were you in that position?

20        A.   As I recall, it was about two years.

21        Q.   And in those two years did you have

22    employees that were located in the United

23    States and Canada?

24        A.   I had employees located in Ottawa, which



1    was in Canada.  I had direct reports in both

2    Raleigh, North Carolina, and in Richardson,

3    Texas, at the Nortel locations.

4        Q.  And those were people who reported to

5    you?

6        A.  They reported to me directly, yes.

7        Q.  And who was your direct supervisor at

8    the time you were terminated?

9        A.  It was a gentleman called John McCready.

10   He was located out of Billerica at the Nortel

11   US facility there.

12       Q.  And how did you understand the

13   operations of Nortel as an in-place Nortel

14   engineer?

15       A.  Well, I always described it as we were a

16   very, very great tech company that was globally

17   located.  We had locations around the world,

18   but we put together teams with the best and

19   brightest, located in various locations, both,

20   you know, in the country and everywhere else.

21       Q.  And your line of business with your

22   supervisor when you were terminated, how did

23   you find out you were going to be terminated?

24       A.  I actually got a note from John telling



1    me that I should be in a certain location in

2    Toronto at a certain time and place, and that

3    was usually a code that we understood meant

4    that it was going to be our turn to be fired.

5        Q.  And at that time was John -- that was

6    your boss, John?

7        A.  Yes, John.  John actually did me the

8    honor of flying in and giving me the news

9    personally.  A lot of them were handled

10   remotely and in many cases over the phone,

11   whereas John had, I think, the decency to come

12   and tell me in person.

13       Q.  And after he told you, did you receive a

14   letter?

15       A.  I was given a letter at that meeting

16   stating, outlining the terms of my termination.

17       Q.  And what did you do after you received

18   that letter?

19       A.  I had actually dismissed enough people

20   in my career and understood the process enough

21   that I wasn't going to sign anything at that

22   point.  I took the letter that they gave me, I

23   made copies, and I Fed Ex'd it to an Ottawa

24   lawyer that I knew had specialization in

**Michael A. Campbell - Direct**                215

1    dealing with Nortel dismissals.

2        Q.   And the reason you went to the lawyer,

3    what was that for; to find out what?

4        A.   I was trying to understand whether or

5    not the terms of my settlement agreement made

6    sense relative to what other Nortel employees

7    and what other employees in similar situations

8    would get.

9        Q.   And did you determine that that was the

10   case?

11       A.   To be honest, I actually found out that

12   the offer was marginal, but in the fullness of

13   time, I decided that I would accept it.

14       Q.   How did you first learn that Nortel --

15   let's go back in time a little bit.  When were

16   you terminated, what year?

17       A.   I was terminated in late 2007,

18   September, if I recall.

19       Q.   Did you actually receive some of the

20   benefits under your termination agreement?

21       A.   I did, yes.  I had approximately a year

22   worth of payments before Nortel went into CCAA.

23       Q.   And what happened when you found out

24   Nortel had filed bankruptcy?  How did you find



1    that out?

2        A.   I found out two ways.  First of all,

3    money stopped coming into my bank account,

4    because I had an agreement with Nortel that

5    they were paying my biweekly.  And then I got a

6    letter from Elena King saying that Nortel was

7    going to terminate my benefits.

8        Q.   Can you refer to the exhibit book and go

9    to Exhibit No. 209?

10       A.   Sure.  Just bear with me.  I am going to

11   try and make my way through this here.  209,

12   yes, got it.

13       Q.   Exhibit 209 is a letter dated

14   January 28, 2009 from Elena King, and this is a

15   letter to Mr. James Carew.  Is this the same

16   letter that you received?

17       A.   I can't say it is identical, but it

18   looks similar to the amount of information that

19   is in here, basically letting me know that

20   Nortel was going to cease everything beyond

21   January of 2009.

22       Q.   And where was this letter from, if you

23   know?

24       A.   I don't recall where it was supposed to



1    have come, to be honest with you.

2       Q.  Is it reflected on the letter?

3       A.  It just says Elena King, senior vice

4    president, human resources.  There is a Chapel

5    Hill address at the bottom in North Carolina.

6       Q.  Were you directed if you had questions

7    to call anywhere?

8       A.  I actually had a slightly different

9    arrangement.  I had a contact in Nortel Canada

10   for any questions.  But I see there is a 1-800

11   number in here.

12      Q.  What did you do after you received this

13   letter?

14      A.  Well, as you can imagine, I and probably

15   a majority of the Nortel people that I knew

16   were surprised, shocked and dismayed by this

17   turn of affairs.  I actually reached out to a

18   number of folks that I knew in the Toronto area

19   from Nortel and discussed what we might do as

20   next steps in terms of getting ourselves

21   organized as employees and seeing if we should

22   go after legal counsel.

23      Q.  Did you help in the formation of an

24   entity to do just that?



1      A.   Yes.   So there was a meeting held in

2   Ottawa we heard about by a group called the

3   NRPC.   I joined the NRPC as part of the Toronto

4   chapter, and I helped organize the first event

5   in Toronto to help employees and pensioners

6   understand what their rights were under this

7   proceeding that we had no idea what it was at

8   the time.

9      Q.   And is that group the NRPC?

10     A.   It is the NRPC today, yes.

11     Q.   Did you work with people to obtain

12   representation through the Court?

13     A.   Yes.   As part of that session and

14   subsequent discussion I worked with other folks

15   in the Toronto area and in the Ottawa area to

16   look for counsel.   There were a number of

17   counsel put forward.   We had contacted Koskie

18   Minsky as a possibility, and we worked to get

19   to the point where three of my colleagues were

20   appointed as court representatives, and Koskie

21   was appointed as representative counsel for us.

22     Q.   When you say Koskie was appointed as

23   representative counsel for "us," first of all,

24   who is the "us"?

1      A.   Sorry.  Let me be more specific.  So

2   there were approximately 20,000 pensioners and

3   former employees in Canada.  The NRPC was a

4   volunteer organization, and Koskie Minsky was

5   appointed to represent all of the employees in

6   Canada terminated, pensioners and deferred

7   pensioners in the Canadian court system.

8      Q.   That is all 20,000 regardless if they

9   were terminated pre-petition or a pensioner?

10      A.   Correct, yes.  If they had a claim

11   against Nortel.  That's how we defined it.

12      Q.   And as the process unfolded, did you

13   personally become appointed as a court

14   representative?

15      A.   Yes.  In May 2009 I was appointed as one

16   of the court representatives, along with Donald

17   Sproule and David Archibold.

18      Q.   And what position were you appointed to

19   represent?

20      A.   Because I was a terminated employee,

21   that I was on a severance at the time the court

22   proceedings started, I was basically asked to

23   look after the terminated employees' rights

24   within the whole larger process.

1      Q.   How did you keep yourself informed about

2    the proceedings?

3      A.   We had -- after we got the NRPC

4    organized and our legal representation put in

5    place, we had regular briefings from our legal

6    team I would say on a biweekly or monthly basis

7    to bring us up to date on where things were

8    going, what we had to do as employees, you

9    know, what rights we should expect and what

10   events upcoming we should be aware of.

11     Q.   What did you understand you were

12   supposed to do?

13     A.   Well, I think that was the question

14   early on.  And one of the things that Nortel

15   trained us to do was to be proactive and to ask

16   questions and to look at what we should do, and

17   we did that.  We went out; we spoke to counsel.

18   And they said that because of the magnitude of

19   the number of employees, there would be a

20   special process put in place for us to deal

21   with our claims in the larger CCAA proceedings.

22     Q.   Did you learn about a US proceeding that

23   was taking place?

24     A.   We had heard through a number of sources



1    that there was a US proceeding.  I think part

2    of the issue for us at the time was that there

3    was lots of information flying around, a lot of

4    misinformation, and so we were relying on our

5    counsel to let us know the areas we should be

6    paying attention to.  So I was aware there was

7    a court proceeding in the US.

8        Q.  Did you learn about a US bar date and,

9    if so, when?

10       A.  I don't recall when I learned about it.

11   I know there was some discussion on the

12   LinkedIn groups.  But as I say, the advice we

13   were getting was that that wouldn't apply to

14   us.  As a matter of fact, I think, if I recall,

15   we asked a question at one of our monthly

16   meetings with our counsel, and they said that

17   was for people that had been employed in the US

18   or had employment contracts; i.e., contractors

19   in the US that would be affected by that, and

20   we didn't need to worry about it.

21       Q.  Did you ever go back and look at your

22   termination letter and see if you had anything

23   different than other people that Koskie was

24   recommending?



1       A.   I actually had to state in my

2    termination letter when I signed it that I

3    would show mine to nobody and that I would not

4    look at other people's.  So I wasn't aware at

5    that time that there were a number of letters

6    like mine.  I subsequently found out that as

7    part of this process, but at that point I

8    wasn't aware.  I had seen similar letters, but

9    I wasn't aware of the ones with the particular

10   wording that was in mine.

11       Q.   Were you part of the group of people

12   that helped design a process for former

13   Canadian employees' claims to be acknowledged

14   by the Court?

15       A.   Yes, I was.  Because of the nature of

16   Nortel laying off lots of people just prior to

17   the CCAA filing and then subsequently to that,

18   there was no way to determine from a severance

19   letter what their entitlements would be.  So

20   the Monitor actually proposed that they handle

21   the claims, and myself and a number of members

22   of the NRPC acted as both representatives to

23   oversee the process as well as test guinea pigs

24   to see whether the numbers and the calculations

**Michael A. Campbell - Direct**                              223

1    they made through that process made sense

2    before we released it.

3              We also helped prepare a FAQ,

4    frequently asked questions, for people that

5    would be getting the letters, to help them

6    understand what they were being asked to do.

7       Q.  And how long did it take to create that

8    process?  When was the process completed?

9       A.  I recall that we started in 2011 to have

10   a number of meetings around that process and

11   that it was released either toward the end of

12   2011 or into early 2012, and there were some

13   specific dates in 2012 where employees had to

14   get back with any objections.

15             The way the process was designed

16   was the Monitor, with some guidance and input

17   from us, from the NRPC and myself, pulled

18   together some formulas, and if people felt

19   those formulas didn't affect their particular

20   situation correctly, that they could get back

21   to the Monitor and make corrections.

22      Q.  Were the people who had termination

23   benefits required to do anything other than

24   wait for that to come and object if they

**Michael A. Campbell - Direct**                    224

1    thought it was wrong?

2        A.   On a number of occasions that question

3    was asked, and we basically received -- I

4    received, the people that asked received the

5    same answer:  That we should wait for the

6    Canadian process to unfold, because that's

7    where our claims were going to be handled.

8        Q.   You say you should wait for the Canadian

9    process to unfold because that's where our

10   claims were going to be handled.  What did that

11   mean to you?

12       A.   Well, we -- I think it is fair to say

13   that we were a bunch of engineers and

14   scientists.  We had no concept of what the

15   process really meant.  I mean, to this day, and

16   this is seven years later, you know, I think I

17   might have a vague understanding of what we

18   need to do.  But as far as I knew, that meant

19   that our claims against Nortel as a corporation

20   were going to be handled as part of this

21   exercise with the Monitor and that we needed to

22   not do anything else until that process

23   unfolded.

24       Q.   But you knew there was a US process;



1    right?

2       A.    We knew that we had a -- that there was

3    a US process in place.  We had asked on a

4    number of occasions and been told to wait for

5    the one to unfold with the Monitor.

6       Q.    At some point in time you learned that

7    there were claims that potentially could be

8    brought against the US Estate; is that correct?

9       A.    Yes, that's correct.

10      Q.    And was that in the spring and summer of

11   2012?

12      A.    I think, as I recall, it was about June

13   of 2012 that our counsel first raised that

14   point with us, that there was an opportunity,

15   an option, if you will, for us to go into a

16   claim with the US Estate.

17      Q.    Was this something that you were

18   surprised about?

19      A.    I was shocked, to be honest with you,

20   that it was coming up that late.  It had never

21   been on our radar screen.  But I was told that

22   the Monitor and Koskie had had some

23   discussions -- this was in our briefings by our

24   representative counsel -- around the filing of



1   some claims in the US by a number of employees

2   that had also filed in Canada.  And subsequent

3   to that Koskie looked at the language, found

4   the actual letters of our termination

5   agreements and found there was some language

6   common that might give us that option.  And

7   that's when we discovered -- that's when I was

8   told of that fact.

9       Q.  Have you subsequently learned that three

10  of those individuals that were identified,

11  Dietmar Wendt, Lauren Flaherty and --

12      A.  John Roese?  John Roese?

13      Q.  And John Roese.  Thank you.  Received

14  notice of a bar date?

15              MR. ROSENTHAL:  Your Honor, it is

16  hearsay.

17              THE COURT:  Yes.

18              MR. ROSENTHAL:  It is rank

19  hearsay.

20              THE COURT:  It is.  I will sustain

21  the objection and will strike the answer.

22              MS. MERSKY:  The record will

23  reflect at Docket No. 1919 that these

24  individuals each received service.  The Court



1    can take --

2                    MR. ROSENTHAL:  She can make

3    whatever arguments she wants in closing based

4    on whatever the record is, but this is not

5    appropriate for questioning the witness.

6                    THE COURT:  Yes, that's fair.

7    BY MS. MERSKY:

8       Q.  When you learned that this was something

9    that could happen, did you understand that you

10   had previously had any option to do that?

11      A.  That had never entered our radar screen

12   prior to that.  There was no discussion with

13   any of our counsel that that was an option that

14   was available to us.  It was entirely new news

15   at that point.

16      Q.  And as soon as you learned about this,

17   what did you do as the representative?

18      A.  Well, first of all, I was surprised.  I

19   saw that -- I heard that we had the option.  We

20   reviewed what it meant.  As it was explained to

21   me, it was potentially risky.  We had to take

22   action on our own, whereas everybody else in

23   Nortel was having their legal fees paid for by

24   the estates, that we had to go and retain



1    counsel ourselves.

2              So I asked our representative

3    counsel to see if they could talk to a lawyer

4    in the US and get an opinion for us, because I

5    wasn't sure at that time that Koskie was able

6    to give me an opinion one way or the other that

7    made sense in the US because they weren't

8    practicing law there.

9    Q.  Did you direct Koskie to ask the Monitor

10   or represent to the Monitor that Koskie should

11   proceed initially?

12   A.  Yes, we asked them to take a look at it

13   and help us.

14   Q.  And did Koskie, to your knowledge,

15   originally indicate that they were going to

16   represent you?

17   A.  They were going to do the initial

18   legwork to find out what our options were, but

19   they weren't -- they couldn't represent us in

20   the US.

21   Q.  And did they, in fact, do what you call

22   the initial legwork?

23   A.  Yes.  They reached out to Clearys on a

24   number of occasions.  They transmitted



1    information in the fall of 2012, and they

2    informed me toward the end of 2012 that we

3    weren't making any progress and that if we

4    wanted to move this forward, that we should

5    actively reach out and engage US counsel.  So

6    we reached out to Ms. Mersky's firm and set up

7    the engagement process with her.

8        Q.  And when you reached out to my firm,

9    were there any factors you considered in

10   retaining my firm?

11       A.  We understood that you had had

12   experience with employee claims in the US in

13   these types of matters, that you had

14   represented some other employees of Nortel, and

15   so we felt you would be well-positioned to

16   understand the issues that we were going to

17   face.

18       Q.  Were you told that as of 2012, in the

19   year 2012, I had had a claim allowed after the

20   bar date?

21       A.  I don't think I was told that in the

22   initial discussions, no.

23       Q.  After you engaged counsel in the United

24   States, how did the process unfold?



1      A.   Well, so the group that I represent is a

2   very highly analytical group that asks lots of

3   questions once information is put in front of

4   them.  So we prepared a FAQ, once again, a

5   frequently asked questions about the process,

6   and we worked with Koskie and yourself to find

7   out who the 300 people were and get information

8   to them so that they could make a decision

9   about joining this motion or not.

10     Q.   Was that accomplished in less than a

11  month?

12     A.   I am sure I am going to say something

13  here that will get me in trouble with the

14  Canadian lawyers.  But based on the speed that

15  had happened with the Nortel case up to that

16  point, I was astounded at how quickly we were

17  able to pull that together, and certainly a

18  credit to yourself and the rest of the team.

19     Q.   I am not asking for that.

20     A.   Sorry.  That's my honest reaction, Your

21  Honor.  If I am going over the top, I

22  apologize.

23     Q.   And from that point on was the action

24  prosecuted, to the best of your knowledge?



1          A.   Yes.   I believe in February of 2013 we

2      actually filed the motion that got us to court

3      here today.

4                    MS. MERSKY:   Thank you very much.

5                    THE WITNESS:   Thank you.

6                    CROSS-EXAMINATION

7      BY MS. VanLARE:

8          Q.   Good afternoon, Mr. Campbell.

9          A.   Good afternoon.   It is a pleasure to see

10     you again.

11         Q.   Thank you.   Mr. Campbell, at the time

12     that you signed your termination letter, you

13     were aware that Nortel was organized into

14     separate legal entities; correct?

15         A.   The way we viewed Nortel was actually

16     that we worked for lines of businesses, and

17     those lines of businesses didn't really have

18     geographical boundaries.   So I had employees in

19     Canada.   I had employees in the US.   John was a

20     US employee.   But we all worked for the CVAS

21     business unit, so we all worked for lines of

22     businesses in reality.

23         Q.   Putting aside how you worked, you were

24     aware that there were separate legal entities?



1     A.   I knew that for various reasons -- and

2  not being a lawyer, I can't tell you exactly

3  why -- that there were different companies in

4  different parts of the world, yes.

5     Q.   And you were aware that US legal

6  entities were separate from Canadian legal

7  entities?

8     A.   Yes.

9     Q.   Throughout the course of your career

10 with Nortel, you understood that you were

11 always employed by a Nortel Canadian entity;

12 correct?

13     A.   Well, my paycheck came from Nortel

14 Canada, but I worked for different lines of

15 businesses, and those lines of businesses might

16 have been headquartered in Europe or North

17 America, the US or Canada, depending on the

18 structure of the company at that point in time.

19     Q.   Mr. Campbell, I am asking a very

20 specific question --

21     A.   Sure.

22     Q.   -- and that question relates to your

23 employment.

24     A.   Sure.



1        Q.   You understood throughout your career

2    that you were employed by a Nortel Canadian

3    entity?

4        A.   Yes.

5        Q.   And at the time of your termination you

6    understood that you were employed by a Nortel

7    Canadian entity?

8        A.   Yes.

9        Q.   And you were never employed by a Nortel

10   US entity?

11       A.   Yes, and that's why the confusion came

12   up that we ran into later, because the

13   information we had been getting was that if we

14   were employed by a US company, that we should

15   put a claim into The States.

16       Q.   To your knowledge, as a court-appointed

17   employee representative, all members of the ad

18   hoc group represented by Ms. Mersky were

19   employees of Nortel Canada at the time of their

20   termination?

21       A.   I don't know that for a certainty, to be

22   honest with you.  I haven't seen their

23   employment letters or contracts.

24       Q.   Well, if I could just ask you to turn to

1    Exhibit 55, please.

2         A.   Sure.  Oh, I recognize this.

3                   MS. VanLARE:   Your Honor, do you

4    have that?

5                   THE COURT:   I do, thank you,

6    Ms. VanLare.

7    BY MS. VanLARE:

8         Q.   This is an affidavit that you submitted;

9    correct?

10        A.   Yes, it is.

11        Q.   If I could ask you to turn to paragraph

12   24, please.

13        A.   Okay.

14        Q.   And I will read the second sentence in

15   that paragraph.  "For the purpose of this

16   motion, each moving party is, to the best of my

17   knowledge, one of these 300 former employees of

18   Nortel Canada terminated prior to the filing

19   date and who has a claim for termination and

20   severance pay against both Nortel Canada and

21   Nortel US."  Do you see that?

22        A.   Correct.

23        Q.   Does that refresh your recollection as

24   to your knowledge?



1      A.   Yes.  I think, to the best of my

2    knowledge, it is applicable here.

3      Q.   So to the best of your knowledge --

4      A.   Yes.

5      Q.   -- all members of the ad hoc group were

6    employees of Nortel Canada?

7      A.   To the best of my knowledge, yes.

8      Q.   Now let's talk a little bit about your

9    appointment as an employee representative.

10     A.   Sure.

11     Q.   In May of 2009 the Canadian Court

12   appointed you to be a representative of the

13   employees; correct?

14     A.   That's correct.

15     Q.   Is it fair to say that your duties as an

16   employee representative included staying

17   generally informed about the claims process for

18   former employees of Nortel Canada?

19     A.   Over time I became aware of my duties as

20   a court rep.  I would say at the beginning we

21   were in a position where it was a brand new

22   process to us.  We were engineers, not lawyers.

23   And we had to learn over the fullness of time

24   actually what was involved in our duties.  So I

1    would say that evolved over a period of time,

2    yes.

3        Q.   So you learned that your duties, as you

4    understood them, included staying informed,

5    generally informed, about the claims process?

6        A.   My duties were actually described to me

7    as representing the employees in the Canadian

8    process, the CCAA process, to understand any

9    decisions that we had to make as part of that

10   process, because we had the ability to bind the

11   group as a whole between the three court

12   representatives, and to do our best and to do

13   what we felt was honestly the right thing to do

14   in the situation at any point as we moved

15   along.

16       Q.   And so part of the role included

17   communicating to recently severed employees;

18   correct?

19       A.   There were a number of communication

20   vehicles.  Part of our role was certainly to,

21   if we saw obvious misinformation or we had

22   questions, to relay that to them.  There were

23   other communication vehicles out there.  Koskie

24   had a number that were available.  The NRPC had



1    a website and other vehicles.

2              I typically stepped in when I saw

3    misinformation that I knew was incorrect, and

4    then I would offer some commentary on that.

5    But typically, I relied on the larger NRPC and

6    Koskie to provide general updates to my

7    particular constituency.

8        Q.   At the time that Nortel Canada commenced

9    the CCAA proceedings, you understood that

10   Nortel US entities commenced their own

11   proceedings in the US?

12       A.   I don't think it was clear at that time

13   to us.  I mean, to be honest with you, I was

14   working at another company.  I was actually, I

15   would have to say, fairly pleased about my

16   arrangement on my termination from Nortel

17   because I was actually going to be put on leave

18   to pension.  So I wasn't -- I mean, I was

19   following generally what was going on, but I

20   really didn't understand until the fullness of

21   time what really was meant by Nortel going into

22   CCAA.

23             For example, Mr. Zafirovski only

24   decided to break the company up and start



1    selling the assets in June of that year, well

2    after January.  So there were many things going

3    on.  And, you know, I was trying to keep myself

4    appraised of them primarily by information that

5    my lawyers gave me in our regular briefings.

6       Q.  Mr. Campbell, my question was very

7    limited.

8       A.  Sure.

9       Q.  At the time that Nortel Canada commenced

10   its CCAA proceedings, you understood that the

11   US entities commenced their own proceedings in

12   the US?

13      A.  I wouldn't say that at that point I

14   understood that, no.  I think in fullness of

15   time I did.

16      Q.  Do you remember testifying in this

17   matter --

18      A.  In depositions, yes, I do.

19      Q.  Let me just refresh your recollection.

20      A.  Sure.  Please do.

21            MS. VanLARE:  And, Your Honor, I

22   am about to read --

23            THE WITNESS:  Could you give me

24   the reference to that as well so I can take a



```
1    look?
2                    MS. VanLARE:  Absolutely.
3                    THE WITNESS:  Thanks.  Holy
4    smokes, I remember this.
5    BY MS. VanLARE:
6        Q.  So, Mr. Campbell, page 62.  I am going
7    to read lines 5 through 13.
8        A.  Sure.
9        Q.  "Question:  At the time that Nortel
10   Canada commenced its CCAA proceedings did you
11   have any reason to believe -- well, strike
12   that.  Let me back up one step.
13                    "At the time Nortel Canada
14   commenced its CCAA proceedings, did you also
15   understand that Nortel's US entities commenced
16   Chapter 11 proceedings?
17                    "Answer:  Yes.
18       A.  Yes.  Sorry, I thought you meant on
19   January 19 of 2009, when Nortel went into CCAA.
20   I would say over the period until I was
21   appointed court rep, I did understand that
22   there were other proceedings.  But as of
23   January, no, I did not.  That's something I
24   subsequently learned.
```



**Michael A. Campbell - Cross**                    240

1      Q.   But you understood as of May when you

2   were appointed --

3      A.   I understood that there were other

4   entities involved, yes.

5      Q.   And that's May 2009?

6      A.   Yes.

7      Q.   Okay.  Thank you for clarifying.

8      A.   My pleasure.  Do I need to keep this or

9   we will be using it again, I suspect?

10     Q.   Please just keep it.

11               At some point in 2009 you became

12   aware that there would be a claims process

13   established in Canada; correct?

14     A.   Yes.

15     Q.   And you knew that in Canada there would

16   be a deadline for claims at some point?

17     A.   I knew that there was a general deadline

18   for people that were not employees, former

19   employees or pensioners.  I knew that there was

20   going to be a process in the future for us, and

21   at that point I don't think a date had been

22   set.

23     Q.   Putting aside a specific date, you were

24   aware that a date for employees would be set at



1   some point in the future?

2       A.  Yes, that was communicated to us.

3       Q.  I would like to speak a little bit about

4   the LinkedIn group.

5       A.  Sure.

6       Q.  You joined the LinkedIn group at some

7   point around March of 2009?

8       A.  To the best of my recollection.  It was

9   a while ago, but yes, I think it was in that

10  timeframe.

11      Q.  If I could ask you to look at Exhibit 55

12  once again.  That is your affidavit.

13      A.  Sure.

14      Q.  Paragraph 11.  The last sentence of

15  paragraph 11 --

16      A.  Sorry.  Could I just read through it?

17      Q.  Absolutely.

18      A.  Thank you.  (Pause) Okay, thank you.

19      Q.  The last sentence reads, "This LinkedIn

20  group has proven to be very useful and in fact

21  has been one of the main tools that I and the

22  other Representatives have used to reach out to

23  our group by posting updates, and also to

24  ensure our group's concerns are addressed by



**Michael A. Campbell - Cross**                    242

1   collecting comments, questions and feedback on

2   various matters."

3       A.   Yes.

4       Q.   So would you agree that the LinkedIn

5   group was, in fact, an important tool for you

6   and other representatives in communicating with

7   the terminated employees?

8       A.   I actually used it more in terms of the

9   points I note at the end, because what I had to

10  do was represent the concerns of the terminated

11  employees in the larger actions around the CCAA

12  and certainly in the larger context of the

13  pensioners, of which there were far more of the

14  pension group than there were of terminated

15  employees.  So I primarily used it to collect

16  comments, questions and concerns and use that

17  as information that I would use to take back to

18  the discussions that I had with our

19  representative counsel and the other

20  court-appointed representatives.

21      Q.   I believe you testified earlier during

22  your direct examination that at some point you

23  learned that a US bar date had been set;

24  correct?



1       A.   Yes.

2       Q.   You learned that in 2009; correct?

3       A.   I believe it was in 2009, yes.

4       Q.   At that time you did not file a claim

5    against the US entities; correct?

6       A.   I did not.  I was accused later in the

7    process of having filed one and using the

8    Canadian process as a method to get into the US

9    through a back door.  But that was not me.

10   That happened to be, unfortunately, another

11   Michael A. Campbell that took us several days

12   of scrambling to determine.  But I had not

13   filed any claims.

14      Q.   No one from the US Debtors or their

15   representative discouraged you from filing a

16   claim in the US; correct?

17      A.   Nobody from the Debtor contacted me the

18   way the Monitor did.  Nobody suggested that

19   because of the letters that they had of mine in

20   the US that I had a claim.  So I did not view

21   that I had a claim.

22              I mean, what I said in my

23   deposition is true.  It didn't enter into our

24   radar screen that this was an option that we



1    had until it was brought forward to us in 2012.

2        Q.   So is it fair to say then that in 2009

3    the reason that you didn't file a claim in the

4    US was that you didn't believe that there was

5    any basis for a claim that you had in the US?

6        A.   You know, I didn't have a belief one way

7    or the other.  It clearly for us, it wasn't on

8    the radar screen.  We were involved in trying

9    to understand what CCAA meant.  We were faced

10   with a group of irate pensioners and employees

11   that had literally hundreds of thousands of

12   dollars taken away from them.  We had

13   pensioners that were facing a cut of 50 percent

14   of their pension because of the subsequent

15   actions through CCAA.  And to be honest with

16   you, we were still trying to figure out what

17   the CCAA thing meant overall.

18                   So the concept of whether there

19   was anything that would cause us to have a

20   claim in the US never entered into our

21   consciousness.  That's the way it was.

22       Q.   So at that point in 2009 you didn't

23   think that you had a basis for a claim in the

24   US?

1      A.   We had been told that our claims would

2    be handled through -- against Nortel would be

3    handled through the Canadian process, and we

4    were just told not to do anything until that

5    process unfolded.  And that was a consistent

6    message that I was given as court rep.  That's

7    the message that I tried consistently to tell

8    my group, because they were very irate and very

9    agitated.

10            If you read the LinkedIn pages,

11    and I tell you, I read a lot of them, there

12    were a lot of very irate, very intelligent

13    people that were dying to do something to get

14    this fixed.  And we took those concerns to our

15    counsel, and every time we did we were told

16    that the process will unfold.  The Monitor is

17    working on it.  And the Monitor was a Canadian

18    company that we thought owned all of Nortel,

19    and so we believed that that was the right

20    process to follow.

21      Q.   Mr. Campbell, again, my question was

22    very simple, really a yes-or-no question.

23      A.   Sure.

24      Q.   In 2009 the reason that you didn't file



1    a claim in the US is that at that time you

2    didn't believe that you had a basis for a claim

3    in the US; is that correct?

4        A.  I had no belief either way.  It is not

5    correct.  I had no belief either way, that I

6    should have filed a claim or not.  It was

7    clearly not in our consciousness at that point

8    in time.

9        Q.  Well, you did not believe affirmatively

10   that you had a claim?

11       A.  I didn't know one way or the other.  It

12   wasn't part of the discussion or the

13   consciousness around that concept.  We just

14   purely weren't talking about it.  When we

15   raised it, we were told to wait for Canada.

16       Q.  And again, affirmatively, there was

17   nothing at that point in 2009 that led you to

18   believe that you had a claim -- let me start

19   over.

20       A.  Sure.  Sorry.  The sentence is confusing

21   me.  We had no indication that there was a

22   basis for a claim in the US for us at that

23   time.  That's all we knew.  And there was no

24   belief one way or the other.  Sorry.  I can't

1    state it any clearer.

2        Q.   And the belief that you didn't have a

3    basis for a claim or you didn't know --

4        A.   Sorry.  I am not trying to be combative.

5    I am just trying to explain sort of where we

6    were at that point.  All right?

7        Q.   You continued to hold this belief until

8    2012, when your lawyers advised you otherwise;

9    correct?

10       A.   So through 2009, 2010, 2011, we were

11   focused on figuring out what needed to be done.

12   We were understanding more about the processes

13   that were going on in the bankruptcies.  There

14   were some mediations that went on that I was

15   not part of.  We were involved in creating the

16   employee claim process so that people without

17   severance letters would be treated as fairly as

18   people that were.  We were dealing with health

19   and welfare issues where pensioners were

20   getting their health and welfare benefits taken

21   away, and I was getting phone calls and emails

22   on a regular basis of pensioners telling me

23   that they were losing their benefits and what

24   they were going to do.  We were scrambling to

1   put a hardship process in place so that

2   terminated employees and seniors without

3   benefits could get at least some relief in

4   advance of any of the settlements.

5              So we were busy.  And I was

6   working full-time at the time.  I was doing

7   what I could to help the folks.  And it wasn't

8   until 2012 that this topic came up.

9      Q.  And in 2012 you were advised that you

10   may have a claim against the US; correct?

11      A.  I was told that as part of the unfolding

12   of the employee process, there had been a

13   number of individuals identified that had

14   certain language in their letters that had

15   raised the option of us having a claim into the

16   US.  Yes, I was told that.

17      Q.  And I believe on direct examination you

18   said you were shocked when you learned this;

19   correct?

20      A.  I was.  I was.

21      Q.  And before that time in 2012 you didn't

22   think at any point in time that you had a basis

23   for a claim in the US?

24      A.  We were -- as I said, we were very, very



1    busy.  We had a number of things that were on

2    the go that were critical to our constituents.

3    There was no basis for me forming an opinion

4    one way or the other at that point.

5        Q.  After you received your termination

6    letter you had a lawyer review it; correct?

7        A.  I did.

8        Q.  That counsel that you retained was from

9    the law firm Nelligan O'Brien Payne?

10       A.  I believe it was, if I recall correctly.

11       Q.  And that's a law firm in Ottawa;

12   correct?

13       A.  It is.

14       Q.  You reviewed the termination letter with

15   your counsel; correct?

16       A.  I did.

17       Q.  After analyzing it, that attorney never

18   advised you that there may be a possible claim

19   against the US entities; correct?

20       A.  Well, I have learned in my career

21   through the legal process that I should ask my

22   lawyer questions and I should look for answers

23   to those questions.  So I asked him or her -- I

24   can't remember whether it was Janice or one of



1    the other members -- was this package

2    comprehensive compared to what the standard was

3    for other Nortel employees and, indeed, for

4    employment standards at that time.  That's what

5    I asked them.

6                    There was, once again, no concept

7    whatsoever.  This was a year and a half before

8    Nortel even thought about getting into CCAA or

9    into Chapter 11 here.  And once again, it

10   wasn't even something that we had considered.

11   It wasn't -- it was -- I was happy that Nortel

12   had given me a package that allowed me to

13   proceed to my pension in 2009.  I had worked

14   for the company for 30 years.  I had the

15   opportunity to go and potentially start another

16   career.  And the thought that Nortel would end

17   up the way it has, the things that I know seven

18   years later, not even on the radar screen.  It

19   just wasn't a question that I would have asked.

20       Q.   After Nortel commenced the CCAA

21   proceedings, you stopped receiving your

22   severance benefits; correct?

23       A.   That's correct.

24       Q.   And so you knew that the company that



1    owed you severance was in bankruptcy?

2        A.    Well, in Canada it is actually

3    different.    In Canada it is the CCAA -- this is

4    a topic that we get on a lot in Canada because

5    my constituents believe that Nortel is in

6    bankruptcy.    It is not.    It is in something

7    called CCAA, which is the creditor protection

8    arrangement.    And it is a step along the way

9    potentially to bankruptcy, but they are not

10    bankrupt.

11                So I knew that they had gone into

12    some kind of creditor protection because I got

13    the letter from Elena.    I knew that my benefits

14    were stopping.    And in January, that's what I

15    knew.

16        Q.    You knew that Nortel Canada commenced

17    CCAA proceedings and your severance benefits

18    had stopped?

19        A.    Correct.    I knew that.

20        Q.    Did you at that point go back to your

21    lawyer at Nelligan and ask what your rights

22    were with respect to the US entities?

23        A.    No.    I actually looked to see if we

24    could as a larger group of employees find that



1   out, and that's what led me into the NRPC,

2   because I thought they were going to go and get

3   a better understanding of what the process

4   meant to us employees, and as part of that

5   process, I would get my questions answered.

6              My wife is an employee of Nortel

7   as well at that time.  She was heavily affected

8   by this.  Her pension has been cut, not as much

9   as the rest, because in Ontario there is a

10  pension benefit fund.  But I felt I had to go

11  and do something to get organization so that

12  not only I could find out what was going on but

13  others in my group and other employees could

14  find out.  And that was my motivation.  So

15  that's the path I chose to find out what my

16  rights were and my options.  And I felt by

17  doing that that I could get that information

18  available to others as well.

19     Q.  You later discussed your termination

20  letter with a second law firm, Koskie Minsky;

21  correct?

22     A.  I did, yes.

23     Q.  And that was sometime in 2009?

24     A.  Yes.  They had asked me to provide the



1    letter because they were collecting a number of

2    them.  I did not have any in-depth discussion

3    as far as what my rights or rights were or were

4    not at that point in time.  They were trying to

5    get representative samples of the termination

6    agreements for use in the CCAA and to represent

7    us.

8        Q.  You testified on direct examination I

9    believe regarding Koskie Minsky being appointed

10   legal counsel to the employees; correct?

11       A.  Representative counsel I think is the

12   term, yes.

13       Q.  You understood that Koskie Minsky was

14   appointed by the Canadian Court to represent

15   yourself and other former employees in Canada;

16   correct?

17       A.  Yes, I understood that.

18       Q.  And you understood that they were a

19   Canadian law firm that was licensed to practice

20   in Canada?

21       A.  I knew they were a Canadian law firm in

22   the area of employment, that they had a number

23   of very successful cases in the Canadian

24   courts.  I didn't know one way or the other



**Michael A. Campbell - Cross**                    254

1    whether they had any branches in the US, to be

2    honest with you.  But they were practicing in

3    Canada, yes.

4        Q.  Well, when you learned about the

5    possibility of a claim against the US in 2012,

6    you instructed Koskie Minsky to get a US

7    lawyer; correct?

8        A.  I asked Koskie to help explore what the

9    option would be, how expensive it would be, and

10   what the likelihood of success was, because as

11   it turned out, I actually recall writing a

12   note, and the cost that we -- again, the cost

13   that we have engaged to this point was far

14   greater than we had ever understood.  So not

15   knowing that at the time, I did want to make

16   sure that we had a reasonable basis for

17   proceeding before I asked some number, 300 or

18   so, to actually put their own hard money on the

19   table to commence these proceedings, yes.

20       Q.  And I believe you testified earlier that

21   you weren't sure whether Koskie Minsky would

22   give you the right answer about the meaning of

23   "Corporation," so --

24       A.  No, I don't believe I said that.  Sorry.



1    What I said was I wanted to know whether or not

2    the truth -- that the matter we were going to

3    take forward had any chance of being

4    successful.  I wasn't asking them to interpret

5    the language.  I was just saying could we get

6    an opinion from a US lawyer about that.

7        Q.   And the reason you asked that was

8    because you knew that they weren't practicing

9    law in the United States?

10       A.   I knew that they weren't specialists in

11   US bankruptcy law, yes.

12       Q.   Well, in fact, you knew not only that

13   they weren't specialists but that they were a

14   Canadian law firm; correct?

15       A.   I knew they practiced law in Canada.  I

16   knew they were an employment law firm.  I knew

17   they weren't a US bankruptcy law firm, yes.

18       Q.   I want to talk now about June of 2012.

19       A.   Sure.

20       Q.   The first time that you considered that

21   you may have a claim against the US was around

22   June 2012; is that right?

23       A.   It was towards the end of June,

24   beginning of July, yes.



1      Q.   And you first came to that understanding

2   after Koskie Minsky told you that you might

3   have a claim against the US Debtors.

4      A.   They explained to me the process that

5   had gone on in the conversations with the

6   Monitor, and they said that that was something

7   that was potentially an option and that we

8   should explore it.  That's when they brought it

9   to my attention, that there was specific

10  language in our agreements that they felt was

11  sufficiently broad in that case.

12     Q.   And they told you that they had previous

13  communications with the Monitor about this?

14     A.   Correct.

15     Q.   And that the Monitor had identified

16  individuals that potentially could have claims

17  against the US?

18     A.   They had identified a list of people

19  that had the equivalent language to my

20  severance agreement in their severance

21  agreements, yes.

22     Q.   Do you know when the Monitor identified

23  individuals with potential claims against the

24  US Estate?



1    A.  I don't know specifically.  I think it

2    was in 2012.  I don't know the exact dates.

3    Q.  Sometime in the first half?

4    A.  Sometime -- I can only tell you it was

5    sometime before July of 2012.

6    Q.  Do you know when the Monitor first

7    communicated about this to Koskie Minsky?

8    A.  Only generally.  I knew that there was

9    some discussions as part of the Canadian

10   employee claims process, the identification of

11   the four individuals.  But I was not briefed.

12   I was not in the meetings nor briefed on the

13   particular contents.  I was given a general

14   overview of that when they brought it to my

15   attention, yes.

16   Q.  Would Koskie Minsky know how long your

17   representatives knew about potential claims

18   against the US before the motion was filed on

19   your behalf?

20   A.  I can't say.  They may have figured it

21   out the day before they told me.  I don't know.

22   Q.  Well, would they know when they found

23   out about the potential to file claims?

24   A.  I assume they would.



1     Q.  You are aware that the term

2   "Corporation" includes subsidiaries and

3   affiliates; correct?  If not, we can look at

4   your termination letter.

5     A.  Sorry, yes.  If you can point me to

6   something.  I am not a lawyer.

7     Q.   In the termination letter.

8     A.   All I know is there is a paragraph in

9   the termination letter that we were directed to

10  that has the word "Corporation" at the

11  beginning with a list of various both

12  subsidiaries, corporations, other corporations,

13  individuals, employees and so on.  Yes, if

14  that's the one you mean, yes, I am familiar

15  with that.

16    Q.  And I think it might just be easier to

17  look at your termination letter.

18    A.  And I appreciate that.

19    Q.  That's Exhibit 50.

20    A.  I only made it to 50?  I thought it

21  would be way lower than that.  I see 49 and I

22  see 54.  Sorry.  Thank you.  Is this the

23  revised one or the original?  Oh, this is the

24  revised one.  Okay.  Okay, thank you.



1      Q.  So if I could ask you to look at

2   paragraph 3.

3      A.  Yes.

4      Q.  That's the "Corporation" language?

5      A.  Yes.  As used in this letter, is that

6   the paragraph?

7      Q.  Yes.

8      A.  Okay, perfect.

9      Q.  You haven't pursued any claims against

10  entities other than US Nortel and US Canada;

11  correct?

12     A.  I have not at this time.

13     Q.  Is that something you are considering

14  doing?

15     A.  I haven't ruled it out.  As I said in my

16  deposition, I have learned that legal

17  proceedings and that can be very expensive,

18  very costly and very time-consuming, and this

19  is the one that is sort of closest to home, to

20  be honest with you.  But I understand that this

21  means I can go after subsidiaries in Europe and

22  other places around the world, yes.

23     Q.  And in this paragraph the word

24  "Corporation" includes not only subsidiaries



```
1    and affiliates, their successors and assigns
2    but also -- and I am reading -- "all of their
3    past and present officers, directors, employees
4    and agents (in their individual and
5    representative capacities), in every case,
6    individually and collectively."
7        A.   Correct.
8        Q.   During your deposition you referred to a
9    settlement agreement that you had entered.
10   Putting aside the settlement agreement, do you
11   believe you have the right to sue past and
12   present officers, directors, employees and
13   agents?
14       A.   I was given -- other than the settlement
15   agreement that you mentioned correctly, which
16   covers officers and directors -- that was one
17   of the releases we gave in exchange for some
18   benefits for our constituents -- I understand
19   that means, yes, that I can go after others as
20   well.
21       Q.   Upon learning that you may have a claim
22   against the Nortel US entities in June of 2012,
23   you didn't immediately file a claim in the US;
24   correct?
```



```
 1        A.   Correct.

 2        Q.   In fact, more than six months passed

 3   between June 2012 and when Ms. Mersky filed the

 4   motion on your behalf?

 5        A.   I believe she filed it in January --

 6   sorry.  February of 2013.  That's correct.

 7              MS. VanLARE:  I have nothing

 8   further.  Thank you.

 9              THE COURT:  Mr. Qureshi, did you

10   have some questions?

11              MR. QURESHI:  I do have just a

12   couple of questions, Your Honor, as well.

13              THE COURT:  Okay.  Take your time

14   getting there.  Good afternoon, Mr. Qureshi.

15              MR. QURESHI:  Good afternoon, Your

16   Honor.  For the record, Abid Qureshi, Akin

17   Gump, on behalf of the committee.

18   BY MR. QURESHI:

19        Q.   Mr. Campbell, good to see you again.

20        A.   Hello, Mr. Qureshi, how are you?  You

21   look like you have lost some weight actually.

22   You are looking good today.

23        Q.   Well, that's what this much Nortel does

24   to you.
```



1       A.   I can imagine.  I can say the same as

2   well, yes.

3       Q.   Mr. Campbell, I just have a few

4   questions for you.  I want to go back to 2009.

5       A.   Sure.

6       Q.   Now, as I understand it, you did discuss

7   the substance of your termination letter with

8   Koskie Minsky in 2009; correct?

9       A.   I had a request for them -- to supply

10  them with my termination letter, and we had

11  some discussions but nothing specific.

12      Q.   And in the discussion that you did have

13  with Koskie Minsky, they did not advise you at

14  that time in 2009 to file a claim in the US

15  bankruptcy case; correct?

16      A.   They did not.

17      Q.   And then I want to move forward in time

18  just a little bit.  This is the last issue I

19  will address.  So you became aware at some

20  point in 2009 of the existence of a bar date in

21  the US; correct?

22      A.   Correct.

23      Q.   And you did not believe that that bar

24  date had any relevance to you because Koskie

1    Minsky and the Monitor had instructed you to

2    wait for the process to unfold in Canada; is

3    that correct?

4         A.   Correct, correct, yes.

5         Q.   And when you did learn of the bar date

6    in 2009, you took no steps at that point to

7    investigate whether you should file a claim in

8    the US because, again, you were advised by

9    Koskie Minsky that there were no steps that

10   needed to be taken in the US; correct?

11        A.   We raised the question on a number of

12   occasions and were told to wait for the

13   Canadian process to unfold, that the US one was

14   not something that we needed to worry about.

15             MR. QURESHI:   Thank you.   That's

16   all I have.

17             THE COURT:   Thank you,

18   Mr. Qureshi.

19             Any further questions, Ms. Mersky?

20             MS. MERSKY:   No, Your Honor.

21             THE COURT:   All right.   You may

22   step down, Mr. Campbell.   Thank you.

23             THE WITNESS:   Thank you, sir.   I

24   hope that I get to see your court again but not



1    in this capacity.

2                    THE COURT:  Yes.  Or perhaps even

3    in this case.

4                    THE WITNESS:  Thank you.  Well,

5    one can only hope.  Thank you.

6                    (Witness excused.)

7                    THE COURT:  Does that conclude the

8    evidence?

9                    MS. MERSKY:  That concludes the

10   live evidence.  We have submitted in binders

11   the deposition testimony as designated by each

12   party which is in the record, and I move for

13   the admission of the exhibits which have been

14   previously presented to the Court.  And it is

15   my understanding that the only objection is to

16   the summary sheet in the front of Exhibit 205.

17   To the extent in responding to that objection,

18   we believe that's covered by Rule 1006.  It is

19   a summary sheet, a summary sheet that

20   identifies the signature on each of the

21   termination agreements that are attached to

22   that, and also refers back from the name of the

23   manager who is on each of those letters to the

24   docket to show the docket address where those

1    people were served.  It is just a summary and

2    it just shows what it shows.  It is my

3    understanding that there is an objection to

4    that summary sheet.

5              We have, in addition, however,

6    attached as another exhibit the relevant docket

7    sheets which show the service and photocopied

8    the pages.  Since there are over 700 pages, we

9    just photocopied the page that had the name of

10   the person.

11             MR. ROSENTHAL:  I guess, Your

12   Honor, I will briefly address the Exhibit 205

13   issue.

14             THE COURT:  Sure.

15             MR. ROSENTHAL:  My apologies.  I

16   am losing my voice as the day goes along and I

17   am not even talking that much.

18             Anyway, to the extent that it

19   purports to be a Rule 1006 summary --

20             THE COURT:  Yes.

21             MR. ROSENTHAL:  -- it is not

22   complete.

23             THE COURT:  Right.

24             MR. ROSENTHAL:  I mean, there are



1    170 or so movants.  So what she has purported

2    to do is summarize 43 of them or so, about

3    25 percent.  The majority are not summarized at

4    all in terms of who their bosses are, where

5    their bosses were located.

6                She also basically draws

7    conclusions that the evidence doesn't suggest

8    by saying that the address where they are

9    mailed a bar date notice is somehow the

10   location of their employment at the time of

11   their terminations.  And there is no evidence

12   that links the two of those together

13   necessarily.

14                I would also note if you look at

15   most of the termination letters, they are not

16   signed by the bosses, as Ms. Mersky said.  We

17   could take Ms. Klein's, for example.  It very

18   clearly is signed by somebody else for the

19   boss.  So to the extent that the argument is

20   that 75 percent of these employees had Canadian

21   supervisors and 25 percent had US supervisors,

22   and for that 25 percent, they are in some

23   different category and that the US was somehow

24   on notice of these particular terms of it

1    because of the US supervisor signing it, there

2    is no evidence that these people signed it.

3    The evidence is that they didn't sign it.  And

4    there is no evidence of where they are located

5    as employees.  And it is incomplete.

6              So I think for all of those

7    reasons that the purported summary document

8    just doesn't fit the requirements under the

9    federal rules of evidence.

10             THE COURT:  All right.  Thank you,

11   Mr. Rosenthal.

12             Ms. Mersky, I am going to sustain

13   the objection to the summary on the basis that

14   it is not complete.  It just should not be part

15   of our evidentiary record in this case.  And on

16   that basis I will sustain the objection.

17             MS. MERSKY:  Thank you.

18             THE COURT:  But otherwise, we

19   don't have any evidentiary objections at this

20   point?

21             MR. ROSENTHAL:  No, we have no

22   objections to any of the other exhibits that

23   they have presented.  If Ms. Mersky is done

24   with her case in chief, I will mention what we



1    are submitting to the Court.

2                    THE COURT:  Please.

3                    MR. ROSENTHAL:  You are done?

4                    MS. MERSKY:  Yes.

5                    MR. ROSENTHAL:  We have given an

6    exhibit list, Your Honor.  I believe that they

7    are all without objection, and therefore, we

8    would move their admission.  We have given

9    deposition designations, as per our agreement,

10   with respect to all witnesses except for the

11   three who testified live here.

12                   THE COURT:  Yes.

13                   MR. ROSENTHAL:  We do have now

14   some supplemental designations with respect to

15   those three.  We just felt it wasn't

16   appropriate to designate before they came in

17   and testified live.

18                   THE COURT:  Of course.

19                   MR. ROSENTHAL:  I can hand those

20   out right now.

21                   THE COURT:  All right.

22                   MR. ROSENTHAL:  We have a list

23   that just has the designations on them.  We

24   will give the binders later.  May I approach,



```
 1    Your Honor?
 2                    THE COURT:  You may.
 3                    MR. ROSENTHAL:  Here are the
 4    designations for Ms. Klein, Mr. Campbell and
 5    Ms. Longchamps.  We will hand a copy to
 6    Ms. Mersky as well.
 7                    THE COURT:  Okay, wonderful.
 8    Thank you.
 9                    MR. ROSENTHAL:  So, Your Honor,
10    the only other thing that we intend to do as
11    part of our case in chief before we can move on
12    to closing arguments is --
13                    THE COURT:  Yes.
14                    MR. ROSENTHAL:  -- since we do not
15    have a witness to call, most of our evidence,
16    in fact, is just really in the form of
17    deposition testimony, or, in fact, all of our
18    evidence is in the form of deposition testimony
19    and exhibits.  With the Court's indulgence,
20    what we had planned to do is spend just 10 to
21    15 minutes where Ms. Parthum would like to just
22    make a brief presentation to Your Honor
23    highlighting some of the factual evidence from
24    these depositions and exhibits that we believe
```



```
1    helps counter the burden of proof by the
2    movants in this case.  So we can do it right
3    now if --
4                  THE COURT:  Would that be part of
5    your argument?
6                  MR. ROSENTHAL:  It is not
7    argumentative, Your Honor.  It is really more
8    factual, where if we had a witness or, in fact,
9    many times in trials we would sit and read
10   deposition testimony and somebody would sit in
11   the stand and we would read it.  We just
12   thought it would be more efficient -- it would
13   just take 10 to 15 minutes -- for Ms. Parthum
14   to highlight those for the Court right now, and
15   then we could move right into argument by
16   Ms. Mersky and myself.
17                  THE COURT:  And you are talking
18   about highlighting the deposition designations
19   or the --
20                  MR. ROSENTHAL:  She is going to
21   just point out to the Court a few select
22   passages from the deposition designations and a
23   few select exhibits which we think would be of
24   assistance to the Court.
```

1                    THE COURT:  Ms. Mersky.

2                    MS. MERSKY:  Your Honor, first as

3    to the designation of the testimony of the live

4    witnesses, that's what I consider an unusual

5    procedure in light of the fact that to the

6    extent they were cross-examined, they had an

7    opportunity to cross-examine on the deposition

8    testimony.

9                    THE COURT:  Right.

10                   MS. MERSKY:  I have not had an

11   opportunity to read this and perhaps would have

12   redirect questions to my clients.  I have never

13   seen deposition testimony designated for live

14   witnesses, so I would object to that.  They

15   certainly had full opportunity to question in

16   any way they elected to do so.  If they wanted

17   to call a witness, they had the opportunity to

18   designate a witness to be called.  And they

19   were clearly informed well in advance of the

20   witnesses that were going to be listed.

21                   In connection with the summarizing

22   the designations of testimony, the parties have

23   agreed to exchange designations, which we did

24   in advance, and worked very hard to make those

1    as simple for the Court in doing that type of

2    designation.  I believe that's in the form at

3    this point of argument.  The testimony is

4    before your court.  You have that testimony.

5    At this point pointing out certain pieces of

6    certain sections of designated testimony is

7    argument.  It is not a factual argument.  You

8    have the full opportunity to review all of the

9    designations, both designations that I made on

10   behalf of these witnesses and designations

11   which the Debtors made in this case.  So at

12   this time I think that that is inappropriate

13   and it is time for closing arguments.

14               Thank you, Your Honor.

15               THE COURT:  Yes, Mr. Rosenthal.

16               MR. ROSENTHAL:  Two specific

17   responses.  One is at all stages in the process

18   we advised Ms. Mersky without objection until

19   this moment that we would be submitting

20   deposition testimony from the three live

21   witnesses after they testified.  And, in fact,

22   just a few days ago by email we confirmed to

23   her when we sent over our deposition

24   designations that these at this time excluded

1    the live witnesses, because it was not

2    appropriate to exchange those at that time.  It

3    may be something unusual to her.  It is very

4    common in my experience, because otherwise, if

5    you give them before the witness testifies, you

6    are essentially saying here is my

7    cross-examination outline potentially.

8                    But we've got correspondence -- I

9    will pull it up if I need -- confirming that we

10    were reserving the right to do that after they

11    testified.

12                    With respect to the presentation,

13    you know, frankly, we could -- we would be

14    within our rights to put somebody in the box

15    and read deposition testimony.  I think that

16    would be inefficient.  I think everybody at

17    4:30 would like to proceed towards closing

18    arguments as quickly as possible.

19                    THE COURT:  Sure.

20                    MR. ROSENTHAL:  We just thought

21    that a 15 -- after having a five-hour or so

22    presentation by the movants of their evidence,

23    spending 10 to 15 minutes giving the Court an

24    evidentiary presentation was both appropriate,

1    efficient and reasonable and a much better

2    process than putting somebody in the box.

3              If the Court prefers, frankly, if

4    she wants to proceed right to closing

5    arguments, I mean, it is not argumentative.  It

6    is factual.  But I can have Ms. Parthum do the

7    first ten minutes of my closing --

8              THE COURT:  Understood.

9              MR. ROSENTHAL:  -- and do that if

10   that's what the Court prefers.  We are in the

11   same place anyway.  If I were Ms. Mersky, I

12   would probably rather have that happen before

13   my argument.  But if she wants to go argue

14   first and then Ms. Parthum can get up, that's

15   also okay.

16             THE COURT:  Here is my concern

17   about your deposition designations.

18   Technically, when a party designates portions

19   of a deposition, the other side can then

20   counterdesignate.  Here we have had live

21   witnesses.  What would be the

22   counterdesignation?  And I know that

23   depositions are used to try to impeach, they

24   are used to refresh recollection.  But I can't



1  say that I have had the situation in which

2  deposition testimony has been used when a live

3  witness was available to be examined.

4          MR. ROSENTHAL:  Well, two

5  responses, Your Honor.  One is with respect to

6  counters, neither party did counterdesignations

7  to any of the depositions.

8          THE COURT:  Okay.

9          MR. ROSENTHAL:  So the mere fact

10  that, well, has she lost an opportunity to

11  counterdesignate is really moot because the 11

12  other witnesses who are testifying or who did

13  not testify live she didn't counterdesignate.

14          THE COURT:  Okay.

15          MR. ROSENTHAL:  So it is not like

16  she has lost the opportunity because of the way

17  we are doing it.

18          With respect to the live witnesses

19  and using their depositions, the difference is

20  normally, Your Honor, if a witness appears

21  live, their deposition is not admissible

22  because they are an available witness.

23          THE COURT:  Correct.

24          MR. ROSENTHAL:  When it is a party



1    opponent, though, it is always available.

2    These are all movants.  So their deposition

3    deposition testimony is admissible for all

4    purposes under all circumstances, whether or

5    not they testify live.  So that's the

6    difference.

7                    You know, in the allocation trial,

8    for example, that's why you needed the

9    procedure where it had to be in advance.  And

10   frankly, I think we had an agreement that

11   witnesses that were called live, often their

12   deposition testimony couldn't be used --

13                   THE COURT:  Right.

14                   MR. ROSENTHAL:  -- because they

15   are not party opponents.

16                   THE COURT:  Right.

17                   MR. ROSENTHAL:  Here these three

18   are, and therefore, the depositions are wholly

19   admissible.

20                   THE COURT:  Any response,

21   Ms. Mersky?

22                   MS. MERSKY:  Your Honor, as

23   regards to the live witnesses here, I am very

24   troubled by that because I did not have an



1    opportunity to have a redirect examination.
2    Right now I have absolutely no idea what has
3    been designated.  And to the extent that
4    perhaps we had a miscommunication, I apologize
5    for that, because I think in terms of
6    designations that they might use it at the
7    trial to cross, whatever.  And that may have
8    been perhaps a misunderstanding on my part.
9    But I believe that it is improper at this point
10   to have deposition testimony.
11            If they wanted to cross-examine
12   the witness, they had that opportunity to do
13   it.  With that, I think it would unfairly
14   prejudice my opportunity to have redirect,
15   particularly when I produced these witnesses
16   live.  I have, as I said, no idea what they
17   have chosen to designate, but I would have had
18   an opportunity to rebut that in redirect.  So
19   as to that, I think it is inappropriate.
20            As to reading sections of the
21   depositions that have been designated, we
22   clearly have both designated them.  The Court
23   has an opportunity to read them and continue.
24   It is the Court's discretion.  To the extent

1    that deposition testimony is going to be read

2    into the record, I clearly should have an

3    opportunity to rebut that.  And since at this

4    point, with deposition testimony that has, in

5    fact, been designated, but at this point I am

6    not aware of what summaries they are electing

7    to designate, I think it is easier if the Court

8    just reads it after the fact.  But obviously,

9    it is up to you, Your Honor

10                   MR. ROSENTHAL:  One final point,

11   Your Honor, just real briefly.

12                   THE COURT:  Sure.  Go on,

13   Mr. Rosenthal.

14                   MR. ROSENTHAL:  Because I do want

15   to read you the scheduling order with regard to

16   these three witnesses.  And clearly, it affects

17   how we crossed.  There are issues that we

18   chose, you know, we have deposition testimony;

19   we won't cross.  So we put into the scheduling

20   order that the parties all agreed to -- this is

21   in paragraph 5, next to last sentence --

22   "Debtors shall serve all such designations" --

23   deposition designations -- "except with respect

24   to live witnesses upon the Ad Hoc Committee by

March 23, 2015." On March 23, on Monday, we sent an email, Ms. Parthum sent an email to Ms. Mersky with our deposition designations and expressly wrote, "For the avoidance of doubt and in accordance with the stipulated protocol, the US Debtors reserve the right to submit deposition testimony for the live witnesses after they have testified."

We got no response saying, well, that's not what we agreed to. I mean, obviously, had Ms. Mersky raised it at that time instead of after the close of the evidence, we would have brought it up with the Court. We could have done cross-examinations differently. I mean, this isn't a surprise.

THE COURT: All right. Ms. Mersky --

MS. MERSKY: Your Honor, the way I have ever read a scheduling order, I believe it is a surprise. And to the extent that I misunderstood or misconstrued something, I certainly didn't do it to mislead in any way. If there is additional cross-examination that the Debtors want to make, the witnesses, with

1    the exception of Jane Longchamps, are still

2    present and are available for additional

3    cross-examination and redirect, if necessary.

4                    THE COURT:  Well, here is what we

5    will do.  I will hear the deposition

6    designations read into the record.  To the

7    extent you believe, Ms. Mersky, that there

8    ought to be some redirect on your part, I will

9    certainly grant you leave to do that before we

10   close the evidence.

11                   MR. ROSENTHAL:  Well, Your Honor,

12   actually, what Ms. Parthum was going to do was

13   going to be far more concise, far less

14   time-consuming.  She had not intended to read

15   all of the deposition designations --

16                   THE COURT:  Right.

17                   MR. ROSENTHAL:  -- from Ms. Klein,

18   Mr. Campbell and Ms. Longchamps.  She was going

19   to do a very brief summary.  And again, if

20   Ms. Mersky prefers that to be considered part

21   of the closing argument and the Court would

22   prefer that, obviously during closing argument

23   I can read any part of the evidence that I

24   want.



```
1                    THE COURT:  Right.

2                    MR. ROSENTHAL:  I thought that it

3      is more appropriately done as part of our

4      evidentiary presentation.  It would have been

5      done by now.

6                    But if the Court prefers, though,

7      I mean, just separating the two things, the

8      deposition designations were just on a list

9      handed up.  We were going to give you the

10     transcripts, just as we have with all of the

11     other witnesses.

12                   THE COURT:  Understood.

13                   MR. ROSENTHAL:  We were not going

14     to read those.  Those would take a long time to

15     read.  We would like to submit those.  We had

16     an agreement to submit those.

17                   The email I read to you, it wasn't

18     a line buried in the email.  That was the

19     entire email that I read.  So it is not like it

20     was lost somewhere.

21                   And then what Ms. Parthum was

22     going to do is something else entirely.  And

23     again, we can have her do it right now as part

24     of our factual presentation.  We could wait
```



1    until after Ms. Mersky closes and she will do

2    the first ten minutes of our closing.  Either

3    one works, with the Court's indulgence.

4              THE COURT:  I would prefer that,

5    and I will tell you why.  Evidence is usually

6    presented through a witness and argument

7    through an attorney.  And I think that

8    Ms. Parthum's presentation to me through an

9    attorney is more in the form of argument.  I

10   wouldn't want to confuse the record here.

11             MR. ROSENTHAL:  That is fine, Your

12   Honor.  We will be happy to do it that way.

13   She will begin.  She will walk you through that

14   evidence.  I will then argue the conclusions

15   based upon them after she has made that

16   presentation.  Would the Court like to proceed

17   into closings right now --

18             THE COURT:  I would like to take

19   about a ten-minute recess.  I think it would be

20   good for all of us to stretch a little bit and

21   be back at five of.

22             MR. ROSENTHAL:  Your Honor, do you

23   have any kind of guidelines you would like each

24   side to close for?



```
1                    THE COURT:  Well, you know, I
2     would like to be finished by around 6:00.  All
3     right.  Just to keep that in mind.  So we are
4     talking roughly -- I don't know.  Is a half an
5     hour sufficient for you?
6                    MR. ROSENTHAL:  Half an hour is
7     fine for me.
8                    MS. MERSKY:  I think both of our
9     voices would barely remain for half an hour,
10    Your Honor.
11                   THE COURT:  I think half an hour
12    per side should do.  All right, anyone else?
13                   We will stand in recess for ten
14    minutes.
15                   MR. ROSENTHAL:  Your Honor, before
16    we recess, you got the deposition designations.
17    We are okay with that.
18                   THE COURT:  Yes.
19                   MS. MERSKY:  I am not sure --
20                   THE COURT:  You know, I want to
21    just go back, take a minute or two, look at the
22    rules, and comfort myself about the designation
23    of the live witnesses, the designations of the
24    live witnesses.  All right?
```



1           MR. ROSENTHAL:  If Your Honor

2   likes, we are happy tomorrow to submit

3   authorities saying that a party opponent

4   deposition can be used even if they testify

5   live.  I don't think it is a controversial

6   issue of law, but we are happy.  If the Court

7   would like to have authority, we can.

8           THE COURT:  Understood.  Let me

9   see what I read on my own, and then I will see

10  if I need some assistance from counsel.  Thank

11  you.

12          (Recess taken.)

13          THE COURT:  You may be seated

14  everyone.  Thank you.

15          You know, on the designations, I

16  understand what the scheduling order says.  I

17  think the scheduling order, as I heard it,

18  could be read a little differently than has

19  been argued.  The except live witnesses strikes

20  me as taking the contrary view from what the

21  Debtors are arguing now.  But what I am going

22  to do, rather than rule, if you would like to

23  submit to me just a very brief letter with a

24  few citations, then I will read those cases and

1    we will see.  And I won't rule right now on the

2    designations.

3              I will say it strikes me as being

4    a little bit troublesome, but perhaps there is

5    an exception that I am not focusing on

6    particular to parties, statements of parties.

7    Normally, a witness has to be given an

8    opportunity to review the statement or the

9    deposition testimony, and the opposing side is

10   then given an opportunity to correct it, if you

11   will.  But I will wait to see the cases you may

12   cite.

13             MR. ROSENTHAL:  That is fine, Your

14   Honor.  We will submit something.

15             THE COURT:  And then I will read

16   the designations if it is appropriate for me to

17   do so of the live witnesses.

18             MR. ROSENTHAL:  Okay, perfectly

19   fine.

20             THE COURT:  Let's do that.

21             As far as the argument, we will

22   proceed as suggested with Ms. Parthum, but

23   Ms. Mersky goes first.

24             MR. ROSENTHAL:  I think Ms. Mersky



1    is going to argue first, and then Ms. Parthum

2    will just start my argument.

3                    THE COURT:  Absolutely.  All

4    right, Ms. Mersky.

5                    MS. MERSKY:  Your Honor, it has

6    been a long day for the members of the former

7    Canadian entities who came down here from a

8    very long distance, many driving, some flying

9    in using their frequent flier points.

10                    THE COURT:  Okay.

11                    MS. MERSKY:  And in this long day

12   I expect this closing statement will be short

13   because we are all tired and we have heard a

14   lot today.

15                    But the first thing we have heard,

16   I think, and I think it is clear, is that these

17   people should be treated as known creditors,

18   and they should be treated as known creditors

19   for clear reasons.  And those clear reasons are

20   from the time they were terminated, from the

21   time they were employed, they thought they were

22   Nortel employees.  But here you have a Nortel,

23   a global Nortel from their perspective, that

24   sends them to be terminated -- in the case of



1    Michael Campbell, he was terminated in Canada.

2    His boss from the United States flew up to have

3    his termination.  His boss from the United

4    States gave him a letter.  In the case of each

5    of the others, they received letters.  And

6    those letters were from Nortel Shared Services.

7    Those letters were directed to be mailed back

8    and said in North Carolina.  If they had

9    questions about those letters, they were to

10   call North Carolina.

11              These global employees from their

12   perspective had every reason to believe they

13   were known creditors.  And there were 311

14   letters that were found, and of those 311

15   letters stored in the United States, many of

16   which had US managers, including the two that

17   testified here today.  Ms. Klein had a US

18   manager who acknowledged and knew about it, and

19   she talked about that today.  And as you heard

20   once again, Mr. Campbell, he had a US manager

21   who had the grace to fly up to Canada to fire

22   him.  All this was known to the US.

23              So even in this courtroom today

24   with understandings very different than the



1    individuals originally had, they were known

2    creditors.  And they are not a lot of known

3    creditors.  We are not talking about sending

4    out thousands of additional pages.  We are

5    talking about 311 additional notices.  And if

6    you look at Docket No. 1354 which sent out the

7    notice, Docket 1354 with its affidavit of

8    service served 700 pages of individuals,

9    including the names of many of the managers

10   here, which can be determined from the actual

11   docket entries.

12            So these were known creditors.

13   And as known creditors, that's where the

14   investigation starts and that's where the

15   investigation ends, because if these were known

16   creditors, if they were reasonably

17   ascertainable, then they are required to be

18   given actual notice.  And if they didn't get

19   actual notice, regardless of what they knew or

20   didn't know, they are required to be given the

21   opportunity to file a claim after the bar date.

22   And that bar date opens for them because they

23   did not receive actual notice.

24            Take a look at the termination



1    letters.  Look at the letter that on the top of

2    it has the symbol of Nortel.  Look at the

3    bottom of it, which has Nortel Shared Services.

4    Look at the references in many of these letters

5    that specifically have the North Carolina

6    address and the North Carolina phone number.

7    These people were ascertainable.  And it may

8    have taken additional work for the Debtor to

9    find them in their North Carolina offices, but

10   they were there and they had that obligation.

11   They failed to meet that obligation, and as a

12   result, the bar date must be lifted as to these

13   people on a mandatory basis.

14                Even if they were not known

15   creditors, there was notice given by

16   publication.  And some of the people even

17   checked and read.  Like Paula Klein said, she

18   read the notice.  And you know what that notice

19   said.  That notice was intended to be crystal

20   clear.  I am sure lots of people read it and

21   thought they were doing the absolute right

22   thing and making it crystal clear.  But it

23   was -- because no one thought about the fact

24   that if you had a claim in the United States

1    and you had a claim in Canada, you might be

2    confused by that language.  The language was

3    undoubtedly intended for one specific purpose:

4    Making things clear.  Unfortunately, it made

5    things unclear and ambiguous.  And an unclear

6    and ambiguous notice is a defective notice.

7    And for a defective notice, the cure is to open

8    the bar date.

9                    And we are not talking about

10   opening the bar date to the world, because

11   there are not that many people who have claims

12   in both estates and in both jurisdictions.  And

13   in this case we are talking about 171 people.

14   And that notice, that notice said if you have

15   claims against, and it names all the Canadian

16   Debtors, file your claim in, and only in,

17   Canada.  Well, all these people have claims in

18   Canada.  There is no question about that.  They

19   do.  But they also have claims in the United

20   States.  But that notice says file it in, and

21   only in, Canada.  That is a reason in and of

22   itself to end the discussion and allow the bar

23   date to be lifted for these individuals.

24                    It is a small and specific thing.



1    It wasn't malice on anyone's part.  In fact,

2    when lawyers try really hard to write very,

3    very clearly, sometimes in their efforts to

4    write very, very clearly, they have this exact

5    problem.  It becomes ambiguous.  And that's

6    what happened here.

7                    And, in fact, to the extent that

8    Paula Klein was doing more than her obligations

9    and was trying to help people and do everything

10   not because she had to, not because she had a

11   responsibility to, but because she was one of

12   the many loyal Nortel former employees who

13   really care about other former employees, she

14   went, she looked at this and she thought this

15   makes sense because this is exactly what I am

16   being told.  I am being told to sit back and

17   wait, sit back and wait.  And there is this US

18   bar date.  I don't think it applies to me.  I

19   am being told it doesn't apply to me.  But I go

20   so far and I look and it says if you have a

21   claim in Canada, file in, and only in, Canada.

22                    And with that, that ambiguity is

23   sufficient to open the date.  So you don't have

24   to go any further, nothing.  It stops either

1    where, one, you are known creditors, or bar 2,

2    that the notice, unintentional though it was,

3    was defective, and these few people have a

4    right to have their claims filed here.

5              Even if you go to the third step,

6    excusable neglect -- and, Your Honor, I don't

7    believe you have to get that far.  I believe

8    that there is more than sufficient knowledge

9    here.  There is more than sufficient evidence

10   so you don't go there.  But if you get to the

11   level of excusable neglect, you can take into

12   consideration, as they did in Pioneer, the

13   confusing notice.  If something is confusing,

14   that adds to the excusable neglect standard.

15   It expands it.  That is a very significant

16   thing.

17             THE COURT:  But at some point they

18   had the notice because they filed their claims.

19             MS. MERSKY:  Your Honor, they

20   didn't file claims.

21             THE COURT:  Or I am sorry.  They

22   moved to enlarge the time to file the claims,

23   so they knew that they had to move to file

24   their claims in order to not file claims.



**WILCOX & FETZER LTD**

Registered Professional Reporters
(302) 655-0477
www.wilfet.com

1            MS. MERSKY:  No.  Because they
2    were told in 2012 for the first time that that
3    was something they should do.
4            THE COURT:  What facts changed
5    between 2009 and 2012 to change someone's view
6    that, in fact, there ought to be a motion to
7    enlarge the time to file claims so the claims
8    can be filed?
9            MS. MERSKY:  They were told by the
10   counsel that the government of the country of
11   Canada gave to them, told them that that was
12   their counsel.  This is not the case of a
13   private counsel.  It is not the case of a
14   committee counsel that represents a big group.
15   This is a government-appointed counsel that
16   wasn't the choice of many of these people, as
17   you heard in the courtroom today.
18            The government-approved, appointed
19   counsel came to them and said you should do
20   this.  You have an opportunity to do this.  And
21   we are going to hear a little bit more about
22   that, because I know there are some people in
23   this courtroom who are very troubled and
24   confused and upset, because they did everything

1    they thought they should do.  They were

2    persistent.  They had engineers' mentality that

3    check every box carefully, quickly, and make

4    sure that everything is in a line the way it is

5    supposed to be.

6                    These are not recalcitrant

7    individuals.  These are not people who sit back

8    on their rights.  These are people who do

9    everything right and they take their

10   responsibilities extraordinarily seriously.

11                   But the notice is important for

12   its defective nature, because the people who

13   are reading the notice are being potentially

14   punished by not being able to file claims,

15   because this notice was the notice that was

16   supposed to give them the information.  And

17   even though published notice is clearly not the

18   best form of information, when that form of

19   information in and of itself is defective,

20   that's a problem.

21                   And so they didn't have actual

22   notice.  They had defective published notice.

23   And when we get to excusable neglect, once

24   again, you have to look at this.

1            And in connection with excusable

2    neglect, you have to take into consideration,

3    as you just asked me a little bit, who was

4    representing these people and why these people

5    should not be potentially penalized by an

6    action that maybe should have been done by

7    government-appointed counsel.  I think the

8    Court really has to look at this and has to be

9    a little -- has to balance this and look at it

10   in the context of what was happening at the

11   time, because this is a court of equity.  This

12   is a court of justice.  This is a court of

13   fairness.

14            We are asking 20,000 former

15   employees approximately to be represented by a

16   law firm, an employment law firm.  That

17   employment law firm gets an order from the

18   Court, and that order of the court absolves

19   them from any liability.  That order of the

20   court, when you look at the docket, I think it

21   is --

22            THE COURT:  But that isn't really

23   relevant to this inquiry.

24            MS. MERSKY:  It is relevant, Your



1    Honor, because they depended on these -- they

2    were told by the Canadian government that this

3    was their attorney.  They depended on this

4    attorney.  The Canadian government absolved

5    these attorneys of any liability as part of

6    their order.  They have -- it was pointed out

7    by opposing counsel that they have some kind of

8    remedy and that remedy is counsel.  Well, they

9    don't have that remedy.  That remedy is a

10   remedy would exist if it wasn't counsel

11   appointed by the government that the government

12   absolved them of the liability.  But we have

13   here a situation which is different.  And we

14   have a situation which is so unusual.

15             We have a Chapter 15 bankruptcy

16   involving I don't even know the number of

17   corporations in each jurisdiction, with, as you

18   heard Jane Longchamps testify, when she got

19   that notice of the joint proceedings, it all

20   made sense to her then.  Why are we sitting

21   back and waiting?  Well, this says joint

22   proceedings and my Canadian lawyers are part of

23   the joint proceedings.  To her and to, you

24   know, the very clear logic, it all made sense.

1    They were doing what they were supposed to do.

2    They were following directions.  They really

3    wanted to preserve their claims, their rights.

4    And they didn't look at the company the way

5    that we look at the company today.

6                    Yes, they knew that they got a

7    paycheck.  They knew the paycheck was in

8    Canadian dollars.  They wish today it was in US

9    dollars.  But back then they were pretty much

10   equal.  They didn't make the distinctions that

11   we do today, and they are not lawyers, and they

12   did depend on counsel.  What they did is they

13   looked at the global company they worked for.

14   They looked at bosses in the United States and

15   employees in the United States.  They looked at

16   a line of business, and they were part of those

17   lines of business, and they were doing what

18   they were supposed to do.  So if they

19   understood the process, and you heard it

20   testified to today, they understood that the

21   line of business was where they worked, but

22   this bankruptcy and the bankruptcies all over,

23   if they were Canadian citizens, then they had

24   to follow the Canadian process.

1              I learned that word "process" over

2       and over at the depositions in Canada.  And the

3       Canada process was something different to them

4       than how this was all panned out.  And they did

5       what they were supposed to do and they followed

6       the process.  And they continued to do what

7       they were supposed to do.  And they continued

8       to inquire, and they were diligent.  And they

9       depended upon counsel that was appointed for

10      them, who was employment law counsel, who was

11      concentrating on pensions, who was

12      concentrating on critical issues in Canada.

13              And it wasn't until 2012 that it

14      came to the attention of the parties that there

15      was something out there that gave these people

16      greater rights.  And they didn't even

17      understand this greater rights thing initially,

18      because they thought there was one pot of gold

19      initially.  And it wasn't until years into this

20      process and letters and newspapers and all

21      kinds of articles that all of a sudden of

22      Nortel they knew, the Nortel where they worked

23      and lines of business, that Nortel wasn't the

24      Nortel that apparently exists today.  In fact,

1    today we don't even know what that Nortel was

2    or who owns what.  They worked in their lines

3    of service.  They did what they were told to

4    do.  They had a business, and they did

5    everything they were supposed to do.

6              And to penalize them today for

7    that when they earned and gave up things on

8    behalf of all the corporations, that's just not

9    fair.  That's just not equitable.  And this

10   would have absolutely no effect, allowing this

11   bar date to be opened for these 170 people, no

12   effect on the administration of the estate.

13   This estate does not have a plan of

14   reorganization.  Frequently the case law and

15   all the New Century cases are situations where

16   you have a confirmed plan of reorganization.

17   Frequently these kinds of cases where you seek

18   to extend the bar date, there has already been

19   a distribution and potentially you have to pull

20   back money in to have a complete distribution.

21   We are so far from that in this case.

22              This case is without other than a

23   blank plan that has been filed years ago and is

24   meaningless, nothing.  There is no



1    distribution.  There is no plan.  These people

2    can be incorporated into the plan.  And that's

3    important, because the concept here which is

4    part of the whole O'Brien standard wants to

5    take thought into how far has the process gone.

6    What is going on.  How will this affect the

7    process or process for the estate.  Well, in

8    this case there is none.  There is no effect,

9    because we are so early in the stages, and

10   these are a small defined group that the

11   Debtors have known about since at least

12   September and October of 2012.  And the Debtors

13   have known not only all of their names since

14   that time; they have known the maximum amount

15   of claims that each of those individuals of the

16   300, of which now there is only 170, would

17   have.

18               So we don't have an effect on the

19   administration of the estate.  We don't have an

20   existence of a plan.  We don't have a concern

21   of floodgates, because I have got to tell you

22   that not many people other than these 170

23   people are ever going to go through the process

24   that these 170 people have gone through to seek

1    to have their claims allowed after the bar

2    date.

3                    THE COURT:  Don't you think if I

4    enter an order saying that the notice was

5    inadequate, that I am going to get -- we are

6    going to get motions to enlarge from everyone

7    and everybody?

8                    MS. MERSKY:  Your Honor, I have

9    thought about that a great deal, because I know

10   you had to think about it.  And one, if it is

11   inadequate, it is inadequate.  If it says in,

12   and only in, and if you read it -- reading it

13   the way my clients would, I think it is pretty

14   clear.  And if that was to happen, that was to

15   happen.

16                    But I also think that the correct

17   notice was if you have claims in both

18   jurisdictions, file.  And I don't think the

19   floodgates are going to open for people who

20   have claims in both jurisdictions.  This is a

21   unique group of people.

22                    And should Your Honor be troubled

23   by the language in the bar date order, as I am,

24   and I think when you read it, you should be,



1  you can also decide that it is not so

2  ambiguous, even though I think it is, as to

3  require an automatic opening of the bar date.

4  But you can say, okay, I can put it down to

5  that third standard, excusable neglect.  And

6  that was what was done in the Pioneer

7  situation, where it was a combination of

8  potential attorney neglect or confusion and a

9  confusing notice.  And I think that gives you

10  an option, Your Honor, that is appropriate that

11  protects these people and protects the

12  integrity of the Court.  But even if you were

13  to look at this as inadequate notice, because

14  it was defective notice, I think it applies to

15  such a minimal amount of people that you aren't

16  opening floodgates.

17              THE COURT:  Your motion is styled,

18  if I recall, motion of former Canadian

19  employees.

20              MS. MERSKY:  Yes.

21              THE US COURT:  It is not a motion

22  of former employees.  And the employees

23  themselves didn't know that they had potential

24  claims.  How is it that these Debtors should

1    have known and therefore provided actual

2    notice?

3                   MS. MERSKY:   Because these Debtors

4    had the letters in North Carolina in their

5    offices, and these Debtors' employees in the

6    United States were answering questions for

7    these people, because these people, many of

8    these people's supervisors were located in the

9    United States and knew of these people.   This

10   was a North Carolina-controlled process.   And

11   the language was known.   And the calls went to

12   the call center in North Carolina.

13                  So I think you go to the first

14   standard, known creditor, which very, very,

15   very much limits the possibility of any

16   floodgate, because there is not a whole heck of

17   a lot of known creditors.   And I think that

18   that should be the start and the end of this.

19   And if you go to the known creditor standard,

20   then you have, I think, no risk of any alleged

21   floodgates opening.

22                  And I think if you look at the

23   termination letters and if you look at the

24   Nortel symbol on the top and you look at the



1    address, you look at where they are supposed to

2    mail it back to, you look at where they are

3    supposed to call if they have questions, you

4    look at the signature lines, says Nortel

5    Networks manager, not Nortel Networks anything

6    else manager.  I think that that takes the

7    story from start to finish.  And I think that's

8    what our clients believe and I think that's the

9    way it is.

10                But if you have to go down and

11   continue down into the standards and if you

12   have to go all the way to excusable neglect, I

13   think you can similarly minimize any risk, and

14   I really don't think there is.  And I can tell

15   you unequivocally I won't take any more cases

16   for motion to extend the bar date in this case.

17   But I think you have to look at this.

18                And the Debtors do allow claims to

19   be filed after the bar date.  They allowed a

20   claim, a 2012 claim, a claim two months before

21   these claimants for $800,000.  And I can say

22   that, and it is part of the record because it

23   is my client.  It was a US employee.  He got,

24   according to the certificate of service, actual

1   notice, but he was in India and he didn't

2   receive it.  And I called Debtors' counsel,

3   just like Koskie Minsky calmed Debtors'

4   counsel, and as is my habit, and tried to

5   negotiate something to keep the floodgates from

6   opening and saying, you know, this happened.

7   Let this guy in.  And in October of 2012 his

8   $800,000 claim was allowed as an allowed claim.

9   We didn't file a motion.  We agreed to amend

10  the schedules.

11               His claim had been eliminated.  He

12  had been a scheduled creditor, but he failed --

13  he is a scheduled creditor with an unliquidated

14  claim.  His claim had been wiped away.  That

15  was in October of 2012.

16               So if you are going to treat

17  people fairly and you are going to do things

18  right, then these known creditors should have

19  been given notice and they should be given an

20  opportunity.

21               You are going to hear a lot of

22  testimony apparently about these people knew

23  that there was such a thing as a bar date or

24  they didn't know why they had a claim or they

1    didn't understand.  What you are not going to

2    hear in the summary is how people looked at

3    their company, why they understood what they

4    did, and why none of the things that matter to

5    lawyers matter to engineers and scientists, and

6    that they were looking at it as engineers and

7    scientists, and they were entitled to do what

8    they were doing because they created this

9    wonderful business.

10              So when you hear all this

11   testimony that they knew everything, that they

12   just sat back, they didn't sit back.  They did

13   what they were told to do.  And they tried very

14   hard to follow through.  And to the extent that

15   there is excusable neglect, you look at these

16   things and you look at the fairness, you look

17   at the administration on the estate, the effect

18   on the plan, the concern of the floodgates, and

19   I think that any opinion that Your Honor would

20   write or any decision Your Honor would make can

21   make those floodgates go away.  I don't think

22   there are floodgates, but I think they are gone

23   because I think you list them as having all

24   these very, very, very special circumstances,

 1    and I think that based on that, each prong of

 2    excusable neglect is met.

 3              Now, there is going to be a lot of

 4    attention on the amount of time that has

 5    passed, and I understand that that is a concern

 6    to the Court.  It was a concern to me when I

 7    was first approached with this case.  But this

 8    cross-border, cross-world case with claimants

 9    from everywhere and procedures that are

10    different and processes that have words that

11    mean different things in different

12    jurisdictions creates something that is unique.

13    Lawyers in Canada talking to lawyers in the

14    United States use the same word to mean

15    different things.  And I learned that the hard

16    way having a conversation with a Canadian

17    lawyer and finding out we were both talking

18    about administrative claim and it meant

19    something entirely different.

20              So you have to take into

21    consideration when you look at this and when

22    you look at the delay and the confusion what

23    was going on.  We have court-appointed lawyers

24    who were handling a huge amount of stuff.

```
 1    These are a small group.  Of 12,000 to 20,000
 2    people, these are 311.
 3              THE COURT:  You make it sound like
 4    court-appointed lawyers, you know, they are
 5    coming in and they are acting in a pro bono
 6    capacity and they were in over their heads.
 7    They were, as everyone has heard, experts in
 8    employment law.  I mean, you could make the
 9    same argument that Cleary Gottlieb and Akin
10    Gump and others are court-appointed.
11              MS. MERSKY:  I would make that
12    assumption of my learned colleague.
13              THE COURT:  I approved their
14    appointments.
15              Well, you know, I must say that
16    the absence of the Koskie Minsky firm here and
17    whose burden it was to involve them to take
18    discovery from them troubles me, because I have
19    heard argument and testimony of extreme
20    reliance on counsel, that counsel told us we
21    didn't have to do anything over and over again.
22    And yet I have no evidence of that.
23              MS. MERSKY:  Your Honor, I can
24    testify as an officer of this court that I
```



1    asked Koskie Minsky to appear for a deposition.

2    My clients don't control Koskie Minsky.  I do

3    not control Koskie Minsky.  Koskie Minsky is a

4    member of the CCC.  Koskie Minsky represents a

5    much larger group.  But had I had the

6    opportunity to depose Koskie Minsky, I would

7    have been glad to depose Koskie Minsky.  The

8    problem is, Your Honor, I can't compel them to

9    testify.

10              The Debtors, on the other hand,

11   have compelled lots of people from all over the

12   world to testify.  They know the procedures.

13   The cost in this case to my clients has been

14   extraordinary.  And if you knew how little each

15   of these people paid, and this process to them

16   seems extraordinary, but they are of very

17   limited means.  Two weeks of depositions in

18   Canada, and the Debtors were nice enough to

19   accommodate my clients and have the depositions

20   in Canada so they did not have to fly down

21   here.  That was an extreme expense.

22              So if the Debtors believed that

23   this was the answer, they could have compelled

24   Koskie Minsky.  Unfortunately, Your Honor, I



1    couldn't afford to compel Koskie Minsky.  And I

2    did ask Koskie Minsky, and I am under the

3    impression from the letters that Koskie Minsky

4    did produce everything they had that wasn't

5    attorney-client.  I know they produced an

6    attorney-client log.  I know they produced

7    documents.  Whether they are all of the

8    documents, I don't have access to those files,

9    but my clients should not be punished by that

10   action.  And I believe Koskie Minsky to do

11   everything they think they should have done in

12   their clients' best interests.  I think they

13   are continuing to believe that they have a

14   group of clients, they have a responsibility

15   both as a member of a committee to

16   confidentiality and is representing a broader

17   group.  This is a small group.  And while you

18   are troubled with Koskie Minsky, and I

19   understand those troubles, I don't think that

20   this group of people should have to be

21   adversely affected by those concerns.

22              And the length of this delay,

23   well, I know the case law says you deal with

24   the length as a linear thing, not in the

1   context of the case.  But I beg Your Honor to

2   look at it in the context of this case, in this

3   very, very unusual Chapter 15 cross-world case,

4   because so much has gone on.

5          And there have been allegations of

6   bad faith, and I can unequivocally tell you,

7   you have heard the testimony of these people.

8   They proceeded from their perspective and from

9   their understanding with all due deliberate

10  speed, and I can represent to this Court as an

11  officer of this court from the day I got this

12  case I have never proceeded more quickly to get

13  100 -- originally 300 people, but 170-plus

14  people on board and get representation so I

15  could make filings which I could do

16  legitimately with this Court.  There was speed.

17  There was action.

18         And what people understood was

19  what their attorneys told them.  And things did

20  happen over four years.  A process was created

21  for these people, and they did get their

22  process, but not till almost 2012.  And that

23  was where all the attention was lying, was

24  creating this giant process that is completely

1  different than anything I have ever heard of

2  and certainly different than what we do in our

3  courts and apparently different than what was

4  normally done in the Canadian courts.  But

5  these rights are legitimate rights that need to

6  be protected.  At the heart of this is

7  confusion caused by the Debtors' notice, of

8  what I believe are known creditors, with time

9  passing but deliberate speed once information

10  is timely gained.

11           And I am sure that my colleagues

12  are going to point out, well, Koskie Minsky

13  should have known this back in 2009 because

14  they saw one or two agreements.  But I can also

15  say that in 2009, when Koskie Minsky was

16  looking at those agreements, the emphasis was

17  completely on trying to create a process and to

18  create a process for all people.  And whether

19  this is right, you have to look at this greater

20  good and the greater fairness and evaluate it.

21           And I see no prejudice to the

22  Debtors.  I am sure they are going to announce

23  that there is great prejudice.  I see every

24  right of these people to pursue these claims

1    against the global entity before the United

2    States and Canada which they believe they

3    worked for.  Whether they got a paycheck in

4    Canadian dollars, American dollars or euros,

5    they didn't see the distinctions here.  And

6    even when you heard Jane Longchamps testify as

7    a finance person, she looked at it differently,

8    too, because she saw it global, she bought for

9    global.  And when she saw the language in her

10   agreement, that's the agreement that she bought

11   for global, she served global.  She didn't know

12   what company her senior manager was from.  He

13   was located in Canada.  But everything was

14   global.  So when they saw that global language

15   and they gave those global releases and they

16   gave their rights globally away to any

17   technology they created, which we know to be

18   very significant, they gave away the rights to

19   bring on their colleagues to future ventures --

20   which these people have great, great futures, I

21   hope and pray for -- well, they were giving up

22   real things to global, including the United

23   States Nortel.  And these rights of these 170

24   people who have worked very hard and at their



```
 1    own expense to pursue them should be allowed to
 2    be filed.
 3                    Thank you, Your Honor.
 4                    THE COURT:  Thank you, Ms. Mersky.
 5                    Are we going to proceed,
 6    Mrs. Rosenthal, with --
 7                    MR. ROSENTHAL:  Before I proceed
 8    with my closing, I am going to give Ms. Parthum
 9    a moment in the sun.
10                    THE COURT:  Good.  Ms. Parthum,
11    good afternoon.  Good evening.
12                    MS. PARTHUM:  Good afternoon.
13    Your Honor, as I walk through, I am going to be
14    reviewing a PowerPoint deck, if I may approach.
15                    THE COURT:  All right.  Thank you.
16                    MS. PARTHUM:  And the binder just
17    has some of the exhibits and some of the
18    deposition testimony for reference.
19                    Your Honor, the US Debtors wish to
20    highlight some of the testimony and the
21    documents in this case that the Court may wish
22    to consider when ruling on the issues from the
23    movants' motion.  And just for context, before
24    beginning, the US Debtors deposed a sample of
```



1    the 170 movants in this case, deposing 14 of

2    those individuals, without waiving our position

3    that their burden is to make an individualized

4    showing that their neglect was excusable.

5              So I will be reviewing some of the

6    evidence from these depositions and the

7    documents produced, while noting that as to the

8    majority of the movants who were not deposed,

9    there really is no evidence that has been

10   introduced as to the basis for their neglect.

11             So turning to page 2, just outline

12   some of the topics that I will be covering

13   today, and the first of these is the evidence

14   as to whether movants were known or unknown to

15   the US Debtors.  And some of this evidence

16   comes from the movants' submissions themselves.

17   In their recent supplemental memorandum the

18   movants stated that they are all former

19   employees of Nortel who were employed in Canada

20   at the time they were terminated.

21   Mr. Campbell, who we heard from today,

22   submitted an affidavit along with the original

23   motion in which he stated that for the purpose

24   of the motion, each moving party is, to the

1    best of his knowledge, one of these 300 former

2    employees of Nortel Canada terminated prior to

3    the filing date.

4                And there was a good amount of

5    evidence on this during depositions as well.

6    The movants testified that they were based in

7    Canada during their tenure with the company,

8    they were paid in Canadian dollars, they knew

9    they were employed by a Nortel Canada entity,

10   knew their paychecks were paid by a Nortel

11   Canada entity, with a single exception,

12   Mr. Briard, were never employed by Nortel US

13   and never received a US paycheck, and expected

14   that their severance would be paid by the same

15   entity that had paid their paycheck.  And we

16   heard Ms. Klein during her testimony today

17   express the same sentiment.

18                One of the movants who was

19   deposed, Mr. Pierre Pierre Blais, was asked

20   about his termination letter.  "Was there

21   anything in this letter that gave you a reason

22   to believe at the time that your severance

23   would be paid by a Nortel entity based in the

24   United States?"  And he answered, "No, not

1    specifically."

2                    Another movant who was deposed,

3    Ms. Shirley Trowbridge, was asked about her

4    termination letter.  "When you first read this

5    after you were advised of your severance from

6    Nortel back in 2008, did you believe that this

7    gave you a basis for a claim against the US?

8                    "In 2008?

9                    "Yes."

10                   She answered no.

11                   "Why didn't you believe that it

12   gave you a basis for a claim against the US at

13   that time?"

14                   And she answered, "I would not

15   have thought of it.  I wouldn't even know why

16   it would."

17                   Mr. Chris Buchanan was asked,

18   "Right.  And at the time Nortel commenced its

19   CCAA proceedings, did you have any reason to

20   believe that you would be paid by some

21   different entity as a result of the

22   insolvency?"

23                   And he answered, "That wouldn't be

24   logical.



```
1              "So no?"

2              And he answered, "So no, no."

3              And generally the movants

4   testified that prior to 2013, when they were

5   alerted of the possibility of this claim, they

6   did not believe that they had a claim against

7   the US Debtors.  By way of example, Ms. Klein

8   testified when asked, "Is it fair to say that

9   up until sometime in 2012 you had been of the

10  view that you don't have a claim against any of

11  the US Debtors," she answered, "I never viewed

12  that I had -- that's correct.  I never viewed

13  that I had a claim in the US."

14             Ms. Trowbridge testified when

15  asked, "In 2009, if you had gotten a claim form

16  in the US, you had believed at that point in

17  time that you had no claim against the US;

18  correct?"

19             She said, "That's correct."

20             She was asked, "Would you have

21  filed a claim in 2009 against the US even if

22  you believed you had no claim?"

23             And she answered, "Well, if I

24  didn't believe I had a claim, then no, I
```



1    wouldn't have filed."

2                Several weeks after her deposition

3    Ms. Trowbridge changed this answer by errata

4    from no to "yes, I would have filed."

5                Turning to the issue of the notice

6    that the movants received and the adequacy of

7    that notice, the movants have asserted in their

8    recent submission that the notice by

9    publication of the bar date was significantly

10   ambiguous and misled the movants, a distinct

11   and limited group, from receiving adequate

12   notice.  And the evidence on this issue was

13   that not one of the movants testified that they

14   failed to file a timely claim in the US

15   proceedings because they were confused by the

16   published notice.  Ms. Klein testified that she

17   understood that claims were to be filed in the

18   jurisdiction of the debtor against which the

19   claim was being asserted.  She was asked,

20   "Well, just because you have a claim against

21   the US in 2013, did anybody explain to you why

22   that claim should be filed in the US?

23                "Well, where else would it be

24   filed?



1            "What do you mean?

2            "Well, if I have got a claim in

3    the US, file in the US.  I wouldn't file it in

4    the UK against the US.

5            "Why wouldn't you file it in

6    Canada?

7            "Because that is for my claim in

8    Canada."

9            Turning to some of the issues that

10    the Court will be considering under the

11    excusable neglect analysis, I am going to focus

12    on both the length of the movants' delay and

13    the reason for their delay.  So looking at some

14    of the events in the period of time from 2007

15    until 2013, now, the movants received their

16    termination letters from March 27, 2007 in the

17    earliest case up until January 9 of 2009.  And

18    just five days later was the petition date.

19    Now, the US bar date was ordered on August 4,

20    2009, with a bar date of September 30, 2009.

21            We have heard from Mr. Campbell in

22    his affidavit that the basis for these claims

23    was allegedly identified in June of 2012 as

24    those same termination letters that had been



1   received between March of 2007 and January of

2   2009.  The motion was then filed on February 1,

3   2013.  And to focus on a selection of some of

4   the communications to or among the movants

5   regarding the US bar date prior to the bar

6   date, I know this side is a bit packed and a

7   little difficult to read, but the petition date

8   is all the way over on the left.

9           And beginning on July 15, there

10  were a number of communications to the movants

11  regard the US bar date.  On July 15 Koskie

12  Minsky issued a bulletin stating a US claims

13  process has been released.  The next day Paula

14  Klein posted on the LinkedIn group that "KM has

15  informed us that a claims process will be

16  announced for US creditors tomorrow with a

17  'claims bar' date of September 30, 2009."  And

18  discovery revealed that at least 143 of the 170

19  movants were members of this LinkedIn group and

20  had access to this post as well as all of the

21  other posts.

22          On July 22 Koskie Minsky issued

23  another bulletin to its clients, including

24  movants, stating that a US claims process had

1    been released, and the next day Koskie Minsky

2    updated its website to inform its clients that

3    "There has been recent discussion surrounding

4    the establishment of a Claims Process in the US

5    Bankruptcy Court."

6              The next day the Canadian Monitor

7    issued a Monitor report, also including notice

8    of the US bar date.  The bar date was then

9    ordered on August 4, and the next day Koskie

10   Minsky issued another news bulletin to its

11   clients again telling them that a US claims

12   process has been released.

13             On August 11 notice of the bar

14   date was published in national and

15   international versions of The Globe and Mail

16   and The Wall Street Journal, and the next day

17   Koskie Minsky once again told its clients that

18   a US claims process had been released and also

19   gave a bit more information, stating that

20   Justice Morawetz had granted orders recognizing

21   the US claims bar order.

22             The next week KM issued another

23   bulletin notifying clients of the US claims

24   process, and on September 25 the Monitor issued



1    another report notifying individuals of the US

2    bar date.

3               Turning to slide 16, there are

4    just two other LinkedIn communications relevant

5    to this time line that we would like to

6    highlight regarding Koskie Minsky's analysis of

7    termination letters prior to the US bar date.

8    On July 29, 2009, in Exhibit 142, is a LinkedIn

9    conversation where Paula Klein told the members

10   of the LinkedIn group that she was looking for

11   a small number of people who would be willing

12   to send Koskie Minsky a copy of their

13   termination package, which would only apply to

14   people terminated pre-petition, such as the

15   movants.  She said that "KM has a meeting this

16   afternoon with the Monitor to start the

17   discussions around the employee claims process.

18   They would like to take a look at the

19   termination packages in order to get a sense of

20   what Nortel typically was giving as severance."

21   So again, this was on July 29, 2009.

22               Then on September 3, still nearly

23   a month before the US bar date, there was

24   another conversation on LinkedIn posted by



1    Ms. Klein.  She said, "Back in July, I asked if

2    there were people willing to send copies of

3    their severance packages to Koskie Minsky so

4    that they could do some analysis on them to

5    find out Nortel's typical severance policy.

6    The analysis of the initial set of documents

7    has not yielded sufficient information and I

8    have been asked if we could get them more

9    examples."

10                   So again, she solicited

11   termination letters from pre-petition-

12   terminated movants among movants and other

13   members of the LinkedIn group on September 3,

14   2009.  And someone later posted in response to

15   that conversation that they could send

16   termination letters, and Ms. Klein said that

17   she had already received enough.  And that

18   conversation is at Exhibit 150.

19                   So based on these and other

20   sources, a majority of the movants deposed

21   admitted to having been aware of the US bar

22   date at or around the time of the bar date.

23                   Other movants who were not able to

24   recall years later whether they had learned of

1    the bar date in 2009 nevertheless admitted

2    during their depositions that they knew prior

3    to the US bar date that a claims process was

4    under way in the US proceedings.  And the

5    remainder of the movants deposed testified that

6    they were disconnected, didn't care, and

7    weren't totally invested in following

8    developments in the claims process.

9              So I would like to just address a

10   few of the asserted reasons for the delay, and

11   I am looking now at slide 19.  The movants have

12   asserted that the employees terminated

13   pre-petition based in Canada were repeatedly

14   advised by Koskie Minsky that there would be a

15   special claims process created for them.  They

16   were repeatedly told that they should do

17   nothing and that they must wait for the special

18   claims process that was going to be created.

19   And so they justifiably relied on their counsel

20   and waited for the process in Canada to unfold.

21   So we just wanted to highlight a few of the

22   pieces of evidence that are relevant when the

23   Court is considering this assertion.

24              And one of these is Exhibit 18,



1   which is a question-and-answer document

2   prepared by Koskie Minsky for its clients,

3   including movants, on August 25, 2009.  And

4   just to direct the Court's attention to the

5   highlighted portion, Koskie Minsky stated that

6   its representation for pensioners and former

7   employees is limited to the Canadian courts.

8   To the best of our knowledge, there is no law

9   firm performing a similar function in the US

10  courts.  And this is something that Koskie

11  Minsky informed its clients more than a month

12  prior to the US bar date.  And accordingly,

13  many movants testified that they understood

14  that Koskie Minsky's representation of them was

15  limited to the Canadian proceedings.

16              One other piece of evidence on

17  slide 22 relevant to the reason for the delay

18  and the assertion that Koskie Minsky's advice

19  is to blame is Exhibit 13, which is a LinkedIn

20  conversation posted by Paula Klein in which she

21  stated at the highlighted text in response to

22  some individuals who had received a letter

23  regarding the claims process in the United

24  States that she asked about the letter from

```
1    Mark Zigler at Koskie Minsky and he advised of
2    the following:  "You only need to file a claim
3    in the US as per the information you received
4    in the mail if you were on the US payroll for
5    Nortel or if you believe you have a claim
6    against the US Estate (NNI) because of some
7    contractual agreement related to your
8    employment."  She went on to say that "If you
9    need help in filing this claim, you can contact
10   Andrea McKinnon (from Koskie Minsky). . .who
11   can in turn put you in touch with a lawyer in
12   Delaware who can help you with the filing."
13                One other reason that the movants
14   have asserted is attributable to their delay is
15   that they understood that Nortel was a global
16   company and that their claims were global
17   claims.  They did not distinguish between
18   borders and they thought that by proceeding as
19   directed in Canada, their claims would be fully
20   protected against all estates.  And the movants
21   cited the deposition testimony of several
22   individuals in support of this assertion.  And
23   on slides 24, 25 and 26, we have highlighted
24   some of the salient testimony from some of the
```

1    individuals who were cited in support of that

2    assertion.

3                     And just one final point on the

4    good faith of the movants' representatives.

5    The Court may wish to consider Exhibit 63 on

6    this issue, which is on slide 28.  This is a

7    letter sent from Koskie Minsky to Goodmans, the

8    law firm representing the Monitor, on July 10,

9    2012.  And in particular, there is a paragraph

10   headed "Impact on Mediation and Claims

11   Process," in which Koskie Minsky stated, "We

12   are open to discussion with you as to how best

13   to approach the US Debtor about these claims.

14   We also note that the existence and pursuit of

15   the claims under the Severance Agreements

16   against the US entities is another indication

17   and further evidence of the global integration

18   of the Nortel companies, and will be of value

19   in the allocation discussions and mediation as

20   it affirms the validity of a substantive

21   consolidation and sharing of Nortel's assets."

22   Thank you.

23                     THE COURT:  Thank you,

24   Ms. Parthum.



1              Mr. Rosenthal.  You know, your

2    voice was like that the last time you were

3    here.  Have you had it checked out?

4              MR. ROSENTHAL:  Was it?

5              THE COURT:  Yes.

6              MR. ROSENTHAL:  It has not been

7    that way ever since, though.

8              THE US COURT:  Oh, okay.  It must

9    be me.  Allergy to the judge.

10              MR. ROSENTHAL:  You get my best.

11              Your Honor, one thing, you know,

12    about the presentation we heard from movants'

13    counsel, there is no question it is

14    impassioned.  You know, Ms. Mersky feels very

15    strongly about her cause.  As I said at the

16    very beginning, this was a tragic circumstance

17    for tens of thousands of employees worldwide.

18    We are sympathetic to all of them.  But one

19    thing we did not hear once today from the

20    movants is a citation to a single case, not

21    even recognition, Your Honor, of the legal

22    authority.  And there is a lot out there.  In

23    fact, Your Honor has authored some of it, and

24    the Third Circuit has given some guidance, and

1    the Supreme Court has given some guidance.  And

2    we haven't heard how the movants' arguments fit

3    within a single relevant case.

4              And it is not by accident that we

5    didn't hear that, because the case law is

6    overwhelmingly against the movants on every

7    issue that has been presented here and with the

8    facts as well.  Your Honor, you just heard some

9    of it from Ms. Parthum, but there is a lot of

10   statements that were made by movants' counsel

11   that are just plain not true, not in the record

12   and inconsistent with the record.

13             Why don't I start with the issue

14   of known creditors versus unknown creditors.

15   And frankly, I don't know why it is relevant,

16   because virtually every movant says they got

17   notice.  And the law doesn't say we have to

18   give them notice.  In fact, that's why

19   constructive notice is generally adequate,

20   because you try to find a way to reach people.

21   And these people were reached.  Ms. Klein

22   testified on the stand she not only heard about

23   it; she read it.  Almost all the movants knew

24   about the bar date.



1              But to the extent that the

2     question of known versus unknown creditors is a

3     relevant one, I would only read Your Honor's

4     words back to you in the In Re Smith case, and

5     that is at 413 BR 161 at page 168, Note 26.

6     And Your Honor wrote, "If the claimant did not

7     know that it had a claim against the debtor,

8     then the debtor could not have expected to know

9     and therefore could not have been expected to

10    provide actual notice."

11             With the exception of

12    Ms. Longchamps, we have not heard a single

13    movant say that he or she thought she had a

14    claim, not one.  And in the White vs. New

15    Century case, 450 BR 504 at 513, following Your

16    Honor's decision in the Smith case, the

17    claimants themselves admit that they were not

18    aware of their claims against the debtors;

19    therefore, the claimants were unknown

20    creditors.

21             And the only argument against

22    that -- and again, we don't even need to get

23    there once we accept that they actually knew

24    about it.  But the only argument against that

1    even were it relevant is, well, these were in

2    somebody's files in North Carolina.  And

3    Ms. Mersky has urged you, she said go look at

4    205.  You will see North Carolina all over

5    these.  And she said -- and, in fact, I wrote

6    down because I want to quote you her words.

7    "This was a North Carolina-controlled process."

8    Those were her exact words.  I don't know where

9    she gets that from, Your Honor, because if you

10   look at the letters in 205, you will not find

11   one reference to North Carolina.  The opening

12   line refers to Nortel Networks Corporation.

13   There is no address on the letterhead.  There

14   is no address that they are directed to return

15   it to.  They are directed to return it to HR.

16   Ms. Mersky says, well, that must have meant

17   North Carolina.  There is no evidence that that

18   means these people have to go put it in the

19   mail to North Carolina.  There is no phone

20   number in here in North Carolina to call.  I

21   don't know where in the record Ms. Mersky makes

22   the statement to you that this is a North

23   Carolina-directed process.

24                   And even if it were, I go back to



1    the point that I made in my opening statement

2    that in hindsight, she could say it is only 300

3    people; why couldn't we have given notice.  On

4    what basis did NNI have to go look through all

5    of its records to go search for employees that

6    might claim to have a claim against the US

7    Debtors that did not work for the US Debtors?

8              And we also heard testimony about

9    the Elena King letter.  Well, this Elena King

10   letter, it happened to have a North Carolina

11   address on it when she wrote to everybody that

12   said we are not going to pay you severance

13   anymore.  Who is Elena King?  She is an NNL

14   employee, worked in Toronto, and she was a vice

15   president in charge of human resources up

16   there.  And the Court can take judicial notice

17   of that because on March 30, 2010 she filed

18   supportive papers in the Canadian court with an

19   affidavit describing her role since 2008.  She

20   is not an NNI employee who wrote to them about

21   their severance.

22             And finally, on this subject, we

23   also looked at earlier today the letters

24   themselves, and she said, well, 25 percent of

1    these people had bosses in the United States.

2    Well, Your Honor, that's the tired argument

3    that we heard throughout the allocation trial,

4    that, well, because Nortel operated a matrix

5    organization, it is all jumbled together and

6    you shouldn't allocate.  Well, unless the Court

7    is going to accept that argument, and if it is,

8    frankly, this becomes moot if there is just one

9    pot that goes to everybody.  But if the Court

10   doesn't accept that argument, then the mere

11   fact that some of these people may have had

12   bosses in the United States entitles them no

13   more to a claim against NNI than any other

14   creditor.

15              And what about the 75 percent of

16   the movants who didn't, and what about the

17   majority, almost all of the 25 percent whose

18   letters weren't actually signed by their

19   supervisor.  You could look at the letters

20   themselves.  They all have initials what they

21   say on behalf of.  We know of only one example

22   where a US supervisor was present at the

23   termination and was even personally involved,

24   and that was what Mr. Campbell talked about.

1              So on the law, they are unknown

2    creditors.  On the facts, they had knowledge of

3    the bar date.  There is no way to sidestep the

4    excusable neglect requirements.

5              Now, when we talk about the

6    excusable neglect requirements, again, there

7    are clear legal standards here in the Third

8    Circuit.  First, as O'Brien said at 188 F.3rd

9    130, the Pioneer, the Supreme Court case,

10   teaches that we should consider the length of

11   delay in absolute terms.  It is three and a

12   half years, Your Honor.  I have not heard

13   movants cite to you one case, not one, where a

14   Court has found a three-and-a-half-year delay

15   to be within the excusable neglect period.

16             Now, In Re Global Aviation

17   Holdings, 459 BR 60 at 64, says, "Courts

18   conduct a threshold inquiry into whether

19   failure to file a claim was through neglect,

20   not a conscious or deliberate decision, because

21   excusable neglect does not encompass conscious

22   disregard of a bar date."  And when you have

23   creditors who are aware of the bar date and

24   choose to disregard it, whether it is because

1    they didn't know they had a claim or they

2    thought somebody else was covering it for them,

3    that's not excusable neglect.

4              And I can't say it better than the

5    Third Circuit did in the Jones case that I

6    cited to you in my opening, 212 F.3rd at 205.

7    That's the case involving the people who were

8    sick, had latent illnesses but they didn't

9    investigate the cause.  "Ignorance of one's own

10   claim does not constitute excusable neglect."

11   And In Re Global Aviation again:  "Failure to

12   file due to inadvertence or ignorance of the

13   rules does not usually constitute excusable

14   neglect."

15             And the question becomes -- and I

16   cited to you your case in Magestic Holdco

17   earlier today as well -- who is in the best

18   position to determine whether they had a claim.

19   And in this case there is no question, however

20   diligent they might have otherwise been in

21   their jobs, however innocent they may be,

22   however engineers may think, as Your Honor

23   said, where a claimant is in the best position

24   to realize the facts that give rise to the

1   claim, it weighs against the finding of

2   excusable neglect.  That's at 213 WL 653091 at

3   Star 3.  Cable and Wireless Company said the

4   exact same thing using the same reasoning as

5   Your Honor.

6               So what we have really heard

7   today, it is interesting, because I have heard

8   it kind of differently at different times, is

9   both a combination of Koskie Minsky bashing

10  from movants' counsel and Koskie Minsky support

11  from movants' counsel.  At one point we are

12  told, and Ms. Mersky said this -- and I only

13  have a rough transcript now, but she said, "I

14  believe Koskie Minsky to do everything they

15  should have done in their clients' best

16  interest."  But on the other hand we say this

17  is excusable neglect because these people were

18  relying on their court-appointed counsel,

19  government-mandated counsel, who was busy, who

20  had other things.

21               I need to say a couple of things

22  about that.  Your Honor kind of stole my

23  thunder a little bit when you pointed to US

24  Bankruptcy counsel that is court-approved.

1    Koskie Minsky is no different.  This isn't the

2    government coming in and dictating you hire

3    these people no matter how incompetent they

4    are.  In fact, Your Honor, Mr. Campbell filed

5    the motion to appoint Koskie Minsky.  And if

6    you look at the order at Exhibit 54, it said

7    this motion made by Donald Sproule, David

8    Archibold and Michael Campbell.  Some of the

9    movants wanted to hire the Nelligan firm.  We

10   heard that from Ms. Klein.  Some of the movants

11   wanted to hire Koskie Minsky.  They are both

12   firms with long history of experience and a

13   strong reputation in the employment law area.

14   And Mr. Campbell was in the camp that wanted to

15   hire Koskie Minsky.

16                    And what was entered in Exhibit 54

17   is the order that those movants sought.  It was

18   the appointment of Koskie Minsky as their

19   counsel, including over the severed employees.

20   And this notion that Koskie Minsky got some

21   government-blessed waiver and right to commit

22   malpractice, that's not what this says.  This

23   says, in fact, that they are liable if they

24   commit gross negligence or unlawful misconduct

1  on their part.  So paragraph 11 says clear as
2  day.
3              So the notion that Koskie Minsky
4  just felt like they could ignore the rights and
5  their obligations to their clients because they
6  had a free pass on malpractice, it is absurd.
7  And the notion that these people just signed
8  away and their severance away to lawyers who
9  didn't care to represent them, it is absurd.
10 And that's why, Your Honor, there is no
11 Bankruptcy Court exception for court-appointed
12 counsel, even if it were the case, because as
13 the Supreme Court itself said in Pioneer, 507
14 US at 397, "It is error not to attribute the
15 fault of counsel to the claimant and noting
16 respondents must be held accountable for the
17 acts and omissions of their chosen counsel.
18 Consequently, in determining whether
19 respondents' failure to file their proofs of
20 claim prior to the bar date was excusable, the
21 proper focus is upon whether the neglect of
22 respondents and their counsel was excusable."
23              And the Third Circuit, following
24 Pioneer, in the Hefta case, which is in the



1    American Classic Voyages bankruptcy, 405 F.3rd

2    127 at 134, Third Circuit said where a delay

3    was the direct result of the negligence of

4    counsel, the delay was entirely avoidable and

5    within claimants' control.

6              However Ms. Mersky may plead with

7    the Court that this is government-mandated

8    counsel, don't tag the movants with their

9    failure to recognize these claims if, indeed,

10    that's the case.  It is not what the law in

11    this country provides.  And whether that result

12    is something that Ms. Mersky's clients think is

13    just or unjust -- and some of them may say,

14    "But I didn't want Koskie in the first place --

15    it is the Supreme Court's law here.

16              And we have not heard any

17    argument -- in fact, we have no evidence that

18    movants and their counsel had excusable

19    neglect, because it has to be looked at

20    together.  And we have heard from a lot of

21    movants and Ms. Mersky about the idea that they

22    are told, "Just wait.  Just wait.  Just wait.

23    You will get your Canadian process."  First,

24    Your Honor, it is not what the evidence shows.

1   It is not.  And Ms. Parthum showed you time and

2   time again they are told there is a US bar

3   date, and they are telling it to employees.

4   And we heard Ms. Klein on the witness stand

5   testify about it.  She knew and she raised the

6   alarm.  Just because you are a Canadian

7   employee, if you have a US claim, you need US

8   counsel and you need to adhere to the bar date.

9   Some movants got the message, some movant

10  perhaps decided they were checked out, they

11  didn't care to get the message.  But the

12  message was told.  And it was also told that

13  Koskie Minsky was not counsel in the US

14  proceedings and if they wanted, they should go

15  get counsel in the US.  And beyond that, that's

16  their responsibility.  And like any other

17  creditor coming to you three and a half years

18  later, if they choose not to do that, they

19  can't tell you later, "Well, if only I had

20  known that I had a potential claim."

21             What is very, very apparent as

22  well, Your Honor, from the testimony you have

23  heard just from the three witnesses today on

24  the witness stand is even if there was a

1    possibility -- and I think on a blanket basis

2    there is none, because this law applies to all

3    of them and it bars all of them.  But even if

4    there is a possibility that some movants could

5    still satisfy the excusable neglect standard,

6    one size plainly doesn't fit all.  We heard

7    three very different stories about why these

8    three people didn't file.

9              You have Ms. Klein as plugged-in

10   as can be.  She has got multiple law firms who

11   looked at her letter.  She is doing independent

12   research.  She is reading the Monitor's stuff.

13   She interacting with Koskie Minsky.  She is

14   going on to the Epiq website and looking at the

15   bar date notice itself.  She wasn't confused by

16   the bar date notice.  The bar date notice, let

17   me say, says if you have claims against the

18   Canadian Debtors, such claims must only be

19   filed in the Canadian court.  It could not be

20   more unambiguous and correct.  But you have

21   Ms. Klein who was very plugged in and says she

22   is completely aware that if she has got a US

23   claim, it has got to be filed in the US, but

24   she thought she had no US claim.



1            You have Ms.  Longchamps who said,
2    "I looked at this letter and I thought I did
3    have a claim, but I just assumed counsel in
4    Canada is looking out for me."  Forget all of
5    the information that is out there that says
6    otherwise.  She has checked out of the process.
7            Then you have Mr. Campbell, who I
8    have to say, as friendly and chatty as he was,
9    it was often difficult to get a straight
10   answer.  We heard about his wife's pension and
11   her losses and things like that in response to
12   questions on completely other topics.  But
13   Mr. Campbell says essentially he kept asking
14   Koskie Minsky what about claims and was told
15   wait for the Canadian process, wait for the
16   Canadian process.  It is not what other movants
17   have testified to.  So we have got three
18   different buckets of people.  And then as you
19   saw from the deposition testimony Ms. Parthum
20   presented, you have got people who said, "I
21   didn't pay attention to any of this."
22            So even if the Court were to say
23   that there is a theoretical possibility of
24   excusable neglect here and we don't think you



1   have to get to an individualized determination

2   because on a blanket basis they can't satisfy

3   it, simply by virtue of the fact that if the

4   Jones case wasn't good enough with latent

5   illnesses, the fact that they all commonly had

6   their termination letters is enough to

7   eliminate all of them.  But even if there is a

8   theoretical possibility, you have got to do an

9   individualized determination to figure out why

10  didn't each of them file given that the

11  differences are significant between just these

12  three people.

13              Once again, as I noted, the notice

14  was not only unambiguous but it wasn't

15  confusing.  Not one witness in deposition or on

16  the witness stand said, "I was confused by the

17  US Debtors' notice."  And Ms. Mersky said there

18  is no Pandora's box here.  Don't worry, Judge;

19  no big deal.  Nobody else is going to come out

20  of the woodwork.  How could she say that?

21              If Your Honor finds that Canadian

22  creditors who had claims in Canada and the

23  United States were misled by the bar date

24  notice that this Court approved, what is to

1    prevent any other Canadian creditor, what is to

2    prevent the 130 people who got this letter who

3    didn't join Ms. Mersky's group and maybe are

4    waiting on the sidelines right now from filing

5    the next day?

6            If we want to look at the letter

7    itself, by the way, the reading of the letter,

8    you know, it frankly leads to absurd results,

9    just absurd, Your Honor.  Mr. Campbell said,

10   well, he hasn't really thought about whether he

11   is going to bring lawsuits against other

12   employees because technically, you know, if one

13   were to take at face value the argument being

14   presented, every employee for any Nortel entity

15   is liable for these 300 people's severance.

16           It also says that all of the IP

17   created by these 300 people are assigned to the

18   "Corporation."  So even though we went through

19   a seven-week trial in which the linchpin of the

20   Canadian argument, including these employees'

21   representatives, is they got the sole

22   assignment to the IP -- and I don't need to

23   repeat those arguments or offer

24   counterarguments -- what we are now told is

1    actually you should read these letters as

2    saying right on the eve of bankruptcy, and it

3    says notwithstanding any other assignment

4    previously, they have actually been assigned to

5    every Nortel entity and, frankly, to all the

6    employees, too.  Just the results would be

7    unreasonable that they are seeking here.

8                    THE COURT:  Help me out for a

9    minute.  This is a question.  There was a bar

10   date in Canada as well.

11                   MR. ROSENTHAL:  Correct.

12                   THE COURT:  Did that specifically

13   not apply to Canadian employees?

14                   MR. ROSENTHAL:  My understanding,

15   Your Honor, is that just as in the US claims

16   can be scheduled and if your claim is scheduled

17   for a set amount and you agree with it --

18                   THE COURT:  Yes.

19                   MR. ROSENTHAL:  -- you don't need

20   to file a notice --

21                   THE COURT:  Right.

22                   MR. ROSENTHAL:  -- that as part of

23   the process in Canada -- Ms. Schweitzer I am

24   sure will jump up if I get it wrong, but as

1    part of the process for the Canadian aspect of

2    claims -- they don't dictate US claims

3    obviously -- but that people got a letter

4    saying this is your Canadian claim.  It will be

5    paid by the Canadian Debtors, and in a number

6    of places referenced here is what you are

7    getting as a Canadian claim against the

8    Canadian Debtors.  Nowhere it led anybody to

9    believe that it was governing the US Debtors.

10   And it had a process, and we saw it as one of

11   the exhibits.  It had a process that said if

12   you disagree with this by this date you have

13   to -- I think it was presented during

14   Mr. Campbell's cross-examination.  If you

15   disagree, you have to submit this form.  But so

16   long as you agree, it is kind of akin to

17   consider it to be scheduled anyway.

18              THE COURT:  But the point is the

19   Canadian notice, bar notice, refers to the US

20   claims process, as I recall.

21              MR. ROSENTHAL:  The Canadian bar

22   notice is in many respects parallel to the US

23   bar notice, in which it tells people don't file

24   your claims against the US Debtors in Canada.

1                  THE COURT:  Right.

2                  MR. ROSENTHAL:  We said here,

3      because Your Honor did not need to be inundated

4      with claims that are not against the US

5      Debtors, don't file your Canadian claims here.

6      We said don't file your US claims there, or

7      they said that.  Nothing -- this cannot be

8      construed, it just cannot be, as saying if you

9      are a Canadian employee, don't file claims

10     here, even if you have them.

11                 And by the way, while we are on

12     the bar date notice, if you look for avoidance

13     of doubt on page 4, it is the thing that says

14     Exhibit B, Your Honor.

15                 THE COURT:  Yes, yes.

16                 MR. ROSENTHAL:  Did I give it to

17     you?  For the avoidance of any doubt, "Who Need

18     Not File a Proof of Claim," and it has ten

19     categories of people:  You have already filed a

20     proof of claim against the Debtors, you are

21     listed on the schedules and you agree with the

22     amount, it has already been allowed, it has

23     been paid in full, there has already been a

24     separate deadline fixed by the Court, you are a



1    Debtor.  Debtors had different deadlines.  You

2    are an entity having a claim against a

3    nondebtor, you are a holder of 503(b) or a

4    507(a)(2) claim, officers and directors,

5    noteholders.  There is actually one more,

6    equity holders.  For the avoidance of doubt,

7    those are the categories of people who don't

8    need to file a claim.  Nothing that says and if

9    you are an employee of another debtor, even if

10   you have a claim here, don't file it.

11              And had they sought legal advice,

12   as they are obligated to do if they want to be

13   diligent, had they sought legal advice from

14   Ms. Mersky at the time or any other Delaware

15   lawyer, they would have said if you have a

16   claim here, you have to file it here.

17              So Ms. Schweitzer points me out to

18   140 in further response to the question you

19   asked, Your Honor, the Canadian notice.  And it

20   notes that certain creditors are exempted to

21   file a proof of claim in Canada, including

22   employees.  And the next paragraph says,

23   "Please note that these procedures apply only

24   to claims filed against the Debtors in the CCAA

1   proceedings.  Several of the Debtors'

2   affiliates are subject to creditor protection

3   proceedings in other jurisdictions, including

4   in the United States."  With respect to the US

5   proceedings, there is a bar date of September

6   30, 2009.  "If you believe you have claims

7   against the US Debtors, any such claims must be

8   filed in, and only in, the US proceedings with

9   the US Debtors' claims agent."

10                  So they are told in our bar date

11   notice and they are told in the Canadian bar

12   date notice don't rely on the fact that you are

13   an employee, that that is going to give you a

14   free pass from the US proceedings.

15                  I guess the last thing I want to

16   just talk about, Your Honor, is just going back

17   to this Koskie Minsky issue and reiterating

18   what I said at the very outset.  When you look

19   at a motion to excuse a late-filed claim, you

20   combine the movant and their representatives.

21   They are like one.  Their knowledge counts as

22   one, their diligence counts as one, their good

23   faith counts as one.  Nobody is accusing these

24   particular movants of acting in bad faith.  But

1    you look at them together with their counsel.

2                    And the evidence is that there are

3    certainly unanswered questions.  Your Honor

4    pointed out to Ms. Mersky that you have got

5    questions and concerns.  Certainly that exhibit

6    that Ms. Parthum showed you causes questions

7    and concerns.  Ms. Mersky herself has made

8    accusations about Koskie Minsky and whether

9    their eyes were off the ball back in 2009

10   because they had a free pass on malpractice,

11   according to her, and they were focused on

12   pensions.

13                   But we also have questions about

14   when did they know definitively that they

15   wanted to bring these claims.  And we heard

16   Mr. Campbell testify that in June of 2012 it

17   was brought to his attention by Koskie Minsky,

18   and he said they learned about it sometime, he

19   believes, in the first half of 2012; can't tell

20   us when.  Koskie Minsky knows.  Was it January?

21   Was it not eight months from the time that they

22   first knew about it till the filing?  Was it 12

23   months?  Was it 13 months?  We don't know.  We

24   don't know what they were doing at that time.



1    All we know is that he knows that they were

2    having discussions about it before he was

3    alerted to it.

4              And Ms. Mersky testified

5    essentially and she said -- she called it

6    testimony -- that she is going to represent to

7    you that she sought to have them sit for a

8    deposition.  First off, that is nowhere in the

9    record.  She never told us that.  The

10   correspondence says otherwise.  But why then if

11   movants want them -- movants do have the

12   ability to demand that their representatives

13   represent them and produce documents.  If

14   that's the case, why weren't they here?

15   Shouldn't that be even all the more confusing,

16   because there are questions that go directly to

17   excusable neglect that only they can answer.

18             And Ms. Mersky said, well, if we

19   thought that they had all the answers, why

20   didn't we move to compel.  Simple answer, Your

21   Honor:  It is not our burden.  The Supreme

22   Court is clear that the burden of proving

23   excusable neglect rests with the movant.  And

24   if Koskie Minsky has information as to when

1    they learned, how diligent they were, and they

2    are akin to the movant here -- that's what the

3    law says -- then their refusal to come, I am

4    fine with it because it means that the movants

5    can't meet their burden.  But we didn't want to

6    just spring that at this hearing and just say,

7    oh, by the way, Koskie Minsky is not here.  And

8    we sought for two months, we wrote letters, we

9    asked them several times, we said -- and this

10   is in the record -- get on a call with us, meet

11   and confer, let's talk about it.  We wrote to

12   Ms. Mersky, "Please help us."

13               And we also didn't want to

14   surprise, that we were going to say we are

15   going to ask for adverse inferences.  And we

16   told Koskie Minsky and we told Ms. Mersky if we

17   don't get this, given that it is not our

18   burden, we are going to ask for adverse

19   inferences.  And once they still refused, it

20   wasn't our duty to still push it.  It was the

21   movants' to get it.  But the fact that Koskie

22   Minsky is not voluntarily coming, is not

23   providing you with information that would

24   answer your questions, that would help you



1    decide how excusable its neglect was, it can't

2    be held against the US Debtors here.

3               So I thank you for your time.  I

4    know it has been a long day.  And I will give

5    my voice a little rest.

6               THE COURT:  Yes, very well.  Thank

7    you, Mr. Rosenthal.

8               Mr. Qureshi.

9               MR. QURESHI:  Very, very briefly,

10   Your Honor.  Again, for the record, Abid

11   Qureshi, Akin Gump, on behalf of the committee.

12               I just want to address one

13   question that Your Honor had asked of

14   Ms. Mersky, and that was what facts changed

15   between 2009 and 2012.  And, Your Honor, the

16   answer to that question, based on the evidence

17   before the Court with respect to any possible

18   basis for a claim of these former Canadian

19   employees against the US, is nothing at all.

20   The language that they base it on in their

21   termination letters obviously did not change

22   between 2008 or whenever those letters were

23   issued and 2009, before the bar date, and 2012,

24   when they finally came to the realization that

1    they allegedly had a basis to pursue a claim in

2    the United States.  And, indeed, that language

3    in those very letters was provided to Koskie

4    Minsky before the bar date.  They gathered that

5    information, and Koskie Minsky elected to do

6    nothing.  The employees elected not to hire US

7    counsel at that time.  So nothing changed.

8              But other facts, Your Honor, did

9    change.  And these are all facts that Your

10   Honor can take notice of.  There was an IP sale

11   in that intervening period at which billions of

12   dollars of sale proceeds were realized.  And in

13   the record of the deposition testimony that has

14   been designated, Your Honor, is evidence that

15   people started to come to the realization that

16   there was a possibility that recoveries might

17   be higher in the US Estate than they would be

18   in the Canadian Estate and that, therefore,

19   there might be a monetary benefit to being able

20   to file in the United States as opposed to

21   Canada.

22             What else happened?  There were

23   multiple mediations, and in 2012 we were in the

24   midst of the third mediation.  And take note,



1    Your Honor, of Exhibit 4.  It is the document

2    that I mentioned in opening.  And Exhibit 4 is

3    a letter from Koskie Minsky to the Monitor

4    which expressly talks about, well, how can we

5    best use this information that we have as

6    evidence of global integration in light of the

7    mediation and the allocation discussions.

8              So what changed, Your Honor, are

9    those things, but nothing with respect to

10   entitlement to a claim.  And Your Honor quite

11   rightly should be concerned about the absence

12   of Koskie Minsky from these proceedings for

13   that very reason.

14              Thank you, Your Honor.

15              THE COURT:  Thank you,

16   Mr. Qureshi.

17              Ms. Mersky, you get the last word.

18              MS. MERSKY:  I get the last word,

19   and it will be short because the hour is

20   passing.

21              First, I am going to start with

22   what you said, what changed.  Well, there were

23   things that changed, and those things had

24   absolutely nothing to do with the mediation

1    process.  What changed was the Monitor was

2    notified and notified Koskie Minsky that there

3    were claims that were filed in both the United

4    States and Canada and that those claims should

5    be withdrawn as to the United States.  And

6    there were three claims specifically that were

7    filed, and those three claims were of three

8    employees who did receive notice from the US

9    Debtor, and that's at Docket 1919:  Rosee,

10   Flaherty and Dietmar Wendt.  And I know those

11   people because those people are my clients.

12   Those people did file proofs of claim, and the

13   reason they filed proofs of claim is because

14   they got a bar date notice.  When they got a

15   bar date notice, they looked at it and they

16   independently inquired.  And that's why

17   physically receiving a bar date notice is very

18   important.  So they received the bar date

19   notice.

20              The Monitor is going through this

21   whole process which you also asked about,

22   because this is not a normal process in Canada.

23   This was a process --

24              THE COURT:  If they filed proofs



1    of claim, why are they your clients?

2                   MS. MERSKY:  They filed proofs of

3    claim.  They are not my clients in this

4    proceeding.  They are my clients because they

5    contacted me about filing proofs of claim

6    before the bar date.

7                   THE COURT:  All right.  Okay.

8                   MS. MERSKY:  So I am aware of

9    these individuals, and I saw the notice, and

10   the Docket 1919 reflects that they were given

11   actual notice.  But they were Canadian

12   employees who received actual notice.  And

13   those employees when they received actual

14   notice took note and did something.  They

15   called US counsel, because when you get a

16   document like that, most people react.

17                   And it was at this point in 2012,

18   when the Monitor was going through the process

19   of a specially created process -- and you asked

20   about this.  There was a bar date in Canada for

21   all claims except employee claims.  They don't

22   have, to my knowledge at least, scheduled

23   claims the way we have scheduled claims.  But

24   in this case there wasn't a schedule that was



1   filed.  What happened -- and Mr. Campbell

2   testified to this.  What happened was Koskie

3   Minsky, the Monitor and he as a representative

4   created a process.  They worked together.  I

5   don't know if you remember some of that

6   testimony, but that was the testimony.  This

7   was a special thing because, as Mr. Campbell

8   testified, there were so many people involved,

9   so they created something different, something

10  unique.  And that's what it took a great deal

11  of time and effort to do.  And it was the

12  Monitor who wrote to them.  And you saw the

13  letters that the Monitor sent.  And then and

14  only then in 2012, after they got the letter

15  from the Monitor, only if they disagreed did

16  they have to file a proof of claim.

17          So to the extent it is parallel in

18  concept to our schedules, yes, but it was a

19  special process.  And that's why the claims bar

20  dates didn't apply to them.

21          And when Debtors' counsel refers

22  to all these notices that Koskie Minsky sent

23  out warning them of the US bar date, the next

24  sentence is employees in Canada don't have to

1   do anything.  You have to wait for your

2   process.  So it wasn't -- the notice was not

3   the notice as it was suggested.  It was a --

4   you have to look at it in context.

5              So there were things that changed

6   that had absolutely nothing to do with the

7   allocation process, and it had to do with what

8   was happening in the employment process and

9   what was discovered and then pulling all 300

10  letters to figure out who had what and make

11  sure they did have claims and then calling

12  Koskie Minsky and saying can we do this.  You

13  know, what can we do?  Can we create this

14  process?

15             So yes, there was a delay and,

16  yes, the delay was long, and, yes, this is an

17  extraordinary case involving an extraordinary

18  number of people, and the delay is excusable.

19  But you don't have to get to that, once again.

20  You start with the Trans World Airlines case

21  and known creditors are entitled to actual

22  notice, not constructive notice, not posted

23  notice.  And the case law -- and I did cite it

24  in my brief -- is that having notice and



1    learning about something outside the system is

2    not sufficient.

3              And I hope it never comes a day

4    where LinkedIn and such social media sites

5    would ever be considered adequate notice for

6    something as important as a bar date, because

7    social media sites are not what this Court is

8    going to rely upon.  And while people may be

9    aware of certain things, the misinformation

10   that passes on social media sites is not

11   something that any court wants anyone to have

12   to rely on.

13             But there was a responsibility to

14   give actual notice.  And you heard testimony

15   today that HR Shared Services was in North

16   Carolina.  And HR Shared Services is on every

17   one of those letters.  HR Shared Services is

18   where you are supposed to call.  You heard

19   people call and say they checked to make sure

20   that the letter they mailed to HR Shared

21   Services actually arrived in HR Shared

22   Services, and they called HR Shared Services in

23   North Carolina.  So these documents which are

24   HR Shared Services documents with employees who

1   had supervisors in the United States, these

2   were known creditors.  And as known creditors,

3   they didn't get actual notice, and they were

4   entitled to actual notice.

5              And people react differently when

6   they get actual notice.  When you get a bar

7   date notice in the mail, you throw it in the

8   trashcan or you don't pay enough attention to

9   it, you still have a right to assert a claim

10  for excusable neglect.  But that's a whole

11  different ball game, because that notice means

12  something.  And our courts want you to take

13  notice of a court notice of a bar date.  They

14  did not get this.

15             And then you get down to the

16  notice by publication.  No one is saying that

17  the extreme efforts of counsel to try and be

18  clear were -- that they did everything they

19  could, I am sure.  However, the notice if you

20  read it is extremely, extremely confusing.  And

21  it is in bold on the first page, parts of it,

22  and it says, "With respect to the Canadian

23  proceedings, a general bar date (date set by

24  the Canadian Court). . .has been published by

1   the Canadian Court."  Of course, that didn't

2   apply to these people.  "If you believe you

3   have claims against Nortel Networks

4   Corporation, Nortel Networks Limited, Nortel

5   Networks Global Corporation, Nortel Networks

6   International Corporation or Nortel Networks

7   Technology Corporation (the 'Canadian

8   Debtors'), any such claim shall be filed in,

9   and only in, the Canadian proceedings with the

10   court-appointed Monitor."

11          And you heard the testimony of

12   Paula Klein say, "Yes, I did look at this.  I

13   took it upon myself, because I didn't get the

14   notice.  I took it upon myself and I did look

15   at it, and that was consistent with what I

16   understood.  I thought that's what we had to

17   do."

18          And that notice is a problem,

19   because when you read this, it is confusing.

20   So you can say that they are known creditors.

21   I think they are known creditors.  You can say

22   there is a defective notice.  When you read

23   this, for people who have claims in both the

24   United States and Canada, or conversely, Canada

1    for people who feel they have claims against

2    both, in those instances -- and they are not

3    common instances and they weren't expected

4    instances, but in those instances, that notice

5    is defective.

6              And once again, should you not

7    want to say that the notice is defective, you

8    should be very concerned about that, then you

9    can either go to the fact that they were known

10   or you can go to the fact that that is a

11   significant element to be considered in

12   excusable neglect, as it was in the Pioneer

13   case, where the combination of a less-than-

14   clear notice together with an attorney's

15   negligence was sufficient to find excusable

16   neglect.

17             And you note in Pioneer and you

18   note in O'Brien that it is not any one thing,

19   that you look at the facts and the justice in

20   each case.  You don't look at one factor.  And

21   I do understand that a lot of time passed by.

22   But that's one factor, and it is a factor which

23   is explained, as I said before.  But you look

24   at these things and you look at the creditors

1    and you look at the process.

2                    And then you look at where we are

3    today in this case, where we are not going to

4    have to pull back money from creditors who have

5    already received distributions.  We are not

6    going to have to create a whole new plan.  We

7    are, unfortunately for a lot of people in the

8    Nortel case, we are not there yet.  So under

9    the facts and circumstances of this case, this

10   group of people, all of which were known

11   creditors, should be given an opportunity to

12   file a claim in the United States.

13                    Thank you very much, Your Honor.

14                    THE COURT:  Thank you, Ms. Mersky.

15                    MR. ROSENTHAL:  Just 60 seconds,

16   Your Honor.

17                    THE COURT:  Of course.

18                    MR. ROSENTHAL:  There are just a

19   few misstatements I need to correct.

20                    THE COURT:  Nobody leaves hungry

21   and nobody leaves without having their full

22   say, so go ahead, Mr. Rosenthal.

23                    MR. ROSENTHAL:  Or with a voice.

24                    The Koskie Minsky, we heard



1    Ms. Mersky just say, notice says employees in

2    Canada don't have to do anything.  You won't

3    find a single piece of evidence in the record

4    where they said that.  You know what?  That's

5    why they didn't come.  That's why they wouldn't

6    produce documents and they wouldn't testify,

7    because they didn't want to go testify against

8    their clients and say, "We always told them we

9    are not advising you with respect to the US.

10   We always told them get US counsel."

11              Ms. Mersky referred to three

12   people who came to her before the bar date.

13   These people could have come to Ms. Mersky.

14   They could have gotten a reference to US

15   counsel and said, "Look at my letter.  What do

16   you think?"  They didn't.  But you won't find

17   anything where they were told something that --

18   and frankly, even if they did get told that, it

19   is movants and their counsel collectively as

20   one.  Fair or unfair, that's the Supreme Court

21   jurisprudence.

22              Second thing, she says you heard

23   testimony that HR Shared Services is in North

24   Carolina.  People spoke to people on the phone.

1   First of all, again, we go to the matrix

2   organization.  But it is not the testimony.

3   Ms. Longchamps says she called HR Shared

4   Services.  They called her back.  She didn't

5   know where they were calling her back from.

6   You never heard her say, "Somebody from North

7   Carolina called me back" or anything like that.

8              And I misspoke on my initial

9   closing when I said you won't find any

10  addresses or anything in these letters.  You

11  actually will.  You will find some Canadian

12  addresses.  Some of the addresses, just to give

13  you one example, in Exhibit 205 -- my eyesight

14  has gotten bad.  Dennis Paradis, P-A-R-A-D-I-S.

15  They are in alphabetical order.  You could pull

16  it up.  He has got a French letter.  I don't

17  think you have to read French to see there is a

18  514 area code.  You know, for reference, that's

19  Quebec.  So there are no US addresses.  Again,

20  it is not a relevant fact, but the facts don't

21  even support the argument.

22              And, Your Honor, the last thing

23  regarding the known creditors/unknown

24  creditors, again, the law is clear.  Your Honor

1    himself has written some of the leading cases

2    on this issue.  And I will also just add in the

3    Cable and Wireless case, 338 BR 617, it is not

4    the duty of the debtors to make any of its

5    creditors aware of every potential claim they

6    may have against the debtors.  To the contrary,

7    it was the claimants' responsibility to

8    explore, investigate and file a proof of claim

9    against the debtors, not the other way around.

10                   And with that, I will sit down.

11   Thank you.

12                   MS. MERSKY:  I hate to do this,

13   but I have to correct what I think is a

14   misstatement.  I would ask the Court to turn to

15   Exhibit 116.  Exhibit 116 is the pensioners and

16   former employee news bulletin from Koskie

17   Minsky dated July 22, 2009.  And in that, on

18   the second page, it says, "The Claims Process.

19   A US claims process has been released.  A

20   Canadian claims process for creditors who are

21   not employees or former employees shall be

22   released very shortly.  Representative Counsel,

23   the NRPC, the Company and the Monitor are

24   conducting discussions about the separate

1    employee and former employee claims process

2    which must then be approved by the Court.

3    However, you need not take any steps in this

4    process for now.  Once finalized, we will

5    notify everybody about the claims process and

6    how it will take place."

7              Perhaps I did not quote

8    specifically, but I certainly believe that this

9    precise language conveys the statements I made

10   about sitting back and waiting, telling them

11   not to do anything.  This is the same language

12   which is in numerous bulletins that Koskie

13   Minsky produced that are also exhibits to this

14   Court.

15             And as far as known creditors and

16   North Carolina, you did hear testimony today

17   that the witness called North Carolina to

18   confirm that her mailed form which was directed

19   to be mailed to North Carolina was, in fact,

20   received in North Carolina.

21             Thank you, Your Honor.

22             MR. ROSENTHAL:  Your Honor, if I

23   could have ten seconds on this one document she

24   just referred to.

```
1              THE COURT:  Yes, please.
2              MR. ROSENTHAL:  The claims
3    process.  A US claims process has been
4    released.  A Canadian process should be
5    released shortly.  And then the reference to
6    you don't need to take any steps in this
7    process for now.  "Once finalized, we will
8    notify everyone. . . ."  Obviously, it is
9    talking about the Canadian process, because the
10   US process has been finalized.  Clear as day,
11   Your Honor.  And if anybody had any doubts,
12   they could have asked Koskie Minsky.  And there
13   is a multitude of documents where Koskie Minsky
14   says we are not your counsel in the US.
15             Thank you.
16             THE COURT:  I will just point out
17   that "the Court," based upon that document,
18   refers to the Canadian Court.
19             MR. ROSENTHAL:  Of course.  It is
20   not this Court.
21             THE COURT:  Well, let me say a few
22   things.  First of all, I will get some
23   submission tomorrow on the issue of the
24   designation of live witnesses' deposition
```



1    testimony.  So that's number one.

2              Number two, I do appreciate the

3    former employees' attendance.  You know, this

4    has been a complex case.  It has been a

5    difficult case, and having you here certainly

6    reminds me that we are talking about real

7    people, which sometimes lawyers and even judges

8    lose sight of.  So that certainly is helpful,

9    and it just makes my consideration of these

10   issues all the more sensitive and important.

11   And I do want to give thought to what I have

12   heard here today.

13             I had actually hoped that maybe I

14   would be able to make a ruling, a prompt

15   ruling.  It won't be as prompt -- it is going

16   to be prompt, I hope.  And I am contemplating

17   the possibility of making an oral ruling, like

18   some of my colleagues in other courts do.  Even

19   I think Judge Drain in New York has even read

20   three hours of an oral ruling because it does

21   expedite the process.  I am hoping that if it

22   is going to be three hours, I will issue

23   something in writing.

24             But I know this is not a matter



1    that can be resolved.  The Court has to decide

2    this issue, and I am prepared to do that in

3    fairly short order.  But I do appreciate the

4    very capable presentations that I heard.  I

5    appreciate the testimony of people who traveled

6    a great distance to provide it.  And with that,

7    I think I am going to call a recess and let you

8    all go home and Mr. Rosenthal rest his voice.

9              Yes, Mr. Abbott.

10             MS. ABBOTT:  Your Honor, I just

11   have one point of order, as long as you are

12   done, that I think we will take about 30

13   seconds.

14             THE COURT:  All right.

15             MS. ABBOTT:  I know we had a

16   little trouble with some of the witnesses and

17   some of the lawyers speaking into microphones

18   today.  We had the luxury of Ms. Marino in the

19   courtroom.  I would just ask the Court to make

20   her transcript the official transcript because

21   I think she had the best access to what

22   happened here today.  And I know Your Honor has

23   done that before in a couple of earlier

24   hearings, and I would just ask you to do that

1    today if you would.

2              THE COURT:  Any objection to my

3    doing so?

4              (There was no response.)

5              THE COURT:  All right.  Let's do

6    it.  I will so order that the transcript is the

7    official transcript.

8              Ms. Mersky.

9              MS. MERSKY:  Your Honor, you

10   raised something, and I don't know if it is

11   doable, but I think it might be worth five

12   minutes in Chambers if we could to have

13   discussion, because you just raised the issue

14   of you didn't think -- that this is not readily

15   resolvable, that it needs a decision.  I would

16   like to at least present to the Court in

17   Chambers an opportunity that may be

18   appropriate.

19             THE COURT:  Well, I would only do

20   that at this point, after hearing all of the

21   testimony, I would only do that if everyone

22   wants to do that.

23             MR. ROSENTHAL:  It kind of catches

24   us a little bit off guard, Your Honor --



```
 1                    THE COURT:  Sure.
 2                    MR. ROSENTHAL:  -- that you will
 3      now be brought in as a mediator.
 4                    THE COURT:  Oh, no.  I certainly
 5      wouldn't mediate.
 6                    MR. ROSENTHAL:  No.  But even the
 7      idea of a proposal that we haven't even been
 8      presented with one on one, presented to us in
 9      front of the Court.
10                    THE US COURT:  Well, let me do
11      this then.  If you want to have discussions, I
12      would obviously encourage that, but I am not
13      ordering it.  And then if need be, you can get
14      me on the telephone, and then we can have
15      further discussion off the record as if we were
16      in Chambers in any event.  I don't know that
17      this is the time to do it.
18                    MR. ROSENTHAL:  I think it makes
19      more sense that if Ms. Mersky has a proposal to
20      make that she make it to us.
21                    THE COURT:  I think that's right.
22                    MR. ROSENTHAL:  And the parties
23      collectively can let you know if we think the
24      Court's involvement would be of assistance.
```



1                    THE COURT:  Sure.  I have to agree

2     with that.  I think, it would put me,

3     Ms. Mersky -- and I know your intentions are

4     good -- in an awkward position at this point.

5                    MS. MERSKY:  Okay.  Thank you,

6     Your Honor.

7                    THE COURT:  Yes.  All right,

8     everyone.  Good evening to you.  Safe travel to

9     all our friends in Canada.  And we stand in

10    recess.

11                   And I believe I referred to you in

12    once exchange as Mr. Bennett.

13                   MR. CAMPBELL:  You did, but I

14    overlooked it, Your Honor.

15                   THE COURT:  You reminded me of a

16    Mr. Bennett, so it is Mr. Campbell, and I

17    apologize.

18                   MR. CAMPBELL:  Thank you.  I

19    appreciate that, Your Honor.

20                            - - -

21                   (Court adjourned at 6:49 p.m.)

22                            - - -

23

24



1                        INDEX

2    MOVANTS' WITNESSES   Direct    Cross    Redr.    Recr.

3    Paula D. Klein         60       110      149      --
     J. Jane Longchamps    159       171      208      --
4    Michael A. Campbell   211       231      --       --

5    EXHIBITS                                         Marked

6    Exhibit 151 Exhibit B Notice of Bar Date

7                Order----------------------    131

8                         - - -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



```
 1                        CERTIFICATE
 2                 I, LORRAINE B. MARINO, Registered
 3    Diplomate Reporter, Certified Realtime Reporter and
 4    Delaware Notary Public, do hereby certify that the
 5    foregoing pages numbered 2 through 375 contain a
 6    true and correct transcription of the proceedings
 7    as stenographically reported by me at the hearing
 8    in the above cause before the United States
 9    Bankruptcy Court for the District of Delaware, on
10    the date therein indicated.
11                 IN WITNESS WHEREOF I have hereunto set
12    my hand at Wilmington, this 27th day of March,
13    2015.
14
15
16
17
```



```
18          _____
                 Registered Diplomate Reporter,
                 Certified Realtime Reporter
19                and Delaware Notary Public
20
21
22
23
24
```



**WILCOX & FETZER LTD**
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

Case 09-10138-MFW   Doc 15396   Filed 03/30/15   Page 378 of 450

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
March 26, 2015

**$**

**$18 (1)** 50:18
**$7.3 (1)** 33:12
**$800,000 (2)**
304:21 305:8

**A**

**Abbott (5)** 32:1,3
372:9,10,15
**Abid (3)** 52:22
261:16 354:10
**abide (1)** 108:3
**ability (3)** 41:13
236:10 352:12
**able (10)** 11:22
29:20 117:10
146:19 228:5
230:17 294:14
324:23 355:19
371:14
**absence (3)** 98:3
308:16 356:11
**absolute (2)**
289:21 335:11
**absolutely (16)**
29:5 31:12
73:9 78:23
84:4 86:21
104:15 106:11
200:23 239:2
241:17 277:2
286:3 299:10
356:24 360:6
**absolved (2)**
296:4,12
**absolves (1)**
295:18
**absurd (4)** 339:6,
9 345:8,9
**accept (5)** 50:23
215:13 331:23
334:7,10
**access (3)** 310:8
321:20 372:21
**accident (1)** 330:4

**accidental (1)**
54:11
**accommodate (1)**
309:19
**accomplished (1)**
230:10
**accordance (1)**
279:5
**according (2)**
304:24 351:11
**accordingly (1)**
326:12
**account (5)**
40:11 146:14
165:20,21
216:3
**accountable (1)**
339:16
**accountant (1)**
159:18
**Accountants (1)**
159:19
**accounting (2)**
153:8,8
**accurate (4)** 55:5
194:13 205:15
206:7
**accusation (1)**
38:14
**accusations (1)**
351:8
**accused (2)**
39:16 243:6
**accusing (3)**
38:11 42:10
350:23
**acknowledged (2)**
222:13 287:18
**acquire (1)** 20:21
**acronyms (2)**
212:14,17
**across (1)** 114:3
**act (2)** 17:23
102:15
**acted (4)** 29:10
42:11 102:17
222:22
**acting (3)** 38:12

308:5 350:24
**action (13)** 78:11,
13 85:2
169:20 171:1
180:17 181:20
196:23 227:22
230:23 295:6
310:10 311:17
**actions (6)**
101:11 180:3
195:19 200:5
242:11 244:15
**active (5)** 36:21
46:6 78:21
79:13 113:23
**actively (3)** 53:11
80:2 229:5
**activities (2)**
88:13 164:17
**activity (2)** 85:19
209:9
**acts (1)** 339:17
**actual (29)** 21:16,
20 26:1,4
36:19 44:13
66:17 67:1,14
68:10 69:21
127:10 226:4
288:10,18,19,
23 294:21
303:1 304:24
331:10 358:11,
12,13 360:21
361:14 362:3,
4,6
**actually (59)** 6:22
33:7 37:19
38:9 49:23
64:9,12 69:1
88:17 96:24
98:3 103:22
105:4 111:22
128:22 130:10,
15 131:13
144:11,13,23
155:18 162:20
164:17,23
166:10 205:9

211:16,22
213:24 214:7,
19 215:11,19
217:8,17
222:1,20
231:2,15
235:24 236:6
237:14,17
242:8 251:2,
23 254:11,18
261:21 280:12
331:23 334:18
346:1,4 349:5
361:21 367:11
371:13
**acutally (1)** 31:21
**ad (6)** 20:3
23:7 55:22
233:17 235:5
278:24
**add (4)** 52:24
63:20 112:3
368:2
**added (1)** 22:12
**addition (6)** 3:5
113:24 129:10
130:9 168:8
265:5
**additional (7)**
18:10 20:19
279:23 280:2
288:4,5 289:8
**address (23)**
50:17 54:5
66:22 67:12
68:21 87:13
103:20,24
192:15,17
201:18 217:5
262:19 264:24
265:12 266:8
289:6 304:1
325:9 332:13,
14 333:11
354:12
**addressed (2)**
199:5 241:24
**addresses (4)**

367:10,12,12,
19
**addressing (1)**
2:14
**adds (1)** 292:14
**adequacy (1)**
319:6
**adequate (4)**
23:21 319:11
330:19 361:5
**adequately (1)**
25:21
**adhere (1)** 341:8
**adjourned (1)**
375:21
**administer (1)**
113:8
**administration (6)**
159:17
168:18 209:12
299:12 300:19
306:17
**administrative (4)**
93:14 153:14,
18 307:18
**administrator (2)**
111:16 114:1
**admissibility (1)**
69:7
**admissible (6)**
68:8 91:2,14
275:21 276:3,
19
**admission (2)**
264:13 268:8
**admit (1)** 331:17
**admitted (3)**
69:11 324:21
325:1
**advance (7)** 41:2
45:6 126:14
248:4 271:19,
24 276:9
**adverse (2)**
353:15,18
**adversely (1)**
310:21
**advice (15)**

Case 09-10138-MFW   Doc 15396   Filed 03/30/15   Page 379 of 450
Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.
Hearing
March 26, 2015

50:13 117:10,
14,15 122:23
123:16 133:19
134:21 135:22
136:14 140:7
221:12 326:18
349:11,13

**advise (10)** 51:2
87:5 105:6
125:24 135:4
137:18 167:20,
22,24 262:13

**advised (22)**
18:19 47:24
49:8 87:3,4,7
92:14 95:5
114:10 134:15
135:23 139:13
185:3 191:12
247:8 248:9
249:18 263:8
272:18 317:5
325:14 327:1

**advising (3)**
137:11,16
366:9

**advocated (1)**
54:5

**advocating (1)**
124:19

**affairs (1)** 217:17

**affect (5)** 96:16
149:21 167:13
223:19 300:6

**affected (8)** 75:9
85:13 96:2,12
99:14 221:19
252:7 310:21

**affects (1)** 278:16

**affidavit (7)**
97:13 234:8
241:12 288:7
315:22 320:22
333:19

**affiliates (10)**
107:2 163:21
164:5 173:12
174:12 175:6

204:1 258:3
260:1 350:2

**affirmatively (2)**
246:9,16

**affirms (1)** 328:20

**afford (1)** 310:1

**afield (1)** 99:10

**after (92)** 21:8
23:3 25:22
29:19 33:23
37:1,7 38:7
39:20 41:3
42:23 47:23
52:13 53:10
54:17,23
72:21 73:3
74:16,22 75:3
79:1 80:21
86:4 88:10
92:20 108:20
110:6 111:6,
13 117:21
118:12 119:1,
6 120:10
121:17,21
126:20 131:21
136:21 139:5
140:15 151:4
154:24 157:18
158:3 165:19
166:16 170:15
172:8 174:3
178:17 183:22
184:20 192:5
202:19,24
203:4,14,22
204:2,18
214:13,17
217:12,22
219:23 220:3
229:19,23
238:2 249:5,
17 250:20
256:2 259:21
260:19 272:21
273:10,21
278:8 279:8,
12 282:1,15

288:21 301:1
304:19 317:5
319:2 359:14
373:20

**afternoon (14)**
110:20
157:20,23
158:1 171:7,8,
9 231:8,9
261:14,15
314:11,12
323:16

**afterwards (1)**
122:2

**again (56)** 2:7
9:14 37:13
46:22 53:10,
12,17 74:14
82:12 87:7
94:8 109:24
134:1,4
135:14 140:23
148:2 151:15
178:8 181:2
185:20 186:1
194:5 206:3
230:4 231:10
240:9 241:12
245:21 246:16
250:6,9
254:12 261:19
263:8,24
280:19 281:23
287:20 294:24
308:21 322:11,
17 323:21
324:10 331:22
335:6 336:11
341:2 344:13
354:10 360:19
364:6 367:1,
19,24

**against (113)**
24:9,13,16
25:3 34:14
35:13,16,17,
19 37:4,12
38:21,23 39:3

43:1 45:18,19,
22 46:8 48:2,
7,24 78:13
118:4,6,11,23
127:18 128:7
129:19 130:6
134:17 135:10,
20 136:4,8,18
137:9,20
139:9,14
141:6 144:19
145:21 146:1,
7,9,17,19
150:5,12
173:2 189:22
199:13,24
200:15 202:1,
3,7 219:11
224:19 225:8
234:20 243:5
245:2 248:10
249:19 254:5
255:21 256:3,
17,23 257:18
259:9 260:22
290:15 313:1
317:7,12
318:6,10,17,
21 319:18,20
320:4 327:6,
20 328:16
330:6 331:7,
18,21,24
333:6 334:13
337:1 342:17
345:11 347:7,
24 348:4,20
349:2,24
350:7 354:2,
19 363:3
364:1 366:7
368:6,9

**agenda (1)** 2:10

**agent (3)** 41:13,
19 350:9

**agents (9)** 38:16,
16,18,21,24
107:4 173:14

260:4,13

**agitated (1)** 245:9

**ago (5)** 112:13
183:7 241:9
272:22 299:23

**agree (12)** 76:14
101:21 113:1,
5 142:18
159:11 170:7
242:4 346:17
347:16 348:21
375:1

**agreed (9)** 65:7,
11 93:10
162:16 178:2
271:23 278:20
279:10 305:9

**agreeing (1)**
108:3

**agreement (36)**
51:17 71:15
72:20,22 73:8
90:2 105:2,23
106:1,9,14,15,
17,18,20
107:16,23
108:4 133:17,
20 137:4,4
147:2 215:5,
20 216:4
256:20 260:9,
10,15 268:9
276:10 281:16
313:10,10
327:7

**agreements (13)**
14:5,16
25:13,15
104:22 226:5
253:6 256:10,
21 264:21
312:14,16
328:15

**ahead (1)** 365:22

**Ainslie (6)**
116:20 193:5,
10,10,14,15

**Airlines (1)**

Case 09-10138-MFW   Doc 15396   Filed 03/30/15   Page 380 of 450
Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.
Hearing
March 26, 2015

360:20

**Akin (6)** 52:23
261:16 308:9
347:16 353:2
354:11

**alarm (1)** 341:6

**alert (1)** 167:12

**alerted (3)** 43:9
318:5 352:3

**ALEXANDER (1)**
210:13

**all (225)** 2:3 3:9
4:6,8 5:4,16,
21 6:16 8:14,
18,21 9:9
12:3 14:15,21,
22 16:20
19:10,11
20:15 21:6,11
22:1 24:9
28:6 29:4
30:4,19 32:3,
14 33:16 34:8,
9 36:5 40:20
42:4,15 50:13
51:15 53:4,6,
22 54:17 55:9,
13 56:10
57:19 59:12
61:9 65:7,11
66:3,7 67:15,
19 68:10,19
70:24 75:9,10
77:8,24 80:18
83:7 85:21
92:23 94:1,5,
20 98:11,14
99:4 101:12
102:8,20
107:3 108:19
109:8,11,14,
21 110:3
111:19 113:18
121:7 123:19,
24 128:14
129:17 140:8
143:7 144:20
147:11,16

148:2,24
149:6 152:5
154:3 155:1
156:23 157:3
158:4 164:16
169:12,13
173:13,20
175:1,5
182:16 186:20
189:9 195:22
197:22 198:12
202:20 203:18
205:12 206:15,
21,22 207:9
208:11 209:14,
21 210:7
216:2 218:23
219:5,8
227:18 231:20,
21 233:17
235:5 245:18
246:23 247:6
258:8 260:2
263:16,21
266:4 267:6,
10 268:7,10,
21 269:17
272:8,17
276:2,3,4
278:20,22
279:16 280:15
281:10 282:20
283:2,12,24
286:3,13
287:22 290:15,
17 296:19,24
297:22 298:4,
20,21 299:8,
15 300:13
304:12 306:10,
23 309:11
310:7 311:9,
23 312:18
314:15 315:18
321:8,20
327:20 329:18
330:23 332:4
333:4 334:5,

17,20 342:2,3,
6 343:4 344:5,
7 345:16
346:5 352:1,
15,19 354:19
355:9 358:7,
21 359:22
360:9 365:10
367:1 370:22
371:10 372:8,
14 373:5,20
375:7,9

**allegation (1)**
58:11

**allegations (2)**
57:7 311:5

**alleged (2)** 99:14
303:20

**allegedly (3)**
133:20
320:23 355:1

**Allergy (1)** 329:9

**allocate (1)** 334:6

**allocated (1)**
35:24

**allocation (13)**
33:13 40:19
54:4,19 57:12,
20 58:16
132:23 276:7
328:19 334:3
356:7 360:7

**allow (4)** 52:7
92:9 290:22
304:18

**allowed (18)**
25:22 29:19
33:22 50:6
107:23,24
108:10,11
144:24 145:11
229:19 250:12
301:1 304:19
305:8,8 314:1
348:22

**allowing (2)**
50:18 299:10

**alluded (2)**

181:17 191:23

**almost (7)** 4:10
35:2 42:24
44:16 311:22
330:23 334:17

**along (5)** 219:16
236:15 251:8
265:16 315:22

**alongside (1)** 5:23

**alphabetical (1)**
367:15

**already (21)** 28:2,
4 29:18 40:2,
3 50:4 77:1,3
85:4 107:10
151:16,21
181:24 183:15
190:3 299:18
324:17 348:19,
22,23 365:5

**also (64)** 13:6
24:24 34:1
38:10 42:21
51:16 52:1,4
56:9,14 59:6
67:2,16 75:13
76:23 77:4
87:5 102:9
103:10 110:21
114:9 125:4
127:9 129:2
135:9 137:11
156:18,18
158:9 159:20
160:21 161:10
166:11 167:3
172:1 191:23
194:14 202:2
206:24 223:3
226:2 239:14
241:23 260:2
264:22 266:6,
14 274:15
290:19 301:16
302:1 312:14
322:7,18
328:14 333:8,
23 341:12

345:16 351:13
353:13 357:21
368:2 369:13

**although (1)**
62:22

**always (17)**
13:24 30:10
50:8 62:6,10
81:14 83:18
142:14 143:20,
23 171:13
175:20 213:15
232:11 276:1
366:8,10

**ambiguity (1)**
291:22

**ambiguous (5)**
290:5,6
291:5 302:2
319:10

**amend (1)** 305:9

**America (1)**
232:17

**American (4)**
3:10 158:14
313:4 340:1

**among (6)** 46:7
119:13 123:19
195:15 321:4
324:12

**amongst (2)**
92:10 161:10

**amount (27)**
16:10 17:22
27:22 37:7,10
38:2 42:24
53:23 90:5
94:21 105:7
113:1 136:24
170:6,7
198:21,24
201:24 205:13
216:18 300:14
302:15 307:4,
24 316:4
346:17 348:22

**amounts (2)** 37:3
138:3

Case 09-10138-MFW    Doc 15396    Filed 03/30/15    Page 381 of 450
Bankruptcy Court for the District of Delaware                                    Hearing
In Re: Nortel Networks Inc., et al.                                    March 26, 2015

**analysis (5)** 138:20 320:11 323:6 324:4,6

**analytical (1)** 230:2

**analyze (2)** 137:24 138:22

**analyzing (2)** 138:17 249:17

**Andrea (3)** 80:3 135:2 327:10

**Ann (2)** 3:14,15

**announce (3)** 26:12 84:18 312:22

**announced (2)** 73:3 321:16

**announcement (2)** 73:10 75:4

**another (20)** 12:2 31:20 75:6,11, 16 128:5 148:3 184:20 237:14 243:10 250:15 265:6 317:2 321:23 322:10,22 323:1,24 328:16 349:9

**answer (16)** 49:19 177:12 193:4 205:7, 14 224:5 226:21 239:17 254:22 309:23 319:3 343:10 352:17,20 353:24 354:16

**answered (13)** 23:6 107:10 120:16 177:19 205:3 252:5 316:24 317:10, 14,23 318:2, 11,23

**answering (3)** 93:15 177:23

**303:6**

**answers (5)** 121:14,18 191:14 249:22 352:19

**Anthony (2)** 62:16 71:19

**anxious (2)** 12:11,14

**anybody (12)** 48:23 86:13 134:24 138:7 144:12 161:17 174:20 190:11 202:1 319:21 347:8 370:11

**anymore (1)** 333:13

**anyone (10)** 2:23 29:23 52:19 108:10,22 148:21 194:17 209:19 283:12 361:11

**anything (68)** 12:24 16:1,6 22:23 24:23 29:5 37:23 47:17 49:6,7, 17 55:4 57:8 58:13,15 66:9 68:21 71:14 72:2,3 75:22 84:19 85:6 86:23 88:24 89:2 104:4,8, 23 107:15 113:3 117:14, 16 123:16 136:10 140:5, 16 147:6,21 156:24 163:17 167:13 170:16 171:2 176:16 180:9 196:11 197:1 199:23 208:4,7,18 214:21 221:22

**223:23 224:22** 244:19 245:4 304:5 308:21 312:1 316:21 360:1 366:2, 17 367:7,10 369:11

**anytime (2)** 81:12 194:17

**anyway (4)** 154:13 265:18 274:11 347:17

**anywhere (6)** 22:23 81:21 97:10 108:11 150:15 217:7

**apologies (1)** 265:15

**apologize (6)** 99:11 106:12 191:1 230:22 277:4 375:17

**apparent (1)** 341:21

**apparently (5)** 4:21,22 298:24 305:22 312:3

**appear (1)** 309:1

**appearance (1)** 31:22

**appeared (1)** 92:1

**appearing (1)** 31:16

**appears (1)** 275:20

**applicability (1)** 182:14

**applicable (2)** 180:5 235:2

**applied (7)** 17:7, 8 127:17 128:2,6 129:4, 5

**applies (5)** 26:18 33:18 291:18 302:14 342:2

**apply (18)** 9:23 10:9,11,17 17:6,11 30:5 33:19 51:14 127:21,24 221:13 291:19 323:13 346:13 349:23 359:20 363:2

**appoint (1)** 338:5

**appointed (24)** 8:12 76:20, 21 77:13 79:2 125:14 168:3, 23 169:9 218:20,21,22 219:5,13,15, 18 235:12 239:21 240:2 253:9,14 293:18 296:11 298:9

**appointing (1)** 77:18

**appointment (2)** 235:9 338:18

**appointments (1)** 308:14

**appraised (1)** 238:4

**appreciate (6)** 58:22 258:18 371:2 372:3,5 375:19

**appreciation (1)** 72:13

**apprise (1)** 25:21

**apprised (1)** 95:18

**approach (9)** 64:17,21 131:5,7 194:19 209:16 268:24 314:14 328:13

**approached (1)** 307:7

**appropriate (11)**

**67:6 68:4** 78:14 157:10 227:5 268:16 273:2,24 285:16 302:10 373:18

**appropriately (2)** 9:10 281:3

**approve (2)** 112:4,8

**approved (6)** 74:4 84:8,13 308:13 344:24 369:2

**approximately (7)** 13:3 92:24 103:4 112:14 215:21 219:2 295:15

**Archibold (2)** 219:17 338:8

**area (8)** 70:11 164:2 217:18 218:15,15 253:22 338:13 367:18

**areas (2)** 36:13 221:5

**argue (4)** 69:7 274:13 282:14 286:1

**argued (1)** 284:19

**arguing (2)** 97:6 284:21

**argument (33)** 34:19,23 35:3 47:12 51:4,22 110:2 144:8 147:14 266:19 270:5, 15 272:3,7,7 274:13 280:21, 22 282:6,9 285:21 286:2 308:9,19 331:21,24 334:2,7,10

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.
Hearing
March 26, 2015

340:17 345:13, 20 367:21

**argumentative (2)** 270:7 274:5

**arguments (10)** 50:23 126:9 142:13 227:3 269:12 272:13 273:18 274:5 330:2 345:23

**around (22)** 33:1 38:7 62:21 70:7 71:1 86:2 108:11 126:13 179:23 213:17 221:3 223:10 225:24 241:7 242:11 246:13 255:21 259:22 283:2 323:17 324:22 368:9

**arrangement (3)** 217:9 237:16 251:8

**arrangements (1)** 93:3

**arrived (1)** 361:21

**articles (1)** 298:21

**ascertain (1)** 21:18

**ascertainable (4)** 21:21 22:14 288:17 289:7

**ASIC (1)** 161:12

**aside (5)** 50:20 171:20 231:23 240:23 260:10

**ask (52)** 47:4 56:15 64:2 65:6 77:11 78:2 81:15,19 83:19 102:2 108:21 113:12 117:16,23 119:1 120:13

140:22 142:3 149:6 163:2 172:4 179:15 184:5 185:18 186:17 188:12 189:7,10 190:11 192:7, 10,22 194:18 195:3 198:4 200:16 202:1, 9 220:15 228:9 233:24 234:11 241:11 249:21 251:21 259:1 310:2 353:15,18 368:14 372:19, 24

**asked (65)** 25:4 36:15 47:2 48:19 63:3 64:8 76:12 77:6,7 79:9, 16 86:11 87:16 90:10 92:12 99:14 100:6,17 110:7 117:9, 11 125:17 147:19 162:14 185:1 186:17 190:5 191:9 198:1 199:8 219:22 221:15 223:4,6 224:3, 4 225:3 228:2, 12 230:5 249:23 250:5, 19 252:24 254:8,17 255:7 295:3 309:1 316:19 317:3,17 318:8,15,20 319:19 324:1, 8 326:24 349:19 353:9 354:13 357:21

358:19 370:12

**asking (21)** 30:4 31:1 35:6,8,9, 20 75:5 147:18 176:18 177:23 178:8 186:19 188:16 190:2 191:6,7 230:19 232:19 255:4 295:14 343:13

**asks (2)** 41:21 230:2

**aspect (2)** 93:14 347:1

**assert (1)** 362:9

**asserted (9)** 58:8 90:24 94:13 173:1 319:7, 19 325:10,12 327:14

**asserting (3)** 28:14 58:3 90:12

**assertion (4)** 325:23 326:18 327:22 328:2

**asset (1)** 33:12

**assets (4)** 132:13 195:15 238:1 328:21

**assigned (3)** 9:9 345:17 346:4

**assignment (2)** 345:22 346:3

**assigns (4)** 107:2 163:22 173:12 260:1

**assistance (6)** 93:16 110:7 129:21 270:24 284:10 374:24

**associate (1)** 31:21

**associated (2)** 28:17 176:10

**associates (1)** 31:18

**assume (9)** 109:6 139:1 145:5 146:3 175:13 193:16, 20 202:4 257:24

**assumed (15)** 47:5,5 51:5 74:6 86:1,16 168:5,6,21 169:10,11 182:15,18 202:5 343:3

**assumes (1)** 191:9

**assuming (1)** 55:19

**assumption (2)** 202:16 308:12

**astounded (1)** 230:16

**astray (1)** 194:11

**attached (4)** 67:17 69:23 264:21 265:6

**attachment (1)** 28:4

**attempt (1)** 133:15

**attempted (2)** 58:5 97:8

**attempting (1)** 92:3

**attend (2)** 79:21 98:16

**attendance (2)** 99:4 371:3

**attended (1)** 80:1

**attending (1)** 120:20

**attention (14)** 84:1 156:6 179:3 184:8 221:6 256:9 257:15 298:14 307:4 311:23

326:4 343:21 351:17 362:8

**attorney (9)** 10:4 190:13 192:6 249:17 282:7, 9 296:3,4 302:8

**attorney-client (3)** 99:2 310:5,6

**attorneys (5)** 12:9 16:19,19 296:5 311:19

**attorney's (1)** 364:14

**attributable (1)** 327:14

**attribute (1)** 339:14

**audience (1)** 160:2

**August (4)** 320:19 322:9, 13 326:3

**authenticate (1)** 67:7

**authenticated (1)** 65:24

**authored (1)** 329:23

**authorities (1)** 284:3

**authority (3)** 39:1 284:7 329:22

**automated (1)** 112:7

**automatic (1)** 302:3

**available (8)** 57:23 227:14 236:24 252:18 275:3,22 276:1 280:2

**Aviation (1)** 335:16 336:11

**avoidable (1)** 340:4

**avoidance (4)** 279:4 348:12,

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

17 349:6

**aware (44)** 10:12
18:19 88:16
89:8 134:11
137:22 145:18
150:24 171:20
172:12,24
175:10,22
176:4,7,14
177:15 178:4
185:9,20
186:8,15
195:13 220:10
221:6 222:4,8,
9 231:13,24
232:5 235:19
240:12,24
258:1 262:19
278:6 324:21
331:18 335:23
342:22 358:8
361:9 368:5

**away (8)** 244:12
247:21 305:14
306:21 313:16,
18 339:8,8

**awkward (1)**
375:4

**Axis (1)** 212:7

**B**

**bachelor (3)** 60:7
159:16,17

**back (97)** 10:1,
21 12:5 18:16
24:21 30:21
34:22 37:23
38:18 39:5
40:10 41:17
43:14 48:1
52:8 53:7
81:14 87:16
94:24 96:24
97:13 101:7,
13 102:13,14
105:23 108:19
114:14 117:23

127:16 131:18,
20 132:5,9,21
133:4 134:3
135:9 136:2,4,
15,20 137:1
140:3,6,12,20
141:4 150:19,
21 151:22
157:17 170:21,
22 174:4
180:11 182:7
183:8,24
191:2 192:6
203:10 209:3
215:15 221:21
223:14,20
239:12 242:17
243:9 251:20
262:4 264:22
282:21 283:21
287:7 291:16,
17 294:7
296:21 297:9
299:20 304:2
306:12,12
312:13 317:6
324:1 331:4
332:24 350:16
351:9 365:4
367:4,5,7
369:10

**background (3)**
60:6 159:15
211:10

**bad (13)** 28:13,
13,14,16,24
38:9,12 40:11
42:11 53:15
311:6 350:24
367:14

**balance (1)** 295:9

**ball (3)** 38:19
351:9 362:11

**bank (2)** 165:21
216:3

**bankrupt (2)**
175:13 251:10

**bankruptcies (2)**

247:13 297:22

**bankruptcy (46)**
5:18 23:4
42:21 73:1
74:17 80:19
104:16 112:24
114:10 119:3
122:17 128:15
165:19 166:8
167:8 174:2,3
175:20,21,23
176:19 177:15,
18 178:17,20
179:1 192:24
193:23,24
203:5,8,15
215:24 251:1,
6,9 255:11,17
262:15 296:15
297:22 322:5
337:24 339:11
340:1 346:2

**bar (171)** 9:22,
22 10:7,13,13
15:16 17:3,5,
6,9,24,24
18:21 19:5
21:8,10,21
22:5 25:23
26:11,13,17
27:15 29:19
33:17,23 37:2
38:2,3,6
42:23 43:15,
21 44:12 45:7,
8,14,21 46:5,
15 47:10 49:9,
16 51:1,11
55:15 78:12
82:20 86:4,7
89:12 118:12,
20 125:11
126:7,8,11,15,
19,24 127:4,9,
13,17,21,24
128:2,6,13,16,
23 129:3,17
130:10,11,15,

21 131:22
137:12,14,24
140:9 141:2,
22 149:22
153:20 155:17,
19 156:3,5
179:24 180:4,
22 181:5,18
221:8 226:14
229:20 242:23
262:20,23
263:5 266:9
288:21,22
289:12 290:8,
10,22 291:18
292:1 299:11,
18 301:1,23
302:3 304:16,
19 305:23
319:9 320:19,
20 321:5,5,11
322:8,8,13,21
323:2,7,23
324:21,22
325:1,3
326:12 330:24
335:3,22,23
339:20 341:2,
8 342:15,16,
16 344:23
346:9 347:19,
21,23 348:12
350:5,10,11
354:23 355:4
357:14,15,17,
18 358:6,20
359:19,23
361:6 362:6,
13,23 366:12

**bar' (1)** 321:17

**barely (1)** 283:9

**barred (1)** 26:16

**bars (1)** 342:3

**base (2)** 133:15
354:20

**based (21)** 19:12
47:20 66:23
104:5 142:19,

22 144:8
147:21 173:2
191:13 195:15
227:3 230:14
282:15 307:1
316:6,23
324:19 325:13
354:16 370:17

**bashing (1)** 337:9

**basically (5)**
93:22 216:19
219:22 224:3
266:6

**basing (1)** 136:10

**basis (36)** 23:11,
11 34:10,15
36:7 48:2,7
58:3,9 101:5
135:19 139:3,
9,14 220:6
244:5,23
246:2,22
247:3,22
248:22 249:3
254:16 267:13,
16 289:13
315:10 317:7,
12 320:22
333:4 342:1
344:2 354:18
355:1

**BASSETT (4)**
55:20,21
56:1,18

**bear (1)** 216:10

**became (6)** 2:22,
24 75:14
235:19 240:11
262:19

**become (3)**
77:22 88:16
219:13

**becomes (4)**
145:5 291:5
334:8 336:15

**beers (1)** 71:3

**before (61)**
18:11 27:19

Case 09-10138-MFW    Doc 15396    Filed 03/30/15    Page 384 of 450

Bankruptcy Court for the District of Delaware                                    Hearing
In Re: Nortel Networks Inc., et al.                                    March 26, 2015

31:16 39:6
40:22 43:14
57:14,20
60:14 76:19
82:13 96:9
109:4,23
116:1,10
117:1 136:23
137:12,14,15,
24 148:7
152:4 158:17
166:11 172:17
203:13 205:2
206:9,14,24
207:3 215:22
223:2 248:21
250:7 254:17
257:5,18,21
268:16 269:11
272:4 273:5
274:12 280:9
283:15 304:20
313:1 314:7,
23 323:23
352:2 354:17,
23 355:4
358:6 364:23
366:12 372:23

**beg (1)** 311:1

**begin (3)** 51:8
157:23 282:13

**beginning (10)**
31:7 54:24
82:13 97:18
235:20 255:24
258:11 314:24
321:9 329:16

**begins (1)** 199:16

**behalf (17)** 2:11
52:23 55:22
81:3 91:23
93:5 107:21
110:16 171:2
200:21 257:19
261:4,17
272:10 299:8
334:21 354:11

**behind (2)** 39:12

50:3

**behold (1)** 54:20

**being (52)** 5:5
6:18 10:19
18:14 35:24
38:3 59:1
75:1,2,4
83:16,17
86:24 88:14,
20 89:16 91:4,
9 93:16 94:8
95:8,18
100:24 105:7
106:21 114:1
116:17 119:24
120:6 125:14
136:24 143:11
147:19 154:11
169:3,13
180:19 184:4
194:12 223:6
232:2 253:9
255:3 285:3
291:16,16,19
294:13,14
319:19 345:13
355:19

**belief (8)** 123:23
142:20 244:6
246:4,5,24
247:2,7

**beliefs (1)** 96:21

**believe (106)**
14:4 23:8,14
30:13 32:8
47:18 48:1,6,
13 52:12
66:16 68:8
74:23 77:7
78:14 87:2,15
90:12,14 94:3
99:12,21
104:7 107:14,
20,22 108:15
125:5 130:23
131:17 133:8
136:7 139:2
141:8,21

144:14,23
145:6,9,9
149:15 150:4
151:12 152:8
154:2 156:6,
15 158:3,5
165:9,13
169:1 181:16
196:19 205:16
206:8,13
208:20 209:7,
8,15 231:1
239:11 242:21
243:3 244:4
246:2,9,18
248:17 249:10
251:5 253:9
254:20,24
260:11 261:5
262:23 264:18
268:6 269:24
272:2 277:9
279:19 280:7
287:12 292:7,
7 304:8
310:10,13
312:8 313:2
316:22 317:6,
11,20 318:6,
24 327:5
337:14 347:9
350:6 363:2
369:8 375:11

**believed (21)**
7:15 30:6
49:21 92:3
95:7 101:17
107:17 115:13,
17 125:7
133:21 134:6
139:8 155:5
175:1 178:23
203:18 245:19
309:22 318:16,
22

**believes (1)**
351:19

**bench (1)** 194:20

**Benedict (6)**
116:20
117:20 137:2
193:10,15,21

**benefit (2)**
252:10 355:19

**benefits (17)** 9:4
10:24 11:2
14:8 28:6,8
75:15 215:20
216:7 223:23
247:20,23
248:3 250:22
251:13,17
260:18

**Bennett (2)**
375:12,16

**besides (1)** 49:15

**best (27)** 8:9
11:12 23:19
24:1 30:14
63:20 97:16
116:17 213:18
230:24 234:16
235:1,3,7
236:12 241:8
294:18 310:12
316:1 326:8
328:12 329:10
336:17,23
337:15 356:5
372:21

**bet (1)** 102:11

**better (4)** 35:15
252:3 274:1
336:4

**between (28)**
12:10 19:20
20:8 27:1
61:22 63:13
81:21 93:21
94:17 95:13
108:6 122:11,
20 153:17
164:9 174:18
193:2 194:9
207:14,23
236:11 261:3

293:5 321:1
327:17 344:11
354:15,22

**beyond (5)** 19:1
39:15 68:21
216:20 341:15

**big (10)** 8:24
9:3 26:6
107:5 150:2,5
154:6 162:24
293:14 344:19

**bigger (1)** 41:2

**biggest (1)** 8:17

**Billerica (1)**
213:10

**billion (1)** 33:12

**billions (3)** 3:1,1
355:11

**bills (2)** 153:13,
17

**bind (1)** 236:10

**binder (4)** 121:1,
4 179:8 314:16

**binders (2)**
264:10 268:24

**binding (2)**
122:19 193:2

**bit (23)** 7:7 38:4,
9 70:5 104:14
114:15,16
118:2 157:9
188:4 207:12
215:15 235:8
241:3 262:18
282:20 285:4
293:21 295:3
321:6 322:19
337:23 373:24

**biweekly (2)**
216:5 220:6

**black (2)** 82:5
133:24

**Blais (3)** 47:16
184:20 316:19

**blame (3)** 32:18
37:21 326:19

**blank (1)** 299:23

**blanket (2)** 342:1

Case 09-10138-MFW    Doc 15396    Filed 03/30/15    Page 385 of 450

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
March 26, 2015

344:2

**block (2)** 67:11
68:12

**blocking (1)** 201:5

**board (1)** 311:14

**bold (2)** 150:2
362:21

**Bondholder (1)**
56:2

**Bondholders (2)**
55:23 58:12

**bono (1)** 308:5

**book (3)** 77:12
172:20 216:8

**bookmark (1)**
114:11

**borders (2)** 5:23
327:18

**borne (1)** 39:18

**boss (4)** 214:6
266:19 287:2,3

**bosses (6)** 266:4,
5,16 297:14
334:1,12

**both (28)** 10:14
33:13 56:11
68:9 90:2
98:5 158:6
213:1,19
222:22 234:20
258:11 272:9
273:24 277:22
283:8 290:12,
12 301:17,20
307:17 310:15
320:12 337:9
338:11 357:3
363:23 364:2

**bottom (8)** 64:21
65:3 66:19
74:12 163:5
184:10 217:5
289:3

**bought (2)** 313:8,
10

**boundaries (2)**
81:11 231:18

**box (7)** 50:24

192:14 200:3
273:14 274:2
294:3 344:18

**BR (4)** 331:5,15
335:17 368:3

**brackets (1)** 193:5

**branches (1)**
254:1

**brand (1)** 235:21

**break (5)** 63:4
109:5 157:11
203:13 237:24

**Briard (4)** 4:14
10:24 46:2
316:12

**brief (14)** 2:15
28:11 33:21
42:4 52:19
55:19 60:22
102:10 149:2
194:15 269:22
280:19 284:23
360:24

**briefed (2)**
257:11,12

**briefings (3)**
220:5 225:23
238:5

**briefly (9)** 10:23
31:14 32:12
52:21 57:5
58:7 265:12
278:11 354:9

**briefs (2)** 13:13
32:6

**brightest (1)**
213:19

**bring (6)** 78:13
212:1 220:7
313:19 345:11
351:15

**brings (1)** 96:24

**broad (1)** 256:11

**broader (2)**
102:19 310:16

**broker (1)** 93:11

**brought (10)** 2:11
156:6 162:6

225:8 244:1
256:8 257:14
279:13 351:17
374:3

**C**

**Cable (2)** 337:3
368:3

**calculations (1)**
222:24

**call (38)** 3:6
15:6 23:4
47:2,3 59:10
60:3 72:19
79:24 131:4
142:7 158:22
159:12 160:11
163:14 165:14,
24 166:2
182:12,24
183:4 185:1
195:24 210:8
211:3,5 217:7
228:21 269:15
271:17 287:10
303:12 304:3
332:20 353:10
361:18,19
372:7

**called (26)** 6:13,
19 37:3 70:8
88:10 165:21
166:4,5
168:13 180:19
183:6 202:14
212:7 213:9
218:2 251:7
271:18 276:11
305:2 352:5
358:15 361:22
367:3,4,7
369:17

**calling (3)** 106:8
360:11 367:5

**calls (6)** 18:13
19:1 80:2
166:3 247:21
303:11

**calmed (1)** 305:3

**came (26)** 6:12
21:6 34:17

**Buchanan (2)**
48:11 317:17

**bucket (3)**
152:18 153:1,
3

**buckets (3)**
152:16,22
343:18

**build-up (1)** 56:4

**built (1)** 27:6

**bulk (1)** 93:14

**bulletin (10)**
10:10 83:12,
20,22 196:23
321:12,23
322:10,23
368:16

**bulletins (4)**
83:16,17
196:21 369:12

**bunch (1)** 224:13

**burden (8)** 98:6
270:1 308:17
315:3 352:21,
22 353:5,18

**buried (1)** 281:18

**business (28)** 3:3,
21 5:1,22,24
6:1 61:23
63:6,8,12,14,
16,21 160:11,
24 162:9,13
212:7,11,12
213:21 231:21
297:16,17,21
298:23 299:4
306:9

**businesses (7)**
27:7 158:12
231:16,17,22
232:15,15

**busy (3)** 248:5
249:1 337:19

**buying (1)** 161:2

41:17 73:21
74:21,24
81:13 86:18
121:23 124:6,
15 136:7
156:16 174:6
196:8 232:13
233:11 248:8
256:1 268:16
286:7 293:19
298:14 354:24
366:12

**camp (1)** 338:14

**campaigns (1)**
211:23

**Campbell (38)**
3:7 90:9 92:5
210:5,9,11,13,
17 211:3
231:8,11
232:19 238:6
239:6 243:11
245:21 261:19
262:3 263:22
269:4 280:18
287:1,20
315:21 320:21
334:24 338:4,
8,14 343:7,13
345:9 351:16
359:1,7
375:13,16,18

**Campbell's (2)**
97:12 347:14

**campus (2)**
211:18,19

**campuses (1)**
211:24

**Canada (153)**
2:12,18 4:21
5:21 6:23
9:19,22 11:6,
24 12:20
13:18 17:3,5,
6,15,16 18:1,
2,4,5 20:19
24:6,11,15,16,
19 26:19,19,

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.
Hearing
March 26, 2015

24 29:9 32:22
34:17 45:16,
20 51:5,6,10
61:6 62:14
76:19 81:21
88:12 89:17,
20 108:10
111:7 114:19,
21 119:3,5
122:6,18
123:7 124:7
143:17 147:8,
22 150:13
159:19 161:21,
22 164:12
165:1,2
168:20 169:19
171:14,18,21
175:11,13,17,
23 192:24
193:23 199:13,
17 200:16
202:2 209:13
212:23 213:1
217:9 219:3,6
226:2 231:19
232:14,17
233:19 234:18,
20 235:6,18
237:8 238:9
239:10,13
240:13,15
246:15 251:2,
3,4,16 253:15,
20 254:3
255:15 259:10
263:2 287:1,
21 290:1,17,
18,21 291:21,
21 293:11
298:2,3,12
307:13 309:18,
20 313:2,13
315:19 316:2,
7,9,11 320:6,
8 325:13,20
327:19 343:4
344:22 346:10,

23 347:24
349:21 355:21
357:4,22
358:20 359:24
363:24,24
366:2 375:9
**Canada's (1)**
199:12
**Canadian (182)**
5:18 8:12,13,
15 10:7 11:7
12:2 13:6,21
15:1,19,22
16:20 24:9,14,
14 34:2,12,14
35:7,16 44:3
45:16,18,19,
21 46:1,4
51:2,4,8,16
55:11 57:3
63:13 74:5,5
77:24 82:1,5,
17,18,20 84:7
85:7,8,9,10,
23 86:6 91:12
103:21 108:6
110:23 114:23
115:3,7,9,14,
19 118:6,11
119:11 122:11
123:10,17
124:9,15
125:3,6,8,15
132:16,23
134:11,16
135:7,8,9
139:20 140:10
141:8,11,12,
16 142:14
143:14 145:13
146:16 150:6,
7,11,12 152:3,
10 153:5
154:18,19
155:19,19
156:19 158:15,
17 182:2
188:8 190:12

196:19 198:24
199:22 219:7
222:13 224:6,
8 230:14
232:6,11
233:2,7
235:11 236:7
243:8 245:3,
17 253:14,19,
21,23 255:14
257:9 263:13
266:20 286:7
290:15 296:2,
4,22 297:8,23,
24 302:18
307:16 312:4
313:4 316:8
322:6 326:7,
15 333:18
340:23 341:6
342:18,19
343:15,16
344:21 345:1,
20 346:13
347:1,4,5,7,8,
19,21 348:5,9
349:19 350:11
354:18 355:18
358:11 362:22,
24 363:1,7,9
367:11 368:20
370:4,9,18
**Canadian-based (1)**
22:22
**Canadians (1)**
46:1
**cancer (1)** 9:15
**candidly (1)**
109:18
**cannot (2)** 348:7,
8
**capable (1)** 372:4
**capacities (2)**
173:15 260:5
**capacity (2)**
264:1 308:6
**card (1)** 104:1
**cards (1)** 103:21

**care (19)** 7:12
83:7 93:13
103:18 153:2
169:11 182:16,
23 184:4
195:22 197:22,
23 202:6
207:8 212:8
291:13 325:6
339:9 341:11
**cared (1)** 47:10
**career (9)** 6:6
64:7 171:13
212:6 214:20
232:9 233:1
249:20 250:16
**careers (1)** 2:20
**careful (3)** 53:6,
7,10
**carefully (1)** 294:3
**Carew (1)** 216:15
**Carolina (33)**
22:2 23:1,4
61:12 70:18
72:19 165:13,
15 166:1
213:2 217:5
287:8,10
289:5,6,9
303:4,12
332:2,4,11,17,
19,20 333:10
361:16,23
366:24 367:7
369:16,17,19,
20
**Carolina-controlled (2)**
303:10 332:7
**Carolina-directed (1)**
332:23
**carrier (1)** 158:12
**cars (1)** 7:20
**carved (1)** 162:12
**case (92)** 10:22
17:15 20:12
23:24 24:14,
14 26:11,23
27:13,14,15,

23 29:3,4
33:22 34:11
36:4 37:6,9
42:15,20
57:16 58:6
86:11,13,16
99:5 107:20
154:23 173:16
177:6 215:10
230:15 256:11
260:5 262:15
264:3 267:15,
24 269:11
270:2 272:11
286:24 287:4
290:13 293:12,
13 299:14,21,
22 300:8
304:16 307:7,
8 309:13
310:23 311:1,
2,3,12 314:21
315:1 320:17
329:20 330:3,
5 331:4,15,16
335:9,13
336:5,7,16,19
339:12,24
340:10 344:4
352:14 358:24
360:17,20,23
364:13,20
365:3,8,9
368:3 371:4,5
**cases (10)**
121:19
160:24 214:10
253:23 284:24
285:11 299:15,
17 304:15
368:1
**catch (1)** 31:7
**catches (1)**
373:23
**categories (5)**
129:10,13
135:1 348:19
349:7

**Min-U-Script®**
Wilcox & Fetzer Ltd.
www.wilfet.com       (302) 655-0477
**(386) Canada's - categories**

Case 09-10138-MFW   Doc 15396   Filed 03/30/15   Page 387 of 450

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
March 26, 2015

**category (3)**
128:1,5
266:23
**Cathy (2)** 4:17,17
**cause (5)** 14:6
78:10 244:19
329:15 336:9
**caused (5)** 43:3,
6 49:9 102:23
312:7
**causes (1)** 351:6
**CCAA (35)** 48:12
73:10 74:22
75:3 111:7,13
117:21,23
119:16 120:3,
10 136:21
137:1 215:22
220:21 222:17
236:8 237:9,
22 238:10
239:10,14,19
242:11 244:9,
15,17 250:8,
20 251:3,7,17
253:6 317:19
349:24
**CCC (6)** 57:1,7,
13,17 58:13
309:4
**CCCs (1)** 54:5
**CCC's (1)** 40:20
**cease (1)** 216:20
**cede (1)** 52:6
**center (1)** 303:12
**central (1)** 160:15
**Century (2)**
299:15 331:15
**certain (17)**
24:13 25:1
100:24 107:18
166:23 173:2
174:8 190:12
191:11 201:7
214:1,2
248:14 272:5,
6 349:20 361:9
**certainly (29)**

31:3 44:9
55:13 64:19
65:2,23 69:10
79:23 81:24
95:21 186:5
189:1,12
194:16 195:11
211:5 230:17
236:20 242:12
271:15 279:22
280:9 312:2
351:3,5 369:8
371:5,8 374:4
**certainty (1)**
233:21
**certificate (2)**
67:17 304:24
**certifying (1)** 20:1
**cetera (1)** 163:22
**chain (1)** 94:22
**challenging (1)**
95:16
**Chambers (3)**
373:12,17
374:16
**chance (2)** 187:1
255:3
**change (4)**
104:13 293:5
354:21 355:9
**changed (9)**
293:4 319:3
354:14 355:7
356:8,22,23
357:1 360:5
**Chapel (2)** 74:13
217:4
**Chapter (8)**
73:10 168:15
208:23 218:4
239:16 250:9
296:15 311:3
**charge (1)**
333:15
**chartered (2)**
159:18,19
**chatty (1)** 343:8
**check (4)** 174:20,

22 205:10
294:3
**checked (6)**
20:17 289:17
329:3 341:10
343:6 361:19
**checks (1)**
164:12
**Chemetron (5)**
42:19 43:2,5,
23 44:9
**chief (4)** 63:1,5
267:24 269:11
**choice (1)** 293:16
**choose (3)** 19:15
335:24 341:18
**chose (3)** 92:21
252:15 278:18
**chosen (2)**
277:17 339:17
**Chris (3)** 4:20
158:10 317:17
**Circuit (14)** 37:2
39:2 42:14,17
43:13,17 44:6
49:13 50:21
329:24 335:8
336:5 339:23
340:2
**circumstance (2)**
53:17 329:16
**circumstances (4)**
141:13 276:4
306:24 365:9
**citation (1)**
329:20
**citations (1)**
284:24
**cite (3)** 285:12
335:13 360:23
**cited (4)** 327:21
328:1 336:6,16
**citizens (1)**
297:23
**claim (235)**
15:19,23
16:9 21:13
22:13 24:13,

15 25:3,22
26:16,18
33:22 34:10,
14,15 35:16,
17,19 37:7
38:7 41:21
43:10,12 44:4,
4,8 46:4,8,13,
18 47:14 48:2,
7,22,24 49:4,
18,21 50:15,
19 51:10
68:15 70:2
75:15 87:11
88:4,6,17
89:11,18
90:12 118:4,6,
11,23 125:8,
10 130:6
133:10 134:9,
17,18 135:1,
10,11,15,17,
20 136:2,3,8,
18 137:19
139:9,14,16
140:2,18
141:6 142:1,
19,24 144:8,
19 145:21,24
146:7,9,17,19
150:12,13,15
151:17,22,23
154:14,18
167:20 169:24
171:2 173:1
181:3,5,12
182:14 189:16
195:20 196:10
197:3 199:1,9,
13,19,22,24,
24 200:15
201:16,24
202:1,15
207:4,8,18
208:6 219:10
225:16 229:19
233:15 234:19
243:4,16,20,

21 244:3,5,20,
23 246:1,2,6,
10,18,22
247:3,16
248:10,15,23
249:18 254:5
255:21 256:3
260:21,23
262:14 263:7
288:21 289:24
290:1,16
291:21 304:20,
20,20 305:8,8,
11,14,14,24
307:18 317:7,
12 318:5,6,10,
13,15,17,21,
22,24 319:14,
19,20,22
320:2,7 327:2,
5,9 331:7,14
333:6,6
334:13 335:19
336:1,10,18
337:1 339:20
341:7,20
342:23,24
343:3 346:16
347:4,7
348:18,20
349:2,4,8,10,
16,21 350:19
354:18 355:1
356:10 357:12,
13 358:1,3,5
359:16 362:9
363:8 365:12
368:5,8
**claimant (4)**
21:12 331:6
336:23 339:15
**claimants (9)**
37:12 58:2
96:1 200:22
201:10 304:21
307:8 331:17,
19
**claimants' (4)**

Case 09-10138-MFW   Doc 15396   Filed 03/30/15   Page 388 of 450

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
March 26, 2015

96:3 172:12
340:5 368:7
**claiming (2)** 43:4
46:11
**claims (230)**
12:21 13:5,7,
9 14:6,20,23
16:2 17:19
18:9 19:5,12
21:8,11 24:8,
10,17 27:20
28:2,3 29:8,9,
17,18 35:13
37:19 38:20,
21 39:21
40:16 41:1
43:24 45:18,
19,19,22,23
46:2 47:7
49:10 50:3,7,
9,18 51:5,6,
20 52:3 54:16
55:14 57:9,10,
13 58:4,14
69:2 74:3,4,6
80:24 81:21,
21 82:22
83:23 84:3,5,
6,12,16,23
85:4,6,22
87:10 89:16
92:16 94:21
100:7 104:17
108:14 118:19
127:17,23
128:7,17
129:4,5,8,19
139:24 141:22
147:24 150:4,
6 152:3,11
153:20 154:12,
12 156:21
169:11,13
176:4,22
177:14,16,20
178:5 180:9
181:17 182:12,
18 183:5,10,

22 184:2,16
188:7 189:19,
22 190:9
196:22 197:12
202:2,7
220:21 222:13,
21 224:7,10,
19 225:7
226:1 229:12
235:17 236:5
240:12,16
243:13 245:1
256:16,23
257:10,17,23
259:9 290:11,
15,17,19
292:4,18,20,
22,24,24
293:7,7
294:14 297:3
300:15 301:1,
17,20 302:24
304:18 312:24
319:17 320:22
321:12,15,17,
24 322:4,11,
18,21,23
323:17 325:3,
8,15,18
326:23 327:16,
17,19 328:10,
13,15 331:18
340:9 342:17,
18 343:14
344:22 346:15
347:2,2,20,24
348:4,5,6,9
349:24 350:6,
7,9 351:15
357:3,4,6,7
358:21,21,23,
23 359:19
360:11 363:3,
23 364:1
368:18,19,20
369:1,5 370:2,
3
**clarification (1)**

36:15
**clarifying (1)**
240:7
**clarity (2)** 183:12
184:3
**Classic (4)** 46:18,
19 91:5 340:1
**classification (1)**
68:9
**clause (9)** 126:3
133:16 143:3,
9,14,19,19,23,
24
**clauses (1)** 14:7
**clear (33)** 21:14
32:16 38:22
39:3 42:9
49:13 53:18
82:21 84:21
99:23 123:19,
24 135:8
171:4 202:10
203:24 204:15
237:12 286:16,
19,19 289:20,
22 290:4
296:24 301:14
335:7 339:1
352:22 362:18
364:14 367:24
370:10
**clearer (2)** 44:11
247:1
**clearly (16)**
25:18 40:15
54:9 81:9
94:10 125:1
244:7 246:7
266:18 271:19
277:22 278:2,
16 291:3,4
294:17
**Cleary (11)** 15:4,
7 18:6,16
94:17,19,20,
23,24 97:8
308:9
**Clearys (1)**

228:23
**clerk (1)** 4:6
**click (2)** 112:4,6
**client (3)** 41:19,
20 304:23
**clients (28)**
76:13 92:13
96:15 99:13
101:23 110:16
271:12 301:13
304:8 309:2,
13,19 310:9,
14 321:23
322:2,11,17,
23 326:2,11
339:5 340:12
357:11 358:1,
3,4 366:8
**clients' (5)** 99:8,
15 212:9
310:12 337:15
**cloak (1)** 58:5
**cloaking (1)** 58:4
**close (4)** 36:22
279:12 280:10
282:24
**closed (1)** 111:18
**closely (1)** 161:7
**closes (1)** 282:1
**closest (1)**
259:19
**closing (12)**
227:3 269:12
272:13 273:17
274:4,7
280:21,22
282:2 286:12
314:8 367:9
**closings (1)**
282:17
**code (3)** 61:17
214:3 367:18
**coincided (1)** 29:2
**colleague (5)**
151:20 156:7,
12 177:22
308:12
**colleagues (18)**

5:21,24 6:18
7:4,19 31:14
35:7 73:4
129:17 143:8,
10,10 144:21
147:10 218:19
312:11 313:19
371:18
**collect (4)** 93:11,
17 137:23
242:15
**collected (7)**
20:15 35:23
94:1 138:1,2,
5,10
**collecting (4)**
39:11 85:21
242:1 253:1
**collectively (4)**
173:16 260:6
366:19 374:23
**college (1)** 60:19
**combative (1)**
247:4
**combination (3)**
302:7 337:9
364:13
**combine (1)**
350:20
**come (34)** 3:9
4:21 5:7 21:2
33:19 36:22
47:13 51:9,22
54:3 59:13
64:11 66:17
83:6 89:5
92:4,6 107:24
114:3,14
158:13 166:24
169:4 170:2
182:7 210:11
214:11 217:1
223:24 344:19
353:3 355:15
366:5,13
**comes (6)** 36:2,4
40:11 54:8
315:16 361:3

Case 09-10138-MFW   Doc 15396   Filed 03/30/15   Page 389 of 450
Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.
Hearing
March 26, 2015

comfort (1)
283:22
coming (13)
11:10 52:8
70:10 74:11,
13 154:12
163:15 216:3
225:20 308:5
338:2 341:17
353:22
commence (2)
29:16 254:19
commenced (13)
48:12 117:22
120:11 237:8,
10 238:9,11
239:10,14,15
250:20 251:16
317:18
commensurate (2)
105:8 117:3
comment (2)
32:17 127:11
commentary (1)
237:4
commenting (1)
45:4
comments (2)
242:1,16
commerce (1)
159:17
commit (2)
338:21,24
committed (1)
126:1
Committee (20)
23:8 52:24
53:3 57:3
79:10,17
98:15 119:10,
13,17,19,22
120:1 123:15
143:12 261:17
278:24 293:14
310:15 354:11
common (6) 3:15
27:14 62:9
226:6 273:4

364:3
commonly (1)
344:5
communicated (3)
123:13 241:2
257:7
communicating (3)
102:19
236:17 242:6
communication (7)
15:5 18:10
156:11 179:2
197:15 236:19,
23
communications (9)
95:13 117:19
197:9,11,14
256:13 321:4,
10 323:4
communities (1)
44:24
community (1)
6:10
commuted (1)
148:5
companies (3)
155:20 232:3
328:18
company (42)
2:21 5:3
10:18 16:5,17
27:6,7 30:7,8
33:1 34:13
63:2 64:1
84:10 87:23
90:3 105:9,14,
21 106:3
107:21 133:4
145:2,9,13
213:16 232:18
233:14 237:14,
24 245:18
250:14,24
297:4,5,13
306:3 313:12
316:7 327:16
337:3 368:23
comparable (1)

35:6
compared (1)
250:2
compel (5) 41:13
98:16 309:8
310:1 352:20
compelled (2)
309:11,23
compelling (1)
42:16
compensate (1)
36:1
Compensation (2)
199:13,19
compiled (1)
120:11
complete (8) 10:4
62:2 93:19
98:21 151:8
265:22 267:14
299:20
completed (3)
158:5 165:7
223:8
completely (7)
57:9 94:9
190:5 311:24
312:17 342:22
343:12
complex (1) 371:4
complicated (2)
85:18,19
complication (1)
26:23
comply (2) 41:24
100:14
component (1)
9:12
comprehensive (1)
250:2
comprised (1)
19:16
computer (2)
60:8 212:8
computers (1)
211:12
concentrating (2)
298:11,12

concept (9)
58:22 155:1
169:3 224:14
244:18 246:13
250:6 300:3
359:18
concepts (1)
29:12
concern (9) 80:8
105:10 136:23
201:18 274:16
300:20 306:18
307:5,6
concerned (5)
81:17 166:19
180:20 356:11
364:8
concerns (9) 79:5
118:10 241:24
242:10,16
245:14 310:21
351:5,7
concise (1)
280:13
conclude (1)
264:7
concluded (1)
97:9
concludes (1)
264:9
conclusion (2)
54:3 140:2
conclusions (3)
98:2 266:7
282:14
conduct (3)
38:15 42:11
335:18
conducted (1)
138:19
conducting (2)
84:11 368:24
confer (1) 353:11
conference (2)
62:7 194:22
confidential (1)
198:12
confidentiality (1)

310:16
configuration (1)
161:11
confirm (6) 19:23
130:24 196:1
198:1 202:15
369:18
confirmed (3)
27:16 272:22
299:16
confirming (1)
273:9
confuse (1)
282:10
confused (6)
180:12 290:2
293:24 319:15
342:15 344:16
confusing (8)
246:20
292:13,13
302:9 344:15
352:15 362:20
363:19
confusion (7)
16:23 17:8
73:14 233:11
302:8 307:22
312:7
Congratulations (1)
31:24
connecting (1)
119:19
connection (6)
40:19 108:5
165:15 169:20
271:21 295:1
conscious (2)
335:20,21
consciousness (3)
244:21 246:7,
13
consequence (1)
128:22
consequences (2)
33:3 39:17
Consequently (1)
339:18

Case 09-10138-MFW   Doc 15396   Filed 03/30/15   Page 390 of 450
Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.
Hearing
March 26, 2015

**conserve (1)** 56:3
**consider (8)**
  39:23 40:8
  199:22 271:4
  314:22 328:5
  335:10 347:17
**consideration (6)**
  120:17
  146:21 292:12
  295:2 307:21
  371:9
**considerations (2)**
  42:13 146:15
**considered (9)**
  71:11 120:7
  142:15 229:9
  250:10 255:20
  280:20 361:5
  364:11
**considering (3)**
  259:13
  320:10 325:23
**consistent (8)**
  14:8 45:12,
  13 95:8 96:21
  101:16 245:5
  363:15
**consistently (1)**
  245:7
**consolidated (1)**
  209:15
**consolidation (4)**
  40:21 54:7
  160:20 328:21
**conspiracy (1)**
  57:8
**constituency (1)**
  237:7
**constituents (3)**
  249:2 251:5
  260:18
**constitute (2)**
  336:10,13
**constitutes (1)**
  55:12
**constructive (13)**
  23:17,23,24
  24:2,3,5,8

  26:1,5 44:14,
  15 330:19
  360:22
**construe (1)**
  51:19
**construed (2)**
  54:11 348:8
**consult (4)**
  135:21
  140:11 141:22
  181:22
**consulted (2)**
  180:11 181:24
**consulting (2)**
  96:8 158:3
**contact (10)** 74:7,
  9 103:18
  135:1 142:9
  189:23 190:8,
  13 217:9 327:9
**contacted (8)**
  14:17 19:11,
  21 92:12
  183:19 218:17
  243:17 358:5
**contained (2)**
  164:3 174:7
**contamination (1)**
  43:2
**contemplating (1)**
  371:16
**contents (1)**
  257:13
**context (8)** 27:23
  28:9 242:12
  295:10 311:1,
  2 314:23 360:4
**continue (2)**
  277:23 304:11
**continued (5)**
  18:15 89:1
  247:7 298:6,7
**continuing (1)**
  310:13
**contract (11)** 17:9,
  10 25:6,10,11
  46:12 51:19
  87:14,22,23

  88:3
**contractors (1)**
  221:18
**contracts (4)**
  19:13 164:3
  221:18 233:23
**contractual (5)**
  46:10,13,14
  87:19 327:7
**contrary (3)** 39:1
  284:20 368:6
**contrast (1)** 38:1
**contributed (4)**
  2:22 33:11
  34:4 72:17
**contributing (1)**
  103:22
**contribution (1)**
  70:13
**contributor (1)**
  113:23
**control (9)** 41:18
  42:5,5 101:22,
  24 102:22
  309:2,3 340:5
**controversial (1)**
  284:5
**conversation (9)**
  159:12
  179:16 194:9
  307:16 323:9,
  24 324:15,18
  326:20
**conversations (4)**
  90:19 91:5
  137:6 256:5
**conversely (1)**
  363:24
**conveys (1)** 369:9
**cooperate (2)**
  110:4,16
**copied (2)** 95:3
  209:1
**copies (4)** 67:16
  120:24 214:23
  324:2
**copy (7)** 19:17
  57:15 70:16

  72:23 116:21
  269:5 323:12
**core (1)** 113:20
**corner (1)** 184:10
**Corp (1)** 22:19
**corporate (3)**
  11:24 12:1,2
**Corporation (30)**
  19:14 30:8
  72:15,18
  106:4,23
  107:1,15
  115:7,10
  163:21 173:6,
  11 174:10,11
  204:20 205:1
  206:11 224:19
  254:23 258:2,
  10 259:4,24
  332:12 345:18
  363:4,5,6,7
**Corporation' (3)**
  106:24
  163:20 173:10
**corporations (6)**
  164:4 175:8
  258:12,12
  296:17 299:8
**correct (163)**
  17:22 38:10
  49:3 57:6
  71:20 95:4
  111:11,16,19,
  20,23 112:11,
  12 113:4,21
  114:1,2 115:4,
  10,23,24
  117:10,22
  120:4 121:15
  122:6,12
  123:3,7,12,18,
  20 124:1,10
  125:3,15
  126:16 127:1,
  2,5,6,14,18
  128:3,8,11
  129:4,11
  130:21 131:14,

  16,23 132:2,7,
  19,24 133:13,
  23 134:7,8,19,
  22 135:4,12,
  23 136:4,5,8,
  9,12,13
  137:24 139:10
  143:9,15
  144:4,9
  145:16 149:19
  170:7 171:14,
  18 172:2
  173:3,22
  174:12,16
  175:11 176:5,
  9 178:14
  179:4 180:1,5
  191:19 192:3
  193:13,16
  198:21 199:1
  202:22 206:11,
  16 207:19
  208:21 209:3
  219:10 225:8,
  9 231:14
  232:12 234:9,
  22 235:13,14
  236:18 240:13
  242:24 243:2,
  5,16 246:3,5
  247:9 248:10,
  19 249:6,12,
  15,19 250:22,
  23 251:19
  252:21 253:10,
  16 254:7
  255:14 256:14
  258:3 259:11
  260:7,24
  261:1,6 262:8,
  15,21,22
  263:3,4,4,10
  275:23 285:10
  301:16 318:12,
  18,19 342:20
  346:11 365:19
  368:13
**corrections (2)**

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
March 26, 2015

200:4 223:21

**correctly (4)**
183:20
223:20 249:10
260:15

**correspondence (3)**
94:16 273:8
352:10

**cost (4)** 30:16
254:12,12
309:13

**costly (1)** 259:18

**costs (1)** 56:3

**could (104)** 5:7
8:9 11:13,14
18:9 19:1,11,
14 20:2 22:12
28:22 40:6
43:19 44:11
50:10 61:18
62:8 63:7,20
69:7 74:7,9
75:10,18
76:16 81:3
90:4 92:8
97:18 98:7
99:5,24
102:22 104:4,
8 110:3
111:10 121:12
130:2 135:2
137:23 139:18
140:2 141:15
147:6 148:14
155:3,6 161:1,
16 162:14
174:20 189:18
190:14 194:14
197:7 198:14
223:20 225:7
227:9 228:3
230:8 233:24
234:11 238:23
241:11,16
248:3,7
251:24 252:12,
13,17 255:5
256:16 259:1

266:17 270:15
273:13 279:14
281:24 284:18
308:8 309:23
311:15,15
324:4,8,15
331:8,9 333:2
334:19 339:4
342:4,19
344:20 362:19
366:13,14
367:15 369:23
370:12 373:12

**couldn't (9)** 19:4
43:22 71:7
94:24 189:20
228:19 276:12
310:1 333:3

**counsel (122)**
8:11 9:10
14:18,19 15:1,
3 18:7 19:2,7
39:11 47:3
65:22 75:23
76:4 77:13
78:13 84:10
87:3 90:15
92:6 93:8
94:4 95:18
96:5,6,8,8
98:11,14 99:3
101:14 102:15
103:2,8 120:2
125:14 126:4,
9 130:7 133:2
135:11 140:12
141:3,14
142:12 146:3
167:3 168:23
169:3,5
172:13,24
189:7 217:22
218:16,17,21,
23 220:17
221:5,16
225:13,24
227:13 228:1,
3 229:5,23

242:19 245:15
249:8,15
253:10,11
284:10 293:10,
12,13,14,15,
19 295:7
296:7,8,10
297:12 298:9,
10 305:2,4
308:20,20
325:19 329:13
330:10 337:10,
11,18,19,24
338:19 339:12,
15,17,22
340:4,8,18
341:8,13,15
343:3 351:1
355:7 358:15
359:21 362:17
366:10,15,19
368:22 370:14

**counsel's (2)**
99:17 169:8

**counter (1)** 270:1

**counterarguments (1)**
345:24

**counterdesignate (3)**
274:20
275:11,13

**counterdesignation (1)**
274:22

**counterdesignations (1)**
275:6

**counters (1)**
275:6

**country (5)** 30:5
61:9 213:20
293:10 340:11

**counts (3)**
350:21,22,23

**couple (11)**
18:11 31:14
53:2,12 54:23
65:12 72:21
212:5 261:12
337:21 372:23

**course (12)** 33:4

53:5 57:1,15
155:16 170:19
171:12 232:9
268:18 363:1
365:17 370:19

**COURT (352)** 2:1,
8,14 3:12 5:4,
8,16 8:12,21
9:14 13:24
14:1,24 15:10,
12,18 17:2
20:5 21:9
23:13,16
26:24 30:19,
24 31:9,12,19,
22,22,24 32:7,
14 39:6,22
40:4,8,18,22
42:21 49:24
52:15,18
55:17,24
56:15,17,24
57:4 58:18
59:2,12,19,23
64:19,23 65:2,
5,14,17 66:2,
7,13,18 67:3,
4,19,23 68:6
69:10,16,18
74:5 76:19
77:5 78:11,17
82:13,17
84:14 88:21
91:15 95:2
96:9,18 98:1
99:9,20 100:4,
16 101:9,10,
21 102:8,11
106:10 107:9
108:17 109:1,
11,14,21
110:5,8,17
121:3 124:7,
16,18,20
125:9 128:15
131:6 132:7
146:13,20
148:21,24

149:9,13
151:9,18
155:8,12
156:23 157:3,
8,17,22 158:2,
8,20,24 159:5,
8 171:9
172:19 177:15,
18 179:13
184:16 185:14
186:3,10,20
189:5,9 190:4,
20 191:8
194:3,16,21,
23 195:2,7,9
198:8 200:19
201:2,17
208:11,23
209:18,21
210:3,7,10,16,
22 212:15
218:12,20
219:7,13,16,
21 221:7
222:14 226:17,
20,24 227:6
231:2 234:5
235:11,20
236:11 239:21
245:6 253:14
261:9,13
263:17,21,24
264:2,7,14
265:14,20,23
267:10,18
268:1,2,12,18,
21 269:2,7,13
270:4,14,17,
21,24 271:1,9
272:1,4,15
273:19,23
274:3,8,10,16
275:8,14,23
276:13,16,20
277:22 278:7,
12 279:14,16
280:4,16,21
281:1,6,12

Case 09-10138-MFW   Doc 15396   Filed 03/30/15   Page 392 of 450

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
March 26, 2015

282:4,16,18
283:1,11,18,
20 284:6,8,13
285:15,20
286:3,10
292:17,21
293:4 295:8,
11,12,12,18,
18,20,22
301:3 302:12,
17,21 307:6
308:3,13,24
311:10,11,16
314:4,10,15,
21 320:10
322:5 325:23
328:5,23
329:5,8 330:1
333:16,18
334:6,9 335:9,
14 339:11,13
340:7 342:19
343:22 344:24
346:8,12,18,
21 347:18
348:1,15,24
352:22 354:6,
17 356:15
357:24 358:7
361:7,11
362:13,24
363:1 365:14,
17,20 366:20
368:14 369:2,
14 370:1,16,
17,18,20,21
372:1,14,19
373:2,5,16,19
374:1,4,9,10,
21 375:1,7,15,
21
**court-appointed (18)**
10:4 12:9
14:14 16:19
18:17 24:20
79:14 169:5,8
182:3 233:16
242:20 307:23

308:4,10
337:18 339:11
363:10
**court-approved (1)**
337:24
**courtroom (15)**
2:7 5:20 31:6
39:8 46:3
52:11 53:19
58:24 158:19
210:6,21
287:23 293:17,
23 372:19
**Courts (11)**
35:24 37:2
52:1 253:24
312:3,4 326:7,
10 335:17
362:12 371:18
**Court's (6)**
269:19
277:24 282:3
326:4 340:15
374:24
**cover (1)** 202:2
**covered (2)**
89:16 264:18
**covering (2)**
315:12 336:2
**covers (1)** 260:16
**co-workers (1)**
107:24
**create (9)** 11:22
15:15 24:1
27:4 223:7
312:17,18
360:13 365:6
**created (29)** 4:1
7:16 10:6
11:21 12:6,13,
19 15:24
16:20 17:14,
18 19:10
24:21 27:3,9
29:8 53:23
69:19,19
147:14 306:8
311:20 313:17

325:15,18
345:17 358:19
359:4,9
**creates (1)**
307:12
**creating (4)** 9:24
17:12 247:15
311:24
**creative (2)**
34:19 139:2
**credit (4)** 103:21
104:1 183:16
230:18
**creditor (17)**
21:17,18
23:20 44:18
119:5 127:23,
23 251:7,12
303:14,19
305:12,13
334:14 341:17
345:1 350:2
**creditors (50)**
17:7,9,10
23:9,14,16
36:3,5 51:2,9,
15 53:5 55:14
84:7 129:12,
14 286:17,18
287:13 288:2,
3,12,13,16
289:15 292:1
303:17 305:18
312:8 321:16
330:14,14
331:2,20
335:2,23
344:22 349:20
360:21 362:2,
2 363:20,21
364:24 365:4,
11 367:24
368:5,20
369:15
**Creditors' (1)** 57:3
**creditors/unknown (1)**
367:23
**cried (1)** 7:21

**critical (3)** 9:12
249:2 298:12
**cross (2)** 277:7
278:19
**cross-border (5)**
26:23 85:19
154:15 209:9
307:8
**crossed (1)**
278:17
**CROSS-EXAMINATION (7)**
110:18
171:10 231:6
273:7 279:23
280:3 347:14
**cross-examinations (1)**
279:14
**cross-examine (2)**
271:7 277:11
**cross-examined (1)**
271:6
**cross-world (2)**
307:8 311:3
**crux (1)** 15:21
**crystal (5)** 39:3
49:13 135:8
289:19,22
**cubicle (2)** 34:24
35:1
**cure (1)** 290:7
**curious (1)** 187:9
**cut (4)** 164:11
174:20 244:13
252:8
**cutting (2)**
174:21 205:9
**CVAS (2)**
212:11 231:20

---

**D**

**Dallas (1)** 61:20
**date (176)** 10:7,
13,14 15:16
17:3,5,6,9,24,
24 18:22 19:5
21:8,10,21
22:5 25:23

26:11,13,17
27:15 29:19
33:17,23 37:2
38:2,3 42:23
43:15,21
44:13 45:7,8,
14,21 46:5,15
47:10 49:10,
16 51:1,11
55:15 75:1
78:12 82:20
86:4,7 89:12
118:12,20
125:11 126:7,
8,11,15,19,24
127:4,9,13,17,
21,24 128:2,6,
13,17,24
129:3,18
130:10,11,15,
21 131:22
137:12,14,24
140:9 141:2,
23 149:22
165:19 170:14
179:20 180:1,
4,22 181:6,14,
19 200:1
204:5 220:7
221:8 226:14
229:20 234:19
240:21,23,24
242:23 262:20,
24 263:5
266:9 288:21,
22 289:12
290:8,10,23
291:18,23
299:11,18
301:2,23
302:3 304:16,
19 305:23
316:3 319:19
320:18,19,20
321:5,6,7,11,
17 322:8,8,14
323:2,7,23
324:22,22

Case 09-10138-MFW    Doc 15396    Filed 03/30/15    Page 393 of 450

Bankruptcy Court for the District of Delaware                                    Hearing
In Re: Nortel Networks Inc., et al.                                         March 26, 2015

325:1,3
326:12 330:24
335:3,22,23
339:20 341:3,
8 342:15,16,
16 344:23
346:10 347:12
348:12 350:5,
10,12 354:23
355:4 357:14,
15,17,18
358:6,20
359:23 361:6
362:7,13,23,
23 366:12
**dated (3)** 156:20
216:13 368:17
**dates (7)** 9:22,
23 38:6
153:20 223:13
257:2 359:20
**David (2)** 219:17
338:7
**day (25)** 6:12
31:11 55:7
70:6,10 71:5
73:3 111:13
119:6 224:15
257:21 265:16
286:6,11
311:11 321:13
322:1,6,9,16
339:2 345:5
354:4 361:3
370:10
**days (8)** 21:10
73:13 79:24
80:4 82:19
243:11 272:22
320:18
**day-to-day (3)**
62:24 88:13
153:15
**deadline (6)**
68:15 128:17,
20 240:16,17
348:24
**deadlines (1)**

349:1
**deal (5)** 220:20
301:9 310:23
344:19 359:10
**dealing (4)** 13:15
38:5 215:1
247:18
**dealings (1)** 76:9
**dealt (1)** 9:19
**debt (1)** 164:8
**debtor (19)**
21:16 28:10
35:19 128:8
129:19 135:10
136:4,8
144:20 146:9
243:17 289:8
319:18 328:13
331:7,8 349:1,
9 357:9
**Debtors (103)**
15:1,2 22:5
24:10 28:11
29:20 34:14
35:11,13,18
36:2,17 37:15,
22 38:23
39:18 40:18
45:18,20,23
46:8,24 47:3
49:1,6 56:9,
12 58:12
68:13 96:1
101:16 118:4,
7,11,12,23
133:21,22
134:6,10,17
135:20 136:18
137:9,20
139:10,15
141:6 142:9
143:14 145:14,
19 146:8,18,
18 150:6,12
173:2 175:7
196:8,12
199:24 208:5,
19 243:14

256:3 272:11
278:22 279:6,
24 284:21
290:16 300:11,
12 302:24
303:3 304:18
309:10,18,22
312:22 314:19,
24 315:15
318:7,11
331:18 333:7,
7 342:18
347:5,8,9,24
348:5,20
349:1,24
350:7 354:2
368:4,6,9
**Debtors' (25)**
14:17,19,24
15:3 18:6
19:2 20:12
35:4 47:2
53:9 69:20
94:4 96:5,5
99:17 148:22
303:5 305:2,3
312:7 344:17
350:1,9
359:21 363:8
**December (9)**
19:8,21 92:1
93:18 176:24
181:1,7,16
182:9
**decency (1)**
214:11
**decide (8)** 19:22
63:4,6 91:22
168:4 302:1
354:1 372:1
**decided (7)** 64:1
75:7 92:5,18
215:13 237:24
341:10
**decides (2)**
146:13,20
**deciding (1)**
39:23

**decision (6)**
161:2 230:8
306:20 331:16
335:20 373:15
**decisions (2)**
27:18 236:9
**deck (1)** 314:14
**declared (4)**
54:24 174:2,
3 175:20
**dedicated (3)**
2:17 6:5
10:16
**Deevey (1)** 4:17
**defective (12)**
25:20 26:2
290:6,7 292:3
294:12,19,22
302:14 363:22
364:5,7
**deferred (1)** 219:6
**define (1)** 3:11
**defined (4)**
129:11
206:10 219:11
300:10
**definitely (4)**
12:13 81:6
183:14,18
**definition (7)**
19:13 105:22
106:3,4,22
173:6 204:20
**definitively (1)**
351:14
**degree (1)**
211:11
**Delaware (10)**
128:15 135:3,
11,21 168:15
189:23 190:8
208:23 327:12
349:14
**delay (28)** 18:15
27:10,11 37:9
39:20 94:23
95:18,23
96:11,14 98:7

99:15 102:20,
22 307:22
310:22 320:12,
13 325:10
326:17 327:14
335:11,14
340:2,4
360:15,16,18
**delayed (2)**
18:15 96:7
**delays (1)** 37:16
**deliberate (3)**
311:9 312:9
335:20
**delivered (2)**
163:11,12
**demand (1)**
352:12
**DENISE (1)** 59:16
**Dennis (1)**
367:14
**dent (1)** 50:19
**deny (1)** 56:15
**depend (1)**
297:12
**depended (3)**
296:1,3 298:9
**depending (1)**
232:17
**depends (1)**
109:8
**depose (2)** 309:6,
7
**deposed (6)**
314:24 315:8
316:19 317:2
324:20 325:5
**deposing (1)**
315:1
**deposition (55)**
10:15 13:12
47:17 48:20
98:17,24 99:1
177:6 178:2
204:18 206:5
243:23 259:16
260:8 264:11
268:9 269:17,

Case 09-10138-MFW    Doc 15396    Filed 03/30/15    Page 394 of 450

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.
Hearing
March 26, 2015

18 270:10,18,
22 271:7,13
272:20,23
273:15 274:17,
19 275:2,21
276:2,3,12
277:10 278:1,
4,18,23 279:3,
7 280:5,15
281:8 283:16
284:4 285:9
309:1 314:18
319:2 327:21
343:19 344:15
352:8 355:13
370:24

**depositions (17)**
20:18 39:10
53:20 99:4
238:18 269:24
274:23 275:7,
19 276:18
277:21 298:2
309:17,19
315:6 316:5
325:2

**describe (1)**
103:6

**described (5)**
87:24 129:14
194:12 213:15
236:6

**describing (2)**
181:8 333:19

**deserving (1)**
29:22

**design (4)**
160:16,22
161:7 222:12

**designate (4)**
268:16
271:18 277:17
278:7

**designated (8)**
264:11
271:13 272:6
277:3,21,22
278:5 355:14

**designates (1)**
274:18

**designation (4)**
271:3 272:2
283:22 370:24

**designations (25)**
268:9,14,23
269:4 270:18,
22 271:22,23
272:9,9,10,24
274:17 277:6
278:22,23
279:3 280:6,
15 281:8
283:16,23
284:15 285:2,
16

**designed (1)**
223:15

**designers (3)**
160:17
161:10,16

**desire (1)** 118:3

**destroyed (1)** 27:7

**destruction (2)**
27:5 32:18

**detail (1)** 153:14

**details (1)** 140:8

**determination (4)**
50:9 63:11
344:1,9

**determine (6)**
162:9 186:21
215:9 222:18
243:12 336:18

**determined (5)**
19:2 50:4
182:2 186:9
288:10

**determining (1)**
339:18

**detriment (1)**
162:21

**develop (1)**
150:20

**developer (1)**
61:17

**development (7)**

4:12 160:13,
14 161:3,12,
24 212:9

**developments (1)**
325:8

**devoted (3)** 2:19
4:2,16

**dial-in (2)** 62:7,
11

**dialogue (2)**
37:23 97:7

**Diane (2)** 4:2,2

**dictate (2)** 23:17
347:2

**dictates (1)** 23:16

**dictating (1)** 338:2

**Dietmar (2)**
226:11 357:10

**difference (7)**
29:13 81:20
162:24 164:9
174:18 275:19
276:6

**differences (3)**
16:23 29:12
344:11

**different (54)**
3:17 5:22 8:2,
7 11:18 13:19
16:6 17:13
22:23 40:16
48:14 61:23
76:8 82:3
101:24 123:11
132:6 148:18
152:6,16,22
154:2 158:15
160:1 193:7,
24 195:16
201:10 217:8
221:23 232:3,
4,14 251:3
266:23 287:24
296:13 298:3
307:10,11,11,
15,19 312:1,2,
3 317:21
337:8 338:1

342:7 343:18
349:1 359:9
362:11

**differentiate (1)**
61:22

**differentiated (2)**
153:16 204:9

**differentiating (1)**
203:22

**differently (8)** 8:3
33:6,14
279:15 284:18
313:7 337:8
362:5

**difficult (5)** 20:21
54:2 321:7
343:9 371:5

**diligence (2)** 99:7
350:22

**diligent (6)** 40:6
104:18 298:8
336:20 349:13
353:1

**dip (1)** 35:4

**direct (21)** 5:19
15:4 60:1
62:15 64:15
88:11 90:19
97:3 110:5
159:4 163:1
184:8 211:1
213:1,7 228:9
242:22 248:17
253:8 326:4
340:3

**directed (11)**
53:18 165:3,
5 190:12
217:6 258:9
287:7 327:19
332:14,15
369:18

**direction (2)**
62:24 88:15

**directions (1)**
297:2

**directly (12)** 3:15
6:8 7:2,3

86:18,20
95:24 96:12
99:14 134:10
213:6 352:16

**director (3)** 61:1,
3 212:10

**directors (7)**
107:4 160:21
173:14 260:3,
12,16 349:4

**disabilities (1)**
187:13

**disability (4)** 8:23
9:13 77:10
169:15

**disagree (2)**
347:12,15

**disagreed (3)**
16:11 17:21
359:15

**disaster (1)** 8:20

**disconnected (1)**
325:6

**discouraged (2)**
196:9 243:15

**discovered (6)**
13:3,8 14:2
29:6 226:7
360:9

**Discovery (11)**
20:15,16,17,
19 41:5,10
53:10 56:4
100:21 308:18
321:18

**discretion (1)**
277:24

**discuss (4)** 59:7
90:15 108:22
262:6

**discussed (9)**
18:24 33:13
56:13 57:13
62:9 76:3
90:21 217:19
252:19

**discussing (3)**
44:24 146:12

Case 09-10138-MFW    Doc 15396    Filed 03/30/15    Page 395 of 450
**Bankruptcy Court for the District of Delaware**                              **Hearing**
In Re: Nortel Networks Inc., et al.                                    **March 26, 2015**

189:16

**discussion (17)**
46:6 92:4
137:3 157:16
177:13,16
218:14 221:11
227:12 246:12
253:2 262:12
290:22 322:3
328:12 373:13
374:15

**discussions (22)**
54:19 84:11
90:10,13,14
91:18,20 92:2
97:7 126:23
179:24 225:23
229:22 242:18
257:9 262:11
323:17 328:19
352:2 356:7
368:24 374:11

**dismayed (1)**
217:16

**dismissals (1)**
215:1

**dismissed (1)**
214:19

**dispositive (1)**
40:3

**dispute (1)** 98:19

**disputing (1)**
118:5

**disregard (2)**
335:22,24

**dissuaded (1)**
48:23

**distance (2)**
286:8 372:6

**distill (2)** 113:8,
18

**distinct (1)**
319:10

**distinction (3)**
43:7 63:13
154:6

**distinctions (3)**
11:24 297:10

313:5

**distinguish (2)**
108:6 327:17

**distinguishes (1)**
34:23

**distinguishing (1)**
154:4

**distract (1)** 58:2

**distribute (2)**
112:20 161:9

**distribution (5)**
27:17 161:8
299:19,20
300:1

**distributions (1)**
365:5

**divergent (1)**
159:22

**divide (1)** 195:15

**divided (1)**
152:17

**dividing (1)** 162:7

**doable (1)**
373:11

**Docket (17)** 22:6
66:17,23
67:16 68:13
69:19,22
226:23 264:24,
24 265:6
288:6,7,11
295:20 357:9
358:10

**docketed (1)**
68:14

**dockets (2)** 67:1
69:20

**document (35)**
67:7 68:5,5
69:4,6,8
70:16 72:7
94:15 98:19,
20 99:24
101:12 106:9
121:13 130:22
131:12 149:18,
21 150:1,10
151:2 181:15,

19 182:19
185:24 194:7,
12 198:11
267:7 326:1
356:1 358:16
369:23 370:17

**documentation (5)**
16:3 19:24
20:20 82:16
144:24

**documented (1)**
108:4

**documents (30)**
12:12 23:5
40:13 41:14,
22 65:20 69:5
95:3,6 96:22
99:16 100:2,
24 101:2
121:7 130:12,
13 180:11,14,
20 310:7,8
314:21 315:7
324:6 352:13
361:23,24
366:6 370:13

**dollar (2)** 36:1
138:3

**dollars (9)** 3:2
114:23 244:12
297:8,9 313:4,
4 316:8 355:12

**Donald (2)**
219:16 338:7

**done (31)** 28:21
39:16 50:13
62:6 63:15
71:2 85:17,22
86:2 89:7
91:10 95:8
102:16 104:4,
8 108:13
145:7,7
247:11 267:23
268:3 279:14
281:3,5 295:6
302:6 310:11
312:4 337:15

372:12,23

**door (2)** 23:10
243:9

**double-check (1)**
87:4

**doubt (5)** 32:19
279:4 348:13,
17 349:6

**doubts (1)** 370:11

**down (17)** 4:21
20:24 34:20
68:18 70:12
116:23 157:5
158:13 263:22
286:7 302:4
304:10,11
309:20 332:6
362:15 368:10

**downloaded (1)**
151:2

**dozen (1)** 145:19

**dozens (2)** 73:4
143:22

**drafted (1)** 103:9

**Drain (1)** 371:19

**drawing (1)** 98:2

**draws (1)** 266:6

**driving (1)** 286:8

**dropping (1)**
38:19

**due (2)** 311:9
336:12

**dug (1)** 187:22

**duly (3)** 59:17
159:2 210:14

**Dumas (1)** 3:22

**during (24)** 29:7
40:5 54:4
61:6 72:14
95:10 100:8
103:5 108:23
122:1 159:12
160:6,10
176:3 208:3
212:3 242:21
260:8 280:22
316:5,7,16
325:2 347:13

**duties (5)**
235:15,19,24
236:3,6

**duty (3)** 10:5
353:20 368:4

**dwelt (1)** 206:20

**dying (1)** 245:13

**E**

**each (33)** 5:20
6:13 14:9
21:12 22:9
28:2 63:8
66:18,19,21,
24 69:21
104:5,7
145:21 146:7
156:19 161:13,
15 226:24
234:16 264:11,
20,23 282:23
287:4 296:17
300:15 307:1
309:14 315:24
344:10 364:20

**earlier (24)** 97:1,
13,19 129:14
132:1 144:2
156:13 158:11
162:23 173:5
174:9 175:9
177:3 190:18
191:17,23
202:18 203:14
204:6 242:21
254:20 333:23
336:17 372:23

**earliest (1)**
320:17

**early (15)** 73:13
79:24 80:4
82:19 93:22
97:18 123:14
171:20 175:9
189:17 209:4
211:24 220:14
223:12 300:9

Case 09-10138-MFW    Doc 15396    Filed 03/30/15    Page 396 of 450

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
March 26, 2015

earned (4) 11:3
    14:8 159:23
    299:7
easier (5) 65:1
    104:1 120:23
    258:16 278:7
easily (1) 99:5
easy (1) 157:13
eat (1) 157:11
educated (1)
    11:14
educational (3)
    60:6 159:15
    211:10
effect (8) 67:6
    87:20 124:3
    299:10,12
    300:8,18
    306:17
effects (1) 26:13
efficient (2)
    270:12 274:1
effort (2) 56:2
    359:11
efforts (4) 2:22
    72:14 291:3
    362:17
E-filing (1) 57:16
eight (10) 37:20,
    24 38:6,8
    40:1,5,9
    54:21 63:22
    351:21
eight-plus-month (1)
    98:1
either (13) 10:17
    40:17 43:19
    109:20 133:9
    136:20 181:19
    223:11 246:4,
    5 282:2
    291:24 364:9
elected (3)
    271:16 355:5,
    6
electing (1) 278:6
electrical (1)
    211:11

electronic (1)
    156:11
element (3)
    28:15 41:21
    364:11
Elena (12) 73:19
    74:17 82:14
    152:7 156:20
    216:6,14
    217:3 251:13
    333:9,9,13
eliminate (1)
    344:7
eliminated (1)
    305:11
else (24) 23:12
    29:23 32:22
    51:18 52:19
    81:22 117:14,
    16 148:21
    150:15 164:23
    170:16 209:19
    213:20 224:22
    227:22 266:18
    281:22 283:12
    304:6 319:23
    336:2 344:19
    355:22
else's (1) 201:6
email (17) 18:10
    81:8 94:16,18,
    22 111:22
    156:9 192:15,
    17,20 193:17
    272:22 279:2,
    2 281:17,18,19
emailed (1)
    103:10
emails (10) 15:6
    40:23 73:4
    75:4 96:5
    97:15 99:12,
    16 111:8
    247:21
embarrassing (1)
    195:4
EMEA (3) 35:19
    132:18 133:6

emphasis (2)
    104:21 312:16
emphasized (1)
    82:11
employ (2) 92:18,
    21
employed (26)
    10:22,23
    12:1 21:6
    25:5,7 35:14
    60:16 70:20
    71:10 107:6
    114:18 115:22
    160:3 164:24
    171:18 221:17
    232:11 233:2,
    6,9,14 286:21
    315:19 316:9,
    12
employee (52)
    4:16 9:6
    10:23 33:9
    34:2 35:11
    74:5 82:6,7,
    22 84:12,12
    115:4 118:10
    125:7 127:20,
    21 129:4,5,8
    134:16 139:7
    141:9,16,20
    150:11 153:5
    156:21 188:7
    219:20 229:12
    231:20 233:17
    235:9,16
    247:16 248:12
    252:6 257:10
    304:23 323:17
    333:14,20
    341:7 345:14
    348:9 349:9
    350:13 358:21
    368:16 369:1,1
employees (165)
    2:12,18 8:13,
    15 9:10 10:16
    14:9 16:20
    17:16 18:1

21:5,24 22:4
    27:3 32:20,21
    34:12 35:12
    36:4 44:1,3
    52:10 53:19
    55:3,11 61:4,
    8,11,11 63:13,
    14 69:3 75:10
    76:22 77:8,13,
    24 79:5,8,20
    80:18 82:1
    83:14 84:8,8
    85:8 86:6
    88:3 107:4
    108:6,7,7
    110:24 111:9
    113:4 119:11,
    16 120:3
    124:9,22
    128:3,7
    134:11 135:7,
    9 137:12,16
    138:6 139:20,
    24 140:10
    141:11,12,17
    142:14 144:6,
    16 146:16,18
    147:12 148:1
    152:11 156:15,
    19 162:10,11
    169:13 173:14
    178:14 190:12
    191:17,19
    212:22,24
    215:6,7
    217:21 218:5
    219:3,5 220:8,
    19 223:13
    226:1 229:14
    231:18,19
    233:19 234:17
    235:6,13,18
    236:7,17
    240:18,19,24
    242:7,11,15
    244:10 248:2
    250:3 251:24
    252:4,13

253:10,15
    258:13 260:3,
    12 266:20
    267:5 286:22
    287:11 291:12,
    13 295:15
    297:15 302:19,
    22,22 303:5
    315:19 316:2
    325:12 326:7
    329:17 333:5
    338:19 341:3
    345:12 346:6,
    13 349:22
    354:19 355:6
    357:8 358:12,
    13 359:24
    361:24 366:1
    368:21,21
employees' (6)
    13:10 169:11
    219:23 222:13
    345:20 371:3
employer (1)
    35:16
employment (37)
    9:18 14:10
    25:9,11 46:13
    51:17 72:14
    76:11 88:1
    104:21 105:22,
    24 106:9,17
    108:1 116:18
    123:11 147:7,
    22 160:7
    171:16 193:6,
    22 221:18
    232:23 233:23
    250:4 253:22
    255:16 266:10
    298:10 308:8
    327:8 338:13
    360:8
encompass (1)
    335:21
encourage (1)
    374:12

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.
Hearing
March 26, 2015

encouraged (1)
188:6
end (20) 19:20
21:19 31:3
41:3 52:8
54:24 55:7
56:23 93:21,
22 154:9
208:1 212:5
223:11 229:2
242:9 250:16
255:23 290:22
303:18
ends (2) 184:12
288:15
engage (1) 229:5
engaged (3) 57:7
229:23 254:13
engagement (1)
229:7
engineer (1)
213:14
engineering (2)
161:12 211:12
engineers (14)
3:2 6:11,12
7:24 8:1,2,5
158:16 211:24
224:13 235:22
306:5,6 336:22
engineers' (1)
294:2
enjoined (1)
168:22
enlarge (5) 17:3,
5 292:22
293:7 301:6
enormous (1)
20:19
enough (9)
26:12 92:9
214:19,20
309:18 324:17
344:4,6 362:8
ensure (3) 89:24
92:7 241:24
ensuring (2)
80:22 105:10

enter (2) 243:23
301:4
entered (6)
175:22,24
227:11 244:20
260:9 338:16
enterprise (2)
3:21 20:14
entertain (1) 40:4
entire (4) 2:19
27:13 38:2
281:19
entirely (6) 16:6
17:13 227:14
281:22 307:19
340:4
entities (31)
51:16 86:2
161:6 164:17
173:21 175:2,
24 202:3,21
203:18 205:12
206:15,23,24
207:2,16
231:14,24
232:6,7
237:10 238:11
239:15 240:4
243:5 249:19
251:22 259:10
260:22 286:7
328:16
entitled (11)
12:23 40:7,8
88:4 115:13,
18 144:19
150:17 306:7
360:21 362:4
entitlement (3)
133:5,9
356:10
entitlements (1)
222:19
entitles (2)
147:22 334:12
entity (34) 12:1,2,
2 35:13 47:20
48:14 62:2

69:4 72:18
105:14,17,19
114:19 115:3,
15,19,22
146:5 153:6
171:18 217:24
232:11 233:3,
7,10 313:1
316:9,11,15,
23 317:21
345:14 346:5
349:2
entries (2) 69:22
288:11
entry (1) 68:13
envelope (1)
163:13
envision (1) 56:5
Epiq (1) 342:14
equal (1) 297:10
equitable (3)
55:8 146:15
299:9
equity (2)
295:11 349:6
equivalent (1)
256:19
Ernie (3) 4:14,
14 10:24
Ernst (10)
139:22 142:7
167:7,10
168:1,6
169:22 170:10
183:4 196:17
errata (2) 130:23
319:3
error (4) 22:9
86:20,24
339:14
essentially (4)
38:17 273:6
343:13 352:5
establish (3)
41:20 84:11
201:13
established (3)
66:1 177:17

240:13
establishment (2)
177:14 322:4
estate (14) 53:24
132:17,17
225:8,16
256:24 299:12,
13 300:7,19
306:17 327:6
355:17,18
Estates (5)
132:18
195:15 227:24
290:12 327:20
Estate's (1)
132:23
et (1) 163:22
ethical (1) 41:23
ethically (2)
145:6,8
Europe (2)
232:16 259:21
euros (1) 313:4
evaluate (2)
12:21 312:20
evaluated (3)
16:5 28:2
29:8
eve (1) 346:2
even (67) 6:17
13:19 23:3
25:24 29:20
37:17 39:7
40:3 43:15
47:6 48:10
51:8 74:20
82:13,15,20
126:14 128:16
134:9 141:12
142:1 150:15
151:4,4,13
188:7 203:16
250:8,10,18
264:2 265:17
284:4 287:23
289:14,16
292:5 294:17
296:16 298:16

299:1 302:2,
12 313:6
317:15 318:21
329:21 331:22
332:1,24
334:23 339:12
341:24 342:3
343:22 344:7
345:18 348:10
349:9 352:15
366:18 367:21
371:7,18,19
374:6,7
evening (3) 76:2
314:11 375:8
event (2) 218:4
374:16
events (3) 5:17
220:10 320:14
Eventually (2)
170:4,5
ever (23) 2:24
16:6 46:9
49:8 72:19
77:18 110:11
137:7,18
139:6 141:19
143:17,18
165:14 167:6
197:1 221:21
254:14 279:19
300:23 312:1
329:7 361:5
every (32) 10:9
23:20 28:22
33:9 34:2
35:2,4,10,19,
24 45:2 51:19
62:10 104:9,
12 127:7
143:16 144:19
145:22 146:7
173:16 245:15
260:5 287:12
294:3 312:23
330:6,16
345:14 346:5
361:16 368:5

Case 09-10138-MFW    Doc 15396    Filed 03/30/15    Page 398 of 450
Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.
Hearing
March 26, 2015

**everybody (8)**
108:19
204:16 227:22
273:16 301:7
333:11 334:9
369:5
**everyone (20)** 2:2
18:14 19:21,
22 21:1,3
23:24 25:1
33:18 84:16
109:1 157:22
194:24 195:2
284:14 301:6
308:7 370:8
373:21 375:8
**Everything (24)**
8:20 11:13
28:21 34:20
89:3 90:4
108:14 134:2
152:7 155:3,5
160:20 216:20
291:9 293:24
294:4,9 299:5
306:11 310:4,
11 313:13
337:14 362:18
**everywhere (3)**
32:22 213:20
307:9
**evidence (51)**
31:2 36:19
44:11 54:2,18,
20 57:12,20,
21,22,22 58:8,
20 97:17
191:10 264:8,
10 266:7,11
267:2,3,4,9
269:15,18,23
273:22 279:13
280:10,23
282:5,14
292:9 308:22
315:6,9,13,15
316:5 319:12
325:22 326:16

328:17 332:17
340:17,24
351:2 354:16
355:14 356:6
366:3
**evidentiary (5)**
58:10 267:15,
19 273:24
281:4
**evolved (1)** 236:1
**exact (9)** 13:20
42:24 44:5
146:4,4 257:2
291:4 332:8
337:4
**exactly (11)**
11:20 43:6
66:5 67:17
74:23 156:9
162:1 167:15
174:17 232:2
291:15
**EXAMINATION (11)**
60:1 109:5,
19 149:4
159:4 208:16
211:1 242:22
248:17 253:8
277:1
**examined (4)**
59:17 159:2
210:14 275:3
**example (11)**
83:8 141:18
143:21 148:4,
18 237:23
266:17 276:8
318:7 334:21
367:13
**examples (1)**
324:9
**except (8)** 17:19
27:22 43:7
125:19 268:10
278:23 284:19
358:21
**exception (5)**
280:1 285:5

316:11 331:11
339:11
**exceptions (1)**
65:13
**exchange (5)**
98:12 260:17
271:23 273:2
375:12
**excluded (2)**
82:22 272:24
**excusable (45)**
26:3,8,11,14
28:15 36:23
39:24 41:16
42:18 44:7
46:19 49:14
50:22 292:6,
11,14 294:23
295:1 302:5
304:12 306:15
307:2 315:4
320:11 335:4,
6,15,21 336:3,
10,13 337:2,
17 339:20,22
340:18 342:5
343:24 352:17,
23 354:1
360:18 362:10
364:12,15
**Excuse (4)** 185:5
200:17,20
350:19
**excused (5)**
157:5,7
209:24 210:2
264:6
**Ex'd (1)** 214:23
**exempted (1)**
349:20
**exercise (1)**
224:21
**exhibit (67)**
64:15,16,20
66:15,16 67:2,
15,18 68:1
69:23 73:17
77:11,15,16

83:9 94:18
105:23 110:5
120:21 124:13
130:18,18,20
131:9,12
149:8,12
155:18 156:4
163:1,4 167:7,
8 172:12,15,
20 179:6,7,8
184:6 186:22
192:11 198:5
216:8,9,13
234:1 241:11
258:19 264:16
265:6,12
268:6 323:8
324:18 325:24
326:19 328:5
338:6,16
348:14 351:5
356:1,2
367:13 368:15,
15
**exhibits (11)**
18:11 19:18
65:7 264:13
267:22 269:19,
24 270:23
314:17 347:11
369:13
**exist (1)** 296:10
**existed (2)**
150:24 197:21
**existence (7)**
21:18 95:6
133:16 156:4
262:20 300:20
328:14
**exists (1)** 298:24
**exonerate (1)**
126:2
**expands (1)**
292:15
**expect (3)** 202:8
220:9 286:12
**expectation (1)**
132:22

**expectations (1)**
36:10
**expected (8)** 2:24
6:16 7:22
158:6 316:13
331:8,9 364:3
**expedite (1)**
371:21
**expeditiously (1)**
91:13
**expense (2)**
309:21 314:1
**expensive (2)**
254:9 259:17
**experience (4)**
117:4 229:12
273:4 338:12
**experienced (1)**
13:21
**experts (1)** 308:7
**explain (3)** 160:7
247:5 319:21
**explained (4)** 5:6
227:20 256:4
364:23
**explaining (1)**
19:16
**explore (3)** 254:8
256:8 368:8
**express (2)**
72:13 316:17
**expressing (1)**
73:5
**expressly (3)**
125:24 279:4
356:4
**extend (2)**
299:18 304:16
**extensively (1)**
79:1
**extent (17)** 40:4
69:2 146:13
185:8 201:5
264:17 265:18
266:19 271:6
277:3,24
279:20 280:7
291:7 306:14

Case 09-10138-MFW    Doc 15396    Filed 03/30/15    Page 399 of 450

Bankruptcy Court for the District of Delaware                    Hearing
In Re: Nortel Networks Inc., et al.                         March 26, 2015

331:1 359:17

**extraordinarily (1)**
294:10

**extraordinary (4)**
309:14,16
360:17,17

**extreme (3)**
308:19
309:21 362:17

**extremely (3)**
5:16 362:20,
20

**eyes (3)** 6:3
154:4 351:9

**eyesight (1)**
367:13

### F

**F3rd (4)** 42:19
335:8 336:6
340:1

**face (2)** 229:17
345:13

**faced (1)** 244:9

**faces (1)** 26:24

**facility (1)** 213:11

**facing (1)** 244:13

**fact (93)** 4:24
19:24 20:2
21:9 26:10
28:1 34:6
36:7,14 39:15
42:16 45:20
46:2 47:1,9
49:20 52:2
60:13 65:18
67:1,13,14
68:23 70:1
74:2,21 76:3
77:12 82:9
83:15 88:10
91:4 93:19
94:13,24
96:20 103:14
111:3 112:13,
17 114:8
117:19 118:2

121:22 123:5
126:18 132:9
133:2 134:14
138:13 139:22
142:13 178:23
182:17,19
194:11 201:9,
11 221:14
226:8 228:21
241:20 242:5
255:12 261:2
269:16,17
270:8 271:5
272:21 275:9
278:5,8
289:23 291:1,
7 293:6
298:24 329:23
330:18 332:5
334:11 338:4,
23 340:17
344:3,5
350:12 353:21
364:9,10
367:20 369:19

**factor (4)** 39:22
364:20,22,22

**factors (1)** 229:9

**facts (12)** 58:8
206:4 293:4
330:8 335:2
336:24 354:14
355:8,9
364:19 365:9
367:20

**factual (5)**
269:23 270:8
272:7 274:6
281:24

**failed (4)** 24:4
289:11 305:12
319:14

**failure (7)** 23:10
38:23 43:17
335:19 336:11
339:19 340:9

**fair (23)** 48:20
113:6 117:12,

18 127:7
142:3 144:5
146:6,16
148:14 175:3
178:21 192:19,
21 200:9
202:16 224:12
227:6 235:15
244:2 299:9
318:8 366:20

**fairly (5)** 109:5
237:15 247:17
305:17 372:3

**fairness (6)**
29:11 30:15
146:11 295:13
306:16 312:20

**faith (21)** 28:13,
13,13,15,16,
24 29:10
30:14 38:9,12
40:11 42:11
53:15 90:2
101:12 145:2,
3 311:6 328:4
350:23,24

**fall (5)** 14:13
15:8,10,14
229:1

**familiar (12)** 9:8
78:8,15 83:15
110:24 158:16
163:24 164:1
174:10 186:2
204:7 258:14

**FAQ (2)** 223:3
230:4

**far (25)** 4:4
27:17 42:16,
21 51:22
57:22 75:2
99:9 100:20
104:11 106:21
163:18 194:11
224:18 242:13
253:3 254:13
280:13,13
285:21 291:20

292:7 299:21
300:5 369:15

**farther (1)** 188:4

**fast (2)** 109:10
157:14

**faster (1)** 109:9

**fault (4)** 38:17,
18,24 339:15

**favorable (1)**
35:20

**Favorite (1)**
209:23

**fears (2)** 8:22,23

**February (8)**
19:21 20:6,8
74:24 182:1
231:1 261:6
321:2

**Fed (1)** 214:23

**federal (1)** 267:9

**fee (1)** 76:17

**feedback (1)**
242:1

**feel (1)** 364:1

**feeling (2)**
167:17 180:12

**feels (1)** 329:14

**fees (1)** 227:23

**fell (1)** 135:1

**felt (12)** 92:8
102:20,22
207:21 223:18
229:15 236:13
252:10,16
256:10 268:15
339:4

**few (20)** 32:11
55:18 56:21
71:3 76:7
102:7 117:7
125:12 172:4
185:18 262:3
270:21,23
272:22 284:24
292:3 325:10,
21 365:19
370:21

**fiduciary (1)** 53:4

**field (1)** 81:10

**fight (3)** 20:15
29:21,22

**fights (1)** 27:1

**figure (4)** 75:23
244:16 344:9
360:10

**figured (2)** 93:24
257:20

**figuring (1)**
247:11

**file (93)** 11:1
15:18,23 16:2
17:19 19:4,5
21:8 24:10,14,
18 26:16
38:24 43:11
45:16 46:15
47:8,15 49:9,
20 50:6 51:3,
4 56:7 73:11
87:10 89:10,
11,18 118:3
125:8 128:17
133:10 134:18
136:3 140:2
142:24 150:13,
14 167:19
168:11,12
169:24 171:1
188:7,22
207:3,17
208:6 243:4
244:3 245:24
257:23 260:23
262:14 263:7
288:21 290:16,
20 291:21
292:20,22,23,
24 293:7
294:14 301:18
305:9 319:14
320:3,3,5
327:2 335:19
336:12 339:19
342:8 344:10
346:20 347:23
348:5,6,9,18

Case 09-10138-MFW    Doc 15396    Filed 03/30/15    Page 400 of 450
Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.
Hearing
March 26, 2015

349:8,10,16,
21 355:20
357:12 359:16
365:12 368:8

**filed (84)** 7:18
13:5 18:4
20:7 28:3
29:19 37:1,7,
20 40:12 43:1,
10 45:20,23
46:1,4 50:15
51:10 53:8,12
55:1,14 56:7,
8 93:20 94:2
103:3 107:20
111:7 119:3,4
136:21 139:20,
24 142:24
150:7 175:10,
13,14,16
176:16,19
178:17 192:5
203:4,7,15
207:3 215:24
226:2 231:2
243:7,13
246:6 257:18
261:3,5 292:4,
18 293:8
299:23 304:19
314:2 318:21
319:1,4,17,22,
24 321:2
333:17 338:4
342:19,23
348:19 349:24
350:8 357:3,7,
13,24 358:2
359:1 363:8

**files (2)** 310:8
332:2

**filing (42)** 5:17
23:3 26:18
30:1 41:3
48:23 57:9
73:10 74:22
85:21 95:19
111:13 117:24

136:2 137:1
138:8 144:12
147:11 154:18
166:8,11,14,
16 168:14,14
175:21 196:10,
17,18 208:22
209:6,13
222:17 225:24
234:18 243:15
316:3 327:9,
12 345:4
351:22 358:5

**filings (1)** 311:15

**fill (2)** 103:13
165:7

**final (2)** 278:10
328:3

**finalized (4)**
84:15 369:4
370:7,10

**finally (6)** 20:22
35:9 48:19
58:7 333:22
354:24

**finance (2)** 4:15
313:7

**find (39)** 23:13
25:24 26:6,8
39:20 44:4
45:1 51:1
66:10 76:4
86:15,21
110:10 119:14
120:2 129:22
130:1,2
165:22 184:6
188:5 213:23
215:3,24
228:18 230:6
251:24 252:12,
14,15 289:9
324:5 330:20
332:10 364:15
366:3,16
367:9,11

**finding (3)**
129:21

307:17 337:1

**finds (3)** 44:22
51:6 344:21

**fine (9)** 65:14
68:3 121:4
204:17 282:11
283:7 285:13,
19 353:4

**finish (3)** 157:9
185:22 304:7

**finished (1)** 283:2

**finite (1)** 35:23

**fire (1)** 287:21

**fired (1)** 214:4

**firm (44)** 9:6
10:2,3 19:9,9,
14 42:5 76:11
92:12,15,19,
21 93:17
99:17 103:18
110:3 114:5
116:14 117:21
119:14 124:8,
20 137:6
140:6 182:4
183:7 229:6,8,
10 249:9,11
252:20 253:19,
21 255:14,16,
17 295:16,16,
17 308:16
326:9 328:8
338:9

**firms (6)** 76:8,23
120:6 152:6
338:12 342:10

**first (73)** 2:13
3:14 19:6
31:17,22
33:16 37:16,
18 47:23 53:8
59:3,10,17
65:16,20
66:15 67:15
68:1,19 69:9
85:3 98:11,14
104:22 105:1
111:24 120:9

136:19,22
149:6 158:2
159:2 161:19
179:16 184:15
186:21 194:20
199:10 200:3
210:14 211:14
215:14 216:2
218:4,23
225:13 227:18
255:20 256:1
257:3,6 271:2
274:7,14
282:2 285:23
286:1,15
293:2 303:13
307:7 315:13
317:4 335:8
340:14,23
351:19,22
352:8 356:21
362:21 367:1
370:22

**fit (3)** 267:8
330:2 342:6

**five (7)** 60:23,
24 160:6
212:3 282:21
320:18 373:11

**five-hour (1)**
273:21

**Five-minute (1)**
194:23

**fixed (2)** 245:14
348:24

**Flaherty (2)**
226:11 357:10

**flew (1)** 287:2

**flier (1)** 286:9

**floodgate (1)**
303:16

**floodgates (12)**
29:15,24
30:2,2 300:21
301:19 302:16
303:21 305:5
306:18,21,22

**fly (2)** 287:21

309:20

**flying (3)** 214:8
221:3 286:8

**focus (10)** 9:16,
16 113:19
118:16 137:2
182:9 184:23
320:11 321:3
339:21

**focused (5)** 9:11
34:9 105:2
247:11 351:11

**focuses (1)** 34:8

**focusing (3)**
38:19,20
285:5

**folks (3)** 217:18
218:14 248:7

**follow (23)** 11:6,
8 74:6 82:6,7
83:3,6 85:11
86:14,21
87:10 125:6
141:10 152:3,
10,10 154:8,9,
14 166:24
245:20 297:24
306:14

**followed (7)**
11:15 13:2
28:22 82:17
83:2 135:7
298:5

**following (13)**
28:23 82:9
89:17,19
104:19 185:4,
24 237:19
297:2 325:7
327:2 331:15
339:23

**follows (4)** 59:18
83:2 159:3
210:15

**follow-up (1)**
157:1

**foolishly (1)** 20:13

**foreign (6)**

Case 09-10138-MFW    Doc 15396    Filed 03/30/15    Page 401 of 450

Bankruptcy Court for the District of Delaware                    Hearing
In Re: Nortel Networks Inc., et al.                          March 26, 2015

168:16,16
182:20,21
209:10,11
**forever (1)** 26:17
**Forget (1)** 343:4
**form (14)** 21:13
103:14 107:8
119:17 134:10
269:16,18
272:2 282:9
294:18,18
318:15 347:15
369:18
**formally (1)** 76:20
**formation (1)**
217:23
**formed (2)** 79:11
119:13
**former (34)** 2:11,
17 9:20 16:20
27:2 44:3
77:8,13,24
81:24 83:13
84:8,12
107:24 219:3
222:12 234:17
235:18 240:18
253:15 286:6
291:12,13
295:14 302:18,
22 315:18
316:1 326:6
354:18 368:16,
21 369:1 371:3
**forming (1)** 249:3
**forms (5)** 165:7
170:5,8,11,15
**formulas (2)**
223:18,19
**forth (2)** 56:11
101:13
**forthcoming (1)**
74:3
**forward (18)**
12:14 51:22
52:8 57:14,21,
23 58:11,14
59:13 77:4

91:19,21
210:11 218:17
229:4 244:1
255:3 262:17
**forwarded (2)**
57:17 121:20
**foul (2)** 35:22
50:21
**found (16)** 7:18
39:21 44:6
52:1 166:13,
21 209:1
215:11,23
216:2 222:6
226:3,5
257:22 287:14
335:14
**foundation (6)**
65:24 185:15
186:2,13
189:2 201:12
**founded (3)**
112:9 113:7
119:7
**founder (1)** 111:3
**founders (2)**
119:21 120:1
**four (5)** 13:4
34:16 42:23
257:11 311:20
**four-letter (1)**
212:14
**fours (1)** 42:15
**frankly (11)**
13:18 91:7
153:19 273:13
274:3 276:10
330:15 334:8
345:8 346:5
366:18
**free (3)** 339:6
350:14 351:10
**French (2)**
367:16,17
**frequent (1)** 286:9
**frequently (4)**
223:4 230:5
299:14,17

**fresh (2)** 6:3
211:17
**friend (1)** 180:18
**friendly (1)** 343:8
**friends (3)** 73:5
166:9 375:9
**front (5)** 121:1
179:9 230:3
264:16 374:9
**frustrating (1)** 8:6
**fulfilled (1)** 115:6
**full (11)** 93:19
98:4,7 101:1
155:3 182:23
199:18 271:15
272:8 348:23
365:21
**fullness (4)**
215:12
235:23 237:20
238:14
**full-time (1)** 248:6
**fully (3)** 9:8
29:18 327:19
**function (1)** 326:9
**fund (1)** 252:10
**fundamentally (2)**
41:18 147:16
**further (27)** 14:3
25:4 29:20
50:10 72:3
75:22 87:13
88:24 89:6
91:23 94:22
96:7 148:19
155:7,10
170:16 171:6
201:19 208:10
209:17,20
261:8 263:19
291:24 328:17
349:18 374:15
**future (3)** 240:20
241:1 313:19
**futures (1)** 313:20

**G**

**gain (1)** 40:17
**gained (1)**
312:10
**Gamble (1)**
164:20
**game (2)** 104:6
362:11
**gather (1)** 80:6
**gathered (2)**
93:23 355:4
**gave (33)** 14:6
22:5,11 43:20
46:18 47:18
48:1,7 53:5
69:20 70:12
74:8 78:17
88:15 116:20
117:6 125:21
136:17 137:8
214:22 238:5
260:17 287:4
293:11 298:15
299:7 313:15,
16,18 316:21
317:7,12
322:19
**gee (1)** 170:20
**general (7)**
70:11 127:23
212:7 237:6
240:17 257:13
362:23
**generally (8)**
176:4 191:7
235:17 236:5
237:19 257:8
318:3 330:19
**generate (1)**
112:7
**gentleman (2)**
158:10 213:9
**geographical (1)**
231:18
**get (92)** 19:5
34:13 35:3
37:22 41:10
43:18 44:21
75:18 76:20

79:6 84:1
87:3,24 90:4
94:24 101:7
109:4 110:4
125:12 130:6
132:22 133:11
141:3,14
144:13 146:9
148:9 152:2
154:9 155:22
159:9 165:22
166:24 188:6
194:4 210:6
215:8 218:18
223:14,20
228:4 230:7,
13 243:8
245:13 248:3
251:4 252:2,5,
11,17 253:5
254:6 255:5
263:24 274:14
288:18 292:7,
10 294:23
301:5,6
311:12,14,21
323:19 324:8
329:10 331:22
340:23 341:11,
15 343:9
344:1 346:24
353:10,17,21
356:17,18
358:15 360:19
362:3,6,6,14,
15 363:13
366:10,18
370:22 374:13
**gets (4)** 55:1
82:23 295:17
332:9
**getting (11)**
45:11 102:13
217:20 221:13
223:5 233:13
247:20,21
250:8 261:14
347:7

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.
Hearing
March 26, 2015

**giant (2)** 29:24
311:24
**give (36)** 15:7
21:19 23:10
41:22 42:7
43:22 60:22
73:24 83:13
87:9 89:10
97:20 117:10
123:16 129:20
131:2 135:22
148:3 206:3
226:6 228:6
238:23 254:22
268:24 273:5
281:9 294:16
314:8 330:18
336:24 348:16
350:13 354:4
361:14 367:12
371:11
**given (33)** 23:1
32:10 50:13
70:1 89:11
92:9 104:8
121:14 132:16,
17,18 163:9
214:15 245:6
250:12 257:13
260:14 268:5,
8 285:7,10
288:18,20
289:15 305:19,
19 329:24
330:1 333:3
344:10 353:17
358:10 365:11
**gives (4)** 46:13
147:2 150:5
302:9
**giving (9)** 41:7
107:14,21
177:5 178:1
214:8 273:23
313:21 323:20
**glad (1)** 309:7
**global (50)** 4:18
6:1 10:18

11:10 16:17,
18 24:17 30:7
33:10 34:4,13
36:10 45:15
51:5 54:6,8
71:13 72:4,5,
18 85:5
105:21 107:15
133:3,4
144:15 152:18
160:15,23
164:2,15
286:23 287:11
297:13 313:1,
8,9,11,11,14,
14,15,22
327:15,16
328:17 335:16
336:11 356:6
363:5
**globally (10)**
13:15 71:12
72:17 115:5
160:17 161:5
207:6,22
213:16 313:16
**Globe (1)** 322:15
**go (69)** 19:1
35:18 44:3
60:10 64:7
68:6 90:11
97:10 105:23
109:9 112:3
113:15,16
131:18 140:12
141:4,14
151:1 154:8
159:13 162:10
170:21,22
174:4 183:8,
24 188:4
192:6 210:6
215:15 216:8
217:22 221:21
225:15 227:24
249:2 250:15
251:20 252:2,
10 259:21

260:19 262:4
274:13 278:12
283:21 291:19,
24 292:5,10
300:23 303:13,
19 304:10,12
306:21 332:3,
18,24 333:4,5
341:14 352:16
364:9,10
365:22 366:7
367:1 372:8
**goal (2)** 41:2
154:9
**God (1)** 11:20
**goes (4)** 36:1
265:16 285:23
334:9
**going (152)** 7:7,
11 8:19 9:23
16:22 18:20,
20 22:13
24:22 29:3,4,
23 31:15
37:22 44:20
45:5,7 50:19
58:23 62:19
64:12 75:7,12
76:6 82:23
84:23 85:10,
17,22 88:20
90:18 91:1,19,
21 93:8 94:7
96:16 97:10,
23 102:3
105:14,17
106:7 107:7
109:12 123:6
124:18 125:8
126:15 130:22
141:9 145:15
150:19 152:16
153:2 156:14,
22 164:7,10,
13,14 166:19
168:4 169:5
176:5,15
177:11 185:6,

18 186:19
187:11 194:11
195:3,14
211:23 213:23
214:4,21
216:7,10,20
220:8 224:7,
10,20 228:15,
17 229:16
230:12,21
237:17,19,21
238:2 239:6
240:20 247:13,
24 252:2,12
255:2 267:12
270:20 271:20
278:1 280:12,
13,18 281:9,
13,22 284:21
286:1 293:21
300:6,23
301:5,6,19
305:16,17,21
306:1 307:3,
23 312:12,22
314:5,8,13
320:11 325:18
333:12 334:7
342:14 344:19
345:11 350:13,
16 352:6
353:14,15,18
356:21 357:20
358:18 361:8
365:3,6
371:15,22
372:7
**gold (1)** 298:18
**gone (10)**
175:12
180:10 183:14
188:10 251:11
256:5 300:5,
24 306:22
311:4
**Good (43)** 2:1,3,
3,5 28:13
29:10 52:22

55:20,24
56:19,20 64:7
90:2 101:11
110:20 121:11
145:2,3 157:8
158:1 171:7,8,
9 197:4
210:22 231:8,
9 261:14,15,
19,22 282:20
312:20 314:10,
11,11,12
316:4 328:4
344:4 350:22
375:4,8
**good-faith (1)** 20:4
**Goodmans (1)**
328:7
**got (66)** 7:5
14:15,21
17:20 18:16
34:18,23 43:4
76:2 81:13
86:17,20
87:16 100:8
101:7 104:22
105:1 120:23
136:14 138:21
148:8,8,16,17,
17 156:1
163:13 169:17
170:11,15
184:7 202:15
204:2 213:24
216:5,12
220:3 231:2
251:12 273:8
279:9 283:16
296:18 297:6
300:21 304:23
311:11 313:3
320:2 330:16
338:20 341:9
342:10,22,23
343:17,20
344:8 345:2,
21 347:3
351:4 357:14,

Case 09-10138-MFW    Doc 15396    Filed 03/30/15    Page 403 of 450

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
March 26, 2015

14 359:14
367:16

**gotten (6)** 42:8
98:7 99:9
318:15 366:14
367:14

**Gottlieb (10)** 15:4,
7 18:6 94:17,
19,20,23,24
97:8 308:9

**governing (1)**
347:9

**government (7)**
75:17 293:10
296:2,4,11,11
338:2

**government-appointed (2)**
293:15 295:7

**government-approved (1)**
293:18

**government-blessed (1)**
338:21

**government-mandated (2)**
337:19 340:7

**grace (1)** 287:21

**grade (1)** 158:12

**graduated (1)**
60:19

**grant (1)** 280:9

**granted (2)**
146:7 322:20

**grateful (1)**
112:19

**great (13)** 27:8
28:11 53:21
54:18,19
98:10 213:16
301:9 312:23
313:20,20
359:10 372:6

**greater (5)**
254:14
298:16,17
312:19,20

**greatly (1)** 98:11

**Gross (4)** 50:6
125:19 210:19
338:24

**group (87)** 2:17
8:13 9:1,6,19
18:22 20:3,12
29:22 30:3
45:2 46:3
53:21 55:22
56:2 63:15,21
75:8 76:1
77:3 79:12
80:13 91:24
93:7 102:19
110:23 111:1,
4 112:10,15
113:7 119:7,
20 120:12
121:14 123:20
124:1 126:24
127:4 128:11
144:2,7,22
161:4 162:6
167:2,3
178:13,16,19
191:17,21
193:22 218:2,
9 222:11
230:1,2
233:18 235:5
236:11 241:4,
6,20,23 242:5,
14 244:10
245:8 251:24
252:13 293:14
300:10 301:21
308:1 309:5
310:14,17,17,
20 319:11
321:14,19
323:10 324:13
345:3 365:10

**groups (9)** 3:23
6:7 61:2,10
63:6,12,16
64:4 221:12

**Group's (2)**
132:13 241:24

**grown (2)** 7:14
112:10

**guarantee (2)**

19:17 51:19

**guard (1)** 373:24

**guess (13)** 67:4
85:15 95:11
111:5 134:1
135:14 164:9
167:17 171:4
175:18 209:16
265:11 350:15

**guidance (4)**
73:24 223:16
329:24 330:1

**guidelines (1)**
282:23

**guinea (1)**
222:23

**Gump (4)** 52:23
261:17 308:10
354:11

**guy (1)** 305:7

---

## H

**habit (1)** 305:4

**Hadley (1)** 55:21

**half (18)** 5:14
33:20,21,23
37:1,9 40:2,7
207:24 250:7
257:3 283:4,6,
9,11 335:12
341:17 351:19

**half-year (1)**
208:4

**halt (1)** 92:4

**hand (7)** 79:19
120:24 130:22
268:19 269:5
309:10 337:16

**handed (1)** 281:9

**handle (1)**
222:20

**handled (6)**
214:9 224:7,
10,20 245:2,3

**handling (1)**
307:24

**hands (1)** 92:11

**handwritten (1)**
121:24

**happen (10)** 8:19
27:20 37:17
96:6 166:19
227:9 274:12
301:14,15
311:20

**happened (21)**
3:18 7:17
8:18 14:12
32:20 73:6
91:5 100:8
111:6 164:18
165:22 215:23
230:15 243:10
291:6 305:6
333:10 355:22
359:1,2 372:22

**happening (10)**
24:20 44:22
45:3 73:15
95:10 96:13
176:23 178:6
295:10 360:8

**happy (8)** 31:23
32:10 183:17
197:6 250:11
282:12 284:2,6

**hard (10)** 23:21
24:1 28:21
205:17 254:18
271:24 291:2
306:14 307:15
313:24

**hardship (1)**
248:1

**harm (1)** 50:17

**harm-no (2)**
35:22 50:21

**Hashanah (1)**
31:7

**hate (1)** 368:12

**He (52)** 4:21,22,
23,23,24
10:23 11:1,2,
3 46:4,4
62:16 71:6,7,

7,8,24 88:10,
17 134:20
158:11,13
161:1,1,2
213:10 214:13
287:1,20
304:23 305:1,
1,11,12,13
313:12 315:23
316:24 317:23
318:2 327:1
331:13 343:8,
13 345:10,10
351:18,18
352:1,2 359:3
367:16

**headed (1)**
328:10

**headquartered (1)**
232:16

**heads (1)** 308:6

**health (2)**
247:18,20

**hear (23)** 3:10
6:21 8:16,21
10:14,17
13:12 18:2
21:15,23
30:11 31:2
59:1 175:20
204:12 280:5
293:21 305:21
306:2,10
329:19 330:5
369:16

**heard (70)** 3:17
33:3 34:3
37:13 44:13
46:23 53:1
54:3 55:10,19
78:6 110:21
112:17 126:9,
11 130:9
139:23 141:1
142:12,16
151:20 156:7
166:9,12
190:24 191:2

Case 09-10138-MFW    Doc 15396    Filed 03/30/15    Page 404 of 450
Bankruptcy Court for the District of Delaware                              Hearing
In Re: Nortel Networks Inc., et al.                                  March 26, 2015

218:2 220:24
227:19 284:17
286:13,15
287:19 293:17
296:18 297:19
308:7,19
311:7 312:1
313:6 315:21
316:16 320:21
329:12 330:2,
8,22 331:12
333:8 334:3
335:12 337:6,
7 338:10
340:16,20
341:4,23
342:6 343:10
351:15 361:14,
18 363:11
365:24 366:22
367:6 371:12
372:4

**hearing (9)**
31:15 52:7
56:5 124:7,16,
18 197:4
353:6 373:20

**hearings (1)**
372:24

**hears (1)** 9:14

**hearsay (9)**
88:20 91:6
94:8 98:5
100:18,19
101:5 226:16,
19

**heart (2)** 63:24
312:6

**heavily (4)** 37:4,
11 39:5 252:7

**heck (1)** 303:16

**Hefta (1)** 339:24

**height (1)** 75:20

**held (3)** 218:1
339:16 354:2

**Hello (1)** 261:20

**help (29)** 63:4
75:11,12,16

80:6 113:8,19
120:1,2
129:20,24
130:2 135:3,
22 154:5
162:15 178:7
217:23 218:5
223:5 228:13
248:7 254:8
291:9 327:9,
12 346:8
353:12,24

**helped (5)** 80:6
138:13 218:4
222:12 223:3

**helpful (2)**
186:21 371:8

**helping (2)** 31:15
79:14

**helps (2)** 113:18
270:1

**her (76)** 4:3,3,6,
8 31:22 34:7,
8 36:11 38:17
42:4 48:20,20
50:1 67:9,11,
21 68:2,4,5
90:19,21,24
91:6 94:8,14,
15 95:9,15,16,
20 97:23
109:19 110:3,
14,16 116:23,
24 117:6,9,11,
13,17,23
166:6 190:2,
18 191:13
192:7 229:7
249:23 252:8
267:24 272:23
273:3 281:23
291:8 296:20,
23 313:9,12
316:16 317:3
319:2 329:15
332:6,8
333:19 342:11
343:11 351:11

366:12 367:4,
5,6 369:18
372:20

**here (122)** 2:8
4:20,23,24
5:5,10 16:7
17:14 20:22
21:2,7,7,14
26:14 28:24
30:3,14,16
31:19,23
32:20 33:13
35:5,11 36:18
37:10 38:15
41:2,10 42:15,
21,24 43:6,8
44:5,9,11
45:8,9 46:2,3,
4 50:1,10,14,
15 51:9,20
52:20 53:7
56:24 57:2
72:3 78:11
101:8 106:22
108:20 118:5,
9 128:15
132:7 140:3
143:12 146:12
157:18 158:11,
13,21 167:17
173:23 188:21
210:23 216:11,
19 217:11
230:13 231:3
235:2 250:9
268:11 269:3
273:6 274:16,
20 276:17,23
280:4 282:10
286:7,22
287:17 288:10
291:6 292:4,9
296:13 300:3
308:16 309:21
313:5 329:3
330:7 332:20
335:7 340:15
343:24 344:18

346:7 347:6
348:2,5,10
349:10,16,16
352:14 353:2,
7 354:2 371:5,
12 372:22

**herself (1)** 351:7

**hesitate (1)**
194:17

**hey (2)** 54:16
130:5

**higher (2)**
147:23 355:17

**highlight (4)**
270:14
314:20 323:6
325:21

**highlighted (4)**
57:24 326:5,
21 327:23

**highlighting (2)**
269:23 270:18

**highly (2)** 55:8
230:2

**Hill (2)** 74:13
217:5

**him (7)** 158:14,
21 192:7
210:6 249:23
287:4,22

**himself (1)** 368:1

**hindsight (5)** 6:2
43:19 151:5
162:22 333:2

**hire (7)** 39:11
92:6 338:2,9,
11,15 355:6

**his (15)** 47:17
67:16 158:11
287:2,3,3
305:7,11,14
316:1,20
320:22 343:10
351:17 372:8

**history (2)** 60:22
338:12

**hoc (6)** 20:3
23:8 55:22

233:18 235:5
278:24

**hold (1)** 247:7

**Holdco (2)** 37:9
336:16

**holder (1)** 349:3

**holders (1)** 349:6

**Holdings (1)**
335:17

**holes (1)** 7:4

**Holy (1)** 239:3

**home (4)** 71:3
116:8 259:19
372:8

**honest (13)**
105:2 146:2,
10 175:19
215:11 217:1
225:19 230:20
233:22 237:13
244:15 254:2
259:20

**honestly (6)**
152:21 178:7
181:4 187:23
188:11 236:13

**honesty (1)** 29:11

**Honor (190)** 2:6
15:21 18:12
19:19 27:18
30:13,23
31:13,16 32:4,
5 33:3 36:14
37:8 38:1
42:15 45:1
50:22 51:6,10
52:10,17,22
53:1,3,13,16
54:1,3,12,21
55:7,16,21
56:1,21,22
57:6,11,19,20,
23 58:2,8,17
64:22 65:4,11
66:6,14 68:8,
16 69:14,15
88:19 90:17,
22 95:12

Case 09-10138-MFW    Doc 15396    Filed 03/30/15    Page 405 of 450

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
March 26, 2015

96:23 98:9
99:12,18
101:6 102:7
106:12 109:9,
24 120:22
131:5 149:11
151:8,15
155:11 157:2,
15 158:2
171:8 172:18
179:11 186:7,
16 188:24
189:6,24
190:24 191:5
194:1,6,14,20
198:6 201:8,
21 205:21
210:4,8,21
214:8 226:15
230:21 234:3
238:21 261:12,
16 263:20
265:12 268:6
269:1,9,22
270:7 271:2
272:14 275:5,
20 276:22
278:9,11
279:18 280:11
282:12,22
283:10,15
284:1 285:14
286:5 292:6,
19 296:1
301:8,22
302:10 306:19,
20 308:23
309:8,24
311:1 314:3,
13,19 329:11,
21,23 330:8
331:6 332:9
334:2 335:12
336:22 337:5,
22 338:4
339:10 340:24
341:22 344:21
345:9 346:15

348:3,14
349:19 350:16
351:3 352:21
354:10,13,15
355:8,10,14
356:1,8,10,14
365:13,16
367:22,24
369:21,22
370:11 372:10,
22 373:9,24
375:6,14,19

**honored (1)** 137:4

**Honor's (2)**
331:3,16

**hope (7)** 4:23
208:15 263:24
264:5 313:21
361:3 371:16

**hoped (1)** 371:13

**hoping (3)**
133:11 157:9
371:21

**hour (6)** 109:7
283:5,6,9,11
356:19

**hours (4)** 73:3
102:3 371:20,
22

**house (1)** 76:3

**how (75)** 14:10
30:16 39:20
40:14 44:1
60:16 61:8,22
62:18 63:4,12,
15 68:20
69:18 72:24
77:21 84:17,
19 87:24
89:13 90:11
91:10,12
92:20 95:12
97:16 102:4,
15 103:1
105:3 122:17
132:6 134:2
150:23 151:6
155:1 156:3

158:13 160:3
162:3 166:7
167:13 192:23
207:3,14,23
212:19 213:12,
22 215:14,24
219:11 220:1
223:7 229:24
230:16 231:23
254:9 257:16
261:20 278:17
298:4 300:5,6
302:24 306:2
309:14 328:12
330:2 338:3
344:20 353:1
354:1 356:4
369:6

**However (10)**
84:9 98:23
101:14 265:5
336:19,21,22
340:6 362:19
369:3

**HR (16)** 70:17
72:7,9 74:14
86:15 165:14
332:15 361:15,
16,17,20,21,
22,24 366:23
367:3

**huge (6)** 7:22
17:15 27:21
50:23 113:1
307:24

**human (3)** 70:8
217:4 333:15

**hundred (1)** 161:4

**hundreds (3)**
111:8 148:6
244:11

**hungry (1)**
365:20

**Hurricane (3)**
18:12 37:16
95:1

**husband (1)** 8:4

274:23

**I**

**idea (11)** 20:9
43:23 44:20
125:12 141:24
200:23 218:7
277:2,16
340:21 374:7

**ideal (1)** 23:19

**identical (1)**
216:17

**identification (3)**
71:22 131:10
257:10

**identified (11)**
14:18 15:17
69:21 97:14
130:23 226:10
248:13 256:15,
18,22 320:23

**identifies (1)**
264:20

**identify (2)** 3:13
66:18

**identifying (2)**
16:9 94:20

**ie (1)** 221:18

**Ignorance (1)**
336:9,12

**ignore (1)** 339:4

**illness (1)** 43:14

**illnesses (3)** 43:3
336:8 344:5

**imagine (2)**
217:14 262:1

**imagined (1)** 7:7

**immediate (1)**
71:4

**immediately (2)**
75:3 260:23

**immensely (1)**
28:19

**impact (2)** 5:19
328:10

**impassioned (1)**
329:14

**impeach (1)**

**imperiled (1)** 33:2

**implications (4)**
82:8 100:20
123:2 153:22

**implying (1)** 50:2

**importance (1)**
113:21

**important (18)**
5:14 14:7
36:18 39:15,
19 81:19
96:18 98:24
99:13,15
123:1 135:21
242:5 294:11
300:3 357:18
361:6 371:10

**importantly (2)**
95:7 99:7

**impression (2)**
183:21 310:3

**improper (2)** 98:5
277:9

**inadequate (5)**
51:1 301:5,
11,11 302:13

**inadvertence (1)**
336:12

**inappropriate (3)**
186:15
272:12 277:19

**include (1)** 175:7

**included (4)**
191:21
235:16 236:4,
16

**includes (5)** 30:9
94:18 206:24
258:2 259:24

**including (12)**
94:23 144:21
287:16 288:9
313:22 321:23
322:7 326:3
338:19 345:20
349:21 350:3

**incompetent (1)**

Case 09-10138-MFW   Doc 15396   Filed 03/30/15   Page 406 of 450
Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.
Hearing
March 26, 2015

338:3

**incomplete (2)**
101:17 267:5

**inconsistent (1)**
330:12

**incorporated (1)**
300:2

**incorrect (1)**
237:3

**increasing (1)**
4:11

**incredibly (2)**
7:24 8:5

**indeed (3)** 250:3
340:9 355:2

**independent (1)**
342:11

**independently (1)**
357:16

**in-depth (1)** 253:2

**India (1)** 305:1

**indicate (3)**
86:23 199:12
228:15

**indicated (5)**
74:13 193:5
196:4,9,14

**indicates (1)**
40:15

**indication (3)**
22:23 246:21
328:16

**indications (1)**
196:5

**individual (10)**
10:3 18:17
21:11,12
38:12 42:10
55:3 164:24
173:15 260:4

**individualized (3)**
315:3 344:1,9

**individually (2)**
173:16 260:6

**individuals (44)**
3:2,8 5:7,15,
20 6:8,13
11:17 13:4,4

14:4 15:17
18:8 19:3,10,
11 20:16 21:6
23:9 29:14
30:4 51:14
101:14 103:10
104:2 143:23
226:10,24
248:13 256:16,
23 257:11
258:13 288:1,
8 290:23
294:7 300:15
315:2 323:1
326:22 327:22
328:1 358:9

**indulgence (2)**
269:19 282:3

**inefficient (1)**
273:16

**inequitable (1)**
55:9

**inequities (2)**
148:11,12

**inferences (2)**
353:15,19

**influence (4)**
40:18,18
79:13,14

**inform (1)** 322:2

**information (51)**
75:5 80:7
97:2,4,21
104:9 111:10
112:20,24
113:2,9,9,12,
15,19,20
114:4,6,12
139:15 140:1
161:17 191:3,
6 196:2,7,8,
13 198:13,17
216:18 221:3
229:1 230:3,7
233:13 238:4
242:17 252:17
294:16,18,19
312:9 322:19

324:7 327:3
343:5 352:24
353:23 355:5
356:5

**informed (10)**
178:20,24
220:1 229:2
235:17 236:4,
5 271:19
321:15 326:11

**informing (2)**
93:6,6

**ingrained (1)**
152:5

**initial (8)** 56:8
93:12 166:2
228:17,22
229:22 324:6
367:8

**initially (6)** 8:18
9:11 166:9
228:11 298:17,
19

**initials (2)**
200:22 334:20

**innocent (2)**
35:21 336:21

**in-place (1)**
213:13

**input (1)** 223:16

**inquire (5)**
170:16
182:13 183:5
184:1 298:8

**inquired (1)**
357:16

**inquiries (2)**
166:20 170:18

**inquiry (2)**
295:23 335:18

**insignificant (2)**
27:13,24

**insofar (1)** 99:22

**insolvency (12)**
5:18 48:15
73:1,20 122:5
154:16,24
175:11,24

176:8 192:6
317:22

**insolvent (1)**
199:17

**instance (2)**
138:4 163:18

**instances (4)**
364:2,3,4,4

**instead (1)**
279:12

**instill (1)** 102:18

**Institute (1)**
159:19

**instructed (2)**
254:6 263:1

**instructions (1)**
103:11

**instructs (1)** 41:22

**insufficient (1)**
98:5

**insurance (2)**
9:13 75:15

**integration (2)**
328:17 356:6

**integrity (1)**
302:12

**intellectual (1)**
107:18

**intelligent (1)**
245:12

**intend (1)** 269:10

**intended (3)**
280:14
289:19 290:3

**intends (1)** 4:23

**intent (2)** 24:12
147:15

**intentions (1)**
375:3

**interacting (1)**
342:13

**interest (6)** 78:21
89:21 113:10
117:2,5 337:16

**interested (2)**
76:23 79:18

**interesting (3)**
21:15 158:18

337:7

**interests (8)** 9:2
80:18,22
182:16,23
195:23 197:22
310:12

**interfered (1)**
18:13

**intern (1)** 60:13

**international (4)**
168:10
169:17 322:15
363:6

**interpret (2)**
132:6 255:4

**interpretation (4)**
125:23 126:3,
5 132:4

**interpreted (1)**
150:10

**intervening (1)**
355:11

**intimately (1)**
161:14

**introduce (3)** 3:8
31:14 158:10

**introduced (4)**
70:18 98:14
100:24 315:10

**introduction (1)**
32:3

**inundated (2)**
75:4 348:3

**inure (1)** 162:20

**invariably (1)**
170:23

**inventive (2)**
47:12 139:2

**invested (1)** 325:7

**investigate (17)**
34:22 43:14,
17 44:8 46:17
49:12,17
90:11 118:22
136:2 140:17
180:4 195:18
197:3 263:7
336:9 368:8

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.
Hearing
March 26, 2015

investigated (2)
13:7 14:3
investigation (2)
288:14,15
invitations (1)
111:22
invite (1) 158:19
inviting (1)
111:22
involve (1)
308:17
involved (14)
39:6,10 56:3
77:3 79:2
182:19,22
211:22 235:24
240:4 244:8
247:15 334:23
359:8
involvement (1)
374:24
involving (6)
17:15 37:9
96:9 296:16
336:7 360:17
IP (3) 345:16,
22 355:10
irate (3) 244:10
245:8,12
irrelevant (5)
47:6 91:2,7
94:10 203:3
irrespective (1)
77:8
isolated (1) 44:18
issue (35) 5:16
7:22 8:17 9:3,
3,12 49:15
57:12 78:6
87:13 91:6
94:9 95:17,23,
24 96:11,24
109:24 118:9
174:2 221:2
262:18 265:13
284:6 319:5,
12 328:6
330:7,13

350:17 368:2
370:23 371:22
372:2 373:13
issued (9) 99:3
143:18 321:12,
22 322:7,10,
22,24 354:23
issues (20) 9:19
41:14 44:10,
24 53:6 54:5
62:9 75:13
79:6,19
118:17,24
122:22 229:16
247:19 278:17
298:12 314:22
320:9 371:10
item (1) 69:19
itemized (1) 18:8
itself (11) 26:8
40:3 50:12
52:5 72:7
74:12 101:5
130:11 290:22
294:19 339:13
342:15 345:7

---

**J**

James (1) 216:15
Jane (11) 3:7
31:17 158:23
159:1,12,14
195:8 208:15
280:1 296:18
313:6
Janice (2) 76:15
249:24
January (26)
75:1 93:20,
22,23 131:19
132:5,10,11,
21 133:4
134:5 156:21
167:9 182:1
193:21 200:5
216:14,21
238:2 239:19,

23 251:14
261:5 320:17
321:1 351:20
JENNIFER (1)
159:1
job (5) 83:3
105:4,12
153:11 202:5
jobs (7) 33:1
75:19,20
153:12,15
212:2 336:21
jog (1) 178:11
John (16) 62:24
63:4 64:2
88:11,14
213:9,24
214:5,6,7,7,
11 226:12,12,
13 231:19
join (4) 79:17
93:7 111:23
345:3
joinder (4) 53:12,
14 56:7,9
joiners (1) 56:7
joined (6) 53:9
167:2,3
178:16 218:3
241:6
joining (1) 230:9
joint (6) 168:17
208:21 209:12
296:19,21,23
Jones (3) 42:19
336:5 344:4
Journal (1)
322:16
journey (1) 6:4
Judge (6) 50:6
110:22 210:18
329:9 344:18
371:19
judges (1) 371:7
judicial (1)
333:16
Julia (2) 4:9,9
July (18) 54:12

126:13 128:19
177:15 178:4
179:21,23
181:4 255:24
257:5 321:9,
11,22 323:8,
21 324:1
328:8 368:17
jumbled (1) 334:5
jump (1) 346:24
June (13) 62:21
63:2 84:9
97:13 225:12
238:1 255:18,
22,23 260:22
261:3 320:23
351:16
jurisdiction (2)
296:17 319:18
jurisdictions (7)
195:16
209:11 290:12
301:18,20
307:12 350:3
jurisprudence (2)
38:22 366:21
justice (5) 3:10
30:5 295:12
322:20 364:19
justifiably (1)
325:19
justification (1)
58:9
justified (1)
110:12
justify (1) 98:6

---

**K**

keep (8) 29:12
178:24 220:1
238:3 240:8,
10 283:3 305:5
kept (2) 12:7
343:13
key (5) 39:22
43:7 113:9
178:24 179:2

kind (18) 36:15
75:20 79:11
93:10 100:7
101:7 154:3
167:16 170:21
188:5,9
251:12 282:23
296:7 337:8,
22 347:16
373:23
kinds (2) 298:21
299:17
King (11) 73:19
74:18 82:15
152:7 156:20
216:6,14
217:3 333:9,9,
13
Kive (1) 195:5
Klein (53) 3:6
45:5 48:19
59:11,12,15,
16,19 60:3
67:5,8,21
69:9 70:3
95:2,5,12
96:12 102:5
108:21 109:18
110:20 121:7
131:12 148:20
155:14 156:24
157:3 179:4
184:15,21,24
188:21 194:8
269:4 280:17
287:17 289:17
291:8 316:16
318:7 319:16
321:14 323:9
324:1,16
326:20 330:21
338:10 341:4
342:9,21
363:12
Klein's (3) 68:1
69:11 266:17
KM (5) 9:7,9
321:14 322:22

Case 09-10138-MFW    Doc 15396    Filed 03/30/15    Page 408 of 450

Bankruptcy Court for the District of Delaware                                    Hearing
In Re: Nortel Networks Inc., et al.                                        March 26, 2015

323:15

**knew (85)** 7:11,
23 36:19 38:5
44:17 46:5,15
70:9 73:14,15
75:5 83:17
102:15,17
104:5,9,12
118:18 127:9
128:19 129:2,
17 131:20
133:5 135:23
139:19 163:15
164:13 168:3
171:17 172:1
175:16 176:16,
18,18 181:5
185:7 191:11,
13 203:7
207:1 214:24
217:15,18
224:18,24
225:2 232:1
237:3 240:15,
17,19 246:23
250:24 251:11,
13,15,16,19
253:21 255:8,
10,12,15,16,
16 257:8,17
287:18 288:19
292:23 297:6,
7 298:22
303:9 305:22
306:11 309:14
316:8,10
325:2 330:23
331:23 341:5
351:22

**knowing (2)**
151:5 254:15

**knowledge (19)**
21:17,20
55:4 63:19
139:8 228:14
230:24 233:16
234:17,24
235:2,3,7

292:8 316:1
326:8 335:2
350:21 358:22

**knowledgeable (1)**
161:14

**known (42)** 10:8,
8 23:9,14,16
76:10 127:13
286:17,18
287:13,22
288:1,2,12,13,
15 289:14
292:1 300:11,
13,14 303:1,
11,14,17,19
305:18 312:8,
13 315:14
330:14 331:2
341:20 360:21
362:2,2
363:20,21
364:9 365:10
367:23 369:15

**knows (2)**
351:20 352:1

**Koskie (198)** 9:6,
8,18 13:2
14:14,20 15:5,
14 18:16,24,
24 39:4,15,18
40:13,14 41:9
42:1,5 45:11
54:14 77:1,2,
12,19 79:1,2
80:1,7,12,15
81:8,15 82:14
83:12 86:12
87:16 89:14
90:10,12,20
92:2 93:4,10
94:17,18 96:1,
16,17 97:1,14,
15 98:16,17,
23 99:23
100:21 101:1,
15,22,24
103:17,18,20
110:4,15

114:4,9
124:20 125:13
129:24 130:2
134:15 135:2
137:11,15,18,
22 138:24
139:6,12
140:1 168:23
169:9 170:9
177:1 181:15
182:11,13,15
183:23 185:3
188:16 195:24
196:13,16
197:2,9,16
202:12,14
218:17,20,22
219:4 221:23
225:22 226:3
228:5,9,10,14
230:6 236:23
237:6 252:20
253:9,13
254:6,8,21
256:2 257:7,
16 262:8,13,
24 263:9
305:3 308:16
309:1,2,3,3,4,
6,7,24 310:1,
2,3,10,18
312:12,15
321:11,22
322:1,9,17
323:6,12
324:3 325:14
326:2,5,10,14,
18 327:1,10
328:7,11
337:9,10,14
338:1,5,11,15,
18,20 339:3
340:14 341:13
342:13 343:14
350:17 351:8,
17,20 352:24
353:7,16,21
355:3,5 356:3,

12 357:2
359:2,22
360:12 365:24
368:16 369:12
370:12,13

**L**

**lack (1)** 99:6
**laid (12)** 63:9
64:10 136:19,
20,22 138:6,7
143:22 144:12
148:8 162:23
201:12

**language (37)**
14:5 16:24
19:12 24:2
26:15 82:21
89:9 91:12
103:16 104:23
136:11 164:3
173:3 174:1,4,
8 203:23
204:6 206:17,
21 226:3,5
248:14 255:5
256:10,19
259:4 290:2,2
301:23 303:11
313:9,14
354:20 355:2
369:9,11

**large (4)** 61:2,
10,15 154:15

**larger (9)** 79:6
80:13 219:24
220:21 237:5
242:11,12
251:24 309:5

**last (26)** 31:5
41:4 42:3
49:22 50:16
60:23,24
62:12,15,20
68:17 72:12
160:6 192:15
212:3,17,18

241:14,19
262:18 278:21
329:2 350:15
356:17,18
367:22

**late (8)** 33:22
37:6 93:18
118:4 142:24
162:5 215:17
225:20

**late-filed (4)**
54:16 92:16
142:19 350:19

**latent (2)** 336:8
344:4

**later (22)** 7:8
34:17 70:24
71:6,6 97:9
104:3 110:2
114:15 159:23
184:19 224:16
233:12 243:6
250:18 252:19
268:24 320:18
324:14,24
341:18,19

**laughing (1)**
212:15

**Lauren (1)**
226:11

**Laurier (1)** 3:22

**law (57)** 9:6
10:2,3 21:14
25:22 26:2
39:2 42:5
49:12 76:8,11,
23 99:17
104:16 114:5
116:14 119:14
120:6 123:11
124:8 145:5
152:6 193:6,
22 228:8
249:9,11
252:20 253:19,
21 255:9,11,
14,15,16,17
284:6 295:16,

Case 09-10138-MFW    Doc 15396    Filed 03/30/15    Page 409 of 450

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
March 26, 2015

16,17 298:10
299:14 308:8
310:23 326:8
328:8 330:5,
17 335:1
338:13 340:10,
15 342:2,10
353:3 360:23
367:24

**lawsuits (2)** 43:1
345:11

**lawyer (36)**
13:22 34:17
41:19,21,22,
23 81:18 99:2
116:11 129:21,
22 130:1,3
135:3,22
141:22 142:4
181:22,24
182:1,3
189:23 190:8
214:24 215:2
228:3 232:2
249:6,22
251:21 254:7
255:6 258:6
307:17 327:11
349:15

**lawyers (41)** 3:4
8:3 9:18
11:22 14:17
47:4,13
116:18 120:13,
16 128:14
138:24 152:6
154:1 158:3
167:5 168:2,4,
7,21 169:12
183:9 195:22
202:8,11
207:8 230:14
235:22 238:5
247:8 291:2
296:22 297:11
306:5 307:13,
13,23 308:4
339:8 371:7

372:17

**lawyers' (1)** 45:9
**lay (1)** 128:16
**laying (2)** 70:10
222:16
**layoffs (1)** 63:23
**lead (2)** 140:16
209:6
**leader (1)** 61:2
**leading (4)** 5:17
107:12 186:13
368:1
**leads (2)** 38:9
345:8
**learn (12)** 62:18
72:24 89:13
100:7 156:3
162:3 170:2
215:14 220:22
221:8 235:23
263:5
**learned (40)**
37:19 62:20
64:12 73:2
74:16 86:4
89:5,14 90:6,
8 112:1 119:2
122:4 126:14,
18 140:9
151:20 166:7,
16 169:4
212:16 221:10
225:6 226:9
227:8,16
236:3 239:24
242:23 243:2
248:18 249:20
254:4 259:16
298:1 307:15
308:12 324:24
351:18 353:1
**learning (2)**
260:21 361:1
**least (14)** 22:8,
10 61:19
75:18 86:20
107:12 155:13
160:8 190:24

248:3 300:11
321:18 358:22
373:16
**leave (3)** 64:2
237:17 280:9
**leaves (2)**
365:20,21
**leaving (1)** 7:9
**led (9)** 3:18
141:8 152:7
196:19 209:8,
14 246:17
252:1 347:8
**left (6)** 7:1 35:2
81:10 147:9
212:10 321:8
**legal (42)** 3:11
76:4,5 79:9,
15,17,18 82:3
86:2 90:15
92:6,9 93:8
105:16,19
120:2 122:11,
19 126:4
140:7 145:10
146:4,12
153:22 154:10
185:1 193:2
217:22 220:4,
5 227:23
231:14,24
232:5,6
249:21 253:10
259:16 329:21
335:7 349:11,
13
**legalities (1)**
134:2
**legitimacy (1)**
58:10
**legitimate (1)**
312:5
**legitimately (1)**
311:16
**legwork (2)**
228:18,22
**leisure (1)** 70:15
**length (4)**

310:22,24
320:12 335:10
**lengthy (5)** 27:11,
11 37:4,11
109:6
**less (5)** 27:21
37:9 38:4
230:10 280:13
**less-than- (1)**
364:13
**letter (171)** 7:2
12:21,22 16:9
17:20 19:15,
20 34:20
43:10 47:12,
18,23 54:15
66:20,20,21
67:9 68:11
70:13 71:15
72:12 73:18
74:10,12,21,
21 82:15
86:17 89:9
93:4 98:12
103:9,15
104:23 105:6
106:24 110:13,
15 115:2
116:2,5,21
117:6,7,9
119:2 131:23
132:5 136:12,
15,17 137:8
138:8 140:13,
16 141:5
142:5 143:3,
17 144:13
145:1 152:7
156:18 163:3,
7,10,17,19
164:19 165:4
167:6,9,12,13
169:22 172:6,
8,11 173:3,9,
9 174:5
184:17 185:2
187:8,21,21
188:2,5,6,9,

13 192:8
198:15,16
199:4,6,8,11,
21 200:2,14,
18,21 201:1,6,
13,15,23
202:15,20,24
203:3,11,16
204:2 205:2
206:9,14
207:1,20,21
214:14,15,18,
22 216:6,13,
15,16,22
217:2,13
221:22 222:2,
19 231:12
249:6,14
251:13 252:20
253:1 258:4,7,
9,17 259:5
262:7,10
284:23 287:4
289:1 316:20,
21 317:4
326:22,24
328:7 333:9,
10 342:11
343:2 345:2,6,
7 347:3 356:3
359:14 361:20
366:15 367:16
**letterhead (1)**
332:13
**letters (77)** 7:1,6,
8 19:1 22:1,3,
15,24 30:7
46:18 50:14
68:10 69:22
98:18 101:13,
13 137:23
138:7,11,14,
20 139:6,9
143:8,15,20,
24 144:11
150:2 174:7
187:3,8,10
188:17 201:4,

Case 09-10138-MFW    Doc 15396    Filed 03/30/15    Page 410 of 450

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
March 26, 2015

9 222:5,8
223:5 226:4
233:23 243:19
247:17 248:14
264:23 266:15
287:5,6,7,9,
14,15 289:1,4
298:20 303:4,
23 310:3
320:16,24
323:7 324:11,
16 332:10
333:23 334:18,
19 344:6
346:1 353:8
354:21,22
355:3 359:13
360:10 361:17
367:10

**letting (1)** 216:19

**level (3)** 26:23
105:9 292:11

**leverage (1)**
40:17

**liabilities (1)**
78:10

**liability (7)**
125:19 204:1
205:8 207:6
295:19 296:5,
12

**liable (9)** 30:9
173:21 203:19
205:12 206:15
207:6,16
338:23 345:15

**license (1)**
160:23

**licensed (1)**
253:19

**licenses (4)**
160:16 161:9,
9 162:16

**licensing (1)**
164:2

**life (5)** 4:3,3,8
159:23 211:20

**lift (2)** 21:9

27:15

**lifted (5)** 17:24
19:6 21:21
289:12 290:23

**lifting (2)** 15:16
18:21

**light (2)** 271:5
356:6

**lightly (1)** 53:16

**like (80)** 2:14
3:8,12 17:23
27:21 32:12
37:24 38:16
49:16 50:14
53:2 56:22
59:21 73:17
83:3,5,8
84:20 94:14
101:2 102:9
107:18 108:5
109:3 114:4
118:1,16
142:14 149:1,
6 152:4
155:21 158:9
163:1 172:4
174:19 177:20
179:6 184:5,8,
23 187:17
192:10,22
198:4,15,19
199:5,7,8
210:19 222:6
241:3 261:21
269:21 273:17
275:15 281:15,
19 282:16,18,
23 283:2
284:7,22
289:17 305:3
308:3 323:5,
18 325:9
329:2 339:4
341:16 343:11
350:21 358:16
367:7 371:17
373:16

**likelihood (1)**

254:10

**likely (1)** 135:17

**likes (1)** 284:2

**limit (1)** 82:10

**limitations (2)**
81:3,6

**limited (10)**
15:16 20:12
91:15 151:12
238:7 309:17
319:11 326:7,
15 363:4

**limiting (1)**
154:19

**limits (1)** 303:15

**linchpin (1)**
345:19

**line (13)** 71:19
72:12 78:3
162:12 164:19
205:22 213:21
281:18 294:4
297:16,21
323:5 332:12

**linear (3)** 11:16
25:7 310:24

**lines (13)** 22:15,
17 162:8
231:16,17,21
232:14,15
239:7 297:17
298:23 299:2
304:4

**link (2)** 112:6
114:9

**LinkedIn (63)**
12:13 20:20
45:2 75:8,9
78:24 80:9
81:7 86:5,24
103:11 110:22
111:12,16
112:5,10,14,
18 113:7,24
114:6,14
119:7,19
120:12 123:20
124:1,4,5

126:24 127:4,
8 128:10,23
130:4 134:22
144:2,7,22
156:10 167:2
178:13,16,19
179:17,24
180:18 189:16
221:12 241:4,
6,19 242:4
245:10 321:14,
19 323:4,8,10,
24 324:13
326:19 361:4

**links (2)** 45:9
266:12

**liquidation (1)** 3:1

**list (17)** 14:21
15:8 18:7
64:3,9 93:2
94:5 120:11
121:23 150:5
195:5 256:18
258:11 268:6,
22 281:8
306:23

**listed (4)** 130:20
155:20 271:20
348:21

**listening (1)** 30:24

**literal (1)** 7:24

**literally (1)**
244:11

**litigate (1)** 52:4

**litigating (2)** 52:3,
3

**litigation (3)** 39:6
50:7 96:10

**little (33)** 7:7
38:4,9 52:24
56:23 70:5
101:7 104:13
114:15,15
118:2 131:21
159:22 160:5
185:15 188:4
207:12 215:15
235:8 241:3

262:18 282:20
284:18 285:4
293:21 295:3,
9 309:14
321:7 337:23
354:5 372:16
373:24

**live (27)** 3:6
10:15 105:11
264:10 268:11,
17 271:3,13
272:20 273:1
274:20 275:2,
13,18,21
276:5,11,23
277:16 278:24
279:7 283:23,
24 284:5,19
285:17 370:24

**lively (1)** 46:6

**lives (3)** 3:19
6:7 32:24

**living (2)** 83:2,4

**lo (1)** 54:20

**local (1)** 7:4

**located (20)**
42:20 62:5,
16 63:18 65:4
72:10 108:7
161:5,20
171:13,22
212:22,24
213:10,17,19
266:5 267:4
303:8 313:13

**location (5)**
74:14 88:14
165:11 214:1
266:10

**locations (4)** 69:1
213:3,17,19

**lockbox (4)**
132:12,16
133:6,12

**log (2)** 111:19
310:6

**logic (1)** 296:24

**logical (2)** 48:16

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
March 26, 2015

317:24

**logistics (1)** 109:3

**long (18)** 6:5
39:20 63:22
117:7 150:5
207:3 212:19
223:7 257:16
281:14 286:6,
8,11 338:12
347:16 354:4
360:16 372:11

**Longchamps (28)**
3:7 158:23
159:1,11
171:8,12
172:22 177:5,
11 186:24
190:7 191:11,
16 195:13
198:11 202:18
204:14 205:20
207:11 210:1
269:5 280:1,
18 296:18
313:6 331:12
343:1 367:3

**longchampsfamily@simpaticoca (1)**
192:16

**longer (5)** 40:9
102:4 105:4
109:20 207:12

**long-term (1)**
77:10

**look (89)** 7:2
11:19 36:18,
20 52:8 63:17
77:11 78:17
83:8 84:2
112:22 120:21
122:16 125:17
133:24 141:22
142:4 149:7
170:24 172:11
173:8 179:19
184:5 187:1
198:14,15
199:10 218:16
219:23 220:16

221:21 222:4
228:12 239:1
241:11 249:22
258:3,17
259:1 261:21
266:14 283:21
288:6,24
289:1,2,4
291:20 294:24
295:8,9,20
297:4,5
302:13 303:22,
23,24 304:1,2,
4,17 306:15,
16,16 307:21,
22 311:2
312:19 323:18
332:3,10
333:4 334:19
338:6 345:6
348:12 350:18
351:1 360:4
363:12,14
364:19,20,23,
24 365:1,2
366:15

**looked (29)** 6:2
14:9,10 25:7
47:11 63:18
116:1 149:18
151:3 153:8
172:17 181:2,
11 196:2
199:7 203:10
226:3 251:23
291:14 297:13,
14,15 306:2
313:7 333:23
340:19 342:11
343:2 357:15

**looking (22)** 36:9
75:19,20 76:7
80:21 103:16
130:18 138:3
151:4 171:3
180:13,20
183:22 211:24
261:22 306:6

312:16 320:13
323:10 325:11
342:14 343:4

**looks (2)** 187:17
216:18

**lose (2)** 36:6
371:8

**losing (5)** 8:22,
23 140:24
247:23 265:16

**losses (1)** 343:11

**lost (5)** 33:1
261:21 275:10,
16 281:20

**lot (26)** 12:12
22:11 29:3
31:1 44:13
56:3 73:14
110:21 206:19
212:13,16
214:9 221:3
245:11,12
251:4 286:14
288:2 303:17
305:21 307:3
329:22 330:9
340:20 364:21
365:7

**lots (6)** 46:1
221:3 222:16
230:2 289:20
309:11

**love (2)** 100:3,4

**lower (1)** 258:21

**loyal (1)** 291:12

**Ltd (1)** 22:19

**lunch (2)** 71:2
109:4

**Luncheon (1)**
157:19

**luxury (1)** 372:18

**lying (1)** 311:23

## M

**Mack (2)** 211:7,8

**made (42)** 3:24
5:2 18:9 22:9

32:17 38:13
49:23 50:1,8
81:14 89:8
93:3 98:10
100:11 101:15
110:11 123:24
126:20 150:23
162:24 165:24
166:3,15,20
192:2 214:23
215:5 223:1,1
228:7 258:20
272:9,11
282:15 290:4
296:20,24
330:10 333:1
338:7 351:7
369:9

**Magestic (2)** 37:8
336:16

**magic (1)** 148:15

**magnitude (1)**
220:18

**mail (10)** 44:14
73:21,22
165:9 208:24
304:2 322:15
327:4 332:19
362:7

**mailed (10)**
68:22 69:2
72:22 103:9
126:10 266:9
287:7 361:20
369:18,19

**mailing (2)**
155:22 156:1

**mailroom (1)** 4:5

**main (6)** 26:10
101:8 109:18
146:5 160:21
241:21

**maintain (2)**
78:21 159:24

**major (2)** 22:6
60:8

**majority (6)**
144:5 217:15

266:3 315:8
324:20 334:17

**make (59)** 2:21
4:24 20:4
32:11 33:19
35:3,18 52:9,
19 53:2 63:13
64:24 68:20
75:7,17 79:4
80:10 90:4
92:23 104:1
117:2 120:15
126:9 129:16
142:12 146:17
154:14 158:4
161:2 170:18
185:23 188:5
198:20 204:15
216:11 223:21
227:2 230:8
236:9 254:15
269:22 271:24
279:24 294:3
297:10 306:20,
21 308:3,8,11
311:15 315:3
360:10 361:19
368:4 371:14
372:19 374:20,
20

**makes (6)** 8:8
54:2 291:15
332:21 371:9
374:18

**making (9)** 31:21
51:23 63:11
124:2 144:9
229:3 289:22
290:4 371:17

**malice (1)** 291:1

**malpractice (4)**
126:1 338:22
339:6 351:10

**management (5)**
4:7 61:3
70:19,23
161:11

**Manager (15)**

Case 09-10138-MFW    Doc 15396    Filed 03/30/15    Page 412 of 450

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
March 26, 2015

22:17,18,19,
20 70:9 71:19,
24 164:20
212:7 264:23
287:18,20
304:5,6 313:12
**managers (4)**
22:21,22
287:16 288:9
**manager's (1)**
71:18
**mandate (1)**
123:15
**mandatory (2)**
23:11 289:13
**Many (38)** 6:19
7:18 11:22
18:10 21:23
33:4 36:13,13
49:20 60:16
63:23,23
68:24 75:19
79:7,7 81:24
112:18 138:5
153:11 160:3
170:19 210:20
214:10 238:2
270:9 286:8
287:15 288:9
289:4 290:11
291:12 293:16
300:22 303:7
326:13 347:22
359:8
**March (7)** 74:24
241:7 279:1,1
320:16 321:1
333:17
**marginal (1)**
215:12
**Marino (1)**
372:18
**mark (4)** 131:1
134:14 185:3
327:1
**marked (2)** 131:9
149:7
**marketing (1)** 4:12

**Mass (1)** 6:7
**master (2)** 57:18
159:20
**material (3)**
33:15 42:12
62:8
**mathematics (1)**
60:7
**matrix (2)** 334:4
367:1
**matter (19)** 2:10
11:9 18:3
25:21 45:10
62:2,4 90:24
94:11,13
95:15 145:5
221:14 238:17
255:2 306:4,5
338:3 371:24
**matters (2)**
229:13 242:2
**maximum (4)**
14:22 18:8
94:21 300:14
**may (55)** 11:24
29:1 39:16
64:17,19,21,
23 65:5 98:19
121:18 123:14
129:19 130:5
131:5,6,7
155:14 157:4
172:18,19
173:1 186:14,
14 188:12
194:16 195:11
198:18 219:15
235:11 240:1,
5 248:10
249:18 255:21
257:20 260:21
263:21 268:24
269:2 273:3
277:7 284:13
285:11 289:7
314:14,21
328:5 334:11
336:21,22

340:6,13
361:8 368:6
373:17
**maybe (11)**
23:13,15
37:20 80:9
86:19 122:15
163:15 203:21
295:6 345:3
371:13
**McCloy (1)** 55:22
**McCready (1)**
213:9
**McKinnon (3)**
80:4 135:2
327:10
**McRuvie (1)** 3:14
**mean (35)** 11:2
13:24 15:1
51:7 61:16
77:23 80:20
85:6 87:21
101:14 104:23
106:24 136:19
150:11 163:20
168:19 170:19
173:10 175:19
176:15 224:11,
15 237:13,18
243:22 258:14
265:24 274:5
279:10,15
281:7 307:11,
14 308:8 320:1
**meaning (4)** 42:1,
2 154:11
254:22
**meaningless (1)**
299:24
**means (10)**
13:23 58:23
154:1,2
259:21 260:19
309:17 332:18
353:4 362:11
**meant (23)** 69:3
72:15 73:12,
16 80:21

117:24 151:24
154:13,13
168:20 180:23
182:21 214:3
224:15,18
227:20 237:21
239:18 244:9,
17 252:4
307:18 332:16
**mechanical (1)**
161:11
**mechanism (1)**
161:8
**media (4)** 75:8
361:4,7,10
**mediate (1)** 374:5
**mediation (11)**
41:4 54:13,
14,20,22,23
328:10,19
355:24 356:7,
24
**mediations (2)**
247:14 355:23
**mediator (1)**
374:3
**Meersky (1)** 32:13
**meet (6)** 42:17
49:14 98:5
289:11 353:5,
10
**meeting (15)**
36:22 62:10
120:9,19
121:17,21,23
122:1,4,11
163:10,13
214:15 218:1
323:15
**meetings (4)** 62:6
221:16 223:10
257:12
**Melnick (2)**
56:19 58:19
**MELNIK (3)**
56:20 57:2,5
**member (3)**
178:13 309:4

310:15
**members (16)**
98:15 111:21
112:3,14
113:10 120:12
123:19,24
222:21 233:17
235:5 250:1
286:6 321:19
323:9 324:13
**membership (1)**
112:9
**memorable (1)**
31:11
**memorandum (2)**
34:7 315:17
**memory (1)**
178:11
**mentality (1)**
294:2
**mention (3)**
196:21
197:21 267:24
**mentioned (18)**
97:1 110:2
136:23 175:9
176:21 181:17,
18 182:17
183:7 191:16
197:8,11,13
204:6 206:17
209:12 260:15
356:2
**mere (3)** 52:2
275:9 334:10
**merits (1)** 147:9
**Mersky (185)** 2:3,
5,9 5:6 15:3,
11,13,20 17:4
30:20 32:17
34:3 36:12
37:14 38:17
39:12 42:3
49:24 52:15,
17 59:10,23
60:2 64:17,20,
24 65:3,10
66:14 67:8

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.
Hearing
March 26, 2015

68:7,20 69:13,
17 70:4 88:23
90:22 91:8,17
93:16 94:12
95:5,23 97:5
98:9 99:11,22
100:1 101:6,
10 102:6,9,12
103:17 106:8,
11,13 107:13
108:16 110:2,
14 116:1
124:12 125:17
149:1,2,5,11,
14 151:11,19
155:7,9
157:24 158:1,
9,22 159:10
171:6 185:5
186:1,3,7,11
188:23 189:12,
24 190:5,16,
21,23 194:1,4,
5,19 200:17,
20 201:3,20
205:21 208:13,
14,17 209:17,
18 210:3,4,8
211:2 226:22
227:7 231:4
233:18 261:3
263:19,20
264:9 266:16
267:12,17,23
268:4 269:6
270:16 271:1,
2,10 272:18
274:11 276:21,
22 279:3,11,
17,18 280:7,
20 282:1
283:8,19
285:23,24
286:4,5,11
292:19 293:1,
9 295:24
301:8 302:20
303:3 308:11,

23 314:4
329:14 332:3,
16,21 337:12
340:6,21
344:17 349:14
351:4,7 352:4,
18 353:12,16
354:14 356:17,
18 358:2,8
365:14 366:1,
11,13 368:12
373:8,9
374:19 375:3,5

**Mersky's (10)**
34:6 46:23
92:12,15,18
110:6 125:22
229:6 340:12
345:3

**message (6)**
45:12 245:6,
7 341:9,11,12

**met (4)** 10:19
76:2 121:15
307:2

**method (1)** 243:8

**mic (1)** 194:3

**Michael (8)** 3:7
210:5,9,13
211:4 243:11
287:1 338:8

**Michelle (1)** 31:21

**microphone (3)**
52:7 186:4,6

**microphones (1)**
372:17

**mid (1)** 162:5

**mid-2012 (1)**
208:2

**middle (2)** 44:19
159:13

**mid-February (1)**
209:5

**mid-January (1)**
209:4

**midst (2)** 54:13
355:24

**might (39)** 44:4

86:12 87:9,9,
17 88:2 89:10
90:11 102:4,
24 107:19
108:2 134:24
135:15 136:7
139:13 140:17
141:5,13
150:16 177:4
178:10 181:11
182:13 183:10
186:21 217:19
224:17 226:6
232:15 256:2
258:16 277:6
290:1 333:6
336:20 355:16,
19 373:11

**Mignault (1)** 4:2

**Mike (4)** 90:9
92:4 211:6,9

**Milbank (1)** 55:21

**million (2)** 27:21
50:18

**mind (11)** 90:24
91:6 95:16,17,
20 97:23
118:24 135:16
183:12 184:3
283:3

**mine (4)** 222:3,6,
10 243:19

**minimal (1)**
302:15

**minimize (1)**
304:13

**Minsky (178)** 9:7,
8,18 13:3
14:14,21 15:5,
14 18:16,24,
24 39:4,16,18
40:13,14 41:9
42:1,6 45:11
54:15 77:1,2,
12,19 79:1,3
80:1,7,12,15
81:8,15 82:14
83:13 86:12

87:16 89:14
90:10,12,20
92:2 93:4,10
94:17,19 96:1,
16,17 97:1,14,
15 98:16,17,
23 99:23
100:21 101:1,
15,22,24
103:17,18
110:4,16
114:4 124:21
125:14 129:24
130:2 134:15
135:2 137:11,
15,18,22
138:24 139:6,
12 140:1
168:23 169:9
170:9 181:16
182:11,13,15
183:23 185:3
188:16 195:24
196:13,16
197:2,9,16
202:12,14
218:18 219:4
252:20 253:9,
13 254:6,21
256:2 257:7,
16 262:8,13
263:1,9 305:3
308:16 309:1,
2,3,3,4,6,7,24
310:1,2,3,10,
18 312:12,15
321:12,22
322:1,10,17
323:12 324:3
325:14 326:2,
5,11 327:1,10
328:7,11
337:9,10,14
338:1,5,11,15,
18,20 339:3
341:13 342:13
343:14 350:17
351:8,17,20

352:24 353:7,
16,22 355:4,5
356:3,12
357:2 359:3,
22 360:12
365:24 368:17
369:13 370:12,
13

**Minsky's (5)**
103:20 114:9
323:6 326:14,
18

**minute (5)** 43:8
198:14,18
223:21 346:9

**minutes (9)**
56:21 102:7
269:21 270:13
273:23 274:7
282:2 283:14
373:12

**mischaracterization (1)**
194:7

**miscommunication (1)**
277:4

**misconduct (2)**
125:20 338:24

**misconstrued (1)**
279:21

**misery (1)** 7:3

**misheard (1)**
191:1

**misinformation (4)**
221:4 236:21
237:3 361:9

**mislead (1)**
279:22

**misled (2)**
319:10 344:23

**misperception (1)**
38:11

**misread (1)**
110:13

**misspoke (3)**
99:22 106:8
367:8

**misstatement (1)**
368:14

Min-U-Script®
Wilcox & Fetzer Ltd.
www.wilfet.com
(302) 655-0477
(413) Mersky's - misstatement

Case 09-10138-MFW    Doc 15396    Filed 03/30/15    Page 414 of 450

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
March 26, 2015

**misstatements (1)**
365:19

**mistake (3)**
25:16,17,18

**misunderstanding (1)**
277:8

**misunderstood (1)**
279:21

**modest (1)** 76:16

**moment (6)** 55:2
67:5 116:7
183:7 272:19
314:9

**moments (1)**
125:12

**Monday (1)** 279:1

**monetary (1)**
355:19

**money (34)** 7:10
8:19 11:10,11
18:3 19:3
21:1,2,3,4
27:22 35:23
39:11 52:3
75:18 89:24
90:5 93:11,11
94:1 105:3,11
117:2 152:2,9,
23 165:20
167:5 183:15,
15 216:3
254:18 299:20
365:4

**Monitor (65)**
12:20 13:2
14:21 16:3,4,
5,7,8,11
17:20,21
18:23 24:7,24
28:1,4 29:7,
17 36:17
40:24 49:7,23
50:3,4,8
54:15 82:14
84:10 86:14
90:14 97:15
152:7 156:16
222:20 223:16,

21 224:21
225:5,22
228:9,10
243:18 245:16,
17 256:6,13,
15,22 257:6
263:1 322:6,7,
24 323:16
328:8 356:3
357:1,20
358:18 359:3,
12,13,15
363:10 368:23

**Monitor's (3)**
50:11 112:22
342:12

**month (8)** 37:21
93:23 103:4,5
162:23 230:11
323:23 326:11

**monthly (2)**
220:6 221:15

**months (17)**
37:10,20,24
38:4,5,6,8
40:1,5,9
54:21 261:2
304:20 351:21,
23,23 353:8

**moot (2)** 275:11
334:8

**Morawetz (1)**
322:20

**more (42)** 2:23
42:16 50:18
55:5 79:7
100:22 101:18
102:7 104:4,8
110:1 144:15
145:18 157:9
158:12 197:5
209:15 219:1
242:8,13
247:12 261:2
270:7,12
280:13 281:3
282:9 291:8
292:8,9

293:21 304:15
311:12 322:19
324:8 326:11
334:13 342:20
349:5 352:15
371:10 374:19

**morning (13)** 2:1,
4,5 28:12
52:22 55:20
56:19,20
70:24 71:6
110:21 126:10
142:13

**most (17)** 7:1
8:2,3 30:14,
16 44:23
52:10 62:23
95:6 99:7
113:2 118:2
160:22 164:2
266:15 269:15
358:16

**motion (40)** 2:10
20:6 30:1
33:7,20 37:1
53:8,9 55:1,8
56:15 57:15
76:19 77:4,6
93:20 94:2
96:2 103:2
130:14 142:24
147:11 230:9
231:2 234:16
257:18 261:4
293:6 302:17,
18,21 304:16
305:9 314:23
315:23,24
321:2 338:5,7
350:19

**motions (2)**
27:14 301:6

**motivation (1)**
252:14

**motivations (1)**
119:24

**mouth (1)** 112:2

**movant (8)** 127:8

317:2 330:16
331:13 341:9
350:20 352:23
353:2

**movants (60)**
32:10 33:11
37:5,18 39:2,
16 41:12,17
42:2 97:3
266:1 270:2
273:22 276:2
315:1,8,14,18
316:6,18
318:3 319:6,7,
10,13 320:15
321:4,10,19,
24 323:15
324:12,12,20,
23 325:5,11
326:3,13
327:13,20
329:20 330:6,
23 334:16
335:13 338:9,
10,17 340:8,
18,21 341:9
342:4 343:16
350:24 352:11,
11 353:4
366:19

**movants' (11)**
37:6 314:23
315:16 320:12
328:4 329:12
330:2,10
337:10,11
353:21

**move (12)** 12:14
17:5 69:14
70:3 229:4
262:17 264:12
268:8 269:11
270:15 292:23
352:20

**moved (3)** 17:2
236:14 292:22

**moving (2)**
234:16 315:24

**Mrs (1)** 314:6

**much (31)** 2:23
30:18 31:1
56:16 59:9
79:4 82:4
87:21,24
102:4 105:3
109:13 141:8
153:23 156:24
175:19 187:11
203:3 206:20
207:14,23
231:4 252:8
261:23 265:17
274:1 297:9
303:15 309:5
311:4 365:13

**multiple (2)**
342:10 355:23

**multitude (1)**
370:13

**must (18)** 6:1
21:12 25:22
43:5 45:23
46:14 84:13
86:18 200:4
289:12 308:15
325:17 329:8
332:16 339:16
342:18 350:7
369:2

**my (206)** 9:15,
19 19:9,9,14
20:10 31:14,
17 35:15,16,
17 41:21
46:12,12,12
51:10,19 58:1
59:10 62:15,
15,23 63:24
64:3,8,9
65:10,21
70:12,13,15
71:9 77:2
78:19 80:11,
21 81:13 83:3
89:4,9 92:21
96:15 98:21

Case 09-10138-MFW   Doc 15396   Filed 03/30/15   Page 415 of 450

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
March 26, 2015

99:7,8,13,15
105:1,8,8,10,
18,20,20
107:19 117:1,
3 121:17,21
125:8 126:3
127:15 135:16
136:23 137:4,
5 138:15
143:16 146:3
148:5,9,14,16
151:20 153:6,
6,11,23 156:6
158:22 159:13
160:12,19,21
165:18,20
168:11,12
170:24 172:20
177:22 178:7,
11 180:11,14,
20 183:12
184:3 195:5,6,
21 199:2,9
200:23 201:8
202:1,2,5,6,7,
24 203:2
204:2 207:7,8
209:1 210:4
212:6 214:16,
20 215:5
216:3,5,7,11
218:19 222:1
229:8,10
230:20 232:13
234:16 235:1,
7,19 236:6
237:6,15,16
238:5,6 240:8
241:8 243:22
245:8,21
249:20,21
250:13 251:5,
13 252:5,6,13,
14,15,16
253:3 256:9,
19 257:14
259:15 262:10
264:15 265:2,

15,16 271:12
273:4,6 274:7,
13,16 277:8,
14 284:9
286:2 296:22
301:13 304:23
305:4 308:12
309:2,13,19
310:9 312:11
314:8 320:7
329:10 333:1
336:6 337:22
346:14 354:5
357:11 358:3,
4,22 360:24
366:15 367:8,
13 371:9,18
373:2

myself (13) 56:5
72:9 81:18
90:3,9 211:23
222:21 223:17
238:3 270:16
283:22 363:13,
14

**N**

naively (1) 85:15
name (16) 28:17
64:3,9,9
66:19 67:16
68:12 69:23
71:18 146:5
159:13 166:6
195:4,6
264:22 265:9
named (2) 24:9
77:5
names (5) 66:4
93:17 288:9
290:15 300:13
narrow (1) 5:16
national (1)
322:14
nature (4) 71:13
74:18 222:15
294:12

navigate (1)
75:16
nearly (3) 143:6,
7 323:22
necessarily (1)
266:13
necessary (4)
32:9 41:15
56:22 280:3
need (38) 32:3
40:23 41:20
47:8 50:7
51:2 84:14
109:15 140:11
141:3,21
167:19 169:24
184:1 185:4,
14 188:21
221:20 224:18
240:8 273:9
284:10 312:5
327:2,9
331:22 337:21
341:7,8
345:22 346:19
348:3,17
349:8 365:19
369:3 370:6
374:13
needed (12)
17:23 91:23
101:18 102:16
135:10 161:17
199:23 224:21
247:11 263:10,
14 276:8
needs (4) 10:19
39:22 194:17
373:15
neglect (47) 26:3,
9,11,14 28:16
36:23 39:24
41:16 42:18
44:7 46:18,19
49:14 50:22
292:6,11,14
294:23 295:2
302:5,8

304:12 306:15
307:2 315:4,
10 320:11
335:4,6,15,19,
21 336:3,10,
14 337:2,17
339:21 340:19
342:5 343:24
352:17,23
354:1 362:10
364:12,16
negligence (4)
125:20
338:24 340:3
364:15
negotiate (1)
305:5
neighbor (1)
148:9
neither (1) 275:6
Nelligan (30)
76:9,17
82:12 105:5
116:13,16,21
117:21 120:7,
10 121:15
124:20 136:14
137:6 140:6
167:4 169:3,4
182:5 183:8,8,
22,24 191:18
192:1 193:11,
15 249:9
251:21 338:9
Nelligans (2)
121:17 124:23
Nelligan's (1)
123:15
network (1) 4:12
Networks (19)
22:18,19,19,
20 71:20 72:1
107:1 163:20
164:20 173:11
212:9 304:5,5
332:12 363:3,
4,5,5,6
never (31) 11:22

23:19 38:13
46:24 47:13
49:2,3,11,11
123:16 126:10
141:19,20
156:1 197:18
198:1 202:14
225:20 227:11
233:9 244:20
249:17 271:12
311:12 316:12,
13 318:11,12
352:9 361:3
367:6
nevertheless (1)
325:1
new (11) 64:7,8
105:12 131:1
149:12 227:14
235:21 299:15
331:14 365:6
371:19
newly (1) 15:17
news (6) 83:12
88:10 214:8
227:14 322:10
368:16
newspapers (1)
298:20
next (16) 74:1,
19 158:22
179:20 199:16
217:20 278:21
321:13 322:1,
6,9,16,22
345:5 349:22
359:23
Nice (3) 2:8
31:19 309:18
nick (1) 55:21
NNI (9) 35:11,
12,17 44:1,1
327:6 333:4,
20 334:13
NNL (1) 333:13
Nobody (12)
73:14,14
95:16 118:5

Case 09-10138-MFW    Doc 15396    Filed 03/30/15    Page 416 of 450

**Bankruptcy Court for the District of Delaware**
In Re: Nortel Networks Inc., et al.

Hearing
**March 26, 2015**

139:6 222:3
243:17,18
344:19 350:23
365:20,21
**nondebtor (1)**
349:3
**none (6)** 7:6
47:1,10 300:8
306:4 342:2
**non-US (1)** 49:8
**nonworking (1)**
115:14
**nor (1)** 257:12
**normal (4)** 96:7
206:21 211:21
357:22
**normally (4)**
159:7 275:20
285:7 312:4
**Nortel (239)** 2:12,
18,20,21 3:15,
16,19,21 4:4,
10,15 5:13,22
6:6 7:9,10,11,
11,13,15
11:10 22:17,
18,19,20
32:19,21 33:9,
10 34:4,5
44:3 45:16
47:20,24
48:12 51:20
54:8 60:11,13,
17,23 61:1
62:10 68:24
70:14,20
71:11,12,15,
19,24 72:5,5,
16 75:13
81:22 90:14
105:21 106:24
107:5 110:23
111:6 112:24
114:10,18
115:2,5,9,15,
19,22 119:2,
11 127:18
132:13 133:3

138:5,18
142:16,20
143:2,17
144:15,19
147:7,12,22,
24 153:12
156:20 160:4,
7,9 161:5
163:20,24
164:14,20
166:22 171:13,
17,18,21,22
173:10,20
174:3 175:2,
10,23 178:17
192:2,5
199:11,13,17
200:15 202:2,
3,7,20 203:4,
7,14,18,24
205:8,12
206:21 207:5,
6,9,9,20,22
211:15,16,21
212:1,4,6,14,
18 213:3,10,
13,13 215:1,6,
14,22,24
216:4,6,20
217:9,15,19
219:11 220:14
222:16 224:19
227:23 229:14
230:15 231:13,
15 232:10,11,
13 233:2,6,9,
19 234:18,20,
21 235:6,18
237:8,10,16,
21 238:9
239:9,13,19
245:2,18
250:3,8,11,16,
20 251:5,16
252:6 259:10
260:22 261:23
286:22,22,23
287:6 289:2,3

291:12 298:22,
22,23,24
299:1 303:24
304:4,5
313:23 315:19
316:2,9,10,12,
23 317:6,18
323:20 327:5,
15 328:18
332:12 334:4
345:14 346:5
363:3,4,4,5,6
365:8
**Nortel's (8)** 175:6
178:20 195:15
206:15,23
239:15 324:5
328:21
**North (37)** 22:2
23:1,4 61:12
70:18 72:19
165:13,15,24
213:2 217:5
232:16 287:8,
10 289:5,6,9
303:4,10,12
332:2,4,7,11,
17,19,20,22
333:10 361:15,
23 366:23
367:6 369:16,
17,19,20
**note (13)** 163:13
168:11 213:24
242:9 254:12
266:14 328:14
331:5 349:23
355:24 358:14
364:17,18
**notebook (1)**
64:16
**noted (3)** 36:24
49:20 344:13
**noteholders (1)**
349:5
**notes (3)** 121:16,
24 349:20
**nothing (27)**

19:16 29:5
49:19 54:22
57:11 84:22
100:9 104:16
180:15 181:21
196:3 208:9
209:20 246:17
261:7 262:11
291:24 299:24
325:17 348:7
349:8 354:19
355:6,7 356:9,
24 360:6
**notice (165)**
19:17 21:19
22:5,6,7,11
23:10,18,18,
18,22,23,24
24:2,3,5,8
25:18,20 26:1,
2,4,5,12,17
38:2 43:18,21,
22 44:13,14,
15,21 45:13,
14,21 51:1,11
67:1,14 68:14
70:2 86:6,14,
17 87:18 88:5,
18 115:14
126:10 127:10
130:11 150:3
155:17,19
156:4,5 168:8,
13,14 169:17
175:14 182:10
196:18 208:21,
22 226:14
266:9,24
288:7,18,19,
23 289:15,18,
18,19 290:6,6,
7,14,14,20
292:2,13,18
294:11,13,15,
15,17,22,22
296:19 301:4,
17 302:9,13,
14 303:2

305:1,19
312:7 319:5,7,
8,12,16 322:7,
13 330:17,18,
19 331:10
333:3,16
342:15,16,16
344:13,17,24
346:20 347:19,
19,22,23
348:12 349:19
350:11,12
355:10 357:8,
14,15,17,19
358:9,11,12,
14 360:2,3,22,
22,23,24
361:5,14
362:3,4,6,7,
11,13,13,16,
19 363:14,18,
22 364:4,7,14
366:1
**noticed (2)** 177:3
204:9
**notices (7)** 22:6
45:11 86:5
103:11 168:9
288:5 359:22
**notifications (1)**
57:16
**notified (6)**
139:22
145:15 161:19
174:7 357:2,2
**notify (4)** 84:16
103:6 369:5
370:8
**notifying (2)**
322:23 323:1
**noting (2)** 315:7
339:15
**notion (8)** 40:5
46:20 50:17
51:13 54:7
338:20 339:3,7
**notwithstanding (1)**
346:3

Case 09-10138-MFW   Doc 15396   Filed 03/30/15   Page 417 of 450

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
March 26, 2015

**November (2)**
70:7 116:3

**Now (69)** 13:10
20:22,24
24:12,24 25:6
26:14 36:11
37:20 38:1
40:1 41:9
42:14 43:11,
11 44:21
46:11 64:6
84:15,22
114:16 118:1
123:9,14
126:7,8,13
129:16 131:18,
18 133:10
139:12 140:9
142:12 157:5
167:22 172:22
179:6 184:5
188:21 190:2
195:9 199:10
235:8 255:18
262:6 268:13,
20 270:3,14
277:2 281:5,
23 282:17
284:21 285:1
300:16 307:3
320:15,19
325:11 335:5,
16 337:13
345:4,24
369:4 370:7
374:3

**Nowhere (2)**
347:8 352:8

**NRPC (16)**
19:18 79:10,
11 84:10
218:3,3,9,10
219:3 220:3
222:22 223:17
236:24 237:5
252:1 368:23

**number (41)** 23:3
70:10 71:2

74:22 108:2
131:2,2
162:11 166:23
172:16 184:12
211:23 217:11,
18 218:16
220:19,24
222:5,21
223:10 224:2
225:4 226:1
228:24 236:19,
24 248:13
249:1 253:1,
22 254:17
263:11 289:6
296:16 321:10
323:11 332:20
347:5 360:18
371:1,2

**numbers (3)** 74:8
184:9 222:24

**numerous (3)**
51:7 101:19
369:12

---

# O

**OA&M (1)** 212:11

**object (10)** 65:19
66:20 88:20
90:18 94:8
106:8 107:8
185:6 223:24
271:14

**objection (32)**
52:16 53:9
56:8,10 66:12
67:21 88:22
91:16 100:19
101:4 107:11
151:7,10,14
186:1 188:23
189:11 190:1,
16,16 194:2,6
200:18 226:21
264:15,17
265:3 267:13,
16 268:7

272:18 373:2

**objections (5)**
65:8,9
223:14 267:19,
22

**obligated (1)**
349:12

**obligating (1)**
133:20

**obligation (3)**
87:19 289:10,
11

**obligations (7)**
41:24 115:3,
6 133:22
134:6 291:8
339:5

**O'Brien (18)** 76:9,
17 82:12
105:5 116:13
120:7,10
167:4 182:5
183:8 191:18
192:1 193:11,
15 249:9
300:4 335:8
364:18

**observations (1)**
32:11

**obtain (2)** 75:23
218:11

**obtained (1)**
92:15

**obvious (2)** 83:5
236:21

**obviously (11)**
32:5 185:9
198:16 206:23
278:8 279:11
280:22 347:3
354:21 370:8
374:12

**occasion (2)**
165:14 180:12

**occasions (5)**
101:20 224:2
225:4 228:24
263:12

**occurred (3)**
15:13 19:8
103:6

**October (5)** 97:6
162:5 300:12
305:7,15

**odyssey (1)** 5:13

**off (21)** 63:10
64:5,10 70:10
136:19,21,22
138:6,7
143:22 144:12
148:8 157:16
162:23 178:11
211:17 222:16
351:9 352:8
373:24 374:15

**offensive (2)**
57:10 58:1

**offer (5)** 117:18
139:3 215:12
237:4 345:23

**offered (5)** 91:4
105:7 136:24
138:4,18

**offering (4)** 80:11
105:3 117:3,12

**office (3)** 35:3
63:5 70:8

**officer (3)** 63:1
308:24 311:11

**officers (6)** 107:3
173:13 260:3,
12,16 349:4

**offices (3)** 68:24
289:9 303:5

**official (3)** 52:23
372:20 373:7

**often (3)** 80:6
276:11 343:9

**Ohio (1)** 42:20

**omissions (1)**
339:17

**once (26)** 70:24
79:24 84:15
102:15,17
169:8 186:1
194:5 230:3,4

241:12 250:6,
9 287:20
294:23 312:9
322:17 329:19
331:23 344:13
353:19 360:19
364:6 369:4
370:7 375:12

**one (166)** 4:4
6:18,18 7:20,
21,23 8:13
10:22 12:1
18:15 19:18
22:6 26:3
27:12 31:17
32:15 36:15,
16 43:7,19
44:12,23 45:4
46:3 49:22
50:16 51:16,
20 52:9 61:15,
17 64:3 68:2,
7,17 70:16
75:6,11,16
76:2 82:9
92:17 96:17
97:11 99:18
103:4,5 113:6,
17 114:8
118:17 119:21,
24,24 120:6
122:14,18,22
126:8 128:1
130:20 133:3
138:4 141:18
142:15,20,23
143:1,11
144:14 145:22,
24 146:7,9,19,
20 155:13,19
160:21 161:15
162:13 165:17
172:16 177:1
185:7 187:2
189:21 193:1
200:21 205:10
208:8,14
212:6 219:15

Case 09-10138-MFW    Doc 15396    Filed 03/30/15    Page 418 of 450
Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.
Hearing
March 26, 2015

220:14 221:15
225:5 228:6
234:17 239:12
241:21 243:7,
14 244:6
246:11,24
249:4,24
253:24 258:14,
23,24 259:19
260:16 263:13
264:5 272:17
275:5 278:10
282:3 289:23
290:3 291:11
292:1 298:18
301:10 312:14
316:1,18
319:13 325:24
326:16 327:13
328:3 329:11,
18 331:3,14
332:11 334:8,
21 335:13,13
337:11 342:6
344:15 345:12
347:10 349:5
350:21,22,22,
23 354:12
361:17 362:16
364:18,20,22
366:20 367:13
369:23 371:1
372:11 374:8,8
**ones (1)** 222:9
**one's (1)** 336:9
**ongoing (1)** 54:22
**online (1)** 44:23
**only (66)** 12:23
16:10 17:22
18:4 24:10,14,
19 26:18,19
28:5 34:13
51:21 67:8
82:9 113:16
129:16 130:18
139:18 146:9,
19 148:4,9,16,
17 150:7,13

152:8 185:4
199:18 203:9
237:23 252:12
255:12 257:4,
8 258:20
259:24 264:5,
15 269:10
290:16,21
291:21 300:13,
16 301:12
323:19 327:2
330:22 331:3,
21,24 333:2
334:21 337:12
341:19 342:18
344:14 349:23
350:8 352:17
359:14,15
363:9 373:19,
21
**Ontario (1)** 252:9
**open (8)** 29:23
50:23 78:11
101:19 290:7
291:23 301:19
328:12
**opened (1)**
299:11
**opening (20)**
2:15 30:20
32:9 34:6,8
36:11 38:18
46:23 52:20
78:6,9 290:10
302:3,16
303:21 305:6
332:11 333:1
336:6 356:2
**openings (1)**
55:19
**opens (2)** 23:10
288:22
**operated (2)**
61:15 334:4
**operating (1)**
61:23
**operations (3)**
4:12 160:12

213:13
**opinion (7)** 80:11
139:4 228:4,6
249:3 255:6
306:19
**opinions (2)** 80:9
113:12
**opponent (2)**
276:1 284:3
**opponents (1)**
276:15
**opportunity (26)**
23:2 76:24
78:12 225:14
250:15 271:7,
11,15,17
272:8 275:10,
16 277:1,12,
14,18,23
278:3 285:8,
10 288:21
293:20 305:20
309:6 365:11
373:17
**opposed (2)**
90:23 355:20
**opposing (3)**
189:7 285:9
296:7
**option (11)** 125:5
225:15 226:6
227:10,13,19
243:24 248:15
254:9 256:7
302:10
**options (3)**
101:18
228:18 252:16
**oral (2)** 371:17,
20
**order (31)** 59:2
77:18 82:13
85:20 124:15
130:14,15,19,
21 135:11
154:9 278:15,
20 279:19
284:16,17

292:24 295:17,
18,19 296:6
301:4,23
322:21 323:19
338:6,17
367:15 372:3,
11 373:6
**ordered (3)**
77:22 320:19
322:9
**ordering (1)**
374:13
**orderly (1)** 85:23
**orders (1)** 322:20
**ordinary (2)**
18:21 57:15
**organization (7)**
160:15 162:7
164:16 219:4
252:11 334:5
367:2
**organize (2)**
121:21 218:4
**organized (4)**
76:15 217:21
220:4 231:13
**organizing (1)**
93:13
**orient (1)** 186:18
**original (2)**
258:23 315:22
**originally (3)**
228:15 288:1
311:13
**Other (126)** 6:21
16:22 17:7
29:2,3,6 33:2,
9 34:2 35:2,4,
11,12 36:5
43:1,9 51:15
55:11 56:4
58:5 59:3,4
71:22 72:3
76:23 77:12
86:2 92:16
95:13 96:17
97:16 107:3
112:23 119:14,

15 120:3
123:16,21
125:6 127:22
129:10,13,15
136:11 138:20,
23 139:7,23,
23 141:11
143:7,10
144:15,19,20,
21 146:16
147:4,12,16,
24 150:16
163:16 171:21,
22 198:16
202:3 208:8
215:6,7
218:14 221:23
222:4 223:23
228:6 229:14
236:23 237:1
239:22 240:3
241:22 242:6,
19 244:7
246:11,24
249:4 250:1,3
252:13 253:15,
24 258:12
259:10,22
260:14 267:22
269:10 274:19
275:12 281:11
291:13 299:22
300:22 309:10
321:21 323:4
324:12,19,23
326:16 327:13
334:13 337:16,
20 341:16
343:12,16
345:1,11
346:3 349:14
350:3 355:8
368:4 371:18
**others (13)** 55:18
90:21 109:20
112:1 114:4
124:19 148:17,
17 252:13,18

Case 09-10138-MFW   Doc 15396   Filed 03/30/15   Page 419 of 450
Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.
Hearing
March 26, 2015

260:19 287:5
308:10
**otherwise (8)**
68:5 99:1
247:8 267:18
273:4 336:20
343:6 352:10
**Ottawa (11)** 3:9
61:11,20 71:7
76:10 116:18
212:24 214:23
218:2,15
249:11
**ought (3)** 59:4
280:8 293:6
**our (99)** 43:9
45:8 51:4
53:14 72:13
75:10 76:5,20
80:23,24
92:11 93:5,8,
24 95:22
99:24 102:21
118:2 124:23
145:10 150:20
153:12,15
154:4 159:12
164:3 166:20
168:7 169:12,
12,13 170:6
174:7 182:16,
23 195:21,22
197:22 198:20
207:7 212:9
214:4 220:4,5,
21 221:4,15,
16 224:7,9,19
225:13,21,23,
23 226:4
227:11,13,22
228:2,18
235:24 236:12,
20 238:5
241:23,24
242:18 243:23
244:20 245:1,
14 246:7
249:2 256:10

260:18 267:15
268:9 269:11,
15,17 272:23
273:14 279:3
281:3,24
282:2 283:8
304:8 312:2
315:2 326:8
350:10 352:21
353:17,20
359:18 362:12
375:9
**ourselves (4)**
92:6 102:23
217:20 228:1
**out (102)** 7:18
8:24 19:3,18,
20 30:17 31:6
32:16 36:1,2,
4 37:15 39:20,
21 44:2,19,22
49:23 66:10
71:2 75:23
81:9 86:15,21
90:13 93:4,24
96:9 97:24
103:9,10,13
110:1 113:2,
19 124:15
162:12,15
165:7,21,22
166:14,21
188:5 201:4,9
203:12 204:10
211:17 213:10,
23 215:3,11,
23 216:1,2
217:17 220:17
222:6 228:18,
23 229:5,6,8
230:7 236:23
241:22 244:16
247:11 252:1,
12,14,15
254:11 257:21,
23 259:15
268:20 270:21
272:5 288:4,6

296:4 298:4,
15 307:17
312:12 324:5
329:3,22
341:10 343:4,
5,6 344:9,19
346:8 349:17
351:4 359:23
360:10 370:16
**outline (2)** 273:7
315:11
**outlining (1)**
214:16
**outplacement (1)**
70:20
**outset (1)** 350:18
**outside (4)** 58:24
59:5 210:5
361:1
**over (40)** 5:11,
21 21:22
22:14 29:24
33:4 61:9
70:15 99:4
101:15,22,24
112:17 131:21
160:5 170:19
171:12 198:14
201:4,10
214:10 230:21
235:19,23
236:1 239:20
246:19 265:8
272:23 297:22
298:1,2 308:6,
21,21 309:11
311:20 321:8
332:4 338:19
**overall (1)** 244:17
**overcome (1)** 40:6
**overlooked (1)**
375:14
**overrule (1)** 91:16
**oversee (1)**
222:23
**overshadowed (1)**
79:6
**overview (1)**

257:14
**overwhelmingly (1)**
330:6
**owed (9)** 11:10
18:3 73:13
90:1 117:24
147:18 152:2,
9 251:1
**own (23)** 19:4
21:1,2,3
30:16 47:4
50:11 76:5
80:11 90:19
92:11 93:8
125:23 140:12,
15 141:5
227:22 237:10
238:11 254:18
284:9 314:1
336:9
**owned (1)** 245:18
**owns (1)** 299:2

**P**

**package (5)**
70:15 198:19
250:1,12
323:13
**packages (2)**
323:19 324:3
**packed (1)** 321:6
**page (29)** 42:3
64:21 65:4,16
78:3 83:19,22
105:24,24
121:12 122:16
150:1 163:2,4
179:16,20
184:9,9,12
199:10 200:3
205:21 239:6
265:9 315:11
331:5 348:13
362:21 368:18
**pages (12)** 22:7,
10 65:20 66:3,
15 68:1 117:7

245:10 265:8,
8 288:4,8
**paid (27)** 47:19
48:14 87:24
89:24 90:5
114:23 115:9
145:9 147:17,
18,20 153:6,
12 167:5
174:19 179:3
183:15 227:23
309:15 316:8,
10,14,15,23
317:20 347:5
348:23
**Pandora's (2)**
50:24 344:18
**panned (1)** 298:4
**paper (2)** 168:11
197:5
**papers (9)** 24:6
37:6 50:2
56:11 95:22
110:22 170:24
181:2 333:18
**paperwork (1)**
178:10
**Paradis (1)**
367:14
**P-A-R-A-D-I-S (1)**
367:14
**paragraph (32)**
34:7 78:5,15,
18,19 125:18
150:3 163:18
173:8,19
184:24 199:11,
16 204:19,22,
24 205:2,5
206:10 207:15
234:11,15
241:14,15
258:8 259:2,6,
23 278:21
328:9 339:1
349:22
**parallel (4)** 17:13
43:6 347:22

Case 09-10138-MFW    Doc 15396    Filed 03/30/15    Page 420 of 450
Bankruptcy Court for the District of Delaware                                    Hearing
In Re: Nortel Networks Inc., et al.                                      March 26, 2015

359:17

**parent (1)** 7:13

**part (56)** 2:19
4:24 5:12,24
13:6 17:8
20:3 41:21
57:17,21 79:9
87:18 90:18
98:13 99:7,8
102:21 107:23
119:9,18
120:17 125:21
162:6 211:20
218:3,13
221:1 222:7,
11 224:20
236:9,16,20
246:12 247:15
248:11 252:4
257:9 267:14
269:11 270:4
277:8 280:8,
20,23 281:3,
23 291:1
296:5,22
297:16 300:4
304:22 339:1
346:22 347:1

**Parthum (20)**
31:21 131:3
269:21 270:13
274:6,14
279:2 280:12
281:21 285:22
286:1 314:8,
10,12,16
328:24 330:9
341:1 343:19
351:6

**Parthum's (1)**
282:8

**participants (3)**
168:16
182:20 209:11

**participate (1)**
94:1

**participated (1)**
53:11

**participating (1)**
100:21

**particular (20)**
63:21 69:4
97:22 101:3
118:16 143:3,
9 146:19
162:12 179:3
186:22 198:11
222:9 223:19
237:7 257:13
266:24 285:6
328:9 350:24

**particularly (1)**
277:15

**parties (11)** 27:2
95:14 101:12
191:12 194:9
271:22 278:20
285:6,6
298:14 374:22

**parts (5)** 3:17
171:21,22
232:4 362:21

**party (8)** 234:16
264:12 274:18
275:6,24
276:15 284:3
315:24

**pass (3)** 339:6
350:14 351:10

**passages (1)**
270:22

**passed (8)** 37:20,
24 131:22
207:14,23
261:2 307:5
364:21

**passes (2)** 54:21
361:10

**passing (2)**
312:9 356:20

**passive (3)**
36:12 37:14
46:22

**past (6)** 75:2
107:3 131:2
173:13 260:3,

11

**patents (2)**
107:19,20

**path (1)** 252:15

**Paula (22)** 3:6
45:5 59:11,16
60:3,5 70:6
77:15 149:6,
15 179:4
184:15,21,24
193:4 194:8
289:17 291:8
321:13 323:9
326:20 363:12

**Pause (2)**
198:18 241:18

**pay (17)** 7:11
9:15 76:16
93:8 105:17
133:21 153:2,
6 164:10,13,
14 165:18
174:19 234:20
333:12 343:21
362:8

**paycheck (8)**
105:20 153:6
232:13 297:7,
7 313:3
316:13,15

**paychecks (1)**
316:10

**paying (12)**
105:14
145:14 153:17
164:8,10
174:15 202:21
203:17 205:6,
9 216:5 221:6

**payment (5)**
30:10 103:17
147:23 192:2
199:3

**payments (5)**
104:1 115:14,
18 117:24
215:22

**Payne (13)** 76:9,

15,17,18
82:12 105:5
116:13 167:4
182:5 192:2
193:11,16
249:9

**payroll (5)** 46:9
134:16 172:2
188:8 327:4

**pays (1)** 105:20

**PDS (2)** 160:14
162:7

**penalize (1)**
299:6

**penalized (1)**
295:5

**pension (13)**
8:19,24 28:7
38:20 148:5,
16 237:18
242:14 244:14
250:13 252:8,
10 343:10

**pensioner (1)**
219:9

**pensioners (20)**
9:11,13 77:4,
9 79:7,8
169:14 187:12
218:5 219:2,6,
7 240:19
242:13 244:10,
13 247:19,22
326:6 368:15

**pensions (4)** 33:2
166:20 298:11
351:12

**People (250)**
3:18,24 5:2
6:4 7:18,20
8:16,20,22,23
9:2,20 10:12,
14 11:14 14:2,
15,18,20,22,
23 15:8 16:24
18:22 19:24
20:23 22:8,11,
12 24:4,18

25:14,19
28:20 29:10,
16,22 30:15
32:18,24 33:5
34:16 35:14
36:1,19 38:12
42:10,20 43:1,
4,9,15,20,21,
22,23 44:12
45:3,3,6 46:3,
7 47:1 49:9
50:14,15,19
51:21 53:21,
21 61:12 62:3,
4 63:5,7,9,18
64:4,10 68:23
69:21 70:11
71:1 72:9
75:5 76:16
81:7 87:5,17
88:2,2 92:10,
16,24 93:5,15
94:5,21 96:2
103:6,12
112:18 113:11,
15,20 114:10
123:21 127:17
128:2,5,6
129:8,12
130:5 134:13
135:23 141:2
142:23 143:13
144:3,6,21
146:8 147:17
148:6 157:10
158:16 161:4
162:16 163:16
169:14 184:16
187:3,7,10,15,
20 188:2,12,
17 213:4
214:19 217:15
218:11 221:17,
23 222:11,16
223:4,18,22
224:4 230:7
240:18 245:13
247:16,18

Case 09-10138-MFW    Doc 15396    Filed 03/30/15    Page 421 of 450

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
March 26, 2015

256:18 265:1
267:2 286:17
289:7,13,16,
20 290:11,13,
17 291:9
292:3 293:16,
22 294:7,8,12
295:4,4
298:15 299:11
300:1,22,23,
24 301:19,21
302:11,15
303:7,7,9
305:17,22
306:2 308:2
309:11,15
310:20 311:7,
13,14,18,21
312:18,24
313:20,24
323:11,14
324:2 330:20,
21 332:18
333:3 334:1,
11 336:7
337:17 338:3
339:7 342:8
343:18,20
344:12 345:2,
17 347:3,23
348:19 349:7
355:15 357:11,
11,12 358:16
359:8 360:18
361:8,19
362:5 363:2,
23 364:1
365:7,10
366:12,13,24,
24 371:7 372:5
**people's (3)**
222:4 303:8
345:15
**per (3)** 268:9
283:12 327:3
**perceive (1)**
81:20
**percent (12)**

148:5,8,9,16
244:13 266:3,
20,21,22
333:24 334:15,
17
**percentage (3)**
17:16 147:23
199:18
**perfect (1)** 259:8
**perfectly (1)**
285:18
**performance (1)**
4:18
**performing (1)**
326:9
**perhaps (11)**
55:5 88:2
141:17 185:14
264:2 271:11
277:4,8 285:4
341:10 369:7
**period (18)**
95:19 97:10,
11 98:1,7
100:8 176:10
181:4 185:19
201:4,10
203:20 208:4
236:1 239:20
320:14 335:15
355:11
**permissive (1)**
23:11
**permitted (1)** 29:9
**persistent (1)**
294:2
**person (16)**
34:24 35:1,2
44:16 49:8
66:22 67:6
69:24 104:18
116:23 128:16
166:5 197:5
214:12 265:10
313:7
**personally (8)**
58:1 119:17
127:3 129:2

143:22 214:9
219:13 334:23
**perspective (18)**
13:11,14
20:11 23:7
26:21 27:5,12
104:3 105:20
108:13 123:12
145:10 155:2
193:7,23
286:23 287:12
311:8
**petition (2)**
320:18 321:7
**petitions (1)** 7:17
**Philpott (1)** 80:3
**phone (16)** 6:20
15:6 18:13
23:3 39:8,9
42:7 47:2
71:7,8 74:8
214:10 247:21
289:6 332:19
366:24
**phoned (1)** 72:22
**photocopied (2)**
265:7,9
**phrase (2)**
163:23,23
**physical (1)** 88:14
**physically (4)**
11:3 39:7
69:1 357:17
**picked (3)** 42:7
47:1 124:20
**picking (1)**
190:21
**picture (2)** 8:24
107:5
**piece (3)** 61:17
326:16 366:3
**pieces (2)** 272:5
325:22
**Pierre (6)** 47:16,
16 184:19,20
316:19,19
**Piggott (1)** 4:9
**pigs (1)** 222:23

**Pioneer (8)**
26:10 292:12
302:6 335:9
339:13,24
364:12,17
**Pirih (6)** 62:16,
23 71:5,19,23
88:9
**pitcher (1)** 59:20
**place (18)** 6:6
27:19 69:9
76:6 84:17
86:9 164:11
167:18 194:9
214:2 220:5,
20,23 225:3
248:1 274:11
340:14 369:6
**places (3)**
147:19
259:22 347:6
**plain (2)** 42:6
330:11
**plainly (1)** 342:6
**plaintiffs (1)** 44:7
**plan (10)** 27:16
57:18 299:13,
16,23 300:1,2,
20 306:18
365:6
**planned (1)**
269:20
**planning (1)**
162:8
**play (1)** 41:15
**plays (1)** 30:17
**plead (1)** 340:6
**pleadings (1)**
50:11
**Please (21)** 2:2
59:13 60:5
109:2 140:24
150:2 157:23
159:14 179:7,
15 194:21
195:3 211:9
234:1,12
238:20 240:10

268:2 349:23
353:12 370:1
**pleased (2)**
158:20 237:15
**pleasure (3)** 2:6
231:9 240:8
**plight (2)** 6:1
9:11
**plugged (1)**
342:21
**plugged-in (1)**
342:9
**pm (3)** 157:19,
21 375:21
**pocket (1)** 19:4
**point (93)** 7:6
26:22 49:22
65:8 68:17,19
74:16 75:14
79:9 91:22
93:3 99:19
100:12 110:14
115:8 124:6
126:13 131:23
135:18 139:19
141:4 146:11
150:9 152:21
168:24 176:23
181:22 182:12
183:4 187:7
188:2 189:17
190:7,11
192:5 195:18,
24 199:22
200:10,16
203:8 204:5
206:13 207:10
214:22 218:19
222:7 225:6,
14 227:15
230:16,23
232:18 236:14
238:13 240:11,
16,21 241:1,7
242:22 244:22
246:7,17
247:6 248:22
249:4 251:20

Case 09-10138-MFW   Doc 15396   Filed 03/30/15   Page 422 of 450
Bankruptcy Court for the District of Delaware                                    Hearing
In Re: Nortel Networks Inc., et al.                                    March 26, 2015

253:4 254:13
258:5 262:20
263:6 267:20
270:21 272:3,
5 277:9 278:4,
5,10 292:17
312:12 318:16
328:3 333:1
337:11 347:18
358:17 370:16
372:11 373:20
375:4
**pointed (6)** 110:1
203:12 204:10
296:6 337:23
351:4
**pointing (1)** 272:5
**points (5)** 53:2,
13 242:9
286:9 349:17
**policy (1)** 324:5
**pool (2)** 35:4
50:20
**portion (3)**
132:22
133:11 326:5
**portions (2)**
133:6 274:18
**posed (1)** 207:12
**position (13)** 4:7
62:12,15
79:22,23
212:18,19
219:18 235:21
315:2 336:18,
23 375:4
**positions (2)**
212:2,5
**positive (2)**
171:1 181:20
**possibility (11)**
90:15 218:18
254:5 303:15
318:5 342:1,4
343:23 344:8
355:16 371:17
**possible (14)**
11:12 18:8

19:12 24:1
75:14 118:22
136:2 140:11
141:3 142:1
205:16 249:18
273:18 354:17
**possibly (1)** 92:8
**post (11)** 75:10
81:7 87:1
184:15,19,21,
24 185:11
188:1 189:1
321:20
**post-CCAA (2)**
138:8 144:12
**posted (13)**
81:14 103:10
114:5 128:23
129:2 130:4
156:10 186:8
321:14 323:24
324:14 326:20
360:22
**posters (1)** 185:8
**posting (6)** 45:3
187:12,13,14,
17 241:23
**post-Pioneer (1)**
26:15
**posts (11)** 114:8
127:8,12,15
179:3 187:2,
18 188:21
189:15,21
321:21
**pot (4)** 35:23
154:19 298:18
334:9
**potential (15)**
14:22,23
40:16 43:24
51:24 112:23
135:19 199:24
256:23 257:17,
23 302:8,23
341:20 368:5
**potentially (16)**
24:16 85:1

86:24 122:19
173:1 193:1
225:7 227:21
250:15 251:9
256:7,16
273:7 294:13
295:5 299:19
**pots (1)** 150:16
**power (2)** 98:15
101:15
**PowerPoint (1)**
314:14
**PR (2)** 200:18,
22
**practice (4)** 3:16
62:10 72:8
253:19
**practiced (1)**
255:15
**practicing (3)**
228:8 254:2
255:8
**pray (1)** 313:21
**precise (1)** 369:9
**predicates (1)**
41:16
**predominantly (2)**
26:12 80:3
**prefer (2)** 280:22
282:4
**prefers (4)** 274:3,
10 280:20
281:6
**prejudice (7)**
28:10 52:1,5
96:15 277:14
312:21,23
**preliminary (1)**
32:11
**prepare (1)** 223:3
**prepared (9)**
65:21,22
69:8 72:7
160:23 194:8
230:4 326:2
372:2
**pre-petition (5)**
2:13 8:14

219:9 323:14
325:13
**pre-petition- (1)**
324:11
**presence (1)**
197:20
**present (10)** 6:22
41:10 107:3
173:13 194:10
260:3,12
280:2 334:22
373:16
**presentation (9)**
269:22
273:12,22,24
281:4,24
282:8,16
329:12
**presentations (1)**
372:4
**presented (11)**
5:15 12:12
264:14 267:23
282:6 330:7
343:20 345:14
347:13 374:8,8
**preserve (2)**
80:23 297:3
**president (5)**
73:19 160:13,
24 217:4
333:15
**presume (1)**
100:3
**pretend (1)**
113:14
**pretty (4)** 171:4
203:3 297:9
301:13
**prevent (2)** 345:1,
2
**previous (2)**
191:14 256:12
**previously (7)**
89:15 94:4
129:11 208:19
227:10 264:14
346:4

**primarily (5)**
11:16 135:16
160:11 238:4
242:15
**primary (6)** 56:2
105:10 113:13
117:1 136:23
147:5
**printed (1)** 62:8
**prior (20)** 74:20
89:11 120:9
131:15 132:10
133:19 140:22
141:16 200:11,
12 222:16
227:12 234:18
316:2 318:4
321:5 323:7
325:2 326:12
339:20
**private (1)** 293:13
**privately (1)**
191:24
**privilege (2)**
20:17 99:2
**privy (1)** 93:2
**pro (1)** 308:5
**proactive (1)**
220:15
**probably (13)**
26:22 27:4
32:18 107:12
109:19 173:24
177:19 187:6
188:10 189:19
200:9 217:14
274:12
**problem (6)**
15:21 165:18
291:5 294:20
309:8 363:18
**problematic (1)**
100:23
**problems (2)**
27:16 43:5
**procedural (1)**
85:14
**procedure (6)**

Case 09-10138-MFW    Doc 15396    Filed 03/30/15    Page 423 of 450
Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.
Hearing
March 26, 2015

15:24 16:1
24:22,23
271:5 276:9
**procedures (3)**
307:9 309:12
349:23
**proceed (11)**
11:13 91:23
195:10 228:11
250:13 273:17
274:4 282:16
285:22 314:5,7
**proceeded (4)** 8:9
99:5 311:8,12
**proceeding (16)**
15:19,22
44:20 73:20
91:11 92:7
118:13 168:10
197:17 218:7
220:22 221:1,
7 254:17
327:18 358:4
**proceedings (65)**
5:10,19
44:22 48:12
54:9 73:1
76:6 80:19
82:3 117:21
119:16 120:3,
10 122:5,12
123:6,10
124:10 125:3,
15 136:21
150:8 168:17,
22 169:18,19,
21 175:24
176:8,8,15
182:21 208:21
209:10 219:22
220:2,21
237:9,11
238:10,11
239:10,14,16,
22 250:21
251:17 254:19
259:17 296:19,
22,23 317:19

319:15 325:4
326:15 341:14
350:1,3,5,8,
14 356:12
362:23 363:9
**proceeds (6)**
132:12,16,24
133:7,12
355:12
**process (252)**
3:11 5:9,11
7:15 8:4 9:17,
24 10:6,7
11:7,9,15,18
12:5,17,18,18,
19,20 13:1,2,
6,16,16 14:10,
13 15:15
16:18,21
17:17 18:21
19:10 20:9
29:7 39:13
46:21,22 47:5
74:3,4,6
78:22 79:3
82:4,6,7,18,
23 83:1,3,5,6,
7,23 84:3,5,6,
7,13,15,16,23
85:4,9,10,11,
24 86:1 87:10
89:1,17,20
91:11 93:19
94:23 96:7,7
99:6 102:14,
16 103:21,23,
24 104:13
118:19 122:17
123:17 125:6
135:8 141:9
152:4,11
153:24 154:1,
5,7,10,12,12,
18 156:15,22
158:18 163:16
167:18,21
168:3 170:1,3
176:4,17,22

177:2,14,17,
21 178:5
180:10,22
181:10,18,23
182:2,12,18
183:5,10
184:2 187:4,
15 192:24
195:14 196:22
197:12,21,23
214:20 219:12,
24 220:20
222:7,12,23
223:1,8,8,10,
15 224:6,9,15,
22,24 225:3
229:7,24
230:5 235:17,
22 236:5,8,8,
10 240:12,20
243:7,8 245:3,
5,16,20
247:16 248:1,
12 249:21
252:3,5 256:4
257:10 263:2,
13 272:17
274:2 297:19,
24 298:1,3,6,
20 300:5,7,7,
23 303:10
309:15 311:20,
22,24 312:17,
18 321:13,15,
24 322:4,12,
18,24 323:17
325:3,8,15,18,
20 326:23
328:11 332:7,
23 340:23
343:6,15,16
346:23 347:1,
10,11,20
357:1,21,22,
23 358:18,19
359:4,19
360:2,7,8,14
365:1 368:18,

19,20 369:1,4,
5 370:3,3,4,7,
9,10 371:21
**processes (13)**
8:1,6 13:19
16:22 29:13
82:10 104:17
123:11 153:21
160:16 193:6
247:12 307:10
**procurement (1)**
160:22
**produce (4)** 98:4
310:4 352:13
366:6
**produced (7)**
20:21 200:21
277:15 310:5,
6 315:7 369:13
**produces (1)**
100:2
**product (6)** 3:24
61:3 160:13,
14 161:3,24
**production (1)**
41:14
**products (4)** 4:18
7:16 160:18
161:15
**professional (3)**
2:20 4:3
159:18
**professionals (1)**
3:3
**progress (2)**
150:20 229:3
**project (6)** 62:1,
2,6,20 63:3,3
**projects (4)** 61:2,
16 71:13
153:16
**promised (2)**
12:18 147:20
**promises (1)**
158:4
**prompt (3)**
371:14,15,16
**prompted (1)**

151:1
**prong (1)** 307:1
**proof (17)** 21:13
28:3 43:10
68:14 69:2
70:1 88:6,17
134:18 167:19
169:24 270:1
348:18,20
349:21 359:16
368:8
**proofs (9)** 15:18,
23 50:15
339:19 357:12,
13,24 358:2,5
**proper (1)** 339:21
**properly (1)** 51:12
**property (1)**
107:18
**proposal (2)**
374:7,19
**proposed (1)**
222:20
**prosecuted (1)**
230:24
**protect (2)** 89:4
155:3
**protected (2)**
312:6 327:20
**protection (7)**
111:7 119:5
122:17 192:24
251:7,12 350:2
**protects (2)**
302:11,11
**protocol (1)** 279:5
**proud (1)** 2:16
**proven (1)**
241:20
**provide (9)** 23:21
97:2,4 113:9
161:16 237:6
252:24 331:10
372:6
**provided (12)**
59:1 67:3
94:4 96:4
114:9 139:9

Case 09-10138-MFW   Doc 15396   Filed 03/30/15   Page 424 of 450

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
March 26, 2015

160:15 161:8
196:3,7 303:1
355:3

**provides (1)**
340:11

**providing (2)**
140:7 353:23

**proving (1)**
352:22

**provision (1)**
126:1

**public (1)** 126:20

**publication (5)**
23:18,19
289:16 319:9
362:16

**publications (2)**
25:1,2

**publicize (1)**
138:13

**publicized (4)**
127:3 128:10
129:18 134:21

**publicly (1)** 73:3

**published (17)**
24:5,6,7 38:3
82:20 83:13,
16,18 84:24
85:10 141:10
152:12 294:17,
22 319:16
322:14 362:24

**pull (5)** 230:17
273:9 299:19
365:4 367:15

**pulled (1)** 223:17

**pulling (1)** 360:9

**punished (2)**
294:14 310:9

**purely (1)** 246:14

**purported (2)**
266:1 267:7

**purports (1)**
265:19

**purpose (8)**
91:16 113:14
138:1,2,16
234:15 290:3

315:23

**purposes (2)**
40:16 276:4

**pursue (10)**
108:14
118:11 135:11
136:17 137:19
152:9 195:19
312:24 314:1
355:1

**pursued (1)** 259:9

**pursuing (2)**
145:21,24

**pursuit (1)** 328:14

**push (1)** 353:20

**put (36)** 21:11
26:7 27:12,22
28:9 40:22
41:15 57:14,
21,23 58:11
63:24 64:3,9,
9 76:19 77:4
131:19 135:3
165:18,19
213:18 218:17
220:4,20
230:3 233:15
237:17 248:1
254:18 273:14
278:19 302:4
327:11 332:18
375:2

**Putting (6)** 50:20
58:14 231:23
240:23 260:10
274:2

---

# Q

**Quebec (1)**
367:19

**question (65)**
26:4,5 32:23
67:5 81:15
100:17 101:4,
5,23 102:1,2
107:10 126:5
134:4 136:3

137:5 140:22
155:13 177:12,
12,23 185:10,
13 186:14,17
189:8,11
190:5,14,17
191:1,2,9
192:23,23
193:12 195:4
204:21 205:1,
4,11 206:3
207:12 208:14
220:13 221:15
224:2 232:20,
22 238:6
239:9 245:21,
22 250:19
263:11 271:15
290:18 329:13
331:2 336:15,
19 346:9
349:18 354:13,
16

**question-and-answer (1)**
326:1

**questioning (4)**
56:6 189:3
201:19 227:5

**questions (56)**
23:2,5 31:1,4
70:23 74:7,9
75:11 80:5,7
93:15 113:13
120:12,16
121:13,18,19,
24 122:14
125:22 148:20,
22 155:7,11
171:6 172:4
185:19 186:12
209:17 217:6,
10 220:16
223:4 230:3,5
236:22 242:1,
16 249:22,23
252:5 261:10,
12 262:4
263:19 271:12

287:9 303:6
304:3 343:12
351:3,5,6,13
352:16 353:24

**quickest (1)**
157:12

**quickly (13)**
91:10 92:8,
20,22 93:9
102:15,17
103:1 126:20
230:16 273:18
294:3 311:12

**quiet (1)** 170:21

**quite (9)** 13:17
58:21 74:22
125:1 133:24
153:19 160:19
203:23 356:10

**quote (2)** 332:6
369:7

**QURESHI (17)**
52:21,23
56:13 57:24
261:9,11,14,
15,16,18,20
263:15,18
354:8,9,11
356:16

---

# R

**R&D (3)** 61:1,2,
10

**raced (1)** 31:6

**radar (5)** 225:21
227:11 243:24
244:8 250:18

**radio (1)** 73:2

**raise (1)** 189:12

**raised (11)** 53:7
95:22,24
225:13 246:15
248:15 263:11
279:11 341:5
373:10,13

**raising (1)** 40:14

**Raleigh (4)**

61:12,21
70:17 213:2

**rallied (1)** 93:24

**ran (1)** 233:12

**rank (1)** 226:18

**rarely (1)** 26:24

**rather (3)** 20:13
274:12 284:22

**Re (3)** 331:4
335:16 336:11

**reach (4)** 140:1
229:5 241:22
330:20

**reached (7)**
37:15 90:13
217:17 228:23
229:6,8 330:21

**react (2)** 358:16
362:5

**reacted (1)** 151:6

**reaction (1)**
230:20

**read (89)** 13:13
25:1 28:11
32:6 47:23
70:15 83:18
110:22 111:19
116:5,8
127:12,15
130:10,15,17
150:10,21
165:6 172:8
173:19,24
174:4 177:11,
19 178:1
180:9,18
185:7,9,12
186:22 187:5,
12,14,15,18,
23 188:11
189:1 190:18
191:4,6 195:4
196:21 204:21
205:1,5
206:10 234:14
238:22 239:7
241:16 245:10,
11 270:9,11

Case 09-10138-MFW    Doc 15396    Filed 03/30/15    Page 425 of 450

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
March 26, 2015

271:11 273:15
277:23 278:1,
15 279:19
280:6,14,23
281:14,15,17,
19 284:9,18,
24 285:15
289:17,18,20
301:12,24
317:4 321:7
330:23 331:3
346:1 362:20
363:19,22
367:17 371:19
**readily (1)** 373:14
**reading (13)**
127:8 180:21
185:23 187:2
188:3 197:1
205:21 260:2
277:20 294:13
301:12 342:12
345:7
**reads (4)** 192:15,
23 241:19
278:8
**ready (3)** 70:16
167:21 195:10
**real (7)** 36:7
44:10 49:15
79:15 278:11
313:22 371:6
**reality (3)** 25:20
148:13 231:22
**realization (2)**
354:24 355:15
**realize (1)** 336:24
**realized (4)**
203:9,23
204:2 355:12
**really (48)** 5:8
27:23 39:20
40:9 50:19
62:22 63:17
70:22 73:14,
15 76:4 80:10,
12 82:1,2,8
88:15 102:20

105:2 110:1,1
139:3 147:14
152:5 153:13,
16,20 175:18
178:7 204:9
205:10 224:15
231:17 237:20,
21 245:22
269:16 270:7
275:11 291:2,
13 295:8,22
297:2 304:14
315:9 337:6
345:10
**reason (29)** 13:9
39:14,19 47:9,
18 48:13
86:19 87:9
97:24 130:18
141:21 147:4,
5 153:22
169:19 215:2
239:11 244:3
245:24 255:7
287:12 290:21
316:21 317:19
320:13 326:17
327:13 356:13
357:13
**reasonable (5)**
25:17 29:14
81:13 254:16
274:1
**reasonably (5)**
21:17,20
22:14 54:11
288:16
**reasoned (3)**
14:17 15:15
29:14
**reasoning (1)**
337:4
**reasons (11)**
55:9 56:11,
12 58:15
92:18 135:15
232:1 267:7
286:19,19

325:10
**rebut (2)** 277:18
278:3
**recalcitrant (1)**
294:6
**recall (28)** 122:9
124:2 170:13
187:1,24
188:16 189:15
193:17,18
197:1 199:4,6,
7 200:2 206:2,
4 212:20
215:18 216:24
221:10,14
223:9 225:12
249:10 254:11
302:18 324:24
347:20
**receive (25)** 86:5
88:5,17
103:15 134:9
150:22 155:18,
21 167:6,10
168:9 187:8,
21 188:9
199:17 201:7
207:10 208:4,
18,20 214:13
215:19 288:23
305:2 357:8
**received (68)**
18:7 22:1,3
57:14 72:23
74:17 86:6,13
116:2,5 119:1
127:10 132:1
148:4 151:6,
13 156:19
167:15 172:5,
8 182:10
184:17 185:2
187:3,7,20
188:2,13,18
192:19 193:19
196:11 197:8
198:16,20
199:8 200:10,

14 201:1,13,
15,23 202:24
203:2 208:7,
24 214:17
216:16 217:12
224:3,4,4
226:13,24
249:5 287:5
316:13 319:6
320:15 321:1
324:17 326:22
327:3 357:18
358:12,13
365:5 369:20
**receiving (18)**
19:23 73:18
74:20 87:17
111:8 133:19
168:8 187:10
188:17 193:17,
18 199:4,6
200:2 202:19
250:21 319:11
357:17
**recent (5)**
143:18
177:13 315:17
319:8 322:3
**recently (6)**
92:15 110:23
115:4 191:19
212:10 236:17
**recess (15)**
102:10
108:18,23,24
157:19 194:15,
17,23 195:1
282:19 283:13,
16 284:12
372:7 375:10
**recession (1)**
75:21
**recognition (2)**
72:16 329:21
**recognize (4)**
81:18 179:19
234:2 340:9
**recognizing (1)**

322:20
**recollection (9)**
122:16,22
177:8 178:3,8
234:23 238:19
241:8 274:24
**recommending (1)**
221:24
**Reconvened (1)**
157:21
**record (40)** 45:6
52:22 57:6
66:15 69:18
97:17 98:4,8,
12,13,22
99:22 100:5,
12,13 101:1,
18 157:16
159:15 190:22
194:13 204:15
226:22 227:4
261:16 264:12
267:15 278:2
280:6 282:10
304:22 330:11,
12 332:21
352:9 353:10
354:10 355:13
366:3 374:15
**records (3)**
199:12 209:2
333:5
**recoveries (1)**
355:16
**recovery (1)** 36:3
**recruited (2)** 6:8
211:17
**recruiting (2)**
211:19,23
**rectified (1)**
165:23
**red (1)** 75:17
**redacted (1)**
198:12
**redirect (11)**
149:1,3,4
208:13,16
271:12 277:1,

Case 09-10138-MFW   Doc 15396   Filed 03/30/15   Page 426 of 450
Bankruptcy Court for the District of Delaware                                    Hearing
In Re: Nortel Networks Inc., et al.                                      March 26, 2015

14,18 280:3,8

**refer (5)** 78:5
129:24 167:7,
8 216:8

**reference (7)**
110:10
238:24 314:18
332:11 366:14
367:18 370:5

**referenced (1)**
347:6

**references (2)**
96:4 289:4

**referral (1)** 142:4

**referred (8)** 54:6
169:23 209:10,
12 260:8
366:11 369:24
375:11

**referring (4)**
39:12 129:8
182:4 193:10

**refers (5)** 264:22
332:12 347:19
359:21 370:18

**reflect (3)** 74:10
94:15 226:23

**reflected (2)**
98:18 217:2

**reflects (5)** 94:16,
22 98:12
121:13 358:10

**refresh (7)**
122:15,21
177:8 178:3
234:23 238:19
274:24

**refusal (1)** 353:3

**refused (2)** 41:11
353:19

**refusing (2)** 97:2,
3

**regard (3)** 46:20
278:15 321:11

**regarding (10)**
40:21 73:20
136:15 190:9
192:2 253:9

321:5 323:6
326:23 367:23

**regardless (2)**
219:8 288:19

**regards (1)**
276:23

**registered (2)**
154:15 165:10

**regular (4)** 73:22
220:5 238:5
247:22

**reiterate (1)** 53:13

**reiterating (1)**
350:17

**relate (3)** 122:18
193:1

**related (4)** 81:22
168:12 209:9
327:7

**relates (1)** 232:22

**relating (3)** 41:23
100:17 187:3

**relationship (3)**
36:2 46:10,14

**relative (2)**
147:11 215:6

**relatively (1)**
20:14

**relay (1)** 236:22

**released (12)**
84:6 85:5
223:2,11
321:13 322:1,
12,18 368:19,
22 370:4,5

**releases (2)**
260:17 313:15

**relevance (2)**
97:23 262:24

**relevant (22)**
91:9 95:15,
19,21 114:3
183:11 185:10,
12 186:12
188:15,20
265:6 295:23,
24 323:4
325:22 326:17

330:3,15
331:3 332:1
367:20

**reliance (1)**
308:20

**relied (2)** 237:5
325:19

**relief (3)** 36:7
56:14 248:3

**rely (5)** 39:22
146:2 350:12
361:8,12

**relying (2)** 221:4
337:18

**remain (3)** 58:24
59:14 283:9

**remainder (2)**
66:11 325:5

**remaining (2)**
65:19 158:6

**remarked (1)**
173:24

**remedy (8)** 38:21,
23 39:3 296:8,
8,9,9,10

**remember (32)**
73:18 74:23
75:1 77:6
122:13 130:17
150:23 151:1
152:21 156:9
163:3,9 166:6
167:15 168:13
170:9 171:3
177:5,22
178:1,9,11
180:11,19,21,
24 181:1
200:1 238:16
239:4 249:24
359:5

**remembered (1)**
190:2

**reminded (1)**
375:15

**reminds (1)** 371:6

**remotely (1)**
214:10

**removed (1)**
198:13

**reorganization (2)**
299:14,16

**rep (3)** 235:20
239:21 245:6

**repeat (7)** 40:23
134:4 140:19
190:22 197:6,
7 345:23

**repeatedly (5)**
47:7 50:1
188:24 325:13,
16

**rephrase (2)**
144:1 190:14

**report (2)** 322:7
323:1

**reported (3)**
164:23 213:4,
6

**reporting (1)**
61:13

**reports (2)** 177:1
213:1

**represent (25)**
2:16 8:13,14
9:9 10:5 76:5
79:19 80:18
119:15 120:2
124:8 191:18
219:5,19
228:10,16,19
230:1 242:10
253:6,14
311:10 339:9
352:6,13

**representation (8)**
100:11 125:2
202:6 218:12
220:4 311:14
326:6,14

**representations (2)**
20:5 98:10

**representative (28)**
14:15 24:20
53:4 77:7,19,
23,23 84:9

124:24 161:13
173:15 218:21,
23 219:14
225:24 227:17
228:2 233:17
235:9,12,16
242:19 243:15
253:5,11
260:5 359:3
368:22

**representatives (24)**
18:18 38:14
39:5 42:12
76:21 77:5
79:15 96:3
97:4 142:10
143:12 208:5
218:20 219:16
222:22 236:12
241:22 242:6,
20 257:17
328:4 345:21
350:20 352:12

**represented (4)**
91:24 229:14
233:18 295:15

**representing (10)**
30:15 80:12,
16 168:5
196:14 197:16
236:7 295:4
310:16 328:8

**represents (2)**
293:14 309:4

**reputable (1)**
76:11

**reputation (2)**
116:17 338:13

**request (16)** 15:7
21:10 52:9,16
81:13 94:20
96:6,15 98:19,
20 102:10
110:11 112:2,
7 194:14 262:9

**requested (4)**
18:7 32:10
100:2 103:12

Case 09-10138-MFW    Doc 15396    Filed 03/30/15    Page 427 of 450

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
March 26, 2015

requests (2)
99:24 101:16
require (1) 302:3
required (11)
22:2,24 26:1
134:18 171:1
181:20 196:24
200:4 223:23
288:17,20
requirements (3)
267:8 335:4,6
reread (2)
140:12 141:4
rereading (1)
140:15
research (2) 4:11
342:12
reserve (2) 56:22
279:6
reserving (1)
273:10
resolvable (1)
373:15
resolved (1)
372:1
resources (3)
70:9 217:4
333:15
respect (24)
57:24 58:13
98:11 123:17
124:9 125:2
133:22 134:7
162:15 197:16
204:24 207:9
251:22 268:10,
14 273:12
275:5,18
278:23 350:4
354:17 356:9
362:22 366:9
respects (2)
33:15 347:22
respond (3)
32:12 84:19
98:18
respondents (2)
339:16,22

respondents' (1)
339:19
responding (1)
264:17
response (13)
87:16,18
100:1 110:6
125:21 148:23
276:20 279:9
324:14 326:21
343:11 349:18
373:4
responses (3)
178:1 272:17
275:5
responsibilities (1)
294:10
responsibility (6)
169:8 291:11
310:14 341:16
361:13 368:7
responsible (12)
61:14 164:7
174:15,19,24
175:2 202:21
204:23 205:6
207:2,21,22
rest (5) 6:7
230:18 252:9
354:5 372:8
restate (1) 190:15
rests (1) 352:23
result (7) 2:24
48:14 111:13
289:12 317:21
340:3,11
results (2) 345:8
346:6
retain (7) 19:14,
22 21:3 103:7
167:5 191:18
227:24
retained (8) 19:7,
9 103:2 167:3
182:1 191:24
192:1 249:8
retainer (2)
76:17 93:12

retaining (3) 19:9
167:4 229:10
retention (1)
102:14
retired (2) 113:3
119:10
return (4) 70:17
165:8 332:14,
15
revealed (1)
321:18
review (8) 94:15
105:6 112:8
117:9 192:7
249:6 272:8
285:8
reviewed (12)
16:3 20:16
74:18 116:24
130:11,12,24
131:13,16
203:15 227:20
249:14
reviewing (1)
314:14 315:5
revised (2)
258:23,24
Richardson (2)
61:13 213:2
right (143) 7:12
12:7,15,16
17:1 21:7
30:19 32:14
34:24 41:3
48:11 59:12
60:10 61:18
64:2 66:7
67:19,23
70:19,23
78:16,17,20
84:22 89:10,
11 101:9
102:8 108:19
109:11,14,21
111:1,6,10
112:4 114:6
115:15,19
116:7,11,18,

24 117:7
118:6,10
120:13,18
123:17 124:21
126:5,21
128:24 129:21
130:1,7,11,14,
16 131:13
132:13 133:7
136:17 137:13,
19 138:11,14
141:14,15,18
142:1,2,21
143:4 146:17
147:3 148:14,
24 150:14
154:24 156:17,
23 157:3
159:9 174:23
175:17 186:10,
20 189:9
208:11 209:21
210:7 225:1
236:13 245:19
247:6 254:22
255:22 260:11
263:21 265:23
267:10 268:20,
21 270:2,14,
15 271:9
273:10 274:4
276:13,16
277:2 279:6,
16 280:16
281:1,23
282:17 283:3,
12,24 285:1
286:4 289:21
292:4 294:9
305:18 312:19,
24 314:15
317:18 338:21
345:4 346:2,
21 348:1
358:7 362:9
372:14 373:5
374:21 375:7
right-hand (1)

184:10
rightly (1) 356:11
rights (31) 3:11
12:6 16:15
28:7 75:24
80:23 85:13
89:4 107:22
137:8 151:13
153:23 155:4
218:6 219:23
220:9 251:21
252:16 253:3,
3 273:14
294:8 297:3
298:16,17
312:5,5
313:16,18,23
339:4
rise (2) 46:18
336:24
risk (3) 21:4
303:20 304:13
risky (1) 227:21
Roese (5) 62:24
88:11 226:12,
12,13
role (8) 80:15,
17 120:7
160:12,19
236:16,20
333:19
roles (5) 3:20
4:10 61:1,3
160:21
Rosee (1) 357:9
Rosenthal (122)
30:21,22
31:5,10,13,20
32:2,8,15
53:1 55:10
56:13 65:12,
15,18 66:3,5,
8 67:20,24
68:16 88:19
90:17 91:3
94:7 95:11
96:23 99:18,
20,21 106:7

Case 09-10138-MFW    Doc 15396    Filed 03/30/15    Page 428 of 450

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
March 26, 2015

107:7 109:7,8,
12,17,23
110:9,19
120:22 121:5,
6 131:4,7,11
148:19 151:7,
14 155:10
157:2,14
226:15,18
227:2 265:11,
15,21,24
267:11,21
268:3,5,13,19,
22 269:3,9,14
270:6,20
272:15,16
273:20 274:9
275:4,9,15,24
276:14,17
278:10,13,14
280:11,17
281:2,13
282:11,22
283:6,15
284:1 285:13,
18,24 314:6,7
329:1,4,6,10
346:11,14,19,
22 347:21
348:2,16
354:7 365:15,
18,22,23
369:22 370:2,
19 372:8
373:23 374:2,
6,18,22
**Rosh (1)** 31:7
**rough (1)** 337:13
**roughly (1)** 283:4
**rounds (1)** 63:23
**rubbing (1)** 154:4
**rule (7)** 28:22
66:16 68:8
264:18 265:19
284:22 285:1
**ruled (1)** 259:15
**rules (5)** 23:17
154:8 267:9

283:22 336:13
**ruling (5)** 314:22
371:14,15,17,
20
**run (3)** 62:2
153:14,15

### S

**sad (1)** 7:9
**Safe (1)** 375:8
**said (117)** 10:10
14:19 18:23
22:17,20 24:8,
24 28:5 32:13
33:11,24
34:18 36:16
37:5,11 38:17
41:12,17 42:2,
7 43:3,8,13,
17 45:8,17,17,
21 46:7 49:16
50:12,14,21
51:11,11
76:18 82:21
117:1,17
130:21 144:2
149:9,15
152:4 156:8
168:15 169:2,
16,23 170:24
172:14 174:9,
14,18 175:12
181:19 182:20
187:7 188:1
190:3,17
191:3 197:18
208:18 220:18
221:16 243:22
248:18,24
254:24 255:1
256:6 259:15
266:16 277:16
287:8 289:17,
19 290:14
293:19 318:19
323:15 324:1,
16 329:15

332:3,5
333:12,24
335:8 336:23
337:3,12,13
338:6 339:13
340:2 343:1,
20 344:16,17
345:9 347:11
348:2,6,7
349:15 350:18
351:18 352:5,
18 353:9
356:22 364:23
366:4,15 367:9
**salary (1)** 115:8
**sale (3)** 132:12
355:10,12
**sales (2)** 4:13
33:12
**salient (1)** 327:24
**same (34)** 11:20
12:3 13:20,22
14:1 22:21
35:7 43:5,11
44:5 45:21
70:11 88:14
106:17 144:8
153:5 160:1
163:16 167:16
181:19 196:23
201:8 216:15
224:5 262:1
274:11 307:14
308:9 316:14,
17 320:24
337:4,4 369:11
**sample (1)**
314:24
**samples (1)** 253:5
**Sandy (3)** 18:12
37:16 95:1
**sat (3)** 70:12
116:23 306:12
**satisfy (2)** 342:5
344:2
**saw (22)** 28:12
43:1 97:14
153:20,21

176:24 189:20
190:1 207:15,
20,21 227:19
236:21 237:2
312:14 313:8,
9,14 343:19
347:10 358:9
359:12
**saying (34)**
13:22 24:21
31:1 32:17
33:5 34:5,12
35:14 37:14,
21 40:24 43:2
46:12 81:8
95:17 100:13
103:14 171:4
174:20 180:13
197:2 216:6
255:5 266:8
273:6 279:9
284:3 301:4
305:6 346:2
347:4 348:8
360:12 362:16
**scenes (1)** 39:13
**schedule (1)**
358:24
**scheduled (8)**
18:14 305:12,
13 346:16,16
347:17 358:22,
23
**schedules (3)**
305:10
348:21 359:18
**scheduling (6)**
109:16
278:15,19
279:19 284:16,
17
**school (1)** 211:17
**Schweitzer (4)**
32:1,2
346:23 349:17
**science (1)** 60:8
**scientific (1)** 6:10
**scientists (7)** 3:3

6:11,12 8:1
224:14 306:5,7
**scope (1)** 51:24
**scores (1)** 143:22
**scrambling (2)**
243:12 247:24
**screen (5)**
225:21
227:11 243:24
244:8 250:18
**search (1)** 333:5
**seated (5)** 2:2
109:2 157:23
195:3 284:13
**second (9)** 49:15
118:21 150:3
184:23,24
234:14 252:20
366:22 368:18
**secondly (2)**
51:13 69:6
**seconds (3)**
365:15
369:23 372:13
**sections (2)**
272:6 277:20
**see (48)** 2:3
3:10 4:7 5:8
28:16 30:16
54:1 55:24
100:3,4 106:5
140:16 141:5
148:18 158:13
170:22 173:17
179:21 184:9,
13,17 187:9
193:8 195:10
199:14,19
200:7 205:17
217:10 221:22
222:24 228:3
231:9 234:21
251:23 258:21,
22 261:19
263:24 284:9,
9 285:1,11
312:21,23
313:5 332:4

Case 09-10138-MFW    Doc 15396    Filed 03/30/15    Page 429 of 450

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
March 26, 2015

367:17

**seeing (2)**
189:15 217:21

**seek (3)** 79:2
299:17 300:24

**seeking (4)**
56:14 68:20
69:14 346:7

**seeks (1)** 33:8

**seemed (1)** 81:12

**seems (2)**
198:19 309:16

**seen (14)** 13:12
19:19 30:1
33:21 37:5
39:1 72:9
77:18 189:19
206:19 210:19
222:8 233:22
271:13

**select (3)** 124:7
270:21,23

**selected (1)**
116:16

**selection (2)**
124:19 321:3

**sell (1)** 162:8

**selling (1)** 238:1

**send (9)** 12:21
22:24 81:7
103:17 112:2
166:22 323:12
324:2,15

**sending (2)**
139:5 288:3

**sends (1)** 286:24

**senior (3)** 73:19
217:3 313:12

**seniority (2)** 4:11
105:9

**seniors (1)** 248:2

**sense (10)** 79:16
102:18 215:6
223:1 228:7
291:15 296:20,
24 323:19
374:19

**sensitive (1)**

371:10

**sent (19)** 16:9
19:18 22:2
38:3 93:4
111:22 156:9
165:10 170:5,
8 201:4,9
272:23 279:2,
2 288:6 328:7
359:13,22

**sentence (1)** 85:4
234:14 241:14,
19 246:20
278:21 359:24

**sentiment (1)**
316:17

**separate (13)**
22:6 26:7
69:23 84:12
119:20 122:5
123:6 193:5
231:14,24
232:6 348:24
368:24

**separately (2)**
69:7 184:1

**separating (1)**
281:7

**September (13)**
128:20,24
129:3 131:15
137:15 215:18
300:12 320:20
321:17 322:24
323:22 324:13
350:5

**sequestration (3)**
52:13,16
58:22

**seriously (4)**
28:18,19,20
294:10

**serve (1)** 278:22

**served (7)** 67:1,
2,14 69:24
265:1 288:8
313:11

**service (12)**

66:23 67:17
68:14 69:21
71:9 105:8
117:4 226:24
265:7 288:8
299:3 304:24

**Services (19)**
70:17,20
72:8,10 74:14
86:15 165:10,
15 287:6
289:3 361:15,
16,17,21,22,
22,24 366:23
367:4

**SESSION (2)**
157:20 218:13

**set (22)** 56:11
75:7,8 82:23
84:24 92:22
111:9,12
126:15,19
127:4 156:22
160:1 170:1,3
229:6 240:22,
24 242:23
324:6 346:17
362:23

**setting (1)** 112:19

**settlement (4)**
215:5 260:9,
10,14

**settlements (1)**
248:4

**seven (3)** 5:12
224:16 250:17

**seven-week (1)**
345:19

**several (15)**
33:15 53:20
54:4 64:2
76:8 161:4
162:14 166:18
170:4 212:17
243:11 319:2
327:21 350:1
353:9

**severance (58)**

38:20 47:19,
24 73:12
75:13 105:15
115:18 117:18,
20 118:7
123:3 133:21,
23 134:7
138:17 145:10
147:17,24
153:7 165:16
170:6 173:21
174:16 175:1,
3 187:18,19
201:24 202:22
203:17,19
205:6,13
206:16 207:2,
4,17,18
219:21 222:18
234:20 247:17
250:22 251:1,
17 256:20,20
316:14,22
317:5 323:20
324:3,5
328:15 333:12,
21 339:8
345:15

**severed (14)**
110:23 111:9
113:3 115:4
119:10 124:8
137:12,16
139:7 144:6
178:14 191:19
236:17 338:19

**shall (7)** 106:24
150:6 163:20
173:10 278:22
363:8 368:21

**share (7)** 7:3
75:6 88:10
111:10 113:12
133:12 161:9

**shared (19)** 62:8
70:17 72:7,10
74:14 86:15
165:10,15

287:6 289:3
361:15,16,17,
20,21,22,24
366:23 367:3

**sharing (1)**
328:21

**Shauna (1)**
164:20

**She (157)** 3:19
4:4,5,7 45:5,8
67:11 68:2,22
70:12,12,13
76:18 90:18,
20,23 91:1,9,
10,11,13,13
95:7 96:13
100:11,12
106:10 110:3,
15 151:15,16,
16 161:22,23,
24 162:1
164:21,22,24
165:2 166:10
185:1,7,7,7,9,
10,11 186:2,
13,14 188:24
189:1,3 190:1,
1,2,2,3,17,18
191:3,6,13
200:24 201:7,
13 227:2,3
252:7 261:5
266:1,6
270:20 274:4,
13 275:10,13,
16 280:14,18
282:1,13,13,
15 287:19
289:17 291:10,
10,11,13,14,
14 296:18
313:7,8,8,9,
10,11,11
317:10,14
318:11,19,20,
23 319:16,19
323:10,15
324:1,10,17

Case 09-10138-MFW    Doc 15396    Filed 03/30/15    Page 430 of 450

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
March 26, 2015

326:20,24
327:8 330:22,
23 331:13,13
332:3,5,9
333:2,11,13,
14,17,19,24
337:13 341:5,
5 342:10,11,
12,13,13,15,
21,22,24,24
343:6 344:20
352:5,5,6,7,9
366:22 367:3,
4 369:23
372:21 374:20
**sheet (5)** 39:9
264:16,19,19
265:4
**sheets (1)** 265:7
**Shirley (2)** 47:22
317:3
**shock (1)** 73:5
**shocked (3)**
217:16
225:19 248:18
**short (4)** 20:6
286:12 356:19
372:3
**shorter (2)** 37:3
158:7
**shortly (9)** 119:1,
9 166:11
178:16 194:15
202:19,23
368:22 370:5
**should (89)**
19:15 21:9
28:23 29:18
34:13 41:1
44:3 45:20
52:13 58:24
59:7 70:14
74:19 76:4
78:13 81:9
84:19 86:21
87:10 93:9
98:2,23,24
101:16 103:7

113:15 129:20,
23 144:23
145:6,9 148:3,
4,9 150:13
167:18 189:10,
23 195:19
197:2 214:1
217:21 220:9,
10,16 221:5
224:5,8
228:10 229:4
233:14 246:6
249:21,22
256:8 263:7
267:14 278:2
283:12 286:17,
18 293:3,19
294:1 295:5,6
301:22,24
302:24 303:18
305:18,19
310:9,11,20
312:13 314:1
319:22 325:16
335:10 337:15
341:14 346:1
356:11 357:4
364:6,8
365:11 370:4
**shouldn't (3)**
208:6 334:6
352:15
**show (7)** 69:5,
20 100:1
179:6 222:3
264:24 265:7
**showed (5)**
116:1 124:12
178:10 341:1
351:6
**showing (3)**
69:23 97:5
315:4
**shown (1)** 204:19
**shows (3)** 265:2,
2 340:24
**sick (7)** 42:22,
23 43:16,16

166:15,15
336:8
**side (10)** 61:18,
18,19,19
148:22 274:19
282:24 283:12
285:9 321:6
**side-bar (1)**
194:22
**sideline (1)** 78:7
**sidelines (1)**
345:4
**sides (2)** 158:7
196:20
**sidestep (1)** 335:3
**sight (2)** 36:6
371:8
**sign (8)** 21:12
70:16 76:16
103:13,13,14
214:21 267:3
**signator (1)** 66:21
**signature (11)**
22:15,17,21
67:10 68:11,
12 71:18 78:2
164:19 264:20
304:4
**signed (19)**
25:14 67:10
72:21 90:2
115:1 116:10
145:2,2
156:20 206:9,
14 207:1
222:2 231:12
266:16,18
267:2 334:18
339:7
**significance (2)**
82:2 203:11
**significant (9)**
2:19 5:19
37:4 105:18
211:20 292:15
313:18 344:11
364:11
**significantly (3)**

50:20 112:10
319:9
**sign-in (1)** 39:9
**signing (3)**
107:15 205:2
267:1
**silent (1)** 159:6
**similar (9)** 86:1
93:1 164:3
174:1 201:1
215:7 216:18
222:8 326:9
**similarly (2)**
119:15 304:13
**simple (5)** 20:14
161:1 245:22
272:1 352:20
**simplify (1)** 85:20
**simply (2)**
103:24 344:3
**Since (14)** 2:9
29:24 111:15
112:9 185:10
187:8 199:16
265:8 269:14
278:3 300:11,
13 329:7
333:19
**single (13)** 10:9
33:22 35:10
37:6 49:12
51:20 110:10
127:7 316:11
329:20 330:3
331:12 366:3
**sinking (1)**
167:16
**Sit (13)** 10:1
24:21,23 38:7
68:18 270:9,
10 291:16,17
294:7 306:12
352:7 368:10
**site (9)** 43:2
111:9,12,16,
18,21 128:23
134:22 185:8
**sites (3)** 361:4,7,

10
**sitting (9)** 10:21
12:5,6 16:14
34:24 35:1
132:6 296:20
369:10
**situated (3)** 33:6
62:3 119:15
**situation (16)**
42:16 43:11
44:5 65:6
67:22 68:2
93:1,6 114:16
154:16 223:20
236:14 275:1
296:13,14
302:7
**situations (2)**
215:7 299:15
**six (5)** 3:8 5:12
97:9,24 261:2
**six-week (1)**
97:10
**size (1)** 342:6
**skill (1)** 160:1
**skills (1)** 63:19
**slide (4)** 323:3
325:11 326:17
328:6
**slides (1)** 327:23
**slightly (1)** 217:8
**small (10)** 5:12
9:5 18:22
29:22 162:6
290:24 300:10
308:1 310:17
323:11
**smaller (1)** 9:1
**smart (1)** 138:24
**Smith (2)** 331:4,
16
**smokes (1)** 239:4
**social (5)** 75:8
159:20 361:4,
7,10
**software (5)** 3:23
61:17 160:16
161:15 212:8

Case 09-10138-MFW    Doc 15396    Filed 03/30/15    Page 431 of 450

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
March 26, 2015

**sold (4)** 63:7,7,
12 64:5
**sole (2)** 2:10
345:21
**solicit (4)** 80:9
107:24 108:10,
12
**solicited (1)**
324:10
**solutions (4)**
160:13,14
161:3 162:1
**some (132)** 5:24
6:16,16 7:3
8:16 9:2 10:8,
12 21:1,2,15
31:3 32:12
34:17 43:16
48:14 59:21
75:16,18
79:18 86:5
88:2,4 91:22
101:3 111:21
113:20 121:19
126:13 130:12,
13 132:15,17,
18 134:11,12
135:18 139:20
146:16 153:1
156:11 165:20
166:20 167:5
174:7 176:23
178:10 184:16
185:2 187:2,7,
9,20 188:1,12,
17 189:17
196:20 200:10,
11 201:11
215:19 221:11
223:12,16,18
225:6,22
226:1,5
229:14 237:4
240:11,16
241:1,6
242:22 247:14
248:3 251:12
254:17 257:9

260:17 261:10,
21 262:11,19
266:22 268:14
269:23 280:8
284:10 286:8
289:16 292:17
293:22 296:7
314:17,17,20
315:5,12,15
317:20 320:9,
13 321:3
324:4 326:22
327:6,24,24
329:23,24
330:1,8
334:11 338:8,
10,20 340:13
341:9,9 342:4
359:5 367:11,
12 368:1
370:22 371:18
372:16,17
**somebody (16)**
34:11 61:19,
20,20 125:24
156:7 163:14
164:23 192:1
201:6 266:18
270:10 273:14
274:2 336:2
367:6
**somebody's (1)**
332:2
**somehow (5)**
49:8 82:10
85:20 266:9,23
**someone (7)**
13:7 70:19
83:1 87:7
141:19 156:7
324:14
**someone's (2)**
76:3 293:5
**something (78)**
8:15 13:24
16:12 17:12
23:12 25:3
51:18 53:16

64:8 65:23
68:22 74:17,
18 81:16 84:2,
20 86:17 87:6,
19 89:6 95:21
96:9 100:11
110:14 130:4
150:24 154:1
155:22 156:10
157:11 170:22,
23 176:24
177:20 180:17,
18,21 183:13,
18 189:19
191:9 204:7
206:19 225:17
227:8 230:12
239:23 245:13
250:10 251:6
252:11 256:6
258:6 259:13
263:14 273:3
279:21 281:22
285:14 292:13
293:3 298:3,
15 305:5
307:12,19
326:10 340:12
358:14 359:9,
9 361:1,6,11
362:12 366:17
371:23 373:10
**sometime (14)**
48:21 74:24
93:18 97:6
136:6 203:22
204:2,5
252:23 257:3,
4,5 318:9
351:18
**Sometimes (5)**
109:9,10
197:13 291:3
371:7
**somewhat (1)**
168:22
**somewhere (2)**
164:14 281:20

**son (1)** 8:4
**soon (3)** 90:6,8
227:16
**sorry (28)** 22:9
67:10 77:17
119:4 140:19,
21 149:10
163:4 172:14
186:4 190:21,
23 194:6
200:19 204:12
212:13 219:1
230:20 239:18
241:16 246:20,
24 247:4
254:24 258:5,
22 261:6
292:21
**sort (11)** 76:16
88:4 92:3
93:12 107:10
109:2 156:11
162:15 208:2
247:5 259:19
**sorts (1)** 81:11
**sought (10)** 41:5
105:11 126:4
207:3,17
338:17 349:11,
13 352:7 353:8
**soul (1)** 63:24
**sound (1)** 308:3
**sounds (1)** 27:21
**source (2)**
113:15 114:11
**sources (3)**
112:23
220:24 324:20
**speak (7)** 50:12
71:4 117:17
123:21 183:9
194:3 241:3
**speaking (1)**
372:17
**special (24)** 9:24
15:23 17:15,
17 24:22 33:8,
16 34:1 35:8,

10 36:8 55:12
63:3 82:23,24
84:23 147:9
156:15 220:20
306:24 325:15,
17 359:7,19
**specialist (1)** 4:19
**specialists (2)**
255:10,13
**specialization (1)**
214:24
**specialized (2)**
161:6,17
**specially (2)**
33:24 358:19
**specific (19)**
51:14 67:22
93:2 94:19
121:18 127:22
136:11 170:14
198:17 204:5
219:1 223:13
232:20 240:23
256:9 262:11
272:16 290:3,
24
**specifically (26)**
17:10 47:21
53:14 86:11
100:6 118:20
122:9,14
125:2,11,15
126:8 127:1
164:4 177:24
180:8,12,19,
24 197:19
257:1 289:5
317:1 346:12
357:6 369:8
**specified (1)** 88:8
**specify (1)** 146:3
**speculation (2)**
151:8,15
**speed (5)**
102:18
230:14 311:10,
16 312:9
**spend (6)** 21:1

Case 09-10138-MFW   Doc 15396   Filed 03/30/15   Page 432 of 450

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
March 26, 2015

52:2 109:13,
15 118:2
269:20

**spending (1)**
273:23

**spent (4)** 3:19
21:2,2 206:20

**spoke (5)** 76:14
134:14 152:6
220:17 366:24

**spoken (2)** 133:3
135:6

**spreadsheet (1)**
65:21

**spring (3)** 14:13
225:10 353:6

**Sproule (2)**
219:17 338:7

**stage (1)** 104:5

**stages (2)**
272:17 300:9

**stand (12)** 3:12
59:14 186:5
210:12,12
270:11 283:13
330:22 341:4,
24 344:16
375:9

**standard (16)**
26:2,15
41:16 42:18
49:14 50:22
72:8 143:19,
24 250:2
292:14 300:4
302:5 303:14,
19 342:5

**standards (4)**
36:22 250:4
304:11 335:7

**standing (2)**
59:14 79:16

**standpoint (1)**
109:3

**stands (1)** 68:21

**Star (1)** 337:3

**start (17)** 2:14
52:7 64:7,8

109:23 162:7
211:14 237:24
246:18 250:15
286:2 303:18
304:7 323:16
330:13 356:21
360:20

**started (12)** 4:5
6:5 60:14
62:21 102:14
104:16 147:8
211:16,18
219:22 223:9
355:15

**starters (1)** 36:24

**starting (2)** 32:16
65:15

**starts (1)** 288:14

**state (12)** 90:24
91:6 95:16,16,
20 97:23
159:14 178:9
196:18,18
222:1 247:1

**stated (6)**
188:24
315:18,23
326:5,21
328:11

**statement (12)**
2:15 34:9
36:12 78:9
166:22 167:1
193:12 198:21
285:8 286:12
332:22 333:1

**statements (8)**
32:9 50:1
78:6,9 124:2
285:6 330:10
369:9

**States (87)** 6:21
11:4,8,9 13:5,
17,18 14:6
22:16 24:17
25:3,5,6,8,9,
10,12,15 27:1
32:22 33:18

35:5 45:7,24
47:20 51:3
53:5 61:5
62:13,17,23
66:18,23
72:11 87:6,8,
12,14 88:9,18
89:19 108:8
126:16,20
129:9,13
133:11 134:19
135:18 155:17
164:12 165:1
169:18,21
175:14 176:5,
9 209:13
212:23 229:24
233:15 255:9
287:2,4,15
289:24 290:20
297:14,15
303:6,9
307:14 313:2,
23 316:24
326:24 334:1,
12 344:23
350:4 355:2,
20 357:4,5
362:1 363:24
365:12

**stating (4)**
214:16
321:12,24
322:19

**status (1)** 20:11

**stay (5)** 64:3
79:12 162:14
178:20 207:11

**staying (2)**
235:16 236:4

**steering (3)**
119:10,22
123:15

**step (12)** 37:16
49:12 59:4,13
74:1 104:9,12
157:4 239:12
251:8 263:22

292:5

**stepped (1)** 237:2

**steps (8)** 84:14
154:8,13
217:20 263:6,
9 369:3 370:6

**still (14)** 4:22
75:19 84:11
87:3,4 95:11
166:10 244:16
280:1 323:22
342:5 353:19,
20 362:9

**stipulated (1)**
279:5

**stole (1)** 337:22

**stomach (1)** 64:6

**stopped (5)**
187:6 188:3
216:3 250:21
251:18

**stopping (1)**
251:14

**stops (1)** 291:24

**stored (2)** 23:5
287:15

**stories (2)** 4:5
342:7

**story (2)** 101:8
304:7

**straight (1)** 343:9

**Street (1)** 322:16

**stretch (1)** 282:20

**strictly (2)**
100:16 153:18

**strike (4)** 138:9
204:8 226:21
239:11

**strikes (2)**
284:19 285:3

**strong (1)** 338:13

**stronger (2)** 50:2
57:22

**strongly (1)**
329:15

**structure (1)**
232:18

**studies (1)** 60:10

**stuff (4)** 26:17
42:8 307:24
342:12

**stumbled (1)**
54:17

**styled (1)** 302:17

**subcontractor (1)**
25:14

**subject (9)** 49:24
65:8,9 68:17
100:3,9
125:22 333:22
350:2

**submission (3)**
49:23 319:8
370:23

**submissions (1)**
315:16

**submit (8)** 16:4
279:6 281:15,
16 284:2,23
285:14 347:15

**submitted (5)**
28:12 149:12
234:8 264:10
315:22

**submitting (2)**
268:1 272:19

**subpoenas (1)**
99:3

**subsequent (6)**
108:1 137:1
166:3 218:14
226:2 244:14

**subsequently (8)**
76:18 82:16
88:16 112:8
222:6,17
226:9 239:24

**subset (2)** 9:5
79:17

**subsidiaries (12)**
30:9 107:1
163:21 164:4
173:11 174:11
175:6 203:24
258:2,12
259:21,24

Case 09-10138-MFW    Doc 15396    Filed 03/30/15    Page 433 of 450
Bankruptcy Court for the District of Delaware                    Hearing
In Re: Nortel Networks Inc., et al.                          March 26, 2015

**substance (1)**
262:7
**substantial (2)**
2:23 37:3
**substantive (3)**
40:21 54:7
328:20
**success (2)** 4:5
254:10
**successful (2)**
253:23 255:4
**successors (4)**
107:2 163:22
173:12 260:1
**sudden (2)** 54:17
298:21
**sue (1)** 260:11
**suffered (2)**
30:15 33:2
**sufficient (8)**
108:18 283:5
291:23 292:8,
9 324:7 361:2
364:15
**sufficiently (1)**
256:11
**suggest (3)** 55:2,
5 266:7
**suggested (3)**
243:18
285:22 360:3
**summaries (2)**
114:5 278:6
**summarize (2)**
121:17 266:2
**summarized (1)**
266:3
**summarizing (1)**
271:21
**summary (15)**
66:16 68:9
69:6,8 194:8
264:16,19,19
265:1,4,19
267:7,13
280:19 306:2
**summer (3)**
176:3,13

225:10
**sun (1)** 314:9
**supervisor (18)**
62:13,15,22
66:19 67:11,
13,13 68:3
71:4 88:8,11
161:20 164:21
213:7,22
267:1 334:19,
22
**supervisors (11)**
6:19,20,22
21:24 22:16
61:5 66:24
266:21,21
303:8 362:1
**supplemental (4)**
34:7 56:10
268:14 315:17
**supply (1)** 262:9
**support (9)** 56:14
58:10 139:16
145:1 160:12
327:22 328:1
337:10 367:21
**supported (3)**
96:4 164:22
169:2
**supporting (1)**
69:5
**supportive (2)**
95:9 333:18
**supports (1)** 50:3
**supposed (23)**
10:20 20:2
73:23 89:2,4,
7 166:21,22
170:23 180:13
183:13 216:24
220:12 294:5,
16 297:1,18
298:5,7 299:5
304:1,3 361:18
**supposedly (1)**
37:18
**Supreme (6)**
330:1 335:9

339:13 340:15
352:21 366:20
**sure (64)** 13:14
19:19 59:2
70:7 75:17
79:4 80:10
81:14 90:4
92:23 117:2
119:18 120:15
129:16 134:5
154:14 162:1
166:4 174:21
177:10 180:23
182:8 185:16,
23 188:5
189:20 197:6,
8 204:15
205:18 207:13,
19 216:10
228:5 230:12
232:21,24
234:2 235:10
238:8,20
239:8 241:5,
13 245:23
246:20 254:16,
21 255:19
262:5 265:14
273:19 278:12
283:19 289:20
294:4 312:11,
22 346:24
360:11 361:19
362:19 374:1
375:1
**surgery (1)** 9:15
**surprise (3)**
279:15,20
353:14
**surprised (4)**
75:1 217:16
225:18 227:18
**surrounding (3)**
177:13,16
322:3
**Susan (1)** 80:3
**suspect (2)**
212:16 240:9

**sustain (8)** 58:10
88:21 100:18
107:11 151:9
226:20 267:12,
16
**sustaining (1)**
101:4
**switching (1)** 3:20
**sworn (5)** 59:15,
17 159:2
210:12,14
**symbol (2)** 289:2
303:24
**sympathetic (2)**
44:6 329:18
**symptoms (1)** 43:5
**system (9)** 3:10
30:5,17
158:13,14,15,
17 219:7 361:1

**T**

**table (2)** 186:5
254:19
**tag (1)** 340:8
**tagged (1)** 38:15
**take (62)** 19:3
21:4 26:3
27:19 28:18
56:21 70:14
76:6,13 84:14,
17 85:2 92:11,
13 98:9
108:17 109:4,
6 120:21
134:3 146:14,
20 149:7
150:2 157:11
169:20 172:11
180:3 195:19
198:14 200:4
223:7 227:1,
21 228:12
238:24 242:17
255:3 261:13
266:17 270:13
281:14 282:18

283:21 288:24
292:11 294:9
295:2 300:5
304:15 307:20
308:17 323:18
333:16 345:13
355:10,24
362:12 369:3,
6 370:6 372:12
**taken (13)** 7:12
20:18 83:7
108:24 157:19
184:4 195:1
209:14 244:12
247:20 263:10
284:12 289:8
**takes (1)** 304:6
**taking (12)** 93:13
150:21 169:10
182:15,22
195:22 197:22,
23 202:6
207:8 220:23
284:20
**talented (1)** 2:17
**talk (23)** 9:7
43:7 68:2,4
90:19,20
92:10 100:22
114:15 118:1,
18,21 125:10,
11 126:7
136:1 137:2
228:3 235:8
255:18 335:5
350:16 353:11
**talked (8)** 53:15
74:2 76:7
150:4 156:21
168:17 287:19
334:24
**talking (40)**
13:21 22:3,4
35:22 46:22
49:5,7,10
66:2 67:21
118:3 128:14
145:12,13

Case 09-10138-MFW    Doc 15396    Filed 03/30/15    Page 434 of 450

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
March 26, 2015

168:21 175:5 182:11 189:22 196:6 198:23, 24 199:2,21 201:15 202:11, 11 204:19 206:22 246:14 265:17 270:17 283:4 288:3,5 290:9,13 307:13,17 370:9 371:6

**talks (4)** 42:4 84:2 163:19 356:4

**tape (1)** 75:17

**teaches (1)** 335:10

**team (8)** 61:14, 15 161:7,11, 12,12 220:6 230:18

**teams (3)** 161:6, 13 213:18

**tech (1)** 213:16

**technical (1)** 160:8

**technically (3)** 164:23 274:18 345:12

**technologies (1)** 11:21

**technology (4)** 63:1,5 313:17 363:7

**teleconference (1)** 80:2

**telephone (2)** 62:7 374:14

**television (1)** 210:20

**telling (12)** 45:6 110:12 140:10 193:22 200:15 201:23 208:5 213:24 247:22 322:11 341:3 369:10

**tells (2)** 71:15 347:23

**ten (7)** 76:2 157:18 274:7 282:2 283:13 348:18 369:23

**ten-minute (1)** 282:19

**tens (4)** 32:21 34:11 44:2 329:17

**tenure (1)** 316:7

**term (10)** 106:4, 24 128:13 130:14 163:19 173:10 174:11 206:10 253:12 258:1

**terminate (2)** 6:23 216:7

**terminated (51)** 2:13 6:14,15, 18,24 8:14 9:20 21:5,24 62:19 64:13 70:6 75:10 76:22 77:9 79:5,8,19 80:13 106:21 114:18 115:21 124:22 141:16 152:24 153:4 162:4 166:11 171:17 213:8, 22,23 215:16, 17 219:6,9,20, 23 234:18 242:7,10,14 248:2 286:20, 24 287:1 315:20 316:2 323:14 324:12 325:12

**terminating (3)** 71:16 72:5,9

**termination (109)** 6:24 7:2,6,8 9:4 14:5

25:13 28:6,7 34:20,21 46:12,17 47:11,23 60:20 67:9 68:10,11 70:12 71:14 73:8 89:9 90:1 103:15 104:22 105:1 106:15,16,20 107:16 115:1, 12 116:2,21 119:2 131:22 132:5 133:16 136:12,15,17 137:8,23 138:7,11,14 139:5 140:13, 15 141:5 142:5 143:3,8, 17,20 144:11, 13 145:1 161:20 163:7, 10 164:8 172:5,6 173:3 192:7 199:2 202:19,24 203:2 214:16 215:20 221:22 222:2 223:22 226:4 231:12 233:5,20 234:19 237:16 249:5,14 252:19 253:5 258:4,7,9,17 262:7,10 264:21 266:15 287:3 288:24 303:23 316:20 317:4 320:16, 24 323:7,13, 19 324:11,16 334:23 344:6 354:21

**terminations (2)** 71:1 266:11

**terms (18)** 26:13 88:1 93:12 95:15 109:16 160:8,23 161:1 174:24 205:9 214:16 215:5 217:20 242:8 266:4, 24 277:5 335:11

**terrified (1)** 8:21

**Territory (1)** 44:19

**test (2)** 212:8 222:23

**testified (41)** 47:16 52:14 59:17 89:15 151:16,21 155:16 156:13, 16 159:3 173:5 190:1 200:24 202:18 203:13 206:23 208:20 210:15 242:21 253:8 254:20 268:11, 17 272:21 273:11 279:8 287:17 297:20 316:6 318:4,8, 14 319:13,16 325:5 326:13 330:22 343:17 352:4 359:2,8

**testifies (1)** 273:5

**testify (17)** 18:18 58:23 59:7 67:12 185:6 275:13 276:5 284:4 296:18 308:24 309:9, 12 313:6 341:5 351:16 366:6,7

**testifying (8)** 52:11,12 59:3 67:9 95:13 206:4

238:16 275:12

**testimony (65)** 10:15,16 13:13 21:15 30:11 44:17 59:1,7 69:12 108:22 125:21 144:3 157:4 158:6 174:9 190:18 191:24 205:15 206:7 264:11 269:17, 18 270:10 271:3,8,13,22 272:3,4,6,20 273:15 275:2 276:3,12 277:10 278:1, 4,18 279:7 285:9 305:22 306:11 308:19 311:7 314:18, 20 316:16 327:21,24 333:8 341:22 343:19 352:6 355:13 359:6, 6 361:14 363:11 366:23 367:2 369:16 371:1 372:5 373:21

**Texas (2)** 61:14 213:3

**text (1)** 326:21

**than (51)** 2:23 8:2,3 11:18 16:6 27:21 29:6 35:15 37:9 38:4 59:3 72:3 79:8 109:9,20 123:16 136:11 139:23 144:15 145:18 147:24 148:18 154:2 158:12 198:16 221:23 223:23

Case 09-10138-MFW   Doc 15396   Filed 03/30/15   Page 435 of 450

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
March 26, 2015

230:10 242:14
254:14 258:21
259:10 260:14
261:2 274:2
284:18,22
287:24 291:8
292:8,9 298:4
299:22 300:22
312:1,2,3
326:11 334:13
336:4 355:17

**Thank (90)** 2:2,9
5:4 11:20
30:18,19,22
52:18 53:22
55:16,17
56:16,17
58:17,18 59:8,
19,22 71:8
108:16,23
109:1 121:4
148:20 155:8,
8 156:23
157:4,6,18,22
158:21 159:5,
9,14 179:13
195:2,9 197:7
198:8 200:13
201:20 205:19
208:12 209:18,
22,24,24
210:10,16,18
226:13 231:4,
5,11 234:5
240:7 241:18,
18 258:22,24
261:8 263:15,
17,22,23
264:4,5
267:10,17
269:8 272:14
284:10,14
314:3,4,15
328:22,23
354:3,6
356:14,15
365:13,14
368:11 369:21

370:15 375:5,
18

**thanked (1)** 70:13

**Thanks (1)** 239:3

**their (205)** 2:19,
22 3:11,18
5:21,23 6:1,7,
9,17,19,24
7:3,13,14,20
8:6,7,22,23
9:3,3,4,10
10:2,2,19
12:6,8,21
13:14 14:5,9,
20 16:9,10,14,
18,21 19:4,13,
17 21:1,2,3
23:4,5 25:22
27:5 29:8
30:7,10,16
32:24 33:1,2,
21 34:10,15
35:6 36:9
37:19 38:16,
16,18,20,23,
24 39:4 42:12
46:17 47:4,11,
12 55:14 59:7
63:19,19 69:2
77:5 80:17
94:21 95:18
97:3 98:3,18
103:24 107:2
110:7 125:20
140:2 142:10
143:15 173:12,
13,14 208:5
212:11 218:6
222:19 223:19
227:23 233:19,
22 237:10
238:11 243:14
244:14 247:20,
23 248:14
254:18 256:20
260:1,2,4
266:4,5,10,11
268:8 273:22

275:19,21
276:2,11
286:9,23
287:11 289:9
291:3 292:4,
18,24 293:12
294:8,9 296:3,
6 297:3,3
299:2 300:13
301:1 303:4
306:3 308:6,
13 310:12
311:8,9,19,21
313:16,19,24
315:3,4,10,17
316:7,10,14,
15 319:7
320:13,15
323:12 324:3
325:2,19
327:14,16,19
331:18 333:21
334:18 336:21
337:15,18
338:18 339:1,
5,5,8,17,19,
22 340:8,18
341:16 344:6
350:20,21,22,
22 351:1,9
352:12 353:3,
5 354:20
365:21 366:8,
19

**theirs (2)** 148:8,
10

**them (166)** 3:12,
13 6:16,16,23
7:1,6,11,12,
14,22 8:8 9:3
10:5,9,17
11:10 12:3,9,
21,22 15:7,24
16:9,21 17:6
21:7 25:21
26:7 30:6
33:19 34:18
35:14 37:20,

23 41:10
43:16 44:14,
16 45:12 46:7
47:1,6,8,10
49:8,20 53:20
66:4 76:12
83:18 90:10
93:6,6 95:1
100:6 101:19
105:5 108:12
111:23 112:3,
4 113:21
121:15 122:1
126:2 129:18,
20 130:2
135:4,21,22
137:24 138:1,
2,5,23 139:5
140:11 145:22
158:18,19
162:13,15
166:12 181:2
182:24 183:6,
14,15,16,16,
17,19 198:1
202:8 205:10
208:8 214:9
223:5 228:12
230:4,8 236:4,
22 238:4
244:12 245:11
250:5 253:2
255:4 262:9,
10 266:2
268:23 273:5
277:22,23
282:15 286:24
288:22 289:9
293:11,11,19
294:16 295:19
296:12 298:3,
10 299:6
306:23 308:17,
18 309:8,15
311:19 314:1
322:11 324:4,
8 325:15
326:14 329:18

330:18 333:20
334:12 336:2
339:9 340:13
342:3,3 344:7,
10 348:10
351:1 352:7,
11,13 353:9
359:12,20,23
366:8,10
369:10

**themIt (1)** 41:18

**themselves (7)**
92:10 142:15
302:23 315:16
331:17 333:24
334:20

**theoretical (2)**
343:23 344:8

**theories (1)** 40:21

**there (353)** 6:12
9:1,22,22
10:12 11:23
13:3,8 14:3
15:5,6,6
16:22,23,23
17:24 18:9,12,
20 22:7,8,10,
22 25:2 26:15
27:10,16,16
28:9,14,24
29:15 30:2
32:19,23
37:15 38:22
40:23,24
42:14 44:10,
20 45:6,8
47:9,17 50:5,
7 52:12 57:22
59:20 60:14
64:11,14
71:14,17,22
72:2 73:13
74:3 76:1
78:8 79:7,24
80:5,22 81:2,
5,6,10,12
82:21,22
84:21 85:1

Case 09-10138-MFW   Doc 15396   Filed 03/30/15   Page 436 of 450

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
March 26, 2015

86:18 87:15
89:1,5,6,9
91:18,20
92:24 97:6,16,
22 98:19
100:5,11,14
101:11,12
104:4,7
105:16 107:17
108:2 110:10
112:13 113:1,
2,19 121:8
122:4,19
123:5 124:6,7
126:14,19,23
127:13 128:23
130:7 132:12
135:14 138:5
139:15,19
140:5 141:9,
13 143:13
145:18 147:6,
21 148:11,12,
23 150:2,16
152:16,17,22
153:1 154:11
157:1 161:10
162:11 163:17
165:17 166:21
167:18 168:3,
15 169:3,17,
19,22 170:2,
16,19 171:21
174:18 176:4,
7,10,22 177:2,
13,16 178:5
179:20,21,23
181:3,5,15,20
182:17,20
183:12,13,17
184:3,9,19,20
186:4,12
187:11 188:1
189:2,21
192:12,13
193:2 194:22
195:14 196:3,
4,7,16,17,22

207:23 209:8,
15 213:11
217:4,10
218:1,16
219:2 220:19
221:1,2,6,11
222:5,18
223:12 224:24
225:2,7,14
226:5 227:12
228:8 229:9
231:24 232:3
236:19,22,23
238:2 239:22
240:3,12,15,
17,19 242:13,
14 244:4,18
245:11 246:16,
21,23 247:13
248:12 249:3,
18 250:6
252:9 256:9
257:8 258:8
261:14 263:9
265:3,8,24
266:11 267:1,
4 278:17
279:23 280:7
285:4 287:13
289:10,15
290:11,18
291:17 292:8,
9,10 293:6,22
298:14,15,18
299:18,24
300:1,8,8,16
303:16 304:14
305:23 306:15,
22 307:3
311:5,16,17
312:23 315:9
316:4,20
321:9 322:3
323:3,23
324:2 325:14
326:8 328:9
329:13,22,22
330:9 331:23

332:13,13,17,
19 333:16
334:8 335:3,6
336:19 339:10
341:2,24
342:2,4 343:5,
23 344:7,17
346:9 348:6,
23 349:5
350:5 351:2
352:16 355:10,
16,19,22
356:22 357:2,
6 358:20,24
359:8 360:5,
15 361:13
363:22 365:8,
18 367:17,19
370:12 373:4

**thereafter (1)**
119:9

**therefore (9)**
51:24 88:3
150:11 268:7
276:18 303:1
331:9,19
355:18

**They (799)** 2:20
3:3 5:8,15,21,
23 6:6,10,11,
15,17,19,23,
24 7:5,9,10,
10,15,16,24
8:7,8,9,9,9
9:2,5,9,23
10:1,5,18,19,
20,21 11:1,2,
5,11,11,12,13,
13,14,15,16,
19,24 12:4,4,
4,6,7,8,10,11,
13,14,15,15,
16,18,22,23
13:5,8,11,14,
15,19 14:7,8,
16,17,18
15:18,22 16:1,
2,3,10,11,12,

14,15,15,16,
16,16,17,24
17:2,4,9,10,
18,18,20,21,
22,23 18:1,11,
22 19:4,5,7,8,
15,22 20:1,1,
2 21:5,5,6,18,
20 22:1,3,11,
11,13,13,24
23:1,2,14,14,
15,15,17 24:9
25:16 26:6
27:3,3,4,5,6,8
28:3,14,21,21,
22,23 30:4,6,
6,7,10 33:9,
14,16,19,23
34:1,3,3,4,5
35:5,8,9,20
36:8,8,13,13,
20,20 37:15,
19,21,22,23
38:5,14,15,21
39:5,7,8,9,10,
21 40:5,9,14,
15,24 41:1,9,
11,12,24 42:1,
1,2,6,8,22,22,
22,24 43:3,8,
18,20,20,22
44:8,9,16
45:1,1,10
46:5,6,11,11,
15,16,16,21,
24 47:2,3,3,4,
5,6,11,13,14,
14 49:10,11,
11,16,17,18,
21,21 50:6,12,
12,13,13
51:23 52:13
53:21 54:21
55:6 56:14
57:14 58:3
63:20 65:7,9,
11 66:17,18,
20 67:2 69:1,

20,24 70:1,10
72:23 76:10,
12,14 77:4,6,
7,9,14,21
80:21,24 81:3
86:20,21 87:5
90:21 92:12
93:7,9 96:14
97:7,9,20
98:6 100:5,14
101:18,18,19
103:7,7,22
105:3 110:3,
11,11,12
112:2,5,6
116:16 117:2,
11 118:17
119:4,20
125:18,24
127:10,11,12,
12,15 129:18,
19,23 135:2,
15,17,17
136:16 138:1,
2,4,10,13,19,
19,22,22,24
139:8,13,15,
16,19,21,21,
23 140:3,5,7
141:12,13,15,
17 144:10,23,
24 145:11,15,
15 148:8
156:9,10
160:11 161:16
162:8,9,13
164:11 165:18,
19,20 166:4
167:20,22,23
168:4 169:1,
10,12 170:5,
24 174:2
175:12,13,14,
16,19,22
176:16,19
182:16,17,18,
21,22 193:5,7
196:4,5,14,21,

Case 09-10138-MFW    Doc 15396    Filed 03/30/15    Page 437 of 450

**Bankruptcy Court for the District of Delaware**
In Re: Nortel Networks Inc., et al.

**Hearing**
**March 26, 2015**

23 197:13,18,
18,19,19,20,
21,22 201:12
202:7 212:16
213:6 214:22
216:5 219:8,
10 220:18
221:16 222:20
223:1,6,20,24
228:3,7,15,17,
19,19,21,23,
24 229:1
230:8 243:19
245:8 247:23,
24 251:9,11
252:2,24
253:1,4,18,21,
22 254:1,2
255:8,10,13,
13,15,16,17
256:4,6,8,10,
12,12,18
257:14,20,21,
22,22,24
262:13,16
266:8,15,22
267:3,4,23
268:6,16
271:6,6,14,16,
16,17,18
272:21 273:10
274:23 275:22
276:5,14
277:6,11,12,
16 278:6
279:8 284:4
286:18,20,21,
21,21 287:5,8,
9,12 288:1,2,
16,17,18,19,
20,22 289:10,
10,11,14,21
290:18,19
291:4 292:12,
17,18,19,21,
23,23 293:1,3,
9,24 294:1,1,
1,2,9,21,22

296:1,1,3,6,7,
8 297:1,1,2,2,
4,6,6,7,8,9,10,
11,11,12,12,
13,14,15,16,
17,18,18,20,
21,23,23
298:4,5,5,6,7,
7,8,8,16,18,
22,22 299:2,3,
3,4,4,5,7
300:14 302:23
304:1,2,3,19
305:19,24,24,
24 306:3,3,6,
7,8,8,11,11,
12,12,13,13,
22 308:4,5,6,
7 309:12,16,
20,23 310:4,5,
6,7,11,11,12,
13,14 311:8,
21 312:14,22
313:2,2,3,5,
14,15,15,17,
18,21 315:18,
20 316:6,8,8,
9 318:4,5,6
319:13,15
323:18 324:4,
15,24 325:2,6,
15,16,17,19
326:13 327:15,
17,18 330:16
331:17,23
332:14,15
334:20,20
335:1,2 336:1,
1,1,8,18,20,
21 337:14
338:3,11,23,
23 339:4,5
340:21 341:2,
3,10,10,14,14,
18,18 344:2,5
345:21 346:4,
7 347:2 348:7
349:11,12,12,

13,15 350:10,
11,21 351:10,
11,14,14,18,
21,24 352:1,
14,17,19
353:1,1,1,19
354:20,24
355:1,4,17
357:13,14,14,
15,15,18,24
358:1,2,3,4,4,
10,11,13,14,
21 359:4,9,14,
15,16 360:11
361:19,20,22
362:3,3,6,13,
18,18 363:20,
21 364:1,2,3,
9 366:4,5,5,6,
7,14,16,17,18
367:4,5,15
368:5 370:12

**thing (35)** 10:13
12:8,15,16
13:22 14:1
38:10 45:22
49:22 50:16
68:7 106:17
139:18 153:9,
18,24 236:13
244:17 269:10
286:15 289:22
290:24 292:16
298:17 305:23
310:24 329:11,
19 337:4
348:13 350:15
359:7 364:18
366:22 367:22

**things (62)** 11:2
13:11 26:6
29:2,4,6
32:13,15
36:20 45:2,9
58:5 80:23
81:1,7 85:16
91:14 92:11
95:7 96:6,13

104:19 107:18
108:2,5
113:17 119:14,
20 150:19
162:15 166:18
171:3 189:3
190:3 197:4
209:14 220:7,
14 238:2
249:1 250:17
281:7 290:4,5
299:7 305:17
306:4,16
307:11,15
311:19 313:22
337:20,21
343:11 356:9,
23,23 360:5
361:9 364:24
370:22

**think (187)** 7:10
8:2 14:16
22:8 25:17,18
31:5 40:1
41:1 54:2,10,
14 57:11
65:22 66:8
67:24 68:3
71:10 72:15,
16 73:7 74:19
78:5 80:14,15
81:8 85:12,13
89:1 91:2,3,8,
14 96:18,24
98:4 100:22,
23 102:4
105:23 106:8,
16 109:7,10,
16,17 110:9
124:12 139:18
146:6,10,11,
15,23 147:7,9,
21 148:13
150:14 151:16
154:3 157:10,
12 162:5
166:10,13
168:2 170:13,

20 172:16,20
174:17 175:18
176:2 181:18
185:12 187:22
188:14 189:10,
17 190:4,17,
20 191:8
192:21 194:2,
6,11 196:11
197:15,19
201:12,18
203:9,12
204:9,13
207:24 208:1,
7 212:15
214:11 220:13
221:1,14
224:12,16
225:12 229:21
235:1 237:12
238:14 240:21
241:9 244:23
248:22 253:11
257:1 258:16
267:6 270:23
272:12 273:15,
16 276:10
277:5,13,19
278:7 282:7,
19 283:8,11
284:5,17
285:24 286:16,
16 291:18
295:7,20
301:3,10,13,
16,18,24
302:2,9,14
303:13,17,20,
22 304:6,7,8,
13,14,17
306:19,21,22,
23 307:1
310:11,12,19
336:22 340:12
342:1 343:24
347:13 363:21
366:16 367:17
368:13 371:19

Case 09-10138-MFW    Doc 15396    Filed 03/30/15    Page 438 of 450
Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.
Hearing
March 26, 2015

372:7,12,21
373:11,14
374:18,21,23
375:2
**thinkers (2)**
11:16 25:7
**thinking (5)**
13:22 105:18
129:7 153:21
180:14
**Third (19)** 37:2
39:2 42:14,17
43:13,16 44:5
49:13 50:21
54:14 199:11
292:5 302:5
329:24 335:7
336:5 339:23
340:2 355:24
**though (17)**
13:19 39:7
43:15 47:6
101:23 134:9
141:12 142:18
188:7 203:16
276:1 281:6
292:2 294:17
302:2 329:7
345:18
**thought (77)** 6:10
7:14,24 8:6
10:18,19
11:18 17:1
18:20 20:13
33:9 34:3,12,
21 35:7 37:22
45:15 47:14
48:9 49:11
53:6,7,10
64:6 80:17
85:5 89:3,16
96:19,20
105:19 107:9
123:22 131:20
139:13 143:1
149:22 150:15
153:4,7,23
181:11 182:21,

22 183:17
188:14,19
197:20 207:20
224:1 239:18
245:18 250:8,
16 252:2
258:20 270:12
273:20 281:2
286:21 289:21,
23 291:14
294:1 298:18
300:5 301:9
317:15 327:18
331:13 336:2
342:24 343:2
345:10 352:19
363:16 371:11
**thoughts (3)**
29:13,15
121:21
**thousands (8)**
32:21 34:11
43:20 44:2
148:6 244:11
288:4 329:17
**threads (1)**
111:19
**three (34)** 3:5
10:16 13:4
33:20,20,23
34:16 37:1,17
40:2,7 54:17
207:24 218:19
226:9 236:11
268:11,15
272:20 276:17
278:16 335:11
341:17,23
342:7,8
343:17 344:12
357:6,7,7
366:11 371:20,
22
**three-and-a- (1)**
208:3
**three-and-a-half-year (1)**
335:14
**three-page (1)**

138:20
**threshold (1)**
335:18
**throughout (5)**
36:11 39:13
232:9 233:1
334:3
**throw (1)** 362:7
**thunder (1)**
337:23
**thwarted (1)** 41:7
**tie (2)** 122:19
193:2
**ties (1)** 122:11
**till (4)** 60:20
115:8 311:22
351:22
**time (206)** 6:15
8:17,22 9:14,
14 20:6 24:19
29:4 31:6,17
36:15 37:3,7,
10,18 38:2
42:24 45:2
47:19 48:8,12
52:2 56:23
58:20 60:19
63:2 64:1,7,
11 70:21 71:8
73:7 80:4
81:23 82:11,
12 86:10
87:11,20 89:5
91:1 92:5,9,
14 95:20
96:22 100:8
103:1,2 104:5
105:13 108:18
109:15 111:15
114:17 115:9,
12,17,21
118:3 123:9,
23 124:6
125:5,13
126:13 127:19
129:6,7
131:18,21,23
132:9 133:8

134:8 135:16
137:7 139:11
141:4,7,24
145:14 147:8,
8 150:9,19
152:13,14
154:17,20
158:4 160:10
162:10 165:17
167:19 168:2
169:4 171:3,
16 173:19,23
176:10 178:9
179:23 181:4,
21 183:21
185:19,20
186:9 189:4,
13,17 190:8
192:5 200:11
201:4,10
203:9,20
204:21 205:4,
17 206:20
207:14,14,17,
23 208:3
213:8 214:2,5
215:13,15
218:8 219:21
221:2 222:5
225:6 228:5
231:11 232:18
233:5,19
235:19,23
236:1 237:8,
12,21 238:9,
15 239:9,13
243:4 245:15
246:1,8,23
248:6,21,22
250:4 252:7
253:4 254:15
255:20 259:12
261:13 262:14,
17 266:10
272:12,13,24
273:2 279:12
281:14 286:20,
21 292:22

293:2,7
295:11 300:14
307:4 312:8
315:20 316:22
317:13,18
318:17 320:14
323:5 324:22
329:2 341:1,2
349:14 351:21,
24 354:3
355:7 359:11
364:21 374:17
**time-consuming (2)**
259:18 280:14
**timeframe (4)**
61:6 95:10
201:8 241:10
**timely (5)** 55:14
91:10,12
312:10 319:14
**times (15)** 6:20,
21 35:4 36:4
54:4,6 64:3
81:6 102:20
170:19 201:5
210:20 270:9
337:8 353:9
**timing (5)** 29:1
40:12,12
54:10 148:7
**tired (2)** 286:13
334:2
**tirelessly (1)** 2:21
**today (52)** 2:10
3:6 5:10,16
18:18 20:9
30:12 31:16
39:8 45:5
52:11 53:20
56:5 118:3
132:7 133:3
135:6 146:12
157:9 158:5
185:1 210:21
218:10 231:3
261:22 286:14
287:17,19,23
293:17 297:5,

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
March 26, 2015

8,11,20
298:24 299:1,
6 315:13,21
316:16 329:19
333:23 336:17
337:7 341:23
361:15 365:3
369:16 371:12
372:18,22
373:1

**together (16)**
14:16 21:11
26:7 61:16
76:2 196:20
209:14 213:18
223:18 230:17
266:12 334:5
340:20 351:1
359:4 364:14

**told (77)** 9:20
10:1,5 11:11,
12,16 12:4,9
15:22 16:2,15,
21 17:11
24:18 36:14
41:7 46:21,24
51:4 70:14
90:20 99:23
110:12,15
134:12,12,20
137:7 139:6
154:11 197:15
214:13 225:4,
21 226:8
229:18,21
245:1,4,15
246:15 248:11,
16 256:2,12
257:21 263:12
291:16,16,19
293:2,9,11
296:2 299:3
306:13 308:20
311:19 322:17
323:9 325:16
337:12 340:22
341:2,12,12
343:14 345:24

350:10,11
352:9 353:16,
16 366:8,10,
17,18

**tomorrow (3)**
284:2 321:16
370:23

**Tony (2)** 62:23
88:9

**took (22)** 6:24
28:10,19,19
49:11 53:20
86:9 116:8,10
121:24 165:6,
20 170:4
194:9 214:22
243:11 245:14
263:6 358:14
359:10 363:13,
14

**tool (3)** 161:7
179:2 242:5

**tools (3)** 160:16,
22 241:21

**top (7)** 150:1
178:12 179:20
192:14 230:21
289:1 303:24

**topic (2)** 248:8
251:4

**topics (3)** 160:20
315:12 343:12

**Toronto (8)** 3:9
211:13 214:2
217:18 218:3,
5,15 333:14

**total (5)** 5:12
9:6 14:4 22:4
27:20

**totally (1)** 325:7

**touch (2)** 135:3
327:11

**toward (2)**
223:11 229:2

**towards (3)**
76:17 255:23
273:17

**track (1)** 140:24

**traffic (1)** 4:22

**tragedy (1)** 7:21

**tragic (2)** 32:23
329:16

**train (1)** 31:8

**trained (1)**
220:15

**training (1)** 8:8

**Trans (1)** 360:20

**transcript (5)**
337:13
372:20,20
373:6,7

**transcripts (1)**
281:10

**transmitted (1)**
228:24

**trashcan (1)**
362:8

**travel (1)** 375:8

**traveled (1)** 372:5

**treat (3)** 33:24
35:15 305:16

**treated (7)** 12:3
33:8,14 36:9
247:17 286:17,
18

**treatment (10)**
33:8,17 34:1
35:6,8,10,21
36:8 55:12
147:10

**tremendous (1)**
53:22

**trial (8)** 3:18
33:14 54:4
58:16 276:7
277:7 334:3
345:19

**trials (1)** 270:9

**trick (1)** 44:15

**tried (8)** 15:15
24:1 39:19
80:10 102:18
245:7 305:4
306:13

**triggered (1)**
180:16

**troops (1)** 93:24

**trouble (3)** 101:2
230:13 372:16

**troubled (4)**
276:24
293:23 301:22
310:18

**troubles (2)**
308:18 310:19

**troublesome (1)**
285:4

**Trowbridge (4)**
47:22 317:3
318:14 319:3

**true (12)** 4:4
42:6 100:15
144:10 171:24
172:3 180:2
183:2 202:17
203:20 243:23
330:11

**truly (2)** 73:15,16

**truth (6)** 50:11
90:23 94:10,
13 95:14 255:2

**try (15)** 58:2
75:22 76:4
89:23 92:7
96:8 109:12
110:4 165:22
195:14 216:11
274:23 291:2
330:20 362:17

**trying (21)** 23:21
68:22 75:6
92:22 109:16
133:10 147:15
162:9 168:12
186:18 191:18
204:14 215:4
238:3 244:8,
16 247:4,5
253:4 291:9
312:17

**turn (17)** 73:17
78:2 83:19
118:1 121:12
163:2 179:7,

15 192:10,22
198:4 214:4
217:17 233:24
234:11 327:11
368:14

**turned (1)** 254:11

**turning (4)**
315:11 319:5
320:9 323:3

**turns (1)** 34:20

**TV (2)** 7:19 73:2

**Tweed (1)** 55:21

**Twelve (1)** 20:18

**Twenty-one (1)**
43:21

**twice (1)** 147:19

**twisted (1)**
147:13

**twists (1)** 147:14

**two (44)** 5:11,14
15:6 20:18
22:5 26:4,5
27:13 29:24
37:21 38:4,4
44:10 56:7
59:4 65:20
66:3,15 68:1
82:9 92:5
102:3 118:16
119:20 122:20
123:6 131:21
147:19 193:3
212:20,21
216:2 266:12
272:16 275:4
281:7 283:21
287:16 304:20
309:17 312:14
323:4 353:8
371:2

**type (1)** 272:1

**typed (2)** 121:16
122:1

**types (1)** 229:13

**typical (1)** 324:5

**typically (4)**
138:18 237:2,
5 323:20

Case 09-10138-MFW   Doc 15396   Filed 03/30/15   Page 440 of 450

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
March 26, 2015

**U**

**uber (1)** 8:24
**UCC (1)** 58:12
**UK (6)** 108:10
122:8,19
171:23 193:2
320:4
**ultimately (10)**
8:11 63:9,22
64:5 76:8
77:21,22
89:23 93:16
139:12
**umbrage (1)**
98:10
**unable (1)** 204:4
**unambiguous (2)**
342:20 344:14
**unanswered (1)**
351:3
**unclear (2)** 290:5,
5
**under (14)** 66:16
68:8 159:18
169:14 183:21
215:20 218:6
267:8 276:4
310:2 320:10
325:4 328:15
365:8
**understand (63)**
13:16 26:20
27:6,8 69:18
75:11 81:2
82:2,8 94:3
95:12 96:19
99:13 101:11
105:13 118:5,
9,13 122:10
123:2 129:6
134:2 139:21
144:7 151:23
152:15,17
153:1,10
154:6,17
161:1 164:6,7

169:7 174:14
180:2 183:20
201:17 204:4,
22 205:5
213:12 215:4
218:6 220:11
223:6 227:9
229:16 236:8
237:20 239:15,
21 244:9
259:20 260:18
262:6 284:16
298:17 306:1
307:5 310:19
364:21
**understanding (32)**
65:10,21
77:2 78:19
79:13 94:6,9,
14 95:9 98:21
99:15 104:11
115:2 132:11
138:16 143:7,
11,16 195:21
196:1 200:23
201:8 203:16
207:7 224:17
247:12 252:3
256:1 264:15
265:3 311:9
346:14
**understandings (2)**
150:20 287:24
**understood (83)**
10:24 11:5,
15 12:16
13:11,17
16:16,17,18
18:1,14 25:16
28:23 30:11
36:13 72:4
81:5,10 85:18
90:23 91:1,9,
11,13,18,20
92:23 96:3,13
105:16 106:22
107:5 115:5
123:5,9 125:1,

4,13 127:16,
19 128:1,16
132:15 135:13
152:1,22
156:14 167:23
169:16 173:20
202:20 203:11
205:7,11
206:14 207:15
214:3,20
229:11 232:10
233:1,6 236:4
237:9 238:10,
14 240:1,3
253:13,17,18
254:14 274:8
281:12 284:8
297:19,20
306:3 311:18
319:17 326:13
327:15 363:16
**undertaking (1)**
102:24
**undoubtedly (1)**
290:3
**undue (1)** 96:14
**unemployment (1)**
75:15
**unequivocally (3)**
57:10 304:15
311:6
**unfair (3)** 55:10,
13 366:20
**unfairly (1)**
277:13
**unfavorably (1)**
102:23
**unfold (12)** 5:9
7:7 20:10
155:1 224:6,9
225:5 229:24
245:16 263:2,
13 325:20
**unfolded (7)** 6:3
9:17 12:17
104:13 219:12
224:23 245:5
**unfolding (2)**

118:19 248:11
**Unfortunately (7)**
24:3 27:18
148:12 243:10
290:4 309:24
365:7
**unfurl (1)** 14:11
**unintentional (1)**
292:2
**unintentionally (1)**
25:19
**unique (6)** 8:7
10:6 15:24
301:21 307:12
359:10
**unit (3)** 212:7,
11 231:21
**United (83)** 6:21
11:3,8,8 13:5,
17,18 14:6
22:16 24:16
25:3,5,6,8,9,
10,11,15 27:1
32:22 33:18
35:5 45:7,24
47:20 51:3
53:5 61:5
62:13,17,23
66:18,22
72:10 87:6,8,
12,14 88:9,18
89:19 108:8
126:15,19
129:9,12
133:11 134:18
135:18 155:17
165:1 169:18,
21 176:5,9
212:22 229:23
255:9 287:2,3,
15 289:24
290:19 297:14,
15 303:6,9
307:14 313:1,
22 316:24
326:23 334:1,
12 344:23
350:4 355:2,

20 357:3,5
362:1 363:24
365:12
**units (4)** 5:22,24
61:23 63:8
**university (7)**
3:16 6:9 7:13
60:9,11
211:12,18
**unjust (1)** 340:13
**unknowable (1)**
51:23
**unknown (6)** 27:2
315:14 330:14
331:2,19 335:1
**unlawful (1)**
125:20 338:24
**unless (2)** 185:6
334:6
**unlikely (1)** 187:5
**unliquidated (1)**
305:13
**unreasonable (1)**
346:7
**unremarkable (2)**
204:8 206:18
**unsecured (1)**
53:4
**unsure (2)** 81:19
180:10
**until (26)** 13:8
37:19 48:21
52:13 95:19
123:14 136:6
145:14 147:8
174:2,6
204:10 224:22
237:20 239:20
244:1 245:4
247:7 248:8
272:18 282:1
298:13,19
318:9 320:15,
17
**untrue (2)** 41:18,
19
**unusual (4)**
271:4 273:3

Case 09-10138-MFW    Doc 15396    Filed 03/30/15    Page 441 of 450
Bankruptcy Court for the District of Delaware                                        Hearing
In Re: Nortel Networks Inc., et al.                                       March 26, 2015

296:14 311:3

**up (58)** 4:6 5:17
34:17 42:7
47:1,13 48:21
63:4 75:8
76:16 78:11
80:11 82:24
84:24 86:14,
21 103:13
104:19 107:14,
21 111:9,12
112:19 115:8
120:24 121:16
122:1 145:14
152:17 156:22
162:7 166:24
170:1,3
190:21 220:7
225:20 229:6
230:15 233:12
237:24 239:12
248:8 250:17
273:9 274:14
278:9 279:13
281:9 287:2,
21 299:7
313:21 318:9
320:17 333:15
346:24 367:16

**upcoming (1)**
220:10

**update (2)** 83:13
181:16

**updated (1)** 322:2

**updates (2)**
237:6 241:23

**upon (19)** 19:9,
12 39:23
54:17 65:7
66:23 104:5
142:19 144:8
191:13 260:21
278:24 282:15
298:9 339:21
361:8 363:13,
14 370:17

**upset (1)** 293:24

**upsetting (1)** 8:16

**upside (1)** 34:20

**urged (4)** 86:13
102:18 134:24
332:3

**urgency (1)**
102:19

**US (465)** 3:12
5:17,24 6:22
10:13,13,22,
23,24 11:1,2
15:1,3 18:6
19:7 21:24
30:9 33:24
35:10,12,17
36:2,3,16
37:15,22 39:3
41:17 42:8
43:6 45:13,14,
22 46:8,9,10,
24 47:5,7,10
48:2,7,24
49:4,6 55:13
56:9 58:12
63:14 66:23,
24 67:11,12,
13,15 68:13
71:2 73:11
75:9,14,19
76:2,5,9,13,
21 79:12,18
80:24 81:9,24
82:4,7,10,11,
16 84:6,24
85:4,9,24
86:4,6 87:10,
20 90:15,16
92:5,13 93:7
96:24 97:2,4,
20 99:23
108:10 110:12,
13 115:22
118:4,12,19,
23 122:5,12
123:6,10,13
126:8,11,24
127:4,9,13,17,
18,20,20,21,
24 128:2,2,6,

7,7,20,23
129:3,17,19,
21,22 130:1,3,
5,6,10 131:1
132:17 133:6,
12,21,22
134:6,10,16,
17 135:10,20
136:4,8,18
137:9,12,14,
20,24 139:10,
14,20 140:9,
11,18 141:1,3,
6,14,17,20,22
142:4,9
145:19 146:8,
9,18,18
147:18,20
148:22 149:16,
22 153:11
154:3,5,12
156:3 166:22
167:20,23
168:5,6,7,20
170:1,5
171:23 172:2
173:2 175:7,8,
23 176:1,19,
23 177:2,14,
17,20 178:5,6
179:24 180:4,
9,22,22 181:3,
5,5,11,17,23
182:11,18
183:5,10,22
184:2,16
187:4 188:7
189:16,19,23
190:9,13
193:1,24
195:20 196:8,
10,12,15,19
197:3,12,17
199:24 206:24
207:1,4,5,16,
18,20 208:5,6,
19 213:11
218:21,23,24

220:7,15,20,
22 221:1,2,5,
7,8,14,17,19
223:17 224:24
225:3,8,14,15,
16 226:1,6
227:14 228:4,
4,7,13,19,20
229:5,12
231:2,19,20
232:5,17
233:10,14
234:21 235:22
237:10,11,13
238:11,12
239:15 240:20
241:2 242:23
243:5,8,11,14,
16,20 244:1,4,
5,7,19,20,24
246:1,3,22,22
248:10,15,16,
23 249:19
251:22 252:4
253:7 254:1,5,
6 255:6,11,17,
21 256:3,17,
24 257:18
259:10,10
260:22,23
262:14,21
263:8,10,13
266:21,23
267:1 279:6
282:20 287:16,
17,20,22
291:17 297:8
302:21 304:23
308:20 314:19,
24 315:15
316:12,13
317:7,12
318:7,11,13,
16,17,21
319:14,21,22
320:3,3,4,19
321:5,11,12,
15,16,24

322:4,8,11,18,
21,23 323:1,7,
23 324:21
325:3,4 326:9,
12 327:3,4,6
328:13,16
329:8 333:6,7
334:22 337:23
339:14 341:2,
7,7,13,15
342:22,23,24
344:17 346:15
347:2,9,19,22,
24 348:4,6
350:4,7,8,9,
14 351:20
352:9 353:10,
12 354:2,19
355:6,17
357:8 358:15
359:23 366:9,
10,14 367:19
368:19 370:3,
10,14 373:24
374:8,10,20

**USA (1)** 122:18

**US-based (1)**
22:21

**use (13)** 13:19
75:7 80:8
97:16 128:13
182:3 186:5
242:16,17
253:6 277:6
307:14 356:5

**used (24)** 36:12
41:2 85:23,24
101:19 103:20,
24 106:23
128:14 161:15
163:19 164:15
173:9 183:16
212:13 241:22
242:8,15
259:5 274:23,
24 275:2
276:12 284:4

**useful (1)** 241:20

Case 09-10138-MFW   Doc 15396   Filed 03/30/15   Page 442 of 450

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
March 26, 2015

**Using (8)** 13:23
40:15 91:12
240:9 243:7
275:19 286:9
337:4
**usually (3)** 214:3
282:5 336:13

### V

**vague (1)** 224:17
**validate (1)** 199:9
**validity (2)** 50:9
328:20
**valuable (1)**
114:11
**value (13)** 2:23
4:1 27:3,8,20
28:5 34:5
53:23 63:20
148:5 199:18
328:18 345:13
**values (2)** 113:7
138:17
**VanLare (39)**
31:17 171:7,
11 172:18,21
179:11,14
185:16,17
186:16,23
189:6,14
190:6 191:5,
15 195:6,8,8,
12 198:6,9,10
201:14,22
205:20 206:1
208:9,12
209:20,22
231:7 234:3,6,
7 238:21
239:2,5 261:7
**varied (1)** 160:19
**variety (1)** 3:20
**various (15)** 3:23
4:10 61:1
63:6 74:8
92:9 153:20
160:20 161:5

162:8 164:17
213:19 232:1
242:2 258:11
**vehicles (3)**
236:20,23
237:1
**venting (1)**
187:15
**ventures (1)**
313:19
**verification (1)**
3:23
**verify (3)** 72:23
182:24 200:15
**versions (1)**
322:15
**versus (4)** 34:2
35:10 330:14
331:2
**vet (1)** 29:20
**vetted (1)** 29:18
**vibrant (1)** 44:23
**vice (5)** 73:19
160:12,24
217:3 333:14
**victims (1)** 55:6
**view (11)** 38:13
48:22 58:1
109:18 113:13
135:7 144:18
243:20 284:20
293:5 318:10
**viewed (19)** 6:2
24:17 49:2,3
82:1,3 85:15,
16 87:21 90:1
102:21,23
108:9 153:13,
18 178:19
231:15 318:11,
12
**views (1)** 80:13
**virtually (3)**
49:19 61:19
330:16
**virtue (2)** 148:7
344:3
**vis-a-vis (2)**

55:11,13
**vitriolic (1)** 27:1
**voice (9)** 36:12,
21 37:14
46:23 265:16
329:2 354:5
365:23 372:8
**voices (1)** 283:9
**voicing (1)** 80:11
**VoIP (1)** 212:11
**volumes (1)** 20:20
**voluntarily (1)**
353:22
**voluntary (1)**
41:11
**volunteer (1)**
219:4
**Voyages (1)**
340:1
**VP (2)** 161:24
164:22
**vs (2)** 42:19
331:14

### W

**Wait (31)** 9:21,
21 10:1 18:23
24:23 46:21,
21 82:24 83:5
84:22 152:10
167:18 171:5
223:24 224:5,
8 225:4
246:15 263:2,
12 281:24
285:11 291:17,
17 325:17
340:22,22,22
343:15,15
360:1
**waited (2)** 12:11
325:20
**waiting (6)** 10:21
12:5 16:13
296:21 345:4
369:10
**waiver (1)** 338:21

**waiving (1)** 315:2
**walk (2)** 282:13
314:13
**Wall (1)** 322:16
**wand (1)** 148:15
**want (60)** 31:2,
13 32:16
33:14,16 34:1
35:18 36:8
38:10 41:24
42:9 43:11
49:22 50:16
53:13,17
55:18 89:18
100:10 101:7,
10 114:15
117:13,15
118:18,21
120:24 121:10
125:12 129:16
131:18 136:1
140:22 147:16,
17 182:9
207:11 254:15
255:18 262:4,
17 278:14
279:24 280:24
282:10 283:20
332:6 340:14
345:6 349:12
350:15 352:11
353:5,13
354:12 362:12
364:7 366:7
371:11 374:11
**wanted (39)** 4:22
5:8 6:6,17
7:20 12:14,15
19:22 21:1,4
57:5 79:4,12
89:23 90:3
92:11 103:12
111:9 117:17
120:13,15
122:10,23
123:2 138:14
152:1,2
163:14 229:4

255:1 271:16
277:11 297:3
325:21 338:9,
11,14 341:14
351:15
**wanting (1)** 12:7
**wants (14)** 4:7
40:4 68:2
100:1,12
146:14,20
157:15 227:3
274:4,13
300:4 361:11
373:22
**warned (3)** 46:7
47:7 141:11
**warning (3)**
140:10 141:2
359:23
**watched (1)** 6:17
**water (2)** 59:20,
20
**watering (1)** 7:4
**Waterloo (2)** 60:9,
11
**wave (1)** 148:14
**way (84)** 3:9 4:6,
6,8 6:9 11:12,
20 13:16 14:9
20:10 26:21
27:19 36:9
53:18 76:15
81:9,13 85:12,
16 96:17
104:10,12
112:20 113:11
121:20 125:7,
17 129:7
138:23 148:15
149:21 152:8
153:11,11,16,
24 154:7
158:11 178:20,
24 190:24
191:2,8
194:12 208:8
216:11 222:18
223:15 228:6

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.
Hearing
March 26, 2015

231:15 243:18
244:6,21
246:4,5,11,24
249:4 250:17
251:8 253:24
258:21 271:16
275:16 279:18,
22 282:12
294:4 297:4
301:13 304:9,
12 307:16
318:7 321:8
325:4 329:7
330:20 335:3
345:7 348:11
353:7 358:23
368:9

**ways (2)** 7:19
216:2

**we (553)** 9:7,24
11:21 13:22,
23 16:6 17:12
18:23 19:10
20:22 21:7,10,
11,16 22:3,4
23:8,12,13,14,
20,20,21
24:21 27:17
30:13,13 32:8,
10,17 33:4
34:2,11,18,22
35:3,22 36:18,
20,21 37:13
38:11,12,13
39:1,8,19
40:1,7,13,20,
22 41:1,5,6,7,
7,10,11,12,17
42:4,4,5,9
43:4,9,10,11
44:13,14,17
46:1,22 49:5,
6,10 51:4,5,7,
7 52:12 53:8,
11,11,14,16,
22 54:6,13,16
56:7,7,13
61:15 62:1,5,

5 63:17,18
65:19 66:9,11
67:20 69:7,13,
14 72:13
75:10,16,17,
18 76:3,4,6,
11,15 80:23
81:16,16 82:1,
1,3,7,17,17
83:5,6 84:15,
22 85:7,7,9,
11 90:11 92:7,
8,8,8,10,11,
17,18,22,23
93:3,23 95:17,
22 97:1,12,14,
16,19,19 98:7
99:9,23 100:2,
6,8,22 101:6
102:3,22,22,
24 103:16
108:19 109:4,
18 110:6,20
112:22 114:14
116:1 121:12
124:23 125:10,
11 126:9
128:13,14
130:6 131:1,4
137:3 146:11
147:15,18,19
153:12,14,15
154:11,24
157:8,17,23
158:3,4 159:8
166:18,21
167:17,19
169:23 170:6
171:1 172:17
173:8 174:6
175:5 182:3,7
185:11,14
189:10 190:20
194:4,11,14,
16,19 198:19,
20 201:5,18
203:21 204:14,
19 206:22

210:6 212:8,
13 213:15,17,
18 214:3
217:19,21
218:2,7,17,18
219:11 220:3,
3,5,8,9,10,16,
17,17,17,24
221:4,5,12,15,
20 223:2,3,9
224:3,5,12,13,
14,17,21
225:2,2,3
226:7 227:19,
19,21,24
228:12 229:2,
3,4,6,11,15,
16 230:4,6,16
231:1,15,16,
20,21 233:12,
13,13,14
235:20,22,23
236:9,10,13,
14,21,21
240:9 243:24
244:8,9,12,16
245:1,3,14,15,
15,18,19
246:13,14,15,
21,23 247:5,
10,12,15,18,
24 248:5,24,
24 249:1
250:10 251:4,
23 254:12,13,
14,16 255:2,5
256:7 258:3,9
260:17 262:10
263:11,14
264:10,18
265:5,8
266:16 267:18,
21,24 268:5,7,
8,13,15,22,23
269:5,10,11,
14,20,24
270:2,8,9,11,
11,15,23

271:23 272:18,
19,22,23
273:9,13,13,
20 274:10,20
275:17 276:10
277:4,21
278:17,17,18,
19,19 279:1,9,
10,13,14
280:4,9 281:9,
10,13,15,15,
23,24 282:12
283:3,13,16,
17 284:2,6,7
285:1,14,21
286:13,13,15
288:3,4 290:9,
13 293:21
294:23 295:14
296:12,13,15,
20 297:5,11
299:1,21
300:9,18,19,
20 301:5
305:9,9
307:17,23
308:20 312:2
313:17 314:5
315:21 316:15
320:21 323:5
324:8 325:21
327:23 328:11,
14 329:12,18,
19 330:2,4,17
331:12,22,23
333:3,8,12,22
334:3,21
335:5,10
337:6,11,16
338:9 340:16,
17,20 341:4
342:6 343:10,
17,24 345:6,
18,24 347:10
348:2,6,11
351:13,15,23,
23 352:1,18,
20 353:5,8,8,

8,9,11,13,14,
14,15,16,16,
18 355:23
356:4,5
358:23 360:12,
13,13 363:16
365:2,3,5,6,8,
24 366:8,8,10
367:1 369:4
370:7,14
371:6 372:12,
15,18 373:12
374:7,14,15,
23 375:9

**wealth (2)** 113:8,
18

**web (1)** 62:7

**website (16)** 45:9,
10 112:6,18,
19,23 113:24
114:6,9,11
149:16 151:2
209:1 237:1
322:2 342:14

**websites (2)** 24:7
45:1

**week (3)** 79:24
111:24 322:22

**weekly (2)** 45:11
62:5

**weeks (10)**
20:18 54:23
72:21 74:22
97:9,24
162:14 166:23
309:17 319:2

**weighing (1)** 37:4

**weighs (2)** 37:11
337:1

**weight (1)** 261:21

**welcome (3)** 5:5
30:21 210:17

**welcoming (1)** 5:8

**welfare (2)**
247:19,20

**well-defined (1)**
29:17

**well-positioned (1)**

Min-U-Script®
Wilcox & Fetzer Ltd.
www.wilfet.com
(302) 655-0477
(443) ways - well-positioned

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
March 26, 2015

229:15

**Wendt (2)**
226:11 357:10

**went (27)** 3:15
6:8 7:1,20
19:20 41:12
71:2,3 76:11
81:14 105:5
117:23 137:1
149:15 181:10
191:2 203:10
208:24 215:2,
22 220:17
239:19 247:14
291:14 303:11
327:8 345:18

**weren't (25)**
10:21 12:6
13:23 21:6
22:14 23:15
158:16 174:21
180:22 187:9
196:4 197:18
228:7,19
229:3 246:14
254:21 255:8,
10,13,17
325:7 334:18
352:14 364:3

**whatever (14)**
39:15 68:19
76:5 98:6
109:15,21
130:17 135:19
146:4 153:22
204:10 227:3,
4 277:7

**whatsoever (5)**
33:6 58:9
98:16 100:9
250:7

**whenever (1)**
354:22

**whereas (2)**
214:11 227:22

**whereby (2)**
14:13 16:1

**wherever (1)**

182:16

**white (3)** 82:5
134:1 331:14

**whole (13)** 4:3
15:21 63:17
72:18 102:13
205:8 219:24
236:11 300:4
303:16 357:21
362:10 365:6

**wholly (1)** 276:18

**whose (4)** 66:19
200:22 308:17
334:17

**wife (1)** 252:6

**wife's (2)** 9:15
343:10

**willing (3)** 76:12
323:11 324:2

**willingness (1)**
98:3

**Winnicki (2)** 4:20
158:10

**wiped (1)** 305:14

**wireless (3)** 3:20
337:3 368:3

**wish (6)** 52:19
72:13 297:8
314:19,21
328:5

**wished (3)** 93:7
124:23 161:2

**wishing (1)** 93:24

**withdrawn (2)**
13:8 357:5

**within (9)** 93:23
105:9 161:5
166:23 219:24
273:14 330:3
335:15 340:5

**without (10)** 5:23
100:13 101:1
247:16 248:2
268:7 272:18
299:22 315:2
365:21

**witness (61)** 59:4,
11,14,22

64:18 65:1,23
66:1,9 96:19,
20 100:18
102:6 107:9
109:4,19
131:7 157:6,7
158:23 159:7
185:6 186:8,
18,22 188:24
189:3 191:3,
11 194:10,13
200:24 205:23
209:23 210:2,
5,12,18 227:5
231:5 238:23
239:3 263:23
264:4,6
269:15 270:8
271:17,18
273:5 275:3,
20,22 277:12
282:6 285:7
341:4,24
344:15,16
369:17

**witness' (1)** 96:21

**witnesses (32)**
3:5 45:4 56:6
58:21 59:4,6,
8 109:9
268:10 271:4,
14,20 272:10,
21 273:1
274:21 275:12,
18 276:11,23
277:15 278:16,
24 279:7,24
281:11 283:23,
24 284:19
285:17 341:23
372:16

**witnesses' (1)**
370:24

**WL (1)** 337:2

**wonderful (3)** 6:5
269:7 306:9

**woodwork (1)**
344:20

**word (13)** 10:7
13:23 28:16
112:2 173:6
174:10 204:20
258:10 259:23
298:1 307:14
356:17,18

**wording (2)**
203:10 222:10

**words (9)** 13:20
28:13 82:15
87:19 209:23
307:10 331:4
332:6,8

**work (19)** 6:6
25:8,8 61:8
63:3 93:15
96:8 105:21
108:1 121:1,3
159:21 161:23
211:8,20
212:3 218:11
289:8 333:7

**worked (69)** 2:18,
20 3:22 4:6,9,
14,17 5:22,23
6:9,11 7:14
11:17 18:2,4
28:20 30:6
32:24 34:3,12
45:15 61:15
62:21 68:23
71:11,12,12
72:4 78:24
80:2 87:6,8,
11 90:9
114:21 129:9,
12 135:18
141:19 142:15,
20 143:1,13
144:14 146:8
158:11 160:10,
17 161:7
162:2 164:2
218:14,18
230:6 231:16,
20,21,23
232:14 250:13

271:24 297:13,
21 298:22
299:2 313:3,
24 333:14
359:4

**worker (1)** 87:22

**working (17)** 11:6,
7 33:10 60:24
61:17,24 62:1
63:5 133:4
164:15 196:20
211:14,16,20
237:14 245:17
248:6

**works (2)** 158:14
282:3

**world (14)** 11:19
32:23 33:1
62:4 86:3
99:4 108:11
171:22 213:17
232:4 259:22
290:10 309:12
360:20

**worldwide (4)**
144:20
147:12 148:1
329:17

**worry (8)** 9:21
10:10 17:11
50:5 184:1
221:20 263:14
344:18

**worth (2)** 215:22
373:11

**Wow (1)** 43:3

**write (3)** 291:2,4
306:20

**writes (2)** 54:15
185:1

**writing (2)**
254:11 371:23

**written (4)** 51:12
173:23 179:4
368:1

**wrong (4)** 39:17
57:10 224:1
346:24

Case 09-10138-MFW    Doc 15396    Filed 03/30/15    Page 445 of 450

Bankruptcy Court for the District of Delaware                                    Hearing
In Re: Nortel Networks Inc., et al.                                       March 26, 2015

**wrote (8)** 279:4
  331:6 332:5
  333:11,20
  353:8,11
  359:12

**Y**

**year (7)** 93:21
  112:13 215:16,
  21 229:19
  238:1 250:7
**years (58)** 3:19,
  22 4:3,10,15,
  15,18 5:1,11,
  13,14 7:12
  29:24 33:4,20,
  21,23 34:16
  37:1,17 40:2,
  7 42:23 54:18
  60:16,18,23,
  24 63:23
  104:3 105:8
  112:17 117:4
  118:12 131:21
  132:1 141:17
  143:18,21
  158:12 160:3,
  6 170:5,20
  207:24 212:3,
  17,20,21
  224:16 250:14,
  18 298:19
  299:23 311:20
  324:24 335:12
  341:17
**yes-or-no (1)**
  245:22
**yielded (1)** 324:7
**York (1)** 371:19
**Young (11)**
  139:22 142:7
  167:7,10
  168:1,6
  169:22 170:10
  183:4 196:17
  211:24
**yourself (10)** 88:5

103:19 131:20
142:14 154:19
191:21 220:1
230:6,18
253:15
**Yukon (1)** 44:19

**Z**

**Zafirovski (1)**
  237:23
**Zigler (3)** 134:14
  185:3 327:1

**1**

**1 (9)** 19:21
  20:6,8 93:20
  131:19 132:5,
  11 134:5 321:2
**1:00 (1)** 28:12
**1:25 (1)** 157:19
**10 (5)** 16:8
  269:20 270:13
  273:23 328:8
**100 (3)** 148:8,
  17 311:13
**1006 (4)** 66:16
  68:9 264:18
  265:19
**11 (19)** 3:22 5:1
  16:8 73:11
  78:5,15,18,19
  125:18 158:12
  179:7,8
  239:16 241:14,
  15 250:9
  275:11 322:13
  339:1
**116 (2)** 368:15,
  15
**12 (3)** 15:12
  70:7 351:22
**12,000 (1)** 308:1
**12:30 (1)** 109:3
**127 (1)** 340:2
**128 (1)** 110:5
**12-minute (1)**

108:17
**13 (4)** 184:6
  239:7 326:19
  351:23
**130 (2)** 335:9
  345:2
**134 (1)** 340:2
**1354 (3)** 22:7
  288:6,7
**14 (2)** 167:9
  315:1
**140 (1)** 349:18
**142 (1)** 323:8
**143 (1)** 321:18
**15 (12)** 35:11
  168:15 198:5
  208:23 269:21
  270:13 273:21,
  23 296:15
  311:3 321:9,11
**150 (1)** 324:18
**151 (8)** 131:3,5,
  9,12 149:8,9
  155:18 156:4
**16 (8)** 35:4,17
  36:4 51:20
  146:8,17
  179:21 323:3
**161 (1)** 331:5
**168 (1)** 331:5
**170 (15)** 2:17
  20:15,24
  29:16 101:14
  147:10,17
  266:1 299:11
  300:16,22,24
  313:23 315:1
  321:18
**170-plus (1)**
  311:13
**171 (1)** 290:13
**18 (4)** 3:19
  27:21 160:5
  325:24
**1-800 (1)** 217:10
**1851 (1)** 184:12
**188 (1)** 335:8
**19 (2)** 239:19

325:11
**1919 (3)** 226:23
  357:9 358:10
**1979 (1)** 211:18
**199 (1)** 42:19

**2**

**2 (3)** 150:1
  292:1 315:11
**2:00 (1)** 157:18
**2:15 (1)** 157:21
**20 (4)** 4:14,15
  37:10 205:22
**20,000 (4)** 219:2,
  8 295:14 308:1
**2000 (1)** 143:21
**2007 (4)** 215:17
  320:14,16
  321:1
**2008 (18)** 48:1,3
  62:21 63:2
  75:21 116:3
  136:20 137:7
  143:21 172:6
  173:20 180:3,
  6 208:1 317:6,
  8 333:19
  354:22
**2008-2009 (1)**
  136:16
**2009 (116)**
  12:10 15:10
  16:8 27:12
  34:22 38:19
  39:5,17 40:10
  81:23 84:9
  118:20,22
  123:14,14
  126:14 127:16
  128:19,20,24
  129:3 131:15
  135:9 136:3,4
  137:7,15,19
  139:17 140:3,
  6,19,20 141:1
  150:10,21
  151:22 152:15,

19 153:19
154:21,24
167:9 171:20
172:1 175:9
176:3,12,14,
23,24 177:3,
15 178:4
179:21,23
180:7,8 181:1,
7,16 182:10
185:21 189:15,
18,20 190:8
191:7,16
193:21 195:13
204:5 206:13
209:3 216:14,
21 219:15
235:11 239:19
240:5,11
241:7 243:2,3
244:2,22
245:24 246:17
247:10 250:13
252:23 262:4,
8,14,20 263:6
293:5 312:13,
15 318:15,21
320:17,20,20
321:2,17
323:8,21
324:14 325:1
326:3 350:6
351:9 354:15,
23 368:17
**2010 (5)** 151:22
  152:15 189:18
  247:10 333:17
**2011 (4)** 170:12
  223:9,12
  247:10
**2012 (79)** 12:10,
  17 14:13 15:9,
  11,14,14 16:7,
  8 17:19 19:8
  27:12 29:7
  47:13 48:21
  54:12 89:7,8
  90:6 92:1,15

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
March 26, 2015

93:18,22
97:19 131:19
132:5,10,11,
21 133:5,19
134:5 136:6
139:13 170:12,
13 200:5
203:12 204:11,
13 207:24
223:12,13
225:11,13
229:1,2,18,19
244:1 247:8
248:8,9,21
254:5 255:18,
22 257:2,5
260:22 261:3
293:2,5
298:13 300:12
304:20 305:7,
15 311:22
318:9 320:23
328:9 351:16,
19 354:15,23
355:23 358:17
359:14
**2013 (11)** 20:6,8
53:7 55:1
93:20 231:1
261:6 318:4
319:21 320:15
321:3
**2015 (1)** 279:1
**202 (2)** 94:15,18
**205 (12)** 64:16,
20 65:16
66:11 68:1
105:24 264:16
265:12 332:4,
10 336:6
367:13
**209 (4)** 73:18
216:9,11,13
**21 (3)** 43:20,22
60:18
**210 (2)** 163:2,4
**212 (2)** 42:19
336:6

**213 (1)** 337:2
**22 (3)** 321:22
326:17 368:17
**23 (2)** 279:1,1
**24 (2)** 234:12
327:23
**25 (9)** 108:20
266:3,21,22
322:24 326:3
327:23 333:24
334:17
**254 (1)** 105:24
**26 (2)** 327:23
331:5
**27 (1)** 320:16
**28 (5)** 4:17
75:2 156:21
216:14 328:6
**29 (2)** 323:8,21

**3**

**3 (9)** 83:19,22
167:7,9 173:8
259:2 323:22
324:13 337:3
**30 (16)** 4:10
7:12 21:10
22:8,10 84:9
128:20,24
129:3 131:15
250:14 320:20
321:17 333:17
350:6 372:12
**300 (19)** 22:7,9
34:16 44:1,4
51:21 92:24
93:5 143:13
230:7 234:17
254:17 300:16
311:13 316:1
333:2 345:15,
17 360:9
**311 (13)** 14:4
18:7 19:10,11
20:24 22:4,12
94:20 103:6
287:13,14

288:5 308:2
**32 (1)** 4:2
**33 (2)** 122:16
192:23
**338 (1)** 368:3
**34 (1)** 205:22
**397 (1)** 339:14

**4**

**4 (5)** 320:19
322:9 348:13
356:1,2
**4:30 (1)** 273:17
**40 (1)** 22:14
**405 (1)** 340:1
**413 (1)** 331:5
**43 (2)** 83:9
266:2
**450 (1)** 331:15
**453 (2)** 64:21
105:24
**459 (1)** 335:17
**49 (1)** 258:21

**5**

**5 (2)** 239:7
278:21
**50 (7)** 22:8,10
148:9,17
244:13 258:19,
20
**503b (1)** 349:3
**504 (1)** 331:15
**507 (1)** 339:13
**507a2 (1)** 349:4
**513 (1)** 331:15
**514 (1)** 367:18
**521 (3)** 163:2,4,
5
**54 (7)** 77:11,15,
16 124:13
258:22 338:6,
16
**55 (2)** 234:1
241:11

**6**

**6 (3)** 121:12
122:16 200:5
**6:00 (1)** 283:2
**6:49 (1)** 375:21
**60 (2)** 335:17
365:15
**600 (1)** 144:21
**617 (1)** 368:3
**62 (1)** 239:6
**63 (1)** 328:5
**64 (1)** 335:17
**653091 (1)** 337:2
**67 (2)** 120:21
192:11

**7**

**7 (1)** 205:22
**700 (3)** 22:10
265:8 288:8
**75 (2)** 266:20
334:15

**8**

**84 (3)** 172:12,
15,20
**86 (2)** 148:5,16

**9**

**9 (1)** 320:17
**900 (2)** 112:14
144:3

SIGN-IN-SHEET

CASE NAME:    Nortel Networks Inc.
CASE NO.:    09-10138 (KG)

COURTROOM LOCATION: 3
DATE:    3/26/15

PLEASE PRINT YOUR NAME OR YOUR APPEARANCE MAY NOT BE CORRECTLY NOTED

| NAME | LAW FIRM OR COMPANY | CLIENT REPRESENTING |
|---|---|---|
| Fred Hodara | Akin | Official Comm. Unsec. Creds. |
| Abid Qureshi | " | (") |
| Christine Doniak | " | (") |
| Ana Emery | " | (") |
| Chris Samis | White and Taylor | (") |
| Mare Cordo | " | (") |
| Derek Abbott | Morris Nichols Arsht Tunnell | Monitor & Debtors |
| Lisa Schweitzer | Cleary Gottlieb Steen Hamilton | " |
| Sanaroo Inve | " | " |
| Marielle Pardum | " | " |
| Jeffrey Rosenthal | " | " |
| Radu B Morski | Morrison Morski Maughlin & Brander | Ad Hoc Committee of Terminated Canadian Employee |
| Michael Hochman | " " | Canadian Employee |
| Selinda A Melnik | DLA Piper | Canadian Creditors Cttee |
| LAURIER DUMAS | " | former Canadian employee |
| Paula Klein | | = |

SIGN-IN-SHEET

CASE NAME:    Nortel Networks Inc.
CASE NO.:    09-10138 (KG)

COURTROOM LOCATION: 3
DATE:    3/26/15

②

PLEASE PRINT YOUR NAME OR YOUR APPEARANCE MAY NOT BE CORRECTLY NOTED

| NAME | LAW FIRM OR COMPANY | CLIENT REPRESENTING |
|---|---|---|
| DAVE MIGNAULT | DELL NORTEL NETWORKS | Former Canadian Employee |
| JANE KONECHAMPS | FED GOVT PWGSC | FORMER EMPROYEE |
| ERNIE BRIARD | STANDARDS council of CANADA | FORMER EMPLOYEE |
| Cathy Deevey | Nortel Networks Retired | FORMER EMPLOYEE |
| Oriel Dickson | | VISITOR |
| Julia Russell | West Consulting Inc. | Former Employee Nortel |
| Ann McRuvie | CHEP Canada | Former Nortel Employee |
| Mike Campbell | WRPC | Client |
| Nicholas Bassett | Nortel Company of Bondholders | Ad hoc Comm of Bondholders |
| Peter J. Kern | Milbank | '' |
| Kathleen Murphy | Pachulski Stang Ziehl & Jones | Monitor |
| Stephen M. Miller | Morris James LLP | Law Debenture as Trustee |
| | | |
| | | |
| | | |

Court Conference

Calendar Date: 03/26/2015
Calendar Time: 10:00 AM ET

U.S. Bankruptcy Court-Delaware (DE - US)
Confirmed Telephonic Appearance Schedule
Honorable Kevin Gross (Nortel Trial Only)
Courtroom

Amended Calendar 03/26/2015 06:44 AM

| Page # | Item # | Case Name | Case # | Proceeding | App ID | Appearance By | Telephone | Firm Name | Representing |
|---|---|---|---|---|---|---|---|---|---|
| | | Nortel Networks Inc., et al. and Ernst & Young Inc., As Monitor & foreign Represent | 09-10138 | Hearing | 6827909 | Justin Brass | (212) 843-1246 | Stone Lion Capital Partners | Interested Party, Stone Lion / LISTEN ONLY |
| | | Nortel Networks Inc., et al. and Ernst & Young Inc., As Monitor & foreign Represent | 09-10138 | Hearing | 6738086 | Peg A. Brickley | (215) 462-0953 | Dow Jones & Co. | Interested Party, Dow Jones News / LISTEN ONLY |
| | | Nortel Networks Inc., et al. and Ernst & Young Inc., As Monitor & foreign Represent | 09-10138 | Hearing | 6825133 | Nicholas W. Chluchiolo | (212) 728-8511 ext. 8638 | Willkie Farr & Gallagher LLP | Interested Party, Nortel Networks UK Pension Trust / LIVE |
| | | Nortel Networks Inc., et al. and Ernst & Young Inc., As Monitor & foreign Represent | 09-10138 | Hearing | 6823607 | Kenneth Coleman | (212) 610-6300 | Allen & Overy, LLP | Monitor, Ernst & Young / LIVE |
| | | Nortel Networks Inc., et al. and Ernst & Young Inc., As Monitor & foreign Represent | 09-10138 | Hearing | 6822378 | Kent Collier | 212-588-8890 | Reorg Research, Inc. | Interested Party, Reorg Research, Inc / LISTEN ONLY |
| | | Nortel Networks Inc., et al. and Ernst & Young Inc., As Monitor & foreign Represent | 09-10138 | Hearing | 6822963 | Brian Guiney | (212) 336-2305 | Patterson Belknap Webb & Tyler | Creditor, Law Debenture Trust Company of New York / LISTEN ONLY |
| | | Nortel Networks Inc., et al. and Ernst & Young Inc., As Monitor & foreign Represent | 09-10138 | Hearing | 6826816 | Charles Huberty | (212) 837-6045 | Hughes Hubbard & Reed | Interested Party, The Joint Administrators / LISTEN ONLY |

Raymond Reyes ext. 881

CourtConfCal2012

| Party | Case | Type | ID | Name | Phone | Firm | Description |
|---|---|---|---|---|---|---|---|
| Nortel Networks Inc., et al. and Ernst & Young Inc., As Monitor & foreign Represent | 09-10138 | Hearing | 6819740 | Thomas Matz | (212) 530-5885 | Milbank, Tweed, Hadley & McCloy, LLC | Creditor, Ad Hoc Group of Bondholders / LISTEN ONLY |
| Nortel Networks Inc., et al. and Ernst & Young Inc., As Monitor & foreign Represent | 09-10138 | Hearing | 6801568 | John Ray | (302) 351-9318 | Nortel Networks Inc. | Debtor, Nortel Networks Inc / LISTEN ONLY |
| Nortel Networks Inc., et al. and Ernst & Young Inc., As Monitor & foreign Represent | 09-10138 | Hearing | 6825257 | Kevin J. Starke | (203) 569-6421 | CRT Capital Group, LLC | Interested Party, CRT Capital Group, LLC / LISTEN ONLY |
| Nortel Networks Inc., et al. and Ernst & Young Inc., As Monitor & foreign Represent | 09-10138 | Hearing | 6827579 | Andrew M. Thau | (203) 862-6231 | Southpaw Asset Management | Interested Party, Southpaw Asset Management / LISTEN ONLY |
| Nortel Networks Inc., et al. and Ernst & Young Inc., As Monitor & foreign Represent | 09-10138 | Hearing | 6827811 | Barbara Walancik | (416) 542-6288 | Koskie Minsky, LLP | Client, Former Employees of Nortel (Canada) / LISTEN ONLY |