## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------- x

| | |
|---|---|
| *In re* | :  Chapter 11 |
| | : |
| | :  Case No. 09-10138(KG) |
| Nortel Networks Inc., *et al.,*[1] | :  Jointly Administered |
| | : |
| Debtors. | :  Hearing Date:    May 5, 2015 at 10:00 a.m. |
| | :  Objections Due:  April 28, 2015 at 4:00 p.m. |

-------------------------------------------------------- x

### DEBTORS' MOTION FOR ENTRY OF THIRD DISCOVERY PROTOCOL IMPLEMENTING THE COURT'S PREVIOUS ORDERS EXTENDING AUTOMATIC STAY AND REGULATING THIRD-PARTY DISCOVERY

Pursuant to Sections 105(a), 107(b), 362(a), and 541 of the Bankruptcy Code, Bankruptcy Rule 9018, and the Order Extending Automatic Stay and Regulating Third-Party Discovery [D.I. 14746], Nortel Networks Inc. ("NNI") and certain of its affiliates (collectively, the "Debtors") hereby move this Court for entry of an order, substantially in the form attached hereto as Exhibit A, adopting a Third Discovery Protocol to govern third-party discovery against the Debtors in connection with patent litigations not already covered by the Second Discovery Protocol adopted by the Court on December 8, 2014 [D.I. 14906].

### INTRODUCTION

1.      Four months ago, in response to Debtors' request for protection from the extraordinary burden and expense of responding to nearly 20 third-party subpoenas seeking

---

[1]      Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Contact information for the U.S. Debtors and their petitions are available at http://dm.epiq11.com/nortel.

documents and testimony in connection with patent infringement litigations involving a subset of the patent portfolio that Debtors and other Nortel entities had previously sold to Rockstar Bidco, LP ("Rockstar Bidco"), this Court adopted a Second Discovery Protocol jointly developed by Debtors, Rockstar Bidco's successors-in-interest to certain former Nortel patents (collectively, "Rockstar"), and various litigants then seeking third-party discovery from Debtors.[2]

2.    The Second Discovery Protocol includes detailed procedures designed to manage the burden and expense of third-party discovery against Debtors in connection with litigations involving any of the patents that Nortel had sold to Rockstar.  Importantly from Debtors' perspective, the Second Discovery Protocol established streamlined procedures for the production of documents that potentially contained third-party confidential and/or privileged information.  In essence, so long as Debtors comply with the provisions of the Second Discovery Protocol before producing any such documents, including the requirement to provide notice and an opportunity to object to interested parties, Debtors are relieved of any potential liability that might arise as a result of disclosing such documents.

3.    Upon entry of the Second Discovery Protocol as an order of the Court in December, 2014, Debtors proceeded to follow the provisions of the Second Discovery Protocol in connection with the numerous third-party discovery requests they had received, and indeed are continuing to do so today with respect to a number of pending requests.  However, shortly thereafter, Debtors were informed by the requesting parties not only that the Rockstar-related litigations were in the process of settling, but also that Rockstar had agreed to sell the patents it had purchased from Nortel to RPX Corporation ("RPX"), a defensive "patent aggregator."  Each

---

[2]    The Court had previously entered a First Discovery Protocol [D.I. 14746-1] in connection with the Order Extending Automatic Stay and Regulating Third-Party Discovery [D.I. 14746], establishing interim procedures for pending third-party discovery requests against Debtors.

of the Rockstar-related litigations in which third-party subpoenas had been served on Debtors was stayed and ultimately dismissed, relieving Debtors of any further discovery obligations in those cases.

4.     The resolution of the Rockstar-related litigations did not, however, relieve Debtors of all third-party discovery obligations.  For instance, Debtors had been served with third-party discovery requests in connection with two litigations involving patents being asserted by Spherix Incorporated ("Spherix").  Spherix apparently had acquired certain of the former Nortel patents from Rockstar prior to the agreement between Rockstar and RPX.  The Spherix patents qualify as "Former Nortel Patents" under the Second Discovery Protocol, and thus third-party discovery of Debtors in connection with the Spherix-related litigations was, and continues to be, governed by the Second Discovery Protocol.

5.     Subsequent to the adoption of the Second Discovery Protocol, Debtors were contacted by counsel for Metaswitch Networks Ltd. and Metaswitch Networks Corp. (collectively, "Metaswitch") regarding Metaswitch's desire to take third-party discovery of Debtors in connection with certain litigations involving patents being asserted by Genband US LLC ("Genband").  Genband had acquired those patents from Debtors and other Nortel entities through an Asset Sale Agreement approved by this Court on March 4, 2010 [D.I. 2632]. Accordingly, those patents are not "Former Nortel Patents" as defined in the Second Discovery Protocol, and thus the Second Discovery Protocol does not apply to Metaswitch's current requests for third-party discovery from Debtors.

6.     Metaswitch's current third-party discovery requests raise precisely the same issues of burden, expense, and potential liability to third parties arising from the production of confidential and/or privileged documents that led this Court to adopt the Second Discovery

Protocol.  Moreover, Genband is just one of several entities that purchased Nortel business lines and related assets, including patents, in connection with these Insolvency Proceedings (as defined below), and thus it is likely that Debtors will be faced with similar third-party discovery requests in future litigations that likewise do not involve the "Former Nortel Patents" sold to Rockstar, and which therefore also fall outside the scope of the Second Discovery Protocol.

7.      Accordingly, for precisely the same reasons that this Court adopted the Second Discovery Protocol, Debtors ask this Court to adopt the Third Discovery Protocol to apply substantially the same procedures and protections to pending and future third-party discovery requests involving patents that Nortel sold to entities other than Rockstar.

## JURISDICTION

8.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the February 29, 2012 Amended Standing Order of Reference from the U.S. District Court for the District of Delaware (the "District Court").  Moreover, this Court has exclusive jurisdiction pursuant to 28 U.S.C. § 1334(e) over Debtors' property and property of their estates, including Debtors' books and records.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The statutory bases for the relief requested herein are Sections 105(a), 107(b), 362(a), and 541 of the Bankruptcy Code, and Bankruptcy Rule 9018.

## FACTUAL BACKGROUND

### A.      The Insolvency Proceedings

10.     On January 14, 2009 (the "Petition Date"), Debtors, other than Nortel Networks (CALA) Inc. ("NN CALA"), filed voluntary petitions for relief under Chapter 11 of the

Bankruptcy Code in this Court.[3]  The cases (the "Chapter 11 Cases") are consolidated for procedural purposes only.  Debtors continue to operate as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

11.    The U.S. Trustee has appointed an Official Committee of Unsecured Creditors (the "Committee") for Debtors [D.I. 141, 142], and an ad hoc group of bondholders has been organized (the "Bondholder Group").

12.    On the Petition Date, Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[4] commenced proceedings seeking relief from their creditors (collectively, the "Canadian Proceedings") in the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada).  The Canadian Court appointed Ernst & Young Inc. as a monitor (the "Monitor").  Also on the Petition Date, the High Court of Justice in England and Wales (the "English Court") placed nineteen of Nortel's European affiliates, including Nortel Networks UK Limited ("NNUK") and certain of its affiliates located in Europe, the Middle East, and Africa (collectively, the "EMEA Debtors"),[5] into administration (the "UK Proceedings") under the

---

[3]    NN CALA filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' Chapter 11 cases for procedural purposes [D.I. 1098].

[4]    The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation, and Nortel Networks International Corporation.

[5]    The EMEA Debtors include the following entities:  NNUK, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks

control of court-appointed administrators and foreign representatives (the "Joint Administrators"). Other Nortel affiliates have commenced and in the future may commence additional creditor protection, insolvency, and dissolution proceedings around the world (collectively, with the Chapter 11 Cases, the Canadian Proceedings, and the UK Proceedings, the "Insolvency Proceedings").

**B.    Establishment Of The Current Protocols Governing Third-Party Discovery**

13.    On October 7, 2014, after having been served with nearly 20 third-party subpoenas in connection with various patent infringement suits involving patents that Debtors and other Nortel entities sold to Rockstar Bidco, Debtors sought relief from the burden, expense, and potential third-party liability of responding to those subpoenas in their Motion for (A) an Order Enforcing and/or Extending the Automatic Stay, (B) an Order Enforcing the Court's Prior Orders, (C) a Protective Order, and (D) Related Relief Under Section 105(a) [D.I. 14535] ("Motion to Extend Automatic Stay").[6]

14.    On November 10, 2014, the Court granted the Motion to Extend Automatic Stay, explaining that:

> The Court has authority pursuant to Sections 362(a) and 105 of the Bankruptcy Code to grant the relief requested and such relief is necessary and appropriate. Exposing Debtors and affiliated persons and entities to multiple discovery requests in actions pending in multiple jurisdictions without a discovery plan and the Court's supervision will expose Debtors and their estates to time and expense which will reduce estate assets. At the same time, the Court must take into account the legitimate interests of third parties who are defending their interests in pending litigation. By this Order and the Court's continuing oversight, the Court is attempting to balance all parties' interests.[7]

Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

[6]    The motion was originally filed on September 26, 2014 [D.I. 14476], but was then withdrawn and re-filed on October 7, 2014.

[7]    Order Extending Automatic Stay and Regulating Third-Party Discovery, ¶ 1 [D.I. 14746] ("Order Regulating Third-Party Discovery").

15.     The Order Regulating Third-Party Discovery relieved Debtors and certain others from any obligation to respond to third-party subpoenas or other discovery requests except as specified by the Court:

> The automatic stay is hereby enforced and extended to protect Debtors, their property, and property of the estate, wherever located and by whomever held, from all third-party subpoenas that have been served on or will in the future be served on Debtors, their counsel, Debtors' former employees (the "Former Employees"), and/or other advisors and professionals retained by the estate in these proceedings (including, but not limited to, Global IP Law Group and Lazard Frères & Co. LLC) and the respective former employees of any such advisors and professionals (each, an "Advisor"), such that Debtors, their counsel, the Former Employees, and the Advisors shall not be obligated to respond to or comply with any now pending or future third-party subpoenas or other discovery requests (collectively, the "Third Party Subpoenas"), except as set forth herein and in subsequent orders.[8]

16.     The Order Regulating Third-Party Discovery also required that "Debtors, Rockstar and the Parties requesting the subpoenas (the 'Requesting Parties') shall meet and confer and attempt to develop a discovery protocol for pending and future third-party discovery of Debtors and affiliates, including the management of confidential information."[9]

17.     On December 2, 2014, in accordance with the Order Regulating Third-Party Discovery, Debtors filed their Submission of Proposed Protocol for Third-Party Discovery Against Debtors [D.I. 14856], attaching as Exhibit A thereto a proposed Second Discovery Protocol [D.I. 14856-1].

18.     On December 8, 2014, the Court entered an Order Approving Second Discovery Protocol in Connection with Order Extending Automatic Stay and Regulating Third Party

---

[8]     *Id.* at ¶ 2.

[9]     *Id.* at ¶ 3.

Discovery [D.I. 1490], thereby approving and adopting the proposed Second Discovery Protocol [D.I. 14906-1] as an order of the Court.

19.     By its express terms, the Second Discovery Protocol governs only "third-party discovery of Debtors in connection with litigation involving *Former Nortel Patents*," defined as "patents sold to Rockstar Bidco, LP through the Asset Sale Agreement dated June 30, 2011 (the 'Nortel-Rockstar ASA'), regardless of the current owner of such patents."[10]

### C.     Sales Of Nortel Businesses And Assets

20.     Soon after commencement of the Insolvency Proceedings, the various companies comprising the Nortel group pursued an orderly and coordinated sale of certain Nortel business lines and related assets.   In furtherance of those efforts, Debtors, the Canadian Debtors, and certain of the EMEA Debtors entered into an Interim Funding and Settlement Agreement, dated as of June 9, 2009 (the "IFSA").[11]  Following a joint hearing on June 29, 2009, the IFSA was approved by this Court[12] and the Canadian Court.   Among other things, the parties to the IFSA agreed to not condition the sale of Nortel's businesses and assets on a prior agreement among the selling parties regarding the allocation of the ultimate sales proceeds from the relevant sale transactions and to hold all such sale proceeds (with accrued interest, the "Sale Proceeds") in escrow accounts until an allocation methodology was agreed upon or resolved pursuant to the IFSA.[13]

---

[10]      Second Discovery Protocol at 1 (emphasis added).

[11]      *See* Motion Pursuant to 11 U.S.C. § 105(a), § 363, § 503 and Fed. R. Bankr. P. 9019 for an Order (A) Approving the Interim Funding and Settlement Agreement, and (B) Granting Related Relief [D.I. 874], Exhibit B.

[12]      D.I. 993.

[13]      *See* IFSA, ¶¶ 12(a), (b).

21.     With this framework in place, from 2009 to 2011 Nortel conducted an extensive series of court-approved sale transactions generating more than $7.3 billion in net sale proceeds. Specifically, assets of various business lines (including Nortel's considerable patent portfolio) were sold with the Court's approval.   In each Sale Order, the Court retained jurisdiction of matters relating to the enforcement and implementation of the orders.[14]

22.     In connection with each of the nine sale transactions, Debtors and other Nortel entities established electronic data rooms with confidential diligence materials.   As each data room was created, Debtors searched for, collected, and included in the electronic data rooms relevant documents and information for each respective sale process.   Access to the confidential

---

[14]     The nine "Sale Orders" are:  (i) Order Authorizing and Approving (A) Sale of Certain Non-Core Assets Free and Clear of All Liens, Claims and Encumbrances and (B) Assumption and Assignment of Certain Contracts, ¶ 25, entered 3/26/09 [D.I. 539]; (ii) Order Authorizing and Approving (A) the Sale of Certain Assets of the Debtors' CDMA and LTE Business Free and Clear of All Liens, Claims and Encumbrances, (B) the Assumption and Assignment of Contracts and (C) the Assumption and Sublease of Certain Leases ("CDMA/LTE Sale Order"), ¶ 45, entered 7/28/09 [D.I. 1205]; (iii) Order Authorizing and Approving (A) the Sale of Certain Assets of, and Equity Interests in, Debtors' Enterprise Solutions Business, (B) the Assumption and Assignment of Certain Contracts and Leases and (C) the Assumption and Sublease of Certain Leases ("Enterprise Sale Order"), ¶ 18, entered 9/16/09 [D.I. 1514]; (iv) Order Authorizing and Approving Sale of Debtors' Next Generation Packet Core Network Components Free and Clear of All Liens, Claims and Interests, ¶ 22, entered 10/28/09 [D.I. 1760]; (v) Order Authorizing and Approving Sale of Debtors' GSM/GSM-R Free and Clear of All Liens, Claims and Encumbrances, ¶36, entered 12/3/09 [D.I. 2065]; (vi) Order Authorizing and Approving (A) the Sale of Certain Assets of the Debtors' Carrier Voice Over IP and Communications Solutions Business Free and Clear of All Liens, Claims and Encumbrances, and (B) the Assumption and Assignment of Certain Executory Contracts ("CVAS Sale Order"), ¶ 32, entered 3/4/10 [D.I. 2632]; (vii) Order (I) Authorizing the Sale of Certain Assets of Debtors' GSM/GSM-R Business Free and Clear of All Liens, Claims and Encumbrances; (II) Authorizing and Approving the Asset Sale Agreement; (III) Authorizing and Approving the Assumption and Assignment of Certain Executory Contracts; and (IV) Authorizing the Filing of Certain Documents Under Seal, ¶ 33, entered 5/24/10 [D.I. 3048]; (viii) Order Authorizing and Approving (A) the Sale of Certain Assets of Debtors' Multi-Service Switch (Formerly Known As "Passport") Business Free and Clear of All Liens, Claims and Encumbrances and (B) the Assumption and Assignment of Certain Executory Contracts, ¶ 34, entered 9/30/10 [D.I. 4054]; and (ix) Order Authorizing and Approving (A) the Sale of Certain Patent and Related Assets Free and Clear of All Claims and Interests, (B) the Assumption and Assignment of Certain Executory Contracts, (C) the Rejection of Certain Patent Licenses and (D) the License Non-Assignment and Non-Renewal Protections ("Patent Sale Order"), ¶ 39, entered 7/11/11 [D.I. 5935].

diligence materials in the electronic data rooms was limited to persons covered by confidentiality and non-disclosure agreements.[15]

23.     At the conclusion of each sale, the sellers delivered to each purchaser at least some, and in some cases all, of the confidential commercial and other proprietary information contained in the respective electronic data room, along with any other sensitive documents and information otherwise required to be delivered under the respective transactional documents.[16]

24.     Under the various purchase and sale agreements, Debtors have ongoing confidentiality obligations to the purchasers.  For example, the Asset Sale Agreement with Genband restricted the sellers from disclosing any "competitively sensitive information and data related to the Business or the Assets (including Transferred Intellectual Property and competitively sensitive Business Information existing as of the Closing Date)."[17]

**D.    Confidential Information Has Been Protected In The Allocation Litigation**

25.     Over the last several years, Debtors, the Canadian Debtors, the Monitor, the EMEA Debtors, the Joint Administrators, the Committee, the Bondholder Group, and other key constituencies, including the so-called "UK Pension Parties" (collectively, the "Core Parties") have engaged in comprehensive settlement discussions with respect to the allocation of the Sale Proceeds and the potential resolution of claims filed by the EMEA Debtors and the UK Pension Parties.  These comprehensive settlement discussions included three formal rounds of mediation, none of which were successful.

---

[15]     Decl. of Timothy C. Ross in Support of Motion to Extend Automatic Stay, Sept. 18, 2014, ¶ 16 [D.I. 14477] (hereinafter, "Ross Decl.").

[16]     Ross Decl., ¶¶ 16.a., 16.d.

[17]     *See* Patent Sale Order [D.I. 2632], Exhibit A (Asset Sale Agreement § 5.11); *see also* CDMA/LTE Sale Order [D.I. 1205], Exhibit A (Asset Sale Agreement § 5.11); and Enterprise Sale Order [D.I. 1514], Exhibit A (Amended and Restated Asset and Share Sale Agreement § 5.11).

26.     After the third mediation ended in January, 2013 without a settlement, certain of the Core Parties sought relief from this Court and the Canadian Court to approve litigation procedures to govern the allocation disputes and the claims filed by the EMEA Debtors and the UK Pension Parties against Debtors and the Canadian Debtors.  On April 3, 2013, the Court (a) granted Debtors' motion for approval of binding procedures and an expedited schedule for the cross-border resolution of the dispute concerning the allocation of the Sale Proceeds (the "Allocation Dispute"), (b) denied the Joint Administrators' cross-motion to compel arbitration, and (c) directed the Core Parties to continue negotiation of an allocation protocol. [18] Additionally, the Court scheduled joint hearings to determine the allocation of the Sale Proceeds (the "Allocation Trial" and, collectively with the Allocation Dispute and related proceedings, the "Allocation Litigation"), the claims of the EMEA Debtors, and the claims of the UK Pension Parties.  The Canadian Court issued a parallel order and endorsement on March 8, 2013 and April 3, 2013 respectively. [19]

27.     On June 11, 2013, the Court issued a protective order governing discovery in the Allocation Litigation. [20]

28.     As a result of a complex process, each estate and the other parties to the Allocation Dispute and related proceedings produced approximately 3 million documents.  The original source of each of these 3 million documents is not readily identifiable or easily obtainable at this time. [21]

---

[18]     D.I. 9946, 9947.

[19]     *See* Notice of Filing of Items Designated for Record on Appeal, Exhibits C and D (May 1, 2013) [D.I. 10414].

[20]     D.I. 10805-2.

[21]     Ross Decl., ¶ 17.

29.     On May 8, 2014, this Court and the Canadian Court (collectively, the "Courts")
held a joint hearing in advance of the Allocation Trial on motions regarding expert reports and
confidentiality of documents.   Several non-litigant parties appeared at the hearing, including
counsel for Rockstar, Ericsson, and Microsoft (in its capacity as a party to a pre-petition license
agreement), to voice their concerns about the need to protect confidential and proprietary
documents and information.[22]   For example, the lawyer representing both Ericsson and Rockstar
stated:

> [A]s the Court correctly observed, in combination [Rockstar] and Ericsson are
> responsible for five and three-quarter billion of the proceeds that are to be divided
> up in the allocation trial.  That price is reflective of the value of the assets that we
> acquired, but it's also reflective of the ancillary protections we acquired under our
> purchase agreements because we not only bought those patents and those assets
> and the technology, but we also bought a lot of other information that is vital to
> maintaining the value of those assets in the marketplace free from competitors and
> free from litigants as we go forward with those assets.  So we have a vital interest
> in the outcome of this and in the outcome of the treatment of the confidentiality of
> documents.   We have really two concerns.   The first is substance, and that's
> protecting what is really confidential and really valuable to our business.  We're
> mindful of the process that is about to unfold.  We have no interest in being
> obstructionist or delaying it.  We don't envision that we're actively participating
> in this in any fashion.  We have no skin in this game other than protecting what
> we purchased.[23]

30.     During that hearing, Debtors also expressed their desire to proceed carefully to
"avoid exposing any of the estates to any potential liability or complaint by a purchaser or by a
counter-party to a confidential document."[24]

---

[22]     Several non-litigants, including Microsoft and Tellabs, also filed their own motions, or joinders in
others' motions, seeking protection of certain confidential and sensitive materials, as explained in detail in
supporting declarations.  *See, e.g.*, D.I.  13500 (Exhibit A (Declaration of Horacio E. Gutiérrez)), 13509,
13515, 13516, 13519, 13520 (Declaration of Donald Powers).

[23]     Tr. of May 8, 2012 Hearing at 57: 4-24 [D.I. 13555].

[24]     *Id*. at 62:15-18.

31.     Following that hearing, the Court on May 12, 2014 entered an Order Providing Directions and Establishing Procedures for Sealing Trial Exhibits, Redacting Pretrial Submissions, and Protecting Confidential Information from Public Disclosure During the Trial.[25] The Court entered a supplementary order on May 30, 2014, which principally addressed confidentiality concerns of the Canadian Revenue Authority (the "CRA").[26]

32.     Also on May 12, 2014, the parties commenced the Allocation Trial before the Courts.  The evidentiary portion of the Allocation Trial concluded on June 24, 2014.  Post-trial briefs were submitted and closing arguments in the Allocation Trial concluded on September 24, 2014.

33.     The parties have largely completed an extensive process of reviewing and redacting for confidentiality and privilege approximately 2,200 Allocation Trial exhibits and deposition designations.[27]  The review process involves Debtors, the Canadian Debtors, the EMEA Debtors, the other Core Parties, certain purchasers of the Nortel assets, and other interested parties such as licensees and the CRA.  At the conclusion of this review and redaction process, public versions of all 2200 Allocation Trial exhibits and deposition designations will be provided to the Courts.[28]

### E.     The Pending Third-Party Discovery Requests To Debtors In Litigations Involving Former Nortel Patents Sold To Genband

34.      In January, 2014, Genband initiated a patent infringement suit against Metaswitch in the U.S. District Court for the Eastern District of Texas, styled *Genband US LLC v.*

---

[25]     D.I. 13554.

[26]     D.I. 13729.

[27]     Ross Decl., ¶ 17.

[28]     *See generally* Stipulation Regarding Exhibits and Other Documents Used at the Allocation Trial [D.I. 15345-1]; Order Approving Trial Exhibits Stipulation [D.I. 15348].

*Metaswitch Networks LTD, et al.*, No. 2:14-cv-33-JRG (E.D. Tex.) (the "*Genband v. Metaswitch* Litigation"). Five of the 8 patents being asserted against Metaswitch were originally issued to Nortel Networks Limited and were acquired by Genband in the 2001 asset sale transaction. Fact discovery is set to close on May 6, 2015.[29]

35.    In July, 2014, Metaswitch filed a counter-suit against Genband in the Eastern District of Texas, styled *Metaswitch Networks LTD v. Genband US LLC*, No. 2:14-cv-744-JRG (E.D. Tex.) (the "*Metaswitch v. Genband* Litigation"), alleging infringement of certain Metaswitch patents by Genband. Fact discovery is set to close on August 10, 2015.[30]

36.    On February 10, 2015, counsel for Metaswitch contacted counsel for Debtors regarding Metaswitch's desire to serve third-party discovery requests on Debtors in connection with the two pending litigations between Metaswitch and Genband. Since that time, the parties have worked cooperatively to reach an agreement regarding a discovery protocol substantially along the lines of the Second Discovery Protocol adopted by this Court for third-party discovery in litigations involving the patents that Nortel sold to Rockstar.[31]

37.    On March 4, 2015, with Debtors' consent, Metaswitch served two substantially identical subpoenas on Debtors seeking production of specified documents in connection with each of the pending Metaswitch/Genband litigations.[32]

38.    Each of the Metaswitch subpoenas contains 53 separate document requests and seeks a broad range of documents relating not only to the particular patents that Genband is

---

[29]    Declaration of Mark M. Supko in Support of Debtors' Motion for Entry of Third Discovery Protocol Implementing the Court's Previous Orders Extending Automatic Stay and Regulating Third-Party Discovery, April 6, 2015, ¶¶ 7-8 (attached as <u>Exhibit B</u> hereto) (hereinafter, "<u>Supko Decl.</u>").
[30]    *See* Supko Decl., ¶ 7.
[31]    Supko Decl., ¶ 10.
[32]    Supko Decl., ¶ 9 and Tabs 1-2.

asserting against Metaswitch, but also technical and financial documents more broadly relating to Nortel's former businesses, including but not limited to documents relating to the business sold to Genband.[33]

39.     In view of the scope and nature of the third-party discovery that Metaswitch is seeking from Debtors, counsel for Debtors informed counsel for Metaswitch that Debtors intended to move this Court to enter a Third Discovery Protocol that essentially extends the procedures and protections embodied in the Second Discovery Protocol to third-party discovery in litigations involving former Nortel patents other than those sold to Rockstar.[34]

40.     Nevertheless, mindful of the May 6, 2015 fact discovery deadline in the *Genband v. Metaswitch* Litigation, Debtors have agreed to begin the process of responding to Metaswitch's discovery requests pursuant to mutually agreed procedures, as reflected in an Agreement Between Metaswitch and Nortel Networks Inc. (the "Nortel-Metaswitch Discovery Agreement").[35]

41.     The Nortel-Metaswitch Discovery Agreement is modeled on the currently proposed Third Discovery Protocol, which is in turn modeled on the Second Discovery Protocol. In particular, the Nortel-Metaswitch Discovery Agreement establishes procedures for running keyword searches against specified document repositories, providing hit counts for those searches, running the searches to identify potentially responsive documents, and electronically filtering out potentially privileged documents.  The Nortel-Metaswitch Discovery Agreement also contemplates that the parties will meet and confer regarding allocation of the costs for these discovery efforts between or among Debtors, Metaswitch, Genband, and/or third parties.  The

---

[33]     Supko Decl., Tabs 1-2.

[34]     Supko Decl., ¶ 11.

[35]     Supko Decl., ¶ 10 and Tab 3.

primary distinction between the Nortel-Metaswitch Discovery Agreement and the proposed Third Discovery Protocol is that the former does not contain any provisions to protect Debtors from potential liability arising from the production of documents that may contain third-party confidential information (as this Court provided in the Second Discovery Protocol).[36]  This is largely why Debtors are seeking entry of the Third Discovery Protocol.

### F.    Debtors Still Face Substantial Challenges In Responding To Third-Party Discovery

42.    In connection with the Insolvency Proceedings, Debtors have divested all of their various business operations.  Debtors' limited present operations exist only to facilitate resolution of the Insolvency Proceedings.[37]

43.    Debtors have only one remaining facility, located in North Carolina, and no remaining employees.  Ongoing administrative operations are being handled by a handful of former employees working on a contract basis, including declarant Timothy C. Ross, as well as by U.S. principal officer John Ray.[38]  These individuals did not hold technical or legal positions that related in any relevant way to the subject matter of the patent infringement suits in connection with which Debtors have been subpoenaed and for which Debtors are seeking the proposed Third Discovery Protocol.[39]

44.    In part due to standard disaster recovery procedures in place when Debtors were actively operating its businesses and in part due to litigation-related holds, including in the context of the ongoing Insolvency Proceedings, Debtors have retained vast stores of paper and

---

[36]    Supko Decl., ¶ 11 and Tab 3.

[37]    Ross Decl., ¶ 8.

[38]    There were 7 former employees supporting Debtors' administrative operations at the time of the Ross Declaration.

[39]    Ross Decl., ¶ 9.

electronic records.  Due to the nature of how those records have been maintained, however, it is extremely difficult to determine whether any particular category of documents exists or where such documents may be located.[40]

45.    Debtors have control over more than a decade's worth of digital media archives, comprising more than 142,000 physical items (mostly magnetic tapes), that are presently maintained by Iron Mountain at approximately six different locations around the country.  Iron Mountain maintains only a high-level online catalog of these digital media archives.  In at least some cases, it may be possible with a substantial degree of effort to trace portions of the archives back to the particular Nortel affiliate that provided them to Iron Mountain, but that would only enable identification of the system or server to which a backup tape corresponds.  In order to view the contents of any given tape, it would be necessary to load the tape onto whichever system/server it came from, if it still exists, and use the corresponding computer application to review the contents, if the magnetic tape is still readable.[41]

46.    Iron Mountain is also holding more than 171,000 boxes of Debtors' documents and other physical items (*e.g.*, laptops, computer hard drives, books, etc.) at more than fifteen warehouses across the country.  Some of this material comprises records put in off-site storage for safekeeping in the ordinary course of Debtors' business operations, but much of it also was sent to Iron Mountain as Debtors were shutting down their operations in the course of the Insolvency Proceedings.  As with the digital media archives discussed above, Iron Mountain maintains only a high-level online catalog for these physical items.  Again, in at least some cases, it may be possible with a substantial degree of effort to trace a particular collection of

---

[40]    Ross Decl., ¶ 10.

[41]    Ross Decl., ¶ 11.

boxes back to the particular Nortel affiliate that provided them to a particular Iron Mountain facility, but in order to determine the contents of any individual box it would be necessary to retrieve the box from Iron Mountain and physically inspect the contents.[42]

47.     Any effort to locate particular documents, or even broad categories of documents, within the physical and electronic stores under Debtors' control is made all the more complicated by the fact that the remaining personnel have little or no personal knowledge of the relevant business and/or legal operations of the company.  Accordingly, even a seemingly simple request such as "find all of John Smith's documents" requires a laborious effort that begins with searching human resource records to determine who "John Smith" was, which affiliate he worked for and in which facility, scouring any accessible paper and/or computer records for that affiliate to try to determine whether and where it may have archived its documents, calling back from Iron Mountain potentially thousands of boxes of documents associated with that affiliate, and then physically inspecting each box to determine whether any of them contain "John Smith's" documents.  To say that this is like looking for the proverbial needle in a haystack would be to dramatically understate the difficulty of the task.[43]

48.     In addition to the above-described archives, Debtors have kept a small number of their computer systems operational in order to assist with the administrative aspects of the wind-down.  These include a human resources/personnel system, certain financial systems, and the "LiveLink" document management system.[44]

49.     The LiveLink system was available to the various Nortel affiliates to use, on a largely voluntary basis, as a document repository that could be accessed by the members of the

---

[42]     Ross Decl., ¶ 12.
[43]     Ross Decl., ¶ 13.
[44]     Ross Decl., ¶ 14.

organization regardless of where they were physically working.  However, there was no standard method by which documents and information were posted to or organized on LiveLink.  Furthermore, at one time, there was a physical instance of the LiveLink system residing on each of several Nortel servers located around the world, and these various instances were logically connected so that users could access documents seamlessly regardless of where the documents were physically stored.  Today, however, as a result of the divestitures, Debtors have possession of, and access to, only the U.S.-based instance of the LiveLink system.[45]

50.    The LiveLink system to which Debtors have access has not been actively maintained for more than three years, but it does provide some rudimentary searching capabilities.  The system supports a relatively crude (by today's standards) Boolean search syntax that enables AND/OR/NOT type searches on specified text strings (*e.g.*, "patent AND infring* AND NOT trademark"), but it does not support proximity searches (*e.g.*, "patent w/5 infring*").  Consequently, it is often not possible to structure a search in a way that returns a manageable number of potentially relevant "hits."[46]

51.    When a search is run in the LiveLink system, the hits can be viewed online in various formats, including in a preview mode that will highlight search terms in the document.  However, the system does not include any facility for efficiently downloading documents returned in a search.  Rather, it is necessary to open each individual document desired to be downloaded and save that document to a storage location (*e.g.*, a Windows folder resident on the computer on which the search was run or a portable drive).  This is an extremely tedious and

---

[45]      Ross Decl., ¶ 14.a.

[46]      Ross Decl., ¶ 14.b.

time-consuming task if any substantial number of documents needs to be downloaded, as it typically takes at least 15-20 seconds to access and download each individual document.[47]

52.    The documents maintained in LiveLink include some basic metadata fields, including the date a document was created and the name of the individual who first stored the document in the system.  The metadata does not identify the business unit with which that individual was associated, nor does it associate the document with any particular Nortel entity. Accordingly, in order to determine whether any particular document "belongs to" Debtors or one of the other Nortel estates (*i.e.*, for purposes of assessing Debtors' confidentiality obligations and/or who owns any privilege), it would be necessary to trace the individual who stored the document in LiveLink back to the Nortel entity by whom he or she was employed using the available human resources records.[48]

### G.    Some Of The Documents Sought By The Pending Subpoenas Were Previously Searched For, Collected, And Transferred To Others

53.    The third-party subpoenas that Metaswitch has served on Debtors seek, among other things, valuation-related documents including (a) documents relating to efforts to assess the potential value of certain patents and businesses prior to putting those assets up for sale, and (b) documents relating to the sale itself, including documents submitted by bidders.[49]  As discussed further below, the vast majority of such valuation-related documents were collected for purposes of the Allocation Litigation among the various Nortel estates.[50]

---

[47]    Ross Decl., ¶ 14.c.

[48]    Ross Decl., ¶ 14.d.

[49]    Supko Decl., Tab 3.

[50]    Ross Decl., ¶ 15.

54.    In connection with the various asset sales made during the Chapter 11 Cases, Nortel affiliates, including Debtors, transferred to the purchasers a large percentage of the paper and electronic documents relating to their former business operations.[51]

55.    Nortel sold various business lines and related assets to separate purchasers, including Avaya, Ciena, Ericsson, Genband, Hitachi, Kapsch, Radware, and Rockstar.  The asset transfer agreements for these business line sales included provisions for transferring to the purchasers Nortel's paper and electronic documents relating to the transferred business lines.[52]

**H.    Some Of The Subpoenaed Documents Still In Debtors' Possession Likely Are Privileged And/Or Confidential**

56.    The third-party subpoenas served by Metaswitch also seek patent-related documents including documents relating not only to the particular patents being asserted against Metaswitch by Genband, but also documents relating to all other patents that Nortel transferred to Genband.[53]

57.    To the extent Debtors still have such patent-related documents in their possession, custody, or control, most or all such documents likely are subject to confidentiality obligations and/or claims of attorney-client privilege and work product immunity, rendering any effort to review such documents for possible production in response to discovery requests extremely burdensome.[54]  A possible result of Debtors undertaking that burden may not be the production of a large number of documents, but rather the production of a small number of documents and a very extensive privilege log.

---

[51]    Ross Decl., ¶ 16.

[52]    Ross Decl., ¶ 16.d.

[53]    Supko Decl., Tab 3.

[54]    *See* Ross Decl., ¶ 18.

58.    In addition, the asset sale agreement between Nortel and Genband includes confidentiality restrictions that obligate Debtors to take reasonably appropriate steps to preserve the confidential status of documents related to the assets that were sold.[55]

59.    Debtors also have confidentiality and privilege obligations with respect to each of the other Nortel estates and the other Core Parties as a result of the Allocation Litigation and the protective and confidentiality orders entered therein.[56]

60.    In view of these various obligations, it would be extremely burdensome, time-consuming, and costly for Debtors to individually review, designate, and produce documents sought by the Metaswitch subpoenas or similar future subpoenas.  Such a review would include a review for both attorney-client privileged information and confidential information.  If protected information relevant to one or more of the business line sales were identified, such parties may be given notice and an opportunity to object before any such documents are disclosed to others. In addition, the information in the requested valuation documents that were collected for the Allocation Litigation are subject to protective orders issued by this Court and, therefore, Debtors would have to consult extensively with the other Nortel estates and Core Parties to ensure that any production it makes complies with the requirements of those protective orders.[57]

61.    Moreover, the documents sought include highly technical business information, and neither outside counsel nor contractors hired to assist with any document review may be able to identify readily which buyers or other third parties have an interest therein.[58] Debtors should not be put in a position where they could subject themselves to liability to third parties by being

---

[55]    *See* Ross Decl., ¶ 18.a.

[56]    Ross Decl., ¶ 18.b.

[57]    Ross Decl., ¶ 19.

[58]    Ross Decl., ¶ 19.

forced to comply with complex subpoenas without the benefit of employees who are knowledgeable about the substance of the information sought.[59] And of course, the issues could be magnified if Debtors are served with additional third-party subpoenas related to the business line sales.

## RELIEF REQUESTED

62.    By this Motion, Debtors seek entry of an order, pursuant to Sections 105(a), 107(b), 362(a), and 541 of the Bankruptcy Code and Bankruptcy Rule 9018, adopting the proposed Third Discovery Protocol to govern third-party discovery against Debtors in any litigation involving patents formerly owned by Debtors and/or other Nortel entities other than the patents sold to Rockstar (third-party discovery as to which is already governed by the previously ordered Second Discovery Protocol [D.I. 14906-1]).

## BASIS FOR RELIEF

### A.    This Court Has Jurisdiction To Grant The Requested Relief

63.    From a jurisdictional standpoint, the relief requested in the present Motion is no different than the relief sought in Debtors' prior Motion to Extend the Automatic Stay, as the Court's authority does not turn on whether the underlying litigation for a third-party subpoena involves patents that Nortel sold to Rockstar or to one of the other purchasers of Nortel's assets (D.I. 14535). As to that prior motion, this Court correctly concluded that it "has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. §§ 105(a), 107(b), 362(a), and 541, and Bankruptcy Rule 9018." Order Extending Automatic Stay at 2 (D.I. 14746). The same rationale applies here.

---

[59]    Ross Decl., ¶ 19.

64.     This Court, through automatic reference by the District Court, has "exclusive jurisdiction of all of the property, wherever located, of [NNI] as of the commencement of [the] case, and of property of the estate. . . ."[60]

65.     The Bankruptcy Code broadly defines "property of the estate" to include all legal or equitable interests of Debtors in property as of the commencement of the case, all proceeds, product, or offspring of or from property of the estate, and any interest in property that the bankruptcy estate acquires after the commencement of the case, wherever located and by whomever held.[61]  As explained below, Debtors' books and records fall within the definition of "property of the estate."

66.     In addition to its exclusive jurisdiction over Debtors' documents, this Court has jurisdiction and inherent authority to enforce its own orders, particularly orders entered in "core proceedings" such as orders approving sales and orders entered in the Allocation Litigation and other matters concerning the administration of the estate.[62]

**B.      The Court Should Enforce And/Or Extend The Automatic Stay To Protect Debtors' Property, Including Documents In Debtors' Possession Or Control**

67.     Section 362 of the Bankruptcy Code automatically and immediately stays all actions against a debtor and its property.  As one of the fundamental debtor protections provided by bankruptcy law, the scope of the automatic stay is broad.[63]

---

[60]     28 U.S.C. § 1334(e)(1).  This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b) (the court has original jurisdiction over "all civil proceedings arising under title 11, or arising in or related to cases under title 11").

[61]     11 U.S.C. § 541(a).

[62]     *See, e.g., Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009) (holding that "the Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders").

[63]     *Midatlantic Nat'l Bank v. N.J. Dept. of Envtl. Prot.*, 474 U.S. 494, 504 (1986) (acknowledging the broad scope of the automatic stay under the 1978 Bankruptcy Code).

68.     Specifically, Section 362(a)(3) stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."[64] Mere possession or control of documents by Debtors is sufficient to invoke the protection of the automatic stay.[65]

69.     Debtors' books and records are "property of the estate" and are protected by Section 362(a)(3).[66]

70.     Because "property of the estate" includes Debtors' documents "wherever located and by whomever held,"[67] the automatic stay of Section 362(a)(3) extends to any of Debtors' documents that may still be in the possession of Genband or Debtors' professionals and former employees.  Thus, any third-party subpoenas not expressly authorized under the First and Second Discovery Protocols and related orders would violate the automatic stay.[68]

71.     In connection with the first-day motions, the Court entered an Order Enforcing Section 362 of the Bankruptcy Code [D.I. 52].  The Court also enforced the automatic stay with respect to certain UK pension proceedings [D.I. 2576], and with respect to third-party discovery in litigations involving patents sold to Rockstar [D.I. 14746].  Debtors respectfully submit that a further order is warranted here, to ensure that the protections afforded by the automatic stay are

---

[64]     11 U.S.C. § 362(a)(3).

[65]     *See, e.g., In re Zartun*, 30 B.R. 543, 545 (B.A.P. 9th Cir. 1983) (citing legislative history in support of a ruling that Section 362(a)(3) protects "property over which the estate has control or possession").

[66]     *See, e.g., In re Integrated Res., Inc.*, No. 91 CIV. 1310 (MJL), 1992 WL 8335, at *1-2 (S.D.N.Y. Jan. 14, 1992) (affirming a bankruptcy court's decision that a debtor's books and records are property of the estate and denying a motion for relief from the automatic stay); *In re Greenlife, Inc.*, No. 88-00825-RS, 1990 WL 10091748, at *3 (Bankr. E.D. Va. July 16, 1990) (acknowledging that a debtor's books and records are protected by the automatic stay and stating that "the party seeking issuance or enforcement of a subpoena would be precluded from taking further action in the absence of relief from the stay").

[67]     11 U.S.C. § 541(a).

[68]     *See Raymark Indus. Inc. v. Lai*, 973 F.2d 1125, 1131 (3d Cir. 1992), and *Maritime Elec. Co. v. United Jersey Bank*, 959 F.2d 1194, 1206 (3d Cir. 1991) (both holding that actions taken in violation of the stay are void *ab initio*).

applied to the current subpoenas as well as any similar future subpoenas not related to the patent portfolio sold to Rockstar.

### C. The Court Should Enforce Its Prior Orders, Including The Sale Orders And The Confidentiality Orders For The Allocation Litigation

72.     This Court has jurisdiction to enforce its own orders.[69]

73.     This Court has entered several relevant orders in "core proceedings" in these Chapter 11 Cases that should be enforced as to the pending subpoenas and any similar future subpoenas not related to the patent portfolio sold to Rockstar.  For example, in the Sale Orders, the Court approved the various sale transaction documents and authorized Debtors to enter into, perform, and comply with their covenants and undertakings in the transaction documents, which include ongoing confidentiality obligations.[70]  The order requested by this Motion is in furtherance of the Sale Orders and the Court-approved, ongoing confidentiality obligations of Debtors.

74.     In addition, the Court has entered orders in connection with the Allocation Litigation that protect confidential, privileged, and other sensitive documents and information from public disclosure.[71]  The Court's orders balance the need for a public trial with the acute

---

[69]     *See, e.g.*, *In re FormTech Indus., LLC*, 439 B.R. 352, 358 (Bankr. D. Del. 2010) (interpretation and enforcement of a sale order is a core proceeding); *In re CD Liquidation Co., LLC*, No. 09-13038(KG), 2012 Bankr. LEXIS 5924 (Bankr. D. Del.  Dec. 28, 2012) (Gross, J.) (upholding and enforcing provisions of a settlement order and a confirmation order).

[70]     *See, e.g.*, CDMA/LTE Sale Order [D.I. 1205], ¶¶ 3, 47; Enterprise Sale Order [D.I. 1514], ¶ 3; CVAS Sale Order [D.I. 2632], ¶ 3; Patent Sale Order [D.I. 5935], ¶ 3.

[71]     *See, e.g.*, Order Entering a Protective Order [D.I. 10805-2], ¶¶ 1(b), 7 (governing the handling of all discovery material in the Allocation Litigation and prohibiting confidential material from being made public); Order Providing Directions and Establishing Procedures for Sealing Trial Exhibits, Redacting Pretrial Submissions, and Protecting Confidential Information from Public Disclosure During the Trial [D.I. 13554], ¶¶ 5, 7 (establishing review procedures for the Core Parties to redact, remove, or otherwise protect from public disclosure Allocation Trial documents); Supplementary Order Providing Directions and Establishing Procedures for Sealing Trial Exhibits, Redacting Pretrial Submissions, and Protecting Confidential Information from Public Disclosure During the Trial [D.I. 13729], ¶¶ 3, 6 (sealing certain documents and prohibiting the use of other information or testimony adduced at the Allocation Trial).

sensitivities relating to third-party proprietary and other interests.  With this Motion, Debtors seek to maintain the integrity of, and respect for, the Court's prior orders.[72]

75.    The Court also has entered other relevant orders, including (i) an order enforcing Section 362 of the Bankruptcy Code by declaring that Debtors are afforded the protections of the automatic stay, (ii) an order approving a cross-border protocol designed to promote respect for comity among the Courts, which recognized the validity of the stay in the Canadian Proceedings, and (c) the Order Enforcing Automatic Stay in connection with the patent portfolio sold to Rockstar as well as the Second Discovery Protocol.[73]  An order enforcing and/or extending the automatic stay would be in furtherance of those orders and the various cross-border stays that are in effect.

76.    In each of these orders, this Court retained jurisdiction of matters relating to the implementation and/or enforcement of its orders.

77.    Given the extensive history and extraordinary complexity of the Nortel Insolvency Proceedings and the extent to which the Court previously granted relief and worked in cooperation with the Canadian Court to protect various privilege and confidentiality interests, it would be appropriate for the Court to grant the further relief sought by this Motion.

**D.    The Court Should Enter Related Relief Under Section 105(a) Of The Bankruptcy Code**

78.    Section 105(a) of the Bankruptcy Code gives the Court the power to "issue any

---

[72]    In similar circumstances, the Second Circuit has affirmed lower court decisions that kept in place protective orders that sealed documents in connection with a post-bankruptcy license transaction.  *See Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion Pictures Corp.)*, 21 F.3d 24, 27-28 (2d Cir. 1994) (affirming the denial of a motion to unseal confidential commercial information).

[73]    *See* Order Enforcing Section 362 of the Bankruptcy Code [D.I. 52], ¶ 2; Order Approving Stipulation of the Debtors and the Official Committee of Unsecured Creditors of Nortel Networks Inc. *et al.*, Amending the Cross-Border Court-to-Court Protocol [D.I. 990], ¶¶ 6, 17; Order Extending Automatic Stay and Regulating Third-Party Discovery [D.I. 14746]; Order Approving Second Discovery Protocol in Connection with Order Extending Automatic Stay and Regulating Third Party Discovery [D.I. 14906].

order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."[74]

79.    This Court has already found that it was appropriate to enforce and extend the automatic stay pursuant to Section 105(a) to protect Debtors against third-party discovery requests in connection with litigations involving former Nortel patents that were sold to Rockstar.[75]  In doing so, the Court noted that "[e]xposing Debtors and affiliated persons and entities to multiple discovery requests in actions pending in multiple jurisdictions without a discovery plan and the Court's supervision will expose Debtors and their estates to time and expense which will reduce estate assets."[76]

80.    In *Residential Capital*, the Bankruptcy Court for the Southern District of New York used its power under Section 105 to extend the automatic stay to protect a debtor from burdensome third-party discovery.[77]  Importantly, that court determined that the relief sought did not require the filing of an adversary proceeding because extension of the stay to protect the debtors related to the administration of the bankruptcy case itself.[78]

81.    *Residential Capital* offers a persuasive model for these Chapter 11 Cases and one that is respectful of the district courts in which the third-party litigations are pending and those in which the third-party subpoenas may be enforced.  In *Residential Capital*, the court as a matter of Chapter 11 case management stayed all discovery from the debtor, but did not prohibit third parties from moving to lift the stay.  The court based its ruling on the principles of Rules 26 and

---

[74]      11 U.S.C. § 105(a).

[75]      Order Extending Automatic Stay [D.I. 14746], ¶ 2.

[76]      *Id.* at ¶ 1.

[77]      *See In re Residential Capital*, 480 B.R. 529, 550 (S.D.N.Y. Bankr. 2012).

[78]      *Id.* at 539.

45 of the Federal Rules of Civil Procedure and the required balancing of burdens and benefits.[79] The court identified six factors relevant to whether the stay should be modified upon future request to permit third-party discovery: (1) scope, (2) context, (3) need, (4) burden, (5) expense, and (6) timing.[80]

82.    During the November 7, 2014 hearing on Debtors' motion with respect to the then-pending third-party discovery requests in Rockstar-related litigations, this Court concluded that although the facts differed in some respects, the rationale of *Residential Capital* supported extending the automatic stay to those third-party discovery requests.[81]

83.    The Court explained that "potential liability [arising from disclosing the requested documents] is of foremost concern to the Court," and also cited the number of current and future subpoenas with which Debtors might be faced as justifying "the protection of this Court."[82] Substantially the same justifications now support extending the protections embodied in the Second Discovery Protocol to third-party discovery requests in litigations involving patents that were transferred to other purchasers of Nortel's businesses and related assets.

84.    An order under Section 105(a) also would be appropriate to confirm that the automatic stay of Section 362(a)(3) protects Debtors' documents that may be in the possession, custody, or control of third parties, such as estate professionals and former employees.

---

[79]    *Id.* at 542-43.
[80]    *Id.* at 544-50.
[81]    Tr. of Proceedings, Nov. 7, 2014 [D.I. 14761], pg. 135.
[82]    *Id.*

85.    Section 541 of the Bankruptcy Code provides that property of the estate includes Debtors' interests in property "wherever located and by whomever held. . . ."[83] Thus, Debtors' interests in the documents and information in the possession of former employees and professionals are property of the estate.  Even if the documents themselves fall outside the broad definition of property of the estate, Debtors' confidentiality and privilege rights – and the confidentiality and privacy rights and interests of third parties – in those documents must be protected.

86.    Principles of comity also justify entry of a Section 105 order.[84]  In addition to recognizing the Canadian and EMEA Proceedings, this Court has approved cross-border protocols and worked in concert with the Canadian Court in hearing the Allocation Trial.  The Court also has extended comity by denying attempts by parties to obtain relief from the Initial Order of the Canadian Court to serve a document preservation subpoena on the Canadian Debtors.[85]

87.    Some of the documents now in Debtors' possession or control may have been authored or created by current and/or former employees of the Canadian and/or EMEA Debtors. In some instances, they were produced to Debtors only for purposes of the Allocation Litigation. Third parties should not be able to obtain from Debtors that which they may not obtain directly

---

[83]    11 U.S.C. § 541(a).  *Cf.* 11 U.S.C. § 542(e) (the court may order third parties that hold recorded information relating to the debtor's property or financial affairs to turn over the information to the debtors).

[84]    *Cf. Stonington Partners, Inc. v. Lernout & Hauspie Speech Products N.V.*, 310 F.3d 118, 126 (3d Cir. 2002) ("The principles of comity are particularly appropriately applied in the bankruptcy context because of the challenges posed by transnational insolvencies and because Congress specifically listed 'comity' as an element to be considered in the context of such insolvencies"); 11 U.S.C. § 1507(b) (listing "principles of comity" as a consideration for whether to provide additional assistance under Chapter 15).

[85]    *See* Order [09-10164, D.I. 265] (denying motion to intervene and to modify stay pursuant to Section 1522(c)); Order Denying Lead Plaintiffs' Renewed Motion for Limited Modification of the Recognition Order to Pursue the Securities Litigation Under 11 U.S.C. § 1522(c) [09-10164, D.I. 585].

from the Canadian or EMEA Debtors.  In addition, the Canadian and EMEA Debtors should have an opportunity to be heard in this Court to the extent they have an interest in any production by or other discovery sought from Debtors.

88.    Finally, relief from this Court would help protect Debtors from the risk of being subjected to inconsistent rulings.  Metaswitch and/or future requesting parties could seek to enforce subpoenas in district courts.  There is a potential for inconsistent rulings from those courts regarding the application and scope of the automatic stay and the document production efforts that Debtors may be required to make.  The potential for inconsistent adjudications is manifest.

89.    It is consistent with the bankruptcy policy of centralizing litigation against a debtor to have this Court exercise control over all of Debtors' documents and all third-party requests to obtain copies of them; in addition, no other court has the ability or responsibility to take account of the impact such subpoenas may have on Debtors' estates and creditors.

## NOTICE

90.    Notice of this amended Motion has been given via electronic transmission, first-class mail, hand delivery, or overnight mail to:  (i) the Core Parties; (ii) the U.S. Trustee; (iii) all creditors and interest holders who have filed claims or have scheduled claims against Debtors that have not been disallowed;[86] (iv) the nine purchasers of Nortel assets and any other "Responding Parties" as defined in the confidentiality orders entered in connection with the Allocation Trial, including Genband, Rockstar, and Rockstar's apparent successor-in-interest to Nortel's former patent portfolio, RPX; (v) the other parties in the litigations with Genband, including Metaswitch; (vi) Spherix Inc., who is currently asserting former Nortel patents that it

---

[86]    Such creditors and interest holders will receive service of a notice of the filing of this Motion in lieu of receiving copies of the Motion.

acquired from Rockstar prior to Rockstar's sale of patents to RPX; (vii) the other parties in the litigations in which Spherix is asserting former Nortel patents, including VTech and Cisco, both of whom are seeking third-party discovery from Debtors, and (viii) the general service list established in these Chapter 11 cases.  Accordingly, Debtors submit that under the circumstances no other or further notice is necessary.

<b><u>NO PRIOR REQUEST</u></b>

91.    No prior request for the relief sought herein has been made to this or any other court.

<b>LOCAL RULE 7026-1(c) CERTIFICATION OF<br>ATTEMPTS TO RESOLVE DISCOVERY DISPUTE</b>

92.    The undersigned counsel for Debtors certifies that they and/or their co-counsel conferred, unsuccessfully, with counsel for Metaswitch in an attempt to resolve all of the issues concerning the third-party subpoenas described in this Motion.  Metaswitch does not necessarily oppose the relief requested herein and reflected in the proposed Third Discovery Protocol, but certain aspects of that relief (*e.g.*, protection of Debtors from potential liability to third parties as a result of disclosing documents) are beyond the parties' ability to accomplish through agreement.

WHEREFORE, Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached as <u>Exhibit A</u> hereto, adopting the Third Discovery Protocol; and (iii) grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated:  April 8, 2015

CROWELL & MORING LLP
Mark D. Plevin (admitted *pro hac vice*)
Mark M. Supko (admitted *pro hac vice*)
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004
Telephone:  (202) 624-2500
Facsimile:  (202) 628-5116

– and –

BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP

*/s/ Jennifer R. Hoover*
Jennifer R. Hoover (No. 5111)
Kevin M. Capuzzi (No. 5462)
222 Delaware Ave., Suite 801
Wilmington, DE  19801
Telephone:  (302) 442-7010
Facsimile:  (302) 442-7012

*Counsel for Debtors and Debtors in Possession*