# Exhibit B

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------- x
                                           :  Chapter 11
*In re*                                    :
                                           :  Case No. 09-10138(KG)
Nortel Networks Inc., *et al.*,[1]         :  Jointly Administered
                                           :
          Debtors.                         :  Hearing Date:     May 5, 2015 at 10:00 a.m.
                                           :  Objections Due:   April 28, 2015 at 4:00 p.m.
-------------------------------------------------------- x

**DECLARATION OF MARK M. SUPKO IN SUPPORT OF DEBTORS'
MOTION FOR ENTRY OF THIRD DISCOVERY PROTOCOL IMPLEMENTING
THE COURT'S PREVIOUS ORDERS EXTENDING AUTOMATIC STAY
AND REGULATING THIRD-PARTY DISCOVERY**

I, Mark M. Supko, state and declare as follows:

1.      I am a partner in the law firm of Crowell & Moring LLP, with an office at 1001

Pennsylvania Avenue NW, Washington, DC 20004.

2.      I am a member in good standing of the bars of the State of New York and the

District of Columbia, and I have been admitted *pro hac vice* in this proceeding.

**Pending Third-Party Discovery Involving Nortel Patents Sold to Rockstar**

3.      The Second Discovery Protocol entered by the Court on December 8, 2014

applies to "[a]ll third-party discovery of Debtors in connection with litigations involving 'Former

---

[1]      Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's tax
identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation
(9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc.
(4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel
Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical
Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.)
Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International
Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc.
(4226).  Contact information for the U.S. Debtors and their petitions are available at
http://dm.epiq11.com/nortel.

Nortel Patents,'" defined as "patents sold to Rockstar Bidco, LP through the Asset Sale Agreement dated June 30, 2011 (the 'Nortel-Rockstar ASA') regardless of the current owner of such patents."  D.I. 14906-1, pg. 1 and n. 2.

4.      On information and belief, Rockstar Bidco, LP or a related Rockstar entity sold or otherwise transferred some number of the patents acquired from Nortel to Spherix Incorporated ("Spherix").

5.      Crowell & Moring is currently representing Nortel Networks Inc. ("NNI") in connection with responding to third-party discovery requests from defendants in the following litigations involving assertions of former Nortel patents by Spherix:

      a.      *Spherix Inc. v. VTech Telecommunications Ltd. et al.*, No. 3:13-cv-3494 (N.D. Tex.); and

      b.      *Spherix Inc. v. Cisco Systems, Inc.*, No. 1:14-cv-00393-SLR (D. Del.).

6.      Third-party discovery against NNI by VTech and Cisco has thus far proceeded in an orderly and cooperative manner in accordance with the terms of the Second Discovery Protocol.  NNI has produced copies of the Cleared Allocation Litigation Documents to the requesting parties, and NNI is in the process of providing "hit counts" for each requesting party's list of electronic search terms to be run against various document repositories identified in the Second Discovery Protocol.

**Pending Third-Party Discovery Involving Other Former Nortel Patents**

7.      On or about February 10, 2015, I was contacted by counsel for Metaswitch Networks Ltd. ("Metaswitch") regarding Metaswitch's intention to serve third-party subpoenas on NNI in connection with two related patent litigations pending in the U.S. District Court for the Eastern District of Texas:

- 2 -

a.      *Genband US LLC v. Metaswitch Networks Ltd., et al.*, No. 2:14-cv-33-JRG (E.D. Tex.); and

b.      *Metaswitch Networks Ltd. v. Genband US LLC*, No. 2:14-cv-744-JRG (E.D. Tex.).

8.      On information and belief, Genband is asserting at least 5 patents against Metaswitch that were originally issued to Nortel Networks Limited but were later acquired by Genband US LLC ("Genband") when it acquired one of the eight business units that Nortel sold in or around 2009-2010 in connection with these bankruptcy proceedings.

9.      Metaswitch's discovery requests to NNI are reflected in the subpoenas attached hereto at Tabs 1 and 2.

10.      Over the past two months, we have been working in a cooperative manner with Metaswitch's counsel in an effort to develop an agreed third-party discovery protocol consistent with the Second Discovery Protocol.  The result of that effort is reflected in a draft Agreement Between Metaswitch and Nortel Networks Inc., attached hereto at Tab 3.

11.      Although substantial progress has been made by NNI and Metaswitch in agreeing on a structure for balancing Metaswitch's discovery needs against the burden and expense on NNI, one critically important issue the parties are unable to resolve by agreement is the risk of third-party liability that NNI could face as a result of producing non-public documents to Metaswitch in which third-parties (*e.g.*, Genband, other purchases of Nortel business units/assets, licensees under former Nortel patents) may claim confidentiality and/or privilege interests. Consequently, NNI informed counsel for Metaswitch that NNI intended to move this Court for entry of an additional discovery protocol substantially the same as the Second Discovery

Protocol to govern third-party discovery in litigations involving former Nortel patents other than those sold to Rockstar, including but not limited to the patents acquired by Genband.

12.     Metaswitch has been understanding of NNI's desire to seek the protection of this Court before producing any non-public documents in response to Metaswitch's third-party discovery requests, albeit expressing concern about the possible impact on its ability to complete the desired discovery from NNI prior to the May 6, 2015 fact discovery cut-off in the earlier of the two pending litigations between Genband and Metaswitch.

13.     In addition to Metaswitch's third-party discovery requests, NNI was served with a third-party subpoena (attached hereto at Tab 4) on or about December 3, 2014 by Aruba Networks, Inc., Netgear Inc. and Belkin International, Inc. in connection with the following patent litigations:

   a. *Innovative Wireless Solutions LLC v. Aruba Networks Inc.*, No. 1:13-cv-01858-RGA (D. Del.);

   b. *Innovative Wireless Solutions LLC v. Belkin International, Inc.*, No. 1:13-cv-01859-RGA (D. Del.);

   c. *Innovative Wireless Solutions LLC v. Motorola Solutions Inc.*, No. 1:13-cv-01864-RGA (D. Del.); and

   d. *Innovative Wireless Solutions LLC v. Belkin International, Inc.*, No. 1:13-cv-01865-RGA (D. Del.).

14.     On information and belief, at least some of the patents being asserted by Innovative Wireless Solutions LLC ("Innovative Wireless") in these litigations were originally issued to Northern Telecom Limited and were later assigned to Elastic Networks Inc., a Nortel subsidiary formed in 1998 that was spun off in May 1999. Ownership of the patents thereafter

passed through several other entities unrelated to Nortel before the patents were apparently acquired by Innovative Wireless.

15.     Upon receiving the above-referenced subpoena, we informed counsel for the requesting parties of the Order Extending Automatic Stay and Regulating Third-Party Discovery [D.I. 14746] and the Order Approving Second Discovery Protocol in Connection with Order Extending Automatic Stay and Regulating Third Party Discovery [D.I. 14906].  In subsequent discussions among counsel, the requesting parties confirmed their willingness to proceed in accordance with the terms of the Second Discovery Protocol.  At present, we are waiting for the requesting parties to sign and return the retention agreement for the Discovery Mediator and provide electronic search terms before proceeding.  However, if the requesting parties remain interested in proceeding with this third-party discovery, NNI will face the same risk of third-party liability discussed in Paragraph 11 above.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 7th day of April, 2015.          _/s/ Mark M. Supko_____
                                                Mark M. Supko

# **Tab  1**

AO 88B (Rev. 12/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

## UNITED STATES DISTRICT COURT
### for the

Eastern District of Texas

| | | |
|---|---|---|
| GENBAND US LLC, | ) | |
| _____ | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. 2:14-cv-33 |
| | ) | |
| Metaswitch Networks LTD, et al. | ) | |
| _____ | ) | |
| *Defendant* | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:    Nortel Networks, Inc.
_____
*(Name of person to whom this subpoena is directed)*

[X] *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: **See Schedule A**

| Place: Quinn Emanuel Urquhart & Sullivan, LLP 50 California St., 22nd Floor San Francisco, CA 94111 | Date and Time: April 17, 2015 |
|---|---|

[ ] *Inspection of Premises*: **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  March 4, 2015

|  | | |
|---|---|---|
| *CLERK OF COURT* | | |
| | OR | */s/ Alex Binder* |
| _____ | | _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Metaswitch Networks, LTD and Metaswitch Networks Corp. _____ who issues or requests this subpoena, are:

Alex Binder, Quinn Emanuel Urquhart & Sullivan, LLP          Email: AlexBinder@quinnemanuel.com
50 California St., 22nd Floor, San Francisco, CA  94103          Tel: (415) 875-6600

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed.  Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 12/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  2:14-cv-33

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐  I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 12/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

　(1) *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
　(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
　(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
　　(i) is a party or a party's officer; or
　　(ii) is commanded to attend a trial and would not incur substantial expense.

　(2) *For Other Discovery.* A subpoena may command:
　(A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
　(B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

　(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

　(2) *Command to Produce Materials or Permit Inspection.*
　(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
　(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
　　(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
　　(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

　(3) *Quashing or Modifying a Subpoena.*
　(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
　　(i) fails to allow a reasonable time to comply;
　　(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
　　(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
　　(iv) subjects a person to undue burden.
　(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

　　(i) disclosing a trade secret or other confidential research, development, or commercial information; or
　　(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
　(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
　　(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
　　(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

　(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
　(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
　(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
　(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
　(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

　(2) *Claiming Privilege or Protection.*
　(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
　　(i) expressly make the claim; and
　　(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
　(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

**SCHEDULE A**

**DEFINITIONS**

The following definitions apply throughout these Topics.

1.         "Action" shall mean the cases entitled *Genband US LLC v. Metaswitch Networks Ltd et al.,* Case No. 2:14-cv-33, and *Metaswitch Networks Ltd. v. GENBAND US LLC, et al.,* Case No. 14-cv-744, both currently pending in the United States District Court for the Eastern District of Texas.

2.         "Metaswitch," shall mean and refer to Metaswitch Networks Ltd, Data Connection Ltd, and Metaswitch Networks Corp.

3.         "Accused Product" shall mean any Product made or marketed by or on behalf of Metaswitch that, when made, used, offered for sale, sold, imported, or otherwise practiced in the United States (either by itself or in combination with other devices) by or on behalf of Metaswitch or any user, allegedly constitutes, practices, incorporates, or embodies a device, process, or method claimed in one or more of the Asserted Patents, including but not limited to Metaswitch Perimeta Products, including its Session Border Controllers and Service Brokers, Metasphere Call Feature Server, Metaswitch DC-SBC, Metaswitch Integrated Softswitches (*e.g.*, VP2510, VP3500, VP3510, VP6010, VP6050), Metaswitch Universal Media Gateways (*e.g.*, MG2510, MG3510, MG6010, MG6050), the Metasphere Telephony Application Server ("MTAS"), Accession, and CommPortal.

4.         "GENBAND US LLC," "GENBAND," or "Genband" shall each mean and refer to GENBAND US LLC or General Bandwidth Inc., individually and collectively, including their agents, officers, directors, employees, consultants, representatives, attorneys, predecessors and successors in interest, subsidiaries, affiliates, parents, divisions, joint ventures, licensees,

franchisees, assigns, members and related entities, and any other legal entities, whether foreign or domestic that are owned or controlled by Genband, and all predecessors and successors in interest to such entities, and any entity owned in whole or in part by, affiliated with, or controlled in whole or in part by Genband, as well as the agents, officers, directors, employees, consultants, representatives and attorneys of any such entities.

5.      "Nortel" shall mean and refer to Nortel Networks Inc., Nortel Networks Corp., Nortel Networks Ltd., and Nortel Networks Cable Solutions, Inc., including their agents, officers, directors, employees, consultants, representatives, attorneys, predecessors and successors in interest, subsidiaries, affiliates, parents, divisions, joint ventures, licensees, franchisees, assigns, members and related entities, and any other legal entities, whether foreign or domestic that are owned or controlled by Nortel, and all predecessors and successors in interest to such entities, and any entity owned in whole or in part by, affiliated with, or controlled in whole or in part by Nortel, as well as the agents, officers, directors, employees, consultants, representatives and attorneys of any such entities.

6.      "CVAS Purchase" means the acquisition, sale, and/or purchase of all (or substantially all) the assets of the Nortel Carrier VoIP and Application Solutions Business (CVAS) by Genband.

7.      "CVAS Unit" means the Nortel Carrier VoIP and Application Solutions Business (CVAS), including all its assets, Products, employees, liabilities, obligations, patents, or other items.

8.      The "Genband Asserted Patents" shall mean United States Patent Nos. 6,772,210 ("the '210 Patent"), 6,791,971 ("the '971 Patent"), 6,885,658 ("the '658 Patent"), 6,934,279 ("the '279 Patent"), 7,995,589 ("the '589 Patent"), 7,047,561 ("the '561 Patent"), 7,184,427

2

("the '427 Patent"),  7,990,984 ("the '984 Patent"), 6,879,667 ("the '667 Patent"), U.S. Patent

No. 7,162,024 ("the '024 Patent"), U.S. Patent No. 7,680,252 ("the '252 Patent"), U.S. Patent

No. 7,953,210 ("the '3210 Patent"), and U.S. Patent No. 8,600,006 ("the '006 Patent")

individually and collectively, including all underlying patent applications, continuations,

continuations-in-part, divisionals, parents, progeny, reexaminations, or reissues thereof and all

foreign counterpart applications and patents which claim the same subject matter.

9.      The "Nortel Asserted Patents" shall mean United States Patent Nos. 6,772,210

("the '210 Patent"), 6,791,971 ("the '971 Patent"), 6,885,658 ("the '658 Patent"), 6,934,279

("the '279 Patent"), 7,995,589 ("the '589 Patent"), 7,047,561 ("the '561 Patent"), and U.S.

Patent No. 8,600,006 ("the '006 Patent") individually and collectively, including all underlying

patent applications, continuations, continuations-in-part, divisionals, parents, progeny,

reexaminations, or reissues thereof and all foreign counterpart applications and patents which

claim the same subject matter.

10.      The terms "Nortel Related Patent" or "Nortel Asserted Patents Family Tree"

means any domestic or foreign patent or patent application to, from, or through which any of the

Nortel Asserted Patents claim priority; and all domestic or foreign patents and patent

applications (including without limitation the Asserted Patents) that claim priority to, from, or

through the aforesaid applications.  This includes without limitation: (a) any continuation,

continuation in part, divisional, or any other patent or patent application (including rejected,

abandoned, provisional, or pending applications) derived in whole or in part from said patents or

applications, and all foreign counterpart patents or patent applications (including rejected,

abandoned, provisional, or pending applications); and (b) all domestic or foreign patents or

patent applications (including rejected, abandoned, provisional, or pending applications) that claim priority to or through any Nortel Asserted Patent.

11.     "Nortel Transferred Patents" means all patents transferred from Nortel to Genband, including those patent listed on reel numbers: 27992-443; 24879-519; 24879-475, accessed via:

http://assignment.uspto.gov/#/search?adv=patAssignorName%3ANortel%2BpatAssignee
Name%3AGenband&sort=patAssignorEarliestExDate%20desc%2C%20id%20desc&syn
onyms=false.

12.     The '612 Patent shall mean U.S. Patent No. 6,937,612, entitled "Communications method and apparatus," all underlying patent applications, all continuations, continuations-in-part, divisionals, reissues, and any other patent applications in the '612 Patent family.

13.     Nortel's Call Manager Software shall include, both collectively and individually Nortel's Personal and Symposium Call Manager, Fastview, Fastcall, and Multimedia conferencing software ("NCM"), which are described (by reference only) in Desktop TAPI Service Provider 1.5 User's Guide (October 1997), the Enterprise Edge Personal Call Manager User Guide (1999), and Norstar Computer Telephony Integration – Norstar Handbook (January 1999) ("Handbook"), attached as Exs. 1, 2, and 3, respectively.

14.     "Zhone Products" means the AccessNode and UE9000 , including any versions of these products, or similar or related products, created prior to October 2005, as referenced in, by way of example only, Ex. 4.

15.     "3GPP" shall mean the 3rd Generation Partnership Project.

16.     "ATIS" shall mean the Alliance for Telecommunications Industry.

17.     "CableLabs" shall mean Cable Television Laboratories, Inc.

18.    "ETSI" shall mean the European Telecommunications Standards Institute.

19.    "IETF" shall mean the Internet Engineering Task Force.

20.    "ITU-T" shall mean the ITU Telecommunication Standardization Sector.

21.    "Standards Setting Organization" or "SSO" shall mean an organization that adopts standards governing an industry or technological field, and includes without limitation 3GPP, ATIS, CableLabs, ETSI, IETF, and ITU-T.

22.    "FRAND" or "RAND" may be used interchangeably and shall mean fair, reasonable, and non-discriminatory.

23.    "FRAND committed" or "RAND committed" means subject to a FRAND and/or RAND commitment.

24.    "Source Code" includes source code, hardware code, machine code, assembly code, or code written in any programming language, and code that can be compiled or acted upon by a processor, any listings or printouts thereof, and any release notes describing the features or modifications of such code.

25.    "Executable Software" means computer files containing encoded instructions capable of being executed by a processing unit (e.g., a central processing unit or microcontroller), and any release notes describing the features or modifications of such files. The term shall include, without limitation, firmware and executable binary files.

26.    "Communication(s)" shall mean, without limitation, any transmittal, conveyance or exchange of a word, statement, fact, Thing, idea, Document, instruction, information, demand, question or other information by any medium, whether by written, oral or other means, including electronic communications and electronic mail.

27.     "Date(s)" shall mean the exact date(s), if known, or the closest approximation to the exact date(s) as can be specified, including without limitation the year, month, week in a month, or part of a month.

28.     "Document(s)" shall be construed under the broadest possible construction under Federal Rule of Civil Procedure 34 and Federal Rule of Evidence 1001.  The term shall include without limitation any written, recorded, graphic, or other matter, whether sent or received or made or used internally, however produced or reproduced and whatever the medium on which it was produced or reproduced (whether on paper, cards, charts, file, or printouts; tapes, discs, belts, video tapes, audiotapes, tape recordings, cassettes, or other types of voice recording or transcription; computer tapes, databases, e-mails; pictures, photographs, slides, films, microfilms, motion pictures; or any other medium), and any other tangible item or Thing of readable, recorded, or visual material of whatever nature including originals, drafts, and all non-identical copies of each Document (which, by reason of any variation, such as the presence of absence of hand-written notes or underlining, represents a distinct version).  By way of example, the term "Document(s)" as used herein shall include: correspondence; blueprints; memoranda; notes; diaries; letters; telegraphs; telegrams; telexes; emails; metadata; minutes; agendas; contracts; reports; studies; checks; statements; receipts; returns; summaries; pamphlets; circulars; press releases; advertisements; books; inter-office and intra-office communications; handwritten or typewritten notes; notations or summaries of telephone conversations, meetings, or conferences; bulletins; computer printouts; databases; teletypes; telefax; invoices; worksheets; photographs; tape recordings; patents and patent application materials; patent appraisals; printed publications; trademark applications, certificates of registration, opinions of counsel; memoranda of agreements, assignments, licenses; reports of or summaries of either negotiations within or

without the corporation or preparations for such; and all other tangible items of readable, recorded, or visual material of any kind.

29.     "Entity" shall mean corporation, company, firm, partnership, joint venture, association, governmental body or agency, or Persons other than a natural person.

30.     Whenever Metaswitch asks Nortel to "identify" a date or dates, Nortel shall respond by providing the exact date(s) if known or obtainable, or the closest approximation to the exact date(s) as can be specified, including the year, month, week in a month, or part of a month or week.

31.     Whenever Metaswitch asks Nortel to "identify" a natural Person, Nortel shall respond by providing, to the extent known or obtainable, at least the following information: (a) the Person's full name; (b) his or her present or last known home address and telephone number; (c) his or her present or last known business address and telephone number; (d) his or her present or last known title or occupation; and (e) his or her present or last known employer. When the Person in question is a current or former director, officer, manager, or other employee of Genband or Nortel, Genband's response additionally shall include, to the extent known or obtainable, at least the following information: (a) the title(s) or position(s) held by the Person at Genband or Nortel; (b) the time periods during which he or she held those title(s) or positions(s); and (c) a description of his or her responsibilities to those title(s) or position(s).

32.     Whenever Metaswitch asks Nortel to "identify" any legal entity, such as a corporation, company, firm, partnership, joint venture, association, government body or agency, or Person other than a natural Person, Nortel shall respond by providing, to the extent known or obtainable, at least the following information: (a) the entity's full legal name; (b) its place of

incorporation or organization; (c) its principal place of business; and (d) the nature of the business conducted by the entity.

33.     Whenever Metaswitch asks Nortel to "identify" a Document, Nortel shall respond by specifying the Document in sufficient detail to enable Metaswitch to locate the Document, including by providing at least the following information: (a) the production number range; (b) the date appearing on such Document, or, if no date appears thereon, the approximate date the Document was prepared; (c) the identifying code number, file number, title, or label of such Document; (d) a general description of the nature (e.g., letter, memorandum, drawing, prototype) and subject matter of the Document; (e) the name of each Person having possession, custody, or control of such Document; (f) if the Document existed at one time but does not presently exist, the reason(s) why it no longer exists and the identity of the last Person having custody of it; and (g) if the Document is in a foreign language, whether a partial or complete English translation of the Document exists.

34.     Whenever Metaswitch asks Nortel to "identify" a Communication, Nortel shall respond by providing, to the extent known or obtainable, at least the following information: (a) the form of the Communication (e.g., telephone call, meeting, letter); (b) a summary of the substance of the Communication; (c) the date and place of the Communication; (d) a list identifying each Person who participated in or was present at, involved in, or connected with the Communication; and (e) a list identifying each Document that memorializes or refers to the Communication.

35.     Whenever Metaswitch asks Nortel to "identify" a tangible Thing that is not a Document or Communication (including any Products manufactured, developed, sold, or imported by Genband), Nortel shall respond by providing, to the extent known or obtainable, at

8

least the following information: (a) the product name(s), product number(s), version number(s), and revision number(s); (b) the date(s) when the Thing first was introduced for sale and first was sold; and (c) all team name(s) or project title(s) used in connection with the design, development, testing, or engineering of that tangible Thing.

36.     Whenever Metaswitch asks Nortel to "identify" a process, Nortel shall respond by providing, to the extent known or obtainable, at least the following information: (a) the date the process first was used; (b) the date that Products or other objects made by the process first were sold; (c) all numbers or codes used to refer to the process, including process revision numbers or codes; (d) all process names; and (e) all team names or project titles used in connection with the design, development, testing, or engineering of that process.

37.     Whenever Metaswitch asks Nortel to "describe" an act, event, instance, occasion, transaction, conversation, or Communication, Nortel shall respond by providing, to the extent known or obtainable, at least the following information: (a) the date and place thereof and of any related occurrences; (b) a list identifying the individual participants and all other knowledgeable Persons; (c) separate summaries of what each individual participant did or said; (d) a list identifying all Documents or Things used or prepared in connection therewith or making any reference thereto; and (e) any other relevant facts and related Documents or Communications.

38.     "Licensee" or "License" means and includes each and every sub-licensee or sublicense, and is intended to include settlements, settlement agreements, non-assert agreements, covenants not to sue, and agreements not to sue.

39.     "Person(s)" shall mean any natural person or any business, proprietorship, firm, partnership, corporation, association, organization, or other legal entity.  The acts of a Person

shall include the acts of directors, officers, owners, consultants, members, employees, agents, attorneys or other representatives acting on the Person's behalf.

40.    "Product(s)" shall mean any machine, manufacture, apparatus, device, software, system, instrument, mechanism, appliance, assemblage of components/parts (either individually or collectively), process, or method which are designed to function together electrically, mechanically, chemically, or otherwise, to achieve a particular function or purpose, including those offered for sale, sold, or under development.

41.    "Thing(s)" shall include any tangible objects of any kind and nature other than a Document, including prototypes, models, and physical specimens thereof.

42.    "Participate" shall mean, without limitation, to communicate, attend, exchange information with, engage, cooperate, observe, contact, publicize, or otherwise interact with.

43.    "Refer to," "referring to," "relate to," "related to," "relating to," "regarding," or "concerning" shall mean in whole or in part constituting, containing, contradicting, embodying, commenting on, depicting, demonstrating, refuting, evidencing, representing, discussing, reflecting, describing, analyzing, identifying, mentioning, stating, summarizing, bearing upon, pertaining to, comprising, involving, alluding to, commenting on, referring directly or indirectly to, dealing with, or in any way pertaining to.

44.    "Third Party" shall mean all Persons who are not parties to this Litigation, as well as their officers, directors, employees, agents and attorneys.

45.    Where a Topic below names a corporation or other legal entity, the Topic includes within its scope any parent, Predecessors-in-Interest, subsidiaries, affiliates, past or present directors, officers, employees, agents, and representatives thereof, including attorneys, Consultants, accountants, and investment bankers.

10

46.     The terms "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

47.     The terms "any," "all," "every," and "each" shall each mean and include the other.

48.     The singular form of any word shall be deemed to include the plural.  The plural form of any word shall be deemed to include the singular.

49.     The use of a verb in any tense shall be construed as the use of the verb in all other tenses.

50.     "Include" and "including" shall mean including without limitation.

## INSTRUCTIONS

The following instructions shall apply to each of the Document Requests herein:

1.     You are to produce the original and each non-identical copy or draft of each Document(s), Source Code, or Thing(s) requested herein that is in Your possession, custody or control in its entirety, without abbreviation or redaction.

2.     If any portion of a Document, Source Code or Thing is responsive to a request, the entire Document, Source Code or Thing should be produced including all attachments and enclosures, redacting only privileged material, if any.

3.     All Documents, Source Code and Things should be produced in the same file or other organizational environment in which they are maintained in the ordinary course of business.  For example, a Document that is part of a file, docket or other grouping should be physically produced together with all other Documents from said file, docket or grouping, in the same order or manner of arrangement as the original.  Additionally, to the extent produced in hardcopy, each Document should be produced stapled, clipped or otherwise bound or connected

11

in the same manner as the original.  File folders with tabs or labels or directories of files identifying Documents should be produced intact with such Documents.  Documents attached to each other should not be separated.

4.      Each item produced should bear unique identifying control numbers (e.g., Bates labels) on each item or page if the item is a Document.

5.      Color copies of Documents are to be produced where color is necessary to interpret or understand the contents.

6.      Electronic records and computerized information should be produced in their native electronic format, together with a description of the system from which they were derived sufficient to permit rendering the records and information intelligible.

7.      If You believe that You are not required to provide any Document, Source Code or Thing on the grounds of a privilege or protection that You are not prepared to waive, pursuant to Federal Rule of Civil Procedure 26(b)(5), please provide a written list describing each Document, Source Code, Executable Software, or Thing not produced, using the unique identifying control numbers (e.g., Bates labels) to specify Documents or ranges where appropriate.  For each item on the list, include the following:

(i)      the specific privilege asserted;

(ii)     all Persons making or receiving the Document, Source Code or Thing;

(iii)    the steps taken to ensure the confidentiality of the Document, Source Code or Thing, including affirmation that no unauthorized Persons have received the Document, Source Code or Thing;

(iv)    the date of the Document, Source Code or Thing; and

(v)     the subject matter of the Document, Source Code or Thing.

## DOCUMENTS TO BE PRODUCED

### DOCUMENT REQUEST NO. 1:

All Documents and Communications relating to the Nortel Asserted Patents and/or to any Related Nortel Patents.

### DOCUMENT REQUEST NO. 2:

Documents and Communications sufficient to show Nortel's first awareness of Metaswitch (Data Connection Ltd.) and its Accused Products.

### DOCUMENT REQUEST NO. 3:

Documents and Communications sufficient to show the corporate and legal structure, capitalization, and management of Nortel Networks Cable Solutions Inc., including its relationship with the other Nortel Networks entities, such as Nortel Networks Inc., Nortel Networks Corp., and Nortel Networks Ltd., and any common ownership, common employees, common management, common control, common or shared capitalization, intermingling of business activity, observance of corporate formalities, and payment of dividends.

### DOCUMENT REQUEST NO. 4:

All Documents and Communications relating to licensing any of the Nortel Asserted Patents or Related Nortel Patents, including, but not limited to, all license agreements, cross licenses, covenants not to sue, or non-assertion agreements that cover any of the Nortel Asserted Patents, all offers to license any of the Nortel Asserted Patents to Genband or to any Third Party, all draft agreements, any negotiation of any agreement or royalty.

### DOCUMENT REQUEST NO. 5:

Documents and Communications sufficient to identify every attempt by Nortel to enforce any of the Nortel Asserted Patents, Related Nortel Patents, or Transferred Patents, either in the United States or abroad.

**DOCUMENT REQUEST NO. 6:**

All Documents and Communications relating to any decision, by Nortel, Genband, or any Third Party, to file or decline to file any potential or actual litigation or other claim relating to any of the Nortel Asserted Patents, the Related Nortel Patents, or to the Transferred Patents.

**DOCUMENT REQUEST NO. 7:**

All Documents and Communications relating to any patent claim charts, infringement or invalidity evaluations, or comparisons between the Nortel Asserted Patents and any Genband, Metaswitch, or Third-Party Product.

**DOCUMENT REQUEST NO. 8:**

All Documents and Communications relating to the CVAS Purchase, including any Documents shared between Genband and Nortel as part of any due diligence; any meeting or other discussion between Genband and Nortel; the structure and formation of the CVAS Unit (including an organizational chart); any decision regarding the organization of the CVAS Unit, including how to structure its departments, employees, assets, and liabilities; and the transfer (or decision not to transfer) any aspect of the CVAS Unit and its underlying departments, employees, assets, and liabilities.

**DOCUMENT REQUEST NO. 9:**

Documents sufficient to show all Nortel employees transferred to Genband.

**DOCUMENT REQUEST NO. 10:**

All Documents and Communications relating to any government inquiry or investigation relating to the CVAS Purchase, including all Documents and Communications with or relating to the Antitrust Division of the U.S. Department of Justice or the Federal Trade Commission ("FTC").

**DOCUMENT REQUEST NO. 11:**

All Documents and Communications relating to any bid, offer, or other proposal, whether or not that bid, offer, or other proposal was ever finalized, executed, or considered, for Nortel's CVAS Unit, the CVAS Patent Portfolio, any Nortel Asserted Patent, Nortel Related Patent, or Nortel Transferred Patent.

**DOCUMENT REQUEST NO. 12:**

All Documents and Communications relating to any confidentiality or non-disclosure agreements executed between Nortel and Genband and/or any Third Party relating to the sale, merger, acquisition, or purchase of the CVAS Unit, the Nortel Asserted Patents, the Related Nortel Patents, and/or the Nortel Transferred Patents.

**DOCUMENT REQUEST NO. 13:**

Documents sufficient to identify all Persons involved in the negotiation or authorization of the CVAS Purchase.

**DOCUMENT REQUEST NO. 14:**

All Documents and Communications relating to the decision to include or exclude any patent related to voice over internet protocol ("VoIP") technology in the patent portfolio in the CVAS purchase or to any other sale of Nortel intellectual property from 2009-2011.

**DOCUMENT REQUEST NO. 15:**

All Communications with Genband relating to any Nortel Asserted Patent, Related Nortel Patent, Transferred Nortel Patent, to this Action, or to Metaswitch.

**DOCUMENT REQUEST NO. 16:**

All Documents and Communications relating to the value of any Nortel Asserted Patent, Transferred Nortel Patent, or Related Nortel Patent, including any valuation performed by Nortel, Genband, and/or a Third Party.

**DOCUMENT REQUEST NO. 17:**

All Documents and Communications relating to any efforts You made to license, sell, monetize, or otherwise generate revenue from Nortel's Asserted Patents or Transferred Nortel Patents, including but not limited to any presentations, meeting minutes, license negotiations, sales negotiations, claim charts, infringement analyses, validity analyses, notice letters, cease and desist letters, offers, draft license agreements, and term sheets.

**DOCUMENT REQUEST NO. 18:**

All Documents and Communications relating to the sales, revenue, income, profit, gross margin, costs, expenses, forecasts, projections, or budgets for any Nortel Product or service that relates to or resulted in any claim of the Nortel Asserted Patents or the Related Nortel Patents.

**DOCUMENT REQUEST NO. 19:**

All Documents and Communications relating to the filing and prosecution of the Nortel Asserted Patents or Related Nortel Patents, including but not limited to all draft and final versions of such applications, office actions, draft and final versions of responses to office actions.

**DOCUMENT REQUEST NO. 20:**

All Documents and Communications relating to the Nortel Asserted Patents or Related Nortel Patents, submitted to the U.S. Patent & Trademark Office or patent office of another

jurisdiction during the prosecution of any of the Nortel Asserted Patents or Related Nortel Patents.

**DOCUMENT REQUEST NO. 21:**

All Documents and Communications related to the '612 Patent.

**DOCUMENT REQUEST NO. 22:**

Documents and Communications related to a generic service framework ("GSF") for the DMS-100, digital multiplex switching device, or related service.

**DOCUMENT REQUEST NO. 23:**

Documents and Communications sufficient to identify, by build or version name or number, all Products used or sold prior to June 7, 1999 related to any GSF efforts, including any user guides, marketing, advertising, or promotional efforts relating to the same.

**DOCUMENT REQUEST NO. 24:**

Documents and Communications sufficient to show the time period during which each Product used or sold prior to June 7, 1999 relating to any GSF efforts was sold, licensed, or made available in the United States and the quantity sold, licensed, or made available in the United States.

**DOCUMENT REQUEST NO. 25:**

Documents and Communications sufficient to identify any Persons knowledgeable about the creation, design, development, operation or implementation of any feature or product used or sold prior to June 7, 1999 relating to any GSF efforts.

**DOCUMENT REQUEST NO. 26:**

Documents and Communications sufficient to show the time period during which each feature or product used or sold prior to March 13, 2000 relating to Nortel's Call Manager

Software was sold, licensed, or made available in the United States and the quantity sold, licensed, or made available in the United States.

**DOCUMENT REQUEST NO. 27:**

Documents and Communications sufficient to identify any Persons knowledgeable about the creation, design, development, operation or implementation of any feature or product used or sold prior to March 13, 2000 relating to Nortel's Call Manager Software.

**DOCUMENT REQUEST NO. 28:**

Documents and Communications sufficient to identify, by build or version name or number, all versions of Nortel's Call Manager Software used or sold prior to March 13, 2000, including Documents and Communications relating to any marketing, advertising, or promotional efforts.

**DOCUMENT REQUEST NO. 29:**

Documents and Communications sufficient to show the time period during which each feature or product used or sold prior to October 2005 relating to the Zhone Products was sold, licensed, or made available in the United States and the quantity sold, licensed, or made available in the United States.

**DOCUMENT REQUEST NO. 30:**

Documents and Communications sufficient to identify, by build or version name or number, all versions of the Zhone Products used or sold prior to October 2005, including Documents and Communications relating to any marketing, advertising, or promotional efforts.

**DOCUMENT REQUEST NO. 31:**

Documents and Communications sufficient to identify any Persons knowledgeable about the creation, design, development, operation or implementation of any feature or product used or sold prior to October 2005 relating to the Zhone Products.

**DOCUMENT REQUEST NO. 32:**

Documents and Communications sufficient to show the technical operation or use of any functionality related to the ability to connect calls between subscribers connected to any of the Zhone Products, whether or not the Zhone Products are operating in emergency stand alone feature (for example, as referenced in Exhibit 4), included in any Products (including software) created or sold by prior to October 2005.

**DOCUMENT REQUEST NO. 33:**

Documents and Communications sufficient to show the technical operation or use of any functionality related to emergency stand alone feature (for example, as referenced in Exhibit 4) in any of the Zhone Products, included in any Products (including software) created or sold by You prior to October 2005.

**DOCUMENT REQUEST NO. 34:**

Documents and Communications sufficient to show the time period during which each feature or product used or sold prior to December 27, 2006 relating to Nortel's Border Control Point Software was sold, licensed, or made available in the United States and the quantity sold, licensed, or made available in the United States.

**DOCUMENT REQUEST NO. 35:**

Documents and Communications sufficient to identify any Persons knowledgeable about the creation, design, development, operation or implementation of any feature or product used or sold prior to December 27, 2006 relating to Nortel's Border Control Point Software.

**DOCUMENT REQUEST NO. 36:**

Documents and Communications sufficient to identify, by build or version name or number, all versions of Nortel's Border Control Point Software used or sold prior to December 27, 2006, including Documents and Communications relating to any marketing, advertising, or promotional efforts.

**DOCUMENT REQUEST NO. 37:**

Documents and Communications sufficient to show the time period during which each feature or product used or sold prior to December 27, 2006 relating to Nortel's Communication Server 2000 (CS 2000) Software was sold, licensed, or made available in the United States and the quantity sold, licensed, or made available in the United States.

**DOCUMENT REQUEST NO. 38:**

Documents and Communications sufficient to identify any Persons knowledgeable about the creation, design, development, operation or implementation of any feature or product used or sold prior to December 27, 2006 relating to Nortel's Communication Server 2000 (CS 2000) Software.

**DOCUMENT REQUEST NO. 39:**

Documents and Communications sufficient to identify, by build or version name or number, all versions of Nortel's Communication Server 2000 (CS 2000) Software used or sold prior to December 27, 2006, including Documents and Communications relating to any

marketing, advertising, or promotional efforts.

**DOCUMENT REQUEST NO. 40:**

Documents and Communications sufficient to show the time period during which each feature or product used or sold prior to December 27, 2006 relating to Nortel's Communication Server 1500 (CS 1500) Software was sold, licensed, or made available in the United States and the quantity sold, licensed, or made available in the United States.

**DOCUMENT REQUEST NO. 41:**

Documents and Communications sufficient to identify any Persons knowledgeable about the creation, design, development, operation or implementation of any feature or product used or sold prior to December 27, 2006 relating to Nortel's Communication Server 1500 (CS 1500) Software.

**DOCUMENT REQUEST NO. 42:**

Documents and Communications sufficient to identify, by build or version name or number, all versions of Nortel's Communication Server 1500 (CS 1500) Software used or sold prior to December 27, 2006, including Documents and Communications relating to any marketing, advertising, or promotional efforts.

**DOCUMENT REQUEST NO. 43:**

Documents and Communications sufficient to show the time period during which each feature or product used or sold prior to December 27, 2006 relating to Nortel's Universal Signaling Point Software was sold, licensed, or made available in the United States and the quantity sold, licensed, or made available in the United States.

**DOCUMENT REQUEST NO. 44:**

Documents and Communications sufficient to identify any Persons knowledgeable about the creation, design, development, operation or implementation of any feature or product used or sold prior to December 27, 2006 relating to Nortel's Universal Signaling Point Software.

**DOCUMENT REQUEST NO. 45:**

Documents and Communications sufficient to identify, by build or version name or number, all versions of Nortel's Universal Signaling Point Software used or sold prior to December 27, 2006, including Documents and Communications relating to any marketing, advertising, or promotional efforts.

**DOCUMENT REQUEST NO. 46:**

Documents and Communications sufficient to show the time period during which each feature or product used or sold prior to December 27, 2006 relating to Nortel's Media Gateway 9000 Software was sold, licensed, or made available in the United States and the quantity sold, licensed, or made available in the United States.

**DOCUMENT REQUEST NO. 47:**

Documents and Communications sufficient to identify any Persons knowledgeable about the creation, design, development, operation or implementation of any feature or product used or sold prior to December 27, 2006 relating to Nortel's Media Gateway 9000 Software.

**DOCUMENT REQUEST NO. 48:**

Documents and Communications sufficient to identify, by build or version name or number, all versions of Nortel's Media Gateway 9000 Software used or sold prior to December 27, 2006, including Documents and Communications relating to any marketing, advertising, or promotional efforts.

**DOCUMENT REQUEST NO. 49:**

Documents or Communications sufficient to show the technical operation or use of any functionality related to an emergency stand alone feature in any of the Your products—included in any media gateways, softswitches, or gatekeepers—including software, created or sold by You prior to October 2005.

**DOCUMENT REQUEST NO. 50:**

Documents and Communications sufficient to show the membership and participation of Nortel in any SSO, including without limitation 3GPP, ATIS, CableLabs, ETSI, IETF, and ITU-T.

**DOCUMENT REQUEST NO. 51:**

Documents and Communications sufficient to show any agreements, declarations, licenses, or other rights in the Nortel Asserted Patents, the Related Nortel Patents, or the Transferred Patents given to any SSO or its members, including without limitation 3GPP, ATIS, CableLabs, ETSI, IETF, and ITU-T.

**DOCUMENT REQUEST NO. 52:**

Documents and Communications sufficient to show Nortel's involvement or participation in the CableLabs PacketCable and/or DOCSIS standards, including access to CableLabs (or its members') information, equipment, or facilities, attendance at CableLabs meetings, submissions or contributions to CableLabs specifications, first access or receipt of CableLabs specifications, and legal agreements or licenses with CableLabs (or its members) relating to or resulting from Nortel's participation in the CableLabs PacketCable and/or DOCSIS standards.

**DOCUMENT REQUEST NO. 53:**

All Documents and Communications relating to any FRAND royalty rate for the Nortel Asserted Patents, the Related Nortel Patents, or the Transferred Patents.

# Tab  2

AO 88B (Rev. 12/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

Case 09-10138-MFW    Doc 15413-2    Filed 04/08/15    Page 36 of 82

## UNITED STATES DISTRICT COURT
### for the

Eastern District of Texas

| | |
|---|---|
| Metaswitch Networks LTD, | ) |
| _____ | ) |
| *Plaintiff* | ) |
| v. | )     Civil Action No. 2:14-cv-744 |
| | ) |
| GENBAND US LLC, | ) |
| _____ | ) |
| *Defendant* | ) |

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
### OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  Nortel Networks, Inc.
_____
*(Name of person to whom this subpoena is directed)*

  ☒ *Production*: **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: **See Schedule A**

| Place:  Quinn Emanuel Urquhart & Sullivan, LLP<br>50 California St., 22ⁿᵈ Floor<br>San Francisco, CA 94111 | Date and Time: April 17,  2015 |
|---|---|

  ☐ *Inspection of Premises*: **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

  The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  <u>March 4, 2015</u>

              *CLERK OF COURT*

                                                             OR

                                                            */s/ Alex Binder*
_____          _____
    *Signature of Clerk or Deputy Clerk*                          *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Metaswitch Networks, LTD and Metaswitch Networks Corp. _____ who issues or requests this subpoena, are:

Alex Binder, Quinn Emanuel Urquhart & Sullivan, LLP          Email: AlexBinder@quinnemanuel.com
50 California St., 22ⁿᵈ Floor, San Francisco, CA  94103          Tel: (415) 875-6600

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 12/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  2:14-cv-744

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

☐  I returned the subpoena unexecuted because: _____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 12/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

**SCHEDULE A**

**DEFINITIONS**

The following definitions apply throughout these Topics.

1.      "Action" shall mean the cases entitled *Metaswitch Networks Ltd. v. GENBAND US LLC, et al.,* Case No. 14-cv-744 and *Genband US LLC v. Metaswitch Networks Ltd et al.,* Case No. 2:14-cv-33, both currently pending in the United States District Court for the Eastern District of Texas.

2.      "Metaswitch," shall mean and refer to Metaswitch Networks Ltd, Data Connection Ltd, and Metaswitch Networks Corp.

3.      "Accused Product" shall mean any Product made or marketed by or on behalf of Metaswitch that, when made, used, offered for sale, sold, imported, or otherwise practiced in the United States (either by itself or in combination with other devices) by or on behalf of Metaswitch or any user, allegedly constitutes, practices, incorporates, or embodies a device, process, or method claimed in one or more of the Asserted Patents, including but not limited to Metaswitch Perimeta Products, including its Session Border Controllers and Service Brokers, Metasphere Call Feature Server, Metaswitch DC-SBC, Metaswitch Integrated Softswitches (*e.g.*, VP2510, VP3500, VP3510, VP6010, VP6050), Metaswitch Universal Media Gateways (*e.g.*, MG2510, MG3510, MG6010, MG6050), the Metasphere Telephony Application Server ("MTAS"), Accession, and CommPortal.

4.      "GENBAND US LLC," "GENBAND," or "Genband" shall each mean and refer to GENBAND US LLC or General Bandwidth Inc., individually and collectively, including their agents, officers, directors, employees, consultants, representatives, attorneys, predecessors and successors in interest, subsidiaries, affiliates, parents, divisions, joint ventures, licensees,

1

franchisees, assigns, members and related entities, and any other legal entities, whether foreign or domestic that are owned or controlled by Genband, and all predecessors and successors in interest to such entities, and any entity owned in whole or in part by, affiliated with, or controlled in whole or in part by Genband, as well as the agents, officers, directors, employees, consultants, representatives and attorneys of any such entities.

5.      "Nortel" shall mean and refer to Nortel Networks Inc., Nortel Networks Corp., Nortel Networks Ltd., and Nortel Networks Cable Solutions, Inc., including their agents, officers, directors, employees, consultants, representatives, attorneys, predecessors and successors in interest, subsidiaries, affiliates, parents, divisions, joint ventures, licensees, franchisees, assigns, members and related entities, and any other legal entities, whether foreign or domestic that are owned or controlled by Nortel, and all predecessors and successors in interest to such entities, and any entity owned in whole or in part by, affiliated with, or controlled in whole or in part by Nortel, as well as the agents, officers, directors, employees, consultants, representatives and attorneys of any such entities.

6.      "CVAS Purchase" means the acquisition, sale, and/or purchase of all (or substantially all) the assets of the Nortel Carrier VoIP and Application Solutions Business (CVAS) by Genband.

7.      "CVAS Unit" means the Nortel Carrier VoIP and Application Solutions Business (CVAS), including all its assets, Products, employees, liabilities, obligations, patents, or other items.

8.      The "Genband Asserted Patents" shall mean United States Patent Nos. 6,772,210 ("the '210 Patent"), 6,791,971 ("the '971 Patent"), 6,885,658 ("the '658 Patent"), 6,934,279 ("the '279 Patent"), 7,995,589 ("the '589 Patent"), 7,047,561 ("the '561 Patent"), 7,184,427

("the '427 Patent"),  7,990,984 ("the '984 Patent"), 6,879,667 ("the '667 Patent"), U.S. Patent No. 7,162,024 ("the '024 Patent"), U.S. Patent No. 7,680,252 ("the '252 Patent"), U.S. Patent No. 7,953,210 ("the '3210 Patent"), and U.S. Patent No. 8,600,006 ("the '006 Patent") individually and collectively, including all underlying patent applications, continuations, continuations-in-part, divisionals, parents, progeny, reexaminations, or reissues thereof and all foreign counterpart applications and patents which claim the same subject matter.

9.    The "Nortel Asserted Patents" shall mean United States Patent Nos. 6,772,210 ("the '210 Patent"), 6,791,971 ("the '971 Patent"), 6,885,658 ("the '658 Patent"), 6,934,279 ("the '279 Patent"), 7,995,589 ("the '589 Patent"), 7,047,561 ("the '561 Patent"), and U.S. Patent No. 8,600,006 ("the '006 Patent") individually and collectively, including all underlying patent  applications,  continuations,  continuations-in-part,  divisionals,  parents,  progeny, reexaminations, or reissues thereof and all foreign counterpart applications and patents which claim the same subject matter.

10.    The terms "Nortel Related Patent" or "Nortel Asserted Patents Family Tree" means any domestic or foreign patent or patent application to, from, or through which any of the Nortel Asserted Patents claim priority; and all domestic or foreign patents and patent applications (including without limitation the Asserted Patents) that claim priority to, from, or through the aforesaid applications.  This includes without limitation: (a) any continuation, continuation in part, divisional, or any other patent or patent application (including rejected, abandoned, provisional, or pending applications) derived in whole or in part from said patents or applications, and all foreign counterpart patents or patent applications (including rejected, abandoned, provisional, or pending applications); and (b) all domestic or foreign patents or

3

patent applications (including rejected, abandoned, provisional, or pending applications) that claim priority to or through any Nortel Asserted Patent.

11.    "Nortel Transferred Patents" means all patents transferred from Nortel to Genband, including those patent listed on reel numbers: 27992-443; 24879-519; 24879-475, accessed via:

> http://assignment.uspto.gov/#/search?adv=patAssignorName%3ANortel%2BpatAssignee
> Name%3AGenband&sort=patAssignorEarliestExDate%20desc%2C%20id%20desc&syn
> onyms=false.

12.    The '612 Patent shall mean U.S. Patent No. 6,937,612, entitled "Communications method and apparatus," all underlying patent applications, all continuations, continuations-in-part, divisionals, reissues, and any other patent applications in the '612 Patent family.

13.    Nortel's Call Manager Software shall include, both collectively and individually Nortel's Personal and Symposium Call Manager, Fastview, Fastcall, and Multimedia conferencing software ("NCM"), which are described (by reference only) in Desktop TAPI Service Provider 1.5 User's Guide (October 1997), the Enterprise Edge Personal Call Manager User Guide (1999), and Norstar Computer Telephony Integration – Norstar Handbook (January 1999) ("Handbook"), attached as Exs. 1, 2, and 3, respectively.

14.    "Zhone Products" means the AccessNode and UE9000 , including any versions of these products, or similar or related products, created prior to October 2005, as referenced in, by way of example only, Ex. 4.

15.    "3GPP" shall mean the 3rd Generation Partnership Project.

16.    "ATIS" shall mean the Alliance for Telecommunications Industry.

17.    "CableLabs" shall mean Cable Television Laboratories, Inc.

18.      "ETSI" shall mean the European Telecommunications Standards Institute.

19.      "IETF" shall mean the Internet Engineering Task Force.

20.      "ITU-T" shall mean the ITU Telecommunication Standardization Sector.

21.      "Standards Setting Organization" or "SSO" shall mean an organization that adopts standards governing an industry or technological field, and includes without limitation 3GPP, ATIS, CableLabs, ETSI, IETF, and ITU-T.

22.      "FRAND" or "RAND" may be used interchangeably and shall mean fair, reasonable, and non-discriminatory.

23.      "FRAND committed" or "RAND committed" means subject to a FRAND and/or RAND commitment.

24.      "Source Code" includes source code, hardware code, machine code, assembly code, or code written in any programming language, and code that can be compiled or acted upon by a processor, any listings or printouts thereof, and any release notes describing the features or modifications of such code.

25.      "Executable Software" means computer files containing encoded instructions capable of being executed by a processing unit (e.g., a central processing unit or microcontroller), and any release notes describing the features or modifications of such files. The term shall include, without limitation, firmware and executable binary files.

26.      "Communication(s)" shall mean, without limitation, any transmittal, conveyance or exchange of a word, statement, fact, Thing, idea, Document, instruction, information, demand, question or other information by any medium, whether by written, oral or other means, including electronic communications and electronic mail.

5

27.     "Date(s)" shall mean the exact date(s), if known, or the closest approximation to the exact date(s) as can be specified, including without limitation the year, month, week in a month, or part of a month.

28.     "Document(s)" shall be construed under the broadest possible construction under Federal Rule of Civil Procedure 34 and Federal Rule of Evidence 1001.  The term shall include without limitation any written, recorded, graphic, or other matter, whether sent or received or made or used internally, however produced or reproduced and whatever the medium on which it was produced or reproduced (whether on paper, cards, charts, file, or printouts; tapes, discs, belts, video tapes, audiotapes, tape recordings, cassettes, or other types of voice recording or transcription; computer tapes, databases, e-mails; pictures, photographs, slides, films, microfilms, motion pictures; or any other medium), and any other tangible item or Thing of readable, recorded, or visual material of whatever nature including originals, drafts, and all non-identical copies of each Document (which, by reason of any variation, such as the presence of absence of hand-written notes or underlining, represents a distinct version).  By way of example, the term "Document(s)" as used herein shall include: correspondence; blueprints; memoranda; notes; diaries; letters; telegraphs; telegrams; telexes; emails; metadata; minutes; agendas; contracts; reports; studies; checks; statements; receipts; returns; summaries; pamphlets; circulars; press releases; advertisements; books; inter-office and intra-office communications; handwritten or typewritten notes; notations or summaries of telephone conversations, meetings, or conferences; bulletins; computer printouts; databases; teletypes; telefax; invoices; worksheets; photographs; tape recordings; patents and patent application materials; patent appraisals; printed publications; trademark applications, certificates of registration, opinions of counsel; memoranda of agreements, assignments, licenses; reports of or summaries of either negotiations within or

without the corporation or preparations for such; and all other tangible items of readable, recorded, or visual material of any kind.

29.    "Entity" shall mean corporation, company, firm, partnership, joint venture, association, governmental body or agency, or Persons other than a natural person.

30.    Whenever Metaswitch asks Nortel to "identify" a date or dates, Nortel shall respond by providing the exact date(s) if known or obtainable, or the closest approximation to the exact date(s) as can be specified, including the year, month, week in a month, or part of a month or week.

31.    Whenever Metaswitch asks Nortel to "identify" a natural Person, Nortel shall respond by providing, to the extent known or obtainable, at least the following information: (a) the Person's full name; (b) his or her present or last known home address and telephone number; (c) his or her present or last known business address and telephone number; (d) his or her present or last known title or occupation; and (e) his or her present or last known employer. When the Person in question is a current or former director, officer, manager, or other employee of Genband or Nortel, Genband's response additionally shall include, to the extent known or obtainable, at least the following information: (a) the title(s) or position(s) held by the Person at Genband or Nortel; (b) the time periods during which he or she held those title(s) or positions(s); and (c) a description of his or her responsibilities to those title(s) or position(s).

32.    Whenever Metaswitch asks Nortel to "identify" any legal entity, such as a corporation, company, firm, partnership, joint venture, association, government body or agency, or Person other than a natural Person, Nortel shall respond by providing, to the extent known or obtainable, at least the following information: (a) the entity's full legal name; (b) its place of

incorporation or organization; (c) its principal place of business; and (d) the nature of the business conducted by the entity.

33.     Whenever Metaswitch asks Nortel to "identify" a Document, Nortel shall respond by specifying the Document in sufficient detail to enable Metaswitch to locate the Document, including by providing at least the following information: (a) the production number range; (b) the date appearing on such Document, or, if no date appears thereon, the approximate date the Document was prepared; (c) the identifying code number, file number, title, or label of such Document; (d) a general description of the nature (e.g., letter, memorandum, drawing, prototype) and subject matter of the Document; (e) the name of each Person having possession, custody, or control of such Document; (f) if the Document existed at one time but does not presently exist, the reason(s) why it no longer exists and the identity of the last Person having custody of it; and (g) if the Document is in a foreign language, whether a partial or complete English translation of the Document exists.

34.     Whenever Metaswitch asks Nortel to "identify" a Communication, Nortel shall respond by providing, to the extent known or obtainable, at least the following information: (a) the form of the Communication (e.g., telephone call, meeting, letter); (b) a summary of the substance of the Communication; (c) the date and place of the Communication; (d) a list identifying each Person who participated in or was present at, involved in, or connected with the Communication; and (e) a list identifying each Document that memorializes or refers to the Communication.

35.     Whenever Metaswitch asks Nortel to "identify" a tangible Thing that is not a Document or Communication (including any Products manufactured, developed, sold, or imported by Genband), Nortel shall respond by providing, to the extent known or obtainable, at

8

least the following information: (a) the product name(s), product number(s), version number(s), and revision number(s); (b) the date(s) when the Thing first was introduced for sale and first was sold; and (c) all team name(s) or project title(s) used in connection with the design, development, testing, or engineering of that tangible Thing.

36.    Whenever Metaswitch asks Nortel to "identify" a process, Nortel shall respond by providing, to the extent known or obtainable, at least the following information: (a) the date the process first was used; (b) the date that Products or other objects made by the process first were sold; (c) all numbers or codes used to refer to the process, including process revision numbers or codes; (d) all process names; and (e) all team names or project titles used in connection with the design, development, testing, or engineering of that process.

37.    Whenever Metaswitch asks Nortel to "describe" an act, event, instance, occasion, transaction, conversation, or Communication, Nortel shall respond by providing, to the extent known or obtainable, at least the following information: (a) the date and place thereof and of any related occurrences; (b) a list identifying the individual participants and all other knowledgeable Persons; (c) separate summaries of what each individual participant did or said; (d) a list identifying all Documents or Things used or prepared in connection therewith or making any reference thereto; and (e) any other relevant facts and related Documents or Communications.

38.    "Licensee" or "License" means and includes each and every sub-licensee or sublicense, and is intended to include settlements, settlement agreements, non-assert agreements, covenants not to sue, and agreements not to sue.

39.    "Person(s)" shall mean any natural person or any business, proprietorship, firm, partnership, corporation, association, organization, or other legal entity.  The acts of a Person

shall include the acts of directors, officers, owners, consultants, members, employees, agents, attorneys or other representatives acting on the Person's behalf.

40.    "Product(s)" shall mean any machine, manufacture, apparatus, device, software, system, instrument, mechanism, appliance, assemblage of components/parts (either individually or collectively), process, or method which are designed to function together electrically, mechanically, chemically, or otherwise, to achieve a particular function or purpose, including those offered for sale, sold, or under development.

41.    "Thing(s)" shall include any tangible objects of any kind and nature other than a Document, including prototypes, models, and physical specimens thereof.

42.    "Participate" shall mean, without limitation, to communicate, attend, exchange information with, engage, cooperate, observe, contact, publicize, or otherwise interact with.

43.    "Refer to," "referring to," "relate to," "related to," "relating to," "regarding," or "concerning" shall mean in whole or in part constituting, containing, contradicting, embodying, commenting on, depicting, demonstrating, refuting, evidencing, representing, discussing, reflecting, describing, analyzing, identifying, mentioning, stating, summarizing, bearing upon, pertaining to, comprising, involving, alluding to, commenting on, referring directly or indirectly to, dealing with, or in any way pertaining to.

44.    "Third Party" shall mean all Persons who are not parties to this Litigation, as well as their officers, directors, employees, agents and attorneys.

45.    Where a Topic below names a corporation or other legal entity, the Topic includes within its scope any parent, Predecessors-in-Interest, subsidiaries, affiliates, past or present directors, officers, employees, agents, and representatives thereof, including attorneys, Consultants, accountants, and investment bankers.

10

46.     The terms "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

47.     The terms "any," "all," "every," and "each" shall each mean and include the other.

48.     The singular form of any word shall be deemed to include the plural.  The plural form of any word shall be deemed to include the singular.

49.     The use of a verb in any tense shall be construed as the use of the verb in all other tenses.

50.     "Include" and "including" shall mean including without limitation.

## **INSTRUCTIONS**

The following instructions shall apply to each of the Document Requests herein:

1.     You are to produce the original and each non-identical copy or draft of each Document(s), Source Code, or Thing(s) requested herein that is in Your possession, custody or control in its entirety, without abbreviation or redaction.

2.     If any portion of a Document, Source Code or Thing is responsive to a request, the entire Document, Source Code or Thing should be produced including all attachments and enclosures, redacting only privileged material, if any.

3.     All Documents, Source Code and Things should be produced in the same file or other organizational environment in which they are maintained in the ordinary course of business.  For example, a Document that is part of a file, docket or other grouping should be physically produced together with all other Documents from said file, docket or grouping, in the same order or manner of arrangement as the original.  Additionally, to the extent produced in hardcopy, each Document should be produced stapled, clipped or otherwise bound or connected

11

in the same manner as the original.  File folders with tabs or labels or directories of files identifying Documents should be produced intact with such Documents.  Documents attached to each other should not be separated.

4.    Each item produced should bear unique identifying control numbers (e.g., Bates labels) on each item or page if the item is a Document.

5.    Color copies of Documents are to be produced where color is necessary to interpret or understand the contents.

6.    Electronic records and computerized information should be produced in their native electronic format, together with a description of the system from which they were derived sufficient to permit rendering the records and information intelligible.

7.    If You believe that You are not required to provide any Document, Source Code or Thing on the grounds of a privilege or protection that You are not prepared to waive, pursuant to Federal Rule of Civil Procedure 26(b)(5), please provide a written list describing each Document, Source Code, Executable Software, or Thing not produced, using the unique identifying control numbers (e.g., Bates labels) to specify Documents or ranges where appropriate.  For each item on the list, include the following:

    (i)    the specific privilege asserted;

    (ii)    all Persons making or receiving the Document, Source Code or Thing;

    (iii)    the steps taken to ensure the confidentiality of the Document, Source Code or Thing, including affirmation that no unauthorized Persons have received the Document, Source Code or Thing;

    (iv)    the date of the Document, Source Code or Thing; and

    (v)    the subject matter of the Document, Source Code or Thing.

## DOCUMENTS TO BE PRODUCED

### DOCUMENT REQUEST NO. 1:

All Documents and Communications relating to the Nortel Asserted Patents and/or to any Related Nortel Patents.

### DOCUMENT REQUEST NO. 2:

Documents and Communications sufficient to show Nortel's first awareness of Metaswitch (Data Connection Ltd.) and its Accused Products.

### DOCUMENT REQUEST NO. 3:

Documents and Communications sufficient to show the corporate and legal structure, capitalization, and management of Nortel Networks Cable Solutions Inc., including its relationship with the other Nortel Networks entities, such as Nortel Networks Inc., Nortel Networks Corp., and Nortel Networks Ltd., and any common ownership, common employees, common management, common control, common or shared capitalization, intermingling of business activity, observance of corporate formalities, and payment of dividends.

### DOCUMENT REQUEST NO. 4:

All Documents and Communications relating to licensing any of the Nortel Asserted Patents or Related Nortel Patents, including, but not limited to, all license agreements, cross licenses, covenants not to sue, or non-assertion agreements that cover any of the Nortel Asserted Patents, all offers to license any of the Nortel Asserted Patents to Genband or to any Third Party, all draft agreements, any negotiation of any agreement or royalty.

### DOCUMENT REQUEST NO. 5:

Documents and Communications sufficient to identify every attempt by Nortel to enforce any of the Nortel Asserted Patents, Related Nortel Patents, or Transferred Patents, either in the United States or abroad.

**DOCUMENT REQUEST NO. 6:**

All Documents and Communications relating to any decision, by Nortel, Genband, or any Third Party, to file or decline to file any potential or actual litigation or other claim relating to any of the Nortel Asserted Patents, the Related Nortel Patents, or to the Transferred Patents.

**DOCUMENT REQUEST NO. 7:**

All Documents and Communications relating to any patent claim charts, infringement or invalidity evaluations, or comparisons between the Nortel Asserted Patents and any Genband, Metaswitch, or Third-Party Product.

**DOCUMENT REQUEST NO. 8:**

All Documents and Communications relating to the CVAS Purchase, including any Documents shared between Genband and Nortel as part of any due diligence; any meeting or other discussion between Genband and Nortel; the structure and formation of the CVAS Unit (including an organizational chart); any decision regarding the organization of the CVAS Unit, including how to structure its departments, employees, assets, and liabilities; and the transfer (or decision not to transfer) any aspect of the CVAS Unit and its underlying departments, employees, assets, and liabilities.

**DOCUMENT REQUEST NO. 9:**

Documents sufficient to show all Nortel employees transferred to Genband.

**DOCUMENT REQUEST NO. 10:**

All Documents and Communications relating to any government inquiry or investigation relating to the CVAS Purchase, including all Documents and Communications with or relating to the Antitrust Division of the U.S. Department of Justice or the Federal Trade Commission ("FTC").

**DOCUMENT REQUEST NO. 11:**

All Documents and Communications relating to any bid, offer, or other proposal, whether or not that bid, offer, or other proposal was ever finalized, executed, or considered, for Nortel's CVAS Unit, the CVAS Patent Portfolio, any Nortel Asserted Patent, Nortel Related Patent, or Nortel Transferred Patent.

**DOCUMENT REQUEST NO. 12:**

All Documents and Communications relating to any confidentiality or non-disclosure agreements executed between Nortel and Genband and/or any Third Party relating to the sale, merger, acquisition, or purchase of the CVAS Unit, the Nortel Asserted Patents, the Related Nortel Patents, and/or the Nortel Transferred Patents.

**DOCUMENT REQUEST NO. 13:**

Documents sufficient to identify all Persons involved in the negotiation or authorization of the CVAS Purchase.

**DOCUMENT REQUEST NO. 14:**

All Documents and Communications relating to the decision to include or exclude any patent related to voice over internet protocol ("VoIP") technology in the patent portfolio in the CVAS purchase or to any other sale of Nortel intellectual property from 2009-2011.

**DOCUMENT REQUEST NO. 15:**

All Communications with Genband relating to any Nortel Asserted Patent, Related Nortel Patent, Transferred Nortel Patent, to this Action, or to Metaswitch.

**DOCUMENT REQUEST NO. 16:**

All Documents and Communications relating to the value of any Nortel Asserted Patent, Transferred Nortel Patent, or Related Nortel Patent, including any valuation performed by Nortel, Genband, and/or a Third Party.

**DOCUMENT REQUEST NO. 17:**

All Documents and Communications relating to any efforts You made to license, sell, monetize, or otherwise generate revenue from Nortel's Asserted Patents or Transferred Nortel Patents, including but not limited to any presentations, meeting minutes, license negotiations, sales negotiations, claim charts, infringement analyses, validity analyses, notice letters, cease and desist letters, offers, draft license agreements, and term sheets.

**DOCUMENT REQUEST NO. 18:**

All Documents and Communications relating to the sales, revenue, income, profit, gross margin, costs, expenses, forecasts, projections, or budgets for any Nortel Product or service that relates to or resulted in any claim of the Nortel Asserted Patents or the Related Nortel Patents.

**DOCUMENT REQUEST NO. 19:**

All Documents and Communications relating to the filing and prosecution of the Nortel Asserted Patents or Related Nortel Patents, including but not limited to all draft and final versions of such applications, office actions, draft and final versions of responses to office actions.

**DOCUMENT REQUEST NO. 20:**

All Documents and Communications relating to the Nortel Asserted Patents or Related Nortel Patents, submitted to the U.S. Patent & Trademark Office or patent office of another

jurisdiction during the prosecution of any of the Nortel Asserted Patents or Related Nortel Patents.

**DOCUMENT REQUEST NO. 21:**

All Documents and Communications related to the '612 Patent.

**DOCUMENT REQUEST NO. 22:**

Documents and Communications related to a generic service framework ("GSF") for the DMS-100, digital multiplex switching device, or related service.

**DOCUMENT REQUEST NO. 23:**

Documents and Communications sufficient to identify, by build or version name or number, all Products used or sold prior to June 7, 1999 related to any GSF efforts, including any user guides, marketing, advertising, or promotional efforts relating to the same.

**DOCUMENT REQUEST NO. 24:**

Documents and Communications sufficient to show the time period during which each Product used or sold prior to June 7, 1999 relating to any GSF efforts was sold, licensed, or made available in the United States and the quantity sold, licensed, or made available in the United States.

**DOCUMENT REQUEST NO. 25:**

Documents and Communications sufficient to identify any Persons knowledgeable about the creation, design, development, operation or implementation of any feature or product used or sold prior to June 7, 1999 relating to any GSF efforts.

**DOCUMENT REQUEST NO. 26:**

Documents and Communications sufficient to show the time period during which each feature or product used or sold prior to March 13, 2000 relating to Nortel's Call Manager

Software was sold, licensed, or made available in the United States and the quantity sold, licensed, or made available in the United States.

**DOCUMENT REQUEST NO. 27:**

Documents and Communications sufficient to identify any Persons knowledgeable about the creation, design, development, operation or implementation of any feature or product used or sold prior to March 13, 2000 relating to Nortel's Call Manager Software.

**DOCUMENT REQUEST NO. 28:**

Documents and Communications sufficient to identify, by build or version name or number, all versions of Nortel's Call Manager Software used or sold prior to March 13, 2000, including Documents and Communications relating to any marketing, advertising, or promotional efforts.

**DOCUMENT REQUEST NO. 29:**

Documents and Communications sufficient to show the time period during which each feature or product used or sold prior to October 2005 relating to the Zhone Products was sold, licensed, or made available in the United States and the quantity sold, licensed, or made available in the United States.

**DOCUMENT REQUEST NO. 30:**

Documents and Communications sufficient to identify, by build or version name or number, all versions of the Zhone Products used or sold prior to October 2005, including Documents and Communications relating to any marketing, advertising, or promotional efforts.

**DOCUMENT REQUEST NO. 31:**

Documents and Communications sufficient to identify any Persons knowledgeable about the creation, design, development, operation or implementation of any feature or product used or sold prior to October 2005 relating to the Zhone Products.

**DOCUMENT REQUEST NO. 32:**

Documents and Communications sufficient to show the technical operation or use of any functionality related to the ability to connect calls between subscribers connected to any of the Zhone Products, whether or not the Zhone Products are operating in emergency stand alone feature (for example, as referenced in Exhibit 4), included in any Products (including software) created or sold by prior to October 2005.

**DOCUMENT REQUEST NO. 33:**

Documents and Communications sufficient to show the technical operation or use of any functionality related to emergency stand alone feature (for example, as referenced in Exhibit 4) in any of the Zhone Products, included in any Products (including software) created or sold by You prior to October 2005.

**DOCUMENT REQUEST NO. 34:**

Documents and Communications sufficient to show the time period during which each feature or product used or sold prior to December 27, 2006 relating to Nortel's Border Control Point Software was sold, licensed, or made available in the United States and the quantity sold, licensed, or made available in the United States.

**DOCUMENT REQUEST NO. 35:**

Documents and Communications sufficient to identify any Persons knowledgeable about the creation, design, development, operation or implementation of any feature or product used or sold prior to December 27, 2006 relating to Nortel's Border Control Point Software.

**DOCUMENT REQUEST NO. 36:**

Documents and Communications sufficient to identify, by build or version name or number, all versions of Nortel's Border Control Point Software used or sold prior to December 27, 2006, including Documents and Communications relating to any marketing, advertising, or promotional efforts.

**DOCUMENT REQUEST NO. 37:**

Documents and Communications sufficient to show the time period during which each feature or product used or sold prior to December 27, 2006 relating to Nortel's Communication Server 2000 (CS 2000) Software was sold, licensed, or made available in the United States and the quantity sold, licensed, or made available in the United States.

**DOCUMENT REQUEST NO. 38:**

Documents and Communications sufficient to identify any Persons knowledgeable about the creation, design, development, operation or implementation of any feature or product used or sold prior to December 27, 2006 relating to Nortel's Communication Server 2000 (CS 2000) Software.

**DOCUMENT REQUEST NO. 39:**

Documents and Communications sufficient to identify, by build or version name or number, all versions of Nortel's Communication Server 2000 (CS 2000) Software used or sold prior to December 27, 2006, including Documents and Communications relating to any

marketing, advertising, or promotional efforts.

**DOCUMENT REQUEST NO. 40:**

Documents and Communications sufficient to show the time period during which each feature or product used or sold prior to December 27, 2006 relating to Nortel's Communication Server 1500 (CS 1500) Software was sold, licensed, or made available in the United States and the quantity sold, licensed, or made available in the United States.

**DOCUMENT REQUEST NO. 41:**

Documents and Communications sufficient to identify any Persons knowledgeable about the creation, design, development, operation or implementation of any feature or product used or sold prior to December 27, 2006 relating to Nortel's Communication Server 1500 (CS 1500) Software.

**DOCUMENT REQUEST NO. 42:**

Documents and Communications sufficient to identify, by build or version name or number, all versions of Nortel's Communication Server 1500 (CS 1500) Software used or sold prior to December 27, 2006, including Documents and Communications relating to any marketing, advertising, or promotional efforts.

**DOCUMENT REQUEST NO. 43:**

Documents and Communications sufficient to show the time period during which each feature or product used or sold prior to December 27, 2006 relating to Nortel's Universal Signaling Point Software was sold, licensed, or made available in the United States and the quantity sold, licensed, or made available in the United States.

**DOCUMENT REQUEST NO. 44:**

Documents and Communications sufficient to identify any Persons knowledgeable about the creation, design, development, operation or implementation of any feature or product used or sold prior to December 27, 2006 relating to Nortel's Universal Signaling Point Software.

**DOCUMENT REQUEST NO. 45:**

Documents and Communications sufficient to identify, by build or version name or number, all versions of Nortel's Universal Signaling Point Software used or sold prior to December 27, 2006, including Documents and Communications relating to any marketing, advertising, or promotional efforts.

**DOCUMENT REQUEST NO. 46:**

Documents and Communications sufficient to show the time period during which each feature or product used or sold prior to December 27, 2006 relating to Nortel's Media Gateway 9000 Software was sold, licensed, or made available in the United States and the quantity sold, licensed, or made available in the United States.

**DOCUMENT REQUEST NO. 47:**

Documents and Communications sufficient to identify any Persons knowledgeable about the creation, design, development, operation or implementation of any feature or product used or sold prior to December 27, 2006 relating to Nortel's Media Gateway 9000 Software.

**DOCUMENT REQUEST NO. 48:**

Documents and Communications sufficient to identify, by build or version name or number, all versions of Nortel's Media Gateway 9000 Software used or sold prior to December 27, 2006, including Documents and Communications relating to any marketing, advertising, or promotional efforts.

**DOCUMENT REQUEST NO. 49:**

Documents or Communications sufficient to show the technical operation or use of any functionality related to an emergency stand alone feature in any of the Your products—included in any media gateways, softswitches, or gatekeepers—including software, created or sold by You prior to October 2005.

**DOCUMENT REQUEST NO. 50:**

Documents and Communications sufficient to show the membership and participation of Nortel in any SSO, including without limitation 3GPP, ATIS, CableLabs, ETSI, IETF, and ITU-T.

**DOCUMENT REQUEST NO. 51:**

Documents and Communications sufficient to show any agreements, declarations, licenses, or other rights in the Nortel Asserted Patents, the Related Nortel Patents, or the Transferred Patents given to any SSO or its members, including without limitation 3GPP, ATIS, CableLabs, ETSI, IETF, and ITU-T.

**DOCUMENT REQUEST NO. 52:**

Documents and Communications sufficient to show Nortel's involvement or participation in the CableLabs PacketCable and/or DOCSIS standards, including access to CableLabs (or its members') information, equipment, or facilities, attendance at CableLabs meetings, submissions or contributions to CableLabs specifications, first access or receipt of CableLabs specifications, and legal agreements or licenses with CableLabs (or its members) relating to or resulting from Nortel's participation in the CableLabs PacketCable and/or DOCSIS standards.

**DOCUMENT REQUEST NO. 53:**

All Documents and Communications relating to any FRAND royalty rate for the Nortel Asserted Patents, the Related Nortel Patents, or the Transferred Patents.

# **Tab 3**

### AGREEMENT BETWEEN METASWITCH AND NORTEL NETWORKS INC.

Metaswitch Networks Corp. and Metaswitch Networks Ltd (collectively, "Metaswitch")

and Nortel Networks Inc. ("NNI") enter into the following Agreement governing NNI's response

to discovery requests issued in *GENBAND US LLC v. Metaswitch Networks Corp.*, Case No. 14-

cv-33 (E.D. Tex.) and *Metaswitch Networks Ltd. v. GENBAND US LLC*, Case No. 14-cv-744

(E.D. Tex) (hereafter "Genband Litigation"). Metaswitch and NNI shall be referred to as "the

Parties." For purposes of clarity, NNI does not include any other Nortel entities, including

Nortel Networks Corp.

### FUTURE MODIFICATIONS

This Agreement is intended to supplement a Third Discovery Protocol, in the form

attached as Schedule B hereto, that NNI is seeking to have adopted by the U.S. Bankruptcy

Court for the District of Delaware in *In re Nortel Networks Inc., et al.*, Case No. 09-10138(KG)

("Nortel Bankruptcy Proceeding"). To the extent that the Delaware Bankruptcy Court enters an

order inconsistent with NNI's proposal for a Third Discovery Protocol, the Parties will meet and

confer to discuss any necessary modifications to the Agreement.

### DOCUMENT REPOSITORIES

With reference to the document repositories identified in the Second Discovery Protocol

adopted in the Delaware Bankruptcy Proceeding (Dkt. No. 14906-1), the Parties agree that NNI

shall only be required to search the following document repositories in accordance with the

procedures set forth herein, including the cost-sharing/allocation provisions: Cleared Allocation

Trial Documents, the Allocation Litigation Database, the Unproduced Allocation Litigation

Documents, the Allocation Laptop Data, the set of deposition transcripts created in the

Allocation Litigation, the LiveLink Database, and the Electronic Data Room. NNI agrees to

consider any future request by Metaswitch that NNI also search the online catalog for the Iron

Mountain Physical Items for references to potentially responsive documents.  NNI represents that it is not aware of any other document repository in its possession, custody or control that is reasonably likely to contain responsive, non-duplicative documents.  If any such repository becomes known to NNI during the term of this agreement, it will identify such repository to Metaswitch, and the Parties will meet and confer as to any appropriate search.

### Cleared Allocation Trial Documents

On or before April 15, 2015, NNI shall produce the Cleared Allocation Trial Documents to Metaswitch.

The Cleared Allocation Trial Documents shall be treated by the Parties as protected material, consistent with the protective orders entered in the Genband Litigation.  All such documents shall be given the  "RESTRICTED - OUTSIDE ATTORNEYS' EYES ONLY" designation until such time, if any, as those documents become part of the public trial record or are otherwise de-designated.

In the event Metaswitch reasonably determines after review that one or more of the produced Cleared Allocation Trial Documents contains redacted information that is likely relevant to the issues in the Genband Litigation, Metaswitch may request that NNI produce specified Cleared Allocation Trial Documents in unredacted form.  The Parties shall meet and confer as to the appropriate method for production, including resolution of any third-party confidentiality issues.

With respect to any of the approximately 390 trial exhibits that were withheld from the Cleared Allocation Trial Documents as potentially privileged, NNI shall run an agreed set of search terms against those exhibits to determine whether any of them are responsive to Metaswitch's subpoenas to NNI served on March 3, 2015.  If they are not responsive, no further action need be taken.  If one or more exhibits are responsive, the Parties shall meet and confer as

to the appropriate method for production, including resolution of any third-party confidentiality issues.

### Electronic Data Rooms ("EDRs")

As to the hard drives containing copies of the electronic data rooms ("EDRs") made available to bidders in connection with various Nortel asset auctions, the Parties agree that NNI shall only search the copy of the EDR relating to the sale of Nortel's Carrier VoIP and Application Solution ("CVAS") business.  NNI will provide Metaswitch a printout of the index of that EDR.

### Iron Mountain Physical Items

Although is not required to search for responsive documents that may be stored with Iron Mountain, NNI will, at NNI's option, either (i) make the online catalog of the Iron Mountain Physical Items available to Metaswitch for purposes of determining whether potentially responsive documents may be identified, or (ii) run searches of the online catalog using keywords to be provided by Metaswitch.

### DOCUMENT SEARCH, REVIEW, AND PRODUCTION

The expenses for the referenced activities may be allocated among NNI, Metaswitch, Genband, or any other third-party, in accordance with any agreement of the participating parties or an order of the Delaware Bankruptcy Court.   This agreement furthermore does not serve to restrict or otherwise prejudice NNI's rights with respect to seeking to apportion among the various Nortel estates any costs incurred by NNI in responding to the discovery requests from the Genband Litigation.

NNI shall provide, at NNI's expense, Metaswitch with the number of documents (the "Hit Counts") returned by a search of the Data Repositories using the Identified Search Terms, attached as Schedule A, as well as for subsequent modifications thereto.  In addition, Metaswitch

and NNI shall meet and confer in good faith to modify any search terms. Metaswitch may propose a reasonable number of modified terms to be run against the Data Repositories for purposes of constructing optimal search terms that return a reasonable number of hits, including after a production is made.  If the Parties cannot reach agreement, they may bring the dispute before the Discovery Mediator (discussed below).

Once Metaswitch and NNI agree on a set of search terms, NNI will run the ESI Searches in the selected repositories to identify a collection of responsive documents, after which an electronic privilege filter will be run against the responsive documents in order to produce a collection of "Responsive/Non-Privileged Documents."  The electronic privilege filters applied to the collection of responsive documents shall be developed in consultation with Metaswitch.

To the extent NNI intends to seek reimbursement of some or all of the costs associated with performing the ESI Searches and electronic privilege filter, NNI will provide the Metaswitch with an estimate of the expense required to perform these activities before undertaking any of these steps.  The expense for these activities may be allocated in accordance with a cost sharing procedure, to be agreed upon.  With respect to potentially privileged documents identified by the electronic privilege filter, NNI shall prepare and serve an electronically generated privilege log.  NNI and Metaswitch shall meet and confer on the data to be provided by the electronically generated privilege log *(e.g.,* custodian, To, From, Cc, Bcc, Date, Subject, and privilege filter terms "hit" by the document).  NNI shall not be obligated to undertake a document-by-document review of these presumptively privileged documents as an initial matter, but NNI shall provide reasonable cooperation with respect to confirming the privileged status of any documents challenged by Metaswitch.  To the extent NNI intends to seek reimbursement of some or all of the costs associated with preparation of the privilege log and/or

performing any privilege review, NNI will provide Metaswitch with an estimate of the expense before performing these activities. The expense for NNI's efforts in preparation of the privilege log, performing any privilege review, and/or addressing any challenges may be allocated in accordance with a cost sharing procedure, to be agreed upon.

NNI shall have clawback rights that comport with the protections afforded by Federal Rule of Evidence 502(b) and Federal Rule of Civil Procedure 26(b)(5)(B).

## DISCOVERY MEDIATOR

Karen Keller of Shaw Keller LLP shall serve as Discovery Mediator, in accordance with the terms of the Retainer Agreement submitted to the Delaware Bankruptcy Court on January 22, 2015. (*In re Nortel Networks Inc., et al.*, Case No. 09-10138 (KG), Dkt. No. 15082-1). Metaswitch shall sign onto the Retainer Agreement before being entitled to receive any discovery pursuant to this Agreement or the Third Discovery Protocol.

## WRITTEN DEPOSITION

NNI agrees to respond to written deposition and/or provide a written declaration/affidavit limited to establishing produced documents as authentic and/or having been produced from NNI's business records.

## TERMINATION

This Agreement shall terminate upon final resolution of the Genband Litigation.


EXECUTED by the Parties

Nortel Networks Inc.                          Metaswitch Networks Ltd and Metaswitch
                                              Networks Corp.

By:    _____        By:    _____


       _____               _____
Date:  _____        Date:  _____

**Schedule A**

**<u>COMMON SEARCH TERMS</u>**

1.    CVAS OR "Carrier VoIP and Application Solution" or Paragon.

2.    "General Bandwidth" or GENBAND

3.    "stalking horse"

4.    "Antitrust" or DOJ or "Department of Justice" or "Federal Trade Commission" or "FTC"

5.    "David Walsh" or McCready or Jarzemsky

6.    6,772,210 or "'210 Patent" or 6,791,971 or "'971 Patent" or 6,885,658 or "'658 Patent" or 6,934,279 "'279 Patent" or 7,995,589 or "the '589 Patent" or 7,047,561 or "'561 Patent"  or 6,879,667 "'667 Patent" or 7,162,024 "'024 Patent" or 7,680,252 or "the '252 Patent" or 7,953,210 and U.S. Patent No. 8,600,006 "'006 Patent" or 27992-443 or 24879-519 or 24879-475

7.    (valu* or evalu* or analy* or residu* or target* or enforce* or assert* or royalt* or monetize*) and ("IP" or "intellectual property" or patent or portfolio or bucket or sale or assign* or notice or infringe* or "claim chart" or litig*)

8.    "licens*" or cross-licens* or "cross licens*" or crosslicens*or sublicens* or "sub-licens*

9.    6,937,612 or "'612 Patent"

10.    "Symposium" or "Fastview" or "Fastcall" or "Multimedia" or "enterprise edge" or "call manager"

11.    AccessNode or UE9000

12.    IETF or IEEE or ITU or 3GPP or ATIS or ETSI or W3C or TIA or "Multiservice Switching Forum" or MSF or "broadband forum" or CableLabs or "Cable Labs" or PacketCable or "Packet Cable" or DOCSIS or "standard-essential" or "standard essential" or SEP or F/RAND or FRAND or RAND or "royalty-free" or "royalty free"

13.    *metaswitch* or meta* or "Data Connection Ltd" or "Data Connection" or *dataconnection*

14.    "Nortel Networks Cable Solutions" or rapporteur*

15.    "emergency stand alone" or "Emergency standalone"  or "emergency stand-alone"  or "ESA"

16.    "Media Gateway 9000" or "MG9000"

17.     "Universal Signaling Point" or "USP"

18.     Communication Server 1500 or CS 1500 or CS1500

19.     Communication Server 2000 or CS 2000 or CS2000

20.     "Border Control Point" or "BCP"

21.     GSF or "generic service framework"

22.     Auction and (patent* or portfolio)

23.     "Inequitable conduct" or "prior art"

24.     Laches or estoppel or "time bar"

25.     "11718 BA" or 11718BA or "10610 RN" or 10610RN or "11694 RO" or 11694RO or "11854 RR" or 11854RR

26.     Perimeta* or Metasphere or "call feature server" or CFS or VP2510 or VP3500 or VP3510 or  VP6010 or VP6050 or MG2510 or MG3510 or MG6010 or MG6050) or MTAS or Accession or CommPortal.

# **Tab  4**

 **CT Corporation**

**Service of Process Transmittal**
12/09/2014
CT Log Number 526209563

**TO:** Timothy Ross
Nortel Networks, Inc.
4001 Chapel Hill Nelson Hwy
Research Triangle Park, NC 27709-0019

**RE:** **Process Served in Delaware**

**FOR:** Nortel Networks, Inc. (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | RE: Innovative Wirless Solutions LLC, Pltf. // To: Aruba Networks Inc., Dft. // To: Nortel Networks Inc.<br>*Name discrepancy noted.* |
| **DOCUMENT(S) SERVED:** | Subpoena, Proof of Service, Attachment(s), Schedule, Instructions |
| **COURT/AGENCY:** | Delaware District - U.S. District Court, DE<br>Case # 113CV01858RGA |
| **NATURE OF ACTION:** | Subpoena - Business records - Pertaining to Any and all documents, including Communications, that related to the IWS Patents (See documents for additional requests) |
| **ON WHOM PROCESS WAS SERVED:** | The Corporation Trust Company, Wilmington, DE |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 12/09/2014 at 15:50 |
| **JURISDICTION SERVED :** | Delaware |
| **APPEARANCE OR ANSWER DUE:** | 12/22/2014 at 9:00 a.m. (Document(s) may contain additional answer dates) |
| **ATTORNEY(S) / SENDER(S):** | Jeffrey S. Pollack<br>Duane Morris LLP<br>30 South 17th Street<br>Philadelphia, PA 19103<br>215-979-1299 |
| **REMARKS:** | The documents received have been modified to reflect the name of the entity being served. |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 12/10/2014, Expected Purge Date: 12/15/2014<br>Image SOP<br>Email Notification, Timothy Ross Tim.Ross@nortel-us.com |
| **SIGNED:**<br>**ADDRESS:** | The Corporation Trust Company<br>1209 Orange Street<br>Wilmington, DE 19801 |
| **TELEPHONE:** | 302-658-7581 |

Page 1 of 2 / HR

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

 CT Corporation

**Service of Process Transmittal**
12/09/2014
CT Log Number 526209563

**TO:** Timothy Ross
Nortel Networks, Inc.
4001 Chapel Hill Nelson Hwy
Research Triangle Park, NC 27709-0019

**RE:** **Process Served in Delaware**

**FOR:** Nortel Networks, Inc. (Domestic State: DE)

**DOCKET HISTORY:**

| DOCUMENT(S) SERVED: | DATE AND HOUR OF SERVICE: | TO: | CT LOG NUMBER: |
|---|---|---|---|
| Attachment(s), Subpoena, Proof of Service, Schedule. Instructions | By Process Server on 12/04/2014 at 13:20 | Timothy Ross Nortel Networks, Inc. | 526182953 |

Page 2 of  2 / HR

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

District of Delaware

*Innovative Wireless Solutions LLC v. Aruba Networks Inc.*, No. 1:13-cv-01858-RGA; *Innovative Wireless Solutions LLC v. Belkin International, Inc.*, No. 1:13-cv-01859-RGA; *Innovative Wireless Solutions LLC v. Motorola Solutions Inc.*, No. 1:13-cv-01864-RGA; *Innovative Wireless Solutions LLC v. NETGEAR, Inc.*, No. 1:13-cv-01865-RGA

**SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION**

To:        Nortel Networks Inc., c/o The Corporation Trust Company
Corporation Trust Center 1209 Orange St., Wilmington, DE 19801
*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Schedule A

| Place: Duane Morris LLP | Date and Time: |
|---|---|
| 222 Delaware Ave., Ste 1600 Wilmington, DE 19801-1659 | 12/22/2014 9:00 am |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
|  |  |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    12/03/2014

                    *CLERK OF COURT*
                                                OR    *Jeffrey Pollack*
    _____            _____
        *Signature of Clerk or Deputy Clerk*            *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Aruba Networks, Inc., Netgear Inc., and Belkin International, Inc._____ , who issues or requests this subpoena, are:
Jeffrey S. Pollack, Duane Morris LLP, 30 South 17th Street, Philadelphia, PA 19103
JSPollack@duanemorris.com, (215)979-1299

**Notice to the person who issues or requests this subpoena**
A notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  1:13-CV-01858

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____0.00_____ .

I declare under penalty of perjury that this information is true.

Date: _____          _____
                                         *Server's signature*

                                 _____
                                         *Printed name and title*

                                 _____
                                         *Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

(1) *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, a hearing, or deposition only as follows:
  (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
    (i) is a party or a party's officer; or
    (ii) is commanded to attend a trial and would not incur substantial expense.

(2) *For Other Discovery.* A subpoena may command:
  (A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  (B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*
  (A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  (B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*
  (A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    (i) fails to allow a reasonable time to comply;
    (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
    (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    (iv) subjects a person to undue burden.
  (B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    (i) disclosing a trade secret or other confidential research, development, or commercial information; or

    (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  (C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  (A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  (B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  (C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  (D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*
  (A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    (i) expressly make the claim; and
    (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  (B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**SCHEDULE A**

**DEFINITIONS**

1.  "Nortel Networks Inc.", "you" or "your" shall mean Nortel Networks Inc., and any and all other predecessors-in-interest and successors-in-interest to Nortel Networks Inc., including all of their corporate locations, and all predecessors, successors, subsidiaries, parents and affiliates, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint-venture or partnership relationships with them, and others acting on their behalf.

2.  "IWS" shall mean Innovative Wireless Services, Inc., and all predecessors-in-interest, successors-in interest, subsidiaries, parents and affiliates, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint-venture or partnership relationships with them, and others acting on their behalf in any location.

3.  "Inventors" or "listed inventors" refers to any of the listed inventors on any of the IWS Patents, including John Brian Terry and Roger St. Patrick Richards.

4.  "IWS Patents" shall refer to U.S. Patent No. 5,912,895, U.S. Patent No. 6,327,264, and U.S. Patent No. 6,587,473, and any Related Patents thereto.

5.  "Related Patent" shall mean any patent or patent application, foreign or U.S., individually and collectively, that (i) claims priority from any IWS Patent, (ii) is identified as priority for any IWS Patent, (iii) claims priority to any application to which any IWS Patent claims priority, (iv) is listed within the "Related U.S. Application Data" section of any IWS Patent, or (v) discloses or claims substantially the same Subject Matter as any IWS Patent, and includes all parents, progeny, provisional and nonprovisional applications, continuations, continuations-in-part, divisionals, reexaminations, reviews, reissues, or foreign counterparts thereof.

6.  "Nortel Affiliate" shall mean a corporation or company which directly or indirectly controls, or is under common control with, or is controlled by, Nortel Networks Limited, Nortel Networks, Inc., or Nortel Networks Corp.  As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of the subject person (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise).

7.  "Nortel Subsidiary" shall mean a company in which Nortel Networks Limited, Nortel Networks, Inc., or Nortel Networks Corp. effectively owns or controls, directly or indirectly, more than fifty percent (50%) of the voting stock or ownership interest therein.

8. "Accused Defendants" shall mean Cisco Systems, Inc., Ruckus Wireless, Inc., ADTRAN, Inc., ARRIS Group, Inc., ARRIS Enterprises, Inc., General Instrument Corp., Aruba Networks Inc., Belkin International Inc., Engenius Technologies, Inc., Senao Networks, Inc., Motorola Solutions, Inc., Netgear, Inc., SMC Networks, Inc., Ubiquiti Networks, Inc., and Zoom Telephonics, Inc., Zyxel Communications, Inc., TP-Link USA Corporation, Trendnet, Inc., Compex, Inc., Hawking Technologies, Inc., and D-Link Systems, Inc.

9. "Prior Art" includes any reference or subject matter set forth in or relevant under 35 U.S.C. §§ 102 and/or 103.

10. "Person" shall mean and refer to any natural person or any business, proprietorship, firm, partnership, corporation, association, organization, or other entity.

11. "Document" shall be given the broadest meaning accorded that term by the Federal Rules of Civil Procedure 34(a) and includes, but is not limited to, all of the items defined in Federal Rule of Evidence 1001, all non-identical copies, all preliminary and final drafts of any such item, and all electronically stored information.

12. "Communication(s)" shall mean and refer to any transmission of information in any context or situation by or between two or more Persons by any means or medium whatsoever, whether in the form of an original, a draft, or a copy, whether stored in hard copy, electronically or digitally, or on tape, either orally or in writing, including conversations, correspondence, electronic mails, telexes, facsimile transmissions, telecopies, recordings in any medium of oral, written, or typed communications, telephone or message logs, notes or memoranda Relating to written or oral communications, and any translation thereof.

13. "Thing" shall mean and refer to any physical specimen or tangible item in Your possession, custody or control, including research and development samples, prototypes, productions samples and the like.

14. "Referring to," "relating to," "related to," "concerning," "referencing" or "regarding" are used in their broadest possible sense and include all matters comprising, constituting, containing, concerning, embodying, reflecting, involving, discussing, describing, analyzing, identifying, stating, referring to, dealing with, or in any way pertaining to, for each request whichever definition makes the request most inclusive.

15. The use of a verb in any tense shall be construed as use of the verb in all other tenses.

16. The term "including" shall be without limitation.

17. The terms "and" and "or" shall be both conjunctive and disjunctive and the terms "each" and "any" shall mean and refer to any and all.

**INSTRUCTIONS**

1.  You are to produce all requested documents which are in your possession, custody or control, or which are within the possession, custody or control of your legal counsel, agents, other representatives, or all other persons acting on your behalf.  In the event that you cannot produce all of the documents designated in particular request, you shall produce those documents or portions of documents that you can produce and describe in detail each reason for your failure or inability to produce each of the remaining documents or portions thereof.

2.  You are to produce all responsive Documents and Things in the manner they are normally kept.

3.  You shall produce the original of any document requested. Each non-identical version of any document shall constitute a separate document. Each draft or version of any document shall also constitute a separate document.

4.  Do not separate attachments from documents.

5.  In the event that you do not produce any document because of a claim of confidentiality, privilege, or any other protection from production including, but not limited to, the attorney-client privilege or the attorney work-product doctrine, your response shall state the following information regarding the document in sufficient detail and with sufficient particularity to enable a court to adjudicate the validity of such claim:

    a.  Which privilege or protection is claimed;

    b.  The author of the document;

    c.  The general subject matter of the document; and

    d.  The addresses and persons to whom the document or any copies thereof were sent.

6.  In answering a request, the use of a plural term shall be read as singular and *vice versa*.

**REQUESTS FOR PRODUCTION**

1.  Documents, including Communications, that relate to the IWS Patents.

2.  Documents and Communications with, or that concern, any named Inventor of the IWS Patents.

3.  Documents and Communications with, or that concern, Robert Westerlund and the IWS Patents.

4.  Documents and Communications related to any license, attempt to license, and/or license negotiation for any of the IWS Patents.

5. Documents and Communications related to any transfer, grant, conveyance, or assignment of any interest in or right under the IWS Patents, including but not limited to any contracts, agreements, understandings, notes, memoranda, letters, e-mails, messages, facsimiles, telecopies, and other correspondence as well as any enclosures or attachments. This request includes but is not limited to:

    a. Documents and Communications related to the Patent Transfer and License Agreement between Nortel Networks Inc. and Elastic Networks Inc., executed on or around May 12, 1999, and all related exhibits and agreements incorporated by reference thereto.

    b. Documents and Communications related to the Intellectual Property Transfer and License Agreement between Nortel Networks Corporation and Elastic Networks Inc., executed on or around May 12, 1999, and all related exhibits and agreements incorporated by reference thereto.

6. Documents, including Communications, that relate to any investigation and/or product information of 802.3 or 802.11 compliant products that are or were made, sold, offered for sale, imported or licensed by any of the Accused Defendants.

7. Documents and Communications that relate to any investigation and/or evaluation regarding the valuation, validity, patentability, enforceability, scope and/or infringement of the IWS Patents, including any investigation and/or evaluation regarding any Prior Art to the IWS patents.

8. Documents sufficient to identify (i) any products made, sold, or offered for sale by You that practice the invention claimed by any of the IWS Patents, including, without limitation, Etherloop products, and (ii) whether such products were marked with the IWS Patents.

9. Documents sufficient to identify any products made, sold, or offered for sale by You that were marked with the IWS Patents.

10. Documents sufficient to show the: (i) gross and net revenues; (ii) costs of goods sold; (iii) gross and net profits; and (iv) number of units sold for each product made, sold, or offered for sale by You that practice the invention claimed by any of the IWS Patents or that were marked with the IWS Patents.

11. Documents and Communications related to Your involvement in the Institute of Electrical and Electronics Engineers ("IEEE"), including Your involvement with the development of the 802.3 and 802.11 standards and any letters of assurance, RAND commitments, intellectual property rights, patents, pending patent applications, or other documents submitted or disclosed by You or the named Inventors to the IEEE.

12. Documents and Communications relating to the preparation, filing and/or prosecution of each of the IWS Patents, any foreign counterpart patents or patent applications to the IWS Patents, including but not limited to:

    a.  the prosecution file(s);

    b.  any initial or preliminary drafts patent application(s);

    c.  official actions, responses, and references cited during prosecution of the patent application(s);

    d.  drafts of any declarations or other documents submitted to the PTO during the prosecution of the patent application(s);

    e.  patents, publications, or other prior art that was cited, referred to, or relied upon during the prosecution of the patent application(s); and

    f.  communications or correspondence with the PTO during the prosecution of the patent application(s).

13. Documents, Things, and Communications concerning prior art to the IWS Patents known to You and/or the named Inventors on or after the time of the filing of the applications for the IWS Patents.

14. Documents and Communications identified at any time to You and/or the named Inventors as potentially or allegedly rendering the IWS Patents unenforceable.

15. Documents and Communications relating to any decision as to what prior art references or other material information to cite, or not cite, including all prior art search results, during prosecution of the IWS Patents.

16. Documents relating to any communication, meeting or contact with the USPTO or any foreign patent office concerning any of the IWS Patents, or any foreign counterpart patents or patent applications to the Asserted Patents, including, without limitation, any internal filing/no-filing review relating to such patents or patent applications.

17. Documents, Things, and Communications relating to the first offer for sale, initial manufacture, initial use, initial sale, initial public use, initial shipment, initial announcement, or initial disclosure of a product embodying any claim of the IWS Patents.

18. Documents, Things, and Communications relating to the first public disclosure or publication of the subject matter of any claim of any of the IWS Patents, including, without limitation, any pre-filing date sales, offers for sale, public uses, demonstrations, announcements, advertisements, correspondence with potential customers, or publications.

19. Documents, Things, and Communications produced by You in any other litigations or legal proceedings involving the IWS Patents.

20. Documents and Communications concerning any litigation, arbitration or any other dispute resolution process regarding the IWS Patents, including but not limited to any correspondence or communications regarding such matters with any third party or any of the named Inventors.

21. Documents sufficient to show the corporate relationship between Nortel Networks Limited, Nortel Networks, Inc., Nortel Networks Corp., and NETGEAR, Inc. (including

the percentage of direct or indirect ownership interest by Nortel Networks Limited, Nortel Networks, Inc., and/or Nortel Networks Corp. of NETGEAR, Inc.) throughout the period from January 1, 1999 to December 31, 2001.

22. Documents sufficient to show the extent to which NETGEAR, Inc. was a Nortel Affiliate or Nortel Subsidiary throughout the period from January 1, 1999 to December 31, 2001.