## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NORTEL NETWORKS, INC., *et al.*, | ) | Case No. 09-10138 (KG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Re: Dkt. No. 9362** |

## MEMORANDUM OPINION

The Court is ruling on the motion of the "Ad Hoc Committee of Canadian Employees Terminated Pre-Petition" (the "Canadian Employees") seeking leave to file proofs of claim after the expiration of the Bar Date (defined below)[1]. For the reasons set forth below, the Court will deny the Motion.

## JURISDICTION

The Court has jurisdiction over this matter and the judicial authority to issue a final order pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## BACKGROUND

Except as otherwise noted, the relevant facts are not the subject of genuine dispute. It is the emphasis on and interpretation of the facts and the application of the law that are disputed.  On January 14, 2009 (the "Petition Date"), Nortel Networks, Inc. and certain of its U.S.-based affiliates (collectively, the "U.S. Debtors") filed voluntary petitions for relief

---

[1]  See Motion of the Ad Hoc Committee of Canadian Employees terminated Pre-Petition for Entry of an Order Allowing Late Filed Claims, dated February 1, 2013, D.I. 9362 (the "Motion").

under chapter 11 of the Bankruptcy Code[2] (the "U.S. Proceedings"). Also on the Petition Date, certain of the U.S. Debtors' Canada-based affiliates (the "Canadian Debtors") initiated insolvency proceedings (the "Canadian Proceedings") in the Ontario Superior Court of Justice (the "Canadian Court") under Canada's Companies' Creditors Arrangement Act (the "CCAA"). As is required under the CCAA, at the outset of the Canadian Proceedings the Canadian Court appointed a monitor, Ernst & Young Inc. (the "Monitor").[3] The Canadian Court also appointed Canadian law firm Koskie Minsky, LLP ("Koskie Minsky") to represent the interests of approximately 20,000 former employees of the Canadian Debtors, including the Canadian Employees. Finally, on the Petition Date, certain of the U.S. Debtors' affiliates based in Europe, the Middle East, and Africa (the "EMEA Debtors," together with the U.S. Debtors and the Canadian Debtors, the "Nortel Debtors") initiated insolvency proceedings in the United Kingdom.

Prior to the Petition Date, the U.S. Debtors, along with the Canadian and EMEA Debtors, operated as an integrated, global networking solutions and telecommunications enterprise ("Nortel"). Nortel was headquartered in Canada but also had significant operations in the U.S., Europe, the Middle East, and Africa.

On August 4, 2009, the Court entered an order (the "Bar Date Order") establishing September 30, 2009 (the "Bar Date"), as the claims bar date in the U.S. Proceedings.  [D.I.

---

[2] 11 U.S.C. § 101 *et seq.*

[3] As is relevant here, the Monitor acts as a fiduciary to the Canadian estate in a role analogous to that of a trustee appointed pursuant to the Bankruptcy Code. Among other duties, the Monitor is responsible for communicating with creditors regarding the claims process. The Monitor maintains a website for purposes of information dissemination.

1280]. The U.S. Debtors subsequently served notice of the Bar Date on all known creditors in compliance with the Bar Date Order, ¶ 11. Further, the U.S. Debtors published notice of the Bar Date in *The Globe and Mail* and *The Wall Street Journal* (national and global editions) in compliance with the Bar Date Order, ¶ 15 (the "Published Notice"). The Published Notice was substantially in the form attached as Exhibit C to the Bar Date Order and, as is relevant here, contained the following language:

> Pursuant to the Bar Date Order, all persons and entities. . . who have a claim or a potential claim against the [U.S.] Debtors that arose prior to January 14, 2009, no matter who remote or contingent such right to payment or equitable remedy may be, MUST FILE A PROOF OF CLAIM so as to be actually received. . . on or before September 30, 2009. . . .
>
> \* \* \*
>
> NOTE: These procedures for filing claims apply only to claims against the Debtors in these chapter 11 cases. Several of the [U.S.] Debtors affiliates are subject to creditor protection proceedings in other jurisdictions, including Canada. Separate proceedings and deadlines have been or will be established in these other jurisdictions for the filing of claims. . . . If you believe you have claims against [the Canadian Debtors], any such claims shall be filed in, and only in, the Canadian proceedings with the court appointed Monitor.
>
> \* \* \*

[D.I. 1280-3]. The Bar Date Order further provided that the Published Notice "is hereby approved and shall be deemed good, adequate and sufficient publication notice of the [Bar Date]."[4]

On August 14, 2009, the Canadian Court entered an order pursuant to Section 18.6 of the CCAA recognizing the Bar Date Order (the "Recognition Order"). Various parties related to the Canadian Proceedings, including Koskie Minsky, received notice of the Recognition Order. Further, the Bar Date was well publicized in connection with the Canadian Proceedings, including in publicly filed documents, on the Monitor's website, in weekly news bulletins issued to former employees of the Canadian Debtors by Koskie Minsky, and through a LinkedIn group set up by former employees of the Canadian Debtors for purposes of information dissemination.

Soon after the Petition Date, the Nortel Debtors proceeded with an orderly and coordinated liquidation of Nortel assets. Of particular note, from 2009 to 2011, the Nortel Debtors executed a series of sales which both the Court and the Canadian Court approved in joint hearings. The sales have come to be known as the "Line of Business" and "Patent Portfolio" sales. The Line of Business and Patent Portfolio sales ultimately generated approximately $7.3 billion in net proceeds (the "Sale Proceeds").

---

[4] For reasons not relevant here, the Court entered a separate bar date order with respect to U.S. Debtor entity Nortel Networks (CALA), Inc. establishing a claims bar date of January 25, 2010 (the "NN CALA Bar Date"). [D.I. 2059]. The U.S. Debtors served and published notice of the NN CALA Bar Date in compliance with the Court's order. The fact that the NN CALA Bar Date was approximately four months later than the Bar Date is immaterial and any reference to the "Bar Date" in this memorandum shall encompass both the Bar Date and the NN CALA Bar Date.

In the years after the Nortel Debtors consummated the Line of Business and Patent Portfolio sales, representatives for the U.S., Canadian, and EMEA insolvency estates were unable to agree on how to allocate the Sale Proceeds between each estate (the "Allocation Dispute"). Over several years, the parties to the Allocation Dispute engaged in protracted settlement discussions, including three failed mediations, the most recent of which ended in late January 2013. The Court, jointly with the Canadian Court, conducted a multi-week trial regarding the Allocation Dispute in May and June of 2014 and took the matter under advisement. On May 13, 2015, the Canadian Court and the Court issued their rulings on the Allocation Dispute, both adopting a pro rata methodology. Consequently, the plan confirmation process in the U.S. Proceedings has yet to begin in earnest.

The Canadian Employees are a self-styled "Ad Hoc Committee" of approximately 170[5] former employees of the Canadian Debtors. Prior to the Petition Date, each of the Canadian Debtors terminated the employment of the Canadian Employees who received a termination letter (the "Termination Letters") which, as is relevant here, proposed a severance payment in return for releases benefitting the Nortel Entities (the "Releases"). "HR Shared Services," a Nortel entity based in North Carolina which handled certain human resources functions for all Nortel Entities prepared the Termination Letters. In order to receive the proposed severance payment, the terminated employee was required

---

[5] The U.S. Debtors stated in argument that the Canadian Employees number 156 while counsel to the Canadian Employees indicated that their number is 170. The difference is immaterial to the issue at hand.

to counter-sign the Termination Letter, thus agreeing to the Releases, and return it to HR

Shared Services.  The Termination Letters provided, in part, that:

> As used in this letter, the term "Corporation" shall mean
> Nortel Networks Corporation,[6] its subsidiaries and affiliates,
> their successors and assigns, and all of their past and present
> officers, directors, employees and agents (in their individual
> and representative capacities), in every case, individually and
> collectively.

*E.g.*, Exhibit 21. Finally, under the terms of the Termination Letters "the Corporation," as

defined above, "shall . . . pay" the severance payment proposed therein.

The Termination Letters were signed on behalf of Nortel by or "for" the terminated

employee's supervisor. Some of these supervisors were based in the U.S. or employed by

a U.S. Debtor entity. While certain of the Canadian Employees may have been employed

by a U.S. Debtor entity at some point prior to the Petition Date, they concede that at the

time of termination of their employment, the Canadian Employees were employed by

Canadian Debtor entities only. None of the Canadian Employees received actual notice

of the Bar Date,[7] nor did they timely file proofs of claim in the U.S. Proceedings.

In connection with the Canadian Proceedings, former employees of the Canadian

Debtors, including the Canadian Employees, were repeatedly advised by Koskie Minsky

not to file claims against the Canadian Debtors, but instead to wait for an employee-

---

[6] Nortel Networks Corporation is a Canadian corporation and the ultimate corporate parent of
Nortel entities spread across the globe, including the U.S. Debtors.

[7] The U.S. Debtors allege that as many as eight of the Canadian Employees received actual notice
of the Bar Date. For the reasons set forth below, whether or not the Canadian Employees received actual
notice of the Bar Date is irrelevant. Accordingly, for purposes of this memorandum, the Court presumes
that none of the Canadian Employees received actual notice of the Bar Date.

specific "process."[8] Under this process the Monitor collected various documents related to the former employees' claims, including, for example, the Termination Letters, and determined if each former employee held a claim against the Canadian Debtors. Only if the former employee disagreed with the Monitor's determination as to his or her claim was he or she required to file a proof of claim against the Canadian Debtors. This employee-specific claims process in the Canadian Proceedings played out well after the Bar Date, into late 2012.

According to the Canadian Employees, sometime in early 2012 the Monitor identified approximately 300 former employees of the Canadian Debtors, of which the Canadian Employees are a subset, who received Termination Letters and thus, in the Monitor's view, held a claim against the U.S. Debtors related to the severance payments proposed therein. Thereafter, in mid-2012, Koskie Minsky reached out to the U.S. Debtors in an effort to come to a tolling agreement with respect to the Canadian Employees' potential claims against the U.S. Debtors. The U.S. Debtors did not respond. Ultimately, the Canadian Employees retained U.S. counsel and, on February 1, 2013, filed a motion seeking leave to file proofs of claim after the expiration of the Bar Date (the "Motion") [D.I. 9362]. On February 12, 2013, the U.S. Debtors filed an objection to the Motion. Both the Canadian Employees and the U.S. Debtors subsequently filed briefs in support of

---

[8] The former employees of the Canadian Debtors were exempt from the general claims bar date applicable to the Canadian Proceedings.

their respective positions.[9] According to the Canadian Employees, their claims, if allowed in full, would total less than $18 million.  The parties, i.e., the U.S. Debtors and the Canadian Employees, agreed to continue the hearing on the dispute until the Court ultimately scheduled the hearing which it held on March 26, 2015 (the "Hearing").

At the Hearing three of the Canadian Employees testified. The Court further admitted several dozen documentary exhibits into evidence. In connection with the Motion, and prior to the Hearing, the U.S. Debtors attempted to take discovery from Koskie Minsky. According to the U.S. Debtors, Koskie Minsky refused to cooperate with such discovery.[10] The Canadian Employees did not seek to compel Koskie Minsky to cooperate with the U.S. Debtors' discovery requests or attend the Hearing, nor did Koskie Minsky attend the Hearing or participate in this matter except to audit the hearing by telephone. At the conclusion of the Hearing, the Court took the Motion under advisement.

The following evidence is uncontroverted.  The Canadian Employees:

1.  were based in Canada;[11]
2.  were paid in Canadian dollars;[12]

---

[9] Certain of the U.S. Debtors' creditor constituencies joined the U.S. Debtors' objection and subsequent supplemental brief. The creditors' arguments are essentially duplicative of the U.S. Debtors' arguments and so are not separately addressed below.

[10] Koskie Minsky, a Canadian law firm, is beyond the Court's jurisdiction for purposes of issuing a subpoena or compelling production in response to the U.S. Debtors' discovery requests.

[11] Blais Dep. 32:10-14; Buchanan Dep. 27:21-28:4; Law Dep. 18:7-9; Klein Dep. 136:24-25; Longchamps Dep. 23:16-18; Roddick Dep. 30:13-22; Trowbridge Dep. 17:8-11

[12] Klein Dep. 136:24-25; Law Dep. 99:13-15; Roddick Dep. 31:10-11; Ruprecht Dep. 31:2-5

3.  knew they were employed by a Canadian entity;[13]

4.  expected to receive severance from the same entity that paid their paycheck;[14]

5.  with one exception were never employed by a U.S. Debtor and never received a U.S. paycheck;[15]

6.  did not think that the Termination Letter meant a U.S. Nortel entity would pay their severance;[16]

7.  never thought until 2012 that they might have a claim against a U.S. Nortel entity;[17]

8.  were told by Koskie Minsky at least as early as July 22, 2009, and numerous times thereafter, that "A U.S. claims process has been released;"[18] and

9.  did not submit any evidence or testify that the Publication Notice was confusing in any way.

The testimony of the witnesses at the Hearing was consistent that they were aware in 2009 of the U.S. claims process but did not think they had a claim until 2012 when Koskie Minsky told them the possibility of a claim in the U.S. Proceedings existed.

The representative witnesses for the Canadian Employees were Ms. Paula Klein, Ms. Jennifer Longchamps and Mr. Michael A. Campbell.  They testified forthrightly and consistently about the key facts:

---

[13] Blais Dep. 33:23-25; Buchanan Dep. 26:19-23; Campbell Dep. 30:13-31:3; Longchamps Dep. 32:23-33:13

[14] Buchanan Dep. 35:22-36:6; Leung Dep. 66:3-7; Longchamps Dep. 111:9-21; Piggott Dep. 51:11-52:7; Ruprecht Dep. 43:2-11; Trowbridge Dep. 37:5-11

[15] Blais Dep. 24:23-25, 101:17-20; Buchanan Dep. 128:10-14; Campbell Dep. 31-25-32:4; Law Dep. 113:22-114:5; Longchamps Dep. 91:4-6; Piggott Dep. 35:11-14; 108:15-18; Roddick Dep. 70:15-22; Ruprecht Dep. 144:6-9; Trowbridge Dep. 78:21-79:3

[16] Blais, Dep. 36:2-6

[17] Trowbridge Dep., 97:14-25

[18] Klein Dep. 132:16-21, Exhibits 43, 44 & 45

1. At all times they were employed in Canada by Canadian Debtors.[19]

2. They knew in July 2009 about the claims process and Bar Date in the U.S. Proceedings.[20]

3. Their entitlement to severance and severance payments came from their Canadian employer.[21]

4. They reviewed their Termination Letter with attorneys, including Koskie Minsky.[22]

5. Until 2012, they did not think they had any rights from the U.S. Proceedings.[23]

6. Canadian Employees had full access to information from LinkedIn and the Canadian Monitor's website.[24]

7. They were surprised when in 2012 Koskie Minsky told them they should seek the right to file claims in the U.S. Proceeding.[25]  The Canadian Employees relied on their court-appointed lawyers, Koskie Minsky, to advise them on their rights.

8. It was clear in 2009 that in order to file a claim in the U.S. proceedings, Canadian Employees had to file a claim utilizing a Delaware lawyer.[26]

9. From the time the Canadian Employees were advised they may have a claim in the U.S. Proceedings and the time they sought relief was approximately six months.[27]

---

[19] Hearing Tr.; (Klein) 82:5-10, 85:7-11, 114:114-115:24; (Longchamps) 171:12-19; (Campbell) 233:1-15, 234:14-235:7.

[20] Hearing Tr., (Klein) 126:13-24; (Longchamps) 197:14-24; (Campbell) 221:8-20.  See also Trial Ex. 14.

[21] Hearing Tr., (Klein) 114:14-115:24.

[22] Hearing Tr., (Klein) 116:10-118:24; (Longchamps) 181:22-182:6.

[23] Hearing Tr., (Klein) 132:9-133:18; (Longchamps) 141:1-10; (Campbell) 225:6-226:8.

[24] Hearing Tr., (Klein) 112:1-20, 126:23-127:6; (Longchamps) 178:13-179:4; (Campbell) 241:3-10; Trial Exs. 5-13, 17, 22.

[25] Hearing Tr., (Klein) 133:14-20; 137:18-21; (Longchamps) 195:18-23.

[26] Hearing Tr., (Klein) 135:1-24; (Longchamps) Exhibit 13.

[27] Hearing Tr., (Campbell) 260:21-261:6.

The testimony of Ms. Klein, Ms. Longchamps and Mr. Campbell makes a number of salient facts abundantly clear.  First, the Canadian Employees (as they refer to themselves) were just that, Canadian not U.S. Employees.  They had the benefit of counsel, the august law firm, Koskie Minsky, appointed by the Canadian Court to represent the approximately 20,000 Canadian Employees.  The Canadian Employees knew about the U.S. claims proceedings and Bar Date by July 2009.  Their lawyers told them to do nothing until a sudden pronouncement in 2012 that they should file claims in the U.S. Proceedings.  Between July 2009 and 2012 nothing changed to cause the about face by Koskie Minsky and its advice to file claims in the U.S. proceedings.  The 2009 Termination Letters did not just appear, Koskie Minsky had reviewed them in 2009.  No ruling by either the U.S. Court or the Canadian Court put matters in a different light.  The Court can only speculate on the reason for Koskie Minsky's new stance.

## ANALYSIS

The Motion sets forth two bases on which the Court should grant the Canadian Employees leave to file proofs of claim after the Bar Date. First, the Canadian Employees argue that they did not receive proper notice, either actual or constructive, of the Bar Date and thus are not bound thereby under basic principles of due process. Second, the Canadian Employees argue that even if they did receive proper notice of the Bar Date, the Court should grant them leave to file proofs of claim after the Bar Date based on a theory of excusable neglect. For the reasons set forth below, the Court finds that the Canadian Employees received proper notice of the Bar Date and their failure to file proofs of claim prior to the Bar Bate was not the result of excusable neglect.

11

A.    <u>Notice</u>

The notice provisions of the Federal Rules of Bankruptcy Procedure strike a delicate balance between each potential claimant's due process rights and "one of the principal purposes of bankruptcy law, to secure within a limited period the prompt and effectual administration and settlement of the debtor's estate." *Chemetron Corp. v. Jones*, 72 F.3d 341, 346 (3d Cir. 1995) ("*Chemetron I*"). On the one hand, FED. R. BANKR. P. 3003(c)(3) empowers the Court to establish a claims bar date, thus setting an outside date by which creditors must file proofs of claim. *See id.*; *In re Smith & Co.*, 413 B.R. 161, 165 (Bankr. D. Del. 2009).[28] On the other hand, "[d]ue process requires notice [of the claims bar date] that is reasonably calculated to reach all interested parties, reasonably conveys all the required information, and permits a reasonable time for a response." *Chemetron I*, 72 F.3d at 346 (quotation omitted). A creditor who does not receive proper notice of the claims bar date is not bound thereby. *See City of New York v. New York, N.H. & H.R. Co.*, 344 U.S. 293, 296 (1953). For purposes of notice, bankruptcy law differentiates between "known" and "unknown" creditors. *Chemetron I*, 72 F.3d at 346. Known creditors are entitled to actual notice of the applicable claims bar date. *Id.* As for unknown creditors, notice by publication is generally sufficient. *Id.*

The law regarding whether a creditor is known or unknown is well settled and discussed at length by the United States Court of Appeals for the Third Circuit in

---

[28] In Chapter 11, only creditors holding claims which are not properly listed in the debtor's schedule of liabilities or which are scheduled as disputed, contingent, or unliquidated must file a proofs of claim prior to the claims bar date in order to preserve their claims. FED. R. BANKR. P. 3003(b)(1).

*Chemetron I.* A known creditor "is one whose identity is either known or 'reasonably ascertainable by the debtor.'" *Chemetron I,* 72 F.3d at 346 (quoting *Tulsa Prof'l Collection Serv., Inc. v. Pope,* 485 U.S. 478, 490 (1988)). An unknown creditor "is one whose 'interests are either conjectural or future or, although they could be discovered upon investigation, do not in due course of business come to knowledge [of the debtor].'" *Id.* (quoting *Mullane v. Central Hanover Bank & Trust, Co.,* 339 U.S. 306, 317 (1950)). The Third Circuit further explained the "reasonably ascertainable" standard as follows:

> A creditor's identity is "reasonably ascertainable" if that creditor can be identified through reasonably diligent efforts. . . . Reasonable diligence does not require impracticable and extended searches . . . in the name of due process. . . . A debtor does not have a duty to search out each conceivable or possible creditor and urge that person or entity to make a claim against it. . . . The requisite search instead focuses on the debtor's own books and records. Efforts beyond a careful examination of these documents are generally not required. . .

*Id.* at 346-47. (internal quotation marks and citations omitted). Ultimately, a debtor "need not be omnipotent or clairvoyant," *In re New Century TRS Holdings, Inc.,* 465 B.R. 38, 46 (Bankr. D. Del. 2012), or conduct "a vast, open-ended investigation," *Chemetron I,* 72 F.3d at 346. The focus is instead on whether the debtor did what was "reasonable under the circumstances to provide notice to ascertainable creditors." *New Century,* 465 B.R. at 46.

The Canadian Employees argue that they are creditors whose identities were reasonably ascertainable by the U.S. Debtors and were thus known creditors entitled to actual notice of the Bar Date. Since the U.S. Debtors did not provide actual notice of the Bar Date to the Canadian Employees, the Canadian Employees argue that they should not be bound by the Bar Date based on principles of due process. In short, to the extent

13

the Canadian Employees are creditors of the U.S. Debtors at all, a point which is far from undisputed, the Court is not convinced that they were creditors whose identities were reasonably ascertainable by the U.S. Debtors at the time the Court entered the Bar Date Order. The Canadian Employees represent approximately one-half of a group of 300 former employees of the Canadian Debtors who received Termination Letters pre-petition. There are approximately 20,000 former employees of the Canadian Debtors participating in the Canadian Proceedings. The Canadian Employees' only tie to the United States, which is tenuous at best, is that the Termination Letters were sent from the centralized human resources office for all Nortel Entities, based in the U.S.  An even weaker and more illusory connection to the United States is that some of the Canadian Employees had U.S.-based supervisors. Identifying a tiny subset of former employees of a foreign, non-debtor affiliate who received a certain form termination letter to which the U.S. Debtors were not a signatory goes well beyond the purview of a reasonably diligent search. Accordingly, the Court finds that the Canadian Employees were not known creditors and were not entitled to actual notice of the Bar Date.  There is no evidence that the U.S. Debtors knew about the self-serving language in the Termination Letters which includes reference to "its subsidiaries and affiliates."  Exhibit 21, *supra*.  More persuasive that the Canadian Employees were not known creditors entitled to actual notice is the fact that the Canadian Employees themselves did not "know" or consider themselves to be creditors of the U.S. Debtors.

The Canadian Employees further argue that even if they were not known creditors entitled to actual notice of the Bar Date, the U.S. Debtors nevertheless failed to provide

14

them with proper constructive notice of the Bar Date as unknown creditors.  It is well settled that constructive notice of the claims bar date by publication, while less direct than actual notice, generally satisfies the requirements of due process for unknown creditors. *Chemetron I*, 72 F.3d at 348; *New Century*, 465 B.R. at 48. The published notice must be "reasonably calculated, under the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Chemetron I*, 72 F.3d at 348 (citing *Mullane*, 339 U.S. at 314). "The proper inquiry in evaluating notice is whether a party acted reasonably in selecting means likely to inform persons affected, not whether each person actually received notice." *New Century*, 465 B.R. at 48-49.

The Canadian Employees' argument that the Published Notice was insufficient for purposes of constructive notice is based not on the means the U.S. Debtors selected to convey the Published Notice, but on their assertion that the wording of the Published Notice itself was confusing or misleading to those creditors holding claims against *both* the U.S. Debtors and Canadian Debtors. According to the Canadian Employees, when creditors holding claims against both the U.S. Debtors and Canadian Debtors read the phrase "[i]f you believe you have claims against [the Canadian Debtors], any such claims shall be filed in, and only in, the Canadian proceedings . . ." they were either confused as to whether to file a claim in the U.S. Proceedings or misled into believing that they were only allowed to file a claim in the Canadian Proceedings despite holding a claim against the U.S. Debtors as well. The Canadian Employees argue that such confusion was

reasonable given the complexity of the Published Notice and the Nortel insolvency proceedings generally. The Court rejects this argument for a number of reasons.

First, the Court is not convinced that a reasonable, objective reader would find the Published Notice to be confusing or misleading. The portion of the Published Notice cited by the Canadian Employees specifically references claims against the Canadian Debtors and states that "such claims" should be filed only in the Canadian Proceedings. That particular passage makes no reference to claims against the U.S. Debtors. In fact, the portions of the Published Notice not cited by the Canadian Employees speak at length about how to proceed with claims against the U.S. Debtors. Further, the Published Notice was vetted by the Court and ultimately approved by the Court as part of the Bar Date Order and thereafter given recognition by the Canadian Court. The Court is not persuaded that it is necessary to revisit the sufficiency of the Published Notice years later based on the subjective views of a relatively small number of potential claimants. Finally, it appears from the evidence presented at the Hearing, and discussed above, that many, if not most, of the Canadian Employees had actual knowledge of the Bar Date, which would suggest that the constructive notice procedures set forth in the Bar Date Order worked as intended. It is also highly significant that the Koskie Minsky firm represented the Canadian Employees and advised them of the U.S. Proceedings and Bar Date.

The Canadian Employees were unknown creditors. The Court is satisfied now, as it was when it entered the Bar Date Order more than five years ago, that the Published Notice satisfies the requirements of due process with respect to unknown creditors. The Canadian Employees had all the necessary information at their fingertips, *i.e.* the

Termination Letters, to determine if they held claims against the U.S. Debtors well prior to the Bar Date. The Canadian Employees also had thorough and regular discussions among themselves, including discussions about filing claims in the U.S. Proceedings. To the extent the Canadian Employees do in fact hold claims against the U.S. Debtors, they either did not realize they held such claims prior to the Bar Date for the same reason they were unknown creditors, or simply chose not to pursue those claims prior to the Bar Date. Accordingly, the Court rejects the Canadian Employees' notice-related arguments.

### B.      Excusable Neglect

"Bankruptcy Rule 9006(b)(1) empowers a bankruptcy court to permit a creditor to file a late claim if the movant's failure to comply with an earlier deadline 'was the result of excusable neglect.'" *Chemetron I*, 72 F.3d at 349. "The determination whether a party's neglect of a bar date is 'excusable' is essentially an equitable one, in which courts are to take into account all relevant circumstances surrounding a party's failure to file." *Id.* (citing *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)). Relevant circumstances, emphasized by the Supreme Court in *Pioneer*, include: "[1] the danger of prejudice to the debtor, [2] the length of the delay and its potential impact on judicial proceedings, [3] the reason for the delay, including whether it was within the reasonable control of the movant, and [4] whether the movant acted in good faith." *Pioneer*, 507 U.S. at 395. "The burden of proving excusable neglect lies with the late-claimant." *Jones v. Chemetron Corp.*, 212 F.3d 199, 205 (3d Cir. 2000) ("*Chemetron II*").

With respect to prejudice to the U.S. Debtors, the Canadian Employees correctly point out that the plan confirmation process has essentially yet to commence in the U.S.

17

Proceedings and the total potential, aggregate amount of their claims, $18 million, is small relative to the $7.3 billion Sale Proceeds. But courts consider a number of factors in connection with the *Pioneer* prejudice analysis including, as is relevant here, "whether allowing the claim would open the floodgates to other similar claims." *Manus Corp. v. NRG Energy, Inc. (In re O'Brien Envtl. Energy, Inc.*), 188 F.3d 116, 126 (3d Cir. 1999); *New Century*, 465 B.R. at 51; *In re U.S. Airways, Inc.*, No. 04-13819, 2005 WL 3676186, at *7-8 (Bankr. E.D. Va. Nov. 21, 2005).

The reasons the Canadian Employees offer for failing to timely file proofs of claim in the U.S. Proceedings are essentially that: (1) they were confused by the multi-jurisdictional nature of the Nortel insolvency proceedings; (2) the Published Notice was confusing or misleading, as discussed above; and (3) Koskie Minsky advised them repeatedly to wait for an employee-specific claims process. Further, the basis for the Canadian Employees' underlying alleged claims is the broad definition of the word "Corporation" in the Termination Letters, to which the U.S. Debtors were not signatories. Some or all of these circumstances could apply to a great number of other potential claimants, including many of the other 20,000 former employees of the Canadian Debtors. The Court is persuaded that the risk of opening the floodgates to similar claims is very real in this instance. Accordingly, the Court finds that the danger of significant prejudice to the U.S. Debtors weighs against granting the Motion.

As for the length of the delay and its potential impact on the U.S. Proceedings, the Canadian Employees assert that they only learned of their potential claims against the U.S. Debtors in mid-2012 and thereafter proceeded diligently first to attempt to reach a

consensual resolution with the U.S. Debtors and then to retain U.S. counsel to file the Motion. The Canadian Employees filed the Motion nearly three and one-half years after the Bar Date. Further, by their own admission, the Canadian Employees waited approximately six months to file the Motion after "discovering" their potential claims against the U.S. Debtors.  The six month delay in and of itself constitutes inexcusable neglect.

It is true that allowing the Canadian Employees to file untimely proofs of claim will not disrupt the U.S. Debtors' plan confirmation process, which has yet to begin. But, outside of the plan confirmation process, the U.S. Proceedings have advanced far in the years since the Bar Date. To effectively re-open the claims process in the U.S. Proceedings to any potential claimant who would state that they felt confused or misled by the Published Notice would do great violence to the U.S. Debtors' ability to efficiently bring the U.S. Proceedings to their end. Moreover, "although it is proper to consider the delay's effect on the judicial proceedings, *Pioneer* teaches that we should consider the length of the delay in absolute terms . . . ." *O'Brien*, 188 F.3d at 130. Therefore, the Court finds that the length of the delay weighs heavily against granting the Motion.

Regarding the Canadian Employees' asserted reasons for the delay, set forth above, first, the Court is not convinced that under the circumstances presented here, a reasonable, objective actor would fail to grasp that there is a separate U.S. insolvency proceeding and that there was a separate claims bar date applicable only to that proceeding. Further, while it appears to the Court that Koskie Minsky's instructions with respect to a separate employee-specific claims process were applicable only to the

19

Canadian Proceedings, to the extent Koskie Minsky acted negligently, that negligence is imputed on the Canadian Employees for purposes of the excusable neglect analysis. *See Pioneer*, 507 U.S. at 397 ("[T]he proper focus is upon whether the neglect of respondents *and their counsel* was excusable." (emphasis in original)).

The Canadian Employees had all the necessary information to discover any potential claims they had against the U.S. Debtors well before the Bar Date. They failed to act prior to the Bar Date. Simple "[i]gnorance of one's own claim does not constitute excusable neglect." *Chemetron II*, 212 F.3d at 205. The Court is not persuaded that any of the other justifications offered by the Canadian Employees for their untimely action support a finding of excusable neglect.  In 2009, the Canadian Employees and their lawyers had all of the facts needed to decide whether to file a claim in the U.S. Proceedings.  The filing of the Motion was a change of mind, not circumstances.  This is amply demonstrated by Koskie Minsky's answer in 2009 prior to the expiration of the Bar Date to the following question in a document disseminated to the Canadian Employees:

> Q.    Do I need to submit separate claims for my pension and retiree benefits (medical, LT care, life insurance, etc.)?  Also do I need to submit both in Canadian and US Courts?
>
> A.    It is likely that you will only have to submit one claim for the loss of all benefits earned as a result of employment in Canada.  You will need to urgently file a separate claim with the US Court for the loss of any benefits earned as a result of employment in the USA.

Exhibit 18 at page 16 (No. 102).

The analysis with respect to the first three *Pioneer* factors is sufficient alone to support the Court's denial of the Motion, thus making a full analysis of the Canadian

Employees' good faith unnecessary. The U.S. Debtors argue that the Canadian Employees and their U.S. counsel are merely pawns and that certain Canadian creditor constituencies engineered the filing of the Motion as a way to advance their arguments with respect to the Allocation Dispute. In support of their argument, the U.S. Debtors cite both the timing of the filing of the Motion, just days after the final failed Allocation Dispute mediation, and the failure of Koskie Minsky to cooperate with discovery or attend the Hearing. Koskie Minsky's failure to cooperate with discovery or participate in this matter in any meaningful way was certainly conspicuous.  But without evidence the Court cannot make any findings.  In any event, based on the first three *Pioneer* factors, the Court rejects the Canadian Employees' excusable neglect argument.

### C.    Evidentiary Matters

At the close of the Hearing, the U.S. Debtors sought to introduce deposition designations for party-witnesses who testified live at the Hearing (the "Deposition Designations") into the evidentiary record. The admissibility of the Deposition Designations was a matter of some dispute both at the Hearing and in letter briefs filed by the U.S. Debtors and Canadian Employees on the day after the Hearing.  The Court has determined to permit the designations pursuant to Fed. R. Civ. P. 32(a)(3).  *See, e.g., Fenstermacher v. Phila. Nat'l Bank*, 493 F.2d 333, 338 (3rd Cir. 1974); *Fey v. Walston & Co.*, 493 F.2d. 1036, 1046 (7th Cir. 1974).

The U.S. Debtors also requested that the Court draw an adverse inference against the Canadian Employees due to Koskie Minsky's refusal to cooperate with discovery in connection with the Motion or attend the Hearing. The Court has already commented

that Koskie Minsky's actions in connection with the Motion were troublesome because Koskie Minsky could have shed light on the issues. But since an adverse inference is not necessary to the U.S. Debtors' success in this matter, the Court declines to formally make such a finding.

## CONCLUSION

For the reasons set forth above, the Court finds that the Published Notice met the requirements of due process with respect to the Canadian Employees and their failure to timely file proofs of claim in the U.S. Proceedings was not the result of excusable neglect. Accordingly, the Court will deny the Motion. The Court will enter a separate order.

Dated: May 21, 2015

KEVIN GROSS, U.S.B.J.