# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------X
                                        :
In re                                   :      Chapter 11
                                        :
Nortel Networks Inc., et al.,¹          :      Case No. 09-10138 (KG)
                                        :
                         Debtors.       :      Jointly Administered
                                        :
                                        :      Re: D.I. 15544 and 15545
                                        :
                                        :      Hearing Date: June 30, 2015 at 10 a.m. (ET) (Or as
                                        :      otherwise ordered by the Court)
                                        :      Objection Deadline: June 15, 2015 at 4 p.m. (ET)
                                        :
-------------------------------------------------------X
```

## U.S. DEBTORS' MOTION FOR
## CLARIFICATION AND/OR RECONSIDERATION OF THE
## MAY 12, 2015 ALLOCATION TRIAL OPINION AND ORDER

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in

possession (collectively, the "U.S. Debtors"), hereby move this Court (the "Motion")² to clarify

and/or reconsider its May 12, 2015 Allocation Trial Opinion [D.I. 15544] (the "Allocation

Opinion" or "U.S. Allocation Opinion") and accompanying Order [D.I. 15545] (the "Allocation

Order").³

---

¹     In addition to Nortel Networks Inc. ("NNI"), the U.S. Debtors in the Chapter 11 cases are: Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc., and Nortel Networks (CALA) Inc. Additional information regarding the U.S. Debtors can be found in their respective Chapter 11 petitions, which are available at http://dm.epiq11.com/nortel.

²     The U.S. Debtors are filing a copy of this Motion in the Canadian Court pursuant to the "Notice" provision of the Cross Border Protocol [D.I. 990]. Given the provisions of the Cross Border Protocol, the subject matter of this Motion and the important interest of consistent rulings between this Court and the Canadian Court, a joint hearing is warranted.

³     All capitalized terms not otherwise defined herein shall have the meaning ascribed in the Allocation Opinion. For example, "Debtors" is defined in the U.S. Allocation Opinion as, collectively, the U.S. Debtors, the Canadian Debtors and the EMEA Debtors.

## PRELIMINARY STATEMENT

1.      By this Motion, the U.S. Debtors respectfully request that the Court reconsider certain specific aspects of its Allocation Opinion and clarify the manner in which the allocation is intended to occur.  In seeking this relief, the U.S. Debtors take heed of the Court's concluding statement that the time is here for the parties to "utilize the Courts' rulings to resolve any remaining differences," Allocation Op. at 113, and share the Court's interest in facilitating the expeditious distribution of the Debtors' assets to their respective creditors.  Indeed, it is these very concerns that motivate the Debtors, immediately after issuance of the Allocation Opinion, to seek this relief in the hope of avoiding further prolonged litigation.

2.      The U.S. Debtors are undeniably disappointed that while the Allocation Opinion adopts most (if not all) of the U.S. Debtors' pivotal factual assertions,[4] it embraces an allocation methodology that is far different from that proposed by the U.S. Debtors and likely leaves its general unsecured creditors with the lowest recoveries from Sales Proceeds held in escrow (the "Lockbox") – both in terms of total dollars allocated and as a percentage of allowed creditor claims – of all three of the Debtor groups.  Nevertheless, while the U.S. Debtors do not agree with the legal basis and supposedly equitable nature of a pro rata allocation approach in lieu of an economic valuation consistent with ownership interests, the U.S. Debtors do not seek to rehash these larger issues through this Motion.  Rather, the U.S. Debtors come to this Court seeking clarification and/or reconsideration of a few particular rulings, including ambiguities within the Allocation Opinion and inconsistencies with the May 12, 2015 Reasons for Judgment of the Ontario Superior Court of Justice (the "Canadian Court," and such Judgment, the "Canadian Allocation Opinion") [*Nortel Networks Corporation (Re)*, 2015 ONSC 2987] that have the individual and collective effect of disproportionately and significantly driving down

---

[4]       The Canadian Allocation Opinion differs from the Allocation Opinion in not making the same findings.

creditor Lockbox recoveries in the U.S. Debtors' estates as compared to similarly situated creditors of the Canadian and EMEA Debtors, particularly in the context of a pro rata allocation framework. Recognizing the Court's goal of developing a fair and equitable mechanism in a "middle ground" between the Parties' allocation positions, the U.S. Debtors are concerned that the complexities of the Debtors' corporate relationships and the nature of their overlapping and intercompany claims obscured the real economic impact of various aspects of the modified pro rata approach crafted by the Court, which results in an allocation of Sales Proceeds to the U.S. Debtors well below either (a) a proportionate or equitable allocation and (b) an allocation to the U.S. Debtors advocated by any other Debtor estate.

3. Specifically, if one were to implement the Court's pro rata allocation method using the assumptions upon which the CCC's expert, Thomas Britven, relied at trial (with a few discrete adjustments to reflect certain subsequent cash and claims changes in the Debtors' cases), the Lockbox proceeds allocated to the Canadian Debtors would put 47 cents on the dollar in their unsecured creditors' pockets and provide 48 cents to creditors of the EMEA Debtors, whereas the allocation to the U.S. Debtors (only 11% of the total Lockbox proceeds or approximately $813 million out of $7.3 billion) would translate to 14 cents on the dollar paid to U.S. unsecured creditors from direct Lockbox distributions to the U.S. Debtors.[5] The disparities between U.S. creditors and similarly situated creditors in the other estates is primarily driven by the exclusion from the U.S. Debtors' allocation claims base of claims made by holders of bonds issued by

---

[5] Sales Proceeds available to creditors of the U.S. Debtors based on distributions on the allowed $2 billion NNI-NNL Claim would add an additional 17 cents to U.S. unsecured creditor recoveries, still leaving the U.S. Debtors' unsecured creditors with a far lower share of Lockbox proceeds than similar creditors of the other Debtors. The U.S. Debtors offer these recovery percentages, which are based on Mr. Britven's model (with certain adjustments), solely by way of example to demonstrate the directional and proportional effect of the Court's ruling on Sales Proceeds allocation among the Debtors and on creditor recoveries, noting that ultimate recoveries remain subject to the final determination of each Debtor's claims base and other contingencies. Moreover, the Britven model includes various simplifying assumptions that the U.S. Debtors do not hereby adopt or certify in any way. We also note that in the case of Canadian pensioners, for example, Mr. Britven's model only takes into account an estimate of the Canadian pension shortfall and does not provide any information on the aggregate recovery of Canadian pensioners based upon the funding status of the Canadian pension as of the Petition Date.

NNC and/or NNL but guaranteed by NNI (the "Guaranteed Bondholders"), even though those claims have been allowed against the U.S. Debtors in their full aggregate $3.93 billion amount. Unless addressed at this time, these issues seriously threaten the Court's stated goal in the Allocation Opinion of achieving a prompt, equitable resolution without further hardship or depletion of the remaining estates. *See* Allocation Op. at 111-13.[6]

4.      In order to avoid these inequitable results, while honoring the spirit underlying the Court's ruling, the two issues upon which the U.S. Debtors seek reconsideration are as follows:

- **Impact of Exclusion of Guaranteed Bondholders' Claims in the Allocation Formula.** The Court's decision that the previously allowed claims of Guaranteed Bondholders against NNI must be excluded from the allocation claims base has the effect of severely depressing the amount of Lockbox proceeds available for distribution to general unsecured creditors holding claims solely against the U.S. Debtors ("U.S.-Only Unsecured Creditors") relative to the Lockbox allocations being made available for creditors holding claims solely against either the Canadian and EMEA Debtors;[7] and

- **NGS/Diamondware Allocation.** The Court's decision not to allocate to the U.S. Debtors any of the Lockbox proceeds attributable to the sale of NGS and Diamondware (hereinafter defined), even though (i) each of these was a non-integrated, non-debtor entity, the equity of which was sold by NNI as part of the Enterprise sale; (ii) in 2009, this Court entered an order granting to the PBGC a lien on that portion of the Enterprise proceeds attributable to the equity of each of NGS and Diamondware, and (iii) the Canadian Debtors' own expert acknowledged the U.S. Debtors' entitlement to the full proceeds of such sales in his allocation calculation. Other Debtors have sold material subsidiaries for substantial sums,[8] but the retention by those Debtors of the proceeds from such sales is not compromised by the Court's pro rata allocation ruling.

Additionally, the U.S. Debtors seek clarification on the following issues:

- **Inclusion of U.S. Settlements in U.S. Claims Base.** That the U.S Debtors' claim settlements with the EMEA Debtors, the U.K. Pension Claimants, U.S. retirees,

---

[6]      *See also* Can. Allocation Op. ¶¶ 200-01 (seeking to avoid outcome that would unjustly enrich the U.S. and Canadian Debtors), 254-55 (requesting briefing on interim distributions to avoid hardship to creditors).

[7]      The U.S.-Only Unsecured Creditors are comprised of trade creditors, disabled former employees, retirees and other former employees, among others.

[8]      These include, for example, the proceeds from NNL's interests in LG, which were sold for $242 million; NNL's interests in GDNT, which were sold by NNL and its partners for $50.4 million; and the proceeds from the sale of Netas, an EMEA non-debtor subsidiary, that yielded $83.7 million.

U.S. disabled former employees, the Internal Revenue Service ("IRS"), the Canadian Debtors (under the IFSA and FCFSA), as well as other claims settled, all of which were approved by this Court and paid by the U.S. Debtors, are included in the Court's reference to "settlements" that are to be incorporated in the allocation measurement so as to not unfairly penalize the U.S. Debtors for proactively resolving and paying such settlements;

- **Impact of Intercompany Claims Within Debtor Groups.** That the Court's reference to intercompany claims being included for purposes of calculating each Debtors' claim base when determining their allocation refers to intercompany claims between Debtor groups, not within them, since the inclusion of any intra-group claims (i.e., Canadian Debtor claims against other Canadian Debtors, EMEA Debtor claims against other EMEA Debtors, and U.S. Debtor claims against other U.S. Debtors) would artificially inflate an estate's allocation claims base;

- **Individual Debtor Allocation.** That allocation will be determined on an individual Debtor basis (not by Debtor groups) based on each Debtor's own claims base so as to ensure that monies allocated to a Debtor from the Lockbox will be paid to the creditors whose claims formed the basis of such allocation and not diverted to creditors of other Debtors within the same Debtor group in contravention of the Court's rationale for pro rata distribution of Sales Proceeds;

- **Oversight of U.K. Pension Claim Reconciliation for Allocation Purposes.** That this Court will confirm that it will oversee the measurement of the amount of large disputed claims of all Debtors, particularly that of the U.K. Pension Claimants and other claims filed against the EMEA Debtors, and adopt prompt procedures detailing such oversight for purposes of determining how much of the Lockbox should be allocated on account of such claims; and

- **Inclusion of Reserve for Certain Claims.** That this Court also will permit the U.S. Debtors to receive a Lockbox allocation in respect of reserved and estimated amounts of claims that arise solely as a result, and therefore subsequent to, an actual allocation of the Sales Proceeds. These claims particularly include claims for taxes, specifically U.S. federal and state taxes, that may arise against the Debtors based on the actual allocation and release of Lockbox proceeds to the U.S. Debtors (i.e., these claims have not, and cannot, be made at this time, but will arise only after receipt by the U.S. Debtors of their share of the Lockbox proceeds).

5.      While the U.S. Debtors have identified various other aspects of the Court's decision that could be subject to further argument or appellate review, the foregoing reconsideration issues have been identified because of their potentially serious detrimental effects on the U.S. Debtors even within the context of a pro rata approach. In the same vein, the

points of clarification are raised to avoid other inconsistent rulings or room for evasion of the Court's intended goals in rendering its decision.

6.     In settling upon a "modified pro rata" allocation that purported to recognize the estates' previous settlements, intercompany claims and guarantees, Allocation Op. at 93, 102,[9] the Court did not have the benefit of briefing by the parties or expert analysis to confirm the critical assumptions underlying the Court's decision, including the various modifications incorporated therein. Therefore, to place this Motion in context, the U.S. Debtors believe it appropriate to remind the Court of the representations made by pro rata proponents with respect to the effect of the various allocation positions on the availability of Lockbox proceeds available for each Debtors' local creditors, and to provide the U.S. Debtors' best estimates of the effects of the Allocation Opinion so that the Court can ascertain whether or not they were intended when it fashioned its allocation.

7.     For starters, all three Debtor groups – the U.S. Debtors, the Canadian Debtors and the EMEA Debtors – advocated for allocations that the CCC's expert, Mr. Britven, represented would yield 100% recoveries to the U.S.-Only Unsecured Creditors. (Additionally, the CCC advocated as its primary theory an allocation to the U.S. Debtors that it claimed would pay U.S.-Only Unsecured Creditors 95% on their claims.) The U.S. and EMEA Debtors vigorously objected to Britven's analysis and particularly his chart because it had numerous uncertainties, inaccuracies and unproven assumptions; no contrary information was offered by the U.S. or EMEA Debtors because the Allocation Protocol provided that the trial would be about allocation of the Lockbox proceeds and not about claims.[10] Britven's chart, referenced throughout the trial

---

[9]     *See also* Can. Allocation Op. ¶¶ 248-51.

[10]    TR50102 (D.I. 10565-1, Allocation Protocol) at 1 ("[C]reditor claims, including but not limited to intercompany claims . . . are not governed by this Allocation Protocol.").

by the CCC, including at opening statements and closing arguments, during testimony and in the briefing, provided as follows:

| Party Receiving Allocation | Allocation Proposal | | | |
|---|---|---|---|---|
| | Monitor and Canadian Debtors | CCC Primary Theory | U.S. Debtors | EMEA Debtors |
| Guaranteed Bondholders | 100% | 100% | 100% | 100% |
| U.S. creditors | 100% | 95% | 100% | 100% |
| Canadian creditors | 61% (plus up to $111 million from cash in NNI) | 59% | 11% (plus up to $1.034 billion from cash in NNI) | 11-25% (plus up to $248-536 million from cash in NNI) |
| EMEA creditors | 19% | 27% | 48% | 50-77% |
| U.K. Pension Claimants | 37% | 44% | 51% | 58-79% |

*See, e.g.*, DEM00016 (Britven Demonstratives) at 9; CCC Post-Trial Br., Aug. 25, 2014 [D.I. 14259] at 7.[11]

8. According to Britven, these recoveries flowed from the respective allocations requested by the estates in the ranges of 14%-73% for the U.S. Debtors, 11%-83% for the Canadian Debtors and 3%-18% for the EMEA Debtors, according to the chart included at page 92 of the Allocation Opinion (derived from the U.K. Pension Claimants' brief, consistent with the EMEA Debtors' demonstrative chart and not contested by any party at trial):

---

[11] Britven testified at trial that "setting aside the two columns for pro rata on the far right [which have thus been excluded herein], it is pretty obvious that the Guaranteed Bondholders and the U.S. creditors basically receive 100 cents on the dollar, regardless of the allocation methodology." Trial Tr. 3374:13-17. While still preserving their criticisms of Mr. Britven's methodologies and assumptions, the U.S. Debtors cite to Mr. Britven's analysis since his calculation of creditor recoveries was the only one presented to the Court.



9.    The Court criticized each of these allocation positions as "extreme" and "irrational[]" in light of the amount each Debtor group sought for itself, Allocation Op. at 92, for example describing the Canadian Debtors' requested allocation as "nothing short of narcissistic" in its "failure to recognize the contributions of the other Nortel companies and the realities of the manner in which the Nortel enterprise operated on a day-to-day basis." *Id.* at 62.[12]

10.    In crafting what it presumably believed was a middle ground, the Court was guided by "the undeniable fact that NNI generated the lion's share of enterprise-wide revenues" and that "NNI is entitled to a greater share of the Sales Proceeds."  Allocation Op. at 63.  In light of the U.S. Debtors' objections to a pro rata allocation, the Court expressed its belief and intention that its modifications would ensure the U.S. Debtors a "greater share of the Sales Proceeds" because, *inter alia*, that share was "already baked into the case by virtue of the [FCFSA] inter-company claim."  *Id.*

---

[12]    *See also* the Can. Allocation Op. ¶¶ 256 (the Debtors' proposals "varied dramatically from party to party"), 197-200 (concluding Canadian Debtors' proposal would unjustly enrich them).

11. Unfortunately, the modified pro rata methodology created by the Court has the opposite impact. While the Canadian Debtors proposed a very limited allocation of 14% of the Lockbox proceeds to the U.S. Debtors that the Court considered to be "nothing short of narcissistic," the Allocation Order will provide as little as 11% of the Lockbox proceeds to the U.S. Debtors using Britven's own data. *See infra*, Ex. A at A-2.

12. As a result of this smaller allocation to the U.S. Debtors, smaller even than the Canadian Debtors proposed, as well as certain flaws in the methodology itself, in contrast to the full recovery the CCC's own analysis predicted for the U.S.-Only Unsecured Creditors, and contrary to the recoveries posited under any of the allocation methodologies proposed by any Debtor group, the Court's alternate chosen methodology dramatically reduces U.S. creditor recoveries – and particularly recoveries based on the receipt of Lockbox proceeds – to a fraction of the amounts advocated by even the Canadian Debtors and the CCC. By contrast, the biggest beneficiaries of the Court's decision – the EMEA Debtors (and thus the U.K. Pension Claimants) – are likely to receive Lockbox proceeds significantly in excess of not only the allocations proposed by the U.S. Debtors and the Canadian Debtors, but by the EMEA Debtors themselves. Given the findings of fact and rationales repeatedly expressed by the Court, the U.S. Debtors are concerned that the facially inequitable consequences of the Court's ruling that inure to the detriment of the U.S. Debtors and their unsecured creditors were unforeseen.

13. While there are obviously uncertainties in both the assets of and claims against each estate, the U.S. Debtors calculate (again using Britven's model for the sake of consistency) that the modified pro rata allocation adopted by the Court – when combined with existing cash and factoring in the U.S. Debtors' $2 billion claim against the Canadian Debtors, both of which were intended to yield U.S. creditors larger relative recoveries according to the Allocation Opinion – will yield total creditor recoveries of approximately 40% for U.S. Unsecured

Creditors, 49% for Canadian unsecured creditors, 65% for EMEA unsecured creditors and 89% for the Guaranteed Bondholders.[13] (As was pointed out at closing arguments specifically in response to questions posed by the U.S. Court, the 49% recovery for certain Canadian creditors is a percentage of their *deficiency* claims; for example, many Canadian retirees are already receiving in excess of 70% of their pension claims as a result of, *inter alia*, funds within their pension plans or governmental support.)

14. However, these projected relative recoveries include more than just the results of the Sales Proceeds allocation and therefore tell only part of the story. It is clear from the Court's Allocation Opinion – and the care the Court took to exclude existing cash from the pro rata methodology and maintain the U.S. Debtors' allowed claim against the Canadian Debtors – that the modified pro rata methodology is intended to divide the *Lockbox* proceeds pro rata for ultimate distribution to creditors, rather than ensure that the total distributions to creditors (including other assets held by each estate) are made pro rata. Whether a particular creditor ultimately receives a greater recovery depends on factors unique to each Debtor estate, such as a Debtor's pre-existing cash and other local assets, allowed inter-company claims and distributions on guarantees, as well as other local law priorities and requirements. The Court's pro rata method only applies to the division of the Lockbox, nothing more or less. As a result, it would

---

[13] As noted in Exhibit A, the U.S. Debtors base these recoveries on the modeling espoused by Britven at trial, with limited adjustments to account for certain subsequent developments. While Britven's purported analysis ignored significant uncertainties and made unsupported assumptions, and thus his numbers themselves were necessarily unreliable, the U.S. Debtors' application of his modeling in Exhibit A nevertheless reliably shows the *directional and proportional impact* of the Allocation Opinion compared to Britven's forecast presented to the Court.

The U.S. Debtors' calculations of relative creditor recoveries assume that, notwithstanding the holding in the Allocation Opinion that the Guaranteed Bondholders will be entitled only to a deficiency claim against NNI, the Guaranteed Bondholders will ultimately prevail (either before this Court on reconsideration or on appeal) in their demand for a right to pursue the full claim already allowed by the Court based on the Supreme Court's holding in *Ivanhoe Building & Loan Association of Newark, New Jersey v. Orr*. 295 U.S. 243 (1935). Should the Guaranteed Bondholders ultimately fail in their efforts to have the full amount of their allowed claim respected, the projected creditor recoveries, including cash on hand, would be approximately 62% for U.S.-Only Unsecured Creditors, 49% for Canadian unsecured creditors, 65% for EMEA unsecured creditors and 81% for the Guaranteed Bondholders. *See infra*, Ex. A.

seem that the Courts did not intend that the modified pro rata allocation penalize Debtor groups based on their relative cash or other assets by counting them against their respective allocations. In addition, it would not be consistent with the Courts' approach if unsecured creditors of the Canadian Debtors are protected from dilution from intercompany and guarantee claims while U.S.-Only Unsecured Creditors are negatively impacted by dilution from these additional claims.

15.     The requested modifications and clarifications are required for the U.S. Debtors because, as drafted, neither the Allocation Opinion nor the Canadian Allocation Opinion even approaches its intended result: an equitable, pro rata allocation of the *Sales Proceeds* based on allowed creditor claims. To the contrary, using Britven's methodology solely for modeling purposes, the average U.S. unsecured creditor will receive a distribution amounting to 14% of its claim on account of the Sales Proceeds, the average Canadian unsecured creditor will receive a distribution amounting to 47% of its claim (or, in most circumstances, deficiency claims after payments from other sources) on account of the Sales Proceeds, and the average EMEA unsecured creditor will receive a distribution amounting to 48% of its claim on account of the Sales Proceeds.[14] As the Court intended, all creditors would ultimately receive additional recoveries because each Debtor group has cash on hand and some have additional assets (such as the IP addresses that may be sold by the Canadian Debtors for which the Canadian Debtors claim sole ownership), differentiating factors that the Court expressly intended to preserve. However,

---

[14]     To be clear, the U.S. unsecured creditors also will receive another approximately 17% indirectly on account of distributions received by the U.S. Debtors on NNI's allowed claim against NNL, but the Court expressly intended that recovery to be supplemental funds available to the U.S. Debtors and their creditors. *See* Allocation Op. at 63; Ex. A (the additional 17% assumes a 47% recovery on NNI's $2.0 billion claim, equal to $940 million, which is then divided among the U.S. unsecured claims base of $5.695 billion). The inter-company claim is otherwise rendered meaningless if it is included among the pro rata calculation, which the Court expressly stated it was not doing.

As before, these calculations assume correction (by this Court or on appeal) of the portion of the Allocation Opinion that is inconsistent with *Ivanhoe* and reduces the Guaranteed Bondholders' allowed claim. Were that not to occur, the approximate calculations of direct distributions on account of the Lockbox proceeds would be 22% for U.S.-Only Unsecured Creditors, 47% for Canadian unsecured creditors and 48% for EMEA unsecured creditors.

the above percentages demonstrate the dramatic consequences of exclusion of the allowed Guaranteed Bondholder guaranty claims from the U.S. allocation on Lockbox proceeds available to the U.S.-Only Unsecured Creditors, given that the U.S. Debtors have a legal obligation to make distributions on such allowed bondholder guaranty claims of $3.93 billion up to the amount of any deficiency.

16.     Reading the Allocation Opinion and its rationale, the U.S. Debtors do not believe that the Court intended such an extreme detrimental and disparate impact on the U.S.-Only Unsecured Creditors with respect to their right to receive an equitable share of the Lockbox proceeds.  Therefore, this Motion respectfully requests clarification and/or reconsideration of a few specific issues where the U.S. Debtors believe the Court's ruling either lacks clarity or is inconsistent with the Court's stated objective and was potentially rendered without recognition of the presumably unintended consequences of such ruling.  This Motion is intended to clarify that the Lockbox allocation effectuates the Court's intention of treating creditors and claims in all the estates equitably and ratably for purposes of dividing the Sales Proceeds, while preserving the U.S. Debtors' $2.06 billion inter-company claim and estate cash and recognizing the Guaranteed Bondholders' guarantees.

17.     Such corrections and clarifications would still leave U.S. creditor recoveries far below the amounts that would logically follow from the Court's finding that the "MRDA grants the Licensed Participants all valuable rights to and beneficial ownership in NN Technology in their respective territories."  Allocation Op. at 75.  The U.S. Debtors continue to firmly believe that the U.S. Debtors' ownership rights in the assets sold entitle them to Lockbox proceeds well in excess of the amount that would be awarded under any pro rata approach.  That said, the U.S. Debtors recognize and share in the interest in bringing these cases to conclusion and to getting

money into creditors' hands and hope that reconsideration and clarification will achieve this result.

## JURISDICTION

18.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

19.     The statutory bases for the relief requested herein are Section 105(a) of chapter 11 of title 11 of the United States Code and Rules 59(e) and 60 of the Federal Rules of Civil Procedure, which are made applicable to these proceedings through Rules 9023 and 9024, respectively, of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  As noted in the companion request to the Canadian Court, that Court has broad judicial power and discretion to alter a judgment before it is entered.  *Griffin v. Dell Canada Inc.*, [2009], O.J. No. 1592 (Can. Ont. S.C.J.), *aff'd* 80 C.P.C. (6th) 154 (Can Ont. C.A.), *lv. to appeal refused* [2010] S.C.C.A. No. 75 (Can. S.C.C.).  This judicial power and discretion has deep historical roots and permits a judge to change his opinion to better serve the ends of justice.  *Montague v. Bank of Nova Scotia* (2004) 69 O.R. (3d) 87 (Can. Ont. C.A.).

## PROCEDURAL HISTORY

20.     On May 13, 2013 and May 17, 2013, respectively, the Canadian Court and this Court entered orders approving an allocation protocol (the "Allocation Protocol"), which established procedures for the resolution of the parties' dispute regarding the allocation of the Sales Proceeds in a joint trial held by both Courts.  *See* TR50025 (Canadian Order Entering Allocation Protocol); TR50102 (D.I. 10565, Order Entering Allocation Protocol).  The joint trial was held between May 12, 2014 and June 24, 2014, and closing arguments were held between September 22, 2014 and September 24, 2014.

21.     On May 12, 2015, the U.S. Court issued the Allocation Opinion and accompanying Allocation Order [D.I.s 15544 and 15545], and the Canadian Court issued the Canadian Allocation Opinion [*Nortel Networks Corporation (Re)*, 2015 ONSC 2987].

## ARGUMENT

22.     By this Motion, the U.S. Debtors seek the Court's reconsideration and/or clarification of certain discrete aspects of its Allocation Opinion.[15]  Motions for reconsideration and clarification are permitted under Rules 59(e) and 60 of the Federal Rules of Civil Procedure, which apply to these proceedings through Bankruptcy Rules 9023 and 9024, respectively.  Rule 59(e) authorizes "[a] motion to alter or amend a judgment" after its entry.  Similarly, Rule 60 authorizes a court to "correct a . . . mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record," Fed. R. Civ. P. 60, and further "allows courts to grant relief from a final order for, among other reasons, 'mistake, inadvertence, surprise, or excusable neglect' and 'any other reason that justifies relief.'"  *Claybrook v. AutoZone Tex., L.P. (In re Am. Remanufacturers, Inc.)*, 439 B.R. 633, 636 (Bankr. D. Del. 2010) (quoting Rule 60).

23.     A court may need to reconsider an opinion or order because of "the need to correct a clear error of law or fact or to prevent manifest injustice," among other reasons.  *Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). Reconsideration may be appropriate "where it appears [a court] has overlooked or misapprehended some factual matter that might reasonably have altered the result reached by the Court," *Official Comm. of Unsecured Creditors v. Catholic Diocese of Wilmington, Inc. (In re*

---

[15]     Since the U.S. Debtors will need to weigh the impact of whatever relief this Court and the Canadian Court grant, the U.S. Debtors reserve all rights to seek relief on these and any other aspects of the Allocation Opinion or the Canadian Allocation Opinion, including by appeal.  The filing of this motion tolls the time to file an appeal, which begins to run at the entry of an order disposing of the motion. Fed. R. Bankr. P. 8002(b).  It is the U.S. Debtors' goal, however, to bring about a swift and final resolution to this dispute, confirmation of plans of reorganization and distribution of their assets to creditors.

*Catholic Diocese of Wilmington)*, 437 B.R. 488, 490 (Bankr. D. Del. 2010) (internal citations omitted), or where a court "has made a decision outside of the adversarial issues presented by the parties." *Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of Del., Inc. ex rel. Hechinger Inv. Co. of Del., Inc. v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co. of Del.)*, 303 B.R. 18, 23 (D. Del. 2003) (internal citations omitted).

24.     As an alternative where reconsideration of an order is not required, a court's order may be clarified to effectuate its intent. Accordingly, if a party believes that the court's intent is unclear under the terms of an order, a court may issue an order that clarifies the earlier order. *See, e.g.*, *Accenture Global Servs., GmbH v. Guideware Software, Inc.*, 800 F. Supp. 2d 613, 623 (D. Del. 2011) (granting motion for clarification and clarifying order); *Morningred v. Delta Family-Care & Survivorship Plan*, 790 F. Supp. 2d 177, 190 (D. Del. 2011) (same); *Midway Games, Inc. v. Anonuevo (In re Midway Games, Inc.*), Bankruptcy No. 09-10465(KG), 2010 WL 2076955, at *1 (Bankr. D. Del. May 20, 2010) (Gross, J.) (clarifying and correcting order pursuant to plaintiffs' request under Rule 60 because the court's opinion was "not consistent with the record").[16]

## I.     The U.S. Debtors' Reconsideration Requests

25.     The U.S. Debtors seek reconsideration of two discrete aspects of the Allocation Opinion and Order to conform them to the Court's stated intention to provide a "fair and equitable" allocation through a "modified pro rata" approach, Allocation Op. at 91, and to avoid any Debtor from receiving "a disproportionate share" of the Sales Proceeds, *id.* at 98.

---

[16] Likewise, in Canada, the Court has broad discretion to reconsider a decision before an order is issued and entered. *Griffin v. Dell Canada Inc.*, [2009], O.J. No. 1592 (Can. Ont. S.C.J.), *aff'd* 80 C.P.C. (6th) 154 (Can Ont. C.A.), lv. to appeal refused [2010] S.C.C.A. No. 75 (Can. S.C.C.). This broad judicial power and discretion has deep historical roots and permits a judge to change his opinion to better serve the ends of justice. *Montague v. Bank of Nova Scotia* (2004), 69 O.R. (3d) 87 (Can. Ont. C.A.).

**A. NNI's Obligation to Pay the Guaranteed Bondholders' Claims Without a Corresponding Allocation of Funds Inequitably Dilutes the Recoveries of the U.S. Debtors' U.S.-Only Unsecured Creditors**

26.     The U.S. Debtors respectfully request that the Court reconsider its ruling that the Guaranteed Bondholders' guaranty claims against the U.S. Debtors be excluded from the measurement of claims against the U.S. Debtors for purposes of determining the proportional allocation of proceeds to each Debtor.  Such ruling has the effect of allocating a disproportionately and inequitably low amount of proceeds to the U.S. Debtors for distribution to their unsecured creditors compared to the creditors of the other Debtor estates.  It is indisputable that under United States Supreme Court precedent the Guaranteed Bondholders have valid contractual claims that enable them to claim equally against both the Canadian Debtors and NNI. NNI is not merely a secondary guarantor of deficiency amounts unpaid by the Canadian Debtors; rather, the Guaranteed Bondholders have the contractual right to collect entirely and primarily against either the Canadian Debtors or the U.S. Debtors.  Consistent with this obligation, on December 18, 2014, this Court entered an order allowing the claims of the Guaranteed Bondholders for principal and accrued prepetition interest in the amount of approximately $3.93 billion as part of the settlement of various claims between NNI and the Guaranteed Bondholders.[17]

27.     The Allocation Opinion accounts for the Guaranteed Bondholders' claim against the U.S. Debtors by permitting the Guaranteed Bondholders to "seek distribution from [NNI] of any deficiency resulting from the allocation" following payments by the Canadian Debtors.  *See* Allocation Op. at 112; *see also* Can. Allocation Op. ¶ 251.  In *Ivanhoe Building & Loan Association of Newark v. Orr*, 295 U.S. 243 (1935), the Supreme Court held that in bankruptcy,

---

[17]     *See* Op. Regarding Debtors' Mot. Pursuant to Bankruptcy Rule 9019 Approving Settlement Agreement by and Among NNI, the Supporting Bondholders, and the Bank of New York Mellon with Respect to the NNI Post-Petition Interest Dispute and Related Issues, Dec. 18, 2014 [D.I. 14949] (the "Bondholder Allowance Order"), and accompanying Order [D.I. 14950].

until its claim is paid in full, a creditor is permitted to file a proof of claim against a debtor for the full amount of indebtedness, irrespective of partial satisfaction of the claim from other sources. 295 U.S. at 245-46. Here, the Guaranteed Bondholders hold allowed general unsecured claims against NNI in the aggregate amount of $3,934,521,442.00. Bondholder Allowance Order at 11. *Ivanhoe* directs that the Guaranteed Bondholders can assert these claims in full against NNI until they receive distributions from the Canadian Debtors and NNI for the full amount of their claims.[18]

28. While the U.S. Debtors would not ordinarily be the ones raising *Ivanhoe* to this Court, hand in hand with this aspect of the Court's ruling, the Court further held that "for allocation purposes [the Guaranteed Bondholder claims] will be included only against the primary obligor [i.e. the Canadian Debtors]." Allocation Op. at 112. As a result, while NNI remains legally obligated to make distributions on billions of dollars of allowed claims made by the Guaranteed Bondholders – whether measured by their full $3.93 billion allowed claim or just a deficiency claim of approximately $2 billion – the Allocation Opinion does not provide for the allocation of a single penny of the Sales Proceeds to the U.S. Debtors on account of such Guaranteed Bondholders' claims. Instead, the Allocation Opinion allocates Lockbox proceeds to the U.S. Debtors based only upon the U.S.-Only Unsecured Creditors' claims and the administrative and priority claims against the U.S. Debtors, an aggregate amount still to be

---

[18] In Canada, if both the principal debtor and the guarantor are in insolvency proceedings, a creditor may claim the full amount of the debt against both the principal debtor and the guarantor so long as that creditor does not recover more than one-hundred cents on the dollar. Kevin Patrick McGuinness, *The Law of Guarantee* 390-391 (3d ed. 2013). In *J. LeBar Seafoods Inc., Re* [1981] O.J. No. 2381 (Can. Ont. Sup. Ct., In Bank.), the Court held that "upon the bankruptcy of its debtor, the creditor is entitled to claim against the estate of the bankrupt guarantor for the full amount of the debt. The claim is to be reduced only by any amount paid to the creditor by the debtor or by the debtor's estate and by the amount of any dividend declared in favour of the creditor prior to proof of the creditor's claim in the estate of the guarantor." *See also Olympia & York Developments Ltd., Re* (1997), 143 D.L.R. (4th) 536 (Can. Ont. Ct. Jus. (Gen. Div)), *citing Re Blakeley* (1892), 9 Morr. 173 ("if after proof is made [against the guarantor's estate] the creditor receives a dividend from the estate of the principal debtor that will not be deducted.") In this case, the Guaranteed Bondholders have not received any payments or dividends from the Canadian Debtors prior to the proof of their claims against the U.S. Debtors, meaning that the Guaranteed Bondholders are entitled to claim against both estates as a matter of Canadian law.

finally determined but smaller than the allowed claims of the Guaranteed Bondholders by orders of magnitude. The denial of the U.S. Debtors' right to receive a pro rata distribution of the Sales Proceeds on account of all of the creditors to whom they are legally obligated to pay stands in stark contrast to the treatment provided to all of the other Debtors. In particular, NNL was granted a right to a Lockbox distribution on account of the full Guaranteed Bondholder liabilities and on account (at least under the Canadian Allocation Opinion) of the allowed guaranty claim by the U.K. Pension Claimants against NNL. Can. Allocation Op. ¶¶ 248, 249, 252. Given that the Guaranteed Bondholders' claims are valid contractual claims against NNI already allowed by the Court, there is no basis in law or equity for the Court to include claims of all other unsecured creditors against the U.S., Canadian and EMEA Debtors for purposes of determining their respective allocations, but exclude the allowed contractual claims of the Guaranteed Bondholders against the U.S. Debtors.

29.     The apparently unintended and inequitable effect of this aspect of the Court's ruling is that the U.S. Debtors (and thus their U.S.-Only Unsecured Creditors) will receive a substantially smaller portion of the Sales Proceeds generated by the sale of the Nortel group's assets than similarly situated Debtors (and creditors) in Canada and EMEA. For example, while the Canadian Debtors will receive an allocation proportional to the claims of the Guaranteed Bondholders as well as their other unsecured creditors – thus enabling each of those creditors to be paid on a *pari passu* basis without adversely impacting each other – the U.S. Debtors will receive an allocation based only on a small fraction of its claims base, but will continue to face the allowed $4 billion claim of the Guaranteed Bondholders. Thus, any U.S. distributions to the Guaranteed Bondholders will reduce, dollar-for-dollar, the recovery by U.S.-Only Unsecured

Creditors. This disparate treatment is inconsistent with a pro rata approach that respects guarantees and strives for an equitable result.[19]

30. The drastic, and presumably unintended, effect of this Court's decision on U.S.-Only Unsecured Creditors can be seen from two simple examples. First, if one hypothetically assumes that the Canadian Debtors pay their unsecured creditors 50% and that the Guaranteed Bondholders are limited to a deficiency claim against the U.S. Debtors, that deficiency claim would be $2 billion. Assuming solely for argument's sake a U.S.-Only Unsecured Creditor pool of $1.3 billion, as the CCC's expert opined in his report, TR00045 (the "Britven Report") at Sched. 6, 000070, the addition of a $2 billion Guaranteed Bondholder claim without any corresponding allocation from the Lockbox would reduce recoveries of U.S.-Only Unsecured Creditors by more than 60%. Thus, from assets that similarly would have yielded those U.S. creditors a 50% recovery, the effect of having to share those assets *pari passu* with the bondholders without any corresponding allocation would instead yield a less than 20% recovery. Second, if the full $3.93 billion Guaranteed Bondholder claim against the U.S. Debtors (that the Court has allowed and as the *Ivanhoe* line of case law requires) is respected – and no adjustment to allocation for the U.S. claims base is made – recoveries for the U.S.-Only Unsecured Creditors that would otherwise hypothetically be 50% would fall to 12%.[20]

31. Indeed, the recoveries of NNI's creditors would have been far greater had the Courts held NNI liable as the *primary* obligor to the Guaranteed Bondholders, provided a corresponding allocation commensurate with that liability, and held the Canadian Debtors liable

---

[19] The preservation of NNI's previously allowed claim against NNL does not in any way insulate the U.S.-Only Unsecured Creditors or equitably compensate for this disparate treatment given that this claim is intended to compensate NNI for prior overpayments of cash to NNL. The Court held that this claim, like all other "intercompany claims, settlements, cash on hand will all be honored in the allocation," Allocation Op. at 102. Moreover, NNI likely will only receive a fractional recovery on that claim from NNL.

[20] Note that these figures – which are for demonstrative purposes only – reflect the recovery of creditors directly from the allocation of the Lockbox proceeds to Debtor groups rather than the final distributions to creditors.

solely for a deficiency claim without any additional allocation. The U.S. Debtors do not request relief to accomplish this result (which would be as unfair to the Canadian Debtors as the present allocation is to the U.S. Debtors), but rather, because under applicable law NNI has equal liability to NNL on the contractually guaranteed bonds, they respectfully request to be treated equally as a primary obligor with a corresponding allocation. The U.S. Debtors note that only this Court has allowed a claim by the Guaranteed Bondholders and that no such claim has yet been allowed in Canada.

32.     Even if this relief is granted, it is still highly unlikely that the U.S. general unsecured creditors will be on equal footing with the creditors of the Canadian Debtors or the EMEA Debtors for various reasons. Solely as one example, U.S. bankruptcy law establishes certain classes of priority and administrative claims that must be paid in full prior to distributions to unsecured creditors. Substantial administrative and priority claims have been filed against the U.S. Debtors and, since an administrative bar date has not been established, significant additional claims may be filed against the U.S. Debtors. The U.S. Debtors' obligation to satisfy these claims before paying unsecured claims will further dissipate Lockbox proceeds available to general unsecured creditors.[21] The U.S. Debtors understand the Court's goal is not to orchestrate identical percentage distributions to each creditor worldwide, nor are the U.S. Debtors trying to manufacture such a result through this Motion. Rather, the U.S. Debtors seek the above relief because of the extreme and disproportionate effect it has on their entire creditor base, to the point where they are deprived of their equitable share in the Sales Proceeds (and forced to bear a disproportionate amount of the losses incurred worldwide) compared to their counterparts in all other countries.

---

[21]     The same is not true under Canadian law, where the only claims entitled to similar status to priority or administrative status are claims specifically granted such status pursuant to an order of the Canadian Court.

**B.    The U.S. Debtors Should Receive All of the Proceeds from the Sale of Their Wholly-Owned Non-Debtor Subsidiaries**

33.    The Court's modified pro rata allocation was motivated by its conclusion that certain Business Lines and the IP Assets were part of an "integrated whole," Allocation Op. at 94, rather than the property of a particular legal entity.[22]  However, even if one were to accept that premise for Business Line assets within the Debtor companies, that conclusion cannot be supported for the sale of two of NNI's wholly-owned, non-debtor subsidiaries included in the Enterprise Business Line sale:  Nortel Government Solutions Incorporated ("NGS") and Diamondware, Ltd. ("Diamondware").  These two subsidiaries were not integrated into the Nortel group – Diamondware because it was a recent acquisition, and NGS because the U.S. Department of Defense demanded it to be wholly-owned by NNI and managed separately from the other Nortel affiliates.[23]  These were the only equity interests of non-debtor subsidiaries sold in the Sales (both were sold as part of the Enterprise sale) and for which Sales Proceeds are held in the Lockbox.  By contrast, when NNL sold its interests in LG-Nortel Co. Ltd. and Guangdong-Nortel Telecommunications Equipment Co. Ltd. and NNUK sold its subsidiary Nortel Networks International Finance & Holding BV's interest in Nortel Networks Netas Telekomunikasyon A.S. in separate sales, the sellers held those proceeds separately and thus they were not subject to allocation in these proceedings.  Notably, while NGS and Diamondware were included in the Enterprise Sale, at trial even the Canadian Debtors conceded that the Enterprise Sales Proceeds from the sale of these two NNI subsidiaries were not shared assets.  As such, the Canadian Debtors' expert, Phillip Green, proposed that the equity value of NGS and

---

[22]    *See also* Can. Allocation Op. ¶ 223 (concluding that pro rata allocation appropriate because the Nortel group had "fully integrated and interdependent operations" and "created IP through integrated R&D" activities, among other reasons).

[23]    Periodic Report Regarding Value, Operations and Profitability of Entities in Which the Estates of NNI, Nortel Altsystems Inc., and Sonoma Systems Hold a Substantial or Controlling Interest, May 11, 2009 [D.I. 729] at Ex. C ("2009 Form 26").

Diamondware, which he valued together at $111 million, be allocated to the U.S. Debtors. TR00042 (Green Report) at Ex. D.[24]

34.     Furthermore, under this Court's orders granted in connection with the Enterprise sale, the lien on the assets of NGS and Diamondware to which the Pension Benefit Guaranty Corporation ("PBGC") would otherwise have been entitled to assert was instead granted on the proceeds of the Enterprise sale in an amount attributable to the value of the equity of NGS and Diamondware (and was established to be no less than 30% of the value attributable to the value of NGS and Diamondware).[25]  This lien was given in exchange for the PBGC's agreement not to assert a lien on these assets prior to the closing of the sale.  Mot. to Approve PBGC Stipulation, at Ex. B.  While the Allocation Opinion does not allocate any Lockbox proceeds to NNI specifically for the sale of its two wholly-owned subsidiaries, it would be both inequitable and inconsistent with the prior orders of the Court to allocate to other Debtors any portion of the Sales Proceeds attributable to these exclusive NNI assets upon which a U.S. creditor has a court-ordered lien.  Accordingly, the U.S. Debtors respectfully request that the proceeds attributable to these companies (which the U.S. Debtors maintained on their books and records at the time of the Enterprise sale, and before this litigation arose, at a combined value of $331,637,000,

---

[24]     Likewise, other estates also have monetized other assets locally and have retained and asserted an exclusive claim to such proceeds rather than put them in the Lockbox for allocation by the Court.  *See, e.g.*, McDonald Dep. Tr. 161:22-162:2; 215:23-217:16 (testimony regarding sales conducted exclusively by the Canadian estates, including the sales of the Calgary warehouse, the Carling facility and IP addresses); One Hundred and Seventh Rep. of the Monitor ¶ 31, Sept. 2, 2014 (proceeds from the sale of IP addresses to be deposited into a bank account in the name of NNL).

[25]     Debtors' Motion for an Order Approving Stipulation with the PBGC, Oct. 8, 2009, [D.I.1639] ("Mot. to Approve PBGC Stipulation") ¶ 17; Order Approving Stipulation with the PBGC, Oct. 13, 2009 [D.I. 1658]; *see also* Order Authorizing and Approving (A) the Sale of Certain Assets of, and Equity Interest in, Debtors' Enterprise Solutions Business, (B) the Assumption and Assignment of Certain Contracts and Leases and (C) the Assumption and Sublease of Certain Leases, Sep. 16, 2009 [D.I. 1514].

including the value of cash holdings[26]) be paid to NNI prior to any other allocation of Enterprise Lockbox proceeds among the Debtors.

## II.     The U.S. Debtors' Request for Clarification

35.     The U.S. Debtors also seek clarification on four issues insofar as they may materially affect the ultimate allocation of the Lockbox proceeds and the fairness of the Court's order.

### A.     The U.S. Debtors Seek Clarification on the Inclusion of Settlements and Intercompany Claims for Allocation Purposes

36.     The Court responded to one of the U.S. Debtors' concerns about the adoption of a pro rata allocation methodology by declaring that "[i]ntercompany claims and settlements approved by the U.S. Court and the Canadian Court will be included in calculating the allocation."  Allocation Op. at 112; *see also* Can. Allocation Op. ¶ 258(3).  The U.S. Debtors seek two points of clarification with respect to this mandate.

37.     First, the U.S. Debtors seek confirmation or clarification that the "intercompany claims" that are "included in calculating the allocation" are claims between Debtors across different Debtor groups (i.e., the U.S. Debtors, the Canadian Debtors and the EMEA Debtors) rather than within Debtor groups.  This clarification is necessary to ensure that allocation of the Lockbox proceeds would not be subjected to a risk of significant distortion by claims allowed between Debtors within the same Debtor group.  For example, the fact that NNSA may have claims against NNUK (or perhaps both may have claims against each other) should not increase the net allocation to either of those EMEA Debtors.  The same is true with respect to claims among members of the U.S. Debtor group and claims among members of the Canadian Debtor group.  Inclusion of such intra-Debtor group claims would result in even greater portions of the

---

[26]     2009 Form 26, at Ex. A.

Lockbox allocated both to the Debtor against whom such claim is allowed and the Debtor that holds that allowed claim, thereby incentivizing both to generously assert and allow such claims. There also is no inconsistency or inequity in excluding these intra-Debtor group claims while including other intercompany claims for allocation purposes, given the presumably non-existent risk that Debtors in different Debtor groups would allow additional claims solely to improve another Debtor group's allocation to their own detriment.

38.    Second, the U.S. Debtors seek clarification or confirmation that, consistent with the Court's direction that all "settlements" will be included in the calculation, the U.S. Debtors' prior Court-approved settlements with the EMEA Debtors and the U.K. Pension Claimants (granting them administrative claims, which were then paid in cash) will be included in the calculation of the allocation owed to the U.S. Debtors.  It would be particularly unjust for the Canadian Debtors to receive an allocation on account of their settlement with the EMEA Debtors (in which they granted a claim that has not yet been paid) or the claim allowed after trial with the U.K. Pension Claimants, but for the U.S. Debtors to receive no allocation credit for their settlements of similar claims with those same entities.  The same is true with respect to the various other claims that the U.S. Debtors not only successfully resolved, but paid, including without limitation their settlement of certain retiree claims,[27] their 2009 settlement with the IRS,[28] and their cash settlements with the Canadian Debtors pursuant to the IFSA[29] and FCFSA.[30]  The U.S. Debtors are not aware of any logical basis upon which these "settlements" would be excluded from calculating the allocation and seek clarification that they are included

---

[27]    Order Granting Debtors Mot. for Entry of an Order Approving a Settlement Agreement with the Official Committee of Retired Employees, Apr. 2, 2013 [D.I. 9938].

[28]    TR 48734 (D.I. 2322, Order Approving IRS Settlement).

[29]    TR50214 (D.I. 993, Order Approving IFSA).

[30]    TR50146 (D.I. 2347, Order Approving FCFSA).

within the word "settlements" in paragraph 4 of the Court's "answers" on page 112 of the Allocation Opinion.

39.     Any other approach would give disparate treatment to the EMEA Debtors' and U.K. Pension Claimants' claims against the Canadian and U.S. Debtors.  Since the Canadian Debtors will receive a Lockbox allocation in respect of their obligations to the EMEA Debtors and the U.K. Pension Claimants,[31] the U.S. Debtors should not be penalized for their efficient administration of the bankruptcy proceedings, having reached pretrial settlements with those same entities as well as other creditors and paid their claims in cash.

**B.     Sales Proceeds Allocations Should Be Made to Specific Debtors, not Debtor Groups**

40.     The allocation methodology is clear as to the Court's desire to distribute the Lockbox in a manner relative to the size of each Debtor's claims that must be satisfied with such proceeds, while at the same time leaving the specific details regarding each Debtor's distribution scheme to their respective insolvency proceedings.  Allocation Op. at 63; *see also* Can. Allocation Op. ¶ 211.

41.     However, clarification is needed to ensure that a recipient Debtor group treats claims that formed the basis for the allocation in the first place (i.e., the U.S. Debtors' $2.06 billion intercompany claim or the Guaranteed Bondholders' $3.93 billion claim being part of the measurement of Canadian Debtors' claims) in an equitable manner and makes distributions in respect of such claims on a basis that is consistent with *pari passu* principles and the fundamental premise upon which the Court has based pro rata allocation.  Such treatment is particularly central to this Court's conclusion that the pro rata approach must be modified to

---

[31]     Can. Allocation Op. ¶ 249 ("The same principles that apply to the US$ 2 billion claim by NNI against NNL [i.e., that claim is included in NNL's allocation] will apply to the admitted claim of NNUK and Nortel Networks SpA against NNL pursuant to the Agreement Settling EMEA Canadian Claims and Related Claims, dated July 9, 2014 and to the claim of the UKPC for £339.75 million recognized in my judgment of December 9, 2014").

provide an extra allocation to the U.S. Debtors on account of their intercompany claim, which "pays heed to the undeniable fact that NNI generated the lion's share of enterprise-wide revenues." Allocation Op. at 62-63, 102, 107. This is also consistent with the Canadian Court's recognition of the principle that all debts should be paid *pari passu* and all creditors should receive equal treatment. *See* Can. Allocation Op. ¶ 209.[32]

42. The necessary clarification is simple: instead of allocation to Debtor groups, the Court should clarify and confirm that allocation of the Lockbox proceeds would be made to specific individual Debtors based upon the respective amounts of their own creditor base (with each creditor's claim only counting once in each group). This will ensure that the Lockbox proceeds are used fairly to pay the claims which led to the allocation.[33]

### C. The Court Should Establish Procedures at this Time to Enable the U.S. Debtors to Promptly Challenge Inflated Claims Asserted Against Other Estates, Including Particularly the U.K. Pension Claimants' $3 Billion Claim

43. As the Court acknowledged in its Allocation Opinion, an "inflated" claim by the U.K. Pension Claimants "would, of course, skew a pro rata allocation and destroy the equitable allocation method." Allocation Op. at 111-12. The solution provided by the Court is that it "will resolve any disputed claims to prevent claim inflation." *Id.* at 112. While the Cross Border Protocol [D.I.s 54, 990] and Cross Border Claims Protocol [D.I. 3956] have been adopted, and other orders have been entered, to provide an avenue for the Court to review and exert decision-

---

[32] The U.S. Debtors expect that at the appropriate time, the Court also will have the ability and inclination to ensure that distributions made by the Canadian Debtors will provide the U.S. Debtors with fair and equitable distributions on their allowed $2.06 billion claim against NNL, and will provide distributions to the Guaranteed Bondholders that do not create a disproportionately large deficit Guaranteed Bondholder guaranty claim against NNI. Otherwise, there is no rationale to allocate proceeds to the Canadian Debtors specifically on account of those claims.

[33] In other words, if hypothetically the Canadian Debtors receive an allocation of $5 billion on account of a claim base of $10 billion ($2 billion U.S. Debtors' claim, $4 billion Guaranteed Bondholders' claim and $4 billion other creditor claims), each of those constituencies is entitled to assurances that it will receive a *pari passu* 50% recovery on their respective claims from Lockbox proceeds since without its claim in the first place, the Canadian allocation would have been lower. Allocation to specific Debtors rather than Debtor groups prevents a re-allocation that could divert funds only allocated to an estate because of the existence of particular claims.

making power with regard to creditor claims in the Canadian Debtors' cases and to provide the

U.S. Debtors and the Official Committee of Unsecured Creditors with standing in the Canadian

Debtors' cases (which they intend to avail themselves of), and although there is a history of

cooperation between the U.S. and Canadian Courts, the U.S. Debtors seek clarification that

effective protections will exist to prevent undue claims inflation in all Debtors' cases, including

particularly the EMEA Debtors' cases where no procedures currently exist.

44.    While the U.S. Debtors presume that the Court does not intend to assert

jurisdiction over the determination of the ultimate amount the U.K. Pension Claimants' allowed

claim against any of the EMEA Debtors for purposes of administering their local proceedings,

there is no question that the Court can determine the reasonable amount of such claim for

purposes of measuring how much of the Lockbox should be allocated to the EMEA Debtors and

also for distribution purposes in the U.S.  Not only is there no jurisdictional impediment to such

measurement, but it is a vital part of a just and equitable allocation.

45.    In particular, the U.K. Pension Claimants have asserted a significant and

seemingly over-inflated $3 billion claim against NNUK and each of the other EMEA Debtors.

Allocation Op. at 111-12.  Given the extremely detrimental effect such a large claim would have

on recoveries for creditors of the U.S. and Canadian Debtors alike,[34] the U.S. Debtors seek

clarification of the Allocation Opinion to set forth the process and schedule by which the U.K.

Pension Claimants' claim will be measured by this Court for purposes of the allocation

---

[34]    It is thus not surprising that the U.K. Pension Claimants were the *only* core party to advocate pro rata distribution as their primary theory.  Indeed, while the Court has stated that the EMEA Debtors will not receive additional *allocation* as a result of the multiple entities against whom the U.K. Pension Claimants have asserted a claim, nothing prevents the U.K. Pension Claimants from asserting claims against multiple EMEA Debtors (along with their claims against the Canadian Debtors and the U.S. Debtors, the latter of which has been paid), as they have done, which will result in the U.K. Pension Claimants receiving a substantially higher recovery than virtually any other creditor of any Nortel Debtor and not a pro rata outcome.  The inflation of these claims would further exacerbate that disparity and enrich the U.K. Pension Claimants at the expense of every other Nortel creditor worldwide.

calculation. In light of both this Court's and the Canadian Court's expressed desire for prompt distributions and the U.S. Debtors' own desire to resolve all remaining claims and confirm their plans of reorganization, the establishment of an immediate procedure for the measurement of the U.K. Pension Claimants' claim will further numerous goals of the Courts and the various creditor constituencies.

46.     The Court properly recognized that the policing of the U.K. Pension Claimants' substantially over-inflated claim by this Court (and the Canadian Court) would be required given that NNUK – whose allocation only decreases in direct proportion to any decrease in the amount of the U.K. Pension Claimants' claim – lacks the same incentive as the U.S. and Canadian Debtors to ensure fair measurement of that claim. Of course, the same reasoning holds with respect to any claim not yet allowed against a particular Debtor: the Allocation Opinion "rewards" Debtors based on their allowed claims, thus disincentivizing any Debtor from challenging inflated claims of its own creditors that it would otherwise be inclined to reject or reduce absent the adopted allocation methodology. The concern is especially heightened with regard to the EMEA Debtors, given that they have neither commenced their formal claims process to date nor entered into claims protocols or other agreements that give the U.S. Debtors any voice (let alone an adequate voice) with regards to their claims resolution.

47.     Because the Allocation Opinion offers no guidance as to how and when the U.K. Pension Claimants' claim or any other disputed claim is to be challenged and considered and rather seeks proposals in this regard, the U.S. Debtors request that the Allocation Opinion be clarified to include and ensure adequate protection against claims inflation for allocation and distribution purposes with regard to these claims.[35] As part of such clarification, the Court

---

[35]     The U.S. Debtors acknowledge that the Allocation Opinion and Order do not intend to address general procedures for the allowance of claims or distributions of the Debtors' allocations from the Lockbox and that these issues will be resolved at a later date. Specifically, the U.S. Debtors expect that the Courts will craft procedures to

should clarify that the EMEA Debtors cannot avoid such Court oversight by privately agreeing to the claimed amount so as to avoid characterizing them as "disputed claims" for purposes of the Court's ruling.

### D. Failure to Reserve for Certain Claims Before Pro Rata Allocation Would Prejudice U.S.-Only Unsecured Creditors

48.     As one prong of its modified pro rata approach, the Court stated that "[a]ny claims not resolved by a date certain would not be recognized." Allocation Op. at 112. However, at least in the U.S. Debtors' cases, certain claims are by definition incapable of being determined, much less resolved, before a final allocation amount has been set as they would only arise as a result of the actual allocation of Lockbox proceeds and may vary depending on the amount of the Sale Proceeds actually allocated to the U.S. Debtors. Accordingly, it would unduly prejudice the U.S. Debtors if they were unable to receive an allocation for certain potentially significant claims merely because of the timing in which such claims would arise relative to the release of Lockbox funds. In particular, the U.S. Debtors would be responsible for paying applicable federal and state taxes on the Sales Proceeds allocated to them.[36] The Court should clarify that the U.S. Debtors are entitled to seek an allocation distribution based on these claims, including based on an estimated or reserved amount if necessary, due to the unique timing of such claims and the inability to resolve them prior to the actual allocation of Sales Proceeds.

---

provide for general reconciliation of claims and their allowance by the various Debtor estates, to address potential requests for interim distributions after the Debtor estates have obtained more clarity on claims, and to ensure that the U.S. Debtors' rights with respect to the Canadian Debtors' distributions on NNI's claim against NNL and payment of the Guaranteed Bondholder Claims (which will determine any deficiency in the U.S. Debtors' estate) are adequately protected. The U.S. Debtors will make submissions on these issues if and as necessary in the future, as they may ripen before the Court.

[36]     In contrast to the Canadian Debtors, whose income from the allocation of the Sales Proceeds will be sheltered by their existing net operating losses, the U.S. Debtors may not have sufficient net operating losses to shelter taxes due as a result of their allocation of Sales Proceeds.

## NOTICE

49.     The U.S. Debtors have provided notice of this Motion via electronic transmission, first class mail, hand delivery, or overnight mail to: (i) the U.S. Trustee; (ii) the Core Parties (as defined in the Allocation Protocol); and (iii) the general service list established in these chapter 11 cases.  Accordingly, the U.S. Debtors submit that under the circumstances no other or further notice is necessary.

## NO PRIOR REQUEST

50.     No prior request for the relief sought herein has been made to this or any other court.

## CONCLUSION

For the reasons set forth herein, the U.S. Debtors respectfully request that the Court reconsider and/or clarify the "modified pro rata" methodology detailed in the Allocation Opinion and accompanying Order in accordance with the relief sought in this Motion, and grant such other and further relief as it deems just and proper.

Dated: May 26, 2015
      Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

Howard Zelbo (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Jeffrey A. Rosenthal (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Andrew R. Remming*
Eric D. Schwartz (No. 3134)
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Tamara K. Minott (No. 5643)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile:  (302) 658-3989

*Counsel for the U.S. Debtors*
*and Debtors in Possession*