**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| *In re* | : | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | : | Case No. 09-10138 (KG) |
| Debtors. | : | (Jointly Administered) |

**Objection Deadline: June 15, 2015 at 4:00 p.m. prevailing Eastern time**
**Hearing Date: June 30, 2015 at 10:00 a.m. prevailing Eastern time**

# *AD HOC* GROUP OF BONDHOLDERS' MOTION FOR RECONSIDERATION OF OPINION AND ORDER ALLOCATING PROCEEDS FROM ASSET SALES OF NORTEL NETWORKS, INC., ITS AFFILIATES AND SUBSIDIARIES

The *ad hoc* group of bondholders (the "Bondholder Group"),[2] files this motion (the "Motion"), pursuant to Rules 59(e) and 60(b) of the Federal Rules of Civil Procedure (the "FRCP"), as made applicable to these bankruptcy proceedings by Rules 9023 and 9024, respectively, of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for reconsideration of the Allocation Trial Opinion [D.I. 15544] (the "Allocation Opinion") and Order [D.I. 15545] (the "Allocation Order") (together with the Allocation Opinion, the "Allocation Decision"), both dated May 12, 2015, allocating the proceeds (the "Sale Proceeds")

---

[1] The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

[2] The Bondholder Group consists of entities that hold certain bonds issued or guaranteed by Nortel Networks Corporation ("NNC" and together with its affiliates worldwide, "Nortel"), Nortel Networks Limited "NNL" and together with NNC and certain of their subsidiaries, the "Canadian Debtors"), Nortel Networks Inc. ("NNI"), and Nortel Networks Capital Corporation ("NNCC" and together with NNI and certain of its subsidiaries, the "U.S. Debtors").

from the asset sales of Nortel Networks, Inc. ("NNI"), its affiliates and subsidiaries, on a *pro rata* basis. In support of this Motion, the Bondholder Group respectfully represents as follows:

**PRELIMINARY STATEMENT**

1. The Bondholder Group submits this Motion solely to seek clarification and, if necessary, modification of one element of the Allocation Decision that is, at best, ambiguous in its meaning and intent. Specifically, the Bondholder Group seeks to clarify that the Court did not intend to limit the claims that Bondholders[3] are entitled to enforce against NNI, as guarantor, in any subsequent distribution of assets by the U.S. Debtors' estates in light of the Court's statement that "[a] claim for the shortfall can be recognized by the Estate that guaranteed the bond." (Allocation Order ¶ 2(e).) Only by addressing this issue, which is ambiguous in both the Allocation Opinion and Allocation Order, will the record accurately reflect the intent of this Court with respect to this critical question.[4]

2. If the Court did intend to limit Bondholders' guarantee claims to only a "shortfall," and not permit Bondholders to assert the full amount of their guarantee claim against the U.S. Debtors, then the Court should reconsider this element of its Allocation Decision. Such an outcome would conflict with this Court's prior orders, binding case law, and the stated purpose of the Court's Allocation Decision.

3. *First*, this Court has already allowed the full amount of Bondholders' guarantee claims against NNI. On December 18, 2014, the Court entered the 9019 Order (defined *infra*) which, in addition to approving the settlement of a dispute relating to certain post-petition interest issues, fixed finally and conclusively Bondholders' guarantee claims against NNI. This

[3] "Bondholders" refers to entities that hold bonds issued by NNC or NNL and guaranteed by NNI.

[4] To be clear, the Bondholder Group fundamentally disagrees with other aspects of the Allocation Decision, including the "modified *pro rata*" approach adopted by the Court.

allowed claim, in the amount of almost $4 billion, represents the full principal amount of Bondholders' claims, plus accrued prepetition interest.[5] To the extent that the Court intended to reduce the claim that Bondholders could assert against NNI, doing so would conflict directly with the 9019 Order.

4. *Second*, even if this Court ignores its prior order, it could not limit Bondholders' guarantee claims to just the "shortfall" as a matter of governing law. Bondholders' ability to assert their full guarantee claims is based on an unbroken line of cases since the precedent established by the Supreme Court in *Ivanhoe Building & Loan Association v. Orr*, 295 U.S. 243 (1935), and, if a contrary result was intended by the Court, it would fundamentally alter long-standing bankruptcy principles. The Court can hardly have intended for its Allocation Decision to have such a sweeping and profound impact on U.S. claims issues.

5. *Finally*, the size of Bondholders' claims against NNI after an allocation is made to each of the Nortel Debtors' estates is not an allocation issue at all, but rather an issue of distribution. The Court went to great lengths to make clear that "[t]he Court is not ordering a distribution scheme." (Allocation Op. at 102.) "Instead, the Court is directing an allocation among the Estate for the Estates to distribute in an appropriate manner." (*Id.*) If the Court intended to affect the size of Bondholders' claims against NNI, then it violated its own admonitions about what it was and was not doing.

6. Consistent with the purpose of the litigation, the Court's own prior order, and well-settled precedent, the Allocation Opinion and Allocation Order must be either clarified or

---

[5] The term "Supporting Bondholders" refers to those entities holding certain bonds issued or guaranteed by NNC, NNL, and NNI that executed the Settlement Agreement approved by the Bankruptcy Court in its *Order Granting Debtors' Motion Pursuant to Bankruptcy Rule 9019 Approving Settlement Agreement By and Among Nortel Networks Inc., The Supporting Bondholders, And The Bank Of New York Mellon With Respect To The NNI Post-Petition Interest Dispute And Related Issues* [D.I. 14950] (the "9019 Order").

modified to make explicit that neither is intended to upset the value of, or rights associated with, Bondholders' claims against NNI.

**JURISDICTION**

7. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**RELEVANT BACKGROUND**

8. On April 3, 2013, after three failed mediations, the Court ordered [D.I. 9947] that a litigation (the "Allocation Litigation") take place to resolve the manner of allocation of the Sale Proceeds among the various Nortel Debtors' estates.

9. The Court subsequently issued several orders clearly defining the Allocation Litigation. On May 17, 2013, the Court issued an order entering the Allocation Protocol [D.I. 10565]. The purpose of the Allocation Protocol was to "set forth binding procedures for determining the allocation of the Sale Proceeds among the Selling Debtors[.]" (Allocation Protocol ¶ 1.) The Allocation Protocol explicitly provided that creditor claims "***are not governed***" by its terms. (*Id.* (emphasis added).)

10. After the Allocation Protocol and other procedural orders related to the Allocation Litigation were put in place, the Court rebuffed several efforts to resolve creditor claim and recovery issues prior to the determination of the allocation of the Sale Proceeds on ripeness and relevance grounds. For example, on November 15, 2013, the Court stated that it was "***not the appropriate time***" to address claims-related objections and, instead, it was time to "***move to that Allocation Trial***." (Hr'g Tr. 39:1-13, 39:22-24, Nov. 15, 2013 (emphasis added).)

11. The trial in the Allocation Litigation (the "Allocation Trial") commenced on May 12, 2014 and ended on June 24, 2014. During a post-trial status conference on June 27, 2014,

the Courts rejected the suggestion by counsel for the U.K. Pension Claimants that each party provide claims and recovery information to the Courts in connection with the Allocation Trial. This Court stated: "based upon the evidence that I heard, ***I don't know how that would be helpful in my determining allocation. In fact, it may be harmful*** . . . ." (Hr'g Tr. 22:23-23:4, June 27, 2014 (emphasis added).) The parties subsequently submitted post-trial briefing, and closing arguments were held over the three day period from September 22 through September 24, 2014.

12. After the Allocation Trial concluded, at the Monitor's urging, and over the objection of the Bondholder Group, among others, the Courts scheduled a joint hearing to consider a dispute relating to Bondholders' claims, including their entitlement to post-petition interest. On July 23, 2014, the Supporting Bondholders and the U.S. Debtors entered into a settlement agreement [D.I. 14076-2] (the "Settlement Agreement") that: (i) fixed the amount of Bondholders' claims against NNI at the total outstanding principal and prepetition interest amounts and (ii) set a cap on the accrual of post-petition interest on Bondholders' claims. (Settlement Agreement §§ 2.1, 2.2, 3.1.) On November 4 and 5, 2014, after the relevant parties submitted briefing and conducted discovery, the Court held a hearing to determine whether or not to approve the Settlement Agreement.

13. On December 18, 2014, the Court issued an opinion [D.I. 14949] and entered the 9019 Order. In relevant part, the 9019 Order held that "[t]he Settlement Agreement shall constitute a full and final settlement of . . . (ii) the allowed claims for outstanding principal obligations and accrued prepetition interest obligations (each as set forth on Schedule A to the Settlement Agreement)[.]" Specifically, Bondholders' claims against NNI were allowed in the amount of $3,934,521,442. (Settlement Agreement, Schedule A.)

14. On January 1, 2015, the Monitor filed a Notice of Appeal indicating its intent to appeal the 9019 Order. On March 30, 2015, the Monitor filed its opening brief challenging only this Court's decision to approve the portion of the settlement that determined the rate at which post-petition interest would accrue in respect of Bondholders' allowed claims. *Ernst & Young Inc. v. Nortel Networks Inc.*, 14-cv-00104-LPS, D.I. 15 (D. Del. Mar. 30, 2015).[6] The Monitor did not challenge the Court's allowance of Bondholders' claims against NNI.[7]

15. On May 12, 2015, the Court issued its Allocation Opinion and Allocation Order, both of which include language that refers to the amount of Bondholders' claims against NNI. Specifically, paragraph 2(e) of the Allocation Order states:

> In determining the amount of the claims against the Debtor Estates, a claim that can be made against more than one Debtor Estate can only be calculated and recognized once. For example, the claims on Bonds are to be made on the Estate of the Issuer. ***A claim for the shortfall can be recognized by the Estate that guaranteed the bond***, but that shortfall will not be taken into account in determining the claims against the Debtor Estates.

(Allocation Order ¶ 2(e) (emphasis added).) The Court used different language in the Allocation Opinion, inserting further confusion into the issue by stating that "for allocation purposes the Bondholder claims will be included only against the primary obligor, but the guarantees will be entitled to seek distribution from the appropriate Debtor of any deficiency resulting from the allocation." (Allocation Op. at 112.)

## RELIEF REQUESTED

---

[6] The Monitor's appeal is currently pending before the United States District Court for the District of Delaware.

[7] Indeed, NNI's liability for the outstanding principal and prepetition interest accrued on bonds held by Bondholders has never been in doubt. The relevant indentures explicitly state that NNI "agrees that its obligations hereunder shall be as if it were the principal debtor and not merely surety, and shall be absolute and unconditional[.]" (*See, e.g.*, TR40050 at BNY-00586 (Bank of New York Mellon Proof of Claim and attached Indenture, dated July 5, 2006).)

16. By this Motion, pursuant to FRCP 59(e) and 60(b), which are incorporated in Bankruptcy Rules 9023 and 9024, respectively, the Bondholder Group respectfully requests that the Court clarify whether or not it intended to limit Bondholders' claims against the NNI estate to the amount they are unable to recover on their primary claims against the Canadian Debtors' estate, rather than permitting the claims to be asserted in the full amount of the guarantee. To the extent the Court did intend to so limit Bondholders' claims, the Bondholder Group respectfully requests that the Court reconsider and modify the Allocation Opinion and Allocation Order to provide that Bondholders are entitled to assert the full amount of their claims against NNI.[8]

**BASIS FOR RELIEF**

17. Bankruptcy courts have broad discretionary power to reconsider, modify, or vacate their previous orders. *See, e.g., In re Marcus Hook Development Park, Inc.*, 943 F.2d 261, 265 n.5 (3d Cir. 1991). In evaluating a motion to reconsider, courts frequently refer to the standards for seeking relief under FRCP 59(e), incorporated in Bankruptcy Rule 9023. *See New Castle County v. Hartford Accident & Indem. Co.*, 933 F.2d 1162, 1176-77 (3d Cir. 1991) (abrogated on other grounds). Under that standard, the purpose of a motion for reconsideration is "to correct manifest errors of law or fact or to present newly discovered evidence." *Max's Seafood Café v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (quoting *Harsco Corp. v. Zlotnick,* 770 F.2d 906, 909 (3d Cir. 1985)). A court will grant a motion for reconsideration "if it appears that the court has patently misunderstood a party, has made a decision outside the adversarial issues presented by the parties, or has made an error not of reasoning, but of apprehension." *In re Meridian Automotive Systems-Composite Operations, Inc.*, No. 07-51195, 2008 WL 141160

8 The Court has already ordered that Bondholders are limited to payment in full of their debt except in the event NNI has more than sufficient funds to pay all of its allowed administrative, priority, secured, and general unsecured claims in full, at which point Bondholders are entitled to post-petition interest pursuant to the terms of the Settlement Agreement. (9019 Order ¶ 5; Settlement Agreement § 2.1.)

(Bankr. D. Del. Jan. 11, 2008) (Gross, J.) (quoting *Stanziale v. Nachtomi*, No. 01-403, 2004 WL 1812705, at *2-3 (D.Del. Aug. 6, 2004)); *see also Flynn v. Dick Corp.*, 565 F. Supp. 2d 141, 147 (D.D.C. 2008) (amending an order granting summary judgment on grounds that the court misapplied the evidentiary burden set forth in relevant case law); *Atlantic States Legal Found. v. Karg. Bros. Inc.*, 841 F.Supp.51, 55 (N.D.N.Y. 1993) (granting motion for reconsideration where previous ruling was premised upon court's misunderstanding of regulatory scheme); *In re Stuart*, 402 B.R. 111, 120-21 (Bankr. E.D. Pa. 2009) (granting motion for reconsideration on grounds the court "committed an error of law warranting reconsideration and reversal" by improperly construing the terms of a plan when denying a stay relief motion).

18. Similarly, Rule 60 of the FRCP provides a mechanism by which a court can "relieve a party . . . from a final judgment, order, or proceeding" on the basis of, among other reasons, "mistake, inadvertence, surprise, or excusable neglect" or "any other reason that justifies relief." Fed. R. Civ. P. 60(b); *see also Boughner v. Sec'y of Health, Ed. & Welfare, U. S.*, 572 F.2d 976, 977 (3d Cir. 1978).

19. The Allocation Decision is not based on any position presented by the parties, but is instead an allocation structure created by the Court. As such, the Court "made a decision outside the adversarial issues presented by the parties." To the extent the Court intended for its Allocation Decision to limit Bondholders' claims after allocation, reconsideration and modification of the Allocation Decision is appropriate and necessary for at least three reasons. *First*, the Allocation Order is inconsistent with the 9019 Order previously entered by the Court that provided Bondholders with allowed claims against the U.S. Debtors in the full amount of their outstanding principal and accrued prepetition interest. *Second*, the Allocation Order is

contrary to Supreme Court precedent (the so-called "*Ivanhoe* rule")[9] and related case law that entitles a creditor holding a guarantee claim against a debtor to assert the full amount of the claim against the debtor regardless of any recovery obtained from the primary obligor. *Finally*, to the extent the Allocation Order addresses the amounts of Bondholders' claims against NNI or any rights associated with those claims, these are distribution issues that were plainly outside the scope of the Allocation Litigation and inconsistent with the stated limitations of the Allocation Opinion.

**A. The Allocation Order must be clarified or modified to account for the 9019 Order**

20. The 9019 Order conclusively orders that Bondholders have "allowed claims for outstanding principal obligations and accrued prepetition interest obligations" against NNI in the amount of $3,934,521,442. (9019 Order ¶ 5, Schedule A.)[10] Accordingly, the size of Bondholders' claims against NNI is now "law of the case" and should not be disturbed. *Am. Civil Liberties Union v. Mukasey*, 534 F.3d 181, 187 (3d Cir. 2008) ("[u]nder the law-of-the-case doctrine, 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'") (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988)); *see also In re Harvard Industries, Inc.*, 153 B.R. 668, 671 (Bankr. D. Del. 1993) (court's previous opinion holding section 502(e)(1)(B) "does not operate to disallow a direct contingent claim" was law of the case and binding on subsequent motion to disallow a direct contingent claim).

---

9 *Ivanhoe Building & Loan Association v. Orr*, 295 U.S. 243 (1935).

10 Although the 9019 Order remains subject to a pending appeal, the Bondholders' allowed claims have not been challenged. The appellants challenge only the rate at which post-petition interest should accrue in respect of Bondholders' claims.

21. If the Allocation Order was intended to order that Bondholders are limited in their ability to assert to full amount of their allowed guarantee claim against NNI, then the Allocation Order and 9019 Order cannot simultaneously be given effect. In addition, nothing in the Allocation Order indicates the Court intended to overrule itself. The Court must therefore clarify or modify the Allocation Order to reconcile it with the 9019 Order and recognize Bondholders' already-allowed claims against NNI. *See Marcus Hook*, 943 F.2d at 265 ("it is doubtful that an estate can be fully administered, consistent with Rule 3022, until conflicting orders are reconciled.").

**B. The Allocation Order must be clarified or modified to comport with the Supreme Court's *Ivanhoe* decision and its progeny**

22. The Supreme Court decision in *Ivanhoe*, handed down in 1935, provides that a creditor may assert the full amount of its claim against a debtor regardless of payments received on account of collateral held by other parties, so long as the creditor's recovery does not exceed 100% of its claim. *Ivanhoe*, 295 B.R. at 246; *see also Reconstruction Fin. Corp. v. Denver & R.G.W.R. Co.*, 328 U.S. 495, 529 (1946) ("The rule is settled in bankruptcy proceedings that a creditor secured by the property of others need not deduct the value of that collateral or its proceeds in proving his debt.") (citing *Ivanhoe*); *Nuveen Mun. Trust v. Withumsmith Brown, P.C.*, 692 F.3d 283, 295 (3d Cir. 2012) (recognizing that *Ivanhoe* "provides that a creditor may file a proof of claim for the total amount it is owed by a debtor even if it has recovered or may recover all or a portion of that amount from a non-debtor.").

23. In other words, rather than reducing the claim against the primary obligor and leaving the creditor with a claim for the deficiency remaining after the application of the recovery from the third party, *Ivanhoe* stands for the proposition that creditors holding guarantee claims are entitled to assert the full amount of their guarantee claims against a debtor regardless

of any satisfaction already obtained from the primary obligor. *Security Nat'l Bank v. Gessin* (*In re Gessin*), 668 F.2d 1105, 1107 (9th Cir. 1982) ("It has long been established that a creditor is entitled to pursue his claims against others liable on the same debt to the full extent of the amount owed on the debt."); *In re F.W.D.C., Inc.*, 158 B.R. 523, 527-28 (Bankr. S.D. Fla. 1993) (relying on *Ivanhoe* for the "legal proposition that a claim against a debtor-guarantor . . . need not be reduced to reflect a creditor's receipt of a third party's . . . collateral securing the third party's indebtedness guaranteed by the debtor."); *see also In re Realty Associates Sec. Corp.*, 66 F. Supp. 416, 424 (E.D.N.Y. 1946) ("an obligee of a bond or the holder of a claim upon which several parties are liable may prove its entire claim against the estate of any who become bankrupt and recover dividends calculated on the basis of such entire claim as it existed when the petition was filed, without regard to partial payments made by other obligors until from all sources it has been paid in full.").

24. If the Allocation Decision limits the Bondholders' guarantee claims to the amount of any "shortfall" that exists after the Bondholders obtain recoveries from NNL or NNC, it is plainly contrary to *Ivanhoe* and its progeny. Under *Ivanhoe*, the Bondholders are entitled to assert the ***full*** amount of their claim—the full principal outstanding under the Bonds, plus accrued prepetition interest (*i.e.*, the amount allowed, without any objection, under the 9019 Order)—regardless of any recoveries obtained from NNL or NNC as primary obligors. The Court must rectify its mistake by modifying the Allocation Order accordingly. A different result would ignore a fundamental principal of bankruptcy law and be clear legal error.

**C. The Allocation Opinion and Allocation Order must be clarified to reflect that neither intended to impact the size of creditors' claims for distribution purposes**

25. The final reason that any discussion of the size of Bondholders' claims must be clarified is that it is directly contrary to the scope of the Allocation Litigation and the express

terms of the Allocation Opinion. This Court has long defined the scope of the Allocation Litigation as a proceeding meant to determine an appropriate allocation of the Sale Proceeds to the Nortel Debtors' estates. (*See supra* ¶¶ 9-11.) In other words, the Allocation Litigation dealt solely with the allocation of certain ***assets*** to estates; it had nothing to do with the fixing or modification of creditor ***claims*** or dictating how distributions would be made to creditors. Indeed, the very first paragraph of the Allocation Protocol explicitly provided that creditor claims "are not governed" by its terms. (Allocation Protocol ¶ 1.) Reaffirming this purpose, the Allocation Opinion repeatedly asserts that the Court "is not ordering a distribution scheme." (Allocation Op. at 102; *see also id.* at 104 ("Again, the Court is not adopting pro rata distribution."; *id.* at 106.) Moreover, the Allocation Order expressly contemplates that unresolved claims will be dealt with through a ***future*** claims resolution process, not as part of the Allocation Litigation itself. (Allocation Order ¶ 2(d).)

26. To the extent the Allocation Order modifies the amount of Bondholders' claims, it decides issues well outside the scope of the Allocation Litigation. Neither the Bondholder Group nor any other Core Party was ever put on notice that the Court may use the Allocation Litigation as an opportunity to adjudicate creditor claims. Had the Bondholder Group received such notice, it would have objected to the adjudication of claims issues in the Allocation Litigation and, if necessary, presented evidence and argument as to why Bondholders' claims must be allowed in their full amount against NNI. As it stands, the Bondholder Group was deprived of this opportunity and thus denied due process.

27. Because the modification of the Bondholders' claims was clearly outside the scope of the Allocation Litigation, the Court should clarify its order to state clearly that it did not intend to increase or decrease the value of creditors' claims.

**NOTICE**

28. The Bondholder Group has provided notice of this Motion via electronic transmission, first class mail, hand delivery, or overnight mail to: (i) the Core Parties; (ii) the U.S. Trustee; and (iii) the general service list established in these chapter 11 cases. Accordingly, the Bondholder Group submits that under the circumstances no other or further notice is necessary.

**NO PRIOR REQUEST**

29. No prior request for the relief sought herein has been made to this or any other court.

[*Remainder of page intentionally left blank*]

Dated: May 26, 2015

**PACHULSKI STANG ZIEHL & JONES LLP**

/s/ *Peter J. Keane*
Laura Davis Jones (No. 2436)
Peter J. Keane (No. 5503)
919 N. Market Street, 17th Floor
PO Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

-and-

**MILBANK, TWEED, HADLEY & McCLOY LLP**
Dennis F. Dunne
Albert A. Pisa
Andrew M. Leblanc
Atara Miller
1 Chase Manhattan Plaza
New York, New York 10005-1413
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

-and-

Thomas R. Kreller
601 S. Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone: (213) 892-4463
Facsimile: (213) 629-5063

***Attorneys for Ad Hoc Group of Bondholders***