**<u>EXHIBIT A</u>**

Court File No: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE** *COMPANIES' CREDITORS ARRANGEMENT ACT*,
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE** *COMPANIES' CREDITORS ARRANGEMENT ACT*,
**R.S.C. 1985, c. C-36, AS AMENDED**

**FACTUM OF NORTEL NETWORKS INC.
AND THE OTHER U.S. DEBTORS**
**(Motion for Clarification, Reconsideration or Amendment)**

Date:  June 8, 2015

**TORYS LLP**
79 Wellington St. W., Suite 3000
Box 270, TD Centre
Toronto, Ontario
M5K 1N2  Canada

Fax:  416.865.7380

**Sheila Block** (LSUC#: 14089N)
Tel: 416.865.7319
Email: sblock@torys.com

**Scott A. Bomhof** (LSUC#: 37006F)
Tel: 416.865.7370
Email: sbomhof@torys.com

**Andrew Gray** (LSUC#: 46626V)
Tel: 416.865.7630
Email: agray@torys.com

**Adam M. Slavens** (LSUC#: 54433J)
Tel: 416.865.7333
Email: aslavens@torys.com

Lawyers for Nortel Networks Inc.
and the other U.S. Debtors

## PART I – OVERVIEW

1.      This factum is filed by Nortel Networks Inc. ("NNI") and certain of its affiliates[1] (collectively, the "U.S. Debtors") in connection with the U.S. Debtors' motion (the "Reconsideration Motion") for, *inter alia*, clarification, reconsideration or amendment of this Court's Reasons for Judgment (the "Ontario Allocation Judgment") that were released on May 12, 2015, in respect of the Allocation Trial (as defined below).

2.      The U.S. Debtors share this Court's interest in facilitating the expeditious distribution of assets to creditors, and the impetus behind this Reconsideration Motion is the avoidance of further prolonged litigation.  While the U.S. Debtors do not agree with the legal basis of a pro rata allocation approach in lieu of an economic valuation consistent with ownership interests, the findings of this Court with respect to its interpretation of the MRDA that were inconsistent with the U.S. Bankruptcy Court, or, as described below, that the pro rata allocation methodology achieves equitable creditor distributions, the U.S. Debtors do not seek to rehash these larger issues through this Reconsideration Motion.  Rather, the U.S. Debtors request that this Court reconsider certain specific aspects of how, and clarify the manner in which, the allocation is intended to occur.

3.      The allocation methodology dictated in the Ontario Allocation Judgment and the U.S. Allocation Opinion (as defined below) provides for an allocation that disproportionately and significantly drives down creditor lockbox recoveries in the U.S. Debtors' estates as compared to similarly situated creditors of the Canadian Debtors and the EMEA Debtors (each, as defined below, and together with the U.S. Debtors, the "Debtors"). The modified pro rata allocation framework likely leaves the U.S. Debtors' general unsecured creditors who have no claims against other estates (the "U.S.-Only Unsecured Creditors")[2] with the lowest recoveries from sales proceeds held in escrow (the "Lockbox") – both in terms of total dollars allocated and as a

---

[1] The U.S. Debtors are Nortel Networks Inc., Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc.

[2] The U.S.-Only Unsecured Creditors are comprised of trade creditors, disabled former employees, retirees and other former employees, among others.

percentage of allowed creditor claims – of all three of the Debtors.  Specifically, if one were to implement this Court's pro rata allocation method using the assumptions upon which the CCC's[3] expert, Thomas Britven, relied at trial (with a few discrete adjustments to reflect certain subsequent cash and claims changes in the Debtors' cases), the Lockbox proceeds allocated to the Canadian Debtors would result in recoveries to their unsecured creditors of 47 cents on the dollar (in the case of Canadian pension claims, this recovery level is a percentage of the Canadian pension plan's actuarial *deficiency*, meaning that Canadian pension claimants will receive payments on account of:  (i) that portion of the pension plan that is funded; (ii) any provincial pension benefit guarantees; and (iii) an additional 47% of the pension plan's actuarial shortfall) and provide 48 cents to creditors of the EMEA Debtors, whereas the allocation to the U.S. Debtors (only 11% of the total Lockbox proceeds or approximately US$813 million out of US$7.3 billion) would result in recoveries of 14 cents on the dollar to U.S. unsecured creditors from direct Lockbox distributions to the U.S. Debtors.[4]

4.      In light of these relative recoveries, the U.S. Debtors are concerned that the complexities of the Debtors' corporate relationships and the nature of their overlapping and intercompany claims obscured the real economic impact of various aspects of the modified pro rata approach imposed by the Courts, which results in an allocation of sales proceeds to the U.S. Debtors well below either: (a) a proportionate or equitable allocation; and (b) an allocation to the U.S. Debtors advocated by any other Debtor estate.

5.      Therefore, the U.S. Debtors seek clarification, reconsideration or amendment of Ontario Allocation Judgment in the following manner:

(a)      To amend the Ontario Allocation Judgment such that it provides that the allowed general unsecured claims against NNI held by holders of bonds issued by Nortel Networks Canada ("NNC") and/or Nortel Networks Limited ("NNL") but guaranteed by NNI (the "Guaranteed Bondholders"), in the aggregate amount of US$3,934,521,442.00, shall be included and recognized among the total claims

---

[3] The CCC is the Canadian Creditors Committee.

[4] These calculations, and their underlying assumptions and related notes, are set out in the Notice of Filing in the U.S. Debtors' Chapter 11 Cases of the *U.S. Debtors' Motion For Clarification And/Or Reconsideration Of The May 12, 2015 Allocation Trial Opinion And Order*, that was filed with this Court on May 26, 2015. Affidavit of Lara Guest, sworn May 28, 2015, Tab A. The U.S. Debtors rely on such Notice of Filing in this regard, including the reservation of rights with respect to Mr. Britven's calculations set out therein.

against the U.S. Debtors for the purpose of determining the allocation from the Lockbox that each Debtor will be entitled to receive.

(b)     To clarify or amend the Ontario Allocation Judgment to provide that the proceeds attributable to NNI's sale of its equity interests in Nortel Government Solutions Incorporated ("NGS") and Diamondware, Ltd. ("Diamondware") shall be excluded from the Lockbox funds allocated pro rata to the various estates and shall instead be allocated and paid directly to NNI.

(c)     To clarify or amend the Ontario Allocation Judgment to provide that, in determining the claims of a Debtor for purposes of calculating the allocation of the Lockbox proceeds, the intercompany claims by and among Debtors within a Debtor group (i.e., the U.S. Debtors, the Canadian Debtors and the EMEA Debtors) shall be excluded.

(d)     To clarify or amend the Ontario Allocation Judgment to provide that among the claims included for calculation of the allocation owed to the U.S. Debtors are settled (or otherwise allowed) claims paid by the U.S. Debtors since the Petition Date, including without limitation: (i) the U.S. Debtors' settlements with the EMEA Debtors and U.K. Pension Claimants, which were approved by the U.S. Bankruptcy Court (as defined below) on January 7, 2014, in the *Order Approving the US Claims Litigation Settlement Agreement by and Among the Debtors, the Creditors' Committee, the Joint Administrators, the EMEA Debtors, Nortel Networks Optical Components Limited, Nortel Telecom France SA, the Liquidator, the French Liquidator, the UK Pension Parties and Certain Affiliates*; (ii) the U.S. Debtors' settlement with their retirees, which was approved by the U.S. Bankruptcy Court on April 2, 2013, in the *Order Granting Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105, 363 and 1114 and Fed. R. Bankr. P. 9019 Approving a Settlement Agreement with the Official Committee of Retired Employees*; (iii) the U.S. Debtors' settlement with the IRS, which was approved by the U.S. Bankruptcy Court on January 21, 2010, in the *Order Approving the Settlement Stipulation Between Nortel Networks Inc. and the Internal Revenue Service, Entry Into The Advance Pricing Agreement, and*

- 4 -

*Related Relief*; (iv) the U.S. Debtors' cash settlement with the Canadian Debtors pursuant to the Interim Funding and Settlement Agreement, which was approved by the U.S. Bankruptcy Court on June 29, 2009, in the *Order (A) Approving the Interim Funding and Settlement Agreement, and (B) Granting Related Relief*; and (v) the U.S. Debtors' cash settlement with the Canadian Debtors pursuant to the Final Canadian Funding and Settlement Agreement, which was approved by the U.S. Bankruptcy Court on January 21, 2010, in the *Order (A) Approving the Final Canadian Funding and Settlement Agreement, and (B) Granting Related Relief* (all such settled (or otherwise allowed) claims, collectively the "Settled Claims").

(e)     To clarify or amend the Ontario Allocation Judgment to provide that the allocation of the Lockbox proceeds will be made to specific Debtors (not to Debtor groups) based on claims existing against each specific Debtor; provided, however, that to the extent a creditor holds claims against multiple Debtors within a Debtor group, solely for purposes of allocation, the creditor's claim shall be included only once in each Debtor group.

(f)     To clarify or amend the Ontario Allocation Judgment to provide that this Court shall retain oversight of and adopt procedures as necessary to measure the amount of disputed claims (which for purposes of this Reconsideration Motion shall include any claim not allowed prior to the date of the Ontario Allocation Judgment) against any Debtor seeking an allocation that may be considered for purposes of determining the allocation of the Lockbox proceeds.  In addition to proposing schedules for expediting claims procedures for their estates as the Court previously ordered, each of the Debtors may submit proposals for procedures regarding and oversight of disputed claims of other Debtors for the purposes of determining allocation.

(g)     To clarify or amend the Ontario Allocation Judgment to provide that the Debtors each shall be entitled to seek an allocation distribution based upon claims that are incapable of being determined before a final allocation amount has been set, including but not limited to applicable taxes on the Lockbox proceeds allocated to them.

6.      Therefore, this Reconsideration Motion respectfully requests clarification and/or reconsideration of the preceding specific issues where the U.S. Debtors believe that this Court's ruling either lacks clarity or is inconsistent with the Court's stated objectives or with the U.S. Allocation Opinion and was potentially rendered without recognition of the presumably unintended consequences of such ruling.  The U.S. Debtors continue to firmly believe that the interests of the U.S. Debtors in the assets sold entitle them to Lockbox proceeds well in excess of the amount that would be awarded under any pro rata approach.  That said, the U.S. Debtors recognize and share in the interest in bringing these cases to conclusion and to getting money into creditors' hands and hope that reconsideration and clarification will achieve this result.

7.      The U.S. Debtors' position is that this Court has the requisite jurisdiction to clarify, reconsider or amend the Ontario Allocation Judgment, and that this is an appropriate case in which to exercise such discretion.  In addition, many of the issues engaged herein are the very sort of issues that would in any event require this Court's clarification during the process of reducing the Ontario Allocation Judgment to an operative order that would typically occur following the release of reasons.  Given the parallel reconsideration process that is unfolding in the United States, now is the appropriate time to deal with these issues in Ontario.  Moreover, by addressing these issues at this time, this Court may further the achievement of a prompt, equitable resolution without further hardship or depletion of the remaining estates.

## PART II – FACTS

**Background**

8.      On January 14, 2009, this Court made an Initial Order granting NNC, NNL, Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation (collectively, the "Canadian Debtors") protection under the CCAA, and, among other things, appointing Ernst & Young Inc. as monitor in these proceedings.

9.      Also on January 14, 2009 (the "Petition Date"), nearly all the U.S. Debtors filed voluntary petitions for relief pursuant to Chapter 11 of Title 11 of the United States Code (the

"Bankruptcy Code") with the United States Bankruptcy Court for the District of Delaware (the "U.S. Bankruptcy Court").[5]

10.     Also on January 14, 2009, this Court granted an Order pursuant to Section 18.6(4) of the CCAA recognizing the chapter 11 cases as "foreign proceedings" in Canada and giving effect to the automatic stay under the Bankruptcy Code in Canada.

11.     Also on January 14, 2009, the High Court of England and Wales placed nineteen of Nortel's[6] European affiliates (the "EMEA Debtors"), including, *inter alia*, Nortel Networks UK Limited ("NNUK"), into administration (the "Administration Proceedings") under the control of individuals from Ernst & Young LLP (the "Joint Administrators").

12.     On February 27, 2009, the U.S. Bankruptcy Court granted petitions recognizing the CCAA proceedings as "foreign main proceedings" pursuant to chapter 15 of the Bankruptcy Code.

13.     On June 26, 2009, the U.S. Bankruptcy Court granted a petition recognizing the Administration Proceeding of NNUK as a "foreign main proceeding" pursuant to chapter 15 of the Bankruptcy Code.

14.     On January 31, 2011, the U.S. Bankruptcy Court granted petitions recognizing the Administration Proceedings of the other EMEA Debtors as "foreign main proceedings" pursuant to chapter 15 of the Bankruptcy Code.

15.     Since the commencement of the Nortel entities' respective creditor protection and insolvency proceedings, Nortel has sold its business units and other assets, including its intellectual property, to various purchasers.

**Allocation Trial and Judgments**

16.     A joint trial was presided over by this Court and the U.S. Bankruptcy Court in order to, *inter alia*, allocate the sale proceeds from such asset sales among the Nortel entities, which trial concluded on September 23, 2014 (the "Allocation Trial").

---

[5] Nortel Networks (CALA) Inc. filed a voluntary petition for relief pursuant to the Bankruptcy Code with the U.S. Bankruptcy Court on July 14, 2009.

[6] "Nortel" or the "Nortel entities" means the affiliates of NNC.  NNC is the ultimate corporate parent of the other Canadian Debtors, the U.S. Debtors and the EMEA Debtors.

17.    In connection with the Allocation Trial, on May 12, 2015, the Ontario Court released its Ontario Allocation Judgment[7] and on the same date the U.S. Bankruptcy Court released its Allocation Trial Opinion (the "U.S. Allocation Opinion").[8]

**Motion for Reconsideration**

18.    On May 26, 2015, the U.S. Debtors filed with the U.S. Bankruptcy Court the *U.S. Debtors' Motion For Clarification And/Or Reconsideration Of The May 12, 2015 Allocation Trial Opinion And Order* (the "U.S. Reconsideration Motion"), seeking the reconsideration and/or clarification of certain aspects of the U.S. Allocation Opinion and accompanying Order.

19.    Also on May 26, 2015, the U.S. Debtors filed with this Court the Notice of Filing in the U.S. Debtors' Chapter 11 Cases of the *U.S. Debtors' Motion For Clarification And/Or Reconsideration Of The May 12, 2015 Allocation Trial Opinion And Order* and Request for a Joint Hearing Pursuant to the Cross-Border Insolvency Protocol (the "Notice of Filing").

20.    On May 29, 2015, the U.S. Debtors filed with this Court a Notice of Motion and Motion Record in connection with this Reconsideration Motion.

## PART III – ISSUES

21.    The following issues are before this Court and addressed below:

(1)    Does this Court have the requisite jurisdiction to clarify, reconsider or amend the Ontario Allocation Judgment?

(2)    In the event that this Court does have the requisite jurisdiction to clarify, reconsider or amend the Ontario Allocation Judgment, should this Court exercise its discretion to so clarify, reconsider or amend the Ontario Allocation Judgment in the following manner:

(a)    To amend the Ontario Allocation Judgment such that it provides that the allowed general unsecured claims against NNI held by the Guaranteed

---

[7] *Nortel Networks Corporation (Re)*, 2015 ONSC 2987, [*Ontario Allocation Judgment*], Brief of Authorities of the U.S. Debtors, Tab 1.

[8] Allocation Trial Opinion, *In re: Nortel Networks, Inc.,* et al., No. 09-10138, May 12, 2015 [D.I. 15544] (Bankr. D. Del.) [*U.S. Allocation Opinion*], Brief of Authorities of the U.S. Debtors, Tab 2. The U.S. Bankruptcy Court has also issued an accompanying Order dated May 12, 2015.

Bondholders, in the aggregate amount of US$3,934,521,442.00, shall be included and recognized among the total claims against the U.S. Debtors for the purpose of determining the allocation from the Lockbox that each Debtor will be entitled to receive.

(b)     To clarify or amend the Ontario Allocation Judgment to provide that the proceeds attributable to NNI's sale of its equity interests in NGS and Diamondware shall be excluded from the Lockbox funds allocated pro rata to the various estates and shall instead be allocated and paid directly to NNI.

(c)     To clarify or amend the Ontario Allocation Judgment to provide that, in determining the claims of a Debtor for purposes of calculating the allocation of the Lockbox proceeds, the intercompany claims by and among Debtors within a Debtor group (i.e., the U.S. Debtors, the Canadian Debtors and the EMEA Debtors) shall be excluded.

(d)     To clarify or amend the Ontario Allocation Judgment to provide that among the claims included for calculation of the allocation owed to the U.S. Debtors are settled (or otherwise allowed) claims paid by the U.S. Debtors since the Petition Date, including without limitation, the Settled Claims.

(e)     To clarify or amend the Ontario Allocation Judgment to provide that the allocation of the Lockbox proceeds will be made to specific Debtors (not to Debtor groups) based on claims existing against each specific Debtor; provided, however, that to the extent a creditor holds claims against multiple Debtors within a Debtor group, solely for purposes of allocation, the creditor's claim shall be included only once in each Debtor group.

(f)     To clarify or amend the Ontario Allocation Judgment to provide that this Court shall retain oversight of and adopt procedures as necessary to measure the amount of disputed claims (which for purposes of the Reconsideration Motion shall include any claim not allowed prior to the date of the Ontario Allocation Judgment) against any Debtor seeking an

allocation that may be considered for purposes of determining the allocation of the Lockbox proceeds.  In addition to proposing schedules for expediting claims procedures for their estates as the Court previously ordered, each of the Debtors may submit proposals for procedures regarding and oversight of disputed claims of other Debtors for the purposes of determining allocation.

(g)     To clarify or amend the Ontario Allocation Judgment to provide that the Debtors each shall be entitled to seek an allocation distribution based upon claims that are incapable of being determined before a final allocation amount has been set, including but not limited to applicable taxes on the Lockbox proceeds allocated to them.

## PART IV – LAW AND ARGUMENT

22.     In addition to the law and argument set out below, the U.S. Debtors rely on the Notice of Filing, and, in particular, the U.S. Reconsideration Motion, that was filed with this Court on May 26, 2015.

**Issue (1):  This Court Should Apply Its Discretion to Clarify, Reconsider or Amend the Ontario Allocation Judgment**

23.     This Court retains a broad jurisdiction to reconsider, amend or clarify the Ontario Allocation Judgment; doing so would:  (i) serve the interest of justice by allowing the Court to maintain consistent decisions with the U.S. Bankruptcy Court; (ii) address the inconsistencies and ambiguities in the Ontario Allocation Judgment; and (iii) ensure that, to the extent that the pro rata allocation is applied in this case, it is applied on a basis that is more fair and equitable.

24.     Until the time that an order is issued and entered, this Court is not *functus officio* and thus retains jurisdiction to reconsider the Ontario Allocation Judgment.[9]  This jurisdiction is independent of the *Rules of Civil Procedure*[10] and is broad: "There can be no doubt that until a judgment is formally entered in the court record, the judge has a very broad discretion to change

---

[9] *Burke v. Sitser*, 2002 NSCA 115, para. 7, Brief of Authorities of the U.S. Debtors, Tab 3.
[10] *Metropolitan Toronto Condominium Corp. 626 v. Bloor/Avenue Road Investment Inc*., [2009] O.J. No. 1205, para. 32 (Ont. S.C.J.), Brief of Authorities of the U.S. Debtors, Tab 4.

it."[11] This principle, recently affirmed by the Ontario Court of Appeal, has "deep historical roots."[12]  As early as 1963, it was recognized by the Court of Appeal as "well settled in law" "that an order can always be withdrawn, altered or modified by a Judge either on his own initiative or on the application of a party until such time as the order has been drawn up, passed and entered." [13] There is no need for new evidence for a judge to exercise this "unfettered discretion;" reconsideration is proper if the trial judge is satisfied that "the original judgment was in error because it overlooked or misconstrued material evidence, or misapplied the law."[14]

25.    In this case, because no order has been entered, the "issue of finality does not apply" as there has been no final determination of the matter in the form of an entered order.[15] Moreover, any concerns regarding finality are overridden by the interests of fairness in reaching the right decision on the merits.[16]  In *Montague* itself, the Court of Appeal upheld the discretion of the trial judge to change the remedy she awarded not once, but twice, before entering her order.[17]

26.    Reconsideration is to be used "sparingly" and only in special circumstances.[18] A decision meets this criteria when the "integrity of the litigation process is at risk unless it occurs."[19] This is the case here for two reasons: (i) given the broad jurisdiction afforded to the U.S. Bankruptcy Court to reconsider its own decision, it is important that this Court be able to maintain the consistency of the Ontario Allocation Judgment with the U.S. Allocation Opinion, if this Court agrees with the merit of the amendment; and (ii) the issues subject to reconsideration or

---

[11] *Montague v. Bank of Nova Scotia*, [2004] O.J. No. 13, para. 34 (Ont. C.A.), Brief of Authorities of the U.S. Debtors, Tab 5.
[12] *Ibid.,* para. 36.
[13] *Holmes Foundry Ltd. v. Point Edward (Village)*, [1963] 2 O.R. 404 (Ont. C.A.), Brief of Authorities of the U.S. Debtors, Tab 6.
[14] *Sykes v. Sykes*, [1995] B.C.W.L.D. 1275, paras. 9-10 (BCCA), Brief of Authorities of the U.S. Debtors, Tab 7; s*ee* also *Constantinescu v. Barriault*, [1996] B.C.W.L.D. 2846, 1996 CarswellBC 2281, para. 16 (BCSC), Brief of Authorities of the U.S. Debtors, Tab 8.
[15] *Metropolitan Toronto Condominium Corp. 626 v. Bloor/Avenue Road Investment Inc*., [2009] O.J. No. 1205, para. 31 (Ont. S.C.J.), Brief of Authorities of the U.S. Debtors, Tab 4.
[16] *671122 Ontario Ltd. v. Sagaz Industries Canada Inc.,* 2001 SCC 59, para. 60, Brief of Authorities of the U.S. Debtors, Tab 9.
[17] *Montague v. Bank of Nova Scotia*, [2004] O.J. No. 13, para. 38 (Ont. C.A.) [*Montague*], Brief of Authorities of the U.S. Debtors, Tab 5.
[18] *671122 Ontario Ltd. v. Sagaz Industries Canada Inc.,* 2001 SCC 59, para. 61, Brief of Authorities of the U.S. Debtors, Tab 9.
[19] *Schmuck v. Reynolds-Schmuck,* [2000] O.J. No. 247, para. 25 (Ont. S.C.J.), Brief of Authorities of the U.S. Debtors, Tab 10.

clarification were not briefed by the parties and have the effect of creating an inequitable allocation that threatens this Court's stated goals.

27.    First, as noted by this Court, there is value in consistent decisions between the U.S. Bankruptcy Court and this Court.[20] The U.S. Bankruptcy Court has clear authority to reconsider or clarify its own decision, as codified in rules 59(e) and 60 of the U.S. Federal Rules of Civil Procedure.[21]

28.    If the U.S. Bankruptcy Court determines that reconsideration of the U.S. Allocation Opinion is in order then, assuming this Court agrees with the merits of the amendment, it would not serve the interests of justice for this Court to decline jurisdiction to reconsider the Ontario Allocation Judgment, thus leading to inconsistent decisions.  While this is not a conventional circumstance for reconsideration, courts have recognized that "a considerable degree of flexibility is needed" for the application of reconsideration because its need may arise "in an almost limitless variety of situations."[22]

29.    Second, this Court did not have the benefit of briefing by the parties or expert analysis to confirm the critical assumptions underlying this Court's decision or to illustrate the effects of the structure of its methodology.  The U.S. Debtors do not believe that the Court intended the extreme detrimental and disparate impact on the U.S.-Only Unsecured Creditors that results from the modified pro rata allocation set out in the Ontario Allocation Judgment. These impacts are explained at length in the U.S. Reconsideration Motion and now is an opportune time for this Court to consider them. As it stands, the methodology adopted in the Ontario Allocation Judgment does not accomplish its stated intended result: an equitable, pro rata allocation of the sales proceeds based on allowed creditor claims.[23]

30.    The fact that the modified pro rata allocation methodology was not before the parties, and thus no party had an ability to make submissions on the effect of any inconsistencies or

---

[20] *Ontario Allocation Judgment*, 2015 ONSC 2987, para. 10, Brief of Authorities of the U.S. Debtors, Tab 1.
[21] Rule 59(e) authorizes "[a] motion to alter or amend a judgment" after its entry.  Similarly, Rule 60 authorizes a court to "correct a . . . mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record," Fed. R. Civ. P. 60, and further "allows courts to grant relief from a final order for, among other reasons, 'mistake, inadvertence, surprise, or excusable neglect' and 'any other reason that justifies relief.'" The scope of the authority of the U.S. Bankruptcy Court is fully described in the U.S. Reconsideration Motion.
[22] *Griffin v. Corcoran*, 2001 NSCA 73, para. 64, Brief of Authorities of the U.S. Debtors, Tab 11.
[23]  *Ontario Allocation Judgment*, 2015 ONSC 2987, para. 251, Brief of Authorities of the U.S. Debtors, Tab 1.

- 12 -

ambiguities it contained, is itself sufficient grounds for reconsideration.[24] Ultimately, reconsideration is appropriate where the trial judge has adopted a complex methodology that has not had the benefit of counsel to analyze, comment and submit evidence on it, and where, as here, the methodology has complex implications that are not immediately apparent. The submissions of counsel on the modified pro rata allocation theory would have been beneficial had they been part of the trial.  However, they were not.  This Reconsideration Motion is an opportunity to rectify this information deficiency.  The Manitoba Court of Appeal's grant of reconsideration in *Abraham v. Wingate Properties Ltd.* is on point.[25]  The Court of Appeal rejected the damages valuation of the trial judge, as well as the valuations proposed by either party, and, in adopting its own approach, the Court later determined that it had failed to take all relevant factors in account. The Court thus reconsidered its previous decision and amended the damages quantum.[26]

31.      As an alternative where reconsideration of the Judgment is not required, the Court may clarify the Judgment to make the Court's intentions clear.[27]

**Issue (2):  This Court Should Exercise its Discretion to Clarify, Reconsider or Amend the Ontario Allocation Judgment**

32.    Each issue that this Court is being asked to clarify, reconsider or amend is addressed separately below.

> *NNI's Obligation to Pay the Guaranteed Bondholders' Claim Without a Corresponding Allocation of Funds Inequitably Dilutes the Recoveries of the U.S. Debtors' U.S.-Only Unsecured Creditors*

33.    The U.S. Debtors respectfully request that the Court reconsider its ruling that the Guaranteed Bondholders' guarantee claims against the U.S. Debtors be excluded from the

---

[24] *See e.g. Compton Agro Inc. (Trustee of) v. Canada (Attorney General)*, 2000 MBCA 29, para. 3, Brief of Authorities of the U.S. Debtors, Tab 12,which held that "[i]f in fact we had decided the appeal on a point of law that counsel had not been given an opportunity to adequately address, we would have readily granted the application [for reconsideration]."

[25] *Abraham v. Wingate Properties Ltd.*, [1986] 2 W.W.R. 568, 1985 CarswellMan 232 (Man. C.A.), Brief of Authorities of the U.S. Debtors, Tab 13.

[26] *Ibid,* paras. 2-3; s*ee also UAP Inc. v. Oak Tree Auto Centre Inc.,* 2003 PESCAD 6*,* 2003 CarswellPEI 28, para. 7, Brief of Authorities of the U.S. Debtors, Tab 14, where the appellate court reconsidered its calculation of damages because in performing it without the assistance or input of counsel, the court had overlooked relevant facts.

[27]  *Bremness v. McGee Capital Management Ltd.*, 1999 CarswellOnt 2866 (Ont. C.A.), Brief of Authorities of the U.S. Debtors, Tab 15.

measurement of claims against the U.S. Debtors for purposes of determining the proportional allocation of proceeds to each Debtor.  No other issue is more detrimental to the recoveries of the U.S.-Only Unsecured Creditors.

34.    The magnitude of this detriment can be seen from the following two hypothetical examples:

- First, if one hypothetically assumes that the Canadian Debtors pay their unsecured creditors 50% and that the Guaranteed Bondholders are limited to a deficiency claim against the U.S. Debtors, that deficiency claim would be $2 billion. Assuming solely for argument's sake a U.S.-Only Unsecured Creditor pool of US$1.3 billion, as the CCC's Thomas Britven opined in his expert report, the addition of a $2 billion Guaranteed Bondholder claim without any corresponding allocation from the Lockbox would reduce recoveries of U.S.-Only Unsecured Creditors by more than 60%.  Thus, from assets that similarly would have yielded those U.S. creditors a 50% recovery, the effect of having to share those assets *pari passu* with the bondholders without any corresponding allocation would instead yield a less than 20% recovery.

- Second, if the full US$3.93 billion Guaranteed Bondholder claim against the U.S. Debtors (that the Court has allowed and as the *Ivanhoe* line of U.S. case law that is discussed below requires) is respected – and no adjustment to allocation for the U.S. claims base is made – recoveries for the U.S.-Only Unsecured Creditors that would otherwise hypothetically be 50% would fall to 12%.[28]

35.    The interplay between the Courts' respective judgments and the U.S. law (and Canadian law, for that matter) on guarantee claims operate to yield this result.  The Ontario Allocation Judgment provides that any claims of a Guaranteed Bondholder against a guarantor Debtor Estate "will not be taken into account in determining claims against the Debtor Estate" for the purpose of allocating the lockbox funds.[29]  However, under U.S. law, the Guaranteed Bondholders have the right to claim in full against the U.S. Debtors, and the U.S. Bankruptcy

---

[28] Note that these figures – which are for demonstrative purposes only – reflect the recovery of creditors directly from the allocation of the Lockbox proceeds to Debtor groups rather than the final distributions to creditors.
[29] *Ontario Allocation Judgment*, 2015 ONSC 2987, para. 251, Brief of Authorities of the U.S. Debtors, Tab 1.

Court has already determined that the Guaranteed Bondholders have an allowed claim of approximately US$3.93 billion. Given the allowance of this sizeable claim, the Ontario Allocation Judgment has the effect of allocating a disproportionately and inequitably low amount of proceeds to the U.S. Debtors for distribution to their unsecured creditors compared to the creditors of the other Debtors.

<u>The Guaranteed Bondholders Can Claim in Full Against The U.S. Estate</u>

36.    It is clear that under the binding U.S. law governing distribution in the U.S. Bankruptcy Court, the Guaranteed Bondholders may claim against NNI in an equal amount to which they may claim against the Canadian Debtors.  The Guaranteed Bondholders have the right to collect entirely and primarily against either the Canadian Debtors or the U.S. Debtors.

37.    In *Ivanhoe Building & Loan Association of Newark v. Orr*, the U.S. Supreme Court held that in bankruptcy, until its claim is paid in full, a creditor is permitted to file a proof of claim against a debtor for the full amount of indebtedness, irrespective of partial satisfaction of the claim from other sources.[30] *Ivanhoe* directs that the Guaranteed Bondholders can assert their claims in full against NNI until they receive distributions from the Canadian Debtors and NNI for the full amount of their claims.

38.    This has been recognized in the Guaranteed Bondholders' allowed claims against NNI. Consistent with the Guaranteed Bondholders rights under *Ivanhoe*, on December 18, 2014, the U.S. Bankruptcy Court entered an order allowing the claims of the Guaranteed Bondholders for principal and accrued prepetition interest in the aggregate amount of US$3,934,521,442.00.[31]

39.    Canadian law on this issue is consistent with the *Ivanhoe* principle. If both the principal debtor and the guarantor are in insolvency proceedings, "the creditor can prove against the estate of each for the full amount owing in respect of the guaranteed obligation."[32]  More specifically, "upon the bankruptcy of its debtor, the creditor is entitled to claim against the estate of the

---

[30]  295 U.S. 243 (1935) at 245-46, Brief of Authorities of the U.S. Debtors, Tab 16.
[31] *See Opinion Regarding Debtors' Motion Pursuant to Bankruptcy Rule 9019 Approving Settlement Agreement by and Among NNI, the Supporting Bondholders, and the Bank of New York Mellon with Respect to the NNI Post-Petition Interest Dispute and Related Issues*, Dec. 18, 2014 [D.I. 14949] , and accompanying Order [D.I. 14950], Brief of Authorities of the U.S. Debtors, Tab 17.
[32]  Kevin Patrick McGuinness, *The Law of Guarantee* at 390 (3d ed. 2013), Brief of Authorities of the U.S. Debtors, Tab 18.

bankrupt guarantor for the full amount of the debt."[33] This claim may only be reduced in the event of any payment made "prior to proof of the creditor's claim in the estate of the guarantor."[34]  In this case, the Guaranteed Bondholders have not received any payments or dividends from the Canadian Debtors prior to the proof of their claims against the U.S. Debtors.

<u>The Disparity Between Recognition of the Guaranteed Bond Claims in Full, But No Credit for the Same Claim in Allocation, is Inequitable</u>

40.    Thus, while NNI remains legally obligated to make distributions on billions of dollars of allowed claims made by the Guaranteed Bondholders, the Ontario Allocation Judgment does not provide for any allocation of the sales proceeds to the U.S. Debtors on account of such Guaranteed Bondholders' claims.  Instead, the Ontario Allocation Judgment allocates Lockbox proceeds to the U.S. Debtors based only upon the U.S.-Only Unsecured Creditors' claims and the administrative and priority claims against the U.S. Debtors, an aggregate amount still to be finally determined but smaller than the allowed claims of the Guaranteed Bondholders by orders of magnitude.

41.    The denial of the U.S. Debtors' right to receive a pro rata distribution of the sales proceeds on account of all of the creditors to whom they are legally obligated to pay stands in contrast to the treatment provided to all of the other Debtors.  In particular, NNL was granted a right to a Lockbox distribution on account of the full Guaranteed Bondholder liabilities and on account of the allowed guarantee claim by the U.K. Pension Claimants[35] against NNL.[36]  Given that the Guaranteed Bondholders' claims are valid claims against NNI and have already been allowed by the U.S. Bankruptcy Court, there is no basis in law or equity for this Court to include claims of all other unsecured creditors against the U.S., Canadian and EMEA Debtors for

---

[33] *J. LeBar Seafoods Inc., Re* [1981] O.J. No. 2381 (Ont. Sup. Ct., In Bank.), Brief of Authorities of the U.S. Debtors, Tab 19.

[34] *Ibid. See also Olympia & York Developments Ltd., Re* (1997), 143 D.L.R. (4th) 536 ( Ont. Ct. Jus. (Gen. Div)), *citing Re Blakeley* (1892), 9 Morr. 173 ("if after proof is made [against the guarantor's estate] the creditor receives a dividend from the estate of the principal debtor that will not be deducted."), Brief of Authorities of the U.S. Debtors, Tab 20.

[35] The U.K. Pension Claimants are Nortel Networks UK Pension Trust Limited and the Board of the Pension Protection Fund.

[36] *Ontario Allocation Judgment*, 2015 ONSC 2987, paras. 248, 249, 252, Brief of Authorities of the U.S. Debtors, Tab 1.

purposes of determining their respective allocations, but to exclude the allowed contractual claims of the Guaranteed Bondholders against the U.S. Debtors.

42.    The apparently unintended and inequitable effect of this aspect of the Ontario Allocation Judgment is that the U.S. Debtors (and their U.S.-Only Unsecured Creditors) will receive a substantially smaller portion of the sales proceeds generated by the sale of the Nortel group's assets than similarly situated Debtors (and creditors) in Canada and EMEA. Thus, any U.S. distributions of lockbox proceeds to the Guaranteed Bondholders will reduce, dollar-for-dollar, the lockbox proceeds available for distribution to U.S.-Only Unsecured Creditors. This disparate treatment is inconsistent with a pro rata approach that respects guarantees and has a stated purpose of reaching an equitable result.

### The U.S. Debtors Should Receive All of the Proceeds from the Sale of Their Wholly-Owned Non-Debtor Subsidiaries

43.    In part, this Court's modified pro rata allocation was motivated by its conclusion that certain Nortel business lines and the intellectual property assets were part of an "integrated whole", rather than the property of a particular legal entity.[37] In the case of the U.S. Debtors, two of its subsidiaries were clearly not integrated into the Nortel group – Diamondware because it was a recent acquisition, and NGS because the U.S. Department of Defense demanded it to be wholly-owned by NNI and managed separately from the other Nortel affiliates. These two non-debtor subsidiaries that were wholly-owned by NNI were the only equity interests of non-debtor subsidiaries sold in the Nortel's asset sales (both were sold as part of the Enterprise business unit sale) and for which sales proceeds are held in the Lockbox.[38] In fact, even the Canadian Debtors' expert, Phillip Green, allocated the full equity value of these companies to the U.S. Debtors in his expert report.

44.    The Ontario Allocation Judgment does not allocate any Lockbox proceeds to NNI specifically for the sale of these subsidiaries. Accordingly, the U.S. Debtors respectfully request that the proceeds attributable to these companies (which the U.S. Debtors maintained on their books and records at the time of the Enterprise business unit sale, and before this litigation arose,

---

[37] *Ibid.*, at para 223.
[38] By contrast, when NNL sold its interests in LG-Nortel Co. Ltd. and Guangdong-Nortel Telecommunications Equipment Co. Ltd. and NNUK sold its subsidiary Nortel Networks International Finance & Holding BV's interest in Nortel Networks Netas Telekomunikasyon A.S. in separate sales, proceeds they were not subject to allocation in these proceedings but were retained exclusively by NNL and NNUK, respectively.

at a combined value of US$331,637,000, including the value of cash holdings) be paid to NNI prior to any other allocation of Enterprise Lockbox proceeds among the Debtors.

### *The U.S. Debtors Seek Clarification on the Inclusion of Intercompany Claims for Allocation Purposes*

45.     This Court held that "[i]ntercompany claims against a Debtor Estate are to be included in the determination of claims against that Estate."[39]  The U.S. Debtors seek confirmation or clarification that the "intercompany claims" that are "included in the determination of claims against that Estate" are claims between Debtors across different Debtor groups (i.e., the U.S. Debtors, the Canadian Debtors and the EMEA Debtors) rather than within Debtor groups.  This clarification is necessary to ensure that allocation of the Lockbox proceeds would not be subjected to a risk of significant distortion by claims allowed between Debtors within the same Debtor group.

### *The U.S. Debtors Seek Clarification on the Inclusion of Settlements for Allocation Purposes*

46.     The U.S. Debtors seek clarification or confirmation that, consistent with this Court's direction that settlements will be included in the calculation,[40] the U.S. Debtors' prior Court-approved settlements with the EMEA Debtors and the U.K. Pension Claimants (granting them administrative claims, which were then paid in cash) will be included in the calculation of the allocation owed to the U.S. Debtors.  It would be particularly unjust for the Canadian Debtors to receive an allocation on account of their settlement with the EMEA Debtors (in which they granted a claim that has not yet been paid) or the claim allowed after trial with the U.K. Pension Claimants, but for the U.S. Debtors to receive no allocation credit for their settlements of similar claims with those same entities.  The same is true with respect to all other Settled Claims.

### *Sales Proceeds Allocations Should Be Made to Specific Debtors, not Debtor Groups*

47.     The allocation methodology is clear as to this Court's desire to distribute the Lockbox in a manner relative to the size of each Debtor's claims that must be satisfied with such proceeds,

---

[39] *Ontario Allocation Judgment*, 2015 ONSC 2987, paras. 258(3), Brief of Authorities of the U.S. Debtors, Tab 1.
[40] *Ibid.*, para. 249.

while at the same time leaving the specific details regarding each Debtor's distribution scheme to their respective insolvency proceedings.[41]

48.      However, clarification is needed to ensure that a recipient Debtor group treats claims that formed the basis for the allocation to such Debtor group in the first place (i.e., the U.S. Debtors' US$2.06 billion claim against NNL) in an equitable manner and makes distributions in respect of such claims on a basis that is consistent with the *pari passu* principles and the fundamental premise upon which this Court has based pro rata allocation.[42]  The U.S. Debtors propose the following clarification: instead of allocation to Debtor groups, the Court should clarify and confirm that allocation of the Lockbox proceeds would be made to specific individual Debtors based upon the respective amounts of their own creditor base (with each creditor's claim only counting once in each group).  This will ensure that the Lockbox proceeds are used fairly to pay the claims which led to the allocation.

### The Court Should Establish Procedures at this Time to Enable the U.S. Debtors to Promptly Challenge Inflated Claims Asserted Against Other Estates, Including Particularly the U.K. Pension Claimants' £2.2 Billion Claim

49.      The U.K. Pension Claimants' £2.2 billion claim asserted against NNUK and the other EMEA Debtors would have an extremely detrimental effect on recoveries for creditors of the U.S. and Canadian Debtors alike under the modified pro rata allocation framework.  While the Cross Border Protocol and Cross Border Claims Protocol have been adopted, and other orders have been entered, by this Court and the U.S. Bankruptcy Court that provide monitoring and other mechanisms in respect of the Canadian and U.S. claims processes, and although there is a history of cooperation between the U.S. and Canadian Courts, the U.S. Debtors seek clarification that effective protections will exist to prevent Debtors from increasing their Lockbox allocation by undue claims inflation, including particularly the EMEA Debtors' cases where no procedures currently exist.

50.      The U.S. Debtors seek clarification of the Ontario Allocation Judgment to set forth the process and schedule by which claims, particularly the U.K. Pension Claimants' claim, will be measured by this Court for purposes of the allocation calculation.  The concern is especially

---

[41] *Ibid.*, para. 211.
[42] *Ibid.*, para. 209.

- 19 -

heightened with regard to the EMEA Debtors, given that they have neither commenced their formal claims process to date nor entered into claims protocols or other agreements that give the U.S. Debtors or the Canadian Debtors any voice (let alone an adequate voice) with regards to their claims resolution.  The U.S. Debtors request that the Ontario Allocation Judgment be clarified to include and ensure adequate protection against claims inflation for allocation and distribution purposes with regard to these claims.  As part of such clarification, this Court should clarify that the EMEA Debtors cannot avoid such Court oversight by privately agreeing to the claimed amount so as to avoid characterizing them as "disputed claims" for purposes of the Court's ruling.

### *Failure to Reserve for Certain Claims Before Pro Rata Allocation Would Prejudice U.S.-Only Unsecured Creditors*

51.    This Court acknowledged that some claims remain unresolved or have not yet been determined.[43]  However, at least in the U.S. Debtors' cases, certain claims are by definition incapable of being determined, much less resolved, before a final allocation amount has been set as they would only arise as a result of the actual allocation of Lockbox proceeds and may vary depending on the amount of the sale proceeds actually allocated to the U.S. Debtors.  Accordingly, it would unduly prejudice the U.S. Debtors if they were unable to receive an allocation for certain potentially significant claims merely because of the timing in which such claims would arise relative to the release of Lockbox funds.  In particular, the U.S. Debtors would be responsible for paying applicable U.S. federal and state taxes on the sales proceeds allocated to them.[44]  The Court should clarify that the U.S. Debtors are entitled to seek an allocation distribution based on these claims, including based on an estimated or reserved amount if necessary, due to the unique timing of such claims and the inability to resolve them prior to the actual allocation of Sales Proceeds.

**Conclusion**

52.    This Court has the requisite jurisdiction to clarify, reconsider or amend the Ontario Allocation Judgment, and that this is an appropriate case in which to exercise such discretion.  In

---

[43] *Ibid.,* para 253.
[44] In contrast to the Canadian Debtors, whose income from the allocation of the Sales Proceeds will be sheltered by their existing net operating losses, the U.S. Debtors may not have sufficient net operating losses to shelter taxes due as a result of their allocation of sales proceeds.

addition, many of the issues engaged herein are the very sort of issues that would in any event require this Court's clarification during the process of reducing the Ontario Allocation Judgment to an operative order that would typically occur following the release of reasons.  Given the parallel reconsideration process that is unfolding in the United States, now is the appropriate time to deal with these issues in Ontario.  Moreover, by addressing these issues at this time, this Court may further the achievement of a prompt, equitable resolution without further hardship or depletion of the remaining estates.

## PART V – ORDER REQUESTED

53.    For the reasons set forth herein, the U.S. Debtors respectfully request that this Court clarify, reconsider or amendment the Ontario Allocation Judgment in the manner set forth herein.

ALL OF WHICH IS RESPECTFULLY SUBMITTED

_____
Sheila Block

_____
Scott Bomhof

_____
Andrew Gray

_____
Adam Slavens

Lawyers for Nortel Networks Inc.
and the other U.S. Debtors

## Schedule "A"

## List of Authorities

1.      *Nortel Networks Corporation (Re)*, 2015 ONSC 2987

2.      *Allocation Trial Opinion, In re: Nortel Networks, Inc.*, et al., No. 09-10138, May 12, 2015 [D.I. 15544] (Bankr. D. Del.)

3.      *Burke v. Sitser*, 2002 NSCA 115

4.      *Metropolitan Toronto Condominium Corp. 626 v. Bloor/Avenue Road Investment Inc.*, [2009] O.J. No. 1205 (Ont. S.C.J.)

5.      *Montague v. Bank of Nova Scotia*, [2004] O.J. No. 13 (Ont. C.A.)

6.      *Holmes Foundry Ltd. v. Point Edward (Village)*, [1963] 2 O.R. 404, 1963 CarswellOnt 272 (Ont. C.A.)

7.      *Sykes v. Sykes*, [1995] B.C.W.L.D. 1275 (BCCA)

8.      *Constantinescu v. Barriault, [1996] B.C.W.L.D. 2846*, 1996 CarswellBC 2281 (BCSC)

9.      *671122 Ontario Ltd. v. Sagaz Industries Canada Inc.*, 2001 SCC 59

10.     *Schmuck v. Reynolds-Schmuck*, [2000] O.J. No. 247 (Ont. S.C.J.)

11.     *Griffin v. Corcoran*, 2001 NSCA 73

12.     *Compton Argo Inc. (Trustee of) v. Canada (Attorney General)*, 2000 MBCA 29

13.     *Abraham v. Wingate Properties Ltd.*, [1986] 2 W.W.R. 568, 1985 CarswellMan 232 (Man. C.A.)

14.     *UAP Inc. v. Oak Tree Auto Centre Inc.*, 2003 PESCAD 6, 2003 CarswellPEI 28

15.     *Bremness v. McGee Capital Management Ltd.*, 1999 CarswellOnt 2866 (Ont. C.A.)

16.     *Ivanhoe Building & Loan Association of Network v. Orr* (1935), 295 U.S. 243

17.     *Opinion Regarding Debtors' Motion Pursuant to Bankruptcy Rule 9019 Approving Settlement Agreement by and Among NNI, the Supporting Bondholders, and the Bank of New York Mellon with Respect to the NNI Post-Petition Interest Dispute and Related Issues, In re: Nortel Networks, Inc.*, et al., No. 09-10138,  Dec. 18, 2014 [D.I. 14949] (Bankr. D. Del.), and accompanying Order [D.I. 14950]

18.     Kevin Patrick McGuinness, *The Law of Guarantee* (3d ed. 2013)

- 2 -

19. *J. LeBar Seafoods Inc., Re*, [1981] O.J. No. 2381 (Ont. Sup. Ct.)

20. *Olympia & York Developments Ltd., Re* (1997), 143 D.L.R. (4th) 536, 1997 CarswellOnt 657 (Ont. Ct. Jus. (Gen. Div))

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED          Court File No. 09-CL-7950

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**
Proceeding commenced at TORONTO

**FACTUM OF NORTEL NETWORKS INC. AND**
**THE OTHER U.S. DEBTORS**
**(Motion for Clarification, Reconsideration or Amendment)**

**TORYS LLP**

79 Wellington St. W., Suite 3000
Box 270, TD Centre
Toronto, Ontario    M5K 1N2  Canada

Fax:  416.865.7380

**Sheila Block** (LSUC#: 14089N)
Tel: 416.865.7319
Email: sblock@torys.com

**Scott A. Bomhof** (LSUC#: 37006F)
Tel: 416.865.7370
Email: sbomhof@torys.com

**Andrew Gray** (LSUC#: 46626V)
Tel: 416.865.7630
Email: agray@torys.com

**Adam M. Slavens** (LSUC#: 54433J)
Tel: 416.865.7333
Email: aslavens@torys.com

Lawyers for Nortel Networks Inc.
and the other U.S. Debtors