**<u>EXHIBIT B</u>**

Court File No: 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

BOOK OF AUTHORITIES OF NORTEL NETWORKS INC.
AND THE OTHER US. DEBTORS
(Motion for Clarification, Reconsideration or Amendment)

**TORYS LLP**
79 Wellington St. W., Suite 3000
Box 270, TD Centre
Toronto, ON  M5K 1N2

Fax:  416.865.7380

**Sheila Block** (LSUC#: 14089N)
Tel: 416.865.7319
Email: sblock@torys.com

**Scott A. Bomhof** (LSUC#: 37006F)
Tel: 416.865.7370
Email: sbomhof@torys.com

**Andrew Gray** (LSUC#: 46626V)
Tel: 416.865.7630
Email: agray@torys.com

**Adam M. Slavens** (LSUC#: 54433J)
Tel: 416.865.7333
Email: aslavens@torys.com

Lawyers for Nortel Networks Inc.
and the other U.S. Debtors

**TO:    SERVICE LIST**

# TABLE OF CONTENTS

| Tab | Case |
|-----|------|
| 1 | *Nortel Networks Corporation (Re)*, 2015 ONSC 2987 |
| 2 | *Allocation Trial Opinion, In re: Nortel Networks, Inc.*, et al., No. 09-10138, May 12, 2015 [D.I. 15544] (Bankr. D. Del.) |
| 3 | *Burke v. Sitser*, 2002 NSCA 115 |
| 4 | *Metropolitan Toronto Condominium Corp. 626 v. Bloor/Avenue Road Investment Inc.*, [2009] O.J. No. 1205 (Ont. S.C.J.) |
| 5 | *Montague v. Bank of Nova Scotia*, [2004] O.J. No. 13 (Ont. C.A.) |
| 6 | *Holmes Foundry Ltd. v. Point Edward (Village)*, [1963] 2 O.R. 404, 1963 CarswellOnt 272 (Ont. C.A.) |
| 7 | *Sykes v. Sykes*, [1995] B.C.W.L.D. 1275 (BCCA) |
| 8 | *Constantinescu v. Barriault*, [1996] B.C.W.L.D. 2846, 1996 CarswellBC 2281 (BCSC) |
| 9 | *671122 Ontario Ltd. v. Sagaz Industries Canada Inc.*, 2001 SCC 59 |
| 10 | *Schmuck v. Reynolds-Schmuck*, [2000] O.J. No. 247 (Ont. S.C.J.) |
| 11 | *Griffin v. Corcoran*, 2001 NSCA 73 |
| 12 | *Compton Argo Inc. (Trustee of) v. Canada (Attorney General)*, 2000 MBCA 29 |
| 13 | *Abraham v. Wingate Properties Ltd.*, [1986] 2 W.W.R. 568, 1985 CarswellMan 232 (Man. C.A.) |
| 14 | *UAP Inc. v. Oak Tree Auto Centre Inc.*, 2003 PESCAD 6, 2003 CarswellPEI 28 |
| 15 | *Bremness v. McGee Capital Management Ltd.*, 1999 CarswellOnt 2866 (Ont. C.A.) |
| 16 | *Ivanhoe Building & Loan Association of Network v. Orr* (1935), 295 U.S. 243 |
| 17 | *Opinion Regarding Debtors' Motion Pursuant to Bankruptcy Rule 9019 Approving Settlement Agreement by and Among NNI, the Supporting Bondholders, and the Bank of New York Mellon with Respect to the NNI Post-Petition Interest Dispute and Related Issues, In re: Nortel Networks, Inc.*, et al., No. 09-10138,  Dec. 18, 2014 [D.I. 14949] (Bankr. |

| | |
|---|---|
| | D. Del.), and accompanying Order [D.I. 14950] |
| 18 | Kevin Patrick McGuinness, *The Law of Guarantee* (3d ed. 2013) |
| 19 | *J. LeBar Seafoods Inc., Re*, [1981] O.J. No. 2381 (Ont. Sup. Ct.) |
| 20 | *Olympia & York Developments Ltd., Re* (1997), 143 D.L.R. (4th) 536, 1997 CarswellOnt 657 (Ont. Ct. Jus. (Gen. Div)) |

# TAB 1

**CITATION:** Nortel Networks Corporation (Re), 2015 ONSC 2987
**COURT FILE NO.:** 09-CL-7950
**DATE:** 20150512

**SUPERIOR COURT OF JUSTICE – ONTARIO**
**COMMERCIAL LIST**

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. c-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

**BEFORE:**     Newbould J.

**HEARD:**     May 12, 13, 14, 15, 20, 21, 22, 27, 28, 29, 30, June 2, 5, 6, 16, 17, 18, 19, 20, 23, 24, September 22, 23 and 24, 2014

**COUNSEL**:     *Benjamin Zarnett*
*Peter  Ruby*
*Jessica Kimmel*
*Graham D. Smith*
*Gale Rubenstein*
*Jennifer Stam*
*Melanie Ouanounou*
*Vasuda Sinha*
*Nicholas Kluge*
*Nicholas Holmberg*
*Julie Rosenthal*
*Jason Wadden*
*Jonathan Edge*
*Paul Keller*                    Counsel for the Monitor and Canadian Debtors

*R. Paul Steep*
*Kenneth T. Rosenberg*
*Mark Zigler*
*Ari Kaplan*
*Jeff Van Bakel*
*Barbara Walancik*                    Counsel for the Canadian Creditors' Committee

*Sheila Block*
*Andrew Gray*
*Scott A. Bomhof*
*Avi Luft*
*James Bromley*
*Lisa Schweitzer*
*Jeffrey Rosenthal*
*Howard Zelbo*                    Counsel for the U.S. Debtors

*Richard Swan*
*Tom Matz*
*Jonathan Bell*
*Gavin H. Finlayson*
*Kevin J. Zych*                    Counsel for the *Ad Hoc* Group of Bondholders

*Matthew P. Gottlieb*
*Matthew Milne-Smith*
*James Doris*
*William Maguire*
*Neil Oxford*
*John Whiteoak*
*Tracy L. Wynne*
*Derek Adler*                    Counsel for the EMEA Debtors

*Michael E. Barrack*
*John L. Finnigan*
*Derek J. Miller*
*Michael Shakra*
*Andrea McEwan*
*Eugene Chang*                    Counsel for the UKPC

*R. Shayne  Kukulowicz*
*Goff Shaw*
*Abid Qureshi*
*David H. Botter*                    Counsel for the U.S. Unsecured Creditors'
                                 Committee
*Kenneth David Kraft*
*Karen B. Dine*                    Counsel for Wilmington Trust, National
                                 Association, Trustee

*Brett Harrison*                    Counsel for The Bank of New York Mellon, Trustee

*John D. Marshall*                    Counsel for Law Debenture Trust Company of New
                                 York, Trustee

# R E A S O N S   F O R   J U D G M E N T

## T A B L E   O F   C O N T E N T S

**PAGE NO.**

Prologue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

Nortel history and its matrix structure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

Bankruptcy filings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

Decision to liquidate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

Interim Funding and Settlement Agreement ("IFSA") . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

Asset sales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

Position of the parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

The MRDA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

    (i)     Governing law of the construction of the contract . . . . . . . . . . . . . . . . . . . . . . .   18

    (ii)    Position of the parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

    (iii)   Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

          a)  The meaning of the exclusive license . . . . . . . . . . . . . . . . . . . . . . . . . .   24

          b)  The right to sue for infringement . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37

    (iv)    Surrounding circumstances or the factual matrix . . . . . . . . . . . . . . . . . . . . . . .   38

          a)  1996 APA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40

          b)  Sub-licences . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   42

          c)  Representations to tax authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   44

          d)  Avoiding permanent establishment status in the U.S. . . . . . . . . . . . . . .   48

          e)  Patent litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   49

          f)  Conclusions of factual matrix evidence . . . . . . . . . . . . . . . . . . . . . . . . .   49

    (v)    Commercial reasonableness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   49

    (vi)    Conclusions on the meaning of the MRDA . . . . . . . . . . . . . . . . . . . . . . . . . . .   52

Applicability of the MRDA to the allocation issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   53

EMEA position on ownership of the Nortel IP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   56

Appropriate method to allocate the proceeds of sale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    58

Appropriate *pro rata* allocation method . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    73

Allocation on a basis other than pro rata . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    74

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    75

Epilogue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    76


**APPENDIX A**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

Allocation of the proceeds of the line of business sales . . . . . . . . . . . . . . . . . . . . . . . . . .    1

      (i) Mr. Kinrich . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2

      (ii) Mr. Malackowski and Mr. Huffard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4

      (iii) Mr. Green . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    9


**APPENDIX B** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

Residual IP proceeds allocation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

      (i) Mr. Kinrich's license approach to value . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

      (ii) Mr. Malackowski's contribution approach to value . . . . . . . . . . . . . . . . . . .    18

      (iii) Mr. Green's approach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    25

**Prologue**

[1]     Until January 14, 2009, Nortel Networks Corporation ("NNC") was a publicly-traded Canadian company and the direct or indirect parent of more than 130 subsidiaries located in more than 100 countries, collectively known as the "Nortel Group" or "Nortel". It operated a global networking solutions and telecommunications business.

[2]     On January 14, 2009 most of the Nortel entities filed for bankruptcy protection. In Canada, the Canadian incorporated entities (the "Canadian Debtors") filed under the *Companies' Creditors Arrangement Act* ("CCAA"). In the United States, most of the U.S. incorporated entities (the "U.S. Debtors") filed under chapter 11 of the *U.S. Bankruptcy Code*. In England, most of the entities incorporated in Europe, the Middle East and Africa (the "EMEA[1] Debtors") were granted administration orders under the *UK Insolvency Act, 1986.*

[3]     The initial intent of Nortel was to downsize and carry on those portions of its telecommunications business that it thought could be profitable. However that plan quickly evaporated and in June, 2009 Nortel decided to liquidate its assets. It sold its business lines for approximately $3.285[2] billion of which approximately $2.85 billion is now available to be allocated. It then sold its residual intellectual property for $4.5 billion. These amounts totalling $7.3 billion are held in escrow (the "lockbox funds"). At issue in these proceedings is how to allocate the $7.3 billion among the Canadian Debtors, the U.S. Debtors and the EMEA Debtors.

[4]     The trial in this case was unique. It was a joint trial of the Ontario Superior Court of Justice (Commercial List) and the U.S. Bankruptcy Court for the District of Delaware[3]. It arose from the arrangements made by the parties as part of the process of selling assets, and from a Cross-border Insolvency Protocol (the "Protocol"). In short:

**(i)**     The parties agreed in an Interim Funding and Settlement Agreement before any of the Nortel assets were sold to put the proceeds of sale into escrow and then attempt to agree

---

[1] EMEA is an acronym for 19 Nortel subsidiaries in Europe, the Middle East and Africa.
[2] All reference to dollars is to U.S. currency.
[3] Judge Kevin Gross is the U.S. bankruptcy judge.

- Page 6 -

on a protocol for resolving how the proceeds were to be allocated. If no agreement was reached, the issues were to be tried by the Ontario and U.S. Courts pursuant to the Protocol.

**(ii)**    The parties could not agree on the allocation, nor could they agree on a protocol process. By orders of the Ontario and U.S. Courts, the allocation was directed to be determined in a joint trial pursuant to the Protocol. The EMEA Debtors were held to have attorned to the jurisdiction of these courts in the escrow agreements made with respect to the proceeds of the several sales that had occurred.[4]

[5]    The Protocol was approved early in the CCAA and chapter 15 proceedings by orders the Ontario and U.S. Courts.[5] This type of protocol has become standard in the last number of years to govern the administration of cross-border insolvency proceedings. The Protocol included it its purposes:

> Accordingly, this Protocol has been developed to promote the following mutually desirable goals and objectives in the Insolvency Proceedings:
>
> (a)    harmonize and coordinate activities in the Insolvency Proceedings before the Courts;
>
> (b)    promote the orderly and efficient administration of the Insolvency Proceedings to, among other things, maximize the efficiency of the Insolvency Proceedings, reduce the costs associated therewith and avoid duplication of effort;
>
> (c)    honor the independence and integrity of the Courts and other courts and tribunals of the United States and Canada, respectively;
>
> (d)    promote international cooperation and respect for comity among the Courts, the Debtors, the Creditors Committee, the Estate Representatives (which include the Chapter 11 Representatives and the Canadian Representatives as such terms are defined below) and other creditors and interested parties in the Insolvency Proceedings;
>
> (e)    facilitate the fair, open and efficient administration of the Insolvency Proceedings for the benefit of all of the Debtors' creditors and other interested parties, wherever located; and

---

[4] See *Nortel Networks Corp. (Re)*, (2013), 2 C.B.R. (6th) 1;aff'd (2013), 5 C.B.R. (6th) 254 (Ont. C.A.); 2013 WL 1385271; aff'd 737 F.3d 265.
[5] A later Allocation Protocol which set out procedural matters to govern the allocation hearing was made and approved by orders of both Courts in May, 2013.

(f)      implement a framework of general principles to address basic administrative issues arising out of the cross-border nature of the Insolvency Proceedings.

[6]     The Protocol contained a number of provisions regarding the independence of the Canadian and U.S. Courts and the exclusive jurisdiction of each Court in the determination of matters arising in the Canadian and U.S. proceedings respectively. Included in the Protocol were the following provisions:

> 7.     The approval and implementation of this Protocol shall not divest nor diminish the U.S. Court's and the Canadian Court's respective independent jurisdiction over the subject matter of the U.S. Proceedings and the Canadian Proceedings, respectively…

> 8.     The U.S. Court shall have sole and exclusive jurisdiction and power over the conduct of the U.S. Proceedings and the hearing and determination of matters arising in the U.S. Proceedings. The Canadian Court shall have sole and exclusive jurisdiction and power over the conduct of the Canadian Proceedings and the hearing and determination of matters arising in the Canadian Proceedings.

[7]     The Protocol provided in paragraph 12 for the harmonization and co-ordination of the administration of the two proceedings in Canada, including the holding of joint hearings of the two Courts and providing for discussions between the two judges. Included were the following:

> 12.     To harmonize and coordinate the administration of the Insolvency Proceedings, the U.S. Court and the Canadian Court each may coordinate activities and consider whether it is appropriate to defer to the judgment of the other Court. In furtherance of the foregoing:

> (a)     The U.S. Court and the Canadian Court may communicate with one another, with or without counsel present, with respect to any procedural matter relating to the Insolvency Proceedings.

> …

> (d)     The U.S. Court and the Canadian Court may conduct joint hearings (each a "Joint Hearing") with respect to any cross-border matter or the interpretation or implementation of this Protocol where both the U.S. Court and the Canadian Court consider such a Joint Hearing to be necessary or advisable, or as otherwise provided herein, to, among other things, facilitate or coordinate proper and efficient conduct of the Insolvency Proceedings or the resolution of any particular issue in the Insolvency Proceedings. With respect to any Joint Hearing, unless otherwise ordered, the following procedures will be followed:

> (vi)    The Judge of the U.S. Court and the Justice of the Canadian Court, shall be entitled to communicate with each other during or after any joint hearing, with or without counsel present, for the purposes of (1) determining whether consistent rulings can be made by both Courts; (2) coordinating the terms upon of the Courts' respective rulings; and (3) addressing any other procedural or administrative matters.

[8]    A joint hearing was held for this allocation dispute. The court rooms in Toronto and Wilmington were set up electronically so that lawyers and witnesses could and did appear in either courtroom and communicate with a lawyer, witness or the judge in the other courtroom through state of the art telecommunications services.

[9]    After the evidence was heard, written closing and reply briefs were filed by the parties and oral argument was made. It was agreed that at the conclusion of the case that each Court would release its decision at the same time. This judgment is being released at the same time as the opinion of Judge Gross in Wilmington.

[10]    Judge Gross in Wilmington and I have communicated with each other in accordance with the Protocol with a view to determining whether consistent rulings can be made by both Courts. We have come to the conclusion that a consistent ruling can and should be made by both Courts. We have come to this conclusion in the exercise of our independent and exclusive jurisdiction in each of our jurisdictions. These insolvency proceedings have now lasted over six years at unimaginable expense and they should if at all possible come to a final resolution. It is in all of the parties' interests for that to occur. Consistent decisions that we both agree with will facilitate such a resolution.

**Nortel history and its matrix structure**

[11]    NNC was the successor to a long line of technology companies headquartered in Canada dating back to the founding of Bell Telephone Company of Canada in 1883. Prior to being named Nortel, it was known as Northern Telecom. NNC's principal, direct operating subsidiary, also a Canadian company, was Nortel Networks Limited ("NNL"), which in turn was the direct or indirect parent of operating companies located around the world.6

---

6 Unless otherwise indicated, statements of fact in these reasons are findings of fact.

[12]    From the mid-1980s, Nortel expanded substantially through the continued development of ground-breaking technology. The Nortel Group moved from developing and manufacturing traditional landline phone technology and equipment into digital, wireless and photonic technologies. At the same time, the Nortel Group expanded into Europe, Asia, Africa, the Middle East and Latin America.

[13]    At the time of its insolvency, Nortel had four main product groups (also known as Lines of Business):

- The "Carrier Networks" segment provided wireless networking solutions that enabled service providers and cable operators to supply mobile voice, data and multimedia communications to individuals and enterprises using mobile phone and other wireless devices. The Carrier Networks business also offered products providing local, toll, long distance and international gateway capabilities to telephone service providers as well as providing support to customers transitioning from one network to another.

- The "Enterprise Solutions" segment provided enterprise communications solutions addressing the headquarters, branch and home office needs of large and small businesses. The Enterprise Solutions segment's offerings included, among other things, Unified Communications, Ethernet routing and multiservice switching, IP and digital telephony (including phones), wireless LANs, security, IP and SIP contact centers, self-service solutions, messaging, conferencing and SIP-based multimedia solutions.

- The Metro Ethernet Networks ("MEN") segment provided carrier-grade Ethernet transport capabilities focused on meeting customers' needs for higher performance and lower cost emerging video-intensive applications. MEN included optical networking, carrier Ethernet switching products and multi-service switching products.

- The "Global Services" segment provided a broad range of services and solutions including network implementation services, network support services, network managed services (which related to the monitoring and management of customer networks and hosted solutions) and network application services.

[14]    The Nortel Group consists of more than 140 separate corporate entities located in 60 separate sovereign jurisdictions including Canada, the United States and the EMEA region, as well as the Caribbean and Latin America and Asia. NNC, the Nortel Group's ultimate parent holding company, was publicly listed and traded on both the Toronto Stock Exchange and the New York Stock Exchange.

[15]   One of NNC's direct subsidiaries is NNL, which was the Canadian operating company of the Nortel Group. NNL in turn owns 100% of the equity of each of NNI, which was the Nortel Group's operating company in the United States, NNUK, which was the Nortel Group's operating company in the United Kingdom, NN Ireland, which was the Nortel Group's operating company in Ireland, and 91.17% of the equity of NNSA, which was the Nortel Group's operating company in France.

[16]   The Nortel Group operated along business lines as a highly integrated multinational enterprise with a matrix structure that transcended geographic boundaries and legal entities organized around the world.  Each entity, such as NNL, NNI, NNUK, NN Ireland and NNSA, was integrated into regional and product line management structures to share information and perform research and development ("R&D"), sales and other common functions across geographic boundaries and across legal entities.  The matrix structure was designed to enable Nortel to function more efficiently, drawing on employees from different functional disciplines worldwide, allowing them to work together to develop products and attract and provide service to customers, fulfilling their demands globally.

[17]   As a result of Nortel's matrix structure, no single Nortel entity, either NNL or any of the other Canadian debtors in Canada, NNI or any of the other US debtors in the United States or NNUK or any of the other EMEA debtors, was able to provide the full line of Nortel products and services, including R&D capabilities, on a stand-alone basis. While Nortel ensured that all corporate entities complied with local laws regarding corporate governance, no corporate entity carried on business on its own.

[18]   R&D was the primary driver of Nortel's value and profit. Together with NNL, the principal companies that performed R&D were NNI, NNUK, NNSA and NN Ireland.  These were known as Integrated Entities or, in transfer pricing terms, Residual Profit Entities ("RPEs") due to their participation from 2001 in a residual profit pool in connection with Nortel's transfer

pricing arrangements[7]. Other operating companies performed sales and distribution functions and were known as Limited Risk Distributors or Entities ("LREs").

[19]    R&D was performed at labs around the world. The advanced technology primary research which was intended to develop novel, cutting edge intellectual property technologies was performed mostly in NNL laboratories in Ottawa, which also did R&D for various lines of business. From 2000 to 2009 NNL accounted on average for just under half of all R&D expenditures, more in the latter years than the earlier years. NNI accounted for 38 to 42% and EMEA accounted for 16 to 20% in the earlier years and 11.7 % from 2005 to 2009. The R&D was shared throughout the Nortel Group as needed by the lines of business and customer needs in the various regions and countries.

[20]    Because R&D was the primary driver of Nortel's value and profit, the residual profits of Nortel, after payment of fixed rates of return to all Nortel companies for sales and distribution functions, were paid to the RPEs under a Master Research and Development Agreement ("MRDA") in accordance with a residual profit split method ("RPSM") based on each RPE's expenditure on R&D relative to the R&D expenditure of all RPEs.

[21]    Under the MRDA, NNL was the legal owner of the Nortel intellectual property and each RPE other than NNL was granted an exclusive license by NNL to make and sell Nortel products in its territory using or embodying Nortel intellectual property developed by Nortel companies anywhere in the world and a non-exclusive license to do so in territories that were not exclusive to an RPE. What the ownership rights of NNL were and what the license rights were that were granted in the MRDA are highly contested. Also contested is the role that the MRDA should play in this allocation proceeding.

**Bankruptcy filings**

[22]    Beginning around 2001, the burst of the dot-com bubble had a severe effect on the global economy and on the telecommunications industry in particular, including Nortel. Market forces

---

[7] Nortel Networks Australia was also a RPE until December 31, 2007.

- Page 12 -

led to a decline in Nortel's revenues and market share, and a decline in customer demand for Nortel's products. Subsequently, Nortel was faced with accounting issues which impacted Nortel's credit rating and its cost of financing and required Nortel to restate its financial statements for the fiscal years 2000 to 2005. The rating downgrades affected Nortel's access to capital markets and cost of financing for some years. The fortunes of Nortel improved for a few years but for various reasons, including the financial meltdown in the fall of 2008, Nortel saw its business decline in the two profitable lines of business that it was operating.

[23]    In light of the impact of the deteriorating market conditions and weakening customer commitments on Nortel's financial outlook, Nortel made the decision to commence formal bankruptcy and insolvency proceedings in Canada, the U.S. and England (respecting various EMEA entities) on January 14, 2009.

[24]    On January 14, 2009 NNC, NNL, the wholly owned subsidiary of NNC which was its operating subsidiary and a number of other Canadian corporations filed for protection under the CCAA. On the same date, Nortel Network Inc. ("NNI"), the principal US subsidiary of NNL, and a number of other US corporations filed for protection under chapter 11 of the US Bankruptcy Code and Nortel Networks UK Limited ("NNUK"), the principal UK subsidiary of NNL, and certain of their subsidiaries (the "EMEA Debtors") save the French subsidiary Nortel Networks S.A. ("NNSA") were granted administration orders under the *UK Insolvency Act, 1986*. On the following day, a liquidator of NNSA was appointed in France pursuant to Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France.

[25]    Subsequent to the filing date, certain other Nortel subsidiaries have filed for creditor protection or bankruptcy proceedings in the local jurisdiction in which they are located. Certain solvent indirect subsidiaries of NNUK are not in administration, but are represented in these proceedings by the Joint Administrators with respect to the allocation issues.

**Decision to liquidate**

[26]    The initial intent on filing was to attempt to restructure the business and downsize it by focusing on Nortel's legacy CDMA (Code Division Multiple Access) wireless business and a

potential business based on LTE (Long-Term Evolution) wireless technology with all other Nortel business lines being sold. However, Nortel's major customers did not support this plan and advised they were not prepared to provide new contracts to Nortel for this purpose. As well, it became clear that it would not be possible for Nortel to obtain the funding that would have been required to restructure around a CDMA business.

[27]    In June 2009, management and the Debtor Estates collectively determined that the best means to maximize value for its creditors was to sell Nortel's lines of business and other assets and to commence a liquidating insolvency. No party in these proceedings has suggested that it was a viable option to restructure along geographic lines or for a country-specific entity to independently continue in Nortel's business.

**Interim Funding and Settlement Agreement ("IFSA")**

[28]    From the petition date of January 14, 2009, NNL incurred significant expenses to preserve the value of the business, including R&D expenses, and it was experiencing negative cash flow. It had not received any transfer pricing payments from its subsidiaries under the MRDA as a result of the insolvency proceedings.

[29]    It was evident that there would be significant issues among the parties as to whom the proceeds of the sale of Nortel's assets should be paid. The parties appreciated that if determining the allocation of proceeds from Nortel's assets were a precondition to their sale, sales would be substantially delayed, and the value of the assets would depreciate, resulting in less money for all creditors.  Avoiding a dispute during the sale processes about how to allocate the proceeds allowed the parties to obtain the highest monetary value for the assets being sold.

[30]    On June 9, 2009, the US Debtors (excluding NN CALA, which had not yet filed for bankruptcy), the Canadian Debtors and the EMEA Debtors (excluding NNSA, which later acceded to the agreement) entered into the Interim Funding and Settlement Agreement ("IFSA") to address both interim funding of NNL as well as principles under which collaborative sales of Nortel's businesses and assets could take place.

[31]    The IFSA provided for a payment by NNI to NNL of $157 million in full settlement of any transfer pricing and other claims NNL might have had against NNI for the period from the petition date through September 30, 2009.  The parties also agreed:

(a)    to cooperate in the anticipated sales of the Nortel Group's assets;

(b)    that their execution of sale documentation or the closing of a sale transaction would not be conditioned upon reaching agreement either on allocation of the sale proceeds or on a binding procedure for determining the allocation question;

(c)    that the sale proceeds would be deposited into escrow, and that there would be no distribution out of escrow without either the agreement of all of the selling debtors or the determination of any dispute relating thereto by the relevant dispute resolver;

(d)    that in order to facilitate the lines of business sales, the U.S. and EMEA Debtors would enter into appropriate license termination agreements which would provide for the termination of the license rights granted by NNL under the MRDA; termination or relinquishment of a license would be deemed a sale with the licensed participants each being deemed a seller; and

(e)    that the agreement would not have any impact on the allocation of proceeds to any Debtor from any asset sale and would not prejudice a party's rights to seek its entitlement to the proceeds from any sale.

[32]    The US and Canadian Courts entered orders approving the IFSA following a joint hearing on June 29, 2009.

[33]    On December 23, 2009 the Canadian and U.S. Debtors signed a Final Canadian Funding and Settlement Agreement (the "FCFSA") under which NNI agreed to pay NNL $190.8 million in full and final settlement of all claims that NNL might have against NNI. Further, NNL granted NNI an allowed $2 billion unsecured claim in NNL's CCAA proceedings ranking pari passu with other pre-petition unsecured claims against NNL, with such claim not being subject to

offset or reduction. This claim had resulted from the tax authorities reviewing requests by the parties for approval of their transfer pricing arrangements. In 2009 NNL and NNI were advised that an agreement between the CRA and IRS sought a reallocation of income from NNL to NNI in the amount of U.S. $2 billion for the tax years ending 2001 to 2005. The tax authorities did not specify on what basis the $2 billion figure was calculated. The FCFSA, including the $2 billion admitted claim of NNI against NNL, was approved by the Canadian Court on January 21, 2010 and by the U.S. Court on the following day.

**Asset sales**

[34]     With the IFSA framework in place, the Debtor Estates embarked on a process that resulted in a series of sales of the various business lines, which occurred from mid-2009 through late 2010, with the last transaction closing in March 2011.   The total proceeds were approximately $3.285 billion. There remains approximately $2.85 billion of that amount now available to be allocated.

[35]     In order to sell the lines of businesses separately, Nortel engaged in a "carve-out process" to identify the bundle of assets, rights and obligations that would have to be conveyed in each sale to enable the lines of business to function on a stand-alone basis.

[36]     An important aspect of the carve-out process was the identification of which IP rights, principally patent rights, needed to be conveyed. Each prospective purchaser of a business line wished to obtain as many patents as possible as part of each sale transaction and, conversely, the Nortel sellers wanted to ensure that the only patents transferred were those incorporated exclusively or principally in the business line in question so as to retain value within Nortel and not to jeopardize the ability to sell the other business lines that might require rights to the same patents.

[37]     Ultimately, those patents that were "predominantly used" in any given line of business were transferred to the purchaser of that line of business as part of the transaction.   In the end, 2,700 patents were transferred as part of the business line sales.

[38]    For all other patents that were used in each line of business but not predominantly used, a non-exclusive license was granted to the purchaser for use of those patents in the operations of the particular business line being purchased.

[39]    By the time that all of the business sales were completed in March 2011, Nortel had no remaining operating businesses.  What it did retain was a residual patent portfolio consisting of approximately 7000 patents and patent applications. These were principally patents and patent applications that were not used in any of the lines of business and therefore were not subject to licenses to the business sale purchasers.   In addition, the residual IP portfolio included patents used by multiple lines of businesses and licensed to the purchasers of those lines of businesses.

[40]    On April 4, 2011, after significant negotiations with two prospective purchasers, certain Nortel entities (including NNC, NNL, NNI and NNUK) entered into a stalking horse asset sale agreement with a wholly owned subsidiary of Google Inc. with a purchase price of $900 million.

[41]    An auction was held at the end of June 2011, and the residual patent portfolio was ultimately sold to Rockstar Bidco, LP, a single purpose entity backed by a consortium of major technology companies (Apple, Microsoft, Ericsson, Blackberry, Sony and EMC), for $4.5 billion.

**Position of the parties**

[42]    In this case the Monitor is acting under what is now referred to as a "super monitor" order of October 3, 2012 in which the Monitor was authorized to exercise any powers which may be exercised by a board of directors of any of the applicants, which includes NNC and NNL. This order occurred after NNC and NNL were left without any board of directors or management and it was necessary for the Monitor to be appointed to advance the interests of NNL and NNC in this CCAA proceeding. While I will refer to the Monitor, I do so in recognition that the Monitor is advancing the position of the Canadian Debtors in this litigation.

[43]    The intellectual property of Nortel represented by far the largest portion of the assets sold. The Rockstar sale of the residual IP generated $4.5 billion. The lines of business generated $3.285 billion of which approximately $2.85 billion is now available. Intellectual property was a

substantial part of the assets of the business lines that were sold, although the experts differed as to its value.

[44]     The parties and their experts for the most part relied on their interpretation of the MRDA in support of their allocation positions for the proceeds from intellectual property for both the Rockstar sale and the lines of business sales. Two parties, the UKPC (the UK pension claimants, being the trustee of the UK pension plan, and the board of the UK Pension Protection Fund) and the Canadian Creditors Committee[8] contended that the MRDA should not govern the allocation and that a pro rata allocation based on a *pari passu* distribution to all creditors should be used to allocate the lockbox funds.

[45]     It is necessary therefore to consider the MRDA and whether it should govern the allocation.

**The MRDA**

[46]     The parties look to the rights of the various Nortel entities to intellectual property under the MRDA as a central issue in this proceeding. What these rights are is contested. Many of its terms have been excruciatingly parsed. I will first deal with the meaning of the MRDA as an operating agreement. I will then deal with the issue as to whether it applies, or was intended to apply, to the allocation of the Nortel assets after the world-wide insolvency of Nortel.

[47]     The MRDA and its predecessor Cost Sharing Agreements[9] ("CSA") were developed for and driven by transfer pricing concepts. Transfer pricing is the act of assigning a monetary value, or price, to movements of resources or economic contributions that occur within a multinational enterprise across different taxing jurisdictions. Against the risk that companies attempt to use transfer pricing to increase operating income (and therefore taxable income) in jurisdictions with low income tax rates and correspondingly to decrease operating income in high-tax jurisdictions, tax authorities around the world have instituted regulations governing intercompany transfer

---

[8] This was an alternative argument for the CCC to its first argument that the MRDA should govern the allocation.
[9] There were different CSAs for different types of costs. The relevant CSAs were the R&D CSAs that provided for the sharing of costs of the R&D carried out by the Nortel entities doing R&D. NNL made a separate CSA with each of those entities.

pricing. These regulations centre on the arm's length principle. The arm's length principle necessitates that intercompany transactions be priced in a manner consistent with the way in which similarly situated uncontrolled parties bargaining at arm's length would price the transactions i.e., within an arm's length range.

[48]    Dr. Eden, a transfer pricing expert who testified on behalf of the U.S. Debtors, well described in her report the way in which transfer pricing agreements are made in light of the fact that governments have developed a dense regulatory framework for transfer pricing due to worries about the potentially negative impacts that transfer pricing can have on government tax and customs duty revenues. The setting of transfer pricing policies for corporate income tax purposes of a multinational enterprise (MNE) is a highly regulated, data-driven and fact-intensive activity dominated by professionals. The establishment of an MNE's transfer pricing policy typically involves not only MNE group in-house staff, but also accountants, economists, lawyers, tax experts and other consultants. Moreover, an MNE's transfer pricing policy may involve the input of revenue authorities through an advance pricing agreement (APA) procedure.

[49]    All of this applied to Nortel and much evidence was given by tax people as to the process by which the MRDA was made and changed. Evidence was also given by some of them as to their view of the meaning of the agreement, the admissibility of which is contested.

 **(i)  Governing law of the construction of the contract**

[50]    The MRDA is by its terms to be construed in accordance with and governed by the law of Ontario. The same applied to the predecessor CSAs.

[51]    A number of authorities have been cited. A brief consideration of them is required in light of the various arguments made about the MRDA, particularly as it involves the principles of interpreting commercial contracts, what can be looked at when considering the factual matrix of the agreement and the use of recitals in an agreement in the interpretive process.

[52]    Winkler C.J.O. articulated the test for construing a commercial contract in *Salah v. Timothy's Coffees of the World Inc.* (2010), 74 B.L.R. (4th) 161 as follows:

**16**     The basic principles of commercial contractual interpretation may be summarized as follows. When interpreting a contract, the court aims to determine the intentions of the parties in accordance with the language used in the written document and presumes that the parties have intended what they have said. The court construes the contract as a whole, in a manner that gives meaning to all of its terms, and avoids an interpretation that would render one or more of its terms ineffective. In interpreting the contract, the court must have regard to the objective evidence of the "factual matrix" or context underlying the negotiation of the contract, but not the subjective evidence of the intention of the parties. The court should interpret the contract so as to accord with sound commercial principles and good business sense, and avoid commercial absurdity. If the court finds that the contract is ambiguous, it may then resort to extrinsic evidence to clear up the ambiguity.

[53]     In *Kentucky Fried Chicken v. Scott's Food Services Inc.* (1998), 41 B.L.R. (2d) 42 (Ont. C.A.) Goudge J.A. stated the following regarding the interpretation of a commercial agreement at para. 27

> Where, as here, the document to be construed is a negotiated commercial document, the court should avoid an interpretation that would result in a commercial absurdity. [*City of Toronto v. W.H. Hotel Ltd*. (1966), 56 D.L.R. (2d) 539 at 548 (S.C.C.)]. Rather, the document should be construed in accordance with sound commercial principles and good business sense; [*Scanlon v. Castlepoint Development Corporation et al.* (1992), 11 O.R. (3d) 744 at 770 (Ont.C.A.)]. Care must be taken, however, to do this objectively rather than from the perspective of one contracting party or the other, since what might make good business sense to one party would not necessarily do so for the other.

[54]     I take the principles in *Kentucky Fried Chicken* and in *Salah,* the latter adopted by Cronk J.A. in *Downey v. Ecore International Inc.* 2012 ONCA 480 and by Juriansz J.A. in *Ariston Realty Corp. v. Elcarim Inc.* 2014 ONCA 737, as the applicable principles governing this case. See also *Unique Broadband Systems Inc. (Re)* 2014 ONCA 538 at para. 88.[10]

---

[10] I prefer this test to that articulated in *Ventas, Inc. v. Sunrise Senior Living Real Estate Investment Trust* (2007), 85 O.R. (3d) 254 (C.A.), in which it was said that interpreting a contract that accords with sound commercial principles is limited to situations in which there is some ambiguity. I do not think that is correct and it is not what other cases of appellate authority have stated. See my comments in *Thomas Cook Canada Inc. v. Skyservice Airlines Inc*. (2011), 83 C.B.R. (5th) 106 at para. 13 and *Oncap L.P. v. Computershare Trust Co. of Canada* (2011), 94 B.L.R. (4th) 314 at paras. 21 to 24. See also Geoff R. Hall, *Canadian Contractual Interpretation Law*, 2nd ed. (Markham Ont.:LexisNexis 2012 at p. 46 fn. 191.

[55]    The factual matrix of the contract is to be considered. What may be considered was expressed in *Kentucky Fried Chicken* as follows:

> 25      …While the task of interpretation must begin with the words of the document and their ordinary meaning, the general context that gave birth to the document or its "factual matrix" will also provide the court with useful assistance. In the famous passage in *Reardon Smith Line Ltd. v. Yngvar Hansen-Tangen*, [1976] 1 W.L.R. 989 at 995-96 (H.L.) Lord Wilberforce said this:
>
> > No contracts are made in a vacuum: there is always a setting in which they have to be placed. The nature of what is legitimate to have regard to is usually described as "the surrounding circumstances" but this phrase is imprecise: it can be illustrated but hardly defined. In a commercial contract it is certainly right that the court should know the commercial purpose of the contract and this in turn presupposes knowledge of the genesis of the transaction, the background, the context, the market in which the parties are operating.
>
> 26    The scope of the surrounding circumstances to be considered will vary from case to case but generally will encompass those factors which assist the court "... to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract." *Consolidated Bathurst Export Ltd. v. Mutual Boiler and Machinery Insurance Co.*, [1980] 1 S.C.R. 888 at 901.

[56]    More recently, Rothstein J. in *Sattva Capital Corp. v. Creston Moly Corp.* 2014 SCC 53 referred to the use of surrounding circumstances and cautioned as to the extent they can be considered:

> 57      While the surrounding circumstances will be considered in interpreting the terms of a contract, they must never be allowed to overwhelm the words of that agreement (*Hayes Forest Services*, at para. 14; and Hall, at p. 30). The goal of examining such evidence is to deepen a decision-maker's understanding of the mutual and objective intentions of the parties as expressed in the words of the contract. The interpretation of a written contractual provision must always be grounded in the text and read in light of the entire contract (Hall, at pp. 15 and 30-32). While the surrounding circumstances are relied upon in the interpretive process, courts cannot use them to deviate from the text such that the court effectively creates a new agreement (*Glaswegian Enterprises Inc. v. B.C. Tel Mobility Cellular Inc*. (1997), 101 B.C.A.C. 62).
>
> 58      The nature of the evidence that can be relied upon under the rubric of "surrounding circumstances" will necessarily vary from case to case. It does, however, have its limits. It should consist only of objective evidence of the background facts at the time of the execution of the contract (*King*, at paras. 66 and 70), that is, knowledge that was or reasonably ought to have been within the

knowledge of both parties at or before the date of contracting. Subject to these requirements and the parol evidence rule discussed below, this includes, in the words of Lord Hoffmann, "absolutely anything which would have affected the way in which the language of the document would have been understood by a reasonable man" (*Investors Compensation Scheme*, at p. 114). Whether something was or reasonably ought to have been within the common knowledge of the parties at the time of execution of the contract is a question of fact.

[57]    It is clear that the factual matrix that can be considered may not include evidence of the subjective intent of a party or what a party believed a contract to mean. See *Sattva*, *supra*, at para. 59. It may also not include evidence of negotiations or create an ambiguity where none exists in an agreement. See also *Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne* (2012), 115 O.R. (3d) 287 in which Feldman J.A. stated:

> **71**    While the scope of the factual matrix is broad, it excludes evidence of negotiations, except perhaps in the most general terms, and evidence of a contracting party's subjective intentions: Geoff R. Hall, *Canadian Contractual Interpretation Law*, 2d ed. (Markham: LexisNexis, 2012), at p. 27. As the cases above suggest, the factual matrix includes only objective facts known to the parties at or before the date of the agreement, and what is common to both parties: Hall, p. 30. Hall goes on to state that while the factual matrix can "be used to clarify the parties' intentions as expressed in a written agreement, it cannot be used to contradict that intention, create an ambiguity which otherwise does not exist in the written document, or have the effect of making a new agreement": p. 31 (footnotes omitted). Ultimately, the words of the agreement are paramount.

[58]    The recitals in the MRDA are the subject of debate in this case. A clear statement of how recitals may be used in the interpretation of an agreement can be found in *Elliott Estate (Re)*, 1962 O.J. No. 164 (C.A.); aff'd [1963] S.C.R. 305. In that case, Kelly J.A. stated that a recital could be used only if there is an ambiguity in the operative parts of the agreement and the recital is clear. He stated:

> **11**    I turn therefore to consider to what extent the recital may be used to overcome the patent deficiencies of clauses 6 and 7 and in fact of the whole operative parts of the agreement. In the first instance it must be borne in mind that a recital is not a necessary part of a document and its use in the interpretation of the document as a whole is strictly limited.
>
> "The reciting Part of a Deed is not at all a necessary Part either in Law or Equity. It may be made use of to explain a Doubt of the Intention and Meaning of the Parties but it hath no Effect or Operation. But when it comes

to limit the estate, there the Deed is to have its Effect according to what Limitations are therein set forth."

Per Holt, C.J., *Bath and Mountague's Case* (1693) 3 Cas. in Ch. 55 at 101; 22 E.R. 963 at 991. An oft quoted statement of the extent to which reference may be had to recitals is contained in the judgment of Lord Esher, M.R. in *Ex Parte Dawes. In Re Moon*, (1886) 17 Q.B.D. 275 at p. 286:

> "Now there are three rules applicable to the construction of such an instrument. If the recitals are clear and the operative part is ambiguous, the recitals govern the construction. If the recitals are ambiguous, and the operative part is clear, the operative part must prevail. If both the recitals and the operative part are clear, but they are inconsistent with each other, the operative part is to be preferred."

It is to be noted that the qualifying condition for the use of a recital in the interpretation of the operative parts is that there must be ambiguity in the operative parts; in such a case the preferred meaning to be given to the operative words should be that consistent with the intention expressed in the recital, provided that the words of the operative part are by themselves capable of such an interpretation. *MacKenzie v. Duke of Devonshire*, (1896) App. Cas. 400; *Ex Parte Dawes. In Re Moon, Supra*; *In re Sugden's Truts, Sugden v. Walker*, (1917) 2 Ch. 92. It is essential, however, that the construction to be placed upon the operative part in the light of the recital be a construction which the words themselves of the operative part are capable of bearing. Where, however, the operative parts of a document, due to the lack of appropriate words, are incapable of a construction which will fulfil the intention expressed in recitals, the recital may not be used for the purpose of reading into the operative clause a meaning which it is incapable of conveying when considered by itself.

[59]    It was held in *PUC v. Distribution Inc. v. Brascan Energy Marketing Inc*., 2008 ONCA 176, that an elevation of a recital to a mutual promise or operative provision was an error.

[60]    *Eli Lilly & Co. v. Novopharm Ltd*., [1998] 2 S.C.R. 129 at para. 57, in which Iacobucci J. in discussing the meaning of an agreement referred to the recitals, was referred to in argument. Iacobucci J. did not discuss the principles to be used in considering recitals. *Sistem v. Kyrgyz Republic,* 2012 ONSC 4983, has also been referred to in argument, a decision in which I did not refer to the principles to be used in considering recitals in interpreting contracts. I consider the decision in *Sistem* to be consistent with the principles enunciated by Kelly J.A. in *Elliott Estate*. I do not see either *Eli Lilly* or *Sistem* establishing any different criteria for the use of recitals from *Elliott Estate*.

[61]     I turn now to the interpretation of the MRDA and the rights accorded in it keeping these interpretive principles in mind.

**(ii)  Position of the parties**

[62]     The essential differences in allocation positions advanced by the parties flow from the different manner in which each characterizes the terms of the MRDA, the interests held by the parties in Nortel's IP, and the applicability of terms of the MRDA to the value ascribed to various assets.

[63]     The Monitor, supported by the CCC, contends that under the MRDA, NNL owned the IP and the interests of NNI and the other participants to the MRDA were restricted to certain exclusive and non-exclusive license rights granted to them by NNL pursuant to the terms of the MRDA.  The Monitor says that the license rights were not unlimited, as they did not cover all rights in the IP in question, but rather covered only a subset (albeit a substantial subset) of the IP rights, on certain terms, all of which have valuation implications.  In particular, the Monitor says that the license rights granted to NNI and the other licensed participants were not all rights to the IP but were subject to "field of use" restrictions that gave the licensees the right to use the IP to make, use or sell "Products" as defined in the MRDA, which meant products, software or services that were made or sold by, or for, any of the licensees. This meant that the Products must have been created or marketed by or for the Nortel Group. No product that was part of a third party's business rather than the business of Nortel could fall within the definition of Products. While the license gave the licensees the right to sublicense, this could not permit the licensees to sublicense what they did not have.

[64]     The Monitor's position, supported by the CCC, is that what was sold in the Rockstar sale of IP was the ownership of residual patents and patent applications owned by NNL. The purchasers would not have bought the residual IP to make Nortel products, and that as the license rights held by NNI and the other licensees would not have permitted them to sublicense to the Rockstar consortium the right to use the IP for the Rockstar consortium's own purposes, the proceeds of the Rockstar sale belong to NNL.

[65]    The position of NNI, supported by the other U.S. interests, asserts that each of NNI and the other licensees held all of the rights and all of the value in the IP in their respective exclusive territories as defined in the MRDA.  The U.S. Debtors assert that the license rights NNI held were not subject to any field of use or scope restriction or limitation, resulting in an assertion that all of the economic value in the IP in the exclusive territory belonged to the licensee. They contend that the legal title held in the IP under the MRDA was a purely "bare" legal title with no monetary value. They also rely on a right to sue for damages in the U.S. for infringement of NN Technology by others.

[66]    The position of the EMEA debtors is that each of the parties to the MRDA jointly owned all of the IP in proportion to their financial contributions to research and development, and that all share in the sale proceeds attributable to IP in those same proportions.  The joint ownership is said to arise independent of, but recognized in, the MRDA.

### (iii)  Analysis

#### (a)    The meaning of the exclusive license

[67]    The agreement is headed MASTER R&D AGREEMENT. It was entered into on December 22, 2004 with an effective date of January 1, 2001 and states that it confirms and formalizes the operating arrangements of the participants as and from that date. It provided that NNL was the legal owner of the NN Technology (the IP), and it contained grants of licenses from NNL to the other participants, referred to as the Licensed Participants. Each Licensed Participant was given an exclusive license for its territory and a non-exclusive license for those parts of the world other than Canada and where the Licensed Participants had their exclusive territory. The exclusive territory for NNI was the U.S. and Puerto Rico, for NNUK was the United Kingdom, for NNSA was France and for Nortel Ireland was the Republic of Ireland.

[68]    At its core, so far as the ownership and licensing of the IP is concerned are articles 4(a) and 5(a) and (b). The original language remained in substance but was amended from time to time. These articles as amended are as follows:

**Article 4 – Legal Title to NN Technology**

(a)      Except as otherwise specifically agreed, legal title to any and all NN Technology whether now in existence or hereafter acquired, or developed pursuant to the terms of this Agreement, shall be vested in NNL. In consideration therefor, NNL agrees to enter into an Exclusive License and a Non-Exclusive License with each of the Licensed Participants as set forth in Article 5.

**Article 5 – Grant of Exclusive Licenses by NNL**

(a)      To the extent of its legal right to do so, and subject to the rights of relevant third parties, NNL hereby:

(i)      continues to grant to each Licensed Participant an exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Exclusive Territory designated for that Licensed Participant, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ("Exclusive License"); and

(ii)      grants to each Licensed Participant, as of January 1, 2009 (the "Non-Exclusive License Effective Date"), a non-exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Non-Exclusive Territory, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ("Non-Exclusive License").

[69]    To support their differing interpretations of these provisions, the parties augment to some extent their arguments by reference to other provisions in the MRDA. It will be necessary to deal with these. As can be seen from article 5(i), NNL "continues to grant", a reflection of the fact that prior to the MRDA, the parties were governed by Cost Sharing Agreements (CSAs)[11]. Recitals to the MRDA make this clear:

---

[11] There was a separate R&D CSA made with each participant. They were the same. Reference during argument was to the CSA made between Northern Telecom Limited [now NNL] and Northern Telecom Inc. [now NNI], and I refer to it in these reasons.

WHEREAS legal title to all NN Technology is held in the name of NNL;

WHEREAS each Licensed Participant held and enjoyed equitable and beneficial ownership of certain exclusive rights under NT Technology for a Specified Territory pursuant to the Amended Research and Development Cost Sharing Agreement entered into on January 1, 1992, and it is the intent of NNL and the Licensed Participants that the Licensed Participants continue, as of the effective date of this Agreement, to hold and enjoy such rights;

[70]     In considering the various interpretations of the MRDA put forward by the parties, it is helpful to compare those provisions with the earlier CSA provisions. Under the CSA, the parties split the costs of R&D by a certain formula. That agreement did not purport to split profits in any way. However, the tax authorities made it clear that they no longer would permit a cost sharing arrangement at Nortel and instead wanted an arrangement whereby profits would be shared among the participants by a residual profit split method (RPSM) that allocated profits according to the amount each participant spent on R&D. Relevant recitals in the MRDA that were not contained in the previous CSA are:

WHEREAS each Participant bears the full entrepreneurial risks and benefits for the Nortel Networks business;

WHEREAS each Participant has performed, in the past, and intends to continue to perform R&D Activity with respect to the Nortel Products;

WHEREAS each Participant desires to avoid the duplication of R&D Activity;

WHEREAS each Participant believes that it is appropriate that each Participant should benefit from its contribution to R&D activity commensurate with the value of its contribution to that R&D activity in the context of the manner in which the Nortel Networks business is conducted and that the residual profit split methodology (RPSM) is the best arm's length measure, in the circumstances of NNL and the Participants, of such contributions with reference to such benefits;

WHEREAS this Agreement reflects the Participants' intent and agreement since January 1, 2001 to enter a license arrangement with the Licensed Participants, and the Participants have operated from January 1, 2001 in accordance with the terms set forth herein;

WHEREAS Participants acknowledge that as a result of a collective review by the Canadian Customs and Revenue Agency, the US Internal Revenue Service, and the UK Inland Revenue  regarding the application of the RPSM, the calculation of

the RPSM as set forth in Amended Schedule A  may be amended which amendments would require the consent of the Participants;

[71]   These recitals and the RPSM method contained in the MRDA were driven by transfer pricing considerations. The language, for example, that each Participant (NNL and the Licensed Participants) bears the full entrepreneurial risks and benefits for the Nortel Networks business was not in the prior CSA and was part of the rationalization adopted to support a RPSM.

[72]   The MRDA provided in article 2 that each Participant would perform R&D at a level consistent with past practices and share the results of its R&D with the other participants. Article 3 provided payment for the R&D as follows:

### Article 3 – R&D Activity Payments

(a)   For and as a consequence of the performance of R&D Activity, each Participant shall be entitled to receive a payment in an amount equal to the allocation determined under the RPSM (the "R&D Allocation") as the measure of the benefit to which it is entitled commensurate with its performance of, and contribution to, R&D Activity.

(b)   Each Participant hereby accepts and agrees to make the payment determined under the RPSM in Amended Schedule A[12] as representing such Participant's share of the R&D Allocation.

(c)   The R&D Allocation will be computed pursuant Amended Schedule A which sets forth the basis of the RPSM as originally proposed to the Revenue Authorities. The Participants understand that the RPSM is the subject of review, discussions and negotiations with the Revenue Authorities. The Participants agree to amend this Agreement and to adjust the RPSM to the extent necessary to reflect any negotiated determination with the Revenue Authorities as to the final R&D Allocation.

[73]   The U.S. Debtors and EMEA take the position that the legal title that is vested in NNL under article 4 of the MRDA is bare legal title given to NNL for administrative convenience to enable it to administer all NN Technology and that the licensed participants own the equitable and beneficial interest in the NN Technology. It draws on the recital that provides:

---

[12] The amended Schedule A was effective January 1, 2006 and reflected a change in the calculation of the amount spent on R&D by each participant.

WHEREAS each Licensed Participant held and enjoyed equitable and beneficial ownership of certain exclusive rights under NT Technology[13] for a Specified Territory pursuant to the Amended Research and Development Cost Sharing Agreement entered into on January 1, 1992, and it is the intent of NNL and the Licensed Participants that the Licensed Participants continue, as of the effective date of this Agreement, to hold and enjoy such rights;

[74]    I do not see this recital as clearly stating that a Licensed Participant has equitable and beneficial ownership of the NT Technology. It states that a Licensed Participant held equitable and beneficial ownership of "certain exclusive rights under NT Technology" and would continue to have such rights. The recital does not say what the "certain exclusive rights" were and it is just as consistent with those rights being license rights rather than ownership rights in the technology. As well, having equitable and beneficial ownership of certain exclusive rights "<u>under</u> NT Technology" would seem to be something different from having equitable and beneficial ownership of certain exclusive rights "of" or "in" the NT Technology.

[75]    In the CSA referred to in the recital, the language used is as follows:

## ARTICLE 4
## LEGAL TITLE TO
## <u>NT TECHNOLOGY</u>

The Parties hereto acknowledge that, except as otherwise specifically agreed, <u>legal title</u> to all NT Technology whether now in existence or developed pursuant to the terms of this Cost Sharing Agreement, except patents <u>owned</u> by Participant [Northern Telecom Inc., now NNI] on January 1, 1980, shall be vested in Northern Telecom [now NNL]. With respect to patentable inventions and copyrightable property encompassed by NT Technology, Northern Telecom shall have the exclusive right but not the obligation to file and prosecute applications in its name for patent or copyright protection in every country of the world. Participant shall execute or cause to be executed such documents reasonably requested by Northern Telecom as may be necessary or desirable to give effect to the foregoing. (Underlining added).

---

[13] The NN Technology in the MRDA was called the NT Technology in the CSA as the parties at the time of the CSA in 1992 were Northern Telecom, later changed to Nortel Networks.

[76]    The exception in this provision for patents owned by Northern Telecom Inc., now NNI, suggests that the legal title vested in Northern Telecom (now NNL) was ownership rather than bare legal title. Otherwise there would have been no purpose in excluding the patents owned by Northern Telecom Inc. It would not have been necessary.

[77]    In article 6 of the CSA, dealing with confidential information, it is stated:

> Participant acknowledges that Northern Telecom is the legal owner of the NT Technology developed pursuant to this Cost Sharing Agreement and that the NT Technology is proprietary and constitutes a trade secret. Participant shall hold the NT Technology in confidence and only make use of or disclose it as permitted by this Cost Sharing Agreement.

[78]    This provision refers to Northern Telecom being the "legal owner". This is consistent with the language of article 4 of the CSA. If, as stated in the recital to the MRDA, it was the intent of NNL and the Licensed Participants that the Licensed Participants would continue under the MRDA to hold and enjoy such rights as they held under the CSA, those rights would not include legal ownership of the NN Technology.

[79]    NNI also relies on language in Schedule A of the MRDA to assert its beneficial ownership of the NN Technology. It provides in part:

### Calculation of Arm's Length R&D Allocation to each Participant

> The purpose of this section is to provide a brief summary of Nortel's transfer pricing policy and to provide clarity as to how each Participant is to be compensated under this Agreement.

> The current transfer pricing methodology is the residual profit split method ("RPSM") which was adopted by the Participants at the request of the tax authorities as the most appropriate method for determining the arm's length compensation to each of the Participants for the R&D Activity to be provided pursuant to the Master R&D Agreement. The RPSM acknowledges the fact that the key profit driver in the Nortel business is the development and maintenance of rapidly depreciating intellectual property ("IP").

> Accordingly, the R&D Allocation provided to Participants under the RPSM reflects the fact that the Participants bear the full entrepreneurial risk of the Nortel business such as the risks attendant with the substantial and continuous development and ownership of the NN Technology. Mathematically, the RPSM

accords the Participants all the upside risk in the Nortel business as well as the downside risk. (Underlining added).

[80]    Schedule A is part of the MRDA. I do not, however, read it as granting rights. The rights are granted in the operative provisions of the MRDA. Schedule A states at the outset that its purpose is to give a brief summary of Nortel's transfer pricing policy and to provide clarity as to how each participant is to be compensated. Schedule A provides in some detail how the residual profit is to be calculated and split amongst the Participants. Stating that Participants bear risks such as risks attendant with the development and ownership of the NN Technology does not state that ownership of the technology is being granted. What the Licensed Participants were granted in the MRDA were license rights.

[81]    Various dictionary definitions were resorted to in arguing what the meaning of "legal title" to the NN Technology was that was vested in NNL under article 4 of the MRDA. In the end, I do not think it necessary to get into that debate. NNL had ownership of NN Technology to the extent that NN Technology was not licensed to the Licensed Participants. Rights in inventions were assigned by the inventors to NNL and NNL applied for the patents and was named as owner of them.  It was NNL who granted licenses to the Licensed Participants. NNUK, for example, did not provide a license to NNI for IP developed by NNUK. It was NNL that did so. Although NNL had the exclusive right to the NN Technology in Canada under the MRDA, the MRDA did not grant any license to NNL. That was recognition that it was NNL that owned the NN Technology.

[82]    A licensee does not enjoy property rights. Its rights are contractual. A licence is merely a permission to do that which would otherwise amount to trespass. See *Euro-Excellence Inc. v. Kraft Canada Inc*., [2007] S.C.R. 20 at para. 27. A licensee's rights are not necessarily equivalent to those of the patentee; rather, they are limited to, and qualified by, the express terms of the license. See *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 at para. 49.  It is the determination of what those license rights were that were granted to the Licensed Participants in the MRDA that is important because it is those license rights that were given up by Licensed Participants to permit the business line sales and the sale of the residual IP to Rockstar.

[83]    The grant of the exclusive license in the MRDA in article 5(i) is:

…NNL hereby:

 (i)      continues to grant to each Licensed Participant an exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights <u>to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology</u> in and for the Exclusive Territory designated for that Licensed Participant, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith (Exclusive License") (Underlining added);

[84]    The license is not a license of NN Technology, but rather a license "to make… and sell Products using or embodying NN Technology". Thus the MRDA definition of "Products" is of central importance and the Monitor says that "Products" is defined to mean products, software or services that were made or sold by, or for, NNL and the Licensed Participants.  The Monitor contends that products not made for NNL or the Licensed Participants, such as products that would be made by the Rockstar consortium members or their licensees are not covered by the license.

[85]    The definition of "Products" at Article 1(g) of the MRDA is:

"Products" shall mean all products, software and services designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured or marketed, at any time <u>by, or for, any of the Participants,</u> and all components, parts, sub-assemblies, features, software associated with or incorporated in any of the foregoing, and all improvements, upgrades, updates, enhancements or other derivatives associated with or incorporated in any of the foregoing. (Underlining added).

[86]    The U.S. Debtors parse the language of the license grant and contend that the Licensed Participants obtained all of the rights to the NN Technology. They break down the grant of the exclusive license into four clauses as follows:

NNL hereby:

continues to grant to each Licensed Participant an exclusive, royalty-free license, including

the right to sublicense, which except as hereinafter provided shall be in perpetuity,

rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Exclusive Territory designated for that Licensed Participant, and

all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ("Exclusive License").

[87]    The U.S. Debtors stated in their opening brief that the opening grant of an exclusive, royalty-free license in the first clause is not limited by the word "including". They say the word "including" does not create a limitation, that the word "including" follows the words "exclusive, royalty-free license" and thus the words that follow cannot, and do not purport to, limit the broad exclusive licenses granted to the licensed participants under the MRDA. In effect they argue that the opening words before the word "including" created a complete grant of a license without reserve.

[88]    I cannot accept that argument. The words "continues to grant an exclusive, royalty-free license", on their own, do not say what the license is, or what it is for, or for how long.  Given that a licensee's rights are limited to, and qualified by, the express terms of the license (*Eli Lilly & Co* at para. 49), a license grant of uncertain scope, such as proposed by the U.S. Debtors, would have no meaning. Moreover, the words "in and for the Exclusive Territory designated for that Licensed Participant" appear after "including".  On the U.S. Debtors' reading of the license, the territorial limitation would only apply to the license to make Products, and would not apply to a broad exclusive license that they say is already created before one gets to the word "including". It would also mean that the words "in perpetuity" which follow the reference to a sublicense would not apply to the broad exclusive license, which is inconsistent with what the U.S. Debtors say is the case.

[89]    There would be no commercial purpose in the MRDA granting a broad unrestrictive license and then providing more specific grants in the license that are restricted. For example, the third clause restricts the licensee to selling Products, which contains terms of limitation.

[90]    The U.S. Debtors also contend that the third clause permits NNI or any other Licensed Participant to make or have made for it Products using NN Technology and that the sublicense rights contained in the second clause are not so limited to Products using NN Technology. I

cannot accept that contention. A sublicense could not sublicense more than the licensee had under its license and the second clause could not purport to do so. This argument of the U.S. Debtors relies on its argument that the first clause was a broad unrestrictive grant of a license, which argument I cannot accept.

[91]    The U.S. Debtors contend that the fourth clause is a free-standing or "catch-all" license grant of all rights to patents etc. unconnected to the license to make, use or sell Products. The language of this provision is:

> all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ("Exclusive License");

[92]    The U.S. Debtors say that the concluding words "in connection therewith" refer to the preceding words "technical know-how". The contention of the U.S. Debtors is that this last clause is like the first clause, being a separate grant not limited by the right to make, use or sell Products.  The Monitor says that these all of these words in the clause relate to the license to make, use or sell Products and that the words "in connection therewith" do not relate only to the reference to technical know-how.

[93]    I must say that I find it difficult to accept that the concluding words "in connection therewith" modify only the words "technical know-how". There would be no need for a comma after the words technical know-how". Those words, even if only applicable to the last clause, could apply equally to "industrial designs (or equivalent)" and "applications therefor".

[94]    I do not find persuasive at all the attempt of the U.S. Debtors to parse the language of the grant of license as they have done. On their reading, there are several different grants of license. Yet at the end of the paragraph are the words "Exclusive License" in parenthesis. There is only one license and the words should be read together harmoniously.

[95]    The U.S. Debtors make the point that what they refer to as the last clause in the license grant would be superfluous on the reading of the Monitor. That is because the definition of Products and NN Technology includes patents and the other things contained in that last clause. The U.S. Debtors say that because in interpreting a contract one should strive to give meaning to all of its terms, the last clause should be read as providing rights different from the rights to

make, use or sell Products. While this argument on its face has a certain attractiveness, I do not think it right in this case.

[96]    The grant of license rights in article 5 is one grant. It does not in the paragraph expressly spell out the definition of Product or NN Technology. The draftsman may have thought it prudent to include the final clause. The words "in connection therewith" must be given some meaning and I do not accept the meaning given to them by the U.S. Debtors. I read the words as relating to the grant of a license to make, use and sell Products employing NN Technology, which in my view was the intent of the entire license granted in clause 5(i).

[97]    The Monitor refers to a statement of Lord Hoffman, no stranger to contract interpretation and a legal giant of his day, in *Beaufort Developments (NI) Ltd. v. Gilbert-Ash NI Ltd,* [1999] A.C. 266 at 274 (H.L.) that arguments of redundancy should be treated with caution. He stated:

> I think, my Lords, that the argument from redundancy is seldom an entirely secure one. The fact is that even in legal documents (or, some might say, especially in legal documents) people often use superfluous words. Sometimes the draftsmanship is clumsy; more often the cause is a lawyer's desire to be certain that every conceivable point has been covered. One has only to read the covenants in a traditional lease to realise that draftsmen lack inhibition about using too many words.

[98]    In *Long v Delta Catalytic Industrial Services Inc.*, [1998] 6 W.W.R. 792, Fruman J. (as she then was) said much the same thing:

> Some might argue that this interpretation makes the provision redundant…That may well be the case, but it won't be the first time that a repetitive provision has been inserted into an agreement.

[99]    Redundancy could also be laid at the feet of the U.S. Debtors in their interpretation of the license grant. If their reading is correct, all of the second, third and fourth clauses would be redundant as the first clause was an unrestricted grant of a license. I think in this case redundancy arguments are just that, arguments that do not deal with the commercial purpose of the agreement.

[100]  An addendum to the MRDA dated December 14, 2007 with effect from January 1, 2006 was made to adopt changes to the terms of the MRDA that had been reflected in the financial statements of the Participants. The first two recitals of this addendum stated:

> Whereas each Participant holds and enjoys equitable and beneficial ownership of NN Technology as defined in the Prior Agreement,

> Whereas this Addendum continues each Participant's rights and obligations in the NN Technology,

[101]  The reason for this addendum was stated in the third recital

> Whereas given changes in the Nortel business, NNL and certain other Participants are seeking governmental approval of modifications to the RPSM.

[102]  This was the first of two addenda that changed the way of calculating the residual profit split each year from an amortized 30% spend of each Participant each year on R&D to a five year rolling average spend by each Participant on R&D. The operative parts of this addendum did not change the operative terms of the prior MRDA relating to the licence rights granted to the participants. I do not read the first two recitals that "each Participant holds and enjoys equitable and beneficial ownership of NN Technology as defined in the Prior Agreement" and the addendum "continues each Participant's rights … in the NN Technology" as changing anything with respect to those rights in the prior MRDA. It is how the prior MRDA defines the rights of the participants that is important.

[103]  Confidentiality provisions are contained in the MRDA. The Monitor contends that because under article 6(a) the licensed participants owe a duty of confidentiality to NNL regarding the NN Technology but NNL does not owe such a duty to the Licensed Participants is an indication of the ownership by NNL of the NN Technology. The U.S. Debtors contend that because exceptions to the duty of confidentiality in article 6(d) give the right to the Licensed Participants to communicate to suppliers, customers and third persons licensing rights to use the NN Technology that they must have been given the authority to license to such third parties.

[104]  I think too much is made by each side of these confidentiality provisions. There is something perhaps in each side's argument, but I would not read article 6 as expanding on or limiting the ownership or license rights of the NN Technology. That was not its purpose.

Regarding article 6(d)(iii), it begs the question as to whom the rights were given to license to third parties, and in light of the evidence of sub-licensing prior to the MRDA, to which I will refer in dealing with surrounding circumstances or the factual matrix, it is clear that NNL was a party to all such sub-licensing and NNI alone never sub-licensed.

[105]   The U.S. debtors contend that what was intended by IPCo comfortably falls within the definition of a Product and that therefore what was sold to Rockstar embodied rights that NNI had. They contend:

> IPCo was a licensing service business that the Participants proposed to be developed and indeed were actively developing, and which indisputably embodied the entirety of the Patent Portfolio sold to Rockstar, fits comfortably within the plain meaning of a "service" and thus the definition of "Products".

[106]   I do not agree. IPCo was considered for a time after the insolvency filings in January 2009. It could not be considered to have been part of the operating arrangements of Nortel while it carried on its business or intended to be governed by the MRDA. IPCo was not intended to be a "licensing service" business. The evidence of Sharon Hamilton, which I accept, is that the proposed business of IPCo was to use threatened or actual litigation against technology companies making their own products which arguably used or embodied NN Technology, in an attempt to encourage them to take and pay for a license to NN Technology. That was not a business contemplated in any meaningful way at any time that the MRDA or its predecessor was negotiated or signed.

[107]   The economic analysis prepared by Horst Frisch in 2002 as part of its work in devising the RPSM for the MRDA referred to Nortel customers choosing Nortel products and services because Nortel is committed to using its R&D resources in providing full pro-active service and support to its customers. A functional analysis for the years 2000 to 2004 sent by Nortel to the tax authorities in 2004 said the same thing. It also stated:

> "Nortel's networking solutions generally bring together diverse networking products from its various product families, and related services, to create either a customized or "off the shelf" solution for customers.  Nortel's business consists of the design, development, manufacture, assembly, marketing, sale, licensing, servicing and support of these networking solutions".

[108]   The definition of Products in the MRDA is:

"**Products**" shall mean all products, software and services designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured or marketed, at any time by, or for, any of the Participants, and all components, parts, sub-assemblies, features, software associated with or incorporated in any of the foregoing, and all improvements, upgrades, updates, enhancements or other derivatives associated with or incorporated in any of the foregoing.

[109]  Taken this definition, the license to NNI and the other participants was to "make, use…, license…sell" Products using or embodying NN Technology by, or for, the Participants. The Monitor contends that giving someone else (i.e. not any of the Participants) the right to use or embody NN Technology in their own products are not "services" within the Products definition in the MRDA.  The Monitor contends that on the U.S. Debtors' reading of the word "services" in the MRDA, NNI could have provided a "service" to competitors of Nortel by permitting them to use in the U.S. the entirety of Nortel's patent pool to make their own products to compete with Nortel.  The plain reading of the MRDA and common sense are contrary to this interpretation.

[110]  I agree with the Monitor's interpretation of the MRDA. At the time the MRDA was being considered, Nortel was not in a business of licensing its services to others for the business of others. It was providing a service to its customers to support the technology being acquired by its customers. The MRDA must be read in that context. What was contemplated for a relatively short period of time after the world wide insolvency of the Nortel Group was simply not in the cards prior to that time.

### (b)    The right to sue for infringement

[111]  The U.S. Debtors contend that the right to sue is central to their rights as exclusive licensee in the U.S. The right to sue is contained under Article 4 which is headed Legal Title to NN Technology. The right is not contained in the exclusive or non-exclusive licenses under article 5. I cannot read this right to sue as being part of the licenses granted to the licensed participants in article 5. Articles 4 (a) and (e) are relevant, and provide:

(a)    Except as otherwise specifically agreed, legal title to any and all NN Technology whether now in existence or hereafter acquired, or developed pursuant to the terms of this Agreement, shall be vested in NNL. In consideration therefor, NNL agrees to enter into an Exclusive License and a Non-Exclusive License with each of the Licensed Participants as set forth in Article 5.

(e)    Licensed Participants have the right to assert actions and recover damages or other remedies in their respective Territories for infringement or misappropriation of NN Technology by others.

[112]   This right was not contained in the prior CSA. It first appeared in the MRDA.

[113]   This right in sub-article 4 (e) does not state that the Licensed Participants have the exclusive right to bring action in their territories. The exclusive rights which the Licensed Participants have are contained in the exclusive license rights in article 5. There is no provision in the MRDA that precluded NNL from suing for patent infringement in a territory in which Licensed Participants had exclusive license rights. Indeed, the limited practice in the U.S. before the MRDA was signed was that both NNL and NNI were named as plaintiffs in infringement actions. To the extent those actions can be considered to be part of the factual matrix, it explains why the right to sue granted to NNI was not an exclusive right.

[114]   The right to sue for damages given to the Licensed Participants in their exclusive territories would obviously require a Licensed Participant to establish that it had been damaged. If the suit involved a breach of rights which the Licensed Participant had under its license, damages could presumably be proven. However, if the suit involved a breach of rights which the Licensed Participant did not have under its license, damages could not be proven.

[115]   If a Licensed Participant were the only plaintiff, which does not appear to have ever been the case, presumably it would be open to a defendant to contend that the Licensed Participant had not suffered any damages as what was being done by the defendant was not something that the Licensed Participants could have done under its license. That defence would not likely be run if both NNL and the Licensed Participant such as NNI were plaintiffs.

[116]   The Licensed Participants were not given any right to sue for damages for patent infringement in non-exclusive territories. This right was held by NNL.

**(iv)   Surrounding circumstances or the factual matrix**

[117]   What may be looked at in constructing an agreement is objective evidence of the background facts at the time of the execution of the contract. It may not include evidence of the subjective intent of a party or what a party believed a contract to mean. Whether something was

or reasonably ought to have been within the common knowledge of the parties at the time of execution of the contract is a question of fact.

[118]  There is an issue regarding the timing of the evidence that may be looked at. The exclusive licence to the Licensed Participants was contained in the 1985 CSA between Northern Telecom Limited [now NNL] and Northern Telecom Inc. [now NNI] signed in December 1984 and continued with no substantive changes in the 1992 CSA and in the MRDA and its later addenda. I would not, however, limit the time of the surrounding circumstances to the time that the CSAs were signed. The MRDA was made on December 22, 2004 effective January 1, 2001. Thereafter, while there were a number of changes to the MRDA in various addenda, no changes of substance were made to the operative provisions regarding the rights of the participants in NN Technology. I think the surrounding circumstances to the time of the signing of the MRDA in December 2004 can be looked at. Although there were some modifications to the MRDA after that, none involved any substantive change to the rights of NNL or to the exclusive licenses given to the Licensed Participants.

[119]  There was a great deal of evidence led by the U.S. and EMEA interests as to the subjective views of the witnesses, mostly tax personnel, regarding the rights of the parties under the CSA or MRDA or what the witnesses understood the language to mean, or in one case as to the witness's understanding of what others understood the documents to mean. Apart from the latter being inadmissible hearsay, all of this evidence was not admissible as it amounted to subjective views as to the meaning of an agreement. Nor was it admissible under the factual matrix rule permitting objective surrounding circumstances at the time of the execution of the agreement to be considered, and I do not consider it[14]. For example, what Mr. Henderson thought about the rights under the CSA license, that he copied from an earlier version of the CSA, or what others thought the MRDA meant or what they thought the intent of it was is not to be taken into account. See *Sattva*, *supra*, at para. 59.

[120]  I think it right to point out that not all of the evidence was one way. For example, the evidence of Angela De Wilton, the director of Intellectual Property in the Nortel IP law group

---

[14] Rulings on admissibility of evidence were left for decision to be made after argument at the conclusion of the trial.

and the director of IP strategy, was that Nortel was the owner of the patents and not just for administrative reasons. This evidence, elicited on cross-examination, also suffers from it being her subjective view of the rights of the parties under the MRDA. There were other witnesses who said much the same thing, such as Mr. Binning, the Executive Vice-President and CFO of NNC and NNL from November, 2007 to March, 2010 who said on his cross-examination that he understood that NNL owned the IP. This evidence suffers from the same problem of being a subjective view of the rights of the parties. The point is that that not all witnesses agreed with the subjective views of other witnesses.

[121]   There was also some evidence led of a prior draft of the MRDA and the views of an outside tax lawyer at Oslers who acted for NNL as to the particular draft language. This evidence is also inadmissible as being a prior draft and as constituting that particular lawyer's subjective views as to what the MRDA should contain.

[122]   A great deal of evidence, including evidence of statements made to tax authorities, had to do with economic theories of transfer pricing. As the transfer pricing principles changed from a cost sharing approach to a residual profit sharing approach, the economic theories and statements to tax authorities changed. One thing that did not change from the CSA approach to the RPSM approach was the language of the license grant from NNL to the other participants. It is that language that must be considered.

(a)    1996 APA

[123]   The 1992 CSA between Northern Telecom Limited (now NNL) and Northern Telecom Inc. (now NNI) was made with effect from January 1, 1992 but was not drafted until 1996 after the negotiations with the CCRA in Canada and the IRS is the U.S. in the advance pricing agreement process, so as to reflect the terms of the APA made with each of those tax authorities.

[124]   The U.S. Debtors say that the APA makes clear that NNI was entitled to all of the benefits of the NN Technology in the U.S., including all sub-licensing rights. I think they draw too long a bow. The APA between Northern Telecom and the CCRA was an agreement which by its terms was to "establish a cost sharing methodology which will result in the allocation of expenses to NNI by [NNL] for R&D done by [NNL] and its subsidiaries…which will constitute reasonable amounts in the circumstances for the purposes of section 69 of the Income Tax Act".

The concern of the tax authorities was that the costs of R&D be properly allocated between NNL and NNI. The purpose of the APA was not to agree how the income of NNL and NNI was to be shared or allocated, but how to apply R&D expenditures to whatever the income was for each of NNL and NNI.

[125]   Article 1.1 of the APA stated that the allocation of R&D expenses was to be determined in accordance with the cost sharing methodology described in appendix A. Appendix A is headed Cost Sharing Methodology. It contains detailed formulae to determine how R&D is to be allocated. At the outset, it has a section headed Understandings. The first understanding is that all benefit derived from R&D expenses is recognized either in the selling of a finished product to an unrelated customer or from the licensing of the technology resulting from the R&D expense (the "Benefit") within a defined geographical market by a Cost Sharing Participant ("CSP"). It goes on to state that "[NNL], as a CSP, "is entitled to all Benefits in all geographical markets except for the part(s) thereof granted to another CSP" and "NNI is also a CSP and its geographical market is the united States of America and the Commonwealth of Puerto Rico".

[126]   This statement that NNL is entitled to all Benefits in all geographical markets except for the part(s) thereof granted to another CSP is somewhat unclear. It could refer to all Benefits except for parts thereof granted to another CSP, or to all geographical markets except for those parts granted to another CSP. The former would seem to make sense because there would be no purpose in stating that NNL was entitled to all benefits in all geographical markets except those granted to another CSP as the following sentence states that the geographical market of NNI is the U.S. and Puerto Rico. If as I read it the understanding was that NNL was entitled to all benefits except for those granted to a CSP, the document begs the question as to what benefits were granted to NNI, which is the issue in this case.

[127]   It is understandable, as Mr. Henderson testified, that the parties needed to wait until the APA was settled with the tax authorities before the 1992 CSA was settled as the APA stated that it was to apply to the taxation years 1992 to 1999. That does not mean, however, that the parties needed to know how revenue was to be allocated by the APA. The purpose of the APA was to obtain an agreement from the revenue authorities how to allocate R&D costs, not revenues. This is borne out by Mr. Henderson's admissions on cross-examination that the 1992 CSA just adopted the license language of the 1985 CSA and that all operative provisions were the same.

**(b)** **Sub-licences**

[128]   Both sides refer to the evidence of sub-licensing as refuting the case of the other. In this I think they are incorrect. Not a great deal is clear from this evidence.

[129]   The reply closing argument of the U.S. Debtors contains a list of "Sublicenses Involving NNI". None were made only by NNI. Many were made by NNL and NNI and others were made by NNL on behalf of itself and its subsidiaries.

[130]   The sublicenses made by NNL and NNI recited that NNL has granted to NNI "certain rights to license said patents" in the U.S. In the body of the agreement it provides that NNL and NNI "to the extent of their legal right to do so" grants a license to the licensee for the countries and jurisdictions in which Nortel now or in the future holds the Nortel patent. What rights had been licensed to NNI is not stated in the sublicense. Some sublicenses provided that the royalties were payable to NNI, with NNI having the right to direct some or all of the payments to NNL. Others, being a majority of them, provided for the royalties to be payable to NNL with NNL having the right to direct some or all of the payments to NNI. In the case of cross-license agreements, the royalties were payable to NNL and there was no provision for NNL to direct some or all of the payments to NNI.

[131]   In agreements made by Nortel, defined as NNL on behalf of itself and its subsidiaries, regarding U.S. patents, it was stated that Nortel was the owner of the patents and that Nortel granted world-wide license rights for the patents. Other agreements involving other patents made by Nortel, also defined as NNL on behalf of itself and its subsidiaries, recited that Nortel was the owner of the patents. The effect of the language in this form of agreement is that the patents are owned by Nortel on behalf itself and its subsidiaries, which supports the position of EMEA that all patents were jointly owned by the MREs.

[132]   The U.S. Debtors point to some evidence of certain Nortel tax personnel to explain the forms of sublicensing agreements used by Nortel. One is an e-mail exchange in 2002 involving two different views from two different tax persons, in which subjective views as to what the license in the CSAs from NNL to the other participants meant and what the theory of the sublicensing agreements was. The other is an e-mail in 2000 from someone professing not to be an expert in tax and passing on his understanding of what the tax people's view was. Apart from

the latter being hearsay and inadmissible, this e-mail evidence contains subjective views of the extent of the license in the CSAs from Nortel to the other participants in the CSAs and is inadmissible.

[133]   Nortel's IP team prepared a presentation after the sale of the business lines in connection with the stalking horse bid process for the residual intellectual property. The presentation reviewed the history of Nortel's portfolio including its past licensing activities. It stated that Nortel previously had a small licensing group which was not a core focus of the company. There were virtually no assertions against major players, customers or partners and they focused on smaller companies with limited ability to fight back. They had earned approximately $37 million per year in royalty income. The licensing operations ceased in 2007 for budgetary reasons but in 2008 Nortel made a decision to restart the licensing organization. Mr. Binning, the Executive Vice-President and CFO of NNC and NNL from November 2007 to March 10, 2010 said that during that time Nortel was not in the license business. I take it from this evidence that for a business as large as the Nortel business, it would appear that sublicensing was an insignificant business for Nortel prior to its bankruptcy.

[134]   If one follows the money from the sublicenses, the evidence is that the royalties were split on the basis of the MRDA participant's contributions to R&D. The royalties were incorporated into the RPSM calculations even although they were not mentioned in Schedule A to the MRDA. Why this was done was not made clear by Mr. Stephens who gave the evidence of this happening. With one exception, we were not pointed to any evidence as to what was done with any royalties received prior to 2006, which is perhaps a more germane period as being prior to the signing of the MRDA.  In 2004 a settlement of $35 million with Foundary Networks, Inc. was split on the basis of the RPSM.

[135]   In sum, there were no sublicenses when the license was granted by NNL to NNI at the time of the 1985 CSA. There were a number after that which do not indicate any clear pattern of what sublicense rights either NNL or the other participants were recognized to have. Sublicensing was a very insignificant part of the Nortel business prior to its insolvency.

(c)        **Representations to tax authorities**

[136]   I have already discussed the 1996 APA process.

[137]   In connection with the switch from a CSA approach to a RPSM approach, Horst Frisch, a leading firm of transfer pricing economists, was retained to advise Nortel. Horst Frisch prepared a report dated March 14, 2002 titled Economic Analysis of Nortel Networks' Intercompany Transactions and this report was given to the tax authorities.

[138]   The U.S. interests point to a statement at page 10 of the report that stated from an economic standpoint, each participant could be considered to "own" the NT Technology. The paragraph in question made clear that what was being discussed was the situation under the CSA that existed up to the end of 1999. It stated:

> Prior to 2000 Nortel shared it global R&D expenses pursuant to its R&D cost sharing arrangement ("R&D CSA"), which dates back to the mid-1970's (with several amendments). Under the arrangement, each cost sharing participant ("CSP") had the right to use the intangible property developed pursuant to the R&D cost sharing arrangement (i.e., the NT Technology") in its respective market. From an economic standpoint, each R&D cost sharing participant could be considered to "own" the NT technology as it related to its specific region.

[139]   What is meant by "from an economic standpoint" each participant could be considered to "own" the NT technology as it related to its specific region is not clear. The OECD Guidelines and transfer pricing regulations in the U.S. and Canada all define intangible property to include licenses or rights to use assets. The statement of Horst Frisch that each participant had the right to use the IP and from an economic standpoint could be considered to "own" the NT technology could well have referred to owning the license rights held by each participant rather than referring to the underlying NT technology. The U.S. Debtors in their opening brief acknowledged case law to the effect that the rights an exclusive licensee holds are referred to as beneficial ownership.

[140]   Horst Frisch was clearly not talking about legal rights, nor were they discussing particular language in the CSA. Even had they purported to give their views as to what legal rights the parties had under the CSA or the MRDA, which they were not, those views would not have been admissible. Horst Frisch was discussing economic theory.

[141]   A few pages further in the report, when Horst Frisch were discussing what would occur under the RPSM method of allocating profits under the MRDA, they stated that the economic theory underlying the CSA was not applicable to the RPSM of allocating profits. The report stated:

> As noted above, under the prior R&D CSA the CSP which ultimately made the sale to a third party in its exclusive territory was deemed to have economic ownership of the NT Technology since the third party sale attracted an R&D allocation under the CSA.
>
> In the absence of the R&D CSA, with the two exceptions noted above, each old CSP will incur R&D expense which should entitle it to share in Nortel's global profits or losses. We have not attempted to attach these R&D expenses to the manufacturing or the distribution operation of the old CSPs since there will no longer be a formula by which global R&D expenses are shared (i.e., a third party sale will not attract an R&D allocation so it is not reasonable to assume that only the selling entity will continue to own the valuable intangibles). The amount of R&D performed is not necessarily correlated with third party sales or manufacturing activity. Rather, each entity will perform and pay for its own R&D expenses, and has the ability to sell Nortel products worldwide and share in global profits or losses.

[142]   What Horst Frisch were saying was that the economic theory of the participant in a third party sale in its territory "owning" the intangibles would not apply to such a sale under the MRDA. Perhaps implicitly they were saying that the economic "ownership" of the intangibles would be owned by all of the participants in accordance with their R&D spend under the MRDA, although this is not expressly stated. If so, from an economic point of view, it would be more consistent with the position of EMEA rather than the U.S. or Canadian interests.[15]

[143]   After the APAs were applied for in 2002, the tax authorities visited various Nortel sites. They then posed a number of questions. In September 2003 Nortel send a 45 page response to these questions. One of the questions was to update the authorities on any developments since the APA submission was made and whether any changes to the proposed transfer pricing methodology were anticipated. One of the responses of Nortel had to do with restructuring charges. The U.S. interests point to a statement that the residual entities are the owners of the

---

[15] At page 30 of the report, Horst Frisch, in referring to intercompany transactions between participants under a RPSM allocation, state-"The old CSPs possess and will continue to possess valuable intangible property." What property is being referred to is not stated. It could be a reference to license rights.

intangible property. The context is important to see what was being said. Included was the following:

> In 2000 and later years, the telecommunications industry experienced a decline in demand unlike any other substantial industry in modem history. For that reason, there does not appear to be any precedent for analyzing the above issues. Accordingly, a reliance on basic economic principles was deemed necessary.
>
> In an arm's length situation, it was determined that the residual entities would agree to reimburse the distribution entities for a portion of their restructuring charges rather than have those entities become insolvent and forced into receivership. Generally, the underlying economic rationale for this argument is this: the residual entities, as the owners of the intangible property, as well as the manufacturers of the tangible goods, would recognize that its distribution network is critically necessary for their long-term survival. Should members of the distribution network become insolvent/cease operations, the residual entities' ability to offer their products for sale may be severely impacted. Therefore, it is in their best economic interests to ensure that a strong global distribution network exists.

[144]   This is a discussion of economic theory. It cannot be construed as a discussion of legal principles or the meaning of the MRDA. The reference to being owners of the intangible property could well be a reference to license rights rather than the underlying intangibles, as license rights are intangible property.

[145]   Dr. Timothy Reichert, a transfer pricing expert called by the Monitor, made the following statement about economic ownership as considered in transfer pricing, a statement not contradicted by any witness:

> A central concept in transfer pricing is that of "economic ownership" (referred to, alternatively, as "beneficial ownership," and simply "ownership").  Economic ownership is not a reference to ownership in a legal sense, but rather refers to a party's right to benefit from an income stream attributable to a defined undertaking or activity.

[146]   This statement cannot be disregarded. An economic right to an income stream attributable to a defined undertaking or activity requires one to know what is the defined undertaking or activity. The economic statements made to the taxing authorities did not purport to define the precise limits to the license granted by NNL to the participants under either the CSA or the MRDA. As seen, the statements made to the taxing authorities did not at all make

clear what rights were being referred to and in particular, whether the "economic or beneficial ownership" was in the underlying NN Technology or in the license rights to that technology. They cannot be taken as statements that under the MRDA the licensees legally owned the NN Technology.

[147]   To the contrary, Mr. Weisz, the Leader of International Tax at NNI who was involved in Nortel's transfer pricing policies, and who was asked by Mr. Dolittle, the VP of Tax for Nortel to become involved in the APA process that had stalled, told the IRS during that process that it was NNL that was the legal owner of the IP.

[148]   It must also be recognized that the APA process with the tax authorities was to arrive at an agreement with them regarding the Nortel operating business. It was an operating business with profits and losses that the tax authorities were interested in. This was the case both for the APA processes for both the CSA and MRDA. There were no discussions with the tax authorities as to what would happen on the insolvency of the entire business of Nortel. The discussion of the economic theory of economic or beneficial ownership must be considered in that light. They were not discussing such a theory in so far as it might apply to the situation of a cessation of business as occurred with Nortel.

[149]   The issue in this case has to do with the breadth of the licenses granted to the Licensed Participants and whether that included the right to sublicense the residual patent portfolio that was eventually sold to Rockstar. However at the time of the APA processes, sublicensing was a miniscule part of the business of Nortel and not surprisingly I have been pointed to no presentation to the tax authorities that discussed this issue. It was not on the Nortel radar.

[150]   The MRDA was provided to the tax authorities. They also had the prior CSA. The U.S. interests do not say that NNI rights were obtained other than in the CSA and then the MRDA. The tax authorities had these agreements and were able to read them, and were in as good a position as anyone to form their own view of what the agreements did or did not do. It cannot be suggested that the tax authorities did not understand transfer pricing. It was their business to know it.

[151]   There is evidence relied on by the EMEA debtors to support their position that the

proceeds of the sale of the residual IP should be allocated in accordance with the relative expenditure on R&D by NNL and the licensed participants. After the APS application was filed by Nortel with the tax authorities in 2002, planning for a June 19, 2002 joint meeting with the three tax authorities took place in earnest, including the preparation of answers to questions Nortel anticipated might be raised by the tax authorities. In preparation for the meeting, Nortel engaged advisors from Deloitte & Touche LLP, KPMG LLP, Horst Frisch, and Sutherland Asbill & Brennan LLP to assist. Mr. O'Connor of Deloitte's prepared the following answer to an anticipated question regarding the sale of any IPCo, an answer that was circulated and agreed before the meeting:

> [Q:] How does Nortel propose to account for any future sale of intellectual property developed prior to or during the term of the APA? Which entities are considered the legal owner of IP and which are considered the economic owners?

> [A:] Proceeds from the sale of IP will be allocated to residual profit split participants on the basis of their economic ownership of the IP – that is, on the basis of their share of total R&D capital stock in the year of sale.

[152]   The document was taken to the joint meeting. There is no evidence one way or the other as to whether the question was asked. While the question does not deal with what would happen if all of the Nortel IP was sold on a world-wide insolvency of Nortel, it is evidence that at the time of the APA process, Nortel was prepared to say that any sale of IP would be split in accordance with the RPSM in the year of the sale.

### (d)      Avoiding permanent establishment status in the U.S.

[153]   The U.S. interests contend that it was important to NNI not to be considered a U.S. resident for U.S. tax purposes and thus not have "permanent establishment" in the U.S. It is contended that it was this concern that drove separate legal entities to be set up for each country and for the license to be exclusive to the Participants for their territory so that the Participants would be the only ones dealing with customers in that territory.

[154]   Taken that as the situation, I do not see that it gets very far. There is no question that the exclusive license gave NNI the exclusive right to sell Nortel products in the U.S. The important issue in this case is what rights NNI had to sub-license and whether it was restricted to Nortel "Products" as defined in the MRDA. Sub-licensing was a miniscule part of the business of Nortel

and there is no evidence at all that sublicensing issues drove the setting up of companies in different jurisdictions.

### (e)      Patent litigation

[155]   I have previously referred to the patent litigation that had taken place prior to the MRDA. Both NNL and NNI were plaintiffs in the actions in the U.S. Why that was so does not really matter. It explains why the right given to licensed participants to sue in their territories for damages for patent infringement was not an exclusive right.

[156]   As to what was done with the proceeds of patent litigation, there was a settlement in October, 2004 of an action commenced by NNL and NNI against Foundary Networks, Inc. $35 million was paid for past infringement and for future royalties under a license agreement. The entire payment was treated as royalty income and allocated to NNL and the Licensed Participants in accordance with the RPSM in the MRDA.

### (f)      Conclusion of factual matrix evidence

[157]   I do not consider the surrounding circumstance or factual matrix evidence to provide much clear assistance in construing the meaning of the terms in the MRDA. Even if it did, I would be required to be guided by the dictates of *Sattva* that while the surrounding circumstances will be considered in interpreting a contract and the goal of examining such evidence is to deepen a decision-maker's understanding of the mutual and objective intentions of the parties as expressed in the words of the contract, they must never be allowed to overwhelm the words of the contract and the interpretation of a contract must always be grounded in the text. While the surrounding circumstances are relied upon in the interpretive process, courts cannot use them to deviate from the text such that the court effectively creates a new agreement.

### (v)  Commercial reasonableness

[158]   The U.S. interests and EMEA say that the Monitor's interpretation of the MRDA is commercially unreasonable. They contend that no party at arm's length would agree to spend large amounts to develop patents but only one party would be entitled to all of the proceeds from the sale of those patents.

[159]   It must be remembered that the MRDA and its predecessor CSA were drafted to come to terms with the tax authorities. The parties to the negotiations were Nortel on the one hand and the tax authorities on the other. The resulting CSA and then MRDA were operating agreements premised on cost sharing under the CSA and profit or loss sharing under the MRDA. The tax authorities were interested in the tax that each Nortel entity would pay each year. The tax authorities dealt in only limited periods of time. The 1992 CSA was settled with the tax authorities only in 1996, yet in 1999 they made it clear they wanted Nortel to abandon the CSA agreement and instead change to a RPS method of transfer pricing.

[160]   Nortel and the tax authorities were not negotiating on what would happen if Nortel stopped operating or in the event of a world-wide insolvency of Nortel. More particularly, they were not negotiating on how the proceeds of the sale of the entire Nortel world-wide patent portfolio would be allocated amongst the various Nortel companies in the event of the insolvency of Nortel. That was not discussed. This is not surprising because, as Dr. Eden testified, transfer pricing rules were developed only in connection with ongoing entities for purposes of determining their corporate tax.

[161]   The issue of commercial reasonableness must be considered in the context of who was involved in the preparation of the MRDA. It was not the technology people. Mr. Brian McFadden, the Chief Technology Officer of Nortel at the time the MRDA was drafted and signed, was not consulted about its terms and never heard of the MRDA while at Nortel. Ms. Angela de Wilton, the Nortel Director of Intellectual Property had no recollection of ever seeing the MRDA. In order to make the argument that it would have been commercially unreasonable for a Nortel company to agree to do R&D leading to patents and not be paid for the patents on the sale of the business, one would think that the people responsible for the R&D would have at least known of the agreement and its terms. The fact that they did not indicates that a trade-off of R&D for future receipts on a sale of the business was not on the radar screen at all so far as the operating people were concerned. The language of the MRDA was all tax driven.

[162]   So far as what was on the radar of the tax people at Nortel at the time the terms of the MRDA were settled, in so far as the quid pro quo for doing R&D was concerned, the MRDA expressly provided in Article 2(c) that any compensation for R&D was to be based solely on the RPSM allocation. It stated:

(c)      All costs incurred directly or indirectly by each Participant for R&D Activity shall be borne exclusively by it. Any reimbursement for costs including any other compensation shall be provided to such Participant for its R&D Activity solely as provided in Article 3 below.

[163]   Article 3 that the annual sharing of profits or losses under the residual profit split method was what was to be received for each participants R&D that year. It stated:

Article 3 – R&D Activity Payments

(a)      For and as a consequence of the performance of R&D Activity, each Participant shall be entitled to receive a payment in an amount equal to the allocation determined under the RPSM (the "R&D Allocation") as the measure of the benefit to which it is entitled commensurate with its performance of, and contribution to, R&D Activity.

[164]   In the context of what the parties were dealing with in the MRDA, I do not see how it can be said that it was commercially unreasonable for them to agree that in return for doing R&D each year, they would share only in the profits or losses in accordance with the RPSM allocation. That is all they had in mind. While Nortel had suffered losses by 2004 when the MRDA was signed, there is no evidence that Nortel expected to have only losses in the future. To the contrary, the operating people at Nortel expected that Nortel would return to profitability.

[165]   Mr. Henderson testified that a bankruptcy or insolvency of Nortel was not in their minds at the time the RPSM in the MRDA was created. The fact that they did not consider or provide what was to happen to the proceeds if all of the IP was sold after a world-wide insolvency does not make the agreement commercially unreasonable. The time for considering whether an agreement properly interpreted is commercially reasonable or unreasonable is surely the time when it was agreed, not in hindsight.

[166]   The U.S. Debtors called Dr. Catherine Tucker, a transfer pricing expert, whose evidence was to the effect that under the Monitor's interpretation of the MRDA, the Licensed Participants would lack appropriate incentives to undertake expensive and speculative R&D for the next potential generation of products. I do not think her evidence helpful. It is really an inadmissible subjective view as to how the MRDA license should be interpreted.

[167]   There is no basis for Professor Tucker's assumption that the MRDA was intended to

create incentives for the Licensed Participants to make forward-looking innovations.  The fact that Mr. McFadden, the Chief Technology Officer of Nortel at the time of the MRDA, was not consulted about the MRDA and knew nothing about it belies any such assumption. Professor Tucker's assumption also ignores the way in which R&D was carried out at Nortel.

[168]   The majority of Nortel R&D was directed by the various Business Lines, which had to prepare annual R&D plans for approval.  The remaining R&D, the advanced technology research (the "leap from one S-curve to the next" that Professor Tucker describes), was coordinated by the Chief Technology Officer. The evidence of Mr. McFadden was that all advanced technology programs were based in Ottawa and were operated by NNL. While product development R&D groups within each of Nortel's lines of business reported directly to the heads of their business units, the advanced technology programs personnel within each line of business reported directly to the CTO's office at NNL. The R&D was not the bailiwick of any Licensed Participant.

### (vi)   Conclusions on the meaning of the MRDA

[169]   I interpret the MRDA, and find, that under it, and while Nortel operated as a going concern business, NNL had all ownership interests of the NN Technology subject to grants, being (i) the grant to each Licensed Participant of a non-exclusive right to assert actions and recover damages in their territory under article 4(e) and (ii) the grant of exclusive and non-exclusive licenses to the Licensed Participants under article 5(a).

[170]   The licenses under article 5(a) were not licenses of all rights to the NN Technology but were subject to field of use restrictions that gave the Licensed Participants the right to use the NN Technology to make, use or sell Products as defined in the MRDA, which meant products, software or services that were made or sold by, or for, any of the Licensed Participants. The Products must have been created or marketed by or for the Nortel Group. No product that was part of a third party's business rather than the business of Nortel fell within the definition of Products. The business considered by IPCo was not covered by the licenses. The Licensed Participants' rights to sublicense were subject to these restrictions.

**Applicability of the MRDA to the allocation issues**

[171]   Nortel Networks UK Pension Trust Limited and the Board of the UK Pension Protection Fund (the "UKPC") contend that the MRDA was never intended to provide an answer to the question of how to allocate among the bankrupt estates the proceeds of the sale of the Nortel Group's assets following the world-wide insolvency of Nortel.

[172]   I agree. The MRDA was an operating agreement and was not intended to, nor did it, deal with the disposal of all of Nortel's assets in a situation in which no revenue was being earned and no profit or losses were occurring. The MRDA provided in its opening line that it was an agreement "confirming and formalizing the operating arrangements" of the parties.

[173]   There is a provision in schedule A to the MRDA added in the third addendum effective January 1, 2006 but signed by the parties late in late December 2008 or early January 2009 that indicates that sales of property were not intended to be dealt with under the MRDA. That schedule A provided that in dealing with the calculations of the Nortel earnings/losses to be used in the RPSM calculation, there was to be deducted "gain/loss on the sale of business". A gain or loss would normally be taken into account on the particular company's statement of profit and loss and the Participants decided they did not want any such gain or loss to influence the calculation of profits or losses for the purposes of calculating the allocation of profits or losses in the RPSM calculation. Mr. Orlando testified that the sale of a business was seen to be a non-operating activity. This provision is an indication that the MRDA was not intended to deal with the sale of any assets, let alone the world-wide assets of the Nortel Group.

[174]   The MRDA and its predecessor Cost Sharing Agreements ("CSAs") were developed for and driven by transfer pricing concepts. They were drafted to come to terms with the tax authorities. The MRDA expressly provided in a recital that the calculation of the RPSM might have to be adjusted as a result of its review by the tax authorities. The MRDA was drafted by tax lawyers and tax advisors. The primary external counsel involved, and lead drafter of the MRDA, Giovanna Sparagna, testified that the MRDA is "primarily focused on transfer pricing," which is "part of tax law," and it is "primarily [a] tax law document[]." The MRDA was signed on behalf of NNL by John Doolittle, Nortel's Vice-President of Tax. All parties acknowledge that the MRDA was a tax-driven document designed to implement Nortel's transfer pricing policies.

[175]   Following the insolvency proceedings on January 14, 2009, no transfer pricing payments were made under the MRDA. The two special cash payments made by NNI to NNL were made under different agreements, being the IFSA dated June 9, 2009 and the FCFSA dated December 23, 2009.

[176]   Dr. Eden, who testified on behalf of the U.S. Debtors, testified that transfer pricing was only for ongoing businesses. She also testified that she saw the MRDA as a transfer pricing document and that the RPSM method contained in it was only used for corporate income tax purposes. She and other transfer pricing experts such as Dr. Richard Cooper, Dr. Steven Felgran and Dr. Timothy Reichert testified to the effect that transfer pricing does not address entitlement to the proceeds of the sale of assets on insolvency.

[177]   I accept that the MRDA was a transfer pricing document created for tax purposes. The licenses were a part of it. The licenses granted under it were never dealt with separately from the MRDA. Their only purpose was to support the intended tax treatment resulting from the MRDA.

[178]   It can perhaps be argued that under article 9 of the MRDA the rights of NNL under article 4 and of the Licensed Participants under article 5 continued on the expiry or termination of the agreement, indicating a purpose other than tax that survives the insolvency of the Nortel enterprise. I would not construe those provisions that way.

[179]   The relevant provisions of article 9 of the MRDA provide:

**Article 9 — Duration and Continuing Rights and Obligations**

(a)      This Agreement shall be effective from January 1, 2001 until December 31, 2004, provided however that this Agreement will automatically renew for additional and unlimited one-year terms until terminated by the mutual written consent of all Participants.

(b)      Upon the expiry or termination of this Agreement as provided herein, each Licensed Participant shall be deemed to have acquired a fully paid up license permitting it to continue to exercise the rights granted to it herein, and, in particular, the rights granted to it in Article 5 as though this Agreement had continued.

(c)      The provisions of Article 4 (Legal Title to NN Technology) with respect

to NN Technology acquired or developed pursuant to this Agreement from the
Effective Date of this Agreement up to and including its expiry or termination
date, Article 6 (relating to confidentiality) and Article 7 (relating to liability) shall
survive notwithstanding the expiry of this Agreement, or any termination of this
Agreement for any cause whatsoever.

[180]  Under article 9, the MRDA automatically renewed after 2004 unless terminated by

mutual consent of all parties to it. If terminated, the Licensed Participants were to be deemed to

have acquired a fully paid up license "permitting it to continue to exercise the rights granted to it

herein… as though this Agreement had continued". This provision by its terms contemplated the

business of the Licensed Participants continuing to operate. It did not contemplate a situation in

which all of the Licensed Participants liquidated their assets and went out of business.

[181]  The CSAs contained a similar provision regarding the rights of the Licensed Participants

on termination to a fully paid up license. At the end of 1999, the tax authorities did not want to

renew the APAs and they encouraged Nortel to adopt a RPSM. In December, 2001, Nortel's

CSAs for R&D were terminated effective January 1, 2001. In spite of the termination of these

agreements, Nortel continued to operate and it was only on December 22, 2004 after negotiations

with the tax authorities that the MRDA was executed with an effective date of January 1, 2001.

The MRDA stated that it confirmed and formalized the operating arrangements of the

Participants as and from that date. That is, the license rights under the CSAs continued to be used

in accordance with the terms of the CSAs, and Nortel's tax advisors told that to the tax

authorities on April 26, 2004. This was contemporaneous with the MRDA being settled.

[182]  One can see from this that the purpose of continuing rights under article 9 of the MRDA

after a termination was to permit the Participants to continue operating, during which a new

agreement would have to be negotiated. Nortel was a multi-national enterprise that had to live

with tax authorities where it operated and could not live without a transfer pricing agreement of

some kind. As previously discussed, there was no thought at the time of the MRDA being settled

that Nortel was not going to return to profitability.

[183]  Article 11(a) of the MRDA provided that any Participant that was not a party to an APA

with the tax authorities could elect to withdraw from the MRDA. Article 11(c)(iv) of the MRDA

provided that it was a defaulting event if one of the Participants became insolvent, in which case

the Participant automatically was terminated from participation in the agreement. A fourth

addendum was made to the MRDA effective December 31, 2008 and signed in early January 2009. It was headed <u>Standstill Provision</u> and provided that in the event of an occurrence of an event described at Section (sic) 11(c)(iv), i.e. if a Participant became insolvent, (i) no Participant effected by such insolvency shall be automatically terminated from participating in the agreement, (ii) no Participant shall elect to withdraw from the agreement under Article 11(a), and (iii) NNL would have the right in its sole discretion to terminate participation in the MRDA of any Participant affected by such event, i.e. of a defaulting Participant by reason of its insolvency.

[184]   This provision did not contain provisions expressed to apply in the event of a world-wide insolvency of all of the Nortel companies. It contained provisions of a standstill nature dealing with a situation in which one Participant became insolvent. It was obviously designed to prevent a Participant from declaring insolvency and then trying to take positions contrary to other Participants and to prevent the other Participants in such an event trying to take positions contrary to other Participants. I do not read this provision as an indication that in the event of a world-wide insolvency of all of the Nortel companies with no operations, the agreement was to continue to govern the affairs of a non-operating enterprise. Had that been the parties' intention, they could have said so in the addendum. They did not.

[185]   I conclude that the circumstances surrounding the creation of the MRDA lead to no other result but that the construct of legal title to the NN Technology being in NNL in return for NNL granting exclusive licenses to the Licensed Participants was only for the purpose of supporting the proposed method to split profits or losses on a tax efficient basis while Nortel operated as a going concern business. The agreement in its application was intended to apply only to Nortel while it operated and not to deal with rights after Nortel and its subsidiaries stopped operating its businesses.

**EMEA position on ownership of the Nortel IP**

[186]   The EMEA Debtors' position is different from the position of the Canadian and U.S. Debtors. They say that the Participants, or RPEs, have joint ownership of all Nortel IP under common law principles by reason of the IP belonging to the RPEs that employed the inventors. They say that the MRDA recognizes that joint ownership and that the joint ownership should be the basis for allocating the proceeds of the sale of the Nortel residual IP.

[187]   The basic premise of the EMEA Debtors' argument is that the Participants or RPEs were joint owners of all Nortel IP by reason of law. They argue that under Canadian law, the inventor is the first owner of an invention and is the legal title holder entitled to apply for any related patent.   However, where the inventor is employed to invent, as the Nortel Group's researchers were, then the employer by operation of law beneficially owns any resulting IP.   While the employee inventor who is listed on the patent application holds legal title, the employer is the beneficial owner. Given the integrated nature of Nortel and its R&D created in multiple jurisdictions, the EMEA Debtors argue that each participant beneficially owned not the IP created in its jurisdiction, but rather a share of the indivisible pool of the Nortel Group's IP.

[188]   Canadian and U.K. law appears to support the principle that where an employee creates an invention as part of his or her employment, the employer is the beneficial owner of the patent.[16] U.S. law is otherwise. Under U.S. law, unless there is agreement to the contrary, it is the inventor and not the employer who is the owner of his or her invention until he or she assigns it[17].

[189]   All Nortel employees, whether employed by NNL or a subsidiary, were required to assign directly or indirectly to NNL any intellectual property which they generated during the course of their employment. At least 98% of the patents and patent applications sold to Rockstar had been assigned by the inventors to NNL.

[190]   The EMEA Debtors say that while the inventors assigned their rights to NNL, the subsidiaries that employed the inventors did not. Thus they say that NNUK, the employer of inventors in the U.K., continued to have beneficial ownership of the patents for inventions created by its employees. I do not accept that. NNUK was required under article 4 (b) of the MRDA to execute such documents as NNL reasonably required to give effect to article 4 (a), which provided for legal title to NN Technology to be vested in NNL. In light of that obligation, NNUK is in no position now to say that the assignment of the IP from its employees to NNL was

---

[16] *C.I. Covington Fund Inc. v. White*, [2000] O.J. No. 4589 paras. 38–39 (S.C.J. (Commercial List)), *aff'd* [2001] O.J. No. 3918 (Div. Ct.). *G.D. Searle & Co. v. Novopharm Ltd.*, [2007] F.C.J. No. 625 (C.A.), *leave to appeal to SCC refused* [2007] S.C.C.A. No. 340 . *Patchett v. Sterling Engineering Coy. Ltd.* (1955), 72 R.P.C. 50 (H.L.).  This has now been codified in section 39 of the *Patents Act 1977* (U.K.), c. 37.
[17] *Board of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 131 S. Ct. 2188, 98 USPQ (2d) 1761 (2011) at p. 2195-2196, quoting *United States v. Dubilier Condenser Corp.*, 289 U.S. 178 (1933) at p. 189.

ineffective.

[191]   This argument of the EMEA Debtors would not apply to NNI in the U.S. as under U.S. law NNI did not have any such common law rights to IP developed by its employees who assigned their rights to NNL. Nor would it apply to patents invented by employees of NNL who assigned their rights to NNL. The EMEA Debtors' argument, if accepted, would mean that NNUK would only have rights to the IP developed by its employees and would have no joint ownership interest in the IP developed by employees of NNL, NNI, NNSA or Nortel .

[192]   I cannot accept the joint ownership theory of the Nortel IP or use that theory as a basis for allocating the proceeds of sale of the Nortel IP assets.

**Appropriate method to allocate the proceeds of sale**

[193]   While the Monitor on behalf of the Canadian Debtors and the U.S. Debtors take diametrically different views as to their rights under the MRDA, they each look to the MRDA and the rights they say were given to them as the basis of their allocation positions. I have not accepted their position that they obtained rights under the MRDA that determine their right to the proceeds of the sale of Nortel's assets.

[194]   Nor have I accepted the position of the EMEA Debtors that the RPEs have joint ownership of all Nortel IP under common law principles recognized in the MRDA and that such joint ownership should be the basis for allocating the proceeds of the sale of the Nortel residual IP.

[195]   Without the MRDA to govern the allocation, and without the joint ownership theory of the EMEA Debtors, the issue becomes one of deciding what metric should be used to allocate the proceeds of sale.

[196]   In so far as the IP is concerned, while the patents were registered in the name of NNL, I would not for that reason hold that NNL is entitled to the proceeds of the IP sales. The patents and application rights to apply for patents were held in the name of IP for administrative purposes. It was best practices in a multi-national enterprise to have all patents assigned to one company, in this case to NNL, as explained by Ms. Anderson and Ms. De Walton, and made

management of the portfolio much easier. While these witnesses expressed subjective views that it was NNL who owned the patents, these views are not determinative, as acknowledged in the Monitor's reply brief at paras 65-66.

[197]    This was not one corporation and one set of employees inventing IP that led to patents. Nortel was a highly integrated multi-national enterprise with all RPEs doing R&D that led to patents being granted. It was R&D that drove Nortel's business. R&D and the intellectual property created from it was the primary driver of Nortel's value and profits. All parties agree on that. It would unjustly enrich NNL to deprive all of the other RPEs of the work that they did in creating the IP just because the patents were registered in NNL's name.

[198]    Canadian law permits recovery for unjust enrichment whenever a plaintiff can establish three elements: an enrichment of or benefit to the defendant, a corresponding deprivation of the plaintiff, and the absence of a juristic reason for the enrichment: *Kerr v. Baranow*, 2011 SCC 10 at para. 32.

[199]    U.S. law provides that unjust enrichment occurs where a party obtains a benefit which, under the circumstances and in light of the relationship between the parties, it would be inequitable to retain: *Counihan v. Allstate Ins. Co.*, 194 F.3d 357, 361 (2d Cir. 1999). It requires the retention of a benefit to the loss of another or the retention of money or property of another against the fundamental principles of justice or equity and good conscience. It is not available if there is a contract that governs the relationship between the parties that gives rise to the claim: *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 891(Del. Ch. 2009).

[200]    On either test, I find that NNL would be unjustly enriched by being entitled to all of the proceeds of the sale of Nortel IP at the expense of the other RPEs who contributed to the creation of that IP just because the patents were registered in NNL's name. It would be inequitable. There would be no juristic reason for the enrichment as the MRDA as I have interpreted it does not deal with the allocation rights of the parties in this world-wide insolvency of Nortel.

[201]    It would also unjustly enrich NNI if it were to be allocated the amount from the IP sales that it claims based principally on its revenues, which is the basis of the claim by the U.S. Debtors. NNI was able to sell Nortel products based on the R&D and resulting IP performed by

other RPEs.

[202]   This is an unprecedented case involving insolvencies of many corporations and bankrupt estates in different jurisdictions. The intangible assets that were sold, being by far the largest type of asset sold, were not separately located in any one jurisdiction or owned separately in different jurisdictions. They were created by all of the RPEs located in different jurisdictions. Nortel was organized along global product lines and global R&D projects pursuant to a horizontally integrated matrix structure and no one entity or region was able to provide the full line of Nortel products and services.   R&D took place in various labs around the world in a collaborative fashion. R&D was organized around a particular project, not particular geographical locations or legal entities, and was managed on a global basis. The fact that Nortel ensured that legal entities were properly created and advised in the various countries in which it operated in order to meet local legal requirements does not mean that Nortel operated a separate business in each country. It did not.

[203]   Nortel's matrix structure also allowed Nortel to draw on employees from different functional disciplines worldwide (*e.g.* sales, R&D, operations, finance, general and administrative, etc.), regardless of region or country according to need. Individuals could be part of a team with horizontal responsibility without removing them from their respective position vertically (or departmentally) within the Nortel group.[18]

[204]   In these circumstances, what principles should be applied to determine the allocation of the proceeds of the asset sales? In my view, doing what is just in the unique circumstances of this case should govern the allocation.

[205]   A court has wide powers in a CCAA proceeding to do what is just in the circumstances. Section 11(1) provides that a court may make any order it considers appropriate in the circumstances. Although this section was provided by an amendment that came into force after Nortel filed under the CCAA, and therefore by the amendment the new section does not apply to Nortel, it has been held that the provision merely reflects past jurisdiction. In *Century Services*,

---

[18] See the affidavit of Peter Currie sworn April 11, 2014 for a full description of Nortel's matrix structure and operations.

Deschamps J. stated:

> **65**    I agree with Justice Georgina R. Jackson and Professor Janis Sarra that the most appropriate approach is a hierarchical one in which courts rely first on an interpretation of the provisions of the *CCAA* text before turning to inherent or equitable jurisdiction to anchor measures taken in a *CCAA* proceeding (see G. R. Jackson and J. Sarra, "Selecting the Judicial Tool to get the Job Done: An Examination of Statutory Interpretation, Discretionary Power and Inherent Jurisdiction in Insolvency Matters", in J. P. Sarra, ed., *Annual Review of Insolvency Law 2007* (2008), 41, at p. 42). The authors conclude that when given an appropriately purposive and liberal interpretation, the *CCAA* will be sufficient in most instances to ground measures necessary to achieve its objectives (p. 94).

> **67**    The initial grant of authority under the *CCAA* empowered a court "where an application is made under this Act in respect of a company ... on the application of any person interested in the matter ..., subject to this Act, [to] make an order under this section" (*CCAA*, s. 11(1)). The plain language of the statute was very broad.

> **68**    In this regard, though not strictly applicable to the case at bar, I note that Parliament has in recent amendments changed the wording contained in s. 11(1), making explicit the discretionary authority of the court under the *CCAA*. Thus in s. 11 of the *CCAA* as currently enacted, a court may, "subject to the restrictions set out in this Act, ... make any order that it considers appropriate in the circumstances" (S.C. 2005, c. 47, s. 128). Parliament appears to have endorsed the broad reading of *CCAA* authority developed by the jurisprudence. (underlining added)

[206]   This Court has a broad inherent jurisdiction to make orders as required to fill in gaps or lacunae not covered by specific provisions in the CCAA. As a superior court of general jurisdiction, the Superior Court of Justice has all of the powers that are necessary to do justice between the parties. Except where provided specifically to the contrary, the Court's jurisdiction is unlimited and unrestricted in substantive law in civil matters. See *80 Wellesley St. East Ltd. v. Fundy Bay Builders Ltd. et al.*, [1972] 2 O.R.280 (C.A.) at para. 9. See also *TCR Holding Corp. v. Ontario*, 2010 ONCA 233 at para. 26, *Beach v. Moffatt* (2005), 75 O.R. (3d) 383 (C.A.) at para. 8, *J.M. v. W.B.* (2004), 71 O.R. (3d) 171 (C.A.) at para. 43 and *McVan General Contracting Ltd. v. Arthur* (2002), 61 O.R. (3d) 240 (C.A.) at para. 56.

[207]   In *Century Services Inc. v. Canada (Attorney General)*, 2010 SCC 60 at paras. 57-61, it was recognized by the Supreme Court and stated by Justice Deschamps that the CCAA is skeletal in nature and does not contain a comprehensive code that lays out all that is permitted, that the incremental exercise of judicial discretion with respect to the CCAA has been adapted

and has evolved to meet contemporary business and social needs and that when large companies encounter difficulty and reorganizations become increasingly complex, CCAA courts have been called upon to innovate accordingly.

[208]  In this case, insolvency practitioners, academics, international bodies, and others have watched as Nortel's early success in maximizing the value of its global assets through cooperation has disintegrated into value-erosive adversarial and territorial litigation described by many as scorched earth litigation.[19] The costs have well exceeded $1 billion. A global solution in this unprecedented situation is required and perforce, as this situation has not been faced before, it will by its nature involve innovation. Our courts have such jurisdiction.

[209]  It is a fundamental tenet of insolvency law that all debts shall be paid *pari passu* and all unsecured creditors receive equal treatment. See *Shoppers Trust Co. (Liquidator of) v. Shoppers Trust Co.* (2005), 74 O.R. (3d) 652 (C.A.) at para. 25, per Blair J.A., *Indalex Ltd. (Re)* (2009), 55 C.B.R. (5th) 64 (Ont. S.C.), at para. 16 per Morawetz J. and my comments in *Nortel Networks Corp. (Re)* (2014), 121 O.R. (3d) 228 at para.12. A pro rata allocation in this case goes partway towards such a result.

[210]  According to the various protocols, the task in this proceeding is to determine the amount that is to be allocated to each of the Canadian, U.S. and EMEA Debtors' Estates. I do not read the protocols or the IFSA as precluding a pro rata allocation. While payment to the Selling Debtors is to be made from the $7.3 billion in the lockbox funds, neither the protocols nor the IFSA determine how the allocation is to be made.

[211]  Directing a pro rata allocation will constitute an allocation as required. Once the lockbox funds have been allocated, it will be up to each Nortel Estate acting under the supervision of its presiding court to administer claims in accordance with its applicable law.  A pro rata allocation can be achieved by directing an allocation of the lockbox funds to each Debtor Estate based on the percentage that the claims against that Estate bear to the total claims against all of the Debtor

---

[19] Early in these proceedings, on the motion in 2009 to approve the IFSA, counsel to the U.S. Debtors stated in its written brief that NNL owned the IP. The report of the administrators for the EMEA Debtors of June 14, 2009 stated that all IP rights belonged to NNL. Once the size of the sale proceeds became known, these positions of the U.S. Debtors and EMEA Debtors changed.

Estates.

[212]  It is argued that a pro rata allocation would constitute an impermissible substantive consolidation of the Estates, or as put by the U.S. Debtors, an impermissible "global substantive consolidation". I do not agree. A pro rata allocation in this case would not constitute a substantive consolidation and, even if it did, it would in my view be permissible within established case law.

[213]  In a liquidation or reorganization of a corporate group, the doctrine of substantive consolidation has emerged in order to provide a mechanism whereby the court may treat the separate legal entities belonging to the corporate group as one. In particular, substantive consolidation allows for the combination of the assets and liabilities of two or more members of the group, extinguishes inter-company debt and creates a single fund from which all claims against the consolidated debtors are satisfied. In effect, under substantive consolidation, claims of creditors against separate debtors instantly become claims against a single entity.

[214]  A pro rata allocation in this case would not constitute a substantive consolidation, either actual or deemed, for a number of reasons. First, and most importantly, the lockbox funds are largely due to the sale of IP and no one Debtor Estate has any right to these funds. It cannot be said that these funds in whole or in part belonged to any one Estate or that they constituted separate assets of two or more Estates that would be combined. Put another way, there would be no "wealth transfer" as advocated by the bondholders. The IFSA, made on behalf of 38 Nortel debtor entities in Canada, the U.S. and EMEA, recognized that the funds would be put into a single fund undifferentiated as to the Debtor Estates and then allocated to them on some basis to be agreed or determined in this litigation. Second, the various entities in the various Estates are not being treated as one entity and the creditors of each entity will not become creditors of a single entity. Each entity remains separate and with its own creditors and its own cash on hand and will be administered separately. The inter-company claims are not eliminated.

[215]  Even if it could be said that a pro rata allocation involved substantive consolidation, which it cannot, I do not see case law precluding it in the unique circumstances of this case international case. Even in domestic cases, CCAA plans involving substantive consolidation are not unknown.

[216]   In Canada, neither the CCAA nor the BIA contains express provisions authorizing substantive consolidation. Similarly, the U.S. Bankruptcy Code does not explicitly permit substantive consolidation. However, courts in both jurisdictions have rendered consolidating orders on the basis of their equitable jurisdiction. See *See* M. MacNaughton and M. Azoumanidis, *Substantive Consolidation in the Insolvency of Corporate Groups: A Comparative Analysis, Annual Review of Insolvency Law, 2007*, J. Sarra, ed. (Carswell: 2008).[20]

[217]   In *Rescue! The Companies' Creditors Arrangement Act*, by Dr. Janis Sarra, Carswell 2007, the grounds for permitting substantive consolidation were described as follows at page 242:

> The court will allow a consolidated plan of arrangement or compromise to be filed for two or more related companies in appropriate circumstances. For example, in *PSINet Ltd*. the Court allowed consolidation of proceedings for four companies that were intertwined and essentially operated as one business. The Court found the filing of a consolidated plan avoided complex issues regarding the allocation of the proceeds realized from the sale of the assets, and that although consolidation by its nature would benefit some creditors and prejudice others, the prejudice had been ameliorated by concessions made by the parent corporation, which was also the major creditor. Other cases of consolidated proceedings such as Philip Services Canadian Airlines, Air Canada and Stelco, all proceeded without issues in respect of consolidation.
>
> Generally, the courts will determine whether to consolidate proceedings by assessing whether the benefits will outweigh the prejudice to particular creditors if the proceedings are consolidated. In particular, the court will examine whether the assets and liabilities are so intertwined that it is difficult to separate them for purposes of dealing with different entities. The court will also consider whether consolidation is fair and reasonable in the circumstances of the case.

[218]   In *Re Lehndorff General Partner Ltd.* (1993), 17 C.B.R. 3d 24, Justice Farley held that a consolidated plan was appropriate, noting that there was significant intertwining of the debtor companies, including multiple instances of inter-company debt, cross-default provisions and guarantees and the existence and operation of a centralized cash-management system. All of these features were present in Nortel.

---

[20] In *In re Owens Corning*, 419 F. 3d 196 at 205 (3rd Cir. 2005) the U.S. Court of Appeals observed that substantive consolidation "treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities, (save for inter-entity liabilities which are erased). The result is that claims of creditors against separate debtors morph to claims against the consolidated survivor."

[219]  In *Re PSINet Ltd.* (2002), 33 C.B.R. 4th 284, Justice Farley noted that a plan of arrangement based on substantive consolidation avoided the "complex and likely litigious issues" that could result from the allocation of the proceeds of the sale of substantially all of the debtor companies' assets. He also noted that the consolidated plan reflected the intertwined nature of the debtors and their operation. In that case, Farley J. stated that the overall effect of a consolidation was required:

> In the circumstances of this case, the filing of a consolidated plan is appropriate given the intertwining elements discussed above. See *Northland Properties Ltd., Re*, 69 C.B.R. (N.S.) 266 (B.C.S.C.), affirmed (B.C.C.A.), *supra*, at p. 202; *Lehndorff General Partner Ltd., Re*, 17 C.B.R. (3d) 24 (Ont. Gen. Div. [Commercial List]) at p. 31. While consolidation by its very nature will benefit some creditors and prejudice others, it is appropriate to look at the overall general effect.

[220]  In *Northland Properties*, a case involving a proposed plan for several companies that operated as a single entity, Justice Trainor considered the tests for permitting a substantive consolidation. He looked to U.S. law for guidance and began his analysis by adopting the balancing test articulated in *Re Baker and Getty Fin. Services Inc.,* U.S. Bankruptcy Court, N.D. Ohio (1987) 78 B.R. 139:

> The propriety of ordering substantive consolidation is determined by a balancing of interests. The relevant enquiry asks whether "the creditors will suffer greater prejudice in the absence of consolidation than the debtors (and any objecting creditors) will suffer from its imposition".

[221]  Trainor J. then went on to list seven factors which had been developed to assist in the balancing of interests. Those factors were:

> 1. difficulty in segregating assets;
> 2. presence of consolidated financial statements;
> 3. profitability of consolidation at a single location;
> 4. commingling of assets and business functions;
> 5. unity of interests in ownership;
> 6. existence of intercorporate loan guarantees; and
> 7. transfer of assets without observance of corporate formalities.

[222]  In considering these factors, it is clear beyond peradventure that Nortel has had significant difficulty in determining the ownership of its principle assets, namely the $7.3 billion representing the proceeds of the sales of the lines of business and the residual patent portfolio.

This amount constitutes over 80% of the total assets of all of the Nortel entities[21]. This issue has taken several years of litigation and untoward costs in the parties attempting to establish an entitlement to it. As the MRDA does not govern how the sales proceeds are to be allocated, there is no one right way to separate them. It cannot be said that there is no question which entity is entitled to the sale proceeds or in what amount. It is clear that these assets are in the language of Dr. Janis Serra "so intertwined that it is difficult to separate them for purposes of dealing with different entities".

[223]   Moreover, the evidence in this case is clear and uncontested that Nortel (a) had fully integrated and interdependent operations; (b) had intercompany guarantees for its primary indebtedness; (c) operated a consolidated treasury system in which generated cash was used throughout the Nortel Group as required; (d) disseminated consolidated financial information throughout its entire history, save for the year before its bankruptcy; and (e) created IP through integrated R&D activates that were global in scope.

[224]   When consolidation occurs, some creditors may be prejudiced if they would have had a greater recovery of so many cents on the dollar against their debtor if there had been no consolidation. Conversely, other creditors may be benefitted by consolidation if they would have had a lesser recovery against their debtor if there had been no consolidation. In this case, even if a pro rata allocation amounted to a consolidation, the issue would be moot because it cannot be said that without consolidation one class of creditors, including the bondholders, would necessarily have had a greater recovery than with consolidation. The reason for this is that there has been no recognized measurable right in any one of the selling Debtor Estates to all or a fixed portion of the proceeds of sale.

[225]   The bondholders who hold bonds with covenants of both NNL and NNI contend that they would be unduly prejudiced by a pro rata allocation of the lockbox funds as they are entitled to look to both NNL and NNI for payment of their claims and if one of these companies did not have sufficient funds to pay the bonds in full, they could look to the other. I agree that they are

---

[21] The projected cash on hand in all of the Nortel entities as of June 30, 2014 after payment of secured creditors was $1.525 billion, being $343 million in the Canadian Debtors, $744 million in the U.S. Debtors and $438 million in the EMEA Debtors. See schedule 5 of the Britven report, ex. 45.

entitled to claim against both companies and this will be recognized in the pro rata allocation that will be ordered.

[226]   The bondholders have the legal right to be paid in full on their bonds. But so do all of the other creditors. Like the pensioners and other creditors, the bondholders are not secured. Because of a shortfall in funds, all of these creditors cannot be paid in full. The issue is how the pain is to be shared.

[227]   The total cash on hand in the U.S. Debtors' and Canadian Debtors' Estates as of June 2014 was a little over 25% of the face amount of the outstanding bonds. Without an allocation from the lockbox funds of a sufficient amount to enable NNL and NNI to pay the bonds in full, the bondholders could not be paid in full. The bondholders, however, have no covenants in their bonds requiring the lockbox funds to be allocated in any manner, and specifically, no right to have lockbox funds allocated to NNL or NNI. Nor do NNL or NNI have any such rights. The lockbox funds are not the property of any one of NNL or NNI or any other RPE.

[228]   The bondholders are like other creditors in this regard. The other creditors of the Canadian Debtors could likewise argue that they will be prejudiced if the argument of the Monitor that all of the IP proceeds should be paid to NNL as the owner of the IP is not accepted. But the prejudice to be considered is not this kind of prejudice, but prejudice to legal rights. Neither the bondholders nor the other creditors of the Canadian Debtors have any legal right to have the lockbox funds allocated in a way that will benefit them.

[229]   The bondholders with covenants of NNL and NNI contend that their expectations will be disregarded by a pro rata allocation and that it will harm the bond markets if they are not somehow paid in full. I think this argument is overblown in this case and in any event not supported by any evidence of their expectations.

[230]   The evidence of Peter Currie, the CFO of NNC and NNL from 2005-2007, which is not contested, was that until the early to mid-2000s, Nortel's public debt was issued by NNL without guarantee from any other Nortel entity. In 2006, while Nortel's credit rating was still adversely affected by various factors, NNL issued notes having an aggregate principal amount of US$2 billion, which notes were conditionally guaranteed by NNI. NNI was a conditional guarantor in

large part because at that time it carried certain hard assets on its balance sheet and because
Nortel could obtain slightly better debt terms given that NNI was domiciled in the same place as
the ultimate lenders, that is, the United States.

[231]   Thus it is quite clear from the evidence that when Nortel went to the bond market in 2006
and 2007 to raise funds, Nortel believed that it required the covenant of NNI in order to get the
financing on terms and at a cost that Nortel wanted. However, prior to the Nortel insolvency in
January, 2009, the market place did not differentiate in any material way the bonds that were
guaranteed by NNI and the bonds not carrying a NNI guarantee.

[232]   From June, 2006 to December, 2008, Moody's and DBRS issued nine credit ratings for
Nortel that did not distinguish between Nortel bonds guaranteed by NNI and those that were not.
The UCC's expert witness Robert Kilimnik[22] agreed on his deposition that if a guarantee is a risk
differentiator from DBRS's point of view, and there were a series of bonds with a guarantee and
a series of bonds without a guarantee, he would expect them to be rated differently. This is an
indication that the market did not differentiate between the NNC bonds guaranteed by NNI from
those that were not guaranteed.

[233]   Another indication is the evidence of the Nortel bond spreads compared to U.S.
government bonds contained in Ex. 58. The chart demonstrates that that Nortel bonds that carried
an NNI guarantee traded at higher or equal spreads to Nortel bonds that did not carry an NNI
guarantee. Mr. Kilimnik, an experienced bond trader, said on his deposition testimony was that
bonds with a lower spread are considered less risky in the marketplace and that if guarantees
were recognized by creditors as reducing the risk of issuances by the same company, he would
have expected to see that expectation reflected in spread comparisons.

[234]   Mr. Paviter Binning, the Executive Vice-President and CFO of NNC from 2007 to March
2010 and an impressive witness to be sure, agreed with that conclusion of Mr. Kilimnik and
testified that the data implied that the market was giving no value to the guarantees. He also

---

[22] Mr. Kilimnik prepared an expert report on which he was deposed prior to the trial. At the opening of the trial,
counsel for the ad hoc group of bondholders said that Mr. Kilimnik would be called as a witness. However, on the
day before he was scheduled to testify, his report was withdrawn by the bondholders and he was not called as a
witness at the trial.

testified that in his experience, investors generally looked to the overall quality of the company and that the guarantees were neither here nor there.  He agreed that part of the reason why the guarantees may have had no meaning for the market was that the bonds were sub-investment grade in the first place. His evidence, which I accept, means that after the bonds were issued, the guarantees by NNI did not have a material effect on the marketplace.

[235]   John McConnell, a professor of business (finance) at Purdue University, delivered a report and testified on behalf the unsecured creditor's committee of NNI in response to a report of Leif M. Clark and Jay L. Westbrook, the latter of whom did not testify at the trial. Professor McConnell's report contained data from the date that the Nortel Group filed for protection on January 14, 2009 to January 2014 which indicated that the bonds not guaranteed by NNI traded at prices below the bonds guaranteed by NNI.

[236]   I do not see this data as relevant. Counsel for the bondholders in his opening asserted that the expectations of bondholders that are relevant are the expectations pre-petition and not post-petition.

[237]   If the expectations of those who purchased bonds post-petition were relevant, there was no evidence at all from such purchasers. Professor McConnell spoke to no bondholder and on cross-examination admitted that he had no way of knowing what factors went into the purchase and/or sale of any of the Nortel bonds by any of the current bondholders in the market post-filing. No bondholder testified or gave any evidence of expectations in acquiring bonds.

[238]   The evidence of Professor McConnell is based entirely on the fact that after the insolvency filings, bonds without a NNI guarantee traded at a lower price than those with a NNI guarantee. There are two points that can be made. The first is that his conclusion is an inference drawn from the trading price of the bonds after the insolvency as to what motivated those purchasers of the bonds after the insolvency. Second, there was no analysis of Professor McConnell that would lead to the conclusion that his inference of bondholder purchaser expectations could apply to purchasers of bonds prior to the onset of insolvency. He said he could not do such an analysis because before insolvency the bonds had different attributes which would not permit him to draw inferences as to the effect of guarantees. Be that as it may, I would not accept the inference drawn by Professor McConnell regarding the effect of the guarantees on

a purchaser of bonds. I prefer the evidence of Mr. Binning to which I have referred.[23]

[239]  Moreover, the evidence is clear that bonds trade on a much different basis after insolvency. Mr. Binning testified that prior to the threat of insolvency, the bonds traded on a yield to maturity basis, meaning that bondholders take all of the payments that would be expected to be made if the bond is held to maturity, and then calculate a percentage yield based upon the price paid for the bonds. Once insolvency or financial distress is anticipated, Mr. Binning testified that bonds trade in the hands of distressed investors who trade not on a yield to maturity basis but in a classic arbitrage market based upon price and expectations of future price and what they think they can make on the bonds during insolvency. He advised the board of Nortel on September 30, 2008, three and a half months before the Nortel filing, that RBC had advised that approximately 50% of the bonds had traded into the hands of distressed investors.

[240]  Professor McConnell also testified that as new information came into the marketplace about the likely recoveries, that would be reflected in the price of the bonds. That is another way of saying that distressed investors have bet on the future outcome of this case. This is reflected in the volumes and trading prices of the bonds at various times between January 14, 2009 and June, 2014, including (i) in the immediate aftermath of the Filing Date when the bonds were trading at very low prices, (ii) during the prolonged three-day auction resulting in the residual IP sale to Rockstar at the beginning of July 2011 as purchasers placed bets on bond price increases and recoveries following the completion of that sale; and (iii) in reaction to Delaware Bankruptcy Court Judge Walrath's September 2011 decision in *In re Washington Mutual* holding that post-petition interest must be awarded at the federal judgment rate and not at the rates in the various bonds.

[241]  The bondholders group that at the time of the trial held a majority of the unsecured guaranteed bonds purchased the vast majority of their holdings after the filing date of January 14, 2009 and at a significant discount to par. Certain members purchased when the bonds were trading at as low as 30 cents on the dollar and others received smaller, but still substantial,

---

[23] I also prefer the evidence of Mr. Kilimnik and Mr. Binning as to the data in exhibit 58 that compared Nortel bond spreads to government yields and what could be drawn from it. Professor McConnell said he could not draw an inference from the data but also said that he was not contradicting Mr. Binning.

discounts. This can be seen in exhibits 59 and 60. The vast majority of their collective holdings were acquired in the period between July 31, 2009, at or around the time when Nortel began to liquidate its assets, and July 18, 2011, at or around the time of the Residual IP Sale.

[242]   The creditor expectations of the current bondholders, who acquired their bonds post-petition, even if known or supported by evidence, is not something I would take into account in this case. I infer from the evidence that any such expectations would have been based on their views as to litigation outcomes and should not be the basis of any decision by the courts.

[243]   In considering potential prejudice to the bondholders in the event of a pro rata allocation, consideration must be given to what the bondholders would gain. The bonds provide access to the assets of the issuer and guarantor. They do not provide any right to assets of any other entity in the Nortel Group. The  2006, 2007 and 2008 offering memoranda for the guaranteed bonds set out risks associated with the bonds, including the following notice regarding the lack of access to other Nortel entities:

> The Issuers' subsidiaries are separate and distinct legal entities and any subsidiary that is not a Guarantor will have no obligation, contingent or otherwise, to pay amounts due under the Notes or the Guarantees or to make any funds available to pay those amounts, whether by dividend, distribution, loan or other payment.

[244]   The offering memoranda also contained the following risk that investors would face in the event of insolvency of Nortel entities and the lack of access to the assets of those entities:

> In the event of a bankruptcy, liquidation or reorganization of any direct or indirect non-guarantor subsidiary of NNC, all of the creditors of that subsidiary (including trade creditors and creditors holding secured or unsecured indebtedness or guarantees issued by that subsidiary) and third parties having the benefit of liens (including statutory liens) against that subsidiary's assets will generally be entitled to payment of their claims from the assets of such non-guarantor subsidiary before any of those assets are made available for distribution to any Issuer that is a shareholder of such subsidiary. As a result, the Notes and the Guarantees are effectively junior to the obligations of non-guarantor subsidiaries.

[245]   Whereas the investors who acquired their bonds pursuant to the offering memoranda were specifically made aware that in the situation in which Nortel now finds itself, they would not have access to assets of other Nortel entities that had not guaranteed the bonds, the effect of a pro rata allocation is to provide the current bondholders with such access. The lockbox funds

represent the proceeds of sale of all of the assets of all of the 38 entities under the IFSA. Creditors holding guarantees have access under a pro rata allocation to not only the assets of the principal obligor and guarantor corporations, but the proceeds of sale of all the assets of the selling debtors.  This is access to more pools of asserts than that for which the holder of a guarantee bargained.

[246]   While the current bondholders may have thought, or bet on an outcome, that NNL or NNI would likely achieve a win in this litigation that would provide those two companies with sufficient assets to pay the bonds in full and with post-filing interest, there was no guarantee at all that this would be achieved. The bonds contained no covenants that required the assets of NNL or NNI to be maintained at a certain level and no covenants that required the lockbox funds to be allocated in any manner. Mr. Binning had advised the Nortel board in September, 2008 that there were no maintenance covenants in the bonds, meaning that Nortel did not have to live up to any debt servicing ration . He testified that what the guarantees under these bonds essentially gave the bondholders was access to the assets in Canada and in the US without a great degree of comfort as to what those assets would be from time to time.  I accept that evidence.

[247]   As to the effect of a pro rata allocation on the ability of issuers to issue bonds in the future, Professor McConnell on his cross-examination said that he had no opinion on that subject and that he had not tried to quantify what effect a pro rata allocation would have on the capital markets. Thus there is no evidence that a pro rata allocation in this case will detrimentally affect the capital markets and the ability of issuers to issue bonds in the future. Professor McConnell's statement that he had no opinion on the subject is perhaps not too surprising taken the highly unusual facts surrounding the Nortel insolvency and the difficulty of determining ownership of the IP that was sold.

[248]   It is said that the $2 billion claim of NNI against NNL that was approved by both courts is an impediment to a pro rata allocation. I do not think that is the case. The $2 billion claim will be treated as one of the unsecured liabilities of NNL.

[249]   The same principles that apply to the US$ 2 billion claim by NNI against NNL will apply to the admitted claim of NNUK and Nortel Networks SpA against NNL pursuant to the Agreement Settling EMEA Canadian Claims and Related Claims dated July 9, 2014, and to the

claim of the UKPC for £339.75 million recognized in my judgment of December 9, 2014.

**Appropriate pro rata allocation method**

[250]   The allocation each Debtor Estate will be entitled to receive from the lockbox funds is the percentage that all accepted claims against that Estate bear to the total claims against all Debtor Estates.

[251]   In determining what the claims against a Debtor Estates are, a claim that can be made against more than one Debtor Estate can only be calculated and recognized once. The one that is known is the bondholder claim for $4 billion, referred to as the claim on cross-over bonds. All but one of such bond issues was issued by NNC or NNL and guaranteed by NNI. One bond issue for $150 million was issued by NNCC, a subsidiary of NNI, and guaranteed by NNL[24]. The claims on the bonds in determining the claims are to be made on the Debtor Estate of the issuer. If a claim on a guaranteed bond is not paid in full by the issuer Debtor Estate, a claim for the shortfall can be recognized by the Debtor Estate that guaranteed the bond, but that shortfall claim will not be taken into account in determining the claims against the Debtor Estates.

[252]   One of the known claims is the claim of the UKPC for the approximately £2.2 billion deficit in the NNUK pension plan. If the UKPC makes a claim for this amount against NNUK and also against other EMEA Debtors, those claims against the other EMEA Debtors will not be taken into account in determining the claims against the Debtor Estates. The claim may be taken into account only once in the pro rata allocation.

[253]   I understand that for the Canadian Debtors and the U.S. Debtors, the claims for the most part are generally known although there are some claims still unresolved, such as the SNMPRI claim. The U.K. Administrator has not yet instituted a claims procedure, apparently awaiting a determination of this allocation proceeding. In my view, the process should be undertaken now and I expect this will happen.

[254]   Interim distributions have been proposed. In my view, this would be especially important

---

[24] There was one series of bonds for $200 million issued by NNL with a NNC guarantee but no guarantee by NNI.

for the predominantly elderly pensioner population and disabled employees who have endured hardship as a result of the loss of their benefits but also for other creditors who have waited more than five years for a distribution on their claims. An interim distribution should be made if possible.

[255]   Briefs should now be filed by those parties supporting an interim distribution with full details of what is requested. Opposing briefs would of course be required. The procedures and timing could be discussed at a 9:30 am appointment.

**Allocation on a basis other than pro rata**

[256]   The evidence on this subject was complex and varied dramatically from party to party. To wit:

 (a) The Monitor on behalf of the Canadian Debtors contended for an allocation of $6.034 billion to the Canadian Debtors, $1.001 billion to the U.S. Debtors and $300.7 million to the EMEA Debtors.[25]

 (b) The U.S. Debtors contended for an allocation of $0.77 billion to the Canadian Debtors, $5.3 billion to the U.S. Debtors and $1.23 billion to the EMEA Debtors.

 (c) The EMEA Debtors contended for an allocation of $2.32 billion to the Canadian Debtors, $3.636 billion to the U.S. Debtors and $1.325 billion to the EMEA Debtors.

[257]   I have given consideration to the valuation issues. To a great extent, they are dependent on the various interpretations of the MRDA asserted by the parties. For that reason I would not use any of the valuations for the purpose of the pro rata allocation as I have found that the MRDA does not govern the allocation. However, my views and findings on the valuations are set

---

[25] The CCC contended for an "ownership" allocation very similar to the Monitor, being $5.805 billion to the Canadian Debtors, $1.009 billion to the U.S. Debtors and $488 million to the EMEA Debtors.

out in Appendix A for the business line sales and Appendix B for the residual IP sale to Rockstar.

**Conclusion**

[258]  A judgment is to go that the lockbox funds are to be allocated on a pro rata allocation basis with the following principles to govern:

(1)    Each Debtor Estate is to be allocated that percentage of the lockbox funds that the total allowed claims against that Estate bear to the total allowed claims against all Debtor Estates.

(2)    In determining what the claims are against the Debtor Estates, a claim that can be made against more than one Debtor Estate can only be calculated and recognized once in accordance with these reasons for judgment. Claims on bonds are to be made on the Debtor Estate of the issuer. A claim for any shortfall can be recognized by the Debtor Estate that guaranteed the bond, but that shortfall claim will not be taken into account in determining the claims against the Debtor Estates. If the UKPC makes a claim against more than one Debtor Estate, such additional claims will not be taken into account in determining the claims against the Debtor Estates.

(3)    Intercompany claims against a Debtor Estate are to be included in the determination of the claims against that Estate.

(4)    Cash on hand in any Debtor Estate will not be taken into account in the pro rata allocation. Each Debtor Estate with cash on hand will continue to hold that cash and deal with it in accordance with its administration.

(5)    An interim distribution may be allowed upon further submissions. Briefs in favour of and opposed to an interim distribution are to be filed on a time-line to be considered at a 9:30 am appointment.

(6)    Proposed schedules for expediting any remaining claims procedures are to be provided without delay.

**Epilogue**

[259]   I cannot leave these reasons without commenting on the persons who made this unique case possible.

[260]   First, to the technical staff who provided the facilities to permit this trial to be conducted in two different countries at the same time, I say it was a job more than well done. It was outstanding and we are indebted to you all. Judge Gross and I have no idea how it was all set up and operated, but I know he is as grateful for the facilities as I am. Thank you.

[261]   Second, to the reporters and their staff, it was also a job more than well done. Apart from the instantaneous real time reporting that permitted all parties to see the evidence as it was being given, we were blessed with draft transcripts being electronically sent to us shortly after the evidence concluded each day and final transcripts later that evening.

[262]   Third, to the lawyers. We were blessed with outstanding counsel on both sides of the border. In a case such as this with the amount at stake, one can understand the pressures on counsel and how those pressures could get in the way of a smooth preparation and presentation of the case. From what I could see, all acted in a professional manner that does them credit. Without that, the case could not have proceeded as well as it did. Their staff should also be congratulated for the smooth way in which the case was electronically presented. It was a marvel.

[263]   Finally, I want to thank Judge Gross for his courtesies and good humour. It has been a pleasure to work with him. Without such a good relationship and the trust that we developed for each other, this trial and its conclusion would not have been possible.

"FJC Newbould J."

_____

Newbould J.

**Date:** May 12, 2015

**APPENDIX A**

**Allocation of the proceeds of the line of business sales**

[1]     The experts for the various parties differ on the way that the proceeds of the sales of the LOB should be allocated amongst the Canadian estate, the U.S. estate and the EMEA estate.

[2]     Mr. Kinrich, the valuer called by the U.S. Debtors, did not value the various assets sold and attempt to allocate them by any particular method. Rather he allocated the entire sale proceeds by taking the revenues of each company whose businesses were sold and allocating to each company (and the group they were in) the percentage of its revenues to the total revenues of all companies whose businesses were sold. His resulting allocation was 11.9% or $340 million to the Canadian Debtors, 18% or $510 million to the EMEA debtors and 70% or $1.99 billion to the U.S. Debtors.

[3]     Mr. Malackowski called by the EMEA debtors valued the IP rights sold by using a revenue or license valuation method. His valuation of the IP sold in the business sales was $765.2 million.

[4]     Mr. Huffard called by the EMEA debtors then allocated the various kinds of assets sold. He valued the tangible assets that were sold at $118 million and allocated this amount to the companies that sold them. He allocated the IP that was sold and valued by Mr. Malackowski at $765.2 million by a contribution approach which allocated the IP according to the amount of R&D expenditures of each of the RPEs. He attributed the balance of the LOB sale proceeds as "customer related assets and goodwill" and allocated them on the basis of the percentage of revenues generated by each entity in 2008. Mr. Huffard did not give a separate total figure in his report for the allocation of the LOB sale proceeds.

[5]     Mr. Green called by the Canadian Debtors dealt with each kind of the various assets sold. He allocated the tangible assets sold by giving to the companies that sold them their book

value, which he calculated to be $534.19 million. He valued the workforces sold by their cost that the selling companies would incur to replace them at $255.33 million and allocated those costs to the companies. He allocated the IP and customer relations by valuing what the licensed participants gave up to enable the sales on the basis that their license rights were limited to the "Products" "by or for the Participants" as defined in the MRDA, and allocated the balance of the sale proceeds to NNL as the "owner" of the IP. His resulting allocation was 54.8% or $1.58 billion to the Canadian Debtors, 10.4% or $300.97 million to the EMEA debtors and 34.7% or $1001.5 billion to the U.S. Debtors.

### (i) Mr. Kinrich

[6]     Mr. Kinrich's view is that the RPEs that were licensed participants had all license and sublicense rights as owners. Assuming that to be the case for this analysis, I have some concerns with his analysis. Mr. Kinrich allocated all of the assets sold in the business sales on a revenue basis. He stated in his report that the value of the sold assets is reflected in the revenue generated by each entity that sold the assets. That is, value he said was reflected in revenue figures.

[7]     Mr. Kinrich himself in his report said that financial economists agree that a discounted cash flow analysis is the preferred technique for asset valuation and that one of the requirements is to have projected future cash flows less costs. In his report he did not say why he had not done such an analysis when dealing with the business sales. At trial he relied on texts to support his use of a revenue approach in firms with losses, one of which is *Valuing Small Businesses and Professional Practices*, which suggests gross revenue multiples may be used in restricted situations, being to approximate a range of possible values with a minimum effort, conclude an estimate of value when other data are unavailable or inadequate or as one indicator of value used in conjunction with more rigorous valuation methods. The text also said that for companies with losses or erratic earnings, multiples of price to revenue for other comparative companies may give some indication of how others asses the future of the industry or profession. But that is not what Mr. Kinrich did. He did not look at revenue multiples from the sale of any comparable companies. I viewed his attempt to bolster his revenue approach by resort at trial to texts to be an attempt at *ex post facto* rationalization. It would have been a little

more persuasive if these rationales has been provided in his report, particularly as in his report he did a sensitivity check based on gross margin (revenue less cost of goods sold) and contribution margin (revenue less selling, general and administrative expenses).

[8]    Mr. Kinrich said at trial that he did not have available forecasts that would divide income streams by territory but that is beside the point so far as a gross revenue valuation is concerned. The issue is whether it would have been preferable to take costs into account in his revenue approach to allocation.

[9]    Because the U.S. market had the highest revenues, it follows that using a revenue approach as Mr. Kinrich did will result in the high allocation of the business sale proceeds to the U.S. (70%) and a low allocation to Canada (11.9%). However, because revenue does not consider costs, this result ignores the way in which Nortel operated as a matrix structure and the reliance by all operating areas, including the U.S., on IP generated by R&D elsewhere. The 2009 revenue that Mr. Kinrich used in his analysis to compare revenues, the basis of which was assumed license rights under the MRDA, was subject to the obligation in the MRDA to make payments pursuant to the RPSM measured by R&D expenditures of each RPE. Mr. Kinrich did not take into account.

[10]    Mr. Kinrich acknowledged on his cross-examination that while he assumed that the set of license rights as he saw them would continue in the future to exist, he gave no effect to sharing obligations that might arise under the MRDA, his reason being that he understood that the sharing provisions did not apply to sales proceeds. That in my view was no answer. What he undertook was to determine the relative value surrendered by each of the selling entities, including the RPEs.  To determine the value of rights of each of the RPEs without taking into account the RPSM sharing obligations failed to properly determine relative values among the RPEs. I accept the opinion of others, including Dr. Bazelon and Mr. Green, on the point. The various businesses in Nortel historically operated on varied operating margins.

[11]    Mr. Green pointed out, with reference to texts including those that Mr. Kinrich referred to at trial, that a disadvantage of focusing on revenues is that it can lull one into assigning high values to firms generating high revenue growth while losing money and that the

- Page 4 -

method assumes that the businesses are equally profitable. His view was that a revenue based allocation was inappropriate in a matrix structure such as Nortel with interrelated operating businesses in which certain entities bore disproportionate shares of expenses like R&D which would be ignored.

[12]     EMEA and the UKPC contend that Mr. Kinrich should not have used 2009 revenue figures as 2009 was an anomalous year for Nortel. Nortel filed for insolvency protection in January 2009 and from then on was operating under the supervision of courts in Canada, the US, the UK, and elsewhere.  Throughout 2009, Nortel was actively engaged in selling its businesses, signing seven out of eight of its sale agreements in that year. All of this affected its ability to generate revenues. Four of the business sales were concluded before the year's end.  Because of these dispositions, complete financials for 2009 were not even available for certain businesses and revenues had to be estimated based upon performance prior to the sale closing date.

[13]     Dr. Bazelon's evidence was that NNI's share of global revenue plateaued by 2008 at about 65% but in 2009 it increased by about 4%. In my view, EMEA and the UKPC have a valid point. 2009 was not a typical year for Nortel. While NNI contends that 2009 resembles the weighted average over the years 2001 to 2008, but that ignores the steadily declining trend from NNI having 74% in 2001 to about 65% in 2008. Using 2009 for his revenue analysis was overly aggressive. The effect was to shift about 4%, or $100 million, from EMEA to the U.S. Debtors.

### (ii) Mr. Malackowski and Mr. Huffard

[14]     The allocation of the proceeds of the LOB sales on behalf of the EMEA Debtors is based on the evidence of Mr. Malackowski who valued the IP sold at $765.2 million and on the evidence of Mr. Huffard who allocated all of the sales proceeds using different methods for each type of asset sold. There are problems with the EMEA allocation.

[15]     Mr. Malackowski used a discounted cash flow analysis to value the IP. He said there was a defensive component and a synergistic component to the IP. To measure the defensive component, he took the revenue forecasts of Nortel in the "deal books", market derived

- Page 5 -

growth rates, and royalty rates from an IPCo model. For a discount rate he used an average of weighted average cost of capital rates of the industry in which the Nortel business operated. To measure the synergistic component, he used revenues of a hypothetical market participant for each line of business sold, market derived growth rates, and royalty rates derived from what he said was the implied rate paid by Ericcson as a member of the Rockstar consortium. He added 15% to the discount rate used in his defensive component.

[16]    Mr. Malackowski's valuation of the IP sold at $765.2 million, if accepted, means that the IP represented roughly 25 % of the total sales proceeds of $3.1 billion. Yet, the evidence is overwhelming that IP created by Nortel's R&D was the driver of the profitability of the business. Even Mr. Huffard view was that within Nortel, IP was considered the driver of revenue in each of the businesses and purchasers of the businesses would have considered the acquisition of IP as a critical aspect. Mr. Britven, an expert called by the CCC, arrived at figures based on the purchase price allocations made by the purchasers that stated what the purchasers considered the fair value of the various acquired assets to be. Those figures put the percentage of the IP of the total business sale proceeds at 40%.

[17]    In his rebuttal report, Mr. Malackowski in an attempt to show the size of what he considered to be a windfall if the position of Mr. Green were accepted, said that all of the Nortel the IP in total in the hands of Nortel could be worth $10.4 billion, of which he allocated $3.761 to the business sales and $6.6 billion to the residual sale to Rockstar. His reason for this extra value in his report was that some of the residual IP sold to Rockstar was encumbered by the non-exclusive licenses given to the purchasers of the lines of business. Rockstar paid $4.5 billion. If Mr. Malackowski's figures are right, it means that the non-exclusive licenses given to the purchasers of the lines of business reduced the value of the residual IP sold to Rockstar from $6.6 billion to $4.5 billion, or by $2.1 billion. That reduction in value to Rockstar attributed to the non-exclusive licenses granted in the business sales means that those non-exclusive licenses were worth $2.1 billion, and it does not make sense that Mr. Malackowski valued both the outright licenses and the non-exclusive licenses given to the purchasers of the lines of business at only $765.2 billion.

[18]    The Monitor points out that the royalty rates used by Mr. Malackowski in establishing revenues to be valued were taken from the IPCo litigation light model and that within that litigation light model he chose the lowest of three rates. He did not use any Nortel intercompany-stated royalty rates. The Monitor suggests that is an explanation why the IP valuation of Mr. Malackowski is too low. For certain the royalty rates charged directly affect the revenues and thus the value obtained by a DCF method of valuation. Whether it is the only reason for the low valuation is another matter. There are many inputs in a valuation.

[19]    Mr. Huffard was the expert called by EMEA to opine on the allocation to be made of each component of the business sales. The Monitor is critical of his qualifications. Mr. Huffard is an investment banker with considerable experience advising distressed companies who has "led valuation analyses" for companies and their assets. He holds a Master of Management degree from Kellogg Graduate School of Management at Northwestern University. Mr. Huffard is not accredited as a valuator and said that in the field of investment banking that is typical.

[20]    I must say that Mr. Huffard was not forthcoming in his evidence about his experience. When asked if he had done any valuations or the allocating of assets in connection with intellectual property companies, he said several times that he had trouble understanding what an intellectual property company was and asked if Nortel was an intellectual property company. Yet when asked on his deposition whether he had done any valuations or the allocating of assets in connection with intellectual property companies, he answered "Not in connection with intellectual property companies." I think it fair to consider this answer in dealing with his evidence.

[21]    Mr. Huffard believed that there were three classes of assets to be valued and examined in the business sales. The first is net tangible assets. The second is the IP. The third is customer-related assets and goodwill not otherwise encompassed in goodwill. Mr. Huffard did not do any valuation exercise for his third class. Rather he just took the balance of the purchase price and allocated it. The values attributed to the first two classes therefore directly affected the value of his third class.

[22]    For the tangible assets, Mr. Huffard took the book values of the assets, which consisted of accounts receivable and prepaid expenses, inventory and fixed assets. This book value in his report totalled $403 million. At trial, in his demonstrative exhibit, his total was $361 million. Why the difference was not explained. From the book values, Mr. Huffard deducted liabilities assumed by the purchasers of the lines of business, the largest of which was deferred revenue. He viewed the assumed liabilities as a fourth asset class that resulted in an increase in the purchase price from the buyer's perspective and a reduction from the seller's perspective.  They had to be deducted from the assets and he did this the tangible asset class. This resulted in net tangible assets in his report of $124 million, being $39 million for Canada, a negative $27 million for EMEA, $106 million for the U.S. and $6 million for Asia and the Caribbean. At trial, his demonstrative showed the net tangible assets at $118 million with the same net figures for Canada, EMEA and the U.S. as in his report. How this occurred on the different book values in his report and in his demonstrative was not explained.

[23]    For the allocation of the IP, Mr. Huffard took Mr. Malackowski's figure of $765.2 billion. He allocated them amongst the RPEs using Mr. Malackowski's contribution approach using historical R&D spending from 1992 to 2008. His view was that the portions of the sale proceeds attributable to IP were, in effect, a capitalization of future revenues that would otherwise have been shared among the RPEs in accordance with the RPS methodology. This resulted in 40.8% or $312.2 million being allocated to Canada, 42.6% or $326 million being allocated to the U.S. and 16.5% or $126.2 million being allocated to EMEA. In his demonstrative at trial, these percentages were rounded, with 41% to Canada, 43% to the U.S. and 16% to EMEA.

[24]    Mr. Huffard then included the balance of the sale proceeds of $2.198 billion into his third class of customer-related assets and goodwill. He did no analyses of the value of either the customer-related assets or of the goodwill and allocated them based on the revenue generated by each entity in fiscal year 2008. He said he did not use net revenues to allocate among the entities because in his view cash flows are influenced by transfer pricing and inter-company arrangements for tax purposes. Based on the revenues alone, he allocated 9.2% or $202 million to Canada, 62.6% or $1.375 million to the U.S., 18.6% or $155 million to EMEA, 2.6% or $57 million to the Caribbean and 7.1% or $155

million to Asia.

[25]    While Mr. Huffard did not provide a total for the business sales allocation, by adding up the different classes, his total allocation to Canada was $553.2 million to Canada, $1.807 billion to the U.S. and $254.2 million to EMEA. This is somewhat less than the $2.85 billion available from the business sales proceeds.

[26]    As Mr. Huffard did not undertake any valuation of his third residual category, his conclusion of the amount to be included in it is dependent upon the amount of his tangible asset valuation and Mr. Malackowski's IP valuation. If Mr. Mr. Malackowski's IP valuation is too low, then the amount in this residual class allocated by Mr. Huffard will be too high.

[27]    There are problems with allocating this residual class entirely by revenues of each company or groupings of companies. Mr. Huffard described it as the value of customer-related assets and goodwill not otherwise associated with IP. He acknowledged that these assets, like any other assets, have their value fundamentally related to their ability to generate profits, and that while Nortel operated the businesses, it was not revenue that allocated those values but the RPS method of sharing profits after revenues and costs were calculated. This is the same criticism made of Mr. Kinrich in using a revenue tool to allocate the sales proceeds rather than a profitability tool.

[28]    Mr. Huffard acknowledged that in circumstance where, because of decisions made and cost-effectiveness and historic reasons, sales and customer support was done in a country which had low domestic revenues, his revenue allocation method for the customer-related assets and goodwill category was not going to compensate that country because it had low revenues. This circumstance was commonplace in Nortel with its matrix structure, with customer support carried out in one country for sales in another. He acknowledged if a large percentage of the workforce is in a place like Canada, which does R&D and which does sales support and supports the global organization but doesn't have a large native revenue stream, he was allocating the value of that workforce to the other entities where there is a revenue stream and not to Canada.

### (iii) Mr. Green

[29]    Mr. Green valued different asset classes differently. He first valued tangible assets by taking their book value and allocating them to the companies which owned them. This was the same method used by Mr. Huffard. However, different from Mr. Huffard, he did not deduct any deferred liabilities from the tangible asset amount. His evidence was that deferred liabilities are essentially amounts that would be due that are related to projects that have already been billed and perhaps paid for and so they didn't offset the physical assets, the tangible assets such as the accounts receivable, the other things that were sold. He pointed out that by his not deducting deferred liabilities, it was to the relative benefit to the U.S. Debtors because they had the highest deferred revenues and, accordingly, deducting the liabilities would most significantly decrease the U.S. Debtors' share of the value of net tangible assets. He also pointed out in his rebuttal report that not all liabilities recorded on the books of Nortel were assumed by the purchasers and for those that were it was not possible to determine on which entity's books those liabilities were recorded. I accept this position of Mr. Green in not deducting assumed liabilities in valuing and allocating the tangible assets on the basis of book values recorded on each entity's books.

[30]    Mr. Green's value for the tangible assets was $534.19 million, and he allocated $121.74 million to the Canadian Debtors, $317.59 million to the U.S. Debtors and $94.86 million to the EMEA Debtors.

[31]    Mr. Green next valued the workforce in the lines of businesses that were transferred to purchasers. His opinion was that generally speaking, the cost approach is applied to the valuation of an assembled or in-place workforce. He valued the workforce by calculating the cost to replace the work force. He concluded that the total value of the work force was $255.33 million and he allocated $78.68 million to the Canadian Debtors, $134.74 million to the U.S. Debtors and $41.91 million to the EMEA Debtors.

[32]    In the sale of the Enterprise business, several corporate entities owned by NNI were sold. Mr. Green valued these assets based on contemporaneous fair market valuations done at the time these businesses were sold.  There is no evidence that these assets had a value other than as set out by Mr. Green. Mr. Green made an allocation to NNI of proceeds

attributable to the sale of its subsidiaries in the amount of $110,970,000. No other valuer dealt with this asset.

[33]    Mr. Green was of the view that once the tangible assets and the workforce were valued, the balance of the business sale proceeds was attributable to IP, the primary driver of Nortel's value, and customer relationships. He valued and allocated the IP and customer relationships sold in the business sales by valuing the license rights of NNI and the EMEA RPEs surrendered by them to permit the sales to take place on the basis that their licenses were restricted to Products by or for the Participants as defined in the MRDA and as contended by the Monitor. The balance he attributed to NNL as the owner of the IP.

[34]    Mr. Green performed a DCF valuation. He projected revenues and expenses for each business sold and for this to project the future revenues of the Nortel businesses he used forecasts prepared by Nortel that were referred to as "Retained by Nortel" forecasts. They projected the revenues that would have been earned and the expenses that would have been incurred, if the operating businesses had been retained by Nortel. After calculating the operating profits of each business sold, Mr. Green aggregated those profits and applied the RPSM on the assumption that the MRDA would have remained in place, using the capital stock percentage for the first quarter of 2010, which covered a rolling average from 2005 to 2009. He applied a discount rate of 12% for the operating profits derived from existing technology and 30% for operating profits to be derived from yet to be invented technology and thus more risky. He concluded that the value of the license rights surrendered by NNI was $438.2 million and by the EMEA RPEs was $164.2 million. The balance of his residual amount, being $1.379 billion was allocated to NNL.

[35]    Mr. Green's resulting allocation was 54.8% or $1.58 billion to the Canadian Debtors, 10.4% or $300.97 million to the EMEA debtors and 34.7% or $1001.5 billion to the U.S. Debtors.

[36]    EMEA and the U.S. Debtors contend that a basic problem with Mr. Green's analysis is his conclusion or assumption that NNL was the owner of the IP and entitled to its residual value after deducting the license rights of EMEA and NNI which he limited to Nortel

Products by or for the Participants. This is a basic legal issue.

[37]   EMEA argues that customer relationships were very important to Nortel and that they should have been valued and allocated separately from IP and not included in Mr. Green's residual category. Mr. Green's explanation for not doing so was that customer intangibles represented historical relationships in which customer files and ongoing agreements exist, the value of which was represented in his revenue figures that he used and were thus subsumed in the IP license rights which he valued. He said that a separate valuation of customer relationships would be duplicative of the values of the license rights surrendered because it would be based on the same revenues and profits as used in the license rights valuation.

[38]   Mr. Malackowski argued that the MRDA did not transfer customer relationships to NNL. This does not strike me as a valuation concept and one can argue, as the Monitor does, that NN Technology was owned by NNL and it included all intangibles.

[39]   This is a valuation issue. There is no question that customer relationships were important to Nortel. However that is not the issue. The issue is how to value them. Mr. Berenblut was of the opinion that customer relations were co-mingled with IP rights because the value to use them depended on the ability to sell Nortel products and that their value would be included in the value of rights to sell Nortel products. Dr. Bazelon, an EMEA expert, agreed on cross-examination that goodwill and customer relationships are entangled with the IP and take their value from the IP, at least in part. Brian McFadden, the Chief Technology Officer at Nortel for some time, said that R&D was crucial in initiating relationships with and developing sales from customers for Nortel products. I accept Mr. Green's opinion that no separate valuation needed to be made for customer relationships.

[40]   It is also argued that Mr. Green should have separately valued and allocated goodwill. Mr. Huffard included goodwill in his residual class, although he did not attempt to value it. Mr. Britven, called by the CCC, included a value for goodwill in his business sales analysis. He took what the purchasers had allocated in their PPAs as goodwill, and referred to it as Purchaser Goodwill.

[41]     Mr. Green's response to this is that Nortel wrote off all of its acquired goodwill at the end of 2008. This indicated that, at the time, Nortel management did not believe it would be able to realize the value of the goodwill from these acquisitions in the future. As for its own "internal goodwill," Nortel was suffering losses from its operations and was not generating positive cash flows. Thus, from an accounting and finance perspective, Nortel had no goodwill from its own operations. By classifying the residual value as goodwill, Mr. Huffard accounted for an asset that did not exist within Nortel and was not transferred to the buyers. By applying the buyer's perspective, Mr. Huffard failed to answer the question of how to allocate the sales proceeds according to the value of the interests each of the Debtors transferred and rights each of them relinquished.

[42]     There is actually support for Mr. Green's position in Mr. Britven's report in which he included a value for goodwill taken from the purchasers' PPAs. These purchaser allocations are done by purchasers for accounting purposes and usually are driven in part at least by tax considerations. Mr. Britven said that Nortel wrote off the value of substantially all of the goodwill that it had on its balance sheet. He said that Nortel did not have sufficient value to support any significant goodwill value and that the goodwill in the business sales related to the attributes of the buyer, not the attributes of Nortel. He said that any goodwill recognized by purchasers in their PPAs did not reflect amounts that could have been realized by the licensed participants through the continued operations of their lines of business.

[43]     I agree with Mr. Green's approach to goodwill and accept his opinion that there was no goodwill value in the Nortel businesses that were sold.

[44]     Regarding the DCF method used by Mr. Green to value the U.S. and EMEA license rights, Mr. Kinrich was critical of the revenue forecasts used by Mr. Green and stated that he had not followed the International Financial Reporting Standards which state that in measuring value in use, an entity shall base cash flow projections on reasonable and supportable assumptions that represent management's best estimate of the range of economic conditions that will exist over the useful life of the asset.

[45]     This IFRS material was not put to Mr. Green on his cross-examination, which it should

have been for this argument to be made. However, I do not think the criticism is justified. Mr. Green used projections made by Nortel. He used projections referred to as a "Retained by Nortel" scenario which projected what revenues and expenses would be either retained by Nortel or spun-out on its own as a stand-alone company. He declined to use Nortel's "Safe Hands" projections for several reasons that he explained, including the fact that they forecasted the businesses in the hands of a well-capitalized third party who could invest adequate capital in the business and who could earn greater profits than if they remained in Nortel's hands. Mr. Green did no DCF analysis as he allocated the business sales solely on revenues.

[46]    Mr. Kinrich was also critical of Mr. Green for not including a terminal value in his DCF valuation. Mr. Green's explanation for this on his deposition was that in his present value analysis, at year nine the present value factors were close to zero. So even if there were a terminal value, it would be virtually of no value in a present value computation. In his report, he said he thought that to include potential profits after nine years was too speculative. There is no competing DCF valuation to indicate what Mr. Green did was wrong.

[47]    Mr. Green's analysis in part is dependent on the interpretation of the MRDA advanced by the Monitor on behalf of the Canadian Debtors. One cannot quarrel with the logic of it if that interpretation were to govern the allocation.

**APPENDIX B**

**Residual IP proceeds allocation**

[1]     The residual IP was sold to Rockstar for $4.5 billion. After payment of a break fee and expense reimbursement to Google, the remaining net proceeds held for allocation amount to $4.45 billion.

[2]     There is differing expert opinion as to how to allocate the proceeds of the Rockstar sale amongst the Canadian debtors, the U.S. debtors and the EMEA debtors.

[3]     Mr. Green allocated the proceeds on the basis of his interpretation of the MRDA under which it was NNL that owned all of the patent rights that were sold to Rockstar.

[4]     Mr. Kinrich for the U.S. debtors allocated the proceeds on a revenue approach on the basis that each Participant owned all of the economic rights to the patent rights sold to Rockstar in their exclusive jurisdictions and that their revenue streams that they gave up should be valued. Mr. Green as an alternative analysis for the Canadian debtors and Mr. Malackowsi as an alternative analysis for the EMEA debtors prepared valuations correcting what they saw as errors by Mr. Kinrich.

[5]     Mr. Malackowski allocated the proceeds on a contribution basis by calculating what he saw as the contributions by each of the Participants to R&D over the life of the patents that were sold to Rockstar.

### (i)  Mr. Kinrich's license approach to value

[6]     Mr. Kinrich assumed that each of NNL, NNI and the EMEA debtors owned all of the economic benefits of the residual IP. He allocated all of the Rockstar proceeds to NNL, NNI and EMEA by taking what he said would be the revenue earned in each of those three geographical areas and then doing what he said was a discounted cash flow analysis ("DCF") on those revenue streams. I have held that the Licensed Participants did not own all of the economic benefits of the

residual IP. However, on the assumption that they did, I will consider Mr. Kinrich's analysis.

[7]     Mr. Kinrich obtained his revenue streams by taking one of the IPCo revenue model assumptions. He then apportioned the net revenues after costs and taxes to each of the three geographical areas by using those countries' relative telecom infrastructure expenditures for six of the eight IPCo franchises that Nortel had and apportioning all of the net revenues after costs and taxes for two of the franchises (PC and Internet advertising) to the U.S. He then applied a discount rate to those net cash flows allocated to each country.

[8]     I have considerable difficulty with a number of aspects of Mr. Kinrich's analysis. If the value of the net cash flows as stated by Mr. Kinrich is overstated, the overstated amount would belong to NNL, as the amount of the sales proceeds from the Rockstar transaction would represent more than the value of the net cash flows, which on Mr. Kinrich's assumption is what the Licensed Participants gave up in the Rockstar sale. The expert evidence called by the Monitor is exactly to that effect, contending that Rockstar paid more than the value of the cash flow projections from the IPCo model for other motives.

[9]     Nortel had no material business licensing its IP or monetizing its technology by suing others, either before or after filing for protection from creditors in early 2009. Mr. John Veschi had been hired in July 2008 to take responsibility for Nortel's IP group and to look at options for licensing its IP.

[10]     Development of the IPCo option was led by Mr. Veschi after the insolvency filings.  The premise of IPCo was that the residual patents would be monetized by the threat of patent infringement litigation and, if necessary, actual infringement proceedings against various technology companies in an attempt to force such companies to pay royalties to IPCo. It was considered important that IPCo not carry on any telecommunications or other technology business, because, if it did, it would be vulnerable to counterclaims for alleged infringement being brought by the targets of its infringement litigation, which would undercut its revenue generating ability.

[11]     Over the course of 2009 and 2010, Mr. Veschi and his team, assisted by Lazard Frères & Co, Nortel's financial advisor, and Global IPCo, a law firm specializing in patent sales, prepared

several versions of a preliminary financial model, in an attempt to forecast the operating profit that could be earned by IPCo so that the potential economic benefits could be weighed against value expected to be received on a sale of the portfolio.

[12]    The various versions of the preliminary financial model had three sub-models, with differing assumptions relating to how much litigation IPCo would pursue.  The scenarios were dubbed "Harvest" (assuming very little litigation), "Litigation Light" and "Litigation Heavy". More litigation resulted in greater forecast revenues, at greater forecast cost. Assumptions regarding litigation success of 60 percent, 70 percent and 100 percent were used. A wide variety of assumed net cash flows were used and a variety of discount rates to value the cash flows were used.

[13]    There is a difference in the evidence of Sharon Hamilton, a partner of Ernst & Young, the Monitor, and Mr. John Ray, the principal officer of NNI, as to how reliable the IPCo forecasts were. Ms. Hamilton was of the view that the projected cash flows were largely guesswork, given that Nortel had little experience in licensing and there were no good precedents about the estimated cash flow. Mr. Ray was more confident of the forecasts taken the work that went into them.

[14]    What is clear is that there were a number of different models. Version 1 was presented on March 10 2010, version 2 on April 27, 2010, version 2.2 on May 6, 2010, version 3 undated, version 3.1 on October 25, 2010 and version 4 on November 18, 2010. Each version had different cash flow forecasts.

[15]    I think it fair to conclude that the forecasts were not considered to be in any way certain. There were many permutations and combinations, and at no time did Nortel agree that any one forecast was the appropriate one. The process never got that far before the decision was made not to operate IPCo but rather to sell the residual IP.

[16]    Mr. Kinrich chose to use version 3.1, although he did not explain why. Version 3.1 had the highest cash flows of all versions. It is noteworthy that the latest version 4 had projected cash flow forecasts of approximately half of what was projected in the earlier version 3.1 used by Mr. Kinrich.

[17]    Mr. Green, an expert valuer called by the Monitor, points out that version 3.1 itself was not a finalized document or accepted by Nortel or its advisors. Within it there were a number of scenarios and options still being explored. The unreliability of the forecasts in the various models can be seen by the wide disparity in discount rates used. Lazard used discounts of 25, 35 and 45% to value the various projected cash flows. These are very high discounts, as more than one expert testified, and indicated a high risk to the cash flows being achieved. Mr. Kinrich used much lower discount rates of 12% and 15%, which I will come back to, which did not reflect the risks in the IPCo forecasts and which caused a higher valuation of the cash flows than would be the case if the discounts used by Lazard in the IPCo models were used.

[18]    While there were multiple scenarios in the version 3.1 model, Mr. Kinrich used only the most aggressive case that maximized revenue. Mr. Green's view is that there is inadequate explanation by Mr. Kinrich why the specific scenarios of Version 3.1 were selected for the analysis as opposed to other lower cash flow scenarios or the later Version 4 model with lower cash flows and as the analysis is unsupported, it makes the valuation unreliable. I must say that in reviewing the details of Mr. Kinrich's report it is not at all apparent what his justification was for using the cash flows that he did. It leaves an open question as to the reliability of what Mr. Kinrich was doing.

[19]    The value allocated to each of the debtors by Mr. Kinrich is based on the attribution to the geographic regions of the debtors of the projected operating cash flows in the IPCo model chosen by Mr. Kinrich. Those cash flows projected royalty payments on a regional level, namely North America, EMEA and China.

[20]    The IPCo model estimated North American licensing revenue based on sales in Canada and the U.S. Mr. Kinrich apportioned the revenue to Canada and the U.S. using those countries' relative telecom infrastructure expenditures, saying that relative telecom expenditures were a reasonable basis on which to estimate relative market size and were consistent with the structure of the IPCo model that used market size as the driver of royalty revenues. He did the same thing for EMEA as the IPCo model estimated EMEA revenue based on sales in France, Germany and the U.K.

[21]    Global IPCo, the IPCo law firm retained to assist in preparing the models, stated early on

in their work that they had no opinion regarding the territorial split of patents or patent-related revenue. There was certainly no agreement by any of the Nortel entities as to how the projected IPCo cash flows would be split territorially.

[22]    Mr. Kinrich then deducted costs from the revenue streams including a number of litigation costs. It is not possible from looking at his report to know exactly what level of litigation costs was assumed by him.

[23]    After calculating the net cash flows for each country, Mr. Kinrich then said he did a discounted cash flow calculation to arrive at a valuation for each country. In my view, Mr. Kinrich did not carry out a valid DCF valuation. The discount rate he used was not appropriate and was not derived by any conventional valuation approach.

[24]    Mr. Kinrich acknowledged in his evidence that a DCF analysis requires knowledge about the cash flows over time and requires a discount rate to take those cash flows over time and convert them to present value. He acknowledged in his report that typically a discount rate is derived from the cost of capital (the cost of debt and equity split on some basis), referred to by valuators as the weighted average cost of capital. However, he did not do this. Instead he said that the value of the residual IP was known from the $4.5 billion paid for it by Rockstar and by taking his projected cash flows that he used from the IPCo model, he could back into (or reverse-engineer) a discount rate, being 12.2% when China is not included and 15% when China is included.

[25]    This analysis proceeds on the assumption that the amount paid by Rockstar was based on the revenues taken by Mr. Kinrich from the particular IPCo model that he used. However, neither Mr. Kinrich nor anyone else knew what revenue streams were used by Rockstar to base their purchase price on or indeed, if Rockstar based their purchase price solely on anticipated revenues they could earn from the patent portfolio they acquired. Without knowing that, it is not possible to say that the Rockstar purchase was based on a discount rate of 12.2% or 15%. A discount rate, as Mr. Kinrich conceded, should reflect the risk of the cash flows being achieved, but without knowing what cash flows Rockstar based its purchase price on, saying the Rockstar purchase reflected a certain discount rate is artificial. Rockstar did not even know what the various IPCo cash flow models were.

[26]    Mr. Green, Mr. Berenblut and Dr. Cox and Mr. Malackowski, all expert valuers, were critical of the method used by Mr. Kinrich to arrive at his discount rates of 12.2% and 15%. I accept their criticism. These discount rates were much lower than the rates used by Lazard in the IPCo models, including the very net cash flow model used by Mr. Kinrich, of 25% to 45%. Mr. Berenblut testified that he would expect the range of discount rates to be between 30% and 70%, recognizing the fact that this was a contemplated rather than an established business and recognizing the risks associated with it.

[27]    Mr. Malackowski used a discount rate of 30% in his analysis of the potential revenue from the residual IP portfolio. He derived that rate by examining risk-adjusted hurdle rates associated with implementation of technology-based IP. These rates account for a buyer's required rate of return or the associated risk of commercializing a technology.

[28]    Mr. Kinrich in his report stated that the inferred rates of 12.2% and 15% that he obtained were consistent with discount rates observed in the market place at the time, being the median weighted average cost of capital for communication equipment companies. However, even Mr. Kinrich noted in his report that IPCo would not have been a communications equipment manufacturer. There was no analysis by Mr. Kinrich to lead to a conclusion that the cost of capital for a start-up litigation and licensing business would be comparable to an established communications equipment manufacturer. Messrs. Berenblut and Cox in their reply report stated:

> The Kinrich Report's use of discount rates for established publicly traded companies in the communications industry as benchmarks for its selection of discount rates for its valuation of a yet-to-be established business to exploit the Residual IP is not supportable. A discount rate of 30 percent or more for this type of business is consistent with our understanding and experience and is also consistent with the discount rates used in the IP Co Model. The academic literature reports venture capital discount rates in the range of 30 to 70 percent.

[29]    I accept the criticism of Messrs. Green, Berenblut and Malackowski that the discount rates obtained by Mr. Kinrich were too low. Had Mr. Kinrich used higher rates such as those used by Lazard in the IPCo models, or the rate used by Mr. Malackowski, the value of the revenues given up by the Licensed Participants, assuming they belonged to the Licensed Participants, would have been far less than opined by Mr. Kinrich.

[30]    Mr. Green calculated the values from the IPCo models using the discount rates used by Lazard in the models. Taking the most optimistic cash flows from the IP Co. model, the lowest discount rate used by Nortel and its advisors, and a litigation success rate of 100%, the maximum DCF value of IP Co. is only $2.7 billion, compared to the $4.5 billion paid by Rockstar. Messrs. Berenblut and Cox calculated that if a 30 percent discount rate is used to discount the cash flows used by Mr. Kinrich, the resulting net present value of the expected cash flows from the IP Co Model is $1.8 billion. They think this figure is overstated because of the range of values for all of the various scenarios in the IPCo models with various discounts of 25 to 45% and litigation strategies and assumed success rates of the litigation strategies from 60 to 75 to 100%. That range went from $424 million to $2.7 billion. Mr. Green put the range of values in the IPCo models from $400 million to $2.7 billion.

[31]    The report of Messrs. Berenblut and Cox explains why Rockstar would be likely to have paid more for the residual IP than Nortel could have made from it, that is, on the theory that the Licensed Participants owned all of the benefits sold to Rockstar, more than what the Licensed Participants gave up in the Rockstar transaction. The defensive value of the residual IP to the members of the Rockstar consortium made the residual IP far more valuable to Rockstar than it was in the hands of Nortel.

[32]    As explained by them, Rockstar obtained ownership of the residual IP and each of the members of the consortium (including Apple, Microsoft, Ericsson and Blackberry) received a license to the residual IP.  The structure enabled Rockstar to exercise all rights of ownership of the residual IP against third parties, while providing the individual consortium members with the defensive benefits to prevent others from suing them for patent infringement. As a single company, Nortel was less likely to be able to derive defensive benefits equal to the combined and cumulative defensive benefits that could be gained by several large companies with extensive product and service lines that ranged well beyond what Nortel offered. Several members participating in the Rockstar portfolio are more likely to find patents contained in the Residual IP that will be useful to responses to litigation. Furthermore, as a company in financial difficulty, Nortel was less likely to be an attractive target for patent litigation and therefore less in need of patents to assert in response.

[33]    Mr. Green also made the same this point. He stated that the members of the Rockstar

consortium purchased the residual IP portfolio, at least in part, as a defensive measure. It was his experience that having access to a large patent portfolio can help protect a large technology firm from lawsuits from other large companies. Access to a large patent portfolio, like the residual IPCo portfolio, can act as a deterrent because potential opposing parties must factor in the probability of a counter-suit. The defensive value of access to a significant patent portfolio is valuable to purchasers like the Rockstar consortium members, but would not be relevant to an entity like IPCo which intended to pursue an offensive licensing and litigation strategy, but had no operating business in the technology sector as all such businesses had been sold. The defensive value of such a portfolio to large companies is not measured exclusively by the present value of the cash flows from licensing.

[34]    Dr. Catherine Tucker, an economist called by the U.S. Debtors with considerable technology experience, stated the same thing. In her report she said that patents are not just used in litigation to assert rights to a particular technology or domain. There is also the important role of a patent being used in a counter-suit should the company itself be sued for patent infringement. She referred to Kent Walker, Google's General Counsel, who wrote at the time of the Rockstar bid that it was supposed to create a disincentive for others to sue Google. This defensive attribute, of course, would not have been available to IPCo if it decided to operate a patent licensing business as it would not have been in a product producing business that would be vulnerable to patent suits.

[35]    Mr. Green also expressed the view that the identity of the bidders themselves in the residual IP auction also illustrates that the basis on which value of the residual IP portfolio was determined is not consistent with that in the Kinrich report. The bidders included Google, Apple, Microsoft, Ericsson and other large technology companies with worldwide operations rather than companies whose primary business model was patent licensing and litigation. If the value of the residual IP sale was closely related to the cash flows from a licensing/litigation strategy, one would expect licensing/litigation businesses to have been bidders in the auction. Instead, the bidders in the auction were operating technology companies, which suggests that the value of the residual IP was determined in the market on some strategic basis in addition to the value of the IP in a licensing/litigation business.

[36]    I accept the evidence of Messrs. Berenblut and Cox and Mr. Green that the approach of

Mr. Kinrich of allocating proceeds based on cash flows from a licensing /litigation business model such as the IPCo models is inappropriate and that what Rockstar paid for was more than the value of the potential revenues from the business that was being considered by IPCo. That is, it was more than what the Licensed Participants gave up in the Rockstar sale, assuming it was theirs to give up.

[37]    The U.S. Debtors contend that it is wrong to say that Rockstar paid more than the value of what the Licensed Participants gave up when they terminated their licenses in anticipation of the Rockstar sale and to say that the extra value belongs to NNL as the owner of the NN Technology. They say that NNL could not transfer its rights without the consent of NNI and the EMEA Licensed Participants, just as NNI and the EMEA Licensed Participants required the consent of NNL to do so. They say that all parties consented to the transfer of their MRDA interests as part of the Rockstar sale, effectively agreeing to the assignment of their rights under article 14(e) of the MRDA which permitted an assignment of a party's rights under the MRDA only with the consent of all of the other parties.

[38]    I do not accept that contention. The MRDA did provide in article 14(a) that the MRDA could not be assigned by any licensed participant without the consent of the other Licensed Participants. But neither the MRDA nor the licenses of the Licensed Participants were assigned to Rockstar. Rockstar would not have taken an assignment of the MRDA with its obligations and duties amongst the participants. I accept the evidence of Mr. Britven, an expert valuer and the national intellectual property consulting practice leader with Duff & Phelps in Houston, that no third party would want to step into the shoes of a Licensed Participant by taking a transfer of the MRDA with its obligations to share profits and transfer ownership of patents to NNL, among other things. Even Mr. Ray eventually admitted that there was no transfer of license rights to Rockstar.

[39]    What occurred was a sale of the residual IP to Rockstar with NNI and the EMEA debtors terminating their licenses under the MRDA as a condition precedent to the sale. What is at issue is the value of those licenses that were terminated. If the value of what could be earned from the licenses was less than Rockstar paid for the residual IP, the difference would belong to NNL, the legal owner of that IP.

[40]    Mr. Green did an alternative valuation on the assumption, with which he disagreed, that IPCo would have operated on a stand-alone business and that the licenses surrendered by U.S. Debtors and EMEA debtors would have included the rights to the residual IP portfolio. He used version 3.1 of the IPCo model, as Mr. Kinrich had, but made some changes. He used the three discount rates that had been used by Lazard in the various IPCo models and used the three assumptions in the IPCo models as to the anticipated success in litigation against infringing third parties. He also deducted from the revenue streams going out to 2020 the RPS percentages for 2010 under the MRDA on the theory that if the Licensed Participants had rights under their licenses to earn the revenues proposed in the IPCo models, those licenses came with an obligation to make RPS adjustments in favour of the other Licensed Participants. Any gain on the sale above the DCF valuations on the revenue streams was allocated to Canada.

[41]    If one assumed the median discount rate (of 35%) and the median litigation success rate (of 70%), and excluding the revenues from China, then Mr. Kinrich's allocation of the Rockstar Sale proceeds, as adjusted by Mr. Green, would be as follows.  Also shown is the allocation advocated by Mr. Kinrich.

|  | Adjusted Kinrich Allocation of Rockstar Sale Proceeds | Kinrich's Actual Proposed Allocation of Rockstar Sale Proceeds |
|---|---|---|
| Canada | $4,003.06 million | $430 million |
| U.S. | $346.12 million | $3,310 million |
| EMEA | $105.19 million | $710 million |
| Total | $4,454.37 million | |

[42]    If revenues from China were included, the results would be an allocation of $3905.44 million to Canada, $420.99 million to the U.S. and $127.94 million to EMEA.

[43]    The U.S. Debtors contend that Mr. Green was wrong to apply the RPSM to the value of

the cash flows. They say firstly that the MRDA expressly provided in the third addendum signed in December 2008 that it does not apply to the sale of a business. What that amendment provided was that the operating income or loss used to calculate the RPSM was to exclude "gain/loss on the sale of business". That is not a reference to the proceeds of the sale of a business, but rather a reference to the gain or loss, presumably capital gain or loss, recognized on a sale of a business. That makes sense because the RPSM was dealing with the split of profits or losses from operating earnings to be allocated to the participants under the MRDA. Ordinarily the gain or loss on the sale of capital assets would be recognized in an earnings statement but the parties to the MRDA did not want that taken into account in the RPSM.

[44]    However, what Mr. Green was valuing in this analysis was the annual profits that would be earned by the Licensed Participants from operating IPCo in the future, assuming the Licensed Participants had the right to do so under their licenses. He was assuming that the profits would be split in accordance with the RPSM in the MRDA. I agree with the theory that if one is to value the benefits that could have been earned by the Licensed Participants if they had operated IPCo, which is what the U.S. Debtors say they would have done but for the Rockstar sale, the Licensed Participants would have been subject to some profit split.

[45]    The U.S. debtors point out that what the profit split would be is a matter of conjecture and that it is not possible to assume, as Mr. Green did, that it would be the same in the future. The RPSM under the MRDA was based on the amount of R&D spend each year by Nortel and the Licensed Participants. After Nortel became insolvent, the R&D expenditures essentially stopped after 2009 and there is no evidence of what R&D would have been undertaken if IPCo had been run as a business by Nortel.

[46]    Certainly there would have had to be some transfer pricing in place if Nortel had run IPCo as a business. What the parties would have worked out is unknown. The tax authorities would certainly have been interested in the transfer pricing associated with the running of the IPCo had that occurred and it does not mean that the parties would not have had to agree on a profit split of some sort. They would have been required to do so.

[47]    It is perhaps fair to be critical of Mr. Green for assuming the transfer pricing would continue to be the same under an IPCo business run by Nortel as it had been before. It is also

fair, however, to ask that if the U.S. debtors contend, as they do, that they are entitled to be paid for what they gave up in the Rockstar sale and that the present value of the anticipated net cash flows is what they gave up, one may have expected them to lead some transfer pricing evidence as to what transfer pricing would have been appropriate.

[48]    The assumption that the transfer pricing that the parties would have worked out in the event that Nortel operated IPCo would have been the same as provided in the MRDA has some logic to it. The residual IP was created by R&D conducted by the parties, at least in part, during the MRDA that split profits on the basis of the R&D expenditures of NNL and the Licensed Participants. R&D was the driver of the profitability of Nortel and the RPSM was chosen at the request of the tax authorities as the most appropriate method for determining the compensation to each of the participants for the R&D performed by them. The profits to be earned from operating IPCo could perhaps be seen to be an extension of the results of the R&D that had been spent.

[49]    The lack of transfer pricing evidence and analysis on the point, however, as to how the profits would be split in an IPCo business casts some doubt on the accuracy of Mr. Green's alternative analysis. It is not a basis, however, to reject it out of hand as contended by the U.S. debtors.

[50]    Mr. Malackowski's preferred allocation approach is a contributions approach based on R&D expenditures made by each of the participants to the MRDA. He prepared an alternative revenue or licensed based allocation which contained dramatically different results from his contributions approach. His revenue approach allocated 33.6% of the Rockstar sale proceeds to the EMEA debtors versus 17.6% using his contribution approach. It allocated 11% to the Canadian debtors versus 39.5% using his contribution approach and it allocated 55.4% to the U.S. debtors versus 42.9% using his contribution approach.

[51]    For his revenue or license approach, Mr. Malackowski used the data generated as a result of his valuation methodology to allocate the proceeds of the Residual IP Sale. He valued the Residual IP Portfolio by determining what revenues were expected to be generated by a worldwide licensing strategy in specific geographic territories and allocating the values to those territories. He estimated global revenues for the business areas in which the technology was used, royalty rates, licensing expenses, tax and discount rates. Mr. Malackowski concluded that

the value of the residual IP was $3.570 billion, approximately one billion less than actually paid by Rockstar. He then "reconciled" this value with the actual purchase price of $4.5 billion by increasing pro rata the values he had calculated for each business franchise.

[52]    For the exclusive territories of Canada, United States, Britain, Ireland and France, he allocated all of the value for those territories to each of the countries. For the rest of the world ("ROW") he allocated 20% to each of the countries. It was this latter allocation of ROW that was the main cause of the increase in the allocation to EMEA as it had what he called "three seats at the table of five".

[53]    I have difficulty with Mr. Malackowski's revenue or license model of allocating the Rockstar sale proceeds. The first is that there is no explanation by Mr. Malackowski why his market based valuation was $1 billion less than the actual sale proceeds. Rather than simply grossing his value up to "reconcile" it with the actual proceeds, it seems to me that his valuation was an indication that Rockstar paid for more than what could be achieved in revenues from the acquired IP portfolio. Mr. Green expressed the opinion that the adjustment was inappropriate and unsupported by valuation principles, and assumed that Rockstar just used different royalty or revenue assumptions. I accept that criticism.

[54]    Mr. Green also expressed other criticisms of Mr. Malackowski's calculations, all of which appear logical and which I accept. For example:

(i)    Mr. Malackowski assumed all revenues for a country should be included in the royalty base, whereas he should have considered that only revenues from products and not services on which no patent royalty would likely be available.

(ii)    Mr. Malackowski assumed that revenues from all licensees will begin to be earned in 2011 i.e. he assumed that all licensing efforts against dozens of targets across multiple jurisdictions would be 100% successful within a few months of the portfolio being sold. Mr. Green's view is that his assumption is hard to credit and is inconsistent with the fact that the royalty rates selected by Mr. Malackowski are the IPCo "litigation light" rates, which would, by definition, require at least some form of enforcement action, which would necessarily delay the receipt of royalty payments.

(iii)   Mr. Malackowski assumed increasing royalties through 2022 without considering that the patents and technologies are wasting assets and many are likely to expire before the end of the period used by Mr. Malackowski.

(iv)   Mr. Malackowski deducted costs of 20% of royalty revenues, stating that he based the rate on the observed financial performance of sophisticated non-practicing entities such as Acacia Research Group. Mr. Green reviewed Acacia's public filings and those of other licensing entities and have found a significant discrepancy between their reported costs and those that the Malackowski Report asserts are representative. The Acacia public filings disclosed that the company's costs of operation from 2005 through 2012 have ranged from 112% of revenue in 2005 to a low of 52% of revenue in 2012. Other licensing entities, such as Interdigital and Rambus, report operating costs from 2005 to 2012 ranging from a low of 28% of revenues to as much as 164% of revenues.

[55]    These errors lead to the conclusion that Mr. Malackowski's valuation of $3.570 billion of the residual IP sold to Rockstar was likely overstated, indicating an even greater discrepancy between his value and the actual sale price. It also indicates issues with the territorial split of the revenues. The assumption of Mr. Malackowski that the entire sale proceeds were based on revenue forecasts by Rockstar, permitting him to simply increase his $3.570 billion value by another $1 billion without analyses ignores the likelihood that Rockstar paid what it did in part as a defensive move for its participants to protect their operating businesses, which Nortel no longer had.  I do not have confidence in using Mr. Malackowski's analysis to allocate the proceeds of the Rockstar sale on a license or revenue basis.

[56]    In the end, I also cannot accept Mr. Kinrich's calculation of the amounts from the Rockstar sale to be allocated to NNL, NNI and EMEA. Assuming the Licensed Participants had a right to the value of the residual IP that Nortel could have achieved, and looking at the various scenarios in the IPCo models, I would recalculate those values and allocate the proceeds by adjusting the calculations of Mr. Kinrich and averaging them with the calculations of Mr. Green in his alternative approach.

[57]    I would take the mid-point between the low value of $400 million to $2.7 billion, or $1.5 billion using the discount rates of Mr. Green and Messrs. Berenblut and Cox. Using the same

split as Mr. Kinrich, on the assumption that value would not be realized in China,  would result in an allocation of 9.3% or $139.5 million to the Canadian debtors, 14% or $210 million to EMEA and 76.7% or $1.15 billion to the U.S. debtors. The balance of the $4.45 billion, or $2.9 billion, would be allocated to Canada. On the assumption that value could be realized in China, the resulting allocation would be 11.1% or $166.5 million to the Canadian debtors, 22% or $330 million to EMEA and 66.9% or $1.0 billion to the U.S. debtors. The balance of the $4.45 billion, or $2.9 billion, would be allocated to the Canadian debtors.

[58]    I would then average these allocations with the allocations arrived at by Mr. Green in his alternative analysis, set out in paragraphs 358 and 359 above, which were based on the median discount rates and litigation success rates used in the IPCo models.

[59]    The results of that allocation, assuming the revenues from China are included, would be an allocation to Canada of $3,485.97 million, to EMEA of $228.97 million and to the U.S. of $710.5 million, or a total of $4,425.44 million. I would round these figures up on a pro rate basis to arrive at the proceeds available of $4,454.37.

[60]    The results of that allocation, assuming the revenues from China are not included, would be an allocation to Canada of $3,521.28 million, to EMEA of $157.6 million and to the U.S. of $748.06, or a total of $4,426.94 million. I would round these figures up on a pro rate basis to arrive at the proceeds available of $4,454.37.

[61]    The U.S interests assert that on a license or revenue analysis, very little revenue should be attributed to China. They assert that the IPCo models included both a "China in" and "China out" option. I must say I have carefully looked at the IPCo model 3.1 used by Mr. Kinrich and I cannot find a China out option. On cross-examination of Mr. Malackowski, who thinks China revenues should be included, it was put to him that the IPCo model had a "toggle" for China, which I take to be a sheet with revenues for China.

[62]    In any event, Mr. Kinrich testified that he at first took the mid-point of the particular China forecasts he used after doing an economic literature search on patent value and speaking with Mr. Zenkich, who told him that the market would pay little to nothing for a China patent, he reduced his revenues for China downward more towards the US in some qualitative fashion. He

reduced then by 75%. Mr. Zenkich,  an expert in valuing patents, testified that in 2009-2010 participants in the market for patent portfolios assigned little to no value to Chinese patents.

[63]    The thinking of Nortel's patent people changed over time. In December 2000, Angela Anderson, Director, Intellectual Property Law in the U.K stated that China was a sizeable and growing market accessible at moderate cost. She said that the target filing % (3% of cases) would be higher but for enforcement issues. "Show the flag, but don't over-invest." She testified that at that time, it was clear that China was going to become more of a potential marketplace for Nortel products. In addition, the patent system was starting to look like a real patent system, so it made sense to start using the patent system in China at that time.

[64]    By 2006, Nortel intended to file far more patents in China. The plan was to file up to 30% of the top patents in China and in 18 months' time raise this to up to 50%, selecting those having the highest commercial potential. In the IPCo model of May, 2010 that included revenues from China, it stated that early 2010 modelling did not include China in its royalty base but the new plan included China but only in the years 2015 to 2020. It stated that 80% of its patents and 70 % of the applications in China were for wireless 4G technology. The logic of waiting until 2015 was the time for 4G market maturity. EMEA contends, and I have no reason to question it, that the assumptions in the IPCo model regarding China were conservative.

[65]    Mr. Malackowski's view was that in doing a revenue or license approach, it would be wrong to exclude China revenues. His reasoning was that Nortel had decided to file high interest patents in China, that patent protection was improving in China and had improved over the past five to ten years and that China was a very important and large market. He has had experience in China. His firm has a partner in Shenzhen for addressing the work they do in China.

[66]    Mr. Zenkich testified that the basis for his conclusion that no one would pay anything for a Chinese patent was based on his business of being a patent broker. He testified that when his clients had large patent portfolios, there was no interest expressed in the Chinese patents that were part of those portfolios. Similarly, they were never asked by clients who looked to purchase patents to identify Chinese assets for purchase. I take this to be no evidence of knowledge of values that could be achieved for a Chinese patent, but only that Mr. Zenkich had no knowledge of a client being interested in in a Chinese patent. Included in material referred to in his report

was a 2011 report entitled "China's Emerging Patent Trading Market" that referred to a patent auction in China in 2010 which sold 38 lots and the intention of the seller to hold another auction in 2011. The article also referred to efforts being made to set up an exchange in China with the support of governments that would facilitate transactions. That article was contradictory of the view expressed by Mr. Zenkich.

[67]    Mr. Zenkich referred to a 2012 publication by the U.S. Patent Office that referred to comments it had received to the effect that there were difficulties with enforcing Chinese patents. That is certainly anecdotal evidence of statements made by others, and it cannot be belittled. How accurate are all of the statements is perhaps a matter of some debate. For example, a comment by one person as to the cap on damages in China was shown during the evidence to be incorrect. While Mr. Zenkich had stated in his report his belief that that significant interest in patent granting activity in China over the last ten years has increased the risk that patents may be challenged as invalid, even if granted, he acknowledged on cross-examination that he had no experience in trying to enforce patents in China and that his company had no experience in trying to enforce a patent anywhere in the world. He also acknowledged that he did not independently conduct surveys or seek out patent data of this kind of activity and that he was unable to identify a single instance where a Chinese patent was found invalid and its US or European counterpart was not. One of the documents cited by Mr. Zenkich in his report was a publication by a Beijing law firm of October 2009 that stated that the major cities, in particular Beijing, Shanghai and Guangzhou, can be considered as a reliable forum for patent infringement actions. Mr. Zenkich chose instead to rely on the U.S. Patent Office document that contained comments regarding the difficulty of enforcing patents in China.

[68]    I am afraid that I cannot put a great deal of reliance on Mr. Zenkich's evidence of the unreliability of the Chinese patent system. I accept he may be of the view that it is unreliable, but his view was not supported by any cogent, reliable and admissible evidence. The views of Mr. Kinrich are also not supported by any cogent evidence. He appears to have largely relied on Mr. Zenkich.

[69]    In my view, if a license or revenue approach to value is to be used to value the residual IP, it should include revenues from China that were used in the IPCo model, mainly for the reasons expressed by Mr. Malackowski and the fact that the projections were somewhat

conservative.

[70]    The conclusion I come to, if an allocation of the proceeds of the Rockstar sale were to be based on a license or revenue approach, would be an allocation to Canada of $3,485.97 million, to EMEA of $228.97 million and to the U.S. of $710.495 million, or a total of $4,425.435 million. I would round these figures up slightly on a pro rate basis to equate to the proceeds available of $4,454.37.

### (ii)  Mr. Malackowski's contribution approach to value

[71]    The EMEA debtors contend that the allocation of the proceeds of the Rockstar sale should be made on the basis of the contribution to R&D made by each of the RPE entities that created the residual IP sold to Rockstar. They contend that the contributions by each RPE to measure this should not be the contributions made during the five year look-back period used to allocate the residual profits under the MRDA but rather the contributions made during the period of time that the residual IP that was sold to Rockstar was invented. Based on the evidence of Mr. Malackowski, they say the look-back period should be from 1991 to 2006[26].

[72]    There are two fundamental issues that have been raised to the calculations if the contribution approach to allocation is to be used. The Canadian Debtors contend that there is no basis to use a contribution approach to allocate the proceeds of the Rockstar sale or the business line sales. They say that if a contribution approach is nevertheless used, the look-back period for looking at R&D contributions should be the five year look-back period under the MRDA from 2005 to 2009. The U.S. Debtors also disagree that a contribution approach should be used to allocate the Rockstar and business line sale, but contend that if a contribution approach is used, they agree with the EMEA debtors as to the length of look-back period but contend that all R&D spending must be taken into account. They contend that what must be taken into account is not only the R&D costs incurred by each RPE in their own exclusive territory, but also all transfer pricing adjustments made by an RPE, particularly the adjustments made under the CSA agreements prior to the MRDA coming into force.

---

[26] For the IP sold in the business line sales, EMEA says that the look-back period should be from 1991 to 2008, two years longer than for the Rockstar sale.

[73]    Mr. Malackowski said in his report that to measure contribution, ideally, the contributions of the RPE's labs to the development of the patented technologies could be fully and accurately determined by interviewing all of the firm's R&D staff, and by reviewing all the documentation related to the firm's research (e.g. lab notebooks, invention disclosures, meeting minutes, research presentations etc.). This approach was not possible for Nortel's IP due to the size of the portfolio, the limitations on time and the availability of information. Mr. Malackowski did not have access to lab notebooks and R&D staff. Moreover, as R&D was organized across the Nortel Group and carried out in a highly coordinated and integrated manner across the various RPEs, it was even more difficult to separate out the distinct contributions of the various RPEs. In these circumstances he said he had to select a proxy data that reasonably reflected the research efforts of the various RPE's labs.

[74]    Mr. Malackowski chose to measure contributions to the development of the IP by measuring each RPE's spending on R&D. He stated that in a large organization, where R&D funding supports a large number of R&D personnel and results in a large number of patents over time, this funding can be valid and indeed the most accurate proxy measurement for determining the contribution of each research group to the development of IP. He stated that it is common practice to regard each dollar spent on R&D as fungible for the purposes of measuring relative contribution to R&D in a group, as Nortel did under the RPSM.

[75]    Mr. Malackowski stated that in his experience, in large IP portfolios the vast majority of the value of the portfolio is usually derived from a minority of the patents. This is due in part to the fact that technology IP can be overlapping and duplicative. Value is often derived from a relatively small number of patents that are essential to industry standard technology or that cover an essential process or solution to a common problem. Mr. Malackowski expressed the view that the patents that were categorized as high interest by Global IP likely represented the vast majority of the value of the residual patent portfolio. Approximately 37% of the total residual patent portfolio was identified as high interest.

[76]    The evidence was that it generally took one year for Nortel R&D spending to result in a patent application for an invention. He therefore thought it appropriate to determine contribution to the creation of Nortel's IP by measuring R&D spending starting the year before the filing of the earliest unexpired patent categorized by Global IP as high interest, i.e. in 1991. He stated that

the most logical end point was in 2006, the year before the last high interest patent was filed. He provided calculations for four look back periods produced by two different start points and end points. His two start points were 1991, reflecting the year before the earliest unexpired high interest patent in the residual patent portfolio, and 2001. His two end points were 2006, representing the year before the last high interest patent in the residual patent portfolio, and 2008, representing the last year of ordinary course operations[27]. 2001 was the start of the MRDA.

[77]    By looking at the expenditures on R&D for this period from 1991 to 2006, Mr. Malackowski allocated 39.5% or $1.777 billion to Canada, 42.9% or $1.930 billion to U.S. and 17.6% or $793 million to EMEA. For the period 1991 to 2008, he allocated 40.6% or $1.827 billion to Canada, 43% or $1.935 billion to U.S. and 16.4% or $738 million to EMEA.

[78]    The effect of using the longer look-back period substantially reduces the amount allocated to Canada, the reason being that the R&D expenditures from 2005 to 2009 during the five year RPSM were proportionally done more by Canada than EMEA and the U.S. The percentages from 2005 to 2009 were 49.5 for Canada, 38.8 for the U.S. and 11.7 for EMEA.

[79]    Mr. Malackowski's report contains discussion why he looked at a long period back to 1991 to measure R&D spending. He said that old patents maybe more valuable than recently filed ones. He said that technologies are adopted by the market slowly over time and do not realize their full value until later in the life of the patent. He did recognize that newer patents will have longer life before they expire and they may have favour due to technological obsolescence, but pointed out that there is risk in newer technologies that they may not be accepted by the market. Based on these considerations he concluded that he should take into account R&D spending from the year before the first high interest patent.

[80]    Mr. Malackowski did not consider what Nortel's thinking was about the life to its technology. In the first version of the MRDA the R&D spending used to split residual profits

---

[27] Mr. Malackowski said he did not think it appropriate to look at 2009 R&D expenditures post-filing as he understood that little basic research was being performed during this time given that R&D spending was cut dramatically and none of the patents designated as high interest by Global IP were filed during this time period. The R&D expenditures in 2008 were $1.458 billion and in 2009 were $1.076 billion. Mr. Malackowski also said an appropriate look-back period for the business sales would be 2001 to 2008.

was calculated using an amortized 30% rate, with expenditures from any one year declining by 30% in the following years. In Nortel's response to questions from the tax authorities in 2003 in connection with its request for an APA for that MRDA , Nortel stated:

> It is difficult to ascertain the exact useful life of R&D developed at Nortel; however, Nortel's analyses indicated that a 30% amortization was conservative yet reasonable. Numerous sources suggest that the useful life of telecommunications R&D is short; however, there is no one definitive external source that explicitly determines that a 30% amortization rate is correct.

[81]    The tax authorities did query this response in a question that referred to information from Nortel that it said seemed to suggest that the useful life of R&D is equivalent to product useful life. "However, isn't it the case that benefits from R&D may persist beyond product useful life? For instance, value may result from further developing the intangible."

[82]    In preparation for APA negotiations with the tax authorities, Gilles Fortier, NNL's taxation manager for transfer pricing, circulated a document among Nortel tax executives dated May 10, 2002 summarizing the "key drivers" for Nortel, on the one hand, and the tax authorities, on the other, with regard to the APA.  The position of the tax authorities was stated to be that the life of Nortel's intellectual property was 7-10 years or more whereas Nortel was suggesting 4-7 years. This position of Nortel was consistent with using a 30% amortization rate for R&D spending in allocating profits under the CSA. Nortel wanted a shorter period because using a longer period would increase the profits in NNI for tax purposes that Nortel did not want. Canada had a lower tax rate due to its generous research and development policies.

[83]    A later application by NNL and NNI for an APA with the tax authorities for the years 2007 to 2011, in which a straight five year R&D expenditure would be used to allocate profits, indicated that NNL and NNI thought that the useful life of the Nortel intangibles was estimated to be approximately five years with a gestation lag of one year. Included in the APA request was the following:

> The economic life of technology is difficult to measure because as long as the technology is being sold, it is also being continuously updated and enhanced. Indeed, software and hardware development in the telecommunications industry is widely understood to be an iterative process, because of the tendency to superimpose improvements upon older versions of the technology. Therefore, any discussion of product useful life must consider when an individual product was

originated, how to apportion the impact of successive improvements, and when the product was completely superseded.

Nortel's telecommunications technology consists of hardware and software, and it continues to grow and change as demand for bandwidth and functionality grows. As a result, there has been an evolution in the commercial and economic life span of technologies from longer to shorter cycles.

Nortel's Chief Technology Office estimated that a dollar spent on R&D typically has a shelf life of about five years, and additionally, the time from when the investment in the R&D is made to the time when revenue can be generated from the investment ranges from about 6 to 12 months.

Recognizing the difficulties inherent in estimating the useful life, based on information obtained in our discussion with Nortel management, and our review of the R&D policy documents, the useful life of the Nortel intangibles is estimated to be approximately five years with a gestation lag of one year.

[84]    The evidence from Mr. Malackowski's report is that 99% of the  high-interest patents sold to Rockstar had an invention date prior to 2006 and the bulk were from 1995 to 2004. This is considerable evidence that what Nortel was telling the tax authorities did not turn out to be the case. This is not to suggest that Nortel did not believe what it was representing to the tax authorities, or perhaps more appropriately put, that Nortel's transfer pricing tax people did not think that a legitimate tax case could be asserted supporting its 30% declining amortization calculation in the first MRDA and then its five year look-back period in the second version of the MRDA. It is clear, however, that Nortel expected negotiations with the tax authorities would take place that could alter the 30% amortization rate and the later five year flat rate, and the MRDA expressly contemplated that in Schedule A. It cannot be said that Nortel as an enterprise conclusively concluded that its profit allocation keys of 30% or five years were necessarily correct. It was a tax position prepared by Nortel and its advisors.

[85]    If a contribution theory is to be used to measure the value of what the parties gave up, I think it inevitable that a longer look-back period would be appropriate. The market has indicated that. However, I would lengthen the time to be taken into account. One of the weaknesses of using a contribution approach is that not every dollar spent results in valuable technology. The theory then must be that what one loses in the corners is gained in the straights. That being the

case, I see no reason to disregard the R&D expenditures in 2007 to 2009. They were real and cannot be said to have contributed to the residual IP sold to Rockstar[28]. The fact that Rockstar has started out by enforcing earlier patents does not mean that later patents or patent applications will not be of value or that Rockstar did not pay anything for them.

[86]    I would take the R&D expenditures from 1991 to 2009. The data is available from exhibit B.1.7.1 of Mr. Malackowski's report. The resulting percentage of expenditures is 40.93% for Canada, 42.87% for the U.S. and 16.2% for EMEA.

[87]    The U.S. Debtors contend that because under the CSA agreement NNI was required to allocate transfer payments to other RPEs, those payments should be included in what is considered to have been contributed to R&D. They rely on upon the opinion of Laureen Ryan, a forensic accountant who went through the transfer pricing worksheets and calculated $4.4 billion allocated to other RPEs under the CSA agreement. On her figures, the percentages for R&D expenditures for 1989 to 2000 would be 21% for Canada, 6% for EMEA and 73% for the U.S.

[88]    There is a problem with Ms. Ryan's evidence. The first is that she did no cash analysis to determine if NNI actually paid out any cash to any other RPE as part of its transfer pricing requirements under the CSA and later MRDA. There is no evidence in the record that anything allocated to any party was actually transferred by way of cash and Ms. Ryan conceded that she could not say if anything was actually paid. She did speak to her general understanding that money was transferred by NNI to NNL but I take that to be hearsay evidence and not any cogent evidence that any funds were transferred in fact. Just as important, there was no evidence as to how cash transferred from NNI or any other RPE was actually used. Cash was moved throughout the Nortel Group as required, but what those requirements were at any time is not a matter of record or available evidence. Ms. Ryan also conceded that she was not able to say where any of the money came from to actually do the R&D spending, whether from customers, governments, shareholders or other Nortel entities.

[89]    While Ms. Ryan in her report and evidence calculated what she said were allocations for

---

[28] The Canadian expenditure in 2009 was not just to preserve the business lines as asserted by EMEA. Canada spent $564 million in 2009 on R&D, far more than the $180 million spent on the CDMA and LTE businesses.

R&D made by NNI to the other RPEs under the MRDA, the U.S. Debtors made no argument in their closing briefs that these payments should be attributed to NNI. One problem with the evidence on this point is that Ms. Ryan assumed that the RPEs used transfer pricing adjustments for only for only two types of expenses:  direct R&D spending figures, and sales, general, and administrative costs. Ms. Ryan pro-rated the intercompany funding between those two expenses. That assumption was obviously incorrect because, as Ms. Ryan conceded, it ignores very significant additional costs incurred by the RPEs, including restructuring costs, costs of revenues, manufacturing, and distribution. The very need for an assumption to be made was because Nortel never kept records of what transferred cash from one Nortel company to another was used for. Ms. Ryan also erred in failing to deduct the $2 billion settlement with the IRS and CRA regarding the $2 billion that was deemed to be a dividend paid by NNI to NNL. She also failed to take into account the sale of Nortel's UMTS business to Alcatel.

[90]    As stated above, Mr. Malackowski thought that ideally to determine contribution to R&D by any particular RPE, he would need to have access to lab notebooks and other records and to Nortel R&D personnel. As he did not have that he had to select a proxy data that reasonably reflected the research efforts of the various RPE's labs. He chose to measure contributions to the development of the IP by measuring each RPE's spending on R&D. He testified that this would be reflective of the types of activities that we know lead directly to the inventive process.  It is the engineering time and the related expenses that result in the innovation. He testified that a transfer pricing adjustment is an allocation that is done for other purposes, specifically tax efficiency, not for recording the matching between the inventive nature of contribution and results, and he viewed it as inappropriate.

[91]    Ms. Ryan is a specialist in accounting and forensic investigations. I prefer the evidence of Mr. Malackowski on this point that for his contribution analysis, it is not appropriate to add to any RPE's contribution amounts that were allocated from that RPE under the transfer pricing regimes in the CSA or MRDA.

[92]    Mr. Malackowski did an "inventorship" analysis in his reply report of the countries in which the inventors of the residual patent portfolio resided. He stated that while he did not consider inventorship to be the appropriate basis for allocation, it was a useful metric for testing the allocations of the various parties.

[93]    The results of Mr. Malackowski's analysis indicated that for the high interest patents, 46.3% were from Canada, 33% from the U.S., 18.7% from EMEA and 2.6% from ROW. For the entire portfolio, 51.9% were from Canada, 27.4% were from the U.S., 17.7% were from EMEA and 2.9% were from ROW. Using the percentages for the entire residual patent portfolio, which is what was sold, and allocating ROW equally to the others, would give Canada 52.9% of $4.45 billion or $2.35 billion, U.S. 28.4% or $1.26 billion and EMEA 18.7% or $832 million.

[94]    Mr. Britven, an expert called by the Monitor, while of the opinion that a contribution allocation theory was not correct, also did an inventor based analysis. That analysis allocated 51.3% to Canada, 28.9% to the U.S., 18.2% to EMEA and 1.6% to others. That is very close to the figures from Mr. Malackowski's inventorship analysis

[95]    I conclude that if the contribution allocation theory asserted by the EMEA debtors is accepted, the percentage allocation of the residual IP sold to Rockstar of $4.45 billion is 40.93% or $1.82 billion for Canada, 42.87% or $1.92 billion for the U.S. and 16.2% or $720 million for EMEA to be rounded down pro rate to get a total of $4.45 billion.

### (iii)  Mr. Green's approach

[96]    Mr. Green allocated virtually all of the proceeds of the Rockstar sale to Canada.[29] There were two categories of patents involved in the sale:

1.    patents that had been used in several business lines and in respect of which non-exclusive licenses had been granted to the business line purchasers; and

2.    the remaining patents, which had not been used in any Nortel business.

[97]    For the group of patents identified in (1) i.e. patents that had been used in several business lines and in respect of which non-exclusive licenses had been granted to the business line purchasers, the value of the U.S. and EMEA Debtors' licenses with respect to those patents

---

[29] He allocated $426,097 to the U.S. representing the value of the workforce transferred to Rockstar, being very few people.

(which is the value that they would have earned had they continued to operate the businesses) was determined by Mr. Green and allocated to them as part of his allocation of the business line sale proceeds.

[98]    With respect to those patents described in (2) that were not used in any of Nortel's operating businesses, Mr. Green considered whether there was any evidence that the U.S. and EMEA Debtors had any prospect of generating earnings through the exercise of their license rights in connection with those patents.  He concluded that they did not because the U.S. and EMEA Debtors' license rights were limited to the right to make Products – i.e. products made or designed (or proposed to be made or designed) by or for a Participant, embodying or using the Nortel IP. This was consistent with the position taken by the Monitor in this case. Thus he allocated none of the proceeds of the Rockstar sale to the U.S. and EMEA Debtors and all of the proceeds to Canada.

[99]    Mr. Green's valuation is a straight result of the interpretation put on the MRDA by the Monitor. One cannot quarrel with the logic of it if that interpretation were to govern the allocation.

**CITATION:** Nortel Networks Corporation (Re), 2015 ONSC 2987
COURT FILE NO.: 09-CL-7950
**DATE:** 20150512

**ONTARIO
SUPERIOR COURT OF JUSTICE
COMMERCIAL LIST**

IN THE MATTER OF THE COMPANIES'
CREDITORS ARRANGEMENT ACT, R.S.C. 1985,
c. c-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION,
NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION,
NORTEL NETWORKS INTERNATIONAL
CORPORATION and NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER THE COMPANIES'
CREDITORS ARRANGEMENT ACT, R.S.C. 1985,
c. C-36, AS AMENDED

---

**REASONS FOR JUDGMENT**

---

Newbould J.

**Released:  May 12, 2015**

# TAB 2

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NORTEL NETWORKS, INC., et al. | ) | Case No. 09-10138(KG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| _____ | ) | **Re Dkt No.  13208** |

## ALLOCATION TRIAL OPINION[1]

### TABLE OF CONTENTS

**INTRODUCTION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**PROCEDURAL SUMMARY**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**FACTS**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      A.     The Business Lines. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      B.     Research & Development. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      C.     Transfer Pricing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      D.     Advanced Pricing Arrangements. . . . . . . . . . . . . . . . . . . . . . . . 13

      E.     Cost Sharing Agreements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      F.     New Transfer Pricing Arrangement. . . . . . . . . . . . . . . . . . . . . 14

      G.     The Master R&D Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . 18

      H.     Rights to Intellectual Property Under the MRDA. . . . . . . . . . 19

      I.     The MRDA Was Tax Driven. . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      J.     The Interim Funding and Settlement Agreement. . . . . . . . . . . 20

---

[1]  The Court uses many defined terms in the opinion and has prepared a glossary of important terms which is attached as Appendix A.

K.   The Final Canadian Funding and Settlement Agreement. . . . . . . . . . . . . 22

L.   The Sale of Nortel's Business Lines. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

M.   Patent Identification. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

N.   Nortel's Patents Had a Useful Life of Many Years.. . . . . . . . . . . . . . . . . 26

O.   A Licensing Business - IPCo. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

P.   All Integrated Entities Expected to Benefit From IP Monetization. . . . . . 33

Q.   Residual Patent Portfolio. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

R.   The Sale of Nortel's Residual Patent Portfolio. . . . . . . . . . . . . . . . . . . . . 35

S.   The Rockstar Sale Approval Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

**THE PARTIES AND THEIR ALLOCATION POSITIONS**. . . . . . . . . . . . . . . . . . . . . . 38

A.   The U.S. Interests.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

B.   The Committee. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

C.   The Bondholders. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

D.   The EMEA Debtors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

E.   The Monitor and the Canadian Debtors. . . . . . . . . . . . . . . . . . . . . . . . . . 46

F.   The Canadian Creditors' Committee. . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

G.   Wilmington Trust Company as Trustee. . . . . . . . . . . . . . . . . . . . . . . . . . 54

H.   The UK Pension Claimants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

**LEGAL ANALYSIS**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

THE MRDA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

A.   Governing Law and Applicable Principles of
     Contract Interpretation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

ii

B.   The Valuable "Bundle of Rights" that a Patent Affords. . . . . . . . . . . . . . . 70

    1.   NNL's Claim to Legal Title to the IP. . . . . . . . . . . . . . . . . . . . . . . 71

    2.   The Factual Matrix Surrounding Transfer Pricing,
         Historical Business Practices and Custom of the Industry. . . . . . . . 75

    3.   Each Participant Exclusively Held Valuable Rights to NN
         Technology, Including Patents, in Its Respective Territory. . . . . . . 80

    4.   Under the MRDA, Each Licensed Participant Held the
         Right to Sublicense in Its Exclusive Territory. . . . . . . . . . . . . . . . . 81

    5.   Article 4(e) Grants the Right to the Right to Assert
         Actions and Recover Damages. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

    6.   The MRDA's Further Confirmation that Licensed
         Participants Held All Valuable Rights to NN Technology. . . . . . . . 83

    7.   NNL Had Nothing of Value to Sell in the Licensed
         Participants Exclusive Territories. . . . . . . . . . . . . . . . . . . . . . . . . . . 85

THE FLAWED POSITIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

    A.   Canadian - Ownership. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

    B.   The EMEA Debtors - Contribution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

    C.   U.S. Revenue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

PRO RATA ALLOCATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

    A.   Global General and Administrative Support Functions. . . . . . . . . . . . . . 93

    B.   R&D Functions Were Collaborative Across Borders. . . . . . . . . . . . . . . . 95

    C.   Authority for Pro Rata Allocation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

    D.   Pro Rata Allocation is Not Substantive Consolidation. . . . . . . . . . . . . . 101

    E.   Pro Rata Criticism is Misplaced. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

    F.   Implementation of the Pro Rata Allocation. . . . . . . . . . . . . . . . . . . . . . . 111

**CONCLUSION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

APPENDIX A:  Glossary of Terms

APPENDIX B:  Business Line Sales

APPENDIX C:  Nortel Bonds Spreads to U.S. Government Yield Curve (Basis Point Chart)

# INTRODUCTION[2]

The gargantuan bankruptcy cases giving rise to the opinions of two courts on either side of the Canadian border emanate from the tragic, almost unimaginable collapse of the Nortel Enterprise. The how and why for the downfall are the subject of numerous books and articles and the Court will not gratuitously add its views which are not necessary to the work at hand. It is sufficient to note that even a writer of fiction would not dare to compose the story of the death of this multi-national enterprise and the harm it inflicted on tens of thousands of employees and creditors. The Nortel Enterprise in 2000 had stock with a value of $124.50 per share and a market capitalization of approximately $260 billion. It employed nearly 100,000 people worldwide and had annual sales of $30 billion. Two years later, the Nortel Enterprise had laid off 60,000 employees and its market capitalization had fallen to $2 billion. Nortel had shifted its focus from research and development to acquisition and expansion and thereby found itself overextended. Scandal among management added to Nortel's problems and it was repeatedly restating its earnings. Soon, Nortel was in bankruptcy.

In issuing this opinion, the Court (sometimes referred to as "U.S. Court") is addressing the allocation of Sales Proceeds among numerous debtor entities from numerous countries.[3] The decision follows 21 days of trial held jointly with the Ontario

---

[2] The Court expresses its profound appreciation and respect for Justice Geoffrey Morawetz and Justice Frank J.C. Newbould who were able and congenial colleagues in this endeavor. Justice is alive and well in Canada.

[3] The Court's authority to decide the allocation issues is discussed in *In re Nortel Networks, Inc.*, 737 F.3d 265 (3d Cir. 2013). There, the Third Circuit Court of Appeals affirmed the Court's ruling that arbitration was not compulsory.

Superior Court of Justice, Commercial List (Honourable Frank J.C. Newbould, presiding) (the "Canadian Court"). At the trial, held simultaneously in two cross-border courtrooms linked by remarkable and effective technology, the Court and the Canadian Court heard the testimony of many witnesses and admitted into evidence over 2,000 exhibits and designations from numerous depositions. Thereafter, the parties submitted post-trial briefs and proposed findings of fact and conclusions of law exceeding 1,000 pages. The parties also presented two days of closing arguments to the U.S. Court and the Canadian Court. It is from this massive and complex record that the Court and the Canadian Court must formulate their decisions.

The issue to be decided by the U.S. Court and Canadian Court is:

What is the appropriate allocation of the sums paid to Nortel in the bankruptcy sales (the "Sales Proceeds") among the Nortel Entities?

The parties identified below have submitted widely varying approaches for deciding the issue leaving virtually no middle ground. Their strong criticism of each other's allocation methodology also reveals why the parties were unable to resolve the dispute without the expenditure of time and expense. The Court can only speculate why the parties, all represented by the ablest of lawyers and sparing no expense, were unable to reach a settlement on allocation. For the reasons described and discussed in this opinion, the Court and the Canadian Court have arrived at the same conclusion: a modified pro rata allocation is required.

## PROCEDURAL SUMMARY

On January 14, 2009 (the "Petition Date") Nortel Networks Inc. ("NNI") and certain

of its affiliates, as debtors and debtors in possession (collectively, the "U.S. Debtors")[4] other

than Nortel Networks (CALA) Inc.,[5] filed voluntary petitions for relief under chapter 11 of

the Bankruptcy Code in the U.S. Court, which cases are consolidated for procedural

purposes only.

As of the Petition Date, Nortel Networks Corporation ("NNC"), a publicly-traded

Canadian company, was the indirect parent of more than 130 subsidiaries, located in more

than 100 countries (collectively "Nortel or the Nortel Entities").[6]  NNC was the successor of

a long line of technology companies, always headquartered in Canada, dating back to the

founding of Bell Telephone Company of Canada in 1883.[7]  NNC's principal, direct

operating subsidiary, also a Canadian company, was Nortel Networks Limited ("NNL"),

which in turn was the direct or indirect parent of operating companies located around the

---

[4] The U.S. Debtors in these chapter 11 cases, are:  Nortel Networks Inc., Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc.

[5] Nortel Networks (CALA) Inc. filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes [D.I. 1098].

[6] TR43999 (Nortel Networks Corporation Form 10-K for fiscal year ended December 31, 2008) p. 1, Exhibit 21.  A corporate chart showing the relevant corporate entities and the Debtor Estate to which each belongs is attached as Appendix "A".

[7] TR00002 (Exh. 2, Affidavit of Clive Allen, April 11, 2014) para. 12

3

world.[8]   Together with NNL, the principal companies that performed research and development ("R&D") were NNI, a U.S. company, Nortel Networks (UK) Ltd. ("NNUK"), a United Kingdom company, Nortel Networks S.A. ("NNSA"), a French company and Nortel Networks Ireland ("NN Ireland"), an Irish company.   These were known as Residual Profit Entities ("RPEs") due to their participation in a residual profit pool in connection with Nortel's transfer pricing arrangements.[9]   Other operating companies performed sales and distribution functions and were known as Limited Risk Entities ("LREs").[10]  LREs were incorporated in most of the countries where Nortel products were sold, including in the Europe, Middle East and Africa ("EMEA") regions.[11]

On the Petition Date, the U.S. Debtors' ultimate corporate parent, NNC, together with NNI's direct corporate parent, NNL, and certain of their Canadian affiliates (collectively, the "Canadian Debtors" or the "Canadian Estate")[12] commenced a proceeding with the Canadian Court under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings"). The Canadian Court appointed a Monitor, Ernst & Young Inc. (the "Monitor")  Also on the

---

[8] TR43999 (Nortel Networks Corporation Form 10-K for fiscal year ended December 31, 2008) p. 1; TR00001 (Exh. 1, Affidavit of Peter Currie, April 11, 2014) paras. 32, 36

[9] TR11055B (Economic Analysis of Nortel Networks' Intercompany Transactions by Horst Frisch, March 14, 2002) p. 1-3; TR21003 (MRDA and addenda)

[10] TR11055B (Economic Analysis of Nortel Networks' Intercompany Transactions by Horst Frisch, March 14, 2002) p. 1-3.

[11] TR40150 (2001 Distribution Agreement between NNL and NN Austria, effective January 1, 2001); TR40151 (2001 Distribution Agreement between NNL and NN Portugal, effective January 1, 2001); TR40155 (2001 Distribution Agreement between NNL and NN Spain, effective January 1, 2001); TR40122 (2001 Distribution Agreement between NNL and NN Asia, effective January 1, 2001)

[12] The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

4

Petition Date, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors" or the "EMEA Estates")[13] into administration (the "UK Proceedings") under the control of individuals from Ernst & Young LLP (collectively, the "Joint Administrators"). Other Nortel affiliates commenced insolvency and dissolution proceedings around the world.

On the Petition Date, the U.S. Debtors filed the Motion for Entry of an Order Pursuant to 11 U.S.C. § 105(a) Approving Cross-Border Court-to-Court Protocol (the "Protocol") [D.I. 18], which established procedures for the coordination of cross-border hearings between the Courts. The U.S. Court approved the Protocol on January 15, 2009 [D.I. 54] and the Canadian Court approved the Protocol on the Petition Date. The Courts later amended the Protocol by order of this Court on June 29, 2009 [D.I. 990] and by an order of the Canadian Court on that same date (as amended, the "Cross Border Protocol"). Subsequently, the Courts approved an Allocation Protocol which governed the trial on allocation. Order Entering Allocation Protocol, dated May 17, 2013. (the "Allocation Protocol") [D.I. 10565].

On January 22, 2009, the Office of the United States Trustee for the District of Delaware appointed an Official Committee of Unsecured Creditors (the "Committee") [D.I.s 141, 142]. An Ad hoc Group of Bondholders (the "Bondholders" or the "Bondholder

---

[13] The EMEA Debtors include the following entities: Nortel Networks UK Limited ("NNUK"), Nortel Networks S.A. ("NNSA"), Nortel Networks (Ireland) Limited ("NNIR"), Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

Group") was also organized.

On June 19, 2009, Nortel announced that it was in discussions with third parties to sell its businesses and that it would consider alternatives if it was unable to maximize value through sales. As discussed below, Nortel did, in fact, sell all of its business units and associated assets to various purchasers. Most of Nortel's intellectual property ("IP") remained unsold until later.

To facilitate the sales of the businesses and defer the issue of the allocation of the sales proceeds, the Nortel Entities entered into the Interim Funding and Settlement Agreement (the "IFSA"), which the U.S. Court approved by Order, dated June 29, 2009 [D.I. 993], and the Canadian Court approved by Order, dated June 29, 2009.

On April 4, 2011, the U.S. Debtors, together with NNL and NNC, announced an agreement with an affiliate of Google Inc. to sell Nortel's remaining patent portfolio and related assets (the "IP Assets") for $900 million (the "Google Bid"), subject to higher or better offers. The sale of the IP Assets through an auction to Rockstar Bidco L.P. ("Rockstar" and "Rockstar Transaction") resulted in a price of $4.6 billion. Rockstar is a consortium comprised of Apple, Ericsson, Microsoft, Blackberry, EMC and Sony.[14]

The IFSA provided, *inter alia*, that proceeds from the sales would be and have been held in escrow pending an agreement of the parties on allocation among them or decision by the U.S. and Canadian Courts in a joint trial to be conducted in accordance with the Cross-Border Protocol, and later the Allocation Protocol. Although the parties engaged in extensive negotiations and there were two formal mediations, the parties could not agree

---

[14] TR44220 (Rockstar Transaction ASA, June 23, 2011).

on an allocation. The U.S. and Canadian Courts have therefore been called upon to make the allocation determination.

## FACTS

### A. The Business Lines

Nortel was organized such that each entity was integrated into regional and product line management structures to share information and perform R&D, sales and other common functions across geographic boundaries and across legal entities. The structure was designed to enable Nortel to function more efficiently, drawing on employees from different functional disciplines worldwide, allowing them to work together to develop products and attract and provide service to customers, fulfilling their demands globally.[15] The matrix structure was reflected in Nortel's R&D, sales organization, distribution channels and transfer pricing arrangements.[16]

As of January 2009, Nortel's lines of business ("Business Lines") were:

(a)    Carrier Networks – wireless networking solutions for providers of mobile voice, data and multimedia communications services over technologies including:

    (i)    Global System for Mobile Communications ("GSM");

    (ii)    Code Division Multiple Access ("CDMA");

    (iii)    Carrier Voice Over Internet Protocol Applications Solutions ("CVAS"); and

    (iv)    the development of long-term evolution ("LTE") wireless technology;

---

[15] TR00001 (Exh. 1, Affidavit of Peter Currie, April 11, 2014) paras. 22-28; TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) paras. 31-38

[16] TR00001 (Exh. 1, Affidavit of Peter Currie, April 11, 2014) paras. 22-28; TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) paras. 45-52

(b)  Enterprise Solutions – enterprise communications solutions addressing the headquarters, branch and home office needs of large and small businesses; and

(c)  Metro Ethernet Networks – optical networking and carrier grade ethernet data networking solutions, including:

   (i)  Carrier Ethernet switching products;

   (ii)  optical networking products; and

   (iii)  multi-service switching products.[17]

As part of the extensive sale processes (see Appendix B), Nortel sold its businesses and assets, including:  (i) the sale of certain portions of its Layer 4-7 data portfolio to Radware Ltd. [D.I. 539] (the "Layer 4-7 Sale"); (ii) the sale of substantially all of its CDMA business and LTE Access assets to Telefonaktiebolaget LM Ericsson (publ) ("Ericsson") [D.I. 1205]; (iii) the sale of substantially all of the assets of the Enterprise Solutions business globally, including the shares of Nortel Government Solutions Incorporated and DiamondWare Ltd. to Avaya Inc. [D.I. 1514]; (iv) the sale of the assets of its Wireless Networks business associated with the development of Next Generation Packet Core network components to Hitachi Ltd. [D.I. 1760]; (v) the sale of substantially all the assets of its Optical Networking and Carrier Ethernet businesses associated with its Metro Ethernet Networks business unit to Ciena Corporation [D.I. 2070]; (vi) the sale of substantially all of its GSM/GSM- R business to Ericsson and Kapsch CarrierCom AG [D.I. 2065]; (vii) the sale of certain assets of its Carrier Voice Over IP and Application Solutions business to

---

[17] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 9-13 (*but note*, at para. 9, that "[a] fourth business segment, Global Services (essentially Nortel's support and services arm), was a separate reportable segment until December 31, 2008, before being integrated into the other LOBs.")

GENBAND US LLC [D.I. 2632]; (viii) the sale of certain assets of the Debtors' Multi-Service Switch business to Ericsson [D.I. 4054]; and (ix) certain other sale transactions.

At the time the EMEA, U.S. and Canadian Debtors (collectively, the "Debtors") filed for creditor protection in January 2009, only the GSM and CDMA lines of business were profitable.[18]  Overall, Nortel was losing vast sums of money, its customers were, in large part, no longer supporting it, and NNC had by the fall of 2008, written off all of its goodwill.[19]

## B.  Research & Development

Nortel spent significant amounts on R&D; in 2004, for example, Nortel spent more on R&D as a percentage of revenue than its competitors.[20]  R&D played a critical role in the sales process of the Business Lines.[21]  Before the 1980s, all of Nortel's R&D was performed in Ottawa – R&D which led to revolutionary telecommunications products that established Nortel's reputation.[22]  Subsequently, Nortel opened R&D facilities in other jurisdictions. Nortel also acquired numerous technology companies during the 1990s and early 2000s and merged their R&D organizations into those of the Nortel subsidiaries operating in their

---

[18] TR00042 (Exh. 42, Expert Report of Philip Green, Reissued February 28, 2014) Appendices A-E Carve-out statements

[19] TR00014 (Exh. 14, Affidavit of Paviter Binning, April 10, 2014) paras. 21, 47; TR46789 (Verizon Press Release regarding Global LTE Ecosystem, February 17, 2009); TR43999 (Nortel Networks Corporation Form 10-K for fiscal year ended December 31, 2008)

[20] TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) para. 28, citing TR44900 (Email regarding Competitor Comparisons, February 19, 2004)

[21] Gregory Mumford Deposition, October 24, 2013, p. 202:19-204:15, regarding TR21226 (Email discussing Harlow Input, October 28, 2003)

[22] TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) para. 16

jurisdictions.[23]

Subsidiaries commenced their operations and produced "state of the art" products which allowed them to become important participants in their markets.[24]  R&D was coordinated through two different management structures.  Decisions about the majority of R&D funding were made by the Business Lines to create, develop and improve technology for products within their particular technology areas.[25]  Advanced technology research, which was intended to develop novel, cutting edge technologies with a longer time horizon to product creation (if successful) was coordinated by Nortel's Chief Technology Officer and allocated funding through a central budget.[26]  The advanced technology research produced the greatest impact in terms of innovation and patent filings.[27]

The following chart summarizes Nortel R&D spending for the years 2000 to 2009.[28]

| R&D Spend | NNL | NNI | EMEA |
|-----------|-----|-----|------|
| 2000 | 42% | 42% | 16% |
| 2001 | 43% | 39% | 18% |
| 2002 | 39% | 41% | 20% |
| 2003 | 42% | 38% | 20% |
| 2005-2009 | 49.8% | 38.5% | 11.7% |

[23] TR40259 (Nortel Networks Corporation Form 10-K for fiscal year ended December 31, 2000) p. F14-F16

[24] TR00002 (Exh. 2, Affidavit of Clive Allen, April 11, 2014) paras. 38-39

[25] TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) paras. 19-21; TR00023 (Exh. 23, Affidavit of Simon Brueckheimer, April 9, 2014) para. 10

[26] TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) paras. 12, 17, 20, 22-23; Simon Brueckheimer Deposition, October 1, 2013, p. 165:6-166:19; Peter Newcombe Trial Testimony, Day 7, May 22, 2014, p. 1608:10-22

[27] TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) para. 22

[28] TR11084 (2004 Functional Analysis, November 30, 2004) p. 23

Nortel's billions in R&D expenditures over the decades preceding January 2009 generated the IP, but it is impossible to trace which R&D expenses produced which IP.[29] As of January 2009, NNL held approximately 8,800 worldwide patents and applications.[30] The majority of all rights, title and interest in inventions by Nortel employees worldwide were assigned directly or indirectly to NNL.[31]  As a result, nearly all of the patents and applications were assigned to Canadian entities; approximately 7000 patents and applications in the portfolio sold in the transaction discussed below had been assigned to NNL.[32]

## C.  Transfer Pricing

Transfer pricing is the process by which a multi-national enterprise ("MNE") sets prices for transactions between related corporate entities across taxing jurisdictions.[33]  The intercompany transactions take place between entities that are commonly controlled. Therefore, transfer prices are assigned by management rather than being the result of arm's length negotiation between parties.[34]  Transfer prices are assigned rather than bargained for and because effective tax rates across jurisdictions may vary, MNEs are incentivized to

---

[29] Michael Orlando Trial Testimony, Day 6, May 21, 2014, p. 1315:21-1316:1; TR11084 (2004 Functional Analysis, November 30, 2004) p. 28-29; TR22078 (Joint Request for US-Canada BAPA 2007-2011 (with rollback to 2006), October 31, 2008) p. 50, Appendix B

[30] TR00006 (Exh. 6, Affidavit of Angela de Wilton, April 11, 2014) para. 12, citing TR47338 (Patent Excel File, January 7, 2009); *see also* TR11151 (Nortel's IP Team and Patent Portfolio PowerPoint, August 2010) Slide 11 (p. 11)

[31] TR00006 (Exh. 6, Affidavit of Angela de Wilton, April 11, 2014) paras. 8-12; Timothy Collins Deposition, November 15, 2013, p. 40:10-41:20

[32] TR00006 (Exh. 6, Affidavit of Angela de Wilton, April 11, 2014) paras. 8-12; TR40197 (List of Transferred Patents in Rockstar Transaction); TR47338 (Patent Excel File, January 7, 2009)

[33] TR00062 (Eden Report) ¶ 20; TR00035 (Cooper Report) ¶ 3.1

minimize their global effective tax rate when setting transfer prices.[35]

In light of these incentives, taxing authorities have implemented regulations that govern transfer pricing generally require that intercompany transactions be priced in a manner consistent with the way that similarly situated, uncontrolled parties would price comparable transactions at arm's length.[36]

Nortel had transfer pricing arrangements that governed how it reported income in each of the jurisdictions in which it did business.[37]  Within Nortel companies were treated as separate legal entities.  These individual entities ("IEs") had their own books and records, financial statements, bank accounts and cash reserves.  Each company was organized in accordance with and operated under local laws.[38]  Subsidiaries within Nortel filed separate financial statements with the appropriate local regulatory agency and Nortel kept detailed revenue figures for different countries and regions.[39]  Nortel entities had separate boards of directors.[40]

---

[34] TR00049 (Reichert Report) at 13

[35] TR00062 (Eden Report); TR00049 (Reichert Report) at 14; Trial Tr. 2632:4-3632:14 (Cooper); TR00016 (Henderson Decl.) ¶ 8.

[36] TR00062 (Eden Report) ¶ 24; TR00049 (Reichert Report) at 16; TR00035 (Cooper Report) ¶ 3.1

[37] TR00049 (Exh. 49, Expert Report of Dr. Timothy Reichert, January 24, 2014) p. 16; TR21389 (Email attaching Memo regarding Nortel's Transfer Pricing Policy, March 18, 2003) p. 1

[38] TR00014 (Binning Aff.) ¶ 9; TR00007A-B (McCorkle Aff.) ¶¶ 16, 17; Doolittle Dep. 258:15-259:3; Trial Tr. 815:11-816:8 (McCorkle); TR21322 (Corporate Procedure 303.37 discussing Regional/Global Cash Pooling); Freemantle Dep. 204:6-204:15;  Rolston Dep. 34:6-35:2.

[39] TR00001 (Currie Aff.) ¶ 39; Binning Dep. 148:13-23; Freemantle Dep. 416:7-17; *see also* TR40269 (NNC 2008 Form 10-K) at 54-59, 197-206, 281.

[40] Trial Tr. 543:21-546:12 (Currie); *id*. 1069:14-1070:20 (Binning); TR00001 (Currie Aff.) ¶ 39; TR00014 (Binning Aff.) ¶ 9; TR00020 (Ray Decl.) ¶¶ 16, 30; TR00013 (G. Davies Aff.) ¶¶ 14, 18; Rolston Dep. 159:22-160:13.

### D.  Advanced Pricing Arrangements

If a tax authority disagrees with the transfer pricing methodology reflected in an MNE's tax return for a particular year, the tax authority may initiate an audit, which could potentially lead to an adjustment in taxes owed by the MNE, penalties, tax court litigation and/or double taxation.[41]   To mitigate this risk, taxpayers may avail themselves of the advanced pricing arrangement ("APA") process offered by tax authorities.  An APA is a contract between a member of an MNE, such as NNL, and a tax authority, such as the Canadian Revenue Authority ("CRA"), the U.S. Internal Revenue Service ("IRS") and the Inland Revenue Service ("Inland Revenue") in the U.K., typically specifying the transfer pricing methodology that the affiliate will be permitted to use for an agreed period of time.  APAs can include multiple tax authorities and members of an MNE.[42]

### E.  Cost Sharing Agreements

From the late 1970s to December 31, 2000, Nortel operated under a series of Cost Sharing Agreements (each a "CSA"), which were bilateral agreements between NNL and each of the other R&D performing Nortel entities, including NNI, NNUK, NN Ireland and NNSA (referred to together with NNL as the "Cost Sharing Participants" or "CSPs").[43] During the period of the final series of CSAs, NNL and each of the other CSPs entered into

---

[41] TR00062 (Eden Report) ¶ 77; TR00049 (Reichert Report) at C-13 to C-15; TR00016 (Henderson Decl.) ¶ 9.

[42] TR00049 (Reichert Report) at C-13 to C-15; TR00016 (Henderson Decl.) ¶¶ 10, 12.

[43] TR46882 (1978 NNL-NNI R&D CSA); TR45048 (1983 NNL-NNI R&D CSA); TR45741 (1985 NNL-NNI R&D CSA); TR45740 (1985 NNL-NNUK R&D CSA); TR45739 (1985 NNL-NN Ireland R&D

13

three separate cost-sharing agreements, which governed pricing for different types of intercompany transactions:  an agreement governing R&D (an "R&D CSA"), another for tangible property and another for headquarters expenses.[44]

The last R&D CSA between NNL and NNI was drafted in 1996 and made effective from January 1, 1992 to reflect the terms of a 1996 APA between NNL, NNI, the CRA and the IRS. The 1992 NNL-NNI R&D CSA provided a mechanism for sharing the "costs and risks of research and development services or activities in return for interests in any NT Technology that [was] produced by such services or activities."

## F.  New Transfer Pricing Arrangement

At the end of 1999, each of the three CSA APAs in effect between NNL and each of the other then-CSPs (governing R&D, tangible property, and headquarters cost sharing) had expired or was nearing expiration.[45]  The CRA, IRS and Inland Revenue did not want to renew the R&D CSA APA after 1999.  They had encouraged Nortel to adopt a residual profit sharing method ("RPSM").

Beginning in late 2000, Nortel formed a team of employees (the "APA Team") to determine the appropriate transfer pricing policy to propose to taxing authorities in the upcoming APA process.  Nortel's APA Team investigated alternatives to the R&D CSA "[i]n an effort to minimize Nortel's long-term effective tax rate, to make the transfer pricing administrative processes more efficient and to, over time, improve the global allocation of

---

CSA); TR21002 (1992 NNL-NNI R&D CSA); TR33067 (1995 NNL-NNUK R&D CSA); TR46945 (2000 NNL-NNSA R&D CSA); TR11055 (Horst Frisch Report) at 1-2; TR00016 (Henderson Decl.) ¶ 14.

[44] TR11055 (Horst Frisch Report) at 1, 10-12.

14

profits among Nortel affiliates." In December 2001, Nortel's R&D CSAs were terminated effective January 1, 2001.[45] Termination of the R&D CSAs resulted in each license-holding CSP receiving "a fully paid up license" to all Nortel intellectual property in existence as of that date with respect to its Exclusive Territory.

From December 2001 through March 2002, the Nortel tax group worked with external advisors to craft the specific mechanics of a RPSM for Nortel that could be submitted simultaneously to the CRA, IRS and Inland Revenue as the basis for proposed APAs for the 2000 to 2004 period.[47] The resulting APA applications to those three tax authorities were filed on or about March 14, 2002.[48] Each APA application included a functional analysis prepared by Horst Frisch entitled "Economic Analysis of Nortel Networks' Intercompany Transactions" (the "Horst Frisch Report"), setting forth Nortel's justification for its proposed RPSM on the basis of various Nortel affiliates' roles and functions, as required to demonstrate that the proposed RPSM satisfied the arm's length standard.[49]

---

[45] TR11058 (Dec. 2, 2001 Email from W. Henderson attaching "Overview of Objectives of December 12, 2001 Presentation") attachment at 1.

[46] TR11103 (2001 Termination of Amended NNL-NNI R&D CSA); TR31016 (2001 Termination of Amended NNL-NNUK R&D CSA); TR 45043 (2001 Termination of Amended NNL-NN Ireland R&D CSA); TR32240 (2001 Termination of NNL-NNSA R&D CSA).

[47] TR00016 (Henderson Decl.) ¶ 32.

[48] TR22122 (attaching letters submitting 2002 APA applications to IRS, CRA and Inland Revenue); TR00016 (Henderson Decl.) ¶ 33.

[49] TR11055 (Horst Frisch Report); TR22122 (Letters submitting 2002 APA Application to IRS, CRA and Inland Revenue) at EY-NRTL-001402 ("[t]he specific details of the proposed RPS methodology are provided in the economic analysis prepared by Horst Frisch Inc., which is attached as *Appendix 1* to this APA Request"); *id.* at EY-NRTL-001406; *id.* at EY-NRTL-001413; TR00016 (Henderson Decl.) ¶ 33.

Nortel's RPSM distinguished between the IEs (then consisting of NNL, NNI, NNUK, NN Ireland, NNSA and Nortel Networks Australia) – who, as discussed above, performed ongoing R&D, had previously been parties to R&D CSAs and performed the full range of functions – and LREs, who were routine distributors whose primary function was to sell Nortel products in their respective geographic regions, did not perform R&D and had not previously participated in an R&D CSA.[50]   The RPSM allocated operating profits or losses to IEs and LREs under a two-step process.[51]

To determine the total "pool" of operating profits (or losses) to be allocated among the IEs and LREs, the RPSM started with Nortel's consolidated operating profits or losses and recalculated this figure on an "economic" basis for each entity through a series of adjustments including adding back R&D expenses and then subtracting an amortized portion of those expenses.  This calculation resulted in the gross "economic profit or loss."[52]

In the second step of the RPSM, "residual" operating profits or losses remaining after the payout of routine returns were allocated to the IEs only, based on each IEs' relative proportion of capitalized R&D expenses from that year and preceding years, assuming a 30% amortization rate.[53]

One of the objectives of Nortel when implementing the RPSM was to minimize tax payments globally.  Nortel personnel and advisors designed the RPSM to shift taxable

---

[50] TR11055 (Horst Frisch Report) at 30; TR00016 (Henderson Decl.) ¶ 35.

[51] TR11055 (Horst Frisch Report) at 34; TR00016 (Henderson Decl.) ¶ 35.

[52] TR11055 (Horst Frisch Report) at 37-40; TR00016 (Henderson Decl.) ¶ 37; TR21003 (MRDA) at 18-19 (Sched. A).

[53]  TR11055 (Horst Frisch Report) at 34-35, 40, 55; TR21003 (MRDA) at 18-19 (Sched. A).

income from NNI to NNL.[54]  Trial testimony of NNL's former chief financial officers

further corroborates that minimizing tax was a key goal for Nortel.[55]

Over the course of eight years (2001-2008) as APA negotiations with the tax

authorities continued regarding Nortel's RPSM, the IEs made or received billions of dollars

in transfer pricing payments under that system.  As summarized in the following table,

NNL was the chief recipient of these payments, totaling more than $4.7 billion, while NNI

was the largest payor, transferring over $6.7 billion to other Nortel entities:

**Table 2:  Transfer Pricing Payments, 2001-2008[56]**

| IE | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | Total |
|---|---|---|---|---|---|---|---|---|---|
| NNL | 589.0 | 482.3 | 391.0 | 652.4 | 496.0 | 511.1 | 725.9 | 879.8 | 4,727.5 |
| NNI | -1,931.2 | -1,140.2 | -857.8 | -722.7 | -631.8 | -371.8 | -508.9 | -537.3 | -6,701.7 |
| NNUK | 902.7 | 198.0 | 443.8 | 307.2 | 205.5 | 36.5 | 28.1 | 20.5 | 2,142.3 |
| NNSA | -92.1 | 81.1 | -27.4 | -145.7 | -12.7 | 3.7 | -95.3 | -46.9 | -335.3 |
| NN Ireland | -44.2 | -70.5 | -67.4 | -64.9 | -50.0 | -102.6 | -119.5 | -147.6 | -666.7 |
| NN Australia | 38.2 | 24.2 | -17.8 | 1.5 | 8.2 | -95.6 | -0.4 | 0.0 | -41.7 |

---

[54] TR11058 (Dec. 2, 2001 Email from W. Henderson attaching "Overview of Objectives of December 12, 2001 Presentation") attachment at 1; TR11053 (Dec. 11, 2001 PowerPoint Presentation titled "Overview of Transfer Pricing APA and Recommendations") at 15; *see also id.* at 16-18; TR11068 (Mar. 17, 2002 Email from W. Henderson titled "Mission Accomplished!") at NNI_01503492; TR22121 (July 5, 2002 Email from R. Prgomet attaching July 11, 2002 PowerPoint Presentation titled "Global Tax Practice") attachment at 13; TR11341 (Dec. 17, 2003 Call Notes); TR21525 (Nov. 23, 2005 Email from J. Doolittle to K. Stevenson and M. McCorkle); TR21169 (Dec. 18, 2005 Email from M. Weisz to M. Orlando) at 1; *see also* TR00028 (Weisz Decl.) ¶¶ 3-4; TR21170 (Dec. 5, 2007 Presentation titled "Global Tax Town Hall" ) at 7, 17; TR21164  (Oct. 22, 2007 Email from R. Culina to P. Carbone) at EMEAPRIV0089376 ; *see also id.* attachment at 1; TR45137 (May 6, 2008 Presentation titled "Tax Matters Update Audit Committee Meeting") at 3.

[55] Trial Tr. 552-53 (Currie); TR00001 (Currie Decl.) ¶ 73.

[56] See Orlando Decl. at 14, Figure 2 (citing TR49192 at "Rona" tab, 2001 Transfer Pricing Worksheet; TR49187 at "Rona" tab, 2002 Transfer Pricing Worksheet; TR49188 at "Rona" tab, 2003 Transfer Pricing Worksheet; TR49194 at "Profit split profit tab, 2004 Transfer Pricing Worksheet; TR49190 at "Profit split profit" tab, 2005 Transfer Pricing Worksheet; TR49191 at "RPS Calculation" tab, 2006 Transfer Pricing Worksheet; TR49193 at "RPS Calculation" tab, 2007 Transfer Pricing Worksheet; TR49189 at "FY RPS Calculation" tab, 2008 Transfer Pricing Worksheet.)

As shown, in each year covered by the RPSM, NNI paid out hundreds of millions of dollars – more than a billion dollars in some years – to the other IEs.  NNL received hundreds of millions of dollars in transfer pricing payments each year.  In part, these transfer pricing payments by NNI were used by NNL to fund its R&D.[57]

The amount of transfer pricing payments attributable to R&D and the Total R&D Funded for each entity each year in the Master Research and Development Agreement (discussed below) period are summarized below.

Table 3:  R&D Funding Under the RPSM, 2001-2008

|  | *NNL* | *NNI* | *EMEA* | *Total* |
|---|---|---|---|---|
| *Direct R&D* | 7,372 | 6,467 | 2,667 | 16,506 |
| *TP – R&D* | (2,986) | 3,006 | (205) | (185) |
| *Total R&D Funded* | 4,385 | 9,473 | 2,462 | 16,321 |
| *% of Total R&D Funded Directly and Indirectly* | 27% | 58% | 15% | 100% |

Neither the IRS nor the CRA approved Nortel's RPSM.  In 2009, following Nortel's insolvency and more than seven years after the 2002 APA applications, the IRS and CRA directed  an income adjustment of $2 billion from NNL to NNI as a condition for resolving the APA for those years.[58]

G.      The Master R&D Agreement

From 2001 until the end of 2004, Nortel operated under the RPSM without any written intercompany agreement memorializing its terms.[59]   In December 2004, Mark

---

[57] Trial Tr. 822:13-823:10 (McCorkle)

[58] TR11239 (2010 NNI-IRS APA) App. A; TR48800 (2010 NNL-CRA APA) at 9.

[59] Trial Tr. 1140:5-23 (Henderson); *id.* 1716:3-1717:21 (Stephens); Stephens Dep.34:15-35:6; Trial Tr. 1848:3-:11; Lebrun Dep. 213:18-214:6.

18

Weisz circulated the final Master R&D Agreement ("MRDA") to the IEs for execution.  The

agreement was signed by NNL, NNI, NNUK, NNSA and NN Ireland at various dates and

made effective January 1, 2001.  John Doolittle signed the MRDA on behalf of NNL.[60]

### H.  Rights to Intellectual Property Under the MRDA

The MRDA sets forth a clear exchange of consideration between the signatories.

Pursuant to Article 4(a), each Licensed Participant ("Licensed Participant") vested legal title

in NNL to the intellectual property it created.  Expressly "in consideration therefor," NNL

granted an exclusive license ("Exclusive License") back to each Licensed Participant: [61]

> Except as otherwise specifically agreed, legal title to any and all NN
> Technology whether now in existence or acquired or developed pursuant to
> the terms of this Agreement shall be vested in NNL.  In consideration
> therefor, NNL agrees in enter into an Exclusive License with each of the
> Licensed Participants as set forth in Article 5.

### I.  The MRDA Was Tax Driven

The risk that Nortel would be audited by tax authorities without an agreement in

place prompted Nortel to draft the MRDA.[62]  Accordingly, the MRDA was a tax-driven

contract, drafted primarily by Nortel's tax team and external tax counsel, and it was

intended to memorialize the group's transfer pricing policy in place from 2001 forward.[63]

Nortel also was aware that the transfer pricing policies it had proposed in its 2002

APA application and which were reflected in the MRDA were subject to approval by the

---

[60] TR11246 (Dec. 22, 2004 Email from Mark Weisz enclosing the Final Master R&D Agreement) at 5;
TR21003 (MRDA) at 13-17 (Signature Blocks).

[61] TR21003 (MRDA) at 6 (Art. 4(a))

[62] Trial Tr. 1848:3-20 (Weisz)

[63] Trial Tr. 1275:6-7; 1725:19-25; TR00028

19

tax authorities, and intended that arrangements in the MRDA would ultimately either be approved by those authorities or be revised to secure approval.[64]

The MRDA enabled Nortel to maintain separate and distinct legal entities in order to avoid NNL having a "permanent establishment" in another jurisdiction by conducting business there, particularly in the United States. Nortel management was aware that under U.S. tax law, if a partnership is engaged in a U.S. trade or business, non-U.S. resident partners that own an interest in that partnership are also deemed to have a U.S. trade or business, and may be subject to tax in the United States if that trade or business is treated as creating a permanent establishment for the non-U.S. partner.[65]

### J. The Interim Funding and Settlement Agreement

On the Petition Date, with the approval of the U.S. Court, NNI loaned to NNL $75 million under a new revolving loan agreement (the "Intercompany DIP Loan"). The amounts owing to NNI under the Intercompany DIP Loan were repaid with proceeds from the sale of Nortel's Carling facility.[66] Also in January 2009, NNI paid to NNL an additional $30 million, as a transfer pricing payment.[67]

On June 9, 2009, the U.S. Debtors (excluding NN CALA, which had not yet filed for bankruptcy), Canadian Debtors and EMEA Debtors (excluding NNSA, who later acceded to the agreement) entered into the IFSA to address both interim funding of NNL as well as

---

[64] TR21003 (MRDA) at 2 (final recital); TR21003 (MRDA) at 5 (Art. 3(c)); TR21003 (MRDA) at 19 n.2 (Schedule A); TR21003(MRDA) at 29 (Addendum to MRDA replacing, *inter alia*, Art. 11(d)).

[65] TR21003 (MRDA) at 12 (Art. 13); TR00062 (Eden Report) ¶¶ 124-126

[66] TR50194; TR50003

[67] TR12032 (IFSA) at 2

principles under which collaborative sales of Nortel's businesses and assets could take place.[68]

The IFSA provided for a payment by NNI to NNL of $157 million (net of the $30 million previously paid in January) in full settlement of any transfer pricing and other claims NNL might have had against NNI for the period from the Petition Date through September 30, 2009.  In April 2009, the Monitor reported that NNL needed this payment in order to have "adequate cash resources to fund operations."[69]   The process allowed, but did not obligate, the U.S. Debtors, Canadian Debtors and EMEA Debtors to jointly sell Nortel's assets without a prior agreement on allocation, but it required the parties to negotiate in good faith to reach agreement on allocation before submitting the question to the Courts.[70]   The IFSA made explicit that there was no obligation for any Debtor to proceed with a sale transaction if it determined that it was not in the best interests of its creditors.[71]

The IFSA also referred to the U.S. Debtors, the Canadian Debtors and the EMEA Debtors as "Selling Debtors."  The IFSA required that any agreement or determination by either the U.S. Debtors or Canadian Debtors related to license termination agreements and the allocation of Sales Proceeds required the prior consent of the Bondholder Group, acting in good faith.  The U.S. Debtors had to obtain similar consent from the Committee.[72]   Each

---

[68] TR12032 (IFSA).

[69] TR12032 (IFSA) § 1; TR45561 (Apr. 24, 2009 Report of the Monitor) ¶¶ 50-51.

[70] TR12032 (IFSA) § 12(c), (d).

[71] *Id.* § 12(e).

[72] *Id.* § 12(g).

Licensed Participant agreed under the IFSA that if, and only if, it determined to participate in a sale that was in the best interests of its creditors, it would enter into a license termination agreement relinquishing its Exclusive License.[73]  The IFSA provided that the termination or relinquishment of a license would be deemed a sale with the Licensed Participant being deemed a seller.[74] The IFSA made clear that any such license terminations would be provided "in consideration of a right to an allocation to be determined" from such sale.[75]  The IFSA was not an "amendment, modification or waiver of rights" of any party under any other agreement, including the MRDA.[76]  The U.S. Court and Canadian Court entered orders approving the IFSA following a joint hearing on June 29, 2009 (the "U.S. IFSA Order" and the "Canadian IFSA Order").[77]

## K.  The Final Canadian Funding and Settlement Agreement

At the end of 2009, NNL approached NNI and requested additional financing, stating that without additional cash, NNL would have to shut down.[78]  At the time of NNL's request for additional financing, NNL's and NNI's requests to the CRA and IRS for approval of an APA governing the RPSM regime for the 2001-2005 and 2006-2011 periods were still unresolved.[79]

The parties addressed both NNL's cash needs and the tax settlement in a new

---

[73] *Id.* ¶¶ 11(a).

[74] *Id.* §11(d); *see also* TR44149 (CDMA-LTE License Termination Agreement) at 2; *id.* at Art. 2.08

[75] TR12032 (IFSA) § 11(a); *see also id.* § 11(d).

[76]  *Id.* § 20.

[77] TR40824 (Motion (A) Approving the IFSA and (B) Granting Related Relief); TR50057 (Canadian Order Approving the IFSA).

[78] TR46910 (FCFSA) at 2.

agreement entitled the Final Canadian Funding and Settlement Agreement (the "FCFSA").

The provisions of the FCFSA included the following:[80]

(a)     NNI agreed to pay NNL $190.8 million in full and final settlement of any and all claims that NNL might have (or could have through the final conclusion of the Canadian Debtors' proceedings) against NNI, whether based on transfer pricing arrangements, other intercompany agreements or otherwise.

(b)     NNI and NNL agreed to enter into APAs with the IRS and CRA, respectively, for the years 2001-2005 on the terms set by the tax authorities.

(c)     NNL granted NNI an allowed $2.06 billion claim in NNL's CCAA proceedings, with such claim not being subject to offset or reduction.

(d)     NNL and NNI agreed not to exercise any rights of termination under the MRDA without the prior written consent of the other parties to the MRDA, the Committee and the Bondholder Group.

The EMEA Debtors and NNL separately agreed that they would not exercise any right of termination.[81]

On December 23, 2009, NNI, NNL, the Monitor and other U.S. and Canadian Debtors executed the FCFSA.[82]   The U.S. Court and Canadian Court entered orders approving the FCFSA following a joint hearing on January 21, 2010.  The order entered by the Canadian Court approving the FCFSA expressly allowed NNI's $2.06 billion claim against NNL, which was not subject to offset or reduction.[83]

---

[79] TR46910 (FCFSA); TR11239 (Feb. 18 2010 NNI and IRS APA).

[80] TR46910 (FCFSA) § 1; *See id.* § 9; *See id.* § 10; *See id.* § 28

[81] TR48613

[82] TR46910 (FCFSA) § 1;

[83] TR40271 (2011 NNC Form 10-K) at 32; TR50431 (Jan. 21, 2010 Canadian Order Approving FCFSA); TR50146 (US D.I. 2347 Order Approving FCFSA).

23

L.  The Sale of Nortel's Business Lines

Nortel's Business Lines were sold in a consensual, "cooperative and coordinated fashion."[84]  From shortly after the IFSA was approved through April 4, 2011, all parties worked together and successfully sold the following businesses in joint sale processes across multiple jurisdictions, most of which involved vigorous auctions conducted pursuant to Section 363 of the United States Bankruptcy Code and Court-approved sales processes in accordance with the CCAA.  These sales (together, the "Business Line Sales") generated $3.285 billion of which approximately $2.85 billion is now available.  The specific details of the Business Line Sales are set forth in Appendix A to this opinion.

As part of the Business Line Sales process, the U.S. and EMEA Debtors entered into License Termination Agreements (the "LTAs").  Prior to the U.S. Debtors executing an LTA for any Business Line Sale, the U.S. Creditors Committee and the Bondholder Group needed to, and did, consent to the transactions.[85]

Only some of Nortel's patents were sold in the Business Line Sales.  If a patent was not "predominantly used" in a Business Line it was not transferred to a purchaser, and the purchaser was generally granted a nonexclusive right to practice the patent in a limited field of use.[86]

Nortel transferred 2,700 patents as part of the Business Line Sales.[87]  NNL retained

---

[84] TR00009A-C (Hamilton Aff.) ¶ 37; Trial Tr. 3208:7-19 (Green); Trial Tr. 4172:2-5 (Kinrich).

[85] TR44149 (CDMA/LTE LTA); TR44186 (MEN LTA); TR12032 (IFSA) § 11(a).

[86] TR44149 (CDMA/LTE LTA); TR44186 (MEN LTA).

[87] TR11151 (Nortel's IP Team and Patent Portfolio PowerPoint, August 2010) Slide 11 (p. 11)

ownership of the patents licensed to the Business Line Sales purchasers.[88]  Thousands of
R&D personnel, principally in Canada but also in the other RPE jurisdictions, were
transferred to the purchasers of the lines of business.[89]  The transfer of the valuable
assembled workforce, including R&D personnel, enabled the purchasers to continue to
operate the businesses without interruption.

As all Debtors, the Committee, Bondholders and the Canadian Creditors Committee
("CCC") agree, and the U.S. Court and the Canadian Court found when they approved
them, the Business Line Sales proceeds generated through the auction process represent the
fair market value of the Business Lines.[90]

## M.   Patent Identification

In the Business Line Sales, it was important that Nortel identify which IP rights –
principally patent rights – needed to be conveyed; each prospective purchaser wished to
obtain as many patents as possible as part of each sale transaction.  Conversely, Nortel
wanted to ensure that the only patents transferred were those incorporated exclusively or
principally in the business line in question so as to retain value within Nortel and not to
jeopardize the ability to sell the other Business Lines that might require rights to the same
patents.[91]

---

[88] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 65

[89] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 52(f)
[90] Trial Tr. 2120:13-2120:20 (Huffard); Trial Tr. 3420:25-3421:7 (Britven); Trial Tr. 3220:23-3221:5
(Green); Trial Tr. 4104:1-4104:12 (Kinrich);

[91] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 59-60; John Veschi Deposition,
November 7, 2013, p. 128:11-25

When the Business Lines were being sold, Nortel's IP Group undertook a patent segmentation process to determine which patents would be transferred with each of the Business Lines. The standard for transfer of a patent in the sales was whether the IP in question was "predominantly used" in a given Business Line. IP that was used in multiple Business Lines ("shared" IP) was not sold with the businesses and rights to use that IP were instead conveyed to Business Line purchasers as necessary, generally via limited, non-exclusive licenses.[92] There is no evidence that, pre-petition, Nortel had ever undertaken such an exercise to determine whether a given patent was predominantly used in a specific Business Line, used in multiple Business Lines or not used in any Business Line in the normal course of its business or that Nortel ever monitored which patents were used or not used in Business Lines. In conducting the patent segmentation process, Nortel's IP Group sought to reduce the number of patents sold in the Business Line Sales to maximize the number of patents that would remain outside the Business Line Sales and retain such patents as part of a large portfolio to maximize value for creditors.[93] [94]

## N.     Nortel's Patents Had a Useful Life of Many Years

U.S. patents are granted for a 20-year period.[95] A patent is within its economic useful life if it can be sold. As Canadian Debtors' expert Timothy Reichert wrote in an article, "commercial transferability is the most objective of the three definitions of economic

---

[92] McColgan Dep. 123:14-22; Veschi Dep. 125:6-126:8

[93] Veschi Dep. 124:10-20.

[94] Veschi Dep. 124:10-20; *id.* at 146:7-17; TR48932 (Presentation titled "Overview") at 8; TR43641.03 (Presentation titled "Project Iceberg") at 1-3.

[95] TR50843

life."[96]  When measuring the useful life of a patent, it is necessary to distinguish between the life of a product utilizing a patent and the life of a technology or patent itself.  While a particular product may become obsolete in a relatively short period, the patents incorporated into that product may survive through many generations of products and be utilized and built upon for a far longer period than the initial product itself.[97]  The useful economic life of many Nortel patents well exceeded five years.[98]  The vast majority of the patents that sold collectively for approximately $4.5 billion were more than a decade old at the time of the sale.[99]  Nortel's valuable patents were largely created in the late 1990s to early 2000s, corresponding to Nortel's peak.[100]  99% of the high-interest patents that were sold to Rockstar had been developed before 2006, more than 5 years before the sale to Rockstar in 2011.[101]  80% of the high-interest patents sold to Rockstar were developed in 2000 or earlier, during the period that Nortel employed a cost-sharing arrangement to fund R&D.[102]

---

[96] TR40710

[97] Trial Tr. 668:25-69:25 (McFadden); Trial Tr. 1595:13-1596:2 (Brueckheimer); Trial Tr. 2868:10-2869:1 (Felgran); Trial Tr. 2270:20-25 (Malackowski); Trial Tr. 2457:22-2458:5; TR31355 (Nortel Networks Functional Analysis for the years ended December 31) at 29; TR44077 (Presentation, Nortel Pre-Filing Conference with CRA) at 5; Tr. 4678:9-22 (Tucker).

[98] Trial Tr. 628:2-6 (Allen); Trial Tr. 2662:19-2663:2 (Cooper); TR48711.02

[99] TR00033; TR41471; TR48835; Trial Tr. 2281:2-12; Trial Tr. 2287:1-20; TR00035; Trial Tr. 2814:5-13; Trial Tr. 2051:5-11; TR21011; TR21013;

[100] Trial Tr. 2266:22-2267:9; Trial Tr. 2276:16-2278; Trial Tr. 4679:1

[101] Trial Tr. 2281:2-12 (Malackowski); TR00034 (Malackowski Rebuttal) at 31.

[102] Trial Tr. 4511:15-4512:22

O.      A Licensing Business - IPCo

After completing the Business Line Sales, Nortel retained a substantial number of intellectual property assets (the "Patent Portfolio" or the "Residual IP").  Over the course of more than a year, the Debtors, other stakeholders and their advisors carefully weighed a possible sale of Nortel's Patent Portfolio against the alternative of an IP licensing service and enforcement business ("IPCo"), a proposed business that Nortel began considering before the insolvency filings as set forth below.[103]

IPCo would monetize the Residual IP by licensing patents to technology companies that were suspected of infringing on them in exchange for the payment of royalties.  IPCo would license the Residual IP by threatening patent infringement litigation and bringing such litigation if necessary.[104]

Early in 2008, as discussed below, Nortel began to explore options for more effectively monetizing its intellectual property through developing a more robust licensing and enforcement business than it had to date.  John Veschi was hired by NNI in July 2008 as Chief Intellectual Property Officer to "look at options for licensing."[105]  Veschi had extensive licensing and IP experience.[106]

One possibility was for the licensing business to be a separate Business Line with direct reporting to Nortel's CEO.[107]  Veschi initiated a program to license group IP to

---

[103] Trial Tr. 1075:2-1076:2 (Binning); Trial Tr. 933:6-12 (Hamilton)

[104] TR00009A-C (Hamilton Aff.) ¶ 73.

[105] Trial Tr. 1073:2-22 (Binning); Veschi Dep. 45:4-7, 47:13-25.

[106] Veschi Dep. 42:5-42:23; ."); id. at 39:11-40:6; 232:21-233:12; TR 44998 (Appointment Notice for John Veschi).

[107] Veschi Dep. 38:6-38:23.

infringing third-parties in four initial technology families or "franchises" – mobile handsets, internet search, TV/display/projector and video game/PC – with plans to license to additional franchises as the licensing business progressed.[108] Coordinating with the leaders of Nortel's Business Lines, in November 2008, Veschi and his team prepared notices of infringement.[109]

Post-petition, Veschi's team made presentations in the summer of 2009 addressing the options for monetizing the Patent Portfolio.[110] Several monetization alternatives were considered: the sale of patents, further developing and operating IPCo, or further developing and then selling IPCo.[111]

Following these presentations, Nortel issued a request for proposals to find a firm to assist in the evaluation of the Patent Portfolio and the further development of IPCo.[112] Thereafter, Nortel jointly retained the Global IP Law Group ("Global IP") in October 2009,[113] to provide advice on monetizing the portfolio, including exploring monetization "options for licensing as opposed to outright sale."[114]

On March 20, 2009, the U.S. Court entered an order approving the retention of

---

[108] Veschi Dep. 148:18-153:9; TR22102 (Dec. 4, 2008 Email from J. Veschi titled "FW:  IP Org Update").

[109] TR50711 (Nov. 6, 2008 Email from J. Veschi; Veschi Dep. 156:6-157:3; TR11150 (July 8, 2009 PowerPoint Presentation titled "IP Aspects of Residual Co") at 7.

[110] Veschi Dep. 70:18-71:12, 94:2–13 (discussing TR22097), 69:18–71:12; ; TR22106 (Aug. 12, 2009 PowerPoint Presentation titled "Strategic Alternatives for IP") at 2; TR22097 (Dec. 16, 2009 PowerPoint Presentation titled "Patent Portfolio Analysis Phase One – Ottawa Presentation").

[111] Trial Tr. 1075:2-1076:2 (Binning).

[112] Veschi Dep. 73:25-77:4.

[113] TR48716 (Oct. 15, 2009, Master Consulting Agreement ("MCA")) at Annex A to Exhibit A, at 15.

[114] TR48716 (MCA) at 15.

Lazard Freres & Co. LLC as financial advisor to the U.S. Debtors ("Lazard").  The U.S.

Court subsequently entered an order amending the terms of Lazard's compensation to

allow for a "IP Transaction Fee" if Nortel consummated "a restructuring and

reorganization around all or substantially all of the Company's intellectual property

assets."[115]  Lazard was involved in evaluating the financial aspects of IPCo on behalf of all

Nortel Entities.[116]

       As part of its evaluation, Global IP reviewed more than 11,000 patent claims,

categorized patents by technology field, mapped claims to markets for potential

enforcement and licensing and screened the patents for encumbrances.[117]  Global IP

confirmed that Nortel's Patent Portfolio was valuable.[118]  Global IP presented its initial

findings to stakeholders of Nortel in December 2009.[119]   Global IP and Lazard made a

follow-on presentation to the boards of directors of NNC and NNL in January 2010.[120]

       The Debtor Estates weighed several options for monetizing the Patent Portfolio.

Stakeholders from the EMEA, Canadian and U.S. Debtors seriously considered IPCo as an

alternative to the sale of the Patent Portfolio.  A committee of representatives of Nortel and

their advisors (the "IP Steering Committee") was formed in January 2010, which led the

---

[115] TR50182 (US D.I. 507 Order Authorizing Retention and Employment of Lazard Freres); TR00001 (Currie Aff.) ¶ 85; US D.1. 2561 Order Approving An Amendment to the Terms of Compensation of Lazard Frères.

[116] Trial Tr. 907:24-908:5 (Hamilton); Trial Tr. 1363:6-11 (Ray); Ray Decl. ¶ 54.

[117] TR22097 (Dec. 16, 2009 PowerPoint Presentation titled "Patent Portfolio Analysis Phase One") at 11-12.

[118] Veschi Dep. 92:6-15

[119] TR50754 (Dec. 11, 2009 Email RE: "December 16 Logistics")

[120] TR43655 (Jan. 29, 2010 PowerPoint Presentation titled "Patent Portfolio Analysis Phase One: Board of Directors Presentation").

evaluation process.[121]  The IPCo option and the sale option were considered in parallel, so Nortel could determine how best to monetize the patent assets.  In the words of the Monitor's lead representative Murray McDonald, IPCo and a sale were considered "concurrently" as "parallel alternatives."[122]

In September 2010, the Monitor advised the IP Steering Committee that IPCo should remain an option for consideration.[123]  In their 2010 10-K, filed with the U.S. Securities and Exchange Commission, NNC disclosed that "[w]e are seeking expressions of interest from potential buyers and partners regarding options that could maximize the value of our intellectual property portfolio. No decision has been made as to how to realize this value, whether through sale, licensing, some combination of the two or other alternatives."[124] IPCo remained a viable option into 2011.[125]

As the Monitor's representative testified, "[o]ver the course of 2009 and 2010, Mr. Veschi and his team, assisted by Lazard and Global IP, prepared various versions of a model that attempted to forecast the revenues that could be earned by IPCo so that its potential economic benefits could be assessed.  The initial IPCo Model had three different sub-models that forecast the revenues of IPCo based on different scenarios, in particular

---

[121]  TR50634.02 (Jan. 22, 2010 Draft PowerPoint Presentation) at 2; TR00020 (Ray Decl.) ¶¶ 51-52; Riedel Dep. 117:20-118:4, 118:6-13.

[122]  McDonald Dep. 165:19-166:10

[123]  TR50656 (Sept. 30, 2010 Email from S. Hamilton titled "Nortel IP Valuation Protocol"); Trial Tr. 933:6-12 (Hamilton)

[124]  TR21541 (2010 NNC 10-K) at 22.

[125]  TR50783 (Oct. 4, 2010 Email from G. Riedel to J. Veschi titled "Speaker Invitation – The IP Summit 2010:  The Power of IP for Business Success"); TR47264 (Jan. 24, 2011 Email from G. McColgan to H. Chambers titled "FW: Nortel IP Follow-Up Information Request"); TR50797 (Jan. 10, 2011 Email from M. Spragg titled "RE:  Nortel IP"); TR00009A-C (Hamilton Aff.) ¶ 69.

the amount of litigation that IPCo would engage in as part of its business model."[126]

The details of the IPCo Model were updated and refined in several revised versions. Later versions of the IPCo Model (including version 4.0) do not dissuade the Court's view that IPCo was a viable option.[127]

The IPCo revenue projections were included in the presentations and models circulated to stakeholders for comment.[128] The United States is the most profitable market for exploiting patents.[129] The IPCo Model did not separate North American revenue between Canada and the United States, but the vast majority of North American revenue from IPCo would have been earned in the United States.[130] This is consistent with where the patents in the portfolio were filed because the value of a patent comes from the right to

---

[126] TR00009A-C (Hamilton Aff.) ¶ 74; *see also* TR00020 (Ray Decl.) ¶ 58; Trial Tr. 1359:25-1360:6 (Ray).

[127] *See* TR22098 (Mar. 17, 2010 PowerPoint titled "Nortel IP Update to Creditor Committees") (reflecting first version of the model); TR50825 (Apr. 28, 2010 PowerPoint Presentation titled "IP Co. Update to Credit Advisor Working Group") (version 2.0); TR43658 (May 5, 2010 PowerPoint Presentation titled "IPCO. Model 2.2 Update") (version 2.2); TR50823 (May 3, 2010 Email from J. Veschi titled "IP Co. Presentation Materials for Creditor Fas") (explaining the evolution from version 2.0 to 2.2); TR43715 (PowerPoint Presentation titled "Model 3.0 Preliminary Valuations") (version 3.0); TR22108 (Oct. 25, 2010 PowerPoint Presentation titled "Project Copperhead IPR Model") (version 3.1); *see also* TR00020 (Ray Decl.) ¶ 59. There were also IPCo Updates for Leadership Teams/Boards. *See, e.g.,* TR50804 (Feb. 23, 2010); TR50817.02 (Mar. 10, 2010); TR50814.04 (Mar. 26, 2010); TR43861 (Apr. 27, 2010). Lazard provided IPCo Financial Projections as well. *See, e.g.,* TR43654 (Apr. 19, 2010); TR47157 (May 12, 2010); TR40022 (June 30, 2010); TR22108 (Oct. 25, 2010); TR48697.02 (Nov. 18, 2010). Mercer also provided an IPCo Management Compensation Analysis. TR50780.02 (Oct. 2010); *see also* TR00011 (US Interests Hamilton IPCo Demonstrative) at 1.

[128] TR49827.01 (Email from Lazard to several recipients attaching IP Co. Model 3.1); TR49827.02 (IP Co. Model 3.1) at tabs "Global Revenue", "Franchise Bucket", "Enterprise Licensee Adress Rev.", "Voice Licensee Adress Rev.", "PC Licensee Adress Rev.", "Internet Licensee Adress Rev.", "Data Net. Licensee Adress Rev.", "Optical Licensee Adress Rev.", "Infra. Adress Rev." and "Handset Licensee Adress Rev."

[129] Trial Tr. 4124:12-4125:24 (Kinrich)

[130] TR00051 (Kinrich Report) at Ex. 31; Trial Tr. 4138:19-24 (Kinrich).

exploit, license and enforce that patent and can only be extracted in the jurisdiction where that patent is filed.[131]

Nortel assembled its IP into groups, or "technologies," which represented an idea that was patented (or one for which an application was filed) in one or more territories.[132] 97% of Nortel's technologies (which includes all patents and applications in a family) were protected by patents filed in the United States.[133]   73% of Nortel's technologies were protected by patents filed only in the United States.[134]   Of the highest value patents that were in IPCo, as determined by Global IP, 99.5% of Nortel's technologies were protected by patents filed in the United States.[135]   Of the highest value patents that were in IPCo, as determined by Global IP, 77% of Nortel's technologies were protected by patents filed only in the United States.[136]

P.   All Integrated Entities Expected to Benefit from IP Monetization

While the stakeholders were considering the alternatives for IP monetization, the expectation was always that the Licensed Participants, and in turn their creditors, would benefit from an eventual sale of the Patent Portfolio or running a business based off of the IPCo Model.  As the Monitor's representative noted at trial, the IEs cooperated to maximize

---

[131] Trial Tr. 2208:16-19 (Anderson); Trial Tr. 4114:21-4115:12 (Kinrich); TR50857 (United States Patent and Trademark Office Screen Shot) at 1; TR50849 (Canadian Intellectual Property Office – A Guide to Patents) at 9, 11; TR50975 (UK Intellectual Property Office – "What is a patent?").

[132] Trial Tr. 4121:15-4123:5 (Kinrich); TR00051 (Kinrich Report) ¶ 79.

[133] DEM00019 at 14, US Interests Kinrich Demonstrative, citing TR00051 (Kinrich Report) Exs. 21-22.

[134] *Id.*

[135] Trial Tr. 4123:23-4124:8 (Kinrich).

[136] *Id.*

the value of the Patent Portfolio, including developing the IPCo Model.[137]  The expectation

that the Licensed Participants would share in the benefit from the monetization of the

Patent Portfolio is reflected by the financial burdens they shared in evaluating that option.

The IEs jointly retained Global IP.[138]  The IEs, in turn, jointly owned all "[d]eliverables,

including Intellectual Property rights in the Deliverables" created by Global IP.[139]

### Q.    Residual Patent Portfolio

By the time that all of the Business Line Sales were completed in March 2011, Nortel

had no remaining operating businesses.  What it did retain was a residual patent portfolio,

consisting of approximately 7000 patents and patent applications.[140]  These were

principally patents and applications that were not used in any of the Business Lines and

therefore were not subject to licenses to the Business Line Sales purchasers.[141]  In addition,

the Residual IP portfolio included patents used by multiple Business Lines and licensed to

the purchasers of those Business Lines.  The costs to capitalize an IPCo Model were

estimated to have been between $269 million and $417 million.[142]  Ultimately, the Canadian

Debtors and the Monitor advised the representatives of the other Debtors and the other

---

[137] Trial Tr. 897:16-898:1, 900:10-17 (Hamilton).

[138] Trial Tr. 905:8-14 (Hamilton); TR49824 (Twenty-Fifth Report of the Monitor) at ¶ 79; TR48716 (MCA) at 1.

[139] TR48716 (MCA) ¶ 6(a).

[140] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 56, 67

[141] Gillian McColgan Deposition, November 8, 2013, p. 141:12-24; TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 65-67; TR11151 (Nortel's IP Team and Patent Portfolio PowerPoint, August 2010) Slide 11 (p. 11) ( "~6,100 patent assets remain, covering wide variety of technologies […] Strict limits on licenses granted (narrow fields of use/product-line limitations")

[142] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 79-80; John Ray Trial Testimony, Day 6, May 21, 2014, p. 1416:19-1420:12

stakeholders that the Canadian Debtors would not provide any funding to establish IPCo.[143]

If any Debtor or other interested party wished to pursue IPCo, they would need to purchase the residual patents from NNL.[144] No Estate or other interested party ever sought to effect such a purchase. Instead, all of the Estates agreed to pursue a sale process for the Residual IP and to terminate consideration of the IPCo option.

R.    The Sale of Nortel's Residual Patent Portfolio

When Google submitted a non-binding indication of interest of $900 million in February 2011, the proposed price was sufficient for the Estates to discuss a sale as a credible alternative to IPCo.[145] Negotiations with Google commenced in earnest in early 2011.[146]

In the IP Stalking Horse Agreement, Google requested a provision pursuant to which Nortel definitively agreed to sell the Residual IP to a third party.[147] Nortel therefore agreed to terminate consideration of IPCo as part of the sale process.[148] However, the IPCo option could be pursued if done in the context of a qualified competing bid, such as a proposal by a third party to sponsor a transaction that would allow Nortel to retain the

---

[143] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 78-80

[144] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 80

[145] TR00021 (Ray Reply Decl.) ¶¶ 8,18.

[146] TR12013 (Feb. 25, 2011 Email from K. Cunningham titled "Fw: Iceberg: Asset Sale Agreement Issues" attaching Bidder 1 Issues List).

[147] TR00009A-C (Hamilton Aff.) ¶ 81.

[148] TR00009A-C (Hamilton Aff.)

Patent Portfolio and operate IPCo.[149] Google insisted that the current licenses be terminated as part of the sale.[150]

Extensive negotiations culminated with the signing of a stalking horse agreement dated April 4, 2011, between each of the IEs as Sellers and Ranger, Inc., a wholly owned subsidiary of Google for a purchase price of $900 million. (the "IP Stalking Horse Agreement").[151]  The U.S. and Canadian Debtors each filed motions seeking approval of their entry into the IP Stalking Horse Agreement and the related auction process.[152]  The Monitor filed a report in support of the Canadian Debtors' entry into the IP Stalking Horse Agreement in which it stated that title to Nortel's intellectual property was held by NNL, but that each of the IEs had Exclusive Licenses to that intellectual property in their Exclusive Territories.[153]

A joint hearing was held before the U.S. and Canadian Courts to consider these motions on May 2, 2011.[154]  The U.S. and Canadian Courts issued orders approving the entry into the agreement for a purchase price of $900 million and the rules for the conduct

---

[149] TR50184 (US D.I. 5202 Motion for Orders Authorizing Stalking Horse Asset Sale Agreement) at Ex. A § 5.13(b); TR00021 (Ray Reply Decl.) ¶ 19.

[150] Riedel Dep. 138:9-139:5; Veschi Dep. 53:13-54:6; TR00009A-C (Hamilton Aff.)  ¶¶ 98-100; Cianciolo Dep. 193:7-194:9; TR12013.

[151] TR43640.01 (Apr. 4, 2011 ASA between Nortel Entities and Ranger Inc.); TR00009A-C (Hamilton Aff.) ¶ 85.

[152] TR40725 (US D.I. 5202 Motion for Orders Authorizing Stalking Horse Asset Sale Agreement); TR49974 (Apr. 7 2011 Motion Record for Canadian Sales Process Order regarding Certain Patents and other Assets).

[153] TR21281 (Sixty-Third Report of the Monitor).

[154] TR50187 (US D.I. 5368 May 2, 2011 Hearing Transcript).

of a subsequent auction for the Patent Portfolio.[155]

When the auction commenced on June 27, 2011, senior representatives of Apple, Microsoft, Intel, Sony, Ericsson, RIM (now Blackberry) and EMC, among others, assembled at the New York offices of NNI's counsel.[156]  Over the course of four days in late June 2011, vigorous bidding took place.[157]

The final winning bid of $4.5 billion came from Rockstar and resulted in an agreement of sale (the "Rockstar Sale Agreement").[158]  As part of the Rockstar Sale Agreement, the relevant U.S. and EMEA Sellers executed a License Termination Agreement pursuant to which their license rights in relation to the residual patents were terminated and they would be granted a right to an allocation of a portion of the sales proceeds in consideration for such termination.[159]  Through the Rockstar Sale Agreement and the License Termination Agreement, the Debtors agreed to transfer all of their rights in the Patent Portfolio to Rockstar.[160]

---

[155] TR50196 (US D.I. 5935 Order Authorizing and Approving Sale); TR50428 (May 2, 2011 Canadian Order re Certain Patents); TR50184 (U.S. D.I. 5202 Motion for Orders Authorizing Stalking Horse Asset Sale Agreement) § 2.2.1; TR40725 (US D.I. 5202 Motion for Orders Authorizing Stalking Horse Asset Sale Agreement) ¶ 11; TR50187 (U.S. D.I. 5368 May 2, 2011 Hearing Transcript) 6:24-7:5.

[156]  TR21509 (July 11, 2011 Hearing Transcript) 40:24-25; TR21282 (Seventy-First Report of the Monitor).

[157] TR00009A-C (Hamilton Aff.) ¶ 95.

[158] TR00009A-C (Hamilton Aff.) ¶¶ 85, 93, 95; TR22085 (June 30, 2011 ASA between Nortel Entities and Rockstar Bidco, LP).

[159] TR21508 (Rockstar License Termination Agreement) Arts. 2.01-2.04; TR43794 (IFSA) § 11(a).

[160]  TR21508 (Rockstar License Termination Agreement); TR22085 (June 30, 2011 ASA between Nortel Entities and Rockstar Bidco, LP) § 5.13(b).

S.    The Rockstar Sale Approval Hearing

The Rockstar Sale Agreement was presented for approval to the U.S. and Canadian Courts at a joint hearing on July 11, 2011.[161]  At that hearing, representations were made about the sale process and the substantial benefit of the result for all of the IEs.[162]  Both the U.S. and Canadian Courts approved the sale.[163]    The Monitor's public report recommending the sale to the Courts represented that NNL's legal title in the Patent Portfolio was "subject to . . . intercompany licensing agreements with other Nortel legal entities around the world . . . in some cases on an exclusive basis," referring to NNI and the other Licensed Participants.[164]

## THE PARTIES AND THEIR ALLOCATION POSITIONS

The parties who participated in the trial and briefing are described below, together with their positions on allocation.  The Court is merely reciting their arguments without comment.

A.    The U.S. Interests

The U.S. Interests include NNI and certain affiliates as debtors and debtors in possession, the Committee and the Bondholders.  The Committee and the Bondholders also participated in the trial and submitted their own briefs.

Allocation involves a two-step process.  First, the Courts must identify and characterize the property or legal rights transferred or surrendered by each debtor – here

---

[161] TR21509 (July 11, 2011 Hearing Transcript).

[162] TR21509 (July 11, 2011 Hearing Transcript) 56:10-18, 101:1-5, 110:6-111:8.

[163] TR50034 (July 11, 2011 Canadian Approval and Vesting Order (Certain Patents and Other Assets)); TR50196 (US D.I. 5935 Order Authorizing and Approving Sale).

grouped by interest.  Second, the Courts must value the property or legal rights.   The buyers of the Business Lines and Patent Portfolio paid fair market value, determined through auctions for the assets.  Allocation is therefore based on the relative value of the assets each debtor transferred.  The Courts should apply standard valuation methods which courts have consistently followed, including in insolvency proceedings.  Also, the Courts must take into account that in insolvency, equity takes last.  Simply, NNI's position is that allocation must be the value of the assets it sold or surrendered.

Allocation must be premised on fair market value, the foundational valuation metric widely accepted in the law and economics throughout the world.  *See United States v. Cartwright*, 411 U.S. 546, 550-51 (1973); *Pocklington Foods Inc. v. Alberta (Provincial Treasurer)* (1998), 218 A.R. 59, para. 197, 354 (Can. Alta. Q.B.), *aff'd* (2000), 250 A.R. 188 (Can. Alta. C.A.) (explaining that "the most common value standard is fair market value"); *Phillips v. Brewin Dolphin Bell Lawrie Ltd,* [2001] UKHL 2, [2001] 1 W.L.R. 143 (H.L.), 154 (appeal taken from Eng.).[165]

Basing allocation on the fair market value of the assets each selling debtor transferred or relinquished in the Sales is consistent with the MRDA.  The MRDA states that if a Licensed Participant becomes insolvent it may be required to surrender the Exclusive License, but only in exchange for the fair market value of the license.  The MRDA, Schedule

---

[164] TR21281 (Sixty-Third Report of the Monitor) ¶ 82.

[165]  The fair market value of a business or asset is the highest amount that a reasonably well-informed purchaser would pay in arm's length negotiations in an open and unrestricted market. *Cartwright*, 411 U.S. at 551; *Henderson v. Minister of Nat'l Revenue*, [1973], C.T.C. 636, para. 21 (Can. Tax Ct.); *see also Slatky v. Amoco Oil Co.*, 830 F.2d 476, 484 (3d Cir. 1987) ("[Fair market value], by definition, is the highest price a willing buyer would pay[.]"); *Phillips*, 1 W.L.R. at 154 ("The value of an asset that is being offered for sale is, prima facie, not less than the amount that a reasonably well

A, RPSM formula that the parties used to divide operating income for transfer pricing purposes when operating as a functioning MNE does not control.  MRDA at Arts. 1, 11. The MRDA explicitly provides that the RPSM transfer pricing formula does not apply to the sale of a line of business.

The RPSM formula was designed to shift income from the U.S. to Canada (within the confines of the arm's length principle) so that NNL and Nortel as a whole could take advantage of the much lower effective tax rate for NNL in Canada rather than the effective tax rate for NNI in the U.S.  Indeed, the IRS criticized and never approved the RPSM formula, which ultimately led to a settlement increasing NNI's revenue and decreasing NNL's revenue by $2 billion for 2001-2005.  The RPSM formula is therefore inappropriate for use in connection with allocation.

Similarly, the parties' transfer pricing formula is irrelevant because the buyers were in no way bound by and thus would not have been concerned with how Nortel divided operating profits for transfer pricing purposes among affiliated entities.  None of the Debtors advocate an approach based solely on the manner in which Nortel divided up operating profits (or, in fact, losses) when it was an operating MNE (*i.e.*, pursuant to the RPSM formula set forth in Schedule A to the MRDA).

In insolvency, a debtor's assets must be made available to satisfy the creditors of that debtor before equity may recover.[166]  Each Selling Debtor is entitled to the value of the

---

informed purchaser is prepared, in arm's length negotiations, to pay for it.").

[166]  11 U.S.C. § 1129(b)(2)(B)(ii); Insolvency Act, 1986, c. 45, § 107 (U.K.); *Central Capital Corp., Re* (1995), 29 C.B.R. (3d) 33, para. 36 (Can. Ont. C.J. (Gen. Div. – Commercial List)), *aff'd* (1996), 38 C.B.R. (3d) (Can. Ont. C.A.); TR50470 (Standing Senate Committee on Banking Trade and Commerce, *Debtors and Creditors Sharing the Burden: A Review of the Bankruptcy and Insolvency Act and*

assets it sold and the allocated are Sales Proceeds available for distribution to that debtor's creditors. The key drivers of the value of a business are revenue and cash flow.[167] NNI generated approximately $46 billion in revenue from 2001 to 2009, which amounted to 69.5% of the revenue generated by the IEs during that same period.[168] NNI generated 75.9% of the cash flow of the IEs during that period.[169]

The vast majority of patents and patent applications in the Patent Portfolio were filed only in the United States.[170] This was a clear recognition by NNL that the U.S. market as to which NNI alone had the exclusive right in perpetuity to exploit – was the most valuable market for Nortel. It was the only market where NNL determined it was worth seeking patent protection for a majority of the inventions the IEs created and, consequently, the only market where those inventions have value (because filing in the U.S. but not in any other jurisdictions means that any third party may use these inventions outside the U.S. without fear of patent infringement suits). By designating the U.S. as the sole jurisdiction

---

the *Companies' Creditors Arrangement Act* (2003)) at 158-59 ("[Holders of equity] should be afforded lower ranking than secured and unsecured creditors, and the law – in the interests of fairness and predictability – should reflect both this lower priority for holders of equity and the interests of fairness and predictability – should reflect both this lower priority for holders of equity and the notion that they will not participate in a restructuring or recover anything until all other creditors have been paid in full."); Roy Goode, *Principles of Corporate Insolvency Law* (4th ed. 2011), ¶ 1-04 ("[O]nly when creditors have been paid in full (which is rarely the case) do shareholders come in to participate in the surplus remaining.") (citation omitted). To ensure this absolute priority scheme is followed, bankruptcy focuses "on legal entities, not on corporate groups." *See* Douglas G. Baird & Anthony J. Casey, *No Exit? Withdrawal Rights and the Law of Corporate Reorganizations*, 113 Colum. L. Rev. 1, 4-5 (2013).

[167] *See* Ibbotson SBBI 2010 Valuation Yearbook: Market Results for Stocks, Bonds, Bills, and Inflation 1926-2009, 19 (James P. Harrington ed., Morningstar 2010); Michael Pellegrino, *BVR's Guide to Intellectual Property Valuation* at 4-5 (2009 ed.).

[168] Transfer Pricing Worksheets.

[169] *Id.*

[170] Kinrich Report ¶¶ 79-80 (citing, *inter alia*, TR43636).

where the vast majority of Nortel's Patent Portfolio was filed, NNL acknowledged that the U.S. is the most profitable market for exploiting Nortel's IP and, accordingly, that NNI's exclusive rights in the U.S. market were by far the most valuable.

The allocation of the Patent Portfolio Sales proceeds by debtor group is as follows:

|  | $ Billions | Percent |
| --- | --- | --- |
| Canadian Debtors | $0.43 | 9.7% |
| EMEA Debtors | $0.71 | 16.0% |
| U.S. Debtors | $3.31 | 74.3% |
| **Total** | $4.45 | 100% |

Each of the Business Lines was sold as a going concern in a coordinated auction and sales transaction. Similar to the Patent Portfolio, the buyers of the Business Lines paid for the amount of value they expected to generate from the assets, not the value each Nortel estate may have derived from the assets in bankruptcy if they were not sold.

The U.S. Debtors contributed the majority of the value in the Business Line Sales. The U.S. Debtors relinquished 70% of the total value of the Business Line Sales.[171] By contrast, the Canadian and EMEA Debtors contributed 11.9% and 18%, respectively, to the Business Line Sales.[172]

| Business Line Sales Valuation Summary | | |
| --- | --- | --- |
|  | **Total Value Relinquished ($ Billions)** | **Percentage** |
| Canadian Debtors | $ 0.34 | 11.9% |
| EMEA Debtors | $ 0.51 | 18.0% |
| U.S. Debtors | $ 1.99 | 70.0% |
| **Total** | $ 2.85 | 100.0% |

---

[171] *See id.* at 30 (Table 5).

[172] *Id.*

A potential buyer naturally would be most interested in acquiring the Business Lines in the territories that are expected to generate the most future cash flows.  Here, NNI was the only Nortel entity operating in the most valuable U.S. market.  It was the only Nortel entity with the exclusive right to operate in the U.S. market and it had the customer relationships in the U.S.  NNI had the exclusive right to convey and did convey those rights, and is entitled to be paid accordingly.

B.      The Committee

The Committee participated in the trial and supports the U.S. Interests.

C.      The Bondholders

The Bondholders consist of entities holding bonds which NNC, NNL, NNI and NNC issued or guaranteed.  Pursuant to the Indenture dated as of July 5, 2006, NNL issued multiple series of senior notes guaranteed by NNC and NNI, including two series of fixed rate 10.75% senior notes in the aggregate principal amounts of $450 million and $675 million due 2016, and a series of floating rate senior notes in the aggregate principal amount of $1 billion due 2011.  Pursuant to the Indenture dated as of March 28, 2007, NNC issued 2.125% convertible senior notes due 2014 in an aggregate principal amount of $575 million and 11.75% convertible senior notes due 2012 in an aggregate principal amount of $575 million.  The 2007 Indenture Notes are each guaranteed by NNI and NNL.

The Bondholder Group represents over half of the Nortel Entities' bonds.  It is the single largest creditor group of both the U.S. Debtors and Canadian Debtors.  The Bondholder Group fully supports the fair market approach which the U.S. Interests

43

advocate and opposes the other parties' positions in accordance with the arguments of the U.S. Interests.

D.    The EMEA Debtors

The EMEA[173] Debtors are acting through the Joint Administrators[174] for Nortel Networks UK Limited and certain of its affiliates in proceedings under the Insolvency Act of 1986, pending before the High Court of Justice of England.  The EMEA Debtors' position is that each party's share of the Nortel asset sales proceeds should be determined according to its relative contributions to creating the value of what was sold. This approach is consistent with (i) the way the Nortel companies allocated the fruits of their business prior to the insolvency filings, (ii) the rights of the parties, and (iii) fundamental principles of justice and fairness.

In determining how to allocate the approximately $7.3 billion in proceeds from the sales of Nortel's global businesses (the "Business Line Sales") and pool of residual patents (the "Residual Patent Sale") among the three estates, i.e., the U.S. Debtors, the Canadian Debtors, and the EMEA Debtors, it is first necessary to identify what classes of assets were conveyed in each of the sales, because the rights of the parties differ in relation to each class of assets. The largest portion of the proceeds from the Business Line Sales and the Residual Patent Sale is attributable to the value of Nortel's IP, which had been the main

---

[173] "EMEA stands for "European, Middle Eastern and African" affiliates.

[174]   The Administrators for all of the EMEA Debtors other than Nortel Networks (Ireland) Limited are Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson and Stephen John Harris.  The Administrators for Nortel Networks (Ireland) Limited are: Alan Robert Bloom and David Martin Hughes.

economic driver of Nortel's business. The biggest issue in the case is therefore how to allocate the asset Sales Proceeds attributable to IP.

The EMEA Debtors want allocation based on the relative contributions to the creation of the IP. The IP that was conveyed in the Business Line Sales and the Residual Patent Sale was the product of collaborative joint R&D efforts by each of the five Nortel residual profit split ("RPS") entities, *i.e.*, NNL, NNI, NNUK, NNSA, and NN Ireland. Each spent billions of dollars on R&D. The product of this R&D was a large portfolio of valuable technology in which the contributions of the individual RPS entities were integrated and indivisible. Prior to insolvency, Nortel allocated the fruits of exploitation of the jointly created IP based on the relative financial contributions of the Nortel entities to the creation of that IP. The EMEA Debtors contend that the benefits of the sale of Nortel's IP should be allocated among the estates using the same approach.

The contribution approach is consistent with the pre- existing rights of the parties, as confirmed by how the parties behaved in sharing proceeds, agreements, dealing with third parties including the IRS and CRA, in allocating the proceeds from a prepetition sale and other indicia.

In their prepetition arrangements, the parties have themselves already created an objective formula for how to allocate the value of Nortel's IP based on their respective contributions to the creation of that value: Because of the integrated and additive nature of R&D at Nortel, and the indivisible character of the IP portfolio that was the product of that R&D, the parties agreed that every dollar spent on R&D by any Nortel party had the same value as any other dollar. The parties therefore agreed that the value of IP

45

should be allocated based on their relative R&D spending during the period when a particular commercially exploitable technology was developed, *i.e.*, during the useful (or economic) life of the IP. Accordingly, the task for the Courts in allocating IP value is to determine (i) the value of the IP transferred to the purchaser in each of the asset sales, and (ii) the relative R&D spending of each of the five RPS entities during the period when that IP was developed. This was the approach taken by Nortel in allocating the proceeds of the one major prepetition asset sale, and it is the approach that would have been taken if the Business Line Sales or the Residual IP Sale had taken place prior to the insolvency filings.

### E.     The Monitor and the Canadian Debtors

The Canadian Interests consist of the Canadian Debtors, NNC and NNL, and Ernst & Young who the Canadian Court appointed to serve as Monitor by Order, dated January 14, 2009.

In addition to the powers and duties set out in the CCAA Initial Order dated January 14, 2009, the Monitor's powers were expanded by order dated August 14, 2009 ("the First Expansion of the Monitor Powers Order").[175]  The First Expansion of the Monitor Powers Order provides, among other things, the Monitor with the authority to cause the Canadian Debtors to take various actions in connection with the sale of the business units and to conduct, supervise and direct any procedure regarding the allocation and/or distribution of proceeds of any sale.[176]   In its Eighty-Eight Report dated September 26,

---

[175] TR50631 (Order of the Ontario Court of Justice, August 14, 2009)

[176] TR50631 (Order of the Ontario Superior Court of Justice, August 14, 2009) para. 3

2012, following the Business Line Sales and sale of the Residual IP, the Monitor reported

that, in light of the cessation of public reporting obligations, the directors and officers of the

Canadian Debtors indicated they would resign their positions.[177]  By order dated October 3,

2012 (the "Second Expansion of Monitor Powers Order"), the Court added to the powers of

the Monitor by, among other things, authorizing and empowering, but not obligating, the

Monitor to exercise any powers which may be properly exercised by a board of directors of

any of the Canadian Debtors.[178]  The Second Expansion of the Monitor Powers Order in no

way limited the powers and protections provided to the Monitor under prior orders of the

Court, the CCAA or applicable law.[179]

The central question before the Courts concerns the basis on which

approximately $7.3 billion in Sales Proceeds, realized on the sales of Nortel assets

following the insolvency filings in 2009, should be allocated among the Estates.  The

Monitor's position on this question is that the proceeds should be allocated based upon

the value of the property rights transferred or surrendered by each Debtor in connection

with the Business Line Sales and the Rockstar Transaction.  In the context of insolvency,

it respects the legal rights of each creditor to recover, from the Debtor indebted to it, out of

funds that represent that Debtor's legal entitlement to a portion of the Sales Proceeds. This

approach is, in essence, the one that the Courts would follow in a priority dispute over

property or over funds derived from property – that is, to determine the priorities and

---

[177]  NNC-NNL11755843 (Eighty-Eighth Report of the Monitor, September 26, 2012) para. 36

[178]  Order (Monitor's Expansion of Power Order #2) of the Ontario Superior Court of Justice,
October 3, 2012, para. 3

how funds will flow according to the applicable legal rights.

The proper approach to allocation involves a two-step process. First, the specific property or legal rights that were transferred or surrendered by each Debtor must be identified and correctly characterized. The second step involves the valuation of those rights.

The Business Line Sales involved the transfer to purchasers of certain categories of assets, including, most importantly, IP. The Rockstar Transaction involved almost exclusively the transfer of IP. The identification and characterization of the property rights in, or legal rights to, the IP that was transferred or surrendered in the sales are at the center of the dispute between the parties.

The Monitor's position is that the IP transferred in each of the sales was legally owned by NNL, the parent operating company of Nortel. It is also the Monitor's position that the only legal rights related to the IP which were held by NNL subsidiaries who are certain of the U.S. and EMEA Debtors were not ownership of the IP, but were license rights that had been granted to them by the IP's owner, NNL, pursuant to, in accordance with, and limited by, the terms of the MRDA.

This position follows from the clear words of the MRDA, most notably (i) the MRDA's express provision that legal title to the IP is and shall be vested in NNL and (ii) the MRDA's express grant of license rights by NNL (a grant which would be impossible if NNL were not the owner of the IP in question). It is consistent with the controlling Ontario law which governs the MRDA and which provides that a license

---

[179] Order (Monitor's Expansion of Power Order #2) of the Ontario Superior Court of Justice, October

grants no property interest, but is rather a contractual consent by an owner which gives rights that are limited by the terms of the license. It is also consistent with the history of NNL as the technology-rich parent of the U.S. and EMEA Debtors, the agreements that preceded the MRDA, the thousands of patent registrations which identified NNL as the owner of the patents, and the description, and inclusion as a plaintiff, of NNL as the patent owner in actions that were taken to enforce patent rights.

NNL's ownership of the IP bears directly on the second aspect of the allocation question, namely, the value of the property rights transferred. It was ownership of IP that was transferred in the Business Line Sales and, accordingly, it was ownership for which the purchasers paid. The proceeds that are attributable to that transfer of ownership is allocable to NNL as the IP's owner.

The characterization (including the scope) of the rights of the U.S. and EMEA Debtors as license rights, also bears directly on the second aspect of the allocation question, because it goes to the value of the rights that were surrendered. The license rights of the U.S. and EMEA Debtors were not transferred to the purchasers in any of the sales. They were non-transferrable rights, which were surrendered or terminated but not transferred. The question to be determined with respect to the terminated licenses raises a valuation issue: not one which inquires into what the purchasers paid for licenses (since the purchasers did not acquire the licenses), but rather one which inquiries into the value of what the U.S. and EMEA Debtors gave up. When a license is given up, what the licensee loses is the future opportunity to earn profit from using the license in accordance

3, 2012, para. 3

with its terms.  A valuation of those license rights must be based upon the terms and scope of the license, in order to determine the profits, if any, that the licensees would have earned had they not surrendered their licenses but had operated under them in accordance with the licenses' terms. To the extent that, in terminating their license rights in connection with the sales, the U.S. and EMEA Debtors gave up something of value then the value of those license rights is properly allocated to the U.S. and EMEA Estates.

The scope of the license rights requires careful examination.  That examination, conducted pursuant to the Ontario law of contractual interpretation, reveals that the license rights granted by NNL under the MRDA were not unlimited. They did not grant to the licensees the right to use, for all purposes, the IP that NNL owned; they granted only the right, exclusive in the designated territories, to use the IP for the purpose of making or selling "Products", a term defined by the MRDA. The definition of "Products" is limited to those products, software and services that were developed or proposed to be developed by or for one or more of the signatories to the MRDA (each a Nortel entity), and no one else. In other words, the MRDA license grant only permitted the use of the IP in connection with Nortel Products made (or proposed to be made) by or for Nortel Entities.

Thus, with respect to the assets sold or surrendered in the Business Line Sales, the proper approach is as follows.  First, tangible assets are valued based on their net book value, which approximates to their fair market value. Each Debtor should receive an allocation equal to the net book value, as identified in Nortel financial statements, of the tangible assets it contributed to each sale. Second, in-place workforce transferred to

the purchasers in each sale is valued based on the cost that would be incurred to replace the employees in question. Each Nortel Debtor should receive an allocation equal to the replacement cost for the employees that were transferred to each purchaser in the Business Line Sales.  Third, it is necessary to value the license rights the U.S. and EMEA Debtors had to the Nortel IP, which license rights were terminated in connection with the sales of Nortel's then operating businesses.  As with any other contract-based right, the value of the license rights is equal to the amounts that the licensees could have earned had the licenses not been terminated.  Thus, the value of the license rights is equal to the present value of the future operating profit that could have been earned by the U.S. and EMEA Debtors had the Nortel businesses continued to operate.  This value includes the value of any customer relationships associated with the U.S. and EMEA Debtors, since the value of customer relationships is determined by the present value of the future cash flows that those relationships could produce – the very same cash flows that the licenses would have generated. Thus, a determination of the present value of the future cash flows that would have accrued to the U.S. and EMEA Debtors, if the Nortel businesses had continued to operate, gives them appropriate credit both for any interests they had in customer relationships and for the licenses they terminated. This approach takes into account the cash inflows (such as revenues) and cash outflows (such as the costs associated with earning those revenues, including the sharing of operating profits and losses required by the MRDA). Any Sales Proceeds that are in excess of the aggregate of the foregoing values (i.e. the aggregate of the value of the tangible assets, the in-place workforce, and the license rights) are attributable to the value of the IP (unencumbered by

the license rights) owned by NNL and to the value of any customer relationships owned by NNL, being assets which NNL transferred to the purchaser. Those proceeds are properly allocated to NNL.

With respect to the sale of the residual patent portfolio, this involved the transfer of ownership of IP by NNL to Rockstar. There were no tangible assets and virtually no in- place workforce transferred as part of this sale transaction. License rights were surrendered, but that fact does not imply that they were valuable. On the contrary, the License Termination Agreement for the Rockstar Transaction specifically provided that the termination itself would not affect the ownership rights that any of the sellers may have to any IP.

A valuation of the license rights surrendered by the U.S. and EMEA Debtors in connection with the Rockstar Transaction requires consideration of the scope of the license as it relates to two categories of patents that were sold:

(a)     First, there were patents transferred in the sale that were not incorporated into any proposed or actual Nortel Products. Due to the terms of the license, properly construed, the license rights had no value in so far as they related to such patents.

(b)     Second, with respect to the patents that had been incorporated into proposed or actual Nortel Products, the value of the license rights in so far as they related to those patents has already been accounted for in valuing the license rights surrendered in connection with the Business Line Sales. This is because the Business Line Sale purchasers acquired and paid for licenses to some of the IP later sold in the Rockstar Transaction.

Accordingly, since there is no value attributable to the U.S. and EMEA license rights over and above the value that has already been ascribed to them in the context of the Business Line Sales, the proceeds realized on the Rockstar Transaction are attributable

to the transfer of NNL's ownership of the patents and properly allocated to NNL.

The Monitor submits that the Courts should allocate the Sales Proceeds as follows:

| Allocation of Sales Proceeds (In Millions of USD) | | | | |
|---|---|---|---|---|
| **Asset** | **Canada** | **U.S.** | **EMEA** | **Total** |
| Tangible Assets | $1,221.74 | $317.59 | $94.86 | $534.19 |
| IP Rights and Customer Relationship | 1,379.85 | 438.20 | 164.20 | 1,982.25 |
| In-Place Workforce | 79.07 | 135.17 | 41.91 | 256.15 |
| Wholly-Owned Businesses | - | 110.97 | - | 110.97 |
| Residual Intellectual Property | 4,453.45 | - | - | 4,453.45 |
| **Total Allocation** | **$6,034.11** | **$1,001.93** | **$300.97** | **$7,337.01** |
| % of Total – Excluding Residual IP | 54.8% | 34.7% | 10.4% | |
| % of Total – Including Residual IP | 82.2% | 13.7% | 4.1% | |

F.     Canadian Creditors' Committee

The CCC represents the interests of more than 20,000 Canadian creditors and includes pensioners, pension interests, and current and former employees who have approximately $3 billion in claims against the Canadian Estate. The Sales Proceeds consist of approximately $2.8 billion from the sales of Nortel's Lines of Business and $4.5 billion resulting from the Residual IP Sale.

The Sales Proceeds should be allocated to the owners of the assets sold. Nortel was a Canadian-based technology company and its most valuable asset was its intellectual property, which was owned by Nortel's Canadian parent corporation, NNL. In contrast, NNL's main operating subsidiaries in the U.S. and the Europe, Middle East

and Africa Regions (EMEA), held limited licenses granted by NNL within a carefully circumscribed field of use. As the owner of the most valuable asset owned and relinquished, NNL is entitled to receive most of the Sales Proceeds.

In the alternative, the Sales Proceeds should be allocated to the Nortel Debtors on a *pro rata* basis so as to provide each creditor having a valid claim the same common dividend. A *pro rata* allocation is the only fair and equitable alternative to an allocation based on the legal rights of the Nortel Debtors in the underlying assets sold.

G.    Wilmington Trust Company as Trustee

Wilmington Trust, National Association ("Wilmington Trust"), appears in its capacity as indenture trustee for the notes NNL issued namely NNL 6.875% Notes due 2023, issued pursuant to that certain Indenture, dated as of November 30, 1988 (as amended, supplemented or modified) between Nortel Networks Limited and the Trustee, as successor trustee to The Bank of New York Mellon (formerly known as The Bank of New York) as successor trustee to the Toronto-Dominion Bank Trust Company.

Wilmington Trust argues that the proceeds from the sale of the Nortel IP should be distributed according to the legal ownership interests in those assets established by the unambiguous written agreement of the parties, and that NNL is the legal owner of the Nortel IP.   The license rights, the only property interest of the Licensed Participants, as defined in the MRDA with respect to the Nortel IP, should be determined by analyzing the value of those licenses had Nortel continued operating.   Once that determination is made, such value should be distributed to those respective Licensed Participants.   The remainder of the proceeds, which Wilmington Trust expects to be the vast majority thereof, would

then inure to the unquestioned title holder and the only party with a legally recognized ownership interest in those assets, NNL.

The U.S. Interests and EMEA Debtors as the Licensed Participants seek to have these Courts: (i) rewrite the clear terms of the MRDA so that they are more to the Licensed Participants liking and (ii) engage in a hindsight reevaluation of the propriety of the conduct of the parties and their respective disclosures in the sale process. The Licensed Participants post-facto arguments cannot change the plain meaning of the MRDA, or the fact that all of the parties acted in the best interests of all of the Nortel Estates when pursuing sales that undisputedly maximized value for all of the Estates and their respective creditors, while prudently setting aside what all knew could be protracted and heated disagreement about allocation.

There is no question that NNL owned the Nortel IP. The only source of rights of any of the parties to the Nortel IP arise from the terms of the MRDA. The MRDA could not be more clear that NNL owned the Nortel IP and licensed the use of specific Nortel IP in specifically designated territories to the Licensees. The Licensees owned beneficial interests in such license rights—but did not own rights to the Nortel IP itself.

The MRDA does not address the rights of the Licensees to any share of the value of the Nortel IP, except as arising from the split of the profits and losses from Nortel's operations and sales of Products (as defined in the MRDA). It does not provide terms for the allocation of Sales Proceeds from the ultimate sale of the Nortel IP.

If the Courts conclude that the MRDA is not clear with respect to the ownership of the assets that were surrendered in the sale, and choose to allocate the Sales Proceeds

instead in a manner tailored to combat unfairness, Wilmington Trust submits that an approach based on the UK Pension Claimants' and/or the CCC's "*pro rata*" theory leads to the most equitable result. Allocation theories that have been advanced by the parties, including the U.S. Interests' "revenue" theory, the EMEA Debtors' "contribution" theory and the Pro Rata Theory are not based on the actual ownership of the assets that the Licensed Participants claim is the key question for allocation.

## H.     UK Pension Claimants

The Board of the UK Pension Protection Fund and Nortel Networks UK Pension Trust Limited (together, the "UK Pension Claimants" or "UKPC") represents over 36,000 involuntary creditors of Nortel who were former employees of Nortel. There is a deficit in excess of $3 billion in the pension plan of which they are members.

The UK Pension Claimants submit that the Courts should determine the Allocation Litigation on the basis of a Pro Rata Distribution Model which has the effect of allocating sufficient funds from the Lockbox to permit a distribution within each Estate to all unsecured creditors on a *pro rata*, *pari passu* basis, relative to the amount of their unsecured claim, irrespective of the entity against which they may have a claim. There are no secured creditors of Nortel, and only a small number of preferred or priority claims. The return to unsecured creditors from a pro rata distribution model would be dictated by a number of factors including the ultimate level of unsecured claims and equitable alternative to an allocation based on the legal rights of the Nortel Debtors in the underlying assets sold. Nortel operated prior to insolvency as a highly integrated multinational that derived significant benefits from operating as "one Nortel".

Based on the evidence, a pro rata distribution model is the most appropriate and just result for several reasons, including:

(a)     Nortel was a technology company whose must valuable asset was its intellectual property assets;

(b)     the assets that were co-developed, jointly used and collectively sold by the members of Nortel giving rise to the proceeds in the Lockbox were so profoundly integrated in creation, ownership and use that they should properly be considered as representing a common pool of assets of the Nortel as a whole;

(c)     there exists no more credible, reliable, equitable or economically rational manner with which to disentangle those assets (most of which are intangible) and ascribe value to component parts rather than the Pro Rata Distribution Model; and

(d)     in particular, and contrary to the allocation position of the U.S. Debtors and the Canadian Debtors, there was no ex ante agreement as to the distribution of the jointly used assets of Nortel when it ceased to do business, whether under the MRDA or otherwise.

The Allocation Litigation should establish a precedent for future international insolvencies involving integrated multinational enterprises, which eliminates territorial wrangling over what entity in a global insolvency involving a highly-integrated multinational enterprise whose assets are entangled should receive what recovery.

If the Courts conclude that ownership should not form the basis for allocating the Sales Proceeds, then the only fair and equitable alternative is to allocate the Sales Proceeds, taking into account approximately $1.7 billion in additional "Residual Assets" (cash and other assets in the possession of Nortel Debtors in various jurisdictions), among the Nortel Debtors so as to effect a *pro rata* distribution among creditors, such that each creditor receives a common dividend on its claim. A *pro rata* allocation is appropriate in light of the globally integrated nature of Nortel's business. Pre-Petition, Nortel was an integrated multinational technology business operating along four interdependent Lines of Business

that spanned borders and legal entities. Employees served dedicated Lines of Business for the benefit of the group as a whole.

The Business Line Sales reflected the integrated nature of the business. Purchasers bought Business Lines consisting of assets residing in various Nortel Entities scattered throughout multiple jurisdictions. Substantive consolidation, which contemplates the merger of the Estates under the supervision of a single court, is neither requested by the CCC nor necessary to effect an allocation that would yield a *pro rata* result. The Canadian Court and the U.S. Court each have equitable jurisdiction to order and direct that the Sales Proceeds be allocated in a manner that achieves a fair and equitable distribution to Nortel's creditors, including the retired, disabled pensioners and other employees who relied and depended on the promise of pensions, health, disability and other benefits as part of their compensation for the significant value they contributed to Nortel. A pro rata distribution would result in all Creditors receiving an approximate 71% return on their Claims.

The Courts have an opportunity to set a precedent that will avoid the time and expense that has plagued the Nortel proceedings for more than five years and has cost more than $1.3 billion in professional fees to date from occurring again in future. Territorial wrangling significantly diminishes value for stakeholders in a global insolvency involving a highly-integrated multinational enterprise whose assets are entangled, and ought not to be condoned or rewarded.

## **LEGAL ANALYSIS**

The parties contemplated and agreed that it would be appropriate and necessary for the U.S. Court and the Canadian Court to confer. In the Protocol which the parties

presented and the Courts approved[180] the parties identified the "mutually desirable goals

and objectives in the Insolvency Proceedings" as follows:

(a)    harmonize and coordinate activities in the Insolvency Proceedings
       before the Courts;

(b)    promote the orderly and efficient administration of the Insolvency
       Proceedings to, among other things, maximize the efficiency of the
       Insolvency Proceedings, reduce the costs associated therewith and
       avoid duplication of effort;

(c)    honor the independence and integrity of the Courts and other courts
       and tribunals of the United States and Canada, respectively;

(d)    promote international cooperation and respect for comity among
       the Courts, the Debtors, the Creditors Committee, the Estate
       Representatives (as such terms are defined in the Protocol) and other
       creditors and interested parties in the Insolvency Proceedings;

(e)    facilitate the fair, open and efficient administration of the Insolvency
       Proceedings for the benefit of all of the Debtors' creditors and other
       interested parties, where located; and

(f)    implement a framework of general principles to address basic
       administrative issues arising out of the cross-border nature of the
       Insolvency Proceedings.

Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. § 105(a) Approving Cross-Border

Court to Court Protocol, ¶ 13 (D.I. 18).

The Courts have conducted the cases independently, while cooperatively. They are

mindful that the parties expect them to communicate and determine whether they can

arrive at consistent rulings. Thus, the Protocol further provides that:

The Judge of the U.S. Court and the Justice of the Canadian Court, shall be
entitled to communicate with each other during or after any joint hearing,
with or without counsel present, for the purposes of determining whether
consistent rulings can be made by both Courts, coordinating the terms
upon of the Courts' respective rulings, and addressing any other

---

180  Order Pursuant to 11 U.S.C. § 105(a) Approving Cross-Border Court-to-Court Protocol, dated
January 15, 2009 (D.I. 54).

procedural or administrative matters.

Protocol, ¶ 12 d(vi). The parties recognized the problems that could result were rulings by the Courts to diverge and one of the reasons the cases have progressed to date is that the Courts have communicated and have arrived at consistent rulings even while exercising their judicial independence.

The Courts have had discussions following the trial of the Allocation Dispute in an effort to avoid the travesty of reaching contrary results which would lead to further and potentially greater uncertainty and delay. Based on these discussions, the Courts have learned that although their approaches to the complex issues differ, they agree upon the result. The Courts have different interpretations of the MRDA, but agree that the MRDA does not apply to or control the allocation of the Sales Proceeds for reasons discussed below. The Courts also agree that the self-serving allocation positions of the Canadian Interests, the U.S. Interests and the EMEA Debtors are not determinative or helpful.

It is incumbent upon the Court to determine a presumptive, baseline allocation approach which leads to an equitable result in the absence of some guiding law or agreement. The Court is convinced that where, as here, operating entities in an integrated, multi-national enterprise developed assets in common and there is nothing in the law or facts giving any of those entities certain and calculable claims to the proceeds from the liquidation of those assets in an enterprise-wide insolvency, adopting a pro rata allocation approach, which recognizes inter-company and settlement related claims and cash in hand, yields the most acceptable result.

There is nothing in the law or facts of this case which weighs in favor of adopting one of the wide ranging approaches of the Debtors. There is no uniform code or international treaty or binding agreement which governs how Nortel is to allocate the Sales Proceeds between the various insolvency estates or subsidiaries spread across the globe.

The MRDA, a tax document, was clearly not meant to, nor does it even purport to, govern inter-company allocation of the proceeds from liquidated Nortel assets. The MRDA does not include any provisions addressing the global insolvency or liquidation of the Nortel Group. The evidence at trial was overwhelming and undisputed that the MRDA was not intended to address that contingency:

a.  Former Chief Legal Officer Clive Allen testified that the group-wide insolvency and liquidation of the Nortel enterprise was "inconceivable" and never a risk he addressed;[181]

b.  Former Sutherland Asbill & Brennan attorney Walter Henderson, who worked on transfer pricing for Nortel, testified that no consideration was given to how the RPSM methodology would work in the event of a liquidation of the Nortel entities "because we never thought about that eventuality coming to pass";[182]

c.  Former director of transfer pricing at Nortel Michael Orlando testified that there is no provision in the MRDA that deals with the insolvency of the entire organization;[183] and

d.  Former director of international tax at Nortel Mark Weisz testified that the MRDA "was not intended to address [global] insolvency" and Nortel did not have any discussions about what would happen in the event of global insolvency.[184]

---

[181] Trial Trans. Day 3, 630:25-631:20 (Allen).

[182] Trial Trans. Day 5, 1143:19-1144:8 (Henderson).

[183] Trial Trans. Day 6, 1324:19-1325:7 (Orlando).

[184] Trial Trans. Day 9, 1877:18-1878:1.

Pursuant to an amendment executed in December 2008 to January 2009 and effective retroactive to January 1, 2006, proceeds from business sales are expressly excluded from global revenues within the RPSM calculation.[185] Mr. Orlando confirmed that the MRDA did not address how to allocate proceeds from the sale of any Nortel business and that the third addendum made explicit that the MRDA did not apply to asset sales.[186] the MRDA was an attempt to allocate annual operating profits, and sales of assets were non-operating activities.[187]

The U.S. Debtors, Canadian Debtors, and EMEA Debtors advance allocation positions which suffer from fatal, substantive flaws. EMEA fails to recognize that spending does not necessarily create value. The Canadian Debtors are nothing short of narcissistic in allocating the bulk of the Sales Proceeds to themselves and in their failure to recognize the contributions of the other Nortel companies and the realities of the manner in which the Nortel enterprise operated on a day-to-day basis. And the U.S. Debtors equate revenue to value without any regard to where the value-generating assets were developed or recognition of the fact that the $2.02 billion inter-company claim already accounts for their contributions as the primary bread-winner of Nortel. The Court's determination to recognize inter-company and settlement claims as well as the cash in hand relegates the arguments raised against a pro rata approach to concerns for process rather than substance. The Court has every confidence that the tribunals overseeing the Nortel insolvency proceedings across the globe will adjudicate the claims at issue therein in a just, efficient

---

185    TR21003(MRDA) pp. 39, 42–47, 49.

186    Trial Trans. Day 6, 1288:14-16; 1323:7-23 (Orlando).

manner.  The Court is prepared to act if they do not.  In any event, such hypothetical, procedural hurdles simply do not persuade the Court against adopting the allocation approach which clearly yields the most equitable result in these circumstances.

To be clear, the Court is not ordering cross-border, global substantive consolidation. The Court will respect the corporate separateness of the various Nortel operating subsidiaries by recognizing cash in hand and both the inter-company and settlement claims.  The Court's recognition of the inter-company claims and, in particular, the FCFSA $2.06 billion allowed claim, pays heed to the undeniable fact that NNI generated the lion's share of enterprise-wide revenues.  In other words, the fact that NNI is entitled to a greater share of the Sales Proceeds based on revenues is already baked into the case by virtue of the IFSA inter-company claim, thus making the U.S. Debtors' revenue-based approach redundant. Further, the Court is not ordering a consolidated or coordinated global distribution to ensure that each creditor of the various insolvency estates actually receives a set, pro rata distribution. The Court is merely ordering that each estate be allocated a pro rata share of the Sales Proceeds based on the amount of claims against it, recognizing all inter-company claims. Each Estate will distribute the funds as appropriate, through a plan process within the bounds of the applicable law.

The parties devoted great efforts to support their position on the MRDA.  The Court and the Canadian Court do not agree on the meaning of the MRDA, but do agree that their respective analyses do not control the Allocation Dispute because the MRDA was never intended to govern the liquidation scenario which they are now deciding. The Canadian

---

[187]    Trial Trans. Day 6, 1323:7-23 (Orlando).

Court favors the ownership position which the Canadian Interests advocate for reasons the Canadian Court explains in its Endorsement. The U.S. Court finds that the U.S. Debtors' and the EMEA Debtors' positions that the factual matrix contravenes the "ownership" claim of the Canadian Interests is what the evidence shows. The Court's discussion of the MRDA explains why the Court is fully satisfied that even in the MRDA, there is no basis to find that the Canadian Debtors owned all rights to the IP. Reading the MRDA in the manner required, the Court finds that the Canadian Debtors held bare legal title.

THE MRDA

A.      <u>Governing Law and Applicable Principles of Contract Interpretation</u>

The Court and the Canadian Court have concluded that the MRDA does not control the Allocation Dispute. Nonetheless, because the MRDA is at the very center of the parties views of the Allocation Dispute, the Court must address the parties respective arguments. The starting point for the analysis of the MRDA is the law on contract interpretation.

All the parties agree that Ontario law governs the interpretation of the MRDA. Article 14(f) of the MRDA so provides. Such a choice of law provision is binding under both Ontario law and U.S. law. *Hilgraeve Corp. v. Symantec Corp.* 265 F.3d 1336, 1340-1341 (Fed. Cir. 2001), cert. denied 535 U.S. 906 (2002); *Vasquez v. Delcan Corp.* (1998), 38 C.C.E.L. (2d) 230 at paras. 30-31 (Ont. S.C., Gen. Div.), citing *Vita Food Products Inc. v. Unus Shipping Co.*, [1939] A.C. 277 (Canada P.C.).

The goal of contractual interpretation is to give effect to the underlying objective intention of the contracting parties. *See, e.g.*, *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 at para. 47; *Consolidated-Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance*

64

*Co.*, [1980] 1 S.C.R. 888 at paras. 25-26; *Toronto-Dominion Bank v. Leigh Instruments Ltd.*, 1998

ONSC 14806, para. 415 (Can. Ont. S.C.J.).  To determine the parties' intent, a court examines

two related components: (i) the words of the contract and (ii) their context.  *See* G. R. Hall,

*Canadian Contractual Interpretation* (Markham: LexisNexis Canada, 2d ed. 2012) at 9; *Sattva*

*Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 at para. 50 (holding that "[c]ontractual

interpretation involves issues of mixed fact and law as it is an exercise in which the

principles of contractual interpretation are applied to the words of the written contract,

considered in light of the factual matrix.").  As the Supreme Court of Canada has recently

held, "[t]he parole evidence rule does not apply to preclude evidence of the surrounding

circumstances."  *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 at para. 60.  The

basic principles of contractual interpretation were clearly and concisely set out by the

Ontario Court of Appeal in *Salah v. Timothy's Coffees of the World Inc.* (2010), 74 B.L.R. (4th)

161 explained as follows:

> The basic principles of commercial contractual interpretation may be
> summarized as follows. When interpreting a contract, the court aims to
> determine the intentions of the parties in accordance with the language used
> in the written document and presumes that the parties have intended what
> they have said. The court construes the contract as a whole, in a manner that
> gives meaning to all of its terms, and avoids an interpretation that would
> render one or more of its terms ineffective. In interpreting the contract, the
> court must have regard to the objective evidence of the "factual matrix" or
> context underlying the negotiation of the contract, but not the subjective
> evidence of the intention of the parties. The court should interpret the
> contract so as to accord with sound commercial principles and good business
> sense, and avoid commercial absurdity. If the court finds that the contract is
> ambiguous, it may then resort to extrinsic evidence to clear up the ambiguity.

See also In *Kentucky Fried Chicken v. Scott's Food Services Inc.* (1998), 41 B.L.R. (2d) 42 (Ont. C.A.) stating the following regarding the interpretation of a commercial agreement at para. 27

> Where, as here, the document to be construed is a negotiated commercial document, the court should avoid an interpretation that would result in a commercial absurdity. [*City of Toronto v. W.H. Hotel Ltd.* (1966), 56 D.L.R. (2d) 539 at 548 (S.C.C.)]. Rather, the document should be construed in accordance with sound commercial principles and good business sense; [*Scanlon v. Castlepoint Development Corporation et al.* (1992), 11 O.R. (3d) 744 at 770 (Ont.C.A.)]. Care must be taken, however, to do this objectively rather than from the perspective of one contracting party or the other, since what might make good business sense to one party would not necessarily do so for the other.

The "cardinal presumption" about the primacy of the language of the contract involves determining the parties' intentions in accordance with the language that they have used. The court's goal in interpreting a contract is to determine the parties' intent as expressed by the words that they have chosen. As the Supreme Court of Canada said in the seminal *Eli Lilly v. Novopharm* case:

> [T]he contractual intent of the parties is to be determined by reference to the words they used in drafting the document . . .

*Eli Lilly & Co. v. Novopharm Ltd.*, [1998] S.C.J. No. 59 at para. 54 (S.C.C.); *See also Merck & Co. Inc. v. Apotex Inc.*, 2010 FC 1265 at para. 47.

Evidence of subjective intention – *i.e.*, evidence of what a party "understood" the contract to mean – is wholly inadmissible. A courts inquiry does not seek to determine what the parties actually intended or what they believed the words of their contract to mean. A leading text on contractual interpretation Canada provides:

> [T]he exercise is not to determine what the parties subjectively intended but what a reasonable person would objectively have understood from the words of the document read as a whole and from the factual matrix.

66

Geoff Hall, *Canadian Contractual Interpretation Law* (2012) at para. 2.4.1; *see also Ontario v. Imperial Tobacco Canada Ltd.*, 2012 ONSC 6027 at para. 29

The Ontario Court of Appeal in *Dumbrell* held that the interpretive exercise should focus on the words used, and not on the parties' subjective beliefs:

> *Eli Lilly* instructs that the words of the contract drawn between the parties must be the focal point of the interpretative exercise. The inquiry must be into the meaning of the words and not the subjective intentions of the parties.

*Dumbrell v. The Regional Group of Companies Inc.*, 2007 ONCA 59 at para. 51; *see also Eli Lilly & Co. v. Novopharm Ltd.*, [1998] S.C.J. No. 59 at para. 54

Courts simply must not consider evidence of what a party says he or she intended to agree to at the time of contracting, nor can courts consider evidence of what a party understands the words of the contract to mean.  In *Zaccardelli v. Kraus* the Court explained that:

> What [a party] thinks the documents mean is irrelevant and so not admissible. . . . What [a party] understood or intended is not relevant and so not admissible.

*Zaccardelli v. Kraus,* [2003] A.J. No. 442 at paras. 29-30 (Master).

Subjective understandings of the meaning of a contract do not become admissible by characterizing those understandings as forming part of the factual matrix.  As the Court of Appeal stated in *Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne*:

> While the scope of the factual matrix is broad, it **excludes** evidence of negotiations, except in the most general terms, **and evidence of a contracting party's subjective intentions.** [emphasis added]

*Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne*, 2012 ONCA 862 at para. 71

*See also Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 at para. 57:

> While the surrounding circumstances will be considered in interpreting the terms of a contract, they must never be allowed to overwhelm the words of

67

that agreement. . . . While the surrounding circumstances are relied upon in the interpretive process, courts cannot use them to deviate from the text such that the court effectively creates a new agreement.

Evidence of the parties' post-contracting conduct by definition is not part of the factual matrix and is generally inadmissible to interpret the contract unless a court finds ambiguity. Geoff R. Hall, *Canadian Contractual Interpretation Law* (2012) at para. 3.2.2; *York Bremner Development Ltd. v. FHR Properties Inc.*, [2007] O.J. No. 3484 at paras. 31-32 (S.C.J.) A contract is not ambiguous merely because it is difficult to interpret. *Geoffrey L. Moore Realty Inc. v. Manitoba Motor League*, 2003 MBCA 71 at para. 25; *Paddon Hughes Development Co. v. Pancontinental Oil Ltd.*, 1998 ABCA 333 at para. 29. Rather, a contractual provision is only ambiguous if it is "reasonably susceptible of more than one meaning". *Geoffrey L. Moore Realty Inc. v. Manitoba Motor League*, 2003 MBCA 71 at para. 25.

Introductory recitals in a contract may not alter the operative terms of the contract, but may be used as an interpretive guide to the parties' intent. *See, e.g., Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 at para. 57 (relying on recitals to determine whether an agreement was a sublicense; *Sistem v. Kyrgyz Republic*, 2012 ONSC 4983 (Newbould, J.) at paras. 25-26 (using recitals to find that a party had an equitable interest in the property at issue). *Accord Time Warner Entm't Co., L.P. v. Everest Midwest Licensee, L.L.C.*, 381 F.3d 1039, 1048 (10th Cir. 2004) (relying on a preamble to determine the purpose of a licensing agreement); *Blackstone Consulting Inc. v. United States*, 65 Fed. Cl. 463, 470 (Fed. Cl. 2005) (noting that "recitals may be read in conjunction with the operative portions of a contract in order to ascertain the intention of the parties" (internal quotations omitted)); *see also Stowers*

68

*v. Cmty. Med. Ctr., Inc.*, 172 P.3d 1252, 1255 (Mont. 2007) ("Recitals in a contract should be reconciled with the operative clauses of the contract and given effect as far as possible.")

A contract should always be interpreted "so as to accord with sound commercial principles and good business sense, and avoid commercial absurdity." *Downey v. Ecore International Inc.*, 2012 ONCA 480 at para. 38 (quoting *Salah v. Timothy's Coffees of the World Inc.*, 2010 ONCA 673 at para. 16); *see also Unique Broadband Systems, Inc. (Re)*, 2014 ONCA 538 at para. 88 ("[A]n interpretation which defeats the intentions of the parties and their objective in entering into the commercial transaction in the first place should be discarded in favour of an interpretation of the policy which promotes a sensible commercial result." (quoting *Consolidated-Bathurst Export Ltd. v. Mutual Boiler and Machinery Insurance Co.*, 1979 CanLII 10 (SCC), [1980] 1 S.C.R. 888, at p. 901)); *id.* at para. 89 ("[C]ommercial contracts should be 'interpreted in the way in which a reasonable commercial person would construe them.'"). *Accord Pan Am. Realty Trust v. Twenty One Kings, Inc.*, 408 F.2d 937, 939 n.4 (3d Cir. 1969) ("Business contracts must be construed with business sense, as they naturally would be understood by intelligent men of affairs." (quoting *N. German Lloyd v. Guar. Trust Co. of New York*, 244 U.S. 12, 24 (1917) (internal quotations omitted))); *see also Baldwin Piano, Inc. v. Deutsche Wurlitzer GmbH*, 392 F.3d 881, 883 (7th Cir. 2004) ("When there is a choice among plausible interpretations, it is best to choose a reading that makes commercial sense, rather than a reading that makes the deal one-sided."). In this analysis, courts may also consider objective manifestations of the parties' intent. *See Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 at para. 57 (holding that the purpose of examining the "surrounding circumstances" of a contract "is to deepen a decision-maker's understanding

69

of the mutual and objective intentions of the parties as expressed in the words of the contract").

Finally, the foregoing ordinary principles of contract law apply equally to the interpretation of a license agreement such as the MRDA. *See, e.g., Merck & Co. Inc. v. Apotex Inc.*, 2010 FC 1265 (Can. F.C.); *Hemosol Corp., Re*, [2006] O.J. No. 4018 (Can. Ont. S.C.J. [Commercial List]); *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129; *Walt Disney Co. (Canada) Ltd. v. Philhobar Design Canada Ltd.*; (2008), 47 B.L.R. (4th) 306 (Can. Ont. S.C.J.); *White v. E.B.F. Manufacturing Ltd.*, 2005 NSCA 167; *Verdellen v. Monaghan Mushrooms Ltd.*, 2011 ONSC 5820; *see also* Roger T. Hughes & Dino P. Clarizio, *Halsbury's Laws of Canada - Patents, Trade Secrets and Industrial Designs (2012 Reissue)* at para. HPT-138 (QL).

## B.   The Valuable "Bundle of Rights" that a Patent Affords

A patent confers valuable exclusivity by providing the party holding rights to the patent the ability to prevent others from making, using or selling the patented invention. See 35 U.S.C. § 154(a)(1); Patent Act (Canada), § 42.  Patents are territorial; thus, a patent filed in the United States, for example, excludes others from utilizing the patent or the patented invention in the United States or importing the patented product into the United States.  *See* 35 U.S.C. § 271(a).  A Canadian patent likewise confers in Canada "the exclusive right, privilege and liberty of making, constructing and using the invention and selling it to others to be used, subject to the adjudication in respect thereof before any court of competent jurisdiction."  Patent Act (Canada), § 42.

A patent "is a bundle of rights which may be retained in whole or in part, divided and assigned."  *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1341 n.8 (Fed. Cir. 2007); *see also*

70

Patent Act (Canada), § 42; *Harvard College v. Canada*, [2002] 4 S.C.R. 45 at para. 64. The

bundle of rights" that comprise a patent may also be transferred to another party through a

license. See, e.g., McCoy, 67 F.3d at 920; *see also* Patent Act (Canada), § 50(2); *Rite*

*Manufacturing Ltd. v. Ever-Tite Coupling Co.* (1976), 27 C.P.R. (2d) 257 at para. 20 (Can.

Registrar of Trade Marks) *citing National Carbonising Co., Ltd. v. British Coal Distillation Ltd.*

(1936), 54 R.P.C. 41 (C.A.) at 56-57 (noting that "a patentee is fully entitled to assign his

rights under the Letters Patent to another").

1.  NNL's Claim to Legal Title to the IP

The Canadian Debtors' position in the Allocation Dispute is that the MRDA

establishes that they own all of the IP and therefore are entitled to all of the IP Sales

Proceeds less a relatively minor value attributable to what they view as limited licenses

held by the U.S. Debtors and the EMEA Debtors. The Canadian Debtors rely on the words

of the MRDA which support them.

NNL's claim of legal title to the IP is reflected in the MRDA's first recital, which

states: "Whereas legal title to all NN Technology is held in the name of NNL." Article 4(a)

of the MRDA states:

> Except as otherwise specifically agreed, legal title to any and all NN
> Technology whether now in existence or hereafter acquired or developed
> pursuant to the terms of this Agreement shall be vested in NNL.

The MRDA further provides that "legal title" survives termination of the MRDA:

> The provisions of Article 4 (Legal Title to NN Technology) with respect to
> NN Technology acquired or developed pursuant to this Agreement from the
> Effective Date of this Agreement up to an including its expiry or termination
> date . . . shall survive notwithstanding the expiry of this Agreement, or any
> termination of this Agreement for any cause whatsoever.

71

The Canadian Debtors argue that with this language and the MRDA taken as a whole, legal title meant ownership. The Canadian Debtors point to other provisions of the MRDA describing the ownership rights of NNL which include:

(a)     NNL's sole and exclusive right (without the obligation to anyone else, including the Licensed Participants) to file and prosecute patent applications (in the absence of which right, intellectual property could not be protected in the form of valuable patents);[188]

(a)     Licensed Participants owed to NNL (but NNL did <u>not</u> owe to the Licensed Participants) obligations of confidentiality regarding the IP;[189]

(b)     If a Participant withdrew from the MRDA, its exclusive license would terminate and be cancelled and NNL would be able to exercise all rights in the former Participant's exclusive territory,[190]; and

(d)     NNL granted license rights to that IP to the U.S. and EMEA Debtors, pursuant to Article 5(a)(i) of the MRDA. Under Ontario law, the right to grant a license is a right enjoyed by the owner of the IP.

In support of its ownership claim, the Canadian Debtors look to the licenses under the MRDA. Article 5(a) grants two licenses: an exclusive license and a non-exclusive license. Those two licenses confer rights to perform the same activities, with those rights being granted on an exclusive basis to the Licensed Participants in their respective "exclusive territories", and the rights being granted on a non-exclusive basis in the designated "non-exclusive territories". Article 5(a) states as follows:

To the extent of its legal right to do so, and subject to the rights of relevant third parties, NNL hereby:

(i)     continues to grant to each Licensed Participant an exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease,

---

[188] TR21003 (MRDA and addenda) Article 4(d)

[189] TR21003 (MRDA and addenda) Article 6(a)

[190] TR21003 (MRDA and addenda) Article 11(d)

license, offer to sell, and sell Products using or embodying NN Technology in and for the Exclusive Territory designated for that Licensed Participant, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ("Exclusive License"); and

(ii)    grants to each Licensed Participant, as of January 1, 2009 (the "Non-Exclusive License Effective Date"), a non-exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Non-Exclusive Territory, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ("Non-Exclusive License").

NNL granted a license to make "Products" that use or embody such IP.  Article

5(a) states that the license is "to make, have made, use, lease, license, offer to sell, and

sell *Products . . .*"  and "rights to patents . . . as necessary or appropriate in connection

therewith". The definition of "Products" at Article 1(g) of the MRDA states:

"Products" shall mean all products, software and services designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured or marketed, at any time *by, or for, any of the Participants*, and all components, parts, sub-assemblies, features, software associated with or incorporated in any of the foregoing, and all improvements, upgrades, updates, enhancements or other derivatives associated with or incorporated in any of the foregoing.

The license rights thus consist of a right to make, use or sell products, software or

services that used or embodied Nortel IP and that were made or sold (or proposed to be

made or sold) by, or for, any of the parties ("Participants") to the MRDA, and the use of

certain Nortel IP as necessary or appropriate in connection with the making, using or

selling of "Products".  The license also included a right to sublicense.

The MRDA also granted Licensed Participants the right to assert actions and recover damages in their respective territories for infringement or misappropriation of NN Technology by others.

The Canadian Debtors' reliance on a strict interpretation of the MRDA ignores both the factual matrix from which the MRDA arose and a reading of the MRDA as an integrated whole.  The MRDA simply does not capture the economic reality that the non-Canadian participants, and the U.S. Debtors in particular, were generating the majority of the value of the Nortel Enterprise.  The U.S. Debtors' interpretation of the MRDA accurately incorporates the MRDA as a whole.

As discussed earlier, the Court is required to review the MRDA in the context of the factual matrix which aids in determining the meaning of the words against the relevant background.  *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 at para. 48.  Indeed, a court should consider the factual matrix even if a contract is unambiguous.  *Sattva*, 2014 SCC at 53.  While the evidence of the factual matrix may not include the subjective intent of the parties, it does include "the genesis of the transaction, the background, the context [and] the market in which the parties are operating."  *Kentucky Fried Chicken Canada v. Scott's Food Services, Inc.*, [1998] O.J. No. 4368 at para. 25 (Can. Oct. C.A.)

Contrary to the arguments of the Canadian Debtors, the MRDA establishes the Participants' shared ownership of the Nortel assets which are now the Sales Proceeds.  The facts make it clear to the Court that the U.S. Debtors and the EMEA Debtors held an economic and beneficial ownership interest in Nortel's assets and thereby are entitled to an equitable allocation of the Sales Proceeds.

74

2.      The Factual Matrix Surrounding Transfer Pricing,
        Historical Business Practices and Custom of the Industry

The MRDA grants the Licensed Participants all valuable rights to and beneficial

ownership in NN Technology in their respective territories.  The Court looks to the

purpose, rules, and representations underlying Nortel's transfer pricing agreements,

including the R&D CSAs and the MRDA; Nortel's pre-petition business practices; and

custom in the industry.[191]

Transfer pricing rules and regulations require that each entity in an MNE "price its

related party transactions as if the entity were at arm's length from its parent and affiliated

entities within the MNE."[192]  Transfer pricing regulations emphasize economic ownership

that arises from the actual functions, assets, and risks of each entity rather than the holding

of legal title.[193]  The OECD (Organization for Economic Co-operation and Development)

Guidelines state that each party to a CSA must be "entitled to exploit its interest in the

[CSA] separately as an effective owner thereof and not as a licensee."[194]   If a CSA

participant's "contribution entitles [that party] to obtain only a right to use intangible

property . . . and the [party] does not also obtain a beneficial interest in the intangible

property itself," then that contribution "would constitute a royalty for the use of intangible

property."[195]    Similarly, CRA Information Circular 87-2R affirms these principles,

---

[191] As an initial matter, the MRDA was subject to continual amendment until December 31, 2008, *see* TR21003 (MRDA) at 59 (4th Addendum), such that the factual matrix throughout the pre-petition period must be considered.

[192] *See* TR11412 (Eden Report) ¶ 26.

[193] *See* Trial Tr. 2667:14-2669:1 (Cooper); 5042:9-5043:17 (Eden).

[194] TR40713 (1997 OECD Guidelines) § 8.3; TR11391 (2010 OECD Guidelines) § 8.3.

[195] TR40713 (1997 OECD Guidelines) ¶ 8.23; TR11391 (2010 OECD Guidelines) ¶ 8.23.

providing that "each participant in a [CSA] is not required to be a legal owner of [intangible] property, but each participant must enjoy substantially similar rights, benefits, and privileges as a legal owner (effective or beneficial ownership)."[196]

Nortel's transfer pricing agreements satisfied these principles:

(a)     The final R&D CSAs, the cost-sharing agreements that preceded the MRDA, provided that each CSP other than NNL held an "Exclusive Royalty-Free License to NT Technology" in the geographic territory assigned to that CSP, while "legal title to all NT Technology whether now in existence or developed pursuant to the terms of [the] Cost Sharing Agreement[s]" was vested in NNL.[197]

(b)     The third recital of the final R&D CSAs provided that the CSPs "wish[ed] to share the costs and risks of research and development services or activities in return for interests in any NT Technology that may be produced by such services or activities."[198]

(c)     Article 7 of the final R&D CSAs provided that each licensed CSP held "the primary right and obligation to bring and defend in and for [its exclusive territory], at its own expense, and for its own benefit, any proceedings relating to alleged infringement of its rights to the NT Technology by a third party or the alleged infringement by Participant's use of the NT Technology of the rights of third parties," with NNL having the right to enforce only if the licensed CSP failed to do so.[199]

(d)     Article 10 of the final R&D CSAs established that upon the expiration or termination of the agreement, each licensed CSP acquired "a fully paid up license" permitting it to continue to exercise its rights in its exclusive territory, without being subject to any further cost sharing

---

[196]  TR50295 (IC 87-2R) ¶ 121.

[197]  TR21002 (1992 NNL-NNI R&D CSA) at 7-8 (Arts. 4, 5); TR31309 (1995 NNL NNUK R&D CSA) at 7 (Arts. 4, 5); TR46945 (2000 NNL-NNSA R&D CSA) at 8 (Arts. 4, 5).

[198]  TR21002 (1992 NNL-NNI R&D CSA) at 1 (Whereas Clauses); TR31309 (1995 NNL-NNUK R&D CSA) at 1 (Whereas Clauses); TR46945 (2000 NNL-NNSA R&D CSA) at 1 (Whereas Clauses).
[199]  TR21002 (1992 NNL-NNI R&D CSA) at 9-10 (Art. 7); TR31309 (1995 NNL-NNUK R&D CSA) at 9 (Art. 7); TR46945 (2000 NNL-NNSA R&D CSA) at 10 (Art. 7).

payments to NNL.[200]  The Licensed Participants maintained their effective ownership of NN Technology under the MRDA.  *See, e.g.*, *supra* Findings of Fact, Section III.C.1 (explaining how tax authorities would have required NNL to make "buy out" payments had the Licensed Participants' rights to Nortel technology been diminished during the transition from the 1992 R&D CSA to the MRDA).

Nortel personnel represented to tax authorities that each Licensed Participant enjoyed economic and beneficial ownership of Nortel IP in its exclusive territory under the R&D CSAs and the MRDA.  *See, e.g.*, *The Canada Trust Co. v. Russell Browne et al.*, [2012] ONCA 862 at paras. 21-23, 83-88 (ruling that correspondence with the CRA regarding the potential adverse tax consequences of a proposed amendment to a contract, as well as a CRA advanced ruling on that subject, must be considered to discern the parties' intent).  For example:

(a)    In March 2002, Nortel reported to the IRS, CRA and Inland Revenue that from an economic standpoint dating back to the previous R&D CSA, each IE "could be considered to 'own' the [Nortel] technology as it related to its specific region." [201]

(b)    This echoed Nortel's previous representation to Inland Revenue that "although Nortel Canada has legal ownership of Nortel's Intellectual Property, each participant [in the R&D CSA] has beneficial ownership, within their country of incorporation." [202]

(c)    In July 2003, Nortel wrote in its Transfer Pricing Report that the parties to the R&D CSA each "contribute to the development of the intangible, and as such share in its ownership."[203]

---

[200] TR21002 (1992 NNL-NNI R&D CSA) at 10 (Art. 10); TR 31309 (1995 NNL-NNUK R&D CSA) at 10 (Art. 10); TR46945 (2000 NNL-NNSA R&D CSA) at 11 (Art. 10).  *See also* Trial Tr. 1165:17-22 (Henderson) ("[W]hen I read that language . . . what I understood it to mean is that when you have a fully paid up perpetual exclusive license, you're effectively the economic owner.  That's commonly understood in – certainly in transfer pricing and I think in general economics.").

[201] TR1105 (Horst Frisch Report) at 10; TR 11343 (IRS Notice of Adjustment) attachment at 3.

[202] TR31022; Barton Dep. 117:6-7 and 117:9-13

[203] TR48969.03 (2003 Transfer Pricing Report) at 25.

(d)     In 2003, in response to questions posed by the relevant taxing authorities, Nortel stated that all IEs were "owners of the intangible property."[204]

(e)     In November 2004, in a response to an IRS Information and Document Request for Functional Analysis, Nortel explained that the IEs "have agreed to continue participating in the future benefits of new IP" under the RPSM because they were "responsible for ongoing entrepreneurship and risk-taking functions with respect to the IP arising from their collective R&D efforts."[205]

(f)     In 2008, in a joint request for a new APA to cover the years 2006-2011, NNL and NNI told the CRA and IRS that although IP was "registered" in NNL's name, "[e]ach IE maintain[ed] an economic ownership in the IP."[206]

Nortel's enforcement and sublicensing practices prior to the bankruptcy confirm the Licensed Participants' exclusive economic and beneficial ownership and rights. For example:

(a)     NNI exercised its enforcement rights with respect to Nortel IP by suing third parties for infringement of Nortel patents in the United States, even when NNI was not in the business of making anything similar to the third party's infringing products.[207]

(b)     Nortel's legal department recognized that NNI, as the exclusive license holder in the United States, held substantially all rights to Nortel's U.S. patents, and therefore had the right to bring such suits on its own.[208]

(c)     In 2004, NNI pleaded in *NNI v. Vonage Holdings Corp.* that it was the "exclusive licensee" of all U.S. patents legally owned by NNL and that it "possesse[d] substantially all rights" with respect to these patents, such that it "ha[d] standing to assert these patents against infringers."

---

[204] TR11169 at 25.

[205] TR11084, cover letter at 2.

[206] TR22078 (2008 Joint APA Request); Trial Tr. 1280:20-23, 1281-24-1289:9

[207] TR50593.01; TR21456; TR22084; TR40777; TR40788.

[208] TR50518; TR50231 at 2-3.

NNL was aware of this pleading and never disputed NNI's position.[209]

(d) During the MRDA period, NNL entered into worldwide IP sublicenses "on behalf of itself and its Subsidiaries," because the Licensed Participants, not NNL, had the right to sublicense Nortel IP in their respective territories.[210]

(e) The Licensed Participants granted licenses to third parties that conveyed the right to use Nortel IP in the third parties' own businesses, with no requirement that such third parties engage in the manufacture, use or sale of products for Nortel and often permitted the third parties to use the IP for a business in which Nortel did not operate.[211]

This interpretation of the MRDA is further supported by evidence on custom and practice. Daniel Bereskin, an expert on the custom and practice in the field of intellectual property, concluded that a sophisticated business person would understand the MRDA as follows:

(a) The MRDA conveyed to the Licensed Participants (1) the right to use, make and have made "Products" embodying NN Technology, where "Products" is broadly defined; (2) the right to all Nortel patents (and other intellectual property including technical know-how); and (3) the right to sublicense the rights in (1) and (2) to a third party for its own use.[212]

(b) These rights conveyed to the Licensed Participants are exclusive, perpetual, and royalty-free for each Licensed Participant in its Exclusive Territory and "essentially comprise all attributes of ownership deemed by custom and practice to be commercially important and valuable."[213]

---

[209] TR50516 ¶¶ 7-9.

[210] TR21080; T. Collins Dep.; 219:8-11, 219:25-220:10.

[211] TR22080 at 3; TR22154 at 1.

[212] Bereskin Rebuttal ¶¶ 38, 45.

[213] Bereskin Rebuttal ¶¶ 38-39.

(c)     Because Article 4(e) of the MRDA gives each Licensed Participant an unrestricted right to enforce NN Technology within its exclusive territory, the affirmative grant of license rights in Article 5 would be read to be coextensive and likewise unrestricted.[214]

(d)     No rational buyer would have purchased the Patent Portfolio without the Licensed Participants first terminating or disavowing their interests in the Patent Portfolio.[215]

3.      Each Participant Exclusively Held Valuable Rights to
        NN Technology, Including Patents, in Its Respective Territory

The MRDA provides that each participant holds exclusive rights to practice, sublicense and enforce NN Technology, including patents, in its territory.[216]   The parties to the MRDA agreed to conduct research and development and to grant to each Participant, in its respective territory, an exclusive license to the patents and other intellectual property generated as a result of such research and development.  *See id.* at 4, 6 (Arts. 2(a), 4(a)).

In Article 4 – titled "Legal Title to NN Technology" – the parties agreed to vest "legal title" to NN Technology in NNL "in consideration" for a grant to each of the Licensed Participants of exclusive, perpetual, and royalty-free rights to NN Technology in its respective territory.  *See id.* at 6 (Art. 4(a)).  "NN Technology" is broadly defined as "any and all intangible assets including but not limited to patents, industrial designs, copyrights and applications thereof, derivative works, technical know-how, drawings, reports, practices, specifications, designs, software and other documentation or information produced or conceived as a result of research and development by, or for, any of the

---

[214]  Bereskin Rebuttal at ¶ 35.

[215]  Bereskin Rebuttal ¶¶ 46, 48, 54

[216]  *See* TR21003 (MRDA) at 20 (Sched. B).

Participants, but excluding trademarks and any associated goodwill."[217]   NNL agreed that

the Licensed Participants would have "an exclusive, royalty-free license, including (i) the

right to sublicense, which except as hereinafter provided shall be in perpetuity, (ii) rights to

make, have made, use, lease, license, offer to sell, and sell Products using or embodying

NN Technology in and for the Exclusive Territory designated for that Licensed Participant,

and (iii) all rights to patents, industrial designs (or equivalent) and copyrights, and

applications therefor, and technical know-how, as necessary or appropriate in connection

therewith ('Exclusive License')."   *Id.* at 6-7 (Art. 5(a)).

> 4.      Under the MRDA, Each Licensed Participant Held
>         the Right to Sublicense in Its Exclusive Territory

The right to sublicense enables a licensee to grant another party the ability to stand

in its shoes and exercise its rights.  *See*, *e.g.*, *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R.

129 at para. 48.   Under the plain language of the MRDA, the exclusive license of each

Licensed Participant includes the right to "sublicense" to other parties.[218]

The MRDA also grants the Licensed Participants both a "have made" right and the

right to sublicense.   Article 5(a) states that the exclusive license includes the "rights to

make, have made, use, lease, license, offer to sell, and sell."[219] Accordingly, each Licensed

Participant held the right to sublicense in its exclusive territory distinct from any right to

have a supplier make products.

---

[217] *See* TR21003 (MRDA) at 3 (Art. 1(f)).

[218] *See* TR21003 (MRDA) at 6 (Art. 5(a)) (granting each Licensed Participant "an exclusive, royalty-free license, including," *inter alia*, "the right to sublicense").

[219] *See* TR21003 (MRDA) at 6 (Art. 5(a)).

5.      Article 4(e) Grants the Right to the
        Right to Assert Actions and Recover Damages

Under Article 4(e) of the MRDA, the "Licensed Participants have the right to assert actions and recover damages or other remedies in their respective Territories for infringement or misappropriation of NN Technology by others," with no requirement to join NNL or any other entity as a plaintiff.[220]  Article 4(e) grants the Licensed Participants the right to enforce any infringement or misappropriation of NN Technology "by others," which includes third parties and other Participants.  *Id.*  The enforcement right in Article 4(e) "survive[s] notwithstanding the expiry of [the MRDA], or any termination of [the MRDA] for any cause whatsoever."[221]

A licensee's right to bring infringement suits is a particularly critical factor in the "all substantial rights" analysis.  *See, e.g., Vaupel*, 944 F.2d at 875 ("This grant [of the right to sue for infringement] is particularly dispositive here because the ultimate question confronting us is whether [the licensee] can bring suit on its own or whether [the patentee] must be joined as a party.").  Given the expansive scope of rights that the MRDA conveyed to NNI, the MRDA comfortably meets the "all substantial rights" test, such that NNI could unilaterally bring infringement actions in the United States.  Even if NNI did not have "all substantial rights" to NN Technology in the United States, NNI could enforce its rights as an exclusive licensee simply by joining or inviting or compelling NNL as a party, which NNL could not prevent.  *See, e.g., Intellectual Prop. Dev.*, 248 F.3d at 1348 ("As a prudential principle, an exclusive licensee having fewer than all substantial patent rights possesses

---

[220]  TR21003 (MRDA) at 6 (Art. 4(e)).

[221]  TR21003 (MRDA) at 9 (Art. 9(c)).

standing under the Patent Act as long as it sues in the name of, and jointly with, the patent owner and meets the [Article III standing] requirements."); *Abbott Labs. v. Diamedix Corp.*, 47 F.3d 1128, 1133 (Fed. Cir. 1995) ("A patentee that does not voluntarily join an action prosecuted by its exclusive licensee can be joined as a defendant or, in a proper case, made an involuntary plaintiff if it is not subject to service of process."); *see also Indep. Wireless Tel. Co. v. Radio Corp. of Am.*, 269 U.S. 459, 469 (1926).

6.     The MRDA's Further Confirmation that Licensed
       Participants Held All Valuable Rights to NN Technology

The MRDA grants the Licensed Participants the rights to exploit, exclude, and sublicense in their exclusive territories. Consistent with the broad scope of that grant, the MRDA and its amendments repeatedly describe the Licensed Participants as having "ownership" of NN Technology in their respective territories.

The recitals to the MRDA describe the Licensed Participants' ownership rights, stating that "each Licensed Participant held and enjoyed equitable and beneficial ownership of certain exclusive rights under [NN] Technology" for its exclusive territory under the R&D CSAs and that "it is the intent of NNL and the Licensed Participants that the Licensed Participants continue. . . to hold and enjoy such rights."[222] The MRDA further states that each Participant "bears the full entrepreneurial risks and benefits for the Nortel Network business." *Id.* (Whereas Clauses).

Schedule A to the MRDA – an operative provision – repeats these statements, explaining that the "Participants bear the full entrepreneurial risk of the Nortel business

---

[222] TR21003 (MRDA) at 2 (second recital).

such as the risks attendant with the substantial and continuous development and ownership of the NN Technology." *Id.* at 18 (Sched. A). Amended Schedule A to the Second Addendum, signed in December 2007, provides the same, as does Second Amended Schedule A, introduced as part of the Third Addendum signed in December 2008 through January 2009, *Id.* at 30 (Second Addendum, Sched. A), *Id.* at 48 (Third Addendum, Sched. A). Again, the Second Addendum states that "each Participant holds and enjoys equitable and beneficial ownership of NN Technology." *Id.* at 27 (Second Addendum, Whereas Clauses).

Similarly, the Memorandum of Understanding ("MOU") – which was drafted "to provide a record of" the Participants' "understandings" with respect to the MRDA and related agreements – states that the Licensed Participants enjoyed "ownership" of NN Technology.[223] The MOU explains that the MRDA "memorializes the agreements of NNL and the Licensed Participants as to the development and deployment of existing and future NN Technology and ownership of the NN Technology, with NNL holding legal title thereto." *Id.* ¶ 3.

Article 9(b) provides that: Upon termination of the MRDA, each Licensed Participant "shall be deemed to have acquired a fully paid up license permitting it to continue to exercise the rights granted to it herein, and, in particular, the rights granted to it in Article 5 as though this Agreement had continued." *Id.* at 9 (Art. 9(b)).

Article 10(a) provides that: NNL Licensed Participants could not add Participants without the consent of all other Licensed Participants.

---

[223] *See* TR48944 (MOU) at 1 & ¶¶ 3, 6.

Article 11 provides that: When a Participant exits from the MRDA due to insolvency, NNL is obligated to pay fair market value in exchange for the cancellation of the exclusive license and the acquisition by NNL of the rights held by the former Licensed Participant. The entitlement of each Licensed Participant to be paid fair market value for its exclusive license in an insolvency substantiates the Licensed Participants' broad rights to NN Technology.

7.    NNL Had Nothing of Value to Sell in the
      Licensed Participants' Exclusive Territories

The Licensed Participants held the right to enforce all the NN Technology in the Exclusive Territories, including the patents included in the Patent Portfolio, and no other party was entitled to control or interfere with their enforcement rights.  As a result, no buyer of the Patent Portfolio would have purchased the patents and other intellectual property rights in the sales unless Licensed Participants terminated those rights.  Absent such termination, if the buyer had sought to exploit NN Technology, Licensed Participants would have had the right and ability to prevent the buyer from doing so.

In the United States the effect of a transfer of title to a U.S. patent on the rights of an existing licensee to the patent is governed by U.S. patent law, even if the underlying license agreement is governed by foreign law.  *Innovus Prime*, 2013 WL 3354390, at *3.  Under U.S. law, a party cannot place a buyer of its patent interests in any better position than the party itself occupied or confer upon the buyer rights that the party itself did not hold.  *See id.* at *5  The same is true under Ontario law.  *See National Carbonising Co., Ltd. v. British Coal Distillation, Ltd.* (1937), 54 R.P.C. 41 (C.A.) (holding that an assignment of a patent cannot

defeat the rights of the licensee under a license); *see also* P. Bradley Limpert, *Technology Contracting: Law, Precedents and Commentary* (Toronto: Carswell, 2011) at 5-31.

Therefore, NNL had no right to practice or otherwise exploit Nortel patents or other NN Technology in the United States and could not place a buyer of its interests in any better position than NNL itself occupied or protect such a buyer from an infringement suit by NNI.

THE FLAWED POSITIONS

The Court has concluded that the MRDA does not govern allocation. In the absence of agreement, and because the Estates' allocation positions are flawed, the Court finds that a modified pro rata allocation method is appropriate by default.

A.    <u>Canadian – Ownership</u>

The U.S. Debtors and the EMEA Debtors had broad, exclusive licenses to use the NN Technology. Accordingly, NNL's "legal title" to IP was fully encumbered by the Exclusive Licenses in the Licensed Participants' territories. It had little to sell in the Rockstar Sale and, in fact, the IP Sale could only have been the success it was because the Licensed Participants agreed to terminate their Exclusive Licenses.

NNI held the right to enforce all of the NN Technology in the United States. This right included the IP in the Patent Portfolio. It is obvious that no buyer of Nortel IP would purchase the IP if NNI – and Exclusive Licenses in other territories – did not terminate such rights. Otherwise, the Exclusive Licensees, including NNI, could enjoin a purchaser from exploiting the IP it purchased.

86

The Monitor also claims that NNL could freely transfer its rights in NN Technology, but that NNI and the other Licensed Participants could not do so.  This is wrong, and the Monitor's "value in use" approach to allocation that rests on this claim is thus necessarily wrong.

The Monitor's value in use analysis inflates NNL's allocation.  On the Business Line Sales, the Monitor and its expert, Philip Green do not value what portion of the purchase price paid for the Business Lines was due to the transfer or surrender of assets and rights by any of the Selling Debtors.  The Canadian Interests value – only for NNI and the EMEA IEs, but not for NNL – what the assets and rights might have been worth if not sold.  Thus, the Monitor and Mr. Green allocate to NNI and the EMEA IEs (but not to NNL) the discounted cash flow value that NNI and the EMEA IEs would have earned had the Business Lines not been sold, which Mr. Green then understates by downwardly adjusting Nortel's cash flow projections. Yet the Monitor and Mr. Green fail to perform any valuation with respect to the intellectual property rights NNL contributed in the Business Line Sales, but instead simply allocate to NNL the remainder of the purchase prices paid.

Had the Monitor and Mr. Green applied to NNL the same value in use methodology and cash flow projections they used for NNI and the EMEA IEs, their allocation to NNL would be reduced by approximately $1 billion.  Moreover, applying their methodology consistently to all parties would leave this $1 billion unallocated to any Selling Debtor.  The Monitor and Mr. Green simply "allocate" this $1 billion solely to NNL without any basis.

On the IP Sale, the Monitor's theory is that NNL is entitled to all of the proceeds.  In addition, Green conducts an alternative analysis whereby the Monitor and Green calculate

an aggregate value in use that is short by \$1.8 to \$4.1 billion.  Again, they allocate these
billions to NNL for no good reason despite admitting they do not know to what that value
is allegedly attributable.[224]  Their premise is that NNI's and the EMEA IEs' interest in NN
Technology was non-transferable but NNL's interest was transferable.  The right of the
NNI and EMEA IEs to transfer their interests greatly reduces the Canadian Interests'
valuation.

B.    The EMEA Debtors - Contribution

The EMEA Debtors agree with NNI's allocation position (with certain modifications)
as an alternative theory, but argue as their principal allocation theory that allocation should
be based on the Selling Debtors' contribution to the development of NN Technology.  The
contribution theory erroneously equates the cost of developing an asset with its value.  The
EMEA Debtors' own valuation expert, Paul Huffard, conceded that the contribution
approach is not a valuation approach:

Q.    Whereas in the contribution approach, you're not valuing any rights
that were contributed to the sale; you're doing an analysis based on
somebody's sense of what is an equitable way to allocate the proceeds
once received.

A.    I think that's fair.[225]

Were the Court to adopt the EMEA Debtors' contribution approach, which it is not,
the amounts allocated to the Selling Debtors must be adjusted to reflect properly the
parties' actual contributions to the development of NN Technology, including using an

---

[224] *See* TR00043 (Green Rebuttal) at 19 (Green indicating that Rockstar paid "additional amounts for
the Residual IP portfolio *on some other basis* than cash flows" (emphasis added)).
[225] Trial Tr. Day 9, 2010:4-9 (Huffard)

appropriate useful life and accounting for the costs actually incurred by the parties in developing NN Technology.

C.   U.S. - Revenue

The basic problem with the U.S. Debtors' revenue approach to allocation is that it is not based upon valuation of specific assets and rights transferred by each Estate in the sales.  For the Business Line Sales, the U.S. Debtors' expert, Mr. Kinrich, did not perform a valuation but, instead, compared the relative revenues.  A discounted cash flow analysis, i.e., a projection of future cash flow (revenues minus costs) discounted to the present value at a discount rate is the preferred valuation method.

Mr. Kinrich did not perform such a calculation.[226]  Instead, he compares the relative revenue earned in each geographical region by the various Nortel entities for each business line in a single year, namely, 2009.[227]  He then allocates the Sales Proceeds from each business line sale to each Debtor Estate based upon the claimed proportionate share of the revenues earned in the Estates' respective geographies.

Although the U.S. Debtors argue that the revenue-based approach is a "standard income-based method" of valuing the assets that were relinquished,[228] Mr. Kinrich acknowledged that this was not the preferred method.  Rather, the preferred method for valuing income-producing assets, such as the IP licenses in the present case, is the discounted cash flow method.[229]

---

[226] TR00051 (Exh. 51, Expert Report of Jeffrey Kinrich, January 24, 2014) paras. 89-90

[227] TR00051 (Exh. 51, Expert Report of Jeffrey Kinrich, January 24, 2014) para. 27

[228] See e.g., Pre-Trial Brief of the U.S. Interests, May 2, 2014, p. 76

[229] Jeffrey Kinrich Trial Testimony, Day 17, June 18, 2014, p. 4328:13-20

Mr. Kinrich agreed that the value of a license is driven by the profits that the licensee could earn by using the patented technology, but he did not determine what those profits would have been in the case of the U.S. and EMEA Debtors.[230] Nonetheless, in determining the value of those licenses, Mr. Kinrich took no steps to attempt to forecast those profits.[231]

The "authoritative" text relied upon by Mr. Kinrich as supporting his revenue-based methodology in fact made it clear that his approach was not appropriate to the valuation task at hand. The authority Mr. Kinrich relied on, *Valuing Small Businesses and Professional Practices,* stated that valuing a business based on a revenue approach may be useful:

(a)     to approximate a range of possible values with a minimum of time and effort;

(b)     to conclude an estimate of value when other data are unavailable or inadequate; or

(c)     as one indicator of value, used in conjunction with other "more rigorous" valuation methods.[232]

The text explained that a revenue approach would require the comparable businesses to have a fairly standard cost structure.[233] Mr. Kinrich acknowledged that the various Nortel entities, among which he was allocating proceeds based on revenue, did not have a standard cost structure.

PRO RATA ALLOCATION

The MRDA does not control allocation. In the absence of an agreement governing allocation or a preponderance of evidence showing entitlement to assets and the value of

---

[230] Jeffrey Kinrich Trial Testimony, Day 17, June 18, 2014, p. 4329:15-20

[231] Jeffrey Kinrich Trial Testimony, Day 17, June 18, 2014, p. 4330:3-4331:2

[232] TR00053 (Exh. 53, *Valuing Small Businesses and Professional Practices*, 3d ed., New York: McGraw-Hill, 1998) p. 340

90

those assets, the Court's task is to arrive at a fair and equitable mechanism to allocate the billions of dollars of Sales Proceeds to numerous international entities for the benefit of their creditors who have now waited years for their recoveries. The Court's decisions will impact investors and pensioners, as well as other unsecured creditors.

The parties' complex arguments for their positions and against others supported by the enormous volume of supporting papers go around and around without end and without a definitive correct answer. It is fair to find that there is validity and error in all of the arguments, largely because the arguments are not rooted in an agreement which applies to the facts. In the meantime, the case remains *in stasis*. The evidence presented to the U.S. Court and the Canadian Court only serves to magnify the differing and irreconcilable approaches taken by the U.S. Debtors, the Canadian Debtors and the EMEA Debtors. All of their approaches yield an unsatisfactory result and the evidence upon which they rely does not comport with the manner in which Nortel operated.

The Court's answer to the dilemma is to a adopt a modified pro rata allocation model which recognizes both the integrated approach which the CCC and the NNUK urge, while maintaining – or at least recognizing – the corporate integrity of the Nortel Entities.

---

[233] TR00053 (Exh. 53, *Valuing Small Businesses and Professional Practices*, 3d ed., New York: McGraw-Hill, 1998) p. 341-342

The extreme allocation proposals of the various debtors is best conveyed by reference to the following comparison chart contained in the UK Pension post trial brief which the Court copies here:



These allocation positions, of course, stand on the shoulders of the parties' interpretations of the MRDA.  Yet the evidence establishes that the MRDA simply does not apply to allocation.  The chart reveals that the Debtors have lost sight of the irrationality of their respective positions.  The variance of the positions are of such magnitude that highly capable and responsible attorneys were unable, or in the heat of the fight were unwilling, to find a middle ground despite three extensive and costly mediations.  Because the Debtors have been unable to prove the plausibleness of their answers to allocation, the Courts are

left to determine an appropriate outcome. The Courts are in agreement that the pro rata approach is the most satisfactory allocation method. They also agree that their methodology does not constitute global substantive consolidation. The Courts will recognize the rights to cash-on-hand, settlements and intercompany claims, one of which resulted in an allowed $2 billion claim of NNI against NNL.

Similarly, the Courts are not dismembering the guaranties provided to the Bondholders which can only be accomplished if the Courts do not recognize separate corporate identities of the Nortel Entities. Doing so would ignore the facts discussed above that the Nortel Entities carefully maintained separate corporate identifications. It could also dangerously impair multinational businesses from raising capital.

A.    Global General and Administrative Support Functions

Much of Nortel's global General and Administrative support ("G&A") was largely performed by NNL. There were four primary global G&A organizations within Nortel: (1) Finance; (2) Information Technology; (3) Human Resources, and (4) Other Real Estate, Legal, Compliance, and Strategy groups. [234] The matrix structure "allowed Nortel to draw on employees from different functional disciplines worldwide (*e.g.*, sales, R&D, operations, finance, general and administrative, etc.), regardless of region or country according to

---

[234] TR22078 (2007–2011 APA) Appx. A pp. 9–10; Drinkwater Dep. 45:21–46:24.

need."[235]  Nortel operated as "an integrated, global whole,"[236] for the benefit of all of

Nortel.[237]

Ernie Briard, an accountant with the Chief Technology Office, testified:  "[W]e did

not run the business with any real knowledge of the statutory entities at all.  We ran it as a

global Nortel corporation."[238]   Decisions to allocate resources and performance were not

based on legal entity lines, but by lines of business.[239]  Nortel reported its finances on a

consolidated basis without regard for its different legal entities.[240]

Employees testified there was one Nortel.[241] Simon Brueckheimer, a Nortel Fellow

and  prolific  inventor  based  in  the  UK,  testified  that  in  customer  activities  he  "was

representing Nortel.  I didn't differentiate any particular geography. . . . I took on the

mantle essentially of representing the company as a whole."[242]  Although employed by a

particular legal entity, employee work responsibilities were directed to the entire Nortel.[243]

The Nortel Networks name and logo were used throughout Nortel to refer to an

integrated whole.  To the outside world, including Nortel's customers, suppliers, and the

---

[235] TR00001 (Currie Aff.) ¶27; Bifield Dep. 257:5–24.

[236] Trial Trans. Day 3, 539:20–540:11 (Currie).

[237] Trial Trans. Days 11–12, 2647:17–2648:18, 2718:16–20, 2737:12–19 (Cooper) (debtors engaged in a common endeavor akin to a joint venture among related parties); Day 8, 1719:6–15, 1721:16–20, 1751:16–25 (Stephens) (MRDA participants appeared to engage in a form of a joint venture to maximize global revenues).

[238] Briard Dep. 21:4–14 (discussing R&D allocation).

[239] Beatty Dep. 22:3–11, 178:19–179:3.

[240] Trial Trans. Day 3, 571:13–572:5 (Currie); Day18, 4599:7–15 (Ryan).

[241] Drinkwater Dep. 21:23-11:10; Riedel Dep. 113:16–23; Dadyburjor Dep. 37:7–13; and Briard Dep. 17:4–18.

[242] Trial Trans. Day 7, 1578:5–1579:22 (Brueckheimer)

[243] Bifield Dep. 256:10–258:25.

rest of the world, the logo referred to all of Nortel, and not to any one geographic entity.[244] Within Nortel, employees "use[d] the term 'Nortel Networks' to be the consolidated global Nortel Networks . . . irrespective of any entity or jurisdiction.  It was the total — it was the one Nortel."[245]

## B.    R&D Functions Were Collaborative Across Borders

R&D was geographically distributed.  Nortel's R&D operations were distributed and were conducted across the globe.  "Nortel's R&D function [was] a global undertaking aligned with its business strategy of technology leadership.  Engineers in each of Nortel's geographic markets work[ed] to develop next generation products."[246]  By 2002, Nortel had 14,000 R&D employees spread across over 20 regions, with its most significant presence in Canada, the U.S., and the UK.[247]  R&D operations relating to Nortel's Business Lines — *e.g.*, Wireless, Enterprise, and Optical — were distributed globally as well.[248]  Nortel's globally distributed R&D distinguished it from other high technology companies which centralized their R&D in a single site.  Examples are Microsoft which conducted over 90 percent of its R&D at its core facility in Seattle, and Cisco Systems conducted over 80 percent of its R&D at its San Francisco Bay campus.[249]

---

[244] Trial Trans. Day 3, 711:11–712:11 (McFadden).

[245] Briard Dep. 76:10–19.

[246] TR11352 (Letter, Apr. 6, 2006) at NNI_01534867.

[247] TR21188 (Global R&D Investment Strategy) p. 4.

[248] TR21188 (Global R&D Investment Strategy) pp. 5–8.

[249] TR21188 (Global R&D Investment Strategy) pp. 9–10; Trial Trans. Day 3, 709:14–710:19 (McFadden).

Nortel's laboratories often worked collaboratively and as a unified whole to develop technology.  As Simon Brueckheimer testified:

> Research & Development . . . at Nortel was generally a collaborative process.  Other NNUK employees and I not only worked together, we routinely shared our expertise, developed foundational technologies and also co-invented patents with Nortel employees based in other geographic locations, which was to the advantage of the Nortel Group.  I never perceived that there was any difference between particular Nortel entities, always thinking of Nortel as a unified whole.[250]

Technology assisted collaboration.  As Mr. McFadden testified:  "At Cisco they'd use a water cooler.  We used telephones."[251]  It was common for R&D personnel from around the world to be involved in the process of addressing customer requests and responding to customer bids.  Nortel's bid response to AT&T in 1997 involved the collaboration of multiple labs.  The effort was led by Simon Brueckheimer, who along with others at Nortel's Harlow, UK, lab contributed the voice compression solution selected for the bid.[252]

Solutions to problems did not stop at borders.[253]  As Mr. Brueckheimer testified:  "[I]n my experience on many, many bid responses, for example the [British Telecom] bid response in 2004, again which I ran, I had 85 people reporting to me from many labs around the world."[254]

---

[250] TR00023 (Brueckheimer Aff.) ¶5.

[251] Trial Trans. Day 3, 713:10–11 (McFadden).

[252] Trial Trans. Day 7, 1573:4–12 (Brueckheimer).

[253] Trial Trans. Day 7, 1573:13–16 (Brueckheimer).

[254] Trial Trans. Day 7, 1573:22–25 (Brueckheimer).

Nortel determined R&D priorities and budgets world-wide.  Nortel did not allocate R&D budgets by geographic entity or subsidiary, but rather by line of business.[255] Spending on R&D was against the budget for the appropriate line of business, regardless of the geographic location in which it occurred.[256]  Most Nortel laboratories did work pertaining to multiple lines of business.[257]

The goal of Nortel's R&D was to create technology that could be commercialized, although it was not necessarily possible to trace research efforts to immediate commercial results.  In its Functional Analysis (2000–2004) prepared for the tax authorities, Nortel explained:

> All R&D projects are ultimately intended to produce commercially exploitable products or knowledge; however, there may be R&D undertaken for which no recognizable commercial gain is immediately evident.  Long-term research projects are undertaken in a somewhat academic environment with the long-term goal of producing a commercially exploitable product.  The information obtained from those projects is intellectual property; however, the ability to commercially exploit that knowledge is not yet available.[258]

Pro rata allocation takes into account Nortel's operations as a unified endeavor.  The pro rata allocation model reflects the underlying economics of the "One Nortel" integrated global business.  The U.S., Canadian and EMEA Debtors allocation methods do not account for the complete absence of any *ex ante* agreement among the Nortel entities as to the division of assets in the event of a global insolvency.  They wrongly assert that the

---

[255] TR00004 (McFadden Aff.) ¶20.

[256] TR00004 (McFadden Aff.) ¶20.

[257] TR00004 (McFadden Aff.) ¶21; TR21188 pp. 5–8.

[258] TR31355 (2000–2004 Functional Analysis) p. 24.

individual geographic regions functioned autonomously and can thus claim credit for, and retain proceeds from the sale of Nortel's assets. Their proposals lead to wildly divergent allocation outcomes. Each proponent seeks to obtain a disproportionate share of the proceeds.

The RPEs' common endeavor was to maximize global profits and the sales of assets likewise crossed borders. The parties signed the IFSA, affirming that they would share proceeds from the sales to further the best interests of Nortel's creditors. They recognized that a cooperative, multi-jurisdictional sale of the Business Lines was the only way to maximize proceeds. Likewise, the RPEs recognized that a collaborative sale of the Residual IP would create the most value and they agreed to facilitate that sale by executing LTA's.

## C.   Authority for Pro Rata Allocation

In this unprecedented, complex and massive dispute involving highly integrated MNE's, the U.S. Court has the authority to adopt a pro rata allocation. The Bankruptcy Code permits courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Code]". 11 U.S.C. §105(a). The Third Circuit has construed this provision to give bankruptcy courts "broad authority" to provide appropriate equitable relief to assure the orderly conduct of reorganization proceedings, See, e.g., *In re Combustion Eng'g, Inc.,* 391 F.3d 190, 236 (3d Cir. 2004), and to "craft flexible remedies that, while not expressly authorized by the Code, effect the result the Code was designed to obtain." *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003) (en banc).  In an international case such as this, there is the principal "that assets should be collected and distributed on a

worldwide basis." *Maxwell Commc'n. Corp v. Barclays Bank (In re Maxwell Commc'n. Corp.)*, 170 B.R. 800, at 816 (Bankr. S.D.N.Y. 1994). See also *In re ABC Learning Centres Limited*, 728 F.3d 301, 305-306 (3d. Cir. 2013).

The Court has toiled mightily to reach a correct and equitable result, consistent with the evidence adduced at trial. The Court, like the Canadian Court, is ordering a modified pro rata allocation – not distribution – which both recognizes the integrity of the corporate separateness and the integrated synergistic operations of Nortel. The Court's adoption of pro rata allocation is the only outcome that reflects uncontroverted evidence and leads to a just result. The master facts are that Nortel functioned as a unified global enterprise and there was no agreement which governed how the individual entities would or could allocate their assets in the event of an insolvency. All parties agree, as they must, that Nortel was centrally managed with employees and assets from many countries and subsidiaries contributing to the R&D which led to the businesses, IP, products and licenses to which they now lay claims of ownership and beneficial interest. The ramifications of the insolvency must be borne by all of the Nortel Entities and, consequently, all of its creditors. A pro rata allocation is driven by the unique facts, the after the fact justifications by parties for their positions and the disparity of those positions.

The Court's ruling is not a substantive consolidation because no one estate is entitled to any specific asset. In *In re Owens Corning*, the U.S. Court of Appeals for the Third Circuit observed that substantive consolidation "treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities, (save for inter-entity liabilities which are erased). The result is that claims of creditors against

separate debtors morph to claims against the consolidated survivor."[259]   A pro rata

allocation does not merge the Nortel Debtors into a single survivor and does not erase

intercompany claims.   All claims against each Nortel Debtor, including intercompany

claims and court approved settlements, will receive distributions from the separate Debtor

Estates.

The decision of the Third Circuit Court of Appeals in *In re Owens Corning*, 419 F.3d

195 (3d Cir. 2005), is a clear and concise exposition of the law on substantive consolidation

for domestic insolvencies.   It includes the history of the legal precept, the standards and the

economic ramifications of substantive consolidation.   Therefore, *Owens Corning* is worthy

of a detailed discussion.

The Third Circuit succinctly framed the issue as follows:

> We consider under what circumstances a court exercising bankruptcy
> powers may substantively consolidate affiliated entities.

*Owens Corning*, 419 F.3d at 199.

In the case, Banks had made $2 billion in unsecured loans to *Owens Corning* and

certain subsidiaries, and obtained guarantees from other subsidiaries.   The Banks appealed

from the district court's order consolidating the assets and liabilities of the borrowers and

guarantors.   The Third Circuit's discussion included the following:

> Substantive consolidation, a construct of federal common law, emanates
> from equity.   It "treats separate legal entities as if they were merged into
> a single survivor left with all the cumulative assets and liabilities (saved for
> inter-entity liabilities, which are erased).   The result is that claims of creditors
> against separate debtors morph into claims against the consolidated
> survivor."   *Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health*

---

[259] *Owens Corning,* 419 F.3d 195, 205 (3d Cir. 2005) (emphasis added) (citation omitted).

100

*Ventures, Inc.*), 402 F.3d 416, 423 (3d Cir. 2005). Consolidation restructures (and thus revalues) rights of creditors and for certain creditors this may result in significantly less recovery.

*Id.* at 205.

\* \* \*

Corporate disregard as a fault may lead to corporate disregard as a remedy.

*Id.* The Third Circuit further discussed approaches courts take for allowing substantive consolidation. The two "themes" are:

(i) whether creditors dealt with the entities as a single economic unit and did not rely on their separate entity in extending credit, . . . or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors. . . ."

*Id.* at 207-208, quoting from *Union Sav. Bank v. Augie / Resivo Baking Co., Ltd.*, 860 F.2d 515, 518 (2d Cir. 1988).

After thoroughly discussing the approaches and the economic impact of substantive consolidation, the Third Circuit settled on the following requirement for substantive consolidation:

In our Court what must be proven (absent consent) concerning the entities for whom substantive consolidation is sought is that (i) prepetition they disregarded separateness so significantly that their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors.

*Id.* at 211. The Third Circuit found that substantive consolidation on the facts presented in *Owens Corning* was inappropriate.

D. <u>Pro Rata Allocation is Not Substantive Consolidation</u>

The discussion of a pro rata allocation requires a discussion of substantive consolidation and, more importantly, why the Court's approach is not that seemingly offensive outcome. The Court understands that the NNUK is campaigning for global substantive consolidation; and to a lesser extent the CCC is doing likewise. The Court's methodology departs from those views. The Court, for one, is not ordering payments to the "most deserving" creditors as the Bondholders fear. The Court is not ordering a distribution scheme. Instead, the Court is directing an allocation among the Estates for the Estates to distribute in an appropriate manner. It is a distinction with a difference. The difference is that intercompany claims, settlements, cash-on-hand will all be honored in the allocation. The logistics and practical concerns with the pro rata calculation are manageable – certainly as much if not more than any prospect of continued litigation and appeals, still more litigation and more appeals.

The basic principal of substantive consolidation is the treatment "of separate" legal entities as if they were merged into a single survivor left with all cumulative assets and liabilities (save for inter-entity liabilities, which are erased)." *In re Owens Corning*, 419 F.3d 195, 205 (3d Cir. 2005). The more relevant inquiry, as the U.S. Debtors point out, is whether creditors of each Nortel estate would have to "share those assets with all creditors of all consolidated entities", thereby raising the specter for some of a significant distribution diminution." *Id.* at 206.

The Estates opposing the pro rata allocation are correct to express concerns over "rough justice" and "free floating discretion." But in giving validity to IFSA, intercompany claims, settlements, and guarantys, there is nothing rough about the justice. Instead, the

Court is attempting to apply an equitable result where parties could not agree upon one and did not prove the validity of any one of the conflicting views. The bases asserted – ownership, revenue, contribution – result in valuations which simply do not match operations. It is highly significant that the U.S. Court and the Canadian Court independently arrived at the same conclusion.

One only has to read the parties' briefs (as the Court has done numerous times) and to have presided over the trial to understand that no Estate – U.S., Canadian or EMEA – was able to raise its position above the others. The Court compares the Allocation Dispute to three people trying to reach the top of a mountain by pulling the others down. In other words, no one gets to the top.

Under U.S. law, a proponent of substantive consolidation must show that either "[1] prepetition [the debtors] disregarded separateness so significantly [that] their creditors relied on the breakdown of entity borders and treated them as one legal entity, or [2] postpetition [the debtors'] assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors." *In re Owens Corning*, 419 F.3d at 211.

The following principles govern: (1) the "general expectation" is that "courts respect entity separateness absent compelling circumstances calling equity (and even then only possibly substantive consolidation) into play"; (2) the "harms substantive consolidation addresses are nearly always those caused by *debtors* (and entities they control) who disregard separateness"; (3) "[m]ere benefit to the administration of the case . . . is hardly a harm calling substantive consolidation into play"; (4) the "rough justice" remedy of substantive consolidation "should be rare and, in any event, one of last resort after

considering and rejecting other remedies"; and (5) substantive consolidation "may not be used offensively (for example, having a primary purpose to disadvantage tactically a group of creditors in the plan process or to alter creditor rights)." *Id.* at 211. Although not for the Court to decide, the law in Canada appears to be similar. *Northland Properties Ltd., Re.,* [1988] 69 C.B.R. (N.S.) 266 at para. 49 (Can. B.C. S.C.), citing *Re Baker and Getty Fin. Services Inc.,* 78 B.R. 139 (Ohio Bankruptcy Court, 1987). This is accomplished with reference to the following seven factors: (1) difficulty in segregating assets; (2) presence of consolidated financial statements; (3) profitability of consolidation at a single location; (4) commingling of assets and business functions; (5) unity of interests in ownership; (6) existence of intercorporate loan guarantees; and (7) transfer of assets without observance of corporate formalities. *Northland Properties Ltd., Re.,* [1988] 69 C.B.R. (N.S.) 266 at para. 49 (Can. B.C.S.C.) citing *In re Vecco Constr. Indus., Inc.,* 4 B.R. 407, 410 (Bankr. E.D. Va. 1980).

The record of Nortel's operations does not satisfy the legal and factual requirements for substantive consolidation. While Nortel operated as a highly integrated multinational enterprise, the evidence establishes that the Nortel affiliates respected corporate formalities and did not commingle their distinct assets or liabilities. Given that Nortel respected and maintained corporate separateness among its distinct legal entities both before and during its insolvency, substantive consolidation cannot be applied in this case.

Again, the Court is not adopting pro rata distribution. Pro rata distribution would result in substantial prejudice to creditors who have bargained for separate contractual rights. It would make the Sales Proceeds available for distribution to all debtor entities regardless of whether a debtor sold assets in a particular sale, with the practical effect of

moving cash from one Estate to another to the detriment of creditors.[260] Implementation of

a pro rata distribution would further prejudice creditors by unwinding the effect of Court-

approved settlements and intercompany claims.[261]

In ruling that substantive consolidation is not justified here, the Court wants to be

clear that pro rata allocation does not constitute substantive consolidation. Nonetheless, it

is worth noting that the *Owens Corning* facts differ from the Nortel facts. The affiliated

*Owens Corning* entities had different, independent, separate business purposes, logos and

trade names, and other features which made separating their assets and liabilities

straightforward.[262] In contrast, Nortel was highly integrated, organized along Lines of

Business operating for the same purpose under the same logo and trade name, and all of

the entities engaged in the development, manufacture, and sale of various products of a

single company. The very issue of this litigation is who owns Nortel's assets and is entitled

to receive the Sales Proceeds. The reason the issue is unsettled is because there is no pre-

determined answer.

In further contrast to Nortel, *Owens Corning*'s affiliated debtors were contractually

bound to maintain their corporate separateness. The *Owens Corning* loan agreement

guaranteed by all affiliated debtors, expressly limited how a borrower could deal with its

subsidiaries. The Nortel cross-over bonds indentures do not contain such restrictive

characteristics.

E.    Pro Rata Criticism is Misplaced

---

[260] Trial Tr. 3054:13-3055:2; 3074:25-3076:1 (Bazelon); TR00041 (DEM00014) at 5.
[261] Trial Tr. 3039:3-3044:21; 3055:3-3057:11; 3072:1-3073:20 (Bazelon); TR00041 (DEM00014) at 4.
[262] *Id.*

105

The evidence at trial established the uniquely integrated nature of Nortel's global enterprise and the extensive integration of IP assets giving rise to the proceeds of the sale in the Lockbox. The evidence further confirmed that Nortel was a truly global enterprise.

By agreeing to the IFSA, the Estates confirmed that the Courts had jurisdiction to determine the appropriate allocation of the Sales Proceeds absent agreement. The IFSA does not require or suggest any allocation method. The IFSA does not suggest the fair market value of the assets and rights sold or relinquished in connection with the sale of Nortel's Business Lines and Residual IP as argued by the U.S. Debtors. Nor does the IFSA indicate any preference for the EMEA Debtors' contribution allocation. The IFSA was entered into and approved by the Courts in June, 2009, before the Estates on behalf of the Selling Debtors had each disclosed the diametrically polar views as to their respective rights to the proceeds of the sale of the Business Lines and Residual IP. Nor is there any suggestion in the IFSA that all of the value for Residual IP belonged solely to NNL and no other entity, as the Canadian Debtors and Monitor argue.

The pro rata allocation method which the Court is adopting is not substantive consolidation of the Estates. The Court is not directing a central insolvency administrator in one jurisdiction, that all of the Nortel Entities be treated as one, that all claims be determined within one proceeding under the supervision of one insolvency administrator, that there be one plan of reorganization for all Nortel Entities or that creditors receive a common dividend on a pro rata, *pari passu* basis.

The Court is not adopting a pro rata distribution, but an allocation to separate interests. The Court's pro rata model recognizes that separate Estates exist, will continue to

exist, and will ultimately be utilized to make distributions to creditors through whatever means is determined by the Courts following the Allocation Dispute.

Moreover, the Court recognizes the separate and distinct integrity of each of the Debtors by recognizing cash-on-hand intercompany claims and settlements. To be clear, the Court's pro rata allocation is not the "new order" which the pro rata proponents urge with terms such as "universalism".

The UKPC's call for Modified Universalism is premised upon the Model Law on Cross-Border Insolvency which the United Nations Commission on International Trade Law proposed in 1997.[263] These cases are not proceeding under the purview of the Model Law which is purely a proposal at this time. These cases are proceeding under the dictates of Chapters 11 and 15 of the Bankruptcy Code.

The pro rata proponents also argue that rejecting the guaranties will not negatively impact the marketplace. The pro rata proponents also cite in support of disregarding the guaranties to the following from Widen, Corporate Form and Substantive Consolidation, 75 Geo. Wash. L. Rev. at 274, 277:

> Before the Third Circuit's decision in *Owens Corning* . . . no sophisticated lending syndicate ever relied on a mere covenant prohibiting merger, consolidation, or dissolution to create priority when the syndicate itself employed a web of guarantees. The reason for non-reliance on such covenants is simple: the market believed that the presence of intercompany guarantees virtually assured that imposition of substantive consolidation would be proper for any companies forming part of an intercompany guarantee web (and no competent counsel would have opined otherwise). In *Owens Corning*, rather than a *bona fide* case of reliance on asset partitions, we have a case of simple good fortune for the lenders, the asset partitions and

---

[263] Model Law on Cross-Border Insolvency of the United Nations Commission on International Trade Law, UN GAOR, 52nd Sess., annex, Agenda Item 148, UN Doc. A/RES/52/158 (1998).

guarantees happened to remain in place until the bankruptcy filing, and the continued presence of the guarantees' structure afforded them a priority.[264]

There is insufficient trial evidence establishing pre-filing reliance by Bondholders on the corporate separateness of the various entities that comprise Nortel. Credit rating agency reports confirmed the trial evidence that the market did not distinguish between Nortel's bonds that were guaranteed by NNI and those that were not.[265] Data in respect of Nortel bonds confirms that the market did not view Nortel bonds that carried an NNI guarantee as being less risky than Nortel bonds that did not carry an NNI guarantee. The chart containing the data, "Nortel Bonds Spreads to U.S. Government Yield Curve (Basis Points), appears as Appendix C to this opinion.

The chart shows that Nortel bonds that carried an NNI guarantee traded at higher or equal spreads to Nortel bonds that did not carry an NNI guarantee. Bonds with a lower spread are considered less risky in the marketplace.[266] Since the marketplace did not more favorably view Nortel bonds guaranteed by NNI, creditor expectations do not support the contention that Nortel's guaranteed bonds would enjoy a greater percentage recovery upon insolvency or should otherwise entitle them to a higher recovery than Nortel's other unsecured creditors.

---

[264] *Id.* at 279.

[265] *See* TR12036 (Moody's Rating Action, June 16, 2006) p. 2; TR12037 (DBRS Credit Rating Report, July 16, 2006) pp. 1–2; TR12038 (Moody's Rating Action, Mar. 22, 2007) p. 1; TR12039 (DBRS Rating Report, Nov. 9, 2007) pp. 1–2; TR12040 (Moody's Rating Action, May 21, 2008) p. 1; TR12041 (DBRS Report, July 14, 2008) p. 2; TR12042 (Moody's Rating Action, Dec. 15, 2008) p. 1; TR12045 (Moody's Credit Opinion, Dec. 16, 2009) p. 3; and TR12045 (Moody's Credit Opinion, Dec. 16, 2009) p. 3.

[266] Kilimnik Dep. 18:12-19:14.

Additionally, the documents evidencing the issuance of the bonds (i.e., the offering memoranda and indentures) do not provide a basis for any Bondholders to have reasonably relied on any particular partitioning of assets among the individual entities.

The guarantees did not restrict NNC or its subsidiaries from lending cash to, or making investments in, affiliates, or from incurring substantial amounts of additional indebtedness,[267] investors were warned of the possibility of consolidation,[268] and that under applicable law principal and interest might not be paid.[269]  Thus, the Bondholders' allegations of reliance on the outcome they now advocate are unfounded.

In addition, the June 29, 2006 Offering Memorandum for NNL's Senior Notes due 2011, 2013, and 2016,[270] the related Indenture dated July 5, 2006 and the related Prospectus dated December 21, 2007 (and all documents incorporated by reference therein) only contained consolidated financial information for Nortel.  Similarly, the March 22, 2007 Offering Memorandum for NNC's Convertible Senior Notes due 2012 and 2014, the related Indenture dated March 28, 2007 and the related Prospectus dated December 21, 2007 (and all documents incorporated by reference therein) only contained consolidated financial information for Nortel. No bondholder could have formed the reasonable expectation that

[267] See June 29, 2006 Offering Memoranda for NNL NoteSenior Notes due 2011, 2013, and 2016 (TR40117) at pp. 29–30 (CCC0004630–CCC0004631).  See also the May 21, 2008 Offering Memorandum for Nortel's Senior Notes due 2016 (TR48723.01) at 22 (NNI_01410294) which contains identical risk factors and warnings; Trial Trans. Day 5, 1112:3–1114:21 (Binning).

[268] TR40117 at p. 34.

[269] Trial Trans. Day 4, 828:7–21 (McCorkle).

[270] TR40117, TR40041 (Proof of Claim for 2006 Indenture and Indenture appended), TR40182 (Prospectus - Offers to Exchange Notes due 2011, 2013, 2016 dated Dec 21, 2007), TR44615, TR40042 (Proof of Claim for 2007 Indenture and Indenture appended), TR40180 (Prospectus for NNC Convertible Notes due 2012 and 2014 dated December 21, 2007).

on insolvency, a guarantee would have entitled bondholders to access distinct pools of assets that may or may not have been held by the entity that guaranteed the bonds.

The pro rata proponents suggest the Courts should consider the identities of the Bondholder Group's members, their purchase history, and the prices they paid for the Bonds when evaluating allocation. The Court answers with a resounding "No." When and at what prices the members of the Bondholder Group acquired their Bonds is irrelevant to this litigation.  The purchaser of a debt instrument on the secondary market is entitled to the exact same rights as the original purchaser of that instrument.  *See In re 785 Partners, LLC*, 470 B.R. 126, 133 (Bankr. S.D.N.Y. 2012) (if a creditor is the assignee of the original lenders, then that creditor "stands in the shoes of the assignor, and takes neither more nor less than the assignor had").[271]  Thus, in a bankruptcy case of the issuer, the secondary purchaser "can assert the same rights subject to the same limitations that the original lenders could have asserted if they still owned the Loans."  *Id.*

Moreover, the price paid by a secondary purchaser has no impact on its substantive rights.  In *785 Partners*, the court found that although "the Debtor's existing default may have been factored into the price that [the creditor] paid to the Original Lenders," this was

---

[271] As Alexander Hamilton recognized soon after the United States' founding:

> [t]he nature of the contract, in its origin, is that the public will pay the sum expressed in the security, to the first holder or his assignee.  The intent in making the security assignable, is, that the proprietor may be able to make use of his property, by selling it for as much as it may be worth in the market, and that the buyer may be safe in the purchase.  ***Every buyer, therefore, stands exactly in the place of the seller; has the same right with him to the identical sum expressed in the security; and, having acquired that right, by fair purchase, and in conformity to the original agreement and intention of the Government, his claim cannot be disputed, without manifest injustice***.

> A. Hamilton, *First Report on Public Credit* (January 9, 1790) (emphasis added).

"a matter between those parties." *785 Partners*, 470 B.R. at 133.   Were the Court to accede

to the suggestion that secondary purchase prices are relevant, the effect on the distressed

market would be devastating.

<br>

F.   Implementation of the Pro Rata Allocation

The U.S. Interests and the EMEA Debtors take strong exception to a pro rata

allocation.  The Court understands their disagreement.[272]  Pro rata is, to say the least, an

extraordinary result, and the Canadian Interests, the U.S. Interests and the EMEA Debtors

devoted enormous skill, time, money and energy in professionally presenting their cases

for a revenue and contribution approach, respectively.  Likewise, the Canadian Interests

forcefully advocate for an ownership allocation, not a pro rata allocation.

The EMEA Debtors and U.S. Interests argue that the pro rata "distribution" theory is

not legally or factually supportable.  The pro rata "distribution" theory does not allocate to

each Selling Debtor the fair market value of the assets it sold or relinquished in the Sales.

It would therefore also violate the absolute priority rule insofar as NNL – NNI's

equityholder – would recover before NNI's own creditors from the proceeds generated by

the sale of NNI's property interests.  Implementation of the pro rata allocation will neither

result in equity receiving preferential treatment nor violate the absolute priority rule.

The parties opposing the pro rata allocation argue that it is "unadministrable" due to

uncertain treatment of claims, timing and creditor recoveries.  In particular, there is concern

---

[272] The Monitor and the Canadian Debtors expressed no position on a pro rata allocation.

111

with inflated claims, particularly the UKPC $3 billion claim against the EMEA Debtors. Inflated claims would, of course, skew a pro rata allocation and destroy the equitable allocation method.

The Court has answers to the concerns expressed.

1.      Any claims not resolved by a date certain would not be recognized.

2.      The Court will resolve any disputed claims to prevent claim inflation.

3.      Claims will be recognized only once.  For example, the UKPC claim will be included in the allocation calculation only once and not against multiple EMEA Debtors. Similarly, for allocation purposes the Bondholder claims will be included only against the primary obligor, but the guarantees will be entitled to seek distribution from the appropriate Debtor of any deficiency resulting from the allocation.

4.      Intercompany claims and settlements approved by the U.S. Court and the Canadian Court will be included in calculating the allocation.  They will not be deducted as the UK Pension Claimants propose.  Doing so would violate the Courts' Orders.

5.      Once all claims are resolved, the amount in the Lock Box will be divided by the total claims and each Estate will be allocated its proportionate amount.

6.      The U.S. Estate will then propose a distribution plan for the Court's consideration.

The administrative steps for allocation contained in the accompanying Order will be prompt, fair and definitive, thereby addressing the concerns expressed by those opposing a pro rata allocation.

# CONCLUSION

Over three years ago, the Third Circuit Court of Appeals noted with both poignancy and command, which the parties disregarded, that:

> We are concerned that the attorneys representing the respective sparring parties may be focusing on some of the technical differences governing bankruptcy in the various jurisdictions without considering that there are real live individuals who will ultimately be affected by the decisions being made in the courtrooms. It appears that the largest claimants are pension funds in the U.K. and the United States, representing pensioners who are undoubtedly dependent, or who will become dependent, on their pensions. They are the pawns in the moves being made by the Knights and the Rooks.
>
> Mediation, or continuation of whatever mediation is ongoing, by the parties in good faith is needed to resolve the differences. No party will benefit if the parties continue to clash over every statement and over every step in the process. This will result in wasteful depletion of the available assets from which each seeks a portion. There appears to be one constructive solution – the protocol agreed upon by appointing Justice Winkler to resolve the allocation issues. He apparently has the respect of all parties and we hope (although it is not in our power to order) that the parties promptly devise a process by which all conflicting claims are put in his hands for resolution.

*In re Nortel Networks, Inc.*, 669 F.3d 128, 143-44 (3d Cir. 2011) (footnote omitted).

The Courts have now ruled on allocation of what remains of Nortel. It is now the parties who have to make a decision: accept the Court's rulings and give them effect, take appeals and thereby prolong the hardship and deplete the remaining estate, or utilize the Courts' rulings to resolve any remaining differences.

The Court will issue its Order making its ruling final.

Dated: May 12, 2015

KEVIN GROSS, U.S.B.J.

113

# APPENDIX A

### Glossary of Terms

## APPENDIX A

### Glossary of Terms

| | |
|---|---|
| Allocation Protocol | Order Entering Allocation Protocol, dated May 17, 2013 |
| APA | An advanced pricing arrangement, which is a contract between a multi-national enterprise and a tax authority specifying the transfer pricing methodology that the affiliate will be permitted to use for an agreed period of time. |
| APA Team | A team of employees formed by Nortel to determine the appropriate transfer pricing policy to propose to taxing authorities in the APA process. |
| Bondholders | The Ad hoc Group of Bondholders, consisting of entities holding bonds which NNC, NNL, NNI and NNC issued or guaranteed. |
| Business Line Sales | The post-filing sales in 2009 to 2011 involving tangible and intangible assets of, for the most part, operating Nortel businesses. |
| Business Lines | Nortel's lines of business |
| Canadian Court | The Ontario Superior Court of Justice. |
| Canadian Debtors | The Canadian Nortel companies that, on January 14, 2009, filed for and obtained protection under the *Companies' Creditors Arrangement Act* from the Ontario Superior Court of Justice, being Nortel Networks Corporation (NNC), Nortel Networks Limited (NNL), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation. |
| Canadian Estate | Collectively, the entities that make up the Canadian Debtors. |
| Canadian Proceedings | Canadian Debtors commenced a proceeding with the U.S. and Canadian Courts under the Companies' Creditors Arrangement Act (Canada), seeking relief from their creditors |
| CCAA | Companies' Creditors Arrangement Act (Canada) |
| CCC | The Canadian Creditors Committee, which represents the interests of Canadian pensioners and other pension interests, long-term disabled and other employees and former employees of Nortel who have claims against the Canadian Debtors. |
| CDMA | Code Division Multiple Access line of business |

| Committee | The Official Committee of Unsecured Creditors, appointed by the United States Trustee for the District of Delaware on January 22, 2009. |
|---|---|
| Cost Sharing Participants | Parties involved in cost sharing agreements, including NNL, NNI, NNUK, NN Ireland, and NNSA (the "CSPs"). |
| Courts | The U.S. Court and the Canadian Court. |
| CRA | The Canadian Revenue Authority |
| Cross Border Protocol | Canadian Court approved the Court-to-Court Protocol on the Petition Date, which was later amended by order of this Court on June 29, 2009 [D.I. 990] and by an order of the Canadian Court on that same date. |
| CSA | Cost Sharing Agreements between NNL and each of the other R&D performing Nortel entities. |
| CTO | Nortel's Chief Technology Officer |
| CVAS | Carrier Voice Over Internet Protocol Applications Solutions line of business |
| Debtor(s) | The companies or entities comprising the Canadian Debtors, the U.S. Debtors and the EMEA Debtors, either individually or collectively. |
| EMEA | The Europe, Middle East and Africa regions |
| EMEA Debtors | The 23 Nortel entities that, on January 15, 2009, were granted administration orders in the U.K. under the *Insolvency Act, 1986* and whose registered offices were in England, Europe, the Middle East and Africa, including Nortel Networks UK Limited (NNUK), Nortel Networks S.A. (NNSA) and Nortel Networks (Ireland) Limited (NN Ireland). |
| EMEA Estates | Collectively, the entities that make up the EMEA Debtors. |
| Ericsson | Telefonaktiebolaget LM Ericsson (publ) |
| Exclusive License | The MRDA sets forth a clear exchange of consideration between the signatories (NNL, NNI, NNUK, NNSA, and NN Ireland). Pursuant to Article 4(a), each Licensed Participant vested legal title in NNL to the intellectual property it created. Expressly "in consideration therefor," NNL granted an exclusive license back to each Licensed Participant. |

2

| FCFSA | Final Canadian Funding and Settlement Agreement |
|---|---|
| First Expansion of the Monitor Powers Order | An order expanding the Monitor's powers, dated August 14, 2009. The Order provides, among other things, the Monitor with the authority to cause the Canadian Debtors to take various actions in connection with the sale of the business units and to conduct, supervise, and direct any procedure regarding the allocation and/or distribution of proceeds of ay sale. |
| G&A | Nortel's global General and Administrative support. There were four primary global G&A organization within Nortel: (1) Finance; (2) Information Technology; (3) Human Resources; and (4) Other Real Estate, Legal, Compliance, and Strategy groups. |
| Global IP | The Global IP Law Group, which Nortel retained to provide advice on monetizing its Patent Portfolio. |
| Google Bid | The U.S. Debtors', NNL's, and NNC's agreement with an affiliate of Google Inc. to sell Nortel's residual patent and patent-related assets for $900 million, subject to higher or better offers. |
| GSM | Global System for Mobile Communications line of business |
| Horst Frisch Report | Functional analysis prepared by Horst Frisch for APA applications covering the 2000 to 2004 period. The reports set forth Nortel's justification for its proposed RPSM. |
| IEs | Individual entities |
| IFSA | Interim Funding and Settlement Agreement, June 9, 2009 (TR43794) |
| Inland Revenue | The Inland Revenue Service in the U.K. |
| Intercompany DIP Loan | NNI loaned to NNL $75 million under a revolving loan agreement. This loan was approved by the U.S. Court on the Petition Date. |
| IP | Intellectual Property |
| IP Assets | Nortel's remaining patent portfolio and related assets |
| IP Stalking Horse Agreement | Agreement dated April 4, 2011 between each of the IEs as Sellers and Ranger, Inc., for a purchase price of $900 million |

| IP Steering Committee | Formed in January 2010, a committee of representatives of Nortel and their advisors which led the evaluation process. |
| --- | --- |
| IPCo | A proposed IP licensing service and enforcement business that Nortel began developing even before the insolvency filings. |
| IRS | The U.S. Internal Revenue Service |
| Joint Administrators | Ernst & Young LLP was appointed administrator of the EMEA Debtors by the High Court of England and Wales on January 14, 2009 |
| Layer 4-7 Sale | Nortel sold its businesses and assets, including the sale of certain portions of its Layer 4-7 data portfolio to Radware Ltd. [D.I. 539] |
| Lazard | Lazard Freres & Co. LLC, financial advisor to the Debtors. |
| Licensed Participant(s) | As defined in Article 1(e) of the MRDA, a Participant (or all Participants) other than NNL. |
| LREs | Limited Risk Entities which were incorporated in most of the countries where Nortel products were sold, including in the EMEA region. |
| LTAs | License Termination Agreements |
| LTE | Long-term evolution wireless technology line of business |
| MNE | A multi-national enterprise |
| Monitor | Ernst & Young Inc. in its capacity as monitor of the Canadian Debtors appointed in the Initial Order granted January 14, 2009. By various orders, the Ontario Superior Court of Justice expanded the Monitor's powers and authorized it to exercise the powers of the boards of directors of the Canadian Debtors. |
| MOU | The Memorandum of Understanding, which was drafted "to provide a record of the Participants' "understandings" with respect to the MRDA and related agreements. |
| MRDA | Master R&D Agreement dated December 22, 2004 but with an effective date of January 1, 2001, between NNL, NNI, NNUK, NNSA, NN Australia and NN Ireland, as amended at least four times (TR21003). |

| NN Ireland | Nortel Networks Ireland, being an entity formed under the laws of the Republic of Ireland, one of the EMEA Debtors, and a direct subsidiary of NNL. |
|---|---|
| NN Technology | As defined in Article 1(f) of the MRDA, NN Technology "shall mean, any and all intangible assets including but not limited to patents, industrial designs, copyrights and applications thereof, derivative works, technical know-how, drawings, reports, practices, specifications, designs, software and other documentation or information produced or conceived as a result of research and development by, or for, any of the Participants, but excluding trademarks and any associated goodwill." |
| NNC | Nortel Networks Corporation, being a corporation incorporated under the laws of Canada, which was the publicly traded, parent holding company of NNL and its subsidiaries. |
| NNI | Nortel Networks Inc., being a corporation incorporated under the laws of the State of Delaware, the main U.S. operating entity and a direct subsidiary of NNL. |
| NNI Guaranteed Bonds | In 2008, NNL issued an additional approximately $675 million in public debt also guaranteed by NNI (together with the 2006 Bond Issuance). |
| NNL | Nortel Networks Ltd., being a corporation incorporated under the laws of Canada, and the main Canadian operating entity. |
| NNSA | Nortel Networks, S.A., being an entity duly formed under the laws of France, one of the EMEA Debtors, and a direct subsidiary of NNL. |
| NNUK | Nortel Networks UK Limited, being an entity formed under the laws of the United Kingdom, one of the EMEA Debtors, and a direct subsidiary of NNL. |
| Non-Exclusive License | As defined in the MRDA, a non-exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Non-Exclusive Territory, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith. |

| Nortel | Collectively, NNC and all of its direct and indirect subsidiaries, including the businesses they operated. |
|---|---|
| Nortel Entity(ies) | Any of the companies or entities, either individually or collectively, within the Nortel Group. |
| Participant(s) | As defined in the MRDA, any of the parties to the MRDA, namely NNL, NNI, NNUK NNSA, NN Australia, NN Ireland |
| Petition Date | January 14, 2009 |
| PR&D | Pricing payments attributable to R&D each year. |
| Products | As defined in Article 1(g) of the MRDA, Products "shall mean all products, software and services designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured or marketed, at any time by, or for, any of the Participants, and all components, parts, sub-assemblies, features, software associated with or incorporated in any of the foregoing, and all improvements, upgrades, updates, enhancements or other derivatives associated with or incorporated in any of the foregoing" (equivalent to "Nortel Products"). |
| Protocol | The Motion for Entry of an Order Pursuant to 11 U.S.C. § 105(a) Approving Cross-Border Court-to-Court Protocol, filed by the U.S. Debtors on the Petition Date. |
| R&D | Research and Development |
| R&D CSA | A cost sharing agreement governing R&D |
| Residual IP | A substantial number of intellectual property assets belonging to Nortel's "Patent Portfolio." |
| Residual Patent Sale | The $4.5 billion sale of Nortel's Residual IP to Rockstar. |
| Rockstar | Rockstar Bidco L.P. is a consortium comprised of Apple, Ericsson, Microsoft, Blackberry, EMC and Sony |
| Rockstar Transaction | The sale to Rockstar Bidco, LP in 2011 of the residual patent and patent-related assets owned by NNL (equivalent to "Rockstar Sale"). |
| RPEs | Residual Profit Entities (NNL, NNI, NNUK, NNSA and NN Ireland) |

| RPS | Residual profit split |
|---|---|
| RPSM | Residual Profit Split Methodology – the transfer pricing methodology used by Nortel from 2001. |
| Sales Proceeds | The money received from Line of Business Sales and the Residual IP. |
| Second Expansion of Monitor Powers Order | An order dated October 3, 2012, adding to the powers of the Monitor by, among other things, authorizing and empowering, but not obligating, the Monitor to exercise any powers which may be properly exercised by a board of directors of any of the Canadian Debtors. |
| U.S. Court | The United States Bankruptcy Court for the District of Delaware. |
| U.S. Debtors | The U.S. Nortel companies that, on January 14, 2009, filed voluntary petitions in the United States Bankruptcy Court for the District of Delaware for protection under Chapter 11 or Title 11 of the U.S. Code, being Nortel Networks Inc. ("NNI") and several of its U.S. affiliates, namely Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc. |
| UK Pension Claimants | Collectively, the Nortel Networks UK Pension Trust Limited and the Board of Directors of the Pension Protection Fund. (the "UKPC") |
| UK Proceedings | On the Petition Date, the High Court of England and Wales placed the EMEA Debtors into administration under the control of the Joint Administrators. |
| Wilmington Trust | Wilmington Trust, National Association |

# APPENDIX B

**Business Line Sales**

## APPENDIX B[1]

### Business Line Sales

| Asset Name (Code Name) | Key Dates | Stalking Horse (Code Name) | Auction | Other bidders | Purchaser & Price |
|---|---|---|---|---|---|
| Layer 4-7 (Velocity) | Sale hearing: 3/26/2009<br>Signing: 2/19/2009<br>Closing: 3/31/2009 | Radware (Velocity)<br>SH agmt. signed: 2/19/2009 | No auction | N/A | Radware<br>**$17.7 million** |
| CDMA/LTE (Eckberg) | Sale hearing: 7/28/2009<br>Signing: 7/24/2009<br>Closing: 11/13/2009 | Nokia Siemens Networks (Narnia)<br>SH agmt. signed: 6/19/2009 | Auction 7/24/2009 | Yes | Ericsson<br>**$1.13 billion** |
| Enterprise (Equinox) | Sale hearing: 9/16/2009<br>Signing : 9/14/2009<br>Closing: 12/18/2009 | Avaya (Equinox)<br>SH agmt. signed: 7/20/2009 | Auction 9/11/2009-9/14/2009 | Yes | Avaya<br>**$900 million** |
| Next Generation Packet Core (Seville) | Sale hearing: 10/28/2009<br>Signing: 10/25/2009<br>Closing: 12/8/2009 | N/A | Auction | No | Hitachi<br>**$10 million** |
| Metro Ethernet Networks (Snow) | Sale hearing: 12/2/2009<br>Signing: 11/24/2009<br>Closing: 3/19/2010 | Ciena (Snow)<br>SH agmt. signed: 10/7/2009 | Auction 11/20/2009-11/22/2009 | Yes | Ciena<br>**$774 million** |
| GSM/GSM-R (Isis) | Sale hearing: 12/2/2009<br>Signing: 11/24/2009<br>Closing: 3/31/2010 | N/A | Auction 11/24/2009 | Yes | Ericsson & Kapsch CarrierCom<br>**$103 million** |
| CVAS (Paragon) | Sale hearing 3/3/2010<br>Signing: 12/22/2009<br>Closing: 5/28/2010 | GENBAND (Paragon)<br>SH agmt. signed: 12/22/2009 | No auction | N/A | GENBAND<br>**$282 million** |
| GSM Retained Contracts (Horus) | Sale hearing: 5/24/2010<br>Signing: 5/11/2010<br>Closing: 6/4/2010 | N/A | No auction | N/A | Ericsson<br>**$2 million**<br>(add-on to GSM sale) |
| Multi Service Switch (Pluto) | Sale hearing: 9/30/2010<br>Signing: 9/24/2010<br>Closing: 3/11/2011 | PSP Holding LLC (Marlin)<br>SH agmt. signed: 8/26/2010 | Auction 9/24/2010 | Yes | Ericsson<br>**$65 million** |

**Layer 4-7:** See TR50324 (Transcript of Proceedings, In re: Nortel Networks, Inc., et al., Hearing re: Layer 4-7 Sale) (Hearing Date); TR50171 (NNI Proposed Disclosure Statement) at 38 (Closing Date); TR50165 (U.S. Motion to Approve the Layer 4-7 Sale) at 2,8 (Signing Date and Purchase Price); TR50188 (U.S. D.I. 539 Sale Order re Layer 4-7), TR50033 (Mar. 30 2009 Layer 4-7 Approval and Vesting Order) (Sale Approval).

**CDMA/LTE:** See TR50114 at 2 (U.S. D.I. 1205 CDMA and LTE Sale Order) (Hearing Date); TR50171 (NNI Proposed Disclosure Statement) at 39 (Closing Date); TR49971 (Canadian Motion Record, Approval and Vesting Order CDMA & LTE Business Sale Transaction) at 5 (Signing Date); TR21541 (2010 NNC 10-K) Purchase Price) at 24-25; TR50114 (U.S. D.I. 1205 CDMA and LTE Sale Order), TR50029 (July 28, 2009 CDMA and LTE Approval and Vesting Order), TR49998 (Oct. 28, 2009 Amendment re Approval and Vesting Order re CDMA and LTE) (Sale Approval).

**Enterprise.** See TR50128 (U.S. D.I. 1514 Enterprise Sale Order) (Hearing Date); TR50171 (NNI Proposed Disclosure Statement) at 39-40 (Closing Date); TR50570 (Canadian Motion Record, Approval and Vesting Order Enterprise Solution Business) at 5 (Signing Date); TR21541 (2010 NNC 10-K) at 25 (Purchase Price); TR50128 (U.S. D.I. 1514 Enterprise Sale Order), TR50030 (Sept. 16, 2009 Enterprise Approval and Vesting Order) (Sale Approval).

**Next Generation Packet Core:** See TR50361 (Transcript of Proceedings, In re: Nortel Networks, Inc., et al., Hearing re: Next Generation Packet Core Sale) (Hearing Date); TR50171 (NNI Proposed Disclosure Statement) at 40 (Closing Date); TR50136 (U.S. D.I. 1760 Next Generation Sale Order) at 1 (Signing Date); TR21541 (2010 NNC 10-K) at 25 (Purchase Price); TR50136 (U.S. D.I. 1760 Next Generation Sale Order), TR50001 (Oct. 28, 2009 Next Generation Approval and Vesting Order) (Sale Approval).

**Metro Ethernet Networks (MEN):** See TR50336 (Transcript of Proceedings, In re: Nortel Networks, Inc., et al., Hearing re: MEN Sale and GSM Sale) (Hearing Date); TR50171 (NNI Proposed Disclosure Statement) at 41 (Closing Date); TR40551 (Canadian Motion Record, Approval and Vesting Order MEN) (Signing Date) at 5; TR21541 (2010 NNC 10-K) at 25 (Purchase Price); TR50140 (U.S. D.I. 2070 MEN Sale Order), TR50060 (Dec. 2, 2009 MEN Approval and Vesting Order) (Sale Approval).

**GSM/GSM-R:** See TR50336 (Transcript of Proceedings, In re: Nortel Networks, Inc., et al., Hearing re: MEN Sale and GSM Sale) (Hearing Date); TR50171 (NNI Proposed Disclosure Statement) at 42 (Closing Date); TR50139 (U.S. D.I. 2065 GSM/GSM-R Sale Order) at 2 (Signing Date); TR21541 (2010 NNC 10-K) at 26 (Purchase Price); TR50139 (U.S. D.I. 2065 GSM/GSM-R Sale Order), TR50032 (Dec. 2, 2009 GSM/GSM-R Approving and Vesting Order) (Sale Approval)

**CVAS:** See TR50149 (U.S. D.I. 2632 CVAS Sale Order) at 2 (Hearing Date); TR50171 (NNI Proposed Disclosure Statement) at 43 (Closing Date); TR50141 (U.S. Motion to Approve the CVAS Sale) at 2 (Signing Date); TR21541 (2010 NNC 10-K) at 26 (Purchase Price); TR50055 (Mar. 3, 2010 CVAS Approval and Vesting Order), TR50149 (U.S. D.I. 2632 CVAS Sale Order) (Sale Approval).

The initial purchase price was for $282 million subject to balance sheet and other adjustments of approximately $100 million resulting in a final purchase price at closing of $182 million. Subsequently a dispute arose between the parties over a defined term in the asset sale agreement which would impact the final purchase price. To resolve the dispute the parties engaged in settlement discussions resulting in the final purchase price of $157 million. The settlement was approved by the U.S. Court and Canadian Court on August 23, 2011. *See* TR40190 (2011 NNC 10K) at 25.

**GSM Retained Contracts:** See TR50271 (Transcript of Proceedings, In re: Nortel Networks, Inc., et al., Hearing re: GSM Retained Contracts Sale) (Hearing Date); TR50171 NNI Proposed Disclosure Statement) at 42 ((Closing Date); TR50157 (U.S. Motion to Approve the Sale of Certain Assets of the GSM/GSM R Business) at 2, 9 (Signing Date and Purchase Price); TR47776 (Canadian Approval and Vesting Order, GSM/GSM-R Remaining Contracts), TR50159 (D.I 3048, U.S. Order Approving the Sale of Certain Assets of the GSM/GSM-R Business) (Sale Approval).

**Multi Service Switch (MSS):** See TR50172 (U.S. D.I. 4054 MSS Sale Order) at 2 (Hearing Date); TR40190 (2011 NNC 10-K) at 25 (Closing Date); TR40633 (Canadian Motion Record, Approval and Vesting Order, MSS Business) at 4 (Signing Date); TR21541 (2010 NNC 10-K) at 27 (Purchase Price); TR50172 (U.S. D.I. 4054 MSS Sale Order), TR50056 (Sept. 30, 2010 Approval and Vesting Order MSS Business) (Sale Approval).

Total value. There were separate sales for the North America; Caribbean & Latin America (CALA); and Europe, Middle East & Africa (EMEA) regions.



# APPENDIX C

**Nortel Bonds Spreads to U.S. Government Yield Curve (Basis Points) Chart**



# Nortel Bond Spreads to U.S. Government Yield Curve (Basis Points)

| | Issue Amount | Issuer/Guarantor(s) | Jun 29, 2006 | Feb 22, 2007 | Mar 22, 2007 | Apr 20, 2007 | Jan 31, 2008 | Mar 31, 2008 | May 21, 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 5-year I+425 due Jul 2011 | 1 Billion | NNL/NNI & NNC | | 276 bps | 326 bps | 277 bps | 718 bps | 1,072 bps | 675 bps |
| 7-year 10.125% due Jul 2013 | 550 Million | NNL/NNI & NNC | 492 bps | | | | 737 bps | 997 bps | 731 bps |
| 10-year 10.75% due Jul 2016 | 450 Million (650 add-on in May 08) | NNL/NNI & NNC | 553 bps | 351 bps | 380 bps | 354 bps | 753 bps | 926 bps | 785 bps |
| 6.875% due Sep 2023 | 200 Million | NNL/ No Guarantee | 387 bps | 281 bps | 279 bps | 265 bps | 617 bps | 852 bps | 702 bps |
| 7.875% due Jun 2026 | 150 Million | NNCC/NNL | 464 bps | 323 bps | 339 bps | 301 bps | 666 bps | 879 bps | 760 bps |

# TAB 3

Date: 20021002

Docket: CA 178260

02 276 035

# NOVA SCOTIA COURT OF APPEAL

**[Cite as:** *Burke v. Sitser***, 2002 NSCA 115]**

## Roscoe, Cromwell and Oland, JJ.A.

**BETWEEN:**

JEFFREY BURKE

Appellant

- and -

JOHN SITSER, THE MUNICIPALITY OF THE COUNTY OF
COLCHESTER and BLAIKIES DODGE CHRYSLER LTD.

Respondents

---

REASONS FOR JUDGMENT

---

| | |
|---|---|
| Counsel: | David S. Green and Rebecca Lamb for the appellant |
| | Glenn R. Anderson for the respondents |
| Appeal Heard: | September 17, 2002 |
| Judgment Delivered: | October 2, 2002 |

**THE COURT:**    The appeal is allowed, the order dismissing the action is set
aside and costs of the appeal are costs

in the cause fixed at $1,500.00

## OLAND, J.A.:

[1]    This is an appeal of a decision of Associate Chief Justice MacDonald in Supreme Court chambers dismissing the appellant's personal injury action for want of prosecution and delay under *Civil Procedure Rule* 28.13.  The appeal was allowed at the hearing, with reasons to follow.  These are the reasons.

[2]    Several times during the history of this proceeding, the appellant did not move along his claim pertaining to alleged injuries sustained in a 1993 motor vehicle accident.  It is also clear that the appellant responded slowly to the respondents' frequent requests for production and answers.  Indeed it seems that sometimes only an imminent application to strike garnered any reaction from the appellant.

[3]    This litigation has included three chambers appearances initiated by the respondents.  They successfully applied to Justice William B. Kelly on October 19, 2000 for an order compelling the appellant to answer or further answer questions asked at the appellant's discovery and to produce relevant documents.  They subsequently brought two applications to strike, both before MacDonald, A.C.J. Their first application to strike which was heard on May 16, 2001, after having been adjourned from March 2001, was dismissed.  While he found that there had been inordinate and inexcusable delay giving rise to a presumption of prejudice, the chambers judge determined that while the outstanding matters amounted to "some prejudice," they were not the type of serious prejudice envisaged in *Martell v. Robert McAlpine Ltd.* (1978), 25 N.S.R. (2d) 540 (C.A.).  His order included costs in any event of the cause against the appellant and was without prejudice to any further application the respondents may take.

[4]    That chambers judge heard the respondents' second application to strike for delay on March 21, 2002 and gave his oral decision at the conclusion of the hearing.  After finding that there had been inordinate and inexcusable delay which gave rise to a presumption of prejudice, he also found that there had been actual prejudice which he specified as including:

1.   The death of the appellant's family physician, Dr. R. Boodoosingh.
     He was no longer available to testify and his records were missing;

2.   The records of Dr. Eapen had not been located; and

3.   Employment insurance records were unavailable.

The chambers judge pointed out that the appellant had one pre-existing injury and
two injuries after this motor vehicle accident, further complicating his claim. He
commented that it seemed that very little had happened in the year since he
dismissed the earlier application.

[5]   The decision on the second application to strike concluded:

> Back in May of 2001, the plaintiff was given an opportunity to salvage this case
> and to aggressively bring it to trial. It is now simply too late and too little has
> been done to do so. I repeat the admonitions for the purposes of this decision that
> I had given the plaintiff in March and in May of 2001. Here, with <u>failing
> memories, lost records, dead physicians and other prejudice</u>, I am satisfied the
> defendant, unfortunately, cannot get a fair trial, and I am left with no course but to
> dismiss the action.

(emphasis added)

[6]   The day following the hearing of the chambers application, counsel for the
appellant wrote the chambers judge enclosing a copy of Dr. Eapen's records which
included the records of the late Dr. Boodoosingh. They had arrived while the
application was being heard. In a letter response to counsel's request that he
reconsider his decision of a day earlier, the chambers judge stated that he had
rendered his decision based on the evidence before him and "my role is now
*functus*. It would be inappropriate for me to have any further involvement in this
matter." His order issued on April 16, 2002.

[7]   In our respectful opinion, the chambers judge erred in determining that he
was *functus*. Until the order issued, he had the discretion to withdraw, modify, or
even reverse his decision. In *Lunenburg v. Bridgewater Public Service Commission*
(1983), 59 N.S.R. (2d) 23 (N.S.S.C.A.D.), where the issue was whether the judge
erred in reversing his oral decision, Cooper, J.A. reviewed the case authority
pertaining to *functus officio* at ¶ 8 and ¶ 9. He stated at ¶ 10:

> . . . in my view Judge Clements was here not *functus*. He could only be so if an
> order giving effect as a judgment to his oral decision had been entered. I quite
> recognize the word of caution entered by Bridges, J., in the *Fruehauf Trailer Co.*

case, *supra*, to the effect that the right to modify or vary a decision in circumstances such as we have here is one which "a court should be most reluctant to exercise and should only do so in an exceptional case", but in my opinion this is such a case. Judge Clements frankly said that he had not clearly dealt with the main argument of the Commission and, that being so, it seems to me highly desirable that he exercise his right to vary his oral decision.

[8]    We would also refer to *Temple v. Riley*, [2001] N.S.J. No. 66 (QL) wherein Saunders, J.A. stated at ¶ 60:

> The general rule is that a trial judge may change or amend his/her judgment at any time before issue and entry thereof, but that after the judgment has been issued and entered, he/she is *functus officio* and relinquishes any power to do so, subject of course to the provisions of the Rules. See, for example, The Law of Civil Procedure, W.B. Williston and R.J. Rolls, Vol. 2, Butterworths (Toronto: 1970), p. 1059.

This court also reviewed the legal principles relating to the reopening of a proceeding after the judge has made a decision and issued reasons but before the formal judgment has issued in *Griffin v. Corcoran*, [2001] N.S.J. No. 158.

[9]    We think it clear that the chambers judge here had a discretion to reopen the matter prior to the issuance of the formal order. While this power is, as noted, discretionary, so that the judge was not obliged to reopen the matter, he had the authority to do so and erred in finding otherwise. Given that the absence of the now located records formed an apparently significant part of the basis of his decision to dismiss the action, we cannot say that the judge's error of law was immaterial to the result which he reached.

[10]    The appeal is allowed. The order dismissing the action is set aside without prejudice to any further application the respondents may bring to strike for delay. The costs of the appeal fixed at $1,500.00 will be costs in the cause.

Oland, J.A.

Concurred in:

Roscoe, J.A.

Cromwell, J.A.

# TAB 4

**Court File No.:** CV-09-370855
**Date:** 2009/03/23

**ONTARIO**
SUPERIOR COURT OF JUSTICE

| | | |
|---|---|---|
| **B E T W E E N:** | ) | |
| | ) | |
| Metropolitan   Toronto   Condominium Corporation 626 | ) ) | *Robert Bell* and Katherine Menear, for the Plaintiff |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| - and - | ) | |
| | ) | |
| | ) | *Chris G. Paliare* and *Matthew Milne-Smith*, |
| | ) | for the Defendants |
| Bloor/Avenue Road Investment Inc., and | ) | |
| Kevric Ontario Real Estate Corporation | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | **HEARD:** March 12, 2009 |

**O'MARRA J.:**

[1]     This matter involves the continuing availability of parking spaces to approximately 40 residents of the plaintiff, Metropolitan Toronto Condominium Corporation 626 (MTCC 626). On February 13, 2009 an interim injunction was ordered to preserve the *status quo* until the matter could be determined. The defendants, Bloor/Avenue Road Investments Inc. and Kevric Ontario Real Estate Corporation the owner of the building and parking garage, have brought a motion under Rule 59.06(2) of the *Rules of Civil Procedure* requesting the court to set aside, varied or declared terminated the interim injunction made in this matter affecting its commercial interests for three reasons:

1. The plaintiff has not complied with an undertaking given to the court in the course of obtaining the interim injunction to seek a minor variance of By-law 492-80 from the Committee of Adjustment for the City of Toronto.

2. The plaintiff has conceded by not following through on its undertaking to seek the variance there is no serious issue to be tried with respect to the municipal by-law on which its claim is based.

Page: 2

3. The plaintiff has frustrated the defendants' efforts to resolve the matter in a timely fashion by not agreeing to an expedited trial timetable and it is taking advantage of the delay to the detriment of the defendants' commercial interests.

Factual Background

[2]     On February 13, 2009 the plaintiff brought an application for injunctive relief pending the determination of the application of the City of Toronto By-law 492-80 to the allocation of parking spaces as between commercial and residential tenants of the building owned by the defendants and occupied by residents of the plaintiff condominium corporation. The building is a mixed use building with commercial tenants and residential condominium owners. The defendants are the owner and manager of 150 Bloor Street West, a 10-storey commercial building and parking garage with 121 parking spaces. The plaintiff, with a municipal address of 175 Cumberland Street, is a residential complex that occupies 15-storeys in the same high-rise building above 150 Bloor Street.

[3]     The property was developed over 27 years ago originally as one development project consisting of two high-rise buildings and two parking garages. By-law No. 492-80 passed May 26, 1980 relating to the overall development dealt with a number of matters, one of which involved the availability of parking within the two buildings. Section 2 (7) of the By-law reads as follows:

> The owners or occupants of buildings A and B provide and maintain, for
> their exclusive use, at least 272 parking spaces in total, either on Lot A or
> on Lot B or on both such lots....

[4]     Building A is called Renaissance Plaza, the building involved in this matter. Building B is called Renaissance Court. The Renaissance Plaza is located at 150 Bloor Street within which is occupied MTCC 626 with a municipal address of 175 Cumberland.   The other building, Renaissance Court, is located at 162/164 Cumberland.  In 1984 the developer entered into a reciprocal agreement with the plaintiff condominium corporation, registered on title as Instrument No. B856574, that provided in section 4.1 of the agreement that "the parties shall comply with all laws, rules, orders, ordinances, regulations and requirements of any government, or municipality, or any agency thereof having jurisdiction over the Renaissance Plaza and Renaissance Court".

[5]     Several years later the ownership of the two buildings split. By-law No. 492-80 applies to both buildings, however, since the split in ownership the parking garages and the spaces therein have been dealt with by the owners separately.  At 150 Bloor Street/175 Cumberland (Renaissance Plaza) the 121 parking spaces have been utilized by the residents and commercial tenants.  There are 150 residences of which 55 residents have "assumption agreements" which have preserved the allocation of parking spaces for their use, while approximately 40 other residents have monthly contractual agreements which can be terminated on 30 days' notice by the building's owner. Eight other spaces were utilized by MTCC 626 for visitor purposes. In total the residents and their visitors had use of 103 of the 121 spaces at the Renaissance Plaza.

Page: 3

[6]    The defendants became the new owners of the building in 2008. Since acquiring the Renaissance Plaza the defendants have taken the position that unit holders without parking assumption agreements would no longer be entitled to park in the Renaissance Plaza parking garage.  Notification that monthly parking agreements were to be terminated as of January 1, 2009 and thereafter tagged and towed caused a great consternation amongst the residents.

[7]    The defendants who own 270,000 sq. ft. of commercial space in the building had reached an agreement with the Ontario Medical Association (OMA) to lease 80,000 sq. ft. commencing March 1, 2009.  As part of its agreement the building owner is required to provide 27 parking spaces for the use of its tenant.  The defendant is also seeking to lease the remainder of the unoccupied commercial space and to do so requires the availability of parking spaces for future tenants.

[8]    On January 23, 2009 the plaintiff commenced an action claiming *inter alia*:

> An interim, interlocutory and permanent injunction restraining the defendants from i) breaching the terms of the reciprocal agreement (as defined herein) and violating By-law No. 492-80 (as defined herein), ii) tagging or towing unit holders or their visitors' vehicles from the parking garage at Renaissance Plaza or otherwise interfering with the quiet enjoyment of unit holders' parking at their homes; a declaration that 103 parking spaces be available in Renaissance Plaza for the exclusive use of unit holders.

[9]    The plaintiff argued on the February 13, 2009 hearing in seeking injunctive relief that the serious issue to be tried involved the interpretation of the reciprocal agreement s. 4.1 requiring the parties to comply with all municipal by-laws and the application of By-law 492-80 to the allocation of parking spaces between residential and commercial use at Renaissance Plaza.  It is the position of the plaintiff that the by-law requires that the defendants make available to the residents sufficient parking spaces for their exclusive use as "owners or occupiers of Building A".  Although the by-law does not specify allocation of the 272 spaces as between the building A or B or within the buildings the plaintiff argued in paragraph 5 of its factum that:

> The parking allocation may be determined by way of variance to zoning before the Committee of Adjustment or re-zoning and then ultimately before the Ontario Municipal Board, where all interests can be considered, including the public interest, before specialized bodies with expertise in dealing with zoning and parking issues. The issue of parking allocation can be determined expeditiously if the route chosen is before the Committee of Adjustment.

[10]    The defendants' position is that they would suffer significant commercial consequences in not being able to provide the necessary spaces to their tenant, OMA, or be able to offer parking spaces in lease agreements with potential tenants. The combined usage of the residential owners, 103 spaces and its new tenant, 27 spaces surpasses the capacity of the parking garage.

Page: 4

Without access to more spaces the marketability of the remaining commercial space becomes limited. It is their position that the by-law relied on by the plaintiff does not convey private rights to the residential unit holders. The by-law only specifies the number of parking spaces required to exist within the two buildings, but not the allocation of those spaces between the owners and occupants.

[11]    The plaintiff, in submissions, indicated that the most expeditious route to clarify any ambiguity in the applicability of the by-law would be by way of a minor variance application to the Committee of Adjustment for the City of Toronto. Such an application could occur as early as April 2009. Notwithstanding the defendants' position that the plaintiff condominium corporation does not have standing to make such an application with respect to their land and building, the plaintiff indicated that it had the opinion of an urban planning expert that it could make such an application under the *Planning Act, R.S.O. 1990, c. P.13*. Counsel for the plaintiff argued that pursuant to section 45(9.1) and (9.2) the Committee of Adjustment, if it agreed with the variance specifying allocation of spaces, could also require the owner of the land to enter into one or more agreements with the municipality reflecting any terms and conditions imposed in its decision. The agreement could then be registered against the land.   The process to obtain clarification could take as little as 30 days.

[12]    Plaintiff's counsel stated that he would undertake to the court that the condominium corporation would pursue the Committee of Adjustment application.

[13]    The plaintiff also submitted that another way certainty could be achieved as to availability and allocation of parking spaces would be to make a re-zoning application to amend the by-law, a process that would take a much greater period of time.

The Endorsement

[14]    On Friday, February 13, 2009 at the conclusion of the hearing, I advised the parties that I would release written reasons at a later date, however, due to the apparent urgency of the application I would provide brief reasons and endorsement, which were as follows:

1.  The three part test to consider in determining whether an interlocutory injunction is warranted is set out in *R.J.R. MacDonald Inc. v. Canada (A.G.)*, [1994] 1 S.C.R.:

    i)    Is there a serious issue to be tried?

    ii)   Will the applicant suffer irreparable harm if the injunction is not granted?

    iii)  Does the balance of convenience favour granting the injunction?

2.  I am satisfied on the materials before me and in hearing submissions of the parties that the necessary criteria have been met to warrant the imposition of an interim injunction in this matter.

Page: 5

3. There is a serious issue to be tried with respect to the application of the reciprocal agreement registered as Instrument No. B85674 and the interpretation of By-law 492-80 with respect to the allocation of residential and commercial parking spaces at Renaissance Plaza. In my view, the question of whether a serious issue exists is not unlike the question before a motion court on a summary judgment application in determining whether there is a genuine issue for trial. In this instance, there is such an issue that requires, in my view, a determination by a trier of fact.

4. Serious and irreparable harm is very real with respect to the deprivation for certain residents of parking spaces that have been available to them for many years at the place they reside. There are also issues of safety that I consider serious in the circumstances, particularly if the parking garage is operated to permit open use, as appears may be the situation, whether it is called public access or not.

5. On a balance of convenience, a temporary continuation of the *status quo* allowing a number of residents to continue to utilize the parking spaces, some of whom for 25 years is not outweighed by the current and immediate future demands of the respondents' commercial tenants in the short term.

6. An interlocutory injunction is granted on the following terms:

   1. The defendants are enjoined from breaching the terms of the reciprocal agreement and violating By-law No. 492-80 and from tagging and towing the unit holders' vehicles from parking spaces at Renaissance Plaza or otherwise interfering with the quiet enjoyment of the unit holder's parking.

   2. All residential unit holders parking in the facility shall be required to enter into a Parking Agreement with the defendant on showing proof of a pre-existing agreement and in full satisfaction of any outstanding arrears.

   3. The parties shall ensure that there is a process in place, as may be required, to ensure the accommodation of the parking requirements of the defendants' tenants, OMA, pursuant to their lease agreements, and the requirements of the residential unit holders at Renaissance Plaza.

   4. This interim order shall remain in place until the earlier of the determination of the matter with respect to an application for a variance to the zoning by-law before the Committee of Adjustment, or a re-zoning application, if required, or the trial of the action.

   5. Submissions as to costs may be made in writing.

Events and Correspondence Subsequent to the February 13 Endorsement

[15]   Following the hearing and prior to the release of written reasons a stream of correspondence was sent to the court and exchanged between the parties that has given rise to

this motion and, in my view, overtaken the need for separate written reasons beyond those cited above and in the discussion to follow with respect to the February 13 hearing. This judgment shall constitute the entirety of the reasons to be issued.

[16]    I do not intend to summarize all of the letters that followed the February 13 hearing however, the detail of several of them are of importance in understanding the development of events that led to the within motion to set aside, vary or terminate the February 13, 2009 endorsement.

[17]    On February 20, 2009, defence counsel, Mr. Milne-Smith wrote to Justice Colin Campbell of this court to arrange the scheduling of an expedited trial. He provided a proposed timetable which would have established a trial date as early as mid-April, time permitting in the court, and if the plaintiff agreed to it. He added "the defendants are willing to comply with any schedule that permits a speedy and efficient resolution of the narrow legal issues raised in this action."

[18]    In a letter dated February 24, 2009, counsel for the plaintiff, Mr. Robert Bell wrote to Justice Campbell in response to the proposed timetable stating that the "plaintiff entirely disagrees with the defendants' proposed timetable or need for an appointment to schedule trial of the action."

[19]    Plaintiff's counsel advised the court in the letter that they had met with their clients on February 23, 2009 and received instructions to pursue the variance before the Committee of Adjustment and to the Ontario Municipal Board, if necessary. Further, he attached to the letter a copy of a letter prepared by the solicitor for the City of Toronto, dated February 4, 2009, which I had excluded from the hearing on February 13, 2009 on a leave application by the plaintiff pursuant to Rule 39.02. It was excluded on the grounds that it was not in affidavit form and the defendants had no opportunity to examine the author on its contents. The City solicitor was in attendance at the hearing and indicated that the City would not seek to intervene as a party to the proceedings.

[20]    The City solicitor's letter is mentioned because it was provided as an attachment to the correspondence to Justice Campbell and reflects support by the City solicitor for the plaintiff's position given at the hearing on February 13, 2009 that the issue of clarifying the application of the by-law and the allocation of parking spaces between the owners and occupiers of Renaissance Plaza could be achieved in very short order by an application to the Committee of Adjustment. Brendan O'Callaghan, Solicitor Planning and Administrative Tribunal Law wrote the following:

> If an application for variance were made immediately to the Committee of Adjustment, a decision would likely be rendered by April or May, 2009. The appeal period is 20 days and if appealed, would proceed to the Ontario Municipal Board. Given the Board's current calendar and scheduling practice, the appeal could be heard by the Fall of 2009 at the latest.

Page: 7

[21]   Although the letter was not before the court on February 13 the information relating to the time frame and expeditious nature of the Committee of Adjustment route was made known to the court by plaintiff's counsel.

[22]   On February 24, 2009 plaintiff's counsel sent a letter to my attention outlining his costs submissions wherein he reiterated that the variance application was being pursued:

> We appreciate the costs are not often awarded to a plaintiff on a successful injunction motion. However, in this case, the injunction has preserved the *status quo* with respect to the right to use parking spaces at the Renaissance Plaza pending a determination of the matter with respect to an application for a variance to the zoning by-law before the Committee of Adjustment, or a re-zoning application, if required, or the trial of this action. The plaintiff, as it advised the court at the hearing of the motion, is seeking a variance to the zoning by-law and/or a re-zoning application and is proceeding expeditiously with respect to same. If the matter is ultimately resolved at either the Committee of Adjustment or the re-zoning application then a trial may not be necessary and there may be no opportunity to recover costs of the successful motion on behalf of the plaintiff.

[23]   On February 27, 2009 in another letter sent to my attention plaintiff's counsel outlined a number of conflicts that had developed between the parties with respect to identifying unit holders with monthly agreements who were entitled to park because parking agreements could not be produced or arrears had not been paid; the new parking rates set by the defendants exceeded the rates charged in neighbouring parking garages; and over the organization of valet parking versus self-parking needed to accommodate all persons using the parking garage. Further, the plaintiff requested the order that had yet to be taken out, include a specific parking fee rate and the order remain in place until a final determination including "any and all appeals to the OMB or the courts from a decision of the City council through zoning application or the Committee of Adjustment through the minor variation process." He concluded the letter stating:

> We have advised counsel for the defendants that our client will be pursuing variance. The defendants maintain this cannot be done and have sought a trial date on an expedited basis.

[24]   A letter dated March 2, 2009 was faxed to my attention on Monday, March 3 wherein defendants' counsel advised that "based on information received last night from counsel to the plaintiff, the defendants intend to bring a motion to you for an order setting aside or dismissing the injunction granted on February 13, 2009, or similar relief". The information received from plaintiff's counsel in an e-mail dated March 2, 2009 was as follows:

> We met with experts today. Given the position you have taken on behalf of Kevric with respect to variance, our client will pursue the more complex re-zoning process. We are working with urgency to commence the application to re-zone.

Page: 8

[25]    The defendants initiated the motion to set aside or vacate the interim injunction on the grounds that the plaintiff had declared it was not going to comply with an undertaking given to the court to pursue the variance application. Rather, it would pursue the longer and more complex rezoning process. The defendants assert it was an acknowledgement by the plaintiff that there was no serious issue to be tried because the law needed to be changed to support their position.  In response, the plaintiff brought a cross-motion to quash the defendant's motion, costs of the interim injunction hearing on February 13, 2009 and an order settling the interim injunction order to include specific parking rates and that the order would remain in place until the final determination of the matter including all appeals to the OMB or the courts.

<u>March 12, 2009 Hearing</u>

[26]    At the outset of the hearing on March 12, 2009 I indicated that the motion to set aside or vary the interim injunction would take priority. I indicated to the parties that I had reviewed the correspondence and I was surprised by two aspects.  The first cause for my surprise was that it appeared the plaintiff did not intend as of March 2 to seek a variance from the Committee of Adjustment.  The reason for my astonishment was because I had specifically noted during the course of argument on February 13, 2009 that plaintiff's counsel had undertaken to the court that the condominium corporation would pursue the Committee of Adjustment process. Plaintiff's counsel had indicated its urban planning expert, Mr. Frank. Lewinberg had opined that a Committee of Adjustment application would bring certainty to the issue. That view was expressed in both his report and examination transcript filed in the proceedings. Further, the court was advised it would be the most expeditious process by which clarification could be obtained and it could be accomplished within 30 days. If there was an appeal it could be concluded by no later than the fall.   Moreover, counsel had specifically argued that the provisions of the *Planning Act* section 45 (1), would permit the plaintiff and residents as owners "affected by any by-law" to apply to the Committee of Adjustment to obtain a variance. Under sections 45 (9.1) and (9.2) if the Committee imposed terms and conditions as a result of the variance it could require the owner of the land (the defendants) to enter into agreements with the municipality, which could be registered against the land on title.

[27]    The second cause of my surprise raised in the correspondence was that the plaintiff did not appear to be prepared to expedite the trial of the matter.

<u>Issues</u>

[28]    The issues raised on this motion are as follows:

1.  Does the court have jurisdiction to set aside, vary or vacate the interim injunction order at this stage?

2.  If the answer to No. 1 is "yes", should the injunction be set aside because the plaintiff has failed to comply with its undertaking?

3.  Should the interim injunction be set aside because the plaintiff has conceded that there is no serious issue to be tried regarding their correct interpretation of By-law 492-80 upon which its claim is based?

Page: 9

4. Should the injunction be set aside because the plaintiff has failed to proceed promptly to trial?

1. <u>Does the court have jurisdiction to set aside, vary or vacate the interim injunction order?</u>

[29] Rule 59.06(2) permits the setting aside or varying of an order where there has been fraud or facts arising or discovered after the order was made.

[30] A judgment can be altered if "the integrity of the litigation process is at risk unless it occurs, or that there is some principle of justice at stake that would override the value of finality in litigation, or that some miscarriage of justice would occur if such reconsideration did not take place". (See: *Schmuck v. Reynolds-Schmuck* (2000), 46 O.R. 3rd 702 (S.C.J.) and *Lawyers' Professional Indemnity Co. v. Geto Investments Ltd.,* [2007] O.J. No. 2793 (S.C.J.)).

[31] In this instance, the order has not been entered and as such, the issue of finality does not apply. Moreover, it is a well-settled principle in law that a judge has the power to reconsider, alter or modify his or her decision until a formal order has been drawn up, passed and entered. In *Montague et al. v. Bank of Nova Scotia* (2004), 69 O.R. 3rd at para. 34, Goudge, J.A. observed the following:

> There can be no doubt that until a judgment is formally entered in the court record, the judge has a very broad discretion to change it. In *Holmes Foundry Ltd. v. Village of Point Edward; Caposite Insulations Ltd. v. Village of Point Edward*, [1963] 2 O.R. 404, 39 D.L.R. 2nd 621 (C.A.) Laidlaw, J.A. put it this way, at page 407 O.R.:
>
> > It is well settled in law that an order can always be withdrawn, altered or modified by a judge either on his own initiative or on the application of a party until such time as the order has been drawn up, passed and entered. I refer to *Re Harrison's Share* under a settlement, *Harrison v. Harrison*, [1955] 1 Ch. 260 at p. 275, [1955] 1 All E.R.185.

[32] Further, the jurisdiction is independent of the *Rules of Civil Procedure* as noted by Justice Sutherland in *Smith Bus Lines Limited v. Bank of Montreal*, [1987] 61 O.R. 2nd 688 at p. 702 where he stated the following:

> Such a jurisdiction is quite independent of the rules, and of the fact that once entered an order takes effect from the time of its pronouncement.

[33] I am satisfied that the court is not *functus officio*. Until judgment is formally entered the court has an inherent jurisdiction to set aside or amend its own order. Rule 59.06(2) is a codification of the jurisdiction.

Page: 10

2.    Should the interim injunction be set aside because the plaintiff has failed to comply with its undertaking?

[34]    At the outset it is important to bear in mind, as observed in *CIBA-Geigy Limited v. Novopharm Ltd.*, [1998] 2 F.C. 527 at para. 17:

> An interlocutory injunction is an extraordinary and drastic restraint on the liberty of action of the enjoined party, in circumstances where the merits of the other party's complaints have yet to be determined. That infringement on the liberty of action of the enjoined party is only justifiable where it is temporary, and meant merely to maintain the status quo until such time as the judicial process can be completed, a point made by a majority of the Supreme Court of Canada in *Wabasso Cotton Co. Ltd. v. Syndicat des Ouvriers*.

[35]    The defendants contend that the plaintiff's undertaking to pursue a variance of the by-law to the Committee of Adjustment was unequivocal. On the other hand, the plaintiff, while not resiling from having provided the undertaking, maintains that it was given with respect to pursuit of the variance process or a re-zoning application. The plaintiff argues that the position it has taken with respect to pursuing the re-zoning application was in keeping with its undertaking as well as the endorsement provided by the court.

[36]    On my review of the proceedings I am satisfied that counsel for the plaintiff gave an explicit undertaking to pursue a variance application to the Committee of Adjustment as the most expeditious manner to achieve clarification. It had undertaken to do so notwithstanding the unequivocal opposition by the defendants. Further, plaintiff's counsel reiterated the undertaking in its correspondence to the court and to the defendants following the hearing  In addition to the correspondence noted earlier, in a letter dated March 5, 2009 tendered on these proceedings as an Exhibit to the Affidavit of Court Peterson, an associate of the plaintiff's law firm, sent by plaintiff's counsel to the defendants' counsel he stated the following:

> On instructions from our client, *we did undertake to the court on behalf of our client that a variance would be sought before the Committee of Adjustment and that could be done as early as April.* Pausing there, this is precisely what was in the City's letter which you have objected to throughout, as was reference to re-zoning. It was also clear in all of the submissions made on behalf of our client that we were aware your clients objected to this and we undertook on behalf of our client that it would, if need be, seek re-zoning.

> Opportunity was given after the injunction to agree to the Committee of Adjustment process, but rejected. Our client has every right not to feed into technical arguments and delay by Kevric with respect to that process and accordingly is pursuing re-zoning. This is entirely consistent with all

> submissions to the court and the injunction continues through the re-
> zoning process, in accordance with the court's order. (emphasis added)

[37]    Even though the plaintiff provided an explicit undertaking to pursue a certain course of action, it would appear that its reading of the endorsement suggested that it had three courses of action it could choose from amongst to pursue.

[38]    The endorsement indicated that the interim injunction would remain in place *until the earlier of the determination of the matter* with respect to an application for a variance or a re-zoning application, if required, or trial of the action. Plaintiff's counsel undertook to pursue the variance application to the Committee of Adjustment, and it reiterated that undertaking in all subsequent correspondence until it notified the defendants by e-mail March 2, and confirmed in its correspondence of March 5, that it was choosing to pursue the more complex re-zoning process. The rationale given in the letter of March 5 for the change in course was stated to have been because the defendants had not agreed to the process. However, the defendants' opposition to the variance application process was not a new development. It was well known to the plaintiff during the hearing on February 13 when it provided the undertaking to the court to pursue the most expeditious route. Plaintiff's counsel argues that the decision to pursue re-zoning is not a new fact that has arisen since the interim injunction and as such the defendants have failed to establish the necessary criteria under Rule 59.06.

[39]    I do not agree. If the variance application was not pursued it would be a significant deviation from the undertaking given to the court. The expeditious nature of the approach was of great importance in the circumstances given the potential detrimental impact on the defendants' commercial interests. It was the reason for an endorsement requiring the *status quo* to remain in place until *the earlier of* the variance application, re-zoning application or trial. The rationale given by the plaintiff that the defendant would not cooperate in the variance application does not bear the heavy weight and consequence of failing to comply with an undertaking to the court.

[40]    An undertaking is an unequivocal promise to perform a certain act. *The Rules of Professional Conduct* of the Law Society of Upper Canada deal with undertakings given by lawyers:

> 1.    Undertakings 4.01(7)
>
> A lawyer shall strictly and scrupulously carry out an undertaking given to the tribunal or to another lawyer in the course of litigation.
>
> 2.    Commentary
>
> Unless clearly qualified, the lawyer's undertaking is a personal promise and responsibility.

In this instance, the plaintiff's counsel gave an undertaking to the court on behalf of his client to pursue a specified course of action. As a result of that undertaking, the endorsement was written to undo the fettering effect of the interim injunction at the earliest opportunity.

Page: 12

[41]    In *Towne v. Miller* (2001), 56 O.R. 3rd 177 at p. 180 Quinn, J. stated the following:

> Undertakings given by lawyers are matters of the utmost good faith and must receive a scrupulous attention.

[42]    In *Boehringer Ingelheim (Canada) Ltd. v. Merck Frosst Canada & Co.*, [2001] O.J. No. 1433 Justice Lane held that where counsel had made certain assurances upon which the court relied to make an order granting an injunction failure to comply was a serious matter and nothing short of staying the entire order would be appropriate.  Similarly, in *Re Leonor*, [1917] 3 W.W.R. 861 in the British Columbia Prize Court, the plaintiff's motion was dismissed when counsel failed to comply with an undertaking to file fresh evidence in the proceeding.  The court had not dismissed the motion at an earlier stage as a result of the undertaking of plaintiff's counsel to do so.  Instead of complying with the undertaking, the plaintiff filed a motion in another jurisdiction and obtained relief.  In the course of dismissing the motion, the court stated that:

> It would be an unheard of thing for any court to allow a plaintiff to obtain and retain an advantage over the defendant because his counsel had broken his undertaking given to the court to avert the consequences of a dismissal of his motion.

[43]    In this matter, the undertaking provided by plaintiff's counsel was a significant factor in fashioning the endorsement such that it would expire at the earliest opportunity which would have been, according to submissions made by plaintiff's counsel, on a variance application to the Committee of Adjustment.  In contrast, the re-zoning process is one which could take, if not a number of years, certainly well beyond the time required to obtain a minor variation, including any appeal to the OMB.  It is of concern as well that the plaintiff resisted the defendants' effort to expedite the trial.

Events Subsequent to March 12, 2009

[44]    Late in the afternoon on Friday, March 13, 2009 another letter was sent to my attention by plaintiff's counsel with attachments to indicate the plaintiff had submitted on that date a minor variance application to the Committee of Adjustment and a zoning by-law application with the City of Toronto Planning office.  It would appear the plaintiff has realized counsel's undertaking bound it to a certain course of action and failure to comply with it would have resulted in an adverse outcome.  In my view, if the undertaking had not been complied with the appropriate remedy would have been to set aside the interim injunction in its entirety.  As noted in *Boehringer* where counsel has made assurances relied on by the court to make the order, a failure to comply shall result in a stay.  In these circumstances, I am inclined to consider the actions of the plaintiff up to submitting the variance application as a baulk.  However, it does not warrant the extreme consequence of setting the endorsement aside.

3.      Should the injunction be set aside because the plaintiff has conceded that there is no serious issue to be tried regarding their correct interpretation of By-law 492-80 upon which its claim is based?

Page: 13

[45]   The defendants argue that in seeking rezoning the plaintiff is seeking to change the law. If the law needs to be changed it means that there is no serious issue to be tried on the interpretation of the existing by-law. In my view the defendants are attempting to relitigate the issue raised and argued on the original hearing February 13. There is nothing new in the plaintiff's position. The plaintiff maintained that it would seek re-zoning, if necessary, in addition to the variance application process. Just as the plaintiff was aware that the defendants opposed the variance process, the defendants' knew of the plaintiff's intention to engage the re-zoning process.

[46]   I am satisfied that the plaintiff in choosing to pursue the re-zoning amendment application does not in and of itself call into question the seriousness of the issue to be tried. As with the variance application, the plaintiff seeks clarification in the re-zoning application as to the allocation of the number of parking spaces for residents as owner occupiers in the Renaissance Plaza, Building A in referred to in By-law 492-80. The concern would have been justified, however, if the plaintiff had chosen to pursue re-zoning instead of the minor variance application or relied on it as a reason to delay a speedy trial in this matter. The resultant delay could have been inordinate and basis to set aside the interim injunction.

4.   Should the injunction be set aside because the plaintiff has failed to proceed promptly to trial?

[47]   Little more than one month has passed since the endorsement was rendered on February 13, 2009. Cases where stays have been ordered involve a much greater period of time between the granting of the injunctive relief and the motion to vacate. Usually in the order of a year or more. Generally, the party benefiting from the injunction has failed or resisted taking a number of steps in the trial process causing substantial delay in bringing the matter to a conclusion. (See: *Bell ExpressVu Ltd. Partnership v. Tedmonds & Co. Inc.*, [2001] O.J. No. 1558 (S.C.J.)).

[48]   The defendants' concern in this instance was not premised on the actual passage of time between the hearings. Rather, it was based on a concern over the anticipated delay that would have been the consequence of the plaintiff pursuing the more complex route to clarification of the by-law, instead of the variance application, combined with an apparent reticence to agree to an expedited trial, which the plaintiff has an obligation to do.  As noted by Southey, J. in *Bourganis v. Glarentzos* (1978), 19 O.R. 2nd 327 at p. 328 a plaintiff who obtains an interlocutory injunction is under a duty to proceed with reasonable dispatch to bring the action to trial, failing which the injunction will be dissolved.

[49]   The purpose of an interlocutory injunction is to ensure that the plaintiff's rights are not impaired by the time the matter goes to trial, but it is also to be of the briefest duration to ensure the harm to the defendants is minimized. There is no basis at this early stage to conclude that the injunction should be dissolved for unreasonable delay now that the plaintiff has embarked on a course to comply with its undertaking.

Page: 14

Conclusion

[50]    The court must do that which is just and equitable in all of the circumstances of the case. While I have concerns the plaintiff was prepared to forgo the most expeditious route it gave assurances it would take in support of its request for an interim injunction it has chosen to do otherwise in a timely fashion. It would appear to that end the hearing of this motion had a salutary effect. Steps have been taken by the plaintiff following the hearing of this matter to embark on the appropriate course of complying with its undertaking to the court. It would have been a most serious matter to have breached the undertaking. Not to have complied would have undermined the validity of the endorsement and the consequence a stay.

[51]    I am not prepared to set aside the endorsement and deny forty residents access to parking spaces where they live. Further, I am not prepared to amend the endorsement to include all appeals and reviews of the variance process. The trial of this matter should not be delayed pending administrative appeals and reviews. The plaintiff is to diligently pursue its variance application and proceed with dispatch to schedule an expedited trial in this matter. In addition, the order when taken out shall include reference to the plaintiff's undertaking given by Mr. Frank Potter, president of its board of directors, in his affidavit dated January 23, 2009 to compensate the defendants for damages if the order causes damage to the defendants for which they ought to be compensated.

[52]    The defendants should not have needed to bring this motion, a factor that will be taken into account on the issue of costs. Counsel may make written submissions of no more that two pages in length, together with a draft bill of costs within 30 days of the release of this judgment.

O'Marra, J.

**Dated:** March 23, 2009

**COURT FILE NO.:** CV-09-370855
**DATE:** 2009/03/23

## ONTARIO

## SUPERIOR COURT OF JUSTICE

**B E T W E E N:**

Metropolitan Toronto Condominium Corporation 626

Plaintiff

- and -

Bloor/Avenue Road Investment Inc., and Kevric Ontario Real Estate Corporation

Defendants

---

### REASONS FOR JUDGMENT

---

O'Marra J.

Released: March 23, 2009



# TAB 5

DATE: 20040107
DOCKET:C37146

# COURT OF APPEAL FOR ONTARIO

## WEILER, LASKIN AND GOUDGE JJ.A.

| | | |
|---|---|---|
| **B E T W E E N:** | ) | |
| | ) | |
| YVONNE MONTAGUE, ASQUITTE | ) | Yvonne Montague |
| MONTAGUE, ANDREA | ) | in person |
| MONTAGUE, YVETTE MONTAGUE, | ) | |
| BRUCE MONTAGUE, JARVON | ) | |
| SCHURTON, By his Litigation | ) | |
| Guardian ANDREA MONTAGUE and | ) | |
| TIANA SCHURTON, By her Litigation | ) | |
| Guardian, ANDREA MONTAGUE | ) | |
| | ) | |
| Plaintiffs | ) | David E. Leonard |
| (Appellants/Respondents by Cross- | ) | for the respondent |
| Appeal) | ) | |
| | ) | |
| - and - | ) | |
| | ) | |
| BANK OF NOVA SCOTIA | ) | |
| | ) | |
| | ) | |
| Defendant | ) | |
| (Respondent/Appellant by Cross- | ) | |
| Appeal) | ) | |
| | ) | Heard:    June 13, 2003 |

On appeal from the judgment and cost of Justice Sandra Chapnik of the Superior Court of Justice dated October 19, 2001.

**GOUDGE J.A.:**

[1]    The appellant Yvonne Montague was terminated from her employment with the respondent, Bank of Nova Scotia, on July 24, 1991.  She sued for wrongful dismissal. Prior to trial, the Bank admitted that it did not have cause to terminate Mrs. Montague's employment.  On October 19, 2001, Chapnik J. awarded the appellant damages

equivalent to sixteen months' notice together with pre-judgment interest and costs fixed at $5,000.

[2]    Mrs. Montague appeals, arguing that the trial judge erred in awarding too little notice and in dismissing her claim for aggravated and punitive damages.

[3]    The Bank cross-appeals, arguing that the notice period is too long and that the trial judge erred in increasing it after she had been advised of the Bank's offer to settle pursuant to Rule 49.

[4]    For the reasons that follow, I would dismiss both the appeal and the cross-appeal.

**THE FACTS**

[5]    Mrs. Montague was employed by the Bank as a data entry operator for approximately fifteen and one-half years, from January 26, 1976 to July 24, 1991. When she was terminated, she was earning an annual salary of $24,750.00, plus a shift bonus valued at $1,254.50 per year. Her employee benefits were valued at $2,600.45 per year.

[6]    On August 13, 1990, Mrs. Montague slipped and fell at work, injuring her right shoulder. As a result she was away from work until January 2, 1991, when she returned to a modified work schedule, as recommended by her doctors.

[7]    On February 18, 1991, Mrs. Montague again fell at work and injured her lower back. Again she was off work, this time until April 15, 1991, again returning to a modified work schedule. However, she was unable to sustain this schedule, and on April 30, 1991 she stopped working altogether.

[8]    Mrs. Montague's claim for long-term disability was denied by the administrator of the Bank's long-term disability plan because it was inadequately supported by the available medical information. On July 8, 1991, the Bank wrote to Mrs. Montague to advise that because of this decision, she was expected to return to her regular work duties on her usual shift no later than July 22, 1991, failing which she would be treated as having abandoned her employment. The letter also indicated that she could appeal the rejection of her long-term disability claim if she provided further medical documentation. At that time, the Bank had a number of medical reports about Mrs. Montague, both from her own doctors and from doctors she had seen at the Bank's request. There was clearly some medical controversy over whether she was able to do the keypunch work required by her regular job.

[9]     On the day she received the Bank's letter of July 8, 1991, Mrs. Montague delivered a written reply advising that she had made appointments with two other physicians to whom she had been referred by her family doctor. One appointment was scheduled for July 12, 1991 and the other, with an internal medicine specialist, for July 23, 1991. Mrs. Montague indicated that reports from these two doctors would be submitted to the Bank.

[10]    Despite this, on July 24 1991, the day after her appointment with the specialist, the Bank wrote to Mrs. Montague terminating her employment. The letter did not acknowledge the fact of the two recent medical consultations. Nor did the Bank make any inquiries of Mrs. Montague about what she had learned or when the resulting medical reports might be expected. It simply fired her.

[11]    Mrs. Montague commenced an action against the Bank, seeking damages for her injuries under the *Occupiers' Liability Act*, R.S.O. 1990, c. O.2 and damages for wrongful dismissal. She succeeded in the former claim, but the latter claim was dismissed as *res judicata* because of a complaint she had lodged with the Canadian Human Rights Commission.

[12]    Mrs. Montague appealed, and this court set aside the dismissal of her wrongful dismissal claim. It then proceeded to the trial from which the present appeal is taken.

[13]    At the conclusion of four days of evidence, the trial judge made the following findings.

[14]    First, she concluded that this case engaged the considerations set out in *Wallace v. United Grain Growers Ltd.*, [1997] 3 S.C.R. 701, thus increasing the period of reasonable notice to which Mrs. Montague was entitled on termination. The trial judge put it this way:

> In all of the circumstances, I have no difficulty whatsoever in finding that the bank acted precipitously and in bad faith; it did not treat the plaintiff fairly in the manner of her dismissal. Ms. Montague at no time took any action which suggested abandonment of her employment. On the contrary, she was in continuous contact with both the nurse, Dorothy Harris, and Linda Jackson, Personnel Manager, as confirmed by Rena Benson, about her disability, which she claimed needed to be accommodated. Her summary dismissal by letter in view of the pending medical visits to the knowledge of the defendant was unreasonable, and the position taken that she had

abandoned her job was, in the circumstances, quite
preposterous.

[15] Second, the trial judge found that it would not be reasonable to place a duty on the
appellant to mitigate her damages during the notice period, given her medical condition at
that time.

[16] Third, the trial judge concluded that the respondent's conduct towards the
appellant did not constitute an independent actionable wrong and was not so egregious as
to offend the court's sense of decency. Hence she dismissed the claims for both
aggravated and punitive damages.

[17] Finally, the trial judge fixed the period of reasonable notice in these words:

In the circumstances, I award her damages at the high end of
the scale, in effect raising the notice period pursuant to the
*Wallace* decision by finding the period of reasonable notice to
be 12 months.

That's my decision.

[18] Immediately thereafter this exchange occurred between counsel for the respondent
and the trial judge:

MR. LEONARD: Perhaps I might go first, Your Honour.
There was an offer to settle. I have to bring it to your
attention, and I apologize for this, Your Honour, I only
brought one set of that. I'm happy to hand it up. You'll see
that you've awarded twelve months. By my calculation that
award would be an award of $28,604.95, and you'll see that
offer is for $30,500, which is more than that, plus
prejudgment interest, plus party and party costs to the date of
that offer. So, my submission to you simply is that we've met
the requirements of Rule 49. I'm completely in Your
Honour's hands, obviously, and your discretion not to apply
Rule 49 in these circumstances if you are so inclined.

THE COURT: Did I say twelve months including the
increase because of the *Wallace* decision?

MR. LEONARD: You did. Is that not what you intended?

THE COURT: No. I meant at least another month.

[19]    Counsel then advised the trial judge that even with a thirteen month notice period, his offer triggered the effect of Rule 49, and he asked for partial indemnity costs from the date of the offer in the amount of $5,000.

[20]    The trial judge concluded the day with this:

> THE COURT: The law is the law; it's not always the fairest thing, but in light of the offer, I don't think I really have a choice. I think I must order the thirteen months reasonable notice and $5,000 costs to the defendant. I would hope that in the long run they are not required.

[21]    Four days later, the judgment not having been entered in the court records, the trial judge summoned the parties back to court. She opened the court as follows:

> THE COURT: You will recall, Mrs. Montague and Mr. Leonard, that at the end of my judgment on Friday, I awarded damages to Mrs. Montague at the high end of the notice scale which I deemed to be eight to twelve months and fixed the period of reasonable notice, the appropriate period at twelve months. I said that would in effect increase the notice period pursuant to the *Wallace* decision. Then in the course of discussion, I increased the entire notice period to thirteen months.
>
> On further reflection, I think that I should have dealt with the period of reasonable notice separately from the *Wallace* factors. And, in my view, the thirteen months is a bit low. To properly reflect my findings regarding the *Wallace* factor, that is, the improper manner of dismissal, the knowledge of its probable effect on the plaintiff, the withholding of the letters and the whole picture from Mr. Seymour, and the actual effect of the dismissal on the plaintiff, I should have added instead of one month four months to the period of reasonable notice. The twelve month period of reasonable notice was decided according to the factors listed in the *Bardal vs. Global and Mail* case, taking into account the plaintiff's age at the time, her qualifications, her disability, and so on. So that the appropriate notice period

> should be twelve months plus four months or sixteen months
> in all.
>
> Now, I know this will change the cost factor, as well.

[22]   The trial judge then invited submissions on costs, given the change in the period of reasonable notice. Counsel for the respondent conceded that he was no longer entitled to the benefit of Rule 49 but urged that there should be no costs against the Bank since Mrs. Montague had represented herself from shortly before the trial. The appellant asked for costs in the amount of $5,000 because that was what counsel for the Bank had sought four days earlier, and because she had in fact paid a lawyer that amount to do the work leading up to the trial.

[23]   The trial judge concluded the proceedings by awarding the appellant costs on a party and party basis throughout, fixed at $5,000.

## THE APPEAL

[24]   The appellant's primary submission is that the trial judge erred in concluding that the period of reasonable notice required in this case was limited to sixteen months. As Laskin J.A. said in *Minott v. O'Shanter Development Co.* (1999), 42 O.R. (3d) 321 (C.A.), this submission must be judged against the standard of appellate review of wrongful dismissal awards. He described it this way at p. 343-344:

> Determining the period of reasonable notice is an art not a
> science. In each case trial judges must weigh and balance a
> catalogue of relevant factors. No two cases are identical; and,
> ordinarily, there is no one "right" figure for reasonable notice.
> Instead, most cases yield a range of reasonableness.
> Therefore, a trial judge's determination of the period of
> reasonable notice is entitled to deference from an appellate
> court. An appeal court is not justified in interfering unless the
> figure arrived at by the trial judge is outside an acceptable
> range or unless, in arriving at the figure, the trial judge erred
> in principle or made an unreasonable finding of fact. ... If the
> trial judge erred in principle, an appellate court may substitute
> its own figure. But it should do so sparingly if the trial
> judge's award is within an acceptable range despite the error
> in principle.

Page: 7

[25]    The trial judge here did not err in principle in fixing the period of reasonable notice. She was alive to and considered the relevant factors as set out in cases like *Bardal v. The Globe and Mail Ltd.* (1960), 24 D.L.R. (2d) 140 (Ont. H.C.). She also discussed and applied the principle set out in *Wallace*. Nor can it be said that the sixteen months is below an acceptable range of notice and must therefore be increased. On the contrary, if anything, this would be on the generous side in these circumstances.

[26]    Thus the appellant's first argument must fail.

[27]    Second, the appellant argues that the trial judge erred in dismissing her claim for aggravated and punitive damages. I do not agree. There was ample evidence to support the conclusion of the trial judge that there was no malice or vindictiveness by the Bank or its officials here. In addition, the evidence does not sustain the conclusion that the Bank's conduct constitutes a separately actionable wrong. Hence punitive damages were properly denied. Moreover, the absence of any separately actionable wrong puts an end to any entitlement to aggravated damages.

[28]    In the result the appellant's second argument must also fail and the appeal must therefore be dismissed.

**THE CROSS-APPEAL**

[29]    The respondent's first submission is that the trial judge erred in extending the period of reasonable notice using the considerations described in *Wallace*.

[30]    I disagree. The trial judge focused on the timing of the termination and the characterization made by the respondent of the appellant's failure to report to work on July 22, 2001. There was ample evidence for her to conclude that the respondent fired the appellant precipitously, knowing of the pending medical visits but making no effort to find out what information they had yielded or when the resulting reports might be available. Moreover, the respondent treated the appellant as having abandoned her position, knowing that she had done nothing to suggest that. It was reasonable for the trial judge to assess this conduct as being unreasonable and in bad faith. As a result, *Wallace* was properly applied.

[31]    Where mitigation or deduction for other benefits is not appropriate, it is no doubt preferable to take a holistic approach to fixing reasonable notice, and to do so on the basis of all relevant factors, including those referred to in *Wallace*, rather than to make a discrete addition to the notice period to reflect the manner of dismissal. See *Noseworthy*

Page: 8

*v. Riverside Pontiac Buick Ltd.* (1998), 168 D.L.R. (4th 629 (Ont. C.A.). Nonetheless, the end result of sixteen months does not constitute error in this case. It is within a range of reasonableness given all the circumstances. The cross-appellant's first argument must therefore fail.

[32]    The Bank's second argument on its cross-appeal is that the trial judge erred in changing her judgment (namely her determination of the reasonable notice period) on two occasions after having reviewed the Bank's offer to settle pursuant to Rule 49.

[33]    The Bank argues that Rule 49.06(2) and (3) prohibits the trial judge from doing this. Rule 49.06 reads as follows:

> DISCLOSURE OF OFFER TO COURT
>
> (1) No statement of the fact that an offer to settle has been made shall be contained in any pleading.
>
> (2)  Where an offer to settle is not accepted, no communication respecting the offer shall be made to the court at the hearing of the proceeding until all questions of liability and the relief to be granted, other than costs, have been determined.
>
> (3)  An offer to settle shall not be filed until all questions of liability and the relief to be granted in the proceeding, other than costs, have been determined.

[34]    I cannot agree that the rule prohibits the trial judge from changing her order. There can be no doubt that until a judgment is formally entered in the court record, the judge has a very broad discretion to change it. In *Holmes Foundry Ltd. v. Village of Point Edward*; *Caposite Insulations Ltd. v. Village of Point Edward* (1963), 2 O.R. 404 (C.A.), Laidlaw J.A. put it this way at 407:

> It is well settled in law that an order can always be withdrawn, altered or modified by a Judge either on his own initiative or on the application of a party until such time as the order has been drawn up, passed and entered. I refer to *Re Harrison's Share under a Settlement, Harrison v. Harrison*, [1955] 1 Ch. 260 at p. 275, [1955] 1 All E.R. 185.

[35]    Rule 49.06 is not a prohibition directed at the court. Rather, the rule targets those who might communicate information about an unaccepted offer to the court before liability and consequential relief are determined. It prevents communications to the judge designed to improperly affect the course of justice.

[36]    The terms of the rule do not purport to limit the broad judicial power to alter a judgment before it is entered. Very clear language would be required to curtail a judicial discretion having such deep historical roots. Nor is there any reason to stretch the rule to achieve this result, since this judicial discretion allows a judge to change his or her judgment precisely to better serve the ends of justice. Rule 49.06 does not prohibit what the trial judge did here.

[37]    The Bank also argues that the changes made by the trial judge constitute reversible error because the only reason she made the changes was to avoid the cost consequences of Rule 49 for Mrs. Montague.

[38]    In my view the record does not sustain the conclusion that the changes were made to avoid the cost consequences of Rule 49. The trial judge candidly acknowledged that her first decision (twelve months) was not what she intended and that she had meant at least thirteen months. Then, when she made the second change four days later (to sixteen months), she explained why in her view the *Wallace* factors warranted an additional four months, not just an additional one month. Had the trial judge simply wished to alleviate the consequences of Rule 49 for Mrs. Montague, she could have done so by using the residual discretion given to her by the rule itself. There was no need to change her judgment. The timing of events in this case was clearly unfortunate, as the trial judge recognized. However, this is no reason not to take the trial judge's conclusions at face value.

[39]    Even if I had come to the opposite conclusion, I would not have interfered with the trial judge's final judgment. I say this because even if the trial judge had erred in principle in the exercise of her discretion, her final assessment that sixteen months constitutes reasonable notice in this case is, in my view, a reasonable conclusion. Hence no appellate intervention is warranted. See *Minott, supra* at 24. Given the factors relevant to the assessment of reasonable notice, including the manner of the appellant's termination, sixteen months, although perhaps generous, is within a range of reasonableness in the circumstances and therefore it is a conclusion entitled to deference in this court.

[40]    I conclude with this. While this is not such a case, I have no doubt that in some cases the very wide discretion a judge has to change his or her judgment before it is entered could be abused if it were exercised for an improper purpose. Any change to a judgment once given, no matter how soundly based, runs the risk of evoking suspicions

of abuse on the part of those adversely affected. It is at the least disquieting, and to that extent can put a cloud over the administration of justice. A judge exercising this discretion bears a significant onus to explain the change. Giving clear reasons for decision is always a profoundly important part of judging. See *R. v. Sheppard*, [2002] 1 S.C.R. 869. It is never more important than in this circumstance.

[41]   The appeal and cross-appeal must both be dismissed. In the circumstances there should be no costs to either party.

Signed:        "S.T. Goudge J.A."

"I agree K.M. Weiler J.A."

"I agree J.I. Laskin J.A."

Released: "KMW" JANUARY 7, 2004



# TAB 6

1963 CarswellOnt 272
Ontario Court of Appeal

Holmes Foundry Ltd. v. Point Edward (Village)

1963 CarswellOnt 272, [1963] 2 O.R. 404, 39 D.L.R. (2d) 621

# Holmes Foundry Ltd. v. Village of Point Edward

Caposite Insulations Ltd. v. Village of Point Edward

Laidlaw, J.A., Schroeder, J.A., McGillivray, J.A.

Judgment: May 21, 1963
Docket: None given.

Counsel: H.E. Manning, Q.C., for appellant - defendant
D. Park Jamieson, Q.C., K.G. Stoner, for respondent - plaintiff

Subject: Civil Practice and Procedure

### Related Abridgment Classifications
For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

### Headnote

**Practice --- Judgments and orders — Amending or varying — Before judgment entered**

Reversal of own judgment — Amending legislation affecting oral judgment of Court of Appeal before judgment perfected — Power to withdraw, alter or modify judgment -- Retroactivity of legislation — Validity of legislation determining reversal of order — Costs — Ontario Municipal Board Act, R.S.O. 1960, c. 274, s. 64 — Ontario Municipal Board Act, R.S.O. 1962-63, c. 97, s. 1(1).

Respondent companies having obtained a judgment holding that a municipality had received the approval of the Ontario Municipal Board under s. 64 of the Act for a sewer project, also required a further approval of the Board to the by-law providing for the raising of funds to pay for the project. The municipality appealed and an oral judgment of the Court of Appeal affirmed the decision of the trial Judge, but the order of the Court was not perfected by entry and issue of the judgment. In the meantime, retroactive amending legislation was passed affecting the operation of s. 64 of the Act and providing that the approval of the Board meant, notwithstanding the decision of any Court, the approval only of the undertaking, work, project, scheme, act, matter or thing mentioned in s. 64(1). On a rehearing of the appeal, held, it was well settled that an order could always be withdrawn, altered or modified by a Judge either on his own initiative or on the application of a party until such time as the order had been drawn up, passed and entered. Once it was established that the amending legislation was within the competence of the Legislature, the retroactive nature of the amending Act compelled the reversal of the oral judgment of the Court of Appeal. The further argument of respondents that the imposition of a sewer rate required a money by-law had no merit as such provisions applied only to debentures. Respondents were entitled to costs down to appellant's motion for a rehearing of the appeal. In the state of the law as it was at the time of the institution of the actions and the appeal, respondents were fully warranted in bringing the proceedings. Consequently, the discretion should be exercised in their favour.

**Practice --- Costs — Costs of appeals — Persons entitled to costs — Successful party deprived of costs**

Exercise of discretion in favour of respondent -- Justification for bringing proceedings before legislative amendment compelling reversal of oral judgment in favour of respondent.

1963 CarswellOnt 272, [1963] 2 O.R. 404, 39 D.L.R. (2d) 621

*Laidlaw, J.A.* (dissenting as to costs):

1     The appellant is an incorporated village in the County of Lambton, Province of Ontario. The respondents are companies duly incorporated and carry on business in the appellant municipality. Each of the respondents commenced an action on May 4, 1962 and claimed *inter alia* "a declaration that the defendant (appellant) municipality wrongfully and without authority levied part of the cost of the sewage works constructed by the defendant municipality against the property of the plaintiff in the Village of Point Edward by including in By-law number 1371 for 1961 of the defendant municipality (which by-law fixed the rates to be levied against the full assessed value of all the property within the limits of the defendant municipality) a sewage rate of 9.05 mills, without passing and obtaining the requisite approval, of a by-law to provide for and authorize the imposition of a sewer rate against the property of the plaintiff and others in the municipality". Both actions came on for trial together before Gale, J., and in written reasons for judgment given by him he expressed the opinion "that Section 64 of The Ontario Municipal Board Act applied in the circumstances, and the result is, that before the Village here could effectively collect moneys to pay for any part of the sewer charges for 1961, it had to pass not only a by-law with respect to the levying of such charges but that by-law had to have the prior approval of the Ontario Municipal Board". Accordingly it was held that although the municipality had received the approval of the Municipal Board under s. 64 of the *Ontario Municipal Board Act*, R.S.O. 1960, c. 274 to the sewer project it also required the approval of the Board to the by-law providing for the raising of funds to pay for the project.

2     The municipal corporation appealed to this Court from the judgment delivered by Gale, J., and at the conclusion of the hearing of the appeal it was the unanimous opinion of the Court that the judgment in appeal should be affirmed and that the appeal should be dismissed with costs. The opinion of the Court and the reasons for judgment were stated orally. The order of the Court has not been perfected by the entry and issue thereof. In the meantime the Legislature of the Province of Ontario passed an Act cited as the *Ontario Municipal Board Amendment Act*, 1962-63, c. 97, s. 1(1). That Act was assented to by His Honour the Lieutenant-Governor of the Province of Ontario on April 26, 1963 and came into force on the day it received Royal assent. I now reproduce s. 1 of the Act.

> 1(1) Section 64 of *The Ontario Municipal Board Act* is amended by adding thereto the following subsection:
>
>> (1a) The approval of the Board mentioned in subsection 1 means and, notwithstanding the decision of any court, shall be deemed always to have meant the approval of the undertaking, work, project, scheme, act, matter or thing mentioned in subsection 1.

3     Counsel for the appellant moves this Court "for leave to present argument that the appeal should be allowed, having regard to the provisions of The Ontario Municipal Board Amendment Act, 1962-63 (No. 2) [now c. 97]".

4     It is well settled in law that an order can always be withdrawn, altered or modified by a Judge either on his own initiative or on the application of a party until such time as the order has been drawn up, passed and entered. I refer to *Re Harrison's Share under a Settlement, Harrison v. Harrison*, [1955] 1 Ch. 260 at p. 275, [1955] 1 All E.R. 185.

5     Counsel for the respondents does not challenge the right of this Court in the circumstances of the instant case to withdraw its oral judgment and to alter or modify that oral judgment in such manner as may be proper. He argued, however, that the Court ought not exercise that right to alter the oral judgment for these reasons

> (1) The *Ontario Municipal Board Amendment Act* was passed without any opportunity being afforded to the respondents to make any submissions as to their rights in law.

> (2) That Act was an unwarranted and unjustifiable intervention in proceedings pending in the Courts and the judgments of the Courts of this Province including the Court of Appeal for Ontario and in part constituted a judicial declaration that those Courts erred in the interpretation and the meaning and effect given by them to s. 64 of the *Ontario Municipal Board Act*.

> (3) The *Ontario Municipal Board Amendment Act* was a wrongful exercise of judicial powers of a Court of last resort.

1963 CarswellOnt 272, [1963] 2 O.R. 404, 39 D.L.R. (2d) 621

(4) In any event and apart altogether from the meaning and effect of s. 64 of the *Ontario Municipal Board Act* and the amendment thereto it was necessary in law for the municipality to pass a special money by-law to provide for annual payments on account of their debt to the Ontario Water Resources Commission and in the absence of such special money by-law the council of the Village of Point Edward could not lawfully include in By-law 1371 for 1961 the rate to be levied against the full assessed value of all the properties within the limits of the municipality to pay the sum due and payable in that year to the Ontario Water Resources Commission.

6    The *Ontario Municipal Board Amendment Act* is twofold in character. First, it contains a definition of the words "approval of the Board mentioned in subsection 1" of s. 64. In that respect counsel for the respondents takes no exception. Secondly it contains a judicial declaration of law that overrules and countermands judgments of the Courts of the Province in pending proceedings and thus is an exercise of judicial functions of a Court of last resort. During the course of argument members of the Court expressed views of disapproval and criticism of that kind of legislation and counsel for all parties notwithstanding their great experience and learning stated that they had been unable to find any precedent for legislation of that character. However, since the hearing I have found the law stated clearly and with ample authority in *Clement's Canadian Constitution*, 3rd ed., pp. 357-8. I quote as follows:

> When once it is determined that an Act passed by any Canadian legislature, federal or provincial, is within the power conferred by the British North America Act it is not for any Court of justice to enquire further.
>
> . . . . .
>
> It can not be too strongly put that with the wisdom or expediency or policy of an Act, lawfully passed, no Court has a word to say.
>
> Courts of law are interpreters merely in such case and have no right to enquire whether the jurisdiction has been exercised wisely or unwisely, justly or unjustly. *Magna Charta* may be interfered with; taxation imposed without regard to uniformity or equality; class legislation and laws discriminating against race may be enacted; one man's property may be taken from him and given to another without compensation; *ex post facto* legislation passed; in short, the power may be abused but "the only remedy is an appeal to those by whom the legislature is elected."

Counsel for the respondent argued that the Legislature did not have power to pass that part of the *Ontario Municipal Board Amendment Act* now the subject of controversy. I reject that argument; it is my opinion that the Legislature did have that power. Unquestionably the Legislature had power at the time s. 64(1) was enacted to define the meaning of the words "approval of the Board" as mentioned therein. Likewise it possessed that power at the time the *Ontario Municipal Board Amendment Act* was passed and in my opinion it had power to make that definition retroactive in force and effect. In *Phillips v. Eyre* (1870), 40 L.J.Q.B. 28, Willes, J., said at p. 37:

> Retrospective laws are no doubt *prima facie* of questionable policy, and contrary to the general principle that legislation by which the conduct of mankind is to be regulated ought, when introduced for the first time, to deal with future acts, and ought not to change the character of past transactions carried on upon the faith of the then existing law.... Accordingly the Courts will not ascribe retrospective force to new laws affecting rights unless by express words or necessary implication it appears that such was the intention of the legislature. But to affirm that it is naturally or necessarily unjust to take away a vested right of action by Act subsequent is inconsistent both with the common law of England and the constant practice of legislation.

At p. 38 he referred to *Calder v. Bull* (1798), 3 Dallas Rep. 386, in which the Supreme Court of the United States "held that an Act of the State of Connecticut passed to set aside a decree of a Court of Probate, and grant a new hearing was valid, though the effect was ultimately to deprive the party in whose favour the first decision was made of the benefit of the decree". After quoting from the decision in that case the learned Justice proceeded to say at p. 39:

> In fine, allowing the general inexpediency of retrospective legislation, it cannot be pronounced naturally or necessarily unjust.... Whether the circumstances of the particular case are such as to call for special and exceptionable remedy, is a

question which must in each case involve matter of policy and discretion fit for debate and decision in the Parliament which would have had jurisdiction to deal with the subject-matter by preliminary legislation, and as to which a court of ordinary municipal law is not commissioned to inquire or adjudicate.

7    I refer also to *A.-G. Can. v. Foster* (1892), 31 N.B.R. 153.

8    Having reached the conclusion that the *Ontario Municipal Board Amendment Act* was wholly within the jurisdiction and power of the Legislature of Ontario I follow the authorities quoted, *supra*, and make no further inquiry and now deliberately refrain from expressing any views as to whether the jurisdiction has been exercised "wisely or unwisely, justly or unjustly".

9    The point that By-law 1371 was invalid in so far as it included the sewer rate to be levied against the full assessed value of all the properties within the limits of the municipality because there is no money by-law approved by the Ontario Municipal Board to provide for and authorize the imposition of such sewer rate was not the subject of argument at the time this appeal first came on for hearing because counsel for the respondents was content to rest his case in this Court on the interpretation and the meaning and effect of s. 64 of the *Ontario Municipal Board Act*. However, he did not waive or abandon his right to support the judgment at trial on the ground now relied on by him and accordingly, this Court heard argument on the point at length. It is my opinion that the objection taken by counsel for the respondent is not sound in law and cannot be given effect. He contended that this case is not distinguishable from one in which the cost of the project is to be paid by the issue of debentures. I cannot agree. I cannot find in s. 282 of the *Municipal Act*, R.S.O. 1960, c. 249, any obligation on the part of a municipality to pass a money by-law for raising in each year by special rate on all the rateable property in the municipality the sum due and payable by the municipality as a contract debt in such year except in the case of a money by-law for the issuing of debentures. But, be that as it may, the Ontario Municipal Board authorized the municipal corporation to enter into an agreement with the Ontario Water Resources Commission for the construction of the sewers and for that purpose the municipal corporation was authorized to "exercise all its powers and pass all requisite by-laws". In pursuance of that authority the council of the municipal corporation passed a by-law authorizing the reeve and clerk of the municipality to enter into an agreement with the Ontario Water Resources Commission for the completion of each phase of the sewage work. Each agreement was made a schedule to a by-law covering each phase. In each agreement the municipality agrees in accordance with s. 40 of the *Ontario Water Resources Commission Act*, R.S.O. 1960, c. 281, to pay to the commission certain sums in each calendar year for a period of 30 years. I conclude that all requisite by-laws were passed by the council of the municipality and that no other special money by-law was requisite to give validity to that part of By-law 1371 now in question.

10    I have given much thought to the matter of costs of the proceedings between the parties at trial and in this Court and have concluded that I must dissent from the opinion of my learned brethren. I can find no reason to believe or even suspect that the *Ontario Municipal Board Amendment Act* was passed at the instigation or upon the request or other action of the appellant. It is said by counsel to have been deemed necessary and expedient by advisors of the government by reason of other similar cases in which large sums of money are owing by various municipalities to the Ontario Water Resources Commission. Thus, whatever may have been the reason for passing the Act I could not justify an order that the appellant pay the costs of the proceedings because of any advantage or benefit obtained by the appellant under the Act or any hardship or prejudice occasioned thereby to the respondents. If the law as declared in the *Ontario Municipal Board Amendment Act* must be deemed to have had force and effect at the time of the commencement of the action, then in my opinion the action would have been properly dismissed with costs to be paid by the plaintiffs to the defendant. Likewise, an appeal, if any, from such a judgment would have been dismissed with costs. I think that in the circumstances of this case the alteration of the opinion of this Court as delivered orally and an order that the judgment at trial be set aside and the action dismissed cannot be attributed directly or indirectly, either wholly or in part, to either party. It is simply the result of a change in the law as made by the *Ontario Municipal Board Amendment Act*. In the circumstances I would not order the payment of costs by either of the parties at trial or in this Court.

11    My conclusion is that the judgment of this Court delivered orally should be withdrawn forthwith; that it should be set aside and in place thereof an order should be made that the appeal to this Court be allowed; that the judgment at trial should be set aside and in place thereof, that the action should be dismissed; and there should be no order as to costs of the action or in this Court.

*Schroeder, J.A.:*

1963 CarswellOnt 272, [1963] 2 O.R. 404, 39 D.L.R. (2d) 621

12    I agree with the disposition of this appeal as proposed by the Honourable Mr. Justice Laidlaw for the reasons expressed by him, except as to the disposition of costs. In the state of the law as it was at the time of the institution of these actions, and the appeal from the judgment at trial, the plaintiffs were fully warranted in taking the proceedings brought and continued by them. I therefore deem it proper to exercise my discretion with respect to costs in favour of the plaintiffs and accordingly I would direct that they should have the costs of the actions and of the appeals down to the defendant's motion to this Court for a rehearing, as to the costs of which latter proceeding I would make no order. Save as aforesaid, I concur in the judgment of my brother Laidlaw.

*McGillivray, J.A.*:

13    Other than as to costs I concur with the disposition of this action by Laidlaw, J.A.; and I concur with Schroeder, J.A., as to costs.

14    *Appeal allowed.*

---

**End of Document**                    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

 Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    5

# TAB 7

CA017649
Vancouver Registry

# *Court of Appeal for British Columbia*

ORAL REASONS FOR JUDGMENT:

Before:

The Honourable Chief Justice McEachern            March 23, 1995
The Honourable Mr. Justice Wood
The Honourable Madam Justice Rowles               Vancouver, B.C.


BETWEEN:

NANCY GAIL SYKES

PETITIONER
(APPELLANT)

AND:

DAVID ARTHUR SYKES

RESPONDENT
(RESPONDENT)


R.G. Neville                appearing for the Appellant
D.A. Sykes                  appearing on his own behalf


1    **WOOD, J.A.:**         The issue on this appeal is whether the trial

judge erred when he exercised his discretion to reconsider and vary

a final order for spousal maintenance before entry of the formal

judgment.

- 2 -

2         On February 10, 1993, following a summary trial under
Rule 18A the petitioner Nancy Gail Sykes, "the wife", was granted
a divorce from the respondent David Arthur Sykes, "the husband".
The wife was also granted sole custody of the three children of the
marriage, with reasonable access to the husband.  The trial judge
reserved on a number of other issues, including the division of
several R.R.S.P.s; the wife's application to defer sale of the
matrimonial home; the quantum of child maintenance; and the
entitlement to and quantum of spousal maintenance.

3         On 31 March, the trial judge delivered reasons for
judgment on the issues reserved.  He ordered the sale of the
matrimonial home be postponed until the children had completed
public school and the wife had completed her vocational training at
U.B.C., which events were expected to coincide.  He found that an
R.R.S.P. purchased in 1985 with part of the proceeds of a severance
package received by the husband was a family asset.  He confirmed
an interim maintenance order of $350.00 per month per child.
Finally, he ordered spousal maintenance in the amount of $350.00
per month payable until the wife has completed her vocational
retraining.  In the event that her career plan was interrupted or
discontinued, he directed that the spousal maintenance payments
would have to be reviewed.  The trial judge concluded his reasons
of 31 March with these words:

        As no unreasonable positions have been taken in this
    summary trial process, I direct the parties to bear their

- 3 -

own costs, although I am prepared to hear submissions on costs if either counsel insists.

No formal judgment was entered with respect to any of those orders until 22 November 1993.

4          What happened next is best described by the trial judge himself in further reasons for judgment handed down 30 July 1993, following a further hearing which was held on the 9th of June.

On February 10, 1993, following a summary trial, the petitioner, Nancy Gail Sykes, and the respondent, David Arthur Sykes, were divorced. Custody of the Sykes three children was awarded to Mrs. Sykes. On March 31, 1993, I filed reasons dealing with:  deferral of sale of the parties' home; division of R.R.S. Plans; quantum of child maintenance; and, entitlement to and quantum of spousal maintenance.      However, there were issues still unresolved, and further submissions were called for.  No order has been entered.

In my earlier reasons I neglected to mention an R.R.S. Plan which Mr. Sykes held, and still holds, through Confederation Life.  When counsel appeared before me on June 9, 1993, and made their further submissions, in addition to the anticipated argument about the Confederation Life plan, counsel for Mrs. Sykes repeated his earlier request for orders enjoining Mr. Sykes from attending at the former matrimonial home, and for the attachment of Mr. Sykes' salary in order than [sic] maintenance will be paid on time.

New counsel, representing Mr. Sykes, applied for leave to adduce further evidence, and additional affidavits were filed.

Two significant problems have arisen here.

First, when new counsel for Mr. Sykes proceeded to re-argue issues which had been fully canvassed at the original trial, I made it clear that I was unlikely to change my mind with respect to either my denial of Mr. Sykes' request for immediate sale of the matrimonial home

- 4 -

or my approval of Mrs. Sykes' educational plan. I am still satisfied that Mrs. Sykes should be given an opportunity to pursue occupational therapy as a career. Review of the parties' situations must, therefore, await the results of Mrs. Sykes' application for entry into the occupational therapy program at the University of British Columbia at the end of the 1994-95 university year.

Second, because this matter was tried summarily, my impressions of the Sykes have, necessarily, been derived from their affidavits. Accordingly, their supplementary material, which was filed after they had had an opportunity to consider my initial conclusions, is revealing.

Aside from the comments and the submission concerning the Confederation Life R.R.S. plan, Mr. Sykes and his counsel emphasize four things: Mrs. Sykes has understated her income; there was no understanding or arrangement that Mrs. Sykes would pursue a career change after the children were all in school; Mr. Sykes is nearing penury as a consequence of my order as to spousal and child maintenance; if the former matrimonial home is not ordered sold, Mrs. Sykes should at least be required to let the basement suite.

5        The trial judge dealt with the Confederation R.R.S.P. which he found to be a family asset. He declined to alter his earlier order that the sale of the matrimonial home be deferred until the wife had been given an opportunity to complete her education. However, he did reconsider his original order for spousal maintenance, based on further affidavits filed by both parties following the delivery of his original reasons for judgment. He concluded that the maintenance obligation stemming from his judgment of 31 March, together with his other debt obligations, was pushing the husband towards bankruptcy. He accepted the husband's submission that the wife could, with the cooperation and assistance of the children, rearrange their use of

- 5 -

the matrimonial home in such a way that she could rent out a
basement suite.    Based on that possibility, he ordered that the
spousal maintenance ordered on 31 March terminate as of 1 September
1993.

6            The appellant argues that the trial judge erred when he
exercised his discretion to reconsider the question of spousal
maintenance.    The argument of the wife, simply put, is that having
argued strenuously for the sale of the matrimonial home, and having
failed to persuade the trial judge to make such an order, the
husband made a deliberate tactical decision to advance a completely
different position by way of, or in the course of, an application
to re-open.    That new position, namely that the spousal maintenance
order would drive him into bankruptcy, was based on information all
of which was before the court at the original trial.    There being
no new evidence, which for some good reason was unavailable at the
original trial, there was no basis upon which the trial judge could
properly exercise his discretion to re-open.

7            Alternatively, counsel argues that even if the trial
judge could properly have re-opened the issue of spousal
maintenance in June of 1993, his decision to vary the order made on
31 March 1993 is flawed and must be set aside because his
conclusion that the husband would face bankruptcy, if forced to pay
$350.00 per month in spousal maintenance, takes into account the
husband's other debts, most of which consist of accumulated unpaid

- 6 -

legal bills, and there is a consistent line of authority in this Court to the effect that debts arising from legal fees ought not to be taken into account when examining the relative financial position of the spouses on the issue of maintenance.

8            In support of his first argument, counsel for the wife relies on the decision of this Court in *Hamilton v. Busch*, (1994) 4 R.F.L. (4th) 119, B.C.C.A.  In dismissing an appeal from the trial judge's decision not to re-open in that case, Madam Justice Southin for the Court commented on the lack of evidence to explain why or how it was that the "new" evidence was not tendered at the original trial.

> I do not in any way doubt the word of counsel, but questions of this kind ought not to be dealt with in such a casual way.  For all we know on the evidence, the appellant had the documents and did not produce them to her solicitor.
>
> In my opinion, the evidence which was put before the learned judge on the application to re-open does not warrant the making of such an order and I would dismiss the appeal from the refusal to do so although not for the reasons given by the learned trial judge.

Counsel relies on this passage in support of his argument that before the trial judge re-opened the issue of spousal maintenance he ought to have been presented with material evidence which for some good reason could not have been produced or made available with due diligence when the original summary trial was heard on 10 February 1993.

- 7 -

9          This seems to me to be the very approach to re-opening

which the trial judge took in *Hamilton v. Busch,* and which Madam

Justice Southin described as "much too limited a view of the extent

of his discretion".  It is well established that the discretion

which a trial judge has to re-open before formal judgment has been

entered is what is called "an unfettered discretion", although it

is one which for obvious reasons must be exercised sparingly.  The

following quotation from the judgment of Mr. Justice Macdonald in

*Clayton v. British American Securities Ltd.,* (1934) 3 W.W.R. 257 at page 295,

still represents the law in this Province:


> It is, I think, a salutary rule to leave unfettered
> discretion to the trial judge.  He would, of course,
> discourage unwarranted attempts to bring forward new
> evidence available at the trial to disturb the basis of
> a judgment delivered, or to permit the litigant after
> discovering the effect of a judgment to re-establish a
> broken down case with the aid of further proof.  If the
> power is not exercised sparingly and with the greatest
> care, fraud and abuse of the court's process would likely
> result.


10          In my view, new evidence is not an essential prerequisite

to a trial judge's exercise of the discretion to re-open.  In some

cases, it may be the only circumstance which would justify a re-

opening.  Indeed it may be that in many cases a re-opening would

only be justified on the basis of new evidence which was not

available at the time of the original trial.  It will in all cases

depend on the circumstances.  But, a discretion to re-open may also

properly be exercised where the trial judge is satisfied, either

- 8 -

because of the argument of one of the parties, or on the basis of his own reconsideration of the record, that the original judgment was in error because it overlooked or misconstrued material evidence, or misapplied the law.

11          However, I am of the view that there is merit in counsel's argument that the husband's application to re-open in this case was prompted solely by the unwillingness of the husband to accept as final the order that the matrimonial home not be sold immediately. This is apparent from the trial judge's own reasons for judgment delivered on 21 March 1994, on the issue of costs, where the following appears:

> It is obvious to me that the June 9th hearing occurred because Mr. Sykes could not accept my decision of March 31st with respect to either postponement of the sale of the matrimonial home or the continuation of Mrs. Sykes' education. The spousal maintenance issue, which I tied to a fairer use of the parties' home, was secondary.

12          From this extract from the trial judge's reasons, I conclude that, as counsel for the wife argued, the application to re-open was based not on any perceived error in the trial judge's approach to the evidence, but rather on the pragmatic decision to advance an alternative argument which could easily have been advanced at the time of the original trial. This is not a proper basis upon which to exercise the discretion to re-open.

- 9 -

13          I would add that I would not accept counsel's argument
that the trial judge's conclusion the husband was sinking towards
bankruptcy was in error because he took into account debts arising
from legal fees.  However, I have concluded that there is simply no
factual support for that conclusion.   Indeed, the trial judge
appears to have overlooked the fact that there was evidence of
R.R.S.P.s of a value exceeding $100,000.00, half of which were
distributed to the husband upon the division of family assets.
There may have been a cash flow problem for the husband, but it was
one which he chose not to solve by having resort to his share of
the R.R.S.P.s, the existence of which were clearly demonstrated on
the evidence before the trial judge.

14          Accordingly, for either or both of the reasons which I
have advanced, I would allow the appeal; and set aside the order of
30 July 1993, which was entered 23 November 1993, terminating the
spousal maintenance of $350.00 per month as of September 1, 1993.
In its place I would make the order that the trial judge originally
made in his reasons of March 31, 1993, and direct that spousal
maintenance be paid in the amount of $350.00 per month from the
date of that order until such time as the wife has concluded her
education at the University of British Columbia.

15          The effect of that order is to create an arrears, the
exact amount of which I have not calculated, but counsel and Mr.
Sykes can do that.   That is because no application was made to

- 10 -

stay the order below, and no maintenance has in fact been paid since the 1st of September 1993. I would not add to or encumber the husband's financial burdens any further at this time by requiring that those arrears be paid forthwith. Instead I would make it a term of the order that those arrears simply be acknowledged by way of a charge against the husband's interest in the matrimonial home, and that they be paid at such time as the matrimonial home is in fact sold.


McEACHERN, C.J.B.C.:            I agree.


ROWLES, J.A.:          I agree.


McEACHERN, C.J.B.C.:            Thank you.   The appeal is allowed in the terms described by Mr. Justice Wood.


_____
The Honourable Mr. Justice Wood

# TAB 8

Case 09-10138-MFW    Doc 15723-2    Filed 06/09/15    Page 306 of 490

Constantinescu v. Barriault, 1996 CarswellBC 2281

1996 CarswellBC 2281, [1996] B.C.W.L.D. 2846, [1996] B.C.J. No. 2105...

1996 CarswellBC 2281
British Columbia Supreme Court

Constantinescu v. Barriault

1996 CarswellBC 2281, [1996] B.C.W.L.D. 2846, [1996] B.C.J. No. 2105, 66 A.C.W.S. (3d) 876

# Cornel Constantinescu (Plaintiff) and John Michael Barriault (Defendant)

Baker J. [In Chambers]

Heard: March 8, 1996
Judgment: October 30, 1996
Docket: Kelowna B920192

Proceedings: varying on reconsideration (December 8, 1995), Doc. Kelowna B920192 (B.C.S.C.)

Counsel: *Valmon J. LeBlanc*, for plaintiff.
*Rodney C. Pacholzuk* and *Jeffrey N. Thom*, for defendant.

Subject: Civil Practice and Procedure; Torts

**Related Abridgment Classifications**
For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

**Headnote**
**Practice --- Judgments and orders — Amending or varying — Before judgment entered — Restrictions on power to vary**

Practice — Judgments and orders — Amending or varying — Before judgment entered — Restrictions on power to vary — Plaintiff applying for reconsideration after judgment issued but before order entered — Judge allowing application — Trial judge correcting error in deducting unemployment insurance benefits from award of damages for past wage loss.

**Damages --- Damages in tort — Personal injury — Special damages (pre-trial pecuniary loss) — Collateral benefits — Statutory and government benefits**

Damages — Damages in tort — Personal injury — Special damages (pre-trial pecuniary loss) — Collateral benefits — Statutory and government benefits — Unemployment insurance benefits — Plaintiff applying for reconsideration after judgment issued but before order entered — Trial judge allowing application — Trial judge erring in deducting unemployment insurance benefits from award of damages for past wage loss and correcting error.

The plaintiff sued for damages for personal injuries sustained in a motor vehicle accident. He was found 75 per cent liable for the accident. In awarding damages for past wage loss, the trial judge deducted unemployment insurance benefits received by the plaintiff. After the judgment was issued, the plaintiff claimed that the trial judge erred in law in deducting the benefits. In particular, the plaintiff objected to the deduction of 11 months of benefits received while the plaintiff convalesced from surgery necessitated by the accident. The plaintiff filed a notice of appeal and indicated that he would be appealing the damages, but not the issue of liability. Before an order was entered, the plaintiff applied to have the deduction of the unemployment benefits reconsidered by the trial judge.

**Held:**

Application allowed.

1996 CarswellBC 2281, [1996] B.C.W.L.D. 2846, [1996] B.C.J. No. 2105...

In certain circumstances, before a final order is entered, a judge has the discretion to re-open a case and reconsider an issue. Generally, a judge may reconsider his or her own judgment where he or she has misapplied or misconstrued material evidence, or has misapplied the law. In the present case, it was an error of law to have deducted the unemployment benefits. Although the plaintiff responded inadequately when the issue of deducting unemployment insurance benefits was raised, he should not be burdened with the expense of appealing the issue when there was a clear error. As a result, the damages for past wage loss should be increased to $23,000 from $10,900, with a 75 per cent reduction to reflect the plaintiff's responsibility for the accident.

**Table of Authorities**

**Cases considered:**

*Bastian v. Mori* (December 20, 1990), Doc. Vancouver C876136, Hood J. (S.C.), [1991] B.C.W.L.D. 348 — *considered*

*Clayton v. British American Securities Ltd.*, [1934] 3 W.W.R. 257, 49 B.C.R. 28, [1935] 1 D.L.R. 432 (C.A.) — *considered*

*D.M. Drake & Co. v. Dave's Plumbing & Heating (1962) Ltd.* (February 2, 1981), Doc. CA791017 (B.C. C.A.) — *considered*

*Hayre v. Walz* (1992), 67 B.C.L.R. (2d) 296 (C.A.) [leave to appeal to S.C.C. refused (1994), 89 B.C.L.R. (2d) xxxiv, 172 N.R. 159, 52 B.C.A.C. 160, 86 W.A.C. 160] — *considered*

*Sykes v. Sykes* (1995), 13 R.F.L. (4th) 273, 6 B.C.L.R. (3d) 296, 38 C.P.C. (3d) 250, 58 B.C.A.C. 294, 96 W.A.C. 294 — *considered*

**Rules considered:**

British Columbia, Rules of Court (1990)

R. 41(24)*referred to*

Application by plaintiff for reconsideration of judgment of Baker J., 19 M.V.R. (3d) 284, awarding damages for personal injuries arising out of motor vehicle accident.

***Baker J.*:**

1    Following a trial of this action, judgment was reserved and Reasons for Judgment were delivered on December 8, 1995. Counsel appeared before me on March 8, 1996 to address certain matters arising out of the Reasons. No order had been entered. Counsel for the plaintiff advised the court that the plaintiff has filed a Notice of Appeal and intends to appeal the judgment in relation to damages, but not liability, to the Court of Appeal.

2    On March 8, I heard and disposed of matters relating to arithmetical errors and inconsistencies in the Reasons for Judgment, and issues relating to costs and court order interest. Counsel for the plaintiff also asked the court to reconsider the decision made about the deduction of unemployment insurance benefits received by the plaintiff following two elbow surgeries necessitated by the motor vehicle accident injuries. Counsel did not wish to adduce new or more evidence. Rather, counsel submitted that the decision made was *per incuriam*, and wrong in law.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Constantinescu v. Barraud, 1996 CarswellBC 2281

1996 CarswellBC 2281, [1996] B.C.W.L.D. 2846, [1996] B.C.J. No. 2105...

3     There was insufficient time available on March 8 to deal with the application to vary, so counsel were directed to submit written argument on two issues:

> 1. whether the court should agree to reconsider the issue of the deductibility of unemployment insurance benefits paid to the plaintiff; and

> 2. if so, whether the award for damages for loss of past income should be varied.

4     Counsel for the plaintiff advised the court on March 8, 1996, that the plaintiff's appeal to the Court of Appeal is not limited to the issue of deductibility of unemployment benefits, and that a reconsideration of this issue, even if it results in a variation of the judgment in the plaintiff's favour, will not dispose of the appeal.

5     The plaintiff relies on the inherent jurisdiction of the court to re-open or reconsider a matter prior to the entry of the order of the court, a jurisdiction which is not dependent upon the so-called "slip rule" - Rule 41(24). In this case, the plaintiff is not seeking to challenge a finding of fact, or to supplement the evidence heard at trial, but wishes to draw the court's attention to authorities which were not provided or referred to at trial, and to submit argument on a matter of law and the application of the law to the facts found at trial.

6     The issue of damages for past loss of income was dealt with in paragraphs 80 to 104 of the Reasons for Judgment. Of particular relevance to the issue of appropriate treatment of unemployment insurance benefits are paragraphs 94 to 100, which are reproduced here.

> The plaintiff has based his claim for past loss of income on the assumption that but for the accident on July 14, 1990, he would have been employed as a heavy duty mechanic full-time and without interruption to the date of trial earning $29,000 a year. The evidence does not support this claim. Since coming to Canada, Mr. Constantinescu's work history indicates a pattern of periods of employment, followed by sometimes lengthy periods of unemployment, with his employment earnings regularly supplemented by unemployment insurance.

> In 1987, Mr. Constantinescu's income from employment was only $16,170; in 1988 he earned only $8,502, with a further $8,340 from unemployment insurance, for a total of $16,842. In 1989 he earned $20,526 from employment, with a further $4,336 from unemployment insurance, for a total of $24,862. In 1990, the year of the accident, and his best income year to date, he earned $23,319, with a further $2,550 from unemployment insurance for a total of $25,869. Of this sum, approximately $7,400 of the employment income was earned after the motor vehicle accident, from his employment with L & D Petch and Tom Tar between September 12, 1990 and the end of the year. His income from employment and unemployment insurance combined in 1991, 1992, 1993 and 1994 was $21,785, $10,209, $15,886 and $14,735 respectively. His lowest income year to date was 1992. In that year his unemployment insurance eligibility expired before he was able to find employment.

> The evidence does not establish that Mr. Constantinescu lost his job with L & D Petch as a result of the accident, or that he was unable to work elsewhere as a mechanic due to his injuries, except in the two month period immediately following the accident and the period of time surrounding his two elbow surgeries.

> Both the Tom Tar job and the Magic Construction job required Mr. Constantinescu to maintain and repair heavy equipment. Both were physically demanding jobs. After the job with Magic ended, Mr. Constantinescu continued to apply for jobs involving heavy physical labour. His inability to find work was not related to his injuries. He did not turn down any jobs because of his injuries.

> Mr. Constantinescu was incapacitated from working in late 1991 and early 1992 because of his elbow and the two surgeries performed in an attempt to relieve his discomfort. I accept the evidence of Dr. Cserepka that Mr. Constantinescu was unable to work from August 23, 1991 and the evidence of Dr. Laidlow that he remained incapacitated until the end of April, 1992, when he was sufficiently recovered from the second surgery to return to work. He was not able to find work

Case 09-10138-MFW    Doc 15723-2    Filed 06/09/15    Page 309 of 490

Constantinescu v. Barriault, 1996 CarswellBC 2281

1996 CarswellBC 2281, [1996] B.C.W.L.D. 2846, [1996] B.C.J. No. 2105...

until July 1992. In my view, the 11 month period of unemployment from August 1991 to July 1992 is properly attributable to the accident injuries.

The last job Mr. Constantinescu had before this period paid him $15.00 an hour, but required him to travel to Revelstoke. The job at Silver Springs paid only $10.00 an hour. At Tom Tar and at L & D Petch he had earned $12.00 an hour. Taking all of these figures in account, it seems reasonable that but for the surgeries, Mr. Constantinescu would have found a job during this 11 month period paying $12.00 an hour and providing 40 hours a week of work. I therefore assess the sum of $23,000 to represent reasonable compensation for lost employment income during this period.

From this figure must be deducted the amount of unemployment insurance actually received, which I assess at approximately $7,700 during the relevant period in 1991 and approximately $4,400 in 1992, taking into account that there was a period of time in 1991 when Mr. Constantinescu was receiving unemployment insurance when he was not incapacitated. I do not consider unemployment insurance to be akin to disability insurance, since it is not payable in respect of a disability. It is a substitute for income lost as a result of unemployment. To assess damages for loss of employment income without taking into account the substitute income he actually received would result in a windfall to the plaintiff which is unwarranted. Accordingly I assess the net sum of $10,900 for past loss of income in the 1991-92 period.

7      The plaintiff's application to reconsider relates only to the finding, in paragraph 100, that unemployment insurance benefits actually received by Mr. Constantinescu in an 11 month period during which he was unable to work by virtue of two elbow surgeries, must be deducted from the award for past loss of employment income. The amount of the deduction made was $12,100, although the net effect on the ultimate award is less, since Mr. Constantinescu was found 75% liable for causation of the accident.

8      There can be no doubt from a reading of paragraph 100 that the court turned its mind to this issue, and that the matter has been adjudicated. Counsel for the plaintiff submits that the conclusion reached is wrong, as a matter of law, and that the decision was made *per incuriam*, because counsel did not make submissions on the point, and did not draw to the court's attention any of the relevant authorities. Counsel for the plaintiff says that no submissions were made or authorities submitted because he assumed that the non-deductibility of unemployment insurance benefits was well-established law. Counsel concedes, however, that the court raised the issue during submissions, and that counsel's only response was that since the payments were in the nature of insurance, they would not be deductible.

9      *Sykes v. Sykes* (1995), 6 B.C.L.R. (3d) 296, is a recent Court of Appeal decision dealing with the discretion of a trial judge to re-open before formal judgment has been entered. At page 300, the court confirmed that the following quotation from the judgment of Justice Macdonald in *Clayton v. British American Securities Ltd.*, [1934] 3 W.W.R. 257 at 295 (B.C. C.A.), is still the law:

It is, I think, a salutary rule to leave unfettered discretion to the trial judge. He would of course discourage unwarranted attempts to bring forward new evidence available at the trial to disturb the basis of a judgment delivered or to permit a litigant after discovering the effect of a judgment to re-establish a broken-down case with the aid of further proof. If the power is not exercised sparingly and with the greatest care, fraud and abuse of the Court's process would likely result.

10      The difficult question posed by the plaintiff's application in this case is whether the discretion to re-open should be exercised where the error alleged is one of law, clearly subject to review in the Court of Appeal, and where the matter could and ought to have been fully canvassed in submissions at trial, but was not.

11      None of the authorities referred to by counsel addresses this point directly. In *Sykes*, Justice Wood held that the unwillingness of one of the parties to accept as final an order made, or the desire to introduce a new or alternative argument which could have been, but was not, advanced at trial, are not proper bases upon which a trial judge should exercise the discretion to re-open. (p.299).

12      In *Bastian v. Mori*, unreported, [1991] B.C.D. Civ. 3710-01, Supreme Court, Vancouver Registry No. C876136, December 20, 1990, Justice Hood declined to reconsider the terms of a trial judgment on the basis that the application had not been made

Constantinescu v. Barriault, 1996 CarswellBC 2281

1996 CarswellBC 2281, [1996] B.C.W.L.D. 2846, [1996] B.C.J. No. 2105...

in a timely fashion, and that it was obvious that the matters in question would be reviewed by the Court of Appeal. In that case, that defendant argued that an award for cost of future care was contrary to the law of the province, as established by another trial court decision six months earlier, which had not been brought to Justice Hood's attention during submissions at trial. The earlier decision, and Justice Hood's decision, were both to be heard by the Court of Appeal.

13      However, in *D.M. Drake & Co. v. Dave's Plumbing & Heating (1962) Ltd.*, unreported, [1981] B.C.D. Civ. 211-0, February 2, 1981, B.C. C.A., Registry No. CA791017, a number of points of law had been advanced in question form and considered by the court below, but on appeal, the court noted that one of the questions posed had not been answered. The court held that it would be beneficial if the consideration of that question by the trial judge could be before the court on appeal. The court suggested that the best course would be for the trial judge to hear and adjudicate upon the issue before it was brought back to appeal.

14      And in *Sykes*, Justice Wood emphasized that it is not only in cases where new evidence is available that the trial judge has a discretion to re-open. He said:

> It will in all cases depend on the circumstances. But a discretion to re-open may also properly be exercised where the trial judge is satisfied, either because of the argument of one of the parties, or on the basis of his own reconsideration of the record, that the original judgment was in error because it overlooked or misconstrued material evidence, *or misapplied the law*. (emphasis added)

15      The danger in allowing a party to reopen to argue a matter which was not argued at trial, or which was inadequately argued at trial, is obvious. There must be an end to litigation, and parties must be encouraged to thoroughly canvass all the live issues raised by the pleadings, and to provide all relevant authorities during their submissions at trial. Counsel should not "assume" that judges are familiar with the authorities in every type of case. It is the job of counsel to bring the relevant authorities to the attention of the court.

16      Although I am reluctant to reconsider a matter which was clearly in issue at trial, and which was raised with plaintiff's counsel at trial, but responded to very inadequately, I am even more reluctant to penalize the plaintiff by putting him to the expense and trouble of carrying an appeal on this issue, when the authorities which have now been brought to my attention indicate that I was in error in the manner in which I disposed of the issue.

17      Accordingly, I have decided to grant the motion to reconsider. In relation to the deductibility of unemployment insurance benefits during the 11 months during which the plaintiff was incapacitated as a result of elbow surgery, which is the only issue before me for reconsideration, I am of the view that I am bound by the authority of *Hayre v. Walz* (1992), 67 B.C.L.R. (2d) 296 (C.A.), and that unemployment insurance benefits received during the 11 month period ought not to have been deducted from the award to the plaintiff for past loss of income.

18      Accordingly, the award for past loss of income for the period August 23, 1991 to July 20, 1992 should be changed from $10,900 to $23,000. That figure should then be reduced by 75% to reflect the finding of liability against the plaintiff.

19      Because of the circumstances in which the application to reconsider has arisen, the defendant shall have his costs of the written submissions on this issue, notwithstanding the ruling in the plaintiff's favour.

*Application allowed.*

---

**End of Document**

Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# TAB 9

27820

Supreme Court of Canada    Cour suprême du Canada

SAGAZ INDUSTRIES CANADA INC., SAGAZ
INDUSTRIES INC. and JOSEPH KAVANA

- v. -

671122 ONTARIO LIMITED formerly DESIGN
DYNAMICS LIMITED
(Ont.)(Crim.)(27820)

SAGAZ INDUSTRIES CANADA INC., SAGAZ
INDUSTRIES INC. et JOSEPH KAVANA

- c. -

671122 ONTARIO LIMITED auparavant
DESIGN DYNAMICS LIMITED
(Ont.)(Crim.)(27820)

CORAM:

The Rt. Honourable Beverley McLachlin, P.C.
The Hon. Mr. Justice Iacobucci
The Hon. Mr. Justice Major
The Hon. Mr. Justice Bastarache
The Hon. Mr. Justice Binnie
The Hon. Madam Justice Arbour
The Hon. Mr. Justice LeBel

Appeal heard:
June 19, 2001

Judgment rendered:
September 28, 2001

Reasons for judgment by:
The Hon. Mr. Justice Major

Concurred in by:
The Rt. Honourable Beverley McLachlin, P.C.
The Hon. Mr. Justice Iacobucci
The Hon. Mr. Justice Bastarache
The Hon. Mr. Justice Binnie
The Hon. Madam Justice Arbour
The Hon. Mr. Justice LeBel

CORAM:

La très honorable Beverley McLachlin, c.p.
L'honorable juge Iacobucci
L'honorable juge Major
L'honorable juge Bastarache
L'honorable juge Binnie
L'honorable juge Arbour
L'honorable juge LeBel

Appel entendu:
le 19 juin 2001

Jugement rendu:
le 28 septembre 2001

Motifs de jugement:
L'honorable juge Major

Souscrivent à l'avis de l'honorable juge Major:
La très honorable Beverley McLachlin, c.p.
L'honorable juge Iacobucci
L'honorable juge Bastarache
L'honorable juge Binnie
L'honorable juge Arbour
L'honorable juge LeBel

- 2 -

Counsel at hearing:

For the appellants:
    H. Lorne Morphy, Q.C.
    John B. Laskin
    M. Paul Michell

For the respondent:
    Martin Teplitsky, Q.C.
    James M. Wortzman

Avocats à l'audience:

Pour les appellants:
    H. Lorne Morphy, c.r.
    John B. Laskin
    M. Paul Michell

Pour l'intimée:
    Martin Teplitsky, c.r.
    James M. Wortzman

| Citations | Références |
|---|---|
| Ont. C.A.: (2000), 46 O.R. (3d) 760, 183 D.L.R. (4th) 488, 128 O.A.C. 46, 2 B.L.R. (3d) 1, 48 C.C.L.T. (2d) 79, 41 C.P.C. (4th) 107, [2000] O.J. No. 121 (QL). | C.A. Ont.: (2000), 46 O.R. (3d) 760, 183 D.L.R. (4th) 488, 128 O.A.C. 46, 2 B.L.R. (3d) 1, 48 C.C.L.T. (2d) 79, 41 C.P.C. (4th) 107, [2000] O.J. No. 121 (QL). |
| Ont. Ct. (Gen. Div.): (1998), 40 O.R. (3d) 229, 42 C.C.L.T. (2d) 50, [1998] O.J. No. 2194 (QL), O.J. No. 4018 (QL). | C. Ont. (Div. gén.): (1998), 40 O.R. (3d) 229, 42 C.C.L.T. (2d) 50, [1998] O.J. No. 2194 (QL), O.J. No. 4018 (QL). |

---

**CITATION**

Before publication in the S.C.R., this judgment should be cited using the neutral citation: *671122 Ontario Ltd. v. Sagaz Industries Canada Inc.*, 2001 SCC 59. Once the judgment is published in the S.C.R., the neutral citation should be used as a parallel citation: *671122 Ontario Ltd. v. Sagaz Industries Canada Inc.*, [2001] 2 S.C.R. xxx, 2001 SCC 59.

---

**RÉFÉRENCE**

Avant sa publication dans le R.C.S., ce jugement devrait être cité en utilisant la référence neutre: *671122 Ontario Ltd. c. Sagaz Industries Canada Inc.*, 2001 CSC 59. Une fois le jugement publié au R.C.S., la référence neutre sera utilisée à titre de référence parallèle: *671122 Ontario Ltd. c. Sagaz Industries Canada Inc.*, [2001] x R.C.S. xxx, 2001 CSC 59.

671122 ontario ltd. *v.* sagaz industries

**Sagaz Industries Canada Inc., Sagaz Industries Inc. and
Joseph Kavana**                                     *Appellants*

*v.*

**671122 Ontario Limited, formerly Design Dynamics Limited**    *Respondent*

**Indexed as:  671122 Ontario Ltd. *v.* Sagaz Industries Canada Inc.**

**Neutral citation:  2001 SCC 59.**

File No.:  27820.

2001:  June 19; 2001:  September 28

Present:    McLachlin C.J. and Iacobucci, Major, Bastarache, Binnie, Arbour and
LeBel JJ.

on appeal from the court of appeal for ontario

*Torts -- Vicarious liability -- Employee versus independent contractor --
Original supplier suffering substantial losses when it was replaced as supplier because
of bribery scheme in large commercial transaction -- Whether rival supplier
vicariously liable to original supplier for tortious conduct of its consultant.*

*Trial -- Evidence -- Re-opening of trial to admit fresh evidence -- Trial
judge declining to reopen trial to admit fresh evidence on a motion brought after*

- 2 -

*release of reasons but before formal judgment entered -- Whether Court of Appeal*
*erred in substituting its discretion for that of trial judge in decision to reopen trial.*

      The respondent ("Design") was Canadian Tire's principal supplier of
synthetic sheepskin car seat covers for 30 years. In 1984, Design was advised by S,
the head of Canadian Tire's automotive division, that the corporate appellants
("Sagaz") would be replacing Design as Canadian Tire's seat cover supplier. S
terminated Canadian Tire's supply relationship with Design in favour of Sagaz because
of bribery in the form of a "kickback" scheme. Sagaz retained American Independent
Marketing Inc. ("AIM"), which was owned and controlled by L, to assist in marketing
Sagaz's seat covers. S was to receive two percent of all sales from L and AIM and
incorporated a sham corporation to receive this money. S's wrongdoing was
discovered and his employment was terminated. New management at Canadian Tire
determined it preferred the seat covers products of Sagaz to those of Design and
retained Sagaz as its supplier. Having lost its major customer, Design's manufacturing
business went into a steep decline and in 1989, Design brought an action alleging that
AIM, L, Sagaz and K, Sagaz's president, had bribed S and, but for the bribes, Design
would have continued as supplier to Canadian Tire. At trial, damages were assessed
against L and AIM, jointly and severally, including punitive damages. The action was
dismissed as against Sagaz and K. After the trial judge's reasons for judgment were
released, but before formal judgement was entered, L, who did not testify at trial, gave
Design an affidavit admitting to the conspiracy to bribe S and implicating K in it. On
the basis of the affidavit, Design brought a motion to have the trial reopened to hear
L's fresh evidence. The trial judge dismissed the motion. The Court of Appeal
reversed the decisions of the trial judge, finding that Sagaz was vicariously liable to
Design and therefore jointly and severally liable with L and AIM for the damages
awarded, with the exception of punitive damages. A new trial was ordered with

- 3 -

respect to the liability of K on the basis that the trial judge should have reopened the trial to hear L's evidence.

*Held*:  The appeal should be allowed and the decisions of the trial judge restored.

The Court of Appeal erred in holding Sagaz vicariously liable to Design. Although the categories of relationships in law that attract vicarious liability are neither exhaustively defined nor closed, the most common one to give rise to vicarious liability is the relationship between master and servant, now more commonly called employer and employee.  This is distinguished from the relationship of an employer and independent contractor which, subject to certain limited exceptions, typically does not give rise to a claim for vicarious liability.  The main policy concerns justifying vicarious liability are to provide a just and practical remedy for the plaintiff's harm and to encourage the deterrence of future harms.  Vicarious liability is fair in principle because the hazards of the business should be borne by the business itself; thus, it does not make sense to anchor liability on an employer for acts of an independent contractor, someone who was in business on his or her own account.  In addition, the employer does not have the same control over an independent contractor as an employee to reduce accidents and intentional wrongs by efficient organization and supervision.  There is no one conclusive test which can be universally applied to determine whether a person is an employee or an independent contractor.  What must always occur is a search for the total relationship of the parties.  The central question is whether the person who has been engaged to perform the services is performing them as a person in business on his own account.  In making this determination, the level of control the employer has over the worker's activities will always be a factor. However, other factors to consider include whether the worker provides his or her own

- 4 -

equipment, whether the worker hires his or her own helpers, the degree of financial

risk taken by the worker, the degree of responsibility for investment and management

held by the worker, and the worker's opportunity for profit in the performance of his

or her tasks. Although the contract designated AIM as an "independent contractor",

this classification is not always determinative for the purposes of vicarious liability.

Looking at the non-exhaustive list of factors set out in *Market Investigations*, it is

clear, based on the total relationship of the parties, that AIM was an independent

contractor. On the totality of the evidence, AIM was in business on its own account.

Absent exceptional circumstances which are not present in this case, it follows that the

relationship between Sagaz and AIM, as employer and independent contractor, is not

one which attracts vicarious liability.


      The Court of Appeal erred in substituting its discretion for that of the trial

judge in deciding to reopen the trial. Absent an error of law, an appellate court should

not interfere with the exercise by a trial judge of his or her discretion in the conduct

of a trial. Appellate courts should defer to the trial judge, who is in the best position

to decide whether fairness dictates that the trial be reopened. The case law dictates that

the trial judge must exercise his discretion to reopen the trial "sparingly and with the

greatest care" so that "fraud and abuse of the Court's process" do not result. In this

case, the trial judge decided not to exercise his discretion to reopen the trial because

neither of the two steps of the test in *Scott* was met to his satisfaction. First, he could

not say that the new evidence, if presented at trial, would probably have changed the

result, only that it may have changed the result. Second, the trial judge found that L's

evidence could have been obtained before trial. L's affidavit evidence contradicts his

sworn evidence on discovery, particularly with respect to the existence of the bribery

scheme which L avoids acknowledging on discovery. Evidence which is not

presumptively credible may fail to probably change the result under the first branch of

- 5 -

the test in *Scott*. This is how the trial judge dealt with the affidavit evidence, and he was correct in so doing.

## Cases Cited

**Referred to:** *London Drugs Ltd. v. Kuehne & Nagel International Ltd.*, [1992] 3 S.C.R. 299; *Scott v. Cook*, [1970] 2 O.R. 769; *Mayer v. J. Conrad Lavigne Ltd.* (1979), 27 O.R. (2d) 129; *Co-operators Insurance Association v. Kearney*, [1965] S.C.R. 106; *Bazley v. Curry*, [1999] 2 S.C.R. 534; *Jacobi v. Griffiths*, [1999] 2 S.C.R. 570; *Wiebe Door Services Ltd. v. M.N.R.*, [1986] 3 F.C. 553; *Regina v. Walker* (1858), 27 L.J.M.C. 207; *Hôpital Notre-Dame de l'Espérance and Théoret v. Laurent*, [1978] 1 S.C.R. 605; *Montreal v. Montreal Locomotive Works Ltd.*, [1947] 1 D.L.R. 161; *Stevenson Jordan and Harrison, Ltd. v. Macdonald and Evans*, [1952] 1 *The Times L.R.* 101; *Market Investigations, Ltd. v. Minister of Social Security*, [1968] 3 All E.R. 732; *Lee Ting Sang v. Chung Chi-Keung*, [1990] 2 A.C. 374; *Hamstra (Guardian Ad Litem of) v. British Columbia Rugby Union*, [1997] 1 S.C.R. 1092; *Clayton v. British American Securities Ltd.*, [1934] 3 W.W.R. 257; *Ladd v. Marshall*, [1954] 1 W.L.R. 1489.

## Statutes and Regulations Cited

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194, r. 59.06(2)(a).

## Authors Cited

Atiyah, P. S. *Vicarious Liability in the Law of Torts*. London: Butterworths, 1967.

Douglas, William O. "Vicarious Liability and Administration of Risk I" (1928-29), 38 *Yale L.J.* 584.

- 6 -

Flannigan, Robert.   "Enterprise control:  The servant-independent contractor distinction" (1987), 37 *U.T.L.J.* 25.

Fleming, John G.  *The Law of Torts*, 9th ed.  Sydney, Australia:  LBC Information Services, 1998.

Fridman, Gerald Henry Louis.  *The Law of Torts in Canada*, vol. 2.  Toronto: Carswell, 1990.

Kidner, Richard.  "Vicarious liability:  for whom should the 'employer' be liable?" (1995), 15 *Legal Studies* 47.

APPEAL from a judgment of the Ontario Court of Appeal (2000), 46 O.R. (3d) 760, 183 D.L.R. (4th) 488, 128 O.A.C. 46, 2 B.L.R. (3d) 1, 48 C.C.L.T. (2d) 79, 41 C.P.C. (4th) 107, [2000] O.J. No. 121 (QL), reversing the decisions of the Ontario Court (General Division) (1998), 40 O.R. (3d) 229, 42 C.C.L.T. (2d) 50, [1998] O.J. No. 2194 (QL), O.J. No. 4018 (QL).  Appeal allowed.

*H. Lorne Morphy, Q.C.*, *John B. Laskin* and *M. Paul Michell*, for the appellants.

*Martin Teplitsky, Q.C.*, and *James M. Wortzman*, for the respondent.

*Solicitors for the appellants:  Torys, Toronto.*

*Solicitors for the respondent:  Teplitsky, Colson, Toronto.*

SUPREME COURT OF CANADA

<u>SAGAZ INDUSTRIES CANADA INC., SAGAZ INDUSTRIES INC. and JOSEPH KAVANA</u>

v.

<u>671122 ONTARIO LIMITED formerly DESIGN DYNAMICS LIMITED</u>

CORAM:     The Chief Justice and Iacobucci, Major, Bastarache, Binnie, Arbour and LeBel JJ.

MAJOR J. –

1        This appeal raises two issues: the application of vicarious liability for a bribery scheme in a large commercial transaction and the appellate court's review of the trial judge's exercise of discretion not to reopen the trial to admit fresh evidence on a motion brought after the release of his reasons but before formal judgment was entered.

2        Vicarious liability describes the event when the law holds one person responsible for the misconduct of another because of their relationship. In this case, the respondent (the original supplier) suffered substantial losses when it was replaced as Canadian Tire's synthetic car seat cover supplier. This happened because a bribe was paid by a rival supplier's consultant to the head of Canadian Tire's automotive division.

- 2 -

3          The first question is whether the appellant Sagaz (the rival automotive

supplier) is vicariously liable for the tortious conduct of its consultant who was hired

to assist in securing Canadian Tire's business. In my opinion the appellant Sagaz, the

competitive supplier, is not vicariously liable for the bribery scheme perpetrated by its

consultant. The consultant was not an employee of the supplier but an independent

contractor. Based on policy considerations, the relationship between an employer and

independent contractor does not typically give rise to a claim in vicarious liability.

4          On the second question, the motion to reopen the trial to adduce fresh

evidence, I conclude for the reasons that follow that the Court of Appeal erred in

substituting its discretion for that of the trial judge.

I.     Facts

5          The respondent, 671122 Ontario Limited, formerly Design Dynamics

Limited ("Design"), was Canadian Tire Corporation's principal supplier of synthetic

sheepskin car seat covers for 30 years. Canadian Tire was the party in the position of

strength in the relationship. This is so as it represented more than 60 per cent of the

Canadian seat cover market and, by 1983, was Design's largest customer accounting

for over 50 per cent of its sales.

6          In June 1984, Design lost Canadian Tire's business. Robert Summers, the

head of Canadian Tire's automotive division, advised Design that another company,

the appellants Sagaz Industries Canada Inc. and Sagaz Industries Inc. (collectively

"Sagaz"), would be replacing Design as Canadian Tire's seat cover supplier. Sagaz is

a Florida corporation and the appellant, Joseph Kavana, is its president. Sagaz

- 3 -

Industries Inc. continues to supply Canadian Tire and Sagaz Industries Canada Inc. is inactive.

7          Summers terminated Canadian Tire's supply relationship with Design in favour of Sagaz because of bribery in the form of a "kickback" scheme. Sagaz retained American Independent Marketing Inc. ("AIM"), a New York corporation, to assist in marketing Sagaz's seat covers to Canadian Tire. AIM was owned and controlled by Stewart Landow. It was later determined that Summers accepted a bribe from Landow and AIM in relation to the Sagaz seat cover contract. Specifically, Summers incorporated a sham corporation, International Marketing Consultants ("IMC"), to receive the bribery money. Summers employed a surrogate, Anthony Brathwaite, as a token manager of IMC. Brathwaite was the puppet of Summers who received all the profits of IMC. Summers entered into an agreement with Landow whereby Landow (through AIM) would pay Summers (through IMC) two percent of all sales by Sagaz to Canadian Tire of synthetic seat covers in order to ensure the sales occurred. As a result of the bribe, Summers terminated Canadian Tire's relationship with Design.

8          Summers' wrongdoing was discovered in 1985. His employment with Canadian Tire was terminated and he was eventually convicted of corruptly accepting benefits and went to prison. He later went bankrupt. Brathwaite pleaded guilty to similar charges.

9          Summers was replaced by new management at Canadian Tire which re-evaluated its purchase of synthetic seat covers. Management determined that it preferred the seat cover products of Sagaz to those of Design. Accordingly, Canadian Tire retained its relationship with Sagaz as its supplier.

- 4 -

10          Having lost its major customer, Design's manufacturing business went into a steep decline. It sold its assets in 1988. In 1989, Design brought an action against some thirteen defendants, including Canadian Tire, Summers, Brathwaite, Landow, AIM, Sagaz and Kavana. At the trial, only AIM, Landow (who did not testify), Sagaz and Kavana remained as defendants. Canadian Tire paid Design $750,000 to settle the action against it. The action against Summers was discontinued when he went bankrupt. Design's action alleged that AIM, Landow, Sagaz and Kavana had bribed Summers and, but for those bribes, Design would have continued as supplier to Canadian Tire.

II.     Judicial History

A.      *Ontario Court of Justice (General Division)* (1998), 40 O.R. (3d) 229

11          The trial judge found that the decision of Canadian Tire management to switch suppliers of seat covers had nothing to do with any belief that the Sagaz product was superior to the Design product. Design's business was lost solely because of the bribe.

12          The bribery scheme was profitable to Landow as commissions on the sales from Sagaz to Canadian Tire would be paid to his solely-owned corporation, AIM. Landow could not hide behind the corporate veil of AIM in his use of the corporation as his agent in the commission of an intentional tort. The trial judge found that Landow and AIM conspired with Summers and IMC to engage in the unlawful conduct of taking away Design's business from Canadian Tire.

- 5 -

13          While the tort of civil conspiracy was sufficient to establish liability, the trial judge found that liability was more directly addressed through the tort of unlawful interference with economic relations, for which Landow and AIM were liable.

14          There were suspicious business dealings raised at the trial in an attempt to implicate Kavana, President of Sagaz, in the bribery scheme.   For instance, commissions that Landow received in respect of the sale of seat covers from Sagaz to Canadian Tire.  Before Sagaz secured the seat cover contract with Canadian Tire, it was paying Landow a five percent commission on sales.  Sagaz then raised Landow's commission from five to six percent.  At the same time, or close to it, Landow entered into the agreement with Summers whereby Landow paid Summers two percent in the form of the kickback scheme.   It was Design's theory at trial that Landow's commission was raised from five to six percent to fund the bribe to Summers.  That implied that Kavana and Landow agreed to share or split the payment of the two per cent bribe.  Kavana denied involvement in the bribery scheme.  He testified that he was misled by Landow in agreeing to change the commission from five to six percent because Landow told him that he was required to hire someone to provide in-store service in Canada which would entail additional expense.  Another suspicious event was the payment of $15,000 by Kavana to Landow in March 1985 which eventually found its way to Robin Addie, a senior buyer for Canadian Tire.  Again, Kavana testified and denied any improper conduct.  He claimed that Landow told him that this expenditure was tied to the purchase of a car as part of an intended promotion to display the Canadian Tire seat covers.  In fact, a car was never purchased.

- 6 -

15          These suspicious circumstances surrounding Kavana were presented at the

trial. The trial judge believed Kavana, found him credible and accepted his evidence

that he had trusted Landow and had accepted Landow's explanation about the

commission and car purchase. As well Summers did not implicate Kavana in his

testimony. The trial judge concluded that Kavana was not involved in the bribery

scheme. He pointed out that had Kavana known of the bribe by Landow then Kavana

and Sagaz would have been held directly liable and obviously vicarious liability would

not have been an issue.

16          The trial judge was brief on the issue of whether Sagaz was vicariously

liable to Design for the wrongdoing of Landow and AIM. He held that, on the

evidence, AIM was an independent contractor to Sagaz. Citing *London Drugs Ltd. v.*

*Kuehne & Nagel International Ltd.*, [1992] 3 S.C.R. 299, he held that vicarious

liability could not and should not be imposed upon Sagaz for the tortious acts of an

independent contractor.

17          Damages were assessed at $1,807,500 against Landow and AIM, jointly

and severally, plus $50,000 in punitive damages, and pre-judgment interest. The

action was dismissed as against Sagaz and Kavana. The trial judge refused to award

Sagaz and Kavana their costs against Design, but awarded Sagaz and Kavana their

costs against Landow and AIM under a "Sanderson order".

B.      *Ontario Court of Justice (General Division)* [1998] O.J. No. 4018 (QL)

18          After the trial judge's reasons for judgment were released, but before

formal judgment was entered, Landow, who did not testify at the trial, gave Design an

- 7 -

affidavit admitting to the conspiracy to bribe Summers and implicating Kavana in it. On the basis of the affidavit, Design brought a motion before the trial judge pursuant to rule 59.06(2)(a) of the *Rules of Civil Procedure*, R.R.O. 1990, Reg. 194, to have the trial reopened to hear Landow's fresh evidence. Design claimed that the fresh evidence would show that Kavana was involved in and had knowledge of the tortious activity of Landow, and was also liable to Design.

19          The trial judge dismissed the motion. He found that there was no direct evidence at trial that Kavana was a party to the bribe paid to Summers. Summers dealt directly with Landow. Summers did not implicate Kavana in his testimony. Kavana testified and denied involvement in the bribe. He was subjected to a thorough and rigorous cross-examination and was credible in his testimony. Landow did not testify nor attend the trial. He was represented by counsel throughout the trial. In the cross-examination of Landow on his affidavit given in connection with the fresh evidence motion, Landow acknowledged that he was aware of his right to attend the trial and to testify. He received daily reports about the course of the trial over its duration.

20          In dismissing the motion to reopen the trial, the trial judge applied a two-part test from *Scott v. Cook*, [1970] 2 O.R. 769 (H.C.J.). First, would the evidence, if presented at trial, probably have changed the result? Second, could the evidence have been obtained before trial by the exercise of reasonable diligence?

21          The trial judge found that neither of the two steps was met. He could not say that the new evidence, if presented at trial, would probably have changed the result, only that it may have changed the result. As well, if the trial were reopened, Landow's evidence might well not be believed. His credibility would be very much in issue. On

- 8 -

the second part of the test, the trial judge found that Landow's evidence could have been obtained before trial. Design could have compelled Landow to testify under oath at trial, although that evidence may not have been helpful to Design. The trial judge concluded that the court would not allow a party to correct what in hindsight was an unsuccessful strategy at trial.

C.    *Ontario Court of Appeal* (2000), 183 D.L.R. (4th) 488

22          The Court of Appeal reversed the decisions of the trial judge. The gist of its view was that Sagaz was vicariously liable to Design. Applying the "organization test" (from *Mayer v. J. Conrad Lavigne Ltd.* (1979), 27 O.R. (2d) 129 (C.A.), as previously approved by this Court in *Co-operators Insurance Association v. Kearney*, [1965] S.C.R. 106), the Court of Appeal found that Landow and AIM did their work as part of the "Sagaz sales team". Sagaz was therefore jointly and severally liable with Landow and AIM for the damages awarded, with the exception of punitive damages. For this reason, the Court of Appeal also allowed Landow's and AIM's cross-appeal on the issue of costs and set aside the costs award to Sagaz and Kavana against Landow and AIM. Design was entitled to costs against Sagaz.

23          A new trial was ordered with respect to the liability of Kavana on the basis that the trial judge should have reopened the trial to hear Landow's evidence. The Court of Appeal found that the evidence, if presented at trial and accepted as credible, would implicate Kavana and Sagaz in the bribery scheme. Also, it held that Landow's evidence was not discoverable by reasonable diligence prior to trial as Design made serious efforts to no avail to persuade Landow to co-operate and to testify against Kavana and Sagaz.

- 9 -

III.   Issues

24              1. Did the Court of Appeal err in holding Sagaz vicariously liable to
                   Design?

                2. Did the Court of Appeal err by substituting its discretion for that of the
                   trial judge in the decision to reopen the trial?

IV.   Analysis

A.   *Vicarious Liability*

   (1)  Policy Rationale Underlying Vicarious Liability

25              Vicarious liability is not a distinct tort. It is a theory that holds one person
responsible for the misconduct of another because of the relationship between them.
Although the categories of relationships in law that attract vicarious liability are
neither exhaustively defined nor closed, the most common one to give rise to vicarious
liability is the relationship between master and servant, now more commonly called
employer and employee.

26              In general, tort law attempts to hold persons accountable for their wrongful
acts and omissions and the direct harm that flows from those wrongs. Vicarious
liability, by contrast, is considered to be a species of strict liability because it requires
no proof of personal wrongdoing on the part of the person who is subject to it. As

- 10 -

such, it is still relatively uncommon in Canadian tort law. What policy considerations govern its discriminate application?

27        As Fleming stated in an oft-quoted passage,

> [T]he modern doctrine of vicarious liability cannot parade as a deduction from legalistic premises, but should be frankly recognised as having its basis in a combination of policy considerations....
>
> (*The Law of Torts* (9th ed. 1998), at p. 410, cited in *Bazley v. Curry*, [1999] 2 S.C.R. 534, at para. 26, *per* McLachlin J. (as she then was), and in *Jacobi v. Griffiths*, [1999] 2 S.C.R. 570, released concurrently, at para. 29, *per* Binnie J.)

However, McLachlin J. noted in *Bazley*, at para. 27 (cited in *Jacobi*, at para. 29) that "[a] focus on policy is not to diminish the importance of legal principle".

28        The most recent discussion by this Court of the policy considerations that justify the imposition of vicarious liability was in *Bazley*, at paras. 26-36, where McLachlin J. succinctly reviewed the relevant jurisprudence. She began with La Forest J.'s opinion (dissenting on the cross-appeal) in *London Drugs*, *supra*, which held that vicarious liability is generally considered to rest on one of two logical bases. The first, known as the "master's tort theory", posits that the employer is vicariously liable for the acts of his employee because the acts are regarded as being authorized by him so that in law the acts of the employee are the acts of the employer. The second, known as the "servant's tort theory", attributes liability to the employer simply because the employer was the employee's superior and therefore in charge or command of the employee (G. H. L. Fridman, *The Law of Torts in Canada* (1990), vol. 2, at pp. 314-15, and P. S. Atiyah, *Vicarious Liability in the Law of Torts* (1967), at pp. 6-7).

- 11 -

29          However, La Forest J. acknowledged that neither of the logical bases for

vicarious liability succeed completely in explaining the operation of the doctrine, and

he found that the vicarious liability regime is a response to a number of policy

considerations, including compensation, deterrence and loss internalization (at p. 336).

McLachlin J. noted that Fleming identified similar policies to justify the imposition

of vicarious liability, including the provision of a just and practical remedy for the

harm and the deterrence of future harm, and held that these two ideas "usefully

embrace the main policy considerations that have been advanced" (para. 29).


30          Identification of the policy considerations underlying the imposition of

vicarious liability assists in determining whether the doctrine should be applied in a

particular case and it is for that reason that the policy considerations set out by this

Court in *Bazley* should be briefly reviewed.


31          First, vicarious liability provides a just and practical remedy to people who

suffer harm as a consequence of wrongs perpetrated by an employee.  Many

commentators are suspicious of vicarious liability in principle because it appears to

hold parties responsible for harm simply because they have "deep pockets" or an

ability to bear the loss even though they are not personally at fault.  The "deep

pockets" justification on its own does not accord with an inherent sense of what is fair

(see also R. Flannigan, "Enterprise control: The servant-independent contractor

distinction" (1987), 37 *U.T.L.J.* 25, at p. 29).  Besides an ability to bear the loss, it

must also seem just to place liability for the wrong on the employer.  McLachlin J.

addresses this concern in *Bazley*, *supra*, at para. 31:

> Vicarious liability is arguably fair in this sense.  The employer puts in the
> community an enterprise which carries with it certain risks.  When those

- 12 -

risks materialize and cause injury to a member of the public despite the employer's reasonable efforts, it is fair that the person or organization that creates the enterprise and hence the risk should bear the loss. This accords with the notion that it is right and just that the person who creates a risk bear the loss when the risk ripens into harm.

Similarly, Fleming stated that "a person who employs others to advance his own economic interest should in fairness be placed under a corresponding liability for losses incurred in the course of the enterprise . . ." (p. 410). McLachlin J. states that while the fairness of this proposition is capable of standing alone, "it is buttressed by the fact that the employer is often in the best position to spread the losses through mechanisms like insurance and higher prices, thus minimizing the dislocative effect of the tort within society" (para. 31). Finally on this point, it is noteworthy that vicarious liability does not diminish the personal liability of the direct tortfeasor (Fleming, *supra*, at p. 411; *London Drugs*, at p. 460, *per* McLachlin J.).

32          The second policy consideration underlying vicarious liability is deterrence of future harm as employers are often in a position to reduce accidents and intentional wrongs by efficient organization and supervision. This policy ground is related to the first policy ground of fair compensation, as "[t]he introduction of the enterprise into the community with its attendant risk, in turn, implies the possibility of managing the risk to minimize the costs of the harm that may flow from it" (para. 34).

### (2) Employee Versus Independent Contractor

33          The most common relationship that attracts vicarious liability is that between employer and employee, formerly master and servant. This is distinguished from the relationship of an employer and independent contractor which, subject to

- 13 -

certain limited exceptions (see Atiyah, *supra*, pp. 327-78), typically does not give rise to a claim for vicarious liability. If a worker is determined to be an employee as opposed to an independent contractor such that vicarious liability can attach to the employer, this is not the end of the analysis. The tortious conduct has to be committed by the employee in the course of employment. For the reasons that follow, this second stage of the analysis is not relevant and need not by analysed in the present appeal.

34          What is the difference between an employee and an independent contractor and why should vicarious liability more likely be imposed in the former case than in the latter? This question has been the subject of much debate. The answer lies with the element of control that the employer has over the direct tortfeasor (the worker). If the employer does not control the activities of the worker, the policy justifications underlying vicarious liability will not be satisfied. See Flannigan, *supra*, at pp. 31-32:

> This basis for vicarious liability discloses a precise limitation on the scope of the doctrine. If the employer does not control the activities of the worker it is clear that vicarious liability should not be imposed, for then insulated risk taking [by the employer] does not occur. Only the worker, authorized to complete a task, could have affected the probability of loss, for he alone had control in any respect. Thus, because there is no mischief where employer control is absent, no remedy is required.

35          Explained another way, the main policy concerns justifying vicarious liability are to provide a just and practical remedy for the plaintiff's harm and to encourage the deterrence of future harms (*Bazley, supra*, at para. 29). Vicarious liability is fair in principle because the hazards of the business should be borne by the business itself; thus, it does not make sense to anchor liability on an employer for acts of an independent contractor, someone who was in business on his or her own account. In addition, the employer does not have the same control over an independent

- 14 -

contractor as an employee to reduce accidents and intentional wrongs by efficient organization and supervision. Each of these policy justifications are relevant to the ability of the employer to control the activities of the employee, justifications which are generally deficient or missing in the case of an independent contractor. As discussed above, the policy justifications for imposing vicarious liability are relevant where the employer is able to control the activities of the employee but may be deficient in the case of an independent contractor over whom the employer has little control. However, control is not the only factor to consider in determining if a worker is an employee or an independent contractor. For the reasons discussed below, a reliance on control alone can be misleading, and there are other relevant factors which should be considered in making this determination.

36          Various tests have emerged in the case law to help determine if a worker is an employee or an independent contractor. The distinction between an employee and an independent contractor applies not only in vicarious liability, but also to the application of various forms of employment legislation, the availability of an action for wrongful dismissal, the assessment of business and income taxes, the priority taken upon an employer's insolvency, and the application of contractual rights (Flannigan, *supra*, at p. 25). Accordingly, much of the case law on point while not written in the context of vicarious liability is still helpful.

37          The Federal Court of Appeal thoroughly reviewed the relevant case law in *Wiebe Door Services Ltd. v. M.N.R.*, [1986] 3 F.C. 553. As MacGuigan J.A. noted, the original criterion of the employment relationship was the control test set out by Baron Bramwell in *Regina v. Walker* (1858), 27 L.J.M.C. 207, and adopted by this Court in *Hôpital Notre-Dame de l'Espérance and Théoret v. Laurent*, [1978] 1 S.C.R. 605. It

- 15 -

is expressed as follows: "the essential criterion of employer-employee relations is the right to give orders and instructions to the employee regarding the manner in which to carry out his work" (*Hôpital*, at p. 613).

38          This criterion has been criticized as wearing "an air of deceptive simplicity" (Atiyah, *supra*, at p. 41). The main problems are set out by MacGuigan J.A. in *Wiebe Door*, *supra*, at pp. 558-59:

> A principal inadequacy [with the control test] is its apparent dependence on the exact terms in which the task in question is contracted for: where the contract contains detailed specifications and conditions, which would be the normal expectation in a contract with an independent contractor, the control may even be greater than where it is to be exercised by direction on the job, as would be the normal expectation in a contract with a servant, but a literal application of the test might find the actual control to be less. In addition, the test has broken down completely in relation to highly skilled and professional workers, who possess skills far beyond the ability of their employers to direct.

39          An early attempt to deal with the problems of the control test was the development of a four-fold test known as the "entrepreneur test". It was set out by W. O. (later Justice) Douglas in "Vicarious Liability and Administration of Risk I" (1928-29), 38 *Yale L.J.* 584, and applied by Lord Wright in *Montreal v. Montreal Locomotive Works Ltd.*, [1947] 1 D.L.R. 161 (P.C.), at p. 169:

> In earlier cases a single test, such as the presence or absence of control, was often relied on to determine whether the case was one of master and servant, mostly in order to decide issues of tortious liability on the part of the master or superior. In the more complex conditions of modern industry, more complicated tests have often to be applied. It has been suggested that a fourfold test would in some cases be more appropriate, a complex involving (1) control; (2) ownership of the tools; (3) chance of profit; (4) risk of loss. Control in itself is not always conclusive.

- 16 -

40          As MacGuigan J.A. notes, a similar general test, known as the "organization test" or "integration test" was used by Denning L.J. (as he then was) in *Stevenson Jordan and Harrison, Ltd. v. Macdonald and Evans*, [1952] 1 *The Times L.R.* 101 (C.A.), at p. 111:

> One feature which seems to run through the instances is that, under a contract of service, a man is employed as part of the business, and his work is done as an integral part of the business; whereas, under a contract for services, his work, although done for the business, is not integrated into it but is only accessory to it.

41          This decision imported the language "contract of service" (employee) and "contract for services" (independent contractor) into the analysis. The organization test was approved by this Court in *Co-operators Insurance, supra* (followed in *Mayer, supra*), where Spence J. observed that courts had moved away from the control test under the pressure of novel situations, replacing it instead with a type of organization test in which the important question was whether the alleged servant was part of his employer's organization (from Fleming, *supra*, at p. 416).

42          However, as MacGuigan J.A. noted in *Wiebe Door*, the organization test has had "less vogue in other common-law jurisdictions" (at p. 561), including England and Australia. For one, it can be a difficult test to apply. If the question is whether the activity or worker is integral to the employer's business, this question can usually be answered affirmatively. For example, the person responsible for cleaning the premises is technically integral to sustaining the business, but such services may be properly contracted out to people in business on their own account (see R. Kidner, "Vicarious liability: for whom should the employer be liable?" (1995), 15 Legal Studies 47, at p. 60). As MacGuigan J.A. further noted in *Wiebe Door*, if the main test is to

- 17 -

demonstrate that, without the work of the alleged employees the employer would be

out of business, a factual relationship of mutual dependency would always meet the

organization test of an employee even though this criterion may not accurately reflect

the parties' intrinsic relationship (at pp. 562-63).

43          Despite these criticisms, MacGuigan J.A. acknowledges, at p. 563, that the

organization test can be of assistance:

> Of course, the organization test of Lord Denning and others produces
> entirely acceptable results when properly applied, that is, when the
> question of organization or integration is approached from the persona of
> the "employee" and not from that of the "employer," because it is always
> too easy from the superior perspective of the larger enterprise to assume
> that every contributing cause is so arranged purely for the convenience of
> the larger entity. We must keep in mind that it was with respect to the
> business of the employee that Lord Wright [in *Montreal*] addressed the
> question "Whose business is it?" [Emphasis added.]

44          According to MacGuigan J.A., the best synthesis found in the authorities

is that of Cooke J. in *Market Investigations, Ltd. v. Minister of Social Security*, [1968]

3 All E.R. 732 (Q.B.D.), at pp. 737-38 (followed by the Privy Council in *Lee Ting*

*Sang v. Chung Chi-Keung*, [1990] 2 A.C. 374, *per* Lord Griffiths, at p. 382):

> The observations of LORD WRIGHT, of DENNING L.J. and of the judges of
> the Supreme Court in the U.S.A. suggest that the fundamental test to be
> applied is this: "Is the person who has engaged himself to perform these
> services performing them as a person in business on his own account?".
> If the answer to that question is "yes", then the contract is a contract for
> services. If the answer is "no" then the contract is a contract of service.
> No exhaustive list has been compiled and perhaps no exhaustive list can
> be compiled of considerations which are relevant in determining that
> question, nor can strict rules be laid down as to the relative weight which
> the various considerations should carry in particular cases. The most that
> can be said is that control will no doubt always have to be considered,
> although it can no longer be regarded as the sole determining factor; and
> that factors, which may be of importance, are such matters as whether the
> man performing the services provides his own equipment, whether he hires

- 18 -

his own helpers, what degree of financial risk he takes, what degree of responsibility for investment and management he has, and whether and how far he has an opportunity of profiting from sound management in the performance of his task. [Emphasis added.]

45          Finally, there is a test that has emerged that relates to the enterprise itself. Flannigan, *supra*, sets out the "enterprise test" at p. 30 which provides that the employer should be vicariously liable because (1) he controls the activities of the worker; (2) he is in a position to reduce the risk of loss; (3) he benefits from the activities of the worker; (4) the true cost of a product or service ought to be borne by the enterprise offering it.   According to Flannigan, each justification deals with regulating the risk-taking of the employer and, as such, control is always the critical element because the ability to control the enterprise is what enables the employer to take risks.  An "enterprise risk test" also emerged in La Forest J.'s dissent on cross-appeal in *London Drugs* where he stated at p. 339 that "[v]icarious liability has the broader function of transferring to the enterprise itself the risks created by the activity performed by its agents".

46          In my opinion, there is no one conclusive test which can be universally applied to determine whether a person is an employee or an independent contractor. Lord Denning stated in *Stevenson Jordan, supra*, that it may be impossible to give a precise definition of the distinction (p. 111) and, similarly, Fleming observed that "no single test seems to yield an invariably clear and acceptable answer to the many variables of ever changing employment relations . . ." (p. 416).  Further, I agree with MacGuigan J.A. in *Wiebe Door*, at p. 563, citing Atiyah, *supra*, at p. 38, that what must always occur is a search for the total relationship of the parties:

- 19 -

> [I]t is exceedingly doubtful whether the search for a formula in the nature of a single test for identifying a contract of service any longer serves a useful purpose.... The most that can profitably be done is to examine all the possible factors which have been referred to in these cases as bearing on the nature of the relationship between the parties concerned. Clearly not all of these factors will be relevant in all cases, or have the same weight in all cases. Equally clearly no magic formula can be propounded for determining which factors should, in any given case, be treated as the determining ones.

47        Although there is no universal test to determine whether a person is an employee or an independent contractor, I agree with MacGuigan J.A. that a persuasive approach to the issue is that taken by Cooke J. in *Market Investigations*, *supra*. The central question is whether the person who has been engaged to perform the services is performing them as a person in business on his own account. In making this determination, the level of control the employer has over the worker's activities will always be a factor. However, other factors to consider include whether the worker provides his or her own equipment, whether the worker hires his or her own helpers, the degree of financial risk taken by the worker, the degree of responsibility for investment and management held by the worker, and the worker's opportunity for profit in the performance of his or her tasks.

48        It bears repeating that the above factors constitute a non-exhaustive list, and there is no set formula as to their application. The relative weight of each will depend on the particular facts and circumstances of the case.

        (3) Application to the Facts

49        According to the agreement between Sagaz and AIM dated January 29, 1985, AIM was hired to "provide assistance to Sagaz in retaining the goodwill of

- 20 -

[Canadian Tire]". Although the contract designated AIM as an "independent contractor", this classification is not always determinative for the purposes of vicarious liability. The starting point for this analysis is whether AIM, while engaged to perform such services for Sagaz, was in business on its own account. If so, AIM is an independent contractor as opposed to an employee of Sagaz and vicarious liability likely will not follow. It is helpful to examine the non-exhaustive list of factors from *Montreal* and *Market Investigations* to assist in this determination.

50         There is some evidence to suggest that Landow and AIM were employees of Sagaz. In other words, in response to the query "whose business is it?", there is some suggestion that Landow worked in what was characterized as a "joint effort" with Sagaz sales managers in order to secure Canadian Tire's business. Specifically, although it was Landow's duty under the contract to obtain Canadian Tire's business and maintain its goodwill, the first letter sent to Canadian Tire on behalf of Sagaz was written by Canadian Tire's national sales manager, David English, who gave price quotations. The first meeting was attended by Landow, English and Kavana. Following that meeting, revised price quotations were sent by English. Landow's role was limited to presenting prices that were set and negotiated by Kavana and English and he required instructions with respect to terms and various other aspects of the business that he was conducting on Sagaz's behalf. Quotations given to Canadian Tire did not disclose Landow as a sales representative. Rather, the space on the invoice for the sales representative was left blank and the account was characterized as a "house account".

51         There was also some issue made about the fact that in a letter dated June 12, 1984, Landow communicated with Canadian Tire directly using Sagaz's letterhead.

- 21 -

On cross-examination, Kavana admitted that Landow had been supplied with Sagaz letterhead. The courts below speculated that these factors came about because Canadian Tire preferred to deal with its suppliers, like Sagaz, directly and not through external sales agents.

52          On the other hand, there are some compelling points which indicate that AIM and Sagaz were separate legal entities, some of which are that AIM had its own offices, located in New York, while the Sagaz head offices were located in Florida. According to the agreement between the parties, AIM was to pay all of its own costs of conducting its business, including travel expenses, commissions and other compensation of salespersons employed by it. AIM remained free to carry on other activities and represent other suppliers provided that it did not take on any competing lines of business.

53          With respect to AIM's responsibility for investment and management, Sagaz did not either specify or control how much time AIM was to devote to representing them in maintaining their goodwill with Canadian Tire, or to performing in-store services. Similarly, it was up to AIM and Landow to decide how many, if any, trips Landow would take to Toronto. According to the agreement and Kavana's testimony, AIM had no authority to bind the Sagaz company.

54          In terms of a risk of loss or an opportunity for profit, Landow and AIM worked on commission on sales of Sagaz's products. As such, the risk of loss and the opportunity for profit depended on whether AIM's expenses (such as travel expenses) exceeded its commissions.

- 22 -

55        Central to this inquiry is the extent of control that Sagaz had over AIM.
While Sagaz directed the prices, terms and other conditions that AIM was to negotiate
on Sagaz's behalf, AIM was ultimately in control of providing assistance to Sagaz in
retaining the goodwill of Canadian Tire.  Again, AIM decided how much time to
devote to Sagaz and how much time to devote to its services for other supply
companies.  Although Sagaz controlled what was done, AIM controlled how it was
done.  This indicates that Landow was not controlled by Sagaz.


56        In my opinion, the contravening factors such as the suggestion that the
Canadian Tire account was a "house account" and the one letter written by Landow on
Sagaz's letterhead, while of interest, are not sufficient to show that AIM was an
employee as part of the Sagaz "sales team".  I agree with the courts below that these
factors likely came about because Canadian Tire preferred to deal with its suppliers,
like Sagaz, directly and not through external sales agents.  Looking at the non-
exhaustive list of factors set out in *Market Investigations*, *supra*, including ownership
of tools, hiring its own helpers, the degree of financial risk or opportunity for profit by
AIM and the responsibility for investment and management, it is clear to me that,
based on the total relationship of the parties, AIM was an independent contractor.


57        On the totality of the evidence, I agree with the trial judge that AIM was
in business on its own account.  Absent exceptional circumstances which are not
present in this case (see Atiyah, *supra*, pp. 327 to 49), it follows that the relationship
between Sagaz and AIM, as employer and independent contractor, is not one which
attracts vicarious liability.  In finding that AIM was an independent contractor and not
an employee in relation to Sagaz, I need not consider the second stage of the analysis

- 23 -

which inquires into whether the tortious conduct of an <u>employee</u> was committed within the scope of employment.

58           Design submitted that if AIM was not an independent contractor, then AIM was an agent of Sagaz and therefore Sagaz was liable for the economic tort committed by AIM in the scope and course of its authority. Absent evidence to the contrary, it cannot be presumed that the scope of AIM's authority in providing "assistance to Sagaz in retaining the goodwill of [Canadian Tire]" was so broad as to include unlawful means such as bribery. This is confirmed by the finding of the trial judge at p. 241 that "Mr. Kavana was not a party to the conspiracy of Messrs. Summers and Landow". As well he also found at p. 245 "that it has not been proven on a balance of the probabilities that Mr. Kavana knew of the bribery by Mr. Landow". In the result, the payment of the bribe by AIM to Summers exceeded the actual and apparent authority of AIM as representative of Sagaz.

B.      *Motion to Reopen the Trial*

59           After the trial judge's reasons were released, but before the formal judgment was entered, Landow, who did not testify at trial, gave Design an affidavit admitting to the conspiracy to bribe and implicating Kavana in the conspiracy. Design brought a motion to have the trial reopened to hear the fresh evidence. The trial judge applied the two-part test from *Scott*, *supra*, to assist in determining whether to exercise his discretion to reopen the trial. First, he decided that the evidence, if presented at trial, probably would not have changed the result. Second, he found that the evidence could have been obtained before trial by the exercise of reasonable diligence. The Court of Appeal overturned the trial judge's decision, having found that he erred on

- 24 -

both branches of the test and that the trial should have been reopened to hear Kavana's evidence. Was the Court of Appeal in error to reverse the trial judge's exercise of discretion to refuse to reopen the trial?

60        This Court provided in *Hamstra (Guardian AD LITEM OF) v. British Columbia Rugby Union*, [1997] 1 S.C.R. 1092, at para. 26:

> It has long been established that, absent an error of law, an appellate court should not interfere with the exercise by a trial judge of his or her discretion in the conduct of a trial.

Appellate courts should defer to the trial judge who is in the best position to decide whether, at the expense of finality, fairness dictates that the trial be reopened. See *Clayton v. British American Securities Ltd.*, [1934] 3 W.W.R. 257 (B.C.C.A.), at p. 295:

> [The trial judge] would of course discourage unwarranted attempts to bring forward new evidence available at the trial to disturb the basis of a judgment delivered or to permit a litigant after discovering the effect of a judgment to re-establish a broken-down case with the aid of further proof.

61        Further, the case law dictates that the trial judge must exercise his discretion to reopen the trial "sparingly and with the greatest care" so that "fraud and abuse of the Court's processes" do not result (see *Clayton, supra*, at p. 295, cited in *Scott*, at pp. 773-74).

62        In this case, the trial judge decided not to exercise his discretion to reopen the trial because neither of the two steps of the test in *Scott, supra*, was met to his satisfaction. First, he found that he could not say that the new evidence, if presented

- 25 -

at trial, would probably have changed the result, only that it may have changed the result. If the trial were to be reopened, Landow's evidence might well not be believed. His credibility would be in issue. Second, the trial judge found that Landow's evidence could have been obtained before trial. Design could have compelled Landow to testify under oath at trial. While this carried some risk, the trial judge viewed it as a trial strategy, a conclusion he was entitled to reach.

63        In my opinion, the Court of Appeal erred in substituting its discretion for that of the trial judge in deciding to reopen the trial. On the first branch of the test set out in *Scott*, the trial judge found that Landow's credibility would be in issue whereas the Court of Appeal found it difficult to see how the trial judge could make this determination without hearing Landow testify. In the Court of Appeal's determination, it was not sufficiently clear that Landow would be disbelieved. I disagree with the Court of Appeal on this point. Landow's affidavit evidence contradicts his sworn evidence on discovery, particularly with respect to the existence of the bribery scheme which Landow avoids acknowledging on discovery. To this significant extent, Landow is akin to a recanting liar. Lord Denning's comments in *Ladd v. Marshall*, [1954] 1 W.L.R. 1489 (C.A.), are applicable:

> It is very rare that application is made to this court for a new trial on the ground that a witness has told a lie. The principles to be applied are the same as those always applied when fresh evidence is sought to be introduced. To justify the reception of fresh evidence or a new trial, three conditions must be fulfilled: first, it must be shown that the evidence could not have been obtained with reasonable diligence for use at the trial; secondly, the evidence must be such that, if given, it would probably have an important influence on the result of the case, though it need not be decisive; thirdly, the evidence must be such as is presumably to be believed, or in other words, it must be apparently credible, though it need not be incontrovertible.
>
> We have to apply those principles to the case where a witness comes and says: "I told a lie but nevertheless I now want to 'tell the truth'". It

- 26 -

> seems to me that the fresh evidence of such a witness will not as a rule
> satisfy the third condition. A confessed liar cannot usually be accepted as
> being credible. To justify the reception of the fresh evidence, some good
> reason must be shown why a lie was told in the first instance, and good
> ground given for thinking the witness will tell the truth on the second
> occasion. [Emphasis added.]

64          These comments, in my opinion, apply with equal force to the present case.

Landow is akin to a "recanting liar" because he failed to tell his "truth" when he had

the opportunity to do so on discovery and again when he declined to testify at trial.

Although the determination in *Ladd* was made under the third branch of the test

applied in that case, a branch that is absent from the two-part test in *Scott*, the

application of the *Scott* test to the situation of a "recanting liar" has the same result in

this case. Evidence which is not presumptively credible may fail to probably change

the result under the first branch of the test in *Scott*. This is how the trial judge dealt

with the affidavit evidence, and in my view he was correct in so doing. Further, it

cannot be ignored that the trial decision imposing liability on Landow and AIM

provided incentive for Landow to attempt to shift some responsibility to Kavana in

order to share the liability of the corresponding damage award. The trial judge had

also seen the evidence of Kavana in the first instance, which he found to be credible

even in the face of a vigorous cross-examination.

65          The court in *Scott* mandated that both branches of the test to reopen a trial

to admit fresh evidence must be met. Having failed to meet the first branch of the test,

it is unnecessary to examine whether the precluded evidence in this case could have

been obtained by the exercise of reasonable diligence. It is sufficient to say that that

too is a matter largely within the discretion of the trial judge and, absent error by him,

that finding should not be interfered with.

- 27 -

V.    Disposition

66         The appeal is allowed with costs.  The order of the Court of Appeal is set aside.  The decisions of Cumming J. are restored.  The order for costs by the Court of Appeal is confirmed.

36P

**SUPREME COURT OF CANADA / COUR SUPRÊME DU CANADA**
Kent & Wellington                          **TELECOPIER TRANSMISSION /**
Ottawa, Ontario K1A 0J1                **TRANSMISSION PAR TÉLÉCOPIEUR**
Fax: (613)947-5033

| Name/Nom | Organization/Organisation | Fax/Télécom |
|---|---|---|
| **Jean Hammell** | **QL Systems Ltd.** | **(613) 238-7597** |
| **Mᵉ Montpetit-Laberge** | **SOQUIJ** | **(514) 844-8984** |
| **Elaine Blake** **Carolyne Terry** | **Butterworths Canada Ltd.** | **(905) 479-2826** |
| **Eric Appleby** | **Maritime Law Book** | **(506) 453-9525** |
| **A. Fulham,** **Judgment Retrieval Clerk** | **Carswell** | **(416) 298-5094** |
| **Barb Rourke** | **Canada Law Book, Editorial** | **(905) 841-5574** |
| **Robin Mackie** | **CCH** | **(416) 224-0729** |
| **Heather Blake** | **Dept. of Justice, Ottawa** | **(613) 952-5792** |
| **S. Bryant Smith** | **Law Post** | **(506) 451-9616** |
| **Hellen Kerr** | **PricewaterhouseCoopers** | **(416) 365-8215** |
| **Lorne O'Connell** | **Qualisult Management Consultants** | **(613) 592-3921** |

**SENDER/EXPÉDITEUR :** __Lee Ann Gorman (613) 992-4429__

**DATE :** __25/10/2001__    NUMBER OF PAGES (including this page) /
                            NOMBRE DE PAGES (incluant cette page)   __2__

*Please call (613) 995-4138 if any problems occur during transmission*
*Veuillez appeler au (613) 995-4138 en cas de problème de transmission*

**REMARKS / REMARQUES:** (French version of the message following the English one)

Please note that paragraph 66 of the English and French versions of Major J.'s reasons in *671122 Ontario Ltd. v. Sagaz Industries Canada Inc.*, 2001 SCC 59 should be changed to the following:

"The appeal is allowed with costs to the appellants in this Court and in the Court of Appeal. The order of the Court of Appeal is set aside. The order of Cumming J., dated December 23, 1998 is restored."

"Le pourvoi est accueilli avec dépens en faveur des appelants en notre Cour et en Cour d'appel. L'ordonnance de la Cour d'appel est annulée. L'ordonnance du juge Cumming datée du 23 décembre 1998 est rétablie."

---

Veuillez prendre note que le par. 66 des versions française et anglaise des motifs de jugement du juge Major dans *671122 Ontario Ltd. c. Sagaz Industries Canada Inc.*, 2001 CSC 59, est remplacé par ce qui suit :

"Le pourvoi est accueilli avec dépens en faveur des appelants en notre Cour et en Cour d'appel. L'ordonnance de la Cour d'appel est annulée. L'ordonnance du juge Cumming datée du 23 décembre 1998 est rétablie."

"The appeal is allowed with costs to the appellants in this Court and in the Court of Appeal. The order of the Court of Appeal is set aside. The order of Cumming J., dated December 23, 1998 is restored."

# TAB 10

**COURT FILE NO.:** D9381/98

## ONTARIO

### SUPERIOR COURT OF JUSTICE

| | | |
|---|---|---|
| **B E T W E E N:** | ) | |
| | ) | |
| DEREK A. SCHMUCK | ) | *Deborah L. Ditchfield* |
| | ) | for the Petitioner (Husband) |
| | ) | |
| Petitioner (Husband) | ) | |
| | ) | |
| - and - | ) | |
| | ) | |
| | ) | |
| PATRICIA REYNOLDS-SCHMUCK | ) | *Catherine A. Haber* |
| | ) | for the Respondent (Wife) |
| | ) | |
| | ) | |
| Respondent (Wife) | ) | |
| | ) | |
| | ) | **HEARD:** May 26, 27, 28, & |
| | ) | June 4, 1999 |

**HIMEL J.**

# R E A S O N S

[1]      On August 12, 1999, I released Reasons for Judgment following a four day trial on two issues, the wife's entitlement to support including quantum, duration and retroactivity and whether child support should be retroactive to April 29, 1998.

[2]      As agreed, the parties have made written submissions to me on the question of costs.

[3]      A second issue has arisen at the instance of the Petitioner who seeks both a clarification and a review of certain matters arising from the judgment.

[4]     I deal first with my decision on costs and second with the request for clarification and reconsideration.

## 1.    COSTS:

[5]     Both parties have made submissions that they are entitled to costs following trial. The issue of costs of an interim motion before Kent J. was also reserved to the trial judge.

[6]     The Petitioner husband submits that he should be awarded costs on a party and party basis. Although neither party made an offer of settlement within the meaning of Rule 49 and obtained a better result at trial, he argues that the results of the motions and trial are closer to his offer than the wife's offers of settlement.

[7]     He also cites the factors in Rule 57.01 and submits that the wife's conduct lengthened unnecessarily the duration of the action by altering her position on the issue of equalization and disputing the value of the law partnership interest of the husband, by claiming excessive spousal support and by initially claiming sole custody. He argues that the results at trial were far below what the wife claimed in her counter-petition and that the court ordered a review in three years which is partial success for the husband.

[8]     In the written submissions filed, the husband does not ask the court to fix costs.

[9]     The Respondent wife submits that she should be awarded costs of this action on a party and party basis. She refers to offers to settle by her which she says were not unreasonable and that aspects of them included offers which were greater than what she was awarded at trial. She argues that her offers were closer to the order made than were the offers made by the husband and that, on balance, she was the more successful party. She also cites the factors under Rule 57 for consideration, namely, that the husband was unreasonable in his position on time-limited support, that the husband paid inadequate support following separation requiring the wife to

3

bring an interim motion and that he made misleading statements at the motion about his income, the amount of time the children were with him, the payment of certain debts and credits that he sought for certain payments. She argues that he should be held to a higher standard because of his experience as a family law practitioner. She finally submits that her overall success on the issue of time-limited support and retroactive support as well as the respective financial abilities of the parties should be considered.

[10]    I have considered the written submissions of the parties including the correspondence and case law enclosed. Section 131 of the <u>Courts of Justice Act</u> provides that costs may be awarded in the discretion of the court and Rule 57.01 sets out a list of factors that may be considered by the trial judge in deciding who should be awarded costs, on what scale and in what amount. Those factors relevant to family law proceedings include the results in the proceeding, whether offers to settle were made in writing, the amount claimed and recovered, the complexity of the matters, the importance of the issues, conduct which tended to shorten or lengthen the proceeding, whether steps were improper or unnecessary and whether the party refused to admit something which should have been admitted.

[11]    In family law matters, the same approach is used as in other litigation. Costs usually follow the event. However, other factors may also be relevant. In a case with many diverse issues, success is often divided. Success is, therefore, only one factor. The conduct of the parties prior to litigation, during litigation and the income and assets of each party which affect their ability to bear their own or the other party's costs are all the factors recognized as relevant to the costs determination: <u>Andrews</u> v. <u>Andrews</u>, (1980), 120 D.L.R. (3d) 252 (Ont.C.A.). Unlike other civil litigation, in family cases, the ability to pay a costs order or the effect of a costs award is taken into account as part of the financial arrangement on judgment.

4

[12]     The court will consider whether a family law claimant has made a reasonable settlement offer. Rule 49 costs consequences can apply but rarely are offers made in a formal way or within the proper time frame. On interim proceedings, in order to promote settlement, the judge is to take written proposals for settlement into account (Rule 69.15(5)).

[13]     In the circumstances of this case, I consider the following factors to be relevant:

(1)     There was divided success following trial. The amount of spousal support was reduced from the interim order. The award of retroactive support and on a non-time limited basis was in favour of the wife. On balance, the wife was the more successful party;

(2)     Offers to settle were made in writing by both parties but neither were offers within the meaning of Rule 49. Aspects of the offers of each party were higher than the order; other aspects were lower. Overall, I find the wife to have been more reasonable in her proposals for settlement;

(3)     The amount of spousal support claimed was less than what was ordered. However, retroactive support and non-time limited support was also awarded;

(4)     The matters in issue at trial were not complex, were not novel and were not of public interest;

(5)     The conduct of the parties' prolonged resolution. The husband did not pay adequate interim support and the wife was required to bring a motion. The wife was endeavouring to settle just prior to trial and once the trial began, the husband's position was even less reasonable;

(6)     The husband's assets and income base is such that he is better able to withstand an award of costs against him and bear his own costs.

[14]    Accordingly, I exercise my discretion and direct that the husband shall pay the costs of the wife for the interim motion and at trial on a party and party scale following assessment.

## 2.    THE REQUEST BY THE HUSBAND FOR CLARIFICATION AND REVIEW:

[15]    In addition to making written submissions on costs, counsel for the husband requested clarification and a review of certain issues addressed in the Reasons for Judgment.  Counsel for the wife responded with the position that it would be inappropriate for counsel to make any further submissions to the court, and inappropriate for me to revise my Reasons for Judgment.  She also requested an opportunity to respond if I chose to consider the questions raised.  Since I am in agreement that it would be inappropriate for me to consider the questions raised, any further submissions are unnecessary.

[16]    At this point, a judgment has been rendered but it has not been formally entered.  The case law is clear that until that time, a trial judge is not yet functus.  The case law also recognizes that a trial judge has a wide discretion to permit the re-opening of a case prior to the entering of the judgment: See Castlerigg Investments Inc. v. Lam & Lam Skincare Products Ltd. (1991) 2 O.R. (3d) 216 (Gen.Div.).  Therefore, it is open to me to exercise my discretion and re-open the case for a reconsideration of certain issues.

[17]    In reviewing the questions posed, I have concluded that three questions are requests for clarification of my order.  In my opinion these three questions are all answered by the Reasons for Judgment.  However, in the interests of ensuring that all parties understand the Reasons for Judgment, I have briefly highlighted relevant portions of my Reasons.

[18]    Question 1 asks whether the Petitioner husband was given all the credit to which he is entitled for direct payments made to the wife after separation when the amount of retroactive support owed was calculated.  I would direct counsel's attention to paragraph 61 of the Reasons

for Judgment where the husband has been credited $4500 of direct payments to be applied against his retroactive support obligation. This amount reflects the entire amount of credit to which I have determined Mr. Schmuck is entitled.

[19]    Question 4 asks for a breakdown of the retroactive support amount in terms of the spousal and child support. Again, I would direct counsel's attention to paragraph 60 of my Reasons for Judgment where the amount of retroactive child support owing is specified.

[20]    The Reasons for Judgment provide for the right to a review of the order for spousal support in three years. Such a review clearly does not preclude either party making an application for a review based on a material change in circumstances at an earlier time. The three year review may be with respect to both the quantum and entitlement to support.

[21]    Questions 2 and 3 are requests for reconsideration of the determinations made on the issue of the amount of credit due to the husband for direct payments made to the wife to offset the amount of retroactive support due and the basis of the calculations for the support credit. I would note that these questions do not amount to a request to consider any new evidence on these issues. They simply ask for a reconsideration of the issues based on evidence already considered by the court.

[22]    Castlerigg Investments is often cited for the rule that a trial judge has untrammelled discretion to prevent abuse, the fundamental consideration being that a miscarriage of justice does not occur. The appropriate exercise of a trial judge's discretion is most often considered in the context of requests to re-open a trial in order to present new evidence: See Qit Fer et Titane Inc. v. Upper Lakes Shipping Ltd. (1991), 3 O.R. (3d) 165 (Gen.Div.); Smith v. Canadian Tire [1994] O.J. No.2843 (Gen. Div.); 671122 Ontario Ltd. v. Sagaz Industries Canada Inc. [1998]

O.J. 4018 (Gen.Div.).  It is extremely rare for there to be a request to re-open a trial on the grounds of a reconsideration of the case.

[23]    In Kent v. Frolick [1996] O.J. No.1899 and Grant v. Grant [1994] O.J. No.1784, the court was faced with a party requesting a reconsideration of the case.  In Grant, one party wanted a reconsideration of the amount of spousal support awarded.  In Kent, the moving party asked for a reconsideration of the child support award, arguing that the evidence on the quantum of support was not fully understood by the court, and not fully canvassed at trial.  In both cases, the court accepted that there was an untrammelled discretion to prevent a miscarriage of justice, but found that there was no justification to reconsider the case.

[24]    In Degroote v. Canadian Imperial Bank of Commerce [1998] O.J. No.1696 (Gen.Div.) at paragraph 6, Lax J. explains the policy concerns in an application to re-open a trial: "The issue with which the cases have concerned themselves is how to balance the need to ascertain the truth upon full disclosure of all material facts with the need to preserve the integrity of the litigation process and prevent an abuse of its process.  Both needs are directed at ensuring that justice is achieved."

[25]    It is my view that a party who wishes a reconsideration alone would have to establish that the integrity of the litigation process is at risk unless it occurs, or that there is some principle of justice at stake that would override the value of finality in litigation, or that some miscarriage of justice would occur if such a reconsideration did not take place.  No such reasons exist in this case.  The questions raised by counsel may be the subject of appeal.  As such, I decline to exercise my discretion to reconsider any of the issues raised by the husband.

HIMEL J.

February 1, 2000

**COURT FILE NO.: D9381/98**
**DATE:** 19990812

# ONTARIO

# SUPERIOR COURT OF JUSTICE

**B E T W E E N:**

DEREK A. SCHMUCK

>*Deborah L. Ditchfield*
>for the Petitioner (Husband)

−   **and −**

PATRICIA REYNOLDS-SCHMUCK

>*Catherine A. Haber*
>For the Respondent (Wife)

---

**REASONS**

---

HIMEL, J.

**Released:**    February 1, 2000

# TAB 11

Date: 20010503
Docket: CA 161519

## NOVA SCOTIA COURT OF APPEAL
### [Cite as: Griffin v. Corcoran, 2001 NSCA 73]

### Glube, C.J.N.S.; Roscoe and Cromwell, JJ.A.

**BETWEEN:**

ANGUS CORCORAN

Appellant
Respondent by cross-appeal

- and -

LAWRENCE GRIFFIN, JOYCE GRIFFIN and
1839894 NOVA SCOTIA LIMITED

Respondents
Appellants by cross-appeal

---

## REASONS FOR JUDGMENT

---

| | |
|---|---|
| Counsel: | David J. Bright, Q.C. for the appellant<br>Kevin A. MacDonald for the respondents |
| Appeal Heard: | April 3, 2001 |
| Judgment Delivered: | May 3, 2001 |
| **THE COURT:** | Appeal dismissed in relation to corporate veil issue; leave to appeal granted with respect to costs issue and appeal allowed with costs; cross-appeal dismissed with costs per reasons for judgment of Cromwell, J.A.; Glube, C.J.N.S. and Roscoe, J.A. concurring. |

01 242 014

**CROMWELL, J.A.:**

## I.    Introduction:

[1]    Lawrence Griffin, his wife Joyce and 1839894 Nova Scotia Limited (the plaintiffs) sued Angus Corcoran (the defendant) for the return of funds they alleged he had misappropriated while employed as the bookkeeper for the Griffin family business.  Mr. Corcoran denied the misappropriation and counterclaimed for unjust dismissal and defamation.

[2]    After an eleven day trial, Hood, J.: (a) found the plaintiffs had not proved any misappropriation of funds by Mr. Corcoran and dismissed their action; (b) held that Mr. Corcoran had been dismissed without cause or notice and allowed his counterclaim against the numbered company for wrongful dismissal; (c) determined that Mr. Corcoran failed to prove that he had been defamed by the plaintiffs and dismissed his counterclaim in defamation; (d) ordered that Mr. Corcoran recover $35,000 as a gross sum in lieu of taxed costs (plus $4680 for discoveries held in May of 1992) and that these costs should be recoverable only from the corporate plaintiff.

[3]    Mr. Corcoran appeals the judge's decision that his damages for wrongful dismissal and his costs should only be recoverable against the corporate plaintiff. The plaintiffs cross-appeal, challenging the judge's dismissal of their misappropriation claim and her decision finding them liable for wrongful dismissal.

## II.    Overview of the Facts and Decision of the Trial Judge:

[4]    In late 1982, Mr. Griffin and his son, Garfield, started a small engine sales, parts and service business in Kentville.  Mrs. Griffin also helped in the business which, at first, was operated as an unincorporated proprietorship.  In 1988, Griffin Sales and Service Limited was incorporated and acquired the assets of the business. In late 1989, the name of the corporation was changed to 1839894 Nova Scotia Limited and in February or March of the following year, the assets were sold to John and Catherine Turner who continued to operate the business under the name Griffin Sales and Service (1989) Limited.

[5]    Mr. Griffin had a heart attack in late 1983 which required that he take some time away from the business. Mr. Corcoran was hired as a part time bookkeeper in

early 1984. This became a permanent part time job on Mr. Griffin's return to work several weeks later.

[6]     In the fall of 1989, Mrs. Griffin became suspicious that Mr. Corcoran was stealing money from the business. The Griffins approached the Kentville Police. After an investigation, Mr. Corcoran was charged with theft on October 4, 1989. It is common ground that he was dismissed from his employment as of that day. Mr. and Mrs. Griffin commenced their civil claim for misappropriation in June of 1990. The criminal charges against Mr. Corcoran were stayed in December of 1991. Thereafter, Mr. Corcoran counterclaimed in the civil misappropriation action for wrongful dismissal and defamation. The civil action did not come to trial until February of 1998.

[7]     The plaintiffs' main allegation against Mr. Corcoran was that he received cheques in the mail as payments on account, placed some of these cheques in the till without ringing them in on the cash register and removed the equivalent amount of cash from the till. They claimed he would later adjust the amount of cash sales downward but record the amount of the payment in the accounts receivable ledger so that the customers' charge accounts would be accurate.

[8]     The evidence offered by the Griffins of the alleged misappropriation consisted of three main elements: the Griffins' observations of Mr. Corcoran in the few days prior to his arrest, the fact that he was found in possession of a $100 bill from the till at the time of his arrest and the report and testimony of Peter Brown, a forensic accountant retained by the Griffins who alleged over one hundred incidents of misappropriation totaling some $14,000.

[9]     Mr. Corcoran denied any misappropriation and, in his counterclaim, alleged that he had been wrongly dismissed and that Mr. and Mrs. Griffin had defamed him by calling him a thief.

[10]     At trial, the Griffins' misappropriation action was dismissed. The judge, after an extensive review of the evidence occupying some 40 pages of her written reasons, concluded that she was "... not satisfied that there is the strong evidence required to satisfy me that Angus Corcoran misappropriated funds." She listed 23 points that led her to this conclusion. She then found that she could give little

weight to the evidence of Mr. Brown and listed six (6) points in support of that finding.

[11]    With respect to Mr. Corcoran's claim for wrongful dismissal, the trial judge found that the unproved allegations of misappropriation did not constitute cause and that the plaintiffs, having not filed a defence to the claim, could not rely at trial on other reasons for dismissal not previously pleaded.  She found, alternatively, that neither insubordination nor incompetence was established.

[12]    The trial judge found that seven (7) months was the appropriate period of notice and declined to award aggravated, punitive or exemplary damages.  She did, however, award $10,000 for mental distress.

[13]    Mr. Corcoran's claim in defamation was dismissed.  The judge found that it had not been proved that either of the Griffins had slandered Mr. Corcoran.

[14]    The bulk of the time at trial was occupied by evidence relating to the plaintiffs' allegations of misappropriation against Mr. Corcoran.  Counsel estimate (and their estimate is consistent with my review of the record) that the misappropriation claim occupied all except between 1 and 3 hours of the 11 days of trial.

[15]    In her reasons for decision, the judge invited further written submissions concerning costs.  The parties provided them and, in addition, asked that the trial be reopened so that two other issues could be considered.  Mr. Corcoran asked that the "corporate veil" be pierced so that all the plaintiffs would be responsible to pay the wrongful dismissal award. The plaintiffs sought to adduce "new" documentary evidence including deposit slips, purchase orders, invoices and bank statements for the period prior to Mr. Corcoran's dismissal.

[16]    In further written reasons, the judge refused to reopen the trial to consider either the "corporate veil" issue or the plaintiffs' new evidence.  She clarified her earlier decision by stating that, as the corporation was clearly the employer, the damages for unjust dismissal were against the corporate plaintiff only.  As noted earlier, she awarded Mr. Corcoran a fixed sum in lieu of costs of $35,000 plus $4680 for discovery costs thrown away as a result of the plaintiffs' abandonment of part of their claim.

[17]   A dispute about the contents of the formal order then arose between the parties. The plaintiffs' view was that only the corporate plaintiff should be responsible for the costs awarded to Mr. Corcoran. The judge agreed.

## III.  Analysis:

[18]   As some of the issues on the appeal and cross-appeal are inter-related, I have found it helpful to consider the case under three main headings: 1. the dismissal of the misappropriation action; 2. the refusal to reopen the trial; and, 3.  costs.

    1.  Dismissal of the Misappropriation Action:

[19]   The plaintiffs' cross-appeal challenges the judge's dismissal of the misappropriation action.  The notice of cross-appeal lists 10 grounds of appeal.  In their factum, one of these (number 10) is abandoned and the remaining grounds are distilled into the following 6 issues:

> 1. Did the Learned Justice err in interpreting or misapplying the law as it relates to the burden of proof required to prove fraud/conversion?;

> 2. Did the Learned Justice err in law by misappreciating the evidence in its totality and by making findings of credibility unsupported by the evidence?;

> 3. Did the Learned Justice err in law by failing to make findings of credibility on pivotal mutually exclusive evidence, thereby causing her to misdirect herself in determining whether or not the Griffins & Company (sic) had met the burden of proof?;

> 4. Did the Learned Justice err in law in ruling on the admissibility of various documentary and *viva voce* evidence, thereby limiting the record available to her for review?;

> 5. Did the Learned Justice err in law in failing to consider evidence presented by the Griffins & Company (sic) after trial but before the Final Order was taken out?;

> 6. Did the Learned Justice err in law in finding that the Plaintiffs were not entitled to rely upon the Defence of justification in the context of the counter-claim for wrongful dismissal and that same had been made out?

[20]   In my view, these grounds are best considered under three headings: (a) findings of fact and credibility; (b) evidentiary rulings; and (c) the justification defence to the wrongful dismissal action.

(a) findings of fact and credibility:

[21]   I will consider the first four grounds together as they all challenge the judge's handling of the evidence. Although the first ground appears to relate to the judge's legal findings in relation to the burden of proof, the plaintiffs do not take issue with the judge's statements of the law on this subject. Instead, the argument in relation to this ground is that, had the judge made appropriate findings of fact, the evidence would have satisfied the burden of proof as described by the trial judge. The first four grounds of appeal may, therefore, be summarized as a submission that the trial judge erred in making certain factual findings, in failing to take account of certain relevant evidence and in failing to make essential findings of credibility.

[22]   The limited scope of appellate review of findings of fact at trial has been described many times. In **Mitsui & Co. (Point Aconi) Ltd. v. Jones Power Co., Ltd. et al.**, 2000 NSCA 95 (leave to appeal to S.C.C. denied April 19, 2001), the Court put it this way at § 39:

> [39]   Appellate courts must treat a trial judge's findings of fact with great deference: **Schwartz v. Canada**, [1996] 1 S.C.R. 254 at 278. Appellate intervention with regard to findings of fact may be justified only if there is a palpable or overriding error: **Toneguzzo-Norvell (Guardian *ad Litem* of) v. Burnaby Hospital**, [1994] 1 S.C.R. 114 at 121. The trial judge's failure to advert to conclusive or relevant evidence may justify appellate review (**Toneguzzo** at 121). However, and this is important for this case, appellate review of findings of fact at trial is not justified simply because a trial judge has omitted reference to some of the relevant evidence in the reasons for judgment. Before the judge's findings should be interfered with, "... <u>an appellate court must come to the conclusion that the evidence in question and the error by the trial judge in disregarding the evidence were overriding and determinative in the assessment of the balance of probabilities with respect to the factual issue.</u>": **MacPhail v. Desrosiers** (1998), 170 N.S.R. (2d) 145 (N.S.C.A.) at § 23 (emphasis added).

[23]   Many individual points are raised in the plaintiffs' cross appeal factum. Several merit summary rejection. These include the attack on the judge's finding

respecting the animosity between Mrs. Griffin and Mr. Corcoran, the judge's reliance on the small increase in the profit margin during the period of the alleged defalcations as being inconsistent with misappropriation during that period, the fact that other bills alleged to be missing were not found in Mr. Corcoran's possession and her acceptance that the evidence was consistent with Mr. Corcoran's testimony that the pink and white copies of the WHIZ slips served no accounting purpose and were discarded. In my view, the trial judge was not clearly wrong on any of these points.

[24]   Several other findings are challenged primarily on the basis of the "new" evidence which the trial judge refused to accept. I will address these submissions when I turn to consider whether the trial judge erred in refusing to reopen the trial. I have concluded that the judge did not err in refusing to reopen the trial. I would, accordingly, reject all of the submissions which challenge her findings at trial on the basis of evidence which the plaintiffs sought to tender after trial.

[25]   The primary focus of the plaintiffs' argument on the cross-appeal is that the judge failed to consider or give adequate weight to three important matters: (1) the pattern of incidents revealed in the evidence which, they say, may only be explained by Mr. Corcoran's misappropriations; (2) the evidence of the Griffins concerning Mr. Corcoran's actions on the days just prior to his arrest; and, (3) the fact that he was found in possession of a $100 bill taken from the till for which no IOU or receipt had been submitted.

(i)   the pattern

[26]   I turn first to the evidence of the pattern of activities which the plaintiffs submit amounted to "a print" left by Mr. Corcoran evidencing fraud. The pattern is said to consist of cheques being placed in the cash register without the appropriate received on account slip and without being rung in on the cash register tape coupled with what the plaintiffs refer to as Mr. Corcoran's "manipulation" of the books to balance to cash deposited instead of cash received.

[27]   This "pattern" was central to the conclusions of Mr. Brown, the plaintiffs' forensic accountant. Referring to the period April 1, 1988 to September 30, 1989, Mr. Brown stated as follows in his report:

We did note, during the course of our testing, that the pattern of record keeping
was not consistent throughout the period tested. As an example, we note that
during the initial period under investigation, the balance on the daily cash register
tape for "Received on Account" would differ from the amount recorded in the
books by an amount equal to the sales slip. This would ensure the general ledger
account remained in balance with the accounts receivable subledger. For the
summer months of 1988 and 1989, however, this pattern changed and the tape
was not altered on a daily basis. Instead, the subledger was kept in balance by
posting an entry to artificially balance the subledger with the general ledger
account. We believe this inconsistency in record keeping happened because the
Griffin's daughter, Christine, helped keep the books during the summer months
and as a result, Mr. Corcoran had to change his methods to continue to conceal the
misappropriation.

We believe this pattern in the records-keeping, accompanied by the systematic
changes in the balance "Received on Account", provide conclusive evidence that
Mr. Corcoran was responsible for the theft of the missing money.

**Conclusion**

We believe our testing results in conclusive evidence that Mr. Corcoran is
responsible for the theft of at least $14,275.22 from Griffin's Sales and Service
over the period April 1, 1988 to September 30, 1989.
(emphasis added)

[28]    It may be helpful to briefly review one of the sample transactions about
which Mr. Brown testified in order to understand the evidence of the alleged
pattern.

[29]    Mr. Brown alleged a theft by Mr. Corcoran on April 15, 1988 of $260.30. In
his testimony, he reviewed the documentation which led him to this conclusion.
There was a slip dated April 15, 1988, recording a payment on account by cheque
in the amount of $260.30 from Cornwallis Trucking. He noted from his
examination of the cash register slips that there is no cheque in that amount rung in
on the cash register on that day or the four days before or after. He noted that the
cash register tape for that day has been manually altered so that the amount of the
received on account was increased by $260.30. He referred to a deposit slip dated
April 19, 1988, showing that a cheque for $260.30 from Cornwallis Trucking had
been deposited on that date. By reference to the "cash scribbler" ( a record
maintained by Mrs. Griffin), he confirmed that, taking into account the float which

varied somewhat but was usually around $200, the cash nearly balanced for April 15.

[30]  Mr. Brown testified that the cash should have been over by $260.30 for April 15 because a cheque in that amount had been received but not reflected on the cash register tape.  As Mr. Brown put it in his evidence, "... that pattern repeated itself time and time again."  The linchpin of the pattern is that although a cheque is not recorded on the tape, the cash count for the day balances to the cash register tape. One would expect that if a cheque that is in the cash count is not on the tape, the cash would exceed the amount on the tape by the amount of the cheque.

[31]  However, it was on this aspect which the plaintiffs' case clearly broke down at trial.

[32]  The cross-examination of Mr. Brown, documentary evidence produced by the plaintiffs during the trial and the evidence of the defendant's expert, Ms. Andrews, showed that there were significant problems with Mr. Brown's analysis.  The judge noted several of them in her reasons at § 143, including:

> 1. The cash scribbler did not balance with the cash register tape.  In some cases, there were shortages and, in others, overages.
>
> ....
>
> 4. Paid outs and returns were not rung in on the cash register and were therefore not on the cash register tape.
>
> 5. Paid out receipts were not always put in the till on the same day the petty cash was taken out.  This is apparent from a comparison of the amounts shown as P.O. (paid out) in the cash scribbler and the receipts in Exhibit 39.
>
> 6. The amounts shown in the cash scribbler, the Brown report and Exhibit 40 as paid outs for the months of January, July and August 1989 are not the same.
>
> 7. Lawrence Griffin testified that petty cash was used primarily for gas and the bus.  The receipts in Exhibit 39 show that this is not the case.
>
> 8. The cash scribbler does not include all paid outs and returns.

9. Less cash than that shown in the cash scribbler was deposited to the bank in the period from November 1988 to August 1989: $750,285.78, apparently received in cash, versus $728, 561.00 deposited to the bank.

10. The cash scribbler for January, July and August 1989 does not include all the paid outs and returns shown in Exhibit 40.

11. When returns were made, the date of the return was not noted, but the original slip merely had a note put on it of the return.

...

20. The business received post-dated cheques which may have been put in the till and counted before the appropriate date and before the RA was rung in.

...

23. The overages during the relevant period total $21,288.17. Peter Brown says that these do not relate to the missing money. I am not satisfied that this is so.

[33]    As noted earlier, the trial judge found that she could "... give little weight to the Brown report ..." . In addition to the points noted above, she set out several reasons for that conclusion. It is instructive to review these reasons briefly. While the judge listed them as six points, there are three main ones: the inaccuracy of the cash scribbler, the fact that not all cash received was deposited by the Griffins and the inadequacy of Mr. Brown's four day test.

[34]    The trial judge first noted that Mr. Brown relied on the accuracy of what was referred to in evidence as a "cash scribbler" maintained by Mrs. Griffin.  It is apparent from Mr. Brown's report and from his oral evidence at trial that this document was central to his conclusions.  Mr. Brown made it clear that Mrs. Griffin's cash scribbler was "a fairly key document from my perspective" and that the absence of such a record was why he excluded the period prior to Mrs. Griffin beginning to maintain the scribbler in this form in April of 1988.  He agreed that the accuracy of Schedule 2 to his report which summarized cash overages from April of 1988 to September of 1989 depended on the accuracy of Mrs. Griffin's cash scribbler and his interpretation of it.  In particular, he noted that he had assumed the accuracy of the scribbler in relation to petty cash and returns.

[35]   As noted, it was central to Mr. Brown's theory that there should have been cash overages, but that there were not. If, contrary to Mr. Brown's conclusions, there were, in fact, overages, not only the details, but the very foundation of Mr. Brown's analysis and his evidence of the "pattern" on which he relied would be thrown into serious question.

[36]   Mrs. Griffin's cash scribbler was shown at trial to be inaccurate and incomplete. Specifically, as the trial judge noted, it was shown not to record all the petty cash and returns evidenced by other documentation produced by the plaintiffs during the course of the trial. It was open to the trial judge, in light of this evidence, to accept the opinion of the defendant's expert, Ms. Andrews, that she would have no confidence in the accuracy of the cash scribbler or in the accuracy of Mr. Brown's Schedule 2 which was based on it. In other words, the inaccuracy of the scribbler coupled with Mr. Brown's reliance on it could reasonably have been taken as going to the heart of whether there was a pattern of the cash balancing when, in fact, there ought to have been an overage in the amount of a cheque received but not recorded on the cash register tape.

[37]   The judge was also entitled to consider it significant that while Mr. Brown in his report alleged theft of some $14,000 during the period April 1988 to September 1989, his report and the evidence at trial showed that there were, in fact, cash overages in roughly the same amount during the same period. This, of course, was not only inconsistent with the pattern he relied on, but cast doubt about whether any money was missing.

[38]   The second point relied on by the trial judge related to the fact that not all cash received as accounted for in Mrs. Griffin's cash scribbler was deposited by the Griffins. Mr. Brown, in reaching his conclusion that there had been misappropriations, relied in part on the fact that Mr. Corcoran was reducing the figures for sales so the books would balance. However, it appeared in the evidence that during the relevant period some $21,000 which was recorded in Mrs. Griffin's cash scribbler was not deposited in the bank. The Griffins had no explanation for this. Mr. Brown agreed in his cross-examination that it would be important to confirm that all the cash the owners received was deposited so that there could be no reasonable explanation for why the sales would be understated. It was open to the judge to conclude that this discrepancy provided an explanation for Mr.

Corcoran's adjustment of sales to match deposits or at least tended to negate an inference of dishonesty from his balancing of the figures in this way.

[39]  Mr. Brown recognized that the "pattern" on which he relied would not evidence misappropriation if the unrecorded cheques were, in fact, recorded on other tapes made on other days. For example, a post-dated cheque could be recorded on the date received but not deposited until its pay date. The judge also found that Mr. Brown's use of the so-called four day test was not appropriate in this case. It was open to her to accept Ms. Andrews' evidence to this effect at trial, especially in light of the significant evidence that there were overages equal to or greater than the amount of the alleged theft during the relevant period and to the timing of other transactions that would not be caught by the four day analysis. The trial judge stated at § 136 of her reasons:

> [136] The most significant comment made by Ms. Andrews in the report and in her testimony is that she believes that the explanation for the overages given in the Deloitte & Touche report is "insufficient." She concludes that in the face of these overages that further testing should have been done to ensure that the missing money was not related to the overages.

[40]  In my respectful view, the plaintiffs' submission that the trial judge failed to consider or give weight to the pattern of incidents has no merit. It was open to the judge on this record to give little or no weight to the evidence of Mr. Brown, who propounded this "pattern" theory. Once it was clear that the evidence did not support the conclusion that there were no overages when they ought to have occurred, the pattern theory could reasonably have been viewed as losing its persuasive value. The judge obviously reached this conclusion and accorded little weight to Mr. Brown's evidence for reasons which she states in detail. In this she made no error.

(ii) Mr. Corcoran's actions in the days before his arrest

[41]   I turn next to the plaintiffs' submissions that the trial judge erred in failing to give adequate weight and make clear findings in relation to the evidence of Mr. Corcoran's actions on the days just prior to his arrest.

[42]   The judge, in her reasons, reviewed the substance of the evidence relating to the Griffins' observations of Mr. Corcoran on the days just before his arrest, noting

that arguably significant details appeared in trial testimony that were lacking in police statements, even though the latter were intended to contain everything important. While I accept the plaintiffs' argument that the judge did not repeat every detail of this evidence or specifically reject it, that does not constitute reversible error. The question is whether this evidence is of overriding or determinative significance to the assessment of the factual issue in question. Having reviewed the record and, in particular, the cross-examination of both Mr. and Mrs. Griffin on these matters, I find the judge's omission does not come close to reaching the level of significance required for appellate intervention.

### (iii) The $100 bill

[43]   The trial judge summarized Mr. Corcoran's evidence relating to his possession of the $100 bill, in part, as follows:

> ¶ 46    Angus Corcoran testified that on October 2, 1989 he took a 100 dollar bill from the till to buy an accounting ledger book. He said that he did not get to the stationery store on that day and took the bill home with him. He testified that he did not work on October 3, 1989 and that he does not believe that he was in Kentville that day. He said that on October 4, 1989 he went to Valley Stationers after he had coffee at Tim Hortons, which is very close to Valley Stationers. When he got to Valley Stationers, he testified that he could not make up his mind about which ledger to get because he wanted the sheets he already had to fit it. He said he then decided that rather than buying one and having to return it he would come back the next day. He said that he then made a small purchase out of his own money and went back to Griffin's. Angus Corcoran admitted on cross-examination that he could have done things differently on October 4, for example, by telephoning Valley Stationers first but that he went in to browse and pick up things he needed.

[44]   The judge specifically accepted his evidence about his reasons for not using purchase orders and for attending at the stationery store rather than telephoning in the orders. She noted that on the day of his arrest Mr. Corcoran had, in fact, attended at the stationery store and readily produced the bill to the police when asked. The trial judge did not err by failing to draw an adverse inference from Mr. Corcoran's refusal to make a statement while in police custody or after he was charged with a criminal offence. I can find no reversible error in the trial judge's conclusions in relation to this evidence.

[45]   Counsel for the plaintiffs submits that this case was, in essence, a credibility contest between the Griffins and Mr. Corcoran. I do not think, with respect, that this is either a fair or accurate characterization. While there were differences in the evidence of the respective parties, some of which the trial judge specifically addressed, the essence of the case was whether Mr. Corcoran had stolen money, as alleged in the pleadings, between April of 1988 and September of 1989. As Mrs. Griffin herself conceded during her testimony, the Griffins had no independent knowledge of any misappropriation during this period apart from their accounting evidence, in other words, Mr. Brown. The trial judge's rejection of Mr. Brown's evidence was amply justified on this record. With that rejection, the case as pleaded by the plaintiffs in their statement of claim dissolved.

[46]   The plaintiffs submit that at the least Mr. Corcoran should have been found to have misappropriated money in October based on the Griffins' observations and the police evidence. For reasons I have already set out, I do not think the judge erred in failing to be convinced by this evidence.

(b) Evidentiary rulings:

[47]   The plaintiffs, in their factum, take issue with three evidentiary rulings made by the trial judge. In my respectful view, the judge did not err in refusing to admit character evidence about the Griffins in the course of a hearing of the preliminary issue about their standing to sue for the misappropriated funds. In any event, other similar evidence was admitted through other witnesses during the course of the trial. The judge did not err in refusing to admit the Crown sheet or the DeZeeuw report as evidence of the truth of their contents. No proper basis was advanced for the admission of this evidence.

(c) Justification defence to the wrongful dismissal action:

[48]   It is submitted that the judge erred in holding that the plaintiffs were precluded from relying on incompetence and insubordination as justifications for dismissal. These issues were not pleaded and were addressed only tangentially in the evidence at trial. The trial judge did not err, in my respectful view, in holding that these matters were not properly before her.

2.  Reopening the trial:

[49]   As noted earlier, after the trial judge had delivered her written reasons, she invited submissions on costs.  In addition to making those submissions, both the plaintiffs and Mr. Corcoran asked the judge to reopen aspects of her decision.  The plaintiffs asked that she receive new evidence and Mr. Corcoran asked that she "pierce the corporate veil" so that the wrongful dismissal damages would be against the Griffins individually as well as their company.

[50]   The judge held that she had jurisdiction to do these things under **Rule 15.07**. That aspect of her ruling is not challenged.

[51]   The judge declined to reopen the matter to deal with the issue of the corporate veil or to consider new evidence.  She held that the issue of the corporate veil had not been raised at trial, although it could have been, and, therefore, was not a matter which "should have been but was not adjudicated upon" within the meaning of **Rule 15.07**.  As for the "new" evidence, the judge concluded that "... this was evidence that was or could have been available at trial and was not brought forward..." and for that reason was not a matter that should have been adjudicated upon.

(a)  Reopening for the plaintiffs' "new" evidence

[52]   The application by the plaintiffs to present "new" evidence after the trial and written decision was accompanied by an affidavit of the plaintiffs' lawyer sworn on February 6, 1999, some two months after the date of the trial judge's written reasons.  In relation to the "discovery" of this "new" evidence, the affidavit states as follows:

> 3. Subsequent to the decision on liability herein and in preparation for our Brief on Costs, I met with Laurence (sic) and Joyce Griffin on February 4, 1999.  At that time they advised me and I did verily believe that since receipt of the decision herein on liability, they have conducted a further extensive and extremely time consuming search of most of the records of the company and have found fresh evidence that was not available at the time of the trial, which they believe is relevant to the issues of liability and/or costs.

[53]    The evidence consisted of documentation under the control of the plaintiffs which they had an obligation to produce as part of the discovery process. The reception of this evidence would have necessitated the reopening of the trial, which had lasted 11 days, for the purpose of further oral evidence and submissions.

[54]    Although the affidavit of the plaintiffs' counsel asserts that the evidence was fresh and that it was not available at the time of trial, it is clear both from the affidavit and Mr. Griffin's trial evidence that what happened is that the Griffins searched company records that had been in their possession for some time and which they had not previously fully searched.

[55]    The plaintiffs on two occasions during the trial adduced extensive documentary evidence which they had not previously produced. On the first occasion, new documents, consisting of petty cash receipts and returns for several months were permitted to be put in during the examination in chief of Mr. Griffin. The trial judge, in permitting this, noted that the plaintiffs should have disclosed these documents during the production of documents. She permitted additional time to counsel for Mr. Corcoran to prepare cross-examination on these documents.

[56]    There was evidence at trial that the plaintiffs had been less than diligent in the pursuit of relevant documentation. In cross examination, Mr. Griffin's evidence in relation to the documentation advanced for the first time during his direct examination was as follows:

> Q. Mr. Griffin, when did you find those documents?
>
> A. When did I find them? Prior to the last trial.
>
> Q. I'm sorry. I can't hear you.
>
> A. Back in February.
>
> Q. February of last year?
>
> A. This year.
>
> Q. Did you bring them to your counsel's attention?

A. Yes, I did.

Q. Did you bring them to Mr. Brown's attention?

A. I don't believe, no.

Q. Where were those files, sir?

A. They were home in a box stored away.

Q. At your home?

A. Yes.

Q. Did you look for the rest of them?

A. The rest of boxes?

Q. Sir, all you've produced there is from November of 1988 to August of 1989. Have you looked for the rest of them?

A. I haven't looked for no more, no.

Q. It's no question, sir, that the remainder of those records exist, is there?

A. I can't tell for sure.

Q. Where in your home were they, sir?

A. They were in the basement for a while and I moved them out to the garage. Kentville police had them and then they gave them back to us, I'll call them boxes, all these invoices that we had. I just dug through some of them and I found those ones.

Q. Did you bring the rest of them in to Mr. MacDonald?

A. I believe I brought a couple in, yes.

Q. Have we seen those, sir?

A. I don't know.
(emphasis added)

[57]   The circumstances of the second occasion where new documents were brought forward by the plaintiffs during the trial are as follows. While Mr. Corcoran was being cross-examined, counsel for the plaintiffs presented a box full of slips that had not been produced. These were advanced as being admissible on the basis of **Rule 31.15(2)** permitting documents which have not been produced to be used solely for the purposes of cross-examination. The judge allowed the plaintiffs to put forward this voluminous documentation, subject once again to providing additional time to counsel for Mr. Corcoran to review them.

[58]   The correctness of the judge's two rulings in relation to these two occasions on which documents which had not been produced were brought forward by the plaintiffs is not in issue. At the very least, it must be said that the judge allowed the plaintiffs every latitude to adduce relevant documentation even though it had not been produced during the discovery process. It is a reasonable inference that the judge was impressed, though not favourably, by the plaintiffs' apparent disregard of their obligations under the Rules to produce relevant documentation.

[59]   It will be helpful at this point to set out the legal principles relating to reopening a trial after the judge has made a decision and issued reasons but before the formal judgment has been issued. I regret to say that counsel were not as helpful as we have come to expect in providing the Court with the most relevant authorities and, as a result, it will be necessary to consider several cases to which they did not make reference.

[60]   As noted, a trial judge has a discretion to reopen the case prior to the entry of the formal judgment. While aspects of this discretion are codified or supplemented by the Rules, including **Rule 15.07**, it derives from the inherent power of the Court: see **W. B. Williston and R.J. Rolls**, *The Law of Civil Procedure*, Vol. 2 (Toronto: Butterworths, 1970) at pp. 1059 - 1060; **Attorney General of Canada v. Murray** (1969), 3 N.S.R. (1965-1969) 112 (T.D.) at 114 - 116; **Boutilier v. Traders Gen. Insurance Co.** (1969), 1 N.S.R. (1965 -69) 810 (T.D.) 1 D.L.R. (3d) 379 at 384, aff'd 7 D.L.R. (3d) 220 (A.D.); **Credit Foncier franco-canadien v. Fort Massey**

**Realties Ltd.** (1981), 49 N.S.R. (2d) 646 (T.D.); **Gateway Realty Ltd. v. Arton Holdings Ltd. and Spiropoulos** (1991), 106 N.S.R (2d) 163 (T.D.); **Fruehauf Trailer Co. v McCrea**, [1955] 3 D.L.R. 543 (N.B.S.C.A.D.); **Clayton v. British American Securities Ltd. et al.**, [1935] 1 D.L.R. 432 (B.C.C.A.); **Becker Milk Co. Ltd. et al. v. Consumers' Gas Co.** (1974), 2 O.R. (2d) 554 (C.A.);

[61]   On appeal, the trial judge's exercise of this discretion is entitled to considerable deference.  In **Edwards v. Edwards** (1994), 133 N.S.R. (2d) 8 (C.A.) where it was argued that the trial judge had erred in failing to reopen the case after decision but prior to the final order, Chipman, J.A. stated at § 26 that  "... this court has repeatedly held that it will not reverse a discretionary order of a trial judge unless wrong principles of law were applied or a manifest injustice ensued. ..."

[62]   The principles which guide the exercise of this discretion attempt to balance the requirements that parties bring forward their whole case and that there must be finality in litigation with the need to reach a result that is just in substance.  In other words, the judge must take account of the, at times, competing goals of employing fair procedure and achieving right results.

[63]   There is a difference in emphasis in some of the case law in relation to the issue of whether the "new" evidence was obtainable with reasonable diligence at trial.  Some of the authorities insist that such diligence is normally a condition for the exercise of the discretion to reopen: see for example **Becker Milk Co. Ltd. v. Consumers' Gas Co., supra**.  Others take the view that there is a broad discretion to reopen where necessary to avoid a miscarriage of justice.  In other words, the importance (or, as sometimes expressed, the materiality) of the evidence will sometimes justify reopening absent due diligence at trial: see for example **Clayton v. British American Securities, supra**; **Castlerigg Investments v. Lam** (1991), 2 O.R. (3d) 216 (Gen.Div.).  So far as I am aware, there is no authority binding on this Court on the point and it has expressly been left open recently by the Ontario Court of Appeal: **671122 Ontario Ltd. v. Sagaz Industries Canada Inc.** (2000), 46 O.R. (3d) 760 (C.A.); (leave to appeal to S.C.C. granted December 7, 2000).

[64]   The application to reopen a trial is one that may be made in an almost limitless variety of situations.  A considerable degree of flexibility is needed in the applicable law if it is to deal justly with such diverse situations.  It is preferable, therefore, for this Court to articulate the fundamental principles that must be

considered, weighed and balanced and leave their application to the discretion of the trial judge. In saying this, however, I would emphasize that the reopening of a trial after the judge has given a decision is an extraordinary and rare step that must be undertaken with great caution.

[65] The decision must be informed by a balancing of the risk of both procedural and substantial injustice to both parties. These fundamental concerns were well-expressed by Macdonald, J.A. in the **Clayton** case, **supra** at page 440:

> If the power [to reopen a trial] is not exercised sparingly and with the greatest care fraud and abuse of the Court's processes would likely result. Without that power however injustice might occur. If, e.g., a document should be discovered after pronouncement of judgment – but before entry showing that the judgment was wrong and the trial Judge was convinced of its authenticity no lack of diligence by solicitor in producing it earlier should serve to perpetuate an injustice. The prudent course is to permit the trial Judge to exercise untrammelled discretion relying upon trained experience to prevent abuse, the fundamental consideration being that a miscarriage of justice does not occur.
> (emphasis added)

[66] An application by one party to reopen a trial presents obvious risks of procedural injustice to the other party and, more generally, of undermining the orderly conduct of litigation. Civil litigation is not a judicial inquiry; a trial judge has no roving commission to examine every aspect of the relationship between the parties. The parties themselves must advance the issues they wish determined by the Court and put forward the evidence they consider necessary to advance their positions. They must disclose the relevant documentation to each other and be subject to extensive discovery. A trial proceeds by each side having the opportunity, in turn, to present its case. A party must bring forward the whole of the evidence on which it intends to rely. This is particularly true of the plaintiff who is not permitted to seek tactical advantage by "splitting" the case; that is, by holding back evidence known to be relevant from the outset until after the defendant has started calling its evidence.

[67] Reopening a trial for further evidence may be offensive to all of these important principles and therefore may be procedurally unfair to the opposite party. And this may not only affect the case at hand. If allowed routinely or too readily, the possibility of reopening will provide an incentive to ignore these principles to gain tactical advantage. If the rules are not enforced, they will tend to be ignored.

[68]   While fair and orderly procedure is essential, so is reaching a correct result on the merits. Genuine mistakes, oversights or even poor judgment should rarely defeat a just cause. If key evidence has been overlooked or an untruth only lately detected, there are strong arguments of justice in favour of allowing the court to reopen its consideration of the matter. The more important the evidence would be to the outcome of the case, the stronger the argument in favour of its reception. To rephrase a familiar adage, justice must not only appear to be done; it must in fact be done.

[69]   In my opinion, the decision to reopen must consider and weigh the aspects of both procedural and substantial justice to which such a decision inevitably relates. Here, the trial judge based her decision not to reopen solely on the fact that the evidence could have been presented at trial. She was right to conclude that the "new" evidence advanced by the plaintiffs was evidence "... that was or could have been available at trial and was not brought forward." However, and with respect, I do not think that, on its own, is a sufficient basis for the refusal to reopen. Both procedural and substantial justice have to be considered. Here, it appears the judge acted on the basis of the risk of procedural injustice to Mr. Corcoran if the case were reopened and did not consider the risk of substantial injustice to the plaintiffs if it were not.

[70]   I am confirmed in this view by the recent decision of this Court in **Federal Business Development Bank v. Silver Spoon Desserts Ltd.** (2000), 189 N.S.R. (2d) 133. Unlike the present case, it concerned an application under **Rule 15.08** to reopen a matter in which the formal judgment had been issued and entered and affirmed on appeal. The Court, speaking through Roscoe, J.A., stated the test for reopening in those circumstances as follows:

> [10] ... In order to succeed on an application of this nature pursuant to Rule 15.08(a), where all appeals and other statutory variation proceedings have been exhausted, in my view, the applicant must prove that:
>
> (1)   the matter or evidence arising or discovered subsequent to the original order, is such that it was not previously capable of being obtained or discovered by the exercise of reasonable diligence;
>
> (2)   the new evidence is apparently credible; and

(3)     when examined with the complete record of the previous
        proceeding, the new evidence is such that it would be practically
        conclusive of the issue in favour of the applicant, provided that, in
        a case of obvious and substantial injustice, if the second and third
        requirements are met, the necessity to prove due diligence, should
        not be applied as strictly.

[71]    I think the test under **Rule 15.08** as discussed in **Silver** is more onerous than
the test applicable to a reopening after trial but before final judgment. Nonetheless,
the final principle stated in **Silver** recognizes that procedural injustice resulting
from a party's lack of diligence in obtaining evidence at trial will give way to the
interests of substantial justice where the "new" evidence is credible and so
important that a substantial injustice will occur if the matter is not reopened.

[72]    In my view, a similar measure of flexibility applies when the application to
reopen is made, as it was here, after trial and decision but before formal judgment.
The risk of procedural injustice, including that flowing from a lack of diligence in
relation to discovery and presentation of the evidence and the risk of substantial
injustice judged mainly by the significance of the evidence to the outcome of the
case should both be considered.  Procedural concerns such as diligence should
generally give way to the demands of substantial justice where failure to do so is
likely to result in an obvious injustice.

[73]    It follows from this that, in my respectful view, the trial judge did not apply
correct legal principles to the application to reopen.  It would appear that she
dismissed it simply on the basis of the plaintiffs' lack of diligence without
balancing the risk of substantial injustice to them if the matter were not reopened.
It is, therefore, appropriate for this Court to consider the application to reopen on its
merits and to exercise the trial judge's discretion in relation to it on proper legal
principles.

[74]    For reasons set out earlier, the trial judge did not err in concluding that the
evidence which the plaintiffs seek to adduce on the reopened trial ought to have
been available at trial with reasonable diligence on their part. Moreover, their lack
of diligence does not simply relate to the preparation and presentation of their own
case, but also to their failure to live up to their obligations to disclose relevant
documentation during discovery.  To state it bluntly but accurately, what the

plaintiffs ask here is an affront to basic principles of civil litigation. In these circumstances, only evidence showing that a substantial injustice will occur would justify reopening in the face of the plaintiffs' lack of diligence and breach of obligation to disclose relevant documents.

[75]   The question becomes, then, whether the proffered evidence meets this standard. I note that even the plaintiffs do not make this claim. As expressed in the plaintiffs' factum in this Court, the proffered evidence, taken together, "... could well have tip[ped] the scales." In my view, that is putting it at its highest and considers the strength of the proffered evidence without opportunity for further cross-examination of the Griffins or further explanation by Mr. Corcoran and Mr. Wile. Taken as a whole, the "new" evidence does not come close to meeting the high threshold of importance that would have to be met to justify reopening the trial in the circumstances of this case.

[76]   I would therefore not disturb the trial judge's refusal to reopen the trial to admit this evidence.

### (b) The corporate veil:

[77]   The "corporate veil" argument was advanced by Mr. Corcoran as an afterthought for which no evidentiary foundation was laid at trial and none was advanced in support of the application to reopen the issue after the trial. There was no evidence of manipulation of the corporate entity to avoid obligations to Mr. Corcoran nor any evidence that he was, in fact, employed by both the Griffins personally and their company at the time of his dismissal. The judge did not err, in my respectful view, in refusing to reopen the trial for the purpose of addressing this issue.

### 3. Costs:

[78]   It may be helpful to set out again the results of the trial and the judge's costs order. The Griffins' misappropriation action, which occupied all but less than half a day of the 11 days of trial, was dismissed. Mr. Corcoran's counterclaim in wrongful dismissal against all plaintiffs succeeded against the corporate plaintiff

but was dismissed as against the individual plaintiffs. His counterclaim in defamation was dismissed.

[79]    The trial judge awarded costs of the main action to Mr. Corcoran against the numbered company only and awarded no costs of the counterclaim. Mr. Corcoran submits on his appeal that the judge erred in depriving him of his costs against the Griffins of his successful defence of their misappropriation claim.

[80]    As this Court has said many times, costs are within the discretion of the presiding judge and the exercise of that discretion should not be disturbed on appeal unless a wrong principle of law has been applied or an injustice would result. For reasons that I will develop, I am respectfully of the view that, in the context of this trial, the judge's decision as to costs was based on an error in principle. It will be helpful to set out the applicable principles briefly before turning to the error that I think the judge made.

[81]    The general rule is that costs follow the event: see **Rule 63.03(1)**. The rationale for this general rule was stated by Saunders, J., as then was in, **Landymore v. Hardy** (1992), 112 N.S.R. (2d) 410 at § 17:

> [17]  Costs are intended to reward success. Their deprivation will also penalize the unsuccessful litigant. One recognizes the link between the rising cost of litigation and the adequacy of recoverable expenses. Parties who sue one another do so at their peril. Failure carries a cost. There are good reasons for this approach. Doubtful actions may be postponed for a sober second thought. Frivolous actions should be abandoned. Settlement is encouraged. Winning counsel's fees will not be entirely reimbursed, but ordinarily the losing side will be obliged to make a sizeable contribution.

[82]    The general rule that costs follow the event also applies to counterclaims. However, for costs purposes, the counterclaim should be treated as a separate proceeding and, generally, the costs of the counterclaim should relate only to the amount by which the costs of the proceedings are increased as a result of the counterclaim: see, for example, Mark Orkin, **The Law of Costs** (2d) section 211 at page 2-100.2. Where a counterclaim succeeds against one plaintiff, but fails against

another in circumstances in which there were good grounds to sue both, the unsuccessful plaintiff may be ordered to pay the costs of the successful plaintiff directly: see for example **Kelly v. Wawanesa** (1979), 30 N.S.R. (2d) 294 (S.C.A.D.).

[83]   While a judge has discretion to depart from the general rule that costs follow the event, there must be a reason in principle for doing so: see, for example, **Bent v. Nova Scotia Farm Loan Board, Horsnell and Horsnell** (1978), 30 N.S.R. (2d) 552 (S.C.A.D.); **Kelly et al. v. Wawanesa Mutual Insurance Co. et al., supra**.

[84]   The question on appeal, therefore, is whether the judge exercised her discretion as to costs on proper grounds by depriving Mr Corcoran of his costs of his successful defence of the Griffins' action against him: see, for example, **Davis v. Lively and Davis & Lively land Development Ltd.** (1980), 43 N.S.R. (2d) 700 (S.C.A.D.); **Coughlan et al. v. Westminer Canada Ltd. et al.** (1994), 127 N.S.R. (2d) 241 (C.A.) at § 198.

[85]   Mr. Corcoran was completely successful in his defence of an action brought by the Griffins and their company which accused him of dishonesty. If the general rule that costs follow the event were applied, Mr. Corcoran would receive his costs of defending the main action against all three plaintiffs, jointly and severally.

[86]   If the general rule were applied to the counterclaim, Mr. Corcoran would pay the costs to the plaintiffs against whom his counterclaim was dismissed. These costs would be restricted to the portion of the costs which the counterclaim added to the costs of the proceedings. Here, the counterclaims added so negligibly to the costs of the trial and were so intimately connected with the plaintiffs' allegations in the main action that no costs might well have been awarded against Mr. Corcoran with respect to his unsuccessful counterclaim. In any event, all three plaintiffs had pleaded in their statement of claim that Mr. Corcoran was employed by them. This gave Mr. Corcoran good grounds for suing all three plaintiffs for wrongful dismissal. It follows that, if costs of the counterclaim were to be awarded at all, the corporate plaintiff against whom Mr. Corcoran succeeded should have been ordered to pay the costs of the individual plaintiffs against whom he failed in relation to the wrongful dismissal counterclaim.

[87]   The rationale for the judge's decision appears to be that the costs of the main action and the costs of the counterclaim cancel each other or balance out. This is implicit in the judge's reasons on this issue set out in her letter to counsel dated January 7th, 2000:

> There was an action by the individual plaintiffs against the defendant which was unsuccessful. There was, as well, a claim by the corporate plaintiffs which was unsuccessful. The defendant's counter-claim against the individual plaintiffs was unsuccessful. His counter-claim against the corporate plaintiff was only partially successful.
>
> The actions involving the individual plaintiffs were not successful, that is, both the claim **by** them and the claim **against** them. Under the circumstances, no costs should be awarded **to** or **against** them.
>
> Because of his partial success on the counter-claim against the corporate plaintiff and his successful defence of its claim against him, the defendant is entitled to his costs against the corporate plaintiff.

[88]   With great respect, this is wrong in principle. The judge's order fails to assess the costs of the counterclaim by determining the extent to which it increased the costs of the proceedings. Here, the counterclaim increased the costs of trial negligibly if at all. This case was about whether the Griffins could prove that Mr. Corcoran misappropriated money from them and their company. The issues raised by the counterclaim were a side show to that main event; they did not add appreciably to the length and complexity of the trial. It was, therefore, an error in principle to treat these costs as if they balanced or cancelled out the costs of the main action. It follows that the failure of parts of the counterclaim was not a reason in principle to deprive Mr. Corcoran of his costs of the main action against all three plaintiffs in the circumstances of this case.

[89]   Having found this error in principle, it is appropriate for this Court to deal with the costs of the trial. The quantum of costs as determined by the trial judge is not in issue. I would simply direct that the costs ordered by the trial judge be as against all three plaintiffs jointly and severally.

[90]   It follows that I would grant leave to appeal the judge's costs order, allow the appeal and in its place make an order that the costs of the main action in the amounts determined by the trial judge be paid to Mr. Corcoran by the plaintiffs

jointly and severally and that the dismissal of his counterclaim as against the Griffins be without costs. I would amend the second paragraph of the Order After Trial Without a Jury so that it would read as follows: " IT IS HEREBY ORDERED THAT THE PLAINTIFFS JOINTLY AND SEVERALLY PAY TO THE DEFENDANT costs in the amount of $39,680 together with disbursements to be taxed."

## IV.  Disposition:

[91]   In the result, I would grant leave to appeal and allow the appeal with respect to costs, but dismiss the appeal in relation to the corporate veil issue. I would dismiss the cross-appeal. In light of the narrow issues raised and the divided success on the appeal, I would order that the plaintiffs pay the costs of the appeal to Mr. Corcoran but in the amount of $1200 plus disbursements. Mr. Corcoran has succeeded on the cross-appeal which raised a number of issues and consumed the bulk of both the oral and written argument. I would order that the plaintiffs pay him his costs of the cross-appeal fixed at $5000 plus disbursements.


Cromwell J.A.

Concurred in:
    Glube, C.J.N.S.
    Roscoe, J.A.



# TAB 12

Citation: Compton Agro Inc. (Trustee of)                           Date: 20000417
v. Canada (Attorney General), 2000 MBCA 29              Docket: AI98-30-04003

## IN THE COURT OF APPEAL OF MANITOBA

### Coram:  Scott C.J.M., Twaddle and Kroft JJ.A.

*B E T W E E N:*

| | |
|---|---|
| ***ARTHUR ANDERSEN INC.***, *as Trustee* )<br>*of Compton Agro Inc. in Bankruptcy* ) | ***D. R. M. Jackson***<br>*for the Applicant* |
| *(Applicant) Applicant* ) | |
| *- and -* ) | ***T. L. Harwood-Jones***<br>*for the Respondent* |
| ***ATTORNEY GENERAL OF CANADA*** )<br>*representing the Minister of National Revenue* ) | *Application heard and*<br>*Decision pronounced:*<br>***April 17, 2000*** |
| *(Respondent) Respondent* ) | |

**SCOTT C.J.M.** (for the Court):

1          At the conclusion of argument the applicant's request that this Court reconsider its judgment delivered January 17, 2000 ([2000] M.J. No. 22), was dismissed with costs.  These are our brief reasons for doing so.

2          In his able submission on behalf of the applicant trustee, Mr. Jackson (not counsel at the earlier hearing), argued that there were special

See (1998) 132 Man.R. (2d) 110
See [2000] M.J. No. 22

circumstances which justified reconsideration. See *Abraham v. Wingate Properties Limited*, [1986] 2 W.W.R. 568. The thrust of his argument was that the point on which the Court ultimately based its decision – that there was a deemed trust in favour of the Crown – was an issue which was not stated or argued by the parties. Thus, it was said counsel were not given a real opportunity to address the issue.

3          If in fact we had decided the appeal on a point of law that counsel had not been given an opportunity to adequately address, we would have readily granted the application. But this is not the case. The issue whether or not there was a deemed trust in favour of the Crown (in which event the question whether payment by the trustee to the Crown constituted a fraudulent preference under the *Bankruptcy Act* became a non-issue) was specifically raised by this Court during oral argument. The point was directly put both to counsel for the federal Crown and for the trustee. The fact that counsel then acting for the trustee chose to respond only briefly cannot now form the basis for reargument.

4          Nor are we persuaded, based on the material before us now, that the applicant has presented a compelling argument that reconsideration of the Court's decision is warranted on the merits. An arguable case that this Court's decision of January 17th might be legally incorrect has not been made.

5          In the above circumstances, we are all of the view that the

application should be dismissed with costs.

_____ C.J.M.

I Agree:

_____ J.A.

I Agree:

_____ J.A.

3P

# TAB 13

1985 CarswellMan 232
Manitoba Court of Appeal

Abraham v. Wingate Properties Ltd.

1985 CarswellMan 232, [1986] 2 W.W.R. 568, 37 Man. R. (2d) 267

# ABRAHAM v. WINGATE PROPERTIES LIMITED

Monnin C.J.M., Hall and Twaddle JJ.A.

Heard: December 2, 1985
Judgment: December 6, 1985
Docket: No. 83/85

Counsel: *S. Green, Q.C.*, for appellant.
*K. Filkow, Q.C.*, and *M. Finlayson*, for respondent.

Subject: Civil Practice and Procedure

**Related Abridgment Classifications**
For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

**Headnote**

**Damages --- Valuation of damages — Where ascertainment difficult**

**Practice --- Judgments and orders — Amending or varying — Before judgment entered**

**Practice --- Judgments and orders — Interest on judgments — Prejudgment interest — Entitlement to**

**Practice --- Costs — Effect of success of proceedings — Successful party deprived of costs — Grounds — Success on ground not pleaded**

Judgments and orders — Amending and varying — Jurisdiction to vary — Before judgment entered — Power to vary — Manitoba Court of Appeal awarding damages for breach of term in contract for sale of building — Court allowing application to reconsider calculation of damages where court adopting method of calculation different from that of trial judge and that argued by parties — Evidence not demonstrating error in original calculation.

Sale of land — Remedies for breach of contract — Damages — Measure of damages — Prejudgment interest — Vendor of land and building warranting that building complying with city by-laws — Vendor securing part of purchase price by mortgage back — Building not complying with by-law and purchaser obtaining judgment for damages for breach of contract — Vendor having commenced statutory sale proceedings on mortgage — Purchaser not entitled to prejudgment interest — Court considering effect of set-off of award against amount due under mortgage and consequent interest adjustment from reduction in sale price.

Costs — Effect of success of proceedings — Costs against successful party — Plaintiff — Purchaser of land and building seeking rescission of contract for sale of land and alleging fraud by vendor — Vendor acting reasonably and paying moneys into court — Purchaser obtaining remedy other than remedy sought — Appeal court refusing to adjust damage award on

1985 CarswellMan 232, [1986] 2 W.W.R. 568, 37 Man. R. (2d) 267

purchaser's request for reconsideration of decision — Allegations of fraud unfounded — Having reconsidered decision court also reconsidering award of costs — Vendor awarded costs at trial and on appeal.

The plaintiff purchased an apartment building from the defendant. The defendant financed the purchase by taking back a mortgage which the defendant subsequently took steps to enforce by sale proceedings pursuant to statutory procedure. After closing, the plaintiff learned that the building did not conform to by-law requirements as warranted in the contract for sale and she commenced an action alleging fraud. At trial, the court awarded nominal damages. On appeal, the court did not calculate damages according to the approach adopted by the trial judge, nor did it adopt the method argued by the plaintiff, of valuation on income production. The Court of Appeal assessed damages on the basis of one third of the contract value of the building and allowed the plaintiff's appeal in part. Before entry of a certificate of decision, the plaintiff applied for reconsideration of the award of damages and asked for prejudgment interest.

**Held:**

Judgment varied; defendant awarded costs throughout.

As a certificate of decision had not been taken out or filed, the court had jurisdiction to reconsider the judgment. As the court had adopted its own approach in calculating damages, it was prepared to reconsider its decision on that limited issue. In the circumstances it was not appropriate to adopt the plaintiff's argument as to valuation: there was evidence that the building was purchased for resale and not for income production, and the argument that the city would require immediate compliance with its by-law was at best a contingency factor. The appeal court's original assessment of loss was therefore correct.

The plaintiff was not entitled to prejudgment interest. She remained liable for the principal and interest due under the mortgage back to the vendor, and had the sale proceedings been enforceable by court action, the two actions would likely have been consolidated and the plaintiff's damages set off against principal with a consequential interest adjustment to reflect the reduction in price. There was no reason why, because sale proceedings had to be taken pursuant to a statutory procedure rather than by court action, a different result should follow.

Finally, as the court had acceded to the plaintiff's request for reconsideration, its disposition as to costs had also to be reviewed. The plaintiff, although successful in recovering damages, had not sought the remedy obtained and had persisted in unfounded allegations of fraud. The defendant in turn had not had the opportunity of consenting to the remedy obtained, had acted reasonably in tendering $10,000 in full settlement, and had successfully defended the claim in the form it was presented. It was accordingly entitled to its costs at trial and on appeal. No costs were allowed on the application for reconsideration.

**Table of Authorities**

**Cases considered:**

  *Chambers v. Leech*, [1976] 4 W.W.R. 568 (Man. C.A.) — *referred to*

  *Trans Trust S.P.R.L. v. Danubian Trading Co.*, [1952] 2 Q.B. 297, [1952] 1 All E.R. 970 (C.A.) — *considered*

Application by plaintiff for reconsideration of judgment of Manitoba Court of Appeal, [1986] 1 W.W.R. 568, awarding damages for breach of contract.

**The judgment of the court was delivered by *Twaddle J.A.*:**

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1   Subsequent to the delivery of written reasons for judgment herein [reported at [1986] 1 W.W.R. 568] the appellant applied by notice of motion for a reconsideration of certain aspects of the judgment. No certificate of decision has been taken out or entered and, in consequence, there is jurisdiction for this court to entertain the motion. Notwithstanding, this court will not in the ordinary course grant an application for reconsideration unless there is a patent error on the face of the reasons delivered or a point for argument not raised at the hearing of the appeal which arises out of the judgment delivered, which point could not reasonably have been foreseen and dealt with at the original hearing.

2   In the present case this court did not accept as the basis for calculating damages the approach adopted by the learned trial judge nor that argued by the parties. We adopted our own approach, but may not have taken all factors relevant to that approach into consideration in the absence of argument on point. On this limited issue we are, therefore, prepared to reconsider our decision.

3   Counsel for the appellant drew our attention to evidence given by Mr. L. O. Rosenberg, a property manager and real estate broker, who testified that the property as purchased would have a value of between $31,000 and $57,000 less than it would have had assuming it had complied with the city of Winnipeg by-law 763/74. This valuation was made, however, on an income basis and takes no account of the fact that the building, even if it were in the condition warranted, could not be said to be an attractive long-term investment for income producing purposes. The advertisement of the property which first attracted the attention of the purchaser referred to the property as having a prime location and having a possibility for land assembly. There was evidence that a third party had looked at the property with a view to its possible redevelopment. The appellant's husband, who negotiated the purchase on her behalf, acknowledged that it was purchased with the possibility of resale with a capital gain in mind. It is difficult to envisage this property with its deficiencies, known to the appellant at least to the extent of the city work orders accepted for completion by her in consideration of a reduction in the purchase price, being sold for a capital gain unless it were scheduled for some form of redevelopment. The capital cost of remedial repair and decoration without the prospect of major change in structure and size or total redevelopment would outweigh the amount and security of revenue that could be generated. In the result we are persuaded that a valuation based on income production is not appropriate in this case.

4   Moreover, Mr. Rosenberg made his calculations on the basis that the city would require immediate compliance with city by-law 763/74, a factor which at best we regard as a contingency. In the circumstances we are not persuaded that the diminution in the value of the property, by reason of the building's non-compliance with the city by-law, is anything approaching the amount suggested by Mr. Rosenberg. Nothing has been said in the further argument we heard that persuades us that we were wrong in our original assessment of the appellant's loss in this regard.

5   The appellant also claims interest on the amount awarded as damages in her favour. Prejudgment interest is recoverable under the present law in very limited circumstances (see *Chambers v. Leech*, [1976] 4 W.W.R. 568 (Man. C.A.)), none of which apply to the present case. The common law, under the influence of the old usury stigma, declined to recognize the loss of use of money as a head of damage. Denning L.J. (as he then was) in *Trans Trust S.P.R.L. v. Danubian Trading Co.*, [1952] 2 Q.B. 297 at 306, [1952] 1 All E.R. 970 (C.A.), adopted, as the rationale of the common law rule, the reasoning of the editors of Bullen and Leake [Precedents of Pleadings], 3rd ed. (1868), at p. 51, where they stated that interest was not recoverable because it was " 'generally presumed not to be within the contemplation of the parties.' " Romer L.J. cautiously agreed, but their statements as to when interest might be a head of damage remain dicta which we have difficulty applying to the facts of the present case, at least as a justification for the payment of interest as interest.

6   What takes this case out of the usual is that, although in the strict sense the consideration is fully executed, the appellant remains liable (or at least did at the date of trial) for the principal and interest due under a mortgage given to secure performance of a covenant to pay part of the purchase price. The respondent had taken steps to enforce the mortgage by sale proceedings which, in Manitoba, are taken in the land titles office rather than a court, but was enjoined from continuing with such proceedings prior to the trial. It is our understanding that pending the final outcome of this appeal the property is being managed by a third party with the net revenue being applied against the mortgage indebtedness. If the sale proceedings had been by way of court action, that action would likely have been consolidated with the present action. In that event, instead of awarding the present appellant damages, the amount by which the purchase price was reduced would have been set off against the principal amount

1985 CarswellMan 232, [1986] 2 W.W.R. 568, 37 Man. R. (2d) 267

due to the respondent. In those circumstances this court would have said that it was within the contemplation of the parties that, if the purchase price were reduced by reason of breach of contract, interest on the amount of that reduction should not be paid by the appellant to the plaintiff under the mortgage. How can the court sanction the payment of interest on an amount which it finds not to be payable? We see no reason why, because in this province mortgage sale proceedings are taken pursuant to a statutory procedure rather than by court action, a different result should follow. We would therefore set off the damages awarded ($8,333.33) against the principal amount due the respondent under its mortgage back with a consequential interest adjustment to reflect the reduction in price ab initio. If the adjustment cannot be agreed upon, it should be referred to the master for determination and report. The mortgage, securing payment of the reduced amount, will remain enforceable in the usual ways.

7       The result is that the appellant, not having paid all of the purchase price in cash, is entitled to the equivalent of interest on her damages from the date of closing, whilst she would not have been entitled to interest on those damages if she had paid cash and borrowed from a third party to enable her to do so. That is an unfortunate result which can only be amended by statute as the principle that interest is not payable on damages, in cases such as this, is too well established to be displaced by judicial intervention.

8       It follows, of course, that, if we are wrong in believing there to be a balance remaining due under the mortgage, the appellant will remain entitled to a judgment for damages in the amount of $8,333.33, but without interest before judgment.

9       Having acceded to the appellant's request that we reconsider our judgment, we must also reconsider our disposition as to costs. Although the appellant was successful in recovering damages and in having them set off against the principal due by her under the mortgage, with a consequential reduction in the interest factor under that mortgage, the remedy obtained was not that sought. Faced with the claim in the form advanced, the respondent acted reasonably in tendering the amount of $10,000 in full settlement. The amount tendered was in excess of the amount of the reduction in the principal due under the mortgage and only marginally less than the total of the principal amount plus the reduction in interest, now allowed, as at the date of payment into court. These factors coupled with the appellant's persistance in pursuing an unfounded allegation of fraud persuade us that costs should not follow the event. Indeed, as the appellant has been afforded a remedy never claimed, we are of the view that the respondent should be paid its costs throughout. Had the remedy now granted been that asked for, the respondent would have had the opportunity of agreeing to it and avoiding the costs of the litigation. The respondent should not be penalized by being found liable in an uncontemplated manner and required to pay all of its costs for defending a claim which in the form presented it succeeded in defending. We allow the respondent its costs in the Court of Queen's Bench, to be taxed as a class II proceeding, and its costs of the appeal to this court together with a factum fee of $100. We allow no costs on the application for reconsideration.

*Judgment varied.*

---

**End of Document**                    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# TAB 14

2003 PESCAD 6, 2003 CarswellPEI 28, 120 A.C.W.S. (3d) 1033, 223 Nfld. & P.E.I.R. 99...

2003 PESCAD 6

Prince Edward Island Supreme Court (Appeal Division)

UAP Inc. v. Oak Tree Auto Centre Inc.

2003 CarswellPEI 28, 2003 PESCAD 6, 120 A.C.W.S. (3d) 1033,
223 Nfld. & P.E.I.R. 99, 38 C.P.C. (5th) 303, 666 A.P.R. 99

# UAP INC. (APPELLANT) AND OAK TREE AUTO CENTRE INC., BAGNALL'S BUILDING SUPPLIES LTD., BAGNALL'S MILLS LIMITED and CARL BAGNALL (RESPONDENTS)

Mitchell C.J.P.E.I., McQuaid J.A., Cheverie J. (ad hoc)

Heard: February 18, 2003
Judgment: March 12, 2003
Docket: S1-AD-0919

Proceedings: varying (2002), 2002 PESCAD 25, 2002 CarswellPEI 114 (P.E.I. C.A.); varying (2001), 2001 CarswellPEI 78, 2001 PESCTD 65, 204 Nfld. & P.E.I.R. 189, 614 A.P.R. 189 (P.E.I. T.D.)

Counsel: James C. Travers, Q.C., Sean J. Casey for Appellant
T. Daniel Tweel for Respondent

Subject: Civil Practice and Procedure; Contracts; Torts

**Table of Authorities**

**Cases considered:**

*Abraham v. Wingate Properties Ltd.* (1985), [1986] 2 W.W.R. 568, 37 Man. R. (2d) 267, 1985 CarswellMan 232 (Man. C.A.) — referred to

*Bailey v. Registered Nurses' Assn. (Saskatchewan)*, 1997 CarswellSask 154, (sub nom. *Bailey v. Saskatchewan Registered Nurses' Assn.*) 154 Sask. R. 201, [1997] 6 W.W.R. 407 (Sask. Q.B.) — referred to

*Fruehauf Trailer Co. v. McCrea*, [1955] 3 D.L.R. 543, 38 M.P.R. 151, 1955 CarswellNB 29 (N.B. C.A.) — referred to

*Metz v. Marshall (No. 2)* (1922), [1923] 1 W.W.R. 201, 16 Sask. L.R. 521, [1923] 1 D.L.R. 367, 1922 CarswellSask 242 (Sask. C.A.) — referred to

*UAP Inc. v. Oak Tree Auto Center Inc.*, 2001 CarswellPEI 78, 2001 PESCTD 65, 204 Nfld. & P.E.I.R. 189, 614 A.P.R. 189 (P.E.I. T.D.) — referred to

**Statutes considered:**

*Supreme Court Act*, R.S.P.E.I. 1988, c. S-10
Generally — referred to

s. 49(1)(d) — referred to

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 15723-2    Filed 06/09/15    Page 398 of 490

UAP Inc. v. Oak Tree Auto Centre Inc., 2003 PESCAD 6, 2003 CarswellPEI 28

2003 PESCAD 6, 2003 CarswellPEI 28, 120 A.C.W.S. (3d) 1033, 223 Nfld. & P.E.I.R. 99...

s. 49(2) — referred to

s. 50 — referred to

s. 50(1) — considered

s. 50(3) — considered

s. 52 — referred to

**Rules considered:**

*Rules of Civil Procedure*, P.E.I. Rules
    R. 59 — referred to

MOTION by corporation for reconsideration of pre-judgment interest award ordered in judgment reported at 2002 PESCAD 25, 2002 CarswellPEI 114, 219 Nfld. & P.E.I.R. 292, 655 A.P.R. 292 (P.E.I. C.A.).

*Per curiam***:**

1    On December 12, 2002 this Court delivered a unanimous decision (See: UAP v. Oak Tree Auto Centre Inc. 2002 PESCAD 25 (P.E.I. C.A.)) allowing, in part, an appeal from the trial judge's assessment of damages suffered by the respondents, Bagnall Building Supplies Ltd. and Bagnall's Mills Limited ("Bagnall") resulting from the appellant's breach of contract. Total damages were assessed in the amount of $407,948.50, calculated in the following manner:

| | | |
|---|---|---|
| One-half of the losses in the first year of operation of the joint venture - | | $ 95,847.50 |
| Loss of profits from the 5 year joint venture agreement (1988-1993) - | | 56,888.00 |
| Loss of profits from the 10 year franchise agreement (1993-2003) - | | 227,000.00 |
| The balance of the appellant's capital contribution - | | 28,832.00 |
| | SUBTOTAL: | $ 408,567.50 |
| LESS: additional capital contribution to be made by Bagnall on acquiring franchise | | 150,000.00 |
| PLUS: Bagnall's costs of mitigation for one year | | 149,381.00 |
| | TOTAL: | $407,948.50 |

2    Bagnall was also awarded prejudgment interest in accordance with the provisions of the Supreme Court Act R.S.P.E.I. 1988 Cap. S-10 on the total assessment from March 1, 1989 to the date of payment. The Court directed the parties, in the absence of their agreement, to make submissions on the issue of costs.

3    After the release of the reasons for judgment and before a formal order was issued, the appellant made a motion asking the Court to reconsider the award of prejudgment interest. The grounds for the motion were as follows: (1) Civil Procedure Rule 59; (2) s-s. 50(3) of the Supreme Court Act; (3) the parties and the trial judge had agreed that there would be no prejudgment interest paid between March 13, 2000 and October 10, 2000; and (4) the prejudgment interest award in the decision of December 12, 2002 was effective from March 1, 1989 and it was to be calculated on damages which would have accrued due to Bagnall subsequent to that date. The motion was scheduled for hearing and the Court directed that, if necessary, the parties would be heard on the matter of costs at the same time.

**MOTION FOR RECONSIDERATION**

4    The parties agree the Court has jurisdiction to reconsider or vary its decision at any time before a formal order has been issued. Nevertheless, to avoid undermining the principle of finality in litigation, a Court should reconsider or vary its judgment only in exceptional and special circumstances. See: *Metz v. Marshall (No. 2)* (1922), [1923] 1 W.W.R. 201 (Sask. C.A.); *Bailey*

**Westlaw**Next® CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    2

UAP Inc. v. Oak Tree Auto Centre Inc., 2003 PESCAD 6, 2003 CarswellPEI 28

2003 PESCAD 6, 2003 CarswellPEI 28, 120 A.C.W.S. (3d) 1033, 223 Nfld. & P.E.I.R. 99...

*v. Registered Nurses' Assn. (Saskatchewan)*, [1997] 6 W.W.R. 407 (Sask. Q.B.); and *Fruehauf Trailer Co. v. McCrea*, [1955] 3 D.L.R. 543 (N.B. C.A.).

5      Having found the trial judge erred in principle when assessing the quantum of damages, the Court had two choices: (i) order a new trial to have the damages re-assessed, or (ii) adopt its own approach to the assessment on the basis of the evidence which was before the trial judge. The Court chose the latter course of action and in doing so made an award of prejudgment interest in the context of its own approach to the assessment, without the benefit of submissions from counsel for the parties.

6      The appellant's position is that special and exceptional circumstances exist which warrant the Court's reconsideration of the award of prejudgment interest. The appellant argues that, in the result, the Court's original decision overlooked the fact that had the contract continued according to its terms, some of the damages assessed as due and owing to Bagnall would have accrued due after March 1, 1989, the date set for the commencement of the payment of prejudgment interest. The appellant also argues that an award of prejudgment interest made in this manner does not comply with the provisions of s-s.50(3) of the Supreme Court Act. Finally, the appellant states there was an agreement between counsel and the trial judge that, because of the delay of Bagnall's counsel in submitting the post trial brief, Bagnall would not be entitled to prejudgment interest for the period from March 13, 2000 and October 10, 2000. Counsel for Bagnall acknowledges the existence of this agreement.

7      The Court has concluded these factors constitute special and exceptional circumstances which warrant the reconsideration of the award of prejudgment interest. We were unaware of the agreement to waive prejudgment interest for a period of time. Having adopted an approach to the assessment of damages put forward by Bagnall's expert witness at trial but not advocated by either party on the appeal, the Court made an award of prejudgment interest, without reasons and which allegedly failed to take into account all the factors, including the implications of s-s.50(3) of the Supreme Court Act, which should necessarily have been considered in the context of that approach. Upon reconsideration and for the following reasons, the Court would vary the award of prejudgment interest, in part. See: *Abraham v. Wingate Properties Ltd.* (1985), [1986] 2 W.W.R. 568 (Man. C.A.) at p.570.

8      The purpose of an award of damages in a breach of contract case is to restore the innocent party to the position it would have been in had the contract been carried out according to its terms. Unless there are grounds which would constitute the basis for an award of punitive damages, the purpose of an award of damages in such a case is not to punish the party who breached the contract. The Court's role in assessing the quantum of damages is to protect the bargain made between the parties.

9      Similarly, prejudgment interest which is ordered to be paid on the quantum of damages assessed must achieve the above objective and be consistent with the underlying principle that the party suffering from the breach not be placed in a better position than it would have been had the contract continued according to its terms. Interest is not a reward or a penalty, it is intended to reflect the value of the money the party would have received had the bargain remained in tact. Prejudgment interest is to compensate the party for being kept out of his money. Therefore, in a breach of contract case prejudgment interest should not accrue until the damages assessed to compensate the innocent party were paid or become payable.

10      Subsection 49(1)(d) of the Supreme Court Act provides:

49.(1) (d) 'prejudgment interest rate' means the bank rate at the end of the first day of the last month of the quarter preceding the quarter in which the proceeding was commenced, rounded to the nearest tenth of a percentage point; ...

11      Subsection 49(2) of the Supreme Court Act provides:

49.(2) After the first day of the last month of each quarter, the Registrar of the court shall forthwith

(a) determine the prejudgment and post-judgment interest rate for the next quarter; and

(b) publish in the Gazette a table showing the rate determined under clause (a) for the next quarter and for all the previous quarters during the preceding ten years.

12      Section 50 of the Supreme Court Act provides:

UAP Inc. v. Oak Tree Auto Centre Inc., 2003 PESCAD 6, 2003 CarswellPEI 28

2003 PESCAD 6, 2003 CarswellPEI 28, 120 A.C.W.S. (3d) 1033, 223 Nfld. & P.E.I.R. 99...

50.(1) A person who is entitled to an order for the payment of money is entitled to claim and have included in the order an award of interest thereon at the pre-judgment interest rate, calculated from the date the cause of action arose to the date of the order.

(2) Notwithstanding subsection (1), the rate of interest on damages for pecuniary loss on non-pecuniary loss in an action for personal injury shall be the discount rate determined by the Rules.

(3) If the order includes an amount for past pecuniary loss, the interest calculated under subsection (1), shall be calculated on the total past pecuniary loss at the end of each six-month period and at the date of the order.

(4) Interest shall not be awarded under subsection (1)

    (a) on exemplary or punitive damages;

    (b) on interest accruing under this section;

    (c) on an award of costs in the proceeding;

    (d) on that part of the order that represents pecuniary loss arising after the date of the order and that is identified by a finding of the court;

    (e) with respect to the amount of any advance payment that has been made towards settlement of the claim, for the period after the advance payment has been made;

    (f) where the order is made on consent, except by consent of the debtor; or

    (g) where interest is payable by a right other than under this section.

(5) Where a proceeding is commenced before this section comes into force, this section does not apply, and section 33 of the *Judicature Act* R.S.P.E.I.1974, Cap. J-3 continues to apply notwithstanding the repeal of that Act.

(6) Where a judgment is obtained by default, the Prothonotary may exercise the functions of the court under this section.

(7) For the purposes of enforcing a judgment, interest awarded under this section shall be deemed to be included in the judgment.

13    Section 52 of the Supreme Court Act provides:

52.(1) The court may, where it considers it just to do so, in respect of the whole or any part of the amount on which interest is payable under section 50 or 51,

    (a) disallow interest under either section;

    (b) allow interest at a rate higher or lower than that provided in either section;

    (c) allow interest for a period other than that provided in either section.

(2) For the purpose of subsection (1), the court shall take into account

    (a) changes in the market interest rate;

    (b) the circumstances of the case;

    (c) the fact that an advance payment was made;

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 15723-2    Filed 06/09/15    Page 401 of 490

UAP Inc. v. Oak Tree Auto Centre Inc., 2003 PESCAD 6, 2003 CarswellPEI 28

2003 PESCAD 6, 2003 CarswellPEI 28, 120 A.C.W.S. (3d) 1033, 223 Nfld. & P.E.I.R. 99...

(d) the circumstances of medical disclosure by the plaintiff;

(e) the amount claimed and the amount recovered in the proceeding;

(f) the conduct of any party that tended to shorten or to lengthen unnecessarily the duration of the proceeding; and

(g) any other relevant consideration.

14    Subsection 50(1) of the *Supreme Court Act* provides that a party who obtains an order for the payment of money is entitled to an award of interest on the amount of money at the prejudgment interest rate, to be calculated from the date the cause of action arose. This provision is qualified by s-s.50(3) which provides that if the money ordered to be paid is for a past pecuniary loss, the prejudgment interest to be awarded under s-s.50(1) shall be calculated on that total past pecuniary loss at the end of each six month period and at the date of the order.

15    The appellant argues that at least a portion of the damages assessed as being due to Bagnall represent past pecuniary loss and thus prejudgment interest should be calculated in accordance with s-s. 50(3) of the Supreme Court Act. It also argues the total loss suffered by Bagnall did not occur on the date of the breach. For example, it points out the loss of profits on the franchise agreement was estimated by Bagnall's expert witness to occur at the rate of $22,700.00 per year over a ten-year period commencing in 1993. Another example, it says, are damages incurred as the cost of mitigation. These were incurred within a one-year period following the date of the breach.

16    On the other hand, Bagnall argues the damages awarded represent general damages for loss of profits as claimed in the counterclaim. Any pecuniary loss i.e. for the balance of the appellant's capital contribution and recovery of Bagnall's share of the losses from the first year of operation, should bear interest from the date of the breach as they accrued due at that date. In summary, Bagnall argues the prejudgment interest award should be calculated from the date of the breach (i.e. the date the cause of action arose), pursuant to s-s.50(1) of the Supreme Court Act.

17    We accept, for the most part, the position put forward by Bagnall. The claim for contribution of the appellant's share of the operating losses while the joint venture agreement did continue, as well as the claim for the balance of the appellant's capital contribution to the joint venture, were clearly a pecuniary loss which accrued due on the date of the breach. Prejudgment interest will be payable on these amounts from March 1, 1989 to the date of this decision, excluding the period of time between March 13, 2000 and October 10, 2000.

18    The claim by Bagnall for loss of profits from the joint venture agreement and from the operation of the franchise was specifically pleaded in the counterclaim as a claim in the nature of general damages for loss of profits. The loss was quantified by the expert who gave evidence on Bagnall's behalf. The appellant had brought forth the opinion evidence of an expert who quantified Bagnall's loss by another method.

19    The Court accepted the opinion evidence of Bagnall's expert witness who quantified the damages on the basis of the loss profits over the term of the joint venture agreement and the ten-year franchise agreement. The fact the damages for loss of profits were assessed by the expert witness on an annual basis and accepted by the Court on that basis, does not change their nature from general damages to a specific pecuniary loss. Regardless of whose opinion the Court accepted, general damages accrued due to Bagnall on the date of the breach. They constituted a loss which flowed as a natural consequence of the appellant's breach of contract. The assessment of the quantum of the loss of profits was not a matter of precise arithmetical calculation nor was it an ascertainable pecuniary loss. It was a matter of an expert opinion accepted by the Court which took into consideration the various uncertainties associated with such an assessment. These damages do not represent a past pecuniary loss and thus they do not fit within the provisions of s-s. 50(3) of the Supreme Court Act.

20    Therefore, except for the period of time the parties agreed prejudgment interest would not accrue, the Court does not consider it necessary to vary the award of prejudgment interest payable on the quantum of damages assessed as lost profits. Interest shall be calculated on the loss of profits pursuant to s-s.50(1) of the Supreme Court Act from March 1, 1989, to the date

UAP Inc. v. Oak Tree Auto Centre Inc., 2003 PESCAD 6, 2003 CarswellPEI 28
Case 09-10138-MFW    Doc 15723-2    Filed 06/09/15    Page 402 of 490

2003 PESCAD 6, 2003 CarswellPEI 28, 120 A.C.W.S. (3d) 1033, 223 Nfld. & P.E.I.R. 99...

of this decision (not to the date of payment as in the decision of December 12, 2002) save and except for that period between March 13, 2000 and October 10, 2000 when no prejudgment interest is to accrue.

21    On the other hand, the costs incurred by Bagnall in an attempt to mitigate the loss arising from the breach represent a specific out-of-pocket expense which was incurred over a one-year period subsequent to the breach. Therefore, on reconsideration, the award of prejudgment interest on this amount shall be varied. It shall now be calculated in accordance with s-s. 50(3) of the Supreme Court Act by calculating the costs of mitigation for each of the two six-month periods after March 1, 1989 and thereafter on the total costs of mitigation in the amount of $149,381.00 up to the date of this decision, also except for the above noted period of time during which the parties agreed no prejudgment interest would accrue.

22    The Court notes, that while the sum of $150,000.00, being the appellant's capital contribution to the joint venture which Bagnall was to repay on acquiring the franchise (see: paras. 42 to 45 of the decision of December 12, 2002), was not to be repaid until four years after the breach, the adjustment of this amount for purposes of assessing the damages was made as of the date of the breach. In summary, to compensate Bagnall in accord with the principles in paragraph 8 and 9 above, prejudgment interest should be calculated pursuant to s-s.50(1) of the Supreme Court Act from March 1, 1989 to the date of this decision, excluding the period from March 13, 2000 to October 10, 2000, on the net damages assessed in the amount of $258,567.50 ($408,567.50 - $150,000.00, See: para 1). Prejudgment interest on Bagnall's costs of mitigation in the amount of $149,381.00 shall be calculated, as above noted, pursuant to s-s.50(3) of the Supreme Court Act also excluding the period from March 13, 2000 to October 10, 2000.

**THE RATE OF PREJUDGMENT INTEREST**

23    On the hearing of the motion for reconsideration an issue arose as to the proper rate to be applied in calculating the amount of prejudgment interest. The parties requested the Court to resolve this issue.

24    Counsel for the appellant indicated the parties proceeded throughout the litigation on the basis that the rate of prejudgment interest would fluctuate at the rate applicable in each quarter and as published in accordance with s-s. 49(1)(d) of the Supreme Court Act. Counsel for Bagnall conceded this had been his understanding; however, he recently realized he may have been in error and he now argues Bagnall is entitled to prejudgment interest at the rate published or applicable at the end of the first day of the last month of the quarter preceding the quarter in which the proceeding was commenced.

25    The bank rate referred to in s-s.49(1)(d) is set and published in the Royal Gazette pursuant to s-s. 49(2) of the Supreme Court Act. We note from the material filed on this motion that, between January 1989 and March 2002, the rate fluctuated from a high of 15% to a low of 2.50%. Counsel advise that at the present time the rate is approximately 3.0%. The parties agree the applicable rate at the time Bagnall commenced the proceeding by way of counterclaim would have been 14%.

26    The rate of prejudgment interest set in accordance with s-s.49(1)(d), which in itself is an indicator of market interest rates, has fluctuated steadily downward since 1989 -1990. The Court has, therefore, taken into consideration the downward trend in the market interest rates between the date Bagnall's cause of action arose and the present date. We would exercise the discretion vested in the Court by s. 52 of the Supreme Court Act and order that the rate of interest applicable to the calculation of prejudgment interest as ordered above shall be the variable rate of interest as set and published by the Registrar of the Court on the last month of each quarter pursuant to s-s. 49(2) of the Supreme Court Act. This rate shall be determined in each quarter from March 1, 1989 to the date of this decision, excluding the period from March 13, 2000 to October 10, 2000.

**COSTS**

27    The matter of costs both at trial and the appeal was left for the parties to agree upon and failing agreement, to be decided by the Court. The parties were unable to reach an agreement.

28    The trial judge's decision which was the subject of this appeal arose only from the assessment of the quantum of damages. The trial judge had assessed Bagnall's damages in the amount of $588,243.00 plus prejudgment interest. The trial judge also ordered that Bagnall was to have its party and party costs on the assessment of damages hearing. See: *UAP Inc. v. Oak Tree*

UAP Inc. v. Oak Tree Auto Centre Inc., 2003 PESCAD 6, 2003 CarswellPEI 28
Case 09-10138-MFW    Doc 15723-2    Filed 06/09/15    Page 403 of 490

2003 PESCAD 6, 2003 CarswellPEI 28, 120 A.C.W.S. (3d) 1033, 223 Nfld. & P.E.I.R. 99...

*Auto Center Inc.*, 2001 PESCTD 65, 204 Nfld. & P.E.I.R. 189 (P.E.I. T.D.). The liability of the appellant for breach of contract had been determined in previous proceedings and Bagnall had been awarded its costs in these proceedings.

29    Bagnall now submits that the award of party and party costs made by the trial judge should not be disturbed by this Court. The appellant, on the other hand, argues that a reasonable disposition of costs on the assessment would be to award it party and party costs and allow Bagnall reasonable costs submitted by its expert witness.

30    We accept the position of Bagnall. We would not vary the award of costs made by the trial judge. While Bagnall did not receive the amount it was seeking from the assessment, the appellant's position as to what it was obligated to pay in damages was also unacceptable to the trial judge. The award of costs to Bagnall on a party and party basis for the trial on the assessment of damages is confirmed.

31    With respect to the costs of the appeal, Bagnall's position is that because the appellant was primarily unsuccessful on all the grounds of appeal, Bagnall should have its party and party costs. In the alternative, Bagnall states that the Court could recognize the appellant's partial success on the appeal and award the appellant a portion of its party and party costs.

32    The appellant's position with respect to the costs on appeal is that it was successful on the majority of its appeal grounds and thus should receive its complete party and party costs on the appeal. The appellant made a motion to stay proceedings after the decision of the trial judge. In doing so it agreed to post security for the award made by the trial judge plus interest. A stay was granted on conditions and the appellant now seeks its costs of this motion.

33    It is our view the alternative position put forward by Bagnall should be accepted. In recognition of the appellant having the quantum of damages reduced by approximately 30%, it should be awarded a portion of its party and party costs on the appeal and on the motion for the stay of proceedings. Therefore, we would allow the appellant 30% of its party and party costs on both the appeal and the motion for a stay of proceedings.

34    Bagnall shall have its party and party costs on the motion for reconsideration. We set the amount of these costs at $750.00 and they are payable forthwith. There will be no order for costs on the submissions as to the applicable interest rate or the matter of costs at trial and the appeal.

*Motion granted in part.*

---

**End of Document**                    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# TAB 15

DATE: 19990916
DOCKET: C30020

# COURT OF APPEAL FOR ONTARIO

RE:            GORDON ANTHONY BREMNESS (Plaintiff/Appellant) –and–
               McGEE CAPITAL MANAGEMENT LIMITED
               (Defendant/Respondent)

BEFORE:        CATZMAN, ABELLA and FELDMAN JJ.A.

COUNSEL:       *Jeffrey A. Kaufman,* for the appellant

               *Geoff R. Hall,* for the respondent

On appeal from the judgment of Wilkins J. dated March 3, 1998.

# **E N D O R S E M E N T**

[1]     We released an endorsement in this matter on February 24, 1999 allowing the appeal "with costs". Counsel for the appellant has asked us to clarify the decision on the issue of the disposition of the costs below.

[2]     We agree with counsel for the appellant that this is not a case to which *Cameron v. Julien* (1957), 9 D.L.R. (2d) 460 is applicable and that leave to appeal was not required to appeal from the order for costs made by Wilkins J.

[3]     We further agree with counsel for the appellant that this court has jurisdiction to clarify or amend the order for costs made on the disposition of the appeal.

[4]     Having regard to the result in this court, we are all of the view that the costs of the appeal and of the proceedings that led to the judgment of Wilkins J. should be assessed on the party-and-party scale of costs appropriate to the quantum of the appellant's ultimate recovery from the respondent, and we direct that the formal order of this court disposing of this appeal be amended accordingly.

Signed: "M.A. Catzman J.A."



"R.S. Abella J.A."

"K. Feldman J.A."

# TAB 16

55 S.Ct. 685, 79 L.Ed. 1419

55 S.Ct. 685
Supreme Court of the United States

IVANHOE BUILDING & LOAN
ASS'N OF NEWARK, N.J.,
v.
ORR.

No. 611.    |    Argued April 5,
1935.    |    Decided April 29, 1935.

On Writ of Certiorari to the United States Circuit Court of Appeals for the Third Circuit.

Proceedings in the matter of the Eastern Sash & Door Company, bankrupt, for which Thomas A. Orr was trustee, and wherein the Ivanhoe Building & Loan Association of Newark, N.J., filed a claim. To review a judgment of the Circuit Court of Appeals (73 F.(2d) 609) affirming a judgment which approved an order of the referee reducing the claim, the claimant appeals.

Judgment reversed.

West Headnotes (3)

**[1]    Bankruptcy**
  Secured Claims

Creditor who had recovered portion of claim against bankrupt by foreclosure of mortgage on property not owned by bankrupt could prove claim for full amount of debt and not merely for balance required to make creditor whole, since he was not "secured creditor" within statute permitting such creditor to prove only for difference between value of security and face amount of debt, in that at date of bankruptcy creditor held no security against bankrupt's property nor security given by any other person who in turn was secured by the bankrupt's assets (Bankr. Act §§ 1 (23), 57e, 11 U.S.C.A. §§ 1 (23), 93 (e); Supreme Court rule 38, subd. 5 (b), 28 U.S.C.A. following section 354).

47 Cases that cite this headnote

**[2]    Bankruptcy**
 Secured Claims

Although creditor, who had recovered portion of claim against bankrupt by foreclosure of mortgage on property not owned by bankrupt, could prove claim for full amount of debt, he could collect and retain only sufficient dividends which, with sum realized from foreclosure, would satisfy indebtedness.

17 Cases that cite this headnote

**[3]    Bankruptcy**
 Set-off against claim

Statute providing that, in case of mutual debts between bankrupt's estate and creditor, one debt shall be set off against the other, held not to preclude creditor, who had recovered portion of claim against bankrupt by foreclosure of mortgage on property not owned by bankrupt, from making proof of claim for more than balance of debt after application of avails of foreclosure, since the well-understood conception of "mutual debts" does not embrace such a situation and a creditor who realizes on his security does not "owe" his debtor the amount realized (Bankr.Act § 68a, 11 U.S.C.A. § 108(a)).

40 Cases that cite this headnote

**Attorneys and Law Firms**

**686   *244** Messrs. Abraham Alboum and Maurice J. Zucker, both of Newark, N.J., for petitioner.

Mr. Saul Nemser, of Jersey City, N.J., for respondent.

**Opinion**

Mr. Justice ROBERTS delivered the opinion of the Court.

**[1]    [2]    [3]**   In this case the question is whether a creditor of a bankrupt, who has recovered a portion of the debt owed him by foreclosure of a mortgage on property not owned by the bankrupt, may prove for the full amount of the debt, or only for the balance required to make him whole.

The owners of real estate in Newark, N.J., executed to the petitioner a bond in the penal sum of $23,000, conditioned for the payment of $11,500, secured by a mortgage on the land. The mortgagors subsequently conveyed the premises to the Eastern Sash & Door Company, which expressly assumed the mortgage debt. That company afterward conveyed to one Yavne. A default occurred, and the petitioner filed a foreclosure bill against Yavne. The amount due was found to be $10,220.96, **\*245** with interest and costs. The property was sold by the sheriff and bid in by the petitioner for $100. Meanwhile the sash and door company had been adjudicated a bankrupt. The petitioner presented a claim against the estate for $10,739.94, the amount then due on the bond less the $100 bid at the sale. It was stipulated that the mortgaged property acquired in foreclosure was worth $9,000. The referee reduced the claim to the difference—$1,739.94—and ruled the petitioner was not entitled to prove for any greater sum. The District Court and the Circuit Court of Appeals have held the referee's ruling was right. [1] The result appearing to be contrary to the weight of authority [2] we granted certiorari. [3]

[1]  73 F.(2d) 609, 610.

[2]  Rule 38, subd. 5(b), 28 USCA following section 354.

[3]  294 U.S. 700, 55 S.Ct. 507, 79 L.Ed. 1237.

Decision must be governed by relevant provisions of the Bankruptcy Act. The definition found in section 1(23) [4] is:

[4]  4 U.S.C. tit. 11, s 1(23), 11 USCA s 1(23).

"Secured creditor' shall include a creditor who has security for his debt upon the property of the bankrupt of a nature to be assignable under this Act (title), or who owns such a debt for which some indorser, surety, or other persons secondarily liable for the bankrupt has such security upon the bankrupt's assets.'

Section 57e [5] directs that 'claims of secured creditors * * * shall be allowed for such sums only as to the courts seem to be owing over and above the value of their securities. * * *'

[5]  5 U.S.C. tit. 11, s 93(e), 11 USCA s 93(e).

Unless the petitioner was a secured creditor as defined by section 1(23), it was not bound to have its security or the avails thereof valued and to prove only for the difference between that value and the face amount of the debt. Petitioner does not come within the definition, for at the date of bankruptcy it held no security against the bankrupt **\*246**

company's property nor security given by any other person who in turn was secured by the bankrupt's assets. [6] Sections 1(23) and 57e do not, therefore, forbid the proof of a claim for the principal of the bond with interest, though the petitioner may not collect and retain dividends which with the sum realized from the foreclosure will more than make up that amount. The court below was of this opinion, but thought that section 68a [7] forbade proof of a claim for more than the balance of the debt after application of the **\*\*687** avails of the foreclosure. That section directs: 'In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid.' The theory upon which this section was held to control the right to prove was thus stated:

[6]   The point was involved and necessarily decided, though not adverted to, in Hiscock v. Varick Bank, 206 U.S. 28, 27 S.Ct. 681, 51 L.Ed. 945; see the same case below sub nom. In re Mertens (C.C.A.) 144 F. 818, 820. See, also, In re Headley (D.C.) 97 F. 765; Swarts v. Fourth Nat. Bank (C.C.A.) 117 F. 1; In re Noyes Bros. (C.C.A.) 127 F. 286; In re Sweetser (D.C.) 128 F. 165; Gorman v. Wright (C.C.A.) 136 F. 164; Board of County Commissioners v. Hurley (C.C.A.) 169 F. 92; In re Bailey (D.C.) 176 F. 990; In re H. V. Keep Shirt Co. (D.C.) 200 F. 80; In re Thompson (D.C.) 208 F. 207; Young v. Gordon (C.C.A.) 219 F. 168; In re Pan-American Match Co. (D.C.) 242 F. 995; In re Anderson (D.C.) 11 F.(2d) 380; Hampel v. Minkwitz (C.C.A.) 18 F.(2d) 3; Bankers' Trust Co. v. Irving Trust Co. (C.C.A.) 73 F.(2d) 296.

[7]   7 U.S.C. tit. 11, s 108(a), 11 USCA s 108(a).

'While the obligation of the bankrupt to pay the mortgage still remained, the mortgagee had gotten possession of the security, and, in enforcing this obligation against the bankrupt, the appellant-creditor (petitioner) must reduce its claim by the admitted value of the security less the $100 paid for it. The bankrupt owed the appellant (petitioner) the amount of the mortgage, and the appellant (petitioner) equitably owed the bankrupt the value of the security in his possession.'

**\*247** This novel application of section 68a is, we think, inadmissible. A creditor holding security, who realizes upon it, does not 'owe' his debtor the amount realized. The wellunderstood concept of mutual debts does not embrace such a situation as is here disclosed.

Judgment reversed.

55 S.Ct. 685, 79 L.Ed. 1419

**Parallel Citations**

55 S.Ct. 685, 79 L.Ed. 1419

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

# TAB 17

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NORTEL NETWORKS, INC., *et al.*, | ) | Case No. 09-10138 (KG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Re: Dkt. No. 14076** |

**OPINION REGARDING DEBTORS' MOTION PURSUANT TO BANKRUPTCY
RULE 9019 APPROVING SETTLEMENT AGREEMENT BY AND AMONG
NORTEL NETWORKS INC., THE SUPPORTING BONDHOLDERS, AND
THE BANK OF NEW YORK MELLON WITH RESPECT TO THE NNI
POST-PETITION INTEREST DISPUTE AND RELATED ISSUES**

KEVIN GROSS                                      Wilmington, Delaware
UNITED STATES BANKRUPCTY JUDGE                   December 18, 2014

The Court is deciding Debtors' Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 Approving Settlement Agreement by and Among Nortel Networks, Inc., the Supporting Bondholders, and the Bank of New York Mellon with Respect to the NNI Post-Petition Interest Dispute and Related Issues (the "Settlement Motion"). The proposed settlement resolves a major dispute in this long-running bankruptcy case regarding the amount of post-petition interest certain holders of what have come to be known as the "Crossover Bonds" are entitled to claim and receive. For the reasons set forth below, the Court finds that the proposed settlement is fair, reasonable, and in the best interest of the estates. Accordingly, the Court will approve the proposed settlement.

## JURISDICTION

The Court has jurisdiction over this matter and the judicial authority to issue a final order pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## BACKGROUND

A complete recitation of the events leading up to the petition date and the complex history of the nearly six-year[1] bankruptcy case itself is not necessary to the resolution of the matter before the Court, which turns on a relatively narrow set of facts. Further, as the Allocation Dispute (defined below) and myriad other plan issues are still pending at this juncture, it is vitally important that the Court avoid "pre-judging" any disputed legal

---

[1]  The docket consists of nearly 15,000 docket entries.

2

issue or fact. Accordingly, the Court will limit the factual underpinning to only those facts which are both undisputed and strictly necessary to the resolution of the Settlement Motion.

### A.  Procedural Background and Allocation Dispute

Prior to the petition date, Nortel[2] operated as a global networking solutions and telecommunications enterprise, tracing its roots back more than a century. On January 14, 2009, Nortel Networks, Inc. ("NNI") and certain of its U.S.-based affiliates (collectively, the "U.S. Debtors")[3] filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code[4] (the "U.S. Proceedings"). On the same day, certain of the U.S. Debtors' foreign affiliates initiated two related insolvency proceedings abroad.

In Canada, Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), and certain of their Canada-based affiliates (collectively, the "Canadian Debtors") initiated an insolvency proceeding (the "Canadian Proceedings") in the Ontario Superior Court of Justice (the "Canadian Court") under Canada's Companies' Creditors Arrangement Act (the "CCAA"). As is required under the CCAA, at the outset

---

[2] "Nortel" shall refer to the entire, worldwide enterprise, as opposed to a single affiliate or subsidiary, many of which are alternatively defined *infra*.

[3] The Debtors in these Chapter 11 cases are Nortel Networks Inc., Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc.

[4] 11 U.S.C. § 101 *et seq.*

3

of the proceeding the Canadian Court appointed a monitor, Ernst & Young Inc. (the "Monitor").[5] For all intents and purposes, the Monitor is the sole fiduciary acting on behalf of the Canadian Debtors in the U.S. Proceedings. NNC is the U.S. Debtors' ultimate corporate parent, while NNL is NNI's direct corporate parent and 100% shareholder.

In the United Kingdom, the High Court of Justice of England and Wales placed certain of the U.S. Debtors' affiliates based in Europe, the Middle East, and Africa (collectively, the "EMEA Debtors") into administration, *i.e.* an insolvency proceeding (the "EMEA Proceedings"), under the supervision of court-appointed administrators and foreign representatives (the "Joint Administrators"). NNC is also the ultimate corporate parent of all EMEA Debtors.

Also pending before the Court are Chapter 15 cases under the caption *In re Nortel Networks Corporation, Foreign Applicants in Foreign Proceedings*, Case No. 09-10164 (Jointly Administered). The Monitor filed the Chapter 15 cases to facilitate the Canadian Proceedings. The Court entered an Order Granting Recognition and Related Relief on February 27, 2009, which recognized the Canadian Proceedings as foreign main

---

[5] As defined by the Office of the Superintendent of Bankruptcy Canada:

> "A monitor is a trustee licensed by the Office of the Superintendent of Bankruptcy who is appointed by the Court in the initial order. As an officer of the Court, the monitor's role is to monitor the company's business and financial affairs to ensure compliance with the law, the court orders and terms of the Plan. The monitor assists the company with the preparation of the Plan, prepares reports for the Court, provides information to the creditors regarding the claims process and creditors' meetings, etc. and oversees any voting at the meetings."

*You are Owed Money – The Companies' Creditors Arrangement Act (The Role of the Monitor)*, INDUSTRY CANADA, http://www.ic.gc.ca/eic/site/bsf-osb.nsf/eng/br02284.html#toc5 (last modified Oct. 9, 2014).

proceedings pursuant to Section 1520 of the Bankruptcy Code.  The subject matter of this Opinion relates only to the Chapter 11 cases.

Soon after the commencement of the various insolvency proceedings, Nortel entities across the globe proceeded with an orderly and coordinated sale of Nortel assets, generating several billion dollars in sale proceeds in the aggregate. Of particular note, from 2009 to 2011, the Nortel entities executed a series of sales which both the Court and the Canadian Court approved in joint hearings.  The sales have come to be known as the "Line of Business" and "Patent Portfolio" sales. The Line of Business and Patent Portfolio sales generated approximately $7.3 billion in proceeds. In order to facilitate speedy consummation of the sales, on June 9, 2009, the parties entered into and the Court and the Canadian Court approved the Interim Funding and Settlement Agreement (the "IFSA") [D.I. 874, 993]. As is relevant here, the parties to the IFSA agreed to allow the sales to proceed and save for another day how the Line of Business and Patent Portfolio sales proceeds would be allocated among the U.S., Canadian and EMEA Debtors (the "Allocation Dispute"). IFSA ¶ 20, Part C.

In the years since the Nortel entities consummated the Line of Business and Patent Portfolio sales, the U.S. Debtors, the Monitor (on behalf of the Canadian Debtors), the Joint Administrators (on behalf of the EMEA Debtors), and various creditor constituencies of each estate engaged in comprehensive settlement discussions. These discussions included three failed mediations. Ultimately, the Court, jointly with the Canadian Court, conducted a multi-week trial regarding the Allocation Dispute in May and June of 2014, and took the matter under advisement. To date, the parties have failed

5

to reach a consensual resolution and the Allocation Dispute remains pending before this Court and the Canadian Court. Neither the Debtors nor any other party has proposed a plan of reorganization in the U.S. Debtors' cases.

### B.   The Crossover Bonds

Prior to the petition date, pursuant to an indenture dated July 5, 2006 (the "2006 Indenture"), NNL issued four series of senior notes which were guaranteed jointly and severally by both NNC and NNI. The 2006 Indenture notes carried interest rates of 10.125%, 10.75% (two series), and LIBOR plus 4.25%. Pursuant to the 2006 Indenture, Bank of New York Mellon, as Indenture Trustee ("BNY Mellon"), timely filed a proof of claim in the U.S. Proceedings on behalf of all 2006 Indenture noteholders in the amount of approximately $2.785 billion.

Similarly, pursuant to an indenture dated March 28, 2007 (the "2007 Indenture"), NNC issued two series of convertible senior notes which were guaranteed jointly and severally by NNL and NNI. The 2007 Indenture notes (together with the 2006 Indenture notes, the "Guaranteed Bonds") carried interest rates of 2.125% and 1.75%. Pursuant to the 2007 Indenture, BNY Mellon timely filed a proof of claim in the U.S. Proceedings on behalf of all 2007 Indenture noteholders (together with the 2006 Indenture noteholders, the "Supporting Bondholders") in the aggregate amount of approximately $1.156 billion.

Additionally, pursuant to an earlier indenture, dated February 15, 1996 (the "1996 Indenture"), NNL and Nortel Networks Capital Corporation ("NNCC") issued a series of senior notes which were guaranteed by NNL. NNI subsequently executed a "Support Agreement," dated February 15, 2006, in favor of NNCC which, as is relevant here,

essentially acts as a guarantee by NNI of the 1996 Indenture notes. The 1996 Indenture

notes (together with the Guaranteed Bonds, the "Crossover Bonds") carried an interest

rate of 7.875%. Pursuant to the 1996 Indenture, Law Debenture Trust Company of New

York, as Successor Indenture Trustee, timely filed a proof of claim in the U.S. Proceedings

on behalf of the 1996 Indenture noteholders (together with the Supporting Bondholders,

the "Crossover Bondholders") in the amount of approximately $151 million.

The total pre-petition amount of the Crossover Bonds claims is approximately

$4.092 billion. All three of the Crossover Bonds proofs of claim include accumulated but

unpaid pre-petition interest and explicitly reserve the claimants' right to seek post-

petition interest. The 2006 Indenture and 2007 Indenture noteholders, *i.e.* the Supporting

Bondholders, are signatories to the Settlement Agreement while the 1996 Indenture

noteholders are not.

### C.   The PPI Dispute and Settlement Agreement

While no party has yet disputed the Crossover Bondholders' entitlement to

principal and pre-petition interest at the contract rate, the Crossover Bondholders, the

Monitor, and certain Canadian creditor constituencies disagree sharply as to the rate at

which the Crossover Bondholders may recover post-petition interest in the event that

NNI is solvent (the "PPI Dispute").[6]  Based on evidence and expert testimony introduced

during the Allocation Dispute trial, NNI could be solvent by more than $1 billion under

---

[6] As discussed in more detail *infra,* under the Bankruptcy Code unsecured creditors are generally entitled to post-petition interest only when the bankruptcy estate is solvent.

certain allocation theories, while it is likely that the Canadian Debtors will be insolvent under any allocation theory.[7] As is relevant here, the Monitor and Canadian creditor constituencies have argued that the Crossover Bondholders are entitled to post-petition interest from NNI at a rate of 0.44%, the Federal Judgment Rate ("FJR") applicable as of the petition date, based on Bankruptcy Code §§ 502(b)(2), 726(a)(5), 1129(a)(7), and 1129(b). Alternatively, the Crossover Bondholders have argued that they are entitled to post-petition interest from NNI at the contract rates set forth above based on the same Bankruptcy Code provisions.[8]

On October 25, 2013, Wilmington Trust, N.A., as successor trustee for a series of notes issued by NNL ("Wilmington Trust"),[9] filed an objection to the Crossover Bondholders' proofs by claim [D.I. 12116]. In its objection, Wilmington Trust asked the Court to disallow the Crossover Bondholders' claims to the extent they exceeded the sum of: (1) principal; (2) accrued but unpaid pre-petition interest; and (3) post-petition interest at the rate of 0.44% (the FJR). On November 15, 2013, after a status conference, the Court entered an order adjourning Wilmington Trust's objection, without date:

> [P]rincipally because the Objection would require the Court to issue an advisory opinion on an issue which may never arise and, if it does, only at a later date and perhaps in a

---

[7] This summary of evidence produced at the Allocation Dispute trial is meant to illustrate a range of possible outcomes set forth by certain parties to the Allocation Dispute and does not constitute a factual or legal finding by the Court as to any allocation theory or the solvency of any of the U.S. or Canadian Debtors.

[8] A more detailed summary of the legal bases for the parties' arguments regarding the rate of post-petition interest to which the Supporting Bondholders are entitled is set forth *infra*.

[9] Neither NNI nor any other U.S.-based debtor guaranteed these notes. Accordingly, Wilmington Trust is not a direct creditor of the U.S. Debtors.

> different context. The Objection will only be germane if the
> U.S. Debtors are found to be solvent and the solvency issue is
> far from decided. Courts do not have the power to render an
> advisory opinion, *i.e.*, based on a contingency and resulting in
> a contingent declaration.

[D.I. 12399] (citing *Pittsburgh Mack Sales & Service, Inc. v. Int'l Union of Operating Engineers,*

*Local Union No. 66*, 580 F.3d 185, 191-193 (3d Cir. 2009)).

On June 19, 2014, several weeks into the Allocation Dispute trial but prior to its

conclusion, after raising the matter in a conference with the Court and the Canadian

Court at which all parties were present, the Monitor filed a memorandum asking this

Court and the Canadian Court to hear and decide the PPI Dispute on an expedited basis

[D.I. 13880]. The Monitor argued that the parties to the Allocation Dispute were unable

to meaningfully analyze settlement proposals while the PPI Dispute remained pending

due to the divergent positions of the Crossover Bondholders and the Monitor with

respect to the post-petition interest rate. According to the Monitor, the Crossover

Bondholders would be entitled to approximately $90 million in post-petition interest as

of December 31, 2013 if the FJR applies, versus approximately $1.6 billion if the contract

rate applies. The Monitor concluded that since the PPI Dispute must be resolved at some

future date in any event, the Court and the Canadian Court should decide the issue

sooner rather than later to facilitate a settlement of the Allocation Dispute.

On June 20, 2014, the U.S. Debtors and Supporting Bondholders filed a joint

memorandum in response to the Monitor's memorandum [D.I. 13883]. The U.S. Debtors

and Supporting Bondholders raised three objections in their response which are relevant

here: (1) the PPI Dispute is not ripe for adjudication by this Court or the Canadian Court,

specifically noting this Court's order of November 15, 2013 with respect to the Wilmington Trust claim objection (quoted above); (2) the expedited process for resolving the PPI Dispute proposed by the Monitor violated due process; and (3) the Monitor's argument that resolving the PPI Dispute would facilitate settlement of the Allocation Dispute was both a violation of the confidentiality of settlement discussions and factually incorrect. Accordingly, the U.S. Debtors and Supporting Bondholders asked the Court and the Canadian Court to deny the Monitor's request to hear and decide the PPI Dispute on an expedited basis.

On June 23, 2014, the Monitor filed a reply memorandum.  [D.I. 13886].  The Monitor argued that the PPI Dispute was ripe for adjudication because it was a purely legal issue, the resolution of which would assist in the negotiation of a consensual resolution to the Allocation Dispute. The Monitor further argued that its proposed expedited briefing schedule raised no due process concerns as the parties had been aware of the issues surrounding the PPI Dispute since the consummation of the Line of Business and Patent Portfolio sales and should have no difficulty preparing for argument in short order.

On June 30, 2014, the Court entered a scheduling order for the PPI Dispute, setting deadlines for opening and reply briefs and scheduling oral argument for July 25, 2014 (the "PPI Dispute Scheduling Order"). The Canadian Court did likewise.  Pursuant to the Court's order, the parties were to address the following questions:

> (1) whether the holders of the crossover bonds claims are legally entitled in each jurisdiction to claim or receive any amounts under the relevant indentures, above and

10

> beyond the outstanding principal debt and prepetition interest; and
>
> (2) if determined that the holders of the crossover bonds claims are so entitled, what additional amounts are such holders entitled to so claim and receive . . . .

[D.I. 13910]. The U.S. Debtors, Supporting Bondholders, Monitor, and various other Canadian and U.S. creditor constituencies subsequently filed opening and reply briefs regarding the merits of the PPI Dispute in accordance with the PPI Dispute Scheduling Order. The Monitor and Canadian creditor constituencies argued in favor of a post-petition interest rate equal to the FJR (0.44%), while the Crossover Bondholders and certain other U.S. creditor constituencies argued in favor the applicable contract rate.[10]  A joint hearing with the Canadian Court was scheduled to begin on July 25, 2014.

On July 24, 2014, the U.S. Debtors filed the Settlement Motion seeking approval of a settlement of the PPI Dispute reached with the Supporting Bondholders (the "Settlement Agreement" or the "Settlement") [D.I. 14076]. The Settlement Agreement resolves the PPI Dispute with respect to all of the Guaranteed Bonds, which constitute over 95% of the Crossover Bonds by principal amount. The core terms of the Settlement Agreement are as follows:

> (1) The Supporting Bondholders shall be allowed a general unsecured claim against NNI in the aggregate amount of $3,934,521,442.00;
>
> (2) In the event that the NNI bankruptcy estate has more than sufficient funds to pay all administrative, priority,

---

[10] The U.S. Debtors' brief did not address the merits of the PPI Dispute but instead addressed "certain procedural issues" related to the PPI Dispute [D.I. 14019].

secured, and general unsecured claims, the Supporting Bondholders shall be entitled to payment of post-petition interest from NNI in accordance with a confirmed chapter 11 plan until the PPI Dispute settlement amount is paid in full. The PPI Dispute settlement amount is an amount equal to:

(a) $876 million for the period from the petition date up to and including June 30, 2014; and

(b) An "additional amount," not to exceed $134 million, which shall accrue at a rate equal to 3.5% per annum from June 1, 2014 until the earlier of June 30, 2015 and the date of the final distribution with respect to the Guaranteed Bonds (thus setting a total cap on post-petition interest with respect to the Guaranteed Bonds of $1.01 billion);

(3) While the Settlement Agreement does not constitute a release, waiver, or discharge of other "contractual entitlements," such as make-whole payments, recovery of those contractual entitlements is subject to the $1.01 billion post-petition interest cap;

(4) The indenture trustee (*i.e.* BNY Mellon) and certain other parties shall be entitled to seek reimbursement from NNI of certain costs, up to an aggregate cap of $6 million, which shall constitute an advance against any distribution to which the Supporting Bondholders are entitled; and

(5) In the event that there are insufficient funds in the U.S. debtors' estates to pay each unsecured creditor the full amount of post-petition interest owed, then, solely for purposes of allocating funds available for post-petition interest, the Supporting Bondholders shall be deemed to have a claim for post-petition interest equal to the full amount of post-petition interest which would have accrued at the applicable contract rate. The Settlement Agreement does not settle the manner in which available funds will be distributed among unsecured creditors in the event there are insufficient funds to pay each unsecured creditor the full amount of post-petition interest owed. (the "Reservation of Rights").

In light of the Settlement Motion, the Court adjourned the hearing on the PPI Dispute

scheduled for the next day. The Official Committee of Unsecured Creditors in the U.S.

Proceedings (the "UCC") and the 1996 Indenture noteholders[11] each subsequently filed

statements in support of the Settlement Motion [D.I. 14189, 14340]

The Canadian Court proceeded alone with the hearing on the PPI Dispute.  The

Canadian Court later issued its ruling that under Canadian law, the Canadian Debtors

were not obligated to pay post-petition interest.  In its Endorsement, dated August 19,

2014, the Canadian Court held that although the Crossover Bondholders have a

contractual right to interest, they are not entitled to receive post-petition interest under

Canadian law.  The Canadian Court thus ruled on the merits of the PPI Dispute, as the

Monitor had insisted.

Neither the Monitor nor the Canadian Debtors, nor any other Canadian creditor

constituency which filed a brief pursuant to the PPI Dispute Scheduling Order was a

signatory to the Settlement Agreement. On July 30, 2014, the Monitor[12] filed a preliminary

objection to the Settlement Motion along with a motion to adjourn the objection deadline

in order to allow for expedited discovery [D.I. 14117]. On September 2, 2014, the Court

---

[11] While the 1996 Indenture noteholders support the Settlement Agreement, they state that given the intricacies of the relationship between NNI and NNCC which arise due to the 2006 Support Agreement, their notes require "bespoke treatment."

[12] Unless otherwise noted, with respect to the Settlement Motion the Monitor is acting on its own behalf as well as for the Canadian Debtors.

13

entered an order establishing an expedited discovery schedule and scheduling a hearing on the Settlement Motion for November 4, 2014.

On October 3, 2014, the Monitor filed a supplemental objection to the Settlement Motion, setting forth its substantive objections [D.I. 14496]. In support of its objection, the Monitor also filed notice of the expert report of Dr. Paul Wertheim [D.I. 14499]. Additionally, Wilmington Trust filed a separate objection to the Settlement Motion [D.I. 14498] and Nortel Networks UK Pension Trust Limited, the Board of the UK Pension Protection Fund, and the Canadian Creditors Committee (collectively, the "Joinder Parties") filed joinders to Wilmington Trust's and the Monitor's objection [D.I. 14534, 14564].[13]

On October 30, 2014, the U.S. Debtors and Supporting Bondholders each filed reply briefs in support of the Settlement Motion [D.I. 14652, 14653]. The UCC additionally filed a statement in further support of the Settlement Agreement and adopted the U.S. Debtors' and Supporting Bondholders' reply briefs [D.I. 14656].

On November 4, 2014, the Court heard testimony from three witnesses and admitted into evidence approximately 250 documentary exhibits regarding the Settlement Motion. The U.S. Debtors called John Ray, the principal officer of NNI, to testify in support of the Settlement Motion. The Supporting Bondholders called Michael Katzenstein, a senior managing director with FTI Consulting and financial advisor to the Supporting Bondholders, to testify in support of the Motion. Mr. Ray represented the U.S.

---

[13] See *infra* note 16.

Debtors and Mr. Katzenstein represented the Supporting Bondholders in the negotiations leading to the Settlement Agreement. Both witnesses were intimately involved in the settlement negotiations and provided substantially consistent testimony regarding the events leading up to the filing of the Settlement Motion, which follows.

### FACTS

In mid-June 2014, around the time the Monitor filed its June 19, 2014, memorandum asking the Court to hear and decide the PPI Dispute on an expedited basis, counsel for the Supporting Bondholders and counsel for the U.S. Debtors began to discuss the possibility of a settlement of the PPI Dispute with respect to the U.S. Debtors. Settlement Transcript of the Hearing on the Motion held on November 4, 2014 ("Tr."), 8, 95. Over the next several weeks, settlement discussions became more serious and on July 15, 2014, various representatives of the U.S. Debtors and Supporting Bondholders met in person to discuss a settlement. Tr. 9, 97. Neither the Monitor, nor the Canadian Debtors, nor any other U.S. or Canadian creditor constituency was present at the July 15, 2014 meeting. Tr. 9, 97. At the meeting, the Supporting Bondholders initially proposed to settle the PPI Dispute with respect to the U.S. Debtors for 70% of the applicable contract rate. Tr. 11, 97. The U.S. Debtors countered with an offer of 30%. Tr. 11, 97. After several hours of give-and-take, the meeting ended with the U.S. Debtors at 40% and the Supporting Bondholders at 60%.  Tr. 11, 98.

Over the course of the next several days, the parties continued to negotiate and eventually settled on 55% of the applicable contract rate, which would mean that the Supporting Bondholders were entitled to $876 million as of June 30, 2014. Tr. 11-12, 101-

102. The parties further negotiated a continued accruals cap of 55% of the applicable contract rate for one year from June 30, 2014, or $134 million, for a total post-petition interest cap on the Guaranteed Bonds of $1.01 Billion. Tr. 12-13, 101. The Supporting Bondholders had sought uncapped continued post-petition accruals. Tr. 12, 101. The parties agreed to convert the percentages stated above to specific dollar amounts in the Settlement Agreement for the avoidance of doubt. Tr. 13. The other core terms of the Settlement Agreement, as set forth above, were negotiated during this time period as well. Tr. 15-16. The U.S. Debtors specifically consulted the UCC regarding the Reservation of Rights, which was included with the intention of "leaving open" the question of how the Supporting Bondholders and other unsecured creditors resolve allocation of amounts available for post-petition interest on an intra-creditor basis in the event that there are insufficient funds to pay all unsecured creditors the full amount of post-petition interest owed. Tr. 16. Neither the Monitor, nor the Canadian Debtors, nor any other U.S. or Canadian creditor constituency (aside from the UCC) was consulted during the post-July 15, 2014 settlement discussions. Tr. 26-27, 61-62.

On July 24, 2014, the U.S. Debtors and Supporting Bondholders executed the Settlement Agreement and filed the Settlement Motion with the Court. Both Mr. Ray and Mr. Katzenstein described the settlement negotiations as "vigorous" and adversarial in nature, with both sides making concessions. Tr. 9, 24, 107-108. Mr. Ray testified that the impetus for commencing the settlement discussions was the Monitor's statement that resolution of the PPI Dispute would facilitate settlement of the Allocation Dispute. Tr. 18-19. Mr. Ray further testified that he did not ask for any financial modeling or specific legal

16

advice regarding the PPI Dispute prior to the July 15, 2014 meeting. Tr. 28, 42-44, 68. According to Mr. Ray, financial modeling to determine the potential amount available for post-petition interest was futile due to the many unresolved issues, variables, and possible outcomes in the U.S. Proceedings, the Canadian Proceedings, and the EMEA Proceedings. Tr. 29, 69.

With respect to consulting the Monitor and other Canadian interests prior to and during the discussions of the terms of the Settlement Agreement, Mr. Ray remarked in his testimony that discussions regarding the PPI Dispute between all parties involved have been going on for years. Tr. 26-27, 62, 88-89. Mr. Ray testified that he was fully aware of the details of the Monitor's and other Canadian interests' positions on the PPI Dispute. Tr. 26-27, 62, 88-89. Mr. Ray excluded the Canadian parties from the June and July 2014 settlement discussions because, in his view, they were not necessary signatories to the Settlement Agreement and their inclusion would only serve to stall and perhaps completely derail settlement discussions. Tr. 27. Mr. Katzenstein generally concurred, noting colorfully in response to a question from the Court that if he "had a dollar for each time [the PPI Dispute was discussed with the Canadian interests], [he] could pay off the bonds." Tr. 126.

The Monitor and Canadian Debtors did not dispute Mr. Ray's and Mr. Katzenstein's testimony from a factual standpoint but did ask a number of question on cross-examination of both witnesses regarding the expedited nature of the June and July 2014 settlement discussions, the fact that Mr. Ray had not sought any specific legal advice or financial modeling prior to the commencement of the settlement discussions, the fact

17

that Mr. Ray did not consult NNI's board of directors prior to executing the Settlement Agreement on the Debtors' behalf, and the fact that the Monitor and other Canadian interests were not consulted prior to or during the settlement discussions. *See generally* Tr. 32-81, 108-125.

The Monitor and Canadian Debtors called Dr. Wertheim to testify in support of their objection. Dr. Wertheim, among numerous other credentials, is a certified public accountant and professor of accounting at Abilene Christian University. Tr. 130-31. The crux of Dr. Wertheim's testimony and report, which was submitted in conjunction with the Monitor's objection, is that even under the best case scenario, the maximum amount of cash available to pay post-petition interest from NNI would be $971 million. Tr. 135. Accordingly, Dr. Wertheim concluded that the Supporting Bondholders gave up no real value under the terms of Settlement Agreement since $971 million is less than the $1.01 billion cap set forth therein. Tr. 138, 176.

In reaching his conclusion, Dr. Wertheim relied solely on a limited set of documents provided to him by the Monitor and did not conduct interviews or any other sort of independent investigation. Wertheim Rep. App. B. [D.I. 14499-1]; Tr. 181-83. Dr. Wertheim repeatedly stated that his mandate was to focus on the "big picture" and that he did not conduct a "detailed analysis" of the minutiae of the various Nortel insolvency proceedings currently under way across the globe. Tr. 141, 172-73, 212-13, 219, 235-36. Consequently, Dr. Wertheim's calculation of the potential cash available to pay post-petition interest from NNI is based on a series of assumptions with respect to a limited set of variables which Dr. Wertheim deemed to be "material." Tr. 141, 173-74. These

18

assumptions, all toggled in such a way as to maximize cash available to pay post-petition

interest from NNI, include: (1) accepting the U.S. Debtors' position in the Allocation

Dispute; (2) assuming that the Crossover Bonds are paid first by the Canadian Debtors

and then by NNI; (3) favorable assumptions with respect to the U.S. Debtors' potential

tax liability; (4) favorable assumptions with respect to certain claims filed against the U.S.

Debtors and Canadian Debtors; and (5) favorable assumptions with respect to the cash

burn rate of both the U.S. Debtors and Canadian Debtors. Wertheim Rep. 7-9; Tr. 144-51.

Dr. Wertheim testified that it is conceivable that certain other variables could align such

that a larger amount of cash could be available to pay post-petition interest from NNI,

but those variables were either immaterial or unlikely to align favorably. Tr. 174, 186-88,

239. All told, Dr. Wertheim spent approximately 100 hours preparing his expert report.

Tr. 287-88. [14]

Dr. Wertheim's testimony was subject to vigorous cross-examination by counsel

for both the U.S. Debtors and the Supporting Bondholders. Cross-examination focused

on three main areas: (1) the limited scope of the documents and other information

considered by Dr. Wertheim, Tr. 179, 181-83, 201-205, 209-210, 255-56; (2) the limited

scope of the variables considered by Dr. Wertheim when making assumptions to

maximize cash available to pay post-petition interest from the NNI estate, Tr. 206, 210,

230-31; and (3) Dr. Wertheim's expertise, or lack thereof, and qualifications to make value

---

[14] Dr. Wertheim also conducted a "sensitivity analysis," the details of which are not necessary to
the resolution of this matter.

judgments with respect to the materiality of certain variables, Tr. 191-98, 220. Examples of specific areas the Debtors and Supporting Bondholders questioned Dr. Wertheim about include his lack of analysis: (1) to support assigning a zero value to 17 million internet protocol addresses owned by NNL, Tr. 206, 266-67; (2) to support assigning a zero value to all intercompany receivables, Tr. 206-210; (3) regarding repatriation of cash held abroad, Tr. 210-11; (4) to support assigning a zero value to certain amounts held in trust that could flow to NNI, Tr. 220-22; (5) to support assigning a zero value to NNI's equity interests in certain foreign affiliates, Tr. 226-33, 269-72; (6) to assume substantive consolidation of the Canadian Debtors, Tr. 245-46; and (7) to support assuming that all claims against the Canadian Debtors will be allowed at their face amount, Tr. 246-56. Dr. Wertheim's analysis to support assumptions with respect to the U.S. Debtors' potential tax liability and certain claims filed against the U.S. Debtors was also faulty or lacking, Tr. 179, 278-84.

On the morning of November 5, 2014, the Court heard closing arguments from counsel for the U.S. Debtors, Supporting Bondholders, and Monitor[15] and took the matter under advisement. Although there was no direct testimony or documentary evidence on the subject, the parties do not dispute the dollar amounts at issue, which are summarized in the chart attached to this Opinion as Exhibit A. For example, as of November 4, 2014, the first day of the hearing on the Settlement Motion, the Supporting Bondholders were

---

[15] Wilmington Trust and the Joinder Parties did not present evidence or argument at the November 4 and 5, 2014 hearing on the Settlement Motion.

potentially entitled to approximately $99 million in post-petition interest at the FJR, approximately $923 million under the Settlement Agreement, and approximately $1.694 billion at the applicable contract rate.

## ANALYSIS

The Court is mindful that this is a decision on a settlement pursuant to Bankruptcy Rule 9019. It is not a decision on the merits. Under Rule 9019, "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." "To obtain approval of a settlement, the Debtors must demonstrate the settlement satisfies, by a preponderance of the evidence, the requirements imposed by Bankruptcy Rule 9019 and the Third Circuit's decision in *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996)." *See In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 509 (Bankr. D. Del. 2010).

In the PPI Dispute Scheduling Order, the Court and the Canadian Court instructed the parties to the PPI Dispute to address the following two questions:

(1) whether the holders of the crossover bonds claims are legally entitled in each jurisdiction to claim or receive any amounts under the relevant indentures, above and beyond the outstanding principal debt and prepetition interest; and

(2) if determined that the holders of the crossover bonds claims are so entitled, what additional amounts are such holders entitled to so claim and receive . . . .

[D.I. 13910]. The Settlement Agreement answers both questions with respect to the U.S. Debtors' and the Guaranteed Bonds, which constitute the vast majority of the Crossover Bonds. In simple terms, in the Settlement Agreement the U.S. Debtors and Supporting Bondholders have agreed that the answer to the first question is "yes" and the answer to

21

the second question is "55% of the contract rate, capped at $1.01 billion." The U.S. Debtors now seek approval of the Settlement Agreement pursuant to Rule 9019.

The Monitor objects to approval of the Settlement Agreement on several grounds, each of which the Court will address in turn. The Monitor's standing to object, and to be heard generally in the PPI Dispute, is based on the Canadian Debtors' 100% equity ownership interest in NNI. Thus, under the Bankruptcy Code's priority scheme, the Canadian Debtors could possibly recover excess funds that a solvent NNI does not pay towards post-petition interest to the Crossover Bondholders and other unsecured creditors. As set forth above, there is considerable likelihood that NNI could be solvent based on certain hypothetical outcomes of the Allocation Dispute.[16]

In *Capmark*, when faced with a similar slate of objections to a pre-plan settlement agreement, Judge Sontchi divided his analysis into a two-part inquiry: (1) *Can* the Court approve the proposed settlement agreement?; and (2) *Should* the Court approve the proposed settlement agreement? *See Capmark*, 438 B.R. at 509-20. The answer to both questions is "Yes."

---

[16] As set forth above, Wilmington Trust and the Joinder Parties also object to approval of the Settlement Agreement. For the reasons set forth in the U.S. Debtors' and Supporting Bondholders' reply briefs, the Court observes that the standing of Wilmington Trust and the Joinder Parties, each of which is a creditor of the Canadian Debtors only and not of the U.S. Debtors, to object to the Settlement Motion is, at best, doubtful. *See* U.S. Debtors' Reply Br. ¶¶ 52-55 [D.I. 14652]; Supporting Bondholders' Reply Br. ¶¶78-83 [D.I. 14653]. A full discussion on standing is unnecessary as Wilmington Trust's and the Objecting Joinder Parties' objections are aligned with the Monitor's objection. Accordingly, the Court's analysis, while explicitly addressing only the arguments raised in the Monitors' objection, fully addresses Wilmington Trust's and the Joinder Parties' arguments as well.

### A.  *Can* the Court Approve the Settlement Agreement?

As an initial matter, the Monitor argues that the Court may not consider a settlement of the type embodied by the Settlement Agreement outside of the plan confirmation process of chapter 11 of the Bankruptcy Code and so the Court may not even reach the Rule 9019 analysis. The Monitor gives two reason for this conclusion. First, the Monitor argues that the Settlement Agreement improperly abrogates the Canadian Debtors' rights under Bankruptcy Code § 1129(a)(7) without their consent. Second, the Monitor argues that the Settlement Agreement constitutes an improper *sub rosa* plan of reorganization. For the reasons that follow, the Court finds that the Settlement Agreement is properly the subject of a Rule 9019 motion.

### 1.  *The Settlement Agreement Does Not Violate Bankruptcy Code § 1129(a)(7).*

As one of a number of requirements for confirmation of a chapter 11 plan of reorganization, Bankruptcy Code § 1129(a)(7) provides:

> (7) With respect to each impaired class of claims or interests —
>
> (A) each holder of a claim or interest of such class —
>
> > (i) has accepted the plan; or
> >
> > (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date . . . .

Section 1129(a)(7) guarantees that creditors and equity holders receiving less than a full recovery under the terms of a chapter 11 plan recover at least what they would have in a

23

chapter 7 liquidation. While Bankruptcy Code § 502(b)(2) generally disallows any claim for "unmatured interest" as of the petition date, Bankruptcy Code § 726(a)(5) allows for payment of post-petition interest to unsecured creditors "at the legal rate" after all allowed claims have been satisfied but before any distribution to equity holders. Thus, since Section 1129(a)(7) essentially makes Section 726(a)(5) applicable in a Chapter 11 case, unsecured creditors are entitled to post-petition interest at the legal rate under the terms of a Chapter 11 plan to the same extent they would be in the context of a Chapter 7 distribution.

A major point of contention in the PPI Dispute is the exact meaning of "the legal rate" in Section 726(a)(5). The Monitor contends that the legal rate refers to the FJR, and that any higher rate would violate the Bankruptcy Code's priority scheme. The Crossover Bondholders argue that the phrase refers to the applicable contract rate. There is no direct, binding Third Circuit authority to guide the parties or the Court on this point.

As an initial matter, the Supporting Bondholders argue that the Monitor should be estopped from arguing that Section 1129 prevents the Court from approving the Settlement Agreement. The Monitor has argued repeatedly, first in its June 19, 2014 memorandum and subsequently in its opening and reply briefs filed pursuant to the PPI Dispute Scheduling Order, that the PPI Dispute is ripe for the Court's immediate consideration. Now the Monitor argues that a motion seeking approval of the PPI Dispute Settlement Agreement is not ripe for the Court's consideration and may only be considered in connection with plan confirmation. The Supporting Bondholders argue

24

that these two positions are so irreconcilably inconsistent as to warrant application of the
doctrine of judicial estoppel.

Judicial estoppel "is a judge-made doctrine that seeks to prevent a litigant from
asserting a position inconsistent with one that she has previously asserted in the same or
in a previous proceeding." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d
355, 358 (3d Cir. 1996). "The basic principle . . . is that absent any good explanation, a
party should not be allowed to gain an advantage by litigation on one theory, and then
seek an inconsistent advantage by pursuing an incompatible theory." *Id.* The Third
Circuit has developed a three-part test to determine if judicial estoppel is warranted: "[(1)
t]he two legal positions taken by the party must be irreconcilably inconsistent, [(2)] bad
faith must be the basis for the change in position, and [(3)] judicial estoppel is not to be
used unless that remedy is 'tailored to address the harm identified' and no lesser sanction
is adequate for that purpose." *Yetter v. Wise Power Sys., Inc.*, 929 F. Supp. 2d 329, 331 (D.
Del. 2013) (citing *Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 777-78
(3d Cir. 2001)).

The Court recognizes the incongruity of the Monitor's arguments and there is little
doubt that the Supporting Bondholders' have presented a strong case for judicial
estoppel. It strains reason and good faith that the Monitor now argues unabashedly that
the Court cannot consider the Settlement Motion.  It was the Monitor, over the objection
of the parties to the Settlement Agreement, which successfully urged the Court and the
Canadian Court to decide expeditiously the merits of the PPI Dispute.  The Court agreed
to hear the PPI Dispute despite ruling previously that it would not.  It is highly significant

that after the U.S. Debtors informed the Court of the Settlement Agreement, the Monitor, without any of the concerns raised in its objection to the Settlement Motion, argued the merits of the PPI Dispute before the Canadian Court and obtained a favorable ruling. But because, for the reasons set forth below, the Monitor's argument with respect to Section 1129(a)(7) fails on its merits and recognizing that judicial estoppel is an "extraordinary remed[y] to be invoked when a party's inconsistent behavior will otherwise result in a miscarriage of justice," *Ryan Operations*, 81 F.3d at 365, the Court will not premise its ruling on the Supporting Bondholders' estoppel argument.

Now, to the merits of the Monitor's Section 1129(a)(7) argument. In *Capmark*, addressing an objection to a pre-plan settlement agreement based on Section 1129(a)(7), Judge Sontchi found that "[a]s a matter of law, Section 1129(a)(7) does not apply to the decision whether to approve a settlement outside of a chapter 11 plan." *Capmark*, 438 B.R. at 513. Judge Sontchi further commented that:

> [A]pproval of the Settlement outside a chapter 11 plan also does not deprive unsecured claimholders of any protection they have from section 1129(a)(7) if the Settlement were embodied in a chapter 11 plan. The reason is that if a claim is settled in a chapter 11 plan, once the court determines that the settlement should be approved, the court will assume the same settlement would be made in chapter 7 for purposes of applying section 1129(a)(7). *See In re Enron Corp.*, Ch. 11 Case No. 01–16034, 2004 Bankr.LEXIS 2549, at *117–20 (Bankr.S.D.N.Y. July 15, 2004) (observing that section 1129(a)(7) requires an "apples to apples" comparison that contains the same settlement, and "assuming common legal issues are resolved the same way [in chapter 7 and chapter 11]").

*Id.* The Court is persuaded by Judge Sontchi's reasoning in *Capmark*.

The Settlement Agreement is not an attempt by the U.S. Debtors and Supporting Bondholders to contract around the priority scheme otherwise mandated by the Bankruptcy Code. The rate at which a solvent estate must pay post-petition interest to unsecured creditors is an open question in the Third Circuit and the subject of heated debate in this case. The U.S. Debtors and Supporting Bondholders have come to an agreement on the PPI Dispute in hopes of moving towards a resolution of the Allocation Dispute and these cases as a whole, as the Monitor urged. While the economic impact of the Settlement Agreement on the Canadian Debtors is sufficient to grant the Monitor standing to object, the Canadian Debtors and Monitor are not necessary signatories to the Settlement Agreement. As discussed in greater detail below, it is for this very reason that under the Rule 9019 standards set forth in the Third Circuit's *Martin* decision, the Court is duty-bound to consider the affect of the Settlement Agreement on non-settling parties. *See Will v. Northwestern Univ.* (*In re Nutraquest*), 434 F.3d 639, 645 (3d. Cir. 2006).

Because, for the reasons discussed below, the Court will approve the Settlement Agreement based on the standards set forth in *Martin* and its progeny, the Court must assume that a Chapter 7 trustee would reach the same settlement. Thus, the Court finds that, to the extent the statute applies at all in the pre-plan settlement context, the terms of the Settlement Agreement do not violate Section 1129(a)(7).[17]

---

[17] While not raised in the Monitor's objection, the Court also finds that, to the extent the rule applies at all in the pre-plan settlement context, the Settlement Agreement does not violate the "absolute priority rule" as codified in Bankruptcy Code § 1129(b)(2)(B). Whether the absolute priority rule mandates payment of post-petition interest by a solvent debtor at the FJR versus the applicable contract rate is an open question in the Third Circuit as well. As with the Section 1129(a)(7) inquiry, the U.S. Debtors and Supporting

## 2. The Settlement Agreement is Not An Impermissible Sub Rosa Plan.

A settlement agreement proposed outside of the plan confirmation process which

has the practical effect of dictating the terms of a prospective Chapter 11 plan constitutes

an improper *sub rosa* plan and may not be approved. *See Capmark*, 438 B.R. at 513.

Settlement agreements which dispose of all claims against the estate, restrict creditors'

right to vote as they see fit on a proposed Chapter 11 plan, or dispose of substantially all

of a debtor's assets have been found to constitute improper *sub rosa* plans. *See Id.; Official

Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc.* (*In re Cajun Elec. Power Coop.,

Inc.*), 119 F.3d 349, 355 (5th Cir. 1997); *Pension Benefit Guar. Corp. v. Braniff Airways, Inc.* (*In

re Braniff Airways, Inc.*), 700 F.2d 935, 940 (5th Cir. 1983); *In re Louise's, Inc.*, 211 B.R. 798,

802 (D. Del. 1997). "Taken together, these cases show that major pre-confirmation

transactions, such as use, sale or lease of estate property under Section 363(b), settlement,

abandonment of property under Section 554, or a transaction out of the ordinary course

of business under Section 1108, raise the concern that the scheme of Chapter 11 will be

distorted." *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 885 (Bankr. S.D.N.Y. 1990).

On the other hand, a settlement agreement which is a "necessary step toward, or

building block of, a plan of reorganization" does not constitute in improper *sub rosa* plan.

*Id. See also Cajun Elec. Power Coop.*, 119 F.3d at 355; *Official Comm. of Unsecured Creditors v.

Debtors & Debtors in Possession* (*In re Tower Automotive Inc.*), 241 F.R.D. 162, 169-70

(S.D.N.Y. 2006). The Court finds the Settlement Agreement is in furtherance of a plan

---

Bondholders have come to an agreement on this question and the Court finds that this agreement passes
muster under the Rule 9019 standards set forth in *Martin*.

process, not a *sub rosa* plan. Despite the Monitor's assertion that the PPI Dispute is "the principal plan issue," Monitor's Supp. Obj. ¶ 15 [D.I. 14496], the Court observes that countless other plan issues remain outstanding. The PPI Dispute is a contentious issue which will impede a plan, but that is certainly no reason to deny approval of the Settlement Agreement. Further, no funds are going "out the door" pursuant to the Settlement Agreement as the amounts may only be paid "in accordance with a confirmed chapter 11 plan." Settlement Agreement § 2.1 [D.I. 14076-2]. Thus, the Monitor and other parties in interest will be given a full opportunity to vote on a plan of reorganization which incorporates the terms of the Settlement Agreement as one of many terms.

The Settlement Agreement resolves a singular dispute with respect to a certain subset of creditors and provides a basis upon which to move toward consensual resolution of the Allocation Dispute, a plan of reorganization in these Chapter 11 proceedings, and final resolution of the Nortel insolvency proceedings spread across the globe. The Settlement Agreement is not a *sub rosa* plan. The cases cited by the Monitor are factually distinguishable. *See Braniff Airways*, 700 F.2d at 940 ("Were this transaction approved, and considering the properties proposed to be transferred, little would remain save fixed based equipment and little prospect or occasion for further reorganization."); *Louise's*, 211 B.R. at 802 (describing the proposed settlement agreement as a "*de facto* transfer of control of the Debtor to a creditor outside the plan confirmation process").

In any event, the Court is convinced that the *sub rosa* inquiry is wholly academic in this instance. There is no real prejudice to the Monitor or Canadian Debtors in considering the Settlement Agreement in the context of a Rule 9019 motion as opposed

to plan confirmation. The Monitor brought the PPI Dispute to the forefront in the first place in its June 19, 2014 memorandum, insisting that the dispute was ripe for the Court's consideration. A settlement was surely foreseeable as the Court cannot conceive of a dispute which is ripe for adjudication but not for settlement. The Monitor could have chosen to engage in settlement discussions. The Monitor was given full notice and opportunity to oppose the Settlement Motion. At least with respect to the Monitor, the Settlement Agreement was essentially considered in the same fashion here as it would have been in the plan confirmation context. For these reasons, the Court rejects the Monitor's *sub rosa* argument.

## B.    *Should* the Court Approve the Settlement?

Having determined that the Court *can* approve the Settlement Agreement, the question now becomes whether the Court *should* approve the Settlement Agreement under the principles set forth in the Third Circuit's *Martin* decision and its progeny.

### 1.    *The Settlement Satisfies the Martin Factors.*

"To minimize litigation and expedite the administration of a bankruptcy estate, '[c]ompromises are favored in bankruptcy.'" *Myers v. Martin* (*In re Martin*), 91 F.3d 389, 393 (3d Cir. 1996) (quoting 9 *Collier on Bankruptcy* ¶ 9019.03[1] (15th ed. 1993)). This principle rings especially true with respect to the Nortel insolvency proceedings. Given the vast complexities involved in winding down Nortel's multi-national operations, coordinating asset sales, and determining how to allocate sale proceeds among multi-national insolvency proceedings, compromise is perhaps the only way to efficiently bring these cases to their end.

30

The Court must not be blinded by the complexities of the case. Given "the unique nature of the bankruptcy process . . . judges must carefully examine settlements before approving them." *Nutraquest*, 434 F.3d at 644. "This particular process of bankruptcy court approval requires a bankruptcy judge to assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." *Martin*, 91 F.3d at 393. In striking this balance the Court must "apprise[ ] itself of all facts necessary to form an intelligent and objective opinion of the probabilities of ultimate success should the claims be litigated, and estimate[ ] the complexity, expense and likely duration of such litigation, and other factors relevant to a full and fair assessment of the [claims]." *Capmark*, 438 B.R. at 514 (quoting *In re Penn Cent. Transp. Co.*, 596 F.2d 1127, 1146 (3d Cir. 1979)).

In *Martin*, the Third Circuit identified four factors a court must consider in assessing a Rule 9019 motion: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Martin*, 91 F.3d at 393. Other courts have considered additional factors, including, as is relevant here, "the extent to which the settlement is truly the product of 'arms-length' bargaining, and not of fraud or collusion." *See, e.g., In re Texaco, Inc.*, 84 B.R. 893, 902 (Bankr. S.D.N.Y. 1988). At base, the Rule 9019 inquiry is one of fairness and equity, including, and perhaps especially, fairness "to other persons, *i.e.,* the parties who did not settle." *Nutraquest*, 434 F.3d at 645.

31

Ultimately, the decision whether or not to approve a settlement agreement lies within the sound discretion of the Court. *Capmark*, 438 B.R. at 515. The Court "need not be convinced that the settlement is the best possible compromise. The Court need only conclude that the settlement falls within the reasonable range of litigation possibilities somewhere above the lowest point in the range of reasonableness." *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 833 (Bankr. D. Del. 2008). *See also In re W.R. Grace & Co.*, 475 B.R. 34, 77-78 (Bankr. D. Del. 2012) ("In analyzing the compromise or settlement agreement under the *Martin* factors, courts should not have a 'mini-trial' on the merits, but rather should canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness.")

### a.      Probability of Success on the Merits

As discussed in some detail above, the PPI Dispute revolves around the meaning of "the legal rate" as it appears in Section 726(a)(5), made applicable in Chapter 11 by Section 1129(a)(7), as well as the interplay between Section 726(a)(5) and the "fair and equitable" standard set forth in Bankruptcy Code § 1129(b). The Monitor, U.S. Debtors, and Supporting Bondholders, as well as various other Canadian and U.S. creditor constituencies, fully briefed the merits of the PPI Dispute pursuant to the PPI Dispute Scheduling Order prior to the date the U.S. Debtors filed the Settlement Motion. While there is no binding Third Circuit authority regarding the appropriate rate of post-petition interest, the parties to the PPI Dispute cited a number of non-binding authorities in their briefs, some of which found the FJR to the appropriate post-petition interest rate and some of which found in favor of the applicable contract rate.

Perhaps most frequently cited by the Monitor and Canadian creditor constituencies in favor of the FJR is *Washington Mutual*, a decision penned by Judge Walrath of this Court. *See In re Washington Mutual, Inc.*, 461 B.R. 200, 241-44 (Bankr. D. Del. 2011). In *Washington Mutual*, Judge Walrath concluded that, in the context of the Section 1129(a)(7) best-interests-of-creditors test, "the better view is that the federal judgment rate is the appropriate rate to be applied under Section 726(a)(5), rather than the contract rate." *Id*. at 242. First, Judge Walrath found that the reference in Section 726(a)(5) to *the* legal rate as opposed to *a* legal rate is indicative of Congress's intent that there be a single source for calculation of the post-petition interest rate, *i.e.* the FJR. *Id*. Second, Judge Walrath observed that post-petition interest is procedural in nature and thus dictated by federal as opposed to state law and so the federal as opposed to state judgment rate should apply. *Id*. at 242-43. Finally, Judge Walrath found that use of the FJR "promotes two important bankruptcy goals: fairness among creditors and administrative efficiency." *Id*. at 243 (quotation omitted). *See also, e.g., Onink v. Cardelucci (In re Cardelucci)*, 285 F.3d 1231, 1234-36 (9th Cir. 2002); *In re Chiapetta*, 159 B.R. 152, 160 (Bankr. E.D. Pa. 1993).

On the other side of the issue, the most significant line of authority cited by the Crossover Bondholders in favor of the contract rate is the *Dow Corning* decisions. *See Official Comm. of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.)*, 456 F.3d 668, 678-80 (6th Cir. 2006) ("*Dow III*"); *In re Dow Corning Corp.*, 244 B.R. 678, 685-95 (Bankr. E.D. Mich. 1999) ("*Dow II*"). In *Dow II*, the court found that in Chapter 11, Section 726(a)(5) merely establishes a minimum post-petition interest rate and that Congress did

33

not intend to preclude a higher rate. *Dow II*, 244 B.R. at 686. The *Dow II* court went on to find that Section 1129(b)'s "fair and equitable" standard, in particular the absolute priority rule, requires that a solvent debtor pay post-petition interest at the contract rate. *Id.* at 695 ("In this context, the rationale for use of the contract rate of interest is straightforward: A debtor with the financial wherewithal to honor its contractual commitments should be required to do so."). In *Dow III*, after several more years of litigation and appeals, the United States Court of Appeals for the Sixth Circuit found that under Section 1129(b)'s fair and equitable standard, when a debtor is solvent the court's primary role is to enforce the contractual rights as written, including, if applicable, any default interest rate provisions. *Dow III*, 456 F.3d at 679. *See also, e.g.*, *In re Fast*, 318 B.R. 183, 191-92 (Bankr. D. Colo. 2004); *In re Carter*, 220 B.R. 411, 414-17 (Bankr. D.N.M. 1998).

Again, it is not the Court's responsibility to ensure that every settlement is the best possible compromise for all affected parties. *Nutritional Sourcing*, 398 B.R. at 833. The Court has had ample opportunity to review the briefs filed by all parties to the PPI Dispute as well as the authorities cited therein and by no means is the PPI Dispute a certain favorable outcome for either side of the issue. The Court finds that there are persuasive arguments and authorities on both sides and is convinced that the Settlement Agreement, which effectively splits the PPI dispute down the middle, falls within the "reasonable range of litigation possibilities." *See id.* Accordingly, the first *Martin* factor weighs in favor of approving the Settlement Agreement.

34

b.      **Likely Difficulties in Collection.**

The Monitor, U.S. Debtors, and Supporting Bondholders agree that the second *Martin* factor is inapplicable here.

c.      **Complexity of the Litigation Involved, and the Expense, Inconvenience and Delay Necessarily Attending it.**

With respect to the third *Martin* factor, the Monitor argues that the PPI Dispute presents a discrete, legal issue which has been fully briefed and is primed for immediate consideration by the Court. As such, the Monitor contends that all that is left is for the Court to decide the issue. Thus, according to the Monitor, very little expense, inconvenience, or delay will be avoided by approving the Settlement Agreement. Moreover, the Monitor continues, the Settlement Agreement only resolves the PPI Dispute with respect to the Supporting Bondholders, a subset of the U.S. Debtors' unsecured creditor body and so any expense, inconvenience, or delay the Settlement Motion purports to avoid is illusory since the PPI Dispute must be resolved with respect to other unsecured creditors in any event.

The Monitor's arguments pre-suppose that the PPI Dispute does in fact present a discrete legal issue, ready for the Court's easy consideration. The Court does not agree with the Monitor. First, even if the PPI Dispute presents only a legal question, to answer that question is no simple endeavor. The PPI Dispute is certainly complex and the result uncertain.

Second, the Court is not convinced that the PPI Dispute presents a pure question of law, ready for the Court's consideration. Some courts consider the equities of the case

when determining the post-petition interest rate. *See, e.g.*, *Dow Corning*, 244 B.R. at 694-95. If the Court were to follow suit, it could become necessary for the Court to conduct a full-blown evidentiary hearing which, based on the U.S. Proceedings to this point, would give rise to considerable administrative expense.

Third, it is possible that the Court could find that the PPI Dispute is not ripe for consideration at all, as it did when ruling on the October 25, 2013, Wilmington Trust claim objection. If the Court were to so find, the PPI Dispute would continue to cast its shadow over the U.S. Proceedings until plan confirmation, which may not occur in the foreseeable future. The Allocation Dispute has yet to be decided by the Court or the Canadian Court and there will be undoubtedly be appeals from those decisions. The Court therefore finds the cases cited by the Monitor to be both factually distinguishable and unpersuasive. *See Porter Drywall Co. v. Haven, Inc.* (*In re Haven, Inc.*), 2005 Bankr. LEXIS 541, at *5 (B.A.P. 6th Cir. 2005) ("The adversary proceeding was not complex . . . the prosecution of the litigation to its conclusion would involve little or no additional 'expense, inconvenience and delay.'"); *Martinson v. Michael* (*In re Michael*), 183 B.R. 230, 238-39 (Bankr. D. Mont. 1995) (addressing an exemption dispute in a consumer chapter 7 case where the trustee was "almost certain to prevail," the court observed that "[t]his litigation is near its end, and little complexity remains. The facts are simple and stipulated.").

Finally, the Court is unpersuaded by the Monitor's argument that approval of the Settlement Agreement does not forestall any expense, inconvenience, or delay because it binds only the Supporting Bondholders and not the general unsecured creditor body as a whole. The Supporting Bondholders hold over 95% of the Crossover Bonds and

36

constitute at least a plurality of the unsecured creditor body in the U.S. Proceedings. In other words, the Supporting Bondholders are the most powerful unsecured creditor constituency in the U.S. Proceedings. The Settlement Agreement removes a significant voice and obstacle standing in the way of plan confirmation and perhaps even settlement of the Allocation Dispute. The Settlement Agreement will further act as a model for settlement agreements between the U.S. Debtors and other U.S. unsecured creditor constituencies. In sum, the fact that the Settlement Agreement does not bind all unsecured creditors is far outweighed by the significant savings of expense, inconvenience, and delay that comes from resolving the PPI Dispute as to the Supporting Bondholders. Accordingly, the Court finds that the third *Martin* factor weighs in favor of approving the Settlement Agreement.

### d.   Paramount Interest of the Creditors.

The focus of the fourth *Martin* factor is not on the fairness of the settlement to those who signed the agreement, but to those affected by the agreement, including in this case the equity holder, who did not settle. *See Nutraquest*, 434 F.3d at 645; *In re RNI Wind Down Corp.*, 348 B.R. 286, 298 (Bankr. D. Del. 2006) ("the Court can and should consider the interest of equity holders in applying the fourth *Martin* factor"). The fourth *Martin* factor recognizes that every constituency affected by a proposed settlement agreement may not be a signatory to the agreement or even involved in the settlement negotiations and so requires that the Court conduct an independent review of the fairness of the proposed settlement agreement. *See, e.g.*, *Capmark*, 438 B.R. at 519-20. While the Court must give the views of objecting parties-in-interest, in this case NNI's 100% equity holder, some

deference, these views are not dispositive and "cannot be permitted to predominate over the best interests of the estate as a whole." *In re Key3Media Grp., Inc.*, 336 B.R. 87, 97 (Bankr. D. Del. 2005). *See also Capmark*, 438 B.R. at 519 ("There is no *per se* rule that the views of a committee or other creditors are dispositive on the reasonableness of a settlement.").

The Monitor's objections with respect to the fourth *Martin* factor revolve around (1) the value, or asserted lack thereof, of the concessions made by the Supporting Bondholders in the Settlement Agreement (the "value-based argument") and (2) the process by which the U.S. Debtors and Supporting Bondholders negotiated the Settlement Agreement (the "process-based argument"). For the reasons set forth below, the Court rejects both arguments.

The Monitor's value-based argument is two pronged. The first prong is based on Dr. Wertheim's conclusion that in agreeing to the $1.01 billion post-petition interest cap, the Supporting Bondholders gave up no real value because, according to Dr. Wertheim, the maximum amount that would be available to pay post-petition interest from the NNI estate in the best case scenario would be only $971 million. The second prong is based on the Reservation of Rights provision in the Settlement Agreement, a brief summary of which is set forth above.

As a preliminary matter, with respect to the first prong of the Monitor's value-based argument, the Supporting Bondholders argue that the Monitor should be judicially estopped from attempting to characterize the PPI Dispute as only a $971 million issue. The Supporting Bondholders correctly point out that the Monitor repeatedly characterized the PPI Dispute as a $1.6 billion, and growing, issue in its June 19, 2014,

memorandum and in argument leading up to the Court's issuance of the PPI Dispute Scheduling Order. Based on the judicial estoppel principals set forth above, the Court will again comment that the Supporting Bondholders' have made a strong case for judicial estoppel. But, because, for the reasons set forth below, the Court is unpersuaded by and will give no weight to Dr. Wertheim's report, and recognizing that judicial estoppel is harsh in its preclusion of a decision on the merits, the Court will not rest its determination on the Supporting Bondholders' judicial estoppel arguments in arriving at its decision.

As to the merits of the first prong of the Monitor's value-based argument, the U.S. Debtors and Supporting Bondholders correctly point out a number of deficiencies in the analysis supporting Dr. Wertheim's conclusions. These deficiencies have nothing to do with Dr. Wertheim's qualifications, which speak for themselves. The deficiencies have to do with the narrow scope of Dr. Wertheim's inquiry, the responsibility for which falls squarely on the shoulders of the Monitor. The Court agrees with the U.S. Debtors and Supporting Bondholders that Dr. Wertheim: (1) failed to value or improperly valued certain assets of both NNI and the Canadian estate which could increase the cash available in the NNI estate to pay post-petition interest; (2) improperly examined only a narrow set of documents to support his analysis; (3) considered too narrow a set of variables and assumptions in coming up with his "best case scenario"; and (4) was asked to make value judgments about what is likely or unlikely to occur which are outside the scope of his qualifications.

Analysis of the kind attempted by Dr. Wertheim relies on a number of factors which are unknown and perhaps unknowable at this point in time. Due to the global

39

nature of the Nortel enterprise, the analysis depends on a vast array of moving variables and to perform a proper analysis, if possible at all, would take a team of analysts a great many hours. In short, a proper analysis would be a far greater undertaking than Dr. Wertheim could have realistically completed within the scope of the Monitor's mandate. Accordingly, the Court is unmoved by Dr. Wertheim's $971 million figure and will give no weight to his expert report and testimony related thereto.

In any event, the Court need not be convinced that the funds available for payment of post-petition interest from the NNI estate are greater than the $1.01 billion post-petition interest cap set forth in the Settlement Agreement. The Court is fully aware of the possibility that the amount ultimately available to pay post-petition from the NNI estate could very well be greater than or less than $1.01 billion. In assessing the reasonableness of the terms contained in the Settlement Agreement, the Court is less concerned with the potential amount available to *pay* post-petition interest from the NNI estate than the amount the NNI estate could potentially *owe* the Supporting Bondholders in post-petition interest. As set forth in the chart attached to this Opinion,  the amount of post-petition interest owed to the Supporting Bondholders, calculated at the applicable contract rate, grows to well over $2 billion by the end of the year 2015, more than double the $1.01 billion cap.

Despite the possibility that there will not be sufficient funds available to exceed the post-petition $1.01 billion cap, given the massive potential amount of post-petition interest which could be owed if calculated at the contract rate, the Court is convinced that the terms of the Settlement Agreement are reasonable, even with respect to the Canadian

Debtors' equity interest. The Settlement Agreement confers a great benefit on the estate in terms of resolving a major dispute, providing certainty with respect to the maximum amount of post-petition interest owed to the Supporting Bondholders, and providing a building block on which parties-in-interest could perhaps construct a resolution to these cases as a whole.  Resolution was the Monitor's stated purpose for raising the PPI Dispute in June 2014.

The Court is similarly unmoved by the second prong of the Monitor's value-based argument, which is based on the Reservation of Rights provision contained in the Settlement Agreement. The Reservation of Rights only comes into play if there are insufficient funds in the NNI estate to pay the full amount of post-petition interest owed to all unsecured creditors, in which case the Supporting Bondholders will be deemed to have a claim for post-petition interest at the full contract-rate amount for purposes of allocating the funds which are available to pay post-petition interest. The Monitor argues that since it is highly unlikely, based on Dr. Wertheim's report, that there will be sufficient funds to pay all of NNI's unsecured creditors the full amount of post-petition interest owed (assuming the $1.01 billion cap is approved), the "deemed claim" for the full amount of contract-rate post-petition interest means that the Supporting Bondholders are essentially giving up nothing at all in the settlement.

As is borne out by the language of the Reservation of Rights itself, as well as Mr. Ray's testimony, the Reservation of Rights is simply meant to reserve for another day the question of how funds available to pay post-petition interest will be distributed among NNI's creditors on an intra-creditor basis in the event there are insufficient funds to pay

41

all unsecured creditors the full amount of post-petition interest owed. Telling of this intent is the fact that the UCC filed two statements in support of the Settlement Agreement. Additionally, the Reservation of Rights does not prejudice the Monitor in any way. The Reservation of Rights only comes into play if there are insufficient funds to reach the $1.01 billion post-petition interest cap. In that case, the Canadian Debtors' equity interest in NNI would essentially be worthless and the manner in which NNI's creditors divide funds available for post-petition interest on an intra-creditor basis has no effect on the Monitor. For this reason, and based on the support of the UCC and the other benefits conferred on the U.S. Debtors' estates by the Settlement Agreement discussed above, the Court rejects the Monitor's value-based argument.

The Monitor's process-based argument is based on its assertion that the manner in which the U.S. Debtors and Supporting Bondholders negotiated the terms of the Settlement Agreement was so lacking in vigor and sincerity that the Court should doubt the *bona fides* of the Settlement Agreement. The Monitor comes to this conclusion based on the following facts, which the U.S. Debtors and Supporting Bondholders do not dispute: (1) the U.S. Debtors and Supporting Bondholders negotiated the terms of the Settlement Agreement in the 10-day period between the July 15, 2014 settlement meeting and July 24, 2014, the date the U.S. Debtors filed the Settlement Motion; (2) Mr. Ray made no presentation to NNI's board of directors regarding the Settlement Agreement; (3) the U.S. Debtors took no formal position regarding the PPI Dispute prior to filing the Settlement Motion; (4) Mr. Ray sought no legal advice or financial modeling prior to the July 15, 2014 settlement meeting; and (5) the parties to the Settlement Agreement did not

include the Monitor in discussions of the terms of the Settlement Agreement. For the reasons that follow, the Court finds that none of these facts provide a basis upon which to deny approval of the Settlement Agreement.

First, while the Settlement Agreement itself was negotiated over only ten days, for the Monitor to insinuate that the totality of the PPI Dispute settlement negotiations was merely a ten-day affair strikes the Court as disingenuous. The PPI Dispute has been a live issue with respect to the U.S. Debtors' case since the Line of Business and Patent Portfolio sales were consummated between 2009 and 2011, raising the possibility that NNI's estate could be solvent. Over the course of the past three years the parties to the PPI Dispute, including the Monitor, have engaged in extensive settlement negotiations in conjunction with the Allocation Dispute, including three failed mediations. The Court is satisfied that the various parties' positions with respect to the PPI Dispute were discussed extensively during that time period. In any event, the Court finds that ten days, in this instance, is sufficient time in which to negotiate a settlement agreement, even regarding a matter as multi-faceted as the PPI Dispute. The Monitor's action, requesting the Court and the Canadian Court to decide the PPI Dispute on an expedited basis, clearly prompted the urgency of the settlement discussions. Therefore, the Court is not concerned that the timing of the settlement negotiations between the U.S. Debtors and Supporting Bondholders weighs against approving the Settlement Agreement.

Second, there has been no indication by the Monitor or any other party that Mr. Ray was under any legal obligation to make a presentation to NNI's board of directors regarding the Settlement Agreement. Further, the Court finds that not making such a

43

presentation is not indicative of a lack of proper consideration of the Settlement Agreement on his part. The Court rejects the absence of a presentation as a basis to deny approval of the Settlement Agreement.

Third, the Court recognizes that the U.S. Debtors previously took no formal position on the PPI Dispute in the briefing completed pursuant to the PPI Dispute Scheduling Order. But the Court also observes that the U.S. Debtors, as debtors in possession, have a fiduciary duty to act in the best interest of all creditors and equity holders. *See, e.g.*, *LaSalle Nat. Bank v. Perelman*, 82 F. Supp. 2d 279, 292 (D. Del. 2000) ("The debtor in a Chapter 11 bankruptcy has a fiduciary duty to act in the best interest of the estate as a whole, including its creditors, equity interest holders and other parties in interest."). In their testimony, Mr. Ray and Mr. Katzenstein described the settlement negotiations as both vigorous and adversarial. There is nothing in the record to refute the U.S. Debtors' assertion that they sought to secure the best deal for all parties-in-interest, including the Canadian Debtors as equity holders. Thus, the Court finds that merely because the U.S. Debtors did not previously take a formal position in the PPI Dispute does not detract from the validity and *bona fides* of the Settlement Agreement.

Fourth, the Court agrees with Mr. Ray that it was not necessary for him to seek specific legal advice or financial modeling prior to the July 15, 2014 settlement meeting. The Court is persuaded that Mr. Ray did not need any further legal advice with respect to the likely outcome of the PPI Dispute as he has been intimately involved with the U.S. Debtors' cases for years and was personally involved in prior settlement discussions and mediations regarding both the Allocation Dispute and the PPI Dispute. The Court is

44

convinced that Mr. Ray fully understood the Monitor's position on the PPI Dispute and each side's relative probability of success. Further, the Court agrees with Mr. Ray that financial modeling to determine the potential amounts available to pay post-petition interest from the NNI estate would be futile at this stage in the U.S. Proceedings for the reasons set forth above in the Court's comments with respect to Dr. Wertheim's expert report.

Finally, while there is no *per se* requirement that the Monitor have been involved in the negotiations regarding the terms of the Settlement Agreement, *see Capmark*, 438 B.R. at 520, the Court is aware that some courts have found that in certain circumstances excluding significant parties in interest from settlement negotiations weighs against approval of a settlement agreement, *see, e.g.*, *Nutritional Sourcing*, 398 B.R. at 836-37. In *Nutritional Sourcing*, Judge Walsh of this Court examined a settlement agreement included in a Chapter 11 plan which, as is relevant here, divided trade creditors between "goods" and "non-goods" based on negotiated definitions. *Id.* at 821-22. Based on the settlement agreement, goods trade creditors would receive a 100% recovery while non-goods trade creditors would receive a recovery of only 13.2%. *Id.* at 822. No non-goods trade creditor was present for the settlement negotiations. *Id.* at 822. Judge Walsh noted that the first and third *Martin* factors[18] weighed "marginally" in favor of approval of the settlement agreement but denied approval based on the fourth *Martin* factor based on the severe treatment of non-goods trade creditors and the fact that non-goods trade creditors

---

[18] In *Nutritional Sourcing*, as here, Judge Walsh deemed the second *Martin* factor to be inapplicable.

were "not at the negotiating table and [ ] were not adequately represented in their absence." *Id.* at 835.

The Court finds *Nutritional Sourcing* to be factually distinguishable. First, the severity of the treatment of the non-present party in *Nutritional Source* was far more striking than here. In *Nutritional Sourcing*, disparate treatment was afforded creditors in the same class. Non-goods trade creditors' recovery in *Nutritional Source* was reduced by almost 77%. Here, the Supporting Bondholders simply agreed to a post-petition interest cap that is almost exactly in the middle of the settlement range. Second, the non-goods trade creditors in *Nutritional Source* were not represented or even consulted prior to or during settlement negotiations. Here, the Monitor has had ample opportunity over the course of several years to fully voice its position with respect to the PPI Dispute. There is no doubt that the U.S. Debtors were fully aware of the Monitor's position entering the July 15, 2014 settlement meeting and, as set forth above, the Court is convinced that the U.S. Debtors fulfilled their fiduciary duty to maximize the value of the Canadian Debtors' equity interest.  The cap on interest evidences the U.S. Debtors' concern for equity. *See Capmark*, 438 B.R. at 520 ("While it is certainly true that the settlement affects the Debtors' unsecured creditors, there is no requirement that those creditors be actively involved in the settlement negotiations. . . . Moreover, there is no support for the Official Committee's insinuation that the Debtors' professionals were conflicted in their negotiations with the secured lenders."); *In re Coram Healthcare Corp.*, 315 B.R. 321, 332 (Bankr. D. Del. 2004) ("The Trustee met with both the Equity Committee and the Noteholders and asked both

to give him their best case against the other. This process was not 'fundamentally unfair' as suggested by the Equity Committee.").

For the reasons set forth above, the Court concludes that the fact that the Monitor did not participate in the negotiations leading to the Settlement Agreement does not provide a basis for denying approval of the Settlement Agreement. Accordingly, the Court rejects the Monitor's process-based argument and finds that the Settlement Agreement is in the Debtors' best interest.

> ### 2. Additional Factor: Extent to which the Settlement is Truly the Product of 'Arm's Length' Bargaining, and not Fraud or Collusion.

Finally, the Monitor argues that the U.S. Debtors failed to conduct an arm's length negotiation in arriving at the terms of the Settlement Agreement, a factor some courts find weighs against approval of a proposed settlement agreement. *See, e.g.*, *Texaco*, 84 B.R. at 902. Consideration of the arm's length nature of the settlement negotiations essentially falls under the umbrella of the fourth *Martin* factor, although the issue was raised separately by the Monitor. *See, e.g.*, *Nutritional Sourcing*, 398 B.R. at 835-37 (discussed above). The evidence the proponents of the Settlement produced, in particular the testimony of Mr. Ray and Mr. Katzenstein, clearly support the Court's finding that the Settlement was the result of arm's length negotiations.  The parties are sophisticated, the roles clearly defined and the stakes are enormous.  For the reasons set forth above, the Court is satisfied that the U.S. Debtors were fully aware of the Monitor's position with respect to the PPI Dispute and, by obtaining the interest cap, fulfilled their fiduciary duty to protect the value of the Canadian Debtors' equity interest. Thus, the Court finds that,

to the extent the arm's length factor is not subsumed in the fourth *Martin* factor, it has been met.

## CONCLUSION

For the reasons set forth above and given the circumstances of this case, the Court finds that the Settlement Agreement is eminently fair, reasonable, and in the best interests of the U.S. Debtors' Estates, and satisfies the Rule 9019 standards set forth in the Third Circuit's *Martin* decision. Accordingly, the Court will grant the Settlement Motion and approve the Settlement Agreement.

Dated:  December 18, 2014

KEVIN GROSS, U.S.B.J.

48

# EXHIBIT A

# Post-Petition Interest



Settlement Agreement Section 2.2 (PPI Settlement Amount); NNI-PPI-00000119-121 (basis for calculation of PPI at contract rate and federal judgment rate) [1]

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NORTEL NETWORKS, INC., *et al.*,[1] | ) | Case No. 09-10138 (KG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Re: Dkt. No. 14076** |

## ORDER GRANTING DEBTORS' MOTION PURSUANT TO BANKRUPTCY RULE 9019 APPROVING SETTLEMENT AGREEMENT BY AND AMONG NORTEL NETWORKS INC., THE SUPPORTING BONDHOLDERS, AND THE BANK OF NEW YORK MELLON WITH RESPECT TO THE NNI POST-PETITION INTEREST DISPUTE AND RELATED ISSUES

Upon the motion dated July 24, 2014 (the "Motion"), of Nortel Networks Inc.

("NNI"), and certain of its affiliates, as debtors and debtors in possession in the above-

captioned cases (the "Debtors"), for entry of an order, as more fully described in the

Motion, pursuant to sections 105(a), 502, 726(a)(5), 1124, 1129(a)(7), and 1129(b) of the

Bankruptcy Code and Bankruptcy Rule 9019, (i) authorizing the entry of NNI into and

approving the Settlement Agreement[2] attached to the Motion as Exhibit B, and (ii)

granting them such other and further relief as the Court deems just and proper; and the

Court having determined that adequate notice of the Motion has been given as set forth

in the Motion; and that no other or further notice is necessary; and the Court having

---

[1]      The Debtors in these chapter 11 cases are:  Nortel Networks Inc., Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc..

[2]      Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion and/or the Settlement Agreement.

jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C.

§§ 157 and 1334 and the Amended Standing Order of Reference from the District Court

dated February 29, 2012; and the Court having determined that consideration of the

Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having

determined that the Debtors have demonstrated sound business justifications for entering

into the Settlement Agreement and the legal and factual bases set forth in the Motion and

presented on the record establish just cause for the relief requested in the Motion; and

taking into account the complexity of the issues being settled by the Settlement

Agreement and the anticipated costs and delays of resolving the US PPI Dispute by

litigation, the Settlement Agreement and the related relief requested in the Motion is fair,

reasonable and in the best interests of the Debtors, their estates, their creditors and the

parties in interest;[3] and upon the record in these proceedings; and after due deliberation;

　　IT IS HEREBY ORDERED THAT:

　　1.　　For the reasons in the Opinion issued this day, the Motion is **GRANTED**

as set forth herein and all objections to the relief requested herein are hereby overruled.

　　2.　　The Debtors are authorized to enter into the Settlement Agreement, and

the Settlement Agreement is approved in its entirety.

　　3.　　The Debtors are authorized pursuant to sections 105(a), 502, 726(a)(5), 1124,

1129(a)(7), and 1129(b) of the Bankruptcy Code and Bankruptcy Rule 9019, to enter into

the Settlement Agreement and to take any and all actions that may be reasonably

---

[3]　　Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact to the fullest extent of the law.  See Fed. R. Bankr. P. 7052.

necessary or appropriate to perform their obligations arising under the Settlement Agreement, and to enforce their rights arising under the Settlement Agreement.

4.      The Settlement Agreement, including, without limitation, the PPI Settlement Amount and the allowance of the Bondholder claims, and this Order shall be binding upon the Debtors, the Bondholders, the Indenture Trustee, and all parties-in-interest in these Chapter 11 Cases, and any of their respective successors and assigns, including, without limitation, any transferees, purchasers or other acquirers of claims in respect of the Guaranteed Bonds.

5.      The Settlement Agreement shall constitute a full and final settlement of (i) the PPI Dispute with respect to the Guaranteed Bonds currently pending before this Court and all of the related submissions and requests for relief, (ii) the allowed claims for outstanding principal obligations and accrued prepetition interest obligations (each as set forth on Schedule A to the Settlement Agreement), and (iii) any entitlement to post-petition interest arising under the Guaranteed Bonds pursuant to the terms of the Settlement Agreement; provided, however that nothing in this Order or the Settlement Agreement is or shall be deemed to be a settlement of the Canada PPI Dispute or any part thereof or otherwise a settlement of any claims of the Indenture Trustee or any Bondholder against any of the Canadian Debtors' estates.

6.      Nothing in the Settlement Agreement or this Order shall constitute settlement, release, waiver or discharge (in whole or in part) of the ability of any unsecured creditor of the Debtors' estates (other than the Bondholders) to assert a claim for PPI against the Debtors' estates at the contract rate (if any) applicable to such

creditor's claims or any alternative theories, and all of the Debtors' rights regarding any such assertion are preserved; provided, however, that if there are insufficient funds available to pay PPI to all unsecured creditors of the Debtors' estates entitled to such amounts (including the Bondholders), then, solely for purposes of determining any allocation of available PPI among such creditors, the holders of the Guaranteed Bonds shall be deemed to have a claim for PPI equal to the amount of post-petition interest that would have accrued at the applicable contract rate of PPI set forth in the applicable indentures for each of the Guaranteed Bonds.

7.      Nothing in the Settlement Agreement or this Order shall constitute a settlement of the manner in which any funds available for distribution shall be allocated among the creditors of the Debtors in the event that less than the full amount of PPI can be paid to all creditors owed such amounts.  Such application shall be determined by later agreement of the parties or order of this Court, whether in connection with the chapter 11 plan(s) of the Debtors in the Chapter 11 Cases or by subsequent agreement among the relevant affected creditors.

8.      In light of the Settlement Agreement, the Monitor's Request currently pending before this Court and all related submissions are hereby deemed resolved, denied or otherwise overruled as they relate to the Guaranteed Bonds.

9.      The Debtors, the Debtors' claim agent, Epiq Bankruptcy Solutions, LLC, and the Clerk of the Court are authorized to take all necessary and appropriate actions to give effect to the Settlement Agreement.

10.     The failure specifically to describe or include any particular provision of the Settlement Agreement in this Order shall not diminish or impair the effectiveness of such a provision, it being the intent of this Court that the Settlement Agreement be approved in its entirety.

11.     The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order. To the extent any provisions of this Order shall be inconsistent with the Motion or Settlement Agreement, the terms of this Order shall control.

Dated:  December 18, 2014

KEVIN GROSS, U.S.B.J.

# TAB 18

# THE LAW OF GUARANTEE

THIRD EDITION

## Kevin McGuinness



**The Law of Guarantee, Third Edition**
© LexisNexis Canada Inc. 2013
November 2013

All rights reserved. No part of this publication may be reproduced, stored in any material form (including photocopying or storing it in any medium by electronic means and whether or not transiently or incidentally to some other use of this publication) without the written permission of the copyright holder except in accordance with the provisions of the *Copyright Act*. Applications for the copyright holder's written permission to reproduce any part of this publication should be addressed to the publisher.

Warning: The doing of an unauthorized act in relation to a copyrighted work may result in both a civil claim for damages and criminal prosecution.

The publisher, (Author(s)/General Editor(s)) and every person involved in the creation of this publication shall not be liable for any loss, injury, claim, liability or damage of any kind resulting from the use of or reliance on any information or material contained in this publication. While every effort has been made to ensure the accuracy of the contents of this publication, it is intended for information purposes only. When creating this publication, none of the publisher, the (Author(s)/General Editor(s)) or contributors were engaged in rendering legal or other professional advice. This publication should not be considered or relied upon as if it were providing such advice. If legal advice or expert assistance is required, the services of a competent professional should be sought and retained. The publisher and every person involved in the creation of this publication disclaim all liability in respect of the results of any actions taken in reliance upon information contained in this publication and for any errors or omissions in the work. They expressly disclaim liability to any user of the work.

**Library and Archives Canada Cataloguing in Publication**

McGuinness, Kevin Patrick, author
       The law of guarantee / Kevin McGuinness.—Third edition.

Includes index.
ISBN 978-0-433-46128-9 (bound)

       1. Suretyship and guaranty—Canada.    2. Indemnity against Liability—Canada.    3. Letters of credit—Canada.    4. Security (Law)—Canada.    I. Title.

KE1211.M34 2013          346.7107'4       C2013-905377-8
KF1045.M34 2013

**Published by LexisNexis Canada, a member of the LexisNexis Group**
LexisNexis Canada Inc.
123 Commerce Valley Dr. E., Suite 700
Markham, Ontario
L3T 7W8

**Customer Service**
Telephone: (905) 479-2665  •  Fax: (905) 479-2826
Toll-Free Phone: 1-800-668-6481  •  Toll-Free Fax: 1-800-461-3275
Email: customerservice@lexisnexis.ca
Web Site: www.lexisnexis.ca

Printed and bound in Canada.

- It confused the extent to which so-called compensated sureties might invoke defences previously available to all sureties (*i.e.*, in respect of the breach of actual conditions, agreed upon as being such by the parties).

- It suggested that so-called "accommodation sureties" were entitled to a broader range of defences than were recognized prior to the decision (namely that any trivial non-compliance will release an accommodation surety).

- It made the law less predictable, and therefore is likely to increase rather than decrease litigation (if only because of the problems of interpretation likely to arise under the three previous criticisms).

Potentially, the basic problem with the decision of the Supreme Court in the *Johns Manville* case lay not in the decision given on the facts of the case (that decision was unquestionably the right one). The problem arose from the extensive passages of *obiter dicta* relating to the purported right of "accommodation sureties" to be discharged from liability where there was a non-consequential departure from the strict (*i.e.*, absolute literal) terms of their guarantees. Had the subsequent case law moved in this direction, there could well have been a serious problem. Put simply, it is highly questionable whether the law of guarantee — or the economy as a whole, for that matter — would draw any benefit from allowing accommodation sureties to raise the same kind of persnickety defences which are raised in answer to claims under letters of credit.

§7.128   It is now well over 30 years since the *Johns Manville* case was decided. Over that period, the actual practical consequences of the decision have proved far less serious than was initially feared. Primarily, the decision has been employed only where the court intends to reject a highly technical defence raised by a "compensated" surety in answer to a claim by the creditor. Many courts have also recognized that the classification of sureties as being either "compensated" or "accommodation" is unrealistic: there are very few true accommodation sureties; in most cases the surety draws a direct or indirect benefit from the guarantee transaction.[82] Viewing this case from the opposite perspective, one might at first assume that apparent accommodation sureties (*i.e.*, those sureties who draw neither a direct nor indirect benefit from the guaranteed transaction between the creditor and principal) will be more likely to succeed when raising a technical defence to a claim under the guarantee than are compensated

---

v. *Johns-Manville Canada Inc.*, ... In the latter case those "who entered into the guarantee in the expectation of little or no remuneration and for the purpose of accommodating others or of assisting others in the accomplishment of their plans," were described as 'accommodation sureties', and were said to have greater protection than 'compensation sureties', and the protection given to them was explained. ... Applying this terminology here, one would say that Mrs. Collum is an accommodation surety, whereas the guarantors in Rooke and White, being involved in the business of the primary debtor, were not. Similarly, the guarantor in Hislop had owned the land and could be expected to retain an interest in the development.

[82]   See, for instance, *Servus Credit Union Ltd. v. Wevlan Mechanical Ltd.*, [2009] A.J. No. 1458 (Alta. Q.B.); *Toronto Dominion Bank v. Rooke* (1983), 24 B.L.R. 124 (B.C.C.A.).

390                           *The Law of Guarantee*

sureties.[363] Usually, however, this will not be the case. The reason is that most true accommodation sureties will be consumers. They will usually have signed standard form guarantees under which they will have raised virtually all of the historic rights that law and equity conferred upon a surety. As a result, their status as accommodation sureties is largely irrelevant.

**§7.129**   We will return to a further discussion of the *Johns Manville* decision in Chapter 12, where we consider the situations in which a surety is entitled to discharge from liability rather than to a mere reduction in the amount for which he or she is liable.

## 5.   COMPLICATING FACTORS

### (A)   *BANKRUPTCY OF A SURETY*

**§7.130**   More than occasionally, the bankruptcy of the principal will be followed shortly afterwards by the bankruptcy of the surety. Where such a double (or back-to-back) bankruptcy occurs, the creditor can prove against the estate of each for the full amount owing in respect of the guaranteed obligation as of the date of bankruptcy. The creditor is entitled to receive payment of any dividend payable out of either estate, provided he or she does not obtain more than complete recovery.[364] Where the total dividend payable out of the estate exceeds 100¢ on the dollar of the guaranteed debt, the primary source of payment to which the creditor must look is the estate of the principal. In *Re J. Lebar Seafoods Inc.*,[365] Henry J. stated:

> … the creditor is entitled to claim against the estate of the bankrupt guarantor for the full amount of the debt. The claim is to be reduced only by any amount paid to the creditor by the debtor or the debtor's estate, and by the amount of any dividend declared in favor of the creditor prior to the proof of the creditor's claim in the estate of the guarantor.[366]

**§7.131**   Even prior to the default of the principal, the creditor has a contingent claim against the estate of a bankrupt surety. For this reason, a surety for a bankrupt debtor falls within the definition of "creditor" under the *Bankruptcy and Insolvency Act*.[367] The right of such a contingent creditor to claim in a bankruptcy is dealt with in sections 121(1) and (2) of that Act:

> (1)   All debts and liabilities, present or future, to which the bankrupt is subject at the date of the bankruptcy or to which he may become subject before his discharge by reason of any obligation incurred before the date of the

[363]   See, for instance, *GMAC Leaseco Corp. v. Jaroszynski*, [2012] O.J. No. 660 (Ont. S.C.J.), *per* Moore J.

[364]   *Ex p. Rushforth* (1805), 10 Ves. 409, 32 E.R. 903 (L.C.); *Ex p. Turquand* (1876), 3 Ch. D. 445 at 450.

[365]   (1981), 38 C.B.R. (N.S.) 64 (Ont. S.C. in Bank.); see also *Re Blackeley* (1892), 9 Morr. 173 (Div. Ct.); *In Re Houldon*, [1929] 1 Ch. 205.

[366]   *Ibid.*

[367]   R.S.C. 1985, c. B-3.

bankruptcy shall be deemed to be claims provable in proceedings under this Act.

(2) The court shall, on the application of the trustee, determine whether any contingent claim or any unliquidated claim is a provable claim, an, if a provable claim, it shall value such claim, and such claim shall after by not before, such valuation be deemed a proved claim to the amount of its valuation.

While the creditor may prove in the bankruptcy of a surety even before the bankruptcy of the principal, such claims would seem to be extremely rare, since the valuation of such a claim would be difficult.[368]

**§7.132**   In view of the surety's right to be indemnified from the principal's estate, in the case of a double bankruptcy, the primary source of the creditor's payment is the principal's estate. If the surety holds a security in respect of the guaranteed debt, the creditor has no direct claim on that security. However, the surety is entitled to look to the security for indemnification in respect to any dividend paid to the creditor.[369] Where a creditor is owed a number of debts by the principal, each of which is guaranteed by a different surety, each debt must be separately considered, and thus the creditor is not permitted to accumulate dividends in excess of full recovery on one debt in order to cover any shortfall on another.[370]

### (B)   GUARANTEES OF PROPOSALS IN A BANKRUPTCY

**§7.133**   Guarantees are not only of concern when dealing with the distribution of the estate of a bankrupt principal debtor. Guarantees are often employed to assist an insolvent debtor to avoid bankruptcy. For instance, a key element in obtaining the consent of the creditors of an insolvent to a proposal under section 50 of the *Bankruptcy and Insolvency Act*, is often whether the debtor is able to provide a guarantee of the proposal. Section 50(4) of the Act provides:

No proposal or any security or guarantee tendered therewith may be withdrawn pending the decision of the creditors and the court.

In order to protect the surety, it is customary to word the guarantee so that it does not become effective unless the guarantee is approved by the creditors of the debtor and the court. The advisability of this course was demonstrated in *Re Film House Limited*. In that case, a parent corporation guaranteed a proposal made by its subsidiary to the extent of 25¢ on the dollar. At the time of giving this guarantee, it was assumed by the parent that, after the repayment of the secured creditor of the subsidiary, the remaining assets of the estate would have at least this worth. Upon realization of security, however the secured creditor failed to realize enough so that he could be repaid. Since the parent corporation

[368]  See generally, *Hardy v. Fothergill* (1888), 3 App. Cas. 351 (H.L.).

[369]  *Royal Bank of Scotland v. Comm. Bank of Scotland* (1882), 7 App. Cas. 366 at 387 (H.L.).

[370]  David Marks, Gabriel Moss, *Rowlatt on Principal & Surety*, 4th ed. (London: Sweet & Maxwell, 1982) at 200.

# TAB 19

1981 CarswellOnt 175
Ontario Supreme Court, In Bankruptcy

J. LeBar Seafoods Inc., Re

1981 CarswellOnt 175, [1981] O.J. No. 2381, 10 A.C.W.S. (2d) 263, 38 C.B.R. (N.S.) 64

# Re J. LeBAR SEAFOODS INC.

Henry J.

Judgment: June 18, 1981
Docket: No. 27667

Counsel: *G.S. Gringorten*, for trustee.
*A.C. Dekany*, for creditor Ocean Garden Products Inc.

Subject: Corporate and Commercial; Insolvency

**Table of Authorities**

**Cases considered:**

*Allflex Co. Ltd., Re* (1961), 3 C.B.R. (N.S.) 80 (Ont. S.C.) — *considered*

*Blakeley, Re; Ex parte Aachener Disconto Gesellschaft* (1892), 9 Morr. 173 (D.C.) — *applied*

*Film House Ltd., Re* (1974), 19 C.B.R. (N.S.) 231 (Ont. S.C.) — *distinguished*

*Houlder, Re*, [1929] 1 Ch. 205 — *applied*

*Mohawk Sports Equipment Ltd., Re* (1971), 15 C.B.R. (N.S.) 63 (Ont. S.C.) — *considered*

**Statutes considered:**

Bankruptcy Act, R.S.C. 1970, c. B-3, ss. 43(2), 95.

Mercantile Law Amendment Act, R.S.O. 1970, c. 272, s. 2.

APPLICATION by trustee for advice and directions.

*Henry J.* **(orally):**

1      This application raises two issues of law: first, whether funds set aside by the trustee under a proposal to provide for payment of a disputed claim, if later validated, are held in trust for the creditor in the subsequent bankruptcy; second, the extent to which a creditor may claim in the bankruptcy of his guarantor. The trustee applies for advice and directions.

2      This case involves three parties. Ocean Garden Products Inc. of San Diego, California, sells seafood products in Ontario and Manitoba. Its sales were made through a broker, J. LeBar Seafoods Inc., on commission. One of the customers of Ocean Garden was S. & C. Foods Limited of Islington, Ontario. Under the broker agreement, LeBar guaranteed the obligations of

1981 CarswellOnt 175, [1981] O.J. No. 2381, 10 A.C.W.S. (2d) 263, 38 C.B.R. (N.S.) 64

the customers including S. & C. Foods. Both LeBar and S. & C. Foods are now in bankruptcy. Ocean Garden claims as an unsecured creditor against both estates.

3    The broker, LeBar, made a proposal to its creditors which was approved by the court on 20th October 1980. Ocean Garden submitted a claim in the proposal which was disputed by the trustee and funds were set aside to provide for payment of the claim if it should subsequently be found valid. A dividend was paid to other creditors. LeBar defaulted on the proposal and on 30th December 1980 an order was made deeming it to have made an assignment in bankruptcy.

4    The sum set aside to protect the claim of Ocean Garden under the proposal is $9,865. That is a requirement of the Bankruptcy Act, R.S.C. 1970, c. B-3, as elaborated by this court in *Re Mohawk Sports Equipment Ltd.* (1971), 15 C.B.R. (N.S.) 63. Ocean Garden now asserts that this amount is held in trust for it by the trustee in the bankruptcy, having been originally earmarked for its claim and placed in the trustee's trust account under the proposal.

5    In *Re Allflex Co. Ltd.* (1961), 3 C.B.R. (N.S.) 80 (Ont. S.C.), Smily J. held that the property of a debtor under a proposal remains vested in him and upon his subsequent bankruptcy vests in the trustee in bankruptcy as property of the debtor and not as money held in trust for creditors. Mr. Dekany submits that the governing principle is found in *Re Mohawk*, supra, where Houlden J. said at p. 65:

> It is my opinion that, if the trustee were to make a distribution to the ordinary creditors whose claims are not disputed and at a later date certain of the disputed claims were found to be valid, the trustee would be personally liable for the dividends on the claims of those creditors for whom funds were not available. This follows, in my opinion, from s. 107(2) [now s. 119(2)] of the Act [the Bankruptcy Act, R.S.C. 1952, c. 14; now R.S.C. 1970, c. B-3] which provides that, where the validity of any claim has not been determined, the trustee shall retain sufficient funds to provide for payment thereof in the event that the claim is admitted. By virtue of s. 38(1) [now s. 46(1)] of the Act, this section is applicable in the case of a proposal.

> It is of the essence of bankruptcy proceedings that all creditors of the same class should be treated in the same way. If the trustee were to use the funds which he presently has on hand to pay a dividend on the claims of creditors which are not in dispute and then, at a later date, did not have sufficient funds to pay a dividend on the claims of creditors which were disputed and were subsequently found to be valid, the trustee would not be dealing with creditors of the same class on an equal basis.

6     It is true that if some creditors are paid a dividend under a proposal, and before all those of the same class are paid, bankruptcy supervenes, the principle of equal treatment is breached. But that was a situation dealt with by Smily J. in *Re Allflex*, supra, where it appears that some but not all preferred creditors had been paid by the trustee under the proposal and the remaining preferred creditors claimed that the moneys held by the trustee were impressed with a trust for their benefit and so did not form part of the estate in bankruptcy; this argument was rejected.

7     I did not understand Mr. Dekany to challenge that decision in principle. It seems to me to be correct. The proposal is a scheme of payment agreed to between the debtor and his creditors and ap proved by the court as an alternative to bankruptcy. The trustee is cast in the role of a manager of funds which remain the property of the debtor. If it was Parliament's intention that funds committed by the debtor to the carrying out of the proposal become impressed with a trust, it presumably would have said so when it dealt with the situations in s. 43(2) of the Bankruptcy Act as follows:

> (2) An order made under subsection (1) shall be made without prejudice to the validity of any sale, disposition of property or payment duly made, or anything duly done under or in pursuance of the proposal and notwithstanding the annulment of the proposal, a guarantee given pursuant to the proposal remains in full force and effect in accordance with its terms.

8     Mr. Dekany sought to distinguish *Re Allflex*, supra, on the ground that in that case there was no disputed claim and no setting aside of the funds, as is the case here. In my opinion there is no substance to this argument.

9     I hold therefore that the $9,685 is not impressed with a trust and passed to the trustee in bankruptcy upon the making of the assignment as property of the debtor.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

10    In his notice of motion, the trustee asks for advice and directions on the following questions:

11    1. Does the agreement entered into by the bankrupt and Ocean Garden Products Inc. on or about 23rd April 1980 operate as a guarantee such that Ocean Garden Products Inc. has the right to assert a claim as a creditor in the estate of J. LeBar Seafoods Inc., a bankrupt?

12    2. If the answer to Q. 1 is "Yes", is the claim of Ocean Garden Products Inc., a contingent or unliquidated claim within the meaning of s. 95(2) of the Bankruptcy Act?

13    3. If the answer to Q. 2 is "Yes", is the trustee at liberty to insist that Ocean Garden Products Inc., assign its claim in the estate of S. & C. Foods Ltd., a bankrupt, as a prerequisite to having Harold Brief & Associates Limited as trustee of the estate of J. LeBar SeaFoods Inc., a bankrupt, apply pursuant to s. 95 to have the claim of Ocean Garden Products Inc. declared a provable claim and having such provable claim valued?

14    4. If the answer to Q. 3 is "No", does Ocean Garden Products Inc. have to assign its claim in the S. & C. Foods Ltd. estate to the trustee in the J. LeBar Seafoods Inc. estate before being paid a dividend by the trustee of either:

15    (a) The sum of $9,865 held back under the proposal; or

16    (b) Out of the funds available for distribution to the creditors in the bankrupt estate of J. LeBar Seafoods Inc.? and

17    5. Is Ocean Garden Products Inc. precluded from asserting any claim against the sum of $9,865 reserved by the trustee under the proposal by reason that the proposal was declared in default and a deemed assignment in bankruptcy having occurred?

18    I have already dealt with Q. 5 which is answered "Yes". There is no real dispute as to Q. 1 which is answered "Yes". I continue with the remaining questions.

19    Ocean Garden has filed a claim in the bankruptcy of its principal debtor, S. & C. Foods. It also claims against the estate of LeBar as guarantor of the indebtedness of S. & C. Foods to Ocean Garden. The trustee of LeBar also claims against the estate of S. & C. Foods as its largest creditor.

20    As I apprehend the law, the right of the principal creditor, Ocean Garden, to claim against the estate of the guarantor LeBar is governed by *Re Blakeley; Ex parte Aachener Disconto Gesellschaft* (1892), 9 Morr. 173 (D.C.). The principle established in that decision is that upon the bankruptcy of its debtor, the creditor is entitled to claim against the estate of the bankrupt guarantor for the full amount of the debt. The claim is to be reduced only by any amount paid to the creditor by the debtor or by the debtor's estate and by the amount of any dividend declared in favour of the creditor prior to proof of the creditor's claim in the estate of the guarantor. There is no evidence of any payment to the creditor, Ocean Garden, by the debtor, S. & C. Foods. There is a projected dividend to be paid by the trustee of S. & C. Foods to Ocean Garden but no dividend has as yet been declared. Ocean Garden may therefore claim in full against the estate of LeBar. That is not an unliquidated or contingent claim; it is liquidated, immediate and direct. Subsequently declared dividends in the estate of S. & C. Foods and paid to Ocean Garden are not to be applied in reduction of the claim against the LeBar estate, subject only to the overriding principle that Ocean Garden is not entitled to recover more than 100 per cent of its claim: see *Re Houlder*, [1929] 1 Ch. 205. Any excess will be held in trust for the trustee of LeBar.

21    Mr. Gringorten relies on the decision of Houlden J. in *Re Film House Ltd.* (1974), 19 C.B.R. (N.S.) 231 (Ont. S.C.), which is not in point but which he submits can be applied by analogy. That decision concerned the right of a guarantor to claim in the bankruptcy of the debtor. There, the considerations may be quite different. I do not, however, see that it has any application to the issues before me.

22    As to the right of the trustee to require an assignment of the creditor's claim in the S. & C. Foods bankruptcy, the guarantor is not entitled to such an assignment until he has paid the creditor's claim in full: see the Mercantile Law Amendment Act, R.S.O. 1970, c. 272, s. 2.

1981 CarswellOnt 175, [1981] O.J. No. 2381, 10 A.C.W.S. (2d) 263, 38 C.B.R. (N.S.) 64

23    Question 2 is, therefore, answered "No". Question 3 does not require an answer. I will answer Q. 4 although it may not require to be answered: the answer is "No". I have already answered Q. 5 above: the answer is "Yes". Costs of this application to be paid to the trustee and to Ocean Garden out of the assets of the estate after taxation, as counsel have agreed.

*Questions determined accordingly.*

---

**End of Document**         Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    4

# Tab 20

Case 09-10138-MEW   Doc 15723-2   Filed 06/09/15   Page 479 of 490

Olympia & York Developments Ltd., Re, 1997 CarswellOnt 657

1997 CarswellOnt 657, 143 D.L.R. (4th) 536, 27 O.T.C. 223, 45 C.B.R. (3d) 85...

1997 CarswellOnt 657

Ontario Court of Justice (General Division) [In Bankruptcy]

Olympia & York Developments Ltd., Re

1997 CarswellOnt 657, 143 D.L.R. (4th) 536, 27 O.T.C. 223, 45 C.B.R. (3d) 85, 69 A.C.W.S. (3d) 15

# In the Matter of The Bankruptcy of Olympia & York Developments Limited, a corporation incorporated under the laws of the Province of Ontario and having its principal place of business in the City of Toronto, in the Municipality of Metropolitan Toronto

Farley J.

Judgment: February 13, 1997 [*]
Docket: 31-204546-T, 31-204573-T, 31-204574-T

Proceedings: additional reasons to *Olympia & York Developments Ltd., Re* (1997), 1997 CarswellOnt 656, 45 C.B.R. (3d) 100 ((Ont. Bktcy.)); additional reasons at (1997), 146 D.L.R. (4th) 382, 39 O.T.C. 396 (Ont. Bktcy.)

Counsel: *Geoffrey B. Morawetz* and *Aida Van Wees*, for Trustee of Estate of Olympia & York Developments Limited.
*Lyndon A. J. Barnes* and *Rupert H. Chartrand*, for Credit Lyonnais Canada in its capacity as Security Agent for Abitibi and Gulf Lenders.
*Benjamin Zamett* and *Jay A. Carfagnini*, for National Bank of Canada.
*Harry M. Fogul* and *Lawrence J. Crozier*, for Montreal Trust Company of Canada.
*Hilary Clarke*, for Royal Bank of Canada.
*John M. Buhlman*, for Scotia Plaza Lenders.
*Bonnie Tough*, for Canadian Imperial Bank of Commerce.

Subject: Insolvency

### Table of Authorities

#### Cases considered:

*A. Marquette & Fils Inc. v. Mercure*, [1977] 1 S.C.R. 547, 10 N.R. 239, 65 D.L.R. (3d) 136 — *referred to*

*Abacus Cities Ltd. (Trustee of) v. AMIC Mortgage Investment Corp.*, 1 Alta. L.R. (3d) 257, 11 C.B.R. (3d) 193, 89 D.L.R. (4th) 84, [1992] 4 W.W.R. 309, 125 A.R. 45, 14 W.A.C. 45 (C.A.) — *considered*

*Asselford Martin Shopping Centers Ltd. v. Ross* (1994), 28 C.B.R. (3d) 130 (Ont. Bktcy.) — *referred to*

*Bitini Construction Co., Re* (1979), 29 C.B.R. (N.S.) 215 (Ont. S.C.) — *referred to*

*Blakeley, Re* (1892), 9 Morr. 173 (Div. Ct.) — *considered*

*Campbell Sharp Ltd. v. Bank of Montreal* (1984), 53 C.B.R. (N.S.) 225, 30 Man. R. (2d) 73 (Q.B.) — *referred to*

*Canadian Tabulating Card Co., Re* (1972), 17 C.B.R. (N.S.) 248 (Ont. S.C.) — *referred to*

Case 09-10138-MFW    Doc 15723-2    Filed 06/09/15    Page 480 of 490

Olympia & York Developments Ltd., Re, 1997 CarswellOnt 657

1997 CarswellOnt 657, 143 D.L.R. (4th) 536, 27 O.T.C. 223, 45 C.B.R. (3d) 85...

*Cattell, Re* (1991), 56 B.C.L.R. (2d) 233, 6 C.B.R. (3d) 178, 80 D.L.R. (4th) 481 (C.A.) — *referred to*

*Crown Royal Clothing Co., Re* (1969), 15 C.B.R. (N.S.) 203 (C.S. Que.) — *considered*

*Film House Ltd., Re* (1974), 19 C.B.R. (N.S.) 231 (Ont. S.C.) [varied (1974), 19 C.B.R. (N.S.) 231 at 234 (Ont. S.C.)] — *distinguished*

*Houlder, Re*, [1929] 1 Ch. 205 — *considered*

*Hunter, Re* (1982), Qd. R. 131 (S.C.) — *considered*

*J. LeBar Seafoods Inc., Re* (1981), 38 C.B.R. (N.S.) 64 (Ont. S.C.) — *referred to*

*Lehndorff General Partner Ltd., Re* (1993), 17 C.B.R. (3d) 24, 9 B.L.R. (2d) 275 (Ont. Gen. Div. [Commercial List]) — *referred to*

*Mallet, Re* (November 29, 1996), Doc. Estate No. 060160 (N.B. Q.B.) — *not followed*

*Mather v. Canadian Credit Men's Trust Assn.* (1933), 14 C.B.R. 292, [1933] 1 W.W.R. 526, [1933] 2 D.L.R. 790 (Sask. Q.B.) — *considered*

*N.T.W. Management Group Ltd., Re* <(1994), 29 C.B.R. (3d) 139 (Ont. Bktcy.) — *referred to*

*Olympia & York Developments Ltd., Re* (1995), 34 C.B.R. (3d) 93 (Ont. Gen. Div. [Commercial List]) — *referred to*

*Penfold, Ex parte* (1851), 4 De G. & Sm. 282 (V.C.) — *applied*

*Quartermain's Case*, [1892] 1 Ch. 639, 66 L.T. 19, 61 L.H. Ch. 273 — *considered*

*Ramsbottom, Ex parte* (1835), 2 Mont. & A. 79, 4 Dea. & Ch. 198 — *applied*

*Savin, Re* (1872), 7 Ch. App. 760 (C.A.) — *applied*

*Turner, Re* (1881), 19 Ch. D. 105 (C.A.) — *considered*

**Statutes considered:**

Bankruptcy Act, 1869 (U.K.), 32 & 33 Vict., c. 71

s. 40*considered*

Bankruptcy Act, 1883 (U.K.), 46 & 47 Vict., c. 52

generally*referred to*

Bankruptcy and Insolvency Act, R.S.C. 1985, c. B-3

s. 2 "secured creditor"*considered*

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MEW    Doc 15723-2    Filed 06/09/15    Page 481 of 490

Olympia & York Developments Ltd., Re, 1997 CarswellOnt 657

1997 CarswellOnt 657, 143 D.L.R. (4th) 536, 27 O.T.C. 223, 45 C.B.R. (3d) 85...

s. 2 "debtor" *considered*

s. 66(2) *considered*

s. 122(2) *referred to*

ss. 127-134 *considered*

s. 127(1) *considered*

s. 128(1.1) *considered*

s. 128(2) *considered*

s. 134 *considered*

s. 143 *considered*

s. 183(1) *referred to*

Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36

generally *considered*

s. 5.22 *referred to*

MOTION for directions by trustee in bankruptcy.

*Farley J.*:

**Endorsement**

1    See Motion Record of Trustee as to directions relating to items (a), (b), (f) and (g). This leaves items (h), (i), (j), (e), (c) and (d) to be dealt with and as to which there was a division of views among the creditor groups, with the trustee essentially adopting a neutral position. As to these remaining items I have the following questions up for directions:

>   (h) Should a creditor who holds an unsecured guaranty from OYDL in support of a secured claim against an OYDL subsidiary claim and the OYDL estate on a gross net basis after taking into account the value of the security granted by the OYDL subsidiary?

>   (i) Should a creditor who holds an unsecured guaranty from OYDL in support of a secured claim against an OYDL subsidiary claim for interest after the date of bankruptcy (May 22, 1992)?

>   (j) In view of the position of s. 5.22 of the CCAA. Plan should a creditor be entitled to claim interest on an unsecured claim after May 22, 1992?

>   (e) Should creditors who hold marketable securities or any other type of security on which interest or dividends (or other distributions) have been paid or declared be required to credit such payments/receipts against their deficiency claim?

>   (c) Should creditors who have claims against OYDL which are secured by marketable securities calculate their deficiency claims, if any, as of December 31, 1996 (or another "current") date? If yes, should

>>     i) for publicly traded securities the value be assessed from the closing markets on December 31, 1996 and

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MEW    Doc 15723-2    Filed 06/09/15    Page 482 of 490

Olympia & York Developments Ltd., Re, 1997 CarswellOnt 657

1997 CarswellOnt 657, 143 D.L.R. (4th) 536, 27 O.T.C. 223, 45 C.B.R. (3d) 85...

(ii) for non publicly traded securities the value be assessed as of December 31, 1996.

(d) Should creditors who have claims against OYDL which are secured by real estate calculate their deficiency claims, if any, as of December 31, 1996?

2    I am of the view that (c) and (d) can be dealt with jointly utilizing the same principles. Sections 127-134 deal with the proof by secured creditors. These sections contemplate that the value of the security will be deducted so that the creditor (in effect stripped of his security and thus not acting in any other way than an unsecured creditor) would prove his claim as to that for which he has an unsecured claim. These questions only have relevance to secured creditors who have not yet realized upon their security *vis a vis* a secured claim against OYDL. At the present time we are approaching the fifth anniversary of the (effective) date of bankruptcy — May 22, 1992. It would seem to me to be desirable to pick a date which is a current date as of the notice sent out by the trustee (I may be spoken to by the trustee if this causes any mechanical problem). It would seem to me that it would be convenient to have that date being as of the date that the trustee sends out notice of these procedures to the creditors. There would not appear to be any merit in selecting any "historical" date given that these secured creditors apparently have hung on to their security to date, appreciating that it has and continues to have intrinsic value.

3    In accordance with the philosophy of s.127(1) there should be an adjustment for all reasonable costs of disposition from the deemed gross proceeds.

4    For security which is publicly traded, the values can be calculated on the basis of the closing market (as of the date notice is mailed out). For security which it does not enjoy a public trading market (non-publicly traded securities and real estate for example), the value to be assessed is as of the date notice is mailed out. The trustee will keep confidential the proposed date of mail-out. I have no doubt but that certain illiquid assets are valued only periodically on a regular basis or otherwise — i.e. monthly, quarterly or yearly; if the trustee has no reason to conclude that the value has materially changed since the last valuation date, it would seem appropriate to take that valuation with whatever adjustment the trustee feels suitable (e.g. Toronto commercial real estate valued at $100,000 as of December 31, 1996 with the Toronto Real Estate Board index of commercial real estate being increased by 2.2 per cent from that date to the date of mail-out — then a value should be $102,200 less the reasonable costs of disposition).

5    The trustee may of course disagree with the valuation of security for which there is not a public trading market. In those circumstances the trustee and the secured creditor will have to proceed in accordance with s. 127-134 to resolve that dispute.

6    Let me now deal with the remaining items (h), (i), (j) and (e). The trustee is helpful and made calculations with the claims made on a gross or net basis (and as well with or without interest as to either of those scenarios). Thus each creditor group is able to see who benefits and who loses under any scenario (and the extent of same) as this is a zero sum game (subject of course to payment of costs for participants in this exercise which should be restricted on any basis to reasonable costs of "value added" presentations — that i.e. those presentations which materially assist in puzzling through the principles and philosophies which are competing here in this motion for directions).

7    It is recognized that a fundamental purpose of the bankruptcy legislation is to provide for the fair and orderly distribution of the bankrupt's property amongst his creditors on a *pari passu* basis: see Houlden and Morawetz, *The 1997 Annotated Bankruptcy and Insolvency Act* (Scarborough: Carswell-Thompson, 1996) at page 2. Where two interpretations of the *Act* are equally possible then the court should select the interpretation which favours equality amongst creditors (having the same characteristics of course): see *Re Canadian Tabulating Card Co.* (1972), 17 C.B.R. (N.S.) 248 (Ont. S.C.) at p. 258. The legislation is a businessman's statute: it should not be interpreted in a technical, narrow, legalistic manner, particularly if that would detract from the underlying philosophy and purpose of the *Act*: see *Re N.T.W. Management Group Ltd.* (1994), 29 C.B.R. (3d) 139 (Ont. Bktcy.) at p. 143; *Re Olympia & York Developments Ltd.* (1995), 34 C.B.R. (3d) 93 (Ont. Gen. Div. [Commercial List]) at p. 101; *Mercure v. A. Marquette & Fils Inc.* (1975), 65 D.L.R. (3d) 136 (S.C.C.) at p. 143. Of course that does not mean that the "rules" and jurisprudence are to be thrown out or the legislation ignored so as to get to what some may feel is a "juster" or more appropriate result in the particular circumstances. However it is recognized that the court has inherent jurisdiction to deal

1997 CarswellOnt 657, 143 D.L.R. (4th) 536, 27 O.T.C. 223, 45 C.B.R. (3d) 85...

with any vacuum in the legislation so as to give purpose to the bankruptcy regime: see *Olympia & York* at p. 101; *Re Lehndorff General Partner Ltd.* (1993), 17 C.B.R. (3d) 24 (Ont. Gen. Div. [Commercial List]). However as I have observed before there is no room for inherent jurisdiction if the legislature has dealt with the matter; inherent jurisdiction only comes into play where the legislature has not dealt with the matter (or to the extent that it has not dealt with it exhaustively).

8    While it is interesting to note that Credit Lyonnais (which proposes a gross treatment now) filed its bankruptcy petition indicating it may be just and equitable for the OYDL *Group* to be dealt with in bankruptcy on a consolidated basis. While this may be somewhat embarrassing to take a contrary approach now five years later I would note the following:

> • Credit Lyonnais was filing in the midst of the chaos that followed resulting from the OYDL *Group* CCAA filing — and in this respect it would appear to have been parroting the views of the OYDL *Group* in its filing relating to intertwining and operating as a single entity.

> • I note that the CCAA filing advises that this was *in most cases* but does not quantify. As well where the trustee observes that in many cases lenders took the approach they were dealing with OYDL with little regard to the independent legal status of the subsidiaries. This was stated somewhat baldly and of course it acknowledges that in the balance of the cases the lenders would have been very cognizant of the separate legal entities.

> • Credit Lyonnais in its petition and affidavit of verification qualified its approach by stating:

>> In the circumstances the just and equitable result *may be* for the affairs and property of the debtors to be dealt with in bankruptcy on a consolidated basis, rather than as separate entities.

> • Certain of the CCAA applicants had to qualify by virtue of instant debt by borrowing $1,000.00 from the Credit Lyonnais or others.

> • The bankruptcy did not proceed on a consolidated basis in 1994 — my December 20, 1994 order dealt with OYDL and not with the other O & Y companies — as noted by the change of style. Blair J.'s order of June 6, 1996 did not change this non-consolidation aspect.

9    In the end result I do not find any of the above factors singly or in combination to be determinative as to whether to afford gross or net treatment as to (h).

10    I note that the Bankruptcy Court is a court of law and equity and as such it is bound to apply the *Act* in accordance with equitable principles — see s. 183(1); Houlden and Morawetz, 1997 Annotation at p. 462.

11    *Ex-parteWest Riding Union Banking Co.* in *Re Turner* (1881), 19 Ch.D. 105 (C.A.) deals with the question of (h); the question is whether the law as stated there is correctly interpreted as requiring a gross approach (i.e. was there magic in the sequence apparently set forth) and whether it should be adjusted in circumstances of the nature we are facing. In *Turner* at p. 113 Jessel M.R. stated:

> ... The whole thing was discussed in *Ex parte Shepherd* which is exceedingly well reported in 1 Phil. 56 under the name of *In re Plummer*, and Lord Lyndhurst there stated what the principles are. He said: "Now what are the principles applicable to cases of this kind? If a creditor of a bankrupt holds a security on part of the bankrupt's estate, he is not entitled to prove his debt under the commission, without giving up or realizing his security. For the principle of the bankruptcy laws is, that all creditors are to be put on an equal footing, and, therefore, if a creditor chooses to prove under the commission, he must sell or surrender whatever property he holds belonging to the bankrupt; but, if he has a security on the estate of a third person, that principle does not apply; he is in that case entitled to prove for the whole amount of his debt, and also to realize the security, provided he does not altogether receive more than 20s, in the pound." Then, further on, he said: "The next point is this: In administration under bankruptcy, the joint estate and separate estate are considered as distinct estates; and accordingly it has been held, that a joint creditor, having a security upon the separate estate, is entitled to prove against the joint estate without giving up his security, on the ground that it is a different estate. That was the principle upon which

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

*Ex parte Peacock* (1) proceeded, and that case was decided first by Sir J. Leach and afterwards by Lord Eldon, and has since been followed in *Ex parte Peacock* (1) proceeded, and that case was decided first by Sir J. Leach and afterwards by Lord Eldon, and has since been followed in *Ex parte Bowden* (2). Now this case is merely the converse of that, and the same principle applies to it."

See also at p. 112 where he said:

... The principles of the bankruptcy law are plain enough. A man is not allowed to prove against a bankrupt's estate and to retain a security which, if given up, would go to augment the estate against which he proves. That is the principle of the whole thing. The only question is whether, if the security were given up, it would augment the estate? Of course, if the security was given by a stranger and you were to cancel it, you would not augment the bankrupt's estate to the extent of one farthing, and consequently such a security need not be given up.

In the subject case how would there be augmentation of the OYDL estate? See *Campbell Sharp Ltd. v. Bank of Montreal* (1984), 53 C.B.R. (N.S.) 225 (Man. Q.B.); *Asselford Martin Shopping Centers Ltd. v. Ross* (1994), 28 C.B.R. (3d) 130 (Ont.Bktcy.); *Re Cattell* (1991), 80 D.L.R. (4th) 481 (B.C. C.A.).

12      While it is not specifically mentioned in the quote it does not appear that Jessel M.R. was in any way dealing with there being some distinction based upon a lack of capacity under the legislation then existing (i.e. at the time of *Turner* which dealt with 1880 events) for there to be evaluation of the security. I note that the 1869 *Act* (as well as the 1883 *Act*) deals specifically in s.40 with a secured creditor "giving credit for the value of his security". Thus it was not a "surrender or sell" situation exclusively at the time of *Turner*.

13      It seems to me that the principle involved becomes clearer if one considers what is at issue is the proof in the separate estate of OYDL. The guaranty of OYDL is an obligation which is separate and apart from the obligation of the subsidiary. The interaction between the two obligations is that, and only that, the guarantee is for the amount of the debt of the subsidiary which is outstanding. If the subsidiary debt has been reduced by repayment of that debt then the guarantee is for the reduced amount. Thus if the original debt of the subsidiary (or better put the principal debtor) was $100 but it has been reduced by repayment (or dividends of the estate of the bankrupt) by $20 to $80, then the guarantee is for $80. Further the guarantee would have been given in favour of the lender for the benefit of the principal debtor for value or other business/economic benefit to have been then been received by the guarantor.

14      Vaughan Williams J. in *Re Blakeley* (1892), 9 Morr. 173 (Div. Ct.) referred to the matter in question being governed by a rule of some seventy to eighty years standing at that time — namely that as set out in the headnote or succently at p. 173:

Where proof is made against a bankrupt's estate on a guarantee entered into by the bankrupt on behalf of another person, if at the time of proving the creditor has received part of the debt, either by payment or as a dividend from the estate of the principal debtor, or even if such dividend has been declared though not actually paid, such creditor will be allowed to prove for the residue only after deducting the amount so paid or declared.

But if after proof is made the creditor receives a dividend from the estate of the principal debtor that will not be deducted from the amount of his proof.

It appears that a line has to be drawn somewhere and in a proof of claim situation it is at the time of proof.

15      In *Re Houlder*, [1929] 1 Ch. 205 Astbury J. at pp. 209-10 recited the principles set out in the headnote of *Blakely* and went on to state:

In other words, where a creditor is proving in the bankruptcy of a surety and that surety is only responsible for the amount in fact owing by the principal debtor, any payment by or on behalf of the principal debtor before proof must be taken into account.

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Olympia & York Developments Ltd., Re, 1997 CarswellOnt 657

1997 CarswellOnt 657, 143 D.L.R. (4th) 536, 27 O.T.C. 223, 45 C.B.R. (3d) 85...

Where, however, the creditor has received from some other source payments in reduction of the principal debtor's debt between the receiving order and the proof the position is different.

16    He went on to decide *Houlder* on the general principles of principal and surety. He concluded at pp. 215-6:

It is true that in the present case the mortgagors paid next to nothing. But they were principal debtors borrowing from creditors and guaranteed by three sureties, one of whom has become bankrupt. There is no doubt that the three sureties were jointly and severally liable for the whole debt, and in my opinion the mortgagee creditors are entitled to prove for the whole amount due at the date of the receiving order.

17    While *Re Hunter* (1982), Qd. R. 131 (S.C.) refers to specific provisions of the Australian Bankruptcy legislation, this does not impact upon the application in that case of *Blakely* and *Houlder*. See also Halsbury's *Laws of England*, 4th ed. Reissue (London: Butterworths, 1989), para. 493 vol. 3(2).

18    Henry in *Re J. LeBar Seafoods Inc.* (1981), 38 C.B.R. (N.S.) 64 (Ont. S.C.) applied both *Blakely* and *Houlder* at p. 68.

19    Those favouring the net approach have claimed that the substratum of *Turner* has disappeared and that the *overriding principle is that creditors should be treated equally*. In my view while this emphasized principle is appropriate it cannot straddle the two entities — both principal debtor and guarantor. The guarantor is exposed for the full amount of the unpaid debt — the guarantor cannot (absent unusual contractual rights) require the principal debtor to liquidate the security which it has given to the creditor. That is the effect of what a net treatment would require.

20    I do not see that the security from a principal debtor as being the equivalent of a declared but unpaid dividend of the principal debtor.

21    The net proponents cited *Re Mallet*; unreported decision of Miller J. released (November 29, 1996), Doc. Estate No. 060160 (N.B. Q.B.). No principles or jurisprudence appeared to have been examined — but rather it appears that in that related guarantor — principal debtor relationship the court there was content to ignore the separation of the entities involved and what was concentrated on was that the creditor had the benefit of direct security from the principal debtor (mortgages on the shopping malls) which the creditor would not have to share with the other unsecureds. I do not find this case persuasive in overcoming the established jurisprudence.

22    I do not see that *Re Film House Limited* (1974), 19 C.B.R. (N.S.) 231 (Ont.S.C.) as helpful to the matters. Houlden J. at p. 235 stated:

If the surety had paid off the bank, it would be entitled to receive the surety [sic — security] in the possession of the principal creditor. And if this happened, there is no doubt that in voting the claim s. 90 would apply, and the surety would have to give credit for the security received from the principal creditor. The fact that it has not paid off the claim, when it is permitted to vote the claim by reason of the principal creditor's election not to vote it, should not in my opinion affect the situation.

23    In the facts of that case *if the principal creditor* (the Bank) had elected to vote its claim then the surety would have had no right to vote (see p. 234). A secured principal creditor has to value its security and deduct same before voting as an unsecured creditor. The surety could step in to the shoes of the principal creditor and receive its security but only upon payment of the debt in full then owed by the principal debtor. A guarantor does not step into the shoes of the creditor until he pays off the creditor in full — see Houlden and Morawetz, *Bankruptcy Law of Canada*, (1997) looseleaf at para. 6-44. As well Houlden J. went on to value the surety's claim on a contingency basis.

24    As to the question of the definition of "secured creditor" pursuant to s. 2 of the *Act* I am of the view that it is overreaching to interpret this as proposed by the netters. "Debtors" includes an insolvent person and a bankrupt (s. 2). It should be noted the *Act* deals not only with bankruptcies but also with proposals of insolvent persons. I do not see that I can ignore the definition of secured creditor: see *Re Bitini Construction Co.* (1979), 29 C.B.R. (N.S.) 215 (Ont. S.C.). It would appear that in *Mather v.*

Olympia & York Developments Ltd., Re, 1997 CarswellOnt 657

1997 CarswellOnt 657, 143 D.L.R. (4th) 536, 27 O.T.C. 223, 45 C.B.R. (3d) 85...

*Canadian Credit Men's Trust Assn.* (1933), 14 C.B.R. 292 (Sask. Q.B.) and *Re Crown Royal Clothing Co.* (1969), 15 C.B.R. (N.S.) 203 (C.S. Que.) were appropriately cautious and careful in interpreting "secured creditor". S. 128(1.1) gives the trustee the right to sell property of the bankrupt's share of the security in certain circumstances but not of course property of a third party.

25     I do not see that there is any subtle shift in s. 128(2) from "secured creditor" to "creditor" when one takes into account the further subtlety that if a secured creditor is in effect stripped of the value of the security he then becomes in essence an (unsecured) creditor for the difference between his gross loan then in place less the value of the security (as valued) — it is on that net amount that he is entitled to receive a dividend (up to 100 per cent).

26     I do however recognize the concern of the netters — one which may well have been exacerbated by the length of time involved here of approximately five years. Certain secured creditors have realized upon their securities held on the principal debtor and therefore are only able to prove in the OYDL estate on the guarantee for the reduced amounts; other secured creditors have not yet done so for whatever reason. However I must assume that the reason(s) is *bona fide*; there was no evidence presented to the contrary view. I sympathize with the possible "inequitable" result that may result, however it would seem to me that there is no gap in the *Act* which requires or better put allows filling — particularly when to do so would go against what is now almost two centuries of certainty pursuant to the case law. If that situation calls out for changing, then it is a task for the legislature.

27     In my view the claims in the OYDL estate as to guarantees in favour of creditors who hold security from the principal debtor (subsidiary) should be permitted to be filed on a gross basis but subject to the principles set out in *Blakely* as to reductions of the principal debt for which OYDL as guarantor may "now" be exposed.

(i) I am of the view that the rules as expressed in *Re Savin* (1872), 7 Ch. App. 760 (C.A.) applies. See at p. 764 where James L.J. stated:

> There is a general rule in bankruptcy — whether a right and a reasonable rule or not — that there is to be no proof in bankruptcy for interest subsequent to the bankruptcy. There was also a rule in bankruptcy, that a creditor holding a mortgage security is to make up his mind whether he will rely upon his security or give it up and come in and prove with the other creditors. This rule was relaxed in favour of the creditor by a rule that his security might be sold, and then he was to apply the realised proceeds in payment of his debt. On this rule a judicial decision was made nearly eighty years ago, that the proceeds of the sale were, in case of deficiency, to be applied in payment of principal and interest up to the date of the bankruptcy, and up to the date of the bankruptcy only; and then the creditor was to prove for the residue of his debt, which, of course did not include any interest subsequent to the date of the bankruptcy.
>
> That rule has been repeated in the very same terms by every writer on the subject, and by every Judge, with the exception perhaps of Mr. Commissioner *Montagu's* note to *Ex parte Ramsbottom* (1). It seems to have been considered as the established rule in bankruptcy, and so it was laid down by Lord *Westbury* in the case already referred to.
>
> That being so, it appears to me that we cannot go into any reasoning whether the rule is unjust or unreasonable, or alter the rule, or say that the rule is only to be applied in the same cases in which it has been applied, or that the rule is not quite consistent with the existing state of circumstances.
>
> I believe, however, that if the question now arose for the first time I should agree with the rule, seeing that the theory in bankruptcy is to stop all things at the date of the bankruptcy, and to divide the wreck of the man's property as it stood at that time.

See also the views of Houden and Morawetz *1997 Annotation* at p. 369:

> If a secured creditor does not realize sufficient to pay the principal amount of his or her claim, the creditor, by s. 134, can only receive 100 cents on the dollar and, if there is a surplus after paying situation, in determining the amount of the unsecured claim of a secured creditor, interest will only be calculated to the date of bankruptcy: *Re Savin* (1872), 7 Ch. App. 760, 27 L.T. 466, 20 W. R. 1027, 42 L.J. Bank 14; *Re Levesque Auto Inc.; Cie Financière Canadienne v. Gagnon* (1978), 26 C.B.R. (N.S.) 234 (C.S. Que.); *Re Développements du Nord-Est Ltée* (1983), 51 C.B.R. (N.S.) 142 (Que.C.A.).

Case 09-10138-MFW    Doc 15723-2    Filed 06/09/15    Page 487 of 490

Olympia & York Developments Ltd., Re, 1997 CarswellOnt 657

1997 CarswellOnt 657, 143 D.L.R. (4th) 536, 27 O.T.C. 223, 45 C.B.R. (3d) 85...

If a secured creditor is proving a claim as an unsecured creditor, he or she must apply payments received after bankruptcy to principal and interest due at the date of bankruptcy. The secured creditor cannot apply the amount received in payment first of interest subsequent to the date of bankruptcy and then in reduction of principal and prove a claim as an unsecured creditor for the remainder: *Quartermain's Case*, [1892] 1 Ch. 639, 66 LT. 19, 61 L.J. Ch. 273.

28      I note the views of the Alberta Court of Appeal in *Abacus Cities Ltd. (Trustee of) v. AMIC Mortgage Investment Corp.* (1992), 89 D.L.R. (4th) 84 (Alta. C.A.) at pp. 87-9. While it accepted:

Savin expresses the law in Canada today: claims provable in bankruptcy cannot include interest after bankruptcy. I would be loath, however, to extend it in a cause where the apparent rationale does not need it.

I would also note in that case the Alberta Court of Appeal focussed only on s. 122(2). I would think it may have been helpful to take a look at s. 134:

Subject to section 130, a creditor shall in no case receive more than one hundred cents on the dollar and interest as provided by this *Act*.

and s. 143:

Where there is a surplus after payment of the claims as provided in sections 136 to 142, it shall be applied in payment of interest from the date of the bankruptcy at the rate of five per cent per annum on all claims proved in the bankruptcy and according to their priority.

A corollary of this would be that there is no interest attributable to a proved claim after the date of bankruptcy *unless* there is a surplus — at which stage the surplus can be used up by paying interest at 5 per cent per annum from the date of bankruptcy. On a practical basis in our situation the funds in the estate fall well short of there being any surplus.

(j) In my view the discussion in sub. (l) is equally applicable here. I note that s. 66 (2) of the *Act* only goes one way — from the *Act* to a CCAA regime for a proposal and not the other way around.

(e) In *Quartermain's* case, the mortgagees put in a receiver who carried on the tavern business at a profit. However these secured creditors were not paid out in full and claimed for the deficiency in the liquidation of the company proceedings. It would seem to me that the head note at p. 639 should be read carefully in conjunction with the order at p. 650 — as to which correction of the order there does not appear to be any analysis. At p. 649 Stirling J. says that:

As regards the application of the income, I confess that if the matter were *res integra*, I should have had some difficulty in holding that there was any difference between that and the proceeds of sale; but it appears to me that I am bound by the decisions in *Ex parte Ramsbottom* (3) and *Ex parte Penfold* (4). Both cases were cited in *In re Savin*, and no doubt was cast upon them.

I therefore thought it prudent to review *Ex parte Ramsbottom*, 2 Mont. & A. 79 (*Ex parte Ramsbottom*; in the matter of *Penfold* (1835), 2 Montagu and Ayrton's Bankruptcy Reports (1833-8) 79, 4 Dea & Ch 198 (4 Deacon & Chitty's Bankruptcy Reports (1832-5) 198 and *Ex parte Penfold* (1851), 4 De G. & Sm. 282 (V.-C.) (*Ex parte William Margesson Penfold and others; in the matter of Field Dunn Baker, a Bankrupt* (1851).

29      In *Penfold*, the Vice-Chancellor's complete reasons were as follows at pp. 283-4:

If I am to be guided by Lord Eldon's order in *Rams-*[284]-*bottom's case*, there is nothing to discuss; for that case closely resembles this, and the point has been settled by a Lord Chancellor of the highest authority. It has been suggested, however, that that order was taken by consent. There is nothing on the records of the Court to denote this, and I see no good reason to infer that it was so. Independently, however, of that decision, I think the Petitioners right on principle.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 15723-2    Filed 06/09/15    Page 488 of 490

Olympia & York Developments Ltd., Re, 1997 CarswellOnt 657

1997 CarswellOnt 657, 143 D.L.R. (4th) 536, 27 O.T.C. 223, 45 C.B.R. (3d) 85...

The amount of principal and interest due at the time of the bankruptcy must be deducted out of the produce of the sale. An account must be taken of the interest upon the debts since the bankruptcy on one side, and the income arising from the security since the same period on the other, and the one must be set against the other. If the interest exceeds the income it will be lost. If the income exceeds the interest it must be carried to account in diminution of the proof.

30    In Ramsbottom the Chief Judge stated his entire reasons at pp. 83-4 (Mont & A):

It is not necessary to consider the general rule in this case, Lord *Eldon's* order being express. The mortgagee does not seek to prove for interest due since the commission, but to prove without accounting for rents and profits, and having them applied in reduction of the interest; and the question is, Can he do so? He could not add subsequent interest to his proof; but it is said he does so in effect. The order of Lord *Eldon* gives interest up to the date of that order, but is silent as to subsequent interest. Without that order the creditor might have an account taken before the commissioners, and the interest kept down. He might also sell the estate, apply the balance in reduction of his debt, and prove for the difference. The sale was in 1827; but, from difficulties which arose, the account was not taken till lately. *From the date of an order of sale the mortgagee in possession is entitled to the rents and profits. If so, the assignees cannot call on a mortgagee to bring into account rents and profits received since an account was ordered to be taken, and which they ought to have taken long ago. It would be unjust to deprive the mortgagee of both rents and interest, because the completion of Lord Eldon's order has been delayed. If the premises had been sold, he would have been enjoying the interest of his money.* (Emphasis added)

31    It is clear that *Ramsbottom* was a situation where the realization by way of sale was sometime before, but that there were subsequent delays in getting an accounting. However I think it reasonably obvious that if the secured creditor is taken as having realized upon a security — and thus turned it into "cash", he should have the benefit of that *corpus* from that period and the fruit from that *corpus* thereafter. The same would hold true when an asset on which the secured creditor holds security is valued instead of being sold. The same philosophy would appear to have been enunciated in *Penfold* but in somewhat less precise language. I am of the view that aside from longevity the principle of *Ramsbottom* is one soundly based in equity. This treatment however may be subject to one *caveat* — the circumstances which would evoke this *caveat* may or may not be present in the case before me. The *caveat* is that historically the *corpus* and the fruit of the *corpus* were fairly distinct — there would be a "regular" income on an annual basis consisting of rents from letting out real estate, interest from bonds, profits from the operation of a business (all "distributed" in a proprietorship or partnership or partially distributed by way of dividend in a limited company and part retained in the business — keeping in mind that two centuries ago the concepts of joint stock companies were much closer to partnerships than the case now). Now however there have been some fundamental changes. Some limited companies never declare a dividend as they are characterized as growth companies from which the investor will realize his "profit" not on an annual basis but by eventually selling the *corpus* for a capital gain. As well there are instances where as part of a re-organization there are significant "one time" distributions of capital by way of dividend. It would seem to me that any such capital dividend would and should be characterized as a return of capital and therefore should be treated as part of the *corpus* for valuation of asset under the security purposes.

32    It would seem to me that Stirling J. in *Quartermain* at p. 649 did not draw the distinction between interest on the unsecured portion of the debt and that which is attributable to the secured (realized) portion of that debt. However, as he rightfully considered himself to be bound by *Ramsbottom* and *Penfold* it appears he did not have to think the matter through.

33    Thus subject to the *caveat* re capital dividends, I am of the view that a secured creditor who has realized on the asset which provides the security by valuing same should be treated as having sold same and need not account for "regular" type interest and dividends as counting against the deficiency claim. For the sake of completeness I merely observe that a dividend out of a bankrupt's estate is not the type of dividend that is being discussed in this section.

34    I understand that counsel will be providing me with written submissions as to costs (which are proposed to be paid out of the OYDL estate) and reasonable quantum thereof.

*Order accordingly.*

1997 CarswellOnt 657, 143 D.L.R. (4th) 536, 27 O.T.C. 223, 45 C.B.R. (3d) 85...

Footnotes

*        Additional reasons at (1997), 146 D.L.R. (4th) 382, 39 O.T.C. 396 (Ont. Bktcy.).

---

**End of Document**                Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

Court File No.  09-CL-7950

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION

|  |  |
|---|---|
|  | ***ONTARIO*** **SUPERIOR COURT OF JUSTICE (COMMERCIAL LIST)** Proceeding commenced at TORONTO |
|  | **BOOK OF AUTHORITIES OF NORTEL NETWORKS INC. AND THE OTHER US. DEBTORS** **(Motion for Clarification, Reconsideration or Amendment)** |
|  | **TORYS LLP** 79 Wellington St. W., Suite 3000 Box 270, TD Centre Toronto, ON M5K 1N2 Tel:  416.865.0040 Fax:  416.865.7380 **Sheila Block** (LSUC#: 14089N) Email: sblock@torys.com **Scott A. Bomhof** (LSUC#: 37006F) Email: sbomhof@torys.com **Andrew Gray** (LSUC#: 46626V) Email: agray@torys.com **Adam M. Slavens** (LSUC#: 54433J) Email: aslavens@torys.com Lawyers for Nortel Networks Inc. and the other U.S. Debtors |