

**ATTACHMENT B**

RELEASE AND ACKNOWLEDGEMENT AGREEMENT
BETWEEN
EMPLOYEE
AND
NORTEL NETWORKS INC.

This Release and Acknowledgment Agreement ("Agreement") is made by and between the employee named in Section 1 below ("Employee") and Nortel Networks Inc., a Delaware Corporation ("NNI"). This Agreement is composed of three sections, I. Employee Data, II. Notice and III. Additional Terms and Conditions, and Attachment A, (collectively referred to as Agreement).

## I. EMPLOYEE DATA

| | |
|---|---|
| Notice Date: 11/12/08 | Agreement Delivery Date: 11/12/08 |
| Employee: **Peter Budihardjo** | Employee Number: **1513137** |
| Continuous Service Date: **1977/06/01** | Severance Eligibility Date: **1977/06/01** |
| Employment Termination Date: **2009/01/11** | Severance Stop Date: **2009/09/20** |
| Employee Home Address:<br><br>103 LOCHFIELD DRIVE<br>CARY<br>NC    27518 | Severance Period (for employees with at least 6 months of service): **36**<br>(Number of Weeks) to Commence Following Termination Date |
| HR Contact: **Nortel HR Shared Services**<br>Mail Stop 570/02/0C2<br>PO Box 13010<br>4001 E. Chapel Hill-Nelson Hwy<br>Research Triangle Park, NC 27709-3010<br>1-800-676-4636 | |

## II. NOTICE

**IMPORTANT NOTICE**

Employee's employment is being terminated effective as of the Employment Termination Date specified above in Section I ("Termination Date"). Employee will be eligible for certain payments and/or benefits listed below in Section III (C) if Employee chooses to sign this Agreement and meets the eligibility requirements for those payments and/or benefits. If the Employee does not sign the Agreement and meets the eligibility requirements for those payments and/or benefits, certain benefits will be provided as described in Section III (D) of this Agreement. The benefits described in Section III (D), item 4 and items 8-17 will also be provided to an Employee who signs the Agreement and meets the eligibility requirements for those payments and/or benefits. The benefits described in Section III (D), items 5-7, will also be provided as described in those items to an Employee who signs the Agreement and meets the eligibility requirements for those payments and/or benefits, but elects at the end of this Agreement to "Terminate" the Group Life, AD&D and Health Benefits as described in Section III (C).

Page 1

V12.0

US Standard Release For Group WFR
For Age 40 and Over

If Employee has at least 6 months of service on the Termination Date and is not subject to any exceptions to eligibility under the Nortel Networks Severance Allowance Plan ("Severance Plan"), Employee is being offered payments and benefits under the terms and conditions of the Severance Plan for the Severance Period specified in Section I of this Agreement ("Severance Period"). "Group Life Insurance" and "Health Benefits" as defined in Section III (C) of this Agreement may be continued at the election of the Employee during the Severance Period or for 90 days from the Termination Date, whichever is greater ("GLI/HB Period").

If Employee has less than 6 months of service as of the Termination Date, Employee is being offered a lump sum payment as described below in Section III (C). Employee will not, however, be eligible for any of the additional payments and/or benefits provided in consideration for this Agreement.

Employee will have forty-five (45) days from the Agreement Delivery Date set out in Section I of this Agreement ("Agreement Delivery Date") to consider whether to sign this Agreement and to return it to the HR Contact listed in Section I of this Agreement ("HR Contact"). Employee will have seven (7) days[1] from the date Employee signs this Agreement to reconsider it and, if Employee elects, to revoke it in a written document delivered to the HR Contact. In order to obtain the payments and/or benefits described in this Section II and Section III (C) of this Agreement for which Employee is eligible, Employee must sign and return this Agreement to the HR Contact by the 46th day after the Agreement Delivery Date and Employee must not revoke this Agreement. However, it is not necessary for Employee to sign this Agreement to obtain the payments and benefits described in Section III (D).

The employee group reviewed when the decision to terminate Employee's employment was made is referred to in this Agreement as the "Decisional Unit." Attachment A contains a list of job titles and ages of employees in the Decisional Unit who have been selected for termination and, as a result, offered the payments and/or benefits described in this Section II and Section III (C) of this Agreement. In addition, Attachment A contains a separate list of the job titles and ages of the employees in the Decisional Unit who are continuing employment and, as a result, are ineligible for those payments and/or benefits. However, if the employment of all of the employees in the Decisional Unit is being terminated, Attachment A contains only one list of employees and each employee is being offered the payments and/or benefits described this Section II and Section III (C) of this Agreement.

Please carefully read this entire Agreement. This Agreement is an important legal document involving significant rights, obligations, benefits and payments. If Employee signs it, Employee is fully and completely releasing all claims that Employee may have against Nortel, as defined below, such as, but not limited to, claims under the laws identified below, as of the date Employee signs this Agreement. As a result, Employee is encouraged to discuss this Agreement with an attorney before signing it. Further, by signing this Agreement, Employee acknowledges that the information in Section I above (including address and dates) is accurate and complete.

Various federal, state and local laws prohibit employment discrimination against employees based on factors such as age, sex, race, national origin, religion, sexual orientation, disability or veteran status. State common law and other federal, state and local laws may also provide a basis for employees to question various employment practices. If Employee believes that Employee may have been subjected to employment practices or actions that are legally prohibited, Employee is encouraged to bring them to the attention of Human Resources or another appropriate manager before signing this Agreement. By signing this Agreement, Employee is agreeing to waive and release any and all claims the Employee may have against Nortel. Please see Section III (F).

As used in this Agreement, the term Nortel means Nortel Networks Inc. (NNI) and Nortel Networks Corporation and all of their subsidiaries, affiliates, predecessors, successors and assigns and all past and present officers, directors, employees and agents (in their individual and representative capacities) of those entities.

IF EMPLOYEE DOES TIMELY SIGN AND RETURN THIS AGREEMENT AND REFRAINS FROM REVOKING THIS AGREEMENT, Employee will be eligible to receive the payments and/or benefits described in this Section II and Section III (C) of this Agreement under the conditions set out in this Agreement and in the official plan documents for each such benefit plan.

Page 2

---

[1] Employees located in Minnesota have a longer revocation period. See Section III(F)(4) for details.

**IF EMPLOYEE DOES <u>NOT</u> TIMELY SIGN AND RETURN THIS AGREEMENT OR EMPLOYEE REVOKES THIS AGREEMENT, Employee will receive regular pay and benefits until the Termination Date and those payments and benefits after the Termination Date described in Section III (D) of this Agreement, but Employee will <u>not</u> be eligible for the additional payments and/or benefits described in this Section II and Section III (C) of this Agreement.**

### III. ADDITIONAL AGREEMENT TERMS AND CONDITIONS

NNI and Employee agree as follows:

(A) **Notice Date.** The last day on which Employee is required to report to work and/or perform job duties and responsibilities is the Notice Date set out in Section I of this Agreement ("Notice Date").

(B) **Termination of Employment.** Employee's employment with Nortel is terminated for all purposes effective the Termination Date. Employee will receive all salary and benefits payable through Termination Date or date as established per Nortel applicable Plans.

(C) **Consideration for Agreement.** Conditional upon (i) Employee's compliance with all terms and conditions of this Agreement and any employee agreement with Nortel previously executed by Employee, (ii) Employee not obtaining employment with Nortel prior to the end of the Severance Period, (iii) Employee signing and returning this Agreement and not revoking this Agreement pursuant to the terms of this Agreement and (iv) Nortel's signing of this Agreement, Nortel shall provide Employee with the following payments and/or benefits for which Employee is eligible:

> A severance allowance (payable in bi-weekly installments) for the Severance Period and the opportunity to continue all basic and optional employee and optional spouse and dependent life insurance ("Group Life Insurance") and AD&D coverage and medical, dental/vision/hearing care, Employee Assistance Program and Health Care Reimbursement Account benefits ("Health Benefits") in which Employee and Employee's covered eligible dependents are enrolled on the Termination Date at the active employee contribution rate for the GLI/HB Period under the Severance Plan if the Employee has at least 6 months of service on the Termination Date and no exceptions to eligibility for benefits under the Severance Plan apply. Nortel will have the right to change these benefits during the Severance Period to the extent that it is generally changing its benefit plans. Employee's contribution for Group Life Insurance, AD&D and Health Benefits will be deducted from Employee's severance allowance in bi-weekly installments. Also, the Employee's right, if any, to exercise any vested Nortel Networks stock options during the Severance Period will be determined in accordance with the applicable provisions under the applicable stock option plan(s) and instruments of grant (see also paragraph 16 entitled Stock Options). The election to receive severance allowance in bi-weekly installments and to continue or to end Group Life Insurance, AD&D and Health Benefits as of the Termination Date must be made in the space provided at the end of this Agreement, OR

> A lump sum payment equal to 4 weeks of base pay if Employee has less than 6 months of service as of the Termination Date. Employee with less than 6 months of service is not eligible for any payments and/or benefits described in this Section III (C).

(D) **BENEFITS AND PAYMENTS AVAILABLE TO EMPLOYEE WITHOUT SIGNING THIS AGREEMENT.** The following payments and benefits shall be provided to Employee, to the extent that the Employee qualifies for such payments and benefits under the provisions of the official plan documents that establish the requirements for such payments and benefits, without the requirement that the Employee sign this Agreement:

*(1) MEDICAL AND DENTAL/VISION/HEARING CARE COVERAGE*

> If enrolled, coverage ends on the last day of the month that includes Employee's Termination Date.

> All eligible expenses incurred prior to the first day of the month following the Termination Date will be covered under the Employee's Medical Plan and Dental/Vision/Hearing Care Plan coverage.

However, certain Medical and Dental/Vision/Hearing Care Plan coverage may be continued beyond the last day of the month that includes Employee's Termination date under COBRA (the Consolidated Omnibus Budget Reconciliation Act). If eligible, Employee may elect to purchase continuation under COBRA of the group Medical and Dental/Vision/Hearing care coverage for Employee and Employee's covered dependents (as defined by COBRA). Generally, Employee's coverage may be continued for 18 months after the coverage ends due to the Employee's termination. If Employee is eligible for and elects to "Continue" the Group Life, AD&D and Health Benefits under Section III (C) of this Agreement, the period of that coverage will be available at active contribution rates during the Severance Period and will count against that 18 month period. Employee's cost will be at the full COBRA rate (102% of the full group rate per person) in all other situations. Information on Employee's COBRA option will be forwarded to Employee's address of record from COBRAServ within 30 days of Employee's Termination Date. If Employee has not received the COBRA enrollment package within 30 days, please call COBRAServ at 1-800-877-7994.

(2) *EMPLOYEE ASSISTANCE PROGRAM (EAP)*

Coverage ends on the last day of the month of Employee's Termination Date.

If the Employee elects COBRA continuation, Employee and Employee's enrolled dependents may continue coverage under the EAP during the COBRA eligibility period. (See COBRA section above for more information). If Employee continues medical coverage under COBRA, the cost of Employee's EAP coverage will be included. However, if Employee does not elect medical coverage, but wishes to continue the EAP participation, the cost will be 102% of the full group rate per person. Employee's COBRA information package will provide Employee additional information and contain an enrollment form, which Employee must return to COBRASERV to continue coverage.

(3) *HEALTH CARE REIMBURSEMENT ACCOUNT (HRCA)*

If enrolled, contribution ends on Employee's Termination Date, unless Employee elects to continue for the period provided under COBRA. Please contact COBRAserv at 1-800-877-7994 for additional information.

If Employee elects not to continue HCRA under COBRA, Employee may continue to receive reimbursements (up to the maximum Employee has elected) from that account for eligible expenses incurred through Employee's Termination Date. Claims with dates of service on or before the Termination Date may be filed up to the deadline for all participants to file claims for the calendar year in which the Termination Date occurs. The filing deadline is May 31 of the year following the year in which expense occurred. For additional information, please contact WageWorks at 1-877-924-3967.

(4) *DEPENDENT DAY CARE REIMBURSEMENT ACCOUNT (DDCRA)*

If enrolled, the contribution to the DDCRA plan ends on Employee's Termination Date.

You may use any money in your account at the time your employment ends to pay eligible expenses incurred before your employment ends. Expenses incurred after your employment ends cannot be reimbursed. Claims with dates of service on or before the Termination Date may be filed up to the deadline for all participants to file claims for the calendar year in which the Termination Date occurs. The filing deadline is March 31 of the year following the year in which expense occurred. For additional information, please contact WageWorks at 1-877-924-3967.

(5) *EMPLOYEE LIFE INSURANCE*

If enrolled, core and optional coverage end on Employee's Termination Date.

Employee may convert the group life insurance to an individual policy (without a medical examination) within 31 days of Employee's Termination Date. Conversion forms must be requested by calling HR Shared Services at 1-800-676-4636.

(6) DEPENDENT LIFE INSURANCE – SPOUSE & CHILD (REN)

If enrolled, coverage ends on Employee's Termination Date.

Employee may convert the group dependent life insurance to an individual policy (without a medical examination) within 31 days of Employee's Termination Date. Conversion forms must be requested by calling HR Shared Services at 1-800-676-4636.

(7) ACCIDENTIAL DEATH & DISMEMBERMENT (AD&D) INSURANCE

If enrolled, coverage ends on Employee's Termination Date.

There is no conversion privilege.

(8) SHORT-TERM (STD) DISABILITY

If enrolled, coverage ends on Employee's Termination Date.

If Employee is actively at work (as defined in the applicable Short-Term Disability and Long-Term Disability Plan documents) on the Notice Date, Employee's existing Short-Term and Long-Term Disability Plan coverage will continue until the Termination Date. Upon the Termination Date, all disability plan coverage terminates. If Employee becomes disabled and qualifies for Short-Term Disability Plan benefits between the Notice Date and the Termination Date, once a period of total disability has ended (by Employee's recovery, a finding by the claims administrator that benefits are no longer payable, or by payment of the maximum STD/LTD Plan benefit), Employee will not be returned to active work status unless Nortel identifies an available job for which Employee is qualified, with or without a reasonable accommodation. If Employee is not returned to active work status, Employee will have no further Short-Term or Long-Term Disability Plan coverage for any conditions that arise after that date (the date total disability ends).

If Employee is not actively at work on the Notice Date, Employee does not have coverage for Short-Term or Long-Term Disability Plan benefits on Employee's Notice Date and such coverage will not resume after the Notice Date. In this situation, it will not be possible for Employee to qualify for Short-Term or Long-Term Disability Plan benefits during the period between the Notice Date and Termination Date.

(9) LONG-TERM (LTD) DISABILITY

If enrolled, coverage ends on Employee's Termination Date.

(10) BUSINESS TRAVEL ACCIDENT INSURANCE

Coverage ends on Employee's Termination Date.

(11) RETIREMENT INCOME PLAN PAYOUT OPTIONS "RETIREMENT INCOME PLAN" (Pension Service Plan & Cash Balance Plan)

Payments are made in accordance with the Retirement Income Plan and its provisions should be consulted for full details. Generally, however, if participating in the Retirement Income Plan and under age 55, payments begin on the first day of the fifth month following the later of the Employee's Termination Date or the last day of severance payments (unless Employee elects deferral of benefit payments). If age 55 and older, payments begin on the first day of the month following the later of the Employee's Termination Date or the last day of severance payments (unless Employee elects deferral of benefit payments). Such timing may be affected by the timing of Employee submission of applications for benefits.

Payment Options (described in detail in the Plan document):
- Lump sum or monthly benefit
- Deferred payments or immediate payments
- No option if value is $1,000 or less – automatic lump sum payment

Employee will be provided any benefits for which Employee is eligible pursuant to the terms of the Retirement Income Plan. If the value of Employee's vested Retirement Income Plan benefit is $1,000 or less, that benefit will automatically be paid in a lump sum following the later of the Termination Date or Severance End Date. If the value of Employee's vested Retirement Income Plan benefit is more than $1,000, Employee may elect a lump sum, monthly benefit, or other arrangement pursuant to the Retirement Income Plan. Payment will be made in accordance with the terms of the Retirement Income Plan.

*(12) LONG TERM INVESTMENT PLAN (Investment Plan)*

If enrolled, Employee's contribution and company contribution end on Employee's Termination Date.

If Employee's account balance is more than $1,000, Employee may leave the account in the Investment Plan or may request a distribution from the Investment Plan. Statements regarding account activity and elections regarding investment options will continue to be available to the Employee if the Employee's account is not distributed. Employee will not be eligible to contribute or rollover new money into the account or take a loan from the account after Employee's Termination Date. If Employee's account balance is $1,000 or less, the account must be distributed to the Employee.

Loans from the Investment Plan become immediately due and payable on the Employee's Termination Date. Employee may initiate pay-off of Employee's loan balance by calling the Nortel Networks Long-Term Savings Service Center (Hewitt Associates LLC) at 1-800-726-0026 and requesting a payoff coupon. However, Employee will have the option to continue the 401(k) loan repayments through the Automated Clearing House (ACH) by making payments directly to Hewitt Associates LLC. Loans that are not repaid are treated as taxable distributions and may be subject to additional federal and state tax penalties.

*(13) RETIREE MEDICAL PLAN ("RETIREE MEDICAL PLAN") and RETIREE LIFE PLAN ("RETIREE LIFE PLAN")*

If eligible,
- Employee will have access to the Retiree Medical Plan and the Retiree Life Insurance Plan on the date benefits commence under the Retirement Income Plan, if the Employee (i) participates in the Traditional or Balanced Program under the Capital Accumulation Retirement Program ("CARP"), (ii) elects to commence benefits under the Retirement Income Plan on the earliest date following the Termination Date or the Severance End Date, (iii) is at least age 55 and meets the Retiree Medical Plan and the Retiree Life Insurance Plan service requirements when benefits commence under the Retirement Income Plan and (iv) is a participant in the Nortel Networks Medical Plan on the date immediately prior to the date of commencement of benefits under the Retirement Income Plan or;
- Employee will have access to the Retiree Medical Plan on the later to occur of the Termination Date or the Severance End Date, if the Employee (i) participates in the Investor Program under CARP, (ii) is at least age 55 on the later to occur of the Termination Date or the Severance End Date, (iii) has ten years of service after age 40 and (iv) is a participant in the Nortel Networks Medical Plan on the date immediately prior to the date of commencement of benefits under the Retirement Income Plan.

*(14) NORTEL U.S. STOCK PURCHASE PLAN (NSPP)*

If Employee was participating in the NSPP, payroll contributions that occurred in the offering period in which Employee's employment terminates will be refunded to Employee without interest unless the Employee terminates at the end of the quarter and the funds have already been transferred to HBOS for purchase. Employee must provide the plan custodian, HBOS, with payment instructions to close Employee's account within 90 days of Employee's Termination Date or it will automatically be closed by HBOS and all shares will be sold at the current market value and the net proceeds sent to Employee.

External contact for HBOS
866-574-0331, toll free in North America
www.eshareplan.com/nspp

*(15) Deferred Compensation*

If enrolled, any amounts in Employee's account in the Nortel Networks U.S. Deferred Compensation Plan ("NNDP") will be distributed to Employee pursuant to the terms of the NNDP.

*(16) STOCK OPTIONS AND RESTRICTED STOCK UNITS ("RSUs") (if applicable)*

Employee will not be eligible for any future or additional grant(s) of stock options or award(s) of restricted stock units (RSUs). Vesting and exercising/settlement entitlements are determined in accordance with the provisions of the applicable plan and instrument of grant/award.

For stock options, please refer to the Stock Options Grant Q&A at:
http://services-canada.ca.nortel.com/Livelink/livelink.exe?func=doc.Fetch&nodeId=162170

For RSUs, please refer to the RSU Q&A at:
http://services-canada.ca.nortel.com/Livelink/livelink.exe?func=doc.Fetch&nodeId=1798865

These documents will provide Employee with details on what happens to Employee's stock options / RSUs upon a change in employment status. To speak with a Customer Service Representative in the Nortel Global Equity Award Services organization, please call esn 333-6001 or 1-905-863-6001 or email equityawards@nortel.com.

**IMPORTANT!** – In order to receive notifications from Solium regarding expiration of equity awards, go to www.solium.com, select your "Personal Profile", enter your personal email address and check off that you wish to have email notifications delivered to your personal email address. Failure to update your personal email address will result in not receiving notification for expiration of equity awards.

*(17) VACATION ENTITLEMENT*

Vacation accrual ends on Employee's Termination Date and Employee will be paid any accrued, unused vacation pursuant to policy following the Termination Date.

*(18) OUTPLACEMENT OR COUNSELING SERVICES*

Nortel will provide Employee with the services of a professional outplacement organization (organization and services to be determined by Nortel).

*(19) OTHER BENEFITS*

Any other benefits not expressly extended to Employee following the Termination Date under this Agreement will end on 12:01am on the day immediately following the Termination Date.

*(20) WITHHOLDINGS*

Nortel will withhold any and all applicable federal, state, or local tax from any monies or monetary equivalents paid under this Agreement. In addition, Employee understands and agrees that Nortel may, to the extent permitted by law, deduct from any payment provided to Employee under this Agreement any amounts (including, but not limited to, any advance, loans, overpayment, excess commissions or other monies including the monetary equivalent of equipment not returned to Nortel) that Nortel has determined that Employee owes Nortel.

(E) **Dismissal of Claims.** Employee agrees to dismiss with prejudice and without costs, within ten (10) days after signing and returning this Agreement, any lawsuit, claim, charge, proceeding or other action filed or pending against Nortel with any court, administrative agency or commission or other foreign or domestic federal, state, provincial or local governmental authority or entity.

(F) **General Release of Claims.**

    (1) EMPLOYEE UNDERSTANDS AND AGREES THAT IN EXCHANGE FOR THOSE PAYMENTS AND/OR BENEFITS PROVIDED UNDER SECTION III (C) OF THIS AGREEMENT, FOR WHICH EMPLOYEE WOULD OTHERWISE BE INELIGIBLE, EMPLOYEE, ON BEHALF OF EMPLOYEE AND EMPLOYEE'S HEIRS, EXECUTORS, ADMINISTRATORS, AND ASSIGNS, VOLUNTARILY AND COMPLETELY RELEASES AND WAIVES ANY RIGHTS, CLAIMS OR REMEDIES WHICH EMPLOYEE MAY HAVE OR NOW HAS, KNOWN OR UNKNOWN, AGAINST NORTEL TO THE EXTENT PERMITTED BY LAW ARISING OUT OF OR IN ANY WAY RELATED TO EMPLOYEE'S EMPLOYMENT WITH NORTEL OR THE TERMINATION OF THAT EMPLOYMENT, AS OF THE DATE EMPLOYEE SIGNS THIS AGREEMENT. THOSE RIGHTS, CLAIMS OR REMEDIES INCLUDE, BUT ARE NOT LIMITED TO, LEGAL ACTIONS FOR WRONGFUL TERMINATION, UNPAID WAGES, VACATION, COMMISSIONS, BONUSES, BREACH OF CONTRACT OR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, DEFAMATION, MISREPRESENTATION, NEGLIGENCE, INVASION OF PRIVACY, BREACH OF A FIDUCIARY DUTY, PHYSICAL INJURY, EMOTIONAL DISTRESS, VIOLATION OF PUBLIC POLICY OR CLAIMS UNDER ANY FEDERAL, STATE OR LOCAL LAW, INCLUDING, WITHOUT LIMITATION, THOSE PROHIBITING DISCRIMINATION, SUCH AS THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE CIVIL RIGHTS ACT OF 1964, THE AMERICANS WITH DISABILITIES ACT, THE EQUAL PAY ACT, THE FAMILY AND MEDICAL LEAVE ACT, AND THE WORKERS ADJUSTMENT RETRAINING AND NOTIFICATION ACT (WARN), INCLUDING ANY AMENDMENTS TO THOSE LAWS. EMPLOYEE UNDERSTANDS THAT THIS AGREEMENT MAY NOT BE USED TO INTERFERE WITH EMPLOYEE'S RIGHT TO FILE A CHARGE OR PARTICIPATE IN AN INVESTIGATION OR PROCEEDING CONDUCTED BY THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION OR ANY OTHER APPROPRIATE AGENCY. HOWEVER, EMPLOYEE ALSO UNDERSTANDS THAT NORTEL WILL USE THIS AGREEMENT AS A DEFENSE TO ANY SUCH CHARGE EMPLOYEE MAY FILE, INVESTIGATION OR PROCEEDING IN WHICH EMPLOYEE PARTICIPATES, OR REMEDY WHICH EMPLOYEE SEEKS.

    (2) **For employees located in California:** Employee acknowledges that Employee is familiar with and understands the significance of California Civil Code Section 1542 ("Section 1542"), which provides as follows:

**A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him/her must have materially affected his/her settlement with the debtor.**

Employee waives any right or benefit which Employee has or may have under Section 1542, or any similar statutory provision of any state, to the full extent that Employee may lawfully waive such rights and benefits pertaining to the subject matter of this Agreement.

    (3) **For employees located in Massachusetts:** Employee specifically and without limitation waives any and all claims under the Massachusetts Fair Employment Practices Act, M.G.L. c. 151B, §1 et seq., the Massachusetts Civil Rights Act, M.G.L. c.12 §§ 11H and 11I; the Massachusetts Equal Rights Act, M.G.L. c.93, § 102 and M.G.L. c.214, § 1C; the Massachusetts Labor and Industries Act, M.G.L. c.149, § 1 et seq.

    (4) **For employees located in Minnesota:** Employee acknowledges that, notwithstanding the revocation period provided in Section II of this Agreement, pursuant to the Minnesota Human Rights Act, Minn. Stat. §§363.01 et seq., Employee has fifteen (15) days from the date Employee signs this Agreement to reconsider it and, if Employee elects, to revoke it in a written document delivered to the HR Contact.

(G) **Return of Company Property and Preservation of Information.** The Employee confirms that Employee has accounted for and returned to Nortel all property (including but not limited to documents and disks, Company car, telephone(s), credit cards, equipment, keys and passes, (including Nortel Networks ID badge) belonging to Nortel or any Affiliated Company which is or has been in Employee's possession or under Employee's control. Documents and disks shall include but not be limited to (i) correspondence, files, e-mails, memos, reports, minutes, plans, records, surveys, software, diagrams, computer print-outs, floppy disks, manuals, customer documentation or any other medium for storing information, and (ii) the Information as described in the documents attached to this Agreement identified as **DATA PRESERVATION INSTRUCTIONS (the "Instructions")**.

(P) **Entire Agreement.** This Agreement contains all of the terms, promises, representations, and understandings between Nortel and Employee with respect to the subject matter of this Agreement and supersedes any other oral or written agreement or understanding between Nortel and Employee regarding these matters. Employee agrees that no promises, representations, or inducements have been made that caused Employee to sign this Agreement, other than those that are stated in this Agreement. This Agreement may be modified only with a written document executed by Employee and NNI.

(Q) **Severability.** If any provision of this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions will, nevertheless, continue in full force and effect to the maximum extent practicable and consistent with the intent of the parties.

(R) **Counterparts.** This Agreement may be delivered by facsimile and executed in one or more counterparts, all of which, taken together, will constitute one and the same original instrument.

(S) **RELEASE ACKNOWLEDGEMENT.** Employee acknowledges having: (i) read and understood this Agreement, including Attachment A, (ii) had at least 45 days from the Agreement Delivery Date to consider this Agreement and 7 days[2] from the date of signing this Agreement to revoke it in a written document to be delivered to the HR Contact, (iii) been encouraged to discuss this Agreement with an attorney of Employee's choice and (iv) executed this Agreement voluntarily with the intention of granting Nortel a full and final release as set out in Section III (F) of this Agreement.

**THE UNDERSIGNED PARTIES HAVE EXECUTED THIS RELEASE AND ACKNOWLEDGEMENT AGREEMENT FREELY AND VOLUNTARILY, INTENDING TO BE LEGALLY BOUND.**

| **EMPLOYEE** | | **NORTEL NETWORKS INC.** | |
|---|---|---|---|
| Signature: | *[signature]* | By: | _____ |
| Printed Name: | PETER V. BUDIHARDJO | Printed Name: | _____ |
| Date: | DEC 11, 2008 | Title: | _____ |
| | | Date: | _____ |

If Employee decides to sign this Agreement and obtain the payments and/or benefits described in Section III (C) of this Agreement, for which Employee is eligible, Employee must make elections below (and initial) for those payments and/or benefits that are applicable and available to Employees. **Please Note: If Employee has less than six (6) months service on the Termination Date, Employee is ineligible for the payments and/or benefits and elections below.**

(i) **Severance allowance (Section III (C)):**

(✓) Elect      (____) Decline      *PB* (Initial)

(ii) **Health Benefits, AD&D and Group Life Insurance (Section III (C)):**

(✓) Continue      (____) Terminate      *PB* (Initial)

Page 10

---

[2] Employees located in Minnesota have a longer revocation period. See Section III(F)(4) for details.

Employee's signature at the end of this Agreement confirms that Employee has read, does understand, agrees and gives consent concerning the statements in the Instructions.

(H) **"Reporting" or "Non-Reporting" Insider Designation, if applicable.** Employee understands and agrees that if Employee has the designation of either "Reporting" or "Non-Reporting" Insider pursuant to Corporate Policy 320.28 of Nortel Networks Corporation (and under applicable Canadian/US securities legislation for Reporting Insiders), the Employee will cease to have this designation effective 12:01 a.m. the day following the Termination Date. Notwithstanding the fact that Employee will no longer have this designation, if Employee is in possession of material non-public information relating to Nortel Networks, Employee is prohibited from trading in Nortel securities (or informing another person of the material non-public information) in accordance with applicable laws. If Employee is a "Reporting" Insider, the Employee understands that s/he is required to amend his or her insider profile within 10 days of Employee's Termination Date on the Canadian System for Electronic Disclosure by Insiders (SEDI) to indicate that Employee is no longer a "Reporting" Insider of Nortel. The Employee should contact the Insider Reporting Department at (905) 863-1220 and fax (905) 863-8524 for assistance in amending the SEDI profile.

(I) **Trade Secret and Confidential Information Acknowledgement.** Employee acknowledges Employee's ongoing and continuing obligations to Nortel (including those specified in any agreement with Nortel that Employee has executed) which include, but are not limited to, the following: keeping secret and confidential and not utilizing in any manner any trade secrets, proprietary or confidential information of Nortel made available to Employee during Employee's period of employment with Nortel and refraining from disclosing such information to any third party or using it for any purpose.

(J) **Non-Disparagement/Non-Solicitation.** Subject to State and Federal law, Employee agrees not to take any action that a reasonable person would view as detrimental to Nortel or to make any statement or publish any communication to any third party that a reasonable person would view as disparaging to Nortel. In addition, for a period of one year after the date Employee signs this Agreement, Employee agrees not to solicit, directly or indirectly, or otherwise to induce any individual who is supplying services to Nortel, whether as an employee, contractor, consultant or otherwise, to end their employment or contractual arrangements with Nortel or to accept engagement with any other person or entity unrelated to Nortel.

(K) **Confidentiality.** Subject to State and Federal law, Employee agrees not to disclose to any person, corporation, agency, group, or other entity, other than to Employee's immediate family and personal financial and legal advisors, either directly or indirectly, any information relating to the contents of this Agreement.

(L) **Material Breach.** Employee acknowledges that Employee's violation of the covenants in Section III (E), (F), (G), (H), (I) (excluding claims or charges to federal, state, or local agencies), (J), and (K) would constitute a material breach of this Agreement and would cause irreparable harm to Nortel. Employee's violation of those covenants will permit Nortel, to the extent permitted by law, to take any or all of the following actions: (i) deny Employee the payments and/or benefits provided in Section III (C) of this Agreement, (ii) recover any payments and/or benefits provided to Employee under Section III (C) of this Agreement or (iii) bring an action for injunctive relief, specific performance, or both, and seek a temporary restraining order or preliminary or permanent injunction against Employee. In addition, Nortel will be entitled to recover from Employee any attorney's fees or other costs of those actions it takes against Employee.

(M) **No Admission of Liability.** Employee understands and agrees that Nortel, by providing the payments and/or benefits set out in Section III (C) of this Agreement, is not admitting any liability with respect to any claim by Employee.

(N) **Non-Assignment.** Employee acknowledges and agrees that Employee has not transferred or assigned, or attempted to transfer or assign, any of the claims, rights or remedies released in this Agreement.

(O) **Advice and Assistance.** Employee shall make available to Nortel advice, assistance and information that shall include, but not be limited to, offering and explaining evidence, providing sworn statements and participating in discovery, trial preparation and testimony as may be deemed necessary by Nortel concerning Nortel's position in any legal proceedings involving issues brought against or initiated by Nortel of which Employee may have knowledge. In the event it is necessary for Employee to provide the aforementioned services, then Nortel shall reimburse Employee for authorized, reasonable and documented travel expenses, including, but not limited to, transportation, lodging and meals.

Page 9

V12.0

US Standard Release For Group WFR
For Age 40 and Over

| NOTICE OF CONTINUING OBLIGATIONS UNDER NORTEL NETWORKS EMPLOYEE AGREEMENT AND ACTIONS TO TAKE IF YOU HAVE BEEN DESIGNATED A "REPORTING" OR "NON-REPORTING" INSIDER ||
|---|---|
| Employee Name: **Peter Budihardjo** | Last Day Worked: |
| Global ID: **1513137** | Termination Effective Date: **2009/01/11** |
| FROM:    Human Resources ||
| SUBJECT:  **CONTINUING OBLIGATIONS UNDER NORTEL NETWORKS EMPLOYEE AGREEMENT** ||

Date: 2008/11/06

Dear Peter Budihardjo

Upon or during your employment with **Nortel,** you executed the **NNI** Employment Agreement or another agreement related to confidentiality, trade secrets and assignment of intellectual property. This notice is to once again remind you of the continuing obligations, as applicable and as outlined within those documents. If you have any questions concerning those obligations, please contact HR Shared Services.

Also, it is important to note and follow the following, if you have been designated a "Reporting" or "Non-Reporting" Insider pursuant to Corporate Policy 320.28 of Nortel Networks Corporation (and under applicable Canadian/US securities legislation for Reporting Insiders). First, you will cease to have this designation effective 12:01 a.m. the day following your employment termination date. If you are a "Reporting" Insider, you understand that you are required to amend your insider profile within 10 days of your employment termination date on the Canadian System for Electronic Disclosure by Insiders (SEDI) to indicate that you are no longer employed. You should contact the Insider Reporting Department at (905) 863-1220 and fax (905) 863-8524 for assistance in amending the SEDI profile.

Finally, you confirm that you have accounted for and returned to Nortel all property (including but not limited to documents and disks, company car, telephone(s), credit cards, equipment, keys and passes, (including Nortel ID badge) belonging to Nortel which is or has been in your possession or under your control. Documents and disks shall include but not be limited to (i) correspondence, files, e-mails, memos, reports, minutes, plans, records, surveys, software, diagrams, computer print-outs, floppy disks, manuals, customer documentation or any other medium for storing information, and (ii) the Information as described in the documents attached to the Release and Acknowledgement Agreement between Employee and Nortel Networks Inc. identified as DATA PRESERVATION INSTRUCTIONS (the "Instructions").

| HR SHARED SERVICES - U.S. SEVERANCE ELECTION |
|---|
| PROBUSINESS / SAP INFORMATION |

EMPLOYEE NAME: **Peter Budihardjo**

EMPLOYEE NUMBER: **1513137**    SEVERANCE STOP DATE: **2009/09/20**

CONTINUOUS SERVICE DATE: **1977/06/01**    ELIGIBILITY SEVERANCE DATE: **1977/06/01**

SALES COMP EMPLOYEE: ___Yes ___No    If Yes, TTC RATE (ANNUAL $) _____

STATUS F/T: **F** P/T: ___    NOTICE DATE: _____ (if applicable)

TERM EFFECTIVE DATE: **2009/01/11**    SEPARATION REASON: **Work force reduction**

EMPLOYEE ADDRESS:
103 LOCHFIELD DRIVE
CARY
NC 27518

Any unused/accrued vacation balance in SAP as of termination date will be paid out in compliance with Company policy.

**SALARY CONTINUATION ENTITLEMENT: 36 WEEKS**

(✓) Elect    (___) Decline the payment of my severance allowance

**PAYROLL DEDUCTIONS FOR MEDICAL, DENTAL/VISION/HEARING CARE AND LIFE INSURANCE**

(✓) Continue bi-weekly deductions per current payroll stub............**BENEFITS STOP DATE: 2009/09/30**

On **FINAL** severance check, deduct current deductions and the pro-rated portion to cover through the benefits ending date. I understand this amount may change based on annual enrollment or life event status changes which may occur between termination date and benefits end date or to correct deduction amounts which may not be reflected correctly. Depending on the amount of the last severance check, US payroll may have to adjust the next to the last severance check in order to have enough after-tax dollars to pay for the benefits.

*Refer to your current payroll stub for bi-weekly Flex credits and benefits deduction amounts.*

(___) No deductions – continuation of insurance not elected............**BENEFITS STOP DATE: 2009/01/31**

Outstanding dollars Owed (as currently known):  Total amount to be deducted $_____ (without prejudice to subsequent revision or other collection methods).

Peter Budihardjo    *[signature]*    DEC 11, 2008
Employee Name    Employee Signature    Date

_____    _____    _____
Manager / HR Print Name    Manager/HR Signature    Date

Page 11

V12.0

US Standard Release For Group WFR
For Age 40 and Over