IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ------------------------------------------------------------x | Chapter 11 |
| In re: : | Case No. 09-10138 (KG) |
| Nortel Networks Inc., et al., : | Joint Administration |
| Debtors. : | Related Documents: 15611, 15612, 15613, 15615, 15622 |
| ------------------------------------------------------------x | Hearing: June 25, 2015 @ 9 a.m. |

**OBJECTION AND RESPONSE
OF STEPHEN TAYLOR, CONFLICTS ADMINISTRATOR
FOR NORTEL NETWORKS SA, TO MOTIONS FOR RECONSIDERATION
AND CLARIFICATION OF THE
U.S. DEBTORS, BONDHOLDERS AND LAW DEBENTURE**

Stephen Taylor, court-appointed conflicts administrator (the "Conflicts Administrator") for Nortel Networks SA [in Administration] ("NNSA"), by his undersigned attorneys, Skadden, Arps, Slate Meagher & Flom, LLP, respectfully submits this objection and response to the motions filed by the U.S. Debtors [D.I. 15611] (the "U.S. Debtors' Motion"), the ad hoc group of bondholders [D.I. 15612] (the "Bondholder Motion"), and Law Debenture Trust Company of New York [D.I. 15615] (the "Law Debenture Motion" and, together with the U.S. Debtors' Motion and the Bondholder Motion, and any joinders thereto, the "Motions") for entry of an order reconsidering or clarifying certain aspects of the Allocation Trial Opinion [D.I. 15544] (the "Allocation Opinion") and related Order [D.I. 15545] (the "Allocation Order" and, together with the Allocation Opinion, the "Állocation  Rulings"), each entered May 12, 2015.  In support, the Conflicts Administrator respectfully states as follows:

**PRELIMINARY STATEMENT**

1. The Conflicts Administrator asks that the Motions be denied on the grounds that they do not satisfy applicable legal standards and seek relief which either (a) is properly addressed on appeal; or (b) is unnecessary based on the clear language of the Allocation Rulings.

2. At the trial, NNSA was represented by the court appointed administrators and authorized foreign representatives (the "Joint Administrators") of certain Nortel entities located in Europe, the Middle East and Africa (collectively, the "EMEA Debtors"). The allocation methodology adopted in the Allocation Rulings has unexpectedly given rise to a conflict between the interests of NNSA and some or all of the other EMEA Debtors. As a result, the Conflicts Administrator was appointed pursuant to an order of the High Court in London dated June 3, 2015, and has retained separate counsel to represent him in this matter.

3. Applying the "modified pro rata" allocation methodology, which was not advocated by any of the participants in the trial below, it is expected that the other jointly-represented EMEA Debtors as a whole will receive an allocation as high or higher than they would receive under the principal allocation methodology that the Joint Administrators advocated at trial. However, because allocations under the modified pro rata approach are based upon the quantum of creditor claims against a particular Nortel entity, and not the value that such entity contributed to the businesses and intellectual property of the Nortel Group, nor the costs incurred in making that contribution, and because other companies have relatively much higher levels of creditors because of special circumstances such as the Pension claims in the UK, the expected allocation for NNSA (and certain other EMEA Debtors, such as NN Ireland) under this methodology is a mere fraction of the amount that NNSA and such other EMEA Debtors would

receive under the allocation methodologies advanced at trial by the Joint Administrators, or notably, by the U.S. Debtors themselves.

4. As the Joint Administrators note in their response to the Motions, the anticipated result is that the general unsecured creditors of NNSA, and possibly those of other EMEA Debtors, will receive lower percentage recoveries than the general unsecured creditors of the U.S. Debtors. This fact is not identified in the U.S. Debtors' Motion, and is an important consideration in assessing the putative fairness of the Motions.

5. Accordingly, the Conflicts Administrator does not disagree with the U.S. Debtors that the Allocation Judgments result in disproportionate impacts on the creditor recoveries of different Nortel entities. However, the Motions' proposed "fix" will exacerbate, not lessen, such disproportionate impacts, and will result in substantially lower allocations for NNSA and presumably every other non-U.S. Debtor.

6. "Motions for reconsideration should be granted sparingly because of the interests in finality and conservation of scarce judicial resources." *In re New Century TRS Holdings, Inc.*, No. 07-10416 (KJC), 2013 WL 5231456, at *2 (Bankr. D. Del. Sept. 17, 2013) (*quoting Pennsylvania Ins. Guaranty Ass'n v. Trabosh*, 812 F.Supp. 522, 524 (E.D.Pa. 1992)). While this Court has discretion to reconsider and/or clarify the Allocation Rulings, such discretion should be reserved for exceptional circumstances (not present here) where the integrity of the litigation process is at risk, new evidence has been found that was not available at trial, or a miscarriage of justice would occur. *See, e.g.*, *Johnson v. Diamond State Port Corp.*, 50 F. App'x 554, 555, 559–60 (3d Cir. 2002); *In re New Century TRS Holdings, Inc.*, *supra*. Thus, reconsideration is only appropriate upon "(1) a change in the controlling law; (2) a need to

receive under the allocation methodologies advanced at trial by the Joint Administrators, or notably, by the U.S. Debtors themselves.

4. As the Joint Administrators note in their response to the Motions, the anticipated result is that the general unsecured creditors of NNSA, and possibly those of other EMEA Debtors, will receive lower percentage recoveries than the general unsecured creditors of the U.S. Debtors. This fact is not identified in the U.S. Debtors' Motion, and is an important consideration in assessing the putative fairness of the Motions.

5. Accordingly, the Conflicts Administrator does not disagree with the U.S. Debtors that the Allocation Judgments result in disproportionate impacts on the creditor recoveries of different Nortel entities. However, the Motions' proposed "fix" will exacerbate, not lessen, such disproportionate impacts, and will result in substantially lower allocations for NNSA and presumably every other non-U.S. Debtor.

6. "Motions for reconsideration should be granted sparingly because of the interests in finality and conservation of scarce judicial resources." *In re New Century TRS Holdings, Inc.*, No. 07-10416 (KJC), 2013 WL 5231456, at *2 (Bankr. D. Del. Sept. 17, 2013) (*quoting Pennsylvania Ins. Guaranty Ass'n v. Trabosh*, 812 F.Supp. 522, 524 (E.D.Pa. 1992)). While this Court has discretion to reconsider and/or clarify the Allocation Rulings, such discretion should be reserved for exceptional circumstances (not present here) where the integrity of the litigation process is at risk, new evidence has been found that was not available at trial, or a miscarriage of justice would occur. *See, e.g.*, *Johnson v. Diamond State Port Corp.*, 50 F. App'x 554, 555, 559–60 (3d Cir. 2002); *In re New Century TRS Holdings, Inc.*, *supra*. Thus, reconsideration is only appropriate upon "(1) a change in the controlling law; (2) a need to

correct a clear error of law or fact or to prevent manifest injustice; or (3) availability of new evidence not available when the judgment was granted." *Kaufman v. Allemang*, No. CV 13-359-SLR, 2014 WL 4954333, at *10 (D. Del. Nov. 18, 2014). "A motion for reconsideration is not properly grounded on a request that a court rethink a decision already made[.]" *Id.*

7. None of these elements are met here. The Movants do not argue a change in the law, manifest injustice or new evidence. Instead, the Motions primarily seek to reargue claims that were asserted at trial and rejected, which are matters that should instead be considered only on appeal. *Id. See also Brambles USA, Inc. v. Blocker*, 735 F. Supp. 1239, 1240 (D. Del. 1990).

8. The U.S. Debtors have not established any grounds for reconsideration. They instead seek fundamental changes to the Allocation Rulings that, if accepted, would have dramatic impacts on the allocation for NNSA and all other Nortel entities. Such changes should only be contemplated in the context of a full appeal where all parties have the opportunity to put forward positions on the correctness and impact of the Allocation Rulings.

9. The Conflicts Administrator therefore agrees with the Joint Administrators that the enumerated issues for reconsideration and clarification are not properly addressed on these Reconsideration Motions, and instead should be reserved for appeal. The Conflicts Administrator reserves all rights to respond to the positions advanced by the U.S. Debtors and other moving parties, and the Allocation Rulings themselves, including at argument and on appeal.

**FACTUAL BACKGROUND**

10. NNSA was the Nortel Group's operating company in France. As acknowledged in the Allocation Rulings (though not reflected in the modified pro rata alloaction methodology), research and development ("R&D") was the primary driver of Nortel's value and profit. The principal Nortel entities that performed R&D were Nortel Networks Limited ("NNL") in Canada, Nortel Networks Inc. ("NNI") in the U.S., Nortel Networks UK Limited ("NNUK") in the United Kingdom, Nortel Networks (Ireland) Limited ("NN Ireland") in Ireland, and NNSA in France. Together, these entities were known as the Residual Profit Entities ("RPEs").

11. NNSA is a direct subsidiary of NNL. While the EMEA Debtors have been represented by the Joint Administrators in this proceeding, the EMEA Debtors did not have a common European or EMEA parent. All of NNI, NNUK, NN Ireland and NNSA operated as direct subsidiaries of NNL.

12. On January 14, 2009 (the "Filing Date"), in addition to the filings in the U.S. and Canada under chapter 11 of the Bankruptcy Code and the CCAA, respectively, the High Court of England and Wales placed nineteen of Nortel's European affiliates, including NNSA, into administration under the control of the Joint Administrators.

13. Subsequent to the Filing Date, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC No 1346/2000) on Insolvency Proceedings in the Republic of France, pursuant to which a liquidator (the "NNSA Liquidator") has been appointed by the Versailles Commercial Court.

14. NNSA was not an original signee of the Interim Funding and Settlement Agreement dated as of June 9, 2009 (the "IFSA"), pursuant to which various Nortel debtors agreed inter alia to relinquish intellectual property licences "for the purpose of facilitating, and in consideration of a right to an allocation . . . to such Debtors of portions of the sale proceeds from, the sale of any material assets of any of the Canadian Debtors and/or the US Debtors to a third party . . ." However, section 7 of the IFSA did contemplate that the EMEA Debtors would use commercially reasonable efforts to obtain letters from the NNSA Liquidator and NNSA Administrator binding NNSA to the provisions of the IFSA.

15. NNSA ultimately acceded to the terms of the IFSA and participated in the trial below under the representation of the Joint Administrators. While the expected allocation to NNSA obviously varied under the different allocation methodologies advanced by the Canadian, U.S. and EMEA Debtor groups, as an RPE that made substantial contributions to the overall R&D in the Nortel Group, NNSA was not in conflict vis-a-vis other EMEA Debtors under any of these proposed methodologies.

16. However, by adopting an allocation methodology that is independent of any contribution to R&D (and, using the Court's own language, independent of "the primary driver of Nortel's value and profit"), the Courts have placed NNSA in a position of direct conflict with some other EMEA Debtors (in particular, NNUK) with a disproportionately large quantum of creditor claims.

17. The Conflicts Administrator was only appointed on June 3, 2015, and is now assessing the Allocation Rulings and their impact on NNSA for purposes of considering his position on appeal. It is clear, however, that while the Allocation Rulings result in an allocation

6

to NNSA substantially lower than what was expected on almost every allocation theory put before the Courts, the allocation for NNSA if the Motions should be granted is substantially lower still. The Motions accordingly place further material risks on the interests of NNSA and its creditors. The Conflicts Administrator opposes the U.S. Debtors' requested piecemeal attempts to greatly increase their allocation through reconsideration when such matters are properly addressed on appeal.

**ARGUMENT**

18. The U.S. Debtors' Motion asks this Court to address seven enumerated grounds for reconsideration and/or clarification in respect of the Allocation Rulings. The other Motions seek similar relief. The Conflicts Administrator opposes the Motions, but such opposition is not a defense of the Allocation Rulings. It is, rather, a reflection that whatever disagreement any party may have with the Allocation Rulings, such disagreement is not the result of judicial mistake concerning the substantial record, and, therefore, is not suitable for piecemeal correction or clarification. Instead, any issues that the parties may seek to raise in respect of the Allocation Rulings are properly addressed on appeal.

19. <u>The Test for Reconsideration is Not Met</u>. As shown above, reconsideration is a rare remedy, and requires either a change in the law, new evidence, or manifest injustice. *See* ¶¶ 6-7, *supra.* The U.S. Debtors fail to meet their high burden. They contend reconsideration is justified by the parties' failure to brief issues subject to reconsideration, but that contention does not provide this Court adequate justification for exercising the exceptional power to reconsider its decision.

20. To the extent that any issues were not briefed by the parties (or, indeed, were not sufficiently addressed in the evidence) because the modified pro rata allocation methodology was not advocated by any party, a motion for reconsideration is not the proper forum for addressing this absence. The U.S. Debtors and other moving parties are not the only Nortel debtors that may be taking the position that they are disproportionately affected by the Allocation Rulings. If additional briefing is required, it should be by all parties on appeal rather than by a single debtor group, without new evidence, on a reconsideration motion.

21. <u>The Grounds for Reconsideration Are Properly Addressed on Appeal</u>. The U.S. Debtors advance two grounds for reconsideration. First, they contend that reconsideration is appropriate to provide that the general unsecured claims against NNI held by the Guaranteed Bondholders shall be included within the total claims against the U.S. Debtors for the purpose of determining the allocation from the Lockbox.

22. The request in the Reconsideration Motions to increase the allocation to NNI to reflect the claim by the guaranteed Bondholders, if granted, would amount to a massive reallocation from that contemplated in the Allocation Rulings, substantially increasing the U.S. Debtors' share of the allocation, and further cutting the already small allocation, in relative terms, to NNSA. There is no foundation for the U.S. Debtors' speculation that this dramatic shift in allocation may have been because "the complexities of the Debtors' corporate relationships and the nature of their overlapping and intercompany claims obscured the real economic impact of various aspects of the modified pro rata approach. . ."

23. The Allocation Rulings are unequivocal that claims (including specifically $4 billion Guaranteed Bondholder claims) asserted against more than one Debtor's estate may be

calculated and recognized only once. This Court gave every indication of understanding the impact of recognizing each claim only once for purposes of allocation, and the financial consequences that would flow from this approach. The proper forum for challenging that decision is on appeal, not reconsideration.

24. As outlined in the submissions of the EMEA Debtors, this is not exclusively an issue in respect of the Guaranteed Bondholder claim. There are others, including the UK Pension claimant, that might assert against more than one Nortel entity, including potentially against NNSA. It would be entirely inappropriate to deal with only one such claim on reconsideration.

25. Second, the U.S. Debtors argue that reconsideration is appropriate to provide that the proceeds attributable to NNI's sale of its equity interests in NGS and Diamondware shall be excluded from the Lockbox funds and allocated directly to NNI.

26. The request by the U.S. Debtors to allocate the sale proceeds from Nortel Government Solutions Incorporated ("NGS") and Diamondware, Ltd. ("Diamondware") to NNI rather than to all Debtors as part of the modified pro rata allocation is inconsistent with the clear determinations set out in the Allocation Rulings. The Courts' modified pro rata methodology was intended to avoid this very sort of dispute. The implication by the U.S. Debtors is that the proceeds from the sales of NGS and Diamondware are the only sales of tangible or intangible property that were not part of the "integrated whole" of the Nortel Group. This is unsupportable, and while there certainly may be arguments on appeal that the wide brush of the Allocation Rulings fails to recognize this fact, it is a point for all affected debtors to argue on appeal and not for one affected debtor to try to circumvent on reconsideration.

27. <u>The Grounds for Clarification are Either Unnecessary or Properly Addressed on Appeal</u>. A request for clarification should only be granted in the event of mistake, a change in the law, or manifest injustice. *See* ¶¶ 6-7, *supra*. The requests for clarification by the U.S. Debtors and other moving parties are, instead, either matters for appeal or points that are already clear in the Allocation Rulings issued.

28. The U.S. Debtors advance five grounds for clarification. None of these have merit. First, they contend that clarification should occur to provide that intercompany claims by and among Debtors within a Debtor Group (i.e., the U.S., Canada and EMEA) shall be excluded from the claims of a Debtor for purposes of calculating allocation of the Lockbox proceeds. U.S. Debtors' Motion at 23-25.

29. The Allocation Order is clear, at paragraph 2(c), that "Intercompany claims against a Debtor Estate will be included in the claims against that Estate." Along with the recognition of cash on hand, the continued inclusion of intercompany claims for purposes of determining the allocation to each debtor is a key basis for calling the adopted allocation methodology a "modified" pro rata rather than a substantive consolidation. Indeed, the preservation of intercompany claims is an important aspect of preserving some recognition of the contributions that individual debtor entities made to the value of the Nortel Group.

30. NNSA is an illustrative example. NNSA was an RPE that contributed substantial R&D to the Nortel Group, irrespective of the revenues earned by NNSA. In order to do so, it was funded by other revenue-generating entities within the Nortel Group. While the Allocation Rulings already disregard NNSA's contribution to the Nortel Group (and, therefore, its contribution to the sales proceeds in the Lockbox), removing the intercompany claims would

further diminish NNSA's allocation and the eventual recoveries of both intercompany and third party creditors who contributed to the R&D performed by NNSA.

31. The U.S. Debtors' proposed removal of intercompany claims within a debtor region but not between regions is both a substantive revision to the Allocation Rulings that should be addressed on appeal and an unprincipled distinction given that the representation of entities by region is for administrative convenience only. As noted above, NNSA is a direct subsidiary of NNL. Its relationship to NNUK, from a corporate perspective, is not materially different from its relationship to NNI. There is accordingly no corporate or legal basis for a regional distinction and any challenge of the Courts' decision that intercompany claims are to be included in the allocation determination is properly addressed on appeal.

32. Second, the U.S. Debtors argue that clarification is appropriate to provide that settled (or otherwise allowed) claims paid by the U.S. Debtors since the Filing Date shall be included among the claims of a Debtor for purposes of calculating allocation of the Lockbox proceeds. U.S. Debtors' Motion at 24-25. However, the U.S. Debtors' request for clarification that claims settlements will be counted for allocation purposes appears unnecessary in light of the Court's statements at page 112, paragraph 4 of the Allocation Opinion ("Intercompany claims and settlements approved by the U.S. Court and the Canadian Court will be included in calculating the allocation.").

33. Third, the U.S. Debtors contend that the Allocation Opinion should be clarified to provide that the allocation of the Lockbox proceeds will be made to specific Debtors, not Debtor groups, based on claims existing against each specific Debtor. U.S. Debtors' Motion at 25-26. This request for clarification similarly appears unnecessary in light of the clear

11

direction of the Courts, including paragraph 2(a) of the Allocation Order. Any party that disagrees with the Court's decision can raise the issue on appeal.

34. Fourth, the U.S. Debtors argue that the Court should clarify that it shall retain oversight of and adopt procedures as necessary to measure the amount of disputed claims against any Debtor seeking an allocation that may be considered for purposes of determining the allocation of the Lockbox proceeds. U.S. Debtors' Motion at 26-29.

35. The U.S. Debtors reference the Cross Border Protocol, and claim that no similar protocol is in place with respect to the EMEA Debtors' claims. *Id.* at 27-28. This is incorrect. By way of example, there is a protocol covering the treatment of claims which has been entered into between the Joint Administrators and the NNSA Liquidator. In addition, the EC Regulation on insolvency proceedings (No. 1346/2000) applies to all the EMEA Debtors and itself deals extensively with the treatment of cross border claims. It is also worth noting that the Cross Border Protocol in place between the U.S. and Canadian courts makes particular note of principles of comity, and the same principles apply among the Canadian, U.S. and European courts whether or not a cross border protocol is in place. No justification has been put forward by the U.S. Debtors as to why this Court should take it upon itself through the Allocation Rulings to impose such oversight, contrary to the principles of comity.

36. Lastly, the U.S. Debtors argue for clarification to provide that the Debtors shall each be entitled to seek an allocation distribution based on claims that are incapable of being determined before a final allocation amount has been set, including but not limited to applicable taxes on Lockbox proceeds allocated to them. U.S. Debtors' Motion at 29.

37. In the context of this request, it is unclear what precise language in the Allocation Rulings the U.S. Debtors seek to clarify. To the extent that the U.S. Debtors seek to address genuine issues in respect of reserved and estimated claims, clarification is premature. To the extent that the U.S. Debtors seek to increase their allocation through a reserve for taxes on their allocations of Sales Proceeds or otherwise, it is improper and should be denied.

## CONCLUSION

WHEREFORE, for the foregoing reasons, and those to be presented at the hearing on the Motions, the Conflicts Administrator requests that the Motions be denied, and that the Court grant such other and further relief as is just.

Dated: Wilmington, Delaware
June 12, 2015

SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP

 /s/ Robert A. Weber
Robert A. Weber (I.D. No. 4013)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000
Fax: (302) 651-3001

- and –

George R. Zimmerman (pro hac vice pending)
Susan L. Saltzstein (pro hac vice pending)
4 Times Square
New York, New York 10036
Telephone: (212) 735-3000
Fax: (212) 735-2000

*Attorneys for Stephen Taylor,
Conflicts Administrator for Nortel Networks SA*

13