Court File No. 09-CL-7950

ONTARIO

SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C.
1985, c. C-36, AS AMENDED

— and —

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br>     NORTEL NETWORKS INC., *et al*.,<br>                                        Debtors. | Chapter 11<br><br>Case No. 09-10138 (KG)<br>(Jointly Administered)<br><br>D.I. 15611, 15612, 15613, 15615, 15622 |

**CANADIAN CREDITORS' COMMITTEE ("CCC") OBJECTION TO
MOTIONS FOR RECONSIDERATION AND/OR CLARIFICATION**

**TABLE OF CONTENTS**

**Page**

PART I – INTRODUCTION ............................................................................................... 1

PART II – ARGUMENT ................................................................................................... 3

      A.      The Applicable Legal Standards ................................................................. 3

            i.      The U.S. Legal Standard ................................................................ 3

            ii.     The Ontario Legal Standard .......................................................... 4

      B.      The U.S. Interests' Reliance on Arguments That Were Already Pursued or Readily Available at Trial is Fatal to the Motions ................................................. 5

      C.      The U.S. Interests' Deliberate Undervaluing of U.S. Unsecured Creditor Recoveries Under Modified Pro Rata Does Not Establish "Manifest Injustice" or a "Miscarriage of Justice" ................................................. 8

      D.      Reconsideration of the Courts' Allocation for the Guaranteed Bondholder Claim is Not Warranted ...................................................... 10

      E.      The Proceeds of the Enterprise Sale (Diamondware and NGS) Were Expressly Included In the Lockbox and Reconsideration of Their Allocation Should Be Denied ...................................................... 12

      F.      The U.S. Interests' Requests For "Clarification" Should Be Denied .................. 14

PART III – CONCLUSION ............................................................................................. 14

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*671122 Ontario Ltd. v. Sagaz Industries Canada Inc.*,
  [2000] O.J. No. 121 (C.A.), var'd on other grounds, [2001] S.C.J. No. 61 ..............................5

*671122 Ontario Ltd.*, v. *Sagaz Industries Canada Inc.*,
  [2001] 2 S.C.R. 983 ......................................................................................................................4

*Alabi-Shonde v. Patterson*,
  C.A. No.: 1:11-CV-00608-LPS, 2014 WL 4954314 (D. Del. Sept. 30, 2014) ..........................4

*Becker Milk Co. Ltd. v. Consumers' Gas Co.*,
  1974 CarswellOnt 870 (C.A.) .......................................................................................................5

*Bhatnagar v. Surrendra Overseas Ltd.*,
  52 F.3d 1220 (3d Cir. 1995) ..........................................................................................................8

*Brambles USA Inc. v. Blocker*,
  735 F. Supp. 1239 (D. Del. 1990) .................................................................................................4

*Degroote* v. *Canadian Imperial Bank of Commerce*,
  [1998] O.J. No. 1696 (S.C.), aff'd [1999] O.J. No. 2313 (C.A.) .................................................4

*Donaghy v. Scotia Capital Inc.*,
  [2004] O.J. No. 2157 (S.C.), Karakatsanis J. (as she then was),
  aff'd [2005] O.J. No. 1303 (C.A.)..................................................................................................5

*Exxon Shipping Co. v. Baker*,
  554 U.S. 471 (2008).......................................................................................................................4

*Gonzalez v. Crosby*,
  545 U.S. 524 (2005).......................................................................................................................3

*Griffin v. Dell Canada Inc.*,
  [2009] O.J. No. 1592 (S.C.), aff'd [2010] O.J. No. 177 (C.A.), leave to appeal to
  S.C.C. refused, [2010] S.C.C.A. No. 75 .......................................................................................5

*In re Joy Global, Inc.*,
  C.A. No.: 01-CV-039-LPS, 2011 WL 5865542 (D. Del. Nov. 22, 2011) ..................................8

*In re National Energy & Gas Transmission, Inc.*,
  492 F.3d 297 (4th Cir. 2007) ......................................................................................................11

*In re Owens Corning,*
   419 F.3d 195 (3d Cir. 2005)..............................................................................7

*In re Tribune Co.,*
   464 B.R. 208 (Bankr. D. Del. 2011) ................................................................3

*Ivanhoe Bldg. & Loan Ass'n. of Newark, N.J. v. Orr,*
   295 U.S. 243 (1935).............................................................................2, 10, 11

*Jones v. Pittsburgh Nat'l Corp.,*
   899 F.2d 1350 (3d Cir. 1990)...........................................................................3

*Kay v. Wirstiuk,*
   [1977] A.J. No. 690..........................................................................................8

*Leo Deluca Enterprises Inc. v. Lombard General Insurance Co. of Canada,*
   [2008] O.J. No. 2876........................................................................................5

*Malandrino v. Astrue,*
   C.A. No.: 10-CV-670-LPS, 2013 WL 6852047 (D. Del. Dec. 27, 2013) ...........7, 8

*Max's Seafood Café v. Quinteros,*
   176 F.3d 669 (3d Cir. 1999).............................................................................4

*Montague v. Bank of Nova Scotia,*
   2004 CarswellOnt 11 (C.A.) ............................................................................5

*Moolenaar v. Gov't of Virgin Islands,*
   822 F.2d 1342 (3d Cir. 1987)...........................................................................4

*Mujagic v. Kamps,*
   2015 CarswellOnt 7272 (C.A.) ........................................................................8

*Qit Fer et Titane Inc. v. Upper Lakes Shipping Ltd.,*
   (1991), 3 O.R. (3d) 165 (Gen. Div.) ...............................................................4

*Samuel v. Carroll,*
   505 F. Supp. 2d 256 (D. Del. 2007)..................................................................4

*Schmuck v. Reynolds-Schmuck,*
   [2000] O.J. No. 247 (S.C.)...............................................................................5

*Smith v. City of Chester,*
   155 F.R.D. 95 (E.D. Pa. 1994)..........................................................................4

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure Rule 59(e) ....................................................3, 6

Federal Rule of Civil Procedure Rule 60(b) ...............................................................................3, 6

The Canadian Creditors Committee ("CCC") hereby objects to the motions ("Motions") filed by the U.S. Debtors [D.I. 15611], the Ad Hoc Group of Bondholders [D.I. 15612], and Law Debenture Trust Company of New York, as Indenture Trustee [D.I. 15615] (together along with the those filing joinders[1] to the Motions, the "U.S. Interests") asking the Courts to reconsider, clarify and/or amend the U.S. Court's May 12, 2015 Allocation Trial Opinion [D.I. 15544] (the "U.S. Allocation Opinion") and accompanying Order [D.I. 15545] (the "U.S. Allocation Order"), and the Canadian Court's May 12, 2015 Allocation Trial Decision (the "Canadian Allocation Decision").

## PART I – INTRODUCTION

1.      Following a 21 day trial, each Court prepared comprehensive and thoughtful decisions (the "Allocation Decisions") addressing each of the theories presented by the numerous parties to this litigation.  After thorough consideration of the facts and arguments before them, the Courts independently came to common conclusions adopting a modified pro rata allocation of the lockbox funds based on claims against the three Debtor Estates.  Despite the Courts' suggestions that the parties use the Allocation Decisions as a foundation to work together to promptly distribute funds to Nortel's creditors, the U.S. Interests have instead opted to challenge the Courts' decisions through a series of Motions for "reconsideration" and "clarification."

2.      Reconsideration of a decision is proper only where a movant demonstrates an intervening change in controlling law, comes forward with newly available evidence, or makes a showing of clear error or manifest injustice.  As we show below, none of these factors are present here and the Motions should be denied in their entirety.

---

[1] The Official Committee of Unsecured Creditors ("UCC") [D.I. 15613], and the Bank of New York Mellon, as Indenture Trustee [D.I. 15622], filed joinders to the Motions.

3.      The U.S. Interests made extensive arguments against the pro rata theory at trial and each of these arguments was carefully considered and dealt with in the Allocation Decisions. To the extent the issues raised in the Motions were not fully canvassed at trial (which the CCC denies), the U.S. Interests have only themselves to blame.  They made a choice not to cross-examine or call rebuttal evidence in response to the pro rata allocation support presented at trial, and may not now reargue their case against pro rata.  Such a thirteenth-hour request for a do-over does not satisfy the standards for reconsideration in the U.S. or Canada.

4.      Through their "reconsideration" Motions, the U.S. Interests seek to create the perception that the Courts' allocation mechanism is "manifestly unjust" to U.S. general unsecured creditors by (a) underplaying creditor recoveries under the Courts' modified pro rata allocation and mischaracterizing evidence relating to the Enterprise Business Sale, and (b) arguing claims treatment issues that are outside the scope of the allocation proceeding.   Here, the Motions rely on misleading slices of data to artificially depress projected U.S. creditor recoveries relative to other creditors, hoping to convince the Courts that their modified pro rata allocation leads to "extreme" and "unjust" results.  These arguments distort the factual record and the letter and spirit of the Courts' well-reasoned Allocation Decisions, and have no merit.  In fact, the U.S. Debtors admit in Exhibit A to their Motion that the Allocation Decisions will lead to generally equivalent total recoveries across all unsecured creditor groups (except guaranteed bondholders, who will recover substantially more).

5.      Likewise, the U.S. Interests' late-breaking reliance on the *Ivanhoe* decision is an inapposite red herring.   Both Courts correctly understood the claims issues raised in *Ivanhoe* to be outside the scope of the Courts' determination of allocation.  The treatment of claims asserted against any individual debtor entity is solely within the jurisdiction of that entity's court, is not

relevant to the Courts' lockbox allocations, and does not require reconsideration of the Allocation Decisions.

6.     The CCC respectfully requests that the Motions be denied, and that the Courts direct the parties to take all actions required to promptly distribute funds to creditors who have waited for more than six years to receive recovery on their claims.

**PART II – ARGUMENT**

**A.     The Applicable Legal Standards**

7.     The legal standards governing motions for reconsideration and/or clarification under Delaware and Ontario law are nearly identical in substance.  Both standards place a heavy burden on the movant, which the U.S. Interests have not met.

**i.     The U.S. Legal Standard**

8.     In the U.S., a motion for reconsideration is the "functional equivalent" of a motion to alter or amend judgment under Federal Rule of Civil Procedure Rule 59(e).  *See Jones v. Pittsburgh Nat'l Corp.*, 899 F.2d 1350, 1352 (3d Cir. 1990) (citing *Fed. Kemper Ins. Co. v. Rauscher*, 807 F.2d 345, 348 (3d Cir. 1986)).  Motions brought under Rule 59(e) must be grounded on "(1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct a clear error of law or prevent manifest injustice."  *In re Tribune Co.*, 464 B.R. 208, 213 (Bankr. D. Del. 2011) (citing *Max's Seafood Café v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999)).  Rule 60(b), which the U.S. Interests cite as an alternative basis for relief, similarly applies only "under a limited set of circumstances including fraud, mistake, and newly discovered evidence."  *Gonzalez v. Crosby*, 545 U.S. 524, 528 (2005).  The purpose of a motion for reconsideration is limited and straightforward: to "correct manifest errors of law or fact or to present newly discovered evidence."  *Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999).

3

9.      Reconsideration motions "should be granted sparingly." *Alabi-Shonde v. Patterson*, C.A. No.: 1:11-CV-00608-LPS, 2014 WL 4954314, at *1 (D. Del. Sept. 30, 2014) (Stark, J.); *see also Samuel v. Carroll*, 505 F. Supp. 2d 256, 261 (D. Del. 2007) (same).  "Rule 59(e) . . . 'may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment.'" *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008); *see also Malandrino v. Astrue*, C.A. No.: 10-CV-670-LPS, 2013 WL 6852047, at *1 (D. Del. Dec. 27, 2013) (Stark, J.) (parties may not use a motion for reconsideration to request that a court rethink a decision already made, and may not use a motion for reconsideration as a vehicle for arguments that "should have been presented to the court previously."); *see also Smith v. City of Chester*, 155 F.R.D. 95, 97 (E.D. Pa. 1994) (same).  Rule 60(b) motions should likewise be granted only in extraordinary circumstances, *see, e.g.*, *Moolenaar v. Gov't of Virgin Islands*, 822 F.2d 1342, 1346 (3d Cir. 1987), and are not appropriate to reargue issues that the court has already considered and decided.  *Brambles USA Inc. v. Blocker*, 735 F. Supp. 1239, 1240 (D. Del. 1990).

**ii.      The Ontario Legal Standard**

10.     Similarly, in Ontario, "[t]he power to re-open a judgment should be exercised sparingly. . . .  Once a litigant has obtained a judgment, he is not entitled to be deprived of it without very solid grounds." *Degroote* v. *Canadian Imperial Bank of Commerce*, [1998] O.J. No. 1696 (S.C.), at para. 9; aff'd [1999] O.J. No. 2313 (C.A.), citing *Qit Fer et Titane Inc.* v. *Upper Lakes Shipping Ltd.* (1991), 3 O.R. (3d) 165 (Gen. Div.) at 169; *671122 Ontario Ltd.*, v. *Sagaz Industries Canada Inc.*, [2001] 2 S.C.R. 983, at para. 61.  "Any change to a judgment once given, no matter how soundly based, runs the risk of evoking suspicions of abuse on the part of those adversely affected.  It is at the least disquieting, and to that extent can put a cloud

4

over the administration of justice.  A judge exercising this discretion bears a significant onus to explain the change." *Montague v. Bank of Nova Scotia*, 2004 CarswellOnt 11 (C.A.), at para. 40.

11.     The moving party must demonstrate that the new information *might probably have altered* the judgment.  *Becker Milk Co. Ltd. v. Consumers' Gas Co.*, 1974 CarswellOnt 870 (C.A.), at para. 9; *671122 Ontario Ltd. v. Sagaz Industries Canada Inc.*, [2000] O.J. No. 121 (C.A.), at para. 27, var'd on other grounds, [2001] S.C.J. No. 61; *Leo Deluca Enterprises Inc. v. Lombard General Insurance Co. of Canada*, [2008] O.J. No. 2876, at para. 6; *Griffin v. Dell Canada Inc.*, [2009] O.J. No. 1592 (S.C.), at para. 11, aff'd [2010] O.J. No. 177 (C.A.), leave to appeal to S.C.C. refused, [2010] S.C.C.A. No. 75.  Where the moving party attempts to introduce new evidence in support of the motion, it must demonstrate that "the evidence *could not previously have been discovered with reasonable diligence.*"  *Dell*, *supra* at para. 11; *Leo Deluca*, *supra* at para. 15.

12.     A party seeking reconsideration without new evidence must satisfy an "even higher test."  "The integrity of the litigation process must be at risk; there must be some principle of justice at stake that would override the value of finality in litigation; or some miscarriage of justice could occur if reconsideration did not take place." *Schmuck v. Reynolds-Schmuck*, [2000] O.J. No. 247 (S.C.), at para. 22, Himel J.  *See also*: *Donaghy v. Scotia Capital Inc.*, [2004] O.J. No. 2157 (S.C.), Karakatsanis J. (as she then was), at para. 4, aff'd [2005] O.J. No. 1303 (C.A.).

**B.     The U.S. Interests' Reliance on Arguments That Were Already Pursued or Readily Available at Trial is Fatal to the Motions**

13.     The Motions are based exclusively on arguments that were either pursued at trial or were readily available to the U.S. Interests at trial.  They plainly fail to meet the standard for reconsideration under Rules 59(e) and 60(b) in the U.S. or the applicable jurisprudence in Ontario.

14.    The trial record in this matter is enormous, and is recounted in impressive detail in the Courts' respective Allocation Decisions.  It includes tens of thousands of documents and the testimony of dozens of fact and expert witnesses, offered by parties in support of and in rebuttal to a number of dramatically different allocation proposals.  The U.S. Interests alone are responsible for more than ten witnesses and designated nearly 2000 documents as trial exhibits.

15.    Three Core Parties recognized that the Courts could conclude that the sale proceeds could not be allocated based on ownership of the assets sold, revenue, or R&D expenditure, and presented evidence in support of a pro rata allocation: the CCC, joined in by Wilmington Trust, National Association, as successor indenture trustee, and the UKPC. (*See* U.S. Allocation Opinion at 53-58.)  The Allocation Decisions cite a great deal of the evidence adduced by these pro rata proponents, which the U.S. Interests made a strategic decision to reject.  (*See, e.g.*, Pre-Trial Brief of the U.S. Interests at 137 ("Nortel, like any multinational enterprise had employees worldwide that collaborated with each other, had superiors or subordinates in other countries and had Business Lines that operated across legal entities. This all is irrelevant."))

16.    Although the affirmative cases made by the CCC, UKPC, and Wilmington Trust during the allocation proceeding provided ample opportunity for any party to provide additional rebuttal evidence, the U.S. Interests did not do so.  The U.S. Interests instead maintained that information about claims and claims recovery outcomes should not be considered, and that fairness of outcomes was not a legitimate consideration for the Courts in determining allocation.[2]

---

[2] *See* U.S. Interests' Motion to Strike the Expert Reports of the UK Pension Claimants and the Canadian Creditors Committee Advocating for a "Pro Rata Distribution" to Creditors [D.I. 13370] at 28 (criticizing "the supposed 'fairness' of perceived recoveries" as an "inappropriate" criterion for choosing an allocation methodology, and asserting that the size of the claims against the Debtor Estates are "irrelevant" to allocation); U.S. Interests' Reply to Oppositions to U.S. Interests' Motion to Strike [D.I. 13492] at 25 (arguing that claims recoveries are "irrelevant" to allocation).

17.     The U.S. Interests also elected to argue that pro rata "should be rejected out of hand"[3] for the following reasons: (1) it was a distribution mechanism to creditors rather than allocation of the Sale Proceeds pursuant to the IFSA; (2) it was equivalent to a global substantive consolidation, for which there was no precedent; (3) it was a "sub rosa" plan or plan of arrangement; (4) Nortel did not satisfy the test for substantive consolidation set out in *In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005); (5) pro rata would prejudice certain creditors, particularly the bondholders; and/or (6) there was no "reliable or workable methodology" for its implementation, in part due to the alleged difficulty in the treatment of guarantee claims, claims against multiple debtors, and intercompany claims – an argument made again in these Motions.[4] The Courts considered and rejected (or otherwise accounted for) each of the U.S. Interests' arguments in coming to their modified pro rata allocation mechanism.

18.     It is noteworthy that the CCC's expert witness, Thomas Britven, testified extensively at trial in support of the CCC's proposed pro rata allocation methodology, including regarding the estimated creditor recoveries based on each of the allocation positions advanced by the parties at trial. (*See* June 6, 2014 Trial Tr. at 3369-3375, 3396-3414.)  The U.S. Interests chose not to cross-examine Mr. Britven on much of this evidence and did not call a witness in rebuttal.[5]  It is too late now to argue that the Courts' modified pro rata allocation is somehow "unfair" to creditors of the U.S. Estate.  The time to do so was at trial, and the U.S. Interests' Motions are simply an inappropriate attempt at a second kick at the can.

---

[3] Pre-Trial Brief of the U.S. Interests at 15; Post-Trial Brief of the U.S. Interests at 17.

[4] Pre-Trial Brief of the U.S. Interests at 128-139; Post-Trial Brief of the U.S. Interests at 128-140.

[5] The UCC called Professor John McConnell to the stand, but his expert testimony focused on alleged harm to the market caused by the elimination of bond guarantees.  These guarantees are preserved under the Allocation Decisions.

19.     The positions taken by the U.S. Interests at trial and their prior failures to challenge the evidence and expert testimony introduced in support of a pro rata allocation are fatal to the Motions.  *Bhatnagar v. Surrendra Overseas Ltd*., 52 F.3d 1220, 1230-31 (3d Cir. 1995) (affirming denial of motion for reconsideration that was "a classic attempt at a 'second bite at the apple'"); *see also In re Joy Global, Inc*., C.A. No.: 01-CV-039-LPS, 2011 WL 5865542, at *2 (D. Del. Nov. 22, 2011) (Stark, J.) (citation omitted) (a motion for reconsideration "is not a substitute for an appeal from a final judgment."); *Malandrino*, 2013 WL 6852047, at *1; *Mujagic v. Kamps*, 2015 CarswellOnt 7272 (C.A.), Doherty J.A., at para. 13 ("[m]otions for reconsideration are not the venue for new arguments that could have been made on the initial motion"); *Kay v. Wirstiuk*, [1977] A.J. No. 690, at para. 18 ("there is a fundamental rule which requires a litigant to have the facts of his case fully prepared to prove those matters that must be proved and to present it once and for all at the time of trial. This rule is fundamental because it is only in this way that endless wrangling and never-ending re-hearings and never-ending re-openings to hear new evidence can be avoided.").

## C.    The U.S. Interests' Deliberate Undervaluing of U.S. Unsecured Creditor Recoveries Under Modified Pro Rata Does Not Establish "Manifest Injustice" or a "Miscarriage of Justice"

20.     The Motions incorrectly argue that the allocation to the U.S. Debtors is too small and as a result is "unfair" and "inequitable" to certain of its creditors.  Specifically, the U.S. Interests argue that "the allocation to the U.S. Debtors (only 11% of the total Lockbox proceeds or approximately $813 million out of $7.3 billion) would translate to 14 cents on the dollar paid to U.S. unsecured creditors from *direct Lockbox distributions* to the U.S. Debtors."  (U.S. Debtors Mot. ¶ 3) (emphasis added).

21.     The U.S. Debtors' assertion that its general unsecured creditors would receive "14 cents on the dollar" is a remarkably transparent attempt to distort the actual record before the Courts and cannot sustain a motion for reconsideration.

22.     The Allocation Decisions recognized that certain realities must be accounted for when assessing whether an allocation is just.  For instance, the U.S. Court noted that NNI had an approved $2 billion intercompany claim against the Canadian Estate that was "already baked into the case by virtue of the IFSA inter-company claim, thus making the U.S. Debtors' revenue-based approach redundant."  (U.S. Allocation Opinion at 63.)  The Courts did not exclude claims made by U.S. unsecured creditors (e.g., bondholders) into the Canadian Estate, and they also considered other sources of value, such as pre-existing cash held by the Debtor Estates and intercompany claims – which "relegate[] the arguments raised against a pro rata approach to concerns for process rather than substance." (*See* U.S. Allocation Opinion at 62; *see also, e.g., id.* at 64.)  Accordingly, the Courts considered factors such as the larger known claims and known cash balances in each of the three Debtor Estates in assessing the fairness of various creditors' total recoveries.

23.     The Motions unsuccessfully try to bury these realities in extended footnotes and exhibits.  Exhibit A to the U.S. Debtors' Motion, however, concedes that the Courts' modified pro rata mechanism will yield to U.S. general unsecured creditors a "total recovery" of either 62 or 40 cents on the dollar.  This is a long way from the purported 11 percent recovery alleged in the main text of the U.S. Debtors' Motion.[6]

---

[6] Whether U.S. general unsecured creditors recover 62% or 40% will depend on whether guaranteed bondholders are permitted to receive distributions from the U.S. Estate on the full amount of their guarantee claim, or are limited to distribution on the amount of any "shortfall" remaining after receipt of a distribution from the Canadian Debtors. As shown below, that is a matter internal to the U.S. Estate and is wholly unrelated to allocation (see discussion at Section D, *infra*).

24.     Exhibit A also indicates that Canadian general unsecured creditors will recover approximately 49% and EMEA creditors will recover approximately 65%.  Consequently, the anticipated percentage recoveries by U.S. general unsecured creditors following distribution are in the same range as what is likely to be recovered by the Canadian and European unsecured creditors.  It is difficult to understand how this is a "manifestly unjust" result or a "miscarriage of justice" requiring reconsideration of the Allocation Decisions.

25.     These arguments are especially dubious when placed in context of the strident positions taken by the U.S. Interests throughout this proceeding, including with respect to the relevance of claims and claims recovery outcomes.  (*See* ¶ 16, *supra*.)  The Courts will also recall the U.S. Interests' forceful advocacy in favor of an unsustainable allocation theory that would have provided guaranteed bondholders in the U.S. with well over 100 cents on the dollar and *Canadian unsecured creditors with a total recovery of just 11 cents*.  These same parties now reverse their position on the relevance of fair and equitable outcomes, and complain that their admitted total recovery of between 40 and 62 cents on the dollar would lead to manifest injustice or a miscarriage of justice.  Respectfully, the Courts should not countenance the U.S. Interests' sudden turnabout.

**D.     Reconsideration of the Courts' Allocation for the Guaranteed Bondholder Claim is Not Warranted**

26.     The Motions also seek to undo the Courts' considered determination that effective allocation requires lockbox funds to be distributed for multi-obligor claims only to the Primary Obligor's Debtor Estate.  For support, the U.S. Interests cite to the U.S. Supreme Court's *Ivanhoe* decision[7] and select cases among its progeny, and then accuse the Courts of having

---

[7] *Ivanhoe Bldg. & Loan Ass'n of Newark, N.J. v. Orr*, 295 U.S. 243 (1935).

violated *Ivanhoe* through their modified pro rata allocation mechanism.[8]    But *Ivanhoe* has

nothing to do with allocation.  Neither it nor its progeny are violated by the Courts' Allocation

Decisions.  *Ivanhoe* deals only with the allowance of multi-obligor claims within individual

debtor entities, which the Courts expressly declined to address in their Allocation Decisions

along with the extent of an allowed multi-obligor claim on which a debtor is authorized to make

a distribution.[9]

27.    Although the U.S. Debtors assert that "this Court did not have the benefit of

briefing by the parties or expert analysis" regarding the "critical assumptions underlying" the

Allocation Decisions (*see* U.S. Debtors Canadian Factum ¶ 29), the treatment of bondholder

claims was at the core of the pro rata allocation model constructed by the CCC's expert, Mr.

Britven.[10]    To the extent that the Courts did not have the benefit of any *further* briefing or

analysis, that is only because the U.S. Interests and other Core Parties made a deliberate choice

not to challenge this aspect of Mr. Britven's model.

28.    Moreover, the Allocation Decisions' treatment of the guaranteed bondholder

claim is reasonable in light of, *inter alia*, the Courts' finding that the guaranteed indentures

lacked any covenant requiring the lockbox funds to be allocated in any particular manner (U.S.

Allocation Opinion at 109; Canadian Allocation Decision ¶ 227), and also the U.S. Court's

---

[8] *See* U.S. Debtors Mot. ¶ 27; U.S. Debtors Canadian Factum ¶¶ 36-39; Ad Hoc Group of Bondholders Mot. ¶¶ 22-24.

[9] Even with respect to distribution, *Ivanhoe* does not address whether the allowed full amount of a multi-obligor claim may be the basis for determining the distribution a debtor is authorized to make on such claim.  That issue is, however, addressed in a decision by the U.S. Court of Appeals for the Fourth Circuit that the U.S. Interests fail to mention in the Motions.  In *In re National Energy & Gas Transmission, Inc.*, 492 F.3d 297 (4th Cir. 2007), the Fourth Circuit instructs that *Ivanhoe* is only the first step in the analysis, and that applicable non-bankruptcy law determines the amount of the allowed claim that may form the basis for distribution.  The Fourth Circuit found that under New York law (which also governs the Nortel guaranteed bond indentures), where the Primary Obligor has partially satisfied the claim, the debtors' distribution is restricted to the unsatisfied portion of the claim.

[10] *See* Schedule 3 to Expert Report on Valuation and Other Issues Related to the Allocation of Sales Proceeds to the Nortel Debtor Groups ("Britven Report") [D.I. 13800].

reasonable concern that inflation of claims could "skew a pro rata allocation and destroy the equitable allocation method." (U.S. Allocation Opinion at 111-12.) Accordingly, the Allocation Decisions treat the UKPC's multi-obligor claims – and, presumably, any related-employer or other veil-piercing claims that might be made across many of the Debtor Estates – in precisely the same manner as the guaranteed bondholder claims. (*See id.*; Canadian Allocation Decision ¶ 252.)

29.      The IFSA vested the Courts with clear authority to allocate the lockbox funds, but the Allocation Decisions note that there is no agreement, law, or treaty that directs how the Courts must fashion allocation in this matter. As a result, the Courts' treatment of bondholder claims in the Allocation Decisions cannot be "clear error" and does not lead to "manifest injustice." The U.S. Interests' request for reconsideration must be denied.

**E.      The Proceeds of the Enterprise Sale (Diamondware and NGS) Were Expressly Included In the Lockbox and Reconsideration of Their Allocation Should Be Denied**

30.      The U.S. Interests contend that the Courts should make an exception to their conclusion that the Business Lines were part of an "integrated whole," and amend the Allocation Decisions to give the U.S. Debtors all of the proceeds of the sales of NGS and Diamondware. (U.S. Debtors Mot. ¶¶ 33-34.) Here too, the U.S. Interests improperly relitigate issues that were raised at trial and rejected in the Allocation Decisions. The trial record contains ample evidence to support the Courts' conclusions with respect to the Business Lines and belies any suggestion that this aspect of the Allocation Decisions requires reconsideration.

31.      As the U.S. Debtors note, the only expert witness to opine on the value of NGS and Diamondware was Philip Green, the valuation expert produced by the Canadian Debtors. Mr. Green opined that NGS and Diamondware together were worth $110.97 million, and he

12

allocated the proceeds from the sale of these business entirely to NNI.[11]  But he did so in accordance with an "ownership" theory that was resisted forcefully and strenuously by the U.S. Interests at trial and ultimately rejected by both Courts.

32.    The trial record confirms that NGS and Diamondware were treated as part of Nortel's global Enterprise Business, and that they were marketed and sold by the Nortel group as such:

(a)    NGS and Diamondware were sold pursuant to a September 14, 2009 Amended and Restated Asset and Share Sale Agreement among various Nortel sellers and Avaya.  Contrary to the other transactions referenced in Footnote 24 of the U.S. Debtors' Motion, this sale was approved by both Courts and the entirety of the sale proceeds were placed in the lockbox.

(b)    Substantially all of the $110.97 million value ascribed to these businesses by Mr. Green pertains to NGS.[12]  George Riedel, a former senior officer of NNI, averred that "NGS performed the role of a systems integrator and channel for *Nortel's Enterprise products* in the US Federal government markets."[13] (Emphasis added).

(c)    The U.S. Debtors expressly acknowledged that NGS and Diamondware were part of the Enterprise Line of Business when they sought "orders…(ii) authorizing and approving (a) the sale of certain assets (*including the stock of certain subsidiaries*

---

[11] *See* Appendix B of Report of Philip Green Regarding the Allocation of Recoveries Among Nortel Entities ("Green Report") [D.I. 13795].

[12] The Diamondware business appears to have been of no real significance.  The trial record discloses only that Diamondware was a company specializing in high-definition, proximity-based 3D positional voice technology, acquired by Nortel on August 19, 2008, for approximately $5 million.  No attempt was made to independently value the Diamondware shares in the context of the sale of the Enterprise Business.  Rather, the purchase price paid by Nortel was simply carried forward.  *See* Green Report, Appendix B; *see also* TR43452.

[13] *See* Affidavit of George Riedel, dated July 30, 2009 [TR50570].

*of the Debtors*) of the Debtors' Enterprise Solutions Business."[14] (Emphasis added).  The U.S. Debtors thus agreed to place the proceeds of the sale of these assets into the lockbox.

33.     The Allocation Decisions recognize the interdependence of the various Nortel entities in the marketing, sale, and support of Nortel products.[15]  Under these circumstances, the fact that NNI owned all of the shares of the corporate conduit for Nortel's Enterprise sales to the U.S. government is no more significant than the fact that NNL owned all or substantially all of the residual patents included in the Rockstar Sale.  Indeed, both of these assertions were considered – and rejected – when the Courts declined to adopt the "ownership" theory, and the U.S. Interests may not now claim the exclusive right to sale proceeds that they expressly agreed to include in the lockbox.

**F.     The U.S. Interests' Requests For "Clarification" Should Be Denied**

34.     The CCC concurs with and adopts the objections made by the Monitor and the Canadian Debtors with respect to the Motions' purported requests for clarification.  The "clarification" sought by the U.S. Interests is unnecessary and unwarranted.

**PART III – CONCLUSION**

35.     The Courts' Allocation Decisions were thoughtful and well-reasoned, and properly encouraged the parties to move toward the finish line to provide for the long overdue distribution of funds to creditors.  There is no clear error or injustice manifest in the Allocation Decisions, and no basis for granting these Motions.  After many years of litigation and well over

---

[14] U.S. Debtors' Motion to Approve Sale [D.I. 1131] [TR50110].

[15] *See, e.g.*, U.S. Allocation Opinion at 94 ("Nortel operated as 'an integrated, global whole,' for the benefit of all Nortel"); *see also* Canadian Allocation Decision ¶ 16 ("The Nortel Group operated . . . as a highly integrated multinational enterprise with a matrix structure that transcended geographic boundaries and legal entities organized around the world.")

$1 billion spent on professional fees, it is time to use the Courts' rulings to resolve any remaining differences and distribute funds to Nortel's global creditors.

36.    In making this Objection, the CCC reserves all rights, including, without limitation, the right to supplement its Objection to the Motions prior to or at the hearing on the Motions, or after the hearing subject to leave of the Courts.

WILMINGTON, DELAWARE:
Dated:  June 12, 2015

Respectfully submitted,

DLA PIPER LLP (US)
   /s/ Selinda A. Melnik
Selinda A. Melnik (DE 4032)
1201 N. Market Street, Suite 2100
Wilmington Delaware 19801
Telephone: (302) 468-5650
E-mail:  selinda.melnik@dlapiper.com

- and –

Richard F. Hans (admitted *pro hac vice*)
Timothy Hoeffner (admitted *pro hac vice)*
Jason D. Gerstein (*pro hac vice* pending*)*
1251 Avenue of the Americas
New York, NY 10020-1104
Telephone: (212) 335-4500
E-mail:  richard.hans@dlapiper.com
E-mail:  timothy.hoeffner@dlapiper.com
E-mail:  jason.gerstein@dlapiper.com

*Counsel for the Canadian Creditors Committee*

TORONTO, ONTARIO:

ALL OF WHICH IS RESPECTFULLY SUBMITTED, THIS 12th DAY OF JUNE 2015

_____/s/ Byron D. Shaw_____
For All CCC Canadian Counsel