Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. c-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | (Jointly Administered) |

**THE MONITOR AND THE CANADIAN DEBTORS' OBJECTION AND RESPONSE TO**
**MOTIONS FOR RECONSIDERATION, CLARIFICATION OR AMENDMENT**

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

**Benjamin Zarnett**  LSUC#: 17247M
bzarnett@goodmans.ca
**Peter Ruby**  LSUC#: 38439P
pruby@goodmans.ca
**Jay A. Carfagnini**  LSUC#: 22293T
jcarfagnini@goodmans.ca
**Joseph Pasquariello** LSUC#: 38390C
jpasquariello@goodmans.ca
Tel:    (416) 979-2211
Fax:    (416) 979-1234
*Lawyers for the Monitor*

**GOWLING LAFLEUR HENDERSON LLP**
Barristers & Solicitors
1 First Canada Place
100 King Street West, Suite 1600
Toronto, ON  M5X 1G5

**Derrick Tay**  LSUC#: 21152A
derrick.tay@gowlings.com
**Jennifer Stam**  LSUC#: 46735J
jennifer.stam@gowlings.com
Tel:    (416) 862-5691
Fax:    (416) 862-7661
*Lawyers for the Canadian Debtors*

June 12, 2015

**BUCHANAN INGERSOLL & ROONEY PC**
919 North Market Street, Suite 1500
Wilmington, DE 19801

**Mary F. Caloway** (No. 3059)
mary.caloway@bipc.com
**Kathleen A. Murphy** (No. 5215)
kathleen.murphy@bipc.com
Tel:   (302) 552-4200
Fax:   (302) 552-4295
*Attorneys for Ernst & Young Inc., as Monitor
and Foreign Representative of the Canadian
Debtors*

**ALLEN & OVERY LLP**
1221 Avenue of the Americas
New York, NY 10020

**Jacob S. Pultman**
jacob.pultman@allenovery.com
**Laura R. Hall**
laura.hall@allenovery.com
**Ken Coleman**
ken.coleman@allenovery.com
**Daniel Guyder**
daniel.guyder@allenovery.com
Tel:   (212) 610-6300
Fax:   (212) 610-6399
*Attorneys for Ernst & Young Inc., as Monitor
and Foreign Representative of the Canadian
Debtors*

TO:    THE CORE PARTIES SERVICE LIST

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9630), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226) (collectively, the "U.S. Debtors").

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................2

STATEMENT OF THE FACTS AND PROCEDURAL HISTORY ............................7

    Trial Proceedings ...................................................................................7

    The Decisions........................................................................................9

    The Motions ........................................................................................14

APPLICABLE U.S. AND CANADIAN LAW ...........................................17

    A.    Applicable U.S. Law.................................................................18

          1.    Reconsideration................................................................18

          2.    Clarification ....................................................................21

    B.    Applicable Canadian Law..........................................................22

          1.    Reconsideration................................................................22

          2.    Clarification ....................................................................25

ARGUMENT ....................................................................................26

I.    THE MOVANTS HAVE NOT ESTABLISHED GROUNDS FOR
    RECONSIDERATION UNDER EITHER U.S. OR CANADIAN LAW ........................26

    A.    The Treatment of Bondholder Guarantee Claims and of NGS and
          Diamondware Are Consistent with the Rationale of the Decisions......................27

    B.    The Movants Cannot Rely on Potential Creditor Recoveries to Establish that
          the Courts' Decisions Result in "Manifest Injustice" and Thus Justify
          Reconsideration..................................................................30

          1.    The Movants' Attempts to Manufacture Inconsistency by
              Mischaracterizing the Decisions Should Be Rejected ...............................30

          2.    The Movants May Not Obtain Reconsideration on the Basis of
              Hypothetical Creditor Outcomes Where They Have Consistently
              Opposed the Presentation of Evidence on Claims Pools and Potential
              Creditor Recoveries ..........................................................31

          3.    The Movants' Request for Reconsideration on the Basis of an
              Analysis of Potential Creditor Recoveries They Characterize as
              Unreliable Should be Rejected.................................................33

          4.    The Uncertainty Over Creditor Recoveries Weighs Against
              Reconsideration................................................................34

    C.    The Movants Have Not Identified Any Error of Law Requiring
          Reconsideration of the Decisions..........................................................35

i

II.    THE MOVANTS' REQUESTS FOR CLARIFICATION SHOULD BE DENIED
       AS DISGUISED REQUESTS FOR RECONSIDERATION OR UNNECESSARY .......37

       A.    The Movants' Requests for "Clarification" about which Entities are
             Receiving Allocations from the Lockbox and Treatment of Post-Petition Tax
             Claims Should Be Rejected as Unsupported Requests for Reconsideration .........37

       B.    Clarification Regarding Claims Resolutions Processes and Treatment of
             Settlements Is Unnecessary....................................................................................41

CONCLUSION AND ORDER SOUGHT ....................................................................................43

SCHEDULE A  TABLE OF AUTHORITIES .............................................................................44

SCHEDULE B  GLOSSARY OF TERMS ..................................................................................49

Ernst & Young Inc., the Canadian court-appointed monitor (the "Monitor")[1] and

authorized foreign representative of the Canadian Debtors in proceedings under Canada's

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (as amended to January 14, 2009),

pending before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court"),

on behalf of itself and the Canadian Debtors, hereby files this objection and response to the

motions (the "Motions")[2] of the U.S. Debtors, the UCC, Bondholders, Law Debenture, and

BoNY (the "Movants") in which they seek reconsideration and clarification of (i) the May 12,

2015, Allocation Trial Opinion [D.I. 15544] (the "U.S. Opinion") of the United States

---

[1] Capitalized terms used herein have the meanings given in the Glossary of Terms attached
hereto as <u>Schedule B</u>.

[2] The Motions filed in the U.S. Court are as follows: (i) U.S. Debtors' Motion for Clarification
and/or Reconsideration of the May 12, 2015 Allocation Trial Opinion and Order (the "U.S.
Debtors U.S. Brief") [D.I. 15611]; (ii) Joinder With Reservation of Rights of the Official
Committee of Unsecured Creditors of Nortel Networks Inc., *et al.*, to the U.S. Debtors' Motion
for Reconsideration (the "UCC U.S. Joinder") [D.I. 15613]; (iii) *Ad Hoc* Group of Bondholders'
Motion for Reconsideration of Opinion and Order Allocating Proceeds from Asset Sales of
Nortel Networks, Inc., Its Affiliates and Subsidiaries (the "Bondholders U.S. Brief") [D.I.
15612]; (iv) Joinder With Reservation of Rights of the Bank of New York Mellon, as Indenture
Trustee, in the Motions for Reconsideration Filed by the *Ad Hoc* Group of Bondholders and the
U.S. Debtors (the "BoNY U.S. Joinder") [D.I. 15622]; and (v) Motion of Law Debenture Trust
Company of New York, as Indenture Trustee for the NNCC Notes, Pursuant to Fed. R. Civ. P.
52(b), 59(e), and 60 for Partial Reconsideration of the Court's Order and Allocation Trial
Opinion (the "Law Debenture U.S. Brief") [D.I. 15615]. Citations in the form "[D.I. __]" are to
the docket of *In re Nortel Networks, Inc.*, Case No. 09-10138 (Bankr. D. Del.).

The Motions filed in the Canadian Court are as follows: (i) U.S. Debtors' Notice of Motion
(Motion for Clarification, Reconsideration or Amendment) dated May 29, 2015 along with the
U.S. Debtors' Factum dated June 8, 2015 (the "U.S. Debtors Cdn. Factum"); (ii) Joinder of the
UCC in the Motion of Nortel Networks Inc. and the Other U.S. Debtors (Motion for
Clarification, Reconsideration or Amendment) dated June 8, 2015 (the "UCC Cdn. Joinder")
[June 8, 2015]; (iii) Notice of Motion for Partial Clarification, Amendment or Reconsideration of
Law Debenture Trust Company of New York in its Capacity as NNCC Indenture Trustee along
with Law Debenture's Factum dated June 8, 2015 (the "Law Debenture Cdn. Factum"); and (iv)
Notice of Motion (Returnable June 25, 2015) of the Bondholders dated June 5, 2015
("Bondholder Cdn. Notice of Motion") along with the Written Submissions of the Bondholders
dated June 8, 2015 (the "Bondholders Cdn. Written Submissions").  In Canada, BoNY filed a
Notice of Filing in the U.S. of the BoNY U.S. Joinder dated May 29, 2015.

Bankruptcy Court for the District of Delaware (the "U.S. Court" and together with the Canadian Court, the "Courts") and the U.S. Court's accompanying Order [D.I. 15545] (the "U.S. Order") and (ii) the Canadian Court's May 12, 2015 Reasons for Judgment (the "Canadian Reasons for Judgment" and, together with the U.S. Opinion, the "Decisions").

Because the Motions seek essentially the same relief from both Courts and in order to make the resolution of the Motions as efficient as possible, the Monitor submits this single brief to both Courts in response to all of the Motions.

## PRELIMINARY STATEMENT

1.      Reconsideration is an extraordinary remedy under the law of both the United States and Canada, to be exercised only where a clear error of law or fact or manifest injustice is proven.  Clarification should not be granted where the relief requested is inconsistent with the court's decision.  Apart from an undisputed typographical error that warrants correction,[3] the Movants have failed to discharge their burden to establish that any aspect of the Decisions merits reconsideration, clarification or amendment.

2.      After ten months of deliberation, the Courts concluded that none of the allocation theories presented by the Debtor Estates (*i.e.*, the Canadian Debtors, U.S. Debtors and EMEA Debtors) control the post-insolvency allocation of the proceeds of the joint sales of the Nortel Group's assets (the "Lockbox").  Instead, based on the factual record developed over the course of a six-week trial, including thousands of exhibits, dozens of deposition transcripts and the live testimony of 36 witnesses, the Courts each independently decided that a pro rata allocation of the Lockbox, a result advocated by the UKPC, the CCC and Wilmington Trust, accords with the way

---

[3] As Law Debenture points out, in the U.S. Opinion's Appendix A and at page 43 of the U.S. Opinion, the definition of "Bondholders" should refer to "NNCC" instead of the second reference to "NNC."

the Nortel Group operated when it created the assets that were sold.  To further align the

allocation methodology with the specific circumstances of the Nortel Group's operations and the

history of these joint and coordinated insolvency proceedings, the Courts incorporated into the

allocation methodology modifications to a purely pro rata approach by establishing certain

principles for the treatment of intercompany claims, claims on the same debt against multiple

estates and cash on hand.

3.      The Movants ignore the principles the Courts articulated for their Decisions and

the Courts' grounding of the principles in the unique facts of the case.  In their efforts to obtain a

different and more favorable result, the Movants create a strawman by mischaracterizing the

Decisions, particularly the U.S. Opinion, as seeking some mathematical "middle ground" among

the Debtor Estates' allocation theories, and then attack that strawman by positing that the U.S.

Court somehow failed to understand that the U.S. Opinion did not guarantee creditors of all

Debtor Estates an equal return or place U.S. creditors in the so-called "middle ground."

4.      Although both Courts are clear that *pari passu* treatment of all creditors is not the

purpose of their Decisions—nor could it be, given that the allowance of claims for distribution

from Debtors to their creditors are subject to separate proceedings for each of the Debtor

Estates—the U.S. Debtors' requests for reconsideration and clarification are all premised on the

supposed unfairness of hypothetical returns to U.S. general unsecured creditors generated by an

"illustrative" analysis claimed to be derived from the testimony of the CCC's expert,

Mr. Britven.  The Movants attacked Mr. Britven's evidence throughout the trial and continue to

criticize it.  But, not content merely to ask the Courts to rely on that which they consider

unreliable, the U.S. Debtors and the UCC go further, altering the Britven analysis through

selective omissions and "limited adjustments" to artificially understate the returns to U.S.

creditors that the model would predict.

5.      Reconsideration or clarification on the basis of the "illustrative analysis" would be improper because none of the adjustments to Mr. Britven's model that the U.S. Debtors now make are based on evidence or argument offered at trial, where the Movants contented themselves to attack the pro rata theory solely as impermissible "substantive consolidation." Having chosen not to present evidence or argument then as to creditor outcomes—indeed, having objected to consideration of creditor outcomes at every turn during the trial and the subsequent litigation over post-petition interest—the Movants may not now seek reconsideration on the basis of creditor outcomes.

6.      Even taking the returns calculated by the U.S. Debtors and the UCC using adjustments to Mr. Britven's figures designed to suppress predicted recoveries by U.S. creditors, the resulting distribution would not be manifestly unjust, were it actually to occur.  A return to bondholders with guarantee claims against the U.S. Debtors of 89%, and a return of 40% to general unsecured creditors of the U.S. Debtors (as compared to 49% for unsecured creditors of the Canadian Debtors), simply is not manifestly unjust.  The U.S. Debtors and the UCC's references to far lower recoveries are misconceived, as they exclude from the analysis other assets available to satisfy U.S. creditor claims—among others, NNI's $2 billion allowed claim against NNL and cash on hand—even though those assets are specifically referenced in the Courts' Decisions as modifications to the pro rata methodology adopted to resolve objections raised at trial.

7.      Accordingly, the U.S. Debtors' two requests for reconsideration—to include bondholder guarantee claims in the U.S. Debtors' claims pool for allocation purposes and to award arbitrary amounts to the U.S. Debtors for NGS and Diamondware —must be rejected. The treatment of these issues by the Courts was completely consistent with the rationale of the Decisions, and there is no basis to reconsider them to move a larger allocation to the U.S. Estate.

8.      The requests for clarification should similarly be rejected.  They are unsupported by the unmeritorious claim of inadequate U.S. creditor recoveries and Movants fail to identify any other justifiable basis for clarification.

9.      The U.S. Debtors request a "clarification" that allocation funds be reserved to meet post-petition tax claims arising from allocation, but including post-petition claims for purposes of allocation would be inconsistent with the Courts' focus on Nortel's pre-insolvency operations and the joint efforts of the Nortel companies that the Courts found had led to the creation of the assets whose sale proceeds are now in the Lockbox.  Taking account of post-petition tax claims (in effect, allowing a gross-up of allocation amounts to mitigate tax consequences) would distort the pro rata allocation methodology beyond recognition, making allocation shares turn on matters such as the relative tax attributes of the Debtor Estates rather than the activity that produced the value to be allocated.

10.      The U.S. Debtors' request for clarification that individual Debtors are to receive allocations directly from the Lockbox also must be denied because the Decisions provide for the allocation from the Lockbox to be made to the three Debtor Estates.  To the extent that the U.S. Debtors seek, as Law Debenture does, to have this methodology reconsidered, they fail to establish any manifest injustice.  Law Debenture's concerns about how the funds will be distributed to each Debtor are pure speculation; the Courts make clear that what each Debtor receives, following the allocation to the Debtor Estates, is a question to be addressed in separate proceedings in each jurisdiction.

11.      Similarly, the request by the U.S. Debtors for clarification of the treatment of intra-Debtor Estate intercompany claims is unnecessary.  The use of the Debtor Estate groupings necessarily implies that intercompany claims among the Debtors in a Debtor Estate are ignored, and the Courts specifically provide that intercompany claims between Debtors in different

Debtor Estates will be given effect for purposes of allocation.  To the extent the Courts wish to reaffirm these principles, the Monitor and the Canadian Debtors do not object.

12.    The Movants' requests for clarification as to the inclusion of settled pre-filing claims for purposes of allocation and oversight of claims processes are also unnecessary.  The Courts have expressed in the Decisions guiding principles and contemplate processes through which issues relating to the inclusion of specific claims to the allocation calculation will be determined.

13.    The Bondholders' request for reconsideration is also misplaced.  Joined by BoNY and Law Debenture, the Bondholders ask that the Decisions be amended or clarified to reflect that the Courts, in providing allocation principles, did not intend to limit the amount of their guarantee claims asserted or assertable against the guarantors of the bonds, not for allocation purposes, but in the context of the claims processes that will lead to distributions by Debtor Estates to creditors.[4]  This request should be denied because, as the Bondholders expressly acknowledge, the Decisions resolve only allocation issues.  The Courts have made clear the Debtor Estates' claims and distribution processes are to be decided by the Courts supervising such processes.

14.    To grant the Movants' inappropriate requests for relief now would only embolden parties intent on delaying the implementation of the allocation principles to bring further non-issues to the Courts and delay the inevitable appeals that each Movant expressly reserves the right to bring no matter the outcome of these motions.[5]

_____

[4] Bondholder Cdn. Notice of Motion ¶ 1; Bondholder U.S. Br. at 7; BoNY U.S. Joinder at 1-2; Law Debenture Cdn. Factum ¶ 2.

[5] U.S. Debtors U.S. Br. at 14, n.15; UCC U.S. Joinder at 2; Bondholders U.S. Br. at 2 n.4; BoNY U.S. Joinder at 2; Law Debenture U.S. Br. at 8.

15.     The Monitor and the Canadian Debtors respectfully submit that the Courts should

deny the Motions (except to clarify the reference to NNCC) so that parties can proceed to carry

out the Decisions.  If the Movants intend to appeal the U.S. Opinion, the appeal should be

certified to the Court of Appeals for the Third Circuit to expedite review. If the Movants intend

to seek leave to appeal the Canadian decision they should do so expeditiously.  Nothing should

be stayed, and claims should be crystalized and categorized in accordance with the principles set

forth in the Decisions, during the pendency of any appeals.  As the Courts have directed, these

cases must be brought to a close.

## STATEMENT OF THE FACTS AND PROCEDURAL HISTORY

Trial Proceedings

16.     In May and June 2014, the Courts presided over a 21-day joint trial.  The Courts

heard from 21 fact witnesses and 15 expert witnesses and admitted over 2,000 exhibits and

designations from depositions into evidence, following which the parties prepared extensive

written briefs exceeding 1,000 pages and made oral closing submissions over three days.

17.     The pro rata allocation theory was a position advanced by the CCC, Wilmington

Trust and the UKPC in their initial pleadings setting out their allocation positions, pre- and post-

trial briefs, opening and closing arguments and trial evidence.  The Movants chose to respond to

those positions in a limited manner, presumably on the basis of strategic and tactical choices.

18.     From their allocation position in May 2013, and in their opening arguments, the

UKPC made clear that, while they were arguing for a specific type of pro rata allocation, the pro

rata concept was flexible and could take into account Nortel's particular facts.[6]  In response to a

specific question from the Canadian Court about how a pro rata allocation would account for

---

[6] May 16, 2013 UKPC Allocation Position [D.I. 10539] ¶¶ 44, 54, 68-70; May 12, 2014 (Day 1)
Trial Tr. (UKPC Opening) 138:1-7, 139:8-18, 140:25-141:5, 160:1-6.

NNI's $2 billion claim against NNL (the "$2 Billion Claim"), the UKPC acknowledged that particular intercompany claims could be recognized in a pro rata allocation.[7]

19.    The UKPC's expert, Mr. Bazelon, was specifically questioned at trial about how a pro rata allocation would account for both claims that had been settled (including the $2 Billion Claim) and guarantees.  Mr. Bazelon's testimony was unequivocal that, while he supported a certain pro rata allocation methodology, it was for the Courts to decide on those matters and they could adjust the methodology accordingly.[8]

20.    In closing argument, the UKPC responded to a question from the Canadian Court by stating that the question of distribution to creditors "could be left to each of the Courts to determine."[9]  The CCC made essentially the same point:

> Both courts can craft orders that preserve its rights to deal with its creditors under the proposed plans, provide for interim distributions while still aiming to achieve a pro rata outcome.  If any court takes the corpus of what would otherwise be a pro rata outcome, and within the confines of its jurisdiction says that's what I've been allocated but I don't want to distribute it on a pure pro rata basis, I'm going to go through a claims process and allocate it according to claims that are admitted, they're free to do so.[10]

21.    The Movants all opposed the pro rata allocation theory, but did so primarily on the basis that it would be a global substantive consolidation of the Debtor Estates (which the Decisions do not cause) and would not be permissible at law.  They provided no alternative calculations, illustrative recoveries or any of the other information upon which they now wish to rely in order to demonstrate results they say are unintended.  To the contrary, they argued that

---

[7] May 12, 2014 (Day 1) Trial Tr. (UKPC Opening) 158:24-160:6.

[8] June 2, 2014 (Day 12) Trial Tr. (Bazelon) 2942:24-2943:8, 2944:5-21, 2952:20-2953:13, 2954:14-22, 2955:16-2956:7, 2960:18-25, 3058:3-7.

[9] September 23, 2014 (Day 23) Trial Tr. (UKPC Closing) 5485:9-5486:3.

[10] May 13, 2014 (Day 2) Trial Tr. (CCC Opening) 486:16-21, 489:11-22.

creditor distributions and relative recoveries were irrelevant to the determination of the

appropriate allocation method.

22.     For example, in their pre-trial brief, the U.S. Debtors asserted that the illustrative

recoveries advanced by the CCC and Mr. Britven had "no evidentiary basis in the record or law,"

that "hypothetical creditor distributions are irrelevant to allocation," and that "[t]o the extent the

CCC or UKPC offer any hypothetical recoveries, there is no evidence in the record to support

such speculation and no basis to allow its admission."[11]

23.     The UCC likewise argued during the allocation trial that creditor recoveries were

"utterly irrelevant":

> Britven, the expert for the CCCs, he includes in his report a chart and what that
> chart -- we have excerpted a page of it here, and what that chart proposes to do or
> purports to do is to show recovery calculations.  He tries to do some math to
> suggest what recoveries would look like based on the application of each of the
> theories.
>
> And just two quick points with respect to that, Your Honours.  First is it's utterly
> irrelevant.  The outcome, what a particular allocation methodology yields in terms
> of creditor recoveries, that is just not relevant to the question of the allocation that
> the estates are entitled to.[12]

The Decisions

24.     On May 12, 2015, the Courts simultaneously released their respective allocation

Decisions, which explicitly set out the justifications for the modified pro rata allocation that both

Courts considered necessary to achieve a just result.[13]  The U.S. Court and the Canadian Court

---

[11] Pre-Trial Brief of the U.S. Interests [D.I.13551] at 139 & n.473.  The Bondholders made
similar arguments in their post-trial brief in section entitled "Creditor Recoveries are Not
Relevant to Allocation."  Post-Trial Brief of the *Ad Hoc* Group of Bondholders [D.I. 14435] at 3-
12.

[12] May 13, 2014 (Day 2) Trial Tr. (UCC Opening Statement) 353:13-354:24.

[13] U.S. Opinion at 99; Canadian Reasons for Judgment ¶¶ 205, 211.

independently arrived at the same conclusion.[14]  While certain of the Courts' findings of fact and

conclusions of law differed, both emphasized the importance of their having agreed upon a

common allocation methodology.[15]  The Courts reserved the jurisdiction to deal with matters of

claims allowance and distributions independently and at an appropriate time in the future.[16]

25.      Both Courts make clear that the Decisions were carefully and deliberately

reached, and are based on principles derived from the facts of this unique case, rather than

results-driven.[17]  The U.S. Debtors' suggestion that the U.S. Opinion was "potentially rendered

without recognition of the presumably unintended consequences of such ruling"[18] unjustifiably

impugns the Courts' deliberative processes.[19]

26.      Contrary to the assertion by the U.S. Debtors' Motion, the Courts' allocation

approach was not based on any finding that the MRDA granted NNI "all valuable rights to and

---

[14] U.S. Opinion at 102-103; *see also id.* at 105; Canadian Reasons for Judgment ¶ 10.

[15] U.S. Opinion at 60 ("The parties recognized the problems that could result were rulings by the Courts to diverge . . . .  The Courts have had discussions following the trial of the Allocation Dispute in an effort to avoid the travesty of reaching contrary results which would lead to further and potentially greater uncertainty and delay."); Canadian Reasons for Judgment ¶ 10 ("We have come to the conclusion that a consistent ruling can and should be made by both Courts. . . . Consistent decisions that we both agree with will facilitate [] a resolution.").  Even the U.S. Debtors in their motion acknowledge "the important interest of consistent rulings between th[e U.S.] Court and the Canadian Court."  U.S. Debtors U.S. Br. at 1 n.2.

[16] Canadian Reasons for Judgment ¶¶ 211 ("Once the lockbox funds have been allocated, it will be up to each Debtor Estate acting under the supervision of its presiding court to administer claims in accordance with its applicable law."), 253, 258(6); U.S. Opinion at 112.

[17] U.S Opinion at 63, 99, 106-07, 111-12; Canadian Reasons for Judgment ¶¶ 209, 211-12, 248-50.

[18] U.S. Debtors U.S. Br. at 12.

[19] The suggestion that the U.S. Court failed to appreciate certain facts now asserted to be relevant to its Opinion is particularly ill-taken given that the U.S. Court has presided over the U.S. Debtors' chapter 11 cases since January 14, 2009, issued each of the sale orders and entered the orders relating to the U.S. Debtors' settlement of claims by the Bondholders and the PBGC.  *See also* U.S. Opinion at 99 ("The Court has toiled mightily to reach a correct and equitable result, consistent with the evidence adduced at trial."), 103 (The Court has "read the parties' briefs . . . numerous times.").

beneficial ownership" in the NN Technology in the United States[20] because the U.S. Court concluded that any such rights were inapplicable to post-insolvency allocation,[21] and the Canadian Court rejected the U.S. Debtors' reading of the MRDA.[22]  Both Courts reject each Debtor Estates' theory of allocation, including that of the U.S. Debtors, as legally flawed in its application to the issue at hand.[23]  The valuation evidence tendered by the U.S. Debtors to support an allocation based on their approach also was rejected by both Courts.[24]

27.    While the U.S. Opinion referenced the failure of the parties to find "middle ground" in their respective allocation positions,[25] it did not purport to correct those failures by determining a "middle ground"—instead the U.S. Court concluded that the Debtor Estates' positions left "virtually no middle ground."[26] The Canadian Reasons for Judgment makes no mention of "middle ground."  Rather, in the absence of any applicable agreement between the parties, each Court independently adopted the modified pro rata approach as an appropriate means to equitably allocate the Lockbox funds *to the Debtor Estates*, not to creditors, in the circumstances of these cases and Nortel's pre-petition operations.[27]

---

[20] U.S. Debtors U.S. Br. at 12.

[21] U.S. Opinion at 62 ("[T]he U.S. Debtors equate revenue to value without any regard to where the value-generating assets were developed or recognition of the fact that the $2.02 billion inter-company claim already accounts for their contributions as the primary bread-winner of Nortel."), 89-90, 99 ("The master facts are that Nortel functioned as a unified global enterprise and there was no agreement which governed how the individual entities would or could allocate their assets in the event of an insolvency.").

[22] Canadian Reasons for Judgment ¶¶ 169-70.

[23] U.S. Opinion at 92-93; *see also* Canadian Reasons for Judgment ¶¶ 193-95, 222-23.

[24] U.S. Opinion at 89-90; Canadian Reasons for Judgment, Schedule A ¶¶ 6-13; *id.* Schedule B ¶¶ 8, 18, 23, 26, 29, 36, 56.

[25] U.S. Opinion at 9, 92.

[26] *Id.* at 2.

[27] *Id.* at 63, 99, 102, 104, 106-07; Canadian Reasons for Judgment ¶ 210.

28.     The Courts explicitly held that they were doing what was just in the unique circumstances of this case.[28]  As Mr. Bazelon had suggested was possible, the Courts intentionally modified the pro rata methodology to account for certain intercompany and quasi-intercompany claims (including the $2 Billion Claim) and to address claims subject to guarantees or made against more than one Debtor Estate[29]—outcomes that the Movants now contend were unintended.

29.     To the contrary, these modifications to the pro rata allocation methodology addressed concerns the Movants raised with respect to a pro rata allocation over the course of the allocation trial.  The U.S. Decision rejected concerns that a pro rata allocation would mete out "rough justice" based on "free floating discretion," because those concerns were addressed by the particular manner in which the modified pro rata allocation was tailored to Nortel's specific facts, including by establishing the principles about which the Movants now complain.[30]

30.     In that context, both Courts considered whether it was fair to exclude the Bondholders' guarantee claims against the U.S. Debtors from the pool of claims that will determine the allocation to the U.S. Estate.[31]  At trial, the Bondholders contended that exclusion of their guarantee claims for purposes of pro rata allocation would be unfair because purchasers of the bonds had allegedly relied on the guarantees,[32] but the U.S. Court found that the evidence

---

[28] The Canadian Court held that "doing what is just in the unique circumstances of this case should govern the allocation," (Canadian Reasons for Judgment ¶ 204) and the U.S. Court held that the modified pro rata allocation ordered was "the most satisfactory allocation method," "the only outcome that reflects uncontroverted evidence and leads to a just result"  and a "fair and definitive" allocation (U.S. Opinion at 93, 99, 112).

[29] U.S. Opinion at 112; Canadian Reasons for Judgment ¶ 258(3).

[30] U.S. Opinion at 102-03; *see also id.* at 105; Canadian Reasons for Judgment ¶ 10.

[31] U.S. Opinion at 105-12; Canadian Reasons for Judgment ¶¶ 224-29.

[32] May 13, 2014 (Day 2) Trial Tr. (Bondholder Opening Statement) 367:4-374:17.

showed that "[n]o bondholder could have formed the reasonable expectation that on insolvency, a guarantee would have entitled bondholders to access distinct pools of assets that may or may not have been held by the entity that guaranteed the bonds"[33] and held that,

> [s]ince the marketplace did not more favorably view Nortel bonds guaranteed by NNI, creditor expectations do not support the contention that Nortel's guaranteed bonds would enjoy a greater percentage recovery upon insolvency or should otherwise entitle them to a higher recovery than Nortel's other unsecured creditors.[34]

31.      The Courts' discussion of the bondholder guarantee claims was solely for the purpose of the *allocation* of the Lockbox funds to the Debtor Estates and does not address the ultimate *distribution* of any particular amounts on those claims, or any other claim, to any particular creditor.[35]

32.      Thus, that a claim is recognized only against the principal obligor (or a single Debtor in the case of the UKPC claims against the EMEA Debtors) for the purpose of calculating allocation is irrelevant to the treatment of such a claim in the claims and distribution processes of any particular Debtor.[36]  The modified pro rata allocation method does not fetter the Courts' abilities to deal with claims matters and distribution issues in the future.

---

[33] U.S. Opinion at 109-10.

[34] U.S. Opinion at 108; *see also* Canadian Reasons for Judgment ¶¶ 229-47.

[35] U.S. Opinion at 102 ("The Court is not ordering a distribution scheme. Instead, the Court is directing an allocation among the Estates for the Estates to distribute in an appropriate manner. It is a distinction with a difference."); *see also id.* at 106-07; Canadian Reasons for Judgment ¶ 211 ("Directing a pro rata allocation will constitute an allocation as required. Once the lockbox funds have been allocated, it will be up to each Nortel Estate acting under the supervision of its presiding court to administer claims in accordance with its applicable law.").

[36] U.S. Opinion at 112; *see also* Canadian Reasons for Judgment ¶ 258.

The Motions

33.     Each of the Movants has expressly reserved the right to appeal in the U.S. regardless of the outcome of the Motions.[37]

34.     The Movants' result-based contentions of manifest injustice and supposed lack of clarity are premised on an analysis they attacked at trial and continue to insist is unreliable—anticipated creditor recoveries.[38]  Even by incorporating assumptions and unsworn facts that are not in the trial record, the Movants cannot demonstrate any manifest injustice to the U.S. Debtors, for several reasons.

35.     *First*, even if results were relevant (and accurately calculated), under the U.S. Debtors' own analysis, anticipated recoveries to unsecured creditors of the U.S. Estate are 40%, as compared to 49% to unsecured creditors of the Canadian Estate and 65% to unsecured creditors for the EMEA Estate.[39]  It is noteworthy that the guaranteed bondholders are anticipated to recover 89% under this analysis.[40]

36.     *Second*, the U.S. Debtors base "illustrative" recoveries on the assumptions of Mr. Britven's Alternative Pro Rata Allocation approach, subject to their own selective "*limited* adjustments to account for certain subsequent developments" (emphasis added) to Mr. Britven's financial modeling.[41]  These adjustments, however, are neither limited nor evidence-based.  For

---

[37] U.S. Debtors U.S. Br. at 14, n.15; UCC U.S. Joinder at 2; Bondholders U.S. Br. at 2 n.4; BoNY U.S. Joinder at 2; Law Debenture U.S. Br. at 8.

[38] *See, e.g.*, June 6, 2014 [Day 14] Trial Tr. (Britven) 3481:8 - 3488:23; U.S. Debtors U.S. Brief at 3 n.5, 10 n.13 and Exhibit A; UCC U.S. Joinder at 3; U.S. Debtors Cdn. Factum ¶ 3; Law Debenture U.S. Br. at 1-2.

[39] U.S. Debtors U.S. Br. at A-2.

[40] *Id.*

[41] U.S. Debtors U.S. Br. at 10 & n.13, A-2, A-3; *see also* U.S. Debtors Cdn. Factum ¶ 3, where the adjustments are characterized as "discrete."

example, on an inconsistent basis, the U.S. Debtors lowered the estimate of their cash on hand by looking to their own (post-trial) March 31, 2015 Monthly Operating Report (the "March 2015 MOR") to decrease the cash balances reflected in Mr. Britven's model.[42]  However, despite the March 2015 MOR also providing that the U.S. Debtors' estimated liabilities for total unsecured claims of the PBGC are $437.7 million, the U.S. Debtors increase Mr. Britven's number for that claim to $703 million.[43]  In addition, the U.S. Debtors do not adjust Mr. Britven's assumptions to reflect their current cash burn rate, which is significantly lower than the burn rate estimated by Mr. Britven, which was based on the pre-trial period where the Debtor Estates were incurring significant professional and litigation expenses.  Such an analysis is unprincipled and unreliable.

37.     *Third*, and even more troubling, the U.S. Debtors attempt to portray anticipated recoveries to unsecured creditors of the U.S. Estate stemming from the Decisions as "14 cents on the dollar,"[44] completely ignoring the Courts' clear findings that the U.S. Estate and the other Debtor Estates are to keep their own cash on hand to distribute to their creditors and that the $2 Billion Claim is to be maintained and respected,[45] both of which add significantly to recoveries of creditors of the U.S. Debtors.[46]  The exclusion of these two items[47] from the

---

[42] U.S. Debtors U.S. Br. at A-4, Note 7.

[43] *Id.* at A-4, Note 4.  This adjustment was made to reflect an amended claim filed (and not accepted or settled) on July 7, 2014, just after evidence closed in the allocation trial, which increased the PBGC claims from $593 million to $707 million.  *See* U.S. Claim Nos. 8760, 8761, 8762, 8763.

[44] U.S. Debtors U.S. Br. at 3 & n. 5; *see also* U.S. Debtors Cdn. Factum ¶ 3.  The U.S. Debtors' motion is joined by BoNY, BoNY U.S. Joinder at 1, and by the UCC, UCC U.S. Joinder at 1.  The UCC base their assertions on the same "illustrative analysis" performed by the U.S. Debtors and excluding recoveries from the $2 Billion Claim and cash on hand.  UCC U.S. Joinder at 3.

[45] U.S. Opinion at 93, 112 (¶ 4); Canadian Reasons for Judgment ¶¶ 248, 258(3)-(4).

[46] These additional recoveries are minimized and referred to only in the footnotes to the U.S. Debtors U.S. Brief and factum.  *See* U.S. Debtors U.S. Brief at 3 & n. 5; U.S. Debtors Cdn. Factum ¶ 34 & n.28.

"illustrative" analysis of hypothetical creditor recoveries proffered by the U.S. Debtors and the UCC in support of their motions for reconsideration artificially suppresses the projected recovery to U.S. general unsecured creditors and the Bondholders.  Thus, the U.S. Debtors' attempt to demonstrate "hardship" focuses only on the percentage allocation from the Lockbox to each of the Debtor Estates (rather than all sources of creditor recoveries for creditors of the U.S. Debtors).

38.     The Movants attempt to use their analysis of anticipated creditor recoveries to colour the Courts' assessment of their specific requests for reconsideration or clarification, which are not independently sustainable.  For example, they seek reconsideration of the exclusion of bondholder guarantee claims from the allocation claims pool, despite the Courts' considered decision to exclude the guarantee claims, and ask the Courts to except from their "One Nortel" allocation principles the sale proceeds that they claim are attributable to two subsidiaries that were sold as part of the Enterprise sale, despite never making any request for allocation on that basis at trial.  The supposed requests for clarification are either disguised requests for reconsideration (such as a request for "clarification" that allocation is to be to individual Debtors rather than Debtor Estates) or submissions that are misplaced in this context as they should be addressed during or at the conclusion of the Debtor Estates' claims processes.

39.     The Bondholders' motion for reconsideration (joined by BoNY[48]) does not address the Decisions' allocation methodology at all and does not join in the U.S. Debtors'

---

[47] The U.S. Debtors deal with only "direct Lockbox distributions to the U.S. Debtors" and only make passing reference to the $2 Billion Claim (but not to cash on hand) in a footnote without accounting for it.  U.S. Debtors U.S. Br. at 3 ("Sales Proceeds available to creditors of the U.S. Debtors based on distributions on the allowed $2 billion NNI-NNL Claim would add an additional 17 cents to U.S. unsecured creditor recoveries.").

[48] BoNY U.S. Joinder at 1.

arguments.  Instead, their motion focuses on the references in the Decisions to a "shortfall" or "deficiency" on their guarantee claims against the U.S. Debtors.[49]  While acknowledging that the Decisions do not purport to resolve issues of claim allowance or distributions on claims,[50] they (with BoNY, and with Law Debenture seeking similar relief in Canada)[51] seek clarification or reconsideration of the Decisions to provide that their guarantee claims may be asserted at the distribution stage in their full amount, notwithstanding any prior recovery on their principal claims.

40.    Finally, Law Debenture alone has moved for clarification that the second reference to "NNC" in the definition of Bondholders in the U.S. Opinion is intended to be "NNCC."[52]

## APPLICABLE U.S. AND CANADIAN LAW

41.    The U.S. and Canadian law applicable to the Motions is very similar.  At this stage of the proceedings, the Courts have the discretion to reconsider and clarify their rulings only to correct errors of law or fact or technical errors, such as typographical errors, or to remedy a manifest injustice.  A request for reconsideration or clarification cannot be based on evidence or arguments that could have been, but were not, presented at trial; most importantly, it is not a vehicle for criticizing results that, if they are to be questioned at all, should be appealed.

---

[49] Bondholders U.S. Br. at 2; Bondholder Cdn. Written Submissions at paras. 3, 6.

[50] Bondholders U.S. Br. at 11-12; Bondholder Cdn. Written Submissions at para. 12.

[51] BoNY U.S. Joinder at 1; Law Debenture Cdn. Factum at paras. 11-13.

[52] Law Debenture U.S. Br. at 1.

A.    **Applicable U.S. Law**

1.    <u>Reconsideration</u>

42.    The Movants seek reconsideration under Rules 59(e)[53] and 60(b)[54] of the Federal

Rules of Civil Procedure (made applicable to bankruptcy proceedings by Bankruptcy Rules 9023

and 9024), but these rules apply only to judgments or final orders.  They do not directly apply

here because the U.S. Order and the U.S. Opinion it implements set out principles for allocation

and requires the completion of claims processes before any final allocation can be calculated and

applied to the Lockbox.  As such, the U.S. Order clearly is an interlocutory order.[55]

43.    The Rule 59(e) standard is important, however, because while the Bankruptcy

Court has the inherent power to reconsider interlocutory orders "when it is consonant with justice

to do so,"[56] the Third Circuit has held that courts relying on their inherent power to reconsider

interlocutory orders "must under all the circumstances provide reasonable justification for

departure from 'the practice of courts generally to refuse to reopen what has been decided.'"[57]

---

[53] U.S. Debtors U.S. Br. at 13; Bondholders U.S. Br. at 1 & 7; Law Debenture U.S. Br. at 2.

[54] U.S. Debtors U.S. Br. at 13; Bondholders U.S. Br. at 1 & 7; Law Debenture U.S. Br. at 2.

[55] *See United States v. Nicolet, Inc.*, 857 F.2d 202, 206-07 (3d Cir. 1988) ("Even in bankruptcy appeals the concept of finality is not open-ended.  Orders that do not fully adjudicate a specific adversary proceeding or that require further factual development are governed by the ordinary finality precepts of routine civil litigation.").  Orders preparatory to formulating a final remedy, after a finding of liability, are typically non-final.  Wright & Miller, Federal Practice and Procedure § 3915.4.

[56] *United States v. Jerry*, 487 F.2d 600, 605 (3d Cir. 1973). The Movants do not address this power in their motions, other than the U.S. Debtors' citation to section 105(a) of the Bankruptcy Code, which provides the Court with the power to issue any order necessary or appropriate to carry out the provisions of the Bankruptcy Code.

[57] *In re Anthanassious*, 418 F. App'x 91, 95-96 (3d Cir. 2011) (quoting *Messenger v. Anderson*, 225 U.S. 436, 444 (1912)).

Thus, courts in the Third Circuit apply the Rule 59(e) standard to motions for reconsideration of interlocutory orders.[58]

44.    Whether under Rule 59(e), Rule 60(b) or a court's inherent authority, reconsideration "is an *extraordinary means of relief* in which the movant must do more than simply reargue the facts or law of the case."[59]  Reconsideration should be granted sparingly due to the judiciary's strong interest in the finality of its decisions.[60]  The purpose of a motion for reconsideration "is not to allow a party to 'simply change[] theories and [try] again,' thus giving them 'a second bite at the apple.'"[61]  Nor may a movant "request that a court rethink a decision already made" or use the motion "'as a means to argue new facts or issues that inexcusably were not presented to the court in the matter previously decided.'"[62]

45.    The purpose of reconsideration under Rule 59(e) "'is to correct manifest errors of law or fact or to present newly discovered evidence.'"[63]  Accordingly, the movant must demonstrate at least one of the following:  "(1) an intervening change in the controlling law; (2) the availability of new evidence . . . ; or (3) the need to correct a clear error of law or fact or

---

[58] *See, e.g.*, *Hooten v. Greggo and Ferrara Co.*, No 10-776, 2011 WL 1754084, at *1 (D. Del. 2011); *Bausch & Lomb v. Moria S.A.*, 222 F. Supp. 2d 616, 669 (E.D. Pa. 2002).

[59] *In re Meridian Automotive Systems-Composite Operations, Inc.*, No. 05-11168, 2008 WL 141160, at *1 (Bankr. D. Del. January 11, 2008) (Gross, J.) (emphasis added); *see also* Memorandum Opinion, *Sebastian v. Frickel (In re Worldspace), Inc.*, Adv. Pro. No. 14-50365 [D.I. 37] (Bankr. D. Del. December 5, 2014) (Walsh, J.) (same).

[60] *See In re Commonwealth's Mot. to Appoint Counsel*, No. 13-510, 2013 WL 5781732, at *1 (M.D. Pa. Oct. 25, 2013); *Conway v. A.I. DuPont Hosp. for Children*, No. 04-4862, 2009 WL 1492178, at *2 (E.D. Pa. May 26, 2009).

[61] *Prusky v. Prudential Ins. Co. of America*, 44 F. App'x 545, 548 n.1 (3d Cir. 2002) (quoting *Bhatnagar v. Surrendra Overseas Ltd.*, 52 F.3d 1220, 1231 (3d Cir.1995)).

[62] *Samuel v. Carroll*, 505 F. Supp. 2d 256, 261 (D. Del. 2007) (quoting *Brambles U.S.A, Inc. v. Blocker*, 735 F. Supp. 1239, 1240 (D. Del. 1990)) (internal citation omitted).

[63] *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (quoting *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985)).

to prevent manifest injustice."[64]  None of the Movants has invoked either of the first two prongs. To show clear error or manifest injustice on a motion for reconsideration, the movant must base its motion on arguments that were previously raised but were overlooked by the court, or that the parties had no notice were relevant to the matter before the court; parties are not free simply to relitigate issues that were squarely before the court and that the court has already decided.[65]

46.    Reconsideration is available under Rule 59(e) to correct a purported error of law only if the "'error . . . is plain and indisputable, and . . . amounts to a complete disregard of the controlling law or the credible evidence in the record.'"[66]  Where the basis for reconsideration is an assertion of manifest injustice, "the [moving] party must persuade the court not only that its prior decision was wrong, 'but that it was clearly wrong and that adherence to the decision would create a manifest injustice.'"[67]  Proving manifest injustice is a heavy burden, requiring the movant to show that the record is "so patently unfair and tainted that the error is manifestly clear to all who view it."[68]  "Mere dissatisfaction with the Court's factual or legal rulings . . . does not

---

[64] *Id.* (citing *North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995)).  The Bondholders cite *Meridian Automotive* for the proposition that a court will grant a motion for reconsideration "if it appears that the court has patently misunderstood a party, has made a decision outside the adversarial issues presented by the parties, or has made an error not of reasoning, but of apprehension," Bondholders U.S. Br. at 7-8 (quoting *Meridian Automotive*, 2008 WL 141160, at *1), without noting that the same paragraph of that decision indicates that a Rule 59(e) motion is "extraordinary" and restricted to cases in which the movant establishes at least one of the three specific grounds discussed above, *Meridian Automotive*, 2008 WL 141160, at *1 (citing *North River Ins.*, 52 F.3d at 1218 and *Harsco*, 779 F.2d at 908).

[65] *United States v. Jasin*, 292 F. Supp. 2d 670, 676 (E.D. Pa. 2003).

[66] *In re InnovaSystems, Inc.*, No. 11-36228-ABA, 2015 WL 2399200, at *2 (Bankr. D.N.J. May 18, 2015) (quoting *In re Titus*, 479 B.R. 362, 368 (Bankr. W.D. Pa. 2012)).  Reconsideration based on legal error is not available at all under Rule 60(b).  *Smith v. Evans*, 853 F.2d 155, 158 (3d Cir. 1988).

[67] *Broad. Music, Inc. v. Crocodile Rock Corp.*, Civ. A. 12-4945, 2014 WL 3953182, at *1 (E.D. Pa. Aug. 12, 2014) (quoting *In re City of Phila. Litig.*, 158 F.3d 711, 720-21 (3d. Cir. 1998)).

[68] *In re Titus*, 479 B.R. 362, 367-68 (Bankr. W.D. Pa. 2012) (quoting *In re Roemmele*, 466 B.R. 706, 712 (Bankr. E.D. Pa. 2012)).

meet the manifest injustice standard; the motion for reconsideration should be more than a forum to express dissatisfaction with the result ordered in the Court's opinion."[69]

47.     Even if Rule 60(b) could apply, the Movants do not specify the subsection of Rule 60(b) on which they rely.  The only section that could possibly apply is Rule 60(b)(6), permitting reconsideration of a judgment on the basis of "any other reason that justifies relief."  Despite the seeming breadth of this clause, however, it is well settled that "only 'extraordinary, and special circumstances' justify relief under Rule 60(b)(6)."[70]  Such extraordinary and special circumstances have been found, for example, where action by the government, the courts or a party's own counsel made it impossible for the party to file a timely appeal.[71]  Rule 60(b)(6) serves as a safety valve where the aggrieved party would otherwise have no means to seek review—not a substitute for appeal.[72]  None of those bases is applicable here.

### 2.     Clarification

48.     The Movants also purport to seek clarification under Rules 52(b)[73] and 60(a),[74] and the court's inherent power to clarify its decisions.[75]  Rule 52 permits amendment to add additional findings of fact consistent with the court's result, and Rule 60(a) is limited to the

---

[69] *Kansas City Fire & Marine Ins. Co. v. Consolidated Rail Corp.*, No. 97-8134, 1999 WL 497232, at *1 (E.D. Pa. July 14, 1999).

[70] *Pridgen v. Shannon*, 380 F.3d 721, 728 (3d Cir. 2004) (quoting *Page v. Schweiker*, 786 F.2d 150, 158 (3d Cir. 1986)).

[71] Wright & Miller, Federal Practice & Procedure § 2864.

[72] *Martinez–McBean v. Gov't of V.I.*, 562 F.2d 908, 911 (3d Cir.1977) ("[I]t is improper to grant relief under Rule 60(b)(6) if the aggrieved party could have reasonably sought the same relief by means of appeal.").

[73] Law Debenture U.S. Br. at 2.

[74] U.S. Debtors U.S. Br. at 15; Law Debenture U.S. Br. at 6.

[75] U.S. Debtors U.S. Br. at 15; Bondholders U.S. Br. at 7.

correction of "clerical mistakes,"[76] such as those that are "mechanical in nature, apparent on the record, and not involving an error of substantive judgment."[77]  The cases cited by the U.S. Debtors that grant motions for clarification on the basis of inherent authority do so without altering the outcome of the earlier orders.[78]  Seeking a change in result is not the purpose of a motion for clarification.[79]

### B.    Applicable Canadian Law

1.    Reconsideration

49.    While the Canadian Court retains broad discretion to change a judgment before it is formally entered,[80] that discretion should be resorted to "sparingly and with the greatest care" to avoid fraud and abuse of the court's process.[81]  Also, "[l]itigation by instalments is not to be

---

[76] *Pfizer Inc. v. Uprichard*, 422 F.3d 124, 129-30 (3d Cir.2005).

[77] *Mack Trucks, Inc. v. Int'l Union*, UAW, 856 F.2d 579, 594 n. 16 (3d Cir. 1988) (quoting *Gilbreth Int'l Corp. v. Lionel Leisure, Inc.*, 645 F. Supp. 732, 734 (E.D. Pa. 1986)).

[78] U.S. Debtors U.S. Br. at 15 (citing *Accenture Global Srvs., GmbH v. Guideware Software, Inc.*, 800 F. Supp. 2d 613 (D. Del. 2011) and *Morningred v. Delta Family-Care & Survivorship Plan*, 790 F. Supp. 2d 177 (D. Del. 2011)).

[79] *See, e.g., Formax, Inc. v. Alkar-Rapidpak-MP Equipment, Inc.*, No. 11-C-298, 2011 WL 4344238 at *1-2 (E.D. Wis. Sept. 14, 2011) (denying defendant's motion for clarification because it was "asking the Court to reconsider its opinion and reverse itself" and failed to "show a need to correct manifest errors of law or fact"); *Integrated Tech. Corp. v. Rudolph Techs., Inc.*, No. CV-09-02182, 2010 WL 8545468, at *1 (D. Ariz. Sept. 2, 2010) ("[Defendant] seeks a 'clarification' directly contrary to the Court's ruling. Rather than a clarification, [Defendant] is actually seeking reconsideration.  Thus, the request for clarification will be denied.").

[80] The U.S. Debtors reference *Holmes Foundry Ltd. v. Point Edward (Village)*, [1963] 2 O.R. 404 (Ont. C.A.) in their factum, but in that case the scope of the power to reconsider was not argued.

[81] *671122 Ontario Ltd. v. Sagaz Industries Canada Inc.*, [2001] 2 S.C.R. 983 at para. 61, citing *Clayton v. British American Securities Ltd.*, [1935] 1 D.L.R. 432 at 440-441 (B.C.C.A.); *Montague v. Bank of Nova Scotia*, 2004 CarswellOnt 11 at para. 40 (C.A.).

encouraged.  There is a strong interest in finality, which should only be departed from in exceptional circumstances."[82]

50.    The U.S. Debtors rely on one line in one decision, which has received little judicial consideration and none on this point, for their assertion at paragraph 25 of their factum that "the issue of finality does not apply" because there has been no formal order.[83]  But several appellate courts, including the Prince Edward Island Supreme Court - Appeal Division in *UAP Inc. v. Oak Tree Centre Inc.*, on which the U.S. Debtors rely at paragraph 30 of their factum addressed to the Canadian Court, have noted the importance of finality in the context of applications for reconsideration prior to entry of the formal judgment.[84]  As the Newfoundland and Labrador Court of Appeal explained in comparing reconsideration before the order has been filed with reconsideration after entry of the formal order: "Since the Court is not *functus officio* before the final order has been filed, the limits on a reconsideration application may be eased somewhat.  However, a decision having been rendered, the principle of finality continues to apply."[85]

51.    Deliberate tactical decisions not to adduce evidence cannot be remedied through an application to re-open the hearing.[86]  Once a theory of the case has been advanced, the trial judge may apply that theory without arriving at exactly the result advocated by either party.[87]

---

[82] *Risorto v. State Farm Mutual Automobile Insurance Co.* (2009), 70 C.P.C. (6th) 390 at para. 35 (Div. Ct).

[83] *Metropolitan Toronto Condominium Corp. 626 v. Bloor/Avenue Road Investment Inc.*, [2009] O.J. No. 1205 at para. 31 (S.C.J.).

[84] *UAP Inc. v. Oak Tree Auto Centre Inc.*, 2003 PESCAD 6 at para. 4 (P.E.I. S.C. (A.D.)).

[85] *Metal World Inc. v. Pennecon Energy Ltd.*, 2014 NLCA 10 at para. 18; *see also id.* at para. 19.

[86] *Risorto v. State Farm Mutual Automobile Insurance Co.* (2009), 70 C.P.C. (6th) 390 at para. 55 (Div. Ct); *Lo v. Ho*, [2010] O.J. No. 1055 at paras. 27-30 (S.C.J.).

52.     The U.S. Debtors' argument at paragraph 30 of their factum to the Canadian

Court that the parties did not have the opportunity to make submissions on the allocation

methodology is unsupported by the record, as shown above.  The authorities on which the U.S.

Debtors rely are either cases in which the court actually denied reconsideration on the basis that

counsel had had the opportunity to address all relevant points at the original hearing,[88] as did the

Movants here, or are distinguishable from the present case.

53.     *UAP Inc. v. Oak Tree Auto Centre Inc.* is such an example of a distinguishable

case.  There, the Prince Edward Island Supreme Court - Appeal Division found the "special and

exceptional circumstances" necessary to allow for a reconsideration existed where the appellate

court awarded pre-judgment interest without the benefit of any submissions from counsel on the

interest point[89] without knowing that, at trial, the parties had entered into an agreement that the

plaintiff would not be entitled to prejudgment interest for a certain period.[90]  The Movants have

not identified anything analogous that applies to the Decisions.

54.     A change should be made on reconsideration only if it is either technical (such as

to correct an arithmetic error) or necessary to avoid a miscarriage of justice.[91]  Miscarriage of

justice goes to the integrity of the judicial process; it means "such departure from the rules which

permeate all judicial procedure as to make that which happened not in the proper use of the word

---

[87] *Barker v. Montfort Hospital*, 2007 ONCA 282 at para. 21, leave to appeal refused, 2007 CanLII 41867 (SCC); *Oshawa Group Ltd. v. Mason Homes Ltd.*, 2005 CanLII 36443 (Ont. C.A.); *Sirisena v. Oakdale Village Homes Inc.*, 2013 ONSC 1051 at paras. 33-37 (Div. Ct).

[88] *Compton Agro Inc. (Trustee of) v. Canada (Attorney General)*, 2000 MBCA 29 at para. 3.

[89] *UAP Inc. v. Oak Tree Auto Centre Inc.*, 2003 PESCAD 6 at para. 5 (P.E.I. S.C. (A.D.)).

[90] *Id.*

[91] *Brown v. The Municipal Property Assessment Corp.*, 2014 ONSC 7137 at para. 20 (Div. Ct), citing *Clayton v. British American Securities Ltd.*, [1935] 1 D.L.R. 432 at 440-441 (B.C.C.A.).

judicial procedure at all,"[92] not merely a finding that a different result might have occurred.[93] The party seeking reconsideration in such circumstances must establish that "the integrity of the litigation process is at risk unless it occurs, or that there is some principle of justice at stake that would override the value of finality in litigation, or that some miscarriage of justice would occur if such a reconsideration did not take place."[94]

55.    Reconsideration is not an alternative method of appeal.  The efficient and fair administration of justice requires that orders be final once pronounced, subject only to appeal; there is no general right to re-open.[95]  Appeal, and not a motion for reconsideration, is the appropriate means of challenging a decision of a court that does not adopt wholesale a particular party's contentions.[96]

### 2.    Clarification

56.    Clarification may be given where the original judgment "was so expressed as to lead to uncertainty and confusion"[97] or contains a latent ambiguity.[98]  Clarification is not to be

---

[92] *Robins v. National Trust Co. Ltd.*, [1927] 2 D.L.R. 97 at para. 7 (P.C.), aff'g 57 O.L.R. 46 (C.A.); see also *Bassi v. Bassi*, 2013 BCCA 422 at paras. 27-29, citing this case.

[93] *Degroote v. Canadian Imperial Bank of Commerce*, [1998] O.J. No. 1696 (Gen. Div.) at para. 11; aff'd [1999] O.J. No. 2313 at paras. 3-4 (C.A.).

[94] *Schmuck v. Reynolds-Schmuck*, 2000 CarswellOnt 202 at para. 25 (S.C.J.).

[95] *Aquiline Resources Inc. v. Wilson*, [2005] B.C.J. No. 2299 at paras. 7-8 (S.C.), citing *Kemp v. Wittenberg*, [1999] B.C.J. No. 810 at para. 5 (S.C.).

[96] *Metal World Inc. v. Pennecon Energy Ltd.*, 2014 NLCA 10 at para. 19 ("In summary, the fundamental principle of finality applies to decisions and orders of the court.  It is expected that the issues, whether at trial, on an application, or on appeal, will be fully and accurately canvassed in the first instance.  The necessity for and appropriateness of a reconsideration will arise only where an exception to the general rule may apply.  As discussed above, such exceptions are limited in scope.  The Court will not grant a reconsideration request where what is being sought is effectively a further appeal by another name.").

[97] *Fame Construction Ltd. v. 430863 Ltd.*, [1997] B.C.J. No. 1053 at para. 4, citing *Sykes v. Sykes* (1995), 6 B.C.L.R. (3d) 296 at 300-301 (C.A.).

[98] *Buckley v. British Columbia Teacher's Federation*, [1995] B.C.J. No. 2971 at para. 17 (C.A.).

confused with an impermissible request to have the judgment altered.[99]  The endorsement of a

panel of the Ontario Court of Appeal, cited at paragraph 31 of the U.S. Debtors' factum,

explaining how its decision to allow the appeal "with costs" applied to the disposition of the

costs in the lower court, illustrates the proper use of clarification.

## ARGUMENT

## I.    THE MOVANTS HAVE NOT ESTABLISHED GROUNDS FOR RECONSIDERATION UNDER EITHER U.S. OR CANADIAN LAW

57.    The U.S. Debtors (joined by the UCC) seek reconsideration to make two changes

to the Decisions:  inclusion of the bond guarantee claims for allocation purposes and a 100%

allocation of what they now say is the value of NGS and Diamondware to the U.S. Debtors.[100]

Neither request for relief should be granted.

58.    The Movants fail to discharge the heavy burden of showing that reconsideration is

necessary to prevent manifest injustice.[101]  The Movants' attempts to have the Courts rewrite

certain aspects of the Decisions on the basis of supposed injustice are really a transparent attack

on Courts' judgment that does not justify reconsideration.

59.    Even if the Courts were inclined to entertain a request for reconsideration or

clarification, the history of these proceedings shows that granting any of the Motions likely

would trigger further motions to reconsider the reconsideration decisions, to account for other

"unique" variables particular to one Debtor Estate or another or to revisit the Decisions based on

subsequent developments in the various claims processes.  Further motion practice on these

---

[99] *Cheema v. Cheema*, 2001 BCSC 298 at paras. 14-16.

[100] Law Debenture's request for "partial reconsideration" if the Courts have not provided for individual Debtors to have separate allocations from the Lockbox is addressed below.

[101] To the extent they allege an error of law with respect to the amount at which guarantee claims are allowed or on which they receive distributions, that issue is irrelevant to allocation and therefore not a basis for reconsideration.

Decisions will only delay application of the Courts' guiding principles for achieving a fair allocation and, ultimately, distributions to creditors. Preventing such chaos is the very basis for the high standard required for reconsideration, and the Motions therefore should be denied.[102]

### A. The Treatment of Bondholder Guarantee Claims and of NGS and Diamondware Are Consistent with the Rationale of the Decisions

60. There was nothing inadvertent in the Courts' exclusion of the bondholder guarantee claims from the claims pools used to determine allocation.[103] The Courts concluded that the best way to reflect Nortel's pre-petition reality in the allocation methodology was to allocate to each the Debtor Estates a proportional share of the Lockbox based on creditors' claims that arose from their operations as part of Nortel's matrix organization.[104] The exclusion of guarantee claims from the allocation claims pool is consistent with the principle of pro rata allocation based on pre-filing creditor claims to recognize the contribution of those creditors to the value of the Nortel Group as a whole, and thus to the assets that were sold.[105] While there is

---

[102] *See Anthanassious*, 418 F. App'x at 96; *Risorto v. State Farm Mutual Automobile Insurance Co.* (2009), 70 C.P.C. (6th) 390 at para. 35 (Div. Ct).

[103] The Movants' focus on the guaranteed bonds obscures the fact that NNL is also subject to substantial guarantee obligations that are affected by the Decisions' exclusion of such claims for the purposes of allocation, including: (i) a guarantee in respect of the 7.875% bonds issued by NNCC in the principal amount of $150 million; and (ii) guarantees of various lease obligations of NNI, NNUK and NNSA with a pending as-filed or accepted value of approximately $440 million as at April 2014. April 25, 2014 Reply Affidavit of Sharon Hamilton (TR00010A) ¶ 23; Law Debenture Cdn. Factum ¶¶ 3-4. Significantly, NNL is also a guarantor of the bond debt issued by NNC in the principal amount of $1.15 billion, and NNC is a guarantor of the bond debt issued by NNL in the principal amount of $2.675 billion. January 14, 2009 Report of Ernst & Young Inc. (TR40136) ¶¶ 51-52.

[104] *See* U.S. Opinion at 97 ("Pro rata allocation takes into account Nortel's operations as a unified endeavor. The pro rata allocation model reflects the underlying economics of the 'One Nortel' integrated global business."), 105-06; Canadian Reasons for Judgment ¶¶ 197, 201-02.

[105] The Decisions create an exception to the treatment of guarantee claims with respect to the UKPC's claim that the Canadian Court allowed against the Canadian Debtors. This claim is more akin to the intercompany claims between Debtor Estates that are being included in the claims pool for Allocation Purposes. *See* Canadian Reasons for Judgment ¶ 249. It is for the

no doubt that the Bondholders contributed significant value—$4 billion that was used to finance the group's operations—that value was contributed only once, to the Canadian issuers.[106] Including the guarantee claims for purposes of allocation would treat the Bondholders as having contributed a multiple of $4 billion in value, which is simply not the case. Notably, the Bondholders themselves have not sought reconsideration of the Decisions on the basis that their guarantee claims do not count toward allocation.

61. Similarly, the Courts made factual findings about the integrated nature of Nortel's operations that are consistent with the treatment NGS and Diamondware as part of "One Nortel."[107] Contrary to the U.S. Debtors' contention (based on no sworn facts, let alone trial evidence) that NGS and Diamondware "were not integrated into the Nortel Group," and

---

guaranteed portion of certain pre-filing pension funding obligations to the NNUK pension plan, which directly reduces the pension funding claims made by the UKPC in the EMEA Estate.

[106] Law Debenture Cdn. Factum ¶¶ 3-4. Conversely, in the case of the $150 million note issued by NNCC, the proceeds were contributed only once and should only count once in the allocation claims pool for the U.S. Estate.

[107] The U.S. Debtors also contend that they are entitled to an allocation specifically on account of the sale of its subsidiaries NGS and Diamondware as part of the Enterprise sale because, as part of a claims settlement, the PBGC was granted a lien over a portion of the proceeds of that sale. This cannot be a basis for reconsideration of the Decisions for at least two reasons. First, despite the claims settlement having been approved on October 3, 2009, four and a half years prior to the allocation trial, the U.S. Debtors never contended in the course of the trial that the settlement was relevant to allocation. Reconsideration on the basis that the settlement should have been considered is therefore unavailable. Second, the PBGC claims settlement itself provides for an allocation procedure, to be conducted by the U.S. Court alone, to determine the proceeds from the Lockbox to which its lien should be deemed to attach. Stipulation Between NNI and the PBGC [D.I.1639, Exhibit B] ¶ 5 ("[T]he Enterprise Proceeds allocated to the US Debtors (the "US Proceeds") will continue to be held in escrow until such time as: (i) the Share Sale Proceeds are determined pursuant to an order of the Bankruptcy Court or other allocation procedures as may be approved by the Bankruptcy Court; and (ii) the PBGC Lien is determined."). Nothing in the Decisions supersedes the settlement provisions, which were subject to the decision on allocation, and this claims issue may therefore be addressed as part of the U.S. claims process in accordance with the terms of the parties' agreement and the U.S. Court's order approving the PBGC claims settlement once the U.S. Estate receives its allocation from the Lockbox.

therefore should not be included in an allocation made on the "One Nortel" principles,[108] the

recitals to the Asset Sale Agreement for the sale of the Enterprise business to Avaya state that

NGS and Diamondware "beneficially own[ed] and operate[d] the [Enterprise] Business"[109]

together with the selling Debtors.[110]  No separate purchase price was paid for the NGS and

Diamondware shares as part of the Enterprise line of business sale;  rather, the purchase price

was payable "in consideration of the sale of the Assets and the Shares."[111]

---

[108] U.S. Debtors U.S. Br. at 21; U.S. Debtors Cdn. Factum ¶ 43.

[109] Notably, the definition of "Business" in the Enterprise Amended and Restated Asset and Share Sale Agreement ("Enterprise ASA") (TR44163) specifically excludes LG-Nortel and NN Turkey (*i.e.*, NETAS), Enterprise ASA (TR44163) at 9, two of the purported single-estate asset analogues to NGS and Diamondware the U.S. Debtors point to in support of their contention that they should receive an allocation for NGS and Diamondware, U.S. Debtors U.S. Br. at 21, U.S. Debtors Cdn. Factum ¶ 5(b).  Like the Canadian Debtors and the EMEA Debtors, the U.S. Debtors have sold various assets owned by U.S. Debtor entities, including equity interests, in separate sales and retained the proceeds for the sole benefit of the U.S. Estate and its creditors: (i) the U.S. Debtors' 15.6% equity interest in Blade Technologies, Inc., sold to International Business Machines Corporation (consideration received filed under seal) [D.I. 4025 & 4162]; (ii) IP addresses sold to Microsoft Corporation for $7,500,000 [D.I. 5143 & 5315]; (iii) NNI's Richardson campus sold to Pillar Commercial, LLC, for $43,100,000 [D.I. 5256 & 5403]; and (iv) various minority equity interests in technology companies and 21 venture capital investments.  Similarly, like the Canadian Debtors (in the case of GDNT) and the EMEA Debtors, the U.S. Debtors also have various non-debtor subsidiaries that have been or will be wound up, with any equity valued being distributed to the parent U.S. Debtor entity for the benefit of its creditors.

[110] Enterprise Amended and Restated Asset and Share Sale Agreement among the various Nortel sellers and Avaya dated September 14, 2009 ("Enterprise ASA") [D.I.1514, Exhibit A] (TR44163) at 1; *see also* July 30, 2009 Affidavit of George Reidel in Support of Approval of Enterprise Sale [D.I. 1248] ¶ 15 ("NGS performs the role of a systems integrator and *channel for Nortel's Enterprise products* in the US Federal government markets.") (emphasis added).

[111] Enterprise ASA § 2.2.1(a).  In what one can only hope was simply a glaring oversight, the $331 million the U.S. Debtors seek to be allocated on account of NGS and Diamondware, which they state to be the book value of the subsidiaries, U.S. Debtors U.S. Br. at 22; U.S. Debtors Cdn. Factum ¶ 44, has not been reduced by the $53 million the U.S. Debtors have already received from the Enterprise sale proceeds escrow account on account of the cash on hand holdings of NGS pursuant to a previous inter-Debtor Estate settlement.  Agreement on Transfer Pricing Amendments and Certain Other Matters dated September 8, 2011 [D.I. 6195, Exhibit A] ¶ 6; *see also* U.S. Debtors' Motion for Entry of an Order Approving Adjustments to Certain Intercompany Agreements [D.I. 6137] at 8-9.  As total net Enterprise sale proceeds remaining as

62.     Moreover, pointing to Mr. Green's ownership-based valuation (which would have allocated the value of NGS and Diamondware to the U.S. Debtors because NNI alone owned the shares of these entities)[112] is of no assistance because the Courts rejected the ownership approach to allocation.  Indeed, the U.S. Debtors' own approach to allocation did not purport to allocate the book value of the NGS and Diamondware shares to the U.S. Debtors, as they now request. Having urged rejection of Mr. Green's evidence, including his treatment of NGS and Diamondware, and having proposed no separate allocation of NGS and Diamondware to themselves either in their own theory or as a fallback alternative if pro rata were accepted, the U.S. Debtors cannot do so now.

**B.      The Movants Cannot Rely on Potential Creditor Recoveries to Establish that the Courts' Decisions Result in "Manifest Injustice" and Thus Justify Reconsideration**

1.      The Movants' Attempts to Manufacture Inconsistency by Mischaracterizing the Decisions Should Be Rejected

63.     The Movants' attempts to recharacterize the Courts' Decisions, and then criticize them for potentially resulting in hypothetical creditor recoveries inconsistent with that recharacterization, must fail.  Select phrases of the Decisions, quoted out of context by the Movants, do not change what was decided by the Courts.

64.     For example, the U.S. Debtors' suggestion that the U.S. Court intended (but failed) to achieve a "middle ground" among the various allocation theories is wrong—nothing in

---

at December 31, 2013, were $842.84 million, April 11, 2014 Affidavit of Sharon Hamilton (TR00009A) ¶ 47, the U.S. Debtors seek more than 39% of the remaining Enterprise sale proceeds on account of NGS/Diamondware.

[112] Mr. Green valued NGS and Diamondware at $110.97 million.  Green Expert Report, Exhibit D-1 [D.I. 13795] (TR00042).  At trial, the Movants offered no evidence contesting Mr. Green's valuation of NGS and Diamondware, but now contend they are entitled to almost three times as much.

either Decision suggests the Courts intended to reach a "middle ground" and neither Court used the term "middle ground" to describe the modified pro rata allocation.

65.     The U.S. Debtors argue that the U.S. Opinion was guided by the "undeniable fact that NNI generated the lion's share of enterprise-wide revenues" and that the result the U.S. Court actually reached cannot be reconciled with that premise.[113]  They seek to turn the U.S. Opinion on its head; allocation to the U.S. Debtors on the basis of their role in generating a significant share of Nortel's worldwide revenues was, as a stand-alone theory, rejected.  The U.S. Court noted, however, that the U.S. Debtors' generation of revenue resulted in value for their creditors through the $2 Billion Claim granted to NNI against NNL and the Courts' decision to leave each of the Debtor Estates with its cash on hand.[114]  The U.S. Debtors have the "lion's share" of cash on hand precisely because of the revenues they generated while operating as part of the Nortel Group, which resulted in significant funds being left with the U.S. Debtors when the various Debtors commenced insolvency proceedings and the operation of Nortel's transfer pricing regime largely ceased.  Thus, the reconsideration sought by the Movants cannot be justified based on mischaracterization of the Decisions.

> 2.     The Movants May Not Obtain Reconsideration on the Basis of Hypothetical Creditor Outcomes Where They Have Consistently Opposed the Presentation of Evidence on Claims Pools and Potential Creditor Recoveries

66.     The Movants cannot justify reconsideration by pointing to hypothetical creditor recoveries and then asking for changes to the Decisions to boost their creditor recoveries. Creditor outcomes cannot form the basis for reconsideration because, as the Movants admit, they

---

[113] U.S. Debtors U.S. Br. at 8.

[114] U.S. Opinion at 63 (concluding that the U.S. Debtors' allocation theory "based on revenue" was "already baked into the case by virtue of the [$2 billion] IFSA inter-company claim").

never presented any such evidence at trial.[115]  The Movants had ample opportunity to present their own analysis of the U.S. claims pool and potential creditor recoveries, but declined to do so.[116]  In the UCC's opening argument, it asserted that "what a particular allocation methodology yields in terms of creditor recoveries, that is just not relevant to the question of the allocation that the estates are entitled to."[117]  Having asked the Courts to ignore creditor outcomes, the Movants cannot now seek reconsideration on the basis of what creditor outcomes might be.  Reconsideration is not "'a means to argue new facts or issues that inexcusably were not presented to the court in the matter previously decided.'"[118]

67.    Indeed, the Movants' efforts to limit evidence on claims pools and ultimate creditor recoveries were not limited to the allocation trial.  Such efforts by the U.S. Debtors, the UCC and the Bondholders continued after trial in the litigation of the U.S. post-petition interest dispute and subsequent settlement motion pursuant to Bankruptcy Rule 9019, in which they relied on uncertainties in claims pools to obtain the U.S. Court's rejection of Dr. Wertheim's

---

[115] U.S. Debtors U.S. Brief at 7 n.11 ("[T]he U.S. Debtors cite to Mr. Britven's analysis since his calculation of creditor recoveries was the only one presented to the Court[s].");  UCC U.S. Joinder at 5 ("[A] full record on claims was not developed during the allocation trial.").

[116] In arguing for reconsideration on the basis of the hypothetical creditor outcomes, the U.S. Debtors also erroneously suggest that the former employees of the U.S. Debtors are differently situated from those of the Canadian Debtors. *See* U.S. Debtors U.S. Br. at 10; U.S. Debtors Cdn. Factum ¶¶ 3, 42.  In fact, former U.S. employees, like former employees of the Canadian and EMEA Debtors, are receiving pension benefits funded by pre-petition employer contributions to their pension plans and government insurance programs  (such as the PBGC), in addition to any distributions they may receive on account of direct claims for employee benefits that do not have the benefit of such insurance.  There are insufficient facts available, let alone in the trial record, for any meaningful calculation of the likely actual returns to individual pensioners, and reconsideration is therefore unwarranted on this basis.

[117] May 13, 2014 (Day 2) Trial Tr. (UCC Opening) 353:22-354:1.

[118] *Samuel*, 505 F. Supp. 2d at 261 (quoting *Brambles*, 735 F. Supp. at 1240); *see also Risorto v. State Farm Mutual Automobile Insurance Co.* (2009), 70 C.P.C. (6th) 390 at para. 55 (Div. Ct); *Lo v. Ho*, [2010] O.J. No. 1055 at paras. 27-30 (S.C.J.).

analysis of the settlement.[119]  Binding case law from the Third Circuit prohibits the U.S. Debtors

from making a contrary argument now when they think it serves them.[120]

> 3.   The Movants' Request for Reconsideration on the Basis of an
> Analysis of Potential Creditor Recoveries They Characterize as
> Unreliable Should be Rejected

68.    Reconsideration designed to boost recoveries to U.S. Creditors is particularly

unwarranted where the very basis for the Movants' result-based contention of manifest injustice

is an analysis that they themselves repeatedly insist is unreliable.[121]  Throughout the allocation

trial, the Movants faulted Mr. Britven's reliance on estimated claims pools to measure ultimate

creditor recoveries, and extensively cross-examined Mr. Bazelon on variations on the pro rata

theory that the Courts could adopt.[122]  The Movants argued vociferously that actual creditor

recoveries are completely uncertain and should not be taken into account by the Courts when

considering allocation.[123]  Having made these arguments, which the Courts considered,[124]

Movants cannot rely on them in support of reconsideration.

---

[119] *See, e.g.*, U.S. Debtors Reply in Support of 9019 Motion [D.I. 14652] ¶ 47 ("The Wertheim Report fails to prove its stated conclusion, but it does prove another—that, absent a fuller understanding of the Canadian Debtors' and US Debtors' claims and assets, it is impossible to calculate the precise amount of assets that will be available for post-petition interest with certainty."); U.S. Court 9019 Opinion [D.I. 14949] at 39-40 ("Analysis of the kind attempted by Dr. Wertheim relies on a number of factors which are unknown and perhaps unknowable at this point in time.").

[120] *Prusky*, 44 F. App'x at 548 n.1 (quoting *Bhatnagar*, 52 F.3d at 1231) (The purpose of a motion for reconsideration "is not to allow a party to 'simply change[ ] theories and [try] again,' thus giving them 'a second bite at the apple.'"); *see also Risorto v. State Farm Mutual Automobile Insurance Co.* (2009), 70 C.P.C. (6th) 390 at para. 55 (Div. Ct); *Lo v. Ho*, [2010] O.J. No. 1055 at paras. 27-30 (S.C.J.).

[121] *See, e.g.*, U.S. Debtors U.S. Br. at 3 n.5, 10 n.13 and Exhibit A; UCC U.S. Joinder at 3.

[122] *See, e.g.*, June 5, 2014 (Day 13) Trial Tr. (Bazelon) 3035:6-3060:16; June 6, 2014 (Day 14) Trial Tr. (Britven) 3481:8-3488:23.

[123] *See, e.g.*, September 23, 2014 (Day 23) Trial Tr. (U.S. Debtors' Closing Argument) 5584:7-19, 5595:7-15, 5599:5-19, 5600:4-5601:13; Bondholder Group Initial Post-Trial Brief [D.I. 14258] ¶ 19 ("Britven's calculation is entirely dependent on unproven assumptions, provided by

69.     Moreover, the U.S. Debtors' combination of their own revised calculations with out-of-context and partial quotations from the U.S. Opinion should not be permitted to obscure that the actual results for U.S. creditors will be derived from all sources of recovery, notably the $2 Billion Claim, cash on hand and other assets of the U.S. Debtors.  An analysis that does not take those factors into account cannot meet the Movants' heavy burden to demonstrate that the Decisions work a manifest injustice.

70.     In any event, the U.S. Debtors are unable to manufacture anything close to manifestly unjust recoveries to creditors of the U.S. Estate.  The Illustrative Total Recovery for Unsecured Creditors on page A-2 of the U.S. Debtors U.S. Brief produces anticipated recoveries of 40% to general unsecured creditors of the U.S. Estate as compared to 49% to unsecured creditors of the Canadian Estate and 65% to unsecured creditors for the EMEA Estate, and the Guaranteed Bondholders are anticipated to recover 89%.  Such recoveries to general unsecured creditors cannot be analogized to the cases in which manifest injustice has been found.[125]

4.     The Uncertainty Over Creditor Recoveries Weighs Against
       Reconsideration

71.     The Movants cannot demonstrate "manifest injustice" where even they concede that "ultimate recoveries remain subject to the final determination of each Debtor Estate's claims

---

counsel, that were used to estimate claim amounts that ultimately would be allowed against each of the Debtors' estates.  During cross-examination, Britven conceded that, if the final quantum of claims is different than what he had chosen and presented to the Courts, the recovery percentages he calculated would change across the board. In some cases, this could produce 'billion-dollar plus adjustment[s]' to his calculation.") (internal citations to trial evidence omitted).

[124] U.S. Opinion at 106-07, 111-12; Canadian Reasons for Judgment ¶¶ 226-28.

[125] *See, e.g.*, *Meridian Automotive*, 2008 WL141160, at *2 (granting reconsideration to correct "manifest injustice" of dismissal of complaint due to procedural error by debtor that, if not reconsidered, would prevent *any* recovery for the benefit of its creditors on the asserted claims); *In re Zilog, Inc.*, 450 F.3d 996 (9th Cir. 2006) (holding failure of confirmation order to "to provide for the presentation and adjudication of claims arising between April 30 and May 13," resulting in dismissal of claim that arose during that period, was manifestly unjust).

pool and other contingencies."[126]  Reconsidering the Courts' allocation principles now, based on the U.S. Debtors' "illustrative analysis" of ultimate outcomes, invites repeated rounds of reconsideration motions as claims are resolved, and risks making an adjustment that is ultimately detrimental in ways that cannot yet be foreseen, as claims remain unknown and unknowable.[127]

### C.  The Movants Have Not Identified Any Error of Law Requiring Reconsideration of the Decisions

72.    The only purported error of law asserted by any of the Movants[128] relates to certain references to the Bondholders' guarantee claims against the Debtor Estates, which the Movants suggest are related to what is to be distributed to Bondholders on their guarantee claims.[129]  This is a red herring because distribution on those claims is a matter for the U.S. Court in the U.S. Debtors' claims and distribution processes and the Canadian Court in the Canadian Debtors' claims and distribution process, not the allocation proceedings.

73.    The Bondholders, joined by BoNY and Law Debenture,[130] assert that an error of law was made with respect to the statements in each Decision that they contend could call into question the allowance of their guarantee claims against the U.S. Debtors in full.[131]  As the

---

[126] U.S. Debtors U.S. Brief at 3 n.5.

[127] U.S. Court 9019 Opinion at 39-40.

[128] The U.S. Debtors disclaim any request for reconsideration on the basis of an error of law. U.S. Debtors U.S. Br. at 2, U.S. Debtors Cdn. Factum ¶ 2 ("[W]hile the U.S. Debtors do not agree with the legal basis and supposedly equitable nature of a pro rata allocation approach in lieu of an economic valuation consistent with ownership interests, the U.S. Debtors do not seek to rehash these larger issues through this Motion.").

[129] Bondholders U.S. Br. at 2 n.3; Bondholders Cdn. Written Submissions ¶¶ 1, 12; Law Debenture Cdn. Factum ¶ 2.

[130] BoNY U.S. Joinder at 1; Law Debenture Cdn. Factum ¶¶ 11-13.

[131] Bondholders U.S. Br. at 2; Bondholder Cdn. Written Submissions ¶¶ 9-11.  The U.S. Debtors and UCC also contend that any reduction in the Bondholders' guarantee claims would be contrary to controlling law, but seek no relief on that basis.  U.S. Debtors U.S. Br. at 17; U.S. Debtors Cdn. Factum ¶¶ 36-39; UCC U.S. Joinder at 5.  Before the Canadian Court, the UCC

Bondholders themselves emphasize, however, the U.S. and Canadian Courts' Decisions are concerned with allocation of the proceeds of the Lockbox, not with the allowance of claims and the distributions that will occur on account of those claims, and the Bondholders, BoNY and Law Debenture seek no change to the principles of allocation.[132]  The Canadian Debtors and the Monitor agree that the Decisions extend only to allocation.

74.    Statements made by the Courts about what the ultimate distribution may be, when read fairly, have nothing to do with the quantum of the Bondholders' allowed claims, but merely acknowledge the bedrock principle that even when claiming on both a principal and a guarantor, a claimant can recover no more than 100 cents on the dollar.[133]  The U.S. Court observed that at the distribution stage, "the guarantees will be entitled to seek distribution from the appropriate Debtor of any deficiency resulting from the allocation."[134]  The Canadian Court used similar shorthand in referring to a claim for any shortfall not paid by the issuer Debtor Estate.[135]  The

---

simply adopts its position and submissions to the U.S. Court in the UCC U.S. Joinder.  *See* UCC Cdn. Joinder.

[132] Bondholders U.S. Br. at 3, 9, 11-12 ("[T]he Allocation Litigation dealt solely with the allocation of certain **assets** to estates; it had nothing to do with the fixing or modification of creditor **claims** or dictating how distributions would be made to creditors.") (emphasis in original); *see also* Bondholders' Cdn. Br. at 3 ("The amount of the bondholders' guarantee claims against the Canadian Debtors is not an allocation issue, but rather an issue of creditor claims and recovery, to be addressed at a subsequent stage of the proceeding."); Bondholder Cdn. Written Submissions ¶ 12; U.S. Opinion at 63, 102, 106-07; Canadian Reasons for Judgment ¶ 211.

[133] *See, e.g.*, *In re LightSquared Inc.*, No. 12-12080, 2014 WL 5488413, at *5 (Bankr. S.D.N.Y. Oct. 30, 2014) (explaining 'single-satisfaction rule' that the creditor could not retain value beyond payment in full.") (citations omitted); *In re F.W.D.C., Inc.*, 158 B.R. 523, 528 (Bankr. S.D. Fla. 1993) (holding that creditor may not collect more than the total amount of the indebtedness); *Re J. LeBar Seafoods Inc.* (1981), 38 C.B.R. (N.S.) 64 at para. 20 (Ont. S.C.); *Olympia & York Developments Ltd., Re* (1997), 45 C.B.R. (3d) 85 at para. 25 (Ont. S.C.J.), aff'd 6 C.B.R. (4th) 254 (Ont. C.A.).

[134] U.S. Opinion at 112.

[135] Canadian Reasons for Judgment ¶ 251.

ultimate distribution on these claims, like any other claim, from the Debtor Estates remains to be determined in accordance with applicable law[136] and are unaffected by the Decisions regarding the allocation issues.

## II.    THE MOVANTS' REQUESTS FOR CLARIFICATION SHOULD BE DENIED AS DISGUISED REQUESTS FOR RECONSIDERATION OR UNNECESSARY

75.    The Movants' requests for clarification fall into two categories:  issues as to which the Courts' holdings are clear but with which they are dissatisfied, and issues as to which further comment by the Courts is unnecessary at this time.[137]

76.    To the extent that "clarifications" are sought to relieve the purported injustice of the hypothetical U.S. creditor outcomes the Movants posit, that is neither a basis for clarification nor reconsideration, as discussed above.  The Movants' requests ail to establish any other meritorious basis for reconsideration or clarification.

### A.    The Movants' Requests for "Clarification" about which Entities are Receiving Allocations from the Lockbox and Treatment of Post-Petition Tax Claims Should Be Rejected as Unsupported Requests for Reconsideration

77.    The U.S. Debtors are entirely incorrect when they assert that allocation to individual Debtors, as opposed to the three Debtor Estates of Canada, the United States and EMEA, was what the Courts intended in order to achieve a result where all debts are paid *pari passu*.[138] The Decisions are clear that allocation shall be made to the Debtor Estates, not to

---

[136] *See, e.g.,* New York General Obligations Law § 15-103 ("[t]he amount or value of any consideration received by the obligee from one or more of several obligors, or from one or more of joint, or of joint and several obligors, in whole or in partial satisfaction of their obligations, shall be credited to the extent of the amount received on the obligations of all co-obligors to whom the obligor or obligors giving the consideration did not stand in the relation of a surety.").

[137] The question whether the second instance of "NNC" in the definition of "Bondholders" at Appendix A and page 43 of the U.S. Opinion was meant to be "NNCC" (as it plainly was) could have been resolved by agreement had Law Debenture consulted the other Core Parties, but may now be clarified by the U.S. Court in accordance with Rule 60(a).

[138] U.S. Debtors U.S. Br. at 25-26; U.S. Debtors Cdn. Factum ¶¶ 47-48.

individual Nortel Debtors, and that *pari passu* creditor recoveries are not the goal of the allocation methodology.[139] Thus, this purported clarification request must be rejected.

78.    That the U.S. and Canadian Courts established principles for allocation to the three regional groups of Nortel debtors is beyond dispute.  Both Decisions speak of allocation to Debtor Estates, which are defined in the U.S. Order, for example, as "[t]he Debtor Estates (*i.e.*, the Canadian Debtors, the U.S. Debtors and the EMEA Debtors),"[140] and which the Canadian Reasons for Judgment make clear were to be the recipients of the allocation.[141]  The Decisions also make clear that each Debtor Estate is comprised of numerous Debtors.[142]  Both Decisions provide that the distribution of the allocated funds to the various Debtors that comprise each Debtor Estate will be a matter for each Court to address separately.[143]  Moreover, the U.S. Debtors' request for clarification that intercompany claims within a Debtor Estate are ignored for allocation purposes[144] is also unnecessary, as plainly the Courts decided that intercompany

---

[139] U.S. Opinion at 106-07; U.S. Order §§ 2(a) & 2(d); Canadian Reasons for Judgment ¶ 211, 251.  The U.S. Court's Opinion stated that it was "not directing . . . that creditors receive a common dividend on a pro rata, *pari passu* basis," U.S. Opinion at 106, and the Canadian Court merely said that the allocation ordered "goes partway" towards the result of debts being paid *pari passu*, Canadian Reasons for Judgment ¶ 211.

[140] U.S. Order § 2(d).

[141] Canadian Reasons for Judgment ¶ 250 and Schedule A, ¶ 1 ("The experts for the various parties differ on the way that the proceeds of the sales of the LOB should be allocated amongst the Canadian estate, the U.S. estate and the EMEA estate.")

[142] U.S. Opinion at 3 n.6 & App'x A; Canadian Reasons for Judgment ¶¶ 25 (noting that the Joint Administrators represent, for purposes of allocation, certain solvent indirect subsidiaries of NNUK that are not in administration), 214.

[143] U.S. Opinion at 106-07, 112 (distinguishing between allocation to Debtor Estates and claims against Debtors), 116; Canadian Reasons for Judgment ¶¶ 211, 214.

[144] U.S. Debtors U.S. Br. at 23; U.S. Debtors Cdn. Factum ¶ 45.

claims within Debtor Estates do not count toward allocation,[145] but also belies their contention that individual Debtors are the relevant entities for allocation.

79.    Despite *de facto* seeking reconsideration of the Courts' holdings that allocation be done by group,[146] the Movants make no attempt to establish that treatment of the Debtors by regional group, consistent with the way the allocation trial was conducted and Mr. Britven's analysis upon which they now rely,[147] constitutes an error of law, error of fact or manifest injustice, nor could they.  Their concerns about the distribution of the allocated funds to particular Debtors are matters that should and will be addressed by each Court in due course.[148]

80.    The request for "clarification" of the treatment of certain post-petition tax claims against the U.S. Debtors[149] is likewise a disingenuous attempt to rewrite an element of the Decisions.  That the relevant claims for allocation are only pre-petition claims is evident for at least three reasons.

81.    *First*, the Courts' modified pro rata allocation is based on the Courts' factual findings about the collective efforts of the Debtors Estates, prior to insolvency proceedings, that created the value realized in the asset sales.  Post-petition expenses, such as taxes, did not

---

[145] U.S. Order § 2(b) (including for purposes of allocation "[i]ntercompany claims against a Debtor Estate," not intercompany claims against each Debtor); Canadian Reasons for Judgment ¶ 258(3) (same). The use of the Debtor Estate groupings necessarily implies that intercompany claims among the Debtors in a Debtor Estate are ignored, and the Courts specifically provide that intercompany claims between Debtors in different Debtor Estates will be given effect for purposes of allocation.

[146] Law Debenture explicitly seeks "partial reconsideration" on this basis.  Law Debenture U.S. Br. at 5-6; Law Debenture Cdn. Factum ¶ 14.

[147] *See* June 6, 2014 (Day 14) Trial Tr. (Britven) 3504:5-10, 3568:17-3569:11.

[148] U.S. Opinion at 112; Canadian Reasons for Judgment ¶ 211.

[149] U.S. Debtors U.S. Br. at 29; U.S. Debtors Cdn. Factum ¶ 51.

contribute to collective creation of value and therefore are inappropriate for inclusion in the claims pool for purposes of allocation.

82.    *Second*, the exclusion of post-insolvency expense claims is implied by the Courts' treatment of cash on hand.  A Debtor Estate that incurs expenses may either pay for such expenses in cash on hand, or grant an administrative expense claim.[150]  If the cash on hand is not shared among the Debtor Estates in allocation, administrative expense claims should not be either.  The inclusion of post-petition tax claims would risk an allocation based on tax attributes, rather than the principles on which modified pro rata is based.[151]  The Courts' Decisions speak only to pre-insolvency claims.  The U.S. Debtors offer no argument why post-petition claims should be included, and no basis to reconsider their exclusion.  This request for clarification also must be denied.

83.    *Third*, the Canadian Court noted that claims against the U.S. and Canadian Debtors largely have been resolved, subject to certain significant outstanding pre-petition claims, but made no mention of post-petition claims being relevant to implementation of the modified pro rata methodology,[152] and both Decisions require that claims be crystalized by a date certain to be included in the claims pool[153]—a requirement that the U.S. Debtors concede their post-petition tax claims cannot meet.[154]

---

[150] *See* Administrative Order Establishing Procedures for Interim Compensation of Fees and Reimbursement of Expenses of Professionals and Official Committee Members [D.I 222].

[151] In the alternative, if the U.S. Debtors seek a tax gross-up only for themselves, their proposal is inconsistent with the pro rata principles announced by the Courts and indefensible.

[152] Canadian Reasons for Judgment ¶ 253.

[153] U.S. Opinion at 112; Canadian Reasons for Judgment ¶ 258.

[154] U.S. Debtors U.S. Br. at 29.

B.       **Clarification Regarding Claims Resolutions Processes and Treatment of Settlements Is Unnecessary**

84.       The Movants' requests for "clarification" with respect to oversight of claims processes and inclusion of settled claims are unnecessary at this juncture.  Consistent with the Courts' direction to work to implement the Decisions, the Debtor Estates and their constituents should first attempt to consensually resolve any disputes regarding the claims to be included in the Debtor Estates' respective claims pools for allocation purposes and the processes required to achieve finality in that respect.  If necessary, the assistance of the Courts can be sought if consensus cannot be achieved.  It is unnecessary to ask that the Courts deal with the minutiae of these issues at present.

85.       Despite asking for clarification with respect to oversight of the claims processes of non-U.S. Debtors,[155] the U.S. Debtors concede that these matters were already addressed in the CCAA and Chapter 11 proceedings in 2010.[156]  With respect to the EMEA Debtors' claims processes, the Courts will be available to resolve any issues that may arise.[157]  As no issue has yet arisen, the U.S. Debtors' request for intervention is a solution in search of a problem.

86.       Clarification regarding the inclusion of settled claims in the pool for allocation[158] also should be denied at this stage.  The Courts articulated the principles—nothing is gained by a selective presentation of some settlements.  The most sensible way forward is the one the Courts have directed the Parties to follow:  each of the Debtor Estates should (i) propose schedules for their own process for the completion of their respective claims processes with all due speed, (ii)

---

[155] U.S. Debtors U.S. Br. at 26; U.S. Debtors Cdn. Factum ¶¶ 49-50.

[156] U.S. Debtors U.S. Br. at 26-27; U.S. Debtors Cdn. Factum ¶ 49; Claims Resolution Order, dated September 16, 2010 at ¶¶ 7-8 and Cross-Border Claims Protocol [D.I. 3956].

[157] U.S. Opinion at 62-63; Canadian Reasons for Judgment ¶¶ 253, 258(6).

[158] U.S. Debtors U.S. Br. at 24; U.S. Debtors Cdn. Factum ¶ 46.

work collaboratively with the other Debtor Estates to develop a mechanism for interim allocations so that interim distributions can be made to the creditors of each Debtor Estate and (iii) develop procedures to implement the allocation principles outlined in the Decisions.[159]  The parties may seek the guidance of the Courts with respect to any disputes and present the bases for inclusion or exclusion of a particular claim, in whole or in part, in light of the allocation principles the Courts have established.

---

[159] U.S. Opinion at 63, 112; U.S. Order ¶¶ 2(d) & 3; Canadian Reasons for Judgment ¶¶ 253-55, 258.

## CONCLUSION AND ORDER SOUGHT

87.     For the foregoing reasons, the Monitor and the Canadian Debtors respectfully

request that the Motions be denied, except with respect to clarifying the inclusion of NNCC.

**ALL OF WHICH IS RESPECTFULLY SUBMITTED**, this 12th day of June, 2015.


**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

**Benjamin Zarnett**  LSUC#: 17247M
bzarnett@goodmans.ca
**Peter Ruby**  LSUC#: 38439P
pruby@goodmans.ca
**Jay A. Carfagnini  LSUC#: 22293T**
jcarfagnini@goodmans.ca
**Joseph Pasquariello**  LSUC #: 38390C
jpasquariello@goodmans.ca
Tel:     (416) 979-2211
Fax:     (416) 979-1234
*Lawyers for the Monitor*

**GOWLING LAFLEUR HENDERSON LLP**
Barristers & Solicitors
1 First Canadian Place,
100 King Street West, Suite 1600
Toronto ON M5X 1G5

**Derrick Tay**  LSUC#: 21152A
derrick.tay@gowlings.com
**Jennifer Stam**  LSUC#: 46735J
jennifer.stam@gowlings.com
Tel:     (416) 862-5697
Fax:     (416) 862-7661
*Lawyers for the Canadian Debtors*


**BUCHANAN INGERSOLL & ROONEY PC**
919 North Market Street, Suite 1500
Wilmington, DE 19801

/s/ Mary F. Caloway
**Mary F. Caloway** (No. 3059)
mary.caloway@bipc.com
**Kathleen A. Murphy** (No. 5215)
kathleen.murphy@bipc.com
(302) 552-4200 (telephone)
(302) 552-4295 (facsimile)
*Attorneys for Ernst & Young Inc., as Monitor and Foreign Representative of the Canadian Debtors*

**ALLEN & OVERY LLP**
1221 Avenue of the Americas
New York, NY  10020

**Jacob S. Pultman**
jacob.pultman@allenovery.com
**Laura R. Hall**
laura.hall@allenovery.com
**Ken Coleman**
ken.coleman@allenovery.com
**Daniel Guyder**
daniel.guyder@allenovery.com
(212) 610-6300 (telephone)
(212) 610-6399 (facsimile)
*Attorneys for Ernst & Young Inc., as Monitor and Foreign Representative of the Canadian Debtors*

# SCHEDULE A

# TABLE OF AUTHORITIES

## US Table of Authorities

*Accenture Global Srvs., GmbH v. Guideware Software, Inc.*,
  800 F. Supp. 2d 613 (D. Del. 2011).........................................................................................22

*Bausch & Lomb v. Moria S.A.*,
  222 F. Supp. 2d 616 (E.D. Pa. 2002) .....................................................................................19

*Bhatnagar v. Surrendra Overseas Ltd.*,
  52 F.3d 1220 (3d Cir.1995)...............................................................................................19, 33

*Brambles U.S.A, Inc. v. Blocker*,
  735 F. Supp. 1239 (D. Del. 1990)......................................................................................19, 32

*Broad. Music, Inc. v. Crocodile Rock Corp.*,
  Civ. A. 12-4945, 2014 WL 3953182 (E.D. Pa. Aug. 12, 2014) ............................................20

*Conway v. A.I. DuPont Hosp. for Children*,
  No. 04-4862, 2009 WL 1492178 (E.D. Pa. May 26, 2009)....................................................19

*Formax, Inc. v. Alkar-Rapidpak-MP Equip., Inc.*,
  No. 11-C-298, 2011 WL 4344238 (E.D. Wis. Sept. 14, 2011)...............................................22

*Gilbreth Int'l Corp. v. Lionel Leisure, Inc.*,
  645 F. Supp. 732 (E.D. Pa. 1986) ..........................................................................................22

*Harsco Corp. v. Zlotnicki*,
  779 F.2d 906 (3d Cir. 1985)...............................................................................................19, 20

*Hooten v. Greggo and Ferrara Co.*,
  No 10-776, 2011 WL 1754084 (D. Del. 2011)........................................................................19

*In re Anthanassious*,
  418 F. App'x 91 (3d Cir. 2011).........................................................................................18, 27

*In re City of Phila. Litig.*,
  158 F.3d 711 (3d. Cir. 1998)...................................................................................................20

*In re Commonwealth's Mot. to Appoint Counsel*,
  No. 13-510, 2013 WL 5781732 (M.D. Pa. Oct. 25, 2013) .....................................................19

*In re F.W.D.C., Inc.*,
    158 B.R. 523 (Bankr. S.D. Fla. 1993) ...................................................................36

*In re InnovaSystems, Inc.*,
    No. 11-36228-ABA, 2015 WL 2399200 (Bankr. D.N.J. May 18, 2015) ...............................20

*In re LightSquared Inc.*,
    No. 12-12080, 2014 WL 5488413 (Bankr. S.D.N.Y. Oct. 30, 2014) ......................................36

*In re Meridian Automotive Systems-Composite Operations, Inc.*,
    No. 05-11168, 2008 WL 141160 (Bankr. D. Del. January 11, 2008)..........................19, 20, 34

*In re Roemmele*,
    466 B.R. 706 (Bankr. E.D. Pa. 2012) ...................................................................20

*In re Titus*,
    479 B.R. 362 (Bankr. W.D. Pa. 2012) ...................................................................20

*In re Zilog, Inc.*,
    450 F.3d 996 (9th Cir. 2006) ...................................................................34

*Integrated Tech. Corp. v. Rudolph Techs., Inc.*,
    No. CV-09-02182, 2010 WL 8545468 (D. Ariz. Sept. 2, 2010) ...........................................22

*Kansas City Fire & Marine Ins. Co. v. Consolidated Rail Corp.*,
    No. 97-8134, 1999 WL 497232 (E.D. Pa. July 14, 1999) ......................................................21

*Mack Trucks, Inc. v. Int'l Union, UAW*,
    856 F.2d 579 (3d Cir. 1988)...................................................................22

*Martinez-McBean v. Gov't of V.I.*,
    562 F.2d 908 (3d Cir.1977)...................................................................21

*Max's Seafood Caf ex rel. Lou-Ann, Inc. v. Quinteros*,
    176 F.3d 669 (3d Cir. 1999)...................................................................19, 20

*Messenger v. Anderson*,
    225 U.S. 436 (1912)...................................................................18

*Morningred v. Delta Family-Care & Survivorship Plan*,
    790 F. Supp. 2d 177 (D. Del. 2011)...................................................................22

*North River Ins. Co. v. CIGNA Reinsurance Co.*,
    52 F.3d 1194 (3d Cir. 1995)...................................................................20

*Page v. Schweiker*,
    786 F.2d 150 (3d Cir. 1986)...............................................................21

*Pfizer Inc. v. Uprichard*,
    422 F.3d 124 (3d Cir.2005)................................................................22

*Pridgen v. Shannon*,
    380 F.3d 721 (3d Cir. 2004)...............................................................21

*Prusky v. Prudential Ins. Co. of America*,
    44 F. App'x 545 (3d Cir. 2002).....................................................19, 33

*Samuel v. Carroll*,
    505 F. Supp. 2d 256 (D. Del. 2007)..............................................19, 32

*Smith v. Evans*,
    853 F.2d 155 (3d Cir. 1988)...............................................................20

*United States v. Jasin*,
    292 F. Supp. 2d 670 (E.D. Pa. 2003) .................................................20

*United States v. Jerry*,
    487 F.2d 600 (3d Cir. 1973)...............................................................18

*United States v. Nicolet, Inc.*,
    857 F.2d 202 (3d Cir. 1988)...............................................................18

## RULES AND STATUTES

Fed. R. Civ. P. 52(b) ............................................................................1

Fed. R. Civ. P. 59(e) ............................................................................1

Fed. R. Civ. P. 60(b) ..........................................................................18

New York General Obligations Law § 15-103 ...........................................37

Wright & Miller, Federal Practice & Procedure § 2864................................21

Wright & Miller, Federal Practice and Procedure § 3915.4 ..........................18

**Canadian Cases**

| Tab | Case |
|-----|------|
| A. | *671122 Ontario Ltd. v. Sagaz Industries Canada Inc.*, [2001] 2 S.C.R. 983 |
| B. | *Aquiline Resources Inc. v. Wilson*, [2005] B.C.J. No. 2299 (S.C.) |
| C. | *Barker v. Montfort Hospital*, 2007 ONCA 282 |
| D. | *Bassi v. Bassi*, 2013 BCCA 422 |
| E. | *Brown v. The Municipal Property Assessment Corp.*, 2014 ONSC 7137 |
| F. | *Buckley v. British Columbia Teacher's Federation*, [1995] B.C.J. No. 2971 |
| G. | *Cheema v. Cheema*, 2001 BCSC 298 |
| H. | *Clayton v. British American Securities Ltd.*, [1935] 1 D.L.R. 432 (B.C.C.A.) |
| I. | *Compton Agro Inc. (Trustee of) v. Canada (Attorney General)*, 2000 MBCA 29 |
| J. | *Degroote v. Canadian Imperial Bank of Commerce*, [1998] O.J. No. 1696 (Gen. Div.) |
| K. | *Fame Construction Ltd. v. 430863 Ltd.*, [1997] B.C.J. No. 1053 |
| L. | *Re J. LeBar Seafoods Inc.* (1981), 38 C.B.R. (N.S.) 64 (Ont. S.C.) |
| M. | *Kemp v. Wittenberg,* [1999] B.C.J. No. 810 (S.C.) |
| N. | *Lo v. Ho,* [2010] O.J. No. 1055 (S.C.J.) |
| O. | *Metal World Inc. v. Pennecon Energy Ltd.,* 2014 NLCA 10 |
| P. | *Metropolitan Toronto Condominium Corp. 626 v. Bloor/Avenue Road Investment Inc.,* [2009] O.J. No. 1205 (S.C.J.) |
| Q. | *Montague v. Bank of Nova Scotia*, 2004 CarswellOnt 11 (C.A.) |
| R. | *Olympia & York Developments Ltd., Re* (1997), 45 C.B.R. (3d) 85 (Ont. S.C.J.) |
| S. | *Oshawa Group Ltd. v. Mason Homes Ltd.*, 2005 CanLII 36443 (Ont. C.A.) |
| T. | *Risorto v. State Farm Mutual Automobile Insurance Co.* (2009), 70 C.P.C. (6th) 390 (Div. Ct) |
| U. | *Robins v. National Trust Co. Ltd.*, [1927] 2 D.L.R. 97 (P.C.) |

| Tab | Case |
|-----|------|
| V. | *Schmuck v. Reynolds-Schmuck*, 2000 CarswellOnt 202 (S.C.J) |
| W. | *Sirisena v. Oakdale Village Homes Inc.*, 2013 ONSC 1051 (Div. Ct.) |
| X. | *UAP Inc. v. Oak Tree Auto Centre Inc.,* 2003 PESCAD 6 |

6463749

**SCHEDULE B**

**GLOSSARY OF TERMS**

| | |
|---|---|
| Bankruptcy Code | Title 11 of the United States Code |
| Bondholders | The *Ad Hoc* Group of Bondholders |
| BoNY | The Bank of New York Mellon, as indenture trustee |
| Canadian Court | The Ontario Superior Court of Justice. |
| Canadian Debtors | The Canadian Nortel companies that, on January 14, 2009, filed for and obtained protection under the *Companies' Creditors Arrangement Act* from the Ontario Superior Court of Justice ,being Nortel Networks Corporation (NNC), Nortel Networks Limited (NNL), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation |
| Canadian Estate | Collectively, the entities that make up the Canadian Debtors |
| Canadian Reasons for Judgment | Reasons for Judgment of the Canadian Court dated May 12, 2015 (*Nortel Networks Corporation (Re)*, 2015 ONSC 2987) |
| CCC | The Canadian Creditors Committee, which represents the interests of Canadian pensioners and other pension interests, long-term disabled and other employees and former employees of Nortel who have claims against the Canadian Debtors |
| Courts | The U.S. Court and the Canadian Court |
| Debtor(s) | The companies or entities comprising the Canadian Debtors, the U.S. Debtors and the EMEA Debtors, either individually or collectively |
| Debtor Estates | Collectively, the Canadian Estate, the U.S. Estate and the EMEA Estate |
| Decisions | The U.S. Opinion and the Canadian Reasons for Judgment |
| Diamondware | Diamondware, Ltd. |
| EMEA Debtors | The 19 Nortel entities that, on January 15, 2009, were granted administration orders in the U.K. under the *Insolvency Act, 1986* and whose registered offices were in England, Europe, the Middle East and Africa, including Nortel Networks UK Limited (NNUK), Nortel Networks S.A. (NNSA) and Nortel Networks (Ireland) Limited, and Nortel Networks Optical Components Ltd., Nortel Networks AS, Nortel Networks AG, Nortel Networks South Africa (Pty) Limited, and Nortel Networks (Northern Ireland) Limited. |

| EMEA Estate | Collectively, the entities that make up the EMEA Debtors. |
|---|---|
| IFSA | Interim Funding and Settlement Agreement, June 9, 2009 (TR43794) |
| IP | Intellectual Property |
| Law Debenture | Law Debenture Trust Company of New York, in its capacity as successor indenture trustee |
| LOBs | Lines of business |
| Lockbox | Approximately $7.3 billion in sale proceeds currently held in escrow |
| Monitor | Ernst & Young Inc. in its capacity as monitor of the Canadian Debtors appointed in the Initial Order granted January 14, 2009: by various orders, the Ontario Superior Court of Justice expanded the Monitor's powers and authorized it to exercise the powers of the boards of directors of the Canadian Debtors. |
| Motions | The motions, including joinders, of the U.S. Debtors, the Bondholders, the UCC, Law Debenture and BoNY filed in the U.S. Court and the Canadian Court, as fully described above in footnote 2 |
| Movants | The U.S. Debtors, the Bondholders, the UCC, Law Debenture and BoNY |
| MRDA | Master R&D Agreement dated December 22, 2004 but with an effective date of January 1, 2001, between NNL, NNI, NNUK, NNSA, Nortel Networks Australia Pty Limited and Nortel Networks (Ireland) Limited, as amended (TR21003) |
| NGS | Nortel Government Solutions Inc. (including its subsidiaries) |
| NNC | Nortel Networks Corporation, being a corporation incorporated under the laws of Canada, which was the publicly traded, parent holding company of NNL and its subsidiaries |
| NNCC | Nortel Networks Capital Corporation (f/k/a Northern Telecom Capital Corporation) |
| NNI | Nortel Networks Inc., being a corporation incorporated under the laws of the State of Delaware, the main U.S. operating entity and a direct subsidiary of NNL |
| NNL | Nortel Networks Ltd., being a corporation incorporated under the laws of Canada, and the main Canadian operating entity |
| NNSA | Nortel Networks, S.A., being an entity duly formed under the laws of France, one of the EMEA Debtors, and a direct subsidiary of NNL |

| | |
|---|---|
| NNUK | Nortel Networks UK Limited, being an entity formed under the laws of the United Kingdom, one of the EMEA Debtors, and a direct subsidiary of NNL |
| NN Technology | As defined in Article 1(f) of the MRDA, NN Technology "shall mean, any and all intangible assets including but not limited to patents, industrial designs, copyrights and applications thereof, derivative works, technical know-how, drawings, reports, practices, specifications, designs, software and other documentation or information produced or conceived as a result of research and development by, or for, any of the Participants, but excluding trademarks and any associated goodwill." |
| Nortel | Collectively, NNC and all of its direct and indirect subsidiaries, including the businesses they operated |
| Nortel Group | Equivalent to "Nortel" |
| R&D | Research and Development |
| UCC | The Official Committee of Unsecured Creditors of the U.S. Debtors |
| U.S. Court | The United States Bankruptcy Court for the District of Delaware |
| U.S. Debtors | The U.S. Nortel companies that, on January 14, 2009, filed voluntary petitions in the United States Bankruptcy Court for the District of Delaware for protection under chapter 11 or Title 11 of the U.S. Code, being Nortel Networks Inc. ("NNI") and several of its U.S. affiliates, namely Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc. |
| U.S. Estate | Collectively, the entities that make up the U.S. Debtors |
| U.S. Order | Order of the U.S. Court dated May 12, 2015 which accompanied the U.S. Opinion [D.I. 15545] |
| U.S. Opinion | Allocation Trial Opinion of the U.S. Court dated May 12, 2015 [D.I. 15544] |
| UKPC | Collectively, the Nortel Networks UK Pension Trust Limited and the Board of Directors of the Pension Protection Fund |
| Wilmington Trust | Wilmington Trust, National Association, in its capacity as successor indenture trustee |