Court File No. 09-CL-7950

ONTARIO

SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C.
1985, c. C-36, AS AMENDED

— and —

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br>        NORTEL NETWORKS INC., *et al.*,<br>                                    Debtors. | Chapter 11<br><br>Case No. 09-10138 (KG)<br>(Jointly Administered) |

# BRIEF OF AUTHORITIES FOR THE CANADIAN CREDITORS' COMMITTEE ("CCC") OBJECTION TO MOTIONS FOR RECONSIDERATION AND/OR CLARIFICATION

- 2 -

**INDEX**

| Tab | Description |
|-----|-------------|
|     | **Cases** |
| 1.  | *671122 Ontario Ltd. v. Sagaz Industries Canada Inc.*, [2000] O.J. No. 121 (C.A.), var'd on other grounds, [2001] S.C.J. No. 61. |
| 2.  | *671122 Ontario Ltd.*, v. *Sagaz Industries Canada Inc.*, [2001] 2 S.C.R. 983. |
| 3.  | *Alabi-Shonde v. Patterson*, 2014 WL 4954314 (D. Del. Sept. 30, 2014). |
| 4.  | *Becker Milk Co. Ltd. v. Consumers' Gas Co.*, 1974 CarswellOnt 870 (C.A.). |
| 5.  | *Bhatnagar v. Surrendra Overseas Ltd.*, 52 F.3d 1220 (3d Cir. 1995). |
| 6.  | *Brambles USA Inc. v. Blocker,* 735 F. Supp. 1239 (D. Del. 1990). |
| 7.  | *Degroote* v. *Canadian Imperial Bank of Commerce*, [1998] O.J. No. 1696 (S.C.), aff'd [1999] O.J. No. 2313 (C.A.). |
| 8.  | *Donaghy v. Scotia Capital Inc.*, [2004] O.J. No. 2157 (S.C.), aff'd [2005] O.J. No. 1303 (C.A.). |
| 9.  | *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008). |
| 10. | *Gonzalez v. Crosby*, 545 U.S. 524 (2005). |
| 11. | *Griffin v. Dell Canada Inc.*, [2009] O.J. No. 1592 (S.C.), aff'd [2010] O.J. No. 177 (C.A.), leave to appeal to S.C.C. refused, [2010] S.C.C.A. No. 75. |
| 12. | *In re Joy Global, Inc.*, 2011 WL 5865542 (D. Del. Nov. 22, 2011). |
| 13. | *In re National Energy & Gas Transmission, Inc.*, 492 F.3d 297 (4th Cir. 2007). |
| 14. | *In re Owens Corning,* 419 F.3d 195 (3d Cir. 2005) |
| 15. | *In re Tribune Co.*, 464 B.R. 208 (Bankr. D. Del. 2011). |
| 16. | *Ivanhoe Building & Loan Association of Newark, New Jersey v. Orr*, 295 U.S. 243 (1935). |
| 17. | *Jones v. Pittsburgh Nat'l Corp.*, 899 F.2d 1350 (3d Cir. 1990). |

| Tab | Description |
|-----|-------------|
| 18. | *Kay v. Wirstiuk*, [1977] A.J. No. 690. |
| 19. | *Leo Deluca Enterprises Inc. v. Lombard General Insurance Co. of Canada*, [2008] O.J. No. 2876. |
| 20. | *Malandrino v. Astrue*, 2013 WL 6852047 (D. Del. Dec. 27, 2013). |
| 21. | *Max's Seafood Café v. Quinteros*, 176 F.3d 669 (3d Cir. 1999). |
| 22. | *Montague v. Bank of Nova Scotia*, 2004 CarswellOnt 11 (C.A.). |
| 23. | *Moolenaar v. Gov't of Virgin Islands*, 822 F.2d 1342 (3d Cir. 1987). |
| 24. | *Mujagic v. Kamps*, 2015 CarswellOnt 7272 (C.A.). |
| 25. | *Qit Fer et Titane Inc.* v. *Upper Lakes Shipping Ltd.* (1991), 3 O.R. (3d) 165 (Gen. Div.) |
| 26. | *Samuel v. Carroll*, 505 F. Supp. 2d 256 (D. Del. 2007). |
| 27. | *Schmuck v. Reynolds-Schmuck*, [2000] O.J. No. 247 (S.C.). |
| 28. | *Smith v. City of Chester*, 155 F.R.D. 95 (E.D. Pa. 1994). |
|     | **Other Authorities** |
| 29. | Federal Rule of Civil Procedure Rule 59(e) |
| 30. | Federal Rule of Civil Procedure Rule 60(b) |

# TAB 1

DATE: 20000125
DOCKET: **C30047**

## COURT OF APPEAL FOR ONTARIO

## CATZMAN, BORINS AND SHARPE JJ.A.

| | | |
|---|---|---|
| B E T W E E N : | ) | |
| | ) | |
| 671122 ONTARIO LIMITED formerly | ) | Martin Teplitsky Q.C. and |
| DESIGN DYNAMICS LIMITED | ) | James M. Wortzman |
| | ) | for the plaintiff/appellant |
| (Plaintiff/ | ) | |
| Appellant) | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SAGAZ INDUSTRIES CANADA INC., | ) | Joel Goldenberg |
| SAGAZ INDUSTRIES INC., STEWART | ) | for the defendants/respondents |
| LANDOW, AMERICAN INDEPENDENT | ) | Sagaz, Sagaz Canada and Kavana |
| MARKETING INC. and JOSEPH KAVANA | ) | |
| | ) | Maxwell M. Steidman |
| (Defendants/ | ) | for the defendants/respondents |
| Respondents)) | ) | Landow, AIM |
| | ) | |
| | ) | Heard: November 30 and |
| | ) | December 1, 1999 |

On appeal from the judgment of Cumming J. dated May 28, 1998.

SHARPE J.A.:

[1]    For some 30 years, the appellant, Design Dynamics Limited, was Canadian Tire's principal supplier of synthetic seat covers. The appellant lost that business in June 1984 when Robert Summers ("Summers"), the head of Canadian Tire's automotive division, decided that the respondents Sagaz Industries Canada Inc. and Sagaz Industries Inc. (collectively "Sagaz") would be Canadian Tire's seat cover supplier. Summers was subsequently charged and convicted of accepting a bribe in relation to the Sagaz contract. The loss of Canadian Tire's business was devastating to the appellant and it brought this action alleging that the defendants had bribed Summers and that, but for those bribes, the appellant would continue to enjoy Canadian Tire's business.

[2]    The defendants, Stewart Landow ("Landow), and his company, American Independent Marketing Inc. ("AIM"), were retained by Sagaz to assist in marketing the seat covers to Canadian Tire. The trial judge found that Landow and AIM had bribed Summers and that those bribes were the cause of the appellant's loss of the Canadian Tire business. He found that Landow and AIM were liable to the appellant in conspiracy and on the basis that their conduct amounted to the tort of unlawful interference with economic relations. The appellant's damages were assessed in the amount of $1,857,500. The appellant was also awarded $50,000 in punitive damages and $3,381,613.51 prejudgment interest.

[3]    The claims against Sagaz and Joseph Kavana ("Kavana"), the principal officer of Sagaz, were dismissed. The trial judge found that AIM was an independent contractor and that, accordingly, Sagaz was not vicariously liable for the tortious conduct of Landow and AIM. The trial judge also found that Kavana and Sagaz did not know that Landow was bribing the Canadian Tire buyer and that neither Kavana, nor Sagaz, were parties to the conspiracy, or otherwise responsible for the tortious acts of AIM.

[4]    After the release of the trial judge's reasons, but before the formal judgment was taken out, Landow, who had not testified at trial, gave the appellant an affidavit admitting to a conspiracy to bribe, implicating Kavana in the conspiracy. A motion was brought before the trial judge to have the trial re-opened to hear Landow's evidence. The trial judge dismissed that motion on the grounds that the appellant failed to show that the new evidence would probably change the result and on the ground that Landow was available as a witness at trial, but appellant's counsel made a tactical choice not to call him.

[5]    Before this court, no issue is taken with the trial judge's findings that Landow and AIM were guilty of bribery, that the bribery caused the loss of the appellant's Canadian Tire business, that Landow and AIM were liable for conspiracy and unlawful interference with economic relations, and that the appellant suffered damages as a result of their tortious conduct in the amount assessed by the trial judge.

[6]    The appellant raises three grounds of appeal:

> 1.  that the trial judge erred in finding that AIM was an independent contractor and in rejecting the appellant's claim against Sagaz for vicarious liability;

> 2.  that the trial judge's factual findings with respect to Kavana's knowledge of, or participation in, the bribery scheme were unreasonable and ought to be set aside; and

Page: 3

3. that the trial judge erred in refusing to reopen the trial.

## Issue 1 – Is Sagaz Vicariously Liable for Landow and AIM?

[7]    While the trial judge gave carefully considered reasons for judgment, those reasons contain no analysis of the evidence or legal principles pertaining to the claim against Sagaz for vicarious liability for the acts of Landow and AIM. In fairness to the trial judge, it would appear that this issue was not pressed as vigorously before him as it was before this court. Mr. Teplitsky conceded that at trial he relied principally upon the contention that Kavana was an actual participant in a bribery conspiracy and that he did not place the same degree of emphasis on the vicarious liability claim. However, there is no doubt that the issue of vicarious liability was raised at trial. In his reasons for judgment, the trial judge specifically identified seven issues to be addressed, one of which was the following:

> If the defendants Mr. Landow and AIM Inc. are found to have bribed Mr. Summers but it is found that this was done without the knowledge of Sagaz, is Sagaz liable to the plaintiff on a basis of vicarious liability for the wrongdoing of Mr. Landow and AIM Inc.?

[8]    The only findings of the trial judge on this point are three one sentence, conclusory statements that AIM was an independent contractor in its relationship with Sagaz. *London Drugs Ltd. v. Kuehne & Nagel International Ltd.*, [1992] 3 S.C.R. 299 was cited for the proposition that liability should not be imposed on Sagaz for the tortious acts of its independent contractors. While the trial judge made no detailed factual findings on this issue, the pertinent facts are not in dispute. The task of this court is to determine whether on those facts, it was open in law for the trial judge to dismiss the appellant's vicarious liability claim against Sagaz.

[9]    The strongest evidence to support the finding that AIM was an independent contractor is the written agreement between Sagaz and AIM which specifically provides as follows:

> 3.    AUTHORITY; RELATIONSHIP.  AIM is and shall in all events be an independent contractor.  AIM shall not have the authority to sign for or bind Sagaz, and nothing herein shall be construed as constituting AIM as the partner or legal representative of Sagaz.

Page: 4

[10]   We were also referred to Kavana's evidence to the effect that Landow insisted upon the written agreement designating him as an independent contractor. Kavana testified that he understood this to mean that Landow and his company had no authority to sign on behalf of or to bind Sagaz. Mr. Goldenberg also referred us to extracts from the examination-for-discovery of Landow, read in at the trial by the appellant, in which Landow described himself as a "consultant". Landow also indicated that he acted in that capacity for many other companies in the United States, although in situations that were not competitive with Sagaz.

[11]   The contract between Sagaz and AIM designating AIM as Sagaz's "independent contractor" does not determine the legal classification of AIM vis-à-vis Sagaz for purposes of vicarious liability. To determine whether one party is vicariously liable for the tortious acts of another, the court is required to scrutinize the facts carefully to determine the true nature of the relationship, rather than base the decision on the label the parties chose to attach to their relationship. Although it is a tax case, *Wiebe Door Services Ltd. v. MNR*, [1986] 5 W.W.R. 450 (Fed. C.A.) is apposite. The court rejected the contention that, with respect to third parties, a principal and agent could themselves control the legal categorization of the nature of their relationship by labelling it "independent contractor". McGuigan J. stated as follows (at 453): "Such an agreement is not of itself determinative of the relationship between the parties, and a court must carefully examine the facts in order to come to its own conclusion." In *A. (C.) v. Critchley* (1998), 166 D.L.R. (4th) 475 (B.C.C.A.), the court held that vicarious liability attached despite the fact that, as between the principal and the agent, the relationship was described as that of independent contractor. McEachern C.J.B.C. wrote (at 503) that: "More recent authorities make it clear, however, that like so many formerly 'well established principles', this distinction between independent contractors and employees may be blurred in many cases where there are overlapping obligations." McEachern C.J.B.C added (at 504) that the "designation [of the agent] as an independent contractor may not be a significant factor in the modern law that tends to look not at traditional classifications but rather at the true nature of the relationship". In *Jacobi v. Griffiths* (1999), 174 D.L.R. (4th) 71 at 99, Binnie J. referred, with apparent approval, to the *Critchley* approach "...that it is the true nature of the relationship, not the traditional classification, that is determinative".

[12]   In *Mayer v. J. Conrad Lavigne Ltd.* (1979), 27 O.R. (2d) 129 (C.A.) at 132, MacKinnon A.C.J.O. described the determination of whether an individual is a servant or independent contractor as being "completely dependent on the facts". MacKinnon A.C.J.O. went on to refer to "the organization test", noting that it had been approved and applied by the Supreme Court of Canada in *Co-operators Insurance Association v. Kearney* (1964), 48 D.L.R. (2d) 1. Reference was also made to *Stevenson, Jordan and Harrison Limited v. MacDonald et al*, [1952] 1 T.L.R. 101 were Lord Denning stated:

> One feature which seems to run through the instances is that,
> under a contract of service, a man is employed as part of the
> business, and his work is done as an integral part of the
> business; whereas, under a contract for services, his work,
> although done for the business, is not integrated into it but is
> only accessory to it.

[13]   MacKinnon A.C.J.O. applied the organization test in holding that a commission agent who sold advertising for a television station was in a master-servant relationship (at 133):

> ...the relationship satisfies the "organization" test. The
> respondent's work was a necessary and integral part of the
> appellant's business. It supplied the financial life-blood of the
> appellant, and his work was subject to the coordinational
> control of management. His work was clearly integrated into
> the business and not merely accessory to it. In my view,
> applying the common law tests, the facts establish that the
> respondent was a servant and employee of the appellant.

[14]   These authorities indicate that the "organization test" inquires into whether the agent or servant functions as part of the principal's organization and whether an agent's work is done as an integral part of the principal's business. If the answer to these questions is yes, the principal is liable for the tortious acts of the agent even though, as between themselves, the principal and the agent have chosen to designate the relationship as that of independent contractor.

[15]   The appellant also relies on the following passage from Fleming, *The Law of Torts* (7th ed.) at 342-343:

> At other times, the term "agent" crops up to designate
> someone through whose instrumentality the defendant has
> committed a tort of his own, as when he has authorised an
> "agent" to commit a tort or ratified it afterwards. It also
> includes situations "where the function entrusted is that of
> representing the person who requests its performance in a
> transaction with others, so that the very service to be
> performed consists in standing in his place and assuming to
> act in his right and not in an independent capacity". On this
> basis, an insurance agent was held to have made his principal
> answerable for defaming a competing company in the course
> of soliciting proposals, because "he was authorised to speak,

Page: 6

and in fact spoke, with the voice of the defendant". Whereas
in the ordinary case, an independent contractor carries out his
work, not as a representative but as principal, here the agent
acts in a genuinely representative capacity for a principal who
is accordingly treated as if he were conducting the transaction
in person. The liability is therefore personal, not vicarious – a
true instance of Qui facit per alium facit per se. [footnotes
omitted]

[16]   The passages quoted by Professor Fleming are taken from the judgment of Dixon
J. in *Colonial Life Assurance v. Producers Assurance Co.* (1931), 46 C.L.R. 41 (Aust.
H.C.) at 48, where liability was imposed on an insurance company for defamatory
statements made by an agent in soliciting business despite an explicit term in the agent's
contract forbidding him from saying anything that would discredit or bring into disrepute
any other person or institution.

[17]   There is no doubt that AIM was a legal entity separate from Sagaz. AIM's offices
were in New York whereas the offices of Sagaz were in Florida. Kavana testified that
Landow was hired to represent Sagaz in Canada and that his duties on Sagaz's behalf
were to obtain Canadian Tire's business and to maintain its goodwill. In the portions of
Landow's discovery evidence, read in as part of the appellant's case, Landow stated that
there was no requirement as to how much time AIM would have to spend on the affairs
of Sagaz. He also stated that he decided for himself how many trips he should take to
Toronto to promote Sagaz's business with Canadian Tire.

[18]   Kavana testified that sales representatives, such as AIM, cover a territory and
work with the sales manager or vice-president of sales. The sales representative
"introduces the sales managers to the accounts" and "does the servicing of the account on
a day-to-day basis". Sagaz relied on its sales representatives to "keep up the maintenance
of the account". It is clear from Kavana's evidence that Landow and AIM did their work
as part of the Sagaz team. In large part, no doubt, this was due to the fact that Canadian
Tire did not wish to deal with external sales agents. Although AIM was hired to
represent Sagaz, AIM did not initiate contact with Canadian Tire on its own. Kavana
testified that initial contact with Canadian Tire was made by Sagaz's national sales
manager, Mr. David English ("English"), who gave price quotations. The initial meeting
with Canadian Tire was attended by Landow, English and Kavana. Following that
meeting, revised price quotations were sent by English. Landow's role was limited to
presenting prices that were set and negotiated by Kavana and English. In his evidence,
Kavana admitted that Landow worked in a joint effort with the in-house sales manager
and that Landow required instructions with respect to price, terms and various other
aspects of the business he was conducting on Sagaz's behalf.

Page: 7

[19]   Apart from the AIM – Sagaz agreement, the documentary evidence does not support a finding that AIM was acting in an independent capacity, outside the Sagaz organization, but suggests that AIM was acting throughout as part of the Sagaz organization. Quotations to Canadian Tire indicated that the account was a "house account". Kavana could not explain why neither Landow nor AIM was shown as the agent. Neither Landow nor AIM was shown on invoices as sales representatives. On one significant occasion, the letter of June 12, 1984, Landow communicated with Canadian Tire directly using Sagaz's letterhead. This letter was written at the time Sagaz was attempting to get Canadian Tire's business away from the appellant. While Kavana at first denied that Landow had been supplied with Sagaz's letterhead, he later admitted this to be the case on cross-examination. The June 12, 1984 letter was signed by Landow in his own name under "Sagaz Industries, Inc.". There is no reference to AIM. The letter confirmed prices and terms under which Sagaz would be prepared to supply Canadian Tire.

[20]   In my view, on the evidence that was presented, the inevitable conclusion is that Landow and AIM were, at all material times, acting on behalf of Sagaz as part of the Sagaz organization and sales team. Neither Landow nor AIM was acting in an independent capacity. They worked under the direct supervision and direction of Sagaz and appear to have exercised no independent discretion on any significant matter in relation to dealings with Canadian Tire. They functioned as integrated elements of the Sagaz organization.

[21]   It is my view that the trial judge erred in dismissing the claim against Sagaz based on vicarious liability for the acts of Landow and AIM. The evidence brings Landow and AIM squarely within the "organization test" for vicarious liability and it follows, accordingly, that Sagaz is liable to the appellant for the tortious conduct of Landow and AIM.

[22]   It is not necessary to consider the alternate argument advanced by the appellant that by receiving the benefit of the wrongful activities of Landow and AIM, Sagaz attracted liability. I would point out, however, that the wrong committed by Landow and AIM fell squarely within the scope of their mandate to secure the business of Canadian Tire and that the wrong was committed in furtherance of the aims and objectives of Sagaz. Even though, on the findings of the trial judge, the wrongful acts were unauthorized by Sagaz, they fall within the category of "unauthorized acts so connected with authorized acts that they may be regarded as modes (albeit improper modes) of doing an authorized act" for which the principal is liable as distinct from "a random act wholly unconnected to the nature of the enterprise and the employee's responsibilities" for which the principal is not liable: *Bazley v. Curry* (1999), 174 D.L.R. (4th) 45 (S.C.C.) at 52-3 and 56, per McLachlin J.

[23]   It follows that Sagaz is liable for the tortious conduct of Landow and AIM. Vicarious liability should not, however, extend to the award of punitive damages, in view of the findings of the trial judge with respect to Kavana's lack of knowledge and participation in the bribery scheme: see: S. M. Waddams, *The Law of Damages* (Canada Law Book: Aurora, 1999 Looseleaf) paras. 11.420 – 11.425.

**Issue 2 - Are the Trial Judge's Factual Findings With Respect to Kavana's Knowledge of or Participation in the Bribery Scheme Unreasonable?**

[24]   The trial judge accepted Kavana's evidence denying knowledge of and participation in the bribery scheme. The appellant submits that the trial judge's factual findings with respect to Kavana were unreasonable and ought to be set aside. The appellant contends that Kavana failed to explain some very suspicious circumstances and that he was successfully impeached on several crucial points on cross-examination.

[25]   The circumstances in which an appellate court will substitute its own findings in the face of an explicit finding of credibility by the trial judge are, to say the least, exceptional. The best the appellant could hope for in the circumstances of the present case would be a new trial, and even that remedy will be rare where the trial judge has considered contested evidence and found a witness to be credible.

[26]   The result of the first ground of appeal is to hold Sagaz liable. As will be seen below, I have concluded, under the third ground of appeal, that a new trial must be ordered with respect to Kavana's liability. In these circumstances, it is neither necessary, nor desirable, for me to deal with this ground of appeal.

**Issue 3 - Did the Trial Judge Err in Refusing to Re-Open the Trial to Hear the Evidence of Landow?**

[27]   The trial judge dismissed the appellant's motion pursuant to rule 59.06(2)(a) of the *Rules of Civil Procedure* to re-open the trial to hear the evidence of Landow. It was common ground between the parties before the trial judge and before this court that, in the circumstances of this case, the appellant had to establish two points:

> 1.     that the evidence "might probably have altered the judgment" and,
>
> 2.     that the evidence "could not with reasonable diligence have been discovered sooner".

(See *Becker Milk Co. Ltd. v. Consumers' Gas Co.* (1974), 2 O.R. (2d) 554 (C.A.) at 557.)
The trial judge found that the appellant failed to satisfy both elements. With respect to
the first test, the trial judge concluded that he should not exercise his discretion in the
appellant's favour because although Landow's evidence "may have" affected the result,
he was not satisfied that it "would probably" have changed the outcome.

[28]   With respect to the second branch, the trial judge found that Landow was available
to be called as a witness at trial and that the appellant was stuck with counsel's tactical
decision not to call him.

[29]   In my view, the trial judge erred on both branches of the test. The affidavit
evidence of Landow, if believed, would clearly implicate Kavana and Sagaz in the
bribery scheme. Accordingly, there is no doubt that if the trial judge accepted the
evidence as truthful it would have changed the outcome. The trial judge's refusal to re-
open the trial on the grounds that Landow's evidence only "may have" changed the
outcome, must have been based on the fact that Landow's evidence might not be
believed.

[30]   In this regard, I note that a recent English case dealing with a motion to re-open a
trial, *Charlesworth v. Relay Roads Ltd.*, [1999] 4 All E.R. 397 (Ch.D.) at 404, Neuberger
J. adopted the test laid down by Lord Denning in *Ladd v. Marshall*, [1954] 3 All E.R. 745
(C.A.) at 748 for admission of new evidence on appeal:

> ...first, it must be shown that the evidence could
> not have been obtained with reasonable diligence
> for use at the trial; second, the evidence must be
> such that, if given, it would probably have an
> important influence on the result of the case,
> although it need not be decisive; third, *the
> evidence must be such as is presumably to be
> believed, or in other words, it must be
> apparently credible, though it need not be
> incontrovertible.*

> While I think that these three factors should be in the
> forefront of the mind of the court when considering an
> application to admit new evidence after judgment has been
> handed down, but before the order has been drawn up, I
> incline to the view that the court is entitled to be somewhat
> more flexible, and not to proceed on the strict basis that each
> of these three conditions always has to be fully satisfied

before fresh evidence can be admitted before judgment.
(emphasis added)

I note that it has been suggested in Ontario as well that a more flexible approach may be
warranted on motions to re-open a trial: see *Castlerigg Investments Inc. v. Lam* (1991), 2
O.R. (3d) 216 at 223; *Scott v. Cook*, [1970] 2 O.R. 769. In Canada, the test for
admission of new evidence on appeal includes a similar criterion of credibility: "the
evidence must be credible in the sense that it is reasonably capable of belief". (See: *R. v.
Palmer*, [1980] 1 S.C.R. 759 at 775; *R. v. Warsing*, [1998] 3 S.C.R. 579 at 592.

[31]    Landow was extensively cross-examined on his affidavit prior to the motion to re-
open. It was not suggested before this court that his evidence was significantly
undermined. In my view, it met the standard of "reasonably capable of belief" or
"apparently credible, though...not...incontrovertible". In the circumstances of this case,
I find it difficult to see how, without hearing Landow, the trial judge could say with a
sufficient degree of certainty that Landow would not be believed. There are undoubtedly
cases where a late blooming affidavit challenging findings of fact in reasons for judgment
can be rejected out of hand. It is my view, however, that on this record, it was not
sufficiently clear that Landow would be disbelieved, and that the appropriate approach in
assessing the motion to re-open the trial was to consider whether Landow's evidence, if
believed, might probably change the result.

[32]    I also find that the trial judge erred with respect to the second branch of the test.
There was uncontradicted affidavit evidence before the judge on the motion to re-open
that before the trial the appellant made serious efforts to persuade Landow to co-operate
and to testify against Kavana and Sagaz. Landow was a named defendant and was
examined for discovery. On discovery, he maintained his own innocence as well as that
of Kavana. Landow did not attend the trial, but he was represented by counsel
throughout. It was only after the trial that he co-operated with the appellant by giving an
affidavit confessing to his own wrongdoing and implicating Kavana in the scheme.

[33]    In these circumstances, it is my view that the appellant satisfied the test of
showing that Landow's evidence was not discoverable by reasonable diligence prior to
the trial. It is difficult to see what more the appellant could have done. The appellant
examined Landow under oath and made repeated efforts to secure his co-operation.
Landow refused to co-operate and denied wrongdoing under oath. While Landow was
available to testify, the evidence he is now prepared to give was not available until he
changed his story. His change of heart and change of story after the trial qualify as
evidence that could not have been discovered by reasonable diligence prior to trial.

[34]    It is also my view that the motion to re-open should not have been dismissed on
the ground that the appellant exercised a tactical choice not to call Landow at trial. The

Page: 11

decision not to call Landow was made on the basis of the facts as they appeared at trial. Landow was a named defendant who gave sworn evidence on discovery denying any wrongdoing. The decision not to call him was made in that specific factual context. The facts have now changed significantly and, as I have already indicated, the appellant cannot be faulted for the change. This is quite unlike the situation (as in *International Corona Resources v. LAC Minerals Ltd.* (1988), 66 O.R. (2d) 610 (H.C.J.)) where counsel is aware of evidence that might or might not assist the case and decides, for tactical reasons, to pursue the case without calling that evidence.

[35]   I note that the trial judge quite appropriately observed that the public interest in the finality of litigation must be taken into account and that the courts must be wary of motions to re-open for they have the potential to create an injustice. As was said in *Charlesworth v. Relay Roads Ltd., supra,* at 404, "there must be a strong presumption against letting [a litigant] have a second chance, particularly after he has seen in detail from the judgment why he has lost". However, it is my view that in refusing the appellant's motion to re-open the trial to hear Landow's evidence, the trial judge did not apply the appropriate principles and that it is open to this court to intervene.

[36]   I would add here that we were not asked to consider whether a trial judge has a broad discretion to re-open the trial "to avoid a miscarriage of justice": see *Castlerigg Investments Inc. v. Lam, supra; Scott v. Cook, supra.* As I have concluded that the appellant has met the test set out in *Beckers Milk Co. Ltd. v. Consumers' Gas Co., supra,* it is unnecessary for me to consider this issue.

[37]   The result of my conclusion with respect to the vicarious liability issue is that Sagaz is liable to the appellants. The remaining issue is whether Kavana is personally liable by reason of his participation in the bribery scheme. In these circumstances, the appropriate order is to allow the appeal on the ground that the trial judge should have reopened the trial to hear Landow's evidence and to order that there be a new trial on the issue of Kavana's liability before a different trial judge. I hardly need add that the findings that have not been appealed or reversed will bind the parties on the subsequent trial.

**Cross Appeal**

[38]   The trial judge refused to award Sagaz and Kavana their costs against the appellant, but did make a "Sanderson order", awarding Sagaz and Kavana costs against Landow and AIM. Landow and AIM seek leave to appeal against that order. In view of the result of the main appeal, leave to appeal is granted and the costs award against Landow and AIM in favour of Sagaz and Kavana is set aside.

Page:  12

## Conclusion

[39]    For these reasons, the appeal and cross appeal are allowed and paragraphs 4, 7, and 8 of the judgment are set aside. The appellant is entitled to judgment against Sagaz for the damages and prejudgment interest awarded in paragraphs 1 and 3. There shall be an order for a new trial with respect to the liability of Kavana. The appellants are entitled to their costs of the trial against Sagaz and their costs of the appeal against both Sagaz and Kavana.  The cross-appellants are entitled to their costs of the appeal against Sagaz.


_____        "Robert J. Sharpe J.A."

_____        "I agree:  M. A. Catzman J.A."

_____        "I agree.  S. Borins J.A."


Released:  January 25, 2000

        "MAC"



**TAB 2**

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 18 of 304
671122 Ontario Ltd. v. Sagaz Industries Canada Inc., 2001 SCC 59, 2001 CSC 59,...

2001 SCC 59, 2001 CSC 59, 2001 CarswellOnt 3357, 2001 CarswellOnt 3358...

2001 SCC 59, 2001 CSC 59

Supreme Court of Canada

671122 Ontario Ltd. v. Sagaz Industries Canada Inc.

2001 CarswellOnt 3357, 2001 CarswellOnt 3358, 2001 SCC 59, 2001 CSC 59, [2001] 2 S.C.R. 983, [2001] 4
C.T.C. 139, [2001] S.C.J. No. 61, 108 A.C.W.S. (3d) 300, 11 C.C.E.L. (3d) 1, 12 C.P.C. (5th) 1, 150 O.A.C. 12,
17 B.L.R. (3d) 1, 2002 C.L.L.C. 210-013, 204 D.L.R. (4th) 542, 274 N.R. 366, 55 O.R. (3d) 782 (headnote
only), 55 O.R. (3d) 782 (note), 55 O.R. (3d) 782, 8 C.C.L.T. (3d) 60, J.E. 2001-1832, REJB 2001-25875

## Sagaz Industries Canada Inc., Sagaz Industries Inc. and
## Joseph Kavana, Appellants v. 671122 Ontario Limited,
## formerly Design Dynamics Limited, Respondent

McLachlin C.J.C., Iacobucci, Major, Bastarache, Binnie, Arbour, Lebel JJ.

Heard: June 19, 2001

Judgment: September 28, 2001[*]

Docket: 27820

Proceedings: reversing (2000), 48 C.C.L.T. (2d) 79 (Ont. C.A.); which reversed in part (1998), 42 C.C.L.T. (2d) 50 (Ont. Gen.
Div.); and reversed (1998), CarswellOnt 3933 (Ont. Gen. Div.); which was additional reasons to (1998), CarswellOnt 3933
(Ont. Gen. Div.); and reversed (1998), CarswellOnt 5010 (Ont. Gen. Div.); which was further additional reasons to (1998),
CarswellOnt 5010 (Ont. Gen. Div.)

Counsel: *H. Lorne Morphy, Q.C.* , *John B. Laskin* , *M. Paul Michell* , for Appellants.
*Martin Teplitsky, Q.C.* , *James M. Wortzman* , for Respondent.

Subject: Employment; Corporate and Commercial; Torts; Public; Civil Practice and Procedure; Income Tax (Federal)

### Related Abridgment Classifications
For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

### Headnote

**Employment law --- Nature of employment relationship — Relationships distinct from employment relationship
— Independent contractor — General**

No single conclusive test exists to determine whether worker is employee or independent contractor — Relevant factors
include whether worker provides own equipment, degree of risk and responsibility borne by worker and worker's
opportunity for profit in enterprise — Marketing consultant which is separately incorporated, maintains separate offices
and remains free to pursue other business is more likely to be independent contractor than employee.

**Employment law --- Relationship to third parties — Liability of employer for acts of employee — Torts — Wilful
acts — General**

No single conclusive test exists to determine whether worker is employee or independent contractor, such that employer
should be vicariously liable for worker's intentional tort — Relevant factors include whether worker provides own
equipment, degree of risk and responsibility borne by worker and worker's opportunity for profit in enterprise — Marketing
consultant which is separately incorporated, maintains separate offices and remains free to pursue other business is more
likely to be independent contractor than employee.

**Practice --- Trials — New trial — Grounds for granting — Discovery of evidence**

**671122 Ontario Ltd. v. Sagaz Industries Canada Inc., 2001 SCC 59, 2001 CSC 59,...**
Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 19 of 304

2001 SCC 59, 2001 CSC 59, 2001 CarswellOnt 3357, 2001 CarswellOnt 3358...

Inappropriate to interfere with trial judge's exercise of discretion to refuse to reopen trial on basis of fresh evidence, absent clear error of law — Fact that witness who is source of fresh evidence is not presumptively credible is proper consideration for trial judge in determining whether new evidence would probably affect verdict.

### Droit du travail individuel --- Nature du lien d'emploi — Liens distincts du lien d'emploi — Entrepreneur indépendant — En général

Il n'existe aucun critère concluant permettant de déterminer si un travailleur est un employé ou un entrepreneur indépendant — Facteurs pertinents incluent le fait que le travailleur fournit son propre équipement, le degré de risque et de responsabilité supporté par le travailleur et la possibilité pour le travailleur de réaliser des profits — Il est plus probable qu'un consultant en marketing, qui est constitué séparément, qui a un bureau séparé et demeure libre de rechercher d'autres affaires, soit un entrepreneur indépendant plutôt qu'un employé.

### Droit du travail individuel --- Relation vis-à-vis des tiers — Responsabilité de l'employeur pour les actions de l'employé — Délits civils — Actions délibérées — En général

Il n'existe aucun critère concluant pouvant permettre de déterminer si le travailleur est un employé ou un entrepreneur indépendant et que l'employeur devrait être tenu responsable du fait d'autrui pour le délit civil intentionel du travailleur — Facteurs pertinents incluent le fait que le travailleur fournit son propre équipement, le degré de risque et de responsabilité supporté par le travailleur et la possibilité pour le travailleur de réaliser des profits — Il est plus probable qu'un consultant en marketing, qui est constitué séparément, qui a un bureau séparé et demeure libre de rechercher d'autres affaires, soit un entrepreneur indépendant plutôt qu'un employé.

### Procédure --- Procès — Nouveau procès — Motifs pour l'accorder — Découverte d'une preuve

En l'absence d'une erreur de droit claire, il est inapproprié d'intervenir dans l'exercice du pouvoir discrétionnaire du juge de première instance, lequel a refusé de rouvrir le débat en raison d'une nouvelle preuve — Fait que le témoin d'où provient la nouvelle preuve ne peut être présumé crédible constitue un élément approprié sur lequel le juge de première instance peut se fonder pour déterminer si la nouvelle preuve aurait probablement un effet sur le verdict.

The respondent, D Ltd., was in the business of manufacturing synthetic sheepskin car seat covers. D ltd. had supplied goods to a major retail chain for many years when it was advised in 1984 that it was being replaced by the appellant supplier, S Inc. When D Ltd. learned that its termination had come about as a result of a "kickback" scheme involving an employee of the retail chain, it brought an action against the supplier, the supplier's marketing consultant, AIM Inc., and the principals of the two companies, alleging civil conspiracy. The action was allowed against AIM Inc. and its principal, L, but dismissed as against S Inc. and its principal, K.

Following release of the trial judge's reasons for judgment but prior to formal entry of the judgment, D Ltd. brought a motion to have the trial reopened on the basis of fresh evidence. The fresh evidence took the form of an affidavit newly supplied by L, who had not testified at trial. L's new evidence purported to implicate K in the bribery scheme. In additional reasons, the trial judge dismissed the motion, holding that while the new evidence may have changed the verdict at trial, it could not be said that it probably would have done so. Furthermore, the so-called fresh evidence could have been obtained before trial with the exercise of reasonable diligence.

D Ltd. and L appealed. The Court of Appeal determined that S Inc. was vicariously liable to D Ltd. as the employer of AIM Inc. The court also ordered a new trial with respect to the issue of K's liability, on the basis that the trial judge erred in refusing to reopen the trial to hear L's evidence.

S Inc. appealed to the Supreme Court of Canada.

**Held:** The appeal was allowed

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 20 of 304**

671122 Ontario Ltd. v. Sagaz Industries Canada Inc., 2001 SCC 59, 2001 CSC 59,...

2001 SCC 59, 2001 CSC 59, 2001 CarswellOnt 3357, 2001 CarswellOnt 3358...

The Court of Appeal erred in holding S Inc. vicariously liable to D Ltd. AIM Inc. was not an employee of S Inc., but an independent contractor for whose acts S Inc. could not be held liable in law.

The policy considerations which gave rise to the doctrine of vicarious liability did not support the imposition of liability in the circumstances of this case. Vicarious liabllity exists to provide a just and practical remedy for those injured as a consequence of wrongs perpetrated by an employee, and as a means of deterring future harm by imposing responsibility on those likely to be in a position to reduce accidents and intentional torts by their employees. The latter consideration required that an employer, to be held responsible, should exercise a certain element of control over the direct tortfeasor, but control could not form the determinative factor. No one conclusive test exists which can be applied to determine whether a person is an employee or an independent contractor. Various considerations which have traditionally been identified as relevant remain so, including whether the worker provides his own equipment or hires his own helpers, the degree of financial risk borne by the worker, the degree of responsibility for investment and management held by the worker, and the worker's opportunity for profit in the performance of his or her tasks. A synthesis of the various considerations gave rise to the general question "is the person performing the services performing them as a person in business on his own account?" Ultimately, what must always occur is a search for the total relationship of the parties.

The facts in this case clearly indicated that AIM Inc. was an independent contractor, rather than an employee of S Inc. The two companies were separate legal entities with their own offices in different locations. AIM Inc. was required, pursuant to the agreement between the parties, to pay all its own costs of conducting business, but remained free to carry on other activities and to represent other, non-competing suppliers. Those factors which appeared to contravene the finding of independent contractor status — including the designation by AIM Inc. of the retail chain as a "house account" and the fact that L wrote one letter to the retail chain on S Inc.'s letterhead — were not sufficient to show that AIM Inc. formed part of S Inc.'s in house sales team. It appeared that the retail chain's preference for dealing directly with suppliers, rather than through sales agents, had been the catalyst for these particular facts.

The contention that AIM Inc. was an agent of S Inc. such that the latter should be liable for the economic tort committed by AIM Inc. in the scope and course of its authority was untenable. Absent evidence to the contrary, it could not be presumed that the scope of AIM Inc.'s authority was sufficiently broad as to include the use of unlawful means. The trial judge's finding that the principal of S Inc. was not aware of the bribery served to confirm this. Since the payment of the bribe exceeded AIM Inc.'s actual and apparent authority as representative of S Inc., no basis for imposing liability was established.

The Court of Appeal also erred in reversing the trial judge's exercise of discretion to refuse to reopen the trial. It is well established that appellate courts, in the absence of an error of law, should defer to the trial judge, who is in the best position to decide whether fairness requires that a trial be reopened. In this case, the trial judge concluded that the new evidence may have altered the result at trial, but determined that it could not be said that it probably would have done so. The new evidence originated with L, who was, in the circumstances, akin to a "recanting liar." L was therefore not presumptively credible and the trial judge dealt correctly with his affidavit evidence.

L'intimée, D ltée, était un manufacturier de housses de sièges d'auto en peau de mouton synthétique. D ltée fournissait depuis plusieurs années des marchandises à une importante chaîne de magasins lorsqu'elle a été informée, en 1984, qu'elle serait remplacée par le fournisseur appelant, S inc. Lorsque D ltée a appris que l'annulation de son contrat était due à un système de pots-de-vin dans lequel était impliqué un employé de la chaîne de magasins, elle a intenté une action à l'encontre du fournisseur, du consultant en marketing du fournisseur, AIM inc., et des directeurs des deux compagnies. Elle alléguait un complot civil. L'action a été accueillie à l'égard d'AIM inc. et de son directeur, mais rejetée à l'égard de S inc. et de son directeur, K.

671122 Ontario Ltd. v. Sagaz Industries Canada Inc., 2001 SCC 59, 2001 CSC 59,...

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 21 of 304

2001 SCC 59, 2001 CSC 59, 2001 CarswellOnt 3357, 2001 CarswellOnt 3358...

À la suite du dépôt de ses motifs par le juge de première instance, mais avant l'inscription du dispositif du jugement, D ltée a présenté une requête en vue d'obtenir la réouverture du procès sous prétexte de l'existence d'un nouvel élément de preuve. Celui-ci était constitué d'un affidavit nouvellement fourni par L, qui n'avait pas témoigné lors du procès. La nouvelle preuve provenant de L semblait impliquer K dans le système de pots-de-vin. Dans des motifs supplémentaires, le juge de première instance a rejeté la requête au motif que, bien que le nouvel élément de preuve eût pu changer le verdict du procès, il ne pouvait être dit que cela l'aurait probablement fait. De plus, ce supposé nouvel élément de preuve aurait pu être obtenu avant le procès si on avait fait preuve de diligence raisonnable.

D ltée et L ont interjeté appel. La Cour d'appel a statué que S inc. était responsable du fait d'autrui à l'égard de D ltée à titre d'employeur d'AIM inc. La Cour a aussi ordonné la tenue d'un nouveau procès relativement à la question de la responsabilité de K au motif que le juge de première instance avait commis une erreur lorsqu'il a refusé de rouvrir le débat afin d'entendre le témoignage de L.

S inc. a interjeté appel à la Cour suprême du Canada.

**Arrêt:** Le pourvoi a été accueilli.

La Cour d'appel a commis une erreur lorsqu'elle a tenu S inc. responsable du fait d'autrui à l'égard de D ltée AIM inc. n'était pas un employé de S inc. mais plutôt un entrepreneur indépendant, et S inc. ne pouvait être tenue juridiquement responsable de ses actions.

Les considérations de politique générale qui ont donné lieu à la doctrine de la responsabilité du fait d'autrui ne justifiaient pas l'imputation de la responsabilité en l'espèce. La responsabilité du fait d'autrui existe afin de fournir un recours juste et pratique à ceux qui ont subi des dommages en raison des mauvaises actions commises par un employé; elle existe à titre de moyen de dissuasion de commettre un autre préjudice en imputant une responsabilité à ceux qui sont probablement en situation de pouvoir réduire les accidents et délits civils intentionnels commis par leurs employés. Cette dernière considération exigeait que, pour tenir un employeur responsable, celui-ci devait avoir un certain élément de contrôle à l'égard de l'auteur du délit civil, mais ce contrôle ne pouvait constituer le facteur déterminant. Dans les faits, il n'existe aucun critère concluant pouvant être appliqué afin de déterminer si une personne est un employé ou un entrepreneur indépendant. Plusieurs considérations qui ont traditionnellement été identifiées comme étant pertinentes le demeurent, dont la question de savoir si le travailleur fournit son propre équipement ou s'il embauche ses propres assistants, le degré de risque financier supporté par le travailleur, le degré de responsabilité qu'a le travailleur à l'égard des investissements et de la gestion et la possibilité pour le travailleur de faire des profits grâce à l'exécution de ses tâches. La synthèse des différentes considérations a donné lieu à la question générale de savoir si la personne exécutant les services les exécute à titre de personne étant en affaires à son compte. Finalement, il doit toujours y avoir un examen de la relation complète entre les parties.

Les faits en l'espèce indiquaient clairement que AIM inc. était un entrepreneur indépendant plutôt qu'un employé de S inc. Les deux compagnies constituaient deux entités juridiques distinctes, avec des bureaux dans des lieux différents. Conformément à l'entente entre les parties, AIM inc. devait payer tous ses coûts d'exploitation et elle demeurait libre de faire d'autres affaires et de représenter d'autres fournisseurs qui n'étaient pas des concurrents. Les facteurs qui semblaient contrevenir à la conclusion de statut d'entrepreneur indépendant, dont la description de AIM inc. que le compte de la chaîne de magasins était un « compte hors commission » et le fait que L avait écrit une lettre sur du papier à l'en-tête de la chaîne de magasins, étaient insuffisants pour permettre de démontrer que AIM inc. constituait une partie de l'équipe de vente de S inc. Il est apparu que la préférence de la chaîne de magasins à traiter directement avec les fournisseurs plutôt qu'avec des représentants commerciaux avait été le catalyseur de ces faits particuliers.

La prétention que AIM inc. était un représentant de S inc., à un point tel que cette dernière devait être tenue responsable pour le délit civil économique commis par AIM inc. dans le cadre de son autorité, ne pouvait être soutenue. En l'absence

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

671122 Ontario Ltd. v. Sagaz Industries Canada Inc., 2001 SCC 59, 2001 CSC 59,...

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 22 of 304

2001 SCC 59, 2001 CSC 59, 2001 CarswellOnt 3357, 2001 CarswellOnt 3358...

de preuve contraire, on ne pouvait présumer que l'étendue de l'autorité de AIM inc. était suffisamment large pour inclure l'usage de moyens illégaux. La conclusion du juge de première instance selon laquelle le directeur de S inc. n'était pas au courant des pots-de-vin donnés le confirmait. Même si le paiement des pots-de-vin excédait l'autorité réelle et apparente détenue par AIM inc. à titre de représentant de S inc., il n'a été démontré aucun motif pouvant justifier d'imposer une responsabilité.

La Cour d'appel a aussi commis une erreur lorsqu'elle a infirmé la décision du juge de première refusant de rouvrir le débat. Il a été bien établi qu'en l'absence d'une erreur de droit, les tribunaux d'appel devraient s'en remettre au juge de première instance, lequel est en meilleure position pour décider si l'équité exige la réouverture du débat. En l'espèce, le juge a conclu que le nouvel élément de preuve aurait pu modifier le résultat du procès, mais a conclu qu'on ne pouvait dire que cela l'aurait probablement fait. Le nouvel élément de preuve provenait de L, lequel était équivalent à un « menteur qui se rétracte ». L n'était donc pas présumément crédible, et le juge de première instance a eu raison de traiter l'affidavit comme il l'a fait.

**Table of Authorities**

**Cases considered by *Major J.* :**

*B. (P.A.) v. Curry, (*sub nom. *B. v. Curry)* 99 C.L.L.C. 210-033, 43 C.C.E.L. (2d) 1, 62 B.C.L.R. (3d) 173, *(*sub nom. *P.A.B. v. Children's Foundation)* 124 B.C.A.C. 119, *(*sub nom. *P.A.B. v. Children's Foundation)* 203 W.A.C. 119, *(*sub nom. *P.A.B. v. Children's Foundation)* 241 N.R. 266, 174 D.L.R. (4th) 45, [1999] 8 W.W.R. 197, [1999] L.V.I. 3046-1, 46 C.C.L.T. (2d) 1, [1999] 2 S.C.R. 534 (S.C.C.) — considered

*Clayton v. British American Securities Ltd.*, [1934] 3 W.W.R. 257, [1935] 1 D.L.R. 432, 49 B.C.R. 28 (B.C. C.A.) — considered

*Co-operators Insurance Assn. v. Kearney* (1964), [1965] S.C.R. 106, 48 D.L.R. (2d) 1 (S.C.C.) — considered

*Hamstra (Guardian ad litem of) v. British Columbia Rugby Union*, 145 D.L.R. (4th) 193, *(*sub nom. *Hamstra v. British Columbia Rugby Union)* 211 N.R. 89, *(*sub nom. *Hamstra v. British Columbia Rugby Union)* 89 B.C.A.C. 161, *(*sub nom. *Hamstra v. British Columbia Rugby Union)* 145 W.A.C. 161, *(*sub nom. *British Columbia Rugby Union v. Hamstra)* [1997] I.L.R. I-3439, [1997] 1 S.C.R. 1092, 35 C.C.L.T. (2d) 1, 34 B.C.L.R. (3d) 10, [1997] 7 W.W.R. 92, 9 C.P.C. (4th) 1 (S.C.C.) — considered

*Hôpital Notre-Dame de l'Espérance c. Laurent* (1977), *(*sub nom. *Laurent v. Theoret)* [1978] 1 S.C.R. 605, 17 N.R. 593, 3 C.C.L.T. 109 (S.C.C.) — referred to

*Ladd v. Marshall*, [1954] 1 W.L.R. 1489, [1954] 3 All E.R. 745 (Eng. C.A.) — followed

*London Drugs Ltd. v. Kuehne & Nagel International Ltd.* (1992), [1993] 1 W.W.R. 1, [1992] 3 S.C.R. 299, *(*sub nom. *London Drugs Ltd. v. Brassart)* 143 N.R. 1, 73 B.C.L.R. (2d) 1, 43 C.C.E.L. 1, 13 C.C.L.T. (2d) 1, *(*sub nom. *London Drugs Ltd. v. Brassart)* 18 B.C.A.C. 1, *(*sub nom. *London Drugs Ltd. v. Brassart)* 31 W.A.C. 1, 97 D.L.R. (4th) 261 (S.C.C.) — considered

*Market Investigations v. Minister of Social Security* (1968), [1969] 2 Q.B. 173, [1968] 3 All E.R. 732 (Eng. Q.B.) — followed

*Mayer v. J. Conrad Lavigne Ltd.* (1979), 27 O.R. (2d) 129, 105 D.L.R. (3d) 734 (Ont. C.A.) — referred to

671122 Ontario Ltd. v. Sagaz Industries Canada Inc., 2001 SCC 59, 2001 CSC 59,...

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 23 of 304

2001 SCC 59, 2001 CSC 59, 2001 CarswellOnt 3357, 2001 CarswellOnt 3358...

*Montreal (City) v. Montreal Locomotive Works Ltd.*, [1946] 3 W.W.R. 748, [1947] 1 D.L.R. 161 (Canada P.C.) — followed

*R. v. Walker* (1858), 169 E.R. 1136, Dears. & Bell 600, 27 L.J.M.C. 207 — referred to

*Sang v. Chi-Keung*, [1990] 2 A.C. 374 (Hong Kong P.C.) — considered

*Scott v. Cook*, [1970] 2 O.R. 769, 12 D.L.R. (3d) 113 (Ont. H.C.) — followed

*Stephenson, Jordan & Harrison Ltd. v. MacDonald & Evans*, [1952] 1 T.L.R. 101, 69 R.P.C. 10 (Eng. C.A.) — considered

*T. (G.) v. Griffiths, (*sub nom. *J. v. Griffiths)* 99 C.L.L.C. 210-034, *(*sub nom. *G.T.-J. v. Griffiths)* 241 N.R. 201, 174 D.L.R. (4th) 71, 124 B.C.A.C. 161, 203 W.A.C. 161, 63 B.C.L.R. (3d) 1, [1999] L.V.I. 3046-2, [1999] 9 W.W.R. 1, 46 C.C.L.T. (2d) 49, 44 C.C.E.L. (2d) 169, [1999] 2 S.C.R. 570 (S.C.C.) — referred to

*Wiebe Door Services Ltd. v. Minister of National Revenue*, [1986] 2 C.T.C. 200, 46 Alta. L.R. (2d) 83, [1986] 5 W.W.R. 450, [1986] C.E.B. & P.G.R. 8023, 86 C.L.L.C. 14,062, 87 D.T.C. 5025, [1986] 3 F.C. 553, 70 N.R. 214 (Fed. C.A.) — followed

**Rules considered:**

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194
    R. 59.06(2)(a) — referred to

APPEAL by supplier from finding of vicarious liability and from order directing new trial in judgment reported at (2000), 46 O.R. (3d) 760, 48 C.C.L.T. (2d) 79, 128 O.A.C. 46, 183 D.L.R. (4th) 488, 2 B.L.R. (3d) 1, 41 C.P.C. (4th) 107, [2000] O.J. No. 121, 2000 CarswellOnt 121 (Ont. C.A.), setting aside in part judgment reported at (1998), 40 O.R. (3d) 229, 42 C.C.L.T. (2d) 50, 1998 CarswellOnt 2219, [1998] O.J. No. 2194 (Ont. Gen. Div.), and setting aside judgments reported at 1998 CarswellOnt 3933 (Ont. Gen. Div.) and 1998 CarswellOnt 5010 (Ont. Gen. Div.).

POURVOI du fournisseur à l'encontre de la conclusion de responsabilité du fait d'autrui et de l'ordonnance d'un nouveau procès de l'arrêt publié à (2000), 46 O.R. (3d) 760, 48 C.C.L.T. (2d) 79, 128 O.A.C. 46, 183 D.L.R. (4th) 488, 2 B.L.R. (3d) 1, 41 C.P.C. (4th) 107, [2000] O.J. No. 121, 2000 CarswellOnt 121 (Ont. C.A.), qui a infirmé en partie le jugement publié à (1998), 40 O.R. (3d) 229, 42 C.C.L.T. (2d) 50, 1998 CarswellOnt 2219, [1998] O.J. No. 2194 (Ont. Gen. Div.), et infirmé les jugements publiés à 1998 CarswellOnt 3933 (Div. Gén. Ont.), et 1998 CarswellOnt 5010 (Div. Gén. Ont.).

**The judgment of the court was delivered by** *Major J.***:**

1    This appeal raises two issues: the application of vicarious liability for a bribery scheme in a large commercial transaction and the appellate court's review of the trial judge's exercise of discretion not to reopen the trial to admit fresh evidence on a motion brought after the release of his reasons but before formal judgment was entered.

2    Vicarious liability describes the event when the law holds one person responsible for the misconduct of another because of their relationship. In this case, the respondent (the original supplier) suffered substantial losses when it was replaced as Canadian Tire's synthetic car seat cover supplier. This happened because a bribe was paid by a rival supplier's consultant to the head of Canadian Tire's automotive division.

Case 09-10138-MFW Doc 15740 Filed 06/12/15 Page 24 of 304

671122 Ontario Ltd. v. Sagaz Industries Canada Inc., 2001 SCC 59, 2001 CSC 59,...

2001 SCC 59, 2001 CSC 59, 2001 CarswellOnt 3357, 2001 CarswellOnt 3358...

3    The first question is whether the appellant Sagaz (the rival automotive supplier) is vicariously liable for the tortious conduct of its consultant who was hired to assist in securing Canadian Tire's business. In my opinion the appellant Sagaz, the competitive supplier, is not vicariously liable for the bribery scheme perpetrated by its consultant. The consultant was not an employee of the supplier but an independent contractor. Based on policy considerations, the relationship between an employer and independent contractor does not typically give rise to a claim in vicarious liability.

4    On the second question, the motion to reopen the trial to adduce fresh evidence, I conclude for the reasons that follow that the Court of Appeal erred in substituting its discretion for that of the trial judge.

## I. Facts

5    The respondent, 671122 Ontario Limited, formerly Design Dynamics Limited ("Design"), was Canadian Tire Corporation's principal supplier of synthetic sheepskin car seat covers for 30 years. Canadian Tire was the party in the position of strength in the relationship. This is so as it represented more than 60 per cent of the Canadian seat cover market and, by 1983, was Design's largest customer accounting for over 50 per cent of its sales.

6    In June 1984, Design lost Canadian Tire's business. Robert Summers, the head of Canadian Tire's automotive division, advised Design that another company, the appellants Sagaz Industries Canada Inc. and Sagaz Industries Inc. (collectively "Sagaz"), would be replacing Design as Canadian Tire's seat cover supplier. Sagaz is a Florida corporation and the appellant, Joseph Kavana, is its president. Sagaz Industries Inc. continues to supply Canadian Tire and Sagaz Industries Canada Inc. is inactive.

7    Summers terminated Canadian Tire's supply relationship with Design in favour of Sagaz because of bribery in the form of a "kickback" scheme. Sagaz retained American Independent Marketing Inc. ("AIM"), a New York corporation, to assist in marketing Sagaz's seat covers to Canadian Tire. AIM was owned and controlled by Stewart Landow. It was later determined that Summers accepted a bribe from Landow and AIM in relation to the Sagaz seat cover contract. Specifically, Summers incorporated a sham corporation, International Marketing Consultants ("IMC"), to receive the bribery money. Summers employed a surrogate, Anthony Brathwaite, as a token manager of IMC. Brathwaite was the puppet of Summers who received all the profits of IMC. Summers entered into an agreement with Landow whereby Landow (through AIM) would pay Summers (through IMC) two percent of all sales by Sagaz to Canadian Tire of synthetic seat covers in order to ensure the sales occurred. As a result of the bribe, Summers terminated Canadian Tire's relationship with Design.

8    Summers' wrongdoing was discovered in 1985. His employment with Canadian Tire was terminated and he was eventually convicted of corruptly accepting benefits and went to prison. He later went bankrupt. Brathwaite pleaded guilty to similar charges.

9    Summers was replaced by new management at Canadian Tire which re-evaluated its purchase of synthetic seat covers. Management determined that it preferred the seat cover products of Sagaz to those of Design. Accordingly, Canadian Tire retained its relationship with Sagaz as its supplier.

10    Having lost its major customer, Design's manufacturing business went into a steep decline. It sold its assets in 1988. In 1989, Design brought an action against some thirteen defendants, including Canadian Tire, Summers, Brathwaite, Landow, AIM, Sagaz and Kavana. At the trial, only AIM, Landow (who did not testify), Sagaz and Kavana remained as defendants. Canadian Tire paid Design $750,000 to settle the action against it. The action against Summers was discontinued when he went bankrupt. Design's action alleged that AIM, Landow, Sagaz and Kavana had bribed Summers and, but for those bribes, Design would have continued as supplier to Canadian Tire.

## II. Judicial History

### A. Ontario Court of Justice (General Division) (1998), 40 O.R. (3d) 229 (Ont. Gen. Div.)

671122 Ontario Ltd. v. Sagaz Industries Canada Inc., 2001 SCC 59, 2001 CSC 59,...

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 25 of 304

2001 SCC 59, 2001 CSC 59, 2001 CarswellOnt 3357, 2001 CarswellOnt 3358...

11    The trial judge found that the decision of Canadian Tire management to switch suppliers of seat covers had nothing to do with any belief that the Sagaz product was superior to the Design product. Design's business was lost solely because of the bribe.

12    The bribery scheme was profitable to Landow as commissions on the sales from Sagaz to Canadian Tire would be paid to his solely-owned corporation, AIM. Landow could not hide behind the corporate veil of AIM in his use of the corporation as his agent in the commission of an intentional tort. The trial judge found that Landow and AIM conspired with Summers and IMC to engage in the unlawful conduct of taking away Design's business from Canadian Tire.

13    While the tort of civil conspiracy was sufficient to establish liability, the trial judge found that liability was more directly addressed through the tort of unlawful interference with economic relations, for which Landow and AIM were liable.

14    There were suspicious business dealings raised at the trial in an attempt to implicate Kavana, President of Sagaz, in the bribery scheme. For instance, commissions that Landow received in respect of the sale of seat covers from Sagaz to Canadian Tire. Before Sagaz secured the seat cover contract with Canadian Tire, it was paying Landow a five percent commission on sales. Sagaz then raised Landow's commission from five to six percent. At the same time, or close to it, Landow entered into the agreement with Summers whereby Landow paid Summers two percent in the form of the kickback scheme. It was Design's theory at trial that Landow's commission was raised from five to six percent to fund the bribe to Summers. That implied that Kavana and Landow agreed to share or split the payment of the two per cent bribe. Kavana denied involvement in the bribery scheme. He testified that he was misled by Landow in agreeing to change the commission from five to six percent because Landow told him that he was required to hire someone to provide in-store service in Canada which would entail additional expense. Another suspicious event was the payment of $15,000 by Kavana to Landow in March 1985 which eventually found its way to Robin Addie, a senior buyer for Canadian Tire. Again, Kavana testified and denied any improper conduct. He claimed that Landow told him that this expenditure was tied to the purchase of a car as part of an intended promotion to display the Canadian Tire seat covers. In fact, a car was never purchased.

15    These suspicious circumstances surrounding Kavana were presented at the trial. The trial judge believed Kavana, found him credible and accepted his evidence that he had trusted Landow and had accepted Landow's explanation about the commission and car purchase. As well Summers did not implicate Kavana in his testimony. The trial judge concluded that Kavana was not involved in the bribery scheme. He pointed out that had Kavana known of the bribe by Landow then Kavana and Sagaz would have been held directly liable and obviously vicarious liability would not have been an issue.

16    The trial judge was brief on the issue of whether Sagaz was vicariously liable to Design for the wrongdoing of Landow and AIM. He held that, on the evidence, AIM was an independent contractor to Sagaz. Citing *London Drugs Ltd. v. Kuehne & Nagel International Ltd.*, [1992] 3 S.C.R. 299 (S.C.C.), he held that vicarious liability could not and should not be imposed upon Sagaz for the tortious acts of an independent contractor.

17    Damages were assessed at $1,807,500 against Landow and AIM, jointly and severally, plus $50,000 in punitive damages, and pre-judgment interest. The action was dismissed as against Sagaz and Kavana. The trial judge refused to award Sagaz and Kavana their costs against Design, but awarded Sagaz and Kavana their costs against Landow and AIM under a "Sanderson order".

### B. Ontario Court of Justice (General Division) [1998] O.J. No. 4018 (Ont. Gen. Div.) (QL)

18    After the trial judge's reasons for judgment were released, but before formal judgment was entered, Landow, who did not testify at the trial, gave Design an affidavit admitting to the conspiracy to bribe Summers and implicating Kavana in it. On the basis of the affidavit, Design brought a motion before the trial judge pursuant to rule 59.06(2)(a) of the *Rules of Civil Procedure*, R.R.O. 1990, Reg. 194, to have the trial reopened to hear Landow's fresh evidence. Design claimed that the fresh evidence would show that Kavana was involved in and had knowledge of the tortious activity of Landow, and was also liable to Design.

19    The trial judge dismissed the motion. He found that there was no direct evidence at trial that Kavana was a party to the bribe paid to Summers. Summers dealt directly with Landow. Summers did not implicate Kavana in his testimony. Kavana

671122 Ontario Ltd. v. Sagaz Industries Canada Inc., 2001 SCC 59, 2001 CSC 59,...

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 26 of 304

2001 SCC 59, 2001 CSC 59, 2001 CarswellOnt 3357, 2001 CarswellOnt 3358...

testified and denied involvement in the bribe. He was subjected to a thorough and rigorous cross-examination and was credible in his testimony. Landow did not testify nor attend the trial. He was represented by counsel throughout the trial. In the cross-examination of Landow on his affidavit given in connection with the fresh evidence motion, Landow acknowledged that he was aware of his right to attend the trial and to testify. He received daily reports about the course of the trial over its duration.

20     In dismissing the motion to reopen the trial, the trial judge applied a two-part test from *Scott v. Cook*, [1970] 2 O.R. 769 (Ont. H.C.) . First, would the evidence, if presented at trial, probably have changed the result? Second, could the evidence have been obtained before trial by the exercise of reasonable diligence?

21     The trial judge found that neither of the two steps was met. He could not say that the new evidence, if presented at trial, would probably have changed the result, only that it may have changed the result. As well, if the trial were reopened, Landow's evidence might well not be believed. His credibility would be very much in issue. On the second part of the test, the trial judge found that Landow's evidence could have been obtained before trial. Design could have compelled Landow to testify under oath at trial, although that evidence may not have been helpful to Design. The trial judge concluded that the court would not allow a party to correct what in hindsight was an unsuccessful strategy at trial.

### C. Ontario Court of Appeal (2000), 183 D.L.R. (4th) 488 (Ont. C.A.)

22     The Court of Appeal reversed the decisions of the trial judge. The gist of its view was that Sagaz was vicariously liable to Design. Applying the "organization test" (from *Mayer v. J. Conrad Lavigne Ltd.* (1979), 27 O.R. (2d) 129 (Ont. C.A.) , as previously approved by this Court in *Co-operators Insurance Assn. v. Kearney* (1964), [1965] S.C.R. 106 (S.C.C.) ), the Court of Appeal found that Landow and AIM did their work as part of the "Sagaz sales team". Sagaz was therefore jointly and severally liable with Landow and AIM for the damages awarded, with the exception of punitive damages. For this reason, the Court of Appeal also allowed Landow's and AIM's cross-appeal on the issue of costs and set aside the costs award to Sagaz and Kavana against Landow and AIM. Design was entitled to costs against Sagaz.

23     A new trial was ordered with respect to the liability of Kavana on the basis that the trial judge should have reopened the trial to hear Landow's evidence. The Court of Appeal found that the evidence, if presented at trial and accepted as credible, would implicate Kavana and Sagaz in the bribery scheme. Also, it held that Landow's evidence was not discoverable by reasonable diligence prior to trial as Design made serious efforts to no avail to persuade Landow to co-operate and to testify against Kavana and Sagaz.

## III. Issues

24

1. Did the Court of Appeal err in holding Sagaz vicariously liable to Design?

2. Did the Court of Appeal err by substituting its discretion for that of the trial judge in the decision to reopen the trial?

## IV. Analysis

### A. Vicarious Liability

### (1) Policy Rationale Underlying Vicarious Liability

25     Vicarious liability is not a distinct tort. It is a theory that holds one person responsible for the misconduct of another because of the relationship between them. Although the categories of relationships in law that attract vicarious liability are neither exhaustively defined nor closed, the most common one to give rise to vicarious liability is the relationship between master and servant, now more commonly called employer and employee.

26     In general, tort law attempts to hold persons accountable for their wrongful acts and omissions and the direct harm that flows from those wrongs. Vicarious liability, by contrast, is considered to be a species of strict liability because it requires no

671122 Ontario Ltd. v. Sagaz Industries Canada Inc., 2001 SCC 59, 2001 CSC 59,...

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 27 of 304

2001 SCC 59, 2001 CSC 59, 2001 CarswellOnt 3357, 2001 CarswellOnt 3358...

proof of personal wrongdoing on the part of the person who is subject to it. As such, it is still relatively uncommon in Canadian tort law. What policy considerations govern its discriminate application?

27    As Fleming stated in an oft-quoted passage,

[T]he modern doctrine of vicarious liability cannot parade as a deduction from legalistic premises, but should be frankly recognised as having its basis in a combination of policy considerations. . . .

(*The Law of Torts* (9th ed. 1998), at p. 410, cited in *B. (P.A.) v. Curry*, [1999] 2 S.C.R. 534 (S.C.C.) , at para. 26, *per* McLachlin J. (as she then was), and in *T. (G.) v. Griffiths*, [1999] 2 S.C.R. 570 (S.C.C.) , released concurrently, at para. 29, *per* Binnie J.)

However, McLachlin J. noted in *B. (P.A.)* , at para. 27 (cited in *T. (G.)* , at para. 29) that "[a] focus on policy is not to diminish the importance of legal principle".

28    The most recent discussion by this Court of the policy considerations that justify the imposition of vicarious liability was in *B. (P.A.)* , at paras. 26-36, where McLachlin J. succinctly reviewed the relevant jurisprudence. She began with La Forest J.'s opinion (dissenting on the cross-appeal) in *London Drugs, supra* , which held that vicarious liability is generally considered to rest on one of two logical bases. The first, known as the "master's tort theory", posits that the employer is vicariously liable for the acts of his employee because the acts are regarded as being authorized by him so that in law the acts of the employee are the acts of the employer. The second, known as the "servant's tort theory", attributes liability to the employer simply because the employer was the employee's superior and therefore in charge or command of the employee (G. H. L. Fridman, *The Law of Torts in Canada* (1990), vol. 2, at pp. 314-15, and P. S. Atiyah, *Vicarious Liability in the Law of Torts* (1967), at pp. 6-7).

29    However, La Forest J. acknowledged that neither of the logical bases for vicarious liability succeed completely in explaining the operation of the doctrine, and he found that the vicarious liability regime is a response to a number of policy considerations, including compensation, deterrence and loss internalization (at p. 336). McLachlin J. noted that Fleming identified similar policies to justify the imposition of vicarious liability, including the provision of a just and practical remedy for the harm and the deterrence of future harm, and held that these two ideas "usefully embrace the main policy considerations that have been advanced" (para. 29).

30    Identification of the policy considerations underlying the imposition of vicarious liability assists in determining whether the doctrine should be applied in a particular case and it is for that reason that the policy considerations set out by this Court in *B. (P.A.)* should be briefly reviewed.

31    First, vicarious liability provides a just and practical remedy to people who suffer harm as a consequence of wrongs perpetrated by an employee. Many commentators are suspicious of vicarious liability in principle because it appears to hold parties responsible for harm simply because they have "deep pockets" or an ability to bear the loss even though they are not personally at fault. The "deep pockets" justification on its own does not accord with an inherent sense of what is fair (see also R. Flannigan, "Enterprise control: The servant-independent contractor distinction" (1987), 37 *U.T.L.J.* 25, at p. 29). Besides an ability to bear the loss, it must also seem just to place liability for the wrong on the employer. McLachlin J. addresses this concern in *B. (P.A.), supra* , at para. 31:

Vicarious liability is arguably fair in this sense. The employer puts in the community an enterprise which carries with it certain risks. When those risks materialize and cause injury to a member of the public despite the employer's reasonable efforts, it is fair that the person or organization that creates the enterprise and hence the risk should bear the loss. This accords with the notion that it is right and just that the person who creates a risk bear the loss when the risk ripens into harm.

Similarly, Fleming stated that "a person who employs others to advance his own economic interest should in fairness be placed under a corresponding liability for losses incurred in the course of the enterprise . . . " (p. 410). McLachlin J. states that while the fairness of this proposition is capable of standing alone, "it is buttressed by the fact that the employer is often in the best position to spread the losses through mechanisms like insurance and higher prices, thus minimizing the dislocative effect of

671122 Ontario Ltd. v. Sagaz Industries Canada Inc., 2001 SCC 59, 2001 CSC 59,...

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 28 of 304

2001 SCC 59, 2001 CSC 59, 2001 CarswellOnt 3357, 2001 CarswellOnt 3358...

the tort within society" (para. 31). Finally on this point, it is noteworthy that vicarious liability does not diminish the personal liability of the direct tortfeasor (Fleming, *supra* , at p. 411; *London Drugs* , at p. 460, *per* McLachlin J.).

32      The second policy consideration underlying vicarious liability is deterrence of future harm as employers are often in a position to reduce accidents and intentional wrongs by efficient organization and supervision. This policy ground is related to the first policy ground of fair compensation, as "[t]he introduction of the enterprise into the community with its attendant risk, in turn, implies the possibility of managing the risk to minimize the costs of the harm that may flow from it" (para. 34).

*(2) Employee Versus Independent Contractor*

33      The most common relationship that attracts vicarious liability is that between employer and employee, formerly master and servant. This is distinguished from the relationship of an employer and independent contractor which, subject to certain limited exceptions (see Atiyah, *supra* , pp. 327-78), typically does not give rise to a claim for vicarious liability. If a worker is determined to be an employee as opposed to an independent contractor such that vicarious liability can attach to the employer, this is not the end of the analysis. The tortious conduct has to be committed by the employee in the course of employment. For the reasons that follow, this second stage of the analysis is not relevant and need not by analysed in the present appeal.

34      What is the difference between an employee and an independent contractor and why should vicarious liability more likely be imposed in the former case than in the latter? This question has been the subject of much debate. The answer lies with the element of control that the employer has over the direct tortfeasor (the worker). If the employer does not control the activities of the worker, the policy justifications underlying vicarious liability will not be satisfied. See Flannigan, *supra* , at pp. 31-32:

> This basis for vicarious liability discloses a precise limitation on the scope of the doctrine. If the employer does not control the activities of the worker it is clear that vicarious liability should not be imposed, for then insulated risk taking [by the employer] does not occur. Only the worker, authorized to complete a task, could have affected the probability of loss, for he alone had control in any respect. Thus, because there is no mischief where employer control is absent, no remedy is required.

35      Explained another way, the main policy concerns justifying vicarious liability are to provide a just and practical remedy for the plaintiff's harm and to encourage the deterrence of future harms (*B. (P.A.), supra* , at para. 29). Vicarious liability is fair in principle because the hazards of the business should be borne by the business itself; thus, it does not make sense to anchor liability on an employer for acts of an independent contractor, someone who was in business on his or her own account. In addition, the employer does not have the same control over an independent contractor as an employee to reduce accidents and intentional wrongs by efficient organization and supervision. Each of these policy justifications are relevant to the ability of the employer to control the activities of the employee, justifications which are generally deficient or missing in the case of an independent contractor. As discussed above, the policy justifications for imposing vicarious liability are relevant where the employer is able to control the activities of the employee but may be deficient in the case of an independent contractor over whom the employer has little control. However, control is not the only factor to consider in determining if a worker is an employee or an independent contractor. For the reasons discussed below, a reliance on control alone can be misleading, and there are other relevant factors which should be considered in making this determination.

36      Various tests have emerged in the case law to help determine if a worker is an employee or an independent contractor. The distinction between an employee and an independent contractor applies not only in vicarious liability, but also to the application of various forms of employment legislation, the availability of an action for wrongful dismissal, the assessment of business and income taxes, the priority taken upon an employer's insolvency, and the application of contractual rights (Flannigan, *supra* , at p. 25). Accordingly, much of the case law on point while not written in the context of vicarious liability is still helpful.

37      The Federal Court of Appeal thoroughly reviewed the relevant case law in *Wiebe Door Services Ltd. v. Minister of National Revenue* , [1986] 3 F.C. 553 (Fed. C.A.) . As MacGuigan J.A. noted, the original criterion of the employment relationship was the control test set out by Baron Bramwell in *R. v. Walker* (1858), 27 L.J.M.C. 207 , and adopted by this Court in *Hôpital Notre-Dame de l'Espérance c. Laurent* (1977), [1978] 1 S.C.R. 605 (S.C.C.) . It is expressed as follows: "the essential criterion

671122 Ontario Ltd. v. Sagaz Industries Canada Inc., 2001 SCC 59, 2001 CSC 59,...

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 29 of 304

2001 SCC 59, 2001 CSC 59, 2001 CarswellOnt 3357, 2001 CarswellOnt 3358...

of employer-employee relations is the right to give orders and instructions to the employee regarding the manner in which to carry out his work" (*Hôpital* , at p. 613).

38    This criterion has been criticized as wearing "an air of deceptive simplicity" (Atiyah, *supra* , at p. 41). The main problems are set out by MacGuigan J.A. in *Wiebe Door, supra* , at pp. 558-59:

> A principal inadequacy [with the control test] is its apparent dependence on the exact terms in which the task in question is contracted for: where the contract contains detailed specifications and conditions, which would be the normal expectation in a contract with an independent contractor, the control may even be greater than where it is to be exercised by direction on the job, as would be the normal expectation in a contract with a servant, but a literal application of the test might find the actual control to be less. In addition, the test has broken down completely in relation to highly skilled and professional workers, who possess skills far beyond the ability of their employers to direct.

39    An early attempt to deal with the problems of the control test was the development of a four-fold test known as the "entrepreneur test". It was set out by W. O. (later Justice) Douglas in "Vicarious Liability and Administration of Risk I" (1928-29), 38 *Yale L.J.* 584, and applied by Lord Wright in *Montreal (City) v. Montreal Locomotive Works Ltd.* (1946), [1947] 1 D.L.R. 161 (Canada P.C.) , at p. 169:

> In earlier cases a single test, such as the presence or absence of control, was often relied on to determine whether the case was one of master and servant, mostly in order to decide issues of tortious liability on the part of the master or superior. In the more complex conditions of modern industry, more complicated tests have often to be applied. It has been suggested that a fourfold test would in some cases be more appropriate, a complex involving (1) control; (2) ownership of the tools; (3) chance of profit; (4) risk of loss. Control in itself is not always conclusive.

40    As MacGuigan J.A. notes, a similar general test, known as the "organization test" or "integration test" was used by Denning L.J. (as he then was) in *Stephenson, Jordan & Harrison Ltd. v. MacDonald & Evans*, [1952] 1 T.L.R. 101 (Eng. C.A.) , at p. 111:

> One feature which seems to run through the instances is that, under a contract of service, a man is employed as part of the business, and his work is done as an integral part of the business; whereas, under a contract for services, his work, although done for the business, is not integrated into it but is only accessory to it.

41    This decision imported the language "contract of service" (employee) and "contract for services" (independent contractor) into the analysis. The organization test was approved by this Court in *Co-operators Insurance, supra* (followed in *Mayer* , *supra* ), where Spence J. observed that courts had moved away from the control test under the pressure of novel situations, replacing it instead with a type of organization test in which the important question was whether the alleged servant was part of his employer's organization (from Fleming, *supra* , at p. 416).

42    However, as MacGuigan J.A. noted in *Wiebe Door* , the organization test has had "less vogue in other common-law jurisdictions" (at p. 561), including England and Australia. For one, it can be a difficult test to apply. If the question is whether the activity or worker is integral to the employer's business, this question can usually be answered affirmatively. For example, the person responsible for cleaning the premises is technically integral to sustaining the business, but such services may be properly contracted out to people in business on their own account (see R. Kidner, "Vicarious liability: for whom should the employer be liable?" (1995), 15 Legal Studies 47, at p. 60). As MacGuigan J.A. further noted in *Wiebe Door* , if the main test is to demonstrate that, without the work of the alleged employees the employer would be out of business, a factual relationship of mutual dependency would always meet the organization test of an employee even though this criterion may not accurately reflect the parties' intrinsic relationship (at pp. 562-63).

43    Despite these criticisms, MacGuigan J.A. acknowledges, at p. 563, that the organization test can be of assistance:

> Of course, the organization test of Lord Denning and others produces entirely acceptable results when properly applied, that is, when the question of organization or integration is approached from the persona of the "employee" and not from that of the "employer," because it is always too easy from the superior perspective of the larger enterprise to assume that

**Case 09-10138-MFW   Doc 15740   Filed 06/12/15   Page 30 of 304**

671122 Ontario Ltd. v. Sagaz Industries Canada Inc., 2001 SCC 59, 2001 CSC 59,...

2001 SCC 59, 2001 CSC 59, 2001 CarswellOnt 3357, 2001 CarswellOnt 3358...

every contributing cause is so arranged purely for the convenience of the larger entity. *We must keep in mind that it was with respect to the business of the employee that Lord Wright [in* Montreal *] addressed the question "Whose business is it?"* [Emphasis added.]

44      According to MacGuigan J.A., the best synthesis found in the authorities is that of Cooke J. in *Market Investigations v. Minister of Social Security*, [1968] 3 All E.R. 732 (Eng. Q.B.) , at pp. 737-38 (followed by the Privy Council in *Sang v. Chi-Keung*, [1990] 2 A.C. 374 (Hong Kong P.C.) , *per* Lord Griffiths, at p. 382):

> The observations of LORD WRIGHT, of DENNING L.J. and of the judges of the Supreme Court in the U.S.A. suggest that the fundamental test to be applied is this: *"Is the person who has engaged himself to perform these services performing them as a person in business on his own account?"* . If the answer to that question is "yes", then the contract is a contract for services. If the answer is "no" then the contract is a contract of service. No exhaustive list has been compiled and perhaps no exhaustive list can be compiled of considerations which are relevant in determining that question, nor can strict rules be laid down as to the relative weight which the various considerations should carry in particular cases. The most that can be said is that control will no doubt always have to be considered, although it can no longer be regarded as the sole determining factor; and that factors, which may be of importance, are such matters as whether the man performing the services provides his own equipment, whether he hires his own helpers, what degree of financial risk he takes, what degree of responsibility for investment and management he has, and whether and how far he has an opportunity of profiting from sound management in the performance of his task. [Emphasis added.]

45      Finally, there is a test that has emerged that relates to the enterprise itself. Flannigan, *supra* , sets out the "enterprise test" at p. 30 which provides that the employer should be vicariously liable because (1) he controls the activities of the worker; (2) he is in a position to reduce the risk of loss; (3) he benefits from the activities of the worker; (4) the true cost of a product or service ought to be borne by the enterprise offering it. According to Flannigan, each justification deals with regulating the risk-taking of the employer and, as such, control is always the critical element because the ability to control the enterprise is what enables the employer to take risks. An "enterprise risk test" also emerged in La Forest J.'s dissent on cross- appeal in *London Drugs* where he stated at p. 339 that "[v]icarious liability has the broader function of transferring to the enterprise itself the risks created by the activity performed by its agents".

46      In my opinion, there is no one conclusive test which can be universally applied to determine whether a person is an employee or an independent contractor. Lord Denning stated in *Stevenson Jordan, supra* , that it may be impossible to give a precise definition of the distinction (p. 111) and, similarly, Fleming observed that "no single test seems to yield an invariably clear and acceptable answer to the many variables of ever changing employment relations . . . " (p. 416). Further, I agree with MacGuigan J.A. in *Wiebe Door* , at p. 563, citing Atiyah, *supra* , at p. 38, that what must always occur is a search for the total relationship of the parties:

> [I]t is exceedingly doubtful whether the search for a formula in the nature of a single test for identifying a contract of service any longer serves a useful purpose. . . . The most that can profitably be done is to examine all the possible factors which have been referred to in these cases as bearing on the nature of the relationship between the parties concerned. Clearly not all of these factors will be relevant in all cases, or have the same weight in all cases. Equally clearly no magic formula can be propounded for determining which factors should, in any given case, be treated as the determining ones.

47      Although there is no universal test to determine whether a person is an employee or an independent contractor, I agree with MacGuigan J.A. that a persuasive approach to the issue is that taken by Cooke J. in *Market Investigations, supra* . The central question is whether the person who has been engaged to perform the services is performing them as a person in business on his own account. In making this determination, the level of control the employer has over the worker's activities will always be a factor. However, other factors to consider include whether the worker provides his or her own equipment, whether the worker hires his or her own helpers, the degree of financial risk taken by the worker, the degree of responsibility for investment and management held by the worker, and the worker's opportunity for profit in the performance of his or her tasks.

48     It bears repeating that the above factors constitute a non-exhaustive list, and there is no set formula as to their application. The relative weight of each will depend on the particular facts and circumstances of the case.

*(3) Application to the Facts*

49     According to the agreement between Sagaz and AIM dated January 29, 1985, AIM was hired to "provide assistance to Sagaz in retaining the goodwill of [Canadian Tire]". Although the contract designated AIM as an "independent contractor", this classification is not always determinative for the purposes of vicarious liability. The starting point for this analysis is whether AIM, while engaged to perform such services for Sagaz, was in business on its own account. If so, AIM is an independent contractor as opposed to an employee of Sagaz and vicarious liability likely will not follow. It is helpful to examine the non-exhaustive list of factors from *Montreal (City)* and *Market Investigations* to assist in this determination.

50     There is some evidence to suggest that Landow and AIM were employees of Sagaz. In other words, in response to the query "whose business is it?", there is some suggestion that Landow worked in what was characterized as a "joint effort" with Sagaz sales managers in order to secure Canadian Tire's business. Specifically, although it was Landow's duty under the contract to obtain Canadian Tire's business and maintain its goodwill, the first letter sent to Canadian Tire on behalf of Sagaz was written by Canadian Tire's national sales manager, David English, who gave price quotations. The first meeting was attended by Landow, English and Kavana. Following that meeting, revised price quotations were sent by English. Landow's role was limited to presenting prices that were set and negotiated by Kavana and English and he required instructions with respect to terms and various other aspects of the business that he was conducting on Sagaz's behalf. Quotations given to Canadian Tire did not disclose Landow as a sales representative. Rather, the space on the invoice for the sales representative was left blank and the account was characterized as a "house account".

51     There was also some issue made about the fact that in a letter dated June 12, 1984, Landow communicated with Canadian Tire directly using Sagaz's letterhead. On cross-examination, Kavana admitted that Landow had been supplied with Sagaz letterhead. The courts below speculated that these factors came about because Canadian Tire preferred to deal with its suppliers, like Sagaz, directly and not through external sales agents.

52     On the other hand, there are some compelling points which indicate that AIM and Sagaz were separate legal entities, some of which are that AIM had its own offices, located in New York, while the Sagaz head offices were located in Florida. According to the agreement between the parties, AIM was to pay all of its own costs of conducting its business, including travel expenses, commissions and other compensation of salespersons employed by it. AIM remained free to carry on other activities and represent other suppliers provided that it did not take on any competing lines of business.

53     With respect to AIM's responsibility for investment and management, Sagaz did not either specify or control how much time AIM was to devote to representing them in maintaining their goodwill with Canadian Tire, or to performing in-store services. Similarly, it was up to AIM and Landow to decide how many, if any, trips Landow would take to Toronto. According to the agreement and Kavana's testimony, AIM had no authority to bind the Sagaz company.

54     In terms of a risk of loss or an opportunity for profit, Landow and AIM worked on commission on sales of Sagaz's products. As such, the risk of loss and the opportunity for profit depended on whether AIM's expenses (such as travel expenses) exceeded its commissions.

55     Central to this inquiry is the extent of control that Sagaz had over AIM. While Sagaz directed the prices, terms and other conditions that AIM was to negotiate on Sagaz's behalf, AIM was ultimately in control of providing assistance to Sagaz in retaining the goodwill of Canadian Tire. Again, AIM decided how much time to devote to Sagaz and how much time to devote to its services for other supply companies. Although Sagaz controlled what was done, AIM controlled how it was done. This indicates that Landow was not controlled by Sagaz.

56     In my opinion, the contravening factors such as the suggestion that the Canadian Tire account was a "house account" and the one letter written by Landow on Sagaz's letterhead, while of interest, are not sufficient to show that AIM was an employee

2001 SCC 59, 2001 CSC 59, 2001 CarswellOnt 3357, 2001 CarswellOnt 3358...

as part of the Sagaz "sales team". I agree with the courts below that these factors likely came about because Canadian Tire preferred to deal with its suppliers, like Sagaz, directly and not through external sales agents. Looking at the non-exhaustive list of factors set out in *Market Investigations, supra*, including ownership of tools, hiring its own helpers, the degree of financial risk or opportunity for profit by AIM and the responsibility for investment and management, it is clear to me that, based on the total relationship of the parties, AIM was an independent contractor.

57    On the totality of the evidence, I agree with the trial judge that AIM was in business on its own account. Absent exceptional circumstances which are not present in this case (see Atiyah, *supra*, pp. 327 to 49), it follows that the relationship between Sagaz and AIM, as employer and independent contractor, is not one which attracts vicarious liability. In finding that AIM was an independent contractor and not an employee in relation to Sagaz, I need not consider the second stage of the analysis which inquires into whether the tortious conduct of an *employee* was committed within the scope of employment.

58    Design submitted that if AIM was not an independent contractor, then AIM was an agent of Sagaz and therefore Sagaz was liable for the economic tort committed by AIM in the scope and course of its authority. Absent evidence to the contrary, it cannot be presumed that the scope of AIM's authority in providing "assistance to Sagaz in retaining the goodwill of [Canadian Tire]" was so broad as to include unlawful means such as bribery. This is confirmed by the finding of the trial judge at p. 241 that "Mr. Kavana was not a party to the conspiracy of Messrs. Summers and Landow". As well he also found at p. 245 "that it has not been proven on a balance of the probabilities that Mr. Kavana knew of the bribery by Mr. Landow". In the result, the payment of the bribe by AIM to Summers exceeded the actual and apparent authority of AIM as representative of Sagaz.

### B. Motion to Reopen the Trial

59    After the trial judge's reasons were released, but before the formal judgment was entered, Landow, who did not testify at trial, gave Design an affidavit admitting to the conspiracy to bribe and implicating Kavana in the conspiracy. Design brought a motion to have the trial reopened to hear the fresh evidence. The trial judge applied the two-part test from *Scott*, *supra*, to assist in determining whether to exercise his discretion to reopen the trial. First, he decided that the evidence, if presented at trial, probably would not have changed the result. Second, he found that the evidence could have been obtained before trial by the exercise of reasonable diligence. The Court of Appeal overturned the trial judge's decision, having found that he erred on both branches of the test and that the trial should have been reopened to hear Kavana's evidence. Was the Court of Appeal in error to reverse the trial judge's exercise of discretion to refuse to reopen the trial?

60    This Court provided in *Hamstra (Guardian ad litem of) v. British Columbia Rugby Union*, [1997] 1 S.C.R. 1092 (S.C.C.), at para. 26:

> It has long been established that, absent an error of law, an appellate court should not interfere with the exercise by a trial judge of his or her discretion in the conduct of a trial.

Appellate courts should defer to the trial judge who is in the best position to decide whether, at the expense of finality, fairness dictates that the trial be reopened. See *Clayton v. British American Securities Ltd.*, [1934] 3 W.W.R. 257 (B.C. C.A.), at p. 295:

> [The trial judge] would of course discourage unwarranted attempts to bring forward new evidence available at the trial to disturb the basis of a judgment delivered or to permit a litigant after discovering the effect of a judgment to re-establish a broken-down case with the aid of further proof.

61    Further, the case law dictates that the trial judge must exercise his discretion to reopen the trial "sparingly and with the greatest care" so that "fraud and abuse of the Court's processes" do not result (see *Clayton*, *supra*, at p. 295, cited in *Scott*, at pp. 773-74).

62    In this case, the trial judge decided not to exercise his discretion to reopen the trial because neither of the two steps of the test in *Scott*, *supra*, was met to his satisfaction. First, he found that he could not say that the new evidence, if presented at trial, would probably have changed the result, only that it may have changed the result. If the trial were to be reopened, Landow's evidence might well not be believed. His credibility would be in issue. Second, the trial judge found that Landow's evidence

2001 SCC 59, 2001 CSC 59, 2001 CarswellOnt 3357, 2001 CarswellOnt 3358...

could have been obtained before trial. Design could have compelled Landow to testify under oath at trial. While this carried some risk, the trial judge viewed it as a trial strategy, a conclusion he was entitled to reach.

63    In my opinion, the Court of Appeal erred in substituting its discretion for that of the trial judge in deciding to reopen the trial. On the first branch of the test set out in *Scott* , the trial judge found that Landow's credibility would be in issue whereas the Court of Appeal found it difficult to see how the trial judge could make this determination without hearing Landow testify. In the Court of Appeal's determination, it was not sufficiently clear that Landow would be disbelieved. I disagree with the Court of Appeal on this point. Landow's affidavit evidence contradicts his sworn evidence on discovery, particularly with respect to the existence of the bribery scheme which Landow avoids acknowledging on discovery. To this significant extent, Landow is akin to a recanting liar. Lord Denning's comments in *Ladd v. Marshall*, [1954] 1 W.L.R. 1489 (Eng. C.A.) , are applicable:

> It is very rare that application is made to this court for a new trial on the ground that a witness has told a lie. The principles to be applied are the same as those always applied when fresh evidence is sought to be introduced. To justify the reception of fresh evidence or a new trial, three conditions must be fulfilled: first, it must be shown that the evidence could not have been obtained with reasonable diligence for use at the trial; secondly, the evidence must be such that, if given, it would probably have an important influence on the result of the case, though it need not be decisive; thirdly, the evidence must be such as is presumably to be believed, or in other words, it must be apparently credible, though it need not be incontrovertible.

> *We have to apply those principles to the case where a witness comes and says: "I told a lie but nevertheless I now want to 'tell the truth'". It seems to me that the fresh evidence of such a witness will not as a rule satisfy the third condition. A confessed liar cannot usually be accepted as being credible* . To justify the reception of the fresh evidence, some good reason must be shown why a lie was told in the first instance, and good ground given for thinking the witness will tell the truth on the second occasion. [Emphasis added.]

64    These comments, in my opinion, apply with equal force to the present case. Landow is akin to a "recanting liar" because he failed to tell his "truth" when he had the opportunity to do so on discovery and again when he declined to testify at trial. Although the determination in *Ladd* was made under the third branch of the test applied in that case, a branch that is absent from the two-part test in *Scott* , the application of the *Scott* test to the situation of a "recanting liar" has the same result in this case. Evidence which is not presumptively credible may fail to probably change the result under the first branch of the test in *Scott* . This is how the trial judge dealt with the affidavit evidence, and in my view he was correct in so doing. Further, it cannot be ignored that the trial decision imposing liability on Landow and AIM provided incentive for Landow to attempt to shift some responsibility to Kavana in order to share the liability of the corresponding damage award. The trial judge had also seen the evidence of Kavana in the first instance, which he found to be credible even in the face of a vigorous cross-examination.

65    The court in *Scott* mandated that both branches of the test to reopen a trial to admit fresh evidence must be met. Having failed to meet the first branch of the test, it is unnecessary to examine whether the precluded evidence in this case could have been obtained by the exercise of reasonable diligence. It is sufficient to say that that too is a matter largely within the discretion of the trial judge and, absent error by him, that finding should not be interfered with.

### V. Disposition

66    The appeal is allowed with costs to the appellants in this Court and in the Court of Appeal. The order of the Court of Appeal is set aside. The order of Cumming J., dated December 23, 1998 is restored.

*Appeal allowed.*

*Pourvoi accueilli.*

Footnotes

*        A corrigendum was issued by the court October 10, 2001 and has been incorporated herein.

         Reconsideration refused at 2001 CarswellOnt 4155 (Eng.), 2001 CarswellOnt 4156 (Fr.) (S.C.C.).

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**671122 Ontario Ltd. v. Sagaz Industries Canada Inc., 2001 SCC 59, 2001 CSC 59,...**

2001 SCC 59, 2001 CSC 59, 2001 CarswellOnt 3357, 2001 CarswellOnt 3358...

---

**End of Document**                    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

---

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.   17

**TAB 3**

2014 WL 4954314
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.

Kunbi Alabi–Shonde, as natural guardian of
O.S., a Minor, and L.S., a Minor., Plaintiffs,

v.

Matthew Patterson, Individually and in his
official capacity of Security Guard; David Jiminez,
Individually and in his official capacity of
Security Guard; IPC International Corporation;
General Growth Properties, Inc.; Christiana
Mall Holdings, LLC; Christiana Mall, LLC; Cpl.
Amber Smith, in her individual capacity as
an officer of the Delaware State Police; Corp.
Raymond Shatley, in his individual capacity as an
officer of the Delaware State Police, Defendants.

C.A. No.: 1:11–cv–00608–LPS
|
Signed September 30, 2014

**Attorneys and Law Firms**

Stephen Price Norman, Daniel Charles Herr, The Norman
Law Firm, Dagsboro, DE, for Plaintiffs.

William A. Crawford, Franklin & Prokopik, Wilmington, DE,
for Defendants.

***MEMORANDUM ORDER***

Leonard P. Stark, UNITED STATES DISTRICT JUDGE

**\*1** Pending before the Court is Plaintiffs' Motion for
Reconsideration filed pursuant to Federal Rule of Civil
Procedure 59(e). (D.I. at 119) For the reasons set forth below,
the Court will deny the motion.

**I. BACKGROUND**

Plaintiffs filed a Complaint alleging unlawful detention,
use of excessive force, battery, false imprisonment, premise
liability negligence, and negligence after an incident in which
Plaintiffs were taken into custody because of their alleged
involvement in the theft of cell phones at the Christiana
Mall (the "Mall"). (D.I. 40) On February 6, 2014, the Court granted
the Motion for Summary Judgment filed by Defendants
Corporal Amber Smith ("Defendant Smith") and Corporal

Raymond Shatley as well as the Motion for Partial Summary
Judgment on Counts I and IV filed by Defendants Matthew
Patterson ("Mall Defendant Patterson") and David Jiminez
("Mall Defendant Jiminez"). (D.I. 117, 118) (collectively, the
"Order")

In the Order, the Court held: (1) Defendant Smith had
probable cause when she arrested Plaintiffs, because she
believed Jayvon Moore's statement that Plaintiffs were "in
with him" when he stole a cell phone in the Mall (D.I.
117 at 11); (2) Mall Defendants Patterson and Jiminez were
not acting "under color of state law," because they were
not trained by state actors, did not have the powers of
public enforcement, had authority to detain Plaintiffs under
the Delaware shopkeeper statute, and had probable cause to
believe Plaintiffs violated mall policy and/or the law (*id.*
at 13); (3) Plaintiffs failed to present objective evidence of
excessive force (*id.* at 14); and (4) Mall Defendants Patterson
and Jiminez did not falsely imprison Plaintiffs, since they had
probable cause to detain Plaintiffs (*id.* at 15).

**II. PARTIES' CONTENTIONS**

By their motion, Plaintiffs contend that the Court "failed
to construe all evidence in the light most favorable to the
[non-moving parties] and to draw all permissible inferences
in [their] favor." (D.I. 119 at 2–10) For example, Plaintiffs
dispute (among others) the statements in the Order regarding
Mall access before official opening hours, what was on the
surveillance footage, what Plaintiffs said about Moore, and
what Mall Security told Smith about Plaintiffs' involvement
in the theft. (*See id.*) In response, Defendants contend that
Plaintiffs are rearguing the same version of events that they
presented in their summary judgment briefs. (D.I. 121 at 3)
Defendants further argue that Plaintiffs fail to set out specific
arguments as to the legal significance of any of the asserted
factual disputes. (*Id.*)

**III. LEGAL STANDARDS**

A motion for reconsideration pursuant to Rule 59(e), which
is timely filed and challenges the correctness of a previously
entered order, is considered the "functional equivalent" of
a motion for reconsideration under Local Rule 7.1.5. *See
Corning Inc. v. SRU Biosystems,* 2006 WL 155255, at \*3 (D.
Del. Jan. 20, 2006). Motions for reconsideration should be
granted sparingly and may not be used to rehash arguments
which have already been briefed by the parties and considered
and decided by the court. *See Karr v. Castle,* 768 F.Supp.
1087, 1090 (D. Del. 1991); *Brambles USA, Inc. v. Blocker,*

735 F.Supp. 1239, 1240 (D. Del. 1990). Such motions are granted only if it appears that the court has patently misunderstood a party, has made a decision outside of the adversarial issues presented by the parties, or has made an error not of reasoning but of apprehension. *See, e.g., Shering Corp. v. Amgen, Inc.,* 25 F.Supp.2d 293, 295 (D. Del. 1998); *Brambles,* 735 F.Supp. at 1240. A court may alter or amend the judgment if the movant demonstrates at least one of the following: (1) a change in the controlling law; (2) availability of new evidence not previously available; or (3) a need to correct a clear error of law or fact or to prevent manifest injustice. *See Max's Seafood Cafe by LouAnn, Inc. v. Quinteros,* 176 F.3d 669, 677 (3d Cir. 1999).

## IV. DISCUSSION [1]

[1]    On July 15, 2014, Plaintiffs wrote to the Court to direct its attention to a recent Supreme Court decision, *Tolan v. Cotton,* 134 S.Ct. 1861, 1863 (2014), which vacated a grant of summary judgment to a defendant. *Tolan* reiterates but does not change the law. *See id.* at 1868. Hence, it does not constitute a change in the controlling law. Moreover, as stated in the instant Memorandum Order, the Court does not believe it clearly erred in application of the summary judgment standard in the instant case. Additionally, although Local Rule 7.15 does not provide for the filing of replies in support of motions for reconsideration, *see* D. Del. LR 7.1.5 ("The Court will determine from the motion and answer whether reargument will be granted."); *Earnes v. Nationwide Mut. Ins. Co.,* 2008 WL 4455743, at *5 (D. Del. Sept. 30, 2008)—the Court has considered Plaintiffs' Reply (D.I. 123).

 *2  A genuine dispute of material fact is present when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986). Most of the factual disputes Plaintiffs identify in their motion are not material, as they were not relied on by Defendant Smith in finding probable cause. Nor do these same disputed facts present a genuine dispute of material fact relating to whether Mall Defendants Patterson and Jimenez were acting "under color of state law," whether Plaintiffs were subject to excessive force, or whether Plaintiffs were falsely imprisoned. [2] *See id.* ("[The] mere existence of *some* alleged factual dispute[s] between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.").

[2]    The following disputed facts are irrelevant to the holdings in the Order because they were not used by Defendant Smith in finding probable cause to detain Plaintiffs: the Mall access policy, what the surveillance footage included, what Mall Defendants Patterson and Jimenez saw, what Plaintiffs said about their relationship or lack thereof with Moore, whether Defendant Smith was given a DVD or CD that contained a recording showing three males committing a crime, and whether Defendant Smith discovered Moore was lying and found that the surveillance video was inconclusive.

Two remaining disputed facts—what Defendant Smith was told about Plaintiffs' involvement in the theft by Mall Security and by Moore—do relate to whether Smith had probable cause to detain Plaintiffs, but Plaintiffs' arguments regarding these disputed facts have already been presented to, and fully considered by, the Court. The Court does not believe it committed a clear error of law or fact in its Order. *See Intermec Techs. Corp. v. Palm Inc.,* 830 F.Supp.2d 1, 4 (D. Del. 2011) ("A motion for reconsideration is not properly grounded on a request that a court rethink a decision already made.").

## V. CONCLUSION

Accordingly, for the reasons stated above,

IT IS HEREBY ORDERED that Plaintiffs' Motion for Reconsideration Under Rule 59(e) (D.I. 119) is DENIED.

IT IS FURTHER ORDERED that the parties shall submit a joint status report no later than October 14, 2014.

---

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**TAB 4**

Becker Milk Co. v. Consumers' Gas Co., 1974 CarswellOnt 870

1974 CarswellOnt 870, 2 O.R. (2d) 554, 43 D.L.R. (3d) 498

1974 CarswellOnt 870
Ontario Court of Appeal

Becker Milk Co. v. Consumers' Gas Co.

1974 CarswellOnt 870, 2 O.R. (2d) 554, 43 D.L.R. (3d) 498

# Becker Milk Co. Ltd. et al. v. Consumers' Gas Co.

Estey J.A., Evans J.A., Gale C.J.O.

Judgment: January 3, 1974
Docket: None given.

Proceedings: Reversed, [1971] I.L.R. 1-438 (Ont. S.C.)

Counsel: D.K. Laidlaw, Q.C., for Appellant
W.H.O. Mueller, for Respondent

Subject: Public; Civil Practice and Procedure; Insurance

### Related Abridgment Classifications

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

### Headnote

#### Public utilities

#### Civil practice and procedure

#### Insurance

*Estey J.A.*:

1    This is an appeal by the plaintiff, the Becker Milk Co. Limited, from the judgment pronounced by the Honourable Mr. Justice Lacourciere on August 4, 1971, wherein the appellant was awarded the sum of $4,750 for loss of profits, loss of leasehold interest and goodwill suffered by the appellant by reason of an explosion and fire on October 25, 1969, for which the respondent, the Consumers' Gas Company, has assumed liability.

2    The appellant at the time of the explosion and fire occupied a store at 2919 Derry Rd. E. in Malton, Ontario, under a lease the term of which commenced in 1967 and of which there remained unexpired eight years, together with two rights of renewal of five years each. The appellant operated what is known as a "convenience" store on these premises specializing in milk and dairy products and some lines of groceries. The question of compensation for store fixtures and equipment and inventory was by consent of all parties referred to the Master so that the learned trial Judge was only concerned with the assessment of claims for loss of income, loss of value of the leasehold interest and loss of goodwill connected with the business carried on in that store. In disposing of these claims the learned trial Judge stated: "I therefore assess the loss of profit at $4,750 which sum will include any claim for loss of the leasehold interest and goodwill. The plaintiff will have its costs of the action, to be taxed."

3    The hearing before the Honourable Mr. Justice Lacourciere took place on March 29, 1971, and reasons for judgment were delivered on August 4, 1971. The transcript of evidence at trial indicates that the appellant had not located itself in another store within the area of service of the store at Derry Rd. E. destroyed in the October fire. At the opening of the appeal to this Court

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

the appellant sought leave to introduce, by way of an affidavit of an officer of the appellant company, further evidence pursuant to Rule 234. Application to do so was made on November 10, 1972, and thereafter counsel for the respondent cross-examined Mr. William M. Baker on his affidavit dated November 10, 1972. The appellant submitted the affidavit, the exhibits thereto, the cross-examination of the affiant and the respondent filed an argument in opposition together with some further documents in connection with the cross-examination. A subsidiary affidavit of Mr. Baker swore to the fact that the matters deposed to in his principal affidavit dated November 10, 1972, occurred after the date of judgment.

4     It appeared in the course of argument on this application that at least some of the principal events described in the affidavit had in fact taken place after the assessment hearing had been completed in March, 1971, and prior to the release of the decision of the trial Judge in August, 1971. This Court in the course of hearing the appeal decided that the matters referred to in the above-mentioned affidavit could have been drawn to the attention of the learned trial Judge before he released the judgment on August 4, 1971. It was therefore concluded that having regard to the provisions of Rule 234 leave should not be granted to the appellant when the new evidence was available prior to judgment but was not brought forward until after the appellant had become aware of the decision of the trial Judge. Put shortly, the application to file this additional evidence was rejected because an unsuccessful litigant, save in very special circumstances, should not be allowed to come forward with new evidence available prior to judgment when he was content to have the trial Judge bring forward his judgment based on the record produced at a trial in which that litigant actively participated. I will return to this issue later.

5     The appellant thereupon took the view that the record before this Court shows that the appellant was unable to replace the location destroyed on October 29, 1969, by the respondent and that therefore the appellant is entitled to the present value, at that date, of the average annual profit enjoyed by the appellant from operations in these premises, over the unexpired eight years of the initial term of the appellant's lease, amounting to approximately $67,000.

6     The learned trial Judge stated with reference to the efforts by the appellant to relocate within the trading area of the store destroyed: "... they were unable to find a suitable location to serve the same market area." Later in his reasons for judgment it was stated:

> The choice of sites is related to many factors such as population density, economic and family levels, location in relation to traffic flow, parking and other factors. Because of these various factors and the uneconomic nearness of competitors, Beckers was unable to relocate in the same area.

It is difficult to read the concluding sentence from the above quotation unless the word "unable" is read as meaning "unwilling". In any case, the judgment concludes: "In view of the inevitable delay involved in the site decision and other factors, I would say that six months would be a reasonable period in which to allow loss of profit ...". Elsewhere in his judgment the trial Judge concluded that the average net earnings per annum before taxes for the location in question was $9,500 and accordingly an assessment was made of loss of profits of $4,750 "which sum will include any claim for loss of the leasehold interest and goodwill".

7     The six-month period used by the learned trial Judge to calculate the lost profits was said to be "a reasonable period" in which to relocate the branch having regard to the appellant's duty to mitigate its damages by acting with reasonable promptness. The evidence discloses that on the average a new location requires about six months to mature into a profitable operation. While the judgment reveals some consideration was given to this factor in determining the length of the period during which the appellant was deprived of its profits from this location, no allowance in time seems to have been given for the start up of a new outlet once the premises had been located. I will return to this issue.

8     As I have mentioned, the evidence with reference to the actual date of relocation in this area by the appellant was rejected on two grounds, first that notwithstanding an affidavit filed by the appellant introducing this evidence wherein it was stated that the matters sworn to occurred "after the date of judgment", it was evident from the submissions of counsel made to this Court that the primary events leading to the opening of the appellant's store in the immediate area of that destroyed, commenced prior to the pronouncement of judgment and therefore the evidence was available to support an application to the trial Judge to reopen the hearing, and secondly, the appellant by failing to avail itself of the opportunity to so reopen the proceedings should

be taken as having elected to have the trial Judge dispose of all issues raised at trial on the basis of the record as it stood at the close of the trial on March 29, 1971.

9      There is no question that until judgment was issued, the learned trial Judge in his discretion could have admitted further evidence if he were satisfied that the matters in question had come to the knowledge of a party after the trial, could not with reasonable diligence have been discovered sooner, and, if the evidence, as is the case here, were of such a character that it might probably have altered the judgment about to be given: *Commercial Life Ass'ce Co. v. Williamson et al. (No. 2)*, [1943] 2 W.W.R. 103, 24 C.B.R. 257. The appellant did not choose to avail itself of this opportunity.

10      Ordinarily the assessment of damages is done "once and for all" and is made as of the date of impact so that the tribunal assessing damages looks forward from that date and takes into account actual loss already suffered and future and contingent losses or considerations bearing on the damages suffered including those presently realized or ascertained and those not then crystalized. It is clear however that a trial Court need not shut its eyes to everything which has happened subsequently to the date on which injury is suffered. For example, where a widow makes a claim under the *Fatal Accidents Act*, R.S.O. 1970, c. 164, damages are fixed at the moment of death but subsequent events, such as the death of the claimant, may be taken into account: *Williamson v. John I. Thornycroft & Co.*, [1940] 2 K.B. 658. As was stated by Vaisey, J., in *Re Viscount Rothermere*, [1945] 1 Ch. 72 at p. 75: "... the court will not treat as an unknown factor anything which has become known or can be ascertained at the time when such a problem as the present receives its solution, that is to say it will not act on hypotheses when it is able to act on realities."

11      On the authorities therefore, I conclude, that the trial Judge would have been entitled to receive before judgment and to consider, such additional evidence as was brought forward by the appellant. No doubt an appellate Court in the ordinary case when faced with evidence of this nature would wish to refer the matter back to a trial Court for reassessment of damages taking into account all the facts including those ascertained and introduced after the completion of the initial hearing. If authority were needed for such a proposition it can be found in the House of Lords decision in *Murphy v. Stonewallwork (Charlton) Ltd.*, [1969] 1 W.L.R. 1023. A respondent in such a circumstance as now before this Court might well wish to challenge or at least respond to such new information and therefore a return to a trial forum would seem the best way to do justice to all the litigants.

12      However, in the circumstances with which this Court is faced different considerations come into play. The appellant, as I have said, was content to allow the trial Court to proceed to judgment on the record established at the hearing in which the appellant fully participated. When the judgment was handed down, the appellant being discontented with the award now seeks to extend and revise the record by the introduction of material much of which was available prior to judgment. Ironically, the alteration has the effect of reducing the period of time during which loss of profits allegedly occurred, from eight years unexpired in the initial term of the lease, to something substantially less. In my view, the approval of such a practice should only be done when there exist the "special grounds" mentioned in Rule 234(3). In the circumstances of this case there are no "special grounds" for the admission of this evidence and in fact its admission at this stage would establish an unhappy precedent in trial procedure. Litigants content with the record at the end of the trial, but finding themselves dissatisfied with the subsequent judgment, could, armed with such a precedent, advance evidence available before judgment and seek on appeal either a variation of the judgment at trial or a new trial. In such a circumstance litigation would be needlessly protracted and expensive. On the facts in these proceedings the consequences of exclusion of such new material should fall on the party who failed to bring it forward when he had the opportunity rather than impose a new hearing on the innocent party.

13      The Chief Justice in rejecting the application to introduce new evidence in the course of the hearing of this appeal said:

We are of the opinion that the admission of the material or new evidence, if you wish to call it that, should be rejected or refused. It is material which would present vital considerations bearing upon the issue, which considerations were not before the trial Judge and it would be unfair to him to give effect to the considerations about which he heard very little, if anything. Secondly, the material could have been presented to the trial Judge while he was seized of the action and therefore to allow it in now would be to permit an unsuccessful litigant to attempt to enlarge the record after it has seen the judgment.

1974 CarswellOnt 870, 2 O.R. (2d) 554, 43 D.L.R. (3d) 498

14    I revert now to the quantum of damages as determined below, namely, one-half year's profit which is $4,750. The record reveals no evidence in support of damages for loss of leasehold interest or goodwill independent of the claim for loss of profits. No argument was advanced by the appellant for any variation of the judgment below except by an increase of the amount awarded for loss of profits. Therefore, only the question of disposition of the loss of profits claim now remains open. For reasons stated above, it would appear that the evidence with reference to a six-month start up period has been overlooked by the learned trial Judge and I would therefore allow the appeal, set aside the judgment below and in place thereof assess the damages of the appellant at $9,500 with costs to the appellant in the Court below and on this appeal.

---

**End of Document**                    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**TAB 5**


KeyCite Yellow Flag - Negative Treatment
**Declined to Extend by** Glyphics Media, Inc. v. M.V. CONTI
SINGAPORE, S.D.N.Y., March 21, 2003

52 F.3d 1220
United States Court of Appeals,
Third Circuit.

Urvashi BHATNAGAR, an Infant by her
Mother and Natural Guardian, Kalpana
Bhatnagar; Kalpana Bhatnagar, Individually,
v.
SURRENDRA OVERSEAS LIMITED; Apeejay
Lines, in personam; M.V. APJ Karan, her engines,
boilers, tackle, etc. in rem, Surrendra Overseas
Limited, Claimant to the Res; Apeejay Lines, in
personam and the M/V APJ Karan, her engines,
boilers, etc. in rem, Appellants in No. 93–2059.
Urvashi BHATNAGAR, an Infant by her
Mother and Natural Guardian, Kalpana
Bhatnagar; Kalpana Bhatnagar, Individually,
v.
SURRENDRA OVERSEAS LIMITED; Apeejay
Lines, in personam; M.V. APJ Karan, her engines,
boilers, tackle, etc. in rem, Urvashi Bhatnagar,
an infant by her Mother and Natural Guardian,
Kalpana Bhatnagar, and Kalpana Bhatnagar,
Individually, Appellants in No. 93–2076.

Nos. 93–2059, 93–2076.   |   Argued
July 19, 1994.   |   Decided April 17, 1995.

Minor, and her mother, who were Indian nationals, sued
Indian shipping company and vessel for injuries sustained
by the child while traveling on the vessel, on which her
father was a crew member. Following denial of motion to
dismiss on ground of forum non conveniens, 820 F.Supp.
958, and ruling on scope of damages, 835 F.Supp. 240,
the United States District Court for the Eastern District
of Pennsylvania, Marvin Katz, J., rendered judgment from
which appeal and cross-appeal were taken. The Court of
Appeals, Lewis, Circuit Judge, held that: (1) extreme delay in
alternative forum can render forum inadequate for purposes
of assessing a forum non conveniens motion; (2) there was
no clear error in determination that litigation backlog in India
rendered that forum inadequate; (3) Indian law applied; and
(4) award of nonpecuniary damages was so disproportionate

to amounts awarded in other Indian tort cases as to require
vacation and remand to reassess damages.

Affirmed in part and vacated and remanded in part.

West Headnotes (13)

[1]    **Federal Courts**
       Forum non conveniens

       District court's determination with respect to
       forum non conveniens may be reversed only
       where there has been clear abuse of discretion,
       and where court has considered all relevant
       public and private interest factors and its
       balancing of these factors are reasonable, its
       decision deserves substantial deference; case law
       demands that Court of Appeals accord deference
       even to trial court's decision to refuse to exercise
       its lawful jurisdiction, on ground of forum non
       conveniens, and deference should be at least as
       great, if not greater, when district court decides
       not to dismiss.

       1 Cases that cite this headnote

[2]    **Federal Courts**
       Forum Non Conveniens

       District court cannot dismiss on forum non
       conveniens grounds if that decision would render
       plaintiff unable to pursue his or her action
       elsewhere; case can be dismissed on that ground
       only when some other forum that would also
       have jurisdiction is better suited to adjudicate the
       controversy.

       6 Cases that cite this headnote

[3]    **Federal Courts**
       Parties' choice of forum;  forum-shopping

       Ordinarily plaintiff's choice of forum is entitled
       to great deference, but amount of deference
       is lessened when foreigner has brought suit;
       however, fact that plaintiff is a foreigner does not
       mean that decision to sue in the United States is
       entitled to no deference, in determining whether

suit should be dismissed on ground of forum non conveniens.

9 Cases that cite this headnote

**[4]** **Federal Courts**
 Presumptions and burden of proof

It is defendant's burden to demonstrate that dismissal on ground of forum non conveniens is warranted.

1 Cases that cite this headnote

**[5]** **Federal Courts**
 Availability and adequacy

No abuse of discretion was shown in refusal to dismiss on ground of forum non conveniens in personal injury suit by Indian nationals against Indian corporation and vessel, based on evidence that it could take up a quarter of a century to resolve the litigation in India.

9 Cases that cite this headnote

**[6]** **Federal Courts**
 Availability and adequacy

Though delays of a few years are of no legal significance in forum non conveniens calculus, at some point the prospective judicial remedy becomes so temporally remote that it is no remedy at all and may render alternative forum so "clearly unsatisfactory" as to be inadequate.

18 Cases that cite this headnote

**[7]** **Federal Courts**
 Findings and conclusions

In denial of motion to dismiss on ground of forum non conveniens in suit brought by Indian nationals against Indian corporation and vessel, there was no clear error in fact findings regarding judicial delay in India rendering Indian courts inadequate as alternative forum in the instant case, despite defendant's evidence that case would be granted expedited hearing request given tender age of minor plaintiff, in light of evidence to contrary by plaintiff's experts.

50 Cases that cite this headnote

**[8]** **Federal Civil Procedure**
 Further evidence or argument

Mere presentation of arguments or evidence seriatim does not justify reconsideration, particularly where district court may reasonably conclude that putative new testimony is of no evidentiary value.

31 Cases that cite this headnote

**[9]** **Federal Courts**
 Reconsideration

After denying motion to dismiss, on ground of forum non conveniens, in suit brought by Indian nationals, resident in the United States, against Indian corporation and Indian vessel, and denying motion for reconsideration, there was no abuse of discretion in denial of second motion for reconsideration based on theory that plaintiffs had withheld information that plaintiffs had been illegal aliens when they brought their action.

76 Cases that cite this headnote

**[10]** **Admiralty**
 Torts

Law of India applied to suit by Indian nationals against Indian corporation and vessel for injuries sustained by a crew member's child aboard the vessel in international waters.

Cases that cite this headnote

**[11]** **Shipping**
 Weight and sufficiency

In action on behalf of injured child of crew member of Indian vessel against Indian shipping company and the vessel, under Indian law, which is like American law with respect to requirements for finding negligence, evidence was sufficient to find negligence on part of duty officer in allowing child to remain on bridge, which was off limits to authorized persons, and in failing to stop negligent acts of steward and helmsman which caused injury to the child.

Bhatnagar v. Surrendra Overseas Ltd., 52 F.3d 1220 (1995)

1995 A.M.C. 1716

Cases that cite this headnote

[12]   **Admiralty**
       👉 Determination and disposition of cause

       **Damages**
       👉 Excessive damages in general

In suit by Indian nationals against Indian shipping company and vessel arising from injury to crew member's child on the vessel on the high seas, award of $150,000 in nonpecuniary damages, in case subject to Indian law, was so disproportionate to amounts awarded in other Indian tort cases as to require vacation and remand for reassessment, in light of principle that Indian courts attempt to make awards comparable and uniform among tort victims.

3 Cases that cite this headnote

[13]   **Parent and Child**
       👉 Loss of child's services, society, or consortium

In suit by Indian nationals against Indian shipping company and vessel arising from injury to crew member's child aboard the vessel in international waters, there was no error in denying award to child's mother for loss of services, absent evidence that damages for loss of services are compensable under Indian law, which was applicable, and in light of lack of evidence that the mother lost any of the services of child, who was six years old at the time of injury.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*1222** William G. Downey (argued), Michael D. Greenberg, Clark, Ladner, Fortenbaugh & Young, Philadelphia, PA, for Surrendra Overseas, Apeejay Lines and M/ V APJ Karan.

Lenore E. McQuilling (argued), Harold Gordon, Kahn & Gordon, P.C., New York City, for Urvashi Bhatnagar and Kalpana Bhatnagar.

Before: SCIRICA, LEWIS and ROSENN, Circuit Judges.

**OPINION OF THE COURT**

LEWIS, Circuit Judge.

This case principally involves an issue of first impression for this court: can extreme delay in an alternative forum render that forum inadequate for purposes of assessing a *forum non conveniens* motion? We answer that question in the affirmative, and then address a number of issues arising from the trial of this matter.

This case comes to us after final judgment *in rem* in favor of plaintiff Urvashi Bhatnagar, a young female Indian national, against Surrendra Overseas Ltd. ("Surrendra"), an Indian shipping company, Apeejay Lines, an unincorporated division of Surrendra, [1] and the M/V APJ KARAN, an Indian vessel, for injuries that Urvashi sustained aboard the APJ KARAN on the high seas. In 1991, while six-year old Urvashi was playing a "game" with one of the ship's crew on the bridge of the APJ KARAN, her right hand and arm were severely lacerated when they came in contact with a device used to repel water from the windows of the bridge.

[1]   Surrendra states in its brief that ApeeJay "is not a legal entity" (Appellant–Cross–Appellee's Br. 5), and in its answer to the Bhatnagars' complaint, Surrendra alleged that "there is not a separate corporation as ApeeJay Lines." Joint Appendix ("J.A.") 2. The Bhatnagars accept Surrendra's characterization of ApeeJay. Appellees–Cross–Appellants' Br. 4. We treat Surrendra, ApeeJay, and the APJ KARAN as one defendant for purposes of this appeal.

Urvashi and her mother, Kalpana, sued Surrendra in federal court in New York under the court's admiralty jurisdiction, then transferred the action to the Eastern District **\*1223** of Pennsylvania. After discovery, Surrendra filed a series of motions seeking to dismiss the complaint on the grounds of *forum non conveniens.* The district court denied the motions, however, and after a two-day bench trial during which the court purported to apply Indian law, the court awarded Urvashi a total of $189,331.00 in damages. Surrendra appeals the judgment, and Urvashi and her mother cross-appeal. We will affirm in most respects but will remand for a redetermination of damages under Indian law.

## I.

### A.

The Bhatnagars are a family of Indian citizens. Sanjay Bhatnagar, Urvashi's father, was hired in India as an assistant engineer aboard the vessel APJ KARAN, one of eight vessels owned and operated in international commerce by Surrendra. Sanjay boarded the APJ KARAN in the Indian territory of Goa in November 1990. With Surrendra's permission, Sanjay's wife, son and daughter were to join him on the vessel.

The family had planned to board the vessel in India with Sanjay, but were unable to obtain the requisite visas. With the Surrendra's assistance, however, Sanjay's wife Kalpana Bhatnagar and her two children flew to the United States and boarded the ship in Portland, Oregon, where the APJ KARAN took on a cargo of grain destined for Alexandria, Egypt.

On board the APJ KARAN, rules and regulations designated areas where unauthorized people were not allowed to go. Notices were posted in several places indicating which areas were off limits. For example, there was a sign posted at the top of the stairs leading to the bridge which said "off limits," and a sign posted outside the radio room which said "Navigators Only." The captain of the APJ KARAN testified that he spoke with Sanjay Bhatnagar and his family and instructed them not to enter the restricted areas, and Sanjay also testified that he spoke with his family concerning the areas they were not allowed to visit.

Despite these rules, on March 17, 1991, the ship's steward took Urvashi to the bridge—an "off limits" area—while he was serving tea to the duty officer. Once on the bridge, the steward left Urvashi, and the six-year old approached the helmsman. The helmsman picked her up and placed her upon a railing facing the windows and a "clearview screen," a device which repels rain and other moisture by revolving at a high rate of speed. It was rainy that day, and the clearview screen revolved rapidly to provide the helm with an unimpeded view of the ocean ahead.

For some reason, the helmsman decided to show Urvashi how to play a "game": he feigned putting his hand on the clearview screen, then encouraged her to do the same. However, when Urvashi followed the helmsman's lead her hand slipped, and the clearview screen severely injured her right hand and portions of her arm.

The APJ KARAN was steaming in international waters when the accident occurred. The captain immediately radioed for help and was transferred to the United States Coast Guard, which directed the captain to divert the vessel to the nearest landfall. That turned out to be the island of Antigua, and Urvashi, her brother and her mother were evacuated there.

After receiving emergency medical treatment on Antigua, on March 20, 1991 Urvashi and her mother and brother flew to New York, where their relatives, who are doctors, arranged for further medical assistance. The three Bhatnagars (later joined by Sanjay) entered the United States on emergency medical visas valid for six months.

Despite the expiration of their emergency medical visas in September 1991, the Bhatnagars have remained in New York living with relatives since the accident. Urvashi has undergone therapy for her wounds and has attended school in West Islip, New York. In all, Urvashi had a series of six operations from March 1991 through May 1992 to repair her hand.

### B.

Urvashi and Kalpana Bhatnagar brought suit in September 1992 against Surrendra, ApeeJay Lines, and the APJ KARAN in the **\*1224** United States District Court for the Southern District of New York. Urvashi alleged negligence, lack of adequate medical care and gross negligence, and Kalpana claimed loss of services resulting from the injuries to her daughter. When the APJ KARAN was docked at the Port of Philadelphia in October 1992, however, the plaintiffs transferred the case to the United States District Court for the Eastern District of Pennsylvania, and Surrendra issued to the plaintiffs a letter of undertaking of $2 million in lieu of the vessel's arrest and detention in Philadelphia.

After substantial discovery, Surrendra moved to dismiss the Bhatnagars' complaint on the ground that it was barred by the forum selection clause in Sanjay Bhatnagar's employment contract [2] or, alternatively, that the district court should exercise its discretion and dismiss the case under the doctrine of *forum non conveniens*. The district court denied the initial motion, denied Surrendra's motion for reconsideration or certification of the *forum non conveniens* ruling under Fed.R.Civ.P. 54(b), and also denied a second motion for

reconsideration filed after further discovery. Thus, the case went to trial.

2       This ground is not pressed by Surrendra on appeal.

The district court, after a bench trial in which it purported to apply Indian law, awarded Urvashi $33,133 in pecuniary damages for past medical expenses, $6,000 for future medical expenses, and $150,000 for pain and suffering, disability, disfigurement, loss of enjoyment of life, mental anguish and emotional injury. The court ruled in favor of Surrendra on Kalpana Bhatnagar's claims, finding that she had not proven any loss of service or psychiatric injury as a result of Urvashi's injuries.

Surrendra appeals the denial of the district court's rulings with respect to *forum non conveniens* and also contends that the district court made numerous errors at trial. Urvashi and Kalpana Bhatnagar cross-appeal the adequacy of the judgment in favor of Urvashi and also challenge the district court's judgment in favor of Surrendra on Kalpana Bhatnagar's claims. The district court had jurisdiction pursuant to 28 U.S.C. § 1333. We have jurisdiction under 28 U.S.C. § 1291.

## II.

Surrendra makes three claims of error: (1) the district court abused its discretion when it failed to dismiss the case under the doctrine of *forum non conveniens;* (2) the court erred in imposing liability upon Surrendra; and (3) the court erroneously calculated Urvashi's damages. We address each of these issues in turn.

## A.

It is undisputed that the parties in this case are Indian nationals and the ship on which Urvashi's accident occurred was an Indian-flagged ship on the high seas. Before the district court rejected Surrendra's motion to dismiss on the grounds of *forum non conveniens* and proceeded to trial, the only links with the United States present in this case were the following: (1) the Bhatnagars claim residence in the United States; (2) Urvashi was treated in the United States by doctors who were therefore available here to testify about the nature and extent of her injuries; and (3) the Bhatnagars were able to secure a letter of undertaking by Surrendra in the United States—after

the suit was filed—when the APJ KARAN dropped anchor in the Port of Philadelphia.

Given these circumstances, it is hardly surprising that Surrendra argued to the district court that this case should be heard in India, rather than the United States. Surrendra contended that the case had a close factual nexus with India and an absence of ties to the United States. The company also submitted an affidavit of an Indian law expert noting that India has a well-developed legal system which would be able to handle the issues presented in this case. Furthermore, although in effect conceding that the Indian legal system moves much less expeditiously than our domestic courts, Surrendra submitted another affidavit stating that if the case were refiled in India, it would join in petitioning the appropriate judicial officer for expedited hearing of the matter, and that it would not file any unnecessary pleadings or requests **\*1225** that would impede the case. Surrendra's legal expert, moreover, opined that because of Urvashi's young age, the Calcutta High Court (which would hear the case) "would undoubtedly grant an 'expedited hearing' request" if the parties made such a motion. Joint Appendix ("J.A.") 240. Despite Surrendra's arguments, however, the district court refused to dismiss.

Surrendra complains that the district court abused its discretion not only when it failed to grant this original motion, but also when it rejected Surrendra's motion for reconsideration and, later, rejected a second motion seeking reconsideration because of alleged discovery abuses by the Bhatnagars. We conclude that none of Surrendra's contentions has merit.

### 1.

[1]    A district court's determination with respect to *forum non conveniens* "may be reversed only when there has been a clear abuse of discretion; where the court has considered all relevant public and private interest factors, and where its balancing of these factors is reasonable, its decision deserves substantial deference." *Lacey v. Cessna Aircraft Co.,* 932 F.2d 170, 178 (3d Cir.1991) (*Lacey II* ), quoting *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 257, 102 S.Ct. 252, 266–67, 70 L.Ed.2d 419 (1981). Certainly, our case law demands that we accord deference even to a trial court's decision to *refuse* to exercise its lawful jurisdiction, dismiss on grounds of *forum non conveniens* and deny the plaintiff the opportunity to litigate in a United States court.

Our deference should be at least as great, if not greater, when a district court decides *not* to dismiss.[3] The district court is capable of measuring its own docket and assessing the practical administrative difficulties that may flow from denying such a motion. Indeed, while we may be able to provide some perspective on the systemic consequences of individual denials of *forum non conveniens* motions—in terms of future case load and other administrative difficulties that may result—we are aware of no evidence suggesting that district courts are unable similarly to take the long view of a particular situation. To the contrary, we believe that district courts are well aware of the caseload pressures they face and rather zealous in their efforts to control their ever-burgeoning responsibilities. Given the incentives that press our district courts to reduce their caseload, we should take particular care before second-guessing a district court that rejects a *forum non conveniens* motion after considering the factors that we and the Supreme Court have deemed relevant.

[3]  A rough suggestion of the deference accorded district court decisions rejecting motions to dismiss on the ground of *forum non conveniens* is found in the case law: while hundreds of *forum non conveniens* decisions have been reported over the years, one article concluded that, as of March 1991, only six reported decisions involved pretrial decisions *not* to dismiss. *See* Note, *Review and Appeal of Forum Non Conveniens and Venue Transfer Orders,* 59 Geo.Wash.L.Rev. 715 at 727–28 (1991). "Only once did an appellate court reverse the denial of a motion to dismiss for forum non conveniens." *Id.* at 728 (footnotes omitted). That case was *Gonzalez v. Naviera Neptuno A.A.,* 832 F.2d 876 (5th Cir.1987), a case very different from the one before us. In *Gonzalez,* "the overwhelming majority" of the witnesses were in the alternative jurisdiction, and the Fifth Circuit found there would be difficulties in enforcing a judgment against the defendant in the United States. *Gonzalez,* 832 F.2d at 879. Here, by contrast, Urvashi and her mother, as well as Urvashi's treating physician, were present in the United States, and the letter of undertaking would make it possible to enforce a judgment against Surrendra in the United States. Even more importantly, in *Gonzalez* there was no issue of whether the alternative forum in that case (Peru) was adequate. As noted *infra* pp. 1227–30, here that issue is dispositive.

[2]  The factors to be evaluated in assessing whether to dismiss for *forum non conveniens* are by now familiar. First—and of dispositive significance here—a district court cannot dismiss on *forum non conveniens* grounds if that decision would render a plaintiff unable to pursue his or her action

elsewhere. That is, since a district court entertaining a *forum non conveniens* motion ordinarily *has* jurisdiction over the dispute, it is only when some other forum that would *also* have jurisdiction is better suited to adjudicate the controversy that a district court may exercise its discretion and dismiss the case. *See Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 506–07, 67 S.Ct. 839, 842, 91 L.Ed. 1055 (1947) ("In all cases in which the doctrine of forum non conveniens comes into play, it presupposes at least two forums in which the **\*1226** defendant is amenable to process; the doctrine furnishes criteria for choice between them"). Thus, as we explained in *Lacey v. Cessna Aircraft Co.,* 862 F.2d 38 (3d Cir.1988) (*Lacey I* ), at the outset of its analysis, "[a] district court entertaining a forum non conveniens motion must first decide whether an adequate alternative forum exists to hear the case." *Id.* at 43.

[3]  [4]  [5]  Provided that an adequate alternative forum is available, the district court must address an additional threshold issue when the case is brought by a foreigner—namely, the amount of weight that should be accorded to the plaintiff's decision to sue in the United States.[4] Then, "the district court must consider and balance several private and public interest factors that are relevant to the forum non conveniens determination." *Lacey I,* 862 F.2d at 43.[5] It is the defendant's burden to demonstrate that *forum non conveniens* dismissal is warranted. *E.g., Lacey I,* 862 F.2d at 43–44; *Gulf Oil,* 330 U.S. at 508, 67 S.Ct. at 843. Surrendra failed to carry that burden because it did not make its threshold demonstration that an adequate alternative forum was available for this litigation.

[4]  Ordinarily, a plaintiff's choice of forum is entitled to great deference, but the amount of deference is lessened when a foreigner has brought suit because we are more skeptical of a foreigner's claim that a United States forum is in fact the most convenient forum available. *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 255, 102 S.Ct. 252, 265, 70 L.Ed.2d 419 (1981). The fact that a plaintiff is a foreigner does not disqualify him or her from suing in the courts of the United States, nor does it mean that his or her decision to sue in the United States is entitled to *no* deference. "*Piper[ Aircraft* ]'s language about according less deference to a foreign plaintiff's forum choice is 'not an invitation to accord a foreign plaintiff's selection of an American forum *no* deference since dismissal for forum non conveniens is the exception rather than the rule.' " *Lacey v. Cessna Aircraft Co.,* 862 F.2d 38, 45–46 (3d Cir.1988) (*Lacey I* ), quoting and adding emphasis to *In re Air Crash Disaster Near New Orleans,*

1995 A.M.C. 1716

*Louisiana on July 9, 1982,* 821 F.2d 1147, 1164 n. 26 (5th Cir.1987). Although we have acknowledged that the deference evaluation cannot be done with mathematical precision, the district court must provide some reasoned indication of how much deference it is according to the particular foreign plaintiff's decision to sue in the United States. *Lacey v. Cessna Aircraft Co.,* 932 F.2d 170, 179 (3d Cir.1991) (*Lacey II* ).

5    Certain of these factors were identified in *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). The private interest factors include such considerations as "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action," and other factors "that make trial of a case easy, expeditious and inexpensive." *Id.* at 508.

With respect to the public interest factors, the Supreme Court has noted that courts should be wary of increasing the congestion in domestic courts and forcing jury duty upon those who have no relation to or interest in a particular controversy. *Gulf Oil,* 330 U.S. at 508–09, 67 S.Ct. at 843. Additionally, courts should prefer to have cases adjudicated in the forum familiar with the law to be applied, instead of taking it upon themselves to become educated about foreign law. *Id.* at 509, 67 S.Ct. at 843. We have further explained that "[i]n evaluating the public interest factors the district court must 'consider the locus of the alleged culpable conduct, often a disputed issue, and the connection of that conduct to plaintiff's chosen forum.' " *Lacey I,* 862 F.2d at 48, quoting *Van Cauwenberghe v. Biard,* 486 U.S. 517, 528, 108 S.Ct. 1945, 1952–53, 100 L.Ed.2d 517 (1988).

The Supreme Court has cautioned, however, that the list of public and private factors in *Gulf Oil* "is by no means exhaustive, and some factors may be relevant in the context of a particular case." *Van Cauwenberghe,* 486 U.S. at 528–29, 108 S.Ct. at 1953.

The Bhatnagars argued in the district court that India did not constitute an adequate alternative forum because its court system was in a state of virtual collapse. Plaintiffs submitted affidavits from Marc S. Galanter and Shardul Shroff in support of this contention (respectively, the "Galanter Aff." and the "Shroff Aff."). Surrendra responded by proffering the affidavit of Talat M. Ansari, who stated that there are numerous ways in which litigation can be expedited in India, including appointment of special judges, intervention by the Supreme Court of India or State High Court, or even requests by the parties for expedition. J.A. 240. Furthermore, Ansari

stated that "given the tender age of the child, the Calcutta High Court (which would be the court in which the action would have to be filed, given the amount of compensation claimed) would undoubtedly grant an 'expedited hearing' request." *Id.* Surrendra also offered the affidavit of Captain Khosla, the company's General Manager, who promised that if the district **\*1227** court dismissed this case Surrendra would cooperate in seeking expedited treatment of any suit brought by the Bhatnagars in India.

The district court agreed with the Bhatnagars. Crediting their legal experts, the court found that the Indian legal system has a tremendous backlog of cases—so great that it could take up to a quarter of a century to resolve this litigation if it were filed in India. J.A. 15–16. Finding that "this remedy is inadequate and unsatisfactory," the court ruled that dismissal was inappropriate. *Id.* at 17.[6]

6    Although the district court also evaluated the Bhatnagars' case under the private and public interest factors of *Gulf Oil,* we do not reach that analysis because of our affirmance on the threshold issue of whether an alternative forum is available.

Surrendra contends on appeal that this analysis constituted an abuse of discretion for two central reasons. The company contends that the district court committed legal error in finding that mere litigation delay can render an alternative forum inadequate, and that in any event the court's fact-finding with respect to delay in the Indian legal system was clearly erroneous. We disagree.

**(a)**

[6]    Surrendra's first attack focuses on the court's premise that litigation backlog can render an alternative forum inadequate for purposes of *forum non conveniens* analysis. Surrendra argues that the alternative forum factor may be used to deny a motion to dismiss only in "extreme cases, such as where an action is barred by an alternative forum...." Appellant–Cross–Appellee's Br. 14. Quoting *Piper Aircraft,* Surrendra contends that unless "the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all" (*Piper Aircraft,* 454 U.S. at 254, 102 S.Ct. at 265), the alternative forum must be deemed to be adequate. Appellant–Cross–Appellee's Br. 14. Thus, although Surrendra does not say so in as many words, it apparently believes that the district court committed legal error in finding that mere delay can

1995 A.M.C. 1716

render the Indian court system inadequate for purposes of a *forum non conveniens* inquiry.

The Supreme Court in *Piper Aircraft* stated that the alternative forum requirement "[o]rdinarily ... will be satisfied when the defendant is 'amenable to process' in the other jurisdiction." *Piper Aircraft,* 454 U.S. at 254 n. 22, 102 S.Ct. at 265 n. 22, quoting *Gulf Oil,* 330 U.S. at 506–07, 67 S.Ct. at 842. Yet the Court qualified this statement:

> In rare circumstances, however, *where the remedy offered by the other forum is clearly unsatisfactory,* the other forum may not be an adequate alternative, and the initial requirement may not be satisfied. Thus, for example, dismissal would not be appropriate where the alternative forum does not permit litigation of the subject matter of the dispute.

*Id.* (emphasis added).

We have never addressed the issue of whether litigation delay could render an alternative forum so "clearly unsatisfactory" as to be inadequate. Nor has the Supreme Court or any of our sister circuits. Thus, we face an issue of first impression.

At the outset of this discussion, it is necessary to recognize that delay is an unfortunate but ubiquitous aspect of the legal process. Our own courts suffer from delay, as does any other system that attempts to accord some modicum of process. *E.g., Rosewell v. LaSalle Nat'l Bank,* 450 U.S. 503, 519–20, 101 S.Ct. 1221, 1232, 67 L.Ed.2d 464 (1981) (noting that delay is pervasive aspect of American courts); *see also Report of the Federal Courts Study Committee* 5–6 (Apr. 2, 1990). Because litigation delay is so pervasive, minor delay could not possibly serve to undermine the adequacy of an alternative forum. Thus, we agree with those courts that have found delays of a few years to be of no legal significance in the *forum non conveniens* calculus. *E.g., Brazilian Investment Advisory Services, Ltda. v. United Merchants & Manufacturing, Inc.,* 667 F.Supp. 136, 138 (S.D.N.Y.1987) (delay of up to two and one-half years); *Broadcasting Rights Int'l Corp. v. Societe du Tour de France, S.A.R.L.,* 708 F.Supp. 83, 85 (S.D.N.Y.1989) (delay of at least two years "and possibly longer").

At some point, however, the prospect of judicial remedy becomes so temporally remote **\*1228** that it is no remedy

at all. Thus, in a variety of circumstances, we and other courts have recognized that delay can, in extreme cases, render meaningless a putative remedy. This principle has been recognized, for example, in the context of habeas corpus law. In *Burkett v. Cunningham,* 826 F.2d 1208 (3d Cir.1987), we excused a state prisoner's failure to exhaust his state-law remedies before seeking federal habeas corpus relief on the ground that he had suffered five and one-half years of delay in attempting to vindicate himself in state court. Such delay, we found, "as a matter of law excuses exhaustion" (*id.* at 1218), and we reiterated the well-worn but nevertheless truthful aphorism that "justice delayed is justice denied" (*id.*). The same result has obtained in our sister circuits. *E.g., Simmons v. Reynolds,* 898 F.2d 865 (2d Cir.1990) (six-year delay in state appeal excused exhaustion requirement in federal habeas action); *Harris v. Champion,* 938 F.2d 1062 (10th Cir.1991) (four-year delay before briefing of prisoner's state appeal and indeterminate amount of time before appeal would be decided); *Coe v. Thurman,* 922 F.2d 528 (9th Cir.1990) (three-year delay).

Similarly, it is well established in administrative law that excessive delay may, in some circumstances, excuse exhaustion requirements. *E.g., McCarthy v. Madigan,* 503 U.S. 140, 147, 112 S.Ct. 1081, 1087–88, 117 L.Ed.2d 291 (1992); *Coit Independence Joint Venture v. FSLIC,* 489 U.S. 561, 587, 109 S.Ct. 1361, 1375–76, 103 L.Ed.2d 602 (1989); *Gibson v. Berryhill,* 411 U.S. 564, 575 n. 14, 93 S.Ct. 1689, 1696 n. 14, 36 L.Ed.2d 488 (1973). Although part of the concern voiced in such cases undoubtedly stems from the possibility that a litigant's subsequent court action may be prejudiced by undue postponement, courts have also recognized the fundamental principle that a remedy too long delayed is tantamount to no remedy at all. *E.g., Smith v. Illinois Bell Telephone Co.,* 270 U.S. 587, 591, 46 S.Ct. 408, 409–10, 70 L.Ed. 747 (1926) ("[p]roperty may be as effectively taken by long-continued and unreasonable delay in putting an end to confiscatory rates as by an express affirmance of them").

Returning to the facts at hand with these legal principles in mind, the delay in the Indian legal system described by plaintiffs' experts in this case is much more than mere minor delay of the sort long tolerated, albeit ruefully, in courts of justice. To the contrary, the delay described by the Bhatnagars' experts is profound and extreme. J.A. 41, 55–65 (Galanter Aff., characterizing Indian legal system as having delays of "Bleak House dimensions"); J.A. 1368, 1374 (Shroff Aff., quoting former Chief Justice of India as saying

that Indian legal system is "almost on the verge of collapse"). The district court explained that, "[i]f this case is an 'average' case, Calcutta's High Court would take 15–20 years to resolve it. Shroff Aff., p. 7. However, the case would also be subject to another three to six years of appeals after that." J.A. 16. Thus, "[i]f this case were to proceed in the Indian court system it might not be resolved until [Urvashi] is an adult." J.A. 17.

Wherever the line might be drawn separating tolerable delay from intolerable—that is, delay that does not vitiate a remedy from that which does—delays of up to a quarter of a century fall on the intolerable side of that line. Delays of such egregious magnitude would render a remedy "clearly inadequate" under *Piper Aircraft*. Thus, we agree with the district court that delay of the magnitude described in the Bhatnagars' experts' affidavits *can* render an alternative forum inadequate as a matter of law.

**(b)**

 **[7]**    Surrendra also argues, however, that regardless of whether delay of such proportions *can* render an alternative forum inadequate, the district court's fact-finding concerning delay in India was fatally flawed in this case. Specifically, Surrendra contends that the district court credited without question the plaintiffs' Shroff Affidavit, while ignoring Surrendra's affidavits from Ansari and Khosla. Appellant–Cross–Appellee's Br. 14–15. However, keeping in mind that it was Surrendra's burden to prove that India was a viable alternative forum, the company's arguments are unpersuasive.

Contrary to Surrendra's contention that the district court "unquestioningly" accepted the Shroff affidavit, the record reflects that the district court relied on both the Shroff and Galanter affidavits in making its fact- **\*1229** finding. J.A. 15 (citing both Shroff Aff. and Galanter Aff.). Additionally, despite Surrendra's complaints about the district court's reliance on plaintiffs' experts' affidavits, the company fails to provide a single reason why the Galanter and Shroff affidavits were not worthy of credence. Thus, Surrendra's indictment of the district court's reliance on the Bhatnagars' evidence amounts to a plaintive assertion that "my experts were better."

In addition to failing to undermine the credibility of the Bhatnagars' affiants, however, Surrendra also failed to counter effectively the Bhatnagars' affidavits with evidence of its own demonstrating that the delays in India's legal system either were not present or would not make a suit by

the Bhatnagars in India an exercise in futility. Surrendra's expert, Ansari, stated that there are ways that parties may expedite litigation in India, but with one exception he did not state that any of the methods he listed would in fact lead to expedited treatment of a suit filed by the Bhatnagars. The sole exception was his assertion that the Calcutta High Court "would undoubtedly grant an 'expedited hearing' request" in Urvashi's case "given the tender age of the child...." J.A. 240. Evidently, the district court did not believe Ansari, because it held that the Bhatnagars' suit was "an average case which would probably not receive expedited treatment." J.A. 16.

We do not believe this ruling was clearly erroneous. Ansari cited no legal authority for his hopeful pronouncement, whereas plaintiffs' experts, Galanter and Shroff, provided both statistical and anecdotal evidence documenting litigation delays and tending to show that a suit like the Bhatnagars' would likely not receive expedited treatment. [7]

[7]    *See* Galanter Aff., J.A. 60–63 (noting backlog); *id.* 63–65 (average duration of reported tort suits 1975–84 was 12 years and nine months); *id.* 68–70 (results of Bhopal litigation "gives little reason to believe that the Indian courts presently afford an adequate forum for an ordinary personal injury case like this one"); Shroff Aff., J.A. 1375 (stating that if suit were filed in Calcutta High Court it would "normally" take "about 15–20 years before it is finally disposed of since, at present, there are only two judges who are singly hearing suits and proceedings for final disposal"); *id.* (quoting retired Chief Justice of India in 1985 speech as noting that "[t]he delay in the disposal of cases has affected not only the ordinary type of cases but also those which, by their very nature, call for early relief").

Turning to the Khosla affidavit, the company contends that the court "ignored" this evidence, but that also is simply not true. Khosla stated that if the Bhatnagars' suit were brought in India, Surrendra would cooperate in seeking expedited treatment of the matter and would not take actions that would unnecessarily interfere with swift resolution of the case. He also stated that if Surrendra failed to meet his promises, the company agreed that the district court could reassume jurisdiction over the case. As Surrendra is forced to concede (Appellant–Cross–Appellee's Br. 16), however, the district court acknowledged on the record that it had reviewed the Khosla affidavit and "recognize[d] that the defendants would not delay and would cooperate in requesting the Court to hear the matter expeditiously" in India (J.A. 285). The court was unpersuaded by this evidence, noting that even though

1995 A.M.C. 1716

Surrendra had promised to cooperate, "there's nothing that gives me comfort that the matter would be heard in India within a reasonable time." J.A. 285. It is clear from the record, therefore, that far from "ignoring" the Khosla affidavit, the district court concluded that Surrendra's promise to cooperate in trying to expedite litigation in India did not amount to proof that the litigation *would* avoid the unreasonable delays that plaintiffs' experts said were endemic in that judicial system. Thus, it was not clearly erroneous for the district court to decide that India was not an adequate alternative forum based upon the evidence before it.

(c)

Surrendra contends that "[e]very other court which has considered this issue has found that India courts do provide an adequate alternative forum in the *forum non conveniens* context." Appellant–Cross–Appellee's Br. 17. Even if that were so, it would be irrelevant to the issue of whether Surrendra met its burden of proof on the issue here. We note, however, that the cases relied upon by Surrendra are factually distinguishable. In *1230 *In re Union Carbide Corp. Gas Plant Disaster at Bhopal, India in Dec., 1984,* 809 F.2d 195 (2d Cir.1987), the court merely found that the district court's finding that India was a reasonably adequate alternative forum did not constitute clear error. *Id. at 202–03.* Significantly, the district court in that case had found that India was an adequate alternative forum *only* because it expected that the Indian Government would not treat the litigation arising from the Bhopal tragedy "in ordinary fashion," given that it was the "most significant, urgent and extensive litigation ever to arise from a single event...." *In re Union Carbide Corp. Gas Plant Disaster at Bhopal, India in December, 1984,* 634 F.Supp. 842, 848 (S.D.N.Y.1986). [8]

---

[8]     In the only other case cited by Surrendra which specifically addressed litigation delay in India, the court noted that the plaintiff's evidence of delay consisted of "one newspaper article, which includes anecdotal references to congestion in Indian courts." *Chhawcharia v. Boeing Co.,* 657 F.Supp. 1157, 1160 (S.D.N.Y.1987). Such meager support is nowhere near as extensive as the evidence submitted by the Bhatnagars in this case. Furthermore, in both *Chhawcharia* and *R. Maganlal & Co. v. M.G. Chemical Co., Inc.,* No. 88 Civ. 4896 (MJL), 1990 WL 200621 (S.D.N.Y.1990), also cited by Surrendra, the district courts relied upon *In re Union Carbide Corp. Gas Plant Disaster,* 809 F.2d 195 (2d Cir.1987), for the proposition that India

provided an adequate alternative forum. As noted in the text, relying on that case for that proposition is at least misleading, given the special circumstances of the Bhopal disaster litigation and the other significant factors that formed the basis of the decision. Surrendra's other putative precedents are similarly unpersuasive. There is no suggestion that the issue of delay was briefed in *Neo Sack, Ltd. v. Vinmar Impex, Inc.,* 810 F.Supp. 829 (S.D.Tex.1993), or *Vaz v. United States Surgical Corp.,* No. B–90–328 (WWE), 1991 WL 47341 (D.Conn. March 13, 1991), neither of which expended any significant effort in determining the adequacy of India's legal system as an alternative to litigation in the United States. Surrendra also cites *ETPM v. Noble Drilling Corp.,* No. H–92–0682 (S.D.Tex. Jan. 12, 1993), but does not even provide us with a copy of the case, so that we could not rely upon it even if we were disposed to credit an unpublished and unreported district court decision from another circuit.

(d)

We should not be read to conclude that the courts of India are always inadequate fora, making *forum non conveniens* dismissal inappropriate whenever an Indian national sues in the United States. That is neither the thrust nor the end point of our analysis. In reaching its conclusion that India was an inadequate alternative forum in this case, the district court was essentially concluding that Surrendra had not met its burden of proof on that threshold issue. We agree. [9] It may well be that the next defendant to face the same issue faced by Surrendra would reach a different result because it would marshal more—or better—proof. Furthermore, another district court presented with the same raw evidence might reach different factual conclusions, and we might be constrained under our lenient standards of review to affirm in that case, as well. Here, however, the district court did not commit legal error in concluding that delay can render a putative alternative forum clearly inadequate. Nor did it commit clear error in its factual findings relating to the issue of delay. That being so, we are constrained to affirm the district court's exercise of discretion under which it retained jurisdiction over this case and adjudicated the Bhatnagars' claims.

---

[9]     While defending the district court's finding that India is an inadequate alternative to the United States because of the delays endemic in the Indian legal system, on appeal the Bhatnagars also argue that we can affirm the district court's finding in this respect on an alternative ground.

According to the Bhatnagars, their claims are now time-barred in India; thus, they argue, "the court [sic] in India cannot hear the case since the statute of limitations has expired and cannot be waived." Appellees–Cross–Appellants' Br. 10. Because we have found that the district court did not abuse its discretion in ruling that India was an inadequate forum based on the evidence of delay presented to that court, we do not reach the Bhatnagars' statute of limitations argument.

## 2.

Ten days after losing the *forum non conveniens* motion, Surrendra submitted a motion for reconsideration which included the unsworn declaration of Shri Venkiteswaran pursuant to 28 U.S.C. § 1746. J.A. 289. [10] Venkiteswaran agreed with the plaintiffs' experts on Indian law that "if no order for expedition is made there could be" significant delay —"anywhere between 10 and 12 years in Bombay and about 10 to 15 years in Calcutta"—before the Bhatnagars' claims **\*1231** were resolved. J.A. 292. However, Venkiteswaran disagreed with Surrendra's own *original* Indian legal expert (Ansari) as well as both of plaintiffs' experts by stating that, contrary to the assumptions of those experts, the Bhatnagars' case could be adjudicated in India as an admiralty case. *Id.* Treating the suit as an admiralty action, Venkiteswaran stated, would reduce the delay to "4 to 5 years if the plaintiffs pursue their action diligently and if defendants are not obstructive in having the matter heard." *Id.* In its motion for reconsideration, Surrendra argued that the Venkiteswaran affidavit demonstrated that the court had erred in finding that India was an inadequate forum, and that the court had abused its discretion in evaluating the public and private interest factors implicated by the case. Alternatively, Surrendra requested that the district court certify the *forum non conveniens* issue for immediate review. The district court denied this motion without a written opinion, noting in its order that "[t]he court considered the factors mentioned in the Motion in reaching its original conclusion." J.A. 22.

[10]    28 U.S.C. § 1746 permits parties to submit unsworn declarations in lieu of sworn statements in certain circumstances.

 **[8]**    Surrendra contends on appeal that the district court abused its discretion in failing to change its mind and dismiss this case on *forum non conveniens* grounds in the face of Surrendra's new evidence. [11] We disagree for two reasons. First, Surrendra's motion for reconsideration strikes us as a classic attempt at a "second bite at the apple." Having failed in its first effort to persuade the court to dismiss on *forum non conveniens* grounds, Surrendra simply changed theories and tried again, contradicting its earlier evidence with its factual support for the new theory. We have explained that although we are not "prepared to enunciate a rule precluding [a] district court from reconsidering the issue" of *forum non conveniens* "on an expanded record in all circumstances," nevertheless we "assume that such reconsideration [will] be limited to exceptional circumstances." *Lony v. E.I. Du Pont de Nemours & Co.,* 935 F.2d 604, 608 (3d Cir.1991). Whatever other circumstances may justify reconsideration, mere presentation of arguments or evidence *seriatim* does not. *See Brambles USA, Inc. v. Blocker,* 735 F.Supp. 1239, 1240 (D.Del.1990) (reargument "should not be used as a means to argue new facts or issues that inexcusably were not presented to the court in the matter previously decided").

[11]    In its brief, Surrendra also suggests that, in the alternative, the district court should have granted the company's request for interlocutory review of the *forum non conveniens* decision under Fed.R.Civ.P. 54(b). Appellant–Cross–Appellee's Br. 18 n. 1. The company does not appeal the denial of certification, however, so we need not address the knotty question of whether we could take jurisdiction over a denial of Rule 54(b) certification. *See Republic of the Philippines v. Westinghouse Elec. Corp.,* 43 F.3d 65, 81 (3d Cir.1994).

In any event, the district court was entitled to disbelieve the Venkiteswaran declaration. Venkiteswaran contradicted the Ansari affidavit, which—according to Surrendra in its earlier papers—had accurately stated the law. Thus, the district court may reasonably have concluded that the putative new "expert" testimony was of no evidentiary value. Furthermore, Venkiteswaran provided the district court with no citation to legal authority suggesting that his conclusion that the Bhatnagars could bring an admiralty action in India was entitled to any weight. Given the incompatibility of his testimony with that of Ansari and the Bhatnagars' experts, the district court may reasonably have concluded that it should not credit the newly proffered opinion. We cannot conclude that the district court abused its discretion in denying the motion for reconsideration.

## 3.

 **[9]**    After denial of the motion for reconsideration, discovery proceeded apace for another two and one-half months. Then,

1995 A.M.C. 1716

on the day after the Bhatnagars' trial brief was submitted, Surrendra filed a Motion for Relief from the Order Denying Claimant's Motion to Dismiss on Grounds of Forum Non Conveniens. *See* J.A. 9. In this motion, Surrendra again contended that the district court should reconsider the motion to dismiss. This time, Surrendra premised its request for relief on allegations that the Bhatnagars, in a wilful abuse of discovery, had misrepresented their immigration status to **\*1232** Surrendra and the court. In fact, Surrendra contended, the Bhatnagars had been illegal aliens when they first brought their action in Pennsylvania. Had the Bhatnagars not wilfully misrepresented their immigration status to the court, the company claimed, the court would have granted the *forum non conveniens* motion because the withheld information would have negated the court's findings of fact—namely, that Urvashi intended to reside in the United States until all medical treatment was completed and that she sought to remain permanently in the United States, if permitted. Surrendra apparently also contended that the motion to dismiss should be reconsidered and granted as a sanction for the Bhatnagars' bad faith during discovery.

The district court rejected this third bite at the apple, noting that this case was "not an immigration appeal." J.A. 26. Furthermore, although the court stated that the "court's role is not to determine ... whether the plaintiffs reside here legally," the court explained that it had "considered the possibility that the minor plaintiff could be deported" at the hearing on Surrendra's *initial* motion to dismiss. *Id.* (Indeed, the court had done so, apparently aware at that time that the plaintiffs were potentially residing in the United States illegally. J.A. 272.) Additionally, relying on *Hagl v. Jacob Stern & Sons, Inc.,* 396 F.Supp. 779, 784 (E.D.Pa.1975), the court ruled that "even if the minor plaintiff is an illegal alien, she still has the right to use this country's courts to sue those persons who allegedly physically injured her." J.A. 26.

The district court did not abuse its discretion in denying this second motion for reconsideration, which amounted to a *third* motion to dismiss on the ground of *forum non conveniens,* and which asserted grounds already briefed to the district court. Reconsideration "should not be granted where it would merely 'allow wasteful repetition of arguments already briefed, considered and decided.' " *Brambles USA,* 735 F.Supp. at 1240, quoting *Weissman v. Fruchtman,* 124 F.R.D. 559, 560 (S.D.N.Y.1989). Furthermore, despite Surrendra's protestations of bad faith and lack of candor by the Bhatnagars, the evidence does not compel the conclusion that the Bhatnagars acted with bad faith, and the district court

found no such bad faith. In short, Surrendra has provided no reason to upset the district court's discretionary decision to deny this final motion for reconsideration.

## B.

**[10]**    Turning to the merits of the trial, Surrendra next contends that the court erred in finding the company negligent under Indian law. [12] Surrendra's challenge takes two forms. First, the company alleges that the court erred in finding that liability could be imposed upon the company on the ground that Surrendra's duty officer should have known of Urvashi's presence on the bridge at the time of the accident. Alternatively, Surrendra argues that the court erred in denying Surrendra's motion for a directed verdict on the ground that there was insufficient evidence either that Surrendra's steward and helmsman had acted within the scope of their employment or that the duty officer had become aware of Urvashi's presence on the bridge. Surrendra's arguments, however, leave us unpersuaded.

[12]    In their cross-appeal, the Bhatnagars contend that the district court erred in concluding that Indian law applied. They reason that because Indian and American law are essentially identical with respect to principles of negligence, the court did not have to find that Indian law applied because there was no "true conflict" of law. *See Coons v. Lawlor,* 804 F.2d 28, 30 (3d Cir.1986). We agree with the Bhatnagars that Indian and American negligence law are essentially the same with respect to duty, breach, cause-in-fact and proximate cause, as well as how one determines the scope of the duty owed (if any) by the defendant to the plaintiff. However, as we discuss *infra* pp. 1234–35, Indian courts award damages in a manner different from American courts. Thus, the district court did not err in making a choice of law inquiry. Furthermore, despite the Bhatnagars' contentions to the contrary, it is clear that, under *Lauritzen v. Larsen,* 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), Indian law applies to this dispute. The law of the flag and the allegiance of the parties to India at the time of the accident point strongly towards the application of Indian law, and the Bhatnagars' subsequent sojourn in the United States does not create sufficient counterbalance to require application of domestic law to the dispute.

**[11]**    The district court made the following findings of fact relevant to this portion of the appeal:

**\*1233**  16. On March 17, 1991, the ship's steward, Mr. Abdul Mutalib, took the plaintiff, Urvashi, to the bridge of the vessel.

17. At the time in question the duty watch officer was on the bridge together with the duty helmsman. The duty watch officer's duties included enforcing the ship's rules that the Bridge of the ship was off limits to all unauthorized persons.

18. At approximately 4:00 p.m. while the plaintiff and Mr. Mutalib were on the bridge, the helmsman picked up plaintiff Urvashi and placed her on a ledge in front of the clear view screen on the bridge....

20. The helmsman of the vessel showed the minor plaintiff how to put her hand on the clear screen a [sic] part of a "game." He feigned putting the palm of his hand on the clear screen [sic] and asked her to do likewise. When minor plaintiff placed her hand on the clear view screen, her right hand and portions of her arm were injured. The helmsman fainted on the bridge.

21. The defendant admits that the acts of the helmsman and steward were negligent. The steward was taking tea to the duty officer on the bridge at the time just before the accident.

22. The duty officer, who is in charge of the bridge, did not stop the helmsman and steward from acting negligently. The duty officer should have known of their permitting the minor plaintiff to play on the bridge.

23. The duty officer, acting for the defendant, breached a duty of care owed to plaintiffs [sic] by permitting plaintiff to be on the bridge, an unauthorized area, and on the ledge in front of the clear view screen. The duty officer should have known of the minor plaintiff's presence on the bridge.

24. The duty officer's failure to stop the helmsman's and steward's negligent acts was a substantial factor in bringing about the harm to the plaintiff.

25. Plaintiff's injury was proximately caused and caused in fact by defendant's breach of duty owed to plaintiff.

26. It was reasonably foreseeable to the duty officer that plaintiff was in danger of sustaining injury on the bridge in general and on the ledge in front of the clear view screen in particular.

J.A. 31–33. As these findings of fact indicate, the district court found that the duty officer had a duty to prevent Urvashi and other unauthorized persons from being on the bridge and to enforce safety precautions during his watch. This finding is amply supported in the record by the unambiguous testimony of the Captain of the APJ KARAN. J.A. 1055. The duty officer breached that duty by failing to act in a manner that would have permitted him to avert the negligent actions of the steward and helmsman.

Contrary to Surrendra's argument, the district court's decision did not constitute a finding of strict liability. In fact, we find Surrendra's contention quite puzzling. It is permissible to find that someone breached a duty of care owed to another without actually knowing that a victim has been harmed until after the fact, so long as a reasonable person would know that acting or failing to act would create an unreasonable risk of harm to a class of persons that includes the plaintiff. *See generally* Restatement (Second) of Torts § 281, comment "c" (1965). Surrendra concedes that under Indian law, like American law, negligence

> consists in the neglect of ordinary care or skill towards a person to whom the defendant owes a duty of observing ordinary care ... the standard of care which would determine whether or not there has been a breach of duty is that of a reasonable person who must be presumed to have foreseen the consequence, or at least, ought to have seen it.

Appellant–Cross–Appellee's Br. 37. Under this standard, the district court could properly conclude that, had the duty officer (Surrendra's agent, acting within the scope of his employment) reasonably fulfilled his duty to enforce the rules of the bridge, Urvashi would not have been harmed. Thus, the district court did not err in finding Surrendra liable.

**\*1234**  Furthermore, because of this conclusion, it was entirely proper for the district court to reject Surrendra's motion for directed verdict based on the sufficiency of the evidence. It did not matter whether the plaintiffs had established that the steward and helmsman were acting within the scope of their employment.[13] Nor did it matter whether there was evidence that the duty officer actually knew of Urvashi's presence on the bridge, given that the district court had reasonably concluded that if the duty officer had been

performing his job properly, she would not have been. Thus, the district court did not err in denying the motion for a directed verdict.

13    Although we see no reason why the court could not have concluded that Surrendra was liable through the actions of the helmsman and steward, the court made no findings to that effect.

## C.

Surrendra next contends that the district court erred in awarding Urvashi a total of $189,331.00 in damages, including $39,133 in pecuniary losses and $150,000 in non-pecuniary losses, "including pain and suffering, disability, disfigurement, loss of enjoyment of life, mental anguish and emotional injury, past, present and future as a result of the accident...." J.A. 37. According to the company, the district court's non-pecuniary damages award was grossly excessive under Indian law. 14 We agree with Surrendra that the district court erred in its application of Indian damages principles regarding non-pecuniary damages.

14    Surrendra does not appear to contest the district court's award of $39,133.00 in pecuniary damages. *See* Appellant–Cross–Appellee's Third Step Reply Br. 21. In any event, we find no error in the district court's award of pecuniary damages. *See, e.g.,* J.A. 1443 (discussing permissible pecuniary damages under Indian law).

[12]    Under Indian law, three principles govern awards of "non-pecuniary" or "general" damages: "(1) Compensation must be reasonable and must be assessed with moderation[;] (2) Regard must be had to awards in comparable cases [; and] (3) sums awarded should, to a considerable extent, be conventional." J.A. 1444 (Opinion of S.C. Pratap (Sept. 16, 1993)); 15 J.A. 1397 (Affidavit of Shardul S. Shroff (Sept. 30, 1993)) ("Shroff Aff. II"). As the experts for the Bhatnagars and Surrendra agree, in applying these principles Indian courts attempt to make awards comparable and uniform among Indian tort victims. J.A. 1398 (Shroff Aff. II); 1448 (Pratap Opinion). Thus, Urvashi was entitled to an award of non-pecuniary damages, but she was not entitled to an award comparable to what a similarly situated American would receive in *this* country. Rather, the district court should have sought to award an amount comparable to what a similarly situated plaintiff would have received in India. 16

15    This document, an opinion by a former judge of the High Court of Bombay and ex-Chief Justice of Andhra Pradesh, was accompanied by an unsworn declaration of Shri Venkiteswaran under 28 U.S.C. § 1746 (*see* J.A. 1466), and was admissible under Fed.R.Civ.P. 44.1 for purposes of determining the law of India.

16    As the Supreme Court explained in *Lauritzen*, "[t]he purpose of a conflict-of-laws doctrine is to assure that a case will be treated in the same way under the appropriate law regardless of the fortuitous circumstances which often determine the forum." 345 U.S. at 591, 73 S.Ct. at 932.

Viewed in this light, the district court's award of $150,000 in non-pecuniary damages may be grossly excessive. One American dollar in early 1995 is worth approximately 31.39 rupees. 17 Thus, the district court's award, in rupees, was in the neighborhood of Rs. 4,708,500. The parties' experts have provided a number of examples of compensation by Indian court victims for various personal injuries, but the highest award mentioned is less than 20 percent of the amount awarded in this case, and it was awarded for an injury that was much more serious than that suffered by Urvashi. 18

17    The Wall Street Journal (Feb. 28, 1995) p. C6. Of course, the relevant exchange rate is actually the one in effect on the date of the verdict and judgment in the district court. However, Surrendra asserted that the exchange rate of rupees to dollars was "more than" 31:1 during the relevant period (Appellant–Cross–Appellee's Br. 42), and the Bhatnagars do not contest this assertion. Thus, the calculation in the text is a reasonable approximation of the value of the district court's award in rupees.

18    The amounts awarded in the cases cited by the Bhatnagars' damage expert, Shroff, range from 5500 rupees (for damage to a left arm) to 143,400 rupees (for an "arm injury"), although in neither of these extreme cases does Shroff note whether the figure is for both pecuniary and non-pecuniary damages, or only non-pecuniary. J.A. 1400. Surrendra's damages expert, Pratap, describes a great many more cases with a broader range of awards (*id.* 1448–56), but the largest award listed was 857,352 rupees, awarded to a former judge who was injured in an automobile accident and suffered 100 percent disability and paraplegia below the waist.

*1235    Because the award in this case was so disproportionate to the amounts awarded in other Indian tort cases, we will vacate the award of non-pecuniary damages and remand with instructions to reassess those damages in accordance with Indian law. We leave it to the district court

to determine whether there is sufficient material in the record to make that determination, or whether supplemental briefing and evidence will be necessary. [19]

[19]    We also note an apparent scrivener's error in the district court's rendition of judgment: although the court's award amounts to only $189,133 ($39,133 + $150,000), the court's judgment was rendered in favor of Urvashi Bhatnagar for $189,331. J.A. 40. Since we are vacating this judgment so that the district court can properly determine non-pecuniary damages under Indian law, the typographical error is of no moment because the district court will undoubtedly correct its calculation upon remand.

### III.

We have already addressed and rejected one of the contentions raised in the Bhatnagars' cross-appeal—namely, that the district court erred in concluding that the law of India applied in this case. *See supra* n. 12. However, the Bhatnagars also argue that the court erred in failing to award damages to Kalpana Bhatnagar, and that the court erred in rendering a "clearly inadequate" award in favor of Urvashi. [20] We address these contentions below.

[20]    The Bhatnagars also contend that the district court erred in admitting certain testimony of the Captain of the APJ KARAN which the Bhatnagars contend was hearsay. However, given that this testimony pertained to the finding of negligence against Surrendra, and given that we have affirmed that finding of negligence, we find that this claim of error is moot.

### A.

**[13]**    The district court found that Kalpana Bhatnagar had "not demonstrated a loss of service as a result of plaintiff Urvashi's injury." J.A. 37. In their cross-appeal, the Bhatnagars contend that this finding was erroneous, but they provide no evidence that damages for loss of services are compensable under Indian law (*see* Appellees–Cross–Appellants' Br. 43–45), whereas Surrendra's expert opined that Kalpana's claim is "unsustainable" under Indian law (J.A. 1458). Furthermore, the Bhatnagars failed to demonstrate that Kalpana lost any of Urvashi's services, even assuming that compensation for such loss is cognizable under Indian law.

For these two independent reasons, the district court did not commit error in denying Kalpana recovery.

### B.

The Bhatnagars also contend that the district court erred in awarding a "clearly inadequate" award in favor of Urvashi. Their argument, however, is confined to the district court's "non-pecuniary" award, which we have already explained in section II(C) must be vacated and remanded for redetermination because of its excessiveness under Indian law. We reject the Bhatnagars' claim that Urvashi's award was inadequate for the reasons we noted in finding that the award was grossly excessive under Indian law.

### IV.

Prophets of litigation doom may contend that our *forum non conveniens* analysis in this case will cause a flood of litigation as foreigners rush to the United States to bring claims that have nothing to do with our nation, our people or our business. We recognize that the possibility of securing a trial before an American jury, under American law, provides a strong draw to foreigners. Indeed, the Supreme Court itself has recognized that our courts are "extremely attractive to foreign plaintiffs." *Piper Aircraft,* 454 U.S. at 252, 102 S.Ct. at 264.

Still, we are not troubled by the precedential effect of our decision. A careful reading of section II(A) makes clear just how **\*1236** narrow and unusual are the facts and circumstances of this case. Additionally, it is likely that future defendants will develop a record (if such can be made) adequate to support dismissal in similar circumstances. Finally, we have confidence that our district courts well understand the weight of their dockets and will not hesitate to dismiss those actions that have no business being before them. Of course, if they do not, we will exercise our superintendence at that time, but we see no reason to reverse a defensible decision to retain jurisdiction in the face of a claim of *forum non conveniens* based upon mere speculation that our courts may have to exercise their discretion more often in the future.

The judgment of the district court will be affirmed except as to the award for non-pecuniary damages. As to the non-pecuniary damages, the judgment of the district court will be vacated and the case remanded to the district court to redetermine those damages in accordance with Indian law.

Two-thirds of plaintiffs' costs will be taxed against the defendants.

**Parallel Citations**

1995 A.M.C. 1716

---

          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 6

735 F.Supp. 1239
United States District Court,
D. Delaware.

BRAMBLES USA, INC., a
Delaware corporation, Plaintiff,

v.

Barry B. BLOCKER, Melvyn Bell, Edwin E. Walhof,
George D. Combs, Charles C. Robertson, William H.
Wilson, Jack W. Forrest, Jim L. Hanna, Theodore
L. Stebbins, C. Warner, Jr., Donald R. Blocker, G
& L Ditz Living Trust, G. Ditz, Jr. Family Trust,
John A. Ditz, Smedjan Enterprises, Ltd., W.D.
Bain, Jr., Anne A. Bain, Nancy B. Cota, Kittler B.
Zibart, Pauline T. Bain, Donald E. Fraser, Steven
J. Anderson and David L. Morrell, Defendants,
and
Environmental Systems Company, a
Delaware corporation, Nominal Defendant.

Civ. A. No. 89–681 LON.    |    April 23, 1990.

Shareholder of parent corporation brought securities fraud
suit seeking rescission of merger between subsidiary and
acquired corporation. Following the granting of defendant's
motion to dismiss, 731 F.Supp. 643, shareholder moved for
reargument. The District Court, Longobardi, Chief Judge,
held that the court fully considered all the controlling cases
and neither overlooked nor misperceived the relief sought or
the transaction of which shareholder complained.

Motion denied.

West Headnotes (5)

**[1]**    **Federal Civil Procedure**
👉 Grounds and Factors
In no event should reargument be granted
where matters advanced for reargument would
not reasonably have altered result previously
reached by court. U.S.Dist.Ct.Rules D.Del.,
Rule 3.3.

25 Cases that cite this headnote

**[2]**    **Federal Civil Procedure**
👉 Further evidence or argument
Reargument should not be granted where it
would merely allow wasteful repetition of
arguments already briefed, considered, and
decided. U.S.Dist.Ct.Rules D.Del., Rule 3.3.

35 Cases that cite this headnote

**[3]**    **Federal Civil Procedure**
👉 Error by court
Reargument may be appropriate where court
has patently misunderstood party, or has
made decision outside adversarial issues
presented to court by parties, or has made
error not of reasoning but of apprehension.
U.S.Dist.Ct.Rules D.Del., Rule 3.3.

204 Cases that cite this headnote

**[4]**    **Federal Civil Procedure**
👉 Further evidence or argument
**Federal Civil Procedure**
👉 Change in law or facts
Reconsideration may be appropriate where
controlling law has been significantly altered,
or where new factual matters not previously
obtainable have been discovered since issue was
submitted to court.

116 Cases that cite this headnote

**[5]**    **Federal Civil Procedure**
👉 Grounds and objections
Corporate shareholder that was found to lack
standing to challenge issuance of common stock
was not entitled to reargument; court fully
considered and correctly applied all controlling
cases, and neither overlooked nor misperceived
relief sought or transaction of which shareholder
complained. U.S.Dist.Ct.Rules D.Del., Rule 3.3.

1 Cases that cite this headnote

Brambles USA, Inc. v. Blocker, 735 F.Supp. 1239 (1990)

**Attorneys and Law Firms**

**\*1239** R. Franklin Balotti and C. Stephen Bigler of Richards, Layton & Finger, Wilmington, **\*1240** Del. (T. Livingston of Mayer, Brown & Platt, Chicago, Ill., of counsel), for plaintiff.

Stephen J. Rothschild and Randolph K. Herndon of Skadden, Arps, Slate, Meagher & Flom, Wilmington, Del., for defendants Bell, Walhof, Combs, Robertson, Wilson, Forrest, Hanna, Stebbins and Warner.

Bruce M. Stargatt, Josy W. Ingersoll and Bruce L. Silverstein of Young, Conaway, Stargatt & Taylor, Wilmington, Del. (Wilson, Sonsini, Goodrich & Rosati, Palo Alto, Cal., and Neisar, Pahl, Cecchini & Gosselin, San Francisco, Cal., of counsel), for Blocker, Blocker, G & L Ditz Living Trust, G. Ditz, Jr. Family Trust, Ditz, Smedjan, Bain, Jr., Bain, Cota, Zibart, Bain, Fraser, Anderson and Morrell.

David B. Ripsom and Judith N. Renzulli of Duane, Morris & Heckscher, Wilmington, Del., for nominal defendant Environmental Systems Co.

## OPINION

LONGOBARDI, Chief Judge.

The Plaintiff, pursuant to Local Rule of Civil Procedure 3.3, filed a motion for reargument of this Court's Opinion, Docket Item ("D.I.") 28, granting the Defendants' motion to dismiss this action because the Plaintiff lacked standing to pursue this lawsuit derivatively. 731 F.Supp. 643, 652.

While common in federal practice, the Federal Rules of Civil Procedure do not provide a mechanism for a motion for reargument or reconsideration of a decision. *See, e.g., Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.,* 99 F.R.D. 99, 101 (E.D.Va.1983); *Fisher v. Samuels,* 691 F.Supp. 63, 74 (N.D.Ill.1988).* Local Rule 3.3 of this Court provides that "a motion for reargument ... shall briefly and distinctly state the grounds therefor.... The Court will determine from the motion and answer whether reargument will be granted." On its face, Local Rule 3.3 admits of no limitations on the grounds for such a motion. Nonetheless, in entertaining such motions, the Court is guided by several considerations.

**[1]**    **[2]**    In no event should reargument be granted where the matters advanced for reargument would not "reasonably have

altered the result [previously] reached by the Court...." *Crane Co. v. Harsco Corp.,* 511 F.Supp. 294, 307 (D.Del.1981), *quoting United States v. International Business Machines Corp.,* 79 F.R.D. 412, 414 (S.D.N.Y.1978). Reargument should not be granted where it would merely "allow wasteful repetition of arguments already briefed, considered and decided." *Weissman v. Fruchtman,* 124 F.R.D. 559, 560 (S.D.N.Y.1989); *see also Samuel M. Feinberg Testamentary Trust v. Carter,* 664 F.Supp. 140, 142 (S.D.N.Y.1987); *Ashley Meadows Farm v. Am. Horse Shows Ass'n,* 624 F.Supp. 856, 858 (S.D.N.Y.1985).[1] Furthermore, the reargument mechanism afforded by Local Rule 3.3 should not be used as a means to argue new facts or issues that inexcusably were not presented to the court in the matter previously decided. *Weissman,* 124 F.R.D. at 560. Finally, reargument and reconsideration requests "are not a substitute for an appeal from a final judgment." *Weissman v. Fruchtman,* 658 F.Supp. 547, 548 (S.D.N.Y.1987). The procedural mechanism afforded by Local Rule 3.3 should not be undermined to allow for endless debate between the parties and the Court. *Cf. Quaker Alloy Casting v. Gulfco Industries, Inc.,* 123 F.R.D. 282, 288 (N.D.Ill.1988) ( "this Court's opinions are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure").

[1]    The local rule utilized in *Weissman* provides, *inter alia,* that "[t]here shall be served with the notice of motion a memorandum setting forth concisely the matters or controlling decisions which counsel believes the court has overlooked." Civil Rules for the United States District Courts for the Southern and Eastern Districts 3(j). Accordingly, *Weissman* stated that the "only proper ground on which a party may move to reargue an unambiguous order is that the court overlooked 'matters or controlling decisions' which, had they been considered, might reasonably have altered the result reached by the court." *Weissman,* 124 F.R.D. at 560 (citations omitted). Delaware District Court Local Rule 3.3 does not contain the same express limitation.

**\*1241**    **[3]**    **[4]**    In exercising its discretion in ruling on a motion for reargument or reconsideration, the Court must keep an open mind. Reargument may be appropriate where "the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Above the Belt,* 99 F.R.D. at 101. Additionally, where the controlling law has been significantly altered, *id. but cf. In re Hackney,* 93 B.R. 213, 215 (Bkrtcy.N.D.Cal.1988) ("a decision cannot be set

aside once it is final simply because it is based on legal precedent that is subsequently reversed"), or new factual matters not previously obtainable have been discovered since the issue was submitted to the Court, reconsideration may be appropriate. *Above the Belt,* 99 F.R.D. at 101; *see also Nat. Union Fire Ins. v. Continental Illinois Corp.,* 116 F.R.D. 252, 253 (N.D.Ill.1987); *Weissman,* 124 F.R.D. at 560. While these situations are seldom present, *Above the Belt,* 99 F.R.D. at 101; *Wielgos v. Commonwealth Edison Co.,* 127 F.R.D. 135, 138 (N.D.Ill.1989), the Court should not hesitate to grant the motion when compelled to prevent manifest injustice or to correct clear error. *Cf. Matarese v. LeFevre,* 801 F.2d 98, 106 (2d Cir.1986), *cert. denied,* 480 U.S. 908, 107 S.Ct. 1353, 94 L.Ed.2d 523 (1987); *Ray v. Lykes Bros. S.S. Co. Inc.,* 626 F.Supp. 120, 123 (E.D.La.1985), *remanded* 805 F.2d 552 (5th Cir.1986).

Thus, Local Rule 3.3 attempts to balance the interests in obtaining a final decision on matters presented to the Court and the recognition that the Court, like all others, is capable of mistake and oversight. *Cf. Federal Deposit Ins. Corp. v. Castle,* 781 F.2d 1101, 1104 (5th Cir.1986).

[5] Plaintiff asks this Court to vacate its Order dismissing the complaint, D.I. 29, based on this Court's "mistaken" findings and conclusions. D.I. 30 at 3. First, Plaintiff would conclude that the wrong complained of occurred after Plaintiff acquired its stock. This conclusion is "compelled", argues Plaintiff, both because it alleged that the wrong complained of occurred on December 1, 1989, (when the exchange of stock occurred) and because the Court "incorrectly applied the reasoning and holding" of *Elster v. American Airlines,* 34 Del.Ch. 94, 100 A.2d 219 (1953). D.I. 30 at 3. Second, Plaintiff argues that this Court's "finding that Brambles knew of the wrongdoing when it purchased its shares is improper" due to its inconsistency with the allegations of the complaint and is contrary to the evidence adduced thus far. *Id.* at 7.

With regard to the Plaintiff's claim that the Court's interpretation and application of *Elster* was incorrect, this serves as no basis for reargument. The Court fully considered all of the controlling cases, including *Elster. See, e.g.,* 731 F.Supp. at 648–52. To the extent that Plaintiff asserts distinctions between this case and *Elster,* this Court has thoroughly considered them. For example, in reaching its decision, the Court considered the Plaintiff's allegations that the exercise of the options constituted waste, *see, e.g.,* 731 F.Supp. at 650, 651, that the entire transaction was procured through fraud making it wrongful for the Exceltech

shareholders to exercise the options, *see, e.g., id.* at 644, 647, 650, and that it was wrongful for the Ensco directors to permit the transaction to go forward, *see, e.g., id.* at 647–48.

Plaintiff's assertion that this Court "misperceived" the relief sought and the transaction challenged is also rejected. This Court acknowledged that Plaintiff challenged as improper the issuance of Ensco common stock to the Exceltech shareholders on December 1, 1989. *See, e.g.,* 731 F.Supp. at 651. In this Court's opinion, however, the issuance of the Ensco common stock was, by that time, a foregone conclusion since it was fixed by the Exchange/Put Agreement. *See, e.g., id.* at 650, 652. Thus, the Court neither overlooked nor misperceived the relief sought or the transaction of which Plaintiff complains.

The Plaintiff's characterization of this Court's policy conclusion is incorrect. The Court said:

> As a matter of policy, one who buys shares with knowledge of a purported wrongdoing should not be permitted to **\*1242** bring suit to challenge that wrongdoing. *FMC Corp.,* C.A. No. 6889 at 5–7. While Brambles may complain that they could not have known that the Exceltech merger and the Exchange/Put Agreement were a bad deal until they became a stockholder and did a "books and records" inspection, the fact remains that by the time Brambles had purchased its stock the merger had occurred and Brambles could have conducted a more stringent inquiry prior to purchasing its large equity stake in Ensco.

731 F.Supp. at 652. Clearly, this is not inconsistent with Plaintiff's well pleaded allegations which the Court accepted as true. *Id.* at 644 n. 1. In fact, when asked at oral argument by the Court, counsel for the Plaintiff represented that the option contract and its attendant consequences were disclosed to Plaintiff when it negotiated its purchase agreement. The Court merely found that the Plaintiff was fully aware of the merger and its terms at the time it purchased its interest in Ensco. This policy statement only served to coincide with the Court's determination that the transaction of which Plaintiff complains was fixed prior to the time Plaintiff acquired its interest in Ensco.

**Brambles USA, Inc. v. Blocker, 735 F.Supp. 1239 (1990)**

---

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**TAB 7**

1998 CarswellOnt 1628, [1998] O.J. No. 1696, 71 O.T.C. 252

1998 CarswellOnt 1628

Ontario Court of Justice (General Division)

DeGroote v. Canadian Imperial Bank of Commerce

1998 CarswellOnt 1628, [1998] O.J. No. 1696, 71 O.T.C. 252

## Roger DeGroote and Montego Forest Products (Holdings) Ltd., Plaintiffs and Canadian Imperial Bank of Commerce, Peat Marwick Thorne and Peat Marwick Thorne Inc., Defendants

Canadian Imperial Bank of Commerce, Plaintiff by Counterclaim and Roger DeGroote, Trudy Nicholas, also known as Trudy DeGroote and also known as Trudy Pelley and Montego Forest Products (Holdings) Ltd., Defendants by Counterclaim

Lax J.

Heard: April 6, 1998
Judgment: April 24, 1998
Docket: 92-CQ-12825

Counsel: *J. Heller*, for the Plaintiffs.
*A. MacFarlane*, for the Defendants.

Subject: Civil Practice and Procedure

### Related Abridgment Classifications

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

### Headnote

**Practice --- Judgments and orders — Amending or varying — Before judgment entered — General**

Plaintiffs brought action for damages for breach of contract and improvident realization — Defendants brought motion for summary judgment, which was granted — Reasons for summary judgment commented adversely on plaintiffs' evidence — After judgment was released but not entered, plaintiffs alleged that their solicitor had been negligent in not presenting additional evidence — Plaintiffs brought motion to re-open judgment and to consider additional evidence — Motion dismissed on basis that courts should discourage attempts to disturb judgment by bringing forward evidence available at trial or to permit litigant to re-establish case with aid of further proof.

### Table of Authorities

**Cases considered by *Lax J.*:**

*Becker Milk Co. v. Consumers' Gas Co.* (1974), 2 O.R. (2d) 554, 43 D.L.R. (3d) 498 (Ont. C.A.) — considered

*Castlerigg Investments Inc. v. Lam* (1991), 2 O.R. (3d) 216, 47 C.P.C. (2d) 270 (Ont. Gen. Div.) — distinguished

*Clayton v. British American Securities Ltd.*, [1934] 3 W.W.R. 257, [1935] 1 D.L.R. 432, 49 B.C.R. 28 (B.C. C.A.) — referred to

*Ferguson v. Panelart Products Inc.* (June 13, 1995), Doc. Kitchener 92-CU-57832 (Ont. Gen. Div.) — distinguished

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 CarswellOnt 1628, [1998] O.J. No. 1696, 71 O.T.C. 252

*Halton Community Credit Union Ltd. v. ICL Computers Ltd.* (1985), 1 C.P.C. (2d) 24, 8 O.A.C. 369 (Ont. C.A.) — distinguished

*Kent v. Frolick* (1996), 3 O.T.C. 122 (Ont. Gen. Div.) — referred to

*Lico v. Griffiths* (1996), *(*sub nom. *Lico v. Griffith)* 28 O.R. (3d) 688 (Ont. Gen. Div.) — distinguished

*Mele v. Royal Bank* (1994), 29 C.P.C. (3d) 3 (Ont. Gen. Div.) — distinguished

*QIT Fer & Titane Inc. v. Upper Lakes Shipping Ltd.* (1991), 3 O.R. (3d) 165 (Ont. Gen. Div.) — applied

*Saginur v. Sbrocchi* (1979), 12 C.P.C. 21 (Ont. S.C.) — referred to

*Sandulo v. Robinson* (1975), 10 O.R. (2d) 778 (Ont. H.C.) — distinguished

*Scott v. Cook*, [1970] 2 O.R. 769, 12 D.L.R. (3d) 113 (Ont. H.C.) — referred to

*Smith v. Canadian Tire Acceptance Ltd.* (December 12, 1994), Doc. CP 93-CQ-32019 (Ont. Gen. Div.) — referred to

*Strategic Resources International Inc. v. Cimetrix Solutions Inc.* (1997), 34 O.R. (3d) 416 (Ont. Gen. Div.) — considered

**Rules considered:**

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194
    R. 20 — referred to

    R. 76 — referred to

MOTION to re-open judgment and consider new evidence.

*Lax J.*:

1     On April 6, 1998, I heard argument in the above-styled matter which was the subject of a judgment released on November 14, 1996. I determined that the plaintiffs had not established that there was a basis to further consider a motion to re-open the judgment. These are the reasons for my decision. In order to place this decision in context, I set out below a short summary of these proceedings.

2     This was an action for damages for breach of contract and improvident realization arising out of the actions of the defendants, who were banker and receiver, respectively, to the plaintiffs. The defendants brought a motion for summary judgment which I heard on November 6, 7 and 8, 1996. Summary judgment was granted in favour of the defendants dismissing the plaintiffs' claim and granting partial summary judgment on the counterclaim against Trudy Nicholas. Ms. Nicholas is either married to or lives in a relationship of marriage with Roger DeGroote. Both were involved in the operation of the corporate plaintiff. The reasons for judgment comment adversely on the quality of the evidence upon which the plaintiffs relied on the motion. Mr. DeGroote, who is a personal plaintiff and the principal shareholder of the corporate plaintiff, was present in court during the three days the motion was argued. The reasons are in error in stating that Trudy Nicholas was also present. The reasons for judgment elaborate the basis for the determination that there were no genuine issues for trial and, except as may be relevant to the issues here, do not need to be repeated.

1998 CarswellOnt 1628, [1998] O.J. No. 1696, 71 O.T.C. 252

3     After the reasons were released, the plaintiffs terminated the retainer of the solicitor who had represented them on the motion and for some time previous to the motion. About a month after the reasons were released, but before formal judgment was entered, newly-retained counsel for the plaintiffs wrote to me requesting the opportunity to deliver additional material in response to the motion for summary judgment and also requested that I hear argument on re-opening the judgment. I permitted counsel to submit the additional material which consisted of several affidavits, the principal affidavit having been sworn by Trudy Nicholas. Ms. Nicholas' affidavit deposes, *inter alia*, to events which occurred at a meeting on June 5, 1990 which she attended, but which Mr. DeGroote did not, and which, on the motion for summary judgment, was the subject of disputed evidence. On the motion, I had indirect evidence from Mr. DeGroote, on information and belief, as to the meeting on June 5, 1990. I did not have evidence from Ms. Nicholas. I had evidence from others who were in attendance at that meeting and whose evidence was supported by documentation as to what transpired at that meeting. I drew an adverse inference from the absence of direct evidence from the plaintiffs as to what occurred at this meeting and determined that their indirect evidence raised no genuine issue for trial.

4     All of the material which I have now received was available at the time I heard the motion for summary judgment in November 1996. According to Ms. Nicholas' affidavit, it was not put before the court because the plaintiffs' former solicitor failed to carry out instructions. After I had received this material, the solicitors for the defendants sought to cross-examine Ms. Nicholas on her affidavit and to file responding material before I heard any argument to re-open the judgment. It was the position of the solicitor for the plaintiffs that if I was disposed to permit any cross-examination and, in particular, cross-examination on those portions of Ms. Nicholas' affidavit relating to the alleged negligence of the former solicitor, he wished an opportunity to examine the former solicitor as a witness on a pending motion. The plaintiffs' former solicitor retained counsel.

5     On June 2, 1997, all counsel attended in court at which time the terms of an order were agreed to whereby Ms. Nicholas would be cross-examined on those portions of her affidavit which alleged a failure to follow instructions, the former solicitor would be examined in regard to those instructions, and my consideration of other evidence was reserved. A schedule for the examinations and for a hearing of argument was established. On the day before the examination of Ms. Nicholas was to proceed, counsel for the plaintiffs purported to serve an additional affidavit of Ms. Nicholas which I ruled I would not consider. The examinations were delayed while counsel for the plaintiffs applied for leave to appeal this ruling to the Divisional Court. A new date was established to hear argument, but counsel were not ready to proceed on that date. Ultimately, the examinations proceeded on the basis of the order made on June 2, 1997. Several months passed and in early March 1998, I wrote to counsel to fix a date for hearing. I was met with a request by the solicitor for the plaintiffs to rule on a large number of refusals arising from the examination of the former solicitor. Pursuant to my direction, all counsel attended before me on March 26, 1998. It was on this attendance that I was first made aware that there is now a pending action which the plaintiffs have brought against their former solicitor and which is being defended. In view of this, I determined that it would be inappropriate for me to consider any evidence on this issue. I directed that argument would proceed before me on the basis that the allegations contained in Ms. Nicholas' affidavit concerning the instructions allegedly given to the plaintiffs' former solicitor would, for the purposes of the motion, be assumed to be true. Accordingly, the following issue was argued on April 6, 1998: should a court consider re-opening a judgment at the instance of an unsuccessful litigant if a solicitor, assuming he was instructed to do so, does not put sufficient or appropriate material before the court? In considering this issue, I have had regard to the evidence which was before me on the motion for summary judgment, my findings on that motion, the proposed evidence of Ms. Nicholas, and a comprehensive brief of law to which I was referred by counsel, and for which I express my gratitude.

6     It is well established that a court may re-open proceedings after judgment has been rendered but before a formal order has been entered. The issue with which the cases have concerned themselves is how to balance the need to ascertain the truth upon full disclosure of all material facts with the need to preserve the integrity of the litigation process and prevent an abuse of its process. Both needs are directed at ensuring that justice is achieved.

7     Until the 1991 decision of this court in *Castlerigg Investments Inc. v. Lam* (1991), 2 O.R. (3d) 216 (Ont. Gen. Div.), the authorities proposed a two-part test based on relevance and diligence: *Becker Milk Co. v. Consumers' Gas Co.* (1974), 2 O.R. (2d) 554 (Ont. C.A.): *Scott v. Cook*, [1970] 2 O.R. 769 (Ont. H.C.); *Saginur v. Sbrocchi* (1979), 12 C.P.C. 21 (Ont. S.C.). Since *Castlerigg*, which followed *Clayton v. British American Securities Ltd.* (1934), 49 B.C.R. 28, [1935] 1 D.L.R. 432 (B.C. C.A.),

1998 CarswellOnt 1628, [1998] O.J. No. 1696, 71 O.T.C. 252

a number of decisions of this court have considered whether *Castlerigg* proposed a new test, the fundamental consideration being to avoid a miscarriage of justice, and the extent to which the diligence requirement of *Becker Milk* continues to be part of the test: *QIT Fer & Titane Inc. v. Upper Lakes Shipping Ltd.* (1991), 3 O.R. (3d) 165 (Ont. Gen. Div.); *Mele v. Royal Bank* (1994), 29 C.P.C. (3d) 3 (Ont. Gen. Div.); *Smith v. Canadian Tire Acceptance Ltd.* (December 12, 1994), Doc. CP 93-CQ-32019 (Ont. Gen. Div.); *Kent v. Frolick* (1996), 3 O.T.C. 122  (Ont. Gen. Div.).

8      The issue has been most recently discussed in *Strategic Resources International Inc. v. Cimetrix Solutions Inc.* (1997), 34 O.R. (3d) 416 (Ont. Gen. Div.) where the court declined to exercise its discretion to re-open judgment in a summary trial under Rule 76. In my view, this decision is of significance and its reasoning extends beyond the considerations to be applied to the re-opening of a judgment under the summary trial procedure. It canvasses the problems which will arise when there is departure from the diligence requirement. It also revisits the Ontario Court of Appeal decision in *Becker Milk*, pointing out that this decision was not placed before the learned justice in *Castlerigg*. This is evident from *Castlerigg* as the learned justice there states at p. 222:

> Accordingly, no Ontario authority has been put before me by counsel which prevents me from adopting the view of the British Columbia Court of Appeal in *Clayton* as the law of Ontario in the narrow set of circumstances here presented.

It is worth remembering that in *Castlerigg*, there was a real prospect that the court had been misled and that to have failed to re-open judgment to admit the further evidence could have countenanced perjury and involved the court in an abuse of its own process.

9      Although *Becker Milk, supra*, involved an application for the admission of evidence after trial and before the Court of Appeal, I agree with the opinion of Wilkins J. in *Strategic, supra*, and of Davidson J. in *Mele , supra*, that in *Becker Milk*, the Ontario Court of Appeal has said that there is a diligence requirement and that the court of first instance must pay attention to it when faced with a motion to re-open judgment to admit further evidence in a civil action. To repose in a court "untrammelled discretion" to avoid a "miscarriage of justice" may be a useful shorthand, but it provides no guidance to courts or to litigants in identifying and weighing the factors which ought to guide the exercise of a court's discretion in these matters. These factors are conveniently summarized by Justice Gravely in *Qit Fer, supra*, at p. 169 and I set them out below:

> 1. Until judgment has been entered, a trial judge has a discretion to re-open the proceeding and hear fresh evidence.

> 2. In exercising such discretion the judge should be guided by the twofold test that the evidence would probably have changed the result and it could not have been discovered by reasonable diligence. This is the *Becker Milk* test.

> 3. Where justice demands it and particularly where fraud is involved or the court may have been deliberately misled, a judge is justified in departing from the diligence requirement in order to prevent a miscarriage of justice. This is the effect of *Castlerigg*.

> 4. The power to re-open a judgment should be exercised sparingly. The court should discourage unwarranted attempts to bring forward evidence available at trial to disturb the basis of a judgment delivered or to permit a litigant after discovering the effect of a judgment to re-establish a broken-down case with the aid of further proof.

> 5. Once a litigant has obtained a judgment, he is not entitled to be deprived of it without very solid grounds.

10      Unlike *Castlerigg* and *Mele* , which are two cases upon which the plaintiffs rely, there is no question of fraud in this matter, nor was the court in any way misled. The affidavit of Ms. Nicholas which I am now asked to admit, either as evidence in support of the motion to re-open judgment or, as evidence on that motion, or both, attempts to fill in the gaps in evidence about which I commented in my judgment. What has happened here is that, with the benefit of the judgment, the plaintiffs now want the opportunity to improve upon the record which was put before the court at the time the motion was heard. This can place the court and the party with the benefit of the judgment in an intolerable position.

 Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 CarswellOnt 1628, [1998] O.J. No. 1696, 71 O.T.C. 252

11     In *Strategic, supra*, Wilkins J. considered the proposed additional evidence on the basis that it was true. He candidly observed at p. 420: "There is no question that the evidence placed before me could be capable of altering the decision which I rendered when the matter was tried in the first instance". The same could be said here. The defendants, who have the benefit of judgment in this matter, understandably resist the receipt of the additional evidence in its present form, untested by cross-examination. If a court is to make any sense of the proffered evidence in order to determine whether "the character of the evidence might probably have altered the judgment about to be given" (see, *Becker Milk, supra*, at p. 557), it seems only fair to assess it critically, which would militate in favour of permitting cross-examination on the evidence and perhaps also permitting responding material to be filed before deciding whether or not to re-open the judgment. Yet, on the facts here, this would lead, on a motion to re-open judgment, to re-litigating the very issue which has already been determined on the motion for summary judgment. The danger in permitting this is sharply illustrated by what has actually transpired in these proceedings since reasons for judgment were released. There have been three attendances before me. There has been two days of cross-examination and additional cross-examination is sought. There have been disputes about the evidence I properly should consider. To my mind, this is an unacceptable process for litigants and for the court and one which undermines the purpose of the diligence requirement which is to preserve the integrity of the litigation process and to prevent abuse of the court process. It seems far more sensible to approach this on the basis that it is only appropriate to depart from the diligence requirement in cases where there is a real risk that justice cannot be achieved. This does not mean that the court could have reached a different result if other evidence had been before it. Otherwise, the diligence requirement disappears, as do the other factors enumerated in *Qit Fer, supra*. In cases such as the one before me, barring the most unusual circumstances, it is my view that the diligence requirement must stand as a guardian to the court process and respect must be paid to the finality of litigation.

12     Initially, my concern in this matter was to permit the defendants, who have the benefit of a judgment, to test the reason offered by the plaintiffs for the absence of comprehensive evidence tendered on the motion for summary judgment and to afford the solicitor whose conduct is impugned, an opportunity to answer the bald allegations levelled against him by his former clients. Ultimately, I determined that this was not possible without embarking on a trial of a solicitor's negligence action in the context of a motion to re-open a judgment. It is for these reasons that I have sought to contain the expansion of the evidence and to determine the issue in the way that I have.

13     The plaintiffs' argument is simply that justice can only be served in this matter by permitting them to do now that which they say their former solicitor ought to have done in November 1996. Apart from *Castlerigg* and *Mele* , which, in my view are clearly distinguishable on their facts, the plaintiffs rely on a series of decisions which have little or no application on a motion to re-open judgment: *Halton Community Credit Union Ltd. v. ICL Computers Ltd.* (1985), 1 C.P.C. (2d) 24 (Ont. C.A.); *Sandulo v. Robinson* (1975), 10 O.R. (2d) 778 (Ont. H.C.); *Lico v. Griffiths* (1996), 28 O.R. (3d) 688 (Ont. Gen. Div.). These cases all concern procedural irregularities where there was no adjudication on the merits. Moreover, in each instance, the trier considered and found that there was no irrevocable prejudice to the innocent adversary in exercising its discretion to permit the irregularity to be cured. This is not a case of a procedural irregularity, nor is it a situation like *Ferguson v. Panelart Products Inc.* (June 13, 1995), Doc. Kitchener 92-CU-57832 (Ont. Gen. Div.) where the application was brought by the plaintiff two days after trial in circumstances where the defendant had called no evidence and judgment was reserved. The court allowed the application. Although the trial judge appears to have adopted the *Castlerigg* test, he nevertheless issued this caveat at paragraph 18:

> Although a civil trial is a search for the truth, it must be done within the context of the adversary system. It must be remembered that the defence may take a particular position at trial and not pursue the questioning of witnesses on a certain point, not because of an intention to hide or suppress relevant evidence, but because counsel for the defence may not feel that it is a meritorious issue. In short, the trial judge must remember that counsel may have adopted a certain tactical position at trial based on the pleadings and discovery. The trial judge must ensure that in allowing a re-opening of proceedings, the defendant's position has not been prejudiced.

It is also worthy of note that in *Ferguson* , *supra*, there was a serious issue of fraud to be determined. In this sense, the facts are not unlike those which were present in *Castlerigg* and *Mele* , but which are not present here.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

DeGroote v. Canadian Imperial Bank of Commerce, 1998 CarswellOnt 1628

1998 CarswellOnt 1628, [1998] O.J. No. 1696, 71 O.T.C. 252

14     Unquestionably, there is prejudice to the defendants in this case. There is a long history to this litigation. The defendants properly brought a motion before the court under Rule 20 of the *Rules of Civil Procedure*. The plaintiffs resisted the hearing of the motion and were unsuccessful in that effort. They were also unsuccessful on the merits of the motion. It is no passing coincidence that it was only after reasons for judgment were released that the plaintiffs sought to re-open the judgment. As was aptly stated by Wilkins J. in *Strategic, supra*, at p. 421:

> After the trial is complete and judgment is rendered, it is always a simple matter, utilizing hindsight, to go about reconstructing a better method of presenting the case when one finds oneself in the sorry position of loser.

And, by Gale, C.J.O., Evans and Estey, JJ.A. in *Becker Milk, supra*, at p. 556:

> Put shortly, the application to file this additional evidence was rejected because an unsuccessful litigant, save in very special circumstances, should not be allowed to come forward with new evidence available prior to judgment when he was content to have the trial Judge bring forward his judgment based on the record produced at a trial in which that litigant actively participated.

15     I do not think that it matters if the evidence was not originally presented for the reason which the plaintiffs now advance. Whether it is the same solicitor or a new solicitor, who seeks to admit the additional evidence cannot change the test for the admission of the evidence. The test is diligence and not negligence. The conduct of the solicitor is a matter for determination in an action for solicitor's negligence at trial where there is *viva voce* evidence and credibility can be assessed. If the judgment is in error, this is a matter for appeal. These are the rules under which our system operates. If the court were to further consider re-opening judgment in this action, it would indeed be blessing a staged process which is not contemplated by our rules, which will engender uncertainty and unpredictability in litigation, and in my opinion, will be highly prejudicial to litigants, the court process and the justice system. I therefore decline to do so.

16     In the result, the motion to re-open the judgment is dismissed with costs. Although the defendants requested that I fix costs, the material submitted by counsel for the defendants does not permit me to do this. If counsel are unable to agree, the defendants shall have their costs on a party-and-party basis after assessment except that I make no order as to the costs of the examination of the former solicitor and each party will bear their own costs of this appointment. Otherwise, the defendants are entitled to their assessed costs of the motion to re-open judgment from December 18, 1996, such costs to include written submissions, attendances before me, attendance on the cross-examination of Ms. Nicholas and any other assessable costs and disbursements as determined by the Assessment Officer.

*Motion dismissed.*

---

**End of Document**                    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 72 of 304

DeGroote v. Canadian Imperial Bank of Commerce, 1999 CarswellOnt 1902

1999 CarswellOnt 1902, [1999] O.J. No. 2313, 121 O.A.C. 327, 80 O.T.C. 159...

1999 CarswellOnt 1902
Ontario Court of Appeal

DeGroote v. Canadian Imperial Bank of Commerce

1999 CarswellOnt 1902, [1999] O.J. No. 2313, 121 O.A.C. 327, 80 O.T.C. 159, 89 A.C.W.S. (3d) 246

# Roger DeGroote and Montego Forest Products (Holdings) Ltd., Plaintiffs/ Appellants v. Canadian Imperial Bank of Commerce, Peat Marwick Thorne and Peat Marwick Thorne Inc., Defendants/Respondents

Canadian Imperial Bank of Commerce, Plaintiff by Counterclaim/Respondent v. Roger DeGroote, Trudy Nicholas, also known as Trudy DeGroote and also known as Trudy Pelley and Montego Forest Products (Holdings) Ltd., Defendants by Counterclaim/Appellants

Abella J.A., Krever J.A., Rosenberg J.A.

Judgment: June 22, 1999
Heard: June 16, 1999
Heard: June 17, 1999
Docket: CA C26276

Proceedings: affirmed *DeGroote v. Canadian Imperial Bank of Commerce* (1996), 1996 CarswellOnt 4244, 18 O.T.C. 93, 67 A.C.W.S. (3d) 121 ((Ont. Gen. Div.)); affirming (April 24, 1998), Doc. 92-CQ-12825 (Ont. Gen. Div.)

Counsel: *Julian Heller* and *Peter Panopoulos* , for Appellants.
*Alex L. MacFarlane* and *Massimo Starnino* , for Respondents.

Subject: Civil Practice and Procedure

### Related Abridgment Classifications
For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

### Headnote

#### Practice --- Judgments and orders — Amending or varying — Before judgment entered — General

Plaintiffs brought action for damages for breach of contract and improvident realization — Defendants brought motion for summary judgment, which was granted — Reasons for summary judgment commented adversely on plaintiffs' evidence — After judgment was released but not entered, plaintiffs alleged that their solicitor had been negligent in not presenting additional evidence — Plaintiffs brought motion to re-open judgment and to consider additional evidence — Motion dismissed on basis that courts should discourage attempts to disturb judgment by bringing forward evidence available at trial or to permit litigant to re-establish case with aid of further proof — Plaintiffs appealed — Agreed with trial judge, for reasons she gave, that on material before her in November 1996, there were no genuine issues for trial — Appeal dismissed.

APPEAL by plaintiffs of judgment of (April 24, 1998), Doc. 92-CQ-12825 (Ont. Gen. Div.).

**Per Curiam:**

**Endorsement**

1    We agree with Lax J., for the reasons she gave, that on the material before her in November 1996, there were no genuine issues for trial.

1999 CarswellOnt 1902, [1999] O.J. No. 2313, 121 O.A.C. 327, 80 O.T.C. 159...

2    The admissibility of the July affidavit is not properly before us. Lax J. held that it was inadmissible and Blair J. refused leave to appeal that decision. The filing of that affidavit for purposes of identification on the cross-examination did not make its contents admissible for their truth. Accordingly, this appeal must be determined without reference to that affidavit.

3    The decision whether or not to reopen the motion was discretionary. While the test has been expressed in a number of different ways, it essentially comes to this. The court must consider whether the evidence would probably have changed the result and whether that evidence could have been discovered by the exercise of reasonable diligence. The reasonable diligence requirement will, however, be relaxed in exceptional circumstances where necessary to avoid a miscarriage of justice.

4    The motions judge found on a preliminary assessment of the additional material that she was prepared to accept that it would probably have changed the result. She also found, and this is incontrovertible, that the evidence could have been presented on the motion through the exercise of reasonable diligence. The issue then was whether there were exceptional circumstances that warranted setting aside the due diligence requirement. Lax J. fully considered that issue. She was prepared to assume that the solicitor was negligent but that even so the circumstances were not so exceptional as to warrant the exercise of discretion in favour of the appellants. On the basis of the material that was properly before her, there is no basis for interfering with Lax J.'s decision or for holding that she failed to exercise her discretion on proper grounds.

5    Accordingly, the appeal is dismissed with costs.

*Appeal dismissed.*

---

**End of Document**

Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

---

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    2

**TAB 8**

2004 CarswellOnt 2057, [2004] O.J. No. 2157, 130 A.C.W.S. (3d) 1102

2004 CarswellOnt 2057

Ontario Superior Court of Justice

Donaghy v. Scotia Capital Inc./Scotia Capitaux Inc.

2004 CarswellOnt 2057, [2004] O.J. No. 2157, 130 A.C.W.S. (3d) 1102

# MARK THOMAS DONAGHY AND SCOTIA CAPITAL INC.

Karakatsanis J.

Heard: May 3, 2004
Judgment: May 19, 2004
Docket: 03-CV-252317CM2

Counsel: Mark Thomas Donaghy for himself
Jeremy Devereux for Defendant

Subject: Civil Practice and Procedure

**Related Abridgment Classifications**
For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

**Headnote**
**Civil practice and procedure --- Judgments and orders — Setting aside — Bars to setting aside — Miscellaneous issues**

**Table of Authorities**

**Cases considered by *Karakatsanis J.*:**

*Scott v. Cook* (1970), [1970] 2 O.R. 769, 12 D.L.R. (3d) 113, 1970 CarswellOnt 253 (Ont. H.C.) — referred to

**Statutes considered:**

*Canada Labour Code*, R.S.C. 1985, c. L-2
Generally — considered

*Employment Standards Act*, R.S.O. 1990, c. E.14
Generally — referred to

**Rules considered:**

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194
R. 59.06 — considered

*Karakatsanis J.*:

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2004 CarswellOnt 2057, [2004] O.J. No. 2157, 130 A.C.W.S. (3d) 1102

1    On November 3, 2003 the defendant moved for judgment in accordance with an agreement of settlement. I found that the parties had agreed to a binding settlement following the termination of the plaintiff's employment with the defendant and prior to the commencement of this action. The plaintiff was represented by counsel at the time. I found that the defendant had not repudiated the agreement by failing to break down the components of the payments in the initial draft release. I found that the plaintiff could not unilaterally cancel the agreement. I granted summary judgment to the defendant in accordance with the settlement agreement.

2    The plaintiff now moves to set aside or vary that decision. As a result, the judgment has not been entered and issued. The plaintiff is unrepresented and submits that he did not understand that the motion could result in the disposition of his entire claim. He asks that the motion be reopened and the decision be set aside on the basis that he did not make the proper submissions at the time and that he has since found additional evidence. He submits that the agreement of settlement cannot lawfully dispose of his claim for over-time work because the defendants did not comply with the provisions of the *Canada Labour Code* and the Ontario *Employment Standards Act* and the defendants did not negotiate in good faith. He provides evidence that the employer has set out in job descriptions and on its website that overtime is required for entry-level positions. He also submits that he is entitled to more for bonus than agreed upon in the settlement and submits letters to an unnamed employee in the plaintiff's department showing that the amount of bonus awarded to that employee exceeded the amount agreed upon in the settlement. The plaintiff submits that the defendants changed the terms of his employment and applied a discriminatory method of calculation of his bonus in violation of the *Canada Labour Code*.

3    The defendant takes the position that the plaintiff should not be entitled to re-argue and make additional submissions or submit additional evidence. The defendant submits that the plaintiff's additional evidence was available at the time the motion was argued and would not have affected the result of the motion for judgment. It submits that any claim for bonus or for overtime would be subsumed in the settlement. If I decide to re-open the motion, the defendant would seek to adduce additional evidence.

4    Rule 59.06 permits a party to seek to amend, set aside or vary an order where there are facts arising or discovered after it was made. Where a party seeks to re-open on the basis of fresh evidence, the moving party must establish that the new evidence would probably have altered the judgment and that the new evidence could not with reasonable diligence have been obtained earlier. See *Scott v. Cook*, [1970] 2 O.R. 769 (Ont. H.C.). Where a party seeks to reopen on the basis of new arguments or seeks reconsideration by the motions judge, without new evidence, the test to be met is even higher. The integrity of the litigation process must be at risk; there must be some principle of justice at stake that would override the value of finality in litigation; or some miscarriage of justice could occur if reconsideration did not take place.

5    Even if I were to agree to re-open the motion, and permit further evidence, I could not provide the relief or the declaration the plaintiff requests. The issue is whether to re-open the motion. The original issue is whether the parties entered into a binding settlement. If so, the defendant is entitled to judgment in accordance with the settlement agreement. If not, the action continues. This is not a forum to make declarations or to determine the merits of the plaintiff's claim.

6    I do not think it is appropriate to re-open a motion to permit new argument simply because the plaintiff submitted (and did not depose) that he believed the motion for judgment would not deal with the entire claim. It was clear from the materials and from the submissions that the defendant sought judgment for the plaintiff's claim in accordance with the settlement reached. The settlement dealt with the payment by the defendant in return for a release of any further claims relating to the plaintiff's employment. In my view, the nature of the motion was clear. Unrepresented parties assume a risk that they will not make the full legal submissions that might be made by counsel on their behalf. Except in exceptional circumstances, unrepresented parties cannot seek to re-open a motion that has already been argued and decided because they did not understand the full legal ramifications or did not make all available submissions. It is not fair to the other party (who may have retained and paid for counsel). The principle of finality is important to the administration of justice and it should not be undermined unless the refusal to allow further submissions would result in a miscarriage of justice.

7    With respect to the bonus, the plaintiff submits that if he had been fairly advised by his employer he would have started employment earlier by May 1st (rather than July 23rd) in order to qualify for the fiscal 2001 bonus and that he received less

incentive pay for the fiscal year 2002 than he was entitled to. Mr Donaghy submitted as new evidence letters from the employer addressed to an unnamed employee in his department advising him of incentive pay awards that exceed the bonus he was paid. Mr Donaghy therefore feels that the employer discriminated against him and the settlement did not fairly represent the bonus due to him. The plaintiff advised the court that he obtained these letters subsequent to the hearing of the motion. Even if this evidence were not reasonably available at the time of the hearing of the motion, it would not have affected the outcome of the decision in this case. The evidence does not establish the *plaintiff's* entitlement to incentive pay. As well, the unnamed employee in the letters appears to have held a different position. There is insufficient evidence to suggest that the employer contravened the terms of the employment agreement, the incentive plan or any legislation in relation to the bonus. The fact that the employer did not advise Mr Donaghy of the eligibility date for incentive pay until after it had passed is not sufficient evidence to establish bad faith on the part of the employer. In any event, the settlement specifically provided for the payment of outstanding bonus. Counsel represented the plaintiff at the time the settlement was reached. In these circumstances, the plaintiff is bound by his agreement to accept the payment in satisfaction of his claim for incentive pay as part of the overall settlement.

8    The plaintiff did not raise the issue that the issue of payment for overtime invalidated the settlement agreement at the hearing of this motion in November. He submits that the employer cannot contract out of the minimum standards for the payment of overtime under the *Canada Labour Code* or the *Employment Standards Act*. He submits that the evidence establishes that the defendant owed him significant payment for overtime that was not encompassed within the offers made by the defendants. He further submits that the defendants have failed to lead evidence to refute his allegations.

9    With respect to the overtime, Mr Donaghy repeats the evidence before the court at the time of the motion that he was required to work extensive overtime hours as a matter of due course of business. In his affidavit, he repeats that weekly hours totalled between 55 and 75. In support of his claim that the employer breached the overtime provisions of the *Canada Labour Code*, Mr Donaghy submitted two job descriptions of similar entry-level positions. One of the job descriptions states that a 60 to 70 hour workweek is typical. However, neither of the job descriptions relates to Mr Donaghy's position and both were posted well after his termination. In addition, an excerpt from Scotia Capital's website states: "Hours worked vary depending on position and department. New employees should expect to work between 50 - 80 hours per week."

10    This new evidence is generic evidence that does not specifically address Mr Donaghy's claim. This new evidence does not establish an entitlement to overtime, the amount of overtime worked, or the amount of money owing for overtime. It falls far short of the evidence that would be required to establish that the employer breached the *Canada Labour Code*. Nor is the defendant required to submit evidence that goes behind the settlement in this matter. This is a motion for judgment based upon a settlement; it is not a determination upon the merits of the claim. The statement in the affidavit is a bald statement that weekly hours were between 55 and 75 hours. The evidence would be insufficient to found a specific claim for overtime. The evidence tendered does not establish bad faith, or breach of the *Canada Labour Code*.

11    Mr Donaghy submits that the defendant made settlement offers in order to avoid exposure of its violation of the *Canada Labour Code*. There is no evidence to support such allegations. I do not decide this issue on the basis of the severity of the charges made but rather upon the basis of the evidence submitted.

12    The defendant submits that the plaintiff has not proven an entitlement to overtime and that any claim for overtime was subsumed in the overall settlement that the employer would pay certain amounts in return for a release from all claims for monies due. Mr Donaghy deposed that he generally worked 55 to 75 hours a week. He submitted that he kept no records. He submitted that he did not know at the time that he was entitled to overtime. He has not provided sufficient evidence to demonstrate that he was entitled to overtime payments beyond the parameters of the settlement reached.

13    Overtime was not specifically mentioned during the settlement negotiations (other than in the release). However, the employer increased its initial offer and accepted the offer to settle made by Mr Donaghy's counsel. Mr Donaghy worked with the company from July 23, 2001 to October 23, 2002. He was a recent MBA graduate and was let go as a result of restructuring. The employer agreed to accept Mr Donaghy's offer to settle on the basis of four months' salary (less the two months' working notice) and $8000 bonus. An initial offer to reimburse club fees was at an earlier stage subsumed in the offer to pay legal fees. The bank's initial offer for severance was for two months' salary or working notice. The parties negotiated the settlement of Mr

2004 CarswellOnt 2057, [2004] O.J. No. 2157, 130 A.C.W.S. (3d) 1102

Donaghy's claim for wrongful dismissal. No doubt both parties compromised. Donaghy was represented by counsel at the time and he agreed to accept the payment in full satisfaction of his claim.

14    Although the provisions of the *Canada Labour Code* provide important protections for employees, there is insufficient evidence in this case to suggest that the defendant did not satisfy any claim the plaintiff may have had for overtime. The settlement agreed upon is capable of subsuming and satisfying any potential claim for overtime.

15    The principle of finality is an important principle. Settlements entered into with the assistance of counsel should be upheld except in the clearest of cases and in exceptional cases. There was no evidence of fraud or mistaken instructions. Counsel agreed on the payments and on the form of the release. There was no evidence of bad faith.

16    It may be that Mr Donaghy could have obtained more after trial on his claim. It may be that he would have received less. However he agreed to settle the claim with the assistance of counsel. Mr Donaghy was not entitled to as many months' notice as it took him to actually find other employment. Mr Donaghy believes he was treated unfairly. However, he cannot unilaterally cancel the agreement because he now believes he should have received more. He has not led evidence to establish that the settlement reached was invalid. The evidence tendered falls short of establishing bad faith or contraventions of the *Canada Labour Code*.

17    I do not re-open the motion for judgment. Nor would I have changed my decision on the basis of the new submissions and new evidence before me.

---

**End of Document**                    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2005 CarswellOnt 1284
Ontario Court of Appeal

Donaghy v. Scotia Capital Inc./Scotia Capitaux Inc.

2005 CarswellOnt 1284, [2005] O.J. No. 1303, 138 A.C.W.S. (3d) 480

# MARK THOMAS DONAGHY (Plaintiff / Appellant) and SCOTIA CAPITAL INC./SCOTIA CAPITAUX INC. and THE BANK OF NOVA SCOTIA (Defendants / Respondents)

Catzman J.A., Juriansz J.A., and Rosenberg J.A.

Heard: April 6, 2005
Judgment: April 6, 2005
Docket: CA C42598, M31858

Proceedings: affirming *Donaghy v. Scotia Capital Inc.* (2004), 2004 CarswellOnt 2057 (Ont. S.C.J.)

Counsel: Mark Donaghy for himself
Jeremy Devereux for Respondents

Subject: Civil Practice and Procedure

### Related Abridgment Classifications
For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

### Headnote

**Civil practice and procedure --- Practice on appeal — Powers and duties of appellate court — Evidence on appeal — New evidence**

**Civil practice and procedure --- Judgments and orders — Setting aside — Bars to setting aside — Miscellaneous issues**

### Table of Authorities

#### Statutes considered:

*Canada Labour Code*, R.S.C. 1985, c. L-2
    Generally — referred to

## Per Curiam:

### 1. Motion to Adduce Fresh Evidence

1    In our view, the moving party has, with the exception of the credibility requirement, established none of the other prerequisites for the admission of the proposed fresh evidence on this appeal. In particular, all of the proposed fresh evidence, though arguably pertinent to procedures available under the *Canada Labour Code*, could not reasonably, when taken with the other evidence adduced before Karakatsanis J., be expected to have affected the result.

2    The motion to admit fresh evidence is dismissed.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2005 CarswellOnt 1284, [2005] O.J. No. 1303, 138 A.C.W.S. (3d) 480

## 2. The Appeal

3    The issue before the motion judge was a motion for judgment based on a settlement of the appellant's civil action against the respondents. Karakatsanis J. granted the motion.

4    On the appellant's motion to set aside or vary her judgment, Karakatsanis J. did not accept the evidence that the appellant tendered because it was generic and did not address his claim for overtime with any specificity. She found that it did not establish bad faith and was insufficient to suggest that the settlement was incapable of satisfying any potential claim for overtime.

5     The motion judge made no palpable and overriding error in her disposition of the motion to enforce the settlement or the motion to set aside her judgment.

6    Accordingly, the appeal is dismissed.

7    Having regard to our disposition of the appeal, it is not necessary to deal with the motion to quash.

8    The appeal is dismissed with costs. We fix the costs of the respondents of the appeal and of all motions in connection with the appeal in the amount of $10,000, inclusive of disbursements and G.S.T.

---

**End of Document** Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

 Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**TAB 9**

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 82 of 304

**Exxon Shipping Co. v. Baker, 554 U.S. 471 (2008)**

128 S.Ct. 2605, 66 ERC 1545, 2008 A.M.C. 1521, 171 L.Ed.2d 570, 76 USLW 4603...

KeyCite Yellow Flag - Negative Treatment

**Declined to Extend by**    Roth v. Islamic Republic of Iran,    D.D.C.,
January 27, 2015

128 S.Ct. 2605
Supreme Court of the United States

EXXON SHIPPING COMPANY, et al., Petitioners,
v.
Grant BAKER et al.

No. 07–219.    |    Argued Feb. 27,
2008.    |    Decided June 25, 2008.

**Synopsis**

**Background:** After third remand for reconsideration of
punitive damages in a suit arising from the 1989 grounding of
an oil supertanker in Alaska, the United States District Court
for the District of Alaska, H. Russel Holland, Chief Judge,
296 F.Supp.2d 1071, entered a $4.5 billion award of punitive
damages against oil company, and parties filed cross-appeals.
The United States Court of Appeals for the Ninth Circuit, 490
F.3d 1066, vacated and remanded for reduction of the punitive
damages award to $2.5 billion, and certiorari was granted.

**Holdings:** The Supreme Court, Justice Souter, held that:

[1] for an equally divided court, defendant could be liable
in punitive damages for reckless acts of its managerial
employees;

[2] Clean Water Act's (CWA) penalties for water pollution did
not preempt maritime common law on punitive damages; and

[3] maximum award of punitive damages allowed under
maritime law was equal to jury's award of $507.5 million in
compensatory damages.

Vacated and Remanded.

Justice Alito took no part in the consideration or decision of
the case.

Justice Scalia filed a concurring opinion in which Justice
Thomas joined.

Justice Stevens filed an opinion concurring in part and
dissenting in part.

Justice Ginsburg filed an opinion concurring in part and
dissenting in part.

Justice Breyer filed an opinion concurring in part and
dissenting in part.

West Headnotes (28)

[1]    **Corporations and Business Organizations**
        **Exemplary damages**

Corporation could be liable in punitive damages
for reckless acts of its managerial employees.
(Per opinion of Justice Souter, for an equally
divided court.) Restatement (Second) of Torts §
909(c).

Cases that cite this headnote

[2]    **Courts**
        **Opinion by divided court**

If the judges of the Supreme Court are divided,
reversal cannot be had, for no order can be made.

2 Cases that cite this headnote

[3]    **Federal Courts**
        **Mode and sufficiency of presentation**
        **Federal Courts**
        **Judgment and Relief**

Court of Appeals had discretion to consider
issue of whether Clean Water Act (CWA)
preempted maritime common law on punitive
damages in action arising from grounding of
supertanker and resulting oil spill in Alaska,
although defendant oil company did not raise
the issue until almost 13 months after stipulated
motions deadline, which was imposed after
jury returned punitive damages verdict. Federal
Water Pollution Control Act, § 101 et seq., 33
U.S.C.A. § 1251 et seq.

9 Cases that cite this headnote

128 S.Ct. 2605, 66 ERC 1545, 2008 A.M.C. 1521, 171 L.Ed.2d 570, 76 USLW 4603...

**[4]**    **Federal Civil Procedure**
　　🔑 Necessity for preverdict motion for judgment as matter of law; different grounds or issues

A renewed motion for judgment as a matter of law following verdict is not allowed unless the movant sought relief on similar grounds before the case was submitted to the jury. Fed.Rules Civ.Proc.Rule 50(b), 28 U.S.C.A.

38 Cases that cite this headnote

**[5]**    **Federal Civil Procedure**
　　🔑 Further evidence or argument

Rule permitting a court to alter or amend a judgment may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment. Fed.Rules Civ.Proc.Rule 59(e), 28 U.S.C.A.

302 Cases that cite this headnote

**[6]**    **Federal Courts**
　　🔑 Presentation of Questions Below or on Review; Record; Waiver

Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below.

7 Cases that cite this headnote

**[7]**    **Federal Courts**
　　🔑 Mode and sufficiency of presentation
**Federal Courts**
　　🔑 Judgment and Relief

Oil company's argument at outset of trial that other statutes preempted punitive damages claim in action arising from grounding of supertanker and resulting oil spill in Alaska did not permit it to raise issue of whether Clean Water Act (CWA) preempted maritime common law on punitive damages in motion filed 13 months after stipulated motions deadline; "statutory preemption" was not a sufficient claim to give oil company license to rely on newly cited statutes

anytime it wished. Federal Water Pollution Control Act, § 101 et seq., 33 U.S.C.A. § 1251 et seq.

42 Cases that cite this headnote

**[8]**    **Federal Courts**
　　🔑 In general; necessity

It is the general rule that a federal appellate court does not consider an issue not passed upon below, when to deviate from this rule being a matter left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases.

7 Cases that cite this headnote

**[9]**    **Damages**
　　🔑 Nature and Theory of Damages Additional to Compensation
**States**
　　🔑 Particular cases, preemption or supersession

Clean Water Act's (CWA) penalties for water pollution did not preempt maritime common law on punitive damages in action arising from grounding of supertanker and resulting oil spill in Alaska. Federal Water Pollution Control Act, § 311, 33 U.S.C.A. § 1321.

8 Cases that cite this headnote

**[10]**    **Environmental Law**
　　🔑 Federal preemption
**States**
　　🔑 Environment; nuclear projects

Clean Water Act, a statute expressly geared to protecting "water," "shorelines," and "natural resources," was not intended to eliminate sub silentio oil companies' common law duties to refrain from injuring the bodies and livelihoods of private individuals. Federal Water Pollution Control Act, § 311, 33 U.S.C.A. § 1321.

4 Cases that cite this headnote

**[11]**    **Environmental Law**
　　🔑 Federal preemption

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 84 of 304

**Exxon Shipping Co. v. Baker, 554 U.S. 471 (2008)**
128 S.Ct. 2605, 66 ERC 1545, 2008 A.M.C. 1521, 171 L.Ed.2d 570, 76 USLW 4603...

**States**

👈 Environment; nuclear projects

Clean Water Act's (CWA) penalties for water pollution were not intended to occupy the entire field of pollution remedies. Federal Water Pollution Control Act, § 311, 33 U.S.C.A. § 1321.

4 Cases that cite this headnote

**[12]**    **Damages**

👈 Nature and Theory of Damages Additional to Compensation

**States**

👈 Particular cases, preemption or supersession

Punitive damages for private harms would not have any frustrating effect on the Clean Water Act (CWA) remedial scheme, which would point to preemption. Federal Water Pollution Control Act, § 311, 33 U.S.C.A. § 1321.

1 Cases that cite this headnote

**[13]**    **Admiralty**

👈 Effect of State Laws

Maritime law falls within a federal court's jurisdiction to decide in the manner of a common law court, subject to the authority of Congress to legislate otherwise if it disagrees with the judicial result. U.S.C.A. Const. Art. 3, § 2, cl. 1.

12 Cases that cite this headnote

**[14]**    **Damages**

👈 Nature and Theory of Damages Additional to Compensation

Consensus today is that punitive damages are aimed not at compensation but principally at retribution and deterring harmful conduct.

20 Cases that cite this headnote

**[15]**    **Damages**

👈 Grounds for Exemplary Damages

Prevailing rule in American courts limits punitive damages to cases where a defendant's conduct is outrageous, owing to gross

negligence, willful, wanton, and reckless indifference for the rights of others, or behavior even more deplorable. Restatement (Second) of Torts § 908(2).

15 Cases that cite this headnote

**[16]**    **Damages**

👈 Grounds for Exemplary Damages

"Reckless conduct" supporting a punitive damages award is not intentional or malicious, nor is it necessarily callous toward the risk of harming others, as opposed to unheedful of it. Restatement (Second) of Torts § 500, Comment.

13 Cases that cite this headnote

**[17]**    **Damages**

👈 Grounds for Exemplary Damages

**Damages**

👈 Nature of act or conduct

Action taken or omitted in order to augment profit represents an enhanced degree of punishable culpability, as does willful or malicious action, taken with a purpose to injure. Restatement (Second) of Torts § 908.

5 Cases that cite this headnote

**[18]**    **Damages**

👈 Nature of act or conduct

Regardless of culpability, heavier punitive awards have been thought to be justifiable when wrongdoing is hard to detect.

19 Cases that cite this headnote

**[19]**    **Constitutional Law**

👈 Punitive damages

Few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process; when compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee. U.S.C.A. Const.Amend. 14.

Exxon Shipping Co. v. Baker, 554 U.S. 471 (2008)

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 85 of 304

128 S.Ct. 2605, 66 ERC 1545, 2008 A.M.C. 1521, 171 L.Ed.2d 570, 76 USLW 4603...

90 Cases that cite this headnote

**[20]**　**Damages**
　　🗝 Measure and Amount of Exemplary Damages

A penalty should be reasonably predictable in its severity.

7 Cases that cite this headnote

**[21]**　**Damages**
　　🗝 Nature and Theory of Damages Additional to Compensation

Punitive damages advance the interests of punishment and deterrence, which are also among the interests advanced by the criminal law. Restatement (Second) of Torts § 908, Comment.

Cases that cite this headnote

**[22]**　**Fines**
　　🗝 Excessive fines

Excessive Fines Clause of the Eighth Amendment does not constrain an award of money damages in a civil suit when the government neither has prosecuted the action nor has any right to receive a share of the damages awarded. U.S.C.A. Const.Amend. 8.

1 Cases that cite this headnote

**[23]**　**Damages**
　　🗝 Pecuniary Losses

The common law traditionally did not compensate purely economic harms, unaccompanied by injury to person or property.

3 Cases that cite this headnote

**[24]**　**Admiralty**
　　🗝 Nature and source of maritime law

**Admiralty**
　　🗝 Effect of United States Constitution; powers of Congress

Congress retains superior authority in maritime matters, and an admiralty court should look primarily to these legislative enactments for policy guidance.

2 Cases that cite this headnote

**[25]**　**Admiralty**
　　🗝 Nature and source of maritime law

The absence of federal legislation constraining punitive damages in maritime cases does not imply a congressional decision that there should be no quantified rule.

17 Cases that cite this headnote

**[26]**　**Damages**
　　🗝 Nature and Theory of Damages Additional to Compensation

Punitive damages by definition are not intended to compensate the injured party but, rather, to punish the tortfeasor and to deter him and others from similar extreme conduct.

14 Cases that cite this headnote

**[27]**　**Damages**
　　🗝 Actual damage or compensatory damages; relationship and ratio

A 1:1 ratio of punitive to compensatory damages, which is above the median award, is a fair upper limit in maritime cases with no earmarks of exceptional blameworthiness, such as intentional or malicious conduct, or behavior driven primarily by desire for gain.

65 Cases that cite this headnote

**[28]**　**Damages**
　　🗝 Amount Awarded in Particular Cases

**Water Law**
　　🗝 Sewage and Pollution

Maximum award of punitive damages allowed under maritime law was equal to jury's award of $507.5 million in compensatory damages, rather than $2.5 billion in punitive damages awarded in action against oil company arising

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 86 of 304

Exxon Shipping Co. v. Baker, 554 U.S. 471 (2008)

128 S.Ct. 2605, 66 ERC 1545, 2008 A.M.C. 1521, 171 L.Ed.2d 570, 76 USLW 4603...

from grounding of supertanker and resulting oil spill in Alaska; the tortious action was worse than negligent but less than malicious, exposing the tortfeasor to certain regulatory sanctions and inevitable damage actions, was profitless to the tortfeasor, and resulted in substantial recovery for substantial injury.

56 Cases that cite this headnote

**\*\*2608   \*471   *Syllabus* \***

\*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

In 1989, petitioners' (collectively, Exxon) supertanker grounded on a reef off Alaska, spilling millions of gallons of crude oil into Prince William Sound. The accident occurred after the tanker's captain, Joseph Hazelwood—who had a history of alcohol abuse and whose blood still had a high alcohol level 11 hours after the spill—inexplicably exited the bridge, leaving a tricky course correction to unlicensed subordinates. Exxon spent some $2.1 billion in cleanup efforts, pleaded guilty to criminal violations occasioning fines, settled a civil action by the United States and Alaska for at least $900 million, and paid another $303 million in voluntary payments to private parties. Other civil cases were consolidated into this one, brought against Exxon, Hazelwood, and others to recover economic losses suffered by respondents (hereinafter Baker), who depend on Prince William Sound for their livelihoods. At Phase I of the trial, the jury found Exxon and Hazelwood reckless (and thus potentially liable for punitive damages) under instructions providing that a corporation is responsible for the reckless acts of employees acting in a managerial capacity in the scope of their employment. In Phase II, the jury awarded $287 million in compensatory damages to some of the plaintiffs; others had settled their compensatory **\*\*2609** claims for $22.6 million. In Phase III, the jury awarded $5,000 in punitive damages against Hazelwood and $5 billion against Exxon. The Ninth Circuit upheld the Phase I jury instruction on corporate liability and ultimately remitted the punitive-damages award against Exxon to $2.5 billion.

*Held:*

1. Because the Court is equally divided on whether maritime law allows corporate liability for punitive damages based on the acts of managerial agents, it leaves the Ninth Circuit's opinion undisturbed in this respect. Of course, this disposition is not precedential on the derivative liability question. See, *e.g., Neil v. Biggers,* 409 U.S. 188, 192, 93 S.Ct. 375, 34 L.Ed.2d 401. Pp. 2614 – 2616.

2. The Clean Water Act's (CWA) water pollution penalties, 33 U.S.C. § 1321, do not preempt punitive-damages awards in maritime spill cases. Section 1321(b) protects "navigable waters ... , adjoining shorelines, ... [and] natural resources," subject to a saving clause reserving " obligations **\*472** ... under any ... law for damages to any ... privately owned property resulting from [an oil] discharge," § 1321(o). Exxon's admission that the CWA does not displace compensatory remedies for the consequences of water pollution, even those for economic harms, leaves the company with the untenable claim that the CWA somehow preempts punitive damages, but not compensatory damages, for economic loss. Nothing in the statute points to that result, and the Court has rejected similar attempts to sever remedies from their causes of action, see *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 255–256, 104 S.Ct. 615, 78 L.Ed.2d 443. There is no clear indication of congressional intent to occupy the entire field of pollution remedies, nor is it likely that punitive damages for private harms will have any frustrating effect on the CWA's remedial scheme. Pp. 2616 – 2619.

3. The punitive-damages award against Exxon was excessive as a matter of maritime common law. In the circumstances of this case, the award should be limited to an amount equal to compensatory damages. Pp. 2619 – 2634.

(a) Although legal codes from ancient times through the Middle Ages called for multiple damages for certain especially harmful acts, modern Anglo–American punitive damages have their roots in 18th-century English law and became widely accepted in American courts by the mid–19th century. See, *e.g., Day v. Woodworth,* 13 How. 363, 371, 14 L.Ed. 181. Pp. 2619 – 2620.

(b) The prevailing American rule limits punitive damages to cases of "enormity," *Day, supra,* at 371, 14 L.Ed. 181, in which a defendant's conduct is outrageous, owing to gross negligence, willful, wanton, and reckless indifference for others' rights, or even more deplorable behavior. The

consensus today is that punitive damages are aimed at retribution and deterring harmful conduct. Pp. 2620 – 2622.

(c) State regulation of punitive damages varies. A few States award them rarely, or not at all, and others permit them only when authorized by statute. Many States have imposed statutory limits on punitive awards, in the form of absolute monetary caps, a maximum ratio of punitive to compensatory damages, or, frequently, some combination of the two. Pp. 2622 – 2624.

(d) American punitive damages have come under criticism in recent decades, but the most recent studies tend to undercut much of it. Although some studies show the dollar amounts of awards growing over time, even in real terms, most accounts show that the median ratio of **2610 punitive to compensatory awards remains less than 1:1. Nor do the data show a marked increase in the percentage of cases with punitive awards. The real problem is the stark unpredictability of punitive awards. Courts are concerned with fairness as consistency, and the available data suggest that the spread between high and low individual awards is unacceptable. The spread in state civil trials is great, and *473 the outlier cases subject defendants to punitive damages that dwarf the corresponding compensatories. The distribution of judge-assessed awards is narrower, but still remarkable. These ranges might be acceptable if they resulted from efforts to reach a generally accepted optimal level of penalty and deterrence in cases involving a wide range of circumstances, but anecdotal evidence suggests that is not the case, see, *e.g.,* BMW of North America, Inc. v. Gore, 517 U.S. 559, 565, n. 8, 116 S.Ct. 1589. Pp. 2624 – 2626.

(e) This Court's response to outlier punitive-damages awards has thus far been confined by claims that state-court awards violated due process. See, *e.g., State Farm Mut. Automobile Ins. Co. v. Campbell,* 538 U.S. 408, 425, 123 S.Ct. 1513, 155 L.Ed.2d 585. In contrast, today's enquiry arises under federal maritime jurisdiction and requires review of a jury award at the level of judge-made federal common law that precedes and should obviate any application of the constitutional standard. In this context, the unpredictability of high punitive awards is in tension with their punitive function because of the implication of unfairness that an eccentrically high punitive verdict carries. A penalty should be reasonably predictable in its severity, so that even Holmes's "bad man" can look ahead with some ability to know what the stakes are in choosing one course of action or another. And a penalty scheme ought to threaten defendants with a fair probability of suffering in like

degree for like damage. Cf. *Koon v. United States,* 518 U.S. 81, 113, 116 S.Ct. 2035, 135 L.Ed.2d 392. Pp. 2626 – 2627.

(f) The Court considers three approaches, one verbal and two quantitative, to arrive at a standard for assessing maritime punitive damages. Pp. 2627 – 2634.

(i) The Court is skeptical that verbal formulations are the best insurance against unpredictable outlier punitive awards, in light of its experience with attempts to produce consistency in the analogous business of criminal sentencing. Pp. 2627 – 2629.

(ii) Thus, the Court looks to quantified limits. The option of setting a hard dollar punitive cap, however, is rejected because there is no "standard" tort or contract injury, making it difficult to settle upon a particular dollar figure as appropriate across the board; and because a judicially selected dollar cap would carry the serious drawback that the issue might not return to the docket before there was a need to revisit the figure selected. Pp. 2629 – 2632.

(iii) The more promising alternative is to peg punitive awards to compensatory damages using a ratio or maximum multiple. This is the model in many States and in analogous federal statutes allowing multiple damages. The question is what ratio is most appropriate. An acceptable standard can be found in the studies showing the median ratio of punitive to compensatory awards. Those studies reflect the judgments of juries and judges in thousands of cases as to what punitive *474 awards were appropriate in circumstances reflecting the most down to the least blameworthy conduct, from malice and avarice to recklessness to gross negligence. The data in question put the median ratio for the entire gamut at less than 1:1, meaning that the compensatory award exceeds the punitive award in most cases. In a well- **2611 functioning system, awards at or below the median would roughly express jurors' sense of reasonable penalties in cases like this one that have no earmarks of exceptional blameworthiness. Accordingly, the Court finds that a 1:1 ratio is a fair upper limit in such maritime cases. Pp. 2632 – 2634.

(iv) Applying this standard to the present case, the Court takes for granted the District Court's calculation of the total relevant compensatory damages at $507.5 million. A punitive-to-compensatory ratio of 1:1 thus yields maximum punitive damages in that amount. P. 2634.

472 F.3d 600 and 490 F.3d 1066, vacated and remanded.

SOUTER, J., delivered the opinion of the Court, in which ROBERTS, C.J., and SCALIA, KENNEDY, and THOMAS, JJ., joined, and in which STEVENS, GINSBURG, and BREYER, JJ., joined, as to Parts I, II, and III. SCALIA, J., filed a concurring opinion, in which THOMAS, J., joined. STEVENS, J., GINSBURG, J., and BREYER, J., filed opinions concurring in part and dissenting in part. ALITO, J., took no part in the consideration or decision of the case.

**Attorneys and Law Firms**

Walter Dellinger, Washington, DC, for petitioners.

Jeffrey L. Fisher, for respondents.

E. Edward Bruce, Covington & Burling LLP, Washington, D.C., Walter Dellinger, Counsel of Record, John F. Daum, Charles C. Lifland, Jonathan D. Hacker, O'Melveny & Myers LLP, Washington, D.C., for Petitioner Exxon Mobil Corporation.

James vanR. Springer, Dickstein Shapiro LLP, Washington, DC, Brian B. O'Neill, Faegre & Benson LLP, Minneapolis, MN, David W. Oesting, Counsel of Record, Stephen M. Rummage, David C. Tarshes, Jeffrey L. Fisher, Davis Wright Tremaine LLP, Anchorage, AK, for Respondents.

**Opinion**

Justice SOUTER delivered the opinion of the Court.

**\*475** There are three questions of maritime law before us: whether a shipowner may be liable for punitive damages **\*476** without acquiescence in the actions causing harm, whether punitive damages have been barred implicitly by federal statutory law making no provision for them, and whether the award of $2.5 billion in this case is greater than maritime law should allow in the circumstances. We are equally divided on the owner's derivative liability, and hold that the federal statutory law does not bar a punitive award on top of damages for economic loss, but that the award here should be limited to an amount equal to compensatory damages.

**I**

On March 24, 1989, the supertanker *Exxon Valdez* grounded on Bligh Reef off the Alaskan coast, fracturing its hull and

spilling millions of gallons of crude oil into Prince William Sound. The owner, petitioner Exxon Shipping Co. (now SeaRiver Maritime, Inc.), and its owner, petitioner Exxon Mobil Corp. (collectively, Exxon), have settled state and federal claims for environmental damage, with payments exceeding $1 billion, and this action by respondent Baker and others, including commercial fishermen and native Alaskans, was brought for economic losses to individuals dependent on Prince William Sound for their livelihoods.

**\*\*2612 A**

The tanker was over 900 feet long and was used by Exxon to carry crude oil from the end of the Trans–Alaska Pipeline in Valdez, Alaska, to the lower 48 States. On the night of the spill it was carrying 53 million gallons of crude oil, or over a million barrels. Its captain was one Joseph Hazelwood, who had completed a 28–day alcohol treatment program while employed by Exxon, as his superiors knew, but dropped out of a prescribed followup program and stopped going to Alcoholics Anonymous meetings. According to the District Court, "[t]here was evidence presented to the jury that after Hazelwood was released from [residential treatment], he drank in bars, parking lots, apartments, airports, **\*477** airplanes, restaurants, hotels, at various ports, and aboard Exxon tankers." *In re Exxon Valdez,* No. A89–0095–CV, Order No. 265 (D.Alaska, Jan. 27, 1995), p. 5, App. F to Pet. for Cert. 255a–256a (hereinafter Order 265). The jury also heard contested testimony that Hazelwood drank with Exxon officials and that members of the Exxon management knew of his relapse. See *ibid.* Although Exxon had a clear policy prohibiting employees from serving onboard within four hours of consuming alcohol, see *In re Exxon Valdez, 270 F.3d 1215, 1238 (C.A.9 2001),* Exxon presented no evidence that it monitored Hazelwood after his return to duty or considered giving him a shoreside assignment, see Order 265, p. 5, *supra,* at 256a. Witnesses testified that before the *Valdez* left port on the night of the disaster, Hazelwood downed at least five double vodkas in the waterfront bars of Valdez, an intake of about 15 ounces of 80–proof alcohol, enough "that a non-alcoholic would have passed out." 270 F.3d, at 1236.

The ship sailed at 9:12 p.m. on March 23, 1989, guided by a state-licensed pilot for the first leg out, through the Valdez Narrows. At 11:20 p.m., Hazelwood took active control and, owing to poor conditions in the outbound shipping lane, radioed the Coast Guard for permission to move east across

the inbound lane to a less icy path. Under the conditions, this was a standard move, which the last outbound tanker had also taken, and the Coast Guard cleared the *Valdez* to cross the inbound lane. The tanker accordingly steered east toward clearer waters, but the move put it in the path of an underwater reef off Bligh Island, thus requiring a turn back west into the shipping lane around Busby Light, north of the reef.

Two minutes before the required turn, however, Hazelwood left the bridge and went down to his cabin in order, he said, to do paperwork. This decision was inexplicable. There was expert testimony that, even if their presence is not strictly necessary, captains simply do not quit the bridge during maneuvers like this, and no paperwork could have **\*478** justified it. And in fact the evidence was that Hazelwood's presence was required, both because there should have been two officers on the bridge at all times and his departure left only one, and because he was the only person on the entire ship licensed to navigate this part of Prince William Sound. To make matters worse, before going below Hazelwood put the tanker on autopilot, speeding it up, making the turn trickier, and any mistake harder to correct.

As Hazelwood left, he instructed the remaining officer, third mate Joseph Cousins, to move the tanker back into the shipping lane once it came abeam of Busby Light. Cousins, unlicensed to navigate in those waters, was left alone with helmsman Robert Kagan, a nonofficer. For reasons that remain a mystery, they failed to make the turn at Busby Light, and a later emergency maneuver attempted by Cousins came too late. The tanker ran aground **\*\*2613** on Bligh Reef, tearing the hull open and spilling 11 million gallons of crude oil into Prince William Sound.

After Hazelwood returned to the bridge and reported the grounding to the Coast Guard, he tried but failed to rock the *Valdez* off the reef, a maneuver which could have spilled more oil and caused the ship to founder. [1] The Coast Guard's nearly immediate response included a blood test of Hazelwood (the validity of which Exxon disputes) showing a blood-alcohol level of .061 11 hours after the spill. Supp.App. 307sa. Experts testified that to have this much alcohol in his bloodstream so long after the accident, Hazelwood at **\*479** the time of the spill must have had a blood-alcohol level of around .241, Order 265, p. 5, *supra*, at 256a, three times the legal limit for driving in most States.

[1]    As it turned out, the tanker survived the accident and remained in Exxon's fleet, which it subsequently

transferred to a wholly owned subsidiary, SeaRiver Maritime, Inc. The *Valdez* "was renamed several times, finally to the *SeaRiver Mediterranean,* [and] carried oil between the Persian Gulf and Japan, Singapore, and Australia for 12 years. ... In 2002, the ship was pulled from service and 'laid up' off a foreign port (just where the owners won't say) and prepared for retirement, although, according to some reports, the vessel continues in service under a foreign flag." *Exxon Valdez* Spill Anniversary Marked, 30 Oil Spill Intelligence Report 2 (Mar. 29, 2007).

In the aftermath of the disaster, Exxon spent around $2.1 billion in cleanup efforts. The United States charged the company with criminal violations of the Clean Water Act, 33 U.S.C. §§ 1311(a) and 1319(c)(1); the Refuse Act of 1899, 33 U.S.C. §§ 407 and 411; the Migratory Bird Treaty Act, 16 U.S.C. §§ 703 and 707(a); the Ports and Waterways Safety Act, 33 U.S.C. § 1232(b)(1); and the Dangerous Cargo Act, 46 U.S.C. § 3718(b). Exxon pleaded guilty to violations of the Clean Water Act, the Refuse Act, and the Migratory Bird Treaty Act and agreed to pay a $150 million fine, later reduced to $25 million plus restitution of $100 million. A civil action by the United States and the State of Alaska for environmental harms ended with a consent decree for Exxon to pay at least $900 million toward restoring natural resources, and it paid another $303 million in voluntary settlements with fishermen, property owners, and other private parties.

## B

The remaining civil cases were consolidated into this one against Exxon, Hazelwood, and others. The District Court for the District of Alaska divided the plaintiffs seeking compensatory damages into three classes: commercial fishermen, Native Alaskans, and landowners. At Exxon's behest, the court also certified a mandatory class of all plaintiffs seeking punitive damages, whose number topped 32,000. Respondents here, to whom we will refer to as Baker for convenience, are members of that class.

For the purposes of the case, Exxon stipulated to its negligence in the *Valdez* disaster and its ensuing liability for compensatory damages. The court designed the trial accordingly: Phase I considered Exxon and Hazelwood's recklessness and thus their potential for punitive liability; Phase II set compensatory damages for commercial fishermen and **\*480** Native Alaskans; and Phase III determined the amount of punitive damages for which Hazelwood and Exxon were each liable. (A contemplated Phase IV, setting

compensation for still other plaintiffs, was obviated by settlement.)

In Phase I, the jury heard extensive testimony about Hazelwood's alcoholism and his conduct on the night of the spill, as **2614 well as conflicting testimony about Exxon officials' knowledge of Hazelwood's backslide. At the close of Phase I, the Court instructed the jury in part that

> "[a] corporation is responsible for the reckless acts of those employees who are employed in a managerial capacity while acting in the scope of their employment. The reckless act or omission of a managerial officer or employee of a corporation, in the course and scope of the performance of his duties, is held in law to be the reckless act or omission of the corporation." App. K to Pet. for Cert. 301a.

The Court went on that "[a]n employee of a corporation is employed in a managerial capacity if the employee supervises other employees and has responsibility for, and authority over, a particular aspect of the corporation's business." *Ibid.* Exxon did not dispute that Hazelwood was a managerial employee under this definition, see App. G, *id.,* at 264a, n. 8, and the jury found both Hazelwood and Exxon reckless and thus potentially liable for punitive damages, App. L, *id.,* at 303a. [2]

[2]   The jury was not asked to consider the possibility of any degree of fault beyond the range of reckless conduct. The record sent up to us shows that some thought was given to a trial plan that would have authorized jury findings as to greater degrees of culpability, see App. 164, but that plan was not adopted, whatever the reason; Baker does not argue this was error.

In Phase II the jury awarded $287 million in compensatory damages to the commercial fishermen. After the Court deducted released claims, settlements, and other payments, the **481 balance outstanding was $19,590,257. Meanwhile, most of the Native Alaskan class had settled their compensatory claims for $20 million, and those who opted out of that settlement ultimately settled for a total of around $2.6 million.

In Phase III, the jury heard about Exxon's management's acts and omissions arguably relevant to the spill. See App. 1291–1320, 1353–1367. At the close of evidence, the court instructed the jurors on the purposes of punitive damages, emphasizing that they were designed not to provide compensatory relief but to punish and deter the defendants.

See App. to Brief in Opposition 12a–14a. The court charged the jury to consider the reprehensibility of the defendants' conduct, their financial condition, the magnitude of the harm, and any mitigating facts. *Id.,* at 15a. The jury awarded $5,000 in punitive damages against Hazelwood and $5 billion against Exxon.

On appeal, the Court of Appeals for the Ninth Circuit upheld the Phase I jury instruction on corporate liability for acts of managerial agents under Circuit precedent. See *In re Exxon Valdez,* 270 F.3d, at 1236 (citing *Protectus Alpha Nav. Co. v. North Pacific Grain Growers, Inc.,* 767 F.2d 1379 (C.A.9 1985)). With respect to the size of the punitive-damages award, however, the Circuit remanded twice for adjustments in light of this Court's due process cases before ultimately itself remitting the award to $2.5 billion. See 270 F.3d, at 1246–1247, 472 F.3d 600, 601, 625 (2006) *(per curiam),* and 490 F.3d 1066, 1068 (2007).

We granted certiorari to consider whether maritime law allows corporate liability for punitive damages on the basis of the acts of managerial agents, whether the Clean Water Act (CWA), 86 Stat. 816, 33 U.S.C. § 1251 *et seq.* (2000 ed. and Supp. V), forecloses the award of punitive damages in maritime spill cases, and whether the punitive damages awarded against Exxon in this case were excessive as a matter of maritime common law. **2615 552 U.S. ——, 128 S.Ct. 492, 169 L.Ed.2d 337 (2007). We now vacate and remand.

### *482 II

[1]   On the first question, Exxon says that it was error to instruct the jury that a corporation "is responsible for the reckless acts of ... employees ... in a managerial capacity while acting in the scope of their employment." [3] App. K to Pet. for Cert. 301a. The Courts of Appeals have split on this issue, [4] and the company relies primarily on two cases, *The Amiable Nancy,* 3 Wheat. 546, 4 L.Ed. 456 (1818), and *Lake Shore & Michigan Southern R. Co. v. Prentice,* 147 U.S. 101, 13 S.Ct. 261, 37 L.Ed. 97 (1893), to argue that this Court's precedents are clear that punitive damages are not available against a shipowner for a shipmaster's recklessness. The former was a suit in admiralty against the owners of *The Scourge,* a privateer whose officers and crew boarded and plundered a neutral ship, *The Amiable Nancy.* In upholding an award of compensatory damages, Justice Story observed that,

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 91 of 304

Exxon Shipping Co. v. Baker, 554 U.S. 471 (2008)

128 S.Ct. 2605, 66 ERC 1545, 2008 A.M.C. 1521, 171 L.Ed.2d 570, 76 USLW 4603...

3    Baker emphasizes that the Phase I jury instructions also allowed the jury to find Exxon independently reckless, and that the evidence for fixing Exxon's punitive liability at Phase III revolved around the recklessness of company officials in supervising Hazelwood and enforcing Exxon's alcohol policies. Thus, Baker argues, it is entirely possible that the jury found Exxon reckless in its own right, and in no way predicated its liability for punitive damages on Exxon's responsibility for Hazelwood's conduct. Brief for Respondents 36–39.

The fact remains, however, that the jury was not required to state the basis of Exxon's recklessness, and the basis for the finding could have been Exxon's own recklessness or just Hazelwood's. Any error in instructing on the latter ground cannot be overlooked, because "when it is impossible to know, in view of the general verdict returned whether the jury imposed liability on a permissible or an impermissible ground, the judgment must be reversed and the case remanded." *Greenbelt Cooperative Publishing Assn., Inc. v. Bresler,* 398 U.S. 6, 11, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970) (internal quotation marks omitted).

4    Compare *Protectus Alpha Nav. Co. v. North Pacific Grain Growers, Inc.,* 767 F.2d 1379, 1386 (C.A.9 1985) (adopting Restatement (Second) of Torts rule), with *CEH, Inc. v. F/V Seafarer,* 70 F.3d 694, 705 (C.A.1 1995); *In re P & E Boat Rentals, Inc.,* 872 F.2d 642, 652 (C.A.5 1989); *United States Steel Corp. v. Fuhrman,* 407 F.2d 1143, 1148 (C.A.6 1969).

**\*483** "if this were a suit against the original wrong-doers, it might be proper to ... visit upon them in the shape of exemplary damages, the proper punishment which belongs to such lawless misconduct. But it is to be considered, that this is a suit against the owners of the privateer, upon whom the law has, from motives of policy, devolved a responsibility for the conduct of the officers and crew employed by them, and yet, from the nature of the service, they can *scarcely ever* be able to secure to themselves an adequate indemnity in cases of loss. They are innocent of the demerit of this transaction, having neither directed it, nor countenanced it, nor participated in it in the slightest degree. Under such circumstances, we are of opinion, that they are bound to repair all the real injuries and personal wrongs sustained by the libellants, but they are not bound to the extent of vindictive damages." *The Amiable Nancy, supra,* at 558–559 (emphasis in original).

Exxon takes this statement as a rule barring punitive liability against shipowners for actions by underlings not "directed," "countenanced," or "participated in" by the owners.

Exxon further claims that the Court confirmed this rule in *Lake Shore, supra,* a railway case in which the Court relied on *The Amiable Nancy* to announce, as a matter of pre-  **\*\*2616** *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), general common law, that "[t]hough [a] principal is liable to make compensation for [intentional torts] by his agent, he is not liable to be punished by exemplary damages for an intent in which he did not participate." 147 U.S., at 110, 13 S.Ct. 261. Because maritime law remains federal common law, and because the Court has never revisited the issue, Exxon argues that *Lake Shore* endures as sound evidence of maritime law. And even if the rule of *Amiable Nancy* and *Lake Shore* does not control, Exxon urges the Court to fall back to a modern-day variant adopted in the context of Title VII of the Civil Rights Act of 1964 in *Kolstad v. American Dental Assn.,* 527 U.S. 526, 544, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999),  **\*484** that employers are not subject to punitive damages for discriminatory conduct by their managerial employees if they can show that they maintained and enforced good-faith antidiscrimination policies.

Baker supports the Ninth Circuit in upholding the instruction, as it did on the authority of *Protectus Alpha Nav. Co.,* 767 F.2d 1379, which followed the Restatement rule recognizing corporate liability in punitive damages for reckless acts of managerial employees, see 4 Restatement (Second) of Torts § 909(c) (1977) (hereinafter Restatement). Baker says that *The Amiable Nancy* offers nothing but dictum, because punitive damages were not at issue, and that *Lake Shore* merely rejected company liability for the acts of a railroad conductor, while saying nothing about liability for agents higher up the ladder, like ship captains. He also makes the broader point that the opinion was criticized for failing to reflect the majority rule of its own time, not to mention its conflict with the *respondeat superior* rule in the overwhelming share of land-based jurisdictions today. Baker argues that the maritime rule should conform to modern land-based common law, where a majority of States allow punitive damages for the conduct of any employee, and most others follow the Restatement, imposing liability for managerial agents.

[2]    The Court is equally divided on this question, and "[i]f the judges are divided, the reversal cannot be had, for no order can be made." *Durant v. Essex Co.,* 7 Wall. 107, 112, 19 L.Ed. 154 (1869). We therefore leave the Ninth Circuit's opinion undisturbed in this respect, though it should go without saying

that the disposition here is not precedential on the derivative liability question. See, *e.g., Neil v. Biggers,* 409 U.S. 188, 192, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Ohio ex rel. Eaton v. Price,* 364 U.S. 263, 264, 80 S.Ct. 1463, 4 L.Ed.2d 1708 (1960) (opinion of Brennan, J.).

### III

[3] Exxon next says that, whatever the availability of maritime punitive damages at common law, the CWA preempts them. Baker responds with both procedural and merits arguments, and although we do not dispose of the issue on procedure, **\*485** a short foray into its history is worthwhile as a cautionary tale.

At the pretrial stage, the District Court controlled a flood of motions by an order staying them for any purpose except discovery. The court ultimately adopted a case-management plan allowing receipt of seven specific summary judgment motions already scheduled, and requiring a party with additional motions to obtain the court's leave. One of the motions scheduled sought summary judgment for Exxon on the ground that the Trans–Alaska Pipeline Authorization Act, 87 Stat. 584, 43 U.S.C. §§ 1651–1656, displaced maritime common law and foreclosed the availability **\*\*2617** of punitive damages. The District Court denied the motion.

[4] [5] After the jury returned the Phase III punitive-damages verdict on September 16, 1994, the parties stipulated that all post-trial Federal Rules of Civil Procedure 50 and 59 motions would be filed by September 30, and the court so ordered. App. 1410–1411. Exxon filed 11 of them, including several seeking a new trial or judgment as a matter of law on one ground or another going to the punitive-damages award, all of which were denied along with the rest. On October 23, 1995, almost 13 months after the stipulated motions deadline, Exxon moved for the District Court to suspend the motions stay, App. to Brief in Opposition 28a–29a, to allow it to file a "Motion and Renewed Motion ... for Judgment on Punitive Damages Claims" under Rules 49(a) and 58(2) and, "to the extent they may be applicable, pursuant to Rules 50(b), 56(b), 56(d), 59(a), and 59(e)," [5] *id.,* at 30a–31a. Exxon's accompanying **\*486** memorandum asserted that two recent cases, *Glynn v. Roy Al Boat Management Corp.,* 57 F.3d 1495 (C.A.9 1995), and *Guevara v. Maritime Overseas Corp.,* 59 F.3d 1496 (C.A.5 1995), suggested that the rule of maritime punitive damages was displaced by federal statutes, including the CWA. On November 2, 1995, the District Court

summarily denied Exxon's request to file the motion, App. to Brief in Opposition 35a, and in January 1996 (following the settlement of the Phase IV compensatory claims) the court entered final judgment.

[5] Most of the rules under which Exxon sought relief are inapplicable on their face. See Fed. Rules Civ. Proc. 49(a), 56(b), (d), and 58(2). Rules 50 and 59 are less inapt: they allow, respectively, entry of judgment as a matter of law and alteration or amendment of the judgment. (At oral argument, counsel for Exxon ultimately characterized the motion as one under Rule 50. Tr. of Oral Arg. 25.)

But to say that Rules 50 and 59 are less inapt than the other Rules is a long way from saying they are apt. A motion under Rule 50(b) is not allowed unless the movant sought relief on similar grounds under Rule 50(a) before the case was submitted to the jury. See Rule 50(b); see also, *e.g., Zachar v. Lee,* 363 F.3d 70, 73–74 (C.A.1 2004); 9B C. Wright & A. Miller, Federal Practice and Procedure § 2537, pp. 603–604 (3d ed.2008). Rule 59(e) permits a court to alter or amend a judgment, but it "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." 11 C. Wright & A. Miller, Federal Practice and Procedure § 2810.1, pp. 127–128 (2d ed.1995) (footnotes omitted). Where Exxon has been unable to demonstrate that any rule supported the motion, we need not choose the best of the worst, and risk implying that this last-minute motion was appropriate under any rule. Suffice it to say that, whatever type of motion it was supposed to be, it was very, very late.

Exxon renewed the CWA preemption argument before the Ninth Circuit. The Court of Appeals recognized that Exxon had raised the CWA argument for the first time 13 months after the Phase III verdict, but decided that the claim "should not be treated as waived," because Exxon had "consistently argued statutory preemption" throughout the litigation, and the question was of "massive ... significance" given the "ambiguous circumstances" of the case. 270 F.3d, at 1229. On the merits, the Circuit held that the CWA did not preempt maritime common law on punitive damages. *Id.,* at 1230.

[6] [7] Although we agree with the Ninth Circuit's conclusion, its reasons for reaching it do not hold up. First, the reason the court thought that the CWA issue was not in fact waived was that Exxon had alleged other statutory grounds for preemption from the outset of the trial. But that is not enough. **\*487** It is true that "[o]nce a federal claim is properly presented, **\*\*2618** a party can make any

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 93 of 304

Exxon Shipping Co. v. Baker, 554 U.S. 471 (2008)

128 S.Ct. 2605, 66 ERC 1545, 2008 A.M.C. 1521, 171 L.Ed.2d 570, 76 USLW 4603...

argument in support of that claim; parties are not limited to the precise arguments they made below. *Yee v. Escondido, 503 U.S. 519, 534, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992).* But this principle stops well short of legitimizing Exxon's untimely motion. If "statutory preemption" were a sufficient claim to give Exxon license to rely on newly cited statutes anytime it wished, a litigant could add new constitutional claims as he went along, simply because he had "consistently argued" that a challenged regulation was unconstitutional. See *id., at 533, 112 S.Ct. 1522* (rejecting substantive due process claim by takings petitioners who failed to preserve it below); *Browning–Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc.,* 492 U.S. 257, 277, n. 23, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989) (rejecting due process claim by Eighth Amendment petitioners).

[8]    That said, the motion still addressed the Circuit's discretion, to which the "massive" significance of the question and the "ambiguous circumstances" of the case were said to be relevant. 270 F.3d, at 1229. "It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below," *Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976), when to deviate from this rule being a matter "left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases," *id., at 121, 96 S.Ct. 2868.* We have previously stopped short of stating a general principle to contain appellate courts' discretion, see *ibid.,* and we exercise the same restraint today.[6]

[6]    We do have to say, though, that the Court of Appeals gave short shrift to the District Court's commendable management of this gargantuan litigation, and if the case turned on the propriety of the Circuit's decision to reach the preemption issue we would take up the claim that it exceeded its discretion. Instead, we will only say that to the extent the Ninth Circuit implied that the unusual circumstances of this case called for an exception to regular practice, we think the record points the other way.

Of course the Court of Appeals was correct that the case was complex and significant, so much so, in fact, that the District Court was fairly required to divide it into four phases, to oversee a punitive-damages class of 32,000 people, and to manage a motions industry that threatened to halt progress completely. But the complexity of a case does not eliminate the value of waiver and forfeiture rules, which ensure that parties can determine when an issue is out of the case, and that litigation remains, to the extent possible, an orderly progression. "The reason for

the rules is not that litigation is a game, like golf, with arbitrary rules to test the skill of the players. Rather, litigation is a 'winnowing process,' and the procedures for preserving or waiving issues are part of the machinery by which courts narrow what remains to be decided." *Poliquin v. Garden Way, Inc.,* 989 F.2d 527, 531 (C.A.1 1993) (Boudin, J.) (citation omitted). The District Court's sensible efforts to impose order upon the issues in play and the progress of the trial deserve our respect.

[9]    [10]    *488    As to the merits, we agree with the Ninth Circuit that Exxon's late-raised CWA claim should fail. There are two ways to construe Exxon's argument that the CWA's penalties for water pollution, see 33 U.S.C. § 1321 (2000 ed. and Supp. V), preempt the common law punitive-damages remedies at issue here. The company could be saying that any tort action predicated on an oil spill is preempted unless § 1321 expressly preserves it. Section 1321(b)(2000 ed.) protects "the navigable waters of the United States, adjoining shorelines, ... [and] natural resources" of the United States, subject to a saving clause reserving "obligations ... under any provision of law for damages to any publicly owned or privately owned property resulting from a discharge of any oil," § 1321(o). Exxon could be arguing that, because the **2619 saving clause makes no mention of preserving punitive damages for economic loss, they are preempted. But so, of course, would a number of other categories of damages awards that Exxon did not claim were preempted. If Exxon were correct here, there would be preemption of provisions for compensatory damages for thwarting economic activity or, for that matter, compensatory damages for physical, personal injury from oil spills or other water pollution. But we find it too hard to conclude that a statute expressly geared to protecting "water," "shorelines," and "natural resources" *489    was intended to eliminate *sub silentio* oil companies' common law duties to refrain from injuring the bodies and livelihoods of private individuals.

[11]    [12]    Perhaps on account of its overbreadth, Exxon disclaims taking this position, admitting that the CWA does not displace compensatory remedies for consequences of water pollution, even those for economic harms. See, *e.g.,* Reply Brief for Petitioners 15–16. This concession, however, leaves Exxon with the equally untenable claim that the CWA somehow preempts punitive damages, but not compensatory damages, for economic loss. But nothing in the statutory text points to fragmenting the recovery scheme this way, and we have rejected similar attempts to sever remedies from their causes of action. See *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 255–256, 104 S.Ct. 615, 78 L.Ed.2d 443

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 94 of 304

Exxon Shipping Co. v. Baker, 554 U.S. 471 (2008)
128 S.Ct. 2605, 66 ERC 1545, 2008 A.M.C. 1521, 171 L.Ed.2d 570, 76 USLW 4603...

(1984). All in all, we see no clear indication of congressional intent to occupy the entire field of pollution remedies, see, *e.g., United States v. Texas,* 507 U.S. 529, 534, 113 S.Ct. 1631, 123 L.Ed.2d 245 (1993) ("In order to abrogate a common-law principle, the statute must speak directly to the question addressed by the common law" (internal quotation marks omitted)); nor for that matter do we perceive that punitive damages for private harms will have any frustrating effect on the CWA remedial scheme, which would point to preemption. [7]

[7]    In this respect, this case differs from two invoked by Exxon, *Middlesex County Sewerage Authority v. National Sea Clammers Assn.,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), and *Milwaukee v. Illinois,* 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981), where plaintiffs' common law nuisance claims amounted to arguments for effluent-discharge standards different from those provided by the CWA. Here, Baker's private claims for economic injury do not threaten similar interference with federal regulatory goals with respect to "water," "shorelines," or "natural resources."

## IV

[13]    Finally, Exxon raises an issue of first impression about punitive damages in maritime law, which falls within a federal court's jurisdiction to decide in the manner of a common law **\*490** court, subject to the authority of Congress to legislate otherwise if it disagrees with the judicial result. See U.S. Const., Art. III, § 2, cl. 1; see, *e.g., Edmonds v. Compagnie Generale Transatlantique,* 443 U.S. 256, 259, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979) ("Admiralty law is judge-made law to a great extent"); *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 360–361, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959) (constitutional grant "empowered the federal courts ... to continue the development of [maritime] law"). In addition to its resistance to derivative liability for punitive damages and its preemption claim already disposed of, Exxon challenges the size of the remaining $2.5 billion punitive-damages award. Other than its preemption argument, it does not offer a legal ground for concluding that maritime law should never award punitive damages, or that none should be awarded in this case, but it does argue that this award exceeds the bounds justified by the punitive-damages **\*\*2620** goal of deterring reckless (or worse) behavior and the consequently heightened threat of harm. The claim goes to our understanding of the place of punishment in modern civil law and reasonable standards of

process in administering punitive law, subjects that call for starting with a brief account of the history behind today's punitive damages.

### A

The modern Anglo–American doctrine of punitive damages dates back at least to 1763, when a pair of decisions by the Court of Common Pleas recognized the availability of damages "for more than the injury received." *Wilkes v. Wood,* Lofft 1, 18, 98 Eng. Rep. 489, 498 (1763) (Lord Chief Justice Pratt). In *Wilkes v. Wood,* one of the foundations of the Fourth Amendment, exemplary damages awarded against the Secretary of State, responsible for an unlawful search of John Wilkes's papers, were a spectacular £4,000. See generally *Boyd v. United States,* 116 U.S. 616, 626, 6 S.Ct. 524, 29 L.Ed. 746 (1886). And in *Huckle v. Money,* 2 Wils. 205, 206–207, 95 Eng. Rep. 768, 768–769 (K.B.1763), the same judge who is recorded in **\*491** *Wilkes* gave an opinion upholding a jury's award of £300 (against a government officer again) although "if the jury had been confined by their oath to consider the mere personal injury only, perhaps [£20] damages would have been thought damages sufficient."

Awarding damages beyond the compensatory was not, however, a wholly novel idea even then, legal codes from ancient times through the Middle Ages having called for multiple damages for certain especially harmful acts. See, *e.g.,* Code of Hammurabi § 8, p. 13 (R. Harper ed.1904) (tenfold penalty for stealing the goat of a freed man); Statute of Gloucester, 1278, 6 Edw. I, ch. 5, 1 Stat. at Large 66 (treble damages for waste). But punitive damages were a common law innovation untethered to strict numerical multipliers, and the doctrine promptly crossed the Atlantic, see, *e.g., Genay v. Norris,* 1 S.C.L. 6, 7 (1784); *Coryell v. Colbaugh,* 1 N.J.L. 77 (1791), to become widely accepted in American courts by the middle of the 19th century, see, *e.g., Day v. Woodworth,* 13 How. 363, 371, 14 L.Ed. 181 (1852).

### B

Early common law cases offered various rationales for punitive-damages awards, which were then generally dubbed "exemplary," implying that these verdicts were justified as punishment for extraordinary wrongdoing, as in Wilkes's case. Sometimes, though, the extraordinary element emphasized was the damages award itself, the punishment

being "for example's sake," *Tullide v. Wade,* 3 Wils. 18, 19, 95 Eng. Rep. 909 (K.B.1769) (Lord Chief Justice Wilmot), "to deter from any such proceeding for the future," *Wilkes, supra,* at 19, 98 Eng. Rep., at 498–499. See also *Coryell, supra,* at 77 (instructing the jury "to give damages for *example's* sake, to prevent such offences in [the] future").

A third historical justification, which showed up in some of the early cases, has been noted by recent commentators, and that was the need "to compensate for intangible injuries, **\*492** compensation which was not otherwise available under the narrow conception of compensatory damages prevalent at the time." [8] *Cooper Industries,* **\*\*2621** *Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 437–438, n. 11, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001) (citing, *inter alia,* Note, Exemplary Damages in the Law of Torts, 70 Harv. L.Rev. 517 (1957)). But see Sebok, What Did Punitive Damages Do? 78 Chi.–Kent L.Rev. 163, 204 (2003) (arguing that "punitive damages have never served the compensatory function attributed to them by the Court in *Cooper* "). As the century progressed, and "the types of compensatory damages available to plaintiffs ... broadened," *Cooper Industries, supra,* at 438, n. 11, 121 S.Ct. 1678, the consequence was that American courts tended to speak of punitive damages as separate and distinct from compensatory damages, see, *e.g., Day, supra,* at 371 (punitive damages "hav[e] in view the enormity of [the] offence rather than the measure of compensation to the plaintiff"). See generally 1 L. Schlueter, Punitive Damages §§ 1.3(C)-(D), 1.4(A) (5th ed. 2005) (hereinafter Schlueter) (describing the "almost total eclipse of the compensatory function" in the decades following the 1830s).

[8]    Indeed, at least one 19th-century treatise writer asserted that there was "no doctrine of authentically 'punitive' damages" and that "judgments that ostensibly included punitive damages [were] in reality no more than full compensation." *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 25, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) (SCALIA, J., concurring in judgment) (citing 2 S. Greenleaf, Law of Evidence 235, n. 2 (13th ed. 1876)). "This view," however, "was not widely shared." *Haslip, supra,* at 25, 111 S.Ct. 1032 (SCALIA, J., concurring in judgment) (citing other prominent 19th-century treatises). Whatever the actual importance of the subterfuge for compensation may have been, it declined.

[14]    [15]    Regardless of the alternative rationales over the years, the consensus today is that punitives are aimed not at compensation but principally at retribution and deterring

harmful conduct. [9] This consensus informs the doctrine in most **\*493** modern American jurisdictions, where juries are customarily instructed on twin goals of punitive awards. See, *e.g.,* Cal. Jury Instr., Civil, No. 14.72.2 (2008) ("You must now determine whether you should award punitive damages against defendant[s] ... for the sake of example and by way of punishment"); N.Y. Pattern Jury Instr., Civil, No. 2:278 (2007) ("The purpose of punitive damages is not to compensate the plaintiff but to punish the defendant ... and thereby to discourage the defendant ... from acting in a similar way in the future"). The prevailing rule in American courts also limits punitive damages to cases of what the Court in *Day, supra,* at 371, spoke of as "enormity," where a defendant's conduct is "outrageous," 4 Restatement § 908(2), owing to "gross negligence," "willful, wanton, and reckless indifference for the rights of others," or behavior even more deplorable, 1 Schlueter § 9.3(A). [10]

[9]    See, *e.g., Moskovitz v. Mount Sinai Medical Center,* 69 Ohio St.3d 638, 651, 635 N.E.2d 331, 343 (1994) ("The purpose of punitive damages is not to compensate a plaintiff, but to punish and deter certain conduct"); *Hamilton Development Co. v. Broad Rock Club, Inc.,* 248 Va. 40, 45, 445 S.E.2d 140, 143 (1994) (same); *Loitz v. Remington Arms Co.,* 138 Ill.2d 404, 414, 150 Ill.Dec. 510, 563 N.E.2d 397, 401 (1990) (same); *Green Oil Co. v. Hornsby,* 539 So.2d 218, 222 (Ala.1989) (same); *Masaki v. General Motors Corp.,* 71 Haw. 1, 6, 780 P.2d 566, 570 (1989) (same); see also *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 432, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001) (punitive damages are "intended to punish the defendant and to deter future wrongdoing"); *State Farm Mut. Automobile Ins. Co. v. Campbell,* 538 U.S. 408, 416, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) ("[P]unitive damages ... are aimed at deterrence and retribution"); 4 Restatement § 908, Comment *a.*

[10]    These standards are from the torts context; different standards apply to other causes of action.

[16]    [17]    Under the umbrellas of punishment and its aim of deterrence, degrees of relative blameworthiness are apparent. Reckless conduct is not intentional or malicious, nor is it necessarily callous toward the risk of harming others, as opposed to unheedful of it. See, *e.g.,* 2 Restatement **\*\*2622** § 500, Comment *a,* pp. 587–588 (1964) ("Recklessness may consist of either of two different types of conduct. In one the actor knows, or has reason to know ... of facts which create a high **\*494** degree of risk of ... harm to another, and deliberately proceeds to act, or to fail to act, in conscious

Case 09-10138-MFW Doc 15740 Filed 06/12/15 Page 96 of 304

Exxon Shipping Co. v. Baker, 554 U.S. 471 (2008)

128 S.Ct. 2605, 66 ERC 1545, 2008 A.M.C. 1521, 171 L.Ed.2d 570, 76 USLW 4603...

disregard of, or indifference to, that risk. In the other the actor has such knowledge, or reason to know, of the facts, but does not realize or appreciate the high degree of risk involved, although a reasonable man in his position would do so"). Action taken or omitted in order to augment profit represents an enhanced degree of punishable culpability, as of course does willful or malicious action, taken with a purpose to injure. See 4 *id.,* § 908, Comment *e,* p. 466 (1977) ("In determining the amount of punitive damages, ... the trier of fact can properly consider not merely the act itself but all the circumstances including the motives of the wrongdoer ... "); cf. *Alaska Stat. § 09.17.020(g) (2006)* (higher statutory limit applies where conduct was motivated by financial gain and its adverse consequences were known to the defendant); *Ark.Code Ann. § 16–55–208(b)* (2005) (statutory limit does not apply where the defendant intentionally pursued a course of conduct for the purpose of causing injury or damage).

**[18]** Regardless of culpability, however, heavier punitive awards have been thought to be justifiable when wrongdoing is hard to detect (increasing chances of getting away with it), see, *e.g., BMW of North America, Inc. v. Gore,* 517 U.S. 559, 582, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) ("A higher ratio may also be justified in cases in which the injury is hard to detect"), or when the value of injury and the corresponding compensatory award are small (providing low incentives to sue), see, *e.g., ibid.* ("[L]ow awards of compensatory damages may properly support a higher ratio ... if, for example, a particularly egregious act has resulted in only a small amount of economic damages"); 4 Restatement § 908, Comment *c,* p. 465 ("Thus an award of nominal damages ... is enough to support a further award of punitive damages, when a tort ... is committed for an outrageous purpose, but no significant harm has resulted"). And, with a broadly analogous object, some regulatory schemes provide by statute for multiple recovery in order to **\*495** induce private litigation to supplement official enforcement that might fall short if unaided. See, *e.g., Reiter v. Sonotone Corp.,* 442 U.S. 330, 344, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979) (discussing antitrust treble damages).

## C

State regulation of punitive damages varies. A few States award them rarely, or not at all. Nebraska bars punitive damages entirely, on state constitutional grounds. See, *e.g., Distinctive Printing & Packaging Co. v. Cox,* 232 Neb. 846, 857, 443 N.W.2d 566, 574 (1989) *(per curiam).* Four

others permit punitive damages only when authorized by statute: Louisiana, Massachusetts, and Washington as a matter of common law, and New Hampshire by statute codifying common law tradition. See *Ross v. Conoco, Inc.,* 02–0299, p. 14 (La.10/15/02), 828 So.2d 546, 555; *Flesner v. Technical Communications Corp.,* 410 Mass. 805, 813, 575 N.E.2d 1107, 1112 (1991); *Fisher Properties, Inc. v. Arden–Mayfair, Inc.,* 106 Wash.2d 826, 852, 726 P.2d 8, 23 (1986); N.H.Rev.Stat. Ann. § 507:16 (1997); see also *Fay v. Parker,* 53 N.H. 342, 382 (1872). Michigan courts recognize only exemplary damages supportable as compensatory, rather than truly punitive, see *Peisner v. Detroit Free Press, Inc.,* 104 Mich.App. 59, 68, 304 N.W.2d 814, 817 (1981), while Connecticut courts have limited what they call punitive recovery to the "expenses of bringing the **\*\*2623** legal action, including attorney's fees, less taxable costs," *Larsen Chelsey Realty Co. v. Larsen,* 232 Conn. 480, 517, n. 38, 656 A.2d 1009, 1029, n. 38 (1995).

As for procedure, in most American jurisdictions the amount of the punitive award is generally determined by a jury in the first instance, and that "determination is then reviewed by trial and appellate courts to ensure that it is reasonable." *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 15, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991); see also *Honda Motor Co. v. Oberg,* 512 U.S. 415, 421–426, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994).[11] Many States have gone further by **\*496** imposing statutory limits on punitive awards, in the form of absolute monetary caps, see, *e.g.,* Va.Code Ann. § 8.01–38.1 (Lexis 2007) ($350,000 cap), a maximum ratio of punitive to compensatory damages, see, *e.g.,* Ohio Rev.Code Ann. § 2315.21(D)(2)(a) ( Lexis 2001) (2:1 ratio in most tort cases), or, frequently, some combination of the two, see, *e.g.,* Alaska Stat. § 09.17.020(f) (2006) (greater of 3:1 ratio or $500,000 in most actions). The States that rely on a multiplier have adopted a variety of ratios, ranging from 5:1 to 1:1.[12]

---

[11] A like procedure was followed in this case, without objection.

[12] See, *e.g.,* Mo.Rev.Stat. Ann. § 510.265(1) (Vernon Supp.2008) (greater of 5:1 or $500,000 in most cases); Ala.Code §§ 6–11–21(a), (d) (2005) (greater of 3:1 or $1.5 million in most personal injury suits, and 3:1 or $500,000 in most other actions); N.D. Cent.Code Ann. § 32–03.2–11(4) (Supp.2007) (greater of 2:1 or $250,000); Colo.Rev.Stat. Ann. § 13–21–102(1)(a) (2007) (1:1).

Oklahoma has a graduated scheme, with the limit on the punitive award turning on the nature of the defendant's conduct. See Okla. Stat., Tit. 23, § 9.1(B)

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 97 of 304

**Exxon Shipping Co. v. Baker, 554 U.S. 471 (2008)**
128 S.Ct. 2605, 66 ERC 1545, 2008 A.M.C. 1521, 171 L.Ed.2d 570, 76 USLW 4603...

(West 2001) (greater of 1:1 or $100,000 in cases involving "reckless disregard"); § 9.1(C) (greater of 2:1, $500,000, or the financial benefit derived by the defendant, in cases of intentional and malicious conduct); § 9.1(D) (no limit where the conduct is intentional, malicious, and life threatening).

Despite these limitations, punitive damages overall are higher and more frequent in the United States than they are anywhere else. See, e.g., Gotanda, Punitive Damages: A Comparative Analysis, 42 Colum. J. Transnat'l L. 391, 421 (2004); 2 Schlueter § 22.0. In England and Wales, punitive, or exemplary, damages are available only for oppressive, arbitrary, or unconstitutional action by government servants; injuries designed by the defendant to yield a larger profit than the likely cost of compensatory damages; and conduct for which punitive damages are expressly authorized by statute. *Rookes v. Barnard,* [1964] 1 All E.R. 367, 410–411 (H.L.). Even in the circumstances where punitive damages are allowed, they are subject to strict, judicially imposed guidelines. The Court of Appeal in *Thompson v. Commissioner of Police of Metropolis,* [1998] Q.B. 498, 518, said that **\*497** a ratio of more than three times the amount of compensatory damages will rarely be appropriate; awards of less than £5,000 are likely unnecessary; awards of £ 25,000 should be exceptional; and £50,000 should be considered the top.

For further contrast with American practice, Canada and Australia allow exemplary damages for outrageous conduct, but awards are considered extraordinary and rarely issue. See 2 Schlueter §§ 22.1(B), (D). Noncompensatory damages are not part of the civil-code tradition and thus unavailable in such countries as France, Germany, Austria, and Switzerland. See *id.,* §§ 22.2(A)-(C), (E). And some legal systems not only decline to recognize punitive damages themselves but refuse to enforce foreign punitive judgments as contrary to public policy. See, **\*\*2624** e.g., Gotanda, Charting Developments Concerning Punitive Damages: Is the Tide Changing? 45 Colum. J. Transnat'l L. 507, 514, 518, 528 (2007) (noting refusals to enforce judgments by Japanese, Italian, and German courts, positing that such refusals may be on the decline, but concluding, "American parties should not anticipate smooth sailing when seeking to have a domestic punitive damages award recognized and enforced in other countries").

**D**

American punitive damages have been the target of audible criticism in recent decades, see, e.g., Note, Developments, The Paths of Civil Litigation, 113 Harv. L.Rev. 1783, 1784–1788 (2000) (surveying criticism), but the most recent studies tend to undercut much of it, see id., at 1787–1788. A survey of the literature reveals that discretion to award punitive damages has not mass-produced runaway awards, and although some studies show the dollar amounts of punitive-damages awards growing over time, even in real terms, [13] by **\*498** most accounts the median ratio of punitive to compensatory awards has remained less than 1:1. [14] Nor do the data substantiate a marked increase in the percentage of cases with punitive awards over the past several decades. [15] The figures **\*499** thus show an overall **\*\*2625** restraint and suggest that in many instances a high ratio of punitive to compensatory damages is substantially greater than necessary to punish or deter.

[13]      See, e.g., RAND Institute for Civil Justice, D. Hensler & E. Moller, Trends in Punitive Damages, table 2 (Mar.1995) (finding an increase in median awards between the early 1980s and the early 1990s in San Francisco and Cook Counties); Moller, Pace, & Carroll, Punitive Damages in Financial Injury Jury Verdicts, 28 J. Legal Studies 283, 307 (1999) (hereinafter Financial Injury Jury Verdicts) (studying jury verdicts in "Financial Injury" cases in six States and Cook County, Illinois, and finding a marked increase in the median award between the late 1980s and the early 1990s); RAND Institute for Civil Justice, M. Peterson, S. Sarma, & M. Shanley, Punitive Damages: Empirical Findings 15 (1987) (hereinafter Punitive Damages: Empirical Findings) (finding that the median punitive award increased nearly 4 times in San Francisco County between the early 1960s and the early 1980s, and 43 times in Cook County over the same period). But see T. Eisenberg et al., Juries, Judges, and Punitive Damages: Empirical Analyses Using the Civil Justice Survey of State Courts 1992, 1996, and 2001 Data, 3 J. of Empirical Legal Studies 263, 278 (2006) (hereinafter Juries, Judges, and Punitive Damages) (analyzing Bureau of Justice Statistics data from 1992, 1996, and 2001, and concluding that "[n]o statistically significant variation exists in the inflation-adjusted punitive award level over the three time periods"); Dept. of Justice, Bureau of Justice Statistics, T. Cohen, Punitive Damage Awards in Large Counties, 2001, p. 8 (Mar.2005) (hereinafter Cohen) (compiling data from the Nation's 75 most populous counties and finding that the median punitive-

Exxon Shipping Co. v. Baker, 554 U.S. 471 (2008)

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 98 of 304

128 S.Ct. 2605, 66 ERC 1545, 2008 A.M.C. 1521, 171 L.Ed.2d 570, 76 USLW 4603...

damages award in civil jury trials decreased between 1992 and 2001.

14   See, *e.g.,* Juries, Judges, and Punitive Damages 269 (reporting median ratios of 0.62:1 in jury trials and 0.66:1 in bench trials using the Bureau of Justice Statistics data from 1992, 1996, and 2001); Vidmar & Rose, Punitive Damages by Juries in Florida, 38 Harv. J. Legis. 487, 492 (2001) (studying civil cases in Florida state courts between 1989 and 1998 and finding a median ratio of 0.67:1). But see Financial Injury Jury Verdicts 307 (finding a median ratio of 1.4:1 in "financial injury" cases in the late 1980s and early 1990s).

15   See, *e.g.,* Cohen 8 (compiling data from the Nation's 75 most populous counties, and finding that in jury trials where the plaintiff prevailed, the percentage of cases involving punitive awards was 6.1% in 1992 and 5.6% in 2001); Financial Injury Jury Verdicts 307 (finding a statistically significant decrease in the percentage of verdicts in "financial injury" cases that include a punitive-damages award, from 15.8% in the early 1980s to 12.7% in the early 1990s). But see Punitive Damages: Empirical Findings 9 (finding an increase in the percentage of civil trials resulting in punitive-damages awards in San Francisco and Cook Counties between 1960 and 1984).

   One might posit that ill effects of punitive damages are clearest not in actual awards but in the shadow that the punitive regime casts on settlement negotiations and other litigation decisions. See, *e.g.,* Financial Injury Jury Verdicts 287; Polinsky, Are Punitive Damages Really Insignificant, Predictable, and Rational? 26 J. Legal Studies 663, 664–671 (1997). But there again the data have not established a clear correlation. See, *e.g.,* Eaton, Mustard, & Talarico, The Effects of Seeking Punitive Damages on the Processing of Tort Claims, 34 J. Legal Studies 343, 357, 353–354, 365 (2005) (studying data from six Georgia counties and concluding that "the decision to seek punitive damages has no statistically significant impact" on "whether a case that was disposed was done so by trial or by some other procedure, including settlement," or "whether a case that was disposed by means other than a trial was more likely to have been settled"); Kritzer & Zemans, The Shadow of Punitives, 1998 Wis. L.Rev. 157, 160 (1998) (noting the theory that punitive damages cast a large shadow over settlement negotiations, but finding that "with perhaps one exception, what little systematic evidence we could find does not support the notion" (emphasis deleted)).

The real problem, it seems, is the stark unpredictability of punitive awards. Courts of law are concerned with fairness as consistency, and evidence that the median ratio of punitive to compensatory awards falls within a reasonable zone, or that punitive awards are infrequent, fails to tell us whether the spread between high and low individual awards is acceptable. The available data suggest it is not. A recent comprehensive study of punitive damages awarded by juries in state civil trials found a median ratio of punitive to compensatory awards of just 0.62:1, but a mean ratio of 2.90:1 and a standard deviation of 13.81. Juries, Judges, and Punitive Damages 269. [16] Even to those of us unsophisticated in statistics, **\*500** the thrust of these figures is clear: the spread is great, and the outlier cases subject defendants to punitive damages that dwarf the corresponding compensatories. The distribution of awards is narrower, but still remarkable, among punitive damages assessed by judges: the median ratio is 0.66:1, the mean ratio is 1.60:1, and the standard deviation is 4.54. *Ibid.* Other studies of some of the same data show that fully 14% of punitive awards in 2001 were greater than four times the compensatory damages, see Cohen 5, with 18% of punitives in the 1990s more than trebling the compensatory damages, see Ostrom, Rottman, & Goerdt, A Step Above Anecdote: A Profile of the Civil Jury in the 1990s, 79 Judicature 233, 240 (1996). And a study of "financial injury" cases using a different data set found that 34% of the punitive awards were greater than three times the corresponding compensatory damages. Financial Injury Jury Verdicts 333.

16   This study examined "the most representative sample of state court trials in the United States," involving "tort, contract, and property cases disposed of by trial in fiscal year 1991–1992 and then calendar years 1996 and 2001. The three separate data sets cover state courts of general jurisdiction in a random sample of 46 of the 75 most populous counties in the United States." Juries, Judges, and Punitive Damages 267. The information was "gathered directly" from state-court clerks' offices and the study did "not rely on litigants or third parties to report." *Ibid.*

Starting with the premise of a punitive-damages regime, these ranges of variation might be acceptable or even desirable if they resulted from judges' and juries' refining their judgments to reach a generally accepted optimal level of penalty and deterrence in cases involving a wide range of circumstances, while producing fairly consistent results in cases with similar facts. Cf. *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 457–458, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) (plurality opinion). But anecdotal evidence suggests **\*\*2626** that nothing of that sort is going on. One of our

128 S.Ct. 2605, 66 ERC 1545, 2008 A.M.C. 1521, 171 L.Ed.2d 570, 76 USLW 4603...

own leading cases on punitive damages, with a $4 million verdict by an Alabama jury, noted that a second Alabama case with strikingly similar facts produced "a comparable amount of compensatory damages" but "no punitive damages at all." See *Gore,* 517 U.S., at 565, n. 8, 116 S.Ct. 1589. As the Supreme Court of Alabama candidly **\*501** explained, "the disparity between the two jury verdicts ... [w]as a reflection of the inherent uncertainty of the trial process." *BMW of North America, Inc. v. Gore,* 646 So.2d 619, 626 (1994) *(per curiam)*. We are aware of no scholarly work pointing to consistency across punitive awards in cases involving similar claims and circumstances. [17]

[17] The Court is aware of a body of literature running parallel to anecdotal reports, examining the predictability of punitive awards by conducting numerous "mock juries," where different "jurors" are confronted with the same hypothetical case. See, *e.g.,* C. Sunstein, R. Hastie, J. Payne, D. Schkade, W. Viscusi, Punitive Damages: How Juries Decide (2002); Schkade, Sunstein, & Kahneman, Deliberating About Dollars: The Severity Shift, 100 Colum. L.Rev. 1139 (2000); Hastie, Schkade, & Payne, Juror Judgments in Civil Cases: Effects of Plaintiff's Requests and Plaintiff's Identity on Punitive Damage Awards, 23 Law & Hum. Behav. 445 (1999); Sunstein, Kahneman, & Schkade, Assessing Punitive Damages (with Notes on Cognition and Valuation in Law), 107 Yale L.J. 2071 (1998). Because this research was funded in part by Exxon, we decline to rely on it.

**E**

**[19]** The Court's response to outlier punitive-damages awards has thus far been confined by claims at the constitutional level, and our cases have announced due process standards that every award must pass. See, *e.g., State Farm Mut. Automobile Ins. Co. v. Campbell,* 538 U.S. 408, 425, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003); *Gore,* 517 U.S., at 574–575, 116 S.Ct. 1589. Although "we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula," *id.,* at 582, 116 S.Ct. 1589, we have determined that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process," *State Farm,* 538 U.S., at 425, 123 S.Ct. 1513; "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee," *ibid.*

Today's enquiry differs from due process review because the case arises under federal maritime jurisdiction, and we **\*502** are reviewing a jury award for conformity with maritime law, rather than the outer limit allowed by due process; we are examining the verdict in the exercise of federal maritime common law authority, which precedes and should obviate any application of the constitutional standard. Our due process cases, on the contrary, have all involved awards subject in the first instance to state law. See, *e.g., id.,* at 414, 123 S.Ct. 1513 (fraud and intentional infliction of emotional distress under Utah law); *Gore, supra,* at 563, and n. 3, 116 S.Ct. 1589 (fraud under Alabama law); *TXO, supra,* at 452, 113 S.Ct. 2711 (plurality opinion) (slander of title under West Virginia law); *Haslip,* 499 U.S., at 7, 111 S.Ct. 1032 (fraud under Alabama law). These, as state-law cases, could provide no occasion to consider a "common-law standard of excessiveness," *Browning–Ferris Industries,* 492 U.S., at 279, 109 S.Ct. 2909, and the only matter of federal law within our appellate authority was the constitutional due process issue.

**[20]** Our review of punitive damages today, then, considers not their intersection with the Constitution, but the desirability of regulating them as a common law **\*\*2627** remedy for which responsibility lies with this Court as a source of judge-made law in the absence of statute. Whatever may be the constitutional significance of the unpredictability of high punitive awards, this feature of happenstance is in tension with the function of the awards as punitive, just because of the implication of unfairness that an eccentrically high punitive verdict carries in a system whose commonly held notion of law rests on a sense of fairness in dealing with one another. Thus, a penalty should be reasonably predictable in its severity, so that even Justice Holmes's "bad man" can look ahead with some ability to know what the stakes are in choosing one course of action or another. See The Path of the Law, 10 Harv. L.Rev. 457, 459 (1897). And when the bad man's counterparts turn up from time to time, the penalty scheme they face ought to threaten them with a fair probability of suffering in like degree when they wreak like damage. **\*503** Cf. *Koon v. United States,* 518 U.S. 81, 113, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (noting the need "to reduce unjustified disparities" in criminal sentencing "and so reach toward the evenhandedness and neutrality that are the distinguishing marks of any principled system of justice"). The common sense of justice would surely bar penalties that reasonable people would think excessive for the harm caused in the circumstances.

**F**

**1**

With that aim ourselves, we have three basic approaches to consider, one verbal and two quantitative. As mentioned before, a number of state courts have settled on criteria for judicial review of punitive-damages awards that go well beyond traditional "shock the conscience" or "passion and prejudice" tests. Maryland, for example, has set forth a nonexclusive list of nine review factors under state common law that include "degree of heinousness," "the deterrence value of [the award]," and "[w]hether [the punitive award] bears a reasonable relationship to the compensatory damages awarded." *Bowden v. Caldor, Inc.,* 350 Md. 4, 25–39, 710 A.2d 267, 277–284 (1998). Alabama has seven general criteria, such as "actual or likely harm [from the defendant's conduct]," "degree of reprehensibility," and "[i]f the wrongful conduct was profitable to the defendant." *Green Oil Co. v. Hornsby,* 539 So.2d 218, 223–224 (1989) (internal quotation marks omitted). But see *McClain v. Metabolife Int'l, Inc.,* 259 F.Supp.2d 1225, 1236 (N.D.Ala.2003) (noting but not deciding claim that post-trial review under *Green Oil* "is unconstitutionally vague and inadequate").

These judicial review criteria are brought to bear after juries render verdicts under instructions offering, at best, guidance no more specific for reaching an appropriate penalty. In Maryland, for example, which allows punitive damages for intentional torts and conduct characterized by "actual malice," *U.S. Gypsum Co. v. Mayor and City Council* **\*504** *of Baltimore,* 336 Md. 145, 185, 647 A.2d 405, 424–425 (1994), juries may be instructed that

"[a]n award for punitive damages should be:

"(1) In an amount that will deter the defendant and others from similar conduct.

"(2) Proportionate to the wrongfulness of the defendant's conduct and the defendant's ability to pay.

"(3) But not designed to bankrupt or financially destroy a defendant." Md. Pattern Jury Instr., Civil, No. 10:13 (4th ed.2007).

In Alabama, juries are instructed to fix an amount after considering "the character **\*\*2628** and degree of the wrong as shown by the evidence in the case, and the necessity of preventing similar wrongs." 1 Ala. Pattern Jury Instr., Civil, No. 23.21 (Supp.2007).

These examples leave us skeptical that verbal formulations, superimposed on general jury instructions, are the best insurance against unpredictable outliers. Instructions can go just so far in promoting systemic consistency when awards are not tied to specifically proven items of damage (the cost of medical treatment, say), and although judges in the States that take this approach may well produce just results by dint of valiant effort, our experience with attempts to produce consistency in the analogous business of criminal sentencing leaves us doubtful that anything but a quantified approach will work. A glance at the experience there will explain our skepticism.

**[21]** **[22]** The points of similarity are obvious. "[P]unitive damages advance the interests of punishment and deterrence, which are also among the interests advanced by the criminal law." *Browning–Ferris Industries,* 492 U.S., at 275, 109 S.Ct. 2909.[18] See also **\*505** 1977 Restatement § 908, Comment *a,* at 464 (purposes of punitive damages are "the same" as "that of a fine imposed after a conviction of a crime"); 18 U.S.C. § 3553(a)(2) (requiring sentencing courts to consider, *inter alia,* "the need for the sentence imposed ... to provide just punishment for the offense" and "to afford adequate deterrence to criminal conduct"); United States Sentencing Commission, Guidelines Manual § 1A1.1, comment. (Nov.2007).

[18] This observation is not at odds with the holding in *Browning–Ferris,* that the Excessive Fines Clause of the Eighth Amendment does not apply to punitive damages. See *Browning–Ferris,* 492 U.S., at 275, 109 S.Ct. 2909. That conclusion did not reject the punitive nature of the damages, see *ibid.,* but rested entirely upon our conviction that "the concerns that animate the Eighth Amendment" were about "plac[ing] limits on the steps a government may take against an individual," *ibid.* Thus the Clause "does not constrain an award of money damages in a civil suit when the government neither has prosecuted the action nor has any right to receive a share of the damages awarded." *Id.,* at 264, 109 S.Ct. 2909. We noted the similarities of purpose between criminal penalties and punitive damages and distinguished the two on the basis of their differing levels of state involvement. See *id.,* at 275, 109 S.Ct. 2909.

It is instructive, then, that in the last quarter century federal sentencing rejected an "indeterminate" system, with relatively unguided discretion to sentence within a wide

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 101 of 304

**Exxon Shipping Co. v. Baker, 554 U.S. 471 (2008)**
128 S.Ct. 2605, 66 ERC 1545, 2008 A.M.C. 1521, 171 L.Ed.2d 570, 76 USLW 4603...

range, under which "similarly situated offenders were sentenced [to], and did actually serve, widely disparate sentences." [19] Instead it became a system of detailed guidelines tied to exactly quantified sentencing results, under the authority of the Sentencing Reform Act of 1984, 18 U.S.C. § 3551 *et seq.* (2000 ed. and Supp. V).

[19]    Nagel, *Structuring Sentencing Discretion: The New Federal Sentencing Guidelines,* 80 J.Crim. L. & C. 883, 895–899 (1990) (citing studies and congressional hearings).

The importance of this for us is that in the old federal sentencing system of general standards the cohort of even the most seasoned judicial penalty-givers defied consistency. Judges and defendants alike were "[l]eft at large, wandering in deserts of uncharted discretion," M. Frankel, Criminal Sentences: Law Without Order 7–8 (1973), which is very much the position of those imposing punitive damages today, be they judges or juries, except that they lack even a statutory maximum; their only restraint beyond a core sense of **\*506** fairness is the due process limit. This federal criminal-law development, with its many state parallels, strongly suggests that as long **\*\*2629** "as there are no punitive-damages guidelines, corresponding to the federal and state sentencing guidelines, it is inevitable that the specific amount of punitive damages awarded whether by a judge or by a jury will be arbitrary." *Mathias v. Accor Economy Lodging, Inc.,* 347 F.3d 672, 678 (C.A.7 2003).

**2**

This is why our better judgment is that eliminating unpredictable outlying punitive awards by more rigorous standards than the constitutional limit will probably have to take the form adopted in those States that have looked to the criminal-law pattern of quantified limits. One option would be to follow the States that set a hard dollar cap on punitive damages, see *supra,* at 2623, a course that arguably would come closest to the criminal law, rather like setting a maximum term of years. The trouble is, though, that there is no "standard" tort or contract injury, making it difficult to settle upon a particular dollar figure as appropriate across the board. And of course a judicial selection of a dollar cap would carry a serious drawback; a legislature can pick a figure, index it for inflation, and revisit its provision whenever there seems to be a need for further tinkering, but a court cannot say when an issue will show up on the docket again. See, *e.g., Jones &*

*Laughlin Steel Corp. v. Pfeifer,* 462 U.S. 523, 546–547, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983) (declining to adopt a fixed formula to account for inflation in discounting future wages to present value, in light of the unpredictability of inflation rates and variation among lost-earnings cases).

The more promising alternative is to leave the effects of inflation to the jury or judge who assesses the value of actual loss, by pegging punitive to compensatory damages using a ratio or maximum multiple. See, *e.g.,* 2 ALI Enterprise Responsibility for Personal Injury: Reporters' Study 258 (1991) (hereinafter ALI Reporters' Study) ("[T]he compensatory **\*507** award in a successful case should be the starting point in calculating the punitive award"); ABA, Report of Special Comm. on Punitive Damages, Section of Litigation, Punitive Damages: A Constructive Examination 64–66 (1986) (recommending a presumptive punitive-to-compensatory damages ratio). As the earlier canvass of state experience showed, this is the model many States have adopted, see *supra,* at 2623, and n. 12, and Congress has passed analogous legislation from time to time, as for example in providing treble damages in antitrust, racketeering, patent, and trademark actions, see 15 U.S.C. §§ 15, 1117 (2000 ed. and Supp. V); 18 U.S.C. § 1964(c); 35 U.S.C. § 284. [20]    And of course the potential relevance of the ratio between compensatory and punitive damages is indisputable, being a central feature in our due process analysis. See, *e.g., State Farm,* 538 U.S., at 425, 123 S.Ct. 1513; *Gore,* 517 U.S., at 580, 116 S.Ct. 1589.

[20]    There are state counterparts of these federal statutes. See, *e.g.,* Conn. Gen.Stat. § 52–560 (2007) (cutting or destroying a tree intended for use as a Christmas tree punishable by a payment to the injured party of five times the tree's value); Mass. Gen. Laws, ch. 91, § 59A (West 2006) (discharging crude oil into a lake, river, tidal water, or flats subjects a defendant to double damages in tort).

Still, some will murmur that this smacks too much of policy and too little of principle. Cf. *Moviecolor Ltd. v. Eastman Kodak Co.,* 288 F.2d 80, 83 (C.A.2 1961). But the answer rests on the fact that we are acting here in the position of a common law court of last review, faced with a perceived defect in a common law remedy. Traditionally, courts have accepted primary **\*\*2630** responsibility for reviewing punitive damages and thus for their evolution, and if, in the absence of legislation, judicially derived standards leave the door open to outlier punitive-damages awards, it is hard to see how the judiciary can wash its hands of a problem it created, simply by calling quantified standards legislative.

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 102 of 304

Exxon Shipping Co. v. Baker, 554 U.S. 471 (2008)

128 S.Ct. 2605, 66 ERC 1545, 2008 A.M.C. 1521, 171 L.Ed.2d 570, 76 USLW 4603...

See *State Farm, supra,* at 438, 123 S.Ct. 1513 (GINSBURG, J., dissenting) ("In a legislative scheme or a state high court's design to cap punitive damages, **\*508** the handiwork in setting single-digit and 1–to–1 benchmarks could hardly be questioned"); 2 ALI Reporters' Study 257 (recommending adoption of ratio, "probably legislatively, although possibly judicially").

[23]  [24]  [25]  History certainly is no support for the notion that judges cannot use numbers. The 21–year period in the rule against perpetuities was a judicial innovation, see, *e.g., Cadell v. Palmer,* 1 Clark & Finnelly 372, 6 Eng. Rep. 956, 963 (H.L.1833), and so were exact limitations periods for civil actions, sometimes borrowing from statutes, see C. Preston & G. Newsom, Limitation of Actions 241–242 (2d ed.1943), but often without any statutory account to draw on, see, *e.g.,* 1 H. Wood, Limitation of Actions § 1, p. 4 (4th ed.1916). For more examples, see 1 W. Blackstone, Commentaries on the Laws of England 451 (1765) (listing other common law age cutoffs with no apparent statutory basis). And of course, adopting an admiralty-law ratio is no less judicial than picking one as an outer limit of constitutionality for punitive awards. See *State Farm, supra,* at 425, 123 S.Ct. 1513. [21]

[21]  To the extent that Justice STEVENS suggests that the very subject of remedies should be treated as congressional in light of the number of statutes dealing with remedies, see *post,* at 2634 – 2636 (opinion concurring in part and dissenting in part), we think modern-day maritime cases are to the contrary and support judicial action to modify a common law landscape largely of our own making. The character of maritime law as a mixture of statutes and judicial standards, "an amalgam of traditional common-law rules, modifications of those rules, and newly created rules," *East River S.S. Corp. v. Transamerica Delaval Inc.,* 476 U.S. 858, 865, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), accounts for the large part we have taken in working out the governing maritime tort principles. See, *e.g., ibid.* ("recognizing products liability ... as part of the general maritime law"); *American Export Lines, Inc. v. Alvez,* 446 U.S. 274, 100 S.Ct. 1673, 64 L.Ed.2d 284 (1980) (recognizing cause of action for loss of consortium); *Moragne v. States Marine Lines, Inc.,* 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970) (recognizing cause of action for wrongful death). And for the very reason that our exercise of maritime jurisdiction has reached to creating new causes of action on more than one occasion, it follows that we have a free hand in dealing with an issue that is "entirely a remedial matter."

*Id.,* at 382, 90 S.Ct. 1772. The general observation we made in *United States v. Reliable Transfer Co.,* 421 U.S. 397, 409, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), when we abrogated the admiralty rule of divided damages in favor of proportional liability, is to the point here. It is urged "that the creation of a new rule of damages in maritime collision cases is a task for Congress and not for this Court. But the Judiciary has traditionally taken the lead in formulating flexible and fair remedies in the law maritime, and Congress has largely left to this Court the responsibility for fashioning the controlling rules of admiralty law" (internal quotation marks and footnote omitted). See also  *Exxon Co., U.S.A. v. Sofec, Inc.,* 517 U.S. 830, 116 S.Ct. 1813, 135 L.Ed.2d 113 (1996) (holding that proportional-liability rule applies only to defendants proximately causing an injury); *McDermott, Inc. v. AmClyde,* 511 U.S. 202, 114 S.Ct. 1461, 128 L.Ed.2d 148 (1994) (adopting proportionate-fault rule for calculation of nonsettling maritime tort defendants' compensatory liability).

Indeed, the compensatory remedy sought in this case is itself entirely a judicial creation. The common law traditionally did not compensate purely economic harms, unaccompanied by injury to person or property. See K. Abraham, Forms and Functions of Tort Law 247–248 (3d ed.2007); see, *e.g., Robins Dry Dock & Repair Co. v. Dahl,* 266 U.S. 449, 45 S.Ct. 157, 69 L.Ed. 372 (1925) (imposing rule in maritime context). But "[t]he courts have ... occasionally created exceptions to the rule. Perhaps the most noteworthy involve cases in which there has been natural-resource damage for which no party seems to have a cause of action." Abraham, *supra,* at 249 (discussing *Union Oil Co. v. Oppen,* 501 F.2d 558 (C.A.9 1974) (recognizing exception for commercial fishermen)). We raise the point not to express agreement or disagreement with the Ninth Circuit rule but to illustrate the entirely judge-made nature of the landscape we are surveying. To be sure, "Congress retains superior authority in these matters," and "[i]n this era, an admiralty court should look primarily to these legislative enactments for policy guidance." *Miles v. Apex Marine Corp.,* 498 U.S. 19, 27, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990). But we may not slough off our responsibilities for common law remedies because Congress has not made a first move, and the absence of federal legislation constraining punitive damages does not imply a congressional decision that there should be no quantified rule, cf. *Rapanos v. United States,* 547 U.S. 715, 749, 126 S.Ct. 2208, 165 L.Ed.2d 159 (2006) (plurality opinion) (noting the Court's "oft-expressed skepticism towards reading the tea leaves of congressional inaction"). Where there is a need for

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 103 of 304

Exxon Shipping Co. v. Baker, 554 U.S. 471 (2008)

128 S.Ct. 2605, 66 ERC 1545, 2008 A.M.C. 1521, 171 L.Ed.2d 570, 76 USLW 4603...

a new remedial maritime rule, past precedent argues for our setting a judicially derived standard, subject of course to congressional revision. See, *e.g., Reliable Transfer, supra,* at 409, 95 S.Ct. 1708.

**2631 *509 Although the legal landscape is well populated with examples of ratios and multipliers expressing policies of retribution and deterrence, most of them suffer from features that stand in the way of borrowing them as paradigms of reasonable *510 limitations suited for application to this case. While a slim majority of the States with a ratio have adopted 3:1, others see fit to apply a lower one, see, *e.g.,* Colo.Rev.Stat. Ann. § 13–21–102(1)(a) (2007) (1:1); Ohio Rev.Code Ann. § 2315.21(D)(2)(a) (Lexis 2005) (2:1), and a few have gone higher, see, *e.g.,* Mo. Ann. Stat. § 510.265(1) (Supp.2008) (5:1). Judgments may differ about the weight to be given to the slight majority of 3:1 States, but one feature of the 3:1 schemes dissuades us from selecting it here. With a few statutory exceptions, generally for intentional infliction of physical injury or other harm, see, *e.g.,* Ala.Code § 6–11–21(j) (2005); Ark.Code Ann. § 16–55–208(b) (2005), the States with 3:1 ratios apply them across the board (as do other States using different fixed multipliers). That is, the upper limit is not directed to cases like this one, where the tortious action was worse than negligent but less than malicious,[22] exposing the tortfeasor to certain regulatory sanctions and inevitable damages actions;[23] the 3:1 ratio in these States also applies to awards in quite different cases involving some of the most egregious conduct, including malicious behavior and dangerous activity carried on for the purpose of increasing a tortfeasor's financial gain.[24] We confront, **2632 instead, a *511 case of reckless action, profitless to the tortfeasor, resulting in substantial recovery for substantial injury. Thus, a legislative judgment that 3:1 is a reasonable limit overall is not a judgment that 3:1 is a reasonable limit in this particular type of case.

[22]    Although the jury heard evidence that Exxon may have felt constrained not to give Hazelwood a shoreside assignment because of a concern that such a course might open it to liabilities in personnel litigation the employee might initiate, see, *e.g.,* App. F to Pet. for Cert. 256a, such a consideration, if indeed it existed, hardly constitutes action taken with a specific purpose to cause harm at the expense of an established duty.

[23]    We thus treat this case categorically as one of recklessness, for that was the jury's finding. But by making a point of its contrast with cases falling within

categories of even greater fault we do not mean to suggest that Exxon's and Hazelwood's failings were less than reprehensible.

[24]    Two of the States with 3:1 ratios do provide for slightly larger awards in actions involving this type of strategic financial wrongdoing, but the exceptions seem to apply to only a subset of those cases. See Alaska Stat. § 09.17.020(g) (2006) (where the defendant's conduct was motivated by financial gain and the adverse consequences of the conduct were actually known by the defendant or the person responsible for making policy decisions on behalf of the defendant, the normal limit is replaced by the greater of four times the compensatory damages, four times the aggregate financial gain the defendant received as a result of its misconduct, or $7 million); Fla. Stat. §§ 768.73(1)(b), (c) (2007) (normal limit replaced by greater of 4:1 or $2 million where defendant's wrongful conduct was motivated solely by unreasonable financial gain and the unreasonably dangerous nature of the conduct, together with the high likelihood of injury, was actually known by the managing agent, director, officer, or other person responsible for making policy decisions on behalf of the defendant).

For somewhat different reasons, the pertinence of the 2:1 ratio adopted by treble-damages statutes (offering compensatory damages plus a bounty of double that amount) is open to question. Federal treble-damages statutes govern areas far afield from maritime concerns (not to mention each other);[25] the relevance of the governing rules in patent or trademark cases, say, is doubtful at best. And in some instances, we know that the considerations that went into making a rule have no application here. We know, for example, that Congress devised the treble-damages remedy for private antitrust actions with an eye to supplementing official enforcement by inducing private litigation, which might otherwise have been too rare if nothing but compensatory damages were available at the end of the day. See, *e.g., Reiter,* 442 U.S., at 344, 99 S.Ct. 2326. That concern has no traction here, in this case of staggering damage inevitably provoking governmental enforcers to indict and any number of private parties to sue. To take another example, although 18 U.S.C. § 3571(d) *512 provides for a criminal penalty of up to twice a crime victim's loss, this penalty is an alternative to other specific fine amounts which courts may impose at their option, see §§ 3571(a)-(c), a fact that makes us wary of reading too much into Congress's choice of ratio in one provision. State environmental treble-damages schemes offer little more support: for one thing, insofar as some appear to punish even negligence, see, *e.g., Mass. Gen. Laws, ch. 130, § 27,* while

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 104 of 304

**Exxon Shipping Co. v. Baker, 554 U.S. 471 (2008)**
128 S.Ct. 2605, 66 ERC 1545, 2008 A.M.C. 1521, 171 L.Ed.2d 570, 76 USLW 4603...

others target only willful conduct, see, *e.g.,* Del.Code Ann., Tit. 25, § 1401 (1989), some undershoot and others may overshoot the target here. For another, while some States have chosen treble damages, others punish environmental harms at other multiples. See, *e.g.,* N.H.Rev.Stat. Ann. § 146–A:10 (2005) (damages of 1 1/2 times the harm caused to private property by oil discharge); Minn.Stat. Ann. § 115A.99 (2005) (civil penalty of 2 to 5 times the costs of removing unlawful solid waste). All in all, the legislative signposts do not point the way clearly to 2:1 as a sound indication of a reasonable limit.

25    See, *e.g.,* 15 U.S.C. § 15 (antitrust); 18 U.S.C. § 1964 (racketeering); 35 U.S.C. § 284 (patent); 15 U.S.C. § 1117 (trademark) (2000 ed. and Supp. V); 7 U.S.C. § 2564 (plant variety protections); 12 U.S.C. § 2607 (real estate settlement antikickback provision); 15 U.S.C. § 1693f (consumer credit protection).

**3**

There is better evidence of an accepted limit of reasonable civil penalty, however, in several studies mentioned before, showing the median ratio of punitive to compensatory verdicts, reflecting what juries and judges have considered reasonable across many hundreds of punitive awards. See *supra,* at 2624 – 2625, and n. 14. We think it is fair to assume that the greater share of the verdicts studied in these comprehensive collections reflect reasonable judgments **\*\*2633** about the economic penalties appropriate in their particular cases.

 [26]    [27]    These studies cover cases of the most as well as the least blameworthy conduct triggering punitive liability, from malice and avarice, down to recklessness, and even gross negligence in some jurisdictions. The data put the median ratio for the entire gamut of circumstances at less than 1:1, see *supra,* at 2624 – 2625, and n. 14, meaning that the compensatory award exceeds the punitive award in most cases. In a well-  **\*513**  functioning system, we would expect that awards at the median or lower would roughly express jurors' sense of reasonable penalties in cases with no earmarks of exceptional blameworthiness within the punishable spectrum (cases like this one, without intentional or malicious conduct, and without behavior driven primarily by desire for gain, for example) and cases (again like this one) without the modest economic harm or odds of detection that have opened the door to higher awards. It also seems fair to suppose that most of the unpredictable outlier cases that

call the fairness of the system into question are above the median; in theory a factfinder's deliberation could go awry to produce a very low ratio, but we have no basis to assume that such a case would be more than a sport, and the cases with serious constitutional issues coming to us have naturally been on the high side, see, *e.g., State Farm,* 538 U.S., at 425, 123 S.Ct. 1513 (ratio of 145:1); *Gore,* 517 U.S., at 582, 116 S.Ct. 1589 (ratio of 500:1). On these assumptions, a median ratio of punitive to compensatory damages of about 0.65:1 [26] probably marks the line near which cases like this one largely should be grouped. Accordingly, given the need to protect against the possibility (and the disruptive cost to the legal system) of awards that are unpredictable and unnecessary, either for deterrence or for measured retribution, we consider that a 1:1 ratio, which is above the median award, is a fair upper limit in such maritime cases. [27]

26    See *supra,* at 2624, n. 14, for the spread among studies.

27    The reasons for this conclusion answer Justice STEVENS's suggestion, *post,* at 2638, that there is an adequate restraint in appellate abuse-of-discretion review of a trial judge's own review of a punitive jury award (or of a judge's own award in nonjury cases). We cannot see much promise of a practical solution to the outlier problem in this possibility. Justice STEVENS would find no abuse of discretion in allowing the $2.5 billion balance of the jury's punitive verdict here, and yet that is about five times the size of the award that jury practice and our judgment would signal as reasonable in a case of this sort.

   The dissent also suggests that maritime tort law needs a quantified limit on punitive awards less than tort law generally because punitives may mitigate maritime law's less generous scheme of compensatory damages. *Post,* at 2636 – 2637. But the instructions in this case did not allow the jury to set punitives on the basis of any such consideration, see Jury Instruction No. 21, App. to Brief in Opposition 12a ("The purposes for which punitive damages are awarded are: (1) to punish a wrongdoer for extraordinary misconduct; and (2) to warn defendants and others and deter them from doing the same"), and the size of the underlying compensatory damages does not bespeak economic inadequacy; the case, then, does not support an argument that maritime compensatory awards need supplementing.

   And this Court has long held that "[p]unitive damages by definition are not intended to compensate the injured party, but rather to punish the tortfeasor ... and to deter him and others from similar extreme

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 105 of 304

**Exxon Shipping Co. v. Baker, 554 U.S. 471 (2008)**

128 S.Ct. 2605, 66 ERC 1545, 2008 A.M.C. 1521, 171 L.Ed.2d 570, 76 USLW 4603...

conduct." *Newport v. Fact Concerns, Inc.,* 453 U.S. 247, 266–267, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981); see *supra,* at 2620 – 2621. Indeed, any argument for more generous punitive damages in maritime cases would call into question the maritime applicability of the constitutional limit on punitive damages as now understood, for we have tied that limit to a conception of punitive damages awarded entirely for a punitive, not quasi-compensatory, purpose. See, *e.g., Philip Morris USA v. Williams,* 549 U.S. 346, 352, 127 S.Ct. 1057, 166 L.Ed.2d 940 (2007) ("This Court has long made clear that '[p]unitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition' " (quoting *BMW of North America, Inc., v. Gore,* 517 U.S. 558, 568, 116 S.Ct. 1589)); *State Farm,* 538 U.S., at 416, 123 S.Ct. 1513 ("[P]unitive damages ... are aimed at deterrence and retribution"); *Cooper Industries,* 532 U.S., at 432, 121 S.Ct. 1678 ("[C]ompensatory damages and punitive damages ... serve distinct purposes. The former are intended to redress the concrete loss that the plaintiff has suffered .... The latter ... operate as 'private fines' intended to punish the defendant and to deter future wrongdoing").

**\*\*2634  \*514** The provision of the CWA respecting daily fines confirms our judgment that anything greater would be excessive here and in cases of this type. Congress set criminal penalties of up to $25,000 per day for negligent violations of pollution restrictions, and up to $50,000 per day for knowing ones. 33 U.S.C. §§ 1319(c)(1), (2). Discretion to double the penalty for knowing action compares to discretion to double the civil liability on conduct going beyond negligence and meriting punitive treatment. And our explanation of the constitutional upper limit confirms that the 1:1 ratio is not too low. In *State Farm,* we said that a single-digit maximum is appropriate **\*515** in all but the most exceptional of cases, and "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." 538 U.S., at 425, 123 S.Ct. 1513. [28]

[28]    The criterion of "substantial" takes into account the role of punitive damages to induce legal action when pure compensation may not be enough to encourage suit, a concern addressed by the opportunity for a class action when large numbers of potential plaintiffs are involved: in such cases, individual awards are not the touchstone, for it is the class option that facilitates suit, and a class

recovery of $500 million is substantial. In this case, then, the constitutional outer limit may well be 1:1.

### V

[28]    Applying this standard to the present case, we take for granted the District Court's calculation of the total relevant compensatory damages at $507.5 million. See *In re Exxon Valdez,* 236 F.Supp.2d 1043, 1063 (D.Alaska 2002). A punitive-to-compensatory ratio of 1:1 thus yields maximum punitive damages in that amount.

We therefore vacate the judgment and remand the case for the Court of Appeals to remit the punitive-damages award accordingly.

*It is so ordered.*

Justice ALITO took no part in the consideration or decision of this case.

Justice SCALIA, with whom Justice THOMAS joins, concurring.

I join the opinion of the Court, including the portions that refer to constitutional limits that prior opinions have imposed upon punitive damages. While I agree with the argumentation based upon those prior holdings, I continue to believe the holdings were in error. See *State Farm Mut. Automobile Ins. Co. v. Campbell,* 538 U.S. 408, 429, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (SCALIA, J., dissenting).

**\*516** Justice STEVENS, concurring in part and dissenting in part.

While I join Parts I, II, and III of the Court's opinion, I believe that Congress, rather than this Court, should make the empirical judgments expressed in Part IV. While maritime law " 'is judge-made law to a great extent,' " *ante,* at 2619 (quoting *Edmonds v. Compagnie Generale Transatlantique,* **\*\*2635** 443 U.S. 256, 259, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979)), it is also statutory law to a great extent; indeed, "[m]aritime tort law is now dominated by federal statute." *Miles v. Apex Marine Corp.,* 498 U.S. 19, 36, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990). For that reason, when we are faced with a choice between performing the traditional task of appellate judges reviewing the acceptability of an award of punitive damages, on the one hand, and embarking on a new lawmaking venture, on the other, we "should

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 106 of 304

Exxon Shipping Co. v. Baker, 554 U.S. 471 (2008)

128 S.Ct. 2605, 66 ERC 1545, 2008 A.M.C. 1521, 171 L.Ed.2d 570, 76 USLW 4603...

carefully consider whether [we], or a legislative body, are better equipped to perform the task at hand." *Boyle v. United Technologies Corp.,* 487 U.S. 500, 531, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988) (STEVENS, J., dissenting).

Evidence that Congress has affirmatively chosen *not* to restrict the availability of a particular remedy favors adherence to a policy of judicial restraint in the absence of some special justification. The Court not only fails to offer any such justification, but also ignores the particular features of maritime law that may counsel against imposing the sort of limitation the Court announces today. Applying the traditional abuse-of-discretion standard that is well grounded in the common law, I would affirm the judgment of the Court of Appeals.

**I**

As we explained in *Miles v. Apex Marine Corp.,* 498 U.S., at 27, 111 S.Ct. 317, "an admiralty court must be vigilant not to overstep the well-considered boundaries imposed by federal legislation." In light of the many statutes governing liability under admiralty law, the absence of any limitation on an award of the sort at issue in this case suggests that Congress **\*517** would *not* wish us to create a new rule restricting the liability of a wrongdoer like Exxon.

For example, the Limitation of Shipowners' Liability Act (Limitation Act), 46 U.S.C.App. § 183 [1], a statute that has been part of the fabric of our law since 1851, provides in relevant part:

[1]   The Limitation Act is now codified as amended at 46 U.S.C. § 30505. See Pub.L. 109–304, § 3, 120 Stat. 1513.

"The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put onboard of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, *without the privity or knowledge of such owner or owners,* shall not, except in the cases provided for in subsection (b) of this section, exceed the amount or value of the interest of such owner in such vessel, and her freight then pending." § 183(a) (emphasis added).

This statute operates to shield from liability shipowners charged with wrongdoing committed without their privity or knowledge; the Limitation Act's protections thus render large punitive damages awards functionally unavailable in a wide swath of admiralty cases. [2] Exxon evidently **\*\*2636** did not **\*518** invoke the protection of the Limitation Act because it recognized the futility of attempting to establish that it lacked "privity or knowledge" of Captain Hazelwood's drinking. [3] Although the existence of the Limitation Act does not resolve this case, the fact that Congress chose to provide such generous protection against liability without including a party like Exxon within that protection counsels against extending a similar benefit here.

[2]   See *Lewis v. Lewis & Clark Marine, Inc.,* 531 U.S. 438, 446, 121 S.Ct. 993, 148 L.Ed.2d 931 (2001) ("Admiralty and maritime law includes a host of special rights, duties, rules, and procedures .... Among these provisions is the Limitation Act .... The Act allows a vessel owner to limit liability for damage or injury, occasioned without the owner's privity or knowledge, to the value of the vessel or the owner's interest in the vessel"); *Coryell v. Phipps,* 317 U.S. 406, 412, 63 S.Ct. 291, 87 L.Ed. 363 (1943) ("One who selects competent men to store and inspect a vessel and who is not on notice as to the existence of any defect cannot be denied the benefit of the limitation as respects a loss incurred by an explosion during the period of storage, unless 'privity' or 'knowledge' are to become empty words").

[3]   Testimony at an early phase of this protracted litigation confirmed as much. In a hearing before the District Court, one of Exxon's attorneys explained that his firm advised Exxon in 1989 that Exxon would " 'never be able to sustain its burden to show lack of privity or knowledge with the use of alcohol by Captain Hazelwood.' " App. to Brief in Opposition 43a.

The Limitation Act is only one of several statutes that point to this conclusion. In the Trans–Alaska Pipeline Authorization Act (TAPAA), 87 Stat. 584, 43 U.S.C. § 1651 *et seq.,* Congress altered the liability regime governing certain types of Alaskan oil spills, imposing strict liability but also capping recovery; notably, it did *not* restrict the availability of punitive damages. [4] (Exxon unsuccessfully argued that the TAPAA precluded punitive damages at an earlier stage of this litigation, see App. 101–107.) And the Court today rightly decides that in passing the Clean Water Act, Congress **\*519** did not displace or in any way diminish the availability of common-law punitive damages remedies. *Ante,* at 2618 – 2619.

Exxon Shipping Co. v. Baker, 554 U.S. 471 (2008)

128 S.Ct. 2605, 66 ERC 1545, 2008 A.M.C. 1521, 171 L.Ed.2d 570, 76 USLW 4603...

4

Although the issue has not been resolved by this Court, there is evidence that in passing TAPAA, Congress meant to prevent application of the Limitation Act to the trans-Alaskan transportation of oil. The House Conference Report includes the following passage:

"Under the Limitation of Liability Act of 1851 (46 U.S.C. 183), the owner of a vessel is entitled to limit his liability for property damage caused by the vessel ... The Conferees concluded that existing maritime law would not provide adequate compensation to all victims ... in the event of the kind of catastrophe which might occur. Consequently, the Conferees established a rule of strict liability for damages from discharges of the oil transported through the trans-Alaska Pipeline up to $100,000,000." H.R. Conf. Rep. No. 93–624, p. 28 (1973), U.S.Code Cong. & Admin.News 1973, p. 2523, 2530.

See also *In re Glacier Bay,* 944 F.2d 577, 583 (C.A.9 1991) ("[W]e hold that TAPAA implicitly repealed the Limitation Act with regard to the transportation of trans-Alaska oil").

The congressional choice not to limit the availability of punitive damages under maritime law should not be viewed as an invitation to make policy judgments on the basis of evidence in the public domain that Congress is better able to evaluate than is this Court.

## II

The Court's analysis of the empirical data it has assembled is problematic for several reasons. First, I believe that the Court fails to recognize a unique feature of maritime law that may counsel against uncritical reliance on data from land-based tort cases: General maritime law limits the availability of compensatory damages. Some maritime courts bar recovery for negligent infliction of purely emotional distress, see 1 T. Schoenbaum, Admiralty and Maritime Law § 5–15 (4th ed.2004), 5 and, on the view of many courts, maritime law **2637 precludes recovery for purely "economic losses ... absent direct physical damage to property or a proprietary interest," 2 *id.,* § 14–7, at 124. 6 Under maritime law, then, more than in the land-tort context, punitive damages may *520 serve to compensate for certain sorts of intangible injuries not recoverable under the rubric of compensation.

5

Schoenbaum explains that "[n]either the general maritime law nor the Jones Act recognizes a right to recover damages for negligent infliction of emotional distress unaccompanied by physical injury." § 5–15, p. 239. See also *Gough v. Natural Gas Pipeline Co. of Am.,* 996 F.2d 763, 765 (C.A.5 1993) (purely emotional injuries are compensable under maritime law when maritime plaintiffs "satisfy the 'physical injury or impact rule' ").

6

The latter limitation has its roots in the "dry dock doctrine" of *Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927) (opinion for the Court by Holmes, J.). See *Barber Lines A/S v. M/V Donau Maru,* 764 F.2d 50 (C.A.1 1985) (opinion for the Court by Breyer, J.) (tracing the history and purposes of the doctrine, and resolving to adhere to its rule); see also *Louisiana ex rel. Guste v. M/V Testbank,* 752 F.2d 1019, 1020 (C.A.5 1985) (en banc) (affirming rule denying recovery for economic loss absent "physical damage to a proprietary interest ... in cases of unintentional maritime tort").

We observed in *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 437–438, n. 11, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001):

"Until well into the 19th century, punitive damages frequently operated to compensate for intangible injuries, compensation which was not otherwise available under the narrow conception of compensatory damages prevalent at the time .... As the types of compensatory damages available to plaintiffs have broadened, see, *e.g.,* 1 J. Nates, C. Kimball, D. Axelrod, & R. Goldstein, Damages in Tort Actions § 3.01[3][a](2000) (pain and suffering are generally available as species of compensatory damages), the theory behind punitive damages has shifted toward a more purely punitive ... understanding."

Although these sorts of intangible injuries are now largely a species of ordinary compensatory damages under general tort law, it appears that maritime law continues to treat such injuries as less than fully compensable, or not compensable at all. Accordingly, there may be less reason to limit punitive damages in this sphere than there would be in any other.

128 S.Ct. 2605, 66 ERC 1545, 2008 A.M.C. 1521, 171 L.Ed.2d 570, 76 USLW 4603...

Second, both caps and ratios of the sort the Court relies upon in its discussion are typically imposed by legislatures, not courts. Although the Court offers a great deal of evidence that States have acted in various ways to limit punitive damages, it is telling that the Court fails to identify a single state *court* that has imposed a precise ratio, as the Court does today, under its common-law authority. State legislatures have done so, of course; and indeed Congress would encounter no obstacle to doing the same as a matter of federal law. But Congress is far better situated than is this Court to assess the empirical data, and to balance competing policy interests, before making such a choice. [7]

[7]    See *Turner Broadcasting System, Inc. v. FCC,* 512 U.S. 622, 665–666, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (plurality opinion) ("As an institution ... Congress is far better equipped than the judiciary to amass and evaluate the vast amounts of data bearing upon an issue as complex and dynamic as that presented here" (internal quotation marks omitted)); *Patsy v. Board of Regents of Fla.,* 457 U.S. 496, 513, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982) (when "relevant policy considerations do not invariably point in one direction, and there is vehement disagreement over the validity of the assumptions underlying many of them[, t]he very difficulty of these policy considerations, and Congress' superior institutional competence to pursue this debate, suggest that legislative not judicial solutions are preferable").

The Court points to *United States v. Reliable Transfer Co.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), a case in which the Court adopted a rule of proportional liability in maritime tort cases, as an illustrative example of the Court's power to craft "flexible and fair remedies in the law maritime." *Id.,* at 409, 95 S.Ct. 1708. In that case, however, the Court noted that not only was the new proportional liability rule not barred by any "statutory or judicial precept," but also that its adoption would "simply bring recovery for property damage in maritime collision cases into line with the rule of admiralty law long since established by Congress for personal injury cases." *Ibid.* By contrast, the Court in this case has failed to demonstrate that adoption of the rule it announces brings the maritime law into line with expressions of congressional intent in this (or any other) context.

**\*\*2638   \*521** The Court concedes that although "American punitive damages have been the target of audible criticism in recent decades," "most recent studies tend to undercut much of [that criticism]." *Ante,* at 2624. It further acknowledges that "[a] survey of the literature reveals that discretion to award punitive damages has not mass-produced runaway awards." *Ibid.* The Court concludes that the real problem is large *outlier* awards, and the data seem to bear this out. But the Court never explains why abuse-of-discretion review is not the precise antidote to the unfairness inherent in such excessive awards.

Until Congress orders us to impose a rigid formula to govern the award of punitive damages in maritime cases, I would employ our familiar abuse-of-discretion standard: "If no constitutional issue is raised, the role of the appellate court, at least in the federal system, is merely to review the trial court's 'determination under an abuse-of-discretion standard,' " *Cooper Industries, Inc.,* 532 U.S., at 433, 121 S.Ct. 1678; see also *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 15, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) **\*522**   ( "Under the traditional common-law approach, the amount of the punitive award is initially determined by a jury instructed to consider the gravity of the wrong and the need to deter similar wrongful conduct. The jury's determination is then reviewed by trial and appellate courts to ensure that it is reasonable").

On an abuse-of-discretion standard, I am persuaded that a reviewing court should not invalidate this award. [8] In light of Exxon's decision to permit a lapsed alcoholic to command a supertanker carrying tens of millions of gallons of crude oil through the treacherous waters of Prince William Sound, thereby endangering all of the individuals who depended upon the sound for their livelihoods, the jury could reasonably have given expression to its "moral condemnation" of Exxon's conduct in the form of this award. *Cooper Industries, Inc.,* 532 U.S., at 432, 121 S.Ct. 1678.

[8]    The idiosyncratic posture of this case makes true abuse-of-discretion appellate review something of a counterfactual, since the $5 billion award returned by the jury was, after several intervening steps, ultimately remitted to $2.5 billion by the Ninth Circuit in order to conform with this Court's due process cases. 472 F.3d 600 (2006) *(per curiam).* Suffice it to say, for now, that although the constitutional limits and the abuse-of-discretion standard are not identical, in this case the $2.5 billion the Ninth Circuit believed survived *de novo* constitutional scrutiny would, in my judgment, also satisfy abuse-of-discretion review.

I would adhere to the principle that " 'it better becomes the humane and liberal character of proceedings in admiralty to give than to withhold the remedy, when not required to withhold it by established and inflexible rules.' " *Moragne v.*

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 109 of 304

Exxon Shipping Co. v. Baker, 554 U.S. 471 (2008)

128 S.Ct. 2605, 66 ERC 1545, 2008 A.M.C. 1521, 171 L.Ed.2d 570, 76 USLW 4603...

*States Marine Lines, Inc.,* 398 U.S. 375, 387, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970) (quoting Chief Justice Chase in *The Sea Gull,* 21 F. Cas. 909, 910 (CC Md. 1865)).

\* \* \*

While I do not question that the Court possesses the power to craft the rule it announces today, in my judgment **\*523** it errs in doing so. Accordingly, I respectfully dissent from Parts IV and V of the Court's opinion, and from its judgment.

**\*\*2639** Justice GINSBURG, concurring in part and dissenting in part.

I join Parts I, II, and III of the Court's opinion, and dissent from Parts IV and V.

This case is unlike the Court's recent forays into the domain of state tort law under the banner of substantive due process. See *State Farm Mut. Automobile Ins. Co. v. Campbell,* 538 U.S. 408, 418–428, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (reining in state-court awards of punitive damages); *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 574–585, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) (same). The controversy here presented "arises under federal maritime jurisdiction," *ante,* at 2626 (opinion of the Court), and, beyond question, "the Court possesses the power to craft the rule it announces today," *ante,* at 2638 (STEVENS, J., concurring in part and dissenting in part). The issue, therefore, is whether the Court, though competent to act, should nevertheless leave the matter to Congress. The Court has explained, in its well stated and comprehensive opinion, why it has taken the lead. While recognizing that the question is close, I share Justice STEVENS' view that Congress is the better equipped decisionmaker.

First, I question whether there is an urgent need in maritime law to break away from the "traditional common-law approach" under which punitive damages are determined by a properly instructed jury, followed by trial-court, and then appellate-court review, to ensure that [the award] is reasonable." *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 15, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). The Court acknowledges that the traditional approach "has not mass-produced runaway awards," *ante,* at 2624, or endangered settlement negotiations, *ante,* at 2624 – 2625, n. 15. Nor has the Court asserted that outlier awards, insufficiently checked by abuse-of-discretion review, occur more **\*524** often or

are more problematic in maritime cases than in other areas governed by federal law.

Second, assuming a problem in need of solution, the Court's lawmaking prompts many questions. The 1:1 ratio is good for this case, the Court believes, because Exxon's conduct ranked on the low end of the blameworthiness scale: Exxon was not seeking "to augment profit," nor did it act "with a purpose to injure," *ante,* at 2622. What ratio will the Court set for defendants who acted maliciously or in pursuit of financial gain? See *ante,* at 2631 – 2632. Should the magnitude of the risk increase the ratio and, if so, by how much? Horrendous as the spill from the *Valdez* was, millions of gallons more might have spilled as a result of Captain Hazelwood's attempt to rock the boat off the reef. See *ante,* at 2613 (opinion of the Court); cf. *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 460–462, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) (plurality opinion) (using potential loss to plaintiff as a guide in determining whether jury verdict was excessive). In the end, is the Court holding only that 1:1 is the maritime-law ceiling, or is it also signaling that any ratio higher than 1:1 will be held to exceed "the constitutional outer limit"? See *ante,* at 2634, n. 28. On next opportunity, will the Court rule, definitively, that 1:1 is the ceiling due process requires in all of the States, and for all federal claims?

Heightening my reservations about the 1:1 solution is Justice STEVENS' comment on the venturesome character of the Court's decision. In the States, he observes, fixed ratios and caps have been adopted by legislatures; this Court has not identified "[any] state *court* that has imposed a precise ratio" in lieu of looking to the legislature as the appropriate source of a numerical damage limitation. *Ante,* at 2637.

**\*\*2640** \* \* \*

For the reasons stated, I agree with Justice STEVENS that the new law made by the Court should have been left **\*525** to Congress. I would therefore affirm the judgment of the Court of Appeals.

Justice BREYER, concurring in part and dissenting in part.

I join Parts I, II, and III of the Court's opinion. But I disagree with its conclusion in Parts IV and V that the punitive damages award in this case must be reduced.

Case 09-10138-MFW   Doc 15740   Filed 06/12/15   Page 110 of 304

**Exxon Shipping Co. v. Baker, 554 U.S. 471 (2008)**

128 S.Ct. 2605, 66 ERC 1545, 2008 A.M.C. 1521, 171 L.Ed.2d 570, 76 USLW 4603...

Like the Court, I believe there is a need, grounded in the rule of law itself, to ensure that punitive damages are awarded according to meaningful standards that will provide notice of how harshly certain acts will be punished and that will help to ensure the uniform treatment of similarly situated persons. See *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 587, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) (BREYER, J., concurring). Legal standards, however, can secure these objectives without the rigidity that an absolute fixed numerical ratio demands. In setting forth constitutional due process limits on the size of punitive damages awards, for example, we said that "*few* awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm Mut. Automobile Ins. Co. v. Campbell,* 538 U.S. 408, 425, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (emphasis added). We thus foresaw exceptions to the numerical constraint.

In my view, a limited exception to the Court's 1:1 ratio is warranted here. As the facts set forth in Part I of the Court's opinion make clear, this was no mine-run case of reckless behavior. The jury could reasonably have believed that Exxon knowingly allowed a relapsed alcoholic repeatedly to pilot a vessel filled with millions of gallons of oil through waters that provided the livelihood for the many plaintiffs in this case. Given that conduct, it was only a matter of time before a crash and spill like this occurred. And as Justice GINSBURG points out, the damage easily could have been much worse. See *ante,* at 2639.

**\*526**  The jury thought that the facts here justified punitive damages of $5 billion. See *ante,* at 2614 (opinion of the Court). The District Court agreed. It "engaged in an exacting review" of that award "not once or twice, but three times, with a more penetrating inquiry each time," the case having

twice been remanded for reconsideration in light of Supreme Court due process cases that the District Court had not previously had a chance to consider. 296 F.Supp.2d 1071, 1110 (D.Alaska 2004). And each time it concluded "that a $5 billion award was justified by the facts of this case," based in large part on the fact that "Exxon's conduct was highly reprehensible," and it reduced the award (slightly) only when the Court of Appeals specifically demanded that it do so. *Ibid.;* see also *id., at 1075.*

When the Court of Appeals finally took matters into its own hands, it concluded that the facts justified an award of $2.5 billion. See 472 F.3d 600, 625 (C.A.9 2006) *(per curiam)*. It specifically noted the "egregious" nature of Exxon's conduct. *Ibid.* And, apparently for that reason, it believed that the facts of the case "justifie[d] a considerably higher ratio" than the 1:1 ratio we had applied in our most recent due process case and that the Court adopts here. *Ibid.*

I can find no reasoned basis to disagree with the Court of Appeals' conclusion that this is a special case, justifying an exception from strict application of the majority's numerical rule. The punitive damages award before us already represents a 50% **\*\*2641** reduction from the amount that the District Court strongly believed was appropriate. I would uphold it.

**Parallel Citations**

128 S.Ct. 2605, 66 ERC 1545, 2008 A.M.C. 1521, 171 L.Ed.2d 570, 76 USLW 4603, 08 Cal. Daily Op. Serv. 7825, 2008 Daily Journal D.A.R. 9529, 21 Fla. L. Weekly Fed. S 459

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**TAB 10**

KeyCite Yellow Flag - Negative Treatment
**Declined to Extend by**    Howard v. U.S.,    6th Cir.(Ohio),    July 22, 2008

125 S.Ct. 2641
Supreme Court of the United States

Aurelio O. GONZALEZ, Petitioner,
v.
James V. CROSBY, Jr., Secretary,
Florida Department of Corrections.

No. 04-6432.    |    Argued April 25,
2005.    |    Decided June 23, 2005.

**Synopsis**
**Background:** Petitioner convicted in state court for robbery
with a firearm filed petition for federal writ of habeas corpus.
The United States District Court for the Southern District
of Florida dismissed petition as time-barred, and denied
a certificate of appealability (COA). The Eleventh Circuit
Court of Appeals also denied a COA. Petitioner moved for
relief from judgment. The United States District Court for
the Southern District of Florida denied motion. Petitioner
appealed. The Eleventh Circuit Court of Appeals initially
granted a COA. The Eleventh Circuit Court of Appeals,
Carnes, Circuit Judge, 317 F.3d 1308, quashed the COA as
improvidently granted. On rehearing en banc, the Eleventh
Circuit Court of Appeals, 366 F.3d 1253, vacated the order
quashing the COA, and affirmed the denial of the motion.

**Holdings:** Following grant of certiorari, the United States
Supreme Court, Justice Scalia held that:

[1] a motion for relief from judgment, seeking to advance one
or more substantive claims, qualified as "second or successive
habeas petition"

[2] motion for relief from judgment, challenging only District
Court's prior ruling that habeas petition was time-barred, was
not the equivalent of a "second or successive habeas petition";
and

[3] Supreme Court's decision in Artuz v. Bennett did not
constitute "extraordinary circumstances," as required for
petitioner to prevail in motion to vacate.

Affirmed.

Justice Breyer filed concurring opinion.

Justice Stevens filed dissenting opinion, in which Justice
Souter joined.

West Headnotes (9)

**[1]    Habeas Corpus**
      Relief from Judgment;  Revocation or
Modification
      Rule of federal civil procedure governing
motion for relief from judgment applies in
habeas proceedings, only to the extent that
it is not inconsistent with applicable federal
statutes and rules. 28 U.S.C.A. § 2254Fed.Rules
Civ.Proc.Rule 60(b), 28 U.S.C.A.

      101 Cases that cite this headnote

**[2]    Habeas Corpus**
      Refusal to Discharge;  Subsequent
Applications;  Prejudice
      As a textual matter, the provision of the
Antiterrorism and Effective Death Penalty
Act (AEDPA) governing second or successive
habeas petitions applies only where the court acts
pursuant to a prisoner's application for a writ of
habeas corpus. 28 U.S.C.A. § 2244(b).

      57 Cases that cite this headnote

**[3]    Habeas Corpus**
      Refusal to Discharge;  Subsequent
Applications;  Prejudice
      For purpose of Antiterrorism and Effective
Death Penalty Act (AEDPA) provision
governing filing of second or successive habeas
petitions, an "application for habeas relief" is
a filing that contains one or more claims. 28
U.S.C.A. § 2244(b).

      220 Cases that cite this headnote

**[4]    Habeas Corpus**

Gonzalez v. Crosby, 545 U.S. 524 (2005)

Case 09-10138-MEW    Doc 15740    Filed 06/12/15    Page 113 of 304

125 S.Ct. 2641, 162 L.Ed.2d 480, 73 USLW 4568, 05 Cal. Daily Op. Serv. 5453...

🔑 Claims Presented Earlier

**Habeas Corpus**
🔑 Claims Not Presented or Adjudicated Earlier

Under provision of Antiterrorism and Effective Death Penalty Act (AEDPA) governing second or successive habeas petitions, if the claim presented in the second or successive petition was also presented in the prior petition, the claim must be dismissed; if not, the analysis proceeds to whether the claim satisfies one of two narrow exceptions. 28 U.S.C.A. § 2244(b).

373 Cases that cite this headnote

---

[5]    **Habeas Corpus**
🔑 Claims Presented Earlier

Term "claim," as used in provision of Antiterrorism and Effective Death Penalty Act (AEDPA) requiring dismissal of a claim presented in a second or successive petition if the claim was also presented in the prior petition, is an asserted federal basis for relief from a state court's judgment of conviction. 28 U.S.C.A. § 2244(b).

112 Cases that cite this headnote

---

[6]    **Habeas Corpus**
🔑 Refusal to Discharge; Subsequent Applications; Prejudice

A motion for relief from judgment, which seeks to advance one or more substantive claims following denial of a habeas petition, such as a motion seeking leave to present a claim that was omitted from habeas petition due to mistake or excusable neglect, or seeking to present newly discovered evidence not presented in petition, or seeking relief due to a purported change in substantive law since the petition was denied, is properly classified as a "second or successive habeas petition," requiring authorization from Court of Appeals before filing, under of Antiterrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C.A. § 2244(b); Fed.Rules Civ.Proc.Rule 60(b), 28 U.S.C.A.

922 Cases that cite this headnote

---

[7]    **Habeas Corpus**
🔑 Refusal to Discharge; Subsequent Applications; Prejudice

If neither a motion for relief from judgment itself nor the federal judgment from which it seeks relief substantively addresses federal grounds for setting aside the movant's state conviction, the motion does not qualify as a second or successive habeas petition, under the Antiterrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C.A. § 2244(b); Fed.Rules Civ.Proc.Rule 60(b), 28 U.S.C.A.

862 Cases that cite this headnote

---

[8]    **Habeas Corpus**
🔑 Refusal to Discharge; Subsequent Applications; Prejudice

Petitioner's motion for relief from judgment, which challenged only the District Court's prior ruling that his habeas petition was time-barred under the Antiterrorism and Effective Death Penalty Act (AEDPA) limitations period, was not the equivalent of a "second or successive habeas petition," as would require authorization from Court of Appeals before filing; motion did not present a claim for relief from the petitioner's state conviction. 28 U.S.C.A. § 2244(b).

1543 Cases that cite this headnote

---

[9]    **Habeas Corpus**
🔑 Relief from Judgment; Revocation or Modification

Supreme Court's decision, subsequent to District Court's dismissal of habeas petition as time-barred, in *Artuz v. Bennett*, holding that an application for state postconviction relief was "properly filed" and would toll the one-year limitations period for filing a habeas petition, even if the state courts dismissed it as procedurally barred, did not constitute "extraordinary circumstances," as required for petitioner to prevail in motion for relief from District Court's dismissal of petition; although *Artuz* changed the law regarding tolling of the habeas limitations period, it was not extraordinary, petitioner did not raise

Case 09-10138-MEW    Doc 15740    Filed 06/12/15    Page 114 of 304

Gonzalez v. Crosby, 545 U.S. 524 (2005)

125 S.Ct. 2641, 162 L.Ed.2d 480, 73 USLW 4568, 05 Cal. Daily Op. Serv. 5453...

the available argument that state application was "properly filed" even if the state court dismissed it as procedurally barred, even though several other circuits had already adopted that view, and petitioner failed to raise the issue in his application for certificate of appealability (COA). 28 U.S.C.A. § 2244(d)(2); Fed.Rules Civ.Proc.Rule 60(b)(6), 28 U.S.C.A.

642 Cases that cite this headnote

**2643  *524 Syllabus *

\* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

Petitioner's federal habeas corpus petition was dismissed as time barred when the District Court concluded that the federal limitations period was not tolled while petitioner's motion for postconviction relief was pending in state court. After petitioner abandoned his attempt to seek review of the District Court's decision, this Court decided that a state postconviction relief petition can toll the federal statute of limitations even if, like petitioner's, the petition is ultimately dismissed as procedurally barred. *Artuz v. Bennett,* 531 U.S. 4, 121 S.Ct. 361, 148 L.Ed.2d 213. Petitioner filed a Federal Rule of Civil Procedure 60(b)(6) motion for relief from the judgment, which the District Court denied. The Eleventh Circuit affirmed the denial, holding that the Rule 60(b) motion was in substance a second or successive habeas petition, which under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2244(b), cannot be filed without precertification by the court of appeals.

*Held:*

1. Because petitioner's Rule 60(b) motion challenged only the District Court's previous ruling on AEDPA's statute of limitations, it is not the equivalent of a successive habeas petition and can be ruled upon by the District Court without precertification by the Eleventh Circuit. Pp. 2645-2650.

(a) Rule 60(b) applies in § 2254 habeas proceedings only "to the extent that [it is] not inconsistent with" applicable federal

statutes and rules. § 2254 Rule 11. Because § 2244(b) applies only where a court acts pursuant to a prisoner's "habeas corpus application," the question here is whether a Rule 60(b) motion is such an application. The text of § 2244(b) shows that, for these purposes, a habeas application is a filing containing one or more "claims." Other federal habeas statutes and this Court's decisions also make clear that a "claim" is an asserted federal basis for relief from a state-court conviction. If a Rule 60(b) motion contains one or more "claims," the motion is, if not in substance a "habeas corpus application," at least similar enough that failing to subject it to **2644 AEDPA's restrictions on successive habeas petitions would be "inconsistent with" the statute. A Rule 60(b) motion can be said to bring a "claim" if it seeks to add a new ground for relief from the state conviction or attacks the federal court's previous resolution of a claim *525 on the merits, though not if it merely attacks a defect in the federal habeas proceedings' integrity. Pp. 2645-2648.

(b) When no "claim" is presented, there is no basis for contending that a Rule 60(b) motion should be treated like a habeas petition. If neither the motion itself nor the federal judgment from which it seeks relief substantively addresses federal grounds for setting aside the movant's state conviction, allowing the motion to proceed on its own terms creates no inconsistency with the habeas statute or rules. Petitioner's motion, which alleges that the federal courts misapplied § 2244(d)'s statute of limitations, fits this description. Nothing in *Calderon v. Thompson,* 523 U.S. 538, 118 S.Ct. 1489, 140 L.Ed.2d 728, suggests that entertaining a filing confined to a *nonmerits* aspect of the first federal habeas proceeding is "inconsistent with" AEDPA. Pp. 2648-2650.

2. Under the proper Rule 60(b) standards, the District Court was correct to deny relief. The change in the law worked by *Artuz* is not an "extraordinary circumstance" justifying relief under Rule 60(b)(6), and it is made all the less extraordinary by the lack of diligence that petitioner showed in seeking direct appellate review of the statute-of-limitations issue. Pp. 2650-2651.

366 F.3d 1253, affirmed.

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, KENNEDY, THOMAS, GINSBURG, and BREYER, JJ., joined. BREYER, J., filed a concurring opinion, *post,* p. 2651. STEVENS, J., filed a dissenting opinion, in which SOUTER, J., joined, *post,* p. 2652.

125 S.Ct. 2641, 162 L.Ed.2d 480, 73 USLW 4568, 05 Cal. Daily Op. Serv. 5453...

**Attorneys and Law Firms**

Patricia A. Millett, for United States as amicus curiae, by special leave of the Court, supporting the respondent.

Kathleen M. Williams, Paul M. Rashkind, Richard C. Klugh, Miami, Florida, for Petitioner.

Charles J. Crist, Jr., Christopher M. Kise, Carolyn Snurkowski, Cassandra Dolgin, Tallahassee, Florida, for Respondent.

**Opinion**

Justice SCALIA delivered the opinion of the Court.

 *526  After the federal courts denied petitioner habeas corpus relief from his state conviction, he filed a motion for relief from that judgment, pursuant to Federal Rule of Civil Procedure 60(b). The question presented is whether, in a habeas case, such motions are subject to the additional restrictions that apply to "second or successive" habeas corpus petitions under the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), codified at 28 U.S.C. § 2244(b).

**I**

Petitioner Aurelio Gonzalez pleaded guilty in Florida Circuit Court to one count of robbery with a firearm. He filed no appeal and began serving his 99-year sentence in 1982. Some 12 years later, petitioner began to seek relief from his conviction. He filed two motions for state **2645 postconviction relief, which the Florida courts denied. Thereafter, in June 1997, petitioner filed a federal habeas petition in the United States District Court for the Southern District of Florida, *527 alleging that his guilty plea had not been entered knowingly and voluntarily.

Upon the State's motion, the District Court dismissed petitioner's habeas petition as barred by AEDPA's statute of limitations, 28 U.S.C. § 2244(d). Under Eleventh Circuit precedent, petitioner's filing deadline, absent tolling, was April 23, 1997, one year after AEDPA's statute of limitations took effect. Wilcox v. Florida Dept. of Corrections, 158 F.3d 1209, 1211 (C.A.11 1998) (per curiam). Adopting a Magistrate Judge's recommendation, the District Court concluded that the limitations period was not tolled during the 163-day period while petitioner's second motion for state postconviction relief was pending. Section 2244(d)(2) tolls the statute of limitations during the pendency of "properly filed" applications only, and the District Court thought petitioner's motion was not "properly filed" because it was both untimely and successive. Without tolling, petitioner's federal habeas petition was two months late, so the District Court dismissed it as time barred. A judge of the Eleventh Circuit denied a certificate of appealability (COA) on April 6, 2000, and petitioner did not file for rehearing or review of that decision.

On November 7, 2000, we held in Artuz v. Bennett, 531 U.S. 4, 121 S.Ct. 361, 148 L.Ed.2d 213, that an application for state postconviction relief can be "properly filed" even if the state courts dismiss it as procedurally barred. See id., at 8–9, 121 S.Ct. 361. Almost nine months later, petitioner filed in the District Court a pro se "Motion to Amend or Alter Judgment," contending that the District Court's time-bar ruling was incorrect under Artuz's construction of § 2244(d), and invoking Federal Rule of Civil Procedure 60(b)(6), which permits a court to relieve a party from the effect of a final judgment. [1] The District Court denied the motion, and petitioner appealed.

[1]    Although the title "Motion to Alter or Amend Judgment" suggests that petitioner was relying on Federal Rule of Civil Procedure 59(e), the substance of the motion made clear that petitioner sought relief under Rule 60(b)(6).

 *528  A judge of the Court of Appeals for the Eleventh Circuit granted petitioner a COA, but a panel quashed the certificate as improvidently granted. 317 F.3d 1308, 1310, 1314 (2003). The full court vacated that order and reheard the case en banc. It granted petitioner a COA but held, by a vote of 7 to 4, that the District Court was correct to deny his Rule 60(b) motion. The en banc majority determined that petitioner's motion-indeed, any postjudgment motion under Rule 60(b) save one alleging fraud on the court under Rule 60(b)(3)-was in substance a second or successive habeas corpus petition. 366 F.3d 1253, 1278, 1281-1282 (2004). A state prisoner may not file such a petition without precertification by the court of appeals that the petition meets certain stringent criteria. § 2244(b). Because petitioner's motion did not satisfy these requirements, the Eleventh Circuit affirmed its denial. Id., at 1282.

We granted certiorari. 543 U.S. 1086, 125 S.Ct. 961, 160 L.Ed.2d 896 (2005).

125 S.Ct. 2641, 162 L.Ed.2d 480, 73 USLW 4568, 05 Cal. Daily Op. Serv. 5453...

## II

Rule 60(b) allows a party to seek relief from a final judgment, and request reopening of his case, under a limited set of circumstances including fraud, mistake, and newly discovered **2646** evidence. [2] Rule 60(b)(6), the particular provision *529 under which petitioner brought his motion, permits reopening when the movant shows "any ... reason justifying relief from the operation of the judgment" other than the more specific circumstances set out in Rules 60(b)(1)-(5). See *Liljeberg v. Health Services Acquisition Corp.,* 486 U.S. 847, 863, n. 11, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988); *Klapprott v. United States,* 335 U.S. 601, 613, 69 S.Ct. 384, 93 L.Ed. 266 (1949) (opinion of Black, J.). The mere recitation of these provisions shows why we give little weight to respondent's appeal to the virtues of finality. That policy consideration, standing alone, is unpersuasive in the interpretation of a provision whose whole purpose is to make an exception to finality. The issue here is whether the text of Rule 60(b) itself, or of some other provision of law, limits its application in a manner relevant to the case before us.

2    Rule 60(b) provides in relevant part:

"On motion and upon such terms as are just, the court may relieve a party ... from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud ..., misrepresentation, or misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken."

[1]    AEDPA did not expressly circumscribe the operation of Rule 60(b). (By contrast, AEDPA directly amended other provisions of the Federal Rules. See, *e.g.,* AEDPA, § 103, 110 Stat. 1218 (amending Fed. Rule App. Proc. 22).) The new habeas restrictions introduced by AEDPA are made indirectly relevant, however, by the fact that Rule 60(b), like the rest of the Rules of Civil Procedure, applies in habeas corpus proceedings under 28 U.S.C. § 2254 [3] only "to the extent that [it is] not inconsistent with" applicable federal statutory provisions and rules. 28 U.S.C. § 2254 Rule 11; see Fed. Rule Civ. Proc. 81(a)(2). The relevant provisions of the AEDPA-amended habeas statutes, 28 U.S.C. §§ 2244(b)(1)-(3), impose three requirements on second or successive habeas petitions: First, any claim that has already **530** been adjudicated in a previous petition must be dismissed. § 2244(b)(1). Second, any claim that has *not* already been adjudicated must be dismissed unless it relies on either a new and retroactive rule of constitutional law or new facts showing a high probability of actual innocence. § 2244(b)(2). Third, before the district court may accept a successive petition for filing, the court of appeals must determine that it presents a claim not previously raised that is sufficient to meet § 2244(b)(2)'s new-rule or actual-innocence provisions. § 2244(b)(3). We proceed to consider whether these provisions limit the application of Rule 60(b) to the present case.

3    In this case we consider only the extent to which Rule 60(b) applies to habeas proceedings under 28 U.S.C. § 2254, which governs federal habeas relief for prisoners convicted in state court. Federal prisoners generally seek postconviction relief under § 2255, which contains its own provision governing second or successive applications. Although that portion of § 2255 is similar to, and refers to, the statutory subsection applicable to second or successive § 2254 petitions, it is not identical. Accordingly, we limit our consideration to § 2254 cases.

### A

[2]    "As a textual matter, § 2244(b) applies only where the court acts pursuant to **2647** a prisoner's 'application' " for a writ of habeas corpus. *Calderon v. Thompson,* 523 U.S. 538, 554, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998). We therefore must decide whether a Rule 60(b) motion filed by a habeas

Gonzalez v. Crosby, 545 U.S. 524 (2005)

Case 09-10138-MEW    Doc 15740    Filed 06/12/15    Page 117 of 304

125 S.Ct. 2641, 162 L.Ed.2d 480, 73 USLW 4568, 05 Cal. Daily Op. Serv. 5453...

petitioner is a "habeas corpus application" as the statute uses that term.

**[3]** **[4]** **[5]** Under § 2244(b), the first step of analysis is to determine whether a "claim presented in a second or successive habeas corpus application" was also "presented in a prior application." If so, the claim must be dismissed; if not, the analysis proceeds to whether the claim satisfies one of two narrow exceptions. In either event, it is clear that for purposes of § 2244(b) an "application" for habeas relief is a filing that contains one or more "claims." That definition is consistent with the use of the term "application" in the other habeas statutes in chapter 153 of title 28. See, *e.g., Woodford v. Garceau,* 538 U.S. 202, 207, 123 S.Ct. 1398, 155 L.Ed.2d 363 (2003) (for purposes of § 2254(d), an application for habeas corpus relief is a filing that seeks "an adjudication on the *merits* of the petitioner's claims"). These statutes, and our own decisions, make clear that a "claim" as used in § 2244(b) is an asserted federal basis for relief from a state court's judgment of conviction.

**[6]** In some instances, a Rule 60(b) motion will contain one or more "claims." For example, it might straightforwardly **\*531** assert that owing to "excusable neglect," Fed. Rule Civ. Proc. 60(b)(1), the movant's habeas petition had omitted a claim of constitutional error, and seek leave to present that claim. Cf. *Harris v. United States,* 367 F.3d 74, 80-81 (C.A.2 2004) (petitioner's Rule 60(b) motion sought relief from judgment because habeas counsel had failed to raise a Sixth Amendment claim). Similarly, a motion might seek leave to present "newly discovered evidence," Fed. Rule Civ. Proc. 60(b)(2), in support of a claim previously denied. *E.g., Rodwell v. Pepe,* 324 F.3d 66, 69 (C.A.1 2003). Or a motion might contend that a subsequent change in substantive law is a "reason justifying relief," Fed. Rule Civ. Proc. 60(b)(6), from the previous denial of a claim. *E.g., Dunlap v. Litscher,* 301 F.3d 873, 876 (C.A.7 2002). Virtually every Court of Appeals to consider the question has held that such a pleading, although labeled a Rule 60(b) motion, is in substance a successive habeas petition and should be treated accordingly. *E.g., Rodwell, supra,* at 71-72; *Dunlap, supra,* at 876.

We think those holdings are correct. A habeas petitioner's filing that seeks vindication of such a claim is, if not in substance a "habeas corpus application," at least similar enough that failing to subject it to the same requirements would be "inconsistent with" the statute. 28 U.S.C. § 2254 Rule 11. Using Rule 60(b) to present new claims for relief from a state court's judgment of conviction-even claims couched in the language of a true Rule 60(b) motion-circumvents AEDPA's requirement that a new claim be dismissed unless it relies on either a new rule of constitutional law or newly discovered facts. § 2244(b)(2). The same is true of a Rule 60(b)(2) motion presenting new evidence in support of a claim already litigated: Even assuming that reliance on a new factual predicate causes that motion to escape § 2244(b)(1)'s prohibition of claims "presented in a prior application," § 2244(b)(2)(B) requires a more convincing factual showing than does Rule 60(b). Likewise, a Rule 60(b) motion based on a purported change in the substantive law governing the claim could be used to circumvent § 2244(b)(2)(A)'s **\*532** dictate that the only new law on which a successive petition may rely is "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme **\*\*2648** Court, that was previously unavailable." In addition to the substantive conflict with AEDPA standards, in each of these three examples use of Rule 60(b) would impermissibly circumvent the requirement that a successive habeas petition be precertified by the court of appeals as falling within an exception to the successive-petition bar. § 2244(b)(3).

In most cases, determining whether a Rule 60(b) motion advances one or more "claims" will be relatively simple. A motion that seeks to add a new ground for relief, as in *Harris, supra,* will of course qualify. A motion can also be said to bring a "claim" if it attacks the federal court's previous resolution of a claim *on the merits*,[4] since alleging that the court erred in denying habeas relief on the merits is effectively indistinguishable from alleging that the movant is, under the substantive provisions of the statutes, entitled to habeas relief. That is not the case, however, when a Rule 60(b) motion attacks, not the substance of the federal court's resolution of a claim on the merits, but some defect in the integrity of the federal habeas proceedings.[5]

---

[4]    The term "on the merits" has multiple usages. See, *e.g., Semtek Int'l Inc. v. Lockheed Martin Corp.,* 531 U.S. 497, 501-503, 121 S.Ct. 1021, 149 L.Ed.2d 32 (2001). We refer here to a determination that there exist or do not exist grounds entitling a petitioner to habeas corpus relief under 28 U.S.C. §§ 2254(a) and (d). When a movant asserts one of those grounds (or asserts that a previous ruling regarding one of those grounds was in error) he is making a habeas corpus claim. He is not doing so when he merely asserts that a previous ruling which precluded a merits determination was in error-for example, a denial

Case 09-10138-MEW    Doc 15740    Filed 06/12/15    Page 118 of 304

Gonzalez v. Crosby, 545 U.S. 524 (2005)

125 S.Ct. 2641, 162 L.Ed.2d 480, 73 USLW 4568, 05 Cal. Daily Op. Serv. 5453...

for such reasons as failure to exhaust, procedural default, or statute-of-limitations bar.

5      Fraud on the federal habeas court is one example of such a defect. See generally *Rodriguez v. Mitchell,* 252 F.3d 191, 199 (C.A.2 2001) (a witness's allegedly fraudulent basis for refusing to appear at a federal habeas hearing "relate[d] to the integrity of the federal habeas proceeding, not to the integrity of the state criminal trial"). We note that an attack based on the movant's own conduct, or his habeas counsel's omissions, see, *e.g., supra,* at 2647, ordinarily does not go to the integrity of the proceedings, but in effect asks for a second chance to have the merits determined favorably.

## *533 B

[7]    [8]    When no "claim" is presented, there is no basis for contending that the Rule 60(b) motion should be treated like a habeas corpus application. If neither the motion itself nor the federal judgment from which it seeks relief substantively addresses federal grounds for setting aside the movant's state conviction, allowing the motion to proceed as denominated creates no inconsistency with the habeas statute or rules. Petitioner's motion in the present case, which alleges that the federal courts misapplied the federal statute of limitations set out in § 2244(d), fits this description. [6]

6      Petitioner notes that we held in *Slack v. McDaniel,* 529 U.S. 473, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000), that when a petition is dismissed without prejudice as unexhausted, the refiled petition is not "successive." He argues that, by parity of reasoning, his Rule 60(b) motion challenging the District Court dismissal of his petition on statute-of-limitations grounds is not "successive." If this argument is correct, petitioner would be able to file not just a Rule 60(b) motion, but a full-blown habeas petition, without running afoul of § 2244(b). But see, *e.g., Murray v. Greiner,* 394 F.3d 78, 81 (C.A.2 2005). We need not consider this contention, however, because we conclude that petitioner's Rule 60(b) motion is not subject to the limitations applicable to habeas petitions.

Like the Court of Appeals, respondent relies heavily on our decision in *Calderon v. Thompson,* 523 U.S. 538, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998). In that case we **2649 reversed the Ninth Circuit's decision to recall its mandate and reconsider the denial of Thompson's first federal habeas petition; the recall was, we held, an abuse of discretion because of its inconsistency with the policies embodied in AEDPA. *Id.,* at 554-559, 118 S.Ct. 1489. Analogizing an

appellate court's recall of its mandate to a district court's grant of relief from judgment, the Eleventh Circuit thought that *Calderon's* disposition applied to Rule 60(b). 366 F.3d, at 1272-1277. We think otherwise. To begin with, as the opinion said, compliance with the actual text of AEDPA's **534 successive-petition provision was not at issue in *Calderon*-because the Court of Appeals considered only the claims and evidence presented in Thompson's first federal habeas petition. 523 U.S., at 554, 118 S.Ct. 1489. *Calderon* did state, however, that "a prisoner's motion to recall the mandate *on the basis of the merits* of the underlying decision can be regarded as a second or successive application." *Id.,* at 553, 118 S.Ct. 1489 (emphasis added). But that is entirely consonant with the proposition that a Rule 60(b) motion that seeks to revisit the federal court's denial *on the merits* of a claim for relief should be treated as a successive habeas petition. The problem for respondent is that this case does not present a revisitation *of the merits.* The motion here, like some other Rule 60(b) motions in § 2254 cases, confines itself not only to the first federal habeas petition, but to a nonmerits aspect of the first federal habeas proceeding. Nothing in *Calderon* suggests that entertaining such a filing is "inconsistent with" AEDPA.

Rule 60(b) has an unquestionably valid role to play in habeas cases. The Rule is often used to relieve parties from the effect of a default judgment mistakenly entered against them, *e.g., Klapprott,* 335 U.S., at 615, 69 S.Ct. 384 (opinion of Black, J.), a function as legitimate in habeas cases as in run-of-the-mine civil cases. The Rule also preserves parties' opportunity to obtain vacatur of a judgment that is void for lack of subject-matter jurisdiction-a consideration just as valid in habeas cases as in any other, since absence of jurisdiction altogether deprives a federal court of the power to adjudicate the rights of the parties. *Steel Co. v. Citizens for Better Environment,* 523 U.S. 83, 94, 101, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). In some instances, we may note, it is the State, not the habeas petitioner, that seeks to use Rule 60(b), to reopen a habeas judgment *granting* the writ. See, *e.g., Ritter v. Smith,* 811 F.2d 1398, 1400 (C.A.11 1987).

Moreover, several characteristics of a Rule 60(b) motion limit the friction between the Rule and the successive-petition prohibitions of AEDPA, ensuring that our harmonization of the two will not expose federal courts to an avalanche *535 of frivolous postjudgment motions. First, Rule 60(b) contains its own limitations, such as the requirement that the motion "be made within a reasonable time" and the more specific 1-year deadline for asserting three of the most open-ended grounds of relief (excusable neglect, newly

Case 09-10138-MEW    Doc 15740    Filed 06/12/15    Page 119 of 304

Gonzalez v. Crosby, 545 U.S. 524 (2005)

125 S.Ct. 2641, 162 L.Ed.2d 480, 73 USLW 4568, 05 Cal. Daily Op. Serv. 5453...

discovered evidence, and fraud). Second, our cases have required a movant seeking relief under Rule 60(b)(6) to show "extraordinary circumstances" justifying the reopening of a final judgment. *Ackermann v. United States,* 340 U.S. 193, 199, 71 S.Ct. 209, 95 L.Ed. 207 (1950); accord, *id., at 202,* 71 S.Ct. 209; *Liljeberg,* 486 U.S., at 864, 108 S.Ct. 2194; *id., at 873,* 108 S.Ct. 2194 (REHNQUIST, C. J., dissenting) ("This very strict interpretation of Rule 60(b) is essential if the finality of judgments is to be preserved"). Such circumstances will rarely occur in the habeas context. Third, Rule 60(b) proceedings are subject to only limited and deferential appellate review. *Browder v. Director, Dept. of Corrections* **2650 *of Ill.,* 434 U.S. 257, 263, n. 7, 98 S.Ct. 556, 54 L.Ed.2d 521 (1978). Many Courts of Appeals have construed 28 U.S.C. § 2253 to impose an additional limitation on appellate review by requiring a habeas petitioner to obtain a COA as a prerequisite to appealing the denial of a Rule 60(b) motion. [7]

[7]    See *Reid v. Angelone,* 369 F.3d 363, 369, n. 2 (C.A.4 2004) (citing cases); 366 F.3d 1253, 1263 (C.A.11 2004) (case below); cf. *Langford v. Day,* 134 F.3d 1381, 1382 (C.A.9 1998) (before AEDPA, a certificate of probable cause was a prerequisite to appealing the denial of a Rule 60(b) motion in a habeas case); *Reid, supra, at 368* (same). But see *Dunn v. Cockrell,* 302 F.3d 491, 492 (C.A.5 2002); 366 F.3d, at 1298-1300 (Tjoflat, J., specially concurring in part and dissenting in part). Although we do not decide in this case whether this construction of § 2253 is correct (the Eleventh Circuit granted petitioner a COA), the COA requirement appears to be a more plausible and effective screening requirement, with sounder basis in the statute, than the near-absolute bar imposed here by the Court of Appeals.

Because petitioner's Rule 60(b) motion challenges only the District Court's previous ruling on the AEDPA statute of limitations, it is not the equivalent of a successive habeas *536 petition. The Eleventh Circuit therefore erred in holding that petitioner did not qualify even to seek Rule 60(b) relief.

### III

Although the Eleventh Circuit's reasoning is inconsistent with our holding today, we nonetheless affirm its denial of petitioner's Rule 60(b) motion.

[9]    Petitioner's only ground for reopening the judgment denying his first federal habeas petition is that our decision in *Artuz* showed the error of the District Court's statute-of-limitations ruling. We assume for present purposes that the District Court's ruling was incorrect. [8] As we noted above, however, relief under Rule 60(b)(6)-the only subsection petitioner invokes-requires a showing of "extraordinary circumstances." Petitioner contends that *Artuz's* change in the interpretation of the AEDPA statute of limitations meets this description. We do not agree. The District Court's interpretation was by all appearances correct under the Eleventh Circuit's then-prevailing interpretation of 28 U.S.C. § 2244(d)(2). It is hardly extraordinary that subsequently, after petitioner's case was no longer pending, this Court arrived at a different interpretation. Although our constructions of federal statutes customarily apply to all cases then pending on direct review, see, *e.g., Harper v. Virginia Dept. of Taxation,* 509 U.S. 86, 97, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993), not every interpretation of the federal statutes setting forth the requirements for habeas provides cause for reopening cases long since final. [9] If *Artuz* justified reopening long-ago dismissals *537 based on a lower court's unduly parsimonious interpretation of § 2244(d)(2), then *Pace v. DiGuglielmo,* 544 U.S. 408, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005), would justify reopening long-ago grants of habeas relief based on a lower court's unduly *generous* **2651 interpretation of the same tolling provision.

[8]    Although respondent contends that petitioner's motion for state postconviction relief was untimely, and that the District Court's denial of statutory tolling was therefore correct under *Pace v. DiGuglielmo,* 544 U.S. 408, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005), the Florida courts made no reference to untimeliness in dismissing petitioner's motion.

[9]    A change in the interpretation of a *substantive* statute may have consequences for cases that have already reached final judgment, particularly in the criminal context. See *Bousley v. United States,* 523 U.S. 614, 619-621, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998); cf. *Fiore v. White,* 531 U.S. 225, 228-229, 121 S.Ct. 712, 148 L.Ed.2d 629 (2001) *(per curiam).*

The change in the law worked by *Artuz* is all the less extraordinary in petitioner's case, because of his lack of diligence in pursuing review of the statute-of-limitations issue. At the time *Artuz* was decided, petitioner had abandoned any attempt to seek review of the District Court's decision on this statute-of-limitations issue. Although the

125 S.Ct. 2641, 162 L.Ed.2d 480, 73 USLW 4568, 05 Cal. Daily Op. Serv. 5453...

District Court relied on Eleventh Circuit precedent holding that a state postconviction application is not "properly filed" if it is procedurally defaulted, and although that precedent was at odds with the rule in several other Circuits, petitioner neither raised that issue in his application for a COA, nor filed a petition for rehearing of the Eleventh Circuit's denial of a COA, nor sought certiorari review of that denial. [10] This lack of diligence confirms that *Artuz* is not an extraordinary circumstance justifying relief from the judgment in petitioner's case. Indeed, in one of the cases in which we explained Rule 60(b)(6)'s extraordinary-circumstances requirement, the movant had failed to appeal an adverse ruling by the District Court, whereas another party to the same judgment **\*538** appealed and won reversal. *Ackermann,* 340 U.S., at 195, 71 S.Ct. 209. Some years later, the petitioner sought Rule 60(b) relief, which the District Court denied. We affirmed the denial of Rule 60(b) relief, noting that the movant's decision not to appeal had been free and voluntary, although the favorable ruling in the companion case made it appear mistaken in hindsight. See *id., at* 198, 71 S.Ct. 209.

[10]   We granted review to resolve the conflict over the interpretation of "properly filed" on April 17, 2000, only eight days after the Eleventh Circuit denied petitioner a COA and well within the 90-day period in which petitioner could have sought certiorari. *Artuz v. Bennett,* 529 U.S. 1065, 120 S.Ct. 1669, 146 L.Ed.2d 479. Whether or not petitioner was aware that the issue was pending before us, see *post,* at 2655, n. 7 (STEVENS, J., dissenting), it is indisputable that had he but filed a petition raising the statute-of-limitations argument he now advances, we would surely have granted him the reconsideration in light of *Artuz v. Bennett,* 531 U.S. 4, 121 S.Ct. 361, 148 L.Ed.2d 213 (2000), that he later sought in his Rule 60(b) motion. See, *e.g., Brown v. Moore,* 532 U.S. 968, 121 S.Ct. 1598, 149 L.Ed.2d 464 (2001) (granting a *pro se* petition for certiorari, vacating the Eleventh Circuit's judgment denying a COA, and remanding for reconsideration in light of *Artuz,* 531 U.S. 4, 121 S.Ct. 361).

Under the Rule 60(b) standards that properly govern petitioner's motion, the District Court was correct to deny relief.

\* \* \*

We hold that a Rule 60(b)(6) motion in a § 2254 case is not to be treated as a successive habeas petition if it does

not assert, or reassert, claims of error in the movant's state conviction. A motion that, like petitioner's, challenges only the District Court's failure to reach the merits does not warrant such treatment, and can therefore be ruled upon by the District Court without precertification by the Court of Appeals pursuant to § 2244(b)(3). In this case, however, petitioner's Rule 60(b)(6) motion fails to set forth an "extraordinary circumstance" justifying relief. For that reason, we affirm the judgment of the Court of Appeals.

*It is so ordered.*

Justice BREYER, concurring.

The majority explains that a proper Federal Rule of Civil Procedure 60(b) motion "attacks, not the substance of the federal court's resolution of a claim on the merits, but some defect in the integrity of the federal habeas proceedings." *Ante,* at 2648. This is consistent with Judge Tjoflat's description of the standard in his opinion below, see **\*\*2652** 366 F.3d 1253, 1297 (C.A.11 2004) (specially concurring in part and dissenting in part), and I agree with it. I fear that other language in the majority's opinion, especially its discussion of the significance of the word "claim," could be taken to imply a different **\*539** standard, with which I would disagree. With that qualification, I join the majority's opinion.

Justice STEVENS, with whom Justice SOUTER joins, dissenting.

The most significant aspect of today's decision is the Court's unanimous rejection of the view that all postjudgment motions under Federal Rule of Civil Procedure 60(b) except those alleging fraud under Rule 60(b)(3) should be treated as second or successive habeas corpus petitions. Not only do I agree with that holding, I believe that we should have more promptly made clear that the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) and Rule 60(b) can coexist in harmony. See *Abdur'Rahman v. Bell,* 537 U.S. 88, 90, 123 S.Ct. 594, 154 L.Ed.2d 501 (2002) (STEVENS, J., dissenting from dismissal of certiorari as improvidently granted).

As the Court recognizes, whether a Rule 60(b) motion may proceed in the habeas context depends on the nature of the relief the motion seeks. See *ante,* at 2648. [1] Given the substance of petitioner's motion, I agree with the Court that this was a "true" Rule 60(b) motion and that the District Court and the Court of Appeals therefore erred in treating it as a successive habeas petition. And while I also agree with

Gonzalez v. Crosby, 545 U.S. 524 (2005)
Case 09-10138-MEW    Doc 15740    Filed 06/12/15    Page 121 of 304

125 S.Ct. 2641, 162 L.Ed.2d 480, 73 USLW 4568, 05 Cal. Daily Op. Serv. 5453...

much of the Court's reasoning in Parts I and II of its opinion, I believe the Court goes too far in commenting on **540** issues that are not directly before us and that have not been fully briefed. See, *e.g., ante,* at 2647-2648 (discussing various Court of Appeals cases). My main disagreement, however, pertains to Part III of the Court's opinion.

[1]    Under the First Circuit's useful formulation, which was invoked by Judge Tjoflat's dissenting opinion below, "[w]hen the motion's factual predicate deals primarily with the constitutionality of the underlying state conviction or sentence, then the motion should be treated as a second or successive habeas petition. This situation should be distinguished from one in which the motion's factual predicate deals primarily with some irregularity or procedural defect in the procurement of the judgment denying relief. That is the classic function of a *Rule 60(b)* motion, and such a motion should be treated within the usual confines of *Rule 60(b).*" *Rodwell v. Pepe,* 324 F.3d 66, 70 (2003) (citation omitted); see also *366 F.3d 1253, 1297 (C.A.11 2004)* (Tjoflat, J., specially concurring in part and dissenting in part).

The Court reaches beyond the question on which we granted certiorari (whether petitioner's *Rule 60(b)* motion should be treated as a successive habeas petition) and adjudicates the merits of that motion. In my judgment, however, "correct procedure requires that the merits of the *Rule 60(b)* motion be addressed in the first instance by the District Court." *Abdur'Rahman,* 537 U.S., at 97, 123 S.Ct. 594 (STEVENS, J., dissenting). A district court considering a *Rule 60(b)* motion will often take into account a variety of factors in addition to the specific ground given for reopening the judgment. These factors include the diligence of the movant, the probable merit of the movant's underlying claims, the opposing party's reliance interests in the finality of the judgment, and other equitable considerations. See *11 C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2857 (2d ed.1995 and Supp.2004);* see *ibid.* (noting that appellate courts will reverse a district court's decision only for an abuse of discretion); *Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211, 233-234, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995) (*Rule 60(b)* "reflects and confirms **2653** the courts' own inherent and discretionary power, 'firmly established in English practice long before the foundation of our Republic,' to set aside a judgment whose enforcement would work inequity"). In light of the equitable, often fact-intensive nature of the *Rule 60(b)* inquiry, it is inappropriate for an appellate court to undertake it in the first instance. This is especially so in this case, in which both the briefing and the record before us are insufficient with regard to the merits issue.

Orderly procedure aside, the Court's truncated analysis is unsatisfactory. At least in some circumstances, a supervening change in AEDPA procedural law can be the kind of "extraordinary circumstanc[e]," *Ackermann v. United States,* **541** 340 U.S. 193, 199, 71 S.Ct. 209, 95 L.Ed. 207 (1950), that constitutes a "reason justifying relief from the operation of the judgment" within the meaning of *Rule 60(b)(6).* In this case, the District Court dismissed petitioner's habeas petition as time barred after concluding that his second motion for state postconviction relief did not toll AEDPA's statute of limitations. See *28 U.S.C. § 2244(d).* After that judgment became final, however, we decided *Artuz v. Bennett,* 531 U.S. 4, 121 S.Ct. 361, 148 L.Ed.2d 213 (2000), which made clear that the District Court's ruling on tolling was erroneous and that the habeas petition should therefore not have been dismissed. [2]

[2]    Although the State contests this point in a footnote, see Brief for Respondent 40-41, n. 33, the Court rightly assumes that the District Court's decision was incorrect. See *ante,* at 2650, and n. 8. If any doubt remains, it should be resolved by the District Court in the first instance.

Unfortunately, the Court underestimates the significance of the fact that petitioner was effectively shut out of federal court-without any adjudication of the merits of his claims-because of a procedural ruling that was later shown to be flatly mistaken. As we have stressed, "[d]ismissal of a *first* federal habeas petition is a particularly serious matter, for that dismissal denies the petitioner the protections of the Great Writ entirely, risking injury to an important interest in human liberty." *Lonchar v. Thomas,* 517 U.S. 314, 324, 116 S.Ct. 1293, 134 L.Ed.2d 440 (1996); see also *Slack v. McDaniel,* 529 U.S. 473, 483, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000) ("The writ of habeas corpus plays a vital role in protecting constitutional rights"). When a habeas petition has been dismissed on a clearly defective procedural ground, the State can hardly claim a legitimate interest in the finality of that judgment. Indeed, the State has experienced a windfall, while the state prisoner has been deprived-contrary to congressional intent-of his valuable right to one full round of federal habeas review.

While this type of supervening change in procedural law may not alone warrant the reopening of a habeas judgment, there may be special factors that allow a prisoner to satisfy **542** the high standard of *Rule 60(b)(6).* For instance, when a prisoner has shown reasonable diligence in seeking relief based on a change in procedural law, and when that prisoner

Case 09-10138-MEW    Doc 15740    Filed 06/12/15    Page 122 of 304

Gonzalez v. Crosby, 545 U.S. 524 (2005)

125 S.Ct. 2641, 162 L.Ed.2d 480, 73 USLW 4568, 05 Cal. Daily Op. Serv. 5453...

can show that there is probable merit to his underlying claims, it would be well in keeping with a district court's discretion under Rule 60(b)(6) for that court to reopen the habeas judgment and give the prisoner the one fair shot at habeas review that Congress intended that he have. After all, we have consistently recognized that Rule 60(b)(6) "provides courts with authority 'adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice.' " *Liljeberg v. Health Services* **2654 *Acquisition Corp.,* 486 U.S. 847, 864, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988) (quoting *Klapprott v. United States,* 335 U.S. 601, 614-615, 69 S.Ct. 384, 93 L.Ed. 266 (1949)). Here, petitioner, who is serving a 99-year term in Florida prison, filed his Rule 60(b) motion approximately eight months after this Court's decision in *Artuz.* A district court could reasonably conclude that this period reveals no lack of diligence on the part of an incarcerated *pro se* litigant.[3] And while we have received scant briefing on the probable merit of his petition, his allegation-that his guilty plea was not knowing and voluntary because it was based on grossly inaccurate advice about the actual time he would serve in prison-at least states a colorable claim of a constitutional violation. See *Finch v. Vaughn,* 67 F.3d 909 (C.A.11 1995); see also *Mabry v. Johnson,* 467 U.S. 504, 104 S.Ct. 2543, 81 L.Ed.2d 437 (1984).[4]

[3]    While Rule 60(b)(6) contains no specific time limitation on filing, it is worth noting that petitioner filed his motion within the strict 1-year limitation that applies to motions under Rules 60(b)(1)-(3).

[4]    It is also worth noting that *Artuz v. Bennett,* 531 U.S. 4, 121 S.Ct. 361, 148 L.Ed.2d 213 (2000), was decided only seven months after petitioner's habeas judgment became final. In cases where significant time has elapsed between a habeas judgment and the relevant change in procedural law, it would be within a district court's discretion to leave such a judgment in repose.

The Court relies on petitioner's supposed lack of diligence in pursuing review of the District Court's initial statute-of-limitations *543 ruling. See *ante,* at 2651. In fact, petitioner did appeal the District Court's ruling, which the Court of Appeals correctly interpreted as a request for a certificate of appealability (COA).[5] As for petitioner's failure to seek rehearing or certiorari, he alleged in his Rule 60(b) motion, App. 16, and again in his reply brief, that he filed a timely petition for rehearing on April 18, 2000, but that the clerk of the Court of Appeals returned the motion unfiled, "explaining, erroneously, that his appeal was dismissed and closed on October 28, 1999." Reply Brief for Petitioner 13

(emphasis deleted). According to petitioner, "[t]his official misinformation carried the weight of a court decision and was enough to convince a *pro se* litigant (and some lawyers) that the 90-day window for filing a certiorari petition expired, as well." *Ibid.* The State, however, represents that petitioner erroneously filed the petition for rehearing under the **2655 case number of an earlier, dismissed appeal. Brief for Respondent 4. *544 I do not know how to resolve these allegations, but this only highlights the propriety of a remand. Even on the State's version of events, petitioner's attempt at filing for rehearing is proof of diligence on his part.

[5]    See Fed. Rule App. Proc. 22(b)(2) ("If no express request for a certificate is filed, the notice of [appeal shall be deemed to constitute] a request addressed to the judges of the court of appeals"). The procedural route that petitioner navigated was actually more complicated. After the Magistrate Judge initially recommended dismissal of the petition as time barred, petitioner filed an objection that raised a Third Circuit case, *Lovasz v. Vaughn,* 134 F.3d 146 (1998), which was among the circuit cases that were later endorsed by *Artuz,* 531 U.S., at 8, 121 S.Ct. 361. The Magistrate's final report noted that the Eleventh Circuit had not addressed the relevant issue of tolling, and then proceeded to rely (oddly) on *Lovasz* to deny petitioner's claim. In my view, the citation to *Lovasz* and the Magistrate's acknowledgment that there was no Eleventh Circuit precedent on point provided a reasonable basis for the granting of a COA.

In fact, on September 23, 1998, petitioner filed an application for a COA, and this application was granted by the District Court. The Court of Appeals, however, dismissed petitioner's appeal on October 28, 1999, and remanded the COA for a determination of which specific issues merited permission to appeal. On remand, petitioner filed a new application for a COA, but this time the District Court denied the request. Petitioner then filed a timely appeal, and the District Court granted his motion to proceed *in forma pauperis* on appeal. The Court of Appeals then declined to issue a COA and dismissed the appeal on April 6, 2000.

Putting these allegations aside, the Court's reasoning is too parsimonious. While petitioner could have shown even greater diligence by seeking rehearing for a second time and then filing for certiorari, we have never held *pro se* prisoners to the standards of counseled litigants. See, *e.g.,* *Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) *(per curiam).* Indeed, petitioner's situation contrasts dramatically with that of the movant in the case the Court relies on, *Ackermann v. United States,* 340 U.S. 193, 71 S.Ct. 209, 95 L.Ed. 207 (1950). See *ante,* at 2651. In upholding

125 S.Ct. 2641, 162 L.Ed.2d 480, 73 USLW 4568, 05 Cal. Daily Op. Serv. 5453...

the denial of Rule 60(b)(6) relief in *Ackermann,* the Court put great emphasis on the fact that the movant had the benefit of paid counsel and that, for much of the relevant period, he was not detained, but rather enjoyed "freedom of movement and action," 340 U.S., at 201, 71 S.Ct. 209. [6] In any event, I believe that our rules governing prisoner litigation should favor a policy of repose rather than a policy that encourages multiple filings with a low probability of success. [7]

[6]     *Ackermann* is further distinguishable in that it did not involve the sort of plain error of law that has been identified in this case. But even if *Ackermann* were not distinguishable, I would find the views expressed by Justices Black, Frankfurter, and Douglas in dissent, see 340 U.S., at 202, 71 S.Ct. 209 (opinion of Black, J.), more persuasive than those expressed by Justice Minton.

[7]     A petition for certiorari seeking review of a denial of a COA has an objectively low chance of being granted. Such a decision is not thought to present a good vehicle for resolving legal issues, and error correction is a disfavored basis for granting review, particularly in

noncapital cases. See generally this Court's Rule 10. As for the fact that this Court granted certiorari in *Artuz* eight days after the Eleventh Circuit denied petitioner a COA, it would be unrealistic to fault petitioner for failing to capitalize on this fortuity. In my experience, even lower courts and counseled litigants are often not aware of our grants of certiorari on issues that may be relevant to their current business. It would be particularly inappropriate to impose such a strict expectation on a *pro se* prisoner, particularly in the absence of any indication of when, given his circumstances in prison, he could have reasonably been expected to learn of our grant in *Artuz.*

  **\*545**  Accordingly, I agree with the Court's conclusion that petitioner filed a "true" Rule 60(b) motion. I respectfully dissent, however, because of the Court's decision to rule on the merits of the motion in the first instance.

### Parallel Citations

125 S.Ct. 2641, 162 L.Ed.2d 480, 73 USLW 4568, 05 Cal. Daily Op. Serv. 5453, 2005 Daily Journal D.A.R. 7508, 18 Fla. L. Weekly Fed. S 449

---

End of Document                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 11

Griffin v. Dell Canada Inc., 2009 CarswellOnt 2085

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 125 of 304

2009 CarswellOnt 2085, [2009] O.J. No. 1592, 177 A.C.W.S. (3d) 314...

2009 CarswellOnt 2085
Ontario Superior Court of Justice

Griffin v. Dell Canada Inc.

2009 CarswellOnt 2085, [2009] O.J. No. 1592, 177 A.C.W.S. (3d)
314, 64 B.L.R. (4th) 186, 72 C.P.C. (6th) 158, 76 C.P.C. (6th) 173

# THADDEUS GRIFFIN (Plaintiff) and DELL CANADA INC. (Defendant)

Lax J.

Heard: April 16, 2009

Judgment: April 21, 2009 * **

Docket: Toronto 07-CV-325223-CP00

Proceedings: affirming on reconsideration *Griffin v. Dell Canada Inc.* (2009), 2009 CarswellOnt 560 (Ont. S.C.J.)

Counsel: Joel Rochon, Patricia LeFebour for Plaintiff / Responding Party
Mahmud Jamal, Jean-Marc Leclerc for Defendant / Moving Party

Subject: Civil Practice and Procedure; Corporate and Commercial; Public

### Related Abridgment Classifications

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

### Headnote

**Alternative dispute resolution --- Relation of arbitration to court proceedings — Stay of court proceedings — Discretion of court to grant stay**

Plaintiff alleged that defendant designed and sold defective notebook computers — Plaintiff brought motion under s. 5(1) of Class Proceedings Act (CPA) — Defendant brought motion for stay and referral to arbitration under s. 7(1) of Arbitration Act — Motions judge conditionally granted motion certifying action as class proceeding and dismissed defendant's motion for stay — British Columbia Court of Appeal subsequently released decision which affirmed that two Supreme Court of Canada cases changed law in British Columbia, and effectively overruled earlier appellate authority on relationship between class actions and arbitration — Defendants brought motion for reconsideration pursuant to Rule 59.06(2) of Rules of Civil Procedure on grounds that Supreme Court decisions applied in Ontario — Motion dismissed — Decision from British Columbia Court of Appeal was material to decision of motions judge in that it addressed same issue of whether Supreme Court decisions applied in Ontario — Motions judge held that because two Supreme Court decisions were decided on basis of Quebec Civil Code, decisions did not apply to Ontario law or common law provinces — Motions judge found that appropriate course of action was to consider validity of arbitration clause in context of preferability analysis on certification motion — British Columbia case did not raise new arguments that were not considered by motions judge, but rather it came to opposite conclusions on same set of difficult issues on basis of identical arguments — Supreme Court did not purport to change law in Ontario and court in Ontario could determine whether or not to stay class proceeding within context of preferable procedure analysis of certification motion — Defendant did not satisfy test for reconsideration — British Columbia decision would not have altered judgment and stay of class proceeding was refused.

**Judges and courts --- Stare decisis — Decisions of Supreme Court of Canada — Effect on lower courts**

Plaintiff alleged that defendant designed and sold defective notebook computers — Plaintiff brought motion under s. 5(1) of Class Proceedings Act (CPA) — Defendant brought motion for stay and referral to arbitration under s. 7(1) of Arbitration Act — Motions judge conditionally granted motion certifying action as class proceeding and dismissed defendant's motion

Griffin v. Dell Canada Inc., 2009 CarswellOnt 2085

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 126 of 304

2009 CarswellOnt 2085, [2009] O.J. No. 1592, 177 A.C.W.S. (3d) 314...

for stay — British Columbia Court of Appeal subsequently released decision which affirmed that two Supreme Court of Canada cases changed law in British Columbia, and effectively overruled earlier appellate authority on relationship between class actions and arbitration — Defendants brought motion for reconsideration pursuant to Rule 59.06(2) of Rules of Civil Procedure on grounds that Supreme Court decisions applied in Ontario — Motion dismissed — Decision from British Columbia Court of Appeal was material to decision of motions judge in that it addressed same issue of whether Supreme Court decisions applied in Ontario — Motions judge held that because two Supreme Court decisions were decided on basis of Quebec Civil Code, decisions did not apply to Ontario law or common law provinces — Motions judge found that appropriate course of action was to consider validity of arbitration clause in context of preferability analysis on certification motion — British Columbia case did not raise new arguments that were not considered by motions judge but rather it came to opposite conclusions on same set of difficult issues on basis of identical arguments — Supreme Court did not purport to change law in Ontario and court in Ontario could determine whether or not to stay class proceeding within context of preferable procedure analysis of certification motion — Defendant did not satisfy test for reconsideration — British Columbia decision would not have altered judgment and stay of class proceeding was refused.

**Civil practice and procedure --- Parties — Representative or class proceedings under class proceedings legislation — Certification — Plaintiff's class proceeding — Miscellaneous**

Stay of proceedings — Plaintiff alleged that defendant designed and sold defective notebook computers — Plaintiff brought motion under s. 5(1) of Class Proceedings Act (CPA) — Defendant brought motion for stay and referral to arbitration under s. 7(1) of Arbitration Act — Motions judge conditionally granted motion certifying action as class proceeding and dismissed defendant's motion for stay — British Columbia Court of Appeal subsequently released decision which affirmed that two Supreme Court of Canada cases changed law in British Columbia, and effectively overruled earlier appellate authority on relationship between class actions and arbitration — Defendants brought motion for reconsideration pursuant to Rule 59.06(2) of Rules of Civil Procedure on grounds that Supreme Court decisions applied in Ontario — Motion dismissed — Decision from British Columbia Court of Appeal was material to decision of motions judge in that it addressed same issue of whether Supreme Court decisions applied in Ontario — Motions judge held that because two Supreme Court decisions were decided on basis of Quebec Civil Code, decisions did not apply to Ontario law or common law provinces — Motions judge found that appropriate course of action was to consider validity of arbitration clause in context of preferability analysis on certification motion — British Columbia case did not raise new arguments that were not considered by motions judge, but rather it came to opposite conclusions on same set of difficult issues on basis of identical arguments — Supreme Court did not purport to change law in Ontario and court in Ontario could determine whether or not to stay class proceeding within context of preferable procedure analysis of certification motion — Defendant did not satisfy test for reconsideration — British Columbia decision would not have altered judgment and stay of class proceeding was refused.

**Judges and courts --- Stare decisis — Decisions of courts of co-ordinate jurisdiction — Provincial courts of appeal**

**Table of Authorities**

**Cases considered by *Lax J.*:**

*Becker Milk Co. v. Consumers' Gas Co.* (1974), 43 D.L.R. (3d) 498, 2 O.R. (2d) 554, 1974 CarswellOnt 870 (Ont. C.A.) — followed

*Dalimpex Ltd. v. Janicki* (2003), 35 B.L.R. (3d) 41, 64 O.R. (3d) 737, 172 O.A.C. 312, 228 D.L.R. (4th) 179, 2003 CarswellOnt 1998, 35 C.P.C. (5th) 55 (Ont. C.A.) — considered

*Dancap Productions Inc. v. Key Brand Entertainment Inc.* (2009), 2009 ONCA 135, 2009 CarswellOnt 710, 246 O.A.C. 226 (Ont. C.A.) — considered

Griffin v. Dell Canada Inc., 2009 CarswellOnt 2085

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 127 of 304

2009 CarswellOnt 2085, [2009] O.J. No. 1592, 177 A.C.W.S. (3d) 314...

*Danyluk v. Ainsworth Technologies Inc.* (2001), 54 O.R. (3d) 214 (headnote only), 201 D.L.R. (4th) 193, 10 C.C.E.L. (3d) 1, 2001 C.L.L.C. 210-033, 272 N.R. 1, 149 O.A.C. 1, 7 C.P.C. (5th) 199, 34 Admin. L.R. (3d) 163, 2001 CarswellOnt 2434, 2001 CarswellOnt 2435, 2001 SCC 44, [2001] 2 S.C.R. 460 (S.C.C.) — followed

*Griffin v. Dell Canada Inc.* (2009), 2009 CarswellOnt 560 (Ont. S.C.J.) — referred to

*Leo Deluca Enterprises Inc. v. Lombard General Insurance Co. of Canada* (2008), 2008 CarswellOnt 4372 (Ont. S.C.J.) — followed

*MacKinnon v. National Money Mart Co.* (2004), 2004 BCSC 136, 2004 CarswellBC 211, 41 B.L.R. (3d) 198, 26 B.C.L.R. (4th) 172, 46 C.P.C. (5th) 80 (B.C. S.C.) — referred to

*MacKinnon v. National Money Mart Co.* (2004), 203 B.C.A.C. 103, 332 W.A.C. 103, 2004 CarswellBC 2253, 2004 BCCA 473, 50 B.L.R. (3d) 291 (B.C. C.A.) — considered

*MacKinnon v. National Money Mart Co.* (2007), 2007 BCSC 348, 2007 CarswellBC 561 (B.C. S.C.) — referred to

*MacKinnon v. National Money Mart Co.* (2008), 2008 CarswellBC 1137, 2008 BCSC 710, 293 D.L.R. (4th) 478, 84 B.C.L.R. (4th) 369, [2009] 1 W.W.R. 129 (B.C. S.C. [In Chambers]) — referred to

*MacKinnon v. National Money Mart Co.* (2009), 2009 BCCA 103, 2009 CarswellBC 635, 89 B.C.L.R. (4th) 1 (B.C. C.A.) — considered

*Montague v. Bank of Nova Scotia* (2004), 2004 CarswellOnt 11, 2004 C.L.L.C. 210-027, 69 O.R. (3d) 87, 30 C.C.E.L. (3d) 71, 180 O.A.C. 381 (Ont. C.A.) — followed

*Muroff c. Rogers Wireless inc.* (2007), 36 B.L.R. (4th) 79, 2007 SCC 35, 2007 CarswellQue 6312, 2007 CarswellQue 6313, 44 C.P.C. (6th) 373, 365 N.R. 177, *(*sub nom. *Rogers Wireless Inc. v. Muroff)* 284 D.L.R. (4th) 675, *(*sub nom. *Rogers Wireless Inc. v. Muroff)* [2007] 2 S.C.R. 921 (S.C.C.) — referred to

*Seidel v. Telus Communications Inc.* (2009), 88 B.C.L.R. (4th) 212, 2009 CarswellBC 608, 2009 BCCA 104 (B.C. C.A.) — considered

*Smith v. National Money Mart Co.* (2005), 2005 CarswellOnt 2640, 8 B.L.R. (4th) 159, 18 C.P.C. (6th) 1 (Ont. S.C.J.) — referred to

*Smith v. National Money Mart Co.* (2005), 204 O.A.C. 47, 12 B.L.R. (4th) 29, 20 C.P.C. (6th) 345, 2005 CarswellOnt 4882, 258 D.L.R. (4th) 453 (Ont. C.A.) — considered

*Smith v. National Money Mart Co.* (2006), [2006] 1 S.C.R. xii (note), 223 O.A.C. 394 (note), 2006 CarswellOnt 1202, 2006 CarswellOnt 1203, 352 N.R. 404 (note) (S.C.C.) — referred to

*Smith v. National Money Mart Co.* (2007), 2007 CarswellOnt 2177, 30 E.T.R. (3d) 163 (Ont. Div. Ct.) — referred to

*Smith v. National Money Mart Co.* (2007), 2007 CarswellOnt 29, 29 E.T.R. (3d) 199, 37 C.P.C. (6th) 171 (Ont. S.C.J.) — referred to

Griffin v. Dell Canada Inc., 2009 CarswellOnt 2085

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 128 of 304

2009 CarswellOnt 2085, [2009] O.J. No. 1592, 177 A.C.W.S. (3d) 314...

*Smith Estate v. National Money Mart Co.* (2008), 2008 CarswellOnt 3310, 57 C.P.C. (6th) 99 (Ont. S.C.J.) — referred to

*Smith Estate v. National Money Mart Co.* (2008), 2008 CarswellOnt 6415, 243 O.A.C. 173, 61 C.P.C. (6th) 72, 2008 ONCA 746, 92 O.R. (3d) 641, 303 D.L.R. (4th) 175 (Ont. C.A.) — referred to

*Smith Estate v. National Money Mart Co.* (2009), 2009 CarswellOnt 1228, 2009 CarswellOnt 1229 (S.C.C.) — referred to

*Union des consommateurs c. Dell Computer Corp.* (2007), 2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, 44 C.P.C. (6th) 205, *(*sub nom. *Dell Computer Corp. v. Union des consommateurs)* 284 D.L.R. (4th) 577, *(*sub nom. *Dell Computer Corp. v. Union des consommateurs)* [2007] 2 S.C.R. 801, 34 B.L.R. (4th) 155, *(*sub nom. *Dell Computer Corp. v. Union des consommateurs)* 366 N.R. 1 (S.C.C.) — referred to

**Statutes considered:**

*Arbitration Act, 1991*, S.O. 1991, c. 17
s. 7 — referred to

s. 7(1) — considered

s. 7(2) — considered

*Class Proceedings Act, 1992*, S.O. 1992, c. 6
s. 5(1) — considered

*Code civil du Québec*, L.Q. 1991, c. 64
en général — referred to

**Rules considered:**

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194
R. 59.06(2) — pursuant to

R. 59.06(2)(a) — considered

**Treaties considered:**

*UNCITRAL Model Law on International Commercial Arbitration, 1985*, 24 I.L.M. 1302
Article 8 ¶ 1 — considered

MOTION by defendants for reconsideration of judgment reported at *Griffin v. Dell Canada Inc.* (2009), 2009 CarswellOnt 560 (Ont. S.C.J.), relating to relationship between *Class Proceedings Act* and *Arbitration Act*.

*Lax J.*:

1    This motion for reconsideration is brought pursuant to Rule 59.06(2) of the *Rules of Civil Procedure*, R.R.O. 1990, Reg. 194 and the inherent jurisdiction of the court. It arises in the context of a class proceeding for products liability in which the plaintiff alleges that the defendant designed and sold defective notebook computers. The plaintiff brought a motion for certification

**Griffin v. Dell Canada Inc., 2009 CarswellOnt 2085**

2009 CarswellOnt 2085, [2009] O.J. No. 1592, 177 A.C.W.S. (3d) 314...

under section 5(1) of the *Class Proceedings Act*, *1992*, S.O. 1992, c. 6. The defendant brought a motion for stay and referral to arbitration under section 7(1) of the *Arbitration Act, 1991*, S.O. 1991, c. 17. The motions raised questions about the relationship between s. 5(1) of the *Class Proceedings Act*, which requires a court to certify an action as a class proceeding when the criteria for certification have been satisfied, and s. 7(1) of the *Arbitration Act*, *1991*, which requires a court to stay the proceedings when the parties have agreed to submit their dispute to arbitration.

2      On February 3, 2009, I released my decision conditionally certifying the action as a class proceeding and dismissing the defendant's motion for stay. [1]   In reaching my decision, I rejected the defendant's submission that the decisions of the Supreme Court of Canada in *Union des consommateurs c. Dell Computer Corp.* ("*Dell*") [2] and *Muroff c. Rogers Wireless inc.* ("*Rogers*") [3]   effectively overruled earlier appellate authority from Ontario and British Columbia on which I relied. *Dell* and *Rogers* are both cases originating in Quebec.

3      On March 13, 2009, a five-judge panel of the British Columbia Court of Appeal released its companion decisions in *MacKinnon v. National Money Mart Co.* ("*MacKinnon 2009*" *per* Newbury J.A.) [4] and *Seidel v. Telus Communications Inc.* ("*Telus*" *per* Tysoe J.A.). [5]   The court unanimously affirmed that *Dell* and *Rogers* changed the law in British Columbia and effectively overruled earlier appellate authority on the relationship between arbitration and class actions.

4      The defendant submits that by implication, the Supreme Court of Canada has also changed the law in Ontario. I am therefore asked to reconsider my decision on the basis that the decision of the British Columbia Court of Appeal would probably have changed the result and to grant the stay I refused so that the dispute can be referred to arbitration pursuant to s. 7(1) of the *Arbitration Act, 1991* and the arbitration agreement in Dell's Terms and Conditions of Sale.

**Background**

5      The decision that culminated in *MacKinnon 2009* has a lengthy history that is related to a parallel action in Ontario, which has an equally lengthy history. Both actions are payday loan cases. There are two plaintiffs in the Ontario action, but for convenience, I will refer to the Ontario action as *Smith* and the British Columbia action as *MacKinnon v. National Money Mart Co.*. I will refer to the defendants collectively as Money Mart.

6      At the time the motions in this proceeding were heard, appellate courts in British Columbia in *MacKinnon 2004* (*per* Levine J.A.) [6] and in Ontario in *Smith 2005* (*per* Weiler J.A.) [7] , had determined that a motion for stay for referral to arbitration should be considered as a part of the preferable procedure analysis on a motion for certification. These actions were later certified in British Columbia in *MacKinnon 2007 per* Brown J. [8]  and in Ontario in *Smith 2007 per* Hoy J. [9]   In both actions, the motions for stay were dismissed.

7      After the Supreme Court of Canada released the decisions in *Dell* and *Rogers* in July 2007, Money Mart brought renewed motions for stay in British Columbia and in Ontario arguing that the Supreme Court of Canada had now resolved the apparent conflict between arbitration and class proceedings in favour of arbitral jurisdiction and that *Dell* and *Rogers* extended the law to these provinces. In both instances, the court referred potential class proceedings to arbitration and granted the defendants' motions for stay of the class proceeding. As a result, Money Mart argued that the decisions in *MacKinnon 2004* (*per* Levine J.A.) and *Smith 2005* (*per* Weiler J.A.) had been effectively overruled.

8      In British Columbia, Brown J. heard Money Mart's renewed stay application in April 2008. In Ontario, Perell J. heard Money Mart's renewed stay application in May 2008. In decisions released within weeks of one another (*MacKinnon 2008* [10] and *Smith 2008* [11] ), both courts dismissed the renewed motions for stay. Neither court accepted the defendant's position that the Supreme Court of Canada effectively overruled previous appellate authority. Both courts concluded that the decisions in *Dell* and *Rogers* had limited application because the Supreme Court of Canada was interpreting provisions in the *Civil Code of Quebec* and did not purport to interpret other legislation, nor affect the law outside Quebec. In the alternative, Brown J. in

2009 CarswellOnt 2085, [2009] O.J. No. 1592, 177 A.C.W.S. (3d) 314...

British Columbia and Perell J. in Ontario held that the defendants were estopped from renewing their stay motion under the doctrine of issue estoppel.

9      Money Mart appealed these decisions. In October 2008, a five member panel of the Ontario Court of Appeal heard the appeal in *Smith* ("*Smith OCA 2008*" *per* Sharpe J.A.) [12]  The court concluded that Perell J. had properly exercised his discretion to apply the doctrine of issue estoppel, but declined to address whether *Dell* and *Rogers* changed the law in Ontario.

10     This brings me back to *MacKinnon 2009*. Although the court concluded that the reasoning in *Dell* and *Rogers* logically extended to British Columbia and effectively overruled its earlier decision in *MacKinnon 2004*, it found that issue estoppel applied to prevent Money Mart from taking advantage of the change in the law. Thus, both appellate courts decided the issue on the basis of issue estoppel, but the British Columbia Court of Appeal found that *Dell* and *Rogers* do apply in British Columbia, whereas the Ontario Court of Appeal found it unnecessary to decide this issue.

**Analysis**

11     The court has a broad discretion to reconsider a decision before judgment is formally entered in the court record and an order drawn up, passed and entered: *Montague v. Bank of Nova Scotia*. [13]  When a motion is brought under Rule 59.06(2)(a) on the basis of "facts arising or discovered after [the order] was made," the test is whether knowledge of the new information "might probably have altered the judgment": *Becker Milk Co. v. Consumers' Gas Co.*; [14]  *Leo Deluca Enterprises Inc. v. Lombard General Insurance Co. of Canada*. [15]  In the case of new evidence, the test involves an additional criterion that the evidence could not previously have been discovered with reasonable diligence, but that requirement does not apply on this motion.

12     The plaintiff raised two arguments purporting to prevent reconsideration in this case. As I believe these can be dealt with without extensive analysis, I shall deal with them at the outset.

13     The first argument is that the Ontario Court of Appeal has already decided this issue in its dismissal of the appeal from Perell J.'s *Smith 2008* decision and that I was therefore bound to have found as I did on the basis of *stare decisis*. This argument cannot succeed as the Court of Appeal decided the appeal on the narrow basis of issue estoppel and did not consider the substantive issue of the application of *Dell* and *Rogers* in Ontario. Sharpe J.A. definitively stated this to be the case:

> [28] In my view, the appeal against the refusal to grant a stay can and should be resolved solely on the basis of issue estoppel. Accordingly, for the purposes of this appeal, I will assume <u>without deciding</u> that *Dell* and *Roger*s do change the law of Ontario... (emphasis added).

14     The plaintiff's second argument is that reconsideration of my decision is blocked by issue estoppel, as was found to be the case in *Smith*. The Supreme Court set out the test for issue estoppel in *Danyluk v. Ainsworth Technologies Inc.*. [16]  First, the court must determine if three threshold criteria are met: (a) the same question has been decided in an earlier proceeding; (b) the judicial ruling deciding it was final; and (c) the parties on the earlier proceeding or their privies are the same as on the current proceeding. Second, if these criteria are met, the court must normatively consider whether estoppel ought to be applied as a matter of discretion.

15     In *Smith* and in *MacKinnon*, issue estoppel arose because the defendant had reapplied for a stay on the strength of the *Dell* and *Rogers* decisions after having been denied a stay on earlier motions. It was the decisions on these earlier motions, which both Courts of Appeal upheld, (the Supreme Court denying leave to appeal in *Smith*), that gave rise to the estoppel. In this case, the plaintiff argues that the very order that is the subject of this motion to reconsider gives rise to issue estoppel. This cannot be correct. My February 3 order cannot fairly be said to have been made in a 'prior proceeding'. The *Danyluk* criteria are not met, but even if they were, I would exercise my discretion not to apply issue estoppel as this would produce the absurd result that a motion for reconsideration can never succeed.

16     I turn next to the defendant's arguments.

2009 CarswellOnt 2085, [2009] O.J. No. 1592, 177 A.C.W.S. (3d) 314...

17     I accept that *MacKinnon 2009* is material to my decision in that it addresses the same issue that I was required to address in considering whether *Dell* and *Rogers* applied in Ontario. In order to decide whether to grant or refuse a stay, it was necessary to resolve this issue. In broad summary, I held that since *Dell* and *Rogers* were decided on the basis of the Quebec *Civil Code*, the decisions did not apply to Ontario law or to the common law provinces generally. I held that the appropriate course of action was to consider the validity of the arbitration clause in the context of the preferability analysis on the certification motion.

18     In coming to these findings, I expressly adopted the reasoning of Perell J. in *Smith 2008*. Justice Perell, in turn, followed appellate authority supporting the approach of an integrated preferable procedure analysis: a prior decision in the same action, *Smith 2005* (*per* Weiler J.A.), and the decision of a five-judge panel of the British Columbia Court of Appeal in *MacKinnon 2004* (*per* Levine J.A.). He also approved the decision of Brown J. in *MacKinnon 2008* which considered and rejected Money Mart's submission that *Dell* and *Rogers* applied in British Columbia.

19     By expressly adopting the analysis of Perell J. in *Smith 2008*, I held that in Ontario, whether an arbitration agreement is "invalid" under one of the exceptions to granting a stay under section 7(2) of the *Arbitration Act, 1991* is a legal issue for the court and not for the arbitrator to determine. As such, the "competence-competence" principle was not engaged. As Justice Perell said:

> [225] ... one way of describing the question to be decided in the case at bar is that it concerns whether as a matter of interpretation, there are exceptions to the direction from the legislature found in s. 7(1) of the *Arbitration Act, 1991* that a stay should be granted when the parties have an arbitration agreement. The competence-competence principle does not create or negate the existence of an exception in the *Arbitration Act, 1991*, which remains a matter of statutory interpretation.

20     The defendant devoted a great deal of time in its factum and in argument to establishing a thread linking my decision to Justice Perell's decision in *Smith*, which in turn, it argued, relied on *MacKinnon 2004* and *MacKinnon 2008*, which have now been effectively overruled by *MacKinnon 2009*. The defendant's factum points out that Perell J. referenced the *MacKinnon* decisions 23 times. I have no reason to doubt this, but it is of no significance. While Perell J. refers to *MacKinnon 2008* and *MacKinnon 2004* at some length, he clearly did so as examples of analyses with which he agreed rather than as authorities by which he was bound. After analyzing the arguments that *Dell* and *Rogers* effectively overruled Ontario law, he said:

> [233] In my opinion, for the circumstances where there is both an arbitration agreement and a pending motion for certification of a class proceeding, Justices Brown, Levine, Macdonald, and Weiler [the judges in the prior *MacKinnon* and *Smith* decisions] correctly interpreted the statutory provisions for granting or refusing a stay, and they did so in a way that both as a matter of statutory interpretation and also as a matter of implementation was correct, fair, and not inconsistent with the competence-competence principle.

21     I do not dispute that *MacKinnon 2004* and *Smith 2005* were based on a common legal premise that the validity of an arbitration agreement is to be determined at certification. Justice Perell concluded that the principle drawn from *Dell* and *Rogers* that a challenge to the arbitrator's jurisdiction or to the validity or applicability of the arbitration agreement should be resolved by the arbitrator was not relevant because the genuine dispute before the court was not about the arbitrator's jurisdiction, which will be subject to the "competence-competence" principle, but rather the court's jurisdiction to grant a stay. In his opinion, with which I agreed, this was a matter of interpreting s. 7 of the *Arbitration Act, 1991*. He explained:

> [226] ... The conclusion that the invalidity (or not) of the arbitration agreement should be determined at the certification hearing does not offend the "competence-competence" principle because that conclusion is about the court's jurisdiction to stay under the *Arbitration Act, 1991* and the "competence-competence" principle is about the arbitrator's jurisdiction to arbitrate under the arbitration agreement, which is not the same thing.

22     Justice Perell paid close attention to the analysis of Deschamps J. in *Dell* at paras. 83 to 89. The defendant also referred me to these passages in support of its position that the Supreme Court of Canada intended *Dell* to apply in the common law provinces. Justice Perell's analysis of these passages, which I expressly adopted, is set out, in part, below:

Griffin v. Dell Canada Inc., 2009 CarswellOnt 2085

2009 CarswellOnt 2085, [2009] O.J. No. 1592, 177 A.C.W.S. (3d) 314...

[262] Justice Deschamps' analysis is about the situation in Québec, but if the above passages about the competence-competence approach are read to apply across the country, then one can extract the following general principles when there is an arbitration agreement: (a) both the court and the arbitrator may rule on whether the arbitrator has jurisdiction; (b) if the challenge to the arbitrator's jurisdiction is solely a question of law, then the court should rule on the arbitrator's jurisdiction; (c) if the challenge to the arbitrator's jurisdiction is a question of mixed fact and law, the arbitrator should rule, unless the questions of fact require only superficial consideration of the documentary evidence, in which case the court should rule; (d) subject to these exceptions, the general rule is that the court should refer a challenge to the arbitrator's jurisdiction to be resolved by the arbitrator.

[263] One can accept all of these principles taken from *Dell Computer* as being the law in Ontario, but these principles do not "effectively overrule" the law articulated or applied by Justices Macdonald, Hoy, and Weiler because these passages do not address their approach to interpreting s. 7 of the *Arbitration Act, 1991*, and their approach to reconciling the tension between s. 7(1) of the *Arbitration Act, 1991* and s. 5(1) of the *Class Proceedings Act, 1992*.

[264] Moreover, it cannot be successfully argued from the above passages of Justice Deschamps' judgment that Courts in Québec and the rest of the country actually do not have the subject matter jurisdiction to decide issues that might be decided by an arbitrator ...

. . . . .

[269] ... when the Ontario courts decided that the application of an arbitration provision should be considered in the context of assessing the criteria for a class proceeding, they may be taken to have known that a class proceeding is a procedure and not a substantive right. In deciding to treat the availability of arbitration as an aspect of the certification of a class proceeding, the courts were not making substantive law altering the law of contract. ... [t]he court was not relying on the *Class Proceedings Act, 1992* to make substantive law; rather it was interpreting its jurisdiction to grant an exception to a stay under s. 7 of the *Arbitration Act, 1991*.

23    Justice Perell and I both found it implausible that the Supreme Court of Canada purported to address the legislative choices of other provinces without any reference to this or to the submissions of the intervenors who provided the court with this law. [17] In the second paragraph of *Dell*, Justice Deschamps describes the matter that was before the Supreme Court:

This appeal relates to the debate over the place of arbitration in Quebec's civil justice system. More specifically, the Court is asked to consider the validity and applicability of an arbitration agreement in the context of a domestic legal dispute under the rules of Quebec law and international law, and to determine whether the arbitrator or a court of law should rule first on these issues.

24    Money Mart argued before Justice Perell and Dell argued before me that it would not be necessary to expressly mention the law in the common law provinces because it was established that the law about arbitration in the common law provinces and Quebec is derived from the same sources and is materially the same. Justice Perell found material differences between the Ontario and Quebec arbitration legislation. He held that it was a matter for the courts of each province to interpret their province's arbitration legislation and that legislation does not have to conform with or be consistent with the legislation in another province. As the law about when actions may be stayed in favour of arbitration is not necessarily or inherently the same in every province, he concluded that the Supreme Court's reasoning does not logically or necessarily extend to the law of other provinces. I agreed with this.

25    *MacKinnon 2009* approached the exact issues analyzed by Perell J. who devoted almost one-third of his 91-page judgment to a consideration of these arguments, including fourteen pages to a close reading of the reasons in *Dell* and *Rogers*. The British Columbia Court of Appeal came to opposite conclusions on every significant premise, including disapproving of his characterization of the issue in para. 39, explicitly disagreeing with him in para. 70 and implicitly rejecting all aspects of his analysis. The defendant submits that as the approach of the British Columbia Court of Appeal in *MacKinnon 2009* was different

Griffin v. Dell Canada Inc., 2009 CarswellOnt 2085

2009 CarswellOnt 2085, [2009] O.J. No. 1592, 177 A.C.W.S. (3d) 314...

from the approach of Perell J. in *Smith 2008* which I adopted, *MacKinnon 2009* would probably have changed the result in the case at bar.

26    In my opinion, it could only probably have changed the result if there were arguments before the court in *MacKinnon 2009* that were not before me and that I did not have the opportunity to consider. *MacKinnon 2009* does not raise new arguments that were not considered by myself or Perell J. Rather, it comes to opposite conclusions on the same set of difficult issues on the basis of the identical arguments that the defendant presented to Perell J. on the renewed motion for stay in *Smith 2008*, that Dell presented to me on the motion for stay in the case at bar, and again on this motion for rehearing.

27    I have not overlooked the recent decision of the Ontario Court of Appeal in *Dancap Productions Inc. v. Key Brand Entertainment Inc.* ("*Dancap*"), [18] where Sharpe J.A. applied *Dell* to set aside a decision of a motion judge who assumed jurisdiction to decide the scope of an arbitration clause. *Dancap* was not a class proceeding, but there is nothing in *Smith 2008* or in my decision that is inconsistent with *Dancap* or with *Dalimpex Ltd. v. Janicki*. [19] *Dalimpex*, an earlier decision of the Ontario Court of Appeal that addresses the granting of stays under art. 8(1) of the Model Law, is discussed in *Dancap* at paras. 32 and 33. The *Dalimpex* decision is also discussed by Justice Perell at paras. 227 to 229. He concludes this part of the discussion by pointing out:

> [230] In considering the role of the court, it may be noted that several paragraphs of s. 7(2) of the *Arbitration Act, 1991* are outside the operation of the competence-competence principle. These exceptions are exclusively for the court to decide. For example, it is for the court and not the arbitrator to determine whether the motion for a stay was brought with undue delay and it is exclusively for the court to determine whether the matter is a proper one for default or summary judgment.

28    There are other exceptions listed in s. 7(2) of the *Arbitration Act, 1991* that are also outside the operation of the competence-competence principle because the legislature has determined that they are exclusively for the court to decide. For example, it is for the court and not the arbitrator to determine that a stay should be refused because a party entered into the arbitration agreement while under a legal incapacity. It is also for the court and not the arbitrator to determine whether the subject matter of the dispute is not capable of being the subject of arbitration under Ontario law. As each of the exceptions under s. 7(2) are exclusively for the court to decide, it does not make sense to me that the remaining exception, namely whether or not the arbitration agreement is invalid, is for the arbitrator and not the court to decide.

29    It is common ground that I am not obliged to follow decisions of provincial appellate courts other than the Ontario Court of Appeal and that the decision of the British Columbia Court of Appeal is not technically binding as a matter of *stare decisis*. Nonetheless, I believe I owe great respect to appellate decisions of other provinces as these decisions are generally regarded as persuasive. The British Columbia Court of Appeal concluded that the Supreme Court of Canada's judgments in *Dell* and *Rogers* extend to the law of British Columbia and that the court's previous holding in *MacKinnon 2004* has been effectively overruled. I reached a different conclusion relying on the analysis of Perell J.

30    I have given *MacKinnon 2009* my most careful consideration, but respectfully, and notwithstanding the forceful submissions of Mr. Jamal which persuaded the British Columbia Court of Appeal with respect to British Columbia law and the Supreme Court of Canada with respect to Quebec law, I am unable to agree that *Dell* and *Rogers* apply in Ontario. I confess that I am given pause by my acceptance of the very arguments that were rejected by a panel of five respected appellate court judges, including a chief justice. I say nothing about the law in British Columbia, but I remain of the view that the Supreme Court of Canada did not purport to change the law in Ontario and that a court in Ontario may determine whether or not to stay a class proceeding within the context of the preferable procedure analysis of a certification motion. Until the Ontario Court of Appeal says otherwise, it is my view that this remains the law in this province.

31    The defendant has not satisfied the test for reconsideration. I am not persuaded that *MacKinnon 2009* might probably have altered my judgment. I therefore refuse to stay the class proceeding and refer the dispute to arbitration under s. 7(1) of the *Arbitration Act, 1991*.

32    The motion is dismissed. If costs are not agreed, they may be addressed by written submissions.

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 134 of 304

Griffin v. Dell Canada Inc., 2009 CarswellOnt 2085

2009 CarswellOnt 2085, [2009] O.J. No. 1592, 177 A.C.W.S. (3d) 314...

*Motion dismissed.*

Footnotes

| | |
|---|---|
| * | A corrigendum issued by the court on April 23, 2009 has been incorporated herein. |
| ** | Affirmed at *Griffin v. Dell Canada Inc.* (2010), 2010 ONCA 29, 2010 CarswellOnt 177, 64 B.L.R. (4th) 199 (Ont. C.A.). |
| 1 | *Griffin v. Dell Canada Inc.* (Ont. S.C.J.), 2009 CanLII 3557 ("*Griffin v. Dell*"). |
| 2 | [2007] 2 S.C.R. 801 (S.C.C.). |
| 3 | [2007] 2 S.C.R. 921 (S.C.C.). |
| 4 | 2009 BCCA 103 (B.C. C.A.). |
| 5 | 2009 BCCA 104 (B.C. C.A.). *MacKinnon 2009* and *Telus* were heard together as the common issue was the effect of *Dell* and *Rogers*. The B.C. Court of Appeal analysed the issues in *MacKinnon 2009* and applied its conclusions in TELUS. For the balance of these reasons, I will therefore refer only to *MacKinnon 2009*. |
| 6 | 2004 BCCA 473 (B.C. C.A.), aff'g 2004 BCSC 136 (B.C. S.C.) |
| 7 | (2005), 258 D.L.R. (4th) 453 (Ont. C.A.), aff'g (2005), 8 B.L.R. (4th) 159 (Ont. S.C.J.), leave to appeal to S.C.C. refused, (2006) (S.C.C.). |
| 8 | 2007 BCSC 348 (B.C. S.C.). |
| 9 | (2007), 37 C.P.C. (6th) 171 (Ont. S.C.J.), leave to appeal to Div. Ct. refused (2007), 30 E.T.R. (3d) 163 (Ont. Div. Ct.). |
| 10 | 2008 BCSC 710 (B.C. S.C. [In Chambers]). |
| 11 | *Smith Estate v. National Money Mart Co.*, 57 C.P.C. (6th) 99 (Ont. S.C.J.). |
| 12 | 2008 ONCA 746 (Ont. C.A.), leave to appeal to S.C.C. refused, [2008] S.C.C.A. No. 535. |
| 13 | (2004), 69 O.R. (3d) 87 (Ont. C.A.) at para. 34. |
| 14 | (1974), 2 O.R. (2d) 554 (Ont. C.A.), at 57. |
| 15 | (Ont. S.C.J.) at para. 6. |
| 16 | [2001] 2 S.C.R. 460 (S.C.C.) at paras. 25 and 33. |
| 17 | *Smith 2008* at paras. 237 and 238 *Griffin v. Dell*, at para. 37. |
| 18 | 2009 ONCA 135 (Ont. C.A.). |
| 19 | (2003), 64 O.R. (3d) 737 (Ont. C.A.). |

**End of Document**                Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 135 of 304

Griffin v. Dell Canada Inc., 2010 ONCA 29, 2010 CarswellOnt 177
2010 ONCA 29, 2010 CarswellOnt 177, [2010] O.J. No. 177, 185 A.C.W.S. (3d) 12...

2010 ONCA 29
Ontario Court of Appeal

Griffin v. Dell Canada Inc.

2010 CarswellOnt 177, 2010 ONCA 29, [2010] O.J. No. 177, 185 A.C.W.S. (3d) 12, 259
O.A.C. 108, 315 D.L.R. (4th) 723, 64 B.L.R. (4th) 199, 80 C.P.C. (6th) 154, 98 O.R. (3d) 481

# Thaddeus Griffin (Plaintiff / Respondent)
# and Dell Canada Inc. (Defendant / Appellant)

W. Winkler C.J.O., Doherty, K. Feldman, Robert J. Sharpe, E.E. Gillese JJ.A.

Heard: November 26, 2009

Judgment: January 20, 2010 [*]
Docket: CA C50137, C50474

Proceedings: affirming *Griffin v. Dell Canada Inc.* (2009), 72 C.P.C. (6th) 158, 2009 CarswellOnt 560 (Ont. S.C.J.); & affirming
*Griffin v. Dell Canada Inc.* (2009), 76 C.P.C. (6th) 173, 2009 CarswellOnt 2085, 72 C.P.C. (6th) 158 (Ont. S.C.J.)

Counsel: Mahmud Jamal, Jean-Marc Leclerc, Catherine Weiler for Appellant
Joel P. Rochon, Sakie Tambakos, Sonya Diesberger for Respondent

Subject: Civil Practice and Procedure; Corporate and Commercial; Public

Related Abridgment Classifications
For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

Headnote

Alternative dispute resolution --- Arbitrators — Miscellaneous

Individual and corporate plaintiff leased computer subject to mandatory arbitration clause — Computer failed after warranty expired — Plaintiffs brought class proceeding for defective computers — Plaintiffs' motion for certification was granted, computer company's motion for stay was dismissed — Second representative plaintiff added who was consumer who purchased computer before effective date of Consumer Protection Act, 2002 — Arbitration forum used to settle disputes ceased to operate — Computer company appealed; plaintiffs brought motion to quash appeal — Motion to quash appeals dismissed; appeal dismissed — Appeal not rendered moot by discontinuance of arbitration body — Although arbitration body created by computer company had ceased to exist, arbitration body covered only consumer arbitrations — Administration body was not named as arbiter in agreement, but only as administer of arbitrations — If necessary, role of arbitration body could be filled by Arbitration Act, 1991 — Section 7(6) of Act, which prevents appeal from court's decision to stay arbitration, not applicable when order refuses to grant stay on ground that matter not subject to arbitration — Order was final for purpose of appeals.

Alternative dispute resolution --- Relation of arbitration to court proceedings — Stay of court proceedings — Whether matter within terms of arbitration clause

Individual and corporate plaintiff leased computer subject to mandatory arbitration clause — Computer failed after warranty expired — Plaintiffs brought class proceeding for defective computers — Plaintiffs' motion for certification was granted, computer company's motion for stay was dismissed — Second representative plaintiff added who was consumer who purchased computer before effective date of Consumer Protection Act, 2002 — Arbitration forum used to settle disputes ceased to operate — Computer company appealed; plaintiffs brought motion to quash appeal — Motion to quash appeals dismissed; appeal dismissed — Computer company did not gain vested interest in enforcement of arbitration clause

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 136 of 304

Griffin v. Dell Canada Inc., 2010 ONCA 29, 2010 CarswellOnt 177...
2010 ONCA 29, 2010 CarswellOnt 177, [2010] O.J. No. 177, 185 A.C.W.S. (3d) 12...

— No partial stay of non-consumer claims, as best that actions be tried together as class proceeding — Most claims were consumer claims and would be litigated in class proceeding — Liability and damage issues were the same in proceedings — Inefficiency and potential multiplicity of proceedings could result if issues not tried in same proceedings, and extra costs could be incurred — Partial stay would require examination of each claim for determination as consumer claim or non-consumer claim — Issue was not proceeding by way of arbitration or court proceeding, true nature of issue was between class proceeding and immunity for computer company — Most purchasers not in position to pursue arbitration — Computer company refused to submit to class arbitration.

**Alternative dispute resolution --- Submission or agreement to arbitrate — Interpretation and construction**

Individual and corporate plaintiff leased computer subject to mandatory arbitration clause — Computer failed after warranty expired — Plaintiffs brought class proceeding for defective computers — Plaintiffs' motion for certification was granted, computer company's motion for stay was dismissed — Second representative plaintiff added who was consumer who purchased computer before effective date of Consumer Protection Act, 2002 — Arbitration forum used to settle disputes ceased to operate — Computer company appealed; plaintiffs brought motion to quash appeal — Motion to quash appeals dismissed; appeal dismissed — Consumer Protection Act, 2002 overrode arbitration clause so that action could be brought in superior court — Arbitration clauses often attempt to avoid liability for low-value wrongs which cannot be litigated individually — Although contract for sale was concluded before Class Proceeding Act came into force, Act was still applicable — No claim existed until computer failed — Computer company did not gain vested interest in enforcement of arbitration clause.

## Table of Authorities

**Cases considered by *Robert J. Sharpe J.A.*:**

*Dancap Productions Inc. v. Key Brand Entertainment Inc.* (2009), 55 B.L.R. (4th) 1, 68 C.P.C. (6th) 34, 2009 ONCA 135, 2009 CarswellOnt 710, 246 O.A.C. 226 (Ont. C.A.) — referred to

*Frambordeaux Developments Inc. v. Romandale Farms Ltd.* (2007), 2007 CarswellOnt 8102 (Ont. S.C.J.) — considered

*Huras v. Primerica Financial Services Ltd.* (2000), 2000 CarswellOnt 3751, 137 O.A.C. 79 (Ont. C.A.) — referred to

*Inforica Inc. v. CGI Information Systems & Management Consultants Inc.* (2009), 97 O.R. (3d) 161, 2009 ONCA 642, 2009 CarswellOnt 5276, 254 O.A.C. 117 (Ont. C.A.) — referred to

*Jean Estate v. Wires Jolley LLP* (2009), 47 E.T.R. (3d) 20, 68 C.P.C. (6th) 1, 2009 CarswellOnt 2250, 2009 ONCA 339, 96 O.R. (3d) 171, 310 D.L.R. (4th) 95 (Ont. C.A.) — referred to

*Johnston v. Mlakar* (2006), 2006 CarswellOnt 3621, *(sub nom. Johnston v. Goudie)* 212 O.A.C. 79 (Ont. C.A.) — referred to

*MacKinnon v. National Money Mart Co.* (2004), 203 B.C.A.C. 103, 332 W.A.C. 103, 2004 CarswellBC 2253, 2004 BCCA 473, 50 B.L.R. (3d) 291 (B.C. C.A.) — considered

*MacKinnon v. National Money Mart Co.* (2008), 2008 CarswellBC 1137, 2008 BCSC 710, 293 D.L.R. (4th) 478, 84 B.C.L.R. (4th) 369, [2009] 1 W.W.R. 129 (B.C. S.C. [In Chambers]) — considered

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 137 of 304

Griffin v. Dell Canada Inc., 2010 ONCA 29, 2010 CarswellOnt 177

2010 ONCA 29, 2010 CarswellOnt 177, [2010] O.J. No. 177, 185 A.C.W.S. (3d) 12...

*MacKinnon v. National Money Mart Co.* (2009), 2009 BCCA 103, 2009 CarswellBC 635, 68 C.P.C. (6th) 241, 304 D.L.R. (4th) 331, 89 B.C.L.R. (4th) 1, 450 W.A.C. 276, 267 B.C.A.C. 276, [2009] 5 W.W.R. 418 (B.C. C.A.) — considered

*Mantini v. Smith Lyons LLP* (2003), 64 O.R. (3d) 505, 2003 CarswellOnt 1732, 34 B.L.R. (3d) 1, 228 D.L.R. (4th) 214, 174 O.A.C. 138 (Ont. C.A.) — referred to

*Markson v. MBNA Canada Bank* (2007), 43 C.P.C. (6th) 10, 2007 ONCA 334, 2007 CarswellOnt 2716, 282 D.L.R. (4th) 385, 32 B.L.R. (4th) 273, 224 O.A.C. 71, 85 O.R. (3d) 321 (Ont. C.A.) — referred to

*Muroff c. Rogers Wireless inc.* (2007), 36 B.L.R. (4th) 79, 2007 SCC 35, 2007 CarswellQue 6312, 2007 CarswellQue 6313, 44 C.P.C. (6th) 373, 365 N.R. 177, *(*sub nom. *Rogers Wireless Inc. v. Muroff)* 284 D.L.R. (4th) 675, *(*sub nom. *Rogers Wireless Inc. v. Muroff)* [2007] 2 S.C.R. 921 (S.C.C.) — considered

*New Era Nutrition Inc. v. Balance Bar Co.* (2004), 2004 ABCA 280, 2004 CarswellAlta 1200, 47 B.L.R. (3d) 296, 357 A.R. 184, 334 W.A.C. 184, 245 D.L.R. (4th) 107, 33 Alta. L.R. (4th) 1 (Alta. C.A.) — referred to

*Penn-Co Construction Canada (2003) Ltd. v. Constance Lake First Nation* (2007), 2007 CarswellOnt 6556, 66 C.L.R. (3d) 78 (Ont. S.C.J.) — referred to

*Radewych v. Brookfield Homes (Ontario) Ltd.* (2007), 2007 CarswellOnt 4027 (Ont. S.C.J.) — considered

*Radewych v. Brookfield Homes (Ontario) Ltd.* (2007), 2007 CarswellOnt 8481, 2007 ONCA 721 (Ont. C.A.) — referred to

*Seidel v. Telus Communications Inc.* (2009), 88 B.C.L.R. (4th) 212, 2009 CarswellBC 608, 2009 BCCA 104, 68 C.P.C. (6th) 57, 304 D.L.R. (4th) 564, 267 B.C.A.C. 266, 450 W.A.C. 266, [2009] 5 W.W.R. 466 (B.C. C.A.) — considered

*Seidel v. Telus Communications Inc.* (2009), 2009 CarswellBC 2442 (S.C.C.) — referred to

*Smith v. National Money Mart Co.* (2005), 204 O.A.C. 47, 12 B.L.R. (4th) 29, 20 C.P.C. (6th) 345, 2005 CarswellOnt 4882, 258 D.L.R. (4th) 453 (Ont. C.A.) — considered

*Smith v. National Money Mart Co.* (2006), [2006] 1 S.C.R. xii (note), 223 O.A.C. 394 (note), 2006 CarswellOnt 1202, 2006 CarswellOnt 1203, 352 N.R. 404 (note) (S.C.C.) — referred to

*Smith Estate v. National Money Mart Co.* (2008), 2008 CarswellOnt 3310, 57 C.P.C. (6th) 99 (Ont. S.C.J.) — considered

*Smith Estate v. National Money Mart Co.* (2008), 2008 CarswellOnt 6415, 243 O.A.C. 173, 61 C.P.C. (6th) 72, 2008 ONCA 746, 92 O.R. (3d) 641, 303 D.L.R. (4th) 175 (Ont. C.A.) — referred to

*Union des consommateurs c. Dell Computer Corp.* (2007), 2007 CarswellQue 6310, 2007 CarswellQue 6311, 2007 SCC 34, 44 C.P.C. (6th) 205, *(*sub nom. *Dell Computer Corp. v. Union des consommateurs)* 284 D.L.R. (4th) 577, *(*sub nom. *Dell Computer Corp. v. Union des consommateurs)* [2007] 2 S.C.R. 801, 34 B.L.R. (4th) 155, *(*sub nom. *Dell Computer Corp. v. Union des consommateurs)* 366 N.R. 1 (S.C.C.) — considered

Case 09-10138-MFW   Doc 15740   Filed 06/12/15   Page 138 of 304

Griffin v. Dell Canada Inc., 2010 ONCA 29, 2010 CarswellOnt 177

2010 ONCA 29, 2010 CarswellOnt 177, [2010] O.J. No. 177, 185 A.C.W.S. (3d) 12...

**Statutes considered:**

*Arbitration Act, 1991*, S.O. 1991, c. 17
    Generally — referred to

    s. 7 — referred to

    s. 7(5) — considered

    s. 7(6) — considered

    s. 10(1) — considered

    s. 10(1)(b) — considered

    s. 16(5) — considered

*Class Proceedings Act, 1992*, S.O. 1992, c. 6
    Generally — referred to

*Competition Act*, R.S.C. 1985, c. C-34
    s. 52 — referred to

*Consumer Protection Act, 2002*, S.O. 2002, c. 30, Sched. A
    Generally — referred to

    s. 1 "consumer" — referred to

    s. 7 — considered

    s. 8 — considered

*Courts of Justice Act*, R.S.O. 1990, c. C.43
    s. 6(1)(b) — referred to

    s. 138 — considered

*Protection du consommateur, Loi sur la*, L.R.Q., c. P-40.1
    en général — referred to

APPEAL by defendant; MOTION to quash appeal by plaintiffs from judgment reported at *Griffin v. Dell Canada Inc.* (2009), 72 C.P.C. (6th) 158, 2009 CarswellOnt 560, 64 B.L.R. (4th) 186 (Ont. S.C.J.), certifying class proceeding.

*Robert J. Sharpe J.A.*:

1    These appeals involve a proposed class action arising from the sale of allegedly defective Dell notebook computers. The class action involves a large number of claims for relatively small amounts. Dell's standard-form sales agreement contains a clause requiring that all disputes be submitted to arbitration. On the certification motion, the motion judge found that it was "fanciful to think that any claimant could pursue an individual claim in a complex products liability case" and that enforcing Dell's arbitration clause would have the effect of immunizing Dell "from accounting to class members for any wrong it may have caused". She refused Dell's request to stay the class action in favour of arbitration, granted a certification order conditional

2010 ONCA 29, 2010 CarswellOnt 177, [2010] O.J. No. 177, 185 A.C.W.S. (3d) 12...

on the plaintiff filing an improved litigation plan, and also gave the plaintiff leave to amend to add a second representative plaintiff. The motion judge subsequently refused Dell's request for a reconsideration of the refusal of a stay in the light of new developments in the jurisprudence. Dell appeals both the initial refusal to grant a stay and the subsequent refusal to reconsider that decision.

2    A second representative plaintiff has now been added who falls within the definition of "consumer" under the *Consumer Protection Act, 2002*, S.O. 2002, c. 30, Sched. A ("*CPA*"). That Act bans mandatory arbitration clauses in consumer agreements. The second representative purchased his computer before the effective date of the *CPA*. However, his claim against Dell did not arise until after the *CPA*'s effective date, when his computer failed. The central issue on these appeals is whether the *CPA* applies to the claim of the second representative plaintiff.

**Facts**

3    This action involves Dell Inspiron computers (models 1100, 1150, 5100, 5150 and 5160) sold in Canada online and by telephone between March 2003 and May 2005. Dell sold 118,629 of the Inspiron computers at a price of approximately $2,000 each. These computers came with Dell's standard one-year limited warranty covering defects in workmanship and materials. Purchasers also had the option of buying an enhanced or extended warranty.

4    The first representative plaintiff, Thaddeus Griffin, leased a Dell Inspiron 5150 notebook, primarily for business purposes, through his business, Griffin Leasing, from a leasing company, National Equipment Leasing Inc. Before leasing the computer, Griffin looked at various Dell products on Dell's website and agreed to be bound by Dell's Terms and Conditions of Sale. Those Terms and Conditions disclaim express or implied warranties, except as provided in the standard one-year limited warranty or in any optional enhanced warranty purchased. Griffin did not purchase the optional extended warranty. The Terms and Conditions also contain a choice of law and choice of forum clause stating that the agreement is to be governed by Ontario law and that the parties agree "to the non-exclusive jurisdiction of the courts" of Ontario. Finally, the Terms and Conditions contain the following mandatory arbitration clause:

> ANY CLAIM, DISPUTE, OR CONTROVERSY (WHETHER IN CONTRACT, TORT, OR OTHERWISE, WHETHER PREEXISTING, PRESENT OR FUTURE, AND INCLUDING STATUTORY, COMMON LAW, INTENTIONAL TORT AND EQUITABLE CLAIMS CAPABLE IN LAW OF BEING SUBMITTED TO BINDING ARBITRATION) AGAINST DELL, its agents, employees, officers, directors, successors, assigns or affiliates (collectively for purposes of this paragraph, "Dell") arising from or relating to this Agreement, its interpretation, or the breach, termination or validity thereof, the relationships between the parties, whether pre-existing, present or future, (including, to the full extent permitted by applicable law, relationships with third parties who are not signatories to this Agreement), Dell's advertising, or any related purchase SHALL BE RESOLVED EXCLUSIVELY AND FINALLY BY BINDING ARBITRATION ADMINISTERED BY THE NATIONAL ARBITRATION FORUM ("NAF") under its Code of Procedure and any specific procedures for the resolution of small claims and/or consumer disputes then in effect (available via the Internet at http://www.arb-forum.com, or via telephone at 1-800-474-2371). The arbitration will be limited solely to the dispute or controversy between Customer and Dell. Any award of the arbitrator(s) shall be final and binding on each of the parties, and may be entered as a judgment in any court of competent jurisdiction. Information may be obtained and claims may be filed with the NAF at P.O. Box 50191, Minneapolis, MN 55405, or by e-mail at file@arb-forum.com, or by online filing at http://www.arb-forum.com.

5    The statement of claim, issued in January 2007, alleges that in 2006, Griffin's computer began to experience overheating problems and that it eventually failed. The statement of claim also alleges that five models of Dell Inspiron computers sold in Canada were defective and asks for certification of the claim as a class proceeding. Claims are asserted in negligence, breach of contract, unjust enrichment, waiver of tort and breach of the *Competition Act*, R.S.C. 1985, c. C-34, s. 52.

6    The representative plaintiff sought to certify a national class of purchasers who bought Dell Inspiron notebook computers between March 2003 and May 2005. At the same time, Dell sought an order staying the action pursuant to the arbitration clause and the *Arbitration Act, 1991*, S.O. 1991, c. 17, s. 7.

**WestlawNext** CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**Griffin v. Dell Canada Inc., 2010 ONCA 29, 2010 CarswellOnt 177**

2010 ONCA 29, 2010 CarswellOnt 177, [2010] O.J. No. 177, 185 A.C.W.S. (3d) 12...

**Reasons of the Motion Judge**

*1. Certification motion and motion for stay*

7    A central issue before the motion judge was whether the decisions of the Supreme Court of Canada in two Quebec appeals, *Union des consommateurs c. Dell Computer Corp.*, [2007] 2 S.C.R. 801 (S.C.C.), and *Muroff c. Rogers Wireless inc.*, [2007] 2 S.C.R. 921 (S.C.C.), required her to grant a stay of the class proceeding. *Dell* involved the same arbitration clause at issue here. The Supreme Court of Canada held that under Quebec law, the right to arbitrate was a substantive right that did not yield to the procedural right to bring a claim by way of class action. The court also held that, as in an individual action, the enforceability of an arbitration clause in a class action should be determinative. If an individual claim would be referred to arbitration, aggregating claims through a class action cannot change this result. Applying the "competence-competence" principle that clothes arbitrators with primary jurisdiction to determine their own competence to deal with a dispute, the court held that the appropriate course was to stay the class proceeding and refer the matter to arbitration.

8    The motion judge held that unless this court said otherwise, she was bound to apply *Smith v. National Money Mart Co.* (2005), 258 D.L.R. (4th) 453 (Ont. C.A.), leave to appeal to S.C.C. refused (2006) (S.C.C.) ("*Smith OCA 2005*"), adopting an approach "consonant with" the decision of the five-judge panel of the British Columbia Court of Appeal in *MacKinnon v. National Money Mart Co.* (2004), 50 B.L.R. (3d) 291 (B.C. C.A.) ("*MacKinnon BCCA 2004*") where the court held, at para. 57:

> An arbitration agreement can be said to be "inoperative" [under the B.C. *Commercial Arbitration Act*, s. 15(2)] only after the court has determined that a class proceeding must be certified because it is the preferable procedure and has met the other requirements for certification. The decision whether to grant a stay of an intended class proceeding should not be made before the court determines whether the action will be certified as a class proceeding.

9    In *Smith OCA 2005*, Weiler J.A. followed *MacKinnon BCCA 2004* and rejected the submission that where a consumer agreement provides for arbitration, a class action should automatically be stayed. She stated, at para. 14, that the "legality of the arbitration provision should be determined at the certification hearing and that it is premature to attempt to stay the action beforehand". Proceeding in this manner allows the judge to consider the language and underlying policies of class action and arbitration legislation and permits the judge to decide upon the enforceability of the arbitration clause and the appropriateness of class action on the basis of a full record.

10    Taking that approach, the motion judge found, at paras. 92-93:

> *It is fanciful to think that any claimant could pursue an individual claim in a complex products liability case.* The defendant does not propose the alternative of individual actions, but relying on the arbitration clauses in Dell's Terms and Conditions, submits that adjudication through arbitration administered by "NAF", the National Arbitration Forum, is preferable to a class proceeding. *Adjudication through arbitration is simply a form of individual adjudication and each claimant will be required to bring separate proceedings before an arbitrator or arbitration panel instead of in the courts.* This will achieve maximum judicial economy, but this is not what the legislators had in mind: [*Markson v. MBNA Canada* (2007), 85 O.R. (3d) 121, at paras. 73-74].
>
> NAF is a U.S. - based administrator of alternative dispute resolution services in Minnesota. NAF's Code of Procedure governs all arbitrations and while NAF offers several methods of dispute resolution including a documentary hearing, *the arbitration process under its Code is a formal and relatively expensive process that includes discovery and can involve a full participatory hearing with oral testimony and argument. It is not the kind of process that would be easy for class members to navigate without legal representation. The multitude of individual issues that Dell says is involved in determining liability will inevitably lead to more complex and therefore more costly arbitration hearings, disproportionate to the small amounts in issue. I do not believe that class members will embark on a NAF arbitration to adjudicate their disputes with the result that Dell will effectively be immunized from accounting to class members for any wrong it may have caused.* Access to justice will not be served. On the other hand, aggregating similar individual actions in a class

Griffin v. Dell Canada Inc., 2010 ONCA 29, 2010 CarswellOnt 177

2010 ONCA 29, 2010 CarswellOnt 177, [2010] O.J. No. 177, 185 A.C.W.S. (3d) 12...

proceeding avoids unnecessary duplication of fact-finding and analysis and distributes fixed litigation costs among class members, making it economical to prosecute this claim, thereby improving access to justice.

[Emphasis added]

*2. Motion for reconsideration*

11      Following the release of *Dell* and *Rogers*, counsel in the two *Money Mart* cases asked the British Columbia Supreme Court and the Ontario Superior Court to find that *Dell* and *Rogers* had effectively overruled *MacKinnon BCCA 2004* and *Smith OCA 2005*. Both courts rejected this submission. In, at para. 35, Brown J. of the British Columbia Supreme Court held that *Dell* and *Rogers* "do not specifically address the issues determined in [*MacKinnon BCCA 2004*], nor do they by necessary implication overturn [*MacKinnon BCCA 2004*]". She added that, in any event, she would exercise her discretion to refuse re-litigation on this issue on the basis of issue estoppel.

12      In *Smith Estate v. National Money Mart Co.* (2008), 57 C.P.C. (6th) 99 (Ont. S.C.J.), Perell J. of the Ontario Superior Court reached the same conclusion after an extensive review of the arbitration and class actions regimes of B.C., Ontario and Quebec. Perell J. held that *Dell* and *Rogers* were explicitly decided on the basis of Quebec law, made no reference to the jurisprudence from the common law provinces, and, at para. 284, that they "do not overrule the law that a court in Ontario or British Columbia may determine whether to stay or not stay an action within the context of the preferable procedure analysis of a certification motion". Perell J. also dismissed the stay motion on the basis of issue estoppel. This court dismissed Money Mart's appeal from that decision on the basis of issue estoppel without deciding whether or not *Dell* and *Rogers* changed the law of Ontario: *Smith Estate v. National Money Mart Co.* (2008), 92 O.R. (3d) 641 (Ont. C.A.) (*Smith OCA 2008*).

13      In *MacKinnon v. National Money Mart Co.* (2009), 304 D.L.R. (4th) 331 (B.C. C.A.) (*MacKinnon BCCA 2009*"), the British Columbia Court of Appeal affirmed the decision of Brown J., refusing to stay the action on the ground of issue estoppel, but after an extensive review of the jurisprudence concluded, at para. 2, that *Dell* and *Rogers* "effectively overruled" its earlier decision in *MacKinnon BCCA 2004* that the validity of an arbitration agreement should to be determined at certification. The court held, at paras. 69-70, that as there was no legislation in British Columbia prohibiting arbitration clauses in consumer agreements, the Supreme Court's reasoning in *Dell* and *Rogers* extends logically to B.C and that the *Dell* and *Rogers* holding that "a valid agreement to arbitrate removes the dispute from the court's purview" applies. In *Seidel v. Telus Communications Inc.*, [2009] 5 W.W.R. 466 (B.C. C.A.) ("*Telus*"), a case decided at the same time as *MacKinnon BCCA 2009*, the British Columbia Court of Appeal applied *Dell* and stayed a proposed class action pursuant to an arbitration clause. The Supreme Court of Canada has granted leave in *Telus* and will likely determine in that appeal the extent to which *Dell* applies outside Quebec: [2009] S.C.C.A. No. 191 (S.C.C.).

14      Following the release of *MacKinnon BCCA 2009* and *Telus*, Dell asked the motion judge to reconsider her earlier decision to conditionally certify the proceeding. The motion judge refused that request and that order is the subject of Dell's second appeal to this court.

**Additional Facts**

15      Since the motion judge's decisions, there have been two significant developments. The first relates to the application of the *CPA*, outlawing mandatory arbitration clauses in consumer contracts. It was common ground before the motion judge that as the representative plaintiff Griffin had purchased his computer for business purposes, he was not a "consumer", defined in s. 1 of the *CPA* as "an individual acting for personal, family or household purposes and does not include a person who is acting for business purposes". Accordingly, the motion judge did not consider the effect of the *CPA*.

16      However, in her certification decision, the motion judge granted the plaintiff leave to add a second representative plaintiff who was a direct purchaser of a computer and who purchased a computer online. That order has now been granted and Ian Andrews, a purchaser who does fall within the definition of "consumer", has been added as a second representative plaintiff. Andrews was a student at the time he purchased a Dell Inspiron 5160 notebook, in November 2004. His computer failed in January 2007. The statement of claim was also amended to include details about the material facts giving rise to a claim under

2010 ONCA 29, 2010 CarswellOnt 177, [2010] O.J. No. 177, 185 A.C.W.S. (3d) 12...

the *CPA*. At a case conference, the motion judge approved the Plaintiff's revised litigation plan and certified the action as a class proceeding. Dell sought leave to appeal the decision to certify this action, but a single judge of the Divisional Court dismissed the motion for leave to appeal on July 31, 2009.

17    The *CPA* came into effect on July 30, 2005. Dell submits that the *CPA* does not apply to Andrews' claim because he purchased his computer before the effective date. Andrews submits that the *CPA* does apply because the facts giving rise to his claim against Dell did not arise until after the effective date.

18    The second development is that the National Arbitration Forum ("NAF"), the body specified in Dell's arbitration clause to administer the exclusive and final arbitration clause, has ceased to function with respect to consumer disputes following allegations of serious impropriety. In a consent judgment entered into between NAF and the State of Minnesota, dated July 17, 2009, NAF agreed to cease accepting or administering any new consumer arbitrations. The consent judgment was entered to settle a suit brought by the Attorney General of Minnesota for declaratory and injunctive relief. While the consent judgment contains no admission of wrongdoing, the suit it settled alleged that NAF had significant conflicts of interest and that it did not provide impartial, independent and neutral adjudicators for consumer disputes.

**Motion to Quash**

19    The respondents move to quash Dell's appeal on the following grounds:

  (1) The demise of NAF renders the arbitration clause unenforceable;

  (2) The appeals are precluded by the *Arbitration Act*, s. 7(6); and

  (3) The orders under appeal are interlocutory in nature.

**Analysis**

*1. Motion to quash*

*(A) The Demise of NAF*

20    The respondents argue that the fact that NAF has ceased to accept consumer arbitrations renders these appeals moot. They submit that the matter is covered by the *Arbitration Act*, s. 16(5), which provides that the court has no power to appoint a substitute arbitrator "if the arbitration agreement provides that the arbitration is to be conducted only by a named arbitrator".

21    A partial answer to this submission is that the consent judgment only bars NAF from conducting "consumer" arbitrations, defined as including "any arbitration involving a dispute between a business entity and a private individual which relates to goods, services, or property of any kind allegedly provided by any business entity to the individual, or payment for such goods, services, or property". Presumably, NAF would still be available to administer arbitrations that fall outside that definition.

22    Second, in my view, s. 16(5) does not apply, as the agreement does not name NAF as the arbitrator. The agreement specifies only that the arbitration is to be "administered" by NAF. NAF's *Code of Procedure* prescribes a method for the selection of the arbitrator. I agree with Dell's submission that the gap created by the demise of NAF with respect to the appointment of the arbitrator is filled by the *Arbitration Act*, s. 10:

  10.(1) The court may appoint the arbitral tribunal, on a party's application, if,

      (a) the arbitration agreement provides no procedure for appointing the arbitral tribunal; or

      (b) a person with power to appoint the arbitral tribunal has not done so after a party has given the person seven days notice to do so.

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 143 of 304

Griffin v. Dell Canada Inc., 2010 ONCA 29, 2010 CarswellOnt 177

2010 ONCA 29, 2010 CarswellOnt 177, [2010] O.J. No. 177, 185 A.C.W.S. (3d) 12...

23    By requiring that claims be submitted for "final and binding arbitration administered by NAF", the agreement gives NAF the power to appoint the arbitral tribunal, and the situation falls under s. 10(1)(b). As NAF is no longer accepting consumer arbitrations, it obviously will not exercise its power under the agreement to appoint an arbitrator and s. 10(1)(b) will thereupon come into play.

24    While the demise of NAF erects a practical hurdle in the way of consumer arbitrations, as a matter of law, I do not agree that the appeal has been rendered moot.

*(b) Arbitration Act, s. 7(6)*

25    The *Arbitration Act*, s. 7(6) provides that "there is no appeal from the court's decision" on a stay application under the section. It is now well-established that this provision does not preclude an appeal from an order refusing to grant a stay on the ground that the matter is not subject to arbitration: *Huras v. Primerica Financial Services Ltd.* (2000), 137 O.A.C. 79 (Ont. C.A.); *Mantini v. Smith Lyons LLP* (2003), 64 O.R. (3d) 505 (Ont. C.A.); *Inforica Inc. v. CGI Information Systems & Management Consultants Inc.* (2009), 97 O.R. (3d) 161 (Ont. C.A.); *Smith OCA 2008*. As the motion judge found that the matter was not subject to arbitration, on the authority of these cases, it follows that s. 7(6) does not bar an appeal to this court.

*(c) Final or interlocutory order*

26    I agree with Dell's submission that *Smith OCA 2008* and the cases it cites decide that an order denying a s. 7 stay is final for the purposes of appeal and therefore that an appeal lies to this court pursuant to the *Courts of Justice Act*, R.S.O. 1990, c. C.43, s. 6(1)(b).

*(d) Motion to quash: conclusion*

27    Accordingly, I would dismiss the motion to quash these appeals.

## 2. Does the Consumer Protection Act, 2002 apply?

28    Contracting parties often specify that any disputes arising from their relationship are to be arbitrated rather than litigated in the courts. When they do, they are ordinarily entitled to have their chosen method of dispute resolution respected by the courts. The modern approach, reflected in *Dell*, is to require parties to adhere to their choice and to view arbitration as an autonomous, self-contained and self-sufficient process, presumptively immune from judicial intervention: *Inforica*, at para. 14.

29    The enactment of the *CPA* reflects the legislature of Ontario's determination that problems arise when this dominant model is applied in the consumer setting. The dominant model is premised upon freedom of contract and party autonomy. Consumer contracts tend to be contracts of adhesion where the suppliers of services and sellers of goods are in a position to impose their own terms unilaterally. Both academic research and the common sense reflected by the findings of the motion judge in this case indicate that suppliers and sellers regularly insert arbitration clauses in order to defeat claims rather than out of a genuine desire to arbitrate disputes with consumers. Such disputes often involve small claims that are not individually viable. Such claims only become viable if they can be aggregated by way of a class proceeding.

30    Clauses that require arbitration and preclude the aggregation of claims have the effect of removing consumer claims from the reach of class actions. The seller's stated preference for arbitration is often nothing more than a guise to avoid liability for widespread low-value wrongs that cannot be litigated individually but when aggregated form the subject of a viable class proceeding: see Theodore Eisenberg, Geoffrey P. Miller and Emily Sherwin, "Mandatory Arbitration for Customers but not for Peers: A Study of Arbitration Clauses in Consumer and Non-Consumer Contracts" (2008), 92 Judicature 118. When consumer disputes are in fact arbitrated through bodies such as NAF that sell their services to corporate suppliers, consumers are often disadvantaged by arbitrator bias in favour of the dominant and repeat-player corporate client: "Developments in the Law: Access to Courts" (2008), 122 Harvard Law Rev. 1151, at pp. 1170-75. I have already noted that allegations of precisely that nature forced NAF to terminate its activities in the field of consumer arbitration. I agree with the observation made by Jonnette Watson Hamilton in "Pre-Dispute Consumer Arbitration Clauses: Denying Access to Justice?" (2006), 51 McGill L.J. 693, at p. 734:

Case 09-10138-MFW   Doc 15740   Filed 06/12/15   Page 144 of 304

Griffin v. Dell Canada Inc., 2010 ONCA 29, 2010 CarswellOnt 177

2010 ONCA 29, 2010 CarswellOnt 177, [2010] O.J. No. 177, 185 A.C.W.S. (3d) 12...

Deference to arbitration is largely based on freedom of contract and the value of personal autonomy. How can such values come into play in contracts of adhesion where that autonomy is only exercised by one of the parties? *There is no reason to defer to businesses that seek to advance only their own self-interests and evade laws not to their liking.*

[Emphasis added]

31      Concerns about the unfairness of mandatory arbitration clauses led the Ontario legislature to enact the *CPA* provisions outlawing mandatory arbitration clauses in consumer agreements. As the announcement from the Ministry of Consumer Services stated, the effect of these clauses is "to diminish consumer protections and in some cases to make satisfactory resolution impossible." The *CPA* provisions are in keeping with what Geneviève Saumier describes in "Consumer Arbitration in the Evolving Canadian Landscape" (2008) 113 Penn St. L. R. 1203, at p. 1226, as a "convergence in most western legal systems *against* the enforcement of pre-dispute mandatory arbitration clauses in consumer contracts and in favor of the maintenance of consumers' access to state courts for the resolution of their disputes." [Emphasis in original]

32      The relevant provisions of the *CPA* are as follows:

7.(1) The substantive and procedural rights given under this Act apply despite any agreement or waiver to the contrary.

(2) Without limiting the generality of subsection (1), any term or acknowledgment in a consumer agreement or a related agreement that requires or has the effect of requiring that disputes arising out of the consumer agreement be submitted to arbitration is invalid insofar as it prevents a consumer from exercising a right to commence an action in the Superior Court of Justice given under this Act.

(3) Despite subsections (1) and (2), after a dispute over which a consumer may commence an action in the Superior Court of Justice arises, the consumer, the supplier and any other person involved in the dispute may agree to resolve the dispute using any procedure that is available in law.

(4) A settlement or decision that results from the procedure agreed to under subsection (3) is as binding on the parties as such a settlement or decision would be if it were reached in respect of a dispute concerning an agreement to which this Act does not apply.

(5) Subsection 7 (1) of the *Arbitration Act, 1991* does not apply in respect of any proceeding to which subsection (2) applies unless, after the dispute arises, the consumer agrees to submit the dispute to arbitration.

8.(1) A consumer may commence a proceeding on behalf of members of a class under the *Class Proceedings Act, 1992* [S.O. 1992, c. 6,] or may become a member of a class in such a proceeding in respect of a dispute arising out of a consumer agreement despite any term or acknowledgment in the consumer agreement or a related agreement that purports to prevent or has the effect of preventing the consumer from commencing or becoming a member of a class proceeding.

(2) After a dispute that may result in a class proceeding arises, the consumer, the supplier and any other person involved in it may agree to resolve the dispute using any procedure that is available in law.

(3) A settlement or decision that results from the procedure agreed to under subsection (2) is as binding on the parties as such a settlement or decision would be if it were reached in respect of a dispute concerning an agreement to which this Act does not apply.

(4) Subsection 7 (1) of the *Arbitration Act, 1991* does not apply in respect of any proceeding to which subsection (1) applies unless, after the dispute arises, the consumer agrees to submit the dispute to arbitration.

33      These *CPA* provisions resolve the tension between the *Arbitration Act* and the *Class Proceedings Act* in favour of class proceedings and, if applicable, constitute a complete refutation of Dell's insistence that the *Arbitration Act* must prevail.

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 145 of 304

Griffin v. Dell Canada Inc., 2010 ONCA 29, 2010 CarswellOnt 177

2010 ONCA 29, 2010 CarswellOnt 177, [2010] O.J. No. 177, 185 A.C.W.S. (3d) 12...

34    The *CPA* came into force on July 30, 2005. Ian Andrews, the added representative plaintiff, purchased his computer in August 2003. His computer allegedly failed in January 2007.

35    Dell submits that as Andrews' claim relates to a computer purchased before July 30, 2005, Dell acquired a "vested right" to enforce the arbitration clause and that the *CPA* does not apply retroactively to deprive it of that right. The respondent plaintiff argues that as the defect in Andrews' computer - the fact upon which his claim is based - did not arise until after July 31, 2005, he is entitled to claim the benefit of the *CPA*.

36    On this issue, the representative plaintiff relies on passages from *Dell*, where the Supreme Court considered the application of an amendment to Quebec's *Consumer Protection Act*, R.S.Q. c. P-40.1, that was enacted after the case had reached the Supreme Court. Like the *CPA*, the Quebec legislation prohibited stipulations in consumer agreements that required the consumer to refer disputes to arbitration or prohibited a consumer from becoming a member of a group bringing a class action. The representative plaintiff submits that Deschamps J.'s analysis of this issue in *Dell*, when applied to the facts of this case, is dispositive in his favour.

37    *Dell* involved a dispute with respect to the online price of two laptop computers. Dell erroneously advertised two models at prices of $89 and $118 rather than $379 and $549 respectively and took steps to correct the error a day later. The representative plaintiff sued to enforce his right to purchase a computer at the lower advertised price. Applying well-established rules of statutory interpretation, the court held that the legislation had immediate effect and applied to all claims that arose after its effective date. As the legislation did not expressly state that it applied retroactively, it did not apply to claims that arose before its effective date. On the facts of the case before the court, all the facts giving rise to the claim had occurred before the effective date of the legislation, and accordingly the legislation did not apply to the claim.

38    In my view, the inevitable conclusion that flows from the court's discussion of the issue is that where, as in the present case, not all the facts giving rise to the claim arose until *after* the effective date of the legislation, the legislation governs, even though the contract was concluded prior to the effective date.

39    Writing for the majority, Deschamps J. wrote, at paras. 113-115:

> Professor P.-A. Côté writes in *The Interpretation of Legislation in Canada* (3rd ed. 2000), at p. 169, that "retroactive operation of a statute is highly exceptional, whereas prospective operation is the rule". He adds that "[a] statute has immediate effect when it applies to a legal situation that is ongoing at the moment of its commencement: the new statute governs the future developments of this situation" (p. 152). *A legal situation is ongoing if the facts or effects are occurring at the time the law is being modified* (p. 153). A statute of immediate effect can therefore modify the future effects of a fact that occurred before the statute came into force without affecting the prior legal situation of that fact.

> To make it clear what is meant by an ongoing situation and one whose facts and effects have occurred in their entirety, it will be helpful to consider the example of the obligation to warrant against latent defects cited by professors P.-A. Côté and D. Jutras in *Le droit transitoire civil: Sources annotées* (loose-leaf), at p. 2-36. *This obligation comes into existence upon the conclusion of the sale, but the warranty clause does not produce tangible effects unless a problem arises with the property sold. The warranty comes into play either when the vendor is put in default or when a claim is made.* Once all the effects of the warranty have occurred, the situation is no longer ongoing and the new legislation will not apply to the situation unless it is retroactive.

> *Can the facts of the case at bar be characterized as those of an ongoing legal situation? If they can, the new legislation applies. If all the effects of the situation have occurred, the new legislation will not apply to the facts.*

> [Emphasis added]

40    Deschamps J. found, at para. 116, that once the representative plaintiff had notified Dell of his claim, "[a]ll the facts of the legal situation had...occurred". As that had happened before the effective date of the legislation, and as there was nothing

Case 09-10138-MFW Doc 15740 Filed 06/12/15 Page 146 of 304

Griffin v. Dell Canada Inc., 2010 ONCA 29, 2010 CarswellOnt 177

2010 ONCA 29, 2010 CarswellOnt 177, [2010] O.J. No. 177, 185 A.C.W.S. (3d) 12...

in the legislation to indicate that it applied retroactively, the legislation did not govern the claim. Deschamps J. concluded this portion of her reasons as follows, at para. 120:

> I accordingly conclude that since the facts triggering the application of the arbitration clause had already occurred before s. 2 of Bill 48 came into force, this provision does not apply to the facts of the case at bar.

41    In the case at bar, until the computers failed, there was no claim but rather "an ongoing legal situation" that only came to an end when the claims of the purchasers arose upon the failure of the computers. As "the facts triggering the application of the arbitration clause" did not occur until after July 31, 2005, it follows from *Dell* that the *CPA* applies and governs those claims.

42    I do not agree with Dell's submission that these passages from Deschamps J.'s judgment should be read as being subject to its "vested rights" argument. At para. 10, Deschamps J. specifically refers to Dell's argument that it "had a vested right to the arbitration procedure provided for in the contract with [the purchaser]" and from the balance of her judgment one can only conclude that her analysis of the "vested rights" submission is subsumed in her discussion of the application of the legislation that I have set out above.

43    I conclude accordingly that the *CPA* applies to exclude the application of Dell's arbitration clause to all "consumer" claims where the alleged defect of malfunction occurred after July 31, 2005, and that as the motion judge found that the unusual certification requirements are satisfied, those claims may proceed by way of class action.

### 2. Should we grant a partial stay of the non-consumer claims?

44    The evidence before the motions judge was that approximately 70% of purchasers of the Dell Inspiron laptops were "consumers". Assuming, without deciding, that *Dell* applies in Ontario and that *Dell* would require the non-consumer claims to proceed by way of arbitration, should the non-consumer claims be stayed?

45    The *Arbitration Act*, s. 7(5) confers a discretion to grant a partial stay where an action involves some claims that are subject to an arbitration and some claims that are not:

> (5) The court may stay the proceeding with respect to the matters dealt with in the arbitration agreement and allow it to continue with respect to other matters if it finds that,

>> (a) the agreement deals with only some of the matters in respect of which the proceeding was commenced; and

>> (b) it is reasonable to separate the matters dealt with in the agreement from the other matters.

46    In my view, it would not be reasonable to separate the consumer from the non-consumer claims. We should, therefore, refuse a partial stay and allow all the claims to proceed under the umbrella of the class proceeding.

47    Granting a stay of the non-consumer claims would lead to inefficiency, a potential multiplicity of proceedings, and added cost and delay. This would be contrary to the *Courts of Justice Act*, s. 138, which provides that "[a]s far as possible, a multiplicity of legal proceedings should be avoided", and contrary to the jurisprudence on the reasonableness of partial stays under s. 7(5) of the *Arbitration Act*.

48    In *Radewych v. Brookfield Homes (Ontario) Ltd.*, [2007] O.J. No. 2483 (Ont. S.C.J.), one party to the dispute was subject to an arbitration clause and another set of parties implicated in the same dispute were not subject to the arbitration clause. Gray J. decided against granting a partial stay, at para. 23:

> To do so would potentially delay the resolution of the entire matter, and could produce a significant duplication of resources and potentially inconsistent findings. Such a course would be contrary to the policy reflected in section 138 of the *Courts of Justice Act* which, simply stated, provides that "as far as possible, multiplicity of legal proceedings shall be avoided". It is preferable, in my view, that all of the various claims, against all of the defendants, be determined in one proceeding.

2010 ONCA 29, 2010 CarswellOnt 177, [2010] O.J. No. 177, 185 A.C.W.S. (3d) 12...

49    This court quashed an appeal from that decision and expressly approved of this passage in Gray J.'s reasons: 2007 ONCA 721 (Ont. C.A.), at para. 3. The same principle has been applied in other cases: see *Johnston v. Mlakar* (2006), 212 O.A.C. 79 (Ont. C.A.), at para. 18; *Penn-Co Construction Canada (2003) Ltd. v. Constance Lake First Nation*, [2007] O.J. No. 3940 (Ont. S.C.J.), at para. 31; *New Era Nutrition Inc. v. Balance Bar Co.* (2004), 245 D.L.R. (4th) 107 (Alta. C.A.), at paras. 37-38. In *Frambordeaux Developments Inc. v. Romandale Farms Ltd.*, [2007] O.J. No. 4917 (Ont. S.C.J.), at para. 34, Thorburn J. summarized the thrust of this jurisprudence in the following way:

> The courts have held that where one of the parties to the action is not subject to an arbitration clause, and the claim involving the non-party to the arbitration clause and the claim sought to be submitted to arbitration both contain closely related facts and issues in dispute, a partial stay is not reasonable. The court should instead exercise its discretion to deny the stay of proceedings and allow the entire matter to proceed in one forum.

50    Seventy per cent of the claims in this case are consumer claims. Those claims will be litigated in the class proceeding. The liability and damages issues to be litigated are the same for both consumer and non-consumer claims. As the consumer claims dominate, it is reasonable that the remaining claims should follow the procedural route that the consumer claims must take.

51    A partial stay would require an examination of each claim and a determination of whether it was a consumer or non-consumer claim. This is bound to be contentious in the case of many purchasers, as laptop computers are portable and regularly used for a variety of purposes. Dividing the claims as between those to be litigated and those to be arbitrated would be costly and time-consuming. That cost and delay can be avoided by refusing a partial stay.

52    The motion judge's finding that claims cannot be efficiently litigated through the arbitration process is another factor supporting the conclusion that it would not be reasonable to grant a partial stay.

53    The motion judge's finding is amply supported by the evidence. The representative plaintiff Griffin deposed as follows:

> As director and officer of Griffin Leasing, I am not in a position to take time away from my business to pursue arbitration. I have never participated in an arbitration dealing with a product defect or any other matter before, let alone an arbitration to establish the defective nature of the Computer. Without the advice of counsel, I would not know how to proceed or what type of evidence I would need to present. There is no reasonable prospect of me pursing an individual arbitration if Dell's motion succeeded. Furthermore, I cannot envision a situation where any other class member would pursue arbitration to recover modest sums.

54    Likewise, the added representative plaintiff Andrews, a student at the time he purchased his computer, deposed:

> I am not in a financial position to pursue my dispute with Dell over the failure of the Computer to arbitration. I have never participated in an arbitration dealing with a product defect or any other matter before, let alone an arbitration to establish the defective nature of the Computer. Without the advice of counsel, I would not how to proceed or what type of evidence I would need to present. There is no reasonable prospect of me pursing an individual arbitration if Dell's motion succeeded.

55    Kelly Reid, another student, is a class member who had purchased a Dell computer for school and personal use. She deposed:

> As I am a university student, I am not in a financial position to pursue my dispute with Dell over the failure of the Computer to arbitration. I have never participated in an arbitration dealing with a product defect or any other matter before, let alone an arbitration to establish the defective nature of the Computer. Without the advice of counsel, I would not know how to proceed or what type of evidence I would need to present. There is no reasonable prospect of me pursuing an individual arbitration if Dell's motion succeeded.

56    Dell offered no evidence to indicate that the arbitration of these claims would be anything other than cost-prohibitive. Dell's witness was unable to answer a question posed on cross-examination as to whether any Dell customer had been able to take a claim to arbitration.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    13

Griffin v. Dell Canada Inc., 2010 ONCA 29, 2010 CarswellOnt 177

2010 ONCA 29, 2010 CarswellOnt 177, [2010] O.J. No. 177, 185 A.C.W.S. (3d) 12...

57    In my view, it is clear beyond any serious doubt on this record that staying any claims advanced in the action will not result in any of the stayed claims being arbitrated. I agree with the motion judge that there is a lack of reality to Dell's argument that the claim should proceed by way of arbitration. There will be no arbitration. The choice is not between arbitration and class proceeding; the real choice is between clothing Dell with immunity from liability for defective goods sold to non-consumers and giving those purchasers the same day in court afforded to consumers by way of the class proceeding.

58    It may be argued that the complexity and cost of the arbitration process selected by Dell will effectively neutralize the risk of multiple proceedings by eliminating arbitration as a viable means of pursuing a claim. This is no doubt true. However, allowing one party to erect economic and procedural barriers which trump substantive rights and deny the other party access to justice is not what the jurisprudence has in mind when it speaks of promoting judicial economy and efficiency and avoiding multiple proceedings: see *Markson v. MBNA Canada Bank* (2007), 85 O.R. (3d) 321 (Ont. C.A.) at para. 73.

59    The fact that NAF is now barred from administering "consumer" arbitrations adds another layer of complexity standing in the way of a customer wishing to assert a claim for a defective laptop. The definition of "consumer" in the *CPA* is not the same as the definition of "consumer" in the consent judgment barring NAF from conducting consumer arbitration. Under both definitions, it will often be difficult to determine whether or not, on the facts, a customer is a "consumer". Given Dell's adamant insistence upon arbitration, I have little doubt that Dell would insist that a disappointed customer who falls into any arguable grey area created by these different definitions of "consumer" must proceed first to arbitration. The customer would then be required to take the following steps: (1) file a claim with NAF and ask to NAF appoint an arbitrator; (2) if NAF refused to do so to avoid the risk of contravening the consent judgment, after seven days, the customer would have to launch a court proceeding pursuant to the *Arbitration Act*, s. 10 to ask the court to appoint an arbitrator; (3) proceed before the arbitrator to argue the jurisdiction of the arbitrator; (4) if the arbitrator accepted jurisdiction, argue the claim on the merits before the arbitrator; or (5) if the arbitrator refused jurisdiction, return to the court. These additional steps, easily avoided if no partial stay is granted, would make it even more difficult to imagine how a customer could advance a claim that his or her $2000 computer does not function as promised by Dell.

60    It is important to note in this regard that Dell's arbitration clause not only requires all claims to be arbitrated, but also provides that "[t]he arbitration will be limited solely to the dispute or controversy between Customer and Dell", thereby precluding the possibility of a class arbitration. I would have found Dell's position much more persuasive had Dell been prepared to submit to an arbitration that would allow for the efficient adjudication of the claims on a group or class basis. However, in oral argument, Dell's counsel confirmed that his client would insist upon the enforcement of this provision and resist any attempt before an arbitrator to join together the claims of a group or class of consumers. In my view, this provides further evidence, if further evidence is required, that Dell does not genuinely seek to have the claims advanced against it determined by way of arbitration. Dell is simply seeking to exploit the inefficiency of arbitrating individual claims. As that inefficiency can be avoided if all the claims proceed by way of the class proceeding, I conclude that a granting a partial stay would not be reasonable.

61    In *Smith OCA 2008*, we faced the issue of whether to exercise our discretion to relieve the defendant of the application of issue estoppel in view of an alleged change in the law and to grant a stay in favour of arbitration. Our comments, at paras. 50-51, are applicable here:

> As the certification judge observed, the claim of each class member is small. For instance, the representative plaintiff's claim is for $83. As the certification judge found, it is simply not economically feasible to arbitrate a claim of that size. In addition, some of the loan agreements signed by the representative plaintiff preclude the "joinder or consolidation of claims with other persons ... without the consent of the parties" and other agreements contain class action waivers. When asked during oral argument, counsel for the appellants could not assure us that their clients would agree to waive their right to object to any form of joinder or consolidated arbitration. It is almost certainly the case that a stay would defeat the claims subject to arbitration clauses, not on the merits but for reasons of practicality. Enforcing the arbitration clauses would not lead to arbitration but would immunize the appellants from any claims. This is hardly a compelling case for the exercise of judicial discretion.

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 149 of 304

Griffin v. Dell Canada Inc., 2010 ONCA 29, 2010 CarswellOnt 177

2010 ONCA 29, 2010 CarswellOnt 177, [2010] O.J. No. 177, 185 A.C.W.S. (3d) 12...

Furthermore, even if the claims subject to arbitration clauses were stayed, the appellants would almost certainly still have to defend a reconstituted class action by the class of borrowers who did not sign similar agreements or who signed agreements after the *Consumer Protection Act, 2002* provisions came into force. I fail to see the justice in an exercise of discretion that would stay these claims at this late stage. It would surely be in the interests of justice to have all claims resolved in one proceeding.

62      Accordingly, I would refuse a partial stay of the claims not covered by the *CPA*.

### 3. Application of Dell in Ontario

63      I turn finally to the issue that was front and centre before the motion judge and that was the main focus of oral argument before this court: does *Dell* apply in Ontario?

64      On more than one occasion, this court has applied some of the general principles relating to the interpretation and application of arbitration clauses that emerge from the Supreme Court's judgment in *Dell*: see *Dancap Productions Inc. v. Key Brand Entertainment Inc.* (2009), 55 B.L.R. (4th) 1 (Ont. C.A.), at paras. 34; *Jean Estate v. Wires Jolley LLP* (2009), 310 D.L.R. (4th) 95 (Ont. C.A.), at paras. 6-8. However, by enacting the *CPA* and by outlawing mandatory arbitration clauses in consumer agreements, the Ontario legislature has excluded the application of the reasoning in *Dell* to agreements covered by the *CPA*. As I have concluded that the *CPA* applies to the claim of the representative plaintiff Andrews and that a partial stay of the claim of the representative plaintiff Griffin should be refused, it is not necessary for me to decide whether, apart from the *CPA*, *Dell* would have applied in Ontario. As the CPA will apply to all consumer claims arising after July 31, 2005, consideration of the application of *Dell* in Ontario has been rendered largely academic. To the extent that the application of *Dell* does remain a live issue, we are likely to receive further guidance from Supreme Court of Canada when it decides the appeal in *Telus*.

### Conclusion

65      For these reasons, I would dismiss Dell's appeals. If the parties are unable to agree as to the costs of these appeals, the respondents may file brief written submissions within fifteen days of the release of these reasons and the appellant may respond with brief written submissions within ten days thereafter.

**W. Winkler C.J.O.:**

I agree.

**Doherty J.A.:**

I agree.

**K. Feldman J.A.:**

I agree.

**E.E. Gillese J.A.:**

I agree.

*Order accordingly.*

Footnotes

\*        Additional reasons at *Griffin v. Dell Canada Inc.* (2010), 2010 CarswellOnt 1192, 2010 ONCA 164 (Ont. C.A.).

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**Griffin v. Dell Canada Inc., 2010 ONCA 29, 2010 CarswellOnt 177**

2010 ONCA 29, 2010 CarswellOnt 177, [2010] O.J. No. 177, 185 A.C.W.S. (3d) 12...

**End of Document**          Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Griffin v. Dell Canada Inc., 2010 CarswellOnt 3417

2010 CarswellOnt 3417, 2010 CarswellOnt 3418, [2010] S.C.C.A. No. 75...

2010 CarswellOnt 3417
Supreme Court of Canada

Griffin v. Dell Canada Inc.

2010 CarswellOnt 3417, 2010 CarswellOnt 3418, [2010]
S.C.C.A. No. 75, 275 O.A.C. 398 (note), 409 N.R. 378 (note)

# Dell Canada Inc. v. Thaddeus Griffin

Abella J., Cromwell J., McLachlin C.J.C.

Judgment: May 20, 2010
Docket: 33588

Proceedings: Leave to appeal refused, 2010 ONCA 29, 2010 CarswellOnt 177, 64 B.L.R. (4th) 199, 98 O.R. (3d) 481, 80 C.P.C. (6th) 154 (Ont. C.A.); Affirmed, 72 C.P.C. (6th) 158, 2009 CarswellOnt 560, [2009] O.J. No. 418 (Ont. S.C.J.); Affirmed, 76 C.P.C. (6th) 173, 2009 CarswellOnt 2085, [2009] O.J. No. 1592, 64 B.L.R. (4th) 186 (Ont. S.C.J.); Affirmed (on reconsideration), 72 C.P.C. (6th) 158, 2009 CarswellOnt 560, [2009] O.J. No. 418 (Ont. S.C.J.)

Counsel: None given

Subject: Civil Practice and Procedure; Corporate and Commercial; Public

### Related Abridgment Classifications
For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

### Headnote
#### Alternative dispute resolution

#### Civil practice and procedure

#### Judges and courts

**Per curiam:**

1    The motion to expedite the application for leave to appeal is granted. The application for leave to appeal from the judgment of the Court of Appeal for Ontario, Numbers C50474 and C50137, 2010 ONCA 29, dated January 20, 2010, is dismissed with costs.

**End of Document**    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# TAB 12

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 153 of 304

In re Joy Global, Inc. f/k/a Harnischfeger Industries, Inc., Not Reported in F.Supp.2d...

2011 WL 5865542

Editor's Note: Additions are indicated by Text and deletions by ~~Text~~ .

Only the Westlaw citation is currently available.
United States District Court,
D. Delaware.

In re JOY GLOBAL, INC. f/k/a
HARNISCHFEGER INDUSTRIES, INC., Debtor.
Joy Global, Inc. f/k/a Harnischfeger
Industries, Inc., Plaintiff,
v.
Wisconsin Department of Workforce
Development, Defendant.

Civ. No. 01–039–LPS.    |    Nov. 22, 2011.

**Attorneys and Law Firms**

Bruce Grohsgal, Laura Davis Jones, Pachulski Stang Ziehl & Jones L.L.P., Wilmington, DE, Scotta E. McFarland, Pachulski Stang Ziehl & Jones L.L.P., Los Angeles, CA, for Plaintiff.

Stuart B. Drowos, Department of Justice, Wilmington, DE, John R. Sweeney, Richard Briles Moriarty, Attorney General's Office/Justice Department, Madison, WI, for Defendant.

**MEMORANDUM ORDER**

LEONARD P. STARK, District Judge.

 *1 Pending before the Court is the Motion of the Wisconsin Department of Workforce Development ("DWD" or "the Department") to Amend or Add to Factual Findings, to Alter or Add to Legal Conclusions, and to Alter or Amend the Judgment Pursuant to Fed.R.Civ.P. 52(b) and 59(e) ("Motion" or "Mot."). (D.I.565) DWD requests extensive revisions to the Court's post-trial Opinion of September 21, 2010 (D.I.563) (hereinafter, "Opinion" or "Op."), and also that the Court "enter[ ] a Judgment in favor of the Department and against Joy Global" (D.I. 565 at 2). Plaintiff, Joy Global, Inc. ("Joy Global"), asks that DWD's Motion be stricken and/or denied. (D.I.567) For the reasons set forth below, the Motion is STRICKEN and DENIED.

**I.** *Violation of Local Rules*

The Court conducted a bench trial on March 1–3, 2010. (D.I. 550–52, hereinafter "Tr.") Following post-trial briefing, on September 21, 2010 the Court issued an Opinion, containing Findings of Fact and Conclusions of Law. (D.I.563) On the same day, the Court entered an Order granting judgment in favor of Joy Global and against DWD. (*Id.* at 1)

On October 18, 2010, DWD filed its 37–page Motion. (D.I.565) The next day, October 19, 2010, DWD added a 29–page brief supporting the Motion. (D.I. 566, hereinafter "Brief")

District of Delaware Local Rule 7.1.3(a)(4) states: "No opening or answering brief shall exceed 20 pages, and no reply brief shall exceed 10 pages, in each instance exclusive of any table of contents or table of citations."DWD's 29–page Brief, plainly, exceeds the page limit imposed by the Local Rule. Moreover, DWD's 37–page Motion is, in essence, another brief, which itself exceeds the Court's page limitations. Together, DWD's 66 pages of briefing constitute a gross violation of the Court's Local Rules.

At no time prior to filing its Motion or Brief did DWD seek leave to file an over-length Motion or Brief. [1] DWD's violation of the Court's rules prejudiced Joy Global, which had to evaluate and respond to more than three times as much argument than would have been necessary had DWD complied with the Local Rules. DWD's filings also imposed an undue burden on the Court.

[1]     Only after Joy Global filed its Answering Brief, requesting that the Motion and Brief be stricken for violating the Court's Local Rules (D.I. 567 at 2), did DWD belatedly seek leave to submit over-length filings or to refile papers that comply with the Local Rules (D.I. 568; D.I. 569 at 1–2). The Court entered an Oral Order stating: "DWD's Motion to Replace Initial Brief Or Alternatively Allow Page Limits to Be Exceeded (D.I.568) is DENIED. The Court will consider DWD's initial 29–page overlength brief (D.I.566) and 37–page motion (D.I.565) and will determine, in connection with its review of the merits of DWD's motion (D.I.565), whether to strike DWD's original filings."(D.I.571) Having now undertaken such analysis, the Court has, for the reasons stated, decided to strike the Motion and Brief.

Joy Global asks the Court to strike DWD's Motion and Brief. (D.I.567) Under the circumstances, such a sanction is both reasonable and appropriate. *See* D. Del. LR 1.3(a) ("Sanctions

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 154 of 304

In re Joy Global, Inc. f/k/a Harnischfeger Industries, Inc., Not Reported in F.Supp.2d...

2011 WL 5865542

may be imposed, at the discretion of the Court, for violations of the Rules, as well as for violations of the Fed.R.Civ.P. and any order of the Court. Such sanctions may include, but are not limited to, costs, fines and attorneys' fees imposed on the offending party and that party's attorney."); D. Del. LR 1.3(b) ("Likewise, failure of counsel to comply with the Rules relating to motions may result in the determination of the motion against the offending party."). Accordingly, the Court STRIKES DWD's Motion and Brief.

## II. *Fed. R. Civ. Proc. 52(b) and 59(e)*

Although DWD's Motion and Brief are STRICKEN, the Court will—just as it did in the Opinion (Op. at 39 n. 4)—reach the other issues raised by the parties. Having undertaken the necessary analysis, the Court concludes that all of the relief requested by DWD is DENIED.

**\*2** DWD's Motion is brought pursuant to Federal Rules of Civil Procedure 52(b) and 59(e).Rule 52(b) provides: "[o]n a party's motion filed no later than 28 days after the entry of judgment, the court may amend its findings—or make additional findings—and may amend the judgment accordingly. The motion may accompany a motion for a new trial under Rule 59."In turn, Rule 59(e) provides: "[a] motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment."

"The purpose of a Rule 52(b) motion is to correct manifest errors of law or fact or, in some limited situations, to present newly discovered evidence."*Power Integrations, Inc. v. Fair child Semiconductor Intern., Inc.,* 762 F.Supp.2d 710, 717 (D.Del.2011) (internal quotation marks omitted)."[S]everal courts have [also] noted that the standard for a 52(b) motion is identical to the standard for a 59(e) motion to alter a judgment."*See id.* at 717 n. 4."A proper Rule 59(e) motion ... must rely on one of three grounds: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error of law or prevent manifest injustice."*Lazaridis v. Wehmer,* 591 F.3d 666, 669 (3d Cir.2010).

"A motion for reconsideration is not properly grounded on a request that a court rethink a decision already made."*Lazaridis v. Wehmer,* 2009 WL 5227659, at \*1 (D.Del. Jan.14, 2009)."[R]eargument and reconsideration requests are not a substitute for an appeal from a final judgment."*Brambles USA, Inc. v. Blocker,* 735 F.Supp. 1239, 1240 (D.Del.1990) (internal quotation marks omitted). Moreover, the availability of such motions is not intended

"to allow for endless debate between the parties and the Court."*Id.* (internal quotation marks omitted).

Here, DWD fails to satisfy the standards for relief under either Rule 52(b) or Rule 59(e). DWD does not identify any manifest or clear errors of law or fact, newly discovered evidence, an intervening change in controlling law, or any need to prevent manifest injustice.

Instead, DWD essentially seeks to rewrite the Court's Opinion, specifically seeking alteration of as many as 20 of the Court's 108 Findings of Fact ("FF") [2] and reversal of several of the Court's Conclusions of Law. In almost all instances, DWD's arguments amount to a rehash of its previous arguments already rejected by the Court.

[2]     DWD is not always consistent in identifying the specific Findings of Fact it seeks to amend. *Compare* D.I. 565 at 2 (identifying FF 27, 28, 29, 30, 38, 40, 48, 52, 55, 57, 63, 67, 71, 72, 73, 74, 77, 83, 91) *with id.* at 12, 541 N.W.2d 203 (identifying FF 29, 30, 38, 40, 48, 52, 55, 57, 63, 67, 71, 72, 73, 74, 77, 83, 91, which adds FF 66 to prior list but omits FF 27 and 28) *and id.* at 12–35, 541 N.W.2d 203 (providing narrative argument regarding amendment of FF 29, 30, 38, 40, 48, 52, 55, 57, 63, 66, 67, 71, 72, 73, 74, 77, 81, and 91).

In many instances, DWD directly challenges the Court's credibility findings and decisions as to the reasonable inferences that may be drawn from the evidence presented at trial. *See, e.g.,* D.I. 565 at 16 (faulting Court for making finding based on Readinger's perception, as "that perception is ill-based," given what DWD views as "Readinger's lack of knowledge"); *id.* at 20 (arguing that Committee was "f[a]r more likely referencing" other major contracts rather than severance contracts); *id.* at 23 (faulting Court, with respect to FF 63, for relying on testimony that purportedly "is demonstrably false"); *id.* at 26 (noting "the numerous reasons to disbelieve all of his [Chokey's] testimony"); *id.* at 28 (stating that "[t]here is no basis, anywhere in the record for either the first or second sentence of FF 73. Even if there were, those findings would [be] overwhelmingly outweighed by the contrary evidence in the record.").

**\*3** In some places, the Motion admits that the Court had an evidentiary basis for its findings and conclusions, but still asks that the Court look again at the very same evidence and come to a completely different result. *See,* e.g., D.I. 565 at 33 (contending, with respect to FF 91, "no evidence —*other than* the second-hand statements that Readinger

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 155 of 304

In re Joy Global, Inc. f/k/a Harnischfeger Industries, Inc., Not Reported in F.Supp.2d...

2011 WL 5865542

heard from Harnischfeger through Dangremond—suggest that the Committee ever actually wanted Beloit to stop paying severance, much less that it expressed any such viewpoint to the Debtors") (emphasis added); *see also id.* at 34–35 (repeating "[n]o evidence—other than" phrase three more times); D.I. 565 at 32 ("The second sentence of FF 81 reflects what Winkleman testified to, but the overwhelming record evidence is to the contrary.").

Throughout its Motion, DWD also complains of the Court's word choice, and proposes to add or delete phrases, sentences, and even paragraphs to or from the Court's Opinion. *See, e.g.,* D.I. 565 at 12 (identifying certain "language that should [be] added through underlining (e.g., *language to add* ) and language that should be omitted through strikeouts (e.g., ~~language to omit~~ )"); *id.* at 15 (suggesting Court omit sentence from Opinion because it is "irrelevant," and its inclusion wrongly "conveys that it has relevance"); *id.* at 16 (complaining of second sentence of FF 40 "[a]s worded"); *id.* at 21 (stating in FF 55 "[a] sentence should be added, between the second and third sentences"); *id.* at 22 (arguing that "second and third sentences of FF 63 should be omitted"); *id.* at 25 ("FF 71 should be amended to insert between the first and second sentences, the following [five new sentences].").

In its Brief, DWD reveals the thinking behind its Motion: "[t]he Department submits that the Opinion is a potentially excellent product that is in need of a rewrite-and a new ending."(D.I. 566 at 1) However, "this Court's opinions are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure."*Brambles,* 735 F.Supp. at 1240 (internal quotation marks omitted). After presiding over trial, and considering the detailed post-trial briefs, the Court issued its 62–page Opinion, containing its Findings of Fact and Conclusions of Law. The Court issued the Opinion the Court felt was warranted by the evidence and the law. DWD has an opportunity to pursue appellate review. DWD's hope to rewrite the Opinion, however, is not a proper basis for relief.

It is not necessary to dissect each of the specific contentions made in DWD's lengthy Motion and Brief. Having reviewed each of them, the Court concludes that none constitute a meritorious basis for relief under either Rule 52(b) or Rule 59(e). Accordingly, again, the Motion is DENIED.

## III. *Intent*
DWD moves for alteration or amendment of the Court's Conclusions of Law regarding "whether the Department

proved the intent element."(D.I. 565 at 2) DWD argues: "the intent element could be proven through two alternate methods, one involving purpose and the other involving predictability. This Motion focuses on the second alternate method."(*Id.* at 3) The bulk of DWD's Brief is devoted to this argument. (D.I. 566 at 13–24) In DWD's view, "[r]egardless of whether the Department proved the intent element through the first alternate method, the preponderance of the evidence established as a matter of law that it was certain or reasonably certain that Harnischfeger's actions, through Dangremond, would interfere with the severance contracts between Beloit Corporation and the former Beloit workers whose claims are pursued by the Department."(*Id.* at 22)

**\*4** As Joy Global points out (D.I. 567 at 1), under Wisconsin law—pursuant to what DWD now calls the "predictability" theory—a party may prove intent when it is apparent at the outset that the alleged tortfeasor acted with the intention to interfere with the prospective contract or acted in such a fashion and for such purpose that he knew that the interference was certain, or substantially certain, to occur. *See Foseid v. State Bank of Cross Plains,* 197 Wis.2d 772, 790 n. 11, 541 N.W.2d 203 (Wisc.Ct.App.1995).

The Opinion demonstrates that the Court recognized and considered DWD's "predictability" theory of intent. For instance, in describing the "Legal Standard for Tortious Interference," the Court stated: "[l]iability will be found only when the actor *knew that the interference was certain, or substantially certain, to occur.*"(Op. at 36) (internal quotation marks omitted; emphasis added) Also, Plaintiff "must prove that (defendant)'s prime purpose was to interfere with the contractual relationship (plaintiff) had with (3rd party) or (defendant) *knew or should have known that such interference was substantially certain to occur* as a result of the conduct." (*Id.* at 36–37, 541 N.W.2d 203) (internal quotation marks omitted; emphasis added) "To demonstrate such intentionality, the record must show that Harnischfeger *either* had as its 'prime purpose' the interference with the former Beloit employees' right to severance *or knew that interference with the Beloit employees' severance rights was substantially certain to occur as a result of Harnischfeger's conduct.*"(*Id.* at 45, 541 N.W.2d 203) (emphasis added) Elsewhere, the Opinion concluded: "In the end, DWD simply has not proven that the 'prime purpose' of Harnischfeger's communication to Beloit through Dangremond was to interfere with the Beloit employees' contractual rights to severance. *Nor has DWD proven that Harnischfeger knew or should have known that it was substantially certain that*

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 156 of 304

In re Joy Global, Inc. f/k/a Harnischfeger Industries, Inc., Not Reported in F.Supp.2d...

2011 WL 5865542

*Beloit would change its severance policies in response to Harnischfeger's communication to Beloit."*(*Id.* at 50, 541 N.W.2d 203) (emphasis added)

The essence of DWD's argument is as follows: "when Dangremond told Readinger that the Committee wanted Beloit to eliminate severance, it was certain or reasonably certain that this initial contact would interfere with the contractual rights of the former workers whose rights are pursued by the Department."(D.I. 565 at 4) In this way, DWD's "predictability" theory of intent is merely a rehash of the argument DWD presented at trial and in its post-trial briefs. The Court finds no proper basis to reconsider the findings and conclusions contained in the Opinion. Thus, DWD's Motion is DENIED.

## IV. *Scope of Interference*

DWD moves for alteration or amendment of the Court's Conclusions of Law "regarding the scope of Harnischfeger's interference."(*Id.* at 2, 541 N.W.2d 203) Specifically, DWD complains that the Court made "the erroneous legal assumption ... that interference by Harnischfeger was restricted to the initial contact by Dangremond."(*Id.* at 7, 541 N.W.2d 203) In other words, the Court "erred as a matter of law ... in determining that Harnischfeger's interference was restricted to the initial contact that Dangremond made with Readinger—telling him that the Creditor's Committee wanted Beloit to eliminate severance."(D.I. 566 at 10)

 **\*5** The Court found that DWD met its burden in proving the essential element of interference. *See* Op. at 40–44. Even had the Court found a more extensive scope of interference by Harnischfeger, this would not have altered the Court's determination that DWD failed to prove the separate essential element of intent. In short, DWD's contention regarding the scope of interference provides no basis for the relief it seeks. Accordingly, again, DWD's Motion is DENIED.

## V. *Financial Interest Privilege*

DWD moves for alteration or amendment of the Court's Conclusions of Law regarding "whether Joy Global proved its financial interest privilege."(D.I. 565 at 2) According to DWD, "the determination that Joy Global proved its financial interest privilege defense resulted from manifest errors of law."(*Id.* at 8, 541 N.W.2d 203) DWD finds "a complete absence of proof by Joy Global about why Harnischfeger, through Dangremond, interfered with the severance contracts

between Beloit and the former workers represented by the Department."(*Id.* at 10–11, 541 N.W.2d 203)

Joy Global responds that the fact that the "alleged interference enhanced Beloit's value—i.e., the value of the asset Harnischfeger owned—demonstrates the absence of any basis to DWD's argument that Harnischfeger's alleged interference 'did not further [Harnischfeger's] economic interest in Beloit's assets.'" (D.I. 567 at 11) (quoting D.I. 566 at 25) The Court agrees with Joy Global that "Harnischfeger had an undisputable economic interest in its subsidiary [Beloit], and its purported interference enhanced the value of an asset it owned (Beloit) and furthered Harnischfeger's legal interest to ensure that its subsidiary received accurate information about what the Committee wanted."(D.I. 567 at 2)

The Court finds no proper basis for DWD's requested relief with regard to the Court's Findings of Fact and Conclusions of Law regarding the financial interest privilege. Therefore, again, DWD's Motion is DENIED. [3]

[3]    To the extent Joy Global is seeking reconsideration of the Court's finding with respect to the timeliness of Joy Global's assertion of a truthful information privilege (*see* D.I. 567 at 12 n. 2)—and the Court does not believe Joy Global is seeking such reconsideration—that request is denied.

## VI. *Evidentiary Objections*

Finally, DWD contends "it was a manifest error of law to conclude that the Department had waived its evidentiary objections."(D.I. 565 at 1; *see also id.* at 23, 541 N.W.2d 203 ("Manifest errors of law and fact were committed in determining that the Department had waived all evidentiary objections...."))  This outcome "resulted from an abuse of discretion in how the court structured resolution of the objections it had allowed to accumulate."(*Id.* at 23, 541 N.W.2d 203;*see also* D.I. 566 at 3 ("Given the mountain of objections that the court allowed to accumulate without resolution, the manner in which the court structured resolution of those objections constituted an abuse of discretion.")) [4]

[4]    On November 15, 2011, DWD submitted a letter, citing this Court's opinion in *Research Foundation of State University of New York v. Mylan Pharmaceuticals Inc.,* 2011 WL 3796288 (D.Del. Aug. 26, 2011), as further support for its evidentiary arguments. (D.I.573)

Case 09-10138-MFW   Doc 15740   Filed 06/12/15   Page 157 of 304

In re Joy Global, Inc. f/k/a Harnischfeger Industries, Inc., Not Reported in F.Supp.2d...

2011 WL 5865542

For the reasons stated in the Opinion, the Court reiterates its conclusion that "all evidentiary objections not previously ruled upon have been waived by the parties due to their failure to brief such objections in their post-trial briefs .... At no point in the post-trial briefing did either DWD or Joy Global do what was required to maintain its evidentiary objections."Op. at 1, 3. With respect to DWD's new argument that the Court's procedure for dealing with objections constituted an abuse of discretion, the Court disagrees.

**\*6** DWD further contends that, even if its objections were waived, it was plain error to rely on the challenged portions of Hiltz's deposition testimony. (D.I. 566 at 6–8) Again, the Court disagrees. The Court would reach the same Findings of Fact and Conclusions of Law even if the objected to portions of the Hiltz deposition were not part of the record. There is other evidence to the same effect as the objected to portions of the Hiltz deposition. [5] Sustaining DWD's objections to the Hiltz deposition would not alter the balance of the evidence on any material point. Again, then, DWD's Motion is DENIED.

[5]     Other evidence supporting the points on which the Court cited Hiltz is contained in the Opinion. (*See* FF

62 (stating Carol Ann Mohr, 21–year Hamischfeger employee with responsibility for benefits, testified Hamischfeger "had no jurisdiction over [Beloit's severance] plan," which "was strictly handled at the Beloit Corporation level"); FF 63 (stating Ross Altman, Beloit's General Counsel, never observed Hamischfeger direct Beloit's corporate activities)); Op. at 52 (describing Chokey's trial testimony that Committee, not Hamischfeger, was entity pressuring Beloit about its severance, and that Beloit operated generally with high degree of corporate independence from Hamischfeger); Op. at 53 (describing Mohr deposition testimony); *see also* D.I. 567 at 1) The supplemental nature of the Hiltz testimony to which the Court cited is reflected in the Court's use of phrases such as "Similarly" (Op. at 53) and *"See, e.g.,"* (Op. at 46) in several of the portions of the Opinion to which DWD objects.

## CONCLUSION

Accordingly, for the reasons stated above, DWD's Motion (D.I.565) is **STRICKEN** and **DENIED**.

---

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

**TAB 13**

58 Collier Bankr.Cas.2d 452, 48 Bankr.Ct.Dec. 123, Bankr. L. Rep. P 80,976

KeyCite Yellow Flag - Negative Treatment
**Declined to Extend by** In re Del Biaggio, Bankr.N.D.Cal., June 29, 2012

492 F.3d 297
United States Court of Appeals,
Fourth Circuit.

In re NATIONAL ENERGY & GAS TRANSMISSION,
INCORPORATED, formerly known as PG
& E National Energy Group, Inc., Debtor.

National Energy & Gas Transmission, Inc. (f/k/
a PG & E National Energy Group, Inc.); NEGT
Energy Trading Power, L.P. (f/k/a PG & E Energy
Trading Power, L.P.), Plaintiffs-Appellants,
and
Gas Transmission Northwest Corporation, Plaintiff,
v.
Liberty Electric Power, LLC, Defendant-Appellee,
John L. Daugherty, Trustee, Trustee-Appellee.

No. 06-1459.   |   Argued: March
13, 2007.   |   Decided: July 10, 2007.

**Synopsis**

**Background:** Creditor that was awarded $140,000,000, plus interest, in arbitration proceeding arising from Chapter 11 debtor's rejection of contract asserted claims against debtor and debtor-parent company for same amount after it allocated $17,000,000 of $140,000,000 payment received from non-debtor guarantor to interest, rather than principal. Debtor and parent objected. The Bankruptcy Court allowed claim against debtor but limited distribution to $17,000,000. Debtor and parent appealed. The United States District Court for the District of Maryland, Peter J. Messitte, J., affirmed. Debtor and parent appealed.

**Holdings:** The Court of Appeals, Shedd, Circuit Judge, held that:

[1] as a matter of bankruptcy law, debt to creditor was not reduced by amount that creditor received from non-debtor guarantor, and

[2] bankruptcy statute barring recovery of unmatured interest precluded creditor from recovering $17,000,000 sought from debtor and parent.

Reversed.

Wilson, District Judge, concurred in the judgment and filed a separate opinion.

Duncan, Circuit Judge, dissented and filed a separate opinion.

West Headnotes (9)

[1]    **Bankruptcy**
        Conclusions of Law;  De Novo Review

        Court of Appeals reviews questions of law de novo. (Per Shedd, Circuit Judge, with one judge concurring in the judgment.)

        Cases that cite this headnote

[2]    **Bankruptcy**
        Set-Off Against Claim

        As a matter of bankruptcy law, Chapter 11 debtor's debt to creditor was not reduced by amount that creditor received from non-debtor guarantor. (Per Shedd, Circuit Judge, with one judge concurring in the judgment.)

        2 Cases that cite this headnote

[3]    **Guaranty**
        Payment or Other Satisfaction by Guarantor

        Under New York law, guarantor was "surety" for debtor's obligations to creditor, despite language in guarantee purporting to make guarantor a co-obligor, and therefore value of debtor's debt to creditor under state law was not reduced by $140,000,000 payment received by creditor from guarantor. (Per Shedd, Circuit Judge, with one judge concurring in the judgment.) N.Y.McKinney's General Obligations Law § 15-103.

        3 Cases that cite this headnote

Case 09-10138-MFW   Doc 15740   Filed 06/12/15   Page 160 of 304

In re National Energy & Gas Transmission, Inc., 492 F.3d 297 (2007)
58 Collier Bankr.Cas.2d 452, 48 Bankr.Ct.Dec. 123, Bankr. L. Rep. P 80,976

**[4]**   **Bankruptcy**

☞ Post-Petition Interest

Purpose of bankruptcy statute providing that claim will not be allowed to the extent that it is for unmatured interest is two-fold: (1) avoidance of unfairness among competing creditors, and (2) avoidance of administrative inconvenience. (Per Shedd, Circuit Judge, with one judge concurring in the judgment.) 11 U.S.C.A. § 502(b)(2).

3 Cases that cite this headnote

**[5]**   **Bankruptcy**

☞ Post-Petition Interest

Application of bankruptcy statute's bar on unmatured interest is to be guided by principles of equity. (Per Shedd, Circuit Judge, with one judge concurring in the judgment.) 11 U.S.C.A. § 502(b)(2).

Cases that cite this headnote

**[6]**   **Bankruptcy**

☞ Determination

In applying bankruptcy statute barring unmatured interest, court has a duty to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankruptcy estate. (Per Shedd, Circuit Judge, with one judge concurring in the judgment.) 11 U.S.C.A. § 502(b)(2).

2 Cases that cite this headnote

**[7]**   **Bankruptcy**

☞ Equitable Powers and Principles

Bankruptcy Code provides parameters within which courts must exercise their equitable powers in administering an estate. (Per Shedd, Circuit Judge, with one judge concurring in the judgment.)

1 Cases that cite this headnote

**[8]**   **Bankruptcy**

☞ Post-Petition Interest

Bankruptcy statute barring recovery of unmatured interest precluded creditor from recovering from Chapter 11 debtors $17,000,000 that it was owed on debt arising from debtor's rejection of contract when creditor had already received full value of $140,000,000 debt that was owed on petition date from non-debtor guarantor, notwithstanding creditor's contention that $17,000,000 sought from debtors was unpaid principal, due to its allocation of payment from guarantor first to $17,000,000 interest obligation and then to principal. (Per Shedd, Circuit Judge, with one judge concurring in the judgment.) 11 U.S.C.A. § 502(b)(2).

2 Cases that cite this headnote

**[9]**   **Bankruptcy**

☞ Post-Petition Interest

In cases in which the allowance of postpetition interest will not result in administrative inconvenience or unfairness to creditors, postpetition interest may be allowed. (Per Shedd, Circuit Judge, with one judge concurring in the judgment.) 11 U.S.C.A. § 502(b)(2).

2 Cases that cite this headnote

**Attorneys and Law Firms**

***298**   **ARGUED:** Steven Wilamowsky, Bingham & McCutchen, L.L.P., New York, New York, for Appellants. Lawrence M. Handelsman, Stroock, Stroock & Lavan, New York, New York, for Appellee. **ON BRIEF:** Jessica S. Etra, Matthew V. Wargin, Willkie, Farr & Gallagher, L.L.P., New York, New York; Kenneth Oestreicher, Susan J. Roberts, Whiteford, Taylor & Preston, L.L.P., Baltimore, Maryland, for Appellants. Lisa Bitte Tancredi, Venable, L.L.P., Baltimore, Maryland; Melvin A. Brosterman, Harold A. Olsen, Stroock, Stroock & Lavan, New York, New York, for Appellee.

Before SHEDD and DUNCAN, Circuit Judges, and SAMUEL G. WILSON, United States District Judge for the Western District of Virginia, sitting by designation.

58 Collier Bankr.Cas.2d 452, 48 Bankr.Ct.Dec. 123, Bankr. L. Rep. P 80,976

Reversed by published opinion. Judge SHEDD wrote the opinion. Judge WILSON wrote an opinion concurring in the judgment. Judge DUNCAN wrote a dissenting opinion.

## OPINION

SHEDD, Circuit Judge.

In this bankruptcy appeal, we must decide whether a creditor may allocate a **\*299** payment made by a non-debtor guarantor first to interest then to principal, thus preserving the unpaid principal for collection in bankruptcy. Because we find that the allocation of a payment in this manner would permit the creditor to collect an amount otherwise disallowed as post-petition interest, we reverse the judgment of the district court which permitted collection of the additional amount.

## I

National Energy & Gas Transmission Energy Trading Power, L.P. ("ET Power"), a debtor here, previously operated as an energy marketing and trading company. As such, it bought and sold electric power, natural gas, coal, and other physical energy commodities. ET Power also engaged in energy-based financial and hedging transactions such as future contracts, swaps, options, and derivatives. As part of its regular course of business, ET Power entered into an electricity tolling agreement (the "Agreement") with Liberty Electric Power, LLC ("Liberty"), an energy-generating company. Under the Agreement, ET Power obtained an option to purchase energy from Liberty in return for a monthly payment to Liberty as well as certain other variable costs based on the actual amount of energy which ET Power purchased. In essence, this permitted ET Power to provide natural gas necessary to generate electricity and then to purchase the electricity which was generated.

To back up its agreement with ET Power, Liberty obtained two guarantees: one from National Energy & Gas Transmission, Inc. ("NEGT"), ET Power's corporate parent (and also a debtor in this bankruptcy); and one from Gas Transmission Northwest Corporation ("GTN"), a subsidiary of NEGT (and a non-debtor). Each guarantee contained the same terms, and in each the respective guarantor guaranteed:

[A]s primary obligor and not merely as surety, the prompt payment when due, in accordance with the terms of the Agreement, of all amounts payable by [ET Power] under the Agreement ... including ... Termination Payment ... and damage awards arising by reason of [ET Power's] breach of its performance obligations under the Agreement or otherwise.

J.A. 98. Each guarantor's liability was capped at $140 million.

On July 8, 2003, NEGT, ET Power, and other debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code and a motion seeking to reject the Agreement. [1] After ET Power and Liberty consented, the bankruptcy court granted the motion rejecting the Agreement. As a result of the rejection, Liberty sought $140 million as a termination payment and approximately $5.4 million in unpaid invoices. Liberty's claim for $140 million proceeded to arbitration pursuant to the terms of the Agreement, and an arbitration panel awarded Liberty the full $140 million plus interest accruing from the date of the Agreement's rejection and continuing subsequent to the arbitration award. [2]

[1]   As the remaining debtors are not parties to this appeal, we refer herein to NEGT and ET Power as "the debtors." However, we note that the bankruptcy court denied Liberty's claim against NEGT, and Liberty does not appeal this denial.

[2]   The debtors stipulated to the amounts owed pursuant to the unpaid invoices, and these claims were not submitted to the arbitration panel. Both the bankruptcy court and the district court allowed a claim for these debts in the amount of $5,428,046, and the debtors do not contest this claim on appeal. Thus, in reversing the district court's order, we do not reverse the allowance of this claim.

**\*300**   During the pendency of the arbitration proceedings, NEGT agreed to sell GTN to TransCanada Corporation. As part of the transaction, $140 million was reserved in escrow to provide for any liability to Liberty under the guarantee. After the arbitration award, the dispute between Liberty and the debtors shifted back to the bankruptcy court, while interest continued to accrue on the $140 million arbitration award. To stop the accrual of interest, which had reached approximately $17 million, the parties agreed that Liberty should receive immediate payment of the amount held in escrow after the

58 Collier Bankr.Cas.2d 452, 48 Bankr.Ct.Dec. 123, Bankr. L. Rep. P 80,976

GTN sale, and the bankruptcy court approved this disbursal. Accordingly, Liberty was paid $140 million from the GTN sale escrow in full and final satisfaction of the GTN guarantee.

Upon receipt of payment from GTN, Liberty allocated the $140 million first to interest, then to principal. Meanwhile, Liberty continued to assert claims in bankruptcy against NEGT and ET Power for $140 million each.[3] Liberty reasoned that it could continue to assert the full value of the award against the debtors, notwithstanding the fact that it had already received payment of $140 million from GTN, because the debtors remained jointly and severally liable until it received full payment of the total debt. At the same time, Liberty recognized that it could not collect more than the approximately $17 million needed to make it whole on ET Power's debt. In seeking this amount, Liberty contended that the amount did not represent disallowed post-petition interest but rather unpaid principal-the interest portion of the award having been paid by GTN.

[3]   Liberty set forth ET Power's approximate liabilities as: $140 million in principal, $5.4 million in unpaid invoices, $16.8 million in interest on the principal and invoice amounts, and $3.7 million in collection costs and fees. Liberty recognized that it could not collect the $16.8 million in interest from the debtors, and the invoice amount and collection costs and fees are not at issue in this appeal. For simplicity, we focus on the $140 million at issue here. Likewise, we recognize that Liberty actually seeks to collect approximately $22 million from the estate but that approximately $5 million of this amount (the unpaid invoices) is not at issue. Thus, again for simplicity, we refer herein to the additional $17 million which Liberty seeks and which is now at issue.

The debtors objected to Liberty's claims, arguing that the $17 million which Liberty sought to collect had to constitute post-petition interest because Liberty had already received $140 million from GTN. Additionally, the debtors maintained that Liberty should not be permitted to assert a claim for $140 million when it had received $140 million and currently was owed only an additional $17 million. Otherwise, the judgment would not accurately reflect what Liberty was owed.

[1]   The bankruptcy court agreed with Liberty's position, allowing the claim for $140 million against ET Power but providing that the "maximum amount of distribution payable to Liberty" would be limited to the additional $17 million which it seeks to collect. J.A. 322. On appeal to the district court, the bankruptcy court order was affirmed. The

debtors once again appeal. Because this appeal presents only questions of law, our review is de novo. *In re Bunker,* 312 F.3d 145, 150 (4th Cir.2002).

## II

### A.

We initially consider the debtors' contention that the value of Liberty's claim **\*301** must be reduced by the $140 million it received from GTN in order to reflect accurately the amount currently owed to Liberty. Because Liberty is currently owed only approximately $17 million, the debtors argue its claim should be limited to this amount.

[2]   The debtors' argument is foreclosed by the combination of *Ivanhoe Building & Loan Ass'n of Newark v. Orr,* 295 U.S. 243, 55 S.Ct. 685, 79 L.Ed. 1419 (1935), and New York law, which governs pursuant to the Agreement. In *Ivanhoe,* the Supreme Court held that a creditor need not deduct from his claim in bankruptcy an amount received from a non-debtor third party in partial satisfaction of an obligation. Thus, as a matter of bankruptcy law, ET Power's debt to Liberty is not reduced by the amount which Liberty received from GTN. However, this merely leads to the question of what the value of ET Power's debt is, and New York law provides the answer to this question. *See Travelers Cas. & Sur. Co. of America v. Pacific Gas & Elec. Co.,* 549 U.S. 443, 127 S.Ct. 1199, 1205, 167 L.Ed.2d 178 (2007) ("[W]e have long recognized that the basic federal rule in bankruptcy is that state law governs the substance of claims [.]") (internal punctuation omitted).

[3]   New York law provides:

> The amount or value of any consideration received by the obligee from one or more of several obligors, or from one or more of joint, or of joint and several obligors, in whole or in partial satisfaction of their obligations, shall be credited to the extent of the amount received on the obligations of all co-obligors to whom the obligor or obligors giving the consideration did not stand in the relation of a surety.

Case 09-10138-MFW Doc 15740 Filed 06/12/15 Page 163 of 304

In re National Energy & Gas Transmission, Inc., 492 F.3d 297 (2007)

58 Collier Bankr.Cas.2d 452, 48 Bankr.Ct.Dec. 123, Bankr. L. Rep. P 80,976

N.Y. Gen. Oblig. L. § 15-103. Under this statute, whether GTN's payment to Liberty must be deducted from ET Power's obligation turns on whether GTN was a surety or a co-obligor.

In *Chemical Bank v. Meltzer,* 93 N.Y.2d 296, 690 N.Y.S.2d 489, 712 N.E.2d 656 (1999), the New York Court of Appeals concluded that the relationship between the guarantor and the primary obligor must determine the guarantor's status as a co-obligor or a surety, notwithstanding language in the contract purporting to render the guarantor a co-obligor. Using this approach, the court found that a suretyship existed. The relationship between ET Power and GTN is nearly identical to that of the guarantor and primary obligor in *Meltzer.* Therefore, we conclude that, despite language in the guarantee purporting to make GTN a co-obligor, GTN was a surety for ET Power's obligations to Liberty. Accordingly, the value of ET Power's debt to Liberty under state law is not reduced by the $140 million received from GTN.

## B.

**[4]** **[5]** **[6]** **[7]** **[8]** We next turn to the more fundamental question presented by this appeal: whether the Bankruptcy Code bars Liberty from collecting the $17 million it now seeks. Section 502(b)(2) of the Code provides that a claim shall not be allowed "to the extent that ... [it] is for unmatured interest[.]" 11 U.S.C. § 502(b)(2). The purpose of this section is two-fold: (1) the avoidance of unfairness among competing creditors, and (2) the avoidance of administrative inconvenience. *Bruning v. United States,* 376 U.S. 358, 362, 84 S.Ct. 906, 11 L.Ed.2d 772 (1964). As with all sections of the Code, § 502(b)(2) exists to guide the court in the administration of a bankruptcy estate so "as to bring about a ratable distribution of assets among the bankrupt's creditors." **\*302** *Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 161, 67 S.Ct. 237, 91 L.Ed. 162 (1946); *see also In re A.H. Robins Co., Inc.,* 972 F.2d 77, 82 (4th Cir.1992) (noting that bankruptcy court possesses "broad equity powers"). Indeed, § 502(b)(2) itself reflects the equitable nature of the Code, and our application of its bar on post-petition interest is to be guided by principles of equity. *Vanston Bondholders,* 329 U.S. at 165, 67 S.Ct. 237 ("It is manifest that the touchstone of each decision on allowance of interest in bankruptcy ... has been a balance of equities between creditor and creditor or between creditors and the debtor."). Thus, in applying § 502(b)(2), we have a duty to "sift the circumstances surrounding any claim to see

that injustice or unfairness is not done in administration of the bankrupt estate." *Smith v. Robinson,* 343 F.2d 793, 801 (4th Cir.1965). [4]

[4]    The Bankruptcy Code, of course, provides parameters within which courts must exercise their equitable powers in administering an estate. *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988).

In this case, Liberty seeks to collect $17 million from ET Power notwithstanding the fact that it has already received the full value-$140 million-of the debt which it was owed by ET Power on the petition date. In so doing, Liberty classifies the additional $17 million which it seeks as unpaid principal. It reaches this result by applying GTN's payment of $140 million first to interest then to principal. Therefore, Liberty maintains that it is coming into bankruptcy to assert a claim for, and to collect only the remaining portion of, the $140 million which it was owed as of the petition date.

We believe that § 502(b)(2) prevents Liberty from collecting the additional $17 million it seeks despite Liberty's classification of that amount as principal. On the date the debtors filed their bankruptcy petition, the Agreement was effectively rejected and Liberty sustained damages, although the value of the damages was then unknown and disputed. Subsequently, through arbitration, Liberty's damages were determined to be $140 million. Thus, Liberty's damages and ET Power's debt to Liberty on the petition date was $140 million, and by the terms of § 502(b)(2), Liberty could not collect in bankruptcy any additional amounts added due to the accrual of interest. *Nicholas v. United States,* 384 U.S. 678, 682, 86 S.Ct. 1674, 16 L.Ed.2d 853 (1966) ("[T]he accumulation of interest on claims against a bankrupt estate is suspended as of the date the petition in bankruptcy is filed."). This result is not altered simply because Liberty holds a guarantee from a non-debtor third party. Accordingly, the arbitration panel's award of interest on the $140 million in damages, while perhaps appropriate under the Agreement and as a matter of non-bankruptcy law, is not collectable from the debtors in bankruptcy by virtue of § 502(b)(2).

The § 502(b)(2) bar to collection of interest is not overcome by Liberty's classification of the $17 million it now seeks as principal. Regardless of how Liberty classifies GTN's payment for its own purposes, we must "sift the circumstances surrounding" the claim to determine the reality of the transaction for purposes of the bankruptcy proceeding. *Smith,* 343 F.2d at 801. Because ET Power's debt was capped

Case 09-10138-MEW    Doc 15740    Filed 06/12/15    Page 164 of 304

In re National Energy & Gas Transmission, Inc., 492 P.3d 297 (2007)

58 Collier Bankr.Cas.2d 452, 48 Bankr.Ct.Dec. 123, Bankr. L. Rep. P 80,976

at $140 million by the filing of the bankruptcy petition and because the debt was increased only by the accrual of interest pursuant to the arbitration award, we view Liberty's claim for an additional $17 million as disallowed post-petition interest no matter how Liberty chooses to classify **\*303** it. [5]

[5] Liberty claims that we must accept its classification of GTN's payment as interest rather than as principal because bankruptcy proceedings cannot affect the liability of a non-debtor on a debt. *See, e.g., In re Stoller's, Inc.,* 93 B.R. 628, 635-36 (Bankr.N.D.Ind.1988) (finding that guarantors remained liable for post-petition interest as allowed by terms of guarantee). Thus, Liberty argues that preventing it from collecting the additional $17 million it seeks will essentially relieve GTN of its obligation to pay interest. We disagree. Liberty is free to classify GTN's payment as interest or to pursue collection from GTN at any time. Any limitation of Liberty's right to recover from GTN the full amount it is owed is due to the terms of GTN's guarantee or to non-bankruptcy law, not to our decision here. We merely hold that Liberty may not affect the rights of a party in bankruptcy by its classification of a payment received from a non-debtor guarantor.

A contrary result would permit Liberty, or any other creditor, to classify a payment on a debt from a non-debtor guarantor as non-principal, thus preserving the full value of the principal for collection in bankruptcy. If, for example, Liberty had classified GTN's payment of $140 million not as a payment on the debt but as consideration received in return for a covenant not to sue, we would certainly look behind the transaction and would not allow collection as principal of the full $140 million. We must likewise look behind Liberty's claim here to find that the claim really constitutes post-petition interest disguised as unpaid principal.

 **[9]**    Our construction of Liberty's claim is reinforced by the policy interests represented by § 502(b)(2). As we noted earlier, the general purpose of § 502 is "to ensure the fair allocation of assets between creditors[.]" *In re Kielisch,* 258 F.3d 315, 325 (4th Cir.2001). Thus, in cases where the allowance of post-petition interest will not result in administrative inconvenience or unfairness to creditors, post-petition interest may be allowed. *See, e.g., United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 246, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (noting pre-Bankruptcy Code rule permitting the award of post-petition interest where estate is solvent); *Ford Motor Credit Co. v. Dobbins,* 35 F.3d 860, 869 (4th Cir.1994) (referring to rule permitting an over-secured creditor to collect interest to the extent of his over-security).

In contrast, allowing Liberty to collect the additional amount it seeks *will* have an impact on ET Power's creditors: namely, the loss of $17 million from the estate which would otherwise be available for distribution. This being so, the purpose of § 502(b)(2) is best served by barring Liberty's collection of an additional $17 million from the estate.

### III

For these reasons, we conclude that § 502(b)(2) prevents Liberty from collecting the additional $17 million which it seeks from the estate. Accordingly, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion. In so doing, we do not reverse the allowance of Liberty's claim for unpaid invoices, which is not before us in this appeal.

*REVERSED*

WILSON, District Judge, concurring in the judgment:

As I view it, the overarching issue in this appeal is reduced to this: does Liberty's contractual right with GTN, a third party, to allocate principal and interest, that is, to call payments from that guarantor what it wants to call them, preclude the Bankruptcy Court from calling those payments what they are vis-à-vis the bankrupt **\*304** debtor. That is, can Liberty allocate its way around § 502(b)(2)'s disallowance of unmatured interest. In my view to do so is to simply call a rose by another name. [*] Accordingly, I concur in the judgment.

[*] Two preliminary observations simplify the playing field for me. First, I do not believe that Judge Shedd's opinion challenges Liberty's contractual rights under its guarantee from GTN to allocate principal and interest in any fashion it sees fit in relation to GTN. Second, we are not compelled to explore Liberty's right to recover from NEGT under NEGT's guarantee because the Bankruptcy Court disallowed Liberty's claim against NEGT and Liberty did not appeal. Indeed, at the risk of oversimplification, NEGT seems to be little more than a cheerleader for ET Power or a surrogate for GTN in this appeal. The real dispute, therefore, is only between the primary obligor and its creditor.

DUNCAN, Circuit Judge, dissenting:

As the bankruptcy court succinctly stated in an order summarily affirmed by the district court, the debtors here proffer no authority "for the proposition that a *non-debtor*

In re National Energy & Gas Transmission, Inc., 492 P.3d 297 (2007)

Case 09-10138-MFW   Doc 15740   Filed 06/12/15   Page 165 of 304

58 Collier Bankr.Cas.2d 452, 48 Bankr.Ct.Dec. 123, Bankr. L. Rep. P 80,976

guarantor is exempt from liability to pay interest accruing after the petition date of the debtor-primary obligor" under 11 U.S.C. § 502(b)(2). *Nat'l Energy & Gas Transmission, Inc. v. Liberty Elec. Power, LLC (In re Nat'l Energy & Gas Transmission, Inc.)*, No. 03-03104, at *6 (Bankr.D. Md. June 27, 2005) (emphasis added). Because the majority advances no support for its conclusion that bankruptcy law governs the contractual relationship between a creditor and a non-debtor guarantor-and ample authority exists to the contrary-I respectfully dissent.

As the majority explains, an arbitration panel awarded Liberty $140 million plus approximately $17 million in interest accrued after the debtors' bankruptcy petition had been filed. Liberty collected $140 million from GTN, which was the maximum amount for which GTN could be liable under the terms of its guarantee. Liberty characterized GTN's payment as first, a payment of the $17 million interest, and next, a payment of part of the $140 million principal.

Liberty continued to assert its claim in bankruptcy against the debtors for the full $140 million, recognizing, however, that it could not collect more than the approximately $17 million needed to satisfy the debt. In Liberty's view, this $17 million represented principal for which the debtors remained jointly and severally liable, even though they had filed for bankruptcy. [1]

[1]    As the majority notes, only Liberty's claim against ET Power is at issue in this appeal.

Proper analysis of Liberty's claim begins with the basic principle of contract law that Liberty is entitled to be paid in full, including interest, by its jointly and severally liable debtors. When one or more debtors file a bankruptcy petition, as here, it is undisputable that § 502(b)(2) bars a creditor from recovering interest not yet accrued as of the date of the bankruptcy petition against such a debtor. *See* Majority Op. at 301-03. However, it is also well-settled that § 502(b)(2) has no impact on the accrual of unmatured interest against non-debtors, including non-debtor guarantors. *See, e.g., Bruning v. United States,* 376 U.S. 358, 362 n. 4, 84 S.Ct. 906, 11 L.Ed.2d 772 (1964) (explaining that claims do not "los[e] their interest-bearing quality" in bankruptcy, but that post-petition interest is disallowed as a "rule of distribution"); *Kielisch v. Educ. Credit Mgmt Corp. (In re Kielisch),* 258 F.3d 315, 323 (4th Cir.2001) ("*Section 502* bars creditors from making *claims* from the bankruptcy estate for unmatured interest," but "does not purport to limit the *liability* on those

claims, i.e., 'debts.' "); **\*305** *In re El Paso Refining, Inc.,* 192 B.R. 144, 146 (Bankr.W.D.Tex.1996) (holding that § 502(b)(2) only bars "unmatured interest from becoming an allowed claim against the debtor's [bankruptcy] estate" and that "the obligation to pay interest vis-a-vis a guarantor is not tolled or eliminated by operation of section 502(b)(2)" (emphasis omitted)).

The majority intermingles these independent principles to arrive at its holding: that the $17 million that Liberty seeks to recover from ET Power represents "disallowed post-petition interest no matter how Liberty chooses to classify it." Majority Op. at 302. This approach, however, has the effect of limiting the non-debtor guarantor's liability for interest accruing after the debtor's bankruptcy petition. That is, the majority would have the bar to recovery of interest from the debtor swallow the accrual of interest on the debt across all parties liable for it. There is simply nothing in the Bankruptcy Code, applicable case law, the relevant guarantee agreement, or nonbankruptcy law to support the jettisoning of basic contract law principles in favor of an expansive reading of § 502(b)(2). [2]

[2]    The majority attempts to justify its result by invoking this court's duty to " 'sift the circumstances surrounding' the claim to determine the reality of the transaction for purposes of the bankruptcy proceeding." Majority Op. at 302 (citing *Smith v. Robinson,* 343 F.2d 793, 801 (4th Cir.1965)). There is no reason, however, to allow "sift[ing] the circumstances" to engulf even basic principles of contract law by restructuring the private contracts of non-debtors.

    The majority also seeks to place the blame for Liberty's inability to collect the full amount of its debt on the guarantee itself, which caps GTN's liability at $140 million. *See id.* at 303 n. 5. If GTN's liability under the guarantee were unlimited, the majority apparently reasons, Liberty could collect the full value of its claim from GTN. As a matter of contract law, the majority is correct. But, as the bankruptcy court noted, "the cap [on GTN's liability in its contract with Liberty is] no impediment to Liberty's right to be paid in full from all sources" where the debtors are jointly and severally liable for the principal debt. *Nat'l Energy & Gas Transmission, Inc.,* No. 03-03104, at *8.

In fact, the majority's approach actually seems to run counter to another section of the Bankruptcy Code. Section 524(e) provides that the "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." *See also El Paso,*

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 166 of 304

In re National Energy & Gas Transmission, Inc., 492 F.3d 297 (2007)
58 Collier Bankr.Cas.2d 452, 48 Bankr.Ct.Dec. 123, Bankr. L. Rep. P 80,976

192 B.R. at 146 (holding that § 524(e) mandated that the independent obligations of a guarantor were unaffected by the bankruptcy of the principal obligor); *Stoller's, Inc. v. Peoples Trust Bank (In re Stoller's, Inc.),* 93 B.R. 628, 635-36 (Bankr.N.D.Ind.1998) (holding guarantors liable for post-petition interest). The majority's holding appears to expressly violate § 524(e) by allowing the bankruptcy filing of the debtors to dictate how Liberty accounts for its contractual payment from GTN, or, in other words, allowing the "discharge of a debt of the debtor [to] affect the liability of [GTN] on ... such debt," § 524(e).

Furthermore, in contrast to the majority's contention, I do not believe that a creditor's receipt of payment from a non-debtor guarantor implicates either of the purposes of § 502(b)(2): (1) avoiding "unfairness as between competing creditors" and (2) minimizing the "administrative inconvenience" that repeated recomputation of interest requires, *Bruning,* 376 U.S. at 362, 84 S.Ct. 906. With respect to the first, I fail to see the unfairness in the fact that Liberty bargained, outside of bankruptcy, for a guarantee of payment. That other creditors may not have secured such a guarantee, and therefore might ultimately recover proportionally less than Liberty, strikes me as no injustice. Second, even **\*306** the debtors do not argue that the bankruptcy court's order below would require burdensome recomputation of interest, as it specifies the allowed amount of Liberty's claim as determined in the arbitration proceeding.

Therefore, because neither bankruptcy law nor the contract governing Liberty's relationship with the non-debtor guarantor GTN limits Liberty's right to allocate its recovery from GTN in any manner that it wishes, I would affirm the district court.

## Parallel Citations

58 Collier Bankr.Cas.2d 452, 48 Bankr.Ct.Dec. 123, Bankr. L. Rep. P 80,976

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 14

**IN RE: OWENS CORNING, a Delaware Corporation CREDIT
SUISSE FIRST BOSTON, as Agent for the prepetition bank lenders,
Appellant**

**No. 04-4080**

**UNITED STATES COURT OF APPEALS FOR THE THIRD
CIRCUIT**

**419 F.3d 195; 2005 U.S. App. LEXIS 17150; Bankr. L. Rep. (CCH)
P80,343; 45 Bankr. Ct. Dec. 36**

**February 7, 2005, Argued
August 15, 2005, Filed**

**SUBSEQUENT HISTORY:** As Amended, October 12, 2005.

As Amended, September 2, 2005.
Amended by In re Owens Corning, 2005 U.S. App. LEXIS 18043 (3d Cir. Del., Aug. 23, 2005)
US Supreme Court certiorari denied by McMonagle v. Credit Suisse First Boston, 547 U.S. 1123,
126 S. Ct. 1910, 164 L. Ed. 2d 685, 2006 U.S. LEXIS 3492 (2006)
US Supreme Court certiorari denied by Official Representatives of the Bondholders & Trade
Creditors of Debtor Owens Corning v. Credit Suisse First Boston, 547 U.S. 1123, 126 S. Ct. 1910,
164 L. Ed. 2d 685, 2006 U.S. LEXIS 3493 (2006)
Amended by In re Owens Corning, 2007 U.S. App. LEXIS 25525 (3d Cir. Del., Nov. 1, 2007)

**PRIOR HISTORY:  [**1]**  On Appeal from the United States District Court for the District of
Delaware. (D.C. Civil Action No. 00-cv-03837). District Judge: Honorable John P. Fullam.
In re Owens Corning, 316 B.R. 168, 2004 Bankr. LEXIS 1838 (Bankr. D. Del., 2004)

**DISPOSITION:** The district court's judgment was reversed, and the matter was remanded.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant, the agent for a syndicate of banks that extended a $
2,000,000,000 loan to debtor and certain of its subsidiaries, appealed a judgment of the United
States District Court for the District of Delaware, which granted a motion to consolidate the assets
and liabilities of the borrowers and guarantors in anticipation of a plan of reorganization.

Page 2

419 F.3d 195, *; 2005 U.S. App. LEXIS 17150, **1;
Bankr. L. Rep. (CCH) P80,343; 45 Bankr. Ct. Dec. 36

**OVERVIEW:** The credit was enhanced in part by guarantees made by some subsidiaries of the debtor. The instant court concluded that no principled reason existed to undo the debtor's and the banks' arms-length negotiation and lending arrangement, especially when to do so punished the very parties that conferred the prepetition benefit--a $ 2,000,000,000 loan unsecured by the debtor and guaranteed by others only in part. To overturn this bargain, set in place by the debtor's own pre-loan choices of organizational form, would have caused chaos in the marketplace. There was no evidence of the prepetition disregard of the borrowing entities' separateness; the debtor negotiated the transaction premised on the separateness of all debtor affiliates. There also was no meaningful evidence postpetition of hopeless commingling of the entities' assets and liabilities; there was no question which entity owned which principal assets and has which material liabilities. Other considerations also counseled strongly against consolidation, e.g., holding out the possibility of later giving priority to the banks on their claims did not cure an improvident grant of substantive consolidation.

**OUTCOME:** The district court's judgment was reversed, and the matter was remanded.

**CORE TERMS:** consolidation, subsidiary, entity, proponent, separateness, guarantor, accounting, equitable, reorganization, prepetition, consolidated, commingling, non-debtor, asbestos, confirmation, separate entity, equitable remedy, intercompany, consolidate, transferred, financing, hopeless, billion, inter alia, fraudulent transfers, consolidating, postpetition, finality, survivor, royalty

## LexisNexis(R) Headnotes

***Bankruptcy Law > Practice & Proceedings > Appeals > Jurisdiction***
***Civil Procedure > Appeals > Appellate Jurisdiction > Final Judgment Rule***
[HN1] 28 U.S.C.S. § 1291, rather than 28 U.S.C.S. § 158(d), applies when the reference to a bankruptcy court is withdrawn.

***Bankruptcy Law > Practice & Proceedings > Appeals > Jurisdiction***
***Civil Procedure > Appeals > Appellate Jurisdiction > Final Judgment Rule***
[HN2] The United States Court of Appeals for the Third Circuit applies a broader concept of "finality" when considering bankruptcy appeals under 28 U.S.C.S. § 1291 than the court does when considering other civil orders under the same section. Issues central to the progress of the bankruptcy petition, those likely to affect the distribution of the debtor's assets, or the relationship among the creditors, should be resolved quickly.

***Bankruptcy Law > Practice & Proceedings > Appeals > Jurisdiction***
***Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview***
***Civil Procedure > Appeals > Appellate Jurisdiction > Final Judgment Rule***
[HN3] The United States Court of Appeals for the Third Circuit considers four factors in determining whether it should exercise jurisdiction over a bankruptcy appeal: (1) the impact on the assets of the bankrupt estate; (2) the necessity for further fact-finding on remand; (3) the preclusive

Case 09-10138-MFW   Doc 15740   Filed 06/12/15   Page 170 of 304

Page 3

419 F.3d 195, *; 2005 U.S. App. LEXIS 17150, **1;
Bankr. L. Rep. (CCH) P80,343; 45 Bankr. Ct. Dec. 36

effect of the court's decision on the merits of further litigation; and (4) the interest of judicial economy. All four factors weigh heavily in favor of the court's jurisdiction to consider the appeal of an order granting substantive consolidation.

***Bankruptcy Law > Practice & Proceedings > Appeals > General Overview***
***Bankruptcy Law > Practice & Proceedings > Jurisdiction > General Overview***
***Bankruptcy Law > Reorganizations > Plans > Contents > General Overview***
[HN4] The United States Court of Appeals for the Third Circuit generally has jurisdiction to review appeals of substantive consolidation orders.

***Bankruptcy Law > Case Administration > General Overview***
***Bankruptcy Law > Reorganizations > Plans > Contents > General Overview***
***Civil Procedure > Federal & State Interrelationships > Federal Common Law > General Overview***
[HN5] Substantive consolidation, a construct of federal common law, emanates from equity. It treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities (save for inter-entity liabilities, which are erased). The result is that claims of creditors against separate debtors morph to claims against the consolidated survivor. Consolidation restructures (and thus revalues) rights of creditors and for certain creditors this may result in significantly less recovery.

***Bankruptcy Law > Reorganizations > Plans > Contents > General Overview***
***Civil Procedure > Judgments > Entry of Judgments > Enforcement & Execution > Fraudulent Transfers***
***Real Property Law > Purchase & Sale > Fraudulent Transfers***
[HN6] Substantive consolidation goes in a direction different (and in most cases further) than any of these remedies; it is not limited to shareholders, it affects distribution to innocent creditors, and it mandates more than the return of specific assets to the predecessor owner. It brings all the assets of a group of entities into a single survivor. Indeed, it merges liabilities as well. The result is that claims of creditors against separate debtors morph to claims against the consolidated survivor. The bad news for certain creditors is that, instead of looking to assets of the subsidiary with whom they dealt, they now must share those assets with all creditors of all consolidated entities, raising the specter for some of a significant distribution diminution.

***Bankruptcy Law > Case Administration > General Overview***
***Bankruptcy Law > Reorganizations > Plans > Contents > General Overview***
[HN7] The United States Court of Appeals for the Third Circuit has adopted an intentionally open-ended, equitable inquiry to determine when substantively to consolidate two entities.

***Bankruptcy Law > Case Administration > General Overview***
***Bankruptcy Law > Reorganizations > Plans > Contents > General Overview***
[HN8] Mere benefit to the administration of the case (for example, allowing a court to simplify a

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 171 of 304

Page 4
419 F.3d 195, *; 2005 U.S. App. LEXIS 17150, **1;
Bankr. L. Rep. (CCH) P80,343; 45 Bankr. Ct. Dec. 36

case by avoiding other issues or to make postpetition accounting more convenient) is hardly a harm calling substantive consolidation into play.

***Bankruptcy Law > Case Administration > General Overview***
***Bankruptcy Law > Reorganizations > Plans > Contents > General Overview***
[HN9] Because substantive consolidation is extreme (it may affect profoundly creditors' rights and recoveries) and imprecise, this "rough justice" remedy should be rare and, in any event, one of last resort after considering and rejecting other remedies (for example, the possibility of more precise remedies conferred by the Bankruptcy Code).

***Bankruptcy Law > Case Administration > General Overview***
***Bankruptcy Law > Reorganizations > Plans > Contents > General Overview***
[HN10] While substantive consolidation may be used defensively to remedy the identifiable harms caused by entangled affairs, it may not be used offensively (for example, having a primary purpose to disadvantage tactically a group of creditors in the plan process or to alter creditor rights).

***Bankruptcy Law > Case Administration > General Overview***
***Bankruptcy Law > Reorganizations > Plans > Contents > General Overview***
[HN11] In the United States Court of Appeals for the Third Circuit what must be proven (absent consent) concerning the entities for whom substantive consolidation is sought is that (i) prepetition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors. Proponents of substantive consolidation have the burden of showing one or the other rationale for consolidation. The second rationale needs no explanation. The first, however, is more nuanced. A prima facie case for it typically exists when, based on the parties' prepetition dealings, a proponent proves corporate disregard creating contractual expectations of creditors that they were dealing with debtors as one indistinguishable entity. Proponents who are creditors must also show that, in their prepetition course of dealing, they actually and reasonably relied on debtors' supposed unity. Creditor opponents of consolidation can nonetheless defeat a prima facie showing under the first rationale if they can prove they are adversely affected and actually relied on debtors' separate existence.

***Bankruptcy Law > Case Administration > General Overview***
***Bankruptcy Law > Reorganizations > Plans > Contents > General Overview***
[HN12] Commingling justifies substantive consolidation only when separately accounting for the assets and liabilities of the distinct entities will reduce the recovery of every creditor--that is, when every creditor will benefit from the consolidation. Moreover, the benefit to creditors should be from cost savings that make assets available rather than from the shifting of assets to benefit one group of creditors at the expense of another. Mere benefit to some creditors, or administrative benefit to the court, falls far short.

***Bankruptcy Law > Case Administration > General Overview***

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 172 of 304

Page 5
419 F.3d 195, *; 2005 U.S. App. LEXIS 17150, **1;
Bankr. L. Rep. (CCH) P80,343; 45 Bankr. Ct. Dec. 36

*Bankruptcy Law > Reorganizations > Plans > Contents > General Overview*
[HN13] Neither the impossibility of perfection in untangling the affairs of the entities nor the likelihood of some inaccuracies in efforts to do so is sufficient to justify substantive consolidation.

*Bankruptcy Law > Case Administration > General Overview*
*Bankruptcy Law > Reorganizations > Plans > Contents > General Overview*
*Real Property Law > Purchase & Sale > Fraudulent Transfers*
[HN14] Substantive consolidation should be used defensively to remedy identifiable harms, not offensively to achieve advantage over one group in the plan negotiation process (for example, by deeming assets redistributed to negate plan voting rights), nor a "free pass" to spare debtors or any other group from proving challenges, like fraudulent transfer claims, that are liberally brandished to scare yet are hard to show.

*Bankruptcy Law > Case Administration > General Overview*
*Bankruptcy Law > Reorganizations > Plans > Contents > General Overview*
[HN15] Substantive consolidation at its core is equity. Its exercise must lead to an equitable result. "Communizing" assets of affiliated companies to one survivor to feed all creditors of all companies may to some be equal (and hence equitable). But it is hardly so for those creditors who have lawfully bargained prepetition for unequal treatment by obtaining guarantees of separate entities.

**COUNSEL:** Martin J. Bienenstock, Esquire (Argued), John J. Rapisardi, Esquire, Richard A. Rothman, Esquire, Timothy E. Graulich, Esquire, Weil, Gotshal & Manges LLP, New York, NY, Ellen R. Nadler, Esquire, Jeffrey S. Trachtman, Esquire, Kenneth H. Eckstein, Esquire, Philip S. Kaufman, Esquire, Kramer, Levin, Naftalis & Frankel LLP, New York, NY, Roy T. Englert, Jr. Esquire, Robbins, Russell, Englert, Orseck & Untereiner LLP, Washington, DC, Rebecca L. Butcher, Esquire, Adam G. Landis, Esquire, Richard S. Cobb, Esquire, Landis, Rath & Cobb LLP, Wilmington, DE, Counsel for (Appellant) Credit Suisse First Boston Corp., as Agent for the prepetition bank lenders.

Alexandra A.E. Shapiro, Esquire, Mitchell A. Seider, Esquire, Alan Leavitt, Esquire, Latham & Watkins LLP, New York, NY, Amanda P. Biles, Esquire, Latham & Watkins LLP, Reston, Virginia, Counsel for (Amicus-appellants) The Loan Syndications and Trading Association, Inc. and Clearing House Association L.L.C.

Richard M. Kohn, Esquire, Andrew R. Cardonick, Esquire, Goldberg,  **[**2]**  Kohn, Bell, Black, Rosenbloom & Moritz Ltd., Chicago, IL, Jonathan N. Helfat, Esquire, Otterbourg, Steindler, Houston & Rosen, P.C., New York, NY, Counsel for (Amicus-appellant) Commercial Financial Association.

Robert K. Rasmussen, Esquire, Milton Underwood Professor of Law, Vanderbilt Law School, Nashville, TN, Counsel for (Amicus-appellants) Robert K. Rasmussen, Barry Adler, Susan Block-Lieb, G. Marcus Cole, Marcel Kahan, Ronald J. Mann, and David A. Skeel, Jr.

419 F.3d 195, *; 2005 U.S. App. LEXIS 17150, **2;
Bankr. L. Rep. (CCH) P80,343; 45 Bankr. Ct. Dec. 36

Adam H. Isenberg, Esquire, Saul Ewing LLP, Philadelphia, PA, Norman L. Pernick, Esquire, J. Kate Stickles, Esquire, Saul Ewing LLP, Wilmington, DE, Charles O. Monk, II, Esquire (Argued), Joseph M. Fairbanks, Esquire, Henry R. Abrams, Esquire, Dan Friedman, Esquire, Saul Ewing LLP, Baltimore, MD, Counsel for (Appellee) Owens Corning, a Delaware Corporation; CDC Corp.; Engineered Yarns American Inc.; Exterior Systems Inc.; Falcon Foam Corp.; Fibreboard Corp.; HomeExperts; Integrex; Integrex Professional Services; Integrex Testing Systems; Integrex Supply Chain Solutions LLC; Integrex Ventures LLC; Jefferson Holdings Inc.; Owens-Corning Fiberglass Technology Inc.; Owens-Corning HT, Inc.; Owens-Corning Overseas Holdings,  [**3]  Inc.; Owens-Corning Remodeling Systems, LLC; Soltech, Inc.

Elihu Inselbuch, Esquire, Caplin & Drysdale, Chartered, New York, NY, Peter Van N. Lockwood, Esquire, Nathan D. Finch, Esquire, Walter B. Slocombe, Esquire, Caplin & Drysdale, Chartered, Washington, DC, Marla R. Eskin, Esquire, Campbell & Levine, LLC, Wilmington, DE, Counsel for (Appellee) Official Committee of Unsecured Creditors.

Michael J. Crames, Esquire, Jane W. Parver, Esquire, Edmund M. Emrich, Esquire, Andrew A. Kress, Esquire, Kaye Scholer LLP, New York, NY, James L. Patton, Jr., Esquire, Joseph M. Barry, Esquire, Young, Conaway, Stargatt & Taylor LLP, Wilmington, DE, Counsel for (Appellee) James J. McMonagle, Legal Representative for Future Claimants.

J. Andrew Rahl, Equire (Argued), John B. Berringer, Esquire, John H. Doyle, III, Esquire, Howard Ressler, Esquire, Dennis J. Artese, Esquire, Anderson, Kill & Olick, P.C., New York, NY, Francis A. Monaco, Jr., Monzack & Monaco P.A., Wilmington, DE, Counsel for (Appellee) Official Representatives of the Bondholders and Trade Creditors f/k/a Official Committee of Unsecured Creditors of Owens Corning.

Howard A. Rosenthal, Esquire, Alan R. Gordon, Esquire,  [**4]  Pelino & Lentz P.C., Philadelphia, PA, Lawrence J. Kaiser, Esquire, Law Office of Laurence J. Kaiser, New York, NY, Counsel for (Amicus-appellee) Commercial Law League America.

**JUDGES:** Before: ROTH, AMBRO and FUENTES, Circuit Judges.

**OPINION BY:** AMBRO

 **OPINION**

 [*199]  OPINION OF THE COURT

AMBRO, Circuit Judge

We consider under what circumstances a court exercising bankruptcy powers may substantively consolidate affiliated entities. Appellant Credit Suisse First Boston ("CSFB") is the agent for a

419 F.3d 195, *199; 2005 U.S. App. LEXIS 17150, **4;
Bankr. L. Rep. (CCH) P80,343; 45 Bankr. Ct. Dec. 36

syndicate of banks (collectively, the "Banks") [1] that extended in 1997 a $ 2 billion unsecured loan to Owens Corning, a Delaware corporation ("OCD"), and certain of its subsidiaries. This credit was enhanced in part by guarantees made by other OCD subsidiaries. The District Court granted a motion to consolidate the assets and liabilities of the OCD borrowers [2] and guarantors in anticipation of a plan of reorganization.

1 Though CSFB is the named appellant, the real parties in interest are the Banks (which include CSFB). Thus, unless the context requires otherwise, CSFB and the Banks are referred to interchangeably in this opinion.
**[**5]**

2 For ease of reference, we refer hereinafter solely to OCD as the borrower.

The Banks appeal and argue that the Court erred by granting the motion, as it misunderstood the reasons for, and standards for considering, the extraordinary remedy of substantive consolidation, and in any event did not make factual determinations necessary even to consider its use. Though we reverse the ruling of the District Court, we do so aware that it acted on an issue with no opinion on point by our Court and differing rationales by other courts.

While this area of law is difficult and this case important, its outcome is easy with the facts before us. Among other problems, the consolidation sought is "deemed." Should we approve this non-consensual arrangement, the plan process would proceed as though assets and liabilities of separate entities were merged, but in fact they remain separate with the twist that the guarantees to the Banks are eliminated. From this we conclude that the **[*200]** proponents of substantive consolidation request it not to rectify the seldom-seen situations that call for this last-resort remedy **[**6]** but rather as a ploy to deprive one group of creditors of their rights while providing a windfall to other creditors.

**I. Factual Background and Procedural History**

**A. Owens Corning Group of Companies**

OCD and its subsidiaries (which include corporations and limited liability companies) comprise a multinational corporate group. Different entities within the group have different purposes. Some, for example, exist to limit liability concerns (such as those related to asbestos), others to gain tax benefits, and others have regulatory reasons for their formation.

Each subsidiary was a separate legal entity that observed governance formalities. Each had a specific reason to exist separately, each maintained its own business records, and intercompany transactions were regularly documented. [3] Although there may have been some "sloppy" bookkeeping, two of OCD's own **[*201]** officers testified that the financial statements of all the

419 F.3d 195, *201; 2005 U.S. App. LEXIS 17150, **6;
Bankr. L. Rep. (CCH) P80,343; 45 Bankr. Ct. Dec. 36

subsidiaries were accurate in all material respects. Further, through an examination of the subsidiaries' books, OCD's postpetition auditors (Ernst & Young) have eliminated most financial discrepancies, particularly with respect to the larger guarantor subsidiaries. **[**7]**

3 For example, Owens-Corning Fiberglass Technology, Inc. ("OCFT") was created as an intellectual property holding company to which OCD assigned all of its domestic intellectual property. OCFT licensed this intellectual property back to OCD in return for royalty payments. OCFT also entered into licensing agreements with parties outside of the OCD family of companies. This structure served to shield OCD's intellectual property assets (valued at over $ 500 million) from liability. OCFT operated as an autonomous entity. It prepared its own accounting and financial records and paid its own expenses from its separate bank accounts. OCFT had its own employees working at its Summit, Illinois plant, which contained machinery and equipment for research and development.

IPM, Inc. ("IPM") was incorporated as a passive Delaware investment holding company by OCD to consolidate the investments of its foreign subsidiaries. IPM shielded the foreign subsidiaries' investments from OCD liability and likewise shielded OCD from the liability of those foreign subsidiaries. OCD transferred ownership of its foreign subsidiaries to IPM and entered into a revolving loan agreement under which IPM loaned dividends from those subsidiaries to OCD. OCD paid interest on this revolving loan. IPM, like OCFT, entered into agreements with parties unaffiliated with the OCD group and operated as an autonomous entity. IPM also prepared its own accounting and financial records and paid its own expenses from its separate bank accounts. IPM's officers oversaw all investment activity and maintained records of investment activity in IPM subsidiaries.

Both OCFT and IPM operated outside of OCD's business units. Neither company received administrative support from OCD and both paid payroll and business expenses from their own accounts. Although summaries of their accounting ledgers were entered into OCD's centralized cash management system, the underlying records were created and maintained by the subsidiaries, not OCD. OCFT and IPM even had their own company logos and trade names.

Integrex was formed by OCD as an asbestos liability management company. For OCD's asbestos liability, Integrex ultimately processed only settled asbestos claims. The company also provided professional services (such as litigation management and materials testing) to the public. It had its own trade name and trademarked logo, its own business unit and its own financial team for business planning, and began several startup businesses that ultimately failed.

As discussed at Section I(B), infra, in 1997 OCD acquired Fibreboard Corporation.

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 176 of 304

Page 9
419 F.3d 195, *201; 2005 U.S. App. LEXIS 17150, **7;
Bankr. L. Rep. (CCH) P80,343; 45 Bankr. Ct. Dec. 36

Subsequently, OCD formed Exterior Systems, Inc. ("ESI") as a separate entity after several subsidiaries of Fibreboard merged in 1999 in order to shield itself from successor liability for Fibreboard's asbestos products. Although the directors and managers of ESI and OCD overlapped, ESI observed corporate formalities in electing its directors and appointing its officers. In addition, it filed its own tax returns and kept its own accounting records. ESI held substantial assets, including over $ 1 billion in property, 20 factories, and between 150 and 180 distribution centers.

**[**8] B. The 1997 Credit Agreement**

In 1997 OCD sought a loan to acquire Fibreboard Corporation. At this time OCD faced growing asbestos liability and a poor credit rating that hindered its ability to obtain financing. When CSFB was invited to submit a bid, it included subsidiary guarantees in the terms of its proposal. The guarantees gave the Banks direct claims against the guarantors for payment defaults. They were a "credit enhancement" without which the Banks would not have made the loan to OCD. All draft loan term sheets included subsidiary guarantees.

A $ 2 billion loan from the Banks to OCD closed in June 1997. The loan terms were set out primarily in a Credit Agreement. Among those terms were the guarantee provisions and requirements for guarantors, who were defined as "present or future Domestic Subsidiaries . . . having assets with an aggregate book value in excess of $ 30,000,000." Section 10.07 of the Agreement provided that the guarantees were "absolute and unconditional" and each "constituted a guarantee of payment and not a guarantee of collection." [4] A "No Release of Guarantor" provision in § 10.8 stated that "the obligations of each guarantor . . . shall not be **[**9]** reduced, limited or terminated, nor shall such guarantor be discharged from any such obligations, for any reason whatsoever," except payment and performance in full or through waiver or amendment of the Credit Agreement. Under § 13.05 of the Credit Agreement, a guarantor could be released only through (i) the unanimous consent of the Banks for the guarantees of Fibreboard subsidiaries or through the consent of Banks holding 51% of the debt for other subsidiaries, or (ii) a fair value sale of the guarantor if its cumulative assets totaled less than 10% of the book value of the aggregate OCD group of entities.

4 This standard guarantee term means simply that, once the primary obligor (here OCD) defaults, the Banks can proceed against the guarantors directly and immediately without first obtaining a judgment against OCD and collecting against that judgment to determine if a shortfall from OCD exists.

CSFB negotiated the Credit Agreement expressly to limit the ways in which OCD could deal with

Case 09-10138-MFW   Doc 15740   Filed 06/12/15   Page 177 of 304

Page 10

419 F.3d 195, *201; 2005 U.S. App. LEXIS 17150, **9;
Bankr. L. Rep. (CCH) P80,343; 45 Bankr. Ct. Dec. 36

its subsidiaries. **[\*\*10]** For example, it could not enter into transactions with a subsidiary that would result in losses to that subsidiary. Importantly, the Credit Agreement contained provisions designed to protect the separateness of OCD and its subsidiaries. The subsidiaries agreed explicitly to maintain themselves as separate entities. To further this agreement, they agreed to keep separate books and financial records in order to prepare separate financial statements. The Banks were given the right to visit each subsidiary and discuss business matters directly with that subsidiary's management. The subsidiaries also were prohibited from merging into OCD because both entities were required to survive a transaction under § 8.09(a)(ii)(A) of the Credit Agreement. This provision also prohibited guarantor subsidiaries from merging with other subsidiaries unless there would be no effect on the guarantees' value.

**C. Procedural History**

On October 5, 2000, facing mounting asbestos litigation, OCD and seventeen of its **[\*202]** subsidiaries (collectively, the "Debtors") filed for reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 et seq. [5] Twenty-seven months later, **[\*\*11]** the Debtors and certain unsecured creditor groups (collectively, the "Plan Proponents") proposed a reorganization plan (as amended, the "Plan") predicated on obtaining "substantive consolidation" of the Debtors along with three non-Debtor OCD subsidiaries. [6] Typically this arrangement pools all assets and liabilities of the subsidiaries into their parent and treats all claims against the subsidiaries as transferred to the parent. In fact, however, the Plan Proponents sought a form of what is known as a "deemed consolidation," under which a consolidation is deemed to exist [7] for purposes of valuing and satisfying creditor claims, voting for or against the Plan, and making distributions for allowed claims under it. Plan § 6.1. Yet "the Plan would not result in the merger of or the transfer or commingling of any assets of any of the Debtors or Non-Debtor Subsidiaries, . . . [which] will continue to be owned by the respective Debtors or Non-Debtors." Plan § 6.1(a). Despite this, on the Plan's effective date "all guarantees of the Debtors of the obligations of any other Debtor will be deemed eliminated, so that any claim against any such Debtor and any guarantee thereof . . . will **[\*\*12]** be deemed to be one obligation of the Debtors with respect to the consolidated estate." Plan § 6.1(b). Put another way, "the Plan eliminates the separate obligations of the Subsidiary Debtors arising from the guarantees of the 1997 Credit Agreement." Plan Disclosure Statement at A-9897.

5 For convenience we refer hereinafter simply to "Bankruptcy Code §   " when citing to a Code section.

6 As the Plan's consolidation provisions affected so significantly voting on the Plan and the manner of proceeding at any confirmation hearing, the Plan Proponents filed a motion for a ruling on consolidation in anticipation of those events. "While not a routine procedure, it is not at all unusual for a plan proponent, or a plan opponent, to seek a determination prior to the plan confirmation hearing as to the legitimacy of a particular provision of a proposed plan." In re Stone & Webster, Inc., 286 B.R. 532, 542 (Bankr. D. Del. 2002) (Walsh, J.).

419 F.3d 195, *202; 2005 U.S. App. LEXIS 17150, **12;
Bankr. L. Rep. (CCH) P80,343; 45 Bankr. Ct. Dec. 36

7 "All assets and liabilities of each Subsidiary Debtor . . . *will be treated as though* they were merged into and with the assets and liabilities of OCD . . . ." Plan § 6.1(b) (emphasis added).

[**13]  The Banks objected to the proposed consolidation. Judge Alfred Wolin held a hearing on this objection. 8 He was subsequently recused from the Debtors' bankruptcy proceedings in light of In re Kensington Int'l Ltd., 368 F.3d 289 (3d Cir. 2004), and Judge John Fullam was designated by the Chief Judge of our Court to replace him. Judge Fullam reviewed the transcripts and exhibits of the hearing, ordered additional briefing and on October 5, 2004, granted the consolidation motion in an order accompanied by a short opinion.  In re Owens Corning, 316 B.R. 168 (Bankr. D. Del. 2004).

8 Pursuant to 28 U.S.C. § 157(d), Judge Wolin withdrew the reference of, inter alia, the consolidation motion to the Bankruptcy Court, thus making the District Court the judicial forum for the motion to proceed.

Judge Fullam concluded that there existed "substantial identity between . . . OCD and its wholly-owned subsidiaries."  Id. at 171. He further determined [**14]  that "there [was] simply no basis for a finding that, in extending credit, the Banks relied upon the separate credit of any of the subsidiary guarantors."  Id. at 172. In Judge Fullam's view, it was "also clear that substantive consolidation would greatly simplify and expedite the successful completion of this entire bankruptcy proceeding.  [*203]  More importantly, it would be exceedingly difficult to untangle the financial affairs of the various entities."  Id. at 171. As such, he held substantive consolidation should be permitted, as not only did it allow "obvious advantages . . . [, but was] a virtual necessity."  Id. at 172. In any event, Judge Fullam wrote, "the real issue is whether the Banks are entitled to participate, pari passu, with other unsecured creditors, or whether the Banks' claim is entitled to priority, in whole or in part, over the claims of other unsecured creditors." Id. But this issue, he stated, "cannot now be determined." Id.

CSFB appeals on the Banks' behalf.

**II. Appellate Jurisdiction**

The Plan Proponents moved to dismiss the appeal of the District Court's order granting consolidation on the [**15]  ground that it is not a "final decision" from which an appeal may be taken pursuant to 28 U.S.C. § 1291. 9 We denied that motion prior to oral argument in this case and noted that our reasoning would follow in this opinion.

419 F.3d 195, *203; 2005 U.S. App. LEXIS 17150, **15;
Bankr. L. Rep. (CCH) P80,343; 45 Bankr. Ct. Dec. 36

9  [HN1] This provision, rather than 28 U.S.C. § 158(d), applies when the reference to a bankruptcy court is withdrawn.

Recognizing the "protracted nature of many bankruptcy proceedings, and the waste of time and resources that might result if immediate appeal [is] denied," United States Trustee v. Gryphon at the Stone Mansion, Inc., 166 F.3d 552, 556 (3d Cir. 1999), [HN2] "we apply a broader concept of 'finality' when considering bankruptcy appeals under § 1291 than we do when considering other civil orders under the same section." In re Marvel Entm't Group, Inc., 140 F.3d 463, 470 (3d Cir. 1998). See also Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV, 229 F.3d 245, 250 (3d Cir. 2000) [**16] (noting that we impose a "relaxed standard" of finality because of unique considerations in bankruptcy cases); 16 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 3926.2 at 274 (2d ed. 1996) (describing the "Third Circuit's especially flexible approach to bankruptcy finality"). Particularly relevant to our case is that "to delay resolution of discrete claims until after final approval of a reorganization plan . . . would waste time and resources, particularly if the appeal resulted in reversal of a bankruptcy court order necessitating re-appraisal of the entire plan." Clark v. First State Bank (In re White Beauty View, Inc.), 841 F.2d 524, 526 (3d Cir. 1988). We have also stressed that "issues central to the progress of the bankruptcy petition, those 'likely to affect the distribution of the debtor's assets, or the relationship among the creditors,' should be resolved quickly." Century Glove, Inc. v. First Am. Bank, 860 F.2d 94, 98 (3d Cir. 1988) (quoting Southeastern Sprinkler Co. Inc. v. Meyertech Corp. (In re Meyertech), 831 F.2d 410, 414 (3d Cir. 1987)).

[HN3] We consider four factors [**17] in determining whether we should exercise jurisdiction over a bankruptcy appeal: "(1) the impact on the assets of the bankrupt estate; (2) [the] necessity for further fact-finding on remand; (3) the preclusive effect of [the Court's] decision on the merits of further litigation; and (4) the interest of judicial economy." Buncher, 229 F.3d at 250. All four factors weigh heavily in favor of our jurisdiction to consider the appeal of an order granting substantive consolidation. We thus join the four Courts of Appeal that have exercised jurisdiction in this context. Alexander v. Compton (In re Bonham)), 229 F.3d 750, 762 (9th Cir. 2000); First Nat'l Bank of El [*204] Dorado v. Giller (In re Giller), 962 F.2d 796, 797-98 (8th Cir. 1992); Eastgroup Properties v. Southern Motel Assoc., Ltd., 935 F.2d 245, 248 (11th Cir. 1991); and Union Sav. Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd.), 860 F.2d 515, 516-17 (2d Cir. 1988).

First, substantive consolidation has a profound effect on the assets of the consolidated entities. See, e.g., Nesbit v. Gears Unlimited, 347 F.3d 72, 86-87 (3d Cir. 2003). [**18] Second, there is no need for additional fact-finding to assess the propriety of an order granting substantive consolidation. In this case, for example, Judge Fullam reached his decision after a thirteen-day evidentiary hearing was held by Judge Wolin, and after Judge Fullam reviewed "the transcript of the testimony, and . . . the voluminous documentary record compiled in the course of the hearing, and [had] the benefit of post-trial briefing and argument." In re Owens Corning, 316 B.R. at 169. Third, a substantive

419 F.3d 195, *204; 2005 U.S. App. LEXIS 17150, **18;
Bankr. L. Rep. (CCH) P80,343; 45 Bankr. Ct. Dec. 36

consolidation order clearly has a preclusive effect on the merits of further litigation. In this case, the order precludes at least the Banks from asserting any right compromised or eliminated by virtue of the substantive consolidation. Last, the interests of judicial economy are best served by an immediate review of a substantive consolidation order. A later reversal of such an order risks rendering meaningless any proceedings premised on the viability of a plan that calls for a consolidation (even if for only a temporary period).

Having concluded that  [HN4] we generally have jurisdiction to review appeals of substantive consolidation [**19]  orders, we inquire whether anything is "different" about this case. The Plan Proponents argue that

> the District Court Order lacks finality because it will be implemented, if at all, only following approval of a disclosure statement, the solicitation and vote of creditors as to the terms of the Proposed Plan, and, assuming the requisite vote, final confirmation of the Proposed Plan, before which creditors other than the Bank Debt Holders shall be given the opportunity to contest substantive consolidation. [Bankruptcy Code] § 1129. Thus, the District Court Order is conditioned upon plan confirmation . . . . The District Court Order has no present impact on the Debtors' estates and does not change the status quo.

Plan Proponents' Mot. to Dismiss at 10. In support of this contention, the Plan Proponents rely primarily on  In re A.S.K. Plastics, Inc., 2004 U.S. Dist. LEXIS 16922, No. Civ. A. 04-2701, 2004 WL 1903322 (E.D. Pa. Aug. 24, 2004). Yet the conclusion that the Court lacked jurisdiction in A.S.K. Plastics was premised on the fact that "under no reasonable construction of the law could the Order's *conditional* consolidation be viewed as effecting [**20]  a 'practical termination' of anything."  Id. 2004 U.S. Dist. LEXIS 16922, at [WL] *2 (emphasis in original). That order "emphasized [that] . . . when a final reorganization plan [was] submitted to the Bankruptcy Court, [the party appealing the order] [was] free to object to consolidation." Id. In effect, the A.S.K. Plastics order was designed to postpone consideration of the substantive consolidation issue until the plan confirmation stage.

That is not our case. For the Banks the District Court's determination is hardly conditional. It concluded "that substantive consolidation should be permitted."  In re Owens Corning, 316 B.R. at 172. It made no provision for the Banks to reassert their objection to substantive consolidation at the plan confirmation stage; the order is final against them and is thus a practical termination of the substantive consolidation litigation.

 [*205]  Lastly, we address the Plan Proponents' argument that a substantive consolidation order must immediately take effect in order to be final for purposes of our jurisdiction. What they ignore is that the order approving substantive consolidation is the foundation on which the Plan is built. To assert that the actual [**21]  substantive consolidation can only be implemented in conjunction with the effectiveness of an approved plan puts form over function. As the Banks point out, "there is no support for the proposition that final orders lose their finality because of a delay in implementation." CSFB Opp'n to Mot. to Dismiss at 13. Certainly, decisions resolving most disputes (notably, disputes over the validity and value of claims) are not implemented until a plan is confirmed and payment under the plan becomes obligatory. Yet we exercise jurisdiction to review many of these decisions before that "final" order issues. See, e.g.,  Hefta v. Official Comm. of Unsecured Creditors

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 181 of 304

Page 14

419 F.3d 195, *205; 2005 U.S. App. LEXIS 17150, **21;
Bankr. L. Rep. (CCH) P80,343; 45 Bankr. Ct. Dec. 36

(In re Am. Classic Voyages Co.), 405 F.3d 127 (3d Cir. 2005). No reason exists for us to vary that routine here.

We conclude readily that we have appellate jurisdiction to consider the Banks' appeal under 28 U.S.C. § 1291.

### III. Substantive Consolidation

[HN5] Substantive consolidation, a construct of federal common law, emanates from equity. It "treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities (save **[\*\*22]** for inter-entity liabilities, which are erased). The result is that claims of creditors against separate debtors morph to claims against the consolidated survivor." Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health Ventures, Inc.), 402 F.3d 416, 423 (3d Cir. 2005). Consolidation restructures (and thus revalues) rights of creditors and for certain creditors this may result in significantly less recovery.

While we have not fully considered the character and scope of substantive consolidation, we discussed the concept in Nesbit, 347 F.3d at 86-88 (surveying substantive consolidation case law for application by analogy to the Title VII inquiry of when to consolidate employers for the purpose of assessing a discrimination claim), and In re Genesis Health Ventures, 402 F.3d at 423-24 (examining, inter alia, whether a "deemed" consolidation for voting in connection with, and distribution under, a proposed plan of reorganization is a substantive consolidation for purposes of calculating U.S. Trustee quarterly fees under 28 U.S.C. § 1930(a)(6)). Other courts, including the Supreme Court itself **[\*\*23]** in an opinion that spawned the concept of consolidation, have holdings more on point than heretofore have we. We begin with a survey of key cases, drawing from them when substantive consolidation may apply consistent with the principles we perceive as cabining its use, and apply those principles to this case.

### A. History of Substantive Consolidation

The concept of substantively consolidating separate estates begins with a commonsense deduction. Corporate disregard [10] as a fault may lead to corporate disregard as a remedy.

10 A term used by Mary Elisabeth Kors in her comprehensive and well-organized article entitled Altered Egos: Deciphering Substantive Consolidation, 59 U. Pitt. L. Rev. 381, 383 (1998) (hereinafter "Kors").

Prior to substantive consolidation, other remedies for corporate disregard were (and remain) in place. For example, where a subsidiary is so dominated by its **[\*206]** corporate parent as to be the parent's "alter ego," the "corporate veil" of the subsidiary can be ignored **[\*\*24]** (or "pierced") under state law. Kors, supra, at 386-90 (citing as far back as I. Maurice Wormser, Piercing the Veil

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 182 of 304

Page 15

419 F.3d 195, *206; 2005 U.S. App. LEXIS 17150, **24;
Bankr. L. Rep. (CCH) P80,343; 45 Bankr. Ct. Dec. 36

of Corporate Entity, 12 Colum. L. Rev. 496 (1912)). Or a court might mandate that the assets transferred to a corporate subsidiary be turned over to its parent's trustee in bankruptcy for wrongs such as fraudulent transfers, Kors, supra, at 391, in effect bringing back to the bankruptcy estate assets wrongfully conveyed to an affiliate. If a corporate parent is both a creditor of a subsidiary and so dominates the affairs of that entity as to prejudice unfairly its other creditors, a court may place payment priority to the parent below that of the other creditors, a remedy known as equitable subordination, which is now codified in § 510(c) of the Bankruptcy Code. See generally id. at 394-95.

Adding to these remedies, the Supreme Court, little more than six decades ago, approved (at least indirectly and perhaps inadvertently) what became known as substantive consolidation. [11] Sampsell v. Imperial Paper & Color Corp., 313 U.S. 215, 85 L. Ed. 1293, 61 S. Ct. 904 (1941). In Sampsell an individual in bankruptcy [**25] had transferred assets prepetition to a corporation he controlled. (Apparently these became the corporation's sole assets.) When the bankruptcy referee ordered that the transferred assets be turned over by the corporation to the individual debtor's trustee, a creditor of the non-debtor corporation sought distribution priority with respect to that entity's assets. In deciding that the creditor should not be accorded priority (thus affirming the bankruptcy referee), the Supreme Court turned a typical turnover/fraudulent transfer case into the forebear of today's substantive consolidation by terming the bankruptcy referee's order (marshaling the corporation's assets for the benefit of the debtor's estate) as "consolidating the estates." Id. at 219.

    11 The actual term was not used until 1967. In re Commercial Envelope Mfg. Co., 1977
    Bankr. LEXIS 15, 3 Bankr. Ct. Dec. 647, 648 (Bankr. S.D.N.Y. 1977) (Babitt, J.).

Each of these remedies has subtle differences. "Piercing the corporate [**26] veil" makes shareholders liable for corporate wrongs. Equitable subordination places bad-acting creditors behind other creditors when distributions are made. Turnover and fraudulent transfer bring back to the transferor debtor assets improperly transferred to another (often an affiliate). [HN6] Substantive consolidation goes in a direction different (and in most cases further) than any of these remedies; it is not limited to shareholders, it affects distribution to innocent creditors, and it mandates more than the return of specific assets to the predecessor owner. It brings all the assets of a group of entities into a single survivor. Indeed, it merges liabilities as well. "The result," to repeat, "is that claims of creditors against separate debtors morph to claims against the consolidated survivor." In re Genesis Health Ventures, 402 F.3d at 423. The bad news for certain creditors is that, instead of looking to assets of the subsidiary with whom they dealt, they now must share those assets with all creditors of all consolidated entities, raising the specter for some of a significant distribution diminution.

Though the concept of consolidating estates had Supreme Court [**27] approval, Courts of Appeal (with one exception) were slow to follow suit. Stone v. Eacho (In re Tip Top Tailors, Inc.), 127

419 F.2d 195, *206; 2005 U.S. App. LEXIS 17150, **27;
Bankr. L. Rep. (CCH) P80,343; 45 Bankr. Ct. Dec. 36

F.2d 284 (4th Cir. 1942), cert. denied, 317 U.S. 635, 87 L. Ed. 512 (1942), was the first to [*207] pick up on Sampsell's new remedy. [12] Little occurred thereafter for more than two decades, until the Second Circuit issued several decisions-- Soviero v. Franklin Nat'l Bank, 328 F.2d 446 (2d Cir. 1964); Chemical Bank New York Trust Co. v. Kheel (In re Seatrade Corp.), 369 F.2d 845 (2d Cir. 1966); Flora Mir Candy Corp. v. R.S. Dickson & Co. (In re Flora Mir Candy Corp.), 432 F.2d 1060 (2d Cir. 1970); and Talcott v. Wharton (In re Continental Vending Machine Corp.), 517 F.2d 997 (2d Cir. 1975)--that brought substantive consolidation as a remedy back into play and premise its modern-day understanding.

   12 Another case oft-mentioned, and preceding both Sampsell and Stone, is Fish v. East, 114 F.2d 177 (10th Cir. 1940). Determining that a corporate subsidiary was simply the parent's "instrumentality," id. at 191, the Tenth Circuit affirmed the turnover of the subsidiary's assets to the parent. Though asserting that a "corporate entity may be disregarded where not to do so will defeat public convenience, justify wrong or protect fraud," id., "consolidation" was not mentioned. Indeed, as creditors of the subsidiary in Fish were given first priority as to its assets, id., a complete consolidation did not occur. Accord Kors, supra, at 391 ("true consolidation" occurs only when creditors of consolidated entities share pari passu).

   A case from our Court - In re Pittsburgh Rys., 155 F.2d 477 (3d Cir. 1946), cert. denied sub nom. Philadelphia Co. v. Pittsburgh, 329 U.S. 731, 67 S. Ct. 90, 91 L. Ed. 632 (1946) - cited Stone, id. at 484-85 n.15, in granting the request of the City of Pittsburgh to exercise bankruptcy jurisdiction over non-debtor companies controlled by the debtor Pittsburgh Railways Company. While guided by the practical need to "strip[] off" corporate "cloak[s]," id. at 484, in reorganizing Pittsburgh's transportation system, our Court pointed out that "[t]he reorganization court cannot indefinitely be called upon to provide . . . unification," id. at 481. In so doing, it emphasized that "we are in no way passing upon the fairness of any plan [of reorganization]." Id. at 485; see also id. at 481.

 [**28] Other Circuit Courts fell in line in acknowledging substantive consolidation as a possible remedy. See, e.g., FDIC v. Hogan (In re Gulfco Inv. Corp.), 593 F.2d 921, 927-28 (10th Cir. 1979); Pension Benefit Guar. Corp. v. Ouimet Corp., 711 F.2d 1085, 1092-93 (1st Cir. 1983), cert. denied, 464 U.S. 961 (1983); Drabkin v. Midland-Ross Corp. (In re Auto-Train Corp.), 258 U.S. App. D.C. 151, 810 F.2d 270, 276 (D.C. Cir. 1987); Eastgroup, 935 F.2d at 248; In re Giller, 962 F.2d at 799; First Nat'l Bank of Barnesville v. Rafoth (In re Baker & Getty Fin. Servs., Inc.), 974 F.2d 712, 720 (6th Cir. 1992); Reider v. FDIC (In re Reider), 31 F.3d 1102, 1106-07 (11th Cir. 1994); and In re Bonham, 229 F.3d at 771.

The reasons of these courts for allowing substantive consolidation as a possible remedy span the spectrum and often overlap. For example, Stone and Soviero followed the well-trod path of alter

419 F.3d 195, *207; 2005 U.S. App. LEXIS 17150, **28;
Bankr. L. Rep. (CCH) P80,343; 45 Bankr. Ct. Dec. 36

ego analysis in state "pierce-the-corporate-veil" cases. Stone, 127 F.2d at 287-89; Soviero, 328 F.2d at 447-48. Accord [**29] In re Gulfco Inv. Corp., 593 F.2d at 928-29. Kheel dealt with, inter alia, the net-negative practical effects of attempting to thread back the tangled affairs of entities, separate in name only, with "interrelationships . . . hopelessly obscured." 369 F.2d at 847. See also, e.g., In re Augie/Restivo, 860 F.2d at 518-19. In re Continental Vending Machine balanced the "inequities" involved when substantive rights are affected against the "practical considerations" spawned by "accounting difficulties (and expense) which may occur where the interrelationships of the corporate group are highly complex, or perhaps untraceable." 517 F.2d at 1001. See also, e.g., In re Auto-Train, 810 F.2d at 276; Eastgroup, 935 F.2d at 249; In re Giller, 962 F.2d at 799; In re Reider, 31 F.3d at 1107-08. See generally Kors, supra, at 402-06.

Ultimately most courts slipstreamed behind two rationales--those of the Second Circuit in Augie/Restivo and the D.C. Circuit in Auto-Train. The former found that the competing "considerations are merely [**30] variants on two critical factors: (i) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit, [*208] . . . or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors . . . ." In re Augie/Restivo, 860 F.2d at 518 (internal quotation marks and citations omitted). Auto-Train touched many of the same analytical bases as the prior Second Circuit cases, but in the end chose as its overarching test the "substantial identity" of the entities and made allowance for consolidation in spite of creditor reliance on separateness when "the demonstrated benefits of consolidation 'heavily' outweigh the harm." In re Auto-Train, 810 F.2d at 276 (citation omitted).

Whatever the rationale, courts have permitted substantive consolidation as an equitable remedy in certain circumstances. [13] No court has held that substantive consolidation is not authorized, [14] though there [*209] appears nearly unanimous consensus that it is a remedy to be used "sparingly." In re Augie/Restivo, 860 F.2d at 518; see also In re Bonham, 229 F.3d at 767 [**31] (explaining that "almost every other court has noted [that substantive consolidation] should be used 'sparingly'") (citing In re Flora Mir, 432 F.2d at 1062-63). [15]

---

13 Indeed, they have not restricted the remedy to debtors, allowing the consolidation of debtors with non-debtors, see, e.g., In re Bonham, 229 F.3d at 765 (explaining that "courts have permitted the consolidation of non-debtor and debtor entities in furtherance of the equitable goals of substantive consolidation") (citing In re Auto-Train, 810 F.2d at 275; In re Tureaud, 59 B.R. 973, 974, 978 (N.D. Okla. 1986); In re Munford, Inc., 115 B.R. 390, 395-96 (Bankr. N.D. Ga. 1990)); Soviero, 328 F.2d 446, and in some cases consolidation retroactively (known also as nunc pro tunc consolidation), see, e.g., In re Bonham, 229 F.3d at 769-71; In re Baker & Getty Fin. Servs., 974 F.2d at 720-21; Kroh Bros. Development Co. v. Kroh Bros. Management Co. (In re Kroh Bros. Dev. Co.), 117 B.R. 499, 502 (W.D. Mo. 1989); see also Auto-Train, 810 F.2d at 277 (acknowledging that nunc pro tunc

consolidations can occur, though not in that case).

In addition, though we do not permit the consolidation sought in this case, no reason exists to limit it under the right circumstances to any particular form of entity. (Indeed, this case involves corporations and limited liability companies.) Accord 2 Collier on Bankruptcy P 105.09[1][c] (15th rev. ed. 2005).

[**32]

14 See  In re Bonham, 229 F.3d at 765 (explaining that "the equitable power [of substantive consolidation] undoubtedly survived enactment of the Bankruptcy Code" and noting that "no case has held to the contrary"); but see  In re Fas Mart Convenience Stores, Inc., 320 B.R. 587, 594 n.3 (Bankr. E.D. Va. 2004) (noting "there is persuasive academic argument that there is no authority in bankruptcy law for substantive consolidation") (citing Daniel B. Bogart, Resisting the Expansion of Bankruptcy Court Power Under Section 105 of the Bankruptcy Code: The All Writs Act and an Admonition from Chief Justice Marshall,  35 Ariz. St. L.J. 793, 810 (2003); J. Maxwell Tucker, Grupo Mexicano and the Death of Substantive Consolidation,  8 Am. Bankr. Inst. L. Rev. 427 (2000) (hereinafter "Tucker")).

Since the Supreme Court's decision in  Grupo Mexicano Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 144 L. Ed. 2d 319, 119 S. Ct. 1961 (1999) (federal district courts lack the equitable power to enjoin prejudgment transfers of assets, as such an equitable remedy did not exist at the time federal courts were created under the Judiciary Act of 1789), some argue that substantive consolidation, judge-made law not expressly codified in the Bankruptcy Code adopted in the late 1970s, does not qualify as an available equitable remedy. See, e.g.,  Tucker, supra at 442-45. This argument has two facets. The first is that bankruptcy courts are limited to exercising only the equitable remedies extant at the time of the adoption of the Judiciary Act of 1789. As substantive consolidation is a relatively recent remedy nowhere contemplated in 1789, Grupo Mexicano by analogy bars substantive consolidation just as it does prejudgment preliminary injunctions forbidding asset transfers. Id. The second (and corollary) facet of the argument is that, as substantive consolidation is not specifically authorized in the Bankruptcy Code, authority to confer it can exist, if at all, only in § 105(a) of the Bankruptcy Code (bankruptcy courts "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title"). Even if § 105(a) "constitutes a direct, fresh grant of supplemental power to the bankruptcy courts, independent of the judicial power granted to the federal courts under title 28 [of the United States Code]," id. at 447, it can only implement powers already expressed in the provisions of the Bankruptcy Code.  Id. at 447-48. See  In re Combustion Eng'g, Inc., 391 F.3d 190, 236 (3d Cir. 2004) ("The general grant of equitable power contained in § 105(a). . . must be exercised within the parameters of the Code itself.");  In re Kmart Corp., 359 F.3d 866, 871 (7th Cir. 2004) ("[T]he power conferred by § 105 is one to implement rather than to override."). But for joint spouse estates in Bankruptcy Code § 302, consolidation is permitted only in the context of a confirmed plan of reorganization and the requirements that entails.

419 F.3d 195, *209; 2005 U.S. App. LEXIS 17150, **32;
Bankr. L. Rep. (CCH) P80,343; 45 Bankr. Ct. Dec. 36

Tucker, supra, at 449 (citing to, inter alia, Bankruptcy Code § 1123(a)(5)(C)).

The first facet of the argument is, at the outset, premature. Consolidating estates (indeed, consolidating debtor and non-debtor entities) traces to the Supreme Court's Sampsell decision in 1941.  313 U.S. at 219. What the Court has given as an equitable remedy remains until it alone removes it or Congress declares it removed as an option. See  In re Stone & Webster, 286 B.R. at 540 (quoting  Official Comm. of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.), 2001 Bankr. LEXIS 2029, Adv. No. 01-3065 (RG) (Bankr. D.N.J. March 12, 2001) (Hearing Tr. at 71-2)).

In addition, at the core of Grupo Mexicano was the extent of general, unarticulated equity authority in the federal courts (which, the Court held, can only be justified by reference to 1789 equity authority). It was *not* a bankruptcy case. The extensive history of bankruptcy law and judicial precedent renders the issue of equity authority in the bankruptcy context different to such a degree as to make it different in kind. Notably, in the only two instances in which the word "bankruptcy" appears in Justice Scalia's majority opinion in Grupo Mexicano, he uses the *existence* of court authority in the bankruptcy context as a reason to support the conclusion that the district court did not have the authority under generalized equity powers to implement the remedy it imposed. First, he pointed out that "*the law of fraudulent conveyances and bankruptcy was developed to prevent [the] conduct [at issue]*; an equitable power to restrict a debtor's use of his unencumbered property before judgment was not." Grupo Mexicano, 527 U.S. at 322 (emphasis added). Second, he stressed that finding the authority to justify the District Court's remedy in generalized equity power would "add[], through judicial fiat, a new and powerful weapon to the creditor's arsenal[;] the new rule could radically alter the balance between debtor's and creditor's rights *which has been developed over centuries through many laws--including those relating to bankruptcy, fraudulent conveyances, and preferences.*"  Id. at 331 (emphasis added).

In short, the Court's opinion in Grupo Mexicano acknowledged that bankruptcy courts *do* have the authority to deal with the problems presented by that case. One way to conceptualize this idea is to recognize that, had the company in Grupo Mexicano been in bankruptcy, the bankruptcy court would have had the authority to implement the remedy the district court lacked authority to order under general equity power outside the bankruptcy context.

As for the argument's second facet, it begins with a concession. Bankruptcy Code § 1123(a)(5)(C)'s very words allow for "consolidation of the debtor with one or more persons" pursuant to a plan "notwithstanding any otherwise applicable non-bankruptcy law." Accord Tucker, supra, at 448-49. See also  In re Stone & Webster, 286 B.R. at 540-43. Whether § 105(a) allows consolidation outside a plan is an issue we need not address--though that arguably is what the Plan Proponents propose by moving for a "deemed" consolidation--because, as we note below, consolidation, no matter how it is packaged, cannot pass muster in this case.

419 F.3d 195, *209; 2005 U.S. App. LEXIS 17150, **32;
Bankr. L. Rep. (CCH) P80,343; 45 Bankr. Ct. Dec. 36

In this context, we also need not address the argument, made in the Amicus Curiae Brief of the Commercial Finance Association, that substantive consolidation fails the "best interests test" of Bankruptcy Code § 1129(a)(7) (a requirement for plan confirmation that each creditor that does not vote to accept the plan must receive or retain property under the plan at least equal to its recovery in a Bankruptcy Code Chapter 7 liquidation). See generally  In re Stone & Webster, 286 B.R. at 544-46.

[**33]

15 Thus we disagree with the assertion of a "liberal trend" toward increased use of substantive consolidation--e.g.,  Eastgroup, 935 F.2d at 248 (describing "a 'modern' or 'liberal' trend toward allowing substantive consolidation") (citing  In re Murray Indus., Inc., 119 B.R. 820, 828 (Bankr. M.D. Fla. 1990);  In re Vecco Constr. Industries, Inc., 4 B.R. 407, 409 (Bankr. E.D. Va. 1980)).

### [*210] B. Our View of Substantive Consolidation

Substantive consolidation exists as an equitable remedy. But when should it be available and by what test should its use be measured? As already noted, we have commented on substantive consolidation only generally in  Nesbit, 347 F.3d at 86-88, and  In re Genesis Health Ventures, 402 F.3d at 423-24. The latter nonetheless left little doubt that, if presented with a choice of analytical avenues, we favor essentially that of  Augie/Restivo.  Id. at 423. The Auto-Train approach (requiring "substantial identity" of entities to be consolidated, plus that [**34]  consolidation is "necessary to avoid some harm or realize some benefit,"  810 F.2d at 276) adopts, we presume, one of the Augie/Restivo touchstones for substantive consolidation while adding the low bar of avoiding some harm or discerning some benefit by consolidation. To us this fails to capture completely the few times substantive consolidation may be considered and then, when it does hit one chord, it allows a threshold not sufficiently egregious and too imprecise for easy measure. For example, we disagree that "if a creditor makes [a showing of reliance on separateness], the court may order consolidation . . . if it determines that the demonstrated benefits of consolidation 'heavily' outweigh the harm."  Id. at 276 (citation omitted); see also  Eastgroup, 935 F.2d at 249. If an objecting creditor relied on the separateness of the entities, consolidation cannot be justified vis-a-vis the claims of that creditor. [16]

16 This opens the question whether a court can order partial consolidation (such a consolidation order "could provide that . . . [a creditor relying on separateness] would receive a distribution equal to what [it] would have received absent consolidation and that the remainder of the assets and liabilities be consolidated.")  Kors, supra, at 450-51. Because this theoretical issue is not before us--and in any event (i) facts bringing it to the fore are unlikely, id. at 451 ("If circumstances lead one party to rely on the single status of the one debtor, it is

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 188 of 304

Page 21

419 F.3d 195, *210; 2005 U.S. App. LEXIS 17150, **34;
Bankr. L. Rep. (CCH) P80,343; 45 Bankr. Ct. Dec. 36

unlikely that other creditors are relying on the joint status of the two entities, especially as reliance must be reasonable."), and (ii) may present practical concerns depending on the facts of a particular case--we do not decide it in this case.

[**35] In assessing whether to order substantive consolidation, courts consider many factors (some of which are noted in  Nesbit, 347 F.3d at 86-88 nn. 7 & 9 ). They vary (with degrees of overlap) from court to court. Rather than endorsing any prefixed factors, in Nesbit  [HN7] we "adopted an intentionally open-ended, equitable inquiry. . . to determine when substantively to consolidate two entities." Id. at 87. While we mentioned that "in the bankruptcy context the inquiry focuses primarily on financial entanglement," id., this comment primarily related to the hopeless commingling test of substantive consolidation. But when creditors deal with entities as an indivisible, single party, "the line between operational and financial [factors] may be blurred." Id. at 88. We reiterate that belief here. Too often the factors in a checklist fail to separate the unimportant from the important, or even to set out a standard to make the attempt. Accord Br. of Law Professors [17] as Amici Curiae at 11-12. This often results in rote following of a form containing factors where courts tally up and spit out a score without an eye on the principles [**36] that give the rationale for substantive consolidation (and why, as a result, it should so seldom be in play). Id. [*211] ("Differing tests with . . . agreed . . . factors run the risk that courts will miss the forest for the trees. Running down factors as a check list can lead a court to lose sight of why we have substantive consolidation in the first instance . . . and often [to] fail [to] identify a metric by which [it] can . . . [assess] the relative importance among the factors. The . . . [result is] resort to ad hoc balancing without a steady eye on the . . . [principles] to be advanced . . . .").

17 They are Robert K. Rasmussen of Vanderbilt Law School, Barry Adler of the NYU School of Law, Susan Block-Leib of Fordham University School of Law, G. Marcus Cole of Stanford Law School, Marcel Kahan of the NYU School of Law, Ronald J. Mann of the University of Texas Law School, and David A. Skeel, Jr. of the University of Pennsylvania School of Law.

What, then, are those principles? We perceive them [**37] to be as follows.

(1) Limiting the cross-creep of liability by respecting entity separateness is a "fundamental ground rule[]." Kors, supra, at 410. As a result, the general expectation of state law and of the Bankruptcy Code, and thus of commercial markets, is that courts respect entity separateness absent compelling circumstances calling equity (and even then only possibly substantive consolidation) into play.

(2) The harms substantive consolidation addresses are nearly always those caused by *debtors* (and entities they control) who disregard separateness. [18] Harms caused by creditors typically are remedied by provisions found in the Bankruptcy Code (e.g., fraudulent transfers, §§ 548 and 544(b)(1), and equitable subordination, § 510(c)).

(3) [HN8] Mere benefit to the administration of the case (for example, allowing a court to simplify a case by avoiding other issues or to make postpetition accounting more convenient) is hardly a harm calling substantive consolidation into play.

419 F.3d 195, *211; 2005 U.S. App. LEXIS 17150, **37;
Bankr. L. Rep. (CCH) P80,343; 45 Bankr. Ct. Dec. 36

(4) Indeed,  [HN9] because substantive consolidation is extreme (it may affect profoundly creditors' rights and recoveries) and imprecise, this "rough justice" remedy should be **[**38]** rare and, in any event, one of last resort after considering and rejecting other remedies (for example, the possibility of more precise remedies conferred by the Bankruptcy Code).

(5)  [HN10] While substantive consolidation may be used defensively to remedy the identifiable harms caused by entangled affairs, it may not be used offensively (for example, having a primary purpose to disadvantage tactically a group of creditors in the plan process or to alter creditor rights).

18 Though creditors conceivably can cause debtors to conflate separate organizational forms, the specter of lender liability (which came to the fore in only the last two decades) makes this theoretical possibility all the more remote.

The upshot is this.  [HN11] In our Court what must be proven (absent consent) concerning the entities for whom substantive consolidation is sought is that (i) prepetition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, [19] **[**39]**  or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors. [20]

19 This rationale is meant to protect in bankruptcy the prepetition expectations of those creditors. Accord  Kors, supra, at 419. The usual scenario is that creditors have been misled by debtors' actions (regardless whether those actions were intentional or inadvertent) and thus perceived incorrectly (and relied on this perception) that multiple entities were one.

20 This rationale is at bottom one of practicality when the entities' assets and liabilities have been "hopelessly commingled."  In re Gulfco Inv. Corp., 593 F.2d at 929;  In re Vecco Constr. Indus., 4 B.R. at 410. Without substantive consolidation all creditors will be worse off (as Humpty Dumpty cannot be reassembled or, even if so, the effort will threaten to reprise Jarndyce and Jarndyce, the fictional suit in Dickens' Bleak House where only the professionals profited). With substantive consolidation the lot of all creditors will be improved, as consolidation "advance[s] one of the primary goals of bankruptcy-enhancing the value of the assets available to creditors . . .-often in a very material respect."  Kors, supra, at 417 (citation omitted).

**[**40]**  **[*212]**  Proponents of substantive consolidation have the burden of showing one or the other rationale for consolidation. The second rationale needs no explanation. The first, however, is more nuanced. A prima facie case for it typically exists when, based on the parties' prepetition dealings, a proponent proves corporate disregard creating contractual expectations of creditors [21]

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 190 of 304

Page 23

419 F.3d 195, *212; 2005 U.S. App. LEXIS 17150, **40;
Bankr. L. Rep. (CCH) P80,343; 45 Bankr. Ct. Dec. 36

that they were dealing with debtors as one indistinguishable entity. Kors, supra, at 417-18; Christopher W. Frost, Organizational Form, Misappropriation Risk, and the Substantive Consolidation of Corporate Groups, 44 Hastings L.J. 449, 457 (1993). Proponents who are creditors must also show that, in their prepetition course of dealing, they actually and reasonably relied on debtors' supposed unity. Kors, supra, at 418-19. Creditor opponents of consolidation can nonetheless defeat a prima facie showing under the first rationale if they can prove they are adversely affected and actually relied on debtors' separate existence. [22]

21 "Tort and statutory claimants, who, as involuntary creditors, by definition did not rely on anything in becoming creditors," Kors, supra, at 418, are excluded, leaving only those creditors who contract with an entity for whom consolidation is sought.

**[**41]**

22 As noted already, supra n.16, we do not decide here whether such a showing by an opposing creditor defeats totally the quest for consolidation or merely consolidation as to that creditor.

### C. Application of Substantive Consolidation to Our Case

With the principles we perceive underlie use of substantive consolidation, the outcome of this appeal is apparent at the outset. Substantive consolidation fails to fit the facts of our case and, in any event, a "deemed" consolidation cuts against the grain of all the principles.

To begin, the Banks did the "deal world" equivalent of "Lending 101." They loaned $ 2 billion to OCD and enhanced the credit of that unsecured loan indirectly by subsidiary guarantees covering less than half the initial debt. What the Banks got in lending lingo was "structural seniority"--a direct claim against the guarantors (and thus against their assets levied on once a judgment is obtained) that other creditors of OCD did not have. This kind of lending occurs every business day. To undo this bargain is a demanding task.

### 1. NO PREPETITION DISREGARD OF CORPORATE [**42] SEPARATENESS

Despite the Plan Proponents' pleas to the contrary, there is no evidence of the prepetition disregard of the OCD entities' separateness. To the contrary, OCD (no less than CSFB) negotiated the 1997 lending transaction premised on the separateness of all OCD affiliates. Even today no allegation exists of bad faith by anyone concerning the loan. [23] In this context, OCD and the other Plan Proponents cannot now ignore, or have us ignore, the very ground rules OCD put in place. Playing by these rules means that obtaining the guarantees of separate entities, made separate [*213] by OCD's choice of how to structure the affairs of its affiliate group of companies, entitles a lender, in bankruptcy or out, to look to any (or all) guarantor(s) for payment when the time comes. As such,

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 191 of 304

Page 24

419 F.3d 195, *213; 2005 U.S. App. LEXIS 17150, **42;
Bankr. L. Rep. (CCH) P80,343; 45 Bankr. Ct. Dec. 36

the District Court's conclusions of "substantial identity" of OCD and its subsidiaries, and the Banks' reliance thereon, are incorrect. For example, testimony presented by both the Banks and the Debtors makes plain the parties' intention to treat the entities separately. CSFB presented testimony from attorneys and bankers involved in negotiating the Credit Agreement that reflected their assessment of the [**43]  value of the guarantees as partially derived from the separateness of the entities. As OCD concedes, these representatives "testified that the guarantees were . . . intended to provide 'structural seniority' to the banks," and were thus fundamentally premised on an assumption of separateness. Debtors Ans. Br. at 26.

    23 The bondholders do claim certain Banks misled them in purchasing OCD debt subsequent to the 1997 loan. But we know of no claim of wrong by the Banks in connection with the 1997 transaction.

In the face of this testimony, Plan Proponents nonetheless argue that the Banks intended to ignore the separateness of the entities. In support of this contention, they assert, inter alia, that because the Banks did not receive independent financial statements for each of the entities during the negotiating process, they must have intended to deal with them as a unified whole. Because the Banks were unaware of the separate financial makeup of the subsidiaries, the argument goes, they could not have relied [**44]  on their separateness. 24

    24 Debtors make a similar argument on the basis of the Banks' failure to exercise their right to monitor the entities independently. For much the same reasoning that follows in the text, we reject that argument as well.

We reject outright Debtors' claim that the Banks' alleged reliance on corporate separateness fails because they did not obtain a third-party legal opinion from counsel that substantive consolidation was unlikely to occur were OCD or the guarantors subject to bankruptcy. By custom and practice this type of counsel opinion is requested and given for newly formed entities whose "special purpose" is to obtain structured financing (i.e., where "a defined group of assets . . . [are] structurally isolated, and thus serve as the basis of a financing . . . ." Committee on Bankruptcy and Corporate Reorganization of The Association of the Bar of the City of New York, Structured Financing Techniques,  50 Bus. Law. 527, 529 (1995)). It is customarily not given (nor even requested) for entities in existence for any significant period of time or set up for other than a structured financing transaction. See Tribar Opinion Committee, Opinions in the Bankruptcy Context: Rating Agency, Structured Financing, and Chapter 11 Transactions,  46 Bus. Law. 717, 726 & n.42 (1991).

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 192 of 304

Page 25

419 F.3d 195, *213; 2005 U.S. App. LEXIS 17150, **45;
Bankr. L. Rep. (CCH) P80,343; 45 Bankr. Ct. Dec. 36

[**45]  This argument is overly simplistic. Assuming the Banks did not obtain separate financial statements for each subsidiary, they nonetheless obtained detailed information about each subsidiary guarantor from OCD, including information about that subsidiary's assets and debt. Moreover, the Banks knew a great deal about these subsidiaries. For example, they knew that each subsidiary guarantor had assets with a book value of at least $ 30 million as per the terms of the Credit Agreement, that the aggregate value of the guarantor subsidiaries was over $ 900 million and that those subsidiaries had little or no debt. Additionally, the Banks knew that Fibreboard's subsidiaries (including the entities that became part of ESI) had no asbestos liability, would be debt-free post-acquisition and had assets of approximately $ 700 million.

Even assuming the Plan Proponents could prove prepetition disregard of Debtors' corporate forms, we cannot conceive of a justification for imposing the rule that a creditor must obtain financial statements from a debtor in order to rely reasonably on the separateness of that debtor. Creditors are free to employ whatever metrics  [*214]  they believe appropriate in deciding [**46]  whether to extend credit free of court oversight. We agree with the Banks that "the reliance inquiry is not an inquiry into lenders' internal credit metrics. Rather, it is about the *fact* that the credit decision was made in reliance on the existence of separate entities . . . ." CSFB Opening Br. at 31 (emphasis in original). [25] Here there is no serious dispute as to that fact.

25 Further, a creditor's lack of diligence is relevant only insofar as it bears on the credibility of its assertion of reliance on separateness.


2. NO HOPELESS COMMINGLING EXISTS POSTPETITION

There also is no meaningful evidence postpetition of hopeless commingling of Debtors' assets and liabilities. Indeed, there is no question which entity owns which principal assets and has which material liabilities. Likely for this reason little time is spent by the parties on this alternative test for substantive consolidation. It is similarly likely that the District Court followed suit.

The Court nonetheless erred in concluding that the [**47]  commingling of assets will justify consolidation when "the affairs of the two companies are so entangled that consolidation *will be beneficial*." In re Owens Corning, 316 B.R. at 171 (emphasis added). As we have explained, [HN12] commingling justifies consolidation only when separately accounting for the assets and liabilities of the distinct entities will reduce the recovery of *every* creditor--that is, when every creditor will benefit from the consolidation. Moreover, the benefit to creditors should be from cost savings that make assets available rather than from the shifting of assets to benefit one group of creditors at the expense of another. Mere benefit to some creditors, or administrative benefit to the Court, falls far short. The District Court's test not only fails to adhere to the theoretical justification for "hopeless commingling" consolidation--that no creditor's rights will be impaired--but also

419 F.3d 195, *214; 2005 U.S. App. LEXIS 17150, **47;
Bankr. L. Rep. (CCH) P80,343; 45 Bankr. Ct. Dec. 36

suffers from the infirmity that it will almost always be met. That is, substantive consolidation will nearly always produce some benefit to some in the form of simplification and/or avoidance of costs. Among other things, following such a path misapprehends the **[**48]** degree of harm required to order substantive consolidation.

But no matter the legal test, a case for hopeless commingling cannot be made. Arguing nonetheless to the contrary, Debtors assert that "it would be practically impossible and prohibitively expensive in time and resources" to account for the voluntary bankruptcies of the separate entities OCD has created and maintained. Debtors Ans. Br. at 63. In support of this contention, Debtors rely almost exclusively on the District Court's findings that

> it would be exceedingly difficult to untangle the financial affairs of the various entities . . . [and] there are . . . many reasons for challenging the accuracy of the results achieved [in accounting efforts thus far]. For example, transfers of cash between subsidiaries and parent did not include any payment of interest; and calculations of royalties are subject to question.

In re Owens Corning, 316 B.R. at 171. Assuming arguendo that these findings are correct, they are simply not enough to establish that substantive consolidation is warranted.

[HN13] Neither the impossibility of perfection in untangling the affairs of the entities nor the likelihood **[**49]** of some inaccuracies in efforts to do so is sufficient to justify consolidation. We find R 2 Investments, LDC v. World Access, Inc. (In re World Access, Inc.), 301 B.R. 217 (Bankr. **[*215]** N.D. Ill. 2003), instructive on this point. In World Access the Court noted that the controlling entity "had no uniform guidelines for the recording of intercompany interest charges" and that the debtors failed to "allocate overhead charges amongst themselves." Id. at 234. The Court held, however, that those accounting shortcomings were "merely imperfections in a sophisticated system of accounting records that were conscienciously maintained." Id. at 279. It ultimately concluded that "all the relevant accounting data . . . still existed," that only a "reasonable review to make any necessary adjustments [was] required," and, thus, that substantive consolidation was not warranted. Id.

The record in our case compels the same conclusion. At its core, Debtors' argument amounts to the contention that because intercompany interest and royalty payments were not perfectly accounted for, untangling the finances of those entities is a hopeless endeavor. **[**50]** Yet imperfection in intercompany accounting is assuredly not atypical in large, complex company structures. For obvious reasons, we are loathe to entertain the argument that complex corporate families should have an expanded substantive consolidation option in bankruptcy. And we find no reason to doubt that "perfection is not the standard in the substantive consolidation context." Id. We are confident that a court could properly order and oversee an accounting process that would sufficiently account for the interest and royalty payments owed among the OCD group of companies for purposes of evaluating intercompany claims--dealing with inaccuracies and difficulties as they arise and not in hypothetical abstractions.

On the basis of the record before us, the Plan Proponents cannot fulfill their burden of demonstrating that Debtors' affairs are even tangled, let alone that the cost of untangling them is so

419 F.3d 195, *215; 2005 U.S. App. LEXIS 17150, **50;
Bankr. L. Rep. (CCH) P80,343; 45 Bankr. Ct. Dec. 36

high relative to their assets that the Banks, among other creditors, will benefit from **[\*\*51]** a consolidation. [26]

26 For example, we simply cannot imagine that it would cost Debtors even 1 of the Banks' asserted $ 1.6 billion claim to account for the allegedly incalculable intercompany interest and royalty payments.

## 3. OTHER CONSIDERATIONS DOOM CONSOLIDATION AS WELL

Other considerations drawn from the principles we set out also counsel strongly against consolidation. First of all, holding out the possibility of later giving priority to the Banks on their claims does not cure an improvident grant of substantive consolidation. Among other things, the prerequisites for this last-resort remedy must still be met no matter the priority of the Banks' claims.

Secondly, [HN14] substantive consolidation should be used defensively to remedy identifiable harms, not offensively to achieve advantage over one group in the plan negotiation process (for example, by deeming assets redistributed to negate plan voting rights), nor a "free pass" to spare Debtors or any other group from proving challenges, like fraudulent transfer **[\*\*52]** claims, that are liberally brandished to scare yet are hard to show. If the Banks are so vulnerable to the fraudulent transfer challenges Debtors have teed up (but have not swung at for so long), then the game should be played to the finish in that arena. [27]

27 The same sentiment applies to the argument of the bondholders that, subsequent to the 1997 loan to OCD, the Banks defrauded them in connection with a prospectus distributed with respect to a sale of OCD bonds underwritten by some of the Banks. If the bondholders have a valid claim, they need to prove it in the District Court and not use their allegations as means to gerrymander consolidation of estates.

**[\*216]** But perhaps the flaw most fatal to the Plan Proponents' proposal is that the consolidation sought was "deemed" (i.e., a pretend consolidation for all but the Banks). If Debtors' corporate and financial structure was such a sham before the filing of the motion to consolidate, then how is it that post the Plan's effective date this structure stays **[\*\*53]** largely undisturbed, with the Debtors reaping all the liability-limiting, tax and regulatory benefits achieved by forming subsidiaries in the first place? In effect, the Plan Proponents seek to remake substantive consolidation not as a remedy, but rather a stratagem to "deem" separate resources reallocated to OCD to strip the Banks of rights under the Bankruptcy Code, favor other creditors, and yet trump possible Plan objections by the Banks. Such "deemed" schemes we deem not Hoyle.

419 F.3d 195, *216; 2005 U.S. App. LEXIS 17150, **53;
Bankr. L. Rep. (CCH) P80,343; 45 Bankr. Ct. Dec. 36

**IV. Conclusion**

 [HN15] Substantive consolidation at its core is equity. Its exercise must lead to an equitable result. "Communizing" assets of affiliated companies to one survivor to feed all creditors of all companies may to some be equal (and hence equitable). But it is hardly so for those creditors who have lawfully bargained prepetition for unequal treatment by obtaining guarantees of separate entities. Accord  Kheel, 369 F.2d at 848 (Friendly, J., concurring) ("Equality among creditors who have lawfully bargained for different treatment is not equity but its opposite . . . ."). No principled, or even plausible, reason exists to undo OCD's and the Banks' arms-length negotiation and lending **[\*\*54]**  arrangement, especially when to do so punishes the very parties that conferred the prepetition benefit--a $ 2 billion loan unsecured by OCD and guaranteed by others only in part. To overturn this bargain, set in place by OCD's own pre-loan choices of organizational form, would cause chaos in the marketplace, as it would make this case the Banquo's ghost of bankruptcy.

With no meaningful evidence supporting either test to apply substantive consolidation, there is simply not the nearly "perfect storm" needed to invoke it. Even if there were, a "deemed" consolidation--"several zip (if not area) codes away from anything resembling substantive consolidation,"  In re Genesis Health Ventures, 402 F.3d at 424--fails even to qualify for consideration. Moreover, it is here a tactic used as a sword and not a shield.

We thus reverse and remand this case to the District Court.

**TAB 15**

464 B.R. 208
United States Bankruptcy Court,
D. Delaware.

In re TRIBUNE COMPANY, et al., [1] Debtors.

[1] The chapter 11 case filed by Tribune Media Services, Inc. (Bky. Case No. 08–13236) is being jointly administered with the Tribune Company bankruptcy case and 109 additional affiliated debtors pursuant to the Order dated December 10, 2008 (docket no. 43). An additional debtor, Tribune CNLBC, LLC (formerly known as Chicago National League Baseball Club, LLC) filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on October 12, 2009 (Bky. Case No. 09–13496), and also is being jointly administered with the Tribune Company bankruptcy case pursuant to this Court's Order dated October 14, 2009 (docket no. 2333). The debtors in the jointly administered cases are referred to herein as the "Debtors."

No. 08–13141 (KJC). | Dec. 29, 2011.

**Synopsis**
**Background:** Competing reorganization plans were proposed in Chapter 11 cases of jointly administered debtors. The Bankruptcy Court, Kevin J. Carey, J., 464 B.R. 126, denied confirmation of both proposed plans for failure to comply with statutory confirmation requirements. Motions for reconsideration were filed.

**Holdings:** The Bankruptcy Court, Kevin J. Carey, J., held that:

[1] reconsideration was warranted with respect to prior determination that fraudulent transfer claims were not debtor assets and thus were not "assets of the Company" subject to indenture's subordination provisions;

[2] phrase "upon distribution of assets of the Company" appearing in introductory language to indenture's subordination provisions did not exclude from subordination obligations any distribution of recoveries from pursuit of fraudulent transfer claims;

[3] reconsideration was not warranted with respect to determination as to fairness of settlements included in one proposed plan; and

[4] reconsideration was not warranted with respect to approval of proposed settlement bar order.

Ordered accordingly.

West Headnotes (14)

**[1]** **Bankruptcy**
    Judgment or Order

Motion to alter or amend a judgment must be grounded on (1) an intervening change in controlling law, (2) the availability of new evidence, or (3) the need to correct a clear error of law or prevent manifest injustice. Fed.Rules Bankr.Proc.Rule 9023, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 59(e), 28 U.S.C.A.

Cases that cite this headnote

**[2]** **Bankruptcy**
    Judgment or Order

Decision should be reconsidered when facts that would alter or impact the decision have been overlooked or misapprehended. Fed.Rules Bankr.Proc.Rule 9023, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 59(e), 28 U.S.C.A.

1 Cases that cite this headnote

**[3]** **Bankruptcy**
    Judgment or Order

Motion for reconsideration should not be used to reargue the facts or applicable law. Fed.Rules Bankr.Proc.Rule 9023, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 59(e), 28 U.S.C.A.

Cases that cite this headnote

**[4]** **Bankruptcy**
    Judgment or Order

Motions for reconsideration should be granted sparingly because of the interests in finality and conservation of scarce judicial resources. Fed.Rules Bankr.Proc.Rule 9023, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 59(e), 28 U.S.C.A.

Cases that cite this headnote

**[5]**    **Bankruptcy**
    ⚷ Modification or revocation

Reconsideration was warranted with respect to bankruptcy court's determination, in order denying confirmation of competing proposed Chapter 11 plans, that fraudulent transfer claims were not debtors' assets and thus were not "assets of the Company" subject to indenture's subordination provisions; court erroneously stated that "noteholders" joined in objection to proposed plan's treatment of subordinated debt with respect to distributions to be made from litigation trust, even though some noteholders had not joined objection, and court's consideration of phrase "assets of the Company" was too limited, such that more complete reading of indenture as a whole was required. Fed.Rules Bankr.Proc.Rule 9023, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 59(e), 28 U.S.C.A.

2 Cases that cite this headnote

**[6]**    **Contracts**
    ⚷ Intention of Parties

In construing a contract under Illinois law, the primary objective is to give effect to the intention of the parties.

Cases that cite this headnote

**[7]**    **Contracts**
    ⚷ Language of contract

Under Illinois law, court will first look to the language of the contract itself to determine the parties' intent.

Cases that cite this headnote

**[8]**    **Contracts**
    ⚷ Construction as a whole

Under Illinois law, contract must construed as a whole, viewing each provision in light of the other provisions.

Cases that cite this headnote

**[9]**    **Contracts**
    ⚷ Construing whole contract together

Under Illinois law, parties' intent is not determined by viewing a clause or provision in isolation, or in looking at detached portions of the contract.

Cases that cite this headnote

**[10]**    **Bankruptcy**
    ⚷ Subordination agreements

Under Illinois law, phrase "upon distribution of assets of the Company" appearing in introductory language to indenture's subordination provisions had to be read in light of overall language of provisions, which were intended to ensure that notes were subordinated to senior indebtedness, and therefore phrase "upon distribution of assets of Company" did not exclude from subordination obligations any distribution of recoveries from pursuit of fraudulent transfer claims by litigation trust under proposed Chapter 11 plan.

2 Cases that cite this headnote

**[11]**    **Bankruptcy**
    ⚷ Judgment or Order

When seeking reconsideration to correct an error of law or to prevent manifest injustice, a litigant should evaluate whether what may seem to be a clear error of law is in fact simply a point of disagreement between the court and the litigant. Fed.Rules Bankr.Proc.Rule 9023, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 59(e), 28 U.S.C.A.

1 Cases that cite this headnote

**[12]**    **Bankruptcy**
    ⚷ Judgment or Order

Motion to alter or amend judgment should not be used as a means to reargue matters already

argued and disposed of by prior rulings, or to put forward additional arguments which a party could have made, but neglected to make, before judgment. Fed.Rules Bankr.Proc.Rule 9023, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 59(e), 28 U.S.C.A.

Cases that cite this headnote

**[13]    Bankruptcy**

👉 Modification or revocation

Reconsideration of order denying confirmation of competing Chapter 11 plans was not warranted with respect to bankruptcy court's determination as to fairness of settlements included in one proposed plan, which permitted leveraged buyout (LBO) lenders to benefit from prosecution of unsettled claims related to LBO, since court had already considered movants' legal arguments in connection with its determination of reasonableness of settlements as a whole. Fed.Rules Bankr.Proc.Rule 9023, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 59(e), 28 U.S.C.A.

Cases that cite this headnote

**[14]    Bankruptcy**

👉 Modification or revocation

Reconsideration of portion of order denying confirmation of competing Chapter 11 plans that approved proposed settlement bar order, which included proportionate judgment reduction provision, was not warranted; contrary to movants' contention that factual findings regarding relative fault of settling and non-settling defendants were required, trial court adjudicating claims against non-settling defendants could determine actual amount of proportionate judgment reduction, and bankruptcy court, in balancing competing concerns of bar order's effect upon future plaintiffs and non-settling defendants, decided that proportionate judgment reduction provision was fairest of three alternatives under the circumstances. Fed.Rules Bankr.Proc.Rule 9023, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 59(e), 28 U.S.C.A.

Cases that cite this headnote

**Attorneys and Law Firms**

*210 Bryan Krakauer, Sidley Austin LLP, Chicago, IL, Carl D. Neff, Ciardi, Ciardi & *211 Astin, Wilmington, DE, Edward Cerasia, II, Seyfarth Shaw, LLP, New York City, George R. Dougherty, Grippo & Elden, LLC, Chicago, IL, Gregory Kopacz, McDermott, Will & Emery, LLP, New York City, Holly Snow, Paul Hastings, LLP, Chicago, IL, J. Kate Stickles, Cole, Schotz, Meisel, Forman & Leonard, Wilmington, DE, James F. Conlan, Sidley Austin, LLP, Chicago, IL, Jared D. Zajac, McDermott Will & Emery LLP, New York City, John R. McCambridge, Grippo & Elden, Chicago, IL, John H. Strock, III, Fox Rothschild LLP, Wilmington, DE, Michael A. Henry, Gross, McGinley, Labarre & Eaton, LLP, Allentown, PA, Michael W. Kazan, Grippo & Elden, LLC, Chicago, IL, Norman L. Pernick, Cole, Schotz, Meisel, Forman & Leonard, Wilmington, DE, O. Andrew F. Wilson, Emery Celli Brinkerhoff & Abady LLP, New York City, Patricia K. Smoots, McGuirewoods LLP, Chicago, IL, Patrick Theodore Garvey, Johnson & Bell, Ltd., Chicago, IL, Patrick T. Nash, Grippo & Elden, Chicago, IL, Patrick J. Reilly, Cole, Schotz, Meisel, Forman & Leonard, Wilmington, DE, Robert S. Brady, Young, Conaway, Stargatt & Taylor, Wilmington, DE, Stephen Novack, Novack and Macey LLP, William S. Brody, Buchalter Nemer, Los Angeles, CA, for Debtors.

*MEMORANDUM ON RECONSIDERATION* [2]

[2]    This Memorandum constitutes the findings of fact and conclusions of law, required by Fed.R.Bankr.P. 7052. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding pursuant to 28 U.S.C. 157(b)(1) and (b)(2)(L) and (O).

KEVIN J. CAREY, Bankruptcy Judge.

On October 31, 2011, this Court issued an Opinion on Confirmation (the "Confirmation Opinion") (D.I. 10133) and Order (D.I. 10134) denying confirmation of two competing plans of reorganization for the Debtors because both plans failed to meet the requirements of Bankruptcy Code § 1129, as detailed in the opinion. [3] In re Tribune Co., No. 08–13141,

2011 WL 5142420 (Bankr.D.Del. Oct. 31, 2011). Currently before the Court are the following motions for reconsideration of the Confirmation Opinion:

[3]    The two competing plans discussed in the Confirmation Opinion are: (i) the Second Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors (the "Creditors' Committee"), Oaktree Capital Management, L.P. ("Oaktree"), Angelo, Gordon & Co., L.P. ("Angelo Gordon"), and JPMorgan Chase Bank, N.A. ("JPM"), as amended (the "DCL Plan"), and (ii) the Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by Aurelius Capital Management, L.P. on behalf of its Managed Entities ("Aurelius"), Deutsche Bank Trust Company Americas, in its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes ("Deutsche Bank"), Law Debenture Trust Company of New York, in its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes ("Law Debenture") and Wilmington Trust Company, in its Capacity as Successor Indenture Trustee for the PHONES Notes ("WTC"), as amended (the "Noteholder Plan"). The Debtors, Committee, Oaktree, Angelo Gordon, and JPM are referred to as the "DCL Plan Proponents." Aurelius, Deutsche Bank, Law Debenture and WTC are referred to as the "Noteholder Plan Proponents" or the "Noteholders." Capitalized terms not defined in this Memorandum shall have the definitions set forth in the Confirmation Opinion.

(1) Joint Motion of Law Debenture Trust Company of New York and Deutsche Bank Trust Company Americas Requesting Reconsideration of the Court's Confirmation Opinion with Respect to the Subordination of the PHONES (the "Law *212 Debenture Reconsideration Motion") (D.I. 10222), [4]

[4]    Davidson Kempner Capital Management LLC, as Investment Advisor, (D.I. 10223) and Brigade Capital Management LLC (D.I. 10225) filed Joinders to the Law Debenture Reconsideration Motion.

(2) Motion of Aurelius Capital Management, LP for Reconsideration of the Court's October 31, 2011 Decision as it Pertains to the Application of the PHONES Notes Subordination (the "Aurelius Reconsideration Motion") (D.I. 10226), [5] and

[5]    Deutsche Bank filed a Joinder to the Aurelius Reconsideration Motion (D.I. 10238).

(3) Motion of the Noteholder Plan Proponents for Reconsideration and Clarification of the Court's October 31, 2011 Decision (the "NPP Reconsideration Motion") (D.I. 10227). [6]

[6]    The Noteholder Plan Proponents also filed a Notice of Appeal from the Confirmation Opinion (D.I. 10276). Pursuant to Fed.R.Bankr.P. 8002(b), the appeal is not effective until entry of an order disposing of the motions under Fed.R.Bankr.P. 9023.

On December 14, 2011, the Court heard oral argument on the three motions for reconsideration.

Also before the Court are the Debtors' motion (D.I. 10274) for scheduling confirmation-related proceedings for the Third Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries proposed by the Debtors, the Creditors' Committee, Oaktree, Angelo Gordon and JPM (D.I. 10273) (the "Third Amended DCL Plan") and the parties' written submissions proposing a process for resolution of certain so-called "allocation disputes." (D.I. 10364, 10369, 10370, 10374, 10392, 10393, 10394, 10395, 10397, and 10415).

The Law Debenture Reconsideration Motion and the Aurelius Reconsideration Motion (jointly, the "Subordination Reconsideration Motions") request reconsideration under Fed.R.Civ.P. 59(e), made applicable hereto pursuant to Fed.R.Bankr.P. 9023, of the portion of the Confirmation Opinion that determined that fraudulent transfer claims are not assets belonging to a debtor and, therefore, would not be "assets of the Company" subject to the subordination provisions of the PHONES Notes. [7] EGI–TRB, LLC ("EGI") and Wilmington Trust Company filed responses opposing the relief sought in the Subordination Reconsideration Motions (D.I. 10365 and D.I. 10371, respectively). The TM Retirees filed a response supporting the Subordination Reconsideration Motions (D.I. 10366). [8] For the reasons discussed below, the relief requested in the Subordination Reconsideration Motions will be granted.

[7]    The "PHONES Notes" are those certain exchangeable Subordinated Debentures due 2029, issued pursuant to that certain Indenture dated April 1, 1999 (the "PHONES Indenture") between Tribune as issuer and Wilmington Trust Company as successor trustee (the "PHONES Trustee").

[8]    The TM Retirees are "approximately 200 former employees (and beneficiaries of such former employees)

of The Times Mirror Company, who were receiving or entitled to receive payments under certain non-qualified retirement plans of one or more of the Debtors." (TM Retirees Response at 1).

The NPP Reconsideration Motion raises three issues. First, the Noteholder Plan Proponents ask the Court to clarify that the Confirmation Opinion does not make a determination regarding the value of the PHONES Notes. Second, the Noteholder Plan Proponents ask the Court to reconsider its "apparent determination" allowing the banks, agents, and arrangers who financed and facilitated the 2007 leveraged buy-out (the "LBO") of the Tribune Company, and the holders of the LBO debt **213** (together with the banks, agents and arrangers, the "LBO Lenders") to share in any recoveries by the litigation trust proposed in the DCL Plan (the "DCL Litigation Trust") resulting from the DCL Litigation Trust's pursuit of causes of action arising from the LBO (the "Litigation Trust Causes of Action"). Third, the Noteholder Plan Proponents ask the Court to reconsider its approval of the proportionate judgment provision in the Bar Order proposed by the DCL Plan.

The Noteholder Plan Proponents' request for clarification is granted. The Court did not make any determination regarding the value of the PHONES Notes in the Confirmation Opinion. The chart in the Background section of the Confirmation Opinion reflected that the Debtors' Pre–LBO Indebtedness included the PHONES Notes indebtedness of $612 million as of April 2007. These figures were taken from the Debtors' Form 10–Q dated April 1, 2007 and used in the Confirmation Opinion for illustrative purposes only. *See Tribune,* 2011 WL 5142420 at *4 citing NPP Ex. 343 at 24.

For the reasons set forth herein, the Noteholder Plan Proponents' requests for reconsideration of the two remaining issues will be denied.

### STANDARD—MOTIONS FOR RECONSIDERATION

**[1]** **[2]** **[3]** **[4]** Federal Rule of Bankruptcy Procedure 9023, which incorporates Fed.R.Civ.P. 59, governs procedures for reconsideration. Fed.R.Civ.P. 59(e). A motion to alter or amend a judgment under Rule 59(e) must be grounded on (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct a clear error of law or prevent manifest injustice. *Max's Seafood Café v. Quinteros,* 176 F.3d 669, 677 (3d Cir.1999). A decision should be reconsidered when facts that would alter or impact

the decision have been overlooked or misapprehended. *Official Comm. of Unsecured Creditors v. Catholic Diocese of Wilmington, Inc. (In re Catholic Diocese of Wilmington, Inc.),* 437 B.R. 488, 490 (Bankr.D.Del.2010) citing *Karr v. Castle,* 768 F.Supp. 1087, 1093 (D.Del.1991) aff'd 22 F.3d 303 (3d Cir.1994). A motion for reconsideration should not be used to reargue the facts or applicable law. *Catholic Diocese,* 437 B.R. at 490; *see also Smith v. City of Chester,* 155 F.R.D. 95, 97 (E.D.Pa.1994) ("Parties are not free to relitigate issues that the Court has already decided, nor should parties make additional arguments which should have been made before judgment"). "Motions for reconsideration should be granted sparingly because of the interests in finality and conservation of scarce judicial resources." *Pennsylvania Ins. Guaranty Ass'n v. Trabosh,* 812 F.Supp. 522, 524 (E.D.Pa.1992).

### DISCUSSION

#### I. *The Subordination Reconsideration Motions.*

The Confirmation Opinion contains the following discussion and determination of an objection by WTC to the DCL Plan's proposed treatment of the claims of the PHONES Notes. [9]

[9]     Law Debenture, Deutsche Bank, and Aurelius (the "Movants") point out correctly that the Confirmation Opinion mistakenly states that both the Noteholders and WTC make the subordination argument. Only WTC filed this objection to the DCL Plan, and although the term "Noteholder Plan Proponents" (and the shortened version "Noteholders") as used in the Confirmation Opinion included Senior Noteholders and PHONES Noteholders, the Senior Noteholders did *not* join in the Objection.

The Noteholders and WTC also argue that the PHONES Notes are entitled to **214** receive distributions from the Litigation Trust and the Creditors' Trust without giving effect to the subordination provision, because the causes of action being pursued in those trusts belong to creditors, not the Debtors. The PHONES Indenture provides in Section 14.02 ("Payment Over of Proceeds upon Dissolution, Etc.") that the PHONES Noteholders' recovery is subordinated to Senior Indebtedness "[u]pon distribution of *assets of the Company* in the event of any ... bankruptcy case." (emphasis added). The DCL Plan Proponents agreed to amend the DCL Plan to provide that distributions from the Creditors' Trust are not subject to the PHONES subordination. (*See* Tr. 4/13/11 at 178).

However, they argue that any recoveries from pursuit of the Litigation Trust causes of action are property of the Debtors and, therefore, subject to the subordination provisions.

In *Cybergenics,* the Third Circuit Court of Appeals decided that fraudulent transfer claims, which state law provides to creditors, are not assets of the debtor, even though the Bankruptcy Code empowers a debtor to pursue those claims for the benefit of all creditors. *Off'l Comm. Of Unsecured Creditors of Cybergenics Corp. v. Scott Chinery (In re Cybergenics Corp.),* 226 F.3d 237, 245 (3d Cir.2000). *See also In re Gentek, Inc.,* 328 B.R. 423 (Bankr.D.Del.2005) (A debtor has the power to pursue and settle fraudulent transfer claims post-petition). The *Cybergenics* Court wrote:

> The avoidance power itself, which we have analogized to the power of a public official to carry out various responsibilities in a representative capacity, was likewise not an asset of Cybergenics, just as this authority would not have been a personal asset of a trustee, had one been appointed.

*Cybergenics,* 226 F.3d at 245. Therefore, the Third Circuit held that the fraudulent transfer claims (which arose from obligations incurred and transfers made in connection with a leveraged buy-out) were not included in an earlier sale of "all of the rights, title, and interest of Cybergenics in and to all of the assets and business as a going concern of Cybergenics." *Id.* at 239, 245.

The Litigation Trust will pursue the Preserved Causes of Action as defined in § 1.1.188 of the DCL Plan. Pursuant to *Cybergenics,* causes of action that the Debtors' estate may assert under Chapter 5 of the Bankruptcy Code are not "assets of the Company" subject to the PHONES Notes' subordination provision.[84] However, causes of action that are based on direct claims owned by the Debtors (for example, a claim for breach of fiduciary duty by an officer or director) would be an asset of the Company and subject to the PHONES Notes' subordination provision.

[84] Bankruptcy Code § 541(a)(3) provides that "property of the estate" includes "any interest in property that the trustee under section ... 550." The *Cybergenics* Court noted, however, that "property of the debtor" and "property of the estate" have different meanings, as evidenced by numerous provisions in the Bankruptcy Code that distinguish between the concepts, or refer to one and not the other. *Cybergenics,* 226 F.3d at 246, n. 15. While the recoveries of the Chapter 5 causes of action would be property of the estate, those recoveries do not fall within the PHONES Notes' provision which subordinates payments from a distribution of assets of the *Company.*]

*Tribune,* 2011 WL 5142420 at *56–*57, slip op. at 111–113 (the "Subordination Determination"). The Movants ask the Court to reconsider the Subordination Determination based upon a reading of the PHONES Indenture as a whole, and in light of applicable state law regarding contract **215 interpretation. WTC objects to Court's reconsideration of the Subordination Determination, arguing that the Movants do not meet the legal standard for reconsideration, that the Court correctly determined that the causes of action under chapter 5 of the Bankruptcy Code are not "assets of the Company," and that the plain language of the PHONES Indenture limits subordination solely to payments and distributions of "assets of the Company."[10]

[10] EGI also argues that the Court's analysis of "assets of the Company" was correct and should not be reconsidered. EGI adds that, if the Court reconsiders the Subordination Determination, it should not address the subordination agreement that applies to the EGI–TRB Notes (the "EGI Subordination Agreement"). The Confirmation Opinion did not address the issue of subordination of Litigation Trust recoveries under the EGI Subordination Agreement and I agree that it is not appropriate to do so here.

[5] Reconsideration is appropriate when there is an error of fact and, in this case, the Court erroneously said that the "Noteholders" joined in the objection to the treatment of subordinated debt with respect to distributions from the DCL Litigation Trust, although the Movants, who are Senior Noteholders, did not join in that objection. No one disputes that this statement of fact was incorrect. Further, reconsideration is appropriate when the Court has overlooked facts that might reasonably have altered or impacted the decision. *Catholic Diocese,* 437 B.R. at 490. Here, the Court's consideration of the phrase "assets of the Company" was too limited. A more complete reading of the PHONES Indenture as a whole is required. Accordingly, the Court will reconsider the Subordination Determination to determine whether the overlooked provisions of the PHONES Indenture alter or impact the prior decision.[11]

[11] I am not reconsidering the legal principle, as decided by the Third Circuit in *Cybergenics,* that fraudulent

transfer claims are not assets of the debtor. *Off'l Comm. Of Unsecured Creditors of Cybergenics Corp. v. Scott Chinery (In re Cybergenics Corp.),* 226 F.3d 237, 245 (3d Cir.2000). I am reconsidering whether the use of the phrase "assets of Company" in Article 14 of the PHONES Indenture insulates the PHONES Noteholders from application of the subordination obligations to payment or distribution of fraudulent transfer recoveries by the proposed DCL Litigation Trust.

WTC objected to any subordination of its claim in the distribution of any recovery from the DCL Plan Trust's pursuit of Remaining LBO–Related Causes of Action. WTC argued that Article 14 of the PHONES Indenture provides for subordination to Senior Indebtedness only "[u]pon distribution of *assets of the Company* in the event of any ... bankruptcy case." I agreed that, under *Cybergenics,* causes of action under chapter 5 of the Bankruptcy Code, including fraudulent transfer claims, were not assets of the "Company," i.e., Tribune.

**[6]  [7]  [8]  [9]** Bankruptcy Code § 510(a) provides that "[a] subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable non-bankruptcy law." Article 1.12 of the PHONES Indenture provides that the Indenture "shall be governed by and construed in accordance with the laws of the State of Illinois except as may be otherwise required by mandatory provisions of law." Here, it is appropriate to construe the PHONES Indenture in accordance with Illinois law, which provides:

> The basic rules of contract interpretation are well settled. In construing a contract, the primary objective is to give effect to the intention of the parties. *Gallagher v. Lenart,* 226 Ill.2d 208, 232, 314 Ill.Dec. 133, 874 N.E.2d 43 (2007). ***216** A court will first look to the language of the contract itself to determine the parties' intent. *Id.* at 233, 314 Ill.Dec. 133, 874 N.E.2d 43. A contract must construed as a whole, viewing each provision in light of the other provisions. *Id.* The parties' intent is not determined by viewing a clause or provision in isolation, or in looking at detached portions of the contract. *Id.*

*Thompson v. Gordon,* 241 Ill.2d 428, 441, 349 Ill.Dec. 936, 944, 948 N.E.2d 39, 47 (2011). The use of the phrase "[u]pon any distribution of the assets of the Company" must be considered in light of the entirety of the PHONES Indenture, including the whole of Section 14.02, which provides:

SECTION 14.02 *Payment Over of Proceeds upon Dissolution, Etc.*

Upon any distribution of assets of the Company in the event of:

> (1) any insolvency or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding in connection therewith, relative to the Company or to its creditors, as such, or to its assets; or

> (2) any liquidation, dissolution or other winding up of the Company, whether voluntary or involuntary and whether or not involving insolvency or bankruptcy; or

> (3) any assignment for the benefit of creditors or any other marshaling of assets and liabilities of the Company; then and in such event

>> (A) The holders of Senior Indebtedness shall be entitled to receive payment in full of all amounts due or to become due on or in respect of all Senior Indebtedness, or provision shall be made for such payment in cash, before the Holders of the Securities of any series are entitled to receive any payment on account of the principal amount, interest or such other amounts as may be provided for in Section 3.01, if any, in respect of the Securities of such series; and

>> (B) Any payment or distribution of assets of the Company of any kind or character, whether in cash, property or securities, by set-off or otherwise, to which the Holders or the Trustee would be entitled but for the provisions of this Article Fourteen, including any such payment or distribution which may be payable or deliverable by reason of the payment of any other Indebtedness of the company being subordinated to the payment of the Securities of such series, shall be paid by the liquidating trustee or agent or other Person making such payment or distribution, whether a trustee in bankruptcy, a receiver or liquidating trustee or otherwise, directly to the holders of Senior Indebtedness or their representative or representatives or to the trustee or trustees under any indenture under

which any instruments evidencing any of such Senior Indebtedness may have been issued, ratably according to the aggregate amounts remaining unpaid on account of the principal of (and premium, if any) and interest on the Senior Indebtedness held or represented by each, to the extent necessary to make payment in full of all Senior Indebtedness remaining unpaid, after giving effect to any concurrent payment or distribution to the holders of such Senior Indebtedness or provision therefor.

In the event that, notwithstanding the foregoing provisions of this Section 14.02, the Trustee or the Holder of any Security of any series shall receive any payment or distribution of assets of the Company of any kind or character, whether in cash, property or securities, **\*217** including any such payment or distribution which may be payable or deliverable by reason of the payment of any other Indebtedness of the Company being subordinated to the payment of the Securities of such series, before all Senior Indebtedness is paid in full or payment thereof provided for, and if such fact shall then have been made known to the Trustee as provided in Section 14.10, or, as the case may be, such Holder, then and in such event such payment or distribution shall be paid over or delivered forthwith to the trustee in bankruptcy, receiver, liquidating trustee, custodian, assignee, agent or other Person making payment or distribution of assets of the Company for application to the payment of all Senior Indebtedness remaining unpaid, to the extent necessary to pay all Senior Indebtedness in full, after giving effect to any concurrent payment or distribution to or for the holders of Senior Indebtedness.

For purposes of this Article Fourteen only, the words "cash, property or securities," or any combination thereof, shall not be deemed to include shares of capital stock of the company as reorganized or readjusted, or securities of the Company or any other corporation provided for by a plan of reorganization or readjustment the payment of which is subordinated, at least to the extent provided in this Article Fourteen with respect to the Securities, to the payment of all Senior Indebtedness which may at the time be outstanding; provided, however, that (i) Senior Indebtedness is assumed by the new corporation, if any, resulting from any such reorganization or readjustment, and (ii) the rights of the holders of the Senior Indebtedness are not, without the consent of such holders, altered, in any manner adverse to such holders, by such reorganization or readjustment.

The consolidation of the Company with, or the merger of the Company into, another corporation or the liquidation or dissolution of the Company following the conveyance or transfer of all or substantially all of its assets to another Person upon the terms and conditions set forth in Article Eight shall not be deemed a dissolution, winding up, liquidation, reorganization, assignment for the benefit of creditors or marshaling of assets and liabilities of the Company for the purposes of this Section 14.02 if the corporation formed by such consolidation or into which the Company is merged or the Person which acquires by conveyance or transfer all or substantially all of the assets of the Company, as the case may be, shall, as part of such consolidation, merger, conveyance or transfer, comply with the conditions set forth in Article Eight.

PHONES Indenture, at 62–64.

WTC argues that the introductory phrase "[u]pon any distribution of assets of the Company" is a condition which qualifies everything else in Section 14.02. Fraudulent transfer claims to be pursued by the DCL Litigation Trust are not "assets of the Company" *(Cybergenics,* 226 F.3d at 245), and, therefore, WTC argues, the subordination provisions that follow the introductory phrase are not applicable to any payment or distribution of recoveries received from those fraudulent transfer claims. WTC claims the Movants' proposed reading lifts the subordination provisions "out of context" by failing to give any effect to the introductory phrase of Section 14.02. *See Willison v. Economy Fire & Cas. Co.,* 294 Ill.App.3d 793, 800, 690 N.E.2d 1073, 1077, 229 Ill.Dec. 26 (1998) (a provision of an insurance contract must be read with regard to the introductory phrase).

**\*218** The Movants argue that the introductory phrase "[u]pon any distribution of assets of the Company" is not a limitation, but, instead, is part of a general introduction of the "triggering events" or conditions precedent to application of the subordination provisions. Subsections (1), (2) and (3) that follow the introductory phrase contain a detailed list to describe all types of bankruptcy, insolvency, liquidation or similar proceedings in which the subordination provisions, which follow, apply. In other words, the parties' intent is clear: *if* the assets of the Company are distributed to creditors in any type of any bankruptcy, insolvency, liquidation or similar proceeding, *then and in such event:*

> the holders of Senior Indebtedness
> shall be entitled to receive payment in

full of all amounts due or to become due on or in respect of all Senior Indebtedness, or provision shall be made for such payment in cash *before the Holders of the [PHONES Notes] are entitled to receive any payment* on account of the principal amount, interest or such other amounts as may be provided for in Section 3.01, if any, in respect of the [PHONES Notes].

PHONES Indenture, Section 14.02(A), at 63 (emphasis added). The language in the subordination provision of Section 14.02(A) is unqualified. Reading the introductory language as limiting the unqualified subordination language in Section 14.02(A) fails to give effect to the provision as a whole.

The phrase "assets of the Company" appears again in Section 14.02(B), which identifies the source of any payments or distributions that must be turned over to the holders of Senior Indebtedness:

> (B) any payment or distribution of assets of the Company of any kind or character, to which the [PHONES Noteholders] would be entitled but for the provisions of this Article Fourteen, including any such payment or distribution which may be payable or deliverable by reason of payment of any other Indebtedness of the Company being subordinated to the payment of the [PHONES Notes] of such series shall be paid by the liquidating trustee, or agent or other Person making such payment or distribution, whether a trustee in bankruptcy, a receiver or liquidating trustee or otherwise, directly to the holders of Senior Indebtedness....

PHONES Indenture, Section 14.02(B), at 63.

The Movants contend that the grammatical "rule of the last antecedent," which is used in both statutory and contractual interpretation, provides that the phrase "assets of the Company" in Section 14.02(B) modifies the term "distribution," but not "payment." According to the "rule of

the last antecedent," a limiting clause or phrase (here, "assets of the Company") should be read ordinarily as modifying only the noun or phrase that it immediately follows (here, "distribution"). *Barnhart v. Thomas,* 540 U.S. 20, 26, 124 S.Ct. 376, 380, 157 L.Ed.2d 333 (2003). In *Barnhart,* the Supreme Court also recognized that while the rule of the last antecedent "is not an absolute and can assuredly be overcome by other indicia of meaning, we have said that construing a statute in accord with the rule is 'quite sensible as a matter of grammar.' " *Id.* quoting *Nobelman v. American Sav. Bank,* 508 U.S. 324, 330, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993).

In a recent decision, the District Court for the Southern District of New York applied the "rule of the last antecedent" when interpreting an indenture. *JPMorgan Chase Bank N.A. v. The Baupost Group, LLC (In re Enron Creditors Recovery Corp.),* 380 B.R. 307, (S.D.N.Y.2008). In *Enron,* the indenture defined **\*219** "Senior Indebtedness" as including "all indebtedness of [Enron] ... evidenced by notes, debentures, bonds, or other securities sold by [Enron] for money borrowed." *Id.* at 319–322. The District Court held that, under the "rule of the last antecedent," the phrase "sold by [Enron] for money borrowed" modified only the immediately preceding term ("other securities"), and not the earlier term ("notes"). *Id.*

The "rule of the last antecedent" should likewise be applied in an interpretation of Section 14.02. Construing the word "payment" broadly, and not limited by the phrase "assets of the Company," is sensible and consistent with the entirety of Section 14.02. First, a broad interpretation of "payment" is consistent with the unqualified subordination language of Section 14.02(A). Second, construing "payment" broadly is consistent with Section 14.02(B), which recognizes that a payment subject to its provisions can be made by a "liquidating trustee or agent or other Person," and the term "Person" is defined in the Indenture as meaning "any individual, corporation, limited liability company, partnership *[sic]*, joint venture, association, joint-stock company, *trust,* unincorporated organization or government or any agency or political subdivision thereof." PHONES Indenture, Section 1.01, at 5 (emphasis added). A broad interpretation of "payment" corresponds to the broad definition of "Person," and applies the subordination provisions to *any* payment, including one received from a liquidating trust, such as the DCL Litigation Trust.

Finally, the paragraph following Section 14.02(B) imposes a so-called "pay-over" obligation: "[i]n the event that,

notwithstanding the foregoing provisions" the PHONES Noteholders receive some payment or distribution of assets of the Company "of any kind or character" before the Senior Indebtedness is paid in full. [12] PHONES Indenture, Section 14.02, at 63. If such a payment or distribution is received:

[12] The "rule of the last antecedent" should likewise apply to the "payment or distribution of assets of the Company" in this paragraph so that "assets of the Company" modifies only "distribution."

> such payment or distribution shall be paid over or delivered forthwith to the trustee in bankruptcy, receiver, liquidating trustee, custodian, assignee, agent or other Person making the payment or distribution of assets of the Company for application to the payment of all Senior Indebtedness remaining unpaid, to the extent necessary to pay all Senior Indebtedness in full, after giving effect to any concurrent payment or distribution to or for the holders of Senior Indebtedness.
>
> Id. Again, the subsections of Section 14.02 demonstrate the parties' intent to apply the subordination provisions to a broad array of payments.

WTC argues that other provisions of the Indenture indicate an intent to allow PHONES Noteholders to pursue and receive payments from sources *other than the Company* that are not subject to the subordination provisions in Article Fourteen. For example, Section 5.05 of the Indenture (entitled "Trustee May Enforce Claims Without Possession Of Securities") allows the PHONES Indenture Trustee to pursue causes of action for the benefit of the PHONES Noteholders and "any recovery of judgment shall ... be for the ratable benefit of the Holders of the Securities in respect of which such judgment has been recovered." Further, WTC argues that Section 5.10 of the Indenture (entitled "Rights and Remedies Cumulative") provides that cumulative remedies are not **\*220** limited to any particular causes of action and would include claims arising outside the PHONES Indenture, including chapter 5 avoidance claims. The Movants, however, point out that Section 14.07(3) specifically provides that any recovery from remedies exercised by the PHONES Trustee or PHONES Noteholders are subject to Article Fourteen's subordination provisions by stating:

> The provisions of this Article Fourteen are and are intended solely for the purpose of defining the relative rights of the Holders of the Securities of any series, on the one hand, and the holders of the Senior Indebtedness, on the other hand. Nothing contained in this Article Fourteen or elsewhere in

this Indenture or in the Securities of any series is intended to or shall:

....

(3) prevent the Trustee of the Holder of any Security of such series from exercising all remedies otherwise permitted by applicable law upon default or an Event of Default under this Indenture, *subject to the rights, if any, under this Article Fourteen of the holders of Senior Indebtedness to receive cash, property or securities otherwise payable or deliverable to the Trustee or such Holder.*

PHONES Indenture, § 14.07, at 66 (emphasis added). Again, the parties' intent to subordinate the PHONES Noteholders is plain.

**[10]**    Previously, when considering an attempt to limit the reach of the subordination provisions of an indenture, I decided that a clause in the subordination provision:

> should not be considered based upon its grammatical structure alone, but also within the context of the entire agreement, which, here, is more reflective of the parties' intent: that except in very limited circumstances, no payment can be made to the Subordinated Noteholders until (1) the Senior Notes are paid in full, or (2) the Senior Noteholders consent..... [The proposed interpretation of the clause would] eviscerate the purpose of the subordination provisions in the Subordinated Notes Indenture and expand the limited carve out beyond its intended scope.

*Kurak v. Dura Automotive Systems, Inc. (In re Dura Automotive Systems, Inc.),* 379 B.R. 257, 270 (Bankr.D.Del.2007). *See also In re Spansion,* 426 B.R. 114, 150–51 (Bankr.D.Del.2010). Similar considerations are present here. The overall purpose of Article 14, in general, and Section 14.02, in particular, is to ensure that the PHONES Notes are subordinated to the Senior Indebtedness. As stated in Section 14.01:

> The Securities shall be subordinated to Senior Indebtedness as set forth in this Article Fourteen. The Company

covenants and agrees, and each Holder of a Security of any series by such Holder's acceptance thereof likewise covenants and agrees, that, to the extent and in the manner hereinafter set forth in this Article Fourteen, the indebtedness represented by the Securities of such series and the payment of the principal amount, interest and such other amounts as provided for in Section 3.01, if any, in respect of each and all of the Securities of such series are hereby expressly made subordinate and subject in right of payment to the prior payment in full of all Senior Indebtedness; provided, however, that no provision of this Article Fourteen shall prevent the occurrence of any default or Even of Default hereunder.

PHONES Indenture, § 14.01, at 61. Each subsection of Section 14.02 further defines and reveals the parties' intent. Therefore, **\*221** the Section 14.02 introductory phrase "upon distribution of the assets of the Company" must be read in light of the overall language of the Section, particularly (i) the lengthy catalog of bankruptcy, insolvency and liquidation proceedings described in subsections (1), (2) and (3) of Section 14.02, (ii) the unqualified subordination language of Section 14.02(A), (iii) application of subordination provisions to all sources of "payment" in Section 14.02(B), and (iv) the catch-all language of the pay-over obligation in the paragraph following Section 14.02(B).

An appropriate order will be entered granting the Subordination Reconsideration Motions and amending the Confirmation Opinion to strike the Subordination Determination.

## II. *The NPP Reconsideration Motion.*

The NPP Reconsideration Motion contains two remaining requests for reconsideration: (1) the Noteholder Plan Proponents ask the Court to reconsider whether the LBO Lenders are entitled to share in any DCL Litigation Trust proceeds received from the pursuit of fraudulent transfer claims arising from the LBO, and (2) the Noteholder Plan Proponents ask the Court to reconsider its approval of the proportionate judgment reduction provision in the Bar Order proposed by the DCL Plan.

**[11]** **[12]** When seeking reconsideration to correct an error of law or to prevent manifest injustice, a litigant should "evaluate whether what may seem to be a clear error of law is in fact simply a point of disagreement between the court and the litigant." *Dodge v. Susquehanna Univ.,* 796 F.Supp. 829, 830 (M.D.Pa.1992) quoting *Atkins v. Marathon LeTourneau Co.,* 130 F.R.D. 625, 626 (S.D.Miss.1990). A Rule 59(e) motion should not be used as a means to reargue matters already argued and disposed of by prior rulings, or to put forward additional arguments which a party could have made, but neglected to make, before judgment. *Dodge,* 796 F.Supp. at 830 citing *Davis v. Lukhard,* 106 F.R.D. 317, 318 (E.D.Va.1984) *judgment vacated on other grounds* 788 F.2d 973 (4th Cir.1986).

Neither of the Noteholder Plan Proponents' remaining requests meet the standard for reconsideration under Rule 59(e).

### (A) *The LBO Lenders*

**[13]** The Noteholder Plan Proponents argue that "permitting the LBO Lenders to benefit from the prosecution of the DCL Litigation Trust Causes of Action, when innocent Non–LBO Creditors will not be paid in full violates principles of law and equity." NPP Reconsideration Motion, at ¶ 8. They argue that this issue should be reconsidered because it is not addressed directly in the Confirmation Opinion.

The DCL Plan included two settlements of LBO–Related Causes of Action and established two trusts to pursue unsettled claims related to the 2007 LBO. The settlements, defined in the Confirmation Opinion as the "LBO Settlement" and the "Step Two Disgorgement Settlement" (together, the "DCL Plan Settlement") settled the LBO–Related Causes of Action against the LBO Lenders. *See Tribune,* 2011 WL 5142420 at \*13–\*14. The DCL Plan proposed to preserve the remaining LBO–Related Causes of Action and other claims for the benefit of Tribune's creditors by assigning those causes of action to the DCL Litigation Trust. *Id.* The DCL Plan also established a Creditors' Trust to pursue certain "Transferred State Law Avoidance Claims" that individual creditors may opt to assign to the Creditors' Trust, rather than pursue on their own. *Id.*

**\*222** The DCL Plan proposed to pay Non–LBO Creditors [13] initial settlement distributions funded from three sources: (1) LBO Lenders will forgo approximately $401.5 million in

recoveries to which they would be entitled upon allowance of their claims, (2) recipients of pre-petition principal, interest, and fee payments on account of certain loans provided at Step Two of the LBO, will contribute $120 million in cash, and (3) the Bridge Lenders will forgo approximately $13.3 million of their natural recoveries. [14] *Id.*

[13]    Non–LBO Creditors were defined in the Confirmation Opinion as including Senior Noteholder Claims, Other Parent Claims, Convenience Claims and General Unsecured Claims.

[14]    The "Bridge Lenders" are "the lenders from time to time party to the "Bridge Loan Agreement," which provided Tribune with $1.6 billion in financing at Step Two of the LBO. The "Bridge Loan Agreement" is defined in the DCL Plan as that certain Senior Unsecured Interim Loan Agreement, dated as of December 20, 2007, among Tribune, the Bridge Lenders, the Former Bridge Loan Agent, JPMorgan Chase Bank, N.A., as syndication agent, and Citicorp North America, Inc. and Bank of America, N.A., as co-documentation agents, as amended, restated, supplemented or otherwise modified from time to time.

The DCL Plan Settlement also included the LBO Lenders' agreement to forgo *pro rata* participation in initial recoveries from the Litigation and Creditors Trusts, so that the Non–LBO Parent Creditors would receive the first $90 million in net recoveries by the Trusts, and, thereafter, 65% of all net recoveries of the Trusts, after repayment of a loan received from Reorganized Tribune to fund the Trust Litigation.

Accordingly, the LBO Lenders' participation in the Trust recoveries is part of the DCL Plan Settlement. The Confirmation Opinion included a discussion of the Examiner's analysis of whether LBO Lenders should be prohibited from sharing in any recovery of payments based on LBO-related avoidance actions, and noted "because the law [on this issue] is unclear or requires specific factual findings subject to further investigation, the Examiner did not reach any conclusion regarding whether a court is likely to apply such equitable remedies here, and he left the issue in 'equipoise.' " *Tribune,* 2011 WL 5142420 at *29. I have already determined that it was appropriate for the parties to include this element as part of the DCL Plan Settlement.

At the Confirmation Hearing, the Noteholder Plan Proponents argued that the proposed DCL Plan Settlement was not fair and equitable for a number of reasons, including the LBO Lenders' participation in the Trusts' recoveries. I considered

the reasonableness of the DCL Plan Settlement and, for all the reasons detailed in the Confirmation Opinion (*see Tribune,* 2011 WL 5142420 at *13–*34), concluded that "the DCL Plan Settlement should be approved because it is fair, reasonable and in the best interest of the Debtors' estates and it is properly part of the DCL Plan pursuant to Bankruptcy Code § 1123(b)(3)(A)." *Tribune,* 2011 WL 5142420 at *34.

The Noteholder Plan Proponents' request for reconsideration of the LBO Lenders' participation in the Trusts' recoveries is a renewed attack against the fairness of the DCL Plan Settlement. I have already considered the Noteholder Plan Proponents' legal arguments on this point in connection with the determination as to the reasonableness of the DCL Plan Settlement as a whole. I decline the invitation to reconsider the fairness of the DCL Plan Settlement.

**\*223  (B)** ***The Bar Order's proportionate judgment reduction provision***

**[14]**    The Noteholder Plan Proponents also request that the Court reconsider the portion of the Confirmation Opinion that approves the proposed Bar Order, which includes a proportionate judgment reduction provision. The Noteholder Plan Proponents argue that the proportionate judgment reduction provision results in manifest injustice due to its potential effect of reducing future judgments obtained in litigation against the non-settling defendants. The Noteholder Plan Proponents contend that a *pro tanto* judgment reduction method would be more equitable.

In the Confirmation Opinion, the Court recognized that there are three basic methods for judgment reduction in bar orders: (i) *pro rata* (which apportions an equal share of liability to each defendant), (ii) proportionate fault method (under which the jury assesses the relative culpability of both settling and non-settling defendants and the non-settling defendants pay a commensurate percentage of the judgment), and (iii) *pro tanto* (which reduces a non-settling defendant's liability for a judgment in the amount paid by the settling defendant(s)). *Tribune,* 2011 WL 5142420 at *34 n. 62 citing *Cullen v. Riley (In re Masters Mates & Pilots Pension Plan and IRAP Litig.),* 957 F.2d 1020, 1028–29 (2d Cir.1992). After considering the competing objections to the Bar Order raised by both the Noteholder Plan Proponents and the officers and directors, I concluded, consistent with the Third Circuit's decision in *Eichenholtz v. Brennan,* 52 F.3d 478, 487 (3d Cir.1995), that the proportionate judgment reduction provision in the proposed Bar Order was fair to both objecting parties,

although I further concluded that the Bar Order's language should be revised to enjoin directly any actions by Potential Plaintiffs that do not conform to the terms of the Bar Order. *Tribune,* 2011 WL 5142420 at *37.

The Noteholder Plan Proponents argue that it was clear error for the Court to approve a proportionate judgment reduction provision without making specific factual findings regarding the relative fault of the settling and non-settling defendants. However, as discussed in the Confirmation Decision, other courts have determined that the trial court adjudicating the claims against the non-settling defendants may determine the actual amount of the proportionate judgment reduction. *Id.* citing *Gerber v. MTC Electronic Tech. Co., Ltd.,* 329 F.3d 297, 305 (2d Cir.2003). [15]

[15]    The Noteholder Plan Proponents' continued insistence upon an evidentiary hearing for determination of the relative fault of LBO Lenders for the proportionate judgment reduction provision is simply another attempt to re-litigate the fairness of the DCL Plan Settlement.

Further, the Noteholder Plan Proponents now argue that the proportionate judgment provision conflicts with certain states' own contribution bar statutes. [16] The DCL Plan Trusts are designed to pursue the remaining LBO–Related federal and state law claims separately in a number of state and federal courts. When discussing the adoption of a nationwide federal bar rule for cases involving federal securities law, the Third Circuit Court noted that "adopting a state's rule would lead to disparate results, because some states do not have a settlement bar rule, and other states have different types of bar rules. Finally, if we adopt state law, we **\*224** would encourage forum shopping and spawn wasteful litigation over the applicable state law." *Eichenholtz,* 52 F.3d at 486 n. 14. These considerations underscore the need for consistent application of a Bar Order in this case for pursuit of the remaining LBO-related claims.

[16]    *See, e.g.,* 740 Ill. Comp. Stat. § 100/2 (2011), Mass. Gen. Laws ch. 231B, § 4 (2011). It appears that this argument was not raised previously and, if so, it is raised improperly for the first time by a Rule 59(e) motion.

In balancing the competing concerns of the Bar Order's effect upon the future plaintiffs and the non-settling defendants, I decided that the proportionate judgment reduction provision is, among the three alternatives, the fairest under these circumstances. The NPP Reconsideration Motion's request

for reconsideration of the proportionate judgement reduction provision in the Bar Order will be denied.

**III.** *Scheduling confirmation-related proceedings and an allocation dispute resolution process.*

The DCL Plan Proponents have now filed the Third Amended DCL Plan and have asked that the Court fix a disclosure/confirmation schedule. The parties have also expressed views about certain "allocation disputes" and when it is appropriate to resolve them, i.e., before, in conjunction with, or after confirmation. [17]

[17]    *See* Motion of Debtors for Order (I) Approving Supplemental Disclosure Statement; (II) Establishing Scope, Forms, Procedures, and Deadlines for Resolicitation and Tabulation of Votes to Accept or Reject DCL Plan from Certain Classes; (III) Authorizing Tabulation of Prior Votes and Elections on DCL Plan made by Holders of Claims in Non–Resolicited Classes; (IV) Scheduling the Confirmation Hearing and Establishing Notice and Objection Procedures in respect thereof; and (V) Granting Related Relief (D.I. 10274). *See also* D.I. 10364, 10369, 10370, 10374, 10392, 10393, 10394, 10395, 10397, and 10415.

At the December 13, 2011 hearing, the Court noted that the competing allocation dispute schedules proposed by the DCL Plan Proponents, on the one hand, and Aurelius, on the other hand, were not meaningfully different. With respect to the proposed disclosure/confirmation schedules, the difference was greater. Embedded in the differing views is the issue of whether all so-called allocation issues should be resolved before voting is allowed on the Third Amended DCL Plan.

To enable the parties to better prepare for the January 11, 2012 status hearing provided in the accompanying Order:

(1) the parties are directed to confer again in an attempt to reach agreement on scheduling with respect to allocation disputes and disclosure/confirmation, with a view toward a confirmation hearing to be held in mid-to late-May 2012; and

(2) the parties are advised that, while open to a two-step process in which remaining allocation disputes are presented to the Court for disposition prior to allowance of voting on the Third Amended Plan, the Court reserves its discretion to determine whether and when allocation disputes—regardless of when actually heard—should be determined; in any event, any such determination(s) will

be made in accord with Fed.R.Bankr.P. 7001(8) and subject to confirmation of a plan.

An appropriate Order follows.

**Parallel Citations**

55 Bankr.Ct.Dec. 259

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

**TAB 16**

55 S.Ct. 685
Supreme Court of the United States

IVANHOE BUILDING & LOAN
ASS'N OF NEWARK, N.J.,
v.
ORR.

No. 611.    |    Argued April 5,
1935.    |    Decided April 29, 1935.

On Writ of Certiorari to the United States Circuit Court of Appeals for the Third Circuit.

Proceedings in the matter of the Eastern Sash & Door Company, bankrupt, for which Thomas A. Orr was trustee, and wherein the Ivanhoe Building & Loan Association of Newark, N.J., filed a claim. To review a judgment of the Circuit Court of Appeals (73 F.(2d) 609) affirming a judgment which approved an order of the referee reducing the claim, the claimant appeals.

Judgment reversed.

West Headnotes (3)

**[1]**    **Bankruptcy**
    👉 Secured Claims

Creditor who had recovered portion of claim against bankrupt by foreclosure of mortgage on property not owned by bankrupt could prove claim for full amount of debt and not merely for balance required to make creditor whole, since he was not "secured creditor" within statute permitting such creditor to prove only for difference between value of security and face amount of debt, in that at date of bankruptcy creditor held no security against bankrupt's property nor security given by any other person who in turn was secured by the bankrupt's assets (Bankr. Act §§ 1 (23), 57e, 11 U.S.C.A. §§ 1 (23), 93 (e); Supreme Court rule 38, subd. 5 (b), 28 U.S.C.A. following section 354).

47 Cases that cite this headnote

**[2]**    **Bankruptcy**
    👉 Secured Claims

Although creditor, who had recovered portion of claim against bankrupt by foreclosure of mortgage on property not owned by bankrupt, could prove claim for full amount of debt, he could collect and retain only sufficient dividends which, with sum realized from foreclosure, would satisfy indebtedness.

17 Cases that cite this headnote

**[3]**    **Bankruptcy**
    👉 Set-off against claim

Statute providing that, in case of mutual debts between bankrupt's estate and creditor, one debt shall be set off against the other, held not to preclude creditor, who had recovered portion of claim against bankrupt by foreclosure of mortgage on property not owned by bankrupt, from making proof of claim for more than balance of debt after application of avails of foreclosure, since the well-understood conception of "mutual debts" does not embrace such a situation and a creditor who realizes on his security does not "owe" his debtor the amount realized (Bankr.Act § 68a, 11 U.S.C.A. § 108(a).

40 Cases that cite this headnote

**Attorneys and Law Firms**

**\*\*686    \*244**  Messrs. Abraham Alboum and Maurice J. Zucker, both of Newark, N.J., for petitioner.

Mr. Saul Nemser, of Jersey City, N.J., for respondent.

**Opinion**

Mr. Justice ROBERTS delivered the opinion of the Court.

 **[1]    [2]    [3]**    In this case the question is whether a creditor of a bankrupt, who has recovered a portion of the debt owed him by foreclosure of a mortgage on property not owned by the bankrupt, may prove for the full amount of the debt, or only for the balance required to make him whole.

The owners of real estate in Newark, N.J., executed to the petitioner a bond in the penal sum of $23,000, conditioned for the payment of $11,500, secured by a mortgage on the land. The mortgagors subsequently conveyed the premises to the Eastern Sash & Door Company, which expressly assumed the mortgage debt. That company afterward conveyed to one Yavne. A default occurred, and the petitioner filed a foreclosure bill against Yavne. The amount due was found to be $10,220.96, **\*245** with interest and costs. The property was sold by the sheriff and bid in by the petitioner for $100. Meanwhile the sash and door company had been adjudicated a bankrupt. The petitioner presented a claim against the estate for $10,739.94, the amount then due on the bond less the $100 bid at the sale. It was stipulated that the mortgaged property acquired in foreclosure was worth $9,000. The referee reduced the claim to the difference—$1,739.94—and ruled the petitioner was not entitled to prove for any greater sum. The District Court and the Circuit Court of Appeals have held the referee's ruling was right. [1] The result appearing to be contrary to the weight of authority [2] we granted certiorari. [3]

[1]    73 F.(2d) 609, 610.

[2]    Rule 38, subd. 5(b), 28 USCA following section 354.

[3]    294 U.S. 700, 55 S.Ct. 507, 79 L.Ed. 1237.

Decision must be governed by relevant provisions of the Bankruptcy Act. The definition found in section 1(23) [4] is:

[4]    4 U.S.C. tit. 11, s 1(23), 11 USCA s 1(23).

"Secured creditor' shall include a creditor who has security for his debt upon the property of the bankrupt of a nature to be assignable under this Act (title), or who owns such a debt for which some indorser, surety, or other persons secondarily liable for the bankrupt has such security upon the bankrupt's assets.'

Section 57e [5] directs that 'claims of secured creditors * * * shall be allowed for such sums only as to the courts seem to be owing over and above the value of their securities. * * *'

[5]    5 U.S.C. tit. 11, s 93(e), 11 USCA s 93(e).

Unless the petitioner was a secured creditor as defined by section 1(23), it was not bound to have its security or the avails thereof valued and to prove only for the difference between that value and the face amount of the debt. Petitioner does not come within the definition, for at the date of bankruptcy it held no security against the bankrupt **\*246**

company's property nor security given by any other person who in turn was secured by the bankrupt's assets. [6] Sections 1(23) and 57e do not, therefore, forbid the proof of a claim for the principal of the bond with interest, though the petitioner may not collect and retain dividends which with the sum realized from the foreclosure will more than make up that amount. The court below was of this opinion, but thought that section 68a [7] forbade proof of a claim for more than the balance of the debt after application of the **\*\*687** avails of the foreclosure. That section directs: 'In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid.' The theory upon which this section was held to control the right to prove was thus stated:

[6]    The point was involved and necessarily decided, though not adverted to, in Hiscock v. Varick Bank, 206 U.S. 28, 27 S.Ct. 681, 51 L.Ed. 945; see the same case below sub nom. In re Mertens (C.C.A.) 144 F. 818, 820. See, also, In re Headley (D.C.) 97 F. 765; Swarts v. Fourth Nat. Bank (C.C.A.) 117 F. 1; In re Noyes Bros. (C.C.A.) 127 F. 286; In re Sweetser (D.C.) 128 F. 165; Gorman v. Wright (C.C.A.) 136 F. 164; Board of County Commissioners v. Hurley (C.C.A.) 169 F. 92; In re Bailey (D.C.) 176 F. 990; In re H. V. Keep Shirt Co. (D.C.) 200 F. 80; In re Thompson (D.C.) 208 F. 207; Young v. Gordon (C.C.A.) 219 F. 168; In re Pan-American Match Co. (D.C.) 242 F. 995; In re Anderson (D.C.) 11 F.(2d) 380; Hampel v. Minkwitz (C.C.A.) 18 F.(2d) 3; Bankers' Trust Co. v. Irving Trust Co. (C.C.A.) 73 F.(2d) 296.

[7]    7 U.S.C. tit. 11, s 108(a), 11 USCA s 108(a).

'While the obligation of the bankrupt to pay the mortgage still remained, the mortgagee had gotten possession of the security, and, in enforcing this obligation against the bankrupt, the appellant-creditor (petitioner) must reduce its claim by the admitted value of the security less the $100 paid for it. The bankrupt owed the appellant (petitioner) the amount of the mortgage, and the appellant (petitioner) equitably owed the bankrupt the value of the security in his possession.'

**\*247** This novel application of section 68a is, we think, inadmissible. A creditor holding security, who realizes upon it, does not 'owe' his debtor the amount realized. The wellunderstood concept of mutual debts does not embrace such a situation as is here disclosed.

Judgment reversed.

55 S.Ct. 685, 79 L.Ed. 1419

**Parallel Citations**

55 S.Ct. 685, 79 L.Ed. 1419

---

**End of Document**                                      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 17

KeyCite Yellow Flag - Negative Treatment

**Distinguished by**    GMAC Bank v. HTFC Corp.,    E.D.Pa.,    August 12, 2008

899 F.2d 1350
United States Court of Appeals,
Third Circuit.

Catherine M. JONES

v.

PITTSBURGH NATIONAL CORPORATION t/
d/b/a Pittsburgh National Bank, a federally-
chartered banking corporation; American Motors
Corporation, a Delaware Business Corporation;
Amica Mutual Insurance Company, a Rhode
Island Business Corporation; American Auto
Sales, Incorporated, t/d/b/a Wilkinsburg
Jeep, a Pennsylvania Business Corporation;
Whitehall Adjusters, a Pennsylvania Business
Corporation; McKean Motors, Inc., a Pennsylvania
Business Corporation; Golick Corporation, a
Pennsylvania Business Corporation; Streets Run
Auto Service, a Pennsylvania Business Corporation

v.

David A. JONES, Third party deft., Appellant.

No. 89–3626.    |    Argued Feb.
6, 1990.    |    Decided April 3, 1990.

Plaintiff brought RICO action based upon purchase and use of car. Defendants filed third-party action against plaintiff's husband attorney who was driver of car when accident occurred. The United States District Court for the Western District of Pennsylvania, Donald E. Ziegler, J., dismissed action in third-party complaint, sanctioned attorney, and denied attorney's motion for recusal and reconsideration. Attorney appealed. The Court of Appeals, Seitz, Circuit Judge, held that: (1) attorney was not entitled to recusal; (2) due process entitled attorney to particularized notice before he was sanctioned for unreasonable and vexatious multiplication of proceedings; and (3) sanctions had to be vacated, even though attorney had notice of Rule 11 basis for sanctions.

Affirmed in part, vacated in part and remanded.

West Headnotes (13)

[1]    **Federal Courts**

👉 Interlocutory, Collateral, and
Supplementary Proceedings and Questions;
Pendent Appellate Jurisdiction

Motion for reconsideration is functional equivalent of Rule 59 motion to alter or amend a judgment, and, thus, timely appeal from denial of motion brought up underlying judgment for review. Fed.Rules Civ.Proc.Rule 59(e), 28 U.S.C.A.

36 Cases that cite this headnote

[2]    **Judges**

👉 Sufficiency of objection, affidavit, or
motion

Plaintiff's allegations that judge was corrupt, chauvinistic, and antagonistic toward Republicans such as her attorney husband and that chauvinism and insensitivity to women were demonstrated by fact that judge took plaintiff's testimony out of context were irrelevant to husband's recusal motion, would not lead reasonable person to doubt judge's impartiality, and did not entitle husband to recusal, even if allegations could be considered factual and relevant to husband. 28 U.S.C.A. §§ 144, 455.

20 Cases that cite this headnote

[3]    **Judges**

👉 Time of making objection

Recusal motion alleging personal bias or prejudice was untimely where filed after entry of orders dismissing complaint and imposing sanctions; there was no showing of good cause for the delay. 28 U.S.C.A. § 144.

20 Cases that cite this headnote

[4]    **Judges**

👉 Sufficiency of objection, affidavit, or
motion

Court should grant recusal if allegations of personal bias or prejudice give fair support to charge of bent of mind that might prevent or impede impartiality of judgment. 28 U.S.C.A. § 144.

22 Cases that cite this headnote

**[5]** **Judges**
👉 Determination of objections

Recusal statute requiring disqualification in proceeding in which impartiality could reasonably be questioned required judge to consider whether reasonable person knowing all circumstances would harbor doubts concerning judge's impartiality. 28 U.S.C.A. §§ 455, 455(a).

40 Cases that cite this headnote

**[6]** **Attorney and Client**
👉 Constitutional and statutory provisions

**Constitutional Law**
👉 Conduct and discipline

Statutory prohibition against attorney's unreasonable and vexatious multiplication of proceedings requires showing of bad faith, is not impermissibly vague, and complies with due process. U.S.C.A. Const.Amends. 5, 14; 28 U.S.C.A. § 1927.

6 Cases that cite this headnote

**[7]** **Constitutional Law**
👉 Penalties, fines, and sanctions in general

**Federal Civil Procedure**
👉 Notice and hearing

Due process entitled attorney to particularized notice before he was sanctioned for unreasonable and vexatious multiplication of proceedings; motions for sanctions referred to only Rule 11; and mere existence of Rule 11 and statutory prohibition against unreasonable and vexatious multiplication of proceedings did not constitute sufficient notice. U.S.C.A. Const.Amends. 5, 14; Fed.Rules Civ.Proc.Rule 11, 28 U.S.C.A.; 28 U.S.C.A. § 1927.

10 Cases that cite this headnote

**[8]** **Federal Civil Procedure**
👉 Notice and hearing

Prior to sanctioning attorney, court must provide attorney with notice and some opportunity to respond to charges. U.S.C.A. Const.Amends. 5, 14; Fed.Rules Civ.Proc.Rule 11, 28 U.S.C.A.; 28 U.S.C.A. § 1927.

12 Cases that cite this headnote

**[9]** **Federal Courts**
👉 Need for further evidence, findings, or conclusions

District court's imposition of sanctions without differentiating between Rule 11 and statutory prohibition against attorney's unreasonable and vexatious multiplication of proceedings and without giving attorney notice of application of statute justified decision to vacate entire order and to remand case, even though attorney was on notice that sanctions were being sought under Rule 11; district court did not identify and relate violations to each source of authority in way that would permit meaningful appellate review with respect even to Rule 11. U.S.C.A. Const.Amends. 5, 14; Fed.Rules Civ.Proc.Rule 11, 28 U.S.C.A.; 28 U.S.C.A. § 1927.

14 Cases that cite this headnote

**[10]** **Federal Civil Procedure**
👉 Notice and hearing

Sanctioned party's right to respond requires district court in exercise of sound discretion to identify and determine legal basis for each sanction charge and need for further proceedings, including evidentiary hearing. Fed.Rules Civ.Proc.Rule 11, 28 U.S.C.A.; 28 U.S.C.A. § 1927.

23 Cases that cite this headnote

**[11]** **Federal Civil Procedure**
👉 Notice and hearing

Jones v. Pittsburgh Nat. Corp., 899 F.2d 1350 (1990)

RICO Bus.Disp.Guide 7454

District court could not dispose of fee application without affording sanctioned attorney opportunity to make appropriate showing as to ability to pay. Fed.Rules Civ.Proc.Rule 11, 28 U.S.C.A.; 28 U.S.C.A. § 1927.

8 Cases that cite this headnote

[12]  Constitutional Law
       👉 Penalties, fines, and sanctions in general

Authorization of personal sanctions against attorney, rather than his law firm, complied with due process. U.S.C.A. Const.Amends. 5, 14; Fed.Rules Civ.Proc.Rule 11, 28 U.S.C.A.; 28 U.S.C.A. § 1927.

1 Cases that cite this headnote

[13]  Federal Civil Procedure
       👉 Reasonableness or bad faith in general; objective or subjective standard

Rule 11 sanctions had to be based on attorney's objective knowledge or belief at time of filing challenged paper. Fed.Rules Civ.Proc.Rule 11, 28 U.S.C.A.

41 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1352** David A. Jones (argued), Professor of Law & Management Graduate School of Public and Intern. Affairs University of Pittsburgh, Pittsburgh, Pa., appellant pro se.

G. Richard Gold and Ann M. Weinthal, Campbell, Sherrard & Burke, P.C., Pittsburgh, Pa., for Pittsburgh Nat. Corp., Golick Corp., and Street Run Auto Service.

Diana F. Wilkins and Barry M. Simpson, Ecker, Rome and Simpson, P.C., Pittsburgh, Pa., for McKean Motors, Inc.

Kenneth W. Lee (argued), Plowman & Spiegel, Pittsburgh, Pa., for American Sales, Inc.

Kenneth S. Mroz, Dickie, McCamey & Chilcote, P.C., Pittsburgh, Pa., for American Motors Corp., Amica Mut. Ins. Co., and Whitehall Adjusters, appellees.

Before SLOVITER, GREENBERG and SEITZ, Circuit Judges.

**OPINION OF THE COURT**

SEITZ, Circuit Judge.

David Jones (appellant), an attorney, appeals from the order of the district court dated August 22, 1989, denying his motion for recusal of the district judge and for reconsideration of the allowance of attorneys' fees and expenses against him.

**I**

[1]  This court views a motion characterized as a motion for reconsideration as the "functional equivalent" of a Rule 59(e) motion to alter or amend a judgment. *Federal Kemper Ins. Co. v. Rauscher,* 807 F.2d 345, 348 (3d Cir.1986); *see* Fed.R.Civ.P. 59(e). A timely appeal from the denial of a 59(e) motion "brings up the underlying judgment for review." *Quality Prefabrication, Inc. v. Daniel J. Keating Co.,* 675 F.2d 77, 78 (3d Cir.1982). We therefore reach the merits of the appeal from the order refusing to recuse and awarding attorneys' **\*1353** fees and costs against appellant under 28 U.S.C. § 1291 (1982).

**II**

Appellant was counsel for his wife Catherine Jones (plaintiff), who had instituted the underlying diversity and RICO action on July 24, 1987, against the numerous defendants, at least some of whom were citizens of Pennsylvania, based upon the purchase and use of an automobile. Because appellant was driving the car when two accidents occurred, defendants joined appellant as a third-party defendant seeking indemnification or contribution on the ground that his negligence caused the car damage. After discovery, the court determined that the two grounds for jurisdiction asserted by plaintiff were lacking and dismissed the action and, as we read the order, the third-party complaint as well.

On defendants' motion, the court determined that appellant had conducted the litigation in bad faith, and imposed sanctions against him in the form of attorneys' fees and costs under Fed.R.Civ.P. 11 and 28 U.S.C. § 1927 (1982). It also determined that the dismissal of the complaint was a sufficient

sanction against plaintiff for her own violations of Rule 11. Appellant's subsequent motion for recusal of the judge and for reconsideration was denied and this appeal followed.

A recital of the often unorthodox details of this litigation is important to an understanding of this appeal. Plaintiff's complaint, filed on her behalf by appellant, asserted seven causes of action, including one RICO count. The complaint based jurisdiction on diversity of citizenship, *see* 28 U.S.C. § 1332 (1982), asserting that plaintiff was a citizen of New Hampshire and indicating that at least some of the defendants were citizens of Pennsylvania. It also invoked the jurisdiction provided by RICO. *See* 18 U.S.C. §§ 1961–1968 (1988).

As we have noted, defendants filed a motion to dismiss the complaint along with a third-party complaint against appellant. Appellant, as third-party defendant, filed an answer to the third-party complaint in which he objected to the jurisdiction of the court on the ground that the addition of appellant, a Pennsylvania citizen, as a party to the action created incomplete diversity of citizenship. In a supporting brief, appellant asserted, strangely enough, that the entire action should be dismissed because of this jurisdictional deficiency. This position, of course, raised a possible conflict of interest between appellant and plaintiff which we are not called on to address.

Defendants then filed a motion for sanctions on April 28, 1988. The motion also requested dismissal for procedural noncompliance and summary judgment. The sole authority cited for the imposition of sanctions was Federal Rule of Civil Procedure 11, although the motion referred to conduct which is not sanctionable under this Rule. Thus, it alleged that plaintiff had failed to file a pre-trial statement, to submit a RICO case statement, to answer interrogatories, to produce documents requested and to conduct any discovery and that plaintiff had had no factual basis for the RICO count.

The district court ordered plaintiff to respond to the motion for sanctions and dismissal, without citing any source for its authority to impose the requested sanctions. Plaintiff's response agreed that the case should be dismissed, but stated that the reason should be because the joining of appellant as a third-party defendant destroyed diversity jurisdiction.

The court subsequently entered an order citing *Field v. Volkswagenwerk AG,* 626 F.2d 293, 299 (3d Cir.1980) (third-party complaint requires no independent jurisdictional basis) and reciting that plaintiff's agreement to a dismissal because

of incomplete diversity due to the addition of appellant as a third-party defendant was "patently without merit." It directed defendants to mail copies of their dismissal and sanctions motion to plaintiff and to notify her that her legal interests were in jeopardy as a result of appellant's conduct. It also instructed plaintiff to inform the court whether she had any objection to granting defendants' motion to dismiss. Plaintiff stated by letter that she did object to dismissal.

**\*1354** In a response to plaintiff's letter, defendants reiterated their request for fees and dismissal. Although this document did not identify any authority in support of their requests, it recited that it sought dismissal and fees based upon plaintiff's "conduct of [the] litigation in general," including the failure to answer interrogatories, failure to file a RICO case statement or pre-trial statement and failure to produce requested documents.

Sometime after the motion for sanctions was served, plaintiff answered certain of defendants' interrogatories. In an answer [1] to one question, she stated that her present address was in Saltsburg, Pennsylvania, and that she "has owned said premises since April 29, 1977, lived there, *seriatim,* since then."

[1]    The answer recited that it was filed "pro se." It was not under oath as required by Fed.R.Civ.P. 33(a). At some unidentified point in these proceedings, appellant ceased in fact to represent plaintiff but did not file a motion to withdraw as counsel.

Thereupon, the district court determined that the two asserted grounds for its jurisdiction, diversity of citizenship and RICO's jurisdictional provisions, were in fact lacking and ordered the case dismissed for lack of subject matter jurisdiction. The court relied on plaintiff's answer to the interrogatory in which she stated that she had lived in Pennsylvania since before filing the action. In addition, the court referred to plaintiff's concession, at a point in the litigation which is unclear from the record, that "[e]arly in the case history, plaintiff decided not to pursue a RICO cause of action." The dismissal has, of course, not been appealed. The court also ordered defendants to submit records of the "reasonable fees incurred in the action for purposes of imposing appropriate sanctions" against appellant.

Thereafter, defendants filed requests for counsel fees and expenses which contained the amount of fees and expenses sought. After receiving submissions from all defendants, the district court on November 8, 1988, ordered third-party

defendant (appellant) to respond to defendants' motions and petitions for counsel fees. This order recited that counsel fees were sought pursuant to Rule 11. It made no mention of 28 U.S.C. § 1927.

Appellant's answer denied liability as either a third-party defendant or as counsel for plaintiff. He reasserted that plaintiff was a citizen of New Hampshire, having been in Pennsylvania for only a few days between June 1985 and September 1987. The answer alleged that the amount of fees and expenses sought was "absurd" and in any event "a sum far in excess of [appellant's] ability to pay." It further stated that liability should be limited to those fees necessary to prepare defendants' answers and to draft the relevant portions of "their non duplicitous interrogatories." In response to the charge of having violated Rule 11, appellant asserted that he "believed throughout a large portion of the instant litigation ... that the Complaint was warranted by existing law; that, alternatively, it was warranted by good faith arguments for extension, modification or reversal of existing laws; and that it was not interposed for delay or needless increase in cost of litigation."

On February 2, 1989, the court issued a memorandum opinion and order sanctioning plaintiff under Rule 11 for her conduct during the litigation. The court, however, determined that dismissal of her action was an adequate sanction and plaintiff has not appealed that decision. The subsequent discussion will deal only with appellant's contentions.

At the same time, the court's order sanctioned appellant. It cited his failure to prosecute any claim, failure to comply with orders and rules of the court, failure to conduct discovery and failure to conduct the inquiry required by Rule 11. The court imposed sanctions, in an amount to be determined, based upon Rule 11 and 28 U.S.C. § 1927. Its memorandum opinion contained the first mention in the record of 28 U.S.C. § 1927.

On February 23, 1989, the court entered judgment against appellant in the amount **1355** of $51,851.69, representing the total amount requested by defendants.

Shortly thereafter appellant filed a motion for recusal of the district judge and for reconsideration. The motion requested that the district judge recuse himself because plaintiff had filed a complaint against him with the Judicial Inquiry Board. The complaint is not part of this record so we do not know when it was filed. The motion again recited that the amount requested was exorbitant and sought an evidentiary hearing. Appellant also asserted that the court erred in imposing

sanctions without an evidentiary hearing. Supported by an affidavit of plaintiff, the motion stated that plaintiff was in fact a citizen of New Hampshire, having resided there continuously, with the exception of several days, from June 1985 until September 1987 (the complaint was filed on July 24, 1987). The motion and affidavit further noted that plaintiff's four children attended New Hampshire schools and that plaintiff held a New Hampshire driver's license.

After defendants' response to this motion, appellant filed a "Reply to [the] 'Reply.' " This submission stated that appellant had previously been "mystified" by the entry of judgment for attorneys' fees against him. It was only after defendants' reply to his motion for reconsideration that he claims to have understood that the complaint was dismissed and attorneys' fees imposed because of the absence of diversity of citizenship. Appellant reiterated his claim that his wife was a citizen of New Hampshire when he filed the signed complaint, the crucial date for Rule 11 purposes, and indicated that the court would reach such a conclusion if it were to hold an evidentiary hearing. Included with this submission was a copy of plaintiff's 1987 New Hampshire Residency Tax bill which, appellant argued, demonstrated her citizenship when the complaint was filed. Appellant stated further that even if plaintiff was not a citizen of New Hampshire, he could have reasonably believed that she was, which satisfied the proper test under Rule 11.

On August 22, 1989, the court denied appellant's motion for recusal and reconsideration. Recusal was denied for the following reasons: the motion was untimely; there was no claim that a reasonable person under the circumstances would doubt the judge's impartiality; the accompanying affidavit of Catherine Jones was insufficient; and appellant did not file the certificate of counsel required by 28 U.S.C. § 144 (1982). The court also rejected the challenge to the amount of defendants' fees and expenses, noting that the large sum granted was due to appellant's failure to inform the court of plaintiff's decision to abandon the RICO claim and his refusal to abide by court orders and to participate in discovery. The court also noted that the deposition transcripts showed that plaintiff had no facts to support her various claims and never conducted discovery to develop them.

The court stated that it need not address evidence of plaintiff's New Hampshire domicile that had been submitted after the order imposing sanctions. It noted that, unless such information was unavailable prior to the court's dismissal of the action, it was not necessary to consider it on a

motion for reconsideration. Nevertheless, the court went on to analyze various facts surrounding plaintiff's citizenship and concluded that "the burden [of establishing a New Hampshire domicile] has not been met in this case." As noted, appellant appeals the district court's denial of his motion for recusal and reconsideration of the fee determination.

### III

[2]   Appellant sought recusal because his wife had filed a complaint and supporting affidavit against the district judge with a Judicial Inquiry Board. In her affidavit accompanying appellant's motion to recuse, plaintiff asserted that the judge permitted defendants to harass her as a woman and mother. She alleged that the judge was "the product of a failed Presidency in Jimmy Carter who is corrupt and chauvinistic and antagonistic toward Republicans such as [her] husband." Finally, she charged **\*1356** that the judge's chauvinism and insensitivity to women was demonstrated by the fact that he took her testimony regarding her residency out of context.

We review a district court's action on recusal, pursuant to either 28 U.S.C. § 144 (1982) or 28 U.S.C. § 455 (1982), under an abuse of discretion standard. *Johnson v. Trueblood,* 629 F.2d 287, 290 (3d Cir.1980), *cert. denied,* 450 U.S. 999, 101 S.Ct. 1704, 68 L.Ed.2d 200 (1981). Since appellant has not indicated which of the two recusal statutes he was relying on, we will address both statutes.

### a) Section 144

[3]   The recusal motion was filed after the entry of the orders dismissing the complaint and imposing sanctions. Under these circumstances, the affidavit (motion) was not timely filed within the meaning of 28 U.S.C. § 144. [2] Any other conclusion would permit a party to play fast and loose with the judicial process by "betting" on the outcome. *See United States v. Rosenberg,* 806 F.2d 1169, 1173, n. 3 (3d Cir.1986), *cert. denied,* 481 U.S. 1070, 107 S.Ct. 2465, 95 L.Ed.2d 873 (1987); *Smith v. Danyo,* 585 F.2d 83, 86 (3d Cir.1978). We are not confronted with an allegation that there was "good cause" for the delay.

[2]   § 144. Bias or prejudice of judge

Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a

personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

[4]   Section 144 also requires that the affidavit be "sufficient" to show that the judge involved has a personal bias or prejudice against the party seeking recusal, or in favor of the adverse party, that dictates that the judge proceed no further. Conclusory allegations need not be accepted as true. *United States v. Vespe,* 868 F.2d 1328, 1340 (3d Cir.1989). A court should grant recusal if the allegations give fair support to a charge of a bent of mind that might prevent or impede impartiality of judgment. *United States v. Townsend,* 478 F.2d 1072, 1073–74 (3d Cir.1973).

It need hardly be said that the allegations here are conclusory. To the extent that they indicate bias against plaintiff, and not appellant, they are irrelevant. To the remote extent that they may be considered factual and relate to appellant, they constitute, in disguised form, no more than a disagreement with the legal conclusions reached by the district judge. *Rosenberg,* 806 F.2d 1169. They do not support a suggestion of partiality.

We conclude that insofar as the motion to recuse is based on § 144, the district judge did not abuse his discretion in concluding that it was both untimely and insufficient.

### b) Section 455

[5]   We turn next to a consideration of the merits of the motion to recuse on the basis of 28 U.S.C. § 455(a) which reads in pertinent part:

Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

Under this section a judge must consider whether a reasonable person knowing all the circumstances would harbor doubts concerning the judge's impartiality. *United States v. Dalfonso,* 707 F.2d 757, 760 (3d Cir.1983). There is nothing in this record to support remotely a conclusion that a reasonable person would doubt the district judge's impartiality. Disagreement with a judge's determinations certainly cannot be equated with the showing required to so reflect on his impartiality as to dictate recusal.

We conclude that the district judge did not abuse his discretion in denying the motion to recuse based on § 455.

**\*1357 IV**

We now address appellant's attacks on the sanctions imposed by the district court. We review for abuse of discretion. *Schering Corp. v. Vitarine Pharmaceuticals, Inc.,* 889 F.2d 490, 496 (3d Cir.1989); *Snow Machines, Inc. v. Hedco, Inc.,* 838 F.2d 718, 725 (3d Cir.1988). We note that we are not dealing with sanctions imposed by the court on its own initiative.

 [6]    As a preliminary matter, we address appellant's contention that the term "vexatious" in 28 U.S.C. § 1927 [3] is unconstitutionally vague and therefore the section violates the due process clause of the fourteenth amendment. We have interpreted that section as requiring a showing of bad faith, *see Gaiardo v. Ethyl Corp.,* 835 F.2d 479, 484 (3d Cir.1987), which has a well understood meaning in the law. Thus, it cannot be described as impermissibly vague and therefore appellant's contention is without merit.

[3]       § 1927. Counsel's liability for excessive costs
         Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

 [7]    [8]    Because of its due process implications, we turn next to the issue of the sufficiency of the notice appellant received before he was sanctioned. Prior to sanctioning an attorney, a court must provide the party to be sanctioned with notice of and some opportunity to respond to the charges. *See Eash v. Riggins Trucking Inc.,* 757 F.2d 557, 570–71 (3d Cir.1985) (considering court's inherent power to impose

sanctions, stating need for "prior notice and some occasion to respond"); *Knorr Brake Corp. v. Harbil, Inc.,* 738 F.2d 223, 227–28 (7th Cir.1984) (§ 1927 case stating the "court should provide counsel with some opportunity to be heard"). *Tom Growney Equip., Inc. v. Shelly Irrigation Dev., Inc.,* 834 F.2d 833, 836 (9th Cir.1987) (Rule 11 case requiring opportunity "to explain the allegedly improper filings," that is, "notice and the *opportunity* to be heard").

An examination of the Memorandum Opinion of the district court granting defendants' motions for counsel fees reveals that the sanctions were imposed under both Rule 11 and 28 U.S.C. § 1927. However, we cannot find where appellant was put on any explicit notice that § 1927 would be relied upon in sanctioning him until he received the court's order of February 2, 1989, actually imposing sanctions. Defendants' motions for sanctions referred only to Rule 11 and appellant's responses primarily addressed that basis for sanctions.

We point out that the mere existence of Rule 11 or 28 U.S.C. § 1927 does not constitute sufficient notice in our view. Rather, we think particularized notice is required to comport with due process. *See Donaldson v. Clark,* 819 F.2d 1551, 1560 (11th Cir.1987) (en banc) (dealing with Rule 11). In this manner a party is on notice as to the particular factors that he must address if he is to avoid sanctions. Therefore, the district court's reliance in part on § 1927, at the point when it actually imposed sanctions, raises a serious question as to the legal sufficiency of the notice as a basis for any § 1927 sanctions.

Although there was reference in various submissions prior to the court's decision to actions that could be sanctionable under § 1927, we cannot say with reasonable assurance on this record that appellant was on notice that § 1927 was being relied on by defendants as a basis for the imposition of sanctions prior to the court's determination. *Cf. Gagliardi v. McWilliams,* 834 F.2d 81 (3d Cir.1987) (remanding Rule 11 sanction to give sanctioned party notice and chance to show why sanction should not issue). To that extent, at least, the sanction order cannot stand. However, appellant clearly was on notice that sanctions in the form of attorneys' fees and costs were being sought under Fed.R.Civ.P. 11.

 [9]    In the foregoing circumstances, we would usually review the sanction order to the extent it was based on Rule 11 and remand only the portion applicable to  **\*1358** § 1927 violations. But that approach is not feasible here. The district court's opinion concluded that appellant,

has conducted this litigation in willful bad faith since the filing of the complaint. He has failed to prosecute any claim asserted on behalf of plaintiff, failed to comply with the orders and rules of this court, failed to engage in discovery and conduct the inquiry required by Rule 11 of the Federal Rules of Civil Procedure. Under such circumstances, we believe that Rule 11 and 28 U.S.C. § 1927 provide the authority relevant to the conduct of Attorney Jones.

It also stated that:

> The record is replete with examples where David Jones neglected his duties as an officer of the court and the representation of his client. Sanctions will therefore be imposed pursuant to 28 U.S.C. § 1927.

As the quoted language demonstrates, the court did not identify and relate the violations to each source of authority in a way that would permit meaningful appellate review with respect even to Rule 11. This infirmity is a critical obstacle because Rule 11 and § 1927, while probably duplicitous to some extent, cover different actions in a lawsuit and require the application of disparate standards of proof.

Rule 11 provides:

> The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

The Rule applies only to pleadings, motions or other papers signed by an attorney or a party. *See Gaiardo,* 835 F.2d at 484. The objective standard incorporated in the Rule does not require a finding of bad faith. If a violation is found, sanctions are mandatory. *Lieb v. Topstone Indus. Inc.,* 788 F.2d 151, 157 (3d Cir.1986). On the other hand, § 1927 only covers the excess costs generated by an attorney that resulted from a multiplication of the proceedings, "unreasonably and vexatiously." It requires a finding of counsel's bad faith. *Gaiardo,* 835 F.2d at 484. Even in the face of such a finding, a district court retains discretion as to the imposition of attorneys' fees as a sanction. *Ford v. Temple Hospital,* 790 F.2d 342, 347 (3d Cir.1986).

Because the district court did not differentiate between Rule 11 and the statute in imposing sanctions, we are not in a position even to know whether the district court applied the correct standard insofar as Rule 11 is concerned. In consequence, the entire order imposing sanctions on appellant must be vacated. If § 1927 is to be relied on in the remanded proceedings, adequate notice of the sanction requested must be given to appellant as well as an opportunity to respond.

## V

Since the order imposing sanctions on appellant must be vacated and the matter remanded, we conclude that certain issues will probably arise on the remand and should, in the interest of justice, be addressed.

 **[10]**    Appellant contends that, notice aside, he was denied a proper hearing in connection with the disposition of the fee applications. Our precedent, *Eash v. Riggins Trucking Inc.,* 757 F.2d 557, 570–71 (3d Cir.1985) (in banc), commands that a party sought to be sanctioned be given "some occasion to respond." *See also Roadway Express, Inc. v. Piper,* 447 U.S. 752, 760–61, 100 S.Ct. 2455, 2461, 65 L.Ed.2d 488 (1980).

Here we must decide what "the occasion to respond" should encompass. Given the permutations inherent in fee applications and response thereto, any rigid rule would, to say the least, be undesirable. The circumstances must dictate what is required. In some cases an oral response may be **\*1359** sufficient, while in others an opportunity to file a written response must be accorded. However, it does not follow, in either case, that further proceedings are automatically unnecessary. *See Donaldson v. Clark,* 819 F.2d 1551, 1560–

61 (11th Cir.1987) (en banc). Rather, we think a district court in the exercise of its sound discretion must identify and determine the legal basis for each sanction charge sought to be imposed, and whether its resolution requires further proceedings, including the need for an evidentiary hearing. *See Sanko S.S. Co., v. Galin,* 835 F.2d 51, 53–54 (2nd Cir.1987); *Oliveri v. Thompson,* 803 F.2d 1265, 1280 (2nd Cir.1986), *cert. denied,* 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987); G. Joseph, Sanctions: The Federal Law of Litigation Abuse § 17(D)(2) (1989).

We believe the rule that we have announced has several factors to commend it. It gives the judge flexibility in deciding on the sound course to pursue. Thus, it permits some cases to be disposed of on the record and, to that extent, prevents unnecessary expenditure of judicial time. In other situations it mandates an evidentiary hearing to resolve disputes of material fact when the cold record may not disclose the full story, as here. Finally, it will afford the attorney the opportunity to show, as here, whether he has the ability to pay or has other relevant defenses that the court should consider.

[11]    On remand, if the district court reimposes sanctions, it will be governed by the principles announced by this court in *Doering v. Union County Bd. of Chosen Freeholders,* 857 F.2d 191, 194 (3d Cir.1988) and in *Gaiardo v. Ethyl Corp.,* 835 F.2d 479, 483 (3d Cir.1987). Among these principles is that at least where, as here, appellant has raised the issue, a court is not free to dispose of a fee application without affording the party to be sanctioned an opportunity to make an appropriate showing as to his ability to pay.

[12]    Certain other matters relevant to the remand must be reiterated. [4]

[4]        Appellant also seems to be attacking both Rule 11 and 28 U.S.C. § 1927 on the grounds that these sections, by authorizing sanctions against him personally rather

than against his law firm, violate due process principles. While we ordinarily would not address this contention in view of our order vacating sanctions, we do not think it inappropriate to do so here. The short answer is that the statute and rule impose liability on counsel directly and we are at a loss to understand how such a grant of authority violates due process.

First, sanctions under Rule 11 must be treated and determined separately from those that may be imposed under § 1927. The resulting findings must appear with reasonable specificity in terms of the perceived misconduct and the sanctioning authority. *See In re Yagman,* 796 F.2d 1165, 1184 (9th Cir.1986).

[13]    Second, Rule 11 sanctions must be based on appellant's objective knowledge or belief at the time of the filing of a challenged paper. *Eavenson, Auchmuty & Greenwald v. Holtzman,* 775 F.2d 535, 540 (3d Cir.1985). This factor is particularly important here because the issue with respect to plaintiff's citizenship at the date the complaint was filed must relate to appellant's objective knowledge at that time. It is not whether, in fact, plaintiff was then a citizen of Pennsylvania for diversity purposes.

## VI

To the extent the order of the district court dated August 22, 1989, denied appellant's recusal motion, it will be affirmed. To the extent the order of the district court dated August 22, 1989, imposed sanctions on appellant, it will be vacated and that matter remanded to the district court for further appropriate proceedings in accordance with this opinion.

**Parallel Citations**

RICO Bus.Disp.Guide 7454

---

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 18

*Case Name:*

# KAY v. WIRSTIUK

[1977] A.J. No. 690

[1978] 1 W.W.R. 317

8 A.R. 405*

[1977] 2 A.C.W.S. 1142

Alberta Supreme Court, Trial Division
Judicial District of Edmonton

**Steer, J.**

November 25, 1977

(10 pages) (37 paras.)

## CASES JUDICIALLY NOTICED:

Stephenson v. Dandy, [1918] 3 W.W.R. 662, appld. [para. 12].
Clayton v. British American Securities et al., [1934] 3 W.W.R. 257, appld. [para. 12].
Sales v. Calgary Stock Exchange, [1931] 3 W.W.R. 392, appld. [para. 18].
Commercial Life Assur. Co. v. Williamson (No. 2), [1943] 2 W.W.R. 103, dist. [para. 20].
Re Heiden & Huck (1972), 21 D.L.R.(3d) 750, dist. [para. 21].
Lawson v. Burns et al. (No. 2) (1976), 70 D.L.R.(3d) 735, dist. [para. 22].
Scott v. Cook (1970) 12 D.L.R.(3d) 113, cons'd. [para. 25].
Becker Mills Co. Ltd. et al. v. Consumer's Gas Co. (1974), 43 D.L.R.(3d) 498, cons'd. [para. 26].
Calder v. Int. Harv. of America, [1918] 2 W.W.R. 905, cons'd. [para. 27].

## COUNSEL:

R.E. HYDE, Q.C., for the plaintiff
M. BERZINS, for the defendant

This case was heard at Edmonton, Alberta, before STEER, J., [*page406] of the Alberta Supreme Court, Trial Division, Judicial District of Edmonton.

On November 25, 1977, STEER, J., delivered the following judgment:

**1**    STEER, J.:-- This is an application to re-open a trial to hear new evidence after reasons for judgment were given but before entry of the judgment roll. The case involved the assessment of damages resulting from a motor vehicle accident which occurred on May 12th, 1974.

**2**    At the conclusion of the hearing I told counsel I would call them back to give reasons. I have now decided that the length of the reasons precludes that course.

**3**    I have reviewed a transcript of the evidence of Dr. MacDonald, who was called for the Plaintiff, and which was provided to me as part of the material on the application. I also reviewed my notes of the evidence given by Dr. Mallen and of the Plaintiff. His opinion was that the dizziness was not caused by any defect in the inner ear.

**4**    After reasons for judgment were given Dr. MacDonald, after he was advised of the result, referred the matter to Dr. Toupin. Dr. Toupin gave a report to Dr. MacDonald. It is dated May 30th, 1977. The report says that his impression is that the dizziness was labyrinthine in origin and from the information he had it was traumatic in origin.

**5**    Following the receipt of Dr. Toupin's report, Dr. MacDonald swore an affidavit. It is dated September 15, 1977. In that affidavit he swears that he was informed that in the reasons for judgment the Court found that the problems which the Plaintiff had following the accident had cleared up by October of 1974. He swears that he felt disturbed and that his evidence was misunderstood or had not been strongly enough expressed. Mr. MacDonald then swore that he verily believed that I ought to hear Dr. Toupin's evidence in the interests of justice.

**6**    The first thing I wish to do is quote some of Dr. MacDonald's evidence. The passage appears at page 31 of the transcript:

"Q. You changed your diagnosis?

A. I added a diagnosis but I say his initial problem [*page407] definitely involved his ear because of the symptoms I found back in July '74 or the signs I found in July of '74.

Q. When would he have recovered from his ear problem?

A. Well, by October he no longer exhibited the symptoms or the signs that he presented with except that he had the complaints but I found no objective evidence on my examination. Now, that is a very distinct point.

        Q.    Okay. Would it be fair to say that by October he had with the exception of the possible

development of this cerebral arteriosclerosis, had recovered from the injuries he sustained in this accident?

A.    I would think he recovered from his muscle sprain to the neck and I think that it was at that point that he may have recovered from any injury that he sustained to his ear."

**7**    From that and from his other evidence I concluded that there had been a definite ear problem after the accident. I further came to the conclusion in the light of Dr. Mallen's examination abd diagnosis of July 29th, 1975, that the problem with the ear had in fact corrected itself by October of 1974. I came to this conclusion because Dr. Mallen's evidence was that there was no problem with the ear on his examination.

**8**    In the light of that, I then had to consider whether or not the atherosclerosis (which is a form of arteriosclerosis) was caused by the accident. I said:

"Now the serious question in this case is whether this present condition of arteriosclerosis which both Doctors agree, that is Dr. MacDonald and Dr. Mallen agree that he has, the question is whether that was caused by the accident."

The reasons then go on to deal with the evidence from that point of view and I concluded that it had not been shown that the atherosclerosis was caused by the accident. I therefore gave damages down to the point at which I concluded that the ear problem had cleared up.

**9**    Dr. MacDonald was cross-examined on his affidavit. I believe [*page408] that his view of the use to be made of Dr. Toupin's evidence is stated in the following evidence which appears at page 17. It reads:

"Q.    Would it be correct, doctor, that Dr. Mallen's evidence was that there was no labyrinthine problem?

A. That's what Dr. Mallen has --

Q. Testified to.

A. -- has testified to.

Q.    And would you agree with me that the problem throughout has been one of trying to determine what the cause of Mr. Kay's problems has been?

A.    No, I would not agree with you. From my standpoint, the diagnosis initially was very clear-cut. Where the problem has existed is how much of Mr. Kay's continuing disability is related directly to the accident and/or to vertebral artery insufficiency which he may or may not have."

He also said that he was not surprised at Dr. Mallen's testimony.

**10**    Now after reasons have been given on the basis of the evidence given at trial new evidence is sought to be introduced to show that the dizziness has its origin in the ear.

**11**    In the light of all this, the question is whether I should hear the evidence of Dr. Toupin and that involves considering on what grounds the Court ought to grant an application to hear new evidence after the reasons for judgment have been given.

**12**    That the jurisdiction exists is beyond question Stephenson v. Dandy, [1918] 3 W.W.R. 662, and Clayton v. British America Securities et al., [1934] 3 W.W.R. 257.

**13**    The conditions that should be met have been considered in a number of cases.

**14**    In Stephenson v. Dandy (supra) Beck, J., at page 667 said that the Judge ought to consider the affidavits as to the further evidence suggested or proposed to be given and the circumstances under which and when it was discovered. [*page409] The judge is the person in the best position to judge its bearing on the case in the light of the evidence already given. He is not bound by the same rule as is a Court of Appeal in an application to hear further evidence. The other three members of the Court did not deal with these matters and simply held that the jurisdiction exists.

**15**    In Clayton v. British American Securities Ltd. et al. (supra) the majority of the British Columbia Court of Appeal endorsed Mr. Justice Beck's view that the Judge in considering such an application is not bound by the rules that are applied when a Court of Appeal considers an application to hear new evidence. Macdonald, J.A., did, however, say that the Judge might well be guided, although not bound by those rules (p. 296). The learned Judge stated the rule to which he was referring at p. 294 in these words:

". . . that apart from fraud or surprise, due diligence in the discovery of the new evidence must be shown; that it must at least be a determining factor in the result; that it will not result merely in placing oath against oath and generally the rules, familiar to us on applications to admit new evidence before a Court of Appeal."

**16**    As to the rule to guide the exercise of discretion the learned Judge said at page 257:

"My view has always been that the trial Judge might resume the hearing of an action apart from rules until entry of judgment but as it was vigorously combatted I have given it careful consideration. The point, as far as I know, has not been squarely decided; at least by any cases binding upon us. It is, I think, a salutary rule to leave unfettered discretion to the trial Judge. He would of course discourage unwarranted attempts to bring forward new evidence available at the trial to disturb the basis of a judgment delivered or to permit a litigant after discovering the effect of a judgment to reestablish a broken-down case with the aid of further proof. If the power is not exercised sparingly and with the greatest care fraud and abuse of the Court's processes would likely result. Without that power however injustice might occur. If, e.g., a document should be discovered after pronouncement of judgment but before entry showing that the judgment was wrong and the

trial Judge was convinced of its authenticity no lack of diligence by solicitor in producing it earlier should serve to perpetuate [*page410] an injustice. The prudent course is to permit the trial Judge to exercise untrammelled discretion relying upon trained experience to prevent abuse, the fundamental consideration being that a miscarriage of justice does not occur."

**17**    In this case there is not the slightest possibility of suggesting fraud and this aspect was properly not mentioned by either party.

**18**    In my view one potential abuse that must clearly be kept in mind is that there is fundamental rule which requires a litigant to have the facts of his case fully prepared to prove those matters that must be proved and to present it once and for all at the time of trial. This rule is fundamental because it is only in this way that endless wrangling and never-ending re-hearings and never-ending re-openings to hear new evidence can be avoided. It is, I believe, this that Mr. Justice Boyle had in mind when in giving his reasons for dismissing such an application in Sales v. Calgary Stock Exchange, [1931] 3 W.W.R. 392. The learned Judge said at p. 392:

"It is in my view a serious matter to open up a trial after all the evidence has been taken, and it should never be done unless it seems imperative in the interests of justice that the case should be re-opened for further evidence."

In that case the motion was dismissed. It was a motion by the plaintiff to have the Court hear evidence to prove special damage because it was for some reason not put in at the trial. Mr. Justice Boyle concluded that the circumstances had changed since the trial and that the plaintiff regarded it now to be to his advantage to prove the special damages.

**19**    There are two further Alberta cases.

**20**    The first is Commercial Life Assur. Co. v. Williamson (No. 2), [1943] 2 W.W.R. 103. In that case the problem arose because a document was not produced, which ought to have been produced, and counsel had overlooked it when the file was given to him by opposing counsel during the course of the trial. The document would have proved the point the defendant wished to prove, and the plaintiff was granted leave to call evidence in reply.

**21**    The second case is Re Heiden & Huck (1972), 21 D.L.R. [*page411] (3d) 750. This was a case in which the facts were not in dispute. One additional fact was admitted after the decision was made, namely that after the decision the husband and wife had been divorced at a date subsequent to the first decision.

**22**    I cite these two decisions to show that in cases in Alberta where this type of application was granted, the piece of evidence sought to be adduced by the applicant was incontrovertible. Both of the learned Judges also made the point that no issue of credibility arose as a result of granting the application. The same may be said with respect to the recent British Columbia case Lawson v. Burns et al. (No. 2) (1976), 70 D.L.R.(3d) 735, where the defendant was allowed to prove a

settlement agreement. In that case Atkins, J., relied on Clayton v. British American Securities Ltd. (supra). Indeed, in Clayton the new evidence with respect to which the application was granted was in the form of documents and the evidence of counsel who had been on the application which was in question in the case, and knew for a fact that a Mr. Shandley had acted for the beneficiaries. It was sought to show that Mr. Shandley was mistaken in his memory at the trial and it was a matter of further cross-examination in the light of the new evidence."

**23**   I point out again that in each of these cases it was virtually impossible to controvert the piece of new evidence sought to be introduced although it may raise new matters for decision once it is admitted.

**24**   The problem of new evidence after the case is closed, and reasons for decision given, has been considered by the Courts in Ontario.

**25**   In Scott v. Cook (1970), 12 D.L.R.(3d) 113, at p. 118, Grant, J., said that in an application to open up on the grounds of newly discovered evidence, the applicant must show that if it had been presented at trial it would probably have changed the result. This is, of course, a relaxation of the test applied when the application is to a Court of Appeal. The learned judge added that once a litigant had obtained judgment he is entitled not to be deprived of it without very solid grounds. In this case the learned Judge balanced possible explanations of the new evidence sought to be introduced against the evidence given at the trial itself in order to reach his conclusion. The application to adduce the new evidence was refused. The learned Judge made it clear that the discretion is unfettered. [*page412]

**26**   The Court of Appeal for Ontario considered the same problem in Becker Mills Co. Ltd. et al. v. Consumer's Gas Co. (1974), 43 D.L.R.(3d) 498. The Court said that the test was "might probably" have altered the judgment.

**27**   The final case I wish to mention is that of Calder v. Int. Harv. of America, [1918] 2 W.W.R. 905, decided in the Saskatchewan King's Bench. There, the Judge refused to receive a document because the defendant had failed to make reasonable efforts to locate it before trial and knew when it came to the trial that the alleged extension agreement, evidenced by the document, would be in issue. The basis on which the application was refused is very similar to that in Sales v. Calgary Stock Exchange (supra).

**28**   My conclusion is that the following are the three general factors that must be weighed in this kind of application:

"(1) The fundamental consideration is that a miscarriage of justice does not occur and therefore the discretion in unfettered. In this regard it is important to keep in mind that regard must be had to the interests of the defendant as well as those of the plaintiff.

   (2)   Once reasons have been given, the successful party is not to be deprived of it without

very solid grounds.

(3)     The greatest care must be exercised to avoid abuse of the Court's process."

**29**     The particular matters to be considered in exercising the discretion and in determining whether the applicant's grounds are solid are:

"(a) Was the issue with respect to which the new evidence is sought to be adduced recognized and dealt with at the trial, or is counsel surprised and unable therefore to properly deal with the question by evidence?

(b)     Is the evidence sought to be adduced incontrovertible in the sense that it is a fact that exists and evidence cannot be called to negative its existence? If so, and had it been adduced at trial, might it probably have altered the decision on that issue and the final result, having regard to the other evidence adduced at the trial?"

**30**     On the first of these particular matters it is my opinion [*page413] that the issue of whether or not the Plaintiff was suffering from an inner ear defect or from atherosclerosis was clearly raised before trial. I refer to Dr. Mallen's letter, which both parties had before trial. At the trial it was also present to everyone's mind. This is also my conclusion with respect to the second issue, namely, whether or not the atherosclerosis was caused by trauma.

**31**     Then on the question of surprise, it must be noted that at the end of the first day the Defendant applied for an adjournment to consider whether evidence should be called concerning the Plaintiff's evidence with respect to pension rights and whether further medical evidence in addition to Dr. Mallen's should be called on behalf of the Defendant. The Plaintiff argued against that and in the result the adjournment was only granted for the purpose of considering the evidence called concerning the pension. It is my opinion overall that surprise cannot be considered as a factor in this case from the point of view of either side.

**32**     With regard to the second particular matter, it is my view that the Plaintiff has two hurdles to overcome with respect to this new evidence. The first of these is whether or not Dr. Toupin's impression, when he says that at the time of his test, which was May 26th, 1977, the defect is in the mechanism of the inner ear, is final - or is there a possibility that it will change before he is called. In this connection it is important to note that Dr. Toupin has not sworn an affidavit stating what his opinion is. What he has done is to provide a letter which states his impression that after doing a neurological examination and cold caloric tests he believes the symptoms are labyrinthine in origin. He recites a very brief history of the background and includes mention of the heart attack in 1971. In forming his belief he was unaware of the views of Dr. MacDonald based on the patient's progress and the Doctor's observations following the accident and up to the time of trial. He was not aware of Dr. MacDonald's observations of the actual symptoms and his evidence at the trial. He was further unaware of Dr. Mallen's diagnosis of July 29th, 1975, and of his evidence at the trial. I am therefore left with the view that this is not Dr. Toupin's final opinion and that it is not, in fact, necessarily the evidence Dr. Toupin would give in the event that the trial were reopened to allow him to give

evidence.

**33**    I must also bear in mind (and this is the second hurdle the Plaintiff must overcome) that what is sought to be put in [*page414] is not a factual matter at all. I have no doubt that Dr. Toupin's evidence can be controverted and it is clear to me that if it is admitted the Defendant must be allowed to do that. Before the Defendant can do that, a further independent medical examination of the Plaintiff by the Defendant would have to be allowed. This is because of the interval of almost two years between the examination conducted by Dr. Mallen and that of Dr. Toupin.

**34**    Finally, I must consider whether or not this proposed new evidence might probably change my decision on the question of whether or not the Plaintiff still had an inner ear problem affecting his balance after October of 1974. The answer to this, on the basis of what is disclosed on this application and when weighed against the evidence of Dr. MacDonald and Dr. Mallen, is in the negative.

**35**    In the result the Plaintiff has, therefore, failed to establish either of the particular matters which, if answered affirmatively, would assist in coming to a conclusion that the discretion ought to be exercised in favour of the Plaintiff.

**36**    The discretion is completely mine and I recognize that I can grant the application in any event. I have concluded, nevertheless, that I ought not. I base this upon the warning that it is a most grave matter to deprive a successful litigant of a judgment without very solid grounds. Here, in view of my conclusions on the subsidiary factors to be considered, the grounds put forward by the Plaintiff are not solid. In my opinion, it would in fact be an abuse of the Court's process in the circumstances of this case to depart from the normal rule that the plaintiff must present his evidence on the issues once and for all. Finally, I am satisfied that in view of the position taken by the Plaintiff with respect to the adjournment after the first day, that to grant the Plaintiff's application would result in a miscarriage of justice against the Defendant.

**37**    I therefore dismiss the application and the costs will follow the event.

Application dismissed.

```
---- End of Request ----
Download Request: Current Document: 1
Time Of Request: Thursday, June 11, 2015  16:30:02
```

# TAB 19

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 236 of 304

Leo Deluca Enterprises Inc. v. Lombard General Insurance..., 2008 CarswellOnt 4372
2008 CarswellOnt 4372, [2008] O.J. No. 2876, 168 A.C.W.S. (3d) 395

2008 CarswellOnt 4372
Ontario Superior Court of Justice

Leo Deluca Enterprises Inc. v. Lombard General Insurance Co. of Canada

2008 CarswellOnt 4372, [2008] O.J. No. 2876, 168 A.C.W.S. (3d) 395

# LEO DELUCA ENTERPRISES INC. and KOOLINI'S ITALIAN CUISINI INC. (Plaintiffs) and LOMBARD GENERAL INSURANCE COMPANY OF CANADA (Defendant)

T.L.J. Patterson J.

Judgment: July 21, 2008
Docket: 04-CV-3339

Proceedings: refused reconsideration or rehearing *Leo Deluca Enterprises Inc. v. Lombard General Insurance Co. of Canada* ((2008)), 2008 CarswellOnt 1778, [2008] O.J. No. 1230, 60 C.C.L.I. (4th) 276, [2008] I.L.R. I-4690 ((Ont. S.C.J.))

Counsel: David Robins for Plaintiff
Mirilyn R. Sharp for Defendant

Subject: Civil Practice and Procedure

 **Related Abridgment Classifications**
For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

 **Headnote**
 **Civil practice and procedure --- Judgments and orders — Amending or varying — After judgment entered — Miscellaneous**


 **Table of Authorities**

 **Cases considered by *T.L.J. Patterson J.*:**

 *Caneast Foods Ltd. v. Lombard General Insurance Co. of Canada* (2008), 61 C.C.L.I. (4th) 163, 2008 ONCA 368, 2008 CarswellOnt 2610 (Ont. C.A.) — followed

 *Castlerigg Investments Inc. v. Lam* (1991), 2 O.R. (3d) 216, 47 C.P.C. (2d) 270, 1991 CarswellOnt 418 (Ont. Gen. Div.) — referred to

 *Dobson v. Winton & Robbins Ltd.* (1959), [1959] S.C.R. 775, 20 D.L.R. (2d) 164, 1959 CarswellOnt 86 (S.C.C.) — referred to

 *Holmes Foundry Ltd. v. Point Edward (Village)* (1963), 39 D.L.R. (2d) 621, [1963] 2 O.R. 404, 1963 CarswellOnt 272 (Ont. C.A.) — referred to

 *Widrig v. Strazer* (1964), [1964] S.C.R. 376, 1964 CarswellAlta 26, 47 W.W.R. 268, 44 D.L.R. (2d) 1 (S.C.C.) — referred to

*671122 Ontario Ltd. v. Sagaz Industries Canada Inc.* (2000), 2000 CarswellOnt 121, 46 O.R. (3d) 760, 183 D.L.R. (4th) 488, 48 C.C.L.T. (2d) 79, 128 O.A.C. 46, 2 B.L.R. (3d) 1, 41 C.P.C. (4th) 107 (Ont. C.A.) — followed

**Statutes considered:**

*Class Proceedings Act, 1992*, S.O. 1992, c. 6
 Generally — referred to

**Rules considered:**

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194
 Generally — referred to

 R. 21 — referred to

 R. 37.14(4) — considered

 R. 59.06 — referred to

 R. 59.06(2) — considered

*T.L.J. Patterson J.***:**

1    On April 2, 2008 I struck out the plaintiffs' claim on the basis that there was no cause of action because I determined there was no coverage available under the defendant's insurance policy.

2    The parties and myself were aware that a case *Caneast Foods Ltd. v. Lombard General Insurance Co. of Canada*, 2008 ONCA 368 (Ont. C.A.) was going to the Court of Appeal on May 9, 2008 in which Justice Brown came to a contrary conclusion involving an identical insurance policy. Justice Borins for the unanimous court determined that Justice Brown was correct and I was not and that there was insurance coverage.

3    On June 26, 2008 the plaintiffs brought a motion asking that I vary and reverse my decision of April 2, 2008 on the basis of the unanimous decision of the Court of Appeal in the *Caneast* case.

4    By rule 59.06(2) a party may make a motion to have an order set aside or varied on the grounds of facts arising or discovered after it was made and under rule 37.14(4) a motion under any rule such as 59.06 may be brought before the judge who made it to set aside, vary or amend an order made by that judge.

5    The court has discretion once reasons for judgment have been released but before the formal judgment has been signed and entered and reconsider its decision. *Holmes Foundry Ltd. v. Point Edward (Village)*, [1963] 2 O.R. 404 (Ont. C.A.) citing *Widrig v. Strazer*, [1964] S.C.R. 376 (S.C.C.) and *Dobson v. Winton & Robbins Ltd.*, [1959] S.C.R. 775 (S.C.C.), at 779.

6    Further the court has inherent jurisdiction to reopen a case to reconsider a matter before the court independent of the Rules and the exercise of discretion to accept jurisdiction will be considered to prevent miscarriage of justice. *Castlerigg Investments Inc. v. Lam* (1991), 2 O.R. (3d) 216 (Ont. Gen. Div.). The test for reopening a matter after a decision has been rendered has been the subject matter of a number of cases. The test was stated in the Court of Appeal decision of *671122 Ontario Ltd. v. Sagaz Industries Canada Inc.* (2000), 46 O.R. (3d) 760 (Ont. C.A.) that an appellant has to establish two points — that the evidence might probably have altered the judgment and that the evidence could not with reasonable diligence have been discovered sooner. There is no question that the Court of Appeal decision in the *Caneast* case on identically the same insurance policy would have altered my judgment on the *Lombard* Rule 21 motion and it was decided after the release of my reasons.

2008 CarswellOnt 4372, [2008] O.J. No. 2876, 168 A.C.W.S. (3d) 395

7    It is the defendant's position, Lombard Insurance, that the plaintiffs in this case should follow the ordinary course and appeal my decision to the Court of Appeal. I disagree with the defendant's submission.

8    I am bound by the decision of the Court of Appeal in the *Caneast* case which involved consideration of an identical insurance policy. The Court of Appeal has in the *Caneast* case included reference to my decision and has made it clear that I was wrong in my interpretation of the insurance contract.

9    I therefore reverse my decision in this matter to dismiss the plaintiffs' action because it is in the interest of justice and will avoid a miscarriage of justice.

10    Further, it would be inappropriate for the plaintiffs to have to bear the burden of proceeding with their appeal in the view of the binding decision made of the Court of Appeal in the *Caneast* case.

11    Also, to require the plaintiffs to proceed with their appeal in these circumstances would be unjust and contrary to the basic objective of the *Class Proceedings Act, 1992* which is to promote amongst other factors judicial economy.

12    On June 26, 2008 I gave an oral decision in this matter granting the motion to the plaintiffs. My endorsement reads as follows:

> June 26, 2008
>
> Motion granted. Having read the reasons of the Court of Appeal in Caneast and Lombard the Rule 21 motion on reconsideration is dismissed with costs to the plaintiff. Full reasons to follow. Ms. Sharpe has advised the court that she will argue in her cost submissions that there should be no order as to costs. Mr. Robins indicated he therefore would make submissions that he is entitled to costs.

13    The reasons herein provide additional details in support of the above endorsement.

---

**End of Document**    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

---

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    3

# TAB 20

2013 WL 6852047

2013 WL 6852047
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.

Ashley R. Malandrino, f/k/
a/ Ashley R. Gilliss, Plaintiff,
v.
Michael J. Astrue, Commissioner
of Social Security, Defendant.

C.A. No. 10–670–LPS    |    Filed 12/27/2013

**Attorneys and Law Firms**

Stephen A. Hampton, Grady & Hampton, Dover, DE, for
Plaintiff.

Dina White Griffin, Heather Benderson, Patricia Anne
Stewart, Social Security Administration, Philadelphia, PA,
for Defendant.

### *MEMORANDUM ORDER*

LEONARD P. STARK, UNITED STATES DISTRICT
JUDGE

**\*1** At Wilmington this 27th day of December, 2013:

IT IS HEREBY ORDERED that;

1. Defendant's Motion to Alter or Amend Judgment Pursuant
to Rule 59(e) of the Federal Rules of Civil Procedure (D.I.
26) is DENIED.

2. Pursuant to Local Rule 7.1.5, a motion for reconsideration,
including a motion brought pursuant to Rule 59(e) to alter
or amend judgment, should be granted only "sparingly."
*See generally* *MobileMedia Ideas, LLC v. Apple, Inc.,* 2013
WL 4764037, at \*2 (D.Del. Sept. 5, 2013) ("A motion
for reargument under Local Rule 7.1.5 is the functional
equivalent of a motion to alter or amend judgment under
Federal Rule of Civil Procedure 59(e). The standard for
obtaining relief under Rule 59(e) is difficult to meet.")
(internal quotation marks and citation omitted). The decision
to grant such a motion lies squarely within the discretion
of the district court. *See* *Dentsply Int'l Inc. v. Kerr Mfg.
Co.,* 42 F.Supp.2d 385, 419 (D.Del. 1999); *Brambles USA,
Inc. v. Blocker,* 735 F.Supp. 1239, 1241 (D.Del.1990).

These types of motions are granted only if the court has
patently misunderstood a party, made a decision outside
the adversarial issues presented by the parties, or made an
error not of reasoning but of apprehension. *See* *Schering
Corp. v. Amgen, Inc.,* 25 F.Supp.2d 293, 295 (D. Del.
1998); *Brambles,* 735 F.Supp. at 1241. "A motion for
reconsideration is not properly grounded on a request that
a court rethink a decision already made." *Smith v. Meyers,*
2009 WL 5195928, at \*1 (D.Del. Dec. 30, 2009); *see
also* *Glendon Energy Co. v. Borough of Glendon,* 836 F.
Supp. 1109, 1122 (E.D.Pa.1993). It is not an opportunity
to "accomplish repetition of arguments that were or should
have been presented to the court previously." *Karr v. Castle,*
768 F. Supp. 1087, 1093 (D.Del.1991). A party may seek
reconsideration only if it can show at least one of the
following: (i) there has been an intervening change in
controlling law; (ii) the availability of new evidence not
available when the court made its decision; or (iii) there
is a need to correct a clear error of law or fact to prevent
manifest injustice. *See* *Max's Seafood Cafe ex rel. LouAnn,
Inc. v. Quinteros,* 176 F.3d 669, 677 (3d Cir.1999). In no
instance should reconsideration be granted if it would not
result in amendment of an order. *See* *Schering Corp.,* 25 F.
Supp.2d at 295.

3. Defendant has failed to show that the requirements for
altering or amending judgment are met here. In its September
18, 2012 opinion and order, the Court held that Defendant's
motion for summary judgment would be denied to the extent
that remand was required to permit the Administrative Law
Judge ("ALJ") to make a determination of disability based on
a hypothetical question to a vocational expert that included
all of Plaintiff's limitations, including an accurate statement
of her educational experience. (*See* D.I. 23 at 20–21; D.I.
24) In its present motion, Defendant argues that the Court
committed a clear error of law when it "found that it was
not harmless error for the ALJ to state in the hypothetical
question that Plaintiff had a 'twelfth grade education.' " (D.I.
26 at 1) The Court has already rejected this contention. (*See*
D.I. 23 at 21) ("Reviewing the entire record here, the Court
does not agree that the error was harmless."). As noted above,
Defendant's instant motion does not present an occasion on
which it is appropriate to repeat an argument previously
made and rejected by the Court. (*See also* D.I. 29–1 at 1–2)
(explaining that ALJ's error was not harmless) It remains the
Court's view that this case should be remanded so that the
ALJ can obtain the assistance of a vocational expert opinion
that is unambiguously based on all of Plaintiff's limitations,

**Malandrino v. Astrue, Not Reported in F.Supp.2d (2013)**

2013 WL 6852047

including an unambiguous statement as to her educational experience.

---

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 21

Case 09-10138-MFW   Doc 15740   Filed 06/12/15   Page 243 of 304

Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros, 176 F.3d 669 (1999)

50 U.S.P.Q.2d 1665

KeyCite Yellow Flag - Negative Treatment
**Declined to Extend by** Long v. Atlantic City Police Dept., 3rd Cir.
(N.J.), February 13, 2012

176 F.3d 669
United States Court of Appeals,
Third Circuit.

MAX'S SEAFOOD CAFE, by LOU–ANN,
INC., successor to Max's Seafood Cafe, Inc.
v.
Max QUINTEROS; Jack–Mack, LLC; and all others
in active concert or participation with Appellants,
jointly, severally, and in the alternative, Appellants.

No. 98–5287.   |   Argued Jan.
25, 1999.   |   Filed May 5, 1999.

Operator of restaurant brought contempt proceeding alleging that individual who operated competing restaurant, and corporation formed by that individual, violated consent order entered by individual and operator's predecessor in trademark infringement action. The United States District Court for the District of New Jersey, Stanley S. Brotman, J., held both individual and corporation in civil contempt for violation of consent order, and they appealed. The Court of Appeals, Sloviter, Circuit Judge, held that: (1) individual could not be held liable for violations of consent order by his business associate; (2) corporation was not liable for violations by associate; and (3) corporation could raise defense based on when it came into existence in motion for reconsideration.

Reversed and remanded.

West Headnotes (9)

**[1]** **Federal Courts**
👉 New Trial, Rehearing, or Reconsideration

**Federal Courts**
👉 Altering, amending, modifying, or vacating judgment or order;  proceedings after judgment

Court of Appeals generally reviews the district court's denial of reconsideration for abuse of discretion, but, to the extent that the denial is predicated on an issue of law, such an issue is reviewed de novo; to the extent that the district

court's disposition of the reconsideration motion is based upon a factual finding, it is reviewed for clear error.

124 Cases that cite this headnote

**[2]** **Federal Civil Procedure**
👉 Compliance;  enforcement

Individual who entered consent decree, in trademark infringement action, prohibiting individual, and those in active concert and participation with him, from using name "Max" in connection with restaurant business and from referring to individual as the original or genuine Max, could not be held liable for conduct of individual's business associate that violated decree, absent evidence that individual instigated, endorsed, or ratified associate's violations.

Cases that cite this headnote

**[3]** **Federal Civil Procedure**
👉 Construction and operation

Terms of consent judgments are construed strictly.

Cases that cite this headnote

**[4]** **Federal Civil Procedure**
👉 Construction and operation

Court discerns the scope of a consent judgment by reviewing what is within the four corners of the consent, not by reference to what might satisfy the purposes of one of the parties to it.

1 Cases that cite this headnote

**[5]** **Contempt**
👉 Persons liable

One with knowledge of a court order who abets another in violating the order is surely in contempt.

4 Cases that cite this headnote

**[6]** **Federal Civil Procedure**

Case 09-10138-MFW   Doc 15740   Filed 06/12/15   Page 244 of 304

Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros, 176 F.3d 669 (1999)

50 U.S.P.Q.2d 1665

👉 **Compliance; enforcement**

Corporation formed by individual that had entered consent decree with restaurant operator, which prohibited individual from using name "Max" in connection with restaurant business and from referring to himself as the original or genuine Max, could not be held in contempt based on violations of decree by individual's former business associate, where corporation did not exist as an entity at time of associate's contemptuous statements.

4 Cases that cite this headnote

[7] **Federal Civil Procedure**

👉 **Compliance; enforcement**

Corporation formed by individual that had entered consent decree with restaurant operator, which prohibited individual from using name "Max" in connection with restaurant business and from referring to himself as the original or genuine Max, was entitled to offer its date of incorporation into evidence on motion for reconsideration, as defense to contempt liability for statements of individual's former business associate that violated decree, to avoid clear error of law and fact, particularly since there was no evidence offered against corporation at contempt hearing.

27 Cases that cite this headnote

[8] **Federal Civil Procedure**

👉 **Grounds and Factors**

A judgment may be altered or amended if the party seeking reconsideration shows at least one of the following grounds: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion for summary judgment; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice.

2045 Cases that cite this headnote

[9] **Corporations and Business Organizations**

👉 **Assumption of or Succession to Transferor's Liabilities**

Successorship liability, where applicable, is imposed only after a full hearing with specific attention given to the details of the arrangements between the parties and full findings of fact that the parties have had an opportunity to address.

Cases that cite this headnote

**Attorneys and Law Firms**

*\*671* Scott R. Knapp (Argued), Steven J. Fram, Archer & Greiner Haddonfield, New Jersey, for Appellants.

Carlo Scaramella (Argued), Scott Freemann, Hunt & Scaramella, Cherry Hill, New Jersey, for Appellee.

Before: SLOVITER, McKEE and RENDELL, Circuit Judges.

**OPINION OF THE COURT**

SLOVITER, Circuit Judge.

**I.**

*INTRODUCTION*

Max Quinteros and Jack–Mack Seafood, LLC ("Jack–Mack") appeal from the District Court's order holding them in civil contempt for violations of a consent order to which Quinteros was a party. Quinteros urges that the District Court erred in holding him liable for Frank Miraglia's violations of that consent order. The other appellant, JackMack, complains that because it was not in existence at the time of the contumacious acts in question, the District Court erred in holding it in contempt. We consider their contentions in turn.

**II.**

*BACKGROUND*

Max's Seafood Cafe is a well-known restaurant in Gloucester City, New Jersey, that had been in operation under that name since at least 1940. Max Quinteros, who had purchased the restaurant in 1977, sold it to Lou–Ann, Inc. ("Lou–Ann") in

1983, who in turn sold it to Stephen Renzi. Several years later, in 1990, Renzi sued Quinteros for trademark infringement. The complaint alleged that, in operating a competing restaurant nearby, Quinteros was breaching his agreement to transfer to the purchaser all goodwill associated with Max's Seafood Cafe and all rights in the trade name "Max's." The lawsuit resulted in a consent order entered in June 1990—signed by Quinteros—that enjoins "Max Quinteros, their [sic] employees, agents, servants and all others in active concert or participation with Defendants" from "(1) Using the name 'The Original Max's Seafood,' ... 'Max's Cafe,' 'Max's,' 'Max,' ... or any confusingly similar designation or name or mark ... [t]o market, designate, or identify Defendants' restaurant business or vocation," and "(2) Communicating to any person ... that one or more Defendants are the 'original' or 'authentic' or 'genuine' Max, or any indication of present association with [plaintiff's restaurant]." The consent order further provides that Quinteros can use the name "Max" in advertisements, provided it is followed immediately by "Quinteros." *Max's Seafood Cafe, Inc. v. Jim E. Kay, Inc.,* Civ. Action No. 90–2137(SSB) (D.N.J. June 13, 1990). The court retained jurisdiction over enforcement of the consent decree.

Lou–Ann repurchased Max's Seafood Cafe from Renzi in 1992. Louis and Antoinette Del Brocco are the principal shareholders of Lou–Ann, Inc. In 1995, Quinteros began operating the kitchen of an establishment owned by Frank Miraglia called "Frank's Place;" the restaurant part of the operation was called "Bayshore Seafood Restaurant." The Del Broccos' attorney sent Quinteros a letter on June 29, 1995, complaining that Quinteros was telling people that he was "the original Max" associated with Max's Seafood Cafe and directing him to cease and desist. The Del Broccos did not pursue the matter further until 1997.

Quinteros, who left the Bayshore establishment for one month in a dispute with Miraglia, finally quit in August of 1996 because, according to Quinteros, Miraglia had not followed through on his promise to make Quinteros a full partner. In 1997, however, Quinteros and his wife returned to the Bayshore, at which point they, **\*672** through a newly formed corporation, appellant Jack–Mack Seafood, LLC, purchased the business on April 23, 1997. The new entity dropped the name "Frank's Place" and began placing advertisements which stated that the Bayshore Seafood Restaurant and Tavern was under new management and which identified Max Quinteros by name.

The contempt proceeding that is the subject of this appeal was initiated when Lou–Ann, proceeding in the name Max's Seafood Cafe, [1] filed an "order to show cause" in the District Court on September 3, 1997, seeking to have Quinteros and Jack–Mack, the new corporation, held in contempt. The District Court held a hearing on October 14, 1997. The gravamen of Lou–Ann's complaint at the hearing was that Quinteros had been violating the consent order since April 1995 by referring to himself as "the original Max," and, after his purchase of the restaurant, by placing advertisements which set the word "Max" in letters larger than the word "Quinteros." Lou–Ann further alleged that Jack–Mack was liable "on an aiding and abetting theory." Lou–Ann did not specify which acts it alleged Jack–Mack aided and abetted. Testimony was taken from several witnesses, including Max Quinteros, Frank Miraglia, and Louis Del Brocco.

[1]    For convenience, we will refer to the plaintiff-appellee as Lou–Ann throughout.

The District Court issued its decision on December 18, 1997. The court concluded that the print advertisements did not violate the consent order. *Max's Seafood Cafe v. Quinteros,* Civ. No. 90–2137(SSB), slip op. at 11 (D.N.J. Dec. 18, 1997). The court found the testimony regarding Quinteros's alleged oral communications to be "unclear and imprecise," "lack[ing in] specificity," and "no better than vague." *Id.* at 7. It noted that none of Lou–Ann's witnesses alleged that any of these oral communications had occurred after August 1996, and it concluded that the contempt allegations relating to Quinteros's alleged statements were barred by the doctrine of laches (a ruling that is not cross-appealed). The court did find, however, that there was clear and convincing evidence "that Frank Miraglia did, on approximately twenty-five (25) occasions, refer to Max Quinteros as the 'original Max' to customers," but that "[I]t has not been clearly established that Max Quinteros ever referred to himself that way." *Id.*

Nonetheless, the District Court found Quinteros liable for Miraglia's statements because Quinteros and Miraglia had split profits from the restaurant. The court stated: "Max Quinteros had influence with Frank Miraglia. He was not a mere 'employee' who simply had no control whatsoever over the actions of Frank Miraglia." *Id.* at 8. The court further found that "Quinteros told Frank Miraglia that he could not introduce Quinteros as the 'original Max,' " but that "[a]fter being advised that he could not introduce Max Quinteros as the 'original Max,' Frank Miraglia nevertheless continued to introduce Max Quinteros as the 'original Max.'

Case 09-10138-MFW   Doc 15740   Filed 06/12/15   Page 246 of 304

Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros, 176 F.3d 669 (1999)

50 U.S.P.Q.2d 1665

Thus, whatever efforts Max Quinteros made to prevent Frank Miraglia from violating the order were ineffective and inadequate. Max Quinteros knew that simply telling Frank Miraglia to stop ... had been ineffective, yet he took no other steps to curb Frank Miraglia's conduct." *Id.* The court ultimately concluded that Max Quinteros was liable in contempt "for his ineffective efforts at ensuring Miraglia's compliance." *Id.* at 18.

Additionally, the court found Jack–Mack in contempt, although there is no discussion in the court's memorandum opinion disclosing the rationale for this decision. As a remedy, the court ordered that advertisements for the Bayshore include the words "not affiliated with Max's Seafood Cafe," fined Quinteros and Jack–Mack each $25 (representing $1 for each of Miraglia's statements), and awarded attorney's fees to Lou–Ann pursuant to the consent order, the amount to be determined after the submission of a fee petition. **673** *Id.* at 24–27. Lou–Ann submitted a fee petition, to which Quinteros and JackMack filed objections. The fee issue is currently pending, and the District Court reserved decision pending this appeal.

Quinteros and Jack–Mack moved for reconsideration. They argued that (1) Quinteros cannot be held liable for Miraglia's violations of the consent decree merely because of the business association between them, (2) Jack Mack cannot be held liable because it was not in existence at the time of the violations, having been incorporated only in June 1997, and (3) the District Court erred in not holding Frank Miraglia in contempt. The District Court denied the motion, concluding that the movants had not satisfied the standard for granting of reconsideration on any of the issues raised. *Max's Seafood Cafe v. Quinteros,* Civ. No. 90–2137(SSB), (D.N.J. May 1, 1998). Quinteros and JackMack timely brought this appeal.

## III.

### DISCUSSION

Quinteros and Jack–Mack assign four errors to the District Court: They argue that the court (1) erred as a matter of law in finding Quinteros in contempt on the basis of statements made by Miraglia; (2) erred as a matter of law in finding Jack–Mack in contempt based upon statements made by a third party before the entity was formed; (3) erred in failing to find plaintiff's entire claim barred under the doctrine of laches; and (4) erred in failing to award attorney's fees to Quinteros

and Jack–Mack as successful parties with respect to the print advertisements issue.

 **[1]**   The first issue, presenting a question of law, is subject to plenary review. *See Harris v. City of Philadelphia,* 47 F.3d 1333, 1338 (3d Cir.1995). The second issue presents a mixed question of law and fact, but it was raised for the first time in appellants' motion for reconsideration. We generally review the District Court's denial of reconsideration for abuse of discretion. *See North River Ins. Co. v. CIGNA Reinsurance Co.,* 52 F.3d 1194, 1203 (3d Cir.1995). However, to the extent that the denial of reconsideration is predicated on an issue of law, such an issue is reviewed *de novo;* to the extent that the District Court's disposition of the reconsideration motion is based upon a factual finding, it is reviewed for clear error. *Id.* The abuse of discretion standard applies to the laches and attorney's fee issues as well. *See Bermuda Express, N.V. v. M/ V Litsa,* 872 F.2d 554, 557 (3d Cir.1989). We address these questions in turn.

### A.

### *Quinteros*

 **[2]**   Quinteros argues that the District Court erred in finding him in contempt, given that the only violations of the consent order that the court found had been committed by Miraglia, not Quinteros. As stated above, the District Court concluded that Quinteros was "in contempt for his ineffective efforts at ensuring Miraglia's compliance." *Max's Seafood Cafe v. Quinteros,* Civ. No. 90–2137(SSB), slip op. at 18 (D.N.J. Dec. 18, 1997).

 **[3]**   **[4]**   At the outset, we note that the consent order does not impose upon Quinteros a duty to police Miraglia's, or any other person's, compliance with the injunction. It simply enjoins Quinteros, and anyone legally associated with him, from violating its terms. We construe the terms of consent judgments strictly. *See Harley–Davidson, Inc. v. Morris,* 19 F.3d 142, 148 (3d Cir.1994). We "discern the scope of a consent judgment by review [ing] what is within the four corners of the consent, not by reference to what might satisfy the purposes of one of the parties to it." *Id.* (internal quotation marks omitted). Accordingly, because the District Court did not find any acts on the part of Quinteros that violated the terms of the court's order, Quinteros's liability may only be established on an aiding and **674** abetting theory or on some rule of imputation.

50 U.S.P.Q.2d 1665

The District Court reasoned, and Lou–Ann urges, that a finding of contempt as to Quinteros is appropriate because of his business association with Miraglia. The court found that the fact that Quinteros and Miraglia shared profits supported the imputation of contempt liability. Neither the District Court nor Lou–Ann has offered any authority for the proposition that the business association between two individuals, standing alone, is a sufficient ground for holding one in contempt for acts committed by another. Nor have we found any such authority.

 [5]   One with knowledge of a court order who abets another in violating the order is surely in contempt. *See Roe v. Operation Rescue,* 54 F.3d 133, 140 (3d Cir.1995); *Quinter v. Volkswagen of Am.,* 676 F.2d 969, 972 (3d Cir.1982). As we have stated: "The law does not permit the instigator of contemptuous conduct to absolve himself of contempt liability by leaving the physical performance of the forbidden conduct to others." *Roe v. Operation Rescue,* 919 F.2d 857, 871 (3d Cir.1990). But the District Court did not find that Quinteros instigated, endorsed, or ratified Miraglia's violations. Nor is there any evidence of record that would permit a reasonable fact-finder to so conclude. Quite the contrary: the District Court found that Quinteros exhorted Miraglia to cease violating the order, and the record plainly supports this finding. We therefore reject the argument that Quinteros's business association with Miraglia alone, in the absence of a finding that Quinteros acted to aid or abet Miraglia's violations, establishes Quinteros's liability for Miraglia's acts.

Lou–Ann emphasizes that the order enjoined not only Quinteros, the only person named in the injunction, but also "all those in active concert and participation" with him. In its opinion, the District Court's also used this rationale, stating, "[t]he Court can think of no better example of 'in active concert and participation' as the profit-sharing business partnership these two men had together." *Max's Seafood Cafe v. Quinteros,* Civ. No. 90–2137(SSB), slip op. at 16 (D.N.J. Dec. 18, 1997). In deciding the motion for reconsideration shortly thereafter, the District Court expressly disavowed resting its holding on a finding that Quinteros and Miraglia were partners: "while the Court acknowledges Miraglia's sole ownership and Quinteros's failed attempt at obtaining partnership recognition, there is no need to delve into the distinctions associated with various business organizations.... The Court does not read the term 'in active concert or participation' to require a finding of the existence of a partnership." *Max's Seafood Cafe v. Quinteros,* Civ. No. 90–2137(SSB), slip op. at 5 (D.N.J. May 1, 1998).

Whether the business relationship between Quinteros and Miraglia was a partnership or not, the inclusion of the phrase of art "in active concert or participation" in the consent order does not support the District Court's conclusion that Quinteros can be held liable for Miraglia's statements. The term "active concert and participation" merely speaks to the question of the persons who can permissibly be bound by an injunction. This is a limitation built into the Federal Rules of Civil Procedure for reasons of due process. *See* Fed.R.Civ.P. 65(d) ("[O]rder granting an injunction ... is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them...."); *Alemite Mfg. Corp. v. Staff,* 42 F.2d 832, 832 (2d Cir.1930) ( "[A court] cannot lawfully enjoin the world at large, no matter how broadly it words its decree."). Thus, a finding that Miraglia was in active concert or participation with Quinteros would support a finding that Miraglia, though not a party, **\*675** could be bound by the injunction.[2] "Active concert or participation" does not, however, speak at all to the question of vicarious liability for another's violation of an order.

2      The District Court, though noting that Miraglia was bound by the injunction, expressly declined to adjudicate Miraglia a contemnor out of concern about Miraglia's lack of representation at the contempt hearing and the unfair surprise that might attend a finding of contempt on the part of Lou–Ann's principal witness. No party has appealed this ruling.

Lou–Ann argues that Quinteros's position should be analogized to that of a union, which can be held liable for contumacious strike activity by members in some circumstances. In support of this contention, Lou–Ann cites two cases in which this court held unions liable for failing to take measures to prevent unlawful strikes. *See Eazor Express, Inc. v. International Brotherhood of Teamsters,* 520 F.2d 951, 959–60 (3d Cir.1975), ("[A] union may not disclaim responsibility [for wildcat strikes by its members] unless and until it has exhausted all reasonable means within its power to bring that unlawful action to an end."), and *United States Steel Corp. v. UMWA,* 534 F.2d 1063 (3d Cir.1976) (same).

We note at the outset that some of the doctrines that evolved in the federal labor law arena do not necessarily lend themselves to application in other contexts. Questions concerning the appropriateness and reach of the courts' equitable powers in

Case 09-10138-MFW   Doc 15740   Filed 06/12/15   Page 248 of 304

Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros, 176 F.3d 669 (1999)

50 U.S.P.Q.2d 1665

the labor setting involve policy judgments that are particular to that context. Indeed, many of these questions are subject to statute, in particular the Norris–LaGuardia, Taft–Hartley, and Landrum–Griffin Acts. [3] Thus, one cannot automatically draw an analogy between a union and its officers and members on the one hand, and an individual who shares profits with another in a business association, on the other hand.

[3]     *See* 29 U.S.C. § 106 ("No[labor organization] participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof."); 29 U.S.C. § 160(*l*) (governing injunctions for secondary activity); 29 U.S.C. § 185(b) (governing responsibility of unions for acts of agents).

An even more telling reason for us to decline Lou–Ann's invitation to extend the holdings of *Eazor* and *United States Steel* is that the Supreme Court disagreed with this court's conclusions in those cases in *Carbon Fuel Co. v. UMWA,* 444 U.S. 212, 215 & n. 4, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979). In *Carbon Fuel,* the Court held that courts cannot imply an obligation on a union to use all reasonable means to prevent and end strikes that it did not authorize, participate in, or ratify. Justice Brennan, writing for the Court, pointed out that the LMRA makes "clear that Congress [has] limited the responsibility of unions for strikes in breach of contract to cases when the union may be found responsible according to the common-law rule of agency." *Id.* at 216. Because the principles that Lou–Ann urges us to apply in this setting no longer have application even within the context in which they were developed, they must perforce be rejected as a basis for finding liability here.

Accordingly, we turn for guidance to cases that concern the question of vicarious liability for contumacious conduct in the business-association setting. There is a body of case law that deals with the subject, although not referred to by either party. In *Wilson v. United States,* 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (1911), the Supreme Court affirmed a contempt judgment against a corporation's president for the corporation's failure to comply with a subpoena. "A command to the corporation," the *Wilson* Court held, "is in effect a command to those who are officially responsible for the conduct of its affairs. If they, apprised of the writ directed to the corporation, prevent compliance or fail to take appropriate

action within their power **\*676** for the performance of the corporate duty, they, no less than the corporation itself, are guilty of disobedience, and may be punished for contempt." *Id.* at 376.

The Court of Appeals for the Fourth Circuit took guidance from *Wilson* in *Colonial Williamsburg Foundation v. Kittinger Co.,* 38 F.3d 133 (4th Cir.1994). That case, like the one before us, involved alleged violations of a consent judgment in a trademark infringement suit. The District Court entered a consent judgment permanently enjoining Kittinger, the former licensee of Colonial Williamsburg, from using the names or marks of Colonial Williamsburg furniture and from manufacturing or selling Colonial Williamsburg products. Finding that the injunction had been violated in several respects by functionaries of Kittinger, the District Court found the corporation, its president, Michael Carlow, and its vice-president, Nicholas Defino, in contempt for violating the judgment. On appeal, Carlow argued that he was not properly found in contempt because "the district court made no specific findings of misconduct with regard to him and premised its finding of contempt on the fact that he, as President of Kittinger, had not done enough to guarantee compliance with the consent judgment." *Id.* at 136. Carlow further urged in his defense that he had delegated the day-to-day activity of running the business to Defino. *Id.*

The Court of Appeals for the Fourth Circuit rejected Carlow's arguments. After noting that Carlow did not read the judgment even though it was served on him, and subsequently signed a letter that specifically referenced Kittinger's former relationship with Colonial Williamsburg, the court ruled:

> As President of Kittinger, Carlow was charged with the responsibility of ensuring that Kittinger complied with the consent judgment, and he did nothing to ensure compliance. While he couches his inaction as a proper delegation of authority to Defino, we are of [the] opinion that his actions evidence a studied disregard of a court order....

*Id.* at 137.

The distinction between the present case and both *Wilson* and *Colonial Williamsburg* is plain. In both of those cases, the individuals who were held responsible for their corporations' contumacy were the chief executive officers of

Case 09-10138-MFW   Doc 15740   Filed 06/12/15   Page 249 of 304

Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros, 176 F.3d 669 (1999)

those entities. There is no finding in this case suggesting that Quinteros had similar responsibility for Frank's Place. In fact, as noted above, the District Court was chary of characterizing Quinteros as a partner, notwithstanding evidence that Quinteros received a percentage return. We need not consider whether partner status would have altered the analysis because the court made no finding that a partnership had been established.

And, unlike the company president in *Colonial Williamsburg,* who failed to read the court order and was thus found to have exercised "studied disregard" of the injunction, Quinteros, by contrast, both read the injunction and, as the District Court found, told Miraglia to stop referring to him as "the original Max." There is, in short, nothing in the record suggesting that Quinteros should be liable on the basis of an agency relationship.

Finally, Lou–Ann urges that a finding of contempt on the part of Quinteros is justified because Quinteros failed to meet his "burden of showing that [he has] made 'in good faith all reasonable efforts to comply.' " Appellee's Br. at 20 (quoting *Harris v. City of Philadelphia,* 47 F.3d 1311, 1324 (3d Cir.1995)). The *Harris* opinion is inapplicable.

*Harris* was the product of litigation involving the Philadelphia Prison system, which resulted in a number of opinions by this court. In the *Harris* opinion referred to, we upheld the District Court's finding that the City of Philadelphia was in contempt for its delay in producing documents in accord with deadlines set forth in a consent decree between the City and the **\*677** plaintiffs. *Id.* at 1324. We acknowledged that "[t]here is general support for the proposition that a defendant may not be held in contempt as long as it took all reasonable steps to comply," *id.,* but concluded on the record before us that the City had not shown "that it was in fact unable to comply" or that it had "good cause for [its] failure to comply" as required by the consent decree, *id.* at 1325. *Accord Harris v. City of Philadelphia,* 47 F.3d 1333, 1340–41 (3d Cir.1995) (employing same analysis with respect to violation of consent decree provision relating to occupancy levels in drug treatment facility).

Unlike *Harris,* where the City was attempting to avoid liability for its own violations of the order, here the terms of the consent order did not put Quinteros under an obligation to take steps to prevent Miraglia, or anyone else, from violating the order. Whatever attempts Quinteros made to stop Miraglia from violating the order were not commanded by court order,

and he cannot be held in contempt merely because the efforts he did make failed to accomplish the end sought. And, as is evident from the *Harris* opinion, it is not ordinarily the alleged contemnor's burden to show compliance. The *Harris* burden only applies to alleged contemnors who assert, as a defense to contempt liability, that adherence to the order is not possible. That is not the case in the instant matter, and therefore *Harris* is inapposite.

Because all of the possible bases for imputation of liability on Quinteros are inapplicable, we conclude that the District Court erred in finding Quinteros in contempt for Miraglia's violations of the consent order.

## B.

### *Jack–Mack*

[6] Jack–Mack argues that because it did not exist as an entity at the time of Miraglia's contemptuous statements about Quinteros, the District Court erred when it found Jack–Mack was also in contempt for Miraglia's statements. Jack–Mack notes that the District Court found that the contumacious acts occurred before August 1996, whereas its certificate of incorporation demonstrates that it came into existence on February 24, 1997, considerably after the events in question. And it is uncontested that promptly after Quinteros, through Jack–Mack, bought the restaurant from Miraglia on April 23, 1997, Miraglia was, in the District Court's words, "out of the picture." *See Max's Seafood Cafe v. Quinteros,* Civ. No. 90–2137(SSB), slip op. at 5 (D.N.J. Dec. 19, 1997). By then, of course, the contemptuous acts and statements by Miraglia had been discontinued. There is therefore nothing on the record showing any relationship between Jack–Mack and Miraglia to support the imposition of liability on Jack–Mack for Miraglia's contumacious statements.

[7] In an effort to sustain the District Court's decision, LouAnn argues that the District Court was not required to take cognizance of Jack–Mack's date of incorporation because Jack–Mack failed to proffer its certificate of incorporation until it filed its motion for reconsideration. We do not regard Jack–Mack's failure to raise the issue of its subsequent incorporation during the contempt proceedings to be fatal to its defense in this case.

[8] "The purpose of a motion for reconsideration," we have held, "is to correct manifest errors of law or fact or to present

50 U.S.P.Q.2d 1665

newly discovered evidence." *Harsco Corp. v. Zlotnicki,* 779 F.2d 906, 909 (3d Cir.1985). Accordingly, a judgment may be altered or amended if the party seeking reconsideration shows at least one of the following grounds: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion for summary judgment; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice. *See North River Ins. Co. v. CIGNA Reinsurance Co.,* 52 F.3d 1194, 1218 (3d Cir.1995).

 **\*678**  In denying reconsideration to Jack–Mack on this issue, the District Court ruled that there was no intervening change in controlling law or newly discovered evidence; it failed to address the third issue: whether holding JackMack in contempt resulted in a clear error of law or fact or resulted in a manifest injustice. Although we have pointed out that "[c]ourts often take a dim view of issues raised for the first time in post-judgment motions," *Kiewit E. Co., Inc. v. L & R Constr. Co., Inc.,* 44 F.3d 1194, 1204 (3d Cir.1995), in this case the issue that Jack–Mack sought to raise as a defense in its motion for reconsideration was so fundamental, i.e., that Jack–Mack had not come into being until more than six months after the last of Miraglia's contumacious acts, that it was not consistent with the wise exercise of discretion for the District Court to have declined even to consider it. As we have previously emphasized, reconsideration is the appropriate means of bringing to the court's attention manifest errors of fact or law. *See Harsco,* 779 F.2d at 909.

In the circumstances of this case, it is not surprising that Jack–Mack did not produce its certificate of incorporation at the contempt hearing. Although Jack–Mack was named by Lou–Ann in this "order to show cause," and Lou–Ann's counsel stated at the beginning of the hearing that it sought to hold Jack–Mack liable "on an aiding and abetting theory," there was no evidence produced to support liability on this basis. Inasmuch as Lou–Ann bore the burden to prove contempt liability by clear and convincing evidence, Jack–Mack may well have believed that in light of the lack of any evidence against it, there was no need to raise its incorporation date as a defense.

Once the evidence is considered, the force of Jack–Mack's argument that it may not be held for Miraglia's acts and statements is clear. The evidence showed, and the District Court was aware at the time of the contempt hearing, that Jack–Mack did not come on the scene until its purchase of the restaurant in April 1997, at which point Miraglia was no longer associated with the restaurant.

 **[9]**  Lou–Ann also urges, for the first time on appeal, that we may affirm the District Court's judgment with respect to Jack–Mack on a theory that was neither raised in nor addressed by the District Court, namely that of "successor liability." However, successorship liability, where applicable, is imposed only after a full hearing with specific attention given to the details of the arrangements between the parties and full findings of fact that the parties have had an opportunity to address. *See, e.g., Stardyne, Inc. v. NLRB,* 41 F.3d 141, 151 (3d Cir.1994); *Systems Management, Inc. v. NLRB,* 901 F.2d 297, 301–05 (3d Cir.1990). This case is devoid of any such record.

Lou–Ann does not suggest that the District Court found Jack–Mack liable as a successor. Instead, it argues disingenuously that there was sufficient evidence to hold Jack–Mack liable for contempt, apparently suggesting that the District Court could have, had it focused on the issue, found Jack–Mack to be a successor. But Lou–Ann's position on the successorship issue is vague, at best. It argues merely that Jack–Mack "was a successor to Quinteros' prior attempts to operate a Bayshore restaurant in Gloucester City," Appellee's Br. at 21, and that "Jack–Mack is the present incarnation of Max Quinteros' effort to own and operate a seafood restaurant in Gloucester City," *id.* at 22. This would be a casual and indefinite basis on which to impose liability, and Lou Ann's one-paragraph discussion of it in its brief demonstrates it does not base much reliance on it.

Nor do the two cases that it cites in that brief discussion mandate a different result. The case before us is not one in which we are dealing with a violation of a continuing nature, as in *Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973), nor is it one in which the defendant operates as "merely a disguised **\*679** continuance of the old employer," *see Regal Knitwear Co. v. NLRB,* 324 U.S. 9, 14, 65 S.Ct. 478, 89 L.Ed. 661 (1945) (internal quotation marks omitted).

The District Court did not find any ongoing conduct by Jack–Mack that would support contempt liability. Nor would the record have supported such a finding. JackMack is a limited liability company owned by Max Quinteros and his wife. Through this entity, Quinteros bought the restaurant from Miraglia. Until that purchase, as the District Court found, the business was a sole proprietorship owned by

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 251 of 304

Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros, 176 F.3d 669 (1999)

50 U.S.P.Q.2d 1665

Miraglia. *See Max's Seafood Cafe v. Quinteros,* Civ. No. 90–2137(SSB), slip op. at 5 (D.N.J. May 1, 1998) ("[T]he Court acknowledges Miraglia's sole ownership...."). The only actions found to be violative of the order, Miraglia's statements, were of a discrete, rather than ongoing, nature, and ceased nearly one year before Jack–Mack acquired the business. In arguing that the contempt judgment against Jack–Mack be affirmed on the basis of successorship principles, Lou–Ann seeks to hold Jack–Mack responsible for past violations committed by Miraglia, the former owner, not for the kind of continuing violation at issue in *Golden State.*

There are substantial questions about the applicability of those two decisions in cases outside of the labor context, and because this rationale for liability was neither raised nor decided in the District Court, we will not undertake to consider those questions here.

We conclude, therefore, that Jack–Mack has shown that the District Court's order resulted in a clear error of law and fact and that the court's later refusal to reconsider the order was not consistent with the sound exercise of its discretion. Consequently, we conclude that the District Court erred in failing to grant reconsideration upon receiving evidence of Jack–Mack's incorporation date.

### C.

#### *Remaining Issues*

In light of our holding, we need not address the laches issue raised by appellants. It follows from our reversal of the decision holding appellants in contempt that the award of attorney's fees to Lou–Ann cannot stand.

Quinteros and Jack–Mack have argued on appeal that because they were successful parties with respect to LouAnn's print advertising claim, the District Court erred in failing to award counsel fees to them. They will undoubtedly extend that claim to the entire contempt order in light of our decision here. The consent order states, "in the event that any party seeks enforcement of this Order, the successful party or parties shall be awarded counsel fees." We will remand this issue to the District Court so that it can consider the applicability of that provision and conduct further proceedings pursuant thereto.

### IV.

#### *CONCLUSION*

For the foregoing reasons, the judgment of the District Court finding Quinteros and Jack–Mack in contempt will be reversed and the case remanded for proceedings consistent with this opinion.

**Parallel Citations**

50 U.S.P.Q.2d 1665

---

**End of Document**
© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 22

Case 09-10138-MFW   Doc 15740   Filed 06/12/15   Page 253 of 304

Montague v. Bank of Nova Scotia, 2004 CarswellOnt 11

2004 CarswellOnt 11, [2004] O.J. No. 13, 128 A.C.W.S. (3d) 93, 180 O.A.C. 381...

2004 CarswellOnt 11
Ontario Court of Appeal

Montague v. Bank of Nova Scotia

2004 CarswellOnt 11, [2004] O.J. No. 13, 128 A.C.W.S. (3d) 93, 180
O.A.C. 381, 2004 C.L.L.C. 210-027, 30 C.C.E.L. (3d) 71, 69 O.R. (3d) 87

# YVONNE MONTAGUE, ASQUITTE MONTAGUE, ANDREA MONTAGUE, YVETTE MONTAGUE, BRUCE MONTAGUE, JARVON SCHURTON, By his Litigation Guardian ANDREA MONTAGUE and TIANA SCHURTON, By her Litigation Guardian, ANDREA MONTAGUE (Plaintiffs / Appellants / Respondents by Cross-Appeal) and BANK OF NOVA SCOTIA (Defendant / Respondent / Appellant by Cross-Appeal)

Weiler, Laskin, Goudge JJ.A.

Heard: June 13, 2003
Judgment: January 7, 2004
Docket: CA C37146

Proceedings: affirming *Montague v. Bank of Nova Scotia* (October 23, 2001), Doc. C37146 (Ont. S.C.J.)**Proceedings: additional reasons to *Montague v. Bank of Nova Scotia* (2001), 2001 CarswellOnt 5894 (Ont. S.C.J.)**

Counsel: Yvonne Montague for herself
David E. Leonard for Respondent

Subject: Employment; Public; Civil Practice and Procedure

### Related Abridgment Classifications

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

### Headnote

**Civil practice and procedure --- Costs — Offers to settle or payment into court — Offers to settle — General principles**

Employee brought action for damages for wrongful dismissal — Employer admitted prior to trial that it did not have cause to dismiss employee — Trial judge found that employer acted precipitously and in bad faith and did not treat employee fairly in manner of her dismissal — Trial judge fixed reasonable notice period at 12 months and stated that in doing so she was increasing otherwise-appropriate notice period to take employer's bad faith into account — Counsel for employer then revealed to trial judge existence of unaccepted offer to settle for more than amount of judgment and sought partial indemnity costs from date of offer in amount of $5,000 pursuant to R. 49 of Ontario Rules of Civil Procedure — Trial judge indicated that she had made mistake and that she had intended to set reasonable notice period at 13 months — When defence counsel indicated that judgment was still less than offer to settle, trial judge awarded costs to defendant in amount of $5,000 — Four days later, before judgment was entered, trial judge recalled parties and stated that upon further reflection she felt that appropriate notice period, in absence of employer's bad faith, was 12 months and that notice period should be increased by four months to reflect employer's bad faith — As judgment based on 16-month notice period was greater than offer to settle, trial judge awarded employee costs on party and party basis throughout — Employee appealed and employer cross-appealed — Appeal and cross-appeal dismissed — Nothing in R. 49 prohibited trial judge from changing her order after existence of offer to settle was revealed to her and before judgment was entered — Record did not sustain conclusion that trial judge made changes in order to avoid cost consequences of R. 49 for employee — Had trial judge

2004 CarswellOnt 11, [2004] O.J. No. 13, 128 A.C.W.S. (3d) 93, 180 O.A.C. 381...

wished to alleviate consequences of R. 49 for employee she could have done so by using residual discretion given to her by R. 49 itself.

**Employment law --- Termination and dismissal — Notice — Considerations affecting length of notice — General**

Employee was employed by bank as data entry operator for 15 1/2 years — Employee was away from work as result of shoulder injury — Employee's claim for long-term disability benefits was denied by administrator of employer's long-term disability plan because it was inadequately supported by available medical information — Employer told employee that she was expected to return to her regular duties no later than July 22, 1991, failing which she would be assumed to have abandoned her employment — Employee notified employer that she had upcoming appointments with two doctors — Employer terminated employee's employment on day after her second medical appointment without acknowledging appointments or making inquiries about what plaintiff had learned or when resulting medical reports might be expected — Employee brought action for damages for wrongful dismissal — Employer admitted prior to trial that it did not have cause to dismiss employee — Trial judge found that employer acted precipitously and in bad faith and did not treat employee fairly in manner of her dismissal — Trial judge fixed reasonable notice period at 12 months and stated that in doing so she was increasing otherwise-appropriate notice period to take employer's bad faith into account — Counsel for employer then revealed to trial judge existence of unaccepted offer to settle for more than amount of judgment and sought partial indemnity costs from date of offer in amount of $5,000 pursuant to R. 49 of Ontario Rules of Civil Procedure — Trial judge indicated that she had made mistake and that she had intended to set reasonable notice period at 13 months — When defence counsel indicated that judgment was still less than offer to settle, trial judge awarded costs to defendant in amount of $5,000 — Four days later, before judgment was entered, trial judge recalled parties and stated that upon further reflection she felt that appropriate notice period, in absence of employer's bad faith, was 12 months and that notice period should be increased by four months to reflect employer's bad faith — As judgment based on 16-month notice period was greater than offer to settle, trial judge awarded employee costs on party and party basis throughout — Employee appealed and employer cross-appealed — Appeal and cross-appeal dismissed — Trial judge did not err in fixing reasonable notice period and it could not be said that 16 months' notice was outside acceptable range — Trial judge did not err in extending notice period because of employer's bad faith.

**Employment law --- Termination and dismissal — Practice and procedure — Remedies — Damages — Punitive or exemplary damages**

Employee was employed by bank as data entry operator for 15 1/2 years — Employee was away from work as result of shoulder injury — Employee's claim for long-term disability benefits was denied by administrator of employer's long-term disability plan because it was inadequately supported by available medical information — Employer told employee that she was expected to return to her regular duties no later than July 22, 1991, failing which she would be assumed to have abandoned her employment — Employee notified employer that she had upcoming appointments with two doctors — Employer terminated employee's employment on day after her second medical appointment without acknowledging appointments or making inquiries about what plaintiff had learned or when resulting medical reports might be expected — Employee brought action for damages for wrongful dismissal — Employer admitted prior to trial that it did not have cause to dismiss employee — Trial judge found that employer acted precipitously and in bad faith and did not treat employee fairly in manner of her dismissal — Trial judge found that reasonable notice period was 12 months and that it should be increased by four months to reflect employer's bad faith — Trial judge declined to award aggravated or punitive damages — Employee appealed — Appeal dismissed — Trial judge did not err in dismissing employee's claim for aggravated and punitive damages as there was ample evidence to support her conclusion that there was no malice or vindictiveness by employer and as employer's conduct did not constitute separately actionable wrong.

**Table of Authorities**

**Cases considered by *Goudge J.A.*:**

![Westlaw Next CANADA] Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2004 CarswellOnt 11, [2004] O.J. No. 13, 128 A.C.W.S. (3d) 93, 180 O.A.C. 381...

*Bardal v. Globe & Mail Ltd.* (1960), 1960 CarswellOnt 144, [1960] O.W.N. 253, 24 D.L.R. (2d) 140 (Ont. H.C.) — considered

*Holmes Foundry Ltd. v. Point Edward (Village)* (1963), [1963] 2 O.R. 404, 39 D.L.R. (2d) 621 (Ont. C.A.) — considered

*Minott v. O'Shanter Development Co.* (1999), 1999 CarswellOnt 1, 99 C.L.L.C. 210-013, 40 C.C.E.L. (2d) 1, 168 D.L.R. (4th) 270, 117 O.A.C. 1, 42 O.R. (3d) 321 (Ont. C.A.) — referred to

*Noseworthy v. Riverside Pontiac-Buick Ltd.* (1998), 1998 CarswellOnt 4889, 39 C.C.E.L. (2d) 37, 168 D.L.R. (4th) 629, 116 O.A.C. 265 (Ont. C.A.) — referred to

*R. v. Sheppard* (2002), 2002 SCC 26, 2002 CarswellNfld 74, 2002 CarswellNfld 75, 162 C.C.C. (3d) 298, 210 D.L.R. (4th) 608, 50 C.R. (5th) 68, 284 N.R. 342, 211 Nfld. & P.E.I.R. 50, 633 A.P.R. 50, [2002] 1 S.C.R. 869 (S.C.C.) — referred to

*Wallace v. United Grain Growers Ltd.* (1997), 152 D.L.R. (4th) 1, 219 N.R. 161, 1997 CarswellMan 455, 1997 CarswellMan 456, 123 Man. R. (2d) 1, 159 W.A.C. 1, 97 C.L.L.C. 210-029, [1997] 3 S.C.R. 701, 36 C.C.E.L. (2d) 1, 3 C.B.R. (4th) 1, [1999] 4 W.W.R. 86, [1997] L.V.I. 2889-1 (S.C.C.) — followed

**Statutes considered:**

*Occupiers' Liability Act*, R.S.O. 1990, c. O.2
    Generally — referred to

**Rules considered:**

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194
    R. 49 — referred to

    R. 49.06 — considered

    R. 49.06(2) — referred to

    R. 49.06(3) — referred to

APPEAL AND CROSS-APPEAL from judgment reported at 2001 CarswellOnt 5895 (Ont. S.C.J.) in action for damages for wrongful dismissal.

***Goudge J.A.*:**

1    The appellant Yvonne Montague was terminated from her employment with the respondent, Bank of Nova Scotia, on July 24, 1991. She sued for wrongful dismissal. Prior to trial, the Bank admitted that it did not have cause to terminate Mrs. Montague's employment. On October 19, 2001, Chapnik J. awarded the appellant damages equivalent to sixteen months' notice together with pre-judgment interest and costs fixed at $5,000.

2    Mrs. Montague appeals, arguing that the trial judge erred in awarding too little notice and in dismissing her claim for aggravated and punitive damages.

Montague v. Bank of Nova Scotia, 2004 CarswellOnt 11

2004 CarswellOnt 11, [2004] O.J. No. 13, 128 A.C.W.S. (3d) 93, 180 O.A.C. 381...

3    The Bank cross-appeals, arguing that the notice period is too long and that the trial judge erred in increasing it after she had been advised of the Bank's offer to settle pursuant to Rule 49.

4    For the reasons that follow, I would dismiss both the appeal and the cross-appeal.

**THE FACTS**

5    Mrs. Montague was employed by the Bank as a data entry operator for approximately fifteen and one-half years, from January 26, 1976 to July 24, 1991. When she was terminated, she was earning an annual salary of $24,750.00, plus a shift bonus valued at $1,254.50 per year. Her employee benefits were valued at $2,600.45 per year.

6    On August 13, 1990, Mrs. Montague slipped and fell at work, injuring her right shoulder. As a result she was away from work until January 2, 1991, when she returned to a modified work schedule, as recommended by her doctors.

7    On February 18, 1991, Mrs. Montague again fell at work and injured her lower back. Again she was off work, this time until April 15, 1991, again returning to a modified work schedule. However, she was unable to sustain this schedule, and on April 30, 1991 she stopped working altogether.

8    Mrs. Montague's claim for long-term disability was denied by the administrator of the Bank's long-term disability plan because it was inadequately supported by the available medical information. On July 8, 1991, the Bank wrote to Mrs. Montague to advise that because of this decision, she was expected to return to her regular work duties on her usual shift no later than July 22, 1991, failing which she would be treated as having abandoned her employment. The letter also indicated that she could appeal the rejection of her long-term disability claim if she provided further medical documentation. At that time, the Bank had a number of medical reports about Mrs. Montague, both from her own doctors and from doctors she had seen at the Bank's request. There was clearly some medical controversy over whether she was able to do the keypunch work required by her regular job.

9    On the day she received the Bank's letter of July 8, 1991, Mrs. Montague delivered a written reply advising that she had made appointments with two other physicians to whom she had been referred by her family doctor. One appointment was scheduled for July 12, 1991 and the other, with an internal medicine specialist, for July 23, 1991. Mrs. Montague indicated that reports from these two doctors would be submitted to the Bank.

10    Despite this, on July 24 1991, the day after her appointment with the specialist, the Bank wrote to Mrs. Montague terminating her employment. The letter did not acknowledge the fact of the two recent medical consultations. Nor did the Bank make any inquiries of Mrs. Montague about what she had learned or when the resulting medical reports might be expected. It simply fired her.

11    Mrs. Montague commenced an action against the Bank, seeking damages for her injuries under the *Occupiers' Liability Act*, R.S.O. 1990, c. O.2 and damages for wrongful dismissal. She succeeded in the former claim, but the latter claim was dismissed as *res judicata* because of a complaint she had lodged with the Canadian Human Rights Commission.

12    Mrs. Montague appealed, and this court set aside the dismissal of her wrongful dismissal claim. It then proceeded to the trial from which the present appeal is taken.

13    At the conclusion of four days of evidence, the trial judge made the following findings.

14    First, she concluded that this case engaged the considerations set out in *Wallace v. United Grain Growers Ltd.*, [1997] 3 S.C.R. 701 (S.C.C.), thus increasing the period of reasonable notice to which Mrs. Montague was entitled on termination. The trial judge put it this way:

> In all of the circumstances, I have no difficulty whatsoever in finding that the bank acted precipitously and in bad faith; it did not treat the plaintiff fairly in the manner of her dismissal. Ms. Montague at no time took any action which suggested abandonment of her employment. On the contrary, she was in continuous contact with both the nurse, Dorothy Harris, and

2004 CarswellOnt 11, [2004] O.J. No. 13, 128 A.C.W.S. (3d) 93, 180 O.A.C. 381...

Linda Jackson, Personnel Manager, as confirmed by Rena Benson, about her disability, which she claimed needed to be accommodated. Her summary dismissal by letter in view of the pending medical visits to the knowledge of the defendant was unreasonable, and the position taken that she had abandoned her job was, in the circumstances, quite preposterous.

15      Second, the trial judge found that it would not be reasonable to place a duty on the appellant to mitigate her damages during the notice period, given her medical condition at that time.

16      Third, the trial judge concluded that the respondent's conduct towards the appellant did not constitute an independent actionable wrong and was not so egregious as to offend the court's sense of decency. Hence she dismissed the claims for both aggravated and punitive damages.

17      Finally, the trial judge fixed the period of reasonable notice in these words:

In the circumstances, I award her damages at the high end of the scale, in effect raising the notice period pursuant to the *Wallace* decision by finding the period of reasonable notice to be 12 months.

That's my decision.

18      Immediately thereafter this exchange occurred between counsel for the respondent and the trial judge:

MR. LEONARD: Perhaps I might go first, Your Honour. There was an offer to settle. I have to bring it to your attention, and I apologize for this, Your Honour, I only brought one set of that. I'm happy to hand it up. You'll see that you've awarded twelve months. By my calculation that award would be an award of $28,604.95, and you'll see that offer is for $30,500, which is more than that, plus prejudgment interest, plus party and party costs to the date of that offer. So, my submission to you simply is that we've met the requirements of Rule 49. I'm completely in Your Honour's hands, obviously, and your discretion not to apply Rule 49 in these circumstances if you are so inclined.

THE COURT: Did I say twelve months including the increase because of the *Wallace* decision?

MR. LEONARD: You did. Is that not what you intended?

THE COURT: No. I meant at least another month.

19      Counsel then advised the trial judge that even with a thirteen month notice period, his offer triggered the effect of Rule 49, and he asked for partial indemnity costs from the date of the offer in the amount of $5,000.

20      The trial judge concluded the day with this:

THE COURT: The law is the law; it's not always the fairest thing, but in light of the offer, I don't think I really have a choice. I think I must order the thirteen months reasonable notice and $5,000 costs to the defendant. I would hope that in the long run they are not required.

21      Four days later, the judgment not having been entered in the court records, the trial judge summoned the parties back to court. She opened the court as follows:

THE COURT: You will recall, Mrs. Montague and Mr. Leonard, that at the end of my judgment on Friday, I awarded damages to Mrs. Montague at the high end of the notice scale which I deemed to be eight to twelve months and fixed the period of reasonable notice, the appropriate period at twelve months. I said that would in effect increase the notice period pursuant to the *Wallace* decision. Then in the course of discussion, I increased the entire notice period to thirteen months.

On further reflection, I think that I should have dealt with the period of reasonable notice separately from the *Wallace* factors. And, in my view, the thirteen months is a bit low. To properly reflect my findings regarding the *Wallace* factor, that is, the improper manner of dismissal, the knowledge of its probable effect on the plaintiff, the withholding of the letters and the whole picture from Mr. Seymour, and the actual effect of the dismissal on the plaintiff, I should have added

2004 CarswellOnt 11, [2004] O.J. No. 13, 128 A.C.W.S. (3d) 93, 180 O.A.C. 381...

instead of one month four months to the period of reasonable notice. The twelve month period of reasonable notice was decided according to the factors listed in the *Bardal vs. Global and Mail* case, taking into account the plaintiff's age at the time, her qualifications, her disability, and so on. So that the appropriate notice period should be twelve months plus four months or sixteen months in all.

Now, I know this will change the cost factor, as well.

22     The trial judge then invited submissions on costs, given the change in the period of reasonable notice. Counsel for the respondent conceded that he was no longer entitled to the benefit of Rule 49 but urged that there should be no costs against the Bank since Mrs. Montague had represented herself from shortly before the trial. The appellant asked for costs in the amount of $5,000 because that was what counsel for the Bank had sought four days earlier, and because she had in fact paid a lawyer that amount to do the work leading up to the trial.

23     The trial judge concluded the proceedings by awarding the appellant costs on a party and party basis throughout, fixed at $5,000.

## THE APPEAL

24     The appellant's primary submission is that the trial judge erred in concluding that the period of reasonable notice required in this case was limited to sixteen months. As Laskin J.A. said in *Minott v. O'Shanter Development Co.* (1999), 42 O.R. (3d) 321 (Ont. C.A.), this submission must be judged against the standard of appellate review of wrongful dismissal awards. He described it this way at p. 343-344:

> Determining the period of reasonable notice is an art not a science. In each case trial judges must weigh and balance a catalogue of relevant factors. No two cases are identical; and, ordinarily, there is no one "right" figure for reasonable notice. Instead, most cases yield a range of reasonableness. Therefore, a trial judge's determination of the period of reasonable notice is entitled to deference from an appellate court. An appeal court is not justified in interfering unless the figure arrived at by the trial judge is outside an acceptable range or unless, in arriving at the figure, the trial judge erred in principle or made an unreasonable finding of fact. . . . If the trial judge erred in principle, an appellate court may substitute its own figure. But it should do so sparingly if the trial judge's award is within an acceptable range despite the error in principle.

25     The trial judge here did not err in principle in fixing the period of reasonable notice. She was alive to and considered the relevant factors as set out in cases like *Bardal v. Globe & Mail Ltd.* (1960), 24 D.L.R. (2d) 140 (Ont. H.C.). She also discussed and applied the principle set out in *Wallace*. Nor can it be said that the sixteen months is below an acceptable range of notice and must therefore be increased. On the contrary, if anything, this would be on the generous side in these circumstances.

26     Thus the appellant's first argument must fail.

27     Second, the appellant argues that the trial judge erred in dismissing her claim for aggravated and punitive damages. I do not agree. There was ample evidence to support the conclusion of the trial judge that there was no malice or vindictiveness by the Bank or its officials here. In addition, the evidence does not sustain the conclusion that the Bank's conduct constitutes a separately actionable wrong. Hence punitive damages were properly denied. Moreover, the absence of any separately actionable wrong puts an end to any entitlement to aggravated damages.

28     In the result the appellant's second argument must also fail and the appeal must therefore be dismissed.

## THE CROSS-APPEAL

29     The respondent's first submission is that the trial judge erred in extending the period of reasonable notice using the considerations described in *Wallace*.

30     I disagree. The trial judge focused on the timing of the termination and the characterization made by the respondent of the appellant's failure to report to work on July 22, 2001. There was ample evidence for her to conclude that the respondent fired

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2004 CarswellOnt 11, [2004] O.J. No. 13, 128 A.C.W.S. (3d) 93, 180 O.A.C. 381...

the appellant precipitously, knowing of the pending medical visits but making no effort to find out what information they had yielded or when the resulting reports might be available. Moreover, the respondent treated the appellant as having abandoned her position, knowing that she had done nothing to suggest that. It was reasonable for the trial judge to assess this conduct as being unreasonable and in bad faith. As a result, *Wallace* was properly applied.

31     Where mitigation or deduction for other benefits is not appropriate, it is no doubt preferable to take a holistic approach to fixing reasonable notice, and to do so on the basis of all relevant factors, including those referred to in *Wallace*, rather than to make a discrete addition to the notice period to reflect the manner of dismissal. See *Noseworthy v. Riverside Pontiac-Buick Ltd.* (1998), 168 D.L.R. (4th) 629 (Ont. C.A.). Nonetheless, the end result of sixteen months does not constitute error in this case. It is within a range of reasonableness given all the circumstances. The cross-appellant's first argument must therefore fail.

32     The Bank's second argument on its cross-appeal is that the trial judge erred in changing her judgment (namely her determination of the reasonable notice period) on two occasions after having reviewed the Bank's offer to settle pursuant to Rule 49.

33     The Bank argues that Rule 49.06(2) and (3) prohibits the trial judge from doing this. Rule 49.06 reads as follows:

**DISCLOSURE OF OFFER TO COURT**

(1) No statement of the fact that an offer to settle has been made shall be contained in any pleading.

(2) Where an offer to settle is not accepted, no communication respecting the offer shall be made to the court at the hearing of the proceeding until all questions of liability and the relief to be granted, other than costs, have been determined.

(3) An offer to settle shall not be filed until all questions of liability and the relief to be granted in the proceeding, other than costs, have been determined.

34     I cannot agree that the rule prohibits the trial judge from changing her order. There can be no doubt that until a judgment is formally entered in the court record, the judge has a very broad discretion to change it. In *Holmes Foundry Ltd. v. Point Edward (Village)*, [1963] 2 O.R. 404 (Ont. C.A.), Laidlaw J.A. put it this way at 407:

It is well settled in law that an order can always be withdrawn, altered or modified by a Judge either on his own initiative or on the application of a party until such time as the order has been drawn up, passed and entered. I refer to *Re Harrison's Share under a Settlement, Harrison v. Harrison*, [1955] 1 Ch. 260 at p. 275, [1955] 1 All E.R. 185.

35     Rule 49.06 is not a prohibition directed at the court. Rather, the rule targets those who might communicate information about an unaccepted offer to the court before liability and consequential relief are determined. It prevents communications to the judge designed to improperly affect the course of justice.

36     The terms of the rule do not purport to limit the broad judicial power to alter a judgment before it is entered. Very clear language would be required to curtail a judicial discretion having such deep historical roots. Nor is there any reason to stretch the rule to achieve this result, since this judicial discretion allows a judge to change his or her judgment precisely to better serve the ends of justice. Rule 49.06 does not prohibit what the trial judge did here.

37     The Bank also argues that the changes made by the trial judge constitute reversible error because the only reason she made the changes was to avoid the cost consequences of Rule 49 for Mrs. Montague.

38     In my view the record does not sustain the conclusion that the changes were made to avoid the cost consequences of Rule 49. The trial judge candidly acknowledged that her first decision (twelve months) was not what she intended and that she had meant at least thirteen months. Then, when she made the second change four days later (to sixteen months), she explained why in her view the *Wallace* factors warranted an additional four months, not just an additional one month. Had the trial judge simply wished to alleviate the consequences of Rule 49 for Mrs. Montague, she could have done so by using the residual

2004 CarswellOnt 11, [2004] O.J. No. 13, 128 A.C.W.S. (3d) 93, 180 O.A.C. 381...

discretion given to her by the rule itself. There was no need to change her judgment. The timing of events in this case was clearly unfortunate, as the trial judge recognized. However, this is no reason not to take the trial judge's conclusions at face value.

39      Even if I had come to the opposite conclusion, I would not have interfered with the trial judge's final judgment. I say this because even if the trial judge had erred in principle in the exercise of her discretion, her final assessment that sixteen months constitutes reasonable notice in this case is, in my view, a reasonable conclusion. Hence no appellate intervention is warranted. See *Minott*, *supra* at 24. Given the factors relevant to the assessment of reasonable notice, including the manner of the appellant's termination, sixteen months, although perhaps generous, is within a range of reasonableness in the circumstances and therefore it is a conclusion entitled to deference in this court.

40      I conclude with this. While this is not such a case, I have no doubt that in some cases the very wide discretion a judge has to change his or her judgment before it is entered could be abused if it were exercised for an improper purpose. Any change to a judgment once given, no matter how soundly based, runs the risk of evoking suspicions of abuse on the part of those adversely affected. It is at the least disquieting, and to that extent can put a cloud over the administration of justice. A judge exercising this discretion bears a significant onus to explain the change. Giving clear reasons for decision is always a profoundly important part of judging. See *R. v. Sheppard*, [2002] 1 S.C.R. 869 (S.C.C.). It is never more important than in this circumstance.

41      The appeal and cross-appeal must both be dismissed. In the circumstances there should be no costs to either party.

**Weiler J.A.:**

I agree

**Laskin J.A.:**

I agree

*Appeal and cross-appeal dismissed.*

---

**End of Document**

Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

 Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# TAB 23

8 Fed.R.Serv.3d 321

KeyCite Yellow Flag - Negative Treatment
**Distinguished by**    Morris v. Mashantucket Pequot Gaming Enterprise,
Mash. Pequot Tribal Ct.,    November 5, 1997

822 F.2d 1342
United States Court of Appeals,
Third Circuit.

Jessica T. and Halver L. MOOLENAAR

v.

GOVERNMENT OF THE VIRGIN ISLANDS
and Virgin Islands Port Authority.
Appeal of GOVERNMENT
OF the VIRGIN ISLANDS.

No. 86–3301.    |    Argued May 1, 1987.
|    Decided July 2, 1987.    |    Rehearing and
Rehearing In Banc    Denied July 27, 1987.

Almost two years after district court's initial judgment reforming contract to exclude disputed area, lessees filed motion for relief from judgment. The District Court of the Virgin Islands, 729 F.2d 1448, David V. O'Brien, J., reopened the judgment. Lessor appealed. The Court of Appeals, Rosenn, Circuit Judge, held that: (1) Government's failure, by reason of honest mistake, to pass on direct information regarding whether lease between Government as lessor and lessees included disputed area, and effort, long after initial trial on appeal, to produce testimony of counsel who had represented lessees, were not such extraordinary circumstances as to justify relief from judgment reforming contract under catch all provisions, for "any other reason justifying relief from the operation of the judgment" of civil procedure rule governing relief from judgment, and (2) motion was not made within reasonable time.

Judgment in district court granting new trial as well as final judgment vacated; case remanded with directions to reinstate November 16, 1984 amended judgment.

West Headnotes (5)

**[1]**    **Federal Civil Procedure**
        ☞ Time for instituting proceedings

Relief from judgment reforming contract to historic "Great House" and surrounding cottages and land out of lease between Government and lessees, on ground of mistake, inadvertence, surprise, excusable neglect, newly discovered evidence, or fraud, approximately six weeks after district court's decision on remand if more than one year after original judgment, was time barred. Fed.Rules Civ.Proc.Rule 60(b), (b)(1–3), 28 U.S.C.A.

11 Cases that cite this headnote

**[2]**    **Federal Civil Procedure**
        ☞ Catch-all provisions

Government's failure, by reason of honest mistake, to pass on direct information regarding whether lease between Government as lessor and lessees included historic "Great House" and surrounding cottages and land, and effort to produce testimony of counsel who represented lessees long after initial trial on appeal, were not such extraordinary circumstances as to justify relief from judgment reforming contract under catch all provisions, for "any other reason justifying relief from the operation of the judgment" of civil procedure rule governing relief from judgment. Fed.Rules Civ.Proc.Rule 60(b), 28 U.S.C.A.

44 Cases that cite this headnote

**[3]**    **Federal Civil Procedure**
        ☞ Catch-all provisions

Exercise of district court's discretionary power to grant relief from judgment for "any other reason justifying relief from the operation of the judgment," requires an extraordinary circumstance. Fed.Rules Civ.Proc.Rule 60(b), 28 U.S.C.A.

102 Cases that cite this headnote

**[4]**    **Federal Civil Procedure**
        ☞ Nature and Form of Remedy
    **Federal Civil Procedure**
        ☞ Further evidence or argument

Party that has not presented known facts helpful to its case by witnesses available to it when it had chance cannot ordinarily avail itself on

8 Fed.R.Serv.3d 321

motion for relief from judgment after adverse judgment has been handed down; reopening case many years later to receive such testimony totally disregards important principle that litigation must finally end, as well as risk of manipulating and fabricating evidence with long lapse of time; motion for relief from judgment is not substitute for appeal. Fed.Rules Civ.Proc.Rule 60(b), 28 U.S.C.A.

16 Cases that cite this headnote

**[5]    Federal Civil Procedure**

👉    Time for instituting proceedings

Motion for relief from judgment for "any other reason justifying relief," although brought only six weeks after district court's judgment on remand, was not made within a reasonable time, as motion occurred almost two years after initial judgment and reason for attack upon judgment was available at time of that judgment. Fed.Rules Civ.Proc.Rule 60(b), (b)(1–3), 28 U.S.C.A.

67 Cases that cite this headnote

**Attorneys and Law Firms**

*1343  Leroy A. Mercer, Atty. Gen., Rosalie Simmonds Ballentine and Karl Raymond Percell (argued), Asst. Attys. Gen., St. Thomas, V.I., for appellant.

Randall Scott Johns (Argued), Christiansted, St. Croix, for appellee.

Before SEITZ, HIGGINBOTHAM, and ROSENN, Circuit Judges.

**OPINION OF THE COURT**

ROSENN, Circuit Judge.

This appeal raises the question of whether, pursuant to Fed.R.Civ.P. 60(b)(6), a district *1344 court may reopen a final judgment assertedly based on an incorrect set of facts, where the plaintiffs' attorney allegedly possessed but did not present, and the Government's trial attorney should have received but by virtue of an honest mistake did

not receive, evidence of the actual facts. In *Moolenaar v. Government of the Virgin Islands,* 729 F.2d 1448 (3d Cir.1984) (memorandum opinion) [*Moolenaar I* ], we affirmed the district court's finding of "mutual mistake" surrounding the question of whether the plaintiffs' lease from the Government of 98.307 acres of land included an historic "Great House" and surrounding cottages and land, and upheld a reformation of the contract to carve the area claimed by the plaintiffs out of the lease. We also remanded to the district court for further consideration of whether the plaintiffs were entitled to receive all previously collected rents.

Approximately a month and a half after the district court's decision on remand, but almost two years after its original judgment, the plaintiffs brought the present action to reopen the judgment. This action was based on credible evidence that the Government had in fact intended the disputed land to be a part of the plaintiffs' lease. Accordingly, the district court reopened the judgment pursuant to Fed.R.Civ.P. 60(b)(6), and the Government appeals. We vacate and remand with directions to reinstate the judgment in *Moolenaar I.*

**I.**

In 1974 the Government of the Virgin Islands leased to the plaintiffs, Jessica and Halver Moolenaar, 98.307 acres of land "for the purpose of farming or the grazing or breeding of livestock, and for no other purpose whatsoever...." The lease had a term of ten years renewable at the Moolenaars' option, provided for an annual rent of $15 per acre per year, and required additional payments to the Government if the Moolenaars were to sublease at a higher rent.

Although most of the above-mentioned land was covered with underbrush, the land as described included an historic "Great House" and surrounding cottages which were rented out and used by the Government. A dispute eventually arose in 1979 over the Government's use of this property, however, and the Moolenaars brought suit on December 30, 1980, against the Government seeking damages for, *inter alia,* wrongful exclusion from the Great House and cottages. After hearing the evidence presented, the district court on February 9, 1983, concluded that there had been a "mutual mistake" between the parties, reformed the contract prospectively to carve the disputed land out of the plaintiffs' lease, [1] and awarded the plaintiffs all rents previously collected for the land. On February 22, 1984, this court affirmed the finding of mutual mistake, but remanded to the district court for

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

further consideration of whether the plaintiffs were entitled to the previously collected rents. On November 16, 1984, the district court decided that they were not.

[1]  In *Moolenaar I,* a panel of this court noted in its memorandum opinion that "Mrs. Moolenaar was quite candid at trial in describing her surprise when she was told that the lease included the Great House." (footnote omitted).

On December 29, 1984, approximately six weeks after the district court's decision on remand but more than a year after its original judgment, the Moolenaars filed a *pro se* motion for retrial. This motion was based, essentially, on what the Moolenaars alleged was newly discovered evidence and inadequate representation by prior counsel. The district court held a hearing on the motion on January 15, 1986.

At the motion hearing, the Moolenaars presented three witnesses: Territorial Court Judge Raymond L. Finch, who had been the Moolenaars' attorney during the 1974 negotiations with the Government; Assistant Attorney General Victor Schneider, who had been assistant legal counsel in the Virgin Islands legislature; and plaintiff Jessica Moolenaar. Judge Finch testified that despite having originally drafted the lease to exclude the disputed lands, and **\*1345** having arranged for a surveyor to overlay the excluded portion on a public works drawing of the entire parcel, the Government insisted that the Moolenaars take the entire property, all 98 acres, or nothing. Finch also testified that before the matter went to trial in 1983 he alerted the office of the Attorney General to the above-stated facts, and that he had turned over the proposed lease and attached map to the Government in his original negotiations. The Moolenaars' trial counsel, Kenneth R. Lindquist, never called Judge Finch to testify at the trial, and the Moolenaars are suing Lindquist in a separate action for malpractice.

Schneider testified that after having been asked to review the initial draft lease on the legislature's behalf, he spoke to either James Bough or Bruce DeLemos, both of whom Finch had previously identified as the Governor's agents in negotiations regarding the lease, and was told that the Government was preparing a new lease which would not exclude the buildings. Schneider therefore verified the existence of the draft lease, and indeed the map attached to that lease was introduced into evidence at the January 1986 hearing.

Based on the above, on January 21, 1986, the district court filed a memorandum opinion vacating its earlier order

in *Moolenaar I,* finding that "this misrepresentation and circumvention by the government was a wrongful act and that it is inequitable for the government to retain the benefits of those acts and omissions." The court cited Fed.R.Civ.P. 60(b)(3), which allows a court to reopen a judgment based on fraud, misrepresentation, or other misconduct of an adverse party, as authority for vacating the prior order, and ordered that the matter be scheduled for the further taking of evidence. [2] At the later hearing, which took place on February 3, 1986, and which was followed by oral argument on February 5, the court found that there was in fact no misconduct, but rather an inadvertent lack of communication: the correct information "had been passed on to one assistant attorney general who failed by reason of an honest mistake to pass it on to the assistant attorney general actually in charge of trying the case." [3] Nevertheless, the court concluded that the lease covered all the disputed land, including the Great House and adjacent cottages, and that the Moolenaars were entitled to $56,700 in lost rents, together with attorneys' fees and other costs.

[2]  It is interesting to note that none of the four assistant attorneys general present at the January 15 hearing would represent the Government, as they claimed that the assistant attorney general in charge of the case was outside the territory negotiating another matter. The district court doubted the veracity of this excuse and the hearing proceeded as if by default.

[3]  Because the transcripts from the February 3 hearing and February 5 oral argument do not appear in the record, the precise facts found by the district court are unclear. Presumably, however, it was Judge Finch whom the court found initially passed the correct information on to an assistant attorney general.

On February 19, the district court entered an order *nunc pro tunc* to February 5 granting the Government's motion to reconsider the January 21 order, but leaving that order in full force and effect. The court held that although its finding that there was no Government misconduct precluded a new trial pursuant to Fed.R.Civ.P. 60(b)(3), a new trial was justified by the "catchall clause," Fed.R.Civ.P. 60(b)(6), because *Moolenaar I* was "based on a set of facts which were incorrect," and because "the government knew of the correct information ... [but] failed by reason of an honest mistake to pass it on...." [4] The Government appeals from the district court's grant of a new trial, as well as from the final judgment entered on April 11.

4      The court therefore also rejected the Moolenaars' arguments that they were entitled to a new trial pursuant to Fed.R.Civ.P. 60(b)(1) because of mistake, inadvertence, or excusable neglect, and that they were entitled to a new trial pursuant to Fed.R.Civ.P. 60(b)(2) because of newly discovered evidence. As to the latter, the court ruled that Fed.R.Civ.P. 60(b)(2) did not apply because the "newly discovered evidence" was available to the plaintiffs at the original trial.

## II.

[1]   Fed.R.Civ.P. 60(b) provides, in pertinent part:

*1346   On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; ... or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken.

In the present case, the district court eventually concluded that Rules 60(b)(1)–(3) did not apply,5 but nevertheless granted relief pursuant to Rule 60(b)(6).

5      Although the plaintiffs have argued in their brief that Rules 60(b)(1)–(3) do apply, the Moolenaars voluntarily withdrew their cross-appeal from the district court's April 11 order, and never filed a cross-appeal from the district court's February 19 order. Further, although the district court's remanded judgment was entered only six weeks prior to the present action, the reason for the attack upon that judgment was available for attack upon the district court's original judgment, which was rendered more than a year prior to the present action. Motions

under Rule 60(b)(1)–(3) must be brought within one year of the entry of a final judgment. An appeal does not toll this time period. Therefore, relief under Rules 60(b)(1)–(3) is time barred. *See Jones v. Anderson-Tully Co.,* 722 F.2d 211, 212–13 (5th Cir.1984) (per curiam); *Stradley v. Cortez,* 518 F.2d 488, 493 (3d Cir.1975); 7 Moore's Federal Practice § 60.28[2] n. 20 (2d ed. 1985). Accordingly, we will not address the merits of the plaintiffs' claim for relief pursuant to Rules 60(b)(1)–(3).

As this court recently stated in *Kock v. Government of the Virgin Islands,* 811 F.2d 240 (3d Cir.1987), Rule 60(b)

must be applied "[s]ubject to the propositions that the finality of judgments is a sound principle that should not lightly be cast aside, [and] that clause (6) is not a substitute for appeal...." *It is intended to be a means for accomplishing justice in extraordinary situations,* and so confined, does not violate the principle of the finality of judgments.

*Id.* at 246 (emphasis added) (quoting *7 Moore's Federal Practice* § 60.27 [2] (2d ed. 1985)). In *Kock,* we denied relief from a money judgment rendered against the Government of the Virgin Islands where relief was sought on the grounds that the Government's liability was predicated on the presence of insurance which turned out to be illusory because the insurance carrier had gone into liquidation.

[2]   [3]   Rule 60(b) "does not confer upon the district courts a '*standardless* residual of discretionary power to set aside judgments.' " *Martinez-McBean,* 562 F.2d at 911 (quoting both *Mayberry v. Maroney,* 529 F.2d 332, 337 (3d Cir.1976) (*Mayberry I* ), and *Mayberry v. Maroney,* 558 F.2d 1159, 1163 (3d Cir.1977) (*Mayberry II* ), and adding emphasis). The remedy provided by Rule 60(b) is "extraordinary, and special circumstances must justify granting relief under it." *Page v. Schweiker,* 786 F.2d 150, 158 (3d Cir.1986) (Garth, J., concurring). *See Marshall v. Board of Educ.,* 575 F.2d 417, 425 (3d Cir.1978) (change in the law not extraordinary); *Martinez-McBean v. Government of the Virgin Islands,* 562 F.2d 908, 911 (3d Cir.1977) (legal error, inconsistencies with legal precedent, and impatience with *pro se* plaintiff's lack of legal skill not extraordinary); *Mayberry II,* 558 F.2d at 1163 (changed circumstances not extraordinary); *Vecchione v. Wohlgemuth,* 558 F.2d 150, 159 (3d Cir.) (Commonwealth's unwillingness to return money or entertain court proceedings not extraordinary) (quoting *Mayberry I,* 529 F.2d at 335), *cert. denied,* 434 U.S. 943, 98 S.Ct. 439, 54 L.Ed.2d 304 (1977); *Stradley v. Cortez,* 518 F.2d 488, 493 (3d Cir.1975) (allegation that jury did other than what

it intended not extraordinary). *See also Ackermann v. United States,* 340 U.S. 193, 199, 71 S.Ct. 209, 212, 95 L.Ed. 207 (1950) (denaturalization judgment erroneous and failure to appeal on advice of counsel and Alien Control Officer not extraordinary). *Compare Klapprott v. United States,* 335 U.S. 601, 69 S.Ct. 384, 93 L.Ed. 266 (1949) (extraordinary circumstance found **\*1347** where United States obtained a default judgment while holding the plaintiff in jail). In the present case, we fail to see any extraordinary circumstances which justify relief pursuant to Rule 60(b). Indeed, the district court did not point to any extraordinary circumstance; but rather, held that relief was justified by the "manifest injustice" which would occur if relief were not granted. According to the district court, "[i]t would be unjust, inequitable, unfair, and a gross miscarriage of justice" to allow *Moolenaar I* to stand, because *Moolenaar I* was "based on a set of facts which were incorrect," and because "the government knew of the correct information ... [but] failed by reason of an honest mistake to pass it on...." As noted above, however, this is not the standard by which a district court's discretionary power to set aside judgments is measured. *See Marshall,* 575 F.2d at 423 (characterization of district court's action as "unequitable" insufficient to establish showing required for the modification of a final judgment). The exercise of a district court's discretionary power requires an extraordinary circumstance.

 [4]    As in *Ackermann v. United States, supra,* where the plaintiff had failed to appeal the cancellation of his naturalization certificate because his attorney told him he would have to sell his home to pay costs and an Alien Control officer told him that he would be released at the end of the war, the present case does not present any extraordinary circumstances. The Moolenaars simply failed to present evidence which was available to them from the outset. The Moolenaars negotiated the lease with the Government in 1974. They did not bring their action until December 1980. Counsel who represented them (Judge Finch) was available to testify, and an effort to produce his testimony and the testimony of legislative counsel Schneider long after the initial trial and appeal—years after suit was initially commenced—is not an extraordinary circumstance justifying the special relief sought. A party that has not presented known facts helpful to its case by witnesses available to it "when it had the chance cannot ordinarily avail itself on rule 60(b) after an adverse judgment has been handed down." *Good Luck Nursing Home, Inc. v. Harris,* 636 F.2d 572, 577 (D.C.Cir.1980). Reopening the case many years later to receive such testimony totally disregards the important

principle that litigation must finally end, not to speak of the risk of manipulating and fabricating evidence with the long lapse of time. Rule 60(b) is not a substitute for appeal. *See, e.g., Kock,* 811 F.2d at 246.

In support of its conclusion that the judgment in this case should be reopened, the district court relied upon *Good Luck Nursing Home, Inc. v. Harris, supra,* and *Chicago & E. Ill. R.R. v. Illinois Cent. R.R.,* 261 F.Supp. 289 (N.D.Ill.1966). *Chicago & E. Ill. R.R.* is readily distinguishable, however, as involving an extraordinary circumstance. The plaintiff's failure to present evidence in that case was based upon an expectation that there would be a second hearing for permanent relief, and therefore the plaintiffs busied themselves preparing their most crucial evidence for that hearing. The court, however, ruled that based on the evidence produced at the first hearing no further hearing was necessary. *Id.* at 305. Accordingly, the court, and not as here, the plaintiffs, was responsible for the failure to present evidence. The court, therefore, concluded that it had "sufficient reason to invoke Rule 60(b) in the circumstances in this case." *Id.*

*Good Luck Nursing Home* presents a more difficult case. In *Good Luck Nursing Home,* the Government failed, for no apparent reason, to advise the district court that the bulk of the money for which the nursing home sought reimbursement related to the legal defense of a related fraud case. This fact would have changed the outcome, and therefore, after setting forth the relevant standards, including a standard set forth in our own opinion in *Marshall, supra,* the D.C. Circuit concluded that a district court is not "powerless to correct errors into which it is led by the parties' failure to make the key facts known." *Id.* at 577. Although noting in a footnote the *Ackermann* requirement of an extraordinary circumstance, *id.* at 577 n. **\*1348** 3, no such circumstance appears to have been present.

In the sentence following its statement of the district court's power to correct errors, however, the D.C. Circuit went on to stress that a previously undisclosed fact must be *timely* presented if it is to justify reconsideration under Rule 60(b) (6). *Id.* at 577. Later, the court noted:

> [T]he rule 60(b) motion in this case was made within three months of the original judgment, and the substitute order entered about three months after that. Although the appellant might have been disappointed by having its initial victory so quickly snatched

away, it has not been so prejudiced as to make reconsideration under the rule inappropriate.... In this case, then, the interest that litigation must some day end was only slightly impinged, while the countervailing interest that justice be done was seriously at stake.

*Id.* at 577–78. Indeed, as the court pointed out in a footnote, the Rule 60(b)(6) motion in *Good Luck Nursing Home* would even have been timely if brought pursuant to Rule 60(b)(1), which contains a strict one year time limitation in which to bring an action. *Id.* at 578 n. 4. Therefore, although we do not necessarily endorse any suggestion that, if brought within one year, a Rule 60(b)(6) motion may be maintained absent extraordinary circumstances, we note that the temporal proximity between the judgment and Rule 60(b)(6) motion in *Good Luck Nursing Home* distinguishes that case from the present one.

[5]    In the present case, the Moolenaars brought their Rule 60(b)(6) motion almost two years after the district court's initial judgment. Although the motion was brought only six weeks after the district court's judgment on remand, the reason for the attack upon that judgment was available for attack upon the original judgment. *See supra* at 1346 n. 5. Accordingly, in addition to concluding that this case does not present any extraordinary circumstances, we further conclude that the Moolenaars' motion was "not made within a

reasonable time." Fed.R.Civ.P. 60(b). *See Stradley,* 518 F.2d at 493.

## III.

In summary, we reaffirm our untrammeled line of cases holding that absent extraordinary circumstances a district court may not grant a new trial pursuant to Rule 60(b)(6) merely because it believes the prior judgment may have been inequitable, and conclude that the facts of this case do not present any extraordinary circumstances. Further, because the relevant evidence was available to the plaintiffs at the time of the original trial, we also conclude that the plaintiffs' request for a new trial almost two years after the original trial was not brought within a reasonable time. Accordingly, the judgment of the district court granting a new trial, as well as the final judgment of April 11, 1986, will be vacated and the case remanded with directions to reinstate the district court's November 16, 1984, amended judgment. [6]

[6]    In view of our disposition of this appeal, we do not reach the government's appeal from the damages awarded in the district court's April 11, 1986, final judgment.

## Parallel Citations

8 Fed.R.Serv.3d 321

---

**End of Document**    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 24

2015 ONCA 360

Ontario Court of Appeal

Mujagic v. Kamps

2015 CarswellOnt 7272, 2015 ONCA 360

## Mirsada Mujagic, Armela Mujagic and Belmir Mujagic, Plaintiffs (Moving Parties) and Annette Kamps and State Farm Mutual Automobile Insurance Company, Defendants (Responding Party)

Doherty J.A., E.E. Gillese J.A., P. Lauwers J.A.

Judgment: May 20, 2015
Docket: CA M44355, M44948

Counsel: Rodney M. Godard, for Moving Parties
Kieran C. Dickson, for Responding party

Subject: Civil Practice and Procedure

**Headnote**
  **Civil practice and procedure**

**Table of Authorities**

  **Cases considered by *Doherty J.A.*:**

  *First Elgin Mills Developments Inc. v. Romandale Farms Ltd.* (2015), 51 R.P.R. (5th) 1, 89 C.E.L.R. (3d) 188, 2015 CarswellOnt 896, 2015 ONCA 54, 381 D.L.R. (4th) 114 (Ont. C.A.) — referred to

  *Holmes Foundry Ltd. v. Point Edward (Village)* (1963), 39 D.L.R. (2d) 621, [1963] 2 O.R. 404, 1963 CarswellOnt 272 (Ont. C.A.) — referred to

  *Metro-Can Construction Ltd. v. R.* (2001), 2001 FCA 227, 2001 CarswellNat 1412, 2001 D.T.C. 5410, 273 N.R. 273, [2001] 4 C.T.C. 13, *(*sub nom. *Metro-Can Construction Ltd. v. Canada)* 203 D.L.R. (4th) 741, 2001 CAF 227, 2001 CarswellNat 4999 (Fed. C.A.) — considered

  *Montague v. Bank of Nova Scotia* (2004), 2004 CarswellOnt 11, 2004 C.L.L.C. 210-027, 69 O.R. (3d) 87, 30 C.C.E.L. (3d) 71, 180 O.A.C. 381 (Ont. C.A.) — referred to

  *Mujagic v. Kamps* (2014), 2014 CarswellOnt 14014, 2014 ONSC 5504 (Ont. Div. Ct.) — referred to

  *Pastore v. Aviva Canada Inc.* (2012), 2012 CarswellOnt 17252, 2012 ONCA 887, *(*sub nom. *Aviva Canada Inc. v. Pastore)* 300 O.A.C. 355 (Ont. C.A.) — referred to

  *Trainor v. Canada (Customs & Revenue Agency)* (2011), 2011 ONCA 794, 2011 CarswellOnt 14268, 20 C.P.C. (7th) 227 (Ont. C.A.) — considered

*Trainor v. Canada (Customs & Revenue Agency)* (2012), 2012 ONSC 3450, 2012 CarswellOnt 7368 (Ont. Div. Ct.) — referred to

*Westerhof v. Gee Estate* (2015), 2015 ONCA 206, 2015 CarswellOnt 3977 (Ont. C.A.) — considered

**Doherty J.A.:**

1    Counsel for the moving parties brings a motion asking this court to reconsider the refusal to grant leave to appeal from the judgment of the Divisional Court. Counsel submits that this court's decision in *Westerhof v. Gee Estate*, 2015 ONCA 206, [2015] O.J. No. 1472 (Ont. C.A.), released after leave to appeal was refused, has significantly changed the interpretation of rule 53.03. Counsel submits that, in light of the interpretation of rule 53.03 provided by this court in *Westerhof*, the trial judge improperly excluded important opinion evidence from two of Ms. Mujagic's treating physicians. Counsel asks for a fresh opportunity, armed with *Westerhof*, to convince a panel of this court that leave to appeal should be granted.

2    Ms. Mujagic was in a car accident in 2001. She eventually sued. The action was tried in 2011. The defence did not deny that Ms. Mujagic suffered from significant pain and disability associated with spine and neck problems. The defence argued, however, that those problems were not caused by the 2001 car accident. Causation was a central issue at trial. The jury found the defendant 30 per cent responsible for the accident, but awarded zero damages. Ms. Mujagic represented herself at the trial.

3    Ms. Mujagic unsuccessfully appealed to the Divisional Court: *Mujagic v. Kamps*, 2014 ONSC 5504 (Ont. Div. Ct.). She sought leave to appeal from that decision to this court. Leave was refused on February 6, 2015. *Westerhof* was released on March 26, 2015, and Ms. Mujagic commenced this motion very shortly thereafter.

4    The motion raises two questions:

    • Does this court have jurisdiction to reconsider the motion for leave to appeal?

    • If the court has jurisdiction, should it order a reconsideration of the motion for leave to appeal?

**Jurisdiction**

5    Neither party has taken out an order dismissing the motion for leave to appeal. Generally speaking, there is no jurisdictional impediment to the court reconsidering its decision when no order has been taken out and entered: *Holmes Foundry Ltd. v. Point Edward (Village)*, [1963] 2 O.R. 404 (Ont. C.A.), at p. 407; *Montague v. Bank of Nova Scotia* (2004), 69 O.R. (3d) 87 (Ont. C.A.), at para. 34; *Pastore v. Aviva Canada Inc.*, 2012 ONCA 887, 300 O.A.C. 355 (Ont. C.A.), at para. 9; *First Elgin Mills Developments Inc. v. Romandale Farms Ltd.*, 2015 ONCA 54, 381 D.L.R. (4th) 114 (Ont. C.A.), at para. 7.

6    Counsel for the respondent has, however, referred the court to rule 61.16(6.1). That rule, brought into force in July 2014 (see: O. Reg. 43/14, ss. 19, 21), applies to motions in the Court of Appeal. It reads:

    Subject to rules 37.14 and 59.06, an order or decision of a panel of an appellate court may not be set aside or varied under these rules.

7    The use of the phrase "order or decision" is instructive and renders the taking out of an order irrelevant to the power to reconsider a decision governed by rule 61.16. The inclusion of the word "decision" reflects the practical reality that orders are often not taken out when motions are dismissed in the Court of Appeal.

8    As rule 61.16(6.1) applies to this motion, the moving parties must bring themselves within rules 37.14 or 59.06 for this court to have jurisdiction to set aside or vary its decision refusing leave to appeal. Rule 37.14 has no application in the circumstances of this case. The moving parties do, however, rely on rule 59.06 and specifically rule 59.06(2)(a), which provides:

    A party who seeks to,

(a) have an order set aside or varied on the ground of fraud or of facts arising or discovered after it was made;

. . . . .

may make a motion in the proceeding for the relief claimed.

9     Counsel for the moving parties submits that the change in the jurisprudence effected by *Westerhof* amounts to a "fact arising" after the decision refusing leave to appeal was made. I cannot accept that submission. The distinction between fact and law is well-established. Facts come from evidence, including new testimony and exhibits. Law comes from statute books and case law. The law is applied to the facts to produce a result. Rule 59.06(2)(a), by its plain meaning, speaks to "facts arising or discovered" and not to jurisprudential changes. New facts, like all facts, are found in evidence, not in the statute books or case law.

10     There is relatively little case law on this exact issue, perhaps because the language of the rule is so clear. The limited case law is against the moving parties. In *Trainor v. Canada (Customs & Revenue Agency)*, 2011 ONCA 794, [2011] O.J. No. 5741 (Ont. C.A.), this court noted, at para. 3, that a change in jurisprudence is not a new fact for the purposes of rule 59.06. The Divisional Court took the same position when the matter went back to that court: see *Trainor v. Canada (Customs & Revenue Agency)*, 2012 ONSC 3450, [2012] O.J. No. 2665 (Ont. Div. Ct.), at para. 5. The Federal Court of Appeal, considering a somewhat differently worded rule, came to the same conclusion in *Metro-Can Construction Ltd. v. R.*, 2001 FCA 227, 203 D.L.R. (4th) 741 (Fed. C.A.). Justice Rothstein observed, at para. 4, that interpreting the phrase "a matter that arose or was discovered" (the language of the operative Federal Court rule) to include changes in the law "would create unacceptable uncertainty for litigants and the public who must be satisfied that, once a judgment is rendered, it is final."

11     I agree with counsel for the respondent's submission that rule 61.16(6.1) applies to a motion to reconsider this court's decision refusing leave to appeal. The moving parties cannot bring themselves within either rule 37.14 or rule 59.06. This court therefore has no jurisdiction to set aside or vary its prior decision refusing leave to appeal.

**The Merits**

12     Although I would dismiss the motion on jurisdictional grounds, I think the motion would fail on its merits in any event. Even where the court has power to reconsider a decision because an order has not been taken out, that power will be exercised sparingly and only where it is clearly in the interests of justice: e.g. see *First Elgin Mills Developments*, at para. 7.

13     There are three reasons why the interests of justice would not favour reconsidering the refusal of leave in this case. First, the moving parties had the opportunity to challenge the correctness of *Westerhof* on the motion for leave to appeal. This court's decision in *Westerhof* was on reserve at the time of the leave motion. The moving parties chose not to make that challenge, but instead advanced a different argument in their factum. Motions for reconsideration are not the venue for new arguments that could have been made on the initial motion.

14     Second, even if this court applied the interpretation of rule 53.03 provided in *Westerhof*, it is far from clear on the record before this court that the plaintiff was entitled to elicit opinions from her treating physicians about any causal connection between the car accident and her injuries without meeting the notice requirements of rule 53.03. It may well be that *Westerhof* would have no impact on the admissibility of that evidence.

15     Third, and I think most importantly, there is nothing filed on the motion for reconsideration to suggest that either treating physician had the expertise required to give an opinion on the causation issue, or that either had an opinion on the causation issue. One of the treating doctors was a psychologist. It seems to me unlikely that he could make any meaningful contribution to the question of the causal link, if any, between Ms. Mujagic's accident and her subsequent neck and back injuries and pain. The other treating physician, a physiatrist, did not see Ms. Mujagic until approximately five years after the accident. There is nothing to suggest he was in a position to give an opinion on the causation question.

16     I would not order a reconsideration of the decision refusing leave even if this court had the jurisdiction to make that order.

**The Alternative Relief Claim**

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

17     Counsel for the moving parties asked this court to extend the time for delivery of an application for leave to appeal to the Supreme Court of Canada, should this court decline to reconsider its earlier decision refusing leave. This court would appear to have jurisdiction to grant the requested extension: *Supreme Court Act*, R.S.C. 1985, c. S-26, s. 59(1).

18     The Supreme Court of Canada, as the court of last resort, has total control over its own docket in civil matters. Except in the most unusual circumstances, questions relating to access to that court should be addressed by that court. The moving parties have not advanced any persuasive reason for this court to make an order in respect of a proceeding in the Supreme Court of Canada. I would not make any order extending the time for delivery of an application for leave to appeal to the Supreme Court of Canada.

**Disposition**

19     I would dismiss the motion with costs, if requested. If counsel cannot agree on the quantum, they may make written submissions of three pages or less within 14 days of the release of these reasons.

*E.E. Gillese J.A.*:

I agree

*P. Lauwers J.A.*:

I agree

---

**End of Document**                    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# TAB 25

Case 09-10138-MFW    Doc 15740    Filed 06/12/15    Page 274 of 304

Qit Fer & Titane Inc. v. Upper Lakes Shipping Ltd., 1991 CarswellOnt 892

1991 CarswellOnt 892, [1991] O.J. No. 733, 27 A.C.W.S. (3d) 31, 2 W.D.C.P. (2d) 319...

1991 CarswellOnt 892
Ontario General Division

Qit Fer & Titane Inc. v. Upper Lakes Shipping Ltd.

1991 CarswellOnt 892, [1991] O.J. No. 733, 27 A.C.W.S. (3d) 31, 2 W.D.C.P. (2d) 319, 3 O.R. (3d) 165

# Qit Fer Et Titane Inc., Plaintiff v. Upper Lakes Shipping Ltd. and Hopkins Steel Works Limited, Defendants

Gravely J.

Judgment: April 16, 1991
Docket: Doc. 20,934/87 (Toronto); 8,147/90 (St. Catherines)

Counsel: *J. Richler, Esquire* and *A. C. McNeely, Ms.* For the Plaintiff.
*J. Morin, Esquire, Q.C.* and *S. Fitterman, Esquire*, For the Defendant Upper Lakes Shipping Ltd.
*R. B. Lawson, Esquire, Q.C.* and *D. Cheifetz, Esquire*, For the Defendant Hopkins Steel Works Limited.

Subject: Civil Practice and Procedure

### Related Abridgment Classifications
For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

### Headnote
**Practice --- Trials — Conduct of trial — Additional evidence after hearing**

Test for allowing evidence — Ont. R. 51.

Plaintiff obtained judgment against first defendant, which was successful in its cross-claim against second defendant. Before the judgment was issued and entered, second defendant moved to re-open the trial so that it might put before the trial Judge its request to admit, and first defendant's response. First defendant's counsel was unaware of his client's response although the assisting counsel was aware. The response went to a matter which was not central to the finding of second defendant's liability on the cross-claim. Held, the motion was dismissed. Second defendant was unable to satisfy the first test, that the new evidence would probably have changed the result at trial. Second defendant was also not able to satisfy the reasonable diligence test. While the latter test could be ignored where justice so demanded, that was not warranted because second defendant was, at best, attempting to set up a technical defence.

*Honourable Mr. Justice R.T.P.* **Gravely reasons for judgment:**

1     The defendant, Hopkins Steel, moves to reopen the trial and put before the court Hopkins Steel's request to admit and the response by the defendant Upper Lakes Shipping Ltd.

2     In written reasons delivered on December 21, 1990 I granted judgment for the plaintiff against Upper Lakes Shipping for damages of $370,000.00, together with prejudgment interest, and found the defendant Hopkins Steel responsible to Upper Lakes shipping on its cross claim in an equivalent amount. The judgment has not yet been issued and entered. The basis for this motion is that admissions made in the response are inconsistent with some of the findings of fact in the reasons for judgment. The explanation given for not utilizing the request and the response at trial is that senior counsel who conducted the trial on behalf of Hopkins Steel was unaware of their existence. They were not in his brief. Assisting counsel knew of them but considered them irrelevant to the case as pleaded.

Qit Fer & Titane Inc. v. Upper Lakes Shipping Ltd., 1991 CarswellOnt 892

1991 CarswellOnt 892, [1991] O.J. No. 733, 27 A.C.W.S. (3d) 31, 2 W.D.C.P. (2d) 319...

3    Counsel agree that I have jurisdiction to entertain the motion since judgment has not yet been entered. They disagree as to the principles to be applied and the application of the principles to the facts. Mr. Lawson on behalf of Hopkins Steel takes the position that this is not an evidentiary matter and there is an untrammelled right to put the documents before the Court subject, perhaps, to considerations of prejudice. In the alternative, he contends that if the test is the same as that for adducing post-trial evidence then that test does not include the "reasonable diligence" requirement imposed by courts of appeal. It is clear that the motion would not survive the reasonable diligence test.

4    Rule 51 provides for requests to admit and responses. Where a party fails to respond it is deemed to admit the truth of the facts or the authenticity of documents mentioned in the request. If there is a response, the same deemed admissions occur unless the response specifically denies the truth of a fact or the authenticity of a document mentioned in the request or refuses to admit and sets out the reason for the refusal. An admission or a deemed admission may be withdrawn on consent or with leave of the court.

5    The rule is useful in reducing time spent on examinations for discovery, trial preparation and at trial. Facts may be established at trial in various ways, for example by evidence of witnesses, by admissions in pleadings and by reading into the trial record answers given in examinations for discovery. Rule 51 provides another convenient method for establishing facts. It does not, I think, possess a status superior to other methods. Until counsel has chosen to put before the trier of fact the notice and the response, those documents are not capable of establishing any facts for trial purposes.

6    Under circumstances where a miscarriage of justice may occur, a trial judge, before becoming functus, may exercise his or her discretion to reopen a trial and allow a party to adduce further facts. A party able to produce after trial a request and an answer under rule 51 may be, in my opinion, no better off on the equities than a party who has belatedly discovered a conclusive witness. In my view, the reception of those documents is not automatic and a court must examine all the circumstances in deciding whether or not to exercise its discretion in favour of their becoming a part of the trial record. Generally, I think, the court should approach that decision having in mind the same principles used in deciding for or against the receipt of fresh evidence.

7    Until the decision of Lane, J., in *Castlerigg Investments Inc v. Lam* [Feb. 15, 1991], the Ontario decisions held that, to succeed in adducing post-trial evidence, an applicant must establish:

   1. That the evidence, if presented at trial, would probably have changed the result, and

   2. The evidence could not have been obtained before trial by the exercise of reasonable diligence.

This twofold test is a somewhat less stringent version of the test applied to the admission of fresh evidence by courts of appeal.

8    In *Castlerigg*, Lane, J., conducted a careful review of cases decided in Ontario and elsewhere and concluded that the two-part test, while providing a guide to the exercise of a trial judge's discretion, was not absolute and, where it appeared the court had been misled, "perhaps deliberately", by the evidence of the plaintiff's witnesses, he admitted new evidence even when it could have been produced at trial had counsel thought it necessary. He said [p. 15]: "I am conscious that a diligence requirement is a salutary one and in most cases I would expect trial judges would scrutinize the circumstances of the discovery of the evidence with care being ... guided but not bound by the rules applicable to appellate courts."

9    In reaching his decision, Lane, J., relied largely on the decision of the British Columbia Court of Appeal in *Clayton v. British American Securities Ltd. et al* [1935], 1 D.L.R. 432. There the trial judge, after written reasons, but before entry of the judgement, reopened the trial to admit new evidence on the issue of fraudulent concealment. That order was appealed directly to the Court of Appeal. One of the issues was whether or not the rules applicable to the receipt of new evidence by courts of appeal and, in particular, the diligence test should have been applied by the trial judge. On this issue Macdonald, J.A., said at pages 440 and 441:

   My view has always been that the trial Judge might resume the hearing of an action apart from rules until entry of judgment but as it was vigorously combatted I have given it careful consideration. The point, as far as I know, has not been squarely

Case 09-10138-MFW   Doc 15740   Filed 06/12/15   Page 276 of 304

Qit Fer & Titane Inc. v. Upper Lakes Shipping Ltd., 1991 CarswellOnt 892

1991 CarswellOnt 892, [1991] O.J. No. 733, 27 A.C.W.S. (3d) 31, 2 W.D.C.P. (2d) 319...

decided; at least by any cases binding upon us. It is, I think a salutary rule to leave unfettered discretion to the trial Judge. He would of course discourage unwarranted attempts to bring forward new evidence available at the trial to disturb the basis of a judgment delivered or to permit a litigant after discovering the effect of a judgment to re-establish a broken-down case with the aid of further proof. If the power is not exercised sparingly and with the greatest care fraud and abuse of the Court's processes would likely result. Without that power however injustice might occur.

10     While the appeal in *Clayton* was dismissed, Macdonald, C.J.B.C. and Martin, J.A. dissented. McQuarrie, J.A. found that reasonable diligence had been shown and McPhilips, J.A. found that the Court of Appeal had no jurisdiction to hear the appeal since there had as yet been no judgment in the action.

11     In *Scott v. Cook*, [1970] 2 O.R. 769, Grant, J., referred to the *Clayton* case and then commented at p. 774:

It would appear from the preceding discussion that on an application to open up the proceedings made to the trial Judge on the grounds of newly discovered evidence, the applicant must show that the evidence he seeks to adduce is such that, if it had been presented at trial, it would *probably* have changed the result. On the other hand, a party seeking leave to introduce new or further evidence on appeal must show that the evidence is such that, if adduced, it would be conclusive or practically conclusive and not merely corroborative. *In both instances* the party must also prove that such evidence could not have been obtained by reasonable diligence before the trial. [underlining added]

In giving a resume of what other courts had said on the issue, Grant, J., noted that the trial judge should have an unfettered discretion "so as to ensure that a miscarriage of justice does not occur", and that "once a litigant has obtained a judgment, he is entitled not to be deprived of it without very solid grounds".

12     While the principles to be applied are, in my opinion, still not entirely clear, the following I think may be derived from the cases:

13     1. Until judgment has been entered, a trial judge has a discretion to reopen the trial and hear fresh evidence.

14     2. In exercising such discretion the judge should be guided by the twofold test: that the evidence would probably have changed the result at trial and it could not have been discovered by reasonable diligence.

15     3. Where justice demands it and particularly where fraud is involved or the court may have been deliberately misled, a judge is justified in departing from the diligence requirement in order to prevent a miscarriage of justice.

16     4. The power should be exercised sparingly. The court should discourage unwarranted attempts to bring forward evidence available at the trial to disturb the basis of a judgment delivered or to permit a litigant after discovering the effect of a judgment to reestablish a broken-down case with the aid of further proof.

17     5. Once a litigant has obtained a judgment, he is entitled not to be deprived of it without very solid grounds.

18     With those principles in mind I turn to the facts here.

19     At trial I found that the defendant, Upper Lakes Shipping, through its subsidiary Canal Electric, had failed to fulfil its contractual obligation to properly repair the plaintiff's aluminum smelter.

20     As to the cross claim, I made the same finding against Hopkins Steel and in particular found:

21     1. There was no clear evidence of instruction to perform only a temporary repair.

22     2. If Hopkins Steel had received specific welding instructions that were incorrect, it should have alerted its principal to the problems or not have proceeded with the work.

23     3. The work was badly done. Improper methods were employed and there was immediate cracking around the welds.

1991 CarswellOnt 892, [1991] O.J. No. 733, 27 A.C.W.S. (3d) 31, 2 W.D.C.P. (2d) 319...

24    4. Even for a temporary repair the work was done incorrectly.

25    I said that, if there had been clear evidence that Canal Electric had instructed Hopkins Steel to "do a temporary repair that would have lasted six months", there would have been some deduction for contributory fault.

26    The response to request to admit admitted that:

> 1. Hopkins Steel Works Limited carried out its contract with Upper Lakes Shipping Ltd. in accordance with the terms of the contract;

> 3. All instructions with respect to the work to be performed by Hopkins Steel Works Limited were given to Hopkins Steel Works Limited by Carborundum (Carborundum as defined in paragraph 7 of the Statement of Claim);

> 5. The welding, as done by Hopkins Steel Works Limited, was done properly for a temporary patch job;

> 6. The welding, as done by Hopkins Steel Works Limited, was done properly for a temporary patch job;

Had those admissions been tendered at trial I could not, as I did, have made the finding that, even for a temporary repair the work was done incorrectly. That finding however was not central to the result since I was unable to find that the instructions were to do only a temporary repair. Admission number one, looked at in isolation, appears to cover all aspects of the instructions given to Hopkins Steel, but when read in context with the whole of the response, it is obvious that the instructions given remained at issue. The answer to question three identifies the approach that Upper Lakes Shipping was taking to the litigation, namely that all instructions went directly from the plaintiff to Hopkins Steel. Questions seven, eight and nine address the issue of temporary repair. The answers in the response were:

> 3. Refuses to admit the truth of facts number 7, 8, and 9 for the following reasons:

>> (a) as to paragraph 7 of the request to admit ULS was not privy to the instructions given to Hopkins Steel Works Limited by Carborundum.

>> (b) As to paragraphs 8 and 9 of the request to admit, ULS retained Hopkins Steel Works Limited to repair the Queen furnace in accordance with the instructions Hopkins Steel Works Limited would receive from Carborundum, which instructions ULS was not privy to and which may have included a requirement that Hopkins Steel Works Limited make the furnace "as good as new".

Those answers make clear that Upper Lakes Shipping was not agreeing that Hopkins Steel was instructed to do only temporary repairs.

27    In my opinion therefore, even if the introduction of the request and response at trial would have altered one of the findings of fact it is unlikely that the result would have been different. I find that the applicant is unable to satisfy the first part of the test, namely that presentation of the rule 51 documents at trial would probably have changed the result.

28    If I am wrong in that conclusion then I think the diligence portion of the test is decisive. While I have a discretion to ignore it, I do not think I should do so here. The issues were developed at trial and the evidence was called without reference by anyone to the request and the response. An important part of the evidence and the argument by all counsel was directed to the nature of the contracts and, in particular, the instructions given by the plaintiff to Canal Electric and by Canal Electric to Hopkins Steel. I made findings of fact based on the evidence. Here, what is being tendered is not evidence which might cast doubt on the correctness of those findings but rather documents which, at best, set up a technical defence. Clearly, counsel for Hopkins Steel was entitled to rely on the rule 51 documents for trial purposes, but did not do so and entered into the contest as if they did not exist. I do not think under all the circumstances it would lead to a miscarriage of justice if Hopkins Steel were denied the opportunity to put them before the court now.

Qit Fer & Titane Inc. v. Upper Lakes Shipping Ltd., 1991 CarswellOnt 892

1991 CarswellOnt 892, [1991] O.J. No. 733, 27 A.C.W.S. (3d) 31, 2 W.D.C.P. (2d) 319...

29     The motion is dismissed.

## APPENDIX

April 22, 1991

**MEMORANDUM**

(from The Honourable Mr. Justice R.T.P. Gravely)

TO ALL COUNSEL:

J. Richler, Esq.,

J. Morin, Esq.,

R.B. Lawson, Esq.

*Re: reading for the Reasons for Judgment*

I note three errors:

1. Page 3: (line 13), the word "aluminium" should read "aluminum".

2. Page 5: (line 19), the word "experience" should read "experienced".

3. Page 7, (line 21), the names are reversed. The sentence should read: "He said Mr. Hannah used the words "temporary repair" and "patch" and said the work could be checked when the furnace was down for inspection in the summer.

---

**End of Document**

Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# TAB 26

505 F.Supp.2d 256
United States District Court,
D. Delaware.

Harry L. SAMUEL, Plaintiff,

v.

Thomas CARROLL, Lt. Porter, Counselor Kramer,
The IBCC, Robert Young, Correctional Medical
Service, and First Correctional Medical, Defendants.

Civ. No. 05–037–SLR.    |    Aug. 28, 2007.

**Synopsis**

**Background:** State inmate filed § 1983 action alleging that prison officials violated his constitutional rights. Officials moved to dismiss. The District Court, 463 F.Supp.2d 488, granted motions. Inmate filed motion for partial reconsideration. Prison's contract medical provider filed motion for summary judgment, and second provider filed motion for entry of judgment. Inmate filed motion to compel discovery against State defendants.

**Holdings:** The District Court, Sue L. Robinson, J., held that:

[1] motion for reconsideration was not a method to relitigate court's previous determination that inmate's claim that he was forced to wear handcuffs during a dental appointment was insufficient to state a claim;

[2] genuine issue of material fact as to whether contract medical provider had a policy or custom, in the form of a standard eight to nine month delay for tooth repair, that amounted to deliberate indifference to inmate's serious medical needs precluded summary judgment in favor of provider;

[3] inmate exhausted the administrative remedies available to him before filing § 1983 action;

[4] second contract medical provider failed to establish that entry of partial final judgment was warranted; and

[5] inmate's discovery requests, which sought names, title and duties of all person that had personal involvement in dealing with inmate's dental treatment, were relevant and appropriately limited to the remaining issues.

Motion for reconsideration denied; motion for summary judgment denied; motion for entry of final judgment denied; motions to compel discovery granted in part and denied in part.

West Headnotes (14)

**[1]**    **Federal Civil Procedure**
    Reconsideration

Motions for reconsideration are the functional equivalent of motions to alter or amend judgment. Fed.Rules Civ.Proc.Rule 59(e), 28 U.S.C.A.

1 Cases that cite this headnote

**[2]**    **Federal Civil Procedure**
            Grounds and Factors

The purpose of motions to alter or amend a judgment is to correct manifest errors of law or fact or to present newly discovered evidence; accordingly, a court may only alter or amend its judgment if the movant demonstrates at least one of the following: (1) a change in the controlling law; (2) the availability of new evidence; or (3) a need to correct a clear error of law or fact or to prevent manifest injustice.

1 Cases that cite this headnote

**[3]**    **Federal Civil Procedure**
            Further evidence or argument

A motion for reconsideration is not properly grounded on a request that a court rethink a decision already made, and may not be used as a means to argue new facts or issues that inexcusably were not presented to the court in the matter previously decided.

3 Cases that cite this headnote

**[4]**    **Federal Civil Procedure**
            Error by court

Reconsideration may be appropriate where the court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension.

2 Cases that cite this headnote

**[5]    Federal Civil Procedure**
     Grounds and objections

Motion for reconsideration of dismissal was not a method to relitigate court's previous determination that state inmate's claim that he was forced to wear handcuffs during a dental appointment, which resulted in painful injuries, was insufficient to state a claim upon which relief could be granted, as inmate identified no intervening facts, changes in controlling law, or manifest errors of law or fact.

Cases that cite this headnote

**[6]    Civil Rights**
     Vicarious or respondeat superior liability in general

The doctrine of respondeat superior is not an acceptable basis for liability under § 1983. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[7]    Civil Rights**
     Criminal law enforcement; prisons

For prison's contract medical provider to be liable under § 1983, there must be a policy or custom that resulted in the alleged deliberate indifference to inmate's serious medical need. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[8]    Civil Rights**
     Medical care and treatment

A prison official may manifest deliberate indifference to inmates' serious medical needs, in violation of § 1983, by intentionally denying or delaying access to medical care. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[9]    Civil Rights**
     Governmental Ordinance, Policy, Practice, or Custom

For purposes of § 1983 claim, a policy is made when a decisionmaker possessing final authority to establish policy with respect to the action issues an official proclamation, policy or edict; custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[10]    Federal Civil Procedure**
     Civil rights cases in general

Genuine issue of material fact as to whether prison's contract medical provider had a policy or custom, in the form of a standard eight to nine month delay for tooth repairs, that amounted to deliberate indifference to inmate's serious medical needs precluded summary judgment in favor of provider on inmate's § 1983 claim that he was forced to wait almost one year for a dental appointment to fill his decayed tooth. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[11]    Civil Rights**
     Criminal law enforcement; prisons

State inmate exhausted the administrative remedies available to him before filing § 1983 claim that he was forced to wait almost one year for a dental appointment to fill his decayed tooth, when he filed a grievance, satisfying the requirements of the Prison Litigation Reform Act (PLRA). 42 U.S.C.A. § 1983; Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

Cases that cite this headnote

**[12]    Health**

👈 Affidavits of merit or meritorious defense;
expert affidavits

State inmate's claim against prison's contract
medical provider, which was filed pursuant to
§ 1983, based on clinic's alleged violation of
inmate's Eighth Amendment rights, was not
subject to Delaware statute requiring submission
of an affidavit of merit to maintain a healthcare
negligence lawsuit. U.S.C.A. Const.Amend. 8;
42 U.S.C.A. § 1983; 18 Del.C. § 6853(a)(1).

1 Cases that cite this headnote

[13]    **Federal Courts**
        👈 Particular Actions and Rulings

Prison's contract medical provider failed to
establish that entry of partial final judgment was
warranted in inmate's § 1983 action. 42 U.S.C.A.
§ 1983; Fed.Rules Civ.Proc.Rule 54(b), 28
U.S.C.A.

Cases that cite this headnote

[14]    **Federal Civil Procedure**
        👈 Identity and location of witnesses and
        others

State inmate's discovery requests, which sought
names, title, and duties of all persons that had
personal involvement in dealing with inmate's
dental treatment, were relevant and appropriately
limited to the remaining issues in § 1983 action,
which alleged that inmate was forced to wait
almost one year for a dental appointment to fill
his decayed tooth. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*258**  Harry L. Samuel, Delaware Correctional Center,
Smyrna, DE. Pro se Plaintiff.

Ophelia Michelle Waters, Esquire, Deputy Attorney General,
Delaware Department of Justice, Wilmington, DE, for
Defendants Carroll, Porter, Kramer, IBCC, and Young.

Kevin J. Connors, Esquire, Marshall, Dennehey, Wagner,
Coleman & Goggin, Wilmington, DE, for Defendant
Correctional Medical Service.

Daniel L. McKenty, Esquire, Heckler & Frabizzio,
Wilmington, DE, for Defendant First Correctional Medical.

**MEMORANDUM OPINION**

SUE L. ROBINSON, District Judge.

**I. INTRODUCTION**

On January 10, 2005, Harry L. Samuel, a *pro se* plaintiff
proceeding *in forma pauperis* ("plaintiff"), [1] filed the present
action against: DCC Warden Thomas Carroll, Lieutenant
Porter ("Porter"), Counselor Kramer ("Kramer"), and
Correctional Officer Robert Young ("Young") (collectively,
**\*259** the "State defendants"); the Institutional Based
Classification Committee ("IBCC"); Correctional Medical
Services, Inc. ("CMS"); and First Correctional Medical
("FCM"). (D.I.2) Plaintiff amended his complaint on October
31, 2005. [2] (D.I.34) Plaintiff contends that defendants
breached his constitutional rights in violation of 42 U.S.C.
§ 1983 [3] by: (1) failing to classify him correctly, despite
his improved conduct and rehabilitation (the "classification
claim"); (2) failing to provide him with a toilet brush and
pillow (the "conditions claim"); (3) forcing him to wait almost
one year for a dental appointment to fill his decayed tooth (the
"dental claim"); and (4) forcing him to wear handcuffs during
a dental appointment which has resulted in painful injuries
(the "handcuff claim"). (D.I. 2 at 3)

[1]     Plaintiff is, and has been at all times relevant hereto,
        incarcerated at Delaware Correctional Center ("DCC")
        in Smyrna, Delaware. (D.I. 2 at 2)

[2]     This document, which measures only a page in length,
        supplements the information contained in the original
        complaint, rather than replacing it entirely. (*See* D.I. 34)

[3]     The statute provides, in pertinent part:
            Every person who, under color of any statute,
            ordinance, regulation, custom, or usage of any State
            or Territory ... subjects, or causes to be subjected,
            any citizens of the United States to the deprivation
            of any rights, privileges, or immunities secured by
            the Constitution and laws, shall be liable to the party
            injured in the action at law, suit in equity, or other
            proper proceeding for redress.

42 U.S.C. § 1983.

On September 26, 2005, pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b)(1), the court dismissed as frivolous plaintiffs classification and conditions claims. (D.I.23) Plaintiff moved for reconsideration of this dismissal (D.I.24, 26); on November 16, 2005, the court granted said motion only as to the conditions claim (D.I.36). In March 2006, the State defendants filed a motion to dismiss the claims against them pursuant to Fed.R.Civ.P. 12(b)(6). (D.I.53) CMS filed its own motion to dismiss on March 22, 2006.[4] (D.I.60) In the meantime, plaintiff filed a motion for default judgment as to all of the defendants (D.I.56), which the court denied as moot on November 15, 2006 (D.I.97).[5] Finally, on December 4, 2006, the court issued a memorandum opinion and order granting the State defendants' and CMS's motions to dismiss, leaving FCM as the sole remaining defendant in the case at bar. (D.I.100)

[4]     The IBCC and FCM, meanwhile, filed answers to the amended complaint and proceeded with discovery. (D.I.67, 74)

[5]     The court also dismissed defendant IBCC from the case, since "the only claim asserted against [it], the classification claim, [had] been dismissed." (D.I. 97 at 1 n. 2)

Presently before the court are: (1) plaintiff's motion for partial reconsideration of the court's December 4, 2006 order dismissing from the case the State defendants and CMS (D.I.103); (2) FCM's motion for summary judgment (D.I.115); (3) CMS's motion for entry of final judgment (D.I.121); and (4) plaintiff's three motions to compel (D.I.102, 106, 116). The court has jurisdiction over the present suit pursuant to 28 U.S.C. § 1331.

## II. BACKGROUND

In the late summer of 2004, plaintiff began experiencing pain and discomfort with one of his teeth. He believed that his tooth filling had fallen out, so he put in a sick call slip at the prison on September 3, 2004, requesting dental treatment. (D.I. 117 at D00016) When one month passed and plaintiff still had not seen a dentist, he filled out another sick call slip on October 2, 2004. (Id. at D00015) Although plaintiff was seen by an FCM dental assistant,[6] he alleges that "[he] did not receive any treatment" **260** and was told there would be an "8–9 month delay to have [his] decayed tooth filled." (D.I. 72 at 1) Dissatisfied by the continued delay in receiving

treatment for his tooth, plaintiff submitted a grievance form on October 7, 2004. (D.I. 19, ex. A–19 at 1)

[6]     At that time, FCM was the contract medical provider for DCC.

Plaintiff alleges that, on November 2, 2004, he underwent a "medical grievance dental examination" conducted by T.K. Kionke ("Kionke").[7] (D.I. 28, ex. 26; D.I. 72 at 2) Plaintiff had submitted an "Informal Resolution" form containing a handwritten note from Kionke, dated November 2, 2004, stating that plaintiff "[did not] want to sign off [on an informal resolution] until he [got] the treatment," even though Kionke "[w]arned him [that] fillings take [approximately] 8–9 months." (D.I. 2, ex. A–19 at 2) A hearing for plaintiffs grievance was held on February 2, 2005;[8] three days later, the Medical Grievance Committee ("MGC") recommended unanimously that plaintiff's grievance be denied, as he had been "seen by the dentist and [was] on the waiting list for a filling." (D.I. 117, ex. 22 at 7) Plaintiff appealed the MGC's decision, stating that "it now has been five and a half months and still no treatment. Every time I eat I think my tooth is going to break without being properly filled. The reason for this appeal is the dentist ['s] lack of diligence [in] the treatment of my tooth." (D.I.19, ex. A–20) On March 17, 2005, the Bureau Grievance Officer ("BGO") issued a decision upholding plaintiff's appeal and "recommend[ed] that FCM resolve the dental services availability problem." The BGO also noted that "an 8 to 9 month wait for tooth repair is unacceptable." (D.I. 117, ex. 22 at 5) The Bureau Chief "concur[red] with the recommendation of the BGO" (id., ex. 22 at 6) and, on June 20, 2005, sent plaintiff a letter stating that, "[b]ased upon the documentation presented for our review, we uphold your appeal request. Accordingly, there is no further issue to mediate nor Outside Review necessary as provided by BOP Procedure ..." (Id., ex.21)[9]

[7]     Plaintiff avers that, during this examination, he was required to "sit on [his] hands and handcuff[ed] in the dentist chair," causing the alleged arm, shoulder, and wrist injuries that form the basis for his handcuff claim. (D.I. 2, "Contin[ue]: Page 4") According to plaintiff, he waited approximately ten months "to see if the pain and injuries ... would go away" but, in September 2005, he put in a medical sick call to see a doctor regarding his alleged injuries from being handcuffed. Plaintiff was seen by a nurse on October 5, 2005. (D.I. 28 at 1) Plaintiff claims to have told the nurse that "it [felt] like something [was] broke[n] in [his] shoulder." (Id.) The nurse instructed him to stop exercising and gave him a

box of pain relievers and a container of muscle cream. (*Id.*) Plaintiff alleges that the nurse also stated that he might have pinched a nerve. (*Id.* at 2)

8    Plaintiff alleges that, at the grievance hearing, he was again informed that it would take between eight and nine months to have his tooth filled. (D.I. 19, ex. A–20; D.I. 72 at 2)

9    In the meantime, plaintiff had filed another sick call slip on June 9, 2005, stating: "My tooth filling came out 9 months ago and my teeth need to be filled.... This is my 6th attempt to get treatment and [it has been] over 9 months and no treatment yet." (D.I. 117, ex. 27)

On July 1, 2005, defendant CMS became the contract medical provider for DCC. (D.I. 34 at 1) Plaintiff's tooth was finally filled on September 7, 2005. According to plaintiff, "[t]he Dentist said plaque developed around the tooth, and [ate] some of the bone away that hold[s] the tooth." (D.I. 22 at 1) Plaintiff further alleges that, due to the year-long delay in treating his tooth (ten months of which was attributable to FCM), "[gingivitis] developed around the tooth and [ate] some of the tooth structure away, and another tooth needed to be filled." Plaintiff claims that **\*261** "[this] serious medical condition significantly affected [his] ability to eat and talk." (D.I. 72 at 3)

## III. STANDARD OF REVIEW

### A. Motion for Reconsideration

**[1]** **[2]** **[3]** **[4]** Motions for reconsideration are the "functional equivalent" of motions to alter or amend judgment under Federal Rule of Civil Procedure 59(e). *See Jones v. Pittsburgh Nat'l Corp.,* 899 F.2d 1350, 1352 (3d Cir.1990) (citing *Fed. Kemper Ins. Co. v. Rauscher,* 807 F.2d 345, 348 (3d Cir.1986)). The standard for obtaining relief under Rule 59(e) is difficult for a movant to meet, and motions for reconsideration or reargument "shall be sparingly granted," D. Del. LR 7.1.5 (effective June 30, 2007). The purpose of such motions is to "correct manifest errors of law or fact or to present newly discovered evidence." *Max's Seafood Café ex rel. Lou Ann, Inc. v. Quinteros,* 176 F.3d 669, 677 (3d Cir.1999). Accordingly, a court may only alter or amend its judgment if the movant demonstrates at least one of the following: (1) a change in the controlling law; (2) the availability of new evidence; or (3) a need to correct a clear error of law or fact or to prevent manifest injustice. *See id.* A motion for reconsideration is not properly grounded on a request that a court rethink a decision already made, *see Glendon Energy Co. v. Borough of Glendon,* 836

F.Supp. 1109, 1122 (E.D.Pa.1993), and may not be used "as a means to argue new facts or issues that inexcusably were not presented to the court in the matter previously decided," *Brambles USA, Inc. v. Blocker,* 735 F.Supp. 1239, 1240 (D.Del.1990). Reconsideration, however, may be appropriate where "the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Brambles USA,* 735 F.Supp. at 1241 (citations omitted).

### B. Summary Judgment

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.,* 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the nonmoving party fails to make a sufficient **\*262** showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### IV. DISCUSSION

## A. Motion for Reconsideration

**[5]** Plaintiff's motion for reconsideration requests reinstatement of the handcuff claim, which the court previously held was insufficient to state a claim upon which relief could be granted.[10] (D.I. 100 at 10) The court determined that the act of restraining a prisoner with shackles and handcuffs during dental treatment is a routine security measure in a prison setting.[11] (*Id.*) Nothing in the record indicated to the court that Young was acting with a culpable state of mind by not removing plaintiff's handcuffs when asked, and the court found that Young was under no duty to do so, since he "was simply following appropriate prison protocol." (*Id.*)

[10]    While the exact legal grounds upon which plaintiff's handcuff claim was based were not entirely clear, the court interpreted it to be a claim of excessive force and cruel and unusual punishment under the Eighth Amendment. (D.I. 100 at 8 n. 7)

[11]    Specifically, the court "[took] judicial notice ... as to the close proximity of the medical care provider and his or her dental instruments to the inmate during dental examinations and treatments, certainly a situation calling for security measures to be imposed." (D.I. 100 at 10 n. 8)

In connection with his motion for reconsideration, plaintiff asserts that the "policy of handcuffing plaintiff during dental treatment/examination was done in a way that cause[d] the plaintiff undue physical discomfort." (D.I. 103 at 1) Plaintiff further alleges (presumably, in response to the court's prior statement that "[p]laintiff admitted in his complaint that he has to be handcuffed everywhere he goes" (D.I. 100 at 10)), that he actually was allowed to walk around without handcuffs on a regular basis, and that "it was only during dental treatment/examination that the plaintiff was handcuffed." (*Id.*) "Plaintiff argue[s] that this **policy** of handcuffing [him] during dental treatment/ examination was done in a way that cause[d] the plaintiff undue physical discomfort, inflicted physical pain and restricted plaintiff['s] blood circulation." (*Id.* (emphasis in original))

A motion for reconsideration is not a method to relitigate issues that have already been decided. This, however, is what plaintiff is currently trying to accomplish. As plaintiff has identified no intervening facts, changes in controlling law, or manifest errors of law or fact, the court will deny his motion for reconsideration.[12] (D.I.103)

[12]    Again, plaintiff has attempted to resurrect his classification claim, arguing that it was not until he was moved to a high security unit, "for no reason," that he was required to be handcuffed at all times. (D.I. 103 at 2) Plaintiff has also submitted evidence purporting to show that he exhibited "good behavior" while classified at a lower level of security, meaning that there was no legitimate reason to increase his classification level or require him to be handcuffed during dental treatment. (*Id.*; *id.*, exs. 1–2) As the court has already determined, however, prison inmates do not have a constitutionally protected right to a certain classification status, and the policy of handcuffing prison inmates during dental treatment, a time at which the inmates are in close proximity to dental instruments that could be used as weapons, is a routine security measure. (D.I. 23 at 4–5; D.I. 100 at 10 n. 8)

## B. FCM's Motion for Summary Judgment

### 1. Respondeat superior liability

**[6]** **[7]** **[8]** **[9]** FCM contends that it is entitled to summary judgment because plaintiff has **\*263** failed to identify or serve any individual who is responsible for the allegedly unconstitutional lack of medical care described in his complaint. (D.I. 115 at ¶ 10) "It is an established principle that the doctrine of respondeat superior is not an acceptable basis for liability under 42 U.S.C. § 1983." *Moody v. Kearney,* 380 F.Supp.2d 393, 398 (D.Del.2005) (citing *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1988); *Swan v. Daniels,* 923 F.Supp. 626, 633 (D.Del.1995) (applying this principle to liability of private corporations that provide medical services for the State)). "In order for [FCM] to be liable, [therefore,] there must be a 'policy' or 'custom' that resulted in the alleged deliberate indifference to plaintiffs serious medical need."[13] *Id.* (citing *Monell,* 436 U.S. at 694, 98 S.Ct. 2018). " 'Policy is made when a decisionmaker possess[ing] final authority to establish ... policy with respect to the action issues an official proclamation, policy or edict.' " *Miller v. Corr. Med. Sys., Inc.,* 802 F.Supp. 1126, 1132 (D.Del.1992) (alteration in original) (quoting *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1480 (3d Cir.1990)). "Custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Id.* (citing *Andrews,* 895 F.2d at 1480; *Fletcher v. O'Donnell,* 867 F.2d 791, 793–94 (3d Cir.1989)).

13    A prison official may manifest deliberate indifference by "intentionally denying or delaying access to medical care." *Estelle v. Gamble,* 429 U.S. 97, 104–05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

Plaintiff's complaint alleges that, when he sought dental treatment from FCM, "[t]he dental assistant told [him] it would take 9 months to get [a] filling in [his] tooth." (D.I. 2, "Contin[ue]: Page 5"; *see also id.,* "Statement of Claims" at ¶ 5) In addition, plaintiff has submitted a handwritten note from T.K. Kionke, dated November 2, 2004, stating that she had "warned [plaintiff] fillings take [approximately] 8–9 months." (*Id.,* ex. A–19 at 2) On June 13, 2005, plaintiff submitted a letter explaining that he had filed another sick call slip because "[he] was told it [would] take 8–9 months to fill [his] tooth" and it had "been over 9 months and [he had] not had [his] tooth filled yet." (D.I.18) Although plaintiff grieved this long delay in dental treatment, the grievance was denied because he "[had been] seen by the dentist and [was] on the waiting list for a filling"; however, in upholding plaintiff's grievance on appeal, the BGO "recommend[ed] that FCM resolve the dental services availability problem; inordinate delays lead to more serious and expanding medical related issues, as well as higher costs. An 8 to 9 month wait for tooth repair is unreasonable." (D.I. 19, ex. 21 at 5, 7)

[10]    Viewing the underlying facts of the case at bar and all reasonable inferences therefrom in a light most favorable to plaintiff, the court finds that he has proffered evidence sufficient to show the existence of a genuine issue of material fact as to whether FCM had a "policy" or "custom" (in the form of a standard eight to nine month delay for tooth repair) that amounted to deliberate indifference to plaintiffs serious medical needs.

## 2. Exhaustion of administrative remedies

Under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, "[n]o action shall be brought with respect to prison conditions under [§ ] 1983 ... by a prisoner confined in any ... correctional facility **\*264** until such administrative remedies as are available are exhausted." *Id.* § 1997e(a). FCM contends that "[p]laintiff failed to exhaust all administrative remedies prior to filing this legal action" and, as such, "[i]n the absence of proof of exhaustion of all administrative remedies, plaintiff's complaint must be dismissed." (D.I. 115 at ¶ 12, citing *Hyson v. Corr. Med. Serv.,* Civ. A. No. 02–318–SLR, 2003 WL 292085, at *3 (D.Del. Feb. 6, 2003))

[11]    Attached to plaintiff's initial complaint is a DCC "Grievance Report" indicating that, on October 7, 2004, plaintiff filed a grievance because he had gone several months without receiving dental treatment and wanted "to have [his] to[o]th fill[ed] in by the dentist soon[,] before [he lost his] tooth." (D.I. 2, ex. A–19 at 1) On July 7, 2005, plaintiff filed a letter stating that, because he had not received the "dental treatment that [he had] requested [,] thereafter [he] submitted a grievance. Next [his] grievance was heard ..., and unresolved." (D.I. 19 at ¶ 1: *see also id.,* ex. A–19) Although plaintiff's grievance was initially denied, it was eventually upheld on appeal, thereby ending administrative review of plaintiff's dental claim. (*Id.* at ¶ ¶ 2–3; *see also id.,* exs. A–20, and "Department of Correction" letter). Plaintiff, therefore, clearly exhausted the administrative remedies available to him before filing the dental claim, satisfying the requirements of the PLRA.

## 3. Certificate of merit

[12]    Pursuant to 18 Del. C. § 6853, healthcare negligence lawsuits filed under the laws of the State of Delaware must be accompanied by an affidavit of merit, signed by an expert witness, "stating that there are reasonable grounds to believe that there has been healthcare medical negligence committed by each defendant." *Id.* § 6853(a)(1). FCM avers that, because "[his] complaint was not accompanied by either an affidavit of merit or a motion to extend time for filing such an affidavit ....[,] plaintiff's state law claims must be dismissed as a matter of law" (D.I. 115 at ¶ 11, citing *Jackson v. First Corr. Med. Servs.,* 380 F.Supp.2d 387, 392 (D.Del.2005)); however, as the case at bar does not involve a state law medical negligence claim, plaintiff's failure to file a certificate of merit is inconsequential. Plaintiff's claim against FCM, which was filed pursuant to federal law, is based on FCM's alleged violation of his Eighth Amendment rights. (D.I.2, 34) Because claimants filing suit under § 1983 are not required to submit an affidavit of merit, FCM's motion for summary judgement on that ground will be denied.

## C. CMS's Motion for Entry of Judgment

[13]    CMS has moved for the entry of partial final judgment under Fed.R.Civ.P. 54(b). (D.I.121) Rule 54(b) states, in pertinent part:

> When more than one claim for relief is presented in an action, ... or when multiple parties are involved, the court may direct the entry of a final

judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.

Fed.R.Civ.P. 54(b). Although the decision whether to certify as a final judgment rests in the discretion of the trial court, *see Sears, Roebuck & Co. v. Mackey,* 351 U.S. 427, 437, 76 S.Ct. 895, 100 L.Ed. 1297 (1956), the Supreme Court in *Curtiss–Wright Corp. v. General Electric Co.,* 446 U.S. 1, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980), suggested two relevant factors a trial court should consider in deciding whether there is just reason for delay: (1) judicial administrative **\*265** interests; and (2) the equities of the parties involved, *see id.* at 8, 100 S.Ct. 1460. Consideration of judicial administration counsels against piecemeal review that would force appellate courts to decide the same issues on subsequent appeal. *See id.*

According to CMS, "there is no just reason to delay the entry of a final judgment" in its favor, as "[CMS] was dismissed because liability did not lie with [it]." In addition, CMS avers that "[e]ntry of a final judgment ... [in its favor] would not hinder the progression of plaintiff's still active case." (D.I. 121 at ¶ 5) Upon consideration of the relevant factors and the record presented, however, the court is not persuaded that "there is no just reason for delay." Fed.R.Civ.P. 54(b). CMS's motion, therefore, is denied.

### D. Plaintiff's Motions to Compel [14]

[14] Plaintiff's first motion to compel, filed December 1, 2006, was directed at the State defendants. (D.I.102) As the claims against those defendants have already been dismissed in their entirety, this motion is denied as moot.

On November 8, 2006, plaintiff filed a motion to compel discovery from FCM. (D.I.95) On November 15, 2006, the court granted in part plaintiff's motion, requiring FCM to respond to discovery request numbers 2, 4, and 5 [15] by December 15, 2006. (D.I.97) FCM filed responses and documents before the expiration of the December 15th deadline (D.I.114, 115); despite this, on December 21, 2006 and March 8, 2007, plaintiff filed two more motions to compel (D.I.106, 116). [16]

[15] These particular paragraphs requested information related to FCM's "policies, directors, custom/procedure or instructions to staff" concerning filling plaintiff's

or other DCC inmates' teeth from September 5, 2004 to September 7, 2005; the duties of FCM "insofar as they pertain to ensuring that [plaintiff's or other inmates'] tooth [was] filled in a timely manner"; and "the [d]ates with all names, titles and duty" of the FCM staff members "[who] responded to, examined, treated, [or] filled plaintiff['s] tooth from September 5, 2004 to September 7, 200[5]." (D.I. 95, ex. 1 at ¶¶ 2, 4, 5)

[16] FCM has not filed a response to either of these motions.

[14] Plaintiff's first motion alleges "that the medical records submitted by FCM do not relate to the time fram[e] or the claim in dispute ( [September] 2004 to [September] 2005 regarding plaintiff['s] tooth problems) in regard to discovery request number 5." (D.I. 106 at 2) While FCM submitted copies of plaintiff's sick call slips from September 3 and October 2, 2004, both of which contain a notation that plaintiff was seen by dental personnel on October 7, 2004, plaintiff avers that FCM has identified neither the person who wrote those notes [17] nor the dental personnel who examined and/or treated plaintiff during the time period in question. (D.I. 106 at 2) Plaintiff's motion, therefore, "request[s] that the ... court order FCM to produce plaintiff['s] discovery request number[s] 5 and 4," as well as entering "judgment in plaintiff['s] favor p[u]rsuant to Fed. R[.] Civ[.] P[.] Rule 37 and grant[ing] plaintiff['s] complaint." (*Id.*)

[17] The entries appear to have been made by someone with the initials "S.W." The person's middle initial is illegible. (D.I. 104 at D00015–D00016)

On November 22, 2006, plaintiff filed an "Additional Discovery Request" directed at FCM. (D.I.99) On March 8, 2007, having failed to receive from FCM a satisfactory response to discovery request number 21, [18] **\*266** plaintiff filed a second motion to compel. (D.I.116) Plaintiff's motion seeks information related to: (1) "the dates with all names, title and dut[ies] of all FCM staff/person that had personal involvement in responding to, examined, treated, [or] filled plaintiff['s] tooth in regard to the matter and time fram[e] in dispute"; (2) "the name(s), title and dut[ies] of FCM staff[ ] and [the] person who is individually responsible for ... delaying plaintiff['s] dental treatment/filling for 8 to 9 months in regard to the matter and time fram[e] in dispute[,] September 3, 2004 to June 30, 2005"; and (3) "the reason why FCM delayed filling plaintiff['s] tooth for ... 8 to 9 month[s]." (*Id.*)

[18] This request directed FCM to

[s]tate the name, title and duty of the ... [FCM] staff member and[/]or person respons[i]ble for ... FCM regulations and policy, insofar as the staff member or person oversees the regulations and policy in ensuring that filling [plaintiff's or any other inmate's] tooth is done in a timely man [ner] that do[es] not cause undue suffering and pain. Produce the document from 10–7–2004 ( [September] 2004 to [September] 2005).

(D.I. 99 at ¶ 21)

The court finds plaintiff's discovery requests to be relevant and appropriately limited to the remaining issues in the litigation. Therefore, plaintiff's motions to compel (D.I.106, 116) are granted.

## V. CONCLUSION

For the reasons state above, plaintiff's motion for reconsideration and FCM's motion for summary judgment will be denied. CMS's motion for entry of judgment is denied. Plaintiff's motion to compel against the State defendants is denied as moot, and plaintiff's remaining two motions to compel discovery from FCM are granted. An appropriate order shall issue.

### ORDER

At Wilmington this 28th day of August, 2007, consistent with the memorandum opinion issued this same date; IT IS ORDERED that:

1. Plaintiff's motion for reconsideration (D.I.103) is denied.

2. FCM's motion for summary judgment (D.I.115) is denied.

3. CMS's motion for entry of final judgment (D.I.121) is denied.

4. Plaintiff's motion to compel discovery from State defendants Carroll, Porter, Kramer, and Young (D.I.102) is denied as moot.

5. Plaintiff's motions to compel discovery from FCM (D.I.106, 116) are granted. FCM shall respond to said discovery requests on or before September 24, 2007.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 27

2000 CarswellOnt 202

Ontario Superior Court of Justice

Schmuck v. Reynolds-Schmuck

2000 CarswellOnt 202, [2000] O.J. No. 247, 46 O.R. (3d) 702, 94 A.C.W.S. (3d) 504

# Derek A. Schmuck, Petitioner (Husband) and
# Patricia Reynolds-Schmuck, Respondent (Wife)

Himel J.

Heard: May 26, 1999
Heard: May 27, 1999
Heard: May 28, 1999
Heard: June 4, 1999
Judgment: February 1, 2000
Docket: D9381/98

Proceedings: additional reasons to (1999), 50 R.F.L. (4th) 429 (Ont. S.C.J.)

Counsel: *Deborah L. Ditchfield*, for Petitioner/Husband.
*Catherine A. Haber*, for Respondent/Wife.

Subject: Family; Civil Practice and Procedure

### Related Abridgment Classifications

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

### Headnote

**Family law --- Costs — Divorce proceedings — General**

Husband and wife were divorced and wife's entitlement to support and child support were determined at trial — Written submissions were made as to costs — Husband shall pay costs of wife for interim motion and at trial on party and party scale following assessment — There was divided success at trial with wife being more successful party — Neither of parties' offers to settle came within meaning of Rule 49 — Matters at trial were not complex, novel nor of public interest — Husband's assets and income base were such that he was better able to withstand award of costs against him and bear his own costs.

**Practice --- Trials — Conduct of trial — Powers and duties of trial Judge — Giving reasons for judgment**

Husband and wife were divorced and wife's entitlement to support and child support were determined at trial — Counsel for husband requested clarification and review of certain issues addressed in reasons for judgment — Reasons for judgment credited husband $4500 for direct payments to be applied against his retroactive support obligation — Reasons for judgment specified amount of retroactive child support owing and provided for right to review of order for spousal support in three years and before if material change in circumstances at earlier time — Husband's request for reconsideration of determinations made on issue of amount of credit due to husband for direct payments made to wife to offset amount of retroactive support due and basis of calculations for support credit based on evidence already considered by court was refused on discretion of court — Questions raised may be subject of appeal.

2000 CarswellOnt 202, [2000] O.J. No. 247, 46 O.R. (3d) 702, 94 A.C.W.S. (3d) 504

**Table of Authorities**

**Cases considered by *Himel J.*:**

*Andrews v. Andrews* (1980), 32 O.R. (2d) 29, 20 R.F.L. (2d) 348, 20 C.P.C. 88, 120 D.L.R. (3d) 252 (Ont. C.A.) — considered

*Castlerigg Investments Inc. v. Lam* (1991), 2 O.R. (3d) 216, 47 C.P.C. (2d) 270 (Ont. Gen. Div.) — applied

*DeGroote v. Canadian Imperial Bank of Commerce* (April 24, 1998), Doc. 92-CQ-12825 (Ont. Gen. Div.) — considered

*Grant v. Grant* (May 31, 1994), Doc. 671/93 (Ont. Gen. Div.) — considered

*Kent v. Frolick* (1996), 3 O.T.C. 122 (Ont. Gen. Div.) — considered

*QIT Fer & Titane Inc. v. Upper Lakes Shipping Ltd.* (1991), 3 O.R. (3d) 165 (Ont. Gen. Div.) — considered

*Smith v. Canadian Tire Acceptance Ltd.* (December 12, 1994), Doc. CP 93-CQ-32019 (Ont. Gen. Div.) — referred to

*671122 Ontario Ltd. v. Sagaz Industries Canada Inc.* (October 9, 1998), Doc. 34883/89 (Ont. Gen. Div.) — referred to

**Statutes considered:**

*Courts of Justice Act*, R.S.O. 1990, c. C.43
s. 131 — considered

**Rules considered:**

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194
R. 49 — considered

R. 57 — considered

R. 57.01 — considered

R. 69.15(5) — pursuant to


ADDITIONAL REASONS to judgment reported at (1999), 50 R.F.L. (4th) 429 (Ont. S.C.J.) dealing with costs and request by husband for clarification and review of judgment.

*Himel J.*:

**Reasons**

1      On August 12, 1999, I released Reasons for Judgment following a four day trial on two issues, the wife's entitlement to support including quantum, duration and retroactivity and whether child support should be retroactive to April 29, 1998.

2      As agreed, the parties have made written submissions to me on the question of costs.

2000 CarswellOnt 202, [2000] O.J. No. 247, 46 O.R. (3d) 702, 94 A.C.W.S. (3d) 504

3     A second issue has arisen at the instance of the Petitioner who seeks both a clarification and a review of certain matters arising from the judgment.

4     I deal first with my decision on costs and second with the request for clarification and reconsideration.

*1. Costs:*

5     Both parties have made submissions that they are entitled to costs following trial. The issue of costs of an interim motion before Kent J. was also reserved to the trial judge.

6     The Petitioner husband submits that he should be awarded costs on a party and party basis. Although neither party made an offer of settlement within the meaning of Rule 49 and obtained a better result at trial, he argues that the results of the motions and trial are closer to his offer than the wife's offers of settlement.

7     He also cites the factors in Rule 57.01 and submits that the wife's conduct lengthened unnecessarily the duration of the action by altering her position on the issue of equalization and disputing the value of the law partnership interest of the husband, by claiming excessive spousal support and by initially claiming sole custody. He argues that the results at trial were far below what the wife claimed in her counter-petition and that the court ordered a review in three years which is partial success for the husband.

8     In the written submissions filed, the husband does not ask the court to fix costs.

9     The Respondent wife submits that she should be awarded costs of this action on a party and party basis. She refers to offers to settle by her which she says were not unreasonable and that aspects of them included offers which were greater than what she was awarded at trial. She argues that her offers were closer to the order made than were the offers made by the husband and that, on balance, she was the more successful party. She also cites the factors under Rule 57 for consideration, namely, that the husband was unreasonable in his position on time-limited support, that the husband paid inadequate support following separation requiring the wife to bring an interim motion and that he made misleading statements at the motion about his income, the amount of time the children were with him, the payment of certain debts and credits that he sought for certain payments. She argues that he should be held to a higher standard because of his experience as a family law practitioner. She finally submits that her overall success on the issue of time-limited support and retroactive support as well as the respective financial abilities of the parties should be considered.

10     I have considered the written submissions of the parties including the correspondence and case law enclosed. Section 131 of the *Courts of Justice Act* provides that costs may be awarded in the discretion of the court and Rule 57.01 sets out a list of factors that may be considered by the trial judge in deciding who should be awarded costs, on what scale and in what amount. Those factors relevant to family law proceedings include the results in the proceeding, whether offers to settle were made in writing, the amount claimed and recovered, the complexity of the matters, the importance of the issues, conduct which tended to shorten or lengthen the proceeding, whether steps were improper or unnecessary and whether the party refused to admit something which should have been admitted.

11     In family law matters, the same approach is used as in other litigation. Costs usually follow the event. However, other factors may also be relevant. In a case with many diverse issues, success is often divided. Success is, therefore, only one factor. The conduct of the parties prior to litigation, during litigation and the income and assets of each party which affect their ability to bear their own or the other party's costs are all the factors recognized as relevant to the costs determination: *Andrews v. Andrews* (1980), 120 D.L.R. (3d) 252 (Ont. C.A.). Unlike other civil litigation, in family cases, the ability to pay a costs order or the effect of a costs award is taken into account as part of the financial arrangement on judgment.

12     The court will consider whether a family law claimant has made a reasonable settlement offer. Rule 49 costs consequences can apply but rarely are offers made in a formal way or within the proper time frame. On interim proceedings, in order to promote settlement, the judge is to take written proposals for settlement into account (Rule 69.15(5)).

2000 CarswellOnt 202, [2000] O.J. No. 247, 46 O.R. (3d) 702, 94 A.C.W.S. (3d) 504

13    In the circumstances of this case, I consider the following factors to be relevant:

(1) There was divided success following trial. The amount of spousal support was reduced from the interim order. The award of retroactive support and on a non-time limited basis was in favour of the wife. On balance, the wife was the more successful party;

(2) Offers to settle were made in writing by both parties but neither were offers within the meaning of Rule 49. Aspects of the offers of each party were higher than the order; other aspects were lower. Overall, I find the wife to have been more reasonable in her proposals for settlement;

(3) The amount of spousal support claimed was less than what was ordered. However, retroactive support and non-time limited support was also awarded;

(4) The matters in issue at trial were not complex, were not novel and were not of public interest;

(5) The conduct of the parties' prolonged resolution. The husband did not pay adequate interim support and the wife was required to bring a motion. The wife was endeavouring to settle just prior to trial and once the trial began, the husband's position was even less reasonable;

(6) The husband's assets and income base is such that he is better able to withstand an award of costs against him and bear his own costs.

14    Accordingly, I exercise my discretion and direct that the husband shall pay the costs of the wife for the interim motion and at trial on a party and party scale following assessment.

### 2. The Request by the Husband for Clarification and Review:

15    In addition to making written submissions on costs, counsel for the husband requested clarification and a review of certain issues addressed in the Reasons for Judgment. Counsel for the wife responded with the position that it would be inappropriate for counsel to make any further submissions to the court, and inappropriate for me to revise my Reasons for Judgment. She also requested an opportunity to respond if I chose to consider the questions raised. Since I am in agreement that it would be inappropriate for me to consider the questions raised, any further submissions are unnecessary.

16    At this point, a judgment has been rendered but it has not been formally entered. The case law is clear that until that time, a trial judge is not yet *functus*. The case law also recognizes that a trial judge has a wide discretion to permit the re-opening of a case prior to the entering of the judgment: See *Castlerigg Investments Inc. v. Lam* (1991), 2 O.R. (3d) 216 (Ont. Gen. Div.). Therefore, it is open to me to exercise my discretion and re-open the case for a reconsideration of certain issues.

17    In reviewing the questions posed, I have concluded that three questions are requests for clarification of my order. In my opinion these three questions are all answered by the Reasons for Judgment. However, in the interests of ensuring that all parties understand the Reasons for Judgment, I have briefly highlighted relevant portions of my Reasons.

18    Question 1 asks whether the Petitioner husband was given all the credit to which he is entitled for direct payments made to the wife after separation when the amount of retroactive support owed was calculated. I would direct counsel's attention to paragraph 61 of the Reasons for Judgment where the husband has been credited $4500 of direct payments to be applied against his retroactive support obligation. This amount reflects the entire amount of credit to which I have determined Mr. Schmuck is entitled.

19    Question 4 asks for a breakdown of the retroactive support amount in terms of the spousal and child support. Again, I would direct counsel's attention to paragraph 60 of my Reasons for Judgment where the amount of retroactive child support owing is specified.

2000 CarswellOnt 202, [2000] O.J. No. 247, 46 O.R. (3d) 702, 94 A.C.W.S. (3d) 504

20    The Reasons for Judgment provide for the right to a review of the order for spousal support in three years. Such a review clearly does not preclude either party making an application for a review based on a material change in circumstances at an earlier time. The three year review may be with respect to both the quantum and entitlement to support.

21    Questions 2 and 3 are requests for reconsideration of the determinations made on the issue of the amount of credit due to the husband for direct payments made to the wife to offset the amount of retroactive support due and the basis of the calculations for the support credit. I would note that these questions do not amount to a request to consider any new evidence on these issues. They simply ask for a reconsideration of the issues based on evidence already considered by the court.

22    *Castlerigg Investments* is often cited for the rule that a trial judge has untrammelled discretion to prevent abuse, the fundamental consideration being that a miscarriage of justice does not occur. The appropriate exercise of a trial judge's discretion is most often considered in the context of requests to re-open a trial in order to present new evidence: See *QIT Fer & Titane Inc. v. Upper Lakes Shipping Ltd.* (1991), 3 O.R. (3d) 165 (Ont. Gen. Div.); *Smith v. Canadian Tire Acceptance Ltd.* (December 12, 1994), Doc. CP 93-CQ-32019 (Ont. Gen. Div.); *671122 Ontario Ltd. v. Sagaz Industries Canada Inc.* (October 9, 1998), Doc. 34883/89 (Ont. Gen. Div.) . It is extremely rare for there to be a request to re-open a trial on the grounds of a reconsideration of the case.

23    In *Kent v. Frolick* (1996), 3 O.T.C. 122  (Ont. Gen. Div.) and *Grant v. Grant* (May 31, 1994), Doc. 671/93 (Ont. Gen. Div.), the court was faced with a party requesting a reconsideration of the case. In *Grant*, one party wanted a reconsideration of the amount of spousal support awarded. In *Kent*, the moving party asked for a reconsideration of the child support award, arguing that the evidence on the quantum of support was not fully understood by the court, and not fully canvassed at trial. In both cases, the court accepted that there was an untrammelled discretion to prevent a miscarriage of justice, but found that there was no justification to reconsider the case.

24    In *DeGroote v. Canadian Imperial Bank of Commerce* (April 24, 1998), Doc. 92-CQ-12825 (Ont. Gen. Div.) at paragraph 6, Lax J. explains the policy concerns in an application to re-open a trial: "The issue with which the cases have concerned themselves is how to balance the need to ascertain the truth upon full disclosure of all material facts with the need to preserve the integrity of the litigation process and prevent an abuse of its process. Both needs are directed at ensuring that justice is achieved."

25    It is my view that a party who wishes a reconsideration alone would have to establish that the integrity of the litigation process is at risk unless it occurs, or that there is some principle of justice at stake that would override the value of finality in litigation, or that some miscarriage of justice would occur if such a reconsideration did not take place. No such reasons exist in this case. The questions raised by counsel may be the subject of appeal. As such, I decline to exercise may discretion to reconsider any of the issues raised by the husband.

*Order accordingly.*

---

**End of Document**

Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# TAB 28

155 F.R.D. 95
United States District Court,
E.D. Pennsylvania.

John I. SMITH and Patricia N. Smith,
Co–Administrators of the Estate of
Patricia Marie Smith, Deceased, and
Natural Guardians of Johnathon Smith

v.

CITY OF CHESTER, Chester–Upland School
District, Chester–Upland Board of School
Directors and City of Chester Police Department.

Civ. A. No. 93–CV–5891.    |    April 19, 1994.

Parents of students who were injured and killed when they attempted to cross street while walking home from school brought action against city, school district, school district's board of directors, and city police department, alleging negligence and willful and wanton misconduct in failing to supervise school crossing guard. Defendants moved to dismiss. The United States District Court for the Eastern District of Pennsylvania, 842 F.Supp. 147, granted motion. Parents moved for reconsideration. The District Court, Joyner, J., held that motion would be denied, where parents failed to demonstrate error in district court's previous decision, and had only disagreed with court, which had determined that defendants were immune from liability under Pennsylvania Political Subdivision Tort Claims Act.

Motion denied.

West Headnotes (4)

**[1]    Federal Civil Procedure**
      🗝 Grounds and Factors

Party moving to alter or amend judgment must rely on one of three grounds: availability of new evidence not previously available, intervening change in controlling law, or need to correct clear error of law or to prevent manifest injustice. Fed.Rules Civ.Proc.Rule 59(e), 28 U.S.C.A.

22 Cases that cite this headnote

**[2]    Federal Civil Procedure**
      🗝 Justice; prevention of injustice

**Federal Civil Procedure**
      🗝 Error by court, clerk, or jury

Litigant considering bringing motion to reconsider judgment based upon need to correct clear error of law or to prevent manifest injustice should evaluate whether what may seem to be clear error of law is in fact simply disagreement between court and litigant. Fed.Rules Civ.Proc.Rule 59(e), 28 U.S.C.A.

74 Cases that cite this headnote

**[3]    Federal Civil Procedure**
      🗝 Further evidence or argument

Under rule governing motion to alter or amend judgment, parties are not free to relitigate issues that court has already decided, nor should parties make additional arguments which should have been made before judgment. Fed.Rules Civ.Proc.Rule 59(e), 28 U.S.C.A.

23 Cases that cite this headnote

**[4]    Federal Civil Procedure**
      🗝 Grounds and objections

Motion for reconsideration brought by parents of students who were injured and killed attempting to cross street while walking home from school, whose action against city, school district, school district's board of directors, and city police department had been dismissed for failure to state claim, would be denied, where parents failed to demonstrate error in district court's previous decision, and had only disagreed with court, which had determined that defendants were immune from liability under Pennsylvania Political Subdivision Tort Claims Act. Fed.Rules Civ.Proc.Rule 59(e), 28 U.S.C.A.; 42 Pa.C.S.A. § 8541.

6 Cases that cite this headnote

**Attorneys and Law Firms**

**\*96**  Anthony F. List, List & List, P.C., Media, PA, for plaintiffs.

Phillip B. Silverman, Philadelphia, PA, for defendants Chester–Upland School Dist. and Bd. of School Directors.

Paula F. Tripodi, Holsten & White, Media, PA, for defendant City of Chester Police Dept.

### *MEMORANDUM AND ORDER*

JOYNER, District Judge.

Pursuant to Federal Rule of Civil Procedure 59, plaintiffs have filed a motion for reconsideration of this Court's previous decision entered January 5, 1994, granting defendants' Chester–Upland School District and Chester–Upland Board of School Directors motion to dismiss, 842 F.Supp. 147. Because plaintiffs have done nothing more than disagree with this Court and have failed to demonstrate a clear error of law, we must deny plaintiffs' motion for reconsideration.

Plaintiffs John I. Smith and Patricia N. Smith initiated this action seeking damages when their daughter was killed and son was injured as they were crossing the street on the way home from school. Plaintiffs have filed a five count complaint against defendants seeking damages for negligence as well as punitive damages for willful and wanton misconduct. The accident occurred at the intersection of Route 320 and the 1700 block of Providence Road in Chester, Pennsylvania. On the day of the accident, the school crossing guard failed to report for duty. Plaintiffs claim that the crossing guard frequently failed to report to duty and further, that defendants were aware of this fact. On January 5, 1994, we granted defendants' motion to dismiss holding that defendants are immune under § 8541 of 42 Pa.C.S.A., The Pennsylvania Political Subdivision Tort Claims Act ("the Act"). It is this decision upon which the plaintiffs filed their motion for reconsideration.

**[1]**  "The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence." Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3rd Cir.1985), cert. denied, 476 U.S. 1171, 106 S.Ct. 2895, 90 L.Ed.2d 982 (1986) (citations omitted); Reich v. Compton, 834 F.Supp. 753, 755 (E.D.Pa.1993). Under Rule 59(e), a party must rely on one of three grounds: 1) the availability of new evidence not previously available, 2) an intervening change in controlling law, or 3) the need to  **\*97**  correct a clear error of law or to prevent manifest injustice. Reich, 834 F.Supp. at 755.

**[2]**  **[3]**  Courts in this circuit recognize that "any litigant considering bringing a motion to reconsider based upon [the third ground] should evaluate whether what may seem to be clear error of law is in fact simply a disagreement between the Court and the litigant." Reich, 834 F.Supp. at 755. Parties are not free to relitigate issues that the Court has already decided, nor should parties make additional arguments which should have been made before judgment. Id.; Rottmund v. Continental Assurance Co., 813 F.Supp. 1104, 1107 (E.D.Pa.1992).

**[4]**  Plaintiffs here offer no evidence not previously available, nor do they claim that there has been a change in controlling law. Rather, plaintiffs contend that there is a need to correct a clear error of law. Plaintiffs' contention is that the defendants are not immune from suit because an exception to immunity applies. Specifically, plaintiffs claim that the crossing guard in this case was a "traffic control" within the meaning of § 8542(b) of the Act. [1]

[1]  We need not consider other issues argued by plaintiffs as they are moot.

We have already addressed the arguments made by plaintiffs in their motion for reconsideration in our decision to grant summary judgment on behalf of defendants City of Chester and City of Chester Police Department, *See Smith v. City of Chester*, No. 93–CV–5891, slip op. (E.D.Pa. April 19, 1994), and have found them to be without merit.

Because plaintiffs have failed to demonstrate an error in our previous decision, and have only disagreed with this Court, plaintiffs' motion for reconsideration is denied. An appropriate order follows.

### *ORDER*

AND NOW, this 19th day of April, 1994, upon consideration of plaintiffs' motion for reconsideration of our previous decision granting defendants' motion to dismiss, and defendants' response thereto, it is hereby ORDERED that plaintiffs' motion is DENIED.

**Smith v. City of Chester, 155 F.R.D. 95 (1994)**
91 Ed. Law Rep. 980

### Parallel Citations

91 Ed. Law Rep. 980

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

**TAB 29**

(As amended Dec. 29, 1948, eff. Oct. 20, 1949; Apr. 30, 2007, eff. Dec. 1, 2007.)

## Rule 58. Entering Judgment

(a) SEPARATE DOCUMENT. Every judgment and amended judgment must be set out in a separate document, but a separate document is not required for an order disposing of a motion:

(1) for judgment under Rule 50(b);

(2) to amend or make additional findings under Rule 52(b);

(3) for attorney's fees under Rule 54;

(4) for a new trial, or to alter or amend the judgment, under Rule 59; or

(5) for relief under Rule 60.

(b) ENTERING JUDGMENT.

(1) *Without the Court's Direction.* Subject to Rule 54(b) and unless the court orders otherwise, the clerk must, without awaiting the court's direction, promptly prepare, sign, and enter the judgment when:

(A) the jury returns a general verdict;

(B) the court awards only costs or a sum certain; or

(C) the court denies all relief.

(2) *Court's Approval Required.* Subject to Rule 54(b), the court must promptly approve the form of the judgment, which the clerk must promptly enter, when:

(A) the jury returns a special verdict or a general verdict with answers to written questions; or

(B) the court grants other relief not described in this subdivision (b).

(c) TIME OF ENTRY. For purposes of these rules, judgment is entered at the following times:

(1) if a separate document is not required, when the judgment is entered in the civil docket under Rule 79(a); or

(2) if a separate document is required, when the judgment is entered in the civil docket under Rule 79(a) and the earlier of these events occurs:

(A) it is set out in a separate document; or

(B) 150 days have run from the entry in the civil docket.

(d) REQUEST FOR ENTRY. A party may request that judgment be set out in a separate document as required by Rule 58(a).

(e) COST OR FEE AWARDS. Ordinarily, the entry of judgment may not be delayed, nor the time for appeal extended, in order to tax costs or award fees. But if a timely motion for attorney's fees is made under Rule 54(d)(2), the court may act before a notice of appeal has been filed and become effective to order that the motion have the same effect under Federal Rule of Appellate Procedure 4(a)(4) as a timely motion under Rule 59.

(As amended Dec. 27, 1946, eff. Mar. 19, 1948; Jan. 21, 1963, eff. July 1, 1963; Apr. 22, 1993, eff. Dec. 1, 1993; Apr. 29, 2002, eff. Dec. 1, 2002; Apr. 30, 2007, eff. Dec. 1, 2007.)

## Rule 59. New Trial; Altering or Amending a Judgment

(a) IN GENERAL.

(1) *Grounds for New Trial.* The court may, on motion, grant a new trial on all or some of the issues—and to any party—as follows:

(A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court; or

(B) after a nonjury trial, for any reason for which a re-hearing has heretofore been granted in a suit in equity in federal court.

(2) *Further Action After a Nonjury Trial.* After a nonjury trial, the court may, on motion for a new trial, open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment.

(b) TIME TO FILE A MOTION FOR A NEW TRIAL. A motion for a new trial must be filed no later than 28 days after the entry of judgment.

(c) TIME TO SERVE AFFIDAVITS. When a motion for a new trial is based on affidavits, they must be filed with the motion. The opposing party has 14 days after being served to file opposing affidavits. The court may permit reply affidavits.

(d) NEW TRIAL ON THE COURT'S INITIATIVE OR FOR REASONS NOT IN THE MOTION. No later than 28 days after the entry of judgment, the court, on its own, may order a new trial for any reason that would justify granting one on a party's motion. After giving the parties notice and an opportunity to be heard, the court may grant a timely motion for a new trial for a reason not stated in the motion. In either event, the court must specify the reasons in its order.

(e) MOTION TO ALTER OR AMEND A JUDGMENT. A motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment.

(As amended Dec. 27, 1946, eff. Mar. 19, 1948; Feb. 28, 1966, eff. July 1, 1966; Apr. 27, 1995, eff. Dec. 1, 1995; Apr. 30, 2007, eff. Dec. 1, 2007; Mar. 26, 2009, eff. Dec. 1, 2009.)

**Rule 60. Relief from a Judgment or Order**

(a) CORRECTIONS BASED ON CLERICAL MISTAKES; OVERSIGHTS AND OMISSIONS. The court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record. The court may do so on motion or on its own, with or without notice. But after an appeal has been docketed in the appellate court and while it is pending, such a mistake may be corrected only with the appellate court's leave.

(b) GROUNDS FOR RELIEF FROM A FINAL JUDGMENT, ORDER, OR PROCEEDING. On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

(1) mistake, inadvertence, surprise, or excusable neglect;

(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

(4) the judgment is void;

# TAB 30

(A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court; or

(B) after a nonjury trial, for any reason for which a re-hearing has heretofore been granted in a suit in equity in federal court.

(2) *Further Action After a Nonjury Trial.* After a nonjury trial, the court may, on motion for a new trial, open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment.

(b) TIME TO FILE A MOTION FOR A NEW TRIAL. A motion for a new trial must be filed no later than 28 days after the entry of judgment.

(c) TIME TO SERVE AFFIDAVITS. When a motion for a new trial is based on affidavits, they must be filed with the motion. The opposing party has 14 days after being served to file opposing affidavits. The court may permit reply affidavits.

(d) NEW TRIAL ON THE COURT'S INITIATIVE OR FOR REASONS NOT IN THE MOTION. No later than 28 days after the entry of judgment, the court, on its own, may order a new trial for any reason that would justify granting one on a party's motion. After giving the parties notice and an opportunity to be heard, the court may grant a timely motion for a new trial for a reason not stated in the motion. In either event, the court must specify the reasons in its order.

(e) MOTION TO ALTER OR AMEND A JUDGMENT. A motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment.

(As amended Dec. 27, 1946, eff. Mar. 19, 1948; Feb. 28, 1966, eff. July 1, 1966; Apr. 27, 1995, eff. Dec. 1, 1995; Apr. 30, 2007, eff. Dec. 1, 2007; Mar. 26, 2009, eff. Dec. 1, 2009.)

## Rule 60. Relief from a Judgment or Order

(a) CORRECTIONS BASED ON CLERICAL MISTAKES; OVERSIGHTS AND OMISSIONS. The court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record. The court may do so on motion or on its own, with or without notice. But after an appeal has been docketed in the appellate court and while it is pending, such a mistake may be corrected only with the appellate court's leave.

(b) GROUNDS FOR RELIEF FROM A FINAL JUDGMENT, ORDER, OR PROCEEDING. On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

(1) mistake, inadvertence, surprise, or excusable neglect;

(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

(4) the judgment is void;

(5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6) any other reason that justifies relief.

(c) TIMING AND EFFECT OF THE MOTION.

(1) *Timing.* A motion under Rule 60(b) must be made within a reasonable time—and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding.

(2) *Effect on Finality.* The motion does not affect the judgment's finality or suspend its operation.

(d) OTHER POWERS TO GRANT RELIEF. This rule does not limit a court's power to:

(1) entertain an independent action to relieve a party from a judgment, order, or proceeding;

(2) grant relief under 28 U.S.C. §1655 to a defendant who was not personally notified of the action; or

(3) set aside a judgment for fraud on the court.

(e) BILLS AND WRITS ABOLISHED. The following are abolished: bills of review, bills in the nature of bills of review, and writs of coram nobis, coram vobis, and audita querela.

(As amended Dec. 27, 1946, eff. Mar. 19, 1948; Dec. 29, 1948, eff. Oct. 20, 1949; Mar. 2, 1987, eff. Aug. 1, 1987; Apr. 30, 2007, eff. Dec. 1, 2007.)

## Rule 61. Harmless Error

Unless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.

(As amended Apr. 30, 2007, eff. Dec. 1, 2007.)

## Rule 62. Stay of Proceedings to Enforce a Judgment

(a) AUTOMATIC STAY; EXCEPTIONS FOR INJUNCTIONS, RECEIVERSHIPS, AND PATENT ACCOUNTINGS. Except as stated in this rule, no execution may issue on a judgment, nor may proceedings be taken to enforce it, until 14 days have passed after its entry. But unless the court orders otherwise, the following are not stayed after being entered, even if an appeal is taken:

(1) an interlocutory or final judgment in an action for an injunction or a receivership; or

(2) a judgment or order that directs an accounting in an action for patent infringement.

(b) STAY PENDING THE DISPOSITION OF A MOTION. On appropriate terms for the opposing party's security, the court may stay the execution of a judgment—or any proceedings to enforce it—pending disposition of any of the following motions:

(1) under Rule 50, for judgment as a matter of law;

(2) under Rule 52(b), to amend the findings or for additional findings;

(3) under Rule 59, for a new trial or to alter or amend a judgment; or

(4) under Rule 60, for relief from a judgment or order.