# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| | Case No. 09-10138 (KG) |
| NORTEL NETWORKS INC., *et al.*, | Jointly Administered |
| Debtors.[1] | **Re Docket Nos. 15611, 15612, 15613, 15615, 15622** |
| | **Hearing Date: June 25, 2015** |

## THE JOINT ADMINISTRATORS' OBJECTION AND RESPONSE TO THE MOTIONS FOR RECONSIDERATION AND CLARIFICATION

---

[1]     The debtors in these chapter 11 cases (the "U.S. Debtors"), along with the last four digits of each debtor's tax identification number, are: Nortel Networks Inc. (6332) ("NNI"); Nortel Networks Capital Corporation (9620) ("NNCC"); Nortel Altsystems Inc. (9769); Nortel Altsystems International Inc. (5596); Xros, Inc. (4181); Sonoma Systems (2073); Qtera Corporation (0251); CoreTek, Inc. (5722); Nortel Networks Applications Management Solutions Inc. (2846); Nortel Networks Optical Components Inc. (3545); Nortel Networks HPOCS Inc. (3546); Architel Systems (U.S.) Corporation (3826); Nortel Networks International Inc. (0358); Northern Telecom International Inc. (6286); Nortel Networks Cable Solutions Inc. (0567); Nortel Networks (CALA) Inc. (4226).

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................2

ARGUMENT .......................................................................................................6

    I.    NOTHING IN THE U.S. ALLOCATION DECISION REQUIRES
        RECONSIDERATION. ........................................................................6

        A.    The U.S. Allocation Decision Properly Excludes the Bondholders'
            Guarantee Claim in Calculating NNI's Allocation. ....................7

            1.    The Court Has Considered and Rejected Counting the
                Bondholders' Guarantee Claim for Allocation. .............................8

            2.    The U.S. Debtors' Characterization of the Impact of the
                U.S. Allocation Decision Is Flawed................................................10

            3.    If the Court Reverses Course and Credits NNI for the
                Bondholders' Guarantee Claim for Allocation Purposes, the
                Same Treatment Should Be Afforded to All Other Similar
                Claims. .............................................................................................12

        B.    NNI Is Not Entitled to a Direct Allocation of Sale Proceeds
            Attributable to NGS and Diamondware........................................13

    II.    NOTHING IN THE U.S. ALLOCATION DECISION REQUIRES
        CLARIFICATION. ..............................................................................15

        A.    Clarification Is Unnecessary Regarding the Court's Recognition of
            Each Individual Debtor's Entitlement to an Allocation that Counts
            All Claims, Including All Intercompany Claims. ......................15

            1.    The Court Made Clear that Allocation Will Be to
                Individual Debtors, Not Debtor Groups, to Respect the
                Corporate Separateness of Each Debtor. .......................................16

            2.    The Court Made Clear that All Intercompany Claims Will
                Be Counted for Purposes of Allocation. ........................................18

                a.    The Court Clearly Decided that Intercompany
                     Claims Will Be Counted in Calculating Each
                       Debtor's Allocation............................................................18

# TABLE OF CONTENTS

b. The U.S. Debtors' Attempt to Exclude Intercompany Claims Between Debtors in the Same Geographic Group Is Unprincipled and Inconsistent.........19

c. The U.S. Debtors' Position Would Eliminate Legitimate Intercompany Claims Between EMEA Debtors. ............................................................................21

B. Clarification Is Unnecessary Regarding the Court's Oversight of the Debtors' Claims Processes...................................................................23

1. Specific Procedures for Resolving Disputed Claims Are Not a Proper Subject of Clarification.............................................23

2. The U.S. Debtors' Aspersions on the EMEA Claims Processes, the UKPC's Claim, and the Joint Administrators Are Baseless and Provide No Support for "Clarifying" the U.S. Allocation Decision. ..............................................................24

a. The Court Should Defer to Recognized U.K. Insolvency Proceedings Under Principles of Comity................................................................................25

b. The UKPC's Claim Will Be Determined Pursuant to Statutory Guidelines and Subject to Comprehensive Review. ....................................................28

C. Clarification Is Unnecessary that the Value of Settlements of Prepetition Debt Will Be Counted for Allocation Purposes. .....................32

D. Clarification Is Unnecessary that Reserved and Estimated Claims Arising Prepetition Will Be Included for Allocation Purposes. ................33

E. Particular Settlements, Intercompany Claims, and Reserves Should Be Subject to Review By the Courts in the Event of Any Bona Fide Dispute. .............................................................................................34

CONCLUSION..................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re ABC Learning Centres Ltd.*,
    728 F.3d 301 (3d Cir. 2013)...........................................................................................26

*Accenture Global Servs., GmbH v. Guideware Software, Inc.*,
    800 F. Supp. 2d 613 (D. Del. 2011)..............................................................................7, 8

*In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd.*,
    238 B.R. 25 (Bankr. S.D.N.Y. 1999), *aff'd sub nom. In re Petition of Bd. of Dirs. of
    Hopewell Int'l Ins. Ltd.*, 275 B.R. 699 (S.D.N.Y. 2002) ...........................................25

*In re Bird*,
    229 B.R. 90 (Bankr. S.D.N.Y. 1999)............................................................................26

*Brambles USA, Inc. v. Blocker*,
    735 F. Supp. 1239 (D. Del. 1990)..............................................................................7, 13

*Petition of Brierley*,
    145 B.R. 151 (Bankr. S.D.N.Y. 1992)......................................................................25, 26

*Elan Pharma Int'l Ltd. v. Abraxis Bioscience, Inc.*,
    No. 06-438 GMS, 2007 WL 6382930 (D. Del. Dec. 17, 2007)...................................15

*In re Gercke*,
    122 B.R. 621 (Bankr. D.D.C. 1991) ........................................................................25, 26

*Hazel v. Smith*,
    190 F. App'x 137 (3d Cir. 2006) .................................................................................15

*In re Ionica PLC*,
    241 B.R. 829 (Bankr. S.D.N.Y. 1999)......................................................................25, 26

*Johnson v. Diamond State Port Corp.*,
    50 F. App'x 554 (3d Cir. 2002) .....................................................................................6

*JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*,
    412 F.3d 418 (2d Cir. 2005)...........................................................................................25

*Lindner Fund, Inc. v. Polly Peck Int'l PLC*,
    143 B.R. 807 (S.D.N.Y. 1992).............................................................................25, 26, 31

*Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros*,
    176 F.3d 669 (3d Cir. 1999)............................................................................................7

# TABLE OF AUTHORITIES

**Page(s)**

*In re Manning*,
   236 B.R. 14 (B.A.P. 9th Cir. 1999)........................................................................26

*In re Maxwell Commc'n Corp.*,
   93 F.3d 1036 (2d Cir. 1996)................................................................................26

*Morningred v. Delta Family-Care & Survivorship Plan*,
   790 F. Supp. 2d 177 (D. Del. 2011), *aff'd*, 526 F. App'x 217 (3d Cir. 2013) ...........7

*In re New Century TRS Holdings, Inc.*,
   No. 07-10416 (KJC), 2013 WL 5231456 (Bankr. D. Del. Sept. 17, 2013) ...........6, 7

*In re Nortel Networks, Inc.*,
   522 B.R. 491 (Bankr. D. Del. 2014) ...............................................................31, 32

*In re Nortel Networks, Inc.*,
   669 F.3d 128 (3d Cir. 2011)................................................................................29

*Official Comm. of Unsecured Creditors v. Catholic Diocese of Wilmington, Inc.*
   *(In re Catholic Diocese of Wilmington, Inc.)*,
   437 B.R. 488 (Bankr. D. Del. 2010) .................................................................7, 8

*Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of Del., Inc.*
   *ex rel. Hechinger Inv. Co. of Del., Inc. v. Fleet Retail Fin. Grp.*
   *(In re Hechinger Inv. Co. of Del.)*,
   303 B.R. 18 (D. Del. 2003)...................................................................................7

*Oui Fin. LLC v. Dellar*,
   No. 12 Civ. 7744(RA), 2013 WL 5568732 (S.D.N.Y. Oct. 9, 2013) ......................25

*Remington Rand Corp.–Delaware v. Bus. Sys. Inc.*,
   830 F.2d 1260 (3d Cir. 1987)..............................................................................25

*SMS Demag, Inc. v. ABB Transmissone & Distribuzone, S.P.A.*,
   No. 05-00466, 2008 WL 2433093 (W.D. Pa. June 12, 2008) ................................15

*Stonington Partners, Inc. v. Lernout & Hauspie Speech Prods. N.V.*,
   310 F.3d 118 (3d Cir. 2002)................................................................................25

*In re W.R. Grace & Co.*,
   398 B.R. 368 (D. Del. 2008).................................................................................7

**STATUTES AND RULES**

11 U.S.C. § 323.......................................................................................................31

11 U.S.C. § 541.......................................................................................................32

iv

# TABLE OF AUTHORITIES

**Page(s)**

11 U.S.C. § 1525......................................................................................................26

11 U.S.C. § 1526......................................................................................................26

11 U.S.C. § 1527......................................................................................................26

11 U.S.C. § 1529......................................................................................................26

29 U.S.C. § 1362............................................................................................... 30, 31

**REGULATIONS**

29 C.F.R. § 4044......................................................................................................30

The court-appointed administrators and authorized foreign representatives

(collectively, the "Joint Administrators")[2] for nineteen Nortel entities located in Europe, the

Middle East, and Africa (collectively, the "EMEA Debtors")[3] in proceedings under the

*Insolvency Act 1986*, pending before the High Court of Justice of England and Wales (the

"English Court"), respectfully submit this objection and response (the "Response") to the

motions filed by the U.S. Debtors [D.I. 15611] (the "U.S. Debtors' Motion"), the ad hoc group of

bondholders [D.I. 15612] (the "Bondholder Motion"), and Law Debenture Trust Company of

New York [D.I. 15615] (the "Law Debenture Motion" and, together with the U.S. Debtors'

Motion, the Bondholder Motion, and joinders thereto, the "Motions")[4] for entry of an order

reconsidering or clarifying certain aspects of the Allocation Trial Opinion [D.I. 15544] (the

---

[2]    The Joint Administrators in the English proceedings for all of the EMEA Debtors, with the exception of Nortel
       Networks (Ireland) Limited ("NNIR"), are:  Alan Robert Bloom, Christopher John Wilkinson Hill, Alan
       Michael Hudson, and Stephen John Harris.  The Joint Administrators in the English proceedings for NNIR are:
       Alan Robert Bloom and David Martin Hughes.  Following the allocation decisions, Stephen Taylor has been
       appointed as a Joint Administrator for Nortel Networks S.A. ("NNSA") to represent NNSA's interests to the
       extent they conflict with the interests of the other eighteen EMEA Debtors.

[3]    The EMEA Debtors are:  Nortel Networks UK Limited ("NNUK"); NNIR; NNSA; Nortel GmbH ("Nortel
       Germany"); Nortel Networks (Austria) GmbH; Nortel Networks AB; Nortel Networks B.V.; Nortel Networks
       Engineering Service Kft; Nortel Networks France S.A.S. ("Nortel France SAS"); Nortel Networks Hispania,
       S.A.; Nortel Networks International Finance & Holding B.V.; Nortel Networks N.V.; Nortel Networks Oy;
       Nortel Networks Polska Sp. z.o.o. ("Nortel Poland"); Nortel Networks Portugal S.A.; Nortel Networks Romania
       SRL; Nortel Networks S.p.A. ("Nortel Italy"); Nortel Networks Slovensko, s.r.o.; Nortel Networks, s.r.o.  Other
       EMEA entities impacted by the allocation decisions are Nortel Networks A.G., Nortel Networks Scandinavia
       AS, and Nortel Networks South Africa (Proprietary) Limited; however, these entities are not in administration,
       they have their own directors and counsel, and this submission is not made on their behalf.  This submission is
       also not made on behalf of NNSA, which for these and certain other purposes is advised by separate legal
       counsel.  The Joint Administrators understand that a separate submission will be made by NNSA in relation to
       these Motions.

       However, for purposes of discussing the effect of the allocation decisions on the EMEA Debtors in this
       Response, references to the EMEA Debtors are to all nineteen entities listed above (including NNSA) and the
       non-filed entities, each of which is a signatory to the Interim Funding and Settlement Agreement ("IFSA") and
       accordingly has rights to the lockbox proceeds.

[4]    The Official Committee of Unsecured Creditors (the "Committee") filed a joinder to the U.S. Debtors' Motion
       [D.I. 15613] (the "Committee Joinder").  The Bank of New York Mellon filed a joinder to the U.S. Debtors'
       Motion and the Bondholder Motion [D.I. 15622].  The U.S. Debtors and others have filed companion motions
       for reconsideration of the allocation decision (the "Canadian Allocation Decision") of the Ontario Superior
       Court of Justice – Commercial List (the "Canadian Court").

"U.S. Allocation Decision") and related Order [D.I. 15545] (the "U.S. Allocation Order"), each

entered May 12, 2015.[5]  In support of the Response, the Joint Administrators respectfully state as

follows:

## PRELIMINARY STATEMENT

1.     On May 12, 2015, following a historic cross-border trial, this Court and

the Canadian Court (the "Courts") issued separate decisions that answered the question put to

them by the parties:  "What is the appropriate allocation of the sums paid to Nortel in the

bankruptcy sales . . . among the Nortel Entities?"  (U.S. Allocation Decision at 2.)  This question

has dominated these proceedings since the Courts approved the IFSA nearly six years ago, laying

the groundwork for the parties to sell their assets and raise the proceeds at issue.  The Courts'

clear answer is that the appropriate allocation methodology is a modified pro rata approach,

measured by allowed claims against each Nortel debtor.

2.     Reconsideration is an extraordinary remedy that will be granted only upon

a showing of clear error or manifest injustice, and the U.S. Debtors' Motion falls well short of

this high standard.  Clarification should also be denied because the U.S. Debtors have failed to

demonstrate that any aspect of the U.S. Allocation Decision is vague or ambiguous.

3.     First, the Court should decline to reconsider its determination that the

claim of the ad hoc group of bondholders (the "Bondholders") – like all claims – should only be

counted once for allocation purposes.  This claim was the subject of significant evidence and

debate at trial, which the Court considered in making its decision.  In an attempt to justify double

counting, the U.S. Debtors mischaracterize the impact of the Court's decision by relying on

---

[5]     The Joint Administrators and the EMEA Debtors reserve all rights to appeal from the U.S. Allocation Decision
and U.S. Allocation Order or from any judgment, order, or decree granting reconsideration or clarification of
the U.S. Allocation Decision and U.S. Allocation Order.

flawed numbers that ignore the impact of NNI's cash on hand and an allowed $2 billion intercompany claim, both of which the Court expressly preserved for NNI's estate.

4. Further, the U.S. Debtors suggest that the outcome of the U.S. Allocation Decision is favorable to the EMEA Debtors as a group, which ignores the effect of the decision on creditors of a number of individual EMEA debtors, for example NNSA's creditors and NNIR's creditors, who likely will receive distributions far below what they would have received under nearly every allocation theory presented by the parties at trial. Indeed, the impact of the U.S. Allocation Decision on NNSA is likely to be so different from the other EMEA entities that a conflicts administrator has been appointed for NNSA, who has retained separate counsel to act in relation to allocation issues.

5. Flawed numbers aside, the debate about which creditors do better than others misses one of the main points of the U.S. Allocation Decision, *i.e.*, that it addresses allocation, not distribution. The Court expressly states that the decision is not intended to effect a global substantive consolidation, an outcome the U.S. Debtors argued was impermissible in this case under U.S. law. Rather, the U.S. Allocation Decision adopts a modified pro rata approach, which expressly preserves debtor-specific cash on hand, among other estate assets. Thus, creditors of different debtors will *necessarily* obtain different recoveries. Even taking the U.S. Debtors' numbers at face value, U.S. creditors will likely receive a higher recovery than creditors of a number of individual EMEA debtors, while receiving a lower recovery than creditors of others. The U.S. Debtors now appear to be complaining that the Court's modified pro rata approach will not result in uniform recoveries for all Nortel creditors around the world – in other words, they are complaining that they did not get the global substantive consolidation they so vehemently opposed at trial.

6.     Second, the Court should decline to make a separate allocation to NNI on account of its outright ownership of the Diamondware and NGS units (each defined below). Again, the U.S. Debtors ostensibly seek reconsideration, but are in fact asking the Court to reverse its decision to adopt an allocation methodology based on allowed claims, not ownership. Carving out sale proceeds attributable to Diamondware and NGS would be entirely inconsistent with the modified pro rata approach and difficult in and of itself due to the conflicting valuation evidence presented at trial. Even if the Court were to do so, it would then have to carve out all other assets that were uncontrovertibly owned outright by every other debtor. The Court rejected an ownership approach to allocation and should not disturb its decision simply because the U.S. Debtors seek to increase NNI's allocation.

7.     Each of the U.S. Debtors' requests for clarification should be denied as well. First, the U.S. Debtors seek clarification that each debtor will receive an individual allocation measured by its respective claims base. Clarification is unnecessary here because the U.S. Allocation Decision clearly respects the legal reality of each debtor's corporate separateness and, consistent with the position taken by the Joint Administrators throughout these proceedings, the Court has indicated that it intends to make allocations on that basis.

8.     In direct contradiction to this position, however, the U.S. Debtors also seek "clarification" that an intercompany claim will only be counted for allocation purposes if it is filed by a debtor in one of the three geographic groups against a debtor in a different geographic group. Clarification of this point should be rejected for several reasons. As a threshold matter, clarification is unnecessary because the U.S. Allocation Decision provides unequivocally that all intercompany claims will be included in each debtor's allocation, with no exception for claims between debtors from the same geographic group. There is, of course, no

principled basis for the arbitrary geographic line-drawing that the U.S. Debtors now propose, since there is no reason that an intercompany claim submitted to NNSA by NNI (its sister in a different debtor group) should be counted for allocation, but a claim submitted to NNSA by NNUK (its sister in the same debtor group) should not. Nor, for that matter, should the $150 million intercompany claim submitted to NNI by its subsidiary NNCC – discussed at length in the Law Debenture Motion – be discounted to zero for purposes of NNI's allocation.

9. Under the guise of seeking clarification, the U.S. Debtors also ask the Court to endorse an attack on the integrity of the Joint Administrators, as well as the English Court under whose supervision they function. Consistent with the longstanding U.S. jurisprudence that grants comity and a presumption of validity to claims determinations in English insolvency proceedings, the Court noted that it "has every confidence that the tribunals overseeing the Nortel insolvency proceedings across the globe will adjudicate the claims at issue therein in a just, efficient manner," but noted that it would be "prepared to act *if* they do not." (U.S. Allocation Decision at 62–63 (emphasis added).) Based on this, the U.S. Debtors ask the Court to immediately establish detailed procedures pursuant to which it will "police" and "oversee" the measurement of claims against the EMEA Debtors on the ground that, without such oversight, the Joint Administrators are likely to allow inflated claims. This attack on the Joint Administrators is unwarranted and wholly inappropriate.

10. The Joint Administrators are officers of the English Court, operating under the supervision of that court within a system whose substantive law and procedural protections are substantially similar to the ones that apply in this Court. They have the same duties and incentives as the estate representatives for the U.S. and Canadian Debtors. In particular, the Joint Administrators cannot allow an inflated claim of one creditor without breaching their duties

to other creditors, who are empowered to challenge such allowance in the event there is any hint of impropriety. Any disputed claims will be addressed in the first instance by the English Court.

11. The Joint Administrators acknowledge that the U.S. and Canadian Courts may review, for purposes of allocation, any bona fide disputes concerning large claims that have been allowed against any debtor, in the same joint-hearing process that has applied to allocation disputes throughout these proceedings, and that the claims processes for all Nortel debtors should be conducted with transparency and close coordination between the various estates. They are in the process of initiating their claims procedures and, as required by the U.S. and Canadian Allocation Decisions, will shortly report to the Courts regarding the procedures and timetable. The U.S. and Canadian Debtors are presumably preparing similar reports regarding the status and timetables for completion of their own claims reconciliation processes.

12. Finally, the U.S. Debtors' two additional requests for clarification should be denied. First, there does not seem to be anything vague or ambiguous about the U.S. Allocation Decision's treatment of claim settlements for purposes of allocation. Second, clarification is unnecessary in respect of reserved and estimated claims, an issue that is appropriately left for the submissions that the Court has already ordered the parties to make regarding their claims processes. Those submissions can confirm that, for purposes of allocation, claims – whether allowed, settled, or reserved for – must be limited to prepetition obligations so that each debtor bears the costs of administering its own estate.

## ARGUMENT

### I. NOTHING IN THE U.S. ALLOCATION DECISION REQUIRES RECONSIDERATION.

13. The standard for granting a motion for reconsideration is extremely high. *See, e.g.*, *Johnson v. Diamond State Port Corp.*, 50 F. App'x 554, 559–60 (3d Cir. 2002); *In re*

*New Century TRS Holdings, Inc.*, No. 07-10416 (KJC), 2013 WL 5231456, at *2 (Bankr. D. Del. Sept. 17, 2013). Specifically, in order to prevail on its Motion, the U.S. Debtors must show: "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion . . . ; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *In re W.R. Grace & Co.*, 398 B.R. 368, 372 (D. Del. 2008) (alteration in original) (quoting *Max's Seafood Cafe ex rel. Lou Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999)).

14.     Not only do the U.S. Debtors fail to carry this heavy burden, the majority of the relief requested is, in substance, nothing more than reargument of points that were made at trial and rejected. Such points can properly be raised, if at all, on appeal. *See, e.g.*, *id.*; *Brambles USA, Inc. v. Blocker*, 735 F. Supp. 1239, 1240 (D. Del. 1990).[6]

A.     **The U.S. Allocation Decision Properly Excludes the Bondholders' Guarantee Claim in Calculating NNI's Allocation.**

15.     The U.S. Debtors seek reconsideration of the Court's decision to exclude the Bondholders' guarantee claim against NNI from the calculation of NNI's claims base for allocation purposes. The U.S. Allocation Decision appropriately provides that the Bondholders'

---

[6]     The U.S. Debtors' own authorities demonstrate how rarely reconsideration is actually granted and how difficult the standard is to meet. *See Official Comm. of Unsecured Creditors v. Catholic Diocese of Wilmington, Inc. (In re Catholic Diocese of Wilmington, Inc.)*, 437 B.R. 488, 493 (Bankr. D. Del. 2010) (denying reconsideration); *Accenture Global Servs., GmbH v. Guideware Software, Inc.*, 800 F. Supp. 2d 613, 622 (D. Del. 2011) (denying reconsideration and describing how such motions should not be used "to allow a never-ending polemic between the litigants and the Court" (citation omitted)); *Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of Del., Inc. ex rel. Hechinger Inv. Co. of Del., Inc. v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co. of Del.)*, 303 B.R. 18, 23 (D. Del. 2003) (refusing reconsideration except with respect to unopposed issues).

The two cases that the U.S. Debtors cite that granted opposed motions for reconsideration are the exceptions that prove the rule. *See Max's Seafood Cafe*, 176 F.3d at 678 (allowing reconsideration only because of the "fundamental" nature of the issue raised – that the uncontroverted date of defendant's incorporation, previously overlooked, conclusively established defendant had no liability); *Morningred v. Delta Family-Care & Survivorship Plan*, 790 F. Supp. 2d 177, 193 (D. Del. 2011) (allowing partial reargument only because previously overlooked evidence conclusively established that plaintiff had not waived certain arguments), *aff'd*, 526 F. App'x 217 (3d Cir. 2013).

claim, like all other claims, must only be credited once for allocation purposes. Crediting any claim more than once is inconsistent with the principles underlying the modified pro rata allocation methodology adopted by the Court, and inequitably favors one set of creditors over all other similarly situated creditors. Should, however, the Court depart from the U.S. Allocation Decision and determine that overlapping claims should be credited against multiple debtors for allocation purposes, it should afford the same treatment to all such claims, including the claims of the U.K. Pension Claimants ("UKPC")[7] against numerous Nortel entities based on financial support directions ("FSDs") arising from the deficit in NNUK's pension plan.

      *1.*      *The Court Has Considered and Rejected Counting the Bondholders' Guarantee Claim for Allocation.*

      16.      The U.S. Debtors' Motion should be denied because the Bondholders' guarantee claim was the subject of argument and evidence submitted to the Court, and was expressly addressed in the U.S. Allocation Decision. *See In re Catholic Diocese of Wilmington*, 437 B.R. at 490 (motion for reconsideration should not be used to reargue facts or applicable law); *see also Accenture Global Servs.*, 800 F. Supp. 2d at 622 (motion for reconsideration "should not be used to rehash arguments already briefed" (citation omitted)).

      17.      Both the UKPC and the Canadian Creditors' Committee ("CCC") addressed the guarantee claim in briefs submitted to the Court. The UKPC argued that "if the Courts adopt the pro rata distribution model there is no need to give additional effect to the guarantees provided to the Nortel Bondholders or to Nortel Networks UK Pension Trust," since "[a] pro rata distribution without providing for double recovery for the bonds would meet the

---

[7]    The UKPC is comprised of the Nortel Networks UK Pension Trust Limited and the Board of the UK Pension Protection Fund.

legitimate expectations imbedded in the terms of the bonds."[8]  The CCC echoed this argument, submitting that "[c]laims of holders of guaranteed unsecured bonds should be treated no differently than other general unsecured creditors of Nortel."[9]  Additionally, the Committee introduced expert evidence regarding the Bondholders' expectations with respect to their guarantees and the potential ramifications of the adoption of a pro rata approach on capital markets, which the Court found unpersuasive.[10]

18.     Indeed, in deciding that allocation should be based on a modified pro rata approach, the Court expressly considered the Bondholders' guarantee claim and rejected the notion that it warranted any additional allocation entitlement.  (*See* U.S. Allocation Decision at 108.)  The decision recognized that "[c]redit rating agency reports confirm the trial evidence that the market did not distinguish between Nortel's bonds that were guaranteed by NNI and those that were not," and concluded that "[s]ince the marketplace did not more favorably view Nortel bonds guaranteed by NNI, creditor expectations do not support the contention that Nortel's guaranteed bonds would enjoy a greater percentage recovery upon insolvency or should otherwise entitle them to a higher recovery than Nortel's other unsecured creditors."  (*Id.*)  Thus, in setting the parameters of its modified pro rata approach, the Court had the opportunity to consider whether both Nortel Networks Limited ("NNL") and NNI should receive an allocation in respect of the Bondholders' claim, concluding that NNL, as primary obligor, should receive an allocation, and that NNI, as guarantor, should not.  (*Id.* at 112.)

---

[8]     (Allocation Post-Trial Brief of Nortel Networks UK Pension Trust Limited and the Board of the Pension Protection Fund ¶¶ 89, 107, Aug. 7, 2014 [D.I. 14269].)

[9]     (Closing Brief of the Canadian Creditors' Committee ("CCC") ¶ 204, Aug. 7, 2014 [D.I. 14259].)

[10]    (*See* TR00057, Expert Report of John J. McConnell ¶¶ 37–70 (Feb. 28, 2014).)

2. *The U.S. Debtors' Characterization of the Impact of the U.S. Allocation Decision Is Flawed.*

19.     The U.S. Debtors' Motion is a transparent effort to reargue the U.S. Debtors' case and seeks modification of the U.S. Allocation Decision in order to increase its recovery.  The U.S. Debtors mischaracterize the U.S. Allocation Decision as a windfall to the Canadian and EMEA Debtors at the expense of creditors of the U.S. Debtors.  (*See* U.S. Debtors' Motion ¶ 3.)  This is incorrect and ignores, among other things, the individual impact of the U.S. Allocation Decision on the nineteen EMEA Debtors, each of which is a separate entity, with its own insolvency proceeding and unique group of creditors.

20.     First, given that the Court explicitly rejected substantive consolidation of the Nortel debtors, individual creditors of each debtor will inevitably be impacted differently by the Court's modified pro rata approach, depending on factors such as cash on hand and intercompany claims held by each estate.  (*See* U.S. Allocation Decision at 99.)  In reality, the creditors of several EMEA debtors, including NNSA and NNIR, residual profit entities ("<u>RPEs</u>") that made substantial contributions to the creation of Nortel's intellectual property,[11] are likely to receive a distribution under the modified pro rata approach that will be far below what they would have expected under nearly every other allocation methodology presented by the parties at trial.  NNSA's creditors are also likely to receive a distribution well below any return that the U.S. general unsecured creditors are likely to receive.

21.     Second, arguments that the U.S. Allocation Decision is ripe for reconsideration because the modified pro rata methodology may result in an allocation to the EMEA Debtors as a group that is in excess of the amount for which they advocated at trial are

---

[11]     (*See* U.S. Allocation Decision at 4; Joint Administrators' Post-Hearing Submission Regarding Allocation of the Proceeds of the Nortel Asset Sales ¶¶ 4, 37, 53, Aug. 7, 2014 [D.I. 14260].)

ill-conceived.  For example, the Committee suggests that the Court's modified pro rata approach is "extreme" because, among other reasons, "the position presented by the EMEA Debtors would have taken only 18% for their estates" while the Court "would award them more."  (Committee Joinder ¶ 5.)  The Joint Administrators, like many parties, advocated alternative theories at trial, including a license theory – similar to the approach advocated by the Committee – which would have entitled the EMEA Debtors to 31% of sale proceeds in the aggregate.[12]  The Committee's argument is also entirely beside the point, since comparing outcomes under a pro rata approach with outcomes under an ownership approach is apples and oranges.  The EMEA Debtors' allocation theory at trial, based on ownership, was rejected in favor of an allocation methodology based on the allowed claims against each debtor.  The fact that the allocation to certain debtors under the modified pro rata approach may be higher than under an ownership approach simply reflects that those debtors have significantly greater creditor bases, which the Court has decided will drive allocation.

22.     Finally, the U.S. creditor recoveries projected by the U.S. Debtors are entirely speculative and profoundly flawed because they exclude significant assets of the U.S. estates that will increase the total amount available for distribution to their general unsecured creditors.  The U.S. Debtors claim that a modified pro rata allocation will translate to a payment of 14 cents on the dollar to U.S. unsecured creditors.  (U.S. Debtors' Motion ¶ 3.)[13]  As the U.S. Debtors admit, however, that figure only reflects lockbox proceeds and excludes the U.S.

---

[12]   (*See* TR00030, Expert Report of Paul P. Huffard ¶ 129 (Apr. 11, 2014) [hereinafter "Huffard Report"].)

[13]   Because the parties do not know the full amount of the claims that will be allowed in each estate, the U.S. Debtors rely on the assumptions, approximations, and opaque calculations of the CCC's expert, Thomas Britven, which they previously argued were faulty.  (*See* Pre-Trial Brief of the US Interests at 131, May 2, 2014 [D.I. 13551]; Post-Trial Brief of the US Interests at 137–38, Aug. 7, 2014 [D.I. 14263] (contesting that Britven "provides nothing more than an 'illustrative' calculation of what pro rata recoveries would be if intercompany and guarantee claims were ignored, his distribution methodology were adopted and all the untested assumptions he was provided by counsel regarding claims turn out to be true").)

Debtors' cash on hand, which is expressly preserved for distribution to creditors under the U.S. Allocation Decision, as well as proceeds payable to NNI as a result of NNI's allowed $2 billion intercompany claim against NNL.  (*See id.* ¶¶ 3 & n.5, 13.)  Including these additional U.S. assets results in recoveries of 81% to the Bondholders and 62% to the balance of U.S. general unsecured creditors.  (*Id.* ¶ 13 n.13.)[14]  These figures are unlikely to be representative of what the real outcome for creditors will be, and in any case the argument that either percentage represents manifest injustice is unfounded.  Under the Court's allocation methodology, and even on their own figures, the U.S. Debtors' unsecured creditors will enjoy a significantly greater recovery than the unsecured creditors of a number of the individual EMEA estates.

3. *If the Court Reverses Course and Credits NNI for the Bondholders' Guarantee Claim for Allocation Purposes, the Same Treatment Should Be Afforded to All Other Similar Claims.*

23.    The Court correctly ruled that the Bondholders' guarantee claim should not be counted in calculating NNI's allocation, and the U.S. Debtors' Motion should be denied. However, should the Court determine that it is appropriate to count the claims of the Bondholders twice for purposes of allocation – for both NNI and NNL – the same treatment should be afforded to all overlapping claims against any Nortel debtor that arise from the same debt.  For example, the UKPC has asserted claims against multiple EMEA entities based on FSDs issued with respect to NNUK's pension funding deficit, which are distinct from the direct claim the UKPC has against NNUK to cover the same shortfall in its pension scheme.  Granting the relief sought only with respect to the Bondholders' guarantee claim against NNI would

---

[14]    This is on the basis that the Bondholders' claim against NNI is for any deficiency on the claim, once the Bondholders have the opportunity to assert their claims against the Canadian Debtors.  (U.S. Debtors' Motion ¶ 13 n.13, Ex. A at A-3.)  If the Bondholders were entitled to assert the full amount of their claim against NNI, then their estimated recovery would be 89%, with other U.S. unsecured creditors recovering 40%.  (*Id.* at ¶ 13 & n.13, Ex. A at A-2.)

inequitably favor NNI's creditors to the detriment of all other Nortel creditors worldwide. The principles that govern allocation should be applied consistently to each individual debtor.

**B.      NNI Is Not Entitled to a Direct Allocation of Sale Proceeds Attributable to NGS and Diamondware.**

24.      The Joint Administrators also oppose the U.S. Debtors' request that the Court reconsider the U.S. Allocation Decision and allocate proceeds from the sales of Nortel Government Solutions Incorporated ("NGS") and Diamondware, Ltd. ("Diamondware") directly to NNI, on the theory that NGS and Diamondware were wholly owned U.S. subsidiaries that were not integrated into the Nortel group. (*See* U.S. Debtors' Motion ¶ 33.)  Reconsideration should be denied for several reasons.

25.      First, the U.S. Debtors' attempt to receive a separate allocation of value attributable to NGS and Diamondware is flatly inconsistent with the modified pro rata methodology adopted by the Court for all sale proceeds subject to these allocation proceedings. While the U.S. Debtors, the EMEA Debtors, and the Canadian Debtors advocated at trial for allocation based on the debtors' ownership interests in the Nortel assets that were sold, the Court expressly rejected any ownership-based approach. (*See* U.S. Allocation Decision at 86.)  Thus, by requesting an allocation of sale proceeds attributable to certain assets that were owned by NNI outright, the U.S. Debtors really seek to re-craft the Court's entire methodology to allow an exception for NNI's wholly owned assets. This relief is appropriate only on appeal.  It is not an appropriate basis for reconsideration and should be denied. *See Brambles USA*, 735 F. Supp. at 1240.

26.      Even if the U.S. Debtors' argument were somehow viable in the face of the modified pro rata approach adopted by the Court, it would have to be applied consistently to all debtors (not just NNI).  All parties recognized at trial that certain debtors owned outright

certain tangible assets that were transferred in the business sales, and allocation experts for the Canadian and EMEA Debtors separately allocated proceeds based on those assets.[15]  The parties also recognized that certain individual debtors owned intangible assets outright.  In particular, two EMEA entities, Nortel Germany and Nortel France SAS – former joint ventures that were never parties to the Master R&D Agreement ("MRDA") – owned valuable patents when they were acquired by Nortel and continued to hold those assets in their own names.[16]  If the U.S. Debtors are correct, and all debtors were entitled to an allocation in respect of their wholly owned assets notwithstanding the modified pro rata approach adopted by the Courts, then sale proceeds attributable to these wholly owned assets must be carved out as well.

27.     The U.S. Debtors argue that they are entitled to a direct allocation for NGS and Diamondware in part because sale proceeds from certain Nortel subsidiaries were allocated directly to NNL or NNUK.  However, as the U.S. Debtors' own expert, Jeffrey Kinrich, acknowledged, those entities were sold outside the scope of the IFSA – *i.e.*, the business sales and the residual patent sale – so the proceeds received are not in the lockbox.[17]  Mr. Kinrich

---

[15]   These tangible assets included: inventories, typically including electronic devices and related parts; prepaid expenses; and real property, plant, and equipment, such as laboratory and office equipment.  (TR00042, Report of Philip Green Regarding the Allocation of Recoveries Among Nortel Entities 5, 41–42, 50 (Feb. 28, 2014) [hereinafter "Green Report"]; *see also* TR00030, Huffard Report ¶¶ 7, 62.)

[16]   (*See* TR00030, Huffard Report ¶ 29, app. 4 ¶ 5; TR00033, Expert Report of James E. Malackowski 51 n.151 (Mar. 24, 2014) [hereinafter "Malackowski Report"].)  James Malackowski, the EMEA Debtors' intellectual property valuation and allocation expert, valued these patents at $20.9 million.  (TR00033, Malackowski Report 47.)  The CCC's allocation expert, Thomas Britven, separately valued these patents at $57 million.  (TR00045, Thomas Britven, Nortel Networks Expert Report on Valuation and Other Issues Related to the Allocation of Sales Proceeds to the Nortel Debtor Groups ¶ 6.65, tbl. 12 (Jan. 24, 2014).)

[17]   (*See* TR00051, Expert Report of Jeffrey H. Kinrich ¶ 20 (Jan. 24, 2014) [hereinafter "Kinrich Report"].)

therefore excluded these transactions from his ownership-based allocation model.[18]  There is no reason that they should be treated differently now.[19]

## II.     NOTHING IN THE U.S. ALLOCATION DECISION REQUIRES CLARIFICATION.

28.     Motions for clarification should only be granted to the extent a court's judgment is vague or ambiguous.  *See, e.g.*, *Elan Pharma Int'l Ltd. v. Abraxis Bioscience, Inc.*, No. 06-438 GMS, 2007 WL 6382930, at *1 (D. Del. Dec. 17, 2007).  Importantly, to the extent the U.S. Debtors ask the Court for clarification but seek relief that effectively requires the Court to alter or amend its decision, the motion should be treated as one for reconsideration and should be granted only if it meets the high standard described above.  *See, e.g.*, *Hazel v. Smith*, 190 F. App'x 137, 138 (3d Cir. 2006); *SMS Demag, Inc. v. ABB Transmissone & Distribuzone, S.P.A.*, No. 05-00466, 2008 WL 2433093, at *1 (W.D. Pa. June 12, 2008).

### A.     Clarification Is Unnecessary Regarding the Court's Recognition of Each Individual Debtor's Entitlement to an Allocation that Counts All Claims, Including All Intercompany Claims.

29.     The U.S. Debtors seek clarification regarding two related, but conflicting, points:  (i) that sale proceeds will be allocated to each of the individual debtor entities on account of their respective claims bases, rather than to the geographic debtor groups, (U.S. Debtors'

---

[18]     (*See* TR00051, Kinrich Report ¶ 20 n.41.)  The Canadian Debtors' expert, Philip Green, also acknowledged this fact and excluded these transactions from his ownership-based allocation model.  (*See* TR00042, Green Report 8 n.12.)

[19]     The U.S. Debtors also request a direct allocation based on an inflated combined value of NGS and Diamondware – approximately $331 million – and observe that Mr. Green separately allocated $111 million to NNI in respect of these entities.  (*See* U.S. Debtors' Motion ¶¶ 33–34.)  Not only is Mr. Green's valuation of NGS and Diamondware approximately one-third the value that the U.S. Debtors allocate to NNI in their motion, (*see* TR00042, Green Report app. B at 10), his valuation is only relevant in the context of an ownership-based allocation approach, which the Court chose not to adopt.  Similarly, the allocation methodology of the EMEA Debtors' expert, Paul Huffard, recognized value flowing from the sale of shares of NGS and Diamondware to NNI, but compensated NNI through the application of his allocation methodology by asset class.  (*See* TR00030, Huffard Report app. 21 ¶¶ 2–3.)

Motion ¶ 42),[20] and (ii) that the intercompany claims that will be counted for allocation purposes are limited to intercompany claims between debtors in different geographic debtor groups, and exclude claims between debtors within the same group, (U.S. Debtors' Motion ¶ 37). The U.S. Allocation Decision, however, is clear on both of these points, though on the second it is clear in ways the U.S. Debtors are trying to change. The U.S. Allocation Decision clearly recognizes the legal separateness of each individual debtor entity and, in furtherance thereof, provides that *each* entity will receive an allocation and that *all* intercompany claims will be counted. The U.S. Debtors' request to "clarify" that "all intercompany claims" means "not all intercompany claims, but only claims between different debtor groups" is really a request for reconsideration and an attempt to enlarge the projected allocation to the U.S. estates, and should be denied.

> 1.     *The Court Made Clear that Allocation Will Be to Individual Debtors, Not Debtor Groups, to Respect the Corporate Separateness of Each Debtor.*

30.     The U.S. Allocation Decision provides that allocation will be calculated based on the allowed claims against each individual debtor entity (*e.g.*, debtors like Nortel Italy, Nortel Poland, and other discrete entities in the EMEA region), since each is legally distinct and has initiated a separate insolvency proceeding, with its own estate, unique creditor constituency, discrete proof process, and distributions. (*See, e.g.*, U.S. Allocation Decision at 63, 91, 93, 99, 100, 106–07 (recognizing "corporate separateness" of Nortel entities and reiterating that each Nortel debtor will be allocated a pro rata share of proceeds based on amount of allowed claims asserted against it).) As the Court acknowledges throughout its decision, the issue to be decided is the allocation of the Sales Proceeds "among the Nortel Entities." (*Id.* at 2, 91, 93, 99.) "All claims against each Nortel Debtor" are accounted for under the modified pro rata methodology,

---

[20]     The Law Debenture Trust Company of New York ("Law Debenture") similarly asserts that the U.S. Allocation Decision "compels the conclusion that each individual debtor is entitled to its respective, pro rata allocation of Lockbox funds." (Law Debenture Motion ¶ 22.)

which is based on the allowed claims "against the numerous entities." (*See id.* at 100; U.S. Allocation Order ¶ 2.)

31.     The U.S. Allocation Decision simply reflects the legal reality that there are many different Nortel debtor entities. Although the insolvency proceedings of individual debtors in the same geographic area are being administered together for procedural purposes in the interests of efficiency, these debtor groups (*e.g.*, the EMEA Debtors) are postpetition constructs.[21] Nothing about these joint administration arrangements impacts the separate identity of each of the EMEA Debtors – NNUK, NNIR, NNSA, Nortel Germany, Nortel France SAS, Nortel Poland, Nortel Italy, Nortel Austria, Nortel Sweden, Nortel Netherlands, Nortel Hungary, Nortel Spain, NNIF, Nortel Belgium, Nortel Finland, Nortel Portugal, Nortel Romania, Nortel Slovakia, and Nortel Czech Republic – which were always, and remain, legally distinct. Consistent with this legal reality, in agreeing to the IFSA, which serves as the basis for the asset sales and each selling debtor's entitlement to an allocation, each EMEA entity executed the agreement independently.[22]

32.     This legal reality has underpinned the Joint Administrators' position throughout the allocation proceedings. It was articulated in the Joint Administrators' post-trial briefing, which noted the need to allocate sale proceeds on account of customer relationships "to compensate all debtors, including non-RPEs" in EMEA that did not create intellectual property, but distributed Nortel products.[23] Indeed, going all the way back to submissions made to the

---

[21]     (*See, e.g.*, Order Directing Joint Administration of Cases Under Chapter 15 of the Bankruptcy Code, *In re Nortel Networks UK Ltd.*, No. 09-11972 (Bankr. D. Del. Oct. 21, 2010) [D.I. 53]; Order Pursuant to 11 U.S.C. § 105, Bankruptcy Rule 1015 and Local Rule 1015-1 (I) Directing Joint Administration of the Debtors' Related Chapter 11 Cases and (II) Granting Related Relief, Jan. 15, 2009 [D.I. 36].)

[22]     (TR12032, IFSA (June 9, 2009).)

[23]     (*See, e.g.*, Joint Administrators' Post-Hearing Submission Regarding Allocation of the Proceeds of the Nortel Asset Sales at 13–14, Aug. 7, 2014 [D.I. 14260].) Additionally, their expert, Mr. Huffard, provided the Courts

Courts in respect of the Allocation Protocol itself, the Joint Administrators have consistently stated that allocation – under whatever approach – ultimately must be made to each debtor on an individual basis.[24]

33. In keeping with the legal status of the various Nortel entities, the U.S. Allocation Decision is clear that the corporate separateness of each individual debtor will be respected for purposes of allocation. Since no clarification is necessary, the U.S. Debtors' Motion should be denied.[25]

      2. *The Court Made Clear that All Intercompany Claims Will Be Counted for Purposes of Allocation.*

34. In direct contradiction to their arguments recognizing the corporate separateness of each Nortel entity, the U.S. Debtors separately argue that the U.S. Allocation Decision should be clarified such that intercompany claims are limited for purposes of allocation to "claims between Debtors across different Debtor groups . . . rather than within Debtor groups." (U.S. Debtors' Motion ¶ 37.) There is no principled basis for this argument, which is a thinly disguised request for reconsideration.

      a. The Court Clearly Decided that Intercompany Claims Will Be Counted in Calculating Each Debtor's Allocation.

35. The U.S. Allocation Decision makes clear that intercompany claims will be included in calculating allowed claims against a debtor for allocation purposes, stating

---

with a comprehensive breakdown of the allocation that each individual EMEA entity would receive under the Joint Administrators' contribution and alternative license theories. (TR00030, Huffard Report app. 23.)

[24] (*See* Allocation Protocol Tr. 71:12–17, Mar. 7, 2013 [D.I. 9617] (noting that allocation will involve addressing the separate claims of some forty parties with rights to the lockbox proceeds).)

[25] The Joint Administrators also object to a related provision in the U.S. Debtors' proposed order that "to the extent a creditor holds claims against multiple Debtors within a Debtor group, solely for purposes of allocation, the creditor's claim shall be included only once in each Debtor group." (U.S. Debtors' Motion Ex. 3 ¶ 7.) This language suggests that a single creditor asserting two claims against different entities within the same debtor group, where each claim is based on a different debt, would lose one of those claims for the simple fact that the entities are within the same debtor group. There is no basis for such a position.

explicitly that the Court intends to "recogniz[e] *all* inter-company claims." (U.S. Allocation Decision at 63 (emphasis added).) The Court broadly ordered that "[i]ntercompany claims against a Debtor Estate will be included in the claims against that Estate," without carving out any intercompany claims. (U.S. Allocation Order ¶ 2(c).) The Court emphasized the need to count all intercompany claims for allocation purposes in order to "recognize[] the *separate and distinct integrity of each of the Debtors*." (U.S. Allocation Decision at 107 (emphasis added).) The Court could not have been clearer in conveying that it intends to respect *all* intercompany claims against *each* individual Nortel debtor, regardless of the debtor group to which the claimant belongs.[26] Clarification is therefore unnecessary, and the U.S. Debtors' request is nothing more than a request that the Court reverse its decision to count all intercompany claims against each debtor for purposes of allocation. The U.S. Debtors do not even attempt to meet the high standard for proving that reconsideration is appropriate here.

        b.      The U.S. Debtors' Attempt to Exclude Intercompany Claims Between Debtors in the Same Geographic Group Is Unprincipled and Inconsistent.

     36.     Not only is the U.S. Allocation Decision clear on this point, it is entirely inconsistent for the U.S. Debtors to ask that the Court respect the legal separateness of an individual debtor for purposes of *making* the allocation, but refuse to include certain intercompany claims against that debtor for purposes of *calculating* the allocation simply because those intercompany claims were made by another debtor in the same geographic group. The Court made no such distinction when crafting its allocation methodology, and allowing such

---

26    The Canadian Court was just as clear that the individual corporate identity of each debtor should be respected and that all intercompany claims must be counted for allocation purposes. (*See* Canadian Allocation Decision ¶ 214 ("Second, the various entities in the various Estates are not being treated as one entity and the creditors of each entity will not become creditors of a single entity. Each entity remains separate and with its own creditors and its own cash on hand and will be administered separately. The inter-company claims are not eliminated."); *id.* ¶ 258(3) ("Intercompany claims against a Debtor Estate are to be included in the determination of the claims against that Estate.").)

a distinction now would be inequitable and unprincipled.

37. The U.S. Debtors' example – "the fact that NNSA may have claims against NNUK (or perhaps both may have claims against each other) should not increase the net allocation to either of those EMEA Debtors" – is particularly instructive. (U.S. Debtors' Motion ¶ 37.) The U.S. Debtors acknowledge that NNI should receive an allocation based on the total amount of allowed claims against NNI; likewise, NNSA, separately and independently, is entitled to receive an allocation based on allowed claims against its respective estate as well. But if any of the allowed claims against, say, NNSA, is an intercompany claim by NNUK, then that claim, argue the U.S. Debtors, should be excluded for purposes of allocation notwithstanding that it would give rise to real liability and entitle NNUK to a distribution from NNSA's estate. This argument makes no sense, and there is no principled basis for it.

38. The argument becomes even more untenable because the U.S. Debtors argue that certain intercompany claims *should* be allowed if they are intercompany claims by a debtor in a different geographic group. Thus, in the example above, if the intercompany claim against NNSA were a claim by NNL instead of NNUK, then that claim, argue the U.S. Debtors, should be counted for purposes of allocation. The only distinction is that the intercompany claimant is part of a different geographic debtor group, which has nothing to do with the way Nortel operated and is instead a postpetition construct established for reasons of administrative efficiency that arose from the locations of the various bankruptcy filings. Such relationships cannot give rise to legally distinct rights, and once again the U.S. Debtors cite no principle of law overlooked by the Court that warrants reconsideration on this point.

39. In addition to being unsupportable and inconsistent with their position regarding individual-entity allocation, the U.S. Debtors' position on intercompany claims would

completely eliminate any allocation to one of their own debtors on account of the intercompany claim against NNI submitted by its subsidiary, NNCC. As Law Debenture notes, "NNCC has an undisputed intercompany claim against NNI . . . in the amount of $147,634,914.66." (Law Debenture Motion ¶ 9 (citing Amended Schedules of NNI, Dec. 10, 2014 [D.I. 14918]).) The U.S. Debtors' position leads inexorably to the conclusion that NNI is not entitled to an allocation in respect of this intercompany claim by NNCC.[27]

40.    Neither the U.S. Debtors nor Law Debenture addresses this inconsistency, which is unsurprising given that the sole purpose of the U.S. Debtors' argument regarding intercompany claims is the movement of money to the U.S. Debtors. The U.S. Debtors attempt to justify such an outcome by relying on inappropriate and distasteful assertions that separate, distinct entities within the EMEA region would "generously assert and allow such [intercompany] claims," a baseless accusation. (*See* U.S. Debtors' Motion ¶ 37.)

c.    The U.S. Debtors' Position Would Eliminate Legitimate Intercompany Claims Between EMEA Debtors.

41.    The practical effect of the U.S. Debtors' clarification would be to disregard valid claims in an individual debtor's estate solely because, postpetition, the debtors were aligned in broad geographic groups for administrative convenience. In addition to lacking any legal basis for excluding valid claims between separate debtors, such a result is inconsistent with the IFSA itself. As noted above, each of the EMEA Debtors executed the IFSA independently, and each debtor is therefore entitled to a separate allocation.[28] By insisting that intercompany claims within a debtor group should be ignored for allocation purposes, the U.S.

---

[27]    "NNCC is a direct and wholly-owned subsidiary of NNI, incorporated in Delaware in 1996," the same year NNCC issued $150 million worth of bonds and loaned the proceeds to NNI. (Law Debenture Motion ¶¶ 6–8.)

[28]    (TR12032, IFSA (June 9, 2009).)

Debtors are effectively arguing for a substantive consolidation of each geographic debtor group, which they have consistently opposed and which, more importantly, both Courts expressly disavowed.[29]

42.     Intercompany claims between individual EMEA debtors constitute legitimate, valid claims *inter se*, and each individual EMEA debtor has a separate group of distinct creditors that would see their recoveries diluted by this arbitrary line-drawing. The impact of such an approach on the EMEA Debtors would be striking. For example, in connection with the settlement of intercompany claims filed by the EMEA Debtors against the Canadian Debtors, NNL assigned to NNUK prepetition intercompany claims that NNL had against certain EMEA debtors. Under the U.S. Debtors' view, these claims could have been counted for allocation purposes had they remained in the hands of NNL, but since the very same claims have now transferred to NNUK – pursuant to a bargained-for settlement provision approved by the Canadian Court – they are now worthless as a matter of allocation. It simply makes no sense that NNL could have a claim against an EMEA entity counted for allocation purposes while NNUK cannot, and the Courts could not have intended this outcome.[30]

43.     There are numerous bona fide intra-EMEA intercompany claims that give rise to real liability – just like NNCC's $150 million claim against NNI – which should be recognized for purposes of allocation on the same basis as other intercompany claims. In addition to the claims assigned from NNL to NNUK, there are also run-of-the-mill trading debt claims that were reflected on the books of the various individual EMEA debtors at filing. These

---

[29]     (*See* Post-Trial Brief of the US Interests at 130, Aug. 7, 2014 [D.I. 14263]; U.S. Allocation Decision at 63, 93, 99–105; Canadian Allocation Decision ¶¶ 212–223.)

[30]     It also makes no sense that such claims would not be counted the same as NNUK's settled intercompany claim against NNI, which the U.S. Debtors expressly seek to include for allocation purposes. (*See* U.S. Debtors' Motion ¶ 38.)

are intra-EMEA claims against entities that performed valuable distribution functions and allowed the Nortel group to trade in countries like Poland, Italy, and Romania.[31]  It would be arbitrary and unprincipled to exclude such straightforward, bedrock claims.

**B.    Clarification Is Unnecessary Regarding the Court's Oversight of the Debtors' Claims Processes.**

44.    The U.S. Allocation Decision is also clear with respect to the treatment of "disputed" claims.  The U.S. Debtors' request for clarification is unnecessary and inconsistent with basic standards of comity.  The request should be denied.

*1.    Specific Procedures for Resolving Disputed Claims Are Not a Proper Subject of Clarification.*

45.    The U.S. Debtors seek an order requiring the Court to outline specific procedures through which the Courts will resolve disputed claims.  The U.S. Allocation Decision expressly contemplates future submissions from the parties to ensure the efficient determination of claims in all jurisdictions and to facilitate the effectuation of the Court's ultimate modified pro rata allocation calculations.  Specifically, the decision states that the "Debtors Estates (i.e., the Canadian Debtors, the U.S. Debtors, and the EMEA Debtors) shall submit proposed schedules for expediting claims procedures for their own Estate."  (U.S. Allocation Order ¶ 2(d).)

46.    The Joint Administrators are committed to providing transparency in the EMEA claims processes.  They intend to present the Courts with a clear outline of the processes and standards governing claims determinations, are willing to make periodic progress reports to the Courts, and will submit additional information as the Courts may require.  These types of

---

[31]    Similarly, numerous EMEA entities, including NNUK and NNSA, have claims into NNIR, whose principal creditor is the Irish pension fund.  Excluding the intercompany claims against NNIR from the allocation calculation would not only be directly contradictory to the clear language of the U.S. Allocation Decision, it would mean that NNIR would be obligated to pay NNUK, NNSA, and other EMEA entities a dividend based on a debt claim for which it cannot recover from the lockbox, and ultimately pay significantly less to the Irish pensioners.

submissions are contemplated by the U.S. Allocation Decision, which the U.S. Debtors acknowledge.  (*See* U.S. Debtors' Motion ¶ 47 n.35.)  It is not necessary, nor would it be expected, for the U.S. Allocation Decision to explicitly lay out all future procedural mechanisms for facilitating the processes for reviewing allowed claims from each jurisdiction, for resolving any bona fide disputes about particular claims, and for calculating each debtor's allocation. Accordingly, no clarification is needed.

> 2.  *The U.S. Debtors' Aspersions on the EMEA Claims Processes, the UKPC's Claim, and the Joint Administrators Are Baseless and Provide No Support for "Clarifying" the U.S. Allocation Decision.*

47.     Rather than seeking to clarify a legitimate ambiguity in the U.S. Allocation Decision, the U.S. Debtors use the procedural mechanism of "clarification" to make baseless accusations regarding the propriety of the individual proceedings in the EMEA region, the UKPC's claim in relation to the section 75 debt, and the integrity of the Joint Administrators themselves, in an attempt to color the Court's view of the nineteen separate EMEA claims processes that will be commenced shortly.  The U.S. Debtors' request for "clarification" in this regard is founded on two baseless arguments:  (i) the EMEA proceedings and the Joint Administrators must be "polic[ed]" and (ii) the UKPC's claim is "seemingly over-inflated." (U.S. Debtors' Motion ¶¶ 45, 46.)  Each argument fails.

48.     The individual EMEA administration proceedings, conducted under the authority and supervision of the English Court, are procedurally robust and trustworthy, are comparable to U.S. and Canadian bankruptcy proceedings, and have been recognized by this Court under chapter 15 of the Bankruptcy Code.  The Joint Administrators are officers of the English Court, who are duty-bound to act in good faith and in accordance with applicable law in those proceedings.  The UKPC's claim against NNUK – as with every claim in each of the nineteen EMEA jurisdictions – will be subject to a formal claims process, which, as described

below, is subject to appeal rights available to creditors. The U.S. Debtors provide no factual or legal support for their request for "clarification" that the EMEA proceedings and the Joint Administrators require more oversight than the U.S. or Canadian proceedings or their estate fiduciaries. The U.S. Debtors' request for "clarification" should be seen for what it truly is – an unseemly and desperate attempt to secure more money for the U.S. Debtors – and should be dismissed.

        a.       The Court Should Defer to Recognized U.K. Insolvency Proceedings Under Principles of Comity.

       49.     Decades of comity and cross-border insolvency jurisprudence make clear that U.K. bankruptcy proceedings are comparable to U.S. bankruptcy proceedings, result in procedurally fair and substantively just claims determinations, and are entitled to deference and a presumption of validity. As an initial matter, U.S. courts have repeatedly held that deference to foreign bankruptcy claim determinations is "appropriate so long as the foreign proceedings are procedurally fair and . . . do not contravene the laws or public policy of the United States." *JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 424 (2d Cir. 2005).[32] Not only is such deference appropriate, but there is also "a distinct judicial preference for deferring to the foreign tribunal litigation respecting the validity or amount of claims against the foreign debtor," as long as the laws of that foreign jurisdiction are not "repugnant" to U.S. law and public policy. *Petition of Brierley*, 145 B.R. 151, 168 (Bankr. S.D.N.Y. 1992). When the foreign jurisdiction is a sister common law jurisdiction, like the United Kingdom, "there is a presumption that such proceedings are fair and comport with American notions of due process."

---

[32]   *See also Stonington Partners, Inc. v. Lernout & Hauspie Speech Prods. N.V.*, 310 F.3d 118, 126 (3d Cir. 2002); *Remington Rand Corp.–Delaware v. Bus. Sys. Inc.*, 830 F.2d 1260, 1271 (3d Cir. 1987); *Oui Fin. LLC v. Dellar*, No. 12 Civ. 7744(RA), 2013 WL 5568732, at *4 (S.D.N.Y. Oct. 9, 2013); *In re Ionica PLC*, 241 B.R. 829, 835 (Bankr. S.D.N.Y. 1999); *In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd.*, 238 B.R. 25, 66–67 (Bankr. S.D.N.Y. 1999), *aff'd sub nom. In re Petition of Bd. of Dirs. of Hopewell Int'l Ins. Ltd.*, 275 B.R. 699 (S.D.N.Y. 2002); *In re Gercke*, 122 B.R. 621, 629, 631 (Bankr. D.D.C. 1991).

*Lindner Fund, Inc. v. Polly Peck Int'l PLC*, 143 B.R. 807, 809–10 (S.D.N.Y. 1992). Going beyond this presumption, U.S. courts have consistently recognized the procedural and substantive similarities between U.S. and U.K. bankruptcy proceedings. *See, e.g.*, *id.* at 809–10.[33] In doing so, U.S. courts have concluded that "English law is consistent with our own concepts of due process and impartiality," "treats all creditors in a just and fair manner," "does not discriminate in favor of British creditors or against American creditors," and "does not foster preferential or fraudulent dispositions of property." *In re Ionica PLC*, 241 B.R. 829, 835–36 (Bankr. S.D.N.Y. 1999).

      50.     The EMEA proceedings fall squarely within this long line of precedent. Just as it did for the Canadian proceedings, this Court has recognized the English proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code for NNUK and each of the other EMEA Debtors.[34] Further, the procedures embedded in the English bankruptcy claims processes mirror many of the features of the U.S. and Canadian Debtors' proceedings.

      51.     NNUK will shortly commence a proof process pursuant to the *Insolvency Act 1986* and the *Insolvency Rules 1986*. Each of the other EMEA entities, which are not registered in England and Wales, will commence its respective company voluntary arrangement ("CVA"), similar to a plan of reorganization in U.S. bankruptcy practice, which will be promulgated pursuant to the *Insolvency Act 1986*. The proof process contained in the CVAs will

---

[33]   *See also In re Manning*, 236 B.R. 14, 25–26 (B.A.P. 9th Cir. 1999); *In re Maxwell Commc'n Corp. plc by Homan*, 93 F.3d 1036, 1040 (2d Cir. 1996); *In re Ionica PLC*, 241 B.R. at 835–36; *In re Bird*, 229 B.R. 90, 95–96 (Bankr. S.D.N.Y. 1999); *Petition of Brierley*, 145 B.R. at 164–66; *In re Gercke*, 122 B.R. at 629.

[34]   (*See* U.S. Allocation Decision at 107; Order Granting Recognition and Relief in Aid of Foreign Main Proceedings, *In re Nortel Networks UK Ltd.*, No. 09-11972 (Bankr. D. Del. June 26, 2009) [D.I. 36]; Order Granting Recognition of Foreign Proceedings and Related Relief with Respect to the EMEA Debtors, *In re Nortel Networks UK Ltd.*, No. 09-11972 (Bankr. D. Del. Jan. 31, 2011) [D.I. 116].) Accordingly, all of the mandatory coordination and cooperation provisions of chapter 15 apply with equal force to this Court's interactions with the English Court as they do with the Canadian Court. *See* 11 U.S.C. §§ 1525, 1526, 1527, 1529; *see also In re ABC Learning Centres Ltd.*, 728 F.3d 301, 304–06 (3d Cir. 2013).

take place in England, subject to supervision of the English Court, and will be substantially similar to NNUK's proof process. In particular, creditors will have the right to challenge claims in a form substantially similar to the NNUK proof process.

52. Both the NNUK proof process and the CVA process will be conducted in accordance with English law by the Joint Administrators. Creditors of the EMEA entities will have the opportunity to review and contest the allowance or rejection of any proof of claim, as noted above. Disputes will be heard by the English Court in a full evidentiary hearing.[35] The claims allowed through each EMEA estate's claims process will be reported to this Court and the Canadian Court to be used in calculating each EMEA estate's respective allocation under the modified pro rata approach.

53. That the formal proof processes have not yet begun is a result of the statutory regime applicable to the individual EMEA proceedings, not any delay by the Joint Administrators. Under English law, a formal proof of claim process may not begin until the estate publicly notifies creditors that a distribution is available to be made. Now that allocation decisions have been rendered by the Courts, providing a framework for funding the EMEA estates, the Joint Administrators are taking steps to apply to the English Court for permission to commence NNUK's proof process and will take all necessary steps to prepare the CVA process.

54. Although the formal proof of claim processes have not yet begun, the Joint Administrators have made every effort to resolve many claims on a preliminary basis while the allocation proceedings were pending. In 2010, the English Court approved the Joint

---

[35] The CVA process may also afford creditors the right to have relatively small claims determined either by expert review or formal arbitration, at a creditor's option, which the Joint Administrators anticipate would be conducted by a retired English Court judge.

Administrators to conduct an initial review process for a large number of trading claims.[36]
Through this informal process, the Joint Administrators reviewed claims and notified creditors of their intention to either reject or allow the claims upon the commencement of the formal claims processes. Therefore, when the formal processes begin, the Joint Administrators will quickly be able to approve or disallow a large number of claims.

55. Because the individual EMEA proceedings are overseen by a sister common law jurisdiction that has been recognized for decades as procedurally fair and comparable to U.S. proceedings and process, and because the EMEA proof processes mirror the processes that have already occurred in Canada and the United States in these proceedings, there is no basis for concluding that the EMEA proceedings must be "policed" by a U.S. court. The U.S. Allocation Decision recognizes this, stating, "[t]he Court has every confidence that the tribunals overseeing the Nortel insolvency proceedings across the globe will adjudicate the claims at issue therein in a just, efficient manner. The Court is prepared to act if they do not." (U.S. Allocation Decision at 62–63.)[37] There is no basis for "clarifying" the U.S. Allocation Decision to eschew longstanding principles of international comity and recognition of the legitimacy and reliability of English proceedings.

b. The UKPC's Claim Will Be Determined Pursuant to Statutory Guidelines and Subject to Comprehensive Review.

56. Just as they have no basis for asking the Court to "police" the individual EMEA proceedings, the U.S. Debtors have no basis for suggesting that the Joint Administrators of NNUK would allow a UKPC claim that is "inflated." Because NNUK's formal claims

---

[36] (*See* TR50310, Joint Administrators' Progress Report to Creditors 9 (Feb. 6, 2014).)

[37] Such relief necessarily extends to this Court's review of claims allowed in the Canadian proceedings and, although the Canadian Allocation Decision does not contain comparable language, to the Canadian Court's review of claims allowed in the U.S. and EMEA proceedings. Review of claims allowed in any jurisdiction should be conducted in a joint hearing before both Courts, as is required for all allocation disputes.

process has not yet begun, the UKPC's claim has not been reviewed by the Joint Administrators or the English Court. Once initiated, NNUK's claims process will ensure that, to the extent any inflation exists in this (or any) claim, it will be identified and disallowed.

57.     Under English law, the UKPC's claim against NNUK constitutes a debt under section 75 of the *Pensions Act 2004*. This is a statutorily recognized debt related to the deficit in NNUK's pension fund that was automatically recorded when NNUK entered insolvency.[38] Pursuant to statutory requirements, the debt must be certified by an actuary before it is submitted as a proof of claim in the administration.[39] To date, the UKPC's claim has been certified and notified to the Joint Administrators but has not been submitted as a formal proof of claim because, and only because, NNUK's formal claims process has not yet begun.

58.     As soon as NNUK's formal claims process begins, the Joint Administrators of NNUK will assess this claim in their capacity as court officers and in accordance with clear statutory rules for recognizing section 75 debts under the *Pensions Act 2004*. The Joint Administrators will only allow the UKPC's claim to the extent it conforms to those statutory requirements. The Joint Administrators will likely seek the prompt assistance of

---

[38]     (*See* Objection of the Trustee of Nortel Networks UK Pension Plan and the Board of the Pension Protection Fund to Debtors' Motion for Entry of an Order Enforcing the Automatic Stay Against Certain Claimants with Respect to the U.K. Pension Proceedings ¶ 25 n.7, Feb. 24, 2010 [D.I. 2503].) In this case, the size of the debt is directly attributable to the fact that there were at least 36,000 Nortel employees affected by shortfalls in NNUK's pension scheme at the petition date. (*See* Allocation Post-Trial Brief of Nortel Networks UK Pension Trust Limited and the Board of the Pension Protection Fund at 1, Aug. 7, 2014 [D.I. 14269].) Indeed, the Third Circuit and this Court have recognized that some of the largest claimants in this litigation are "pension funds in the U.K. and the United States, representing pensioners who are undoubtedly dependent, or who will become dependent, on their pensions. They are the pawns in the moves being made by the Knights and the Rooks." (U.S. Allocation Decision at 113 (quoting *In re Nortel Networks, Inc.*, 669 F.3d 128, 143–44 (3d Cir. 2011)).) Recognizing the full and legitimate value of the UKPC's claim for allocation purposes, whatever that value is determined to be after full review in NNUK's formal claims process, will ensure that the "pawns" in this cross-jurisdictional chess match are adequately and fairly compensated.

[39]     (*See* Declaration of Richard Hitchcock in Support of Debtors' Motion for Entry of an Order to Enforce the Automatic Stay Against Certain Claimants with Respect to the U.K. Pension Proceedings ¶¶ 24–28, Feb. 18, 2010 [D.I. 2445] (describing section 75 debts and how they are calculated).)

expert legal counsel to ensure compliance with section 75's requirements.  NNUK's other creditors have every opportunity, pursuant to the procedures described above, to object to the UKPC's claim and seek judicial intervention if there is any concern that it is inflated.

59.     The section 75 claim against NNUK is directly analogous to the claims that have been asserted by the Pension Benefit Guaranty Corporation ("PBGC") against NNI.[40] As the Court is well aware, the PBGC files a proof of claim in a bankruptcy to recover unfunded benefit liabilities.[41]  Like claims under section 75, the PBGC's claims for unfunded benefit liabilities are calculated pursuant to statutes and regulations.  Per section 4062(b) of ERISA, the PBGC is entitled to recover "the total amount of the unfunded benefit liabilities (as of the termination date) to all participants and beneficiaries under the plan, together with interest (at a reasonable rate) calculated from the termination date in accordance with regulations prescribed by [the PBGC]."  29 U.S.C. § 1362(b)(1)(A).  Much like the section 75 process in the United Kingdom, the valuation of unfunded benefit liabilities requires a complex actuarial analysis of the plan, applying methods and assumptions pursuant to PBGC regulations.[42]  The valuation must accord with generally accepted actuarial principles and practices.[43]

60.     The section 75 claim is distinct from the FSD process.  FSDs are more analogous to claims that the PBGC could assert in order to impose "controlled group" liability on

---

[40]   (See PBGC Am. Proof of Claim Against NNI *et al.* (July 7, 2014) [Claim 8760] (amends Claim 4738); PBGC Am. Proof of Claim Against NNI *et al.* (July 7, 2014) [Claim 8761] (amends Claim 4736); PBGC Am. Proof of Claim Against NNI *et al.* (July 7, 2014) [Claim 8762] (amends Claim 4737); PBGC Am. Proof of Claim Against NNI *et al.* (July 7, 2014) [Claim 8763] (amends Claim 4735).)

[41]   (See Order Approving Stipulation Regarding Filing of Claims by Pension Benefit Guaranty Corporation Ex. 1 ¶ D–E (Sept. 24, 2009) [D.I. 1546].)

[42]   See 29 C.F.R. §§ 4044.41 ("The plan administrator of a plan that has been or will be placed into trusteeship by the PBGC shall value plan benefits in accordance with §§ 4044.51 through 4044.57."); 29 C.F.R. §§ 4044.51– 4044.57 and Appendices A to D to Part 4044 (assumptions include, for example, those for benefit starting date, form of payment, expected retirement age, and mortality).

[43]   29 C.F.R. § 4044.52(c).

members of a corporate group other than the employer entity. Similar to the FSD process, under ERISA, the contributing sponsor and each control group member are jointly and severally liable to the PBGC for the plan's unfunded benefit liabilities. *See* 29 U.S.C. § 1362(a).[44] Pursuant to the Courts' decisions, the Joint Administrators understand that the FSDs are to be excluded from the calculation of allowed claims for allocation purposes. (*See* U.S. Allocation Decision at 112; Canadian Allocation Decision ¶¶ 252, 258.)

61. The U.S. Debtors' accusations that claim inflation is inevitable in NNUK's proceedings due to the fact that the Joint Administrators will "privately agree[]" to inflate the UKPC's claim and that they "lack[] the same incentive as the U.S. and Canadian Debtors to ensure fair measurement of that claim," (U.S. Debtors' Motion ¶¶ 46, 47), are insulting and absurd. The Joint Administrators are officers of the English Court, appointed by the English Court to administer each of the separate EMEA estates, with duties to act in good faith, with candor, and in accordance with applicable law in their fiduciary roles with respect to each EMEA entity.[45] The Joint Administrators are no different from a trustee in the United States or a monitor in Canada in this regard. *See Lindner Fund*, 143 B.R. at 808 n.2 ("An administration order and an administrator are akin to a petition under Chapter 11 of the United States Bankruptcy Code and a trustee who is appointed as the debtor's representative under 11 U.S.C. § 323(a)."); *In re Nortel Networks, Inc.*, 522 B.R. 491, 496 n.5 (Bankr. D. Del. 2014)

---

[44] (*See* Order Approving Stipulation Regarding Filing of Claims by Pension Benefit Guaranty Corporation Ex. 1 ¶ D–E (Sept. 24, 2009) [D.I. 1546]; PBGC Am. Proof of Claim Against NNI *et al.* (July 7, 2014) [Claim 8763] (amends Claim 4735), Statement of the Pension Benefit Guaranty Corporation in Support of its Amended Claim for Unfunded Benefit Liabilities ¶¶ 5, 8.)

[45] (*See, e.g.*, Verified Petition for Recognition of Foreign Proceedings Pursuant to Chapter 15 of the United States Bankruptcy Code, Ex. A, *In re Nortel Networks UK Ltd.*, No. 09-11972 (Bankr. D. Del. June 8, 2009) (initial order of the English Court dated Jan. 14, 2009).)

(noting that the "monitor is a trustee licensed by the Office of the Superintendent of Bankruptcy who is appointed by the Court in the initial order" and, as such, is an officer of the court).

62. If the Joint Administrators were to allow an artificially inflated UKPC claim against NNUK, they would not only directly violate English law and their obligations to the English Court, but they would also prejudice all other NNUK creditors. The U.S. Debtors' allegation that, in essence, the Joint Administrators will abandon their duties in order to manipulate the allocation process and defraud the courts and creditors, is not only baseless, it is offensive.

**C.    Clarification Is Unnecessary that the Value of Settlements of Prepetition Debt Will Be Counted for Allocation Purposes.**

63. Similar to their other requests for clarification, the U.S. Debtors' request for the Court to clarify that claims settlements will be counted for allocation purposes appears unnecessary and redundant. The decision specifically provides that the Court's modified pro rata approach "honor[s]" settlements and "recognizes . . . settlement related claims." (U.S. Allocation Decision at 60, 102; *see also id.* at 62, 63, 107.) No clarification appears necessary – the actual dollar value of settlements entered into by any of the Nortel debtors, whether NNI, a debtor in Canada, or a debtor in EMEA, will be included for purposes of allocation.[46]

---

[46] Although the Court clearly stated that the Nortel debtors should not be penalized for successfully resolving claims via settlement, the value of settled claims that are counted for allocation purposes must not relate to postpetition expenses for estate administration. Section 541 of the Bankruptcy Code provides that property of a debtor's estate is comprised of "all legal or equitable interests of the debtor in property *as of the commencement of the case*." 11 U.S.C. § 541 (emphasis added). Further, this dispute concerns the allocation of proceeds from asset sales governed by the IFSA, and it would be illogical to assert that any debtor's entitlement to proceeds should be impacted by claims arising after those proceeds were realized. Thus, settlement values should be counted for allocation purposes only to the extent that they address obligations that had accrued as of the petition date, whether or not the postpetition settlement of these prepetition obligations granted any administrative priority.

**D.** **Clarification Is Unnecessary that Reserved and Estimated Claims Arising Prepetition Will Be Included for Allocation Purposes.**

64.     The U.S. Debtors also seek clarification that they are entitled to receive an allocation on account of reserved or estimated claims that arise from allocation itself (*e.g.*, tax claims on sale proceeds).  Although the Joint Administrators generally agree that some mechanism is appropriate to estimate and reserve so that unresolved prepetition claims do not hold up the allocation process, this should be addressed in due course as the process for calculating and making the allocation is put into place.  However, reserving and allocating proceeds based on postpetition liabilities, as the U.S. Debtors suggest, would be inappropriate and inconsistent with the approach to allocation adopted by the Court.

65.     The issue of reserved and estimated claims, which pertains to the specific procedures and timing of each debtor's claims process, was one of many issues that was clearly too granular for the Court to address in the context of its decision on the appropriate allocation methodology.  Instead, the Court made clear that it was laying the framework for its approach, and it ordered the parties to submit additional papers to iron out the specifics of how the Court's approach would be implemented in each estate.  (*See* U.S. Allocation Order ¶ 2(d).)  There is no need to clarify the Court's decision since this issue can be addressed by the debtors in making these submissions.

66.     Second, the U.S. Debtors' specific proposal to reserve for tax claims and other postpetition liabilities the U.S. Debtors may incur is just another improper attempt to obtain a larger allocation from the lockbox.  The expenses of estate administration, such as legal fees and postpetition taxes, should not be considered claims for purposes of allocation.  The U.S.

Debtors have no basis for attempting to expand their claims base through this "clarification."[47] As there is no basis for "clarifying" an issue that is not even addressed in the U.S. Allocation Decision, the Motion should be denied.

E.    **Particular Settlements, Intercompany Claims, and Reserves Should Be Subject to Review By the Courts in the Event of Any Bona Fide Dispute.**

67.    While the EMEA Debtors do not believe that clarification is necessary with respect to the general principles applicable to the treatment of settlements, intercompany claims within geographical groups, and reserves as part of the claims base for allocation purposes, these categories of claims should be subject to review by the Courts in the same manner as other forms of claim.  In the event any debtor raises a bona fide dispute about the amount of any particular such claim, or whether the inclusion of such claim as part of the claims base for allocation purposes is consistent with the principles of the modified pro rata methodology proposed by the Courts, the Courts can address it in the ordinary course.

---

[47]    If, however, the Court concludes that reserved and estimated postpetition claims should be included in the calculation of NNI's allowed claims base for allocation purposes, this must be the case for all debtors.  NNI is not unique in incurring postpetition liabilities.  For example, certain EMEA Debtors, including NNUK, may also incur significant tax liability based on allocation under the modified pro rata model.

## <u>CONCLUSION</u>

For the foregoing reasons, the Joint Administrators respectfully request that the Court (i) deny the U.S. Debtors' Motion, and (ii) grant such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware
      June 12, 2015

YOUNG CONAWAY STARGATT & TAYLOR, LLP

By:      /s/ Patrick A. Jackson
        James L. Patton (No. 2202)
        Edwin J. Harron (No. 3396)
        John T. Dorsey (No. 2988)
        Jaime Luton Chapman (No. 4936)
        Patrick A. Jackson (No. 4976)

        Rodney Square
        1000 North King Street
        Wilmington, Delaware 19801
        Telephone:  302-571-6600
        Fax:  302-571-1253

        – and –

        HUGHES HUBBARD & REED LLP

        William R. Maguire (*admitted pro hac vice*)
        Derek J.T. Adler (*admitted pro hac vice*)
        Neil J. Oxford (*admitted pro hac vice*)

        One Battery Park Plaza
        New York, New York 10004
        Telephone:  212-837-6000
        Fax:  212-422-4726

        *Counsel for the Joint Administrators*