Court File No.: 09-CL-7950

## ONTARIO
## SUPERIOR COURT OF JUSTICE
## (COMMERCIAL LIST)

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

- and -

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| NORTEL NETWORKS, INC., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | (Jointly Administered) |

## OPPOSITION OF THE U.K. PENSION CLAIMANTS TO THE MOTIONS FOR CLARIFICATION AND/OR RECONSIDERATION OF THE MAY 12, 2015 ALLOCATION TRIAL OPINION AND ORDER / REASONS FOR JUDGMENT

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................2

ARGUMENT    .............................................................................................5

A.    Standards For Reconsideration And Clarification Under U.S. Law. ....................5

B.    Standards Applicable Under Canadian Law. .......................................................8

C.    Even If Creditor Recoveries Were Relevant, Movants' "Evidence" Fails To
      Meet The Stringent Standard For Reconsideration And Portrays An
      Inaccurate Picture Of  U.S. Creditor Recoveries...................................................12

D.    The Courts' Treatment Of Bondholder Guaranty Claims For Allocation
      Purposes Warrants No Reconsideration. ...............................................................15

    i.    Excluding The Bondholder Guaranty Claim Comports With The
          Courts' Decision That Multiple Claims Will Only Be Recognized
          Once For Allocation Purposes. ...................................................................15

    ii.   Ivanhoe Is Not Relevant To The Allocation Analysis, And The
          Bondholders' Request To Adjudicate Distribution Issues Now
          Should Be Rejected.....................................................................................18

A.    U.S. Debtors Have Failed to Demonstrate Any Basis For Reconsideration
      Of The Allocation Of NGS/Diamondware Sale Proceeds. ...................................19

B.    Clarification Of Claims-Related Issues ...............................................................20

    i.    The Debtors' Request For Clarification Of Certain Claims-Related
          Issues Is Premature. ...................................................................................20

    ii.   All Intercompany Claims Should Be Recognized For Purposes Of
          Allocation....................................................................................................21

    iii.  Inclusion Of U.S. Settlements In The U.S. Debtors' Claims Base. ...........21

    iv.   Oversight Of U.K. Pension Claimants' Section 75 Debt Claim
          Against NNUK..............................................................................................23

    v.    Inclusion Of Reserve For Certain Claims....................................................28

CONCLUSION    .............................................................................................29

US LAW

*In re ABC Learning Centres, Ltd.*,
    728 F.3d 301 (3d Cir. 2013)..............................................................................................24

*Accenture Global Servs., GmbH v. Guidewire Software, Inc.*,
    800 F. Supp. 2d 613 (D. Del. 2011), *aff'd*, 728 F.3d 1336 (Fed. Cir. 2013).......................6

*Brambles USA, Inc. v. Blocker*,
    735 F. Supp. 1239 (D. Del.1990)..........................................................................7, 8, 19

*In re Coral Petroleum, Inc.*,
    60 B.R. 377 (Bankr. S.D. Tex. 1986) ............................................................................28

*Dentsply Int'l, Inc. v. Kerr Mfg. Co.*,
    42 F. Supp. 2d 385 (D. Del. 1999)................................................................................6, 8

*Daoud v. City of Wilmington*,
    946 F. Supp. 2d 369 (D. Del. 2013)...................................................................................6

*In re Gercke*,
    122 B.R. 621 (Bankr. D.D.C. 1991) ..............................................................................24

*HHCA Texas Health Servs., L.P. v. LHS Holdings, Inc.*,
    268 B.R. 74 (Bankr. D. Del. 2001) ...................................................................................5

*Ivanhoe Building & Loan Ass'n of Newark v. Orr*,
    295 U.S. 243 (1935)........................................................................................................18

*Kloth v. S. Christian Univ.*, Civ.
    No. 06-244-SLR, 2007 WL 3036893 (D. Del. Oct. 17, 2007) ........................................13

*Kyoei Fire & Marine Ins. Co. v. M/V Mar. Antalya*,
    No. 06 CV 2043 (LAP), 2006 WL 3802209 (S.D.N.Y. Dec. 22, 2006) ...........................12

*Mathis v. Christian Heating & Air Conditioning, Inc.*,
    No. 13-CV-3740, 2015 WL 1084308 (E.D. Pa. Mar. 12, 2015).........................................7

*Max's Seafood Café v. Quinteros*,
    176 F.3d 669 (3d Cir. 1999)...............................................................................................6

*In re Meridian Automotive Sys.-Composite Operations, Inc.*,
    No. 05-11168 (MFW), 2008 WL 141160 (Bankr. D. Del. Jan. 11, 2008) (Gross, J.).....6, 7

*MobileMedia Ideas, LLC v. Apple Inc.*,
    966 F. Supp. 2d 433 (D. Del. 2013)...................................................................................5

*In re New Century TRS Holdings, Inc.*, No. 07-10416 KJC, 2012 WL 38974 (Bankr. D. Del. Jan.
    9, 2012) *aff'd*, No. ADV 09-52251 KJC, 2013 WL 1196605 (D. Del. Mar. 25, 2013) ......5

*Official Comm. of Unsecured Creditors v. Catholic Diocese of Wilmington, Inc.*,
    437 B.R. 488 (Bankr. D. Del. 2010) ...................................................................5

*Pennsylvania Ins. Guar. Ass'n v. Trabosh*,
    812 F. Supp. 522 (E.D. Pa. 1992) ......................................................................8

*Resolution Trust Corp. v. KPMG Peat Marwick*,
    No. 92-1373, 1993 WL 211555 (E.D. Pa. June 8, 1993)...............................7, 22

*Ryan v. Asbestos Workers Union Local 42 Pension Fund*,
    No. Civ.A. 97-604-GMS, 2000 WL 1239958 (D. Del. Aug. 25, 2000) ............19

*Samuel v. Carroll*,
    505 F. Supp. 2d 256 (D. Del. 2007)....................................................................5

*In re South Beach Secs., Inc.*,
    606 F.3d 366 (7th Cir. 2010) ............................................................................28

*Teri Woods Publ'g, L.L.C. v. Williams*,
    No. 12-04854, 2013 WL 6388560 (E.D. Pa. Dec. 6, 2013)...............................6

*Wallace v. Powell*,
    No. 3:09-CV-0291, 2012 WL 2007294 (M.D. Pa. June 5, 2012)......................7


STATUTES

11 U.S.C. § 103(a) ...................................................................................................25

Fed. R. Evid. 706 .....................................................................................................18


Other Authorities

12 James W. Moore et al., Moore's Federal Practice, § 59.30 .................................5


CANADIAN LAW

*Constantinescu v. Barriault*, [1996] B.C.W.L.D. 2846 (S.C.)....................................10

*Elias v. Hutchiso*n, [1980] 12 Alta. L.R. (2d) 241(Q.B.); aff'd 14 Alta. L.R. (2d) 268 (C.A.).......9

*Griffin v. Corcoran*, 2010 NSCA 73.........................................................................10

- 4 -

*Holmes Foundry Ltd. v. Point Edward (Village)*, [1963] 2 O.R. 404 (C.A.) ...............................10

*Montague v. Bank of Nova Scotia,* [2004] O.J. No. 13 (C.A.)..................................................10, 11

*Re HOJ National Leasing Corp*, 2008 ONCA 390...........................................................................9

*Schmuck v. Reynolds-Schmuck*, [2000] O.J. No. 247 ...................................................................10

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194 .........................................................................11

*Companies' Creditors Arrangement Act*, R.S.C. 1985...................................................................8

Nortel Networks U.K. Pension Trust Limited and the Board of the Pension Protection Fund (collectively, the "U.K. Pension Claimants" or "UKPC"), hereby oppose (the "Opposition") (a) the following motions and joinders before the U.S. Court: the U.S. Debtors' Motion For Clarification And/Or Reconsideration Of The May 12, 2015 Allocation Trial Opinion And Order, dated May 26, 2015 [D.I. 15611] (the "U.S. Debtors' Reconsideration Motion"); the Ad Hoc Group Of Bondholders' (the "Bondholders") Motion For Reconsideration Of Opinion And Order Allocating Proceeds From Asset Sales Of Nortel Networks, Inc., Its Affiliates And Subsidiaries (the "Bondholders' Reconsideration Motion") [D.I. 15612]; the Joinder With Reservation Of Rights Of The Official Committee Of Unsecured Creditors (the "UCC") of Nortel Networks Inc., Et Al. To The U.S. Debtors' Motion For Reconsideration (the "UCC Joinder") [D.I. 15613]; the Motion Of Law Debenture Trust Company Of New York ("Law Debenture"), as Indenture Trustee For The NNCC Notes, Pursuant To Fed. R. Civ. P. 52(b), 59(e), And 60 For Partial Reconsideration Of The Court's Order And Allocation Trial Opinions (the "Law Debenture Reconsideration Motion") [D.I. 15615]; and the Joinder With Reservation Of Rights Of The Bank Of New York Mellon ("BNYM," and together with U.S. Debtors, Bondholders, UCC, and Law Debenture, "Movants"), As Indenture Trustee, In The Motions For Reconsideration Filed By The Ad Hoc Group Of Bondholders And The U.S. Debtors [D.I. 15622] (the "BNYM Joinder"); and (b) the following motions and joinders before the Canadian Court: U.S. Debtors - Motion For Clarification, Reconsideration Or Amendment; Bondholders – Motion For Clarification; Law Debenture - Motion For Clarification, Amendment Or Reconsideration; And UCC – Joinder To The U.S. Debtors' Motion For Clarification, Reconsideration Or Amendment (collectively, all of the foregoing motions and joinders, the "Reconsideration Motions").

In support of this Opposition, the U.K. Pension Claimants, by and through their undersigned counsel, respectfully state as follows:

## PRELIMINARY STATEMENT

1.     After a twenty-one day joint trial at which nearly forty witnesses testified, the deposition testimony of 130 witnesses was designated, and in excess of 2,200 exhibits were admitted into evidence, the Courts spent the last eight months reviewing the voluminous trial record before each issuing their respective opinions on the allocation of the $7.3 billion in Lockbox Funds (the "Allocation Opinions"). Those Allocation Opinions, which collectively exceed 240 pages in length, comprehensively address the myriad conflicting arguments advanced by the Core Parties.  In the end, each Court determined that the Lockbox Funds should be allocated based on a modified pro rata methodology.  Instead of heeding the Courts' admonitions to accept and implement their rulings, Movants have decided to continue this value-destructive litigation by filing the Reconsideration Motions.  As demonstrated below, reconsideration is sparingly granted, and Movants do not come remotely close to satisfying the heavy burden they bear for such extraordinary relief.

2.     The crux of the U.S. Debtors Motion is that the Courts should reconsider their rulings because those rulings purportedly  lead to "inequitable" results.[2]  But the U.S. Debtors' professed "disappointment" with what they contend to be an inequitable result, even if it were true, would not be a proper basis for reconsideration.

3.     In any event, the result is not inequitable and the "evidence" presented in the U.S. Debtors' Reconsideration Motion demonstrates no such thing.  Rather, in an attempt to create the

---

[2]     U.S. Debtors' Reconsideration Motion at ¶¶ 26-32.

appearance of inequality, the U.S. Debtors cherry-pick amounts allocated to the Debtors' estates

from the Lockbox and ignore other sources of recovery for the U.S. Debtors' creditors, such as

NNI's $2 billion intercompany claim against NNL and cash and other assets on hand, to arrive at

U.S. unsecured creditor recoveries "from direct Lockbox distributions,"  of approximately 14%

As demonstrated below, however, based on the data included in the  U.S. Debtors' own motion

papers (assuming its accuracy for purposes of their motion), aggregate U.S. unsecured creditor

returns would be between 75% and 62% and Bondholder returns would be between 88% and

81%.[3]  Hardly an inequitable result.

     4.     The principal relief sought by the U.S. Debtors is reconsideration of the Courts'

rulings that the Bondholders' guaranty claims should be excluded from the U.S. Debtors' claims

pool for allocation purposes.  Granting the U.S. Debtors' relief would reverse the express ruling

by both Courts that the same creditor claim into more than one estate will count only once in the

allocation formula.  There is no basis to suggest that the Courts' decision on this issue was

anything other than a very deliberate one properly arrived at after a lengthy joint trial, and central

to the modified pro rata allocation methodology the Courts  crafted.

     5.     The U.S. Debtors also seek reconsideration of the Allocation Opinions to provide

that the proceeds from the sale of NGS and Diamondware should be allocated in whole to the

---

[3]    *See* U.S. Debtors' Reconsideration Motion, Ex. A at A-3.  The recoveries of 75% for the U.S. unsecured creditors and 88% for Bondholders have been calculated based on the same methodology used by the U.S. Debtors on page A-3 based on the unadjusted Britven data presented on page A-1.  If the Courts intend to undertake a results-oriented analysis, the unadjusted Britven data is the only evidence that has been before the Courts previously and therefore the only evidence appropriate for consideration by the Courts without subjecting the U.S. Debtors' analysis to further evidentiary proceedings.  Even if the U.S. Debtors' adjustments to the Britven data were accepted, it would result in recoveries of 62% and 81% to U.S. unsecured creditors and Bondholders, respectively.  If the Bondholders are permitted to assert their guarantee claim against NNI in the full amount (as opposed to the deficiency) for distribution purposes, U.S. unsecured creditor recoveries would further decrease and Bondholder recoveries would further increase.

U.S. Debtors.  That argument was not made by the U.S. Debtors in their pre-trial or post-trial briefs and cannot be advanced at this late stage under the guise of a reconsideration motion.  Nor, in any event, have they demonstrated any basis upon which reconsideration would be warranted.

6.      Finally, the U.S. Debtors' Reconsideration Motion sets forth five purported requests for "clarification."  Four of the five requests are inextricably related to issues concerning the manner and process for determining the claims that should be included in a Debtor's claims pool for allocation purposes and at what amount.[4]  As such, these requests are premature.  Indeed, the Allocation Opinions recognized that further proceedings would be required to resolve claims-related issues.  Moreover, even if the Courts were to consider them now, many of the U.S. Debtors' purported requests for "clarification" are in fact disguised attempts to seek substantive amendments to the Allocation Opinions.

7.      Having failed to demonstrate any basis for reconsideration or supposed "clarification" of the Courts' decisions, Movants' remedy – if they insist on unnecessarily prolonging this corrosive litigation – is an appeal (in the U.S.), and a Motion for Leave to Appeal (in Ontario), not reconsideration or clarification.  The Courts, of course, cannot control whether Movants seek to appeal from the Allocation Opinions and ignore the strong message the Courts sent the parties that it is time to end this protracted litigation, but they can refuse to provide the fora in which value-destructive litigation can continue by denying the Reconsideration Motions.  To do otherwise, the U.K. Pension Claimants submit, would only encourage the divisive behavior that has plagued these cases for years.  Instead, it is time for the parties to act constructively to unlock the Lockbox for the benefit of Nortel's worldwide creditors.

---

[4]      The fifth request for clarification, which seeks clarification that the Lockbox Funds will be allocated to specific Debtor estates and not to Debtor groups, is not controversial, and the U.K. Pension Claimants do not object to the U.S. Debtors' request for such clarification.

**ARGUMENT**

**A.     Standards For Reconsideration And Clarification Under U.S. Law.**

8.      Reconsideration is an "extraordinary" remedy that should be granted only

sparingly.  *HHCA Texas Health Servs., L.P. v. LHS Holdings, Inc.*, 268 B.R. 74, 76 (Bankr. D.

Del. 2001); *Samuel v. Carroll*, 505 F. Supp. 2d 256, 261 (D. Del. 2007) (citing D. Del. LR

7.1.5).  Such motions are treated as a motion to alter or amend a judgment pursuant to Fed. R.

Civ. P. 59(e), which is made applicable to these proceedings by Bankruptcy Rule 9023.  *See*

*Official Comm. of Unsecured Creditors v. Catholic Diocese of Wilmington, Inc.*, 437 B.R. 488,

490 (Bankr. D. Del. 2010) ("Federal Rule of Civil Procedure 59(e), made applicable . . . pursuant

to Rule 9023 of the Federal Rules of Bankruptcy Procedure, governs motions for

reconsideration.").  The standard for obtaining relief under Fed. R. Civ. P. 59(e) is "difficult to

meet."  *MobileMedia Ideas, LLC v. Apple Inc.*, 966 F. Supp. 2d 433, 437 (D. Del. 2013); *Samuel*,

505 F. Supp. 2d at 261.[5]

9.      Given the extraordinary nature of reconsideration or reargument after a final

judgment has been entered, courts in this Circuit recognize only three narrow grounds upon

which a party can seek reconsideration: "(1) an intervening change in the controlling law; (2) the

availability of new evidence that was not available when the court [issued its ruling]; or (3) the

need to correct a clear error of law or fact or to prevent manifest injustice."  *Max's Seafood Café*

*v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999).  A motion for reconsideration that does not

---

[5]     Because the Reconsideration Motions were filed within the time specified by Rule 59(e), *i.e.*, 28 days from
entry of judgment, Rule 60(b), cited by the U.S. Debtors, the Bondholders, and the UCC, has no
applicability here.  *See* 12 James W. Moore et al., Moore's Federal Practice, § 59.30 ("Courts have
generally held that, regardless of the title, any motion for reconsideration filed within the time specified by
Rule 59(e) is treated as a motion to alter or amend judgment").  Even if the Court were to consider Rule
60(b), Movants cannot overcome the "high hurdle" to obtain relief under that rule.  *In re New Century TRS*
*Holdings, Inc.*, No. 07-10416 KJC, 2012 WL 38974, at *2 (Bankr. D. Del. Jan. 9, 2012) *aff'd*, No. ADV
09-52251 KJC, 2013 WL 1196605 (D. Del. Mar. 25, 2013).  Movants do not identify any mistake,
inadvertence, surprise, or excusable neglect that would justify the extraordinary relief they request.

demonstrate one of these three bases as a ground for relief must be denied.  *See Accenture*

*Global Servs., GmbH v. Guidewire Software, Inc.*, 800 F. Supp. 2d 613, 622 (D. Del. 2011)

(denying motion to alter or amend judgment because movant did not allege any of the three

recognized bases for relief) *aff'd*, 728 F.3d 1336 (Fed. Cir. 2013).

10.     Although it is not entirely clear upon which of the three bases for reconsideration

Movants rely (and for this reason alone their motions should be denied), no intervening change

in the controlling law has occurred, and no party has identified new evidence that was not

available when the Courts rendered their Allocation Opinions.[6]  Consequently, the only basis on

which reconsideration could be considered here would be the need to correct a clear error of law

or to prevent manifest injustice.  To satisfy this ground for relief, Movants cannot reargue issues

already litigated or ask the Courts to rethink their decisions on allocation.  *See Daoud v. City of*

*Wilmington*, 946 F. Supp. 2d 369, 372 (D. Del. 2013) ("A motion for reconsideration is not

properly grounded on a request that a court rethink a decision already made."); *see also Dentsply*

*Int'l, Inc. v. Kerr Mfg. Co.*, 42 F. Supp. 2d 385, 419 (D. Del. 1999) (stating that reconsideration

motions "should not be used to rehash arguments already briefed or to allow a never-ending

polemic between the litigants and the Court").  Likewise, motions for reconsideration may not be

used "as a means to argue new facts or issues that inexcusably were not presented to the court in

the matter previously decided."  *Brambles USA, Inc. v. Blocker,* 735 F. Supp. 1239, 1240 (D.

---

[6]     The U.S. Debtors' Reconsideration Motion contains data said to support their allegation that the Allocation Opinions lead to unfair results.  These data are not "new evidence" not available previously.  *See In re Meridian Automotive Sys., Inc.*, No. 05-11168 (MFW), 2008 WL 141160, at *1 (Bankr. D. Del. Jan. 11, 2008) (Gross, J.) (noting that reconsideration requires the availability of new evidence not available previously).  All of the numbers and calculations used to create these data were available to the U.S. Debtors during trial and, thus, the U.S. Debtors could have made the same arguments at trial as they make now for the first time.  The U.S. Debtors' strategic decision not to make these arguments at trial is not a basis for reconsideration.  *See Teri Woods Publ'g, L.L.C. v. Williams*, No. 12-04854, 2013 WL 6388560, at *3 (E.D. Pa. Dec. 6, 2013) ("[I]t is not the job of courts deciding motions for reconsideration to rescue parties from their strategic litigation choices.").

Del.1990); *see also In re Meridian Auto. Sys.-Composite Operations, Inc.*, No. 05-11168 MFW, 2008 WL 141160, at *1 (Bankr. D. Del. Jan. 11, 2008) (same).

11.     The U.S. Debtors' Reconsideration Motion also purports to request clarification on five separate issues.[7]  The proper purpose of a motion for clarification is to seek further information about what the court intended by its ruling but not to alter, amend, or seek additional findings or rulings.  *See Wallace v. Powell*, No. 3:09-CV-0291, 2012 WL 2007294, at *1 (M.D. Pa. June 5, 2012) ("The general purpose of a motion for clarification is to explain or clarify something ambiguous or vague, not to alter or amend.") (internal citations omitted); *see also Resolution Trust Corp. v. KPMG Peat Marwick*, No. 92-1373, 1993 WL 211555, at *2 (E.D. Pa. June 8, 1993) (same).  When a party attempts to revise a court order under the guise of seeking "clarification," the court will evaluate the motion under the strict standard for motions for reconsideration.  *See, e.g.*, *Mathis v. Christian Heating & Air Conditioning, Inc.*, No. 13-CV-3740, 2015 WL 1084308, at *3 (E.D. Pa. Mar. 12, 2015) (converting clarification motion to motion for reconsideration).

12.     Several of the purported points of "clarification" raised by the U.S. Debtors are thinly-veiled attempts to ask the Courts to revise their Allocation Opinions.  Accordingly, the Courts should evaluate the U.S. Debtors' requests for clarification under the stringent reconsideration standard discussed above.

13.     In sum, if ever there were a poster child for why reconsideration is considered such an extraordinary remedy, this is it.  The standard for reconsideration is intentionally high because the courts and litigants have an interest in finality and in preventing "a never-ending polemic between the litigants and the Court."  *Dentsply Int'l, Inc.*, 42 F. Supp. 2d at 419;

---

[7]        *See* U.S. Debtors' Reconsideration Motion at ¶ 4.

(quoting *Oglesby v. Penn. Mut. Life Ins. Co.*, 877 F. Supp. 872, 892 (D. Del. 1994)); *Brambles*, 735 F. Supp. at 1240; *see also Pennsylvania Ins. Guar. Ass'n v. Trabosh*, 812 F. Supp. 522, 524 (E.D. Pa. 1992) ("Motions for reconsideration should be granted sparingly because of the interests in finality and conservation of scarce judicial resources."). As in any case, there will always be parties unhappy with the result. But a party's "undeniabl[e] disappoint[ment]"[8] is not a cognizable basis for reconsideration or clarification. The Reconsideration Motions should accordingly be denied.

**B.    Standards Applicable Under Canadian Law.**

14.    There is no mechanism or procedure under the *Companies' Creditors Arrangement Act*[9] ("<u>CCAA</u>") for considering or granting the relief sought by Movants. Within Canada's two federal insolvency statutes (the CCAA and the *Bankruptcy and Insolvency Act*[10] ("<u>BIA</u>"), Canada's Federal Parliament has chosen to expressly incorporate the power to review, rescind or vary an order made in proceedings under the BIA,[11] but not under the CCAA.

15.    While certain sections of the BIA have been expressly incorporated into the CCAA,[12] Canada's Federal Parliament has chosen not to incorporate section 187(5) of the BIA, or any similar provision, into the CCAA. The U.K. Pension Claimants submit that this is a clear recognition of the different framework underlying the CCAA and the BIA, particularly as it

---

[8]    U.S. Debtors' Reconsideration Motion at ¶ 2.

[9]    R.S.C., 1985, c. C-36.

[10]    R.S.C., 1985, c. B-3.

[11]    Section 187(5) of the BIA provides, under the heading "Court may review, etc." as follows: "187(5) Every court may review, rescind or vary any order made by it under its bankruptcy jurisdiction."

[12]    *See, e.g.,* § 36.1 of the CCAA, which incorporates §§ 38 and 95-101 of the BIA.

relates to orders issued by the Court and avenues available to a party who feels aggrieved by a decision.[13]

16.     Whereas there is a right to request that the Court review, rescind or vary a decision made in a BIA proceeding,[14] the only avenue available in a CCAA proceeding is to seek leave to appeal.

17.     Even if it could be established that the power to review, rescind or vary a CCAA decision pursuant to section 187(5) of the BIA existed – which the U.K. Pension Claimants dispute – the way in which section 187(5) has been interpreted by Canadian Courts provides a clear basis for refusing to grant the relief sought by Movants.

18.     Under Canadian bankruptcy law, it is uncontroverted that the power to review, rescind or vary a court's order should be exercised sparingly and is matter of indulgence that must be carefully guarded.[15]  Courts have held that in order to vary or rescind a judgment or order of a bankruptcy court, there must be a fundamental change in circumstance between the original hearing and the time of the motion to vary, or evidence must have been discovered that was not known at the time of the original hearing and that could have led to a different result.[16]

19.     Movants do not even contend – much less establish – that there has been a fundamental change in circumstances of this case between the Allocation trial and the submission of the Reconsideration Motions.  The extensive relief requested by Movants goes well beyond simple clarifications to address ambiguities or make the Courts' intentions clear.

---

[13]     For example, the CCAA and BIA contain different processes and timelines for appeals.  The BIA contains automatic rights of appeal provided a Notice of Appeal is filed within ten (10) days:  Rule 31, BIA Rules.  The CCAA requires leave to appeal, with a request for leave being sought within twenty-one (21) days of the order or decision having been rendered:  CCAA, section 14(2).

[14]     Section 187(5) of the BIA.

[15]     *Elias v. Hutchison*, [1980] 12 Alta. L.R. (2d) 241(Q.B.) at para. 28; aff'd 14 Alta. L.R. (2d) 268 (C.A.)

[16]     *Re HOJ National Leasing Corp*, 2008 ONCA 390 at para. 27. *Re Garritty Id* at para. 46.

Movants are effectively seeking to reargue the Courts' rulings under the guise of a motion to "reconsider, amend or clarify" the judgments.

20.    Outside of a bankruptcy context, a Canadian Court's inherent jurisdiction to reconsider, modify or amend its own judgment prior to the entry and issuance of a formal Order is an extraordinary remedy to be used sparingly.[17]  The U.K. Pension Claimants submit that there is no legitimate basis to do so in this case.

21.    Reconsideration of the Canadian Court's judgment in the manner suggested by the U.S. Debtors would be unprecedented.  The only authorities relied on by the U.S. Debtors in which reconsideration was permitted and the judgment was modified involve situations where the trial judge sought to clarify an issue on his or her own initiative,[18] where the trial judge clearly misapplied the law,[19] where new legislation came into effect following the rendering of the judgment,[20] or where the court failed to apply an applicable set off in calculating its damages award.[21]  None of these narrow and exceptional circumstances is present in this case.

22.    The U.S. Debtors' reliance on the *Montague* decision is also misguided. *Montague* was a wrongful termination dispute in which the trial judge originally fixed the

---

[17]    *Griffin v. Corcoran*, 2010 NSCA 73 [Brief of Authorities of the U.S. Debtors, Tab 11], at paras. 64 and 75 ("I would emphasize that the reopening of a trial after the judge has given a decision is an extraordinary and rare step that must be undertaken with great caution…"); *Schmuck v. Reynolds-Schmuck*, [2000] O.J. No. 247 (S.C.J.) [Brief of Authorities of the U.S. Debtors, Tab 10], at para. 25 ("It is my view that a party who wishes a reconsideration alone would have to establish that the integrity of the litigation process is at risk unless it occurs, or that there is some principle of justice at stake that would override the value of finality in litigation, or that some miscarriage of justice would occur if such a reconsideration did not take place.").

[18]    *Montague v. Bank of Nova Scotia,* [2004] O.J. No. 13 (C.A.) [Brief of Authorities of the U.S. Debtors, Tab 5].

[19]    *Constantinescu v. Barriault*, [1996] B.C.W.L.D. 2846 (S.C.) [Brief of Authorities of the U.S. Debtors, Tab 8].

[20]    *Holmes Foundry Ltd. v. Point Edward (Village)*, [1963] 2 O.R. 404 (C.A.) [Brief of Authorities of the U.S. Debtors, Tab 6].

[21]    *Constantinescu v. Barriault*, [1996] B.C.W.L.D. 2846 (S.C.) [Brief of Authorities of the U.S. Debtors, Tab 8].

reasonable notice period at twelve months and then immediately clarified at the hearing that she meant to award thirteen months.  Four days later, the trial judge on her own initiative summoned the parties back to court to explain that upon further reflection the appropriate notice period should be sixteen months.[22]  In upholding the trial judge's decision to modify her judgment, the Court of Appeal for Ontario noted that any change to a judgment runs the risk of evoking suspicions of abuse and can put a cloud over the administration of justice and, accordingly, a judge exercising this discretion bears a "significant onus to explain the change".[23]

23.     The reasons put forward by Movants fall well short of the high threshold required to justify reconsideration.  The suggestion that the U.S. Court's limited jurisdiction to reconsider its own decision can form the basis for having the Canadian Court reconsider its own judgment is both novel and without any authority.  Furthermore, the U.S. Debtors' hypothetical plea regarding potential inconsistencies between the judgments is unfounded, as there is no evidence to suggest that the U.S. Court will reconsider its judgment.  In any event, consistency is most easily preserved by allowing both judgments to remain undisturbed.

24.     Finally, similar to section 187(5) of the BIA, Rule 59.06 of the Ontario *Rule of Civil Procedure*[24] provides the Court with the jurisdiction to vary, set aside or amend an Order. While Rule 59.06 has no direct application to Movants' motions given that no Order has been entered in the Canadian Allocation proceeding, the very limited basis upon which Courts are willing to consider such extraordinary relief informs why Movants' motion to vary the Courts' rulings must be dismissed.

---

[22]     *Montague v. Bank of Nova Scotia*, [2004] O.J. No. 13 (C.A.), at para. 40 (emphasis added) [Brief of Authorities of the U.S. Debtors, Tab 5].

[23]     *Montague v. Bank of Nova Scotia*, [2004] O.J. No. 13 (C.A.), at para. 40 (emphasis added) [Brief of Authorities of the U.S. Debtors, Tab 5].

[24]     R.R.O. 1990, Reg 194.

25.    Pursuant to Rule 59.06, Ontario courts can vary, set aside or amend an order :

    a.  that contains an error arising from an accidental slip or omission;

    b.  that is based on fraud;

    c.  if new facts are discovered or arise after the order was made; or

    d.  to address a particular issue on which the court did not adjudicate.

The Movants have failed to establish that their motions for reconsideration and clarification satisfy any of the limited circumstances upon which courts are willing to revisit their Orders.

**C.    Even If Creditor Recoveries Were Relevant, Movants' "Evidence" Fails To Meet The Stringent Standard For Reconsideration And Portrays An Inaccurate Picture Of U.S. Creditor Recoveries.**

26.    Movants had every opportunity at trial to argue, and to introduce evidence, that a pro rata or modified pro rata methodology would produce inequitable creditor recoveries. Instead, they staunchly took the position that creditor recoveries were irrelevant to allocation. *See* Aug. 7, 2014 Post-Trial Brief Of The Ad Hoc Group Of Bondholders, at 3 ("CREDITOR RECOVERIES ARE NOT RELEVANT TO ALLOCATION").  Indeed, in a telephonic conference before both the U.S. and Canadian Courts, in which counsel for  the U.S. Debtors stated that "we are not, from the U.S. perspective, comfortable with providing any additional information beyond that which has already been provided," the U.S. Court observed, "based on the evidence that I heard, I don't know how that would be helpful in my determining allocation. In fact, it may be harmful . . . ."  June 27, 2014 Joint Hr'g Tr. [D.I. 13906] at p. 22:8-10, p.23:2-4.

27.    Having taken that position, Movants should not now be heard to argue that claims and ultimate creditor recoveries justify reconsideration by the Courts of the Allocation Opinions. *Kyoei Fire & Marine Ins. Co. v. M/V Mar. Antalya*, No. 06 CV 2043 (LAP), 2006 WL 3802209,

- 12 -

at *1 (S.D.N.*Y.* Dec. 22, 2006) (Preska, J.) ("[A] party seeking reconsideration is not supposed to

treat the Court's initial decision as the opening of a dialogue in which that party then may use

such a motion to advance new theories or adduce new evidence in response to the court's

ruling.") (internal citation and quotation marks omitted).  Further, as noted above, none of the

"evidence" cited by Movants is newly discovered evidence that was unavailable at trial.  As

such, it cannot form the basis for the U.S. Court's reconsideration of its decision.  *See Kloth v. S.*

*Christian Univ.*, Civ. No. 06-244-SLR, 2007 WL 3036893, at *2 (D. Del. Oct. 17, 2007)

(denying motion for reconsideration because new facts presented by the plaintiff were previously

available).

28.     Moreover, even if Movants could otherwise meet the standard for reconsideration,

the "evidence" they rely on to demonstrate the purported inequity produced by the modified pro

rata methodology does not do that.  Buried in a note to an exhibit, the U.S. Debtors acknowledge

that their analysis "*may not be representative of actual recoveries for a number of*

*reasons . . . .*"[25]

29.     The U.S. Debtors' own "evidence"—even if accepted as accurate for purposes of

their motion—fails to demonstrate that the modified pro rata methodology adopted by the Courts

produces inequitable creditor recoveries.  Rather, it demonstrates the reverse.  The U.S. Debtors

emphasize that "only 11% of the total Lockbox proceeds" is allocated to the U.S. Debtors

resulting in "14 cents on the dollar paid to U.S. unsecured creditors from direct Lockbox

distributions to the U.S. Debtors."[26]  But the U.S. Debtors' "direct Lockbox" allocation is not the

*sole* source of recovery for their creditors.  The U.S. Debtors will also receive distributions from

---

[25]     U.S. Debtors' Reconsideration Motion Ex. A at A-4. (emphasis added).

[26]     U.S. Debtors' Reconsideration Motion at ¶ 3.

- 13 -

NNL based on NNI's $2 billion intercompany claim against NNL.  In addition, the U.S. Debtors'

supposed 14 cents on the dollar recovery for their creditors also does not account for other

sources of recovery available to U.S. creditors, including cash and other assets already on hand,

all of which materially augment U.S. creditors' ultimate distributions.[27]  The U.S. Debtors'

figures also ignore that other U.S. creditors, such as the Bondholders and priority creditors, stand

to recover substantially more.

30.     When these considerations are factored in, the modified pro rata methodology

produces an equitable range of creditor recoveries for U.S. Other Unsecured Creditors of 75%  to

62% and for Bondholders of 88% to 81% even on  the data contained in the U.S. Debtors' own

motion papers.[28]

31.     Moreover,  the U.S. Debtors' "evidence" is based on inaccurate data with

incomplete adjustments cherry-picked by the U.S. Debtors.  The U.S. Debtors' calculations are

based on asset and liability figures from Britven's report, which none of the Core Parties

accepted at trial (other than the CCC),[29] and which the U.S. Debtors themselves concede contain

"numerous uncertainties, inaccuracies and unproven assumptions."[30]  In addition, the U.S.

Debtors  make unilateral adjustments to these unsubstantiated figures.  The specific adjustments

---

[27]     Moreover, the supposed 14-cent recovery presumes that the U.S. Court will allow the full amount of the
Bondholders' guarantee claim against NNI rather than only the deficiency claim.

[28]     U.S. Debtors' Reconsideration Motion, Exh. A at A2-A3.

[29]     To the extent the U.S. Allocation Opinion inadvertently attributes Britven's conclusions regarding a 71%
return to creditors or the CCC's other arguments to the U.K. Pension Claimants, that  is incorrect.  *See* U.S.
Allocation Opinion at 58; Britven Report ¶ 3.13 (opining that each creditor group would recover 71%).

[30]     U.S. Debtors' Reconsideration Motion at ¶¶ 3, 7; see also ¶¶ 3 n.5, 13 (citing "uncertainties in both the
assets of and claims against each estate"), 13 n. 13.  The U.S. Debtors' attempts to explain that they only
rely on the Britven model for its "directional and proportional effect" ring hollow (U.S. Debtors'
Reconsideration Motion ¶¶ 3 n.5, 13 n. 13; *see also* ¶ 15 ("modeling purposes"), Exhibit A at A-4
("illustrative effect")), as the U.S. Debtors use figures based on Britven's model to purportedly illustrate
that U.S. creditor recoveries would be inequitably low.  U.S. Debtors' Reconsideration Motion ¶ 15.

that the U.S. Debtors make have the effect of depressing recoveries to U.S. creditors.  At the same time, they ignore other adjustments that would have the effect of enhancing U.S. creditor recoveries.

**D.**     **The Courts' Treatment Of Bondholder Guaranty Claims For Allocation Purposes Warrants No Reconsideration.**

> **i.**     **Excluding The Bondholder Guaranty Claim Comports With The Courts' Decision That Multiple Claims Will Only Be Recognized Once For Allocation Purposes.**

32.     Movants' arguments in favor of reconsideration can be boiled down to a single remarkable assertion: that after presiding over a 21-day joint trial, considering a formidable trial record, reflecting on extensive briefing by numerous litigants and independently arriving at the same conclusions, both Courts failed to adequately understand the effect the modified pro rata allocation methodology would have on the U.S. Debtors' share of the Lockbox Funds.[31]

33.     Although the U.S. Debtors' Reconsideration Motion is replete with presumptions regarding the U.S. Court's "intentions,"[32] the U.S. Debtors' analysis primarily focuses on isolated statements quoted out of context.[33]

34.     The Courts' equitable decision to recognize all claims only once was a conscious and deliberate conclusion that flowed from the Courts' rationale for adopting the modified pro

---

[31]     *See, e.g.*, U.S. Debtors' Reconsideration Motion at ¶ 2; UCC Joinder at ¶ 1.

[32]     *See, e.g.*, U.S. Debtors' Reconsideration Motion, at ¶¶ 10, 13, 14, 15, 15 n. 14, 16, 25, 29, 29 n. 19, 30, 44, 47 n. 35.

[33]     For example, in paragraphs 10 – 12 of the U.S. Debtors' Reconsideration Motion, the U.S. Debtors suggest that the modified pro rata approach conflicts with the U.S. Court's statements that "NNI is entitled to a greater share of the Sales Proceeds" and "the undeniable fact that NNI generated the lion's share of enterprise-wide revenues." (U.S. Debtors' Reconsideration Motion ¶ 10.)  However, read in context, the U.S. Court was explaining why a modified pro rata approach that gave effect to the $2 billion NNI-NNL intercompany claim was more justified than a "pure" pro rata approach, which would have eliminated all intercompany claims.  By recognizing the NNI-NNL intercompany claim, the U.S. Court explained that NNI would be entitled to a "greater share" of the Lockbox Funds than it would have received under the pure pro rata approach.

rata allocation methodology. The Courts arrived at the modified pro rata allocation methodology only after first examining, in critical detail, the MRDA and each of Debtor groups' respective allocation theories, then concluding that there was no "guiding law or agreement" that dictated a "definitive correct answer."[34]

35.    With "nothing in the law or facts giving any of [the] entities certain and calculable claims to the proceeds from the liquidation of … assets in an enterprise-wide insolvency," the Courts' only option was to exercise their inherent equitable powers to "craft flexible remedies" to decide the allocation dispute.[35] In exercising those powers, the Courts were clearly not attempting to ensure that all creditors achieved the same dividend returns.[36] Rather, the Courts formulated the precise contours of the modified pro rata allocation methodology to reflect the Nortel Group's operations.[37] Based on the Nortel Group's operations as multiple "operating entities in an integrated, multi-national enterprise develop[ing] assets in common," the Courts crafted the modified pro rata allocation methodology to recognize "both the integrated approach which the CCC and the [U.K. Pension Claimants][38] urge, while maintaining – or at least

---

[34]    U.S. Allocation Opinion at 60, 90-91.

[35]    U.S. Allocation Opinion at 60, 93, 98.

[36]    Although the Courts' modified pro rata allocation methodology applies many overlapping principles with the pure pro rata allocation methodology advocated by the U.K. Pension Claimants, the Courts purposely rejected any approach designed to dictate or equalize recoveries for all creditors. *See, e.g., id.* at 63 (stating that Court is "not ordering a consolidated or coordinated global distribution to ensure that each creditor of the various insolvency estates actually receives a set, pro rata distribution."); *see also* Canadian Allocation Opinion at ¶ 212 ) "It is argued that a pro rata allocation would constitute an impermissible substantive consolidation of the Estates, or as put by the U.S. Debtors, an impermissible "global substantive consolidation". I do not agree. A pro rata allocation in this case would not constitute a substantive consolidation…") *see also id.* at 102 ("The Court, for one, is not ordering payments to the 'most deserving' creditors as the Bondholders fear.").

[37]    *Re Nortel Networks Corporation*, 2015 ONSC 2987 ("Canadian Allocation Opinion") at ¶¶ 202-204.

[38]    The U.S. Allocation Opinion inadvertently refers to "NNUK" instead of the U.K. Pension Claimants on pp. 91 and 102 thereof.

recognizing – the corporate integrity of the Nortel entities."[39]  To accomplish that, the Courts determined that allocating the Lockbox Funds to each Debtor based on its respective claims provides the most appropriate proxy for each Debtor's role, or share, in the Lockbox proceeds by reference to the Nortel Group's operations.[40]

36.    Understood in that context, it is clear why the Courts determined that duplicate claims – such as the Bondholders' guarantee claims and the U.K. Pension Claimants' FSD claims against certain EMEA Debtors – would be "recognized only once."[41]  Recognition of duplicate claims more than once would "skew a pro rata allocation" by misrepresenting the claim and its respective Debtor's role in the operations of the integrated Nortel Group.[42]  While such recognition of duplicate claims would be problematic and 'skewing' enough in the case of Bonds with only one issuer and one guarantor, the effect would be exacerbated for three of the Bond issuances in this case, where there are multiple guarantors.[43]  To accept the Bondholders' argument would effectively also mean that, in addition to crediting NNI for the Bond guarantee claims made against it for allocation purposes, the Canadian Debtors would get to double count the primary claim against NNL and the guarantee claim against NNC.

37.    Movants ignore all of this when they contend that the modified pro rata allocation methodology conflicts with the Courts' "intended" result.  Instead, they rely on precisely the same "reverse-engineering" approach that the Courts rejected.  Contending—incorrectly—that the modified pro rata methodology produces an inequitable result for the U.S.-only unsecured

---

[39]    U.S. Allocation Opinion at 60, 91, 93-98.

[40]    *See* U.S. Allocation Opinion at 99; *see also* Canadian Allocation Opinion at ¶ 250.

[41]    U.S. Allocation Opinion at 112; *see also* Canadian Allocation Opinion at ¶¶ 251-252.

[42]    U.S. Allocation Opinion at 112.

[43]    *See* U.S. Allocation Opinion at Appendix C (listing issuer and guarantor(s) of each series of Bonds).

- 17 -

creditors, Movants urge the Courts to make an exception for the Bondholder claims by allowing

those claims to be counted twice for allocation purposes, unlike any other claims.[44]  Had the

Courts intended to craft an outcome-based methodology, the Courts could have easily sought to

confirm that their methodology would have the intended outcome by requesting that the parties

submit supplemental briefing and/or expert testimony from the parties' experts, or by appointing

its own expert.[45]  The Courts did none of that, for the simple reason that they expressly declined

to adopt an outcome-based allocation methodology and, instead, crafted a principles-driven

methodology.

      ii.      ***Ivanhoe* Is Not Relevant To The Allocation Analysis, And The Bondholders'
            Request To Adjudicate Distribution Issues Now Should Be Rejected.**

      38.      Contrary to the U.S. Debtors' and UCC's assertions, the issues underpinning the

Supreme Court's decision in *Ivanhoe Building & Loan Ass'n of Newark v. Orr*, 295 U.S. 243

(1935), are not relevant to allocation.  *Ivanhoe* concerned the quantum of a creditor's claim

against a debtor for *distribution* purposes.  In contrast, as the Courts took pains to emphasize, the

modified pro rata methodology adopted by the Courts relates only to *allocation*.  *Distribution*

issues – which relate to a Debtor's relationship with its creditors – are reserved for future judicial

determinations in the appropriate jurisdictions, as governed by local insolvency laws.

Accordingly, nothing in *Ivanhoe* requires that the Bondholder guarantee claim against the U.S.

Debtors be recognized, whether in full or a lesser amount, for allocation purposes.

---

[44]      The U.S. Debtors assert that "NNL was granted a right to a Lockbox distribution … on account (as least
under the Canadian Allocation Opinion) of the allowed guaranty claim by the U.K. Pension Claimants
against NNL."  U.S. Debtors' Reconsideration Motion at ¶ 28.  With respect, that is a different situation.
The U.K. Pension Claimants' section 75 claim against NNUK is a statutory claim, whereas its claim against
NNL is based in contract.  In contrast, the Bondholder's primary and guaranty claims both arise in contract
out of the same transaction and in the same amount.

[45]      *See* Fed. R. Evid. 706.

A.    **U.S. Debtors Have Failed to Demonstrate Any Basis For Reconsideration Of The Allocation Of NGS/Diamondware Sale Proceeds.**

39.    The U.S. Debtors' argument, asserted for the first time in their Reconsideration Motion, that the proceeds of the NGS/Diamondware subsidiaries should be allocated in whole to the U.S. Debtors, should be rejected.  Because the U.S. Debtors failed to assert these arguments in their pre-trial or post-trial briefs, they cannot be  "reconsidered" now

40.    As stated above, it is well-settled that "motions for reconsideration 'should not be used as a means to argue new facts or issues that inexcusably were not presented to the court in the matter previously decided.'"  *Ryan v. Asbestos Workers Union Local 42 Pension Fund*, No. Civ.A. 97-604-GMS, 2000 WL 1239958, at *1, 8 (D. Del. Aug. 25, 2000) (denying motion for reconsideration for raising a new argument based on previously known facts); *Brambles*, 735 F. Supp. at 1240.

41.    The U.S. Debtors had numerous opportunities to raise the argument that they should be entitled to all of the proceeds of the NGS/Diamondware sale, dating back to when the sale of the Enterprise Business Line was approved (by, for example, seeking to have these proceeds released directly to the U.S. Debtors rather than paid into escrow), when the settlement with the PBGC regarding the grant of the lien on the NGS/Diamondware sale proceeds was entered into, or in the briefs submitted to the Courts during the Allocation Trial.

42.    Tellingly, this new argument is not at all unique to the modified pro rata allocation methodology, but rather, the U.S. Debtors' purported rationale for claiming 100% of the NGS/Diamondware proceeds would have applied equally under any allocation theory, including the U.S. Debtors' own revenue-based allocation approach.  The Courts should therefore reject the U.S. Debtors' request based on the settled law described above embodying the bedrock principle of finality.

- 19 -

**B.**     **Clarification Of Claims-Related Issues**

> **i.**     **The Debtors' Request For Clarification Of Certain Claims-Related Issues Is Premature.**

43.     Of the five issues set forth in the U.S. Debtors' proposed order for clarification, four of the issues relate to claims determinations for allocation purposes: (a) inclusion of U.S. settlements in the U.S. Debtors' claims base; (b) the impact of intercompany claims within Debtor groups; (c) oversight of the U.K. Pension Claimants' statutory claim against NNUK for allocation purposes; and (d) inclusion of a reserve for certain claims.  The fifth issue – which seeks clarification that the Lockbox Funds will be made to specific Debtor estates (not to Debtor groups) – is not controversial, and the U.K. Pension Claimants do not object to the U.S. Debtors' clarification request.[46]

44.     In the Allocation Opinions, the Courts recognized that further proceedings would be required to determine claims-related issues, including the process for resolving claims disputes.[47]  As such, the U.S. Debtors acknowledge that each Court "seeks proposals" on how and when claims will be addressed.[48]  Yet, rather than adhering to the process contemplated by the Courts—and before parties have had any opportunity to formulate and discuss appropriate claims procedures—the U.S. Debtors have preemptively sought "clarification" of four distinct claims issues.

---

[46]     The U.K. Pension Claimants agree that allocation to each Debtor as opposed to Debtor groups is consistent with the Courts' holding that the modified pro rata allocation is not substantive consolidation and recognizes the corporate separateness of the Nortel entities.  U.S. Allocation Opinion, at 91, 101-105; *see also* Law Debenture Reconsideration Motion at ¶¶ 22-23.  It further ensures that Lockbox Funds are allocated to the specific debtor who will make distributions on its claims, so that the allocated Lockbox Funds are not diverted to pay other claims and diluted by other debtors' claims.

[47]     *See* Order re Allocation Trial [D.I. 15545], at 1.

[48]     U.S. Debtors' Reconsideration Motion at ¶¶ 47, 47 n. 35.

### ii.    All Intercompany Claims Should Be Recognized For Purposes Of Allocation.

45.    The U.K. Pension Claimants understand the Allocation Opinions to provide that all intercompany claims should be recognized for allocation purposes.  The U.K. Pension Claimants accept that ruling, as they do all of the Courts' rulings in the Allocation Opinions.  No basis exists for reconsideration of this issue.

46.    Recognition of  intra-group intercompany claims in a Debtor's claims pool is consistent with the Courts' statements that they are not ordering substantive consolidation by ensuring that such consolidation does not occur at any level – whether within or between Debtor groups – and that the separate corporate form of each debtor should be maintained and recognized.[49]  The recognition of intercompany claims on a debtor-by-debtor basis, rather than a group-by-group basis, is also consistent with the U.S. Debtors' requested clarification that allocations be made on a debtor-by-debtor, as opposed to a group-by-group basis.

47.    The U.S. Debtors' unsubstantiated concerns that the estates within EMEA or other estates will attempt to game the process by multiplying intra-group intercompany claims, or that the English High Court would be complicit in such actions, are misplaced and inappropriate.  The Courts should not be asked to intervene in response to such speculative accusations, rather than evidence of particular facts.

### iii.    Inclusion Of U.S. Settlements In The U.S. Debtors' Claims Base.

48.    The U.S. Debtors seek "clarification" that settlements of claims  that have been approved and fully and finally paid should nevertheless be included in the aggregate claims pool

---

[49]    U.S. Allocation Order at 63, 93; Canadian Allocation Opinion at ¶¶ 14, 212, 214.

for the purpose of receiving an allocation from the Lockbox Funds, even though the settled claims have been extinguished and will not "receive" future distributions from the estates.[50]

49.     In the U.S. Allocation Opinion, the U.S Court stated that "[a]ll claims against each Nortel Debtor, including intercompany claims and court approved settlements, will receive distributions from the separate Debtor Estates."[51]  The U.S. Court's wording suggests that it intended that only existing "claims" that "will receive" distributions are to be considered for allocation purposes, and not settled claims that have already been paid and expunged from a debtor's claims register.[52]

50.     If this was the Court's intent, Movants' request to "clarify" the Allocation Opinions to provide that all settled claims should be included would be not be a permissible clarification, but rather  an amendment to the Allocation Opinions. *See Resolution Trust Corp.*, 1993 WL 211555, at *2.

51.     On the other hand, if the Court did in fact intend to include all settled claims that have been paid for allocation purposes over the six-year history of these proceedings, the U.S. Debtors' request would be a permissible clarification.  However, in that event, the Court should further clarify that the principle applies equally to each Debtor, and that only court-approved

---

[50]     For example, the Agreement Settling U.S. Claims Litigation provided, upon payment, that the settled claims are deemed withdrawn with prejudice, and the claims registrar is amended to reflect the withdrawal of the claims.  *See* section 3 of the Agreement Settling  U.S. Claims Litigation in respect of the EMEA and U.K. Pension Claimants' claims against the U.S. Debtors dated December 17, 2013 [D.I. 12618], approved by the Courts at a Joint Hearing on January 7, 2014 [D.I. 12785].

[51]     U.S. Allocation Opinion, page 100; see also Can. Allocation Opinion at ¶ 214.

[52]     That would be an entirely understandable and rational approach, both respecting the finality of steps taken to date by each Debtor and recognizing that each Debtor's cash in hand (howsoever arrived at) shall not influence the allocation methodology.  Indeed seeking now to treat even very limited classes of payment made by each Debtor over more than six years of bankruptcy proceedings as notional 'claims' for allocation purposes risks further delay and satellite disputes among Core Parties, as each Debtor would have to assess the degree to which it might now seek to claim credit (for allocation purposes) for such previous payments.

- 22 -

settlements in respect of prepetition claims should be included for allocation purposes, and be limited to the amount actually paid rather than the asserted amount of the claim, which was settled.

**iv.    Oversight Of U.K. Pension Claimants' Section 75 Debt Claim Against NNUK.**

52.    The U.S. Debtors' request that the U.S. Court "retain oversight of and adopt procedures as necessary to measure the amount of disputed claims (which for purposes of this Order shall include any claim not allowed prior to the date of the Allocation Opinions) against any Debtor seeking an allocation that may be considered for purposes of determining the allocation of the Lockbox proceeds."[53]  The U.S. Debtors focus singularly on the U.K. Pensions Claimants' Section 75 debt in the U.K. insolvency proceedings currently pending in respect of NNUK.

53.    The U.S. Debtors' request goes beyond seeking mere clarification and is inconsistent with the Courts' determinations regarding the claims resolution process in the Allocation Opinions.  In the U.S. Allocation Opinion, the U.S. Court appropriately expressed that it "has every confidence that the tribunals overseeing the Nortel insolvency proceedings across the globe will adjudicate the claims at issue therein in a just, efficient manner.  The Court is prepared to act if they do not."[54]  Furthermore, the U.S. Court expressly stated that, unlike substantive consolidation, the modified pro rata allocation methodology does not establish a

---

[53]    Proposed Order, at ¶ 8.

[54]    U.S. Debtors' Reconsideration Motion at 62-63.

single claims administrator.[55]  Accordingly, the Courts respected the sovereignty of each

jurisdiction to oversee its own claims process pursuant to its local insolvency laws.[56]

54.    Rather than inappropriately substituting its judgment for that of the local tribunal

with respect to any claim that has not been allowed as of May 12, 2015 – as the U.S. Debtors

would propose – the Courts struck the appropriate balance by limiting any proposed oversight to

the unlikely situation in which the local tribunal effectively forfeited its presumption of comity

through an unjust or inefficient claims process.  This willingness to extend comity to the

jurisdiction exercising its authority as the main proceeding for a Debtor accords with principles

of Chapter 15 jurisprudence, as well as longstanding common law principles of comity.  *In re

ABC Learning Centres, Ltd.*, 728 F.3d 301, 306 (3d Cir. 2013) (Chapter 15 favors "that our

courts act in aid of the main proceedings…. Mandatory recognition … fosters comity and

predictability, and benefits bankruptcy proceedings in the United States that seek to administer

property located in foreign countries that have adopted the Model Law.") (internal quotations

and citations omitted); *In re Gercke*, 122 B.R. 621, 626-27 (Bankr. D.D.C. 1991) (under former

Section 304, enjoining litigation of claims in U.S. while U.K. insolvency proceeding were

pending, as English court was best able to determine when and where claims determination

should go forward).[57]

---

[55]    U.S. Debtors' Reconsideration Motion at 106 ("The pro rata allocation method which the Court is adopting is not substantive consolidation of the Estates.  The Court is not directing … that all claims be determined within one proceeding under the supervision of one insolvency administrator….").

[56]    The Courts' general deferral to the claims process conducted by local tribunals is also consistent with the Cross-Border Protocol on the Resolution of Claims approved in this case [D.I. 3922, 3956] (the "Cross-Border Claims Protocol"), which took care to ensure that each Court's "independent jurisdiction over the subject matter" of their respective insolvency proceedings would not be divested or diminished.  Cross-Border Claims Protocol at ¶ 19.

[57]    The oversight function that the U.S. Debtors propose treads dangerously over the autonomy of the various local tribunal's authority over its own claims administration process, and should not be granted lightly.  The U.S. Court has made it clear that the modified pro rata allocation methodology would not establish a "new order" of "universalism" for international insolvencies.  (U.S. Debtors' Reconsideration Motion at

55.     Consistent with these principles, Congress chose not to incorporate Section 502 and other sections concerning claims-adjudication under the Bankruptcy Code to cases under chapter 15.  11 U.S.C. § 103(a).  As such bankruptcy courts do not have the authority to adjudicate claims of a foreign debtor in chapter 15.

56.     Moreover, based on the fact that the process for determining the U.K. Pension Claimants' Section 75 debt is prescribed by U.K. statute and regulation, there is no credible basis for any suggestion that the claim is "inflated."

57.     Under section 75 of the U.K. Pensions Act 1995, as amended ("section 75"), when a company which sponsors a defined benefit pension plan becomes insolvent and the assets in the plan are insufficient to meet its liabilities, a debt for the shortfall automatically arises against the plan's sponsoring employer.  The debt is popularly referred to as "the employer debt" or the "section 75 debt."  Regulations have been issued by the U.K. Government that stipulate precisely how a section 75 debt must be calculated.

58.     The "Scheme Actuary" (which is a recognized statutory role or office) is required by the regulations to calculate and verify the liabilities of the pension plan based on the benefits that are provided under the rules of the plan.[58]  The prescribed statutory basis for this calculation is the cost of buying out the plan's benefits by purchasing annuity policies from an insurance company that match the benefits payable under the plan.  The regulations expressly anticipate

---

¶ 107.)  Doing so, the U.S. Court recognized, would set a dangerous precedent that could lead down a slippery slope, threatening to unravel the reciprocity-based framework upon which international insolvency cases are predicated.  Moreover, allowing for secondary review would be completely unworkable, as it would open the door for the U.S. Court to review Canadian Court claims, the Canadian Court to review U.S. Court claims (including previously approved settlements), and subject every  claim within each EMEA estate to further review.  Such a claims process would be a recipe for disaster, as it would invite the parties to engage in years of further satellite litigation.

[58]     Regulation 8, Employer Debt Regulations

that the costs will be evaluated by the Scheme Actuary, based on market data at the applicable time.[59]

59.     Having completed the exercise required by statute (which, given the size of the UK Plan was a particularly onerous task in this case), on January 6, 2015, the Scheme Actuary issued the "section 75 certificate" detailing the amount of the employer debt against NNUK in the amount of £2.147 billion.[60]

60.     The fact that this figure is materially the same as the £2.1 billion estimate that has been available to the U.S. Debtors and Canadian Debtors throughout the U.S. and Canadian cases (a figure that has never been challenged by the U.S. Debtors) completely undermines any suspicion that it has somehow been "inflated."[61]  The £2 billion estimate was also provided to the Joint Administrators of NNUK in a proof of debt submitted as long ago as March 2009, and that figure has featured in the publicly-filed progress reports from NNUK's Joint Administrators ever since.

61.     The standing and effect of the section 75 certificate was recognized in the claims decision of Mr. Justice Newbould at paragraph 163 where he compared the [U.K. Pensions] Regulator's estimate of the section 75 debt (for the purposes of the "Insufficiently Resourced Test")[62]with the Scheme Actuary's certification:

---

[59]     Regulation 11, Employer Debt Regulations.  Generally, the methodology and assumptions required by U.K. statutes and regulations are consistent with those employed under ERISA to the calculation of the PBGC's unfunded benefit liability claim.  There is no more room for the U.K. Pension Claimants' claim to be "inflated" than the PBGC's claim.

[60]     Regulation 5(18) and Schedule 1, Employer Debt Regulations

[61]     *See, e.g.*, Proof of Claim of NNUK against NNI, dated September 30, 2009 at ¶ 2.9 (stating "The Plan Actuary has estimated the section 75 debt of NNUK as of January 13, 2009 to be (UK) £2.1 billion," and attaching letter, dated Sept. 29, 2009, from Neil Mobbs stating estimate).

[62]     Section 43, U.K. Pensions Act 2004

*"It [the Regulator's estimate] is a different exercise than the scheme actuary's certification of the section 75 debt at the insolvency date. The scheme actuary's certification cannot be challenged under the statute."*

62.     The Scheme Actuary has an independent, professional, duty to conduct the calculation and estimate the debt as the regulations prescribe. The trustees of a plan are unable, as a matter of law, to negotiate the section 75 debt with the employer. Accordingly, the suggestion that the debt could be artificially inflated is baseless.

63.     Nor is there any basis for the U.S. Debtors' suggestion that the U.S. Court expressed concern about the U.K. Pension Claimant's "inflated" section 75 debt.[63] That assertion takes the Court's words entirely out of context. As is clear from the U.S. Allocation Opinion, the Court was concerned with the mischief that could be caused by duplicative claims based on the same claim being asserted against multiple estates. Indeed, that same concern underlies the Courts' ruling that the Bondholder claims can be asserted only once.

64.     Furthermore, the U.S. Debtors' attempts to twist the Cross-Border Claims Protocol to justify the need for oversight of the EMEA Claims do not hold up under scrutiny. Despite the U.S. Debtors' attempts to characterize the cross-border claims process as permitting the U.S. Debtors to be heard on claims issues in Canada (and vice-versa), nothing in the Cross-Border Claims Protocol confers the U.S. Debtors with a right to be heard on claims that have only been asserted against the Canadian estates (or vice-versa).[64]

---

[63]     U.S. Debtors' Reconsideration Motion at ¶ 43.

[64]     Under Paragraph 24 of the Cross-Border Claims Protocol, the U.S. Debtors, UCC, Bondholders, Canadian Debtors and Monitor were granted rights to be heard at "any hearing provided herein [i.e., joint hearings] … with respect to Specific Claims…, Overlapping Claims or Same-Creditor Claims [i.e., claims that have been filed in both the U.S. and Canadian proceedings]."

###### v.        Inclusion Of Reserve For Certain Claims.

65.     The U.S. Debtors' request to set aside a reserve for taxes is a new argument that cannot be raised in a motion for clarification.  Each Debtor's requirement to pay taxes on their share of the Lockbox Funds is not an issue that the Debtors have only now been confronted with because the Courts have adopted the modified pro rata approach.  Taxes will have had to be paid under any allocation theory, and the Debtors' tax attributes available to shield that tax liability will not depend on the allocation methodology.  Tax attributes, like net operating losses or refund entitlements, are assets of an estate (to the extent there is taxable income against which they can be applied),[65] and just like cash or any other asset currently held by or for the benefit of a Debtor, they should not, as a matter of principle, be factored into the allocation analysis.

66.     Moreover, attempting to set aside a reserve for taxes needlessly adds an additional layer of complexity to the allocation process: how much a Debtor will be required to pay in taxes based on a post-petition sale of assets will depend in part on how much of the sale proceeds are allocated to the Debtor from the Lockbox.  That amount cannot be determined now if taxes arising from the Lockbox allocation have to be included in the allocation claim base – it is an entirely circular argument.  Whether local taxing authorities accept the Debtors' respective allocations for tax purposes also remains to be seen.  If they challenge them, each Debtor's tax bill may not be known from some time to come.

---

[65]     *See In re South Beach Secs., Inc.*, 606 F.3d 366, 372, 374 (7th Cir. 2010) (describing net operating assets as "potential assets" dependent on whether they can be set off against taxable income); *In re Coral Petroleum, Inc.*, 60 B.R. 377, 385-86 (Bankr. S.D. Tex. 1986) (value of net operating losses as an asset derives from debtor's ability to generate future profits or to market net operating losses for use by another profitable company).

**CONCLUSION**

For all of the reasons above, the U.K. Pension Claimants respectfully request that the

Courts deny Movants' Motions to Reconsider except to the extent provided herein.

ALL OF WHICH IS RESPECTFULLY SUBMITTED this 12th day of June 2015.

June 12, 2015                          */s/ D.J. Miller*
                                       _____

                                       **Thornton Grout Finnigan LLP**
                                       Barristers and Solicitors
                                       100 Wellington Street West, Suite 3200
                                       Toronto, Ontario, M5K 1K7

                                       **D. J. Miller** (LSUC# 34393P)
                                       **John Finnigan** (LSUC # 24040L)
                                       **Michael S. Shakra** (LSUC# 64604K)

                                       Tel:    416-304-1616
                                       Fax:    416-304-1313

                                       */s/ Michael E. Barrack*
                                       _____

                                       **Blake, Cassels & Graydon LLP**
                                       199 Bay Street
                                       Suite 4000, Commerce Court West
                                       Toronto, Ontario  M5L 1A9

                                       **Michael E. Barrack** (LSUC# 21941W)

                                       Tel:    416-863-5280
                                       Fax:    416-863-2653

                                       */s/ Brian E. O'Connor*
                                       _____

                                       **Willkie Farr & Gallagher LLP**
                                       787 Seventh Avenue
                                       New York, New York 10019-6099, U.S.A

                                       **Brian E. O'Connor**
                                       **Sameer Advani**
                                       **Weston T. Eguchi**
                                       **Nicholas W. Chiuchiolo**

                                       Tel:    212-728-8000
                                       Fax:    212-728-8111

*/s/ Justin R. Alberto*

**Bayard, P.A.**
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19899

**Charlene D. Davis** (No. 2336)
**Justin R. Alberto** (No. 5126)
Tel: 302-655-5000
Fax: 302-658-6395
cdavis@bayardlaw.com
jalberto@bayardlaw.com

14599478