# EXHIBIT A

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. c-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS
LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL
NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT
ACT*, R.S.C. 1985, c. C-36, AS AMENDED

**FACTUM OF THE JOINT ADMINISTRATORS**
**TO THE MOTIONS FOR RECONSIDERATION AND CLARIFICATION**

June 12, 2015

**LAX O'SULLIVAN SCOTT LISUS LLP**
Counsel
Suite 2750, 145 King Street West
Toronto, ON  M5H 1J8
**Matthew P. Gottlieb**  LSUC#: 32268B
Email:  mgottlieb@counsel-toronto.com
Tel:    (416) 598-1744
Fax:    (416) 598-3730

**DAVIES WARD PHILLIPS & VINEBERG LLP**
155 Wellington Street West
Toronto, ON  M5V 3J7
**Matthew Milne-Smith**  LSUC#: 44266P
Email:  mmilne-smith@dwpv.com
Tel:    (416) 863-0900
Fax:    (416) 863-0871

Lawyers for the Joint Administrators

2

TO:        SERVICE LIST

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. c-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS
LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL
NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT
ACT*, R.S.C. 1985, c. C-36, AS AMENDED

**TABLE OF CONTENTS**

**Page No.**

**PART I - INTRODUCTION**................................................................................................... **1**

**PART II - SUMMARY OF POSITION**................................................................................ **3**

**PART III - THE ISSUES** .................................................................................................... **8**

**PART IV - ARGUMENT & AUTHORITIES**................................................................... **8**

**I.**    **RECONSIDERATION SHOULD BE DENIED** .................................................... **8**

**A.**    **THE LAW REGARDING RECONSIDERATION**....................................................... **9**

**B.**    **THE DECISION PROPERLY EXCLUDES THE BONDHOLDERS' GUARANTEE
          CLAIMS IN CALCULATING NNI'S ALLOCATION**............................................. **12**

   *1.*    *The Court Has Considered and Rejected Counting the Bondholders' Guarantee
          Claim for Allocation*......................................................................................... **13**

   *2.*    *The U.S. Debtors' Characterization of the Impact of the Decision Is Flawed*.. **14**

   *3.*    *If the Court Reverses Course and Credits the Bondholders' Guarantee Claim for
          Allocation, the Same Treatment Should be Afforded to All Other Similar Claims*
          .............................................................................................................................. **17**

**C.**    **NNI IS NOT ENTITLED TO A DIRECT ALLOCATION OF SALE PROCEEDS
          ATTRIBUTABLE TO NGS AND DIAMONDWARE**............................................. **17**

**II.**    **CLARIFICATION SHOULD BE DENIED**.................................................................. **19**

**A.    CLARIFICATION IS UNNECESSARY REGARDING THE COURT'S RECOGNITION OF EACH INDIVIDUAL DEBTOR'S ENTITLEMENT TO AN ALLOCATION THAT COUNTS ALL CLAIMS, INCLUDING ALL INTERCOMPANY CLAIMS** ................................................................ **20**

    *1.    The Court Made Clear that Allocation Will Be to Individual Debtors, Not Debtor Groups, to Respect the Corporate Separateness of Each Debtor* ...................... **21**

    *2.    The Court Made Clear that All Intercompany Claims Will Be Counted for Purposes of Allocation* ........................................................................ **22**

        a.    The Court Clearly Decided that Intercompany Claims Will Be Counted in Calculating Each Debtor's Allocation ............................................. 23

        b.    The U.S. Debtors' Attempt to Exclude Intercompany Claims Between Debtors in the Same Geographic Group is Inconsistent and Unprincipled ..................... 24

        c.    The U.S. Debtors' Position Would Eliminate Valuable Intercompany Claims Between EMEA Debtors ......................................................... 26

**B.    CLARIFICATION IS UNNECESSARY REGARDING THE COURT'S OVERSIGHT OF THE DEBTORS' CLAIMS PROCESSES** ................................... **28**

    *1.    Specific Procedures for Resolving Disputed Claims Are Not a Proper Subject for Clarification* .................................................................................... **28**

    *2.    The U.S. Debtors' Aspersions on the EMEA Claims Processes, the UKPC's Claim, and the Joint Administrators Are Baseless and Provide No Support for "Clarifying" the Decision* .............................................................. **29**

        a.    The Court Should Defer to Recognized U.K. Insolvency Proceedings Under Principles of Comity ....... 30

        b.    The UKPC's Claim Will Be Determined Pursuant to Statutory Guidelines and Subject to Comprehensive Review .......................................................... 34

**C.    CLARIFICATION IS UNNECESSARY THAT THE VALUE OF SETTLEMENTS OF PRE-PETITION DEBT WILL BE COUNTED FOR ALLOCATION PURPOSES** ..................................................................................................... **37**

**D.    CLARIFICATION IS UNNECESSARY THAT RESERVED AND ESTIMATED CLAIMS ARISING PRE-PETITION WILL BE INCLUDED FOR ALLOCATION PURPOSES** ..................................................................................................... **37**

**E.    PARTICULAR SETTLEMENTS, INTERCOMPANY CLAIMS AND RESERVES SHOULD BE SUBJECT TO REVIEW BY THE COURTS IN THE EVENT OF ANY *BONA FIDE* DISPUTE** ............................................................................. **38**

**PART V - ORDER REQUESTED** .............................................................................................. **39**

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. c-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS
LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL
NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT
ACT*, R.S.C. 1985, c. C-36, AS AMENDED

**FACTUM OF THE JOINT ADMINISTRATORS**
**TO THE MOTIONS FOR RECONSIDERATION AND CLARIFICATION**

**PART I - INTRODUCTION**

1.      The U.S. Debtors and Bondholders are not happy with this Court's Allocation decision dated May 12, 2015 (the "Decision") and want significant changes made to it.  Rather than seeking leave to appeal the Decision, which is the proper route under the CCAA, they have brought these misguided Motions seeking to have important aspects of the Decision, in effect, overturned.  The Motions should be dismissed.  This Court's Decision was comprehensive, it followed a lengthy and exhaustively litigated trial, and it considered and determined each issue raised on these Motions. There is no basis upon which to reconsider or clarify the Decision.

2.      This submission is filed by the court-appointed administrators and authorized foreign representatives (collectively, the "Joint Administrators")[1] for nineteen distinct Nortel entities located in Europe, the Middle East, and Africa (collectively, the "EMEA Debtors").[2]  The Joint Administrators have been appointed for each of the EMEA Debtors in proceedings under the *Insolvency Act 1986*, which are pending before the High Court of Justice of England and Wales (the "English Court").  The Joint Administrators oppose the relief sought by the U.S. Debtors, the *ad hoc* group of bondholders (the "Bondholders"), and Law Debenture Trust Company of New York (collectively referred to herein as the "U.S. Debtors") for the reconsideration, amendment and/or clarification of certain aspects of the Decision.

3.      Reconsideration is a rare and exceptional remedy that is only appropriate where the integrity of the judicial process is at risk or it is necessary to avoid a miscarriage of justice.  The Motions have not come close to meeting that high threshold for relief.  Further, the issues raised as purported points of clarification in the Motion generally seek changes to the Decision without

---

[1] The Joint Administrators in the English proceedings for all of the EMEA Debtors, with the exception of Nortel Networks (Ireland) Limited ("NNIR"), are:  Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson, and Stephen John Harris.  The Joint Administrators in the English proceedings for NNIR are:  Alan Robert Bloom and David Martin Hughes.  Following the allocation decisions, Stephen Taylor was appointed as a Joint Administrator for Nortel Networks S.A. ("NNSA") to represent NNSA's interests to the extent they conflict with the interests of the other eighteen EMEA Debtors.

[2] The EMEA Debtors are:  Nortel Networks UK Limited ("NNUK"); NNIR; NNSA; Nortel GmbH ("Nortel Germany"); Nortel Networks (Austria) GmbH; Nortel Networks AB; Nortel Networks B.V.; Nortel Networks Engineering Service Kft; Nortel Networks France S.A.S. ("Nortel France SAS"); Nortel Networks Hispania, S.A.; Nortel Networks International Finance & Holding B.V.; Nortel Networks N.V.; Nortel Networks Oy; Nortel Networks Polska Sp. z.o.o. ("Nortel Poland"); Nortel Networks Portugal S.A.; Nortel Networks Romania SRL; Nortel Networks S.p.A. ("Nortel Italy"); Nortel Networks Slovensko, s.r.o.; and Nortel Networks, s.r.o.  Other EMEA entities impacted by the allocation decisions are Nortel Networks A.G., Nortel Networks Scandinavia AS, and Nortel Networks South Africa Proprietary Limited; however, these entities are not in administration, they have their own directors and counsel, and this submission is not made on their behalf.  This submission is also not made on behalf of NNSA, which for these and certain other purposes is advised by separate legal counsel.  The Joint Administrators understand that a separate submission will be made by NNSA in relation to these Motions.  However, for purposes of discussing the effect of the allocation decisions on the EMEA Debtors in this Response, the reference to the EMEA Debtors is to all nineteen entities listed above (including NNSA) and the non-filed entities, each of which is a signatory to the IFSA and accordingly has rights to the lockbox proceeds.

raising any miscarriage of justice. As such, they are equally disguised appeals that fail to meet the test for reconsideration. Nothing in the Decision is ambiguous or requires clarification. The Motions should be dismissed.

## PART II - SUMMARY OF POSITION

4.      On May 12, 2015, following an historic cross-border trial, this Court and Judge Gross of the U.S. Bankruptcy Court in Delaware (the "U.S. Court") issued decisions that answered the question put to them by the parties: "What is the appropriate allocation of the sums paid to Nortel in the bankruptcy sales . . . among the Nortel Entities?" This question has dominated these proceedings since the Courts approved the Interim Funding and Settlement Agreement (the "IFSA") nearly six years ago, which laid the groundwork for the parties to sell their assets and raise the proceeds at issue. The Courts' answer is that the appropriate allocation methodology is a modified *pro rata* approach, measured by allowed claims against each Nortel debtor.

5.      Reconsideration is an extraordinary remedy – not a substitute for appeal – and the Motions fail to even approach the high bar. Clarification should also be denied because the U.S. Debtors have failed to demonstrate that any aspect of the Decision is vague or ambiguous. Indeed, the contrary is true.

6.      First, there is no basis for the Court to reconsider the determination that the Bondholders' claim – like all claims – should only be counted once for allocation purposes. This issue was the subject of significant evidence and debate at trial, and the Decision makes abundantly clear that the Court considered this issue in great detail and made a reasoned determination on the point (paras. 225-249). This issue may be the proper subject of an application for leave to appeal, but not reconsideration.

7.      In an attempt to manufacture hardship to U.S. creditors and thereby justify double counting, the U.S. Debtors mischaracterize the impact of the Court's decision by relying on misleading numbers that ignore the impact of NNI's cash on hand and an allowed $2 billion intercompany claim, both of which the Court expressly preserved for NNI's estate. Further, the U.S. Debtors suggest that the outcome of the Decision is favourable to the EMEA Debtors as a group, which ignores the effect of the Decision on creditors of a number of the individual EMEA debtors. For example, creditors of NNSA and creditors of NNIR, residual profit entities that were material sources of both R&D and revenue, will likely receive distributions far below what they would have received under other allocation theories presented at trial.

8.      Distorted numbers aside, the debate about which creditors do better than others is largely beside the point. The Decision addresses allocation, not distribution. The Decision expressly is not intended to effect a global substantive consolidation, an outcome the U.S. Debtors argued was impermissible in this case. Rather, the Decision adopts a modified *pro rata* approach, which expressly preserves debtor-specific cash, among other estate assets. Thus, creditors of different debtors will *necessarily* obtain different recoveries. Even taking the U.S. Debtors' numbers at face value, U.S. creditors will likely receive a higher recovery than creditors of a number of individual EMEA debtors, while receiving a lower recovery than creditors of other estates. The U.S. Debtors now appear to be complaining that the Court's modified *pro rata* approach will not result in uniform recoveries for all Nortel creditors around the world – in other words, they are complaining that they did not get the global substantive consolidation they so vehemently opposed at trial.

9.      Second, the Court should not reconsider its decision not to make a separate allocation to NNI on account of its ownership of the Diamondware and NGS units (each defined below). Again, the U.S. Debtors ostensibly seek reconsideration on this point, but they are really asking the

Court to overturn its decision to adopt an allocation methodology based on allowed claims, rather than ownership interests.  Even if the Court were to carve-out sale proceeds attributable to Diamondware and NGS – which would be entirely different than the *pro rata* approach and difficult in and of itself, since at trial the parties each offered conflicting evidence regarding their value – it would then have to make the same carve-out for assets that were uncontrovertibly owned outright by every other debtor.  The Court rejected an ownership approach to allocation and should not disturb its decision simply because the U.S. Debtors would like to increase NNI's allocation.

10.    Each of the U.S. Debtors' requests for clarification should be denied as well because the issues raised are clear in the Decision and what is mostly sought is either unnecessary or is not clarification but overturning specific aspects of the Decision.

11.    First, the U.S. Debtors seek clarification that each debtor will receive an individual allocation measured by its respective claims base.  Clarification of this point is unnecessary. The Decision respects each debtor's corporate separateness and, consistent with the position taken by the Joint Administrators (and other parties) throughout these proceedings, the Court has indicated that it intends to make allocations on that basis.

12.    Second, in direct contradiction of their corporate separateness argument, the U.S. Debtors simultaneously assert, by way of purported clarification, that an intercompany claim should only be counted for allocation purposes if it is filed by a debtor in one of the three geographic groups against a debtor in a different geographic group.  "Clarification" of this point should be rejected for several reasons.  As a threshold matter, the Decision unequivocally and repeatedly provides that all intercompany claims will be included in each debtor's allocation, with no exception for claims between debtors from the same geographic group.  Nor would there be any principled basis for

drawing such an arbitrary line, since there is no reason that an intercompany claim submitted by NNI against NNSA should be counted for allocation, but a claim by NNUK against NNSA should not.  Also, the Decision was in this regard consistent with the conduct of the parties, both in the IFSA and in their filings in the various insolvency proceedings in Canada, the U.S. and the U.K. The parties have at all times respected that each Nortel debtor is a distinct legal entity.  Further, the U.S. Debtors' position is incompatible with the $150 million intercompany claim by NNCC against NNI – discussed at length in the Law Debenture Motion – which the U.S. Debtors purport to include for purposes of NNI's allocation.

13.    Third, under the guise of seeking clarification, the U.S. Debtors also ask the Court to endorse an attack on the integrity of the Joint Administrators, as well as the English Court, under whose supervision they function.  Consistent with principles of comity, Canadian courts have long shown respect to insolvency proceedings in foreign jurisdictions, including specifically the United Kingdom.  The insolvency process in the UK is similar to that in Canada, it is supervised by the English Court, and it deserves the respect historically afforded it by Canadian courts.

14.    Notwithstanding this historic respect, and the fact that the Decision expressly provides that the Joint Administrators should now undertake a claims procedure, the U.S. Debtors ask the Court to immediately establish detailed procedures under which it will "police" and "oversee" the measurement of claims against the EMEA Debtors. Remarkably, U.S. Debtors allege that without such oversight, the Joint Administrators are likely to allow inflated claims.  This attack on the integrity of the Joint Administrators, and English Court that supervises them, is unwarranted and wholly inappropriate.

15.     The Joint Administrators are officers of the English Court, operating under the supervision of that court within a system whose substantive law and procedural protections are substantially similar to the ones that apply in this Court.  They have the same duties and incentives as the estate representatives for the U.S. and Canadian Debtors.  In particular, the Joint Administrators cannot allow an inflated claim of one creditor without breaching their duties to other creditors, who are empowered to challenge such allowance in the event there is any hint of impropriety.  Any disputed claims will be addressed in the first instance by the English Court.

16.     The Joint Administrators acknowledge that the U.S. and Canadian Courts may review, for purposes of allocation, any *bona fide* disputes concerning large claims that have been allowed against any debtor, in the same joint-hearing process that has applied to allocation disputes throughout these proceedings, and that the claims processes for all Nortel debtors should be conducted with transparency and close coordination between the various estates.  They are in the process of initiating their claims procedures and, as required by the U.S. and Canadian Allocation Decisions, will shortly report to the Courts regarding the procedures and timetable.  The U.S. and Canadian Debtors are presumably preparing similar reports regarding the status and timetables for completion of their own claims reconciliation processes.

17.     Fourth, there does not appear to be anything vague or ambiguous about the Decision's treatment of claim settlements for purposes of allocation.  No clarification is needed.  Finally, clarification is unnecessary in respect of reserved and estimated claims, an issue that is appropriately left for the submissions that the Court has already ordered the parties to make regarding their claims processes.  Those submissions can address an overreach in the U.S. Debtors' Motion: for purposes of allocation, claims – whether allowed, settled or reserved for –

must be limited to pre-petition obligations since the costs of estate administration should be borne by each debtor itself.

## PART III - THE ISSUES

18.     The Motions give rise to the following issues:

(a)     Have the moving parties established that the Decision as it relates to (a) the Bondholders' claim being counted once for allocation purposes, or (b) the U.S. Debtors not receiving a unique allocation for its ownership of particular assets, puts the "integrity of the process" at risk or creates a "miscarriage of justice" so as to have the Court reconsider the Decision?

(b)     If the Court answers yes to (a), should the Court change its Decision regarding those issues?

(c)     Is the Decision ambiguous as set out in the Motions in a manner that requires a clarification of the Decision?

(d)     Should the Decision be "clarified" in the manner sought in the Motions?

19.     The Joint Administrators respectfully submit that the answer to each question above is no. The Motions ought to be dismissed.

## PART IV - ARGUMENT & AUTHORITIES

## I.      RECONSIDERATION SHOULD BE DENIED

20.     The U.S. Debtors state that they seek "clarification, reconsideration or amendment" of the Court's Decision.  In reality, the U.S. Debtors seek relief in the nature of an appeal, insofar as they ask the Court to make a different determination because they do not agree with the Decision.

These matters are not appropriate for a reconsideration – they are issues to be dealt with at an appeal, if leave is granted.

## A.    THE LAW REGARDING RECONSIDERATION

21.    While this Court maintains jurisdiction to reopen its Decision until a formal judgment has been entered, it has been firmly established that such jurisdiction is to be exercised sparingly, only in exceptional circumstances and with great care.[3]  The U.S. Debtors have failed to establish that any such exceptional circumstances are present that could justify reconsideration of the Decision.

22.    There are strong policy reasons why courts are reluctant to reopen their decisions.  The Supreme Court of Canada has made clear that the interests of justice are best served when the principle of finality is respected.[4]  The underlying theme of this principle is that the appropriate avenue to challenge a decision is through the appeal process and that a reconsideration motion is not to be used to re-argue the case.  It is expected that the issues, whether at trial, on an application, or on appeal, will be fully and accurately canvassed in the first instance.  The court will not grant a reconsideration request where what is being sought is effectively an appeal by another name.[5]

23.    These policy reasons against reconsideration are amplified in the circumstances of this case where leave to appeal is required to appeal the Decision.  In imposing a leave requirement, Parliament clearly intended that appeals of CCAA matters are only to be permitted in the rare circumstances where leave requirements have been met.  Here, the U.S. Debtors are effectively

---

[3] *671122 Ontario Ltd. v. Sagaz Industries Canada Inc.*, [2001] 2 S.C.R. 983 at para. 61 (Tab 1, Brief of Authorities of the Joint Administrators ("JA BOA")); *Montague v. Bank of Nova Scotia* (2004), 69 O.R. (3d) 87 at paras. 34, 38 and 40 (C.A.), leave to appeal ref'd [2004] S.C.C.A. No. 79 (Tab 2, JA BOA); *Mujagic v. Kamps*, 2015 ONCA 360 at para. 12 (Tab 3, JA BOA); *First Elgin Mills Development Inc. v. Romandale Farms Ltd.*, 2015 ONCA 54 at paras. 7-9 (Tab 4, JA BOA); *Holmes Foundry Ltd. v Village of Point Edward*, [1963] 2 O.R. 404 at 407 (C.A.) (Tab 5, JA BOA); *Carmen Alfano Family Trust v. Piersanti*, 2014 ONSC 60 at para. 26 [*Alfano*] (Tab 6, JA BOA).
[4] *Carey v. Laiken*, 2015 SCC 17 at para. 61 (Tab 7, JA BOA).
[5] *Bimman v. Neiman*, 2015 ONSC 3076 at para. 3 [*Bimman*] (Tab 8, JA BOA).

attempting to bypass the leave requirement by asking this Court to hear a *de facto* appeal from its own decision, without first considering whether the test for leave can be met.

24.     Given the importance of the principle of finality, it should be no surprise that the test the U.S. Debtors must meet on this motion is a high one.    For example, in *Schmuck v. Reynolds-Schmuck*, Justice Himel described the extremely high bar that must be overcome to have a court reconsider its decision:

> [A] party who wishes a reconsideration alone would have to establish that the integrity of the litigation process is at risk unless it occurs, or that there is some principle of justice at stake that would override the value of finality in litigation, or that some miscarriage of justice would occur if such a reconsideration did not take place. [6]

25.     Similarly, in *Carmen Alfano Family Trust v. Piersanti*, Justice Newbould expressed the same test using slightly different language:

> [A] court has a wide discretion to re-open a matter **where the integrity of the process is at risk or a principle of justice is at stake** that requires the reconsideration of the matter, and while a court should re-open a motion or other matter sparingly and with the greatest of care, it may re-open it when it is just to do so in exceptional circumstances. [7] [emphasis added]

26.     Further, the recent Divisional Court decision in *Brown (Trustee of) v. The Municipal Property Assessment Corp., Region 14* described the limited circumstances in which a court may change a decision once made and before the Order is entered:

---

[6] *Schmuck v. Reynolds-Schmuck* (2000), 46 O.R. (3d) 702 at para. 25 (S.C.J.) (Tab 9, JA BOA).  This test has been widely followed. For example, by Gans J. in *Bimman, supra* note 5 at para. 5 (Tab 8, JA BOA) [motion for reconsideration and adjudication of terms defined in a contract denied]; by Perrell J. in *Shaw Satellite G.P. v. Pieckenhagen*, 2011 ONSC 5968 at paras. 18-26 (Tab 10, JA BOA) [motion for reconsideration of motion to stay an action based on evidence introduced during oral argument and not mentioned in decision denied]; by Perrell J. in *Mishev v. Shah*, 2011 ONSC 3134 at para. 12 (Tab 11, JA BOA) [motion for reconsideration based on new evidence relating to potential sale of asset denied]; and by Shaw J. in *Jourdain v. Ontario* (2009), 177 A.C.W.S. (3d) 488 at para. 10 (Ont. S.C.J.) (Tab 12, JA BOA) [motion for reconsideration of costs decision based on hardship denied].
[7] *Alfano, supra* note 3 at para. 26 (Tab 6, JA BOA).

11

[19] … In my view, the mere fact that the technical requirements for the finality of the earlier order are missing because the order was not signed and entered, does not permit a judge to vary that order in whatever manner s/he happens to consider to be appropriate at a later date. **The principle of finality, that underlies the *functus officio* principle, weighs against that scope of authority and that type of alteration. Parties have a right to expect that once a matter is determined by a judge, it is over. Our rules of procedure do not envisage that parties will be allowed to reargue matters, except in very narrow circumstances.**

[20] **I acknowledge that there is a fairly broad power, in a judge, to change an order after it has been announced but before it has been signed and entered. Any such change should only be made, however, if it is either technical (e.g. to correct an arithmetic error) or it is necessary to avoid a miscarriage of justice:** *Clayton v. British American Securities Ltd.*, [1935] 1 D.L.R. 432 (B.C.C.A.) at pp. 440-441. **Even then, if a change is to be made, it must be fully explained to ensure that the authority is not abused.** The concern that arises from changes being made by a judge to an order, that has already been pronounced, has been expressed in other cases. For example, in *Montague v. Bank of Nova Scotia* (2004), 69 O.R. (3) 87 (C.A.), Goudge J.A. said that, notwithstanding the very wide discretion a judge has to change his or her judgment before it is entered, that discretion had to be exercised cautiously and for very good reasons. He commented, at para. 40:

> Any change to a judgment once given, no matter how soundly based, runs the risk of evoking suspicions of abuse on the part of those adversely affected. It is at the least disquieting, and to that extent can put a cloud over the administration of justice. A judge exercising this discretion bears a significant onus to explain the change.[8] [emphasis added]

27.    Where parties have fully argued all issues and those issues have been decided by the court,

a decision must not be revisited under the guise of "reconsideration."[9] Such issues can properly be

---

[8] *Brown (Trustee of) v. The Municipal Property Assessment Corp., Region 14*, 2014 ONSC 7137 at paras. 19-20 (Div Ct) [*Brown*] (Tab 13, JA BOA).
[9] *Stradiotto v. BMO Nesbitt Burns et. al.*, 2015 ONSC 461 at paras. 10-20 (Tab 14, JA BOA); *National Trust Co. v. Saks* (1995), A.C.W.S. (3d) 567 at para. 3 (Ont. Ct. J. (Gen. Div.)) (Tab 15, JA BOA).

raised, if at all, on appeal.  In the unlikely event that reconsideration is appropriate, the court bears a heavy onus to fully and completely explain the reason for the changes made.[10]

28.    It is respectfully submitted that there is no basis to reconsider any aspect of the Decision. The issues raised were fully argued at trial and are dealt with and determined in the Decision.  The U.S. Debtors have failed to show how the Decision puts the integrity of the judicial process at risk or that a miscarriage of justice has occurred.

29.    Indeed, the contrary is true.  The Decision is lengthy, well-considered and goes into detail on all material issues.  A change in the Decision would be "disquieting and to that extent can put a cloud over the administration of justice."[11]

### B.    THE DECISION PROPERLY EXCLUDES THE BONDHOLDERS' GUARANTEE CLAIMS IN CALCULATING NNI'S ALLOCATION

30.    The U.S. Debtors seek reconsideration of the Court's decision to exclude the guarantee claims of the Bondholders against NNI from the calculation of NNI's claims base for allocation purposes.  There is no basis to reconsider this issue.  The Decision in this regard does not put the integrity of the process at risk or create a miscarriage of justice.  On the contrary, the Decision thoroughly addresses this issue and appropriately provides that the Bondholders' claims, like all other claims, must only be credited once for allocation purposes.

31.    Crediting any claim more than once is inconsistent with the principles underlying the modified *pro rata* allocation methodology adopted by the Court, and inequitably favors one set of creditors over all other similarly situated creditors.  Should, however, the Court depart from the Decision and determine that overlapping claims should be credited against multiple debtors for

---

[10] *Brown*, *supra*, note 8 at paras. 20-21 (Tab 13, JA BOA).
[11] *Brown*, *supra*, note 8 at paras. 19-20 (Tab 13, JA BOA).

allocation purposes, it should afford the same treatment to all such claims, including the claims of the UK pension Claimants (the "UKPC") against numerous Nortel entities based on financial support directions ("FSDs") arising from the deficit in NNUK's pension plan.

*1.    The Court Has Considered and Rejected Counting the Bondholders' Guarantee Claim for Allocation*

32.    The Motions should be denied because the Bondholders' guarantee claims were the subject of argument submitted to the Court, evidence presented to the Court, and were extensively dealt with in the Decision.

33.    Both the UKPC[12] and the Canadian Creditors' Committee addressed the guarantee claims in briefs submitted to the Court.    The UKPC argued that "if the Courts adopt the *pro rata* distribution model there is no need to give additional effect to the guarantees provided to the Nortel Bondholders or to Nortel Networks UK Pension Trust," since "[a] *pro rata* distribution without providing for double recovery for the bonds would meet the legitimate expectations imbedded in the terms of the bonds."[13]    The CCC echoed this argument, submitting that "[c]laims of holders of guaranteed unsecured bonds should be treated no differently than other general unsecured creditors of Nortel."[14]    On the other side, the Bondholders introduced expert evidence regarding the Bondholders' expectations with respect to their guarantees and the potential ramifications of the adoption of a *pro rata* approach on capital markets.[15]

34.    The Court considered the evidence and argument regarding the guarantee claims at length (paras. 225-249), and rejected the notion that they warranted duplicative allocation entitlement.

---

[12] The UKPC is comprised of the Nortel Networks UK Pension Trust Limited and the Board of the UK Pension Protection Fund.

[13] Allocation Post-Trial Brief of Nortel Networks UK Pension Trust Limited and the Board of the Pension Protection Fund at paras. 89, 107, Aug. 7, 2014.

[14] Closing Brief of the Canadian Creditors' Committee ("CCC") at para. 204, Aug. 7, 2014.

[15] *See* TR00057, Expert Report of John J. McConnell at paras. 37–70, Feb. 28, 2014.

35.    After recognizing that the Bondholders, like other creditors, have the "legal right to be paid

in full on their bonds," the Court noted that the evidence showed that the bonds did not have a right

to require the lockbox funds to be allocated in any particular manner and concluded that:

> [I]n determining what the claims against a Debtor Estate's are, a
> claim that can be made against more than one Debtor Estate can
> only be calculated and recognized once.  The one that is known is
> the Bondholder claim for $4 billion, referred to as the claim on
> cross-over bonds. … If a claim on a guaranteed bond is not paid in
> full by the issuer Debtor Estate, a claim for the shortfall can be
> recognized by the Debtor Estate that guaranteed the bond but that
> shortfall will not be taken into account in determining the claims
> against the Debtor Estates.[16]

36.    Thus, in setting the parameters of its modified *pro rata* approach, the Court had the

opportunity to consider whether both NNL and NNI should receive an allocation in respect of the

Bondholders' claim.  It heard the Bondholders' submissions that U.S. creditors would be

prejudiced by a *pro rata* allocation that did not permit a double allocation on account of the

guaranteed bonds.  It concluded that NNL, as primary obligor, should receive an allocation, and

that NNI, as guarantor, should not.

37.    This issue was fully argued and decided by the Court.

> 2.    *The U.S. Debtors' Characterization of the Impact of the Decision Is Flawed*

38.    The U.S. Debtors' Motion is a transparent effort to reargue the U.S. Debtors' case and

seeks modification of the Decision in order to increase its recovery.  The U.S. Debtors

mischaracterize the Decision as a windfall to the Canadian and EMEA Debtors at the expense of

creditors of the U.S. Debtors.  This is simply incorrect and ignores among other things, the

individual impact of the Decision on the 19 EMEA Debtors, each of which is a separate entity,

---

[16] Decision at para. 251.

with its own insolvency proceeding, and with a unique group of creditors who are impacted differently by the Decision.

39.    First, given that the Court explicitly rejected substantive consolidation of the Nortel debtors (para. 214), individual creditors inevitably will be impacted differently by the Court's modified *pro rata* approach, depending on factors such as cash on hand and intercompany claims held by each estate.  In reality, the creditors of several EMEA Debtors, including NNSA and NNIR, residual profit entities that undeniably made substantial contributions to the creation of Nortel's intellectual property,[17] are likely to receive a distribution under the modified *pro rata* approach that will be far below what they would have expected under nearly every other allocation methodology presented by each debtor group at trial.  NNSA is also likely to receive a distribution well below any return that the U.S. general unsecured creditors are likely to receive.

40.    Second, results-driven arguments that the Decision is ripe for reconsideration because the modified *pro rata* methodology may result in an allocation to the EMEA Debtors as a whole that is in excess of the amount for which they advocated at trial are ill-conceived. For example, the Committee suggests that the Courts' modified *pro rata* approach is "extreme" because, among other reasons, "the position presented by the EMEA Debtors would have taken only 18% for their estates" while the Court "would award them more."[18]  The Joint Administrators, like many parties, advocated alternative theories at trial, including a license theory – similar to the approach advocated by the Committee – which would have entitled the EMEA Debtors to 31% of sale proceeds in the aggregate.[19]  The Committee's argument is also entirely beside the point, since

---

[17] *See* U.S. Allocation Decision at page 4; Joint Administrators' Post-Hearing Submission Regarding Allocation of the Proceeds of the Nortel Asset Sales at paras. 4, 37, 53, Aug. 7, 2014.
[18] Official Committee of Unsecured Creditors of Nortel Networks Inc., *et al*. Joinder, at para. 5.
[19] *See* TR00030, Expert Report of Paul P. Huffard at page 60, Apr. 11, 2014 [the "Huffard Report"].

comparing outcomes under a *pro rata* approach with outcomes under an ownership approach is comparing apples and oranges.   The EMEA Debtors' allocation theory at trial, based on ownership, was rejected in favour of an allocation methodology based on the allowed claims against each debtor.   The fact that the allocation to certain debtors under the modified *pro rata* approach may be higher than under an ownership approach simply reflects that those debtors have significantly greater creditor bases, which the Court has expressly and intentionally decided will drive allocation.

41.     Finally, the U.S. creditor recoveries put forward by the U.S. Debtors are misleading and entirely speculative because they exclude significant assets of the U.S. estates that will increase the total amount available for distribution to their general unsecured creditors.   The U.S. Debtors claim that a modified *pro rata* allocation will translate to a payment of 14 cents on the dollar to U.S. unsecured creditors.[20]   As the U.S. Debtors admit, however, that figure only reflects lockbox proceeds and excludes the U.S. Debtors' cash on hand, which is expressly preserved for distribution to creditors under the Decision, as well as proceeds payable to NNI as a result of NNI's allowed $2 billion intercompany claim against NNL.   Including these additional U.S. assets results in recoveries of 81% to the Bondholders and 62% to the balance of U.S. general unsecured creditors.[21]   Although the Joint Administrators believe that these figures are unlikely to be representative of what the real outcome for creditors will be, in any case, the argument that either

---

[20] Because the parties do not know the full amount of the claims that will be allowed in each estate, the U.S. Debtors rely on the assumptions, approximations, and opaque calculations of the CCC's expert, Thomas Britven, which they previously argued were faulty.  *See* Pre-Trial Brief of the U.S. Interests at page 131, May 2, 2014; Post-Trial Brief of the U.S. Interests at pages 137–38, Aug. 7, 2014 (contesting that Britven "provides nothing more than 'illustrative' calculation [sic] of what *pro rata* recoveries would be if intercompany and guarantee claims were ignored, his distribution methodology were adopted and all the untested assumptions he was provided by counsel regarding claims turn out to be true").

[21] This is on the basis that the Bondholders' claim against NNI is for any deficiency on the claim, once the Bondholders' have the opportunity to assert their claims against the Canadian Debtors. U.S. Debtors' Motion Ex. A at A-3.  If the Bondholders were entitled to assert the full amount of their claim against NNI, then their estimated recovery would be 89%, while other U.S. unsecured creditors recovering 40%.  Id. at A-2.

percentage represents manifest injustice is unfounded.  Under the Court's allocation methodology, and even on their own figures, the U.S. Debtors' unsecured creditors will enjoy a significantly greater recovery than the unsecured creditors of several of the individual EMEA estates.

> 3.    *If the Court Reverses Course and Credits the Bondholders' Guarantee Claim for Allocation, the Same Treatment Should be Afforded to All Other Similar Claims*

42.    The Court correctly ruled that the Bondholders' claims should not be counted in calculating NNI's allocation and the Motions for reconsideration should be dismissed.  However, should the Court determine that it is appropriate to count the claims of the Bondholders twice – against NNI and NNL – for purposes of allocation, the same treatment should be afforded to all overlapping claims against any Nortel debtor that arise from the same debt.  For example, the UKPC has asserted claims against multiple EMEA entities based on FSDs issued with respect to NNUK's pension funding deficit, which are distinct from the direct claim the UKPC has against NNUK to cover the same shortfall in its pension scheme.  Granting the relief sought only with respect to the Bondholders' guarantee claim against NNI would inequitably favor NNI's creditors to the detriment of all other Nortel creditors worldwide. The principles that govern allocation must be applied consistently to each individual debtor.

## C.    NNI IS NOT ENTITLED TO A DIRECT ALLOCATION OF SALE PROCEEDS ATTRIBUTABLE TO NGS AND DIAMONDWARE

43.    The Joint Administrators oppose the U.S. Debtors' request to have the Court reconsider the Decision and allocate proceeds from the sales of Nortel Government Solutions Incorporated ("NGS") and Diamondware, Ltd. ("Diamondware") directly to NNI on the theory that NGS and Diamondware were wholly-owned U.S. subsidiaries that were not integrated into the Nortel group.

The issue, again, does not put the integrity of the judicial process at risk or create a miscarriage of justice.  Reconsideration should be denied for several reasons.

44.    First, the U.S. Debtors' attempt to receive a separate allocation on account of value attributable to NGS and Diamondware is flatly inconsistent with the modified *pro rata* methodology adopted by the Court for all proceeds subject to the allocation proceeding.  While the U.S. Debtors, the EMEA Debtors, and the Canadian Debtors advocated at trial for allocation based on the debtors' ownership interests in the Nortel assets that were sold, the Court expressly rejected any ownership-based approach.  Thus, by requesting an allocation of sale proceeds attributable to certain assets that were owned by NNI outright, the U.S. Debtors seek to re-craft the Court's entire methodology to allow an exception for certain of NNI's wholly owned assets.  This request for this relief is only appropriately sought on appeal.  It is not an appropriate basis for reconsideration and should be denied.

45.    Even if the U.S. Debtors' argument was somehow viable in the face of the modified *pro rata* approach adopted by the Court, it would have to be applied consistently to all debtors (not just NNI).  All parties recognized at trial that certain debtors owned outright certain tangible assets that were transferred in the business sales, and allocation experts for the Canadian and EMEA Debtors separately allocated proceeds based on those assets.[22]  The parties also recognized that certain individual debtors owned intangible assets outright.  For example, two EMEA entities, Nortel Germany and Nortel France SAS – former joint ventures that were never parties to the Master R&D Agreement – owned valuable patents when they were acquired by Nortel and continued to

---

[22] These tangible assets included: inventories, typically including electronic devices and related parts, prepaid expenses, real property, plant, and equipment, such as laboratory and office equipment.  TR00042, Report of Philip Green Regarding the Allocation of Recoveries Among Nortel Entities at pages 5, 41–42, 50 (Feb. 28, 2014) [the "Green Report"]; *see also* TR00030, Huffard Report at pages 7, 62.

hold those assets in their own names.[23]  If the U.S. Debtors were correct, and debtors were entitled

to an allocation in respect of their wholly owned assets notwithstanding the modified *pro rata*

approach adopted by the Courts, then sale proceeds attributable to these wholly-owned assets must

be carved out as well.

46.      The U.S. Debtors argue that they are entitled to a direct allocation for NGS and

Diamondware in part because sale proceeds from certain Nortel subsidiaries were allocated

directly to NNL or NNUK.  This argument is, with respect, disingenuous. As the U.S. Debtors'

own expert, Jeffrey Kinrich, acknowledged, those entities were sold outside the scope of the IFSA

– *i.e.*, the business sales and the residual patent sale – so the proceeds received are not in the

lockbox.[24]  Mr. Kinrich therefore excluded these transactions from his ownership-based allocation

model.[25]  There is no reason that they would be treated differently.[26]

## II.      CLARIFICATION SHOULD BE DENIED

47.      While courts are asked to "clarify" their decisions when there are slips or mistakes, it is

improper for a court to otherwise change its decision on the basis of a "clarification".  Changes

must be sought on the basis of a request for reconsideration (as above) or on appeal, if leave is

---

[23] *See* TR00030, Huffard Report at 29, App. 4 at para. 5; TR00033, Expert Report of James E. Malackowski at page 51, ftn.151 (Mar. 24, 2014) [the "Malackowski Report"].  James Malackowski, the EMEA Debtors' intellectual property valuation and allocation expert, valued these patents at $20.9 million.  TR00033, Malackowski Report at page 47.  The CCC's allocation expert, Thomas Britven, separately valued these patents at $57 million.  TR00045, Thomas Britven, Nortel Networks Expert Report on Valuation and Other Issues Related to the Allocation of Sales Proceeds to the Nortel Debtor Groups at page 42, para. 6.65, Tbl. 12 (Jan. 24, 2014).

[24] *See* TR00051, Expert Report of Jeffrey H. Kinrich at para. 20 (Jan. 24, 2014) [the "Kinrich Report"].

[25] *See* TR00051, Kinrich Report at para. 20 ftn. 41.  The Canadian Debtors' expert, Philip Green, also acknowledged this fact and excluded these transactions from his ownership-based allocation model.  *See* TR00042, Green Report at page 8 ftn.12.

[26] The U.S. Debtors also request a direct allocation based on an inflated combined value of NGS and Diamondware – approximately $331 million – and observe that Mr. Green separately allocated $111 million to NNI in respect of these entities.  U.S. Debtors' Motion at paras. 34–35.  Not only is Mr. Green's valuation of NGS and Diamondware approximately one-third the value that the U.S. Debtors allocate to NNI in their Motion, TR00042, Green Report App. B at page 10, his valuation is only relevant in the context of an ownership-based allocation approach, which the Court chose not to adopt.  Similarly, the allocation methodology of the EMEA Debtors' expert, Paul Huffard, recognized value flowing from the sale of shares of NGS and Diamondware to NNI, but compensated NNI through the application of his allocation methodology by asset class.  TR00030, Huffard Report App. 21 at paras. 2–3.

granted.  Otherwise, a clarification can be made only where a court's judgment is so vague or ambiguous that an actual clarification is needed regarding the issue already determined improper.[27]  Importantly, to the extent the U.S. Debtors and other moving parties have asked the Court for "clarification", but seek relief that effectively requires the Court to alter or amend its decision, the motion will be treated as one for reconsideration and will only be granted if it meets the high standard described above.

### A.    Clarification Is Unnecessary Regarding the Court's Recognition of Each Individual Debtor's Entitlement to an Allocation that Counts All Claims, Including All Intercompany Claims

48.    The U.S. Debtors seek what they say is "clarification" regarding two related, but conflicting, points:  (i) that sale proceeds will be allocated to each of the individual debtor entities on account of their respective claims bases, rather than to the geographic debtor groups,[28] and (ii) that the intercompany claims that will be counted for allocation purposes are limited to intercompany claims between debtors in different geographic debtor groups, and exclude claims between debtors within the same group.  The Decision, however, is clear on both of these points.  The Decision clearly recognizes the legal separateness of each individual debtor entity and, in furtherance thereof, provides that *each* entity will receive an allocation and that *all* intercompany claims will be counted.  The U.S. Debtors' request to "clarify" that "all intercompany claims" means "not all intercompany claims, but only claims between different debtor groups" is really a request for reconsideration (and an appeal) and an improper attempt to increase the projected allocation to the U.S. estates, and should be denied.

---

[27] *Bremness v. McGee Capital Mangement Ltd.*, 1999 CarswellOnt 2866 at paras. 1 and 3 (C.A.) (Tab 16, JA BOA); *Hawkes v. Levelton Holdings Ltd.*, 2012 BCSC 1968 at paras. 16 and 18 (Tab 17, JA BOA); *Farm Credit Canada v. Beaumont (Trustee of)*, 2012 NSSC 378 at para. 2 (Tab 18, JA BOA); *Elan Pharma Int'l Ltd. v. Abraxis Bioscience, Inc.*, No. 06-438 GMS, 2007 WL 6382930, at *1 (D. Del. Dec. 17, 2007) (Tab 19, JA BOA).

[28] The Law Debenture Trust Company of New York similarly asserts that the Decision "compels the conclusion that each individual debtor is entitled to its respective, *pro rata* allocation of Lockbox funds."  Law Debenture Motion, at para. 22.

      1.    *The Court Made Clear that Allocation Will Be to Individual Debtors,*
               *Not Debtor Groups, to Respect the Corporate Separateness of Each Debtor*

49.    The Decision provides that allocation will be calculated based on the allowed claims against each individual debtor entity (*e.g.*, debtors like Nortel Italy, Nortel Poland, and other discrete entities in the EMEA region), since each is legally distinct and has initiated a separate insolvency proceeding, with its own estate, unique creditor constituency, discrete proof process, and distributions (ftn 2 and paras. 14, 30, 214, 245, 249, 252 and 258) (recognizing "corporate separateness" of Nortel entities and reiterating that each Nortel debtor will be allocated a *pro rata* share of proceeds based on amount of allowed claims asserted against it).  As the Decision makes clear, "[T]he various entities in the various Estates are not being treated as one entity …" (para. 214) and "Each Debtor Estate is to be allocated a percentage of the lockbox funds …." (para. 258).

50.    The Decision simply reflects the legal reality that there are many different Nortel debtor entities.  Although the insolvency proceedings of individual debtors in the same geographic area are being administered together for procedural purposes in the interests of efficiency, these debtor groups (*i.e.*, the EMEA Debtors) are post-petition constructs.  Nothing about these joint administration arrangements impacts the separate identity of each of the 19 EMEA Debtors – NNUK, NNIR, NNSA, Nortel Germany, Nortel France SAS, Nortel Poland, Nortel Italy, Nortel Austria, Nortel Sweden, Nortel Netherlands, Nortel Hungary, Nortel Spain, NNIF, Nortel Belgium, Nortel Finland, Nortel Portugal, Nortel Romania, Nortel Slovakia, and Nortel Czech Republic – which have always been legally distinct.  Consistent with this legal reality, in agreeing to the IFSA, which serves as the basis for the asset sales and each selling debtor's entitlement to an allocation, each EMEA entity executed the agreement independently.[29]

---

[29] TR12032, IFSA (Jun. 9, 2009).

51.     This legal reality has underpinned the Joint Administrators' position throughout the allocation proceedings.  It was articulated in the Joint Administrators' post-trial briefing, which noted the need to allocate sale proceeds on account of customer relationships "to compensate all debtors, including non-RPEs" in EMEA that did not create intellectual property, but distributed Nortel products.[30]  Indeed, going all the way back to submissions made to the Courts in respect of the Allocation Protocol itself, the Joint Administrators have consistently stated that allocation – under whatever approach – ultimately must be made to each debtor on an individual basis.[31]  This point has never been contested.

52.     In keeping with the legal status of the various Nortel entities, the Decision is clear that the corporate separateness of each individual debtor will be respected for purposes of allocation.  Since no clarification is necessary, the U.S. Debtors' Motion should be denied.[32]

2.     *The Court Made Clear that All Intercompany Claims Will Be Counted for Purposes of Allocation*

53.     In direct contradiction to their arguments recognizing the corporate separateness of each Nortel entity, the U.S. Debtors separately argue that the Decision should be "clarified" such that intercompany claims are limited to "claims between Debtors across different Debtor groups . . . rather than within Debtor groups."[33]  There is no clarification needed as the Decision explicitly

---

[30] *See, e.g.*, Joint Administrators' Post-Hearing Submission Regarding Allocation of the Proceeds of the Nortel Asset Sales at paras. 13–14, Aug. 7, 2014.  Additionally, their expert, Mr. Huffard, provided the Courts with a comprehensive breakdown of the allocation that each individual EMEA entity would receive under the Joint Administrators' contribution and alternative license theories.  TR00030, Huffard Report App. 23.

[31] *See* Allocation Protocol Tr. 71:12–17, Mar. 7, 2013 (noting that allocation will involve addressing the separate claims of some forty parties with rights to the lockbox proceeds).

[32] The Joint Administrators also object to a related provision in the U.S. Debtors' request that "to the extent a creditor holds claims against multiple Debtors within a Debtor group, solely for purposes of allocation, the creditor's claim shall be included only once in each Debtor group."  U.S. Debtors' Motion, Draft Order, at para. 7.  This language suggests that a single creditor asserting two distinct claims against different entities within the same debtor group, where each claim is based on a different debt, would lose one of those claims for the simple fact that the entities are within the same debtor group.  There is no basis for such a position.

[33] U.S. Debtors' Motion at para. 37.

provides the opposite and there is no principled basis for this argument, which is a thinly disguised request for reconsideration.

        a.       **The Court Clearly Decided that Intercompany Claims Will Be Counted in Calculating Each Debtor's Allocation**

54.    The Decision makes clear that intercompany claims will be included in calculating allowed claims against a debtor for allocation purposes, stating explicitly that "The inter-company claims are not eliminated" (para. 214).  Indeed, the Court makes this point clear in several parts of the Decision:

> [214]   A pro rata allocation in this case would not constitute a substantive consolidation, either actual or deemed, for a number of reasons. First, and most importantly, the lockbox funds are largely due to the sale of IP and no one Debtor Estate has any right to these funds. It cannot be said that these funds in whole or in part belonged to any one Estate or that they constituted separate assets of two or more Estates that would be combined. Put another way, there would be no "wealth transfer" as advocated by the bondholders. **The IFSA, made on behalf of 38 Nortel debtor entities in Canada, the U.S. and EMEA, recognized that the funds would be put into a single fund undifferentiated as to the Debtor Estates and then allocated to them on some basis to be agreed or determined in this litigation. Second, the various entities in the various Estates are not being treated as one entity and the creditors of each entity will not become creditors of a single entity. Each entity remains separate and with its own creditors and its own cash on hand and will be administered separately. The inter-company claims are not eliminated.**
>
> …
>
> [252]   One of the known claims is the claim of the UKPC for the approximately £2.2 billion deficit in the NNUK pension plan. **If the UKPC makes a claim for this amount against NNUK and also against other EMEA Debtors, those claims against the other EMEA Debtors will not be taken into account in determining the claims against the Debtor Estates. The claim may be taken into account only once in the pro rata allocation.**
>
> …

> [258]  A judgment is to go that the lockbox funds are to be allocated on a pro rata allocation basis with the following principles to govern:
>
> …
>
> **(3)    Intercompany claims against a Debtor Estate are to be included in  the determination of the claims against that Estate.**  [emphasis added]

55.    The Court could not have been more clear in conveying that it intends to respect *all* intercompany claims against *each* individual Nortel debtor, regardless of which debtor group the claimant belongs to.[34]  Clarification is therefore unnecessary, and the U.S. Debtors' request is nothing more than a request that the Court reconsider and reverse its decision in order to improve the U.S. Debtors' allocation.  The U.S. Debtors do not even attempt to meet the high standard for proving that reconsideration is appropriate here.

>       b.      The U.S. Debtors' Attempt to Exclude Intercompany Claims Between Debtors in the Same Geographic Group is Inconsistent and Unprincipled

56.    Not only is the Decision clear on this point, it is entirely inconsistent for the U.S. Debtors to ask that the Court respect the legal separateness of an individual debtor for purposes of *making* the allocation, but refuse to include certain intercompany claims against that debtor for purposes of *calculating* the allocation simply because those intercompany claims were made by another debtor in the same geographic group.  The Court made no such distinction when crafting its allocation methodology and allowing such a distinction would be inequitable and unprincipled.

57.    The U.S. Debtors' example – "the fact that NNSA may have claims against NNUK (or perhaps both may have claims against each other) should not increase the net allocation to either of

---

[34] The U.S. Court was just as clear that the individual corporate identity of each debtor should be respected and that all intercompany claims must be counted for allocation purposes.  *See* U.S. Allocation Decision, at para. 63.

those EMEA Debtors" – is particularly instructive.[35]  The U.S. Debtors acknowledge that NNI should receive an allocation based on the total amount of allowed claims against NNI; likewise, NNSA, separately and independently, is entitled to receive an allocation based on allowed claims against its respective estate as well.  But if any of the allowed claims against, say, NNSA, is an intercompany claim by NNUK then those claims, argue the U.S. Debtors, should be excluded for purposes of allocation notwithstanding that it would give rise to real liability and entitle NNUK to a distribution from NNSA's estate.  This argument makes no sense, and there is no principled basis for it.

58.    The argument becomes even more untenable because the U.S. Debtors argue that certain intercompany claims *should* be allowed if they are intercompany claims by a debtor in a different geographic group.  Thus, in the example above, if the intercompany claim against NNSA were a claim by NNL instead of NNUK, then that claim, argue the U.S. Debtors, should be counted for purposes of allocation. The only distinction is that the intercompany claimant is part of a different geographic debtor group, which has nothing to do with the way Nortel operated and is instead a post-petition construct established for reasons of administrative efficiency that arose from the location of the various bankruptcy filings.  Such relationships cannot give rise to legally distinct rights, and once again the U.S. Debtors cite no principle of law overlooked by the Court that warrants reconsideration on this point.

59.    In addition to being unsupportable and inconsistent with their position regarding individual-entity allocation, the U.S. Debtors' position on intercompany claims would completely eliminate any allocation to one of their own debtors on account of the intercompany claim against NNI submitted by its subsidiary, NNCC.  As the Law Debenture Motion notes, "NNCC has an

---

[35] U.S. Debtors' Motion at para. 37.

undisputed intercompany claim against NNI . . . in the amount of $147,634,914.66." The U.S.

Debtors' position leads inexorably to the conclusion that NNI is not entitled to an allocation in

respect of this intercompany claim by NNCC.[36]

60. Neither the U.S. Debtors nor Law Debenture addresses this inconsistency, which is

unsurprising given that the sole purpose of the U.S. Debtors' argument regarding intercompany

claims is the movement of money away from the EMEA Debtors to the U.S. Debtors. The U.S.

Debtors attempt to justify such an outcome by relying on inappropriate and distasteful assertions

that separate, distinct entities within the EMEA region would "generously assert and allow such

[intercompany] claims,";[37] a baseless accusation.

        c.      The U.S. Debtors' Position Would Eliminate Valuable
              Intercompany Claims Between EMEA Debtors

61. The practical effect of the U.S. Debtors' clarification would be to disregard valid claims in

an individual debtor's estate solely because, post-filing, the debtors were aligned in broad

geographic groups for administrative convenience. In addition to lacking any legal basis for

excluding valid claims between separate debtors, such a result is inconsistent with the IFSA itself.

As noted above, each of the EMEA Debtors executed the IFSA independently, and each debtor is

therefore entitled to a separate allocation.[38] By insisting that intercompany claims within a debtor

group should be ignored for allocation purposes, the U.S. Debtors are effectively arguing for a

---

[36] "NNCC is a direct and wholly-owned subsidiary of NNI, incorporated in Delaware in 1996," the same year NNCC
issued $150 million worth of bonds and loaned the proceeds to NNI. Law Debenture Motion at paras. 6–7.
[37] U.S. Debtors' Motion at para. 37.
[38] TR12032, IFSA (Jun. 9, 2009).

substantive consolidation of each geographic debtor group, which they have consistently opposed and, which more importantly, both Courts expressly disavowed.[39]

62.    Intercompany claims between individual EMEA debtors constitute legitimate, valid claims *inter se*, and each individual EMEA debtor has a separate group of distinct creditors that would see their recoveries diluted by this arbitrary line-drawing.  The impact of such an approach on the EMEA debtors would be striking. For example, in connection with the Court approved settlement of intercompany claims filed by the EMEA Debtors against the Canadian Debtors, NNL assigned to NNUK pre-petition intercompany claims that NNL had against certain EMEA Debtors.  Under the U.S. Debtors' view, these claims could have been counted for allocation purposes had they remained in the hands of NNL, but since the very same claims have now transferred to NNUK – pursuant to a bargained-for settlement provision approved by this Court – they are now worthless as a matter of allocation.  It simply makes no sense that NNL could have a claim against an EMEA entity counted for allocation purposes while NNUK cannot, and the Court could not have intended this outcome.[40]

63.    There are numerous *bona fide* intra-EMEA intercompany claims that give rise to real liability – just like NNCC's $150 million claim against NNI – which should be recognized for purposes of allocation on the same basis as other intercompany claims.  In addition to the claims assigned from NNL to NNUK, there are also run-of-the-mill trading debt claims that were reflected on the books of the various individual EMEA debtors at filing.  These are intra-EMEA claims against entities that performed valuable distribution functions and allowed the Nortel group

[39] See Post-Trial Brief of the U.S. Interests at page 130, Aug. 7, 2014; U.S. Allocation Decision at pages 63, 93, 99, 105; Canadian Allocation Decision at paras. 212–223.
[40] It also makes no sense that such claims would not be counted the same as NNUK's settled intercompany claim against NNI, which the U.S. Debtors expressly seek to include for allocation purposes.  U.S. Debtors' Motion at para. 38.

to trade in countries like Poland, Italy and Romania.[41]  It would be arbitrary and unprincipled to exclude such straightforward, bedrock claims.

> **B.** **Clarification is Unnecessary Regarding the Court's Oversight of the Debtors' Claims Processes**

64.     The U.S. Debtors' request for clarification regarding treatment of "disputed claims" is unnecessary, inconsistent with basic standards of comity and serves only to support its arguments for a larger allocation.  There is nothing in the Decision regarding this issue that should be clarified and the request should be denied.

> *1.* *Specific Procedures for Resolving Disputed Claims Are Not a Proper Subject for Clarification*

65.     As referred to above, the Decision does not suggest this Court will have oversight of the claims processes in other jurisdictions, including regarding EMEA.  Indeed, the Decision states (at para. 253) that:

> The UK Administrator has not yet instituted a claims procedure, apparently awaiting a determination of this allocation proceeding. In my view, the process should be undertaken now and I expect this will happen.

66.     To bring about the allocation of the proceeds in the lockbox, there will need to be future submissions from the parties to ensure the efficient determination of claims in all jurisdictions and to facilitate the Court's ultimate modified *pro rata* allocation calculations.  Specifically, the

---

[41] Similarly, both NNUK and NNSA have claims into NNIR, whose only other major creditor is the Irish pension fund.  Excluding the intercompany claims against NNIR from the allocation calculation would not only be directly contradictory to the clear language of the Decision, it would mean that NNIR would be obligated to pay NNUK and NNSA a dividend based on a debt claim for which it cannot recover from the lockbox, and ultimately pay less to the Irish pensioners.

Decision states that "Proposed schedules for expediting any remaining claims procedures are to be provided without delay".[42]

67.     The Joint Administrators are committed to providing transparency in the EMEA claims processes.  The Joint Administrators intend to present the Courts with a clear outline of the processes and standards governing claims determinations; are willing to submit periodic progress reports to the Courts; and will submit additional information as the Courts may require.  It is not necessary, nor would it be expected, for the Decision to explicitly lay out all future procedural mechanisms for facilitating the processes for reviewing allowed claims from each jurisdiction, and for calculating each debtor's allocation.  Accordingly, no clarification is needed for resolving any *bona fide* disputes about particular claims.

> 2.     *The U.S. Debtors' Aspersions on the EMEA Claims Processes, the UKPC's Claim, and the Joint Administrators Are Baseless and Provide No Support for "Clarifying" the Decision*

68.     Rather than seeking to clarify a legitimate ambiguity in the Decision, the U.S. Debtors use the procedural mechanism of "clarification" to make baseless accusations regarding the propriety of the UKPC's claim in relation to the section 75 debt, the individual proceedings in the EMEA region, and, the integrity of the Joint Administrators themselves, in an attempt to colour the Court's view of the nineteen separate EMEA claims processes that will be commenced shortly. The U.S. Debtors' request for "clarification" in this regard is founded on two baseless arguments: (i) the EMEA proceedings and the Joint Administrators must be "polic[ed]" and (ii) the UKPC's claim is "seemingly over-inflated."  Each argument fails.

---

[42] Decision at para. 258(b).

69.     The individual EMEA administration proceedings, conducted under the authority and supervision of the English Court, are procedurally robust and trustworthy, and are comparable to U.S. and Canadian bankruptcy proceedings.  The Joint Administrators are officers of the English Court who are duty-bound to act in good faith and in accordance with applicable law in those proceedings.  The UKPC's claim against NNUK – as with every claim in each of the nineteen EMEA jurisdictions – will be subject to a formal claims process, which, as described below, is subject to appeal rights available to creditors and shareholders.  The U.S. Debtors provide no factual or legal support for their "clarification" that the EMEA proceedings and the Joint Administrators require more oversight than the U.S. or Canadian proceedings or estate fiduciaries. The U.S. Debtors' request for "clarification" should be seen for what it truly is – an unseemly and desperate attempt to secure more money for the U.S. Debtors – and should be dismissed.

a.      The Court Should Defer to Recognized U.K. Insolvency
Proceedings Under Principles of Comity

70.     Decades of comity and cross-border insolvency jurisprudence make clear that bankruptcy proceedings in fellow common law jurisdictions are comparable to Canadian insolvency proceedings, result in procedurally fair and substantively just claims determinations, and are entitled to deference.

71.     Canadian courts have consistently recognized the principle of international comity to give effect to orders made in foreign proceedings.  The Supreme Court has stated that the doctrine is of particular importance viewed internationally, and must evolve concomitantly with international business relations, cross-border transactions as well as mobility.[43]

---

[43] *Beals v. Saldanha*, 2003 SCC 72 at para. 27 (Tab 20, JA BOA).

72.     Consistent with the principle of comity, Canadian courts have long shown respect to insolvency proceedings in foreign jurisdictions, by giving effect to their processes.[44]  In instances of concurrent insolvency proceedings, Canadian Courts should avoid conflicts wherever possible.[45]  Justice Blair emphasized the need for multi-jurisdictional insolvency proceedings to be adjudicated in the jurisdiction with the closest connection to the debtor:

> In the context of multi-jurisdictional insolvencies the courts of different jurisdictions should strive — to the extent they can within the parameters of their own fundamental precepts of justice — to ensure that matters are adjudicated in the proper forum with the closest connection to the subject matter.[46]

73.     Canadian courts have recognized and come to the aid of U.K. insolvency and restructuring proceedings,[47] noting that their statutory processes are familiar, provide for analogous procedures, and are supervised by the U.K. court, which has long been accorded respect.[48]

74.     The EMEA proceedings fall squarely within these principles.  While a similar motion for recognition was not brought in Canada, the U.S. Court in this matter recognized the English proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code for NNUK and each of the other EMEA Debtors.  Further, procedures embedded in the English bankruptcy claims processes mirror many of the features of the U.S. and Canadian Debtors' proceedings.

75.     NNUK will shortly commence a proof process pursuant to the *Insolvency Act 1986* and the Insolvency Rules 1986.  Each of the other EMEA entities, which are not registered in England and

---

[44] *MtGox Co., Re,* 2014 ONSC 5811 at para. 11 (Tab 21, JA BOA); *Babcock & Wilcox Canada Ltd., Re* (2000), 18 C.B.R. (4th) 157 at paras. 8 and 9 (Ont. S.C.J.) (Tab 22, JA BOA); *Lear Canada, Re* (2009), 55 C.B.R. (5th) 57 at para. 11 (Ont. S.C.J.) (Tab 23, JA BOA); *Tucker v. Aero Inventory (U.K.) Ltd.* (2009), A.C.W.S. (3d) 443 at paras. 15 and 19 (Ont. S.C.J.) [*Tucker*] (Tab 24, JA BOA).
[45] *Holt Cargo Systems Inc. v. ABC Containerline N.V. (Trustee of),* 2001 SCC 90 at para. 79 (Tab 25, JA BOA).
[46] *Olympia & York Developments Ltd., Re* (1996), 29 O.R. (3d) 626 at para. 19 (Ct. J. (Gen. Div.)) (Tab 26, JA BOA).
[47] *Tucker, supra* note 44 at paras. 15 and 19 (Tab 24, JA BOA).
[48] *Cavell Insurance Co., Re* (2006), 80 O.R. (3d) 500 at para. 48 (C.A.) (Tab 27, JA BOA).

Wales, will commence its respective company voluntary arrangement ("CVA"), similar to a plan

of reorganization in U.S. bankruptcy practice, which will be promulgated pursuant to the

*Insolvency Act 1986*.  The proof process contained in the CVAs will take place in England, subject

to supervision of the English Court, and will be substantially similar to NNUK's proof process.  In

particular, creditors and shareholders will have the right to challenge claims in a form substantially

similar to the NNUK proof process.

76.      Both the NNUK proof processes and the CVA process will be conducted in accordance

with English law by the Joint Administrators.  Creditors and shareholders of the EMEA entities

will have the opportunity to review and contest the allowance or rejection of any proof of claim as

noted above.  Disputes will be heard by the English Court in a full evidentiary hearing.[49]  The

claims allowed through each EMEA estate's claims process will be reported to this Court and the

Canadian Court to be used in calculating each EMEA estate's respective allocation under the

modified *pro rata* approach.

77.      That the formal proof processes have not yet begun is a result of the statutory regime

applicable to the individual EMEA proceedings, not any delay by the Joint Administrators.  Under

English law, a formal proof of claim process may not begin until the estate publicly notifies

creditors that a distribution is available to be made.  Now that allocation decisions have been

rendered by the Courts, providing a framework for funding the EMEA estates, the Joint

Administrators are taking steps to apply to the English Court for permission to commence

NNUK's proof process and will take all necessary steps to prepare the CVA process.

---

[49] The CVA process may also afford creditors the right to have relatively small claims determined either by expert
review or formal arbitration, at a creditor's option, which the Joint Administrators anticipate would be conducted by a
retired English Court judge.

78.    Although the formal proof of claim processes have not yet begun, the Joint Administrators have made every effort to resolve many claims on a preliminary basis while the allocation proceedings were pending.  In 2010, the English Court approved the Joint Administrators to conduct an initial review process for a large number of trading claims.[50]  Through this informal process, the Joint Administrators reviewed claims and notified creditors of their intention to either reject or allow the claims upon the commencement of the formal claims processes.  Therefore, when the formal processes begin, the Joint Administrators will quickly be able to approve or disallow, as appropriate, a large number of claims.

79.    Because the individual EMEA proceedings are overseen by a sister common law jurisdiction, and because the EMEA proof processes mirror the processes that have already occurred in Canada and the United States in these proceedings, there is no basis for concluding that the EMEA proceedings must be "policed" by this Court.  There is no basis for "clarifying" the Decision to eschew longstanding principles of international comity and recognition of the legitimacy and reliability of English proceedings.

80.    Further, the U.S. Debtors have failed to point to a single reason – because none exists – that would counsel the Court to abandon for the English Court the bedrock principles of cooperation and respect for sister jurisdictions it has so successfully embraced in dealings with the U.S. Court. The U.S. Debtors' unbalanced and singular focus on the EMEA proceedings in this regard betrays the self-serving nature of their request for "clarification."

---

[50] *See* TR50310, Joint Administrators' Progress Report to Creditors at page 9 (Feb. 6, 2014).

b.    The UKPC's Claim Will Be Determined Pursuant to Statutory
       Guidelines and Subject to Comprehensive Review

81.    Just as they have no basis for asking the Court to "police" the individual EMEA

proceedings, the U.S. Debtors have no basis for suggesting that the Joint Administrators of NNUK

would allow a UKPC claim that is "inflated."  Because the NNUK's formal claims process has not

yet begun, the UKPC's claim has not been reviewed by the Joint Administrators or the English

Court.  Once initiated, the NNUK's claims process will ensure that, to the extent any inflation

exists in this (or any) claim, it will be identified and disallowed.

82.    Under English law, the UKPC's claim against NNUK constitutes a debt under section 75 of

the *Pensions Act 2004*.  This is a statutorily recognized debt related to the deficit in NNUK's

pension fund that was automatically recorded when NNUK entered insolvency.[51]  Pursuant to

statutory requirements, the debt must be certified by an actuary before it is submitted as a proof of

claim in the administration.[52]  To date, the UKPC's claim has been certified and notified to the

Joint Administrators, but has not been submitted as a formal proof of claim because and only

because NNUK's formal claims process has not yet begun.

83.    As soon as NNUK's formal claims process begins, the Joint Administrators of NNUK will

assess this claim in their capacity as court officers and in accordance with clear statutory rules for

recognizing section 75 debts under the *Pensions Act 2004*.  The Joint Administrators will only

allow the UKPC's claim to the extent it conforms with those statutory requirements.  The Joint

---

[51] *See* Objection of the Trustee of Nortel Networks UK Pension Plan and the Board of the Pension Protection Fund to
Debtors' Motion for Entry of an Order Enforcing the Automatic Stay Against Certain Claimants with Respect to the
U.K. Pension Proceedings at para. 25 ftn.7, Feb. 24, 2010.  In this case, the size of the debt is directly attributable to the
fact that there were at least 36,000 Nortel employees affected by shortfalls in NNUK's pension scheme at the petition
date.  *See* Allocation Post-Trial Brief of Nortel Networks UK Pension Trust Limited and the Board of the Pension
Protection Fund at para. 1, Aug. 7, 2014.  Recognizing the full and legitimate value of the UKPC's claim for allocation
purposes, whatever that value is determined to be after full review in the formal EMEA claims process, will ensure that
the "pawns" in this cross-jurisdictional chess match are adequately and fairly compensated.
[52] *See* Declaration of Richard Hitchcock in Support of Debtors' Motion for Entry of an Order to Enforce the Automatic
Stay Against Certain Claimants with Respect to the U.K. Pension Proceedings at para. 27, Feb. 18, 2010.

Administrators will likely seek the prompt assistance of expert legal counsel to ensure compliance with section 75's requirements.  NNUK's other creditors have every opportunity, pursuant to the procedures described above, to object to the UKPC's claim and seek judicial intervention if there is any concern that it is inflated.

84.      The section 75 claim against NNUK is directly analogous to the claims that have been asserted by the Pension Benefit Guarantee Corporation ("PBGC") against NNI.[53]  The PBGC files a proof of claim in a bankruptcy to recover unfunded benefit liabilities.[54]  Like claims under section 75, the PBGC's claims for unfunded benefit liabilities are calculated pursuant to statutes and regulations.  Per section 4062(b) of *Employee Retirement Income Security Act, 1974*, the PBGC is entitled to recover "the total amount of the unfunded benefit liabilities (as of the termination date) to all participants and beneficiaries under the plan, together with interest (at a reasonable rate) calculated from the termination date in accordance with regulations prescribed by [the PBGC]."[55]  Much like the section 75 process in the UK, the valuation of unfunded benefit liabilities requires a complex actuarial analysis of the plan, applying methods and assumptions pursuant to PBGC regulations.[56]  The valuation must accord with generally accepted actuarial principles and practices.[57]

---

[53] *See* PBGC Am. Proof of Claim Against NNI *et al.* (July 7, 2014) [Claim 8760] (amends Claim 4738); PBGC Am. Proof of Claim Against NNI *et al.* (July 7, 2014) [Claim 8761] (amends Claim 4736); PBGC Am. Proof of Claim Against NNI *et al.* (July 7, 2014) [Claim 8762] (amends Claim 4737); PBGC Am. Proof of Claim Against NNI *et al.* (July 7, 2014) [Claim 8763] (amends Claim 4735).

[54] *See* Order Approving Stipulation Regarding Filing of Claims by Pension Benefit Guarantee Corporation With the Pension Benefit Guarantee Corporation Ex. 1 at paras. D–E (Sept. 24, 2009).

[55] *Employee Retirement Income Security Act, 1974* § 4062(b), 29 U.S.C.A. § 1362(b)(1)(A) (Tab 28, JA BOA).

[56] *See* 29 C.F.R. § 4044.41 (Tab 29, JA BOA) ("The plan administrator of a plan that has been or will be placed into trusteeship by the PBGC shall value plan benefits in accordance with §§ 4044.51 through 4044.57."); 29 C.F.R. §§ 4044.51–4044.57 and Appendices A to D to Part 4044 (Tab 30, JA BOA) (assumptions include, for example, those for benefit starting date, form of payment, expected retirement age, and mortality).

[57] 29 C.F.R. § 4044.52(c) (Tab 30, JA BOA).

85.    The section 75 claim is distinct from the FSD process.  FSDs are more analogous to claims that the PBGC could assert in order to impose "controlled group" liability on members of a corporate group other than the employer entity.  Similar to the FSD process, under ERISA, the contributing sponsor and each control group member are jointly and severally liable to the PBGC for the plan's unfunded benefit liabilities.[58]  Pursuant to the Decision, the Joint Administrators understand that the FSDs are to be excluded from the calculation of allowed claims for allocation purposes (paras. 252 and 258).

86.    The U.S. Debtors' accusations that claim inflation is inevitable in NNUK's proceedings due to the fact that the Joint Administrators will privately agree to inflate the UKPC's claim and that they lack the same incentive as the U.S. and Canadian Debtors to ensure fair measurement of that claim, are insulting and absurd.  The Joint Administrators are officers of the English Court, appointed by the English Court to administer each of the separate EMEA estates, with duties to act in good faith, with candour, and in accordance with applicable law in their fiduciary roles with respect to each EMEA entity.[59]  The Joint Administrators are no different from a court-appointed officer in Canada in this regard.

87.    If the Joint Administrators were to allow an artificially inflated UKPC claim against NNUK, they would not only directly violate English law and their obligations to the English Court, but they would also prejudice all other NNUK creditors.  The U.S. Debtors' allegation that, in essence, the Joint Administrators will abandon their duties in order to manipulate the allocation

---

[58] 29 U.S.C.A. § 1362(a) (Tab 28, JA BOA) *See also* Order Approving Stipulation Regarding Filing of Claims by Pension Benefit Guarantee Corporation With the Pension Benefit Guarantee Corporation Ex. 1 at paras. D–E (Sept. 24, 2009); PBGC Am. Proof of Claim Against NNI *et al.* (July 7, 2014) [Claim 8763] (amends Claim 4735); Statement of the Pension Benefit Guarantee Corporation in Support of its Amended Claim for Unfunded Benefit Liabilities at paras. 5, 8, Sept. 24, 2009.

[59] *See, e.g.*, Verified Petition for Recognition of Foreign Proceedings Pursuant to Chapter 15 of the United States Bankruptcy Code, Ex. A, *In re Nortel Networks U.K. Ltd.*, No. 09-11972 (Bankr. D. Del. Jun. 8, 2009) (initial order of the English Court dated Jan. 14, 2009) (Tab 31, JA BOA).

process and defraud the courts and creditors, is not only baseless, it is offensive.  As said above, this relief is not necessary and therefore this "clarification" should be dismissed.

### C.    Clarification Is Unnecessary that the Value of Settlements of Pre-Petition Debt Will Be Counted for Allocation Purposes

88.    Similar to their other requests for clarification, the U.S. Debtors' request for the Court to clarify that claims settlements will be counted for allocation purposes is unnecessary and redundant.  The Decision clearly provides that the Court's modified *pro rata* approach allows claims regarding settlements of claims (paras. 248-249).  No clarification is necessary – the actual dollar value of settlements in respect of pre-prepition debts entered into by any of the Nortel debtors, whether NNI, a debtor in Canada, or a debtor in EMEA, will be included for purposes of allocation.[60]

### D.    Clarification is Unnecessary that Reserved and Estimated Claims Arising Pre-Petition Will Be Included for Allocation Purposes

89.    The U.S. Debtors also seek clarification that they are entitled to receive an allocation on account of reserved or estimated claims that arise from allocation itself (*e.g.*, tax claims on sale proceeds).  Although the Joint Administrators generally agree that some mechanism is appropriate to estimate and reserve so that unresolved pre-petition claims do not hold up the allocation process, this should be addressed in due course as the process for calculating and making the allocation is put in place.  However, reserving and allocating proceeds based on post-petition liabilities, as the

---

[60] Although the Court clearly stated that the Nortel debtors should not be penalized for successfully resolving claims via settlement, the value of settled claims that are counted for allocation purposes must not relate to post-petition expenses for estate administration.  Section 541 of the Bankruptcy Code provides that property of a debtor's estate is comprised of "all legal or equitable interests of the debtor in property **as of the commencement of the case**."  11 U.S.C.A. § 541  (Tab 32, JA BOA) [emphasis added].  Further, this dispute concerns the allocation of proceeds from asset sales governed by the IFSA, and it would be illogical to assert that any debtor's entitlement to proceeds should be impacted by claims arising after those proceeds were realized.  Thus, settlement values should be counted for allocation purposes only to the extent that they address obligations that had accrued as of the petition date, whether or not the post-petition settlement of these pre-petition obligations granted any administrative priority.

U.S. Debtors suggest, would be inappropriate and inconsistent with the approach to allocation adopted by the Court.  The U.S. Debtors' request should therefore be denied.

90.     The issue of reserved and estimated claims, which pertains to the specific procedures and timing of each debtor's claims process, was one of many issues that was clearly too granular for the Court to address in the context of its Decision on the appropriate allocation methodology. Instead, the Court made clear that it was laying the framework for its approach, and it ordered the parties to submit additional papers to iron out the specifics of how the Court's approach would be implemented in each estate.  There is no need to clarify the Court's Decision since this issue can be addressed by the debtors in making these submissions.

91.     Further, the U.S. Debtors' specific proposal to reserve for tax claims and other post-petition liabilities the U.S. Debtors may incur, is just another improper attempt to obtain a larger allocation from the lockbox.  The expenses of estate administration, such as legal fees and post-petition taxes, should not be considered claims for purposes of allocation.  The U.S. Debtors have no basis for attempting to expand their claims base by requesting that the Court "clarify" an issue that is not even addressed in the Decision.[61]

> ### E.     Particular Settlements, Intercompany Claims and Reserves Should Be Subject To Review By The Courts In The Event Of Any *Bona Fide* Dispute

92.     While the EMEA Debtors do not believe that clarification is necessary with respect to the general principles applicable to the treatment of settlements, intercompany claims within geographical groups, and reserves as part of the claims base for allocation purposes, these

---

[61] If, however, the Court concludes that reserved and estimated post-petition claims should be included in the calculation of NNI's allowed claims base for allocation purposes, this must be the case for all debtors.  NNI is not unique in incurring post-petition liabilities.  For example, certain EMEA Debtors, including NNUK, may also incur significant tax liability based on allocation under the *pro rata* model.

categories of claims should be subject to review by the Courts in the same manner as other forms of claim. In the event any debtor raises a *bona fide* dispute about the amount of any particular such claim, or whether the inclusion of such claim as part of the claims base for allocation purposes is consistent with the principles of the modified *pro rata* methodology proposed by the courts, the Courts can address it in the ordinary course.

## PART V - ORDER REQUESTED

93.    For the foregoing reasons, the Joint Administrators respectfully request that the Court (i) deny the Motions, and (ii) grant such other and further relief as the Court deems just and proper.

**ALL OF WHICH IS RESPECTFULLY SUBMITTED** this 12th day of June, 2015.

_____
Matthew P. Gottlieb

_____
Matthew Milne-Smith

**LAX O'SULLIVAN SCOTT LISUS LLP**
Counsel
Suite 2750, 145 King Street West
Toronto, ON  M5H 1J8

**Matthew P. Gottlieb**  LSUC#: 32268B
Email:  mgottlieb@counsel-toronto.com
Tel:    (416) 598-1744
Fax:    (416) 598-3730

**DAVIES WARD PHILLIPS & VINEBERG LLP**
155 Wellington Street West
Toronto, ON  M5V 3J7

**Matthew Milne-Smith** LSUC#: 44266P
Email:  mmilne-smith@dwpv.com
Tel:    (416) 863-0900
Fax:    (416) 863-0871

Lawyers for the Joint Administrators

## SCHEDULE "A"

## LIST OF AUTHORITIES

1.  *671122 Ontario Ltd. v. Sagaz Industries Canada Inc.*, [2001] 2 S.C.R. 983

2.  *Montague v. Bank of Nova Scotia* (2004), 69 O.R. (3d) 87 (C.A.), leave to appeal ref'd [2004] S.C.C.A. No. 79

3.  *Mujagic v. Kamps*, 2015 ONCA 360

4.  *First Elgin Mills Development Inc. v. Romandale Farms Ltd.*, 2015 ONCA 54

5.  *Holmes Foundry Ltd. v. Village of Point Edward*, [1963] 2 O.R. 404 (C.A.)

6.  *Carmen Alfano Family Trust v. Piersanti*, 2014 ONSC 60

7.  *Carey v. Laiken*, 2015 SCC 17

8.  *Bimman v. Neiman*, 2015 ONSC 3076

9.  *Schmuck v. Reynolds-Schmuck* (2000), 46 O.R. (3d) 702 (S.C.J.)

10. *Shaw Satellite G.P. v. Pieckenhagen*, 2011 ONSC 5968

11. *Mishev v. Shah*, 2011 ONSC 3134

12. *Jourdain v. Ontario* (2009), 177 A.C.W.S. (3d) 488 (Ont. Div. Ct.)

13. *Brown (Trustee of) v. The Municipal Property Assessment Corp., Region 14*, 2014 ONSC 7137 (Div. Ct.)

14. *Stradiotto v. BMO Nesbitt Burns et. al.*, 2015 ONSC 461

15. *National Trust Co. v. Saks* (1995), A.C.W.S. (3d) 567 (Ont. Ct. J. (Gen. Div.))

16. *Bremness v. McGee Capital Mangement Ltd.*, 1999 CarswellOnt 2866 (C.A.)

17. *Hawkes v. Levelton Holdings Ltd.*, 2012 BCSC 1968

18. *Farm Credit Canada v. Beaumont (Trustee of)*, 2012 NSSC 378

19. *Elan Pharma Int'l Ltd. v. Abraxis Bioscience, Inc.*, No. 06-438 GMS, 2007 WL 6382930 (D. Del. Dec. 17, 2007)

2

20.      *Beals v. Saldanha*, 2003 SCC 72

21.      *MtGox Co., Re*, 2014 ONSC 5811

22.      *Babcock & Wilcox Canada Ltd., Re* (2000), 18 C.B.R. (4th) 157 (Ont. S.C.J.)

23.      *Lear Canada, Re* (2009), 55 C.B.R. (5th) 57 (Ont. S.C.J.)

24.      *Tucker v. Aero Inventory (U.K.) Ltd.* (2009), A.C.W.S. (3d) 443 (Ont. S.C.J.)

25.      *Holt Cargo Systems Inc. v. ABC Containerline N.V. (Trustee of)*, 2001 SCC 90

26.      *Olympia & York Developments Ltd., Re* (1996), 29 O.R. (3d) 626 (Ct. J. (Gen. Div.))

27.      *Cavell Insurance Co., Re* (2006), 80 O.R. (3d) 500 (C.A.)

28.      *Verified Petition for Recognition of Foreign Proceeds Pursuant to Chapter 15 of the United Statues Bankruptcy Code, In re Nortel Networks U.K. Ltd.*, No. 09-11972 (Bankr. D. Del. Jun. 8, 2009)

## SCHEDULE "B"

## TEXT OF STATUTES, REGULATIONS & BY - LAWS

### 29 U.S.C.A. § 1362
### § 1362. Liability for termination of single-employer plans under a distress termination or a termination by corporation
### Effective: December 16, 2014

**(a) In general**

In any case in which a single-employer plan is terminated in a distress termination under section 1341(c) of this title or a termination otherwise instituted by the corporation under section 1342 of this title, any person who is, on the termination date, a contributing sponsor of the plan or a member of such a contributing sponsor's controlled group shall incur liability under this section. The liability under this section of all such persons shall be joint and several. The liability under this section consists of--

**(1)** liability to the corporation, to the extent provided in subsection (b) of this section, and

**(2)** liability to the trustee appointed under subsection (b) or (c) of section 1342 of this title, to the extent provided in subsection
**(c)** of this section.

**(b) Liability to corporation**

**(1) Amount of liability**

**(A) In general**

Except as provided in subparagraph (B), the liability to the corporation of a person described in subsection (a) of this section shall be the total amount of the unfunded benefit liabilities (as of the termination date) to all participants and beneficiaries under the plan, together with interest (at a reasonable rate) calculated from the termination date in accordance with regulations prescribed by the corporation.

**(B) Special rule in case of subsequent insufficiency**

For purposes of subparagraph (A), in any case described in section 1341(c)(3)(C)(ii) of this title, actuarial present values shall be determined as of the date of the notice to the corporation (or the finding by the corporation) described in such section.

**(2) Payment of liability**

**(A) In general**

Except as provided in subparagraph (B), the liability to the corporation under this subsection shall be due and payable to the corporation as of the termination date, in cash or securities acceptable to the corporation.

**(B) Special rule**

Payment of so much of the liability under paragraph (1)(A) as exceeds 30 percent of the collective net worth of all persons described in subsection (a) of this section (including interest) shall be made under commercially reasonable terms prescribed by the corporation. The parties involved shall make a reasonable effort to reach agreement on such commercially reasonable terms. Any such terms prescribed by the corporation shall provide for deferral of 50 percent of any amount of liability otherwise payable for any year under this subparagraph if a person subject to such liability demonstrates to the satisfaction of the corporation that no person subject to such liability has any individual pre-tax profits for such person's fiscal year ending during such year.

**(3) Alternative arrangements**

The corporation and any person liable under this section may agree to alternative arrangements for the satisfaction of liability to the corporation under this subsection.

**(c) Liability to section 1342 trustee**

A person described in subsection (a) of this section shall be subject to liability under this subsection to the trustee appointed under subsection (b) or (c) of section 1342 of this title. The liability of such person under this subsection shall consist of—

**(1)** the sum of the shortfall amortization charge (within the meaning of section 1083(c)(1) of this title and 430(d)(1) 1 of Title 26) with respect to the plan (if any) for the plan year in which the termination date occurs, plus the aggregate total of shortfall amortization installments (if any) determined for succeeding plan years under section 1083(c)(2) of this title and section 430(d)(2) of such Title 26 (which, for purposes of this subparagraph, shall include any increase in such sum which would result if all applications for waivers of the minimum funding standard under section 1082(c) of this title and section 412(c) of such Title 26 which are pending with respect to such plan were denied and if no additional contributions (other than those already made by the termination date) were made for the plan year in which the termination date occurs or for any previous plan year), and

**(2)** the sum of the waiver amortization charge (within the meaning of section 1083(e)(1) of this title and 430(e)(1) of Title 26) with respect to the plan (if any) for the plan year in which the termination date occurs, plus the aggregate total of waiver amortization installments (if any) determined for succeeding plan years under section 1083(e)(2) of this title and section 430(e)(2) of such Title 26,

together with interest (at a reasonable rate) calculated from the termination date in accordance with regulations prescribed by the corporation. The liability under this subsection shall be due and payable to such trustee as of the termination date, in cash or securities acceptable to such trustee.

**(d) Definitions**

**(1) Collective net worth of persons subject to liability**

**(A) In general**

The collective net worth of persons subject to liability in connection with a plan termination consists of the sum of the individual net worths of all persons who—

**(i)** have individual net worths which are greater than zero, and

**(ii)** are (as of the termination date) contributing sponsors of the terminated plan or members of their controlled groups.

**(B) Determination of net worth**

For purposes of this paragraph, the net worth of a person is—

**(i)** determined on whatever basis best reflects, in the determination of the corporation, the current status of the person's operations and prospects at the time chosen for determining the net worth of the person, and

**(ii)** increased by the amount of any transfers of assets made by the person which are determined by the corporation to be improper under the circumstances, including any such transfers which would be inappropriate under Title 11 if the person were a debtor in a case under chapter 7 of such title.

**(C) Timing of determination**

For purposes of this paragraph, determinations of net worth shall be made as of a day chosen by the corporation (during the 120-day period ending with the termination date) and shall be computed without regard to any liability under this section.

**(2) Pre-tax profits**

The term "pre-tax profits" means--

**(A)** except as provided in subparagraph (B), for any fiscal year of any person, such person's consolidated net income (excluding any extraordinary charges to income and including any extraordinary credits to income) for such fiscal year, as shown on audited financial statements prepared in accordance with generally accepted accounting principles, or

4

**(B)** for any fiscal year of an organization described in section 501(c) of Title 26, the excess of income over expenses (as such terms are defined for such organizations under generally accepted accounting principles), before provision for or deduction of Federal or other income tax, any contribution to any single-employer plan of which such person is a contributing sponsor at any time during the period beginning on the termination date and ending with the end of such fiscal year, and any amounts required to be paid for such fiscal year under this section. The corporation may by regulation require such information to be filed on such forms as may be necessary to determine the existence and amount of such pre-tax profits.

## (e) Treatment of substantial cessation of operations

### (1) General rule

Except as provided in paragraphs (3) and (4), if there is a substantial cessation of operations at a facility in any location, the employer shall be treated with respect to any single employer plan established and maintained by the employer covering participants at such facility as if the employer were a substantial employer under a plan under which more than one employer makes contributions and the provisions of sections 1363, 1364, and 1365 of this title shall apply.

### (2) Substantial cessation of operations

For purposes of this subsection:

#### (A) In general

The term "substantial cessation of operations" means a permanent cessation of operations at a facility which results in a workforce reduction of a number of eligible employees at the facility equivalent to more than 15 percent of the number of all eligible employees of the employer, determined immediately before the earlier of—

> **(i)** the date of the employer's decision to implement such cessation, or

> **(ii)** in the case of a workforce reduction which includes 1 or more eligible employees described in paragraph (6)(B), the earliest date on which any such eligible employee was separated from employment.

#### (B) Workforce reduction

Subject to subparagraphs (C) and (D), the term "workforce reduction" means the number of eligible employees at a facility who are separated from employment by reason of the permanent cessation of operations of the employer at the facility.

#### (C) Relocation of workforce

An eligible employee separated from employment at a facility shall not be taken into account in computing a workforce reduction if, within a reasonable period of time, the employee is replaced by the employer, at the same or another facility located in the United States, by an employee who is a citizen or resident of the United States.

**(D) Dispositions**

If, whether by reason of a sale or other disposition of the assets or stock of a contributing sponsor (or any member of the same controlled group as such a sponsor) of the plan relating to operations at a facility or otherwise, an employer (the 'transferee employer') other than the employer which experiences the substantial cessation of operations (the 'transferor employer') conducts any portion of such operations, then—

> **(i)** an eligible employee separated from employment with the transferor employer at the facility shall not be taken into account in computing a workforce reduction if—
>
> > **(I)** within a reasonable period of time, the employee is replaced by the transferee employer by an employee who is a citizen or resident of the United States; and
> >
> > **(II)** in the case of an eligible employee who is a participant in a single employer plan maintained by the transferor employer, the transferee employer, within a reasonable period of time, maintains a single employer plan which includes the assets and liabilities attributable to the accrued benefit of the eligible employee at the time of separation from employment with the transferor employer; and

**(ii)** an eligible employee who continues to be employed at the facility by the transferee employer shall not be taken into account in computing a workforce reduction if--

> **(I)** the eligible employee is not a participant in a single employer plan maintained by the transferor employer, or
>
> **(II)** in any other case, the transferee employer, within a reasonable period of time, maintains a single employer plan which includes the assets and liabilities attributable to the accrued benefit of the eligible employee at the time of separation from employment with the transferor employer.

**(3) Exemption for plans with limited underfunding**

6

Paragraph (1) shall not apply with respect to a single employer plan if, for the plan year preceding the plan year in which the cessation occurred—

> **(A)** there were fewer than 100 participants with accrued benefits under the plan as of the valuation date of the plan for the plan year (as determined under section 1083(g)(2) of this title); or

> **(B)** the ratio of the market value of the assets of the plan to the funding target of the plan for the plan year was 90 percent or greater.

**(4) Election to make additional contributions to satisfy liability**

> **(A) In general**

> An employer may elect to satisfy the employer's liability with respect to a plan by reason of paragraph (1) by making additional contributions to the plan in the amount determined under subparagraph (B) for each plan year in the 7-plan year period beginning with the plan year in which the cessation occurred. Any such additional contribution for a plan year shall be in addition to any minimum required contribution under section 1083 of this title for such plan year and shall be paid not later than the earlier of--

> > **(i)** the due date for the minimum required contribution for such year under section section 1083(j) of this title; or

> > **(ii)** in the case of the first such contribution, the date that is 1 year after the date on which the employer notifies the Corporation of the substantial cessation of operations or the date the Corporation determines a substantial cessation of operations has occurred, and in the case of subsequent contributions, the same date in each succeeding year.

> **(B) Amount determined**

> > **(i) In general**
> > Except as provided in clause (iii), the amount determined under this subparagraph with respect to each plan year in the 7-plan-year period is the product of--

> > > **(I)** 1 /7 of the unfunded vested benefits determined under section 1306(a)(3)(E) of this title as of the valuation date of the plan (as determined under section 1083(g)(2) of this title) for the plan year preceding the plan year in which the cessation occurred; and

> > > **(II)** the reduction fraction.

> > **(ii) Reduction fraction**

For purposes of clause (i), the reduction fraction of a single employer plan is equal to—

**(I)** the number of participants with accrued benefits in the plan who were included in computing the workforce reduction under paragraph (2)(B) as a result of the cessation of operations at the facility; divided by

**(II)** the number of eligible employees of the employer who are participants with accrued benefits in the plan, determined as of the same date the determination under paragraph (2)(A) is made.

**(iii) Limitation**

The additional contribution under this subparagraph for any plan year shall not exceed the excess, if any, of—

**(I)** 25 percent of the difference between the market value of the assets of the plan and the funding target of the plan for the preceding plan year; over

**(II)** the minimum required contribution under section 1083 of this title for the plan year.

**(C) Permitted cessation of annual installments when plan becomes sufficiently funded**

An employer's obligation to make additional contributions under this paragraph shall not apply to—

**(i)** the first plan year (beginning on or after the first day of the plan year in which the cessation occurs) for which the ratio of the market value of the assets of the plan to the funding target of the plan for the plan year is 90 percent or greater, or

**(ii)** any plan year following such first plan year.

**(D) Coordination with funding waivers**

**(i) In general**

If the Secretary of the Treasury issues a funding waiver under section 1082(c) of this title with respect to the plan for a plan year in the 7-plan-year period under subparagraph (A), the additional contribution with respect to such plan year shall be permanently waived.

**(ii) Notice**

An employer maintaining a plan with respect to which such a funding waiver has been issued or a request for such a funding waiver is pending shall provide notice to

the Secretary of the Treasury, in such form and at such time as the Secretary of the Treasury shall provide, of a cessation of operations to which paragraph (1) applies.

**(E) Enforcement**

**(i) Notice**

An employer making the election under this paragraph shall provide notice to the Corporation, in accordance with rules prescribed by the Corporation, of--

    **(I)** such election, not later than 30 days after the earlier of the date the employer notifies the Corporation of the substantial cessation of operations or the date the Corporation determines a substantial cessation of operations has occurred;

    **(II)** the payment of each additional contribution, not later than 10 days after such payment;

    **(III)** any failure to pay the additional contribution in the full amount for any year in the 7-plan-year period, not later than 10 days after the due date for such payment;

    **(IV)** the waiver under subparagraph (D)(i) of the obligation to make an additional contribution for any year, not later than 30 days after the funding waiver described in such subparagraph is granted; and

    **(V)** the cessation of any obligation to make additional contributions under subparagraph (C), not later than 10 days after the due date for payment of the additional contribution for the first plan year to which such cessation applies.

**(ii) Acceleration of liability to the plan for failure to pay**

If an employer fails to pay the additional contribution in the full amount for any year in the 7-plan-year period by the due date for such payment, the employer shall, as of such date, be liable to the plan in an amount equal to the balance which remains unpaid as of such date of the aggregate amount of additional contributions required to be paid by the employer during such 7-year-plan period. The Corporation may waive or settle the liability described in the preceding sentence, at the discretion of the Corporation.

**(iii) Civil action**

The Corporation may bring a civil action in the district courts of the United States in accordance with section 1303(e) of this title to compel an employer making such election to pay the additional contributions required under this paragraph.

**(5) Definitions**

For purposes of this subsection:

**(A) Eligible employee**

The term "eligible employee" means an employee who is eligible to participate in an employee pension benefit plan (as defined in section 1002(2) of this title) established and maintained by the employer.

**(B) Funding target**

The term "funding target" means, with respect to any plan year, the funding target as determined under section 1306(a) (3)(E)(iii)(I) of this title for purposes of determining the premium paid to the Corporation under section 1307 of this title for the plan year.

**(C) Market value**

The market value of the assets of a plan shall be determined in the same manner as for purposes of section 1306(a)(3) (E) of this title.

**(6) Special rules**

**(A) Change in operation of certain facilities and property**

For purposes of paragraphs (1) and (2), an employer shall not be treated as ceasing operations at a qualified lodging facility (as defined in section 856(d)(9)(D) of Title 26) if such operations are continued by an eligible independent contractor (as defined in section 856(d)(9)(A) of Title 26) pursuant to an agreement with the employer.

**(B) Aggregation of prior separations**

The workforce reduction under paragraph (2) with respect to any cessation of operations shall be determined by taking into account any separation from employment of any eligible employee at the facility (other than a separation which is not taken into account as workforce reduction by reason of subparagraph (C) or (D) of paragraph (2)) which—

**(i)** is related to the permanent cessation of operations of the employer at the facility, and

**(ii)** occurs during the 3-year period preceding such cessation.

**(C) No addition to prefunding balance**

For purposes of section 303(f)(6)(B) and section 430(f)(6)(B) of Title 26, any additional contribution made under paragraph (4) shall be treated in the same manner as a contribution an employer is required to make in order to avoid a benefit reduction under

10

paragraph (1), (2), or (4) of section 1056(g) of this title or subsection (b), (c), or (e) of section 436 of Title 26 for the plan year.

**11 U.S.C.A. § 541**
**§ 541. Property of the estate**
**Effective: December 19, 2014**

**(a)** The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

> **(1)** Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

> **(2)** All interests of the debtor and the debtor's spouse in community property as of the commencement of the case that is—

>> **(A)** under the sole, equal, or joint management and control of the debtor; or

>> **(B)** liable for an allowable claim against the debtor, or for both an allowable claim against the debtor and an allowable claim against the debtor's spouse, to the extent that such interest is so liable.

> **(3)** Any interest in property that the trustee recovers under section 329(b), 363(n), 543, 550, 553, or 723 of this title.

> **(4)** Any interest in property preserved for the benefit of or ordered transferred to the estate under section 510(c) or 551 of this title.

> **(5)** Any interest in property that would have been property of the estate if such interest had been an interest of the debtor on the date of the filing of the petition, and that the debtor acquires or becomes entitled to acquire within 180 days after such date—

>> **(A)** by bequest, devise, or inheritance;

>> **(B)** as a result of a property settlement agreement with the debtor's spouse, or of an interlocutory or final divorce decree; or

>> **(C)** as a beneficiary of a life insurance policy or of a death benefit plan.

> **(6)** Proceeds, product, offspring, rents, or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case.

> **(7)** Any interest in property that the estate acquires after the commencement of the case.

**(b)** Property of the estate does not include—

> **(1)** any power that the debtor may exercise solely for the benefit of an entity other than the debtor;

**(2)** any interest of the debtor as a lessee under a lease of nonresidential real property that has terminated at the expiration of the stated term of such lease before the commencement of the case under this title, and ceases to include any interest of the debtor as a lessee under a lease of nonresidential real property that has terminated at the expiration of the stated term of such lease during the case;

**(3)** any eligibility of the debtor to participate in programs authorized under the Higher Education Act of 1965 (20 U.S.C. 1001 et seq.; 42 U.S.C. 2751 et seq.), or any accreditation status or State licensure of the debtor as an educational institution;

**(4)** any interest of the debtor in liquid or gaseous hydrocarbons to the extent that—

> **(A)(i)** the debtor has transferred or has agreed to transfer such interest pursuant to a farmout agreement or any written agreement directly related to a farmout agreement; and

> **(ii)** but for the operation of this paragraph, the estate could include the interest referred to in clause (i) only by virtue of section 365 or 544(a)(3) of this title; or

> **(B)(i)** the debtor has transferred such interest pursuant to a written conveyance of a production payment to an entity that does not participate in the operation of the property from which such production payment is transferred; and

> **(ii)** but for the operation of this paragraph, the estate could include the interest referred to in clause (i) only by virtue of section 365 or 542 of this title;

**(5)** funds placed in an education individual retirement account (as defined in section 530(b)(1) of the Internal Revenue Code of 1986) not later than 365 days before the date of the filing of the petition in a case under this title, but—

> **(A)** only if the designated beneficiary of such account was a child, stepchild, grandchild, or stepgrandchild of the debtor for the taxable year for which funds were placed in such account;

> **(B)** only to the extent that such funds—

>> **(i)** are not pledged or promised to any entity in connection with any extension of credit; and

>> **(ii)** are not excess contributions (as described in section 4973(e) of the Internal Revenue Code of 1986); and

> **(C)** in the case of funds placed in all such accounts having the same designated beneficiary not earlier than 720 days nor later than 365 days before such date, only so much of such funds as does not exceed $6,225;

**(6)** funds used to purchase a tuition credit or certificate or contributed to an account in accordance with section 529(b)(1)(A) of the Internal Revenue Code of 1986 under a qualified State tuition program (as defined in section 529(b)(1) of such Code) not later than 365 days before the date of the filing of the petition in a case under this title, but—

> **(A)** only if the designated beneficiary of the amounts paid or contributed to such tuition program was a child, stepchild, grandchild, or stepgrandchild of the debtor for the taxable year for which funds were paid or contributed;

> **(B)** with respect to the aggregate amount paid or contributed to such program having the same designated beneficiary, only so much of such amount as does not exceed the total contributions permitted under section 529(b)(6) of such Code with respect to such beneficiary, as adjusted beginning on the date of the filing of the petition in a case under this title by the annual increase or decrease (rounded to the nearest tenth of 1 percent) in the education expenditure category of the Consumer Price Index prepared by the Department of Labor; and

> **(C)** in the case of funds paid or contributed to such program having the same designated beneficiary not earlier than 720 days nor later than 365 days before such date, only so much of such funds as does not exceed $6,225;

**(7)** any amount—

> **(A)** withheld by an employer from the wages of employees for payment as contributions--

>> **(i)** to—

>>> **(I)** an employee benefit plan that is subject to title I of the Employee Retirement Income Security Act of 1974 or under an employee benefit plan which is a governmental plan under section 414(d) of the Internal Revenue Code of 1986;

>>> **(II)** a deferred compensation plan under section 457 of the Internal Revenue Code of 1986; or

>>> **(III)** a tax-deferred annuity under section 403(b) of the Internal Revenue Code of 1986; except that such amount under this subparagraph shall not constitute disposable income as defined in section 1325(b)(2); or § 541. Property of the estate, 11 USCA § 541

>> **(ii)** to a health insurance plan regulated by State law whether or not subject to such title; or

> **(B)** received by an employer from employees for payment as contributions—

        **(i)** to--

                **(I)** an employee benefit plan that is subject to title I of the Employee Retirement Income Security Act of 1974 or under an employee benefit plan which is a governmental plan under section 414(d) of the Internal Revenue Code of 1986;

                **(II)** a deferred compensation plan under section 457 of the Internal Revenue Code of 1986; or

                **(III)** a tax-deferred annuity under section 403(b) of the Internal Revenue Code of 1986; except that such amount under this subparagraph shall not constitute disposable income, as defined in section 1325(b)(2); or

        **(ii)** to a health insurance plan regulated by State law whether or not subject to such title;

**(8)** subject to subchapter III of chapter 5, any interest of the debtor in property where the debtor pledged or sold tangible personal property (other than securities or written or printed evidences of indebtedness or title) as collateral for a loan or advance of money given by a person licensed under law to make such loans or advances, where--

        **(A)** the tangible personal property is in the possession of the pledgee or transferee;

        **(B)** the debtor has no obligation to repay the money, redeem the collateral, or buy back the property at a stipulated price; and

        **(C)** neither the debtor nor the trustee have exercised any right to redeem provided under the contract or State law, in a timely manner as provided under State law and section 108(b);

**(9)** any interest in cash or cash equivalents that constitute proceeds of a sale by the debtor of a money order that is made--

        **(A)** on or after the date that is 14 days prior to the date on which the petition is filed; and

        **(B)** under an agreement with a money order issuer that prohibits the commingling of such proceeds with property of the
debtor (notwithstanding that, contrary to the agreement, the proceeds may have been commingled with property of the debtor), unless the money order issuer had not taken action, prior to the filing of the petition, to require compliance with the prohibition; or § 541. Property of the estate, 11 USCA § 541

**(10)** funds placed in an account of a qualified ABLE program (as defined in section 529A(b) of the Internal Revenue Code of 1986) not later than 365 days before the date of the filing of the petition in a case under this title, but—

> **(A)** only if the designated beneficiary of such account was a child, stepchild, grandchild, or stepgrandchild of the debtor for the taxable year for which funds were placed in such account;

> **(B)** only to the extent that such funds--

>> **(i)** are not pledged or promised to any entity in connection with any extension of credit; and

>> **(ii)** are not excess contributions (as described in section 4973(h) of the Internal Revenue Code of 1986); and

> **(C)** in the case of funds placed in all such accounts having the same designated beneficiary not earlier than 720 days nor later than 365 days before such date, only so much of such funds as does not exceed $6,225. Paragraph (4) shall not be construed to exclude from the estate any consideration the debtor retains, receives, or is entitled to receive for transferring an interest in liquid or gaseous hydrocarbons pursuant to a farmout agreement.

**(c)(1)** Except as provided in paragraph (2) of this subsection, an interest of the debtor in property becomes property of the estate under subsection (a)(1), (a)(2), or (a)(5) of this section notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law--

> **(A)** that restricts or conditions transfer of such interest by the debtor; or

> **(B)** that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title, or on the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement, and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

**(2)** A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title.

**(d)** Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

16

**(e)** In determining whether any of the relationships specified in paragraph (5)(A) or (6)(A) of subsection (b) exists, a legally adopted child of an individual (and a child who is a member of an individual's household, if placed with such individual by an authorized placement agency for legal adoption by such individual), or a foster child of an individual (if such child has as the child's principal place of abode the home of the debtor and is a member of the debtor's household) shall be treated as a child of such individual by blood.

**(f)** Notwithstanding any other provision of this title, property that is held by a debtor that is a corporation described in section 501(c)(3) of the Internal Revenue Code of 1986 and exempt from tax under section 501(a) of such Code may be transferred to an entity that is not such a corporation, but only under the same conditions as would apply if the debtor had not filed a case under this title.

**29 C.F.R. § 4044.41**
**§ 4044.41 General valuation rules.**
**Effective: July 14, 2011**

**(a)** Valuation of benefits—

> **(1)** Trusteed plans. The plan administrator of a plan that has been or will be placed into trusteeship by the PBGC shall value plan benefits in accordance with §§ 4044.51 through 4044.57.

> **(2)** Non-trusteed plans. The plan administrator of a non-trusteed plan shall value plan benefits in accordance with §§ 4044.71 through 4044.75. If a plan is unable to satisfy all benefits assigned to priority categories 1 through 4 on the distribution date, the PBGC will place it into trusteeship and the plan administrator shall re-value the benefits in accordance with §§ 4044.51 through 4044.57.

**(b)** Valuation of assets. Plan assets shall be valued at their fair market value, based on the method of valuation that most accurately reflects such fair market value.

## 29 C.F.R. § 4044.51
## § 4044.51 Benefits to be valued.

 **(a)** Form of benefit. The plan administrator shall determine the form of each benefit to be valued in accordance with the following rules:

**(1)** If a benefit is in pay status as of the valuation date, the plan administrator shall value the form of the benefit being paid.

**(2)** If a benefit is not in pay status as of the valuation date but a valid election with respect to the form of benefit has been made on or before the valuation date, the plan administrator shall value the form of benefit so elected.

**(3)** If a benefit is not in pay status as of the valuation date and no valid election with respect to the form of benefit has been made on or before the valuation date, the plan administrator shall value the form of benefit that, under the terms of the plan, is payable in the absence of a valid election.

**(b)** Timing of benefit. The plan administrator shall value benefits whose starting date is subject to election using the assumption specified in paragraph (b)(1) or (b)(2) of this section.

**(1)** Where election made. If a valid election of the starting date of a benefit has been made on or before the valuation date, the plan administrator shall assume that the starting date of the benefit is the starting date so elected.

**(2)** Where no election made. If no valid election of the starting date of a benefit has been made on or before the valuation date, the plan administrator shall assume that the starting date of the benefit is the later of—

**(i)** The expected retirement age, as determined under §§ 4044.55 through 4044.57, of the participant with respect to whom the benefit is payable, or

**(ii)** The valuation date.

**29 C.F.R. § 4044.52**
**§ 4044.52 Valuation of benefits.**
**Effective: January 1, 2006**

The plan administrator shall value all benefits as of the valuation date by—

**(a)** Using the mortality assumptions prescribed by § 4044.53 and the interest assumptions prescribed in appendix B to this part;

**(b)** Using interpolation methods, where necessary, at least as accurate as linear interpolation;

**(c)** Using valuation formulas that accord with generally accepted actuarial principles and practices; and

**(d)** Adjusting the values to reflect loading expenses in accordance with appendix C to this part.

20

**29 C.F.R. § 4044.53**
**§ 4044.53 Mortality assumptions.**
**Effective: January 1, 2006**

**(a)** General rule. Subject to paragraph (b) of this section (regarding certain death benefits), the plan administrator shall use the mortality factors prescribed in paragraphs (c), (d), (e), (f), and (g) of this section to value benefits under § 4044.52.

**(b)** Certain death benefits. If an annuity for one person is in pay status on the valuation date, and if the payment of a death benefit after the valuation date to another person, who need not be identifiable on the valuation date, depends in whole or in part on the death of the pay status annuitant, then the plan administrator shall value the death benefit using—

   **(1)** The mortality rates that are applicable to the annuity in pay status under this section to represent the mortality of the pay status annuitant; and

   **(2)** The mortality rates under paragraph (c) of this section to represent the mortality of the death beneficiary.

**(c)** Healthy lives. If the individual is not disabled under paragraph (f) of this section, the plan administrator will value the benefit using—

   **(1)** For male participants, the rates in Table 1 of Appendix A to this part projected from 1994 to the calendar year in which the valuation date occurs plus 10 years using Scale AA from Table 2 of Appendix A to this part; and

   **(2)** For female participants, the rates in Table 3 of Appendix A to this part projected from 1994 to the calendar year in which the valuation date occurs plus 10 years using Scale AA from Table 4 of Appendix A to this part.

**(d)** Social Security disabled lives. If the individual is Social Security disabled under paragraph (f)(1) of this section, the plan administrator will value the benefit using—

   **(1)** For male participants, the rates in Table 5 of Appendix A to this part; and

   **(2)** For female participants, the rates in Table 6 of Appendix A to this part.

**(e)** Non–Social Security disabled lives. If the individual is non–Social Security disabled under paragraph (f)(2) of this section, the plan administrator will value the benefit at each age using—

   **(1)** For male participants, the lesser of—

      **(i)** The rate determined from Table 1 of Appendix A to this part projected from 1994 to the calendar year in which the valuation date occurs plus 10 years using Scale AA from Table 2 of Appendix A to this part and setting the resulting table forward three years, or

(**ii**) The rate in Table 5 of Appendix A to this part.

(**2**) For female participants, the lesser of—

(**i**) The rate determined from Table 3 of Appendix A to this part projected from 1994 to the calendar year in which the valuation date occurs plus 10 years using Scale AA from Table 4 of Appendix A to this part and setting the resulting table forward three years, or

(**ii**) The rate in Table 6 of Appendix A to this part.

(**f**) Definitions of disability.

(**1**) Social Security disabled. A participant is Social Security disabled if, on the valuation date, the participant is less than age 65 and has a benefit in pay status that—

(**i**) Is being received as a disability benefit under a plan provision requiring either receipt of or eligibility for Social Security disability benefits, or

(**ii**) Was converted under the plan's terms from a disability benefit under a plan provision requiring either receipt of or eligibility for Social Security disability benefits to an early or normal retirement benefit for any reason other than a change in the participant's health status.

(**2**) Non–Social Security disabled. A participant is non–Social Security disabled if, on the valuation date, the participant is less than age 65, is not Social Security disabled, and has a benefit in pay status that—

(**i**) Is being received as a disability benefit under the plan, or

(**ii**) Was converted under the plan's terms from a disability benefit to an early or normal retirement benefit for any reason other than a change in the participant's health status.

(**g**) Contingent annuitant mortality during deferral period. If a participant's joint and survivor benefit is valued as a deferred annuity, the mortality of the contingent annuitant during the deferral period will be disregarded.

22

**29 C.F.R. § 4044.54**
**§ 4044.54 [Reserved]**

**29 C.F.R. § 4044.55**
**§ 4044.55 XRA when a participant must retire to receive a benefit.**


**(a)** Applicability. Except as provided in § 4044.57, the plan administrator shall determine the XRA under this section when plan provisions or established plan practice require a participant to retire from his or her job to begin receiving an early retirement benefit.

**(b)** Data needed. The plan administrator shall determine for each participant who is entitled to an early retirement benefit—

    **(1)** The amount of the participant's monthly benefit payable at unreduced retirement age in the normal form payable under the terms of the plan or in the form validly elected by the participant before the termination date;

    **(2)** The calendar year in which the participant reaches unreduced retirement age ("URA");

    **(3)** The participant's URA; and

    **(4)** The participant's earliest retirement age at the valuation date.

**(c)** Procedure.

    **(1)** The plan administrator shall determine whether a participant is in the high, medium or low retirement rate category using the applicable Selection of Retirement Rate Category Table in appendix D, based on the participant's benefit determined under paragraph (b)(1) of this section and the year in which the participant reaches URA.

    **(2)** Based on the retirement rate category determined under paragraph (c)(1), the plan administrator shall determine the XRA from Table II–A, II–B or II–C, as appropriate, by using the participant's URA and earliest retirement age at valuation date.

24

**29 C.F.R. § 4044.56**
**§ 4044.56 XRA when a participant need not retire to receive a benefit.**

**(a)** Applicability. Except as provided in § 4044.57, the plan administrator shall determine the XRA under this section when plan provisions or established plan practice do not require a participant to retire from his or her job to begin receiving his or her early retirement benefit.

**(b)** Data needed. The plan administrator shall determine for each participant—

    **(1)** The participant's URA; and

    **(2)** The participant's earliest retirement age at valuation date.

**(c)** Procedure. Participants in this case are always assigned to the high retirement rate category and therefore the plan administrator shall use Table II–C of appendix D to determine the XRA. The plan administrator shall determine the XRA from Table II–C by using the participant's URA and earliest retirement age at termination date.

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, et al.

Court File No. 09-CL-7950

|  |  |
|---|---|
|  | ***ONTARIO***<br>**SUPERIOR COURT OF JUSTICE**<br>**COMMERCIAL LIST**<br>PROCEEDING COMMENCED AT<br>TORONTO |
|  | **FACTUM OF THE JOINT ADMINISTRATORS**<br>**TO THE MOTIONS FOR RECONSIDERATION AND**<br>**CLARIFICATION** |
|  | **LAX O'SULLIVAN SCOTT LISUS LLP**<br>Counsel<br>Suite 2750, 145 King Street West<br>Toronto, ON  M5H 1J8<br><br>**Matthew P. Gottlieb**  LSUC#: 32268B<br>Email:  mgottlieb@counsel-toronto.com<br>Tel:      (416) 598-1744<br>Fax:      (416) 598-3730<br><br>**DAVIES WARD PHILLIPS & VINEBERG LLP**<br>155 Wellington Street West<br>Toronto, ON  M5V 3J7<br><br>**Matthew Milne-Smith**  LSUC#: 44266P<br>Email:  mmilne-smith@dwpv.com<br>Tel:      (416) 863-0900<br>Fax:      (416) 863-0871<br><br>Lawyers for the Joint Administrators |