# EXHIBIT B

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. c-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS
LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL
NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT
ACT*, R.S.C. 1985, c. C-36, AS AMENDED

**BRIEF OF AUTHORITIES OF THE JOINT ADMINISTRATORS
TO THE MOTIONS FOR RECONSIDERATION AND CLARIFICATION**

June 12, 2015

**LAX O'SULLIVAN SCOTT LISUS LLP**
Counsel
Suite 2750, 145 King Street West
Toronto, ON  M5H 1J8
**Matthew P. Gottlieb**  LSUC#: 32268B
Email:  mgottlieb@counsel-toronto.com
Tel:     (416) 598-1744
Fax:     (416) 598-3730

**DAVIES WARD PHILLIPS & VINEBERG LLP**
155 Wellington Street West
Toronto, ON  M5V 3J7
**Matthew Milne-Smith**  LSUC#: 44266P
Email:  mmilne-smith@dwpv.com
Tel:     (416) 863-0900
Fax:     (416) 863-0871

Lawyers for the Joint Administrators

2

TO:          SERVICE LIST

# INDEX

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. c-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS
LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL
NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT
ACT*, R.S.C. 1985, c. C-36, AS AMENDED

**TABLE OF CONTENTS**

| Tab | Case Citation |
|-----|---------------|
| 1. | *671122 Ontario Ltd. v. Sagaz Industries Canada Inc.*, [2001] 2 S.C.R. 983 |
| 2. | *Montague v. Bank of Nova Scotia* (2004), 69 O.R. (3d) 87 (C.A.), leave to appeal ref'd [2004] S.C.C.A. No. 79 |
| 3. | *Mujagic v. Kamps*, 2015 ONCA 360 |
| 4. | *First Elgin Mills Development Inc. v. Romandale Farms Ltd.*, 2015 ONCA 54 |
| 5. | *Holmes Foundry Ltd. v. Village of Point Edward*, [1963] 2 O.R. 404 (C.A.) |
| 6. | *Carmen Alfano Family Trust v. Piersanti*, 2014 ONSC 60 |
| 7. | *Carey v. Laiken*, 2015 SCC 17 |
| 8. | *Bimman v. Neiman*, 2015 ONSC 3076 |
| 9. | *Schmuck v. Reynolds-Schmuck* (2000), 46 O.R. (3d) 702 (S.C.J.) |

| 10. | *Shaw Satellite G.P. v. Pieckenhagen*, 2011 ONSC 5968 |
| 11. | *Mishev v. Shah*, 2011 ONSC 3134 |
| 12. | *Jourdain v. Ontario* (2009), 177 A.C.W.S. (3d) 488 (Ont. Div. Ct.) |
| 13. | *Brown (Trustee of) v. The Municipal Property Assessment Corp., Region 14*, 2014 ONSC 7137 (Div. Ct.) |
| 14. | *Stradiotto v. BMO Nesbitt Burns et. al.*, 2015 ONSC 461 |
| 15. | *National Trust Co. v. Saks* (1995), A.C.W.S. (3d) 567 (Ont. Ct. J. (Gen. Div.)) |
| 16. | *Bremness v. McGee Capital Mangement Ltd.*, 1999 CarswellOnt 2866 (C.A.) |
| 17. | *Hawkes v. Levelton Holdings Ltd.*, 2012 BCSC 1968 |
| 18. | *Farm Credit Canada v. Beaumont (Trustee of)*, 2012 NSSC 378 |
| 19. | *Elan Pharma Int'l Ltd. v. Abraxis Bioscience, Inc.*, No. 06-438 GMS, 2007 WL 6382930 (D. Del. Dec. 17, 2007) |
| 20. | *Beals v. Saldanha*, 2003 SCC 72 |
| 21. | *MtGox Co., Re*, 2014 ONSC 5811 |
| 22. | *Babcock & Wilcox Canada Ltd., Re* (2000), 18 C.B.R. (4th) 157 (Ont. S.C.J.) |
| 23. | *Lear Canada, Re* (2009), 55 C.B.R. (5th) 57 (Ont. S.C.J.) |
| 24. | *Tucker v. Aero Inventory (U.K.) Ltd.* (2009), A.C.W.S. (3d) 443 (Ont. S.C.J.) |
| 25. | *Holt Cargo Systems Inc. v. ABC Containerline N.V. (Trustee of)*, 2001 SCC 90 |
| 26. | *Olympia & York Developments Ltd., Re* (1996), 29 O.R. (3d) 626 (Ct. J. (Gen. Div.)) |
| 27. | *Cavell Insurance Co., Re* (2006), 80 O.R. (3d) 500 (C.A.) |
| 28. | *Employee Retirement Income Security Act, 1974*, 29 U.S.C.A. § 1362 |
| 29. | General valuation rules, 29 C.F.R. § 4044.41 |
| 30. | Valuation of Benefits and Assets Trusteed Plans, 29 C.F.R. §§ 4044.51 – 4044.57 |

| 31. | Verified Petition for Recognition of Foreign Proceeds Pursuant to Chapter 15 of the United Statues Bankruptcy Code, *In re Nortel Networks U.K. Ltd.*, No. 09-11972 (Bankr. D. Del. Jun. 8, 2009) |
|-----|---|
| 32. | Property of the estate, 11 U.S.C.A. § 541 |

# Tab 1

2001 SCC 59, 2001 CSC 59
Supreme Court of Canada

671122 Ontario Ltd. v. Sagaz Industries Canada Inc.

2001 CarswellOnt 3357, 2001 CarswellOnt 3358, 2001 SCC 59, 2001 CSC 59, [2001] 2 S.C.R. 983, [2001] 4
C.T.C. 139, [2001] S.C.J. No. 61, 108 A.C.W.S. (3d) 300, 11 C.C.E.L. (3d) 1, 12 C.P.C. (5th) 1, 150 O.A.C. 12,
17 B.L.R. (3d) 1, 2002 C.L.L.C. 210-013, 204 D.L.R. (4th) 542, 274 N.R. 366, 55 O.R. (3d) 782 (headnote
only), 55 O.R. (3d) 782 (note), 55 O.R. (3d) 782, 8 C.C.L.T. (3d) 60, J.E. 2001-1832, REJB 2001-25875

## Sagaz Industries Canada Inc., Sagaz Industries Inc. and Joseph Kavana, Appellants v. 671122 Ontario Limited, formerly Design Dynamics Limited, Respondent

McLachlin C.J.C., Iacobucci, Major, Bastarache, Binnie, Arbour, Lebel JJ.

Heard: June 19, 2001
Judgment: September 28, 2001 *
Docket: 27820

Proceedings: reversing (2000), 48 C.C.L.T. (2d) 79 (Ont. C.A.); which reversed in part (1998), 42 C.C.L.T. (2d) 50 (Ont. Gen.
Div.); and reversed (1998), CarswellOnt 3933 (Ont. Gen. Div.); which was additional reasons to (1998), CarswellOnt 3933
(Ont. Gen. Div.); and reversed (1998), CarswellOnt 5010 (Ont. Gen. Div.); which was further additional reasons to (1998),
CarswellOnt 5010 (Ont. Gen. Div.)

Counsel: *H. Lorne Morphy, Q.C.* , *John B. Laskin* , *M. Paul Michell* , for Appellants.
*Martin Teplitsky, Q.C.* , *James M. Wortzman* , for Respondent.

Subject: Employment; Corporate and Commercial; Torts; Public; Civil Practice and Procedure; Income Tax (Federal)

Headnote

**Employment law --- Nature of employment relationship — Relationships distinct from employment relationship
— Independent contractor — General**

No single conclusive test exists to determine whether worker is employee or independent contractor — Relevant factors
include whether worker provides own equipment, degree of risk and responsibility borne by worker and worker's
opportunity for profit in enterprise — Marketing consultant which is separately incorporated, maintains separate offices
and remains free to pursue other business is more likely to be independent contractor than employee.

**Employment law --- Relationship to third parties — Liability of employer for acts of employee — Torts — Wilful
acts — General**

No single conclusive test exists to determine whether worker is employee or independent contractor, such that employer
should be vicariously liable for worker's intentional tort — Relevant factors include whether worker provides own
equipment, degree of risk and responsibility borne by worker and worker's opportunity for profit in enterprise — Marketing
consultant which is separately incorporated, maintains separate offices and remains free to pursue other business is more
likely to be independent contractor than employee.

**Practice --- Trials — New trial — Grounds for granting — Discovery of evidence**

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 10 of 342

671122 Ontario Ltd. v. Sagaz Industries Canada Inc., 2001 SCC 59, 2001 CSC 59,...

2001 SCC 59, 2001 CSC 59, 2001 CarswellOnt 3357, 2001 CarswellOnt 3358...

Inappropriate to interfere with trial judge's exercise of discretion to refuse to reopen trial on basis of fresh evidence, absent clear error of law — Fact that witness who is source of fresh evidence is not presumptively credible is proper consideration for trial judge in determining whether new evidence would probably affect verdict.

### Droit du travail individuel --- Nature du lien d'emploi — Liens distincts du lien d'emploi — Entrepreneur indépendant — En général

Il n'existe aucun critère concluant permettant de déterminer si un travailleur est un employé ou un entrepreneur indépendant — Facteurs pertinents incluent le fait que le travailleur fournit son propre équipement, le degré de risque et de responsabilité supporté par le travailleur et la possibilité pour le travailleur de réaliser des profits — Il est plus probable qu'un consultant en marketing, qui est constitué séparément, qui a un bureau séparé et demeure libre de rechercher d'autres affaires, soit un entrepreneur indépendant plutôt qu'un employé.

### Droit du travail individuel --- Relation vis-à-vis des tiers — Responsabilité de l'employeur pour les actions de l'employé — Délits civils — Actions délibérées — En général

Il n'existe aucun critère concluant pouvant permettre de déterminer si le travailleur est un employé ou un entrepreneur indépendant et que l'employeur devrait être tenu responsable du fait d'autrui pour le délit civil intentionel du travailleur — Facteurs pertinents incluent le fait que le travailleur fournit son propre équipement, le degré de risque et de responsabilité supporté par le travailleur et la possibilité pour le travailleur de réaliser des profits — Il est plus probable qu'un consultant en marketing, qui est constitué séparément, qui a un bureau séparé et demeure libre de rechercher d'autres affaires, soit un entrepreneur indépendant plutôt qu'un employé.

### Procédure --- Procès — Nouveau procès — Motifs pour l'accorder — Découverte d'une preuve

En l'absence d'une erreur de droit claire, il est inapproprié d'intervenir dans l'exercice du pouvoir discrétionnaire du juge de première instance, lequel a refusé de rouvrir le débat en raison d'une nouvelle preuve — Fait que le témoin d'où provient la nouvelle preuve ne peut être présumé crédible constitue un élément approprié sur lequel le juge de première instance peut se fonder pour déterminer si la nouvelle preuve aurait probablement un effet sur le verdict.

The respondent, D Ltd., was in the business of manufacturing synthetic sheepskin car seat covers. D Ltd. had supplied goods to a major retail chain for many years when it was advised in 1984 that it was being replaced by the appellant supplier, S Inc. When D Ltd. learned that its termination had come about as a result of a "kickback" scheme involving an employee of the retail chain, it brought an action against the supplier, the supplier's marketing consultant, AIM Inc., and the principals of the two companies, alleging civil conspiracy. The action was allowed against AIM Inc. and its principal, L, but dismissed as against S Inc. and its principal, K.

Following release of the trial judge's reasons for judgment but prior to formal entry of the judgment, D Ltd. brought a motion to have the trial reopened on the basis of fresh evidence. The fresh evidence took the form of an affidavit newly supplied by L, who had not testified at trial. L's new evidence purported to implicate K in the bribery scheme. In additional reasons, the trial judge dismissed the motion, holding that while the new evidence may have changed the verdict at trial, it could not be said that it probably would have done so. Furthermore, the so-called fresh evidence could have been obtained before trial with the exercise of reasonable diligence.

D Ltd. and L appealed. The Court of Appeal determined that S Inc. was vicariously liable to D Ltd. as the employer of AIM Inc. The court also ordered a new trial with respect to the issue of K's liability, on the basis that the trial judge erred in refusing to reopen the trial to hear L's evidence.

S Inc. appealed to the Supreme Court of Canada.

**Held:** The appeal was allowed

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

The Court of Appeal erred in holding S Inc. vicariously liable to D Ltd. AIM Inc. was not an employee of S Inc., but an independent contractor for whose acts S Inc. could not be held liable in law.

The policy considerations which gave rise to the doctrine of vicarious liability did not support the imposition of liability in the circumstances of this case. Vicarious liablilty exists to provide a just and practical remedy for those injured as a consequence of wrongs perpetrated by an employee, and as a means of deterring future harm by imposing responsibility on those likely to be in a position to reduce accidents and intentional torts by their employees. The latter consideration required that an employer, to be held responsible, should exercise a certain element of control over the direct tortfeasor, but control could not form the determinative factor. No one conclusive test exists which can be applied to determine whether a person is an employee or an independent contractor. Various considerations which have traditionally been identified as relevant remain so, including whether the worker provides his own equipment or hires his own helpers, the degree of financial risk borne by the worker, the degree of responsibility for investment and management held by the worker, and the worker's opportunity for profit in the performance of his or her tasks. A synthesis of the various considerations gave rise to the general question "is the person performing the services performing them as a person in business on his own account?" Ultimately, what must always occur is a search for the total relationship of the parties.

The facts in this case clearly indicated that AIM Inc. was an independent contractor, rather than an employee of S Inc. The two companies were separate legal entities with their own offices in different locations. AIM Inc. was required, pursuant to the agreement between the parties, to pay all its own costs of conducting business, but remained free to carry on other activities and to represent other, non-competing suppliers. Those factors which appeared to contravene the finding of independent contractor status — including the designation by AIM Inc. of the retail chain as a "house account" and the fact that L wrote one letter to the retail chain on S Inc.'s letterhead — were not sufficient to show that AIM Inc. formed part of S Inc.'s in house sales team. It appeared that the retail chain's preference for dealing directly with suppliers, rather than through sales agents, had been the catalyst for these particular facts.

The contention that AIM Inc. was an agent of S Inc. such that the latter should be liable for the economic tort committed by AIM Inc. in the scope and course of its authority was untenable. Absent evidence to the contrary, it could not be presumed that the scope of AIM Inc.'s authority was sufficiently broad as to include the use of unlawful means. The trial judge's finding that the principal of S Inc. was not aware of the bribery served to confirm this. Since the payment of the bribe exceeded AIM Inc.'s actual and apparent authority as representative of S Inc., no basis for imposing liability was established.

The Court of Appeal also erred in reversing the trial judge's exercise of discretion to refuse to reopen the trial. It is well established that appellate courts, in the absence of an error of law, should defer to the trial judge, who is in the best position to decide whether fairness requires that a trial be reopened. In this case, the trial judge concluded that the new evidence may have altered the result at trial, but determined that it could not be said that it probably would have done so. The new evidence originated with L, who was, in the circumstances, akin to a "recanting liar." L was therefore not presumptively credible and the trial judge dealt correctly with his affidavit evidence.

L'intimée, D ltée, était un manufacturier de housses de sièges d'auto en peau de mouton synthétique. D ltée fournissait depuis plusieurs années des marchandises à une importante chaîne de magasins lorsqu'elle a été informée, en 1984, qu'elle serait remplacée par le fournisseur appelant, S inc. Lorsque D ltée a appris que l'annulation de son contrat était due à un système de pots-de-vin dans lequel était impliqué un employé de la chaîne de magasins, elle a intenté une action à l'encontre du fournisseur, du consultant en marketing du fournisseur, AIM inc., et des directeurs des deux compagnies. Elle alléguait un complot civil. L'action a été accueillie à l'égard d'AIM inc. et de son directeur, mais rejetée à l'égard de S inc. et de son directeur, K.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

À la suite du dépôt de ses motifs par le juge de première instance, mais avant l'inscription du dispositif du jugement, D ltée a présenté une requête en vue d'obtenir la réouverture du procès sous prétexte de l'existence d'un nouvel élément de preuve. Celui-ci était constitué d'un affidavit nouvellement fourni par L, qui n'avait pas témoigné lors du procès. La nouvelle preuve provenant de L semblait impliquer K dans le système de pots-de-vin. Dans des motifs supplémentaires, le juge de première instance a rejeté la requête au motif que, bien que le nouvel élément de preuve eût pu changer le verdict du procès, il ne pouvait être dit que cela l'aurait probablement fait. De plus, ce supposé nouvel élément de preuve aurait pu être obtenu avant le procès si on avait fait preuve de diligence raisonnable.

D ltée et L ont interjeté appel. La Cour d'appel a statué que S inc. était responsable du fait d'autrui à l'égard de D ltée à titre d'employeur d'AIM inc. La Cour a aussi ordonné la tenue d'un nouveau procès relativement à la question de la responsabilité de K au motif que le juge de première instance avait commis une erreur lorsqu'il a refusé de rouvrir le débat afin d'entendre le témoignage de L.

S inc. a interjeté appel à la Cour suprême du Canada.

**Arrêt:** Le pourvoi a été accueilli.

La Cour d'appel a commis une erreur lorsqu'elle a tenu S inc. responsable du fait d'autrui à l'égard de D ltée AIM inc. n'était pas un employé de S inc. mais plutôt un entrepreneur indépendant, et S inc. ne pouvait être tenue juridiquement responsable de ses actions.

Les considérations de politique générale qui ont donné lieu à la doctrine de la responsabilité du fait d'autrui ne justifiaient pas l'imputation de la responsabilité en l'espèce. La responsabilité du fait d'autrui existe afin de fournir un recours juste et pratique à ceux qui ont subi des dommages en raison des mauvaises actions commises par un employé; elle existe à titre de moyen de dissuasion de commettre un autre préjudice en imputant une responsabilité à ceux qui sont probablement en situation de pouvoir réduire les accidents et délits civils intentionnels commis par leurs employés. Cette dernière considération exigeait que, pour tenir un employeur responsable, celui-ci devait avoir un certain élément de contrôle à l'égard de l'auteur du délit civil, mais ce contrôle ne pouvait constituer le facteur déterminant. Dans les faits, il n'existe aucun critère concluant pouvant être appliqué afin de déterminer si une personne est un employé ou un entrepreneur indépendant. Plusieurs considérations qui ont traditionnellement été identifiées comme étant pertinentes le demeurent, dont la question de savoir si le travailleur fournit son propre équipement ou s'il embauche ses propres assistants, le degré de risque financier supporté par le travailleur, le degré de responsabilité qu'a le travailleur à l'égard des investissements et de la gestion et la possibilité pour le travailleur de faire des profits grâce à l'exécution de ses tâches. La synthèse des différentes considérations a donné lieu à la question générale de savoir si la personne exécutant les services les exécute à titre de personne étant en affaires à son compte. Finalement, il doit toujours y avoir un examen de la relation complète entre les parties.

Les faits en l'espèce indiquaient clairement que AIM inc. était un entrepreneur indépendant plutôt qu'un employé de S inc. Les deux compagnies constituaient deux entités juridiques distinctes, avec des bureaux dans des lieux différents. Conformément à l'entente entre les parties, AIM inc. devait payer tous ses coûts d'exploitation et elle demeurait libre de faire d'autres affaires et de représenter d'autres fournisseurs qui n'étaient pas des concurrents. Les facteurs qui semblaient contrevenir à la conclusion de statut d'entrepreneur indépendant, dont la description de AIM inc. que le compte de la chaîne de magasins était un « compte hors commission » et le fait que L avait écrit une lettre sur du papier à l'en-tête de la chaîne de magasins, étaient insuffisants pour permettre de démontrer que AIM inc. constituait une partie de l'équipe de vente de S inc. Il est apparu que la préférence de la chaîne de magasins à traiter directement avec les fournisseurs plutôt qu'avec des représentants commerciaux avait été le catalyseur de ces faits particuliers.

La prétention que AIM inc. était un représentant de S inc., à un point tel que cette dernière devait être tenue responsable pour le délit civil économique commis par AIM inc. dans le cadre de son autorité, ne pouvait être soutenue. En l'absence

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 13 of 342

671122 Ontario Ltd. v. Sagaz Industries Canada Inc., 2001 SCC 59, 2001 CSC 59,...

2001 SCC 59, 2001 CSC 59, 2001 CarswellOnt 3357, 2001 CarswellOnt 3358...

de preuve contraire, on ne pouvait présumer que l'étendue de l'autorité de AIM inc. était suffisamment large pour inclure l'usage de moyens illégaux. La conclusion du juge de première instance selon laquelle le directeur de S inc. n'était pas au courant des pots-de-vin donnés le confirmait. Même si le paiement des pots-de-vin excédait l'autorité réelle et apparente détenue par AIM inc. à titre de représentant de S inc., il n'a été démontré aucun motif pouvant justifier d'imposer une responsabilité.

La Cour d'appel a aussi commis une erreur lorsqu'elle a infirmé la décision du juge de première refusant de rouvrir le débat. Il a été bien établi qu'en l'absence d'une erreur de droit, les tribunaux d'appel devraient s'en remettre au juge de première instance, lequel est en meilleure position pour décider si l'équité exige la réouverture du débat. En l'espèce, le juge a conclu que le nouvel élément de preuve aurait pu modifier le résultat du procès, mais a conclu qu'on ne pouvait dire que cela l'aurait probablement fait. Le nouvel élément de preuve provenait de L, lequel était équivalent à un « menteur qui se rétracte ». L n'était donc pas présumément crédible, et le juge de première instance a eu raison de traiter l'affidavit comme il l'a fait.

## Table of Authorities

### Cases considered by *Major J.* :

*B. (P.A.) v. Curry, (sub nom. B. v. Curry)* 99 C.L.L.C. 210-033, 43 C.C.E.L. (2d) 1, 62 B.C.L.R. (3d) 173, *(sub nom. P.A.B. v. Children's Foundation)* 124 B.C.A.C. 119, *(sub nom. P.A.B. v. Children's Foundation)* 203 W.A.C. 119, *(sub nom. P.A.B. v. Children's Foundation)* 241 N.R. 266, 174 D.L.R. (4th) 45, [1999] 8 W.W.R. 197, [1999] L.V.I. 3046-1, 46 C.C.L.T. (2d) 1, [1999] 2 S.C.R. 534 (S.C.C.) — considered

*Clayton v. British American Securities Ltd.*, [1934] 3 W.W.R. 257, [1935] 1 D.L.R. 432, 49 B.C.R. 28 (B.C. C.A.) — considered

*Co-operators Insurance Assn. v. Kearney* (1964), [1965] S.C.R. 106, 48 D.L.R. (2d) 1 (S.C.C.) — considered

*Hamstra (Guardian ad litem of) v. British Columbia Rugby Union*, 145 D.L.R. (4th) 193, *(sub nom. Hamstra v. British Columbia Rugby Union)* 211 N.R. 89, *(sub nom. Hamstra v. British Columbia Rugby Union)* 89 B.C.A.C. 161, *(sub nom. Hamstra v. British Columbia Rugby Union)* 145 W.A.C. 161, *(sub nom. British Columbia Rugby Union v. Hamstra)* [1997] I.L.R. I-3439, [1997] 1 S.C.R. 1092, 35 C.C.L.T. (2d) 1, 34 B.C.L.R. (3d) 10, [1997] 7 W.W.R. 92, 9 C.P.C. (4th) 1 (S.C.C.) — considered

*Hôpital Notre-Dame de l'Espérance c. Laurent* (1977), *(sub nom. Laurent v. Theoret)* [1978] 1 S.C.R. 605, 17 N.R. 593, 3 C.C.L.T. 109 (S.C.C.) — referred to

*Ladd v. Marshall*, [1954] 1 W.L.R. 1489, [1954] 3 All E.R. 745 (Eng. C.A.) — followed

*London Drugs Ltd. v. Kuehne & Nagel International Ltd.* (1992), [1993] 1 W.W.R. 1, [1992] 3 S.C.R. 299, *(sub nom. London Drugs Ltd. v. Brassart)* 143 N.R. 1, 73 B.C.L.R. (2d) 1, 43 C.C.E.L. 1, 13 C.C.L.T. (2d) 1, *(sub nom. London Drugs Ltd. v. Brassart)* 18 B.C.A.C. 1, *(sub nom. London Drugs Ltd. v. Brassart)* 31 W.A.C. 1, 97 D.L.R. (4th) 261 (S.C.C.) — considered

*Market Investigations v. Minister of Social Security* (1968), [1969] 2 Q.B. 173, [1968] 3 All E.R. 732 (Eng. Q.B.) — followed

*Mayer v. J. Conrad Lavigne Ltd.* (1979), 27 O.R. (2d) 129, 105 D.L.R. (3d) 734 (Ont. C.A.) — referred to

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 14 of 342

671122 Ontario Ltd. v. Sagaz Industries Canada Inc., 2001 SCC 59, 2001 CSC 59,...

2001 SCC 59, 2001 CSC 59, 2001 CarswellOnt 3357, 2001 CarswellOnt 3358...

*Montreal (City) v. Montreal Locomotive Works Ltd.*, [1946] 3 W.W.R. 748, [1947] 1 D.L.R. 161 (Canada P.C.) — followed

*R. v. Walker* (1858), 169 E.R. 1136, Dears. & Bell 600, 27 L.J.M.C. 207 — referred to

*Sang v. Chi-Keung*, [1990] 2 A.C. 374 (Hong Kong P.C.) — considered

*Scott v. Cook*, [1970] 2 O.R. 769, 12 D.L.R. (3d) 113 (Ont. H.C.) — followed

*Stephenson, Jordan & Harrison Ltd. v. MacDonald & Evans*, [1952] 1 T.L.R. 101, 69 R.P.C. 10 (Eng. C.A.) — considered

*T. (G.) v. Griffiths, (sub nom. J. v. Griffiths)* 99 C.L.L.C. 210-034, *(sub nom. G.T.-J. v. Griffiths)* 241 N.R. 201, 174 D.L.R. (4th) 71, 124 B.C.A.C. 161, 203 W.A.C. 161, 63 B.C.L.R. (3d) 1, [1999] L.V.I. 3046-2, [1999] 9 W.W.R. 1, 46 C.C.L.T. (2d) 49, 44 C.C.E.L. (2d) 169, [1999] 2 S.C.R. 570 (S.C.C.) — referred to

*Wiebe Door Services Ltd. v. Minister of National Revenue*, [1986] 2 C.T.C. 200, 46 Alta. L.R. (2d) 83, [1986] 5 W.W.R. 450, [1986] C.E.B. & P.G.R. 8023, 86 C.L.L.C. 14,062, 87 D.T.C. 5025, [1986] 3 F.C. 553, 70 N.R. 214 (Fed. C.A.) — followed

**Rules considered:**

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194
    R. 59.06(2)(a) — referred to

APPEAL by supplier from finding of vicarious liability and from order directing new trial in judgment reported at (2000), 46 O.R. (3d) 760, 48 C.C.L.T. (2d) 79, 128 O.A.C. 46, 183 D.L.R. (4th) 488, 2 B.L.R. (3d) 1, 41 C.P.C. (4th) 107, [2000] O.J. No. 121, 2000 CarswellOnt 121 (Ont. C.A.), setting aside in part judgment reported at (1998), 40 O.R. (3d) 229, 42 C.C.L.T. (2d) 50, 1998 CarswellOnt 2219, [1998] O.J. No. 2194 (Ont. Gen. Div.), and setting aside judgments reported at 1998 CarswellOnt 3933 (Ont. Gen. Div.) and 1998 CarswellOnt 5010 (Ont. Gen. Div.).

POURVOI du fournisseur à l'encontre de la conclusion de responsabilité du fait d'autrui et de l'ordonnance d'un nouveau procès de l'arrêt publié à (2000), 46 O.R. (3d) 760, 48 C.C.L.T. (2d) 79, 128 O.A.C. 46, 183 D.L.R. (4th) 488, 2 B.L.R. (3d) 1, 41 C.P.C. (4th) 107, [2000] O.J. No. 121, 2000 CarswellOnt 121 (Ont. C.A.), qui a infirmé en partie le jugement publié à (1998), 40 O.R. (3d) 229, 42 C.C.L.T. (2d) 50, 1998 CarswellOnt 2219, [1998] O.J. No. 2194 (Ont. Gen. Div.), et infirmé les jugements publiés à 1998 CarswellOnt 3933 (Div. Gén. Ont.), et 1998 CarswellOnt 5010 (Div. Gén. Ont.).

**The judgment of the court was delivered by *Major J.*:**

1    This appeal raises two issues: the application of vicarious liability for a bribery scheme in a large commercial transaction and the appellate court's review of the trial judge's exercise of discretion not to reopen the trial to admit fresh evidence on a motion brought after the release of his reasons but before formal judgment was entered.

2    Vicarious liability describes the event when the law holds one person responsible for the misconduct of another because of their relationship. In this case, the respondent (the original supplier) suffered substantial losses when it was replaced as Canadian Tire's synthetic car seat cover supplier. This happened because a bribe was paid by a rival supplier's consultant to the head of Canadian Tire's automotive division.

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 15 of 342

671122 Ontario Ltd. v. Sagaz Industries Canada Inc., 2001 SCC 59, 2001 CSC 59,...

2001 SCC 59, 2001 CSC 59, 2001 CarswellOnt 3357, 2001 CarswellOnt 3358...

3      The first question is whether the appellant Sagaz (the rival automotive supplier) is vicariously liable for the tortious conduct of its consultant who was hired to assist in securing Canadian Tire's business. In my opinion the appellant Sagaz, the competitive supplier, is not vicariously liable for the bribery scheme perpetrated by its consultant. The consultant was not an employee of the supplier but an independent contractor. Based on policy considerations, the relationship between an employer and independent contractor does not typically give rise to a claim in vicarious liability.

4      On the second question, the motion to reopen the trial to adduce fresh evidence, I conclude for the reasons that follow that the Court of Appeal erred in substituting its discretion for that of the trial judge.

## I. Facts

5      The respondent, 671122 Ontario Limited, formerly Design Dynamics Limited ("Design"), was Canadian Tire Corporation's principal supplier of synthetic sheepskin car seat covers for 30 years. Canadian Tire was the party in the position of strength in the relationship. This is so as it represented more than 60 per cent of the Canadian seat cover market and, by 1983, was Design's largest customer accounting for over 50 per cent of its sales.

6      In June 1984, Design lost Canadian Tire's business. Robert Summers, the head of Canadian Tire's automotive division, advised Design that another company, the appellants Sagaz Industries Canada Inc. and Sagaz Industries Inc. (collectively "Sagaz"), would be replacing Design as Canadian Tire's seat cover supplier. Sagaz is a Florida corporation and the appellant, Joseph Kavana, is its president. Sagaz Industries Inc. continues to supply Canadian Tire and Sagaz Industries Canada Inc. is inactive.

7      Summers terminated Canadian Tire's supply relationship with Design in favour of Sagaz because of bribery in the form of a "kickback" scheme. Sagaz retained American Independent Marketing Inc. ("AIM"), a New York corporation, to assist in marketing Sagaz's seat covers to Canadian Tire. AIM was owned and controlled by Stewart Landow. It was later determined that Summers accepted a bribe from Landow and AIM in relation to the Sagaz seat cover contract. Specifically, Summers incorporated a sham corporation, International Marketing Consultants ("IMC"), to receive the bribery money. Summers employed a surrogate, Anthony Brathwaite, as a token manager of IMC. Brathwaite was the puppet of Summers who received all the profits of IMC. Summers entered into an agreement with Landow whereby Landow (through AIM) would pay Summers (through IMC) two percent of all sales by Sagaz to Canadian Tire of synthetic seat covers in order to ensure the sales occurred. As a result of the bribe, Summers terminated Canadian Tire's relationship with Design.

8      Summers' wrongdoing was discovered in 1985. His employment with Canadian Tire was terminated and he was eventually convicted of corruptly accepting benefits and went to prison. He later went bankrupt. Brathwaite pleaded guilty to similar charges.

9      Summers was replaced by new management at Canadian Tire which re-evaluated its purchase of synthetic seat covers. Management determined that it preferred the seat cover products of Sagaz to those of Design. Accordingly, Canadian Tire retained its relationship with Sagaz as its supplier.

10      Having lost its major customer, Design's manufacturing business went into a steep decline. It sold its assets in 1988. In 1989, Design brought an action against some thirteen defendants, including Canadian Tire, Summers, Brathwaite, Landow, AIM, Sagaz and Kavana. At the trial, only AIM, Landow (who did not testify), Sagaz and Kavana remained as defendants. Canadian Tire paid Design $750,000 to settle the action against it. The action against Summers was discontinued when he went bankrupt. Design's action alleged that AIM, Landow, Sagaz and Kavana had bribed Summers and, but for those bribes, Design would have continued as supplier to Canadian Tire.

## II. Judicial History

### A. Ontario Court of Justice (General Division) (1998), 40 O.R. (3d) 229 (Ont. Gen. Div.)

671122 Ontario Ltd. v. Sagaz Industries Canada Inc., 2001 SCC 59, 2001 CSC 59,...

2001 SCC 59, 2001 CSC 59, 2001 CarswellOnt 3357, 2001 CarswellOnt 3358...

11    The trial judge found that the decision of Canadian Tire management to switch suppliers of seat covers had nothing to do with any belief that the Sagaz product was superior to the Design product. Design's business was lost solely because of the bribe.

12    The bribery scheme was profitable to Landow as commissions on the sales from Sagaz to Canadian Tire would be paid to his solely-owned corporation, AIM. Landow could not hide behind the corporate veil of AIM in his use of the corporation as his agent in the commission of an intentional tort. The trial judge found that Landow and AIM conspired with Summers and IMC to engage in the unlawful conduct of taking away Design's business from Canadian Tire.

13    While the tort of civil conspiracy was sufficient to establish liability, the trial judge found that liability was more directly addressed through the tort of unlawful interference with economic relations, for which Landow and AIM were liable.

14    There were suspicious business dealings raised at the trial in an attempt to implicate Kavana, President of Sagaz, in the bribery scheme. For instance, commissions that Landow received in respect of the sale of seat covers from Sagaz to Canadian Tire. Before Sagaz secured the seat cover contract with Canadian Tire, it was paying Landow a five percent commission on sales. Sagaz then raised Landow's commission from five to six percent. At the same time, or close to it, Landow entered into the agreement with Summers whereby Landow paid Summers two percent in the form of the kickback scheme. It was Design's theory at trial that Landow's commission was raised from five to six percent to fund the bribe to Summers. That implied that Kavana and Landow agreed to share or split the payment of the two per cent bribe. Kavana denied involvement in the bribery scheme. He testified that he was misled by Landow in agreeing to change the commission from five to six percent because Landow told him that he was required to hire someone to provide in-store service in Canada which would entail additional expense. Another suspicious event was the payment of $15,000 by Kavana to Landow in March 1985 which eventually found its way to Robin Addie, a senior buyer for Canadian Tire. Again, Kavana testified and denied any improper conduct. He claimed that Landow told him that this expenditure was tied to the purchase of a car as part of an intended promotion to display the Canadian Tire seat covers. In fact, a car was never purchased.

15    These suspicious circumstances surrounding Kavana were presented at the trial. The trial judge believed Kavana, found him credible and accepted his evidence that he had trusted Landow and had accepted Landow's explanation about the commission and car purchase. As well Summers did not implicate Kavana in his testimony. The trial judge concluded that Kavana was not involved in the bribery scheme. He pointed out that had Kavana known of the bribe by Landow then Kavana and Sagaz would have been held directly liable and obviously vicarious liability would not have been an issue.

16    The trial judge was brief on the issue of whether Sagaz was vicariously liable to Design for the wrongdoing of Landow and AIM. He held that, on the evidence, AIM was an independent contractor to Sagaz. Citing *London Drugs Ltd. v. Kuehne & Nagel International Ltd.*, [1992] 3 S.C.R. 299 (S.C.C.) , he held that vicarious liability could not and should not be imposed upon Sagaz for the tortious acts of an independent contractor.

17    Damages were assessed at $1,807,500 against Landow and AIM, jointly and severally, plus $50,000 in punitive damages, and pre-judgment interest. The action was dismissed as against Sagaz and Kavana. The trial judge refused to award Sagaz and Kavana their costs against Design, but awarded Sagaz and Kavana their costs against Landow and AIM under a "Sanderson order".

### B. Ontario Court of Justice (General Division) [1998] O.J. No. 4018 (Ont. Gen. Div.) (QL)

18    After the trial judge's reasons for judgment were released, but before formal judgment was entered, Landow, who did not testify at the trial, gave Design an affidavit admitting to the conspiracy to bribe Summers and implicating Kavana in it. On the basis of the affidavit, Design brought a motion before the trial judge pursuant to rule 59.06(2)(a) of the *Rules of Civil Procedure* , R.R.O. 1990, Reg. 194, to have the trial reopened to hear Landow's fresh evidence. Design claimed that the fresh evidence would show that Kavana was involved in and had knowledge of the tortious activity of Landow, and was also liable to Design.

19    The trial judge dismissed the motion. He found that there was no direct evidence at trial that Kavana was a party to the bribe paid to Summers. Summers dealt directly with Landow. Summers did not implicate Kavana in his testimony. Kavana

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 17 of 342

671122 Ontario Ltd. v. Sagaz Industries Canada Inc., 2001 SCC 59, 2001 CSC 59,...

2001 SCC 59, 2001 CSC 59, 2001 CarswellOnt 3357, 2001 CarswellOnt 3358...

testified and denied involvement in the bribe. He was subjected to a thorough and rigorous cross-examination and was credible in his testimony. Landow did not testify nor attend the trial. He was represented by counsel throughout the trial. In the cross-examination of Landow on his affidavit given in connection with the fresh evidence motion, Landow acknowledged that he was aware of his right to attend the trial and to testify. He received daily reports about the course of the trial over its duration.

20    In dismissing the motion to reopen the trial, the trial judge applied a two-part test from *Scott v. Cook*, [1970] 2 O.R. 769 (Ont. H.C.) . First, would the evidence, if presented at trial, probably have changed the result? Second, could the evidence have been obtained before trial by the exercise of reasonable diligence?

21    The trial judge found that neither of the two steps was met. He could not say that the new evidence, if presented at trial, would probably have changed the result, only that it may have changed the result. As well, if the trial were reopened, Landow's evidence might well not be believed. His credibility would be very much in issue. On the second part of the test, the trial judge found that Landow's evidence could have been obtained before trial. Design could have compelled Landow to testify under oath at trial, although that evidence may not have been helpful to Design. The trial judge concluded that the court would not allow a party to correct what in hindsight was an unsuccessful strategy at trial.

### C. Ontario Court of Appeal (2000), 183 D.L.R. (4th) 488 (Ont. C.A.)

22    The Court of Appeal reversed the decisions of the trial judge. The gist of its view was that Sagaz was vicariously liable to Design. Applying the "organization test" (from *Mayer v. J. Conrad Lavigne Ltd.* (1979), 27 O.R. (2d) 129 (Ont. C.A.) , as previously approved by this Court in *Co-operators Insurance Assn. v. Kearney* (1964), [1965] S.C.R. 106 (S.C.C.) ), the Court of Appeal found that Landow and AIM did their work as part of the "Sagaz sales team". Sagaz was therefore jointly and severally liable with Landow and AIM for the damages awarded, with the exception of punitive damages. For this reason, the Court of Appeal also allowed Landow's and AIM's cross-appeal on the issue of costs and set aside the costs award to Sagaz and Kavana against Landow and AIM. Design was entitled to costs against Sagaz.

23    A new trial was ordered with respect to the liability of Kavana on the basis that the trial judge should have reopened the trial to hear Landow's evidence. The Court of Appeal found that the evidence, if presented at trial and accepted as credible, would implicate Kavana and Sagaz in the bribery scheme. Also, it held that Landow's evidence was not discoverable by reasonable diligence prior to trial as Design made serious efforts to no avail to persuade Landow to co-operate and to testify against Kavana and Sagaz.

## III. Issues

24

1. Did the Court of Appeal err in holding Sagaz vicariously liable to Design?

2. Did the Court of Appeal err by substituting its discretion for that of the trial judge in the decision to reopen the trial?

## IV. Analysis

### A. Vicarious Liability

*(1) Policy Rationale Underlying Vicarious Liability*

25    Vicarious liability is not a distinct tort. It is a theory that holds one person responsible for the misconduct of another because of the relationship between them. Although the categories of relationships in law that attract vicarious liability are neither exhaustively defined nor closed, the most common one to give rise to vicarious liability is the relationship between master and servant, now more commonly called employer and employee.

26    In general, tort law attempts to hold persons accountable for their wrongful acts and omissions and the direct harm that flows from those wrongs. Vicarious liability, by contrast, is considered to be a species of strict liability because it requires no

671122 Ontario Ltd. v. Sagaz Industries Canada Inc., 2001 SCC 59, 2001 CSC 59,...

2001 SCC 59, 2001 CSC 59, 2001 CarswellOnt 3357, 2001 CarswellOnt 3358...

proof of personal wrongdoing on the part of the person who is subject to it. As such, it is still relatively uncommon in Canadian tort law. What policy considerations govern its discriminate application?

27      As Fleming stated in an oft-quoted passage,

> [T]he modern doctrine of vicarious liability cannot parade as a deduction from legalistic premises, but should be frankly recognised as having its basis in a combination of policy considerations. . . .

> (*The Law of Torts* (9th ed. 1998), at p. 410, cited in *B. (P.A.) v. Curry,* [1999] 2 S.C.R. 534 (S.C.C.) , at para. 26, *per* McLachlin J. (as she then was), and in *T. (G.) v. Griffiths,* [1999] 2 S.C.R. 570 (S.C.C.) , released concurrently, at para. 29, *per* Binnie J.)

However, McLachlin J. noted in *B. (P.A.)* , at para. 27 (cited in *T. (G.)* , at para. 29) that "[a] focus on policy is not to diminish the importance of legal principle".

28      The most recent discussion by this Court of the policy considerations that justify the imposition of vicarious liability was in *B. (P.A.)* , at paras. 26-36, where McLachlin J. succinctly reviewed the relevant jurisprudence. She began with La Forest J.'s opinion (dissenting on the cross-appeal) in *London Drugs, supra* , which held that vicarious liability is generally considered to rest on one of two logical bases. The first, known as the "master's tort theory", posits that the employer is vicariously liable for the acts of his employee because the acts are regarded as being authorized by him so that in law the acts of the employee are the acts of the employer. The second, known as the "servant's tort theory", attributes liability to the employer simply because the employer was the employee's superior and therefore in charge or command of the employee (G. H. L. Fridman, *The Law of Torts in Canada* (1990), vol. 2, at pp. 314-15, and P. S. Atiyah, *Vicarious Liability in the Law of Torts* (1967), at pp. 6-7).

29      However, La Forest J. acknowledged that neither of the logical bases for vicarious liability succeed completely in explaining the operation of the doctrine, and he found that the vicarious liability regime is a response to a number of policy considerations, including compensation, deterrence and loss internalization (at p. 336). McLachlin J. noted that Fleming identified similar policies to justify the imposition of vicarious liability, including the provision of a just and practical remedy for the harm and the deterrence of future harm, and held that these two ideas "usefully embrace the main policy considerations that have been advanced" (para. 29).

30      Identification of the policy considerations underlying the imposition of vicarious liability assists in determining whether the doctrine should be applied in a particular case and it is for that reason that the policy considerations set out by this Court in *B. (P.A.)* should be briefly reviewed.

31      First, vicarious liability provides a just and practical remedy to people who suffer harm as a consequence of wrongs perpetrated by an employee. Many commentators are suspicious of vicarious liability in principle because it appears to hold parties responsible for harm simply because they have "deep pockets" or an ability to bear the loss even though they are not personally at fault. The "deep pockets" justification on its own does not accord with an inherent sense of what is fair (see also R. Flannigan, "Enterprise control: The servant-independent contractor distinction" (1987), 37 *U.T.L.J.* 25, at p. 29). Besides an ability to bear the loss, it must also seem just to place liability for the wrong on the employer. McLachlin J. addresses this concern in *B. (P.A.), supra* , at para. 31:

> Vicarious liability is arguably fair in this sense. The employer puts in the community an enterprise which carries with it certain risks. When those risks materialize and cause injury to a member of the public despite the employer's reasonable efforts, it is fair that the person or organization that creates the enterprise and hence the risk should bear the loss. This accords with the notion that it is right and just that the person who creates a risk bear the loss when the risk ripens into harm.

Similarly, Fleming stated that "a person who employs others to advance his own economic interest should in fairness be placed under a corresponding liability for losses incurred in the course of the enterprise . . . " (p. 410). McLachlin J. states that while the fairness of this proposition is capable of standing alone, "it is buttressed by the fact that the employer is often in the best position to spread the losses through mechanisms like insurance and higher prices, thus minimizing the dislocative effect of

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 19 of 342

671122 Ontario Ltd. v. Sagaz Industries Canada Inc., 2001 SCC 59, 2001 CSC 59,...

2001 SCC 59, 2001 CSC 59, 2001 CarswellOnt 3357, 2001 CarswellOnt 3358...

the tort within society" (para. 31). Finally on this point, it is noteworthy that vicarious liability does not diminish the personal liability of the direct tortfeasor (Fleming, *supra* , at p. 411; *London Drugs* , at p. 460, *per* McLachlin J.).

32      The second policy consideration underlying vicarious liability is deterrence of future harm as employers are often in a position to reduce accidents and intentional wrongs by efficient organization and supervision. This policy ground is related to the first policy ground of fair compensation, as "[t]he introduction of the enterprise into the community with its attendant risk, in turn, implies the possibility of managing the risk to minimize the costs of the harm that may flow from it" (para. 34).

*(2) Employee Versus Independent Contractor*

33      The most common relationship that attracts vicarious liability is that between employer and employee, formerly master and servant. This is distinguished from the relationship of an employer and independent contractor which, subject to certain limited exceptions (see Atiyah, *supra* , pp. 327-78), typically does not give rise to a claim for vicarious liability. If a worker is determined to be an employee as opposed to an independent contractor such that vicarious liability can attach to the employer, this is not the end of the analysis. The tortious conduct has to be committed by the employee in the course of employment. For the reasons that follow, this second stage of the analysis is not relevant and need not by analysed in the present appeal.

34      What is the difference between an employee and an independent contractor and why should vicarious liability more likely be imposed in the former case than in the latter? This question has been the subject of much debate. The answer lies with the element of control that the employer has over the direct tortfeasor (the worker). If the employer does not control the activities of the worker, the policy justifications underlying vicarious liability will not be satisfied. See Flannigan, *supra* , at pp. 31-32:

> This basis for vicarious liability discloses a precise limitation on the scope of the doctrine. If the employer does not control the activities of the worker it is clear that vicarious liability should not be imposed, for then insulated risk taking [by the employer] does not occur. Only the worker, authorized to complete a task, could have affected the probability of loss, for he alone had control in any respect. Thus, because there is no mischief where employer control is absent, no remedy is required.

35      Explained another way, the main policy concerns justifying vicarious liability are to provide a just and practical remedy for the plaintiff's harm and to encourage the deterrence of future harms (*B. (P.A.), supra* , at para. 29). Vicarious liability is fair in principle because the hazards of the business should be borne by the business itself; thus, it does not make sense to anchor liability on an employer for acts of an independent contractor, someone who was in business on his or her own account. In addition, the employer does not have the same control over an independent contractor as an employee to reduce accidents and intentional wrongs by efficient organization and supervision. Each of these policy justifications are relevant to the ability of the employer to control the activities of the employee, justifications which are generally deficient or missing in the case of an independent contractor. As discussed above, the policy justifications for imposing vicarious liability are relevant where the employer is able to control the activities of the employee but may be deficient in the case of an independent contractor over whom the employer has little control. However, control is not the only factor to consider in determining if a worker is an employee or an independent contractor. For the reasons discussed below, a reliance on control alone can be misleading, and there are other relevant factors which should be considered in making this determination.

36      Various tests have emerged in the case law to help determine if a worker is an employee or an independent contractor. The distinction between an employee and an independent contractor applies not only in vicarious liability, but also to the application of various forms of employment legislation, the availability of an action for wrongful dismissal, the assessment of business and income taxes, the priority taken upon an employer's insolvency, and the application of contractual rights (Flannigan, *supra* , at p. 25). Accordingly, much of the case law on point while not written in the context of vicarious liability is still helpful.

37      The Federal Court of Appeal thoroughly reviewed the relevant case law in *Wiebe Door Services Ltd. v. Minister of National Revenue*, [1986] 3 F.C. 553 (Fed. C.A.) . As MacGuigan J.A. noted, the original criterion of the employment relationship was the control test set out by Baron Bramwell in *R. v. Walker* (1858), 27 L.J.M.C. 207 , and adopted by this Court in *Hôpital Notre-Dame de l'Espérance c. Laurent* (1977), [1978] 1 S.C.R. 605 (S.C.C.) . It is expressed as follows: "the essential criterion

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 20 of 342

671122 Ontario Ltd. v. Sagaz Industries Canada Inc., 2001 SCC 59, 2001 CSC 59,...

2001 SCC 59, 2001 CSC 59, 2001 CarswellOnt 3357, 2001 CarswellOnt 3358...

of employer-employee relations is the right to give orders and instructions to the employee regarding the manner in which to carry out his work" (*Hôpital* , at p. 613).

38    This criterion has been criticized as wearing "an air of deceptive simplicity" (Atiyah, *supra* , at p. 41). The main problems are set out by MacGuigan J.A. in *Wiebe Door, supra* , at pp. 558-59:

A principal inadequacy [with the control test] is its apparent dependence on the exact terms in which the task in question is contracted for: where the contract contains detailed specifications and conditions, which would be the normal expectation in a contract with an independent contractor, the control may even be greater than where it is to be exercised by direction on the job, as would be the normal expectation in a contract with a servant, but a literal application of the test might find the actual control to be less. In addition, the test has broken down completely in relation to highly skilled and professional workers, who possess skills far beyond the ability of their employers to direct.

39    An early attempt to deal with the problems of the control test was the development of a four-fold test known as the "entrepreneur test". It was set out by W. O. (later Justice) Douglas in "Vicarious Liability and Administration of Risk I" (1928-29), 38 *Yale L.J.* 584, and applied by Lord Wright in *Montreal (City) v. Montreal Locomotive Works Ltd.* (1946), [1947] 1 D.L.R. 161 (Canada P.C.) , at p. 169:

In earlier cases a single test, such as the presence or absence of control, was often relied on to determine whether the case was one of master and servant, mostly in order to decide issues of tortious liability on the part of the master or superior. In the more complex conditions of modern industry, more complicated tests have often to be applied. It has been suggested that a fourfold test would in some cases be more appropriate, a complex involving (1) control; (2) ownership of the tools; (3) chance of profit; (4) risk of loss. Control in itself is not always conclusive.

40    As MacGuigan J.A. notes, a similar general test, known as the "organization test" or "integration test" was used by Denning L.J. (as he then was) in *Stephenson, Jordan & Harrison Ltd. v. MacDonald & Evans,* [1952] 1 T.L.R. 101 (Eng. C.A.) , at p. 111:

One feature which seems to run through the instances is that, under a contract of service, a man is employed as part of the business, and his work is done as an integral part of the business; whereas, under a contract for services, his work, although done for the business, is not integrated into it but is only accessory to it.

41    This decision imported the language "contract of service" (employee) and "contract for services" (independent contractor) into the analysis. The organization test was approved by this Court in *Co-operators Insurance, supra* (followed in *Mayer* , *supra* ), where Spence J. observed that courts had moved away from the control test under the pressure of novel situations, replacing it instead with a type of organization test in which the important question was whether the alleged servant was part of his employer's organization (from Fleming, *supra* , at p. 416).

42    However, as MacGuigan J.A. noted in *Wiebe Door* , the organization test has had "less vogue in other common-law jurisdictions" (at p. 561), including England and Australia. For one, it can be a difficult test to apply. If the question is whether the activity or worker is integral to the employer's business, this question can usually be answered affirmatively. For example, the person responsible for cleaning the premises is technically integral to sustaining the business, but such services may be properly contracted out to people in business on their own account (see R. Kidner, "Vicarious liability: for whom should the employer be liable?" (1995), 15 Legal Studies 47, at p. 60). As MacGuigan J.A. further noted in *Wiebe Door* , if the main test is to demonstrate that, without the work of the alleged employees the employer would be out of business, a factual relationship of mutual dependency would always meet the organization test of an employee even though this criterion may not accurately reflect the parties' intrinsic relationship (at pp. 562-63).

43    Despite these criticisms, MacGuigan J.A. acknowledges, at p. 563, that the organization test can be of assistance:

Of course, the organization test of Lord Denning and others produces entirely acceptable results when properly applied, that is, when the question of organization or integration is approached from the persona of the "employee" and not from that of the "employer," because it is always too easy from the superior perspective of the larger enterprise to assume that

2001 SCC 59, 2001 CSC 59, 2001 CarswellOnt 3357, 2001 CarswellOnt 3358...

every contributing cause is so arranged purely for the convenience of the larger entity. *We must keep in mind that it was with respect to the business of the employee that Lord Wright [in* Montreal *] addressed the question "Whose business is it?"* [Emphasis added.]

44      According to MacGuigan J.A., the best synthesis found in the authorities is that of Cooke J. in *Market Investigations v. Minister of Social Security*, [1968] 3 All E.R. 732 (Eng. Q.B.) , at pp. 737-38 (followed by the Privy Council in *Sang v. Chi-Keung*, [1990] 2 A.C. 374 (Hong Kong P.C.) , *per* Lord Griffiths, at p. 382):

> The observations of LORD WRIGHT, of DENNING L.J. and of the judges of the Supreme Court in the U.S.A. suggest that the fundamental test to be applied is this: *"Is the person who has engaged himself to perform these services performing them as a person in business on his own account?"* . If the answer to that question is "yes", then the contract is a contract for services. If the answer is "no" then the contract is a contract of service. No exhaustive list has been compiled and perhaps no exhaustive list can be compiled of considerations which are relevant in determining that question, nor can strict rules be laid down as to the relative weight which the various considerations should carry in particular cases. The most that can be said is that control will no doubt always have to be considered, although it can no longer be regarded as the sole determining factor; and that factors, which may be of importance, are such matters as whether the man performing the services provides his own equipment, whether he hires his own helpers, what degree of financial risk he takes, what degree of responsibility for investment and management he has, and whether and how far he has an opportunity of profiting from sound management in the performance of his task. [Emphasis added.]

45      Finally, there is a test that has emerged that relates to the enterprise itself. Flannigan, *supra* , sets out the "enterprise test" at p. 30 which provides that the employer should be vicariously liable because (1) he controls the activities of the worker; (2) he is in a position to reduce the risk of loss; (3) he benefits from the activities of the worker; (4) the true cost of a product or service ought to be borne by the enterprise offering it. According to Flannigan, each justification deals with regulating the risk-taking of the employer and, as such, control is always the critical element because the ability to control the enterprise is what enables the employer to take risks. An "enterprise risk test" also emerged in La Forest J.'s dissent on cross- appeal in *London Drugs* where he stated at p. 339 that "[v]icarious liability has the broader function of transferring to the enterprise itself the risks created by the activity performed by its agents".

46      In my opinion, there is no one conclusive test which can be universally applied to determine whether a person is an employee or an independent contractor. Lord Denning stated in *Stevenson Jordan, supra* , that it may be impossible to give a precise definition of the distinction (p. 111) and, similarly, Fleming observed that "no single test seems to yield an invariably clear and acceptable answer to the many variables of ever changing employment relations . . . " (p. 416). Further, I agree with MacGuigan J.A. in *Wiebe Door* , at p. 563, citing Atiyah, *supra* , at p. 38, that what must always occur is a search for the total relationship of the parties:

> [I]t is exceedingly doubtful whether the search for a formula in the nature of a single test for identifying a contract of service any longer serves a useful purpose. . . . The most that can profitably be done is to examine all the possible factors which have been referred to in these cases as bearing on the nature of the relationship between the parties concerned. Clearly not all of these factors will be relevant in all cases, or have the same weight in all cases. Equally clearly no magic formula can be propounded for determining which factors should, in any given case, be treated as the determining ones.

47      Although there is no universal test to determine whether a person is an employee or an independent contractor, I agree with MacGuigan J.A. that a persuasive approach to the issue is that taken by Cooke J. in *Market Investigations, supra* . The central question is whether the person who has been engaged to perform the services is performing them as a person in business on his own account. In making this determination, the level of control the employer has over the worker's activities will always be a factor. However, other factors to consider include whether the worker provides his or her own equipment, whether the worker hires his or her own helpers, the degree of financial risk taken by the worker, the degree of responsibility for investment and management held by the worker, and the worker's opportunity for profit in the performance of his or her tasks.

671122 Ontario Ltd. v. Sagaz Industries Canada Inc., 2001 SCC 59, 2001 CSC 59,...

2001 SCC 59, 2001 CSC 59, 2001 CarswellOnt 3357, 2001 CarswellOnt 3358...

48    It bears repeating that the above factors constitute a non-exhaustive list, and there is no set formula as to their application. The relative weight of each will depend on the particular facts and circumstances of the case.

*(3) Application to the Facts*

49    According to the agreement between Sagaz and AIM dated January 29, 1985, AIM was hired to "provide assistance to Sagaz in retaining the goodwill of [Canadian Tire]". Although the contract designated AIM as an "independent contractor", this classification is not always determinative for the purposes of vicarious liability. The starting point for this analysis is whether AIM, while engaged to perform such services for Sagaz, was in business on its own account. If so, AIM is an independent contractor as opposed to an employee of Sagaz and vicarious liability likely will not follow. It is helpful to examine the non-exhaustive list of factors from *Montreal (City)* and *Market Investigations* to assist in this determination.

50    There is some evidence to suggest that Landow and AIM were employees of Sagaz. In other words, in response to the query "whose business is it?", there is some suggestion that Landow worked in what was characterized as a "joint effort" with Sagaz sales managers in order to secure Canadian Tire's business. Specifically, although it was Landow's duty under the contract to obtain Canadian Tire's business and maintain its goodwill, the first letter sent to Canadian Tire on behalf of Sagaz was written by Canadian Tire's national sales manager, David English, who gave price quotations. The first meeting was attended by Landow, English and Kavana. Following that meeting, revised price quotations were sent by English. Landow's role was limited to presenting prices that were set and negotiated by Kavana and English and he required instructions with respect to terms and various other aspects of the business that he was conducting on Sagaz's behalf. Quotations given to Canadian Tire did not disclose Landow as a sales representative. Rather, the space on the invoice for the sales representative was left blank and the account was characterized as a "house account".

51    There was also some issue made about the fact that in a letter dated June 12, 1984, Landow communicated with Canadian Tire directly using Sagaz's letterhead. On cross-examination, Kavana admitted that Landow had been supplied with Sagaz letterhead. The courts below speculated that these factors came about because Canadian Tire preferred to deal with its suppliers, like Sagaz, directly and not through external sales agents.

52    On the other hand, there are some compelling points which indicate that AIM and Sagaz were separate legal entities, some of which are that AIM had its own offices, located in New York, while the Sagaz head offices were located in Florida. According to the agreement between the parties, AIM was to pay all of its own costs of conducting its business, including travel expenses, commissions and other compensation of salespersons employed by it. AIM remained free to carry on other activities and represent other suppliers provided that it did not take on any competing lines of business.

53    With respect to AIM's responsibility for investment and management, Sagaz did not either specify or control how much time AIM was to devote to representing them in maintaining their goodwill with Canadian Tire, or to performing in-store services. Similarly, it was up to AIM and Landow to decide how many, if any, trips Landow would take to Toronto. According to the agreement and Kavana's testimony, AIM had no authority to bind the Sagaz company.

54    In terms of a risk of loss or an opportunity for profit, Landow and AIM worked on commission on sales of Sagaz's products. As such, the risk of loss and the opportunity for profit depended on whether AIM's expenses (such as travel expenses) exceeded its commissions.

55    Central to this inquiry is the extent of control that Sagaz had over AIM. While Sagaz directed the prices, terms and other conditions that AIM was to negotiate on Sagaz's behalf, AIM was ultimately in control of providing assistance to Sagaz in retaining the goodwill of Canadian Tire. Again, AIM decided how much time to devote to Sagaz and how much time to devote to its services for other supply companies. Although Sagaz controlled what was done, AIM controlled how it was done. This indicates that Landow was not controlled by Sagaz.

56    In my opinion, the contravening factors such as the suggestion that the Canadian Tire account was a "house account" and the one letter written by Landow on Sagaz's letterhead, while of interest, are not sufficient to show that AIM was an employee

671122 Ontario Ltd. v. Sagaz Industries Canada Inc., 2001 SCC 59, 2001 CSC 59,...

2001 SCC 59, 2001 CSC 59, 2001 CarswellOnt 3357, 2001 CarswellOnt 3358...

as part of the Sagaz "sales team". I agree with the courts below that these factors likely came about because Canadian Tire preferred to deal with its suppliers, like Sagaz, directly and not through external sales agents. Looking at the non-exhaustive list of factors set out in *Market Investigations, supra* , including ownership of tools, hiring its own helpers, the degree of financial risk or opportunity for profit by AIM and the responsibility for investment and management, it is clear to me that, based on the total relationship of the parties, AIM was an independent contractor.

57    On the totality of the evidence, I agree with the trial judge that AIM was in business on its own account. Absent exceptional circumstances which are not present in this case (see Atiyah, *supra* , pp. 327 to 49), it follows that the relationship between Sagaz and AIM, as employer and independent contractor, is not one which attracts vicarious liability. In finding that AIM was an independent contractor and not an employee in relation to Sagaz, I need not consider the second stage of the analysis which inquires into whether the tortious conduct of an *employee* was committed within the scope of employment.

58    Design submitted that if AIM was not an independent contractor, then AIM was an agent of Sagaz and therefore Sagaz was liable for the economic tort committed by AIM in the scope and course of its authority. Absent evidence to the contrary, it cannot be presumed that the scope of AIM's authority in providing "assistance to Sagaz in retaining the goodwill of [Canadian Tire]" was so broad as to include unlawful means such as bribery. This is confirmed by the finding of the trial judge at p. 241 that "Mr. Kavana was not a party to the conspiracy of Messrs. Summers and Landow." As well he also found at p. 245 "that it has not been proven on a balance of the probabilities that Mr. Kavana knew of the bribery by Mr. Landow". In the result, the payment of the bribe by AIM to Summers exceeded the actual and apparent authority of AIM as representative of Sagaz.

### *B. Motion to Reopen the Trial*

59    After the trial judge's reasons were released, but before the formal judgment was entered, Landow, who did not testify at trial, gave Design an affidavit admitting to the conspiracy to bribe and implicating Kavana in the conspiracy. Design brought a motion to have the trial reopened to hear the fresh evidence. The trial judge applied the two-part test from *Scott* , *supra* , to assist in determining whether to exercise his discretion to reopen the trial. First, he decided that the evidence, if presented at trial, probably would not have changed the result. Second, he found that the evidence could have been obtained before trial by the exercise of reasonable diligence. The Court of Appeal overturned the trial judge's decision, having found that he erred on both branches of the test and that the trial should have been reopened to hear Kavana's evidence. Was the Court of Appeal in error to reverse the trial judge's exercise of discretion to refuse to reopen the trial?

60    This Court provided in *Hamstra (Guardian ad litem of) v. British Columbia Rugby Union*, [1997] 1 S.C.R. 1092 (S.C.C.) , at para. 26:

It has long been established that, absent an error of law, an appellate court should not interfere with the exercise by a trial judge of his or her discretion in the conduct of a trial.

Appellate courts should defer to the trial judge who is in the best position to decide whether, at the expense of finality, fairness dictates that the trial be reopened. See *Clayton v. British American Securities Ltd.*, [1934] 3 W.W.R. 257 (B.C. C.A.) , at p. 295:

[The trial judge] would of course discourage unwarranted attempts to bring forward new evidence available at the trial to disturb the basis of a judgment delivered or to permit a litigant after discovering the effect of a judgment to re-establish a broken-down case with the aid of further proof.

61    Further, the case law dictates that the trial judge must exercise his discretion to reopen the trial "sparingly and with the greatest care" so that "fraud and abuse of the Court's processes" do not result (see *Clayton* , *supra* , at p. 295, cited in *Scott* , at pp. 773-74).

62    In this case, the trial judge decided not to exercise his discretion to reopen the trial because neither of the two steps of the test in *Scott* , *supra* , was met to his satisfaction. First, he found that he could not say that the new evidence, if presented at trial, would probably have changed the result, only that it may have changed the result. If the trial were to be reopened, Landow's evidence might well not be believed. His credibility would be in issue. Second, the trial judge found that Landow's evidence

671122 Ontario Ltd. v. Sagaz Industries Canada Inc., 2001 SCC 59, 2001 CSC 59,...

2001 SCC 59, 2001 CSC 59, 2001 CarswellOnt 3357, 2001 CarswellOnt 3358...

could have been obtained before trial. Design could have compelled Landow to testify under oath at trial. While this carried some risk, the trial judge viewed it as a trial strategy, a conclusion he was entitled to reach.

63      In my opinion, the Court of Appeal erred in substituting its discretion for that of the trial judge in deciding to reopen the trial. On the first branch of the test set out in *Scott* , the trial judge found that Landow's credibility would be in issue whereas the Court of Appeal found it difficult to see how the trial judge could make this determination without hearing Landow testify. In the Court of Appeal's determination, it was not sufficiently clear that Landow would be disbelieved. I disagree with the Court of Appeal on this point. Landow's affidavit evidence contradicts his sworn evidence on discovery, particularly with respect to the existence of the bribery scheme which Landow avoids acknowledging on discovery. To this significant extent, Landow is akin to a recanting liar. Lord Denning's comments in *Ladd v. Marshall*, [1954] 1 W.L.R. 1489 (Eng. C.A.) , are applicable:

> It is very rare that application is made to this court for a new trial on the ground that a witness has told a lie. The principles to be applied are the same as those always applied when fresh evidence is sought to be introduced. To justify the reception of fresh evidence or a new trial, three conditions must be fulfilled: first, it must be shown that the evidence could not have been obtained with reasonable diligence for use at the trial; secondly, the evidence must be such that, if given, it would probably have an important influence on the result of the case, though it need not be decisive; thirdly, the evidence must be such as is presumably to be believed, or in other words, it must be apparently credible, though it need not be incontrovertible.

> *We have to apply those principles to the case where a witness comes and says: "I told a lie but nevertheless I now want to 'tell the truth'". It seems to me that the fresh evidence of such a witness will not as a rule satisfy the third condition. A confessed liar cannot usually be accepted as being credible* . To justify the reception of the fresh evidence, some good reason must be shown why a lie was told in the first instance, and good ground given for thinking the witness will tell the truth on the second occasion. [Emphasis added.]

64      These comments, in my opinion, apply with equal force to the present case. Landow is akin to a "recanting liar" because he failed to tell his "truth" when he had the opportunity to do so on discovery and again when he declined to testify at trial. Although the determination in *Ladd* was made under the third branch of the test applied in that case, a branch that is absent from the two-part test in *Scott* , the application of the *Scott* test to the situation of a "recanting liar" has the same result in this case. Evidence which is not presumptively credible may fail to probably change the result under the first branch of the test in *Scott* . This is how the trial judge dealt with the affidavit evidence, and in my view he was correct in so doing. Further, it cannot be ignored that the trial decision imposing liability on Landow and AIM provided incentive for Landow to attempt to shift some responsibility to Kavana in order to share the liability of the corresponding damage award. The trial judge had also seen the evidence of Kavana in the first instance, which he found to be credible even in the face of a vigorous cross-examination.

65      The court in *Scott* mandated that both branches of the test to reopen a trial to admit fresh evidence must be met. Having failed to meet the first branch of the test, it is unnecessary to examine whether the precluded evidence in this case could have been obtained by the exercise of reasonable diligence. It is sufficient to say that that too is a matter largely within the discretion of the trial judge and, absent error by him, that finding should not be interfered with.

**V. Disposition**

66      The appeal is allowed with costs to the appellants in this Court and in the Court of Appeal. The order of the Court of Appeal is set aside. The order of Cumming J., dated December 23, 1998 is restored.

*Appeal allowed.*

*Pourvoi accueilli.*

Footnotes

*        A corrigendum was issued by the court October 10, 2001 and has been incorporated herein.

         Reconsideration refused at 2001 CarswellOnt 4155 (Eng.), 2001 CarswellOnt 4156 (Fr.) (S.C.C.).

**671122 Ontario Ltd. v. Sagaz Industries Canada Inc., 2001 SCC 59, 2001 CSC 59,...**

2001 SCC 59, 2001 CSC 59, 2001 CarswellOnt 3357, 2001 CarswellOnt 3358...

---

**End of Document**                Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# Tab 2

2004 CarswellOnt 11

Ontario Court of Appeal

Montague v. Bank of Nova Scotia

2004 CarswellOnt 11, [2004] O.J. No. 13, 128 A.C.W.S. (3d) 93, 180
O.A.C. 381, 2004 C.L.L.C. 210-027, 30 C.C.E.L. (3d) 71, 69 O.R. (3d) 87

## YVONNE MONTAGUE, ASQUITTE MONTAGUE, ANDREA MONTAGUE, YVETTE MONTAGUE, BRUCE MONTAGUE, JARVON SCHURTON, By his Litigation Guardian ANDREA MONTAGUE and TIANA SCHURTON, By her Litigation Guardian, ANDREA MONTAGUE (Plaintiffs / Appellants / Respondents by Cross-Appeal) and BANK OF NOVA SCOTIA (Defendant / Respondent / Appellant by Cross-Appeal)

Weiler, Laskin, Goudge JJ.A.

Heard: June 13, 2003
Judgment: January 7, 2004
Docket: CA C37146

Proceedings: affirming *Montague v. Bank of Nova Scotia* (October 23, 2001), Doc. C37146 (Ont. S.C.J.)**Proceedings: additional reasons to *Montague v. Bank of Nova Scotia* (2001), 2001 CarswellOnt 5894 (Ont. S.C.J.)**

Counsel: Yvonne Montague for herself
David E. Leonard for Respondent

Subject: Employment; Public; Civil Practice and Procedure

### Headnote

**Civil practice and procedure --- Costs — Offers to settle or payment into court — Offers to settle — General principles**

Employee brought action for damages for wrongful dismissal — Employer admitted prior to trial that it did not have cause to dismiss employee — Trial judge found that employer acted precipitously and in bad faith and did not treat employee fairly in manner of her dismissal — Trial judge fixed reasonable notice period at 12 months and stated that in doing so she was increasing otherwise-appropriate notice period to take employer's bad faith into account — Counsel for employer then revealed to trial judge existence of unaccepted offer to settle for more than amount of judgment and sought partial indemnity costs from date of offer in amount of $5,000 pursuant to R. 49 of Ontario Rules of Civil Procedure — Trial judge indicated that she had made mistake and that she had intended to set reasonable notice period at 13 months — When defence counsel indicated that judgment was still less than offer to settle, trial judge awarded costs to defendant in amount of $5,000 — Four days later, before judgment was entered, trial judge recalled parties and stated that upon further reflection she felt that appropriate notice period, in absence of employer's bad faith, was 12 months and that notice period should be increased by four months to reflect employer's bad faith — As judgment based on 16-month notice period was greater than offer to settle, trial judge awarded employee costs on party and party basis throughout — Employee appealed and employer cross-appealed — Appeal and cross-appeal dismissed — Nothing in R. 49 prohibited trial judge from changing her order after existence of offer to settle was revealed to her and before judgment was entered — Record did not sustain conclusion that trial judge made changes in order to avoid cost consequences of R. 49 for employee — Had trial judge wished to alleviate consequences of R. 49 for employee she could have done so by using residual discretion given to her by R. 49 itself.

2004 CarswellOnt 11, [2004] O.J. No. 13, 128 A.C.W.S. (3d) 93, 180 O.A.C. 381...

**Employment law --- Termination and dismissal — Notice — Considerations affecting length of notice — General**

Employee was employed by bank as data entry operator for 15 1/2 years — Employee was away from work as result of shoulder injury — Employee's claim for long-term disability benefits was denied by administrator of employer's long-term disability plan because it was inadequately supported by available medical information — Employer told employee that she was expected to return to her regular duties no later than July 22, 1991, failing which she would be assumed to have abandoned her employment — Employee notified employer that she had upcoming appointments with two doctors — Employer terminated employee's employment on day after her second medical appointment without acknowledging appointments or making inquiries about what plaintiff had learned or when resulting medical reports might be expected — Employee brought action for damages for wrongful dismissal — Employer admitted prior to trial that it did not have cause to dismiss employee — Trial judge found that employer acted precipitously and in bad faith and did not treat employee fairly in manner of her dismissal — Trial judge fixed reasonable notice period at 12 months and stated that in doing so she was increasing otherwise-appropriate notice period to take employer's bad faith into account — Counsel for employer then revealed to trial judge existence of unaccepted offer to settle for more than amount of judgment and sought partial indemnity costs from date of offer in amount of $5,000 pursuant to R. 49 of Ontario Rules of Civil Procedure — Trial judge indicated that she had made mistake and that she had intended to set reasonable notice period at 13 months — When defence counsel indicated that judgment was still less than offer to settle, trial judge awarded costs to defendant in amount of $5,000 — Four days later, before judgment was entered, trial judge recalled parties and stated that upon further reflection she felt that appropriate notice period, in absence of employer's bad faith, was 12 months and that notice period should be increased by four months to reflect employer's bad faith — As judgment based on 16-month notice period was greater than offer to settle, trial judge awarded employee costs on party and party basis throughout — Employee appealed and employer cross-appealed — Appeal and cross-appeal dismissed — Trial judge did not err in fixing reasonable notice period and it could not be said that 16 months' notice was outside acceptable range — Trial judge did not err in extending notice period because of employer's bad faith.

**Employment law --- Termination and dismissal — Practice and procedure — Remedies — Damages — Punitive or exemplary damages**

Employee was employed by bank as data entry operator for 15 1/2 years — Employee was away from work as result of shoulder injury — Employee's claim for long-term disability benefits was denied by administrator of employer's long-term disability plan because it was inadequately supported by available medical information — Employer told employee that she was expected to return to her regular duties no later than July 22, 1991, failing which she would be assumed to have abandoned her employment — Employee notified employer that she had upcoming appointments with two doctors — Employer terminated employee's employment on day after her second medical appointment without acknowledging appointments or making inquiries about what plaintiff had learned or when resulting medical reports might be expected — Employee brought action for damages for wrongful dismissal — Employer admitted prior to trial that it did not have cause to dismiss employee — Trial judge found that employer acted precipitously and in bad faith and did not treat employee fairly in manner of her dismissal — Trial judge found that reasonable notice period was 12 months and that it should be increased by four months to reflect employer's bad faith — Trial judge declined to award aggravated or punitive damages — Employee appealed — Appeal dismissed — Trial judge did not err in dismissing employee's claim for aggravated and punitive damages as there was ample evidence to support her conclusion that there was no malice or vindictiveness by employer and as employer's conduct did not constitute separately actionable wrong.

**Table of Authorities**

**Cases considered by *Goudge J.A.*:**

> *Bardal v. Globe & Mail Ltd.* (1960), 1960 CarswellOnt 144, [1960] O.W.N. 253, 24 D.L.R. (2d) 140 (Ont. H.C.) — considered

Case 09-10138-MFW   Doc 15744-2   Filed 06/12/15   Page 29 of 342

Montague v. Bank of Nova Scotia, 2004 CarswellOnt 11

2004 CarswellOnt 11, [2004] O.J. No. 13, 128 A.C.W.S. (3d) 93, 180 O.A.C. 381...

*Holmes Foundry Ltd. v. Point Edward (Village) (1963), [1963] 2 O.R. 404, 39 D.L.R. (2d) 621* (Ont. C.A.) — considered

*Minott v. O'Shanter Development Co. (1999), 1999 CarswellOnt 1, 99 C.L.L.C. 210-013, 40 C.C.E.L. (2d) 1, 168 D.L.R. (4th) 270, 117 O.A.C. 1, 42 O.R. (3d) 321* (Ont. C.A.) — referred to

*Noseworthy v. Riverside Pontiac-Buick Ltd. (1998), 1998 CarswellOnt 4889, 39 C.C.E.L. (2d) 37, 168 D.L.R. (4th) 629, 116 O.A.C. 265* (Ont. C.A.) — referred to

*R. v. Sheppard (2002), 2002 SCC 26, 2002 CarswellNfld 74, 2002 CarswellNfld 75, 162 C.C.C. (3d) 298, 210 D.L.R. (4th) 608, 50 C.R. (5th) 68, 284 N.R. 342, 211 Nfld. & P.E.I.R. 50, 633 A.P.R. 50, [2002] 1 S.C.R. 869* (S.C.C.) — referred to

*Wallace v. United Grain Growers Ltd. (1997), 152 D.L.R. (4th) 1, 219 N.R. 161, 1997 CarswellMan 455, 1997 CarswellMan 456, 123 Man. R. (2d) 1, 159 W.A.C. 1, 97 C.L.L.C. 210-029, [1997] 3 S.C.R. 701, 36 C.C.E.L. (2d) 1, 3 C.B.R. (4th) 1, [1999] 4 W.W.R. 86, [1997] L.V.I. 2889-1* (S.C.C.) — followed

**Statutes considered:**

*Occupiers' Liability Act*, R.S.O. 1990, c. O.2
    Generally — referred to

**Rules considered:**

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194
    R. 49 — referred to

    R. 49.06 — considered

    R. 49.06(2) — referred to

    R. 49.06(3) — referred to

APPEAL AND CROSS-APPEAL from judgment reported at *2001 CarswellOnt 5895* (Ont. S.C.J.) in action for damages for wrongful dismissal.

*Goudge J.A.*:

1    The appellant Yvonne Montague was terminated from her employment with the respondent, Bank of Nova Scotia, on July 24, 1991. She sued for wrongful dismissal. Prior to trial, the Bank admitted that it did not have cause to terminate Mrs. Montague's employment. On October 19, 2001, Chapnik J. awarded the appellant damages equivalent to sixteen months' notice together with pre-judgment interest and costs fixed at $5,000.

2    Mrs. Montague appeals, arguing that the trial judge erred in awarding too little notice and in dismissing her claim for aggravated and punitive damages.

3    The Bank cross-appeals, arguing that the notice period is too long and that the trial judge erred in increasing it after she had been advised of the Bank's offer to settle pursuant to Rule 49.

4    For the reasons that follow, I would dismiss both the appeal and the cross-appeal.

2004 CarswellOnt 11, [2004] O.J. No. 13, 128 A.C.W.S. (3d) 93, 180 O.A.C. 381...

## THE FACTS

5    Mrs. Montague was employed by the Bank as a data entry operator for approximately fifteen and one-half years, from January 26, 1976 to July 24, 1991. When she was terminated, she was earning an annual salary of $24,750.00, plus a shift bonus valued at $1,254.50 per year. Her employee benefits were valued at $2,600.45 per year.

6    On August 13, 1990, Mrs. Montague slipped and fell at work, injuring her right shoulder. As a result she was away from work until January 2, 1991, when she returned to a modified work schedule, as recommended by her doctors.

7    On February 18, 1991, Mrs. Montague again fell at work and injured her lower back. Again she was off work, this time until April 15, 1991, again returning to a modified work schedule. However, she was unable to sustain this schedule, and on April 30, 1991 she stopped working altogether.

8    Mrs. Montague's claim for long-term disability was denied by the administrator of the Bank's long-term disability plan because it was inadequately supported by the available medical information. On July 8, 1991, the Bank wrote to Mrs. Montague to advise that because of this decision, she was expected to return to her regular work duties on her usual shift no later than July 22, 1991, failing which she would be treated as having abandoned her employment. The letter also indicated that she could appeal the rejection of her long-term disability claim if she provided further medical documentation. At that time, the Bank had a number of medical reports about Mrs. Montague, both from her own doctors and from doctors she had seen at the Bank's request. There was clearly some medical controversy over whether she was able to do the keypunch work required by her regular job.

9    On the day she received the Bank's letter of July 8, 1991, Mrs. Montague delivered a written reply advising that she had made appointments with two other physicians to whom she had been referred by her family doctor. One appointment was scheduled for July 12, 1991 and the other, with an internal medicine specialist, for July 23, 1991. Mrs. Montague indicated that reports from these two doctors would be submitted to the Bank.

10    Despite this, on July 24 1991, the day after her appointment with the specialist, the Bank wrote to Mrs. Montague terminating her employment. The letter did not acknowledge the fact of the two recent medical consultations. Nor did the Bank make any inquiries of Mrs. Montague about what she had learned or when the resulting medical reports might be expected. It simply fired her.

11    Mrs. Montague commenced an action against the Bank, seeking damages for her injuries under the *Occupiers' Liability Act*, R.S.O. 1990, c. O.2 and damages for wrongful dismissal. She succeeded in the former claim, but the latter claim was dismissed as *res judicata* because of a complaint she had lodged with the Canadian Human Rights Commission.

12    Mrs. Montague appealed, and this court set aside the dismissal of her wrongful dismissal claim. It then proceeded to the trial from which the present appeal is taken.

13    At the conclusion of four days of evidence, the trial judge made the following findings.

14    First, she concluded that this case engaged the considerations set out in *Wallace v. United Grain Growers Ltd.*, [1997] 3 S.C.R. 701 (S.C.C.), thus increasing the period of reasonable notice to which Mrs. Montague was entitled on termination. The trial judge put it this way:

> In all of the circumstances, I have no difficulty whatsoever in finding that the bank acted precipitously and in bad faith; it did not treat the plaintiff fairly in the manner of her dismissal. Ms. Montague at no time took any action which suggested abandonment of her employment. On the contrary, she was in continuous contact with both the nurse, Dorothy Harris, and Linda Jackson, Personnel Manager, as confirmed by Rena Benson, about her disability, which she claimed needed to be accommodated. Her summary dismissal by letter in view of the pending medical visits to the knowledge of the defendant was unreasonable, and the position taken that she had abandoned her job was, in the circumstances, quite preposterous.

Montague v. Bank of Nova Scotia, 2004 CarswellOnt 11

2004 CarswellOnt 11, [2004] O.J. No. 13, 128 A.C.W.S. (3d) 93, 180 O.A.C. 381...

15    Second, the trial judge found that it would not be reasonable to place a duty on the appellant to mitigate her damages during the notice period, given her medical condition at that time.

16    Third, the trial judge concluded that the respondent's conduct towards the appellant did not constitute an independent actionable wrong and was not so egregious as to offend the court's sense of decency. Hence she dismissed the claims for both aggravated and punitive damages.

17    Finally, the trial judge fixed the period of reasonable notice in these words:

In the circumstances, I award her damages at the high end of the scale, in effect raising the notice period pursuant to the *Wallace* decision by finding the period of reasonable notice to be 12 months.

That's my decision.

18    Immediately thereafter this exchange occurred between counsel for the respondent and the trial judge:

MR. LEONARD: Perhaps I might go first, Your Honour. There was an offer to settle. I have to bring it to your attention, and I apologize for this, Your Honour, I only brought one set of that. I'm happy to hand it up. You'll see that you've awarded twelve months. By my calculation that award would be an award of $28,604.95, and you'll see that offer is for $30,500, which is more than that, plus prejudgment interest, plus party and party costs to the date of that offer. So, my submission to you simply is that we've met the requirements of Rule 49. I'm completely in Your Honour's hands, obviously, and your discretion not to apply Rule 49 in these circumstances if you are so inclined.

THE COURT: Did I say twelve months including the increase because of the *Wallace* decision?

MR. LEONARD: You did. Is that not what you intended?

THE COURT: No. I meant at least another month.

19    Counsel then advised the trial judge that even with a thirteen month notice period, his offer triggered the effect of Rule 49, and he asked for partial indemnity costs from the date of the offer in the amount of $5,000.

20    The trial judge concluded the day with this:

THE COURT: The law is the law; it's not always the fairest thing, but in light of the offer, I don't think I really have a choice. I think I must order the thirteen months reasonable notice and $5,000 costs to the defendant. I would hope that in the long run they are not required.

21    Four days later, the judgment not having been entered in the court records, the trial judge summoned the parties back to court. She opened the court as follows:

THE COURT: You will recall, Mrs. Montague and Mr. Leonard, that at the end of my judgment on Friday, I awarded damages to Mrs. Montague at the high end of the notice scale which I deemed to be eight to twelve months and fixed the period of reasonable notice, the appropriate period at twelve months. I said that would in effect increase the notice period pursuant to the *Wallace* decision. Then in the course of discussion, I increased the entire notice period to thirteen months.

On further reflection, I think that I should have dealt with the period of reasonable notice separately from the *Wallace* factors. And, in my view, the thirteen months is a bit low. To properly reflect my findings regarding the *Wallace* factor, that is, the improper manner of dismissal, the knowledge of its probable effect on the plaintiff, the withholding of the letters and the whole picture from Mr. Seymour, and the actual effect of the dismissal on the plaintiff, I should have added instead of one month four months to the period of reasonable notice. The twelve month period of reasonable notice was decided according to the factors listed in the *Bardal vs. Global and Mail* case, taking into account the plaintiff's age at

Montague v. Bank of Nova Scotia, 2004 CarswellOnt 11

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 32 of 342

2004 CarswellOnt 11, [2004] O.J. No. 13, 128 A.C.W.S. (3d) 93, 180 O.A.C. 381...

the time, her qualifications, her disability, and so on. So that the appropriate notice period should be twelve months plus four months or sixteen months in all.

Now, I know this will change the cost factor, as well.

22    The trial judge then invited submissions on costs, given the change in the period of reasonable notice. Counsel for the respondent conceded that he was no longer entitled to the benefit of Rule 49 but urged that there should be no costs against the Bank since Mrs. Montague had represented herself from shortly before the trial. The appellant asked for costs in the amount of $5,000 because that was what counsel for the Bank had sought four days earlier, and because she had in fact paid a lawyer that amount to do the work leading up to the trial.

23    The trial judge concluded the proceedings by awarding the appellant costs on a party and party basis throughout, fixed at $5,000.

**THE APPEAL**

24    The appellant's primary submission is that the trial judge erred in concluding that the period of reasonable notice required in this case was limited to sixteen months. As Laskin J.A. said in *Minott v. O'Shanter Development Co.* (1999), 42 O.R. (3d) 321 (Ont. C.A.), this submission must be judged against the standard of appellate review of wrongful dismissal awards. He described it this way at p. 343-344:

> Determining the period of reasonable notice is an art not a science. In each case trial judges must weigh and balance a catalogue of relevant factors. No two cases are identical; and, ordinarily, there is no one "right" figure for reasonable notice. Instead, most cases yield a range of reasonableness. Therefore, a trial judge's determination of the period of reasonable notice is entitled to deference from an appellate court. An appeal court is not justified in interfering unless the figure arrived at by the trial judge is outside an acceptable range or unless, in arriving at the figure, the trial judge erred in principle or made an unreasonable finding of fact. . . . If the trial judge erred in principle, an appellate court may substitute its own figure. But it should do so sparingly if the trial judge's award is within an acceptable range despite the error in principle.

25    The trial judge here did not err in principle in fixing the period of reasonable notice. She was alive to and considered the relevant factors as set out in cases like *Bardal v. Globe & Mail Ltd.* (1960), 24 D.L.R. (2d) 140 (Ont. H.C.). She also discussed and applied the principle set out in *Wallace*. Nor can it be said that the sixteen months is below an acceptable range of notice and must therefore be increased. On the contrary, if anything, this would be on the generous side in these circumstances.

26    Thus the appellant's first argument must fail.

27    Second, the appellant argues that the trial judge erred in dismissing her claim for aggravated and punitive damages. I do not agree. There was ample evidence to support the conclusion of the trial judge that there was no malice or vindictiveness by the Bank or its officials here. In addition, the evidence does not sustain the conclusion that the Bank's conduct constitutes a separately actionable wrong. Hence punitive damages were properly denied. Moreover, the absence of any separately actionable wrong puts an end to any entitlement to aggravated damages.

28    In the result the appellant's second argument must also fail and the appeal must therefore be dismissed.

**THE CROSS-APPEAL**

29    The respondent's first submission is that the trial judge erred in extending the period of reasonable notice using the considerations described in *Wallace*.

30    I disagree. The trial judge focused on the timing of the termination and the characterization made by the respondent of the appellant's failure to report to work on July 22, 2001. There was ample evidence for her to conclude that the respondent fired the appellant precipitously, knowing of the pending medical visits but making no effort to find out what information they had yielded or when the resulting reports might be available. Moreover, the respondent treated the appellant as having abandoned

Montague v. Bank of Nova Scotia, 2004 CarswellOnt 11

2004 CarswellOnt 11, [2004] O.J. No. 13, 128 A.C.W.S. (3d) 93, 180 O.A.C. 381...

her position, knowing that she had done nothing to suggest that. It was reasonable for the trial judge to assess this conduct as being unreasonable and in bad faith. As a result, *Wallace* was properly applied.

31    Where mitigation or deduction for other benefits is not appropriate, it is no doubt preferable to take a holistic approach to fixing reasonable notice, and to do so on the basis of all relevant factors, including those referred to in *Wallace*, rather than to make a discrete addition to the notice period to reflect the manner of dismissal. See *Noseworthy v. Riverside Pontiac-Buick Ltd.* (1998), 168 D.L.R. (4th) 629 (Ont. C.A.). Nonetheless, the end result of sixteen months does not constitute error in this case. It is within a range of reasonableness given all the circumstances. The cross-appellant's first argument must therefore fail.

32    The Bank's second argument on its cross-appeal is that the trial judge erred in changing her judgment (namely her determination of the reasonable notice period) on two occasions after having reviewed the Bank's offer to settle pursuant to Rule 49.

33    The Bank argues that Rule 49.06(2) and (3) prohibits the trial judge from doing this. Rule 49.06 reads as follows:

**DISCLOSURE OF OFFER TO COURT**

(1) No statement of the fact that an offer to settle has been made shall be contained in any pleading.

(2) Where an offer to settle is not accepted, no communication respecting the offer shall be made to the court at the hearing of the proceeding until all questions of liability and the relief to be granted, other than costs, have been determined.

(3) An offer to settle shall not be filed until all questions of liability and the relief to be granted in the proceeding, other than costs, have been determined.

34    I cannot agree that the rule prohibits the trial judge from changing her order. There can be no doubt that until a judgment is formally entered in the court record, the judge has a very broad discretion to change it. In *Holmes Foundry Ltd. v. Point Edward (Village)*, [1963] 2 O.R. 404 (Ont. C.A.), Laidlaw J.A. put it this way at 407:

It is well settled in law that an order can always be withdrawn, altered or modified by a Judge either on his own initiative or on the application of a party until such time as the order has been drawn up, passed and entered. I refer to *Re Harrison's Share under a Settlement, Harrison v. Harrison*, [1955] 1 Ch. 260 at p. 275, [1955] 1 All E.R. 185.

35    Rule 49.06 is not a prohibition directed at the court. Rather, the rule targets those who might communicate information about an unaccepted offer to the court before liability and consequential relief are determined. It prevents communications to the judge designed to improperly affect the course of justice.

36    The terms of the rule do not purport to limit the broad judicial power to alter a judgment before it is entered. Very clear language would be required to curtail a judicial discretion having such deep historical roots. Nor is there any reason to stretch the rule to achieve this result, since this judicial discretion allows a judge to change his or her judgment precisely to better serve the ends of justice. Rule 49.06 does not prohibit what the trial judge did here.

37    The Bank also argues that the changes made by the trial judge constitute reversible error because the only reason she made the changes was to avoid the cost consequences of Rule 49 for Mrs. Montague.

38    In my view the record does not sustain the conclusion that the changes were made to avoid the cost consequences of Rule 49. The trial judge candidly acknowledged that her first decision (twelve months) was not what she intended and that she had meant at least thirteen months. Then, when she made the second change four days later (to sixteen months), she explained why in her view the *Wallace* factors warranted an additional four months, not just an additional one month. Had the trial judge simply wished to alleviate the consequences of Rule 49 for Mrs. Montague, she could have done so by using the residual discretion given to her by the rule itself. There was no need to change her judgment. The timing of events in this case was clearly unfortunate, as the trial judge recognized. However, this is no reason not to take the trial judge's conclusions at face value.

**Montague v. Bank of Nova Scotia, 2004 CarswellOnt 11**

2004 CarswellOnt 11, [2004] O.J. No. 13, 128 A.C.W.S. (3d) 93, 180 O.A.C. 381...

39      Even if I had come to the opposite conclusion, I would not have interfered with the trial judge's final judgment. I say this because even if the trial judge had erred in principle in the exercise of her discretion, her final assessment that sixteen months constitutes reasonable notice in this case is, in my view, a reasonable conclusion. Hence no appellate intervention is warranted. See *Minott*, *supra* at 24. Given the factors relevant to the assessment of reasonable notice, including the manner of the appellant's termination, sixteen months, although perhaps generous, is within a range of reasonableness in the circumstances and therefore it is a conclusion entitled to deference in this court.

40      I conclude with this. While this is not such a case, I have no doubt that in some cases the very wide discretion a judge has to change his or her judgment before it is entered could be abused if it were exercised for an improper purpose. Any change to a judgment once given, no matter how soundly based, runs the risk of evoking suspicions of abuse on the part of those adversely affected. It is at the least disquieting, and to that extent can put a cloud over the administration of justice. A judge exercising this discretion bears a significant onus to explain the change. Giving clear reasons for decision is always a profoundly important part of judging. See *R. v. Sheppard*, [2002] 1 S.C.R. 869 (S.C.C.). It is never more important than in this circumstance.

41      The appeal and cross-appeal must both be dismissed. In the circumstances there should be no costs to either party.

***Weiler J.A.:***

I agree

***Laskin J.A.:***

I agree

*Appeal and cross-appeal dismissed.*

---

**End of Document**

Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

 Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Montague v. Bank of Nova Scotia, 2004 CarswellOnt 3446

2004 CarswellOnt 3446, 2004 CarswellOnt 3447, [2004] S.C.C.A. No. 79...

2004 CarswellOnt 3446
Supreme Court of Canada

Montague v. Bank of Nova Scotia

2004 CarswellOnt 3446, 2004 CarswellOnt 3447, [2004]
S.C.C.A. No. 79, 200 O.A.C. 200 (note), 332 N.R. 398 (note)

# Yvonne Montague, Asquitte Montague, Andrea Montague, Yvette Montague, Bruce Montague, Jahvon Schurton, by his Litigation Guardian, Andrea Montague and Tiana Schurton, by her Litigation Guardian, Andrea Montague v. Bank of Nova Scotia

Bank of Nova Scotia v. Yvonne Montague, Asquitte Montague, Andrea Montague,
Yvette Montague, Bruce Montague, Jahvon Schurton, by his Litigation Guardian,
Andrea Montague and Tiana Schurton, by her Litigation Guardian, Andrea Montague

Binnie J., Fish J., Major J.

Judgment: August 26, 2004
Docket: 30191

Proceedings: Leave to appeal refused, 2004 CarswellOnt 11, 2004 C.L.L.C. 210-027, 69 O.R. (3d) 87, 30 C.C.E.L. (3d) 71, 180 O.A.C. 381 (Ont. C.A.); Affirmed, 2001 CarswellOnt 5895 (Ont. S.C.J.); Additional reasons, 2001 CarswellOnt 5894 (Ont. S.C.J.)

Counsel: None given

Subject: Civil Practice and Procedure; Employment; Public

**Headnote**
  **Civil practice and procedure**

  **Employment law**

**Per Curiam:**

1    The applications for leave to appeal from the judgment of the Court of Appeal for Ontario, Number C37146, dated January 7, 2004, are dismissed

**End of Document**    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# Tab 3

2015 ONCA 360
Ontario Court of Appeal

Mujagic v. Kamps

2015 CarswellOnt 7272, 2015 ONCA 360

# Mirsada Mujagic, Armela Mujagic and Belmir Mujagic, Plaintiffs (Moving Parties) and Annette Kamps and State Farm Mutual Automobile Insurance Company, Defendants (Responding Party)

Doherty J.A., E.E. Gillese J.A., P. Lauwers J.A.

Judgment: May 20, 2015
Docket: CA M44355, M44948

Counsel: Rodney M. Godard, for Moving Parties
Kieran C. Dickson, for Responding party

Subject: Civil Practice and Procedure; Insurance

**Headnote**

**Insurance --- Actions on policies — Practice and procedure — Miscellaneous**

Jurisdiction — Plaintiff was involved in automobile accident — Plaintiffs' action for damages was dismissed — Trial judge found plaintiff 30 per cent liable and awarded zero damages — Trial judge found injuries were not due to accident — Appeal by plaintiffs to divisional court was dismissed — Plaintiffs' application for leave to appeal was dismissed — Plaintiffs brought motion for reconsideration — Motion dismissed — Court had no jurisdiction to set aside findings — Rule 61.16(6.1) of Rules of Civil Procedure governed motion, so that plaintiffs required to rely on R. 37.14 or R. 59.06 or decision could not be set aside or varied — No new fact had been introduced to allow reconsideration — Jurisprudence relied upon by plaintiff was not new fact as required under R. 59.06 — Rule 37.14 was inapplicable.

**Civil practice and procedure --- Practice on appeal — Appeal to Supreme Court of Canada — Leave to appeal — General principles**

Jurisdiction.

**Table of Authorities**

**Cases considered by *Doherty J.A.*:**

*First Elgin Mills Developments Inc. v. Romandale Farms Ltd.* (2015), 51 R.P.R. (5th) 1, 89 C.E.L.R. (3d) 188, 2015 CarswellOnt 896, 2015 ONCA 54, 381 D.L.R. (4th) 114 (Ont. C.A.) — referred to

*Holmes Foundry Ltd. v. Point Edward (Village)* (1963), 39 D.L.R. (2d) 621, [1963] 2 O.R. 404, 1963 CarswellOnt 272 (Ont. C.A.) — referred to

*Metro-Can Construction Ltd. v. R.* (2001), 2001 FCA 227, 2001 CarswellNat 1412, 2001 D.T.C. 5410, 273 N.R. 273, [2001] 4 C.T.C. 13, *(sub nom. Metro-Can Construction Ltd. v. Canada)* 203 D.L.R. (4th) 741, 2001 CAF 227, 2001 CarswellNat 4999 (Fed. C.A.) — considered

**WestlawNext**® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

*Montague v. Bank of Nova Scotia* (2004), 2004 CarswellOnt 11, 2004 C.L.L.C. 210-027, 69 O.R. (3d) 87, 30 C.C.E.L. (3d) 71, 180 O.A.C. 381 (Ont. C.A.) — referred to

*Mujagic v. Kamps* (2014), 2014 CarswellOnt 14014, 2014 ONSC 5504 (Ont. Div. Ct.) — referred to

*Pastore v. Aviva Canada Inc.* (2012), 2012 CarswellOnt 17252, 2012 ONCA 887, *(sub nom. Aviva Canada Inc. v. Pastore)* 300 O.A.C. 355 (Ont. C.A.) — referred to

*Trainor v. Canada (Customs & Revenue Agency)* (2011), 2011 ONCA 794, 2011 CarswellOnt 14268, 20 C.P.C. (7th) 227 (Ont. C.A.) — considered

*Trainor v. Canada (Customs & Revenue Agency)* (2012), 2012 ONSC 3450, 2012 CarswellOnt 7368 (Ont. Div. Ct.) — referred to

*Westerhof v. Gee Estate* (2015), 2015 ONCA 206, 2015 CarswellOnt 3977 (Ont. C.A.) — considered

**Statutes considered:**

*Supreme Court Act*, R.S.C. 1985, c. S-26
    s. 59(1) — referred to

**Rules considered:**

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194
    R. 37.14 — considered

    R. 53.03 — considered

    R. 59.06 — considered

    R. 59.06(2)(a) — considered

    R. 61.16 — considered

    R. 61.16(6.1) [en. O. Reg. 43/14] — considered

**Words and phrases considered:**

**law**

The distinction between fact and law is well-established. Facts come from evidence,

including new testimony and exhibits. Law comes from statute books and case

law. The law is applied to the facts to produce a result.

MOTION by plaintiffs to set aside judgment refusing leave to appeal from judgment arising out of personal injury claim.

*Doherty J.A.:*

1    Counsel for the moving parties brings a motion asking this court to reconsider the refusal to grant leave to appeal from the judgment of the Divisional Court. Counsel submits that this court's decision in *Westerhof v. Gee Estate*, 2015 ONCA 206, [2015] O.J. No. 1472 (Ont. C.A.), released after leave to appeal was refused, has significantly changed the interpretation of rule 53.03. Counsel submits that, in light of the interpretation of rule 53.03 provided by this court in *Westerhof*, the trial judge improperly excluded important opinion evidence from two of Ms. Mujagic's treating physicians. Counsel asks for a fresh opportunity, armed with *Westerhof*, to convince a panel of this court that leave to appeal should be granted.

2    Ms. Mujagic was in a car accident in 2001. She eventually sued. The action was tried in 2011. The defence did not deny that Ms. Mujagic suffered from significant pain and disability associated with spine and neck problems. The defence argued, however, that those problems were not caused by the 2001 car accident. Causation was a central issue at trial. The jury found the defendant 30 per cent responsible for the accident, but awarded zero damages. Ms. Mujagic represented herself at the trial.

3    Ms. Mujagic unsuccessfully appealed to the Divisional Court: *Mujagic v. Kamps*, 2014 ONSC 5504 (Ont. Div. Ct.). She sought leave to appeal from that decision to this court. Leave was refused on February 6, 2015. *Westerhof* was released on March 26, 2015, and Ms. Mujagic commenced this motion very shortly thereafter.

4    The motion raises two questions:

  • Does this court have jurisdiction to reconsider the motion for leave to appeal?

  • If the court has jurisdiction, should it order a reconsideration of the motion for leave to appeal?

**Jurisdiction**

5    Neither party has taken out an order dismissing the motion for leave to appeal. Generally speaking, there is no jurisdictional impediment to the court reconsidering its decision when no order has been taken out and entered: *Holmes Foundry Ltd. v. Point Edward (Village)*, [1963] 2 O.R. 404 (Ont. C.A.), at p. 407; *Montague v. Bank of Nova Scotia* (2004), 69 O.R. (3d) 87 (Ont. C.A.), at para. 34; *Pastore v. Aviva Canada Inc.*, 2012 ONCA 887, 300 O.A.C. 355 (Ont. C.A.), at para. 9; *First Elgin Mills Developments Inc. v. Romandale Farms Ltd.*, 2015 ONCA 54, 381 D.L.R. (4th) 114 (Ont. C.A.), at para. 7.

6    Counsel for the respondent has, however, referred the court to rule 61.16(6.1). That rule, brought into force in July 2014 (see: O. Reg. 43/14, ss. 19, 21), applies to motions in the Court of Appeal. It reads:

  Subject to rules 37.14 and 59.06, an order or decision of a panel of an appellate court may not be set aside or varied under these rules.

7    The use of the phrase "order or decision" is instructive and renders the taking out of an order irrelevant to the power to reconsider a decision governed by rule 61.16. The inclusion of the word "decision" reflects the practical reality that orders are often not taken out when motions are dismissed in the Court of Appeal.

8    As rule 61.16(6.1) applies to this motion, the moving parties must bring themselves within rules 37.14 or 59.06 for this court to have jurisdiction to set aside or vary its decision refusing leave to appeal. Rule 37.14 has no application in the circumstances of this case. The moving parties do, however, rely on rule 59.06 and specifically rule 59.06(2)(a), which provides:

  A party who seeks to,

  (a) have an order set aside or varied on the ground of fraud or of facts arising or discovered after it was made;

                                         . . . . .

  may make a motion in the proceeding for the relief claimed.

9    Counsel for the moving parties submits that the change in the jurisprudence effected by *Westerhof* amounts to a "fact arising" after the decision refusing leave to appeal was made. I cannot accept that submission. The distinction between fact and law is

well-established. New facts come from evidence, including new testimony and exhibits. Law comes from statute books and case law. The law is applied to the facts to produce a result. Rule 59.06(2)(a), by its plain meaning, speaks to "facts arising or discovered" and not to jurisprudential changes. New facts, like all facts, are found in evidence, not in the statute books or case law.

10      There is relatively little case law on this exact issue, perhaps because the language of the rule is so clear. The limited case law is against the moving parties. In *Trainor v. Canada (Customs & Revenue Agency)*, 2011 ONCA 794, [2011] O.J. No. 5741 (Ont. C.A.), this court noted, at para. 3, that a change in jurisprudence is not a new fact for the purposes of rule 59.06. The Divisional Court took the same position when the matter went back to that court: see *Trainor v. Canada (Customs & Revenue Agency)*, 2012 ONSC 3450, [2012] O.J. No. 2665 (Ont. Div. Ct.), at para. 5. The Federal Court of Appeal, considering a somewhat differently worded rule, came to the same conclusion in *Metro-Can Construction Ltd. v. R.*, 2001 FCA 227, 203 D.L.R. (4th) 741 (Fed. C.A.). Justice Rothstein observed, at para. 4, that interpreting the phrase "a matter that arose or was discovered" (the language of the operative Federal Court rule) to include changes in the law "would create unacceptable uncertainty for litigants and the public who must be satisfied that, once a judgment is rendered, it is final."

11      I agree with counsel for the respondent's submission that rule 61.16(6.1) applies to a motion to reconsider this court's decision refusing leave to appeal. The moving parties cannot bring themselves within either rule 37.14 or rule 59.06. This court therefore has no jurisdiction to set aside or vary its prior decision refusing leave to appeal.

**The Merits**

12      Although I would dismiss the motion on jurisdictional grounds, I think the motion would fail on its merits in any event. Even where the court has power to reconsider a decision because an order has not been taken out, that power will be exercised sparingly and only where it is clearly in the interests of justice: e.g. see *First Elgin Mills Developments*, at para. 7.

13      There are three reasons why the interests of justice would not favour reconsidering the refusal of leave in this case. First, the moving parties had the opportunity to challenge the correctness of *Westerhof* on the motion for leave to appeal. This court's decision in *Westerhof* was on reserve at the time of the leave motion. The moving parties chose not to make that challenge, but instead advanced a different argument in their factum. Motions for reconsideration are not the venue for new arguments that could have been made on the initial motion.

14      Second, even if this court applied the interpretation of rule 53.03 provided in *Westerhof*, it is far from clear on the record before this court that the plaintiff was entitled to elicit opinions from her treating physicians about any causal connection between the car accident and her injuries without meeting the notice requirements of rule 53.03. It may well be that *Westerhof* would have no impact on the admissibility of that evidence.

15      Third, and I think most importantly, there is nothing filed on the motion for reconsideration to suggest that either treating physician had the expertise required to give an opinion on the causation issue, or that either had an opinion on the causation issue. One of the treating doctors was a psychologist. It seems to me unlikely that he could make any meaningful contribution to the question of the causal link, if any, between Ms. Mujagic's accident and her subsequent neck and back injuries and pain. The other treating physician, a physiatrist, did not see Ms. Mujagic until approximately five years after the accident. There is nothing to suggest he was in a position to give an opinion on the causation question.

16      I would not order a reconsideration of the decision refusing leave even if this court had the jurisdiction to make that order.

**The Alternative Relief Claim**

17      Counsel for the moving parties asked this court to extend the time for delivery of an application for leave to appeal to the Supreme Court of Canada, should this court decline to reconsider its earlier decision refusing leave. This court would appear to have jurisdiction to grant the requested extension: *Supreme Court Act*, R.S.C. 1985, c. S-26, s. 59(1).

18      The Supreme Court of Canada, as the court of last resort, has total control over its own docket in civil matters. Except in the most unusual circumstances, questions relating to access to that court should be addressed by that court. The moving

parties have not advanced any persuasive reason for this court to make an order in respect of a proceeding in the Supreme Court of Canada. I would not make any order extending the time for delivery of an application for leave to appeal to the Supreme Court of Canada.

**Disposition**

19      I would dismiss the motion with costs, if requested. If counsel cannot agree on the quantum, they may make written submissions of three pages or less within 14 days of the release of these reasons.

***E.E. Gillese J.A.***:

I agree

***P. Lauwers J.A.***:

I agree

*Motion dismissed.*

---

End of Document        Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.        5

# Tab 4

2015 ONCA 54, 2015 CarswellOnt 896, 249 A.C.W.S. (3d) 503, 381 D.L.R. (4th) 114...

2015 ONCA 54
Ontario Court of Appeal

First Elgin Mills Developments Inc. v. Romandale Farms Ltd.

2015 CarswellOnt 896, 2015 ONCA 54, 249 A.C.W.S. (3d) 503,
381 D.L.R. (4th) 114, 51 R.P.R. (5th) 1, 89 C.E.L.R. (3d) 188

# First Elgin Mills Developments Inc., Applicant (Appellant/Responding Party) and Romandale Farms Limited, Angela Maria Roman, Anne Catherine Ruth Roman, David Andrew Roman, Stephen George Roman, and Helen Elizabeth Roman-Barber, Respondents (Respondents/Moving Parties)

Gloria Epstein, P. Lauwers, G. Pardu JJ.A.

Judgment: January 28, 2015 *
Docket: CA M44238, C57028

Proceedings: Refusing reconsideration *First Elgin Mills Developments Inc. v. Romandale Farms Ltd.* (2014), 2014 CarswellOnt 10590, [2014] O.J. No. 3626, 45 R.P.R. (5th) 1, 84 C.E.L.R. (3d) 70, 324 O.A.C. 153, 2014 ONCA 573, G. Pardu J.A., Gloria Epstein J.A., P. Lauwers J.A. (Ont. C.A.); Reversing *First Elgin Mills Developments Inc. v. Romandale Farms Ltd.* (2013), 75 C.E.L.R. (3d) 296, 2013 ONSC 4220, 2013 CarswellOnt 3897, 31 R.P.R. (5th) 297, 2013 ONSC 1919, E.M. Morgan J. (Ont. S.C.J.)

Counsel: R. Leigh Youd, Adam J. Wygodny, for Moving Parties
John J. Longo, Martin J. Henderson, for Responding Party

Subject: Civil Practice and Procedure; Contracts; Corporate and Commercial; Property; Public

## Headnote

### Administrative law --- Standard of review — Correctness

Standard of review on appeal was held to be correctness, because it involved interpretation of contract — Respondents brought motion for re-hearing of appeal on basis that court applied wrong standard of review — Motion dismissed — Result of appeal was not driven by standard of review and would not have been different under application of test in Sattva Capital Corp. v. Creston Moly Corp. — Application judge misapprehended evidence, reached interpretation of agreement that was commercially unreasonable and improperly implied term in agreement when legal standard for doing so was not met — Predominant errors made by application judge were properly classified as legal errors, thus attracting standard of correctness.

## Table of Authorities

### Cases considered:

*Creston Moly Corp. v. Sattva Capital Corp.* (2014), 2014 SCC 53, 2014 CSC 53, 461 N.R. 335, 25 B.L.R. (5th) 1, 373 D.L.R. (4th) 393, [2014] 9 W.W.R. 427, 2014 CarswellBC 2267, 2014 CarswellBC 2268, 59 B.C.L.R. (5th) 1, 358 B.C.A.C. 1, 614 W.A.C. 1 (S.C.C.) — followed

*Doman Forest Products Ltd. v. GMAC Commercial Credit Corp. - Canada* (2005), 7 C.P.C. (6th) 309, 209 B.C.A.C. 197, 345 W.A.C. 197, 2005 BCCA 111, 2005 CarswellBC 433 (B.C. C.A.) — referred to

First Elgin Mills Developments Inc. v. Romandale Farms Ltd., 2015 ONCA 54, 2015...

2015 ONCA 54, 2015 CarswellOnt 896, 249 A.C.W.S. (3d) 503, 381 D.L.R. (4th) 114...

*Gore Mutual Insurance Co. v. 1443249 Ontario Ltd.* (2004), 2004 CarswellOnt 1468, 70 O.R. (3d) 404, [2004] O.T.C. 319, 10 M.V.R. (5th) 67 (Ont. S.C.J.) — referred to

*McDowell v. Barker* (2014), 2014 CarswellOnt 6184 (Ont. C.A.) — referred to

*Pastore v. Aviva Canada Inc.* (2012), 2012 CarswellOnt 17252, 2012 ONCA 887, *(sub nom. Aviva Canada Inc. v. Pastore)* 300 O.A.C. 355 (Ont. C.A.) — referred to

MOTION by respondents for re-hearing appeal on basis that court applied wrong standard of review in case reported at *First Elgin Mills Developments Inc. v. Romandale Farms Ltd.* (2014), 2014 ONCA 573, 2014 CarswellOnt 10590, 84 C.E.L.R. (3d) 70, 45 R.P.R. (5th) 1, [2014] O.J. No. 3626, 324 O.A.C. 153 (Ont. C.A.).

*Per curiam*:

1      Reasons for judgment in this appeal were released by the court on Wednesday, August 6, 2014, and are reported at 2014 ONCA 573 (Ont. C.A.). The moving parties, led by Romandale Farms, have brought a motion for a re-hearing of the appeal on the basis that the court applied the wrong standard of review and that the interests of justice require a re-hearing.

2      The moving parties allege that the Supreme Court of Canada's decision in *Creston Moly Corp. v. Sattva Capital Corp.*, 2014 SCC 53 (S.C.C.), released on Friday, August 1, 2014, altered the applicable standard of review.

3      Our decision was released several days after the Supreme Court's decision in *Sattva*. It did not refer to that decision. Writing for the court, Lauwers J.A. described the applicable standard of review at para. 29:

> In my view, the standard of review on this appeal is correctness, since it involves the interpretation of a contract, with due deference to be paid to the application judge on those determinations in which the facts dominate: *The Plan Group v. Bell Canada*, 2009 ONCA 548, 96 O.R. (3d) 81, at paras. 19-20, 27, 30, 31.

4      In *Sattva*, Rothstein J., writing for the court, held at para. 50 that contractual interpretation involves issues of mixed fact and law. Rothstein J. went on to leave open the possibility of identifying "an extricable question of law from within what was initially characterized as a question of mixed fact and law", including the application of an incorrect principle, the failure to consider a required element of a legal test, or the failure to consider a relevant factor (at para. 53).

5      The moving parties assert that *Sattva* requires a greater degree of appellate deference to the decision of the application judge than this court showed in its reasons for judgment. Accordingly, they argue that this court's decision was made in error, and that the interests of justice require a re-hearing of the appeal.

6      The respondent on the motion, First Elgin Mills Developments Inc., contends that our approach to the standard of review was entirely consistent with the principles articulated in *Sattva*. The predominant errors made by the application judge in this case were properly classified as legal errors, thus attracting the standard of correctness in accordance with the principles articulated in *Sattva*.

7      This court has jurisdiction to reconsider and vary its decision before the formal order is issued: *McDowell v. Barker*, [2014] O.J. No. 2363 (Ont. C.A.), at para. 22; *Pastore v. Aviva Canada Inc.*, 2012 ONCA 887 (Ont. C.A.), at para. 9; *Gore Mutual Insurance Co. v. 1443249 Ontario Ltd.*, [2004] O.J. No. 1896 (Ont. S.C.J.), at paras. 3, 7. However, the court will re-open an appeal prior to the entering of the order only in the type of rare circumstance where it is in the interests of justice to withdraw the reasons of the court and re-hear the case on the merits: *Pastore*, at para. 9.

8      We agree with the British Columbia Court of Appeal that "[s]omething in the nature of overlooked or misapprehended evidence, or failing that, a clear and compelling case in law on the point and the prospect of a very serious injustice absent

**First Elgin Mills Developments Inc. v. Romandale Farms Ltd., 2015 ONCA 54, 2015...**

2015 ONCA 54, 2015 CarswellOnt 896, 249 A.C.W.S. (3d) 503, 381 D.L.R. (4th) 114...

reconsideration" would be required to justify withdrawing the court's reasons and holding a re-hearing: *Doman Forest Products Ltd. v. GMAC Commercial Credit Corp. - Canada*, 2005 BCCA 111, 209 B.C.A.C. 197 (B.C. C.A.), at para. 6.

9    In our view, this is not one of those rare circumstances in which it would be in the interests of justice to withdraw the reasons of the court and re-hear the case on the merits: *Doman Forest Products Ltd.*, at para. 6; *Pastore*, at para. 9. The result in the appeal was not driven by the standard of review and would not have been different under the application of the *Sattva* test. As found in our reasons, the application judge misapprehended the evidence, reached an interpretation of the agreement that was commercially unreasonable, and improperly implied a term in the agreement when the legal standard for doing so was not met. The standard of review articulated in *Sattva* supports appellate intervention in these circumstances.

10    Accordingly, there is no serious injustice that will result if the court refuses to re-hear the appeal.

11    The request to re-hear the appeal in this case is denied.

*Motion dismissed.*

Footnotes

\*    Additional reasons at *First Elgin Mills Developments Inc. v. Romandale Farms Ltd.* (2015), 51 R.P.R. (5th) 5, 2015 ONCA 138, 2015 CarswellOnt 2801, 89 C.E.L.R. (3d) 192 (Ont. C.A.).

---

**End of Document** Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    3

# Tab 5

1963 CarswellOnt 272, [1963] 2 O.R. 404, 39 D.L.R. (2d) 621

1963 CarswellOnt 272
Ontario Court of Appeal

Holmes Foundry Ltd. v. Point Edward (Village)

1963 CarswellOnt 272, [1963] 2 O.R. 404, 39 D.L.R. (2d) 621

# Holmes Foundry Ltd. v. Village of Point Edward

Caposite Insulations Ltd. v. Village of Point Edward

Laidlaw, J.A., Schroeder, J.A., McGillivray, J.A.

Judgment: May 21, 1963
Docket: None given.

Counsel: H.E. Manning, Q.C., for appellant - defendant
D. Park Jamieson, Q.C., K.G. Stoner, for respondent - plaintiff

Subject: Civil Practice and Procedure

### Headnote

**Practice --- Judgments and orders — Amending or varying — Before judgment entered**

Reversal of own judgment — Amending legislation affecting oral judgment of Court of Appeal before judgment perfected — Power to withdraw, alter or modify judgment -- Retroactivity of legislation — Validity of legislation determining reversal of order — Costs — Ontario Municipal Board Act, R.S.O. 1960, c. 274, s. 64 — Ontario Municipal Board Act, R.S.O. 1962-63, c. 97, s. 1(1).

Respondent companies having obtained a judgment holding that a municipality had received the approval of the Ontario Municipal Board under s. 64 of the Act for a sewer project, also required a further approval of the Board to the by-law providing for the raising of funds to pay for the project. The municipality appealed and an oral judgment of the Court of Appeal affirmed the decision of the trial Judge, but the order of the Court was not perfected by entry and issue of the judgment. In the meantime, retroactive amending legislation was passed affecting the operation of s. 64 of the Act and providing that the approval of the Board meant, notwithstanding the decision of any Court, the approval only of the undertaking, work, project, scheme, act, matter or thing mentioned in s. 64(1). On a rehearing of the appeal, held, it was well settled that an order could always be withdrawn, altered or modified by a Judge either on his own initiative or on the application of a party until such time as the order had been drawn up, passed and entered. Once it was established that the amending legislation was within the competence of the Legislature, the retroactive nature of the amending Act compelled the reversal of the oral judgment of the Court of Appeal. The further argument of respondents that the imposition of a sewer rate required a money by-law had no merit as such provisions applied only to debentures. Respondents were entitled to costs down to appellant's motion for a rehearing of the appeal. In the state of the law as it was at the time of the institution of the actions and the appeal, respondents were fully warranted in bringing the proceedings. Consequently, the discretion should be exercised in their favour.

**Practice --- Costs — Costs of appeals — Persons entitled to costs — Successful party deprived of costs**

Exercise of discretion in favour of respondent -- Justification for bringing proceedings before legislative amendment compelling reversal of oral judgment in favour of respondent.

*Laidlaw, J.A.* (dissenting as to costs):

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1    The appellant is an incorporated village in the County of Lambton, Province of Ontario. The respondents are companies duly incorporated and carry on business in the appellant municipality. Each of the respondents commenced an action on May 4, 1962 and claimed *inter alia* "a declaration that the defendant (appellant) municipality wrongfully and without authority levied part of the cost of the sewage works constructed by the defendant municipality against the property of the plaintiff in the Village of Point Edward by including in By-law number 1371 for 1961 of the defendant municipality (which by-law fixed the rates to be levied against the full assessed value of all the property within the limits of the defendant municipality) a sewage rate of 9.05 mills, without passing and obtaining the requisite approval, of a by-law to provide for and authorize the imposition of a sewer rate against the property of the plaintiff and others in the municipality". Both actions came on for trial together before Gale, J., and in written reasons for judgment given by him he expressed the opinion "that Section 64 of The Ontario Municipal Board Act applied in the circumstances, and the result is, that before the Village here could effectively collect moneys to pay for any part of the sewer charges for 1961, it had to pass not only a by-law with respect to the levying of such charges but that by-law had to have the prior approval of the Ontario Municipal Board". Accordingly it was held that although the municipality had received the approval of the Municipal Board under s. 64 of the *Ontario Municipal Board Act*, R.S.O. 1960, c. 274 to the sewer project it also required the approval of the Board to the by-law providing for the raising of funds to pay for the project.

2    The municipal corporation appealed to this Court from the judgment delivered by Gale, J., and at the conclusion of the hearing of the appeal it was the unanimous opinion of the Court that the judgment in appeal should be affirmed and that the appeal should be dismissed with costs. The opinion of the Court and the reasons for judgment were stated orally. The order of the Court has not been perfected by the entry and issue thereof. In the meantime the Legislature of the Province of Ontario passed an Act cited as the *Ontario Municipal Board Amendment Act*, 1962-63, c. 97, s. 1(1). That Act was assented to by His Honour the Lieutenant-Governor of the Province of Ontario on April 26, 1963 and came into force on the day it received Royal assent. I now reproduce s. 1 of the Act.

1(1) Section 64 of *The Ontario Municipal Board Act* is amended by adding thereto the following subsection:

(1a) The approval of the Board mentioned in subsection 1 means and, notwithstanding the decision of any court, shall be deemed always to have meant the approval of the undertaking, work, project, scheme, act, matter or thing mentioned in subsection 1.

3    Counsel for the appellant moves this Court "for leave to present argument that the appeal should be allowed, having regard to the provisions of The Ontario Municipal Board Amendment Act, 1962-63 (No. 2) [now c. 97]".

4    It is well settled in law that an order can always be withdrawn, altered or modified by a Judge either on his own initiative or on the application of a party until such time as the order has been drawn up, passed and entered. I refer to *Re Harrison's Share under a Settlement, Harrison v. Harrison*, [1955] 1 Ch. 260 at p. 275, [1955] 1 All E.R. 185.

5    Counsel for the respondents does not challenge the right of this Court in the circumstances of the instant case to withdraw its oral judgment and to alter or modify that oral judgment in such manner as may be proper. He argued, however, that the Court ought not exercise that right to alter the oral judgment for these reasons

(1) The *Ontario Municipal Board Amendment Act* was passed without any opportunity being afforded to the respondents to make any submissions as to their rights in law.

(2) That Act was an unwarranted and unjustifiable intervention in proceedings pending in the Courts and the judgments of the Courts of this Province including the Court of Appeal for Ontario and in part constituted a judicial declaration that those Courts erred in the interpretation and the meaning and effect given by them to s. 64 of the *Ontario Municipal Board Act*.

(3) The *Ontario Municipal Board Amendment Act* was a wrongful exercise of judicial powers of a Court of last resort.

(4) In any event and apart altogether from the meaning and effect of s. 64 of the *Ontario Municipal Board Act* and the amendment thereto it was necessary in law for the municipality to pass a special money by-law to provide for annual

payments on account of their debt to the Ontario Water Resources Commission and in the absence of such special money by-law the council of the Village of Point Edward could not lawfully include in By-law 1371 for 1961 the rate to be levied against the full assessed value of all the properties within the limits of the municipality to pay the sum due and payable in that year to the Ontario Water Resources Commission.

6    The *Ontario Municipal Board Amendment Act* is twofold in character. First, it contains a definition of the words "approval of the Board mentioned in subsection 1" of s. 64. In that respect counsel for the respondents takes no exception. Secondly it contains a judicial declaration of law that overrules and countermands judgments of the Courts of the Province in pending proceedings and thus is an exercise of judicial functions of a Court of last resort. During the course of argument members of the Court expressed views of disapproval and criticism of that kind of legislation and counsel for all parties notwithstanding their great experience and learning stated that they had been unable to find any precedent for legislation of that character. However, since the hearing I have found the law stated clearly and with ample authority in *Clement's Canadian Constitution*, 3rd ed., pp. 357-8. I quote as follows:

When once it is determined that an Act passed by any Canadian legislature, federal or provincial, is within the power conferred by the British North America Act it is not for any Court of justice to enquire further.

. . . . .

It can not be too strongly put that with the wisdom or expediency or policy of an Act, lawfully passed, no Court has a word to say.

Courts of law are interpreters merely in such case and have no right to enquire whether the jurisdiction has been exercised wisely or unwisely, justly or unjustly. *Magna Charta* may be interfered with; taxation imposed without regard to uniformity or equality; class legislation and laws discriminating against race may be enacted; one man's property may be taken from him and given to another without compensation; *ex post facto* legislation passed; in short, the power may be abused but "the only remedy is an appeal to those by whom the legislature is elected."

Counsel for the respondent argued that the Legislature did not have power to pass that part of the *Ontario Municipal Board Amendment Act* now the subject of controversy. I reject that argument; it is my opinion that the Legislature did have that power. Unquestionably the Legislature had power at the time s. 64(1) was enacted to define the meaning of the words "approval of the Board" as mentioned therein. Likewise it possessed that power at the time the *Ontario Municipal Board Amendment Act* was passed and in my opinion it had power to make that definition retroactive in force and effect. In *Phillips v. Eyre* (1870), 40 L.J.Q.B. 28, Willes, J., said at p. 37:

Retrospective laws are no doubt *prima facie* of questionable policy, and contrary to the general principle that legislation by which the conduct of mankind is to be regulated ought, when introduced for the first time, to deal with future acts, and ought not to change the character of past transactions carried on upon the faith of the then existing law.... Accordingly the Courts will not ascribe retrospective force to new laws affecting rights unless by express words or necessary implication it appears that such was the intention of the legislature. But to affirm that it is naturally or necessarily unjust to take away a vested right of action by Act subsequent is inconsistent both with the common law of England and the constant practice of legislation.

At p. 38 he referred to *Calder v. Bull* (1798), 3 Dallas Rep. 386, in which the Supreme Court of the United States "held that an Act of the State of Connecticut passed to set aside a decree of a Court of Probate, and grant a new hearing was valid, though the effect was ultimately to deprive the party in whose favour the first decision was made of the benefit of the decree". After quoting from the decision in that case the learned Justice proceeded to say at p. 39:

In fine, allowing the general inexpediency of retrospective legislation, it cannot be pronounced naturally or necessarily unjust.... Whether the circumstances of the particular case are such as to call for special and exceptionable remedy, is a question which must in each case involve matter of policy and discretion fit for debate and decision in the Parliament

which would have had jurisdiction to deal with the subject-matter by preliminary legislation, and as to which a court of ordinary municipal law is not commissioned to inquire or adjudicate.

7    I refer also to *A.-G. Can. v. Foster* (1892), 31 N.B.R. 153.

8    Having reached the conclusion that the *Ontario Municipal Board Amendment Act* was wholly within the jurisdiction and power of the Legislature of Ontario I follow the authorities quoted, *supra*, and make no further inquiry and now deliberately refrain from expressing any views as to whether the jurisdiction has been exercised "wisely or unwisely, justly or unjustly".

9    The point that By-law 1371 was invalid in so far as it included the sewer rate to be levied against the full assessed value of all the properties within the limits of the municipality because there is no money by-law approved by the Ontario Municipal Board to provide for and authorize the imposition of such sewer rate was not the subject of argument at the time this appeal first came on for hearing because counsel for the respondents was content to rest his case in this Court on the interpretation and the meaning and effect of s. 64 of the *Ontario Municipal Board Act*. However, he did not waive or abandon his right to support the judgment at trial on the ground now relied on by him and accordingly, this Court heard argument on the point at length. It is my opinion that the objection taken by counsel for the respondent is not sound in law and cannot be given effect. He contended that this case is not distinguishable from one in which the cost of the project is to be paid by the issue of debentures. I cannot agree. I cannot find in s. 282 of the *Municipal Act*, R.S.O. 1960, c. 249, any obligation on the part of a municipality to pass a money by-law for raising in each year by special rate on all the rateable property in the municipality the sum due and payable by the municipality as a contract debt in such year except in the case of a money by-law for the issuing of debentures. But, be that as it may, the Ontario Municipal Board authorized the municipal corporation to enter into an agreement with the Ontario Water Resources Commission for the construction of the sewers and for that purpose the municipal corporation was authorized to "exercise all its powers and pass all requisite by-laws". In pursuance of that authority the council of the municipal corporation passed a by-law authorizing the reeve and clerk of the municipality to enter into an agreement with the Ontario Water Resources Commission for the completion of each phase of the sewage work. Each agreement was made a schedule to a by-law covering each phase. In each agreement the municipality agrees in accordance with s. 40 of the *Ontario Water Resources Commission Act*, R.S.O. 1960, c. 281, to pay to the commission certain sums in each calendar year for a period of 30 years. I conclude that all requisite by-laws were passed by the council of the municipality and that no other special money by-law was requisite to give validity to that part of By-law 1371 now in question.

10    I have given much thought to the matter of costs of the proceedings between the parties at trial and in this Court and have concluded that I must dissent from the opinion of my learned brethren. I can find no reason to believe or even suspect that the *Ontario Municipal Board Amendment Act* was passed at the instigation or upon the request or other action of the appellant. It is said by counsel to have been deemed necessary and expedient by advisors of the government by reason of other similar cases in which large sums of money are owing by various municipalities to the Ontario Water Resources Commission. Thus, whatever may have been the reason for passing the Act I could not justify an order that the appellant pay the costs of the proceedings because of any advantage or benefit obtained by the appellant under the Act or any hardship or prejudice occasioned thereby to the respondents. If the law as declared in the *Ontario Municipal Board Amendment Act* must be deemed to have had force and effect at the time of the commencement of the action, then in my opinion the action would have been properly dismissed with costs to be paid by the plaintiffs to the defendant. Likewise, an appeal, if any, from such a judgment would have been dismissed with costs. I think that in the circumstances of this case the alteration of the opinion of this Court as delivered orally and an order that the judgment at trial be set aside and the action dismissed cannot be attributed directly or indirectly, either wholly or in part, to either party. It is simply the result of a change in the law as made by the *Ontario Municipal Board Amendment Act*. In the circumstances I would not order the payment of costs by either of the parties at trial or in this Court.

11    My conclusion is that the judgment of this Court delivered orally should be withdrawn forthwith; that it should be set aside and in place thereof an order should be made that the appeal to this Court be allowed; that the judgment at trial should be set aside and in place thereof, that the action should be dismissed; and there should be no order as to costs of the action or in this Court.

*Schroeder, J.A.*:

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1963 CarswellOnt 272, [1963] 2 O.R. 404, 39 D.L.R. (2d) 621

12     I agree with the disposition of this appeal as proposed by the Honourable Mr. Justice Laidlaw for the reasons expressed by him, except as to the disposition of costs. In the state of the law as it was at the time of the institution of these actions, and the appeal from the judgment at trial, the plaintiffs were fully warranted in taking the proceedings brought and continued by them. I therefore deem it proper to exercise my discretion with respect to costs in favour of the plaintiffs and accordingly I would direct that they should have the costs of the actions and of the appeals down to the defendant's motion to this Court for a rehearing, as to the costs of which latter proceeding I would make no order. Save as aforesaid, I concur in the judgment of my brother Laidlaw.

*McGillivray, J.A.*:

13     Other than as to costs I concur with the disposition of this action by Laidlaw, J.A.; and I concur with Schroeder, J.A., as to costs.

14     *Appeal allowed.*

---

**End of Document**                    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# Tab 6

2014 ONSC 60
Ontario Superior Court of Justice [Commercial List]

Carmen Alfano Family Trust v. Piersanti

2014 CarswellOnt 33, 2014 ONSC 60, 236 A.C.W.S. (3d) 480

# Bertina Alfano, Trustee of the Carmen Alfano Family Trust, Bertina Alfano, Italo Alfano, trustee of the Italo Alfano Family Trust, Italo Alfano, Ulti Alfano Trustee of the Ulti Alfano Family Trust and Ulti Alfano, Plaintiffs and Terry Piersanti also known as Terry Scatcherd, Christian Piersanti, Piersanti and Co. Barristers and Solicitors, Piersanti and Co. Professional Corporation, 1269906 Ontario Limited, 1281111 Ontario Limited, 1281038 Ontario Limited, 1314112 Ontario Limited, 1281633 Ontario Limited, 1281632 Ontario Limited, 1466556 Ontario Limited, 3957331 Canada Inc., 3964400 Canada Inc., 3968626 Canada Inc., 4002598 Canada Inc., 4011902 Canada Inc., 6051685 Canada Inc., 6060439 Canada Inc., 6260365 Canada Inc., 6292470 Canada Inc., 6306560 Canada Inc., 6324223 Canada Inc., 6792715 Canada Inc., Yonge Centre Properties Inc., 6335144 Canada Inc., TMJ Investments, Tara Piersanti also known as Tara Piersanti-Blake, Justin Piersanti and Morgan Piersanti, Defendants

Newbould J.

Heard: December 23, 2013
Judgment: January 3, 2014
Docket: CV-11-9318-00CL

Counsel: V. Ross Morrison, R. Samantha Chapman, for Moving Parties, the Piersantis
Kevin D. Sherkin, for Plaintiffs / Responding Parties

Subject: Civil Practice and Procedure

### Headnote

**Civil practice and procedure --- Judgments and orders — Nature and characteristics — Orders**

In motion to trial judge toward end of trial. plaintiffs asked for order that documents be produced and order that defendants pay $4.8 million into court pending release of trial reasons on basis defendants paid that amount to parties out of ordinary course of business contrary to Mareva injunction — Trial judge declined to order $4.8 million be paid into court, made no decision on request for declaration, and said she would make findings on matter in reasons for judgment — In reasons for judgment trial judge appeared to make finding that Mareva injunction had been breached and ordered company to pay $2.5 million into court — Court of Appeal set aside this part of judgment holding that trial judge made no finding of breach of Mareva injunction but that issue was not finally disposed of — Plaintiffs made submissions for motion to be disposed of with respect to whether there had been breach of Mareva injunction¶ — udge sent email that she was not prepared to amend judgment without reasons — Judge retired — No order was taken out — Defendants brought motion to quash plaintiffs' attempt to bring on for hearing motion made to trial judge towards end of trial — Motion dismissed — There was no order — Email was not order or endorsement and thus there was no final decision on motion — Judge was not functus and judge directed to hear remaining issues in action was not functus — Matter of whether Mareva injunction was breached was open question and judge had jurisdiction to deal with matter.

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 55 of 342

Carmen Alfano Family Trust v. Piersanti, 2014 ONSC 60, 2014 CarswellOnt 33...

2014 ONSC 60, 2014 CarswellOnt 33, 236 A.C.W.S. (3d) 480

**Table of Authorities**

**Cases considered by *Newbould J.*:**

*Carmen Alfano Family Trust v. Piersanti* (2009), 2009 CarswellOnt 3632 (Ont. S.C.J.) — referred to

*DeGroote v. Canadian Imperial Bank of Commerce* (1998), 1998 CarswellOnt 1628, 71 O.T.C. 252 (Ont. Gen. Div.) — referred to

*DeGroote v. Canadian Imperial Bank of Commerce* (1999), 121 O.A.C. 327, 1999 CarswellOnt 1902 (Ont. C.A.) — referred to

*R. v. Sheppard* (2002), 50 C.R. (5th) 68, 211 Nfld. & P.E.I.R. 50, 633 A.P.R. 50, 210 D.L.R. (4th) 608, 284 N.R. 342, [2002] 1 S.C.R. 869, 2002 SCC 26, 2002 CarswellNfld 74, 2002 CarswellNfld 75, 162 C.C.C. (3d) 298 (S.C.C.) — followed

*Strugarova v. Air France* (2009), 2009 CarswellOnt 4575, 82 C.P.C. (6th) 298 (Ont. S.C.J.) — referred to

**Rules considered:**

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194
    R. 59.02(1) — considered

    R. 59.06(1) — considered

MOTION by defendants to quash plaintiffs' attempt to bring on for hearing motion made to trial judge towards end of trial.

***Newbould J.*:**

1    The Piersantis move to quash the attempt of the plaintiffs to bring on for hearing a motion made to the trial judge, Justice Ellen Macdonald, in June 2009 towards the end of the trial. Part of the relief sought by the plaintiffs at that time was dismissed. Later, the trial judge released her reasons for judgment in the action in which she held for the plaintiffs in a number of respects. An appeal by the defendants to the Court of Appeal was partially successful. Leave to appeal to the Supreme Court of Canada was denied.

2    In their motion to the trial judge, the plaintiffs asked for an order that a number of documents be produced, and an order that a number of the defendants pay $4.8 million into court pending the release of the trial reasons for judgment on the basis that those defendants had paid that amount to various parties out of the ordinary course of business and therefore contrary to a Mareva injunction granted by Malloy J. in 2002 several years before the trial. That injunction had enjoined the defendants from dissipating their assets or dealing with their assets other than in the ordinary course of business. The plaintiffs also asked for a declaratory order that those defendants had breached the Mareva injunction.

3    In her reasons for decision released on June 22, 2009 [2009 CarswellOnt 3632 (Ont. S.C.J.)], the trial judge declined the request to order that the $4.8 million be paid into court, holding that the plaintiffs were protected by the Mareva injunction registered on title to three plaza properties. She did not make any decision on the request for a declaration that the defendants had breached the Mareva injunction and said she would make findings on this matter in her reasons for judgment. More particularly, she said:

    [8]... With respect to the payment into court of the $4,800,000, I decline to grant such relief. I do so even in the face of the very broad discretion that I have under Rule 60.02...

2014 ONSC 60, 2014 CarswellOnt 33, 236 A.C.W.S. (3d) 480

[9] The attitude of the Defendants towards their obligation to make full and timely production of all relevant documents was appalling, if not defiant. Collectively or individually, they held back many documents from the very early stages of these proceedings. They picked or chose the documents that they would produce. For example, there has been almost no production of the documents listed in paras. 1, 2, 3, and 4 of the notice of motion. Mr. Diamond conceded that it is too late to order this production. Except for closing submissions, scheduled to begin tomorrow, this case is closed. The Defendants justified their actions with respect to the three plazas to which the Alfanos claim an interest on a very fluid concept of what is in the ordinary course of business. It will be for me to make findings on this matter and on the credibility of the parties and their witnesses when I am considering the totality of the evidence when writing my reasons for judgment. It must be kept in mind that I ordered the re-registration of the Mareva on title to the three plaza properties very recently. Bearing in mind that I have carefully listened to the Piersanti and Gold defendants, there are matters that I cannot decide until I hear and consider closing submissions. The plaintiffs are sufficiently protected with the existence of the Mareva injunction on title to the three plaza properties. The request for payment into court of the $4,800,000 or such lesser sum as I might arbitrarily fix is therefore dismissed. Costs of this motion are reserved to be dealt with at the time of the ultimate disposition of costs in this action.

4     In her reasons for judgment dated September 3, 2010 the trial judge appeared to make a finding, or come close to making a finding, that the Mareva injunction had been breached, and she ordered that 1281632 Ontario Limited, a Piersanti company, pay $2.5 million into court. She stated:

103 The evidence is that they have conducted the operation of 1281632 Ontario Limited (the mall properties) without regard to the injunction. Ms. Piersanti was cross-examined extensively on payments made that appear to contravene the terms of the injunction. Ms. Piersanti justified these payments on the basis that it was necessary to do so because they were in the ordinary course of business. Her interpretation of what was in the ordinary course of business was a very fluid one. Mr. Diamond prepared a chart revealing a total of $2,465,436.46 in payments that he submitted were not in the ordinary course of business.

104 There was brief reply evidence on June 5, 2009, followed by the renewal of a motion by the Plaintiffs to compel the Gold Defendants to pay into court $2,465,436.43. The Plaintiffs alleged that these monies were used by Mr. and Ms. Piersanti in contravention of the injunction imposed by Molloy J. in September 2002. I declined to order the payment into court stating that I would deal with these issues in these reasons. The following is the chart prepared by Mr. Diamond setting out the details of payments made from the proceeds of mortgages on the Mall properties.

. . .

TOTAL $2,465,436.46

105 I have concluded that $2,500,000 shall be paid into court to the credit of the Plaintiffs within 30 days of the release of these reasons. This will not cause any hardship to the Piersanti Defendants and will be some security for the Plaintiffs who will most likely encounter great difficulty in enforcing any judgment granted by this court in respect of their damages for losses in Osler.

5     In the Court of Appeal, this part of the judgment was set aside. It was held that the trial judge had made no finding of a breach of the Mareva injunction but that that issue had not finally been disposed of. O'Connor A.C.J.O stated:

[165] The appellants argue that the trial judge erred in ordering 128 (a Piersanti related company) to pay $2.5 million into court.

[166] The respondents sought the payment into court on the basis that Ms. Piersanti had caused 128 to pay out approximately $2.5 million in breach of the Mareva injunction granted on June 18, 2002.

[167] I would set aside this order.

Carmen Alfano Family Trust v. Piersanti, 2014 ONSC 60, 2014 CarswellOnt 33...

2014 ONSC 60, 2014 CarswellOnt 33, 236 A.C.W.S. (3d) 480

. . .

[171] In para. 105, the trial judge did not link the award to the breach of the Mareva injunction. Notably, she did not make any finding of contempt, nor give any indication that the $2.5 million award was being ordered for punitive or denunciatory purposes. On the contrary, she appears to have considered the payment of $2.5 million as a down payment against her damage award.

[172] 128, the party ordered to pay the $2.5 million, was not a defendant in the claim for fraud related to the Osler bankruptcy that gave rise to the judgment against Mr. Piersanti. The trial judge did not make any findings that would render 128 liable to pay the damage award for the fraud claim.

[173] In the result, I would set aside this order. <u>To be clear, I do not conclude that there was no basis for a finding that the Piersantis breached the Mareva injunction. Rather, I am not satisfied that the trial judge, in her reasons, made that finding. That being the case, the trial judge's reasons and these reasons should not be read as finally disposing of that issue.</u> (underlining added).

6    Mr. Morrison for the Piersantis contends that by deciding in her reasons on the motion dated June 22, 2009 to refuse to order $4.8 million be paid into court, the trial judge effectively dismissed the application for a declaration that the Mareva injunction had been breached. I do not read her decision that way. I read her decision to have put off any decision on the request for declaratory relief until her reasons for judgment would be prepared and released. To repeat, in her reasons on the motion she stated:

> The Defendants justified their actions with respect to the three plazas to which the Alfanos claim an interest on a very fluid concept of what is in the ordinary course of business. It will be for me to make findings on this matter and on the credibility of the parties and their witnesses when I am considering the totality of the evidence when writing my reasons for judgment.

7    The trial judge confirmed in paragraph 104 of her reasons for judgment of September 3, 2010 that in her reasons on the motion, she had put off the issue so it could be dealt with in her reasons for judgment.

8    While it appeared in her reasons for judgment in paragraph 103 that the trial judge found that there had been a breach of the Mareva injunction, the Court of Appeal though otherwise, as set out in paragraph 173 of its reasons. The plaintiffs point to the underlined passages of that paragraph to assert that it cannot be said that the trial judge found there to have been no breach of the Mareva injunction. Rather, the plaintiffs say, it is clear from that passage of the Court of Appeal's reasons that the issue has been left open.

9    I agree with the plaintiffs. The decision of the Court of Appeal, binding on the parties and on me, means that the issue of whether there was a breach of the Mareva injunction was not finally disposed of and it cannot be said that there was no basis for a conclusion that the Piersantis breached the injunction.

10    However, it is necessary to consider what happened after the decision of the Court of Appeal.

11    On January 3, 2013, counsel for the plaintiffs provided written submission to Macdonald J. asking her to dispose of their motion that there had been a breach of the Mareva injunction and asked that it be dealt with at an appointment on February 8, 2013 that had been scheduled to deal with other issues. It was contended that rule 59.06 (1) provided her with the necessary jurisdiction. That rule provides that an order that requires amendment in any particular on which the Court did not adjudicate may be amended on a motion in the proceeding. Reliance was placed on the decision of the Court of Appeal that said the issue was still open.

12    Counsel for the Piersantis filed written submissions opposing the request, essentially arguing that Macdonald J. had decided the issue in her reasons on the motion of June 22, 2009 in declining to order payment into court and therefore there was no issue that had not been adjudicated upon. This submission appears to have disregarded paragraph 173 of the reasons of the Court of Appeal.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    4

2014 ONSC 60, 2014 CarswellOnt 33, 236 A.C.W.S. (3d) 480

13      Due to health issues, the trial judge adjourned the appointment on several occasions. The appointment eventually took place on April 26, 2013. Oral submissions were made on the request of the plaintiffs that day to decide whether there had been a breach of the Mareva injunction. Near the end of that appointment, counsel for the Mrs. Piersanti provided a draft order to the trial judge that there be an inquiry into damages sustained by the Gold Defendants (some of the defendants, including Mrs. Piersanti) as a result of the Mareva injunction. This was caused by the action being dismissed against the Gold Defendants in the Court of Appeal. Macdonald J. signed the order that day.

14      On June 13, 2013, the parties received an e-mail from Theresa Finelli, the administrative assistant to Macdonald J. The e-mail was as follows:

> After hearing submissions on April 26, 2013, I have concluded that I am not prepared to amend my judgment.

> Madam Justice Ellen Macdonald

15      On the same day, June 13, 2013, Mr. Sherkin for the plaintiffs sent an e-mail back to Theresa Finelli and stated:

16      Your Honour

> With great respect, our clients did not ask that you amend your judgment. Our clients asked for a disposition on their motion which pursuant to your Endorsement on the motion was to form part of the Trial Endorsement. The Court of Appeal left that issue open for determination by stating that neither your Trial Endorsement nor the Court of Appeal's decision foreclosed that open motion and it was not disposed of.

> We would graciously appreciate knowing the following:

>> 1. Is your email to be codified in an Endorsement?

>> 2. Will there be further reasons?

>> 3. If not your Honour, is your email directing our clients to seek a disposition of that motion from another judge?

> Thank you for your continued assistance and clarification in that regard.

17      On the following day, June 14, 2013, Mr. Diamond on behalf of the plaintiffs emailed Mr. Morrison and other defence counsel and stated that depending on the response of Macdonald J. to Mr. Sherkin's email of the previous day, in the event that the email from Macdonald J. is the "Endorsement", he wished to place Mr. Morrison on the earliest possible notice that it was his clients' intention to appeal the ruling.

18      On June 17, 2013 Mr. Diamond sent a further email to Mr. Morrison and other defence counsel and asked them if they required the plaintiffs to serve a formal notice of appeal from the email of Macdonald J. He said he was not sure how to proceed without an actual endorsement and was hopeful that Macdonald J. would provide a further response. He asked for a response a.s.a.p. if they needed a formal notice of appeal. No substantive response was received to this email.

19      A further attendance before Macdonald J. was scheduled to deal with outstanding costs of the proceedings. Unfortunately, that attendance was also cancelled, again due to her health issues.

20      On August 27, 2013, Mr. Sherkin wrote to Macdonald J. and asked that an appointment be scheduled to deal with his email to her of June 13, 2013. No response was received. Unbeknownst to the parties, on August 30, 2013 Justice Macdonald retired from the bench for health reasons. On October 10, 2013, and not knowing of her retirement, Mr. Sherkin emailed Ms. Finelli and asked Justice Macdonald to deal with the issues raised in his email of June 13, 2013.

Carmen Alfano Family Trust v. Piersanti, 2014 ONSC 60, 2014 CarswellOnt 33...

2014 ONSC 60, 2014 CarswellOnt 33, 236 A.C.W.S. (3d) 480

21    Mr. Morrison takes the position that by her email of June 13, 2013, Macdonald J. disposed of the request by the plaintiffs to have her rule on whether there had been a breach of the Mareva injunction. He says the only route open to the plaintiffs was to appeal that decision to the Court of Appeal, which did not occur. Mr. Sherkin says that the email was not an endorsement.

22    This is an unfortunate situation. Madam Justice Macdonald was not well in the spring of 2013 and eventually retired from the court at the end of August. What is most concerning is that no reasons whatsoever were given by her for the statement that she was not prepared to amend her judgment. Requests for her clarification of the e-mail went unanswered. If the e-mail could be considered to be a final decision dismissing the motion, it would not be possible for an appellate court to make any meaningful review of it in accordance with the principles of *R. v. Sheppard*, [2002] 1 S.C.R. 869 (S.C.C.) and the matter would have to be sent back for a rehearing.

23    I disagree with the plaintiffs that they did not request the judgment to be amended. They justified their renewal of the motion on the basis that the judgment could be amended to deal with something not dealt with by the judge. To this extend the e-mail dealt with their request.

24    The e-mail was not an order. Nor was it an endorsement as required by rule 59.02(1). That rule requires it to be "made" by a judge on the motion record. No such endorsement was made by Macdonald J. I would not treat the endorsement as a valid endorsement. Thus there has been no final decision on the motion.

25    It seems to me that even if it could be said that the e-mail passed procedural muster, no order has been taken out and Macdonald J. was not *functus*. As I am the judge directed to hear the remaining issues in the action, it follows that I am not *functus*. This is not a rule 59.06(1) situation in which an order taken out is sought to be amended because of some accidental slip or omission or requires amendment in any particular on which the court did not adjudicate. There has been no order.

26    There is authority, mainly in cases involving attempts to re-open matters because of alleged new evidence, that a court has a wide discretion to re-open a matter where the integrity of the process is at risk or a principle of justice is at stake that requires the reconsideration of the matter, and while a court should re-open a motion or other matter sparingly and with the greatest of care, it may re-open it when it is just to do so in exceptional circumstances. See *Strugarova v. Air France* (2009), 82 C.P.C. (6th) 298 (Ont. S.C.J.) at para. 7 per Roberts J. See also *DeGroote v. Canadian Imperial Bank of Commerce*, [1998] O.J. No. 1696 (Ont. Gen. Div.) at para. 6, per Lax J.; aff'd [1999] O.J. No. 2313 (Ont. C.A.).

27    In these circumstances, even if the endorsement could be said to be a real or proper endorsement, which in my view it was not, the circumstances here, in which no reasons were provided by Macdonald J. who before her retirement failed to respond to requests for clarification of the e-mail, are exceptional and the integrity of the process is at stake. Moreover, any appeal would inevitably result in the matter being sent back to me for decision on the basis of *R. v. Sheppard*. I would exercise my discretion and re-hear the matter.

28    In the circumstances, I am of the view that the matter of whether the Mareva injunction was breached is an open question and that I have jurisdiction to deal with the matter. Counsel may arrange a 9:30 a.m. appointment to discuss scheduling of the motion.

29    The motion of the Piersantis is dismissed. The plaintiffs are entitled to their costs. If costs are not agreed, the plaintiffs may make brief written submissions no longer than three pages in length along with a proper cost outline within 10 days and the Piersantis may make brief written reply submissions no longer than three pages in length within a further 10 days.

*Motion dismissed.*

---

**End of Document**

Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# Tab 7

Case 09-10138-MEW    Doc 15744-2    Filed 06/12/15    Page 61 of 342

Carey v. Laiken, 2015 SCC 17, 2015 CSC 17, 2015 CarswellOnt 5237

2015 SCC 17, 2015 CSC 17, 2015 CarswellOnt 5237, 2015 CarswellOnt 5238...

2015 SCC 17, 2015 CSC 17

Supreme Court of Canada

Carey v. Laiken

2015 CarswellOnt 5237, 2015 CarswellOnt 5238, 2015 SCC 17, 2015 CSC 17, [2013] C.S.C.R. No. 431,
[2013] S.C.C.A. No. 431, 251 A.C.W.S. (3d) 242, 382 D.L.R. (4th) 577, 66 C.P.C. (7th) 1, J.E. 2015-660

# Peter W. G. Carey, Appellant and Judith Laiken, Respondent

McLachlin C.J.C., Abella, Rothstein, Cromwell, Moldaver, Karakatsanis, Wagner JJ.

Heard: December 10, 2014

Judgment: April 16, 2015

Docket: 35597

Proceedings: affirming *Laiken v. Carey* (2013), 116 O.R. (3d) 641, 52 C.P.C. (7th) 144, 367 D.L.R. (4th) 415, 310 O.A.C. 209, 2013 CarswellOnt 11824, 2013 ONCA 530, E.E. Gillese J.A., M. Rosenberg J.A., Robert J. Sharpe J.A. (Ont. C.A.); reversing *Laiken v. Carey* (2012), [2012] O.J. No. 6596, 2012 CarswellOnt 17537, 2012 ONSC 7252, L.B. Roberts J. (Ont. S.C.J.)

Counsel: Patricia D.S. Jackson, Rachael Saab, for Appellant

Kevin Toyne, John Philpott, for Respondent

Subject: Civil Practice and Procedure

## Headnote

### Judges and courts --- Contempt of court — Nature of offence

In course of litigation, L obtained broad ex parte Mareva injunction restraining client's assets — Solicitor obeyed client's instructions to return funds to client that he had earlier paid into solicitor's trust account — L's motion for order finding solicitor in contempt of injunction was granted — Solicitor's motion to re-open contempt hearing and set aside contempt finding was granted — Motions judge found that solicitor's new evidence raised reasonable doubt that his interpretation of Mareva injunction was deliberately and willfully blind — L's appeal was allowed and contempt finding was restored — Court of Appeal accepted that solicitor did not knowingly choose to disobey injunction, but found that it was unnecessary to establish this to find solicitor liable for civil contempt — Solicitor appealed — Appeal dismissed — Proof beyond reasonable doubt of intentional act or omission that was in breach of clear order of which alleged contemnor had notice was required to establish civil contempt — Contumacy, being intent to interfere with administration of justice, was not element of civil contempt and lack of contumacy was not defence — Heightened fault requirement should not apply to individuals who cannot purge their contempt, to lawyers and to third parties — Existing discretion not to enter contempt finding and defence of impossibility of compliance provided better answers than heightened degree of fault where party was unable to purge his or her contempt — Motions judge erred in law to extent that she found that contumacious intent was required.

### Judges and courts --- Contempt of court — Forms of contempt — Disobedience of court — Injunctions — Miscellaneous

In course of litigation, L obtained broad ex parte Mareva injunction restraining client's assets — Solicitor obeyed client's instructions to return funds to client that he had earlier paid into solicitor's trust account — L's motion for order finding solicitor in contempt of injunction was granted — Solicitor's motion to re-open contempt hearing and set aside contempt finding was granted — L's appeal was allowed and contempt finding was restored — Court of Appeal held that motions judge had erred in setting aside contempt finding — Court of Appeal accepted that solicitor did not knowingly choose to disobey injunction, but found that it was unnecessary to establish this to find solicitor liable for civil contempt, as he committed act that violated clear court order that he knew of — Solicitor appealed — Appeal dismissed — It would be

Case 09-10138-MEW    Doc 15744-2    Filed 06/12/15    Page 62 of 342

Carey v. Laiken, 2015 SCC 17, 2015 CSC 17, 2015 CarswellOnt 5237

2015 SCC 17, 2015 CSC 17, 2015 CarswellOnt 5237, 2015 CarswellOnt 5238...

illogical to interpret court order as allowing trustees of assets held for client's benefit to freely transfer those assets between accounts and even between jurisdictions, putting those assets beyond reach of court, so long as client retained beneficial ownership of assets — Such interpretation would run counter to plain language of order specifically prohibiting those with knowledge of it from "dealing with" client's assets — Solicitor's characterization of $500,000 in his trust account as "overpayment" of "reasonable legal fees" was artificial — Solicitor's other conduct showed that he understood that order was in full force and was binding on him.

### Judges and courts --- Contempt of court — Forms of contempt — Disobedience of court — Injunctions — Liability of third persons

In course of litigation, L obtained broad ex parte Mareva injunction restraining client's assets — Solicitor obeyed client's instructions to return funds to client that he had earlier paid into solicitor's trust account — L's motion for order finding solicitor in contempt of injunction was granted — Solicitor's motion to re-open contempt hearing and set aside contempt finding was granted — L's appeal was allowed and contempt finding was restored — Court of Appeal held that motions judge had erred in setting aside contempt finding — Solicitor appealed — Appeal dismissed — There was not true conflict between order and solicitor's professional duties such that he had no option but to transfer trust funds back to client — Solicitor's assumed duty to guard solicitor-client privilege did not conflict with his duty to comply with order, as he only had to leave funds in his trust account, or he could have sought other appropriate avenues — There was no legal or ethical duty that compelled solicitor to breach injunction by transferring trust funds back to client or that conflicted with obeying order.

### Judges and courts --- Contempt of court — Practice and procedure — General principles

In course of litigation, L obtained broad ex parte Mareva injunction restraining client's assets — Solicitor obeyed client's instructions to return funds to client that he had earlier paid into solicitor's trust account — L's motion for order finding solicitor in contempt of injunction was granted — Solicitor's motion to re-open contempt hearing and set aside contempt finding was granted — L's appeal was allowed and contempt finding was restored — Court of Appeal held that motions judge had erred in setting aside contempt finding — Court of Appeal held that solicitor had inappropriately used second stage of contempt proceedings to attack motion judge's earlier findings, based on evidence he ought to have filed at first hearing — Solicitor appealed — Appeal dismissed — Neither Rules of Civil Procedure nor case law contemplated procedure motions judge followed — It was inappropriate for solicitor to use second stage of contempt proceedings to attack motions judge's findings and declaration of contempt — Once finding of contempt had been made at first stage of bifurcated proceeding, that finding was usually final, unless contemnor had subsequently purged contempt or new evidence was brought to light that was not available at initial hearing — Motions judge erred in exercising her discretion to permit solicitor to re-litigate initial contempt finding and erred in setting that finding aside.

### Juges et tribunaux --- Outrage au tribunal — Nature de l'infraction

Dans le contexte d'un litige, L a obtenu, en l'absence de la partie adverse, une injonction de type Mareva formulée en termes larges visant à interdire le transfert des actifs du client — Avocat a exécuté les directives du client de lui retourner les fonds qu'il avait versés plus tôt dans son compte en fiducie — Requête de L visant à obtenir une ordonnance d'outrage au tribunal pour ne pas avoir respecté les termes de l'injonction a été accordée — Requête de l'avocat visant à rouvrir l'audience relative à l'outrage et annuler l'outrage a été accordée — Juge des requêtes a conclu que la nouvelle preuve introduite par l'avocat soulevait un doute raisonnable que son interprétation de l'injonction de type Mareva équivalait à un aveuglement volontaire et délibéré — Appel interjeté par L a été accueilli et l'ordonnance d'outrage a été rétablie — Cour d'appel a convenu que l'avocat n'avait pas consciemment choisi de contrevenir à l'injonction, mais a conclu qu'il n'était pas nécessaire pour arriver à ce résultat de rendre l'avocat coupable d'outrage civil — Avocat a formé un pourvoi — Pourvoi rejeté — Pour établir l'outrage civil, il était nécessaire de prouver hors de tout doute raisonnable que l'auteur présumé d'un outrage a intentionnellement commis un acte, ou omis d'agir, en violation d'une ordonnance claire dont il avait connaissance — Désobéissance, soit l'intention d'entraver l'administration de la justice, n'était pas un élément constitutif de l'outrage civil, et l'absence d'intention de désobéir ne pouvait pas être invoquée comme moyen de défense — Exigence plus rigoureuse en matière de faute ne devrait pas s'appliquer aux individus qui ne peuvent pas faire amende honorable pour l'outrage, aux avocats et aux tiers — Pouvoir discrétionnaire actuel de ne pas tirer une conclusion d'outrage ainsi que

Case 09-10138-MEW   Doc 15744-2   Filed 06/12/15   Page 63 of 342

Carey v. Laiken, 2015 SCC 17, 2015 CSC 17, 2015 CarswellOnt 5237

2015 SCC 17, 2015 CSC 17, 2015 CarswellOnt 5237, 2015 CarswellOnt 5238...

le moyen de défense fondé sur l'impossibilité de se conformer convient davantage qu'un degré plus élevé de faute ne le ferait quand une personne n'est pas en mesure de faire amende honorable pour outrage — Juge des requêtes a commis une erreur de droit dans la mesure où elle a conclu que l'intention de désobéir était requise.

**Juges et tribunaux --- Outrage au tribunal — Formes d'outrage — Désobéissance à un ordre du tribunal — Injonctions — Divers**

Dans le contexte d'un litige, L a obtenu, en l'absence de la partie adverse, une injonction de type Mareva formulée en termes larges visant à interdire le transfert des actifs du client — Avocat a exécuté les directives du client de lui retourner les fonds qu'il avait versés plus tôt dans son compte en fiducie — Requête de L visant à obtenir une ordonnance d'outrage au tribunal pour ne pas avoir respecté les termes de l'injonction a été accordée — Requête de l'avocat visant à rouvrir l'audience relative à l'outrage et annuler l'outrage a été accordée — Appel interjeté par L a été accueilli et l'ordonnance d'outrage a été rétablie — Cour d'appel a estimé que la juge des requêtes avait commis une erreur en annulant l'ordonnance d'outrage — Cour d'appel a convenu que l'avocat n'avait pas consciemment choisi de contrevenir à l'injonction, mais a conclu qu'il n'était pas nécessaire pour arriver à ce résultat de rendre l'avocat coupable d'outrage civil, puisqu'il a posé un geste qui contrevenait à une ordonnance formelle du tribunal et dont il avait connaissance — Avocat a formé un pourvoi — Pourvoi rejeté — Il ne serait pas logique d'interpréter l'ordonnance du tribunal de manière à permettre aux fiduciaires des actifs détenus au bénéfice du client de les transférer librement d'un compte à un autre et même d'un lieu à un autre, et à ainsi les mettre hors de portée du tribunal advenant une procédure d'exécution, et ce, tant et aussi longtemps que le client en conservait la propriété effective — Telle interprétation irait à l'encontre du libellé clair de l'ordonnance interdisant précisément ceux en ayant connaissance d'« utiliser » les actifs du client — Avocat a qualifié le montant de 500 000 $ détenu dans son compte en fiducie de « versement excédentaire d'honoraires raisonnables », ce qui était artificiel — Autres agissements de l'avocat indiquaient qu'il comprenait que l'ordonnance était en vigueur et qu'il était lié par elle.

**Juges et tribunaux --- Outrage au tribunal — Formes d'outrage — Désobéissance à un ordre du tribunal — Injonctions — Responsabilité d'une tierce personne**

Dans le contexte d'un litige, L a obtenu, en l'absence de la partie adverse, une injonction de type Mareva formulée en termes larges visant à interdire le transfert des actifs du client — Avocat a exécuté les directives du client de lui retourner les fonds qu'il avait versés plus tôt dans son compte en fiducie — Requête de L visant à obtenir une ordonnance d'outrage au tribunal pour ne pas avoir respecté les termes de l'injonction a été accordée — Requête de l'avocat visant à rouvrir l'audience relative à l'outrage et annuler l'outrage a été accordée — Appel interjeté par L a été accueilli et l'ordonnance d'outrage a été rétablie — Cour d'appel a estimé que la juge des requêtes avait commis une erreur en annulant l'ordonnance d'outrage — Avocat a formé un pourvoi — Pourvoi rejeté — Il n'y avait pas de véritable conflit entre l'ordonnance et les obligations professionnelles de l'avocat, de sorte qu'il n'avait d'autre choix que de remettre les fonds détenus en fiducie à son client — Obligation qu'a assumée l'avocat relativement au secret professionnel n'était pas incompatible avec son obligation de respecter l'ordonnance puisqu'il n'avait qu'à laisser les fonds dans son compte en fiducie ou recourir à d'autres solutions appropriées — Il n'y avait aucune obligation légale ou éthique qui l'obligeait à violer l'injonction en remettant les fonds en fiducie à son client ou qui était incompatible avec le respect de l'ordonnance.

**Juges et tribunaux --- Outrage au tribunal — Procédure — Principes généraux**

Dans le contexte d'un litige, L a obtenu, en l'absence de la partie adverse, une injonction de type Mareva formulée en termes larges visant à interdire le transfert des actifs du client — Avocat a exécuté les directives du client de lui retourner les fonds qu'il avait versés plus tôt dans son compte en fiducie — Requête de L visant à obtenir une ordonnance d'outrage au tribunal pour ne pas avoir respecté les termes de l'injonction a été accordée — Requête de l'avocat visant à rouvrir l'audience relative à l'outrage et annuler l'outrage a été accordée — Appel interjeté par L a été accueilli et l'ordonnance d'outrage a été rétablie — Cour d'appel a estimé que la juge des requêtes avait commis une erreur en annulant l'ordonnance d'outrage — Cour d'appel a estimé que l'avocat avait utilisé de manière inappropriée la deuxième étape de la procédure pour outrage pour contester les conclusions tirées précédemment par la juge des requêtes, à partir de la preuve qu'il aurait dû déposer lors de la première audition — Avocat a formé un pourvoi — Pourvoi rejeté — Ni les Règles de procédure civile ni la jurisprudence ne prévoient le recours à la procédure suivie par la juge des requêtes — Il n'était pas approprié de la part

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MEW   Doc 15744-2   Filed 06/12/15   Page 64 of 342

Carey v. Laiken, 2015 SCC 17, 2015 CSC 17, 2015 CarswellOnt 5237

2015 SCC 17, 2015 CSC 17, 2015 CarswellOnt 5237, 2015 CarswellOnt 5238...

de l'avocat d'utiliser la deuxième étape de la procédure pour outrage pour contester les conclusions de la juge des requêtes et la déclaration d'outrage — Une fois qu'une conclusion d'outrage a été tirée à la première étape d'une procédure scindée, cette conclusion est habituellement définitive à moins que l'auteur de l'outrage n'ait par la suite fait amende honorable pour outrage ou qu'une nouvelle preuve qui n'était pas connue à l'occasion de l'audition initiale n'ait été introduite — Juge des requêtes a commis une erreur en exerçant sa discrétion pour autoriser l'avocat à remettre en cause la conclusion initiale et en annulant cette conclusion.

In the course of litigation, L obtained a broad ex parte Mareva injunction restraining the client's assets. The solicitor obeyed the client's instructions to return funds to the client that he had earlier paid into the solicitor's trust account.

L's motion for an order finding the solicitor in contempt of the injunction was granted.

The solicitor's motion to re-open the contempt hearing and set aside the contempt finding was granted. The motions judge found that the solicitor's new evidence raised a reasonable doubt that his interpretation of the Mareva injunction was deliberately and willfully blind.

L's appeal was allowed and the contempt finding was restored. The Court of Appeal held that the motions judge had erred in setting aside the contempt finding. The Court of Appeal held that the solicitor had inappropriately used the second stage of the contempt proceedings to attack the motion judge's earlier findings, based on evidence he ought to have filed at the first hearing. The Court of Appeal accepted that the solicitor did not knowingly choose to disobey the injunction, but found that it was unnecessary to establish this to find the solicitor liable for civil contempt, as he committed an act that violated a clear court order that he knew of.

The solicitor appealed.

**Held:** The appeal was dismissed.

Per Cromwell J. (McLachlin C.J.C., Abella, Rothstein, Moldaver, Karakatsanis and Wagner JJ. concurring): Proof beyond a reasonable doubt of an intentional act or omission that was in breach of a clear order of which the alleged contemnor had notice was required to establish civil contempt. Contumacy, being the intent to interfere with the administration of justice, was not an element of civil contempt and lack of contumacy was not a defence. A heightened fault requirement should not apply to individuals who cannot purge their contempt, to lawyers and to third parties. The existing discretion not to enter a contempt finding and the defence of impossibility of compliance provided better answers than a heightened degree of fault where a party was unable to purge his or her contempt. The motions judge erred in law to the extent that she found that contumacious intent was required.

It would be illogical to interpret the court order as allowing trustees of assets held for the client's benefit to freely transfer those assets between accounts and even between jurisdictions, putting those assets beyond the reach of the court, so long as the client retained beneficial ownership of the assets. Such an interpretation would run counter to the plain language of the order specifically prohibiting those with knowledge of it from "dealing with" the client's assets. The solicitor's characterization of the $500,000 in his trust account as an "overpayment" of "reasonable legal fees" was artificial. The solicitor's other conduct showed that he understood that the order was in full force and was binding on him.

There was not a true conflict between the order and the solicitor's professional duties such that he had no option but to transfer the trust funds back to the client. The solicitor's assumed duty to guard solicitor-client privilege did not conflict with his duty to comply with the order, as he only had to leave the funds in his trust account, or he could have sought other appropriate avenues. There was no legal or ethical duty that compelled the solicitor to breach the injunction by transferring trust funds back to the client or that conflicted with obeying the order.

Case 09-10138-MEW    Doc 15744-2    Filed 06/12/15    Page 65 of 342
Carey v. Laiken, 2015 SCC 17, 2015 CSC 17, 2015 CarswellOnt 5237

2015 SCC 17, 2015 CSC 17, 2015 CarswellOnt 5237, 2015 CarswellOnt 5238...

Neither the Rules of Civil Procedure nor case law contemplated the procedure the motions judge followed. It was inappropriate for the solicitor to use the second stage of contempt proceedings to attack the motions judge's findings and declaration of contempt. Once a finding of contempt had been made at the first stage of the bifurcated proceeding, that finding was usually final, unless the contemnor had subsequently purged the contempt or new evidence was brought to light that was not available at the initial hearing. The motions judge erred in exercising her discretion to permit the solicitor to re-litigate the initial contempt finding and erred in setting that finding aside.

Dans le contexte d'un litige, L a obtenu, en l'absence de la partie adverse, une injonction de type Mareva formulée en termes larges visant à interdire le transfert des actifs du client. L'avocat a exécuté les directives du client de lui retourner les fonds qu'il avait versés plus tôt dans son compte en fiducie.

La requête de L visant à obtenir une ordonnance d'outrage au tribunal pour ne pas avoir respecté les termes de l'injonction a été accordée.

La requête de l'avocat visant à rouvrir l'audience relative à l'outrage et annuler l'outrage a été accordée. La juge des requêtes a conclu que la nouvelle preuve introduite par l'avocat soulevait un doute raisonnable que son interprétation de l'injonction de type Mareva équivalait à un aveuglement volontaire et délibéré.

L'appel interjeté par L a été accueilli et l'ordonnance d'outrage a été rétablie. La Cour d'appel a estimé que la juge des requêtes avait commis une erreur en annulant l'ordonnance d'outrage. La Cour d'appel a estimé que l'avocat avait utilisé de manière inappropriée la deuxième étape de la procédure pour outrage pour contester les conclusions tirées précédemment par la juge des requêtes, à partir de la preuve qu'il aurait dû déposer lors de la première audition. La Cour d'appel a convenu que l'avocat n'avait pas consciemment choisi de contrevenir à l'injonction, mais a conclu qu'il n'était pas nécessaire pour arriver à ce résultat de rendre l'avocat coupable d'outrage civil, puisqu'il a posé un geste qui contrevenait à une ordonnance formelle du tribunal et dont il avait connaissance.

L'avocat a formé un pourvoi.

**Arrêt:** Le pourvoi a été rejeté.

Cromwell, J. (McLachlin, J.C.C., Abella, Rothstein, Moldaver, Karakatsanis, Wagner, JJ., souscrivant à son opinion) : Pour établir l'outrage civil, il suffit de prouver hors de tout doute raisonnable que l'auteur présumé d'un outrage a intentionnellement commis un acte, ou omis d'agir, en violation d'une ordonnance claire dont il avait connaissance. La désobéissance, soit l'intention d'entraver l'administration de la justice, n'était pas un élément constitutif de l'outrage civil et, par conséquent, l'absence d'intention de désobéir ne pouvait pas être invoquée comme moyen de défense. Une exigence plus rigoureuse en matière de faute ne devrait pas s'appliquer aux individus qui ne peuvent pas faire amende honorable pour l'outrage, aux avocats et aux tiers. Le pouvoir discrétionnaire actuel de ne pas tirer une conclusion d'outrage ainsi que le moyen de défense fondé sur l'impossibilité de se conformer conviennent davantage qu'un degré plus élevé de faute ne le ferait quand une personne n'est pas en mesure de faire amende honorable pour outrage. La juge des requêtes a commis une erreur de droit dans la mesure où elle a conclu que l'intention de désobéir était requise.

Il ne serait pas logique d'interpréter l'ordonnance du tribunal de manière à permettre aux fiduciaires des actifs détenus au bénéfice du client de les transférer librement d'un compte à un autre et même d'un lieu à un autre, et à ainsi les mettre hors de portée du tribunal advenant une procédure d'exécution, et ce, tant et aussi longtemps que le client en conservait la propriété effective. Une telle interprétation irait à l'encontre du libellé clair de l'ordonnance interdisant précisément ceux en ayant connaissance d'« utiliser » les actifs du client. L'avocat a qualifié le montant de 500 000 $ détenu dans son compte en fiducie de « versement excédentaire d'honoraires raisonnables », ce qui était artificiel. Les autres agissements de l'avocat indiquaient qu'il comprenait que l'ordonnance était en vigueur et qu'il était lié par elle.

Il n'y avait pas de véritable conflit entre l'ordonnance et les obligations professionnelles de l'avocat, de sorte qu'il n'avait d'autre choix que de remettre les fonds détenus en fiducie à son client. L'obligation qu'a assumée l'avocat relativement au secret professionnel n'était pas incompatible avec son obligation de respecter l'ordonnance puisqu'il n'avait qu'à laisser les fonds dans son compte en fiducie ou recourir à d'autres solutions appropriées. Il n'y avait aucune obligation légale ou éthique qui l'obligeait à violer l'injonction en remettant les fonds en fiducie à son client ou qui était incompatible avec le respect de l'ordonnance.

Ni les Règles de procédure civile ni la jurisprudence ne prévoient le recours à la procédure suivie par la juge des requêtes. Il n'était pas approprié de la part de l'avocat d'utiliser la deuxième étape de la procédure pour outrage pour contester les conclusions de la juge des requêtes et la déclaration d'outrage. Une fois qu'une conclusion d'outrage a été tirée à la première étape d'une procédure scindée, cette conclusion est habituellement définitive à moins que l'auteur de l'outrage n'ait par la suite fait amende honorable pour outrage ou qu'une nouvelle preuve qui n'était pas connue à l'occasion de l'audition initiale n'ait été introduite. La juge des requêtes a commis une erreur en exerçant sa discrétion pour autoriser l'avocat à remettre en cause la conclusion initiale et en annulant cette conclusion.

**Table of Authorities**

**Cases considered by *Cromwell J.*:**

*Attorney General v. Punch Ltd.* (2002), [2002] UKHL 50, [2003] 1 All E.R. 289, [2003] 1 A.C. 1046 (U.K. H.L.) — referred to

*Baker v. Paul* (2013), [2013] NSWCA 426 (New South Wales S.C.) — referred to

*Bell ExpressVu Ltd. Partnership v. Torroni* (2009), 94 O.R. (3d) 614, *(sub nom. Bell Express Vu Ltd. Partnership v. Torroni)* 304 D.L.R. (4th) 431, 69 C.P.C. (6th) 14, 2009 ONCA 85, 2009 CarswellOnt 416, 246 O.A.C. 212 (Ont. C.A.) — referred to

*Bhatnager v. Canada (Minister of Employment & Immigration)* (1990), 1990 CarswellNat 73, 36 F.T.R. 91 (note), 1990 CarswellNat 737, 44 Admin. L.R. 1, 71 D.L.R. (4th) 84, [1990] 2 S.C.R. 217, 111 N.R. 185, 12 Imm. L.R. (2d) 81, 43 C.P.C. (2d) 213 (S.C.C.) — referred to

*Canada Metal Co. v. Canadian Broadcasting Corp. (No. 2)* (1974), 4 O.R. (2d) 585, 48 D.L.R. (3d) 641, 19 C.C.C. (2d) 218, 1974 CarswellOnt 894 (Ont. H.C.) — referred to

*Canada Metal Co. v. Canadian Broadcasting Corp. (No. 2)* (1975), 11 O.R. (2d) 167, 29 C.C.C. (2d) 325, 65 D.L.R. (3d) 231, 1975 CarswellOnt 810 (Ont. C.A.) — referred to

*Canadian Transport (U.K.) Ltd. v. Alsbury* (1953), *(sub nom. Poje v. British Columbia (Attorney General))* 17 C.R. 176, *(sub nom. Poje v. British Columbia (Attorney General))* [1953] 1 S.C.R. 516, 1953 CarswellBC 3, 105 C.C.C. 311, [1953] 2 D.L.R. 785, 53 C.L.L.C. 15,055 (S.C.C.) — referred to

*Centre commercial Les Rivières ltée c. Jean bleu inc.* (2012), 2012 QCCA 1663, 2012 CarswellQue 9227 (C.A. Que.) — referred to

*College of Optometrists (Ontario) v. SHS Optical Ltd.* (2008), 300 D.L.R. (4th) 548, 241 O.A.C. 225, 2008 ONCA 685, 2008 CarswellOnt 6073, 93 O.R. (3d) 139 (Ont. C.A.) — referred to

Case 09-10138-MEW    Doc 15744-2    Filed 06/12/15    Page 67 of 342

Carey v. Laiken, 2015 SCC 17, 2015 CSC 17, 2015 CarswellOnt 5237

2015 SCC 17, 2015 CSC 17, 2015 CarswellOnt 5237, 2015 CarswellOnt 5238...

*Culligan Canada Ltd. v. Fettes* (2010), [2011] 7 W.W.R. 726, 2 C.P.C. (7th) 79, 506 W.A.C. 24, 366 Sask. R. 24, 326 D.L.R. (4th) 463, 2010 SKCA 151, 2010 CarswellSask 802 (Sask. C.A.) — referred to

*Customs & Excise Commissioners v. Barclays Bank Plc* (2006), [2006] UKHL 28, [2006] 3 W.L.R. 1, [2006] 4 All E.R. 256, [2007] 1 A.C. 181 (Eng. H.L.) — referred to

*Daigle c. St-Gabriel de Brandon (Paroisse)* (1991), [1991] R.D.J. 249, 1991 CarswellQue 664 (C.A. Que.) — referred to

*G. (N.) c. Services aux enfants & adultes de Prescott-Russell* (2006), 2006 CarswellOnt 3772, *(sub nom. G. (N.) v. Services aux enfants & adultes de Prescott-Russell)* 271 D.L.R. (4th) 750, 214 O.A.C. 146, 29 R.F.L. (6th) 92, 82 O.R. (3d) 669, *(sub nom. Prescott-Russell Services for Children & Adults v. G. (N.))* 82 O.R. (3d) 686, 2006 CarswellOnt 10335 (Ont. C.A.) — referred to

*Gaudet v. Soper* (2011), 2011 NSCA 11, 2011 CarswellNS 40, *(sub nom. Soper v. Gaudet)* 298 N.S.R. (2d) 303, *(sub nom. Soper v. Gaudet)* 945 A.P.R. 303, *(sub nom. Soper v. Gaudet)* 330 D.L.R. (4th) 742, 95 R.F.L. (6th) 32 (N.S. C.A.) — referred to

*Godin v. Godin* (2012), 2012 CarswellNS 357, 2012 NSCA 54, 23 R.F.L. (7th) 46, 1003 A.P.R. 204, 317 N.S.R. (2d) 204 (N.S. C.A.) — referred to

*Hefkey v. Hefkey* (2013), 30 R.F.L. (7th) 65, 2013 CarswellOnt 2986, 2013 ONCA 44 (Ont. C.A.) — referred to

*Jackson v. Honey* (2009), 2009 CarswellBC 643, 2009 BCCA 112, 64 R.F.L. (6th) 88, 267 B.C.A.C. 210, 450 W.A.C. 210 (B.C. C.A.) — referred to

*Jaskhs Enterprises Inc. v. Indus Corp.* (2004), 2004 CarswellOnt 4036, [2004] O.T.C. 859 (Ont. S.C.J.) — referred to

*Korea Data Systems Co. v. Chiang* (2009), *(sub nom. Chiang (Trustee of) v. Chiang)* 93 O.R. (3d) 483, 49 C.B.R. (5th) 1, *(sub nom. Chiang (Trustee of) v. Chiang)* 305 D.L.R. (4th) 655, *(sub nom. Mendlowitz & Associates Inc. v. Chiang)* 257 O.A.C. 64, 2009 CarswellOnt 28, 2009 ONCA 3, 78 C.P.C. (6th) 110 (Ont. C.A.) — referred to

*Laiken v. Carey* (2011), 2011 CarswellOnt 13706, 2011 ONSC 5892 (Ont. S.C.J.) — referred to

*Mileage Conference Group of the Tyre Manufacturers' Conference, Re* (1966), [1966] 2 All E.R. 849, 6 R.P. 49, [1966] 1 W.L.R. 1137 (Eng. Restrictive Practices Ct.) — referred to

*Morrow, Power v. Newfoundland Telephone Co.* (1994), 121 Nfld. & P.E.I.R. 334, 377 A.P.R. 334, 1994 CarswellNfld 322 (Nfld. C.A.) — referred to

*Paul Magder Furs Ltd. v. Ontario (Attorney General)* (1991), 3 C.P.C. (3d) 240, 85 D.L.R. (4th) 694, *(sub nom. Magder (Paul) Furs Ltd. v. Ontario (Attorney General))* 52 O.A.C. 151, *(sub nom. Ontario (Attorney General) v. Paul Magder Furs Ltd.)* 6 O.R. (3d) 188, 1991 CarswellOnt 403 (Ont. C.A.) — referred to

*Pro Swing Inc. v. ELTA Golf Inc.* (2006), 52 C.P.R. (4th) 321, [2006] 2 S.C.R. 612, 2006 SCC 52, 2006 CarswellOnt 7203, 2006 CarswellOnt 7204, 354 N.R. 201, 218 O.A.C. 339, 273 D.L.R. (4th) 663, 41 C.P.C. (6th) 1 (S.C.C.) — referred to

Case 09-10138-MEW    Doc 15744-2    Filed 06/12/15    Page 68 of 342

Carey v. Laiken, 2015 SCC 17, 2015 CSC 17, 2015 CarswellOnt 5237

2015 SCC 17, 2015 CSC 17, 2015 CarswellOnt 5237, 2015 CarswellOnt 5238...

*R. v. Wilson* (1983), 1983 CarswellMan 154, 1983 CarswellMan 189, [1983] 2 S.C.R. 594, 4 D.L.R. (4th) 577, 51 N.R. 321, [1984] 1 W.W.R. 481, 26 Man. R. (2d) 194, 9 C.C.C. (3d) 97, 37 C.R. (3d) 97 (S.C.C.) — referred to

*Sheppard, Re* (1976), 67 D.L.R. (3d) 592, 1976 CarswellOnt 835, 12 O.R. (2d) 4 (Ont. C.A.) — referred to

*St. Elizabeth Home Society v. Hamilton (City)* (2008), 52 C.P.C. (6th) 48, 237 O.A.C. 25, 169 C.R.R. (2d) 283, 2008 CarswellOnt 1381, 230 C.C.C. (3d) 199, 2008 ONCA 182, 89 O.R. (3d) 81, 291 D.L.R. (4th) 338 (Ont. C.A.) — referred to

*Sussex Group Ltd. v. Fangeat* (2003), 2003 CarswellOnt 3246, 42 C.P.C. (5th) 274, [2003] O.T.C. 781 (Ont. S.C.J.) — referred to

*TG Industries Ltd. v. Williams* (2001), 196 N.S.R. (2d) 35, 613 A.P.R. 35, 2001 CarswellNS 219, 2001 NSCA 105 (N.S. C.A.) — referred to

*U.N.A. v. Alberta (Attorney General)* (1992), [1992] 3 W.W.R. 481, 89 D.L.R. (4th) 609, 71 C.C.C. (3d) 225, 135 N.R. 321, 92 C.L.L.C. 14,023, 1 Alta. L.R. (3d) 129, 13 C.R. (4th) 1, 125 A.R. 241, 14 W.A.C. 241, [1992] 1 S.C.R. 901, 9 C.R.R. (2d) 29, [1992] Alta. L.R.B.R. 137, 1992 CarswellAlta 10, 1992 CarswellAlta 465 (S.C.C.) — referred to

*Vidéotron ltée c. Industries Microlec produits électroniques inc.* (1992), 141 N.R. 281, *(sub nom. Vidéotron Ltée v. Industries Microlec Produits Électroniques Inc.)* 50 Q.A.C. 161, *(sub nom. Vidéotron Ltée v. Industries Microlec Produits Électroniques Inc.)* 76 C.C.C. (3d) 289, *(sub nom. Vidéotron Ltée v. Industries Microlec Produits Électroniques Inc.)* 96 D.L.R. (4th) 376, *(sub nom. Vidéotron Ltée v. Industries Microlec Produits Électroniques Inc.)* [1992] 2 S.C.R. 1065, 1992 CarswellQue 125, 45 C.P.R. (3d) 1, 1992 CarswellQue 125F (S.C.C.) — referred to

*Z Ltd. v. A.* (1982), [1982] Q.B. 558, [1982] 1 All E.R. 556, [1982] 1 Lloyd's Rep. 240, [1982] 2 W.L.R. 288 (Eng. C.A.) — referred to

**Rules considered:**

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194
    Generally — referred to

    R. 60.11 — considered

    R. 60.11(1) — considered

    R. 60.11(5) — considered

    R. 60.11(8) — considered

**Authorities considered:**

Sharpe, Robert J., *Injunctions and Specific Performance*, 2nd ed. (Toronto: Canada Law Book, 1992) (looseleaf)

APPEAL by defendant solicitor from judgment reported at *Laiken v. Carey* (2013), 2013 ONCA 530, 2013 CarswellOnt 11824, 116 O.R. (3d) 641, 310 O.A.C. 209, 367 D.L.R. (4th) 415, 52 C.P.C. (7th) 144 (Ont. C.A.), allowing plaintiff's appeal from judgment setting aside finding of contempt of court against solicitor.

Case 09-10138-MEW    Doc 15744-2    Filed 06/12/15    Page 69 of 342

**Carey v. Laiken, 2015 SCC 17, 2015 CSC 17, 2015 CarswellOnt 5237**

2015 SCC 17, 2015 CSC 17, 2015 CarswellOnt 5237, 2015 CarswellOnt 5238...

POURVOI formé par un avocat défendeur à l'encontre d'une décision publiée à *Laiken v. Carey* (2013), 2013 ONCA 530, 2013 CarswellOnt 11824, 116 O.R. (3d) 641, 310 O.A.C. 209, 367 D.L.R. (4th) 415, 52 C.P.C. (7th) 144 (Ont. C.A.), ayant accueilli l'appel interjeté par le demandeur à l'encontre d'un jugement ayant annulé une ordonnance d'outrage au tribunal prononcée à l'encontre de l'avocat.

***Cromwell J.*** (McLachlin C.J.C. and Abella, Rothstein, Moldaver, Karakatsanis and Wagner JJ. concurring):

## I. Introduction

1    Contempt of court proceedings against lawyers are rare; so are situations in which judges reverse their own previous findings. But this case, which gives the Court the opportunity to clarify some aspects of the common law of civil contempt of court, has both of these unusual elements.

2    The appellant, Peter Carey, is a lawyer who was the object of contempt proceedings for allegedly breaching the terms of an injunction. He was initially found in contempt by a judge of the Ontario Superior Court of Justice, but the judge revisited that finding and reversed it when the matter came back before her for consideration of the appropriate penalty. The Court of Appeal set the judge's second decision aside and found Mr. Carey in contempt. He now appeals to this Court, raising three questions:

    1. To have committed contempt, did Mr. Carey have to intend to interfere with the administration of justice?

    2. Was Mr. Carey in Contempt?

    3. Was it open to the judge to set aside her initial finding of contempt?

3    I conclude that the Court of Appeal for Ontario was correct to answer the first and third questions in the negative and the second in the affirmative: to be in contempt, Mr. Carey did not need to intend to interfere with the administration of justice; Mr. Carey was in contempt and his obligations to his client did not justify or excuse his breaching the injunction; and it was not open to the judge to set aside her initial finding of contempt. I would therefore dismiss the appeal with costs.

4    The factual and procedural context in which these issues arise is complicated and I will turn to that before getting into the legal analysis that has led me to these conclusions.

## II. Background

### *A. Overview*

5    The appeal arises out of Mr. Carey's alleged breach of a so-called *Mareva* injunction that enjoined any person with knowledge of the order from "disposing of, or otherwise dealing with" any assets of various parties, including Peter Sabourin for whom Mr. Carey acted. The injunction was issued in the course of litigation between the respondent, Judith Laiken, and Mr. Sabourin and related parties. Ultimately, Ms. Laiken obtained a judgment against Mr. Sabourin and his companies for roughly one million dollars and costs.

6    Following the conclusion of this litigation, Ms. Laiken brought contempt proceedings against Mr. Carey, who unquestionably had knowledge of the injunction. She alleged he had breached its terms by returning to Mr. Sabourin over $400,000 that Mr. Carey was holding in trust for him. These contempt proceedings have led to the appeal before this Court.

### *B. The Litigation Leading to the Injunction*

7    Ms. Laiken retained Mr. Sabourin and his group of companies to conduct off-shore security trades on her behalf. To this end, she transferred approximately $885,000 to various bank accounts he and his businesses held. Ultimately, these funds were lost and, unsurprisingly, the business relationship between Ms. Laiken and Mr. Sabourin soured. In 2000, he sued her for $364,000, alleging a deficit in her margin account. She counterclaimed for over $800,000, alleging that he had defrauded her. Mr. Carey represented Mr. Sabourin and his business entities in these proceedings.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MEW    Doc 15744-2    Filed 06/12/15    Page 70 of 342

Carey v. Laiken, 2015 SCC 17, 2015 CSC 17, 2015 CarswellOnt 5237

2015 SCC 17, 2015 CSC 17, 2015 CarswellOnt 5237, 2015 CarswellOnt 5238...

8    Ms. Laiken obtained an *ex parte Mareva* injunction from the Ontario Superior Court of Justice freezing the assets of the defendants to her counterclaim, including Mr. Sabourin. The injunction had broad terms. It prohibited, among other things, Mr. Sabourin and any person with knowledge of the order from "disposing of, or otherwise dealing with" any of Mr. Sabourin's assets: Order of May 4, 2006, by Campbell J. (see A.R., vol. I, at p. 2). The injunction also directed any person with knowledge of it to "take immediate steps to prevent the ... transfer" of the assets, including those held in "trust accounts" in that person's power, possession or control (*ibid.*). The Superior Court of Justice continued the injunction on multiple occasions with the understanding that the parties needed to work out between themselves variations to it to allow for payment of legal fees and living expenses. However, the injunction was never formally amended.

9    A few months after the initial order had been made Mr. Sabourin sent Mr. Carey a cheque for $500,000. No instructions accompanied the cheque and Mr. Carey could not reach Mr. Sabourin to obtain instructions. Pursuant to Law Society of Upper Canada by-law requirements, Mr. Carey deposited the cheque in his trust account, applying some of the money towards Mr. Sabourin's outstanding legal fees, since the parties had agreed that the injunction did not prohibit the payment of reasonable legal fees.

10    Mr. Sabourin later called Mr. Carey and told him to use the rest of the funds to settle the claims of creditors represented by Bill Brown, who had invested in the Sabourin entities. Mr. Carey advised Mr. Sabourin that he could not do that because making a payment to a third-party creditor would breach the injunction. Mr. Sabourin then instructed Mr. Carey to attempt to negotiate a settlement with Ms. Laiken.

11    A few days later, during a conference call with Messrs. Brown and Carey, Mr. Sabourin advised that Mr. Carey was holding some $500,000 in trust. The money, he said, was intended for Mr. Brown, but the injunction prohibited Mr. Carey from paying it to him.

12    Mr. Carey could not reach a settlement with Ms. Laiken's lawyers. At no point did he reveal to them the existence of the trust money. After the failed settlement negotiations, Mr. Sabourin instructed Mr. Carey to return the balance of the funds to him, which Mr. Carey did after deducting an amount to cover future legal fees. Mr. Carey transferred a total of $440,000 back to Mr. Sabourin in October and November 2006.

13    Early in 2007, Mr. Sabourin called Mr. Carey and terminated his retainer and instructed him to take no further steps until he had retained new counsel. Shortly after this call, Mr. Sabourin went out of business and vanished. Mr. Carey never received a notice of change of lawyers and remained counsel of record in the Laiken-Sabourin litigation.

14    Later that year, Mr. Brown obtained judgment against Mr. Sabourin and receivership over his assets and those of his companies. Advised of the trust funds that Mr. Carey had held for Mr. Sabourin, the receiver demanded that Mr. Carey provide a full accounting of these funds. Mr. Carey replied that he had received $500,000 from Mr. Sabourin, returned $440,000 and that just over $6,000 remained in the trust account. Mr. Carey indicated that he felt he could provide this information without violating any solicitor-client privilege, but he refused to provide additional information or documents that he thought might be privileged. A further court order required Mr. Carey to give a "full accounting of all funds" from Mr. Sabourin, which he provided.

15    In November 2007, Ms. Laiken obtained summary judgment dismissing Mr. Sabourin's claim against her and granting her over $1 million in damages and costs on her counterclaim for fraud.

### C. The Contempt Proceedings

16    Ms. Laiken applied to have Mr. Carey found in contempt. She alleged that he breached the *Mareva* injunction by returning the $440,000 in his trust account to Mr. Sabourin. The series of decisions related to this motion led ultimately to the appeal before us.

Carey v. Laiken, 2015 SCC 17, 2015 CSC 17, 2015 CarswellOnt 5237

2015 SCC 17, 2015 CSC 17, 2015 CarswellOnt 5237, 2015 CarswellOnt 5238...

17    In Ontario, civil contempt proceedings are governed by Rule 60.11 of the *Rules of Civil Procedure*, R.R.O. 1990, Reg. 194. Under this Rule, a party may move to obtain a contempt order: Rule 60.11(1). A judge, in dealing with such a motion, can "make such order as is just" and, following "a finding" of contempt, he or she may order the contemnor to be imprisoned, pay a fine, do or refrain from doing an act, pay just costs, and comply with any other order the judge considers necessary: Rule 60.11(5). Upon motion, "a judge may discharge, set aside, vary or give directions in respect of an order under subrule (5) ... and may grant such other relief and make such other order as is just": Rule 60.11(8).

18    The *Rules* do not prescribe the form of contempt proceedings. However, as a general rule, proceedings are bifurcated into a liability phase — where the case on liability proceeds and a defence is offered — and, if liability is established, a penalty phase. In contempt proceedings, liability and penalty are discrete issues: *College of Optometrists (Ontario) v. SHS Optical Ltd.*, 2008 ONCA 685, 241 O.A.C. 225 (Ont. C.A.), at paras. 72-75.

19     It is within this procedural framework that the Ontario courts considered Ms. Laiken's motion to find Mr. Carey in contempt of the *Mareva* injunction.

*(1) The First Contempt Decision: Ontario Superior Court of Justice (Roberts J., 2011 ONSC 5892 (Ont. S.C.J.)*

20    The motions judge found Mr. Carey in contempt and issued an order to that effect. She was satisfied beyond a reasonable doubt that the *Mareva* order was clear and that Mr. Carey "knowingly and deliberately breached" it by transferring the funds from his trust account to Mr. Sabourin (para. 42 (CanLII)). The motions judge ordered the parties to appear before her at a later date for another hearing. She stated she would take into account any further evidence and testimony the parties submitted in making any order under Rules 60.11(5) and 60.11(8).

*(2) The Stay Application Decision: Court of Appeal for Ontario (Sharpe J.A., 2011 ONCA 757, 286 O.A.C. 273 (Ont. C.A. [In Chambers])*

21     A judge of the Court of Appeal dismissed Mr. Carey's motion for a stay of the motions judge's order and any further proceedings pending appeal of that order. The court held that the contempt proceedings were not yet completed and that until they were, the Court of Appeal would not know relevant information, including whether the judge considered the contempt to be trivial or serious.

*(3) The Second Contempt Decision: Ontario Superior Court of Justice (Roberts J., 2012 ONSC 7252, [2012] O.J. No. 6596 (Ont. S.C.J.)*

22     When the matter resumed before the motions judge, Mr. Carey moved to reopen the contempt hearing. He filed new evidence, including an affidavit sworn by Alan Lenczner, Q.C., stating that by returning the money in excess of that required to cover legal fees, Mr. Carey had acted in a manner consistent with the practice of counsel generally. Mr. Carey also proffered his own testimony about what he perceived to be his professional obligations and his motivations in dealing with the trust funds.

23    The motions judge set aside her previous finding of contempt. Based on the new evidence, she doubted whether the terms of the order were clear and whether Mr. Carey's interpretation of it was deliberately and wilfully blind.

*(4) The Appeal Decision: Court of Appeal for Ontario (Sharpe J.A. (Rosenberg and Gillese JJ.A. concurring), 2013 ONCA 530, 367 D.L.R. (4th) 415 (Ont. C.A.)*

24     The Court of Appeal unanimously allowed the appeal and restored the initial contempt finding. The motions judge had erred, the Court of Appeal found, in setting it aside. Mr. Carey had inappropriately used the second stage of the contempt proceedings to attack the motions judge's earlier findings and based this attack on evidence he ought to have filed at the first hearing. While the appeal could have been resolved on these procedural grounds, the court went on to hold that the motions judge erred in finding Mr. Carey was not in contempt.

Case 09-10138-MEW    Doc 15744-2    Filed 06/12/15    Page 72 of 342

**Carey v. Laiken, 2015 SCC 17, 2015 CSC 17, 2015 CarswellOnt 5237**

2015 SCC 17, 2015 CSC 17, 2015 CarswellOnt 5237, 2015 CarswellOnt 5238...

25      The Court of Appeal accepted that Mr. Carey did not desire or knowingly choose to disobey the order, but found that it is unnecessary to establish this in order to find him liable for civil contempt. Mr. Carey knew of a clear court order and he committed an act that violated it. This was sufficient to constitute civil contempt.

### III. Analysis

*A. First Issue: To Have Committed Contempt, Did Mr. Carey Have to Intend to Interfere With the Administration of Justice?*

*(1) Overview*

26      At the initial contempt hearing, Roberts J. stated, in my view correctly, that "civil contempt consists of the intentional doing of an act which is in fact prohibited by the order": 2011 ONSC 5892 (Ont. S.C.J.), at para. 24 (CanLII). However, she subsequently set aside her earlier finding of contempt. She held:

> Based on Mr. Carey's oral evidence, because of the protracted history between Mr. Carey's clients and the plaintiff and the way that Mr. Carey viewed the merits of the plaintiffs claim, the unusual form of the May 4, 2006 Mareva Order, and the variations discussed and agreed upon between counsel, which were not set out in one document by formal amendment, I have a reasonable doubt as to whether the terms of the May 4, 2006 Mareva Order were completely clear to Mr. Carey, and I am not satisfied beyond a reasonable doubt that Mr. Carey's interpretation of the May 4, 2006 Mareva Order was deliberately and willfully blind.

> [Emphasis added; 2012 ONSC 7252 (Ont. S.C.J.), at para. 36.]

27      The Court of Appeal, however, held that it was an error of law to conclude that Mr. Carey could not be found in contempt because he did not deliberately breach the order. Ms. Laiken did not have to prove that Mr. Carey had "deliberately" breached the order or, as the court put it elsewhere in its reasons, to establish "contumacious intent": 2013 ONCA 530 (Ont. C.A.), at paras. 65, 62. The order clearly prohibited dealing in trust funds belonging to Mr. Sabourin, yet Mr. Carey knew of the order and he intentionally transferred the funds, an act that was contrary to the order. This is all that is required to establish the elements of civil contempt.

28      Before this Court, the parties devoted a substantial portion of their written submissions to the mental element of civil contempt. Mr. Carey's position is that in various circumstances — namely, where the alleged contemnor cannot "purge" his contempt, is a lawyer or is a third party to an order — proof of an intention to interfere with the administration of justice is required. In other words, in these circumstances contumacy or intent to breach the order is an element of the offence. Ms. Laiken frames the issue slightly differently. Rather than viewing the question as one turning on the elements of civil contempt, she submits that lack of contumacious intent is not a defence in civil contempt proceedings, regardless of the alleged contemnor's circumstances.

29      However framed, the issue boils down to the required intent for a finding of civil contempt. Canadian jurisprudence clearly sets out the requirements for establishing civil contempt, of which I provide an overview below. Contumacy — the intent to interfere with the administration of justice — is not an element of civil contempt and lack of contumacy is therefore not a defence. I do not accept Mr. Carey's position that a different rule should apply to individuals who cannot purge their contempt, to lawyers and to third parties.

*(2) The Canadian Common Law of Civil Contempt*

30      Contempt of court "rest[s] on the power of the court to uphold its dignity and process .... The rule of law is directly dependent on the ability of the courts to enforce their process and maintain their dignity and respect": *U.N.A. v. Alberta (Attorney General)*, [1992] 1 S.C.R. 901 (S.C.C.), at p. 931. It is well-established that the purpose of a contempt order is "first and foremost a declaration that a party has acted in defiance of a court order": *Pro Swing Inc. v. ELTA Golf Inc.*, 2006 SCC 52, [2006] 2 S.C.R. 612 (S.C.C.), at para. 35, cited in *Bell ExpressVu Ltd. Partnership v. Torroni*, 2009 ONCA 85, 94 O.R. (3d) 614 (Ont. C.A.), at para. 20.

Carey v. Laiken, 2015 SCC 17, 2015 CSC 17, 2015 CarswellOnt 5237

2015 SCC 17, 2015 CSC 17, 2015 CarswellOnt 5237, 2015 CarswellOnt 5238...

31      The common law has developed to recognize two forms of contempt of court: criminal contempt and civil contempt. The distinction, which the parties to this appeal accept, rests on the element of public defiance accompanying criminal contempt: see, e.g., *United Nurses*, at p. 931; *Canadian Transport (U.K.) Ltd. v. Alsbury*, [1953] 1 S.C.R. 516 (S.C.C.), at p. 522. With civil contempt, where there is no element of public defiance, the matter is generally seen "primarily as coercive rather than punitive": R. J. Sharpe, *Injunctions and Specific Performance* (2nd ed. (looseleaf)), at ¶6.100. However, one purpose of sentencing for civil contempt is punishment for breaching a court order: *Korea Data Systems Co. v. Chiang*, 2009 ONCA 3, 305 D.L.R. (4th) 655 (Ont. C.A.), at para. 117. Courts sometimes impose substantial fines to match the gravity of the contempt, to deter the contemnor's continuing conduct and to deter others from comparable conduct: Sharpe, at ¶6.100.

32      Civil contempt has three elements which must be established beyond a reasonable doubt: *G. (N.) c. Services aux enfants & adultes de Prescott-Russell* (2006), 82 O.R. (3d) 686 (Ont. C.A.), at para. 27; *College of Optometrists*, at para. 71; *Bhatnager v. Canada (Minister of Employment & Immigration)*, [1990] 2 S.C.R. 217 (S.C.C.), at pp. 224-25; *Jackson v. Honey*, 2009 BCCA 112, 267 B.C.A.C. 210 (B.C. C.A.), at paras. 12-13; *TG Industries Ltd. v. Williams*, 2001 NSCA 105, 196 N.S.R. (2d) 35 (N.S. C.A.), at paras. 17 and 32; *Godin v. Godin*, 2012 NSCA 54, 317 N.S.R. (2d) 204 (N.S. C.A.), at para. 47; *Gaudet v. Soper*, 2011 NSCA 11, 298 N.S.R. (2d) 303 (N.S. C.A.), at para. 23. These three elements, coupled with the heightened standard of proof, help to ensure that the potential penal consequences of a contempt finding ensue only in appropriate cases: *Bell ExpressVu*, at para. 22; *Chiang*, at paras. 10-11.

33      The first element is that the order alleged to have been breached "must state clearly and unequivocally what should and should not be done": *Prescott-Russell*, at para. 27; *Bell ExpressVu*, at para. 28, citing with approval *Jaskhs Enterprises Inc. v. Indus Corp.* [2004 CarswellOnt 4036 (Ont. S.C.J.)] 2004 CanLII 32262, at para. 40. This requirement of clarity ensures that a party will not be found in contempt where an order is unclear: *Pro Swing*, at para. 24; *Bell ExpressVu*, at para. 22. An order may be found to be unclear if, for example, it is missing an essential detail about where, when or to whom it applies; if it incorporates overly broad language; or if external circumstances have obscured its meaning: *Culligan Canada Ltd. v. Fettes*, 2010 SKCA 151, 326 D.L.R. (4th) 463 (Sask. C.A.), at para. 21.

34      The second element is that the party alleged to have breached the order must have had actual knowledge of it: *Bhatnager*, at p. 226; *College of Optometrists*, at para. 71. It may be possible to infer knowledge in the circumstances, or an alleged contemnor may attract liability on the basis of the wilful blindness doctrine (*ibid.*).

35      Finally, the party allegedly in breach must have intentionally done the act that the order prohibits or intentionally failed to do the act that the order compels: *Sheppard, Re* (1976), 12 O.R. (2d) 4 (Ont. C.A.). at p. 8. The meaning of this element is one of the main points in contention on appeal and I will turn to consider it in more detail momentarily.

36      The contempt power is discretionary and courts have consistently discouraged its routine use to obtain compliance with court orders: see, e.g., *Hefkey v. Hefkey*, 2013 ONCA 44, 30 R.F.L. (7th) 65 (Ont. C.A.), at para. 3. If contempt is found too easily, "a court's outrage might be treated as just so much bluster that might ultimately cheapen the role and authority of the very judicial power it seeks to protect": *Centre commercial Les Rivières ltée c. Jean bleu inc.*, 2012 QCCA 1663 (C.A. Que.), at para. 7. As this Court has affirmed, "contempt of court cannot be reduced to a mere means of enforcing judgments": *Vidéotron ltée c. Industries Microlec produits électroniques inc.*, [1992] 2 S.C.R. 1065 (S.C.C.), at p. 1078, citing *Daigle c. St-Gabriel de Brandon (Paroisse)*[1991] R.D.J. 249 (C.A. Que.). Rather, it should be used "cautiously and with great restraint": *TG Industries*, at para. 32. It is an enforcement power of last rather than first resort: *Hefkey*, at para. 3; *St. Elizabeth Home Society v. Hamilton (City)*, 2008 ONCA 182, 89 O.R. (3d) 81 (Ont. C.A.), at paras. 41-43; *Centre commercial Les Rivières ltée*, at para. 64.

37      For example, where an alleged contemnor acted in good faith in taking reasonable steps to comply with the order, the judge entertaining a contempt motion generally retains some discretion to decline to make a finding of contempt: see, e.g., *Morrow, Power v. Newfoundland Telephone Co.* (1994), 121 Nfld. & P.E.I.R. 334 (Nfld. C.A.), at para. 20; *TG Industries*, at para. 31. While I prefer not to delineate the full scope of this discretion, given that the issue was not argued before us, I wish to leave open the possibility that a judge may properly exercise his or her discretion to decline to impose a contempt finding where it would work an injustice in the circumstances of the case.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

*Carey v. Laiken*, 2015 SCC 17, 2015 CSC 17, 2015 CarswellOnt 5237

2015 SCC 17, 2015 CSC 17, 2015 CarswellOnt 5237, 2015 CarswellOnt 5238...

### *(3) The Required "Intent"*

38    It is well settled in Canadian common law that all that is required to establish civil contempt is proof beyond a reasonable doubt of an intentional act or omission that is in fact in breach of a clear order of which the alleged contemnor has notice: *Prescott-Russell*, at para. 27; *College of Optometrists*, at para. 71; *Sheppard*, at p. 8; *TG Industries*, at paras. 17 and 32; *Bhatnager*, at pp. 224-25, Sharpe, at ¶ 6.190. The Court of Appeal followed this approach. As it noted, to require a contemnor to have intended to disobey the order would put the test "too high" and result in "mistakes of law [becoming] a defence to an allegation of civil contempt but not to a murder charge" (2013 ONCA 530 (Ont. C.A.), at para. 59). Instead, contumacy or lack thereof goes to the penalty to be imposed following a finding of contempt: para. 62; see also *Sheppard* and Sharpe, at ¶6.200.

39    The appellant submits, however, that in situations in which the alleged contemnor cannot "purge" the contempt, is a lawyer or is a third party to the order, the intent to interfere with the administration of justice must be proved. I understand this to mean that "the intention to disobey, in the sense of desiring or knowingly choosing to disobey the order" must be established: *TG Industries*, at para. 17. This is sometimes also referred to as "contumacious" intent.

40    The appellant submits that the mental element of civil contempt must address at least one of the two goals of civil contempt: securing compliance with court orders or protecting the integrity of the administration of justice. Finding a party in contempt where he or she cannot purge (either because the act that constituted the contempt cannot be undone or because a conflicting legal duty prevents compliance with the order) furthers neither of these goals absent some heightened mental element for contempt. Only if the person is shown to have had the intent to interfere with the administration of justice would one of these purposes — protecting the integrity of the administration of justice — be served.

41    I cannot accept this position. There is no principled reason to depart from the established elements of civil contempt in situations in which compliance has become impossible for either of the reasons referred to by the appellant. Where, as here, the person's own actions contrary to the terms of a court order make future compliance impossible, I fail to see the logic or justice of requiring proof of some higher degree of fault in order to establish contempt. The appellant's submission also overlooks the point that one of the purposes of the contempt power is to deter violations of court orders, thereby encouraging respect for the administration of justice. It undermines that purpose to treat with special charity people whose acts in violation of an order make subsequent compliance impossible. It seems to me that the existing discretion not to enter a contempt finding and the defence of impossibility of compliance provide better answers than a heightened degree of fault where a party is unable to purge his or her contempt for the reasons the appellant outlines: *Jackson* at para. 14; *Sussex Group Ltd. v. Fangeat* (2003), 42 C.P.C. (5th) 274 (Ont. S.C.J.), at para. 56.

42    The appellant correctly notes that civil contempt is quasi-criminal in nature, which he says justifies a higher fault element where contempt cannot be purged. But civil contempt is always quasi-criminal, so this provides no justification for carving out a distinct mental element for particular types of civil contempt cases. As I have already discussed, requiring contumacious intent would open the door to mistakes of law providing a defence to an allegation of civil contempt. It could also permit an alleged contemnor to rely on a misinterpretation of a clear order to avoid a contempt finding, which would significantly undermine the authority of court orders.

43    Further, adopting the appellant's proposal would in effect make the required mental element dependent on the nature of the order alleged to have been breached. Those who breach a prohibitory order would benefit from this heightened mental element disproportionately, due to subsequent impossibility of compliance, as compared to those who breach a mandatory order, with which the alleged contemnor will be able to subsequently comply absent a conflicting legal duty. I see no principled basis for creating this distinction.

44    The appellant also submits that lawyers should benefit from a heightened fault requirement, but I do not agree. As the Court of Appeal recognized, reliance on legal advice does not shield a party from a finding of contempt: para. 61, citing *Mileage Conference Group of the Tyre Manufacturers' Conference, Re,* [1966] 2 All E.R. 849 (Eng. Restrictive Practices Ct.), at p. 862; *Canada Metal Co. v. Canadian Broadcasting Corp. (No. 2)* (1974), 48 D.L.R. (3d) 641 (Ont. H.C.), at p. 661, aff'd (1975),

Case 09-10138-MEW   Doc 15744-2   Filed 06/12/15   Page 75 of 342

Carey v. Laiken, 2015 SCC 17, 2015 CSC 17, 2015 CarswellOnt 5237

2015 SCC 17, 2015 CSC 17, 2015 CarswellOnt 5237, 2015 CarswellOnt 5238...

65 D.L.R. (3d) 231 (Ont. C.A.). Still less should the law permit lawyers to escape a finding of contempt because they have, in effect, relied on their own legal advice.

45      As for third parties, the appellant points to some authority in the United Kingdom and Australia to the effect that intent to interfere with the administration of justice is a prerequisite for finding a third party in contempt: e.g., *Customs & Excise Commissioners v. Barclays Bank Plc*, [2006] UKHL 28, [2007] 1 A.C. 181 (Eng. H.L.), at para. 29; *Attorney General v. Punch Ltd.*, [2002] UKHL 50, [2003] 1 A.C. 1046 (U.K. H.L.), at para. 87; *Z Ltd. v. A.*, [1982] 2 W.L.R. 288 (Eng. C.A.), at p. 305; *Baker v. Paul*, [2013] NSWCA 426 (New South Wales S.C.), at para. 19. It has also been noted that "[i]t would appear that a higher degree of intention is required to make a non-party liable for contempt": Sharpe, at ¶6.210.

46      The short answer to this point is that, even accepting this line of authority, Mr. Carey is not in the same category as the third parties discussed in this line of authority. I would respectfully adopt as my own the following excerpt on this point from the reasons of Sharpe J.A. in the Court of Appeal:

> The solicitor-client bond creates a community of interest between Carey and Sabourin that is plainly distinguishable from the situation of a stranger to the litigation who is apprised of the court order. As an officer of the court, a solicitor of record is duty-bound to take scrupulous care to ensure respect for court orders. ... [A]s the solicitor of record in the case, Carey should be held to the same standard of compliance as his client who was a party. [para. 64]

*(4) Conclusion*

47      I conclude that "contumacious" intent was not required in this case, and to the extent that the judge at first instance found otherwise in overturning her earlier finding of contempt, she erred in law.

**B. Second Issue: Was Mr. Carey in Contempt?**

48      Mr. Carey submits that he was not in contempt, making two main points. He submits first that the payment of funds from his trust account to Mr. Sabourin was not a "transfer" within the meaning of the order, either because beneficial ownership of the funds did not change or because it amounted to a permissible return of an overpayment of legal fees that informal variations to the order permitted. Second, he also says that his conduct complied with his solicitor-client obligations and that such compliance cannot be considered to have been in breach of the *Mareva* injunction. The existence of Mr. Sabourin's funds in his trust account attracted solicitor-client privilege and, as such, Mr. Carey was bound not to disclose that the funds were in his account. But, he submits, leaving the funds where they were and maintaining the privilege would have sheltered them from execution. He maintains that his only option that was consistent with both his professional obligations to his client and to the court was to return the funds to Mr. Sabourin as he did. The privileged nature of the funds precluded him from seeking advice about the proper course of action from the court.

49      Respectfully, neither of these points withstands careful scrutiny.

*(1) The "Transfer"*

50      Mr. Carey contends that there was no transfer of funds within the meaning of the order because there was no change in beneficial ownership when he returned them to Mr. Sabourin. As the Court of Appeal pointed out, the purpose of the order was to prevent dealings with Mr. Sabourin's assets that would defeat the court's process (para. 50). Mr. Carey's position, if accepted, would mean the order actually permitted trustees of assets held for Mr. Sabourin's benefit to freely transfer those assets between accounts and even between jurisdictions, putting those assets beyond the reach of the court in the event of execution, so long as Mr. Sabourin retained beneficial ownership of the assets. An interpretation of the order that permitted this would be illogical: it would clearly defeat the purpose of the order and would also run counter to the plain language of the order specifically prohibiting those with knowledge of it from "dealing with" Mr. Sabourin's assets. For these reasons, I cannot accept Mr. Carey's position.

Case 09-10138-MEW    Doc 15744-2    Filed 06/12/15    Page 76 of 342
Carey v. Laiken, 2015 SCC 17, 2015 CSC 17, 2015 CarswellOnt 5237

2015 SCC 17, 2015 CSC 17, 2015 CarswellOnt 5237, 2015 CarswellOnt 5238...

51      Mr. Carey also submits that the return of the funds to Mr. Sabourin did not constitute a "transfer" within the meaning of the injunction because it amounted simply to returning an overpayment of reasonable legal fees, the payment of which was permitted by the informal variations to the order agreed to by counsel. Mr. Carey also contends that returning the overpayment was consistent with the standard of practice of the profession at the time. Moreover, if moving funds from the trust account to Mr. Sabourin did constitute a "transfer", then it actually corrected a violation of the order that would have occurred when Mr. Sabourin originally transferred funds to Mr. Carey and he deposited them in his trust account.

52      Mr. Carey's characterization of the $500,000 in his trust account as an "overpayment" of "reasonable legal fees" in the circumstances of this case is artificial in the extreme. Moreover, even if I were to accept that characterization (and I do not), the clear terms of this order still prohibited any transfer of those "excess" funds. Further, while the question of whether Mr. Sabourin's initial transfer of the funds to Mr. Carey breached the order is not before us, I reject Mr. Carey's submission that if it were a breach, this justifies a subsequent violation of the order by returning the money to Mr. Sabourin.

53      In my view, Mr. Carey's submissions on this issue rely on alleged uncertainty where none in fact exists. The order clearly prohibited, as the Court of Appeal held at para. 49, dealing with money held in trust. Mr. Carey's other conduct showed that he understood that, even taking into account the variations informally agreed to by counsel to permit payment of legal and ordinary living expenses, the order was in full force and was binding on him. He unsuccessfully tried to vary the order to permit payments to third party creditors and he rightly declined, on the basis of the order, to carry out Mr. Sabourin's instructions to use the trust money to settle the Brown claims.

*(2) Solicitor-Client Privilege*

54      I am not persuaded by Mr. Carey's arguments before this Court that there was a true conflict between the order and his professional duties such that he had no option but to transfer the trust funds back to Mr. Sabourin.

55      I will assume, but not decide, that the existence of the funds was privileged at the time of the transfer. There are certainly arguments to be considered that the privilege never attached in the first place, or that it was waived by Mr. Sabourin's disclosure of the funds' existence to a third party adverse in interest, as Ms. Laiken submits was the case. Moreover, Mr. Carey's claim in this litigation that the funds' existence was privileged is undermined by his disclosure of that fact in response to a request from the receiver in the unrelated litigation for a full accounting of trust funds, a disclosure which he indicated he believed could be made without even any danger of violating any privilege. Mr. Carey wrote:

> ... I believe I can provide you with the following information <u>without danger of violating any privilege:</u> on September 21, 2006 our firm was provided with a cheque for $500,000.00 from Peter Sabourin. Subsequently, on October 25, 2006, at the request of Mr. Sabourin, we returned $400,000.00, by way of four (4) Bank Drafts, payable to Mr. Sabourin. On November 30, 2006 we returned another $40,000.00 to Peter Sabourin. The balance of the monies were kept in the Trust account and used to pay legal fees resulting in the balance that is currently in our account. [Emphasis added; Letter from Mr. Carey to receiver, November 1, 2007; A.R., vol. IV, at p. 145.]

56      Be that as it may, Mr. Carey's assumed duty to guard solicitor-client privilege did not conflict with his duty to comply with the order. To fulfill both, he needed only to leave the funds in his trust account once they had been deposited there. In doing so, he would have respected any obligations arising from solicitor-client privilege to maintain the confidentiality of the funds and he would have abided by the terms of the *Mareva* order not to transfer funds held in trust for Mr. Sabourin.

57      In my view, leaving the funds in his trust account would not have conflicted with other asserted professional obligations. Mr. Carey expressed concern that if he left the funds where they were, he would be assisting in shielding them from execution in the event that Ms. Laiken succeeded in her action against Mr. Sabourin. This position is not only illogical, but ironic in view of the fact that returning them certainly had that effect. It is true that Mr. Carey retained the funds, a conflict might have developed at the point when Ms. Laiken obtained judgment against Mr. Sabourin. Then Mr. Carey might have had an ethical dilemma on his hands: how would he comply with any solicitor-client privilege obligations (assuming the existence of the funds in trust was privileged), with the *Mareva* order and with any duty to avoid assisting his client in evading execution

Case 09-10138-MEW   Doc 15744-2   Filed 06/12/15   Page 77 of 342

**Carey v. Laiken, 2015 SCC 17, 2015 CSC 17, 2015 CarswellOnt 5237**

2015 SCC 17, 2015 CSC 17, 2015 CarswellOnt 5237, 2015 CarswellOnt 5238...

arising from the judgment? But it is not an answer for Mr. Carey to say that he breached the order so that he would avoid the possibility of a future ethical dilemma.

58      Accepting that Mr. Carey believed — albeit mistakenly — that there was a true conflict, there were other appropriate avenues open to him other than making a unilateral decision to breach the order. The unilateral approach that he adopted gave no weight to the important principle that "a court order, made by a court having jurisdiction to make it, stands and is binding and conclusive unless it is set aside on appeal or lawfully quashed": *R. v. Wilson*, [1983] 2 S.C.R. 594 (S.C.C.), at p. 599. See also *Paul Magder Furs Ltd. v. Ontario (Attorney General)* (1991), 6 O.R. (3d) 188 (Ont. C.A.), at p. 192: "It is elementary that so long as ... an order of the court remains in force it must be obeyed."

59      For one thing, Mr. Carey could have obtained a determination about whether the existence of the funds in trust was covered by solicitor-client privilege. Only if it was would a true conflict potentially exist. He himself at one point thought that information about the funds' existence could be released without any danger of violating solicitor-client privilege. He could have asked his client to waive any privilege over the existence of the funds. Had his client agreed, that would have put an end to any potential future conflict. Mr. Carey also could have sought a variation of the order or direction from the court on an *ex parte* and *in camera* basis. But there is no evidence that Mr. Carey took or even considered taking any of these steps.

60      In any event, we do not need to make any final pronouncements on what Mr. Carey should have done instead of unilaterally deciding to give the money back. One thing is crystal clear: there was no legal or ethical duty that compelled Mr. Carey to breach the injunction by transferring the trust funds back to Mr. Sabourin or that conflicted with obeying the order. Although I accept that Mr. Carey did not breach the order maliciously or with the intent to interfere with the administration of justice, the law does not require that he have done so in order to satisfy the elements of civil contempt.

### *C. Third Issue: Was It Open to the Motions Judge to Set Aside Her Initial Contempt Finding?*

61      The Court of Appeal held that the motions judge erred in setting aside her initial contempt finding. Neither the *Rules* nor the case law contemplates the procedure the motions judge followed. The interests of justice are best served when the principle of finality is respected. Mr. Carey used the second stage of the proceedings to attack the motions judge's findings and declaration of contempt. This was inappropriate. (paras. 30-2)

62      The court identified two qualifications to the general rule that a contempt finding at the first hearing is final. First, Rule 60.11 contemplates that a judge may set aside a finding of contempt if the contemnor purges the contempt, since the contempt proceedings have secured compliance with the court order. Second, contempt proceedings are subject to the standard principles that allow parties to reopen findings in exceptional circumstances to permit consideration of fresh evidence or new facts that were not before the court at the first hearing.

63      The appellant submits that the Court of Appeal was wrong for two principal reasons: Rule 60.11(8) grants the court discretion to set aside a contempt finding and the quasi-criminal nature of civil contempt proceedings demands that judges retain discretion to set aside a finding on the basis of new material evidence. The appellant submits that the motions judge properly exercised her discretion to set aside the contempt finding in this case.

64      I do not accept these submissions and I agree with the Court of Appeal, for substantially the reasons it gave.

65      The starting point is that, in civil contempt proceedings, once a finding of contempt has been made at the first stage of a bifurcated proceeding, that finding is usually final. As the Court of Appeal stated, "[a] party faced with a contempt motion is not entitled to present a partial defence [at the liability stage] and then, if the initial gambit fails, have a second 'bite at the cherry'" at the penalty stage (para. 32). This would defeat the purpose of the first hearing. This is what the judge at first instance erroneously permitted Mr. Carey to do.

66      Without exhaustively outlining the circumstances in which a judge may properly revisit an initial contempt finding, I agree with the Court of Appeal that he or she may do so where the contemnor subsequently complies with the order or otherwise

**Carey v. Laiken, 2015 SCC 17, 2015 CSC 17, 2015 CarswellOnt 5237**

2015 SCC 17, 2015 CSC 17, 2015 CarswellOnt 5237, 2015 CarswellOnt 5238...

purges his or her contempt or, in exceptional circumstances, where new facts or evidence have come to light after the contempt finding was made.

67      Although the motions judge was concerned that refusing to consider the new evidence would lead to a miscarriage of justice, I agree that neither Rule 60.11 nor the case law permitted her to revisit her earlier finding in the circumstances of this case. Rule 60.11(8) allows a judge, on motion, to "discharge, set aside, vary or give directions in respect of an order under subrule (5) or (6) and ... grant such other relief and make such other order as is just". Relying on the Court of Appeal's comments in its stay decision, the motions judge thought that there was no need to "reopen" Ms. Laiken's motion for contempt, as it was not yet completed: 2012 ONSC 7252 (Ont. S.C.J.), at para. 8. I agree with the Court of Appeal that the motions judge misinterpreted this aspect of the stay decision. The Court of Appeal correctly held that in these circumstances, the motions judge erred in exercising her discretion to permit Mr. Carey to relitigate the initial contempt finding and erred in setting that finding aside.

## IV. Disposition

68      I would dismiss the appeal with costs.

*Appeal dismissed.*

*Pourvoi rejeté.*

---

**End of Document**                          Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# Tab 8

2015 ONSC 3076
Ontario Superior Court of Justice

Bimman v. Neiman

2015 CarswellOnt 7485, 2015 ONSC 3076

# Alexander Bimman and 2182474 Ontario Inc., Plaintiffs and Arkadi Neiman, Coryana Enterprises Limited, 1050828 Ontario Ltd., Canadian Investment & Consulting Central Corporation, Larwest Canada (Caribbean) Inc., 2182158 Ontario Ltd., 1765350 Ontario Inc., 1771636 Ontario Ltd., Edward Poberezkin, Victor Itkine, Roman Shmulik, Alex Glozman and Corayana Services Ltd., Defendants

Gans J.

Judgment: May 19, 2015
Docket: CV-11-0000904800-CL

Counsel: Igor Ellyn, Belinda Schubert, for Plaintiffs
Douglas Christie, David Rubin, for Defendants

Subject: Civil Practice and Procedure; Corporate and Commercial

Headnote
  Business associations

  Civil practice and procedure

Table of Authorities

Cases considered by *Gans J.*:

*Bimman v. Neiman* (2015), 2015 CarswellOnt 5361, 2015 ONSC 2313 (Ont. S.C.J.) — referred to

*Épiciers Unis Metro-Richelieu Inc. c. Québec (Régie des alcools, des courses & des jeux)* (1996), [1996] R.J.Q. 608, 1996 CarswellQue 145 (C.A. Que.) — referred to

*Gore Mutual Insurance Co. v. 1443249 Ontario Ltd.* (2004), 2004 CarswellOnt 1468, 70 O.R. (3d) 404, [2004] O.T.C. 319, 10 M.V.R. (5th) 67 (Ont. S.C.J.) — distinguished

*j2 Global Communications Inc. v. Protus IP Solutions Inc.* (2008), *(sub nom. J2 Global Communications Inc. v. Protus IP Solutions Inc.)* 330 F.T.R. 176 (Eng.), 2008 FC 759, 2008 CarswellNat 1975 (F.C.) — referred to

*National Trust Co. v. Saks* (1995), 1995 CarswellOnt 4366 (Ont. Gen. Div.) — followed

*R. v. C. (C.R.)* (2009), 242 C.C.C. (3d) 64, 451 W.A.C. 37, 324 Sask. R. 37, 2009 SKCA 13, 2009 CarswellSask 75 (Sask. C.A.) — referred to

*R. v. Tong* (2014), 2014 ONSC 1861, 2014 CarswellOnt 3560 (Ont. S.C.J.) — referred to

*R. v. Vuradin* (2013), 2013 SCC 38, 2013 CarswellAlta 1057, 2013 CarswellAlta 1058, 3 C.R. (7th) 1, 361 D.L.R. (4th) 34, 80 Alta. L.R. (5th) 291, [2013] 8 W.W.R. 211, 298 C.C.C. (3d) 139, 553 A.R. 1, 583 W.A.C. 1, [2013] 2 S.C.R. 639, 446 N.R. 53 (S.C.C.) — referred to

*Roopchand v. Chau* (2013), 2013 CarswellOnt 4057, 2013 ONSC 2119 (Ont. S.C.J. [Commercial List]) — distinguished

*Schmuck v. Reynolds-Schmuck* (2000), 2000 CarswellOnt 202, 46 O.R. (3d) 702 (Ont. S.C.J.) — followed

*Toliver v. Koepke* (2013), 2013 ABCA 390, 2013 CarswellAlta 2267, 566 A.R. 24, 597 W.A.C. 24 (Alta. C.A.) — referred to

*Gans J.*:

**Introduction**

1    The plaintiffs bring a motion to amend the Reasons for Judgment ("the Reasons") that I released on April 16, 2015: *Bimman v. Neiman*, 2015 ONSC 2313 (Ont. S.C.J.). Putting the issues simply, they ask that I formally "adjudicate" on an interpretation of the words "the necessary funds" found in Article 6.01(b) of the Shareholders' Agreement, set out verbatim at paragraphs 66 and 137 of the Reasons.

2    In the alternative, they ask that if I am not persuaded that the interpretation of that phrase accords with their position, I should nevertheless amend the calculation of the en-bloc value of the shares to reflect the fact that the total sums advanced under the Cash Calls should be treated as equity and not debt.

**Analysis**

3    I am not persuaded that the procedure asked of me is appropriate in these circumstances. The plaintiffs have rights of appeal of which they may avail themselves should they so desire.

4    In that respect, I am of the view that the cases to which my attention was directed as part of the motion, namely *Roopchand v. Chau* [1] and *Gore Mutual Insurance Co. v. 1443249 Ontario Ltd.*, [2] are distinguishable on their facts. Indeed, I am of the view that this case is more analogous to the decision of Borins J., as he then was, in *National Trust Co. v. Saks*, [3] which would permit an outright dismissal of the motion.

5    Furthermore, I do not think that the principles discussed by Himel J. in *Schmuck v. Reynolds-Schmuck*, [4] applicable in instances where a "reconsideration" of the arguments and evidence may be appropriate, are engaged in the instant case.

6    However, I make the following observations in this Addendum to my Reasons for Judgment:

a. A reading of my Reasons indicates that while I did not deal with the argument sought to be revisited in this motion head on, which I am not in any event obliged to do in the discharge of my duties as a jurist, [5] I implicitly rejected the interpretation asserted again in this motion. I was very much alive to the issue when it was argued and as I wrote the judgment.

b. The argument now advanced by the plaintiffs was not rooted in any facts to which my attention was directed during the evidence portion of the trial, nor during argument. In effect, it was a gloss put on the words of the November Shareholders'

Agreement by plaintiffs' counsel. It was, as I observed during argument, a "4 a.m. inspiration," which all good counsel have in the heat of battle. It was not plaintiffs' counsel's primary or strongest argument.

c. Put otherwise, the argument advanced by plaintiffs' counsel was not within the reasonable contemplation of the parties at the time the Shareholders' Agreements were being negotiated. Indeed, while the words "necessary funds" were used in an earlier draft of the August Agreement, when Article 6.01(b) was debated by Itkine and Bimman in various email exchanges, its use in the earlier iteration of the agreement actually undercuts the plaintiffs' suggested interpretation in my view. [6]

d. Finally, this proposed interpretation is not referenced in the pleadings, which although not those of trial counsel, still must be considered in defining the issues for trial and judgment. In that respect, a review of paragraph 6 of the Plaintiffs' Reply and Defence to Counterclaim is most instructive.

7    Insofar as the second issue is concerned, namely that I am obliged to revalue Bimman's interest at this moment in time as if the Cash Calls resulted in the creation of equity and not a hybrid of debt and equity as I have found, I agree with the position of the defendants that: (a) this position was specifically abandoned at the commencement of trial and the defendants were not permitted an opportunity to lead evidence on this issue by agreement of the parties; and (b) this position is at variance with the manner in which the plaintiffs argued the issue pertaining to the allegedly criminal rate of interest on the shareholder loans. I decline further comment accordingly. The plaintiffs have their remedies elsewhere.

**Conclusion**

8    The plaintiffs' motion is hereby dismissed with costs.

Footnotes

1    2013 ONSC 2119, [2013] O.J. No. 1646 (Ont. S.C.J. [Commercial List]).

2    [2004] O.J. No. 1896, 130 A.C.W.S. (3d) 597 (Ont. S.C.J.).

3    [1995] O.J. No. 853, 54 A.C.W.S. (3d) 567 (Ont. Gen. Div.).

4    (2000), 46 O.R. (3d) 702, [2000] O.J. No. 247 (Ont. S.C.J.), at para. 25.

5    *R. v. Vuradin*, 2013 SCC 38 (S.C.C.) at para. 17; *j2 Global Communications Inc. v. Protus IP Solutions Inc.*, 2008 FC 759 (F.C.) at para. 42; *R. v. Tong*, 2014 ONSC 1861 (Ont. S.C.J.) at para. 35; *R. v. C. (C.R.)*, 2009 SKCA 13 (Sask. C.A.) at para. 25; *Toliver v. Koepke*, 2013 ABCA 390 (Alta. C.A.) at para. 4(b); *Épiciers Unis Metro-Richelieu Inc. c. Québec (Régie des alcools, des courses & des jeux)*, [1996] J.Q. no. 330 (C.A.) at para. 42.

6    08-100: Shareholders' Agreement August 9, 2009; Exhibit 10 — August 15, 2009 e-mail from SB to AN re. SHA amendments.

**End of Document**          Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# Tab 9

2000 CarswellOnt 202, [2000] O.J. No. 247, 46 O.R. (3d) 702, 94 A.C.W.S. (3d) 504

2000 CarswellOnt 202
Ontario Superior Court of Justice

Schmuck v. Reynolds-Schmuck

2000 CarswellOnt 202, [2000] O.J. No. 247, 46 O.R. (3d) 702, 94 A.C.W.S. (3d) 504

# Derek A. Schmuck, Petitioner (Husband) and
# Patricia Reynolds-Schmuck, Respondent (Wife)

Himel J.

Heard: May 26, 1999
Heard: May 27, 1999
Heard: May 28, 1999
Heard: June 4, 1999
Judgment: February 1, 2000
Docket: D9381/98

Proceedings: additional reasons to (1999), 50 R.F.L. (4th) 429 (Ont. S.C.J.)

Counsel: *Deborah L. Ditchfield*, for Petitioner/Husband.
*Catherine A. Haber*, for Respondent/Wife.

Subject: Family; Civil Practice and Procedure

## Headnote

**Family law --- Costs — Divorce proceedings — General**

Husband and wife were divorced and wife's entitlement to support and child support were determined at trial — Written submissions were made as to costs — Husband shall pay costs of wife for interim motion and at trial on party and party scale following assessment — There was divided success at trial with wife being more successful party — Neither of parties' offers to settle came within meaning of Rule 49 — Matters at trial were not complex, novel nor of public interest — Husband's assets and income base were such that he was better able to withstand award of costs against him and bear his own costs.

**Practice --- Trials — Conduct of trial — Powers and duties of trial Judge — Giving reasons for judgment**

Husband and wife were divorced and wife's entitlement to support and child support were determined at trial — Counsel for husband requested clarification and review of certain issues addressed in reasons for judgment — Reasons for judgment credited husband $4500 for direct payments to be applied against his retroactive support obligation — Reasons for judgment specified amount of retroactive child support owing and provided for right to review of order for spousal support in three years and before if material change in circumstances at earlier time — Husband's request for reconsideration of determinations made on issue of amount of credit due to husband for direct payments made to wife to offset amount of retroactive support due and basis of calculations for support credit based on evidence already considered by court was refused on discretion of court — Questions raised may be subject of appeal.

## Table of Authorities

**Cases considered by *Himel J.*:**

*Andrews v. Andrews* (1980), 32 O.R. (2d) 29, 20 R.F.L. (2d) 348, 20 C.P.C. 88, 120 D.L.R. (3d) 252 (Ont. C.A.) — considered

*Castlerigg Investments Inc. v. Lam* (1991), 2 O.R. (3d) 216, 47 C.P.C. (2d) 270 (Ont. Gen. Div.) — applied

*DeGroote v. Canadian Imperial Bank of Commerce* (April 24, 1998), Doc. 92-CQ-12825 (Ont. Gen. Div.) — considered

*Grant v. Grant* (May 31, 1994), Doc. 671/93 (Ont. Gen. Div.) — considered

*Kent v. Frolick* (1996), 3 O.T.C. 122 (Ont. Gen. Div.) — considered

*QIT Fer & Titane Inc. v. Upper Lakes Shipping Ltd.* (1991), 3 O.R. (3d) 165 (Ont. Gen. Div.) — considered

*Smith v. Canadian Tire Acceptance Ltd.* (December 12, 1994), Doc. CP 93-CQ-32019 (Ont. Gen. Div.) — referred to

*671122 Ontario Ltd. v. Sagaz Industries Canada Inc.* (October 9, 1998), Doc. 34883/89 (Ont. Gen. Div.) — referred to

**Statutes considered:**

*Courts of Justice Act*, R.S.O. 1990, c. C.43
    s. 131 — considered

**Rules considered:**

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194
    R. 49 — considered

    R. 57 — considered

    R. 57.01 — considered

    R. 69.15(5) — pursuant to

ADDITIONAL REASONS to judgment reported at (1999), 50 R.F.L. (4th) 429 (Ont. S.C.J.) dealing with costs and request by husband for clarification and review of judgment.

*Himel J.*:

**Reasons**

1    On August 12, 1999, I released Reasons for Judgment following a four day trial on two issues, the wife's entitlement to support including quantum, duration and retroactivity and whether child support should be retroactive to April 29, 1998.

2    As agreed, the parties have made written submissions to me on the question of costs.

3    A second issue has arisen at the instance of the Petitioner who seeks both a clarification and a review of certain matters arising from the judgment.

4    I deal first with my decision on costs and second with the request for clarification and reconsideration.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2000 CarswellOnt 202, [2000] O.J. No. 247, 46 O.R. (3d) 702, 94 A.C.W.S. (3d) 504

*1. Costs:*

5    Both parties have made submissions that they are entitled to costs following trial. The issue of costs of an interim motion before Kent J. was also reserved to the trial judge.

6    The Petitioner husband submits that he should be awarded costs on a party and party basis. Although neither party made an offer of settlement within the meaning of Rule 49 and obtained a better result at trial, he argues that the results of the motions and trial are closer to his offer than the wife's offers of settlement.

7    He also cites the factors in Rule 57.01 and submits that the wife's conduct lengthened unnecessarily the duration of the action by altering her position on the issue of equalization and disputing the value of the law partnership interest of the husband, by claiming excessive spousal support and by initially claiming sole custody. He argues that the results at trial were far below what the wife claimed in her counter-petition and that the court ordered a review in three years which is partial success for the husband.

8    In the written submissions filed, the husband does not ask the court to fix costs.

9    The Respondent wife submits that she should be awarded costs of this action on a party and party basis. She refers to offers to settle by her which she says were not unreasonable and that aspects of them included offers which were greater than what she was awarded at trial. She argues that her offers were closer to the order made than were the offers made by the husband and that, on balance, she was the more successful party. She also cites the factors under Rule 57 for consideration, namely, that the husband was unreasonable in his position on time-limited support, that the husband paid inadequate support following separation requiring the wife to bring an interim motion and that he made misleading statements at the motion about his income, the amount of time the children were with him, the payment of certain debts and credits that he sought for certain payments. She argues that he should be held to a higher standard because of his experience as a family law practitioner. She finally submits that her overall success on the issue of time-limited support and retroactive support as well as the respective financial abilities of the parties should be considered.

10    I have considered the written submissions of the parties including the correspondence and case law enclosed. Section 131 of the *Courts of Justice Act* provides that costs may be awarded in the discretion of the court and Rule 57.01 sets out a list of factors that may be considered by the trial judge in deciding who should be awarded costs, on what scale and in what amount. Those factors relevant to family law proceedings include the results in the proceeding, whether offers to settle were made in writing, the amount claimed and recovered, the complexity of the matters, the importance of the issues, conduct which tended to shorten or lengthen the proceeding, whether steps were improper or unnecessary and whether the party refused to admit something which should have been admitted.

11    In family law matters, the same approach is used as in other litigation. Costs usually follow the event. However, other factors may also be relevant. In a case with many diverse issues, success is often divided. Success is, therefore, only one factor. The conduct of the parties prior to litigation, during litigation and the income and assets of each party which affect their ability to bear their own or the other party's costs are all the factors recognized as relevant to the costs determination: *Andrews v. Andrews* (1980), 120 D.L.R. (3d) 252 (Ont. C.A.). Unlike other civil litigation, in family cases, the ability to pay a costs order or the effect of a costs award is taken into account as part of the financial arrangement on judgment.

12    The court will consider whether a family law claimant has made a reasonable settlement offer. Rule 49 costs consequences can apply but rarely are offers made in a formal way or within the proper time frame. On interim proceedings, in order to promote settlement, the judge is to take written proposals for settlement into account (Rule 69.15(5)).

13    In the circumstances of this case, I consider the following factors to be relevant:

2000 CarswellOnt 202, [2000] O.J. No. 247, 46 O.R. (3d) 702, 94 A.C.W.S. (3d) 504

(1) There was divided success following trial. The amount of spousal support was reduced from the interim order. The award of retroactive support and on a non-time limited basis was in favour of the wife. On balance, the wife was the more successful party;

(2) Offers to settle were made in writing by both parties but neither were offers within the meaning of Rule 49. Aspects of the offers of each party were higher than the order; other aspects were lower. Overall, I find the wife to have been more reasonable in her proposals for settlement;

(3) The amount of spousal support claimed was less than what was ordered. However, retroactive support and non-time limited support was also awarded;

(4) The matters in issue at trial were not complex, were not novel and were not of public interest;

(5) The conduct of the parties' prolonged resolution. The husband did not pay adequate interim support and the wife was required to bring a motion. The wife was endeavouring to settle just prior to trial and once the trial began, the husband's position was even less reasonable;

(6) The husband's assets and income base is such that he is better able to withstand an award of costs against him and bear his own costs.

14      Accordingly, I exercise my discretion and direct that the husband shall pay the costs of the wife for the interim motion and at trial on a party and party scale following assessment.

### 2. The Request by the Husband for Clarification and Review:

15      In addition to making written submissions on costs, counsel for the husband requested clarification and a review of certain issues addressed in the Reasons for Judgment. Counsel for the wife responded with the position that it would be inappropriate for counsel to make any further submissions to the court, and inappropriate for me to revise my Reasons for Judgment. She also requested an opportunity to respond if I chose to consider the questions raised. Since I am in agreement that it would be inappropriate for me to consider the questions raised, any further submissions are unnecessary.

16      At this point, a judgment has been rendered but it has not been formally entered. The case law is clear that until that time, a trial judge is not yet *functus*. The case law also recognizes that a trial judge has a wide discretion to permit the re-opening of a case prior to the entering of the judgment: See *Castlerigg Investments Inc. v. Lam* (1991), 2 O.R. (3d) 216 (Ont. Gen. Div.). Therefore, it is open to me to exercise my discretion and re-open the case for a reconsideration of certain issues.

17      In reviewing the questions posed, I have concluded that three questions are requests for clarification of my order. In my opinion these three questions are all answered by the Reasons for Judgment. However, in the interests of ensuring that all parties understand the Reasons for Judgment, I have briefly highlighted relevant portions of my Reasons.

18      Question 1 asks whether the Petitioner husband was given all the credit to which he is entitled for direct payments made to the wife after separation when the amount of retroactive support owed was calculated. I would direct counsel's attention to paragraph 61 of the Reasons for Judgment where the husband has been credited $4500 of direct payments to be applied against his retroactive support obligation. This amount reflects the entire amount of credit to which I have determined Mr. Schmuck is entitled.

19      Question 4 asks for a breakdown of the retroactive support amount in terms of the spousal and child support. Again, I would direct counsel's attention to paragraph 60 of my Reasons for Judgment where the amount of retroactive child support owing is specified.

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2000 CarswellOnt 202, [2000] O.J. No. 247, 46 O.R. (3d) 702, 94 A.C.W.S. (3d) 504

20    The Reasons for Judgment provide for the right to a review of the order for spousal support in three years. Such a review clearly does not preclude either party making an application for a review based on a material change in circumstances at an earlier time. The three year review may be with respect to both the quantum and entitlement to support.

21    Questions 2 and 3 are requests for reconsideration of the determinations made on the issue of the amount of credit due to the husband for direct payments made to the wife to offset the amount of retroactive support due and the basis of the calculations for the support credit. I would note that these questions do not amount to a request to consider any new evidence on these issues. They simply ask for a reconsideration of the issues based on evidence already considered by the court.

22    *Castlerigg Investments* is often cited for the rule that a trial judge has untrammelled discretion to prevent abuse, the fundamental consideration being that a miscarriage of justice does not occur. The appropriate exercise of a trial judge's discretion is most often considered in the context of requests to re-open a trial in order to present new evidence: See *QIT Fer & Titane Inc. v. Upper Lakes Shipping Ltd.* (1991), 3 O.R. (3d) 165 (Ont. Gen. Div.); *Smith v. Canadian Tire Acceptance Ltd.* (December 12, 1994), Doc. CP 93-CQ-32019 (Ont. Gen. Div.); *671122 Ontario Ltd. v. Sagaz Industries Canada Inc.* (October 9, 1998), Doc. 34883/89 (Ont. Gen. Div.) . It is extremely rare for there to be a request to re-open a trial on the grounds of a reconsideration of the case.

23    In *Kent v. Frolick* (1996), 3 O.T.C. 122 (Ont. Gen. Div.) and *Grant v. Grant* (May 31, 1994), Doc. 671/93 (Ont. Gen. Div.), the court was faced with a party requesting a reconsideration of the case. In *Grant*, one party wanted a reconsideration of the amount of spousal support awarded. In *Kent*, the moving party asked for a reconsideration of the child support award, arguing that the evidence on the quantum of support was not fully understood by the court, and not fully canvassed at trial. In both cases, the court accepted that there was an untrammelled discretion to prevent a miscarriage of justice, but found that there was no justification to reconsider the case.

24    In *DeGroote v. Canadian Imperial Bank of Commerce* (April 24, 1998), Doc. 92-CQ-12825 (Ont. Gen. Div.) at paragraph 6, Lax J. explains the policy concerns in an application to re-open a trial: "The issue with which the cases have concerned themselves is how to balance the need to ascertain the truth upon full disclosure of all material facts with the need to preserve the integrity of the litigation process and prevent an abuse of its process. Both needs are directed at ensuring that justice is achieved."

25    It is my view that a party who wishes a reconsideration alone would have to establish that the integrity of the litigation process is at risk unless it occurs, or that there is some principle of justice at stake that would override the value of finality in litigation, or that some miscarriage of justice would occur if such a reconsideration did not take place. No such reasons exist in this case. The questions raised by counsel may be the subject of appeal. As such, I decline to exercise may discretion to reconsider any of the issues raised by the husband.

*Order accordingly.*

---

**End of Document**          Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# Tab 10

Case 09-10138-MEW    Doc 15744-2    Filed 06/12/15    Page 90 of 342

Shaw Satellite G.P. v. Pieckenhagen, 2011 ONSC 5968, 2011 CarswellOnt 10976

2011 ONSC 5968, 2011 CarswellOnt 10976, [2011] O.J. No. 4587...

2011 ONSC 5968

Ontario Superior Court of Justice

Shaw Satellite G.P. v. Pieckenhagen

2011 CarswellOnt 10976, 2011 ONSC 5968, [2011] O.J. No. 4587, 207 A.C.W.S. (3d) 781

**Shaw Satellite G.P. c.o.b. as Shaw DirectTM (Plaintiff) and Curt-Michael Pieckenhagen, a.k.a. Curt-Michael Pieckenhagen, Curt Pieckenhagen a.k.a Curt-Michael Pieckenhagen a.k.a. Kurt Michael, a.k.a Pat Turner, Kurt Pieckenhagen, Megan Anderson, Julita Pieckenhagen, Julita-Luise Pieckenhagen a.k.a Jules Luise a.k.a. Jules Michael, Vera Pieckenhagen, Christopher Brooks a.k.a. Chris Brooks a.k.a. Andrew Brooks, Nicole Pieckenhagen, 1125749 Ontario Limited, Eccelerated Digital, Accelerated Digital Communications Inc., 121429 Ontario Inc., 373041 Ontario Inc., Graydon Hall Property Management Ltd., GH Capital Corporation, Andrew Brooks, Chris Brooks, Theo Bulk, Jules Luise, Jules Michael, Kurt Michael and Pat Turner (Defendants)**

Perell J.

Heard: October 7, 2011
Judgment: October 17, 2011
Docket: 11-CV-9070CL

Counsel: Christopher D. Bredt, Isabella Massimi, for Plaintiff

Melvyn L. Solmon, Nancy J. Tourgis, for Defendants, 373041 Ontario Inc., Kurt Pieckenhagen, Julita Pieckenhagen, Julita-Luise Pieckenhagen a.k.a Jules Luise a.k.a. Jules Michael, Vera Pieckenhagen, Christopher Brooks a.k.a. Chris Brooks a.k.a. Andrew Brooks, Nicole Pieckenhagen, Graydon Hall Property Management Ltd., GH Capital Corporation

Michael Spears, for Defendants, Curt-Michael Pieckenhagen, a.k.a. Curt Michael Pieckenhagen, Curt Pieckenhagen a.k.a Curt-Michael Pieckenhagen a.k.a. Kurt Michael, Megan Anderson, 1125749 Ontario Limited, Eccelerated Digital, Accelerated Digital Communications Inc.

Subject: Civil Practice and Procedure; Contracts; Corporate and Commercial; Public

## Headnote

**Civil practice and procedure --- Judgments and orders — Amending or varying — Before judgment entered — Restrictions on power to vary**

Plaintiff was satellite service provider whose customer agreement included arbitration clause — Defendants were individuals and entities who were allegedly using plaintiff's service unlawfully — Plaintiff commenced action against defendants on basis that they were breaching customer agreement — Defendants brought motion pursuant to s. 7 of Arbitration Act, 1991 for order staying action in favour of arbitration — Defendants argued they did not have to admit they were customers bound by agreement — At hearing of motion, one defendant acknowledged being customer bound by agreement — Motion was dismissed on basis that defendants could only benefit from arbitration clause if they admitted they were bound by customer agreement — Defendants brought motion for variation of order on basis that acknowledgement of one defendant had not been taken into account — Motion dismissed — Failure to mention acknowledgement of one defendant in reasons for judgment had not resulted in error arising from accidental slip or omission or particular on which court had not adjudicated — Failure to mention acknowledgement had been inadvertent but acknowledgement had no effect on outcome — Acknowledgement had come too late to change outcome — Defendants had brought their stay motion on basis that they collectively did not have to admit they were parties to customer agreement — Defendants' collective

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 91 of 342

Shaw Satellite G.P. v. Pieckenhagen, 2011 ONSC 5968, 2011 CarswellOnt 10976

2011 ONSC 5968, 2011 CarswellOnt 10976, [2011] O.J. No. 4587...

argument had been rejected and two alternative bases for dismissing stay motion had been provided — Defendants were now attempting to submit acknowledgement of one defendant as new evidence even though this evidence had always been available to them.

**Table of Authorities**

**Cases considered by *Perell J.*:**

*Bemrose v. Fetter* (2005), 2005 CarswellOnt 3481 (Ont. S.C.J.) — referred to

*Central Canada Travel Services v. Bank of Montreal* (1986), 13 C.P.C. (2d) 119, 57 O.R. (2d) 633, 1986 CarswellOnt 454 (Ont. H.C.) — referred to

*Clarke v. Clarke* (2002), [2002] O.T.C. 611, 2002 CarswellOnt 2759, 32 R.F.L. (5th) 282 (Ont. S.C.J.) — referred to

*Dhaliwal v. Plantus* (2007), 64 R.P.R. (4th) 297, [2008] G.S.T.C. 66, 2007 CarswellOnt 9071 (Ont. S.C.J.) — referred to

*Holmes Foundry Ltd. v. Point Edward (Village)* (1963), 39 D.L.R. (2d) 621, [1963] 2 O.R. 404, 1963 CarswellOnt 272 (Ont. C.A.) — referred to

*Hunter v. Hunter* (2005), 2005 CarswellOnt 7478 (Ont. S.C.J.) — referred to

*Millard v. North George Capital Management Ltd.* (1999), 1 B.L.R. (3d) 106, 1999 CarswellOnt 3345 (Ont. S.C.J. [Commercial List]) — referred to

*Montague v. Bank of Nova Scotia* (2004), 2004 CarswellOnt 11, 2004 C.L.L.C. 210-027, 69 O.R. (3d) 87, 30 C.C.E.L. (3d) 71, 180 O.A.C. 381 (Ont. C.A.) — referred to

*Montague v. Bank of Nova Scotia* (2004), 2004 CarswellOnt 3446, 2004 CarswellOnt 3447, 332 N.R. 398 (note), 200 O.A.C. 200 (note) (S.C.C.) — referred to

*Schmuck v. Reynolds-Schmuck* (2000), 2000 CarswellOnt 202, 46 O.R. (3d) 702 (Ont. S.C.J.) — referred to

*Shaw Satellite G.P. v. Pieckenhagen* (2011), 2011 CarswellOnt 7000, 337 D.L.R. (4th) 369, 2011 ONSC 4360 (Ont. S.C.J.) — considered

*Smith Bus Lines Ltd. v. Bank of Montreal* (1987), 61 O.R. (2d) 688, 1987 CarswellOnt 566, 25 C.P.C. (2d) 255 (Ont. H.C.) — referred to

*Toole v. Acres Inc.* (2007), 2007 CarswellOnt 4301 (Ont. S.C.J.) — referred to

*Wright, Re* (1949), [1949] O.W.N. 113, 1949 CarswellOnt 127 (Ont. H.C.) — referred to

**Statutes considered:**

*Arbitration Act, 1991*, S.O. 1991, c. 17
    s. 7 — referred to

Case 09-10138-MEW    Doc 15744-2    Filed 06/12/15    Page 92 of 342

Shaw Satellite G.P. v. Pieckenhagen, 2011 ONSC 5968, 2011 CarswellOnt 10976

2011 ONSC 5968, 2011 CarswellOnt 10976, [2011] O.J. No. 4587...

s. 7(1) — considered

**Rules considered:**

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194
　　R. 59.01 — referred to

　　R. 59.06 — referred to

　　R. 59.06(1) — considered

MOTION by defendants for variation of order on basis that evidence had not been taken into account.

*Perell J.*:

**Reasons for Decision No.2**

### A. Introduction and Overview

1    In this action, the Plaintiff Shaw Satellite G.P. sues the Defendants, who have divided themselves into two groups. The first group is comprised of 373041 Ontario Inc., Kurt Pieckenhagen, Julita Pieckenhagen, Julita-Luise Pieckenhagen, Vera Pieckenhagen, Christopher Brooks, Graydon Hall Property Management Ltd. and GH Capital Corporation. The second group is comprised of Curt-Michael Pieckenhagen, Megan Anderson, 1125749 Ontario Limited, Eccelerated Digital, Accelerated Digital Communications Inc., and 121429 Ontario Inc.

2    Mainly pursuant to s. 7 of the *Arbitration Act, 1991*, S.O. 1991, c. 17, all of the Defendants brought motions to stay Shaw Satellite's action. I dismissed the motions on July 14, 2011. My Reasons for Decision are reported as *Shaw Satellite G.P. v. Pieckenhagen*, 2011 ONSC 4360 (Ont. S.C.J.). The Order for the motions to stay has not yet been issued, but my decision is under appeal.

3    Pursuant to rule 59.06 (1) of the *Rules of Civil Procedure*, all the Defendants now bring motions to vary or amend the Reasons for Decision.

4    For the Reasons that follow, I dismiss the motions.

### B. Factual Background

5    The factual background to this motion under rule 59.06 (1) is as follows.

6    A consumer or subscriber to the services of Shaw Satellite enters into a written contract with Shaw Satellite. The Shaw Satellite Residential Agreement contains an arbitration clause.

7    Alleging that the Defendants were subscribers, on January 24, 2011, Shaw Satellite sued the Defendants, and on January 28, 2011, Justice Cumming granted interim injunctions and *Anton Piller* Orders against certain of the Defendants. The *Anton Pillar* Orders were executed, and Shaw Satellite receivers were found and seized at the Graydon Hall Apartments.

8    In its Statement of Claim, Shaw Satellite alleged that all the Defendants had breached the Shaw Satellite Residential Customer Agreement.

9    The Defendants did not deliver a Statement of Defence. Rather, they brought motions pursuant to under s. 7 (1) of the *Arbitration Act* to stay Shaw Satellite's action.

**WestlawNext** CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2011 ONSC 5968, 2011 CarswellOnt 10976, [2011] O.J. No. 4587...

10      Until the oral argument of their motions to stay, the Defendants' argument was that since Shaw Satellite sued them for breaching the terms of the Shaw Satellite Residential Agreement and since that Agreement contained an Arbitration Agreement, therefore, it followed that each of the Defendants was entitled to have the Arbitration Agreement enforced and the lawsuit stayed until the arbitrator ruled as to whether he or she had jurisdiction to decide the dispute between Shaw Satellite and the Defendants.

11      Until the oral argument of their motions to stay, the Defendants submitted that it did not matter that they did not admit that they were parties to the Shaw Satellite Residential Agreement nor did it matter that they were reserving the right to deny that they were parties to the Shaw Satellite Residential Agreement. They submitted that based solely on Shaw Satellites' Statement of Claim, the action should be stayed.

12      However, during the course of the argument of the motions to stay, through his counsel - one of the Defendants - Curt-Michael Pieckenhagen, acknowledged that he was a party to the Shaw Satellite Residential Agreement.

13      None of the other Defendants made a similar acknowledgment, and all of the Defendants persisted in their argument that based solely on Shaw Satellites' Statement of Claim, the action should be stayed and the matter referred to an arbitrator.

14      In my Reasons for Decision, I do not mention the acknowledgement made by Mr. Curt-Michael Pieckenhagen during the course of the oral argument, nor do I address the significance of this acknowledgement. Rather, in paragraphs 31 to 32 of my Reasons, I stated:

[31] I disagree with the Defendants' argument. For a moving party, to qualify to obtain a stay under s. 7 (1) of the *Arbitration Act*, the moving party must be "another party to the arbitration agreement." Section 7(1) of the *Arbitration Act* states:

**Stay**

7.(1) If a party to an arbitration agreement commences a proceeding in respect of a matter to be submitted to arbitration under the agreement, the court in which the proceeding is commenced shall, on the motion of another party to the arbitration agreement, stay the proceeding.

[32] The motion before the court is the Defendants' motion. The onus is on them to prove that they qualify for the relief sought, which is to say that they must prove that it is true that they are parties to the arbitration agreement. The moving parties have not met the onus of showing that they are qualified to bring their motion. Indeed, it appears that they are refusing to qualify themselves to bring their own motion. A party to an action who is not a party to an arbitration agreement has no right to invoke the arbitration agreement under Section 7(1) of the *Arbitration Act*: *Smith Estate v. National Money Mart Co*., [2008] O.J.No 2248 (S.C.J) at paras. 94 and 95.

[33] The fact that Shaw Satellite has pleaded that the Defendants are parties to an arbitration agreement could be evidence that the Defendants could rely on to qualify themselves for this motion. However, they can rely on this evidence only if they are prepared to admit the truth of the evidence.

[34] The Defendants' status or qualification to bring the motion before the court is not a matter for the arbitrator to decide. The matter before the court is not a matter of determining the arbitrator's jurisdiction to arbitrate; the matter before the court is a motion under s. 7 (1), and in order for the moving party to obtain relief under that provision, he or she must prove that it is true that he or she is a party to an arbitration agreement. The moving party cannot reserve the right to disprove what it must prove in order to get the stay.

[35] Further, in my opinion, the competence-competence principle upon which the Defendants' rely does not apply to the circumstances of the case at bar. Under the competence-competence principle, subject to certain exceptions, where there is a dispute about the arbitrator's jurisdiction, the court stays its own proceeding and allows the arbitrator to determine first whether he or she has jurisdiction over the litigants and whether he or she has jurisdiction over the dispute.

Shaw Satellite G.P. v. Pieckenhagen, 2011 ONSC 5968, 2011 CarswellOnt 10976

2011 ONSC 5968, 2011 CarswellOnt 10976, [2011] O.J. No. 4587...

[36] The competence-competence principle would apply if the issue for the arbitrator was whether a party resisting arbitration was a party to the arbitration agreement. Thus, for example, in the companion action, if the Defendants sought a submission to arbitration and Bell ExpressVu resisted, it would be for the arbitrator to decide whether Bell ExpressVu's contract included an arbitration provision that applied to Bell ExpressVu. The situation at the case at bar, however, is different. The Defendants are not resisting arbitration (they seek arbitration) but they are reserving the right to deny that they are parties to the arbitration agreement. In my opinion, the Defendants cannot rely on the competence-competence principle in these circumstances.

15    Thus, I concluded that the action should not be stayed. However, on the assumption that my reasoning was incorrect, I went on to provide two mutually exclusive other grounds for refusing to stay the action.

16    In this motion, the Defendants assert, however, that my failure to mention Mr. Curt-Michael Pieckenhagen's acknowledgement creates a circumstance that falls within rule 59.01 or the court's inherent jurisdiction to amend an order. The Defendants submit that my Reasons contain an error or omission because the defendant, Mr. Curt-Michael Pieckenhagen acknowledged during oral argument that he is a party to the Arbitration Agreement and therefore, he did meet the onus of showing that he is qualified to obtain a stay under s. 7(1) of the *Arbitration Act*.

17    In response, Shaw Satellite submits that the Defendants' motion should be dismissed because: (a) rule 59.06 applies only to amending or varying Orders, and does not apply to amending or varying the Reasons; and (b) there is no error or omission, and (c) there are no new facts that would have altered the decision given that it was based on three mutually exclusive grounds.

## C. Discussion

18    The Defendants rely on rule 59.06 (1) and the court's inherent jurisdiction and request an amendment or clarification of the Reasons for Decision delivered on the stay motion.

19    Rule 59.06(1) provides:

An order that contains an error arising from an accidental slip or omission or requires amendment in any particular on which the court did not adjudicate may be amended on a motion in the proceeding.

20    Rule 59.06 (1) is designed to amend judgments containing a slip, not to set aside judgments resulting from a slip: *Central Canada Travel Services v. Bank of Montreal*, [1986] O.J. No. 1249 (Ont. H.C.) at para. 21; *Dhaliwal v. Plantus*, [2007] O.J. No. 5450 (Ont. S.C.J.) at para. 4. The errors to which the rule refers are clerical, mathematical and other errors due to misadventure or oversight: *Hunter v. Hunter*, [2005] O.J. No. 5571 (Ont. S.C.J.); *Clarke v. Clarke*, [2002] O.J. No. 3223 (Ont. S.C.J.); *Bemrose v. Fetter*, [2005] O.J. No. 3362 (Ont. S.C.J.). Rule 59.06(1) is operative only in exceptional circumstances given the public interest in the principle of finality to the litigation process: *Toole v. Acres Inc.*, [2007] O.J. No. 2666 (Ont. S.C.J.) at para. 2.

21    Until an order is formally entered in the court record, the court has a broad discretion to vary or withdraw it, if it is in the interests of justice to do so: *Montague v. Bank of Nova Scotia* (2004), 69 O.R. (3d) 87 (Ont. C.A.), leave to appeal refused [2004] S.C.C.A. No. 79 (S.C.C.); *Schmuck v. Reynolds-Schmuck* (2000), 46 O.R. (3d) 702 (Ont. S.C.J.); *Smith Bus Lines Ltd. v. Bank of Montreal* (1987), 61 O.R. (2d) 688 (Ont. H.C.). In *Holmes Foundry Ltd. v. Point Edward (Village)*, [1963] 2 O.R. 404 (Ont. C.A.) at p. 407, Laidlaw J.A. stated:

It is well settled in law that an order can always be withdrawn, altered or modified by a judge either on his own initiative or on the application of a party until such time as the order has been drawn up, passed and entered.

22    However, the circumstances in which a court may vary an order are limited. A court may only vary an order where: (a) there are new facts arising or discovered after the order was made that might probably have altered the judgment and could not with reasonable diligence have been discovered sooner; or (b) there has been an error in expressing the manifest intention of the court: *Millard v. North George Capital Management Ltd.*, [1999] O.J. No. 3957 (Ont. S.C.J. [Commercial List]) at para. 4; *Wright, Re*, [1949] O.J. No. 3 (Ont. H.C.) at para. 7.

2011 ONSC 5968, 2011 CarswellOnt 10976, [2011] O.J. No. 4587...

23    In my Reasons for Decision on the stay motion, it is true that I did not mention the acknowledgement made by Mr. Curt-Michael Pieckenhagen, which was made for the first time during the course of the oral argument. This may have been a lapse on my part, because nobody disputes that the acknowledgement was made, but, in my opinion, my failure to mention the acknowledgment was not "an error arising from an accidental slip or omission" or a "particular on which the court did not adjudicate."

24    I advertently did not mention the acknowledgment. If I had mentioned the acknowledgement in my Reasons for Decision, I would have said that the acknowledgment had come too late to change my judgment. The Defendants brought their motions on the basis that they collectively did not have to prove that they were parties to an arbitration agreement and that the court must base its decision to refer the matter to arbitration solely on the plaintiff's Statement of Claim. That collective argument did not change after Mr. Curt-Michael Pieckenhagen's acknowledgment. In my Reasons for Decision, I express my opinion about their request for a stay should their collective argument be incorrect.

25    In my opinion, what the Defendants are now attempting to do is to submit Mr. Curt-Michael Pieckenhagen's acknowledgment as new evidence. This evidence, however, was always available to them before the argument of the stay motion, but in bringing their motion for a stay, they rather relied only on the Statement of Claim as the evidentiary basis for a stay and for a referral to arbitration. Mr. Curt-Michael Pieckenhagen's evidentiary acknowledgment comes too late to be considered for the motion to stay.

26    In my opinion, I made no accidental slip or omission in not addressing this new evidence, and if I made an error, it is an error for the Court of Appeal to address and not for this court to fix.

### D. Conclusion

27    Accordingly, I dismiss this motion. If the parties cannot agree about the matter of costs, they may make written submissions beginning with Shaw Satellite within 15 days of the release of these Reasons for Decision, followed by the Defendants' submissions within a further 15 days.

*Motion dismissed.*

---

**End of Document**                Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# Tab 11

2011 ONSC 3134
Ontario Superior Court of Justice

Mishev v. Shah

2011 CarswellOnt 3748, 2011 ONSC 3134, 202 A.C.W.S. (3d) 584

# Ivan Mishev, Margarita Platov, Borislav Mishev and Paul Kimber, Plaintiffs and Yogesh Shah, Rita Shah, Kemit Investments Ltd., 9099575 Ontario Ltd., 2033447 Ontario Ltd., 401 Meadow Holdings Ltd., 1039350 Ontario Ltd. JSM Group, YSM Group, Suresh Shah, Chiman Mistry, Surya Kant Shah, Kandavel Palantivel and Bharati Shah, Defendants

Perell J.

Heard: May 19, 2011
Judgment: May 20, 2011
Docket: 10-CV-401105

Counsel: Robert Klotz, Kristine G. Holder, for Plaintiffs
Richard J. Worsfold, for Yogesh Shah, Rita Shah

Subject: Property; Corporate and Commercial; Contracts

### Headnote

**Real property --- Mortgages — Possession and ejectment — Right of mortgagee to possession — Miscellaneous**

Defendant mortgagees attempted to sell two properties under power of sale for almost one year — Plans for sale were thwarted by series of interlocutory injunctions — Latest injunction order ("Order"), granted March 2011, allowed plaintiff mortgagors to remain in homes while they continued litigation against defendants, provided they complied with certain conditions — Plaintiffs sought to extend time to obtain mortgage financing, reduce mortgage payment, order to discharge mortgage on one home and leave to register certification of pending litigation — Plaintiffs applied for order varying March 2011 injunction Order — Motion dismissed — There was no reason in law or equity for reconsidering Order — Order took into account that there was serious issue to be tried, that defendants might succeed against plaintiffs, and that defendants had strong claim that they had not been repaid — Plaintiffs proposed variations to Order that sacrificed fairness to parties — Fact that mortgagees were unable to comply with conditions of Order was not reason to change it.

**Real property --- Mortgages — Possession and ejectment — Right of mortgagee to possession — General principles**

### Table of Authorities

**Cases considered by *Perell J.*:**

*Arnold v. Bronstein* (1970), 15 D.L.R. (3d) 649, [1971] 1 O.R. 467, 1970 CarswellOnt 776 (Ont. H.C.) — considered

*Mishev v. Shah* (2011), 3 R.P.R. (5th) 269, 105 O.R. (3d) 387, 2011 ONSC 1672, 2011 CarswellOnt 1778 (Ont. S.C.J.) — referred to

*Schmuck v. Reynolds-Schmuck* (2000), 2000 CarswellOnt 202, 46 O.R. (3d) 702 (Ont. S.C.J.) — considered

2011 ONSC 3134, 2011 CarswellOnt 3748, 202 A.C.W.S. (3d) 584

MOTION by plaintiff mortgagors to vary injunction order.

*Perell J.*:

## A. Introduction

1      As I described in my Reasons for Decision cited as *Mishev v. Shah*, 2011 ONSC 1672 (Ont. S.C.J.), for the past year, the Defendants Yogesh Shah and Rita Shah, who are mortgagees, have attempted to sell two mortgaged properties under power of sale. The Shahs' plans have been thwarted by a series of interlocutory injunctions granted by Justices Penny, Moore, and Lederman to the Plaintiffs, Ivan Mishev, Margarita Platov, Borislav Mishev, and Paul Kimber, who are the mortgagors of the two properties.

2      On March 16, 2011, I continued the trend, and I also enjoined the power of sale and thus provided the Plaintiffs with an opportunity to remain in their homes while they continued litigation against the Shahs. However, as had Justices Penny, Moore, and Lederman, the injunction required that the Plaintiffs comply with certain terms or conditions In this regard, I stated in paragraphs 8 and 9 of my Reasons for Decision:

> 8. Relying on a novel use of s. 12 of the *Mortgages Act*, R.S.O. 1990, c. M.40, I shall grant a conditional writ of possession to the Shahs on terms that will suspend its operation to allow the Plaintiffs to refinance the mortgage loan. Rather, than order a discharge of the Shahs' mortgage, I will order that the Shahs' mortgage be postponed to a new first mortgage and that the funds from the first mortgage be paid to the Shahs.

> 9 The new mortgage will be for a principal sum of $320,000, which is a without prejudice determination that the Plaintiffs owe the Shahs at least this sum. From a jurisdictional perspective, the $320,000 is to be notionally paid into and then out of court to the Shahs within 40 days. To make the refinancing possible, the Shahs' mortgage, which shall remain on title, shall be postponed to the new mortgage. However, if the Plaintiffs fail to pay the $320,000 to the Shahs or if their new mortgage goes into default, the Shahs' writ of possession will become operative and the Shahs may commence a new power of sale proceeding with a new updated notice.

3      I explained the rationale for my order in paras. 54 to 59, where I stated, with emphasis added:

> 54. The sum of $320,000 as the amount payable for the postponement of the mortgage represents a repayment of funds that were actually advanced by the Shahs to pay the debt to Maple Trust, to pay a car loan, and to discharge the indebtedness of the fourth transaction. In my opinion as was the case in *493680 Ontario Ltd. v. Morgan*, it would be unjust if the Plaintiffs lost their homes only to obtain a judgment later that the Shahs' claims were overtopped by the Plaintiffs' claims.

> 55. The Plaintiffs are unable to refinance the $515,431.10 and growing sum claimed by the Shahs and thus ordering the Plaintiffs to pay the full amount claimed to obtain a discharge is a futile order. In contrast, ordering a postponement of the Shahs' mortgage should permit a refinancing of a feasible sum that will be paid to the Shahs.

> 56. Granting conditional writs of possession to the Shahs and ordering a postponement but not a discharge of the Shahs' mortgage seems fair to both parties. **If the Plaintiffs are unable to refinance, then the Shahs may obtain possession of the properties and complete their power of sale proceedings. If the Plaintiffs are able to refinance, the Shahs will receive an immediate payment of the proceeds of that refinancing without prejudice to the position of the parties as to whether the payment is an overpayment or underpayment.**

> 57. A postponement with payment preserves the Shahs' security in both mortgaged properties and with the power of sale proceedings effectively stayed, the court is in a position to determine the merits of the claims of both parties.

> 58. I appreciate that s. 12 of the *Mortgages Act* does not speak of postponements, but a postponement with payment is more favourable to the mortgagee than a forced discharge of the mortgage with the mortgagee's disputed monies in court awaiting a trial.

59. Giving s. 12 a generous and remedial interpretation, in my opinion, I have the jurisdiction to make this order. If *493680 Ontario Ltd. v. Morgan* is correct, as an alternative, I could simply order the mortgage discharged upon payment of $320,000 into court, but the order I propose is fairer to the mortgagee and serves the proper purposes of the mortgagor.

4     The Plaintiffs now apply for an order varying my order of March 16, 2011 as follows: (a) extending the time to obtain mortgage financing until May 30, 2011; (b) reducing the mortgage payment from $320,000 to $250,000; (c) an order discharging the Shahs' mortgage at 48 Brian Avenue, Toronto; and (e) granting the Shahs leave to register a certificate of pending litigation against 48 Brian Avenue.

5     For the reasons that follow, I dismiss the motion.

**B. Factual Background**

6     The factual background to my order of March 16, 2011 are set out in my Reasons for Decision (2011 ONSC 1672 (Ont. S.C.J.)), and I will not repeat the facts here and rather will recount what has happened since I made my order.

7     The Shahs claim that there is an outstanding indebtedness of $535,522.75 as of April 18, 2011.

8     After I made my order, Mr. Mishev obtained a mortgage commitment from Home Trust in the amount of $320,000, but that mortgage commitment is subject to, among other conditions, the conditions that: (a) he pay a commitment fee of $3,200, (b) he pay $18,490.89 in municipal tax arrears; (c) he pay a writ of execution against his wife of $6,454; (d) he pay the Royal Bank a $5,000 referral fee; (e) $5,000 is held back until Mr Mishev provides proof of a roof repair; and (f) $21,930.60 is held back for one year of mortgage payments and municipal tax payments.

9     Thus, if the above conditions to the refinancing are met, the Plaintiffs will have available only $259,924.51 and not the $320,000 necessary to comply with my order of March 16, 2011, which compliance would avoid the implementation of the writs of possession and the resumption of the Shahs' power of sale proceeding. They propose that $250,000 of the approximately $260,000 be paid to the Shahs. I understand the $10,000 being held back is for financing the litigation against the Shahs.

10     The Defendants point out that it is unlikely that the Home Trust mortgage can be implemented because it is also subject to other conditions that Mr. Mishev is unlikely to be able to satisfy. For example, there is a condition that Mr. Mishev have an annual income of $90,000, which is not the case; rather, Mr. Mishev has sworn during cross-examinations that his income is around $13,000.

11     When the Plaintiffs did not comply with the order of March 16, 2011, the Shahs delivered notices of power of sale, which were served on April 18, 2011. If there is no redemption, the Shahs will be in a position to sell the properties after May 26, 2011.

**C. Discussion**

12     Relying on *Schmuck v. Reynolds-Schmuck* (2000), 46 O.R. (3d) 702 (Ont. S.C.J.), which was a family law dispute where the husband requested a reconsideration of already litigated issues, the Shahs submit that in order for the court to reconsider a decision, the moving party must establish that the integrity of the litigation process or some principal of justice is at risk and the risk overrides the value of finality in litigation. In the *Schmuck* case, Justice Himel stated at para. 25:

It is my view that a party who wishes a reconsideration alone would have to establish that the integrity of the litigation process is at risk unless it occurs, or that there is some principle of justice at stake that would override the value of finality in litigation, or that some miscarriage of justice would occur if such a reconsideration did not take place. No such reasons exist in this case. The questions raised by counsel may be the subject of appeal. As such, I decline to exercise my discretion to reconsider any of the issues raised by the husband.

13     The Shahs submit that there is no reason in law or in equity for reconsidering my order of March 16, 2011. I agree with that submission.

14    The proposed variations to my order are inconsistent with the letter and spirit of my order, and the variations are unfair and prejudicial to the Shahs. In fashioning my injunctive order, I took into account that while there is a serious issue to be tried that the Plaintiffs may succeed in their various claims against the Shahs, the Shahs have a strong claim that they advanced at least the sum of $320,000 for the benefit of the Plaintiffs and the Shahs have not been repaid. The variations to the order proposed by the Plaintiffs sacrifice the fairness to both parties that I tried to achieve at the Plaintiffs' alter of expediency and feasibility.

15    It is to be noted that apart from the unprecedented use of s.12 of the *Mortgages Act* to order a postponement, it is an extraordinary order to enjoin a mortgagee in the exercise of a power of sale. The rule from *Arnold v. Bronstein* (1970), [1971] 1 O.R. 467 (Ont. H.C.) is that except in exceptional cases, a mortgagee, acting in good faith and without fraud, will not be restrained from a proper exercise of his power of sale except upon tender by the mortgagor of the principal monies due, interest and costs. In *Arnold v. Bronstein*, the court held that enjoining a sale on a mortgagor's vague and indefinite hope of finding new financial backing would be an unwarranted interference with the contractual rights of the mortgagee, even if the mortgaged property is ample security for the loan.

16    Turning to the proposed variation of my order, it is unfair that an unsecured execution creditor should benefit from the refinancing and advance ahead of the Shahs. It is unfair that the Plaintiffs use the money to pay their municipal realty obligations, which they are obliged to do in any event and which they have been promising to do for the past year. It is unfair the Plaintiffs finance their litigation against the Shahs from the money earmarked to be the price of enjoining the Shahs' power of sale proceedings.

17    That the Plaintiffs are unable to comply with the conditions of the most recent injunctive order is not a reason for changing the conditions of the order. If anything, it is a reason for enforcing the order and ending the pattern of the Plaintiffs' non-compliance followed by their requests for a relaxation of the conditions of enjoining the power of sale proceedings.

18    The spirit of my order of March 16, 2011 recognized that there was evidence that the Shahs had advanced at least $320,000 to the Plaintiffs and subject to the Plaintiffs' disputed counterclaims, the Shahs were entitled to repayment of at least this sum. In his affidavit describing the mortgage transaction that is now subject to the power of sale, Mr. Mishev stated:

> ... The $430,000 mortgage was to be used to pay out Maple Trust's first mortgage of about $220,000 on Brian Avenue and to discharge Shah's second mortgage for $100,000 on the property (which would also discharge his security on my Dodge Viper). I needed about $320,000 to pay out these mortgages. However, Shah decided to make the mortgage amount $425,000, ...

19    Mr. Mishev's own evidence indicates that some monies were advanced under the disputed mortgage, and it remains to be determined whether the Shahs committed any wrongs that would offset that indebtedness.

20    In my opinion, it would not be just or fair to vary the order of March 16, 2011, even assuming that there was a jurisdictional basis to do so.

**D. Conclusion**

21    For the above reasons, I dismiss the Plaintiffs' motion.

22    If the parties cannot agree about the matter of costs, they may make submissions in writing beginning with the Shahs' submissions within 10 days of the release of these Reasons followed by the Plaintiffs' submissions within a further 10 days.

*Motion dismissed.*

End of Document          Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# Tab 12

2009 CarswellOnt 2245
Ontario Superior Court of Justice

Jourdain v. Ontario

2009 CarswellOnt 2245, 177 A.C.W.S. (3d) 488

**LEON JOSEPH JOURDAIN, ELAINE JOURDAIN, ANDREA JOURDAIN and COURTNEY JOURDAIN (Plaintiffs) and HER MAJESTY THE QUEEN IN RIGHT OF ONTARIO, KAREN D. RUSTIGE, WADE MEEKS, ATTORNEY GENERAL FOR ONTARIO, THOMAS E.K. FITZGERALD, RICHARD D. CUMMINE, DANIEL M. MITCHELL, ROBERT A. YOUNG, DAVID MACKENZIE and such further and other Crown Attorneys as yet unidentified and GERALDINE CAMERON (Defendants)**

D.C. Shaw J.

Judgment: March 10, 2009
Docket: CV-05-0247

Counsel: Francis J. Thatcher for Plaintiffs
Heather Mackay for Crown Defendants

Subject: Civil Practice and Procedure

**Headnote**

**Civil practice and procedure --- Costs — Particular orders as to costs — General principles**

**Civil practice and procedure --- Costs — Particular items of costs — Disbursements — Miscellaneous**

**Table of Authorities**

**Cases considered by *D.C. Shaw J.*:**

*Schmuck v. Reynolds-Schmuck* (2000), 2000 CarswellOnt 202, 46 O.R. (3d) 702 (Ont. S.C.J.) — considered

**Rules considered:**

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194
R. 59.06(2) — considered

*D.C. Shaw J.*:

1    The plaintiffs bring a motion for reconsideration of my order of December 5, 2008, pursuant to which costs were awarded to the defendants in the sum of $14,947.48, payable within 30 days. The order has not been issued and entered.

2    The plaintiffs request, firstly, that they be permitted to satisfy the order by paying $500.00 per month, and secondly, that disbursements which were allowed in the amount of $2,870.48 for airfare for two counsel, from Toronto to Thunder Bay, return, be reduced to $800.00.

3    With respect to the request to extend the time for payment, the plaintiffs plead hardship arising out of:

a) the fact that the order was made immediately prior to Christmas;

b) the international economic situation which did not exist when the plaintiffs made their costs submissions;

c) the fact that the plaintiff, Leon Jourdain, was diagnosed with a serious throat condition that required his attendance before a specialist on December 11, 2008; and

d) the possibility that if the plaintiffs do not comply with the order within the prescribed time, their claim may be struck.

4    With respect to the amount of the airfare allowed as a disbursement, the plaintiffs submit that it is excessive and that counsel for the defendants should have booked cheaper flights.

5    The Crown prepared a draft order and on December 9, 2008 sent the draft to counsel for the plaintiffs for approval. Counsel for the plaintiffs did not respond. However, on December 12, 2008, the plaintiffs served a notice of motion for reconsideration, asking for an extension of four months to pay the costs. One of the grounds for the motion was that the order had not been issued and entered. Therefore, the Crown did not take out the order. The plaintiffs did not proceed with the motion until February 6, 2009, when counsel for the plaintiff served an amended notice of motion, asking that costs be satisfied by payments of $500.00 per month.

6    The Crown advises that it is willing to extend the date for compliance with the costs order to May 1, 2009. The Crown objects to the proposal for payments of $500.00 per month. The Crown also objects to reduction of the amount allowed for airfare. The tickets were booked as refundable tickets, as required by Ontario government travel directive applicable to the Crown Law Office - Civil. This policy is due to the frequency with which litigation matters are rescheduled. The Crown submits that the rationale for the policy is particularly applicable in this case as matters have been cancelled on more than one occasion.

**Decision**

7    Rule 59.06(2) provides that a party may make a motion to have an order varied on the ground of fraud or of facts arising or discovered after it was made. There is no allegation of fraud. There is no evidence of facts arising or discovered after the order was made that lead me to conclude that the order of December 5, 2008 should be varied in any respect.

8    The issue of when the costs should be payable was expressly addressed in my reasons for the costs order.

9    The plaintiffs did not challenge the amounts of the defendants' disbursements when they made their original costs submissions.

10    In *Schmuck v. Reynolds-Schmuck* (2000), 46 O.R. (3d) 702 (Ont. S.C.J.) at para. 25, Himel, J. set out the principles governing reconsideration of an order:

It is my view that a party who wishes a reconsideration alone would have to establish that the integrity of the litigation process is at risk unless it occurs, or that there is some principle of justice at stake that would override the value of finality in litigation, or that some miscarriage of justice would occur if such a reconsideration did not take place.

11    In my opinion, none of the submissions put forward by the plaintiffs meet these criteria. As such, I decline to exercise my discretion to reconsider the decision to make costs payable within 30 days or to reduce the amount of the costs which were awarded.

12    If the defendants do not wish to enforce the order until after May 1, 2009, and if the defendants have decided that in the event the plaintiffs do not pay the costs order, they will not move to strike the plaintiffs' claim pending adjudication of the summary judgment motion, that is the prerogative of the defendants. However, it is not a basis for reconsideration of my order.

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    2

2009 CarswellOnt 2245, 177 A.C.W.S. (3d) 488

13      The defendants request costs of this motion to reconsider, in the sum of $500.00. The defendants were successful. There is no reason costs should not follow the result. The amount requested is reasonable. An order will go that the plaintiffs pay the costs of this motion to reconsider, fixed in the sum of $500.00, payable within 30 days.

---

**End of Document**                              Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

 Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# Tab 13

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 106 of 342

Brown (Trustee of) v. Municipal Property Assessment..., 2014 ONSC 7137,...
2014 ONSC 7137, 2014 CarswellOnt 17302, 247 A.C.W.S. (3d) 795...

2014 ONSC 7137
Ontario Superior Court of Justice (Divisional Court)

Brown (Trustee of) v. Municipal Property Assessment Corp., Region 14

2014 CarswellOnt 17302, 2014 ONSC 7137, 247 A.C.W.S. (3d) 795, 31 M.P.L.R. (5th) 77

# Sylviette Brown as Trustee of Property Roll 1970 000 012 7610 000 (Georgina) and Sylviette Brown on her own behalf as owner of Little River Farms (Respondents/Plaintiffs) and The Municipal Property Assessment Corporation (Region 14), The Assessment Review Board and the Corporation of the Town of Georgina (Appellant/Defendants)

Spence, Sachs, Nordheimer JJ.

Heard: December 3, 2014
Judgment: December 9, 2014
Docket: Toronto 361/13

Counsel: S. Brown, for herself
C.A. Painter, for Appellant

Subject: Civil Practice and Procedure; Property; Public; Tax — Miscellaneous

### Headnote

**Municipal law --- Municipal tax assessment — Practice and procedure on assessment appeals and objections — Procedural requirements — Miscellaneous**

Plaintiffs brought action against defendants arising out of dispute regarding assessment of two properties that she owned in town — Motion judge dismissed action against all defendants on basis that subject matter of claim was outside jurisdiction of Ontario Superior Court of Justice — On May 6, 2013 motion judge varied terms of September 25, 2012 order to permit plaintiffs to file amended statement of claim against municipality only and also provided that amended pleading was to be prepared by lawyer — Municipality appealed — Appeal allowed — Other than offering vague references to fairness and practicalities, there were no reasons given by motion judge for why it was appropriate to vary earlier order rather than simply leave plaintiffs to commence fresh action — By permitting plaintiffs to advance new claim, motion judge had created situation where plaintiffs could shelter older claims in any amended claim, thus affecting limitation periods — There was also no basis for motion judge to order that individual advancing personal claim be represented by lawyer.

### Civil practice and procedure --- Pleadings — Amendment — Grounds for amendment — Miscellaneous

Plaintiffs brought action against defendants arising out of dispute regarding assessment of two properties that she owned in town — Motion judge dismissed action against all defendants on basis that subject matter of claim was outside jurisdiction of Ontario Superior Court of Justice — On May 6, 2013 motion judge varied terms of September 25, 2012 order to permit plaintiffs to file amended statement of claim against municipality only and also provided that amended pleading was to be prepared by lawyer — Municipality appealed — Appeal allowed — Other than offering vague references to fairness and practicalities, there were no reasons given by motion judge for why it was appropriate to vary earlier order rather than simply leave plaintiffs to commence fresh action — By permitting plaintiffs to advance new claim, motion judge had created situation where plaintiffs could shelter older claims in any amended claim, thus affecting limitation periods — There was also no basis for motion judge to order that individual advancing personal claim be represented by lawyer.

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 107 of 342

Brown (Trustee of) v. Municipal Property Assessment..., 2014 ONSC 7137,...
2014 ONSC 7137, 2014 CarswellOnt 17302, 247 A.C.W.S. (3d) 795...

**Table of Authorities**

**Cases considered by *Nordheimer J.*:**

*Clayton v. British American Securities Ltd.* (1934), [1934] 3 W.W.R. 257, [1935] 1 D.L.R. 432, 49 B.C.R. 28, 1934 CarswellBC 62 (B.C. C.A.) — referred to

*Montague v. Bank of Nova Scotia* (2004), 2004 CarswellOnt 11, 2004 C.L.L.C. 210-027, 69 O.R. (3d) 87, 30 C.C.E.L. (3d) 71, 180 O.A.C. 381 (Ont. C.A.) — considered

*Property Roll No. 1970 000 012 (Trustee of) v. Municipal Property Assessment Corp., Region 14* (2013), 2013 CarswellOnt 5597, 2013 ONSC 2640, 76 O.M.B.R. 181 (Ont. S.C.J.) — referred to

*Scaini v. Prochnicki* (2007), 39 C.P.C. (6th) 1, 2007 CarswellOnt 408, 219 O.A.C. 317, 2007 ONCA 63, 85 O.R. (3d) 179 (Ont. C.A.) — followed

*671122 Ontario Ltd. v. Sagaz Industries Canada Inc.* (2001), 2001 SCC 59, 204 D.L.R. (4th) 542, 274 N.R. 366, 55 O.R. (3d) 782 (headnote only), [2001] 4 C.T.C. 139, 17 B.L.R. (3d) 1, 2001 CarswellOnt 3357, 2001 CarswellOnt 3358, 11 C.C.E.L. (3d) 1, 12 C.P.C. (5th) 1, 150 O.A.C. 12, 8 C.C.L.T. (3d) 60, [2001] 2 S.C.R. 983, *(sub nom. Sagaz Industries Canada Inc. v. 671122 Ontario Ltd.)* 2002 C.L.L.C. 210-013, 55 O.R. (3d) 782, 2001 CSC 59, 55 O.R. (3d) 782 (note) (S.C.C.) — considered

*1711811 Ontario Ltd. v. Buckley Insurance Brokers Ltd.* (2014), 2014 ONCA 125, 2014 CarswellOnt 1770, 315 O.A.C. 160, 371 D.L.R. (4th) 643 (Ont. C.A.) — considered

**Statutes considered:**

*Assessment Act*, R.S.O. 1990, c. A.31
    Generally — referred to

    s. 40 — considered

**Rules considered:**

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194
    Generally — referred to

    R. 37.14(1) — considered

    R. 37.14(1)(b) — considered

    R. 59.06(2) — considered

    R. 59.06(2)(a) — considered

APPEAL by municipality from motion judge's decision to vary terms of order to permit plaintiffs to file amended statement of claim against municipality only.

***Nordheimer J.*:**

Brown (Trustee of) v. Municipal Property Assessment..., 2014 ONSC 7137,...

2014 ONSC 7137, 2014 CarswellOnt 17302, 247 A.C.W.S. (3d) 795...

1    The Corporation of the Town of Georgina appeals, with leave, from the order of Perell J. dated May 6, 2013 in which the motion judge varied the terms of an earlier order that he had made in which he dismissed Mrs. Brown's action. The variation permitted Mrs. Brown to file an amended statement of claim against the appellant only and also provided that the amended pleading was to be prepared by a lawyer. For the following reasons, I conclude that the motion judge was in error in making the order that he did.

2    Before turning to the facts and analysis, I should mention how the hearing of this matter unfolded. At the start of the hearing, Mr. Brown appeared and asked that the matter be adjourned because his wife was in hospital. Mr. Brown produced a letter from a clinic that simply advised that Mrs. Brown had been seen at the clinic. For reasons given at the time, we declined to adjourn the matter. [1] Mr. Brown then asked that the hearing be held down until 12:30 p.m. so that he could consult with his wife. We agreed to do so. At 12:45 p.m., Mr. Brown appeared and asked that the matter be held down further to 2:30 p.m. He said that his wife would be able to attend at that time. Again, we agreed to do so. When we returned at 2:30 p.m., Mrs. Brown was present. After we heard from counsel for the appellant, Mrs. Brown was able to very capably make her responding submissions.

3    I now turn to the background facts and my analysis of the issues raised.

**Background**

4    Mrs. Brown commenced this proceeding arising out of a dispute that she has with the appellant, and others, regarding the assessment of two properties that she owns in the Town of Georgina. The three defendants brought motions to dismiss this action. On September 25, 2012, Perell J. granted an order dismissing the action against all three defendants. As the motion judge explained, he dismissed the action principally on the basis that the subject matter of the claim was outside the jurisdiction of the Superior Court of Justice. In particular, the motion judge said, at para. 51:

> I agree with MPAC's so-called issue estoppel argument, which, in its essence, is that Mrs. Brown's action is a disguised attempt to litigate a claim over which an administrative tribunal and not the court has jurisdiction.

5    On April 26, 2013, Mrs. Brown, who is unrepresented, brought a motion pursuant to rules 59.06 (2) and 37.14 (1) of the *Rules of Civil Procedure*, R.R.O. 1990, Reg. 194, to introduce new evidence and to set aside or vary the September 25, 2012 order. The motion judge dismissed that motion as it related to the other two defendants but "practically speaking, and as a matter of justice", he granted the motion as it related to the appellant.

6    While the background facts are not really necessary to the determination of this appeal, I will nonetheless set them out briefly. To the degree that I do so, I borrow the recitation of those facts from the reasons of the motion judge. [2]

7    Mrs. Brown owns a 100-acre farm in the Town of Georgina, on which she has carried on business as Little River Farms since 1975. She also owns a recreational investment property at 32 Shirlea Boulevard.

8    In this action, which was commenced in 2011, Mrs. Brown alleged that, for the purposes of municipal taxation, her properties have been wrongly, unfairly, fraudulently, and improperly assessed.

9    Mrs. Brown's assessment complaints have been around for some time. For many years, she has complained bitterly about the assessment of the farm property and about the Town's use of that assessment to impose municipal realty taxes. She has also complained about the assessment of the Shirlea Boulevard property. She has frequently filed appeals of the assessments. Pursuant to s. 40 of the *Assessment Act*, R.S.O. 1990, c. A.31, Mrs. Brown appealed the assessments of the farm property to the Assessment Review Board. She challenged the correctness of the assessments for the 2004, 2005, 2006, 2007, and 2008 taxation years. She also appealed the assessment of the Shirlea Boulevard property.

10    Previously, in 2002, Mrs. Brown had commenced an action against the Town, the Region of York, and others alleging, among other things, negligence, nuisance, strict liability, and abuse of power. The action sought relief with respect to the flooding of the farm property allegedly caused by the misconduct of the Town. Nothing seems to have happened in the 2002

Brown (Trustee of) v. Municipal Property Assessment..., 2014 ONSC 7137,...

2014 ONSC 7137, 2014 CarswellOnt 17302, 247 A.C.W.S. (3d) 795...

action, and by order dated October 2009, the 2002 action was dismissed for delay. Some of the allegations in the 2002 action are repeated in this action.

11    It appears that the core of the dispute in the 2011 action is Mrs. Brown's complaint that road and drainage work undertaken by the Town many years ago and, again recently, has caused flooding and pollution that has destroyed the agricultural capability of the farm with the result that the Municipal Property Assessment Corporation's assessment of the farm lands is incorrect, i.e., MPAC has overvalued the farm and by not taking into account the harm caused by the Town's work.

12    In the 2011 action, Mrs. Brown pleads that MPAC purposefully or negligently and corruptly and fraudulently failed to properly assess her properties in order to assist the Town. She alleges that the Assessment Review Board's handling of her assessments was questionable, biased, unprofessional, damaging to the image of the *Assessment Act*, injurious to the public, and a cover-up of the fraudulent concealments and dubious assessments of MPAC and the Town. She alleges and believes that the Town has taken advantage of MPAC's fraudulent assessments.

13    Mrs. Brown now has arrears of property taxes that exceed $20,000.

14    On October 18, 2012, Mrs. Brown served a Notice of Appeal, and on November 28, 2012, she served an amended Notice of Appeal, from the September 25, 2012 order. On December 7, 2012, the Registrar of the Court of Appeal delivered a Notice of Intention to Dismiss the Appeal for Delay. On January 9, 2013, Mrs. Brown's appeal was administratively dismissed for delay. Mrs. Brown moved to have the dismissal set aside. That motion was heard on May 23, 2013 and is still under reserve by a judge of the Court of Appeal.

**Analysis**

15    Rule 59.06(2)(a) permits a party to seek to have an order set aside or varied on the ground of fraud or of facts arising or discovered after it is made. Rule 37.14(1)(b) allows a party to set aside or vary an order if the party failed to appear on the motion through accident, mistake or insufficient notice.

16    The motion judge concluded that Mrs. Brown could not satisfy the prerequisites for relief under either of those rules. There was no fraud. There were no facts that arose or that were discovered after the order was made. Mrs. Brown did not fail to appear on the motion through accident, mistake or insufficient notice. No appeal has been taken from any of those findings. In my view, the motion judge was correct in each of those conclusions.

17    Consequently, the motion judge dismissed the motion to vary as it related to the other two defendants. He did not do so, however, against the appellant. Rather, the motion judge varied the order to permit Mrs. Brown to continue her action against the appellant but on certain terms. His reasons for doing so are as follows (paras. 49-53):

> However, practically speaking, it does not make sense nor would it be fair to dismiss Mrs. Brown's action against the Town provided that she confined that action to claims that are properly before the court. There is nothing stopping Mrs. Brown from commencing a new action based on the events happening since September 2012.
>
> Without admitting any liability during argument, the Town honourably and commendably acknowledged that Mrs. Brown might have a torts claim arising from the flooding and the installation of municipal road or drainage works near the farm property. The Town also acknowledged that Mrs. Brown's 2002 action was decided on procedural grounds and not based on a decision on the merits.
>
> I, therefore, conclude that it would be appropriate to allow Mrs. Brown's motion as against the Town on terms that she be given an opportunity to start afresh as against the Town but only to assert claims that are within the jurisdiction of this court.
>
> As a self-represented litigant, Mrs. Brown, has shown that she is unable to transverse the difficult jurisdictional territory of differentiating claims that are properly before this court or that are within the jurisdiction of other tribunals. Therefore, I am imposing the additional term that leave to file a fresh pleading is conditional on the pleading being prepared by a lawyer licensed to practice in Ontario.

Case 09-10138-MFW   Doc 15744-2   Filed 06/12/15   Page 110 of 342

Brown (Trustee of) v. Municipal Property Assessment..., 2014 ONSC 7137,...

18      There is one further salient fact that needs to be mentioned in order to fully understand the factual background to this matter. The order that the motion judge made on September 25, 2012 was never taken out. That is, the order was never signed and entered. If it had been, the motion judge would have been *functus officio* in terms of that order. He would have then been precluded from making any variations to that order except through the express authority given to a judge under the *Rules of Civil Procedure*. The two rules that the motion judge referred to are the principal rules that permit a judge to vary an order s/ he has made after it is signed and entered. However, the motion judge, in this case, found that neither of those rules applied. Consequently, had the order been signed and entered, there would have been no authority for the motion judge to grant the relief to Mrs. Brown that he did. Rather, it appears that the motion judge relied on his inherent authority to change the order that arose from the fact that the order had not been signed and entered.

19      I do not believe that the motion judge had the jurisdiction to proceed in the manner that he did but, even if that jurisdiction existed, it was not properly exercised in this case. In my view, the mere fact that the technical requirements for the finality of the earlier order are missing, because the order was not signed and entered, does not permit a judge to vary that order in whatever manner s/he happens to consider to be appropriate at a later date. The principle of finality, that underlies the *functus officio* principle, weighs against that scope of authority and that type of alteration. Parties have a right to expect that once a matter is determined by a judge, it is over. Our rules of procedure do not envisage that parties will be allowed to reargue matters, except in very narrow circumstances.

20      I acknowledge that there is a fairly broad power, in a judge, to change an order after it has been announced but before it has been signed and entered. Any such change should only be made, however, if it is either technical (e.g. to correct an arithmetic error) or it is necessary to avoid a miscarriage of justice: *Clayton v. British American Securities Ltd.* (1934), [1935] 1 D.L.R. 432 (B.C. C.A.), at pp. 440-441. Even then, if a change is to be made, it must be fully explained to ensure that the authority is not abused. The concern that arises from changes being made by a judge to an order, that has already been pronounced, has been expressed in other cases. For example, in *Montague v. Bank of Nova Scotia* (2004), 69 O.R. (3d) 87 (Ont. C.A.), Goudge J.A. said that, notwithstanding the very wide discretion a judge has to change his or her judgment before it is entered, that discretion had to be exercised cautiously and for very good reasons. He commented, at para. 40:

Any change to a judgment once given, no matter how soundly based, runs the risk of evoking suspicions of abuse on the part of those adversely affected. It is at the least disquieting, and to that extent can put a cloud over the administration of justice. A judge exercising this discretion bears a significant onus to explain the change.

21      The onus on a judge to clearly explain the basis for a change to an order already given was repeated in *1711811 Ontario Ltd. v. Buckley Insurance Brokers Ltd.*, [2014] O.J. No. 697 (Ont. C.A.) where Gillese J.A. said, at para. 73:

A clear explanation for the change to the order was required so that the parties, and this court on review, could know the reason for the change. It was an error to fail to give that explanation.

22      In addition to these principles, it is also clear that the discretion to re-open a matter is one that should be resorted to "sparingly and with the greatest care": *671122 Ontario Ltd. v. Sagaz Industries Canada Inc.*, [2001] 2 S.C.R. 983 (S.C.C.) at para. 61; *Clayton v. British American Securities Ltd.* at p. 440.

23      In this case, the motion judge found that it would not be "fair" to dismiss Mrs. Brown's action against the appellant. Yet that is what the motion judge had already done, some eight months earlier. Indeed, in his reasons for the order under appeal, the motion judge repeated his concerns respecting the existing claim. He said, at para. 7:

Although as currently drafted, Mrs. Brown's Statement of Claim against the Town is <u>jurisdictionally untenable</u>, it is in the interests of justice that she have the opportunity to advance a claim that would be within the jurisdiction of the Superior Court for the alleged harm that she has allegedly recently suffered.

[emphasis added]

Brown (Trustee of) v. Municipal Property Assessment..., 2014 ONSC 7137,...

2014 ONSC 7137, 2014 CarswellOnt 17302, 247 A.C.W.S. (3d) 795...

24    Notwithstanding his views about the existing claim, the motion judge said that it was "in the interests of justice" and "appropriate" to permit Mrs. Brown to "start afresh" to advance a claim for recent harm she allegedly has suffered. However, that is not the effect of what the motion judge did. While acknowledging that there was nothing preventing Mrs. Brown from commencing a fresh action, the motion judge did not dismiss her motion to vary and leave it to Mrs. Brown to start that fresh action, if she wished to do so. Rather, the motion judge allowed her to amend the claim in the action that she had started in 2011. Unfortunately, other than offering vague references to fairness and practicalities, there are no reasons given by the motion judge for why it was appropriate to vary the earlier order, in the way that he did, rather than simply leave Mrs. Brown to commence a fresh action.

25    This is of particular concern since, in varying his earlier order, the motion judge does not appear to have considered (certainly there is no mention of it in his reasons) that he could be affecting limitation periods that might arise regarding any different claims that Mrs. Brown might choose to advance. That possible impact would be a very serious one for the appellant and could work a significant unfairness. It is also a very real concern given the nature of the allegations made by Mrs. Brown that essentially tie the various floods that have occurred on her property to one course of conduct by the appellant.

26    I appreciate that the motion judge appears to have been focussed on new claims for recent harm and, thus, would not likely have turned his mind to questions about limitation periods since, if the only claims to be advanced were new claims, no limitation issue would likely present itself. However, by permitting Mrs. Brown to advance her new claim within the 2011 action, the motion judge has, I believe unintentionally, created a situation where Mrs. Brown could shelter older claims in any amended claim she might deliver. Indeed, that appears to be exactly what has happened in the "Fresh as Amended" statement of claim that Mrs. Brown filed before this court.

27    In reaching his conclusion, the motion judge placed reliance on the "contextual approach" referred to in *Scaini v. Prochnicki* (2007), 85 O.R. (3d) 179 (Ont. C.A.). With respect, I believe that the motion judge's reliance on that approach is misplaced for two reasons. One is that the decision in *Scaini* was predicated on the appellant having satisfied the requirements of r. 37.14(1), something that the motion judge here expressly found that Mrs. Brown had not done. The other is that, in applying the contextual approach, the motion judge did not, as I have already said, consider the limitations issue. This was a matter that was expressly mentioned by the Court of Appeal in *Scaini* where Goudge J.A. said, at para. 27:

    And the respondent can point to no prejudice. Importantly, no limitation period has passed.

28    Further, and in any event, assuming that there was a proper basis for the motion judge to permit Mrs. Brown to amend her statement of claim, no authority is cited by the motion judge for his position that Mrs. Brown could only amend her pleading, if that amended pleading was prepared by a lawyer licensed to practice in Ontario.

29    The *Rules of Civil Procedure* have certain restrictions regarding when a plaintiff must be represented by a lawyer. None of those restrictions apply to the situation involving Mrs. Brown. Absent anything in the *Rules of Civil Procedure*, or elsewhere, that would grant a judge the authority to require an individual, who is advancing a personal claim, to be represented by a lawyer, only the inherent jurisdiction of the court to control its own process could be relied upon for the condition that the motion judge imposed.

30    I am not prepared, on the basis of this record, to conclude that the court's inherent jurisdiction goes so far as to permit a judge to order that an individual must be represented by a lawyer, whether in whole or in part. It may be that such an order could be justified, under the court's inherent jurisdiction, in an exceptional case. However, any determination that the court's inherent jurisdiction extends that far, should await a case where the matter can be fully canvassed on a proper record and after full argument.

31    The appeal is allowed and paragraphs 2(b) and 2(c) of the order of Perell J. dated May 6, 2013 are set aside. The appellant is entitled to its costs of the appeal, to be paid by the respondents, and fixed in the amount of $5,000, inclusive of disbursements and HST.

*Appeal allowed.*

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Brown (Trustee of) v. Municipal Property Assessment..., 2014 ONSC 7137,...

2014 ONSC 7137, 2014 CarswellOnt 17302, 247 A.C.W.S. (3d) 795...

Footnotes

1       *Brown (Trustee of) v. Municipal Property Assessment Corp., Region 14,* 2014 ONSC 7137 (Ont. Div. Ct.)

2       *Property Roll No. 1970 000 012 (Trustee of) v. Municipal Property Assessment Corp., Region 14,* [2013] O.J. No. 2052 (Ont. S.C.J.)

---

**End of Document**                    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# Tab 14

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 114 of 342

Stradiotto v. BMO Nesbitt Burns Inc., 2015 ONSC 461, 2015 CarswellOnt 1333

2015 ONSC 461, 2015 CarswellOnt 1333, 124 O.R. (3d) 57, 17 C.C.P.B. (2nd) 1...

2015 ONSC 461
Ontario Superior Court of Justice

Stradiotto v. BMO Nesbitt Burns Inc.

2015 CarswellOnt 1333, 2015 ONSC 461, 124 O.R. (3d) 57, 17 C.C.P.B. (2nd) 1, 249 A.C.W.S. (3d) 196

# Donna Stradiotto and Rino Stradiotto, Plaintiffs and BMO Nesbitt Burns Inc., Brad Charlton and Albrecht Weller, Defendants

Graeme Mew J.

Judgment: January 26, 2015
Docket: CV-09-930853

Proceedings: additional reasons to *Stradiotto v. BMO Nesbitt Burns Inc.* (2014), 15 C.C.P.B. (2nd) 169, 2014 ONSC 3477, 2014 CarswellOnt 16070, 123 O.R. (3d) 184, Mew J. (Ont. S.C.J.)

Counsel: Mark Wainberg, for Plaintiffs
Jeremy Devereux, Robert Blair, for Defendant, BMO Nesbitt Burns Inc., Brad Charlton
Julia Dublin, for Defendant, Albrecht Weller

Subject: Civil Practice and Procedure; Corporate and Commercial; Evidence; Securities

**Headnote**

**Securities --- Brokers — Miscellaneous**

Remedies — Plaintiff RS invested money from 1960s for his retirement, including RRSP and spousal RRSP for his wife DS — Defendant AW was investment manager employed by defendant bank and hired by RS — RS had registered retirement income fund and cash account in his wife's name at bank — Defendant BC was manager at defendant bank who took over accounts in 2008 — DS held units of CCL stock which dropped in value from $100,444 when they were transferred to defendant bank, to $8,800 in March 2009 — RS and DS brought action against AW, BC and employer bank — Action allowed — Hearing held regarding damages and liability — Taking calculation error into account, award of damages varied to $134,000 — Inappropriate to receive further submissions on issue of income and capital gains — Arguments on capital gains were fully canvassed in parties' arguments and had been considered in reasons for judgment — Determination on bank liability did not require reconsideration but was further explained — Bank was directly liable to plaintiffs due to breach of duty of care in both contract and tort — Bank did not meet standard of care required of investment dealer in circumstances, and from its vicarious liability for the negligence of AW and BC, Bank was not liable to plaintiffs in tort for any acts or omissions beyond those of individual defendants — No further submissions required regarding liability.

**Table of Authorities**

**Cases considered by *Graeme Mew J.*:**

*Brown (Trustee of) v. Municipal Property Assessment Corp., Region 14* (2014), 2014 ONSC 7137, 2014 CarswellOnt 17302 (Ont. Div. Ct.) — considered

*Montague v. Bank of Nova Scotia* (2004), 2004 CarswellOnt 11, 2004 C.L.L.C. 210-027, 69 O.R. (3d) 87, 30 C.C.E.L. (3d) 71, 180 O.A.C. 381 (Ont. C.A.) — considered

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 115 of 342

Stradiotto v. BMO Nesbitt Burns Inc., 2015 ONSC 461, 2015 CarswellOnt 1333

2015 ONSC 461, 2015 CarswellOnt 1333, 124 O.R. (3d) 57, 17 C.C.P.B. (2nd) 1...

*Montague v. Bank of Nova Scotia* (2004), 2004 CarswellOnt 3446, 2004 CarswellOnt 3447, 332 N.R. 398 (note), 200 O.A.C. 200 (note) (S.C.C.) — referred to

*Pammett v. 1230174 Ontario Inc.* (2014), 2014 ONSC 4072, 2014 CarswellOnt 9229 (Ont. S.C.J.) — referred to

*1711811 Ontario Ltd. v. Buckley Insurance Brokers Ltd.* (2014), 2014 ONCA 125, 2014 CarswellOnt 1770, 315 O.A.C. 160, 371 D.L.R. (4th) 643 (Ont. C.A.) — considered

**Statutes considered:**

*Negligence Act*, R.S.O. 1990, c. N.1
  s. 4 — referred to

ADDITIONAL RREASONS to judgment reported at *Stradiotto v. BMO Nesbitt Burns Inc.* (2014), 2014 ONSC 3477, 2014 CarswellOnt 16070, 15 C.C.P.B. (2nd) 169, 123 O.R. (3d) 184 (Ont. S.C.J.), regarding liability and damages.

*Graeme Mew J.*:

1    Following a two week trial in March 2014 and extensive written submissions delivered in May and June 2014, I released reasons for judgment dated 17 November 2014: 2014 ONSC 3477 (Ont. S.C.J.).

2     The parties have not yet taken out a formal judgment. Costs submissions have been made but a decision on costs has not yet been rendered.

3     Following the release of my reasons for judgment, I have been asked to receive further submissions on matters said to arise from them.

4     The first request, made by the plaintiffs, is for an opportunity to make further submissions arising from an apparent arithmetical error in the damages calculation contained in one of the expert reports. I made reference to this report in the course of my comments on the quantum of damages. I was advised that the defendants had no objections further submissions being made in respect of this particular issue and, accordingly, have now received those submissions.

5    The second request related to the effect on the determination of damages of the potential income and capital gains resulting from the notional increase in the fixed income portion of the plaintiffs' portfolios (and the corresponding notional decrease in the equity portion of their portfolios). I indicated to counsel that I would need to be persuaded that it was appropriate for me to receive further submissions on this issue. I have now received written submissions from each of the parties on whether I should receive further submissions on the substantive issue raised.

6     The third request made relates to the issue of the direct liability (if any) of BMO Nesbitt Burns. I indicated that I would also need to be persuaded with respect to that issue that it was appropriate for me to receive further submissions on the issue. I have now received those submissions.

7     Accordingly, I will deal in this endorsement with the following matters:

  1. Whether my award of damages should be adjusted to reflect the calculation error contained in Mr. Horgan's report;

  2. Whether further submissions should be received by the court on the issue of potential income and capital gains resulting from the portfolio balance which I held should have existed; and

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 116 of 342

Stradiotto v. BMO Nesbitt Burns Inc., 2015 ONSC 461, 2015 CarswellOnt 1333

2015 ONSC 461, 2015 CarswellOnt 1333, 124 O.R. (3d) 57, 17 C.C.P.B. (2nd) 1...

3. Whether the court should receive further submissions on the issue of the direct liability (if any) of BMO Nesbitt Burns (as opposed to the vicarious liability of BMO Nesbitt Burns for its employees, the defendants Albrecht Weller and Brad Charlton).

**General Principles**

8    An Ontario court retains a broad discretion to alter or vary a decision until the formal judgment is taken out (*Montague v. Bank of Nova Scotia* [2004 CarswellOnt 11 (Ont. C.A.)], 2004 CanLII 27211, para. 34, leave to appeal denied, (S.C.C.); *Pammett v. 1230174 Ontario Inc.*, 2014 ONSC 4072 (Ont. S.C.J.) at para. 4.

9    Although the discretion is broad, it is one that should be exercised with caution, particularly where (as was the case in *Montague v. Bank of Nova Scotia*) there may be costs consequences. In *1711811 Ontario Ltd. v. Buckley Insurance Brokers Ltd.*, 2014 ONCA 125 (Ont. C.A.), the Court of Appeal referred to the "significant onus" on the judge to explain a change. The Divisional Court recently noted that the discretion to re-open a matter is generally one that should be resorted to "sparingly and with the greatest care": *Brown (Trustee of) v. Municipal Property Assessment Corp., Region 14*, 2014 ONSC 7137 (Ont. Div. Ct.) at para. 22.

**The Arithmetical Issue**

10    In para. 181 of my reasons for judgment, I made reference to an argument, put forward by counsel for BMO and Charlton, which, in turn, was based upon some methodology put forward by Michael Horgan for calculating the plaintiffs' loss. Mr. Horgan had calculated the plaintiffs' losses caused by their accounts having more than 70% in equities as being $39,604. Using this methodology, counsel for BMO and Charlton calculated that if the yardstick was the losses caused by the accounts holding more than 50% in equities, the resulting total loss would be $127,279. In fact, Mr. Horgan's calculation contained an error, so that the loss of $39,604 should have been $75,076. This would apparently have had an impact on the calculation undertaken by counsel for BMO and Charlton (at least, according to the plaintiffs). The end result, they say, would be the addition of $10,875.33 to the aggregate loss of $127,279 that had been calculated by counsel for BMO and Charlton, i.e. $138,154.33.

11    I also made reference in my reasons to a calculation using Professor Chris Robinson's hypothetical portfolio too which would result in a net loss of $128,663. And in para. 182 of my reasons I considered what I described as an "alternative, less arithmetic, approach namely the selection of an amount which adequately reflected the impact of the CCL loss and the lost opportunity resulting from the plaintiffs' portfolio being over weighted in favour of equities.

12    Ultimately, I selected as an appropriate damages figure $128,000, a rounded figure lying between the results of the first and second approaches that I had considered.

13    The defendants submit that I should not make any adjustment to my original assessment of damages based on the fact that the alternative calculation which they had put forward (and which was based on the erroneous calculation by Mr. Horgan) was only one of three bases for arriving at the damage figure of $128,000.

14    In arriving at a figure which would reasonably reflect the measure of the plaintiffs' loss, as I saw it, I looked at the two calculations which I thought yielded a reasonable result and then considered the "less arithmetic" approach described above.

15    In seeking a reasonable figure I am satisfied that I would have been influenced by the fact that one of the approaches considered by me should have yielded a total of $138,154.33, rather than $127,279. The result would have been the selection of a higher figure than $128,000. I would have looked for a rounded number close to the mid-point between the two calculated figures of $128,663 and $138,154.

16    That revised figure would have been $134,000 and, accordingly, the amount of damages awarded by me should be amended accordingly.

**The Income and Capital Gains Issue**

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Stradiotto v. BMO Nesbitt Burns Inc., 2015 ONSC 461, 2015 CarswellOnt 1333

2015 ONSC 461, 2015 CarswellOnt 1333, 124 O.R. (3d) 57, 17 C.C.P.B. (2nd) 1...

17     The plaintiffs point to their initial closing argument in which submissions were made to the effect that if the fixed income component of the plaintiffs' portfolios had been increased to 50%, there would have been a proportionately larger capital gain and the income from that increased fixed income component would also have been proportionately larger. The plaintiffs submit that:

> If the amount of the judgment is not adjusted to include the additional damages (opportunity costs) resulting from the insufficient percentage of fixed income investments in the plaintiffs' portfolios, the judgment will not properly reflect your Honour's finding that the plaintiffs' portfolios should not have included more than 50% equities (and therefore it should have included at least 50% fixed income investments).

18     The plaintiffs note that my judgment set out a calculation (in para. 181) which started with an estimated loss of $330,513 based on Professor Robinson's hypothetical "portfolio two" (50% equities) but then subtracted $201,850 which was a figure based on the plaintiffs actual portfolios not on the notional portfolios of 50% equities and 50% fixed income. According to the plaintiffs:

> That $201,850 figure would not accurately reflect the effect of lack of diversification in a portfolio containing only 50% equities as opposed to 75% (Rino's portfolio) or $79% (Donna's portfolio). The effect of lack of diversification on a portfolio containing 40% or 30% equities would be proportionately less than in a portfolio containing 50%, 75% or 79% equities.

19     The defendants BMO and Charlton make a number of points as to why there should be no further consideration of the incoming capital gains issue. First, the issue was raised and, indeed, canvassed at some length by the plaintiffs in their initial closing argument. Second, it is not clear that a calculation of the interest in capital gains in the manner in which the plaintiffs now suggest should be undertaken could be done without further evidence having to be adduced. Third, as already discussed in respect of the arithmetical issue, my award of damages was not based solely on Mr. Horgan's figures nor for that matter Professor Robinson's. Fourth, while Professor Robinson calculated the improvement over actual accounts as being $330,513 based on 1) changing the allocation to 50% fixed income and 50% equities; and 2) the change in diversification which he proposed; he agreed in cross-examination that $201,850 of that amount related to diversification. The defendants submit:

> Given that the Court rejected Prof. Robinson's diversification argument, $201,850 must be subtracted from $330,513. The remaining $128,663 represents Prof. Robinson's view as to the full amount of the loss attributable to the equity portion being greater than 50% and the fixed income portion being less than 50%.

20     Having carefully considered the positions of the parties, I am not persuaded that it would be appropriate for me to receive further submissions on the issue of income and capital gains. The arguments were fully canvassed in the initial closing argument presented by the plaintiffs and in the responding arguments of the defendants. I took it all into consideration in formulating my reasons for judgment. If I erred, the plaintiffs have the option of appealing.

**Direct Liability of BMO Nesbitt Burns**

21     As the plaintiffs point out, I found that the Stradiottos were not provided with the level of service that met BMO's own standards or the requisite level of proper care, skill and diligence as would be expected over an investment dealer and its registered representatives.

22     Because there were two registered representatives who worked on the plaintiffs' accounts, I apportioned responsibility for the losses experienced by the plaintiffs 50% to the defendant Albrecht Weller, who was the first registered representative at BMO who the plaintiffs worked with, and 50% to Brad Charlton, the second registered representative on the accounts. While I said, at para 176, that Messrs. Weller and Charlton "are jointly and severally liable with BMO to the plaintiffs for the full amount of the judgement, but as between themselves each of Mr. Weller and Mr. Charlton is liable to make contribution an indemnity to each other to the extent of their 50% fault" I did not clearly address the issue of BMO's direct liability (if any).

Stradiotto v. BMO Nesbitt Burns Inc., 2015 ONSC 461, 2015 CarswellOnt 1333

2015 ONSC 461, 2015 CarswellOnt 1333, 124 O.R. (3d) 57, 17 C.C.P.B. (2nd) 1...

23      I did, as noted, say that BMO were vicariously liable for both of their registered representatives (BMO having acknowledged that it would be). The plaintiffs and the defendant Albrecht Weller submit that I should go further than this. Reference is made to a number of points during my reasons for judgment where I talk about failure on the part of the defendants, i.e. all of the defendants.

24      On behalf of Mr. Weller, it is argued:

> Your Honour held at para. 176 of the Reasons for Judgement [*sic*] that s. 4 of the *Negligence* Act (Ontario) applied to a portion liability of contribution equally between the two defendants. The reasoning set out in paras. 175 and 176 of the Reasons for Judgement would apply equally to BMO as a direct defendant, such that liability for contribution should be apportioned 1/3 to each.

> The importance of the issue to Albrecht Weller is quite simply to divide the liability for contribution to the Plaintiffs' damages three rather than two ways, reducing his effective personal liability to the Plaintiffs. This clarification would not impose undue financial hardship on BMONB, particularly as they are vicariously liable at present for all of the damages awarded to the Plaintiffs.

25      BMO and Charlton oppose further consideration of the issue of the direct liability of BMO on a number of grounds, the most compelling of which are:

> a) The issue of direct liability of BMO was fully canvassed in the submissions made by the parties at the end of trial; and

> b) That the finding, in the reasons, that BMO, the employer of the two registered representatives who actually recommended the plaintiffs' securities, is vicariously liable rather than direct liable, is a supportable based on the findings of fact contained in the Reasons for Judgment.

26      It is clear from the submissions made by the parties that there is confusion as to how to interpret this aspect of my reasons for judgment. I acknowledge that this confusion results from my not having more pointedly explained my decision as it pertained to BMO Nesbitt Burns.

27      Having given further, careful, consideration to the concerns of the plaintiffs and Mr. Weller, I have concluded that I do not need to reconsider my decision. I just need to explain it better.

28      BMO Nesbitt Burns had contracts with each of the plaintiffs.

29      The plaintiffs' accounts with BMO Nesbitt Burns were negligently handled by Mr. Weller and Mr. Charlton.

30      BMO Nesbitt Burns is directly liable to the plaintiffs as a result. That liability arises from the breach of the duty of care which it owed the plaintiffs in both contract and tort, which required it to exercise such reasonable proper care, skill and diligence as would be expected of an investment dealer and its registered representatives in the circumstances and from its vicarious liability for the negligence of Mr. Weller and Mr. Charlton who I found to be each 50% at fault.

31      I did not, and did not intend to, find BMO Nesbitt Burns liable to the plaintiffs in tort for any acts or omissions beyond those of the individual defendants.

32      It is therefore not necessary for me to receive further submissions on the issue of apportionment and, as a result of doing so, to possibly adjust the apportionment of liability between the defendants. Again, if I am found to have erred, the appropriate remedy would most likely be to appeal my decision.

## Next Steps

33      I have now received costs submissions from all of the parties. Counsel for the plaintiffs has asked for an opportunity to deliver further costs submissions, responding to those of the defendants. This request is not opposed by the defendants.

2015 ONSC 461, 2015 CarswellOnt 1333, 124 O.R. (3d) 57, 17 C.C.P.B. (2nd) 1...

Accordingly, the plaintiffs may deliver further, responding, costs submissions not more than 4 pages in length (responding both sets of costs submissions made on behalf of the defendants). I would ask that these further submissions are provided to me no later than 2 February 2015.

*Order accordingly.*

---

**End of Document**
Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    6

# Tab 15

1995 CarswellOnt 4366, [1995] O.J. No. 853, 54 A.C.W.S. (3d) 567, 6 W.D.C.P. (2d) 175

1995 CarswellOnt 4366
Ontario Court of Justice (General Division)

National Trust Co. v. Saks

1995 CarswellOnt 4366, [1995] O.J. No. 853, 54 A.C.W.S. (3d) 567, 6 W.D.C.P. (2d) 175

# National Trust Company, Plaintiff and Uri Saks, Orle Developments Inc. and Dharam P. Malik, Defendants

Uri Saks and Orle Developments Inc., Plaintiff by Counterclaim
and National Trust Company, Defendant by Counterclaim

Borins J.

Heard: March 22, 1995
Judgment: March 29, 1995
Docket: 92-CQ-15760CM

Counsel: Milton A. Davis, Carlo P. Vairo, for National Trust Company
Irving Marks, David Taub, for Uri Saks and Orle Developments Inc.

Subject: Civil Practice and Procedure

**Headnote**
  **Civil practice and procedure**

***Borins J.*:**

1    This is a motion pursuant to rule 59.06(2)(d) brought by one of the defendants, Orle Developments Inc., ("Orle") for an order varying the amount of damages it was awarded on its counterclaim in reasons for judgment which were released on November 2, 1994. Rule 59.06(2)(d) states:

> (2) a party who seeks to,
>
>> (d) obtain other relief than that originally awarded,
>
> may make a motion in the proceeding for the relief claimed.

2    The reasons for judgment, which are 129 pages long, followed a complex commercial trial which required 35 days to complete. The plaintiff obtained judgment on its claim for $8,800,000 and Orle obtained judgment on its counterclaim for $6,900,000, with a set-off to apply. Orle requests that the amount of its damages should be varied to $11,100,000. The plaintiff has served a notice of appeal to the Court of Appeal, alleging a number of grounds of error. Orle has cross-appealed, asking that its damages be increased to $11,100,000. A formal judgment has not been issued and entered.

3    It would appear to be settled law that, in the appropriate circumstances, an order or a judgment may be reconsidered and withdrawn, altered or modified by a judge on motion by a party before the judgment has been drafted, issued and entered: *Holmes Foundry Ltd. v. Village of Point Edward,* [1963] 2 O.R. 404 at 407 (C.A.); *Canadian Acceptance Corporation Ltd. v. Biluk (1978), 10 C.P.C. 178 at 180* (Ont. Dist. Ct.). However, in my view, a judge should be most reluctant to do so, absent exceptional circumstances, where the issue in respect to which the variance is sought was fully argued at trial and is dealt with in his or her reasons for judgment: *cf. Credit Foncier Franco-Canadian v. Fort Massey Realties Ltd. (1981), 49 N.S.R. (2d)*

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1995 CarswellOnt 4366, [1995] O.J. No. 853, 54 A.C.W.S. (3d) 567, 6 W.D.C.P. (2d) 175

646 (T.D.). The power to vary or amend may be exercised notwithstanding the service of a notice of appeal: *Axelrod v. Beth Jacob of Kitchener*. [1943] O.W.N. 80.

4     In *Rickett v. Rickett (1990), 71 D.L.R. (4th) 734* (Ont. High Ct.) Granger J. was asked to vary or amend his reasons for judgment prior to the entry of the formal judgment on the basis of the reasons for judgment of the Supreme Court of Canada in *Rawluk v. Rawluk,* [1990] 1 S.C.R. 70, which were released between the time he reserved judgment and he released his reasons for judgment. In declining to do so, Granger J. stated at 725:

> In my opinion, I should avoid the temptation of tinkering with my judgment unless I have inadvertently failed to deal with a claim or made a mathematical error. If it is obvious that an error or omission has been made, counsel should always feel free to approach the trial judge and request that he or she reconsider his or her judgment in order to avoid the necessity of an appeal. On the other hand, counsel should not attempt to reargue their case prior to the formal judgment being issued and entered. If counsel becomes aware of a decision which might be relevant while judgment is reserved, I personally would welcome being advised by counsel of such decision. If however, reasons for judgment have been released, decisions which were not brought to the attention of the trial judge ought to be left for consideration by an appellate court.

> In my opinion, Mr. Skapinker had sufficient time prior to the release of my reasons for judgment to ask me to consider Rawluk. In addition, my reasons for judgment reflect the result which I intended, based upon the cases submitted to me and my consideration of Rawluk. If Mr. Skapinker feels that I have wrongly interpreted the law, including Rawluk, such submissions should be made to the Court of Appeal.

5     I adopt, and apply, the comments of Granger J. to the circumstances of this case. In elaborate submissions, Orle's counsel submitted why I should increase the damages awarded to it to $11,100,000, consistent with the facts which I found and the principles which I applied in assessing its damages in the amount of $8,800,000. I do not feel that it is appropriate for me to say anything further about the submissions of counsel in light of Orle's cross-appeal. However, it seems clear to me, as it did to counsel for National Trust, that I have been asked to deal with the very subject matter of Orle's cross-appeal. Although I appreciate that there would be a saving in terms of costs and time if the cross-appeal were to be avoided, the circumstances are not appropriate for me to vary the result which I reached, together with the reasons on which it is based.

6     The determination and calculation of Orle's damages were fully considered in my reasons for judgment. It was not suggested that the reasons contain any mathematical error. My reasons for judgment reflect the result which I intended, based upon my understanding of the submissions of counsel and the authorities which he provided, and other authorities which he did not provide. What Orle's counsel did, in essence, was to reargue his client's position with respect to its damages and attempt to convince me that the approach taken in my reasons for judgment was wrong. In my view, I was asked to review my own reasoning. It may be that I was wrong. If I was, no doubt the Court of Appeal will correct the error.

7     Accordingly, the motion is dismissed. The costs of the motion are reserved to the Court of Appeal.

---

**End of Document**          Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    2

# Tab 16

1999 CarswellOnt 2866
Ontario Court of Appeal

Bremness v. McGee Capital Management Ltd.

1999 CarswellOnt 2866

# Gordon Anthony Bremness, Plaintiff/Appellant and McGee Capital Management Limited, Defendant/Respondent

Abella J.A., Catzman J.A., Feldman J.A.

Judgment: September 16, 1999
Docket: CA C30020

Counsel: *Jeffrey A. Kaufman*, for Appellant.
*Geoff R. Hall*, for Respondent.

Subject: Civil Practice and Procedure

**Headnote**
  **Practice --- Costs — Particular orders as to costs — General**


**Table of Authorities**

  **Cases considered:**

    *Cameron v. Julien*, [1957] O.W.N. 430, 9 D.L.R. (2d) 460 (Ont. C.A.) — referred to


RULING on costs.

**Per Curiam:**

**Endorsement**

1    We released an endorsement in this matter on February 24, 1999 allowing the appeal "with costs". Counsel for the appellant has asked us to clarify the decision on the issue of the disposition of the costs below.

2    We agree with counsel for the appellant that this is not a case to which *Cameron v. Julien* (1957), 9 D.L.R. (2d) 460 (Ont. C.A.) is applicable and that leave to appeal was not required to appeal from the order for costs made by Wilkins J.

3    We further agree with counsel for the appellant that this court has jurisdiction to clarify or amend the order for costs made on the disposition of the appeal.

4    Having regard to the result in this court, we are all of the view that the costs of the appeal and of the proceedings that led to the judgment of Wilkins J. should be assessed on the party-and-party scale of costs appropriate to the quantum of the appellant's ultimate recovery from the respondent, and we direct that the formal order of this court disposing of this appeal be amended accordingly.

*Party and party costs awarded.*

**Bremness v. McGee Capital Management Ltd., 1999 CarswellOnt 2866**

1999 CarswellOnt 2866

**End of Document**        Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# Tab 17

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 127 of 342

Hawkes v. Levelton Holdings Ltd., 2012 BCSC 1968, 2012 CarswellBC 4033

2012 BCSC 1968, 2012 CarswellBC 4033, [2012] B.C.J. No. 2748...

2012 BCSC 1968
British Columbia Supreme Court

Hawkes v. Levelton Holdings Ltd.

2012 CarswellBC 4033, 2012 BCSC 1968, [2012] B.C.J. No. 2748, [2013] B.C.W.L.D. 5098, [2013] B.C.W.L.D. 5105, [2013] B.C.W.L.D. 5204, [2013] B.C.W.L.D. 5205, [2013] B.C.W.L.D. 5206, [2013] B.C.W.L.D. 5207, [2013] B.C.W.L.D. 5208, [2013] B.C.W.L.D. 5209, [2013] B.C.W.L.D. 5210, 225 A.C.W.S. (3d) 131

# Darryl Hawkes, Plaintiff and Levelton Holdings Ltd., Levelton Consultants Ltd., Neil Alexander Cumming, and Alex Schutte, Defendants and Robert Bourne and Elite Sports Management Inc., Defendants by Counterclaim

Susan A. Griffin J.

Heard: September 20, 2012; December 12, 2012
Judgment: December 12, 2012
Docket: Vancouver S108241

Proceedings: additional reasons to *Hawkes v. Levelton Holdings Ltd.* (2012), 2 C.C.E.L. (4th) 1, 2012 CarswellBC 2493, 2012 BCSC 1219 (B.C. S.C.)

Counsel: Donald Boyle, for Plaintiff
Scott R. Brearley, Debra L. Rusnak, for Defendants
No one for Defendants by Counterclaim

Subject: Civil Practice and Procedure; Employment; Public; Corporate and Commercial; Contracts

### Headnote

**Civil practice and procedure --- Judgments and orders — Amending or varying — Before judgment entered — Miscellaneous**

Re-open judgment to clarify ambiguities — Plaintiff employee successfully brought action for damages for wrongful dismissal and was found to be entitled to 18 months' notice — Trial judge held that employee was required to sell his shares back to employer's parent company LH Ltd. — Trial judge held that employee was entitled to receive equivalent of higher share price at end of reasonable notice period rather than share price set at time of dismissal — Prior to entry of final order, employee brought application for reconsideration or re-opening of judgment to clarify reasons — Application granted; additional reasons to trial judgment issued — It was not unjust to clarify ambiguities in reasons respecting treatment of purchase of employee's shares, and treatment of shareholder loan owed by LH Ltd. to employee — Mathematical error in calculation of difference in share prices in trial judgment was corrected — Reasons were reworded to clarify that share purchase was to be completed at original price and that employee was entitled to damages equivalent to increase in share price — Judgment was clarified to confirm that repayment of shareholder loan was not damages for wrongful dismissal but was repayment of debt owed by LH Ltd. to employee — Employee was not entitled to reconsideration of tax consequences, as those submissions could have been made during trial.

**Labour and employment law --- Employment law — Termination and dismissal — Remedies — Damages — Stock options and shares**

Plaintiff employee was dismissed by employer LC Ltd. after 18 years of employment — Employee was also shareholder in employer's parent company, LH Ltd. — Share price increased significantly between dismissal and end of reasonable notice period — Employee successfully brought action for damages for wrongful dismissal — Trial judge ordered defendants to purchase employee's shares at $431.13 per share for total of $541,068.15 — Trial judge held that it was unreasonable to

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 128 of 342

Hawkes v. Levelton Holdings Ltd., 2012 BCSC 1968, 2012 CarswellBC 4033

2012 BCSC 1968, 2012 CarswellBC 4033, [2012] B.C.J. No. 2748...

conclude that wrongful termination would trigger mandatory sale of shares or preclude employee from claiming damages for loss of benefits as shareholder-employee — Trial judge held that employee was entitled to increase in value of shares between termination and end of reasonable notice period — Prior to entry of final order, employee brought application for reconsideration or re-opening of judgment to clarify reasons respecting repurchase of shares — Application granted; additional reasons to trial judgment issued — It was not unjust to clarify ambiguities in reasons respecting treatment of purchase of employee's shares — Reasons were reworded to clarify that share purchase was to be completed at original price and that employee was entitled to damages equivalent to increase in share price.

**Business associations --- Specific matters of corporate organization — Shareholders — Loans to shareholders**

Plaintiff employee successfully brought action for damages for wrongful dismissal — Trial judge found that employee should have been given 18 months' notice — Trial judge held that employee was required to sell his shares back to employer's parent company LH Ltd. — Trial judge held that employee was entitled to repayment of his shareholder loan in amount of $58,581.67 plus interest — Prior to entry of final order, employee brought application for reconsideration or re-opening of judgment to clarify reasons — Application granted; additional reasons to trial judgment issued — It was not unjust to clarify ambiguities in reasons respecting treatment of purchase of employee's shares, and treatment of shareholder loan owed by LH Ltd. to employee — Repayment of shareholder loan was not damages for wrongful dismissal, but was repayment of debt owed by LH Ltd. to employee — General relief pleaded by employee was sufficient to encompass order that LH Ltd. be directed to repay shareholder loan owed to employee — Reasons were corrected to characterize shareholder loan as amount due from LH Ltd. to employee and not as part of damages due from employer for wrongful dismissal.

**Table of Authorities**

**Cases considered by *Susan A. Griffin J.*:**

*Fame Construction Ltd. v. 430863 B.C. Ltd.* (1997), 1997 CarswellBC 995 (B.C. S.C.) — considered

*Hawkes v. Levelton Holdings Ltd.* (2011), 2011 BCSC 861, 2011 CarswellBC 1639 (B.C. S.C. [In Chambers]) — referred to

*Hawkes v. Levelton Holdings Ltd.* (2012), 2 C.C.E.L. (4th) 1, 2012 CarswellBC 2493, 2012 BCSC 1219 (B.C. S.C.) — referred to

*Sykes v. Sykes* (1995), 13 R.F.L. (4th) 273, 38 C.P.C. (3d) 250, 6 B.C.L.R. (3d) 296, 58 B.C.A.C. 294, 96 W.A.C. 294, 1995 CarswellBC 266 (B.C. C.A.) — considered

*Vance v. Vance* (1981), [1982] 2 W.W.R. 472, 26 R.F.L. (2d) 55, 34 B.C.L.R. 209, 1981 CarswellBC 392 (B.C. S.C.) — considered

**Statutes considered:**

*Business Corporations Act*, S.B.C. 2002, c. 57
Generally — referred to

s. 227 — considered

s. 227(3) — considered

**Rules considered:**

2012 BCSC 1968, 2012 CarswellBC 4033, [2012] B.C.J. No. 2748...

*Supreme Court Civil Rules*, B.C. Reg. 168/2009
    Generally — referred to

    R. 13-1(17) — considered


ADDITIONAL REASONS after re-opening judgment reported at *Hawkes v. Levelton Holdings Ltd. (2012), 2 C.C.E.L. (4th) 1, 2012 CarswellBC 2493, 2012 BCSC 1219* (B.C. S.C.), allowing employee's action for wrongful dismissal.

**Susan A. Griffin J.**:

**Introduction**

1    I delivered Reasons for Judgment on August 15, 2012 after trial, indexed at 2012 BCSC 1219 (B.C. S.C.) ("Trial Reasons").

2    These Reasons for Judgment are to be considered Supplemental to the Trial Reasons.

3    The main issue at trial was whether or not the plaintiff had been wrongfully dismissed from his employment without notice, or, whether he had been dismissed for just cause by Levelton Consultants Ltd. ("Consultants"). I found that he had been dismissed without just cause and should have been given 18 months' notice.

4    Dismissal from his employment had an effect on the plaintiff's rights and status as a shareholder of Consultants' parent company, Levelton Holdings Ltd. ("Holdings"). After the plaintiff's termination without notice from employment, Holdings had attempted to repurchase the plaintiff's shares in Holdings based on the terms of a Shareholder Buy/Sell Agreement, defined as the "BSA" in my Trial Reasons. The attempted purchase by Holdings of the plaintiff's shares was at a share price of $228.05. Holdings had been restrained by an injunction order, made by Macaulay J. on June 29, 2011 [2011 CarswellBC 1639 (B.C. S.C. [In Chambers])] (the "Injunction Order"), from completing the purchase pending the outcome of this case.

5    As part of his claim based on shareholders' remedies, the plaintiff argued that he should not be required to sell his shares to Holdings despite terms of the BSA that required departing employees to sell their shares. Holdings disagreed and argued that it had the right to repurchase his shares, and specifically sought an order setting aside the Injunction Order allowing them to do so. While I may not have expressed this sufficiently clearly in the Trial Reasons, I ultimately agreed with Holdings in this regard. This meant that the plaintiff was required to sell his shares to Holdings and Holdings was required to purchase his shares.

6    The plaintiff also claimed general damages for his wrongful dismissal. As he stated in his written opening submission at para. 35 (a theme repeated elsewhere, including at paras. 34(b) and 46):

First and foremost, this is a wrongful dismissal claim, and the plaintiff says that he was dismissed without cause and without reasonable notice, and is entitled to be put into the position that he would have been in, if his employer, Levelton Consultants Ltd., had given him reasonable notice of termination, including:

    a. Lost wages until he found alternate employment (December 5, 2011);

    b. The cost to replace lost benefits until he found alternate employment;

    c. The bonuses that he would have earned during the period of reasonable notice;

    d. The difference between the formulated price at the time of his dismissal and the higher formulated price [at the end of the reasonable notice period].

7    I ultimately agreed with the plaintiff and found that the plaintiff was entitled to all of the pecuniary benefits that he would have received had he remained an employee, and consequently also a shareholder, during the 18 month reasonable notice period.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2012 BCSC 1968, 2012 CarswellBC 4033, [2012] B.C.J. No. 2748...

8    I found that had the plaintiff remained an employee and shareholder during his period of reasonable notice of termination of employment, he would have received a higher share price than the $228.05 price set by Holdings at the time of the plaintiff's dismissal, and instead he would have received a share price of $431.13 per share at the end of the notice period. I found that the plaintiff was entitled to be made whole and receive the equivalent of $431.13 per share.

9    Holdings had also conceded during the trial that it was required to pay back to the plaintiff a shareholder loan.

**Present Application**

10    Prior to entry of a final order following the trial, the plaintiff has applied for reconsideration or re-opening of the judgment. There are two aspects to the application.

11    First, the plaintiff applies to clarify two ambiguities in the remedies portion of the Trial Reasons which the plaintiff argues have left both sides of the case confused.

12    Second, the plaintiff applies to advance new submissions as to the court's order respecting the repurchase of the plaintiff's shares. In effect, the plaintiff seeks to raise certain income tax considerations and have the court reconsider the order so as to allow the plaintiff to offer his shares to other shareholders for purchase.

13    The defendants appear to agree that there is some confusion in the Trial Reasons as to which defendant is subject to which remedy. However, the defendants oppose going so far as requested by the plaintiff to reconsider the court's order regarding the sale of the plaintiff's shares so as to improve his tax consequences.

**Legal Principles on Reconsideration**

14    The plaintiff relies on the law regarding a judge's discretion to re-open a trial before entry of the final order, as stated in *Sykes v. Sykes* (1995), 6 B.C.L.R. (3d) 296 (B.C. C.A.) as follows at paras. 9-10:

> It is well established that the discretion which a trial judge has to re-open before formal judgment has been entered is what is called "an unfettered discretion", although it is one which for obvious reasons must be exercised sparingly. The following quotation from the judgment of Mr. Justice Macdonald in *Clayton v. British American Securities Ltd.*, [1934] 3 W.W.R. 257 at 295 (B.C.C.A.), still represents the law in this Province:
>
>> It is, I think, a salutary rule to leave unfettered discretion to the trial judge. He would of course discourage unwarranted attempts to bring forward new evidence available at the trial to disturb the basis of a judgment delivered or to permit the litigant after discovering the effect of a judgment to re-establish a broken-down case with the aid of further proof. If the power is not exercised sparingly and with the greatest care fraud and abuse of the Court's process would likely result.
>
> In my view, new evidence is not an essential prerequisite to a trial judge's exercise of the discretion to re-open. In some cases, it may be the only circumstance which would justify a re-opening. Indeed it may be that in many cases a re-opening would only be justified on the basis of new evidence which was not available at the time of the original trial. It will in all cases depend on the circumstances. But, a discretion to re-open may also properly be exercised where the trial judge is satisfied, either because of the argument of one of the parties, or on the basis of his own reconsideration of the record, that the original judgment was in error because it overlooked or misconstrued material evidence, or misapplied the law.

15    The defendants emphasize that the burden of persuasion rests with the applicant, who must show that a miscarriage of justice would probably occur unless the issue is reconsidered and decided in his favour, as held in *Vance v. Vance* (1981), 34 B.C.L.R. 209 (B.C. S.C.), at 211 .

16    As seen in *Fame Construction Ltd. v. 430863 B.C. Ltd.*, [1997] B.C.J. No. 1053 (B.C. S.C.) at para. 4, an application for reconsideration may be allowed where the original judgment was "so expressed as to lead to uncertainty and confusion."

Hawkes v. Levelton Holdings Ltd., 2012 BCSC 1968, 2012 CarswellBC 4033

2012 BCSC 1968, 2012 CarswellBC 4033, [2012] B.C.J. No. 2748...

17     The plaintiff also relies on the slip rule, R. 13-1(17), which provides:

The court may at any time correct a clerical mistake in an order or an error arising in an order from an accidental slip or omission, or may amend an order to provide for any matter that should have been but was not adjudicated on.

**Clarifying Ambiguities**

18     Dealing with the first aspect of the plaintiff's application, I agree with the plaintiff that there are ambiguities in the Trial Reasons in the way I described the plaintiff's remedies and that I did not clearly delineate which defendant was subject to which remedy. These ambiguities were unintended. I find that it would be unjust to not correct these ambiguities.

19     The two ambiguities have to do first, with the treatment of the purchase of the plaintiff's shares in Holdings, which I will describe as the share price remedy, and second, with the treatment of the shareholder loan owed by Holdings to the plaintiff.

20     I found as a fact that the employment and shareholder relationship were intertwined (at paras. 256-269). All parties and counsel in the case commonly referred to both corporate defendants as simply "Levelton". Because of this and the fact that the same people operated both corporate defendants, when it came to addressing the plaintiff's employment remedies as against Consultants versus his shareholder remedies as against Holdings, I did not sufficiently untangle the strands by which these entities were intertwined.

21     I will address each of the two ambiguities in turn, first relating to the share price remedy and second in relation to repayment of the plaintiff's shareholder loan.

***Share Price Remedy***

22     In the Trial Reasons the issue of the purchase of the plaintiff's shares, and the price, came up both in terms of his claim for damages for wrongful dismissal as against his employer, Consultants, and in his claim for shareholder remedies as against Holdings.

23     At paras. 308-309 of the Trial Reasons I held:

I find that had the defendants not breached Mr. Hawkes' contract of employment, Mr. Hawkes would have continued in his employment for 18 months after receiving reasonable notice of his dismissal. Given that his employment would not have ceased during this time, clause 10.1(g) of the BSA would not have applied and there would have been no triggering event to cause the sale of his shares until after his employment did actually cease 18 months later.

As damages flowing from the breach of the employment contract, Mr. Hawkes is therefore entitled to compensation for the loss of the opportunity to share in whatever pecuniary benefits flowed from being a shareholder during that 18 month notice period. This conclusion is in keeping with the analysis of the Court of Appeal in *Saalfeld* at paras. 33 and 42.

24     The reference to clause 10.1(g) was to a term in the BSA which entitled Holdings to purchase the plaintiff's shares on cessation of his employment.

25     I further held at paras. 351-353 of the Trial Reasons:

Conceptually I have already found that the plaintiff is entitled to damages for the loss of any benefits he would have enjoyed as a shareholder during the notice period. The increase in share value is one of those benefits.

Had Mr. Hawkes been given reasonable notice of the termination of his employment, he would have continued as an employee-shareholder until roughly the end of May 2012, and only then would his employment and all related benefits end, including the benefit of owning shares. Thus only then would he have been required to sell his shares.

2012 BCSC 1968, 2012 CarswellBC 4033, [2012] B.C.J. No. 2748...

Therefore, if the employer's breach of the employment contract would have caused him to sell his shares (as Levelton claims it did), it would have caused Mr. Hawkes to suffer damages equal to the difference in share price as between his actual dismissal and what would have happened had he had to sell his shares at the end of the period of reasonable notice.

26    In this regard, I was accepting the plaintiff's position advanced in the plaintiff's opening and closing submissions at trial, that his damages for wrongful dismissal included the increase in the price of his shares in Holdings as between the date when he was actually dismissed and the end of the reasonable notice period. I further held at paras. 361-363 of the Trial Reasons:

If Mr. Hawkes was required to sell his shares as of 60 days after November 22, 2010, pursuant to the terms of the BSA, as argued by the defendants, then his damages from his wrongful dismissal include the difference in the value of his shares sold as at that date, $228.05 per share, and the value as of what would have been the end of a reasonable notice period, May 2012, namely $431.13. This equals an additional $186.92 per share.

After Mr. Hawkes' dismissal, the defendants did not properly invoke the buysell provisions of the BSA. However, I conclude that the defendants would have corrected any deficiencies in the buy-sell procedure but for an outstanding injunction order preventing them from doing so. Either way, had reasonable notice been given, the defendants would have been entitled to and would have taken the necessary steps to purchase the plaintiff's shares as of approximately the end of May 2012 (or within 60 days afterwards), at the price of $431.13.

Subject to what I say in relation to the oppression remedy, his shares ought to be purchased now at the price of $431.13 per share.

[Emphasis added.]

27    There was a mathematical error in the Trial Reasons at para. 361. The difference between $431.13 per share and $228.05 per share is $203.08 per share, not $186.92 per share.

28    My finding of fact at para. 362 of the Trial Reasons underlined above was that Holdings would have completed the purchase of the plaintiff's shares but for the Injunction Order. This was responding to Holdings' submissions at trial that the court should order that the Injunction Order be set aside so that the plaintiff's shares could be purchased by Holdings. I ultimately accepted Holdings' position in the trial that it should be permitted to complete the purchase of the plaintiff's shares in Holdings, but the Trial Reasons should have been clearer in this regard.

29    Paragraphs 362 and 363 of the Trial Reasons were poorly worded and lead to confusion. What I should have said was that unless the plaintiff could persuade me he was entitled to a different remedy based on his claim pursuant to the oppression remedy (in which he was arguing that his shares should not be sold), my finding was that Holdings was entitled to complete the purchase of the plaintiff's shares at $228.05 per share. I also should have more clearly said that this conclusion would make Consultants liable in damages to the plaintiff for the difference between that share price to be paid by Holdings and the share price he would have received had his employment been terminated at the end of the 18 month reasonable notice period, $431.13 per share. These damages total $254,865.40 (($431.13 -$228.05) multiplied by 1,255 shares).

30    Therefore, to make it clear what my intentions were, I consider that paras. 362 and 363 of the Trial Reasons should have been worded as follows:

[362] After Mr. Hawkes' dismissal, Holdings did not properly invoke the buysell provisions of the BSA. However, I conclude that Holdings would have corrected any deficiencies in the buy-sell procedure but for an outstanding Injunction Order preventing it from doing so.

[363] Unless I conclude otherwise in relation to the oppression remedy, Holdings is entitled to proceed with the purchase of the plaintiff's shares now at the price of $228.05 per share and Consultants is liable in damages to the plaintiff for the difference between that share price and the price of $431.13. These damages total $254,865.40.

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 133 of 342

Hawkes v. Levelton Holdings Ltd., 2012 BCSC 1968, 2012 CarswellBC 4033

2012 BCSC 1968, 2012 CarswellBC 4033, [2012] B.C.J. No. 2748...

31    Next, I ought to have carried through this clarification in the shareholder's remedies section of the Trial Reasons.

32    When it came to my analysis of the shareholder's remedies claim, I concluded at para. 377:

However, based on the findings I have already made, Levelton's attempt to deny Mr. Hawkes the benefits he would have received as shareholder during a period of reasonable notice of termination of employment (his bonuses and the increase in share value) may be such as to constitute oppressive or unfairly prejudicial conduct, contrary to s. 227(2) of the *BCA*. I have already provided remedies for these wrongs in the wrongful dismissal aspect of Mr. Hawkes' claim: Mr. Hawkes' shares should be purchased at a price of $431.03 per share; and, Mr. Hawkes has been awarded damages for the lost bonuses. I see no need for additional remedies.

[Emphasis added.]

33    The reference to $431.03 was a typographical error and should have been $431.13.

34    I further held at paras. 394-397 of the Trial Reasons:

Once Mr. Hawkes' employment was terminated, he was soon told he was in default of the BSA based on the same allegations and Holdings attempted to treat this as a triggering event to purchase his shares under the BSA immediately. Thus, Holdings attempted to use the incorrect allegations against Mr. Hawkes, which had not been fairly assessed, to deprive Mr. Hawkes of the benefits he would have otherwise received as a shareholder: his bonuses and the increase in share value.

Levelton's witnesses at trial emphasized that they had high expectations for each other's conduct, as fellow shareholders and employees. Unfortunately, this treatment of Mr. Hawkes was unfair and did not meet those expectations.

Thus I find that the manner in dealing with Mr. Hawkes' dismissal and the corresponding attempt to deny him the benefits he would have been entitled to as a shareholder during a period of reasonable notice, was unfairly prejudicial to him as a shareholder, within the meaning of s. 227(2)(b) of the *BCA*.

Were this relief not duplicative of the relief I have ordered in respect of the wrongful dismissal damages, I would conclude that it would be appropriate to fashion a remedy pursuant to s. 227(3) of the *BCA*, directing Holdings to cause the payment of the bonuses to Mr. Hawkes that I have already assessed as due to him during the period of reasonable notice, and directing Holdings to purchase his shares at a price of $431.13 per share.

[Emphasis added.]

35    My above analysis in error did not distinguish between damages due from Consultants, and directions as against Holdings in relation to re-purchasing the plaintiff's shares. The plaintiff's damages for wrongful dismissal are of course only due from his employer, Consultants.

36    My intention was to ensure that the plaintiff was made whole in relation to the breach of his employment contract and would receive a pecuniary result in the sale of his shares that was equivalent to what he would have received had he received reasonable notice of 18 months before termination of his employment. My intention was also to avoid duplication of damages. Because of the nature of the submissions I had received which did not point out any difference to the plaintiff, I had concluded that the result was the same to the plaintiff whether:

(a) Holdings completed the purchase of the plaintiff's shares at a price of $228.05 per share and Consultants paid breach of employment contract damages equal to the difference between that share price and the higher share price of $431.13; or

(b) Holdings purchased the plaintiff's shares at a price of $431.13 as a remedy for the unfairly prejudicial conduct towards him as shareholder.

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 134 of 342

Hawkes v. Levelton Holdings Ltd., 2012 BCSC 1968, 2012 CarswellBC 4033

2012 BCSC 1968, 2012 CarswellBC 4033, [2012] B.C.J. No. 2748...

37     What I intended to order in my Trial Reasons was remedy (a) above. I also saw it as practical for the parties that Holdings be permitted to carry out what it had started, namely, complete the purchase of the plaintiff's shares at a price of $228.05 per share, which was also consistent with the order Holdings sought at trial.

38     It would be unjust to not correct the errors and confusion in my Trial Reasons. I conclude that what para. 377 should have stated is as follows:

> [377] However, based on the findings I have already made, Levelton's attempt to deny Mr. Hawkes the benefits he would have received as shareholder during a period of reasonable notice of termination of employment (his bonuses and the increase in share value) may be such as to constitute oppressive or unfairly prejudicial conduct, contrary to s. 227(2) of the *BCA*. I have already provided remedies for these wrongs in the wrongful dismissal aspect of Mr. Hawkes' claim: on the basis that Mr. Hawkes' shares will be purchased by Holdings at a price of $228.05 per share, Mr. Hawkes has been awarded damages as against Consultants for the lost bonuses and benefits and loss of increase in share value that he suffered during the period when he ought to have been given reasonable notice of dismissal. I see no need for additional remedies.

### *Shareholder Loan*

39     The next area of ambiguity has to do with the shareholder loan owed by Holdings to the plaintiff.

40     My analysis of the shareholder loan begins under the subheading "Shareholder Loan" at para. 340 of the Trial Reasons.

41     As mentioned, I noted in the Trial Reasons at para. 342 that the defendants conceded that the plaintiff was owed the amount in his shareholder loan account. It was clear to all parties that it was an amount owed by Holdings to the plaintiff.

42     Later, under the heading "Conclusion", in an effort to conveniently summarize all payments due from both defendants to the plaintiff at the end of their relationship, I addressed the shareholder loan but mistakenly referred to it as part of the damages for wrongful dismissal at para. 404(e) of the Trial Reasons. This was a slip and was unintended.

43     The repayment of the shareholder loan was not damages for wrongful dismissal. It was simply repayment of a debt owed by Holdings to the plaintiff and properly falls under the remedies pursuant to s. 227 of the *BCA*.

44     On this application for reconsideration, Holdings raises an objection that the debt had not been specifically pleaded by the plaintiff. However, Holdings was not taken by surprise by the fact that the shareholder loan needed to be paid back and had conceded that it was due.

45     Indeed, at para. 360 of his written submissions given in final argument at trial, counsel for the defendants wrote:

> First, regardless of Court's decision on cause, certain monies are owing to Mr. Hawkes. Those monies [... his shareholder loan balance...] are not "damages".

46     Thus neither party characterized the shareholder loan as damages due from Consultants to the plaintiff for wrongful dismissal.

47     Counsel for the defendants explained at trial that the amount of the plaintiff's shareholder loan balance was not contested. These were simply monies he was owed by Holdings.

48     The objective of both parties at the trial was to finalize all pecuniary issues as between the plaintiff and both defendants. It would be contrary to the general purpose of the *Civil Rules* that the plaintiff be put to the burden of starting an entirely new action against Holdings related to this uncontested but outstanding debt, and the defendants did not suggest at trial that they were in any way prejudiced by this being included in the relief.

49     The remedies pleaded by the plaintiff included the general relief: "such other order pursuant to s. 227(3) of the *Business Corporations Act*...as this Honourable Court may deem just" (at para. 8 of the Amended Notice of Civil Claim). As I noted

2012 BCSC 1968, 2012 CarswellBC 4033, [2012] B.C.J. No. 2748...

in the Trial Reasons at para. 365, the shareholders remedies in the *BCA* are equitable remedies, and the court is given broad discretion to do what is fair.

50      It was clearly fair in addressing the shareholder remedies as between Holdings and the plaintiff to order relief that both parties agreed to, namely, repayment of the shareholder loan. In the circumstances here, I find that the general relief pleaded by the plaintiff was sufficient to encompass an order that Holdings be directed to repay the shareholder loan owed to the plaintiff, plus interest. This is the relief I intended to order. I saw it as practical and in accord with the parties' expectations that in purchasing the plaintiff's shares, Holdings would also pay to the plaintiff his shareholder loan in accordance with its terms. I should have expressly stated this in the Trial Reasons.

51      I conclude that my Trial Reasons must be corrected so as to characterize the shareholder loan as an amount due from Holdings to the plaintiff and not as part of the damages due from Consultants for wrongful dismissal.

**Conclusion on Reconsideration to Clarify Ambiguities**

52      In conclusion, on the first part of the plaintiff's application, it is necessary to correct unintentional errors in wording of my Trial Reasons so as to clarify two areas of ambiguity. I have relied on the slip rule and the concept referred to in *Fame Construction*. I have not changed my intended findings of fact or reasoning, but have corrected my choice of words so as to clarify the intended result of the Trial Reasons. I have concluded that it would be manifestly unjust not to make these corrections.

53      The two unfortunate ambiguities in the Trial Reasons culminated under the heading "Conclusion" where I attempted for ease of reference to summarize the amounts awarded to the plaintiff. In doing so, I made erroneous or poor choices of words which created confusion, wrongly suggesting that all of these remedies were due to the plaintiff's dismissal without notice, and erroneously not clearly separating out what remedies had to do with Consultants and what remedies had to do with Holdings.

54      It would be unjust to leave my concluding paragraphs of the Trial Reasons as they do not capture my intentions and could lead to unintended negative tax consequences for the plaintiff if all of the monies owed to him by both Consultants and Holdings are characterized as damages for wrongful dismissal. Leaving the Trial Reasons uncorrected would be unjust as it would not provide the parties with the necessary clarity with which to carry out the relief I intended to order.

55      In the result, I conclude that paragraphs 404-407 of the Trial Reasons should be considered deleted and rescinded and the following paragraphs should be considered substituted in their place:

[404] To remedy Mr. Hawkes' wrongful dismissal, he is to be put in the same position he would have been had he been given 18 months' notice, as follows:

    1. he is to be paid by Consultants:

        a. lost salary of $107,900.00;

        b. lost vehicle allowance of $3,600.00;

        c. lost Share Pool and Equal Pool bonuses of $157,697.00;

        d. lost Performance Pool bonuses of $64,733.00; and,

        e. damages equivalent to the increase in share price he would have received from Holdings had he continued being a shareholder for 18 months, namely, $254,865.40.

[405] In addition, I find that the plaintiff is not entitled to continue to own shares in Holdings. Holdings is directed to purchase all of the plaintiff's shares at the price of $228.05 and I set aside the Injunction Order of Macaulay J. made June 29, 2011, restraining Holdings from doing so.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 136 of 342

Hawkes v. Leventon Holdings Ltd., 2012 BCSC 1968, 2012 CarswellBC 4033

2012 BCSC 1968, 2012 CarswellBC 4033, [2012] B.C.J. No. 2748...

[406] Holdings is also directed to repay the shareholder loan owed to the plaintiff, in the amount of $58,581.00 together with interest at the rate of 1% over the Bank of Montreal prime rate calculated to the date when other shareholder-employees were repaid their shareholder loans in the same period.

[407] While I have found that Holdings' treatment of the plaintiff was unfairly prejudicial to him as a shareholder of Holdings, I have also found that he is not entitled to any additional remedy other than that set out above as he will be made whole in the above manner.

### Reconsideration Based on Tax Consequences and Mechanics

56    As a second aspect to the plaintiff's application, the plaintiff has filed additional submissions since trial arguing that there are different tax consequences to the plaintiff, depending on the way the purchase of his shares is fashioned, and seeking to have the court make the most favourable orders from a tax standpoint. As a first step, the plaintiff wishes to be able to offer his shares for sale to other shareholders of Holdings at a price of $228.05; and only those shares remaining after that offer would then be sold to Holdings at the same price.

57    The defendants argue that these submissions could have been made during the trial and are not a proper matter for reconsideration.

58    I agree with the defendants.

59    I find that the current proposal of the plaintiff is not supported by the evidence at trial nor the theory of his case as argued at trial.

60    The plaintiff's first position at trial was that he would have held on to his shares after termination of his employment, and that he had a right to do so; his second and alternate position was that if he was forced to sell his shares to Holdings, it should be at a fair market value price and not the price in the BSA. Both positions were argued as remedies for shareholder oppression. The plaintiff's further and alternative argument, in relation to damages for his breach of employment contract, was that if he had to sell his shares, he should be entitled to damages for the loss of the higher share price he would have received as at the end of the period of reasonable notice.

61    There was no evidence at trial that had the plaintiff been given proper notice of dismissal, he would have then chosen to offer to sell his shares to other employees immediately at the low price of $228.05. I do not accept that this is what the plaintiff would have chosen to do.

62    As I have attempted to clarify above, I intended to communicate in the Trial Reasons my finding that but for the Injunction Order, Holdings would have completed its intended re-purchase of the plaintiff's shares at a price of $228.05. I find that it is not an appropriate case to reconsider that conclusion.

63    As for the plaintiff's suggestion that the court make other orders regarding supervising the process for the sale of his shares to Holdings, I do not see the need to do so in anticipation of a hypothetical problem.

64    Lastly, the plaintiff raised an additional matter for re-opening at today's hearing. This has to do with an argument apparently raised in the defendants' factum submitted on appeal, to the effect that implied terms of the employment contract were not sufficiently pleaded. The plaintiff has made the offer to the defendants to re-open the trial to address that issue now, before the trial order is finalized. The defendants submit that they do not wish to do so and that it would be inappropriate to do so. I do not consider it appropriate for me to consider arguments that might be made by either side on appeal. The proper forum for that is of course the Court of Appeal. Given that there is an appeal process, it is important that the present application be very narrowly confined and this is what I have attempted to do.

*Order accordingly.*

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW   Doc 15744-2   Filed 06/12/15   Page 137 of 342

**Hawkes v. Leveton Holdings Ltd., 2012 BCSC 1968, 2012 CarswellBC 4033**

2012 BCSC 1968, 2012 CarswellBC 4033, [2012] B.C.J. No. 2748...

**End of Document**                   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# Tab 18

2012 NSSC 378, 2012 CarswellNS 778, 222 A.C.W.S. (3d) 508

2012 NSSC 378

Nova Scotia Supreme Court

Farm Credit Canada v. Beaumont (Trustee of)

2012 CarswellNS 778, 2012 NSSC 378, 222 A.C.W.S. (3d) 508

# Farm Credit Canada, a body corporate Applicant v. Pricewaterhousecoopers Inc., Trustee in Bankruptcy on behalf of Micah Ronald Beaumont, Micah Ronald Beaumont, carrying on business as Paradise Charolais Farms, Audrey Irene Beaumont, Hatt's Quality Meats Inc., a body corporate, Branch Tree Nursery & Landscaping Incorporated, a body corporate, Respondents

Deborah K. Smith A.C.J.S.C.

Judgment: October 29, 2012
Docket: Hfx 391213

Proceedings: additional reasons to *Farm Credit Canada v. Beaumont (Trustee of)* (2012), 2012 NSSC 356, 2012 CarswellNS 727 (N.S. S.C.)

Counsel: Maurice P. Chiasson, Q.C., Sara Scott, for Applicant
No one for Respondents

Subject: Civil Practice and Procedure; Corporate and Commercial; Insolvency; Property

### Headnote

**Civil practice and procedure --- Judgments and orders — Construction and interpretation**

Clarification of decision — At different times, mortgagors signed two collateral mortgages over three properties to applicant mortgagee as security for three loans — Loans were in significant arrears — Mortgagee brought application for foreclosure, sale and possession of certain properties — Parties made submissions as to which loan agreements were secured by each collateral mortgage, and what property was mortgaged by second collateral mortgage — Issues were determined — Application judge held that only loans that were to be secured by particular mortgage were covered by that mortgage — Application judge held that mortgage amending agreement confirmed which properties were to be mortgaged — Mortgagee made additional submissions requesting clarification of decision — In light of fact that mortgagee was exploring option of appealing decision, it was not appropriate to issue substantive supplementary reasons — Sentence was added to decision that it was unnecessary to decide issue of what property was mortgaged by second collateral mortgage in absence of mortgage amending agreement.

ADDITIONAL REASONS respecting clarification of judgment reported at *Farm Credit Canada v. Beaumont (Trustee of)* (2012), 2012 NSSC 356, 2012 CarswellNS 727 (N.S. S.C.), determining issues regarding mortgages.

*Deborah K. Smith A.C.J.S.C.*:

## Addendum

1    The Applicant seeks clarification in relation to my oral decision given on October 9th, 2012 and released in written form on October 16th, 2012 (see [*Farm Credit Canada v. Beaumont (Trustee of)*] 2012 NSSC 356 (N.S. S.C.)).

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Farm Credit Canada v. Beaumont (Trustee of), 2012 NSSC 378, 2012 CarswellNS 778

2012 NSSC 378, 2012 CarswellNS 778, 222 A.C.W.S. (3d) 508

2    In light of the fact that the Applicant's solicitor has informed me that the Applicant is exploring the option of appealing my decision, I do not consider it to be appropriate (at least in the circumstances of this case) to issue substantive supplementary reasons for my decision. A sentence will be added, however, after the second sentence of paragraph 24 to read "In light of this conclusion, it is unnecessary for me to decide what the result would have been on this issue in the absence of a Mortgage Amending Agreement".

*Order accordingly.*

---

**End of Document**          Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# Tab 19

2007 WL 6382930
Only the Westlaw citation is currently available.
United States District Court,
D. Delaware.

ELAN PHARMA INTERNATIONAL LTD., Plaintiff,

v.

ABRAXIS BIOSCIENCE, INC., Defendant.

C.A. No. 06–438 GMS.   |   Dec. 17, 2007.

## Attorneys and Law Firms

John G. Day, Steven J. Balick, Lauren E. Maguire, Tiffany Geyer Lydon, Ashby & Geddes, Wilmington, DE, Jeffrey D. Sullivan, Baker Botts L.L.P., New York, NY, for Plaintiff.

Josy W. Ingersoll, Elena C. Norman, Jeffrey Thomas Castellano, Karen Elizabeth Keller, Young, Conaway, Stargatt & Taylor, Wilmington, DE, Diana B. Kruze, Emily A. Evans, Paul F. Coyne, Morrison & Foerster LLP, Palo Alto, CA, Jeremy W. Bock, Morrison & Foerster LLP, San Francisco, CA, Eric S. Walters, Michael A. Jacobs, for Defendant.

## *ORDER*

GREGORY M. SLEET, Chief Judge.

**\*1** At Wilmington this 17th day of December, 2007, having reviewed and duly considered the plaintiff's motion for clarification of the court's claim construction Order;

IT IS ORDERED that the plaintiff's motion for clarification of Order construing the terms of U.S. Patent No. 5,834,025 (D.I.307) is DENIED. The court agrees with the defendant that there is no ambiguity in its claim construction Order. The claim construction Order is clear that it is the composition that is intravenously administered at an infusion rate not exceeding 10 mg/min. Thus, the "mg" in 10 mg/min refers to the "nanoparticulate drug composition."

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 20

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 144 of 342

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

2003 SCC 72, 2003 CSC 72
Supreme Court of Canada

Beals v. Saldanha

2003 CarswellOnt 5101, 2003 CarswellOnt 5102, 2003 SCC 72, 2003 CSC 72, [2003] 3 S.C.R. 416, [2003]
S.C.J. No. 77, 113 C.R.R. (2d) 189, 127 A.C.W.S. (3d) 648, 182 O.A.C. 201, 234 D.L.R. (4th) 1, 314 N.R. 209,
39 B.L.R. (3d) 1, 39 C.P.C. (5th) 1, 70 O.R. (3d) 94 (note), 70 O.R. (3d) 94, J.E. 2004-127, REJB 2003-51513

# Geoffrey Saldanha, Leueen Saldanha and Dominic Thivy, Appellants
# v. Frederick H. Beals-III and Patricia A. Beals, Respondents

McLachlin C.J.C., Gonthier, Iacobucci, Major, Bastarache, Binnie, Arbour, LeBel, Deschamps JJ.

Heard: February 20, 2003

Judgment: December 18, 2003 [*]

Docket: 28829

Proceedings: affirming *Beals v. Saldanha* (2001), 2001 CarswellOnt 2286, 54 O.R. (3d) 641, 202 D.L.R. (4th) 630, 148 O.A.C.
1, 10 C.P.C. (5th) 191 (Ont. C.A.); reversing in part *Beals v. Saldanha* (1998), 1998 CarswellOnt 4295, 42 O.R. (3d) 127, 27
C.P.C. (4th) 144 (Ont. Gen. Div.); additional reasons at *Beals v. Saldanha* (1999), 1999 CarswellOnt 19 (Ont. Gen. Div.)

Counsel: J. Brian Casey, Janet E. Mills, Matthew J. Latella for Appellants, Geoffrey and Leueen Saldanha
Neal H. Roth for Appellant, Dominic Thivy
Messod Boussidan, Larry J. Levine, Q.C., Kevin D. Sherkin for Respondents

Subject: International; Constitutional; Insolvency

Headnote

**Conflict of laws --- Enforcement of foreign judgments — Prerequisites for enforcement — Jurisdiction of foreign
court over defendant — General principles**

"Real and substantial connection" test for enforcing interprovincial judgments also applies to enforcing foreign judgments.

**Conflict of laws --- Enforcement of foreign judgments — Types of foreign judgments not enforced — Obtained
by fraud**

Merits of foreign judgment can be challenged for fraud only where allegations are new and not subject of prior adjudication
— "New and material facts" are those facts that defendant could not have discovered and brought to attention of foreign
court through exercise of reasonable diligence — Defendant has burden to show that facts sought to be raised could not
have been discovered by exercise of due diligence before foreign judgment was obtained.

**Conflict of laws --- Enforcement of foreign judgments — Types of foreign judgments not enforced — Contrary to
public policy of lex fori**

Public policy defence depends on whether foreign law is contrary to Canadian view of basic morality — Such defence
would prohibit enforcement of foreign judgment founded on law contrary to fundamental morality of Canadian legal
system, or rendered by foreign court proven to be corrupt or biased — Defence should not be expanded to include perceived
injustices that do not offend Canadians' sense of morality.

**Conflict of laws --- Enforcement of foreign judgments — Defences — Miscellaneous defences**

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 145 of 342

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

Denial of natural justice can be basis of challenge to foreign judgment and if proven will allow domestic court to refuse enforcement — Party seeking to impugn judgment must prove on civil standard that foreign proceedings were contrary to Canadian notion of fundamental justice — Domestic court must be satisfied that minimum standards of fairness have been applied to Ontario defendants by foreign court — Defendant in foreign action has burden of alleging unfairness in foreign legal system.

**Constitutional law --- Charter of Rights and Freedoms — Nature of rights and freedoms — Life, liberty and security — General principles**

Section 7 of Canadian Charter of Rights and Freedoms does not shield Canadian resident from financial effects of enforcement of judgment rendered by Canadian court — Obligation of domestic court to recognize and enforce foreign judgment cannot depend on financial ability of defendant to pay that judgment — Section 7 of Charter does not shield Canadian defendant from enforcement of foreign judgment.

**Droit international privé --- Exécution des jugements étrangers — Conditions préalables à l'exécution — Compétence du tribunal étranger à l'égard du défendeur — Principes généraux**

Critère du « lien réel et substantiel » utilisé pour l'exécution des jugements interprovinciaux s'appliquait également à l'exécution des jugements étrangers.

**Droit international privé --- Exécution des jugements étrangers — Types de jugements étrangers non exécutés — Obtenus par fraude**

Bien-fondé du jugement étranger ne peut être attaqué pour fraude que lorsqu'il s'agit de nouvelles allégations et que celles-ci n'ont pas déjà été tranchées — « Faits substantiels nouveaux » sont des faits que le défendeur, même en faisant preuve de diligence raisonnable, n'aurait pas été en mesure de découvrir et de présenter devant le tribunal étranger — Défendeur a le fardeau de prouver que, même en faisant preuve de diligence raisonnable, il n'aurait pas été en mesure de découvrir les faits avant que le jugement final ne soit rendu.

**Droit international privé --- Exécution des jugements étrangers — Types de jugements étrangers non exécutés — Contraire à la règle d'ordre public lex fori**

Moyen de défense fondé sur l'ordre public repose sur la question de savoir si le droit étranger est contraire aux valeurs morales canadiennes — Un tel moyen de défense empêcherait l'exécution d'un jugement étranger fondé sur des règles de droit contraires aux valeurs morales fondamentales du système judiciaire canadien ou d'un jugement rendu par un tribunal étranger dont on a prouvé qu'il était corrompu ou partial — Moyen de défense ne pouvait être élargi pour inclure les injustices apparentes qui n'offensent pas le sens de la moralité des Canadiens.

**Droit international privé --- Exécution des jugements étrangers — Moyens de défense — Moyens de défense divers**

Jugement étranger peut être contesté sur la base d'un déni de justice naturelle, qui, s'il est prouvé, pourra fonder un tribunal national à refuser l'exécution du jugement — Partie qui attaque le jugement doit démontrer, selon la norme applicable en matière civile, que les procédures étrangères étaient contraires à la notion de justice fondamentale canadienne — Tribunal national doit être convaincu que le tribunal étranger a fait bénéficier les défendeurs ontariens des normes minimales d'équité — Défendeur dans le cadre d'une action à l'étranger a le fardeau d'alléguer l'absence d'équité au sein du système judiciaire étranger.

**Droit constitutionnel --- Charte canadienne des droits et libertés — Nature des droits et libertés — Vie, liberté et sécurité — Principes généraux**

Article 7 de la Charte canadienne des droits et libertés ne protège pas les résidents canadiens des conséquences financières résultant de l'exécution d'un jugement rendu par un tribunal canadien — Obligation du tribunal national de reconnaître et d'exécuter un jugement étranger ne peut reposer sur la capacité financière du défendeur de payer le montant adjugé — Article 7 de la Charte ne protège par le défendeur canadien de l'exécution d'un jugement étranger.

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 146 of 342

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

The plaintiffs brought an action in Florida against the defendants and two others for damages for fraudulent misrepresentation and rescission of a contract of purchase and sale relating to the purchase of a vacant lot owned by the defendants in Florida. The amount of the claim was US $8,000. The pleadings claimed damages in "excess of $5,000" as was customary to give the Circuit Court of Florida monetary jurisdiction. The defendants filed a defence but did not defend later amendments to the action. The effect of this failure was the same as not defending the action. The plaintiffs obtained default judgment. A jury assessed damages and awarded the plaintiffs US $210,000 as compensatory damages, US $50,000 as punitive damages, and post-judgment interest at 12 per cent per year. Relying on legal advice, the defendants neither brought a motion to set aside the default judgment nor appealed from the damages award.

The plaintiffs brought an action in Ontario to enforce the Florida judgment. By the time of the trial, the judgment was worth CAD $800,000. The action was dismissed on the grounds that the Florida judgment had been obtained by fraud in relation to the assessment of damages and that public policy precluded enforcement in Ontario. On appeal by the plaintiffs, it was ruled that there was no denial of natural justice to the defendants in the Florida proceedings, the defence of fraud was not met, and there were no public policy grounds precluding enforcement. The defendants appealed. It had been conceded by the parties at trial and on appeal that Florida had jurisdiction over the action pursuant to the "real and substantial connection" test. The issue of whether the test applies to the enforcement of foreign judgments arose.

**Held:** The appeal was dismissed.

Per Major J. (McLachlin C.J.C., Gonthier, Bastarache, Arbour, Deschamps JJ. concurring): Subject to the legislatures adopting a different approach by way of statute, the "real and substantial connection" test that applies to interprovincial judgments should also apply to the recognition and enforcement of foreign judgments. International comity and the prevalence of international cross-border transactions and movement call for a modernization of private international law. The test requires a significant connection between the cause of action and the foreign court. A defendant can reasonably be brought under the law of a foreign jurisdiction where he/she has participated in something of significance or was actively involved in that foreign jurisdiction. The defendants entered into a property transaction in Florida when buying and selling land. There was a real and substantial connection between the Florida jurisdiction, the subject-matter of the action, and the defendants. In the absence of unfairness or other equally compelling reasons, there is no reason to distinguish between a judgment after trial and a default judgment.

Generally, neither foreign nor domestic judgments will be enforced if obtained by fraud. The distinction between intrinsic and extrinsic fraud should be discontinued. Fraud going to jurisdiction can always be raised before a domestic court to challenge the judgment. The merits of a foreign judgment can be challenged for fraud only where the allegations are new and not the subject of prior adjudication. The domestic court can refuse to recognize a foreign judgment where material facts not previously discoverable arise that potentially challenge the evidence that was before the foreign court. The defendants did not allege that there was evidence of fraud that they could not have discovered had they defended the Florida action. In the absence of newly discovered evidence of fraud, the trial judge erred in admitting evidence that, in his view, established fraud and by failing to limit new and material facts to those facts that could not have been discovered by the defendants exercising reasonable diligence prior to the obtaining of the foreign judgment. There was no evidence before the trial judge to support fraud. There was no evidence that the jury was misled on the extent of the damages. The trial judge made a palpable and overriding error by concluding on the dollar amount of the damages judgment alone that the Florida jury must have been misled.

The defence of natural justice requires that the party seeking to impugn the judgment prove on the civil standard that the foreign proceedings were contrary to Canadian notions of fundamental justice. The defence is restricted to the form of the foreign procedure and to due process. It does not relate to the merits of the case. If the foreign procedure, although valid in the foreign jurisdiction, is not in accord with Canada's concept of natural justice, then the foreign judgment will be rejected. The defendants failed to raise any reasonable apprehension of unfairness. They were fully informed about the

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

Florida action and about the case they were required to meet, and were granted a fair opportunity to do so but failed to defend the action. Their failure to move to set aside or appeal the Florida judgment was not because of a lack of notice but because of reliance upon negligent legal advice. That negligence could not bar the enforcement of the judgment.

The defence of public policy prevents the enforcement of a foreign judgment contrary to the Canadian concept of justice and depends on whether a foreign law is contrary to the Canadian view of basic morality. The defence should continue to have a narrow application. The defence does not bar the enforcement of a judgment rendered by a foreign court with a real and substantial connection to the cause of action for the sole reason that the claim in the foreign jurisdiction would not yield comparable damages in Canada. The award of damages by the Florida jury did not violate Canadian principles of morality such that enforcement would shock the conscience of the reasonable Canadian.

The recognition and enforcement of the Florida judgment by a Canadian court would not violate s. 7 of the Canadian Charter of Rights and Freedoms. Section 7 does not shield a Canadian resident from the financial effects of the enforcement of a judgment rendered by a Canadian court. It should not shield a Canadian defendant from the enforcement of a foreign judgment.

Per Binnie J. (dissenting) (Iacobucci J. concurring): The "real and substantial connection" test is an appropriate conceptual basis for the enforcement of final judgments obtained in foreign jurisdictions. There is no doubt that Florida had jurisdiction in this dispute. The land was located there.

The judgment should not be enforced because the defendants were denied natural justice. They were not sufficiently informed of the case against them to allow them to determine in a reasonable way whether to participate in the Florida action. They were not served with important documents on liability filed in the Florida action before being noted in default, nor were they served with other important documents relevant to the assessment of damages filed after default but before the trial at which judgment was entered against them. After the defendants decided not to defend the case, the case was transformed. The defendants should have been told in general terms of the case they were required to meet on liability and alerted to the jeopardy they faced in terms of damages. The complaint did not adequately convey the importance of the decision to be made by the Florida court. The defendants were not informed that they had to refile their defence every time the plaintiffs amended the complaint against other defendants. The defendants were entitled to assume that in the absence of any new allegations against them, they did not need to refile their defence. A Canadian resident served with a legal process from within his/her own jurisdiction is presumed to know the law and the risks attendant with the notice; however, there is no such presumption across different legal systems. The defendants' failure to move to set aside or appeal the Florida judgment was relevant but not fatal and did not justify the enforcement of the judgment.

Per LeBel J. (dissenting): The "real and substantial connection" test should be modified significantly where it is applied to judgments originating outside Canada. Consideration should be given to the differences between the international and interprovincial contexts, as well as between the rationales that structure Canadian conflicts law in these two spheres. The rules for the recognition and enforcement of foreign judgments should not be as liberal as the interprovincial rule. The connections required before foreign judgments will be enforced should be specified more strictly and in a manner giving due weight to the protection of Canadian defendants without disregarding the legitimate interests of foreign claimants. Consideration should be given to the additional hardship imposed on a defendant who is required to litigate in a foreign country. Section 7 Charter rights are not usually relevant to jurisdictional issues in civil disputes and did not arise in this case.

The test should be interpreted so as to be satisfied even if the court has no connection to the defendant. Jurisdiction should be acknowledged as proper where the forum was a reasonable place to hear the action, taking into account all circumstances including judicial efficiency and the legitimate interests of both parties. The test should ensure that it is not unfair to expect the defendant to litigate in that forum. If the process that led to the judgment was itself unfair, then it is not fair to the defendant to enforce that judgment, even if the forum has very strong connections to the action and appears in every other

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 148 of 342

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

aspect to be the natural place for the action to be heard. It should be part of the plaintiffs' burden in establishing a prima facie case of enforceability to prove that the system from which the judgment came is basically fair. Florida was the natural place for this action to be heard. The plaintiffs lived there, the land was located there, and the defendants were involved in real estate transactions there.

There should be a flexible approach to the categories of defences. The impeachment defences of public policy, fraud, and natural justice should be reformulated.

The public policy defence should be reserved for cases in which the objection is to the law of the foreign forum, rather than the way in which the law was applied, or the size of the award. The defence will arise where the foreign law is contrary to basic morality or the fundamental tenets of justice recognized by the Canadian legal system. The defence was not met in this case. The enforcement of the large award in the absence of a connection to the harm suffered by the plaintiffs and caused by the defendants or to conduct deserving of punishment on the part of the defendants would be contrary to the basic Canadian ideas of justice, but there was no evidence that the laws of Florida offended these principles.

The rule that the defence of fraud must be based on previously undiscovered evidence is a reasonably balanced solution. The distinction between extrinsic and intrinsic fraud is obscure and creates uncertainty. It was possible that a broader test should apply to default judgments where the decision not to participate was a demonstrably reasonable one. A more generous version of the fraud defence ought to be available as required to address the dangers of abuse associated with the loosening of the jurisdiction test to admit a broad category of formerly unenforceable default judgments. The defence of fraud was not met. All of the facts that the defendants raised in this connection were known to them or could have been discovered at the time of the Florida action. This case was appropriate for a more lenient interpretation of the fraud defence because the defendants' decision not to attend the Florida proceedings was a reasonable one. However, given the lack of evidence, the defence could not succeed even on the view that the judgment could be vitiated by proof of intentional fraud.

The defence of natural justice concerns the procedure by which the foreign court reached its decision. If a defendant can establish that the process by which the foreign judgment was obtained was contrary to the Canadian concept of natural justice, then the foreign judgment should not be enforced. The requirements of notice and a hearing should be construed in a purposive and flexible manner. The substantive principles of justice should also be included in the scope of the defence. Notice is adequate when the defendant is given enough information to assess the extent of his/her jeopardy. The obligation of the defendant to pursue remedies available in the originating jurisdiction should be considered. The defendants were not given sufficient notice of the extent and nature of the plaintiffs' claims. The defendants were not given notice of the serious consequences of the failure to refile the defence in response to repeatedly amended pleadings. The defendants' receipt of mistaken legal advice and the failure to use the remedies available in Florida should not relieve the plaintiffs of the consequences of the failure to observe the rules of natural justice and should not bar the defendants from relying on this defence.

Even if the defence did not apply, the judgment should not be enforced. Enforcement would shock the conscience of Canadians and cast a negative light on the Canadian justice system. The defendants did not infringe the plaintiffs' rights and did not deserve such harsh punishment. The defendants acted diligently and in good faith throughout on the basis of the information and advice that they had.

Les demandeurs ont intenté, en Floride, une action en dommages contre les défendeurs et deux autres personnes pour représentation frauduleuse et annulation d'un contrat d'achat et de vente relativement à l'achat d'un terrain vacant, qui appartenait aux défendeurs et était situé en Floride. Le montant réclamé était de 8 000 $US. Les procédures écrites réclamaient des dommages supérieurs à 5 000 $, ainsi qu'il était fait habituellement pour conférer compétence pécuniaire à la Circuit Court de la Floride. Les défendeurs ont déposé une défense, mais n'ont produit aucune défense à l'égard de modifications subséquemment apportées à l'action. Le défaut de le faire n'avait pas la même conséquence que le défaut de produire une défense à l'action. Les demandeurs ont obtenu un jugement par défaut. Un jury a évalué les dommages

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 149 of 342

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

et leur a accordé des dommages compensatoires de 210 000 $US, des dommages punitifs de 50 000 $US et un intérêt après jugement de 12 pour cent par année. Sur la foi d'un avis juridique, les défendeurs n'ont présenté aucune requête en annulation du jugement ni n'ont interjeté appel des dommages octroyés.

Les demandeurs ont intenté une action en Ontario afin de faire exécuter le jugement rendu en Floride. Au moment du procès, le montant adjugé correspondait à 800 000 $CA. L'action a été rejetée au motif que le jugement de la Floride avait été obtenu par fraude, en ce qui concernait l'évaluation des dommages, et que l'ordre public empêchait son exécution en Ontario. À la suite de l'appel des demandeurs, il a été statué que les défendeurs n'avaient fait l'objet d'aucun déni de justice naturelle dans le cadre des procédures intentées en Floride, que le moyen de défense fondé sur la fraude ne pouvait être invoqué et qu'aucune raison d'ordre public n'empêchait l'exécution du jugement. Les défendeurs ont interjeté appel. Les parties ont concédé au procès et en appel que le tribunal de Floride avait compétence pour instruire l'action conformément au critère du « lien réel et substantiel ». La question s'est posée de savoir si ce critère était applicable à l'exécution des jugements étrangers.

**Arrêt:** Le pourvoi a été rejeté.

Major, J. (McLachlin, J.C.C., Gonthier, Bastarache, Arbour et Deschamps, JJ., souscrivant à l'opinion de Major, J.): À moins que les législatures n'adoptent des lois prescrivant une approche différente, le critère du « lien réel et substantiel », applicable aux jugements interprovinciaux, doit également s'appliquer en matière de reconnaissance et d'exécution des jugements étrangers. La courtoisie internationale et la prédominance de la circulation et des opérations transfrontalières internationales commandent une modernisation du droit international privé. Le critère requiert l'existence d'un lien important entre la cause d'action et le tribunal étranger. Il est raisonnable d'assujettir au droit d'un ressort étranger le défendeur qui a été un acteur important ou qui a participé à quelque chose d'important dans ce ressort. Les défendeurs ont conclu une opération immobilière en Floride en achetant et en vendant le terrain. Un lien réel et substantiel existait entre la compétence de la Floride, la cause d'action et les défendeurs. En l'absence d'injustice ou d'autres raisons aussi sérieuses, rien ne justifie d'établir une distinction entre un jugement rendu à l'issue d'un procès et un jugement par défaut.

De façon générale, les jugements obtenus par fraude ne seront pas exécutés, qu'ils soient étrangers ou nationaux. La distinction établie entre la fraude intrinsèque et la fraude extrinsèque doit être écartée. La fraude qui touche la compétence du tribunal peut toujours être soulevée devant un tribunal national afin de contester le jugement. La fraude ne peut être invoquée pour contester le bien-fondé d'un jugement étranger qu'en présence d'allégations nouvelles qui n'ont pas déjà été examinées et tranchées. Un tribunal national peut refuser de reconnaître un jugement étranger lorsque surgissent de faits substantiels nouveaux qui n'auraient pu être découverts avant et qui sont susceptibles de mettre en doute la preuve dont a été saisi le tribunal étranger. Les défendeurs n'ont allégué l'existence d'aucune preuve de fraude qu'ils n'auraient pas été en mesure de découvrir s'ils s'étaient défendus à l'égard de l'action en Floride. En l'absence d'une nouvelle preuve de fraude, fraîchement découverte, le juge de première instance a commis une erreur en admettant une preuve qui, selon lui, établissait l'existence d'une fraude et en ne limitant pas les faits substantiels nouveaux à ceux que les défendeurs n'auraient pas été en mesure de découvrir en faisant preuve de diligence raisonnable avant que le jugement étranger ne soit rendu. Rien de ce qui avait été mis en preuve devant le juge de première instance ne permettait d'appuyer la fraude alléguée. Il n'y avait aucune preuve que le jury avait été induit en erreur relativement à l'étendue des dommages. Le juge de première instance a commis une erreur manifeste et dominante en concluant que le montant des dommages accordés démontrait à lui seul que le jury avait nécessairement été induit en erreur.

Le moyen de défense fondé sur la justice naturelle exige de la partie qui attaque le jugement de prouver, selon la norme applicable en matière civile, que les procédures étrangères ont été engagées de façon contraire à la notion de justice fondamentale canadienne. Le moyen de défense se limite à la forme de la procédure étrangère et à l'application régulière de la loi. Cela n'a rien à voir avec le bien-fondé de la cause. L'exécution du jugement sera refusée si la procédure étrangère ne respecte pas la notion canadienne de la justice naturelle, même si la procédure est valide dans la juridiction étrangère. Les défendeurs n'ont prouvé aucune crainte raisonnable d'injustice. Ils n'ont pas contesté l'action, même s'ils étaient très

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 150 of 342

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

bien informés de l'action intentée en Floride, de la preuve à réfuter, et ils ont eu une possibilité raisonnable de le faire. Leur défaut de demander l'annulation du jugement rendu en Floride ou de le porter en appel résultait non pas de l'absence d'avis, mais plutôt du fait qu'ils avaient suivi les conseils erronés d'un avocat. Cette négligence ne pouvait empêcher l'exécution du jugement.

Le moyen de défense fondé sur l'ordre public empêche l'exécution d'un jugement étranger contraire à la notion de justice canadienne et repose sur la question de savoir si le droit étranger est contraire aux valeurs morales canadiennes. Le moyen de défense devrait continuer de recevoir une application restreinte. Il n'empêche pas l'exécution d'un jugement rendu par un tribunal étranger, qui a un lien réel et substantiel avec la cause d'action, pour le seul motif que la demande présentée dans ce ressort étranger ne donnerait pas lieu à des dommages-intérêts comparables au Canada. Le montant des dommages accordés par le jury de la Floride ne portait pas atteinte à nos valeurs morales à un point tel que l'exécution du jugement choquerait la conscience d'un Canadien raisonnable.

Le fait pour un tribunal canadien de reconnaître et d'exécuter un jugement étranger ne porte pas atteinte à l'art. 7 de la Charte canadienne des droits et libertés. L'article 7 ne protège pas le citoyen canadien des conséquences financières de l'exécution d'un jugement rendu par un tribunal canadien. Il ne devrait pas non plus protéger un défendeur canadien de l'exécution d'un jugement étranger.

Binnie, J., dissident (Iacobucci, J., souscrivant à l'opinion de Binnie, J.): Le critère du « lien réel et substantiel » fournit un fondement conceptuel approprié pour exécuter au Canada les jugements définitifs obtenus dans des ressorts étrangers. Il n'y avait aucun doute que la Floride avait compétence dans ce litige. Le terrain y était situé.

Le jugement ne devrait pas être exécuté parce que les défendeurs ont fait l'objet d'un déni de justice naturelle. L'avis reçu par les défendeurs au sujet du risque auquel ils étaient exposés ne suffisait pas pour qu'ils soient en mesure de décider raisonnablement s'il devaient participer à l'action intentée en Floride. Plusieurs documents concernant la responsabilité, déposés dans le cadre de l'action en Floride, ne leur ont pas été signifiés avant le prononcé du jugement par défaut; ils n'ont pas non plus reçu signification d'autres documents importants relativement à l'évaluation des dommages, lesquels documents ont été déposés après le jugement par défaut, mais avant le procès au terme duquel jugement a été rendu contre eux. La preuve a été modifiée, après que les défendeurs eurent décidé de ne pas contester la preuve déposée contre eux. Les défendeurs auraient dû être avertis de façon générale de leur fardeau de preuve en matière de responsabilité et informés des dommages-intérêts auxquels ils risquaient d'être condamnés. La plainte ne permettait pas aux défendeurs de saisir la gravité de la décision que pourrait rendre le tribunal de la Floride. Les défendeurs n'ont pas été avisés du fait qu'ils devaient déposer une nouvelle défense chaque fois que les demandeurs modifiaient leur plainte contre d'autres défendeurs. Ils étaient en droit de présumer que, en l'absence de nouvelles allégations les visant, ils n'avaient pas besoin de produire à nouveau une défense. Le résident canadien qui reçoit signification de procédures judiciaires émanant de son propre ressort est présumé connaître la loi applicable et les risques que suppose l'avis qui lui est alors donné; cette présomption ne s'applique cependant pas lorsqu'un régime juridique différent est en cause. Le défaut des défendeurs de demander l'annulation du jugement de la Floride ou de le porter en appel était certes pertinent, mais il n'était pas fatal et ne justifiait aucunement d'accorder l'exécution du jugement.

LeBel, J., (dissident): Il y a lieu de modifier sensiblement le critère du « lien réel et substantiel » lorsqu'il est appliqué à des jugements émanant de l'extérieur du Canada. Il faut tenir compte des différences qui existent entre les contextes international et interprovincial, de même qu'entre les raisonnements qui définissent le droit international privé canadien à ces deux égards. Les règles applicables en matière de reconnaissance et d'exécution de jugements étrangers ne devraient pas être aussi libérales que la règle interprovinciale. Les liens nécessaires à l'exécution de ces jugements doivent être précisés davantage de manière à donner à la protection des défendeurs canadiens toute l'importance qu'elle mérite, sans pour autant négliger les intérêts légitimes des demandeurs étrangers. Il faut tenir compte des difficultés additionnelles auxquelles doit faire face un défendeur qui doit se défendre dans un pays étranger. Les droits protégés par l'art. 7 ne sont généralement pas pertinents aux questions de compétence dans le cadre de litiges civils et ne trouvaient pas application en l'espèce.

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 151 of 342

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

Le critère devrait être interprété de façon à ce qu'il soit respecté même s'il n'y a aucun lien avec le défendeur. On devrait reconnaître la compétence d'un ressort, lorsque celui-ci est un endroit raisonnable pour instruire l'action, compte tenu de l'ensemble des circonstances, notamment de l'efficacité du système judiciaire et des intérêts légitimes des deux parties. Le critère devrait contribuer à assurer qu'il n'est pas déraisonnable de s'attendre à ce que le défendeur plaide dans ce ressort. Lorsque la procédure suivie pour rendre le jugement en cause était inéquitable en soi, il est alors injuste d'imposer au défendeur l'exécution du jugement, même si des liens très solides rattachent l'action au ressort et que ce dernier paraît être, à tous autres égards, l'endroit logique pour l'instruction de l'instance. En s'acquittant de l'obligation d'établir une preuve prima facie de la force exécutoire, le demandeur doit notamment démontrer le caractère foncièrement équitable du régime juridique d'où émane cette décision. La Floride était le lieu naturel pour entendre l'action. Les demandeurs y vivaient, le terrain y était situé et les défendeurs ont participé là à des transactions immobilières.

Il faudrait appliquer une approche plus souple aux catégories de moyens de défense. Les moyens de défense fondés sur l'ordre public, la fraude et la justice naturelle, soit ceux qui consistent à attaquer la validité du jugement, devraient être reformulés.

Le moyen de défense fondé sur l'ordre public ne devrait pouvoir être utilisé que dans le cadre d'affaires où l'objection vise le droit applicable dans le ressort étranger et non la manière dont ce droit a été appliqué ou le montant des dommages-intérêts qui a été accordé. Ce moyen de défense pourra être invoqué lorsque le droit étranger est contraire aux valeurs morales fondamentales ou aux principes fondamentaux de justice reconnus par le système judiciaire canadien. Il n'était pas possible d'invoquer ce moyen de défense en l'espèce. À défaut d'un lien soit avec un préjudice causé aux demandeurs par les défendeurs, soit avec une conduite des défendeurs qui méritait d'être punie, l'exécution d'un jugement accordant un montant de dommages-intérêts élevé serait contraire aux notions de justice fondamentale canadiennes; rien ne prouvait cependant que les lois de la Floride violaient ces principes.

La règle voulant que le moyen de défense fondé sur la fraude ne puisse être invoqué qu'à la lumière d'éléments de preuve impossibles à découvrir antérieurement représente un juste milieu raisonnable. La distinction entre la fraude extrinsèque et la fraude intrinsèque est une distinction obscure qui crée de l'incertitude. Il était possible d'appliquer un critère plus large aux jugements par défaut, dans les situations où la décision du défendeur de ne pas participer à l'instance était manifestement raisonnable. On devrait pouvoir invoquer une version plus généreuse du moyen de défense fondé sur la fraude lorsque cela s'avère nécessaire pour réduire les risques d'abus liés à l'assouplissement du critère de compétence, qui permet désormais la reconnaissance d'une large catégorie de jugements par défaut auparavant inexécutoires. Le moyen de défense fondé sur la fraude ne pouvait être invoqué en l'espèce. Tous les faits évoqués par les défendeurs à l'appui de ce moyen de défense étaient connus d'eux ou auraient pu être découverts à l'époque de l'action en Floride. Il s'agissait d'un cas où il était approprié de donner une interprétation plus généreuse du moyen de défense fondé sur la fraude, parce que la décision des défendeurs de ne pas participer aux procédures en Floride était raisonnable. Par ailleurs, en l'absence de preuve, la défense ne pouvait invoquer avec succès ce moyen de défense même en tenant pour acquis que le jugement serait vicié si on pouvait établir l'existence d'une fraude commise délibérément.

Le moyen de défense fondé sur la justice naturelle vise la procédure que le tribunal étranger a suivie pour rendre sa décision. Si le défendeur arrive à prouver que la procédure suivie pour obtenir le jugement étranger était contraire aux principes de justice naturelle canadiens, le jugement étranger ne devrait alors pas être exécuté. Les exigences en matière d'avis et d'audience doivent recevoir une interprétation téléologique et souple. Ce moyen de défense doit également englober les principes de justice substantiels. L'avis est suffisant lorsque le défendeur reçoit assez de renseignements pour pouvoir mesurer l'ampleur du risque auquel il est exposé. Il faut également tenir compte de l'obligation qu'a le défendeur d'exercer les recours disponibles dans le ressort d'origine. Les défendeurs n'ont pas suffisamment été avertis de l'étendue et de la nature des allégations formulées par les demandeurs. Les défendeurs n'ont pas été avisés des risques sérieux auxquels les exposerait le défaut de déposer à nouveau leur défense pour répondre aux actes de procédure maintes fois modifiés. Le fait que les défendeurs avaient reçu des conseils juridiques erronés et qu'ils avaient omis d'exercer les recours existant en

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW   Doc 15744-2   Filed 06/12/15   Page 152 of 342

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

Floride ne devrait ni soustraire le demandeur à toutes les conséquences d'une violation des règles de justice naturelle, ni empêcher les défendeurs d'invoquer ce moyen de défense.

Le jugement ne devrait pas être exécuté, même si ce moyen de défense ne trouvait pas application. Son exécution choquerait la conscience des Canadiens et jetterait une ombre sur le système judiciaire canadien. Les défendeurs n'ont pas violé les droits des demandeurs et ne méritaient pas d'être aussi sévèrement punis. Ils ont agi avec diligence et bonne foi en tout temps, compte tenu des informations et des conseils reçus.

**Table of Authorities**

**Cases considered by *Major J.*:**

*Hunt v. T & N plc* (1993), [1994] 1 W.W.R. 129, 21 C.P.C. (3d) 269, *(sub nom. Hunt v. Lac d'Amiante du Québec Ltée)* 37 B.C.A.C. 161, *(sub nom. Hunt v. Lac d'Amiante du Québec Ltée)* 60 W.A.C. 161, *(sub nom. Hunt v. T&N plc)* 109 D.L.R. (4th) 16, 85 B.C.L.R. (2d) 1, *(sub nom. Hunt v. Lac d'Amiante du Québec Ltée)* 161 N.R. 81, *(sub nom. Hunt v. T&N plc)* [1993] 4 S.C.R. 289, 1993 CarswellBC 1271, 1993 CarswellBC 294 (S.C.C.) — followed

*Indyka v. Indyka* (1967), [1967] 2 All E.R. 689, [1969] 1 A.C. 33, [1967] 3 W.L.R. 510 (U.K. H.L.) — referred to

*Jacobs v. Beaver* (1908), 17 O.L.R. 496 (Ont. C.A.) — considered

*Moran v. Pyle National (Canada) Ltd.* (1973), [1975] 1 S.C.R. 393, [1974] 2 W.W.R. 586, 43 D.L.R. (3d) 239, 1 N.R. 122, 1973 CarswellSask 132, 1973 CarswellSask 146 (S.C.C.) — considered

*Morguard Investments Ltd. v. De Savoye* (1990), 46 C.P.C. (2d) 1, 15 R.P.R. (2d) 1, 76 D.L.R. (4th) 256, 122 N.R. 81, [1991] 2 W.W.R. 217, 52 B.C.L.R. (2d) 160, [1990] 3 S.C.R. 1077, 1990 CarswellBC 283, 1990 CarswellBC 767 (S.C.C.) — followed

*Moses v. Shore Boat Builders Ltd.* (1993), 83 B.C.L.R. (2d) 177, 35 B.C.A.C. 146, 57 W.A.C. 146, 19 C.P.C. (3d) 219, [1994] 1 W.W.R. 112, 106 D.L.R. (4th) 654, 1993 CarswellBC 241, [1994] I.L.Pr. 747 (B.C. C.A.) — referred to

*Moses v. Shore Boat Builders Ltd.* (1994), [1994] 2 W.W.R. lxv, 23 C.P.C. (3d) 294 (note), 87 B.C.L.R. (2d) xxxii (note), 172 N.R. 157 (note), 109 D.L.R. (4th) vii (S.C.C.) — referred to

*Muscutt v. Courcelles* (2002), 2002 CarswellOnt 1756, 213 D.L.R. (4th) 577, 160 O.A.C. 1, 60 O.R. (3d) 20, 13 C.C.L.T. (3d) 161, 26 C.P.C. (5th) 206 (Ont. C.A.) — referred to

*Old North State Brewing Co. v. Newlands Services Inc.* (1998), 1998 CarswellBC 2294, 113 B.C.A.C. 186, 184 W.A.C. 186, 23 C.P.C. (4th) 217, 41 B.L.R. (2d) 191, 58 B.C.L.R. (3d) 144, [1999] 4 W.W.R. 573 (B.C. C.A.) — referred to

*Powell v. Cockburn* (1976), [1977] 2 S.C.R. 218, 22 R.F.L. 155, 8 N.R. 215, 68 D.L.R. (3d) 700, 1976 CarswellOnt 114, 1976 CarswellOnt 403 (S.C.C.) — considered

*Roglass Consultants Inc. v. Kennedy* (1984), 65 B.C.L.R. 393, 1984 CarswellBC 475 (B.C. C.A.) — considered

*Spar Aerospace Ltd. v. American Mobile Satellite Corp.* (2002), [2002] 4 S.C.R. 205, 220 D.L.R. (4th) 54, 297 N.R. 83, 2002 SCC 78, 2002 CarswellQue 2593, 2002 CarswellQue 2594, 28 C.P.C. (5th) 201 (S.C.C.) — considered

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 153 of 342

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

*United States v. Ivey* (1996), 30 O.R. (3d) 370, 27 B.L.R. (2d) 243, 21 C.E.L.R. (N.S.) 92, 139 D.L.R. (4th) 570, 93 O.A.C. 152, 1996 CarswellOnt 3586 (Ont. C.A.) — referred to

*Woodruff v. McLennan* (1887), 14 O.A.R. 242 (Ont. C.A.) — considered

**Cases considered by *Binnie J.* (dissenting):**

*Adams v. Cape Industries Plc* (1989), [1990] 1 Ch. 433, [1991] 1 All E.R. 929, [1990] 2 W.L.R. 657 (Eng. C.A.) — considered

*Baker v. Canada (Minister of Citizenship & Immigration)* (1999), 174 D.L.R. (4th) 193, 1999 CarswellNat 1124, 1999 CarswellNat 1125, 243 N.R. 22, 1 Imm. L.R. (3d) 1, 14 Admin. L.R. (3d) 173, [1999] 2 S.C.R. 817 (S.C.C.) — considered

*Hunt v. T & N plc* (1993), [1994] 1 W.W.R. 129, 21 C.P.C. (3d) 269, *(sub nom. Hunt v. Lac d'Amiante du Québec Ltée)* 37 B.C.A.C. 161, *(sub nom. Hunt v. Lac d'Amiante du Québec Ltée)* 60 W.A.C. 161, *(sub nom. Hunt v. T&N plc)* 109 D.L.R. (4th) 16, 85 B.C.L.R. (2d) 1, *(sub nom. Hunt v. Lac d'Amiante du Québec Ltée)* 161 N.R. 81, *(sub nom. Hunt v. T&N plc)* [1993] 4 S.C.R. 289, 1993 CarswellBC 1271, 1993 CarswellBC 294 (S.C.C.) — considered

*Morguard Investments Ltd. v. De Savoye* (1990), 46 C.P.C. (2d) 1, 15 R.P.R. (2d) 1, 76 D.L.R. (4th) 256, 122 N.R. 81, [1991] 2 W.W.R. 217, 52 B.C.L.R. (2d) 160, [1990] 3 S.C.R. 1077, 1990 CarswellBC 283, 1990 CarswellBC 767 (S.C.C.) — considered

*Spar Aerospace Ltd. v. American Mobile Satellite Corp.* (2002), [2002] 4 S.C.R. 205, 220 D.L.R. (4th) 54, 297 N.R. 83, 2002 SCC 78, 2002 CarswellQue 2593, 2002 CarswellQue 2594, 28 C.P.C. (5th) 201 (S.C.C.) — referred to

*Tolofson v. Jensen* (1994), [1995] 1 W.W.R. 609, 22 C.C.L.T. (2d) 173, 100 B.C.L.R. (2d) 1, 32 C.P.C. (3d) 141, 7 M.V.R. (3d) 202, 26 C.C.L.I. (2d) 1, 175 N.R. 161, 120 D.L.R. (4th) 289, *(sub nom. Lucas (Litigation Guardian of) v. Gagnon)* [1994] 3 S.C.R. 1022, 77 O.A.C. 81, 51 B.C.A.C. 241, 84 W.A.C. 241, 1994 CarswellBC 1, 1994 CarswellBC 2578 (S.C.C.) — considered

**Cases considered by *LeBel J.* (dissenting):**

*Abouloff v. Oppenheimer & Co.* (1882), 10 Q.B.D. 295 (Eng. C.A.) — considered

*Adams v. Cape Industries Plc* (1989), [1990] 1 Ch. 433, [1991] 1 All E.R. 929, [1990] 2 W.L.R. 657 (Eng. C.A.) — considered

*BMW of North America Inc. v. Gore* (1996), 134 L.Ed.2d 809, 517 U.S. 559, 116 S.Ct. 1589, 64 U.S.L.W. 4335 (U.S. Ala.) — considered

*Boardwalk Regency Corp. v. Maalouf* (1992), 6 O.R. (3d) 737, 88 D.L.R. (4th) 612, 51 O.A.C. 64, 1992 CarswellOnt 1299 (Ont. C.A.) — considered

*Duchess of Kingston's Case, Re* (1776), 168 E.R. 175, 20 State Tr. 619, 20 State Tr. 355, 1 Leach 146, 20 State Tr. 335, 2 Smith L.C. 644 (Eng. C.C.R.) — considered

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 154 of 342

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

*Emmanuel v. Symon* (1907), [1908] 1 K.B. 302, 77 L.J.K.B. 180, 98 L.T. 304, 24 T.L.R. 85 (Eng. C.A.) — considered

*Gauthier Manufacturing Ltd. v. Pont Viau (City)* (1978), *(sub nom. Cité de Pont Viau v. Gauthier Mfg. Ltd.)* [1978] 2 S.C.R. 516, 21 N.R. 192, 1978 CarswellQue 128, 1978 CarswellQue 128F (S.C.C.) — considered

*Hilton v. Guyot* (1895), 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (U.S. N.Y.) — considered

*Hunt v. T & N plc* (1993), [1994] 1 W.W.R. 129, 21 C.P.C. (3d) 269, *(sub nom. Hunt v. Lac d'Amiante du Québec Ltée)* 37 B.C.A.C. 161, *(sub nom. Hunt v. Lac d'Amiante du Québec Ltée)* 60 W.A.C. 161, *(sub nom. Hunt v. T&N plc)* 109 D.L.R. (4th) 16, 85 B.C.L.R. (2d) 1, *(sub nom. Hunt v. Lac d'Amiante du Québec Ltée)* 161 N.R. 81, *(sub nom. Hunt v. T&N plc)* [1993] 4 S.C.R. 289, 1993 CarswellBC 1271, 1993 CarswellBC 294 (S.C.C.) — considered

*Jacobs v. Beaver* (1908), 17 O.L.R. 496 (Ont. C.A.) — considered

*Kidron v. Grean* (1996), 48 O.R. (3d) 775, 1996 CarswellOnt 5559 (Ont. Gen. Div.) — referred to

*Loewen Group Inc. v. United States of America* (June 26, 2003), Doc. ARB(AF)/98/3 (U.S. Miss.) — considered

*Mercandino v. Devoe & Raynolds Inc.* (1981), 436 A.2d 942, 181 N.J. Super. 105 (U.S. N.J. Super. A.D.) — referred to

*Moran v. Pyle National (Canada) Ltd.* (1973), [1975] 1 S.C.R. 393, [1974] 2 W.W.R. 586, 43 D.L.R. (3d) 239, 1 N.R. 122, 1973 CarswellSask 132, 1973 CarswellSask 146 (S.C.C.) — considered

*Morguard Investments Ltd. v. De Savoye* (1990), 46 C.P.C. (2d) 1, 15 R.P.R. (2d) 1, 76 D.L.R. (4th) 256, 122 N.R. 81, [1991] 2 W.W.R. 217, 52 B.C.L.R. (2d) 160, [1990] 3 S.C.R. 1077, 1990 CarswellBC 283, 1990 CarswellBC 767 (S.C.C.) — considered

*Owens Bank Ltd. v. Bracco* (1992), [1992] 2 All E.R. 193 (U.K. H.L.) — considered

*Powell v. Cockburn* (1976), [1977] 2 S.C.R. 218, 22 R.F.L. 155, 8 N.R. 215, 68 D.L.R. (3d) 700, 1976 CarswellOnt 114, 1976 CarswellOnt 403 (S.C.C.) — considered

*Spar Aerospace Ltd. v. American Mobile Satellite Corp.* (2002), [2002] 4 S.C.R. 205, 220 D.L.R. (4th) 54, 297 N.R. 83, 2002 SCC 78, 2002 CarswellQue 2593, 2002 CarswellQue 2594, 28 C.P.C. (5th) 201 (S.C.C.) — considered

*United States v. Ivey* (1995), 27 B.L.R. (2d) 221, 18 C.E.L.R. (N.S.) 157, 130 D.L.R. (4th) 674, 26 O.R. (3d) 533, 1995 CarswellOnt 1656 (Ont. Gen. Div.) — considered

*Woodruff v. McLennan* (1887), 14 O.A.R. 242 (Ont. C.A.) — considered

*Yahoo! Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme* (2001), 169 F.Supp.2d 1181, 30 Media L. Rep. 1001 (U.S. N.D. Cal.) — considered

**Statutes considered by *Major J.*:**

*Canadian Charter of Rights and Freedoms*, Part I of the Constitution Act, 1982, being Schedule B to the Canada Act 1982 (U.K.), 1982, c. 11

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 155 of 342

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

Generally — referred to

s. 7 — considered

**Statutes considered by *LeBel J.* (dissenting):**

*Canadian Charter of Rights and Freedoms*, Part I of the Constitution Act, 1982, being Schedule B to the Canada Act 1982 (U.K.), 1982, c. 11
Generally — referred to

s. 7 — referred to

*Code civil du Québec*, L.Q. 1991, c. 64
en général — referred to

*Constitution Act, 1982*, being Schedule B to the Canada Act 1982 (U.K.), 1982, c. 11, reprinted R.S.C. 1985, App. II, No. 44
Generally — referred to

*United States Constitution*
Generally — referred to

*United States Constitution, Fifth Amendment*
Generally — referred to

*United States Constitution, Fourteenth Amendment*, 1868
Generally — referred to

**Rules considered by *Binnie J.* (dissenting):**

*Florida Rules of Civil Procedure*, Fla. R. Civ. P.
R. 1.190(a) — referred to

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194
Generally — referred to

R. 19.02(3) — referred to

**Words and phrases considered:**

**INTRINSIC FRAUD**

[Per Major J. (McLachlin C.J.C., Gonthier, Bastarache, Arbour, Deschamps JJ. concurring):] Courts have drawn a distinction between "intrinsic fraud" and "extrinsic fraud" in an attempt to clarify the types of fraud that can vitiate the judgment of a foreign court. Extrinsic fraud is identified as fraud going to the jurisdiction of the issuing court or the kind of fraud that misleads the court, foreign or domestic, into believing that it has jurisdiction over the cause of action. Evidence of this kind of fraud, if accepted, will justify setting aside the judgment. On the other hand, intrinsic fraud is fraud which goes to the merits of the case and to the existence of a cause of action. The extent to which evidence of intrinsic fraud can act as a defence to the recognition of a judgment has not been as clear as that of extrinsic fraud.

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 156 of 342

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

Termes et locutions cités

**FRAUDE INTRINSÈQUE**

[Major, J. (McLachlin, J.C.C., Gonthier, Bastarache, Arbour, Deschamps, souscrivant à l'opinion de Major, J.):] Afin de clarifier les types de fraude susceptibles de vicier un jugement étranger, les tribunaux ont établi une distinction entre la « fraude intrinsèque » et la « fraude extrinsèque ». La fraude extrinsèque est décrite comme celle qui touche la compétence du tribunal d'origine ou comme le type de fraude qui amène à tort le tribunal étranger ou national à croire que la cause d'action relève de sa compétence. Si elle est retenue, la preuve de ce type de fraude justifie l'annulation du jugement. Par ailleurs, la fraude intrinsèque est celle qui touche le bien-fondé de l'affaire et l'existence d'une cause d'action. La mesure dans laquelle la preuve d'une fraude intrinsèque peut être opposée à la reconnaissance d'un jugement n'est pas aussi claire que dans le cas d'une preuve de fraude extrinsèque.

APPEAL from judgment reported at (2001), 2001 CarswellOnt 2286, [2001] O.J. No. 2586, 54 O.R. (3d) 641, 202 D.L.R. (4th) 630, 148 O.A.C. 1, 10 C.P.C. (5th) 191 (Ont. C.A.), reversing refusal to enforce foreign judgment.

POURVOI à l'encontre de l'arrêt publié à (2001), 2001 CarswellOnt 2286, [2001] O.J. No. 2586, 54 O.R. (3d) 641, 202 D.L.R. (4th) 630, 148 O.A.C. 1, 10 C.P.C. (5th) 191 (C.A. Ont.), qui a infirmé le jugement refusant l'exécution d'un jugement étranger.

*Major J.*:

## I. Introduction

1    The rules related to the recognition and enforcement of foreign judgments by Canadian courts are the focus of this appeal. "Foreign" in the context of this case refers to a judgment rendered by a court outside Canada, as opposed to an interprovincial judgment.

2    The appellants, residents of Ontario, were the owners of a vacant lot in Sarasota County, Florida. They sold the lot to the respondents. A dispute arose as a result of that transaction. The respondents eventually commenced two actions against the appellants in Florida. Only the second action is relevant to this appeal. The appellants received notice at all stages of the litigation and defended the first action, which was dismissed without prejudice. A defence was filed to the second action without the knowledge of the Saldanhas.

3    The appellants chose not to defend any of the three subsequent amendments to the second action. Pursuant to Florida law, the failure to defend the amendments had the effect of not defending the second action and the appellants were subsequently noted in default. Damages of US $260,000 were awarded by a jury convened to assess damages. The damages were not paid and an action was started in Ontario to enforce the Florida judgment.

4    We have to first determine the circumstances under which a foreign judgment shall be recognized and enforced in Canada. Next, the nature and scope of the defences available to the judgment debtor must be established. For the purposes of these reasons, I assume the laws of other Canadian provinces are substantially the same as in Ontario and for that reason, Canada and Ontario are used interchangeably. A future case involving another part of Canada will be considered in light of whatever differences, if any, exist there.

## II. Facts

5    The appellants were Ontario residents. In 1981, they and Rose Thivy, who is Dominic Thivy's wife and no longer a party to this action, purchased a lot in Florida for US $4,000. Three years later, Rose Thivy was contacted by a real estate agent acting for the respondents as well as for William and Susanne Foody (who assigned their interest to the Beals' and are no longer parties to this action) enquiring about purchasing the lot. In the name of her co-owners, Mrs. Thivy advised the agent that they would sell the lot for US $8,000. The written offer erroneously referred to "Lot 1" as the lot being purchased instead of "Lot 2". Rose

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 157 of 342

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

Thivy advised the real estate agent of the error and subsequently changed the number of the lot on the offer to "Lot 2". The amended offer was accepted and "Lot 2" was transferred to the respondents and the Foodys.

6    The respondents had purchased the lot in question in order to construct a model home for their construction business. Some months later, the respondents learned that they had been building on Lot 1, a lot that they did not own. In February 1985, the respondents commenced what was the first action in Charlotte County, Florida, for "damages which exceeds $5,000". This was a customary way of pleading in Florida to give the Circuit Court monetary jurisdiction. The appellants, representing themselves, filed a defence. In September 1986, the appellants were notified that that action had been dismissed voluntarily and without prejudice because it had been brought in the wrong county.

7    In September 1986, a second action ("Complaint") was commenced by the respondents in the Circuit Court for Sarasota County, Florida. That Complaint was served on the appellants, in Ontario, to rescind the contract of purchase and sale and claimed damages in excess of US $5,000, treble damages and other relief authorized by statute in Florida. This complaint was identical to that in the first action except for the addition of allegations of fraud. Shortly thereafter, an Amended Complaint, simply deleting one of the defendants, was served on the appellants. A statement of defence (a duplicate of the defence filed in the first action) was filed by Mrs. Thivy on behalf of the appellants. The trial judge accepted the evidence of the Saldanhas that they had not signed the document. Accordingly, the Saldanhas were found not to have attorned. As discussed further in these reasons, Dominic Thivy's situation differs.

8    In May 1987, the respondents served a Second Amended Complaint which modified allegations brought against a co-defendant who is no longer a party, but included all the earlier allegations brought against the appellants. No defence was filed. A Third Amended Complaint was served on the appellants on May 7, 1990 and again, no defence was filed. Under Florida law, the appellants were required to file a defence to each new amended complaint; otherwise, they risked being noted in default. A motion to note the appellants in default for their failure to file a defence to the Third Amended Complaint and a notice of hearing were served on the appellants in June 1990. The appellants did not respond to this notice. On July 25, 1990, a Florida court entered "default" against the appellants, the effect of which, under Florida law, was that they were deemed to have admitted the allegations contained in the Third Amended Complaint.

9    The appellants were served with notice of a jury trial to establish damages. They did not respond to the notice nor did they attend the trial held in December 1991. Mr. Foody, the respondent Mr. Beals, and an expert witness on business losses testified at the trial. The jury awarded the respondents damages of US $210,000 in compensatory damages and US $50,000 punitive damages, plus post-judgment interest of 12% per annum. Notice of the monetary judgment was received by the appellants in late December 1991.

10    Upon receipt of the notice of the monetary judgment against them, the Saldanhas sought legal advice. They were advised by an Ontario lawyer that the foreign judgment could not be enforced in Ontario because the appellants had not attorned to the Florida court's jurisdiction. Relying on this advice, the appellants took no steps to have the judgment set aside, as they were entitled to try and do under Florida law, or to appeal the judgment in Florida. Florida law permitted the appellants ten days to commence an appeal and up to one year to bring a motion to have the judgment obtained there set aside on the grounds of "excusable neglect", "fraud" or "other misconduct of an adverse party".

11    In 1993, the respondents brought an action before the Ontario Court (General Division) seeking the enforcement of the Florida judgment. By the time of the hearing before that court, in 1998, the foreign judgment, with interest, had grown to approximately C $800,000. The trial judge dismissed the action for enforcement on the ground that there had been fraud in relation to the assessment of damages and for the additional reason of public policy. The Ontario Court of Appeal, Weiler J.A. dissenting, allowed the appeal.

### III. Judgments Below

#### A. Ontario Court (General Division) (1998), 42 O.R. (3d) 127 (Ont. Gen. Div.)

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 158 of 342

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

12    The trial judge declared the Florida judgment unenforceable in Ontario. Having concluded from the verdict of the Florida jury that it had not been made aware of certain facts, the trial judge dismissed the action on the basis of fraud. He also held that the judgment was unenforceable on the grounds of public policy. The trial judge recommended that the defence of public policy be broadened to include a "judicial sniff test" which would permit a domestic court to refuse enforcement of a foreign judgment in cases where the facts did not satisfy any of the three existing defences to enforcement but were nevertheless egregious.

**B. Ontario Court of Appeal (2001), 54 O.R. (3d) 641 (Ont. C.A.)**

13    A majority of the Ontario Court of Appeal allowed the appeal. Doherty and Catzman JJ.A. concluded that neither the defence of fraud nor of public policy had application to this case.

14    As to the defence of fraud, Doherty J.A. held that that defence was only available where the allegations of fraud rest on "newly discovered facts", that is, facts that a defendant could not have discovered through the exercise of reasonable diligence prior to the granting of the judgment. He concluded that the trial judge erred in relying on assumed facts that conceivably might have been uncovered by the appellants had they chosen to participate in the Florida proceedings. Even if the trial judge had correctly defined the defence of fraud, Doherty J.A. held that there was no evidence that the judgment had been obtained by fraud.

15    On the defence of public policy, Doherty J.A. rejected the need to incorporate a "judicial sniff test" as part of that defence. Assuming a "sniff test" was required, he held that no reasons existed in this appeal for public policy to preclude the enforcement of the foreign judgment. He stated (at para. 84):

The Beals and Foodys launched a lawsuit in Florida. Florida was an entirely proper court for the determination of the allegations in the lawsuit. The Beals and Foodys complied with the procedures dictated by the Florida rules. There is no evidence that they misled the Florida court on any matter. Rather, it would seem they won what might be regarded as a very weak case because the respondents chose not to defend the action. I find nothing in the record to support the trial judge's characterization of the conduct of the Beals and Foodys in Florida as "egregious". They brought their allegations in the proper forum, followed the proper procedures, and were immensely successful in no small measure because the respondents chose not to participate in the proceedings.

16    Weiler J.A., in dissent, would have dismissed the appeal. She concluded that the defences of natural justice and fraud made it inappropriate for a domestic court to enforce the Florida judgment. She stated that the appellants were deprived of natural justice by not having been given sufficient notice to permit them to appreciate the extent of their jeopardy prior to the judgment for damages against them. Weiler J.A. also held that the respondents had concealed certain facts from the Florida jury.

**IV. Analysis**

17    It was properly conceded by the parties, as explained below, in both the trial court and Court of Appeal, that the Florida court had jurisdiction over the respondents' action pursuant to the "real and substantial connection"test set out in *Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077 (S.C.C.). As a result, the issues raised in this appeal were limited to the application and scope of the defences available to a domestic defendant seeking to have a Canadian court refuse enforcement of a foreign judgment.

18    In *Morguard*, supra, the "real and substantial connection" test for the recognition and enforcement of interprovincial judgments was adopted. *Morguard* did not decide whether that test applied to foreign judgments. However, some courts have extended the application of *Morguard* to judgments rendered outside Canada: *Moses v. Shore Boat Builders Ltd.* (1993), 106 D.L.R. (4th) 654 (B.C. C.A.); leave to appeal refused, [1994] 2 W.W.R. lxv (S.C.C.); *United States v. Ivey* (1996), 30 O.R. (3d) 370 (Ont. C.A.); *Old North State Brewing Co. v. Newlands Services Inc.* (1998), [1999] 4 W.W.R. 573 (B.C. C.A.).

19    The question arises whether the "real and substantial connection" test, which is applied to interprovincial judgments, should apply equally to the recognition of foreign judgments. For the reasons that follow, I conclude that it should. While there

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

are compelling reasons to expand the test's application, there does not appear to be any principled reason not to do so. In light of this, the parties' concession on the point was appropriate.

20    *Morguard*, supra, altered the old common law rules for the recognition and enforcement of interprovincial judgments. These rules, based on territoriality, sovereignty, independence and attornment, were held to be outmoded. La Forest J. concluded that it had been an error to adopt this approach "even in relation to judgments given in sister-provinces" (p. 1095). Central to the decision to modernize the common law rules was the doctrine of comity. Comity was defined as (at pp. 1095 and 1096, respectively):

> ...the deference and respect due by other states to the actions of a state legitimately taken within its territory.
>
> . . . . .
>
> ...the recognition which one nation allows within its territory to the legislative, executive and judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.

21    Early common law rules were amended by rules intended to facilitate the flow of wealth, skills and people across boundaries, particularly boundaries of a federal state. *Morguard* established that the determination of the proper exercise of jurisdiction by a court depended upon two principles (relied on by the Ontario Court of Appeal in *Muscutt v. Courcelles* (2002), 213 D.L.R. (4th) 577 (Ont. C.A.), at para. 34), the first being the need for "order and fairness". The second was the existence of a "real and substantial connection" (see also *Indyka v. Indyka* (1967), [1969] 1 A.C. 33 (U.K. H.L.); *Moran v. Pyle National (Canada) Ltd.*, [1975] 1 S.C.R. 393 (S.C.C.)).

22    Modern ideas of order and fairness require that a court must have reasonable grounds for assuming jurisdiction where the participants to the litigation are connected to multiple jurisdictions.

23    *Morguard* established that the courts of one province or territory should recognize and enforce the judgments of another province or territory, if that court had properly exercised jurisdiction in the action, namely that it had a real and substantial connection with either the subject matter of the action or the defendant. A substantial connection with the subject matter of the action will satisfy the real and substantial connection test even in the absence of such a connection with the defendant to the action.

### A. The "Real and Substantial Connection" Test and Foreign Judgments

24    The question then is whether the real and substantial connection test should apply to the recognition and enforcement of foreign judgments?

25    In *Moran*, supra, at p. 409, it was recognized that where individuals carry on business in another provincial jurisdiction, it is reasonable that those individuals be required to defend themselves there when an action is commenced:

> By tendering his products in the market place directly or through normal distributive channels, a manufacturer ought to assume the burden of defending those products wherever they cause harm as long as the forum into which the manufacturer is taken is one that he reasonably ought to have had in his contemplation when he so tendered his goods.

That reasoning is equally compelling with respect to foreign jurisdictions.

26    Although La Forest J. noted in *Morguard*, that judgments from beyond Canada's borders could raise different issues than judgments within the federation, he recognized the value of revisiting the rules related to the recognition and enforcement of foreign judgments (at p. 1098):

> The business community operates in a world economy and we correctly speak of a world community even in the face of decentralized political and legal power. <u>Accommodating the flow of wealth, skills and people across state lines has now</u>

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 160 of 342

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

become imperative. Under these circumstances, our approach to the recognition and enforcement of foreign judgments would appear ripe for reappraisal.... [Emphasis added.]

Although use of the word "foreign" in the above quotation referred to judgments rendered in a sister province, the need to accommodate "the flow of wealth, skills and people across state lines" is as much an imperative internationally as it is interprovincially.

27    The importance of comity was analysed at length in *Morguard*, supra. This doctrine must be permitted to evolve concomitantly with international business relations, cross-border transactions, as well as mobility. The doctrine of comity is:

...grounded in the need in modern times to facilitate the flow of wealth, skills and people across state lines in a fair and orderly manner (*Morguard, supra*, at p. 1096).

This doctrine is of particular importance viewed internationally. The principles of order and fairness ensure security of transactions, which necessarily underlie the modern concept of private international law. Although *Morguard* recognized that the considerations underlying the doctrine of comity apply with greater force between the units of a federal state, the reality of international commerce and the movement of people continue to be "directly relevant to determining the appropriate response of private international law to particular issues, such as the enforcement of monetary judgments" (J. Blom, "The Enforcement of Foreign Judgments: *Morguard* Goes Forth Into the World" (1997), 28 *Can. Bus. L.J.* 373, at p. 375).

28    International comity and the prevalence of international cross-border transactions and movement call for a modernization of private international law. The principles set out in *Morguard*, supra, and further discussed in *Hunt v. T & N plc*, [1993] 4 S.C.R. 289 (S.C.C.), can and should be extended beyond the recognition of interprovincial judgments, even though their application may give rise to different considerations internationally. Subject to the legislatures adopting a different approach by statute, the "real and substantial connection" test should apply to the law with respect to the enforcement and recognition of foreign judgments.

29    Like comity, the notion of reciprocity is equally compelling both in the international and interprovincial context. La Forest J. discussed interprovincial reciprocity in *Morguard*, supra. He stated (at p. 1107):

...if this Court thinks it inherently reasonable for a court to exercise jurisdiction under circumstances like those described, it would be odd indeed if it did not also consider it reasonable for the courts of another province to recognize and enforce that court's judgment.

In light of the principles of international comity, La Forest J.'s discussion of reciprocity is also equally applicable to judgments made by courts outside Canada. In the absence of a different statutory approach, it is reasonable that a domestic court recognize and enforce a foreign judgment where the foreign court assumed jurisdiction on the same basis as the domestic court would, for example, on the basis of a "real and substantial connection" test.

30    Federalism was a central concern underlying the decisions in *Morguard*, supra, and *Hunt*, supra. In the latter, La Forest J. stated that he did not think that "litigation engendered against a corporate citizen located in one province by its trading and commercial activities in another province should necessarily be subject to the same rules as those applicable to international commerce" (*Hunt*, supra, at p. 323). Recently, *Spar Aerospace Ltd. v. American Mobile Satellite Corp.* (2002), [2002] 4 S.C.R. 205, 2002 SCC 78 (S.C.C.), suggested, in *obiter*, that it may be necessary to afford foreign judgments a different treatment than that recognized for interprovincial judgments (*per* LeBel J., at para. 51):

However, it is important to emphasize that *Morguard* and *Hunt* were decided in the context of interprovincial jurisdictional disputes. In my opinion, the specific findings of these decisions cannot easily be extended beyond this context. In particular, the two cases resulted in the enhancing or even broadening of the principles of reciprocity and speak directly to the context of interprovincial comity within the structure of the Canadian federation.

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 161 of 342

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

Although La Forest J. and LeBel J. suggested that the rules applicable to interprovincial versus foreign judgments should differ, they do not preclude the application of the "real and substantial connection" test to both types of judgments provided that any unfairness that may arise as a result of the broadened application of that test be taken into account.

31    The appellants submitted that the recognition of foreign judgments rendered by courts with a real and substantial connection to the action or parties is particularly troublesome in the case of foreign default judgments. If the real and substantial connection test is applied to the recognition of foreign judgments, they argue that test should be modified in the recognition and enforcement of default judgments. In the absence of unfairness or other equally compelling reasons which were not identified in this appeal, there is no logical reason to distinguish between a judgment after trial and a default judgment.

32    The "real and substantial connection" test requires that a significant connection exist between the cause of action and the foreign court. Furthermore, a defendant can reasonably be brought within the embrace of a foreign jurisdiction's law where he or she has participated in something of significance or was actively involved in that foreign jurisdiction. A fleeting or relatively unimportant connection will not be enough to give a foreign court jurisdiction. The connection to the foreign jurisdiction must be a substantial one.

33    In the present case, the appellants purchased land in Florida, an act that represents a significant engagement with the foreign jurisdiction's legal order. Where a party takes such positive and important steps that bring him or her within the proper jurisdiction of a foreign court, the fear of unfairness related to the duty to defend oneself is lessened. If a Canadian enters into a contract to buy land in another country, it is not unreasonable to expect the individual to enter a defence when sued in that jurisdiction with respect to the transaction.

34    The "real and substantial connection" test is made out for all of the appellants. There exists both a real and substantial connection between the Florida jurisdiction, the subject matter of the action and the defendants. As stated in J.-G. Castel and J. Walker, *Canadian Conflict of Laws* (5th ed. (loose-leaf)), at p. 14-10:

> For the recognition or enforcement in Canada of a foreign judgment *in personam*, the foreign court must have had jurisdiction according to Canadian rules of the conflict of laws.

In light of Canadian rules of conflict of laws, Dominic Thivy attorned to the jurisdiction of the Florida court when he entered a defence to the second action. His subsequent procedural failures under Florida law do not invalidate that attornment. As such, irrespective of the real and substantial connection analysis, the Florida court would have had jurisdiction over Mr. Thivy for the purposes of enforcement in Ontario.

35    A Canadian defendant sued in a foreign jurisdiction has the ability to redress any real or apparent unfairness from the foreign proceedings and the judgment's subsequent enforcement in Canada. The defences applicable in Ontario are natural justice, public policy and fraud. In addition, defendants sued abroad can raise the doctrine of *forum non conveniens*. This would apply in the usual way where it is claimed that the proceedings are not, on the basis of convenience, expense and other considerations, in the proper forum.

36    Here, the appellants entered into a property transaction in Florida when they bought and sold land. Having taken this positive step to bring themselves within the jurisdiction of Florida law, the appellants could reasonably have been expected to defend themselves when the respondents started an action against them in Florida. The appellants failed to defend the claim pursuant to the Florida rules. Nonetheless, they were still entitled, within ten days, to appeal the Florida default judgment, which they did not. In addition, the appellants did not avail themselves of the additional one-year period to have the Florida judgment for damages set aside. While their failure to move to set aside or appeal the Florida judgment was due to their reliance upon negligent legal advice, that negligence cannot be a bar to the enforcement of the respondents' judgment.

37    There are conditions to be met before a domestic court will enforce a judgment from a foreign jurisdiction. The enforcing court, in this case Ontario, must determine whether the foreign court had a real and substantial connection to the action or the parties, at least to the level established in *Morguard*, supra. A real and substantial connection is the overriding factor in the

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 162 of 342

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

determination of jurisdiction. The presence of more of the traditional indicia of jurisdiction (attornment, agreement to submit, residence and presence in the foreign jurisdiction) will serve to bolster the real and substantial connection to the action or parties. Although such a connection is an important factor, parties to an action continue to be free to select or accept the jurisdiction in which their dispute is to be resolved by attorning or agreeing to the jurisdiction of a foreign court.

38    If a foreign court did not properly take jurisdiction, its judgment will not be enforced. Here, it was correctly conceded by the litigants that the Florida court had a real and substantial connection to the action and parties.

### B. Defences to the Enforcement of Judgments

39    Once the "real and substantial connection" test is found to apply to a foreign judgment, the court should then examine the scope of the defences available to a domestic defendant in contesting the recognition of such a judgment.

40    The defences of fraud, public policy and lack of natural justice were developed before *Morguard*, supra, and still pertain. This Court has to consider whether those defences, when applied internationally, are able to strike the balance required by comity, the balance between order and fairness as well as the real and substantial connection, in respect of enforcing default judgments obtained in foreign courts.

41    These defences were developed by the common law courts to guard against potential unfairness unforeseen in the drafting of the test for the recognition and enforcement of judgments. The existing defences are narrow in application. They are the most recognizable situations in which an injustice may arise but are not exhaustive.

42    Unusual situations may arise that might require the creation of a new defence to the enforcement of a foreign judgment. However, the facts of this case do not justify speculating on that possibility. Should the evolution of private international law require the creation of a new defence, the courts will need to ensure that any new defences continue to be narrow in scope, address specific facts and raise issues not covered by the existing defences.

### (1) The Defence of Fraud

43    As a general but qualified statement, neither foreign nor domestic judgments will be enforced if obtained by fraud.

44    Inherent to the defence of fraud is the concern that defendants may try to use this defence as a means of relitigating an action previously decided and so thwart the finality sought in litigation. The desire to avoid the relitigation of issues previously tried and decided has led the courts to treat the defence of fraud narrowly. It limits the type of evidence of fraud which can be pleaded in response to a judgment. If this Court were to widen the scope of the fraud defence, domestic courts would be increasingly drawn into a re-examination of the merits of foreign judgments. That result would obviously be contrary to the quest for finality.

45    Courts have drawn a distinction between "intrinsic fraud" and "extrinsic fraud" in an attempt to clarify the types of fraud that can vitiate the judgment of a foreign court. Extrinsic fraud is identified as fraud going to the jurisdiction of the issuing court or the kind of fraud that misleads the court, foreign or domestic, into believing that it has jurisdiction over the cause of action. Evidence of this kind of fraud, if accepted, will justify setting aside the judgment. On the other hand, intrinsic fraud is fraud which goes to the merits of the case and to the existence of a cause of action. The extent to which evidence of intrinsic fraud can act as a defence to the recognition of a judgment has not been as clear as that of extrinsic fraud.

46    A restrictive application of the defence of fraud was endorsed in *Woodruff v. McLennan* (1887), 14 O.A.R. 242 (Ont. C.A.). The Ontario Court of Appeal stated, at pp. 254-55, that the defence could be raised where:

the recovery was collusive, [the] defendant had never been served with process, [][the] suit had been undefended without defendant's default, [][the] defendant had been fraudulently persuaded by plaintiff to let judgment go by default ... or some fraud to defendant's prejudice committed or allowed in the proceedings of the other Court.

Case 09-10138-MFW   Doc 15744-2   Filed 06/12/15   Page 163 of 342

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

*Woodruff* established that evidence of fraud that went to the merits of the case (intrinsic) was inadmissible. Only evidence of fraud which misled a court into taking jurisdiction (extrinsic) was admissible and could bar the enforcement of the judgment.

47    *Woodruff*, supra, was subsequently modified by the Ontario Court of Appeal. See *Jacobs v. Beaver* (1908), 17 O.L.R. 496 (Ont. C.A.), at p. 506:

> ...the fraud relied on must be something collateral or extraneous, and not merely the fraud which is imputed from alleged false statements made at the trial, which were met by counter-statements by the other side, and the whole adjudicated upon by the Court and so passed on into the limbo of estoppel by the judgment. This estoppel cannot, in my opinion, be disturbed except upon the allegation and proof of new and material facts, or newly discovered and material facts which were not before the former Court and from which are to be deduced the new proposition that the former judgment was obtained by fraud. The burden of that issue is upon the defendant, and until he at least gives *prima facie* evidence in support of it, the estoppel stands. And it may be, as I have before stated, that when such evidence is given, and in order to fully prove this new issue, the whole case should be re-opened. [Emphasis added.]

The court, in *Jacobs*, acknowledged that in addition to evidence of extrinsic fraud, evidence of intrinsic fraud was admissible where the defendant could establish "proof of new and material facts" that, not being available at the time of trial, were not before the issuing court and demonstrate that the judgment sought to be enforced was obtained by fraud.

48    Contrary to the decision of the Ontario Court of Appeal in *Jacobs*, the courts of British Columbia take a different view. In *Roglass Consultants Inc. v. Kennedy* (1984), 65 B.C.L.R. 393 (B.C. C.A.), the British Columbia Court of Appeal maintained the strict approach to the fraud defence set out in *Woodruff*. It held that only extrinsic fraud could be raised in defence of the enforcement of a foreign judgment.

49    In *Powell v. Cockburn*, [1977] 2 S.C.R. 218 (S.C.C.), it was clear that the aim in refusing recognition of a judgment because of fraud "is to prevent abuse of judicial process" (p. 234). In that case, the Court did not address fraud going to the merits of a judgment but did confirm that fraud going to jurisdiction (extrinsic fraud) is always open to impeachment.

50    What should be the scope of the defence of fraud in relation to foreign judgments? *Jacobs*, supra, represents a reasonable approach to that defence. It effectively balances the need to guard against fraudulently obtained judgments with the need to treat foreign judgments as final. I agree with Doherty J.A. for the majority in the Court of Appeal that the "new and material facts" discussed in *Jacobs* must be limited to those facts that a defendant could not have discovered and brought to the attention of the foreign court through the exercise of reasonable diligence.

51    The historic description of and the distinction between intrinsic and extrinsic fraud is of no apparent value and, because of its ability to both complicate and confuse, should be discontinued. It is simpler to say that fraud going to jurisdiction can always be raised before a domestic court to challenge the judgment. On the other hand, the merits of a foreign judgment can be challenged for fraud only where the allegations are new and not the subject of prior adjudication. Where material facts not previously discoverable arise that potentially challenge the evidence that was before the foreign court, the domestic court can decline recognition of the judgment.

52    Where a foreign judgment was obtained by fraud that was undetectable by the foreign court, it will not be enforced domestically. "Evidence of fraud undetectable by the foreign court" and the mention of "new and material facts" in *Jacobs*, supra, demand an element of reasonable diligence on the part of a defendant. To repeat Doherty J.A.'s ruling, in order to raise the defence of fraud, a defendant has the burden of demonstrating that the facts sought to be raised could not have been discovered by the exercise of due diligence prior to the obtaining of the foreign judgment. See para. 43:

> A due diligence requirement is consistent with the policy underlying the recognition and enforcement of foreign judgments. In the modern global village, decisions made by foreign courts acting within Canadian concepts of jurisdiction and in accordance with fundamental principles of fairness should be respected and enforced. That policy does not, however,

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 164 of 342

Beals v. Saldanna, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

extend to protect decisions which are based on fraud that could not, through the exercise of reasonable diligence, have been brought to the attention of the foreign court. Respect for the foreign court does not diminish when a refusal to enforce its judgment is based on material that could not, through the exercise of reasonable diligence, have been placed before that court. [Emphasis added.]

Such an approach represents a fair balance between the countervailing goals of comity and fairness to the defendant.

53    Although *Jacobs*, supra, was a contested foreign action, the test used is equally applicable to default judgments. Where the foreign default proceedings are not inherently unfair, failing to defend the action, by itself, should prohibit the defendant from claiming that any of the evidence adduced or steps taken in the foreign proceedings was evidence of fraud just discovered. But if there is evidence of fraud before the foreign court that could not have been discovered by reasonable diligence, that will justify a domestic court's refusal to enforce the judgment.

54    In the present case, the appellants made a conscious decision not to defend the Florida action against them. The pleadings of the respondents then became the facts that were the basis for the Florida judgment. As a result, the appellants are barred from attacking the evidence presented to the Florida judge and jury as being fraudulent.

55    The appellants have not claimed that there was evidence of fraud that they could not have discovered had they defended the Florida action. In the absence of newly discovered evidence of fraud, I agree with the Court of Appeal that the trial judge erred in admitting evidence he found established fraud. He erred in law by failing to limit "new and material facts" to facts which could not have been discovered by the appellants by the exercise of reasonable diligence.

56    There was no evidence before the trial judge to support fraud. In fact, the trial judge, himself, stated (at p. 131):

No record of the damage assessment proceedings exists, and the evidence heard by the jury is unknown. There is similarly no record of the instructions given to the jury by the trial judge.

In the absence of such evidence, the trial judge erred in concluding the existence of fraud. It is impossible to know whether the evidence now sought to be adduced by the appellants had been previously considered by the jury. The respondent Mr. Beals and an expert on business losses, both testified before the Florida jury and gave uncontradicted evidence. Before the Ontario court, Mr Beals was available for questioning but was not called upon by the appellants to address the allegations of fraud. Similarly, the respondents' counsel in the Florida action testified but no questions of fraud were raised with him.

57    No evidence was led to show that the jury was misled (deliberately or not) on the extent of the damages. The admitted facts presented to the jury included allegations of fraudulent misrepresentations and loss of profits. The claim by the respondents was for damages to recoup the purchase price of the land, loss of profits and punitive damages. The nature of the damages sought, as well as the admitted facts presented to the Florida jury, was evidence upon which that jury could reasonably reach the damages that it did. I agree with the majority in the Court of Appeal that, although the amount of damages awarded may seem disproportionate, it was a palpable and overriding error for the trial judge to conclude on the dollar amount of the judgment alone that the Florida jury must have been misled.

58    As the appellants did not provide any evidence of new and previously undiscoverable facts suggestive of fraud, the defence of fraud cannot form the basis of a valid challenge to the application for enforcement of the respondents' judgment.

*(2) The Defence of Natural Justice*

59    As previously stated, the denial of natural justice can be the basis of a challenge to a foreign judgment and, if proven, will allow the domestic court to refuse enforcement. A condition precedent to that defence is that the party seeking to impugn the judgment prove, to the civil standard, that the foreign proceedings were contrary to Canadian notions of fundamental justice.

60    A domestic court enforcing a judgment has a heightened duty to protect the interests of defendants when the judgment to be enforced is a foreign one. The domestic court must be satisfied that minimum standards of fairness have been applied to the Ontario defendants by the foreign court.

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 165 of 342

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

61       The enforcing court must ensure that the defendant was granted a fair process. Contrary to the position taken by my colleague LeBel J., it is not the duty of the plaintiff in the foreign action to establish that the legal system from which the judgment originates is a fair one in order to seek enforcement. The burden of alleging unfairness in the foreign legal system rests with the defendant in the foreign action.

62       Fair process is one that, in the system from which the judgment originates, reasonably guarantees basic procedural safeguards such as judicial independence and fair ethical rules governing the participants in the judicial system. This determination will need to be made for all foreign judgments. Obviously, it is simpler for domestic courts to assess the fairness afforded to a Canadian defendant in another province in Canada. In the case of judgments made by courts outside Canada, the review may be more difficult but is mandatory and the enforcing court must be satisfied that fair process was used in awarding the judgment. This assessment is easier when the foreign legal system is either similar to or familiar to Canadian courts.

63       In the present case, the Florida judgment is from a legal system similar, but not identical, to our own. If the foreign state's principles of justice, court procedures and judicial protections are not similar to ours, the domestic enforcing court will need to ensure that the minimum Canadian standards of fairness were applied. If fair process was not provided to the defendant, recognition and enforcement of the judgment may be denied.

64       The defence of natural justice is restricted to the form of the foreign procedure, to due process, and does not relate to the merits of the case. The defence is limited to the procedure by which the foreign court arrived at its judgment. However, if that procedure, while valid there, is not in accordance with Canada's concept of natural justice, the foreign judgment will be rejected. The defendant carries the burden of proof and, in this case, failed to raise any reasonable apprehension of unfairness.

65       In Canada, natural justice has frequently been viewed to include, but is not limited to, the necessity that a defendant be given adequate notice of the claim made against him and that he be granted an opportunity to defend. The Florida proceedings were not contrary to the Canadian concept of natural justice. The appellants concede that they received notice of all the legal procedure taken in the Florida action and that the judge of the foreign court respected the procedure of that jurisdiction. The appellants submit, however, that they were denied natural justice because they were not given sufficient notice to enable them to discover the extent of their financial jeopardy.

66       The appellants claim to have been denied the opportunity to assess the extent of their financial jeopardy because the respondents' claim failed to specify the exact dollar amount of damages and types of damages they were seeking. The Florida claims, particularly the third amended complaint, made it clear that the damages sought were potentially significant. The complaints filed in Florida raised allegations of fraud and sought punitive damages, both of which allow for the possibility of a substantial award of damages. Treble damages were sought. Repayment of the purchase price, the amount lost by the respondents due to their inability to construct a model home on the lot, the expenses incurred in preparing that lot and lost revenue due to the respondents' inability to construct a model home to be used in their construction business were all sought in the third amended complaint. In light of knowing the types of damages claimed, not being provided with a specific dollar value of the amount of damages sought cannot constitute a denial of natural justice. The appellants were mistaken when they presumed that the damages award would be approximately US $8,000.00.

67       The respondents did not give notice that an expert on the assessment of business losses would testify before the Florida jury. The failure to disclose witnesses in a notice of assessment is not a denial of natural justice.

68       LeBel J. would expand the defence of natural justice by interpreting the right to receive notice of a foreign action to include notice of the legal steps to be taken by the defendant where the legal system differs from that of Canada's and of the consequences flowing from a decision to defend, or not defend, the foreign action. Where such notice was not given, he would deny enforcement of the resulting judgment. No such burden should rest with the foreign plaintiff. Within Canada, defendants are presumed to know the law of the jurisdiction seized with an action against them. Plaintiffs are not required to expressly or implicitly notify defendants of the steps that they must take when notified of a claim against them. This approach is equally appropriate in the context of international litigation. To find otherwise would unduly complicate cross-border transactions and

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 166 of 342

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

hamper trade with Canadian parties. A defendant to a foreign action instituted in a jurisdiction with a real and substantial connection to the action or parties can reasonably be expected to research the law of the foreign jurisdiction. The Saldanhas and Thivys owned land in the State of Florida and entered into a real estate transaction in that state. When served with notice of an action against them in the State of Florida, the appellants were responsible for gaining knowledge of Florida procedure in order to discover the particularities of that legal system.

69      My interpretation of the Florida legal system differs from that of LeBel J. in that I am of the opinion that the appellants were fully informed about the Florida action. They were advised of the case to meet and were granted a fair opportunity to do so. They did not defend the action. Once they received notice of the amount of the judgment, the appellants obviously had precise notice of the extent of their financial exposure. Their failure to act when confronted with the size of the award of damages was not due to a lack of notice but due to relying on the mistaken advice of their lawyer.

70      For these reasons, the defence of natural justice does not arise.

*(3) The Defence of Public Policy*

71      The third and final defence is that of public policy. This defence prevents the enforcement of a foreign judgment which is contrary to the Canadian concept of justice. The public policy defence turns on whether the foreign *law* is contrary to our view of basic morality. As stated in Castel and Walker, *supra*, at p.14-28:

> ...the traditional public policy defence appears to be directed at the concept of repugnant laws and not repugnant facts.

72      How is this defence of assistance to a defendant seeking to block the enforcement of a foreign judgment? It would, for example, prohibit the enforcement of a foreign judgment that is founded on a law contrary to the fundamental morality of the Canadian legal system. Similarly, the public policy defence guards against the enforcement of a judgment rendered by a foreign court proven to be corrupt or biassed.

73      The appellants submitted that the defence of public policy should be broadened to include the case where neither the defence of natural justice nor the current defence of public policy would apply but where the outcome is so egregious that it justifies a domestic court's refusal to enforce the foreign judgment. The appellants argued that, as a matter of Canadian public policy, a foreign judgment should not be enforced if the award is excessive, would shock the conscience of, or would be unacceptable to, reasonable Canadians. The appellants claimed that the public policy defence provides a remedy where the judgment, by its amount alone, would shock the conscience of the reasonable Canadian. It was argued that, if the respondents and their witnesses were truthful in the Florida proceeding, it must follow that the laws in Florida permit a grossly excessive award for lost profits absent a causal connection between the acts giving rise to liability and the damages suffered. Such a result, the appellants submitted, would shock the conscience of the reasonable Canadian. I do not agree.

74      J. Blom, *supra*, predicted the appellants' request for the expansion of the public policy defence (at p. 400):

> The only change that the *Morguard* approach to recognition may bring in its wake is a greater temptation to expand the notion of public policy, so as to justify refusing a foreign default judgment that meets the *Morguard* criteria, but whose enforcement nevertheless appears to impose a severe hardship on the defendant.

75      The use of the defence of public policy to challenge the enforcement of a foreign judgment involves impeachment of that judgment by condemning the foreign law on which the judgment is based. It is not a remedy to be used lightly. The expansion of this defence to include perceived injustices that do not offend our sense of morality is unwarranted. The defence of public policy should continue to have a narrow application.

76      The award of damages by the Florida jury does not violate our principles of morality. The sums involved, although they have grown large, are not by themselves a basis to refuse enforcement of the foreign judgment in Canada. Even if it could be argued in another case that the arbitrariness of the award can properly fit into a public policy argument, the record here does not provide any basis allowing the Canadian court to re-evaluate the amount of the award. The public policy defence is not meant

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 167 of 342

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

to bar enforcement of a judgment rendered by a foreign court with a real and substantial connection to the cause of action for the sole reason that the claim in that foreign jurisdiction would not yield comparable damages in Canada.

77      There was no evidence that the Florida procedure would offend the Canadian concept of justice. I disagree for the foregoing reasons that enforcement of the Florida monetary judgement would shock the conscience of the reasonable Canadian.

### C. Section 7 of the Canadian Charter of Rights and Freedoms

78      The appellants submitted that the Florida judgment cannot be enforced because its enforcement would force them into bankruptcy. It was argued that the recognition and enforcement of that judgment by a Canadian court would constitute a violation of s. 7 of the *Charter*. The appellants submitted that a *Charter* remedy should be recognized to the effect that, before a domestic court enforces a foreign judgment which would result in the defendant's bankruptcy, the court must be satisfied that the foreign judgment has been rendered in accordance with the principles of fundamental justice. No authority is offered for that proposition with which I disagree but, in any event, the Florida proceedings were conducted in conformity with fundamental justice. The obligation of a domestic court to recognize and enforce a foreign judgment cannot depend on the financial ability of the defendant to pay that judgment. As s. 7 of the *Charter* does not shield a Canadian resident from the financial effects of the enforcement of a judgment rendered by a Canadian court, I have difficulty accepting that s. 7 should shield a Canadian defendant from the enforcement of a foreign judgment.

## V. Disposition

79      The parties agreed that the Florida court had a real and substantial connection to the action launched by the respondents. Having properly taken jurisdiction, the judgment of that court must be recognized and enforced by a domestic court, provided that no defences bar its enforcement. None of the existing defences of fraud, natural justice or public policy have been supported by the evidence. Although the damage award may appear disproportionate to the original value of the land in question, that cannot be determinative. The judgment of the Florida court should be enforced.

80      The appeal is dismissed with costs.

### Binnie J.:

81      The question raised by this appeal is the sufficiency of the notice provided to Ontario defendants (the appellants) of Florida proceedings against them by two Sarasota County real estate developers over the sale of an empty residential building lot in 1984 for US$8,000. The subject matter of their contract turned out to be the wrong lot. The respondents kept the lot (they say they did not intend to purchase) and sued the appellants for damages.

82      The Florida default judgment now commands payment of over $1,000,000 Canadian dollars, an award described by the Ontario trial judge as "breathtaking". The damages were assessed by a Florida jury in less than half a day.

83      If the notice had been sufficient, I would have agreed reluctantly with the majority of my colleagues that the default judgment against them would be enforceable in Ontario despite the fact the foreign court never got to hear the Ontario defendants' side of the story. Their failure to participate using the procedures open to them in Florida would have bound them to the result. However, in my view, the appellants' inactivity in the face of their mushrooming legal problem is explained by the fact they were kept in the dark about the true nature and extent of their jeopardy. They were not served with some of the more important documents on liability filed in the Florida proceeding *before* they were noted in default, nor were they served with other important documents relevant to the assessment of damages filed after default but *prior* to the trial at which judgment was entered against them. Proper notice is a function of the particular circumstances of the case giving rise to the foreign default judgment. In this case, in my view, there was a failure of notification amounting to a breach of natural justice. In these circumstances, the Ontario courts ought not to give effect to the Florida judgment.

## I. Real and Substantial Connection

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

84    I agree with Major J. that the "real and substantial connection test" developed in *Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077 (S.C.C.), *Hunt v. T & N plc*, [1993] 4 S.C.R. 289 (S.C.C.), at p. 325, and *Tolofson v. Jensen*, [1994] 3 S.C.R. 1022 (S.C.C.), at p. 1058, provides an appropriate conceptual basis for the enforcement in Canada of final judgments obtained in foreign jurisdictions as it does for final judgments obtained in other provinces.

85    That said, I recognize that there are significant differences between enforcement of a foreign judgment and enforcement of judgments from one province or territory to another within the Canadian federation. As La Forest J. observed in *Morguard* (p. 1098):

The considerations underlying the rules of comity apply with much greater force between the units of a federal state.

*Morguard* went on to refer to "[t]he integrating character of our constitutional arrangements" (p. 1100), including (1) common citizenship, (2) interprovincial mobility of citizens, (3) the common market among the provinces envisaged by our Constitution, and (4) the essentially unitary structure of our judicial system presided over by the Supreme Court of Canada. The constitutional flavour of the *Morguard* analysis was picked up and emphasized in *Hunt, supra*, and again in *Spar Aerospace Ltd. v. American Mobile Satellite Corp.*, [2002] 4 S.C.R. 205, 2002 SCC 78, at para. 53. We should not backtrack on the importance of that distinction.

86    It stands to reason that if the issues posed by the enforcement of foreign judgments differ from the issues encountered in the enforcement of judgments among the provinces and the territories, the legal rules are not going to be identical. Accordingly, while I accept that the *Morguard* test ("real and substantial connection") provides a framework for the enforcement of foreign judgments, it would be prudent at this stage not to be overly rigid in staking out a position on available defences beyond what the facts of this case require. Both Major J. (paras. 39-41) and LeBel J. (paras. 217-18) acknowledge (with varying degrees of enthusiasm) that a greater measure of flexibility may be called for in considering defences to the enforcement of foreign judgments as distinguished from interprovincial judgments. The time will come when such a re-examination of available defences will be necessary. The need for such a re-examination does not arise in this case. The appellants come within the traditional limits of the natural justice defence, and their appeal should be allowed on that ground.

## II. The Foreign Judgment

87    In 1981, the appellants bought an empty lot in a Florida real estate subdivision near Sarasota for US$4,000. It was described as Lot 2. They did not build. They didn't even visit it. They just paid the municipal taxes. In 1983, they thought they had sold it to the respondents for US$8,000. Despite the fact that all of the closing documentation referred to Lot 2, the respondents (who say they didn't "catch" the reference to Lot 2 in the closing document) eventually claimed that they had *intended* to purchase the lot next door — Lot 1 — and that they had been falsely and fraudulently induced to buy Lot 2 by the appellants and a Florida real estate agent called O'Neill.

88    No doubt the Florida courts had jurisdiction over the ensuing dispute. The land was located in that jurisdiction. The appellants ought to have anticipated, and probably did anticipate, that disputes over Florida land would be decided by Florida courts. However, they could not fairly have anticipated that this pedestrian real estate deal gone sour would eventually explode into a Florida judgment against them said to be worth in excess of $800,000 Canadian dollars at the time of the trial in Ontario in November 1998 with interest continuing to run for the past five years at 12 per cent per annum, producing an ultimate Kafka-esque judgment with an apparent value of over $1,000,000 Canadian dollars.

89    It appears that soon after being served with the respondents' Complaint, the appellants decided to tell their story to the Florida court by filing a Statement of Defence, but to forgo the further expense of hiring a Florida lawyer to represent their interests. The costs would likely have exceeded the amount they thought was in issue. As the trial judge in Ontario put it, based on what was disclosed in the Complaint, litigation of an US$8,000 real estate transaction in Florida hardly seemed to be "worth the candle". The fact this evaluation proved to be disastrously wrong is a measure of the inadequacy of what they were told about the Florida proceedings.

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 169 of 342

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

90    My colleague Major J. holds, in effect, that the appellants are largely the victims of what he considers to be some ostrich-like inactivity and some poor legal advice from their Ontario solicitor. There is some truth to this, but such a bizarre outcome nevertheless invites close scrutiny of how the Florida proceedings transformed a minor real estate transaction into a major financial bonanza for the respondents.

91    While the notification procedures under the Florida rules may be considered in Florida to be quite adequate for Florida residents with easy access to advice and counsel from Florida lawyers (and there is no doubt that Florida procedures in general conform to a reasonable standard of fairness), nevertheless the question here is whether the appellants *in this proceeding* were sufficiently informed of the case against them, both with respect to liability and the potential financial consequences, to allow them to determine in a reasonable way whether or not to participate in the Florida action, or to let it go by default.

### III. The Initial Aborted Proceedings

92    The Florida action was initially commenced on February 15, 1985 by the two respondents and their then partners (who will collectively be referred to as the respondents) in the Twentieth Judicial Circuit in and for Charlotte County, Florida. The appellants duly filed a defence. Eventually, this first action was "voluntarily dismissed ... without prejudice" by the Florida court, apparently on the basis the respondents had commenced their action in the wrong Circuit. The respondents immediately started a second action in the Twelfth Judicial Circuit and again the appellants filed a defence. This suggests that when the appellants were notified of what pleading had to be done, they did it.

### IV. The Nature of the Complaint Against the Appellants

93    The original plaintiffs, two real estate developers and their wives (including the present respondents), alleged that the appellants misrepresented that they owned building Lot 1, whereas they owned building Lot 2, and that this misrepresentation was "willfully false and fraudulent". The respondents said "they" (i.e., the individual respondents) began building on Lot 1, discovered the error, and "immediately ceased construction". As a result, the respondents incurred the expenses of preparing the lot for construction and lost revenue because they were unable to construct a model home on Lot 1, which was a corner lot.

94    It is not our function to get into the merits of the Florida case but I note the respondent, Frederick Beals III, eventually acknowledged in the Florida proceedings that work terminated in October 1984 not because of an error in the legal description of the lot but because of a falling out among the respondents. At that time, a "Johnny Quick toilet" had been delivered to the work site but the floor slab had not yet been poured. The error with regard to Lot 1 and Lot 2 was not discovered by the respondents until three months later in January 1985.

95    The total expenditures on the project, including the purchase price, the building permits, the survey tests, trusses and some other materials was about US$14,000. The respondent Beals later testified that the average profit experienced on the houses he built in 1984 was about US$5,000 per home. The respondents' eventual award on account of loss of profit was more than ten times that figure.

96    The Complaint and each subsequent "as amended" Complaint simply refers to the *respondents*' damages on "*a* model home" (emphasis added). "A" model home is expressed in the singular and would not normally be understood, I think, to encompass an undisclosed and unbuilt residential subdivision which the respondents now say they had in mind.

97    The respondents claimed treble damages, rescission, punitive damages and costs. In the end, the jury seems to have ordered reimbursement of the actual expenditures (about US$14,000) plus loss of profit (about US$56,000), all of which was trebled to make the total of US$210,000, plus punitive damages of US$50,000. The balance of the current million dollar claim consists of accumulated post-judgment interest compounding at the rate of 12 per cent, plus the effect of a less favourable U.S. currency exchange rate.

### V. The Complaint Against Other Parties

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 170 of 342

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

98      The respondents also alleged that, in August 1984, they - the developers - had initiated contact with a Sarasota real estate firm, O'Neill's Realty, who showed them Lot 1. The respondents go on to state in their Complaint *that the realtor was only authorized by the appellants to sell Lot 2* (para 25). Nevertheless, the realtor (both the corporation and James O'Neill personally), "knowingly and falsely" misrepresented that the appellants owned Lot 1 (para. 27) and "fraudulently" failed to stop the closing of the sale of the wrong lot (paras. 33, 51). The respondents claimed the same relief against the realtor as they had against the appellants (para. 37). As will be seen, the respondents' allegation in their Complaint against the realtor O'Neill more or less corresponded with the appellants' version of events set out in their Statement of Defence.

99      The respondents subsequently added a complaint against a new defendant, the Commonwealth Land Title Insurance Company, alleging that the title insurer knew or should have known that all of the closing documentation erroneously referred to the appellants' Lot 2, instead of the desired Lot 1, and by "remaining silent" breached its corporate duty of disclosure.

100     With respect to the issue of notice, Florida rules require the written Complaint to expressly warn that "[e]ach defendant is hereby required to serve written defenses ... within 20 days.... If a defendant fails to do so, a default [judgment] will be entered against that defendant for the relief demanded...". This is what the appellants were told. The logical implication of this statement, it seems to me, is that if a written defence were served, the defendants would *not* be in default of the pleading. This also turned out not to be true.

## VI. The Statement of Defence

101     The appellants filed, then refiled in the different judicial circuit, a Statement of Defence which pleaded in the relevant part, as follows:

2 The facts are as follows:

a) At no time did the Sellers engage the services of O'Neill's Realty, Inc., and/or James O'Neill to sell the property above-referred to or any other property whatsoever.

b) On or about 1984, the Defendant, James O'Neill, contacted the Sellers and informed them that he had a client who wished to purchase the above-referred to property. As there had been no previous communication of any kind whatsoever between the Sellers and James O'Neill, the Sellers believed that he, the said James O'Neill, represented the Plaintiffs.

c) During subsequent telephone conversations in or about August, 1984, the Sellers advised James O'Neill that they had never been in Port Charlotte, Florida, and that the only information in their possession with respect to the above-referred to property was the number allocated to same, that is to say: Lot 2, Block 3694 of Port Charlotte Subdivision, Section 65.

d) James O'Neill assured the Sellers that they were the owners of the lands that *his* client wished to purchase as he, the said James O'Neill, had perused the Public Records for the property in which *his* client was interested, and the names of the Sellers appeared thereon as owners. The Sellers were satisfied with his representations and therefore proceeded on that basis.

3 On or about August, 1984, the Sellers received a Contract for Sale of Real Estate which said Contract described the above-referred to property as being Lot 1. The Sellers contacted James O'Neill to advise him of the discrepancy.

4 James O'Neill once again assured the Sellers that they did own the property in which his client was interested and therefore the requisite change to the Contract was made. James O'Neill did not indicate to the Sellers that the change had to be initialled.

5 The Contract was returned to James O'Neill and on or about September 20th, 1984, the Sellers received a Warranty Deed which indicated that the property being sold was Lot 2.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 171 of 342

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

6 As the discrepancy had been discussed with and pointed out to James O'Neill, and as the Warranty Deed specified Lot 2, Block 3694 of Port Charlotte Subdivision, Section 65, the Sellers had no reason to believe that the discrepancy in the Lot Number, that is to say Lot 2 as opposed to Lot 1, had not been discussed with the Plaintiffs and that the matter had not been efficiently and legally resolved.

[Emphasis in original.]

102     The respondents never amended their Complaint against the appellants even though, as we will see, there was a good deal of activity in relation to the other defendants (before and after default was noted against the appellants) prior to the Florida court's final judgment against the appellants dated December 13, 1991.

## VII. The Appellants' Dilemma

103     The appellants had to decide how to respond to the Complaint. To make an informed decision, they should have been told in general terms of the case they had to meet on liability and, more importantly on these facts, an indication of the jeopardy they faced in terms of damages. This is not a case where the plaintiffs were satisfied with the damages implicit in a failed minor real estate transaction. The Complaint, in my view, did not adequately convey to the appellants the importance of the decision that would eventually be made in the Florida court. The appellants were merely told, unhelpfully, that the claim exceeded US$5,000.

104     The appellants were entitled to draw some comfort from the fact that the respondents' guns were trained not on them alone, but on the real estate agent and the title insurer as well. Moreover, the respondent developers' allegations against the realtor O'Neill coincided with their own Statement of Defence, particularly the allegation that the appellants authorized the realtor to sell only Lot 2 — not Lot 1. On September 12, 1991, prior to the damages trial, the respondents settled with the realtor and the title insurer for US$10,750. This radically transformed the potential jeopardy of the appellants. They were never told of the settlement.

## VIII. The Florida Pleadings Rule

105     Under Rule 1.190(a) of the Florida *Rules of Civil Procedure* (Fla. Stat. Ann. § 1.190(a)), the appellants were required to refile their Defence every time the respondents amended their Complaint, even if the amendments were solely directed at other defendants. This was nowhere brought to the appellants' attention. As mentioned earlier, I think the appellants could fairly understand from the "warning" in the original Complaint that only if *no* defence were filed would there be a pleadings default in the action. Otherwise there would be no pleadings default. The respondents never amended their Complaint against the appellants. There was therefore nothing further for the appellants "to answer". They were nevertheless noted in default for failing to file a defence.

106     The respondents' Amended Complaint, Second Amended Complaint, Third Amended Complaint and ultimately Fourth Amended Complaint modified the allegations against other parties. In terms of procedural fairness, I think the appellants were entitled to assume that in the absence of any new allegations against them there was no need to refile a defence that had already been filed in the same action. To non-lawyers, a requirement for such apparently useless duplication would come as a surprise.

107     Yet we are told that:

Under Florida law Dominic Thivy, Rose Thivy, Geoffrey Saldanha and Leueen Saldanha were under a *mandatory* obligation to deliver a defence to each of the new amended complaints. [Emphasis added.]

It seems to me the appellants were entitled to be told from the outset that their defence would be treated as non-existent if the Complaint were thereafter amended against *other* defendants.

108     When a Canadian resident is served with a legal process from within his or her own jurisdiction, he or she is presumed to know the law and the risks attendant with the notice. There can be no such presumption across different legal systems.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW Doc 15744-2 Filed 06/12/15 Page 172 of 342

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

109    As the basis of the respondents' judgment is *default of pleading*, this lack of notification goes to the heart of the present appeal.

## IX. Other Information the Appellants Didn't Know

110    It is to be remembered that although the appellants had decided not to have a Florida lawyer, they were very much part of the liability phase of the action until noted in default on July 25, 1990, and very much interested in the assessment of damages phase of the action which did not take place until December 11, 1991. Even a defendant who concedes liability (as opposed to one who merely defaults) might want to contest what may appear to be "breathtaking" damages claimed by the successful party. Liability and assessment of damages are two distinct and separate issues. A defendant may choose to concede the one but contest the other.

111    In administrative law, where issues of notification have been extensively canvassed, albeit in a different context, it is well established that a party must be made aware of "the potential jeopardy faced": D.J.M. Brown and J.M. Evans, *Judicial Review of Administrative Action in Canada* (loose-leaf ed.), para. 9:5222. One of the criteria determining the stringency of natural justice requirements in particular circumstances is "[t]he importance of the decision to the individual or individuals affected": *Baker v. Canada (Minister of Citizenship & Immigration)*, [1999] 2 S.C.R. 817 (S.C.C.), at para. 25. There is a difference in "importance" between a minor real estate transaction whose defence is "not worth the candle" and a major claim which the respondents have successfully orchestrated into a million dollar liability.

### (a) During the Liability Phase which Concluded July 25, 1990

112    The appellants received no notice of the court order dated November 6, 1987, striking out the claim for punitive damages against the realtor and the title insurance defendant on the basis, apparently, that treble damages are themselves intended to be punitive, and an additional claim for punitive damages is not permitted under Florida law. Despite this ruling, the appellants, as defaulters, were subsequently held liable for treble damages of US$210,000 *plus* punitive damages of US$50,000. The punitive damages issue went very much to the appellants' potential jeopardy, yet it seems they were not kept in the picture about court orders made in the same action as between the other parties relevant to the same head of damage alleged against them. This event pre-dated being noted in default. If the appellants had received the advantage of this ruling, it would potentially have reduced the eventual damages against them by almost 20 per cent. In other words, the oversight, if that is what it was, related to what is now claimed to be worth about a quarter of a million dollars.

113    On June 19, 1990, the appellants were sent a notice that an application would be made to the Florida court to note them in default for failure to file a defence to the Third Amended Complaint or "serve any pleading or other paper as required by law". The appellants had no reason to think that the defence they had already filed was not applicable to the Third Amended Complaint. (Indeed, there apparently was a Fourth Amended Complaint but it is not in the record before us.) Unless the appellants were made aware of the Florida pleadings rule, which they were not, such a notice would simply add to their confusion. It may be obvious to a Florida lawyer that every amended Complaint requires a fresh defence even if there are no changes relevant to the defendant called upon to plead, but such a requirement would not be obvious to an Ontario lawyer, still less to self-represented litigants such as the appellants.

114    The appellants were noted in default on July 25, 1990.

### (b) After Being Noted in Default but Prior to the Jury Trial on December 11, 1991

115    In some cases, a court making an assessment of unliquidated damages might think it unnecessary to notify the defaulters of the ongoing proceedings. It would depend on the circumstances. For example, in Ontario, Rule 19.02(3) leaves notice in the discretion of the court (*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194). Whatever may be the minimum requirements in some cases, I believe the circumstances here cried out for notice of the subsequent proceedings because in the period between the noting of default on July 25, 1990 and the damages trial on December 11, 1991, the potential jeopardy changed radically to the appellants' disadvantage.

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

116    The appellants were not told that by Stipulation dated October 31, 1990, the respondents and realtor (both corporate and individual) made a deal "to delete claims against [the realtor] for treble damages, punitive damages, and statutory violations", leaving the respondents' claim against the realtor (who had been the only contact between the respondents and the appellants) to proceed in simple negligence. The appellants were now the only parties against whom treble damages and punitive damages were sought, but they were not told of that fact. Had they been so advised, they would have been able to consider cross-proceedings against the realtor for indemnification in respect of the more substantial claims now asserted against them alone.

117    Nor were the appellants served with the court order dated March 27, 1991, striking out as improper the respondents' claim for attorney's costs against the realtor and the title insurance company. By way of contrast, the final judgment against the appellants dated December 13, 1991, specifically "reserves jurisdiction to tax costs, prejudgment interest, and attorney's fees" against the appellants.

118    Nor were the appellants served with an order dated June 17, 1991 for mandatory mediation which provided that "[*a*]*ll* parties are required to participate" (emphasis added). Even defendants who consider it uneconomical to litigate an US $8,000 building lot deal in a foreign country might well consider it to be in their best interest to participate in a mediation. The respondents say that the appellants were not entitled to notice of the order for mediation but it seems wholly incongruous to have a mediation order requiring "[a]ll parties" to participate when the *only* parties who were now the respondents' target for treble and punitive damages were not even told about it.

119    Nor were the appellants told that on September 12, 1991, the respondents settled with the realtor for US$8,250 and subsequently settled with the title insurers for US$2,500 while still retaining title to Lot 2. This left the appellants as the sole target at the damages trial. According to the documents they had received, the appellants were still entitled to believe that the respondents continued to make against the realtor essentially the same points as those the appellants themselves had set out in their Statement of Defence. This was no longer true. The appellants did not know that they were now on their own.

120    Nor were the appellants served, as required by the Florida rules, with notice of the experts the respondents proposed to call at the damages assessment. This too might have operated as a wake-up call to the appellants, who at this late stage were drifting obliviously toward financial disaster.

121    As mentioned above, the Third Amended Complaint claimed the *respondents*' damages on *a* model home. It is true that by their default, the appellants admitted the allegations of fact in the Complaint, but the facts thus admitted were specific to the respondents and to a single model home. There is surely a significant difference between damages on a single home (even a "model" home) and damages on a theory of lost profit from the construction of a non-existent residential subdivision. Yet it is a judgment largely based on the latter allegation, not the allegation in the Complaint, that is the basis of the bulk of the million dollar judgment now sought to be enforced against the appellants in Ontario.

122    On December 11, 1991, the Florida court entered a directed verdict for unliquidated damages against the appellants, and assessed the damages at US$210,000 plus US$50,000 punitive damages. It now appears that the out-of-pocket construction costs which formed a substantial part of the award of compensatory damages against the appellants were not incurred by the respondents, as had been alleged in their Complaint, but by Fox Chase Homes of Sarasota, Inc. or Fox Chase Homes of Charlotte County, Inc., whose names appeared nowhere in the pleadings. In the Ontario action, the trial judge found that under Florida law "causes of action of a corporation such as Fox Chase are the property of the corporation and cannot be passed through to its shareholders. Dissolved corporations cannot maintain actions except through their last directors with appropriate description in the style of cause not present in this matter." There was no such "appropriate description" in the Florida style of cause. In my view, the intervention of one or two corporate entities could raise a number of potential defences not otherwise available in the assessment of damages. The purpose of a pleading is to give notice. It is certainly not implicit in anything said in the Complaint that the respondents were claiming damages on behalf of corporations in which they had an interest.

123    The appellants had not even been told that the respondents would be seeking damages for the *corporation's* lost opportunity to build an undefined number of homes on land to which neither the respondents nor the corporation held title.

Case 09-10138-MFW   Doc 15744-2   Filed 06/12/15   Page 174 of 342

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

124     I do not accept the suggestion that the appellants are the authors of their own misfortune on the basis that if they had hired a Florida lawyer they would have found out about all of these developments. The appellants decided not to defend the case set out against them in the Complaint. That case was subsequently transformed. They never had the opportunity to put their minds to the transformed case because they were never told about it.

125     I do not suggest that any one of the foregoing omissions of notice would necessarily have been fatal to enforcement of the respondents' default judgment in Ontario. Cumulatively, at all events, these continuing omissions seem to me to demonstrate an unfair procedure which in this particular case failed to meet the standards of natural justice.

## X. Availability of an Appeal

126     The appellants had ten days to appeal the default judgment. They did not do so, apparently based on advice from their Ontario solicitor. I agree with Major J. that the appellants cannot be relieved of the consequences of their failure to appeal simply because they acted on legal advice.

127     The failure to exhaust local remedies in the foreign court is ordinarily a factor to be taken into account in determining whether a foreign judgment is enforceable in Ontario, but I do not think it is fatal here. We are dealing with a *default* judgment obtained, in my view, without compliance with the rules of natural justice. Morever, even if the appellants had appealed, we are told that no record of the damage assessment proceedings exists. There is no transcript of the evidence heard by the jury. There is similarly no record of the instructions given to the jury by the trial judge. If the respondents complied with the letter of the Florida rules, as they say they did, a Florida appellate court might well uphold the default judgment. The Ontario court is faced with a *different* issue than that which would have confronted a Florida appellate court. Was the notice, notwithstanding presumed compliance with Florida court rules, sufficient to alert the *foreign* defendants to the case they had to meet, and the potential jeopardy they faced?

128     I agree in this respect with the view of the English Court of Appeal in *Adams v. Cape Industries Plc* (1989), [1991] 1 All E.R. 929 (Eng. C.A.), at pp. 1052-53, that the availability of an appeal in the foreign jurisdiction is not necessarily determinative. *Cape Industries* was also a case of a default judgment.

129     I would also reject the argument that the appeal should be dismissed because the appellants ought to have moved "promptly" to set aside the default judgment for "excusable neglect". Such relief is normally available to a defendant who has formed an intention to defend but for some "excusable" reason had "delayed" in taking appropriate steps. The problem here is that the appellants had in fact filed a Statement of Defence but had decided, based on what they were told about the respondents' action, not to defend it further. The appellants' problem was not that they failed to implement an intention to defend but that their intention not to further defend was based on a different case.

130     In these circumstances, I would not enforce a judgment based on (in my view) inadequate notice __ and thus violative of natural justice __ just because the appellants did not appeal the Florida judgment to the Florida appellate court, or seek the indulgence of the Florida court to set aside for "excusable neglect" a default judgment that rests on such a flawed foundation.

## XI. Disposition

131     I would allow the appeal to dismiss the action, with costs throughout to the appellants.

*LeBel J.*:

## I. Introduction

132     The enforcement of this judgment, which has its origins in a straightforward sale of land for US$8,000 and has now grown to well over C$800,000, is unusually harsh. In my view, our law should be flexible enough to recognize and avoid such harshness in circumstances like these, where the respondents' original claim was dubious in the extreme and the appellants are guilty of little more than bad luck. To hold that the appellants are the sole authors of their own misfortune, it seems to me,

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 175 of 342

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

is to rely heavily on the benefit of hindsight; and to characterize the respondents' case in the original action as merely weak is something of an understatement. The implication of the position of the majority is that Canadian defendants will from now on be obliged to participate in foreign lawsuits no matter how meritless the claim or how small the amount of damages in issue reasonably appears to be, on pain of potentially devastating consequences from which Canadian courts will be virtually powerless to protect them.

133     In my opinion, this Court should avoid moving the law of conflicts in such a direction. Thus, I respectfully disagree with the reasons of the majority on two points. I would hold that this judgment should not be enforced because a breach of natural justice occurred in the process by which it was obtained. I also have concerns about the way the real and substantial connection test, in its application to foreign-country judgments, is articulated by the majority.

134     Although I agree both that the real and substantial connection test should be extended to judgments from outside Canada and that the Florida court properly took jurisdiction over the defendants in this particular case, in my view the test should be modified significantly when it is applied to judgments originating outside the Canadian federation. Specifically, the assessment of the propriety of the foreign court's jurisdiction should be carried out in a way that acknowledges the additional hardship imposed on a defendant who is required to litigate in a foreign country.

135     Furthermore, the philosophy of *Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077 (S.C.C.), which replaces traditional categories with a purposive, principled framework, should not be confined to the question of jurisdiction, but should also be extended to the defences. In my view, liberalizing the jurisdiction side of the analysis while retaining narrow, strictly construed categories on the defence side is not a coherent approach. I would adopt a more flexible approach to the defences than the majority, and on that approach it is my view that the appellants have made out the defence of natural justice.

136     The solution that the majority sets out to the question of recognition and enforcement of foreign judgments appears to go further than courts have gone in other Commonwealth jurisdictions or in the United States (as I will discuss below). This discrepancy may place Canadian defendants in a disadvantageous position in international litigation against foreign plaintiffs. As a result, the risks and thus the transaction costs to our citizens of cross-border ventures will be increased, in some cases beyond what commercially reasonable people would consider acceptable. Canadian residents may consequently be deterred from entering into international transactions — an outcome that frustrates, rather than furthers, the purpose of private international law.

## II. Background

137     I agree with Major J.'s outline of the facts. I would, however, place additional emphasis on a number of details that emerge from the record.

138     The Saldanhas and the Thivys (to whom I will refer collectively as the "Sellers") purchased the lot in Florida thinking that they might eventually build a vacation home on it. In the meantime, they had little to do with it. They purchased it without having visited it, and they never saw it. They did not think seriously about selling the land until they received the unsolicited offer from the Bealses and Foodys (the "Buyers") in 1984. This was a relatively small investment from which they anticipated no more than modest returns and on which, it seems reasonable to infer, they did not expect to expend much energy.

139     The Sellers received the Buyers' offer to purchase from a Florida real estate agent, a Mr. O'Neill, in August 1984. They had had no prior dealings with Mr. O'Neill. Mrs. Rose Thivy, who worked in a law office and had done some work as a law clerk as well as some title searching and conveyancing, dealt with Mr. O'Neill on behalf of the group. She testified that she asked Mr. O'Neill how he found her telephone number, and he told her that he had searched the County records to find the owners of the lot his clients wanted to buy.

140     The Buyers' written offer was sent to Mrs. Thivy. She noticed that it erroneously referred to "Lot 1". She assumed that the Buyers were not interested in buying the Sellers' property and that the deal would not proceed. The Sellers did not pursue the matter. Mr. O'Neill then contacted Mrs. Thivy to ask why there had been no response to the offer. Mrs. Thivy pointed out the misidentification of the lot to Mr. O'Neill, who insisted that the Sellers were the registered owners of the lot the Buyers

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 176 of 342

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

wanted. Mrs. Thivy changed the number on the document to "Lot 2". The Buyers accepted this counteroffer. Subsequently, the Sellers received a deed and other closing documents in the mail. All the documents referred to Lot 2 and not to Lot 1.

141    In January 1985, Mr. Beals telephoned Mrs. Thivy and complained that he had been sold the wrong lot. Mrs. Thivy told him about her conversation with Mr. O'Neill, and suggested that Mr. Beals resolve the problem with him.

142    In March 1985 the Sellers received a copy of a pleading initiating an action by the Buyers in a Florida Circuit Court (the "Complaint"). The Complaint stated that it related to "an action for damages which exceeds $5,000", as was required to give the Circuit Court monetary jurisdiction over the matter, but otherwise did not specify the quantum of damages claimed.

143    The Complaint alleged that the Sellers had fraudulently induced the Buyers to purchase the wrong lot. The Buyers claimed damages based on the purchase price of the lot, the expenses they had incurred in preparing the lot for construction, and revenue they had lost because they had been unable to build a model home on Lot 1. There were also claims against two other defendants, O'Neill's Realty and the Buyers' title insurance company. Attached to the Complaint was the original offer to purchase referring to Lot 1. The contract of purchase and sale referring to Lot 2 was not attached.

144    Mrs. Thivy and Mr. Saldanha both testified that the Sellers had hoped to "rectify the situation" with the Buyers, perhaps by rescinding the transaction and refunding the Buyers' money. When they received the Complaint, however, they decided to defend the lawsuit. Mrs. Thivy telephoned the Florida court for instructions on procedure and form. She then drafted a defence for all the Sellers to sign, and sent it to the court in Florida. In the defence, the Sellers denied that they had ever represented that they owned Lot 1.

145    In the fall of 1986, the Sellers received notice that the action in Florida had been voluntarily dismissed, without prejudice. Mr. Saldanha testified that he thought the reason the action had been dismissed was that the facts the Sellers had set out in their defence were dispositive. As he put it, "when it went away I said, 'Okay, people know the facts, it's over'."

146    But it was not over. A short time later, the Buyers commenced a second action in the Florida court, and the Sellers received a new Complaint in the mail (the "Amended Complaint"). The Amended Complaint set out essentially the same allegations as the previous one. A claim for treble damages was added against the Sellers, and the language was somewhat different, alleging that "wilfully false and fraudulent" misrepresentations were made by the Sellers both directly and through Mr. O'Neill. The Amended Complaint also said that the Sellers had "willingly and wilfully" changed the contract of purchase and sale to read "Lot 2", without informing the Buyers. The damages claimed were spelled out in more detail than before; the Buyers claimed three times the amount they had paid for the land, three times their construction expenses and business losses, rescission of the contract and return of the purchase price, punitive damages, attorney's fees and court costs. Again, the original offer referring to Lot 1, without the Sellers' signatures, was attached, but the contract of purchase and sale, and the other closing documents which identified Lot 2 as the property being transferred, were not.

147    Mrs. Thivy prepared a new defence, which was simply a copy of the old one, and sent it to the Florida court purportedly on behalf of all four defendants. The trial judge accepted the evidence of the Saldanhas, which differed from that of the Thivys on this point, that the Saldanhas chose not to defend the second action and that Mrs. Thivy signed their names to the new defence without their authorization. The Saldanhas therefore did not attorn to the reinstated action, although the Thivys did.

148    Mr. Saldanha testified that when he and his wife learned of the Amended Complaint, they discussed the matter, and decided that "we were not going to respond to this, because we had already responded". Mr. Saldanha thought that the resurrection of the action was an error of some kind, because the new complaint "seemed to be the same thing regurgitated again" and, in his view, the Sellers had already informed the Florida court of facts that disproved the regurgitated allegations. At this point, as the trial judge put it, "[G]iven their share of the amount at issue, which they assumed to be one-half of the US $8,000, [the Saldanhas] decided the game was not worth the candle, and they would participate no further" ((1998), 42 O.R. (3d) 127 (Ont. Gen. Div.), at p. 130).

149    The Thivys seem to have come to the same conclusion not long afterwards. After the action was relaunched, the Amended Complaint was amended three times, and the Sellers duly received copies of each new version. The Thivys sent their initial

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 177 of 342

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

defence to the Florida court, but did not respond to any of the new versions of the Amended Complaint. Mrs. Thivy testified that they decided "just to forget about it" because defending the action would probably cost them just as much as the lawsuit was worth, and because they thought that the Florida courts had no jurisdiction over them.

150     The successive versions of the Amended Complaint did not change the allegations against the Sellers in any way. The only changes were to claims against other defendants. Mr. Richard Groner, who acted for the respondents in the litigation in Florida, testified at the Ontario trial as an expert in Florida civil procedure. He testified that, under the applicable rules, each amendment to a complaint requires a response from all the parties on whom it is served, even parties to whom the changes in the pleading have no relevance. Such a party may simply resubmit a copy of his or her earlier defence, or may seek the court's permission to let the earlier defence stand over, but if these steps are not taken the defence that has already been filed ceases to have any legal effect. Therefore, the result of the Sellers' failure to respond to new versions of the Amended Complaint was that they were viewed under the Florida rules as not having raised any defence at all. There was nothing in the documents served on the Sellers to notify them that this was a potential consequence of failure to refile their defence.

151     The Sellers received notice of a default hearing on July 25, 1990, but did not attend or respond. In due course, they were noted in default. As a result, they were deemed to have admitted all the allegations in the Amended Complaint so far as they related to liability. Damages are still a live issue. A hearing was held before a judge and a jury in Florida to assess damages. The Sellers received notice of this hearing, too, but again they did not respond.

152     We do not know much about what was said in the damages hearing. There is no transcript of that proceeding. Mr. Groner testified that in Florida courts transcripts are not mandatory for civil trials; a reporter is provided at the option of and at the expense of the litigants. In this case, he decided not to incur the expense. There is no record of the judge's instructions to the jury. An expert witness testified on the valuation of the Buyers' business losses. No expert's report was filed. Mr. Groner testified that it is usual in civil litigation in Florida for parties to obtain information about an expert witness's qualifications and proposed testimony through the discovery process. Expert reports are generally not submitted to the court. All that survives to provide some clue as to how a simple $8,000 land transaction turned into the extraordinary amount now at stake in this appeal is a "Memorandum of Lost Profits Damage" prepared by Mr. Groner, which he submitted to the trial judge in Florida to support his submissions on jury instructions.

153     In late December 1991, the Sellers received the judgment of the Florida court in the mail. The total amount of the judgment was slightly over $270,000, of which $50,000 was punitive damages, with interest set at 12 per cent per annum from the date of the judgment, December 12, 1991 (there seems some confusion in the record over the amount awarded, which the trial judge said was $260,000; the copy of the Florida court's judgment filed in the record is for two amounts which together total $270,886.57). The Sellers were surprised and dismayed at the size of this amount. Mr. Saldanha testified that at first he thought it was a joke. Mrs. Saldanha testified that when she read the number in print "it was like a real blow to the stomach".

154     The Sellers realized only at this point that the Florida action was not, as they had assumed, a minor dispute that would be more expensive to defend than to lose. They recognized that they needed to seek legal advice immediately. The Thivys and the Saldanhas separately consulted lawyers. They were advised that the judgment would not be enforced in Ontario because the Florida court did not have jurisdiction over them. Acting on this advice, the Sellers did not avail themselves of the various means available to them in the Florida system to challenge the judgment.

155     Mr. Beals was examined for discovery in the proceedings in Ontario, and his testimony was read in. His deposition in the Florida proceedings was also an exhibit in the Ontario trial. Based on that evidence, the trial judge made findings of fact that included the following:

Mr. Beals signed all the closing documents referring to Lot 2 without reading them.

Construction of the model home on Lot 1 stopped before the Buyers learned that they had bought the wrong lot. Mr. Beals and Mr. Foody decided to discontinue their business relationship for unrelated reasons, and Mr. Beals bought out his partner's interest in the company.

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 178 of 342

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

Mr. Beals's company, Fox Chase Homes, was dissolved before the Florida action was commenced.

There is no suggestion that these factual findings were in error.

156    Mr. David Mulock, a Florida litigator, testified for the appellants as an expert on Florida procedural and substantive law. He testified that justifiable reliance is one of the essential components of a fraud claim in Florida law. He stated his opinion that reliance by the Buyers on misrepresentations that they were buying Lot 1 could not have been reasonable, because the ownership of land is a matter of public record which can easily be checked, and routinely is checked in any real estate transaction. Mr. Mulock said that the allegations in the Complaint, even if true, were therefore insufficient to support damages for fraud.

157    Mr. Mulock also testified that when a corporation that has a claim for damages is dissolved, its last directors can pursue the cause of action as long as they indicate in the pleadings that they do so in the capacity of representatives of the corporation. None of the many versions of the Complaint in the Florida action made any reference to Fox Chase Homes.

158    The trial judge inferred from the contents of the Memorandum of Lost Profits Damage and from the verdict reached by the Florida jury that the jury had not been informed of several key facts: that the decision to stop construction and the winding-up of Fox Chase Homes were unrelated to the mistake in the land transaction; that the corporation that had allegedly suffered business losses was not a party to the action; and that there was a contract of purchase and sale signed by both the Buyers and the Sellers referring to Lot 2. This was the basis for his finding that the jury was deliberately misled and the defence of fraud was made out.

### III. The Extension of the "Real and Substantial Connection" Test to Foreign-Country Judgments

#### A. The Need for Clarification

159    The parties agreed before the trial judge that the Florida court had properly assumed jurisdiction. As a result, it is not strictly necessary to deal with the application of the "real and substantial connection" test to foreign-country judgments to dispose of this appeal. Although the issue is moot between these parties, the Court asked for additional submissions on it. My discussion of the jurisdiction question is more extensive than would ordinarily be necessary in light of the appellants' concession of this point and of my agreement with Major J. on what the result of the jurisdiction analysis should be in this case. I have set out my views on this issue in detail because the principles that ought to shape the jurisdiction analysis should also inform the interpretation of the defences, on which I disagree with the majority.

160    I will follow Major J. in assuming that the relevant laws of other Canadian provinces are substantially the same as those of Ontario. I will be referring to Canada and Ontario interchangeably, except where the context indicates otherwise.

161    *Morguard*, supra, marked the beginning of a new era in Canadian conflicts law, and set out the basic principles and policy objectives underlying that new legal framework. At a practical level, however, it left many questions unanswered. Among them are whether the "real and substantial connection" test applies in international situations, and the precise nature of the connections that support the recognition of jurisdiction. The present appeal is a suitable occasion within which to clarify some of the implications of *Morguard* and to develop its ramifications in the international context. For these reasons, this Court decided to hear submissions on the international application of the test, in the hope of providing some guidance to lower courts on the issues that this case raises although those issues are no longer live between the parties.

162    Under the approach adopted by the majority, the "real and substantial connection" test applies in the international context just as it does within Canada, and if any unfairness results it may be dealt with only by arguing *forum non conveniens* in the foreign forum or invoking defences to the enforcement of the final judgment. My view is different. The jurisdiction test itself should be applied so that the assumption of jurisdiction will not be recognized if it is unfair to the defendant. To do so requires taking into account the differences between the international and interprovincial contexts as well as between the rationales that structure our conflicts law in these two spheres.

#### B. Constitutional Imperatives Versus International Comity

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

163     The adoption in *Morguard* of new, liberal and purposive rules governing recognition and enforcement of judgments from one province by the courts of another was based on two underlying rationales: constitutional considerations, particularly the intention of the framers of the Constitution to create an integrated national economy; and considerations of international comity, which La Forest J. held should be evaluated anew "in the light of a changing world order" (p. 1097). While the latter rationale extends to foreign-country judgments, the former does not.

164     In *Morguard*, La Forest J. emphasized that the integrated character of the Canadian federation makes a high degree of cooperation between the courts of the various provinces a practical necessity. As this Court later confirmed in *Hunt v. T & N plc*, [1993] 4 S.C.R. 289 (S.C.C.), it is a "constitutional imperative", inherent in the relationship between the units of our federal state, that each province must recognize the properly assumed jurisdiction of another, and conversely that no court in a province can intermeddle in matters that are without a constitutionally sufficient connection to that province. Provided that a court's assumption of jurisdiction is based on a real and substantial connection to the forum, the matter is within the sphere of provincial authority, and the resulting judgment is entitled to "full faith and credit", to borrow the language of the United States Constitution, in all the other provinces.

165     As I observed in *Spar Aerospace Ltd. v. American Mobile Satellite Corp.* (2002), [2002] 4 S.C.R. 205, 2002 SCC 78 (S.C.C.), at para. 53, it is clear from the reasoning in both *Morguard* and in *Hunt*, supra, "that federalism was the central concern underlying both decisions". At the same time, *Morguard* left little doubt that the old common law rules were as outdated in the international sphere as they were inappropriate in the interprovincial context. La Forest J. noted that international borders are far more permeable, and international travel and communications much easier, than was the case when the traditional rules were developed in the nineteenth century. Business dealings with residents of other states are both commonplace and essential for any sophisticated modern economy. It is contrary to the interests of a modern state to retain rules of private international law that impede its citizens' participation in the increasingly integrated world economy. La Forest J. endorsed the view of H. E. Yntema that the rules of private international law ought to "promote suitable conditions of interstate and international commerce" ("The Objectives of Private International Law" (1957), 35 Can. Bar Rev. 721, at p. 741, cited in *Morguard*, at p. 1097).

166     *Morguard* thus strongly suggested that the recognition and enforcement of foreign-country judgments should be subject to a more liberal test informed by an updated understanding of international comity. It is equally clear from a reading of *Morguard* and its progeny that the considerations informing the application of the test to foreign-country judgments are not identical to those that shape conflict rules within Canada. As I observed in *Spar*, supra, at para. 51, "it is important to emphasize that *Morguard* and *Hunt* were decided in the context of interprovincial jurisdictional disputes ... [and that] the specific findings of these decisions cannot easily be extended beyond this context". See also *Hunt*, supra, at p. 328. Although constitutional considerations and considerations of international comity both point towards a more liberal jurisdiction test, important differences remain between them.

167     One of those differences is that the rules that apply within the Canadian federation are "constitutional imperatives". Comity as between sovereign nations is not an obligation in the same sense, although it is more than a matter of mere discretion or preference. In *Morguard*, La Forest J. adopted the definition of comity stated by the United States Supreme Court in *Hilton v. Guyot*, 159 U.S. 113 (U.S. N.Y. 1895), at pp. 163-64 (cited in *Morguard*, at p. 1096):

"Comity," in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.

168     The phrase "international duty and convenience" does not refer to a legally enforceable duty. No super-national legal authority can impose on sovereign states the obligation to honour the principle of comity. Rather, states choose to cooperate with other states out of self-interest, because it is convenient to do so, and out of "duty" in the sense that it is fair and sensible for State A to recognize the acts of State B if it expects State B to recognize its own acts.

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 180 of 342

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

169    The provinces, on the other hand, are constitutionally bound both to observe the limits on their own power to assert jurisdiction over defendants outside the province, and to recognize the properly assumed jurisdiction of courts in sister provinces; for them, this is "a matter of absolute obligation". This obligation reflects the unity in diversity that is characteristic of our federal state. In *Morguard*, supra, this Court acknowledged the shared values of the Canadian justice system which, as we know, fully accepts the relevance and importance of its two great legal systems, common law and civil law. The *Morguard* rule was designed in full awareness that Canada shares two legal systems.

170    A further point is that there are significant factual differences between the international and interprovincial contexts that should be reflected in the private international law rules applicable to each. These contextual differences are important because the doctrine of comity should be applied in a context-sensitive manner. The ultimate purpose of rules based on the idea of comity is to "facilitate the flow of wealth, skills and people across state lines in a fair and orderly manner" (*Morguard*, supra, at p. 1096). How this purpose is best to be achieved depends on the context in which the rules operate.

171    A context-sensitive jurisdiction test ought to take into account the difficulty of defending in a foreign jurisdiction and the possibility that the quality of justice there may not meet Canadian standards. Judgments should travel more easily across provincial borders than across international ones, both because of the relative ease of mobility between the provinces and because of the consistent nationwide standards of the Canadian justice system. When a judgment comes from a foreign country, the logistical difficulties of defending in the originating forum may be much greater, and the foreign legal system may be different from those with which Canadians are familiar. Canada is a single country with a fully integrated economy, but the world is not. In *Morguard*, at p. 1095, this Court rightly emphasized that "[m]odern states ... cannot live in splendid isolation". But we still do not live in a borderless global village; our modern world is "home to widely varied cultures with radically divergent value systems" (*Yahoo! Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme*, 169 F.Supp.2d 1181 (U.S. N.D. Cal. 2001), at p. 1186).

172    In my view, it follows from the contextual and purpose-driven approach adopted in *Morguard* that the rules for recognition and enforcement of foreign-country judgments should be carefully fashioned to reflect the realities of the international context, and calibrated to further to the greatest degree possible, the ultimate objective of facilitating international interactions. This means that the rule should be far more liberal than the categorical approach that was followed before *Morguard* (and most influentially stated in *Emmanuel v. Symon* (1907), [1908] 1 K.B. 302 (Eng. C.A.)), but by no means does it follow that it should be as liberal as the interprovincial rule.

173    The traditional rules impeded cross-border commerce by making it difficult for judgment creditors to obtain effective remedies against defendants resident in other countries, thus undermining the security of transactions. But an excessively generous test would be unduly burdensome for defendants and might discourage persons with assets in Canada from entering into transactions that could eventually get them involved in international disputes. This result, too, would frustrate the purpose of private international law. Ideally, the test should represent a balance designed to create the optimum conditions favouring the flow of commodities and services across state lines. In our enthusiasm to advance beyond the parochialism of the past, we should be careful not to overshoot this goal.

174    I would conclude that the "real and substantial connection" test should apply to foreign-country judgments, but the connections required before such judgments will be enforced should be specified more strictly and in a manner that gives due weight to the protection of Canadian defendants without disregarding the legitimate interests of foreign claimants. In my view, this approach is consistent with both the flexible nature of international comity as a principle of enlightened self-interest rather than absolute obligation and the practical differences between the international and interprovincial contexts.

*C. The Nature of the Requisite Connecting Factors*

175    The "real and substantial connection" test is simply a way of asking whether it was appropriate for the originating forum to take jurisdiction over the matter. If the originating court is an appropriate forum, then it is reasonable to expect the defendant to defend his interests there and to live with the consequences if he decides not to do so. Conversely, if it is not

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

reasonable in the circumstances to expect the defendant to go to the originating court, then it was probably not appropriate for it to take jurisdiction. I would also emphasize at the outset that the requirement that the originating court act "with properly restrained jurisdiction" was expressly recognized by La Forest J. as a means of ensuring fairness to the defendant (*Morguard*, supra, at p. 1103).

176     In my view, it is important to take into account the burdens that defending in the foreign forum would impose on a defendant, in order to determine whether it is reasonable to expect the defendant to accept them. Among the factors that affect the onerousness of defending in a foreign forum are the difficulty and expense of travelling there and the juridical disadvantage that the defendant may face as a result of differences between the foreign legal system and our own. In *Morguard*, supra, this Court recognized the unfairness of forcing a plaintiff to bring an action in the place where the defendant now resides, "whatever the inconvenience and costs this may bring" (p. 1103). Correlatively, defendants should not be compelled to defend in the jurisdiction of the plaintiff's choosing regardless of the inconvenience and expense entailed; all of these factors should be taken into account by the court in arriving at a solution that justly accommodates the legitimate interests of both parties.

177     One question left open in *Morguard* was exactly what must be connected to the forum to satisfy the "real and substantial connection" test. At various points, La Forest J. refers to "significant contacts with the subject-matter of the action" (p. 1103), "contacts ... to the defendant or the subject-matter of the suit" (p. 1103), "a nexus ... between the subject-matter of the action and the territory where the action is brought" (p. 1104), a "connection between the damages suffered and the jurisdiction" (p. 1108), and a "connection with the transaction or the parties" (p. 1108) (see J. Blom, "Conflict of Laws — Enforcement of Extraprovincial Default Judgment — Real and Substantial Connection": *Morguard Investments Ltd. v. De Savoye* (1990), 46 C.P.C. (2d) 1 (S.C.C.); G. D. Watson and F. Au, "Constitutional Limits on Service Ex Juris: Unanswered Questions from Morguard" (2000), 23 *Advocates' Q.* 167, at p. 200).

178     The justification for requiring a defendant to go to the foreign forum is generally strongest when there is a link to the defendant. If the defendant has become involved in activities in the jurisdiction, or in activities with foreseeable effects in the jurisdiction, it is hardly reasonable for her to claim that she should be shielded from the process of that jurisdiction's courts. This reasoning is reflected in *Moran v. Pyle National (Canada) Ltd.*, [1975] 1 S.C.R. 393 (S.C.C.), a case relied on in *Morguard*. In *Moran* it was held that, in a products liability tort case, the place where the victim suffered damages could assume jurisdiction over a foreign defendant manufacturer who knew or ought to have known that the defective product "would be used or consumed where the plaintiff used or consumed it" — *i.e.*, if there was an indirect but substantial connection between the defendant and the forum (*Moran*, supra, at p. 409, cited in *Morguard*, at p. 1106).

179     But there may be good reasons why jurisdiction should be recognized even where there is little or no connection to the defendant, particularly when other considerations, such as fairness to the plaintiff and the importance of administering the justice system in an efficient manner, are taken into account along with the interests of the defendant. It is not unusual for cross-border litigation to arise out of complex transactions involving a number of parties with connections to several jurisdictions. Watson and Au, *supra*, point out, at p. 200, that when litigation involves "multiple defendants in different jurisdictions, insisting on a substantial connection between each defendant and the forum can lead to a multiplicity of actions and inconsistent findings". In such circumstances, a test that recognizes jurisdiction based on a connection to the subject matter of the action seems better suited to identifying whether the forum is a reasonable place for the action to be heard.

180     Moreover, the Canadian Constitution does not mandate that the jurisdiction test provide a minimum level of procedural protection to the defendant, regardless of other factors (see Watson and Au, *supra*, at p. 180). In this respect, Canada's Constitution can be contrasted with that of the United States. In the U.S., defendants are protected by the due process clauses of the Fifth and Fourteenth Amendments, which expressly provide that a person cannot be deprived of property without due process of law. Because the defendant in a civil case stands to be deprived of property by an adverse judgment, the court's jurisdiction will not be recognized unless it accords with the defendant's due process rights — a requirement which has been interpreted to mean that there must be certain minimum connections between the defendant and the forum. By contrast, in the *Canadian Charter of Rights and Freedoms*, due process is enshrined in s. 7, which protects "life, liberty and security of the person", but not property rights. As a general rule, the defendant's life, liberty and security of the person are unaffected by the outcome of civil litigation. In Canada, therefore, the defendant's individual constitutional rights are not the starting point for

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 182 of 342

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

jurisdictional analysis as they are in the U.S. — nor, indeed, would s. 7 rights usually be relevant to jurisdictional issues in civil disputes, although it is possible that there may be situations where fundamental interests of the defendant are implicated and s. 7 could come into play.

181    A broad interpretation of the "real and substantial connection" test, whereby the test may be satisfied even in the absence of a connection to the defendant, seems appropriate given both our constitutional arrangements and the ultimate objective of facilitating the flow of goods and services across borders. Jurisdiction should be acknowledged as proper where the forum was a reasonable place to hear the action, taking into account all the circumstances, including judicial efficiency and the legitimate interests of both parties. At the same time, it should not be forgotten that the jurisdiction test is a safeguard of fairness to the defendant.

182    The test should ensure that, considering the totality of the connections between the forum and all aspects of the action, it is not unfair to expect the defendant to litigate in that forum. It does not follow that there necessarily has to be a connection between the defendant and the forum. There are situations where, given the other connections between the forum and the proceeding, it is a reasonable place for the action to be heard and the defendant can fairly be expected to go there even though he personally has no link at all to that jurisdiction.

### D. Balancing Hardship to the Defendant Against the Strength of the Connections

183    The approach outlined above suggests that when a court is asked to recognize and enforce a foreign judgment, and questions whether the originating court's jurisdiction was properly restrained, it should inquire into the connections between the forum and all aspects of the action, on the one hand, and the hardship that litigation in the foreign forum would impose on the defendant, on the other. The question is how real and how substantial a connection has to be to support the conclusion that the originating court was a reasonable place for the action to be heard. The answer is that the connection must be strong enough to make it reasonable for the defendant to be expected to litigate there even though that may entail additional expense, inconvenience and risk. If litigating in the foreign jurisdiction is very burdensome to the defendant, a stronger degree of connection would be required before the originating court's assumption of jurisdiction should be recognized as fair and appropriate.

184    In some respects, this formulation of the jurisdiction test might overlap with the doctrine of *forum non conveniens*, although it is not exactly the same. Certain considerations, such as juridical disadvantage to a defendant required to litigate in the foreign forum, are relevant to both inquiries. When the issue is jurisdiction, however, the court should restrict itself to asking whether the forum was *a* reasonable place for the action to be heard, and should not inquire into whether another place would have been more reasonable.

185    There is an important difference between the inquiry conducted by a court assuming jurisdiction at the outset of the action and the test applied by a court asked to recognize and enforce a judgment at the end. In the former case, two steps are involved: the court must first determine that it has a basis for jurisdiction, and if it does it must go on to decide whether it should nevertheless decline to exercise that jurisdiction because another forum is clearly more appropriate for the hearing of the action. In the latter case of a receiving court, only the first step in this inquiry is relevant. Provided that the originating court had a reasonable basis for jurisdiction, the defendant had its chance to appear there and argue *forum non conveniens*, and cannot question the originating court's decision on that issue in the receiving court.

186    Nevertheless, the receiving court is not bound to agree with the originating court's opinion that it had a reasonable basis on which to assume jurisdiction. If the connections to the originating forum are tenuous or greatly outweighed by the hardship imposed on the defendant forced to litigate there, the receiving court may conclude that it was not even *a* reasonable place for the action to be heard. It is no good to say that the defendant should have raised the question of hardship by arguing *forum non conveniens* before the foreign court. If it is unfair to expect the defendant to litigate on the merits in the foreign jurisdiction, it is probably unfair to expect the defendant to appear there to argue *forum non conveniens*.

### E. The Application of the Test in the Canadian and International Contexts

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

187     A test which balances hardship to the defendant (with due regard to the interests of the plaintiff) against the factors connecting the action to the forum — including links to either party or any other aspect of the action — leads to a very generous approach to the recognition and enforcement of judgments originating in other Canadian provinces. The reason for this is that the hardship imposed on a defendant who has to appear in another province within the Canadian federation will generally be minimal and will usually be outweighed by a genuine connection between the forum and the defendant, the subject-matter of the action or the damages suffered — all of which are invoked as bases of jurisdiction in provincial service *ex juris* statutes and in the *Civil Code of Québec*, S.Q. 1991, c. 64, and each of which, as I noted in *Spar*, supra, at para. 56, appears to be an example of a real and substantial connection.

188     Litigation outside the defendant's home forum may entail a number of burdens, which vary depending on the context. Those burdens potentially include the expense and inconvenience of travelling, the need to obtain legal advice in the foreign jurisdiction, the perils of navigating an unfamiliar legal system whose substantive and procedural rules may be quite different from those that apply in the defendant's home jurisdiction, and even the possibility that the foreign court may be biased against foreign defendants or generally corrupt.

189     Within Canada, most of these problems do not arise. It is true that physical distances within this country can be significant, and the expense and inconvenience to a defendant in Newfoundland who is required to litigate in British Columbia, for example, would not be inconsiderable. As a rule, however, the distances involved are manageable for citizens of a modern country with an efficient transportation infrastructure. In any event, it may not be necessary for the defendant to go to the jurisdiction in person. Given the relative ease of travel and communications today, it is usually not an extraordinary burden to litigate in another Canadian province.

190     More importantly, there is very little concern that the defendant will be at a disadvantage because she is not familiar with the legal system in the other province, and still less that the legal systems applied in Canada will actually treat her unfairly. As La Forest J. pointed out in *Morguard*, supra, there can be no genuine concern about "differential quality of justice among the provinces" (p. 1100). Indeed, *Morguard* establishes that the Canadian justice system should be understood as an integrated whole. Differences exist in both procedural and substantive matters, but the same basic values apply across the country, and our judicial system is basically unitary. Excessive discrepancies between the provinces will tend to become harmonized under the guidance of the federally appointed judiciary and the overall superintending authority of the Supreme Court of Canada. Furthermore, interprovincial law firms have become commonplace and lawyers across the country are required to abide by the same ethical standards (*Morguard*, at p. 1100).

191     It follows that the assumption of jurisdiction by a sister province, provided that it does not exceed the province's constitutional authority over property, civil rights and the administration of justice in the province and is not prompted by unfair forum-shopping tactics on the plaintiff's part, should be entitled to full recognition and enforcement throughout Canada. A connection to the subject matter of the action should usually suffice to meet the "real and substantial connection" test.

192     Exceptions may arise in cases where litigation away from home would involve travel of a particularly arduous nature for the defendant (which might arise, for example, where the defendant resides in the far north) and, at the same time, the connections to the forum are not especially strong (an example might be a case where all the facts giving rise to the cause of action took place outside the jurisdiction and the only connection is that the plaintiff has suffered damages there). Absent such exceptional circumstances, grounds such as a wrong committed in the jurisdiction or damages suffered there would probably support the assumption of jurisdiction by the province in accordance with the requirements of order and fairness.

193     A judgment which comes to a Canadian court from beyond our international borders is another matter altogether. The distances involved and the difficulty of travelling can be considerably greater when litigation is in a foreign country, and a Canadian defendant faced with a lawsuit outside this country will have to deal with an unfamiliar, and in some cases a very different, legal system.

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

194     In extreme cases, the foreign legal system itself may be inherently unfair. It is an unfortunate fact that not every country's courts are free of official corruption or systemic bias. In my opinion, it is to this possibility that La Forest J. alluded when he specified that "fairness to the defendant requires that the judgment be issued by a court acting *through fair process* and with properly restrained jurisdiction" (*Morguard*, at p.1103 (emphasis added)). If the process that led to the judgment was unfair in itself, it is not fair to the defendant to enforce that judgment in any circumstance, even if the forum has very strong connections to the action and appears in every other respect to be the natural place for the action to be heard.

195      It should therefore be part of the plaintiff's burden in establishing a *prima facie* case of enforceability to prove that the system from which the judgment came is basically fair. When the originating jurisdiction is another democratic country with fair institutions, this burden will be easily met and may call for nothing more than reliance on judicial notice that the judgment emanates from a legitimate and respected legal system.

196     A less troubling but more common situation arises when there is nothing inherently wrong with the foreign legal system, but it is different enough from ours that a Canadian defendant may encounter considerable difficulties understanding her rights and obligations and the steps she needs to take to defend herself. To take a simple example, a defendant from a Canadian common law province may find a civilian system such as that of France or Germany quite unfamiliar. Continental legal systems are, of course, just as fair and sophisticated as the legal system of Ontario. The fact remains that an Ontario defendant who is used to a very different system may suffer prejudice as a result of the foreign system's unfamiliarity. Such a defendant cannot hope to protect herself unless she retains local counsel who can both negotiate the process on her behalf and explain it to her in a language she knows. It is not a simple thing to find trustworthy, competent, bilingual counsel in a foreign country; nor is it cheap. The plaintiff, who chose the forum, will presumably not face these difficulties, and therefore the parties will not be on a level playing field. (Conversely, the plaintiff would face the same kind of disadvantage if required to come to Ontario to pursue his case; it is in the nature of international litigation that one party or the other must accept the hardship of litigation in a foreign jurisdiction. The touchstone for an enforcing court in reaching a fair decision as to which of them should bear this burden is the strength of the connections between the action and the originating jurisdiction.)

197     Even legal systems that are relatively similar to Canada's can differ from our system significantly, and in ways that affect a Canadian defendant's ability to make his case effectively and to understand the strengths and weaknesses of his position. The common law system in the United States remains very close in many respects to that of Canada. Yet this action itself provides numerous examples of substantive and procedural differences between the legal system in Florida and that of Ontario which created unforeseen perils for the Ontario defendants. Those differences include the following:

— Discovery in Florida is even broader in scope than it is in Ontario, and some of the functions of pleadings in Ontario are left to the discovery process. The record in this case indicates that it is standard practice for pleadings to disclose no more than a rough outline of the plaintiff's claim and for the defendant to find out the specifics through discovery. Thus, the Amended Complaint did not set out the amount of damages claimed, but simply stated a minimum amount necessary to support the monetary jurisdiction of the Circuit Court. The expert witness, Mr. Groner, testified that the Ontario defendants were expected to ascertain the actual amount being sought through the discovery process. This would, of course, involve expense and would probably necessitate retaining local counsel in Florida.

— Under Florida's procedural rules, the defence filed by the appellants ceased to have any effect once a new version of the Amended Complaint was filed, in spite of the fact that the allegations concerning the appellants were unchanged and the lack of any notification to the appellants that they were supposed to file a new defence.

— Even in cases where significant sums of money are at stake, transcripts are not produced in the Florida courts as a matter of course, but at the option and expense of the litigants. In a default case, this effectively means the plaintiff has complete control over whether there will be a record of what is said in the proceedings.

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 185 of 342

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

— Punitive damages appear to be available in a wider range of cases and in much larger amounts under Florida law than they are under Ontario law. An Ontario defendant sued in Florida may therefore be at risk of a far higher damage award than would be contemplated in Ontario.

198     These differences illustrate that for an Ontario defendant, litigation in Florida entails greater hardship and risk than litigation in another Canadian province — and of all 'truly foreign' jurisdictions, Florida, which is not very far away and has a legal system essentially similar to Ontario's, is one of the least foreign. In my opinion, therefore, fairness to defendants requires a stronger degree of connection to support Florida's assumption of jurisdiction than would be the case if the originating court were in a sister province. Furthermore, if the judgment had originated from a more 'foreign' jurisdiction which involved greater difficulties for the defendant, the requisite degree of connection would be even higher.

199     In this case, the jurisdictional point is easily dealt with, not only because of the appellants' concession, but also because there were very strong connections between Florida and every component of the action: the plaintiffs, who live there; the land, which is in Florida; and the defendants, who involved themselves in real estate transactions there. Florida was the natural place for the action to be heard. If the connections were less robust, however, the conclusion might be different. For example, in a case where the only connection to Florida is that the plaintiffs are Florida residents and suffer damages there, it would, as a rule, be unfair to Canadian defendants to expect them to face the expense and risks of litigation in Florida.

### F. Should the Test for Jurisdiction be Based on "Reciprocity"?

200     It follows from the propositions set out above that I do not agree with the majority that the notion of "interprovincial reciprocity" is "equally applicable to judgments made by courts outside Canada" (Major J., at para. 29). The argument is that if the circumstances are such that an Ontario court could reasonably take jurisdiction based on equivalent connecting factors to Ontario, then the Ontario court should recognize the jurisdiction of the foreign court. Although there is some initial appeal to this idea, ultimately I do not agree with it. Its effect is to treat a judgment from a foreign country exactly like one that originates within Canada. This approach, in my view, fails to take into account the very real differences between the interprovincial and international contexts.

201     A few preliminary words should be said about the concept of "reciprocity". Some ambiguity is associated with this term. It is sometimes used to refer to the idea that State A should recognize the jurisdiction of State B's courts if State B would do the same for State A in the same circumstances. On the other hand, "reciprocity" sometimes refers to the quite different notion (invoked by the majority here) that State A should recognize the jurisdiction of State B if State A would have assumed jurisdiction in the same circumstances (see *Dicey and Morris on the Conflict of Laws* (13th ed. 2000), vol. 1, at p. 501). Blom has suggested that the latter approach is more properly one of "equivalence of jurisdiction" rather than "reciprocity" (Blom, *supra*, at p. 735).

202     I would note that in *Morguard*, supra, La Forest J. rejected reciprocity in the latter sense (equivalence of jurisdiction) as the basis for a new jurisdiction test in the interprovincial context, and also questioned its usefulness on the international plane (see *Morguard*, at p. 1104; Blom, *supra*, at p. 735). Instead, he espoused an approach whereby the assumption of jurisdiction by a court in a province would be governed by the same principles of order and fairness that guide a court in another province when it determines whether to recognize the first court's jurisdiction. Within Canada, the bases for assuming jurisdiction and the bases for recognizing it should be correlative; as La Forest J. pointed out, "[i]f it is fair and reasonable for the courts of one province to exercise jurisdiction over a subject-matter, it should as a general principle be reasonable for the courts of another province to enforce the resultant judgment" (p. 1094). The logic underlying this statement is not that the forum should recognize a jurisdiction that it claims for itself, but rather that the same principles define when it is reasonable to assume jurisdiction and when it is reasonable to recognize it.

203     It makes sense that the jurisdictional rules on assumption and recognition should dovetail together in a federal state where the justice systems of the various provinces are interconnected parts of a harmonized whole. This reasoning does not extend to the international setting.

WestlawNext· CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 186 of 342

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

204    Nor does the concept of reciprocity in the sense of equivalence of jurisdiction serve the purposes of private international law well. This idea fails to reflect the differences between assuming jurisdiction and enforcing a foreign judgment. When a Canadian court takes jurisdiction over a foreign defendant, it need not inquire into the fairness of its own process, which can be taken for granted. Potential hardship to the defendant can be dealt with under *forum non conveniens*. The ultimate practical effect of the court's judgment will not be determined by its own decision to take jurisdiction, but by the decision of the courts in the defendant's home jurisdiction whether or not to recognize and enforce the Canadian judgment based on that jurisdiction's own domestic law and policy. Conversely, when a foreign judgment arrives in Canada, the enforcing court is the last line of defence for the Canadian defendant. The court should have a discretion to decide that it is not fair to the defendant to recognize the jurisdiction of the foreign court, even if the Canadian court would have decided it was fair to take jurisdiction itself based on the same connecting factors.

*G. Conclusion on Jurisdiction*

205    In conclusion, I agree with Major J. that considerations of comity, order and fairness support the application of the "real and substantial connection" test to the recognition and enforcement of judgments originating in foreign countries. In my view, however, the application of the test should be purpose-driven and contextual. What constitutes a connection sufficient to meet the test will not be the same in every context. The jurisdiction test should reflect the difference between the international and interprovincial contexts and the greater hardship that litigation in a foreign country can entail. There is no good reason why Ontario courts should have to treat a judgment from Florida — or one from China, Turkmenistan or Sierra Leone — exactly like a judgment from another Canadian province.

206    I would also question whether international comity requires us to move as far as the majority does in the direction of openness to foreign judgments when the position of jurisdictions with which we tend to compare ourselves is less generous. In England and Australia, for example, the *Emmanuel v. Symon*, supra, framework remains substantially unchanged and the jurisdiction of a foreign court must be based on the presence or residence of the defendant in the foreign jurisdiction or on the defendant's voluntary submission (see, e.g., *Dicey and Morris on the Conflict of Laws*, supra, at pp. 487 and 503; P. E. Nygh, *Conflict of Laws in Australia* (6th ed. 1995), at p. 138). The U.S. position is more liberal, but still does not go as far as the majority does in this case. Generally, U.S. states will apply the "minimum contact test" to foreign-country judgments as they do to judgments of sister states. This test is made out when a non-resident defendant seeking to avail himself of some benefit within a state affirmatively acts in a manner which he knows or should know will result in a significant impact within the forum state (see, e.g., *Mercandino v. Devoe & Raynolds Inc.*, 436 A.2d 942 (U.S. N.J. Super. A.D. 1981), at p. 943). Thus, a connection between the foreign jurisdiction and the cause of action alone, in the absence of purposive conduct by the defendant establishing a connection between himself and the forum, would be insufficient as a basis for jurisdiction and enforceability in the U.S. In such a case, however, the "real and substantial connection" test as it is interpreted by the majority would always be satisfied.

207    Finally, I would note that the logic on which the *Morguard* test is founded suggests that it should supersede, rather than complement, the traditional common law bases of jurisdiction. In my view, it is not necessary to ask whether any of the traditional grounds are present and then go on to ask whether there is a real and substantial connection (as the majority reasons suggest, at para. 37). There should be just one question: is the "real and substantial connection" test made out?

208    This Court noted in *Hunt*, supra, that the traditional grounds were generally sound bases of jurisdiction and were "a good place to start", but also observed that "some of these may well require reconsideration in light of *Morguard*" (p. 325). Such factors as contractual agreement to accept jurisdiction and habitual residence in the foreign forum are usually very clear examples of the kind of connection that reasonably supports the assumption of jurisdiction. Attornment by actively defending the action in the foreign jurisdiction is a slightly different kind of connection; because the defendant has chosen to have his day in court in the foreign forum, no unfairness results from the enforcement of the foreign court's judgment.

209    In some cases, however, the traditional grounds may be more arbitrary and formalistic than they are fair and reasonable. Under the traditional rules, for example, jurisdiction could be acquired by serving a defendant who was present in the jurisdiction, even if her presence was only fleeting and was completely unconnected to the action, and in the absence of

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

any other factor supporting jurisdiction. Another example is the common-law rule that an appearance solely for the purpose of challenging the jurisdiction of the foreign court was an attornment to its jurisdiction, which was argued (but not commented on by the court) in *United States v. Ivey* (1995), 26 O.R. (3d) 533 (Ont. Gen. Div.). Circumstances such as these may not amount to a real and substantial connection, and in my view they should not continue to be recognized as bases for jurisdiction just because they were under the traditional rules.

## IV. The Impeachment Defences

### A. The Principle Behind the Defences

210    Claimants who seek to have foreign judgments recognized or enforced in this country ask for the support and cooperation of Canadian courts. They thus face the initial burden of showing that the judgment is valid on its face and was issued by a court acting through fair process and with properly restrained jurisdiction based on a real and substantial connection to the action. The petitioner must convince the receiving court that the values of international comity require it to exercise its power in favour of enforcing the judgment. Once this burden has been met, the judgment is *prima facie* enforceable by a Canadian court. The common law has long recognized, however, that the defendant can still establish that the judgment should not be enforced by showing that one of a number of defences to recognition and enforcement applies. The defences relevant to this appeal are commonly grouped under the heading of "impeachment" defences, since all are based on the notion that the way the foreign judgment was obtained was in some way tainted or contrary to Canadian notions of justice. (Other potential defences, such as the foreign public law exception to enforceability in Canada, which might apply, for example, to a tax claim, are not implicated by the facts of this case.)

211    A foreign judgment may be impeached on the basis that its recognition or enforcement would be contrary to public policy, that it was obtained by fraud, or that the foreign proceedings were contrary to natural justice. The burden is on the party raising one of these defences to prove that it applies; the foreign judgment is presumed to be valid, and there is a basic principle that the domestic court will not permit relitigation of matters tried before the foreign court (J.-G. Castel and J. Walker, *Canadian Conflict of Laws* (5th ed. (loose-leaf) at p. 14-24). At the same time, the receiving court has both the authority and the responsibility to uphold the essential values of the domestic legal system and to protect citizens under the protection of its laws from unfairness. The three impeachment defences are established situations where the domestic court will intervene and refuse to enforce the judgment because the law on which it is based or the way it was obtained is simply too offensive to local notions of what is just and reasonable.

### B. The Need to Reconsider the Impeachment Defences as a Result of the Change in the Jurisdiction Test

212    An intrinsic tension arises between the impeachment defences and the principle that the law and facts on which the foreign judgment is based cannot be reargued. Acknowledging the foreign court's jurisdiction would mean very little if the defences could be routinely used to discredit the legal, factual or procedural basis of its judgment. On the other hand, the principle of finality of judgments has its limits; it does not and should not mean that the enforcing court can do no more than rubber-stamp the foreign judgment while turning a blind eye to unfairness or impropriety in its provenance.

213      The impeachment defences represent the balance that the courts have found to be appropriate between security of transactions, on the one hand, and fairness in the individual case, on the other. Traditionally, they have been narrow in scope. The old, strict approach to these defences struck a balance appropriate to the requirements of international comity under the pre-*Morguard* common law, when the jurisdiction test was a difficult threshold for foreign plaintiffs to cross. Nearly all judgments that passed it did so because the defendant had either participated in the action in the foreign forum or selected it by agreement. As J. Walker notes in a comment on this case:

> Under such conditions, defendants resisting the enforcement of foreign judgments could be presumed to have defended the actions against them and to have benefited from the procedural safeguards available in the foreign legal systems. Alternatively, defendants could be presumed to have chosen, on the strength of some familiarity with the foreign legal

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 188 of 342

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

systems, to let their matters be decided in default. ("*Beals v. Saldanha*: Striking the Comity Balance Anew" (2002), 5 *Can. Int'l Law.* 28, at p. 30).

In short, the potential for unfairness to the defendant was minimal, and accordingly there was no need for courts to be concerned with shortcomings in the way the judgment was obtained absent "some egregiously bad feature of the process or the result" (Walker, *supra*, at p. 30).

214      The balance that existed under the traditional approach is lacking in the new test set out by the majority. The category of foreign judgments that are *prima facie* enforceable in this country has been greatly expanded by virtue of the adoption of the *Morguard* test for foreign-country judgments. The law as it now stands will admit a default judgment emanating from a forum that the defendant did not consent to and may have been connected to only indirectly or not at all. This is a salutary development in our law on jurisdiction; if there are sufficient connections between the action and the forum, the judgment should not be shut out on the basis that the forum was inappropriate. But the possibility that the judgment should be unenforceable for some other reason should be considered anew in light of this new context. Castel and Walker, *supra*, have commented that if this Court confirms the application of the *Morguard* test to foreign judgments, "it would seem necessary to revise the defences ... so as to protect persons in Canada who have been sued in foreign courts from the particular kinds of unfairness that can arise in crossborder litigation, and so as to prevent abuse from occurring as a result of liberal rules for the enforcement of foreign default judgments" (p. 14-26).

215      One example of the kind of unfairness Castel and Walker refer to is the increased vulnerability of Canadian residents to nuisance lawsuits in other countries. A defendant may be confronted with a claim that he knows to be frivolous brought by an overseas claimant. His choices are to defend, to settle, or to ignore the claim. Defending in a foreign country is often expensive and difficult. Many foreign jurisdictions do not award costs to the successful party, so that the defendant will have to bear the expenses of litigation even if his position is fully vindicated. On the other hand, failure to defend brings with it considerable risk. The defendant may have little or no knowledge of the legal system and may be unable to predict with confidence that the foreign court will not be persuaded, or required by the operation of its own rules, to uphold a meritless claim.

216      A defendant faced with this dilemma ought to be afforded some protection by Canadian courts against foreign judgments that are clearly flawed, even if the flaws do not meet the stringent tests that traditionally defined the impeachment defences. If no such protection is available, in many cases the only safe option for defendants will be to settle with the claimant despite the fact that the claim is baseless. If the position of the Canadian courts is to be that defendants who fail to defend in the foreign forum do so entirely at their peril, regardless of whether the decision not to defend was based on a rational cost-benefit analysis and irrespective of the frivolousness of the claim and of the use of improper means to persuade the foreign court that it should succeed, Canadian residents may become attractive targets for opportunistic plaintiffs' lawyers in other jurisdictions.

217      In my opinion, the impeachment defences, particularly the defences of fraud and natural justice, ought to be reformulated. The law of conflicts needs to take these new possibilities for abuse into account and to ensure an appropriate recalibration of the balance between respect for the finality of foreign judgments and protection of the rights of Canadian defendants.

218      Furthermore, the nominate defences should be looked at as examples of a single underlying principle governing the exercise of the receiving court's power to recognize and enforce a foreign judgment. The claimant must come before the Canadian court with clean hands, and the court will not accept a judgment whose enforcement would amount to an abuse of its process or bring the administration of justice in Canada into disrepute. Serious consideration should be given to the possibility of a residual category of judgments, beyond those addressed by the defences of public policy, fraud and natural justice, that should not be enforced because they, too, engage this principle — in short, because their enforcement would shock the conscience of Canadians.

*C. Reformulation of the Nominate Defences*

*(1) Public Policy*

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 189 of 342

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

219    If the enforcement of a foreign judgment in Canada would be contrary to Canadian public policy, the judgment will not be enforced here. This defence addresses objections to the foreign law on which the judgment was based. It will be engaged if the foreign law is either contrary to basic morality or contrary to the fundamental tenets of justice recognized by our legal system.

220    The trial judge held that the public policy defence should be expanded to incorporate a "judicial sniff test" that would allow enforcing courts to reject foreign judgments obtained through questionable or egregious conduct (Jennings J., at p. 144). It has also been suggested that excessively high punitive damage awards should be unenforceable in whole or in part as a matter of public policy; see, e.g., J.S. Ziegel, "Enforcement of Foreign Judgments in Canada, Unlevel Playing Fields, and *Beals v. Saldanha*: A Consumer Perspective" (2003), 38 Can. Bus. L.J. 294, at pp. 306-307; *Kidron v. Grean* (1996), 48 O.R. (3d) 775 (Ont. Gen. Div.) (where the court refused to enforce on summary judgment a foreign judgment for $15 million for emotional distress based on evidence of "hurt feelings"). Ziegel notes that the Preliminary Draft Convention on Jurisdiction and Foreign Judgments in Civil and Commercial Matters adopted in October 1999, and revised June 2001, by the Special Commission of the Hague Conference on Private International Law, provides that a court asked to enforce an award of non-compensatory damages may, if satisfied that the amount awarded is "grossly excessive", limit enforcement to a lesser amount (Article 33). The Draft Convention may reflect an international consensus that large punitive damage awards can raise serious concerns, although this idea does not rise to the level of a customary norm.

221    In my view, the better approach is to continue to reserve the public policy defence for cases where the objection is to the law of the foreign forum, rather than the way the law was applied, or the size of the award *per se*. In other words, this defence should continue to be, as the trial judge put it, "directed at the concept of repugnant *laws*, not repugnant *facts*" (at p. 144, (italics in original)). Public policy is potentially an expansive enough concept to subsume the other two defences; it is, of course, contrary to public policy in a broad sense to enforce a judgment that was fraudulently or unfairly obtained. But it is useful to maintain an analytical distinction between the three defences. Furthermore, the defence of public policy has long been associated with condemnation of the foreign jurisdiction's law. To extend it to cover situations where there is nothing objectionable about the foreign law but, rather, a defect in the way the law was applied might send the wrong message, one that conflicts with the norms of international cooperation and respect for other legal systems underlying the doctrine of comity.

222    In *Boardwalk Regency Corp. v. Maalouf* (1992), 88 D.L.R. (4th) 612 (Ont. C.A.), the Ontario Court of Appeal held that the public policy defence applies to laws that violate "conceptions of essential justice and morality" (p. 615). As an example, the court cited a contract relating to the corruption of children (at p. 622). It emphasized that a mere difference between the policy choices reflected in the foreign law and those that prevail in Canada is not enough to engage the defence (pp. 615-16). This approach reflects the principle that diversity among the legal systems of the world should be respected, while at the same time establishing the limits of that principle. A law that offends fundamental or essential moral precepts will not be enforced. While the question is always whether the foreign law violates Canadian ideas of essential justice and morality, the relevant precepts of morality and justice are so basic that they can be said to have a universal character and will generally be respected by all fair legal systems.

223    The defence of public policy should not, however, be reserved for such shockingly immoral laws that one would be hard-pressed to find a non-hypothetical example of the kind of law that would engage it. In my opinion, there is more work for this defence to do. It should also apply to foreign laws that offend basic tenets of our civil justice system, principles that are widely recognized as having a quality of essential fairness. Among these, I would include the idea that civil damages should only be awarded when the defendant is responsible for harm to the plaintiff, and the rule that punitive damages are available when the defendant's conduct goes beyond mere negligence and is morally blameworthy in some way. These are basic principles of justice that are reflected in some form in most developed legal systems, although the particular form in which they are expressed may vary.

224    A law which violates these basic tenets of justice would be fundamentally unfair and worthy of condemnation. A Canadian court presented with a judgment from a jurisdiction whose law provides, for example, that punitive damages can be awarded on the basis of simple negligence or strict liability ought to have a discretion to deny or limit the enforceability of the judgment on grounds of public policy.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    46

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 190 of 342

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

225    This does not dispose of all the difficulties raised by large punitive damage awards, which in practice seldom result from the application of unjust laws. The most common source of punitive damage awards that are unusually high by international standards is the United States. In that country, it is more common to use punitive damages as an instrument of social engineering than it is in Canada, and American law tends to permit larger awards as a way of modifying the behaviour of well-funded defendants. There is nothing about that approach that is inherently offensive to Canadian ideas of basic fairness; it is simply a different policy choice, and it affords U.S. plaintiffs a level of protection of which they ought not necessarily to be deprived just because the defendant's assets are here. As far as I know, U.S. federal and state law generally allows for punitive damages only when the defendant's behaviour is morally blameworthy in some way. In this sense, their policy is similar in principle to ours even though the amounts awarded are sometimes startlingly high to Canadian eyes.

226    Serious problems can, however, arise when an exorbitant damage award is granted against a defendant whose actions were merely careless, rather than reprehensible, or where the defendant's actions were blameworthy enough to merit punitive damages in some amount but the amount awarded is so unimaginably large that it would only be justified as a response to the most heinous and despicable conduct. In many such cases, the applicable law does not, in theory at least, support the size of the damage award. Such awards may be fixed by juries or judges who may not apply the law with the utmost scrupulousness, and they are often overturned on appeal.

227    Some very large judgments of this kind have gained a certain level of notoriety and are probably the first to come to mind when concerns about the size of punitive damage awards are raised. A well-known example is *BMW of North America Inc. v. Gore*, 517 U.S. 559  (U.S. Ala. 1996), where the United States Supreme Court overturned a judgment of the Alabama Supreme Court which had awarded $2 million against BMW because they had sold the defendant a car without revealing that it had been repainted.

228    Another example is the *Loewen* case, where a Mississippi jury awarded $500 million (including punitive damages of $400 million) against a funeral company based in British Columbia for anti-competitive behaviour. The Mississippi court rules made the defendant's right to appeal conditional on the posting of a bond worth 125% of the damages owed. The defendants settled the case in 1996, and went on to file a NAFTA claim against the United States, arguing that the verdict amounted to an uncompensated appropriation of foreign investors' assets. This claim was ultimately unsuccessful, but the NAFTA tribunal remarked on the unfairness of the verdict and the appearance that improper considerations had played a part in inflating it; the trial judge had allowed the plaintiff's attorney to make irrelevant and prejudicial references to matters of race and class and to the fact that the defendants were foreign nationals (*Loewen Group Inc. v. United States of America*, Doc. ARB(AF)/98/3 (U.S. Miss. June 26, 2003) (International Centre for Settlement of Investment Disputes), at para. 4). See also J.A. Talpis, "*If I am from Grand-Mère, Why Am I Being Sued in Texas*?" *Responding to Inappropriate Foreign Jurisdiction in Quebec-United States Crossborder Litigation* (2001).

229    In cases like those referred to above, the problem is not that the law of the foreign jurisdiction conflicts with Canadian public policy, but that the facts of the case do not really justify the size of the award even under the foreign law. These are issues that, in my view, engage the defence of natural justice rather than that of public policy.

*(2) Fraud*

230    Fraud perpetrated on the court that issued the foreign judgment is a defence to its enforcement in Canada. The defence of fraud is hard to reconcile with the principle that the original court's findings of fact are final and binding. As Castel and Walker, *supra*, observe, "[t]he difficulty lies in defining the extent to which the defence of fraud can be considered without reviewing the deliberations of the foreign court or reconsidering the merits of the claims or defences adjudicated in the foreign proceeding" (pp. 14-24 to 14-25).

231    Courts have attempted to resolve this conflict by distinguishing between the kind of fraud of which evidence will be admitted by the domestic court, and allegations of fraud which are considered to have been directly or impliedly disposed of by the foreign judgment and cannot be raised again. Different courts have drawn the line in different places. At one end of the

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 191 of 342

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

spectrum is the very strict rule followed in *Woodruff v. McLennan* (1887), 14 O.A.R. 242 (Ont. C.A.), admitting only evidence of "extrinsic fraud" (fraud going to the jurisdiction of the court that issued the judgment, or affecting the defendant's opportunity to present her case). At the other is the liberal rule followed by the English courts in *Abouloff v. Oppenheimer & Co.* (1882), 10 Q.B.D. 295 (Eng. C.A.), and recently affirmed by the House of Lords in *Owens Bank Ltd. v. Bracco,* [1992] 2 All E.R. 193 (U.K. H.L.), whereby the judgment will be vitiated by evidence that the foreign court was deliberately deceived on any matter, including on the merits of the case. A middle position was taken by the Ontario Court of Appeal in *Jacobs v. Beaver* (1908), 17 O.L.R. 496 (Ont. C.A.), and in this case, where it was held that fraud can only be argued on the basis of fresh evidence that was not known, and could not have been discovered with reasonable effort, at the time of the original decision.

232      It should be noted that each of these approaches represents a compromise between the conflicting propositions that the original judgment is conclusive and that a judgment obtained by deception or based on false facts should not be enforced. Even under the permissive English rule, the foreign court's factual conclusions can only be displaced by proof of conscious and intentional deception; it is not enough to argue that the foreign court drew the wrong conclusion from the evidence. In the *Duchess of Kingston's Case, Re* (1776), 2 Smith L.C. 644 (Eng. C.C.R.) (cited in *Abouloff,* supra, at p. 300), De Grey C.J. remarked that "although it is not permitted to show that the [foreign] Court was mistaken, it may be shown that they were misled" (p. 794). None of these compromises has an absolute claim to be the correct solution to the conundrum. What is the best approach depends on the context in which the rule is applied, and the most appropriate rule will be the one that is most conducive in the circumstances to furthering the objectives of private international law.

233      I agree with Major J. that in general the rule that the defence of fraud must be based on previously undiscoverable evidence is a reasonably balanced solution. The distinction between extrinsic and intrinsic fraud is, as Major J. says, an obscure one which creates uncertainty. It is also unduly strict; as Jennings J. noted in the court below, it leaves space for the fraud defence that is not already occupied by a principled jurisdiction test and by the defence of natural justice (at p. 140). On the other hand, defendants usually should not be allowed to reargue matters that they already raised before the foreign court, or chose not to raise there. These considerations suggest that the "extrinsic fraud" approach is too narrow and the "intentional fraud" approach too broad; the rule that only fresh evidence of fraud can be looked at by the enforcing court is, generally speaking, a good compromise.

234      I would not, however, rule out the possibility that a broader test should apply to default judgments in cases where the defendant's decision not to participate was a demonstrably reasonable one. If the defendant ignored what it justifiably considered to be a trivial or meritless claim, and can prove on the civil standard that the plaintiff took advantage of his absence to perpetrate a deliberate deception on the foreign court, it would be inappropriate to insist that a Canadian court asked to enforce the resulting judgment must turn a blind eye to those facts. In *Powell v. Cockburn,* [1977] 2 S.C.R. 218 (S.C.C.), at p. 234, Dickson J. (as he then was) observed that "[t]he aim of the Courts, in refusing recognition because of fraud, is to prevent abuse of the judicial process". In my opinion, enforcement of a judgment that was obtained by intentionally misleading the foreign court in the kind of circumstances I have outlined could well amount to an abuse of the judicial process. In my opinion, a more generous version of the fraud defence ought to be available, as required, to address the dangers of abuse associated with the loosening of the jurisdiction test to admit a broad category of formerly unenforceable default judgments.

*(3) Natural Justice*

235      A foreign judgment will not be enforced in Canada if the foreign proceedings were contrary to natural justice. The defence concerns the procedure by which the foreign court reached its decision. The clearest examples of a deprivation of natural justice occur when the defendant lacks notice of the foreign proceedings or an opportunity to present his case to the court.

236      In my opinion, two developments should be recognized in connection with this defence. First, the requirements of notice and a hearing should be construed in a purposive and flexible manner. Secondly, substantive principles of justice should also be included in the scope of the defence. The ultimate inquiry is always whether the foreign judgment was obtained in a manner that was fair to the defendant and consistent with basic Canadian notions of justice.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 192 of 342

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

237      The purposive interpretation of the notice requirement was addressed in some detail by Weiler J.A. in her dissenting opinion in the court below ((2001), 54 O.R. (3d) 641 (Ont. C.A.)). The notice requirement is based on "the underlying fundamental principle of justice that defendants have a right to know the case against them and to make an informed decision as to whether or not to present a defence" (at pp. 675-76).

238      Notice is adequate when the defendant is given enough information to assess the extent of his or her jeopardy. This means, among other things, that the defendant should be made aware of the approximate amount sought. Canadian procedural rules require that the amount of damages claimed be stated in the pleadings (Weiler J.A., at p. 676). This is not the rule in all jurisdictions, and notice will still be adequate even where the pleadings do not conform to Canadian standards as long as the defendant is informed in some other way of the amount in issue.

239      A requirement of particular relevance to this appeal is that adequate notice must include alerting the defendant to the consequences of any procedural steps taken or not taken, to the extent that those consequences would not be reasonably apparent to someone in the defendant's position. The claimant bears a certain responsibility for ensuring that a defendant who is not reasonably in a position to understand the particular workings of the foreign process does not inadvertently give up defences or waive rights as a result.

240      Proper notice also requires alerting the defendant to the allegations that will be adjudicated at trial. The defendant must be informed, by the pleadings or otherwise, of the basis on which damages are sought and the case to be answered. As Weiler J.A. noted, if in fact damages are assessed "beyond the pleadings" then the defendant will not have had true notice of what would take place in the proceedings and will have been deprived of the opportunity to make an informed decision as to whether to participate (at p. 676).

241      Authority for the proposition that natural justice comprises substantive principles of justice, as well as minimum procedural standards, is to be found in the judgment of the English Court of Appeal in *Adams v. Cape Industries Plc* (1989), [1991] 1 All E.R. 929 (Eng. C.A.), the leading English case on the enforcement of foreign judgments. The judgment sought to be enforced in that case originated in Texas and arose from a complex asbestos-poisoning action involving numerous plaintiffs and defendants. Damages were assessed in a rather unconventional way. On the suggestion of plaintiffs' counsel, the judge arrived at a global amount of damages to be distributed among the plaintiffs in fixed amounts which were not based on proof of the damages suffered by each individual plaintiff. This method of calculating damages was held by the English court to be contrary to natural justice because it was "not the result of a judicial assessment of the individual entitlements of the respective plaintiffs" and because no proper judicial hearing had been held on the quantum of damages (*Adams*, supra, at p. 1042). Slade L.J. held that it was a principle of substantive justice that unliquidated damages must be assessed "objectively by the independent judge on proof by the plaintiff of the relevant facts" (p. 1050).

242      *Adams* sets out a flexible and pragmatic approach to the natural justice defence which is appropriate for the Canadian context following *Morguard*. I agree with the English Court of Appeal that the defence can be triggered by principles of substantive justice, such as the proposition that damages should be based on objective proof and judicial assessment. In Weiler J.A.'s words, "the ultimate guidepost in deciding whether the defence of natural justice may be raised is procedural fairness based on underlying fundamental principles of justice" (at p. 675). The category is not closed. If a defendant can establish that the process by which the foreign judgment was obtained was contrary to the Canadian conception of natural justice — because the process itself is flawed, by reason of the way the plaintiff manipulated the process, or both — then the foreign judgment should not be enforced.

243      Weiler J.A. understood La Forest J.'s allusion to "fair process" in *Morguard* to refer to the rules of natural justice (p. 671). My colleague Major J. also appears to be of this opinion when he states, under the heading of " The Defence of Natural Justice", that the enforcing court must ensure that the judgment originates from a fair legal system (at para. 61). While these concepts are certainly related, in my view there is a meaningful distinction between the fairness of the legal system from which the judgment came and the fairness of the procedure followed in the particular case. Slade L.J. underlined this distinction in *Adams*, supra, when he observed that the Texas judgment originated from "an unimpeachable system of justice within one of the

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

great common law jurisdictions of the world" (p. 1048). The defendants in *Adams* argued not that the judgment was a product of an unfair system of justice, but that the judge's method of assessing damages did not comply with the rules of that system.

244     I would also note that La Forest J. expressly stated, in *Morguard*, supra, at p. 1103, that "fair process is not an issue within the Canadian federation". I would not take this to mean that the defence of natural justice can never be available against enforcement of a Canadian judgment. Although the justice system in Canada is fair, it is possible for failures of the system to occur in individual cases. For these reasons, I would hold that the "fair process" referred to in *Morguard* means a legal system that is free from corruption and bias — a requirement which, it seems to me, is relevant to the questions of whether the foreign court's jurisdiction should be recognized at all. The defence of natural justice, on the other hand, is concerned with whether the procedural steps followed in the particular case ensured that the defendant was treated with basic fairness.

245     Finally, the obligation of a defendant to pursue remedies available in the originating jurisdiction must be addressed. In *Adams*, supra, Slade L.J. held that opportunities for correcting a denial of natural justice that existed in the originating jurisdiction should be taken into account in assessing whether the defence of natural justice has been made out. It does not follow that the existence of such remedies automatically cures a failure of natural justice. Slade L.J. also recognized that the significance and weight of the fact that remedies were available in the originating forum must be assessed in light of all the relevant factors, including "the reasonableness in the circumstances of requiring or expecting that [the defendants] made use of the remedy in all the particular circumstances" (p. 1052-53).

### D. Application of the Impeachment Defences to the Facts of this Case

#### (1) Public Policy

246     If the defence of public policy is understood as a bar to enforcing immoral or unjust foreign laws, it is not met here. The enforcement of such a large award in the absence of a connection either to harm suffered by the plaintiffs and caused by the defendants or to conduct deserving of punishment on the part of the defendants would be contrary to basic Canadian ideas of justice. But there is no evidence that the law of Florida offends these principles. On the contrary, the record indicates that Florida law requires proof of damages in the usual fashion. Treble damages are only available by statute to victims of crimes. There is no indication that punitive damages are available where the defendant's conduct is not morally blameworthy.

247     In my view, the defects in the judgment, while severe, do not engage the public policy defence.

#### (2) Fraud

248     Under the rule that an allegation of fraud can only be considered if based on fresh evidence, the defence of fraud is not made out. All the facts that the appellants raise in this connection were known to them or could have been discovered at the time of the Florida action.

249     A further issue arises as to whether evidence of deliberate deception would be enough to vitiate the judgment. In my opinion, this is the kind of case for which a more lenient interpretation of the fraud defence would, in principle, be appropriate, because the appellants' decision not to attend the Florida proceedings was a reasonable one. Full participation in the Florida action would have been expensive, time-consuming and difficult. The appellants' own knowledge of the facts convinced them that the claim was frivolous, to say the least; they were amazed that it even resulted in a lawsuit. They thought, and they had every reason to think, that even if the claim succeeded they would be liable for no more than about US$8,000. Their conclusion that "the game was not worth the candle" was reasonable in the circumstances. Mr. Mulock testified that the defendants' non-participation might well have qualified as "excusable neglect" under Florida law due to the weakness of the claim and the fact that the defendants were foreign residents, among other factors. I see no reason why our law should deem these factors to be irrelevant.

250     If, in these circumstances, the plaintiffs took advantage of the opportunity to deceive the court by putting forward perjured or misleading evidence in order to obtain a higher award of damages, it would be unfair and contrary to the interests of the Canadian justice system for our courts to be obliged to enforce the judgment in spite of the fact that it was obtained by

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 194 of 342

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101
2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

deception. Such conduct by counsel for the Florida plaintiffs would be contrary to the ethical obligations of Ontario lawyers to pursue their clients' interests by fair and honourable means and without misrepresentation of the facts, and Ontario courts should not be put in the position of having to reward that conduct handsomely when the perpetrator is a lawyer in another jurisdiction.

251    The difficulty the appellants face is that there is no evidence that anything of this kind happened, because no record exists of the evidence and arguments put forward in the Florida damages hearing. Given the jury's findings, it is certainly a possibility, perhaps a strong possibility, that they were deliberately misled, but there are other possible explanations — for example, the plaintiffs may have presented only true facts and the jury might have misunderstood how the law applied to those facts. The allegation of fraud is a serious one, and the onus remains on the appellants to support it. It is significant that the appellants did not use their opportunity to question Mr. Beals or Mr. Groner, either in discovery or at trial, as to what was said in the damages hearing. Given the lack of evidence, even on the view that this judgment could be vitiated by proof of intentional fraud, the defence has not been made out. I agree with Major J. that the trial judge's findings of fact that the plaintiffs deliberately misled the jury are unsupported by the evidence and should not be upheld. The defence of fraud therefore does not apply. Natural justice, though, is a different matter.

*(3) Natural Justice*

252    The Ontario defendants were not given sufficient notice of the extent and nature of the claims against them in the Florida action. The claimants failed to give the defendants proper notice of the true nature of their claim and its potential ramifications. Furthermore, there was no notice as to the serious consequences to the defendants of failure to refile their defence in response to the claimant's repeatedly amended pleadings. As a result, the notice afforded to the defendants did not meet the requirements of natural justice.

253    The amount of damages claimed was not stated in the Amended Complaint. The only mention of a monetary amount was the formulaic reference to damages over $5,000 required to give the Florida Circuit Court monetary jurisdiction. This form of pleading did not give the defendants a clear picture of what was at stake. Indeed, Mr. Groner testified that as a matter of Florida practice they were expected to find out exactly what was being claimed through discovery.

254    Nor did the Amended Complaint set out with any precision the allegations on the basis of which damages, beyond the sale price of the land, were claimed. There is reference to construction costs and lost revenue, but none to the plaintiffs' assertion that the planned model home was to be rented to their company, Fox Chase Homes, and used to obtain further construction contracts. In fact, there is no mention at all of Fox Chase Homes. As Weiler J.A. noted, the plaintiffs could easily have provided the defendants with a copy of Mr. Beals's deposition, where he explained these matters, and thus ensured that the defendants were aware that significant business losses were being claimed (at p. 677). But the plaintiffs failed to alert the defendants to the peril they faced in this or any other way.

255    Perhaps the most important failure of natural justice in this case is the fact that the defendants were not given notice of the consequences of failing to continue to file new defences to the repeated changes to the Amended Complaint. There was nothing on the face of the Amended Complaint that would alert them to the need to refile, especially since the allegations against them remained unaltered. The annulment of their defence resulted from a technicality of Florida procedure of which defendants from a foreign jurisdiction could hardly be expected to be aware. Again, the plaintiffs could easily have advised them that a new defence was required, but they did not. The defendants had no warning of the danger in which they placed themselves simply by assuming that their initial defence was, as it appeared to be, an adequate response to the Amended Complaint. Not only did they lack the information they needed to assess whether or not they should defend; their failure to defend was not in any genuine sense a product of their own volition.

256    A foreign plaintiff who expects to have a judgment in his or her favour enforced by a Canadian court has a responsibility to ensure that the defendant is in a position to make an informed decision about how to respond. If the defendant can show that the plaintiff failed to discharge that responsibility, the court should refuse to enforce the judgment on the basis that the defendant was deprived of proper notice, a basic condition of natural justice. In this case, the Florida claimants should have notified the appellants of the steps they could take after new versions of the Amended Complaint were filed and, more importantly, of

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

the consequences of not taking those steps. Because they failed to do so, the appellants were unaware of the danger that their defence would lapse.

257      I would also note that in this case it appears that the judgment may have offended substantive principles of natural justice of the kind addressed in *Adams*, supra. It seems likely that the quantum of damages was fixed without proof that damages flowed from harm suffered by the plaintiffs as a result of the defendants' actions, and that punitive damages were awarded without demonstration of conduct on the defendants' part that was deserving of punishment. The problem, again, is that we do not know what was offered in evidence in the damages hearing in Florida. The conclusion seems all but inescapable that one of two things happened: either the Florida court was presented with false evidence on the damages issue, or it reached its conclusion without a proper judicial assessment of the conditions required, both by Florida law and as a matter of natural justice, to support an award of unliquidated damages. But because there is no transcript of the damages hearing and no other clear evidence of what took place there, neither scenario has been proven.

258      A deficiency in the fairness of the procedure by which the Florida court reached its decision having been established, the availability of remedies for that deficiency in Florida falls to be considered. The defendants did have options for correcting the problem in Florida. They could have moved for relief based on excusable neglect, or appealed. They did not avail themselves of those remedies.

259      What this means for the appellants' entitlement to rely on the natural justice defence must be ascertained by considering the reasonableness in all the circumstances of requiring them to make use of the remedies available in Florida. We must look at the reasons why they decided not to go to Florida to attack the judgment, but chose instead to trust that the Ontario courts would not enforce it.

260      The defendants' main reason for deciding as they did was that they were following the advice (which turned out to be erroneous) of legal counsel. They were told that if they went to Florida to challenge the judgment, Ontario courts would regard them as having attorned to Florida's jurisdiction and would be more likely to enforce the judgment against them. Given the information they had, the decision not to take steps in Florida was not only understandable but the only sensible option.

261      The majority appears to be of the view that the appellants are not entitled to any relief from the consequences of relying on mistaken legal advice. In my view, the mere fact that a defendant has received mistaken legal advice should not operate to relieve the claimant entirely of the consequences of a significant or substantial failure to observe the rules of natural justice, and it should not, in itself, bar the appellants from relying on this defence. I agree with Weiler J.A. that the reasonableness of expecting a defendant to use a remedy in a foreign jurisdiction must be assessed from that person's point of view. If the defendants were under a misapprehension as a result of reasonable reliance on the advice of counsel as to the relative risks of the options open to them, their assessment of the risks should not for that reason be discounted. This Court recognized in *Gauthier Manufacturing Ltd. v. Pont Viau (City)*, [1978] 2 S.C.R. 516 (S.C.C.), that a party should not be penalized for an error which is solely that of counsel, where the party itself has acted with diligence. This is not to say that a lawyer's mistake will always be an excuse for not participating in foreign proceedings. The totality of the circumstances must be examined. In this case, the appellants did their best to deal with the dispute conscientiously. In retrospect, it seems that applying for relief in the Florida court would have been a wiser choice, but no reasonable person in their position would have thought so at the time the choice was made.

262      A second factor relevant to the appellants' decision not to make use of remedies in Florida is their knowledge of the circumstances that would entitle them to such a remedy. In *Adams*, supra the defendant's failure to appeal the judgment in Texas was not dispositive, because the procedural irregularities that would have formed the basis of an appeal were not apparent on the face of the judgment. The only way that the defendant could have known about those defects was if it had participated in the proceedings. The court did not consider it fair to charge the defendants with knowledge of procedural irregularities that they would have known about had they attended the proceedings. The plaintiffs had the responsibility of avoiding procedural errors that would prevent enforcement in England. I agree with this reasoning, which in my view is also applicable to the present case. When the appellants received the Florida judgment, all they knew was the amount awarded against them. There was nothing

Case 09-10138-MFW Doc 15744-2 Filed 06/12/15 Page 196 of 342

Beals v. Saldanha, 2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101

2003 SCC 72, 2003 CSC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102...

to inform them of the method by which the Florida court reached its conclusion or to alert them to problems with that method that might form the basis of an appeal or a motion to set the judgment aside.

263     Finally, the appellants' perception of the quality of justice they were likely to receive in Florida must be taken into consideration. The evidence at trial was that Florida's legal system provides all the appropriate protections for judgment debtors in the appellants' position, and probably would have afforded them a remedy in these circumstances. But at the relevant time the appellants did not know this; they only knew that Florida's legal system had produced a judgment against them for an astronomical amount, a verdict that was difficult to reconcile with the simple facts they had set out in their defence. Their apprehensiveness about going back to that very legal system to seek relief was, in the circumstances, understandable.

*(4) Residual Concerns*

264     The facts of this appeal raise very serious concerns about the fairness of enforcing the Florida judgment which do not fit easily into the categories identified by the traditional impeachment defences. I have stated my conclusion that the facts do trigger the defence of natural justice, if it is interpreted in a purposive and flexible manner. Even if the natural justice defence did not apply, however, I would hold that this judgment should not be enforced.

265     The circumstances of this case are such that the enforcement of this judgment would shock the conscience of Canadians and cast a negative light on our justice system. The appellants have done nothing that infringes the rights of the respondents and have certainly done nothing to deserve such harsh punishment. Nor can they be said to have sought to avoid their obligations by hiding in their own jurisdiction or to have shown disrespect for the legal system of Florida. They have acted in good faith throughout and have diligently taken all the steps that appeared to be required of them, based on the information and advice they had. The plaintiffs in Florida appear to have taken advantage of the defendants' difficult position to pursue their interests as aggressively as possible and to secure a sizeable windfall. In an adversarial legal system, it was, of course, open to them to do so, but the Ontario court should not have to set its seal of approval on the judgment thus obtained without regard for the dubious nature of the claim, the fact that the parties did not compete on a level playing field and the lack of transparency in the Florida proceedings.

266     On this last point, I would add that their failure to obtain a record of the proceedings in the Florida court does not reflect well on the respondents. In this case, the appellants, who had the burden of proving that one of the impeachment defences applied, failed to pursue their opportunity to investigate what transpired in the damages hearing by questioning those who were there. As a result, it would be inappropriate to draw any negative inference in their favour from the lack of evidence about the Florida proceedings. But defendants will not always have such an opportunity. When one party entirely controls whether there will be a transcript of the proceedings in the foreign court and chooses not to get one, thus depriving the enforcing court of a full record of what happened and an opportunity to verify that there was no fraud and no procedural irregularities, Canadian courts should be highly circumspect about giving effect to the judgment.

**V. Conclusion**

267     In my view, this judgment should not be enforced in Canada. I would allow the appeal with costs to the appellants.

*Appeal dismissed.*

*Pourvoi rejeté.*

Footnotes

*     A corrigendum was issued by the court on January 22, 2004, and has been incorporated herein.

End of Document     Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# Tab 21

2014 ONSC 5811, 2014 CarswellOnt 13871, 122 O.R. (3d) 465, 20 C.B.R. (6th) 307...

2014 ONSC 5811
Ontario Superior Court of Justice [Commercial List]

MtGox Co., Re

2014 CarswellOnt 13871, 2014 ONSC 5811, 122 O.R. (3d) 465, 20 C.B.R. (6th) 307, 245 A.C.W.S. (3d) 280

# In the Matter of the Bankruptcy and Insolvency Act, R.S.C. 1992, C. 27, S.2, as Amended

In the Matter of Mtgox Co., Ltd., the Bankrupt in a Proceeding under Japan's
Bankruptcy Act before the Tokyo District Court Twentieth Civil Division

Application of Nobuaki Kobayashi, in his capacity as the bankrupcty Trustee of MtGox Co., Ltd. Pursuant to Japan's Bankruptcy Act Under Part XIII of The Bankruptcy and Insolvency Act (Cross-Border Insolvencies)

Newbould J.

Heard: October 3, 2014
Judgment: October 6, 2014
Docket: CV-14-10709-00CL

Counsel: Margaret R. Sims for Applicant

Subject: Insolvency; International

## Headnote

**Bankruptcy and insolvency --- Bankruptcy and insolvency jurisdiction — Jurisdiction of courts — Jurisdiction of Bankruptcy Court — Territorial jurisdiction — Foreign bankruptcies**

M Co. was Japanese corporation that operated online exchange for purchase and sale of bitcoins, a form of digital currency — M Co. was located and headquartered in Tokyo, Japan — In February 2014, M Co. halted all bitcoin withdrawals by its customers after it was subject to a massive theft — These events caused M Co. to become insolvent, and eventually led to bankruptcy proceeding in Japan — M Co. was subsequently named as defendant in pending class action filed in Ontario Superior Court of Justice (Ontario Court) — Trustee of M Co. applied to Ontario Court for initial recognition order recognizing bankruptcy proceeding commenced in Japan, declaring trustee as foreign representative, and staying all proceedings against M Co. — Application granted — Japan bankruptcy proceeding was judicial proceeding dealing with creditors' collective interests generally under Japan Bankruptcy Act (JPA), in which M Co.'s property was subject to supervision by Tokyo District Court — Trustee had authority pursuant to JPA and order of Tokyo District Court to administer M Co.'s property and affairs and to act as foreign representative — Accordingly, Japan bankruptcy proceeding constituted "foreign proceeding" and trustee constituted "foreign representative" under s. 268(1) of Bankruptcy and Insolvency Act (BIA) — M Co.'s centre of its main interests was its registered head office in Japan — Accordingly, Japan bankruptcy proceeding was foreign main proceeding, entitling M Co. to automatic stay under s. 271(1) of BIA.

## Table of Authorities

**Cases considered by *Newbould J.*:**

*Babcock & Wilcox Canada Ltd., Re* (2000), 5 B.L.R. (3d) 75, 18 C.B.R. (4th) 157, 2000 CarswellOnt 704 (Ont. S.C.J. [Commercial List]) — referred to

*Braycon International Inc. v. Everest & Jennings Canadian Ltd.* (2001), 26 C.B.R. (4th) 154, 2001 CarswellOnt 396 (Ont. S.C.J.) — considered

*Lear Canada, Re* (2009), 2009 CarswellOnt 4232, 55 C.B.R. (5th) 57 (Ont. S.C.J. [Commercial List]) — referred to

*Lightsquared LP, Re* (2012), 2012 ONSC 2994, 2012 CarswellOnt 8614, 92 C.B.R. (5th) 321 (Ont. S.C.J. [Commercial List]) — referred to

*Morguard Investments Ltd. v. De Savoye* (1990), 46 C.P.C. (2d) 1, 15 R.P.R. (2d) 1, 76 D.L.R. (4th) 256, 122 N.R. 81, [1991] 2 W.W.R. 217, 52 B.C.L.R. (2d) 160, [1990] 3 S.C.R. 1077, 1990 CarswellBC 283, 1990 CarswellBC 767 (S.C.C.) — followed

**Statutes considered:**

*Bankruptcy Act*, Act No. 75 of 2004
    Generally — referred to

*Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3
    Generally — referred to

    Pt. XIII — referred to

    s. 267 — considered

    ss. 267-284 — referred to

    s. 268(1) "foreign proceeding" — considered

    s. 268(1) "foreign representative" — considered

    s. 268(2) — considered

    s. 269 — pursuant to

    s. 269(1) — considered

    s. 270 — pursuant to

    s. 270(1) — considered

    s. 271(1)(a) — considered

*Civil Rehabilitation Act*, Act No. 225 of 1999
    Article 21(1) — pursuant to

    Article 25(iii) — considered

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36
    Generally — referred to

**Treaties considered:**

2014 ONSC 5811, 2014 CarswellOnt 13871, 122 O.R. (3d) 465, 20 C.B.R. (6th) 307...

*Hague Convention on the Civil Aspects of International Child Abduction, 1980*, C.T.S. 1983/35; 19 I.L.M. 1501
Generally — referred to

APPLICATION by bankruptcy trustee for initial recognition order pursuant to Part XIII of *Bankruptcy and Insolvency Act*.

***Newbould J.*:**

1      Nobuaki Kobayashi, in his capacity as the bankruptcy trustee of MtGox Co., Ltd. applied on October 3, 2014 for an initial recognition order pursuant to Part XIII (section 267 to 284) of the Bankruptcy and Insolvency Act, R.S.C. 1992, c. 27, s.2, as amended ("BIA"):

> (a) declaring and recognizing the bankruptcy proceedings commenced in respect of MtGox pursuant to the Bankruptcy Act of Japan, Act No. 75 of June 2, 2004 before the Tokyo District Court, Twentieth Civil Division as a foreign main proceeding for the purposes of section 270 of the BIA;

> (b) declaring that the Trustee is a foreign representative pursuant to section 268(1) of the BIA, and is entitled to bring this application pursuant to section 269 of the BIA; and

> (c) staying and enjoining any claims, rights, liens or proceedings against or in respect of MtGox and the property of MtGox.

2      I concluded at the hearing that the relief sought should be granted, for reasons to follow. These are my reasons.

3      MtGox is a Japanese corporation formed in 2011. It is, and always has been, located and headquartered in Tokyo, Japan. From April 2012 to February 2014, its business was the operation of an online exchange for the purchase and sale of bitcoins through its website located at http://www.mtgox.com. Bitcoins are a form of digital currency. At one time, the MtGox Exchange was reported to be the largest online bitcoin exchange in the world.

4      On or about February 10, 2014, MtGox halted all bitcoin withdrawals by its customers after it was subject to what appears to have been a massive theft or disappearance of bitcoins held by it. MtGox suspended all trading on or about February 24, 2014 after it was discovered that approximately 850,000 bitcoins were missing. These events caused, among other things, MtGox to become insolvent and ultimately led to the Japan bankruptcy proceeding.

5      On February 28, 2014, MtGox filed a petition for the commencement of a civil rehabilitation proceeding in the Tokyo Court pursuant to Article 21(1) of the Japan Civil Rehabilitation Act (JCRA), reporting that it had lost almost 850,000 bitcoins. A civil rehabilitation proceeding under the JCRA is analogous to a restructuring proceeding in Canada pursuant to the BIA or the CCAA.

6      Following the filing of the Japan civil rehabilitation petition, MtGox commenced an investigation with regard to the circumstances that led to the Japan civil rehabilitation. However, by mid-April, 2014, the Tokyo Court decided to dismiss the Japan civil rehabilitation petition pursuant to Article 25(3) of the JCRA, recognizing that under the circumstances it would be very difficult for MtGox to successfully prepare and obtain approval of a rehabilitation plan or otherwise successfully carry out the Japan civil rehabilitation.

7      On April 24, 2014, the Tokyo Court entered the Japan bankruptcy order, formally commencing MtGox's Japan bankruptcy proceeding and appointing the applicant as bankruptcy trustee.

8      MtGox has approximately 120,000 customers who had a bitcoin or fiat currency balance in their accounts as of the date of the Japan petition. The customers live in approximately 175 countries around the world.

9      MtGox has been named as a defendant in a pending class action filed in the Ontario Superior Court of Justice. The notice of action and statement of claim were provided to the Trustee under the Hague Convention on August 29, 2014.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

MtGox Co., Re, 2014 ONSC 5811, 2014 CarswellOnt 13871

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 201 of 342

2014 ONSC 5811, 2014 CarswellOnt 13871, 122 O.R. (3d) 465, 20 C.B.R. (6th) 307...

**Applicable law**

10     Various theories as to how multi-national bankruptcies should be dealt with have long existed. Historically many countries adopted a territorialism approach under which insolvency proceedings had an exclusively national or territorial focus that allowed each country to distribute the assets located in that country to local creditors in accordance with its local laws. Universalism is a theory that posits that the bankruptcy law to be applied should be that of the debtor's home jurisdiction, that all of the assets of the insolvent corporation, in whichever country they are situated, should be pooled together and administered by the court of the home country. Local courts in other countries would be expected, under universalism, to recognize and enforce the judgment of the home country's court. This theory of universalism has not taken hold.

11     There is increasingly a move towards what has been called modified universalism. The notion of modified universalism is court recognition of main proceedings in one jurisdiction and non-main proceedings in other jurisdictions, representing some compromise of state sovereignty under domestic proceedings to advance international comity and cooperation. It has been advanced by the United Nations Commission on International Trade Law (UNCITRAL) Model Law on Cross Border Insolvency, which Canada largely adopted by 2009 amendments to the CCAA and the BIA. [1] Before this amendment, Canada had gone far down the road in acting on comity principles in international insolvency. See *Babcock & Wilcox Canada Ltd., Re* (2000), 18 C.B.R. (4th) 157 (Ont. S.C.J. [Commercial List]) and *Lear Canada, Re* (2009), 55 C.B.R. (5th) 57 (Ont. S.C.J. [Commercial List]).

12     In the BIA, the Model Law was introduced by the enactment of Part XIII. Section 267 sets out the policy objectives of Part XIII as follows:

The purpose of this Part is to provide mechanisms for dealing with cases of cross-border insolvencies and to promote

(a) cooperation between the courts and other competent authorities in Canada with those of foreign jurisdictions in cases of cross-border insolvencies;

(b) greater legal certainty for trade and investment;

(c) the fair and efficient administration of cross-border insolvencies that protects the interests of creditors and other interested persons, and those of debtors;

(d) the protection and the maximization of the value of debtors' property; and

(e) the rescue of financially troubled businesses to protect investment and preserve employment.

*(a) Recognition of foreign proceeding*

13     Section 269(1) of the BIA provides for the application by a foreign representative to recognize a foreign proceeding. Pursuant to section 270(1) of the BIA, the court shall make an order recognizing the foreign proceeding if (i) the proceeding is a foreign proceeding and (ii) the applicant is a foreign representative of that proceeding.

14     A foreign proceeding is broadly defined in section 268(1) to mean a judicial or an administrative proceeding in a jurisdiction outside Canada dealing with creditor's collective interests generally under any law relating to bankruptcy or insolvency in which a debtor's property and affairs are subject to control or supervision by a foreign court for the purpose of reorganization or liquidation.

15     The Japan bankruptcy proceeding is a judicial proceeding dealing with creditors' collective interests generally under the Japan Bankruptcy Act, which is a law relating to bankruptcy and insolvency, in which MtGox's property is subject to supervision by the Tokyo District Court, Twentieth Civil Division. As such, the Japan bankruptcy proceeding is a foreign proceeding pursuant to section 268(1) of the BIA.

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 202 of 342

MtGox Co., Re, 2014 ONSC 5811, 2014 CarswellOnt 13871

2014 ONSC 5811, 2014 CarswellOnt 13871, 122 O.R. (3d) 465, 20 C.B.R. (6th) 307...

16      Section 268(1) of the BIA defines a foreign representative as a person or body who is authorized in a foreign proceeding in respect of a debtor company to (a) administer the debtor's property or affairs for the purpose of reorganization or liquidation or (b) act as a representative in respect of the foreign proceeding.

17      The Trustee has authority, pursuant to the Japan Bankruptcy Act and the bankruptcy order made by the Tokyo District Court in the Japan bankruptcy proceeding, to administer MtGox's property and affairs for the purpose of liquidation and to act as a foreign representative. Thus the Trustee is a foreign representative pursuant to section 268(1) of the BIA.

18      In the circumstances it is appropriate to recognize the Japan bankruptcy proceeding as a foreign proceeding.

***(b) Foreign Main Proceeding***

19      A foreign proceeding can be a foreign main proceeding or a foreign non-main proceeding. If the foreign proceeding is recognized as a main proceeding, there is an automatic stay provided in section 271(1) against law suits concerning the debtor's property, debts, liabilities or obligations and prohibitions against selling or disposing of property in Canada. If the foreign proceeding is recognized as a non-main proceeding, there is no such automatic stay and prohibition and it is necessary for an application to be made to obtain such relief. For that reason, it is advantageous for a foreign representative to seek an order recognizing the foreign proceeding as a main proceeding. The Trustee in this case has made such a request.

20      A foreign main proceeding is defined in section 268(1) as a foreign proceeding in a jurisdiction where the debtor company has the centre of its main interests (COMI). Section 268(2) provides that in the absence of proof to the contrary, a debtor company's registered office is deemed to be the centre of its main interests.

21      In considering whether the registered office presumption has been rebutted a court should consider the following factors in determining COMI (i) the location is readily ascertainable by creditors (ii) the location is one in which the debtor's principal assets and operations are found and (iii) the location is where the management of the debtor takes place. See *Lightsquared LP, Re* (2012), 92 C.B.R. (5th) 321 (Ont. S.C.J. [Commercial List]).

22      The Trustee relies on the following facts in support of his position that the COMI of MtGox is in Japan and not in Canada.

> (1) MtGox has no offices in Canada, there are no Canadian subsidiaries and no assets in located in Canada.

> (2) MtGox is and has always been organized under the laws of Japan.

> (3) MtGox's registered office and corporate headquarters are, and have always been, located in Japan, and the its books and records are located at its head office in Japan.

> (4) The Debtor's sole director and representative director, Mr. Karpeles, resides, and at all relevant times has resided, in Japan.

> (5) Most of the MtGox's bank accounts are located in Japan, including the primary account for operating its business.

> (6) MtGox's parent company, Tibanne, provided operational and administrative services to it, including the provision of its primary workforce, in Japan.

> (7) MtGox's Website clearly disclosed to customers and other third parties that it is a Japanese corporation that is located in Japan.

> (8) Upon the filing of the Japan Petition, MtGox commenced an investigation in Japan with regard to the circumstances that led to the Japan civil rehabilitation, which investigation was subject to the oversight of the Tokyo Court.

23      Taking into account this evidence, I am satisfied that the COMI of MtGox is its registered head office in Japan and that the Japan bankruptcy proceeding is a foreign main proceeding.

2014 ONSC 5811, 2014 CarswellOnt 13871, 122 O.R. (3d) 465, 20 C.B.R. (6th) 307...

**Stay of Proceedings**

24    The effect of recognition of a foreign main proceeding is an automatic grant of the relief set out under subsection 271(1) of the BIA:

271. (1) Subject to subsections (2) to (4), on the making of an order recognizing a foreign proceeding that is specified to be a foreign main proceeding,

(a) no person shall commence or continue any action, execution or other proceedings concerning the debtor's property, debts, liabilities or obligations;

(b) if the debtor carries on a business, the debtor shall not, outside the ordinary course of the business, sell or otherwise dispose of any of the debtor's property in Canada that relates to the business and shall not sell or otherwise dispose of any other property of the debtor in Canada; and

(c) if the debtor is an individual, the debtor shall not sell or otherwise dispose of any property of the debtor in Canada.

25    The Trustee seeks recognition of the the Japan bankruptcy proceeding in an effort to maximize recoveries to, and provide for an equitable distribution of value among, all creditors. In particular, the Trustee believes that the enjoining of the ongoing litigation against MtGox in Canada, in conjunction with the protections afforded by the Japan bankruptcy proceeding, is essential to this effort.

26    In *Braycon International Inc. v. Everest & Jennings Canadian Ltd.* (2001), 26 C.B.R. (4th) 154 (Ont. S.C.J.), prior to the adoption of the Model Law in Canada, a stay of an action in Ontario against a U.S. corporation subject to bankruptcy proceedings in the U.S. under chapter 11 of U.S. the Bankruptcy Code in which there was a stay of all proceedings against it was ordered pursuant to the comity principles recognized in *Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077 (S.C.C.).

27    The Model Law, which was adopted in Japan in 2000, provides a transparent regime for the right of foreign creditors to commence or participate in an insolvency proceeding in another state. See Dr. Janis Sarra, *supra*, at fn 1. Section 271(1)(a) of the BIA provides for an automatic stay in furtherance of that objective. As the Japanese foreign proceeding is a foreign main proceeding, the Trustee is entitled to that automatic stay. The Tokyo court has order ordered a process for claims to be made with a filing date of no later than May 29, 2015.

28    There have been two class actions commenced against MtGox in the U.S. The Trustee has obtained recognition of the Japan bankruptcy proceedings in the U.S. under chapter 15 of the U.S. Bankruptcy Code as a foreign main proceeding, resulting in an automatic stay of the U.S. litigation. The Trustee is entitled to the same relief in Canada relating to the class action filed in Ontario.

29    At the conclusion of the hearing on October 3, 2014 I signed an order reflecting these reasons.

*Application granted.*

Footnotes

1    See Dr. Janis Sarra, *Oversight and Financing of Cross-Border Business Enterprise Group Insolvency Proceedings*, 44 Texas International Law Journal 547

**End of Document**          Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# Tab 22

2000 CarswellOnt 704, [2000] O.J. No. 786, 18 C.B.R. (4th) 157, 5 B.L.R. (3d) 75...

2000 CarswellOnt 704
Ontario Superior Court of Justice [Commercial List]

Babcock & Wilcox Canada Ltd., Re

2000 CarswellOnt 704, [2000] O.J. No. 786, 18 C.B.R. (4th) 157, 5 B.L.R. (3d) 75, 95 A.C.W.S. (3d) 608

## In the Matter of Section 18.6 of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended

In the Matter of Babcock & Wilcox Canada Ltd.

Farley J.

Heard: February 25, 2000
Judgment: February 25, 2000
Docket: 00-CL-3667

Counsel: *Derrick Tay*, for Babcock & Wilcox Canada Ltd.
*Paul Macdonald*, for Citibank North America Inc., Lenders under the Post-Petition Credit Agreement.

Subject: Corporate and Commercial; Insolvency

### Headnote

**Corporations --- Arrangements and compromises — Under Companies' Creditors Arrangement Act — Arrangements — Effect of arrangement — Stay of proceedings**

Solvent corporation applied for interim order under s. 18.6 of Companies' Creditors Arrangement Act for stay of actions and enforcements against corporation in respect of asbestos tort claims — Application granted — Application was to be reviewed in light of doctrine of comity, inherent jurisdiction, and aspect of liberal interpretation of Act generally — Proceedings commenced by corporation's parent corporation in United States and other United States related corporations for protection under c. 11 of United States Bankruptcy Code in connection with mass asbestos tort claims constituted foreign proceeding for purposes of s. 18.6 of Act — Insolvency of debtor in foreign proceeding was not condition precedent for proceeding to be foreign proceeding under definition of s. 18.6 of Act — Corporation was entitled to avail itself of provisions of s. 18.6 of Act — Relief requested was not of nature contrary to provisions of Act — Recourse may be had to s. 18.6 of Act in case of solvent debtor — Chapter 11 proceedings in United States were intended to resolve mass asbestos-related tort claims that seriously threatened long-term viability of corporation's parent — Corporation was significant participant in overall international operation and interdependence existed between corporation and its parent as to facilities and services — Bankruptcy Code, 11 U.S.C. 1982, c. 11 — Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 18.6.

### Table of Authorities

**Cases considered by *Farley J.*:**

*Arrowmaster Inc. v. Unique Forming Ltd.* (1993), 17 O.R. (3d) 407, 29 C.P.C. (3d) 65 (Ont. Gen. Div.) — applied

*ATL Industries Inc. v. Han Eol Ind. Co.* (1995), 36 C.P.C. (3d) 288 (Ont. Gen. Div. [Commercial List]) — applied

**Westlaw**Next CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2000 CarswellOnt 704, [2000] O.J. No. 786, 18 C.B.R. (4th) 157, 5 B.L.R. (3d) 75...

Hongkong Bank of Canada v. Chef Ready Foods Ltd. (1990), 51 B.C.L.R. (2d) 84, 4 C.B.R. (3d) 311, *(sub nom. Chef Ready Foods Ltd. v. Hongkong Bank of Canada)* [1991] 2 W.W.R. 136 (B.C. C.A.) — referred to

Hunt v. T & N plc (1993), [1994] 1 W.W.R. 129, 21 C.P.C. (3d) 269, *(sub nom. Hunt v. Lac d'Amiante du Québec Ltée)* 37 B.C.A.C. 161, *(sub nom. Hunt v. Lac d'Amiante du Québec Ltée)* 60 W.A.C. 161, *(sub nom. Hunt v. T&N plc)* [1993] 4 S.C.R. 289, *(sub nom. Hunt v. T&N plc)* 109 D.L.R. (4th) 16, 85 B.C.L.R. (2d) 1, *(sub nom. Hunt v. Lac d'Amiante du Québec Ltée)* 161 N.R. 81 (S.C.C.) — referred to

Lehndorff General Partner Ltd., Re (1993), 17 C.B.R. (3d) 24, 9 B.L.R. (2d) 275 (Ont. Gen. Div. [Commercial List]) — referred to

Loewen Group Inc. v. Continental Insurance Co. of Canada (1997), 48 C.C.L.I. (2d) 119, 44 B.L.R. (3d) 387 (B.C. S.C.) — considered

Microbiz Corp. v. Classic Software Systems Inc. (1996), 45 C.B.R. (3d) 40 (Ont. Gen. Div.) — referred to

Morguard Investments Ltd. v. De Savoye (1990), 46 C.P.C. (2d) 1, 15 R.P.R. (2d) 1, 76 D.L.R. (4th) 256, 122 N.R. 81, [1991] 2 W.W.R. 217, 52 B.C.L.R. (2d) 160, [1990] 3 S.C.R. 1077 (S.C.C.) — applied

Olympia & York Developments Ltd. v. Royal Trust Co. (1993), 20 C.B.R. (3d) 165 (Ont. Gen. Div.) — considered

Pacific National Lease Holding Corp. v. Sun Life Trust Co., 34 C.B.R. (3d) 4, 10 B.C.L.R. (3d) 62, [1995] 10 W.W.R. 714, *(sub nom. Pacific National Lease Holding Corp., Re)* 62 B.C.A.C. 151, *(sub nom. Pacific National Lease Holding Corp., Re)* 103 W.A.C. 151 (B.C. C.A.) — referred to

Roberts v. Picture Butte Municipal Hospital (1998), 64 Alta. L.R. (3d) 218, 23 C.P.C. (4th) 300, 227 A.R. 308, [1999] 4 W.W.R. 443 (Alta. Q.B.) — considered

Taylor v. Dow Corning Australia Pty. Ltd. (December 19, 1997), Doc. 8438/95 (Australia Vic. Sup. Ct.) — referred to

Tradewell Inc. v. American Sensors & Electronics Inc. (U.S. S.D. N.Y. 1997)

Westar Mining Ltd., Re, 70 B.C.L.R. (2d) 6, 14 C.B.R. (3d) 88, [1992] 6 W.W.R. 331 (B.C. S.C.) — referred to

**Statutes considered:**

Bankruptcy Amendment Code, (U.S.), 1994
    Generally — considered

Bankruptcy Code, 11 U.S.C. 1982
    Chapter 11 — considered

    s. 524(g) — considered

Bankruptcy and Insolvency Act, R.S.C. 1985, c. B-3
    Pt XIII [en. 1997, c. 12, s. 118] — referred to

    s. 267 "debtor" [en. 1997, c. 12, s. 118] — considered

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 207 of 342

Babcock & Wilcox Canada Ltd., Re, 2000 CarswellOnt 704

2000 CarswellOnt 704, [2000] O.J. No. 786, 18 C.B.R. (4th) 157, 5 B.L.R. (3d) 75...

ss. 267-275 [en. 1997, c. 12, s. 118] — referred to

*Bankruptcy and Insolvency Act, the Companies' Creditors Arrangement Act and the Income Tax Act, Act to amend the*, S.C. 1997, c. 12
Generally — referred to

*Business Corporations Act*, R.S.O. 1990, c. B.16
Generally — referred to

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36
s. 2 "debtor company" — considered

s. 3 — considered

s. 4 — considered

s. 5 — considered

s. 17 — referred to

s. 18.6 [en. 1997, c. 12, s. 125] — considered

s. 18.6(1) "foreign proceeding" [en. 1997, c. 12, s. 125] — considered

s. 18.6(2) [en. 1997, c. 12, s. 125] — considered

s. 18.6(3) [en. 1997, c. 12, s. 125] — considered

s. 18.6(4) [en. 1997, c. 12, s. 125] — considered

s. 18.6(8) [en. 1997, c. 12, s. 125] — considered

APPLICATION by solvent corporation for interim order under s. 18.6 of *Companies' Creditors Arrangement Act*.

*Farley J.*:

1    I have had the opportunity to reflect on this matter which involves an aspect of the recent amendments to the insolvency legislation of Canada, which amendments have not yet been otherwise dealt with as to their substance. The applicant, Babcock & Wilcox Canada Ltd. ("BW Canada"), a solvent company, has applied for an interim order under s. 18.6 of the *Companies' Creditors Arrangement Act* ("CCAA"):

(a) that the proceedings commenced by BW Canada's parent U.S. corporation and certain other U.S. related corporations (collectively "BWUS") for protection under Chapter 11 of the U.S. Bankruptcy Code in connection with mass asbestos claims before the U.S. Bankruptcy Court be recognized as a "foreign proceeding" for the purposes of s. 18.6;

(b) that BW Canada be declared a company which is entitled to avail itself of the provisions of s. 18.6;

(c) that there be a stay against suits and enforcements until May 1, 2000 (or such later date as the Court may order) as to asbestos related proceedings against BW Canada, its property and its directors;

2000 CarswellOnt 704, [2000] O.J. No. 786, 18 C.B.R. (4th) 157, 5 B.L.R. (3d) 75...

     (d) that BW Canada be authorized to guarantee the obligations of its parent to the DIP Lender (debtor in possession lender) and grant security therefor in favour of the DIP Lender; and

     (e) and for other ancillary relief.

2    In Chapter 11 proceedings under the U.S. Bankruptcy Code, the U.S. Bankruptcy Court in New Orleans issued a temporary restraining order on February 22, 2000 wherein it was noted that BW Canada may be subject to actions in Canada similar to the U.S. asbestos claims. U.S. Bankruptcy Court Judge Brown's temporary restraining order was directed against certain named U.S. resident plaintiffs in the asbestos litigation:

     . . . and towards all plaintiffs and potential plaintiffs in Other Derivative Actions, that they are hereby restrained further prosecuting Pending Actions or further prosecuting or commencing Other Derivative Actions against Non-Debtor Affiliates, until the Court decides whether to grant the Debtors' request for a preliminary injunction.

Judge Brown further requested the aid and assistance of the Canadian courts in carrying out the U.S. Bankruptcy Court's orders. The "Non-Debtor Affiliates" would include BW Canada.

3    Under the 1994 amendments to the U.S. Bankruptcy Code, the concept of the establishment of a trust sufficient to meet the court determined liability for a mass torts situations was introduced. I am advised that after many years of successfully resolving the overwhelming majority of claims against it on an individual basis by settlement on terms BWUS considered reasonable, BWUS has determined, as a result of a spike in claims with escalating demands when it was expecting a decrease in claims, that it is appropriate to resort to the mass tort trust concept. Hence its application earlier this week to Judge Brown with a view to eventually working out a global process, including incorporating any Canadian claims. This would be done in conjunction with its joint pool of insurance which covers both BWUS and BW Canada. Chapter 11 proceedings do not require an applicant thereunder to be insolvent; thus BWUS was able to make an application with a view towards the 1994 amendments (including s. 524(g)). This subsection would permit the U.S. Bankruptcy Court on confirmation of a plan of reorganization under Chapter 11 with a view towards rehabilitation in the sense of avoiding insolvency in a mass torts situation to:

     . . . enjoin entities from taking legal action for the purpose of directly or indirectly collecting, recovering, or receiving payment or recovery with respect to any claims or demand that, under a plan of reorganization, is to be paid in whole or in part by a trust.

4    In 1997, ss. 267-275 of the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3, as amended ("BIA") and s. 18.6 of the CCAA were enacted to address the rising number of international insolvencies ("1997 Amendments"). The 1997 Amendments were introduced after a lengthy consultation process with the insolvency profession and others. Previous to the 1997 Amendments, Canadian courts essentially would rely on the evolving common law principles of comity which permitted the Canadian court to recognize and enforce in Canada the judicial acts of other jurisdictions.

5    La Forest J in *Morguard Investments Ltd. v. De Savoye* (1990), 76 D.L.R. (4th) 256 (S.C.C.), at p. 269 described the principle of comity as:

     "Comity" in the legal sense, is neither a matter of absolute obligation, on the one hand, nor mere courtesy and goodwill, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protections of its laws . . .

6    In *ATL Industries Inc. v. Han Eol Ind. Co.* (1995), 36 C.P.C. (3d) 288 (Ont. Gen. Div. [Commercial List]), at pp. 302-3 I noted the following:

     Allow me to start off by stating that I agree with the analysis of MacPherson J. in *Arrowmaster Inc. v. Unique Forming Ltd.* (1993), 17 O.R. (3d) 407 (Gen. Div.) when in discussing *Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R.

2000 CarswellOnt 704, [2000] O.J. No. 786, 18 C.B.R. (4th) 157, 5 B.L.R. (3d) 75...

1077, 76 D.L.R. (4th) 256, 52 B.C.L.R. (2d) 160, 122 N.R. 81, [1991] 2 W.W.R. 217, 46 C.P.C. (2d) 1, 15 R.P.R. (2d) 1, he states at p.411:

> The leading case dealing with the enforcement of "foreign" judgments is the decision of the Supreme Court of Canada in *Morguard Investments, supra.* The question in that case was whether, and the circumstances in which, the judgment of an Alberta court could be enforced in British Columbia. A unanimous court, speaking through La Forest J., held in favour of enforceability and, in so doing, discussed in some detail the doctrinal principles governing inter-jurisdictional enforcement of orders. I think it fair to say that the overarching theme of La Forest J.'s reasons is the necessity and desirability, in a mobile global society, for governments and courts to respect the orders made by courts in foreign jurisdictions with comparable legal systems, including substantive laws and rules of procedure. He expressed this theme in these words, at p. 1095:

>> Modern states, however, cannot live in splendid isolation and do give effect to judgments given in other countries in certain circumstances. Thus a judgment *in rem*, such as a decree of divorce granted by the courts of one state to persons domiciled there, will be recognized by the courts of other states. In certain circumstances, as well, our courts will enforce personal judgments given in other states. Thus, we saw, our courts will enforce an action for breach of contract given by the courts of another country if the defendant was present there at the time of the action or has agreed to the foreign court's exercise of jurisdiction. *This, it was thought, was in conformity with the requirements of comity, the informing principle of private international law, which has been stated to be the deference and respect due by other states to the actions of a state legitimately taken within its territory. Since the state where the judgment was given has power over the litigants, the judgments of its courts should be respected.* (emphasis added in original)

> *Morguard Investments* was, as stated earlier, a case dealing with the enforcement of a court order across provincial boundaries. However, the historical analysis in La Forest J.'s judgment, of both the United Kingdom and Canadian jurisprudence, and the doctrinal principles enunciated by the court are equally applicable, in my view, in a situation where the judgment has been rendered by a court in a foreign jurisdiction. This should not be an absolute rule - there will be some foreign court orders that should not be enforced in Ontario, perhaps because the substantive law in the foreign country is so different from Ontario's or perhaps because the legal process that generates the foreign order diverges radically from Ontario's process. (my emphasis added)

Certainly the substantive and procedural aspects of the U.S. Bankruptcy Code including its 1994 amendments are not so different and do not radically diverge from our system.

7    After reviewing La Forest J.'s definition of comity, I went on to observe at p. 316:

> As was discussed by J.G. Castel, *Canadian Conflicts of Laws*, 3rd ed. (Toronto: Butterworths, 1994) at p. 270, there is a presumption of validity attaching to a foreign judgment unless and until it is established to be invalid. It would seem that the same type of evidence would be required to impeach a foreign judgment as a domestic one: fraud practiced on the court or tribunal: see *Sun Alliance Insurance Co. v. Thompson* (1981), 56 N.S.R. (2d) 619, 117 A.P.R. 619 (T.D.), Sopinka, supra, at p. 992.

La Forest J. went on to observe in *Morguard* at pp. 269-70:

> In a word, the rules of private international law are grounded in the need in modern times to facilitate the flow of wealth, skills and people across state lines in a fair and orderly manner.

>                                         . . . . .

> Accommodating the flow of wealth, skills and people across state lines has now become imperative. Under these circumstances, our approach to the recognition and enforcement of foreign judgments would appear ripe for reappraisal.

See also *Hunt v. T & N plc* (1993), 109 D.L.R. (4th) 16 (S.C.C.), at p. 39.

2000 CarswellOnt 704, [2000] O.J. No. 786, 18 C.B.R. (4th) 157, 5 B.L.R. (3d) 75...

8      While *Morguard* was an interprovincial case, there is no doubt that the principles in that case are equally applicable to international matters in the view of MacPherson J. and myself in *Arrowmaster* (1993), 17 O.R. (3d) 407 (Ont. Gen. Div.), and *ATL* respectively. Indeed the analysis by La Forest J. was on an international plane. As a country whose well-being is so heavily founded on international trade and investment, Canada of necessity is very conscious of the desirability of invoking comity in appropriate cases.

9      In the context of cross-border insolvencies, Canadian and U.S. Courts have made efforts to complement, coordinate and where appropriate accommodate the proceedings of the other. Examples of this would include *Olympia & York Developments Ltd.*, *Ever fresh Beverages Inc.* and *Loewen Group Inc. v. Continental Insurance Co. of Canada* (1997), 48 C.C.L.I. (2d) 119 (B.C. S.C.). Other examples involve the situation where a multi-jurisdictional proceeding is specifically connected to one jurisdiction with that jurisdiction's court being allowed to exercise principal control over the insolvency process: see *Roberts v. Picture Butte Municipal Hospital* (1998), 23 C.P.C. (4th) 300 (Alta. Q.B.), at pp. 5-7 [[1998] A.J. No. 817]; *Microbiz Corp. v. Classic Software Systems Inc.* (1996), 45 C.B.R. (3d) 40 (Ont. Gen. Div.), at p. 4; *Tradewell Inc. v. American Sensors Electronics, Inc.*, 1997 WL 423075  (S.D.N.Y. 1997).

10      In *Roberts*, Forsythe J. at pp. 5-7 noted that steps within the proceedings themselves are also subject to the dictates of comity in recognizing and enforcing a U.S. Bankruptcy Court stay in the *Dow Corning* litigation [*Taylor v. Dow Corning Australia Pty. Ltd.* (December 19, 1997), Doc. 8438/95 (Australia Vic. Sup. Ct.)] as to a debtor in Canada so as to promote greater efficiency, certainty and consistency in connection with the debtor's restructuring efforts. Foreign claimants were provided for in the U.S. corporation's plan. Forsyth J. stated:

> Comity and cooperation are increasingly important in the bankruptcy context. *As internationalization increases, more parties have assets and carry on activities in several jurisdictions. Without some coordination there would be multiple proceedings, inconsistent judgments and general uncertainty.*
>
> . . . I find that common sense dictates that these matters would be best dealt with by one court, and in the interest of promoting international comity it seems the forum for this case is in the U.S. Bankruptcy Court. Thus, in either case, whether there has been an attornment or not, I conclude it is appropriate for me to exercise my discretion and apply the principles of comity and grant the Defendant's stay application. I reach this conclusion based on all the circumstances, including the clear wording of the U.S. Bankruptcy Code provision, the similar philosophies and procedures in Canada and the U.S., the Plaintiff's attornment to the jurisdiction of the U.S. Bankruptcy Court, and the incredible number of claims outstanding . . . (emphasis added)

11      The CCAA as remedial legislation should be given a liberal interpretation to facilitate its objectives. See *Hongkong Bank of Canada v. Chef Ready Foods Ltd.* (1990), 4 C.B.R. (3d) 311 (B.C. C.A.), at p. 320; *Lehndorff General Partner Ltd., Re* (1993), 17 C.B.R. (3d) 24 (Ont. Gen. Div. [Commercial List]).

12      David Tobin, the Director General, Corporate Governance Branch, Department of Industry in testifying before the Standing Committee on Industry regarding Bill C-5, An Act to amend the BIA, the CCAA and the Income Tax Act, stated at 1600:

> Provisions in Bill C-5 attempt to actually codify, which has always been the practice in Canada. They include the Court recognition of foreign representatives; Court authority to make orders to facilitate and coordinate international insolvencies; provisions that would make it clear that foreign representatives are allowed to commence proceedings in Canada, as per Canadian rules - however, they clarify that foreign stays of proceedings are not applicable but a foreign representative can apply to a court for a stay in Canada; and Canadian creditors and assets are protected by the bankruptcy and insolvency rules.

The philosophy of the practice in international matters relating to the CCAA is set forth in *Olympia & York Developments Ltd. v. Royal Trust Co.* (1993), 20 C.B.R. (3d) 165 (Ont. Gen. Div.), at p. 167 where Blair J. stated:

2000 CarswellOnt 704, [2000] O.J. No. 786, 18 C.B.R. (4th) 157, 5 B.L.R. (3d) 75...

The Olympia & York re-organization involves proceedings in three different jurisdictions: Canada, the United States and the United Kingdom. Insolvency disputes with international overtones and involving property and assets in a multiplicity of jurisdictions are becoming increasingly frequent. Often there are differences in legal concepts - sometimes substantive, sometimes procedural - between the jurisdictions. The Courts of the various jurisdictions should seek to cooperate amongst themselves, in my view, in facilitating the trans-border resolution of such disputes as a whole, where that can be done in a fashion consistent with their own fundamental principles of jurisprudence. The interests of international cooperation and comity, and the interests of developing at least some degree of certitude in international business and commerce, call for nothing less.

Blair J. then proceeded to invoke inherent jurisdiction to implement the Protocol between the U.S. Bankruptcy Court and the Ontario Court. See also my endorsement of December 20, 1995, in *Everfresh Beverages Inc.* where I observed: "I would think that this Protocol demonstrates the 'essence of comity' between the Courts of Canada and the United States of America." *Everfresh* was an example of the effective and efficient use of the Cross-Border Insolvency Concordat, adopted by the Council of the International Bar Association on May 31, 1996 (after being adopted by its Section on Business Law Council on September 17, 1995), which Concordat deals with, inter alia, principal administration of a debtor's reorganization and ancillary jurisdiction. See also the UNCITRAL Model Law on Cross-Border Insolvency.

13      Thus it seems to me that this application by BW Canada should be reviewed in light of (i) the doctrine of comity as analyzed in *Morguard, Arrowmaster* and *ATL, supra*, in regard to its international aspects; (ii) inherent jurisdiction; (iii) the aspect of the liberal interpretation of the CCAA generally; and (iv) the assistance and codification of the 1997 Amendments.

"Foreign proceeding" is defined in s. 18.6(1) as:

In this section,

"foreign proceeding" means a judicial or administrative proceeding commenced outside Canada in respect of a debtor under a law relating to bankruptcy or insolvency and dealing with the collective interests of creditors generally; . . .

Certainly a U.S. Chapter 11 proceeding would fit this definition subject to the question of "debtor". It is important to note that the definition of "foreign proceeding" in s. 18.6 of the CCAA contains no specific requirement that the debtor be insolvent. In contrast, the BIA defines a "debtor" in the context of a foreign proceeding (Part XIII of the BIA) as follows:

s. 267 In this Part,

"debtor" means an *insolvent person* who has property in Canada, a *bankrupt* who has property in Canada or a *person who has the status of a bankrupt* under foreign law in a foreign proceeding and has property in Canada; . . . (emphasis added)

I think it a fair observation that the BIA is a rather defined code which goes into extensive detail. This should be contrasted with the CCAA which is a very short general statute which has been utilized to give flexibility to meet what might be described as the peculiar and unusual situation circumstances. A general categorization (which of course is never completely accurate) is that the BIA may be seen as being used for more run of the mill cases whereas the CCAA may be seen as facilitating the more unique or complicated cases. Certainly the CCAA provides the flexibility to deal with the thornier questions. Thus I do not think it unusual that the draftees of the 1997 Amendments would have it in their minds that the provisions of the CCAA dealing with foreign proceedings should continue to reflect this broader and more flexible approach in keeping with the general provisions of the CCAA, in contrast with the corresponding provisions under the BIA. In particular, it would appear to me to be a reasonably plain reading interpretation of s. 18.6 that recourse may be had to s. 18.6 of the CCAA in the case of a solvent debtor. Thus I would conclude that the aspect of insolvency is not a condition precedent vis-a-vis the "debtor" in the foreign proceedings (here the Chapter 11 proceedings) for the proceedings in Louisiana to be a foreign proceeding under the definition of s. 18.6. I therefore declare that those proceedings are to be recognized as a "foreign proceeding" for the purposes of s. 18.6 of the CCAA.

Babcock & Wilcox Canada Ltd., Re, 2000 CarswellOnt 704

2000 CarswellOnt 704, [2000] O.J. No. 786, 18 C.B.R. (4th) 157, 5 B.L.R. (3d) 75...

14     It appears to me that my conclusion above is reinforced by an analysis of s. 18.6(2) which deals with concurrent filings by a debtor under the CCAA in Canada and corresponding bankruptcy or insolvency legislation in a foreign jurisdiction. This is not the situation here, but it would be applicable in the *Loewen* case. That subsection deals with the coordination of proceedings as to a "debtor company" initiated pursuant to the CCAA and the foreign legislation.

> s. 18.6(2). The court may, in respect of a *debtor company*, make such orders and grant such relief as it considers appropriate to facilitate, approve or implement arrangements that will result in a coordination of proceedings under the Act with any foreign proceeding. (emphasis added)

15     The definition of "debtor company" is found in the general definition section of the CCAA, namely s. 2 and that definition incorporates the concept of insolvency. Section 18.6(2) refers to a "debtor company" since only a "debtor company" can file under the CCAA to propose a compromise with its unsecured or secured creditors: ss. 3, 4 and 5 CCAA. See also s. 18.6(8) which deals with currency concessions "[w]here a compromise or arrangement is proposed in respect of a debtor company . . . ". I note that "debtor company" is not otherwise referred to in s. 18.6; however "debtor" is referred to in both definitions under s. 18.6(1).

16     However, s. 18.6(4) provides a basis pursuant to which a company such as BW Canada, a solvent corporation, may seek judicial assistance and protection in connection with a foreign proceeding. Unlike s. 18.6(2), s. 18.6(4) does not contemplate a full filing under the CCAA. Rather s. 18.6(4) may be utilized to deal with situations where, notwithstanding that a full filing is not being made under the CCAA, ancillary relief is required in connection with a foreign proceeding.

> s. 18.6(4) Nothing in this section prevents the court, on the application of a foreign representative or *any other interested persons*, from applying such legal or equitable rules governing the recognition of foreign insolvency orders and assistance to foreign representatives as are not inconsistent with the provisions of this Act. (emphasis added)

BW Canada would fit within "any interested person" to bring the subject application to apply the principles of comity and cooperation. It would not appear to me that the relief requested is of a nature contrary to the provisions of the CCAA.

17     Additionally there is s. 18.6(3) whereby once it has been established that there is a foreign proceeding within the meaning of s. 18.6(1) (as I have concluded there is), then this court is given broad powers and wide latitude, all of which is consistent with the general judicial analysis of the CCAA overall, to make any order it thinks appropriate in the circumstances.

> s. 18.6(3) An order of the court under this Section may be made on such terms and conditions as the court considers appropriate in the circumstances.

This subsection reinforces the view expressed previously that the 1997 Amendments contemplated that it would be inappropriate to pigeonhole or otherwise constrain the interpretation of s. 18.6 since it would be not only impracticable but also impossible to contemplate the myriad of circumstances arising under a wide variety of foreign legislation which deal generally and essentially with bankruptcy and insolvency but not exclusively so. Thus, the Court was entrusted to exercise its discretion, but of course in a judicial manner.

18     Even aside from that, I note that the Courts of this country have utilized inherent jurisdiction to fill in any gaps in the legislation and to promote the objectives of the CCAA. Where there is a gap which requires bridging, then the question to be considered is what will be the most practical common sense approach to establishing the connection between the parts of the legislation so as to reach a just and reasonable solution. See *Westar Mining Ltd., Re* (1992), 14 C.B.R. (3d) 88 (B.C. S.C.), at pp. 93-4; *Pacific National Lease Holding Corp. v. Sun Life Trust Co.* (1995), 34 C.B.R. (3d) 4 (B.C. C.A.), at p. 2; *Lehndorff General Partner Ltd.* at p. 30.

19     The Chapter 11 proceedings are intended to resolve the mass asbestos related tort claims which seriously threaten the long term viability of BWUS and its subsidiaries including BW Canada. BW Canada is a significant participant in the overall Babcock & Wilcox international organization. From the record before me it appears reasonably clear that there is an interdependence between BWUS and BW Canada as to facilities and services. In addition there is the fundamental element of

financial and business stability. This interdependence has been increased by the financial assistance given by the BW Canada guarantee of BWUS' obligations.

20    To date the overwhelming thrust of the asbestos related litigation has been focussed in the U.S. In contradistinction BW Canada has not in essence been involved in asbestos litigation to date. The 1994 amendments to the U.S. Bankruptcy Code have provided a specific regime which is designed to deal with the mass tort claims (which number in the hundreds of thousands of claims in the U.S.) which appear to be endemic in the U.S. litigation arena involving asbestos related claims as well as other types of mass torts. This Court's assistance however is being sought to stay asbestos related claims against BW Canada with a view to this stay facilitating an environment in which a global solution may be worked out within the context of the Chapter 11 proceedings trust.

21    In my view, s. 18.6(3) and (4) permit BW Canada to apply to this Court for such a stay and other appropriate relief. Relying upon the existing law on the recognition of foreign insolvency orders and proceedings, the principles and practicalities discussed and illustrated in the Cross-Border Insolvency Concordat and the UNCITRAL Model Law on Cross-Border Insolvencies and inherent jurisdiction, all as discussed above, I would think that the following may be of assistance in advancing guidelines as to how s. 18.6 should be applied. I do not intend the factors listed below to be exclusive or exhaustive but merely an initial attempt to provide guidance:

(a) The recognition of comity and cooperation between the courts of various jurisdictions are to be encouraged.

(b) Respect should be accorded to the overall thrust of foreign bankruptcy and insolvency legislation in any analysis, unless in substance generally it is so different from the bankruptcy and insolvency law of Canada or perhaps because the legal process that generates the foreign order diverges radically from the process here in Canada.

(c) All stakeholders are to be treated equitably, and to the extent reasonably possible, common or like stakeholders are to be treated equally, regardless of the jurisdiction in which they reside.

(d) The enterprise is to be permitted to implement a plan so as to reorganize as a global unit, especially where there is an established interdependence on a transnational basis of the enterprise and to the extent reasonably practicable, one jurisdiction should take charge of the principal administration of the enterprise's reorganization, where such principal type approach will facilitate a potential reorganization and which respects the claims of the stakeholders and does not inappropriately detract from the net benefits which may be available from alternative approaches.

(e) The role of the court and the extent of the jurisdiction it exercises will vary on a case by case basis and depend to a significant degree upon the court's nexus to that enterprise; in considering the appropriate level of its involvement, the court would consider:

(i) the location of the debtor's principal operations, undertaking and assets;

(ii) the location of the debtor's stakeholders;

(iii) the development of the law in each jurisdiction to address the specific problems of the debtor and the enterprise;

(iv) the substantive and procedural law which may be applied so that the aspect of undue prejudice may be analyzed;

(v) such other factors as may be appropriate in the instant circumstances.

(f) Where one jurisdiction has an ancillary role,

(i) the court in the ancillary jurisdiction should be provided with information on an ongoing basis and be kept apprised of developments in respect of that debtor's reorganizational efforts in the foreign jurisdiction;

2000 CarswellOnt 704, [2000] O.J. No. 786, 18 C.B.R. (4th) 157, 5 B.L.R. (3d) 75...

(ii) stakeholders in the ancillary jurisdiction should be afforded appropriate access to the proceedings in the principal jurisdiction.

(g) As effective notice as is reasonably practicable in the circumstances should be given to all affected stakeholders, with an opportunity for such stakeholders to come back into the court to review the granted order with a view, if thought desirable, to rescind or vary the granted order or to obtain any other appropriate relief in the circumstances.

22    Taking these factors into consideration, and with the determination that the Chapter 11 proceedings are a "foreign proceeding" within the meaning of s. 18.6 of the CCAA and that it is appropriate to declare that BW Canada is entitled to avail itself of the provisions of s. 18.6, I would also grant the following relief. There is to be a stay against suits and enforcement as requested; the initial time period would appear reasonable in the circumstances to allow BWUS to return to the U.S. Bankruptcy Court. Assuming the injunctive relief is continued there, this will provide some additional time to more fully prepare an initial draft approach with respect to ongoing matters. It should also be recognized that if such future relief is not granted in the U.S. Bankruptcy Court, any interested person could avail themselves of the "comeback" clause in the draft order presented to me and which I find reasonable in the circumstances. It appears appropriate, in the circumstances that BW Canada guarantee BWUS' obligations as aforesaid and to grant security in respect thereof, recognizing that same is permitted pursuant to the general corporate legislation affecting BW Canada, namely the *Business Corporations Act* (Ontario). I note that there is also a provision for an "Information Officer" who will give quarterly reports to this Court. Notices are to be published in the Globe & Mail (National Edition) and the National Post. In accordance with my suggestion at the hearing, the draft order notice has been revised to note that persons are alerted to the fact that they may become a participant in these Canadian proceedings and further that, if so, they may make representations as to pursuing their remedies regarding asbestos related claims in Canada as opposed to the U.S. As discussed above the draft order also includes an appropriate "comeback" clause. This Court (and I specifically) look forward to working in a cooperative judicial way with the U.S. Bankruptcy Court (and Judge Brown specifically).

23    I am satisfied that it is appropriate in these circumstances to grant an order in the form of the revised draft (a copy of which is attached to these reasons for the easy reference of others who may be interested in this area of s. 18.6 of the CCAA).

24    Order to issue accordingly.

*Application granted.*

## APPENDIX

Court File No. 00-CL-3667

SUPERIOR COURT OF JUSTICE
COMMERCIAL LIST

THE HONOURABLE                    FRIDAY, THE 25{TH} DAY OF
MR. JUSTICE FARLEY                 FEBRUARY, 2000

IN THE MATTER OF S. 18.6 OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED
AND IN THE MATTER OF BABCOCK & WILCOX CANADA LTD.

INITIAL ORDER

*THIS MOTION* made by the Applicant Babcock & Wilcox Canada Ltd. for an Order substantially in the form attached to the Application Record herein was heard this day, at 393 University Avenue, Toronto, Ontario.

*ON READING* the Notice of Application, the Affidavit of Victor J. Manica sworn February 23, 2000 (the "Manica Affidavit"), and on notice to the counsel appearing, and upon being advised that no other person who might be interested in these proceedings was served with the Notice of Application herein.

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 215 of 342

Babcock & Wilcox Canada Ltd., Re, 2000 CarswellOnt 704

2000 CarswellOnt 704, [2000] O.J. No. 786, 18 C.B.R. (4th) 157, 5 B.L.R. (3d) 75...

SERVICE

1. *THIS COURT ORDERS* that the time for service of the Notice of Application and the Affidavit in support of this Application be and it is hereby abridged such that the Application is properly returnable today, and, further, that any requirement for service of the Notice of Application and of the Application Record upon any interested party, other than the parties herein mentioned, is hereby dispensed with.

RECOGNITION OF THE U.S. PROCEEDINGS

2. *THIS COURT ORDERS AND DECLARES* that the proceedings commenced by the Applicant's United States corporate parent and certain other related corporations in the United States for protection under Chapter 11 of the U.S. Bankruptcy Code in connection with asbestos claims before the U.S. Bankruptcy Court (the "U.S. Proceedings") be and hereby is recognized as a "foreign proceeding" for purposes of Section 18.6 of the Companies' Creditors Arrangement Act, R.S.C. 1985, c.C-36, as amended, (the "CCAA").

APPLICATION

3. *THIS COURT ORDERS AND DECLARES* that the Applicant is a company which is entitled to relief pursuant to s. 18.6 of the CCAA.

PROTECTION FROM ASBESTOS PROCEEDINGS

4. *THIS COURT ORDERS* that until and including May 1, 2000, or such later date as the Court may order (the "Stay Period"), no suit, action, enforcement process, extra-judicial proceeding or other proceeding relating to, arising out of or in any way connected to damages or loss suffered, directly or indirectly, from asbestos, asbestos contamination or asbestos related diseases ("Asbestos Proceedings") against or in respect of the Applicant, its directors or any property of the Applicant, wheresoever located, and whether held by the Applicant in whole or in part, directly or indirectly, as principal or nominee, beneficially or otherwise shall be commenced, and any Asbestos Proceedings against or in respect of the Applicant, its directors or the Applicant's Property already commenced be and are hereby stayed and suspended.

5. *THIS COURT ORDERS* that during the Stay Period, the right of any person, firm, corporation, governmental authority or other entity to assert, enforce or exercise any right, option or remedy arising by law, by virtue of any agreement or by any other means, as a result of the making or filing of these proceedings, the U.S. Proceedings or any allegation made in these proceedings or the U.S. Proceedings be and is hereby restrained.

DIP FINANCING

6. *THIS COURT ORDERS* that the Applicant is hereby authorized and empowered to guarantee the obligations of its parent, The Babcock & Wilcox Company, to Citibank, N.A., as Administrative Agent, the Lenders, the Swing Loan Lender, and Issuing Banks (as those terms are defined in the Post-Petition Credit Agreement (the "Credit Agreement")) dated as of February 22, 2000 (collectively, the "DIP Lender"), and to grant security (the "DIP Lender's Security") for such guarantee substantially on the terms and conditions set forth in the Credit Agreement.

7. *THIS COURT ORDERS* that the obligations of the Applicant pursuant to the Credit Agreement, the DIP Lender's Security and all the documents delivered pursuant thereto constitute legal, valid and binding obligations of the Applicant enforceable against it in accordance with the terms thereof, and the payments made and security granted by the Applicant pursuant to such documents do not constitute fraudulent preferences, or other challengeable or reviewable transactions under any applicable law.

8. *THIS COURT ORDERS* that the DIP Lender's Security shall be deemed to be valid and effective notwithstanding any negative covenants, prohibitions or other similar provisions with respect to incurring debt or the creation of liens or security contained in any existing agreement between the Applicant and any lender and that, notwithstanding any provision to the contrary in such agreements,

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 216 of 342

Babcock & Wilcox Canada Ltd., Re, 2000 CarswellOnt 704

2000 CarswellOnt 704, [2000] O.J. No. 786, 18 C.B.R. (4th) 157, 5 B.L.R. (3d) 75...

(a) the execution, delivery, perfection or registration of the DIP Lender's Security shall not create or be deemed to constitute a breach by the Applicant of any agreement to which it is a party, and

(b) the DIP Lender shall have no liability to any person whatsoever as a result of any breach of any agreement caused by or resulting from the Applicant entering into the Credit Agreement, the DIP Lender's Security or other document delivered pursuant thereto.

REPORT AND EXTENSION OF STAY

9. As part of any application by the Applicant for an extension of the Stay Period:

(a) the Applicant shall appoint Victor J. Manica, or such other senior officer as it deems appropriate from time to time, as an information officer (the "Information Officer");

(b) the Information Officer shall deliver to the Court a report at least once every three months outlining the status of the U.S. Proceeding, the development of any process for dealing with asbestos claims and such other information as the Information Officer believes to be material (the "Information Reports"); and

(c) the Applicant and the Information Officer shall incur no liability or obligation as a result of the appointment of the Information Officer or the fulfilment of the duties of the Information Officer in carrying out the provisions of this Order and no action or other proceedings shall be commenced against the Applicant or Information Officer as an result of or relating in any way to the appointment of the Information Officer or the fulfilment of the duties of the Information Officer, except with prior leave of this Court and upon further order securing the solicitor and his own client costs of the Information Officer and the Applicant in connection with any such action or proceeding.

SERVICE AND NOTICE

10. *THIS COURT ORDERS* that the Applicant shall, within fifteen (15) business days of the date of entry of this Order, publish a notice of this Order in substantially the form attached as Schedule "A" hereto on two separate days in the Globe & Mail (National Edition) and the National Post.

11. *THIS COURT ORDERS* that the Applicant be at liberty to serve this Order, any other orders in these proceedings, all other proceedings, notices and documents by prepaid ordinary mail, courier, personal delivery or electronic transmission to any interested party at their addresses as last shown on the records of the Applicant and that any such service or notice by courier, personal delivery or electronic transmission shall be deemed to be received on the next business day following the date of forwarding thereof, or if sent by ordinary mail, on the third business day after mailing.

MISCELLANEOUS

12. *THIS COURT ORDERS* that notwithstanding anything else contained herein, the Applicant may, by written consent of its counsel of record herein, agree to waive any of the protections provided to it herein.

13. *THIS COURT ORDERS* that the Applicant may, from time to time, apply to this Court for directions in the discharge of its powers and duties hereunder or in respect of the proper execution of this Order.

14. *THIS COURT ORDERS* that, notwithstanding any other provision of this Order, any interested person may apply to this Court to vary or rescind this order or seek other relief upon 10 days' notice to the Applicant and to any other party likely to be affected by the order sought or upon such other notice, if any, as this Court may order.

15. *THIS COURT ORDERS AND REQUESTS* the aid and recognition of any court or any judicial, regulatory or administrative body in any province or territory of Canada (including the assistance of any court in Canada pursuant to Section 17 of the CCAA) and the Federal Court of Canada and any judicial, regulatory or administrative tribunal or other court constituted pursuant to

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 217 of 342
Babcock & Wilcox Canada Ltd., Re, 2000 CarswellOnt 704

2000 CarswellOnt 704, [2000] O.J. No. 786, 18 C.B.R. (4th) 157, 5 B.L.R. (3d) 75...

the Parliament of Canada or the legislature of any province and any court or any judicial, regulatory or administrative body of the United States and the states or other subdivisions of the United States and of any other nation or state to act in aid of and to be complementary to this Court in carrying out the terms of this Order.

### Schedule "A"

NOTICE

RE: IN THE MATTER OF S. 18.6 OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED (the "CCAA")

AND IN THE MATTER OF BABCOCK & WILCOX CANADA LTD.

*PLEASE TAKE NOTICE* that this notice is being published pursuant to an Order of the Superior Court of Justice of Ontario made February 25, 2000. The corporate parent of Babcock & Wilcox Canada Ltd. and certain other affiliated corporations in the United States have filed for protection in the United States under Chapter 11 of the Bankruptcy Code to seek, as the result of recent, sharp increases in the cost of settling asbestos claims which have seriously threatened the Babcock & Wilcox Enterprise's long term health, protection from mass asbestos claims to which they are or may become subject. Babcock & Wilcox Canada Ltd. itself has not filed under Chapter 11 but has sought and obtained an interim order under Section 18.6 of the CCAA affording it a stay against asbestos claims in Canada. Further application may be made to the Court by Babcock & Wilcox Canada Ltd. to ensure fair and equal access for Canadians with asbestos claims against Babcock & Wilcox Canada Ltd. to the process established in the United States. Representations may also be made by parties who would prefer to pursue their remedies in Canada.

Persons who wish to be a party to the Canadian proceedings or to receive a copy of the order or any further information should contact counsel for Babcock & Wilcox Canada Ltd., Derrick C. Tay at Meighen Demers (Telephone (416) 340-6032 and Fax (416) 977-5239).

DATED this day of, 2000 at Toronto, Canada

---

**End of Document**          Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# Tab 23

2009 CarswellOnt 4232, 179 A.C.W.S. (3d) 45, 55 C.B.R. (5th) 57

2009 CarswellOnt 4232
Ontario Superior Court of Justice [Commercial List]

Lear Canada, Re

2009 CarswellOnt 4232, 179 A.C.W.S. (3d) 45, 55 C.B.R. (5th) 57

## IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF LEAR CANADA, LEAR CANADA INVESTMENTS LTD., LEAR CORPORATION CANADA LTD. AND THE OTHER APPLICANTS LISTED ON SCHEDULE "A"

APPLICATION UNDER SECTION 18.6 OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

Pepall J.

Judgment: July 14, 2009
Docket: CV-09-00008269-00CL

Counsel: K. McElcheran, R. Stabile for Applicants
E. Lamek for Proposed Information Officer
A. Cobb for J.P. Morgan Chase Bank, N. A.

Subject: Insolvency

### Headnote

**Bankruptcy and insolvency --- Bankruptcy and insolvency jurisdiction — Jurisdiction of courts — Jurisdiction of Bankruptcy Court — Territorial jurisdiction — Foreign bankruptcies**

Insolvent debtor American company had Canadian subsidiary — Debtor was unable to meet obligations and began restructuring process in United States — Subsidiary and company brought application for recognition of foreign order — Application granted — Stay of proceedings in Canada granted — Subsidiary was entitled to apply for order as interested person under s. 18.6(4) of Companies' Creditors Arrangement Act and as debtor within s. 18.6(1) — While Companies' Creditors Arrangement Act does not define person, Bankruptcy and Insolvency Act extends definition to partnership — Real and substantial connection existed to American proceedings — Canadian operations were inextricably linked with business in foreign jurisdiction — Restructuring process required to occur internationally — Multiplicity of proceedings should be avoided.

### Table of Authorities

**Cases considered by *Pepall J.*:**

*Babcock & Wilcox Canada Ltd., Re* (2000), 5 B.L.R. (3d) 75, 18 C.B.R. (4th) 157, 2000 CarswellOnt 704 (Ont. S.C.J. [Commercial List]) — considered

*Holt Cargo Systems Inc. v. ABC Containerline N.V. (Trustees of)* (2001), 2001 SCC 90, 2001 CarswellNat 2816, 2001 CarswellNat 2817, [2001] 3 S.C.R. 907, 30 C.B.R. (4th) 6, 280 N.R. 1, 207 D.L.R. (4th) 577 (S.C.C.) — referred to

*Magna Entertainment Corp., Re* (2009), 2009 CarswellOnt 1267, 51 C.B.R. (5th) 82 (Ont. S.C.J.) — referred to

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

*Matlack Inc., Re* (2001), [2001] O.T.C. 382, 26 C.B.R. (4th) 45, 2001 CarswellOnt 1830 (Ont. S.C.J. [Commercial List]) — considered

*United Air Lines Inc., Re* (2003), 43 C.B.R. (4th) 284, 2003 CarswellOnt 2786 (Ont. S.C.J. [Commercial List]) — referred to

**Statutes considered:**

*Bankruptcy Code*, 11 U.S.C.
    Generally — referred to

    Chapter 11 — referred to

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36
    Generally — referred to

    s. 2 "debtor company" — referred to

    s. 18.6 [en. 1997, c. 12, s. 125] — considered

    s. 18.6(1) "foreign proceeding" [en. 1997, c. 12, s. 125] — considered

    s. 18.6(2) [en. 1997, c. 12, s. 125] — considered

    s. 18.6(3) [en. 1997, c. 12, s. 125] — referred to

    s. 18.6(4) [en. 1997, c. 12, s. 125] — considered

APPLICATION by subsidiary of debtor and debtor for recognition of foreign order in bankruptcy proceedings.

***Pepall J.*:**

**Relief Requested**

1    Lear Canada, Lear Canada Investments Inc., Lear Corporation Canada Ltd. (the "Canadian Applicants") and other Applicants listed on Schedule "A" to the notice of motion request:

    1. an order pursuant to section 18.6 of the CCAA recognizing and declaring that the Chapter 11 proceedings in the U.S. Bankruptcy Court for the Southern District of New York constitute "foreign proceedings";

    2. a stay of proceedings against any of the Applicants or their property; and

    3. an order appointing RSM Richter Inc. as information officer to report to this Court on the status of the U.S proceedings.

**Backround Facts**

2    Lear Corporation is a corporation organized under the laws of the State of Delaware with headquarters in Southfield, Michigan. Its shares are listed on the New York Stock Exchange. It conducts its operations through approximately 210 facilities in 36 countries and is the ultimate parent company of about 125 directly and indirectly wholly-owned subsidiaries (collectively, "Lear"). Lear Canada Investments Ltd. and Lear Corporation Canada are both wholly-owned indirect subsidiaries of Lear

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2009 CarswellOnt 4232, 179 A.C.W.S. (3d) 45, 55 C.B.R. (5th) 57

Corporation. They are incorporated pursuant to the laws of Alberta. Lear Canada is a partnership owned 99.9% by Lear Corporation Canada Ltd. and 0.1% by Lear Canada Investments Ltd. and is the only operating entity of Lear in Canada.

3    Lear is a leading global supplier of automotive seating systems, electrical distribution systems, and electronic products. It has established itself as a Tier 1 global supplier of these parts to every major original equipment manufacturer ("OEM"). Lear has world wide manufacturing and production facilities, four of which are in Canada, namely Ajax, Kitchener, St. Thomas, and Whitby, Ontario. A fifth facility in Windsor, Ontario was closed in May of this year. Lear employs approximately 7,200 employees world wide of which 1,720 are employed by the Canadian operations. 1,600 are paid on an hourly basis and 120 are paid salary. 1,600 are members of the CAW and are covered by 5 separate collective bargaining agreements. Lear maintains a qualified defined contribution component of the Canadian salaried pension plan and 8 Canadian qualified defined benefit plans.

4    Lear conducts its North American business on a fully integrated basis. All management functions are based at the corporate headquarters in Southfield, Michigan and all customer relationships are maintained on a North American basis. The U.S. headquarters' operational support for the Canadian locations includes, but is not limited to, primary customer interface and support, product design and engineering, manufacturing and engineering, prototyping, launch support, programme management, purchasing and supplier qualification, testing and validation, and quality assurance. In addition, other support is provided for human resources, finance, information technology and other administrative functions.

5    Lear's Canadian operations are also linked to its U.S. operations through the companies' supply chain. Lear's facilities in Whitby, Ajax, and St. Thomas supply complete seat systems on a just-in-time basis to automotive assembly operations of the U.S. based OEMs, General Motors and Ford in Ontario. Lear's Kitchener facility manufactures seat metal components which are supplied primarily to several Lear assembly locations in the U.S., Canada and Mexico.

6    Lear Corporation, Lear Canada and others entered into a credit agreement with a syndicate of institutions led by J.P. Morgan Chase Bank, N.A. acting as general administrative agent and the Bank of Nova Scotia acting as the Canadian administrative agent. It provides for aggregate commitments of $2.289US billion. Although Lear Canada is a borrower under this senior secured credit facility, it is only liable for borrowings made in Canada and no funds have been advanced in this country.

7    Additionally, Lear Corporation has outstanding approximately $1.29US billion of senior unsecured notes. The Canadian Applicants are not issuers or guarantors of any of them.

8    Over the past several years, Lear has worked on restructuring its business. As part of this initiative, it closed or initiated the closure of 28 manufacturing facilities and 10 administrative/engineering facilities by the end of 2008. This included the Windsor facility for which statutory severance amounts owing to all employees have been paid.

9    Despite its efforts, Lear was faced with turmoil in the automotive industry. Decreased consumer confidence, limited credit availability and decreased demand for new vehicles all led to decreased production. As a result of these conditions, Lear defaulted under its senior secured credit facility in late 2008. In early 2009, Lear engaged in discussions with senior secured facility lenders and unsecured noteholders. It reached an agreement with the majority of them wherein they agreed to support a Chapter 11 plan.

10    On July 7, 2009, Lear filed voluntary petitions for relief under Chapter 11 of the US Bankruptcy Code and sought "first day" orders in those proceedings in the United States Bankruptcy Court for the Southern District of New York. The Applicants now seek recognition of those proceedings and the orders. Lear expects to emerge from the Chapter 11 proceedings and any associated proceedings in other jurisdictions as a substantially de-leveraged enterprise with competitive going forward operations, and to do so in a timely basis.

**Applicable Law**

11    Section 18.6 of the CCAA was introduced in 1997 to address the rising number of international insolvencies. Courts have recognized that in the context of cross-border insolvencies, comity is to be encouraged. Efforts are made to complement, coordinate, and where appropriate, accommodate insolvency proceedings commenced in foreign jurisdictions.

2009 CarswellOnt 4232, 179 A.C.W.S. (3d) 45, 55 C.B.R. (5th) 57

12    Section 18.6(1) provides that "foreign proceeding" means a judicial or administrative proceeding commenced outside Canada in respect of a debtor under a law relating to bankruptcy or insolvency and dealing with the collective interests of creditors generally. It is well recognized that proceedings under Chapter 11 of the U.S. Bankruptcy Code fall within that definition and that, while not identical, the substance and procedures of the U.S. Bankruptcy Code are similar to those found in the Canadian bankruptcy regime: *United Air Lines Inc., Re* [1]

13    *Babcock & Wilcox Canada Ltd., Re* [2] provided an early interpretation of section 18.6, and while not without some controversy [3], the practice in Canadian insolvency proceedings has evolved accordingly. In that case, Farley J. distinguished between section 18.6(2) of the Act, which deals with concurrent filings by a debtor company under the CCAA in Canada and corresponding bankruptcy or insolvency legislation in a foreign jurisdiction, and section 18.6(4) which may deal with ancillary proceedings such as this one. As with section 2 of the Act, section 18.6(2) is in respect of a debtor company whereas section 18.6(4) permits any interested person to apply for recognition. As such, he held that the applicant before him was not required to meet the Act's definition of "debtor company" which required the company to be insolvent. [4] In addition, he noted that section 18.6(3) provides that an order of the Court under section 18.6 may be made on such terms and conditions as the Court considers appropriate in the circumstances.

14    Applying those legal principles, the Applicants are entitled to apply for an order pursuant to section 18.6 of the CCAA. They are debtors within the definition of section 18.6(1) and interested persons falling within section 18.6(4). In this regard, while the CCAA does not define the term "person", the BIA definition extends to include a partnership. In the absence of a definition in the CCAA, by analogy it is reasonable to interpret the term "person" as including a partnership.

15    I must then consider whether the order requested should be granted. In exercising discretion under section 18.6, it has been repeatedly held that in the context of an insolvency, the Court should consider whether a real and substantial connection exists between a matter and the foreign jurisdiction: *Matlack Inc., Re* [5] and *Magna Entertainment Corp., Re* [6] Where the operations of debtors are most closely connected to a foreign jurisdiction and the Canadian operations are inextricably linked with the business located in that foreign jurisdiction, it is appropriate for the Court in the foreign jurisdiction to exercise principal control over the insolvency process in accordance with the principles of comity and to avoid a multiplicity of proceedings: *Matlack, Re* [7]. As noted in that case, it is in the interests of creditors and stakeholders that a reorganization proceed in a coordinated fashion. This provides for stability and certainty. "The objective of such coordination is to ensure that creditors are treated as equitably and fairly as possible, wherever they are located." [8]

16    I am satisfied that an order recognizing the U.S. proceeding as a foreign proceeding within the meaning of section 18.6(1) should be granted and that a real and substantial connection has been established. The Applicants including Lear Canada are part of an integrated multi-national corporate enterprise with operations in 36 countries, one of which is Canada. Lear conducts its North American business on a fully integrated basis. As mentioned, all management functions are based at the U.S. corporate headquarters and all customer relationships are maintained on a North American basis. As such, the managerial and operational support for the Canadian locations is situate in the United States. In addition, Lear's Canadian operations are linked to the U.S. operations through the Lear's supply chain. As evidence of same, a note to Lear Canada's December 31, 2008 unaudited financial statement states that Lear Corporation provides Lear Canada with "significant operating support, including the negotiation of substantially all of its sales contracts. Such support is significant to the success of the Partnership's future operations and its ability to realize the carrying value of its assets."

17    I am also of the view that it is both necessary and desirable that the restructuring of this international enterprise be coordinated and that a multiplicity of proceedings in two different jurisdictions should be avoided. Granting relief will enable the Applicants to continue to operate in the ordinary course and preserve value and customer relationships. Coordination will also provide stability. The U.S. Court will be the primary court overseeing the restructuring proceedings of Lear. I also note that in its report filed with the Court, the proposed Information Officer, RSM Richter Inc., expressed its support for the relief requested by the Applicants.

18      That said, increasingly with the downturn in the global economy, this Court is entertaining requests for concurrent or ancillary orders relating to multi-group enterprises typically with a significant cross-border element. Frequently, relative to the whole enterprise, the Canadian component is small. From the viewpoint of efficiency and speed, both of which are important features of a restructuring, an applicant may be of the view that the Canadian operations do not merit a CCAA filing other than a section 18.6 request. In addressing whether to grant relief pursuant to section 18.6, the Court should, amongst other things, consider the interests of stakeholders in this country and the impact, if any, that may result from the relief requested. This would include benefits and prejudice such as any juridical advantage that may be compromised. [9] These issues should be addressed by an applicant in its materials. Assuming there are benefits, the existence of prejudice does not necessarily mean that the order will be refused but it is important that these facts at least be considered, and if appropriate, certain protections should be incorporated into the order granted.

19      By way of example, in this case, the Court raised certain issues with the Applicants and they readily and appropriately in my view, filed additional affidavit evidence and included other provisions in the proposed order. The Court was concerned with the treatment that might be afforded Canadian unsecured creditors and particularly employees and trade creditors. Lear Canada had total current assets of approximately $60US million as at May 31, 2009 which included approximately $20US million in cash. Its total assets amounted to approximately $115US million. Total current liabilities as at the same time period amounted to about $75US million. In addition, pension and other post-retirement benefit obligations were stated to amount to about $170US million. There were also intercompany accounts of approximately $190US million in favour of Lear Canada for total liabilities of about $55US million. Counsel for the Applicants advised that significant pre-petition payments had been made to suppliers and that the intention is for Lear Canada to continue to carry on business.

20      In the additional evidence filed, the Applicants indicated that they had not yet sought approval of DIP financing arrangements but that under the proposed arrangement, the Canadian Applicants would not be borrowers or guarantors. In addition, the term sheet agreed to between the Applicants and the senior credit facility lenders provided that the Canadian Applicants had agreed to pay all general unsecured claims in full as they become due. Additionally, the Applicants had obtained an order in the U.S. proceedings authorizing them to pay and honour certain pre-petition claims for wages, salaries, bonuses and other compensation and it is the intention of the Applicants to continue to pay all wages and compensation due and to be due to Canadian employees. The Applicants are up to date on all current and special payments associated with the Canadian pension plans and will continue to make these payments going forward. Provisions reflecting this evidence were incorporated into the Court order.

21      The Canadian Applicants were not to make any advances or transfers of funds except to pay for goods and services in the ordinary course of business and in accordance with existing practices and similarly were not to grant security over or encumber or release their property. They also were to pay current service and special payments with respect to the Canadian pensions. The order further provided that in the event of inconsistencies between it and the terms of the Chapter 11 orders, the provisions of my order were to govern.

22      The order includes a stay of proceedings against the Applicants and their property, a recognition of various orders and an administration charge and a directors' charge. The order also includes the usual come back provision in which any person affected may move to rescind or vary the order on at least 7 days' notice.

23      Where one jurisdiction has an ancillary role, the Court in the ancillary jurisdiction should be provided with information on an on going basis and be kept apprised of developments in respect of the debtors' reorganization efforts in the foreign jurisdiction. In addition, stakeholders in the ancillary jurisdiction should be afforded appropriate access to the proceedings in the principal jurisdiction. [10] In this case, RSM Richter Inc. as Information Officer intends to be a watchdog and monitor developments in the U.S. proceedings and keep this Court informed. This Court supports its request to be added to the service list in the Chapter 11 proceeding and any request for standing before the U.S. Bankruptcy Court for the Southern District of New York that the Information Officer may make. In this regard, this Court seeks the aid and assistance of that Court.

*Application granted.*

WestlawNext. CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Lear Canada, Re, 2009 CarswellOnt 4232
2009 CarswellOnt 4232, 179 A.C.W.S. (3d) 45, 55 C.B.R. (5th) 57

Footnotes

1    (2003), 43 C.B.R. (4th) 284 (Ont. S.C.J. [Commercial List]), at 285.

2    (2000), 18 C.B.R. (4th) 157 (Ont. S.C.J. [Commercial List]).

3    See for example, Professor J.S. Ziegel's article "Corporate Groups and Canada-U.S. Cross-Border Insolvencies: Contrasting Judicial Visions", (2001) 35 C.B.L.J. 459.

4    It should be noted that a voluntary filing under Chapter 11 does not require an applicant to be insolvent and a partnership is eligible to apply for relief as well.

5    (2001), 26 C.B.R. (4th) 45 (Ont. S.C.J. [Commercial List]).

6    (2009), 51 C.B.R. (5th) 82 (Ont. S.C.J.).

7    Supra, note 5 at para. 8.

8    Ibid, at para. 3.

9    See *Holt Cargo Systems Inc. v. ABC Containerline N.V. (Trustees of)*, [2001] 3 S.C.R. 907 (S.C.C.).

10   See *Babcock & Wilcox Canada Ltd., Re*, supra, note 2 at para. 21.

**End of Document**        Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# Tab 24

2009 CarswellOnt 7007
Ontario Superior Court of Justice [Commercial List]

Tucker v. Aero Inventory (UK) Ltd.

2009 CarswellOnt 7007, 183 A.C.W.S. (3d) 443

## IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

JAMES ROBERT TUCKER, RICHARD HEIS, AND ALLAN WATSON GRAHAM OF KPMG LLP AS JOINT ADMINISTRATORS (Applicants) and AERO INVENTORY (UK) LIMITED and AERO INVENTORY PLC (Respondents)

Newbould J.

Heard: November 11, 2009
Judgment: November 12, 2009
Docket: 09-CL-8456-00CL

Counsel: Orestes Pasparakis, Virginie Gauthier for Applicants

Subject: Insolvency; International; Corporate and Commercial

### Headnote

**Bankruptcy and insolvency --- Bankruptcy and insolvency jurisdiction — Jurisdiction of courts — Jurisdiction of Bankruptcy Court — Territorial jurisdiction — Foreign bankruptcies**

**Bankruptcy and insolvency --- Companies' Creditors Arrangement Act — Initial application — Proceedings subject to stay — Set-off**

### Table of Authorities

**Cases considered by _Newbould J._:**

_Air Canada, Re_ (2003), 45 C.B.R. (4th) 13, 2003 CarswellOnt 4016, 39 B.L.R. (3d) 153 (Ont. S.C.J. [Commercial List]) — considered

_Lear Canada, Re_ (2009), 2009 CarswellOnt 4232, 55 C.B.R. (5th) 57 (Ont. S.C.J. [Commercial List]) — considered

_Olympia & York Developments Ltd. v. Royal Trust Co._ (1993), 1993 CarswellOnt 212, 20 C.B.R. (3d) 165 (Ont. Gen. Div.) — considered

_United Air Lines Inc., Re_ (2003), 43 C.B.R. (4th) 284, 2003 CarswellOnt 2786 (Ont. S.C.J. [Commercial List]) — considered

**Statutes considered:**

_Companies' Creditors Arrangement Act_, R.S.C. 1985, c. C-36

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Generally — referred to

Pt. IV — referred to

s. 9(1) — considered

s. 18.1 [en. 1997, c. 12, s. 125] — considered

s. 21 — considered

s. 44 — referred to

s. 45(1) "foreign proceeding" — considered

s. 45(2) — considered

s. 47 — considered

s. 47(1) — considered

s. 47(2) — considered

s. 49(1) — considered

s. 50 — considered

*Insolvency Act*, 1986, c. 45
Generally — referred to

*Newbould J.*:

1    This application was made on November 11, 2009 under s. 47(1) [1] of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 ("CCAA") for an order recognizing the administration proceedings (the "foreign proceedings") commenced in respect of each of Aero Inventory (UK) Limited and Aero Inventory plc (the "foreign debtors") in the High Court of Justice of England and Wales as a "foreign main proceeding" for the purposes of section 47 of the CCAA, and for other consequential relief. At the conclusion of the hearing I made the order sought for reasons to follow. These are my reasons.

**Factual background**

2    On November 11, 2009, the applicants were appointed by the High Court of Justice of England and Wales (Chancery Division, Companies Court) as administrators (the "Administrators") over Aero Inventory (UK) Limited ("Aero Inventory (UK)") and Aero Inventory plc ("Aero plc").

3    Aero Inventory (UK) provides procurement and inventory management services in the aerospace industry. These services are provided with regard to consumable and expendable parts required for aerospace maintenance and related activities, such as nuts, bolts and gaskets. Aero plc is the corporate parent of Aero Inventory (UK) and has been listed on the Alternative Investment Market (AIM) of the London Stock Exchange since 2000.

4    The foreign debtors are both located in New Barnet, Hertfordshire, United Kingdom. Their business operations are managed and administered in the United Kingdom. Aero Inventory (UK) has customers and/or supplies products from the following countries and regions: England, The Republic of Ireland, Australia, Bahrain, El Salvador, Canada, China, Hong Kong, Indonesia, Japan, Switzerland and the United States.

5    Aero Inventory (UK) has conducted business in Canada since 2007. It provides inventory and procurement services to two Canadian customers, Air Canada and Aveos Fleet Performance Inc. ("Aveos").

6    While it has a registered address in Quebec, Aero Inventory (UK) has no physical presence in Canada. The property at this address is in fact leased by the foreign debtors' Canadian affiliate, Aero Inventory (Canada) Inc. ("Aero (Canada)"). The foreign debtors have no premises and no employees in Canada. The inventory of Aero Inventory (UK) is physically located at the premises of its customer.

7    Aero (Canada) provides services in Canada to the foreign debtors pursuant to a management arrangement. Aero (Canada) has employees but no customers or inventory and no source of revenues other than through its management arrangement.

8    In November 2007, Aero Inventory (UK) signed a 10-year sole supplier agreement for consumable aircraft parts with ACTS Technical Support & Services Inc., which was later renamed Aveos. This agreement covers the procurement and management of all parts required by Aveos for its operations in Canada and, through its subsidiary Aeroman, in El Salvador.

9    The entire inventory owned by the foreign debtors in Canada, whether bound for Air Canada or for Aveos, is located at various warehouses across Canada operated by Aveos These warehouses are located in Ontario, Quebec, Manitoba and British Columbia. This inventory is not physically segregated from inventory owned by Aveos and is not within the foreign debtors' control. Further, inventory bound for Air Canada is not segregated from inventory bound for Aveos.

10    According to the Aveos accounting systems, approximately Cdn. $130 million in inventory owned by the foreign debtors is currently held at Aveos sites across Canada. This represents a supply of over nine months worth of inventory based upon traditional turnover rates.

11    As stated, on November 11, 2009, James Robert Tucker, Richard Heis and Allan Watson Graham of KPMG LLP were appointed Administrators of the foreign debtors by orders of the High Court of England and Wales. These orders were made pursuant to the *Insolvency Act 1986*. Pursuant to these orders, the Administrators are responsible for managing the affairs, business and property of the foreign debtors. They are required to perform their functions with the objective of: (a) rescuing the foreign debtors as a going concern or in the alternative, winding up or realizing upon the property of the foreign debtors in order to make a distribution to one or more secured or preferential creditors.

**Recognition of the UK Proceeding**

*(a) Jurisdiction*

12    Pursuant to section 9(1) of the CCAA, where a company does not have a place of business in Canada it may file an application in any province in which it has assets. Neither of the foreign debtors appears to have a place of business in Canada. Given that the foreign debtors have assets located within Ontario, this Court has jurisdiction to deal with this application.

*(b) Recognition*

13    Under s. 47 of the CCAA, a court shall make an order recognizing a foreign proceeding if it is satisfied that the application for such recognition "relates to a foreign proceeding and that the applicant is a foreign representative in respect of that foreign proceeding." Section 47(1) states:

If the court is satisfied that the application for the recognition of a foreign proceeding relates to a foreign proceeding and that the applicant is a foreign representative in respect of that foreign proceeding, the court shall make an order recognizing the foreign proceeding. (Underlining added)

14    Section 45(1) of the CCAA defines "foreign proceeding" as:

a judicial or an administrative proceeding, including an interim proceeding, in a jurisdiction outside Canada dealing with creditors' collective interests generally under any law relating to bankruptcy or insolvency in which a debtor company's business and financial affairs are subject to control or supervision by a foreign court for the purpose of reorganization.

15     As the Administrators were appointed by the English High Court pursuant to the *Insolvency Act 1986*, there can be no doubt that the foreign proceeding is a "foreign proceeding" within the meaning of s. 45(1) of the CCAA.

16     It is to be noted that under s. 47(1), the order sought is mandatory if the conditions in that section are met. This is in keeping with the purpose of the new cross-border provisions of the CCAA as set out in s. 44 to promote cooperation with foreign jurisdictions in cases of cross-border insolvencies. This statutory recognition of comity follows the principles of international comity in insolvency situations recognized in such cases as *Olympia & York Developments Ltd. v. Royal Trust Co.* (1993), 20 C.B.R. (3d) 165 (Ont. Gen. Div.), *United Air Lines Inc., Re* (2003), 43 C.B.R. (4th) 284 (Ont. S.C.J. [Commercial List]) and *Lear Canada, Re* (2009), 55 C.B.R. (5th) 57 (Ont. S.C.J. [Commercial List]).

17     In this case as the conditions of s. 47(1) have been met, an order recognizing the foreign proceedings shall go. It is to be noted that Lloyds TSB Commercial Finance Limited, which holds a debenture and is owed approximately $500 million, supports the appointment of the Administrators and this application in Canada. The only other party with a registered security interest in Canada is Air Canada, but nothing is owed by the foreign debtors to it. Rather, there is a receivable of approximately $9.6 million owed by Air Canada to Aero Inventory UK.

18     Under s. 47(2) of the CCAA, a court making an order recognizing a foreign proceeding must specify whether such proceeding is the "foreign main proceeding" or the "foreign non-main proceeding". Under s. 45(1), a "foreign main proceeding" is a "foreign proceeding in a jurisdiction where the debtor company has the centre of its main interests." Section 45(2) provides that in the absence of proof to the contrary, a debtor company's registered office is deemed to be the centre of its main interests.

19     Aero Inventory UK has a registered office in Quebec. Thus by virtue of section 45(2), in the absence of proof to the contrary, Quebec is deemed to be the centre of its main interest. However, the foreign debtors have business interests globally and their head office is in the United Kingdom from where they are managed and administered. Aero plc is publicly listed on the AIM of the London Stock Exchange. I am satisfied that this evidence is sufficient to conclude that the main interests of the foreign debtors are centred in the United Kingdom and thus the foreign proceeding should be specified as the "foreign main proceeding".

**Other relief sought**

*(a) Appointment of an Information Officer*

20     The applicants have requested an order appointing KPMG Inc. as an information officer in respect of these proceedings. While the CCAA does not expressly provide for the appointment of an information officer, such an officer is sometimes appointed under the Court's general powers to make appropriate orders in the circumstances. In the case of an application such as this in connection with a cross-border insolvency, the Court is expressly given the power to make such order as it considers appropriate in section 49(1), so long as the order is consistent with any other order that may be made under the Act, and in section 50 which provides:

> 50. An order under this Part may be made on any terms and conditions that the court considers appropriate in the circumstances.

21     The order sought would authorize, but not require, the information officer to provide such assistance to the Foreign Representative as might be required, and authorize the information officer to respond to reasonable requests for information from stakeholders. The information officer would be required to report to the Court at least once every three months regarding the proceedings and other information the information officer believes material.

2009 CarswellOnt 7007, 183 A.C.W.S. (3d) 443

22    In the circumstances of this case, in which the foreign debtors have no place of business or employees in Canada, it is particularly appropriate to have an information officer appointed who can deal with matters as they arise in Canada and who can also provide information and advice to the Foreign Representative as needed. The order sought shall go.

### (b) Stay of Set-Off Rights

23    In this case, because of the fact that the foreign debtors do not have physical control of their inventory in Canada as the inventory is in warehouses operated by Aveos, a concern has been raised that set-off could adversely impact the foreign proceeding and impact the recoveries available to creditors. Although Aveos is a purchaser from Aero Inventory (UK), it apparently is owed approximately $1 million and its contract with Aero Inventory (UK) contains a liquidated damage clause.

24    As stated, a court on an application under the CCAA in cross-border insolvencies has the power under sections 49(1) and 50 to make an order considered appropriate in the circumstances.

25    The provisions regarding set-off in section 21 must, however, be considered in the request for relief regarding a stay of set-off. Section 21 provides:

> 21. The law of set-off or compensation applies to all claims made against a debtor company and to all actions instituted by it for the recovery of debts due to the company in the same manner and to the same extent as if the company were plaintiff or defendant, as the case may be.

26    The applicants submit that while the provisions of section 21 of the CCAA may prevent a court from permanently barring all claims of set-off, it does not prevent a court from making an order in appropriate circumstances temporarily staying the determination and enforcement of a person's rights of set-off pending leave of the court. They rely on *Air Canada, Re* (2003), 45 C.B.R. (4th) 13 (Ont. S.C.J. [Commercial List]). In that case, Farley J. reviewed in some detail the law of set-off and struck from the Initial Order a provision that no person could set off any obligations of Air Canada to such person which arose prior to the Initial Order. Farley J. held that while the Initial Order should recognize the rights of set-off permitted under section 18.1 of the CCAA (now section 21), such rights could be temporarily stayed pending further order of the Court. In that case there was no opposition to such a temporal stay. He stated:

> With respect to the question of what I have described as a temporal stay, there does not appear to be any opposition by the Moving Creditors to the proposition that whatever their rights of set-off in substance are determined to be, that such determination and enforcement of such determined rights should await until a convenient time when AC has stabilized (or I suppose, alternatively cratered). It would seem to me that the likely time for this would be in conjunction with the formation of a reorganization plan of arrangement and compromise. However I leave that question open pending future submissions and further order of the court emanating as a result thereof.

27    I accept that a court may temporarily stay the right of set-off protected in section 21 of the CCAA. How temporary that stay should be will obviously depend on the circumstances existing at the relevant time.

28    In his witness statement provided to the High Court in England, Mr. Trupp, a director of the foreign debtors, discussed concerns relating to the fact that the inventory is out of their control. He stated:

> 19. The Companies are, in their current financial position, extremely distressed with the threat of creditor enforcement action in key countries. and

> 29. This matter is now urgent and there are a number of reasons for this urgency, including:

> (a) the supply of airline, parts is time critical and must continue uninterrupted;

> (c) there is a risk that if the stock is not secured quickly it will disappear or become very difficult to access, particularly as it is not in the physical control of the Companies. There is therefore a risk of significant loss

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

to the secured creditors and creditors generally if there is any delay in getting the administration orders made. Customers have direct control of the stock and could seize it if concerned about the solvency of the Companies;

29    The applicants submit that no party is unreasonably prejudiced by the proposed set-off relief which is intended to operate only to prevent fresh inventory of the foreign debtors from being appropriated by third parties without an ensuing payment. The proposed relief does not affect the position of the parties on the date of the recognition order but ensures that no further prejudice is caused to the foreign debtors' estate. If the foreign debtors' inventory were in their possession rather than in the possession of third parties, they could control and minimize such potential prejudice by obtaining assurances of payment ahead of providing new supplies.

30    The applicants are concerned that as Aveos has physical control of the foreign debtors' inventory, any refusal to supply their inventory without assurances of payment might lead to the grounding of several airplanes, thereby causing prejudice to the foreign debtors' customers. They submit that in the circumstances, the better option to ensure continued supply to customers and payment for fresh inventory is by the granting of a temporal stay of any right of set-off

31    It seems to me that at this stage the relief sought should be granted. The amount of inventory in Canada, $130 million, is substantial. The consolidated interim financial statements of the foreign debtors as at December 30, 2008 indicate that there are total inventories of U.S. $751 million, although Mr. Trupp believes these are inaccurate and may be overstated. It is apparent that the Canadian inventory comprises a substantial portion of the total inventory. That inventory should be properly protected to enable the foreign debtors to attempt to continue as a going concern.

32    Taking into account the purposes of part IV if the CCAA relating to cross-border insolvencies, as set out in section 44, including co-operation between the courts of the jurisdictions involved and the maximization of the value of the debtor company's property, it is appropriate in this circumstances of this case to stay set-off rights pending further order of this Court. How long that stay should be is a matter of conjecture at this stage. The proceedings have just commenced and what the outcome will be is not possible to know. Thus the length of any stay of set-of rights is an unknown.

33    The order contains a 4 days notice come-back clause and any person concerned with the order thus has the ability to make application to vary or rescind the order. .

34    The application is granted in accordance with these reasons.

Footnotes

1    This section and the other sections dealing with cross-border insolvencies in part IV of the CCAA came into effect on September 18, 2009

---

**End of Document**                Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# **Tab 25**

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 233 of 342

Holt Cargo Systems Inc. v. ABC Containerline N.V. (Trustee of), 2001 SCC 90, 2001...

2001 SCC 90, 2001 CSC 90, 2001 CarswellNat 2816, 2001 CarswellNat 2817...

2001 SCC 90, 2001 CSC 90
Supreme Court of Canada

Holt Cargo Systems Inc. v. ABC Containerline N.V. (Trustee of)

2001 CarswellNat 2816, 2001 CarswellNat 2817, 2001 SCC 90, 2001 CSC 90,
[2001] 3 S.C.R. 907, [2001] S.C.J. No. 89, 110 A.C.W.S. (3d) 588, 207 D.L.R.
(4th) 577, 280 N.R. 1, 30 C.B.R. (4th) 6, J.E. 2002-121, REJB 2001-27202

# Frans G. A. De Roy and Thierry Van Doosselaere, as Trustees in Bankruptcy of ABC Containerline N.V., the Owners, Charterers and all others interested in the Ship "Brussel" and the Ship "Brussel", Appellants v. Holt Cargo Systems Inc., Respondent

McLachlin C.J.C., L'Heureux-Dubé, Gonthier, Iacobucci, Major, Bastarache, Binnie, Arbour, LeBel JJ.

Heard: March 20, 2001

Judgment: December 20, 2001 [*]
Docket: 27290

Proceedings: affirming (1999), 173 D.L.R. (4th) 493 (Fed. C.A.); affirming (1997), 146 D.L.R. (4th) 736 (Fed. T.D.)

Counsel: *David G. Colford*, for Appellants
*Thomas E. Hart*, *Jane O'Neill*, for Respondent

Subject: International; Insolvency; Estates and Trusts; Civil Practice and Procedure

## Headnote

**Maritime law --- Admiralty courts — Maritime jurisdiction of Federal Court — Maritime liens — Lien arising under foreign law**

Federal Court of Canada did not err in refusing to stay maritime law proceedings — Trial judge did not err in placing primary emphasis on fact that subject matter of case before him was in rem action by maritime lienholder against ship which had already been arrested at the time of Belgian bankruptcy and which had already been ordered to be appraised and sold at time of involvement of Canadian bankruptcy court — American creditor was holder of maritime lien validly created under U.S. law and was properly regarded as secured creditor under Canadian law — Bankruptcy and Insolvency Act, R.S.C. 1985, c. B-3.

**Bankruptcy --- Conflict of laws — Assets of foreign bankrupt — General**

Federal Court of Canada did not err in refusing to stay maritime law proceedings — Trial judge did not err in placing primary emphasis on fact that subject matter of case before him was in rem action by maritime lienholder against ship which had already been arrested at the time of Belgian bankruptcy and which had already been ordered to be appraised and sold at time of involvement of Canadian bankruptcy court — American creditor was holder of maritime lien validly created under U.S. law and was properly regarded as secured creditor under Canadian law. — Bankruptcy and Insolvency Act, R.S.C. 1985, c. B-3.

**Droit maritime --- Tribunaux d'amirauté — Compétence maritime de la Cour fédérale — Privilèges maritimes — Privilège en vertu du droit étranger**

Cour fédérale du Canada n'a pas commis d'erreur en refusant de suspendre les procédures en droit maritime — Juge de première instance n'a pas commis d'erreur en insistant principalement sur le fait que le litige devant lui était une action

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 234 of 342

Holt Cargo Systems Inc. v. ABC Containerline N.V. (Trustee of), 2001 SCC 90, 2001...
2001 SCC 90, 2001 CSC 90, 2001 CarswellNat 2816, 2001 CarswellNat 2817...

in rem intentée par un titulaire d'un privilège maritime sur un navire qui, au moment de la faillite belge, avait déjà fait l'objet d'une saisie et, au moment de l'intervention du tribunal de faillite canadien, d'une ordonnance pour son évaluation et sa vente — Créancier américain était titulaire d'un privilège maritime validement créé en vertu du droit américain et était considéré à bon droit comme un créancier garanti en vertu du droit canadien — Loi sur la faillite et l'insolvabilité, L.R.C. 1985, c. B-3.

**Faillite --- Conflit de lois — Actifs d'un failli étranger — En général**

Cour fédérale du Canada n'a pas commis d'erreur en refusant de suspendre les procédures en droit maritime — Juge de première instance n'a pas commis d'erreur en insistant principalement sur le fait que le litige devant lui était une action in rem intentée par un titulaire d'un privilège maritime sur un navire qui, au moment de la faillite belge, avait déjà fait l'objet d'une saisie et, au moment de l'intervention du tribunal de faillite canadien, d'une ordonnance pour son évaluation et sa vente — Créancier américain était titulaire d'un privilège maritime validement créé en vertu du droit américain et était considéré à bon droit comme un créancier garanti en vertu du droit canadien — Loi sur la faillite et l'insolvabilité, L.R.C. 1985, c. B-3.

An American creditor brought an in rem action in the Federal Court of Canada against a Belgian ship for unpaid fees for stevedoring and other services provided to the ship in the United States from 1994 to 1996. A warrant of arrest was issued by the Federal Court of Canada and the ship was arrested in the waters near Halifax on March 30, 1996. One week later the Belgian owner of the ship and its affiliated companies made an assignment in bankruptcy in Belgium.

The Belgian trustees in bankruptcy brought applications in those jurisdictions where proceedings had been commenced against the bankrupt for release of the bankrupt's ships from arrest and for orders directing that all claims against the bankrupt be submitted to the bankruptcy proceedings in Belgium.

The trustees obtained an order from the Quebec Superior Court sitting in bankruptcy confirming that upon the Belgian bankruptcy the interest in the assets of the bankrupt passed to the Belgian trustees, subject to the rights of any secured creditors under Canadian law. In the meantime the Federal Court of Canada awarded judgment to the American creditor against the ship and ordered the ship appraised and set out the procedure for its sale. The trustees appealed and requested a stay of proceedings from the Federal Court of Canada pending final disposition of the matter by the Quebec Superior Court. The appeal and request for a stay of proceedings were dismissed. The trustees appealed.

**Held:** The appeal was dismissed.

The Federal Court of Canada did not err in refusing to stay the maritime law proceedings.

The American creditor's maritime lien for services rendered was validly created under U.S. law and therefore had the same priority in Canada as a maritime lien created under Canadian law.

Canadian public policy as expressed through the *Bankruptcy and Insolvency Act* protects the rights of secured creditors and the trial judge did not err in regarding the American creditor, as holder of a maritime lien, as a secured creditor in bankruptcy terms. Under Canadian law, as of the date of the bankruptcy in Belgium, the Belgian trustees in bankruptcy acquired the interest of the bankrupt shipowner in the ship, but that interest was subject to the prior claim of secured creditors, including maritime lienholders.

The Federal Court of Canada did not lose jurisdiction as a result of the Belgian bankruptcy and the subsequent orders of the Quebec bankruptcy court. The Federal Court was not exercising jurisdiction in bankruptcy. It was addressing in rem claims against the ship, not in personam claims against the ship's owner.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Canadian public policy as expressed through the 1997 amendments to the *Bankruptcy and Insolvency Act* supports the plurality approach to international bankruptcies. International coordination is an important but not always a controlling consideration. Canadian courts must exercise their discretion to stay or not to stay domestic proceedings in light of all of the relevant facts and considerations in a particular case. The trial judge did not err in considering the importance of comity and international coordination but in placing primary emphasis on the fact that the subject matter of the case before him was an in rem action by a maritime lienholder against a ship which had already been arrested at the time of the Belgian bankruptcy and which had already been ordered to be appraised and sold at the time of the involvement of the Canadian bankruptcy court. Furthermore, the order of the Canadian bankruptcy court itself stated that the interest of the Belgian trustees was subject to the rights of any secured creditors under Canadian law.

A lack of substantial connection to any particular jurisdiction is a feature of ships engaged in international maritime commerce and this fact must be taken into account when applying the "real and substantial connection" test to ocean-going ships.

Un créancier américain a intenté, en Cour fédérale du Canada, une action in rem contre un navire belge pour obtenir le paiement de services d'acconage et d'autres services fournis au navire entre 1994 et 1996 aux États-Unis. La Cour fédérale du Canada a émis un mandat de saisie; le navire a été saisi le 30 mars 1996 dans les eaux près de Halifax. Une semaine plus tard, le propriétaire belge du navire et ses compagnies affiliées ont fait cession de leurs biens en Belgique.

Les syndics de faillite belges ont présenté des demandes dans les ressorts où des procédures avaient été commencées contre la faillie pour obtenir la remise des navires de la faillie et des ordonnances déclarant que toutes les réclamations contre la faillie devaient être soumises dans le cadre des procédures de faillite en cours en Belgique.

Les syndics ont obtenu de la Cour supérieure siégeant en matière de faillite une ordonnance reconnaissant que, à la suite de la faillite belge, les droits dans l'actif de la faillie étaient passés aux syndics belges et étaient sujets aux droits de tout créancier garanti en vertu du droit canadien. Pendant ce temps-là, la Cour fédérale du Canada rendait jugement contre le navire en faveur du créancier américain, ordonnait que le navire soit évalué et établissait la procédure à suivre pour sa vente. Les syndics ont interjeté appel et demandé à la Cour fédérale du Canada de suspendre les procédures en attendant une décision finale de la Cour supérieure du Québec dans cette affaire. Le pourvoi et la demande de suspension des procédures ont été rejetés. Les syndics ont interjeté appel.

**Arrêt:** Le pourvoi a été rejeté.

La Cour fédérale du Canada n'a pas commis d'erreur en refusant de suspendre les procédures en droit maritime.

Le privilège maritime détenu par le créancier américain pour les services fournis a été validement créé en vertu du droit américain; il avait donc la même priorité au Canada qu'un privilège maritime créé en vertu du droit canadien.

La politique générale canadienne énoncée dans la *Loi sur la faillite et l'insolvabilité* protège les droits des créanciers garantis; le juge de première instance n'a pas commis d'erreur en considérant le créancier américain comme un titulaire d'un privilège maritime et comme un créancier garanti au sens de la faillite. En vertu du droit canadien, les syndics de faillite belges ont acquis, à partir de la date de la faillite en Belgique, le droit de propriété du propriétaire failli sur le navire. Par contre, ce droit de propriété était assujetti aux réclamations antérieures des créanciers garantis, y compris les titulaires de privilèges maritimes.

La Cour fédérale du Canada n'a pas perdu compétence à cause de la faillite belge et des ordonnances subséquentes du tribunal de faillite québécois. La Cour fédérale n'exerçait pas une compétence en matière de faillite. Elle abordait des réclamations in rem contre le navire et non des réclamations in personam contre le propriétaire du navire.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 236 of 342

Holt Cargo Systems Inc. v. ABC Containerline N.V. (Trustee of), 2001 SCC 90, 2001...
2001 SCC 90, 2001 CSC 90, 2001 CarswellNat 2816, 2001 CarswellNat 2817...

La politique générale canadienne telle qu'énoncée dans les amendements de 1997 à la *Loi sur la faillite et l'insolvabilité* appuyait une approche plurale à l'égard des faillites internationales. La coordination internationale est importante, mais elle ne peut pas toujours être une considération déterminante. Les tribunaux canadiens doivent exercer leur pouvoir discrétionnaire de suspendre ou non les procédures engagées au pays en tenant compte de tous les faits et considérations pertinents d'une affaire particulière. Le juge de première instance n'a pas commis d'erreur en tenant compte de l'importance de la courtoisie et de la coordination internationales et en insistant principalement sur le fait que le litige devant lui était une action in rem intentée par un titulaire d'un privilège maritime sur un navire qui, au moment de la faillite belge, avait déjà fait l'objet d'une saisie et, au moment de l'intervention du tribunal de faillite canadien, d'une ordonnance pour son évaluation et sa vente. De plus, l'ordonnance du tribunal de faillite canadien énonçait elle-même que les droits des syndics belges étaient assujettis aux droits de tout créancier garanti en vertu du droit canadien.

L'absence de lien important avec un ressort particulier est une caractéristique des navires qui servent au commerce maritime international. On doit tenir compte de ce fait lors de l'application du critère du « lien réel et important » aux navires de haute mer.

**Table of Authorities**

**Cases considered by *Binnie J.*:**

Allen v. Hanson (1890), 18 S.C.R. 667, 4 Cart. B.N.A. 470 (S.C.C.) — considered

Amchem Products Inc. v. British Columbia (Workers' Compensation Board), [1993] 3 W.W.R. 441, 14 C.P.C. (3d) 1, [1993] 1 S.C.R. 897, 150 N.R. 321, 23 B.C.A.C. 1, 39 W.A.C. 1, 102 D.L.R. (4th) 96, 77 B.C.L.R. (2d) 62 (S.C.C.) — distinguished

Anantapadmanabhaswami v. Official Receiver of Secunderabad, [1933] A.C. 394 (India P.C.) — considered

Antares Shipping Corp. v. "Capricorn" (The) (1976), [1977] 2 S.C.R. 422, 7 N.R. 518, 65 D.L.R. (3d) 105 (S.C.C.) — distinguished

Antwerp Bulkcarriers, N.V., Re, 2001 SCC 91, 30 C.B.R. (4th) 68 (S.C.C.) — considered

"Atlantic Star" (The) v. "Bona Spes" (The) (1973), [1974] A.C. 436, [1973] 2 Lloyd's Rep. 197, [1973] 2 All E.R. 175 (U.K. H.L.) — considered

Babcock & Wilcox Canada Ltd., Re (2000), 5 B.L.R. (3d) 75, 18 C.B.R. (4th) 157 (Ont. S.C.J. [Commercial List]) — referred to

Breakwater Co., Re (1914), 33 O.L.R. 65, 22 D.L.R. 294 (Ont. H.C.) — referred to

Cadillac Fairview Inc., Re (1995), 30 C.B.R. (3d) 17 (Ont. Gen. Div. [Commercial List]) — referred to

Canada Southern Railway v. Gebhard (1883), 109 U.S. 527 — considered

E.H. Clarke & Co., Re, 3 C.B.R. 593, 23 O.W.N. 277, [1923] 1 D.L.R. 716 (Ont. Bktcy.) — referred to

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 237 of 342

Holt Cargo Systems Inc. v. ABC Containerline N.V. (Trustee of), 2001 SCC 90, 2001...

2001 SCC 90, 2001 CSC 90, 2001 CarswellNat 2816, 2001 CarswellNat 2817...

*Estonian State Cargo & Passenger Steamship Line v. "Elise", (The)*, [1949] S.C.R. 530, [1949] 2 D.L.R. 641 (S.C.C.) — considered

*Friends of the Oldman River Society v. Canada (Minister of Transport)*, [1992] 2 W.W.R. 193, [1992] 1 S.C.R. 3, 3 Admin. L.R. (2d) 1, 7 C.E.L.R. (N.S.) 1, 84 Alta. L.R. (2d) 129, 88 D.L.R. (4th) 1, 132 N.R. 321, 48 F.T.R. 160 (S.C.C.) — referred to

*Galbraith v. Grimshaw*, [1910] A.C. 508 (U.K. H.L.) — considered

*Harelkin v. University of Regina*, [1979] 2 S.C.R. 561, [1979] 3 W.W.R. 676, 26 N.R. 364, 96 D.L.R. (3d) 14 (S.C.C.) — referred to

*Hunt v. T & N plc* (1993), [1994] 1 W.W.R. 129, 21 C.P.C. (3d) 269, *(sub nom. Hunt v. Lac d'Amiante du Québec Ltée)* 37 B.C.A.C. 161, *(sub nom. Hunt v. Lac d'Amiante du Québec Ltée)* 60 W.A.C. 161, *(sub nom. Hunt v. T&N plc)* 109 D.L.R. (4th) 16, 85 B.C.L.R. (2d) 1, *(sub nom. Hunt v. Lac d'Amiante du Québec Ltée)* 161 N.R. 81, *(sub nom. Hunt v. T&N plc)* [1993] 4 S.C.R. 289 (S.C.C.) — referred to

*Husky Oil Operations Ltd. v. Minister of National Revenue*, [1995] 10 W.W.R. 161, 35 C.B.R. (3d) 1, 128 D.L.R. (4th) 1, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, 188 N.R. 1, 24 C.L.R. (2d) 131 (S.C.C.) — considered

*Marlex Petroleum Inc. v. "Har Rai" (The)*, 4 D.L.R. (4th) 739, 53 N.R. 1, [1984] 2 F.C. 345 (Fed. C.A.) — referred to

*Marlex Petroleum Inc. v. "Har Rai" (The)*, 72 N.R. 75, [1987] 1 S.C.R. 57 (S.C.C.) — referred to

*Miida Electronics Inc. v. Mitsui O.S.K. Lines Ltd.*, *(sub nom. ITO - International Terminal Operators Ltd. v. Miida Electronics Inc.)* [1986] 1 S.C.R. 752, 28 D.L.R. (4th) 641, 68 N.R. 241, 34 B.L.R. 251 (S.C.C.) — referred to

*Morguard Investments Ltd. v. De Savoye* (1990), 46 C.P.C. (2d) 1, 15 R.P.R. (2d) 1, 76 D.L.R. (4th) 256, 122 N.R. 81, [1991] 2 W.W.R. 217, 52 B.C.L.R. (2d) 160, [1990] 3 S.C.R. 1077 (S.C.C.) — considered

*Olympia & York Developments Ltd. v. Royal Trust Co.* (1993), 20 C.B.R. (3d) 165 (Ont. Gen. Div.) — referred to

*Ordon Estate v. Grail*, 40 O.R. (3d) 639 (headnote only), *(sub nom. Ordon v. Grail)* 232 N.R. 201, 166 D.L.R. (4th) 193, *(sub nom. Ordon v. Grail)* 115 O.A.C. 1, [1998] 3 S.C.R. 437 (S.C.C.) — referred to

*Q.N.S. Paper Co. v. Chartwell Shipping Ltd.*, [1989] 2 S.C.R. 683, 62 D.L.R. (4th) 36, 26 Q.A.C. 81, *(sub nom. Chartwell Shipping Ltd. v. Q.N.S. Paper Co.)* 101 N.R. 1 (S.C.C.) — referred to

*Québec (Commission de la santé & de la sécurité du travail) c. Banque fédérale de développement*, 84 N.R. 308, [1988] R.D.I. 376, 50 D.L.R. (4th) 577, 14 Q.A.C. 140, 68 C.B.R. (N.S.) 209, *(sub nom. Federal Business Development Bank v. Québec (Comm. de la santé & de la sécurité du travail))* [1988] 1 S.C.R. 1061 (S.C.C.) — referred to

*R. v. Spencer*, [1985] 2 S.C.R. 278, [1985] 2 C.T.C. 311, 21 D.L.R. (4th) 756, 62 N.R. 81, 11 O.A.C. 207, 21 C.C.C. (3d) 385, 48 C.R. (3d) 265, 85 D.T.C. 5446, [1986] D.L.Q. 80 (S.C.C.) — considered

*R. v. Zingre*, [1981] 2 S.C.R. 392, 23 C.P.C. 259, 10 Man. R. (2d) 62, 38 N.R. 272, 61 C.C.C. (2d) 465, 127 D.L.R. (3d) 223 (S.C.C.) — considered

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 238 of 342

Holt Cargo Systems Inc. v. ABC Containerline N.V. (Trustee of), 2001 SCC 90, 2001...
2001 SCC 90, 2001 CSC 90, 2001 CarswellNat 2816, 2001 CarswellNat 2817...

*Riordon Co. v. John W. Danforth Co.*, 4 C.B.R. 248, [1923] S.C.R. 319, [1923] 2 D.L.R. 788 (S.C.C.) — referred to

*Roberts v. Picture Butte Municipal Hospital* (1998), 64 Alta. L.R. (3d) 218, 23 C.P.C. (4th) 300, 227 A.R. 308, [1999] 4 W.W.R. 443 (Alta. Q.B.) — referred to

*Stewart & Matthews Ltd., Re* (1916), 10 W.W.R. 154, 26 Man. R. 277, 34 W.L.R. 47 (Man. K.B.) — referred to

*Todd Shipyards Corp. v. Altema Compania Maritima S.A.* (1972), [1974] S.C.R. 1248, 32 D.L.R. (3d) 571, [1974] 1 Lloyd's Rep. 174 (S.C.C.) — considered

*Tolofson v. Jensen* (1994), [1995] 1 W.W.R. 609, 22 C.C.L.T. (2d) 173, 100 B.C.L.R. (2d) 1, 32 C.P.C. (3d) 141, 7 M.V.R. (3d) 202, 26 C.C.L.I. (2d) 1, 175 N.R. 161, 120 D.L.R. (4th) 289, *(sub nom. Lucas (Litigation Guardian of) v. Gagnon)* [1994] 3 S.C.R. 1022, 77 O.A.C. 81, 51 B.C.A.C. 241, 84 W.A.C. 241 (S.C.C.) — considered

*"Tolton" (The)*, [1946] P. 135 (Eng. P.D.A.) — referred to

*Treco, Re* (2001), 240 F.3d 148 (U.S. C.A. 2nd Cir.) — referred to

*Walker, Re* (1998), 5 C.B.R. (4th) 123 (Ont. Bktcy.) — referred to

*Walter W. Hodder Co. v. "Strandhill" (The)*, [1926] S.C.R. 680, [1926] 4 D.L.R. 801 (S.C.C.) — considered

**Statutes considered:**

*Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3
   Generally — considered

   Pt. XIII [en. 1997, c. 12, s. 118(1)] — referred to

   s. 2 "secured creditor" — considered

   s. 43(7) — considered

   s. 69.3 [en. 1992, c. 27, s. 36(1)] — considered

   s. 69.3(1) [en. 1992, c. 27, s. 36(1)] — considered

   s. 69.3(2) [en. 1992, c. 27, s. 36(1)] — considered

   s. 69.3(2)(a) [en. 1992, c. 27, s. 36(1)] — considered

   s. 136 — referred to

   s. 136(1) — considered

   s. 183(1) — considered

   s. 183(1)(b) — considered

   s. 268(2) [en. 1997, c. 12, s. 118(1)] — referred to

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 239 of 342

Holt Cargo Systems Inc. v. ABC Containerline N.V. (Trustee of), 2001 SCC 90, 2001...

2001 SCC 90, 2001 CSC 90, 2001 CarswellNat 2816, 2001 CarswellNat 2817...

s. 268(3) [en. 1997, c. 12, s. 118(1)] — referred to

s. 268(6) [en. 1997, c. 12, s. 118(1)] — referred to

s. 269 [en. 1997, c. 12, s. 118(1)] — referred to

s. 271(1) [en. 1997, c. 12, s. 118(1)] — referred to

*Commercial Instruments and Maritime Liens Act*, 46 U.S.C.
    s. 31342 — considered

*Federal Court Act*, R.S.C. 1985, c. F-7
    Generally — referred to

s. 3 — considered

s. 17(6) — considered

s. 22(1) — considered

s. 50 — considered

s. 50(1) — considered

APPEAL by trustees in bankruptcy from judgment reported at [1999] F.C.J. No. 337, 1999 CarswellNat 381, *(sub nom. Holt Cargo Systems Inc. v. ABC Containerline N.V. (Bankrupt))* 239 N.R. 114, 173 D.L.R. (4th) 493, [1999] I.L.Pr. 634 (Fed. C.A.), dismissing trustees' appeal from judgment ordering appraisal and sale of ship and dismissing request for stay of proceedings.

POURVOI des syndics de faillite à l'encontre de l'arrêt publié à [1999] F.C.J. No. 337, 1999 CarswellNat 381, *(sub nom. Holt Cargo Systems Inc. v. ABC Containerline N.V. (Bankrupt))* 239 N.R. 114, 173 D.L.R. (4th) 493, [1999] I.L.Pr. 634 (Fed. C.A.), qui a rejeté le pourvoi des syndics à l'encontre du jugement ordonnant l'évaluation et la vente du navire et rejetant la demande de suspension des procédures.

*Binnie J.*:

1    The problems of international bankruptcies have excited much recent judicial and academic commentary. In this appeal, we are required to determine whether a maritime law proceeding by a U.S. creditor against a Belgian ship in a Canadian court ought to have been stayed in deference to a Belgian court dealing with the subsequent bankruptcy of its Belgian shipowner. Deference to the Belgian bankruptcy court, it is argued, was required by the principles of international comity. Despite the obvious benefits of international coordination of bankruptcies that spread their financial wreckage across multiple jurisdictions, the Federal Court of Canada declined to stay its proceedings under Canadian maritime law. The present appeal is from its decision. The companion case, *Antwerp Bulkcarriers, N.V., Re,* 2001 SCC 91 (S.C.C.), released at the same time, deals with the appeal from the Quebec Court of Appeal on the bankruptcy side of the concurrent and interconnected proceedings.

2    The history of this litigation, in brief summary, is as follows. On March 30, 1996, the M/V "Brussel"(the "Ship") was arrested in Canadian waters near the entrance to Halifax harbour by order of the Federal Court of Canada. A week later, its Belgian owner made an assignment in bankruptcy at Antwerp with debts vastly exceeding its assets. The U.S. creditor, Holt Cargo Systems Inc. ("Holt"), persisted with its *in rem* action. Four months later, after a storm of motions and applications in the Federal Court and the Superior Court of Quebec sitting in Bankruptcy, with periodic interventions by the Eleventh Chamber of the Commercial Court of the Judicial District of Antwerp ("the Belgian bankruptcy court") and a related order by a U.S.

2001 SCC 90, 2001 CSC 90, 2001 CarswellNat 2816, 2001 CarswellNat 2817...

bankruptcy court, the Ship was sold over the objection of the trustees in bankruptcy. The Federal Court ruled that the proceeds of the sale are eventually to be distributed to secured creditors, including the respondent, depending on the outcome of this appeal.

3    The Superior Court of Quebec sitting in Bankruptcy (the "Canadian bankruptcy court") played a potentially important role in responding to the request for assistance from the Belgian Commercial Court exercising Belgian bankruptcy jurisdiction. However, I believe the trustees asked for more assistance from the Canadian bankruptcy court than could lawfully be given, and that the Federal Court did not err in principle in refusing a stay of the maritime law proceedings.

4    I would therefore dismiss the appeal.

**I. Facts**

5    The Ship was arrested at Halifax under a warrant of arrest issued at the instance of Holt, a U.S. company incorporated under the laws of New Jersey. The warrant for arrest was issued in connection with an *in rem* action commenced by Holt the same day in the Federal Court of Canada against the "owners, charterers and all others interested in the Ship", and the Ship itself. The M/V "Brussel" was owned by Antwerp Bulkcarriers N.V. which, with other interrelated companies, carried on the business of international carriage of goods by sea.

6    Holt's action was for unpaid fees and charges for stevedoring and other related services provided to the Ship at Gloucester City, New Jersey, in the United States between 1994 and 1996 inclusive. No part of the debt was incurred in Canada and neither the Ship nor its creditors were ordinarily resident here.

7    Following the arrest of the Ship, cargo and container owners, shippers, suppliers, insurers and others also filed claims in the Federal Court. In total, statements of claim were filed in 27 separate actions. Moreover, notices of claim were filed in Holt's *in rem* action against the Ship by more than 20 claimants in response to the Federal Court's order, discussed below, that the Ship be appraised and sold.

8    On April 5, 1996, a week after the Ship's arrest, the shipowner was adjudged bankrupt by the Belgian bankruptcy court, which appointed the appellants, T. Van Doosselaere and F. De Roy, as trustees in bankruptcy (the "Trustees"). Under Belgian law, the Trustees were required to take possession of all assets of the bankrupt holding company and its bankrupt affiliated companies, wherever situated. The major assets of the group of bankrupt companies were six cargo vessels, and at the time of the bankruptcy order at least five of these were under arrest in ports in Israel, Singapore, New Zealand, the Bahamas and, as stated, Canada. Other assets owned or leased by the debtors, including unpaid freight and shipping containers, had also been arrested, detained or threatened with seizure at various locations throughout the world. The Trustees filed applications in jurisdictions where proceedings had been commenced against the debtors seeking the release of the bankrupts' assets from arrest, preventing further seizure and arrest of their assets, and directing the submission of all claims against them to the bankruptcy proceedings in Belgium.

9    Faced with these difficult circumstances, the appellant Trustees urged on the Federal Court on several occasions the need for international cooperation in the resolution of bankruptcies and insolvencies that cross national boundaries. The effect of these arguments was to advocate deference to the Belgian courts, being the courts of the bankrupts' domicile. Adherence to what is sometimes called the "Grab Rule", in which each national court takes charge of assets in its own jurisdiction for the benefit of creditors who win the race to its courthouse, was said to be destructive of international order and fairness. (As will be seen, there is much merit in these submissions.)

10    The "universalist" position advocated by the appellant Trustees was put forward in a series of motions and applications before the courts of Quebec and the Federal Court of Canada. A detailed summary of the complicated procedural history of this dispute is set out in an Appendix to the judgment in the companion case, *Antwerp Bulkcarriers, N.V., Re, supra*. What follows is a summary of the motions and applications most relevant to this appeal:

**May 3, 1996**

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 241 of 342

Holt Cargo Systems Inc. v. ABC Containerline N.V. (Trustee of), 2001 SCC 90, 2001...

2001 SCC 90, 2001 CSC 90, 2001 CarswellNat 2816, 2001 CarswellNat 2817...

The appellant Trustees appear before MacKay J. of the Federal Court, Trial Division, to support moving the Ship to a "safe berth" at Halifax and to "remain under arrest" at its new location "until further orders are given by this Court". Order granted. The Ship was moved and remained there until its sale closed on August 1, 1996.

**May 9, 1996**

The appellant Trustees move *ex parte* before the Quebec Superior Court, Civil Chamber (i.e., not specified to be sitting in bankruptcy) and obtain an order which "recognized and declared executory <u>in Quebec</u>" (emphasis added) the Belgian bankruptcy order.

**May 13, 1996**

The appellant Trustees apply to the Federal Court to have the *in rem* proceedings against the Ship adjourned for four weeks to enable them to make further inquiries about the claims and assets of the bankrupt estate. They do not undertake to file a defence in the action, or indeed suggest that a valid defence exists. MacKay J. expresses concern that the Ship has been under arrest for six weeks and that dock charges and other expenses are mounting. He concludes that he is exercising a maritime law jurisdiction, not a bankruptcy jurisdiction. The adjournment is denied.

**May 14, 1996**

In default of defence, judgment is awarded to Holt against the Ship for $572,128.06, with leave to the Trustees to challenge the precise *quantum* of the judgment if done promptly.

**May 17, 1996**

The Federal Court orders the Ship appraised and lays down the procedure for its sale. The Trustees appeal. They also seek review and reconsideration of the orders of appraisal and sale of the Ship.

**June 14, 1996**

The appellant Trustees request a stay of proceedings from the Federal Court "pending final disposition of the matter by the [Quebec] Superior Court". The Trustees produce an *ex parte* order dated June 11, 1996 obtained from the Quebec Superior Court sitting in Bankruptcy that purports to dispose of the Ship and the proceeds of sale. Despite the Trustees' participation in the Federal Court proceedings over the previous six weeks, no notice of the application in Montreal was given to the Federal Court litigants. It subsequently emerges that the Quebec judge hearing the *ex parte* application was not told that the Ship has been arrested and ordered sold by the Federal Court. The stay is denied for reasons eventually issued on April 9, 1997. In MacKay J.'s view, this is still a maritime law case.

**July 9, 1996**

The appellant Trustees return before the Federal Court seeking to have the proceeds paid to them if the sale goes ahead, as ordered, on July 12. They are now armed with a further order dated June 28, 1996 of the Quebec Superior Court sitting in Bankruptcy, in which Guthrie J. confirmed with variations the *ex parte* order of June 11, after notice to all interested parties and a full hearing on the merits. It is the June 28, 1996 order that is the centrepiece of the appellants' argument. I therefore reproduce its relevant portions below:

> ... THE COURT:

> · · · · ·

> RECOGNIZES the Trustees as trustees in the bankruptcy of Antwerp Bulkcarriers, N.V., with the duty and power to take possession of, realise upon and confirm the assets of the Bankrupt situated <u>anywhere in Canada, subject however to the rights, if any, of any creditors with claims secured under the laws of Canada, as by law provided</u>;

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

PERMITS the sale of the ship "Brussel" to take place in accordance with the judgment rendered by the Federal Court of Canada, Trial Division, on May 17, 1996 provided that such sale is completed and the purchase price paid in full by the close of business in Halifax, Canada on July 12, 1996;

ORDERS that, in the event that the said sale is completed as aforesaid, the net proceeds of such sale (after payment of all expenses of advertisement of the sale, appraisal fees, insurance and all other costs, disbursements, commissions and other expenses necessary for the sale) be paid promptly to the Trustees for distribution amongst the creditors of the Bankrupt in observance of all their rights and in conformity with Belgian law;

ORDERS that, in the event the said sale is not so completed, the ship "Brussel" be delivered into the possession of the Trustees so that they can proceed to the sale of the said ship, locally or in any other place they consider more appropriate, and to the distribution of the net proceeds amongst the creditors of the Bankrupt in observance of all their rights and in conformity with Belgian law;

REQUESTS the aid of the Supreme Court of Nova Scotia with jurisdiction in bankruptcy, insofar as such aid may be necessary under the laws of Nova Scotia to give effect to the present judgment;

ORDERS that the present judgment be served promptly on Chief Justice of the Supreme Court of Nova Scotia, on the Marshall of the Federal Court of Canada in Halifax, on the Sheriff of the Halifax Regional Municipality, and on all parties who have asserted a claim in Canada in respect of the ship "Brussel"... [Emphasis added.]

11    It is clear from the order of June 28, 1996 that the Canadian bankruptcy court is now asserting control over the Ship and the related proceedings. It "permits" the sale ordered by MacKay J. to proceed, but only if it is completed by July 12. The proceeds of sale are to go to the appellant Trustees, not to the secured claimants who are litigating in the Federal Court. If the sale is not completed by July 12, the Ship is to be turned over to the Trustees irrespective of the orders of the Federal Court. The Supreme Court of Nova Scotia is requested to "aid" in giving effect to these directions.

12    As of July 1996, it will be noted, default judgment had been signed in the *in rem* action, the Ship had been appraised, and bids were being invited from potential purchasers. MacKay J. eventually ruled that the Trustees could obtain the proceeds of sale only if they posted security to answer the claims of the secured creditors. This was never forthcoming. His reasons were compendiously explained in a subsequent judgment of April 9, 1997, as will now be described.

## II. Judicial History

### A. Federal Court, Trial Division, [1997] 3 F.C. 187

13    MacKay J. said he accepted the principle of comity of nations but pointed out that "the Court is urged to respect jurisdiction claimed by others and to forego considering claims to relief in proceedings long established in maritime law" (para. 45). The Trustees alleged that Holt was forum shopping, but MacKay J. said he was "not persuaded it did more than seek recovery of its claim against the vessel where the ship was located" (para. 46).

14    MacKay J. "found no persuasive grounds ... [for the Court] to stay its own processes which were then underway, and to permit determination of the outcome to be effectively left to the bankruptcy proceedings of the Commercial Court at Antwerp, recognized by the Superior Court of Quebec" (para. 47). He was "not persuaded that matters before this Court were those of bankruptcy" nor had it been "suggested that any bankruptcy would be based in or administered by any court in Canada" (para. 47). "[T]he balance of convenience favoured denying the stay since the majority of claimants, in Canada and the United States, appeared to be based on the east coast of North America with relatively easy access to the Court's process in Canada" (para. 48). Accordingly, the stay was refused.

15    The claim of the appellant Trustees to the proceeds of the sale of the Ship was based on their view that once the matter was before the bankruptcy court in Quebec, "it alone had jurisdiction over the assets of the bankrupt" (para. 72). MacKay J. disagreed. On the contrary, he ruled "the determinations of this court in relation to the arrest of a ship, a judgment in default

and the sale of the ship, or the determination of a claim by a secured creditor to the proceeds of the sale of the ship, [are not] proceedings in bankruptcy" (para. 74). Therefore, in his view, the involvement of the Canadian bankruptcy court did not divest the Federal Court of jurisdiction.

16    As to the Trustees' argument that the Federal Court, even if it had jurisdiction, should in any event defer to the order for the distribution of the proceeds approved by the Quebec Superior Court sitting in Bankruptcy, MacKay J. held that Canadian law "does not establish a process that in any way bars a secured creditor from realizing on the security given by the debtor before its bankruptcy" (para. 80). A maritime lien is a secured claim. Accordingly, "a maritime lien, attaching before bankruptcy of a ship's owner, may be enforced and the claim based upon it may be realized from proceeds of sale of a ship without restriction under the *Bankruptcy and Insolvency Act*, or, with respect to other views, by the courts acting under that *Act*" (para. 83). MacKay J. thus concluded that Holt and the other secured creditors should have their secured claims paid out of the proceeds of sale in priority to the Trustees. (In the end, the fund was exhausted by the secured claims.)

### *B. Federal Court of Appeal (1999), 173 D.L.R. (4th) 493*

17    Noël J.A. observed, at para. 4, that Holt would "derive a distinct legal advantage" from having its claim determined by the Federal Court. Relying on this Court's decision in *Amchem Products Inc. v. British Columbia (Workers' Compensation Board)*, [1993] 1 S.C.R. 897 (S.C.C.), he acknowledged that juridical advantage is but one factor to consider when determining whether a Canadian court should stay its proceedings in favour of a foreign court. However, this factor takes on "considerable significance" (para. 4) when it arises in the normal course of litigation and not as a result of forum shopping. Here there had been a finding that no such forum shopping had occurred. "Having arrested the ship where it was found, the respondent could legitimately expect that Canadian maritime law would apply" (para. 5). Using the words of this Court in *Amchem, supra*, Noël J.A. found that Holt's "claim had a 'real and substantial connection' with Canadian maritime law and there was a 'reasonable expectation' that the rights arising thereunder would be enforced" (para. 5). Accordingly, he concluded, MacKay J. did not err in exercising his discretion against a stay.

18    With respect to the intervention of the Quebec Superior Court sitting in Bankruptcy, Noël J.A. said "comity also extends to domestic courts" (para. 10). In his view, it was "significant that domestically at least, the secured nature of maritime liens has always been maintained in the context of bankruptcy proceedings without the need for either of the two jurisdictions to supersede one another" (para. 10). By seeking an *ex parte* order from the Quebec Superior Court for the release of the Ship, "the appellants launched what is in effect a collateral attack on MacKay J.'s decision" (para. 12). In Noël J.A.'s view, the proper approach would have been to seek "the assistance of the Federal Court which is the only Court that had jurisdiction over the arrested ship and the respondent's *in rem claim*" (para. 13). The appeal was accordingly dismissed.

### III. Relevant Statutory Provisions

19    *Federal Court Act*, R.S.C. 1985, c. F-7

**3.** The court of law, equity and admiralty in and for Canada now existing under the name of the Federal Court of Canada is hereby continued as an additional court for the better administration of the laws of Canada and shall continue to be a superior court of record having civil and criminal jurisdiction.

**17.** ...

(6) Where an Act of Parliament confers jurisdiction in respect of a matter on a court constituted or established by or under a law of a province, the Trial Division has no jurisdiction to entertain any proceeding in respect of the same matter unless the Act expressly confers that jurisdiction on the Court.

**22.** (1) The Trial Division has concurrent original jurisdiction, between subject and subject as well as otherwise, in all cases in which a claim for relief is made or a remedy is sought under or by virtue of Canadian maritime law or any other law of Canada relating to any matter coming within the class of subject of navigation and shipping, except to the extent that jurisdiction has been otherwise specially assigned.

**WestlawNext** CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Holt Cargo Systems Inc. v. ABC Containerline N.V. (Trustee of), 2001 SCC 90, 2001...

2001 SCC 90, 2001 CSC 90, 2001 CarswellNat 2816, 2001 CarswellNat 2817...

**50.** (1) The Court may, in its discretion, stay proceedings in any cause or matter,

    (*a*) on the ground that the claim is being proceeded with in another court or jurisdiction; or

    (*b*) where for any other reason it is in the interest of justice that the proceedings be stayed.

*Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3

    **2.** In this Act,

. . . . .

"secured creditor" means a person holding a mortgage, hypothec, pledge, charge, lien or privilege on or against the property of the debtor or any part thereof as security for a debt due or accruing due to him from the debtor, or a person whose claim is based on, or secured by, a negotiable instrument held as collateral security and on which the debtor is only indirectly or secondarily liable...

**Stay of Proceedings**

**69.3** (1) Subject to subsection (2) and sections 69.4 and 69.5, on the bankruptcy of any debtor, no creditor has any remedy against the debtor or the debtor's property, or shall commence or continue any action, execution or other proceedings, for the recovery of a claim provable in bankruptcy, until the trustee has been discharged.

(2) Subject to sections 79 and 127 to 135 and subsection 248(1), the bankruptcy of a debtor does not prevent a secured creditor from realizing or otherwise dealing with his security in the same manner as he would have been entitled to realize or deal with it if this section had not been passed, unless the court otherwise orders.

**Scheme of Distribution**

**136.** (1) Subject to the rights of secured creditors, the proceeds realized from the property of a bankrupt shall be applied in priority of payment as follows ...

**Jurisdiction of Courts**

**183.** (1) The following courts are invested with such jurisdiction at law and in equity as will enable them to exercise original, auxiliary and ancillary jurisdiction in bankruptcy and in other proceedings authorized by this Act during their respective terms, as they are now, or may be hereafter, held, and in vacation and in chambers:

. . . . .

    (*b*) in the Province of Quebec, the Superior Court;

## IV. Analysis

20    In this appeal we are urged to adopt a "universalist approach" to bankruptcies and insolvencies that affect more than one jurisdiction. I accept at the outset that bankruptcies that engage multiple jurisdictions may not be administered effectively if each national court goes its own way with the assets that happen physically to be within its control. The chaotic fact situation faced by the Trustees in this case, from Singapore to the Bahamas and Israel to New Zealand, is eloquent testimony to the need for judicial cooperation and international comity.

21    Moreover, it must also be freely acknowledged that the connection between this litigation and Canada is relatively weak. None of the parties (including the Ship) resides here. The debt was incurred in the United States. The shipowner resides in Belgium. There are no bankruptcy proceedings in Canada other than those initiated by the appellant Trustees for recognition of various orders of the Belgian bankruptcy court.

**WestlawNext**® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Holt Cargo Systems Inc. v. ABC Containerline N.V. (Trustee of), 2001 SCC 90, 2001...

2001 SCC 90, 2001 CSC 90, 2001 CarswellNat 2816, 2001 CarswellNat 2817...

22    Canadian courts have become seized with the dispute only because the vagaries of maritime commerce carried the M/V "Brussel" into Canadian waters on March 30, 1996. It was certainly open to the Federal Court to defer in these matters to the bankruptcy court of the bankrupt's domicile. The question is whether, as contended by the appellant Trustees, the Federal Court was *obliged* to do so. If not, did the Federal Court nevertheless commit an error in the exercise of its discretion not to stay the *in rem* action in deference to the Belgian bankruptcy court?

23    For present purposes, I accept the following convenient definitions of the "universalist approach" and the "territorialist approach" (sometimes referred to as the "Grab Rule"):

> ... courts and commentators have identified two general approaches to distributing assets in such proceedings. Under the "territoriality" approach, or the "Grab Rule," the court in each jurisdiction where the debtor has assets distributes the assets located in that jurisdiction pursuant to local rules. Under the "universality" approach, a primary insolvency is instituted in the debtor's domiciliary country, and ancillary courts in other jurisdictions — typically in jurisdictions where the debtor has assets — defer to the foreign proceeding and in effect collaborate to facilitate the centralized liquidation of the debtor's estate according to the rules of the debtor's home country.

> (*Treco, Re,* 240 F.3d 148 (U.S. C.A. 2nd Cir. 2001), at p. 153)

24    The Federal Court was clearly of the view that it was not in this case choosing between the "universalist" approach and the "Grab Rule". It was making a choice between the conflicting demands of two international systems of commercial dispute resolution, namely the rules of maritime law, with long historical roots in the practicalities of ocean shipping, and more recent legal initiatives to establish coherent rules for the administration of international bankruptcies and insolvencies. In its view, I think correctly, the choice was dictated not by some abstract rule of "universalism" but by what the Federal Court understood to be the specific circumstances and justice of this particular case.

**A. Maritime Law**

25    Shipping was one of the earliest activities that required international cooperation in the regulation of the rights and obligations of its participants. "For the cradle of our maritime law we must turn to the Mediterranean Sea where the sea commerce has had a continuous history for nearly five thousand years": *Benedict on Admiralty* (7th ed. (loose-leaf)), vol. 1, at p. 1-4; and see generally W. Tetley, *Maritime Liens and Claims* (2nd ed. 1998), at pp. 7-8. Maritime lawyers were forced to confront the need for rules to govern international commerce centuries before the "universalist approach" became a key issue in bankruptcy. Seamen, salvors, ship chandlers, repairers and other suppliers of essential goods and services to the ship in foreign ports required some assurance of payment. They looked to the ship. Common rules were essential because suppliers dealt with ships from many countries and the Masters found themselves in distant ports in an age when communications with ship owners were slow and unreliable. In maritime commerce, "rules of practical convenience commanding general assent are a virtual necessity": *Estonian State Cargo & Passenger Steamship Line v. "Elise", (The),* [1949] S.C.R. 530 (S.C.C.), *per* Rand J., at p. 545. See also: *Q.N.S. Paper Co. v. Chartwell Shipping Ltd.,* [1989] 2 S.C.R. 683 (S.C.C.), at p. 695. Practicality required an *in rem* proceeding against the ship as distinguished from an *in personam* action against the shipowner. The need for predictability and uniformity was so strong that even the common law courts, ever protective of their own ways, ceded jurisdiction to specialized courts of admiralty applying a largely international law of maritime commerce. As Professor Tetley, *supra*, writes, at p. 56:

> [M]aritime law as we know it today is civilian in nature, finding its source in the *lex maritima* (the law maritime) which is a part of the *lex mercatoria* (the law merchant). Maritime law was codified, international law and, in England, it was apart from, and opposed to, its nearly mortal enemy, the common law.

26    The *in rem* interest in ships took many forms, some created by statute, others by mortgage, still others by possession. One of the most ancient and effective forms of security was (and is) the maritime lien. In this action, Holt claims a maritime lien for stevedoring services pursuant to the U.S. *Commercial Instruments and Maritime Liens Act,* 46 U.S.C. §31342. Broadly speaking, a maritime lien arises without registration or other formality when debts of a specific nature are incurred by or on behalf of a

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 246 of 342

Holt Cargo Systems Inc. v. ABC Containerline N.V. (Trustee of), 2001 SCC 90, 2001...
2001 SCC 90, 2001 CSC 90, 2001 CarswellNat 2816, 2001 CarswellNat 2817...

ship. The lien creates a charge which "goes with the ship everywhere, even in the hands of a purchaser for value without notice, and has a certain ranking with other maritime liens, all of which take precedence over mortgages" (*"Tolton" (The)*, [1946] P. 135 (Eng. P.D.A.), at p. 150, *per* Scott L.J.). It may be described, in that sense, as a "secret lien".

27    The reason for this privileged status for maritime lien holders is entirely practical. The ship may sail under a flag of convenience. Its owners may be difficult to ascertain in a web of corporate relationships (as indeed was the case here, where initially Holt named the wrong corporation as ship owner). Merchant seamen will not work the vessel unless their wages constitute a high priority against the ship. The same is true of others whose work or supplies are essential to the continued voyage. The Master may be embarrassed for lack of funds, but the ship itself is assumed to be worth something and is readily available to provide a measure of security. Reliance on that security was and is vital to maritime commerce. Uncertainty would undermine confidence. The appellant Trustees' claim to "international comity" in matters of bankruptcy must therefore be weighed against competing considerations of a more ancient and at least equally practical international system — the law of maritime commerce.

**B. Foreign Bankruptcy Orders**

28    The appellant Trustees take the position that once the Canadian bankruptcy court was activated on this file, its power and authority occupied the field in relation to matters pertaining to the bankrupt, so to speak, to the exclusion of courts not possessing bankruptcy jurisdiction. This proposition is, in my view, too broad.

29    I propose to make a few preliminary observations about the appellant Trustees' position. More detailed consideration follows.

30    The first preliminary observation is that Antwerp Bulkcarriers N.V. was not placed in bankruptcy under the laws of Canada. The only proceedings before a Canadian bankruptcy court were for the recognition and implementation of the orders of the Belgian bankruptcy court. Part XIII of the *Bankruptcy and Insolvency Act* (the "Act"), entitled "International Insolvencies", was not yet in force at the time of these events. Nevertheless, Canadian bankruptcy courts have long exercised a jurisdiction to come to the aid of foreign bankruptcy courts where it has been in their power to do so. Part XIII put the stamp of parliamentary approval on an initiative supported by judges and scholarly practitioners, both before and after enactment of Part XIII: see *Olympia & York Developments Ltd. v. Royal Trust Co.* (1993), 20 C.B.R. (3d) 165 (Ont. Gen. Div.), at p. 167; *Cadillac Fairview Inc., Re* (1995), 30 C.B.R. (3d) 17 (Ont. Gen. Div. [Commercial List]); *Roberts v. Picture Butte Municipal Hospital* (1998), 64 Alta. L.R. (3d) 218 (Alta. Q.B.), at pp. 224 and 226; *Walker, Re* (1998), 5 C.B.R. (4th) 123 (Ont. Bktcy.); *Babcock & Wilcox Canada Ltd., Re* (2000), 18 C.B.R. (4th) 157 (Ont. S.C.J. [Commercial List]); and see generally J. D. Honsberger, "Canadian Recognition of Foreign Judicially Supervised Arrangements" (1990), 76 C.B.R. (N.S.) 204.

31    My second preliminary observation is that the bankruptcy courts in Belgium and Canada had (and have) a legitimate interest in the *in rem* action in the Federal Court. On May 9, 1996, when the Trustees obtained the order of recognition of the Belgian judgment, title to the M/V "Brussel", however heavily encumbered, was still registered in the name of the bankrupt. It is true that the market value of the Ship (ultimately sold for U.S. \$4.6 million) was a mere fraction of the first mortgage (about \$68 million) held by the Belgian state bank, Société Nationale de Crédit à l'Industrie S.A. ("SNCI"). It is also true that there were maritime liens and statutory charges that ranked ahead of that first mortgage. The bankrupt company nevertheless retained legal title, and to that extent the Ship constituted part of the property of the bankrupt, at least as that term is understood in Canadian law: *Québec (Commission de la santé & de la sécurité du travail) c. Banque fédérale de développement*, [1988] 1 S.C.R. 1061 (S.C.C.).

32    Counsel for the respondent appeared to consider it dispositive of the appeal to characterize the issue before us as concerning "maritime law" as opposed to "bankruptcy law". The facts here present both aspects, and in my view, with respect, the issue before the Federal Court was one of finding the proper balance of relevant factors on the stay application as opposed to trying to preempt further debate with a "pith and substance" characterization of the nature of the proceeding.

33    Thirdly, a Canadian bankruptcy court has a responsibility to consider the interests of the litigants before it and other affected parties in this country as well as the desirability of international cooperation and other relevant circumstances. Its

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 247 of 342

Holt Cargo Systems Inc. v. ABC Containerline N.V. (Trustee of), 2001 SCC 90, 2001...

2001 SCC 90, 2001 CSC 90, 2001 CarswellNat 2816, 2001 CarswellNat 2817...

function is not simply to rubber stamp commands issuing from the foreign court of the primary bankruptcy. Thus the exigencies of international cooperation were significant to both the Federal Court and the Canadian bankruptcy court, but they were not a factor that necessarily trumped all other factors.

34      Fourthly, the Canadian bankruptcy court derives its authority from Canadian law. When called upon to lend assistance to foreign bankruptcy courts, Canadian law requires our courts to consider as *one* of the relevant circumstances the juridical advantage which those disadvantaged by deferral to the foreign court would enjoy in a Canadian court. I appreciate that over-emphasis on juridical advantage as a factor would lead to enthronement of the "Grab Rule" because claimants in the Canadian court will inevitably have a good reason why they do not wish to take their chances in the general bankruptcy in the court of the bankrupt's domicile. Nevertheless, all of the relevant factors must be weighed in a stay application and the nature and extent of juridical advantage for the various parties was clearly an important factor to throw into the balance.

35      Fifthly, the public policy expressed in our own bankruptcy laws is a relevant consideration. Bankruptcy usually signals at least a temporary "cease fire" against the bankrupt's estate. However, if this had been a Canadian bankruptcy, the statutory stay of a creditor's action would have been of little practical relevance because s. 69.3 of the Act exempts from the statutory stay (with exceptions not relevant here) proceedings by secured creditors to realize on their security. Section 69.3(2)(*a*) would have authorized the Canadian bankruptcy court to order a postponement of no more than six months. The effect of the Canadian bankruptcy court's order in this case was a permanent stay of proceedings for realization of the security of the Ship in Canada.

36      I now turn to the more detailed submissions of the parties.

## C. Issues Raised by the Present Appeal

37      It is common ground that ordinarily the Federal Court, Trial Division, would have jurisdiction to arrest the Ship, to entertain Holt's claim for debts incurred on the Ship's behalf, to assess the validity of Holt's claim to a maritime lien, to order the appraisal and sale of the Ship and to see the successful secured claimants paid out of the proceeds of sale.

38      The Trustees advance three broad submissions in support of their position that once the shipowner was declared bankrupt on April 5, 1996, the Federal Court was "bound to act in comity with the direction" given by the Belgian bankruptcy court, whose edicts were recognized and accepted by the Canadian bankruptcy court. Firstly, as already mentioned, they say that Canadian courts should follow a "universalist" rather than a "territorial" approach to bankruptcy. Secondly, they say that a Canadian court exercising admiralty jurisdiction (the Federal Court) must defer to or at least cooperate with (which in their eyes seems to amount to the same thing) the Canadian court exercising bankruptcy jurisdiction (the Quebec Superior Court). Thirdly, the Trustees say that the response of Canadian courts should be "uniform" by which they appear to mean the Federal Court should have acceded to the request of the Belgian court because the Quebec Superior Court sitting in Bankruptcy had already done so.

39      In light of these preliminary observations, I think the Trustees' arguments may be conveniently addressed under the following headings:

1. Did the respondent Holt possess a valid claim to a maritime lien under Canadian law against the M/V "Brussel" prior to the Belgian bankruptcy of the owners on April 5, 1996?

2. Did Holt thereby enjoy a juridical advantage in Canada that would be in jeopardy if the Federal Court proceedings were stayed in deference to the Belgian bankruptcy court?

3. Did the Federal Court err in treating Holt as a "secured creditor" as that term is understood in Canadian bankruptcy law?

4. Did the Belgian bankruptcy of April 5, 1996 give the Belgian Trustees a valid claim to the Ship?

5. Did the Federal Court of Canada lose jurisdiction to proceed as a result of the various orders of the Quebec Superior Court sitting in Bankruptcy?

6. Even if the Federal Court retained jurisdiction, ought it nevertheless to have deferred to the Belgian bankruptcy court on the basis of "international comity" and the need for an integrated "universalist" approach to the bankruptcy?

7. In light of the foregoing, did the Federal Court err in the exercise of its discretion to deny the Trustees' application for a stay of proceedings?

40     I will address each of these issues in turn.

### 1. Did the Respondent Holt Possess a Valid Claim to a Maritime Lien Under Canadian Law Against the M/V "Brussel" Prior to the Belgian Bankruptcy of the Owners of April 5, 1996?

41     A maritime lien validly created under foreign law will be recognized and given the same priority in Canada as would be given to a maritime lien created in Canada under Canadian maritime law "unless opposed to some rule of domestic policy or procedure which prevents the recognition of the right": *Walter W. Hodder Co. v. "Strandhill" (The),* [1926] S.C.R. 680 (S.C.C.), *per* Newcombe J., at p. 685. The theory is that "if a maritime lien exists it cannot be shaken off by changing the location of the *res*": *Todd Shipyards Corp. v. Altema Compania Maritima S.A.* (1972), [1974] S.C.R. 1248 (S.C.C.), at p. 1252.

42     Under U.S. law, as stated, the respondent Holt acquired a maritime lien against the Ship at the moment when services were rendered in U.S. ports. All such services were rendered prior to March 30, 1996. The Ship thus arrived in Canadian waters burdened with a maritime lien. A maritime lien would not have arisen under Canadian law for similar stevedoring services rendered to a ship at a port in Canada, but the proper law giving rise to the debt was U.S. law, not Canadian law.

43     It is Canadian law, once it recognizes the right, that grants the remedy and sets the priorities. At Canadian law, a maritime lien ranks ahead of a ship's mortgage (i.e., the $68 million claim of SNCI). See *Todd Shipyards, supra,* at p. 1259, and *Marlex Petroleum Inc. v. "Har Rai" (The),* [1987] 1 S.C.R. 57 (S.C.C.), affirming [1984] 2 F.C. 345 (Fed. C.A.).

44     The appellant Trustees argue that a "universalist" approach to trans-border bankruptcies is a domestic policy opposable to recognition of the U.S. maritime lien in this case within the meaning of the *Standhill* exception, but I do not think so. Newcombe J. was looking to something offensive about the origin of the right being asserted (as was the case in *Laane and Baltser, supra*). There is nothing offensive about the origin of Holt's claim. If stevedoring services had not been rendered, the Ship could not have unloaded its cargo at Gloucester City, New Jersey. If Holt is to be defeated by considerations of "universalism", it will be as a result of a balancing of relevant factors under s. 50 of the *Federal Court Act* which authorizes the court, in its discretion, to stay its own proceedings.

45     In my view, on the existing state of the law, Holt was entitled to have its maritime lien recognized as such by the Federal Court in these proceedings.

### 2. Did Holt Thereby Enjoy a Juridical Advantage in Canada that Would be in Jeopardy if the Federal Court Proceedings Were Stayed in Deference to the Belgian Bankruptcy Court?

46     There were clear advantages to Holt in having its claim disposed of in Canada. Firstly, at the time the Trustees intervened, Holt's *in rem* action was undefended and speeding to a successful conclusion. According to the anticipated timetable, its claim would be paid in full, plus expenses, within a matter of months. The Belgian bankruptcy was still in the early stages of organization.

47     Secondly, and more importantly, it seems clear that Holt's claim would not enjoy the same priority in Belgium as it enjoyed under Canadian maritime law.

48     In an affidavit sworn in this action on June 5, 1996, the appellant De Roy deposed that the applicable Belgian law "prohibits the arrest or execution by creditors of the debtor's property to enforce preferential/lien claims" (para. 26). De Roy further deposed that Belgian maritime law "gives specific priorities to certain types of claims" (para. 42) but declined to state whether such "priority" claims included that of Holt and other maritime lien holders. In the hearing before Guthrie J. of the

**Holt Cargo Systems Inc. v. ABC Containerline N.V. (Trustee of), 2001 SCC 90, 2001...**

2001 SCC 90, 2001 CSC 90, 2001 CarswellNat 2816, 2001 CarswellNat 2817...

Canadian bankruptcy court, Me Édouard Baudry, an experienced admiralty law practitioner arguing for the intervener, SNCI, who supported the appellant Trustees, expressed the common understanding of counsel that Holt would likely be disadvantaged if required to take its claim to Belgium:

> Me ÉDOUARD BAUDRY
>
> I would add, though, as my friend will no doubt tell you, that the possibility of an American maritime lien being recognized by Belgian Court is a ...
>
> THE COURT
>
> Being maintained by the Antwerp Court is slimmer than in here?
>
> Me ÉDOUARD BAUDRY
>
> ... is a lot slimmer than here.
>
> THE COURT
>
> I can understand that.
>
> Me ÉDOUARD BAUDRY
>
> I think we all ...
>
> THE COURT
>
> I think that is one of the reasons, if not the major reason, why we're here.

49     Further, according to endnote 5 of the judgment of the Federal Court of Appeal, counsel for both parties conceded on the appeal that it was "<u>unlikely</u> that the respondent's *in rem* rights <u>could</u> subsist in one form or another under Belgian bankruptcy laws" (emphasis added).

50     While the onus was on the appellant Trustees to establish the grounds for a stay of proceedings, it was up to Holt to prove Belgian law if Holt wished to rely on any difference between the expected treatment of its claim under Belgian law as opposed to Canadian law. The trial judge noted the absence of evidence on this point. However, as the parties were apparently in agreement that Belgian law would not recognize Holt's maritime lien both before Guthrie J. in the Canadian bankruptcy court, and subsequently in the present case before the Federal Court of Appeal, I do not think we should interfere with the Federal Court of Appeal on this factual point. As Guthrie J. pointed out, the reason "we're here" is that Holt's claim enjoys a juridical advantage in the Federal Court of Canada that it would not command in the Belgian bankruptcy court.

### 3. Did the Federal Court Err in Treating Holt as a "Secured Creditor" as that Term is Understood in Canadian Bankruptcy Law?

51     Canadian bankruptcy law takes an expansive view of who is a secured creditor, as confirmed by the relevant provisions in the Act. If Antwerp Bulkcarriers N.V. had declared bankruptcy in Canada, there is no doubt that Holt would be considered "a person holding ... a lien ... against the property of the debtor ... as security for a debt due" within the definition of "secured creditor" in s. 2 of the Act. Once the Federal Court had determined as a matter of Canadian maritime law that Holt's claim was secured by a maritime lien on the Ship itself, the bankruptcy court would be bound by that determination: *Riordon Co. v. John W. Danforth Co.*, [1923] S.C.R. 319 (S.C.C.).

52     If this were a Canadian bankruptcy, Holt would have been entitled to realize on its security irrespective of the bankruptcy. As Gonthier J. said in *Husky Oil Operations Ltd. v. Minister of National Revenue*, [1995] 3 S.C.R. 453 (S.C.C.), at p. 472, "the entire scheme of distribution is '[s]ubject to the rights of secured creditors'". The opening words of s. 136 (under the heading

"Scheme of Distribution") establish the priority of claims against the bankrupt's estate subject always "to the rights of secured creditors". L. W. Houlden and G. B. Morawetz state that "[t]he policy of the Act in the case of bankruptcy is not to interfere with secured creditors except in so far as may be necessary to protect the estate as to any surplus on the assets covered by the security" (*The 2001 Annotated Bankruptcy and Insolvency Act* (2001), at p. 346). See also: L. M. LoPucki, "Cooperation in International Bankruptcy: A Post-Universalist Approach" (1999), 84 *Cornell L. Rev.* 696.

53      I appreciate, of course, that "universalism" will not work if every jurisdiction only defers to the law of the primary bankruptcy where that law coincides precisely with the domestic law of the deferring court. The fact remains, however, that Canadian public policy, expressed through the Act, strongly supports the rights of claimants whom we would regard as secured creditors. Our law considers it in the interests of commercial activity generally that secured rights be protected. It seems to me that MacKay J. correctly regarded Holt as a "secured creditor" in bankruptcy terms, and in the exercise of his discretion under s. 50 of the *Federal Court Act*, he was entirely justified in putting considerable weight on that factor.

### 4. Did the Belgian Bankruptcy of April 5, 1996 Give the Belgian Trustees a Valid Claim to the Ship?

54      Under the Belgian bankruptcy court's order of April 5, 1996, the Trustees were given the duty and power to take possession of the assets of the bankrupt wherever located. At that stage, the Ship was no longer in the possession of the bankrupt shipowner. It was in the possession of the Marshal of the Federal Court at Halifax and subject to further orders of that court.

55      In Canada, the bankruptcy order pronounced by the court of the domicile operated as an assignment by operation of law of the moveable assets of the bankrupt shipowner located in Canada, including its interest in the M/V "Brussel", but this assignment is subject to any prior charges upon it recognized by *Canadian* law (J.-G. Castel, *Canadian Conflict of Laws* (4th ed. 1997), at pp. 564-65).

56      In this respect, our conflict of laws rule is the same as the English rule set out by the editors of *Dicey and Morris on the Conflict of Laws* (13th ed. 2000), at p. 1184:

> The general principle of English law is that bankruptcy, or any proceeding in the nature of bankruptcy, in a foreign country whose courts have jurisdiction over a debtor operates as an assignment to the trustee, assignees, curators, syndics or others, who under the law of that country are entitled to administer his property, of all his movables in England, if that is its effect under the foreign law.

> See also I. F. Fletcher, *Insolvency in Private International Law* (1999), at pp. 61-62.

As in Canada, the assignment by operation of law of the debtor's property is subject to a number of limitations, one of which as noted is that the property passes subject to existing charges recognized under English law:

> The property in England passes subject to any existing charges upon it recognised by the law of England, even if these charges would be postponed under the law of the place of bankruptcy to the claim of the creditors, and even if under the English bankruptcy the charges would be defeated by the title of the trustee in bankruptcy.

> (*Dicey and Morris on the Conflict of Laws, supra*, at pp. 1184-85)

57      An illustration of the proposition that the trustee cannot obtain more of an interest than it was in the power of the debtor to assign is in *Galbraith v. Grimshaw*, [1910] A.C. 508 (U.K. H.L.). In that case, creditors had obtained judgment in Scotland against a Scottish company and, having had the judgment extended to England, served a garnishee order on an English firm that was indebted to the Scottish debtor. Two weeks later, the Scottish debtor became bankrupt. The trustee sought to take possession of the garnisheed debt, but was refused by the House of Lords on the principle that the trustee "could not have it unless the bankrupt could himself have assigned it" (p. 511). Accordingly, the trustee was not entitled to receive the debt free of the garnishee order "because the bankrupt could only have assigned it on November 12, subject to the garnishee order" (at p. 511). In *Anantapadmanabhaswami v. Official Receiver of Secunderabad*, [1933] A.C. 394 (India P.C.), the Privy Council

**WestlawNext**® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    18

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 251 of 342

Holt Cargo Systems Inc. v. ABC Containerline N.V. (Trustee of), 2001 SCC 90, 2001...

2001 SCC 90, 2001 CSC 90, 2001 CarswellNat 2816, 2001 CarswellNat 2817...

extended the *Galbraith* analysis to debts that were the subject of collection proceedings in progress provided that at the date of the bankruptcy the bankrupt could not have assigned the debt clear of the plaintiff's claim.

58     While such a rule may be modified by statute, it has not been so modified in Canada in any way relevant to the question of the foreign bankruptcy before us.

59     I conclude therefore that on April 5, 1996, the Belgian Trustees acquired under Canadian law the interest of the bankrupt shipowner in the M/V "Brussel" but that its interest was and remained subject to the prior claim of the secured creditors, including the maritime lienholders, who were seeking relief in the Federal Court Trial Division.

### 5. Did the Federal Court of Canada Lose Jurisdiction to Proceed as a Result of the Various Orders of the Quebec Superior Court Sitting in Bankruptcy?

60     The Trustees argue that once the Belgian bankruptcy court issued its order on April 5, 1996, or, at the very latest, when the request for assistance was accepted by the Canadian bankruptcy court, the matter before MacKay J. became one of bankruptcy and thus within the *exclusive* jurisdiction of the Canadian bankruptcy court. I have already rejected the Trustees' notion that once a foreign bankruptcy court is activated it necessarily occupies the field in relation to matters pertaining to the bankrupt in this country. I have also rejected the idea that "international coordination" necessitates the rubber stamping of orders made by the foreign bankruptcy court.

61     The appellant Trustees nevertheless contend that the Federal Court lost jurisdiction because of the combined operation of s. 183(1) of the *Bankruptcy and Insolvency Act* and s. 17(6) of the *Federal Court Act*. Section 183(1) reads as follows:

**183.** (1) The following courts are invested with such jurisdiction at law and in equity as will enable them to exercise original, auxiliary and ancillary jurisdiction in bankruptcy and in other proceedings authorized by this Act during their respective terms, as they are now, or may be hereafter, held, and in vacation and in chambers:

. . . . .

(*b*) in the Province of Quebec, the Superior Court;

(The Trustees commenced their proceedings in Montreal, Quebec, because that was the place of business of the shipowner's agents in Canada.)

62     Section 17(6) of the *Federal Court Act* provides:

**17.** ...

(6) Where an Act of Parliament confers jurisdiction in respect of a matter on a court constituted or established by or under a law of a province, the Trial Division has no jurisdiction to entertain any proceeding in respect of the same matter unless the Act expressly confers that jurisdiction on the Court.

63     The Trustees do not contend that the arrest of the Ship and the adjudication of claims under maritime law are bankruptcy matters. Their position is that the bankruptcy order of the Belgian bankruptcy court, and the follow-up orders of the Canadian bankruptcy court, transformed a maritime matter into one of bankruptcy. The corollary to this argument is that the Federal Court, which has no bankruptcy jurisdiction, thereby lost subject-matter jurisdiction in the case.

64     In my view MacKay J. was not exercising original, ancillary or auxiliary jurisdiction in bankruptcy. If he had, he would have been without jurisdiction and it would not be necessary to have recourse to s. 17(6) of the *Federal Court Act*. This is because s. 17(6) presupposes that the Federal Court *would* have jurisdiction but for that subsection. In *Miida Electronics Inc. v. Mitsui O.S.K. Lines Ltd.*, [1986] 1 S.C.R. 752 (S.C.C.), at p. 766, this Court concluded that the Federal Court has jurisdiction only if certain conditions are satisfied, including a statutory grant of jurisdiction by the federal Parliament. There has been no such statutory grant of bankruptcy jurisdiction to the Federal Court.

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 252 of 342

Holt Cargo Systems Inc. v. ABC Containerline N.V. (Trustee of), 2001 SCC 90, 2001...
2001 SCC 90, 2001 CSC 90, 2001 CarswellNat 2816, 2001 CarswellNat 2817...

65    The subject matter of the dispute before MacKay J. was the maritime lien asserted by Holt and the claims of other creditors to security in the Ship. He was dealing with *in rem* claims against the Ship, not *in personam* claims against the shipowner. It was apparent from the SNCI's intervention that its mortgage claim of $68 million would, if allowed, swallow whatever funds might be left after the claims of the maritime lienholders had been satisfied. There was therefore no realistic possibility of any residual funds to which the Trustees could properly lay claim.

66    The bankruptcy was certainly not irrelevant to the Federal Court proceedings. The Trustees rightly demanded (and were accorded) rights of participation in the proceedings to protect the interest of the bankrupt shipowner. There was a continuing bankruptcy aspect throughout the Federal Court proceedings after April 5, 1996 which MacKay J. acknowledged in his various orders. Nevertheless, having ruled that he would recognize Holt's security interest as a matter of maritime law, and having regard to the priority accorded to secured creditors in the order of the Canadian bankruptcy court dated June 28, 1996, he rightly concluded that there was no *jurisdictional* barrier to the Federal Court continuing to adjudicate Holt's *in rem* action against the Ship.

### 6. Even If the Federal Court Retained Jurisdiction, Ought It Nevertheless to Have Deferred to the Belgian Bankruptcy Court on the Basis of "International Comity" and the Need for an Integrated "Universalist" Approach to the Bankruptcy?

67    I should first of all address the issue of "international comity" as it pertains to the present appeal and then move on to consider some of the more specific approaches that have been devised to solve problems arising from international bankruptcies. I will then outline what I believe is the preferred approach in cases of this kind.

*(a) The Role of International Comity*

68    In *R. v. Zingre*, [1981] 2 S.C.R. 392 (S.C.C.), Dickson J. (as he then was) commented at p. 401 that "the Courts of one jurisdiction will give effect to the laws and judicial decisions of another jurisdiction, not as a matter of obligation but out of mutual deference and respect".

69    Subsequently, in *R. v. Spencer*, [1985] 2 S.C.R. 278 (S.C.C.), at p. 283, Estey J. accepted as accurate the following definition of international comity:

"Comity" in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws: *Hilton v. Guyot*, 159 U.S. 113 (1895), at pp. 163-64.

70    The Canadian bankruptcy court in this case did not have a monopoly in the determination of what level of "deference and respect" was owed to the Belgian bankruptcy court. Within its own bankruptcy jurisdiction, of course, it could and did make that determination. Insofar as Holt's claim was "integrally connected to maritime matters", it lay within the jurisdiction of the Federal Court (*Ordon Estate v. Grail*, [1998] 3 S.C.R. 437 (S.C.C.), at para. 73) and it was for that court to decide whether to defer to the Belgian bankruptcy court "having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws".

71    In *Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077 (S.C.C.), the Court expanded on the definition of international comity by noting that the twin objectives sought by private international law in general and the doctrine of international comity in particular were order and fairness. This was reiterated in *Hunt v. T & N plc*, [1993] 4 S.C.R. 289 (S.C.C.), at p. 325, and again in *Tolofson v. Jensen*, [1994] 3 S.C.R. 1022 (S.C.C.), at p. 1058, where the Court gave pre-eminence to the objective of order:

While, no doubt, as was observed in *Morguard*, the underlying principles of private international law are order and fairness, order comes first. Order is a precondition to justice.

Holt Cargo Systems Inc. v. ABC Containerline N.V. (Trustee of), 2001 SCC 90, 2001...

2001 SCC 90, 2001 CSC 90, 2001 CarswellNat 2816, 2001 CarswellNat 2817...

72    It has been, of course, the objective of international maritime law for centuries to create conditions of order and fairness for those engaged in maritime commerce.

*(b) The "Universalist" Approach*

73    The Trustees argue that to achieve the twin objectives of order and fairness in an international insolvency, it is necessary to adopt the "universalist" approach because in fairness "the claims of creditors can be finally determined only by the court of the debtor's domicile in accordance with the law of that place" (Castel, *supra*, p. 553). They advocate a "close networking between courts on an international level" (factum, para. 36).

74    In the case at bar the debtor's domicile was Belgium, and the Trustees contend that the Federal Court erred in not requiring Holt and the other secured creditors to pursue their claims in that country. The Trustees also argue that as the Quebec Superior Court decided to come to the aid of the Belgian bankruptcy court, the Federal Court ought, as a matter of "domestic" comity, to have deferred to that decision.

75    There is much to be said for the proposition that primary insolvency proceedings having been instituted in Belgium, other jurisdictions where the bankrupt possessed assets should cooperate to the extent permitted by their respective laws with the Belgian courts. The need for such international cooperation in bankruptcy and insolvency has been evident for a very long time, though the ever-continuing ascendency of multi-national enterprises and acceleration towards a global economy have made the underlying problems more acute. As long ago as 1883, in the case of *Canada Southern Railway v. Gebhard*, 109 U.S. 527 (U.S. S.C. 1883), the United States Supreme Court said, at p. 539:

> Unless all parties in interest, wherever they reside, can be bound by the arrangement which it is sought to have legalized the scheme may fail. All home creditors can be bound. What is needed is to bind those who are abroad. Under these circumstances the true spirit of international comity requires that schemes of this character, legalized at home, should be recognized in other countries.

76    The essence of the universalist approach advocated by the Trustees is that there ought to be a primary bankruptcy proceeding, title to assets locally situated should be vested in the foreign representative of the bankrupt estate, creditors should not be permitted to realize on a foreign debtor's assets in the local courts outside the framework of the primary bankruptcy, and orders made in foreign bankruptcy proceedings should be recognized and enforced elsewhere.

77    Professor J. Ziegel contrasts the "universalist" approach to the "territorialist" approach, earlier referred to as the "Grab Rule", and concludes that most jurisdictions exhibit elements of both approaches:

> International insolvency jurists have long classified countries and their conflict of laws rules according to their willingness to recognize and give effect to foreign insolvency orders and judgments. Those regimes that are hospitable to extending such recognition are labelled universalist; those that deny such recognition are classified as territorialist. Common law countries are often described as belonging among the universalist families, while civil law systems are believed to be territorialist.

> However, the pigeonholing is misleading. Common law countries differ as widely in their international insolvency rules as do civil law jurisdictions. On closer examination it will be found that some of the jurisdictions that claim to be universalist only practise a very diluted form of universalism while countries labelled as territorialist in fact extend varying measures of recognition to foreign insolvency orders and foreign insolvency representatives.

> ("Ships at Sea, International Insolvencies, and Divided Courts" (1998), 53 C.B.R. (3d) 310. See also *In re Treco, supra*, and Castel, *supra*, at pp. 553-54.)

78    Traditionally, only some of the key components of the universalist approach have been reflected in Canadian law. While our courts generally favour a process of universal distribution and recognize a foreign trustee's title to property, they also permit concurrent bankruptcies and protect the vested rights of what we regard as secured creditors under Canadian law.

2001 SCC 90, 2001 CSC 90, 2001 CarswellNat 2816, 2001 CarswellNat 2817...

With respect to the latter, the usual Canadian position has been that a foreign trustee in bankruptcy should have no higher claim on the *secured* assets of a bankrupt than if the bankruptcy had occurred here. In a true universalist system the question of encumbrances would be settled by the law of the place of the bankruptcy (which may, as in this case, produce a result contrary to Canadian maritime law).

79    Further, Canadian law has always recognized that initiation of foreign bankruptcy proceedings does not prevent concurrent insolvency proceedings in Canada: see Castel, *supra*, at p. 565; *Allen v. Hanson* (1890), 18 S.C.R. 667 (S.C.C.); *Breakwater Co., Re* (1914), 33 O.L.R. 65 (Ont. H.C.), and *E.H. Clarke & Co., Re*, [1923] 1 D.L.R. 716 (Ont. Bktcy.). The existence of two sets of proceedings obviously raises the spectre of conflicting decisions or approaches, although as noted in 1890 by the Chief Justice of this Court in *Allen*, *supra*, at p. 674, it is "the duty of the courts of both countries to see no conflict should arise". Conflict avoidance can take many forms, including dismissing or staying Canadian proceedings. Subsection 43(7) of the *Bankruptcy and Insolvency Act* permits the court to dismiss a petition if it has "sufficient cause". This requirement may be satisfied if the debtor has been declared bankrupt elsewhere. In fact, the courts have stayed liquidation proceedings where bankruptcy proceedings are on foot in a foreign jurisdiction: *Stewart & Matthews Ltd., Re* (1916), 10 W.W.R. 154 (Man. K.B.). Similarly, in an appropriate case, the Federal Court can avoid conflict by staying its proceedings pursuant to s. 50 of the *Federal Court Act*.

80    In short, Canada has adhered to a middle position (dignified by the name "plurality approach") which recognizes that different jurisdictions may have a legitimate and concurrent interest in the conduct of an international bankruptcy, and that the interests asserted in Canadian courts may, but not necessarily must, be subordinated in a particular case to a foreign bankruptcy regime. The general approach reflects a desire for coordination rather than subordination, with deference being accorded only after due consideration of all the relevant circumstances rather than automatically accorded because of an abstract "universalist" principle. As pointed out by Professor Castel, *supra*, at pp. 554-55:

> Under the doctrine of plurality which prevails in Canada, each country has the right, if it deems it advisable, to allow bankruptcy proceedings to begin in its territory by virtue of its bankruptcy law. The court applies its own substantive law. Thus, bankruptcies may be initiated in a number of countries with respect to the same debtor. In Canada, this rigid doctrine is partially tempered by close cooperation with foreign courts.

81    The question is whether, as argued by the appellant Trustees, this orientation in Canada ought now to be changed to a more "universalist" approach.

*(c) The 1997 Amendments to the Act*

82    In April 1997 Parliament enacted Part XIII of the *Bankruptcy and Insolvency Act*, entitled "International Insolvencies". It applies only to bankruptcy proceedings initiated after September 30, 1997, and thus has no direct application here. Nevertheless, it is worth noting that Parliament has continued the diluted universalism (or "plurality approach") adopted by Canadian courts under the common law. There is now, under Part XIII, specific authority to come to the aid of foreign courts and "foreign representatives" in the administration and adjudication of insolvencies that have international dimensions. There is also authority for Canadian courts, under s. 271(1), to request "the aid and assistance of a court, tribunal or other authority in a foreign proceeding". The objective of these provisions is to facilitate the coordination of foreign and domestic insolvency proceedings. Nevertheless, there is no rule requiring Canadian courts to refrain from entertaining concurrent proceedings. On the contrary, concurrent proceedings are anticipated as Canadian courts are given authority under s. 268(3) to make orders that will result in a *coordination* of foreign and domestic proceedings, not the *elimination* of one in preference to the other. By authorizing a Canadian court under subsection (2) to limit the domestic trustee's authority to property situated in Canada, Parliament obviously anticipated that in certain cases a territorial approach would be acceptable. The amendments provide specifically that a court is not compelled to enforce any order made by a foreign court: s. 268(6).

83    Moreover, s. 269 explicitly denies extraterritorial reach to foreign stay orders. It says that a foreign stay of proceedings "does not apply in respect of creditors who reside or carry on business in Canada with respect to property in Canada unless the stay of proceedings is the result of proceedings taken in Canada".

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 255 of 342

Holt Cargo Systems Inc. v. ABC Containerline N.V. (Trustee of), 2001 SCC 90, 2001...

2001 SCC 90, 2001 CSC 90, 2001 CarswellNat 2816, 2001 CarswellNat 2817...

84     It thus appears that Canadian public policy, expressed as recently as 1997 by Parliament, endorses the plurality approach developed over the years by the courts.

*(d) The Preferred Approach*

85     Given the almost infinite variations in circumstances that can occur in an "international bankruptcy", the pragmatism of the "plurality" approach continues to recommend itself. International coordination is an important factor, but it is not necessarily a controlling factor.

86     Where a stay is sought of Canadian proceedings in deference to a foreign bankruptcy court, the Canadian court before which the stay application is made (in this case the Federal Court) ought to be mindful of the difficulties confronting the bankruptcy trustees in the fulfilment of their public mandate to bring order out of financial disorder and the desirability of maximizing the size of the bankrupt estate. These objectives are furthered by minimizing the multiplicity of proceedings, and the attendant costs, and the possibility of inconsistent decisions in relation to the same claims or assets.

87     Nevertheless, courts must have regard to the need to do justice to the particular litigants who come before them as well as to the public interest in the efficient administration of bankrupt estates. It would be inappropriate to elevate any one consideration to a controlling position in the exercise of a bankruptcy court's discretion to dismiss a petition under s. 43(7) *or* to stay proceedings under Part XIII of the Act *or* in the Federal Court's decision to stay proceedings under s. 50 of the *Federal Court Act*. Discretion should not be thus predetermined. The desirability of international coordination is an important consideration. In some cases, it may be the controlling consideration. The courts nevertheless have to exercise their discretion to stay or not to stay domestic proceedings according to all of the relevant facts of a particular case.

### 7. In Light of the Foregoing, Did the Federal Court Err in the Exercise of its Discretion to Deny the Trustees' Application for a Stay of Proceedings?

88     The dollars and cents issue in this case should not be obscured entirely by the scholarly debate between universalists, pluralists and territorialists. The Trustees advocate a "universalist" approach because it is in their interest, acting on behalf of all creditors, to take the proceeds of sale of the Ship home to Belgium for distribution according to Belgian law. It is clearly not in the respondent's interest, because it appears that Holt's claim would not enjoy under Belgian law the priority it has under Canadian law. If Holt is obliged to defend variations of the "territorialist" position, it is because it seems that is the only way its claim will be paid in full on a timely basis or perhaps at all.

89     The Federal Court's authority to stay proceedings is found, as noted, in s. 50 of the *Federal Court Act*:

**50.** (1) The Court may, in its discretion, stay proceedings in any cause or matter,

(*a*) on the ground that the claim is being proceeded with in another court or jurisdiction; or

(*b*) where for any other reason it is in the interest of justice that the proceedings be stayed.

The principles on which the discretion should be exercised in this type of case were authoritatively settled in *Amchem, supra*. Sopinka J., speaking for the Court, posed the question at p. 920, "is there a more appropriate jurisdiction based on the relevant factors", to which he added at p. 921, "the existence of a more appropriate forum must be <u>clearly</u> established to displace the forum selected by the plaintiff" (emphasis in original).

90     *Amchem* was a purely private piece of litigation involving product liability claims related to exposure to asbestos. International bankruptcies have a public aspect, because it is in the public interest to facilitate the speedy resolution of the fallout from a financial collapse. This does not change the *Amchem* analysis. It is simply to emphasize an important public aspect of this case that was not present in the *Amchem* fact situation.

**WestlawNext** CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 256 of 342

Holt Cargo Systems Inc. v. ABC Containerline N.V. (Trustee of), 2001 SCC 90, 2001...
2001 SCC 90, 2001 CSC 90, 2001 CarswellNat 2816, 2001 CarswellNat 2817...

91     The "natural forum" is the one to which the action has the most real and substantial connection (*Amchem*, at pp. 916, 935). Relevant circumstances include not only issues of public policy (as in this case) but also the potential loss to the plaintiff of a juridical advantage sufficient to work an injustice if the proceedings were stayed, the place or places where the parties carry on their business, the convenience and expense of litigating in one forum or the other, and the discouragement of forum shopping. In short, within the overall framework of public policy, any injustice to the plaintiff in having its action stayed must be weighed against any injustice to the defendant if the action is allowed to proceed. What is required is that these factors be carefully weighed in the balance.

92     In addressing the issue of a stay, MacKay J. acknowledged the importance of comity and international coordination in a proper case. Having done so, he went on to place primary emphasis on the fact he was dealing with an *in rem* action by secured creditors against a ship which at the time of the bankruptcy the Federal Court had already arrested and at the time of the interventions of the Canadian bankruptcy court (June 11 and June 28, 1996) he had already ordered appraised and sold. Moreover, the order dated June 28 had expressly made the interest of the appellant Trustees subject "to the rights, if any, of any creditors with claims secured under the laws of Canada, as by law provided".

93     The appellants' strongest argument is that the dispute is but weakly connected to Canada. This Court, however, in *Antares Shipping Corp. v. "Capricorn" (The)* (1976), [1977] 2 S.C.R. 422 (S.C.C.), recognized that lack of substantive connections to *any* particular jurisdiction, including its home port, is a feature of ships engaged in international maritime commerce. In that case, the Court refused to stay proceedings *in rem* in which three Liberian corporations contested in Canada the ownership of a Liberian registered ship. Liberia, of course, is a flag of convenience. Ships registered there may never have occasion to "go home". In *Antares Shipping*, the only connection to Canada was that the ship was arrested at the suit of one of the Liberian corporations while it was in Canadian waters. Ritchie J., speaking for the majority, recognized that ocean-going ships present a particular problem. At p. 453, he adopted the following observations of Lord Simon, dissenting, in *"Atlantic Star" (The) v. "Bona Spes" (The)*, [1973] 2 All E.R. 175 (U.K. H.L.), at p. 197:

> Ships are elusive. The power to arrest in any port and found thereon an action *in rem* is increasingly required with the custom of ships being owned singly and sailing under flags of convenience. A large tanker may by negligent navigation cause extensive damage to beaches or to other shipping: she will take very good care to keep out of the ports of the 'convenient' forum. If the aggrieved party manages to arrest her elsewhere, it will be said forcibly (as the appellants say here): "the defendant has no sort of connection with the forum except that she was arrested within its jurisdiction". But that will frequently be the only way of securing justice.

Belgium is not a "flag of convenience" like Liberia but the principle remains the same. The "real and substantial connection" test must take into account the special lifestyle of ocean-going freighters.

94     As to the appellants' allegation that Holt was engaged in "forum shopping", the further observations of Lord Simon quoted in *Antares Shipping* are also apposite:

> "Forum-shopping" is, indeed, inescapably involved with the concept of maritime lien and the action *in rem*. Every port is automatically an admiralty emporium. This may be very inconvenient to some defendants; but the system has unquestionably proved itself on the whole as an instrument of justice.

95     With respect to juridical advantage, the trial judge stated that "there simply was no evidence of the comparative status of the plaintiff's claim under Belgian and Canadian law" (para. 76). On appeal, as mentioned, the Federal Court of Appeal noted that "both parties concede [that it was] unlikely that Holt's *in rem* rights could subsist in one form or another under Belgian bankruptcy laws" (endnote 5). The apparent concession at the hearing before the Federal Court of Appeal only adds to the weight of the arguments earlier accepted by MacKay J. to allow the *in rem* action to proceed.

96     If, contrary to the concession in the Federal Court of Appeal, we were to assume in the Trustees' favour that there was no juridical advantage to Holt or other secured creditors in keeping alive the *in rem* action in Canada, it means that there would equally be no advantage to the Trustees in moving the proceedings to Belgium. The same secured creditors would (on that

2001 SCC 90, 2001 CSC 90, 2001 CarswellNat 2816, 2001 CarswellNat 2817...

assumption) exhaust the proceeds of the sale of the Ship, but pay the additional penalty of the cost of duplicative proceedings in Belgium. To talk of the benefits of the "universalist" approach to international bankruptcies in such circumstances is illusory.

97     The trial judge also placed reliance on the convenience to the U.S. creditors of litigating in Canada rather than Belgium. This factor is relevant (*Amchem, supra*, at p. 917) but would not, I think, be of great weight if the appellant Trustees had been able to show that justice required deference to the court of the domicile of the bankrupt.

98     In summary, the trial judge considered the relevant factors in reaching his conclusion that the Federal Court was the appropriate forum to resolve the respondent's claim. He committed no error of principle and did not refuse "to take into consideration a major element for the determination of the case": *Harelkin v. University of Regina*, [1979] 2 S.C.R. 561 (S.C.C.), at p. 588; *Friends of the Oldman River Society v. Canada (Minister of Transport)*, [1992] 1 S.C.R. 3 (S.C.C.), at p. 77. In the absence of error, we are not entitled to interfere with the exercise of his discretion.

## V. Conclusion

99     The appeal is dismissed with costs.

*Appeal dismissed.*

*Pourvoi rejeté.*

Footnotes

\*          A corrigendum issued by the court on February 18, 2002 has been incorporated herein.

---

**End of Document**          Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

 Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# Tab 26

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 259 of 342

Olympia & York Developments Ltd., Re, 1996 CarswellOnt 2814

1996 CarswellOnt 2814, 29 O.R. (3d) 626, 43 C.B.R. (3d) 111, 64 A.C.W.S. (3d) 62...

1996 CarswellOnt 2814

Ontario Court of Justice (General Division) [Commercial List]

Olympia & York Developments Ltd., Re

1996 CarswellOnt 2814, 29 O.R. (3d) 626, 43 C.B.R. (3d) 111, 64 A.C.W.S. (3d) 62, 7 C.P.C. (4th) 157, 8 O.T.C. 364

# In the matter of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36; and In the matter of a plan of arrangement of Olympia & York Developments Limited and all other companies set out in Schedule "A" attached to the notice of motion herein

Blair J.

Judgment: June 27, 1996

Docket: B125/92

Counsel: *Michael E. Barrack* and *Kevin J. Zych*, for Canadian Protocol Companies.
*James D.G. Douglas*, *Geoffrey B. M orawetz* and *Lorne Sossen*, for administrator.
*William V. Sasso*, for monitoring committee.
*Peter F.C. Howard*, for Citibank Canada and Citibank NA.
*Bonnie Tough*, for Canadian Imperial Bank of Commerce.

Subject: Civil Practice and Procedure; Corporate and Commercial; Insolvency

### Headnote

**Corporations --- Arrangements and compromises — Under Companies' Creditors Arrangement Act — Miscellaneous issues**

**Practice --- Disposition without trial — Stay or dismissal of action — Grounds**

Corporations — Arrangements and compromises — Under Companies' Creditors Arrangement Act — Bankruptcy proceedings being before American courts — Administrator moving for directions regarding provision of services to Canadian afflitates, paid for by American corporation — Canadian affiliates opposing order on ground that United States being forum conveniens — Real and substantial connection to American restructuring existing — No jurisdictional barrier to ordering stay of motion in Companies' Creditors Arrangement Act proceeding — Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36.

Practice — Disposition without trial — Stay or dismissal of action — Grounds — Bankruptcy proceedings being before American courts — Administrator moving for directions regarding provision of services to Canadian afflitates, paid for by American corporation — Canadian affiliates opposing order on ground that United States being forum conveniens — Real and substantial connection to American restructuring existing — No jurisdictional barrier to ordering stay of motion in Companies' Creditors Arrangement Act proceeding — Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36.

A *Companies' Creditors Arrangement Act* proceeding was commenced regarding OYD Ltd. The administrator moved for authorization that the Canadian affiliates of OYD Ltd. pay for management fees, services, costs, and expenses provided and paid for by OYD Ltd. The services pertained to day-to-day management, and to efforts provided during the American restructuring process. The Canadian affiliates opposed the motion on the ground that the United States Bankruptcy Court, where Chapter 11 proceedings under the *Bankruptcy Code* were pending, was the forum conveniens.

1996 CarswellOnt 2814, 29 O.R. (3d) 626, 43 C.B.R. (3d) 111, 64 A.C.W.S. (3d) 62...

**Held:**

The administrator's request for directions regarding the restructuring was stayed.

There was a real and substantial factual connection with the American restructuring process in the American bankruptcy proceedings. The argument that the court was without jurisdiction to apply the doctrine of forum conveniens to a motion within an action could not prevail in a *Companies' Creditors Arrangement Act* proceeding. A *Companies' Creditors Arrangement Act* proceeding is complex by nature, particularly in multinational insolvency situations. The proceeding should be dealt with on a discrete basis, and treated as a separate proceeding.

**Table of Authorities**

**Cases considered:**

*A Company (No. 00359 of 1987), Re* (1987), [1988] Ch. 210 — *referred to*

*Amchem Products Inc. v. British Columbia (Workers' Compensation Board),* [1993] 1 S.C.R. 897, [1993] 3 W.W.R. 441, 77 B.C.L.R. (2d) 62, 14 C.P.C. (3d) 1, 150 N.R. 321, 23 B.C.A.C. 1, 39 W.A.C. 1, 102 D.L.R. (4th) 96 — *referred to*

*C.A. Kennedy Co. v. Stibbe-Monk Ltd.* (1976), 14 O.R. (2d) 439, 3 C.B.R. (N.S.) 81 (Div. Ct.) — *referred to*

*Campeau v. Olympia & York Developments Ltd.* (1992), 14 C.B.R. (3d) 303, 14 C.P.C. (3d) 339 (Ont. Gen. Div.) — *referred to*

*Frymer v. Brettschneider* (1994), 19 O.R. (3d) 60, 28 C.P.C. (3d) 84, 115 D.L.R. (4th) 744, 72 O.A.C. 360 (C.A.) — *referred to*

*Lehndorff General Partner Ltd., Re* (1993), 17 C.B.R. (3d) 24, 9 B.L.R. (2d) 275 (Ont. Gen. Div. [Commercial List]) — *referred to*

*Maxwell Communications Corp. v. Barclays Bank (In re Maxwell Communications Corp.),* 170 B.R. 800, 25 Bankr.Ct.Dec. (CRR) 1567 (Bankr. S.D.N.Y. 1994) [affirmed, complaint dismissed *(*sub nom. *Maxwell Communications Corp. PLC by Homan v. Societe Generale PLC (In re Maxwell Communications Corp. PLC))* 186 B.R. 807, 34 Collier Bankr.Cas.2d (MB) 1382, Bankr.L.Rep. (CCH) P 76681 (S.D.N.Y. 1995), affirmed 93 F.3d 1036, 29 Bankr.Ct.Dec. (C.R.R.) 788 (2d Cir. N.Y. 1996)] — *referred to*

*Olympia & York Developments Ltd. v. Royal Trust Co.* (1993), 20 C.B.R. (3d) 165 (Ont. Gen. Div.) — *referred to*

*Sefel Geophysical Ltd., Re* (1988), 70 C.B.R. (N.S.) 97, 62 Alta. L.R. (2d) 193, 92 A.R. 51, [1989] 1 W.W.R. 251, 54 D.L.R. (4th) 117 (Q.B.) — *referred to*

*Upper Lakes Shipping Ltd. v. Foster Yeoman Ltd.* (1993), 17 C.P.C. (3d) 150, 14 O.R. (3d) 548 (Gen. Div.) — *referred to*

**Statutes considered:**

Case 09-10138-MEW    Doc 15744-2    Filed 06/12/15    Page 261 of 342

Olympia & York Developments Ltd., Re, 1996 CarswellOnt 2814
1996 CarswellOnt 2814, 29 O.R. (3d) 626, 43 C.B.R. (3d) 111, 64 A.C.W.S. (3d) 62...

Bankruptcy Code, 11 U.S.C.

generally *referred to*

Companies' Creditors Arrangements Act, R.S.C. 1985, c. C-36

generally *referred to*

Courts of Justice Act, R.S.O. 1990, c. C.43

s. 106 *considered*

**Rules considered:**

Ontario, Rules of Civil Procedure

r. 1.03 "proceeding" *considered*

R. 17 *considered*

R. 21 *considered*

MOTION for authorization of payments to administrator.

*Blair J.*:

**Background**

1    The matters to be determined on this Motion revolve around "stay of proceedings" and *"forum non conveniens"* arguments in the context of the Olympia & York *CCAA* proceedings.

2    In June 1995, Coopers & Lybrand OYDL Inc, the Administrator under the Plan of Arrangement approved by this Court on February 5, 1993, brought a motion for authorization and direction from this Court,

a) approving the Administrator's statement of receipts and disbursements regarding four Canadian OYDL affiliates that have become known in the proceedings as "the Canadian Protocol Corporations";

b) authorizing and directing the Administrator to turn over books and records in its possession to the Canadian Protocol Corporations; and,

c) requiring the Canadian Protocol Corporations to pay to the Administrator, on behalf of OYDL, a management fee for services, costs and expenses provided and paid for by OYDL in relation to the Canadian Protocol Corporations for a period of approximately two years between February, 1993 and March 31, 1995.

3    The matter of the turning over of the Canadian Protocol Companies' books and records was dealt with by Order of Farley J. on June 21, 1995. The remaining issues were adjourned at that time to enable the Administrator to provide counsel with further particulars of what may loosely be called its "reimbursement claim". The Administrator did so. A claim that was initially asserted in the neighbourhood of $1.4 million emerged from this exercise as a claim for approximately $8.2 million, and has since attracted the additional concentrated attention that might be expected from such a development.

4    The major reason for the increase is that the Administrator has included in its claim for reimbursement a claim for fees and disbursements incurred in connection with negotiations and the presentation of a plan in the U.S. restructuring process,

Case 09-10138-MEW    Doc 15744-2    Filed 06/12/15    Page 262 of 342

Olympia & York Developments Ltd., Re, 1996 CarswellOnt 2814

1996 CarswellOnt 2814, 29 O.R. (3d) 626, 43 C.B.R. (3d) 111, 64 A.C.W.S. (3d) 62...

which is proceeding under the supervision of the U.S. Bankruptcy Court, under Chapter 11. This portion of the reimbursement claim is placed at about $7 million.

5    In January of this year, the Canadian Protocol Corporations — to whom the Administrator is looking for payment in this regard — brought the cross-motion which is the subject matter of these Reasons. I earlier directed that it be dealt with separately from the hearing of the Administrator's motion for reimbursement on its merits. On the cross-motion, the Canadian Protocol Corporations seek an Order staying the Administrator's claims on the grounds that the United States Bankruptcy Court (Southern District of New York), where the Chapter 11 proceedings are pending, is the *forum conveniens*, and that the claims should properly be determined there by His Honour Judge James L. Garrity Jr., who has had carriage of those proceedings.

**Additional Facts**

6    There are four Canadian Protocol Corporations. They are: Olympia & York Realty Corp. ("Realty"), O & Y Equity (Canada) Ltd. ("Equity Canada"), O & Y Development Canada Ltd. ("Development Canada") and Olympia & York SF Holdings corporation ("OYSF"). They are Canadian corporations, at the time of the initial *CCAA* proceedings incorporated under the laws of Ontario, and subsequent to the sanctioning of the Plan continued under the laws of New Brunswick.

7    The Canadian Protocol Corporations were all amongst the original *CCAA* Applicants in the Canadian proceedings. At the same time, they filed voluntary petitions for relief under Chapter 11 in the U.S. Bankruptcy Court on the same day as the initial *CCAA* Application was made. At the end of the Plan period, however, three of the Canadian Protocol Companies — Realty, Equity Canada and Development Canada — were not included in the Plan. The Administrator is thus not appointed administrator of them pursuant to the Plan and Sanction Order. Nonetheless, it appears from the evidence that the management of the Canadian Protocol Companies was left in the hands of the Administrator as a practical matter until February 1995.

8    Realty, Equity Canada and Development Canada are three of the six primary holding companies for OYDL's U.S. assets. Subsequent to the approval of the Plan the Administrator's efforts to be involved in the U.S. restructuring proceedings led to friction with U.S. Creditors and this, in turn led to the negotiation and approval (by both this Court and the U.S. Court) of a Corporate Governance Protocol. It is the Protocol Board of Directors which is ultimately responsible for the OYDL U.S. operations. In February 1995, as I have indicated, it put in place new management for the Canadian Protocol Companies.

9    This led to the Administrator's motion for directions.

**Law and Analysis**

10    Without dwelling on the merits of its claim, the Administrator asserts in essence that the fees and expenses it has incurred relate primarily to two types of services, namely:

a) those pertaining to the day to day management of and "caring for" the Canadian Protocol Companies in its role as Administrator of OYDL and its affiliates under the Plan (including the Canadian Protocol Companies because, although not formally their administrator under the Plan, management was left to it for practical purposes); and,

b) those pertaining to its efforts in the U.S. restructuring which, it is asserted, "enhanced" that process and which "conferred a benefit" for all creditors in respect of the U.S. restructuring efforts.

11    In my view, the matters referred to in (b) above — what I will call "the restructuring claim" — are best and most properly dealt with in the U.S. Bankruptcy proceedings, and I am satisfied that a stay ought to be granted in respect of the Administrator's claim in that regard in this Court.

12    The concept of a stay of proceedings in the *CCAA* context has been examined in this Court in *Re Lehndorff General Partner Ltd.* (1993), 17 C.B.R. (3d) 24 (Ont. Gen. Div.), and *Campeau v. Olympia & York Developments Ltd.* (1992), 14 C.B.R. (3d) 303 (Ont. Gen. Div.). I need not repeat what was said there. Suffice it to say that the Court has a broad discretion and an inherent jurisdiction to grant a stay of proceedings whenever it is just and convenient to do so, in order to control its own process or prevent an abuse of that process. This general power is captured, in statutory form, in section 106 of the *Courts of Justice*

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1996 CarswellOnt 2814, 29 O.R. (3d) 626, 43 C.B.R. (3d) 111, 64 A.C.W.S. (3d) 62...

*Act*, R.S.O. 1990, c. C.43. In my view this broad power is available, in appropriate circumstances, in matters that arise within an overall *CCAA* proceeding, just as it is to the proceeding or any other action as a whole; but I shall return to that in a moment.

13      In terms of the *forum non conveniens* concept itself, the principals to be applied have to do with whether it can be said that there is another forum that is clearly more appropriate for the adjudication in question and which should displace the forum already chosen, and whether or not an injustice would occur if the stay is imposed: see, *Amchem Products Inc. v. British Columbia (Workers' Compensation Board)*, [1993] 1 S.C.R. 897; *Frymer v. Brettschneider (1994), 19 O.R. (3d) 60* (C.A.); *Upper Lakes Shipping Ltd. v. Foster Yeoman Ltd. (1993), 14 O.R. (3d) 548* (Ont. Gen. Div.), at pp. 570-571. I am satisfied this test has been met on the facts of this case.

14      In my view, the real and substantial factual connection, in this case, with respect to matters relating to the U.S. restructuring process — and appropriate reimbursement respecting it — lies with the U.S. Bankruptcy Court and not with this Court. The following facts (summarized in part here from Mr. Barrack's factum at paragraph 9, and amply supported in the voluminous materials and transcripts, filed) lead me to that conclusion:

a) The buildings and real estate relating to the Canadian Protocol Companies and the U.S. restructuring, are all in the United States;

b) The chain of ownership involves several American limited partnerships and corporations;

c) The only asset in Canada is cash which the Administrator is holding back against the Canadian Protocol Companies pending the outcome of its motion for directions;

d) The governance of the Canadian Protocol Companies is subject to U.S. law according to the Protocol and the directors of the Canadian Protocol Companies, including the Administrator, are subject to American fiduciary duties;

e) The complex restructuring activity in respect of the U.S. Operation has been carried out before the U.S. Bankruptcy Court, and has in fact included several steps initiated by the Administrator, including a previous claim to recover compensation in relation to work done in connection with the Canadian Protocol Companies;

f) The relief by the Administrator in its restructuring claim is available to it in the U.S. proceedings and, as noted above, is the type of relief that has already been sought successfully by the Administrator in those proceedings on a prior occasion;

g) A consideration of the Administrator's restructuring claim will require an assessment of the services provided in putting forward a restructuring plan for the U.S. Operations by the Administrator's New York City law firm, Robinson Silverman; advice provided in relation to that exercise by a New York investment firm, CS First Boston Corporation; and advisory services provided by the Chicago and New York offices of Coopers & Lybrand, an affiliate of the Administrator. Much of this assessment will involve an appreciation of complex matters of U.S. tax, corporate and real estate law, and while a Canadian Court is able to absorb such considerations — when properly proved and put before it — it seems to me to make much more sense that this sort of analysis be conducted by Judge Garrity, the person who has had carriage of the U.S. Bankruptcy proceedings.

h) Moreover, many of the issues relating to the Administrator's restructuring claim will require the court to become familiar with the restructuring process in the Chapter 11 proceedings pending in the U.S. — something which is, of course, already the case with Judge Garrity;

i) Although the location of witnesses is not as important a factor in complicated international commercial matters as it might be in other circumstances, it remains the case that the majority of witnesses who will be necessary to determine the "value" of the Administrator's services in conferring a benefit upon the U.S. Restructuring will be in or around New York.

Olympia & York Developments Ltd., Re, 1996 CarswellOnt 2814

1996 CarswellOnt 2814, 29 O.R. (3d) 626, 43 C.B.R. (3d) 111, 64 A.C.W.S. (3d) 62...

15    Mr. Douglas raises a procedural argument that at first glance appears to present an impediment to the exercise of the Court's discretion to impose a stay in the circumstances of this motion, and which warrants comment. In the end, however, I am satisfied that it does not present such a roadblock.

16    The argument is that the doctrine of *forum non conveniens* has no application *to a motion within a proceeding or action*, as opposed to a situation where what is sought is a stay of an action, application or proceeding itself. In Mr. Douglas' colourful analogy, the Court has no jurisdiction "to punt" *a motion* to another jurisdiction. This submission is based upon the premise that the only statutory provisions which enable the Court to grant a stay are to be found in s. 106 of the *Courts of Justice Act, supra*, and in Rules 17 and 21 of the Rules of Civil Procedure. They, in turn, are said to apply only to "actions" or "proceedings"; and "proceedings" are defined in Rule 1.03 as meaning "an action or an application". A motion within a proceeding, Mr. Douglas argues, does not qualify.

17    There would be merit in this submission if what were in question was an ordinary motion in an ordinary type of proceeding, perhaps. It cannot prevail in the context of a *CCAA* application, in my opinion, however. A *CCAA* proceeding, by its very nature — particularly in complex multi-national insolvency situations involving assets in various jurisdictions — is a veritable Pandora's Box of matters which, in themselves, would amount to substantial actions or applications. They find their way under the rubric of the *CCAA* umbrella because of the all-embracing reach of the proceedings in relation to the activities of the debtor company.

18    The Administrator's restructuring claim falls within this category. It is, in reality, a claim by the Administrator on behalf of OYDL to be reimbursed on a quantum meriut or quasi-contractual basis for services rendered in putting forward the restructuring plan in the U.S proceedings. Characterizing it as a "motion" for advice and directions, does not change the essential nature of the relief sought. Moreover, it is a claim for perhaps $7 million which is likely to require — before it is ultimately disposed of — a great deal of evidence and possibly hotly contested issues of credibility. This, to my mind, is the kind of claim which has a life of its own and which can be separated and dealt with on a discrete basis as a separate "proceeding" — and, indeed, should be so treated. In that sense it is not a "motion" to which the analysis of Mr. Douglas — skilfully put forward as it was — can apply.

19    There is nothing the *Courts of Justice Act, supra*, itself which defines "proceeding" in the narrow fashion outlined in the Rules of Civil Procedure, and I have no difficulty in giving the concept a broad enough definition, outside of the Rules context, to encompass the type of matter that I have described in a *CCAA* application. In my opinion, the Court has the power, in the exercise of its inherent jurisdiction to which I have referred earlier in these Reasons, to impose a stay — where the circumstances warrant it — with regard to such a "proceeding" (widely defined). In the context of multi-jurisdictional insolvencies the courts of different jurisdictions should strive — to the extent they can within the parameters of their own fundamental precepts of justice — to ensure that matters are adjudicated in the proper forum with the closest connection to the subject matter. Principles of international comity, including those incorporated in the *forum non conveniens* test, provide the touchstones to assist them in doing so. See: *Maxwell Communications Corp. v. Barclays Bank (In re Maxwell Communications Corp.)*, 170 B.R. 800 (Bankr. S.D.N.Y. 1994); *Olympia & York Developments Ltd. v. Royal Trust Co.* (1993), 20 C.B.R. (3d) 165 (Ont. Gen. Div.); *C.A. Kennedy Co. v. Stibbe-Monk Ltd.* (1976), 23 C.B.R. (N.S.) 81 (Ont. Div. Ct.); *Re Sefel Geophysical Ltd.* (1988), 62 Alta. L.R. (2d) 193 (Q.B.); *Re A Company (No. 00359 of 1987)* (1987), [1988] Ch. 210 (Ch. D.).

20    This approach is confirmed in amendments to the *Companies Creditors' Arrangement Act*, presently before Parliament. *An Act to amend the Bankruptcy and Insolvency Act, the Companies' Creditors' Arrangement Act and the Income Tax Act*, 45 Elizabeth II, 1996 Bill C-5 has received second reading. Section 125 states:

> 125. The court may, in respect of a debtor company, make such orders and grant such relief as it considers appropriate to facilitate, approve or implement arrangements that will result in a coordination of proceedings under this Act with any foreign proceeding.

21    I conclude that the circumstances warrant the imposition of a stay here, for the reasons that I have outlined above.

**Disposition**

1996 CarswellOnt 2814, 29 O.R. (3d) 626, 43 C.B.R. (3d) 111, 64 A.C.W.S. (3d) 62...

22    In the result, then, an Order is granted staying the Administrator's request for directions in so far as it relates to the Administrator's restructuring claim. I impose no such stay with respect to the Administrator's request for approval of its Statements of Receipts and Disbursements for the Canadian Protocol Corporations or in respect of its claim regarding the non-restructuring component of the reimbursement sought. These matters, it seems to me, require the review of this Court in the exercise of its supervisory function over the Administrator's actions, and should not be severed.

23    Having regard to this disposition, I think it would be premature to accede to the request of the Canadian Protocol Companies to dismiss the *CCAA* Application with respect to them, or to grant them leave to file a Notice of Abandonment. At least the outward rubric of that structure may be necessary to ensure the proper determination of the outstanding matters which remain to be determined and dealt with in relation to that Application, and I see no pressing need, in view of the stay which has been granted, to dispose of the *CCAA* structure.

24    I may be spoken to at a later date with respect to costs.

25    I thank all counsel for their helpful submissions and materials.

*Motion dismissed.*

---

**End of Document**          Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# Tab 27

2006 CarswellOnt 3070, [2006] I.L.R. I-4510, 212 O.A.C. 48, 25 C.B.R. (5th) 7...

2006 CarswellOnt 3070
Ontario Court of Appeal

Cavell Insurance Co., Re

2006 CarswellOnt 3070, [2006] I.L.R. l-4510, 212 O.A.C. 48, 25 C.B.R. (5th) 7,
269 D.L.R. (4th) 679, 30 C.P.C. (6th) 1, 39 C.C.L.I. (4th) 159, 80 O.R. (3d) 500

# IN THE MATTER OF AN APPLICATION BY CAVELL INSURANCE COMPANY LIMITED UNDER THE RECIPROCAL ENFORCEMENT OF JUDGMENTS (U.K.) ACT, R.S.O. 1990, c. R.6, SECTION 106 OF THE COURTS OF JUSTICE ACT, R.S.O. 1990, c. C.43 and Rule 73 of the RULES OF CIVIL PROCEDURE (ONTARIO) R.R.O. 1990, REG. 194, IN RESPECT OF A SCHEME OF ARRANGEMENT OF CAVELL INSURANCE COMPANY LIMITED PURSUANT TO SECTION 425 OF THE COMPANIES ACT 1985 OF GREAT BRITAIN

Rosenberg, Goudge, Simmons JJ.A.

Heard: November 29, 2005

Judgment: May 23, 2006 [*]
Docket: CA C43657

Proceedings: additional reasons at *Cavell Insurance Co., Re* (2006), 2006 CarswellOnt 5192 (Ont. C.A.); affirming *Cavell Insurance Co., Re* (2004), 6 C.B.R. (5th) 11, 2004 CarswellOnt 5439, 11 C.P.C. (6th) 239 (Ont. S.C.J. [Commercial List]); and affirming *Cavell Insurance Co., Re* (2005), 25 C.C.L.I. (4th) 230, 2005 CarswellOnt 641 (Ont. S.C.J. [Commercial List]); additional reasons at *Cavell Insurance Co., Re* (2005), 25 C.C.L.I. (4th) 245, 2005 CarswellOnt 1721 (Ont. S.C.J. [Commercial List])

Counsel: David Hager for Appellant, Pilot Insurance Company
Graham D. Smith for Respondent, Reliance Insurance Company
Elizabeth Pillon for Respondent, Cavell Insurance Company Limited

Subject: International; Corporate and Commercial; Civil Practice and Procedure; Insolvency

## Headnote

**Conflict of laws --- Enforcement of foreign judgments — Reciprocal enforcement of judgments legislation — General principles**

Company incorporated in United Kingdom (UK) was registered in Ontario to accept primarily property and casualty reinsurance business — Company ceased doing active business in Canada in 1993 but there was estimated run-off of 40 years plus — Company was involved in UK proceedings regarding proposed scheme of arrangement of company pursuant to Companies Act 1985 (UK) — UK court made initial order dealing with proposed scheme including claims procedure, holding of meeting, and notice — Office of Superintendent of Financial Institutions, which had jurisdiction over company's Canadian property, was content with proposed procedures — Company obtained order in Ontario Superior Court of Justice in December 2004 recognizing initial order of UK court — Fifteen Canadian insurers brought motions in February 2005 pursuant to comeback clause in recognition order to set aside or vary recognition order — In dismissing motion, further conditions were added — Both Ontario orders were based on Reciprocal Enforcement of Judgments (U.K.) Act, R. 73 of Ontario Rules of Civil Procedure, and rules of private international law — Canadian insurance company P Co. appealed — Appeal dismissed — Orders were upheld on basis of private international law, specifically, inherent jurisdiction of court and principle of comity — Rule 73 did not apply because UK order was not judgment that could be registered under Act

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Cavell Insurance Co., Re, 2006 CarswellOnt 3070

2006 CarswellOnt 3070, [2006] I.L.R. I-4510, 212 O.A.C. 48, 25 C.B.R. (5th) 7...

as it was not one which made sum of money payable — Act and Convention between Canada and the United Kingdom of Great Britain and Northern Ireland for the Reciprocal Recognition and Enforcement of Judgments in Civil and Commercial Matters were relied upon in error because company did not serve recognition order with originating process in UK court that led to UK order, and UK order was not final order in issuing state.

### Conflict of laws --- Enforcement of foreign judgments — Reciprocal enforcement of judgments legislation — Bars to registration — General principles

Company incorporated in United Kingdom (UK) was registered in Ontario to accept primarily property and casualty reinsurance business — Company ceased doing active business in Canada in 1993 but there was estimated run-off of 40 years plus — Company was involved in UK proceedings regarding proposed scheme of arrangement of company pursuant to Companies Act 1985 (UK) — UK court made initial order dealing with proposed scheme including claims procedure, holding of meeting, and notice — Office of Superintendent of Financial Institutions, which had jurisdiction over company's Canadian property, was content with proposed procedures — Company obtained order in Ontario Superior Court of Justice in December 2004 recognizing initial order of UK court — Fifteen Canadian insurers brought motions in February 2005 pursuant to comeback clause in recognition order to set aside or vary recognition order — In dismissing motion, further conditions were added — Both Ontario orders were based on Reciprocal Enforcement of Judgments (U.K.) Act, R. 73 of Ontario Rules of Civil Procedure, and rules of private international law — Canadian insurance company P Co. appealed — Appeal dismissed — Orders were upheld on basis of private international law, specifically, inherent jurisdiction of court and principle of comity — Rule 73 did not apply because December 2004 UK order was not judgment that could be registered under Act as it was not one which made payable sum of money — Act and Convention between Canada and the United Kingdom of Great Britain and Northern Ireland for the Reciprocal Recognition and Enforcement of Judgments in Civil and Commercial Matters were relied upon in error because company did not serve recognition order with originating process in U.K. court that led to UK order and UK order was not final order in issuing state.

### Conflict of laws --- Enforcement of foreign judgments — Prerequisites for enforcement — Finality of judgment — Interlocutory orders

Company incorporated in United Kingdom (UK) was registered in Ontario to accept primarily property and casualty reinsurance business — Company ceased doing active business in Canada in 1993 but there was estimated run-off of 40 years plus — Company was involved in UK proceedings regarding proposed scheme of arrangement of company pursuant to Companies Act 1985 (UK) — UK court made initial order dealing with proposed scheme including claims procedure, holding of meeting, and notice — Office of Superintendent of Financial Institutions, which had jurisdiction over company's Canadian property, was content with proposed procedures — Company obtained order in Ontario Superior Court of Justice in December 2004 recognizing initial order of UK court — Fifteen Canadian insurers brought motions in February 2005 pursuant to comeback clause in recognition order to set aside or vary recognition order — In dismissing motion, further conditions were added — Canadian insurance company P Co. appealed — Appeal dismissed — Orders were upheld on basis of private international law, specifically, inherent jurisdiction of court and principle of comity — Although UK order did not finally decide substantive issue because it did not approve scheme of arrangement but merely commenced procedure that might lead to UK court ultimately doing so, order clearly set out meeting, its location and notice requirements such that Ontario court knew precisely what it was agreeing to recognize and enforce — Recognition presented little if any risk of injustice to P Co. — Nature of UK order and terms of its recognition had little risk of undermining public confidence even if procedure initiated by UK order changed after recognition by Ontario Court — UK order merely started procedure that was supervised by UK court — Requirement in recognition order that Ontario court be kept informed of changes was to avoid issuance of recognition order whose foreign foundation might disappear.

### Conflict of laws --- Enforcement of foreign judgments — Prerequisites for enforcement — Reciprocity

Company incorporated in United Kingdom (UK) was registered in Ontario to accept primarily property and casualty reinsurance business — Company ceased doing active business in Canada in 1993 but there was estimated run-off of 40 years plus — Company was involved in UK proceedings regarding proposed scheme of arrangement of company pursuant to Companies Act 1985 (UK) — UK court made initial order dealing with proposed scheme including claims procedure,

holding of meeting, and notice — Office of Superintendent of Financial Institutions, which had jurisdiction over company's Canadian property, was content with proposed procedures — Company obtained order in Ontario Superior Court of Justice in December 2004 recognizing initial order of UK court — Fifteen Canadian insurers brought motions in February 2005 pursuant to comeback clause in recognition order to set aside or vary recognition order — In dismissing motion, further conditions were added — Canadian insurance company P Co. appealed — Appeal dismissed — Orders were upheld on basis of private international law, specifically, inherent jurisdiction of court and principle of comity — Doctrine of comity and notion of reciprocity were served by Ontario recognition of order — UK court had long been accorded respect in Ontario and statutory process started with initiating order was familiar to Ontario courts — Commercial legislation in Ontario had analogous procedures — Recognition order facilitated effective and early participation by parties ultimately affected by scheme — Recognition order enhanced fairness to those affected — Recognition order in effect declared that Ontario court accepted jurisdiction of UK court to carry on statutory procedure under s. 425 of Companies Act 1985 (UK) and that Ontario court would support that procedure to extent it affected interests in Ontario.

### Conflict of laws --- Enforcement of foreign judgments — General principles — Miscellaneous issues

Service and submission to jurisdiction — Company incorporated in United Kingdom (UK) was registered in Ontario to accept primarily property and casualty reinsurance business — Company ceased doing active business in Canada in 1993 but there was estimated run-off of 40 years plus — Company was involved in UK proceedings regarding proposed scheme of arrangement of company pursuant to Companies Act 1985 (UK) — UK court made initial order dealing with proposed scheme including claims procedure, holding of meeting, and notice — Office of Superintendent of Financial Institutions, which had jurisdiction over company's Canadian property, was content with proposed procedures — Company obtained order in Ontario Superior Court of Justice in December 2004 recognizing initial order of UK court — Fifteen Canadian insurers brought unsuccessful motions in February 2005 pursuant to comeback clause in recognition order to set aside or vary recognition order — Canadian insurance company P Co. appealed — Appeal dismissed — Orders were upheld on basis of private international law, specifically, inherent jurisdiction of court and principle of comity — Although P Co. was not served with originating papers in UK, in circumstances, P Co. received fair process — P Co. had been alerted earlier by letter that company was proposing to proceed by way of scheme of arrangement — P Co. was also served with full application record for proceedings before reorganization motion — UK order merely started process in UK court in which P Co. would have full opportunity to participate before its rights were determined — Real and substantial connection test was satisfied by connection between UK jurisdiction and scheme of arrangement proposed by UK company under UK legislation — Meeting would occur in UK and it was not required that there be link between P Co. and others worldwide who might be affected by proceedings.

### Business associations --- Specific corporate organization matters — Foreign and extra-provincial corporations — Jurisdiction of courts

Company incorporated in United Kingdom (UK) was registered in Ontario to accept primarily property and casualty reinsurance business — Company ceased doing active business in Canada in 1993 but there was estimated run-off of 40 years plus — Company was involved in UK proceedings regarding proposed scheme of arrangement of company pursuant to Companies Act 1985 (UK) — UK court made initial order dealing with proposed scheme including claims procedure, holding of meeting, and notice — Office of Superintendent of Financial Institutions, which had jurisdiction over company's Canadian property, was content with proposed procedures — Company obtained order in Ontario Superior Court of Justice in December 2004 recognizing initial order of UK court — Fifteen Canadian insurers brought motions in February 2005 pursuant to comeback clause in recognition order to set aside or vary recognition order — In dismissing motion, further conditions were added — Both Ontario orders were based on Reciprocal Enforcement of Judgments (U.K.) Act, R. 73 of Ontario Rules of Civil Procedure, and rules of private international law — Canadian insurance company P Co. appealed — Appeal dismissed — Orders were upheld on basis of private international law, specifically, inherent jurisdiction of court and principle of comity — Rule 73 did not apply because UK order was not judgment that could be registered under Act as it was not one which made sum of money payable — Act and Convention between Canada and the United Kingdom of Great Britain and Northern Ireland for the Reciprocal Recognition and Enforcement of Judgments in Civil and Commercial

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 270 of 342

Cavell Insurance Co., Re, 2006 CarswellOnt 3070

2006 CarswellOnt 3070, [2006] I.L.R. I-4510, 212 O.A.C. 48, 25 C.B.R. (5th) 7...

Matters were relied upon in error because company did not serve recognition order with originating process in UK court that led to UK order and UK order was not final order in issuing state.

**Business associations --- Specific corporate organization matters — Foreign and extra-provincial corporations — Carrying on business — Comity of nations (common law) — General principles**

Company incorporated in United Kingdom (UK) was registered in Ontario to accept primarily property and casualty reinsurance business — Company ceased doing active business in Canada in 1993 but there was estimated run-off of 40 years plus — Company was involved in UK proceedings regarding proposed scheme of arrangement of company pursuant to Companies Act 1985 (UK) — UK court made initial order dealing with proposed scheme including claims procedure, holding of meeting, and notice — Office of Superintendent of Financial Institutions, which had jurisdiction over company's Canadian property, was content with proposed procedures — Company obtained order in Ontario Superior Court of Justice in December 2004 recognizing initial order of UK court — Fifteen Canadian insurers brought motions in February 2005 pursuant to comeback clause in recognition order to set aside or vary recognition order — In dismissing motion, further conditions were added — Canadian insurance company P Co. appealed — Appeal dismissed — Orders were upheld on basis of private international law, specifically, inherent jurisdiction of court and principle of comity — Although UK order did not finally decide substantive issue because it did not approve scheme of arrangement but merely commenced procedure that might lead to UK court ultimately doing so, order clearly set out meeting, its location and notice requirements such that Ontario court knew precisely what it was agreeing to recognize and enforce — Recognition presented little if any risk of injustice to P Co. — Nature of UK order and terms of its recognition had little risk of undermining public confidence — UK order merely started procedure that was supervised by UK court — Requirement in recognition order that Ontario court be kept informed of changes was to avoid issuance of recognition order whose foreign foundation might disappear.

**Business associations --- Legal proceedings involving business associations — Practice and procedure in actions involving corporations — On appeal**

Company incorporated in United Kingdom (UK) was registered in Ontario to accept primarily property and casualty reinsurance business — Company ceased doing active business in Canada in 1993 but there was estimated run-off of 40 years plus — Company was involved in UK proceedings regarding proposed scheme of arrangement of company pursuant to Companies Act 1985 UK — UK court made initial order dealing with proposed scheme including claims procedure, holding of meeting, and notice — Office of Superintendent of Financial Institutions, which had jurisdiction over company's Canadian property, was content with proposed procedures — Company obtained order in Ontario Superior Court of Justice in December 2004 recognizing initial order of UK court — Fifteen Canadian insurers brought motions in February 2005 pursuant to comeback clause in recognition order to set aside or vary recognition order — In dismissing motion, further conditions were added, one of which gave right of appeal to Ontario court concerning evaluation of commuted value of claims of Canadian creditors of company — Ontario court clarified order in April 2005 to indicate that question of appeal being heard in Ontario was peripheral point, that intention was to ensure availability of appeal if valuation done in UK was not conducted by applying OSFI rules, and that it would be appropriate for right of appeal to be to UK court as alternative — True intention was for appeal to UK court to avoid risk that if reference to Ontario court remained, order would determine whether Canadian creditors should be separate class for voting on scheme of arrangement and such was question for UK court — Canadian insurance company P Co. appealed — Appeal dismissed — There was discretion to make April clarification because order from February hearing had not yet been issued and draft order as approved captured true decision.

**Civil practice and procedure --- Judgments and orders — Amending or varying — Before judgment entered — General principles**

Company incorporated in United Kingdom (UK) was registered in Ontario to accept primarily property and casualty reinsurance business — Company ceased doing active business in Canada in 1993 but there was estimated run-off of 40 years plus — Company was involved in UK proceedings regarding proposed scheme of arrangement of company pursuant to Companies Act 1985 UK — UK court made initial order dealing with proposed scheme including claims procedure, holding of meeting, and notice — Office of Superintendent of Financial Institutions, which had jurisdiction over company's

Canadian property, was content with proposed procedures — Company obtained order in Ontario Superior Court of Justice in December 2004 recognizing initial order of UK court — Fifteen Canadian insurers brought motions in February 2005 pursuant to comeback clause in recognition order to set aside or vary recognition order — In dismissing motion, further conditions were added, one of which gave right of appeal to Ontario court concerning evaluation of commuted value of claims of Canadian creditors of company — Ontario court clarified order in April 2005 to indicate that question of appeal being heard in Ontario was peripheral point, that intention was to ensure availability of appeal if valuation done in UK was not conducted by applying OSFI rules, and that it would be appropriate for right of appeal to be to UK court as alternative — True intention was for appeal to UK court to avoid risk that if reference to Ontario court remained, order would determine whether Canadian creditors should be separate class for voting on scheme of arrangement and such was question for UK court — Canadian insurance company P Co. appealed — Appeal dismissed — There was discretion to make April clarification because order from February hearing had not yet been issued and draft order as approved captured true decision.

**Table of Authorities**

**Cases considered by *Goudge J.A.*:**

*Beals v. Saldanha* (2003), 2003 SCC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102, 113 C.R.R. (2d) 189, 70 O.R. (3d) 94 (note), 39 B.L.R. (3d) 1, 39 C.P.C. (5th) 1, 234 D.L.R. (4th) 1, [2003] 3 S.C.R. 416, 314 N.R. 209, 182 O.A.C. 201 (S.C.C.) — considered

*Four Embarcadero Center Venture v. Kalen* (1988), 27 C.P.C. (2d) 260, 65 O.R. (2d) 551, 1988 CarswellOnt 412 (Ont. H.C.) — considered

*Morguard Investments Ltd. v. De Savoye* (1990), 46 C.P.C. (2d) 1, 15 R.P.R. (2d) 1, 76 D.L.R. (4th) 256, 122 N.R. 81, [1991] 2 W.W.R. 217, 52 B.C.L.R. (2d) 160, [1990] 3 S.C.R. 1077, 1990 CarswellBC 283, 1990 CarswellBC 767 (S.C.C.) — followed

*Parsons v. McDonald's Restaurants of Canada Ltd.* (2005), *(sub nom. Currie v. McDonald's Restaurants of Canada Ltd.)* 74 O.R. (3d) 321, 2005 CarswellOnt 544, 7 C.P.C. (6th) 60, *(sub nom. Currie v. McDonald's Restaurants of Canada Ltd.)* 250 D.L.R. (4th) 224, *(sub nom. Currie v. McDonald's Restaurants of Canada Ltd.)* 195 O.A.C. 244 (Ont. C.A.) — referred to

*Pro Swing Inc. v. ELTA Golf Inc.* (2004), 71 O.R. (3d) 566, 2004 CarswellOnt 2685 (Ont. C.A.) — considered

**Statutes considered:**

*Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3
    Generally — referred to

*Business Corporations Act*, R.S.O. 1990, c. B.16
    Generally — referred to

*Canada Business Corporations Act*, R.S.C. 1985, c. C-44
    Generally — referred to

*Companies Act*, 1985, c. 6
    s. 425 — considered

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 15744-2    Filed 06/12/15    Page 272 of 342

Cavell Insurance Co., Re, 2006 CarswellOnt 3070

2006 CarswellOnt 3070, [2006] I.L.R. I-4510, 212 O.A.C. 48, 25 C.B.R. (5th) 7...

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36
    Generally — referred to

*Reciprocal Enforcement of Judgments (U.K.) Act*, R.S.O. 1990, c. R.6
    Generally — referred to

**Rules considered:**

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194
    R. 73 — considered

    R. 73.02 — referred to

**Treaties considered:**

*Convention between Canada and the United Kingdom of Great Britain and Northern Ireland for the Reciprocal Recognition and Enforcement of Judgments in Civil and Commercial Matters*
    Article II ¶ 4 — considered

    Article II ¶ 3 — referred to

    Article III — referred to

    Article VI ¶ 4(c) — considered

    Article VIII — considered

**Words and phrases considered**

**long tail claims**

In Canada, Cavell primarily reinsured insurers writing casualty policies covering claims such as those arising from pollution, asbestos, sexual abuse, tobacco and tainted blood. These types of claims are sometimes referred to as "long tail" claims because they may come to light many years after the policies are written, and may take many more years for coverage and quantum issues to be resolved.

**solvent scheme of arrangement**

In 2004, Cavell decided to bring an end to its reinsurance run-off business. It proposed to implement a scheme of arrangement with its policy holders that would, in effect, bring to an end its contracts of reinsurance with them. The scheme provided for the valuation as of December 31, 2004 of all present, future and contingent claims of the policyholders against Cavell, and for the immediate payment of those claims in full without discount for present valuing. Since Cavell is a solvent company, this is known as a solvent scheme of arrangement.

APPEAL from judgments reported at *Cavell Insurance Co., Re* (2004), 6 C.B.R. (5th) 11, 2004 CarswellOnt 5439, 11 C.P.C. (6th) 239 (Ont. S.C.J. [Commercial List]) and *Cavell Insurance Co., Re* (2005), 25 C.C.L.I. (4th) 230, 2005 CarswellOnt 641 (Ont. S.C.J. [Commercial List]), additional reasons at *Cavell Insurance Co., Re* (2005), 25 C.C.L.I. (4th) 245, 2005 CarswellOnt 1721 (Ont. S.C.J. [Commercial List]) recognizing foreign judgment on terms.

***Goudge J.A.:***

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**Cavell Insurance Co., Re, 2006 CarswellOnt 3070**

2006 CarswellOnt 3070, [2006] I.L.R. I-4510, 212 O.A.C. 48, 25 C.B.R. (5th) 7...

**Introduction**

1    On December 10, 2004, the respondent, Cavell Insurance Company Limited, brought an application in the Chancery Division of the High Court of Justice in the United Kingdom for approval of a scheme of arrangement under s. 425 of the *Companies Act, 1985* (U.K.), 1985, c. 6. On December 20, 2004 that court granted an initial order in the application, ordering Cavell to convene a meeting of its creditors affected by the scheme, and providing for the location and notice to be given for the meeting.

2    The fundamental question in this proceeding is whether that initial order can properly be recognized in Ontario.

3    On December 21, 2004, Farley J. issued an order recognizing the U.K. order and adding a number of terms to "implement" that order. On February 17, 2005 he issued a second order continuing his earlier order with several further conditions. This is the appeal from those orders.

4    He rested his orders on both the *Reciprocal Enforcement of Judgements (U.K.) Act*, R.S.O. 1990, C.R-6 (*REJUKA*) and the rules of private international law. For the reasons that follow, I would sustain his orders. I would do so not on the basis of *REJUKA*, but on the basis of private international law.

**Background to the Appeal**

5    Cavell was incorporated in 1919 under the laws of England, with the principal object of carrying on the business of reinsurance. Over the years, it wrote reinsurance policies in the London market, and overseas, through branches in South Africa, Australia, New Zealand and Canada.

6    In Canada, Cavell primarily reinsured insurers writing casualty policies covering claims such as those arising from pollution, asbestos, sexual abuse, tobacco and tainted blood. These types of claims are sometimes referred to as "long tail" claims because they may come to light many years after the policies are written, and may take many more years for coverage and quantum issues to be resolved.

7    In December 2004, Cavell's business in Canada represented approximately 7.5% of its total, estimated on the basis of claims to be paid. As of the fall of 2004, in addition to its contracts of reinsurance with Canadian insurers, Cavell had total assets in Canada of approximately $23,149,000, of which $20,849,000 were held in trust, as required by the relevant insurance company legislation.

8    In the mid 1990's, Cavell stopped writing new reinsurance business but continued to administer the "run-off" of its existing reinsurance business, paying the insurers it had reinsured from its reserves as claims arose.

9    In 2004, Cavell decided to bring an end to its reinsurance run-off business. It proposed to implement a scheme of arrangement with its policy holders that would, in effect, bring to an end its contracts of reinsurance with them. The scheme provided for the valuation as of December 31, 2004 of all present, future and contingent claims of the policyholders against Cavell, and for the immediate payment of those claims in full without discount for present valuing. Since Cavell is a solvent company, this is known as a solvent scheme of arrangement.

10    Cavell proposed to implement the scheme by way of the procedure provided by s. 425 of the U.K. *Companies Act, 1985*. For the scheme to be binding on the company and its creditors, that section requires that a majority of the relevant creditors, in number representing not less than 75% in value of those creditors present and voting in person or by proxy, vote in favour of the scheme at a meeting convened with the permission of the court. The U.K. court must then sanction the scheme.

11    Cavell took the first step in this process by obtaining the order of December 20, 2004 from the High Court of Justice in the U.K. That order authorized the company to convene a meeting of creditors to consider, and if thought fit, approve the scheme with or without modification. It fixed a location for the meeting, provided for the giving of notice of the meeting,

2006 CarswellOnt 3070, [2006] I.L.R. I-4510, 212 O.A.C. 48, 25 C.B.R. (5th) 7...

required details of the scheme to be made accessible to the creditors, and appointed a chair of the meeting who was ordered to report the results to the court.

12    The Canadian policyholders were not served with the papers for the December 20 proceeding, received no notice of it and did not appear in the U.K. court. However, in mid-November, Cavell had circulated a letter to them advising that it would be applying for leave to hold a meeting of creditors and that a court application was expected to take place in early to mid December.

13    In obtaining the December 20 order, Cavell filed with the U.K. court an explanatory statement indicating that it would apply in Canada for an order recognizing the U.K. proceedings and the U.K. order of December 20, and confirming the directions given by the U.K. court in relation to the convening of the meeting of creditors. The purpose of doing so was to ensure that the Canadian court would recognize the scheme as binding on Cavell's Canadian creditors.

14    Cavell proceeded with this step by applying to the Ontario Superior Court of Justice on December 21, 2004 for an order recognizing the U.K. proceedings and recognizing and implementing the U.K. order of December 20. It also sought a stay of proceedings in respect of its Canadian property, and advice or direction in connection with Cavell's application to approve the scheme and the meeting ordered to consider the scheme.

15    Cavell served its Canadian creditors with the material for this application. The appellant, like many of those creditors, did not attend before the motion judge on December 21. However, counsel for one Canadian insurer and for the office of the Superintendent of Financial Institutions (OSFI) did appear.

16    Farley J. heard the Cavell application on December 21, 2004, and granted the order sought. In brief reasons, he found that there was a real and substantial connection between the subject matter of the proceeding under s. 425 of the U.K. *Companies Act, 1985* and the U.K. court, and that it was appropriate to recognize the December 20 order of that court. In doing so, he relied on *REJUKA* (together with Rule 73 of the *Rules of Civil Procedure*) and the inherent jurisdiction of the Ontario Superior Court.

17    As issued, Farley J.'s order of December 21, 2004 recited in its preamble the need to recognize and co-ordinate the actions before the U.K. court and the application brought in Ontario. In addition to ordering that the U.K. order of December 20 be recognized, the Ontario order contained a number of additional terms which may be grouped as follows:

    a) an order that the U.K. proceedings be recognized;

    b) corollary provisions for the purposes of recognizing the U.K. proceedings and implementing the U.K. order of December 20 and any further relevant orders of the U.K. court in that proceeding, including

        i) that Cavell keep the Ontario court advised of any material developments in the U.K. proceeding and any further orders of the U.K. court, and seek any further orders from the Ontario court needed to co-ordinate the two proceedings;

        ii) that a video link to the creditors meeting be provided in the offices of Cavell's counsel in Toronto;

        iii) that notice of the meeting and access to documents be provided to Canadian creditors;

    c) an order banning other proceedings against Cavell or its Canadian property in connection with the scheme of arrangement except with leave of the Ontario court;

    d) a "comeback" provision entitling any interested party to return to the court for further order, or to amend or vary the December 21 order.

18    On February 17, 2005, fifteen of the Canadian insurers, including the appellant, utilized the "comeback" provision and sought to set aside or vary the December 21 order. In reasons issued on February 21, Farley J. dismissed their motions and continued the recognition order, but added four conditions to it. He described the three principal ones as follows:

2006 CarswellOnt 3070, [2006] I.L.R. I-4510, 212 O.A.C. 48, 25 C.B.R. (5th) 7...

1. The UK Scheme Adjudicator is to reach a commutation valuation based on the OSFI rules ...

2. Given the uniqueness of the OSFI rules to be only applicable to Canadian carriers being reinsured by Cavell, there is to be a further right of appeal to this court on this point, recognizing that the Scheme Adjudicator would lose jurisdiction completely if he did not truly apply the OSFI rules.

3. There is to be a videotape taken of a meeting on February 23 $^{rd}$ and a transcript made. ...

19    In his reasons, Farley J. reviewed the notification that had been provided in several ways of the December 21 application and found that it was "not insufficient." He confirmed his view that a basis existed under either *REJUKA* and Rule 73, or the inherent jurisdiction of the court to make the recognition order of December 21. He also held that the U.K. order of December 20, although not for the payment of money, was sufficiently precise to be enforceable in Ontario. Finally, he made it clear that the provisions of s. 425 of the *U.K. Companies Act*, *1985* are neither foreign nor repugnant to the Canadian court and that an order facilitating access to that process for those in Canada affected by it, was desirable and consistent with the requirements of comity.

20    Following the hearing on February 17, a dispute arose over the form of the order to be taken out, resulting in a re-attendance before Farley J. In reasons released April 22, 2005, he clarified two things. First, the OSFI rules to which he had referred in the recognition order are *Canadian Generally Accepted Actuarial Principles*. Second, he made clear that his primary intention in his February 21 reasons was to ensure that an appeal was available if the valuation done in the U.K. proceedings was not conducted by applying the OSFI rules. He stated that his reference to the appeal being to the Ontario court was a very peripheral point, and that it would be appropriate for the right of appeal to be to the U.K. court as an alternative. With this clarification, the order of February 17, 2005 was issued.

### Analysis

21    The appellant raises three issues in this appeal:

a) Did Farley J. err in relying on *REJUKA* and Rule 73 as a basis for recognizing and enforcing the U.K. order of December 20, 2004?

b) Did Farley J. err in relying on the inherent jurisdiction of the court and the principle of comity as a basis for recognizing the U.K. order of December 20, 2004?

c) Did Farley J. err in varying his February 21, 2005 reasons by removing the right of appeal to the Ontario court?

### First Issue : REJUKA and Rule 73

22    *REJUKA* is the Ontario statute that brings into force in Ontario the Convention between Canada and the United Kingdom providing for the reciprocal recognition and enforcement of judgments in civil and commercial matters.

23    The Convention is designed on the basis of reciprocity. Its purpose is to facilitate the recognition and enforcement of civil and commercial judgments granted by the courts of one country in the courts of the other. It defines "judgment" very broadly, to mean any decision given by a court in a civil or commercial matter. The person in whose favour the judgment is given is described as the "judgment creditor".

24    Part II Article II s. 4 of the Convention demonstrates that it is intended as a more convenient method of recognizing certain judgments, not as a code that precludes resort to the rules of private international law:

4. This Convention is without prejudice to any other remedy available to a judgment creditor for the recognition and enforcement in one Contracting State of a judgment given by a court of the other Contracting State.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Cavell Insurance Co., Re, 2006 CarswellOnt 3070

2006 CarswellOnt 3070, [2006] I.L.R. I-4510, 212 O.A.C. 48, 25 C.B.R. (5th) 7...

25    Part III Article III provides for the registration of judgments. Part II Article II s. 3 limits registration only to judgments whereby a sum of money is made payable.

26    Part IV Article VI s. 4(c) provides that the registering court may require that an application for registration be accompanied by proof of the notice given to the defendant in the original proceedings, unless this appears from the judgment. Rule 73.02 of the *Rules of Civil Procedure* makes that a requirement for the Ontario court. It establishes the form required for notice of application for registration of a U.K. judgment under *REJUKA*. It requires that proof of service of the originating process of the U.K. court accompany the affidavit in support of the application.

27    Finally, in addition to this expeditious process for registering a U.K. judgment, Part V Article VIII provides for the recognition of a judgment, whether it is one for the payment of the money or not, and whether it has been registered or not. It reads:

> Any judgment given by a court of one Contracting State for the payment of a sum of money which could be registered under this Convention, whether or not the judgment has been registered, and <u>any other judgment given by such a court, which if it were a judgment for the payment of a sum of money could be registered under this Convention</u>, shall, unless registration has been or would be refused or set aside on any ground other than that the judgment has been satisfied or could not be enforced in the territory of origin, be recognised in a court of the other Contracting State as conclusive between the parties thereto in all proceedings founded on the same cause of action (emphasis added).

28    In making his recognition order of December 21, 2004, Farley J. relied in part on Rule 73. The appellant argues that he was wrong to do so because its application is limited to judgments that can be registered under *REJUKA* and these must be judgments that make payable a sum of money. The U.K. order of December 20, 2004 is clearly not that.

29    I agree. The procedure under Rule 73 is simply not available here.

30    In his reasons of February 21, 2005, Farley J. focused much more on Part V Article VIII as the provision that permitted *REJUKA* to serve as a basis for his recognition order. The appellant contests this for two reasons: (a) Cavell did not serve it with the originating process in the U.K. court that led to the December 20 order; and (b) that order is not a final order.

31    Again I agree with the appellant. Under Part V Article VIII, Cavell is entitled to an order recognizing the U.K. order of December 20 if that order could be registered under *REJUKA*, had it been a judgment for the payment of a sum of money. Part IV Article VI s. 4(c) together with Rule 73 require that for a money judgment to be registered, Cavell would have to show proof of service on the appellant of the originating process in the U.K. court. There was no such service, and hence if the U.K. order of December 20 had been a judgment for the payment of money it could not have been registered under *REJUKA*. Even if the Ontario court could be said to have a discretion to dispense with this service, Farley J. made no finding that he would have done so had this been a money judgment. The respondent's inability to prove service thus bars the recognition of the U.K. order of December 20 under Article VIII of the Convention and *REJUKA*.

32    As well, I think Article VIII requires a judgment to be final and conclusive before it can be recognized under that Article. Article VIII provides that where a judgment is recognized thereunder, it is "recognized in a court of the other contracting state as *conclusive* between the parties thereto in all proceedings founded on the same cause of action" (emphasis added). It would be illogical if the Convention required a judgment that was not final and therefore conclusive in the issuing state to be treated as conclusive in the other state. Rather, I conclude that a judgment must be final in the issuing state to be recognized under Article VIII. All agree that the U.K. order of December 20, 2004 was not a final order for this purpose. For this reason as well it could not be recognized under Article VIII.

33    I would therefore conclude that *REJUKA* and Rule 73 cannot serve as a basis for the recognition in Ontario of the U.K. order of December 20, 2004.

### *Second Issue : Private International Law*

34     Farley J. also based his recognition order of December 21, 2004 on the common law rules of private international law, which he referred to as the inherent jurisdiction of the court and the principle of comity.

35     The appellant argues that the recognition of the U.K. order of December 20 on this basis was in error because:

      (a) the order is not a final order;

      (b) the appellant was not served with the originating process in the U.K. proceedings; and

      (c) the real and substantial connection test is not met in these circumstances.

In my view, none of these arguments can succeed.

36     Any consideration of the recognition and enforcement of a foreign judgment pursuant to the rules of private international law must begin with the groundbreaking judgment in *Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077 (S.C.C.). Speaking for the Court, LaForest J. recognized the pressing need to modernize these rules to accommodate the increasingly transnational nature of commercial transactions that accompanies the inexorable evolution towards a global economy. He put it this way at p. 1098:

The business community operates in a world economy and we correctly speak of a world community even in the face of decentralized political and legal power. Accommodating the flow of wealth, skills and people across state lines has now become imperative. Under these circumstances, our approach to the recognition and enforcement of foreign judgments would appear ripe for reappraisal.

37     Of central importance in this task of reappraisal is the doctrine of comity, a doctrine "grounded in the need in modern times to facilitate the flow of wealth, skills and people across state lines in a fair and orderly manner". See *Morguard*, *supra*, at p. 1096. At the same page, the doctrine was defined as follows:

"Comity" in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws ...

38     LaForest J. went on to identify the principles of "real and substantial connection" and "order and fairness" as fundamental considerations for a court to properly determine whether to recognize a foreign judgment pursuant to private international law. These principles allow the domestic court to assess whether the foreign court took jurisdiction and issued the judgment in a way that the domestic court should recognize.

39     The first of these, the real and substantial connection principle, is now clearly applicable both to the recognition of foreign judgments and interprovincial judgments. This was established in *Beals v. Saldanha*, [2003] 3 S.C.R. 416 (S.C.C.) where, at p. 436, the Court made it clear that "the need to accommodate the flow of wealth skills and people across state lines' is as much an imperative internationally as it is interprovincially."

40     The second principle, order and fairness, recognizes the importance of both the security of international transactions and as well the need for fairness to those against whom recognition and enforcement is sought, and the need to balance the two.

41     Traditionally, to recognize and enforce a foreign judgment in Ontario, the court has required that it be both a final judgment and for a definite sum of money. In this proceeding, while the appellant argues the finality requirement, it does not raise as an issue the fact that the foreign judgment, the U.K. order of December 20, 2004, is not for a fixed sum of money. The appellant appears to accept the need, in the modern world of international commerce, to revisit this requirement. This need has been recognized by Castel and Walker in *Canadian Conflict of Laws*, 5th ed. at 14-21 and by this court *in obiter* in *Pro Swing Inc. v. ELTA Golf Inc.* (2004), 71 O.R. (3d) 566 (Ont. C.A.), at 570. It should be noted that this judgment has been appealed

Cavell Insurance Co., Re, 2006 CarswellOnt 3070

2006 CarswellOnt 3070, [2006] I.L.R. I-4510, 212 O.A.C. 48, 25 C.B.R. (5th) 7...

to the Supreme Court of Canada which reserved its decision on December 15, 2005. Because this issue has not been argued by the appellant here, and because of the views expressed in this court in *Pro Swing*, *supra*, I will proceed on the basis that the non-monetary nature of the U.K. order of December 20 is not an impediment to its recognition in Ontario.

42    However, the appellant does assert that Farley J. erred by recognizing a foreign order that is not final, although it would appear that this argument was not put to him and he did not deal with it in his reasons. *Four Embarcadero Center Venture v. Kalen* (1988), 65 O.R. (2d) 551 (Ont. H.C.) is a frequently cited articulation of this requirement where Henry J. said this at p. 563:

> The foreign money judgment must be final and *res judicata* in the foreign jurisdiction. This occurs when the judgment of the foreign court is final in the sense that the court that made it no longer has the power to rescind or vary it[.]

43    Such a requirement serves at least three purposes. First, the domestic court knows precisely what it is agreeing to recognize and enforce. The importance of the foreign judgment being clear and certain was emphasized by this court in *Pro Swing*, *supra*. Second, finality removes the risk of the injustice that would be done to the party against whom the foreign order is enforced if that order is subsequently changed. This is particularly germane where the foreign order is for the payment of money. Third, finality removes the risk of undermining public confidence that might arise if the domestic court were to issue a recognition order and permit its enforcement, only to have the foundation of that order, namely the foreign order, disappear.

44    In my view, if the U.K. order of December 20, 2004 is recognized, each of these purposes will nonetheless be served. That order obviously does not finally decide the substantive issue affecting the appellant and the respondent Cavell, because it does not approve the scheme of arrangement. It merely commences the procedure which may lead to the U.K. court ultimately doing so. There is no doubt that subsequent orders of the U.K. court may affect the course of that court procedure. However the initiating order of December 20 is undoubtedly clear and certain. The meeting, its location and the notice requirements for it are clearly spelled out. Thus the Ontario court knows what it is recognizing.

45    Second, recognition of the U.K. order presents little if any risk of injustice to the appellant. The order does not require the appellant to pay money, or indeed to do anything. If it is subsequently amended, even to the point of cancelling the meeting altogether, this does not infringe on the appellant in any meaningful way.

46    Finally, because of the nature of the order and the terms of its recognition, I think there is little risk of undermining public confidence if the procedure initiated by the U.K. order is changed following its recognition by the Ontario court. The U.K. order merely commences a procedure that is supervised by that court. It would be unsurprising for that court to issue subsequent orders providing further guidance for that procedure. Moreover, a term of the recognition order is that the Ontario court must be kept advised of any such changes and that Cavell must seek such further orders of the Ontario Court as are necessary as a result. The Ontario court is therefore not put in the position of issuing a recognition order whose foreign foundation may disappear.

47    Moreover, not only can recognition of the U.K. order of December 20 satisfy the purposes served by finality but there are also strong policy reasons for doing so.

48    The doctrine of comity is well served by an Ontario recognition order. The U.K. court has long been accorded respect in this jurisdiction and the statutory process it initiated with the December 20 order is one familiar to the courts of Ontario. Various pieces of commercial legislation in this province provide for analogous procedures. In each case, it is important that parties ultimately affected by the scheme be permitted to participate effectively from the beginning. A recognition order facilitates this where, as here, the statutory procedure must reach across national boundaries.

49    The related notion of reciprocity is also well served by a recognition order. Each of the *Canada Business Corporations Act* and the Ontario *Business Corporations Act* provide court procedures for the approval of solvent schemes of arrangement. If an Ontario court were administering such a scheme, and it affected interests in the United Kingdom, the court would hope for the same recognition of its orders as is sought in this case.

50    In addition, fairness to those who are to be affected by recognition is enhanced rather than diminished if the Ontario recognition order is granted. The conditions attached to the recognition order such as the added notice provisions and the

2006 CarswellOnt 3070, [2006] I.L.R. I-4510, 212 O.A.C. 48, 25 C.B.R. (5th) 7...

required video link make participation in the U.K. statutory procedure by the appellant and others in the same position that much easier. Put another way, if a recognition order were denied at this stage, an attempt to recognize any U.K. order finally approving the scheme of arrangement might be met with a complaint that those in Canada affected by the final order were afforded no satisfactory way to participate in the U.K. process leading to that order. The recognition order avoids that risk.

51      The conditions of the recognition order that entitle an affected party to come back to the Ontario court to seek the further assistance of the court and that require the U.K. evaluator to reach a commutation value based on the OSFI rules also serve the objective of fairness to those affected by the order.

52      I recognize that because of the conditions attached to it, the recognition order of December 21, 2004, does not just recognize the U.K. order of December 20. It also in effect declares that the Ontario court accepts the jurisdiction of the U.K. court to carry on the statutory procedure authorized by s. 425 of the U.K. *Companies Act, 1985* and provides that the Ontario court will co-ordinate with and support that procedure to the extent it affects interests in Ontario.

53      Clearly this result could have been achieved by domestic legislation as it has been in both the *Bankruptcy and Insolvency Act* and the *Companies' Creditors Arrangement Act* for foreign proceedings brought under bankruptcy or insolvency legislation. Neither Act applies to this circumstance, because of the legislation used in the U.K.

54      However, in an age where the rules of private international law are evolving to accommodate the increasingly transnational nature of commerce, I see no reason why this result should be precluded by those rules just because the foreign order to be recognized is not final. In my view the want of finality carries with it no substantive effect that should deny recognition. I would therefore conclude that the appellant's finality argument fails.

55      The appellant's second argument is that the U.K. order of December 20, 2004, ought not to have been recognized because the appellant was not served with the originating papers in the U.K. and did not appear or otherwise submit to the jurisdiction of the U.K. court.

56      In my view, this argument must also fail. There is no doubt that the appellant was not served with notice of the December 20 proceeding. However, whether that is viewed as bearing upon the jurisdiction of the U.K. court to issue the order (as in *Parsons v. McDonald's Restaurants of Canada Ltd.* (2005), 74 O.R. (3d) 321 (Ont. C.A.)) or as bearing upon natural justice and therefore raising a possible defence to the enforcement of the U.K. order (as in *Beals*, *supra*), the ultimate question is whether in the circumstances the appellant has been accorded a fair process.

57      Farley J. answered that question in the affirmative and I see no basis to interfere with his finding. As my colleague, Sharpe J.A., said about the analogous finding in *Parsons*, *supra*, it is essentially a finding of fact that is entitled to deference in this court. Moreover, in the circumstances, it is entirely reasonable. The appellant was alerted by letter in mid-November that Cavell was proposing to proceed by way of a scheme of arrangement, but it does not appear to have sought further details. It was also served with the full application record for the proceedings before Farley J. but chose not to appear. The order in the proceeding of which the appellant says it received no notice, namely the U.K. order of December 20, merely initiates the statutory procedure in the U.K. court in which the appellant will have the full opportunity to participate before its rights are determined. Given the letter notification given to the appellant, the nature of the order made, and the appellant's right to be heard in the U.K. proceeding when it matters, I find entirely reasonable the conclusion that the appellant received a fair process.

58      The appellant's third argument is that Farley J. erred in finding that the real and substantial connection test was met here. Again, I disagree with the appellant.

59      The argument can be disposed of briefly. Farley J. found a connection between the U.K. jurisdiction and the subject matter of the proceedings that was sufficient to meet the test. I agree. The subject matter is a scheme of arrangement proposed by a U.K. company under U.K. legislation. It would affect all the creditors of the company, only a small percentage of which are in Canada. The meeting authorized by the December 20 order will take place in the U.K. It is not required that there be any particular linkage with those like the appellant who may be among those worldwide to be affected by the proceedings. All this, in my view, is more than enough to warrant rejection of this argument.

 Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Cavell Insurance Co., Re, 2006 CarswellOnt 3070

2006 CarswellOnt 3070, [2006] I.L.R. I-4510, 212 O.A.C. 48, 25 C.B.R. (5th) 7...

60      I would therefore conclude that all of the appellant's challenges to the use of the rules of private international law as a basis for recognition of the U.K. order of the December 20, 2004 must fail.

### Third Issue : Removal of the Right to Appeal to the Ontario Court

61      In his reasons of February 21, 2005, Farley J. added a condition to his recognition order of December 21, 2004. That condition gave a right of appeal "to this court" concerning the evaluation, using OSFI rules, of the commuted value of the claims of Canadian creditors of Cavell. Those reasons recite Farley J.'s concern about the absence from the scheme of arrangement of a meaningful right of appeal from these evaluations. The reasons say nothing about why this should be to the Ontario court rather than the U.K. court.

62      When asked to settle the terms of the order flowing from his reasons, Farley J. released a further brief endorsement on April 22, 2005. He said that his primary concern was the right of appeal, and that the question of the appeal being heard "in the Ontario court" was "a very peripheral point". He made it clear that the draft order providing for the appeal to go to the U.K. court captured his true intention. It also avoided the risk that if the reference to the Ontario court remained, his order would determine whether the Canadian creditors should constitute a separate class for voting on the scheme of arrangement, something which was not his intention and which was clearly a question for the U.K. court. He therefore approved the draft order as presented by Cavell.

63      The appellant, supported by the respondent Reliance Insurance Company, a second Canadian creditor of Cavell, argues that Farley J. erred in making this change. I disagree. In my view, it was entirely within his discretion to make the clarification of April 22, 2005. The order from the February hearing had not yet been issued. The draft order as he approved it captures his fundamental intention. The change in court was peripheral to that intention and was necessary to avoid an outcome he did not intend. By proceeding as he did, Farley J. ensured that the order reflected his true decision. He had the discretion to do so.

64      In summary, the appeal must be dismissed. No party seeks costs and none are ordered.

**Rosenberg J.A.:**

I agree.

**Simmons J.A.:**

I agree.

                                                                                *Appeal dismissed.*

Footnotes

*          Additional reasons at *Cavell Insurance Co., Re* (2006), 2006 CarswellOnt 5192 (Ont. C.A.).

End of Document          Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# Tab 28

---

| United States Code Annotated |
| Title 29. Labor |
|    Chapter 18. Employee Retirement Income Security Program (Refs & Annos) |
|      Subchapter III. Plan Termination Insurance (Refs & Annos) |
|       Subtitle D. Liability (Refs & Annos) |

29 U.S.C.A. § 1362

§ 1362. Liability for termination of single-employer plans
under a distress termination or a termination by corporation

Effective: December 16, 2014

Currentness

(a) In general

In any case in which a single-employer plan is terminated in a distress termination under section 1341(c) of this title or a termination otherwise instituted by the corporation under section 1342 of this title, any person who is, on the termination date, a contributing sponsor of the plan or a member of such a contributing sponsor's controlled group shall incur liability under this section. The liability under this section of all such persons shall be joint and several. The liability under this section consists of--

   **(1)** liability to the corporation, to the extent provided in subsection (b) of this section, and

   **(2)** liability to the trustee appointed under subsection (b) or (c) of section 1342 of this title, to the extent provided in subsection (c) of this section.

(b) Liability to corporation

   (1) Amount of liability

     (A) In general

     Except as provided in subparagraph (B), the liability to the corporation of a person described in subsection (a) of this section shall be the total amount of the unfunded benefit liabilities (as of the termination date) to all participants and beneficiaries under the plan, together with interest (at a reasonable rate) calculated from the termination date in accordance with regulations prescribed by the corporation.

     (B) Special rule in case of subsequent insufficiency

     For purposes of subparagraph (A), in any case described in section 1341(c)(3)(C)(ii) of this title, actuarial present values shall be determined as of the date of the notice to the corporation (or the finding by the corporation) described in such section.

---

(2) Payment of liability

(A) In general

Except as provided in subparagraph (B), the liability to the corporation under this subsection shall be due and payable to the corporation as of the termination date, in cash or securities acceptable to the corporation.

(B) Special rule

Payment of so much of the liability under paragraph (1)(A) as exceeds 30 percent of the collective net worth of all persons described in subsection (a) of this section (including interest) shall be made under commercially reasonable terms prescribed by the corporation. The parties involved shall make a reasonable effort to reach agreement on such commercially reasonable terms. Any such terms prescribed by the corporation shall provide for deferral of 50 percent of any amount of liability otherwise payable for any year under this subparagraph if a person subject to such liability demonstrates to the satisfaction of the corporation that no person subject to such liability has any individual pre-tax profits for such person's fiscal year ending during such year.

(3) Alternative arrangements

The corporation and any person liable under this section may agree to alternative arrangements for the satisfaction of liability to the corporation under this subsection.

(c) Liability to section 1342 trustee

A person described in subsection (a) of this section shall be subject to liability under this subsection to the trustee appointed under subsection (b) or (c) of section 1342 of this title. The liability of such person under this subsection shall consist of--

(1) the sum of the shortfall amortization charge (within the meaning of section 1083(c)(1) of this title and 430(d)(1)[1] of Title 26) with respect to the plan (if any) for the plan year in which the termination date occurs, plus the aggregate total of shortfall amortization installments (if any) determined for succeeding plan years under section 1083(c)(2) of this title and section 430(d)(2) of such Title 26 (which, for purposes of this subparagraph, shall include any increase in such sum which would result if all applications for waivers of the minimum funding standard under section 1082(c) of this title and section 412(c) of such Title 26 which are pending with respect to such plan were denied and if no additional contributions (other than those already made by the termination date) were made for the plan year in which the termination date occurs or for any previous plan year), and

(2) the sum of the waiver amortization charge (within the meaning of section 1083(e)(1) of this title and 430(e)(1) of Title 26) with respect to the plan (if any) for the plan year in which the termination date occurs, plus the aggregate total of waiver amortization installments (if any) determined for succeeding plan years under section 1083(e)(2) of this title and section 430(e)(2) of such Title 26,

together with interest (at a reasonable rate) calculated from the termination date in accordance with regulations prescribed by the corporation. The liability under this subsection shall be due and payable to such trustee as of the termination date, in cash or securities acceptable to such trustee.

(d) Definitions

(1) Collective net worth of persons subject to liability

(A) In general

The collective net worth of persons subject to liability in connection with a plan termination consists of the sum of the individual net worths of all persons who--

(i) have individual net worths which are greater than zero, and

(ii) are (as of the termination date) contributing sponsors of the terminated plan or members of their controlled groups.

(B) Determination of net worth

For purposes of this paragraph, the net worth of a person is--

(i) determined on whatever basis best reflects, in the determination of the corporation, the current status of the person's operations and prospects at the time chosen for determining the net worth of the person, and

(ii) increased by the amount of any transfers of assets made by the person which are determined by the corporation to be improper under the circumstances, including any such transfers which would be inappropriate under Title 11 if the person were a debtor in a case under chapter 7 of such title.

(C) Timing of determination

For purposes of this paragraph, determinations of net worth shall be made as of a day chosen by the corporation (during the 120-day period ending with the termination date) and shall be computed without regard to any liability under this section.

(2) Pre-tax profits

The term "pre-tax profits" means--

(A) except as provided in subparagraph (B), for any fiscal year of any person, such person's consolidated net income (excluding any extraordinary charges to income and including any extraordinary credits to income) for such fiscal year, as shown on audited financial statements prepared in accordance with generally accepted accounting principles, or

(B) for any fiscal year of an organization described in section 501(c) of Title 26, the excess of income over expenses (as such terms are defined for such organizations under generally accepted accounting principles),

before provision for or deduction of Federal or other income tax, any contribution to any single-employer plan of which such person is a contributing sponsor at any time during the period beginning on the termination date and ending with the end of such fiscal year, and any amounts required to be paid for such fiscal year under this section. The corporation may by regulation require such information to be filed on such forms as may be necessary to determine the existence and amount of such pre-tax profits.

**(e) Treatment of substantial cessation of operations**

### (1) General rule

Except as provided in paragraphs (3) and (4), if there is a substantial cessation of operations at a facility in any location, the employer shall be treated with respect to any single employer plan established and maintained by the employer covering participants at such facility as if the employer were a substantial employer under a plan under which more than one employer makes contributions and the provisions of sections 1363, 1364, and 1365 of this title shall apply.

### (2) Substantial cessation of operations

For purposes of this subsection:

#### (A) In general

The term "substantial cessation of operations" means a permanent cessation of operations at a facility which results in a workforce reduction of a number of eligible employees at the facility equivalent to more than 15 percent of the number of all eligible employees of the employer, determined immediately before the earlier of--

**(i)** the date of the employer's decision to implement such cessation, or

**(ii)** in the case of a workforce reduction which includes 1 or more eligible employees described in paragraph (6)(B), the earliest date on which any such eligible employee was separated from employment.

#### (B) Workforce reduction

Subject to subparagraphs (C) and (D), the term "workforce reduction" means the number of eligible employees at a facility who are separated from employment by reason of the permanent cessation of operations of the employer at the facility.

#### (C) Relocation of workforce

An eligible employee separated from employment at a facility shall not be taken into account in computing a workforce reduction if, within a reasonable period of time, the employee is replaced by the employer, at the same or another facility located in the United States, by an employee who is a citizen or resident of the United States.

#### (D) Dispositions

If, whether by reason of a sale or other disposition of the assets or stock of a contributing sponsor (or any member of the same controlled group as such a sponsor) of the plan relating to operations at a facility or otherwise, an employer (the 'transferee employer') other than the employer which experiences the substantial cessation of operations (the 'transferor employer') conducts any portion of such operations, then--

(i) an eligible employee separated from employment with the transferor employer at the facility shall not be taken into account in computing a workforce reduction if--

(I) within a reasonable period of time, the employee is replaced by the transferee employer by an employee who is a citizen or resident of the United States; and

(II) in the case of an eligible employee who is a participant in a single employer plan maintained by the transferor employer, the transferee employer, within a reasonable period of time, maintains a single employer plan which includes the assets and liabilities attributable to the accrued benefit of the eligible employee at the time of separation from employment with the transferor employer; and

(ii) an eligible employee who continues to be employed at the facility by the transferee employer shall not be taken into account in computing a workforce reduction if--

(I) the eligible employee is not a participant in a single employer plan maintained by the transferor employer, or

(II) in any other case, the transferee employer, within a reasonable period of time, maintains a single employer plan which includes the assets and liabilities attributable to the accrued benefit of the eligible employee at the time of separation from employment with the transferor employer.

**(3) Exemption for plans with limited underfunding**

Paragraph (1) shall not apply with respect to a single employer plan if, for the plan year preceding the plan year in which the cessation occurred--

(A) there were fewer than 100 participants with accrued benefits under the plan as of the valuation date of the plan for the plan year (as determined under section 1083(g)(2) of this title); or

(B) the ratio of the market value of the assets of the plan to the funding target of the plan for the plan year was 90 percent or greater.

**(4) Election to make additional contributions to satisfy liability**

**(A) In general**

An employer may elect to satisfy the employer's liability with respect to a plan by reason of paragraph (1) by making additional contributions to the plan in the amount determined under subparagraph (B) for each plan year in the 7-plan-year period beginning with the plan year in which the cessation occurred. Any such additional contribution for a plan year shall be in addition to any minimum required contribution under section 1083 of this title for such plan year and shall be paid not later than the earlier of--

(i) the due date for the minimum required contribution for such year under section section 1083(j) of this title; or

(ii) in the case of the first such contribution, the date that is 1 year after the date on which the employer notifies the Corporation of the substantial cessation of operations or the date the Corporation determines a substantial cessation of operations has occurred, and in the case of subsequent contributions, the same date in each succeeding year.

**(B) Amount determined**

**(i) In general**

Except as provided in clause (iii), the amount determined under this subparagraph with respect to each plan year in the 7-plan-year period is the product of--

**(I)** $^1/_7$ of the unfunded vested benefits determined under section 1306(a)(3)(E) of this title as of the valuation date of the plan (as determined under section 1083(g)(2) of this title) for the plan year preceding the plan year in which the cessation occurred; and

**(II)** the reduction fraction.

**(ii) Reduction fraction**

For purposes of clause (i), the reduction fraction of a single employer plan is equal to--

**(I)** the number of participants with accrued benefits in the plan who were included in computing the workforce reduction under paragraph (2)(B) as a result of the cessation of operations at the facility; divided by

**(II)** the number of eligible employees of the employer who are participants with accrued benefits in the plan, determined as of the same date the determination under paragraph (2)(A) is made.

**(iii) Limitation**

The additional contribution under this subparagraph for any plan year shall not exceed the excess, if any, of--

**(I)** 25 percent of the difference between the market value of the assets of the plan and the funding target of the plan for the preceding plan year; over

**(II)** the minimum required contribution under section 1083 of this title for the plan year.

**(C) Permitted cessation of annual installments when plan becomes sufficiently funded**

An employer's obligation to make additional contributions under this paragraph shall not apply to--

**(i)** the first plan year (beginning on or after the first day of the plan year in which the cessation occurs) for which the ratio of the market value of the assets of the plan to the funding target of the plan for the plan year is 90 percent or greater, or

**(ii)** any plan year following such first plan year.

**(D) Coordination with funding waivers**

**(i) In general**

If the Secretary of the Treasury issues a funding waiver under section 1082(c) of this title with respect to the plan for a plan year in the 7-plan-year period under subparagraph (A), the additional contribution with respect to such plan year shall be permanently waived.

**(ii) Notice**

An employer maintaining a plan with respect to which such a funding waiver has been issued or a request for such a funding waiver is pending shall provide notice to the Secretary of the Treasury, in such form and at such time as the Secretary of the Treasury shall provide, of a cessation of operations to which paragraph (1) applies.

**(E) Enforcement**

**(i) Notice**

An employer making the election under this paragraph shall provide notice to the Corporation, in accordance with rules prescribed by the Corporation, of--

**(I)** such election, not later than 30 days after the earlier of the date the employer notifies the Corporation of the substantial cessation of operations or the date the Corporation determines a substantial cessation of operations has occurred;

**(II)** the payment of each additional contribution, not later than 10 days after such payment;

**(III)** any failure to pay the additional contribution in the full amount for any year in the 7-plan-year period, not later than 10 days after the due date for such payment;

**(IV)** the waiver under subparagraph (D)(i) of the obligation to make an additional contribution for any year, not later than 30 days after the funding waiver described in such subparagraph is granted; and

**(V)** the cessation of any obligation to make additional contributions under subparagraph (C), not later than 10 days after the due date for payment of the additional contribution for the first plan year to which such cessation applies.

#### (ii) Acceleration of liability to the plan for failure to pay

If an employer fails to pay the additional contribution in the full amount for any year in the 7-plan-year period by the due date for such payment, the employer shall, as of such date, be liable to the plan in an amount equal to the balance which remains unpaid as of such date of the aggregate amount of additional contributions required to be paid by the employer during such 7-year-plan period. The Corporation may waive or settle the liability described in the preceding sentence, at the discretion of the Corporation.

#### (iii) Civil action

The Corporation may bring a civil action in the district courts of the United States in accordance with section 1303(e) of this title to compel an employer making such election to pay the additional contributions required under this paragraph.

### (5) Definitions

For purposes of this subsection:

#### (A) Eligible employee

The term "eligible employee" means an employee who is eligible to participate in an employee pension benefit plan (as defined in section 1002(2) of this title) established and maintained by the employer.

#### (B) Funding target

The term "funding target" means, with respect to any plan year, the funding target as determined under section 1306(a)(3)(E)(iii)(I) of this title for purposes of determining the premium paid to the Corporation under section 1307 of this title for the plan year.

#### (C) Market value

The market value of the assets of a plan shall be determined in the same manner as for purposes of section 1306(a)(3)(E) of this title.

### (6) Special rules

**(A) Change in operation of certain facilities and property**

For purposes of paragraphs (1) and (2), an employer shall not be treated as ceasing operations at a qualified lodging facility (as defined in section 856(d)(9)(D) of Title 26) if such operations are continued by an eligible independent contractor (as defined in section 856(d)(9)(A) of Title 26) pursuant to an agreement with the employer.

**(B) Aggregation of prior separations**

The workforce reduction under paragraph (2) with respect to any cessation of operations shall be determined by taking into account any separation from employment of any eligible employee at the facility (other than a separation which is not taken into account as workforce reduction by reason of subparagraph (C) or (D) of paragraph (2)) which--

**(i)** is related to the permanent cessation of operations of the employer at the facility, and

**(ii)** occurs during the 3-year period preceding such cessation.

**(C) No addition to prefunding balance**

For purposes of section 303(f)(6)(B) and section 430(f)(6)(B) of Title 26, any additional contribution made under paragraph (4) shall be treated in the same manner as a contribution an employer is required to make in order to avoid a benefit reduction under paragraph (1), (2), or (4) of section 1056(g) of this title or subsection (b), (c), or (e) of section 436 of Title 26 for the plan year.

**CREDIT(S)**

(Pub.L. 93-406, Title IV, § 4062, Sept. 2, 1974, 88 Stat. 1029; Pub.L. 95-598, Title III, § 321(b), Nov. 6, 1978, 92 Stat. 2678; Pub.L. 96-364, Title IV, § 403(g), Sept. 26, 1980, 94 Stat. 1301; Pub.L. 99-272, Title XI, § 11011(a), (b), Apr. 7, 1986, 100 Stat. 253, 257; Pub.L. 100-203, Title IX, § 9312(b)(1), (2)(A), (B)(ii), Dec. 22, 1987, 101 Stat. 1330-361; Pub.L. 101-239, Title VII, §§ 7881(f)(2), (10)(A), (B), 7891(a)(1), Dec. 19, 1989, 103 Stat. 2440, 2441, 2445; Pub.L. 109-280, Title I, § 108(b)(4), formerly § 107(b)(4), Aug. 17, 2006, 120 Stat. 819, renumbered § 108(b)(4), Pub.L. 111-192, Title II, § 202(a), June 25, 2010, 124 Stat. 1297; Pub.L. 113-235, Div. P, § 1(a), Dec. 16, 2014, 128 Stat. 2822.)

Notes of Decisions (56)

Footnotes

1        So in original. Probably should be preceded by ''section''.

29 U.S.C.A. § 1362, 29 USCA § 1362

Current through P.L. 114-9 approved 4-7-2015

---

End of Document                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 29

Code of Federal Regulations
   Title 29. Labor
      Subtitle B. Regulations Relating to Labor
         Chapter XL. Pension Benefit Guaranty Corporation (Refs & Annos)
            Subchapter E. Plan Terminations
               Part 4044. Allocation of Assets in Single–Employer Plans (Refs & Annos)
                  Subpart B. Valuation of Benefits and Assets
                     General Provisions

29 C.F.R. § 4044.41

§ 4044.41 General valuation rules.

Effective: July 14, 2011

Currentness

(a) Valuation of benefits—

(1) Trusteed plans. The plan administrator of a plan that has been or will be placed into trusteeship by the PBGC shall value plan benefits in accordance with §§ 4044.51 through 4044.57.

(2) Non-trusteed plans. The plan administrator of a non-trusteed plan shall value plan benefits in accordance with §§ 4044.71 through 4044.75. If a plan is unable to satisfy all benefits assigned to priority categories 1 through 4 on the distribution date, the PBGC will place it into trusteeship and the plan administrator shall re-value the benefits in accordance with §§ 4044.51 through 4044.57.

(b) Valuation of assets. Plan assets shall be valued at their fair market value, based on the method of valuation that most accurately reflects such fair market value.

**Credits**

[76 FR 34606, June 14, 2011]

SOURCE: 61 FR 34003, July 1, 1996; 61 FR 34059, July 1, 1996; 68 FR 61347, Oct. 28, 2003; 76 FR 34605, June 14, 2011, unless otherwise noted.

AUTHORITY: 29 U.S.C. 1301(a), 1302(b)(3), 1341, 1344, 1362.

Notes of Decisions (11)

Current through June 4, 2015; 80 FR 31866.

    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 30

Code of Federal Regulations
    Title 29. Labor
        Subtitle B. Regulations Relating to Labor
            Chapter XL. Pension Benefit Guaranty Corporation (Refs & Annos)
                Subchapter E. Plan Terminations
                    Part 4044. Allocation of Assets in Single–Employer Plans (Refs & Annos)
                        Subpart B. Valuation of Benefits and Assets
                            Trusteed Plans

29 C.F.R. § 4044.51

§ 4044.51 Benefits to be valued.

Currentness

(a) Form of benefit. The plan administrator shall determine the form of each benefit to be valued in accordance with the following rules:

(1) If a benefit is in pay status as of the valuation date, the plan administrator shall value the form of the benefit being paid.

(2) If a benefit is not in pay status as of the valuation date but a valid election with respect to the form of benefit has been made on or before the valuation date, the plan administrator shall value the form of benefit so elected.

(3) If a benefit is not in pay status as of the valuation date and no valid election with respect to the form of benefit has been made on or before the valuation date, the plan administrator shall value the form of benefit that, under the terms of the plan, is payable in the absence of a valid election.

(b) Timing of benefit. The plan administrator shall value benefits whose starting date is subject to election using the assumption specified in paragraph (b)(1) or (b)(2) of this section.

(1) Where election made. If a valid election of the starting date of a benefit has been made on or before the valuation date, the plan administrator shall assume that the starting date of the benefit is the starting date so elected.

(2) Where no election made. If no valid election of the starting date of a benefit has been made on or before the valuation date, the plan administrator shall assume that the starting date of the benefit is the later of—

(i) The expected retirement age, as determined under §§ 4044.55 through 4044.57, of the participant with respect to whom the benefit is payable, or

(ii) The valuation date.

SOURCE: 61 FR 34003, July 1, 1996; 61 FR 34059, July 1, 1996; 68 FR 61347, Oct. 28, 2003; 76 FR 34605, June 14, 2011, unless otherwise noted.

AUTHORITY: 29 U.S.C. 1301(a), 1302(b)(3), 1341, 1344, 1362.

Current through June 4, 2015; 80 FR 31866.

---

**End of Document**
© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 31

Code of Federal Regulations
    Title 29. Labor
        Subtitle B. Regulations Relating to Labor
            Chapter XL. Pension Benefit Guaranty Corporation (Refs & Annos)
                Subchapter E. Plan Terminations
                    Part 4044. Allocation of Assets in Single–Employer Plans (Refs & Annos)
                        Subpart B. Valuation of Benefits and Assets
                            Trusteed Plans

29 C.F.R. § 4044.52

§ 4044.52 Valuation of benefits.

Effective: January 1, 2006
Currentness

The plan administrator shall value all benefits as of the valuation date by—

(a) Using the mortality assumptions prescribed by § 4044.53 and the interest assumptions prescribed in appendix B to this part;

(b) Using interpolation methods, where necessary, at least as accurate as linear interpolation;

(c) Using valuation formulas that accord with generally accepted actuarial principles and practices; and

(d) Adjusting the values to reflect loading expenses in accordance with appendix C to this part.

**Credits**

[63 FR 38306, July 16, 1998; 65 FR 14753, March 17, 2000; 70 FR 72207, Dec. 2, 2005]

SOURCE: 61 FR 34003, July 1, 1996; 61 FR 34059, July 1, 1996; 68 FR 61347, Oct. 28, 2003; 76 FR 34605, June 14, 2011, unless otherwise noted.

AUTHORITY: 29 U.S.C. 1301(a), 1302(b)(3), 1341, 1344, 1362.

Current through June 4, 2015; 80 FR 31866.

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 32

Code of Federal Regulations
    Title 29. Labor
        Subtitle B. Regulations Relating to Labor
            Chapter XL. Pension Benefit Guaranty Corporation (Refs & Annos)
            Subchapter E. Plan Terminations
                Part 4044. Allocation of Assets in Single–Employer Plans (Refs & Annos)
                Subpart B. Valuation of Benefits and Assets
                    Trusteed Plans

29 C.F.R. § 4044.53

§ 4044.53 Mortality assumptions.

Effective: January 1, 2006

Currentness

(a) General rule. Subject to paragraph (b) of this section (regarding certain death benefits), the plan administrator shall use the mortality factors prescribed in paragraphs (c), (d), (e), (f), and (g) of this section to value benefits under § 4044.52.

(b) Certain death benefits. If an annuity for one person is in pay status on the valuation date, and if the payment of a death benefit after the valuation date to another person, who need not be identifiable on the valuation date, depends in whole or in part on the death of the pay status annuitant, then the plan administrator shall value the death benefit using—

(1) The mortality rates that are applicable to the annuity in pay status under this section to represent the mortality of the pay status annuitant; and

(2) The mortality rates under paragraph (c) of this section to represent the mortality of the death beneficiary.

(c) Healthy lives. If the individual is not disabled under paragraph (f) of this section, the plan administrator will value the benefit using—

(1) For male participants, the rates in Table 1 of Appendix A to this part projected from 1994 to the calendar year in which the valuation date occurs plus 10 years using Scale AA from Table 2 of Appendix A to this part; and

(2) For female participants, the rates in Table 3 of Appendix A to this part projected from 1994 to the calendar year in which the valuation date occurs plus 10 years using Scale AA from Table 4 of Appendix A to this part.

(d) Social Security disabled lives. If the individual is Social Security disabled under paragraph (f)(1) of this section, the plan administrator will value the benefit using—

(1) For male participants, the rates in Table 5 of Appendix A to this part; and

(2) For female participants, the rates in Table 6 of Appendix A to this part.

(e) Non–Social Security disabled lives. If the individual is non–Social Security disabled under paragraph (f)(2) of this section, the plan administrator will value the benefit at each age using—

(1) For male participants, the lesser of—

(i) The rate determined from Table 1 of Appendix A to this part projected from 1994 to the calendar year in which the valuation date occurs plus 10 years using Scale AA from Table 2 of Appendix A to this part and setting the resulting table forward three years, or

(ii) The rate in Table 5 of Appendix A to this part.

(2) For female participants, the lesser of—

(i) The rate determined from Table 3 of Appendix A to this part projected from 1994 to the calendar year in which the valuation date occurs plus 10 years using Scale AA from Table 4 of Appendix A to this part and setting the resulting table forward three years, or

(ii) The rate in Table 6 of Appendix A to this part.

(f) Definitions of disability.

(1) Social Security disabled. A participant is Social Security disabled if, on the valuation date, the participant is less than age 65 and has a benefit in pay status that—

(i) Is being received as a disability benefit under a plan provision requiring either receipt of or eligibility for Social Security disability benefits, or

(ii) Was converted under the plan's terms from a disability benefit under a plan provision requiring either receipt of or eligibility for Social Security disability benefits to an early or normal retirement benefit for any reason other than a change in the participant's health status.

(2) Non–Social Security disabled. A participant is non–Social Security disabled if, on the valuation date, the participant is less than age 65, is not Social Security disabled, and has a benefit in pay status that—

(i) Is being received as a disability benefit under the plan, or

(ii) Was converted under the plan's terms from a disability benefit to an early or normal retirement benefit for any reason other than a change in the participant's health status.

(g) Contingent annuitant mortality during deferral period. If a participant's joint and survivor benefit is valued as a deferred annuity, the mortality of the contingent annuitant during the deferral period will be disregarded.

**Credits**

[65 FR 14753, March 17, 2000; 70 FR 72207, Dec. 2, 2005]

SOURCE: 61 FR 34003, July 1, 1996; 61 FR 34059, July 1, 1996; 68 FR 61347, Oct. 28, 2003; 76 FR 34605, June 14, 2011, unless otherwise noted.

AUTHORITY: 29 U.S.C. 1301(a), 1302(b)(3), 1341, 1344, 1362.

Current through June 4, 2015; 80 FR 31866.

---

**End of Document**                                        © 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

# Tab 33

Code of Federal Regulations
    Title 29. Labor
        Subtitle B. Regulations Relating to Labor
            Chapter XL. Pension Benefit Guaranty Corporation (Refs & Annos)
            Subchapter E. Plan Terminations
                Part 4044. Allocation of Assets in Single–Employer Plans (Refs & Annos)
                    Subpart B. Valuation of Benefits and Assets
                        Expected Retirement Age

29 C.F.R. § 4044.55

§ 4044.55 XRA when a participant must retire to receive a benefit.

Currentness

(a) Applicability. Except as provided in § 4044.57, the plan administrator shall determine the XRA under this section when plan provisions or established plan practice require a participant to retire from his or her job to begin receiving an early retirement benefit.

(b) Data needed. The plan administrator shall determine for each participant who is entitled to an early retirement benefit—

(1) The amount of the participant's monthly benefit payable at unreduced retirement age in the normal form payable under the terms of the plan or in the form validly elected by the participant before the termination date;

(2) The calendar year in which the participant reaches unreduced retirement age ("URA");

(3) The participant's URA; and

(4) The participant's earliest retirement age at the valuation date.

(c) Procedure.

(1) The plan administrator shall determine whether a participant is in the high, medium or low retirement rate category using the applicable Selection of Retirement Rate Category Table in appendix D, based on the participant's benefit determined under paragraph (b)(1) of this section and the year in which the participant reaches URA.

(2) Based on the retirement rate category determined under paragraph (c)(1), the plan administrator shall determine the XRA from Table II–A, II–B or II–C, as appropriate, by using the participant's URA and earliest retirement age at valuation date.

SOURCE: 61 FR 34003, July 1, 1996; 61 FR 34059, July 1, 1996; 68 FR 61347, Oct. 28, 2003; 76 FR 34605, June 14, 2011, unless otherwise noted.

AUTHORITY: 29 U.S.C. 1301(a), 1302(b)(3), 1341, 1344, 1362.

Notes of Decisions (1)

Current through June 4, 2015; 80 FR 31866.

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 34

Code of Federal Regulations
    Title 29. Labor
        Subtitle B. Regulations Relating to Labor
            Chapter XL. Pension Benefit Guaranty Corporation (Refs & Annos)
            Subchapter E. Plan Terminations
                Part 4044. Allocation of Assets in Single–Employer Plans (Refs & Annos)
                    Subpart B. Valuation of Benefits and Assets
                        Expected Retirement Age

29 C.F.R. § 4044.56

§ 4044.56 XRA when a participant need not retire to receive a benefit.

Currentness

(a) Applicability. Except as provided in § 4044.57, the plan administrator shall determine the XRA under this section when plan provisions or established plan practice do not require a participant to retire from his or her job to begin receiving his or her early retirement benefit.

(b) Data needed. The plan administrator shall determine for each participant—

(1) The participant's URA; and

(2) The participant's earliest retirement age at valuation date.

(c) Procedure. Participants in this case are always assigned to the high retirement rate category and therefore the plan administrator shall use Table II–C of appendix D to determine the XRA. The plan administrator shall determine the XRA from Table II–C by using the participant's URA and earliest retirement age at termination date.

SOURCE: 61 FR 34003, July 1, 1996; 61 FR 34059, July 1, 1996; 68 FR 61347, Oct. 28, 2003; 76 FR 34605, June 14, 2011, unless otherwise noted.

AUTHORITY: 29 U.S.C. 1301(a), 1302(b)(3), 1341, 1344, 1362.

Notes of Decisions (1)

Current through June 4, 2015; 80 FR 31866.

# Tab 35

---

Code of Federal Regulations
    Title 29. Labor
        Subtitle B. Regulations Relating to Labor
            Chapter XL. Pension Benefit Guaranty Corporation (Refs & Annos)
                Subchapter E. Plan Terminations
                    Part 4044. Allocation of Assets in Single–Employer Plans (Refs & Annos)
                        Subpart B. Valuation of Benefits and Assets
                            Expected Retirement Age

29 C.F.R. § 4044.57

§ 4044.57 Special rule for facility closing.

Currentness

(a) Applicability. The plan administrator shall determine the XRA under this section, rather than § 4044.55 or § 4044.56, when both the conditions set forth in paragraphs (a)(1) and (a)(2) of this section exist.

(1) The facility at which the participant is or was employed permanently closed within one year before the valuation date, or is in the process of being permanently closed on the valuation date.

(2) The participant left employment at the facility less than one year before the valuation date or was still employed at the facility on the valuation date.

(b) XRA. The XRA is equal to the earliest retirement age at valuation date.

SOURCE: 61 FR 34003, July 1, 1996; 61 FR 34059, July 1, 1996; 68 FR 61347, Oct. 28, 2003; 76 FR 34605, June 14, 2011, unless otherwise noted.

AUTHORITY: 29 U.S.C. 1301(a), 1302(b)(3), 1341, 1344, 1362.

Current through June 4, 2015; 80 FR 31866.

---

   © 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 36

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------------- X

In re:                                              : Chapter 15

                                     :

NORTEL NETWORKS UK LIMITED,                         : Case No. 09 - 11972

                                     :

       Debtor in a Foreign Proceeding.             : Proposed Hearing Date: June 26,
                                       2009 at 3 p.m.

                                       Proposed Objection Deadline:
                                       June 23, 2009 at 4 p.m.

-------------------------------------------------------------------- X

## VERIFIED PETITION FOR RECOGNITION
## OF FOREIGN PROCEEDINGS PURSUANT TO CHAPTER 15
## OF THE UNITED STATES BANKRUPTCY CODE

      Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson and Stephen John Harris are the court-appointed administrators and authorized foreign representatives (the "Administrators") of Nortel Networks UK Limited ("NNUK" or the "Foreign Debtor") in proceedings (the "English Proceedings") under the *Insolvency Act 1986* (the "English Insolvency Act"), pending before the High Court of Justice of England and Wales (the "English Court").

      The Administrators have commenced this chapter 15 case ancillary to the English Proceedings and respectfully submit this Verified Petition for Recognition of Foreign Proceedings Pursuant to Chapter 15 of the United States Bankruptcy Code (the "Verified Petition") with the documentation required by sections 1504 and 1515 of title 11 of the United States Code (the "Bankruptcy Code") seeking entry of an order: (i) recognizing the English Proceedings as "foreign main proceedings" under section 1517 of the Bankruptcy Code (the "Recognition Order"); (ii) enforcing the initial order of the English Court, dated January 14, 2009 (as it may be amended or extended from time to time by the English Court, the "Initial Order") in the United States; and (iii) granting such other and further relief as this Court deems

just and proper.  In support of the Verified Petition, the Administrators respectfully state as follows:

<strong>JURISDICTION AND VENUE</strong>

1.        The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and section 1501 of the Bankruptcy Code.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(P).  Venue in this district is proper pursuant to 28 U.S.C. § 1410(3).

2.        The statutory predicates for the relief requested herein are sections 1504, 1507, 1515, 1517, 1520, 1521 and 105(a) of the Bankruptcy Code.

<strong>BACKGROUND</strong>

**A.      The Nortel Global Enterprise**

3.        Nortel Networks Corporation ("NNC") is the direct or indirect parent of 142 subsidiaries operating worldwide, including Nortel Networks Limited ("NNL"), the primary Canadian operating company and holding company for most of the global subsidiaries, Nortel Networks Inc. ("NNI"), the primary U.S. operating company, and NNUK, the center of operations for Nortel's Europe, Middle East and Africa region (the "EMEA Region" or the "EMEA Companies").  See Declaration of Sharon L. Rolston, dated June 6, 2009 (including the exhibits thereto, the "Rolston Declaration"), Exhibit A (Witness Statement of Sharon Lynette Rolston, dated January 14, 2009 ("Rolston Witness Statement")), at ¶¶ 11-12, 25.

4.        Nortel is a global supplier of networking solutions, i.e. telecommunications, computer networks and software, and provides hardware and software solutions and related services to customers in North America, Europe, the Middle East, Africa,

2

Latin America and Asia.[1] Id. at ¶ 22.  Nortel has a history of innovation in the design, development and deployment of products, systems and communications solutions.  Nortel's activities include internal Research & Development ("R&D") initiatives and external R&D partnerships.  Id. at ¶ 23.

5.    The Nortel Companies, including the Foreign Debtor, operate in a highly integrated manner globally, and the individual entities are interdependent.  Id. at ¶¶ 57-68.  In particular, Nortel employs a complex internal purchasing system for its hardware and software products and the Nortel Companies engage in frequent intercompany trading (the "Intercompany Trading").  Id. ¶¶ 76-79.  The resulting large number of intercompany receivables and payables necessitates transfer payment and intercompany settlement methods, including a suite of agreements governing transfer pricing and Intercompany Trading.  Id. at ¶ 80.

6.    Due to the highly competitive nature of the telecommunications industry in which the Nortel Companies operate and several years of consolidated net loss, the Nortel Companies attempted unsuccessfully to restructure the business.[2] Id. at ¶¶ 90-97.

## B.    The Nortel Enterprise Bankruptcy

7.    Insolvency proceedings for NNC and certain of its direct and indirect Canadian subsidiaries, including NNL, (collectively, the "Canadian Companies") were initiated on January 14, 2009, and are pending before the Ontario Superior Court of Justice (Commercial List) (the "Ontario Court").  In addition, chapter 11 proceedings for NNI and certain of its direct and indirect U.S. subsidiaries (together, the "U.S. Companies") were initiated in this Court on

---

[1]    References to "Nortel" or the "Nortel Companies" refer to the global enterprise as a whole.

[2]    For additional information regarding the Nortel Companies' operations, the Administrators respectfully refer the Court to the Rolston Declaration and Rolston Witness Statement, attached thereto, which are incorporated herein by reference.

DB02:8280447.1                                                                              900002.0001

January 14, 2009, and are pending before this Court.[3]  Chapter 15 proceedings for the Canadian

Companies are pending before this Court as well.[4]

**EVENTS LEADING TO THE**
**COMMENCEMENT OF THE ENGLISH PROCEEDINGS**

8.      The Nortel Companies operate in a highly competitive industry that is

consolidating.  Id. at ¶ 92.  For example, during recent years, two of Nortel's largest customers

merged, as did two of its largest competitors.  Id. at ¶¶ 92-93.  Also in recent years, the Nortel

Companies' operating losses have generally exceeded their revenues.  Id. at ¶ 90.  Factors

contributing to these results include Nortel's inability to reduce operating expenses, restructuring

costs, competitor and customer consolidation, and customers cutting back on capital

expenditures and deferring new investments.  Id. at ¶ 93.

9.      More specifically, the Nortel Companies have reported only losses or

break even financial results in the last five fiscal years.  Id. at ¶ 90.  Total losses increased

dramatically between 2007 and 2008.  For the nine months ended September 30, 2008, the Nortel

Companies incurred a consolidated net loss after tax of $3.7 billion, as compared to a net loss

after tax of $1 billion for the year ended December 31, 2007.  Id.  The EMEA Companies,

including the Foreign Debtor, are loss-making, and incurred combined losses after tax of $261

million and $134 million during the same periods, respectively.  Id. at ¶ 91.

10.      Beginning in September 2008, in response to increasing pressure on its

businesses resulting from the general economic downturn, Nortel began to restructure its

businesses and workforce in order to reduce costs.  These efforts, which included asset sale

negotiations, were ultimately unsuccessful.  Id. at ¶¶ 94-97.

---

[3]    In re Nortel Networks Inc., et al., Case No. 09-10138 (Bankr. D. Del. Jan. 14, 2009).

[4]    In re Nortel Networks Corp., et al., Case No. 09-10164 (Bankr. D. Del. Jan. 14, 2009).

4

11.    Consequently, on January 14, 2009, the Canadian and U.S. Companies, the Foreign Debtor and certain other EMEA Companies[5] simultaneously commenced insolvency proceedings in the U.S., Canada and England.  Id. at ¶ 99.  That same day, the English Court approved the Initial Order that, among other things, appointed the Administrators and stayed proceedings against the Foreign Debtor and its property.  See Initial Order at ¶¶ 3-4 and Schedule at ¶ 6(6), attached hereto as Exhibit A.

12.    As noted above, insolvency proceedings for the U.S. and Canadian Companies are pending before this Court.  The Administrators seek chapter 15 recognition in order to: (i) promote full cooperation between the Nortel Companies and the various courts in which their insolvency proceedings are pending; (ii) protect the Foreign Debtor's assets and interests in the United States; and (iii) ensure that the comprehensive cross-border restructuring of the Nortel Companies progresses in an orderly and efficient way.  Due to the highly interdependent nature of the Nortel Companies, an orderly reorganization is crucial to avoid the threat of disrupted operations and Intercompany Trading and the resulting loss in value for all interested parties that could result if there are chaotic, piecemeal or competing insolvency proceedings.

13.    The Administrators are not aware of any other foreign proceedings within the meaning of Bankruptcy Code § 101(23) with respect to the Foreign Debtor.

---

[5]    The following EMEA Companies, which are direct or indirect subsidiaries of the Foreign Debtor, commenced insolvency proceedings under the English Insolvency Act in the English Court on January 14, 2009: Nortel GmbH; Nortel Networks NV; Nortel Networks SpA; Nortel Networks BV; Nortel Networks Polska SP Zoo; Nortel Networks Hispania SA; Nortel Networks (Austria) GmbH; Nortel Networks sro; Nortel Networks Engineering Service Kft; Nortel Networks Portugal SA; Nortel Networks Slovensko sro; Nortel Networks Oy; Nortel Networks Romania SRL; Nortel Networks AB; and Nortel Networks International Finance & Holding BV. In addition Nortel Networks (Ireland) Limited, Nortel Networks SA, Nortel Networks France SAS, which are not subsidiaries of the Foreign Debtor, also commenced insolvency proceedings under the English Insolvency Act in the English Court on January 14, 2009.  With the exception of Nortel Networks (Ireland) Limited, the Administrators are the court-appointed administrators and foreign representatives for all of the EMEA Companies that have commenced insolvency proceedings in the English Court. Alan Robert Bloom and David Martin Hughes are the court-appointed administrators and foreign representatives of Nortel Networks (Ireland) Limited.

## CENTER OF MAIN INTERESTS OF THE FOREIGN DEBTOR

14.     The center of main interests, or "COMI", for the Foreign Debtor is in England.

15.     The Foreign Debtor is organized under English law and has its registered, headquarter office in England. Rolston Decl., Ex. A, at ¶¶ 8-9, 14; Declaration of Stephen John Harris, dated June 5, 2009 (the "Harris Declaration"), at ¶ 4.d. Pursuant to Bankruptcy Code § 1516(c), therefore, the presumptive COMI for the Foreign Debtor is England. Moreover, even in the absence of this presumption, the COMI would undoubtedly be established in England for the following reasons:

(a)     In the Initial Order, the English Court found that the English Proceedings are main proceedings as defined in Article 3 of Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings. By definition, a main proceeding is one that takes place in the jurisdiction where the debtor has its center of main interests. Therefore, the English Court concluded that the COMI for the Foreign Debtor was, in fact, England. See Initial Order; Council Regulation (EC) No 1346/2000 (June 29, 2000);

(b)     As NNC itself recognized in its chapter 15 petition, "The majority of the Nortel Companies within the EMEA . . . are subsidiaries of NNUK, which is by far the largest business in the EMEA, is the headquarters for the EMEA region." In re Nortel Networks Corp., et al., Case No. 09-10164, Verified Petition for Recognition of Foreign Proceedings, Docket Entry No. 1 at 8;

(c)     The Foreign Debtor is the center of operations and headquarters for the EMEA Region. As a result, key sales, legal, finance, compliance and human resource functions for the entire EMEA Region are carried out in England;

(d)     The Foreign Debtor funds and conducts R&D initiatives in England. As a result, key intellectual property assets are developed in England;

(e)     The Foreign Debtor's books and records are maintained in England. Finance and internal audit control functions for the EMEA Region are also run from England;

6

(f)    The majority of the Foreign Debtor's creditors, by number, are located in England;

(g)    Third parties, including customers, are thought to recognize that key governance and decision making for the EMEA Region takes place in England, and would understand that England is the center of operations for the Foreign Debtor;

(h)    The majority of the Foreign Debtor's employees are located in England. In addition, senior management for the EMEA Region work at the Foreign Debtor's Maidenhead campus in England where they make the vast majority of decisions concerning the EMEA Companies' operations.

See Rolston Decl., Ex. A, at ¶¶ 15, 87, 114, 118, 120, 148-49; Harris Declaration, at ¶¶ 4.a-c, e.

## RELIEF SOUGHT

16.    By this Verified Petition, the Administrators seek ancillary relief under chapter 15 of the Bankruptcy Code in order to maximize value for all interested parties and to facilitate a comprehensive cross-border restructuring of the Foreign Debtor in cooperation with the Nortel Companies worldwide.  Specifically, the Administrators seek entry of the Recognition Order, after notice and a hearing: (i) granting recognition of the English Proceedings as a foreign main proceeding pursuant to section 1517(b)(1) and relief related thereto; (ii) enforcing the Initial Order (or such further order of the English Court as may then be appropriate) in the U.S. on a permanent basis; and (iii) such further relief as this Court deems just and proper.

17.    For the reasons set forth herein, and in Administrator's Memorandum of Law in Support of Verified Petition for Recognition of Foreign Proceeding Pursuant to Chapter 15 of the United States Bankruptcy Code (the "Memorandum of Law"), the English Proceedings are (i) foreign proceedings within the meaning of Bankruptcy Code section 101(23) and (ii) foreign main proceedings within the meaning of Bankruptcy Code section 1502(4).  As described above, the Foreign Debtor's management, strategic planning, decision making and key functions are located in England, which is the Foreign Debtor's center of main interests within the meaning

of Bankruptcy Code section 1516(c). The Administrators are foreign representatives within the meaning of Bankruptcy Code section 101(24). Moreover, the chapter 15 Petition and this Verified Petition meet the requirements of Bankruptcy Code section 1515.

18.     In addition, the requested relief is consistent with the goals of chapter 15. The Administrators submit that granting the relief sought herein will aid the English Proceedings, best assure an opportunity for the Foreign Debtor to conduct an orderly reorganization of its financial affairs in cooperation with the efforts of the Canadian and U.S. Companies, and maximize enterprise value for the benefit of all parties in interest. See 11 U.S.C. § 1501(a)(3) (among the objectives of chapter 15 is to contribute to the fair and efficient administration of cross-border insolvencies).

19.     Moreover, recognizing the English Proceedings would not be manifestly contrary to the public policy of the United States under Bankruptcy Code section 1506. In fact, granting recognition will promote the public policy respecting foreign proceedings as articulated in, inter alia, Bankruptcy Code sections 1501(a) and 1508. Thus, the conditions for recognition of the Administrators and the English Proceedings under Bankruptcy Code section 1517 have been satisfied.

20.     The English Proceedings and the facts of this case support the Administrators' request for additional assistance in the form of enforcement by this Court of the Initial Order of the English Court to the extent such relief cannot be granted directly pursuant to sections 105(a), 1520, and 1521 of the Bankruptcy Code. Indeed, proceedings under the English Insolvency Act have uniformly been found to meet the requirements for additional assistance set forth in section 1507(b) of the Bankruptcy Code, including: (1) just treatment of all holders of claims against or interests in the debtor's property; (2) protection of claimholders in the United

States against prejudice and inconvenience in the processing of claims in such foreign proceeding; (3) prevention of preferential or fraudulent dispositions of property of the debtor; and (4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title.[6] Accordingly, granting additional assistance to the Foreign Debtor to aid the English Proceedings is warranted and justified.

**CONCLUSION**

WHEREFORE, the Administrators respectfully request that this Court (a) enter the Recognition Order, after notice and a hearing, in substantially the form attached hereto as Exhibit B; (b) enforce the Initial Order of the English Court; and (c) grant such other further relief and additional assistance as this Court may deem just and proper.

Dated:   June 8, 2009
   Wilmington, Delaware

By: _____ /s/ Daniel Connolly _____
BRACEWELL & GIULIANI LLP
Daniel Connolly
David Albalah
1177 Avenue of the Americas
New York, New York  10036-2714
Telephone: (212) 508-6100
Facsimile: (212) 508-6101
daniel.connolly@bgllp.com
david.albalah@bgllp.com

Evan Flaschen
Katherine Lindsay
225 Asylum Street, Suite 2600
Hartford, Connecticut  06103-1534
Telephone: (860) 947-9000
Facsimile: (860) 246-3201
evan.flaschen@bgllp.com
katherine.lindsay@bgllp.com

-and-

---

[6]  Section 1507(b) provides a fifth element, "the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns," that is inapplicable to these circumstances.  11 U.S.C. § 1507(b)(5).

YOUNG CONAWAY STARGATT & TAYLOR, LLP
James L. Patton, Jr. (No. 2202)
Edwin J. Harron (No. 3396)
The Brandywine Building
100 West Street, 17th Floor
Wilmington, DE 09801
Telephone: (302) 571-6600
Facsimile:  (302) 571-1253
jpatton@ycst.com
eharron@ycst.com

*Attorneys for Alan Robert Bloom, Christopher John*
*Wilkinson Hill, Alan Michael Hudson, and Stephen John*
*Harris In their Capacity as Joint Administrators and*
*Foreign Representatives for the Foreign Debtor*

10

## VERIFICATION

Stephen John Harris declares under the penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. §1746, as follows:

Christopher John Wilkinson Hill, Alan Michael Hudson and Alan Robert Bloom and I are the administrators appointed and authorized to act as foreign representative of the Foreign Debtor, by the High Court of Justice of England and Wales. I have full authority to verify the foregoing Verified Petition for Recognition of Foreign Proceedings Pursuant to Chapter 15 of the United States Bankruptcy Code ("Verified Petition"). I have read the foregoing Verified Petition and am informed and do believe that the allegations contained therein are true and correct to the best of my knowledge, information, and belief. I also have relied on the contents of the Declaration of Sharon L. Rolston, dated June 5, 2009 ("Rolston Declaration") and Exhibit A (Witness Statement of Sharon Lynette Rolston, dated January 14, 2009) thereto, and am informed and do believe that the allegations contained therein are true and correct to the best of my knowledge, information, and belief.

Dated: London, England.
      June 5, 2009

_____
Stephen John Harris
In his capacity as Administrator for the Foreign Debtor

**EXHIBIT A**

**INITIAL ORDER**

**IN THE HIGH COURT OF JUSTICE**     No. ○○5 36  of 2009

**CHANCERY DIVISION**

**COMPANIES COURT**

**THE HONOURABLE MR JUSTICE BLACKBURNE**

**14TH JANUARY 2009**



**IN THE MATTER OF NORTEL NETWORKS UK LIMITED**

**AND IN THE MATTER OF THE INSOLVENCY ACT 1986**

---

**Draft/ORDER**

---

UPON THE APPLICATION of the directors of Nortel Networks UK Limited ("the Company")

AND UPON HEARING Leading Counsel for the Applicants

AND UPON READING the evidence relating to this Application

AND UPON THE COURT being satisfied on the evidence before it that the EC Regulation on Insolvency Proceedings 2000 ("the EC Regulation") does apply and that these proceedings are main proceedings as defined in Article 3 of the EC Regulation

AND UPON the Applicants undertaking by their Counsel that they will issue and file an Ordinary Application in the same or substantially the same terms as the draft shown to the Court

10/18042781_2

WE HEREBY CERTIFY
THIS TO BE A TRUE AND
ACCURATE COPY OF
THE ORIGINAL
Herbert Smith LLP
**HERBERT SMITH LLP**
Exchange House
Primrose Street
London EC2A 2HS
Date 4/6/2009

1

IT IS ORDERED AND DIRECTED THAT:

1. Pursuant to rule 12.9(2) of the Insolvency Rules 1986 ("the Rules"), the period of time for service of the application provided by rule 2.8(1) of the Rules be abridged.

2. Pursuant to rule 12.9(2) of the Rules, the period of time for filing evidence of service of the administration application provided by rule 2.9(2) of the Rules be abridged.

3. For the period during which this Order is in force, the affairs, business and property of the Company be managed by the Administrators appointed by paragraph 4 of this Order.

4. The Administrators of the Company shall be Alan Robert Bloom, Alan Michael Hudson, Stephen John Harris, David Hughes and Christopher John Wilkinson Hill of Ernst & Young LLP ("the Joint Administrators").

5. The responsibilities and powers of the Joint Administrators and the material effect of the making of this Order are those set out in Schedule B1 and in Schedule 1 to the Insolvency Act 1986 ("IA 1986"), and the provisions summarised in the schedule hereto will apply.

6. Pursuant to paragraph 3 of Schedule 1, IA 1986, the Joint Administrators be at liberty to enter into and to procure the Company to enter into an administration expense funding agreement (whether as borrower or lender thereunder) in the same or substantially the same terms as the draft shown to the Court, such agreement to take effect as a contract entered into by the Joint Administrators within the meaning of paragraph 99(4) of Schedule B1, IA 1986.

7. Pursuant to paragraph 66 of Schedule B1, IA 1986, provided that they consider the making of such payments is likely to assist achievement of the purpose of the administration, the Joint Administrators may make payment in respect of pre-administration liabilities of the Company.

8. The Joint Administrators, being officers of this Court, may apply to the relevant judicial authorities in any other country or territory for such assistance as they consider they may require in connection with the exercise of their functions.

9. The Joint Administrators may appoint a duly qualified professional person resident in or licensed to act in Saudi Arabia to assist them in the performance of their functions, if

they consider that it is necessary or expedient to do so for the management of the affairs, business and property of the Company, pursuant to paragraph 4 of Schedule 1, IA 1986 and/or paragraph 59(1) of Schedule B1, IA 1986.

10. Pursuant to paragraph 100(2) of Schedule B1, IA 1986, any function to be exercised or performed by an administrator may be done by all or any of one or more of the persons for the time being holding that office.

11. Pursuant to rule 7.31(5) of the Rules, the First Witness Statement of Sharon Lynette Rolston and the exhibits thereto shall not be available for public inspection without the Court's leave.

12. The costs of and occasioned by this Application, including the costs of Ernst & Young LLP, be paid as an expense of the administration.

13. This Order shall take effect from 8pm on 14 January 2009.

## SCHEDULE

1. The objectives of the Joint Administrators are those set out in paragraphs 3 and 4 of Schedule B1 to the Insolvency Act 1986 ("Schedule B1").

2. Without prejudice to the provisions of Schedule B1 and by way of summary the functions and objectives of the Joint Administrators are:

   (1) Under paragraph 3(1) of Schedule B1, the Joint Administrators must perform their functions with the objective of:

   (a) rescuing the company as a going concern ("objective (a)"); or

   (b) achieving a better result for the Company's creditors as a whole than would be likely if the Company were wound up (without first being in Administration) ("objective (b)"), but only if the Joint Administrators think that it is not reasonably practicable to achieve objective (a) or that objective (b) would achieve a better result for the company's creditors as a whole; or

   (c) realising property in order to make a distribution to one or more secured or preferential creditors, but only if the Joint Administrators think it is not reasonably practicable to achieve objective (a) or objective (b) and they do not unnecessarily harm the interests of the Company as a whole.

   (2) Under paragraphs 49-51 of Schedule B1, the Joint Administrators must make a statement setting out their proposals for achieving the purpose of administration and must, inter alia, send those proposals to every creditor of the Company of whose details they are aware.

   (3) Under paragraphs 51 and 52 of Schedule B1, unless the Joint Administrators are of the view that no monies will be available to distribute to the creditors of the Company or that creditors will be paid in full they must convene and hold within 10 weeks of the making of the Administration Order a meeting of creditors for the purposes of considering and, if thought fit, approving their proposals with or without modification or seek the approval of creditors by correspondence.

(4) Under paragraph 67 of Schedule B1, the Joint Administrators have a duty to take custody or control of all property of the Company on being appointed.

(5) Under paragraph 68 of Schedule B1, the Joint Administrators are under a duty to manage the affairs, business and property of the Company in accordance with their proposals as approved by the Company's creditors and subject to any directions that the English Court may give them.

(6) The Joint Administrators must obtain approval for payment of their fees and disbursements from the creditors of the Company or from a committee of the Company's creditors or from the English Court.

3. The powers of the Joint Administrators are those set out in Schedule B1 and in Schedule 1 to the Insolvency Act 1986.

4. Without prejudice to those provisions and by way of summary, the Joint Administrators have the following powers under Schedule B1:

(1) The power to do anything necessary or expedient for the management of the affairs, business and property of the Company.

(2) The Joint Administrators may remove and appoint directors of the Company, and no officer of the Company may exercise a management power without consent of the Joint Administrators.

(3) The Joint Administrators may convene and hold meetings of members and creditors of the Company.

(4) The Joint Administrators may apply to the English Court for directions in connection with their functions.

(5) The Joint Administrators may pay monies to secured or preferential creditors of the Company and, with the consent of the English Court, may make a distribution to unsecured creditors.

(6) In exercising their functions, the Joint Administrators act as agents of the Company.

5.   The effect of the moratorium on insolvency and other proceedings against the Company which came into effect on 14 January 2009 is set out in Schedule B1.

6.   Without prejudice to the provisions of Schedule B1 and by way of summary the moratorium has the following effect on insolvency and other proceedings:

(1)  No resolution may be passed to wind up the Company;

(2)  No order may be made for the winding up of the Company;

(3)  No step may be taken to enforce any security over the Company's property without the consent of the Joint Administrators or the permission of the English Court;

(4)  No step may be taken to repossess any goods in the Company's possession under any hire purchase agreement, except with the consent of the Joint Administrators or the permission of the English Court;

(5)  A landlord may not exercise a right of forfeiture by peaceable re-entry in relation to any premises let to the Company except with the consent of the Joint Administrators or the permission of the English Court; and

(6)  No legal process (including legal proceedings, execution, distress and diligence) may be instituted or continued against the Company or the property of the Company, except with the consent of the Joint Administrators or the permission of the English Court.

IN THE HIGH COURT OF JUSTICE                    No.    of 2009

CHANCERY DIVISION

COMPANIES COURT


THE HONOURABLE MR JUSTICE BLACKBURNE

14 TH  JANUARY 2009


IN THE MATTER OF NORTEL NETWORKS UK LIMITED

AND IN THE MATTER OF THE INSOLVENCY ACT 1986




—————————————

**Draft/ORDER**

—————————————




**HERBERT SMITH LLP**
**Exchange House**
**Primrose Street**
**London EC2A 2HS**
**Tel: 020 7374 8000**
**Fax: 020 7374 0888**
**Ref:  3946/30895329**

# EXHIBIT B

## PROPOSED FORM OF RECOGNITION ORDER

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------------ X
In re:                                          :   Chapter 15
                                                :
NORTEL NETWORKS UK LIMITED,                     :   Case No. 09 - _____
                                                :
        Debtor in a Foreign Proceeding.         :
------------------------------------------------------------------ X

### ORDER GRANTING RECOGNITION
### AND RELIEF IN AID OF FOREIGN MAIN PROCEEDINGS

A hearing having been held before this Court on June __, 2009 (the "Hearing") to

consider the Official Form B-1 Petition (the "Chapter 15 Petition") and the Verified Petition for

Recognition of Foreign Proceedings Pursuant to Chapter 15 of the United States Bankruptcy

Code (together, with all exhibits appended thereto, the "Verified Petition") of Nortel Networks

UK Limited ("NNUK" or the "Foreign Debtor") presented by Alan Robert Bloom, Christopher

John Wilkinson Hill, Alan Michael Hudson and Stephen John Harris in their capacity as court-

appointed administrators and authorized foreign representative of the Foreign Debtor (the

"Administrators"), for recognition of foreign main proceedings (the "English Proceedings")

under the *Insolvency Act 1986* (the "English Insolvency Act") pending before the High Court of

Justice of England and Wales (the "English Court"), and seeking enforcement, pursuant to

sections 105(a), 1504, 1507, 1515, 1517, 1520, and 1521 of title 11 of the United States Code

(the "Bankruptcy Code"), of the initial order of the English Court dated January 14, 2009 (as

amended or extended from time to time by the English Court, the "Initial Order") in the United

States; and upon this Court's review and consideration of the Chapter 15 Petition, the Verified

Petition, the Declaration of Sharon L. Rolston, dated June 6, 2009, and Exhibit A (Witness

Statement of Sharon Lynette Rolston, dated January 14, 2009) thereto, the Declaration of

Stephen John Harris, dated June 5, 2009, the Memorandum of Law in Support of Verified

Petition for Recognition of Foreign Proceeding Pursuant to Chapter 15 of the United States Bankruptcy Code, and all other documents filed in support of thereof on behalf of the Foreign Debtor; and this Court having concluded that appropriate and timely notice of the filing of the Chapter 15 Petition and the Verified Petition has been given; and the Hearing having been held; and upon the record of the statements made at the Hearing; and after due deliberation and sufficient cause appearing therefore, this Court finds and concludes as follows:

A.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

B.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).

C.    Venue is properly located in this District pursuant to 28 U.S.C. § 1410.

D.    These chapter 15 cases were properly commenced pursuant to sections 1504 and 1515 of the Bankruptcy Code.

E.    The Administrators are each a person within the meaning of sections 101(24) and 1517(a)(2) of the Bankruptcy Code; and the Administrators are the duly appointed foreign representatives of the Foreign Debtor, as required by section 101(24) of the Bankruptcy Code.

F.    The English Proceedings currently pending before the English Court for the Foreign Debtor constitute "foreign proceedings" within the meaning of section 101(23) of the Bankruptcy Code.

G.    The English Proceedings are pending in England, which is where the center of main interests of the Foreign Debtor is located, and are "foreign main proceedings" within the meaning of section 1502(4) of the Bankruptcy Code and under section 1517(b)(1) of the Bankruptcy Code.

2

H.      The Chapter 15 Petition and the Verified Petition meet the requirements of section 1515 of the Bankruptcy Code.

I.      The English Proceedings are entitled to recognition as foreign main proceedings under section 1517 of the Bankruptcy Code.

J.      The Administrators are entitled to all of the relief provided under sections 1520 and 1521 of the Bankruptcy Code, without limitation.

K.      The relief granted hereby is necessary and appropriate, in the interests of the public and international comity, consistent with the public policy of the United States, and warranted pursuant to sections 1517, 1520 and 1521 of the Bankruptcy Code.

L.      To the extent not already provided by virtue of sections 105(a), 1517, 1520 and 1521 of the Bankruptcy Code, and as may be necessary to effectuate the Initial Order in the United States, additional assistance pursuant to section 1507 of the Bankruptcy Code is consistent with the principles of comity as the English Proceedings reasonably assure: (1) just treatment of all holders of claims against or interests in the Foreign Debtor's property; (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in the English Proceedings; (3) prevention of preferential or fraudulent dispositions of property of the Foreign Debtor; and (4) distribution of proceeds of the Foreign Debtor's property substantially in accordance with the order prescribed by title 11 of the United States Code.

THEREFORE, IT IS HEREBY ORDERED AS FOLLOWS:

1.      The English Proceedings are recognized as foreign main proceedings under section 1517(b)(1) of the Bankruptcy Code.

2.      All provisions of sections 1520 and 1521(a) of the Bankruptcy Code apply in this chapter 15 case, including, without limitations, the stay under section 362 of the Bankruptcy Code and the provisions of section 363 of the Bankruptcy Code throughout the duration of this chapter 15 case or until otherwise ordered by this Court.

3.      Pursuant to sections 1520 and 1521 of the Bankruptcy Code and, as necessary, sections 105(a) and 1507 of the Bankruptcy Code, the Initial Order is hereby given full force and effect in the United States as to the Foreign Debtor so long as such Initial Order is in effect in the English Proceedings.

4.      Nothing in this Order shall be construed to limit, in any way, any additional relief granted by this Court or any other additional injunctive relief the Court may grant from time to time.

5.      Notwithstanding anything to the contrary in the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure or the Federal Rules of Civil Procedure, all persons and entities (other than the Administrators and their expressly authorized representatives and agents) are hereby enjoined from invoking, enforcing or relying on the benefits of any statute, rule or requirement of federal, state or local law or regulation requiring the Administrators or the Foreign Debtor to establish or post security in the form of a bond, letter of credit or otherwise as a condition of prosecuting or defending any proceeding, and such statute, rules or requirement will be rendered null and void for the purposes of such proceedings.

6.      The Administrators shall provide service and notice of this Order in accordance with this Court's Order Scheduling Hearing and Specifying Form and Manner of Service of Notice dated June __, 2009 (Docket No. __) on or before June __, 2009 which service and notice shall constitute sufficient service and notice of this Order.

7.     The Chapter 15 Petition and the Verified Petition, including all documents attached thereto, shall be made available by the Administrators upon request in writing to their counsel (i) Bracewell & Giuliani LLP, 225 Asylum Street, Suite 2600, Hartford, CT 06103, Attention Evan Flaschen (evan.flaschen@bgllp.com) and Katherine Lindsay (katherine.lindsay@bgllp.com) and (ii) Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 17th Floor, 1000 West Street, Wilmington, Delaware 19801, Attention: Edwin J. Harron (eharron@ycst.com).

8.     Notwithstanding any provision in the Bankruptcy Rules to the contrary: (a) this Order shall be effective immediately and enforceable upon its entry; (b) the Administrators are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order; and (c) the Administrators are authorized, empowered, and may in their discretion and without further delay, take any action and perform any act necessary to implement and effectuate the terms of this Order.

9.     This Court shall retain jurisdiction with respect to the enforcement, amendment, or modification of this Order, any request for additional relief and any request by an entity for relief from the provisions of this Order, for cause shown, that is properly commenced and within the jurisdiction of this Court.

June __, 2009
Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

5

# **Tab 37**

United States Code Annotated
  Title 11. Bankruptcy (Refs & Annos)
    Chapter 5. Creditors, the Debtor, and the Estate (Refs & Annos)
      Subchapter III. The Estate (Refs & Annos)

11 U.S.C.A. § 541

§ 541. Property of the estate

Effective: December 19, 2014
Currentness

**(a)** The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

**(1)** Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

**(2)** All interests of the debtor and the debtor's spouse in community property as of the commencement of the case that is--

**(A)** under the sole, equal, or joint management and control of the debtor; or

**(B)** liable for an allowable claim against the debtor, or for both an allowable claim against the debtor and an allowable claim against the debtor's spouse, to the extent that such interest is so liable.

**(3)** Any interest in property that the trustee recovers under section 329(b), 363(n), 543, 550, 553, or 723 of this title.

**(4)** Any interest in property preserved for the benefit of or ordered transferred to the estate under section 510(c) or 551 of this title.

**(5)** Any interest in property that would have been property of the estate if such interest had been an interest of the debtor on the date of the filing of the petition, and that the debtor acquires or becomes entitled to acquire within 180 days after such date--

**(A)** by bequest, devise, or inheritance;

**(B)** as a result of a property settlement agreement with the debtor's spouse, or of an interlocutory or final divorce decree; or

**(C)** as a beneficiary of a life insurance policy or of a death benefit plan.

**(6)** Proceeds, product, offspring, rents, or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case.

**(7)** Any interest in property that the estate acquires after the commencement of the case.

**(b)** Property of the estate does not include--

**(1)** any power that the debtor may exercise solely for the benefit of an entity other than the debtor;

**(2)** any interest of the debtor as a lessee under a lease of nonresidential real property that has terminated at the expiration of the stated term of such lease before the commencement of the case under this title, and ceases to include any interest of the debtor as a lessee under a lease of nonresidential real property that has terminated at the expiration of the stated term of such lease during the case;

**(3)** any eligibility of the debtor to participate in programs authorized under the Higher Education Act of 1965 (20 U.S.C. 1001 et seq.; 42 U.S.C. 2751 et seq.), or any accreditation status or State licensure of the debtor as an educational institution;

**(4)** any interest of the debtor in liquid or gaseous hydrocarbons to the extent that--

**(A)(i)** the debtor has transferred or has agreed to transfer such interest pursuant to a farmout agreement or any written agreement directly related to a farmout agreement; and

**(ii)** but for the operation of this paragraph, the estate could include the interest referred to in clause (i) only by virtue of section 365 or 544(a)(3) of this title; or

**(B)(i)** the debtor has transferred such interest pursuant to a written conveyance of a production payment to an entity that does not participate in the operation of the property from which such production payment is transferred; and

**(ii)** but for the operation of this paragraph, the estate could include the interest referred to in clause (i) only by virtue of section 365 or 542 of this title;

**(5)** funds placed in an education individual retirement account (as defined in section 530(b)(1) of the Internal Revenue Code of 1986) not later than 365 days before the date of the filing of the petition in a case under this title, but--

**(A)** only if the designated beneficiary of such account was a child, stepchild, grandchild, or stepgrandchild of the debtor for the taxable year for which funds were placed in such account;

**(B)** only to the extent that such funds--

**(i)** are not pledged or promised to any entity in connection with any extension of credit; and

**(ii)** are not excess contributions (as described in section 4973(e) of the Internal Revenue Code of 1986); and

**(C)** in the case of funds placed in all such accounts having the same designated beneficiary not earlier than 720 days nor later than 365 days before such date, only so much of such funds as does not exceed $6,225 [1] ;

**(6)** funds used to purchase a tuition credit or certificate or contributed to an account in accordance with section 529(b)(1)(A) of the Internal Revenue Code of 1986 under a qualified State tuition program (as defined in section 529(b)(1) of such Code) not later than 365 days before the date of the filing of the petition in a case under this title, but--

**(A)** only if the designated beneficiary of the amounts paid or contributed to such tuition program was a child, stepchild, grandchild, or stepgrandchild of the debtor for the taxable year for which funds were paid or contributed;

**(B)** with respect to the aggregate amount paid or contributed to such program having the same designated beneficiary, only so much of such amount as does not exceed the total contributions permitted under section 529(b)(6) of such Code with respect to such beneficiary, as adjusted beginning on the date of the filing of the petition in a case under this title by the annual increase or decrease (rounded to the nearest tenth of 1 percent) in the education expenditure category of the Consumer Price Index prepared by the Department of Labor; and

**(C)** in the case of funds paid or contributed to such program having the same designated beneficiary not earlier than 720 days nor later than 365 days before such date, only so much of such funds as does not exceed $6,225 [1] ;

**(7)** any amount--

**(A)** withheld by an employer from the wages of employees for payment as contributions--

**(i)** to--

**(I)** an employee benefit plan that is subject to title I of the Employee Retirement Income Security Act of 1974 or under an employee benefit plan which is a governmental plan under section 414(d) of the Internal Revenue Code of 1986;

**(II)** a deferred compensation plan under section 457 of the Internal Revenue Code of 1986; or

**(III)** a tax-deferred annuity under section 403(b) of the Internal Revenue Code of 1986; or

except that such amount under this subparagraph shall not constitute disposable income as defined in section 1325(b)(2); or

**(ii)** to a health insurance plan regulated by State law whether or not subject to such title; or

**(B)** received by an employer from employees for payment as contributions--

**(i)** to--

**(I)** an employee benefit plan that is subject to title I of the Employee Retirement Income Security Act of 1974 or under an employee benefit plan which is a governmental plan under section 414(d) of the Internal Revenue Code of 1986;

**(II)** a deferred compensation plan under section 457 of the Internal Revenue Code of 1986; or

**(III)** a tax-deferred annuity under section 403(b) of the Internal Revenue Code of 1986;

except that such amount under this subparagraph shall not constitute disposable income, as defined in section 1325(b)(2); or

**(ii)** to a health insurance plan regulated by State law whether or not subject to such title;

**(8)** subject to subchapter III of chapter 5, any interest of the debtor in property where the debtor pledged or sold tangible personal property (other than securities or written or printed evidences of indebtedness or title) as collateral for a loan or advance of money given by a person licensed under law to make such loans or advances, where--

**(A)** the tangible personal property is in the possession of the pledgee or transferee;

**(B)** the debtor has no obligation to repay the money, redeem the collateral, or buy back the property at a stipulated price; and

**(C)** neither the debtor nor the trustee have exercised any right to redeem provided under the contract or State law, in a timely manner as provided under State law and section 108(b);

**(9)** any interest in cash or cash equivalents that constitute proceeds of a sale by the debtor of a money order that is made--

**(A)** on or after the date that is 14 days prior to the date on which the petition is filed; and

**(B)** under an agreement with a money order issuer that prohibits the commingling of such proceeds with property of the debtor (notwithstanding that, contrary to the agreement, the proceeds may have been commingled with property of the debtor),

unless the money order issuer had not taken action, prior to the filing of the petition, to require compliance with the prohibition; or

**(10)** funds placed in an account of a qualified ABLE program (as defined in section 529A(b) of the Internal Revenue Code of 1986) not later than 365 days before the date of the filing of the petition in a case under this title, but--

**(A)** only if the designated beneficiary of such account was a child, stepchild, grandchild, or stepgrandchild of the debtor for the taxable year for which funds were placed in such account;

**(B)** only to the extent that such funds--

**(i)** are not pledged or promised to any entity in connection with any extension of credit; and

**(ii)** are not excess contributions (as described in section 4973(h) of the Internal Revenue Code of 1986); and

**(C)** in the case of funds placed in all such accounts having the same designated beneficiary not earlier than 720 days nor later than 365 days before such date, only so much of such funds as does not exceed $6,225.

Paragraph (4) shall not be construed to exclude from the estate any consideration the debtor retains, receives, or is entitled to receive for transferring an interest in liquid or gaseous hydrocarbons pursuant to a farmout agreement.

**(c)(1)** Except as provided in paragraph (2) of this subsection, an interest of the debtor in property becomes property of the estate under subsection (a)(1), (a)(2), or (a)(5) of this section notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law--

**(A)** that restricts or conditions transfer of such interest by the debtor; or

**(B)** that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title, or on the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement, and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

**(2)** A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title.

**(d)** Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

**(e)** In determining whether any of the relationships specified in paragraph (5)(A) or (6)(A) of subsection (b) exists, a legally adopted child of an individual (and a child who is a member of an individual's household, if placed with such individual by an authorized placement agency for legal adoption by such individual), or a foster child of an individual (if such child has as

the child's principal place of abode the home of the debtor and is a member of the debtor's household) shall be treated as a child of such individual by blood.

**(f)** Notwithstanding any other provision of this title, property that is held by a debtor that is a corporation described in section 501(c)(3) of the Internal Revenue Code of 1986 and exempt from tax under section 501(a) of such Code may be transferred to an entity that is not such a corporation, but only under the same conditions as would apply if the debtor had not filed a case under this title.

**CREDIT(S)**

(Pub.L. 95-598, Nov. 6, 1978, 92 Stat. 2594; Pub.L. 98-353, Title III, §§ 363(a), 456, July 10, 1984, 98 Stat. 363, 376; Pub.L. 101-508, Title III, § 3007(a)(2), Nov. 5, 1990, 104 Stat. 1388-28; Pub.L. 102-486, Title XXX, § 3017(b), Oct. 24, 1992, 106 Stat. 3130; Pub.L. 103-394, Title II, §§ 208(b), 223, Oct. 22, 1994, 108 Stat. 4124, 4129; Pub.L. 109-8, Title II, § 225(a), Title III, § 323, Title XII, §§ 1212, 1221(c), 1230, Apr. 20, 2005, 119 Stat. 65, 97, 194, 196, 201; Pub.L. 111-327, § 2(a)(22), Dec. 22, 2010, 124 Stat. 3560; Pub.L. 113-295, Div. B, Title I, § 104(a), Dec. 19, 2014, 128 Stat. 4063.)

Notes of Decisions (2841)

Footnotes

1    Dollar amount as adjusted by the Judicial Conference of the United States. See Adjustment of Dollar Amounts notes set out under this section and 11 U.S.C.A. § 104.

11 U.S.C.A. § 541, 11 USCA § 541

Current through P.L. 114-9 approved 4-7-2015

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.    6

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, et al.

Court File No. 09-CL-7950

| |
|---|
| ***ONTARIO*** <br> **SUPERIOR COURT OF JUSTICE** <br> **COMMERCIAL LIST** <br> PROCEEDING COMMENCED AT <br> TORONTO |
| **BRIEF OF AUTHORITIES OF THE JOINT ADMINISTRATORS'** <br> **TO THE MOTIONS FOR RECONSIDERATION AND CLARIFICATION** |
| **LAX O'SULLIVAN SCOTT LISUS LLP** <br> Counsel <br> Suite 2750, 145 King Street West <br> Toronto, ON  M5H 1J8 <br><br> **Matthew P. Gottlieb**  LSUC#: 32268B <br> Email:  mgottlieb@counsel-toronto.com <br> Tel:      (416) 598-1744 <br> Fax:      (416) 598-3730 <br><br> **DAVIES WARD PHILLIPS & VINEBERG LLP** <br> 155 Wellington Street West <br> Toronto, ON  M5V 3J7 <br><br> **Matthew Milne-Smith**  LSUC#: 44266P <br> Email:  mmilne-smith@dwpv.com <br> Tel:      (416) 863-0900 <br> Fax:      (416) 863-0871 <br><br> Lawyers for the Joint Administrators |