## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------X
                                 :

| | |
|---|---|
| *In re* | Chapter 11 |
| | |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| | |
|            Debtors. | Jointly Administered |
| | |
| | Re: D.I. 15544 and 15545 |
| | 15611, 15734, 15737, |
| | 15738, 15739, 15741, |
| | 15742, 15743 |
| | |
| | Hearing Date: June 25, 2015 at 9:00 a.m. (ET) |

-------------------------------------------------------X

### U.S. DEBTORS' REPLY IN SUPPORT OF THEIR MOTION
### FOR CLARIFICATION AND/OR RECONSIDERATION OF
### THE MAY 12, 2015 ALLOCATION TRIAL OPINION AND ORDER

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in

possession (collectively, the "U.S. Debtors"), hereby file this reply in further support of their

Motion dated May 26, 2015 (the "Motion") to clarify and/or reconsider the Court's May 12,

2015 Allocation Trial Opinion [D.I. 15544] (the "Allocation Opinion" or "U.S. Allocation

Opinion") and accompanying Order [D.I. 15545] (the "Allocation Order"), and in response to the

Objections and Responses to the Motions filed by (i) the Canadian Creditors' Committee (the

"CCC") [D.I. 15738] (the "CCC Br."), (ii) the Monitor and the Canadian Debtors [D.I. 15739]

(the "Canadian Br."), (iii) the Joint Administrators [D.I. 15741] (the "EMEA Br."), (iv) the U.K.

---

[1]       In addition to Nortel Networks Inc. ("NNI"), the U.S. Debtors in the Chapter 11 cases are: Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Systems International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc., and Nortel Networks (CALA) Inc.  Additional information regarding the U.S. Debtors can be found in their respective Chapter 11 petitions, which are available at http://dm.epiq11.com/nortel.

Pension Claimants (the "UKPC") [D.I. 15743] (the "UKPC Br."), (v) Wilmington Trust,

National Association [D.I. 15742] (the "Wilmington Trust Br."), and (vi) Stephen Taylor,

Conflicts Administrator for NNSA [D.I. 15737] (the "NNSA Del. Br." and collectively, the

"Oppositions").[2]

## PRELIMINARY STATEMENT

1.     The Oppositions filed by the other Nortel affiliates and creditor groups, while

opposing the reconsideration and clarification relief sought by the U.S. Debtors, demonstrate

why such relief should be granted.  What is most remarkable about the Oppositions is their

advocacy of continued uncertainty, deferred resolution of already identified disagreements (often

by virtue of their own conflicting objections), and unwarranted delay in satisfying the Court's

objectives of prompt allocations and distributions.  The U.S. Debtors brought the Motion in

response to the Court's admonition at the end of the Allocation Opinion that "[i]t is now the

parties who have to make a decision:  accept the Court's rulings and give them effect, take

appeals and thereby prolong the hardship and deplete the remaining estate, or utilize the Courts'

rulings to resolve any remaining differences," Allocation Op. at 113, and expected others to

share the same goal, which can only be accomplished by resolving differences and uncertainties

now.

2.     Despite their continued strong disagreement with the Allocation Opinion – and

their firm belief that if challenged on appeal, it would not be upheld – the U.S. Debtors pursue

their Motion with the goal of avoiding prolonged appeals and achieving finality.  Granting the

U.S. Debtors' reconsideration and clarification requests will still leave their creditors far short of

not only the recoveries the U.S. Debtors advocated at trial, but significantly less than *every* other

---

[2]     Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the
Motion or, if not defined in the Motion, the Allocation Opinion.

estate proposed that U.S. creditors receive.  In fact, granting the Motion would still likely leave Canadian creditors with nearly a complete victory in the allocation of Lockbox proceeds relative to the Canadian Debtors' requested allocation, and the EMEA estates collectively with more than the EMEA Debtors sought under their primary allocation theory.  None of the Oppositions disagree that this is the result.

3.       In that light, the vehemence of the Oppositions to the relief sought by the U.S. Debtors is surprising, especially on issues parties did not even advocate for at trial, such as respecting the validity of NNI's bondholder guarantees while not allocating to the U.S. Debtors any Sales Proceeds on their account.  Notably, when presented with the hypothetical possibility that sale proceeds would not be allocated to the U.S. Debtors on account of allowed Guaranteed Bondholder Claims that remained against NNI, the CCC's own expert testified under oath that such an outcome would be a "grossly inequitable result."  The Oppositions offer no basis for the other parties' entrenchment in the current rulings, other than that they are more favorable to those estates than they even advocated and so should remain untouched.  Perhaps no argument better reflects the Allocation Opinion's failure to satisfy the Court's stated goal of "a presumptive, baseline allocation approach which leads to an equitable result," Allocation Op. at 60, than the emphatic insistence of the Canadian Debtors that the Court did not purport to adopt a "middle ground."  Canadian Br. ¶¶ 3, 27, 64.  Because it is beyond question that by adopting an allocation methodology that provides the Canadian Debtors with nearly everything they sought, and the EMEA Debtors with even more, both necessarily at the expense of the U.S. Debtors, the Court did not come close to a middle ground.[3]

---

[3]       The Court's finding that "[t]he Monitor's value in use analysis inflates NNL's allocation," Allocation Op. at 87, and references to billion dollar reductions in NNL's allocations from both the Business Line Sales and IP Sale, strongly suggest the Court's desire for a middle ground rather than a conscious decision to award the Canadian Debtors nearly their entire desired allocation.

4.      The Oppositions are equally vociferous in their resistance to the Court clarifying other parts of its ruling, even though not doing so at this time would only lead to further uncertainty, appeals, entangled disputes and litigation in this Court.  The estates cannot make meaningful progress toward distributions to creditors until disagreements amongst the Oppositions, seen in their responsive filings, are resolved.

5.      For example, while offering no disagreement with the U.S. Debtors' position that paid settlements are included among "settlements" for allocation purposes (or with any of the examples provided in the Motion), the Canadian Debtors urge the Court *not* to clarify its Allocation Opinion.  Instead, the Canadian Debtors take a "let's argue later" approach by stating that "[t]he Courts articulated the principles" and therefore: each of the Debtors Estates should (i) propose schedules for their own process for the completion of their respective claims processes with all due speed, (ii) work collaboratively with the other Debtor Estates to develop a mechanism for interim allocations so that interim distributions can be made to the creditors of each Debtor Estate and (iii) develop procedures to implement the allocation principles outlined in the Decisions.  The parties may seek the guidance of the Courts with respect to any disputes . . . . Canadian Br. ¶ 86.  But as to the very foundation – whether the "principles" for the parties to implement include or exclude paid settlements – the Canadian Debtors urge the Court to reject the U.S. Debtors' request for guidance.  How are the parties to proceed?  And if a party disagrees with the outcome, when is it to commence an appeal?  Or must it appeal now just in case it disagrees with the future guidance the Court gives?

6.      This is far from the only example.  To give just two more examples, many of the Core Parties oppose the Court's mere establishment of procedures for the resolution of disputed claims that the Court explicitly held it "will" conduct, while both the EMEA Debtors and the Canadian Debtors urge the Court not to explain whether inter-company claims under the

allocation methodology include or exclude claims within the same Debtor Group (despite the EMEA and Canadian Debtors proffering opposite interpretations of the Allocation Opinion that each says is clear). Even though the Motion may be the last opportunity for collaboration between the U.S. and Canadian Courts to offer clarity and correct their decisions as may be fair and appropriate, the other Core Parties urge the Court to eschew this opportunity and force the U.S. Debtors to appeal on these issues. However, those parties fail to acknowledge or appreciate the potential materiality of the issues raised in the Motion to the issues and arguments that would be presented on appeal, and even the determination of whether to appeal. The Court should take this opportunity to provide the requested clarifications and not be lulled into a false comfort that leaving these known and fundamental disagreements to another day will in any way facilitate resolution of these cases.

7.      Turning to the substance of the Motion, while the Oppositions argue that the CCC's expert, Thomas Britven, previously urged the result adopted by the Courts with respect to Guaranteed Bondholder-related allocations and the U.S. Debtors failed to avail themselves of the opportunity to respond at trial, in fact, Britven testified to the contrary at his deposition: "[i]f you want to pay the bonds out of the U.S. estate then you need to put more money into the U.S. estate to pay the bondholders." Britven Dep. 284:13-15.

8.      Believing it utterly inconceivable that the Court would allow the Guaranteed Bondholder Claims in the United States without providing for a corresponding allocation to the U.S. Debtors – precisely what the Court has done in the Allocation Opinion – Britven continued:

> Q.  Now, let's say that the Courts fell for what you did hook, line and sinker in table 5, and they allocated 5 billion to Canada, 182 million to the U.S. and 2 billion to EMEA?
>
> A.  Yes, sir.
>
> Q.  And then let's say that the bondholders' claim was allowed in the United States?

MS. McEWAN: Object to form.

BY MR. ROSENTHAL:

Q.  The U.S. creditor recovery that you have on a percentage basis would plummet, correct?

MS. McEWAN: Object to form.

THE WITNESS: If you follow your math, I'm of the view the Court would see that and  understand it and take it into account in their ultimate rulings. It is a Court of equity and you're suggesting some kind of grossly inequitable result in my view. I have much more confidence in the Courts than that.

Britven Dep. 290:2-21.

9.      At trial, Britven not only reiterated this testimony, but agreed that "[i]f you are going to change the underlying assumption to have the bondholders paid out of the United States, it would require a billion-plus-dollar adjustment" in favor of the U.S. Debtors to his proposed allocation.  Trial Tr. (Britven) 3491:21-24.

10.      Being the enormous, unanticipated beneficiaries of a Court ruling that not even their expert imagined possible, the CCC – as  well as the other Core Parties, who nearly all benefited – now seek to justify the Allocation Opinion, with the CCC and UKPC going so far as to assert that this scenario was explicitly contemplated and argued by the CCC's expert and therefore reconsideration is inappropriate.  In fact, the record reveals the exact opposite.  While the other estates and creditors excoriate the U.S. Debtors even for seeking reconsideration, the U.S. Debtors seek relief that would correct for and reverse a small portion of the significant and unexpected windfall to the other estates as a means to find a resolution to these long proceedings. What is unfortunately clear from the Oppositions is that recoveries that were once inconceivable and concededly "grossly inequitable" to the U.S. Debtors (indeed, the EMEA Debtors do not contest that their recovery from the Allocation Opinion far exceeds what their primary allocation theory requested, stating only that they had an alternative theory that would have provided more,

6

EMEA Br. ¶ 21[4]) have now become lines in the sand to be defended even at the cost of years of

further litigation.  In seeking such modest changes to the Allocation Opinion in the hope that

they could avoid an appeal altogether, it is not the U.S. Debtors who are the obstacles to closure.

11.     There is no principled basis behind the Oppositions to any of the discrete

reconsideration and clarification requests, some of which are on issues with respect to which

other Core Parties either *agree* with the U.S. Debtors or disagree with each other, yet oppose

clarification.[5]  The end of this litigation can be in sight as the U.S. Debtors propose to eschew

appeal if the Motion is granted in its entirety; it is up to the Court to reject the arguments of the

parties who wish to prolong it by urging delay, confusion and "gross inequity" over immediacy,

clarity and consistency.

## ARGUMENT

### 1.    The U.S. Debtors' Reconsideration Requests

#### A.    This Court Should Reconsider Its Decision Not to Allocate Any Sales Proceeds on Account of the Allowed Guaranteed Bondholder Claims

13.     As the U.S. Debtors established in their Motion, the Court's decision to allocate

the Sales Proceeds based on all allowed claims *except* the allowed Guaranteed Bondholder

Claims against NNI was both inequitable and inconsistent with the Court's rationale for adopting

a pro rata methodology.  The Oppositions further support the U.S. Debtors' request for

reconsideration on this point.

---

[4]     NNSA expressly agrees that "the other jointly-represented EMEA Debtors as a whole will receive an allocation as high or higher than they would receive under the principal allocation methodology that the Joint Administrators advocated at trial."  NNSA Del. Br. ¶ 3.

[5]     The UKPC argue that "Rule 60(b), cited by the U.S. Debtors . . . has no applicability here," and that even if it did, the U.S. Debtors "cannot overcome the 'high hurdle' to obtain relief under that rule."  UKPC Br. ¶ 8 n.5.  But the U.S. Debtors rely upon "Rules 59(e) and 60."  Motion ¶ 22.  It is beyond reasonable dispute that in addition to satisfying Rule 59(e), the requirements of Rule 60(a) – which allows correction of any "oversight or omission whenever one is found in a judgment, order, or other part of the record" – are met by the Motion.

14.     Not one of the Oppositions argues an equitable basis for excluding the allowed Guaranteed Bondholder Claims against NNI from the allocation methodology, an adjustment which severely penalizes not merely the Guaranteed Bondholders, but to an even greater extent, NNI's general unsecured creditors in a manner not borne by any other estate's creditors.  This alone speaks volumes.[6]

15.     Rather than address the fundamental inequity of the exclusion of the allowed Guaranteed Bondholder Claims from the U.S. Debtors' allocation, the primary argument advanced in the Oppositions is that reconsideration is inappropriate because, in the words of the CCC, "the treatment of bondholder claims was at the core of the pro rata allocation model constructed by the CCC's expert, Mr. Britven."  CCC Br. ¶ 27.  *See also* EMEA Br. ¶¶ 16-17 ("the Bondholders' guarantee claim was the subject of argument and evidence was submitted to the Court" because both the UKPC and CCC offered arguments that bondholder expectations do not compel double recovery); Wilmington Trust Br. ¶ 3 ("the truth is that the Court did have the benefit of briefing of parties and expert analysis on these precise issues").  But the truth is the opposite.  Neither Britven nor Bazelon proposed the modified pro rata allocation methodology, as the Court recognized.  Instead, they each suggested that funds be allocated to effect a pro rata distribution to creditors, rather than proposing a pro rata allocation to Debtors on the basis of allowed claims (let alone limiting, as the Court did, which allowed claims will count for such allocation).  Allocation Op. at 102 ("The Court understands that the NNUK is campaigning for global substantive consolidation; and to a lesser extent the CCC is doing likewise.  The Court's

---

[6]     It is surprising that the Canadian Debtors suggest that the U.S. Debtors have held back claims information, Canadian Br. § I.B.2., given that the Canadian Debtors and Monitor have consistently refused to provide claims information, even when making claims based arguments in the same contested matters.  Hr'g Tr., Oct. 21, 2014 (the "Oct. 21 Hr'g Tr.") 16:25-17:5, 18:15-18, 19:2-4 (Monitor's counsel refusing to disclose claims information and arguing that NNL's claims should not be brought into the discussion of the PPI dispute).  In any event the Britven estimates are consistent with what the Court was presented by the CCC at trial and sufficient to illustrate to the Court the proportional and directional effect of the Allocation Opinion's methodology.

methodology departs from these views.").[7]   While each expert conceded that their proposals could be adjusted in innumerable ways, the mere suggestion that their vague positions could be modified in an undefined and unknown manner could not possibly have required the U.S. Debtors to speculate about every possible permutation or modification the Court might contemplate even if the pro rata advocates themselves did not present it.  Simply put, the Court's construction of an entirely new allocation theory not advocated by any party renders it impossible for the U.S. Debtors to have addressed these issues at trial.[8]

16.    Not only did Britven *never* suggest that the U.S. Debtors bear the responsibility to pay the Guaranteed Bondholder Claims without receiving an allocation to do so, but he declared that such an outcome would be a "grossly inequitable result" that he was confident the Court would never adopt.  Britven Dep. 290:2-21.  The U.S. Debtors did not need to respond to Britven's opinion on this issue through a competing expert or otherwise; Britven himself stated

---

[7]    The UKPC argue that the U.S. Court's recognition of NNI's $2 billion claim against NNL was intended to ensure that "NNI would be entitled to a 'greater share' of the Lockbox Funds than it would have received under the pure pro rata approach."  UKPC Br. ¶ 33 n.33.  The U.S. Debtors agree that the Court *intended* to increase the U.S. Debtors' share of the Lockbox Funds due to the "undeniable fact that NNI generated the lion's share of enterprise-wide revenues." Allocation Op. at 63.  However, the UKPC cite no basis for its bald assertion that the Court's modifications will provide NNI with a greater share of the Lockbox funds than it would have received under a "pure pro rata" approach.  Indeed, the inclusion of NNI's $2 billion claim against NNL in the modified pro rata methodology results in *NNL* receiving a greater allocation from the Lockbox.  The indirect benefit to the U.S. Debtors from NNL's increased allocation on account of NNI's $2 billion claim will depend on NNL – not the Canadian Debtors generally – receiving that allocation and thus ensuring that the allocation attributable to the U.S. Debtors' claim is not diverted to pay non-NNL Canadian creditors, a clarification that the Canadian Debtors remarkably oppose.

[8]    The case law cited by the Oppositions in support of the proposition that the U.S. Debtors have somehow waived their right to seek reconsideration and clarification because they "fail[ed] to establish a record," Wilmington Trust Br. ¶ 4, at trial assumes that the U.S. Debtors failed to argue "facts or issues that inexcusably were not presented to the court," *In re. W.R. Grace & Co.*, 398 B.R. 368, 372 (D. Del. 2008) (internal citation omitted), or that they are attempting to present "new arguments that *could have been advanced earlier*," *Transportes Aereos Pegaso, S.A. de C.V. v. Bell Helicopter Textron Inc.*, Civil Action No. 09-959, 2009 WL 2059084, at *2 (D. Del. July 10, 2009) (emphasis added).  Clearly, no party (including the proponents) could have – or did – anticipate the Court's construction of a modified pro rata allocation theory nor its decision to saddle the U.S. Debtors with the responsibility to pay the Guaranteed Bondholder Claims without receiving an allocation to do so.  Because the U.S. Debtors' arguments on this point plainly could not have been advanced earlier, they are precisely what reconsideration is intended to promote.  *Cf. Brambles USA, Inc. v. Blocker*, 735 F. Supp. 1239, 1241 (D. Del. 1990) (citing *Ray v. Lykes Bros. S.S. Co. Inc.*, 626 F. Supp. 120, 123 (E.D. La. 1985), *vacated on other grounds by* 805 F.2d 552 (5th Cir. 1986) ("[A] court should . . . reconsider any determination which, on the basis of additional briefing and later analysis, it finds inappropriate.")).

in his sworn testimony that responsibility for payment of the Guaranteed Bondholder Claims by the U.S. Debtors would require a "billion-plus-dollar" adjustment to any pro rata allocation. Trial Tr. (Britven) 3491:21-24.[9]

17.    As for the EMEA Debtors, they confuse the CCC's and UKPC's arguments at trial against double recovery for the Guaranteed Bondholders (which the Court considered and rejected[10]) with the question of whether NNI should not receive an allocation for any allowed Guaranteed Bondholder Claims (which no party advocated and the CCC's expert opined was inconceivable).[11]

18.    Other than this misguided procedural objection, the Oppositions do no more than seek to divine reasons why the Court might have desired such a grossly inequitable result had that been its conscious intent.  Thus, in their single paragraph devoted to this issue, the Canadian Debtors argue that the "exclusion of guarantee claims from the allocation claims pool is consistent with the principle of pro rata allocation based on pre-filing creditor claims to recognize the contribution of those creditors to the value of the Nortel Group as a whole, and thus to the assets that were sold."  Canadian Br. ¶ 60.  While this "principle" cannot be found

---

[9]    The CCC cites Schedule 3 of Britven's report as its sole support for its argument that the treatment of bondholder claims in a pro rata allocation was briefed to the court.  CCC Br. ¶ 27 n.10.  Consistent with Briven's sworn testimony, Schedule 3 completely supports the U.S. Debtors' position.  In Schedule 3, Britven suggests allocating $2,913 million to the Canadian Debtors, which would then have the full and *exclusive* obligation to pay the Guaranteed Bondholder Claims.

[10]    *See* Allocation Op. at 112 ("for allocation purposes the Bondholder claims will be included only against the primary obligor, but the guarantees will be entitled to seek distribution from the appropriate Debtor of any deficiency resulting from the allocation"); *see also* Canadian Op. ¶ 225 ("I agree that [the bondholders] are entitled to claim against both companies and this will be recognized in the pro rata allocation that will be ordered.").

[11]    As noted above, the EMEA Debtors never take issue (and NNSA affirmatively agrees) with the assertion in the Motion that the EMEA Debtors collectively will receive an allocation greater than advocated in the EMEA Debtors' primary allocation theory.  Instead, the EMEA Debtors and NNSA assert – with no explanation or support whatsoever – that creditors of certain EMEA Debtors may receive a lower recovery than the EMEA Debtor group as a whole (such that, conversely, other EMEA Debtors would receive correspondingly larger allocations).  *See, e.g.*, EMEA Br. ¶¶ 20, 22, NNSA Del. Br. ¶¶ 3-4.  To the extent true (and the Court has no basis even to evaluate these *ipse dixit* assertions), it is presumably because of the concern that the UKPC's inflated and duplicative claims will be allowed against multiple EMEA Debtors, thereby giving the UKPC an enormous windfall at the expense of other unsecured creditors of certain EMEA Debtors.  This, of course, is among the largest flaws of the "pro rata" approach and presumably a significant reason why the UKPC were its champion.

anywhere in the Allocation Opinion, arguments about the Guaranteed Bondholders'

"contribution" logically could only be a basis to prevent the Guaranteed Bondholders from

receiving *distributions* from multiple estates (which the Court rejected), not to deny an estate an

allocation necessary to pay its allowed claims.  If one accepts the premise that claims should be

recognized to account for the value created while generating such claims, denying an allocation

while allowing the claims penalizes primarily the U.S. Debtors' other creditors (by requiring the

U.S. share of the Lockbox funds to be spread over a comparatively larger allowed claims base

than with other estates) despite their contributions "to the value of the Nortel Group as a whole."

This is not only inequitable, but also disregards the fact NNI's guarantees of the underlying

liabilities contributed significantly "to the value of the Nortel Group as a whole, and thus to the

assets that were sold."  *Id.*; *see also, e.g.*, Canadian Op. ¶ 231 ("Thus it is quite clear from the

evidence that when Nortel went to the bond market in 2006 and 2007 to raise funds, Nortel

believed that it required the covenant of NNI in order to get the financing on terms and at a cost

that Nortel wanted."); Trial Tr. 820:24-821:15 (McCorkle) (testifying that the banks "who

arranged the loan told us that we would get much better reception, be able to raise higher

amounts and at lower interest rates with NNI's guarantee").  Thus, if anything, the Canadian

Debtors' "contribution" theory compels an allocation to the U.S. Debtors under these

circumstances.

19.     Fundamentally, treating NNI – as guarantor – significantly *worse* than the primary

obligors on the Guaranteed Bondholder debt makes no sense.  The *Canadian Debtors* received

the $4 billion proceeds from the issuance of the bonds, and yet the Court's Allocation Opinion

would impose a significantly greater burden of repayment on NNI's general unsecured creditors

relative to the Canadian Debtors' general unsecured creditors by only allocating Sales Proceeds

to the Canadian Debtors on account of the Guaranteed Bondholder Claims.  No Opposition has

articulated how that could be just or equitable.  The inequity is so great that the U.S. Debtors

submit that if only one estate is to receive an allocation on account of the Guaranteed

Bondholder Claims, NNI would rather accept that it be charged with the primary obligation to

repay the Guaranteed Bondholder Claims (notwithstanding that the proceeds went to the

Canadian Debtors) and receive a commensurate allocation for such claims, and that the Canadian

Debtors only be obligated to pay the deficiency without any respective allocation, than be

subjected to the current allocation principle.  If the Canadian Debtors view the present outcome

as fair and equitable, they would presumably have no objection to reversing roles and being

responsible only as guarantor.

20.     There is no logical basis for the Court to adopt any pro rata methodology and fail

to allocate Sales Proceeds to NNI on account of *allowed* Guaranteed Bondholder Claims.  The

Oppositions' inability to articulate how such a result can be equitable, the drastic and lopsided

effect on U.S. general unsecured creditor recoveries, and Britven's own admission that this is a

"grossly inequitable result" all support reconsideration.[12]

**B.     This Court Should Reconsider Its Decision Not to Allocate to the U.S.
        Debtors the Sales Proceeds Attributable to Businesses Owned Exclusively by
        the U.S. Debtors**

21.     The Oppositions likewise fail to offer a reasoned basis for why this Court should

not reconsider its decision not to allocate the sales proceeds attributable to the sale of Nortel

Government Solutions Incorporated ("NGS") and DiamondWare, Ltd. ("DiamondWare") –

subsidiaries owned exclusively by the U.S. Debtors – to the U.S. Debtors.  As with Britven with

respect to whether the U.S. Debtors should have received an allocation commensurate with their

---

[12]     The Guaranteed Bondholders are not similarly situated to the UKPC.  Unlike the Guaranteed Bondholders, there is a very real risk (particularly with the Court's adoption of a modified "pro rata" methodology) that the UKPC may actually recover an amount greater than their shortfall by seeking contribution from numerous affiliates.  *In the matters of Storm Funding Limited (In Administration) and other companies in administration and in the matter of the Insolvency Act 1986*, [2013] EWHC 4019 (Ch) (permitting aggregate recovery in excess of the Section 75 pension deficit amount).

liability to the Guaranteed Bondholders, the Canadian Debtors' own expert, Philip Green, conceded the U.S. Debtors' entitlement to the proceeds from the sales of NGS and DiamondWare.

22.    This Court entered an order prior to the Enterprise sale – which allowed the sale to occur in the first place – approving a stipulation and granting a lien on the Enterprise "proceeds ultimately allocated to the sale of the NGS Shares and the DiamondWare Shares" in favor of the PBGC.  [D.I. 1639-3 ¶ 3; D.I. 1658].  The stipulation also provided to the IRS a junior lien on the portion of the Enterprise proceeds attributable to NGS and DiamondWare. NNI and the PBGC agreed, and the Court ordered, that if the amount of the sales proceeds attributable to NGS and DiamondWare exceeded the amount of the PBGC and IRS liens, the excess would be remitted in equal parts to the PBGC and to NNI.  D.I. 1693-3 ¶ 4.  The Court's order expressly contemplated, indeed required, that an allocation of sale proceeds be made to the U.S. Debtors for the value of the NGS Shares and DiamondWare Shares.  To preserve its previous order, this Court must allocate those sale proceeds attributable to the sale of NGS and DiamondWare to the U.S. Debtors.  *See* Motion ¶ 34.

23.    Nearly completely ignoring the PBGC lien and the Court's direction that settlements will be respected,[13] the Oppositions instead raise incorrect procedural obstacles.  The EMEA Debtors suggest without explanation that this issue is "appropriate only on appeal," EMEA Br. ¶ 25, while the UKPC claim that "the U.S. Debtors failed to assert these arguments in their pre-trial or post-trial briefs" and thus they cannot be considered because the "U.S. Debtors

---

[13]    The only response relating to the PBGC lien can be found in one of the Canadian Debtors' 159 footnotes where they suggest the Court can disregard its prior order because it wasn't raised by the U.S. Debtors at trial. Canadian Br. ¶ 61 n.107.  But the U.S. Debtors did not have to raise this issue separately at trial; *even the Canadian Debtors* conceded at trial that the NGS and DiamondWare sale proceeds should be allocated to the U.S. Debtors (as the U.S. Debtors argued as well).  Trial Tr. (Green) 3148:9-11 ("We figured out what the values of the wholly owned subsidiaries [NGS and DiamondWare] were.  Those aren't really subject to much dispute."); *id.* 3222:5-7 (allocating "the 110 million for the US subsidiaries" to the U.S. Debtors).

had numerous opportunities to raise the argument that they should be entitled to all of the proceeds of the NGS/DiamondWare sale." UKPC Br. ¶¶ 39-41.  This can be easily disposed of: while the U.S. Debtors had no need to raise this issue because it is the law of the case and thus can't be revisited, they unquestionably *did* argue their entitlement to the entire value of NGS and DiamondWare.  TR00051 (Kinrich Report) at 9 n.34, 14 n.48.

24.     The only other argument advanced in the Oppositions (stated in multiple ways) is essentially that because the Nortel Group operated its businesses on a global, integrated basis, individual allocations in respect of NGS and DiamondWare are inappropriate.  *See* Canadian Br. ¶ 61; CCC Br. ¶ 33; EMEA Br. ¶ 26.  But that argument is plainly fallacious as applied here. Unlike assets (such as factories or individual patents) that could comprise a single, integrated business, NGS and DiamondWare were standalone, non-integrated businesses owned by the U.S. Debtors, operated that way because of legal requirements (NGS) or the recency of their acquisition (DiamondWare).  As such, the U.S. Debtors have just as much a right to the proceeds of the sale of NGS and DiamondWare as the Canadian Debtors have to keep for themselves the entire proceeds from the sale of LG-Nortel Co. Ltd and Guangdong-Nortel Telecommunications Equipment Co. Ltd or the EMEA Debtors have to retain the entire proceeds from the sale of Nortel Networks Netas Telekomunikasyon A.S., to take just a few examples.  Thus, in his expert report, the Canadian Debtors' valuation expert, Philip Green, independently valued NGS and DiamondWare at more than $100 million and allocated that entire amount to the U.S. Debtors. TR00042 (Green Report) at app. B at 10.[14]

---

[14]     The Canadian Debtors' (Canadian Br. ¶ 62) and CCC's (CCC Br. ¶ 31) assertion that the U.S. Debtors' own approach to allocation did not purport to allocate the value of NGS and DiamondWare to the U.S. Debtors is flat-out false: Mr. Kinrich's revenue-based allocation methodology by definition attributed all of the NGS and DiamondWare revenue to the U.S. Debtors and thus allocated to the U.S. Debtors their full value.  *See* (TR00051) Kinrich Report at 9 n.34, 14 n.48.

25.     Finally, the Canadian Debtors aptly note that with the consent of all of the Nortel sellers, the value of the cash on hand at NGS at the time of its sale, which was originally included in the sale price that went into the Lockbox, was released from the Lockbox and paid entirely to the U.S. Debtors.  Canadian Br. ¶ 61 n.111.  The parties' agreement on the release of all of NGS's cash to the U.S. Debtors further established the *universal* understanding at the time of its sale that NGS belonged exclusively to the U.S. Debtors; otherwise, its cash would have remained in the Lockbox and not gone to the U.S. Debtors.[15]  Green's valuation of NGS (at slightly more than $100 million) was *after* taking into account the payment of this cash.[16]

26.     In short, the Court explicitly held that it "is not adopting a pro rata distribution" because it "would make the Sales Proceeds available for distribution to all debtor entities regardless of whether a debtor sold assets in a particular sale, with the practical effect of moving cash from one Estate to another to the detriment of creditors."  Allocation Op. at 104-05.  In nevertheless failing to allocate to the U.S. Debtors the proceeds of the NGS and DiamondWare sales – businesses the other Nortel debtors did not own and thus could not and did not sell – reconsideration is appropriate.

---

[15]     Thus, the reality of the estates' agreement to release all cash from the Lockbox to NNI (and the preservation of the remainder in the Lockbox pending a determination of the *value* of the Enterprise sale attributable to NGS and DiamondWare, not *whether* NGS and DiamondWare belonged to the U.S. Debtors) thoroughly undermines the CCC's assertion that NGS and DiamondWare were shared assets because "[t]he U.S. Debtors thus agreed to place the proceeds of the sale of these assets into the lockbox."  CCC Br. ¶ 32.  *See also* UKPC Br. ¶ 41 (presumably unaware of NGS cash release to U.S. Debtors in arguing that if NNI's ownership of NGS were material to allocation, the U.S. Debtors could have "[sought] to have these proceeds released directly to the U.S. Debtors rather than paid into escrow").

[16]     In merely noting in the Motion that NGS had a book value of $331 million, the U.S. Debtors were not advocating allocation of that amount as the Canadian Debtors miscomprehend in their footnote 111.  At no time in this long proceeding did the U.S. Debtors ever propose adoption of book value as a valuation theory.  Kinrich's valuation for NGS was slightly less than $150 million (consisting of 27% percent of the value of the Enterprise assets allocable to the U.S. Debtors) and Green's was $111 million, both of which took into account the cash payment to the U.S. Debtors on closing.  It is thus a relatively narrow range in which the Court would need to perform a valuation.

**2.      The U.S. Debtors' Clarification Requests**

27.      There can be no stronger argument in support of the U.S. Debtors' clarification requests than that the Oppositions repeatedly disagree with each other in their submissions as to what the Court held.  That uncertainty and confusion easily satisfies the standard for clarification.

28.      Other than certain subjects on which other Core Parties assert the Allocation Opinion is clear (but contrary to each other's interpretations), there generally is little disagreement that some of the issues identified by the U.S. Debtors require clarification.  But the common theme urged in the Oppositions is delay – the Court should leave its Allocation Opinion unclear (and presumably either require parties to appeal prophylactically or delay the appellate process entirely) and let the parties come back in the future to resolve inevitable disagreements.  This approach makes no sense for issues so fundamental to the meaning and implementation of the Court's order and is contrary to the goal of prompt allocations, distributions to creditors and conclusion of these insolvency proceedings.

**A.      The Court Should Clarify that "Intercompany Claims" Included in the Allocation Calculation Are Claims Between Debtors Across Different Debtor Groups**

29.      The treatment of intercompany claims is an issue where there is no common or reconcilable understanding among the parties.  The Canadian Debtors assert that "the U.S. Debtors' request for clarification that intercompany claims within a Debtor Estate are ignored for allocation purposes is also unnecessary, as plainly the Courts decided that intercompany claims within Debtor Estates do not count toward allocation."  Canadian Br. ¶ 78.  The CCC "concurs with and adopts" the Monitor's assertions regarding the U.S. Debtors' requests for clarification.  CCC Br. ¶ 34.

30.     But the EMEA Debtors disagree with the U.S. Debtors', the Canadian Debtors', and the CCC's interpretation of the Allocation Opinion, asserting that the opinion "provides that *each* entity will receive an allocation and that *all* intercompany claims will be counted."  EMEA Br. ¶ 29 (emphasis in original).  Like the EMEA Debtors, the UKPC "understand the Allocation Opinions to provide that all intercompany claims should be recognized for allocation purposes." UKPC Br. ¶ 45.  NNSA similarly believes that "[t]he Allocation Order is clear" on this point and that "the continued inclusion of intercompany claims for purposes of determining the allocation to each debtor is a key basis for calling the adopted methodology a 'modified' pro rata . . ." NNSA Del. Br. ¶ 29.

31.     Given this disagreement between the Core Parties as to the Court's intent with respect to the meaning of "intercompany claims," the standard for clarification is plainly satisfied.  *See* Canadian Br. ¶ 56 ("Clarification may be given where the original judgment 'was so expressed as to lead to uncertainty or confusion' or contains a latent ambiguity" (citations omitted)); EMEA Br. ¶ 28 ("Motions for clarification should only be granted to the extent a court's judgment is vague or ambiguous.").  Frankly, the U.S. Debtors cannot understand why any party would oppose any clarification that would enable them to swiftly effectuate the Court's decision; otherwise, the different interpretations proffered by the Core Parties would stand as a continued obstacle that will require subsequent judicial resolution and thus further delay allocation and distribution.  And absent clarification, parties may be encouraged to appeal now in order to preserve their rights just in case they are wrong about what the Court ruled (because at least three Core Parties plainly are wrong, however the Court clarifies its Allocation Opinion).

32.     Substantively, defining "intercompany claims" as including only those between Debtor Groups – as the U.S. and Canadian Debtors and CCC interpret the Allocation Opinion – rather than those within a Debtor Group is consistent with the Allocation Opinion itself.  Intra-

group claims need not be abandoned, as they are an issue for local insolvency proceedings. But allowing intra-group claims to increase allocations risks significant distortion of the allocation process; indeed, it could potentially undermine entirely the Court's ruling that the UKPC claim only counts once for allocation purposes. *See* Allocation Op. at 112. This is because the UKPC have asserted claims against multiple EMEA Debtors; while the Court has held that the UKPC's claims against multiple EMEA Debtors do not each count in the allocation methodology, the identical result would be achieved if each EMEA Debtor has a claim against NNUK on account of the UKPC's claims against them. NNUK would end up with tens of billions of dollars of intercompany claims against it from the other EMEA Debtors pertaining to the UKPC's claims, thus swallowing nearly all of the allocation pool and destroying the recoveries of all non-EMEA creditors. This cannot be the Court's intended result.

33.     Similarly, the Court need look no further than its own experience with inflated, overreaching claims by EMEA Debtors; the EMEA Debtors filed multi-billion dollar claims against the U.S. Debtors, all of which were eventually settled to avoid cost, distraction and delay for a collective paid amount of $37.5 million. The EMEA Debtors are currently pursuing claims against certain of their former officers and directors, and it is reasonable (based on their litigation strategies to date, rather than the merits of any such claim) to anticipate further multi-billion dollar claims could be asserted among the EMEA affiliates arising out of the same facts and circumstances. Because the EMEA Debtors are only now just "initiating their claims procedures" more than six years into these insolvency proceedings. EMEA Br. ¶¶ 11, 53, 56, the nature and magnitude of their potential intercompany claims – and the potentially drastic impact on allocation, as well as the likely years until resolution – is wholly unknown. It would be inappropriate and inconsistent with the Allocation Opinion to leave any opportunity for any

18

estate, particularly those who have shown a propensity for claim inflation, to increase their collective allocations by pursuing further litigation against each other.

34.     The EMEA Debtors assert that the "U.S. Debtors' position leads inexorably to the conclusion that NNI is not entitled to an allocation in respect of this [$150 million] intercompany claim by NNCC" and states that "[n]either the U.S. Debtors nor Law Debenture addresses this inconsistency, which is unsurprising given that the sole purpose of the U.S. Debtors' argument regarding intercompany claims is the movement of money to the U.S. Debtors."  EMEA Br. ¶¶ 39-40.  The EMEA Debtors could not be more wrong in their accusation – the U.S. Debtors *agree* that if only inter-Group claims count, NNI would not receive an allocation in respect of the NNCC Claim.  The U.S. Debtors have never taken a contrary position.[17]

**B.     The Court Should Clarify that All Settlements Are Included in the Allocation Calculation**

35.     Although other parties oppose clarification being provided by the Court, no party openly disagrees with the U.S. Debtors' position that paid settlements are included in the Court's allocation methodology or takes issue with any specific paid settlement identified in the Motion. The EMEA Debtors assert that "the U.S. Debtors' request for the Court to clarify that claims settlements will be counted for allocation purposes appears unnecessary and redundant" because "the actual dollar value of settlements entered into by any of the Nortel debtors, whether NNI, a debtor in Canada, or a debtor in EMEA, will be included for purpose of allocation."  EMEA Br. ¶ 63;[18] *see also* NNSA Del. Br. ¶ 32.

---

[17]     Motion at A-5, ¶ 8.  By contrast, to the extent that intercompany claims are counted for allocation purposes, the U.S. Debtors would be entitled to include these intercompany claims between NNI and NNCC and, in seeking the relief requested in the Motion they in no way intend to waive their right to include those claims in such circumstances.

[18]     The EMEA Debtors propose that settlements for post-petition expenses for estate administration be excluded from such settlements.  *See* EMEA Br. ¶ 63 n.46.  Neither the EMEA Debtors nor any other party has asserted that any settlement identified by the U.S. Debtors in the Motion would be excluded on that basis and, on that condition, the U.S. Debtors would not have an objection to the further clarification sought by the EMEA Debtors.

36.     Inexplicably, the Canadian Debtors advocate for continued uncertainty, stating that "[t]he Courts articulated the principles – nothing is gained by a selective presentation of some settlements."  Canadian Br. ¶ 86.  But the U.S. Debtors do not seek to present "some settlements"; rather, they seek to clarify the "principle" itself, namely that the Court's reference to "settlements" at page 112 of the Allocation Opinion includes settlements for cash consideration as well as other allowed claims.  In asserting that the "Courts articulated the principles," while affirmatively asking the Court not to clarify what those principles are with respect to settlements, the Canadian Debtors are inviting future litigation and delay when clarity at this time would enable "each of the Debtor estates [to] propose schedules[,] work collaboratively with the other Debtor Estates to develop a mechanism for interim allocations so that interim distributions can be made . . . and develop procedures to implement the allocation principles outlined in the Decision."  Canadian Br. ¶ 86.  It is further noteworthy that while they oppose clarification, the Canadian Debtors have not disagreed that paid settlements are (or should be) considered in the allocation methodology, either generally or with regard to a single specific example offered by the U.S. Debtors in the Motion.

37.     The UKPC seem unsure as to the Court's intent with respect to paid settlements.  First ignoring the reference to "settlements" on page 112 of the Allocation Opinion, the UKPC assert that the Court "suggests" an intent to exclude paid settlements for allocation purposes.  UKPC Br. ¶ 49.  Acknowledging its uncertainty, the UKPC argue that "*[i]f* this was the Court's intent," the U.S. Debtors' request would be for reconsideration rather than clarification.  *Id.* ¶ 50 (emphasis added).  The UKPC concede, however, that "if the Court did in fact intend to include all settled claims that have been paid . . . the U.S. Debtors' request would be a permissible clarification," *id.* ¶ 51, and like EMEA, request the further clarification that it be limited to

settlements in respect of prepetition claims in the amount actually paid, rather than the claim asserted.  *Id.*

C.    **The Court Should Clarify that Sales Proceeds Allocations Will Be Made to Specific Debtors, not Debtor Groups**

38.    Once again, while opposing clarification, the other two Debtor Groups articulate diametrically opposed interpretations of the Allocation Opinion.  The EMEA Debtors assert that "the Court made clear that allocation will be to individual debtors, not debtor groups, to respect the corporate separateness of each debtor."  EMEA Br. § II.A.1; *see also* NNSA Del. Br. ¶ 33.  Accordingly, the EMEA Debtors state that clarification is unnecessary.  *Id.* ¶ 33.  The Canadian Debtors come to the opposite conclusion, asserting that "[b]oth Decisions speak of allocation to Debtor Estates"  and that "the distribution of the allocated funds to the various Debtors that comprise each Debtor Estate will be a matter for each Court to address separately."  Canadian Br. ¶ 78.  Once again, this disagreement about the meaning of the Allocation Opinion renders it a textbook case for clarification.

39.    On the substance, the U.S. and EMEA Debtors' position should prevail for a very simple reason – Sales Proceeds are only being allocated on account of specifically identifiable and calculable claims allowed against a debtor.  It would be inequitable and contrary to the most fundamental principles articulated in the Allocation Opinion to adopt a group allocation methodology that could possibly permit the diversion of any Sales Proceeds allocated on account of a specific creditor claim base to a different debtor than the one that will pay those claims.  Notably, while opposing clarification, the Canadian Debtors never articulate a contrary position on why allocation by Debtor group is appropriate, particularly in a claims-based allocation context.  *See* Canadian Br. ¶¶ 78-79.  The Canadian Debtors' further suggestion that these subsequent inter-estate allocation and distribution issues should be dealt with by the respective

local courts could divest this Court's ability to ensure that its core purpose underlying allocation is effectuated.[19]

**D.    The Court Should Establish Procedures at this Time to Enable the U.S. Debtors to Promptly Challenge Inflated Claims Asserted Against Other Estates**

40.    Through the Motion, the U.S. Debtors merely ask that the Court clarify how it "will" resolve any disputed claim or prevent claim inflation, Allocation Op. at 112, by instituting procedures "to enable the U.S. Debtors to promptly challenge inflated claims asserted against other estates, including particularly the U.K. Pension Claimants' $3 billion claim," Motion at § II.C (emphasis removed).  The EMEA Debtors concede that such oversight is necessary.  EMEA Br. § II.E ("Particular settlements, intercompany claims and reserves should be subject to review by the Courts in the event of any bona fide dispute" (emphasis removed)).  In advocating for the Court not to involve itself in resolution of disputed claims for allocation purposes, the Motion's opponents are the ones inappropriately seeking reconsideration without making a proper or timely motion or satisfying the applicable standards.

41.    The EMEA Debtors' Opposition squarely seeks to litigate issues very different from those sought in the Motion.  Focusing on the Joint Administrators' commitment to transparency, willingness to make periodic progress reports, duty to act in good faith, and appeal rights available to "creditors," EMEA Br. ¶¶ 46-48, the EMEA Debtors urge the Court to defer to "principles of comity," EMEA Br. ¶¶ 49-55, rather than give effect to its unambiguous ruling on page 112 of the Allocation Opinion.

---

[19]    The UKPC also agree with the U.S. and EMEA Debtors on this issue, stating that "[t]he fifth issue – which seeks clarification that the Lockbox Funds will be made to specific Debtor estates (not to Debtor groups) – is not controversial, and the U.K. Pension Claimants do not object to the U.S. Debtors' clarification request."  UKPC Br. ¶ 43.  The UKPC agree with the rationale that allocation to specific Debtor estates "is consistent with the Courts' holding that the modified pro rata allocation is not substantive consolidation and recognizes the corporate separateness of the Nortel entities."  *Id.* ¶ 43 n.46.  The UKPC further agree that it "ensures that Lockbox Funds are allocated to the specific debtor who will make distributions on its claims, so that the allocated Lockbox Funds are not diverted to pay other claims and diluted by other debtors' claims."  *Id.*

42.     Likewise, without citation to the Allocation Opinion, the UKPC assert that "the Courts struck the appropriate balance by limiting any proposed oversight to the unlikely situation in which the local tribunal effectively forfeited its presumption of comity through an unjust or inefficient claims process."  UKPC Br. ¶ 54.[20]

43.     These Oppositions miss the boat entirely and are utterly irrelevant.  The Court acknowledged the U.S. Debtors' "concern with inflated claims, particularly the UKPC $3 billion claim against the EMEA Debtors.  Inflated claims would, of course, skew a pro rata allocation and destroy the equitable allocation method."  Allocation Op. at 111-12.  Seeking to "answer" that precise concern, the Court ruled that it "*will* resolve any disputed claims to prevent claim inflation."  *Id.* at 112 (emphasis added).  No party has sought reconsideration of that ruling, and no party has stated that clarification is necessary.  *See* EMEA Br. ¶ 67.

44.     The only motion filed on this issue was by the U.S. Debtors seeking clarification on the *procedures* that the Court intends to follow in order to "resolve any disputed claims to prevent claim inflation" and to confirm that parties cannot evade review by this Court with respect to material future settlements.  Allocation Op. at 112.  The UKPC claim will have an enormous impact on allocations given its size, and therefore the U.S. Debtors are eager to move forward promptly so that distribution to creditors can occur.  In that vein, it is important to clarify the nature of the oversight the court intends to provide, so that no party later disputes how the Court will make such determinations.

45.     On that sole subject of the clarification request, the only responses are (i) the EMEA Debtors' effort to re-litigate what has already been decided, (ii) the UKPC's attempt to recharacterize the Court's ruling as applying only when the "presumption of comity" is forfeited and (iii) the Canadian Debtors' request for further delay.  All three should be rejected.

---

[20]     In fact, this passage wholly contradicts the Court's ruling at page 112 of the Allocation Opinion.

46.     With respect to the EMEA Debtors' improper reconsideration request and the UKPC's recharacterization of the Court's ruling, there is no basis for the Court to reverse its decision that it "will resolve any disputed claims to prevent claim inflation," a holding specifically intended to "address" the concern that the UKPC's inflated $3 billion claim would "skew a pro rata allocation and destroy the equitable allocation method." *Id.* This ruling has nothing to do with comity, the sovereignty of other jurisdictions or the like. Rather, it has to do with *this* Court's allocation of Lockbox Funds under *its* jurisdiction. This Court has every right – indeed, along with the Canadian Court, it is *exclusively* charged with the responsibility – to satisfy itself as to the propriety of any allocation of the Sales Proceeds. If the Court had the legal right to adopt a pro rata methodology as advocated by the UKPC, it surely has the power to prevent inflated claims from "skew[ing]" and "destroy[ing]" that method.[21]

47.     In their misguided argument on the wrong issue, the EMEA Debtors trumpet the rights of creditors in the U.K. to challenge claims and appeal. *See, e.g.,* EMEA Br. ¶¶ 48, 51, 52. But again putting aside that this Court has not been asked to reconsider its ruling that it "will resolve any disputed claims to prevent claim inflation," the EMEA Debtors brush completely over the fact that the U.S. Debtors are *not creditors* in the NNUK insolvency proceedings. And unlike the cross-border protocols affording the U.S. and Canadian Debtors with reciprocal standing in each other's proceedings, [D.I. 990-1], the U.S. Debtors have no such opportunity to

---

[21]     The Court's pronouncement that it "will resolve any disputed claims to prevent claim inflation" no more violates comity than its direction that "[c]laims will be recognized only once. For example, the UKPC claim will be included in the allocation calculation only once and not against multiple EMEA Debtors." Allocation Op. at 112. The UKPC, of course, are still free to continue to pursue claims against more than one EMEA debtor – as the U.S. Debtors believe it intends to do – but the Court's ruling limits the *allocation* of Sales Proceeds under its jurisdiction on account of such duplicative claims, just as a finding by this Court that the UKPC claims are inflated will have the effect of limiting the *allocation* from the U.S. Lockbox on account of these claims and not the UKPC's right to pursue in full such claims in the local fora.

challenge claims against EMEA debtors. [22]  Ensuring that no allocation is given by *this* Court in

respect of the amount by which any EMEA claims are inflated is the U.S. Debtors' only

opportunity to protect its interests regarding claims amounts that will affect the U.S. Debtors

ultimate allocation.

48.     The Canadian Debtors have little to say on this issue other than again urging

delay.  Notwithstanding the Court's instruction that the "administrative steps for allocation . . .

be prompt, fair and definitive, thereby addressing the concerns expressed by those opposing a

pro rata allocation," Allocation Op. at 112, the Canadian Debtors suggest that the Court should

refrain from ordering *any* steps with regard to this specifically identified concern but instead

"[w]ith respect to the EMEA Debtors' claims processes, the Courts will be available to resolve

any issues that may arise."  Canadian Br. ¶ 85.  But they do not say how or when issues "may

arise" in the absence of procedures.  As it is wholly inconsistent with the Court's clear directive

for prompt resolution, that plea to defer consideration of procedures for the future should be

rejected. [23]

**E.     The Court Should Reserve for Certain Claims Before Pro Rata Allocation**

49.     There is no principled basis on which to oppose the U.S. Debtors' request for a

reserve with respect to claims that will not be liquidated at the time of allocation, such as tax

claims.  The EMEA Debtors, for example, agree that "some mechanism is appropriate to

estimate and reserve so that unresolved prepetition claims do not hold up the allocation process."

---

[22]     For the same reason, NNSA's citation to "a protocol covering the treatment of claims which has been entered into between the *Joint Administrators and the NNSA Liquidator*" is meaningless to the protection of the U.S. Debtors' rights.  NNSA Del. Br. ¶ 35 (emphasis added).

[23]     Certain objectors also quibble about the scope of rights the U.S. Debtors and this Court have with respect to the claims filed against the Canadian Debtors.  *See, e.g.*, UKPC Br. ¶ 64.  In addition to the rights granted under the cross border claims protocol, the U.S. Debtors have additional rights to be heard with regard to claims matters under other Canadian court orders.  *See, e.g.*, Canadian Claims Procedure Order, July 30, 2009.  However, in seeking confirmation of the procedures that would be implemented, the U.S. Debtors did not in any way intend to limit their rights or the jurisdiction of the Court with regard to claims against the Canadian Debtors.

EMEA Br. ¶ 64.  But after acknowledging the reasonableness of the request for a reserve, the

EMEA Debtors draw a false distinction between prepetition and post-petition claims that finds

no basis in the Allocation Opinion.  *See* EMEA Br. ¶ 66.  While rationalizing it on the basis that

the "expenses of estate administration . . . should not be considered claims for purposes of

allocation," *id.*, post-petition taxes are plainly not "expenses of estate administration" even if the

Court intended to exclude the latter category of expenses.

50.     The other arguments against this request are virtually identical to those made in

opposition to other requests, such as the UKPC's claim that it is a "new argument," UKPC Br.

¶ 65; that "[t]axes will have had to be paid under any allocation theory, and the Debtors' tax

attributes available to shield that tax liability will not depend on the allocation methodology," *id.*;

and that "the Courts' modified pro rata allocation is based on the Courts' factual findings about

the collective efforts of the Debtors' Estates, prior to insolvency proceedings, that created the

value realized in the asset sales."  Canadian Br. ¶ 81.

51.     These arguments are all baseless.  The need to reserve for tax claims plainly was

not an issue until the Court created its modified pro rata methodology in the Allocation Opinion

and decreed that it would effectively set a "bar date" for the resolution of claims for purposes of

counting toward allocation.  No party advocated such an approach and, therefore, the U.S.

Debtors were never on notice that they needed to argue in favor of a reserve in case the Court

decided *sua sponte* to adopt an allocation methodology that excluded claims triggered by

allocation itself.

52.     The UKPC's secondary argument misses the mark entirely.  While they are

correct that taxes would have to be paid under any allocation theory, it is only the pro rata theory

that allocates based upon claims, thereby making the different available tax attributes and

different amounts of taxes that may be owed relevant to allocation.[24]

    53.    As for the Canadian Debtors' divination that the basis for the Court's modified

pro rata allocation was a qualitative assessment of value creation associated with individual

claims (for which no support is cited), there is nothing in the Allocation Opinion that would limit

allocation to claims that "created the value realized in the asset sales." *Id.* To the contrary, there

is no question that pre-petition tax claims, claims for expenses associated with failed research

and development, liabilities incurred with respect to shuttered businesses and so on all count in

the allocation methodology regardless of whether or not value was obtained in return. Even had

the Court imposed such a requirement, post-petition tax claims would satisfy any criteria; the

$7.3 billion in value realized for the Nortel Group's creditors through the asset sales was not

possible without the incurrence of corresponding tax liability and, therefore, the U.S. Debtors

should not be left with a disproportionate (or potentially sole) burden to pay taxes associated

with the Assets Sales without any corresponding allocation.

    54.    The Canadian Debtors' final arguments that "the exclusion of post-insolvency

expense claims is *implied* by the Courts' treatment of cash on hand" and that the "Canadian

Court noted that claims against the U.S. and Canadian Debtors largely have been resolved"

without mentioning post-petition claims, *id.* ¶¶ 82-83 (emphasis added), find no support in the

Allocation Opinion.[25] The silence of the Courts (and particularly the U.S. Court) is precisely the

reason why clarification is appropriate; it may well be that the Court intended its silence to be

construed as a determination that tax claims are to be included or disregarded, but it may also be

---

[24]    The UKPC's additional argument that a tax reserve is unduly complex is hardly worth mentioning. Tax gross-ups based upon estimated taxes are extremely common, straightforward and implemented in business transactions every day.

[25]    Moreover, material claims against the Canadian Debtors indisputably remain unresolved; in fact, only a small minority of such claims have yet been allowed.

that the Court was silent because it did not consider the issue at all and thus now needs to address it. If the latter, there is no basis for the Court to exclude claims incurred by the U.S. Debtors not for the administration of their own estates, but as part of the realization of value from the sale of Nortel's assets.

**3.     Creditor Recoveries Are Only Relevant to the Reconsideration Motion Because the Court Made Them Relevant in the Allocation Opinion**

55.     Finally, much has been made of the U.S. Debtors' discussion of creditor recoveries derived from the CCC's Britven report. All of the Oppositions' criticisms are off-base.

56.     For the avoidance of doubt, the U.S. Debtors believed at the time of the allocation trial, and continue to believe today, that creditor recoveries are irrelevant to the allocation of the Lockbox funds. If forced to pursue an appeal of the Allocation Opinion, the Court's adoption of any pro rata methodology – which based allocation on the amount of creditor claims against a debtor – will be a primary basis of challenge by the U.S. Debtors.

57.     But given that the Court crafted a *claims-focused* pro rata allocation methodology, it is appropriate to identify for the Court how its modifications, ostensibly to address the U.S. Debtors' concerns, Allocation Op. at 112, significantly diminish the recoveries to the U.S.-Only Unsecured Creditors in a manner that undermines the Court's stated rationale for adopting such an approach. In so doing, the U.S. Debtors do not endorse Britven's proposed methodologies or calculations, but point out that even under his approach, the Court's modifications are "grossly inequitable."[26]

---

[26]     In its joinder to the Canadian Opposition, Wilmington Trust argues without support that "[t]he question of equity is invoked not by each Debtors' allocation of the Lockbox proceeds, but by the eventual recoveries by the creditors." Wilmington Trust Br. ¶ 6. It claims that the Motion's citation to inequity as a basis for the Court to clarify and/or reconsider its Allocation Opinion is "irrelevant" for that reason. *Id.* Notwithstanding that (as discussed further below) the creditor recoveries from the Lockbox are inequitable, Wilmington Trust's argument runs counter to the Court's avowed "task" of "arriv[ing] at a fair and equitable mechanism to *allocate* the billions of dollars of Sales Proceeds . . . ." Allocation Op. at 91 (emphasis added). The U.S. Debtors merely ask the Court to

58.     As an initial matter, the U.S. Debtors' reconsideration and clarification requests do not rely on the illustrative recovery analysis from Britven's data presented in the Motion. Rather, this was presented to the Court primarily to show the relative directional and proportional impact on U.S. general unsecured creditor recoveries from the Court's decision not to allocate any Sales Proceeds on account of the Guaranteed Bondholder Claims against NNI. Whether or not one makes *any* adjustments to Britven's data, the effect of a non-allocation to the U.S. Debtors for these allowed claims is a dramatic and inequitable reduction in the recoveries to the U.S. general unsecured creditors such that their payout on their claims attributable to the Sales Proceeds is orders of magnitude less than the unsecured creditors of the other Debtor estates.

59.     The Oppositions to the Motion play a veritable shell game with Britven's computations and the U.S. Debtors' unassailable modifications to them.  The major ones are dealt with in turn below.

60.     First, the Canadian Debtors argue that there is nothing "manifestly unjust" about creditor recoveries of "40% to the general unsecured creditors of the U.S. Debtors (as compared to 49% for the unsecured creditors of the Canadian Debtors)."  Canadian Br. ¶¶ 6, 34, 35, 70. But even if one were to accept Britven's model for purpose of this argument, those creditor recoveries are *not* achieved from the *allocation of the Lockbox funds* – the *sole* task the Allocation Opinion purports to undertake – but only as a result of the distribution of assets *outside* the Lockbox funds.  Indeed, the Court took great measures to rule explicitly that it was excluding from its modified pro rata methodology any increased recovery resulting from an estate's cash-on-hand or the U.S. Debtors' $2 billion claim against the Canadian Debtors.  That

clarify and/or reconsider discrete aspects of its Allocation Opinion in order to conform with the Court's own articulation of its principles of equity, a proposition which we trust the Court will not find "irrelevant."

is because off-setting or reducing the allocation to which a party is entitled by its pre-existing

cash or the U.S. Debtors' intercompany claim (for which it, *inter alia*, paid cash to Canada)

would be further evidence of cross-border substantive consolidation, which the Court expressly

held was inappropriate here.

61.    In arguing the relative equities of a 40% recovery for the general unsecured

creditors of the U.S. Debtors versus a 49% recovery for the unsecured creditors of the Canadian

Debtors, the Canadian Debtors (and all of the other opponents to the Motion) ignore the Court's

central holding that its "modified pro rata" allocation was directed exclusively to the *Sales*

*Proceeds* without regard to other assets.  *See* Allocation Op. at 63 ("The Court is merely ordering

that each estate be allocated a pro rata share *of the Sales Proceeds* based on the amount of the

claims against it") (emphasis added); *id.* at 112 ("the amount in the Lock Box will be divided by

the total claims and each Estate will be allocated its proportionate amount").[27]  And when we

focus exclusively on how the Sales Proceeds are divided – again, the sole task at hand for the

Court – the analysis in the Motion is uncontested that based on Britven's own data (with which

the CCC tellingly does not disagree), under "modified pro rata," the average U.S. unsecured

creditor will receive a distribution amounting to 14% of its claim on account of the Sales

Proceeds, the average Canadian unsecured creditor will receive a distribution amounting to 47%

of its claim (or its deficiency after its claim is partially satisfied by other sources), and the

average EMEA unsecured creditor will receive a distribution amounting to 48% of its claim on

account of the Sales Proceeds.  That is a far cry from "pro rata" allocation and it is manifestly

---

[27]    The Oppositions' references to higher recoveries for U.S. general unsecured creditors (such as the EMEA Debtors' claim of 62%, EMEA Br. ¶ 22) depend upon the $4 billion allowed Bondholder Guarantee Claim against the U.S. Debtors being disregarded and instead limited to a deficiency claim, which the Oppositions all disclaim is the intent or effect of the Allocation Opinion.  *See, e.g.*, EMEA Br. ¶ 22, n.14 (acknowledging that unless the allowed Bondholder Guarantee Claim is limited to the deficiency, the correct figure is 40%, not 62%).  *See also* CCC Br. ¶ 23, n.6 (acknowledging that 62% recovery depends on reduction of allowed Guaranteed Bondholder Claim).  The UKPC simply refer to 75% to 62% as fact without even acknowledging this contingency.  UKPC Br. ¶¶ 3, 30.

unjust in light of the principles espoused by the Court that led it to embrace pro rata allocation in the first place.  And it cannot be justified – as the opponents of the Motion seek to do – by reference to additional recoveries U.S. creditors will receive from other assets without the Court completely rewriting the rationale of its Allocation Opinion.  The fact that the Oppositions' sole response to this stark contrast between the U.S. Debtors' creditors' supposed "pro rata" share of the Sales Proceeds as compared to creditors of the other debtors is to argue that "the U.S. creditors have more outside what is being allocated" truly underscores and concedes the failure of modified pro rata to achieve its stated purpose.

62.    Second, the U.S. Debtors are not offering new evidence on this Motion.  We are offering no evidence at all.  Britven's methodology and data were all offered into evidence by the CCC, and the U.S. Debtors' modifications are nearly entirely based upon undeniable facts in this Court's record.  For example, the modification of Britven's data to account for the actual UKPC claim allowed by the Canadian Court ($495 million)[28] rather than Britven's trial projection ($880) is unassailable.  The same is true for the amount of the NNUK claim allowed by the Canadian Court's order granting the EMEA settlement motions ($123 million).  Additionally, Britven's data omitted the U.S. Debtors' settlement with the EMEA Debtors and the UKPC ($75 million) that was paid in cash in early 2014.[29]  While the U.S. Debtors did make minor adjustments to the estates' current cash balance, for example, to take into account more recently filed public information, these adjustments were immaterial and have virtually no effect

---

[28]    This number is calculated using the £339 claim allowed by the Canadian Court and the foreign exchange rate on the Canadian bar date.

[29]    For this reason, the U.S. Debtors used the most recently reported current cash balance by each Debtor Group in its original Exhibit A.  *See* Motion at A-4 to A-5.

on the modified calculations.  The Court can disregard any adjustments that it believes are not within the indisputable record without much effect.[30]

63.    Third, the oft-repeated allegations that the U.S. Debtors could have, but chose not to, presented this recovery analysis at trial is simply wrong.  No party advocated the particular modified pro rata methodology adopted by the Court; indeed, when presented hypothetically with the possibility that the U.S. Debtors might have to make some payment to the Guaranteed Bondholders without any corresponding allocation from the Lockbox funds, the CCC's own expert retorted that "I have much more confidence in the Courts than that" given what a "grossly inequitable result" that would be.  Britven Dep. 290:2-21.  In short, the U.S. Debtors could not have anticipated every theoretical permutation of a "modified" pro rata allocation (particularly where only a pro rata distribution was proposed at trial) and presented the Court with a recovery analysis reflecting each such permutation; and they certainly could not have done so, nor were they required to do so, with respect to the one that even the CCC's expert dismissed as inconceivable.[31]

64.    Fundamentally, not a single one of the U.S. Debtors' reconsideration and clarification requests depends on the illustrative recovery analysis from Britven's data presented in the Motion.  With or without that data, it is clear that providing the U.S. Debtors no allocation for $4 billion of allowed Guaranteed Bondholder Claims, and the Court's failure to grant the Motion's other requests, will unjustly devastate recoveries specifically for general unsecured creditors of the U.S. Debtors and contradict the Court's stated principles of equity and fairness.

---

[30]    The EMEA Debtors refer to "flawed numbers" without explanation or citation.  EMEA Br. ¶ 5. The UKPC state that the U.S. Debtors "ignore other adjustments that would have the effect of enhancing U.S. creditor recoveries" without identifying any such adjustments or effects.  UKPC Br. ¶ 31.

[31]    Likewise, the Canadian Debtors cite Mr. Bazelon's testimony that modification of the pro rata approach "was possible" to assert that these particular outcomes were intended by the Court.  Canadian Br. ¶ 28.  Of course, not even Bazelon suggested that both the Canadian Debtors and NNI pay the Guaranteed Bondholders but only the Canadian Debtors receive any allocation to do so.

## <u>CONCLUSION</u>

For the reasons set forth herein, the U.S. Debtors respectfully request that the Court reconsider and/or clarify the "modified pro rata" methodology detailed in the Allocation Opinion and accompanying Order in accordance with the relief sought in the Motion, and grant such other and further relief as it deems just and proper.

Dated: June 22, 2015
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

Howard Zelbo (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Jeffrey A. Rosenthal (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

   - and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


   */s/ Andrew R. Remming*
Eric D. Schwartz (No. 3134)
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Tamara K. Minott (No. 5643)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile:  (302) 658-3989

*Counsel for the U.S. Debtors*
*and Debtors in Possession*

34