IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------ X
                                :

*In re*                           :      Chapter 11

Nortel Networks Inc., *et al.*,      :      Case No. 09-10138 (KG)

                   Debtors.[1]    :      Jointly Administered

------------------------------------------------------------ X

**REPLY OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF NORTEL NETWORKS INC., ET AL. IN FURTHER SUPPORT
OF THE U.S. DEBTORS' MOTION FOR RECONSIDERATION**

The Official Committee of Unsecured Creditors (the "Committee") of Nortel Networks Inc. ("NNI") and certain of its U.S. affiliates, as debtors and debtors in possession (collectively, the "U.S. Debtors"), by and through its undersigned counsel, hereby submits this Reply (the "Reply") in further support of the *U.S. Debtors' Motion for Clarification and/or Reconsideration of the May 12, 2015 Allocation Trial Opinion and Order* (D.I. 15611) (the "U.S. Debtors' Motion for Reconsideration")[2] and the Committee's *Joinder with Reservation of Rights* (D.I. 15613), and in response to the objections made by the Monitor and the Canadian Debtors (the "Monitor") (D.I. 15739), the Canadian Creditors' Committee (the "CCC") (D.I. 15738), Wilmington Trust, National Association (D.I. 15742), the Joint Administrators for the EMEA

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226) ("NN CALA").

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the U.S. Debtors' Motion for Reconsideration or in the *Allocation Trial Opinion* (D.I. 15544) and *Order* (D.I. 15545).

Debtors ("EMEA") (D.I. 15741), the U.K. Pension Claimants (the "UKPC") (D.I. 15743), and the Conflicts Administrator for Nortel Networks SA ("NNSA") (D.I. 15737).

I. **RECONSIDERATION AND CLARIFICATION ARE APPROPRIATE**

1. The multiple objections to the U.S. Debtors' Motion for Reconsideration underscore the fundamental reason why reconsideration is appropriate: After conducting an allocation trial pursuant to an agreed Allocation Protocol – separate and distinct from a Claims trial conducted solely in the Canadian Court – it is manifestly unjust that the U.S. Court then used an incomplete and undeveloped record regarding worldwide claims to craft a "modified pro rata" methodology of asset allocation. The U.S. Court thereby "made a decision outside the adversarial issues presented by the parties," which, as shown below, is appropriate for reconsideration.[3]

2. The Committee continues to believe that the entire basis of the Allocation Opinion – the "modified pro rata" theory – has no basis in law and no justification in equity. As the fiduciary for all U.S. general unsecured creditors, the Committee fully reserves its right to appeal the *Allocation Opinion* and *Order*, regardless of the outcome of the U.S. Debtors' Motion for Reconsideration and regardless of whether the U.S. Debtors decide to appeal the *Allocation Opinion* and *Order*. Nevertheless, in order to foster the potential of a consensual resolution of these cases prior to the commencement of a lengthy appellate process, the Committee believes that the parties should be ordered to engage in a mediation or other well-defined settlement process. Yet due to the manifest injustice and the potential ambiguities described in the U.S. Debtors' and the Committee's prior pleadings, reconsideration and clarification should take place before any such process.

---

[3] The Committee has joined in the U.S. Debtors' motion for corresponding relief from the Canadian Court.

2

3. The question presented in the Allocation Trial was to determine the value that each of the Nortel debtors relinquished in the sales of the lines of business and the residual patent portfolio. The U.S. Court and the Canadian Court jointly framed the structure of the litigations such that allocation was to be tried first, followed by a trial on the claims being asserted by the EMEA Debtors and the UKPC. "The Court will begin the trial with the allocation issues and continue thereafter with remaining issues to be addressed in the Allocation Protocol, including EMEA claims and U.K. Pension matters." Order Approving Allocation Protocol (TR50215, D.I. 9947) (April 3, 2013), ¶ 4. The detailed Allocation Protocol approved by both the U.S. Court and the Canadian Court clearly provided that the subject of the Allocation Trial was allocation, not claims:

> The purpose of this Allocation Protocol is for the U.S. and Canadian Courts to set forth *binding procedures for determining the allocation of the Sale Proceeds* among the Selling Debtors .…  Subject to paragraphs 5 and 6 hereof, *creditor claims*, including but not limited to intercompany claims by and between any Nortel entities, their representatives or successors ("Intercompany Claims") *are not governed by this Allocation Protocol*.

Order Approving Allocation Protocol (TR50102, D.I. 10565) (May 17, 2013), Sched. A, at 1 (defined terms omitted) (emphasis added). Paragraphs 5 and 6 of the Allocation Protocol related to the EMEA Claims and UK Pension Claims, respectively, that were to be the subject of a separate Claims Trial. As the U.S. Court is aware, the U.S. Debtors entered into a settlement with EMEA and UKPC in December 2013, rendering moot the need to have a claims trial in the United States.

4. This framing of the adversarial issue was entirely consistent with the IFSA, pursuant to which all of the Sales Proceeds were realized. Section 11(a) of the IFSA provided:

> 11. <u>Relinquishment of Intellectual Property Licenses</u>
>
> Each of the US Debtors and the EMEA Debtors hereby agrees to enter into an Appropriate License Termination … with respect to the licenses and rights granted by NNL to such Debtors under or pursuant to the provisions of the [MRDA] … for the purpose of facilitating, and *in consideration of a right to an allocation*….

TR12032 (D.I. 874-3, D.I. 993), Section 11(a).

5. Indeed, the Allocation Protocol "set forth binding procedures for determining the allocation of the Sale Proceeds among the Selling Debtors," and that "creditor claims … are not governed by this Allocation Protocol." Accordingly, most of the parties, including the U.S. Interests, did not provide the Courts with evidence regarding the claims asserted against the various Debtors worldwide. Nevertheless, the CCC offered the expert report of Thomas Britven, who offered an "illustrative" analysis of worldwide claims in order to justify a pro rata allocation of assets. Britven's report drew significant criticism, notably for his Schedule 6 with its erroneous assumptions – based on "Counsel instructions" – regarding claims against various Nortel debtors and the cash in the various estates. The U.S. Interests did not provide a rebuttal expert because Britven's assumptions were not relevant to the trial issues set out in the Allocation Protocol. The U.S. Interests' decision not to present trial evidence on claims or recoveries was neither tactical nor strategic, as is now alleged. Rather, it was in reliance on the clear statements of the Court that the trial was not about claims or recoveries.

6. Even at the close of the evidentiary portion of the trial, the U.S. Court indicated that it did not consider information regarding the assets and claims of each of the debtors to be relevant for allocation. In a joint U.S.-Canadian telephonic conference regarding various procedural matters on June 27, 2014, three days after the last allocation witness testified, counsel for the UKPC stated:

> We have written on behalf of the UKPC to each of the estates – and I won't go through the details, but a very brief note asking for *their best estimate of the assets in the various estates and the claims*. And we think that would be beneficial for the Court to have for the purposes of the allocation argument.

Transcript of June 27, 2014 telephonic hearing (D.I. 13906), 20:19-24 (emphasis added).

Following an objection and colloquy, the U.S. Court and the Canadian Court responded:

> THE COURT:  *Well, I'm not sure how it's relevant.*
>
> JUSTICE NEWBOULD:  What I was going to say is I don't know if it's relevant or not. I don't know if it's helpful or not. If somebody doesn't want to provide the information, there's no reason why they should provide the information. I just don't know whether it's helpful or not until I see the argument. I'm not fussed about it, but I don't think anybody should be obliged to file information if they don't want to.
>
> THE COURT: You know, what you want to exchange as far as this type of information in your private discussions, you know, that's something you should discuss and if you agree, fine; if not, fine, too. But as far as I am concerned, based upon the evidence that I heard, *I don't know how that would be helpful in my determining allocation. In fact, it may be harmful ….*

*Id.*, 22:14 – 23:4 (emphasis added).

7.  Despite the clear framing of the adversarial issue as allocation of the value of the various debtors' interests in the property held in the lockbox, and *not* the quantum or nature of claims asserted against each estate, the U.S. Court rejected the allocation methodologies presented by the Debtor estates and determined that the adoption of a "modified pro rata" approach "clearly yields the most equitable result in these circumstances." (Op. at 63). Yet how could the U.S. Court determine "the most equitable result" without financial analysis of what the "modified pro rata" approach would produce? Because the U.S. Interests relied upon the Court's framing of the issue for the Allocation Trial, and because the only evidence regarding the claims against the estates was the flawed evidence presented by Britven, it is entirely appropriate for the U.S. Interests to now ask the Court to reconsider its decision. Financial

analysis provided by the U.S. Debtors, using the Court's announced "modified pro rata" methodology – even using the flawed Britven Schedule, as adjusted with publicly available information, including the data in the U.S. Debtors' Monthly Operating Reports – shows that the resulting Lockbox allocation will be manifestly unjust. The Court apparently would allocate even less to the U.S. estate than the Monitor had advocated, and even more to EMEA than the Joint Administrators had requested. (Committee Joinder, D.I. 15613, ¶ 5.) The outcome of this flawed methodology is that U.S. non-bondholder general unsecured creditors ("U.S. GUCs") would receive a significantly lower recovery than the general unsecured creditors of other estates, notwithstanding that the U.S. Debtors were demonstrably the economically healthiest of the three large Nortel estate groups. It is ironic and manifestly unfair that because of the relatively healthy cash flow and wherewithal of the pre-petition U.S. Nortel group, the U.S. estate has a lower non-bond general unsecured claims base than the other estates, all of which works to the detriment of U.S. GUCs in a claims-driven "modified pro rata" allocation methodology.

        8.     Courts have found reconsideration appropriate "to prevent manifest injustice," including when a court "has made a decision outside the adversarial issues presented by the parties". *See MAS Litigation Trust v. Plastech LDM (In re Meridian Auto. Sys.)*, No. 05-11168 (MFW), Adv. Proc. No. 07-51195 (KG), 2008 Bankr. LEXIS 61, at *3-4. It is not fair to the parties for the court to structure a litigation to focus on one issue and then adjudicate something else. *See, e.g., Pirelli Cable Corp. v. Ciena Corp.*, 988 F. Supp. 424, 447 (D. Del. 1997) ("Pirelli correctly argues that it is inappropriate in a *Markman* hearing for a court to make a § 112, ¶ 6, equivalents determination without first alerting the parties so that they have the opportunity to provide a full record on the 'equivalent' issue"). Accordingly, because the

Allocation Opinion makes a decision "outside the adversarial issues presented by the parties," and is manifestly unjust to U.S. general unsecured creditors, reconsideration here is appropriate.

9. Apart from reconsideration, clarification on a number of items is entirely appropriate. Consider, for instance, the issue of whether the Court has instructed that allocation will be done by individual Debtor corporations, or by the geographical Debtor Groups (*i.e.*, Canada, U.S., EMEA). Both the Monitor and EMEA say there is no need for clarification on this issue, because the Opinion and Order are clear and unequivocal. Yet the Monitor says the Opinion and Order clearly provide for allocation by debtor groups (see Monitor Obj. ¶¶ 77-78), while EMEA says they clearly call for allocation by individual debtor (¶¶7, 29-33). Additionally, clarification of the treatment of the tax claim is appropriate. Failure to take into account the tax claim will diminish recoveries to U.S. general unsecured creditors, both as a result of a smaller distribution from the Lockbox, as well as decreasing the net amount of such already diminished recoveries. And by sheer happenstance of valuable tax credits for R&D in Canada, the Canadian estates will be able to shelter all income from the sale proceeds, while the U.S. estates likely will incur a substantial administrative expense priority claim that will reduce U.S. proceeds dollar for dollar. That is manifestly unjust. On this issue, as well as others, confusion and fairness warrant clarification.

## II. EQUITY REQUIRES THAT THE COURT RECONSIDER ALLOCATION FOR THE CROSSOVER BONDS' GUARANTEE CLAIM

10. As previously noted, the Committee submits that the Court's principles of allocation must be reconsidered to prevent manifest injustice. Assuming, *arguendo*, the continued application of the "modified pro rata" methodology, the Crossover Bond guarantee claims that will be asserted against the U.S. Debtors must be counted when calculating the U.S. Debtors' allocation from the Lockbox. (*See* D.I. 15613, ¶ 8.) The size of the Crossover Bond

7

guarantee claims is presently expected to exceed the total of all other U.S. GUC claims – whether as a "shortfall" deficiency claim or as a claim in the full outstanding principal amount. Without an allocation to account for this claim, the result will be a massive dilution of recoveries to the U.S. GUCs. Among those harmed by this massive dilution are trade claimants and more than 22,000 participants in the Nortel Retirement Income Plan. While not holding direct claims, the Nortel plan participants will benefit from the recoveries by the Pension Benefit Guaranty Corporation for its statutory claim related to the plan's unfunded benefit liabilities. 29 U.S.C. §§ 1322(c), 1362(b). Although all of the objecting parties contend that there should be no reconsideration of this point, no one articulates why it would be equitable to require NNI to pay the enormous Crossover Bond guarantee claim without getting any allocation in respect of such claim.

        11.     The Monitor's objection on this point must be rejected. The Monitor argues that the exclusion of the guarantee claims from allocation "is consistent with the principle of pro rata allocation based on pre-filing creditor claims to recognize the contribution of those creditors to the value of the Nortel Group as a whole, and thus to the assets that were sold." (Monitor Obj. at ¶ 60.) This argument lays bare the manifest unjustness of allocating value based on claims. The Monitor implies that the value that each debtor contributed to the Nortel Group is best measured by how much they left their creditors unsatisfied, which is nonsense.[4]

---

[4] The Monitor also makes the argument that "Post-petition expenses, such as taxes, did not contribute to collective creation of value and therefore are inappropriate for inclusion in the claims pool for purposes of allocation. (Monitor Obj. at ¶ 81.) But taxes are a function of profit, and profit is an output of the "collective creation of value". "Modified pro rata" is a manifestly unjust construct if no portion of the Lockbox is allocated to account for the taxes that the Lockbox proceeds will incur.

Moreover, it is undisputed that the provision of the guarantee added value to the Nortel Group; but for the guarantee, the bond issuance would not have cleared the market on favorable terms.[5]

12. The Court went to great lengths to show that the "modified pro rata" allocation is different from global substantive consolidation, because corporate separateness is to be honored. Ironically, by purporting to require the U.S. estate to pay a recovery on account of the Crossover Bond guarantee claim without a corresponding allocation to the U.S. estate, the Court's ruling has precisely the effect that the Court sought so hard to avoid: It requires U.S. GUCs to share assets of the U.S. estate with other creditors (guaranteed bondholders) whose massive deficiency claim will result in *zero* incremental allocation to the U.S. Debtors. By counting the Crossover Bond claim solely for the purposes of allocating Lockbox proceeds to Canada, while NNI continues to be obligated to the holders of the Crossover Bonds on account of the guarantee claim, the Court's allocation decision effectively results in the U.S. GUCs subsidizing Canadian creditors' recoveries to the detriment of their own.

13. The Court seems to consider the harm done by this punitive choice of allocating no value to the U.S. Debtors for the known Crossover Bond guarantee claim to be balanced, somehow, by the allowed $2 billion claim by NNI against NNL. The Court said the $2 billion claim "already accounts for [the US estate's] contributions as the primary bread-winner of Nortel" (Op. at 62), and that "[t]he Court's recognition of the inter-company claims and, in particular, the FCFSA $2.06 billion allowed claim, pays heed to the undeniable fact that NNI generated the lion's share of enterprise-wide revenues" (Op. at 63). Yet NNL is to receive an

---

[5] *See* U.S. Debtors' Reply, ¶ 18. Canadian Op. ¶ 231 ("Thus it is quite clear from the evidence that when Nortel went to the bond market in 2006 and 2007 to raise funds, Nortel believed that it required the covenant of NNI in order to get the financing on terms and at a cost that Nortel wanted."); Trial Tr. 820:24-821:15 (McCorkle) (testifying that the banks "who arranged the loan told us that we would get much better reception, be able to raise higher amounts and at a lower interest rate with NNI's guarantee.")

9

allocation on account of that $2 billion claim, while NNI is to receive no allocation for the Crossover Bond guarantee claims – a manifestly unjust outcome.

14. Furthermore, the $2 billion claim was the result of the taxing authorities' review of the transfer pricing done from 2001 through 2005, presumably based on the conclusion that $2 billion too much profit had been diverted to Canada under the MRDA, where it was sheltered from tax. It is manifestly unjust for the Court to consider a transfer pricing adjustment made at the insistence of the IRS as somehow providing equitable relief to the U.S. Debtors for being short-changed on allocation for the bond deficiency claim. Similarly, the Court's "recognizing cash-on-hand" (Op. at 107) does not diminish the manifest injustice of the Court's choice to deny any allocation on account of the Crossover Bond guarantee claims. Both the $2 billion allowed claim and the cash on hand are – and always have been – property of the U.S. Debtors' estates.

### III. THE COURT SHOULD CLARIFY ITS PROCEDURES FOR RESOLVING DISPUTED CLAIMS

15. Among the U.S. Debtors' requests for clarification, the Committee would like to highlight the need for clear procedures regarding the resolution of disputed claims worldwide. The Joint Administrators for EMEA and the UKPC take umbrage at the U.S. Debtors' request for clarification, implying that the U.S. Debtors are impugning the integrity of the Joint Administrators, while the Monitor argues that no clarification is needed at this time. These objections should be disregarded; as the Court said, "Inflated claims would, of course, skew a pro rata allocation and destroy the equitable allocation method." (Op. at 112.) The need for clear procedures is particularly acute because the Court's "modified pro rata" methodology has placed at issue, for allocation purposes, all of the claims worldwide. Each of the UKPC claims, the CCC claims, and the IRS claim, in addition to the Crossover Bond guarantee claim, is

so large as to single-handedly move the needle of individual Debtor recoveries in the "modified pro rata" structure that the Court has created. It is only sensible and logical that the Court would clarify these procedures now.

## IV. RESERVATION OF RIGHTS

16. In addition to the arguments made herein, the Committee adopts the substantive arguments that are made by the U.S. Debtors regarding reconsideration and clarification in their Reply (D.I. 15783) in further support of the Motion, and the Committee does not repeat those arguments unnecessarily. However, as previously stated by the Committee (D.I. 15613), the Committee expressly reserves all rights to appeal from the *Opinion* and *Order*.

Dated: June 22, 2015
Wilmington, Delaware

Respectfully submitted,

By: */s/ Christopher M. Samis*
Christopher M. Samis (No. 4909)
L. Katherine Good (No. 5101)
Whiteford, Taylor & Preston LLC
The Renaissance Centre
405 North King Street, Suite 500
Wilmington, Delaware 19801
Tel.: (302) 353-4144

and

Fred S. Hodara (*pro hac vice*)
David H. Botter (*pro hac vice*)
Abid Qureshi (*pro hac vice*)
Brad M. Kahn (*pro hac vice*)
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Tel.: (212) 872-1000

*Co-counsel to the Committee*

110374235