**<u>EXHIBIT A</u>**

**CITATION:** Re Nortel Networks Corporation et al, 2015 ONSC 4170
**COURT FILE NO.:** 09-CL-7950
**DATE:** 20150706

**SUPERIOR COURT OF JUSTICE – ONTARIO**
**COMMERCIAL LIST**

RE:      IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. c-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

BEFORE:      Newbould J.

COUNSEL:      *Sheila Block, Scott A. Bomhof and Jeremy Opolsky,* for the US Debtors

*Gavin H. Finlayson and Jonathan Bell,* for the Ad Hoc Bondholder Group

*R. Shayne Kukulowicz and Stephanie Holland,* for the U.S. Unsecured Creditors Committee

*Benjamin Zarnett, Jessica Kimmel, Peter Ruby and Peter Kolla,* for the Monitor and Canadian Debtors

*Ken Rosenberg, Paul Steep, Massimo Starnino, Lily Harmer and Barbara Walancik,* for the Canadian Creditors' Committee

*Michael E. Barrack, D.J. Miller* and *Michael Shakra,* for the UK Pension Claimants

*Matthew P. Gottlieb and Matthew Milne-Smith,* for the Joint Administrators of the EMEA Debtors

*John Salmas and Sara-Ann Van Allen,* for the Wilmington Trust, National Association

*Daniel S. Murdoch,* for the Conflicts Administrator of NNSA

- Page 2 -

*Edmund F.B. Lamek,* for Law Debenture Trust Company of New York

**HEARD:**    June 25, 2015

## RULING ON RECONSIDERATION/CLARIFICATION MOTION

[1]    On May 12, 2015, I released my reasons for judgment in the joint trial held with Judge Kevin Gross of the U.S. Bankruptcy Court for the District of Delaware to determine how to allocate the $7.3 billion held in escrow (the "lockbox funds"). On the same day Judge Gross released his opinion. We came to the same conclusion as to how the lockbox funds were to be allocated. No signed judgment has been signed in this Court. Judge Gross signed an order making his ruling final.

[2]    Motions have now been brought by different U.S. interests seeking reconsideration or clarification of both decisions, as follows:

  (i)    NNI and certain of its affiliates (the "U.S. Debtors") have moved in this Court for "clarification, reconsideration or amendment of the May 12, 2015 reasons for judgment". In the U.S. Bankruptcy Court the U.S. Debtors have moved "to clarify and/or reconsider" the opinion and order of Judge Gross. Several aspects of the decisions have been raised in both motions. These motions are supported by the U.S. Unsecured Creditors Committee.

  (ii)    The Ad Hoc Group of Bondholders (the "bondholders") have moved in this Court "for clarification, or if necessary, amendment of" the reasons for judgment with respect to one aspect of the decision. They have moved in the U.S. Bankruptcy Court "for reconsideration" of the same one aspect of the opinion and order of Judge Gross and thereby seek clarification and if necessary modification of the opinion and order.

**Test for reconsideration**

[3]     There is no doubt that a court has jurisdiction to change or amend a judgment in Canada before it is formally drawn up and signed, but a court should be most reluctant to do so and should exercise the jurisdiction only in an exceptional case. See *Burke v. Sitser*, 2002 NSCA 115, para. 7 and *Holmes Foundry Ltd. v. Point Edward (Village)*, [1963] 2 O.R. 404 (Ont. C.A.). In the leading case of *671122 Ontario Ltd. v. Sagaz Industries Canada Inc.*, [2001] 2 S.C.R. 983, Major J. for the Court stated:

> Further, the case law dictates that the trial judge must exercise his discretion to reopen the trial "sparingly and with the greatest care" so that "fraud and abuse of the Court's processes" do not result (citations omitted).

[4]     In *Schmuck v. Reynolds-Schmuck* (2000), 46 O.R. (3d) 702, Himel J. referred to the confines of the jurisdiction to reopen a case as follows:

> **22**     … It is extremely rare for there to be a request to re-open a trial on the grounds of a reconsideration of the case.
>
> **25**     It is my view that a party who wishes a reconsideration alone would have to establish that the integrity of the litigation process is at risk unless it occurs, or that there is some principle of justice at stake that would override the value of finality in litigation, or that some miscarriage of justice would occur if such a reconsideration did not take place.

[5]     In *Risorto v. State Farm Mutual Automobile Insurance Co.* (2009), 70 C.P.C. (6th) 390 at para. 55 (Div. Ct), Gray J. stated:

> **35**     …Litigation by instalments is not to be encouraged. There is a strong interest in finality, which should only be departed from in exceptional circumstances. Parties make strategic decisions in the course of litigation, and except in narrow circumstances they must be held to those decisions.

[6]     Motions for reconsideration are not the venue for new arguments that could have been made initially. See *Mujagic v. Kamps*, 2015 ONCA 360 per Doherty J.A. at para. 13. In *Kay v. Wirstiuk*, [1977] A.J. No. 690 Steer J. stated:

In my view, one potential for abuse that must clearly be kept in mind is that there is a fundamental rule which requires a litigant to have the facts of his case fully prepared to prove those matters that must be proved and to present it once and for all at the time of trial. This rule is fundamental because it is only in this way that endless wrangling and never-ending re-hearings and never-ending re-openings to hear new evidence can be avoided.

[7]    Clarification is a less contentious matter. Clarification may be given where the original judgment "was so expressed as to lead to uncertainty and confusion" or contains a latent ambiguity. See *Fame Construction Ltd. v. 430863 Ltd.*, [1997] B.C.J. No. 1053 at para. 4 and *Buckley v. British Columbia Teacher's Federation*, [1995] B.C.J. No. 2971 at para. 17 (C.A.).

**No double counting of the bond claims for allocation purposes**

[8]    In the allocation decision, it was ordered that in determining what the claims are against the Debtor Estates, a claim that can be made against more than one Debtor Estate can only be calculated and recognized once for allocation purposes. This principle is applicable to all such claims, including claims by the bondholders against the issuer and the guarantor Debtor Estates and possible claims by the UKPC against NNUK and other EMEA Debtors.

[9]    In the allocation decision, it was ordered that claims on bonds are to be made on the Debtor Estate of the issuer. Claims on those bonds may also be made on the Debtor Estate of the guarantor but those claims will not be taken into account in determining the claims against the Debtor Estates for allocation purposes. The U.S. Debtors and the UCC contend that the allocation decision should be changed to provide that the claims by the bondholders on the guaranteed bonds against both the issuer and guarantor Debtor Estates should be included in the claims for allocation purposes. As nearly all of the $4 billion in bonds were guaranteed by NNI, that would result in a much higher figure of claims for allocation purposes recognized in the U.S. Debtors Estates.

[10]    In my view, there is no basis for that argument to be made on a reconsideration motion such as this.

[11]   It is contended that without such a change, there would be a manifest injustice or miscarriage of justice to the unsecured creditors of the U.S. Debtors other than the bondholders. The U.S. Debtors point to evidence of Mr. Britven, an expert witness at the trial called on behalf of the CCC who gave estimates of recoveries to various creditor classes based on the different allocation theories advanced by the other parties. They say that the result would be that the creditors of the U.S. Debtors would recover only 14 cents on the dollar from the lockbox funds, which amount they say would be manifestly unjust.

[12]   However, this figure is misleading. It ignores the cash on hand in the U.S. Debtors Estates available to their creditors and the $2 billion admitted claim of the U.S. Debtors against NNL. In exhibit A to the U.S. Debtors' motion, it is stated that the recovery to unsecured creditors of the U.S. Debtors from all sources will be 40% of claims if the bondholders are entitled to claim all of their outstanding bonds against the guarantor NNI and 62% if the bondholders claims against the guarantor NNI may only be made on the shortfall after partial recovery from the issuer NNL. I see no basis to conclude that such a recovery would be manifestly unjust or constitute a miscarriage of justice.

[13]   The primary argument of the U.S. Debtors in the allocation trial, based on their expert witness Jeffery Kinrich, was that the proceeds should be allocated on a revenue basis. The calculations of Mr. Britven at the trial indicated that if the U.S. Debtors position were to be accepted, the Canadian unsecured creditors would recover 11% of their claims. It hardly lies in the mouth of the U.S. Debtors to now say that the recovery of 40% or 62% of their claims, let alone 14%, would be manifestly unjust. Exhibit A to the U.S. Debtors' motion states that recovery to the unsecured creditors of the Canadian Debtors will be 49% and to the EMEA Debtors 65%.

[14]   The U.S. Debtors do not adopt or validate the assumptions that Mr. Britven used in his analysis and they did not do so at the trial. However they rely on these assumptions in their argument now except for changes they have with respect to cash and claims since the date of his

report[1]. It is somewhat ironic in that the U.S. Debtors had nothing good to say at the trial about the Britven report and filed no evidence of potential creditor recoveries. They took the position at the trial, and before the trial on a motion to strike the reports of Mr. Britven and Dr. Bazelon, called on behalf of the UKPC, that what a particular allocation methodology yielded in terms of creditor recoveries was not relevant to the question of the allocation that the estates are entitled to. They assert in their brief now that the analysis of Mr. Britven is unreliable but that it shows a "directional and proportional impact" of the allocation decision. The fact is that there is not sufficient evidence for any meaningful calculation of the likely actual returns to individual pensioners, taken their recoveries from various government plans. That lack of evidence was the result of tactical decisions taken by the U.S. Debtors and other U.S. interests in presenting their cases at the trial that creditor recoveries were not relevant to how the lockbox funds should be allocated. That tactical decision cannot be ignored on a motion to reconsider and instead is one that the U.S. Debtors and the UCC should be held to.

[15]    The U.S. Debtors contend that the Court did not have the benefit of briefing by the parties or expert analysis "to confirm the critical assumptions underlying this Court's decision" or to illustrate the effects of the structure of its methodology and that the fact that the modified pro rata allocation methodology was not before the parties, and thus no party had an ability to make submissions on the effect of any inconsistencies or ambiguities it contained, is itself sufficient grounds for reconsideration.

[16]    I do not agree and would make two points. The first is that it was clear that the issue of the treatment of bondholder claims was an issue in the pro rata allocation method proposed by the UKPC's expert. The second is that any lack of briefing by the U.S. Debtors and the UCC was a deliberate tactic taken by them in attacking the pro rata allocation method proposed at the trial. Even if I were to reconsider the issue, I do not accept that the U.S. Debtors have established any manifest injustice.

---

[1] The changes are not based on admitted evidence. See the critique of the changes in paragraph 36 of the Monitor's brief in opposition to this reconsideration motion.

[17]    As to the first point, the issue of the treatment of the guaranteed bonds and whether they should be counted once or twice in a pro rata allocation was a live issue in evidence at the trial. Dr. Bazelon was called as an expert witness by the UKPC in support of its pro rata allocation approach. During his examination in chief, and in connection with exhibit 41, he testified as to the pro rata allocation method he was proposing. He had different formulae about how to calculate a pro rata distribution rate. Included in his formulae was a scenario to recognize the guaranteed bonds twice. He was expressly asked about how bond guarantee claims could be dealt with and said that it was for the courts to decide whether to allocate the claims once or in multiple Debtor Estates. His preference was that the bonds be recognized only once, which he said was a true pro rata allocation approach, but he acknowledged that it was up to the Courts to decide. He was cross-examined on this evidence by Mr. Qureshi on behalf of the UCC. Counsel for the U.S. Debtors chose not to cross-examine Dr. Bazelon at all.

[18]    As to the second point, the U.S. Debtors and the UCC took the position that creditor recoveries were irrelevant. While their pre-trial motions to strike the expert reports of the UKPC and the CCC advocating for a pro rata allocation were dismissed, it was without prejudice to their right to renew the motions at the end of the trial, and in its closing brief, the U.S. Debtors renewed their motions to strike the reports they asserted were irrelevant.

[19]    The U.S. Debtors and the UCC in their closing briefs attacked the pro rata allocation theory on several basis, including arguing that it was an impermissible global substantive consolidation, a "sub rosa" plan of distribution, and that there was no reliable method for its implementation. The U.S. Debtors criticized Dr. Bazelon's evidence and argued in their closing brief that the various experts could not figure out how to treat guarantee claims and claims against multiple debtors. It was quite open to the U.S. Debtors to explore the issue at the trial, which they did not do presumably for tactical reasons, or to offer their view in their closing brief as to how guaranteed bonds should be treated in a pro rata allocation. Any failure to brief was a decision taken by the U.S. Debtors and the UCC.

[20]    Even if I were to reconsider this issue, I could not find that the decision to permit claims on the guaranteed bonds to be calculated only once for allocation purposes should be changed. As stated, I see no injustice in the result. I need not repeat what is contained in the reasons for

judgment released on May 12, 2015. Nothing argued on this motion leads me to consider that I erred in any way in those reasons. There must also be considered other claims that could be made against more than one Debtor Estate, including the pension claim by the UKPC against NNUK that could be made against other EMEA Debtors and claims that could be made on bonds issued by NNL and guaranteed by NNC. The allocation decision precludes the double counting of any such claims for allocation purposes. The U.S. Debtors and UCC do not suggest that any of these other claims should be permitted to be claimed twice for allocation purposes. I see no basis to treat the guaranteed bonds any differently for allocation purposes. The principles that govern allocation should be applied consistently to each debtor.

**Bondholder shortfall claim issue**

[21]    There are $4 billion in outstanding guaranteed bonds, mostly issued by NNL and guaranteed by NNI. One is the reverse, issued by NNCC, a subsidiary of NNI and guaranteed by NNL. The bondholders have asked for clarification as to what they are entitled to claim against the guarantor for amounts not collected from the primary debtor. They are concerned that the decisions permit them to claim only for the shortfall against the guarantor rather than the full amount of the bonds. That was not what was intended and on reflection, clarification is warranted. The confusion arises from the following paragraphs in the reasons for judgment:

> [225]   The bondholders who hold bonds with covenants of both NNL and NNI contend that they would be unduly prejudiced by a pro rata allocation of the lockbox funds as they are entitled to look to both NNL and NNI for payment of their claims and if one of these companies did not have sufficient funds to pay the bonds in full, they could look to the other. I agree that they are entitled to claim against both companies and this will be recognized in the pro rata allocation that will be ordered.

> [251]   In determining what the claims against a Debtor Estates are, a claim that can be made against more than one Debtor Estate can only be calculated and recognized once. The one that is known is the bondholder claim for $4 billion, referred to as the claim on cross-over bonds. All but one of such bond issues was issued by NNC or NNL and guaranteed by NNI. One bond issue for $150 million was issued by NNCC, a subsidiary of NNI, and guaranteed by NNL. The claims on the bonds in determining the claims are to be made on the Debtor Estate of the issuer. *If a claim on a guaranteed bond is not paid in full by the issuer Debtor Estate, a claim for the shortfall can be recognized by the Debtor Estate that*

*guaranteed the bond, but that shortfall claim will not be taken into account in determining the claims against the Debtor Estates.* (Italics added)

[258]   A judgment is to go that the lockbox funds are to be allocated on a pro rata allocation basis with the following principles to govern:

...

(2)      In determining what the claims are against the Debtor Estates, a claim that can be made against more than one Debtor Estate can only be calculated and recognized once in accordance with these reasons for judgment. Claims on bonds are to be made on the Debtor Estate of the issuer. *A claim for any shortfall can be recognized by the Debtor Estate that guaranteed the bond, but that shortfall claim will not be taken into account in determining the claims against the Debtor Estates.* If the UKPC makes a claim against more than one Debtor Estate, such additional claims will not be taken into account in determining the claims against the Debtor Estates. (Italics added)

[22]   As can be seen, it was stated in para. 225 that the bondholders were entitled to claim against both the debtor and guarantor companies. However as seen in the in paras. 251 and 258(2) it was stated that "a claim for any shortfall" could be recognized by the guarantor company. Judge Gross stated the same thing in his opinion.

[23]   The concern of the bondholders is that the language could be construed to limit the claim to be filed against a guarantor to only to the shortfall caused by the payment of only so many cents on the dollar of the company that issued the bond. That is, if a bondholder of a bond in the face amount of $1,000 issued by NNL received for example only 40 cents on the dollar from the estate of NNL, or $400, could that bondholder claim only $600 against the estate of the guarantor NNI and collect only so many cents on the dollar for the $600 from NNI? That was not the intent. The intent was that in that circumstance, the bondholder could claim $1,000 against NNI as well but collect from both NNL and NNI together a maximum of $1,000 on the bond. That is, the shortfall of $600 could be collected from the guarantor company NNI, assuming it had sufficient money to pay the shortfall, on a claim filed by the bondholder against NNI for the face amount of the bond of $1,000.

[24]    In the circumstances, I think it preferable to clarify or amend paragraphs 251 and 258(2) by deleting the reference to a shortfall, so that these paragraphs will read as follows:

> 251.        In determining what the claims against a Debtor Estates are, a claim that can be made against more than one Debtor Estate can only be calculated and recognized once. The one that is known is the bondholder claim for $4 billion, referred to as the claim on cross-over bonds. All but one of such bond issues was issued by NNC or NNL and guaranteed by NNI. One bond issue for $150 million was issued by NNCC, a subsidiary of NNI, and guaranteed by NNL. The claims on the bonds in determining the claims are to be made on the Debtor Estate of the issuer. If a claim on a guaranteed bond is not paid in full by the issuer Debtor Estate, a claim can be recognized by the Debtor Estate that guaranteed the bond, but that claim will not be taken into account in determining the claims against the Debtor Estates.

> 258. (2)        In determining what the claims are against the Debtor Estates, a claim that can be made against more than one Debtor Estate can only be calculated and recognized once in accordance with these reasons for judgment. Claims on bonds are to be made on the Debtor Estate of the issuer. A claim can be recognized by the Debtor Estate that guaranteed the bond, but that claim will not be taken into account in determining the claims against the Debtor Estates. If the UKPC makes a claim against more than one Debtor Estate, such additional claims will not be taken into account in determining the claims against the Debtor Estates for allocation purposes.

**NGS and Diamondware**

[25]    NGS and Diamondware were two subsidiaries of NNI. The U.S. Debtors contend that the proceeds from the sale of those companies, sold as part of the sale of the Enterprise line of business, should not be part of the assets taken into account in the allocation process but rather should be the sole property of the NNI estate. They raise this as part of their reconsideration request in this motion.

[26]    The U.S. Debtors say that these two subsidiaries were not integrated into the Nortel Group and therefore should not be included in the allocation made under the "one Nortel" principle. This issue was not raised by the U.S. Debtors at the trial and there is no evidence supporting the statement that the two subsidiaries were not integrated into the Nortel Group.

- Page 11 -

[27]    What is in the trial record appears to confirm that NGS and Diamondware were treated as part of Nortel's global Enterprise Business, and that they were marketed and sold by the Nortel group as such:

(a)    NGS and Diamondware were sold pursuant to a September 14, 2009 Amended and Restated Asset and Share Sale Agreement among various Nortel sellers and Avaya. This sale was approved by both Courts and the entirety of the sale proceeds were placed in the lockbox.

(b)    The evidence of George Riedel, a former senior officer of NNI, was that "NGS performed the role of a systems integrator and channel for Nortel's Enterprise products in the US Federal government markets."

(c)    The U.S. Debtors expressly acknowledged that NGS and Diamondware were part of the Enterprise Line of Business when they sought "orders... (ii) authorizing and approving (a) the sale of certain assets (including the stock of certain subsidiaries of the Debtors) of the Debtors' Enterprise Solutions Business." The U.S. Debtors agreed to place the proceeds of the sale of these assets into the lockbox.

[28]    The U.S. Debtors point to the expert evidence of Mr. Green, the valuation expert called by the Monitor, who on an ownership approach to valuing the lines of business sales attributed the proceeds of the sale of NGS and Diamondware to NNI as it owned those subsidiaries. This however is no reason to allocate the proceeds of sale to NNI on the pro rata allocation method ordered in the allocation decision. The ownership approach of Mr. Green and the Monitor on behalf of NNC and NNL was rejected. Moreover, the U.S. Debtors' approach to allocation did not purport to allocate the value of NGS and Diamondware to the U.S. Debtors.

[29]    If the U.S. Debtors' argument were correct, it would have to be applied consistently to all debtors and not just NNI.  All parties recognized at trial that certain debtors owned outright certain tangible assets that were transferred in the business sales.  The parties also recognized that certain individual debtors owned intangible assets outright.  For example, two EMEA entities, Nortel Germany and Nortel France SAS, former joint ventures that were never parties to

- Page 12 -

the MRDA, owned valuable patents when they were acquired by Nortel and continued to hold those assets in their own names. If the U.S. Debtors were correct, and debtors were entitled to an allocation in respect of their wholly owned assets notwithstanding the pro rata approach adopted in the allocation decision, then sale proceeds attributable to these wholly-owned assets would have to be carved out as well.

[30]    The U.S. Debtors also point to a lien given to the U.S. government's Public Benefit Guaranty Corporation on the proceeds of the sale of the two subsidiaries and contends that it would be inequitable to and contrary to the court orders permitting this lien arrangement to allocate to any other Debtor Estates the proceeds of sale upon which a U.S. creditor has a lien. The Monitor however points out in its brief at fn. 107 that the PBGC claims settlement provides for an allocation procedure to determine what proceeds from the lockbox should be subject to the lien, to be conducted by the U.S. Court alone. In argument counsel for the Monitor pointed to other provisions that he asserts means that the PBGC claims settlement was without prejudice to the allocation to be made to the Debtor Estates.

[31]    The U.S. Debtors could have raised all of these issues regarding NGS and Diamondware at the trial in the face of the arguments of the UKPC, CCC and Wilmington Trust[2] contending for a pro rata allocation approach, but they did not do so. They took the position that the fact that Nortel operated through employees worldwide that collaborated with each other and had business lines that operated across legal entities i.e. was "one Nortel", was irrelevant. Moreover, the argument of the U.S. Debtors is not unique to the pro rata allocation method, but would have applied under any of the allocation theories advanced at the trial, including the U.S. Debtors' revenue-based theory of allocation.

[32]    These issues are not now a proper matter for reconsideration.

---

[2] In the allocation decisions, Wilmington Trust, National Association was omitted as being a proponent of the pro rata allocation method. The record should be clarified to make it clear that Wilmington Trust joined the UKPC and CCC in this position at the trial as an alternative argument in addition to its first argument that the MRDA should govern the allocation.

**Intercompany claims and allocation to Debtor Estates**

[33]    In the allocation decisions, it was ordered that intercompany claims against a Debtor Estate are to be included in the determination of the claims against that Estate. The U.S. Debtors seek confirmation or clarification that the intercompany claims that are included in calculating the allocation are claims between Debtors across different Debtor groups (i.e., the U.S. Debtors, the Canadian Debtors and the EMEA Debtors) rather than within Debtor groups.   This clarification is said to be necessary to ensure that allocation of the lockbox proceeds would not be subjected to a risk of significant distortion by claims allowed between Debtors within the same Debtor group.

[34]    I would not have thought that this is an issue for clarification at all, but interestingly the parties differ as to what was decided. The Monitor on behalf of the Canadian Debtors sides on this point with the U.S. Debtors and asserts that "plainly" the Courts decided that intercompany claims within Debtor Estates do not count toward allocation. The EMEA Debtors and the UKPC on the other hand say that it was clear from the allocation decisions that all intercompany claims would be taken into account for allocation purposes and not just those claims within each Debtor group.

[35]    The U.S. Debtors also seek clarification that the allocation of the lockbox funds is to be made to individual Debtors rather than to the three Debtor groups (i.e., the U.S. Debtors, the Canadian Debtors and the EMEA Debtors). I would have thought that this too was not an issue for clarification, but again the parties differ as to what was decided. The Monitor on behalf of the Canadian Debtors takes the position that the allocation decisions established principles for allocation to the three regional groups (i.e., the U.S. Debtors, the Canadian Debtors and the EMEA Debtors). The CCC adopts this view. The EMEA Debtors and the UKPC on the other hand say that the allocation decisions made clear that allocation would be made to individual debtors, not to the three regional groups.

[36]    To be clear, the allocation decisions were intended to permit all intercompany claims to be recognized in the allocation process, not just claims among the three regional groups, and the principles established for the allocation were intended to apply to all debtors and not just provide

an allocation to the three regional groups, with the amounts allocated to be paid directly to each debtor.

[37]    Regarding the allocation process, Mr. Coleman for the Monitor contended that after the allocation to the three regional groups, it would be up to "the relevant court" to make a further allocation to individual estates. I cannot agree with such an approach. First of all, each debtor is a distinct entity. Although the insolvency proceedings of individual debtors in the same geographic area are being administered together for procedural purposes in the interests of efficiency, these debtor groups (*i.e.*, the Canadian Debtors, the U.S. Debtors and the EMEA Debtors) are post-petition constructs. Nothing about these joint administration arrangements impacts the separate identity of each debtor.

[38]    Secondly, the allocation trial resulted from the IFSA that was signed by 38 Nortel debtor entities in Canada, the U.S. and EMEA. The IFSA recognized that the funds would be put into a single fund undifferentiated as to the debtor estates and then allocated to them on some basis to be agreed or determined in this litigation. The end result of the IFSA process was that an allocation protocol was approved by both Courts requiring a joint trial of the Superior Court of Justice (Commercial List) and the U.S. Bankruptcy Court for the District of Delaware to determine the allocation of the lockbox funds[3]. Included in those reasons was a reference to section 16(b) of the IFSA that provided:

> 16(b) To the fullest extent permitted by applicable law, each Party...(ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in ... a joint hearing of both the Canadian and US Courts conducted under the Cross-Border Protocol if such claim, action or proceeding would affect the Canadian Debtors and the US Debtors or the EMEA Debtors ...

---

[3] See *Nortel Networks Corp. (Re),* (2013), 2 C.B.R. (6th) 1;aff'd (2013), 5 C.B.R. (6th) 254 (Ont. C.A.); 2013 WL 1385271; aff'd 737 F.3d 265.

[39]    In light of this process, there is no room now for some other court acting alone to allocate the proceeds of the lockbox funds. That responsibility lies with the Canadian and US Court which has now been exercised.

[40]    Regarding intercompany claims to be recognized, it would be inconsistent to have allocations made to each individual estate, as required by the IFSA, based on claims against that estate, but only permit such claims that are between two or more of the three regional groups. There is no principled basis for the contention that only such intercompany claims and not claims between two debtors within any regional group should be permitted for allocation purposes. The effect of the U.S. Debtors' clarification, and the position of the Monitor, would be to disregard valid claims in an individual debtor's estate solely because, post-filing, the debtors were aligned in broad geographic groups for administrative convenience. There is no legal basis for excluding valid claims between separate debtors.

[41]    In the circumstances, there is no basis for reconsideration or clarification of these two issues. The judgment provided in paragraph 258 of my reasons for judgment is clear. The reference to a Debtor Estate in that paragraph is to a single debtor estate and not to the Canadian Debtors, the U.S. Debtors or the EMEA Debtors.

**Recognition of settled and paid claims**

[42]    The allocation decisions made clear that settled court-approved claims will be taken into account in determining the claims against a debtor estate. The U.S. Debtors seek "clarification or confirmation" that the U.S. Debtors' prior court-approved settlements with the EMEA Debtors and the U.K. Pension Claimants (granting them administrative claims, which were then paid in cash) will be included in the calculation of the allocation owed to the U.S. Debtors. The U.S. Debtors also refer to the various other claims that the U.S. Debtors not only successfully resolved, but paid, including without limitation their settlement of certain retiree claims, their 2009 settlement with the IRS, and their cash settlements with the Canadian Debtors pursuant to the IFSA and FCFSA.

[43]    These issues were not raised by the U.S. Debtors at the trial, which should have been done had they sought what is now being requested.

[44]    There is however some logic to the principle raised by the U.S. Debtors. Why they ask should a claim recognized against a debtor but unpaid be included in the claims against such a debtor while other claims against a debtor and paid should not? I accept the principle. However, it should be restricted to court approved settlements of pre-filing claims and restricted to the amounts actually paid under the settlements and not to the claimed amounts. It should also not apply to post-filing claims. I am not aware of all of the particulars of the claims referred to by the U.S. Debtors in their argument, but it seems to me clear that payments made to NNL under the IFSA and FCFSA were not to settle pre-filing claims. The settlement of claims of course is a matter for the Court dealing with each debtor.

[45]    The principle that court approved settlement of pre-filing claims, i.e. claims that are provable under the CCAA, that have been paid may be taken into account in calculating the claims against a debtor for allocation purposes should of course apply to all debtors to the extent that the settled claim has been paid by the debtor.

[46]    Whether this is a clarification or reconsideration of this issue, I would make a change to paragraph 258 to add a new subparagraph (2A) as follows;

> (2A)   In determining what the claims are against the Debtor Estates, pre-filing claims of the kind provable under the CCAA that have received court approval and which have been paid may be taken into account to the extent that they have been paid under the settlement.

**Tax claims**

[47]    The U.S. Debtors seek "clarification" that they are entitled to seek an allocation based on paying applicable U.S. federal and state taxes on the sales proceeds allocated to them. This issue was not raised by the U.S. Debtors at the trial.

[48]    I see no basis to clarify, or for that matter to reconsider, this issue. Apart from not raising it at the trial, which should have been done in the face of the pro rata claim asserted against them, it would be to permit a post-filing claim to be used for allocation purposes. The inclusion of post-petition tax claims would result in an allocation partly based on tax attributes, rather than the principles on which modified pro rata is based.  The allocation decisions dealt with only pre-filing claims.

[49]    There is no difference in principle between legal fees incurred post-filing and tax liabilities incurred post-filing. Under Canadian law, neither of these are provable claims. As I understand it, under the U.S. Bankruptcy Code, taxes incurred by an estate and legal fees are both considered to be an administrative expense and not a provable claim. It would be quite inconsistent with the pro rata allocation decision to start permitting these types of claims to be considered. If they were, other debtors in other countries might well have tax issues and all would have legal fees to a lesser or greater extent.

**Court supervision of claims**

[50]    The U.S. Debtors seek "clarification" that effective protection will exist to prevent debtors in other jurisdictions from increasing their lockbox allocation by "undue claims inflation". They seek clarification to set forth the process and schedule by which claims, particularly the UKPC claim, will be measured by the Canadian and U.S. Courts for allocation purposes. They assert that "policing" of the UKPC claim will be required by the Canadian and U.S. Courts. They seek an order that the two Courts "shall retain oversight of and adopt procedures as necessary to measure the amount of the disputed claims" including any claim not allowed prior to the allocation decisions.

[51]    I see no basis to make such an order. In my reasons for judgment, I stated at para. 253:

> [253] I understand that for the Canadian Debtors and the U.S. Debtors, the claims for the most part are generally known although there are some claims still unresolved, such as the SNMPRI claim. The U.K. Administrator has not yet instituted a claims procedure, apparently awaiting a determination of this

allocation proceeding. In my view, the process should be undertaken now and I
expect this will happen.

[52]    Judge Gross in his opinion stated at page 62:

> The Court has every confidence that the tribunals overseeing the Nortel
> insolvency proceedings across the globe will adjudicate the claims at issue therein
> in a just, efficient manner. The Court is prepared to act if they do not.

[53]    As now advised, the reason for no claims procedure having being undertaken in the U.K.
was that under the U.K. *Insolvency Act 1986*, the Joint Administrators appointed by the English
Court had no authority to commence a formal claims process until there were funds available for
distribution. Nevertheless an informal claims process was undertaken in 2010 and sanctioned by
the High Court of England and Wales.

[54]    Following the release of the allocation decisions, an application in the U.K. was made to
the Chancellor of the High Court of England and Wales for the appointment of a supervisory
judge in this matter. The Chancellor has now appointed Mr. Justice Snowden, a judge of the
Chancery Division of the High Court of England and Wales, as the supervisory judge in relation
to the various EMEA Debtors. Justice Snowden will deal with any hearings in relation to the
EMEA Debtors including contested claims and will be the appropriate judge to engage in any
judicial co-operation with the Canadian and U.S. Courts that is deemed necessary and
appropriate. The Joint Administrators intend to apply shortly to Justice Snowden to have the
claims process move along.

[55]    The Joint Administrators are officers of the English Court who are duty-bound to act in
good faith and in accordance with applicable law in those proceedings. The UKPC's claim
against NNUK, as with every claim in each of the nineteen EMEA jurisdictions, will be subject
to a formal claims process which is subject to appeal rights available to creditors and
shareholders. Creditors and shareholders of the EMEA entities will have the opportunity to
review and contest the allowance or rejection of any proof of claim as noted above. Disputes
will be heard by Justice Snowden in a full evidentiary hearing.

[56]    I think too much is made of the suggestion of inflated claims being made by the UKPC. The claim is one made under section 75 of the U.K. *Pensions Act, 1995*. Under that section, when a company which sponsors a defined benefit pension plan becomes insolvent and the assets in the plan are insufficient to meet its liabilities, a debt for the shortfall automatically arises against the plan's sponsoring employer, in this case NNUK. Regulations have been issued by the U.K. Government that stipulate precisely how a section 75 debt must be calculated.

[57]    The "Scheme Actuary" (which is a recognized statutory role or office) is required by the regulations to calculate and verify the liabilities of the pension plan based on the benefits that are provided under the rules of the plan. The prescribed statutory basis for this calculation is the cost of buying out the plan's benefits by purchasing annuity policies from an insurance company that match the benefits payable under the plan. The regulations expressly anticipate that the costs will be evaluated by the Scheme Actuary, based on market data at the applicable time. The Scheme Actuary has an independent professional duty to conduct the calculation and estimate the debt as the regulations prescribe. The trustees of a plan are unable, as a matter of law, to negotiate the section 75 debt with the employer.

[58]    On January 6, 2015, the Scheme Actuary issued the section 75 certificate detailing the amount of the employer debt against NNUK in the amount of £2.147 billion. This is remarkably similar to the £2.1 billion figure estimated as early as September 30, 2009 and made available to the parties including NNI.

[59]    To make the order sought by the U.S. Debtors would fly in the face of the principles of comity which Canadian courts have long shown respect to in insolvency proceedings and which are now promulgated in the CCAA that has adopted the UNCITRAL model law provisions regarding recognition of foreign insolvency proceedings. See *MtGox Co., Re,* (2014), 20 C.B.R. (6th) 307 at paras. 11 and 12.

[60]    I would not make the order sought by the U.S. Debtors.


_____
                                    Newbould J.


**Date:** July 6, 2015