## <u>Exhibit A</u>

**Allocation Trial Opinion**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NORTEL NETWORKS, INC., et al. | ) | Case No. 09-10138(KG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| _____ | ) | **Re Dkt No. 13208** |

## ALLOCATION TRIAL OPINION[1]

## TABLE OF CONTENTS

**INTRODUCTION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**PROCEDURAL SUMMARY**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**FACTS**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      A.     The Business Lines. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      B.     Research & Development. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      C.     Transfer Pricing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      D.     Advanced Pricing Arrangements. . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      E.     Cost Sharing Agreements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      F.     New Transfer Pricing Arrangement. . . . . . . . . . . . . . . . . . . . . . . . . 14

      G.     The Master R&D Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      H.     Rights to Intellectual Property Under the MRDA. . . . . . . . . . . . . . 19

      I.     The MRDA Was Tax Driven. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      J.     The Interim Funding and Settlement Agreement. . . . . . . . . . . . . . . 20

---

[1] The Court uses many defined terms in the opinion and has prepared a glossary of important terms which is attached as Appendix A.

K.      The Final Canadian Funding and Settlement Agreement. . . . . . . . . . . . . 22

L.      The Sale of Nortel's Business Lines. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

M.      Patent Identification. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

N.      Nortel's Patents Had a Useful Life of Many Years.. . . . . . . . . . . . . . . . . . 26

O.      A Licensing Business - IPCo. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

P.      All Integrated Entities Expected to Benefit From IP Monetization. . . . . . . 33

Q.      Residual Patent Portfolio. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

R.      The Sale of Nortel's Residual Patent Portfolio. . . . . . . . . . . . . . . . . . . . . . 35

S.      The Rockstar Sale Approval Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

**THE PARTIES AND THEIR ALLOCATION POSITIONS**. . . . . . . . . . . . . . . . . . . . . . . 38

A.      The U.S. Interests.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

B.      The Committee. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

C.      The Bondholders. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

D.      The EMEA Debtors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

E.      The Monitor and the Canadian Debtors. . . . . . . . . . . . . . . . . . . . . . . . . . . 46

F.      The Canadian Creditors' Committee. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

G.      Wilmington Trust Company as Trustee. . . . . . . . . . . . . . . . . . . . . . . . . . . 54

H.      The UK Pension Claimants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

**LEGAL ANALYSIS**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

THE MRDA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

A.      Governing Law and Applicable Principles of
        Contract Interpretation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

B.      The Valuable "Bundle of Rights" that a Patent Affords. . . . . . . . . . . . . . . 70

     1.      NNL's Claim to Legal Title to the IP. . . . . . . . . . . . . . . . . . . . . . . 71

     2.      The Factual Matrix Surrounding Transfer Pricing,
              Historical Business Practices and Custom of the Industry . . . . . . . . 75

     3.      Each Participant Exclusively Held Valuable Rights to NN
              Technology, Including Patents, in Its Respective Territory. . . . . . . 80

     4.      Under the MRDA, Each Licensed Participant Held the
              Right to Sublicense in Its Exclusive Territory. . . . . . . . . . . . . . . . . . 81

     5.      Article 4(e) Grants the Right to the Right to Assert
              Actions and Recover Damages. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

     6.      The MRDA's Further Confirmation that Licensed
              Participants Held All Valuable Rights to NN Technology . . . . . . . . 83

     7.      NNL Had Nothing of Value to Sell in the Licensed
              Participants Exclusive Territories. . . . . . . . . . . . . . . . . . . . . . . . . . . 85

THE FLAWED POSITIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

    A.      Canadian - Ownership. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

    B.      The EMEA Debtors - Contribution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

    C.      U.S. Revenue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

PRO RATA ALLOCATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

    A.      Global General and Administrative Support Functions. . . . . . . . . . . . . 93

    B.      R&D Functions Were Collaborative Across Borders. . . . . . . . . . . . . . . . 95

    C.      Authority for Pro Rata Allocation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

    D.      Pro Rata Allocation is Not Substantive Consolidation. . . . . . . . . . . . . . 101

    E.      Pro Rata Criticism is Misplaced. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

    F.      Implementation of the Pro Rata Allocation. . . . . . . . . . . . . . . . . . . . . . . 111

**CONCLUSION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

APPENDIX A:  Glossary of Terms

APPENDIX B:  Business Line Sales

APPENDIX C:  Nortel Bonds Spreads to U.S. Government Yield Curve (Basis Point Chart)

# INTRODUCTION[2]

The gargantuan bankruptcy cases giving rise to the opinions of two courts on either side of the Canadian border emanate from the tragic, almost unimaginable collapse of the Nortel Enterprise. The how and why for the downfall are the subject of numerous books and articles and the Court will not gratuitously add its views which are not necessary to the work at hand. It is sufficient to note that even a writer of fiction would not dare to compose the story of the death of this multi-national enterprise and the harm it inflicted on tens of thousands of employees and creditors. The Nortel Enterprise in 2000 had stock with a value of $124.50 per share and a market capitalization of approximately $260 billion. It employed nearly 100,000 people worldwide and had annual sales of $30 billion. Two years later, the Nortel Enterprise had laid off 60,000 employees and its market capitalization had fallen to $2 billion. Nortel had shifted its focus from research and development to acquisition and expansion and thereby found itself overextended. Scandal among management added to Nortel's problems and it was repeatedly restating its earnings. Soon, Nortel was in bankruptcy.

In issuing this opinion, the Court (sometimes referred to as "U.S. Court") is addressing the allocation of Sales Proceeds among numerous debtor entities from numerous countries.[3] The decision follows 21 days of trial held jointly with the Ontario

---

[2] The Court expresses its profound appreciation and respect for Justice Geoffrey Morawetz and Justice Frank J.C. Newbould who were able and congenial colleagues in this endeavor. Justice is alive and well in Canada.

[3] The Court's authority to decide the allocation issues is discussed in *In re Nortel Networks, Inc.*, 737 F.3d 265 (3d Cir. 2013). There, the Third Circuit Court of Appeals affirmed the Court's ruling that arbitration was not compulsory.

Superior Court of Justice, Commercial List (Honourable Frank J.C. Newbould, presiding) (the "Canadian Court").  At the trial, held simultaneously in two cross-border courtrooms linked by remarkable and effective technology, the Court and the Canadian Court heard the testimony of many witnesses and admitted into evidence over 2,000 exhibits and designations from numerous depositions.  Thereafter, the parties submitted post-trial briefs and proposed findings of fact and conclusions of law exceeding 1,000 pages.  The parties also presented two days of closing arguments to the U.S. Court and the Canadian Court.  It is from this massive and complex record that the Court and the Canadian Court must formulate their decisions.

The issue to be decided by the U.S. Court and Canadian Court is:

What is the appropriate allocation of the sums paid to Nortel in the bankruptcy sales (the "Sales Proceeds") among the Nortel Entities?

The parties identified below have submitted widely varying approaches for deciding the issue leaving virtually no middle ground.  Their strong criticism of each other's allocation methodology also reveals why the parties were unable to resolve the dispute without the expenditure of time and expense.  The Court can only speculate why the parties, all represented by the ablest of lawyers and sparing no expense, were unable to reach a settlement on allocation.  For the reasons described and discussed in this opinion, the Court and the Canadian Court have arrived at the same conclusion: a modified pro rata allocation is required.

## **PROCEDURAL SUMMARY**

On January 14, 2009 (the "Petition Date") Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession (collectively, the "U.S. Debtors")[4] other than Nortel Networks (CALA) Inc.,[5] filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the U.S. Court, which cases are consolidated for procedural purposes only.

As of the Petition Date, Nortel Networks Corporation ("NNC"), a publicly-traded Canadian company, was the indirect parent of more than 130 subsidiaries, located in more than 100 countries (collectively "Nortel or the Nortel Entities").[6] NNC was the successor of a long line of technology companies, always headquartered in Canada, dating back to the founding of Bell Telephone Company of Canada in 1883.[7] NNC's principal, direct operating subsidiary, also a Canadian company, was Nortel Networks Limited ("NNL"), which in turn was the direct or indirect parent of operating companies located around the

---

[4] The U.S. Debtors in these chapter 11 cases, are:  Nortel Networks Inc., Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc.

[5] Nortel Networks (CALA) Inc. filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes [D.I. 1098].

[6] TR43999 (Nortel Networks Corporation Form 10-K for fiscal year ended December 31, 2008) p. 1, Exhibit 21.  A corporate chart showing the relevant corporate entities and the Debtor Estate to which each belongs is attached as Appendix "A".

[7] TR00002 (Exh. 2, Affidavit of Clive Allen, April 11, 2014) para. 12

world.[8]  Together with NNL, the principal companies that performed research and development ("R&D") were NNI, a U.S. company, Nortel Networks (UK) Ltd. ("NNUK"), a United Kingdom company, Nortel Networks S.A. ("NNSA"), a French company and Nortel Networks Ireland ("NN Ireland"), an Irish company.  These were known as Residual Profit Entities ("RPEs") due to their participation in a residual profit pool in connection with Nortel's transfer pricing arrangements.[9]  Other operating companies performed sales and distribution functions and were known as Limited Risk Entities ("LREs").[10]  LREs were incorporated in most of the countries where Nortel products were sold, including in the Europe, Middle East and Africa ("EMEA") regions.[11]

On the Petition Date, the U.S. Debtors' ultimate corporate parent, NNC, together with NNI's direct corporate parent, NNL, and certain of their Canadian affiliates (collectively, the "Canadian Debtors" or the "Canadian Estate")[12] commenced a proceeding with the Canadian Court under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings"). The Canadian Court appointed a Monitor, Ernst & Young Inc. (the "Monitor")  Also on the

---

[8] TR43999 (Nortel Networks Corporation Form 10-K for fiscal year ended December 31, 2008) p. 1; TR00001 (Exh. 1, Affidavit of Peter Currie, April 11, 2014) paras. 32, 36

[9] TR11055B (Economic Analysis of Nortel Networks' Intercompany Transactions by Horst Frisch, March 14, 2002) p. 1-3; TR21003 (MRDA and addenda)

[10] TR11055B (Economic Analysis of Nortel Networks' Intercompany Transactions by Horst Frisch, March 14, 2002) p. 1-3.

[11] TR40150 (2001 Distribution Agreement between NNL and NN Austria, effective January 1, 2001); TR40151 (2001 Distribution Agreement between NNL and NN Portugal, effective January 1, 2001); TR40155 (2001 Distribution Agreement between NNL and NN Spain, effective January 1, 2001); TR40122 (2001 Distribution Agreement between NNL and NN Asia, effective January 1, 2001)

[12] The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

Petition Date, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors" or the "EMEA Estates")[13] into administration (the "UK Proceedings") under the control of individuals from Ernst & Young LLP (collectively, the "Joint Administrators"). Other Nortel affiliates commenced insolvency and dissolution proceedings around the world.

On the Petition Date, the U.S. Debtors filed the Motion for Entry of an Order Pursuant to 11 U.S.C. § 105(a) Approving Cross-Border Court-to-Court Protocol (the "Protocol") [D.I. 18], which established procedures for the coordination of cross-border hearings between the Courts. The U.S. Court approved the Protocol on January 15, 2009 [D.I. 54] and the Canadian Court approved the Protocol on the Petition Date. The Courts later amended the Protocol by order of this Court on June 29, 2009 [D.I. 990] and by an order of the Canadian Court on that same date (as amended, the "Cross Border Protocol"). Subsequently, the Courts approved an Allocation Protocol which governed the trial on allocation. Order Entering Allocation Protocol, dated May 17, 2013. (the "Allocation Protocol") [D.I. 10565].

On January 22, 2009, the Office of the United States Trustee for the District of Delaware appointed an Official Committee of Unsecured Creditors (the "Committee") [D.I.s 141, 142]. An Ad hoc Group of Bondholders (the "Bondholders" or the "Bondholder

---

[13] The EMEA Debtors include the following entities: Nortel Networks UK Limited ("NNUK"), Nortel Networks S.A. ("NNSA"), Nortel Networks (Ireland) Limited ("NNIR"), Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

Group") was also organized.

On June 19, 2009, Nortel announced that it was in discussions with third parties to sell its businesses and that it would consider alternatives if it was unable to maximize value through sales. As discussed below, Nortel did, in fact, sell all of its business units and associated assets to various purchasers. Most of Nortel's intellectual property ("IP") remained unsold until later.

To facilitate the sales of the businesses and defer the issue of the allocation of the sales proceeds, the Nortel Entities entered into the Interim Funding and Settlement Agreement (the "IFSA"), which the U.S. Court approved by Order, dated June 29, 2009 [D.I. 993], and the Canadian Court approved by Order, dated June 29, 2009.

On April 4, 2011, the U.S. Debtors, together with NNL and NNC, announced an agreement with an affiliate of Google Inc. to sell Nortel's remaining patent portfolio and related assets (the "IP Assets") for $900 million (the "Google Bid"), subject to higher or better offers. The sale of the IP Assets through an auction to Rockstar Bidco L.P. ("Rockstar" and "Rockstar Transaction") resulted in a price of $4.6 billion. Rockstar is a consortium comprised of Apple, Ericsson, Microsoft, Blackberry, EMC and Sony.[14]

The IFSA provided, *inter alia*, that proceeds from the sales would be and have been held in escrow pending an agreement of the parties on allocation among them or decision by the U.S. and Canadian Courts in a joint trial to be conducted in accordance with the Cross-Border Protocol, and later the Allocation Protocol. Although the parties engaged in extensive negotiations and there were two formal mediations, the parties could not agree

---

[14] TR44220 (Rockstar Transaction ASA, June 23, 2011).

on an allocation.  The U.S. and Canadian Courts have therefore been called upon to make the allocation determination.

## FACTS

### A.  The Business Lines

Nortel was organized such that each entity was integrated into regional and product line management structures to share information and perform R&D, sales and other common functions across geographic boundaries and across legal entities.  The structure was designed to enable Nortel to function more efficiently, drawing on employees from different functional disciplines worldwide, allowing them to work together to develop products and attract and provide service to customers, fulfilling their demands globally.[15] The matrix structure was reflected in Nortel's R&D, sales organization, distribution channels and transfer pricing arrangements.[16]

As of January 2009, Nortel's lines of business ("Business Lines") were:

(a)     Carrier Networks – wireless networking solutions for providers of mobile voice, data and multimedia communications services over technologies including:

   (i)     Global System for Mobile Communications ("GSM");

   (ii)    Code Division Multiple Access ("CDMA");

   (iii)   Carrier Voice Over Internet Protocol Applications Solutions ("CVAS"); and

   (iv)    the development of long-term evolution ("LTE") wireless technology;

---

[15] TR00001 (Exh. 1, Affidavit of Peter Currie, April 11, 2014) paras. 22-28; TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) paras. 31-38

[16] TR00001 (Exh. 1, Affidavit of Peter Currie, April 11, 2014) paras. 22-28; TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) paras. 45-52

     (b)    Enterprise Solutions – enterprise communications solutions addressing the headquarters, branch and home office needs of large and small businesses; and

     (c)    Metro Ethernet Networks – optical networking and carrier grade ethernet data networking solutions, including:

          (i)    Carrier Ethernet switching products;

          (ii)    optical networking products; and

          (iii)    multi-service switching products.[17]

As part of the extensive sale processes (see Appendix B), Nortel sold its businesses and assets, including: (i) the sale of certain portions of its Layer 4-7 data portfolio to Radware Ltd. [D.I. 539] (the "Layer 4-7 Sale"); (ii) the sale of substantially all of its CDMA business and LTE Access assets to Telefonaktiebolaget LM Ericsson (publ) ("Ericsson") [D.I. 1205]; (iii) the sale of substantially all of the assets of the Enterprise Solutions business globally, including the shares of Nortel Government Solutions Incorporated and DiamondWare Ltd. to Avaya Inc. [D.I. 1514]; (iv) the sale of the assets of its Wireless Networks business associated with the development of Next Generation Packet Core network components to Hitachi Ltd. [D.I. 1760]; (v) the sale of substantially all the assets of its Optical Networking and Carrier Ethernet businesses associated with its Metro Ethernet Networks business unit to Ciena Corporation [D.I. 2070]; (vi) the sale of substantially all of its GSM/GSM- R business to Ericsson and Kapsch CarrierCom AG [D.I. 2065]; (vii) the sale of certain assets of its Carrier Voice Over IP and Application Solutions business to

---

[17] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 9-13 (*but note*, at para. 9, that "[a] fourth business segment, Global Services (essentially Nortel's support and services arm), was a separate reportable segment until December 31, 2008, before being integrated into the other LOBs.")

GENBAND US LLC [D.I. 2632]; (viii) the sale of certain assets of the Debtors' Multi-Service Switch business to Ericsson [D.I. 4054]; and (ix) certain other sale transactions.

At the time the EMEA, U.S. and Canadian Debtors (collectively, the "Debtors") filed for creditor protection in January 2009, only the GSM and CDMA lines of business were profitable.[18]  Overall, Nortel was losing vast sums of money, its customers were, in large part, no longer supporting it, and NNC had by the fall of 2008, written off all of its goodwill.[19]

## B.   Research & Development

Nortel spent significant amounts on R&D; in 2004, for example, Nortel spent more on R&D as a percentage of revenue than its competitors.[20]  R&D played a critical role in the sales process of the Business Lines.[21]  Before the 1980s, all of Nortel's R&D was performed in Ottawa – R&D which led to revolutionary telecommunications products that established Nortel's reputation.[22]  Subsequently, Nortel opened R&D facilities in other jurisdictions. Nortel also acquired numerous technology companies during the 1990s and early 2000s and merged their R&D organizations into those of the Nortel subsidiaries operating in their

---

[18] TR00042 (Exh. 42, Expert Report of Philip Green, Reissued February 28, 2014) Appendices A-E Carve-out statements

[19] TR00014 (Exh. 14, Affidavit of Paviter Binning, April 10, 2014) paras. 21, 47; TR46789 (Verizon Press Release regarding Global LTE Ecosystem, February 17, 2009); TR43999 (Nortel Networks Corporation Form 10-K for fiscal year ended December 31, 2008)

[20] TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) para. 28, citing TR44900 (Email regarding Competitor Comparisons, February 19, 2004)

[21] Gregory Mumford Deposition, October 24, 2013, p. 202:19-204:15, regarding TR21226 (Email discussing Harlow Input, October 28, 2003)

[22] TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) para. 16

jurisdictions.[23]

Subsidiaries commenced their operations and produced "state of the art" products which allowed them to become important participants in their markets.[24]  R&D was coordinated through two different management structures.  Decisions about the majority of R&D funding were made by the Business Lines to create, develop and improve technology for products within their particular technology areas.[25]  Advanced technology research, which was intended to develop novel, cutting edge technologies with a longer time horizon to product creation (if successful) was coordinated by Nortel's Chief Technology Officer and allocated funding through a central budget.[26]  The advanced technology research produced the greatest impact in terms of innovation and patent filings.[27]

The following chart summarizes Nortel R&D spending for the years 2000 to 2009.[28]

| R&D Spend | NNL | NNI | EMEA |
|-----------|-----|-----|------|
| 2000 | 42% | 42% | 16% |
| 2001 | 43% | 39% | 18% |
| 2002 | 39% | 41% | 20% |
| 2003 | 42% | 38% | 20% |
| 2005-2009 | 49.8% | 38.5% | 11.7% |

[23] TR40259 (Nortel Networks Corporation Form 10-K for fiscal year ended December 31, 2000) p. F14-F16

[24] TR00002 (Exh. 2, Affidavit of Clive Allen, April 11, 2014) paras. 38-39

[25] TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) paras. 19-21; TR00023 (Exh. 23, Affidavit of Simon Brueckheimer, April 9, 2014) para. 10

[26] TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) paras. 12, 17, 20, 22-23; Simon Brueckheimer Deposition, October 1, 2013, p. 165:6-166:19; Peter Newcombe Trial Testimony, Day 7, May 22, 2014, p. 1608:10-22

[27] TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) para. 22

[28] TR11084 (2004 Functional Analysis, November 30, 2004) p. 23

Nortel's billions in R&D expenditures over the decades preceding January 2009 generated the IP, but it is impossible to trace which R&D expenses produced which IP.[29] As of January 2009, NNL held approximately 8,800 worldwide patents and applications.[30] The majority of all rights, title and interest in inventions by Nortel employees worldwide were assigned directly or indirectly to NNL.[31]  As a result, nearly all of the patents and applications were assigned to Canadian entities; approximately 7000 patents and applications in the portfolio sold in the transaction discussed below had been assigned to NNL.[32]

### C.   Transfer Pricing

Transfer pricing is the process by which a multi-national enterprise ("MNE") sets prices for transactions between related corporate entities across taxing jurisdictions.[33]  The intercompany transactions take place between entities that are commonly controlled. Therefore, transfer prices are assigned by management rather than being the result of arm's length negotiation between parties.[34]  Transfer prices are assigned rather than bargained for and because effective tax rates across jurisdictions may vary, MNEs are incentivized to

---

[29] Michael Orlando Trial Testimony, Day 6, May 21, 2014, p. 1315:21-1316:1; TR11084 (2004 Functional Analysis, November 30, 2004) p. 28-29; TR22078 (Joint Request for US-Canada BAPA 2007-2011 (with rollback to 2006), October 31, 2008) p. 50, Appendix B

[30] TR00006 (Exh. 6, Affidavit of Angela de Wilton, April 11, 2014) para. 12, citing TR47338 (Patent Excel File, January 7, 2009); *see also* TR11151 (Nortel's IP Team and Patent Portfolio PowerPoint, August 2010) Slide 11 (p. 11)

[31] TR00006 (Exh. 6, Affidavit of Angela de Wilton, April 11, 2014) paras. 8-12; Timothy Collins Deposition, November 15, 2013, p. 40:10-41:20

[32] TR00006 (Exh. 6, Affidavit of Angela de Wilton, April 11, 2014) paras. 8-12; TR40197 (List of Transferred Patents in Rockstar Transaction); TR47338 (Patent Excel File, January 7, 2009)

[33] TR00062 (Eden Report) ¶ 20; TR00035 (Cooper Report) ¶ 3.1

minimize their global effective tax rate when setting transfer prices.[34]

In light of these incentives, taxing authorities have implemented regulations that govern transfer pricing generally require that intercompany transactions be priced in a manner consistent with the way that similarly situated, uncontrolled parties would price comparable transactions at arm's length.[36]

Nortel had transfer pricing arrangements that governed how it reported income in each of the jurisdictions in which it did business.[37]  Within Nortel companies were treated as separate legal entities.   These individual entities ("IEs") had their own books and records, financial statements, bank accounts and cash reserves.   Each company was organized in accordance with and operated under local laws.[38] Subsidiaries within Nortel filed separate financial statements with the appropriate local regulatory agency and Nortel kept detailed revenue figures for different countries and regions.[39]   Nortel entities had separate boards of directors.[40]

---

[34] TR00049 (Reichert Report) at 13

[35] TR00062 (Eden Report); TR00049 (Reichert Report) at 14; Trial Tr. 2632:4-3632:14 (Cooper); TR00016 (Henderson Decl.) ¶ 8.

[36] TR00062 (Eden Report) ¶ 24; TR00049 (Reichert Report) at 16; TR00035 (Cooper Report) ¶ 3.1

[37] TR00049 (Exh. 49, Expert Report of Dr. Timothy Reichert, January 24, 2014) p. 16; TR21389 (Email attaching Memo regarding Nortel's Transfer Pricing Policy, March 18, 2003) p. 1

[38] TR00014 (Binning Aff.) ¶ 9; TR00007A-B (McCorkle Aff.) ¶¶ 16, 17; Doolittle Dep. 258:15-259:3; Trial Tr. 815:11-816:8 (McCorkle); TR21322 (Corporate Procedure 303.37 discussing Regional/Global Cash Pooling); Freemantle Dep. 204:6-204:15;  Rolston Dep. 34:6-35:2.

[39] TR00001 (Currie Aff.) ¶ 39; Binning Dep. 148:13-23; Freemantle Dep. 416:7-17; *see also* TR40269 (NNC 2008 Form 10-K) at 54-59, 197-206, 281.

[40] Trial Tr. 543:21-546:12 (Currie); *id*. 1069:14-1070:20 (Binning); TR00001 (Currie Aff.) ¶ 39; TR00014 (Binning Aff.) ¶ 9; TR00020 (Ray Decl.) ¶¶ 16, 30; TR00013 (G. Davies Aff.) ¶¶ 14, 18; Rolston Dep. 159:22-160:13.

### D. Advanced Pricing Arrangements

If a tax authority disagrees with the transfer pricing methodology reflected in an MNE's tax return for a particular year, the tax authority may initiate an audit, which could potentially lead to an adjustment in taxes owed by the MNE, penalties, tax court litigation and/or double taxation.[41]  To mitigate this risk, taxpayers may avail themselves of the advanced pricing arrangement ("APA") process offered by tax authorities.  An APA is a contract between a member of an MNE, such as NNL, and a tax authority, such as the Canadian Revenue Authority ("CRA"), the U.S. Internal Revenue Service ("IRS") and the Inland Revenue Service ("Inland Revenue") in the U.K., typically specifying the transfer pricing methodology that the affiliate will be permitted to use for an agreed period of time.  APAs can include multiple tax authorities and members of an MNE.[42]

### E. Cost Sharing Agreements

From the late 1970s to December 31, 2000, Nortel operated under a series of Cost Sharing Agreements (each a "CSA"), which were bilateral agreements between NNL and each of the other R&D performing Nortel entities, including NNI, NNUK, NN Ireland and NNSA (referred to together with NNL as the "Cost Sharing Participants" or "CSPs").[43]  During the period of the final series of CSAs, NNL and each of the other CSPs entered into

---

[41] TR00062 (Eden Report) ¶ 77; TR00049 (Reichert Report) at C-13 to C-15; TR00016 (Henderson Decl.) ¶ 9.

[42] TR00049 (Reichert Report) at C-13 to C-15; TR00016 (Henderson Decl.) ¶¶ 10, 12.

[43] TR46882 (1978 NNL-NNI R&D CSA); TR45048 (1983 NNL-NNI R&D CSA); TR45741 (1985 NNL-NNI R&D CSA); TR45740 (1985 NNL-NNUK R&D CSA); TR45739 (1985 NNL-NN Ireland R&D

13

three separate cost-sharing agreements, which governed pricing for different types of intercompany transactions: an agreement governing R&D (an "R&D CSA"), another for tangible property and another for headquarters expenses.[44]

The last R&D CSA between NNL and NNI was drafted in 1996 and made effective from January 1, 1992 to reflect the terms of a 1996 APA between NNL, NNI, the CRA and the IRS. The 1992 NNL-NNI R&D CSA provided a mechanism for sharing the "costs and risks of research and development services or activities in return for interests in any NT Technology that [was] produced by such services or activities."

## F.   New Transfer Pricing Arrangement

At the end of 1999, each of the three CSA APAs in effect between NNL and each of the other then-CSPs (governing R&D, tangible property, and headquarters cost sharing) had expired or was nearing expiration.[45]   The CRA, IRS and Inland Revenue did not want to renew the R&D CSA APA after 1999.  They had encouraged Nortel to adopt a residual profit sharing method ("RPSM").

Beginning in late 2000, Nortel formed a team of employees (the "APA Team") to determine the appropriate transfer pricing policy to propose to taxing authorities in the upcoming APA process.  Nortel's APA Team investigated alternatives to the R&D CSA "[i]n an effort to minimize Nortel's long-term effective tax rate, to make the transfer pricing administrative processes more efficient and to, over time, improve the global allocation of

---

CSA); TR21002 (1992 NNL-NNI R&D CSA); TR33067 (1995 NNL-NNUK R&D CSA); TR46945 (2000 NNL-NNSA R&D CSA); TR11055 (Horst Frisch Report) at 1-2; TR00016 (Henderson Decl.) ¶ 14.

[44] TR11055 (Horst Frisch Report) at 1, 10-12.

profits among Nortel affiliates."  In December 2001, Nortel's R&D CSAs were terminated

effective January 1, 2001.[46]   Termination of the R&D CSAs resulted in each license-holding

CSP receiving "a fully paid up license" to all Nortel intellectual property in existence as of

that date with respect to its Exclusive Territory.

From December 2001 through March 2002, the Nortel tax group worked with

external advisors to craft the specific mechanics of a RPSM for Nortel that could be

submitted simultaneously to the CRA, IRS and Inland Revenue as the basis for proposed

APAs for the 2000 to 2004 period.[47]   The resulting APA applications to those three tax

authorities were filed on or about March 14, 2002.[48]   Each APA application included a

functional analysis prepared by Horst Frisch entitled "Economic Analysis of Nortel

Networks' Intercompany Transactions" (the "Horst Frisch Report"), setting forth Nortel's

justification for its proposed RPSM on the basis of various Nortel affiliates' roles and

functions, as required to demonstrate that the proposed RPSM satisfied the arm's length

standard.[49]

---

[45] TR11058 (Dec. 2, 2001 Email from W. Henderson attaching "Overview of Objectives of December 12, 2001 Presentation") attachment at 1.

[46] TR11103 (2001 Termination of Amended NNL-NNI R&D CSA); TR31016 (2001 Termination of Amended NNL-NNUK R&D CSA); TR 45043 (2001 Termination of Amended NNL-NN Ireland R&D CSA); TR32240 (2001 Termination of NNL-NNSA R&D CSA).

[47] TR00016 (Henderson Decl.) ¶ 32.

[48] TR22122 (attaching letters submitting 2002 APA applications to IRS, CRA and Inland Revenue); TR00016 (Henderson Decl.) ¶ 33.

[49] TR11055 (Horst Frisch Report); TR22122 (Letters submitting 2002 APA Application to IRS, CRA and Inland Revenue) at EY-NRTL-001402 ("[t]he specific details of the proposed RPS methodology are provided in the economic analysis prepared by Horst Frisch Inc., which is attached as *Appendix 1* to this APA Request"); *id*. at EY-NRTL-001406; *id*. at EY-NRTL-001413; TR00016 (Henderson Decl.) ¶ 33.

Nortel's RPSM distinguished between the IEs (then consisting of NNL, NNI, NNUK, NN Ireland, NNSA and Nortel Networks Australia) – who, as discussed above, performed ongoing R&D, had previously been parties to R&D CSAs and performed the full range of functions – and LREs, who were routine distributors whose primary function was to sell Nortel products in their respective geographic regions, did not perform R&D and had not previously participated in an R&D CSA.[50]   The RPSM allocated operating profits or losses to IEs and LREs under a two-step process.[51]

To determine the total "pool" of operating profits (or losses) to be allocated among the IEs and LREs, the RPSM started with Nortel's consolidated operating profits or losses and recalculated this figure on an "economic" basis for each entity through a series of adjustments including adding back R&D expenses and then subtracting an amortized portion of those expenses.  This calculation resulted in the gross "economic profit or loss."[52]

In the second step of the RPSM, "residual" operating profits or losses remaining after the payout of routine returns were allocated to the IEs only, based on each IEs' relative proportion of capitalized R&D expenses from that year and preceding years, assuming a 30% amortization rate.[53]

One of the objectives of Nortel when implementing the RPSM was to minimize tax payments globally.  Nortel personnel and advisors designed the RPSM to shift taxable

---

[50] TR11055 (Horst Frisch Report) at 30; TR00016 (Henderson Decl.) ¶ 35.

[51] TR11055 (Horst Frisch Report) at 34; TR00016 (Henderson Decl.) ¶ 35.

[52] TR11055 (Horst Frisch Report) at 37-40; TR00016 (Henderson Decl.) ¶ 37; TR21003 (MRDA) at 18-19 (Sched. A).

[53]  TR11055 (Horst Frisch Report) at 34-35, 40, 55; TR21003 (MRDA) at 18-19 (Sched. A).

income from NNI to NNL.[54]  Trial testimony of NNL's former chief financial officers

further corroborates that minimizing tax was a key goal for Nortel.[55]

Over the course of eight years (2001-2008) as APA negotiations with the tax

authorities continued regarding Nortel's RPSM, the IEs made or received billions of dollars

in transfer pricing payments under that system.  As summarized in the following table,

NNL was the chief recipient of these payments, totaling more than $4.7 billion, while NNI

was the largest payor, transferring over $6.7 billion to other Nortel entities:

**Table 2:  Transfer Pricing Payments, 2001-2008[56]**

| IE | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | Total |
|----|------|------|------|------|------|------|------|------|-------|
| NNL | 589.0 | 482.3 | 391.0 | 652.4 | 496.0 | 511.1 | 725.9 | 879.8 | 4,727.5 |
| NNI | -1,931.2 | -1,140.2 | -857.8 | -722.7 | -631.8 | -371.8 | -508.9 | -537.3 | -6,701.7 |
| NNUK | 902.7 | 198.0 | 443.8 | 307.2 | 205.5 | 36.5 | 28.1 | 20.5 | 2,142.3 |
| NNSA | -92.1 | 81.1 | -27.4 | -145.7 | -12.7 | 3.7 | -95.3 | -46.9 | -335.3 |
| NN Ireland | -44.2 | -70.5 | -67.4 | -64.9 | -50.0 | -102.6 | -119.5 | -147.6 | -666.7 |
| NN Australia | 38.2 | 24.2 | -17.8 | 1.5 | 8.2 | -95.6 | -0.4 | 0.0 | -41.7 |

---

[54] TR11058 (Dec. 2, 2001 Email from W. Henderson attaching "Overview of Objectives of December 12, 2001 Presentation") attachment at 1; TR11053 (Dec. 11, 2001 PowerPoint Presentation titled "Overview of Transfer Pricing APA and Recommendations") at 15; *see also id.* at 16-18; TR11068 (Mar. 17, 2002 Email from W. Henderson titled "Mission Accomplished!") at NNI_01503492; TR22121 (July 5, 2002 Email from R. Prgomet attaching July 11, 2002 PowerPoint Presentation titled "Global Tax Practice") attachment at 13; TR11341 (Dec. 17, 2003 Call Notes); TR21525 (Nov. 23, 2005 Email from J. Doolittle to K. Stevenson and M. McCorkle); TR21169 (Dec. 18, 2005 Email from M. Weisz to M. Orlando) at 1; *see also* TR00028 (Weisz Decl.) ¶¶ 3-4; TR21170 (Dec. 5, 2007 Presentation titled "Global Tax Town Hall" ) at 7, 17; TR21164 (Oct. 22, 2007 Email from R. Culina to P. Carbone) at EMEAPRIV0089376 ; *see also id.* attachment at 1; TR45137 (May 6, 2008 Presentation titled "Tax Matters Update Audit Committee Meeting") at 3.

[55] Trial Tr. 552-53 (Currie); TR00001 (Currie Decl.) ¶ 73.

[56] See Orlando Decl. at 14, Figure 2 (citing TR49192 at "Rona" tab, 2001 Transfer Pricing Worksheet; TR49187 at "Rona" tab, 2002 Transfer Pricing Worksheet; TR49188 at "Rona" tab, 2003 Transfer Pricing Worksheet; TR49194 at "Profit split profit tab, 2004 Transfer Pricing Worksheet; TR49190 at "Profit split profit" tab, 2005 Transfer Pricing Worksheet; TR49191 at "RPS Calculation" tab, 2006 Transfer Pricing Worksheet; TR49193 at "RPS Calculation" tab, 2007 Transfer Pricing Worksheet; TR49189 at "FY RPS Calculation" tab, 2008 Transfer Pricing Worksheet.)

As shown, in each year covered by the RPSM, NNI paid out hundreds of millions of dollars – more than a billion dollars in some years – to the other IEs. NNL received hundreds of millions of dollars in transfer pricing payments each year. In part, these transfer pricing payments by NNI were used by NNL to fund its R&D.[57]

The amount of transfer pricing payments attributable to R&D and the Total R&D Funded for each entity each year in the Master Research and Development Agreement (discussed below) period are summarized below.

Table 3: R&D Funding Under the RPSM, 2001-2008

|  | NNL | NNI | EMEA | Total |
|---|---|---|---|---|
| *Direct R&D* | 7,372 | 6,467 | 2,667 | 16,506 |
| *TP – R&D* | (2,986) | 3,006 | (205) | (185) |
| *Total R&D Funded* | 4,385 | 9,473 | 2,462 | 16,321 |
| *% of Total R&D Funded Directly and Indirectly* | 27% | 58% | 15% | 100% |

Neither the IRS nor the CRA approved Nortel's RPSM. In 2009, following Nortel's insolvency and more than seven years after the 2002 APA applications, the IRS and CRA directed an income adjustment of $2 billion from NNL to NNI as a condition for resolving the APA for those years.[58]

G.    The Master R&D Agreement

From 2001 until the end of 2004, Nortel operated under the RPSM without any written intercompany agreement memorializing its terms.[59]   In December 2004, Mark

---

[57] Trial Tr. 822:13-823:10 (McCorkle)

[58] TR11239 (2010 NNI-IRS APA) App. A; TR48800 (2010 NNL-CRA APA) at 9.

[59] Trial Tr. 1140:5-23 (Henderson); *id.* 1716:3-1717:21 (Stephens); Stephens Dep.34:15-35:6; Trial Tr. 1848:3-:11; Lebrun Dep. 213:18-214:6.

Weisz circulated the final Master R&D Agreement ("MRDA") to the IEs for execution. The agreement was signed by NNL, NNI, NNUK, NNSA and NN Ireland at various dates and made effective January 1, 2001. John Doolittle signed the MRDA on behalf of NNL.[60]

### H. Rights to Intellectual Property Under the MRDA

The MRDA sets forth a clear exchange of consideration between the signatories. Pursuant to Article 4(a), each Licensed Participant ("Licensed Participant") vested legal title in NNL to the intellectual property it created. Expressly "in consideration therefor," NNL granted an exclusive license ("Exclusive License") back to each Licensed Participant: [61]

> Except as otherwise specifically agreed, legal title to any and all NN Technology whether now in existence or acquired or developed pursuant to the terms of this Agreement shall be vested in NNL. In consideration therefor, NNL agrees in enter into an Exclusive License with each of the Licensed Participants as set forth in Article 5.

### I. The MRDA Was Tax Driven

The risk that Nortel would be audited by tax authorities without an agreement in place prompted Nortel to draft the MRDA.[62] Accordingly, the MRDA was a tax-driven contract, drafted primarily by Nortel's tax team and external tax counsel, and it was intended to memorialize the group's transfer pricing policy in place from 2001 forward.[63]

Nortel also was aware that the transfer pricing policies it had proposed in its 2002 APA application and which were reflected in the MRDA were subject to approval by the

---

[60] TR11246 (Dec. 22, 2004 Email from Mark Weisz enclosing the Final Master R&D Agreement) at 5; TR21003 (MRDA) at 13-17 (Signature Blocks).

[61] TR21003 (MRDA) at 6 (Art. 4(a))

[62] Trial Tr. 1848:3-20 (Weisz)

[63] Trial Tr. 1275:6-7; 1725:19-25; TR00028

tax authorities, and intended that arrangements in the MRDA would ultimately either be approved by those authorities or be revised to secure approval.[64]

The MRDA enabled Nortel to maintain separate and distinct legal entities in order to avoid NNL having a "permanent establishment" in another jurisdiction by conducting business there, particularly in the United States. Nortel management was aware that under U.S. tax law, if a partnership is engaged in a U.S. trade or business, non-U.S. resident partners that own an interest in that partnership are also deemed to have a U.S. trade or business, and may be subject to tax in the United States if that trade or business is treated as creating a permanent establishment for the non-U.S. partner.[65]

## J.  The Interim Funding and Settlement Agreement

On the Petition Date, with the approval of the U.S. Court, NNI loaned to NNL $75 million under a new revolving loan agreement (the "Intercompany DIP Loan"). The amounts owing to NNI under the Intercompany DIP Loan were repaid with proceeds from the sale of Nortel's Carling facility.[66] Also in January 2009, NNI paid to NNL an additional $30 million, as a transfer pricing payment.[67]

On June 9, 2009, the U.S. Debtors (excluding NN CALA, which had not yet filed for bankruptcy), Canadian Debtors and EMEA Debtors (excluding NNSA, who later acceded to the agreement) entered into the IFSA to address both interim funding of NNL as well as

---

[64] TR21003 (MRDA) at 2 (final recital); TR21003 (MRDA) at 5 (Art. 3(c)); TR21003 (MRDA) at 19 n.2 (Schedule A); TR21003(MRDA) at 29 (Addendum to MRDA replacing, *inter alia*, Art. 11(d)).

[65] TR21003 (MRDA) at 12 (Art. 13); TR00062 (Eden Report) ¶¶ 124-126

[66] TR50194; TR50003

[67] TR12032 (IFSA) at 2

principles under which collaborative sales of Nortel's businesses and assets could take place.[68]

The IFSA provided for a payment by NNI to NNL of $157 million (net of the $30 million previously paid in January) in full settlement of any transfer pricing and other claims NNL might have had against NNI for the period from the Petition Date through September 30, 2009.  In April 2009, the Monitor reported that NNL needed this payment in order to have "adequate cash resources to fund operations."[69]   The process allowed, but did not obligate, the U.S. Debtors, Canadian Debtors and EMEA Debtors to jointly sell Nortel's assets without a prior agreement on allocation, but it required the parties to negotiate in good faith to reach agreement on allocation before submitting the question to the Courts.[70]   The IFSA made explicit that there was no obligation for any Debtor to proceed with a sale transaction if it determined that it was not in the best interests of its creditors.[71]

The IFSA also referred to the U.S. Debtors, the Canadian Debtors and the EMEA Debtors as "Selling Debtors."  The IFSA required that any agreement or determination by either the U.S. Debtors or Canadian Debtors related to license termination agreements and the allocation of Sales Proceeds required the prior consent of the Bondholder Group, acting in good faith.  The U.S. Debtors had to obtain similar consent from the Committee.[72]   Each

---

[68] TR12032 (IFSA).

[69] TR12032 (IFSA) § 1; TR45561 (Apr. 24, 2009 Report of the Monitor) ¶¶ 50-51.

[70] TR12032 (IFSA) § 12(c), (d).

[71] *Id.* § 12(e).

[72] *Id.* § 12(g).

Licensed Participant agreed under the IFSA that if, and only if, it determined to participate in a sale that was in the best interests of its creditors, it would enter into a license termination agreement relinquishing its Exclusive License.[73]  The IFSA provided that the termination or relinquishment of a license would be deemed a sale with the Licensed Participant being deemed a seller.[74] The IFSA made clear that any such license terminations would be provided "in consideration of a right to an allocation to be determined" from such sale.[75]  The IFSA was not an "amendment, modification or waiver of rights" of any party under any other agreement, including the MRDA.[76]  The U.S. Court and Canadian Court entered orders approving the IFSA following a joint hearing on June 29, 2009 (the "U.S. IFSA Order" and the "Canadian IFSA Order").[77]

### K.  The Final Canadian Funding and Settlement Agreement

At the end of 2009, NNL approached NNI and requested additional financing, stating that without additional cash, NNL would have to shut down.[78]  At the time of NNL's request for additional financing, NNL's and NNI's requests to the CRA and IRS for approval of an APA governing the RPSM regime for the 2001-2005 and 2006-2011 periods were still unresolved.[79]

The parties addressed both NNL's cash needs and the tax settlement in a new

---

[73] *Id.* ¶¶ 11(a).

[74] *Id.* §11(d); *see also* TR44149 (CDMA-LTE License Termination Agreement) at 2; *id.* at Art. 2.08

[75] TR12032 (IFSA) § 11(a); *see also id.* § 11(d).

[76] *Id.* § 20.

[77] TR40824 (Motion (A) Approving the IFSA and (B) Granting Related Relief); TR50057 (Canadian Order Approving the IFSA).

[78] TR46910 (FCFSA) at 2.

agreement entitled the Final Canadian Funding and Settlement Agreement (the "FCFSA").

The provisions of the FCFSA included the following:[80]

(a)     NNI agreed to pay NNL $190.8 million in full and final settlement of any and all claims that NNL might have (or could have through the final conclusion of the Canadian Debtors' proceedings) against NNI, whether based on transfer pricing arrangements, other intercompany agreements or otherwise.

(b)     NNI and NNL agreed to enter into APAs with the IRS and CRA, respectively, for the years 2001-2005 on the terms set by the tax authorities.

(c)     NNL granted NNI an allowed $2.06 billion claim in NNL's CCAA proceedings, with such claim not being subject to offset or reduction.

(d)     NNL and NNI agreed not to exercise any rights of termination under the MRDA without the prior written consent of the other parties to the MRDA, the Committee and the Bondholder Group.

The EMEA Debtors and NNL separately agreed that they would not exercise any right of termination.[81]

On December 23, 2009, NNI, NNL, the Monitor and other U.S. and Canadian Debtors executed the FCFSA.[82]   The U.S. Court and Canadian Court entered orders approving the FCFSA following a joint hearing on January 21, 2010.  The order entered by the Canadian Court approving the FCFSA expressly allowed NNI's $2.06 billion claim against NNL, which was not subject to offset or reduction.[83]

---

[79] TR46910 (FCFSA); TR11239 (Feb. 18 2010 NNI and IRS APA).

[80] TR46910 (FCFSA) § 1; *See id.* § 9; *See id.* § 10; *See id.* § 28

[81] TR48613

[82] TR46910 (FCFSA) § 1;

[83] TR40271 (2011 NNC Form 10-K) at 32; TR50431 (Jan. 21, 2010 Canadian Order Approving FCFSA); TR50146 (US D.I. 2347 Order Approving FCFSA).

23

L.  The Sale of Nortel's Business Lines

Nortel's Business Lines were sold in a consensual, "cooperative and coordinated fashion."[84]  From shortly after the IFSA was approved through April 4, 2011, all parties worked together and successfully sold the following businesses in joint sale processes across multiple jurisdictions, most of which involved vigorous auctions conducted pursuant to Section 363 of the United States Bankruptcy Code and Court-approved sales processes in accordance with the CCAA.  These sales (together, the "Business Line Sales") generated $3.285 billion of which approximately $2.85 billion is now available.  The specific details of the Business Line Sales are set forth in Appendix A to this opinion.

As part of the Business Line Sales process, the U.S. and EMEA Debtors entered into License Termination Agreements (the "LTAs").  Prior to the U.S. Debtors executing an LTA for any Business Line Sale, the U.S. Creditors Committee and the Bondholder Group needed to, and did, consent to the transactions.[85]

Only some of Nortel's patents were sold in the Business Line Sales.  If a patent was not "predominantly used" in a Business Line it was not transferred to a purchaser, and the purchaser was generally granted a nonexclusive right to practice the patent in a limited field of use.[86]

Nortel transferred 2,700 patents as part of the Business Line Sales.[87]  NNL retained

---

[84] TR00009A-C (Hamilton Aff.) ¶ 37; Trial Tr. 3208:7-19 (Green); Trial Tr. 4172:2-5 (Kinrich).

[85] TR44149 (CDMA/LTE LTA); TR44186 (MEN LTA); TR12032 (IFSA) § 11(a).

[86] TR44149 (CDMA/LTE LTA); TR44186 (MEN LTA).

[87] TR11151 (Nortel's IP Team and Patent Portfolio PowerPoint, August 2010) Slide 11 (p. 11)

24

ownership of the patents licensed to the Business Line Sales purchasers.[88]  Thousands of R&D personnel, principally in Canada but also in the other RPE jurisdictions, were transferred to the purchasers of the lines of business.[89]  The transfer of the valuable assembled workforce, including R&D personnel, enabled the purchasers to continue to operate the businesses without interruption.

As all Debtors, the Committee, Bondholders and the Canadian Creditors Committee ("CCC") agree, and the U.S. Court and the Canadian Court found when they approved them, the Business Line Sales proceeds generated through the auction process represent the fair market value of the Business Lines.[90]

## M.   Patent Identification

In the Business Line Sales, it was important that Nortel identify which IP rights – principally patent rights – needed to be conveyed; each prospective purchaser wished to obtain as many patents as possible as part of each sale transaction.  Conversely, Nortel wanted to ensure that the only patents transferred were those incorporated exclusively or principally in the business line in question so as to retain value within Nortel and not to jeopardize the ability to sell the other Business Lines that might require rights to the same patents.[91]

---

[88] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 65

[89] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 52(f)
[90] Trial Tr. 2120:13-2120:20 (Huffard); Trial Tr. 3420:25-3421:7 (Britven); Trial Tr. 3220:23-3221:5 (Green); Trial Tr. 4104:1-4104:12 (Kinrich);

[91] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 59-60; John Veschi Deposition, November 7, 2013, p. 128:11-25

When the Business Lines were being sold, Nortel's IP Group undertook a patent segmentation process to determine which patents would be transferred with each of the Business Lines.  The standard for transfer of a patent in the sales was whether the IP in question was "predominantly used" in a given Business Line.  IP that was used in multiple Business Lines ("shared" IP) was not sold with the businesses and rights to use that IP were instead conveyed to Business Line purchasers as necessary, generally via limited, non-exclusive licenses.[92]  There is no evidence that, pre-petition, Nortel had ever undertaken such an exercise to determine whether a given patent was predominantly used in a specific Business Line, used in multiple Business Lines or not used in any Business Line in the normal course of its business or that Nortel ever monitored which patents were used or not used in Business Lines.  In conducting the patent segmentation process, Nortel's IP Group sought to reduce the number of patents sold in the Business Line Sales to maximize the number of patents that would remain outside the Business Line Sales and retain such patents as part of a large portfolio to maximize value for creditors.[93] [94]

### N.    Nortel's Patents Had a Useful Life of Many Years

U.S. patents are granted for a 20-year period.[95]  A patent is within its economic useful life if it can be sold.  As Canadian Debtors' expert Timothy Reichert wrote in an article, "commercial transferability is the most objective of the three definitions of economic

---

[92] McColgan Dep. 123:14-22; Veschi Dep. 125:6-126:8

[93] Veschi Dep. 124:10-20.

[94] Veschi Dep. 124:10-20; *id.* at 146:7-17; TR48932 (Presentation titled "Overview") at 8; TR43641.03 (Presentation titled "Project Iceberg") at 1-3.

[95] TR50843

life."[96]  When measuring the useful life of a patent, it is necessary to distinguish between the life of a product utilizing a patent and the life of a technology or patent itself.  While a particular product may become obsolete in a relatively short period, the patents incorporated into that product may survive through many generations of products and be utilized and built upon for a far longer period than the initial product itself.[97]  The useful economic life of many Nortel patents well exceeded five years.[98]  The vast majority of the patents that sold collectively for approximately $4.5 billion were more than a decade old at the time of the sale.[99]  Nortel's valuable patents were largely created in the late 1990s to early 2000s, corresponding to Nortel's peak.[100]  99% of the high-interest patents that were sold to Rockstar had been developed before 2006, more than 5 years before the sale to Rockstar in 2011.[101]  80% of the high-interest patents sold to Rockstar were developed in 2000 or earlier, during the period that Nortel employed a cost-sharing arrangement to fund R&D.[102]

---

[96] TR40710

[97] Trial Tr. 668:25-69:25 (McFadden); Trial Tr. 1595:13-1596:2 (Brueckheimer); Trial Tr. 2868:10-2869:1 (Felgran); Trial Tr. 2270:20-25 (Malackowski); Trial Tr. 2457:22-2458:5; TR31355 (Nortel Networks Functional Analysis for the years ended December 31) at 29; TR44077 (Presentation, Nortel Pre-Filing Conference with CRA) at 5; Tr. 4678:9-22 (Tucker).

[98] Trial Tr. 628:2-6 (Allen); Trial Tr. 2662:19-2663:2 (Cooper); TR48711.02

[99] TR00033; TR41471; TR48835; Trial Tr. 2281:2-12; Trial Tr. 2287:1-20; TR00035; Trial Tr. 2814:5-13; Trial Tr. 2051:5-11; TR21011; TR21013;

[100] Trial Tr. 2266:22-2267:9; Trial Tr. 2276:16-2278; Trial Tr. 4679:1

[101] Trial Tr. 2281:2-12 (Malackowski); TR00034 (Malackowski Rebuttal) at 31.

[102] Trial Tr. 4511:15-4512:22

O.     A Licensing Business - IPCo

After completing the Business Line Sales, Nortel retained a substantial number of intellectual property assets (the "Patent Portfolio" or the "Residual IP").  Over the course of more than a year, the Debtors, other stakeholders and their advisors carefully weighed a possible sale of Nortel's Patent Portfolio against the alternative of an IP licensing service and enforcement business ("IPCo"), a proposed business that Nortel began considering before the insolvency filings as set forth below.[103]

IPCo would monetize the Residual IP by licensing patents to technology companies that were suspected of infringing on them in exchange for the payment of royalties.  IPCo would license the Residual IP by threatening patent infringement litigation and bringing such litigation if necessary.[104]

Early in 2008, as discussed below, Nortel began to explore options for more effectively monetizing its intellectual property through developing a more robust licensing and enforcement business than it had to date.  John Veschi was hired by NNI in July 2008 as Chief Intellectual Property Officer to "look at options for licensing."[105]  Veschi had extensive licensing and IP experience.[106]

One possibility was for the licensing business to be a separate Business Line with direct reporting to Nortel's CEO.[107]  Veschi initiated a program to license group IP to

---

[103] Trial Tr. 1075:2-1076:2 (Binning); Trial Tr. 933:6-12 (Hamilton)

[104] TR00009A-C (Hamilton Aff.) ¶ 73.

[105] Trial Tr. 1073:2-22 (Binning); Veschi Dep. 45:4-7, 47:13-25.

[106] Veschi Dep. 42:5-42:23; ."); *id.* at 39:11-40:6; 232:21-233:12; TR 44998 (Appointment Notice for John Veschi).

[107] Veschi Dep. 38:6-38:23.

28

infringing third-parties in four initial technology families or "franchises" – mobile handsets, internet search, TV/display/projector and video game/PC – with plans to license to additional franchises as the licensing business progressed.[108] Coordinating with the leaders of Nortel's Business Lines, in November 2008, Veschi and his team prepared notices of infringement.[109]

Post-petition, Veschi's team made presentations in the summer of 2009 addressing the options for monetizing the Patent Portfolio.[110] Several monetization alternatives were considered: the sale of patents, further developing and operating IPCo, or further developing and then selling IPCo.[111]

Following these presentations, Nortel issued a request for proposals to find a firm to assist in the evaluation of the Patent Portfolio and the further development of IPCo.[112] Thereafter, Nortel jointly retained the Global IP Law Group ("Global IP") in October 2009,[113] to provide advice on monetizing the portfolio, including exploring monetization "options for licensing as opposed to outright sale."[114]

On March 20, 2009, the U.S. Court entered an order approving the retention of

---

[108] Veschi Dep. 148:18-153:9; TR22102 (Dec. 4, 2008 Email from J. Veschi titled "FW: IP Org Update").

[109] TR50711 (Nov. 6, 2008 Email from J. Veschi; Veschi Dep. 156:6-157:3; TR11150 (July 8, 2009 PowerPoint Presentation titled "IP Aspects of Residual Co") at 7.

[110] Veschi Dep. 70:18-71:12, 94:2–13 (discussing TR22097), 69:18–71:12; ; TR22106 (Aug. 12, 2009 PowerPoint Presentation titled "Strategic Alternatives for IP") at 2; TR22097 (Dec. 16, 2009 PowerPoint Presentation titled "Patent Portfolio Analysis Phase One – Ottawa Presentation").

[111] Trial Tr. 1075:2-1076:2 (Binning).

[112] Veschi Dep. 73:25-77:4.

[113] TR48716 (Oct. 15, 2009, Master Consulting Agreement ("MCA")) at Annex A to Exhibit A, at 15.

[114] TR48716 (MCA) at 15.

Lazard Freres & Co. LLC as financial advisor to the U.S. Debtors ("Lazard").  The U.S. Court subsequently entered an order amending the terms of Lazard's compensation to allow for a "IP Transaction Fee" if Nortel consummated "a restructuring and reorganization around all or substantially all of the Company's intellectual property assets."[115] Lazard was involved in evaluating the financial aspects of IPCo on behalf of all Nortel Entities.[116]

As part of its evaluation, Global IP reviewed more than 11,000 patent claims, categorized patents by technology field, mapped claims to markets for potential enforcement and licensing and screened the patents for encumbrances.[117] Global IP confirmed that Nortel's Patent Portfolio was valuable.[118]  Global IP presented its initial findings to stakeholders of Nortel in December 2009.[119]   Global IP and Lazard made a follow-on presentation to the boards of directors of NNC and NNL in January 2010.[120]

The Debtor Estates weighed several options for monetizing the Patent Portfolio. Stakeholders from the EMEA, Canadian and U.S. Debtors seriously considered IPCo as an alternative to the sale of the Patent Portfolio.  A committee of representatives of Nortel and their advisors (the "IP Steering Committee") was formed in January 2010, which led the

---

[115] TR50182 (US D.I. 507 Order Authorizing Retention and Employment of Lazard Freres); TR00001 (Currie Aff.) ¶ 85; US D.1. 2561 Order Approving An Amendment to the Terms of Compensation of Lazard Frères.

[116] Trial Tr. 907:24-908:5 (Hamilton); Trial Tr. 1363:6-11 (Ray); Ray Decl. ¶ 54.

[117] TR22097 (Dec. 16, 2009 PowerPoint Presentation titled "Patent Portfolio Analysis Phase One") at 11-12.

[118] Veschi Dep. 92:6-15

[119] TR50754 (Dec. 11, 2009 Email RE: "December 16 Logistics")

[120]  TR43655 (Jan. 29, 2010 PowerPoint Presentation titled "Patent Portfolio Analysis Phase One: Board of Directors Presentation").

evaluation process.[121]  The IPCo option and the sale option were considered in parallel, so Nortel could determine how best to monetize the patent assets.  In the words of the Monitor's lead representative Murray McDonald, IPCo and a sale were considered "concurrently" as "parallel alternatives."[122]

In September 2010, the Monitor advised the IP Steering Committee that IPCo should remain an option for consideration.[123]  In their 2010 10-K, filed with the U.S. Securities and Exchange Commission, NNC disclosed that "[w]e are seeking expressions of interest from potential buyers and partners regarding options that could maximize the value of our intellectual property portfolio. No decision has been made as to how to realize this value, whether through sale, licensing, some combination of the two or other alternatives."[124]  IPCo remained a viable option into 2011.[125]

As the Monitor's representative testified, "[o]ver the course of 2009 and 2010, Mr. Veschi and his team, assisted by Lazard and Global IP, prepared various versions of a model that attempted to forecast the revenues that could be earned by IPCo so that its potential economic benefits could be assessed.  The initial IPCo Model had three different sub-models that forecast the revenues of IPCo based on different scenarios, in particular

---

[121]  TR50634.02 (Jan. 22, 2010 Draft PowerPoint Presentation) at 2; TR00020 (Ray Decl.) ¶¶ 51-52; Riedel Dep. 117:20-118:4, 118:6-13.

[122]  McDonald Dep. 165:19-166:10

[123]  TR50656 (Sept. 30, 2010 Email from S. Hamilton titled "Nortel IP Valuation Protocol"); Trial Tr. 933:6-12 (Hamilton)

[124]  TR21541 (2010 NNC 10-K) at 22.

[125]  TR50783 (Oct. 4, 2010 Email from G. Riedel to J. Veschi titled "Speaker Invitation – The IP Summit 2010:  The Power of IP for Business Success"); TR47264 (Jan. 24, 2011 Email from G. McColgan to H. Chambers titled "FW: Nortel IP Follow-Up Information Request"); TR50797 (Jan. 10, 2011 Email from M. Spragg titled "RE:  Nortel IP"); TR00009A-C (Hamilton Aff.) ¶ 69.

the amount of litigation that IPCo would engage in as part of its business model."[126]

The details of the IPCo Model were updated and refined in several revised versions. Later versions of the IPCo Model (including version 4.0) do not dissuade the Court's view that IPCo was a viable option.[127]

The IPCo revenue projections were included in the presentations and models circulated to stakeholders for comment.[128] The United States is the most profitable market for exploiting patents.[129] The IPCo Model did not separate North American revenue between Canada and the United States, but the vast majority of North American revenue from IPCo would have been earned in the United States.[130] This is consistent with where the patents in the portfolio were filed because the value of a patent comes from the right to

---

[126] TR00009A-C (Hamilton Aff.) ¶ 74; *see also* TR00020 (Ray Decl.) ¶ 58; Trial Tr. 1359:25-1360:6 (Ray).

[127] *See* TR22098 (Mar. 17, 2010 PowerPoint titled "Nortel IP Update to Creditor Committees") (reflecting first version of the model); TR50825 (Apr. 28, 2010 PowerPoint Presentation titled "IP Co. Update to Credit Advisor Working Group") (version 2.0); TR43658 (May 5, 2010 PowerPoint Presentation titled "IPCO. Model 2.2 Update") (version 2.2); TR50823 (May 3, 2010 Email from J. Veschi titled "IP Co. Presentation Materials for Creditor Fas") (explaining the evolution from version 2.0 to 2.2); TR43715 (PowerPoint Presentation titled "Model 3.0 Preliminary Valuations") (version 3.0); TR22108 (Oct. 25, 2010 PowerPoint Presentation titled "Project Copperhead IPR Model") (version 3.1); *see also* TR00020 (Ray Decl.) ¶ 59. There were also IPCo Updates for Leadership Teams/Boards. *See, e.g.,* TR50804 (Feb. 23, 2010); TR50817.02 (Mar. 10, 2010); TR50814.04 (Mar. 26, 2010); TR43861 (Apr. 27, 2010). Lazard provided IPCo Financial Projections as well. *See, e.g.,* TR43654 (Apr. 19, 2010); TR47157 (May 12, 2010); TR40022 (June 30, 2010); TR22108 (Oct. 25, 2010); TR48697.02 (Nov. 18, 2010). Mercer also provided an IPCo Management Compensation Analysis. TR50780.02 (Oct. 2010); *see also* TR00011 (US Interests Hamilton IPCo Demonstrative) at 1.

[128] TR49827.01 (Email from Lazard to several recipients attaching IP Co. Model 3.1); TR49827.02 (IP Co. Model 3.1) at tabs "Global Revenue", "Franchise Bucket", "Enterprise Licensee Adress Rev.", "Voice Licensee Adress Rev.", "PC Licensee Adress Rev.", "Internet Licensee Adress Rev.", "Data Net. Licensee Adress Rev.", "Optical Licensee Adress Rev." and "Infra. Adress Rev." and "Handset Licensee Adress Rev."

[129] Trial Tr. 4124:12-4125:24 (Kinrich)

[130] TR00051 (Kinrich Report) at Ex. 31; Trial Tr. 4138:19-24 (Kinrich).

exploit, license and enforce that patent and can only be extracted in the jurisdiction where that patent is filed.[131]

Nortel assembled its IP into groups, or "technologies," which represented an idea that was patented (or one for which an application was filed) in one or more territories.[132] 97% of Nortel's technologies (which includes all patents and applications in a family) were protected by patents filed in the United States.[133]  73% of Nortel's technologies were protected by patents filed only in the United States.[134]  Of the highest value patents that were in IPCo, as determined by Global IP, 99.5% of Nortel's technologies were protected by patents filed in the United States.[135]  Of the highest value patents that were in IPCo, as determined by Global IP, 77% of Nortel's technologies were protected by patents filed only in the United States.[136]

### P.   All Integrated Entities Expected to Benefit from IP Monetization

While the stakeholders were considering the alternatives for IP monetization, the expectation was always that the Licensed Participants, and in turn their creditors, would benefit from an eventual sale of the Patent Portfolio or running a business based off of the IPCo Model.  As the Monitor's representative noted at trial, the IEs cooperated to maximize

---

[131] Trial Tr. 2208:16-19 (Anderson); Trial Tr. 4114:21-4115:12 (Kinrich); TR50857 (United States Patent and Trademark Office Screen Shot) at 1; TR50849 (Canadian Intellectual Property Office – A Guide to Patents) at 9, 11; TR50975 (UK Intellectual Property Office – "What is a patent?").

[132] Trial Tr. 4121:15-4123:5 (Kinrich); TR00051 (Kinrich Report) ¶ 79.

[133] DEM00019 at 14, US Interests Kinrich Demonstrative, citing TR00051 (Kinrich Report) Exs. 21-22.

[134] *Id.*

[135] Trial Tr. 4123:23-4124:8 (Kinrich).

[136] *Id.*

the value of the Patent Portfolio, including developing the IPCo Model.[137]  The expectation that the Licensed Participants would share in the benefit from the monetization of the Patent Portfolio is reflected by the financial burdens they shared in evaluating that option.  The IEs jointly retained Global IP.[138]  The IEs, in turn, jointly owned all "[d]eliverables, including Intellectual Property rights in the Deliverables" created by Global IP.[139]

## Q.    Residual Patent Portfolio

By the time that all of the Business Line Sales were completed in March 2011, Nortel had no remaining operating businesses.  What it did retain was a residual patent portfolio, consisting of approximately 7000 patents and patent applications.[140]  These were principally patents and applications that were not used in any of the Business Lines and therefore were not subject to licenses to the Business Line Sales purchasers.[141]  In addition, the Residual IP portfolio included patents used by multiple Business Lines and licensed to the purchasers of those Business Lines.  The costs to capitalize an IPCo Model were estimated to have been between $269 million and $417 million.[142]  Ultimately, the Canadian Debtors and the Monitor advised the representatives of the other Debtors and the other

---

[137] Trial Tr. 897:16-898:1, 900:10-17 (Hamilton).

[138] Trial Tr. 905:8-14 (Hamilton); TR49824 (Twenty-Fifth Report of the Monitor) at ¶ 79; TR48716 (MCA) at 1.

[139] TR48716 (MCA) ¶ 6(a).

[140] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 56, 67

[141] Gillian McColgan Deposition, November 8, 2013, p. 141:12-24; TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 65-67; TR11151 (Nortel's IP Team and Patent Portfolio PowerPoint, August 2010) Slide 11 (p. 11) ( "~6,100 patent assets remain, covering wide variety of technologies […] Strict limits on licenses granted (narrow fields of use/product-line limitations")

[142] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 79-80; John Ray Trial Testimony, Day 6, May 21, 2014, p. 1416:19-1420:12

stakeholders that the Canadian Debtors would not provide any funding to establish IPCo.[143]

If any Debtor or other interested party wished to pursue IPCo, they would need to purchase the residual patents from NNL.[144] No Estate or other interested party ever sought to effect such a purchase. Instead, all of the Estates agreed to pursue a sale process for the Residual IP and to terminate consideration of the IPCo option.

## R.    The Sale of Nortel's Residual Patent Portfolio

When Google submitted a non-binding indication of interest of $900 million in February 2011, the proposed price was sufficient for the Estates to discuss a sale as a credible alternative to IPCo.[145]  Negotiations with Google commenced in earnest in early 2011.[146]

In the IP Stalking Horse Agreement, Google requested a provision pursuant to which Nortel definitively agreed to sell the Residual IP to a third party.[147]  Nortel therefore agreed to terminate consideration of IPCo as part of the sale process.[148]  However, the IPCo option could be pursued if done in the context of a qualified competing bid, such as a proposal by a third party to sponsor a transaction that would allow Nortel to retain the

---

[143] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 78-80

[144] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 80

[145] TR00021 (Ray Reply Decl.) ¶¶ 8,18.

[146] TR12013 (Feb. 25, 2011 Email from K. Cunningham titled "Fw: Iceberg: Asset Sale Agreement Issues" attaching Bidder 1 Issues List).

[147] TR00009A-C (Hamilton Aff.) ¶ 81.

[148] TR00009A-C (Hamilton Aff.)

Patent Portfolio and operate IPCo.[149] Google insisted that the current licenses be terminated as part of the sale.[150]

Extensive negotiations culminated with the signing of a stalking horse agreement dated April 4, 2011, between each of the IEs as Sellers and Ranger, Inc., a wholly owned subsidiary of Google for a purchase price of $900 million. (the "IP Stalking Horse Agreement").[151]  The U.S. and Canadian Debtors each filed motions seeking approval of their entry into the IP Stalking Horse Agreement and the related auction process.[152]  The Monitor filed a report in support of the Canadian Debtors' entry into the IP Stalking Horse Agreement in which it stated that title to Nortel's intellectual property was held by NNL, but that each of the IEs had Exclusive Licenses to that intellectual property in their Exclusive Territories.[153]

A joint hearing was held before the U.S. and Canadian Courts to consider these motions on May 2, 2011.[154]  The U.S. and Canadian Courts issued orders approving the entry into the agreement for a purchase price of $900 million and the rules for the conduct

---

[149] TR50184 (US D.I. 5202 Motion for Orders Authorizing Stalking Horse Asset Sale Agreement) at Ex. A § 5.13(b); TR00021 (Ray Reply Decl.) ¶ 19.

[150] Riedel Dep. 138:9-139:5; Veschi Dep. 53:13-54:6; TR00009A-C (Hamilton Aff.)  ¶¶ 98-100; Cianciolo Dep. 193:7-194:9; TR12013.

[151] TR43640.01 (Apr. 4, 2011 ASA between Nortel Entities and Ranger Inc.); TR00009A-C (Hamilton Aff.) ¶ 85.

[152] TR40725 (US D.I. 5202 Motion for Orders Authorizing Stalking Horse Asset Sale Agreement); TR49974 (Apr. 7 2011 Motion Record for Canadian Sales Process Order regarding Certain Patents and other Assets).

[153] TR21281 (Sixty-Third Report of the Monitor).

[154] TR50187 (US D.I. 5368 May 2, 2011 Hearing Transcript).

of a subsequent auction for the Patent Portfolio.[155]

When the auction commenced on June 27, 2011, senior representatives of Apple, Microsoft, Intel, Sony, Ericsson, RIM (now Blackberry) and EMC, among others, assembled at the New York offices of NNI's counsel.[156] Over the course of four days in late June 2011, vigorous bidding took place.[157]

The final winning bid of $4.5 billion came from Rockstar and resulted in an agreement of sale (the "Rockstar Sale Agreement").[158] As part of the Rockstar Sale Agreement, the relevant U.S. and EMEA Sellers executed a License Termination Agreement pursuant to which their license rights in relation to the residual patents were terminated and they would be granted a right to an allocation of a portion of the sales proceeds in consideration for such termination.[159] Through the Rockstar Sale Agreement and the License Termination Agreement, the Debtors agreed to transfer all of their rights in the Patent Portfolio to Rockstar.[160]

---

[155] TR50196 (US D.I. 5935 Order Authorizing and Approving Sale); TR50428 (May 2, 2011 Canadian Order re Certain Patents); TR50184 (U.S. D.I. 5202 Motion for Orders Authorizing Stalking Horse Asset Sale Agreement) § 2.2.1; TR40725 (US D.I. 5202 Motion for Orders Authorizing Stalking Horse Asset Sale Agreement) ¶ 11; TR50187 (U.S. D.I. 5368 May 2, 2011 Hearing Transcript) 6:24-7:5.

[156] TR21509 (July 11, 2011 Hearing Transcript) 40:24-25; TR21282 (Seventy-First Report of the Monitor).

[157] TR00009A-C (Hamilton Aff.) ¶ 95.

[158] TR00009A-C (Hamilton Aff.) ¶¶ 85, 93, 95; TR22085 (June 30, 2011 ASA between Nortel Entities and Rockstar Bidco, LP).

[159] TR21508 (Rockstar License Termination Agreement) Arts. 2.01-2.04; TR43794 (IFSA) § 11(a).

[160] TR21508 (Rockstar License Termination Agreement); TR22085 (June 30, 2011 ASA between Nortel Entities and Rockstar Bidco, LP) § 5.13(b).

S.    The Rockstar Sale Approval Hearing

The Rockstar Sale Agreement was presented for approval to the U.S. and Canadian Courts at a joint hearing on July 11, 2011.[161]  At that hearing, representations were made about the sale process and the substantial benefit of the result for all of the IEs.[162]  Both the U.S. and Canadian Courts approved the sale.[163]    The Monitor's public report recommending the sale to the Courts represented that NNL's legal title in the Patent Portfolio was "subject to . . . intercompany licensing agreements with other Nortel legal entities around the world . . . in some cases on an exclusive basis," referring to NNI and the other Licensed Participants.[164]

## THE PARTIES AND THEIR ALLOCATION POSITIONS

The parties who participated in the trial and briefing are described below, together with their positions on allocation.  The Court is merely reciting their arguments without comment.

A.    The U.S. Interests

The U.S. Interests include NNI and certain affiliates as debtors and debtors in possession, the Committee and the Bondholders.  The Committee and the Bondholders also participated in the trial and submitted their own briefs.

Allocation involves a two-step process.  First, the Courts must identify and characterize the property or legal rights transferred or surrendered by each debtor – here

---

[161] TR21509 (July 11, 2011 Hearing Transcript).

[162] TR21509 (July 11, 2011 Hearing Transcript) 56:10-18, 101:1-5, 110:6-111:8.

[163] TR50034 (July 11, 2011 Canadian Approval and Vesting Order (Certain Patents and Other Assets)); TR50196 (US D.I. 5935 Order Authorizing and Approving Sale).

grouped by interest.  Second, the Courts must value the property or legal rights.   The buyers of the Business Lines and Patent Portfolio paid fair market value, determined through auctions for the assets.  Allocation is therefore based on the relative value of the assets each debtor transferred.  The Courts should apply standard valuation methods which courts have consistently followed, including in insolvency proceedings.  Also, the Courts must take into account that in insolvency, equity takes last.  Simply, NNI's position is that allocation must be the value of the assets it sold or surrendered.

Allocation must be premised on fair market value, the foundational valuation metric widely accepted in the law and economics throughout the world.  *See United States v. Cartwright*, 411 U.S. 546, 550-51 (1973); *Pocklington Foods Inc. v. Alberta (Provincial Treasurer)* (1998), 218 A.R. 59, para. 197, 354 (Can. Alta. Q.B.), *aff'd* (2000), 250 A.R. 188 (Can. Alta. C.A.) (explaining that "the most common value standard is fair market value"); *Phillips v. Brewin Dolphin Bell Lawrie Ltd,* [2001] UKHL 2, [2001] 1 W.L.R. 143 (H.L.), 154 (appeal taken from Eng.).[165]

Basing allocation on the fair market value of the assets each selling debtor transferred or relinquished in the Sales is consistent with the MRDA.  The MRDA states that if a Licensed Participant becomes insolvent it may be required to surrender the Exclusive License, but only in exchange for the fair market value of the license.  The MRDA, Schedule

---

[164] TR21281 (Sixty-Third Report of the Monitor) ¶ 82.
[165]  The fair market value of a business or asset is the highest amount that a reasonably well-informed purchaser would pay in arm's length negotiations in an open and unrestricted market. *Cartwright*, 411 U.S. at 551; *Henderson v. Minister of Nat'l Revenue*, [1973], C.T.C. 636, para. 21 (Can. Tax Ct.); *see also Slatky v. Amoco Oil Co.*, 830 F.2d 476, 484 (3d Cir. 1987) ("[Fair market value], by definition, is the highest price a willing buyer would pay[.]"); *Phillips*, 1 W.L.R. at 154 ("The value of an asset that is being offered for sale is, prima facie, not less than the amount that a reasonably well

A, RPSM formula that the parties used to divide operating income for transfer pricing purposes when operating as a functioning MNE does not control. MRDA at Arts. 1, 11. The MRDA explicitly provides that the RPSM transfer pricing formula does not apply to the sale of a line of business.

The RPSM formula was designed to shift income from the U.S. to Canada (within the confines of the arm's length principle) so that NNL and Nortel as a whole could take advantage of the much lower effective tax rate for NNL in Canada rather than the effective tax rate for NNI in the U.S. Indeed, the IRS criticized and never approved the RPSM formula, which ultimately led to a settlement increasing NNI's revenue and decreasing NNL's revenue by $2 billion for 2001-2005. The RPSM formula is therefore inappropriate for use in connection with allocation.

Similarly, the parties' transfer pricing formula is irrelevant because the buyers were in no way bound by and thus would not have been concerned with how Nortel divided operating profits for transfer pricing purposes among affiliated entities. None of the Debtors advocate an approach based solely on the manner in which Nortel divided up operating profits (or, in fact, losses) when it was an operating MNE (*i.e.*, pursuant to the RPSM formula set forth in Schedule A to the MRDA).

In insolvency, a debtor's assets must be made available to satisfy the creditors of that debtor before equity may recover.[166] Each Selling Debtor is entitled to the value of the

---

informed purchaser is prepared, in arm's length negotiations, to pay for it.").

[166] 11 U.S.C. § 1129(b)(2)(B)(ii); Insolvency Act, 1986, c. 45, § 107 (U.K.); *Central Capital Corp., Re* (1995), 29 C.B.R. (3d) 33, para. 36 (Can. Ont. C.J. (Gen. Div. – Commercial List)), *aff'd* (1996), 38 C.B.R. (3d) (Can. Ont. C.A.); TR50470 (Standing Senate Committee on Banking Trade and Commerce, *Debtors and Creditors Sharing the Burden: A Review of the Bankruptcy and Insolvency Act and*

assets it sold and the allocated are Sales Proceeds available for distribution to that debtor's creditors. The key drivers of the value of a business are revenue and cash flow.[167] NNI generated approximately $46 billion in revenue from 2001 to 2009, which amounted to 69.5% of the revenue generated by the IEs during that same period.[168] NNI generated 75.9% of the cash flow of the IEs during that period.[169]

The vast majority of patents and patent applications in the Patent Portfolio were filed only in the United States.[170] This was a clear recognition by NNL that the U.S. market as to which NNI alone had the exclusive right in perpetuity to exploit – was the most valuable market for Nortel. It was the only market where NNL determined it was worth seeking patent protection for a majority of the inventions the IEs created and, consequently, the only market where those inventions have value (because filing in the U.S. but not in any other jurisdictions means that any third party may use these inventions outside the U.S. without fear of patent infringement suits). By designating the U.S. as the sole jurisdiction

---

*the Companies' Creditors Arrangement Act* (2003)) at 158-59 ("[Holders of equity] should be afforded lower ranking than secured and unsecured creditors, and the law – in the interests of fairness and predictability – should reflect both this lower priority for holders of equity and the interests of fairness and predictability – should reflect both this lower priority for holders of equity and the notion that they will not participate in a restructuring or recover anything until all other creditors have been paid in full."); Roy Goode, *Principles of Corporate Insolvency Law* (4th ed. 2011), ¶ 1-04 ("[O]nly when creditors have been paid in full (which is rarely the case) do shareholders come in to participate in the surplus remaining.") (citation omitted). To ensure this absolute priority scheme is followed, bankruptcy focuses "on legal entities, not on corporate groups." *See* Douglas G. Baird & Anthony J. Casey, *No Exit? Withdrawal Rights and the Law of Corporate Reorganizations*, 113 Colum. L. Rev. 1, 4-5 (2013).

[167] *See* Ibbotson SBBI 2010 Valuation Yearbook: Market Results for Stocks, Bonds, Bills, and Inflation 1926-2009, 19 (James P. Harrington ed., Morningstar 2010); Michael Pellegrino, *BVR's Guide to Intellectual Property Valuation* at 4-5 (2009 ed.).

[168] Transfer Pricing Worksheets.

[169] *Id.*

[170] Kinrich Report ¶¶ 79-80 (citing, *inter alia*, TR43636).

where the vast majority of Nortel's Patent Portfolio was filed, NNL acknowledged that the U.S. is the most profitable market for exploiting Nortel's IP and, accordingly, that NNI's exclusive rights in the U.S. market were by far the most valuable.

The allocation of the Patent Portfolio Sales proceeds by debtor group is as follows:

|  | $ Billions | Percent |
|---|---|---|
| Canadian Debtors | $0.43 | 9.7% |
| EMEA Debtors | $0.71 | 16.0% |
| U.S. Debtors | $3.31 | 74.3% |
| **Total** | $4.45 | 100% |

Each of the Business Lines was sold as a going concern in a coordinated auction and sales transaction. Similar to the Patent Portfolio, the buyers of the Business Lines paid for the amount of value they expected to generate from the assets, not the value each Nortel estate may have derived from the assets in bankruptcy if they were not sold.

The U.S. Debtors contributed the majority of the value in the Business Line Sales. The U.S. Debtors relinquished 70% of the total value of the Business Line Sales.[171] By contrast, the Canadian and EMEA Debtors contributed 11.9% and 18%, respectively, to the Business Line Sales.[172]

| Business Line Sales Valuation Summary | | |
|---|---|---|
|  | Total Value Relinquished ($ Billions) | Percentage |
| Canadian Debtors | $ 0.34 | 11.9% |
| EMEA Debtors | $ 0.51 | 18.0% |
| U.S. Debtors | $ 1.99 | 70.0% |
| **Total** | $ 2.85 | 100.0% |

---

[171] *See id.* at 30 (Table 5).

[172] *Id.*

A potential buyer naturally would be most interested in acquiring the Business Lines in the territories that are expected to generate the most future cash flows.  Here, NNI was the only Nortel entity operating in the most valuable U.S. market.  It was the only Nortel entity with the exclusive right to operate in the U.S. market and it had the customer relationships in the U.S.  NNI had the exclusive right to convey and did convey those rights, and is entitled to be paid accordingly.

### B.    The Committee

The Committee participated in the trial and supports the U.S. Interests.

### C.    The Bondholders

The Bondholders consist of entities holding bonds which NNC, NNL, NNI and NNC issued or guaranteed.  Pursuant to the Indenture dated as of July 5, 2006, NNL issued multiple series of senior notes guaranteed by NNC and NNI, including two series of fixed rate 10.75% senior notes in the aggregate principal amounts of $450 million and $675 million due 2016, and a series of floating rate senior notes in the aggregate principal amount of $1 billion due 2011.  Pursuant to the Indenture dated as of March 28, 2007, NNC issued 2.125% convertible senior notes due 2014 in an aggregate principal amount of $575 million and 11.75% convertible senior notes due 2012 in an aggregate principal amount of $575 million.  The 2007 Indenture Notes are each guaranteed by NNI and NNL.

The Bondholder Group represents over half of the Nortel Entities' bonds.  It is the single largest creditor group of both the U.S. Debtors and Canadian Debtors.  The Bondholder Group fully supports the fair market approach which the U.S. Interests

advocate and opposes the other parties' positions in accordance with the arguments of the U.S. Interests.

D.      The EMEA Debtors

The EMEA[173] Debtors are acting through the Joint Administrators[174] for Nortel Networks UK Limited and certain of its affiliates in proceedings under the Insolvency Act of 1986, pending before the High Court of Justice of England.  The EMEA Debtors' position is that each party's share of the Nortel asset sales proceeds should be determined according to its relative contributions to creating the value of what was sold. This approach is consistent with (i) the way the Nortel companies allocated the fruits of their business prior to the insolvency filings, (ii) the rights of the parties, and (iii) fundamental principles of justice and fairness.

In determining how to allocate the approximately $7.3 billion in proceeds from the sales of Nortel's global businesses (the "Business Line Sales") and pool of residual patents (the "Residual Patent Sale") among the three estates, i.e., the U.S. Debtors, the Canadian Debtors, and the EMEA Debtors, it is first necessary to identify what classes of assets were conveyed in each of the sales, because the rights of the parties differ in relation to each class of assets. The largest portion of the proceeds from the Business Line Sales and the Residual Patent Sale is attributable to the value of Nortel's IP, which had been the main

---

[173] "EMEA stands for "European, Middle Eastern and African" affiliates.

[174]   The Administrators for all of the EMEA Debtors other than Nortel Networks (Ireland) Limited are Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson and Stephen John Harris.  The Administrators for Nortel Networks (Ireland) Limited are: Alan Robert Bloom and David Martin Hughes.

economic driver of Nortel's business. The biggest issue in the case is therefore how to allocate the asset Sales Proceeds attributable to IP.

The EMEA Debtors want allocation based on the relative contributions to the creation of the IP. The IP that was conveyed in the Business Line Sales and the Residual Patent Sale was the product of collaborative joint R&D efforts by each of the five Nortel residual profit split ("RPS") entities, *i.e.*, NNL, NNI, NNUK, NNSA, and NN Ireland. Each spent billions of dollars on R&D. The product of this R&D was a large portfolio of valuable technology in which the contributions of the individual RPS entities were integrated and indivisible. Prior to insolvency, Nortel allocated the fruits of exploitation of the jointly created IP based on the relative financial contributions of the Nortel entities to the creation of that IP. The EMEA Debtors contend that the benefits of the sale of Nortel's IP should be allocated among the estates using the same approach.

The contribution approach is consistent with the pre- existing rights of the parties, as confirmed by how the parties behaved in sharing proceeds, agreements, dealing with third parties including the IRS and CRA, in allocating the proceeds from a prepetition sale and other indicia.

In their prepetition arrangements, the parties have themselves already created an objective formula for how to allocate the value of Nortel's IP based on their respective contributions to the creation of that value: Because of the integrated and additive nature of R&D at Nortel, and the indivisible character of the IP portfolio that was the product of that R&D, the parties agreed that every dollar spent on R&D by any Nortel party had the same value as any other dollar. The parties therefore agreed that the value of IP

45

should be allocated based on their relative R&D spending during the period when a particular commercially exploitable technology was developed, *i.e.*, during the useful (or economic) life of the IP. Accordingly, the task for the Courts in allocating IP value is to determine (i) the value of the IP transferred to the purchaser in each of the asset sales, and (ii) the relative R&D spending of each of the five RPS entities during the period when that IP was developed. This was the approach taken by Nortel in allocating the proceeds of the one major prepetition asset sale, and it is the approach that would have been taken if the Business Line Sales or the Residual IP Sale had taken place prior to the insolvency filings.

### E.     The Monitor and the Canadian Debtors

The Canadian Interests consist of the Canadian Debtors, NNC and NNL, and Ernst & Young who the Canadian Court appointed to serve as Monitor by Order, dated January 14, 2009.

In addition to the powers and duties set out in the CCAA Initial Order dated January 14, 2009, the Monitor's powers were expanded by order dated August 14, 2009 ("the First Expansion of the Monitor Powers Order").[175]  The First Expansion of the Monitor Powers Order provides, among other things, the Monitor with the authority to cause the Canadian Debtors to take various actions in connection with the sale of the business units and to conduct, supervise and direct any procedure regarding the allocation and/or distribution of proceeds of any sale.[176]   In its Eighty-Eight Report dated September 26,

---

[175] TR50631 (Order of the Ontario Court of Justice, August 14, 2009)

[176] TR50631 (Order of the Ontario Superior Court of Justice, August 14, 2009) para. 3

2012, following the Business Line Sales and sale of the Residual IP, the Monitor reported that, in light of the cessation of public reporting obligations, the directors and officers of the Canadian Debtors indicated they would resign their positions.[177] By order dated October 3, 2012 (the "Second Expansion of Monitor Powers Order"), the Court added to the powers of the Monitor by, among other things, authorizing and empowering, but not obligating, the Monitor to exercise any powers which may be properly exercised by a board of directors of any of the Canadian Debtors.[178] The Second Expansion of the Monitor Powers Order in no way limited the powers and protections provided to the Monitor under prior orders of the Court, the CCAA or applicable law.[179]

The central question before the Courts concerns the basis on which approximately $7.3 billion in Sales Proceeds, realized on the sales of Nortel assets following the insolvency filings in 2009, should be allocated among the Estates. The Monitor's position on this question is that the proceeds should be allocated based upon the value of the property rights transferred or surrendered by each Debtor in connection with the Business Line Sales and the Rockstar Transaction. In the context of insolvency, it respects the legal rights of each creditor to recover, from the Debtor indebted to it, out of funds that represent that Debtor's legal entitlement to a portion of the Sales Proceeds. This approach is, in essence, the one that the Courts would follow in a priority dispute over property or over funds derived from property – that is, to determine the priorities and

---

[177] NNC-NNL11755843 (Eighty-Eighth Report of the Monitor, September 26, 2012) para. 36

[178] Order (Monitor's Expansion of Power Order #2) of the Ontario Superior Court of Justice, October 3, 2012, para. 3

how funds will flow according to the applicable legal rights.

The proper approach to allocation involves a two-step process. First, the specific property or legal rights that were transferred or surrendered by each Debtor must be identified and correctly characterized. The second step involves the valuation of those rights.

The Business Line Sales involved the transfer to purchasers of certain categories of assets, including, most importantly, IP. The Rockstar Transaction involved almost exclusively the transfer of IP. The identification and characterization of the property rights in, or legal rights to, the IP that was transferred or surrendered in the sales are at the center of the dispute between the parties.

The Monitor's position is that the IP transferred in each of the sales was legally owned by NNL, the parent operating company of Nortel. It is also the Monitor's position that the only legal rights related to the IP which were held by NNL subsidiaries who are certain of the U.S. and EMEA Debtors were not ownership of the IP, but were license rights that had been granted to them by the IP's owner, NNL, pursuant to, in accordance with, and limited by, the terms of the MRDA.

This position follows from the clear words of the MRDA, most notably (i) the MRDA's express provision that legal title to the IP is and shall be vested in NNL and (ii) the MRDA's express grant of license rights by NNL (a grant which would be impossible if NNL were not the owner of the IP in question). It is consistent with the controlling Ontario law which governs the MRDA and which provides that a license

---

[179] Order (Monitor's Expansion of Power Order #2) of the Ontario Superior Court of Justice, October

grants no property interest, but is rather a contractual consent by an owner which gives rights that are limited by the terms of the license. It is also consistent with the history of NNL as the technology-rich parent of the U.S. and EMEA Debtors, the agreements that preceded the MRDA, the thousands of patent registrations which identified NNL as the owner of the patents, and the description, and inclusion as a plaintiff, of NNL as the patent owner in actions that were taken to enforce patent rights.

    NNL's ownership of the IP bears directly on the second aspect of the allocation question, namely, the value of the property rights transferred. It was ownership of IP that was transferred in the Business Line Sales and, accordingly, it was ownership for which the purchasers paid. The proceeds that are attributable to that transfer of ownership is allocable to NNL as the IP's owner.

    The characterization (including the scope) of the rights of the U.S. and EMEA Debtors as license rights, also bears directly on the second aspect of the allocation question, because it goes to the value of the rights that were surrendered. The license rights of the U.S. and EMEA Debtors were not transferred to the purchasers in any of the sales. They were non-transferrable rights, which were surrendered or terminated but not transferred. The question to be determined with respect to the terminated licenses raises a valuation issue: not one which inquires into what the purchasers paid for licenses (since the purchasers did not acquire the licenses), but rather one which inquiries into the value of what the U.S. and EMEA Debtors gave up. When a license is given up, what the licensee loses is the future opportunity to earn profit from using the license in accordance

3, 2012, para. 3

with its terms.  A valuation of those license rights must be based upon the terms and scope of the license, in order to determine the profits, if any, that the licensees would have earned had they not surrendered their licenses but had operated under them in accordance with the licenses' terms. To the extent that, in terminating their license rights in connection with the sales, the U.S. and EMEA Debtors gave up something of value then the value of those license rights is properly allocated to the U.S. and EMEA Estates.

The scope of the license rights requires careful examination.  That examination, conducted pursuant to the Ontario law of contractual interpretation, reveals that the license rights granted by NNL under the MRDA were not unlimited. They did not grant to the licensees the right to use, for all purposes, the IP that NNL owned; they granted only the right, exclusive in the designated territories, to use the IP for the purpose of making or selling "Products", a term defined by the MRDA. The definition of "Products" is limited to those products, software and services that were developed or proposed to be developed by or for one or more of the signatories to the MRDA (each a Nortel entity), and no one else. In other words, the MRDA license grant only permitted the use of the IP in connection with Nortel Products made (or proposed to be made) by or for Nortel Entities.

Thus, with respect to the assets sold or surrendered in the Business Line Sales, the proper approach is as follows.  First, tangible assets are valued based on their net book value, which approximates to their fair market value. Each Debtor should receive an allocation equal to the net book value, as identified in Nortel financial statements, of the tangible assets it contributed to each sale. Second, in-place workforce transferred to

the purchasers in each sale is valued based on the cost that would be incurred to replace the employees in question. Each Nortel Debtor should receive an allocation equal to the replacement cost for the employees that were transferred to each purchaser in the Business Line Sales.  Third, it is necessary to value the license rights the U.S. and EMEA Debtors had to the Nortel IP, which license rights were terminated in connection with the sales of Nortel's then operating businesses.  As with any other contract-based right, the value of the license rights is equal to the amounts that the licensees could have earned had the licenses not been terminated.  Thus, the value of the license rights is equal to the present value of the future operating profit that could have been earned by the U.S. and EMEA Debtors had the Nortel businesses continued to operate.  This value includes the value of any customer relationships associated with the U.S. and EMEA Debtors, since the value of customer relationships is determined by the present value of the future cash flows that those relationships could produce – the very same cash flows that the licenses would have generated. Thus, a determination of the present value of the future cash flows that would have accrued to the U.S. and EMEA Debtors, if the Nortel businesses had continued to operate, gives them appropriate credit both for any interests they had in customer relationships and for the licenses they terminated. This approach takes into account the cash inflows (such as revenues) and cash outflows (such as the costs associated with earning those revenues, including the sharing of operating profits and losses required by the MRDA).  Any Sales Proceeds that are in excess of the aggregate of the foregoing values (i.e. the aggregate of the value of the tangible assets, the in-place workforce, and the license rights) are attributable to the value of the IP (unencumbered by

51

the license rights) owned by NNL and to the value of any customer relationships owned by NNL, being assets which NNL transferred to the purchaser. Those proceeds are properly allocated to NNL.

With respect to the sale of the residual patent portfolio, this involved the transfer of ownership of IP by NNL to Rockstar. There were no tangible assets and virtually no in-place workforce transferred as part of this sale transaction. License rights were surrendered, but that fact does not imply that they were valuable. On the contrary, the License Termination Agreement for the Rockstar Transaction specifically provided that the termination itself would not affect the ownership rights that any of the sellers may have to any IP.

A valuation of the license rights surrendered by the U.S. and EMEA Debtors in connection with the Rockstar Transaction requires consideration of the scope of the license as it relates to two categories of patents that were sold:

(a)   First, there were patents transferred in the sale that were not incorporated into any proposed or actual Nortel Products. Due to the terms of the license, properly construed, the license rights had no value in so far as they related to such patents.

(b)   Second, with respect to the patents that had been incorporated into proposed or actual Nortel Products, the value of the license rights in so far as they related to those patents has already been accounted for in valuing the license rights surrendered in connection with the Business Line Sales. This is because the Business Line Sale purchasers acquired and paid for licenses to some of the IP later sold in the Rockstar Transaction.

Accordingly, since there is no value attributable to the U.S. and EMEA license rights over and above the value that has already been ascribed to them in the context of the Business Line Sales, the proceeds realized on the Rockstar Transaction are attributable

to the transfer of NNL's ownership of the patents and properly allocated to NNL.

The Monitor submits that the Courts should allocate the Sales Proceeds as follows:

| Allocation of Sales Proceeds (In Millions of USD) | | | | |
|---|---|---|---|---|
| **Asset** | **Canada** | **U.S.** | **EMEA** | **Total** |
| Tangible Assets | $1,221.74 | $317.59 | $94.86 | $534.19 |
| IP Rights and Customer Relationship | 1,379.85 | 438.20 | 164.20 | 1,982.25 |
| In-Place Workforce | 79.07 | 135.17 | 41.91 | 256.15 |
| Wholly-Owned Businesses | - | 110.97 | - | 110.97 |
| Residual Intellectual Property | 4,453.45 | - | - | 4,453.45 |
| **Total Allocation** | **$6,034.11** | **$1,001.93** | **$300.97** | **$7,337.01** |
| % of Total – Excluding Residual IP | 54.8% | 34.7% | 10.4% | |
| % of Total – Including Residual IP | 82.2% | 13.7% | 4.1% | |

### F.    Canadian Creditors' Committee

The CCC represents the interests of more than 20,000 Canadian creditors and includes pensioners, pension interests, and current and former employees who have approximately $3 billion in claims against the Canadian Estate. The Sales Proceeds consist of approximately $2.8 billion from the sales of Nortel's Lines of Business and $4.5 billion resulting from the Residual IP Sale.

The Sales Proceeds should be allocated to the owners of the assets sold. Nortel was a Canadian-based technology company and its most valuable asset was its intellectual property, which was owned by Nortel's Canadian parent corporation, NNL. In contrast, NNL's main operating subsidiaries in the U.S. and the Europe, Middle East

53

and Africa Regions (EMEA), held limited licenses granted by NNL within a carefully circumscribed field of use. As the owner of the most valuable asset owned and relinquished, NNL is entitled to receive most of the Sales Proceeds.

In the alternative, the Sales Proceeds should be allocated to the Nortel Debtors on a *pro rata* basis so as to provide each creditor having a valid claim the same common dividend. A *pro rata* allocation is the only fair and equitable alternative to an allocation based on the legal rights of the Nortel Debtors in the underlying assets sold.

G.    Wilmington Trust Company as Trustee

Wilmington Trust, National Association ("Wilmington Trust"), appears in its capacity as indenture trustee for the notes NNL issued namely NNL 6.875% Notes due 2023, issued pursuant to that certain Indenture, dated as of November 30, 1988 (as amended, supplemented or modified) between Nortel Networks Limited and the Trustee, as successor trustee to The Bank of New York Mellon (formerly known as The Bank of New York) as successor trustee to the Toronto-Dominion Bank Trust Company.

Wilmington Trust argues that the proceeds from the sale of the Nortel IP should be distributed according to the legal ownership interests in those assets established by the unambiguous written agreement of the parties, and that NNL is the legal owner of the Nortel IP.   The license rights, the only property interest of the Licensed Participants, as defined in the MRDA with respect to the Nortel IP, should be determined by analyzing the value of those licenses had Nortel continued operating.  Once that determination is made, such value should be distributed to those respective Licensed Participants. The remainder of the proceeds, which Wilmington Trust expects to be the vast majority thereof, would

54

then inure to the unquestioned title holder and the only party with a legally recognized ownership interest in those assets, NNL.

The U.S. Interests and EMEA Debtors as the Licensed Participants seek to have these Courts: (i) rewrite the clear terms of the MRDA so that they are more to the Licensed Participants liking and (ii) engage in a hindsight reevaluation of the propriety of the conduct of the parties and their respective disclosures in the sale process.  The Licensed Participants post-facto arguments cannot change the plain meaning of the MRDA, or the fact that all of the parties acted in the best interests of all of the Nortel Estates when pursuing sales that undisputedly maximized value for all of the Estates and their respective creditors, while prudently setting aside what all knew could be protracted and heated disagreement about allocation.

There is no question that NNL owned the Nortel IP.  The only source of rights of any of the parties to the Nortel IP arise from the terms of the MRDA.  The MRDA could not be more clear that NNL owned the Nortel IP and licensed the use of specific Nortel IP in specifically designated territories to the Licensees.  The Licensees owned beneficial interests in such license rights—but did not own rights to the Nortel IP itself.

The MRDA does not address the rights of the Licensees to any share of the value of the Nortel IP, except as arising from the split of the profits and losses from Nortel's operations and sales of Products (as defined in the MRDA).  It does not provide terms for the allocation of Sales Proceeds from the ultimate sale of the Nortel IP.

If the Courts conclude that the MRDA is not clear with respect to the ownership of the assets that were surrendered in the sale, and choose to allocate the Sales Proceeds

instead in a manner tailored to combat unfairness, Wilmington Trust submits that an approach based on the UK Pension Claimants' and/or the CCC's "*pro rata*" theory leads to the most equitable result. Allocation theories that have been advanced by the parties, including the U.S. Interests' "revenue" theory, the EMEA Debtors' "contribution" theory and the Pro Rata Theory are not based on the actual ownership of the assets that the Licensed Participants claim is the key question for allocation.

H.    UK Pension Claimants

The Board of the UK Pension Protection Fund and Nortel Networks UK Pension Trust Limited (together, the "UK Pension Claimants" or "UKPC") represents over 36,000 involuntary creditors of Nortel who were former employees of Nortel. There is a deficit in excess of $3 billion in the pension plan of which they are members.

The UK Pension Claimants submit that the Courts should determine the Allocation Litigation on the basis of a Pro Rata Distribution Model which has the effect of allocating sufficient funds from the Lockbox to permit a distribution within each Estate to all unsecured creditors on a *pro rata*, *pari passu* basis, relative to the amount of their unsecured claim, irrespective of the entity against which they may have a claim. There are no secured creditors of Nortel, and only a small number of preferred or priority claims. The return to unsecured creditors from a pro rata distribution model would be dictated by a number of factors including the ultimate level of unsecured claims and equitable alternative to an allocation based on the legal rights of the Nortel Debtors in the underlying assets sold. Nortel operated prior to insolvency as a highly integrated multinational that derived significant benefits from operating as "one Nortel".

56

Based on the evidence, a pro rata distribution model is the most appropriate and just result for several reasons, including:

(a)     Nortel was a technology company whose must valuable asset was its intellectual property assets;

(b)     the assets that were co-developed, jointly used and collectively sold by the members of Nortel giving rise to the proceeds in the Lockbox were so profoundly integrated in creation, ownership and use that they should properly be considered as representing a common pool of assets of the Nortel as a whole;

(c)     there exists no more credible, reliable, equitable or economically rational manner with which to disentangle those assets (most of which are intangible) and ascribe value to component parts rather than the Pro Rata Distribution Model; and

(d)     in particular, and contrary to the allocation position of the U.S. Debtors and the Canadian Debtors, there was no ex ante agreement as to the distribution of the jointly used assets of Nortel when it ceased to do business, whether under the MRDA or otherwise.

The Allocation Litigation should establish a precedent for future international insolvencies involving integrated multinational enterprises, which eliminates territorial wrangling over what entity in a global insolvency involving a highly-integrated multinational enterprise whose assets are entangled should receive what recovery.

If the Courts conclude that ownership should not form the basis for allocating the Sales Proceeds, then the only fair and equitable alternative is to allocate the Sales Proceeds, taking into account approximately $1.7 billion in additional "Residual Assets" (cash and other assets in the possession of Nortel Debtors in various jurisdictions), among the Nortel Debtors so as to effect a *pro rata* distribution among creditors, such that each creditor receives a common dividend on its claim. A *pro rata* allocation is appropriate in light of the globally integrated nature of Nortel's business. Pre-Petition, Nortel was an integrated multinational technology business operating along four interdependent Lines of Business

57

that spanned borders and legal entities. Employees served dedicated Lines of Business for the benefit of the group as a whole.

The Business Line Sales reflected the integrated nature of the business. Purchasers bought Business Lines consisting of assets residing in various Nortel Entities scattered throughout multiple jurisdictions. Substantive consolidation, which contemplates the merger of the Estates under the supervision of a single court, is neither requested by the CCC nor necessary to effect an allocation that would yield a *pro rata* result. The Canadian Court and the U.S. Court each have equitable jurisdiction to order and direct that the Sales Proceeds be allocated in a manner that achieves a fair and equitable distribution to Nortel's creditors, including the retired, disabled pensioners and other employees who relied and depended on the promise of pensions, health, disability and other benefits as part of their compensation for the significant value they contributed to Nortel. A pro rata distribution would result in all Creditors receiving an approximate 71% return on their Claims.

The Courts have an opportunity to set a precedent that will avoid the time and expense that has plagued the Nortel proceedings for more than five years and has cost more than $1.3 billion in professional fees to date from occurring again in future. Territorial wrangling significantly diminishes value for stakeholders in a global insolvency involving a highly-integrated multinational enterprise whose assets are entangled, and ought not to be condoned or rewarded.

## **LEGAL ANALYSIS**

The parties contemplated and agreed that it would be appropriate and necessary for the U.S. Court and the Canadian Court to confer. In the Protocol which the parties

presented and the Courts approved[180] the parties identified the "mutually desirable goals

and objectives in the Insolvency Proceedings" as follows:

(a)     harmonize and coordinate activities in the Insolvency Proceedings
        before the Courts;

(b)     promote the orderly and efficient administration of the Insolvency
        Proceedings to, among other things, maximize the efficiency of the
        Insolvency Proceedings, reduce the costs associated therewith and
        avoid duplication of effort;

(c)     honor the independence and integrity of the Courts and other courts
        and tribunals of the United States and Canada, respectively;

(d)     promote international cooperation and respect for comity among
        the Courts, the Debtors, the Creditors Committee, the Estate
        Representatives (as such terms are defined in the Protocol) and other
        creditors and interested parties in the Insolvency Proceedings;

(e)     facilitate the fair, open and efficient administration of the Insolvency
        Proceedings for the benefit of all of the Debtors' creditors and other
        interested parties, where located; and

(f)     implement a framework of general principles to address basic
        administrative issues arising out of the cross-border nature of the
        Insolvency Proceedings.

Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. § 105(a) Approving Cross-Border

Court to Court Protocol, ¶ 13 (D.I. 18).

The Courts have conducted the cases independently, while cooperatively. They are

mindful that the parties expect them to communicate and determine whether they can

arrive at consistent rulings.   Thus, the Protocol further provides that:

The Judge of the U.S. Court and the Justice of the Canadian Court, shall be
entitled to communicate with each other during or after any joint hearing,
with or without counsel present, for the purposes of determining whether
consistent rulings can be made by both Courts, coordinating the terms
upon of the Courts' respective rulings, and addressing any other

---

[180]  Order Pursuant to 11 U.S.C. § 105(a) Approving Cross-Border Court-to-Court Protocol, dated
January 15, 2009 (D.I. 54).

procedural or administrative matters.

Protocol, ¶ 12 d(vi). The parties recognized the problems that could result were rulings by the Courts to diverge and one of the reasons the cases have progressed to date is that the Courts have communicated and have arrived at consistent rulings even while exercising their judicial independence.

The Courts have had discussions following the trial of the Allocation Dispute in an effort to avoid the travesty of reaching contrary results which would lead to further and potentially greater uncertainty and delay. Based on these discussions, the Courts have learned that although their approaches to the complex issues differ, they agree upon the result. The Courts have different interpretations of the MRDA, but agree that the MRDA does not apply to or control the allocation of the Sales Proceeds for reasons discussed below. The Courts also agree that the self-serving allocation positions of the Canadian Interests, the U.S. Interests and the EMEA Debtors are not determinative or helpful.

It is incumbent upon the Court to determine a presumptive, baseline allocation approach which leads to an equitable result in the absence of some guiding law or agreement. The Court is convinced that where, as here, operating entities in an integrated, multi-national enterprise developed assets in common and there is nothing in the law or facts giving any of those entities certain and calculable claims to the proceeds from the liquidation of those assets in an enterprise-wide insolvency, adopting a pro rata allocation approach, which recognizes inter-company and settlement related claims and cash in hand, yields the most acceptable result.

There is nothing in the law or facts of this case which weighs in favor of adopting one of the wide ranging approaches of the Debtors. There is no uniform code or international treaty or binding agreement which governs how Nortel is to allocate the Sales Proceeds between the various insolvency estates or subsidiaries spread across the globe.

The MRDA, a tax document, was clearly not meant to, nor does it even purport to, govern inter-company allocation of the proceeds from liquidated Nortel assets. The MRDA does not include any provisions addressing the global insolvency or liquidation of the Nortel Group. The evidence at trial was overwhelming and undisputed that the MRDA was not intended to address that contingency:

a.   Former Chief Legal Officer Clive Allen testified that the group-wide insolvency and liquidation of the Nortel enterprise was "inconceivable" and never a risk he addressed;[181]

b.   Former Sutherland Asbill & Brennan attorney Walter Henderson, who worked on transfer pricing for Nortel, testified that no consideration was given to how the RPSM methodology would work in the event of a liquidation of the Nortel entities "because we never thought about that eventuality coming to pass";[182]

c.   Former director of transfer pricing at Nortel Michael Orlando testified that there is no provision in the MRDA that deals with the insolvency of the entire organization;[183] and

d.   Former director of international tax at Nortel Mark Weisz testified that the MRDA "was not intended to address [global] insolvency" and Nortel did not have any discussions about what would happen in the event of global insolvency.[184]

---

[181] Trial Trans. Day 3, 630:25-631:20 (Allen).

[182] Trial Trans. Day 5, 1143:19-1144:8 (Henderson).

[183] Trial Trans. Day 6, 1324:19-1325:7 (Orlando).

[184] Trial Trans. Day 9, 1877:18-1878:1.

Pursuant to an amendment executed in December 2008 to January 2009 and effective retroactive to January 1, 2006, proceeds from business sales are expressly excluded from global revenues within the RPSM calculation.[185] Mr. Orlando confirmed that the MRDA did not address how to allocate proceeds from the sale of any Nortel business and that the third addendum made explicit that the MRDA did not apply to asset sales.[186] the MRDA was an attempt to allocate annual operating profits, and sales of assets were non-operating activities.[187]

The U.S. Debtors, Canadian Debtors, and EMEA Debtors advance allocation positions which suffer from fatal, substantive flaws. EMEA fails to recognize that spending does not necessarily create value. The Canadian Debtors are nothing short of narcissistic in allocating the bulk of the Sales Proceeds to themselves and in their failure to recognize the contributions of the other Nortel companies and the realities of the manner in which the Nortel enterprise operated on a day-to-day basis. And the U.S. Debtors equate revenue to value without any regard to where the value-generating assets were developed or recognition of the fact that the $2.02 billion inter-company claim already accounts for their contributions as the primary bread-winner of Nortel. The Court's determination to recognize inter-company and settlement claims as well as the cash in hand relegates the arguments raised against a pro rata approach to concerns for process rather than substance. The Court has every confidence that the tribunals overseeing the Nortel insolvency proceedings across the globe will adjudicate the claims at issue therein in a just, efficient

---

185    TR21003(MRDA) pp. 39, 42–47, 49.

186    Trial Trans. Day 6, 1288:14-16; 1323:7-23 (Orlando).

manner.  The Court is prepared to act if they do not.  In any event, such hypothetical, procedural hurdles simply do not persuade the Court against adopting the allocation approach which clearly yields the most equitable result in these circumstances.

To be clear, the Court is not ordering cross-border, global substantive consolidation. The Court will respect the corporate separateness of the various Nortel operating subsidiaries by recognizing cash in hand and both the inter-company and settlement claims.  The Court's recognition of the inter-company claims and, in particular, the FCFSA $2.06 billion allowed claim, pays heed to the undeniable fact that NNI generated the lion's share of enterprise-wide revenues.  In other words, the fact that NNI is entitled to a greater share of the Sales Proceeds based on revenues is already baked into the case by virtue of the IFSA inter-company claim, thus making the U.S. Debtors' revenue-based approach redundant. Further, the Court is not ordering a consolidated or coordinated global distribution to ensure that each creditor of the various insolvency estates actually receives a set, pro rata distribution. The Court is merely ordering that each estate be allocated a pro rata share of the Sales Proceeds based on the amount of claims against it, recognizing all inter-company claims. Each Estate will distribute the funds as appropriate, through a plan process within the bounds of the applicable law.

The parties devoted great efforts to support their position on the MRDA.  The Court and the Canadian Court do not agree on the meaning of the MRDA, but do agree that their respective analyses do not control the Allocation Dispute because the MRDA was never intended to govern the liquidation scenario which they are now deciding. The Canadian

---

[187]    Trial Trans. Day 6, 1323:7-23 (Orlando).

Court favors the ownership position which the Canadian Interests advocate for reasons the
Canadian Court explains in its Endorsement.  The U.S. Court finds that the U.S. Debtors'
and the EMEA Debtors' positions that the factual matrix contravenes the "ownership"
claim of the Canadian Interests is what the evidence shows.  The Court's discussion of the
MRDA explains why the Court is fully satisfied that even in the MRDA, there is no basis to
find that the Canadian Debtors owned all rights to the IP.  Reading the MRDA in the
manner required, the Court finds that the Canadian Debtors held bare legal title.

THE MRDA

A.        Governing Law and Applicable Principles of Contract Interpretation

The Court and the Canadian Court have concluded that the MRDA does not control
the Allocation Dispute.  Nonetheless, because the MRDA is at the very center of the parties
views of the Allocation Dispute, the Court must address the parties respective arguments.
The starting point for the analysis of the MRDA is the law on contract interpretation.

All the parties agree that Ontario law governs the interpretation of the MRDA.
Article 14(f) of the MRDA so provides.  Such a choice of law provision is binding under
both Ontario law and U.S. law.  *Hilgraeve Corp. v. Symantec Corp.* 265 F.3d 1336, 1340-1341
(Fed. Cir. 2001), cert. denied 535 U.S. 906 (2002); *Vasquez v. Delcan Corp.* (1998), 38 C.C.E.L.
(2d) 230 at paras. 30-31 (Ont. S.C., Gen. Div.), citing *Vita Food Products Inc. v. Unus Shipping
Co.*, [1939] A.C. 277 (Canada P.C.).

The goal of contractual interpretation is to give effect to the underlying objective
intention of the contracting parties.  *See, e.g.*, *Sattva Capital Corp. v. Creston Moly Corp.*, 2014
SCC 53 at para. 47; *Consolidated-Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance*

*Co.*, [1980] 1 S.C.R. 888 at paras. 25-26; *Toronto-Dominion Bank v. Leigh Instruments Ltd.*, 1998 ONSC 14806, para. 415 (Can. Ont. S.C.J.). To determine the parties' intent, a court examines two related components: (i) the words of the contract and (ii) their context. *See* G. R. Hall, *Canadian Contractual Interpretation* (Markham: LexisNexis Canada, 2d ed. 2012) at 9; *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 at para. 50 (holding that "[c]ontractual interpretation involves issues of mixed fact and law as it is an exercise in which the principles of contractual interpretation are applied to the words of the written contract, considered in light of the factual matrix."). As the Supreme Court of Canada has recently held, "[t]he parole evidence rule does not apply to preclude evidence of the surrounding circumstances." *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 at para. 60. The basic principles of contractual interpretation were clearly and concisely set out by the Ontario Court of Appeal in *Salah v. Timothy's Coffees of the World Inc.* (2010), 74 B.L.R. (4th) 161 explained as follows:

> The basic principles of commercial contractual interpretation may be summarized as follows. When interpreting a contract, the court aims to determine the intentions of the parties in accordance with the language used in the written document and presumes that the parties have intended what they have said. The court construes the contract as a whole, in a manner that gives meaning to all of its terms, and avoids an interpretation that would render one or more of its terms ineffective. In interpreting the contract, the court must have regard to the objective evidence of the "factual matrix" or context underlying the negotiation of the contract, but not the subjective evidence of the intention of the parties. The court should interpret the contract so as to accord with sound commercial principles and good business sense, and avoid commercial absurdity. If the court finds that the contract is ambiguous, it may then resort to extrinsic evidence to clear up the ambiguity.

See also In *Kentucky Fried Chicken v. Scott's Food Services Inc.* (1998), 41 B.L.R. (2d) 42 (Ont. C.A.) stating the following regarding the interpretation of a commercial agreement at para. 27

> Where, as here, the document to be construed is a negotiated commercial document, the court should avoid an interpretation that would result in a commercial absurdity. [*City of Toronto v. W.H. Hotel Ltd.* (1966), 56 D.L.R. (2d) 539 at 548 (S.C.C.)]. Rather, the document should be construed in accordance with sound commercial principles and good business sense; [*Scanlon v. Castlepoint Development Corporation et al.* (1992), 11 O.R. (3d) 744 at 770 (Ont.C.A.)]. Care must be taken, however, to do this objectively rather than from the perspective of one contracting party or the other, since what might make good business sense to one party would not necessarily do so for the other.

The "cardinal presumption" about the primacy of the language of the contract involves determining the parties' intentions in accordance with the language that they have used. The court's goal in interpreting a contract is to determine the parties' intent as expressed by the words that they have chosen. As the Supreme Court of Canada said in the seminal *Eli Lilly v. Novopharm* case:

> [T]he contractual intent of the parties is to be determined by reference to the words they used in drafting the document . . .

*Eli Lilly & Co. v. Novopharm Ltd.*, [1998] S.C.J. No. 59 at para. 54 (S.C.C.); *See also Merck & Co. Inc. v. Apotex Inc.*, 2010 FC 1265 at para. 47.

Evidence of subjective intention – *i.e.*, evidence of what a party "understood" the contract to mean – is wholly inadmissible. A courts inquiry does not seek to determine what the parties actually intended or what they believed the words of their contract to mean. A leading text on contractual interpretation Canada provides:

> [T]he exercise is not to determine what the parties subjectively intended but what a reasonable person would objectively have understood from the words of the document read as a whole and from the factual matrix.

Geoff Hall, *Canadian Contractual Interpretation Law* (2012) at para. 2.4.1; *see also Ontario v. Imperial Tobacco Canada Ltd.*, 2012 ONSC 6027 at para. 29

The Ontario Court of Appeal in *Dumbrell* held that the interpretive exercise should focus on the words used, and not on the parties' subjective beliefs:

> *Eli Lilly* instructs that the words of the contract drawn between the parties must be the focal point of the interpretative exercise. The inquiry must be into the meaning of the words and not the subjective intentions of the parties.

*Dumbrell v. The Regional Group of Companies Inc.*, 2007 ONCA 59 at para. 51; *see also Eli Lilly & Co. v. Novopharm Ltd.*, [1998] S.C.J. No. 59 at para. 54

Courts simply must not consider evidence of what a party says he or she intended to agree to at the time of contracting, nor can courts consider evidence of what a party understands the words of the contract to mean.  In *Zaccardelli v. Kraus* the Court explained that:

> What [a party] thinks the documents mean is irrelevant and so not admissible. . . . What [a party] understood or intended is not relevant and so not admissible.

*Zaccardelli v. Kraus,* [2003] A.J. No. 442 at paras. 29-30 (Master).

Subjective understandings of the meaning of a contract do not become admissible by characterizing those understandings as forming part of the factual matrix.  As the Court of Appeal stated in *Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne*:

> While the scope of the factual matrix is broad, it **excludes** evidence of negotiations, except in the most general terms, **and evidence of a contracting party's subjective intentions.** [emphasis added]

*Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne*, 2012 ONCA 862 at para. 71

*See also Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 at para. 57:

> While the surrounding circumstances will be considered in interpreting the terms of a contract, they must never be allowed to overwhelm the words of

that agreement. . . . While the surrounding circumstances are relied upon in the interpretive process, courts cannot use them to deviate from the text such that the court effectively creates a new agreement.

Evidence of the parties' post-contracting conduct by definition is not part of the factual matrix and is generally inadmissible to interpret the contract unless a court finds ambiguity. Geoff R. Hall, *Canadian Contractual Interpretation Law* (2012) at para. 3.2.2; *York Bremner Development Ltd. v. FHR Properties Inc.*, [2007] O.J. No. 3484 at paras. 31-32 (S.C.J.) A contract is not ambiguous merely because it is difficult to interpret. *Geoffrey L. Moore Realty Inc. v. Manitoba Motor League*, 2003 MBCA 71 at para. 25; *Paddon Hughes Development Co. v. Pancontinental Oil Ltd.*, 1998 ABCA 333 at para. 29. Rather, a contractual provision is only ambiguous if it is "reasonably susceptible of more than one meaning". *Geoffrey L. Moore Realty Inc. v. Manitoba Motor League*, 2003 MBCA 71 at para. 25.

Introductory recitals in a contract may not alter the operative terms of the contract, but may be used as an interpretive guide to the parties' intent. *See, e.g., Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 at para. 57 (relying on recitals to determine whether an agreement was a sublicense; *Sistem v. Kyrgyz Republic*, 2012 ONSC 4983 (Newbould, J.) at paras. 25-26 (using recitals to find that a party had an equitable interest in the property at issue). *Accord Time Warner Entm't Co., L.P. v. Everest Midwest Licensee, L.L.C.*, 381 F.3d 1039, 1048 (10th Cir. 2004) (relying on a preamble to determine the purpose of a licensing agreement); *Blackstone Consulting Inc. v. United States*, 65 Fed. Cl. 463, 470 (Fed. Cl. 2005) (noting that "recitals may be read in conjunction with the operative portions of a contract in order to ascertain the intention of the parties" (internal quotations omitted)); *see also Stowers*

68

*v. Cmty. Med. Ctr., Inc.*, 172 P.3d 1252, 1255 (Mont. 2007) ("Recitals in a contract should be reconciled with the operative clauses of the contract and given effect as far as possible.")

A contract should always be interpreted "so as to accord with sound commercial principles and good business sense, and avoid commercial absurdity." *Downey v. Ecore International Inc.*, 2012 ONCA 480 at para. 38 (quoting *Salah v. Timothy's Coffees of the World Inc.*, 2010 ONCA 673 at para. 16); *see also Unique Broadband Systems, Inc. (Re)*, 2014 ONCA 538 at para. 88 ("[A]n interpretation which defeats the intentions of the parties and their objective in entering into the commercial transaction in the first place should be discarded in favour of an interpretation of the policy which promotes a sensible commercial result." (quoting *Consolidated-Bathurst Export Ltd. v. Mutual Boiler and Machinery Insurance Co.*, 1979 CanLII 10 (SCC), [1980] 1 S.C.R. 888, at p. 901)); *id.* at para. 89 ("[C]ommercial contracts should be 'interpreted in the way in which a reasonable commercial person would construe them.'"). *Accord Pan Am. Realty Trust v. Twenty One Kings, Inc.*, 408 F.2d 937, 939 n.4 (3d Cir. 1969) ("Business contracts must be construed with business sense, as they naturally would be understood by intelligent men of affairs." (quoting *N. German Lloyd v. Guar. Trust Co. of New York*, 244 U.S. 12, 24 (1917) (internal quotations omitted))); *see also Baldwin Piano, Inc. v. Deutsche Wurlitzer GmbH*, 392 F.3d 881, 883 (7th Cir. 2004) ("When there is a choice among plausible interpretations, it is best to choose a reading that makes commercial sense, rather than a reading that makes the deal one-sided."). In this analysis, courts may also consider objective manifestations of the parties' intent. *See Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 at para. 57 (holding that the purpose of examining the "surrounding circumstances" of a contract "is to deepen a decision-maker's understanding

69

of the mutual and objective intentions of the parties as expressed in the words of the contract").

Finally, the foregoing ordinary principles of contract law apply equally to the interpretation of a license agreement such as the MRDA.  *See, e.g., Merck & Co. Inc. v. Apotex Inc.*, 2010 FC 1265 (Can. F.C.); *Hemosol Corp., Re*, [2006] O.J. No. 4018 (Can. Ont. S.C.J. [Commercial List]); *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129; *Walt Disney Co. (Canada) Ltd. v. Philhobar Design Canada Ltd.*; (2008), 47 B.L.R. (4th) 306 (Can. Ont. S.C.J.); *White v. E.B.F. Manufacturing Ltd.*, 2005 NSCA 167; *Verdellen v. Monaghan Mushrooms Ltd.*, 2011 ONSC 5820; *see also* Roger T. Hughes & Dino P. Clarizio, *Halsbury's Laws of Canada - Patents, Trade Secrets and Industrial Designs (2012 Reissue)* at para. HPT-138 (QL).

## B.   The Valuable "Bundle of Rights" that a Patent Affords

A patent confers valuable exclusivity by providing the party holding rights to the patent the ability to prevent others from making, using or selling the patented invention. See 35 U.S.C. § 154(a)(1); Patent Act (Canada), § 42.  Patents are territorial; thus, a patent filed in the United States, for example, excludes others from utilizing the patent or the patented invention in the United States or importing the patented product into the United States.  *See* 35 U.S.C. § 271(a).  A Canadian patent likewise confers in Canada "the exclusive right, privilege and liberty of making, constructing and using the invention and selling it to others to be used, subject to the adjudication in respect thereof before any court of competent jurisdiction."  Patent Act (Canada), § 42.

A patent "is a bundle of rights which may be retained in whole or in part, divided and assigned."  *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1341 n.8 (Fed. Cir. 2007); *see also*

70

Patent Act (Canada), § 42; *Harvard College v. Canada*, [2002] 4 S.C.R. 45 at para. 64. The

bundle of rights" that comprise a patent may also be transferred to another party through a

license.  See, e.g., McCoy, 67 F.3d at 920; *see also* Patent Act (Canada), § 50(2); *Rite*

*Manufacturing Ltd. v. Ever-Tite Coupling Co.* (1976), 27 C.P.R. (2d) 257 at para. 20 (Can.

Registrar of Trade Marks) *citing National Carbonising Co., Ltd. v. British Coal Distillation Ltd.*

(1936), 54 R.P.C. 41 (C.A.) at 56-57 (noting that "a patentee is fully entitled to assign his

rights under the Letters Patent to another").

    1.   <u>NNL's Claim to Legal Title to the IP</u>

The Canadian Debtors' position in the Allocation Dispute is that the MRDA

establishes that they own all of the IP and therefore are entitled to all of the IP Sales

Proceeds less a relatively minor value attributable to what they view as limited licenses

held by the U.S. Debtors and the EMEA Debtors.  The Canadian Debtors rely on the words

of the MRDA which support them.

NNL's claim of legal title to the IP is reflected in the MRDA's first recital, which

states: "Whereas legal title to all NN Technology is held in the name of NNL."  Article 4(a)

of the MRDA states:

> Except as otherwise specifically agreed, legal title to any and all NN
> Technology whether now in existence or hereafter acquired or developed
> pursuant to the terms of this Agreement shall be vested in NNL.

The MRDA further provides that "legal title" survives termination of the MRDA:

> The provisions of Article 4 (Legal Title to NN Technology) with respect to
> NN Technology acquired or developed pursuant to this Agreement from the
> Effective Date of this Agreement up to an including its expiry or termination
> date . . . shall survive notwithstanding the expiry of this Agreement, or any
> termination of this Agreement for any cause whatsoever.

71

The Canadian Debtors argue that with this language and the MRDA taken as a whole, legal title meant ownership. The Canadian Debtors point to other provisions of the MRDA describing the ownership rights of NNL which include:

(a)    NNL's sole and exclusive right (without the obligation to anyone else, including the Licensed Participants) to file and prosecute patent applications (in the absence of which right, intellectual property could not be protected in the form of valuable patents);[188]

(a)    Licensed Participants owed to NNL (but NNL did <u>not</u> owe to the Licensed Participants) obligations of confidentiality regarding the IP;[189]

(b)    If a Participant withdrew from the MRDA, its exclusive license would terminate and be cancelled and NNL would be able to exercise all rights in the former Participant's exclusive territory,[190]; and

(d)    NNL granted license rights to that IP to the U.S. and EMEA Debtors, pursuant to Article 5(a)(i) of the MRDA. Under Ontario law, the right to grant a license is a right enjoyed by the owner of the IP.

In support of its ownership claim, the Canadian Debtors look to the licenses under the MRDA. Article 5(a) grants two licenses: an exclusive license and a non-exclusive license. Those two licenses confer rights to perform the same activities, with those rights being granted on an exclusive basis to the Licensed Participants in their respective "exclusive territories", and the rights being granted on a non-exclusive basis in the designated "non-exclusive territories". Article 5(a) states as follows:

To the extent of its legal right to do so, and subject to the rights of relevant third parties, NNL hereby:

(i)    continues to grant to each Licensed Participant an exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease,

---

[188] TR21003 (MRDA and addenda) Article 4(d)

[189] TR21003 (MRDA and addenda) Article 6(a)

[190] TR21003 (MRDA and addenda) Article 11(d)

license, offer to sell, and sell Products using or embodying NN Technology in and for the Exclusive Territory designated for that Licensed Participant, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ("Exclusive License"); and

(ii)     grants to each Licensed Participant, as of January 1, 2009 (the "Non-Exclusive License Effective Date"), a non-exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Non-Exclusive Territory, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ("Non-Exclusive License").

NNL granted a license to make "Products" that use or embody such IP.  Article 5(a) states that the license is "to make, have made, use, lease, license, offer to sell, and sell *Products . . .*"  and "rights to patents . . . as necessary or appropriate in connection therewith". The definition of "Products" at Article 1(g) of the MRDA states:

"Products" shall mean all products, software and services designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured or marketed, at any time *by, or for, any of the Participants*, and all components, parts, sub-assemblies, features, software associated with or incorporated in any of the foregoing, and all improvements, upgrades, updates, enhancements or other derivatives associated with or incorporated in any of the foregoing.

The license rights thus consist of a right to make, use or sell products, software or services that used or embodied Nortel IP and that were made or sold (or proposed to be made or sold) by, or for, any of the parties ("Participants") to the MRDA, and the use of certain Nortel IP as necessary or appropriate in connection with the making, using or selling of "Products".  The license also included a right to sublicense.

73

The MRDA also granted Licensed Participants the right to assert actions and recover damages in their respective territories for infringement or misappropriation of NN Technology by others.

The Canadian Debtors' reliance on a strict interpretation of the MRDA ignores both the factual matrix from which the MRDA arose and a reading of the MRDA as an integrated whole.  The MRDA simply does not capture the economic reality that the non-Canadian participants, and the U.S. Debtors in particular, were generating the majority of the value of the Nortel Enterprise.  The U.S. Debtors' interpretation of the MRDA accurately incorporates the MRDA as a whole.

As discussed earlier, the Court is required to review the MRDA in the context of the factual matrix which aids in determining the meaning of the words against the relevant background.  *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 at para. 48.  Indeed, a court should consider the factual matrix even if a contract is unambiguous.  *Sattva*, 2014 SCC at 53.  While the evidence of the factual matrix may not include the subjective intent of the parties, it does include "the genesis of the transaction, the background, the context [and] the market in which the parties are operating."  *Kentucky Fried Chicken Canada v. Scott's Food Services, Inc.*, [1998] O.J. No. 4368 at para. 25 (Can. Oct. C.A.)

Contrary to the arguments of the Canadian Debtors, the MRDA establishes the Participants' shared ownership of the Nortel assets which are now the Sales Proceeds.  The facts make it clear to the Court that the U.S. Debtors and the EMEA Debtors held an economic and beneficial ownership interest in Nortel's assets and thereby are entitled to an equitable allocation of the Sales Proceeds.

2.    The Factual Matrix Surrounding Transfer Pricing,
Historical Business Practices and Custom of the Industry

The MRDA grants the Licensed Participants all valuable rights to and beneficial ownership in NN Technology in their respective territories.  The Court looks to the purpose, rules, and representations underlying Nortel's transfer pricing agreements, including the R&D CSAs and the MRDA; Nortel's pre-petition business practices; and custom in the industry.[191]

Transfer pricing rules and regulations require that each entity in an MNE "price its related party transactions as if the entity were at arm's length from its parent and affiliated entities within the MNE."[192]  Transfer pricing regulations emphasize economic ownership that arises from the actual functions, assets, and risks of each entity rather than the holding of legal title.[193]  The OECD (Organization for Economic Co-operation and Development) Guidelines state that each party to a CSA must be "entitled to exploit its interest in the [CSA] separately as an effective owner thereof and not as a licensee."[194]   If a CSA participant's "contribution entitles [that party] to obtain only a right to use intangible property . . . and the [party] does not also obtain a beneficial interest in the intangible property itself," then that contribution "would constitute a royalty for the use of intangible property."[195]    Similarly, CRA Information Circular 87-2R affirms these principles,

---

[191]  As an initial matter, the MRDA was subject to continual amendment until December 31, 2008, *see* TR21003 (MRDA) at 59 (4th Addendum), such that the factual matrix throughout the pre-petition period must be considered.

[192]  *See* TR11412 (Eden Report) ¶ 26.

[193]  *See* Trial Tr. 2667:14-2669:1 (Cooper); 5042:9-5043:17 (Eden).

[194]  TR40713 (1997 OECD Guidelines) ¶ 8.3; TR11391 (2010 OECD Guidelines) ¶ 8.3.

[195]  TR40713 (1997 OECD Guidelines) ¶ 8.23; TR11391 (2010 OECD Guidelines) ¶ 8.23.

providing that "each participant in a [CSA] is not required to be a legal owner of [intangible] property, but each participant must enjoy substantially similar rights, benefits, and privileges as a legal owner (effective or beneficial ownership)."[196]

Nortel's transfer pricing agreements satisfied these principles:

(a)     The final R&D CSAs, the cost-sharing agreements that preceded the MRDA, provided that each CSP other than NNL held an "Exclusive Royalty-Free License to NT Technology" in the geographic territory assigned to that CSP, while "legal title to all NT Technology whether now in existence or developed pursuant to the terms of [the] Cost Sharing Agreement[s]" was vested in NNL.[197]

(b)     The third recital of the final R&D CSAs provided that the CSPs "wish[ed] to share the costs and risks of research and development services or activities in return for interests in any NT Technology that may be produced by such services or activities."[198]

(c)     Article 7 of the final R&D CSAs provided that each licensed CSP held "the primary right and obligation to bring and defend in and for [its exclusive territory], at its own expense, and for its own benefit, any proceedings relating to alleged infringement of its rights to the NT Technology by a third party or the alleged infringement by Participant's use of the NT Technology of the rights of third parties," with NNL having the right to enforce only if the licensed CSP failed to do so.[199]

(d)     Article 10 of the final R&D CSAs established that upon the expiration or termination of the agreement, each licensed CSP acquired "a fully paid up license" permitting it to continue to exercise its rights in its exclusive territory, without being subject to any further cost sharing

---

[196]  TR50295 (IC 87-2R) ¶ 121.

[197]  TR21002 (1992 NNL-NNI R&D CSA) at 7-8 (Arts. 4, 5); TR31309 (1995 NNL NNUK R&D CSA) at 7 (Arts. 4, 5); TR46945 (2000 NNL-NNSA R&D CSA) at 8 (Arts. 4, 5).

[198]  TR21002 (1992 NNL-NNI R&D CSA) at 1 (Whereas Clauses); TR31309 (1995 NNL-NNUK R&D CSA) at 1 (Whereas Clauses); TR46945 (2000 NNL-NNSA R&D CSA) at 1 (Whereas Clauses).
[199] TR21002 (1992 NNL-NNI R&D CSA) at 9-10 (Art. 7); TR31309 (1995 NNL-NNUK R&D CSA) at 9 (Art. 7); TR46945 (2000 NNL-NNSA R&D CSA) at 10 (Art. 7).

payments to NNL.[200]  The Licensed Participants maintained their
effective ownership of NN Technology under the MRDA.  *See, e.g.,*
*supra* Findings of Fact, Section III.C.1 (explaining how tax authorities
would have required NNL to make "buy out" payments had the
Licensed Participants' rights to Nortel technology been diminished
during the transition from the 1992 R&D CSA to the MRDA).

Nortel personnel represented to tax authorities that each Licensed Participant

enjoyed economic and beneficial ownership of Nortel IP in its exclusive territory under the

R&D CSAs and the MRDA.  *See, e.g., The Canada Trust Co. v. Russell Browne et al.,* [2012]

ONCA 862 at paras. 21-23, 83-88 (ruling that correspondence with the CRA regarding the

potential adverse tax consequences of a proposed amendment to a contract, as well as a

CRA advanced ruling on that subject, must be considered to discern the parties' intent).

For example:

(a)    In March 2002, Nortel reported to the IRS, CRA and Inland Revenue
       that from an economic standpoint dating back to the previous R&D
       CSA, each IE "could be considered to 'own' the [Nortel] technology as
       it related to its specific region."[201]

(b)    This echoed Nortel's previous representation to Inland Revenue that
       "although Nortel Canada has legal ownership of Nortel's Intellectual
       Property, each participant [in the R&D CSA] has beneficial ownership,
       within their country of incorporation."[202]

(c)    In July 2003, Nortel wrote in its Transfer Pricing Report that the
       parties to the R&D CSA each "contribute to the development of the
       intangible, and as such share in its ownership."[203]

---

[200] TR21002 (1992 NNL-NNI R&D CSA) at 10 (Art. 10); TR 31309 (1995 NNL-NNUK R&D CSA) at
10 (Art. 10); TR46945 (2000 NNL-NNSA R&D CSA) at 11 (Art. 10).  *See also* Trial Tr. 1165:17-22
(Henderson) ("[W]hen I read that language . . . what I understood it to mean is that when you have
a fully paid up perpetual exclusive license, you're effectively the economic owner.  That's
commonly understood in – certainly in transfer pricing and I think in general economics.").

[201] TR1105 (Horst Frisch Report) at 10; TR 11343 (IRS Notice of Adjustment) attachment at 3.

[202] TR31022; Barton Dep. 117:6-7 and 117:9-13

[203] TR48969.03 (2003 Transfer Pricing Report) at 25.

(d)     In 2003, in response to questions posed by the relevant taxing authorities, Nortel stated that all IEs were "owners of the intangible property."[204]

(e)     In November 2004, in a response to an IRS Information and Document Request for Functional Analysis, Nortel explained that the IEs "have agreed to continue participating in the future benefits of new IP" under the RPSM because they were "responsible for ongoing entrepreneurship and risk-taking functions with respect to the IP arising from their collective R&D efforts."[205]

(f)     In 2008, in a joint request for a new APA to cover the years 2006-2011, NNL and NNI told the CRA and IRS that although IP was "registered" in NNL's name, "[e]ach IE maintain[ed] an economic ownership in the IP."[206]

Nortel's enforcement and sublicensing practices prior to the bankruptcy confirm the Licensed Participants' exclusive economic and beneficial ownership and rights.  For example:

(a)     NNI exercised its enforcement rights with respect to Nortel IP by suing third parties for infringement of Nortel patents in the United States, even when NNI was not in the business of making anything similar to the third party's infringing products.[207]

(b)     Nortel's legal department recognized that NNI, as the exclusive license holder in the United States, held substantially all rights to Nortel's U.S. patents, and therefore had the right to bring such suits on its own.[208]

(c)     In 2004, NNI pleaded in *NNI v. Vonage Holdings Corp.* that it was the "exclusive licensee" of all U.S. patents legally owned by NNL and that it "possesse[d] substantially all rights" with respect to these patents, such that it "ha[d] standing to assert these patents against infringers."

---

[204] TR11169 at 25.

[205] TR11084, cover letter at 2.

[206] TR22078 (2008 Joint APA Request); Trial Tr. 1280:20-23, 1281-24-1289:9

[207] TR50593.01; TR21456; TR22084; TR40777; TR40788.

[208] TR50518; TR50231 at 2-3.

 NNL was aware of this pleading and never disputed NNI's position.[209]

(d)     During the MRDA period, NNL entered into worldwide IP sublicenses "on behalf of itself and its Subsidiaries," because the Licensed Participants, not NNL, had the right to sublicense Nortel IP in their respective territories.[210]

(e)     The Licensed Participants granted licenses to third parties that conveyed the right to use Nortel IP in the third parties' own businesses, with no requirement that such third parties engage in the manufacture, use or sale of products for Nortel and often permitted the third parties to use the IP for a business in which Nortel did not operate.[211]

This interpretation of the MRDA is further supported by evidence on custom and practice.  Daniel Bereskin, an expert on the custom and practice in the field of intellectual property, concluded that a sophisticated business person would understand the MRDA as follows:

(a)     The MRDA conveyed to the Licensed Participants (1) the right to use, make and have made "Products" embodying NN Technology, where "Products" is broadly defined; (2) the right to all Nortel patents (and other intellectual property including technical know-how); and (3) the right to sublicense the rights in (1) and (2) to a third party for its own use.[212]

(b)     These rights conveyed to the Licensed Participants are exclusive, perpetual, and royalty-free for each Licensed Participant in its Exclusive Territory and "essentially comprise all attributes of ownership deemed by custom and practice to be commercially important and valuable."[213]

---

[209] TR50516 ¶¶ 7-9.

[210] TR21080; T. Collins Dep.; 219:8-11, 219:25-220:10.

[211] TR22080 at 3; TR22154 at 1.

[212]  Bereskin Rebuttal ¶¶ 38, 45.

[213]  Bereskin Rebuttal ¶¶ 38-39.

(c)     Because Article 4(e) of the MRDA gives each Licensed Participant an unrestricted right to enforce NN Technology within its exclusive territory, the affirmative grant of license rights in Article 5 would be read to be coextensive and likewise unrestricted.[214]

(d)     No rational buyer would have purchased the Patent Portfolio without the Licensed Participants first terminating or disavowing their interests in the Patent Portfolio.[215]

3.      Each Participant Exclusively Held Valuable Rights to
        NN Technology, Including Patents, in Its Respective Territory

The MRDA provides that each participant holds exclusive rights to practice, sublicense and enforce NN Technology, including patents, in its territory.[216]   The parties to the MRDA agreed to conduct research and development and to grant to each Participant, in its respective territory, an exclusive license to the patents and other intellectual property generated as a result of such research and development.  *See id.* at 4, 6 (Arts. 2(a), 4(a)).

In Article 4 – titled "Legal Title to NN Technology" – the parties agreed to vest "legal title" to NN Technology in NNL "in consideration" for a grant to each of the Licensed Participants of exclusive, perpetual, and royalty-free rights to NN Technology in its respective territory.  *See id.* at 6 (Art. 4(a)).  "NN Technology" is broadly defined as "any and all intangible assets including but not limited to patents, industrial designs, copyrights and applications thereof, derivative works, technical know-how, drawings, reports, practices, specifications, designs, software and other documentation or information produced or conceived as a result of research and development by, or for, any of the

---

[214]  Bereskin Rebuttal at ¶ 35.

[215]  Bereskin Rebuttal ¶¶ 46, 48, 54

[216]  *See* TR21003 (MRDA) at 20 (Sched. B).

Participants, but excluding trademarks and any associated goodwill."[217]   NNL agreed that
the Licensed Participants would have "an exclusive, royalty-free license, including (i) the
right to sublicense, which except as hereinafter provided shall be in perpetuity, (ii) rights to
make, have made, use, lease, license, offer to sell, and sell Products using or embodying
NN Technology in and for the Exclusive Territory designated for that Licensed Participant,
and (iii) all rights to patents, industrial designs (or equivalent) and copyrights, and
applications therefor, and technical know-how, as necessary or appropriate in connection
therewith ('Exclusive License')."  *Id.* at 6-7 (Art. 5(a)).

4.     Under the MRDA, Each Licensed Participant Held
the Right to Sublicense in Its Exclusive Territory

The right to sublicense enables a licensee to grant another party the ability to stand
in its shoes and exercise its rights.  *See*, *e.g.*, *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R.
129 at para. 48.  Under the plain language of the MRDA, the exclusive license of each
Licensed Participant includes the right to "sublicense" to other parties.[218]

The MRDA also grants the Licensed Participants both a "have made" right and the
right to sublicense.  Article 5(a) states that the exclusive license includes the "rights to
make, have made, use, lease, license, offer to sell, and sell."[219] Accordingly, each Licensed
Participant held the right to sublicense in its exclusive territory distinct from any right to
have a supplier make products.

---

[217] *See* TR21003 (MRDA) at 3 (Art. 1(f)).

[218] *See* TR21003 (MRDA) at 6 (Art. 5(a)) (granting each Licensed Participant "an exclusive, royalty-free license, including," *inter alia*, "the right to sublicense").

[219] *See* TR21003 (MRDA) at 6 (Art. 5(a)).

5.      Article 4(e) Grants the Right to the
        Right to Assert Actions and Recover Damages

Under Article 4(e) of the MRDA, the "Licensed Participants have the right to assert actions and recover damages or other remedies in their respective Territories for infringement or misappropriation of NN Technology by others," with no requirement to join NNL or any other entity as a plaintiff.[220]  Article 4(e) grants the Licensed Participants the right to enforce any infringement or misappropriation of NN Technology "by others," which includes third parties and other Participants.  *Id.*  The enforcement right in Article 4(e) "survive[s] notwithstanding the expiry of [the MRDA], or any termination of [the MRDA] for any cause whatsoever."[221]

A licensee's right to bring infringement suits is a particularly critical factor in the "all substantial rights" analysis.  *See, e.g., Vaupel*, 944 F.2d at 875 ("This grant [of the right to sue for infringement] is particularly dispositive here because the ultimate question confronting us is whether [the licensee] can bring suit on its own or whether [the patentee] must be joined as a party.").  Given the expansive scope of rights that the MRDA conveyed to NNI, the MRDA comfortably meets the "all substantial rights" test, such that NNI could unilaterally bring infringement actions in the United States.  Even if NNI did not have "all substantial rights" to NN Technology in the United States, NNI could enforce its rights as an exclusive licensee simply by joining or inviting or compelling NNL as a party, which NNL could not prevent.  *See, e.g., Intellectual Prop. Dev.*, 248 F.3d at 1348 ("As a prudential principle, an exclusive licensee having fewer than all substantial patent rights possesses

---

[220] TR21003 (MRDA) at 6 (Art. 4(e)).

[221] TR21003 (MRDA) at 9 (Art. 9(c)).

standing under the Patent Act as long as it sues in the name of, and jointly with, the patent owner and meets the [Article III standing] requirements."); *Abbott Labs. v. Diamedix Corp.*, 47 F.3d 1128, 1133 (Fed. Cir. 1995) ("A patentee that does not voluntarily join an action prosecuted by its exclusive licensee can be joined as a defendant or, in a proper case, made an involuntary plaintiff if it is not subject to service of process."); *see also Indep. Wireless Tel. Co. v. Radio Corp. of Am.*, 269 U.S. 459, 469 (1926).

6. The MRDA's Further Confirmation that Licensed Participants Held All Valuable Rights to NN Technology

The MRDA grants the Licensed Participants the rights to exploit, exclude, and sublicense in their exclusive territories. Consistent with the broad scope of that grant, the MRDA and its amendments repeatedly describe the Licensed Participants as having "ownership" of NN Technology in their respective territories.

The recitals to the MRDA describe the Licensed Participants' ownership rights, stating that "each Licensed Participant held and enjoyed equitable and beneficial ownership of certain exclusive rights under [NN] Technology" for its exclusive territory under the R&D CSAs and that "it is the intent of NNL and the Licensed Participants that the Licensed Participants continue. . . to hold and enjoy such rights."[222] The MRDA further states that each Participant "bears the full entrepreneurial risks and benefits for the Nortel Network business." *Id.* (Whereas Clauses).

Schedule A to the MRDA – an operative provision – repeats these statements, explaining that the "Participants bear the full entrepreneurial risk of the Nortel business

---

[222] TR21003 (MRDA) at 2 (second recital).

such as the risks attendant with the substantial and continuous development and ownership of the NN Technology." *Id.* at 18 (Sched. A). Amended Schedule A to the Second Addendum, signed in December 2007, provides the same, as does Second Amended Schedule A, introduced as part of the Third Addendum signed in December 2008 through January 2009, *Id.* at 30 (Second Addendum, Sched. A), *Id.* at 48 (Third Addendum, Sched. A).   Again, the Second Addendum states that "each Participant holds and enjoys equitable and beneficial ownership of NN Technology." *Id.* at 27 (Second Addendum, Whereas Clauses).

Similarly, the Memorandum of Understanding ("MOU") – which was drafted "to provide a record of" the Participants' "understandings" with respect to the MRDA and related agreements – states that the Licensed Participants enjoyed "ownership" of NN Technology.[223]  The MOU explains that the MRDA "memorializes the agreements of NNL and the Licensed Participants as to the development and deployment of existing and future NN Technology and ownership of the NN Technology, with NNL holding legal title thereto." *Id.* ¶ 3.

Article 9(b) provides that:   Upon termination of the MRDA, each Licensed Participant "shall be deemed to have acquired a fully paid up license permitting it to continue to exercise the rights granted to it herein, and, in particular, the rights granted to it in Article 5 as though this Agreement had continued." *Id.* at 9 (Art. 9(b)).

Article 10(a) provides that:  NNL Licensed Participants could not add Participants without the consent of all other Licensed Participants.

---

[223] *See* TR48944 (MOU) at 1 & ¶¶ 3, 6.

Article 11 provides that: When a Participant exits from the MRDA due to insolvency, NNL is obligated to pay fair market value in exchange for the cancellation of the exclusive license and the acquisition by NNL of the rights held by the former Licensed Participant. The entitlement of each Licensed Participant to be paid fair market value for its exclusive license in an insolvency substantiates the Licensed Participants' broad rights to NN Technology.

7.    NNL Had Nothing of Value to Sell in the
      Licensed Participants' Exclusive Territories

The Licensed Participants held the right to enforce all the NN Technology in the Exclusive Territories, including the patents included in the Patent Portfolio, and no other party was entitled to control or interfere with their enforcement rights.  As a result, no buyer of the Patent Portfolio would have purchased the patents and other intellectual property rights in the sales unless Licensed Participants terminated those rights.  Absent such termination, if the buyer had sought to exploit NN Technology, Licensed Participants would have had the right and ability to prevent the buyer from doing so.

In the United States the effect of a transfer of title to a U.S. patent on the rights of an existing licensee to the patent is governed by U.S. patent law, even if the underlying license agreement is governed by foreign law. *Innovus Prime*, 2013 WL 3354390, at *3. Under U.S. law, a party cannot place a buyer of its patent interests in any better position than the party itself occupied or confer upon the buyer rights that the party itself did not hold. *See id.* at *5  The same is true under Ontario law. *See National Carbonising Co., Ltd. v. British Coal Distillation, Ltd.* (1937), 54 R.P.C. 41 (C.A.) (holding that an assignment of a patent cannot

defeat the rights of the licensee under a license); *see also* P. Bradley Limpert, *Technology Contracting: Law, Precedents and Commentary* (Toronto: Carswell, 2011) at 5-31.

Therefore, NNL had no right to practice or otherwise exploit Nortel patents or other NN Technology in the United States and could not place a buyer of its interests in any better position than NNL itself occupied or protect such a buyer from an infringement suit by NNI.

## THE FLAWED POSITIONS

The Court has concluded that the MRDA does not govern allocation. In the absence of agreement, and because the Estates' allocation positions are flawed, the Court finds that a modified pro rata allocation method is appropriate by default.

### A.    Canadian – Ownership

The U.S. Debtors and the EMEA Debtors had broad, exclusive licenses to use the NN Technology. Accordingly, NNL's "legal title" to IP was fully encumbered by the Exclusive Licenses in the Licensed Participants' territories. It had little to sell in the Rockstar Sale and, in fact, the IP Sale could only have been the success it was because the Licensed Participants agreed to terminate their Exclusive Licenses.

NNI held the right to enforce all of the NN Technology in the United States. This right included the IP in the Patent Portfolio. It is obvious that no buyer of Nortel IP would purchase the IP if NNI – and Exclusive Licenses in other territories – did not terminate such rights. Otherwise, the Exclusive Licensees, including NNI, could enjoin a purchaser from exploiting the IP it purchased.

86

The Monitor also claims that NNL could freely transfer its rights in NN Technology, but that NNI and the other Licensed Participants could not do so.  This is wrong, and the Monitor's "value in use" approach to allocation that rests on this claim is thus necessarily wrong.

The Monitor's value in use analysis inflates NNL's allocation.  On the Business Line Sales, the Monitor and its expert, Philip Green do not value what portion of the purchase price paid for the Business Lines was due to the transfer or surrender of assets and rights by any of the Selling Debtors.  The Canadian Interests value – only for NNI and the EMEA IEs, but not for NNL – what the assets and rights might have been worth if not sold.  Thus, the Monitor and Mr. Green allocate to NNI and the EMEA IEs (but not to NNL) the discounted cash flow value that NNI and the EMEA IEs would have earned had the Business Lines not been sold, which Mr. Green then understates by downwardly adjusting Nortel's cash flow projections. Yet the Monitor and Mr. Green fail to perform any valuation with respect to the intellectual property rights NNL contributed in the Business Line Sales, but instead simply allocate to NNL the remainder of the purchase prices paid.

Had the Monitor and Mr. Green applied to NNL the same value in use methodology and cash flow projections they used for NNI and the EMEA IEs, their allocation to NNL would be reduced by approximately $1 billion.  Moreover, applying their methodology consistently to all parties would leave this $1 billion unallocated to any Selling Debtor.  The Monitor and Mr. Green simply "allocate" this $1 billion solely to NNL without any basis.

On the IP Sale, the Monitor's theory is that NNL is entitled to all of the proceeds.  In addition, Green conducts an alternative analysis whereby the Monitor and Green calculate

an aggregate value in use that is short by $1.8 to $4.1 billion. Again, they allocate these billions to NNL for no good reason despite admitting they do not know to what that value is allegedly attributable.[224] Their premise is that NNI's and the EMEA IEs' interest in NN Technology was non-transferable but NNL's interest was transferable. The right of the NNI and EMEA IEs to transfer their interests greatly reduces the Canadian Interests' valuation.

B.    The EMEA Debtors - Contribution

The EMEA Debtors agree with NNI's allocation position (with certain modifications) as an alternative theory, but argue as their principal allocation theory that allocation should be based on the Selling Debtors' contribution to the development of NN Technology. The contribution theory erroneously equates the cost of developing an asset with its value. The EMEA Debtors' own valuation expert, Paul Huffard, conceded that the contribution approach is not a valuation approach:

> Q.    Whereas in the contribution approach, you're not valuing any rights that were contributed to the sale; you're doing an analysis based on somebody's sense of what is an equitable way to allocate the proceeds once received.
>
> A.    I think that's fair.[225]

Were the Court to adopt the EMEA Debtors' contribution approach, which it is not, the amounts allocated to the Selling Debtors must be adjusted to reflect properly the parties' actual contributions to the development of NN Technology, including using an

---

[224] *See* TR00043 (Green Rebuttal) at 19 (Green indicating that Rockstar paid "additional amounts for the Residual IP portfolio *on some other basis* than cash flows" (emphasis added)).

[225] Trial Tr. Day 9, 2010:4-9 (Huffard)

appropriate useful life and accounting for the costs actually incurred by the parties in developing NN Technology.

### C.    U.S. - Revenue

The basic problem with the U.S. Debtors' revenue approach to allocation is that it is not based upon valuation of specific assets and rights transferred by each Estate in the sales.  For the Business Line Sales, the U.S. Debtors' expert, Mr. Kinrich, did not perform a valuation but, instead, compared the relative revenues.  A discounted cash flow analysis, i.e., a projection of future cash flow (revenues minus costs) discounted to the present value at a discount rate is the preferred valuation method.

Mr. Kinrich did not perform such a calculation.[226]  Instead, he compares the relative revenue earned in each geographical region by the various Nortel entities for each business line in a single year, namely, 2009.[227]  He then allocates the Sales Proceeds from each business line sale to each Debtor Estate based upon the claimed proportionate share of the revenues earned in the Estates' respective geographies.

Although the U.S. Debtors argue that the revenue-based approach is a "standard income-based method" of valuing the assets that were relinquished,[228] Mr. Kinrich acknowledged that this was not the preferred method.  Rather, the preferred method for valuing income-producing assets, such as the IP licenses in the present case, is the discounted cash flow method.[229]

---

[226] TR00051 (Exh. 51, Expert Report of Jeffrey Kinrich, January 24, 2014) paras. 89-90

[227] TR00051 (Exh. 51, Expert Report of Jeffrey Kinrich, January 24, 2014) para. 27

[228] *See e.g.,* Pre-Trial Brief of the U.S. Interests, May 2, 2014, p. 76

[229] Jeffrey Kinrich Trial Testimony, Day 17, June 18, 2014, p. 4328:13-20

Mr. Kinrich agreed that the value of a license is driven by the profits that the licensee could earn by using the patented technology, but he did not determine what those profits would have been in the case of the U.S. and EMEA Debtors.[230]  Nonetheless, in determining the value of those licenses, Mr. Kinrich took no steps to attempt to forecast those profits.[231]

The "authoritative" text relied upon by Mr. Kinrich as supporting his revenue-based methodology in fact made it clear that his approach was not appropriate to the valuation task at hand.  The authority Mr. Kinrich relied on, *Valuing Small Businesses and Professional Practices,* stated that valuing a business based on a revenue approach may be useful:

    (a)       to approximate a range of possible values with a minimum of time and effort;

    (b)       to conclude an estimate of value when other data are unavailable or inadequate; or

    (c)       as one indicator of value, used in conjunction with other "more rigorous" valuation methods.[232]

The text explained that a revenue approach would require the comparable businesses to have a fairly standard cost structure.[233]  Mr. Kinrich acknowledged that the various Nortel entities, among which he was allocating proceeds based on revenue, did not have a standard cost structure.

PRO RATA ALLOCATION

The MRDA does not control allocation.  In the absence of an agreement governing allocation or a preponderance of evidence showing entitlement to assets and the value of

---

[230] Jeffrey Kinrich Trial Testimony, Day 17, June 18, 2014, p. 4329:15-20

[231] Jeffrey Kinrich Trial Testimony, Day 17, June 18, 2014, p. 4330:3-4331:2

[232] TR00053 (Exh. 53, *Valuing Small Businesses and Professional Practices*, 3d ed., New York: McGraw-Hill, 1998) p. 340

those assets, the Court's task is to arrive at a fair and equitable mechanism to allocate the billions of dollars of Sales Proceeds to numerous international entities for the benefit of their creditors who have now waited years for their recoveries. The Court's decisions will impact investors and pensioners, as well as other unsecured creditors.

The parties' complex arguments for their positions and against others supported by the enormous volume of supporting papers go around and around without end and without a definitive correct answer. It is fair to find that there is validity and error in all of the arguments, largely because the arguments are not rooted in an agreement which applies to the facts. In the meantime, the case remains *in stasis*. The evidence presented to the U.S. Court and the Canadian Court only serves to magnify the differing and irreconcilable approaches taken by the U.S. Debtors, the Canadian Debtors and the EMEA Debtors. All of their approaches yield an unsatisfactory result and the evidence upon which they rely does not comport with the manner in which Nortel operated.

The Court's answer to the dilemma is to a adopt a modified pro rata allocation model which recognizes both the integrated approach which the CCC and the NNUK urge, while maintaining – or at least recognizing – the corporate integrity of the Nortel Entities.

---

[233] TR00053 (Exh. 53, *Valuing Small Businesses and Professional Practices*, 3d ed., New York: McGraw-Hill, 1998) p. 341-342

The extreme allocation proposals of the various debtors is best conveyed by reference to the following comparison chart contained in the UK Pension post trial brief which the Court copies here:



These allocation positions, of course, stand on the shoulders of the parties' interpretations of the MRDA. Yet the evidence establishes that the MRDA simply does not apply to allocation. The chart reveals that the Debtors have lost sight of the irrationality of their respective positions. The variance of the positions are of such magnitude that highly capable and responsible attorneys were unable, or in the heat of the fight were unwilling, to find a middle ground despite three extensive and costly mediations. Because the Debtors have been unable to prove the plausibleness of their answers to allocation, the Courts are

left to determine an appropriate outcome. The Courts are in agreement that the pro rata approach is the most satisfactory allocation method. They also agree that their methodology does not constitute global substantive consolidation. The Courts will recognize the rights to cash-on-hand, settlements and intercompany claims, one of which resulted in an allowed $2 billion claim of NNI against NNL.

Similarly, the Courts are not dismembering the guaranties provided to the Bondholders which can only be accomplished if the Courts do not recognize separate corporate identities of the Nortel Entities. Doing so would ignore the facts discussed above that the Nortel Entities carefully maintained separate corporate identifications. It could also dangerously impair multinational businesses from raising capital.

A. Global General and Administrative Support Functions

Much of Nortel's global General and Administrative support ("G&A") was largely performed by NNL. There were four primary global G&A organizations within Nortel: (1) Finance; (2) Information Technology; (3) Human Resources, and (4) Other Real Estate, Legal, Compliance, and Strategy groups. [234] The matrix structure "allowed Nortel to draw on employees from different functional disciplines worldwide (*e.g.*, sales, R&D, operations, finance, general and administrative, etc.), regardless of region or country according to

---

[234] TR22078 (2007–2011 APA) Appx. A pp. 9–10; Drinkwater Dep. 45:21–46:24.

need."[235]  Nortel operated as "an integrated, global whole,"[236] for the benefit of all of Nortel.[237]

Ernie Briard, an accountant with the Chief Technology Office, testified: "[W]e did not run the business with any real knowledge of the statutory entities at all.  We ran it as a global Nortel corporation."[238]  Decisions to allocate resources and performance were not based on legal entity lines, but by lines of business.[239]  Nortel reported its finances on a consolidated basis without regard for its different legal entities.[240]

Employees testified there was one Nortel.[241] Simon Brueckheimer, a Nortel Fellow and prolific inventor based in the UK, testified that in customer activities he "was representing Nortel.  I didn't differentiate any particular geography. . . . I took on the mantle essentially of representing the company as a whole."[242]  Although employed by a particular legal entity, employee work responsibilities were directed to the entire Nortel.[243]

The Nortel Networks name and logo were used throughout Nortel to refer to an integrated whole.  To the outside world, including Nortel's customers, suppliers, and the

---

[235] TR00001 (Currie Aff.) ¶27; Bifield Dep. 257:5–24.

[236] Trial Trans. Day 3, 539:20–540:11 (Currie).

[237] Trial Trans. Days 11–12, 2647:17–2648:18, 2718:16–20, 2737:12–19 (Cooper) (debtors engaged in a common endeavor akin to a joint venture among related parties); Day 8, 1719:6–15, 1721:16–20, 1751:16–25 (Stephens) (MRDA participants appeared to engage in a form of a joint venture to maximize global revenues).

[238] Briard Dep. 21:4–14 (discussing R&D allocation).

[239] Beatty Dep. 22:3–11, 178:19–179:3.

[240] Trial Trans. Day 3, 571:13–572:5 (Currie); Day18, 4599:7–15 (Ryan).

[241] Drinkwater Dep. 21:23-11:10; Riedel Dep. 113:16–23; Dadyburjor Dep. 37:7–13; and Briard Dep. 17:4–18.

[242] Trial Trans. Day 7, 1578:5–1579:22 (Brueckheimer)

[243] Bifield Dep. 256:10–258:25.

rest of the world, the logo referred to all of Nortel, and not to any one geographic entity.[244]

Within Nortel, employees "use[d] the term 'Nortel Networks' to be the consolidated global

Nortel Networks . . . irrespective of any entity or jurisdiction.  It was the total—it was the

one Nortel."[245]

## B.    R&D Functions Were Collaborative Across Borders

R&D was geographically distributed.  Nortel's R&D operations were distributed and

were conducted across the globe.  "Nortel's R&D function [was] a global undertaking

aligned with its business strategy of technology leadership.  Engineers in each of Nortel's

geographic markets work[ed] to develop next generation products."[246]  By 2002, Nortel had

14,000 R&D employees spread across over 20 regions, with its most significant presence in

Canada, the U.S., and the UK.[247]  R&D operations relating to Nortel's Business Lines—*e.g.*,

Wireless, Enterprise, and Optical—were distributed globally as well.[248]  Nortel's globally

distributed R&D distinguished it from other high technology companies which centralized

their R&D in a single site.  Examples are Microsoft which conducted over 90 percent of its

R&D at its core facility in Seattle, and Cisco Systems conducted over 80 percent of its R&D

at its San Francisco Bay campus.[249]

---

[244] Trial Trans. Day 3, 711:11–712:11 (McFadden).

[245] Briard Dep. 76:10–19.

[246] TR11352 (Letter, Apr. 6, 2006) at NNI_01534867.

[247] TR21188 (Global R&D Investment Strategy) p. 4.

[248] TR21188 (Global R&D Investment Strategy) pp. 5–8.

[249] TR21188 (Global R&D Investment Strategy) pp. 9–10; Trial Trans. Day 3, 709:14–710:19 (McFadden).

Nortel's laboratories often worked collaboratively and as a unified whole to develop technology.  As Simon Brueckheimer testified:

> Research & Development . . . at Nortel was generally a collaborative process.  Other NNUK employees and I not only worked together, we routinely shared our expertise, developed foundational technologies and also co-invented patents with Nortel employees based in other geographic locations, which was to the advantage of the Nortel Group.  I never perceived that there was any difference between particular Nortel entities, always thinking of Nortel as a unified whole.[250]

Technology assisted collaboration.  As Mr. McFadden testified:  "At Cisco they'd use a water cooler.  We used telephones."[251] It was common for R&D personnel from around the world to be involved in the process of addressing customer requests and responding to customer bids.  Nortel's bid response to AT&T in 1997 involved the collaboration of multiple labs.  The effort was led by Simon Brueckheimer, who along with others at Nortel's Harlow, UK, lab contributed the voice compression solution selected for the bid.[252]

Solutions to problems did not stop at borders.[253]  As Mr. Brueckheimer testified:  "[I]n my experience on many, many bid responses, for example the [British Telecom] bid response in 2004, again which I ran, I had 85 people reporting to me from many labs around the world."[254]

---

[250] TR00023 (Brueckheimer Aff.) ¶5.

[251] Trial Trans. Day 3, 713:10–11 (McFadden).

[252] Trial Trans. Day 7, 1573:4–12 (Brueckheimer).

[253] Trial Trans. Day 7, 1573:13–16 (Brueckheimer).

[254] Trial Trans. Day 7, 1573:22–25 (Brueckheimer).

Nortel determined R&D priorities and budgets world-wide.  Nortel did not allocate R&D budgets by geographic entity or subsidiary, but rather by line of business.[255] Spending on R&D was against the budget for the appropriate line of business, regardless of the geographic location in which it occurred.[256]  Most Nortel laboratories did work pertaining to multiple lines of business.[257]

The goal of Nortel's R&D was to create technology that could be commercialized, although it was not necessarily possible to trace research efforts to immediate commercial results.  In its Functional Analysis (2000–2004) prepared for the tax authorities, Nortel explained:

> All R&D projects are ultimately intended to produce commercially exploitable products or knowledge; however, there may be R&D undertaken for which no recognizable commercial gain is immediately evident.  Long-term research projects are undertaken in a somewhat academic environment with the long-term goal of producing a commercially exploitable product. The information obtained from those projects is intellectual property; however, the ability to commercially exploit that knowledge is not yet available.[258]

Pro rata allocation takes into account Nortel's operations as a unified endeavor.  The pro rata allocation model reflects the underlying economics of the "One Nortel" integrated global business.  The U.S., Canadian and EMEA Debtors allocation methods do not account for the complete absence of any *ex ante* agreement among the Nortel entities as to the division of assets in the event of a global insolvency.  They wrongly assert that the

---

[255] TR00004 (McFadden Aff.) ¶20.

[256] TR00004 (McFadden Aff.) ¶20.

[257] TR00004 (McFadden Aff.) ¶21; TR21188 pp. 5–8.

[258] TR31355 (2000–2004 Functional Analysis) p. 24.

individual geographic regions functioned autonomously and can thus claim credit for, and retain proceeds from the sale of Nortel's assets. Their proposals lead to wildly divergent allocation outcomes. Each proponent seeks to obtain a disproportionate share of the proceeds.

The RPEs' common endeavor was to maximize global profits and the sales of assets likewise crossed borders. The parties signed the IFSA, affirming that they would share proceeds from the sales to further the best interests of Nortel's creditors. They recognized that a cooperative, multi-jurisdictional sale of the Business Lines was the only way to maximize proceeds. Likewise, the RPEs recognized that a collaborative sale of the Residual IP would create the most value and they agreed to facilitate that sale by executing LTA's.

## C.     Authority for Pro Rata Allocation

In this unprecedented, complex and massive dispute involving highly integrated MNE's, the U.S. Court has the authority to adopt a pro rata allocation. The Bankruptcy Code permits courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Code]". 11 U.S.C. §105(a). The Third Circuit has construed this provision to give bankruptcy courts "broad authority" to provide appropriate equitable relief to assure the orderly conduct of reorganization proceedings, See, e.g., *In re Combustion Eng'g, Inc.,* 391 F.3d 190, 236 (3d Cir. 2004), and to "craft flexible remedies that, while not expressly authorized by the Code, effect the result the Code was designed to obtain." *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery,* 330 F.3d 548, 568 (3d Cir. 2003) (en banc). In an international case such as this, there is the principal "that assets should be collected and distributed on a

worldwide basis." *Maxwell Commc'n. Corp v. Barclays Bank (In re Maxwell Commc'n. Corp.)*,
170 B.R. 800, at 816 (Bankr. S.D.N.Y. 1994). See also *In re ABC Learning Centres Limited*, 728
F.3d 301, 305-306 (3d. Cir. 2013).

The Court has toiled mightily to reach a correct and equitable result, consistent with
the evidence adduced at trial.  The Court, like the Canadian Court, is ordering a modified
pro rata allocation – not distribution – which both recognizes the integrity of the corporate
separateness and the integrated synergistic operations of Nortel.  The Court's adoption of
pro rata allocation is the only outcome that reflects uncontroverted evidence and leads to a
just result.  The master facts are that Nortel functioned as a unified global enterprise and
there was no agreement which governed how the individual entities would or could
allocate their assets in the event of an insolvency.  All parties agree, as they must, that
Nortel was centrally managed with employees and assets from many countries and
subsidiaries contributing to the R&D which led to the businesses, IP, products and licenses
to which they now lay claims of ownership and beneficial interest.  The ramifications of the
insolvency must be borne by all of the Nortel Entities and, consequently, all of its creditors.
 A pro rata allocation is driven by the unique facts, the after the fact justifications by parties
for their positions and the disparity of those positions.

The Court's ruling is not a substantive consolidation because no one estate is entitled
to any specific asset.  In *In re Owens Corning*, the U.S. Court of Appeals for the Third Circuit
observed that substantive consolidation "treats separate legal entities as if they were
merged into a single survivor left with all the cumulative assets and liabilities, (save for
inter-entity liabilities which are erased).  The result is that claims of creditors against

separate debtors morph to claims against the consolidated survivor."[259]   A pro rata allocation does not merge the Nortel Debtors into a single survivor and does not erase intercompany claims.  All claims against each Nortel Debtor, including intercompany claims and court approved settlements, will receive distributions from the separate Debtor Estates.

The decision of the Third Circuit Court of Appeals in *In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005), is a clear and concise exposition of the law on substantive consolidation for domestic insolvencies.  It includes the history of the legal precept, the standards and the economic ramifications of substantive consolidation.  Therefore, *Owens Corning* is worthy of a detailed discussion.

The Third Circuit succinctly framed the issue as follows:

> We consider under what circumstances a court exercising bankruptcy powers may substantively consolidate affiliated entities.

*Owens Corning*, 419 F.3d at 199.

In the case, Banks had made $2 billion in unsecured loans to *Owens Corning* and certain subsidiaries, and obtained guarantees from other subsidiaries.  The Banks appealed from the district court's order consolidating the assets and liabilities of the borrowers and guarantors.  The Third Circuit's discussion included the following:

> Substantive consolidation, a construct of federal common law, emanates from equity.  It "treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities (saved for inter-entity liabilities, which are erased).  The result is that claims of creditors against separate debtors morph into claims against the consolidated survivor."  *Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health*

---

[259] *Owens Corning,* 419 F.3d 195, 205 (3d Cir. 2005) (emphasis added) (citation omitted).

*Ventures, Inc.*), 402 F.3d 416, 423 (3d Cir. 2005). Consolidation restructures (and thus revalues) rights of creditors and for certain creditors this may result in significantly less recovery.

*Id.* at 205.

\* \* \*

Corporate disregard as a fault may lead to corporate disregard as a remedy.

*Id.* The Third Circuit further discussed approaches courts take for allowing substantive consolidation. The two "themes" are:

> (i) whether creditors dealt with the entities as a single economic unit and did not rely on their separate entity in extending credit, . . . or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors. . . ."

*Id.* at 207-208, quoting from *Union Sav. Bank v. Augie / Resivo Baking Co., Ltd.*, 860 F.2d 515, 518 (2d Cir. 1988).

After thoroughly discussing the approaches and the economic impact of substantive consolidation, the Third Circuit settled on the following requirement for substantive consolidation:

> In our Court what must be proven (absent consent) concerning the entities for whom substantive consolidation is sought is that (i) prepetition they disregarded separateness so significantly that their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors.

*Id.* at 211. The Third Circuit found that substantive consolidation on the facts presented in *Owens Corning* was inappropriate.

D. <u>Pro Rata Allocation is Not Substantive Consolidation</u>

The discussion of a pro rata allocation requires a discussion of substantive consolidation and, more importantly, why the Court's approach is not that seemingly offensive outcome. The Court understands that the NNUK is campaigning for global substantive consolidation; and to a lesser extent the CCC is doing likewise. The Court's methodology departs from those views. The Court, for one, is not ordering payments to the "most deserving" creditors as the Bondholders fear. The Court is not ordering a distribution scheme. Instead, the Court is directing an allocation among the Estates for the Estates to distribute in an appropriate manner. It is a distinction with a difference. The difference is that intercompany claims, settlements, cash-on-hand will all be honored in the allocation. The logistics and practical concerns with the pro rata calculation are manageable – certainly as much if not more than any prospect of continued litigation and appeals, still more litigation and more appeals.

The basic principal of substantive consolidation is the treatment "of separate" legal entities as if they were merged into a single survivor left with all cumulative assets and liabilities (save for inter-entity liabilities, which are erased)." *In re Owens Corning*, 419 F.3d 195, 205 (3d Cir. 2005). The more relevant inquiry, as the U.S. Debtors point out, is whether creditors of each Nortel estate would have to "share those assets with all creditors of all consolidated entities", thereby raising the specter for some of a significant distribution diminution." *Id.* at 206.

The Estates opposing the pro rata allocation are correct to express concerns over "rough justice" and "free floating discretion." But in giving validity to IFSA, intercompany claims, settlements, and guaranties, there is nothing rough about the justice. Instead, the

Court is attempting to apply an equitable result where parties could not agree upon one and did not prove the validity of any one of the conflicting views.  The bases asserted – ownership, revenue, contribution – result in valuations which simply do not match operations.  It is highly significant that the U.S. Court and the Canadian Court independently arrived at the same conclusion.

One only has to read the parties' briefs (as the Court has done numerous times) and to have presided over the trial to understand that no Estate – U.S., Canadian or EMEA – was able to raise its position above the others.  The Court compares the Allocation Dispute to three people trying to reach the top of a mountain by pulling the others down.  In other words, no one gets to the top.

Under U.S. law, a proponent of substantive consolidation must show that either "[1] prepetition [the debtors] disregarded separateness so significantly [that] their creditors relied on the breakdown of entity borders and treated them as one legal entity, or [2] postpetition [the debtors'] assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors."  *In re Owens Corning*, 419 F.3d at 211.

The following principles govern: (1) the "general expectation" is that "courts respect entity separateness absent compelling circumstances calling equity (and even then only possibly substantive consolidation) into play"; (2) the "harms substantive consolidation addresses are nearly always those caused by *debtors* (and entities they control) who disregard separateness"; (3) "[m]ere benefit to the administration of the case . . . is hardly a harm calling substantive consolidation into play"; (4) the "rough justice" remedy of substantive consolidation "should be rare and, in any event, one of last resort after

considering and rejecting other remedies"; and (5) substantive consolidation "may not be used offensively (for example, having a primary purpose to disadvantage tactically a group of creditors in the plan process or to alter creditor rights)." *Id.* at 211. Although not for the Court to decide, the law in Canada appears to be similar. *Northland Properties Ltd., Re.*, [1988] 69 C.B.R. (N.S.) 266 at para. 49 (Can. B.C. S.C.), citing *Re Baker and Getty Fin. Services Inc.*, 78 B.R. 139 (Ohio Bankruptcy Court, 1987). This is accomplished with reference to the following seven factors: (1) difficulty in segregating assets; (2) presence of consolidated financial statements; (3) profitability of consolidation at a single location; (4) commingling of assets and business functions; (5) unity of interests in ownership; (6) existence of intercorporate loan guarantees; and (7) transfer of assets without observance of corporate formalities. *Northland Properties Ltd., Re.*, [1988] 69 C.B.R. (N.S.) 266 at para. 49 (Can. B.C.S.C.) citing *In re Vecco Constr. Indus., Inc.*, 4 B.R. 407, 410 (Bankr. E.D. Va. 1980).

The record of Nortel's operations does not satisfy the legal and factual requirements for substantive consolidation. While Nortel operated as a highly integrated multinational enterprise, the evidence establishes that the Nortel affiliates respected corporate formalities and did not commingle their distinct assets or liabilities. Given that Nortel respected and maintained corporate separateness among its distinct legal entities both before and during its insolvency, substantive consolidation cannot be applied in this case.

Again, the Court is not adopting pro rata distribution. Pro rata distribution would result in substantial prejudice to creditors who have bargained for separate contractual rights. It would make the Sales Proceeds available for distribution to all debtor entities regardless of whether a debtor sold assets in a particular sale, with the practical effect of

moving cash from one Estate to another to the detriment of creditors.[260]  Implementation of

a pro rata distribution would further prejudice creditors by unwinding the effect of Court-

approved settlements and intercompany claims.[261]

   In ruling that substantive consolidation is not justified here, the Court wants to be

clear that pro rata allocation does not constitute substantive consolidation.  Nonetheless, it

is worth noting that the *Owens Corning* facts differ from the Nortel facts.  The affiliated

*Owens Corning* entities had different, independent, separate business purposes, logos and

trade names, and other features which made separating their assets and liabilities

straightforward.[262] In contrast, Nortel was highly integrated, organized along Lines of

Business operating for the same purpose under the same logo and trade name, and all of

the entities engaged in the development, manufacture, and sale of various products of a

single company.  The very issue of this litigation is who owns Nortel's assets and is entitled

to receive the Sales Proceeds.  The reason the issue is unsettled is because there is no pre-

determined answer.

   In further contrast to Nortel, *Owens Corning*'s affiliated debtors were contractually

bound to maintain their corporate separateness.  The *Owens Corning* loan agreement

guaranteed by all affiliated debtors, expressly limited how a borrower could deal with its

subsidiaries.   The Nortel cross-over bonds indentures do not contain such restrictive

characteristics.

E.    <u>Pro Rata Criticism is Misplaced</u>

---

[260]  Trial Tr. 3054:13-3055:2; 3074:25-3076:1 (Bazelon); TR00041 (DEM00014) at 5.
[261]  Trial Tr. 3039:3-3044:21; 3055:3-3057:11; 3072:1-3073:20 (Bazelon); TR00041 (DEM00014) at 4.
[262] *Id.*

The evidence at trial established the uniquely integrated nature of Nortel's global enterprise and the extensive integration of IP assets giving rise to the proceeds of the sale in the Lockbox. The evidence further confirmed that Nortel was a truly global enterprise.

By agreeing to the IFSA, the Estates confirmed that the Courts had jurisdiction to determine the appropriate allocation of the Sales Proceeds absent agreement. The IFSA does not require or suggest any allocation method. The IFSA does not suggest the fair market value of the assets and rights sold or relinquished in connection with the sale of Nortel's Business Lines and Residual IP as argued by the U.S. Debtors. Nor does the IFSA indicate any preference for the EMEA Debtors' contribution allocation. The IFSA was entered into and approved by the Courts in June, 2009, before the Estates on behalf of the Selling Debtors had each disclosed the diametrically polar views as to their respective rights to the proceeds of the sale of the Business Lines and Residual IP. Nor is there any suggestion in the IFSA that all of the value for Residual IP belonged solely to NNL and no other entity, as the Canadian Debtors and Monitor argue.

The pro rata allocation method which the Court is adopting is not substantive consolidation of the Estates. The Court is not directing a central insolvency administrator in one jurisdiction, that all of the Nortel Entities be treated as one, that all claims be determined within one proceeding under the supervision of one insolvency administrator, that there be one plan of reorganization for all Nortel Entities or that creditors receive a common dividend on a pro rata, *pari passu* basis.

The Court is not adopting a pro rata distribution, but an allocation to separate interests. The Court's pro rata model recognizes that separate Estates exist, will continue to

106

exist, and will ultimately be utilized to make distributions to creditors through whatever means is determined by the Courts following the Allocation Dispute.

Moreover, the Court recognizes the separate and distinct integrity of each of the Debtors by recognizing cash-on-hand intercompany claims and settlements. To be clear, the Court's pro rata allocation is not the "new order" which the pro rata proponents urge with terms such as "universalism".

The UKPC's call for Modified Universalism is premised upon the Model Law on Cross-Border Insolvency which the United Nations Commission on International Trade Law proposed in 1997.[263] These cases are not proceeding under the purview of the Model Law which is purely a proposal at this time. These cases are proceeding under the dictates of Chapters 11 and 15 of the Bankruptcy Code.

The pro rata proponents also argue that rejecting the guaranties will not negatively impact the marketplace. The pro rata proponents also cite in support of disregarding the guaranties to the following from Widen, Corporate Form and Substantive Consolidation, 75 Geo. Wash. L. Rev. at 274, 277:

> Before the Third Circuit's decision in *Owens Corning* . . . no sophisticated lending syndicate ever relied on a mere covenant prohibiting merger, consolidation, or dissolution to create priority when the syndicate itself employed a web of guarantees. The reason for non-reliance on such covenants is simple: the market believed that the presence of intercompany guarantees virtually assured that imposition of substantive consolidation would be proper for any companies forming part of an intercompany guarantee web (and no competent counsel would have opined otherwise). In *Owens Corning*, rather than a *bona fide* case of reliance on asset partitions, we have a case of simple good fortune for the lenders, the asset partitions and

---

[263] Model Law on Cross-Border Insolvency of the United Nations Commission on International Trade Law, UN GAOR, 52nd Sess., annex, Agenda Item 148, UN Doc. A/RES/52/158 (1998).

guarantees happened to remain in place until the bankruptcy filing, and the continued presence of the guarantees' structure afforded them a priority.[264]

There is insufficient trial evidence establishing pre-filing reliance by Bondholders on the corporate separateness of the various entities that comprise Nortel. Credit rating agency reports confirmed the trial evidence that the market did not distinguish between Nortel's bonds that were guaranteed by NNI and those that were not.[265] Data in respect of Nortel bonds confirms that the market did not view Nortel bonds that carried an NNI guarantee as being less risky than Nortel bonds that did not carry an NNI guarantee. The chart containing the data, "Nortel Bonds Spreads to U.S. Government Yield Curve (Basis Points), appears as Appendix C to this opinion.

The chart shows that Nortel bonds that carried an NNI guarantee traded at higher or equal spreads to Nortel bonds that did not carry an NNI guarantee. Bonds with a lower spread are considered less risky in the marketplace.[266] Since the marketplace did not more favorably view Nortel bonds guaranteed by NNI, creditor expectations do not support the contention that Nortel's guaranteed bonds would enjoy a greater percentage recovery upon insolvency or should otherwise entitle them to a higher recovery than Nortel's other unsecured creditors.

---

[264] *Id.* at 279.

[265] *See* TR12036 (Moody's Rating Action, June 16, 2006) p. 2; TR12037 (DBRS Credit Rating Report, July 16, 2006) pp. 1–2; TR12038 (Moody's Rating Action, Mar. 22, 2007) p. 1; TR12039 (DBRS Rating Report, Nov. 9, 2007) pp. 1–2; TR12040 (Moody's Rating Action, May 21, 2008) p. 1; TR12041 (DBRS Report, July 14, 2008) p. 2; TR12042 (Moody's Rating Action, Dec. 15, 2008) p. 1; TR12045 (Moody's Credit Opinion, Dec. 16, 2009) p. 3; and TR12045 (Moody's Credit Opinion, Dec. 16, 2009) p. 3.

[266] Kilimnik Dep. 18:12-19:14.

Additionally, the documents evidencing the issuance of the bonds (i.e., the offering memoranda and indentures) do not provide a basis for any Bondholders to have reasonably relied on any particular partitioning of assets among the individual entities.

The guarantees did not restrict NNC or its subsidiaries from lending cash to, or making investments in, affiliates, or from incurring substantial amounts of additional indebtedness,[267] investors were warned of the possibility of consolidation,[268] and that under applicable law principal and interest might not be paid.[269] Thus, the Bondholders' allegations of reliance on the outcome they now advocate are unfounded.

In addition, the June 29, 2006 Offering Memorandum for NNL's Senior Notes due 2011, 2013, and 2016,[270] the related Indenture dated July 5, 2006 and the related Prospectus dated December 21, 2007 (and all documents incorporated by reference therein) only contained consolidated financial information for Nortel.  Similarly, the March 22, 2007 Offering Memorandum for NNC's Convertible Senior Notes due 2012 and 2014, the related Indenture dated March 28, 2007 and the related Prospectus dated December 21, 2007 (and all documents incorporated by reference therein) only contained consolidated financial information for Nortel. No bondholder could have formed the reasonable expectation that

---

[267] See June 29, 2006 Offering Memoranda for NNL NoteSenior Notes due 2011, 2013, and 2016 (TR40117) at pp. 29–30 (CCC0004630–CCC0004631).   See also the May 21, 2008 Offering Memorandum for Nortel's Senior Notes due 2016 (TR48723.01) at 22 (NNI_01410294) which contains identical risk factors and warnings; Trial Trans. Day 5, 1112:3–1114:21 (Binning).

[268] TR40117at p. 34.

[269] Trial Trans. Day 4, 828:7–21 (McCorkle).

[270] TR40117, TR40041 (Proof of Claim for 2006 Indenture and Indenture appended), TR40182 (Prospectus - Offers to Exchange Notes due 2011, 2013, 2016 dated Dec 21, 2007), TR44615, TR40042 (Proof of Claim for 2007 Indenture and Indenture appended), TR40180 (Prospectus for NNC Convertible Notes due 2012 and 2014 dated December 21, 2007).

on insolvency, a guarantee would have entitled bondholders to access distinct pools of

assets that may or may not have been held by the entity that guaranteed the bonds.

The pro rata proponents suggest the Courts should consider the identities of the

Bondholder Group's members, their purchase history, and the prices they paid for the

Bonds when evaluating allocation. The Court answers with a resounding "No." When and

at what prices the members of the Bondholder Group acquired their Bonds is irrelevant to

this litigation.  The purchaser of a debt instrument on the secondary market is entitled to

the exact same rights as the original purchaser of that instrument.  *See In re 785 Partners,*

*LLC*, 470 B.R. 126, 133 (Bankr. S.D.N.Y. 2012) (if a creditor is the assignee of the original

lenders, then that creditor "stands in the shoes of the assignor, and takes neither more nor

less than the assignor had").[271]  Thus, in a bankruptcy case of the issuer, the secondary

purchaser "can assert the same rights subject to the same limitations that the original

lenders could have asserted if they still owned the Loans."  *Id.*

Moreover, the price paid by a secondary purchaser has no impact on its substantive

rights.  In *785 Partners*, the court found that although "the Debtor's existing default may

have been factored into the price that [the creditor] paid to the Original Lenders," this was

---

[271] As Alexander Hamilton recognized soon after the United States' founding:

> [t]he nature of the contract, in its origin, is that the public will pay the sum
> expressed in the security, to the first holder or his assignee.  The intent in making
> the security assignable, is, that the proprietor may be able to make use of his
> property, by selling it for as much as it may be worth in the market, and that the
> buyer may be safe in the purchase.  ***Every buyer, therefore, stands exactly in the***
> ***place of the seller; has the same right with him to the identical sum expressed in the***
> ***security; and, having acquired that right, by fair purchase, and in conformity to the***
> ***original agreement and intention of the Government, his claim cannot be disputed,***
> ***without manifest injustice***.
>
> A. Hamilton, *First Report on Public Credit* (January 9, 1790) (emphasis added).

"a matter between those parties." *785 Partners*, 470 B.R. at 133.   Were the Court to accede to the suggestion that secondary purchase prices are relevant, the effect on the distressed market would be devastating.

### F.     Implementation of the Pro Rata Allocation

The U.S. Interests and the EMEA Debtors take strong exception to a pro rata allocation.   The Court understands their disagreement.[272]   Pro rata is, to say the least, an extraordinary result, and the Canadian Interests, the U.S. Interests and the EMEA Debtors devoted enormous skill, time, money and energy in professionally presenting their cases for a revenue and contribution approach, respectively.   Likewise, the Canadian Interests forcefully advocate for an ownership allocation, not a pro rata allocation.

The EMEA Debtors and U.S. Interests argue that the pro rata "distribution" theory is not legally or factually supportable.   The pro rata "distribution" theory does not allocate to each Selling Debtor the fair market value of the assets it sold or relinquished in the Sales. It would therefore also violate the absolute priority rule insofar as NNL – NNI's equityholder – would recover before NNI's own creditors from the proceeds generated by the sale of NNI's property interests.   Implementation of the pro rata allocation will neither result in equity receiving preferential treatment nor violate the absolute priority rule.

The parties opposing the pro rata allocation argue that it is "unadministrable" due to uncertain treatment of claims, timing and creditor recoveries.   In particular, there is concern

---

[272] The Monitor and the Canadian Debtors expressed no position on a pro rata allocation.

with inflated claims, particularly the UKPC $3 billion claim against the EMEA Debtors. Inflated claims would, of course, skew a pro rata allocation and destroy the equitable allocation method.

The Court has answers to the concerns expressed.

1.      Any claims not resolved by a date certain would not be recognized.

2.      The Court will resolve any disputed claims to prevent claim inflation.

3.      Claims will be recognized only once. For example, the UKPC claim will be included in the allocation calculation only once and not against multiple EMEA Debtors. Similarly, for allocation purposes the Bondholder claims will be included only against the primary obligor, but the guarantees will be entitled to seek distribution from the appropriate Debtor of any deficiency resulting from the allocation.

4.      Intercompany claims and settlements approved by the U.S. Court and the Canadian Court will be included in calculating the allocation. They will not be deducted as the UK Pension Claimants propose. Doing so would violate the Courts' Orders.

5.      Once all claims are resolved, the amount in the Lock Box will be divided by the total claims and each Estate will be allocated its proportionate amount.

6.      The U.S. Estate will then propose a distribution plan for the Court's consideration.

The administrative steps for allocation contained in the accompanying Order will be prompt, fair and definitive, thereby addressing the concerns expressed by those opposing a pro rata allocation.

## CONCLUSION

Over three years ago, the Third Circuit Court of Appeals noted with both poignancy and command, which the parties disregarded, that:

> We are concerned that the attorneys representing the respective sparring parties may be focusing on some of the technical differences governing bankruptcy in the various jurisdictions without considering that there are real live individuals who will ultimately be affected by the decisions being made in the courtrooms.  It appears that the largest claimants are pension funds in the U.K. and the United States, representing pensioners who are undoubtedly dependent, or who will become dependent, on their pensions.  They are the pawns in the moves being made by the Knights and the Rooks.
>
> Mediation, or continuation of whatever mediation is ongoing, by the parties in good faith is needed to resolve the differences.  No party will benefit if the parties continue to clash over every statement and over every step in the process.  This will result in wasteful depletion of the available assets from which each seeks a portion.  There appears to be one constructive solution – the protocol agreed upon by appointing Justice Winkler to resolve the allocation issues.  He apparently has the respect of all parties and we hope (although it is not in our power to order) that the parties promptly devise a process by which all conflicting claims are put in his hands for resolution.

*In re Nortel Networks, Inc.*, 669 F.3d 128, 143-44 (3d Cir. 2011) (footnote omitted).

The Courts have now ruled on allocation of what remains of Nortel.  It is now the parties who have to make a decision: accept the Court's rulings and give them effect, take appeals and thereby prolong the hardship and deplete the remaining estate, or utilize the Courts' rulings to resolve any remaining differences.

The Court will issue its Order making its ruling final.

Dated:  May 12, 2015

KEVIN GROSS, U.S.B.J.

113

# APPENDIX A

### Glossary of Terms

## APPENDIX A

### Glossary of Terms

| | |
|---|---|
| Allocation Protocol | Order Entering Allocation Protocol, dated May 17, 2013 |
| APA | An advanced pricing arrangement, which is a contract between a multi-national enterprise and a tax authority specifying the transfer pricing methodology that the affiliate will be permitted to use for an agreed period of time. |
| APA Team | A team of employees formed by Nortel to determine the appropriate transfer pricing policy to propose to taxing authorities in the APA process. |
| Bondholders | The Ad hoc Group of Bondholders, consisting of entities holding bonds which NNC, NNL, NNI and NNC issued or guaranteed. |
| Business Line Sales | The post-filing sales in 2009 to 2011 involving tangible and intangible assets of, for the most part, operating Nortel businesses. |
| Business Lines | Nortel's lines of business |
| Canadian Court | The Ontario Superior Court of Justice. |
| Canadian Debtors | The Canadian Nortel companies that, on January 14, 2009, filed for and obtained protection under the *Companies' Creditors Arrangement Act* from the Ontario Superior Court of Justice, being Nortel Networks Corporation (NNC), Nortel Networks Limited (NNL), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation. |
| Canadian Estate | Collectively, the entities that make up the Canadian Debtors. |
| Canadian Proceedings | Canadian Debtors commenced a proceeding with the U.S. and Canadian Courts under the Companies' Creditors Arrangement Act (Canada), seeking relief from their creditors |
| CCAA | Companies' Creditors Arrangement Act (Canada) |
| CCC | The Canadian Creditors Committee, which represents the interests of Canadian pensioners and other pension interests, long-term disabled and other employees and former employees of Nortel who have claims against the Canadian Debtors. |
| CDMA | Code Division Multiple Access line of business |

1

| | |
|---|---|
| Committee | The Official Committee of Unsecured Creditors, appointed by the United States Trustee for the District of Delaware on January 22, 2009. |
| Cost Sharing Participants | Parties involved in cost sharing agreements, including NNL, NNI, NNUK, NN Ireland, and NNSA (the "CSPs"). |
| Courts | The U.S. Court and the Canadian Court. |
| CRA | The Canadian Revenue Authority |
| Cross Border Protocol | Canadian Court approved the Court-to-Court Protocol on the Petition Date, which was later amended by order of this Court on June 29, 2009 [D.I. 990] and by an order of the Canadian Court on that same date. |
| CSA | Cost Sharing Agreements between NNL and each of the other R&D performing Nortel entities. |
| CTO | Nortel's Chief Technology Officer |
| CVAS | Carrier Voice Over Internet Protocol Applications Solutions line of business |
| Debtor(s) | The companies or entities comprising the Canadian Debtors, the U.S. Debtors and the EMEA Debtors, either individually or collectively. |
| EMEA | The Europe, Middle East and Africa regions |
| EMEA Debtors | The 23 Nortel entities that, on January 15, 2009, were granted administration orders in the U.K. under the *Insolvency Act, 1986* and whose registered offices were in England, Europe, the Middle East and Africa, including Nortel Networks UK Limited (NNUK), Nortel Networks S.A. (NNSA) and Nortel Networks (Ireland) Limited (NN Ireland). |
| EMEA Estates | Collectively, the entities that make up the EMEA Debtors. |
| Ericsson | Telefonaktiebolaget LM Ericsson (publ) |
| Exclusive License | The MRDA sets forth a clear exchange of consideration between the signatories (NNL, NNI, NNUK, NNSA, and NN Ireland).  Pursuant to Article 4(a), each Licensed Participant vested legal title in NNL to the intellectual property it created.  Expressly "in consideration therefor," NNL granted an exclusive license back to each Licensed Participant. |

| FCFSA | Final Canadian Funding and Settlement Agreement |
|---|---|
| First Expansion of the Monitor Powers Order | An order expanding the Monitor's powers, dated August 14, 2009. The Order provides, among other things, the Monitor with the authority to cause the Canadian Debtors to take various actions in connection with the sale of the business units and to conduct, supervise, and direct any procedure regarding the allocation and/or distribution of proceeds of ay sale. |
| G&A | Nortel's global General and Administrative support. There were four primary global G&A organization within Nortel: (1) Finance; (2) Information Technology; (3) Human Resources; and (4) Other Real Estate, Legal, Compliance, and Strategy groups. |
| Global IP | The Global IP Law Group, which Nortel retained to provide advice on monetizing its Patent Portfolio. |
| Google Bid | The U.S. Debtors', NNL's, and NNC's agreement with an affiliate of Google Inc. to sell Nortel's residual patent and patent-related assets for $900 million, subject to higher or better offers. |
| GSM | Global System for Mobile Communications line of business |
| Horst Frisch Report | Functional analysis prepared by Horst Frisch for APA applications covering the 2000 to 2004 period. The reports set forth Nortel's justification for its proposed RPSM. |
| IEs | Individual entities |
| IFSA | Interim Funding and Settlement Agreement, June 9, 2009 (TR43794) |
| Inland Revenue | The Inland Revenue Service in the U.K. |
| Intercompany DIP Loan | NNI loaned to NNL $75 million under a revolving loan agreement. This loan was approved by the U.S. Court on the Petition Date. |
| IP | Intellectual Property |
| IP Assets | Nortel's remaining patent portfolio and related assets |
| IP Stalking Horse Agreement | Agreement dated April 4, 2011 between each of the IEs as Sellers and Ranger, Inc., for a purchase price of $900 million |

| IP Steering Committee | Formed in January 2010, a committee of representatives of Nortel and their advisors which led the evaluation process. |
|---|---|
| IPCo | A proposed IP licensing service and enforcement business that Nortel began developing even before the insolvency filings. |
| IRS | The U.S. Internal Revenue Service |
| Joint Administrators | Ernst & Young LLP was appointed administrator of the EMEA Debtors by the High Court of England and Wales on January 14, 2009 |
| Layer 4-7 Sale | Nortel sold its businesses and assets, including the sale of certain portions of its Layer 4-7 data portfolio to Radware Ltd. [D.I. 539] |
| Lazard | Lazard Freres & Co. LLC, financial advisor to the Debtors. |
| Licensed Participant(s) | As defined in Article 1(e) of the MRDA, a Participant (or all Participants) other than NNL. |
| LREs | Limited Risk Entities which were incorporated in most of the countries where Nortel products were sold, including in the EMEA region. |
| LTAs | License Termination Agreements |
| LTE | Long-term evolution wireless technology line of business |
| MNE | A multi-national enterprise |
| Monitor | Ernst & Young Inc. in its capacity as monitor of the Canadian Debtors appointed in the Initial Order granted January 14, 2009. By various orders, the Ontario Superior Court of Justice expanded the Monitor's powers and authorized it to exercise the powers of the boards of directors of the Canadian Debtors. |
| MOU | The Memorandum of Understanding, which was drafted "to provide a record of the Participants' "understandings" with respect to the MRDA and related agreements. |
| MRDA | Master R&D Agreement dated December 22, 2004 but with an effective date of January 1, 2001, between NNL, NNI, NNUK, NNSA, NN Australia and NN Ireland, as amended at least four times (TR21003). |

| NN Ireland | Nortel Networks Ireland, being an entity formed under the laws of the Republic of Ireland, one of the EMEA Debtors, and a direct subsidiary of NNL. |
|---|---|
| NN Technology | As defined in Article 1(f) of the MRDA, NN Technology "shall mean, any and all intangible assets including but not limited to patents, industrial designs, copyrights and applications thereof, derivative works, technical know-how, drawings, reports, practices, specifications, designs, software and other documentation or information produced or conceived as a result of research and development by, or for, any of the Participants, but excluding trademarks and any associated goodwill." |
| NNC | Nortel Networks Corporation, being a corporation incorporated under the laws of Canada, which was the publicly traded, parent holding company of NNL and its subsidiaries. |
| NNI | Nortel Networks Inc., being a corporation incorporated under the laws of the State of Delaware, the main U.S. operating entity and a direct subsidiary of NNL. |
| NNI Guaranteed Bonds | In 2008, NNL issued an additional approximately $675 million in public debt also guaranteed by NNI (together with the 2006 Bond Issuance). |
| NNL | Nortel Networks Ltd., being a corporation incorporated under the laws of Canada, and the main Canadian operating entity. |
| NNSA | Nortel Networks, S.A., being an entity duly formed under the laws of France, one of the EMEA Debtors, and a direct subsidiary of NNL. |
| NNUK | Nortel Networks UK Limited, being an entity formed under the laws of the United Kingdom, one of the EMEA Debtors, and a direct subsidiary of NNL. |
| Non-Exclusive License | As defined in the MRDA, a non-exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Non-Exclusive Territory, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith. |

| | |
|---|---|
| Nortel | Collectively, NNC and all of its direct and indirect subsidiaries, including the businesses they operated. |
| Nortel Entity(ies) | Any of the companies or entities, either individually or collectively, within the Nortel Group. |
| Participant(s) | As defined in the MRDA, any of the parties to the MRDA, namely NNL, NNI, NNUK NNSA, NN Australia, NN Ireland |
| Petition Date | January 14, 2009 |
| PR&D | Pricing payments attributable to R&D each year. |
| Products | As defined in Article 1(g) of the MRDA, Products "shall mean all products, software and services designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured or marketed, at any time by, or for, any of the Participants, and all components, parts, sub-assemblies, features, software associated with or incorporated in any of the foregoing, and all improvements, upgrades, updates, enhancements or other derivatives associated with or incorporated in any of the foregoing" (equivalent to "Nortel Products"). |
| Protocol | The Motion for Entry of an Order Pursuant to 11 U.S.C. § 105(a) Approving Cross-Border Court-to-Court Protocol, filed by the U.S. Debtors on the Petition Date. |
| R&D | Research and Development |
| R&D CSA | A cost sharing agreement governing R&D |
| Residual IP | A substantial number of intellectual property assets belonging to Nortel's "Patent Portfolio." |
| Residual Patent Sale | The $4.5 billion sale of Nortel's Residual IP to Rockstar. |
| Rockstar | Rockstar Bidco L.P. is a consortium comprised of Apple, Ericsson, Microsoft, Blackberry, EMC and Sony |
| Rockstar Transaction | The sale to Rockstar Bidco, LP in 2011 of the residual patent and patent-related assets owned by NNL (equivalent to "Rockstar Sale"). |
| RPEs | Residual Profit Entities (NNL, NNI, NNUK, NNSA and NN Ireland) |

| RPS | Residual profit split |
|---|---|
| RPSM | Residual Profit Split Methodology – the transfer pricing methodology used by Nortel from 2001. |
| Sales Proceeds | The money received from Line of Business Sales and the Residual IP. |
| Second Expansion of Monitor Powers Order | An order dated October 3, 2012, adding to the powers of the Monitor by, among other things, authorizing and empowering, but not obligating, the Monitor to exercise any powers which may be properly exercised by a board of directors of any of the Canadian Debtors. |
| U.S. Court | The United States Bankruptcy Court for the District of Delaware. |
| U.S. Debtors | The U.S. Nortel companies that, on January 14, 2009, filed voluntary petitions in the United States Bankruptcy Court for the District of Delaware for protection under Chapter 11 or Title 11 of the U.S. *Code*, being Nortel Networks Inc. ("NNI") and several of its U.S. affiliates, namely Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc. |
| UK Pension Claimants | Collectively, the Nortel Networks UK Pension Trust Limited and the Board of Directors of the Pension Protection Fund. (the "UKPC") |
| UK Proceedings | On the Petition Date, the High Court of England and Wales placed the EMEA Debtors into administration under the control of the Joint Administrators. |
| Wilmington Trust | Wilmington Trust, National Association |

# APPENDIX B

**Business Line Sales**

## APPENDIX B[1]

### Business Line Sales

| Asset Name (Code Name) | Key Dates | Stalking Horse (Code Name) | Auction | Other bidders | Purchaser & Price |
|---|---|---|---|---|---|
| Layer 4-7 (Velocity) | Sale hearing: 3/26/2009 Signing: 2/19/2009 Closing: 3/31/2009 | Radware (Velocity) SH agmt. signed: 2/19/2009 | No auction | N/A | Radware **$17.7 million** |
| CDMA/LTE (Eckberg) | Sale hearing: 7/28/2009 Signing 7/24/2009 Closing: 11/13/2009 | Nokia Siemens Networks (Narnia) SH agmt. signed: 6/19/2009 | Auction 7/24/2009 | Yes | Ericsson **$1.13 billion** |
| Enterprise (Equinox) | Sale hearing: 9/16/2009 Signing : 9/14/2009 Closing: 12/18/2009 | Avaya (Equinox) SH agmt. signed: 7/20/2009 | Auction 9/11/2009-9/14/2009 | Yes | Avaya **$900 million** |
| Next Generation Packet Core (Seville) | Sale hearing: 10/28/2009 Signing: 10/25/2009 Closing: 12/8/2009 | N/A | Auction | No | Hitachi **$10 million** |
| Metro Ethernet Networks (Snow) | Sale hearing: 12/2/2009 Signing: 11/24/2009 Closing: 3/19/2010 | Ciena (Snow) SH agmt. signed: 10/7/2009 | Auction 11/20/2009-11/22/2009 | Yes | Ciena **$774 million** |
| GSM/GSM-R (Isis) | Sale hearing: 12/2/2009 Signing: 11/24/2009 Closing: 3/31/2010 | N/A | Auction 11/24/2009 | Yes | Ericsson & Kapsch CarrierCom **$103 million** |
| CVAS (Paragon) | Sale hearing 3/3/2010 Signing: 12/22/2009 Closing: 5/28/2010 | GENBAND (Paragon) SH agmt. signed: 12/22/2009 | No auction | N/A | GENBAND **$282 million** |
| GSM Retained Contracts (Horus) | Sale hearing: 5/24/2010 Signing: 5/11/2010 Closing: 6/4/2010 | N/A | No auction | N/A | Ericsson **$2 million** (add-on to GSM sale) |
| Multi Service Switch (Pluto) | Sale hearing: 9/30/2010 Signing: 9/24/2010 Closing: 3/11/2011 | PSP Holding LLC (Marlin) SH agmt. signed: 8/26/2010 | Auction 9/24/2010 | Yes | Ericsson **$65 million** |

**Layer 4-7:** See TR50324 (Transcript of Proceedings, In re: Nortel Networks, Inc., et al., Hearing re: Layer 4-7 Sale) (Hearing Date); TR50171 (NNI Proposed Disclosure Statement) at 38 (Closing Date); TR50165 (U.S. Motion to Approve the Layer 4-7 Sale) at 2.8 (Signing Date and Purchase Price); TR50188 (U.S. D.I. 539 Sale Order re Layer 4-7), TR50033 (Mar. 30 2009 Layer 4-7 Approval and Vesting Order) (Sale Approval).

**CDMA/LTE:** See TR50114 at 2 (U.S. D.I. 1205 CDMA and LTE Sale Order) (Hearing Date); TR50171 (NNI Proposed Disclosure Statement) at 39 (Closing Date); TR49971 (Canadian Motion Record, Approval and Vesting Order CDMA & LTE Business Sale Transaction) at 5 (Signing Date); TR21541 (2010 NNC 10-K) Purchase Price) at 24-25; TR50114 (U.S. D.I. 1205 CDMA and LTE Sale Order), TR50029 (July 28, 2009 CDMA and LTE Approval and Vesting Order), TR49998 (Oct. 28, 2009 Amendment to Approval and Vesting Order re CDMA and LTE) (Sale Approval).

**Enterprise:** See TR50128 (U.S. D.I. 1514 Enterprise Sale Order) (Hearing Date); TR50171 (NNI Proposed Disclosure Statement) at 39-40 (Closing Date); TR50570 (Canadian Motion Record, Approval and Vesting Order Enterprise Solution Business) at 5 (Signing Date); TR21541 (2010 NNC 10-K) at 25 (Purchase Price); TR50128 (U.S. D.I. 1514 Enterprise Sale Order), TR50030 (Sept. 16, 2009 Enterprise Approval and Vesting Order) (Sale Approval).

**Next Generation Packet Core:** See TR50361 (Transcript of Proceedings, In re: Nortel Networks, Inc., et al., Hearing re: Next Generation Packet Core Sale) (Hearing Date); TR50171 (NNI Proposed Disclosure Statement) at 40 (Closing Date); TR50136 (U.S. D.I. 1760 Next Generation Sale Order) at 1 (Signing Date); TR21541 (2010 NNC 10-K) at 25 (Purchase Price); TR50136 (U.S. D.I. 1760 Next Generation Sale Order), TR50001 (Oct. 28, 2009 Next Generation Approval and Vesting Order) (Sale Approval).

**Metro Ethernet Networks (MEN):** See TR50336 (Transcript of Proceedings, In re: Nortel Networks, Inc., et al., Hearing re: MEN Sale and GSM Sale) (Hearing Date); TR50171 (NNI Proposed Disclosure Statement) at 41 (Closing Date); TR40551 (Canadian Motion Record, Approval and Vesting Order MEN) (Signing Date) at 5; TR21541 (2010 NNC 10-K) at 25 (Purchase Price); TR50140 (U.S. D.I. 2070 MEN Sale Order), TR50060 (Dec. 2, 2009 MEN Approval and Vesting Order) (Sale Approval).

**GSM/GSM-R:** See TR50336 (Transcript of Proceedings, In re: Nortel Networks, Inc., et al., Hearing re: MEN Sale and GSM Sale) (Hearing Date); TR50171 (NNI Proposed Disclosure Statement) at 42 (Closing Date); TR50139 (U.S. D.I. 2065 GSM/GSM-R Sale Order) at 2 (Signing Date); TR21541 (2010 NNC 10-K) at 26 (Purchase Price); TR50139 (U.S. D.I. 2065 GSM/GSM-R Sale Order), TR50032 (Dec. 2, 2009 GSM/GSM-R Approving and Vesting Order) (Sale Approval)

**CVAS:** See TR50149 (U.S. D.I. 2632 CVAS Sale Order) at 2 (Hearing Date); TR50171 (NNI Proposed Disclosure Statement) at 43 (Closing Date); TR50141 (U.S. Motion to Approve the CVAS Sale) at 2 (Signing Date); TR21541 (2010 NNC 10-K) at 26 (Purchase Price); TR50055 (Mar. 3, 2010 CVAS Approval and Vesting Order), TR50149 (U.S. D.I. 2632 CVAS Sale Order) (Sale Approval).

The initial purchase price was for $282 million subject to balance sheet and other adjustments of approximately $100 million resulting in a final purchase price at closing of $182 million.  Subsequently a dispute arose between the parties over a defined term in the asset sale agreement which would impact the final purchase price.  To resolve the dispute the parties engaged in settlement discussions resulting in the final purchase price of $157 million.  The settlement was approved by the U.S. Court and Canadian Court on August 23, 2011.  *See* TR40190 (2011 NNC 10K) at 25.

**GSM Retained Contracts:** See TR50271 (Transcript of Proceedings, In re: Nortel Networks, Inc., et al., Hearing re: GSM Retained Contracts Sale) (Hearing Date); TR50171 NNI Proposed Disclosure Statement) at 42 ( (Closing Date); TR50157 (U.S. Motion to Approve the Sale of Certain Assets of the GSM/GSM R Business) at 2, 9 (Signing Date and Purchase Price); TR47776 (Canadian Approval and Vesting Order, GSM/GSM-R Remaining Contracts), TR50159 (D.I 3048, U.S. Order Approving the Sale of Certain Assets of the GSM/GSM-R Business) (Sale Approval).

**Multi Service Switch (MSS):** See TR50172 (U.S. D.I. 4054 MSS Sale Order) at 2 (Hearing Date); TR40190 (2011 NNC 10-K) at 25 (Closing Date); TR40633 (Canadian Motion Record, Approval and Vesting Order, MSS Business) at 4 (Signing Date); TR21541 (2010 NNC 10-K) at 27 (Purchase Price); TR50172 (U.S. D.I. 4054 MSS Sale Order), TR50056 (Sept. 30, 2010 Approval and Vesting Order MSS Business) (Sale Approval).

Total value.  There were separate sales for the North America; Caribbean & Latin America (CALA); and Europe, Middle East & Africa (EMEA) regions.



# APPENDIX C

**Nortel Bonds Spreads to U.S. Government Yield Curve (Basis Points) Chart**



# Nortel Bond Spreads to U.S. Government Yield Curve (Basis Points)

| | Issue Amount | Issuer/Guarantor(s) | Jun 29, 2006 | Feb 22, 2007 | Mar 22, 2007 | Apr 20, 2007 | Jan 31, 2008 | Mar 31, 2008 | May 31, 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 5-year I+425 due Jul 2011 | 1 Billion | NNL/NNI & NNC | | 276 bps | 326 bps | 277 bps | 718 bps | 1,072 bps | 675 bps |
| 7-year 10.125% due Jul 2013 | 550 Million | NNL/NNI & NNC | 492 bps | | | | 737 bps | 997 bps | 731 bps |
| 10-year 10.75% due Jul 2016 | 450 Million (650 add-on in May 08) | NNL/NNI & NNC | 553 bps | 351 bps | 380 bps | 354 bps | 753 bps | 926 bps | 785 bps |
| 6.875% due Sep 2023 | 200 Million | NNL/ No Guarantee | 387 bps | 281 bps | 279 bps | 265 bps | 617 bps | 852 bps | 702 bps |
| 7.875% due Jun 2026 | 150 Million | NNCC/NNL | 464 bps | 323 bps | 339 bps | 301 bps | 666 bps | 879 bps | 760 bps |

1