# **EXHIBIT G**

*UCC Canadian Notice of Motion for Leave to Appeal*

Court of Appeal File No.
Court File No. 09-CL-7950

## COURT OF APPEAL FOR ONTARIO

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

### NOTICE OF MOTION FOR LEAVE TO APPEAL

The Official Committee of Unsecured Creditors (the "**Official Committee**") of Nortel Networks Inc. ("**NNI**") and certain of its affiliates, as debtors and debtors in possession (collectively, the "**US Debtors**"), seeks leave of the Court of Appeal to appeal the order of the Honourable Justice Newbould dated May 12, 2015 (the "**Order**"), arising from the Decision (as that term is defined below).

**THE MOTION IS FOR:**

(a) an order granting leave to appeal to the Court of Appeal for Ontario from the reasons for judgment of Justice Newbould of the Ontario Superior Court of Justice (the "**Court below**"), dated May 12, 2015 (the "**Original Decision**") and as clarified and amended by the Court below's ruling on the reconsideration and/or clarification motion, dated July 6, 2015 (the "**Reconsideration Decision**") (collectively the "**Decision**");

(b)  the costs of this Motion; and

(c)  such further and other relief as this Honourable Court may deem just.

**PROPOSED METHOD OF THE HEARING:**

The motion will be heard in writing, 36 days after service of the Official Committee's motion record, factum and transcripts, if any, or on the filing of the Official Committee's reply factum, if any, whichever is earlier, pursuant to Rule 61.03.1 of the *Rules of Civil Procedure*.

**THE GROUNDS FOR THE MOTION ARE:**

1.  Pursuant to section 13 of the *Companies' Creditors Arrangement Act*[1] ("**CCAA**"), the Committee requests leave to appeal to the Court of Appeal, the Order which arises out of the cross-border trial (the "**Allocation Trial**") heard jointly between the Court below and the United States Bankruptcy Court for the District of Delaware (the "**U.S. Court**") to allocate the proceeds arising from the sales of the business lines and intellectual property of the Nortel entities (the "**NN Technology**") of approximately US$7.3 billion (the "**Lockbox Funds**").

2.  Specifically, the allocation methodology created by the Court below after the Allocation Trial and labelled as a "pro rata" allocation method, arbitrarily allocates value to Nortel Entities based on certain, but not all, claims asserted against such entities and *not* based on the actual property rights and interests that each distinct legal entity relinquished in the transactions that generated the Lockbox Funds. Quite simply, the Court below invented a methodology for allocation of the Lockbox Funds that disregards the rights of separate corporate entities and their creditors, fails entirely to respect longstanding tenets of

---

[1] R.S.C., 1985, c. C-36.

Case 09-10138-MFW    Doc 15924-7    Filed 07/23/15    Page 4 of 18
-3-

corporate, commercial and bankruptcy law and ultimately, was imposed in a manner that denied the parties the necessary procedural fairness to address this methodology.

**Background**

3. The following provides a brief chronological overview of the history of the proceedings:

    a. On January 14, 2009, the Court below made an Initial Order granting protection under the CCAA to Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation (collectively, the "**Canadian Debtors**"), including the appointment of Ernst & Young Inc. as monitor;

    b. On January 14, 2009, the US Debtors filed voluntary petitions for relief pursuant to Chapter 11 of Title 11 of the United States Code with the U.S. Court (the "**Chapter 11 Cases**");

    c. On the same day, the Court below granted an Order pursuant to section 18.6(iv) of the CCAA recognizing the Chapter 11 Cases as *"foreign main proceedings"*;

    d. On January 14, 2009, the High Court of England and Wales placed those Nortel entities incorporated in Europe, the Middle East and Africa (the "**EMEA Debtors**", and together with the US Debtors and the Canadian Debtors, the "**Nortel Estates**") (with each entity hereinafter referred to as a "**Nortel Entity**") including Nortel Networks UK Limited, into administration under the control of Ernst & Young affiliates.

4.  Over the course of the proceedings, the Nortel Estates liquidated their assets and sold their business lines for approximately $3.285 billion of which approximately $2.85 billion is now available to be allocated. The Nortel Estates also sold their residual intellectual property for approximately $4.5 billion. These amounts totalling approximately $7.3 billion are currently being held in escrow, as the Lockbox Funds.

5.  Pursuant to escrow agreements that were made with respect to the Lockbox Funds such funds are not to be released out of escrow without either the agreement of all of the selling Nortel Estates (which in the case of any consent by the US Debtors, requires the consent of the Official Committee and the bondholders) or the determination of any dispute relating thereto by the relevant dispute resolver – in this case, the Court below and the U.S. Court.

6.  As the parties could not agree to a protocol for allocating the Lockbox Funds, by orders of the Court below and the U.S. Court, the allocation was directed to be determined in a cross-border joint trial of both Courts, through which the value relinquished by each estate in the sale of assets and the corresponding proceeds that comprised the Lockbox Funds would be allocated to the debtors in each Nortel Estate.

**The Official Committee**

7.  The Official Committee was appointed on January 22, 2009 by the Office of the United States Trustee for the District of Delaware and is currently comprised of the following three members: (i) The Bank of New York Mellon, as indenture trustee; (ii) Law Debenture Trust Company of New York, as indenture trustee; (iii) and the Pension Benefit Guaranty Corporation.

8. In accordance with the Cross-Border Insolvency Protocol incorporated by Court order into the CCAA Proceedings, the Official Committee is recognized as a primary party who has the right to appear and to be heard in the CCAA proceedings to the same extent as individual creditors and other interested parties domiciled in Canada.

9. The Official Committee is a creature of United States statute, appointed to represent, in a fiduciary capacity, the interests of *all* general unsecured creditors of the US Debtors. In that capacity the Official Committee seeks to maximize value for *all* general unsecured creditors of the US Debtors and to protect and promote the interests of general unsecured creditors by, among other things, monitoring Nortel's business operations, investigating its business and financial affairs, and participating in all aspects of the bankruptcy proceedings, including the negotiation of the terms of any ultimate plan of reorganization, liquidation or distribution.

10. For the purposes of this notice of motion for leave to appeal, the Official Committee adopts the short forms and acronyms used in the Decision if otherwise not defined herein.

**The Order**

11. The Original Decision was released on May 12, 2015. Shortly thereafter, a motion for reconsideration and/or clarification of the Original Decision was brought by certain parties (the "**Reconsideration/Clarification Motion**"). On May 29, 2015, Justice Newbould extended the date for any party to file a motion for leave to appeal to the Court of Appeal from the Original Decision until 10 days following the release of the Reconsideration Decision.

Case 09-10138-MFW    Doc 15924-7    Filed 07/23/15    Page 7 of 18

-6-

12. As embodied in the Decision, the Court below made the following ruling in respect of the specific allocation of the Lockbox Funds and the adoption of the "pro rata" allocation to the Nortel Entities:

  a. Each Nortel Entity is to be allocated that percentage of the Lockbox Funds based on the total of allowed pre-filing claims against that Nortel Entity in relation to the total of such allowed pre-filing claims against all Nortel Entities;

  b. In respect of the claims against a Nortel Entity, any claim that can be asserted against more than one Nortel Entity can only be calculated and recognized once;

  c. Bond claims are to be asserted against the Nortel Entity that issued the bonds. A claim may be asserted against the Nortel Entity that guaranteed the bond debt for distribution purposes only, but such guarantee claim will not be taken into account in determining the total claims against that Nortel Entity for allocation purposes;

  d. Intercompany claims against a Nortel Entity are to be included in the determination of the total claims against that Nortel Entity;

  e. Settlements of pre-filing claims both paid and unpaid are to be included in the determination of the total claims against that Nortel Entity; and

  f. Cash on hand in any Nortel Entity will not be taken into account in the pro rata allocation and any cash on hand in a Nortel Entity will be dealt with in accordance with the administration of that Nortel Entity's estate.

**The Committee Should be Granted Leave to Appeal**

13.  In the Decision, the Court below made the following fundamental errors of law and fact:

   a. it erred in failing to determine the very issue that was before the Court below, namely the proper allocation of the value relinquished by each Nortel Estate in the sale of assets and the corresponding proceeds that comprised the Lockbox Funds;

   b. it erred in finding that the appropriate method to allocate Lockbox Funds was to create an allocation methodology based on consolidating assets of separate Nortel Entities and distributing them based on certain, but not all, claims against each Nortel Entity, instead of allocating value based on property rights and the interests of the various Nortel Entities;

   c. it erred in imposing an allocation methodology that overrides legal rights in an unprecedented fashion. The "pro rata" allocation method completely disregards the value that the different Nortel Estates relinquished in the sales of the business lines and in the NN Technology and the impact of such determination on the recoveries of the creditors of each of the respective Nortel Estates;

   d. it erred in devising an allocation methodology based, not on property rights or interests, but on calculating claims asserted against each of the Nortel Entities in proportion to the total claims against all of the Nortel Entities which is an arbitrary basis for facilitating creditor recoveries and perversely rewards various of the Nortel Entities that incurred the most debt while penalizing the more profitable

Nortel Entities which paid their own creditors and supported the other Nortel Entities through guarantees;

e. it erred in devising the "pro rata" allocation method based on an apparent effort to achieve a "just" outcome but without having the necessary record regarding the nature or quantity of the claims against the various Nortel Entities at the Allocation Trial to support such a result, with the inevitable effect of unjustly prejudicing various stakeholders;

f. it erred in establishing a "pro rata" allocation method and then modifying such method in an arbitrary and unjustly prejudicial manner. In particular, the Court below excluded the bondholder guarantee claims of approximately $4 billion from the "pro rata" allocation calculation, leaving the US Debtors with a significant liability but without any corresponding allocation of the Lockbox Funds to pay such liability;

g. it erred in inventing its own methodology for "pro rata" allocation, which was not before the Court below at the Allocation Trial, and not supported by the parties' pleadings or submissions. By doing so, the Official Committee was denied the necessary procedural fairness to adduce evidence and address this court-ordered approach and all of its legal and procedural flaws;

h. it erred in its application of the relevant and binding case law in respect of substantive consolidation as a justification for imposing an unprecedented global pro rata allocation, which among many flaws, fails to properly consider the

prejudicial effect of such a methodology on specific creditors and the legitimate commercial expectations of the creditors of the different Nortel Estates;

i. it erred in resorting to its own "pro rata" allocation method based on its misinterpretation and disregard of the key contract in question, the Master Research and Development Agreement (the "**MRDA**"), which expressly sets out the property interests and rights of the Nortel Entities in and to the NN Technology, including NNI's perpetual, exclusive and royalty-free licence for the NN Technology. The Court below misinterpreted the relevance of the terms of the MRDA in its finding that the rights and interests of the parties as set out in the MRDA applied only for tax purposes. Misguided by the fact that the MRDA did not contemplate a situation in which the parties liquidated their assets on a worldwide insolvency of the Nortel Entities, the Court below erroneously concluded that the MRDA was not relevant to the rights and interests of the parties in the NN Technology and the resulting Lock Box Funds for allocation purposes, and could simply be disregarded. In doing so, the Court below completely nullified the property rights of the parties with respect to the NN Technology;

j. it erred in failing to consider relevant and admissible evidence that established the surrounding circumstances and parties' common intention as to their respective rights and interests in the NN Technology at the time of the execution of the MRDA;

k. it erred in interpreting the MRDA to limit the perpetual, exclusive and royalty-free license rights of NNI granted under the MRDA to making, using or selling

Products, as defined in the MRDA, which finding is entirely inconsistent with the plain language of the MRDA, the overwhelming and virtually uncontested factual matrix evidence and the interpretation of such license rights under the MRDA by the U.S. Court;

l. it erred in its application of the law of unjust enrichment by choosing to disregard the bona fide property rights and interests as set out in the MRDA; and

m. it improperly exercised its judicial discretion afforded by section 11 of the CCAA by (i) completely disregarding the property rights of the different Nortel Entities; and (ii) exercising such discretion in a manner that is inconsistent with the underlying purpose and scope of the CCAA.

**The Proposed Appeal is Meritorious and not Frivolous**

14. The creation by the Court below of the "pro rata" allocation as a methodology to establish the value to be allocated to the Nortel Entities is unprecedented and represents a marked departure from the established methods for determining the rights and interests of parties in the proceeds from the sale of assets in an insolvency proceeding.

15. The methodology created by the Court below is directly based on the claims asserted against the Nortel Entities in an apparent effort to achieve a "just" result. However, the Court below did not have the necessary record at the Allocation Trial to even consider such a claims-based methodology and did not provide the parties with the necessary procedural fairness to adduce evidence and address this methodology and all of its legal and procedural flaws.

16. The Court below held that it would be permissible under existing case law to order a global substantive consolidation combining all claims and all assets of 38 Nortel Entities around the world in these circumstances. In doing so, the Court below misinterpreted the relevant and binding case law governing substantive consolidation and the Decision is entirely inconsistent with the finding by the U.S. Court that substantive consolidation was clearly not appropriate in the circumstances of this case (applying the U.S. principles which guide the law of substantive consolidation in Canada). This flawed analysis leads to the invention of the unprecedented and arbitrary "pro rata" allocation methodology in order to allocate the value of assets liquidated in a global multi-party insolvency proceeding.

17. In simple terms, substantive consolidation combines all the claims and all the assets into one pool. By contrast, the "pro rata" allocation methodology in this case relies on the trier of fact to arbitrarily select which claims and which assets are to be included in the pro rata calculation. For example, the Court below held that the tax claims arising from the sale of assets by the US Debtors which gave rise to a portion of the Lockbox Funds would not be included in its modified "pro rata" allocation methodology adopted (to the detriment of the US Debtors) but the proceeds of sale from the wholly-owned non-debtor subsidiaries of the US Debtors were to be included in the pro rata calculation (again to the detriment of the US Debtors). In doing so, the Court below disregarded legal rights and affected creditor recoveries without any consideration of the protections that are fundamental to a substantive consolidation analysis. If, as the U.S. Court found, substantive consolidation on the facts of these cases is not permitted under existing legal precedent, it follows that the judge-made "pro rata" methodology which lacks the principles applied in the rare circumstances when substantive consolidation is appropriate, cannot be permitted under

the law. Likewise, the Court below inconsistently held that the US Debtors would not receive an allocation on account of the allowed guarantee claims of the bondholders but the Canadian Debtors would receive an allocation on account of the allowed guarantee claims of the UK Pension Claimants.

18.  By finding that the MRDA is a tax driven document and therefore not applicable in the insolvency context, the Court below ignored well established principles of contract and property law and disregarded all intellectual property rights held in the NN Technology.

19.  In effect, the Court below found that the rights and interest of parties in and to intellectual property which are set out in a contract can be ignored if the result is considered unjust. Such a complete disregard for intellectual property rights cannot be correct. This fundamental error in law caused the Court below to make further errors in its application of the principles of unjust enrichment and in exercising its discretion under section 11 of the CCAA.

20.  Further, the fact that the U.S. Court came to a contradictory interpretation on many of the provisions of the MRDA on the exact same record is, in itself, evidence that the proposed appeal is prima facie meritorious.

**The Appeal Involves Issues that are Significant to the Practice**

21.  As intellectual property and global corporate structures are increasingly common, the impact of the Decision is of wide significance to the practice generally and will impact on future insolvency and reorganization case law.

22. Further, understanding the jurisdiction of a court in a CCAA proceeding to use subjective, arbitrary and relative fairness to override property rights and ignore significant case law on the principles of contract law, property rights and corporate separateness, is of importance not only to the insolvency practice generally, but to all commercial stakeholders seeking certainty in business dealings in Canada.

23. The understanding of the scope of such boundaries further extends to a court's authority to create novel methodologies that abrogate parties' legal rights, in this case the right to receive a portion of the Lockbox Funds, and particularly a methodology that was not pleaded or submitted by any party before the Court below and ultimately, never argued. The granting of relief without giving parties an opportunity to adduce evidence or make argument in respect of such methodology, is a denial of procedural fairness that significantly impacts the practice of insolvency.

24. Many insolvency proceedings involve the remnants of tax driven corporate structures. The novel and erroneous finding that agreements created for tax purposes and which do not specifically contemplate insolvency, yet determine ownership, should be completely disregarded in an insolvency scenario has wide ranging effects on the practice of insolvency law generally.

**The Appeal is of Significance to the Proceeding**

25. The proposed appeal involves the allocation of US$7.3 billion dollars of the Lock Box Funds. This is substantially all of the proceeds of sale of the Nortel Entities' global assets. Such an allocation will in turn impact on the recoveries by creditors of the Nortel Entities all over the world. It is those unsecured creditors located in the United States for which the

Official Committee speaks, including employees, bondholders, pensioners and trade creditors, each of whom is significantly disadvantaged on an absolute and relative basis by the Order.

**The Appeal will not Hinder the Progress of the Proceeding**

26. If leave is granted, the appeal will not unduly delay the progress of this CCAA proceeding, the payment of money from the Lockbox Funds to the various Nortel Entities or the distribution of money to the ultimate creditors.

27. Payment of money from the Lockbox Funds can only be made on consent of the relevant parties, including the Official Committee, or in accordance with final decisions of both the applicable U.S. and Canadian Courts. The decision of the U.S. Court on this matter is already subject to an appeal by the Official Committee in that jurisdiction and it is expected that other parties will also file appeals. Granting leave to appeal in Canada will not delay the matter as the Order cannot be acted upon in any event until the appeal process is concluded.

28. Further, implementation of the "pro rata" allocation methodology requires a known claim base in each of the 38 Nortel Entities. Claims against a significant number of the Nortel Entities, including the EMEA Debtors have yet to be determined and could potentially take years to resolve on a final basis. The process to determine the level of claims for each Nortel Entity in accordance with the Order is expected to take a significant amount of time and can progress in tandem with this appeal, should leave to appeal be granted. As such, no delay of the ultimate allocation of funds would be caused by the granting of leave to appeal.

29.  The Official Committee relies on Rules 1.04, 37 and 61.03.1 of the *Rules of Civil Procedure*, Sections 11, 13, and 14 of the CCAA and such further and other grounds as counsel may advise.

**THE FOLLOWING DOCUMENTARY EVIDENCE** will be used at the hearing of the Motion:

(a)  The Decision and Order of the Honourable Justice Newbould, dated May 12, 2015;

(a)  The Decision of the Honourable Justice Newbould, dated July 6, 2015;

(b)  The Committee's Motion Record, and Reply Motion Record, if any;

(c)  The Transcript of the Allocation Trial;

(d)  Such further and other materials that were before the Court below on the Allocation Trial and Reconsideration/Clarification Motion, as counsel deems necessary.

(e)  Such further and other evidence as counsel may advise and this Honourable Court may permit.

July 16, 2015

**CASSELS BROCK & BLACKWELL LLP**
2100 Scotia Plaza
40 King Street West
Toronto, ON  M5H 3C2

**Shayne Kukulowicz (LSUC#: 30729S)**
Tel: 416 860-6463
Fax: 416 640-3176
Email: skukulowiz@casselsbrock.com

**Michael Wunder (LSUC#: 31351O)**
Tel: 416-860-6484
Fax:  416 640-3206
Email: mwunder@casselsbrock.com

**Ryan Jacobs (LSUC#: 59510J)**
Tel: 416 860-6465
Fax: 416 640-3189
Email: rjacobs@casselsbrock.com

**Geoffrey Shaw (LSUC#: 26367J)**
Tel:  416 869-5982
Fax:  416 350-6916
Email: gshaw@casselsbrock.com

**Stefanie Holland (LSUC#: 58204S)**
Tel:  416 860-6467
Fax: 416 640-3204
Email: sholland@casselsbrock.com

**Lawyers for the Official Committee of Unsecured Creditors of Nortel Networks Inc., et al.**

**TO**        Service List

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

Court of Appeal File No.
Court File No. 09-CL-7950

## COURT OF APPEAL FOR ONTARIO

## NOTICE OF MOTION (LEAVE TO APPEAL)

**Cassels Brock & Blackwell LLP**
2100 Scotia Plaza, 40 King Street West
Toronto, ON  M5H 3C2

**Shayne Kukulowicz (LSUC#: 30729S)**
Tel: 416 860-6463
Fax: 416 640-3176
Email: skukulowiz@casselsbrock.com

**Michael Wunder (LSUC#: 31351O)**
Tel: 416-860-6484
Fax:  416 640-3206
Email: mwunder@casselsbrock.com

**Ryan Jacobs (LSUC#: 59510J)**
Tel: 416 860-6465
Fax: 416 640-3189
Email: rjacobs@casselsbrock.com

**Geoffrey Shaw (LSUC#: 26367J)**
Tel:  416 869-5982
Fax:  416 350-6916
Email: gshaw@casselsbrock.com

**Stefanie Holland (LSUC#: 58204S)**
Tel:  416 860-6467
Fax: 416 640-3204
Email: sholland@casselsbrock.com

**Lawyers for the Official Committee of Unsecured Creditors of Nortel Networks Inc., et al.**