## EXHIBIT I

*Ad Hoc Group of Bondholders Canadian Notice of Motion for Leave to Appeal*

Court of Appeal File No.
Court File No. 09-CL-7950

**COURT OF APPEAL FOR ONTARIO**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C.
1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**NOTICE OF MOTION FOR LEAVE TO APPEAL
OF THE AD HOC GROUP OF BONDHOLDERS**

The Ad Hoc Group of Nortel Bondholders (the "**Leave Applicant**") seeks leave of the

Court of Appeal to appeal the allocation judgment of Mr. Justice Newbould dated May 12, 2015,

clarified by subsequent order dated July 6, 2015 (collectively, the "**Judgment**"), holding, *inter*

*alia,* that approximately US $7.3 billion in "lockbox" funds arising from the sale of Nortel business

lines and other assets are to be allocated among multiple international Nortel debtors on a "pro

rata" allocation basis with the following principles to govern:

"(1)  Each Debtor Estate is to be allocated that percentage of the lockbox funds that

the total allowed claims against that Estate bear to the total allowed claims against

all Debtor Estates.

(2)  In determining what the claims are against the Debtor Estates, a claim that can

be made against more than one Debtor Estate can only be calculated and recognized

once in accordance with these reasons for judgment.  Claims on bonds are to be

made on the Debtor Estate of the issuer.  A claim can be recognized by the Debtor

Estate that guaranteed the bond, but that claim will not be taken into account in determining the claims against the Debtor Estates.  If the UKPC makes a claim against more than one Debtor Estate, such additional claims will not be taken into account in determining the claims against the Debtor Estates.

(3)    Intercompany claims against a Debtor Estate are to be included in the determination of the claims against that Estate.

(4)  Cash on hand in any Debtor Estate will not be taken into account in the pro rata allocation.  Each Debtor Estate with cash on hand will continue to hold that cash and deal with it in accordance with its administration.

(5)  An interim distribution may be allowed upon further submissions…

(6)  Proposed schedules for expediting any remaining claims procedures are to be provided without delay."

**THE LEAVE APPLICANT ASKS:**

a)  that leave be granted to appeal from the Judgment, with costs reserved to the appeal panel; and

b)  such further or other relief as this Honourable Court deems just.

**PROPOSED METHOD OF HEARING**:

The motion will be heard in writing 36 days after service of the Leave Applicant's motion record, factum and transcripts, if any, or on the filing of the Leave Applicant's reply factum, if any, whichever is earlier, pursuant to Rule 61.03.1 of the *Rules of Civil Procedure.*

The time for filing this Notice of Motion for Leave to Appeal was extended by order of Newbould J. dated May 29, 2015, pursuant to subsection 14(2) of the *Companies' Creditors Arrangement Act,* R.S.C. 1985, c. C-36 ("**CCAA**"), to ten days following the release of the clarification decision (being July 16, 2015).

## THE GROUNDS FOR THE MOTION ARE:

1.     The issue that was before Justice Newbould, and the proposed appeal, is one of the most significant issues in the Nortel proceedings and determines how billions of dollars will be allocated to the various Nortel estates.

## Background

2.     On January 14, 2009, the Nortel Canadian Debtors[1], the U.S. Debtors[2] and the EMEA Debtors[3] filed for insolvency protection in their respective jurisdictions. The Canadian Debtors filed under the CCAA in a proceeding supervised by Regional Senior Justice Morawetz from 2009-2014, at which time Justice Newbould was designated to hear the allocation trial (described below).

3.     Nortel Networks Canada ("**NNC**") and Nortel Networks Limited ("**NNL**"), two of the Canadian Debtor entities, are variously liable as primary obligor (and in the case of one smaller series, as guarantor) for Guaranteed Bonds with a face value in excess of $4 billion.[4] The Leave Applicant is a group consisting of substantial holders of Guaranteed

---

[1] Comprised of Nortel Networks Corporation, Nortel Networks Limited, and several related Canadian companies (collectively, the "**Canadian Debtors**").
[2] Comprised of Nortel Networks Inc., an American subsidiary of Nortel Networks Corporation, as well as other related American companies (collectively, the "**U.S. Debtors**").
[3] Comprised of the Joint Administrators of Nortel Networks UK Limited, on behalf of 24 Nortel entities in Europe, the Middle East and Africa (collectively, the "**EMEA Debtors**").
[4] All figures in this document are in US funds.

Bonds. Holders of Guaranteed Bonds represent the largest creditor group by value in these proceedings.

**The Business of Nortel**

4.  The primary driver of Nortel's value and profit was research and development ("**R&D**"). The principal companies that performed R&D were NNL, Nortel Networks Inc. ("**NNI**") (one of the U.S. Debtors), and to significantly lesser extents Nortel Networks UK Limited, NNSA (France) and NN Ireland.  These were known as Residual Profit Entities ("**RPEs**") due to their participation from 2001 in a residual profit pool.

5.  The residual profits, after payment of fixed rates of return to all Nortel companies for sales and distribution functions, were paid to the RPEs under a Master Research and Development Agreement ("**MRDA**").

6.  Pursuant to the MRDA, NNL had legal title to all intellectual property and the other RPEs were granted an exclusive license for the intellectual property in each of their jurisdictions.

**The Sale of Nortel's Assets and the Interim Funding and Settlement Agreement**

7.  When the insolvency proceedings were commenced in January 2009, it was believed that a restructuring of the Nortel companies that would see them emerge from insolvency protection might be possible.  However, it later became apparent that the Nortel companies would not be restructured and would not emerge from the insolvency proceedings in their various jurisdictions as going-concerns, but rather that the business lines of the Nortel companies would be sold on a going-concern basis, and residual assets would be sold.

8.      On June 9, 2009, the US Debtors, the Canadian Debtors and the EMEA Debtors entered into the Interim Funding and Settlement Agreement (the "**IFSA**"), to address the interim funding of NNL and a mechanism for cooperating on the sale of the business lines and assets of the Nortel companies.

9.      The IFSA was entered into and approved by the CCAA court and, in concurrent Chapter 11 proceedings,[5] by the U.S. Court on June 29, 2009 (together, the Ontario Superior Court and the U.S. Court are referred to as the "**Courts**").

10.     The IFSA provided for a payment by NNI to NNL of up to $157 million in full settlement of any transfer pricing and other claims.  Pursuant to the IFSA, the Nortel Debtors agreed (with certain consultation rights to certain creditor groups), among other things:

    a)      to cooperate in the anticipated sale of Nortel's business lines and assets, the understanding being the selling debtors would pool their business lines and assets to maximize value and in return receive the portion of the sales proceeds allocated to those assets and corresponding rights and entitlements;

    b)      in order to facilitate those sales, the U.S. and EMEA Debtors would enter into appropriate license termination agreements which would provide for the termination of the license rights granted under the MRDA;

    c)      that termination or relinquishment of a license would be deemed a sale with the licensed participant being deemed a seller; and

---

[5] United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

d)      that the sale proceeds would be put into escrow (the "**Lockbox Funds**") and no distribution of the funds would occur absent agreement of all of the selling debtors, or the determination of any dispute relating thereto.

11.     The IFSA does not contain any language to suggest that any of the Nortel debtors contemplated forfeiting their assets or property rights for an allocation with no correlation to those assets or rights.

12.     The business lines of Nortel were sold for approximately $3.285 billion (of which approximately $2.85 billion is available for distribution) and Nortel's residual intellectual property was sold for $4.5 billion. The total amount of the Lockbox Funds available for allocation is approximately $7.3 billion.

13.     The parties tried, but failed, over the course of years and through multiple mediations to settle the allocation of those sales proceeds between the debtor estates. The IFSA provided that if no agreement could be reached, the allocation of the sales proceeds was to be tried by the Courts pursuant to a Cross-Border Insolvency Protocol that had been agreed to by the parties and approved by the Courts at the inception of the insolvency proceedings.  The Cross-Border Insolvency Protocol provides for, among other things, the harmonization and co-ordination of the administration of the two proceedings.

**The Procedural History of the Allocation Trial**

14.     On June 7, 2011, in a joint hearing of the Courts, the Canadian Debtors and Monitor and the U.S. Debtors brought motions seeking approval of an Allocation Protocol by which the two Courts would determine the allocation of the sales proceeds, as well as certain specific

inter-company claims advanced by the EMEA Debtors and the UKPC[6] that are intertwined with the allocation determination.

15.     By Order dated April 3, 2013, Morawetz R.S.J. ordered that the Allocation Protocol be approved and directed that a trial under the Allocation Protocol was to commence on January 6, 2014. The trial was to commence with the allocation issues and continue thereafter with the inter-company claims advanced by the EMEA Debtors and the UKPC.

16.     The stated and approved purpose of the Allocation Protocol "is for the U.S. and Canadian Courts to set forth binding procedures for determining the allocation of the Sale Proceeds among the Selling Debtors".

17.     Shortly before the Allocation Trial began, the Court advised that Justice Newbould rather than Regional Senior Justice Morawetz would preside over the trial in the Ontario Court.

18.     The Allocation Trial began on May 12, 2014 and continued for 21 days thereafter. Oral submissions were delivered in September 2014 and concluded on September 24, 2014.

**The Judgment Appealed From**

19.     On May 12, 2015, Justice Newbould released his decision in the Allocation Trial. Judge Gross released the U.S. Court's decision on the same day.

20.     The U.S. Debtors subsequently moved before Justice Newbould for "clarification, reconsideration or amendment of the May 12, 2015 reasons for judgment" and the Ad Hoc Group of Bondholders moved "for clarification, or if necessary, amendment of" the reasons for judgment solely with respect to one aspect of the Judgment. Similar motions were

---

[6] "**UKPC**" refers to Nortel Networks UK Pension Trust Limited and the Board of the Pension Protection Fund.

made before Judge Gross.  On May 29, 2015, pursuant to subsection 14(2) of the CCAA, Justice Newbould granted an extension of the time to file any motion for leave to appeal to 10 days following the release of his decision on the motions for reconsideration or clarification.

21.    Justice Newbould and Judge Gross released their respective decisions on the reconsideration and clarification motions on July 6, 2015.  Justice Newbould denied the relief sought by the U.S. Debtors but granted the clarification relief sought by the Ad Hoc Group of Bondholders with respect to one aspect of the Judgment.

22.     The conclusion of Justice Newbould's decision in the Allocation Trial is a "pro rata" allocation as described in paragraph 258 of the Judgment, and as clarified and amended in his decision on July 6, 2015:

A judgment is to go that the lockbox funds are to be allocated on a pro rata allocation basis with the following principles to govern:

(1)     Each Debtor Estate is to be allocated that percentage of the lockbox funds that the total allowed claims against that Estate bear to the total allowed claims against all Debtor Estates.

(2)     In determining what the claims are against the Debtor Estates, a claim that can be made against more than one Debtor Estate can only be calculated and recognized once in accordance with these reasons for judgment.  Claims on bonds are to be made on the Debtor Estate of the issuer.  A claim can be recognized by the Debtor Estate that guaranteed the bond, but that claim will not be taken into account in determining the claims against the Debtor Estates.  If the UKPC makes a claim against more than one Debtor Estate, such additional claims will not be taken into account in determining the claims against the Debtor Estates.

(3)     Intercompany claims against a Debtor Estate are to be included in the determination of the claims against that Estate.

(4)     Cash on hand in any Debtor Estate will not be taken into account in the pro rata allocation.  Each Debtor Estate with cash on hand will continue to hold that cash and deal with it in accordance with its administration.

(5)    An interim distribution may be allowed upon further submissions.  Briefs in favour of and opposed to an interim distribution are to be filed on a time-line to be considered at a 9:30 am appointment.

(6)    Proposed schedules for expediting any remaining claims procedures are to be provided without delay.

## The Leave Applicant Should be Granted Leave to Appeal

### *Errors in the Decision from which Leave is Sought*

23.    In the course of his analysis and in his decision, Justice Newbould made a number of errors of both law and fact, including that His Honour:

a)    erred in failing to determine the actual issue before him, namely the proper allocation from the Lockbox Funds of the value relinquished by each Nortel debtor in the sale of business lines and assets;

b)    erred in deciding the case based on a "pro rata" allocation methodology that is unknown to Canadian insolvency law, and resulted in a conclusion marked by a complete disregard of fundamental principles of insolvency, contract and property law, including any recognition of the ownership of the assets sold;

c)    erred in deciding the case based on a particular "pro rata" allocation approach that was not pleaded, advocated or briefed by any party;

d)    misinterpreted and misapplied the court's jurisdiction pursuant to section 11 of the CCAA;

e)    exceeded his jurisdiction under the CCAA and any inherent jurisdiction of the court by determining allocation without proper regard for applicable statutory and

common law legal principles, and applicable contractual and legal ownership rights, including the agreement of the debtors pursuant to the MRDA and IFSA;

f)      misinterpreted the various Protocols and the IFSA agreed to by the parties as allowing for a *pro rata* allocation;

g)      erred in his interpretation of the IFSA resulting in a conclusion that is inconsistent with the language of the IFSA and the parties' agreement to obtain fair consideration from the agreed-upon sale of their business lines and assets;

h)      disregarded and effectively expropriated rights of ownership of assets by providing no correlating entitlement to proceeds from the sale of those assets;

i)      erred in directing that certain creditor claims will be included in the claims pool for distribution of proceeds, but will not be included in the court-devised *pro rata* formula for purposes of allocating proceeds;

j)      erred in treating creditor claims inconsistently for allocation purposes without any appropriate basis for doing so;

k)      erred in interpreting the MRDA;

l)      misconstrued and misapplied the evidence applicable to the interpretation of the MRDA;

m)      erred with respect to the identification and delineation of rights of the parties under the MRDA;

n)      erred in his analysis and application of unjust enrichment;

o)    erred in his analysis and application of "substantive consolidation", and applied it in an unprecedented and inconsistent manner;

p)    erred in his direction of a *pro rata* allocation such that it is in fact and in substance a modified form of impermissible global substantive consolidation of all of the Nortel estates by a different name;

q)    erred in his application of the *pari passu* rule which is not applicable and which, in any event, is not achieved through the directed *pro rata* allocation;

r)    erred in considering and misinterpreting "bondholder expectations";

s)    erred in finding that the purported subjective expectations of bondholders can undermine, impact or affect their contractual rights;

t)    erred in considering, interpreting and applying the provisions of the relevant bond indentures to a determination of *pro rata* allocation;

u)    erred in the treatment given to the expert evidence before the court;

v)    erred in the treatment given to the evidence of Mr. Binning;

w)    erred in making findings of law and fact inconsistent with prior decisions and orders of the court; and

x)    erred in concluding that the allocation provided for in the Judgment is just and appropriate, and in accordance with Canadian insolvency law.

**The Proposed Appeal is Meritorious and not Frivolous**

24.    Justice Newbould has ordered an unprecedented *pro rata* allocation between multiple, international debtors with no basis, authority or jurisdiction under the CCAA for doing so. The allocation is contrary to, among other things, the contractual agreements between the parties and the selling debtors' legal rights and ownership in the assets.  The appeal is not frivolous; rather, it raises a number of clear errors of fact and law.

**The Proposed Appeal Involves Issues that are Significant to the Practice**

25.    As the Court below noted in its decision, this is an unprecedented case.  The imposition of a *pro rata* allocation allegedly based on the Court's inherent jurisdiction and discretion under the CCAA expands the limits for the authority of courts under the CCAA, and its impact on creditor groups will influence the capital markets more broadly.  These are clearly issues of significance to the practice.

**The Proposed Appeal is of Significance to the Proceeding**

26.    The issue that was before Justice Newbould, and the proposed appeal, is one of the most significant issues in the Nortel proceedings and determines how billions of dollars will be allocated to the various Nortel estates.

**The Proposed Appeal will not Hinder the Progress of the Action**

27.    The various Nortel debtors have not yet completed their claims processes and therefore the Nortel estates are not yet close to being ready for distribution.

28.  There is no ongoing restructuring that would be delayed.  The Judgment also contemplates interim distributions.

29.  The Leave Applicant is willing to accommodate an expedited schedule should this Court determine that such an expedited schedule would be appropriate.

30.  Given that there is an appeal as of right from the equivalent decision of Judge Gross in the U.S., it is appropriate that leave be granted to ensure this Court has the opportunity to consider the Judgment in light of any variations that may be made in the equivalent U.S. decision.

31.  Rules 1.04, 37 and 61 of the *Rules of Civil Procedure*;

32.  Sections 11, 13 and 14 of the CCAA; and

33.  Such further and other grounds as counsel may advise.

**THE FOLLOWING DOCUMENTARY EVIDENCE** will be used at the hearing of the motion:

34.  The trial record of the allocation trial including relevant exhibits and transcripts;

35.  The Judgment; and

36.  The reasons on the reconsideration and clarification motion dated July 6, 2015.

July 16, 2015

**BENNETT JONES LLP**

3400 One First Canadian Place
P.O. Box 130
Toronto, Ontario
M5X 1A4

**Richard B. Swan (#32076A)**
Email: swanr@bennettjones.com

**S. Richard Orzy (#23181I)**
Email: orzyr@bennettjones.com

**Gavin H. Finlayson (#44126D)**
Email: finlaysong@bennettjones.com

Telephone:    (416) 863-1200
Facsimile:     (416) 863-1716

Canadian Lawyers for the Bondholder Group

TO: THE ATTACHED SERVICE LIST

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,* R.S.C. 1985, c. C-36, AS AMENDED AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

|  | Court File No. |
|---|---|
|  | **COURT OF APPEAL FOR ONTARIO**<br><br>Proceeding Commenced At Toronto |
|  | **NOTICE OF MOTION FOR LEAVE TO APPEAL** |
|  | **BENNETT JONES LLP**<br>3400 One First Canadian Place<br>P.O. Box 130<br>Toronto, Ontario  M5X 1A4<br><br>**Richard B. Swan (#32076A)**<br>Email:       swanr@bennettjones.com<br>**S. Richard Orzy (#23181I)**<br>Email:       orzyr@bennettjones.com<br>**Gavin H. Finlayson (#44126D)**<br>Email:       finlaysong@bennettjones.com<br><br>Telephone:   (416) 863-1200<br>Facsimile:   (416) 863-1716<br><br>Canadian Lawyers for the Bondholder Group |